TAB 11

United States Code Annotated
    Title 35. Patents (Refs & Annos)
        Part III. Patents and Protection of Patent Rights
        Chapter 28. Infringement of Patents (Refs & Annos)

35 U.S.C.A. § 271

§ 271. Infringement of patent

Effective: March 23, 2010

Currentness

**(a)** Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.

**(b)** Whoever actively induces infringement of a patent shall be liable as an infringer.

**(c)** Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

**(d)** No patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having done one or more of the following: (1) derived revenue from acts which if performed by another without his consent would constitute contributory infringement of the patent; (2) licensed or authorized another to perform acts which if performed without his consent would constitute contributory infringement of the patent; (3) sought to enforce his patent rights against infringement or contributory infringement; (4) refused to license or use any rights to the patent; or (5) conditioned the license of any rights to the patent or the sale of the patented product on the acquisition of a license to rights in another patent or purchase of a separate product, unless, in view of the circumstances, the patent owner has market power in the relevant market for the patent or patented product on which the license or sale is conditioned.

**(e)(1)** It shall not be an act of infringement to make, use, offer to sell, or sell within the United States or import into the United States a patented invention (other than a new animal drug or veterinary biological product (as those terms are used in the Federal Food, Drug, and Cosmetic Act and the Act of March 4, 1913) which is primarily manufactured using recombinant DNA, recombinant RNA, hybridoma technology, or other processes involving site specific genetic manipulation techniques) solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs or veterinary biological products.

**(2)** It shall be an act of infringement to submit--

**(A)** an application under section 505(j) of the Federal Food, Drug, and Cosmetic Act or described in section 505(b)(2) of such Act for a drug claimed in a patent or the use of which is claimed in a patent,

**(B)** an application under section 512 of such Act or under the Act of March 4, 1913 (21 U.S.C. 151-158) for a drug or veterinary biological product which is not primarily manufactured using recombinant DNA, recombinant RNA, hybridoma technology, or other processes involving site specific genetic manipulation techniques and which is claimed in a patent or the use of which is claimed in a patent, or

**(C)(i)** with respect to a patent that is identified in the list of patents described in section 351(l)(3) of the Public Health Service Act (including as provided under section 351(l)(7) of such Act), an application seeking approval of a biological product, or

**(ii)** if the applicant for the application fails to provide the application and information required under section 351(l)(2)(A) of such Act, an application seeking approval of a biological product for a patent that could be identified pursuant to section 351(l)(3)(A)(i) of such Act,

if the purpose of such submission is to obtain approval under such Act to engage in the commercial manufacture, use, or sale of a drug, veterinary biological product, or biological product claimed in a patent or the use of which is claimed in a patent before the expiration of such patent.

**(3)** In any action for patent infringement brought under this section, no injunctive or other relief may be granted which would prohibit the making, using, offering to sell, or selling within the United States or importing into the United States of a patented invention under paragraph (1).

**(4)** For an act of infringement described in paragraph (2)--

**(A)** the court shall order the effective date of any approval of the drug or veterinary biological product involved in the infringement to be a date which is not earlier than the date of the expiration of the patent which has been infringed,

**(B)** injunctive relief may be granted against an infringer to prevent the commercial manufacture, use, offer to sell, or sale within the United States or importation into the United States of an approved drug, veterinary biological product, or biological product,

**(C)** damages or other monetary relief may be awarded against an infringer only if there has been commercial manufacture, use, offer to sell, or sale within the United States or importation into the United States of an approved drug, veterinary biological product, or biological product, and

**(D)** the court shall order a permanent injunction prohibiting any infringement of the patent by the biological product involved in the infringement until a date which is not earlier than the date of the expiration of the patent that has been infringed under paragraph (2)(C), provided the patent is the subject of a final court decision, as defined in section 351(k)(6) of the Public Health Service Act, in an action for infringement of the patent under section 351(l)(6) of such Act, and the biological product has not yet been approved because of section 351(k)(7) of such Act.

The remedies prescribed by subparagraphs (A), (B), (C), and (D) are the only remedies which may be granted by a court for an act of infringement described in paragraph (2), except that a court may award attorney fees under section 285.

**(5)** Where a person has filed an application described in paragraph (2) that includes a certification under subsection (b)(2)(A)(iv) or (j)(2)(A)(vii)(IV) of section 505 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 355), and neither the owner of the patent that is the subject of the certification nor the holder of the approved application under subsection (b) of such section for the drug that is claimed by the patent or a use of which is claimed by the patent brought an action for infringement of such patent before the expiration of 45 days after the date on which the notice given under subsection (b)(3) or (j)(2)(B) of such section was received, the courts of the United States shall, to the extent consistent with the Constitution, have subject matter jurisdiction in any action brought by such person under section 2201 of title 28 for a declaratory judgment that such patent is invalid or not infringed.

**(6)(A)** Subparagraph (B) Applies, in lieu of paragraph (4), in the case of a patent--

**(i)** that is identified, as applicable, in the list of patents described in section 351(l)(4) of the Public Health Service Act or the lists of patents described in section 351(l)(5)(B) of such Act with respect to a biological product; and

**(ii)** for which an action for infringement of the patent with respect to the biological product--

**(I)** was brought after the expiration of the 30-day period described in subparagraph (A) or (B), as applicable, of section 351(l)(6) of such Act; or

**(II)** was brought before the expiration of the 30-day period described in subclause (I), but which was dismissed without prejudice or was not prosecuted to judgment in good faith.

**(B)** In an action for infringement of a patent described in subparagraph (A), the sole and exclusive remedy that may be granted by a court, upon a finding that the making, using, offering to sell, selling, or importation into the United States of the biological product that is the subject of the action infringed the patent, shall be a reasonable royalty.

**(C)** The owner of a patent that should have been included in the list described in section 351(l)(3)(A) of the Public Health Service Act, including as provided under section 351(l)(7) of such Act for a biological product, but was not timely included in such list, may not bring an action under this section for infringement of the patent with respect to the biological product.

**(f)(1)** Whoever without authority supplies or causes to be supplied in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.

**(2)** Whoever without authority supplies or causes to be supplied in or from the United States any component of a patented invention that is especially made or especially adapted for use in the invention and not a staple article or commodity of commerce suitable for substantial noninfringing use, where such component is uncombined in whole or in part, knowing that

such component is so made or adapted and intending that such component will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.

**(g)** Whoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent. In an action for infringement of a process patent, no remedy may be granted for infringement on account of the noncommercial use or retail sale of a product unless there is no adequate remedy under this title for infringement on account of the importation or other use, offer to sell, or sale of that product. A product which is made by a patented process will, for purposes of this title, not be considered to be so made after--

**(1)** it is materially changed by subsequent processes; or

**(2)** it becomes a trivial and nonessential component of another product.

**(h)** As used in this section, the term "whoever" includes any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his official capacity. Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this title in the same manner and to the same extent as any nongovernmental entity.

**(i)** As used in this section, an "offer for sale" or an "offer to sell" by a person other than the patentee, or any designee of the patentee, is that in which the sale will occur before the expiration of the term of the patent.

**CREDIT(S)**

(July 19, 1952, c. 950, 66 Stat. 811; Pub.L. 98-417, Title II, § 202, Sept. 24, 1984, 98 Stat. 1603; Pub.L. 98-622, Title I, § 101, Nov. 8, 1984, 98 Stat. 3383; Pub.L. 100-418, Title IX, § 9003, Aug. 23, 1988, 102 Stat. 1564; Pub.L. 100-670, Title II, § 201(i), Nov. 16, 1988, 102 Stat. 3988; Pub.L. 100-703, Title II, § 201, Nov. 19, 1988, 102 Stat. 4676; Pub.L. 102-560, § 2(a) (1), Oct. 28, 1992, 106 Stat. 4230; Pub.L. 103-465, Title V, § 533(a), Dec. 8, 1994, 108 Stat. 4988; Pub.L. 108-173, Title XI, § 1101(d), Dec. 8, 2003, 117 Stat. 2457; Pub.L. 111-148, Title VII, § 7002(c)(1), Mar. 23, 2010, 124 Stat. 815.)

### VALIDITY

<The United States Supreme Court, in Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank, 119 S.Ct. 2199, 144 L.Ed. 2d 575, June 23, 1999, found unconstitutional the Patent and Plant Variety Protection Remedy Clarification Act, Pub.L. 102-560, which added subsec. (h) to this section.>

Notes of Decisions (2929)

35 U.S.C.A. § 271, 35 USCA § 271
Current through P.L. 113-92 (excluding P.L. 113-76, 113-79, and 113-89) approved 3-25-14

# TAB 12A

Canada Federal Statutes
Bankruptcy and Insolvency Act
Part IV — Property of the Bankrupt (ss. 67-101.2)
Preferences and Transfers at Undervalue [Heading amended 2005, c. 47, s. 71; 2007, c. 36, s. 41.]

R.S.C. 1985, c. B-3, s. 96

# s 96.

Currency

## 96.

### 96(1)Transfer at undervalue

On application by the trustee, a court may declare that a transfer at undervalue is void as against, or, in Quebec, may not be set up against, the trustee — or order that a party to the transfer or any other person who is privy to the transfer, or all of those persons, pay to the estate the difference between the value of the consideration received by the debtor and the value of the consideration given by the debtor — if

> (a) the party was dealing at arm's length with the debtor and
>
>> (i) the transfer occurred during the period that begins on the day that is one year before the date of the initial bankruptcy event and that ends on the date of the bankruptcy,
>>
>> (ii) the debtor was insolvent at the time of the transfer or was rendered insolvent by it, and
>>
>> (iii) the debtor intended to defraud, defeat or delay a creditor; or
>
> (b) the party was not dealing at arm's length with the debtor and
>
>> (i) the transfer occurred during the period that begins on the day that is one year before the date of the initial bankruptcy event and ends on the date of the bankruptcy, or
>>
>> (ii) the transfer occurred during the period that begins on the day that is five years before the date of the initial bankruptcy event and ends on the day before the day on which the period referred to in subparagraph (i) begins and
>>
>>> (A) the debtor was insolvent at the time of the transfer or was rendered insolvent by it, or
>>>
>>> (B) the debtor intended to defraud, defeat or delay a creditor.

### 96(2)Establishing values

In making the application referred to in this section, the trustee shall state what, in the trustee's opinion, was the fair market value of the property or services and what, in the trustee's opinion, was the value of the actual consideration given or received by the debtor, and the values on which the court makes any finding under this section are, in the absence of evidence to the contrary, the values stated by the trustee.

### 96(3)Meaning of "person who is privy"

In this section, a **"person who is privy"** means a person who is not dealing at arm's length with a party to a transfer and, by reason of the transfer, directly or indirectly, receives a benefit or causes a benefit to be received by another person.

### Amendment History

1997, c. 12, s. 79; 2004, c. 25, s. 57; 2005, c. 47, s. 73; 2007, c. 36, s. 43

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**Currency**

Federal English Statutes reflect amendments current to April 11, 2014

Federal English Regulations are current to Gazette Vol. 148:8 (April 9, 2014)

**End of Document**                    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# TAB 12B



CANADA

CONSOLIDATION

CODIFICATION

# Bankruptcy and Insolvency General Rules

# Règles générales sur la faillite et l'insolvabilité

C.R.C., c. 368

C.R.C., ch. 368

Current to April 16, 2014

À jour au 16 avril 2014

Last amended on March 25, 2011

Dernière modification le 25 mars 2011

Published by the Minister of Justice at the following address:
http://laws-lois.justice.gc.ca

Publié par le ministre de la Justice à l'adresse suivante :
http://lois-laws.justice.gc.ca

OFFICIAL STATUS
OF CONSOLIDATIONS

CARACTÈRE OFFICIEL
DES CODIFICATIONS

Subsections 31(1) and (3) of the *Legislation Revision and Consolidation Act*, in force on June 1, 2009, provide as follows:

Les paragraphes 31(1) et (3) de la *Loi sur la révision et la codification des textes législatifs*, en vigueur le 1er juin 2009, prévoient ce qui suit :

Published consolidation is evidence

**31.** (1) Every copy of a consolidated statute or consolidated regulation published by the Minister under this Act in either print or electronic form is evidence of that statute or regulation and of its contents and every copy purporting to be published by the Minister is deemed to be so published, unless the contrary is shown.

...

**31.** (1) Tout exemplaire d'une loi codifiée ou d'un règlement codifié, publié par le ministre en vertu de la présente loi sur support papier ou sur support électronique, fait foi de cette loi ou de ce règlement et de son contenu. Tout exemplaire donné comme publié par le ministre est réputé avoir été ainsi publié, sauf preuve contraire.

[...]

Codifications comme élément de preuve

Inconsistencies in regulations

(3) In the event of an inconsistency between a consolidated regulation published by the Minister under this Act and the original regulation or a subsequent amendment as registered by the Clerk of the Privy Council under the *Statutory Instruments Act*, the original regulation or amendment prevails to the extent of the inconsistency.

(3) Les dispositions du règlement d'origine avec ses modifications subséquentes enregistrées par le greffier du Conseil privé en vertu de la *Loi sur les textes réglementaires* l'emportent sur les dispositions incompatibles du règlement codifié publié par le ministre en vertu de la présente loi.

Incompatibilité — règlements

NOTE

This consolidation is current to April 16, 2014. The last amendments came into force on March 25, 2011. Any amendments that were not in force as of April 16, 2014 are set out at the end of this document under the heading "Amendments Not in Force".

NOTE

Cette codification est à jour au 16 avril 2014. Les dernières modifications sont entrées en vigueur le 25 mars 2011. Toutes modifications qui n'étaient pas en vigueur au 16 avril 2014 sont énoncées à la fin de ce document sous le titre « Modifications en vigueur ».

TABLE OF PROVISIONS                    TABLE ANALYTIQUE

| Section | | Page |
|---|---|---|
| | Bankruptcy and Insolvency General Rules | |
| 1 | INTERPRETATION | 1 |
| 2 | GENERAL | 2 |
| 9 | COURT PROCEEDINGS | 4 |
| 11 | MOTIONS | 5 |
| 14 | WITNESSES AND DEPOSITIONS | 5 |
| 15 | SEARCH, SEIZURE AND ARREST | 5 |
| 18 | COSTS AND TAXATION | 6 |
| 27 | FEES OF COURT OFFICERS | 8 |
| 30 | APPEALS FROM DECISIONS OF THE REGISTRAR | 8 |
| 31 | APPEAL TO COURT OF APPEAL | 9 |
| 33 | OFFICIAL RECEIVER | 9 |
| 34 | CODE OF ETHICS FOR TRUSTEES | 9 |
| 54 | APPOINTMENT AND SUBSTITUTION OF TRUSTEES | 13 |
| 55 | DUTIES OF TRUSTEES | 13 |
| 58 | REMUNERATION OF TRUSTEES | 14 |
| 59 | PRESCRIBED CIRCUMSTANCES FOR OPERATION OF PARAGRAPH 67(1)(B.1) OF ACT | 15 |
| 59.1 | PRESCRIBED PENSION PLANS FOR OPERATION OF SUBSECTION 60(1.5) AND SECTIONS 81.5 AND 81.6 OF THE ACT | 16 |
| 59.2 | PRESCRIBED PLAN FOR OPERATION OF PARAGRAPH 67(1)(b.3) OF THE ACT | 16 |
| 60 | TAXATION OF ACCOUNTS AND DISCHARGE OF TRUSTEE | 16 |
| 60 | GENERAL | 16 |
| 62 | SUMMARY ADMINISTRATION | 17 |

| Article | | Page |
|---|---|---|
| | Règles générales sur la faillite et l'insolvabilité | |
| 1 | DÉFINITIONS | 1 |
| 2 | DISPOSITIONS GÉNÉRALES | 2 |
| 9 | PROCÉDURE JUDICIAIRE | 4 |
| 11 | REQUÊTES ET MOTIONS | 5 |
| 14 | TÉMOINS ET DÉPOSITIONS | 5 |
| 15 | SAISIE, PERQUISITION ET ARRESTATION | 5 |
| 18 | FRAIS ET TAXATION | 6 |
| 27 | HONORAIRES DES FONCTIONNAIRES DU TRIBUNAL | 8 |
| 30 | APPEL DES DÉCISIONS DU REGISTRAIRE | 8 |
| 31 | APPELS DEVANT LA COUR D'APPEL | 9 |
| 33 | SÉQUESTRE OFFICIEL | 9 |
| 34 | CODE DE DÉONTOLOGIE DES SYNDICS | 9 |
| 54 | NOMINATION ET SUBSTITUTION DU SYNDIC | 13 |
| 55 | ATTRIBUTIONS DU SYNDIC | 13 |
| 58 | RÉMUNÉRATION DU SYNDIC | 14 |
| 59 | CIRCONSTANCES PRESCRITES POUR L'APPLICATION DE L'ALINÉA 67(1)B.1) DE LA LOI | 15 |
| 59.1 | RÉGIME DE PENSION PRESCRIT POUR L'APPLICATION DU PARAGRAPHE 60(1.5) ET DES ARTICLES 81.5 ET 81.6 DE LA LOI | 16 |
| 59.2 | RÉGIME PRESCRIT POUR L'APPLICATION DE L'ALINÉA 67(1)b.3) DE LA LOI | 16 |
| 60 | TAXATION DES COMPTES ET LIBÉRATION DU SYNDIC | 16 |
| 60 | DISPOSITIONS GÉNÉRALES | 16 |
| 62 | ADMINISTRATION SOMMAIRE | 17 |

*C.R.C., c. 368 — April 16, 2014*

| Section | | Page | Article | | Page |
|---|---|---|---|---|---|
| 68 | BOOKS, RECORDS AND DOCUMENTS | 22 | 68 | LIVRES, REGISTRES ET DOCUMENTS | 22 |
| 69 | APPLICATION FOR BANKRUPTCY ORDER | 22 | 69 | REQUÊTE EN FAILLITE | 22 |
| 77 | INTERIM RECEIVER | 24 | 77 | SÉQUESTRE INTÉRIMAIRE | 24 |
| 83 | BANKRUPTCY ORDERS | 26 | 83 | ORDONNANCE DE FAILLITE | 26 |
| 85 | ASSIGNMENTS | 26 | 85 | CESSION | 26 |
| 89 | PROPOSALS | 27 | 89 | PROPOSITIONS CONCORDATAIRES | 27 |
| 96 | CONSUMER PROPOSALS | 30 | 96 | PROPOSITION DE CONSOMMATEUR | 30 |
| 103.1 | PRESCRIBED REGULATORY BODY | 34 | 103.1 | ORGANISMES ADMINISTRATIFS | 34 |
| 104 | CONTRIBUTORIES | 35 | 104 | CONTRIBUTAIRES | 35 |
| 105 | MEDIATION | 35 | 105 | MÉDIATION | 35 |
| 106 | ORDER FOR PAYMENT | 40 | 106 | ORDONNANCE DE PAIEMENT | 40 |
| 107 | PREFERENCES AND TRANSFERS AT UNDERVALUE | 41 | 107 | TRAITEMENT PRÉFÉRENTIEL ET OPÉRATIONS SOUS-ÉVALUÉES | 41 |
| 108 | MEETINGS OF CREDITORS | 41 | 108 | ASSEMBLÉE DES CRÉANCIERS | 41 |
| 111 | CROWN'S SECURITY | 42 | 111 | GARANTIE OU SÛRETÉ DE LA COURONNE | 42 |
| 112 | NOTICE OF DIVIDEND | 42 | 112 | AVIS DE DIVIDENDE | 42 |
| 113 | NOTICE OF DISALLOWANCE OR OF VALUATION | 42 | 113 | AVIS DE REJET OU D'ÉVALUATION | 42 |
| 114 | BANKRUPT PARTNERSHIPS | 43 | 114 | SOCIÉTÉ DE PERSONNES EN FAILLITE | 43 |
| 115 | EXAMINATIONS | 43 | 115 | INTERROGATOIRES | 43 |
| 118 | DISCHARGE OF BANKRUPTS | 44 | 118 | LIBÉRATION DU FAILLI | 44 |
| 121.1 | TRUSTEE REPORT | 44 | 121.1 | RAPPORT DU SYNDIC | 44 |
| 122 | PUBLIC RECORDS | 45 | 122 | REGISTRES PUBLICS | 45 |
| 123 | RATE OF LEVY | 47 | 123 | TAUX DE PRÉLÈVEMENT | 47 |
| 124 | SECURED CREDITORS AND RECEIVERS | 48 | 124 | CRÉANCIERS GARANTIS ET SÉQUESTRES | 48 |
| 128 | TRUSTEE'S FEES AND DISBURSEMENTS IN SUMMARY ADMINISTRATION | 49 | 128 | HONORAIRES ET DÉBOURS DU SYNDIC EN CAS D'ADMINISTRATION SOMMAIRE | 49 |

*C.R.C., ch. 368 — 16 avril 2014*

| Section | | Page | Article | | Page |
|---|---|---|---|---|---|
| 129 | ADMINISTRATOR'S FEES AND EXPENSES IN A CONSUMER PROPOSAL | 50 | 129 | HONORAIRES ET DÉPENSES DE L'ADMINISTRATEUR D'UNE PROPOSITION DE CONSOMMATEUR | 50 |
| 130 | APPLICATION OF SUMMARY ADMINISTRATION PROVISIONS | 51 | 130 | APPLICATION DE DISPOSITIONS RELATIVES À L'ADMINISTRATION SOMMAIRE | 51 |
| 131 | MISCELLANEOUS FEES | 51 | 131 | HONORAIRES DIVERS | 51 |
| 137 | PRESCRIBED DATE | 53 | 137 | DATE PRESCRITE | 53 |
| 138 | NOTICE RELATED TO FOREIGN PROCEEDING | 54 | 138 | AVIS CONCERNANT LA RECONNAISSANCE D'UNE INSTANCE ÉTRANGÈRE | 54 |
| | SCHEDULE | 55 | | ANNEXE | 58 |
| | SCHEDULE II | 61 | | ANNEXE II | 61 |
| | SCHEDULE III | 62 | | ANNEXE III | 62 |

**CHAPTER 368**

BANKRUPTCY AND INSOLVENCY ACT

**Bankruptcy and Insolvency General Rules**

BANKRUPTCY AND INSOLVENCY GENERAL RULES

INTERPRETATION

**1.** The definitions in this section apply in these Rules.

"Act" means the *Bankruptcy and Insolvency Act*. (*Loi*)

"business hours", in relation to a Division Office, means the hours during which the Division Office is open to the public from Monday to Friday, holidays excepted, as posted by that Division Office. (*heures d'ouverture*)

"directive" means a directive issued by the Superintendent pursuant to subsection 5(4) of the Act. (*instructions*)

"Division Office" means the office of the Superintendent, Department of Industry, for the bankruptcy division in which the proceedings were commenced. (*bureau de division*)

"judge" means a judge of a court having jurisdiction in bankruptcy under sections 183 to 186 of the Act. (*juge*)

"petition" [Repealed, SOR/2007-61, s. 1]

"registrar" means a person appointed or assigned as a registrar in bankruptcy under section 184 of the Act. (*registraire*)

"tariff" means the tariff of costs set out in the schedule. (*tarif*)

"taxing officer" means the registrar or other officer appointed or assigned under section 184 of the Act for the taxation or fixing of costs or the passing of accounts. (*fonctionnaire taxateur*)

SOR/92-579, s. 2; SOR/98-240, s. 1; SOR/2007-61, s. 1.

**1.1** A stock exchange that is regulated by an Act of Parliament or of the legislature of a province is prescribed for the purposes of the definition "income trust" in section 2 of the Act.

SOR/2009-218, s. 1.

**CHAPITRE 368**

LOI SUR LA FAILLITE ET L'INSOLVABILITÉ

**Règles générales sur la faillite et l'insolvabilité**

RÈGLES GÉNÉRALES SUR LA FAILLITE ET L'INSOLVABILITÉ

DÉFINITIONS

**1.** Les définitions qui suivent s'appliquent aux présentes règles.

«bureau de division» Le bureau du surintendant, du ministère de l'Industrie, pour la division de faillite dans laquelle les procédures ont été intentées. (*Division Office*)

«fonctionnaire taxateur» Registraire ou autre fonctionnaire nommé ou désigné en vertu de l'article 184 de la Loi pour taxer ou fixer les frais ou approuver les comptes. (*taxing officer*)

«heures d'ouverture» Heures durant lesquelles le bureau de division est ouvert au public du lundi au vendredi, à l'exclusion des jours fériés, telles qu'affichées à ce bureau. (*business hours*)

«instructions» Instructions données par le surintendant en vertu du paragraphe 5(4) de la Loi. (*directive*)

«juge» Juge du tribunal ayant compétence en matière de faillite en vertu des articles 183 à 186 de la Loi. (*judge*)

«Loi» La *Loi sur la faillite et l'insolvabilité*. (*Act*)

«pétition» [Abrogée, DORS/2007-61, art. 1]

«registraire» Registraire en matière de faillite nommé ou désigné en vertu de l'article 184 de la Loi. (*registrar*)

«tarif» Le tarif des frais figurant à l'annexe. (*tariff*)

DORS/92-579, art. 2; DORS/98-240, art. 1; DORS/2007-61, art. 1.

**1.1** Pour l'application de la définition de «fiducie de revenu» à l'article 2 de la Loi, est visée toute bourse de valeurs mobilières régie par une loi fédérale ou provinciale.

DORS/2009-218, art. 1.

**1.2** The MFDA Investor Protection Corporation is a prescribed body for the purposes of the definition "customer compensation body" in section 253 of the Act.

SOR/2011-94, s. 1.

**1.2** La Corporation de protection des investisseurs de l'ACFM est une entité prescrite au sens de la définition de «organisme d'indemnisation des clients» prévue à l'article 253 de la Loi.

DORS/2011-94, art. 1.

## GENERAL

**2.** Documents that by the Act are to be prescribed must be in the form prescribed, with any modifications that the circumstances require and subject to any deviations permitted by section 32 of the *Interpretation Act*, and must be used in proceedings under the Act.

SOR/92-579, s. 3; SOR/98-240, s. 1; SOR/2007-61, s. 2(E).

## DISPOSITIONS GÉNÉRALES

**2.** Les documents à prescrire au titre de la Loi sont en la forme prescrite, avec les adaptations nécessaires et les différences de présentation permises par l'article 32 de la *Loi d'interprétation*, et sont utilisés dans les procédures engagées sous le régime de la Loi.

DORS/92-579, art. 3; DORS/98-240, art. 1; DORS/2007-61, art. 2(A).

**3.** In cases not provided for in the Act or these Rules, the courts shall apply, within their respective jurisdictions, their ordinary procedure to the extent that that procedure is not inconsistent with the Act or these Rules.

SOR/98-240, s. 1.

**3.** Dans les cas non prévus par la Loi ou les présentes règles, les tribunaux appliquent, dans les limites de leur compétence respective, leur procédure ordinaire dans la mesure où elle est compatible avec la Loi et les présentes règles.

DORS/98-240, art. 1.

**4.** If a period of less than six days is provided for the doing of an act or the initiating of a proceeding under the Act or these Rules, calculation of the period does not include Saturdays or holidays.

SOR/98-240, s. 1; SOR/2007-61, s. 63(E).

**4.** Lorsqu'un délai de moins de six jours est prévu pour accomplir un acte ou intenter une procédure en vertu de la Loi ou des présentes règles, les samedis et les jours fériés n'entrent pas dans le calcul du délai.

DORS/98-240, art. 1; DORS/2007-61, art. 63(A).

**5.** (1) Subject to subsection (2), a notice or other document that is received by a Division Office outside of its business hours is deemed to have been received

*(a)* on the next business day of that Division Office, if it was received

(i) between the end of business hours and midnight, local time, on a business day, or

(ii) on a Saturday or holiday; or

*(b)* at the beginning of business hours of that Division Office, if it was received between midnight and the beginning of business hours, local time, on a business day.

**5.** (1) Sous réserve du paragraphe (2), les avis et autres documents que le bureau de division reçoit en dehors des heures d'ouverture sont réputés reçus :

*a)* le premier jour ouvrable suivant de ce bureau, s'ils sont reçus :

(i) après les heures d'ouverture et avant minuit, heure locale, un jour ouvrable,

(ii) le samedi ou un jour férié;

*b)* au début des heures d'ouverture de ce bureau, s'ils sont reçus entre minuit et le début des heures d'ouverture, heure locale, un jour ouvrable.

(2) Subsection (1) does not apply to documents related to proceedings under Part III of the Act that are filed by facsimile.

SOR/78-389, s. 1; SOR/92-579, s. 4; SOR/98-240, s. 1; SOR/2005-284, s. 1.

**6.** (1) Unless otherwise provided in the Act or these Rules, every notice or other document given or sent pursuant to the Act or these Rules must be served, delivered personally, or sent by mail, courier, facsimile or electronic transmission.

(2) Unless otherwise provided in these Rules, every notice or other document given or sent pursuant to the Act or these Rules

(*a*) must be received by the addressee at least four days before the event to which it relates, if it is served, delivered personally, or sent by facsimile or electronic transmission; or

(*b*) must be sent to the addressee at least 10 days before the event to which it relates, if it is sent by mail or by courier.

(3) A trustee, receiver or administrator who gives or sends a notice or other document shall prepare an affidavit, or obtain proof, that it was given or sent, and shall retain the affidavit or proof in their files.

(4) The court may, on an *ex parte* application, exempt any person from the application of subsection (2) or order any terms and conditions that the court considers appropriate, including a change in the time limits.

SOR/98-240, s. 1; SOR/2007-61, ss. 3(E), 63(E).

**7.** An assignment, proposal or notice of intention that is respectively offered, lodged or filed pursuant to the Act must be offered, lodged or filed by service, personal delivery, mail, courier, facsimile or electronic transmission.

SOR/78-389, s. 1; SOR/98-240, s. 1.

**8.** An interim receiver, a trustee, an administrator of a consumer proposal, an official receiver or a representa-

(2) Le paragraphe (1) ne s'applique pas aux documents concernant les procédures fondées sur la partie III de la Loi qui sont déposés par télécopieur.

DORS/78-389, art. 1; DORS/92-579, art. 4; DORS/98-240, art. 1; DORS/2005-284, art. 1.

**6.** (1) Sauf disposition contraire de la Loi ou des présentes règles, les avis et autres documents à remettre ou à envoyer sous le régime de la Loi ou des présentes règles sont signifiés, remis en mains propres ou envoyés par courrier, par service de messagerie, par télécopieur ou par transmission électronique.

(2) Sauf disposition contraire des présentes règles, les avis et autres documents à remettre ou à envoyer sous le régime des présentes règles :

a) doivent être reçus par le destinataire au moins quatre jours avant l'événement auquel ils se rapportent, s'ils sont signifiés, remis en mains propres ou envoyés par télécopieur ou par transmission électronique;

b) doivent être envoyés au destinataire au moins 10 jours avant l'événement auquel ils se rapportent, s'ils sont envoyés par courrier ou par service de messagerie.

(3) Le syndic, le séquestre ou l'administrateur qui remet ou envoie un avis ou tout autre document doit remplir un affidavit ou obtenir une preuve à cet effet, et conserver l'affidavit ou la preuve dans ses dossiers.

(4) Le tribunal peut, sur demande *ex parte*, dispenser toute personne de l'application du paragraphe (2) ou ordonner les modalités d'application qu'il juge indiquées, notamment un délai différent.

DORS/98-240, art. 1; DORS/2007-61, art. 3(A) et 63(A).

**7.** La cession, la proposition ou l'avis d'intention à présenter ou à déposer sous le régime de la Loi sont soit signifiés, soit remis en mains propres, soit envoyés par courrier, par service de messagerie, par télécopieur ou par transmission électronique.

DORS/78-389, art. 1; DORS/98-240, art. 1.

**8.** Le séquestre intérimaire, le syndic, l'administrateur d'une proposition de consommateur, le séquestre officiel

tive of the Superintendent is not required to be represented by a barrister or solicitor or, in the Province of Quebec, an advocate when appearing before a registrar on any court proceeding under the Act.

SOR/98-240, s. 1; SOR/2007-61, s. 4(E).

## COURT PROCEEDINGS

**9.** (1) All proceedings used in court must be dated and entitled in the name of the court in which they are used, together with the words "in Bankruptcy and Insolvency".

(2) Every document used in the filing of a bankruptcy application or used after the filing of an assignment must be entitled "In the Matter of the Bankruptcy of...".

(3) Every document used in the filing of a proposal before bankruptcy must be entitled "In the Matter of the Proposal of...".

(4) Every document used in the course of a receivership must be entitled "In the Matter of the Receivership of...".

(5) Unless the Chief Justice, Associate Chief Justice or Commissioner, as the case may be, referred to in section 184 of the Act otherwise directs, every document that is required to be filed in court must first be filed at the office of the registrar.

(6) If the court deems necessary that any notice be sent to the Superintendent in any proceeding before it, a copy of that notice shall be sent to the Division Office.

SOR/98-240, s. 1; SOR/2007-61, s. 63(E), 64.

**10.** If any proceedings are transferred from one court to another court under subsection 187(7) or (10) of the Act, the registrar of the former court shall send the file to the registrar of the latter court, with a copy of the order of transfer attached to it.

SOR/98-240, s. 1; SOR/2007-61, s. 63(E).

ou le représentant du surintendant n'ont pas à être représentés par un avocat lorsqu'ils comparaissent devant le registraire au sujet d'une procédure judiciaire engagée sous le régime de la Loi.

DORS/98-240, art. 1; DORS/2007-61, art. 4(A).

## PROCÉDURE JUDICIAIRE

**9.** (1) Tous les actes de procédure présentés devant le tribunal sont datés et portent en titre le nom du tribunal visé et la mention « En matière de faillite et d'insolvabilité ».

(2) Les documents utilisés lors du dépôt d'une requête en faillite ou après le dépôt d'une cession portent le titre « Dans l'affaire de la faillite de... ».

(3) Les documents utilisés lors du dépôt d'une proposition antérieure à la faillite portent le titre « Dans l'affaire de la proposition de... ».

(4) Les documents relatifs à une mise sous séquestre portent le titre « Dans l'affaire de la mise sous séquestre de... ».

(5) À moins que le juge en chef, le juge en chef adjoint ou le commissaire, selon le cas, visé à l'article 184 de la Loi n'en ordonne autrement, les documents à déposer auprès du tribunal sont déposés au préalable au bureau du registraire.

(6) Si le tribunal juge qu'il est nécessaire, dans toute procédure dont il est saisi, d'envoyer un avis au surintendant, une copie de cet avis est envoyée au bureau de division.

DORS/98-240, art. 1; DORS/2007-61, art. 63(A) et 64.

**10.** En cas de renvoi des procédures d'un tribunal à un autre conformément aux paragraphes 187(7) ou (10) de la Loi, le registraire du premier tribunal fait parvenir le dossier au registraire du second tribunal en y joignant une copie de l'ordonnance de renvoi.

DORS/98-240, art. 1; DORS/2007-61, art. 63(A).

*C.R.C., ch. 368 — 16 avril 2014*

## MOTIONS

**11.** Subject to these Rules, every application to the court must be made by motion unless the court orders otherwise.

SOR/98-240, s. 1.

**12.** The Superintendent may intervene in any application to the court by filing a notice of intervention with the court.

SOR/98-240, s. 1.

**13.** Subject to any order of the court given in exigent circumstances, a party who makes a motion must, at least one day before the day set for the hearing of the motion, file with the court

(*a*) the original of the notice of motion, or the motion, as the case may be;

(*b*) every affidavit in support of the notice of motion or the motion, as the case may be; and

(*c*) proof of service, if any, of the documents described in paragraphs (*a*) and (*b*).

SOR/98-240, s. 1; SOR/2005-284, s. 2.

## WITNESSES AND DEPOSITIONS

**14.** (1) A party to any court proceedings may, with leave of the court, examine the other party or any other person and require them to produce documents.

(2) A party to any court proceedings may, with leave of the court, require the attendance of any person for examination on an affidavit that the person filed with the court.

(3) An application for leave of the court under subsection (1) or (2) may be made *ex parte*.

SOR/98-240, s. 1.

## SEARCH, SEIZURE AND ARREST

**15.** A warrant issued under the Act, including a warrant of seizure and a search warrant, must be executed by the executing officer.

SOR/98-240, s. 1; SOR/2007-61, s. 5(E).

## REQUÊTES ET MOTIONS

**11.** Sous réserve des autres dispositions des présentes règles, toute demande au tribunal se fait par requête ou par motion, à moins que celui-ci n'en ordonne autrement.

DORS/98-240, art. 1.

**12.** Le surintendant peut intervenir dans une demande présentée au tribunal en déposant un avis d'intervention auprès de celui-ci.

DORS/98-240, art. 1.

**13.** Sous réserve d'une ordonnance du tribunal rendue en cas d'urgence, la partie qui présente une requête ou une motion dépose auprès du tribunal, au moins un jour avant la date fixée pour l'audition de celle-ci :

*a*) l'original de l'avis de requête ou de motion, ou de la requête ou de la motion, selon le cas;

*b*) les affidavits à l'appui de l'avis de requête ou de motion, ou de la requête ou de la motion, selon le cas;

*c*) une preuve de la signification, le cas échéant, des documents visés aux alinéas *a*) et *b*).

DORS/98-240, art. 1; DORS/2005-284, art. 2.

## TÉMOINS ET DÉPOSITIONS

**14.** (1) Toute partie à une procédure judiciaire peut, avec l'autorisation du tribunal, interroger l'autre partie ou toute autre personne et exiger d'elles la production de documents.

(2) Toute partie à une procédure judiciaire peut, avec l'autorisation du tribunal, exiger la comparution d'une personne pour qu'elle subisse un interrogatoire sur l'affidavit qu'elle a déposé auprès du tribunal.

(3) La demande de l'autorisation du tribunal peut se faire *ex parte*.

DORS/98-240, art. 1.

## SAISIE, PERQUISITION ET ARRESTATION

**15.** L'huissier-exécutant est chargé de l'exécution de tout mandat, notamment de saisie ou de perquisition, délivré en vertu de la Loi.

DORS/98-240, art. 1; DORS/2007-61, art. 5(A).

*C.R.C., c. 368 — April 16, 2014*

**16.** (1) A bankrupt or other person who is apprehended under section 166 of the Act shall be kept in the place of custody set out in the warrant, pending the order of the court.

(2) As soon as a bankrupt or other person has been handed over to the authority at a place of custody, the person who made the apprehension under section 166 of the Act or the arrest under section 168 of the Act shall so report to the court.

(3) After the report mentioned in subsection (2) is made, the court may make an order fixing a time and place for the examination of the bankrupt or other person by the official receiver, if section 166 of the Act applies, or by the court, if section 168 of the Act applies.

(4) As soon as a time and place are set for the examination of a bankrupt or other person by the official receiver pursuant to subsection (3), the registrar shall so notify the official receiver and the trustee.

(5) As soon as a time and place are set for the examination of a bankrupt, other than an examination referred to in subsection (4), the registrar shall so notify the trustee and the person who applied for the examination.

SOR/98-240, s. 1; SOR/2007-61, s. 63(E).

**17.** Subject to any contrary order of the court, a person in possession or control of any property seized under the Act or these Rules shall immediately deliver it to the trustee or the interim receiver.

SOR/98-240, s. 1; SOR/2007-61, s. 6(E).

## COSTS AND TAXATION

**18.** All bills of costs for legal services – other than those that do not exceed $2,500 in aggregate, excluding applicable federal and provincial taxes – must be taxed by the taxing officer.

SOR/98-240, s. 1; SOR/2009-218, s. 2.

**16.** (1) Le failli ou toute autre personne appréhendé en vertu de l'article 166 de la Loi est gardé au lieu de détention indiqué dans le mandat jusqu'à ce que le tribunal rende son ordonnance.

(2) La personne qui a appréhendé ou arrêté le failli ou toute autre personne en vertu des articles 166 ou 168 de la Loi fait rapport au tribunal dès qu'elle l'a remis aux responsables du lieu de détention.

(3) Après que le rapport mentionné au paragraphe (2) a été fait, le tribunal peut rendre une ordonnance fixant les date, heure et lieu où le failli ou la personne subira, en cas d'application de l'article 166 de la Loi, l'interrogatoire devant le séquestre officiel ou, en cas d'application de l'article 168 de la Loi, l'interrogatoire devant le tribunal.

(4) Dès que les date, heure et lieu de l'interrogatoire du failli ou de la personne devant le séquestre officiel ont été fixés en application du paragraphe (3), le registraire en avise le séquestre officiel et le syndic.

(5) Dès que les date, heure et lieu de l'interrogatoire du failli, autre que l'interrogatoire visé au paragraphe (4), ont été fixés, le registraire en avise le syndic et la personne qui a demandé l'interrogatoire.

DORS/98-240, art. 1; DORS/2007-61, art. 63(A).

**17.** Sauf ordonnance contraire du tribunal, quiconque a en sa possession ou sous sa garde des biens saisis en vertu de la Loi ou des présentes règles les remet sans délai au syndic ou au séquestre intérimaire.

DORS/98-240, art. 1; DORS/2007-61, art. 6(A).

## FRAIS ET TAXATION

**18.** Les mémoires de frais pour services juridiques, sauf ceux dont le montant total ne dépasse pas 2 500 $ — abstraction faite des taxes fédérales et provinciales applicables — sont taxés par le fonctionnaire taxateur.

DORS/98-240, art. 1; DORS/2009-218, art. 2.

**19.** A bill of costs must describe, in a fair, reasonable and detailed manner, the nature of the legal services rendered.

SOR/98-240, s. 1.

**20.** The bill of costs shall not be taxed unless the trustee is represented at the taxation or the bill of costs has attached to it a declaration, signed by the trustee, stating that

(*a*) [Repealed, SOR/2009-218, s. 3]

(*b*) the services have been duly authorized and duly rendered; and

(*c*) the charges are reasonable in the trustee's opinion.

SOR/98-240, s. 1; SOR/2009-218, s. 3.

**21.** In determining the amount of costs to be allowed, the taxing officer shall determine whether

(*a*) the legal services have been duly rendered;

(*b*) the charges are reasonable and, if applicable, are in accordance with the tariff;

(*c*) the legal services rendered are accounted for, and are not services that should have been rendered by the trustee; and

(*d*) the legal services have been authorized and approved in accordance with the Act, if the Act so requires.

SOR/98-240, s. 1; SOR/2007-61, s. 63(E).

**22.** When a bill of costs has been taxed, the taxing officer shall make a statement to that effect on the bill and shall sign that statement, and a bill of costs so signed has the same effect as a judgment of the court and may be enforced in the same manner as a judgment.

SOR/98-240, s. 1.

**23.** The court may, on *ex parte* application by a trustee, order a barrister or solicitor or, in the Province of Quebec, an advocate to submit a bill of costs to the trustee, or to bring the bill of costs into court to be taxed, and, if the barrister, solicitor or advocate fails to comply, the court may, on *ex parte* application by the trustee, order that the trustee distribute the proceeds of the estate

**19.** Les mémoires de frais indiquent, de façon juste, raisonnable et détaillée, la nature des services juridiques rendus.

DORS/98-240, art. 1.

**20.** Un mémoire de frais ne peut être taxé que si le syndic est représenté lors de la taxation ou a joint au mémoire une déclaration signée par lui indiquant :

*a*) [Abrogé, DORS/2009-218, art. 3]

*b*) que les services ont été dûment autorisés et rendus;

*c*) qu'à son avis les frais sont raisonnables.

DORS/98-240, art. 1; DORS/2009-218, art. 3.

**21.** Dans l'établissement du montant des frais à accorder, le fonctionnaire taxateur détermine si :

*a*) les services juridiques ont été dûment rendus;

*b*) les frais sont raisonnables et, le cas échéant, conformes au tarif;

*c*) les services juridiques rendus sont justifiés et ne relèvent pas des attributions du syndic;

*d*) le cas échéant, les services juridiques ont été autorisés et approuvés conformément à la Loi.

DORS/98-240, art. 1; DORS/2007-61, art. 63(A).

**22.** Une fois le mémoire de frais taxé, le fonctionnaire taxateur inscrit une mention à cet effet sur le mémoire, suivie de sa signature. Le mémoire de frais signé par lui a dès lors la valeur d'un jugement du tribunal et peut être exécuté de la même manière que celui-ci.

DORS/98-240, art. 1.

**23.** Le tribunal peut, sur demande *ex parte* du syndic, ordonner à l'avocat de présenter son mémoire de frais au syndic ou de le lui produire pour taxation. Si l'avocat ne se conforme pas à l'ordonnance, le tribunal peut, sur demande *ex parte* du syndic, ordonner au syndic de faire la distribution du produit de l'actif entre ses mains sans égard au mémoire de frais de l'avocat.

DORS/98-240, art. 1; DORS/2007-61, art. 7.

*C.R.C., c. 368 — April 16, 2014*

that the trustee possesses without regard to the barrister, solicitor or advocate's bill of costs.

SOR/98-240, s. 1; SOR/2007-61, s. 7.

**24.** (1) The barrister or solicitor or, in the Province of Quebec, the advocate shall give to the trustee, to any other person who is liable for payment of the bill of costs and, on request, to the Division Office, a notice of the time and place of the taxation, at least 10 days before the day set for the taxation.

(2) A certified copy of the bill of costs to be presented for taxation must be attached to the notice referred to in subsection (1).

SOR/98-240, s. 1; SOR/2007-61, s. 8.

**25.** (1) A decision of a taxing officer on the taxation of a bill of costs may be appealed to the court if a notice stating the grounds of appeal is given to the opposite party and the Division Office within 10 days after the day of the decision.

(2) The judge who hears the appeal may retax the bill of costs as if it were being taxed for the first time.

SOR/98-240, s. 1.

**26.** [Repealed, SOR/2009-218, s. 4]

FEES OF COURT OFFICERS

**27.** If the amount of the fees payable to a court officer is contested, the judge shall fix the amount.

SOR/98-240, s. 1; SOR/2007-61, s. 63(E).

**28.** Fees payable to a registrar under these Rules belong to Her Majesty in right of the province for which the registrar was appointed.

SOR/98-240, s. 1.

**29.** [Repealed, SOR/2005-284, s. 3]

APPEALS FROM DECISIONS OF THE REGISTRAR

**30.** (1) An appeal from an order or decision of the registrar must be made by motion to a judge.

**24.** (1) Au moins dix jours avant la date de la taxation, l'avocat envoie au syndic, à toute autre personne responsable du paiement des frais et, sur demande, au bureau de division, un avis indiquant les date, heure et lieu de la taxation.

(2) Une copie certifiée conforme du mémoire de frais présenté pour taxation est jointe à l'avis.

DORS/98-240, art. 1; DORS/2007-61, art. 8.

**25.** (1) La décision du fonctionnaire taxateur au sujet de la taxation d'un mémoire de frais peut être portée en appel devant le tribunal à la condition qu'un avis énonçant les motifs de l'appel soit envoyé à la partie adverse et au bureau de division dans les 10 jours suivant celui de la décision.

(2) Le juge qui entend l'appel peut procéder à une nouvelle taxation comme si le mémoire de frais était taxé pour la première fois.

DORS/98-240, art. 1.

**26.** [Abrogé, DORS/2009-218, art. 4]

HONORAIRES DES FONCTIONNAIRES DU TRIBUNAL

**27.** En cas de contestation des honoraires payables à un fonctionnaire du tribunal, le juge en fixe le montant.

DORS/98-240, art. 1; DORS/2007-61, art. 63(A).

**28.** Les honoraires payables au registraire conformément aux présentes règles appartiennent à Sa Majesté du chef de la province pour laquelle il a été nommé.

DORS/98-240, art. 1.

**29.** [Abrogé, DORS/2005-284, art. 3]

APPEL DES DÉCISIONS DU REGISTRAIRE

**30.** (1) L'appel d'une ordonnance ou d'une décision du registraire est formé par la présentation d'une requête ou d'une motion au juge.

(2) A notice of motion or a motion, as the case may be, must be filed at the office of the registrar and served on the other party within 10 days after the day of the order or decision appealed from, or within such further time as the judge stipulates.

(3) The notice of motion or the motion must set out the grounds of the appeal.

SOR/98-240, s. 1.

### APPEAL TO COURT OF APPEAL

**31.** (1) An appeal to a court of appeal referred to in subsection 183(2) of the Act must be made by filing a notice of appeal at the office of the registrar of the court appealed from, within 10 days after the day of the order or decision appealed from, or within such further time as a judge of the court of appeal stipulates.

(2) If an appeal is brought under paragraph 193(*e*) of the Act, the notice of appeal must include the application for leave to appeal.

SOR/98-240, s. 1; SOR/2007-61, s. 63(E).

**32.** The registrar of the court appealed from shall transmit to the court of appeal the notice of appeal and the file.

SOR/98-240, s. 1.

### OFFICIAL RECEIVER

**33.** The official receiver may request instructions from the registrar or, if the official receiver is the registrar, from the judge, in case of doubt respecting any matter arising out of the Act, these Rules or a directive.

SOR/98-240, s. 1.

### CODE OF ETHICS FOR TRUSTEES

**34.** Every trustee shall maintain the high standards of ethics that are central to the maintenance of public trust and confidence in the administration of the Act.

SOR/98-240, s. 1.

**35.** For the purposes of sections 39 to 52, "professional engagement" means any bankruptcy or insolvency

(2) L'avis de requête ou de motion, ou la requête ou la motion, selon le cas, est déposé au bureau du registraire et signifié à l'autre partie dans les 10 jours qui suivent la date de l'ordonnance ou de la décision faisant l'objet de l'appel, ou dans tel autre délai fixé par le juge.

(3) L'avis de requête ou de motion ou la requête ou la motion énonce les motifs de l'appel.

DORS/98-240, art. 1.

### APPELS DEVANT LA COUR D'APPEL

**31.** (1) Un appel est formé devant une cour d'appel visée au paragraphe 183(2) de la Loi par le dépôt d'un avis d'appel au bureau du registraire du tribunal ayant rendu l'ordonnance ou la décision portée en appel, dans les 10 jours qui suivent le jour de l'ordonnance ou de la décision, ou dans tel autre délai fixé par un juge de la cour d'appel.

(2) En cas d'application de l'alinéa 193*e*) de la Loi, l'avis d'appel est accompagné de la demande d'autorisation d'appel.

DORS/98-240, art. 1; DORS/2007-61, art. 63(A).

**32.** Le registraire du tribunal ayant rendu l'ordonnance ou la décision portée en appel transmet à la cour d'appel l'avis d'appel et le dossier.

DORS/98-240, art. 1.

### SÉQUESTRE OFFICIEL

**33.** Le séquestre officiel peut demander des consignes au registraire ou, s'il agit en qualité de registraire, au juge, en cas de doute au sujet de toute question relevant de la Loi, des présentes règles ou des instructions.

DORS/98-240, art. 1.

### CODE DE DÉONTOLOGIE DES SYNDICS

**34.** Le syndic se conforme à des normes élevées de déontologie, lesquelles sont d'une importance primordiale pour le maintien de la confiance du public dans la mise en application de la Loi.

DORS/98-240, art. 1.

**35.** Pour l'application des articles 39 à 52, «activité professionnelle» s'entend de toute affaire de faillite ou

matter in respect of which a trustee is appointed or designated to act in that capacity pursuant to the Act.

SOR/98-240, s. 1.

**36.** Trustees shall perform their duties in a timely manner and carry out their functions with competence, honesty, integrity and due care.

SOR/98-240, s. 1.

**37.** Trustees shall cooperate fully with representatives of the Superintendent in all matters arising out of the Act, these Rules or a directive.

SOR/78-389, s. 2; SOR/98-240, s. 1.

**38.** Trustees shall not assist, advise or encourage any person to engage in any conduct that the trustees know, or ought to know, is illegal or dishonest, in respect of the bankruptcy and insolvency process.

SOR/98-240, s. 1.

**39.** Trustees shall be honest and impartial and shall provide to interested parties full and accurate information as required by the Act with respect to the professional engagements of the trustees.

SOR/81-646, s. 2; SOR/98-240, s. 1.

**40.** Trustees shall not disclose confidential information to the public concerning any professional engagement, unless the disclosure is

(*a*) required by law; or

(*b*) authorized by the person to whom the confidential information relates.

SOR/81-646, s. 3; SOR/98-240, s. 1.

**41.** Trustees shall not use any confidential information that is gathered in a professional capacity for their personal benefit or for the benefit of a third party.

SOR/98-240, s. 1.

**42.** Trustees shall not purchase, directly or indirectly,

(*a*) property of any debtor for whom they are acting with respect to a professional engagement; or

(*b*) property of any estates in respect of which the Act applies, for which they are not acting, unless the property is purchased

(i) at the same time as it is offered to the public,

d'insolvabilité dans laquelle le syndic est nommé ou désigné pour exercer ses fonctions dans le cadre de la Loi.

DORS/98-240, art. 1.

**36.** Le syndic s'acquitte de ses obligations dans les meilleurs délais et exerce ses fonctions avec compétence, honnêteté, intégrité, prudence et diligence.

DORS/98-240, art. 1.

**37.** Le syndic coopère entièrement avec les représentants du surintendant dans toute affaire qui relève de la Loi, des présentes règles ou des instructions.

DORS/78-389, art. 2; DORS/98-240, art. 1.

**38.** Le syndic n'aide, ne conseille ni n'encourage quiconque à accomplir un acte qu'il sait — ou devrait savoir — être illégal ou malhonnête dans le contexte du régime de la faillite et de l'insolvabilité.

DORS/98-240, art. 1.

**39.** Le syndic est honnête et impartial et fournit, conformément aux exigences de la Loi, des renseignements exacts et complets aux parties intéressées au sujet de ses activités professionnelles.

DORS/81-646, art. 2; DORS/98-240, art. 1.

**40.** Le syndic ne divulgue aux membres du public aucun renseignement confidentiel relatif à ses activités professionnelles, sauf dans les cas suivants :

*a*) il y est tenu par la loi;

*b*) il a obtenu le consentement de la personne visée par le renseignement confidentiel.

DORS/81-646, art. 3; DORS/98-240, art. 1.

**41.** Le syndic n'utilise ni pour son propre bénéfice ni pour celui d'un tiers les renseignements confidentiels recueillis dans le cadre de ses fonctions professionnelles.

DORS/98-240, art. 1.

**42.** Le syndic n'achète, ni directement ni indirectement :

*a*) les biens d'un débiteur pour lequel il agit dans le cadre d'une activité professionnelle;

*b*) les biens des actifs régis par la Loi et auxquels il n'est pas commis, à moins que ces biens ne soient achetés :

(ii) at the same price as it is offered to the public, and

(iii) during the normal course of business of the bankrupt or debtor.

SOR/98-240, s. 1.

**43.** (1) Subject to subsection (2), if trustees have a responsibility to sell property in connection with a proposal or bankruptcy, they shall not sell the property, directly or indirectly,

(*a*) to their employees, agents or mandataries, or persons not dealing at arms' length with the trustees;

(*b*) to other trustees or, knowingly, to employees of other trustees; or

(*c*) to related persons of the trustees or, knowingly, to related persons of the persons referred to in paragraph (*a*) or (*b*).

(2) If trustees have a responsibility to act in accordance with subsection (1), they may sell property in connection with a proposal or bankruptcy to the persons set out in paragraph (1)(*a*), (*b*) or (*c*), if the property is offered for sale

(*a*) at the same time as it is offered to the public;

(*b*) at the same price as it is offered to the public; and

(*c*) during the normal course of business of the bankrupt or debtor.

SOR/98-240, s. 1; SOR/2007-61, ss. 9(E), 63(E).

**44.** Trustees who are acting with respect to any professional engagement shall avoid any influence, interest or relationship that impairs, or appears in the opinion of an informed person to impair, their professional judgment.

SOR/98-240, s. 1.

**45.** Trustees shall not sign any document, including a letter, report, statement, representation or financial statement that they know, or reasonably ought to know, is false or misleading, and shall not associate themselves

(i) en même temps qu'ils sont offerts au public,

(ii) à un prix égal à celui auquel ils sont offerts au public,

(iii) dans le cours normal des affaires du failli ou du débiteur.

DORS/98-240, art. 1.

**43.** (1) Sous réserve du paragraphe (2), lorsque le syndic a la responsabilité de vendre des biens dans le cadre d'une proposition ou d'une faillite, il ne les vend, ni directement ni indirectement :

*a*) à ses employés, à ses mandataires ou à des personnes ne traitant pas à distance avec lui;

*b*) à un autre syndic ou, sciemment, aux employés de ce dernier;

*c*) aux personnes liées à lui ou, sciemment, aux personnes liées à celles mentionnées aux alinéas *a*) ou *b*).

(2) Lorsque le syndic a la responsabilité d'agir conformément au paragraphe (1), il peut vendre des biens dans le cadre d'une proposition ou d'une faillite aux personnes mentionnées aux alinéas (1)*a*), *b*) ou *c*), dans la mesure où ces biens sont offerts en vente :

*a*) en même temps qu'ils sont offerts au public;

*b*) à un prix égal à celui auquel ils sont offerts au public;

*c*) dans le cours normal des affaires du failli ou du débiteur.

DORS/98-240, art. 1; DORS/2007-61, art. 9(A) et 63(A).

**44.** Dans toute activité professionnelle, le syndic évite les influences, les intérêts et les relations qui compromettent son jugement professionnel ou qui, aux yeux d'une personne avisée, donnent à croire qu'ils ont un tel effet.

DORS/98-240, art. 1.

**45.** Le syndic ne signe aucun document, notamment une lettre, un rapport, une déclaration, un exposé et un état financier, qu'il sait ou devrait raisonnablement savoir être faux ou trompeur, ni ne s'associe de quelque

*C.R.C., c. 368 — April 16, 2014*

with such a document in any way, including by adding a disclaimer of responsibility after their signature.

SOR/98-240, s. 1; SOR/2005-284, s. 4.

**46.** Trustees may transmit information that they have not verified, respecting the financial affairs of a bankrupt or debtor, if

(*a*) the information is subject to a disclaimer of responsibility or an explanation of the origin of the information; and

(*b*) the transmission of the information is not contrary to the Act, these Rules or any directive.

SOR/98-240, s. 1.

**46.1** [Repealed, SOR/98-240, s. 1]

**47.** Trustees shall not engage in any business or occupation that would compromise their ability to perform any professional engagement or that would jeopardize their integrity, independence or competence.

SOR/98-240, s. 1.

**48.** Trustees who hold money or other property in trust shall

(*a*) hold the money or property in accordance with the laws, regulations and terms applicable to the trust; and

(*b*) administer the money or property with due care, subject to the laws, regulations and terms applicable to the trust.

SOR/98-240, s. 1.

**49.** Trustees shall not, directly or indirectly, pay to a third party a commission, compensation or other benefit in order to obtain a professional engagement or accept, directly or indirectly from a third party, a commission, compensation or other benefit for referring work relating to a professional engagement.

SOR/98-240, s. 1.

**50.** Trustees shall not obtain, solicit or conduct any engagement that would discredit their profession or jeopardize the integrity of the bankruptcy and insolvency process.

SOR/98-240, s. 1.

manière à un tel document, y compris en y joignant sous sa signature un déni de responsabilité.

DORS/98-240, art. 1; DORS/2005-284, art. 4.

**46.** Le syndic peut communiquer des renseignements financiers concernant le failli ou le débiteur sans les avoir vérifiés si :

*a*) d'une part, ils font l'objet d'un déni de responsabilité ou d'une explication de leur origine;

*b*) d'autre part, cette communication n'est pas contraire à la Loi, aux présentes règles et aux instructions.

DORS/98-240, art. 1.

**46.1** [Abrogé, DORS/98-240, art. 1]

**47.** Le syndic ne se livre à aucune occupation ni aucune activité commerciale qui compromettraient son intégrité, son indépendance et sa compétence ou qui le gêneraient dans l'exercice de ses activités professionnelles.

DORS/98-240, art. 1.

**48.** Le syndic qui détient de l'argent ou d'autres biens en fiducie ou en fidéicommis :

*a*) se conforme aux lois, règlements et conditions applicables à la fiducie ou au fidéicommis;

*b*) sous réserve des lois, règlements et conditions applicables à la fiducie ou au fidéicommis, administre l'argent et les biens avec prudence et diligence.

DORS/98-240, art. 1.

**49.** Le syndic ne verse, ni directement ni indirectement, de commission, de rémunération ou d'autre avantage à un tiers en vue d'exercer une activité professionnelle et il n'accepte, ni directement ni indirectement, le versement par un tiers d'une commission, d'une rémunération ou de tout autre avantage pour lui avoir confié un travail lié à une activité professionnelle.

DORS/98-240, art. 1.

**50.** Le syndic n'accepte, ne sollicite ni n'exerce d'activité qui tendrait à discréditer la profession de syndic ou à compromettre l'intégrité du régime de la faillite et de l'insolvabilité.

DORS/98-240, art. 1.

**51.** Trustees shall not, directly or indirectly, advertise in a manner that

(*a*) they know, or should know, is false, misleading, materially incomplete or likely to induce error; or

(*b*) unfavourably reflects on the reputation or competence of another trustee or on the integrity of the bankruptcy and insolvency process.

SOR/98-240, s. 1.

**52.** Trustees, in the course of their professional engagements, shall apply due care to ensure that the actions carried out by their employees, agents or mandataries or any persons hired by the trustees on a contract basis are carried out in accordance with the same professional standards that those trustees themselves are required to follow in relation to that professional engagement.

SOR/98-240, s. 1; SOR/2007-61, s. 10(E).

**53.** Any complaint that relates to a contravention of any of sections 36 to 52 must be sent to the Division Office in writing.

SOR/98-240, s. 1.

### APPOINTMENT AND SUBSTITUTION OF TRUSTEES

**54.** A certificate of the official receiver, or a certified copy of it, is admissible in any proceeding under the Act as evidence of the appointment or substitution of a trustee, without proof of the authenticity of the signature or of the official character of the signatory.

SOR/98-240, s. 1; SOR/2007-61, s. 11(E).

**54.1 to 54.49** [Repealed, SOR/98-240, s. 1]

### DUTIES OF TRUSTEES

**55.** A trustee who is appointed pursuant to subsection 41(11) of the Act shall notify the Division Office of the appointment, in writing, within 10 days after the appointment.

SOR/98-240, s. 1.

**51.** Le syndic ne fait, ni directement ni indirectement :

*a*) de la publicité qu'il sait — ou devrait savoir — être fausse, trompeuse, substantiellement incomplète ou susceptible d'induire en erreur;

*b*) de la publicité qui porte atteinte à la réputation ou à la compétence d'un autre syndic ou à l'intégrité du régime de la faillite et de l'insolvabilité.

DORS/98-240, art. 1.

**52.** Dans toute activité professionnelle, le syndic veille avec prudence et diligence à ce que les actes accomplis par ses mandataires, ses employés ou toute personne engagée par lui à contrat respectent les mêmes normes professionnelles qu'il aurait lui-même à appliquer relativement à cette activité.

DORS/98-240, art. 1; DORS/2007-61, art. 10(A).

**53.** Les plaintes relatives à la violation d'un des articles 36 à 52 sont envoyées par écrit au bureau de division.

DORS/98-240, art. 1.

### NOMINATION ET SUBSTITUTION DU SYNDIC

**54.** Dans les procédures intentées sous le régime de la Loi, le certificat du séquestre officiel ou la copie certifiée conforme de celui-ci constitue une preuve admissible de la nomination ou de la substitution d'un syndic sans qu'il soit nécessaire de prouver l'authenticité de la signature ou la qualité officielle du signataire.

DORS/98-240, art. 1; DORS/2007-61, art. 11(A).

**54.1 à 54.49** [Abrogés, DORS/98-240, art. 1]

### ATTRIBUTIONS DU SYNDIC

**55.** Le syndic nommé conformément au paragraphe 41(11) de la Loi en avise le bureau de division par écrit dans les 10 jours suivant sa nomination.

DORS/98-240, art. 1.

**56.** A former trustee who is to pass the accounts before the court in accordance with subsection 36(1) of the Act shall make an application to the court and attach to it an affidavit in prescribed form, and shall send a notice in prescribed form, accompanied by a copy of the statement of receipts and disbursements, specifying the time and place set for passing the accounts, to the following persons:

(*a*) every creditor whose claim has been proved;

(*b*) the registrar;

(*c*) the bankrupt;

(*d*) the substituted trustee; and

(*e*) a representative of the Division Office.

However, the court may order that the notice is not required to be given to the persons referred to in paragraph (*a*).

SOR/92-579, s. 7; SOR/98-240, s. 1.

**57.** If a bankrupt who is being examined pursuant to subsection 161(1) of the Act cannot speak fluently in the official language in which the examination is being conducted, the trustee shall arrange for the services, at the examination, of an interpreter approved by the official receiver.

SOR/98-240, s. 1; SOR/2007-61, s. 63(E).

REMUNERATION OF TRUSTEES

**58.** (1) Unless the court orders otherwise, the remuneration of a trustee is deemed to take into account all services performed by the trustee and by the trustee's partners and employees.

(2) In taxing the accounts of a trustee pursuant to section 152 of the Act, the taxing officer shall tax disbursements at the rates provided by the tariff.

(3) A trustee's disbursements do not include the indirect costs of the trustee's facilities or premises.

(4) The expenses incurred by a trustee for the services of an interpreter referred to in section 57 and subsection 108(2) are calculated, at the time of taxation, at a rate that the taxing officer deems reasonable.

**56.** L'ancien syndic qui doit soumettre ses comptes au tribunal conformément au paragraphe 36(1) de la Loi lui présente une demande en ce sens accompagnée d'un affidavit en la forme prescrite et envoie un avis en la forme prescrite, accompagné d'une copie de l'état des recettes et des débours, indiquant les date, heure et lieu fixés pour la production des comptes, aux personnes suivantes :

*a*) les créanciers qui ont prouvé leur réclamation;

*b*) le registraire;

*c*) le failli;

*d*) le syndic substitué à l'ancien syndic;

*e*) un représentant du bureau de division.

Toutefois, le tribunal peut rendre une ordonnance dispensant de l'envoi d'un avis aux personnes visées à l'alinéa *a*).

DORS/92-579, art. 7; DORS/98-240, art. 1.

**57.** Lorsque le failli interrogé conformément au paragraphe 161(1) de la Loi ne parle pas couramment celle des langues officielles dans laquelle se déroule l'interrogatoire, le syndic retient pour l'interrogatoire les services d'un interprète agréé par le séquestre officiel.

DORS/98-240, art. 1; DORS/2007-61, art. 63(A).

RÉMUNÉRATION DU SYNDIC

**58.** (1) Sauf ordonnance contraire du tribunal, la rémunération du syndic est censée englober tous les services rendus par lui, ses associés et ses employés.

(2) Lors de la taxation des comptes du syndic conformément à l'article 152 de la Loi, le fonctionnaire taxateur taxe les débours aux taux prévus au tarif.

(3) Les débours du syndic ne peuvent comprendre les coûts indirects de ses installations et équipements.

(4) Les frais engagés par le syndic pour les services d'un interprète prévus à l'article 57 et au paragraphe 108(2) sont calculés, lors de la taxation, au taux que le fonctionnaire taxateur estime raisonnable.

(5) The taxing officer shall determine the disbursements for which the trustee is entitled to be repaid in accordance with this section.

SOR/98-240, s. 1; SOR/2005-284, s. 5; SOR/2009-218, s. 5.

**58.1** (1) For the purposes of section 156.1 of the Act, the amount required to be paid under the agreement must not be more than $1,800.

(2) Subject to section 136 of the Act, money from the estate of the bankrupt shall be applied to satisfy the amount to be paid under the agreement.

(3) The trustee shall provide the Superintendent and the bankrupt with a signed copy of the agreement immediately after it is entered into.

SOR/2009-218, s. 6.

## PRESCRIBED CIRCUMSTANCES FOR OPERATION OF PARAGRAPH 67(1)(*B.1*) OF ACT

**59.** (1) A goods and services tax credit payment is not comprised in the property of the bankrupt for the purpose of paragraph 67(1)(*b.1*) of the Act if a dividend is available to the creditors without taking that payment into account.

(2) If, in order for a dividend to be available to the creditors, it would be necessary to take into account all or part of a goods and services tax credit payment, the portion of that payment that is not comprised in the property of the bankrupt for the purpose of paragraph 67(1)(*b.1*) of the Act is the portion, if any, that would have been paid as a dividend to the creditors had all of the payment been comprised in the property of the bankrupt.

(3) For greater certainty, if no dividend would be available to the creditors even if a goods and services tax credit payment were taken into account, all of that payment is comprised in the property of the bankrupt for the purpose of paragraph 67(1)(*b.1*) of the Act.

SOR/98-240, s. 1.

(5) Le fonctionnaire taxateur qui établit le montant du remboursement auquel le syndic a droit pour ses débours le fait conformément au présent article.

DORS/98-240, art. 1; DORS/2005-284, art. 5; DORS/2009-218, art. 5.

**58.1** (1) Pour l'application de l'article 156.1 de la Loi, la somme dont l'accord prévoit le paiement n'excède pas 1 800 $.

(2) Sous réserve de l'article 136 de la Loi, les sommes qui se trouvent à l'actif de la faillite sont appliquées au paiement de la somme prévue à l'accord.

(3) Le syndic transmet au surintendant et au failli une copie signée de l'accord dès sa conclusion.

DORS/2009-218, art. 6.

## CIRCONSTANCES PRESCRITES POUR L'APPLICATION DE L'ALINÉA 67(1)*B.1* DE LA LOI

**59.** (1) Pour l'application de l'alinéa 67(1)*b.1*) de la Loi, le paiement au titre d'un crédit de la taxe sur les produits et services n'est pas compris dans les biens du failli si un dividende est payable aux créanciers sans qu'il faille prendre en compte ce paiement.

(2) Dans le cas où le versement d'un dividende aux créanciers nécessiterait la prise en compte de tout ou partie du paiement au titre d'un crédit de la taxe sur les produits et services, la partie de ce paiement qui n'est pas comprise dans les biens du failli pour l'application de l'alinéa 67(1)*b.1*) de la Loi est la partie qui serait versée aux créanciers à titre de dividende si la totalité du paiement était comprise dans les biens du failli.

(3) Il est entendu que dans le cas où aucun dividende ne serait payable aux créanciers même si le paiement au titre d'un crédit de la taxe sur les produits et services était pris en compte, la totalité du paiement est comprise dans les biens du failli pour l'application de l'alinéa 67(1)*b.1*) de la Loi.

DORS/98-240, art. 1.

## PRESCRIBED PENSION PLANS FOR OPERATION OF SUBSECTION 60(1.5) AND SECTIONS 81.5 AND 81.6 OF THE ACT

**59.1** A pension plan regulated by an Act of Parliament or of the legislature of a province is prescribed for the purposes of

(*a*) subsection 60(1.5) of the Act; and

(*b*) sections 81.5 and 81.6 of the Act.

SOR/2008-223, s. 1.

## PRESCRIBED PLAN FOR OPERATION OF PARAGRAPH 67(1)(*b.3*) OF THE ACT

**59.2** A deferred profit sharing plan, as defined in subsection 147(1) of the *Income Tax Act*, is prescribed for the purpose of paragraph 67(1)(*b.3*) of the Act.

SOR/2008-223, s. 1.

## TAXATION OF ACCOUNTS AND DISCHARGE OF TRUSTEE

### General

**60.** If, pursuant to subsection 152(4) of the Act, the Superintendent gives a letter of comment to the trustee, the trustee shall, within 30 days after receiving the letter, apply to the taxing officer for a date for a taxation hearing.

SOR/92-579, s. 9; SOR/98-240, s. 1; SOR/2007-61, s. 63(E).

**61.** (1) An application of a trustee for discharge must

(*a*) be made in prescribed form; and

(*b*) be accompanied by a copy of the notice of final dividend and application for discharge of trustee, a copy of the final statement of receipts and disbursements as taxed, both in prescribed form, and a dividend sheet.

(2) At the time of discharge, the trustee must satisfy the court that

(*a*) the statements made in connection with the discharge are true;

## RÉGIME DE PENSION PRESCRIT POUR L'APPLICATION DU PARAGRAPHE 60(1.5) ET DES ARTICLES 81.5 ET 81.6 DE LA LOI

**59.1** Tout régime de pension qui est régi par une loi fédérale ou provinciale est un régime de pension prescrit pour l'application des dispositions suivantes :

*a*) le paragraphe 60(1.5) de la Loi;

*b*) les articles 81.5 et 81.6 de la Loi.

DORS/2008-223, art. 1.

## RÉGIME PRESCRIT POUR L'APPLICATION DE L'ALINÉA 67(1)*b.3*) DE LA LOI

**59.2** Est un régime prescrit, pour l'application de l'alinéa 67(1)*b.3*) de la Loi, tout régime de participation différée aux bénéfices, au sens du paragraphe 147(1) de la *Loi de l'impôt sur le revenu*.

DORS/2008-223, art. 1.

## TAXATION DES COMPTES ET LIBÉRATION DU SYNDIC

### Dispositions générales

**60.** Lorsque le surintendant remet une lettre de commentaires au syndic conformément au paragraphe 152(4) de la Loi, celui-ci s'adresse au fonctionnaire taxateur, dans les 30 jours suivant la réception de la lettre, pour obtenir une date d'audition de la taxation.

DORS/92-579, art. 9; DORS/98-240, art. 1; DORS/2007-61, art. 63(A).

**61.** (1) La demande de libération du syndic :

*a*) est établie en la forme prescrite;

*b*) est accompagnée d'une copie de l'avis de dividende définitif et de demande de libération du syndic et d'une copie de l'état définitif des recettes et des débours taxés, lesquels sont en la forme prescrite, ainsi que du bordereau de dividende.

(2) Au moment de sa libération, le syndic démontre au tribunal qu'il a rempli les conditions suivantes :

*a*) les déclarations relatives à sa libération sont vraies;

(*b*) the final statement of receipts and disbursements is an accurate and correct statement of the administration of the estate, and has been approved by the inspectors and taxed by the court;

(*c*) [Repealed, SOR/2009-218, s. 7]

(*d*) all the property of the bankrupt for which the trustee was accountable has been sold, realized or disposed of in the manner described in the final statement of receipts and disbursements;

(*e*) every claim subject to a dividend was properly examined and that

(i) to the best of the trustee's knowledge, the dividend sheet presented to the court contains a true and correct list of the claims of creditors entitled to share in the estate,

(ii) all payments shown on the dividend sheet have been duly made, and

(iii) unclaimed dividends and undistributed funds have been forwarded to the Superintendent by the trustee in accordance with subsection 154(1) of the Act;

(*f*) the trustee has not received, does not expect to receive, and has not been promised, any remuneration or consideration other than as shown in the final statement of receipts and disbursements;

(*g*) the trustee has complied with subsection 170(2) of the Act; and

(*h*) the final statement of receipts and disbursements, the dividend sheet and the notice of application for discharge of trustee have been sent to the registrar, the Division Office, the bankrupt and every creditor whose claim has been proved.

SOR/98-240, s. 1; SOR/2005-284, s. 6(F); SOR/2009-218, s. 7.

## SUMMARY ADMINISTRATION

**62.** The trustee of the estate of a bankrupt under summary administration shall apply for taxation of the trustee's accounts and for the discharge of the trustee by sending to the Division Office

*b*) l'état définitif des recettes et des débours constitue un état exact et fidèle de l'administration de l'actif et a été approuvé par les inspecteurs et taxé par le tribunal;

*c*) [Abrogé, DORS/2009-218, art. 7]

*d*) les biens du failli dont il était responsable ont été vendus, réalisés ou disposés de la manière indiquée dans cet état;

*e*) les réclamations ayant fait l'objet d'un dividende ont été dûment examinées et :

(i) pour autant qu'il sache, le bordereau de dividende soumis au tribunal donne une liste véridique et fidèle des réclamations des créanciers ayant droit à une partie de l'actif,

(ii) les paiements mentionnés dans ce bordereau ont été dûment effectués,

(iii) il a fait parvenir les dividendes non réclamés et les fonds non distribués au surintendant conformément au paragraphe 154(1) de la Loi;

*f*) il n'a reçu ni ne compte recevoir et il ne lui a été promis aucune rémunération ou rétribution autre que celle figurant sur l'état définitif des recettes et des débours;

*g*) il s'est conformé au paragraphe 170(2) de la Loi;

*h*) l'état définitif des recettes et des débours, le bordereau de dividende et l'avis de demande de libération du syndic ont été envoyés au registraire, au bureau de division, au failli et à chaque créancier dont la réclamation a été prouvée.

DORS/98-240, art. 1; DORS/2005-284, art. 6(F); DORS/2009-218, art. 7.

## ADMINISTRATION SOMMAIRE

**62.** Le syndic de l'actif d'un failli, dans le cadre de l'administration sommaire de cet actif, demande la taxation de ses comptes et sa libération en envoyant au bureau de division les documents suivants :

(*a*) the trustee's final statement of receipts and disbursements, in prescribed form; and

(*b*) the dividend sheet, showing the dividends paid or to be paid to the creditors of the bankrupt.

(*c*) [Repealed, SOR/2009-218, s. 8]

SOR/98-240, s. 1; SOR/2007-61, s. 12(E); SOR/2009-218, s. 8.

**63.** The Superintendent shall examine all documents sent to the Division Office pursuant to section 62 and issue a letter of comment to the trustee, stating whether the Superintendent is requesting from the registrar the taxation of the trustee's accounts.

SOR/98-240, s. 1.

**64.** (1) If the Superintendent's letter of comment states that the Superintendent is not requesting the taxation of the trustee's accounts, the trustee shall, within 30 days after receipt of the letter of comment, send to each creditor who has proved a claim a notice of taxation of the trustee's accounts and discharge of the trustee, in prescribed form, attaching

(*a*) a copy of the trustee's final statement of receipts and disbursements;

(*b*) a copy of the dividend sheet, showing the dividends paid or to be paid to the creditors of the bankrupt; and

(*c*) the final dividend that is owed to the creditor, if the trustee is satisfied that no creditor will object to the taxation of the trustee's accounts and the discharge of the trustee.

(2) A creditor may, within 30 days after the day on which the notice referred to in subsection (1) is sent, object to the taxation of the trustee's accounts and the discharge of the trustee by

(*a*) serving a notice of objection on the trustee or sending a notice of objection to the trustee by registered mail or courier;

(*b*) filing a copy of the notice of objection with the registrar, along with any applicable fee provided by the tariff; and

*a*) l'état définitif des recettes et des débours, établi en la forme prescrite;

*b*) le bordereau de dividende indiquant les dividendes payés ou à payer aux créanciers du failli.

*c*) [Abrogé, DORS/2009-218, art. 8]

DORS/98-240, art. 1; DORS/2007-61, art. 12(A); DORS/2009-218, art. 8.

**63.** Le surintendant examine les documents envoyés au bureau de division conformément à l'article 62 et remet au syndic une lettre de commentaires indiquant s'il demande ou non au registraire la taxation des comptes du syndic.

DORS/98-240, art. 1.

**64.** (1) Si la lettre de commentaires du surintendant indique qu'il ne demande pas la taxation des comptes du syndic, celui-ci envoie, dans les 30 jours suivant la réception de la lettre, aux créanciers qui ont prouvé leur réclamation, un avis de la taxation de ses comptes et de sa libération, établi en la forme prescrite et accompagné de ce qui suit :

*a*) une copie de son état définitif des recettes et des débours;

*b*) une copie du bordereau de dividende indiquant les dividendes payés ou à payer aux créanciers du failli;

*c*) le dividende définitif qui revient au créancier, si le syndic est convaincu qu'il n'y aura pas d'opposition de la part des créanciers à la taxation de ses comptes et à sa libération.

(2) Tout créancier peut s'opposer à la taxation des comptes et à la libération du syndic en prenant les mesures suivantes dans les 30 jours suivant la date d'envoi de l'avis visé au paragraphe (1) :

*a*) il signifie au syndic ou lui envoie par courrier recommandé ou par service de messagerie un avis d'opposition;

*b*) il dépose auprès du registraire une copie de l'avis d'opposition accompagnée d'un paiement représentant les frais applicables selon le tarif;

(*c*) sending a copy of the notice of objection to the Division Office.

SOR/81-646, s. 4; SOR/92-579, s. 11(F); SOR/98-240, s. 1; SOR/2007-61, s. 63(E).

**64.1 to 64.6** [Repealed, SOR/98-240, s. 1]

**65.** (1) If a trustee receives no notice of objection within the time limit set out in subsection 64(2), the trustee shall

(*a*) at the expiration of that time limit, take the trustee's fee;

(*b*) at the expiration of that time limit, if the trustee has not already done so, send a final dividend to each creditor to whom one is owed; and

(*c*) within three months after the day on which the notice referred to in subsection 64(1) is sent,

(i) close the bank account used in administering the estate of the bankrupt, if that account is not a consolidated account, or, if the account is a consolidated account, ensure that all estate funds have been withdrawn from it,

(ii) remit any unclaimed dividends and undistributed funds to the Superintendent, and

(iii) send to the Division Office a certificate of compliance and deemed discharge, in prescribed form.

(2) A trustee is deemed to be discharged on meeting the requirements of paragraphs (1)(*b*) and (*c*).

(3) If a trustee receives a notice of objection within the time limit set out in subsection 64(2), the trustee shall

(*a*) [Repealed, SOR/2009-218, s. 9]

(*b*) obtain a hearing date from the registrar; and

(*c*) within 30 days after the day on which the notice of objection is received, send the objecting creditor a notice of hearing, which notice must be sent at least 30 days before the date of the hearing and must be in prescribed form.

SOR/81-646, s. 4; SOR/98-240, s. 1; SOR/2007-61, s. 63(E); SOR/2009-218, s. 9.

*c*) il envoie une copie de l'avis d'opposition au bureau de division.

DORS/81-646, art. 4; DORS/92-579, art. 11(F); DORS/98-240, art. 1; DORS/2007-61, art 63(A).

**64.1 à 64.6** [Abrogés, DORS/98-240, art. 1]

**65.** (1) Si le syndic ne reçoit aucun avis d'opposition dans le délai prévu au paragraphe 64(2), il prend les mesures suivantes :

*a*) à l'expiration du délai, il prélève ses honoraires;

*b*) à l'expiration du délai, s'il ne l'a pas déjà fait, il envoie à chaque créancier qui y a droit son dividende définitif;

*c*) dans les trois mois suivant la date d'envoi de l'avis visé au paragraphe 64(1), il prend les mesures suivantes :

(i) il ferme le compte en banque ayant servi à l'administration de l'actif du failli s'il ne s'agit pas d'un compte consolidé ou, dans le cas contraire, il vérifie que tous les fonds de l'actif du failli ont été retirés du compte consolidé,

(ii) il remet au surintendant les dividendes non réclamés et les fonds non distribués,

(iii) il envoie au bureau de division un certificat de conformité et de libération présumée, établi en la forme prescrite.

(2) Le syndic est réputé libéré dès qu'il a pris les mesures visées aux alinéas (1)*b*) et *c*).

(3) Si le syndic reçoit un avis d'opposition dans le délai prévu au paragraphe 64(2) :

*a*) [Abrogé, DORS/2009-218, art. 9]

*b*) il obtient du registraire une date d'audition;

*c*) dans les 30 jours suivant la date de réception de l'avis d'opposition, il envoie au créancier qui s'oppose un avis d'audition. Cet avis, établi en la forme prescrite, est envoyé au moins 30 jours avant la date d'audition.

DORS/81-646, art. 4; DORS/98-240, art. 1; DORS/2007-61, art. 63(A); DORS/2009-218, art. 9.

**66.** (1) If the Superintendent issues a letter of comment pursuant to section 63 requesting the taxation of a trustee's accounts, the trustee shall, after obtaining a hearing date from the registrar and within 30 days after the day of receipt of the letter of comment, send to each creditor who has proved a claim and to the Division Office

(*a*) a notice of hearing for the taxation of the trustee's accounts and the discharge of the trustee, in prescribed form, which notice must be sent at least 30 days before the date of the hearing;

(*b*) a copy of the trustee's final statement of receipts and disbursements; and

(*c*) a copy of the dividend sheet, showing the dividends paid or to be paid to the creditors of the bankrupt.

(2) A creditor may object to the taxation of the trustee's accounts and discharge of the trustee by

(*a*) serving a notice of objection on the trustee or sending a notice of objection to the trustee by registered mail or courier, which notice of objection must be received by the trustee before the start of the hearing;

(*b*) filing a copy of the notice of objection with the registrar, along with any applicable fee provided by the tariff; and

(*c*) sending a copy of the notice of objection to the Division Office.

SOR/98-240, s. 1; SOR/2007-61, s. 63(E).

**67.** (1) At the time of the hearing, the registrar shall consider the creditors' objections and the letter of comment issued by the Superintendent, and shall tax the trustee's accounts accordingly.

(2) If the registrar taxes a trustee's accounts as submitted, the trustee shall

(*a*) take the trustee's fee as taxed;

(*b*) send a final dividend to each creditor to whom one is owed; and

**66.** (1) Si le surintendant remet, conformément à l'article 63, une lettre de commentaires indiquant qu'il demande la taxation des comptes du syndic, celui-ci, après avoir obtenu une date d'audition du registraire, envoie dans les 30 jours suivant la date de réception de la lettre les documents suivants aux créanciers qui ont prouvé leur réclamation et au bureau de division :

*a*) un avis d'audition de la taxation de ses comptes et de sa demande de libération, établi en la forme prescrite; cet avis est envoyé au moins 30 jours avant la date d'audition;

*b*) une copie de son état définitif des recettes et des débours;

*c*) une copie du bordereau de dividende indiquant les dividendes payés ou à payer aux créanciers du failli.

(2) Tout créancier peut s'opposer à la taxation des comptes et à la libération du syndic en prenant les mesures suivantes :

*a*) il signifie au syndic ou lui envoie par courrier recommandé ou par service de messagerie un avis d'opposition qui doit lui parvenir avant le début de l'audition;

*b*) il dépose auprès du registraire une copie de l'avis d'opposition accompagnée d'un paiement représentant les frais applicables selon le tarif;

*c*) il envoie une copie de l'avis d'opposition au bureau de division.

DORS/98-240, art. 1; DORS/2007-61, art. 63(A).

**67.** (1) Lors de l'audition, le registraire taxe les comptes du syndic en tenant compte des oppositions des créanciers et de la lettre de commentaires du surintendant.

(2) Si le registraire taxe les comptes du syndic tels qu'ils ont été soumis, le syndic prend les mesures suivantes :

*a*) il prélève ses honoraires tels qu'ils ont été taxés;

*b*) il envoie à chaque créancier qui y a droit son dividende définitif;

(*c*) within two months after the date of the taxation order,

    (i)  close the bank account used in administering the estate of the bankrupt, if that account is not a consolidated account, or, if the account is a consolidated account, ensure that all estate funds have been withdrawn from it,

    (ii)  remit any unclaimed dividends and undistributed funds to the Superintendent, and

    (iii)  send to the Division Office a certificate of compliance and deemed discharge, in prescribed form.

(3)  A trustee is deemed to be discharged on meeting the requirements of paragraphs (2)(*b*) and (*c*).

(4)  If the registrar taxes a trustee's accounts otherwise than as submitted, the trustee shall

(*a*)  take the trustee's fee as taxed;

(*b*)  send a final dividend to each creditor to whom one is owed, in accordance with the taxation order; and

(*c*)  within two months after the date of the taxation order,

    (i)  close the bank account used in administering the estate of the bankrupt if that account is not a consolidated account or, if the account is a consolidated account, ensure that all estate funds have been withdrawn from it,

    (ii)  remit any unclaimed dividends and undistributed funds to the Superintendent,

    (iii)  send to the Division Office and to each creditor a revised final statement of receipts and disbursements, a revised dividend sheet and a copy of the taxation order, and

    (iv)  send to the Division Office and to the registrar a certificate of compliance and deemed discharge, in prescribed form.

*c*)  il prend les mesures suivantes dans les deux mois suivant la date de l'ordonnance de taxation :

    (i)  il ferme le compte en banque ayant servi à l'administration de l'actif du failli s'il ne s'agit pas d'un compte consolidé ou, dans le cas contraire, il vérifie que tous les fonds de l'actif du failli ont été retirés du compte consolidé,

    (ii)  il remet au surintendant les dividendes non réclamés et les fonds non distribués,

    (iii)  il envoie au bureau de division un certificat de conformité et de libération présumée, établi en la forme prescrite.

(3)  Le syndic est réputé libéré dès qu'il a pris les mesures visées aux alinéas (2)*b*) et *c*).

(4)  Si le registraire taxe les comptes du syndic autrement que dans l'état où ils ont été soumis, le syndic prend les mesures suivantes :

*a*)  il prélève ses honoraires tels qu'ils ont été taxés;

*b*)  il envoie à chaque créancier qui y a droit son dividende définitif, selon ce que prévoit l'ordonnance de taxation;

*c*)  il prend les mesures suivantes dans les deux mois suivant la date de l'ordonnance de taxation :

    (i)  il ferme le compte en banque ayant servi à l'administration de l'actif du failli s'il ne s'agit pas d'un compte consolidé ou, dans le cas contraire, il vérifie que tous les fonds de l'actif du failli ont été retirés du compte consolidé,

    (ii)  il remet au surintendant les dividendes non réclamés et les fonds non distribués,

    (iii)  il envoie au bureau de division et à chaque créancier l'état définitif révisé des recettes et des débours, le bordereau de dividende révisé et une copie de l'ordonnance de taxation,

    (iv)  il envoie au bureau de division et au registraire un certificat de conformité et de libération présumée, établi en la forme prescrite.

(5) A trustee is deemed to be discharged on meeting the requirements of paragraphs (4)(*b*) and (*c*).

SOR/98-240, s. 1; SOR/2007-61, s. 63(E).

### BOOKS, RECORDS AND DOCUMENTS

**68.** (1) Unless the court orders otherwise, a trustee shall keep, for at least four years after the date of the trustee's discharge, the books, records and documents relating to the administration of that estate.

(2) Unless the court orders otherwise, the trustee shall, after being discharged, send to the latest known address of the debtor, bankrupt or officer of the bankrupt corporation, a written notice, unless there is a written waiver giving up the right to be notified, that they or their representative may, within the 30 days following the sending of the notice, take back any of the debtor's or bankrupt's books, records and documents to which subsection (1) does not apply.

(3) If no person has taken back the books, records and documents within 30 days after the sending of the notice or the giving of the waiver referred to in subsection (2), the trustee may dispose of them.

(4) Documents on which legal counsel has a lien or a right of retention shall be returned to the legal counsel on completion of the administration of the estate to which the documents relate.

SOR/98-240, s. 1; SOR/2007-61, ss. 13, 63(E).

### APPLICATION FOR BANKRUPTCY ORDER

[SOR/2007-61, s. 14]

**69.** No bankruptcy application filed with the registrar in the judicial district of the locality of the debtor may be served pursuant to subsection 70(1) unless the court has signed it and affixed to it the seal of the court.

SOR/98-240, s. 1; SOR/2007-61, s. 64.

**70.** (1) A notice indicating the time and place of the hearing of the bankruptcy application, together with a certified copy of the application and of the affidavit referred to in subsection 43(3) of the Act, must be served on the debtor, on the trustee named in the application

(5) Le syndic est réputé libéré dès qu'il a pris les mesures visées aux alinéas (4)*b*) et *c*).

DORS/98-240, art. 1; DORS/2007-61, art. 63(A).

### LIVRES, REGISTRES ET DOCUMENTS

**68.** (1) Sauf ordonnance contraire du tribunal, le syndic conserve pendant au moins les quatre ans suivant la date de sa libération les livres, registres et documents concernant l'administration de l'actif.

(2) Sauf ordonnance contraire du tribunal, le syndic envoie après sa libération un avis écrit au débiteur, au failli ou à un dirigeant de la personne morale en faillite — à moins d'avoir reçu une renonciation écrite à l'avis — à sa dernière adresse connue, l'informant que lui ou son représentant peut, dans les trente jours suivant l'envoi de l'avis, reprendre les livres, registres et documents lui appartenant qui ne sont pas visés par le paragraphe (1).

(3) Si personne ne reprend ces livres, registres et documents dans les 30 jours suivant l'envoi de l'avis ou la réception de la renonciation mentionnés au paragraphe (2), le syndic peut s'en départir.

(4) Les documents sur lesquels le conseiller juridique a un droit de rétention ou un privilège lui sont remis après que l'administration de l'actif auquel ils se rapportent est terminée.

DORS/98-240, art. 1; DORS/2007-61, art. 13 et 63(A).

### REQUÊTE EN FAILLITE

[DORS/2007-61, art. 14]

**69.** Une requête en faillite déposée auprès du registraire dans le district judiciaire de la localité du débiteur ne peut être signifiée selon le paragraphe 70(1) que si elle porte la signature et le sceau du tribunal.

DORS/98-240, art. 1; DORS/2007-61, art. 64.

**70.** (1) Un avis indiquant les date, heure et lieu de l'audition de la requête en faillite ainsi qu'une copie certifiée conforme de cette requête et de l'affidavit visé au paragraphe 43(3) de la Loi sont signifiés au débiteur, au syndic nommé dans la requête et au bureau de division

and on the Division Office at least 10 days, or any shorter period that the court may order, before the hearing.

(2) After service of an application in accordance with this section, a copy of that application must immediately be filed at the office of the registrar.

(3) Subject to section 71, service on the debtor under subsection (1) must be effected by personal service.

(4) For the purposes of paragraph 256(3)(*c*) of the Act, the interval is 10 days.

SOR/98-240, s. 1; SOR/2007-61, s. 15; SOR/2009-218, s. 10.

**71.** (1) If the court determines that service of documents cannot, for cause, be effected by personal service as required by subsection 70(3), the court shall make an order stating the manner of service of the documents.

(2) As soon as an order is made pursuant to subsection (1), the documents shall be served together with the order.

SOR/98-240, s. 1; SOR/2007-61, s. 63(E).

**72.** Service of a bankruptcy application must be proved by affidavit or bailiff's return of service, attached to the original application and filed with the court at least two days before the date of the hearing set out in the application.

SOR/98-240, s. 1; SOR/2007-61, s. 16.

**73.** In the case of a deceased debtor, service of a bankruptcy application must be effected on the executor or administrator of the estate or the liquidator of the deceased debtor's succession.

SOR/98-240, s. 1; SOR/2007-61, s. 16.

**74.** A debtor who contests a bankruptcy application shall file with the court in which the application was filed a notice setting out the contested allegations contained in the application, the grounds for contesting them and the debtor's address, and shall serve a copy of the notice on the applicant or their barrister or solicitor or, in the Province of Quebec, their advocate, at least two days before the date of the hearing set out in the application.

SOR/98-240, s. 1; SOR/2007-61, s. 16.

au moins dix jours avant l'audition, ou dans le délai plus court fixé par le tribunal.

(2) Une fois la requête signifiée conformément au présent article, une copie en est déposée sans délai au bureau du registraire.

(3) Sous réserve de l'article 71, la signification au débiteur se fait par signification à personne.

(4) Pour l'application du paragraphe 256(3) de la Loi, la période prescrite est de 10 jours.

DORS/98-240, art. 1; DORS/2007-61, art. 15; DORS/2009-218, art. 10.

**71.** (1) Lorsque le tribunal estime que les documents ne peuvent être signifiés à personne au débiteur pour un motif valable, il rend une ordonnance indiquant la manière de les signifier.

(2) Les documents sont dès lors signifiés, accompagnés de l'ordonnance.

DORS/98-240, art. 1; DORS/2007-61, art. 63(A).

**72.** La preuve de la signification d'une requête en faillite est établie par un affidavit ou par le procès-verbal de signification de l'huissier. Cette preuve, jointe à la requête originale, est déposée auprès du tribunal au moins deux jours avant la date d'audition indiquée dans la requête.

DORS/98-240, art. 1; DORS/2007-61, art. 16.

**73.** En cas de décès du débiteur, la signification de la requête en faillite peut être faite au liquidateur ou à l'administrateur de sa succession ou à son exécuteur testamentaire.

DORS/98-240, art. 1; DORS/2007-61, art. 16.

**74.** Le débiteur qui conteste une requête en faillite dépose auprès du tribunal où celle-ci a été déposée un avis indiquant les allégations contestées, les motifs de sa contestation et son adresse; il en signifie copie au requérant ou à son avocat, au moins deux jours avant la date d'audition indiquée dans la requête.

DORS/98-240, art. 1; DORS/2007-61, art. 16.

**75.** If a debtor who has filed a notice under section 74 does not appear at the hearing of the bankruptcy application, the court may make a bankruptcy order based on the allegations contained in the application if the court considers those allegations to be sufficient.

SOR/92-579, s. 13; SOR/98-240, s. 1; SOR/2007-61, s. 16.

**76.** If the hearing of a bankruptcy application has been stayed for the trial of an issue in dispute on a question of fact, the registrar shall, as soon as the issue has been determined, on the application of the debtor or the applicant, fix a time and place for the resumption of the hearing, and the party who makes the application shall give the other party at least two days' notice of the time and place fixed by the registrar.

SOR/98-240, s. 1; SOR/2007-61, s. 16.

**76.1 to 76.4**  [Repealed, SOR/98-240, s. 1]

### INTERIM RECEIVER

**77.**  [Repealed, SOR/2009-218, s. 11]

**78.** If a bankruptcy application is dismissed, the court may, on application presented within 30 days after the day of the dismissal, give judgment with respect to any claim for damages, or with respect to any claim other than a claim for damages arising out of the appointment of an interim receiver, and may make any orders that the court sees fit.

SOR/98-240, s. 1; SOR/2007-61, s. 17.

**79.** (1) An interim receiver shall apply to the court for taxation of accounts and discharge within two months after completion of the interim receiver's duties, after giving notice to

(*a*) the debtor, or in the case of a bankruptcy, the trustee;

(*b*) every creditor; and

(*c*) the Division Office.

(2) The notice referred to in subsection (1) must

(*a*) be in prescribed form; and

**75.** Si le débiteur qui a déposé un avis de contestation ne se présente pas à l'audition de la requête en faillite, le tribunal peut rendre l'ordonnance de faillite en se fondant sur les allégations contenues dans la requête s'il les juge suffisantes.

DORS/92-579, art. 13; DORS/98-240, art. 1; DORS/2007-61, art. 16.

**76.** Si l'audition de la requête en faillite a été suspendue pour l'instruction d'un litige sur une question de fait, dès que la décision est rendue, le registraire, sur demande du débiteur ou du requérant, fixe les date, heure et lieu de la reprise de l'audition. La partie ayant fait la demande donne à l'autre partie un préavis d'au moins deux jours des date, heure et lieu fixés par le registraire.

DORS/98-240, art. 1; DORS/2007-61, art. 16.

**76.1 à 76.4**  [Abrogés, DORS/98-240, art. 1]

### SÉQUESTRE INTÉRIMAIRE

**77.**  [Abrogé, DORS/2009-218, art. 11]

**78.** En cas de rejet de la requête en faillite, le tribunal peut, sur demande présentée dans les trente jours suivant celui du rejet, rendre son jugement à l'égard de toute réclamation en dommages-intérêts ou de toute autre réclamation, autre qu'en dommages-intérêts, découlant de la nomination d'un séquestre intérimaire et rendre toute autre ordonnance qu'il juge indiquée.

DORS/98-240, art. 1; DORS/2007-61, art. 17.

**79.** (1) Le séquestre intérimaire demande la taxation de ses comptes et sa libération au tribunal dans les deux mois suivant la fin de son mandat, après en avoir donné avis aux personnes suivantes :

*a*) le débiteur ou, dans le cas d'une faillite, le syndic;

*b*) les créanciers;

*c*) le bureau de division.

(2) Cet avis est :

*a*) établi en la forme prescrite;

(*b*) have attached to it a copy of the interim receiver's statement of receipts and disbursements, in prescribed form and stating

(i) the number of hours spent, the tasks performed, the hourly rates and other factors for consideration in the calculation of fees, and

(ii) the expenses incurred by the interim receiver, attaching a copy of any bills of costs for legal services.

SOR/98-240, s. 1.

**80.** A person referred to in paragraph 79(1)(*a*) or (*b*) may object to the taxation of the accounts and discharge of the interim receiver by filing a notice of objection with the court within 30 days after the giving of the notice referred to in subsection 79(1).

SOR/98-240, s. 1.

**81.** If no objection is filed within 30 days after the giving of the notice referred to in subsection 79(1), the interim receiver's accounts are deemed to have been taxed and the interim receiver is deemed to be discharged, unless the court requires that the accounts be taxed on their own merit.

SOR/92-579, s. 15; SOR/98-240, s. 1; SOR/2007-61, s. 63(E).

**82.** (1) If an objection is filed within 30 days after the giving of the notice referred to in subsection 79(1), the interim receiver shall, within 10 days after the filing of the objection, apply to the court for a date for a hearing, and shall send a notice of the date of the hearing to the objecting party.

(2) The court, at the hearing, shall tax the interim receiver's accounts on their own merit and may discharge the interim receiver, who shall send the Division Office a copy of the court order relating to the taxation and discharge.

SOR/78-389, s. 3; SOR/92-579, s. 15; SOR/98-240, s. 1; SOR/2007-61, s. 63(E).

**82.1** [Repealed, SOR/98-240, s. 1]

*b*) accompagné d'une copie de l'état des recettes et des débours du séquestre intérimaire, établi en la forme prescrite et indiquant :

(i) le nombre d'heures travaillées, les tâches accomplies, les taux horaires et les autres éléments à considérer dans le calcul des honoraires,

(ii) la liste des dépenses engagées par lui, accompagnée d'une copie des mémoires de frais pour services juridiques.

DORS/98-240, art. 1.

**80.** Toute personne visée aux alinéas 79(1)*a*) ou *b*) peut s'opposer à la taxation des comptes et à la libération du séquestre intérimaire en déposant un avis d'opposition auprès du tribunal dans les 30 jours suivant l'envoi de l'avis visé au paragraphe 79(1).

DORS/98-240, art. 1.

**81.** Lorsqu'aucune opposition n'est déposée dans les 30 jours suivant l'envoi de l'avis visé au paragraphe 79(1), les comptes du séquestre intérimaire sont réputés taxés et celui-ci est réputé libéré, à moins que le tribunal n'exige que les comptes soient taxés au mérite.

DORS/92-579, art. 15; DORS/98-240, art. 1; DORS/2007-61, art. 63(A).

**82.** (1) Lorsqu'une opposition est déposée dans les 30 jours suivant l'envoi de l'avis visé au paragraphe 79(1), le séquestre intérimaire demande au tribunal, dans les 10 jours suivant le dépôt de l'opposition, de fixer une date d'audition et envoie un avis de cette date à la partie qui s'oppose.

(2) Lors de l'audition, le tribunal procède à la taxation au mérite des comptes du séquestre intérimaire et peut libérer celui-ci. Le séquestre intérimaire envoie alors au bureau de division une copie de l'ordonnance du tribunal portant sur la taxation de ses comptes et sa libération.

DORS/78-389, art. 3; DORS/92-579, art. 15; DORS/98-240, art. 1; DORS/2007-61, art. 63(A).

**82.1** [Abrogé, DORS/98-240, art. 1]

*C.R.C., c. 368 — April 16, 2014*

## BANKRUPTCY ORDERS

**83.** (1) The applicant shall, as soon as possible and not later than two days after a bankruptcy order is made under subsection 43(6) of the Act, serve, deliver personally or send by courier, facsimile or electronic transmission a copy of the order to the trustee appointed under subsection 43(9) of the Act.

(2) Within two days after receiving the copy of the bankruptcy order, the trustee shall serve a copy of the order on the bankrupt and send a copy to the Division Office.

SOR/98-240, s. 1; SOR/2007-61, s. 18.

**84.** (1) An application to revoke a bankruptcy order or to stay proceedings may be made to the court if a notice of the application, together with copies of supporting affidavits, is served on the applicant and the trustee and is filed with the Division Office.

(2) Pending the hearing of the application mentioned in subsection (1), the court may make an interim order staying the whole or any part of the proceedings.

SOR/98-240, s. 1; SOR/2007-61, s. 19.

**84.1 to 84.8** [Repealed, SOR/98-240, s. 1]

## ASSIGNMENTS

**85.** An official receiver shall, on appointing a trustee pursuant to subsection 49(4) of the Act, prepare a certificate of appointment, in prescribed form, and send a copy of it to the trustee.

SOR/98-240, s. 1.

**86.** On receiving from a bankrupt a statement of affairs described in paragraph 158(*d*) of the Act, a trustee shall file a copy of it at the office of the official receiver.

SOR/98-240, s. 1.

**86.1 to 86.4** [Repealed, SOR/98-240, s. 1]

**87.** The court may order the trustee to file with the court, before or immediately after the first meeting of the creditors, a copy of the following documents:

## ORDONNANCE DE FAILLITE

**83.** (1) Le plus tôt possible dans les deux jours suivant la date où l'ordonnance de faillite est rendue en vertu du paragraphe 43(6) de la Loi, le requérant signifie, remet en mains propres ou envoie par service de messagerie, par télécopieur ou par transmission électronique une copie de l'ordonnance de faillite au syndic nommé aux termes du paragraphe 43(9) de la Loi.

(2) Dans les deux jours suivant la réception d'une copie de l'ordonnance de faillite, le syndic en signifie une copie au failli et en envoie une autre au bureau de division.

DORS/98-240, art. 1; DORS/2007-61, art. 18.

**84.** (1) Une demande de révocation de l'ordonnance de faillite ou de suspension des procédures peut être présentée au tribunal, si un avis à cet effet, accompagné d'une copie des affidavits à l'appui de la demande, est signifié au requérant et au syndic et est déposé au bureau de division.

(2) En attendant l'instruction de la demande de révocation, le tribunal peut rendre une ordonnance intérimaire suspendant tout ou partie des procédures.

DORS/98-240, art. 1; DORS/2007-61, art. 19.

**84.1 à 84.8** [Abrogés, DORS/98-240, art. 1]

## CESSION

**85.** Dès la nomination d'un syndic aux termes du paragraphe 49(4) de la Loi, le séquestre officiel établit le certificat de nomination en la forme prescrite et en envoie une copie au syndic.

DORS/98-240, art. 1.

**86.** Dès que le syndic reçoit le bilan du failli visé à l'alinéa 158*d*) de la Loi, il en dépose une copie au bureau du séquestre officiel.

DORS/98-240, art. 1.

**86.1 à 86.4** [Abrogés, DORS/98-240, art. 1]

**87.** Le tribunal peut ordonner au syndic de déposer auprès du tribunal, avant la première assemblée des créanciers ou aussitôt après celle-ci, une copie des documents suivants :

*C.R.C., ch. 368 — 16 avril 2014*

(*a*) the assignment that was filed with the official receiver;

(*b*) the statement of affairs that was filed with the official receiver; and

(*c*) the minutes of the first meeting of creditors.

SOR/92-579, s. 20; SOR/98-240, s. 1; SOR/2007-61, s. 20(E); SOR/2009-218, s. 12.

**87.01 to 87.18** [Repealed, SOR/98-240, s. 1]

**88.** (1) An application to annul an assignment may be made to the court if a notice of the application, together with copies of supporting affidavits, is served on the trustee, on the Division Office, and also on the bankrupt if the application is made by a person other than the bankrupt.

(2) Pending the hearing of the application mentioned in subsection (1), the court may make an interim order staying the whole or any part of the proceedings.

SOR/98-240, s. 1.

**88.1** [Repealed, SOR/98-240, s. 1]

PROPOSALS

**89.** If a trustee has received a proposal made under subsection 50(1) of the Act, the trustee shall file a copy of it with the official receiver.

SOR/98-240, s. 1; SOR/2007-61, s. 63(E).

**90.** (1) As soon as the following documents are filed with the official receiver, the trustee shall file a copy of them with the court:

(*a*) the proposal;

(*b*) the cash-flow statement, the report on the reasonableness of the cash-flow statement and the report containing the representations by the insolvent person, required by paragraphs 50(6)*a*), (*b*) and (*c*), respectively, of the Act;

(*c*) the material adverse change report required by subparagraph 50(10)(*a*)(i) of the Act;

(*d*) the report on the state of the insolvent person's business and financial affairs required by paragraph 50(10)(*b*) of the Act;

*a*) la cession déposée auprès du séquestre officiel;

*b*) le bilan déposé auprès du séquestre officiel;

*c*) le procès-verbal de la première assemblée des créanciers.

DORS/92-579, art. 20; DORS/98-240, art. 1; DORS/2007-61, art. 20(A); DORS/2009-218, art. 12.

**87.01 à 87.18** [Abrogés, DORS/98-240, art. 1]

**88.** (1) Une demande d'annulation de la cession peut être présentée au tribunal si un avis à cet effet, accompagné d'une copie des affidavits à l'appui de la demande, est signifié au syndic, au bureau de division ainsi qu'au failli dans le cas où il n'est pas l'auteur de la demande.

(2) En attendant l'instruction de la demande d'annulation, le tribunal peut rendre une ordonnance intérimaire suspendant tout ou partie des procédures.

DORS/98-240, art. 1.

**88.1** [Abrogé, DORS/98-240, art. 1]

PROPOSITIONS CONCORDATAIRES

**89.** Lorsque le syndic reçoit une proposition visée au paragraphe 50(1) de la Loi, il en dépose une copie auprès du séquestre officiel.

DORS/98-240, art. 1; DORS/2007-61, art. 63(A).

**90.** (1) Dès que les documents suivants sont déposés auprès du séquestre officiel, le syndic en dépose une copie auprès du tribunal :

*a*) la proposition;

*b*) l'état de l'évolution de l'encaisse, le rapport sur le caractère raisonnable de l'état de l'évolution de l'encaisse et le rapport contenant les observations de la personne insolvable, visés respectivement aux alinéas 50(6)*a*), *b*) et *c*) de la Loi;

*c*) le rapport sur le changement négatif important, visé au sous-alinéa 50(10)*a*)(i) de la Loi;

*d*) le rapport sur l'état des affaires et des finances de la personne insolvable, visé à l'alinéa 50(10)*b*) de la Loi;

(*e*) the notice of intention referred to in subsection 50.4(1) of the Act;

(*f*) the cash-flow statement required by paragraph 50.4(2)(*a*) of the Act;

(*g*) the report on the reasonableness of the cash-flow statement, required by paragraph 50.4(2)(*b*) of the Act;

(*h*) the report containing the representations by the insolvent person required by paragraph 50.4(2)(*c*) of the Act;

(*i*) the material adverse change report required by subparagraph 50.4(7)(*b*)(i) of the Act; and

(*j*) the notice of the meeting of creditors required by paragraph 51(1)(*a*) of the Act.

(2) For the purposes of paragraphs 50(6)(*c*) and 50.4(2)(*c*) of the Act, the representations are as follows:

The hypothetical assumptions are reasonable and consistent with the purpose of the projection described in Note ........, and the probable assumptions are suitably supported and consistent with the plans of the insolvent person and provide a reasonable basis for the projection. All such assumptions are disclosed in Notes ........

Since the projection is based on assumptions regarding future events, actual results will vary from the information presented, and the variations may be material.

The projection has been prepared solely for the purpose described in Note ........, using a set of probable and hypothetical assumptions set out in Notes ........ Consequently, readers are cautioned that it may not be appropriate for other purposes.

SOR/98-240, s. 1.

**91.** For the purposes of section 53 of the Act, the manner in which a creditor who has proved a claim may indicate to the trustee assent to or dissent from the proposal is by personal delivery, by mail, by facsimile or by electronic transmission.

SOR/92-579, s. 23; SOR/98-240, s. 1.

*e*) l'avis d'intention visé au paragraphe 50.4(1) de la Loi;

*f*) l'état de l'évolution de l'encaisse, visé à l'alinéa 50.4(2)*a*) de la Loi;

*g*) le rapport sur le caractère raisonnable de l'état de l'évolution de l'encaisse, visé à l'alinéa 50.4(2)*b*) de la Loi;

*h*) le rapport contenant les observations de la personne insolvable, visé à l'alinéa 50.4(2)*c*) de la Loi;

*i*) le rapport sur le changement négatif important, visé au sous-alinéa 50.4(7)*b*)(i) de la Loi;

*j*) l'avis de convocation d'une assemblée des créanciers, visé à l'alinéa 51(1)*a*) de la Loi.

(2) Les observations prescrites pour l'application des alinéas 50(6)*c*) et 50.4(2)*c*) de la Loi sont les suivantes :

Les hypothèses conjecturales utilisées sont raisonnables et cadrent avec l'objet des projections mentionné dans la note ........, et les hypothèses probables sont convenablement étayées, cadrent avec les projets de la personne insolvable et constituent un fondement raisonnable pour les projections. Toutes ces hypothèses sont énoncées dans les notes ........

Puisque les projections sont fondées sur des hypothèses concernant des événements à venir, les résultats réels différeront des renseignements présentés, et les écarts peuvent être importants.

Les projections ont été établies exclusivement aux fins mentionnées dans la note ........, à partir d'un ensemble d'hypothèses probables et conjecturales énoncées dans les notes ........ En conséquence, il est à signaler que les projections peuvent ne pas convenir à d'autres fins.

DORS/98-240, art. 1.

**91.** Pour l'application de l'article 53 de la Loi, le créancier qui a prouvé une réclamation indique au syndic son approbation ou sa désapprobation de la proposition par un message en ce sens remis en mains propres ou en-

*C.R.C., ch. 368 — 16 avril 2014*

voyé par courrier, par télécopieur ou par transmission électronique.

DORS/92-579, art. 23; DORS/98-240, art. 1.

**92.** When approving a proposal, the court may correct any clerical error or omission in it, if the correction does not constitute an alteration in substance.

SOR/98-240, s. 1.

**93.** For the purposes of section 62.1 of the Act,

(*a*) the time for an insolvent person to remedy a default in the performance of any provision in a proposal is 30 days after the day the default was made; and

(*b*) the time for a trustee to inform the creditors and the official receiver of the situation is 30 days after the expiration of the 30 day period described in paragraph (*a*).

SOR/98-240, s. 1.

**94.** If an official receiver, under paragraph 57(*b.1*) or 61(2)(*b.1*) or subsection 63(6) of the Act, issues a certificate of assignment, the official receiver shall immediately

(*a*) send a copy of it to the trustee acting with respect to the proposal; and

(*b*) file it with the court.

SOR/98-240, s. 1; SOR/2007-61, s. 21(E); SOR/2009-218, s. 13.

**94.1** The notice to disclaim or resiliate an agreement that is given by the debtor under subsection 65.11(1) of the Act must be served or be sent by registered mail, by courier or, if the recipient agrees, by electronic transmission.

SOR/2009-218, s. 14.

**95.** The notice to disclaim or resiliate a lease that is given by an insolvent person under subsection 65.2(1) of the Act must be served or be sent by registered mail, by courier or, if the recipient agrees, by electronic transmission.

SOR/98-240, s. 1; SOR/2007-61, s. 22(E); SOR/2009-218, s. 14.

**92.** En cas d'approbation de la proposition, le tribunal peut y corriger les erreurs d'écriture ou les omissions, à condition que les corrections apportées ne modifient pas le fond.

DORS/98-240, art. 1.

**93.** Pour l'application de l'article 62.1 de la Loi, le délai dont dispose :

*a*) la personne insolvable pour remédier au défaut d'exécution d'une disposition de la proposition est la période de 30 jours suivant le premier jour de défaut;

*b*) le syndic pour informer de la situation les créanciers et le séquestre officiel est la période de 30 jours suivant celle visée à l'alinéa *a*).

DORS/98-240, art. 1.

**94.** Le séquestre officiel qui, conformément aux alinéas 57*b.1*) ou 61(2)*b.1*) ou au paragraphe 63(6) de la Loi, délivre un certificat de cession :

*a*) en envoie sans délai une copie au syndic agissant relativement à la proposition;

*b*) en dépose sans délai une copie auprès du tribunal.

DORS/98-240, art. 1; DORS/2007-61, art. 21(A); DORS/2009-218, art. 13.

**94.1** Le préavis de résiliation de contrat que donne le débiteur conformément au paragraphe 65.11(1) de la Loi est soit signifié, soit envoyé par courrier recommandé, par service de messagerie ou, si le destinataire y consent, par voie électronique.

DORS/2009-218, art. 14.

**95.** Le préavis de résiliation du bail que donne la personne insolvable conformément au paragraphe 65.2(1) de la Loi est soit signifié, soit envoyé par courrier recommandé, par service de messagerie ou, si le destinataire y consent, par voie électronique.

DORS/98-240, art. 1; DORS/2007-61, art. 22(A); DORS/2009-218, art. 14.

CONSUMER PROPOSALS

**96.** For the purposes of paragraph 66.13(1)(*b*) of the Act, the information that the consumer debtor must provide the administrator is

(*a*) information respecting the consumer debtor's financial situation, for the purpose of preparing the consumer proposal; and

(*b*) an explanation of the causes of the consumer debtor's insolvency.

SOR/92-579, s. 24; SOR/98-240, s. 1.

**96.1 to 96.6** [Repealed, SOR/98-240, s. 1]

**97.** For the purposes of subsection 66.17(1) of the Act, the manner in which a creditor who has proved a claim may indicate to the administrator assent to or dissent from the consumer proposal is in person, by personal delivery, by agent or mandatary, by proxy, by mail, by facsimile or by electronic transmission.

SOR/98-240, s. 1; SOR/2007-61, s. 23(E).

**98.** The administrator of a consumer proposal shall apply for taxation of accounts and for discharge by sending to the Division Office

(*a*) the administrator's final statement of receipts and disbursements, in prescribed form;

(*b*) a dividend sheet, showing the dividends paid or to be paid to the creditors under the consumer proposal; and

(*c*) if inspectors have been appointed by the creditors, a copy of the minutes of the meeting of inspectors at which the inspectors approved or refused to approve the administrator's final statement of receipts and disbursements and the dividend sheet.

SOR/98-240, s. 1; SOR/2007-61, s. 63(E).

**99.** The Superintendent shall examine all documents sent pursuant to section 98 and shall issue a letter of comment to the administrator, stating whether the Super-

PROPOSITION DE CONSOMMATEUR

**96.** Pour l'application de l'alinéa 66.13(1)*b*) de la Loi, l'information que le débiteur consommateur doit fournir à l'administrateur est la suivante :

*a*) les renseignements concernant sa situation financière aux fins de la préparation de la proposition de consommateur;

*b*) un exposé des causes de son insolvabilité.

DORS/92-579, art. 24; DORS/98-240, art. 1.

**96.1 à 96.6** [Abrogés, DORS/98-240, art. 1]

**97.** Pour l'application du paragraphe 66.17(1) de la Loi, le créancier qui a prouvé une réclamation indique à l'administrateur son approbation ou sa désapprobation de la proposition de consommateur en personne, par mandataire, par procuration ou par un message remis en mains propres ou envoyé par courrier, par télécopieur ou par transmission électronique.

DORS/98-240, art. 1; DORS/2007-61, art. 23(A).

**98.** L'administrateur de la proposition de consommateur demande la taxation de ses comptes et sa libération en envoyant au bureau de division les documents suivants :

*a*) l'état définitif des recettes et des débours, établi en la forme prescrite;

*b*) le bordereau de dividende indiquant les dividendes payés ou à payer aux créanciers aux termes de la proposition de consommateur;

*c*) dans le cas où des inspecteurs ont été nommés par les créanciers, une copie du procès-verbal de la réunion des inspecteurs à laquelle l'état définitif des recettes et des débours et le bordereau de dividende établis par l'administrateur ont été approuvés ou refusés.

DORS/98-240, art. 1; DORS/2007-61, art. 63(A).

**99.** Le surintendant examine les documents envoyés conformément à l'article 98 et remet à l'administrateur une lettre de commentaires indiquant s'il demande ou

intendent is requesting from the registrar the taxation of the administrator's accounts.

SOR/98-240, s. 1.

**100.** (1) If the Superintendent's letter of comment states that the Superintendent is not requesting the taxation of the administrator's accounts, the administrator shall, within 30 days after receipt of the letter of comment, send to each creditor who has proved a claim a notice of taxation of the administrator's accounts and discharge of the administrator, in prescribed form, attaching

(*a*) a copy of the administrator's final statement of receipts and disbursements;

(*b*) a copy of the dividend sheet, showing the dividends paid or to be paid to the creditors under the consumer proposal; and

(*c*) the final dividend that is owed to the creditor, if the administrator is satisfied that no creditor will object to the taxation of the administrator's accounts and the discharge of the administrator.

(2) A creditor may, within 30 days after the day on which the notice referred to in subsection (1) is sent, object to the taxation of the administrator's accounts and the discharge of the administrator by

(*a*) serving a notice of objection on the administrator or sending a notice of objection to the administrator by registered mail or courier;

(*b*) filing a copy of the notice of objection with the registrar, along with any applicable fee provided by the tariff; and

(*c*) sending a copy of the notice of objection to the Division Office.

SOR/78-389, s. 4; SOR/98-240, s. 1; SOR/2007-61, s. 63(E).

**101.** (1) If the administrator receives no notice of objection within the time limit set out in subsection 100(2), the administrator shall, within three months after the day on which the notice referred to in subsection 100(1) is sent,

(*a*) if the administrator has not already done so, send each creditor the final dividend that is owed to them;

non au registraire la taxation des comptes de l'administrateur.

DORS/98-240, art. 1.

**100.** (1) Si la lettre de commentaires du surintendant indique qu'il ne demande pas la taxation des comptes de l'administrateur, celui-ci envoie, dans les 30 jours suivant la réception de la lettre, aux créanciers qui ont prouvé leur réclamation, un avis de la taxation de ses comptes et de sa libération, établi en la forme prescrite et accompagné de ce qui suit :

*a*) une copie de son état définitif des recettes et des débours;

*b*) une copie du bordereau de dividende indiquant les dividendes payés ou à payer aux créanciers aux termes de la proposition de consommateur;

*c*) le dividende définitif qui revient au créancier, si l'administrateur est convaincu qu'il n'y aura pas d'opposition de la part des créanciers à la taxation de ses comptes et à sa libération.

(2) Tout créancier peut s'opposer à la taxation des comptes et à la libération de l'administrateur en prenant les mesures suivantes dans les 30 jours suivant la date d'envoi de l'avis visé au paragraphe (1) :

*a*) il signifie à l'administrateur ou lui envoie par courrier recommandé ou par service de messagerie un avis d'opposition;

*b*) il dépose auprès du registraire une copie de l'avis d'opposition accompagnée d'un paiement représentant les frais applicables selon le tarif;

*c*) il envoie une copie de l'avis d'opposition au bureau de division.

DORS/78-389, art. 4; DORS/98-240, art. 1; DORS/2007-61, art. 63(A).

**101.** (1) Si l'administrateur ne reçoit aucun avis d'opposition dans le délai prévu au paragraphe 100(2), il prend les mesures suivantes dans les trois mois suivant la date d'envoi de l'avis visé au paragraphe 100(1) :

*a*) s'il ne l'a pas déjà fait, il envoie à chaque créancier qui y a droit son dividende définitif;

(*b*) close the bank account used in administering the consumer proposal, if that account is not a consolidated account, or, if the account is a consolidated account, ensure that all funds governed by the consumer proposal have been withdrawn from it;

(*c*) remit any unclaimed dividends and undistributed funds to the Superintendent; and

(*d*) send to the Division Office a certificate of compliance and deemed discharge, in prescribed form.

(2) The administrator is deemed to be discharged on meeting the requirements of subsection (1).

(3) If the administrator receives a notice of objection within the time limit set out in subsection 100(2), the administrator shall

(*a*) [Repealed, SOR/2009-218, s. 15]

(*b*) obtain a hearing date from the registrar; and

(*c*) within 30 days after the day on which the notice of objection is received, send the objecting creditor a notice of hearing, which notice must be sent at least 30 days before the date of the hearing and must be in prescribed form.

SOR/78-389, s. 5; SOR/98-240, s. 1; SOR/2007-61, s. 63(E); SOR/2009-218, s. 15.

**102.** (1) If the Superintendent issues a letter of comment pursuant to section 99 requesting the taxation of an administrator's accounts, the administrator shall, after obtaining a hearing date from the registrar and within 30 days after the day of receipt of the letter of comment, send to each creditor who has proved a claim and to the Division Office

(*a*) a notice of hearing for the taxation of the administrator's accounts and the discharge of the administrator, in prescribed form, which notice must be sent at least 30 days before the date of the hearing;

(*b*) a copy of the administrator's final statement of receipts and disbursements; and

*b*) il ferme le compte en banque ayant servi à l'administration de la proposition de consommateur s'il ne s'agit pas d'un compte consolidé ou, dans le cas contraire, il vérifie que tous les fonds régis par cette proposition ont été retirés du compte consolidé;

*c*) il remet au surintendant les dividendes non réclamés et les fonds non distribués;

*d*) il envoie au bureau de division le certificat de conformité et de libération présumée, établi en la forme prescrite.

(2) L'administrateur est réputé libéré dès qu'il a pris les mesures visées au paragraphe (1).

(3) Si l'administrateur reçoit un avis d'opposition dans le délai prévu au paragraphe 100(2) :

*a*) [Abrogé, DORS/2009-218, art. 15]

*b*) il obtient du registraire une date d'audition;

*c*) dans les 30 jours suivant la date de réception de l'avis d'opposition, il envoie au créancier qui s'oppose un avis d'audition. Cet avis, établi en la forme prescrite, est envoyé au moins 30 jours avant la date d'audition.

DORS/78-389, art. 5; DORS/98-240, art. 1; DORS/2007-61, art. 63(A); DORS/2009-218, art. 15.

**102.** (1) Si le surintendant remet, conformément à l'article 99, une lettre de commentaires indiquant qu'il demande la taxation des comptes de l'administrateur, celui-ci, après avoir obtenu une date d'audition du registraire, envoie dans les 30 jours suivant la date de réception de la lettre les documents suivants aux créanciers qui ont prouvé leur réclamation et au bureau de division :

*a*) un avis d'audition de la taxation de ses comptes et de sa libération, établi en la forme prescrite; cet avis est envoyé au moins 30 jours avant la date d'audition;

*b*) une copie de son état définitif des recettes et des débours;

*c*) une copie du bordereau de dividende indiquant les dividendes payés ou à payer aux créanciers aux termes de la proposition de consommateur.

(*c*) a copy of the dividend sheet, showing the dividends paid or to be paid to the creditors under the consumer proposal.

(2) A creditor may object to the taxation of the administrator's accounts and discharge of the administrator by

(*a*) serving a notice of objection on the administrator or sending a notice of objection to the administrator by registered mail or courier, which notice of objection must be received by the administrator before the start of the hearing;

(*b*) filing a copy of the notice of objection with the registrar, along with any applicable fee provided by the tariff; and

(*c*) sending a copy of the notice of objection to the Division Office.

SOR/98-240, s. 1; SOR/2007-61, s. 63(E).

**103.** (1) At the time of the hearing, the registrar shall consider the creditors' objections and the letter of comment issued by the Superintendent, and shall tax the administrator's accounts accordingly.

(2) If the registrar taxes an administrator's accounts as submitted, the administrator shall, within two months after the date of the taxation order,

(*a*) send each creditor the final dividend that is owed to them;

(*b*) close the bank account used in administering the consumer proposal, if that account is not a consolidated account, or, if the account is a consolidated account, ensure that all funds governed by the consumer proposal have been withdrawn from it;

(*c*) remit any unclaimed dividends and undistributed funds to the Superintendent; and

(*d*) send to the Division Office a certificate of compliance and deemed discharge, in prescribed form.

(3) The administrator is deemed to be discharged on meeting the requirements of subsection (2).

(2) Tout créancier peut s'opposer à la taxation des comptes et à la libération de l'administrateur en prenant les mesures suivantes :

*a*) il signifie à l'administrateur ou lui envoie par courrier recommandé ou par service de messagerie un avis d'opposition qui doit lui parvenir avant le début de l'audition;

*b*) il dépose auprès du registraire une copie de l'avis d'opposition accompagnée d'un paiement représentant les frais applicables selon le tarif;

*c*) il envoie une copie de l'avis d'opposition au bureau de division.

DORS/98-240, art. 1; DORS/2007-61, art. 63(A).

**103.** (1) Lors de l'audition, le registraire taxe les comptes de l'administrateur en tenant compte des oppositions des créanciers et de la lettre de commentaires du surintendant.

(2) Si le registraire taxe les comptes de l'administrateur tels qu'ils ont été soumis, l'administrateur prend les mesures suivantes dans les deux mois suivant la date de l'ordonnance de taxation :

*a*) il envoie à chaque créancier qui y a droit son dividende définitif;

*b*) il ferme le compte en banque ayant servi à l'administration de la proposition de consommateur s'il ne s'agit pas d'un compte consolidé ou, dans le cas contraire, il vérifie que tous les fonds régis par cette proposition ont été retirés du compte consolidé;

*c*) il remet au surintendant les dividendes non réclamés et les fonds non distribués;

*d*) il envoie au bureau de division un certificat de conformité et de libération présumée, établi en la forme prescrite.

(3) L'administrateur est réputé libéré dès qu'il a pris les mesures visées au paragraphe (2).

(4) If the registrar taxes an administrator's accounts otherwise than as submitted, the administrator shall

(*a*) adjust the administrator's fee as taxed and, if that fee was reduced by the taxation, reimburse the difference to the bank account used in administering the consumer proposal; and

(*b*) within two months after the date of the taxation order,

(i) send each creditor the final dividend that is owed to them, in accordance with the taxation order,

(ii) close the bank account used in administering the consumer proposal, if that account is not a consolidated account, or, if the account is a consolidated account, ensure that all funds governed by the consumer proposal have been withdrawn from it,

(iii) remit any unclaimed dividends and undistributed funds to the Superintendent,

(iv) send to the Division Office and to each creditor a revised final statement of receipts and disbursements, a revised dividend sheet and a copy of the taxation order, and

(v) send to the Division Office and to the registrar a certificate of compliance and deemed discharge, in prescribed form.

(5) The administrator is deemed to be discharged on meeting the requirements of subsection (4).

SOR/98-240, s. 1; SOR/2007-61, s. 63(E).

## PRESCRIBED REGULATORY BODY

**103.1** A stock exchange that is regulated by an Act of Parliament or of the legislature of a province, the Investment Industry Regulatory Organization of Canada and the Mutual Fund Dealers Association of Canada are prescribed for the purposes of section 69.6 of the Act.

SOR/2009-218, s. 16.

(4) Si le registraire taxe les comptes de l'administrateur autrement que dans l'état où ils ont été soumis, l'administrateur prend les mesures suivantes :

*a*) il rajuste ses honoraires tels qu'ils ont été taxés et, s'ils ont été taxés à la baisse, il rembourse l'excédent en le versant au compte en banque servant à l'administration de la proposition de consommateur;

*b*) il prend les mesures suivantes dans les deux mois suivant la date de l'ordonnance de taxation :

(i) il envoie à chaque créancier qui y a droit son dividende définitif, selon ce que prévoit l'ordonnance de taxation,

(ii) il ferme le compte en banque ayant servi à l'administration de la proposition de consommateur s'il ne s'agit pas d'un compte consolidé ou, dans le cas contraire, il vérifie que tous les fonds régis par cette proposition ont été retirés du compte consolidé,

(iii) il remet au surintendant les dividendes non réclamés et les fonds non distribués,

(iv) il envoie au bureau de division et à chaque créancier l'état définitif révisé des recettes et des débours, le bordereau de dividende révisé et une copie de l'ordonnance de taxation,

(v) il envoie au bureau de division et au registraire un certificat de conformité et de libération présumée, établi en la forme prescrite.

(5) L'administrateur est réputé libéré dès qu'il a pris les mesures visées au paragraphe (4).

DORS/98-240, art. 1; DORS/2007-61, art. 63(A).

## ORGANISMES ADMINISTRATIFS

**103.1** Pour l'application de l'article 69.6 de la Loi, sont des organismes administratifs l'Organisme canadien de réglementation du commerce des valeurs mobilières, l'Association canadienne des courtiers de fonds mutuels et toute bourse de valeurs mobilières régie par une loi fédérale ou provinciale.

DORS/2009-218, art. 16.

*C.R.C., ch. 368 — 16 avril 2014*

CONTRIBUTORIES

**104.** (1) In this section, "contributory" has the same meaning as in section 77 of the Act.

(2) The trustee may at any time, by written notice, demand payment from a contributory, within 30 days after the day of service or sending of the notice, of the amount that the contributory is liable to contribute under subsection 77(1) of the Act. The notice must include the relevant information on the contributory's right of dispute under subsection (4).

(3) The notice under subsection (2) must be served personally on the contributory, or sent by registered mail or courier to the contributory's latest known address or the address shown in the stock register or other books of the bankrupt corporation.

(4) Within the 30 days after the day on which notice was served or sent, the contributory may dispute their liability, in whole or in part, in respect of the amount to be contributed, by giving the trustee a written notice of dispute setting out the disputed items and the grounds for disputing them and, after this notice is given, except with leave of the court, the contributory may not plead any other ground of dispute in any proceedings brought against the contributory by the trustee.

(5) If the amount to be contributed is not paid, or a notice of dispute is not sent, within the 30 day period referred to in subsection (4), the trustee may take *ex parte* proceedings for the recovery of the amount from the contributory in question.

(6) When the trustee receives a notice of dispute, the trustee may apply to the court to decide the issue and, within 10 days after making that application, shall send the contributory a notice of hearing of the application.

SOR/98-240, s. 1; SOR/2005-284, s. 7(F); SOR/2007-61, ss. 24(E), 63(E).

MEDIATION

**105.** (1) For the purposes of subsections 68(8) and 170.1(2) of the Act, the procedures governing a mediation are as set out in this section.

CONTRIBUTAIRES

**104.** (1) Dans le présent article, «contributaire» s'entend au sens de l'article 77 de la Loi.

(2) Le syndic peut exiger à tout moment, par un avis écrit, que le contributaire verse, dans les 30 jours suivant la date de signification ou d'envoi de l'avis, le montant qu'il est tenu de verser en application du paragraphe 77(1) de la Loi. L'avis présente au contributaire l'information nécessaire à l'établissement de sa contestation selon les règles énoncées au paragraphe (4).

(3) L'avis est donné au contributaire soit par signification à personne, soit par envoi par courrier recommandé ou par service de messagerie à sa dernière adresse connue ou à l'adresse indiquée dans le registre des actionnaires ou tout autre registre de la personne morale en faillite.

(4) Le contributaire peut, dans les 30 jours suivant la date de signification ou d'envoi de l'avis, contester, en tout ou en partie, sa responsabilité à l'égard du montant à contribuer, en envoyant au syndic un avis écrit indiquant les postes contestés et ses motifs; il ne peut par la suite, sauf avec l'autorisation du tribunal, apporter d'autres motifs de contestation lors de procédures intentées contre lui par le syndic.

(5) Si, dans le délai prévu au paragraphe (4), le contributaire ne verse pas le montant exigé ou n'envoie pas d'avis de contestation, le syndic peut intenter une action *ex parte* en recouvrement du montant.

(6) Sur réception d'un avis de contestation, le syndic peut demander au tribunal de trancher la question; il envoie alors un avis de l'audition de la demande au contributaire dans les 10 jours après avoir présenté celle-ci.

DORS/98-240, art. 1; DORS/2005-284, art. 7(F); DORS/2007-61, art. 24(A) et 63(A).

MÉDIATION

**105.** (1) Pour l'application des paragraphes 68(8) et 170.1(2) de la Loi, la procédure de médiation est celle établie au présent article.

*C.R.C., c. 368 — April 16, 2014*

(2) For the purposes of this section,

(*a*) the bankrupt and the trustee are always parties to the mediation;

(*b*) the trustee may act either personally or through a representative;

(*c*) an opposition to discharge made by a creditor or the trustee, referred to in subsection 170.1(1) of the Act, is deemed to be a request by the creditor or the trustee, as the case may be, for mediation; and

(*d*) a creditor who requests mediation is a party to the mediation.

(3) For the purpose of conducting a particular mediation, the Superintendent shall designate as mediator

(*a*) an employee of a Division Office, including Division Offices other than the one for the bankruptcy division in which the proceedings were commenced; or

(*b*) any other person with training or experience in mediation and whom the Superintendent considers qualified.

(4) On receipt of a request for mediation from a trustee under subsection 68(6) or (7) or 170.1(1) of the Act, accompanied by the most recent income and expense statement in prescribed form completed by the bankrupt, the official receiver shall refer the matter to the mediator, who shall set the time and place for the mediation. The time set for the mediation must be within 45 days after the official receiver received the request for mediation.

(5) The mediator shall conduct the mediation with all parties physically present, unless the mediator decides to conduct the mediation by telephone conference call or by means of any other communication facilities that permit all persons participating in the mediation to communicate with each other.

(6) The mediation must be held at the Division Office, at any other place that is designated by the mediator, or, if the mediation is conducted otherwise than with

(2) Pour l'application du présent article :

*a*) le failli et le syndic sont obligatoirement parties à la médiation;

*b*) le syndic peut se représenter lui-même ou se faire représenter;

*c*) l'opposition faite par un créancier ou le syndic, visée au paragraphe 170.1(1) de la Loi, est réputée être une demande de médiation;

*d*) le créancier qui demande la médiation est partie à celle-ci.

(3) Pour la conduite d'une médiation, le surintendant désigne à titre de médiateur :

*a*) soit un employé d'un bureau de division, y compris un bureau de division autre que celui de la division de faillite dans laquelle les procédures ont été intentées;

*b*) soit une autre personne qui a reçu une formation ou possède de l'expérience en médiation et que le surintendant juge qualifiée.

(4) Sur réception d'une demande de médiation d'un syndic conformément aux paragraphes 68(6) ou (7) ou 170.1(1) de la Loi, accompagnée de l'état des revenus et dépenses le plus récent établi par le failli en la forme prescrite, le séquestre officiel confie le dossier au médiateur qui fixe les date, heure et lieu de la médiation. La médiation a lieu dans les 45 jours suivant la réception par le séquestre officiel de la demande de médiation.

(5) Le médiateur tient la médiation en présence des parties, sauf s'il décide de le faire par conférence téléphonique ou par un autre moyen de communication qui permet à toutes les personnes participant à la médiation de communiquer entre elles.

(6) La médiation est tenue soit au bureau de division, soit en tout autre lieu désigné par le médiateur ou, si elle est tenue autrement qu'en présence de toutes les parties, dans toute combinaison de lieux nécessaire à cette fin.

all parties physically present, at any combination of places necessary for that purpose.

(7) The mediator shall send a copy of the notice of the mediation, in prescribed form, to the bankrupt, to the trustee and to any creditor who requested mediation, at least 15 days, or any shorter period that may be agreed to by all the parties concerned, before the date set for the mediation.

(8) If, at any time before the mediation has started, the mediator believes on reasonable grounds that the mediation cannot proceed at the time scheduled, the mediator shall reschedule it, setting a new time and place.

(9) Except when it would constitute a second adjournment, the mediator shall, subject to subsection (13), adjourn mediation at any time during the mediation if

(*a*) a party requests an adjournment and the mediator believes on reasonable grounds that the mediation would benefit from further negotiations or the provision of additional information;

(*b*) the mediator believes on reasonable grounds that one of the parties, other than the trustee in the case of a mediation requested by a creditor under subsection 170.1(1) of the Act, cannot continue the mediation for a certain period of time;

(*c*) all the creditors who were informed of the mediation in accordance with subsection (7) or (11) fail to appear at the mediation and the mediator believes on reasonable grounds, with respect to at least one of those creditors, that the non-appearance is neither a delaying tactic nor intended to bring the mediation into disrepute;

(*d*) in the case of a mediation requested by a creditor under subsection 170.1(1) of the Act, a party, other than the trustee, who was informed of the mediation in accordance with subsection (7) or (11) fails to appear at the mediation and the mediator believes on reasonable grounds that the non-appearance is neither a delaying tactic nor intended to bring the mediation into disrepute; or

(7) Le médiateur envoie une copie de l'avis de médiation, établi en la forme prescrite, au failli, au syndic ainsi qu'aux créanciers qui ont demandé la médiation, le cas échéant, au moins 15 jours avant la date prévue de celle-ci ou dans le délai plus court dont conviennent les parties.

(8) Si, avant la médiation, le médiateur a des motifs raisonnables de croire que la médiation ne peut être tenue à la date prévue, il la reporte et fixe à nouveau les date, heure et lieu de celle-ci.

(9) Sauf dans le cas où cela constituerait un second ajournement et sous réserve du paragraphe (13), le médiateur ajourne la médiation pendant qu'elle est en cours, dans l'une ou l'autre des situations suivantes:

*a*) une partie demande l'ajournement et le médiateur a des motifs raisonnables de croire que des négociations ou des renseignements supplémentaires pourraient aider à la médiation;

*b*) le médiateur a des motifs raisonnables de croire que l'une des parties, autre que le syndic dans le cas d'une demande de médiation faite par un créancier en vertu du paragraphe 170.1(1) de la Loi, ne peut poursuivre la médiation pendant une période déterminée;

*c*) l'ensemble des créanciers qui ont été informés de la médiation conformément aux paragraphes (7) ou (11) ne s'y présentent pas et le médiateur a des motifs raisonnables de croire, à l'égard d'au moins l'un d'entre eux, qu'il ne s'agit pas là d'une manœuvre dilatoire ou d'une manœuvre visant à discréditer le processus;

*d*) dans le cas d'une demande de médiation faite par un créancier en vertu du paragraphe 170.1(1) de la Loi, l'une des parties, autre que le syndic, qui a été informée de la médiation conformément aux paragraphes (7) ou (11) ne s'y présente pas et le médiateur a des motifs raisonnables de croire qu'il ne s'agit pas là d'une manœuvre dilatoire ou d'une manœuvre visant à discréditer le processus;

(*e*) in any case other than the one referred to in paragraph (*d*), a party, other than a creditor, who was informed of the mediation in accordance with subsection (7) or (11) fails to appear at the mediation and the mediator believes on reasonable grounds that the non-appearance is neither a delaying tactic nor intended to bring the mediation into disrepute.

(10) If a mediation is rescheduled or adjourned, the new date set must be within 10 days after the date on which the rescheduling or adjournment occurs.

(11) If a mediation is rescheduled or adjourned, the mediator shall inform the parties of the new time and place.

(12) At any time during the mediation, the mediator shall, subject to subsection (13), cancel the mediation if

(*a*) there is an outstanding opposition to the discharge of the bankrupt by a creditor or the trustee on a ground referred to in paragraphs 173(1)(*a*) to (*l*) or (*o*) of the Act;

(*b*) the mediator believes on reasonable grounds that a party is abusing the rescheduling procedures;

(*c*) there has already been an adjournment and

    (i) there is a request for adjournment under paragraph (9)(*a*), or

    (ii) one of the circumstances referred to in paragraphs (9)(*b*) to (*e*) occurs;

(*d*) the mediator believes on reasonable grounds that one of the parties, other than the trustee in the case of a mediation requested by a creditor under subsection 170.1(1) of the Act, cannot continue the mediation at all;

(*e*) all the creditors who were informed of the mediation in accordance with subsection (7) or (11) fail to appear at the mediation and the mediator believes on reasonable grounds, with respect to all of those creditors, that the non-appearance is a delaying tactic or is intended to bring the mediation into disrepute;

*e*) dans tout cas autre que celui visé à l'alinéa *d*), l'une des parties, autre qu'un créancier, qui a été informée de la médiation conformément aux paragraphes (7) ou (11) ne s'y présente pas et le médiateur a des motifs raisonnables de croire qu'il ne s'agit pas là d'une manœuvre dilatoire ou d'une manœuvre visant à discréditer le processus.

(10) En cas de report ou d'ajournement de la médiation, la nouvelle date se situe dans les 10 jours suivant celui où la médiation a été reportée ou ajournée.

(11) Lorsque la médiation est reportée ou ajournée, le médiateur informe les parties des date, heure et lieu de reprise de la médiation.

(12) Sous réserve du paragraphe (13), le médiateur annule la médiation pendant qu'elle est en cours, dans l'une ou l'autre des situations suivantes :

*a*) une opposition à la libération du failli est pendante, laquelle a été faite par un créancier ou le syndic pour l'un des motifs visés aux alinéas 173(1)*a*) à *l*) ou *o*) de la Loi;

*b*) le médiateur a des motifs raisonnables de croire qu'il y a abus de la procédure de report par l'une des parties;

*c*) il y a déjà eu un ajournement et :

    (i) ou bien une demande d'ajournement est faite selon l'alinéa (9)*a*),

    (ii) ou bien l'une des situations visées aux alinéas (9)*b*) à *e*) survient;

*d*) le médiateur a des motifs raisonnables de croire que l'une des parties, autre que le syndic dans le cas d'une demande de médiation faite par un créancier en vertu du paragraphe 170.1(1) de la Loi, ne peut plus poursuivre la médiation;

*e*) l'ensemble des créanciers qui ont été informés de la médiation conformément aux paragraphes (7) ou (11) ne s'y présentent pas et le médiateur a des motifs raisonnables de croire, à l'égard de tous ces créanciers, qu'il s'agit là d'une manœuvre dilatoire ou d'une manœuvre visant à discréditer le processus;

(*f*) in the case of a mediation requested by a creditor under subsection 170.1(1) of the Act, a party, other than the trustee, who was informed of the mediation in accordance with subsection (7) or (11) fails to appear at the mediation and the mediator believes on reasonable grounds that the non-appearance is a delaying tactic or is intended to bring the mediation into disrepute; or

(*g*) in any case other than the one referred to in paragraph (*f*), a party, other than a creditor, who was informed of the mediation in accordance with subsection (7) or (11) fails to appear at the mediation and the mediator believes on reasonable grounds that the non-appearance is a delaying tactic or is intended to bring the mediation into disrepute.

(13) Despite paragraphs (9)(*b*) and (*d*) and (12)(*d*) and (*f*), the absence of one or more creditors who requested mediation, or the inability of one or more creditors who requested mediation to continue the mediation, is not a ground for adjourning or cancelling the mediation if at least one creditor who requested mediation is present at the mediation, or is able to continue the mediation, as the case may be.

(14) In the case of a mediation under section 170.1 of the Act, if all of the creditors who requested the mediation cause the cancellation of the mediation under paragraph (12)(*e*),

(*a*) the opposition to discharge on the part of each of those creditors on a ground referred to in paragraph 173(1)(*m*) or (*n*) of the Act is deemed withdrawn; and

(*b*) the issues submitted to mediation are deemed to have been thereby resolved for the purposes of subsection 170.1(3) of the Act.

(15) For greater certainty, if

(*a*) a mediation under section 68 of the Act is cancelled under any of paragraphs (12)(*a*) to (*g*), or

(*b*) a mediation under section 170.1 of the Act is cancelled otherwise than under paragraph (12)(*e*),

*f*) dans le cas d'une demande de médiation faite par un créancier en vertu du paragraphe 170.1(1) de la Loi, l'une des parties, autre que le syndic, qui a été informée de la médiation conformément aux paragraphes (7) ou (11) ne s'y présente pas et le médiateur a des motifs raisonnables de croire qu'il s'agit là d'une manœuvre dilatoire ou d'une manœuvre visant à discréditer le processus;

*g*) dans tout cas autre que celui visé à l'alinéa *f*), l'une des parties, autre qu'un créancier, qui a été informée de la médiation conformément aux paragraphes (7) ou (11) ne s'y présente pas et le médiateur a des motifs raisonnables de croire qu'il s'agit là d'une manœuvre dilatoire ou d'une manœuvre visant à discréditer le processus.

(13) Malgré les alinéas (9)*b*) et *d*) et (12)*d*) et *f*), l'absence d'un ou de plusieurs créanciers qui ont demandé la médiation ou l'impossibilité pour l'un ou plusieurs d'entre eux de poursuivre la médiation ne peut être considérée comme un motif d'ajournement ou d'annulation de celle-ci, si au moins un des créanciers qui a demandé la médiation y est présent ou est en mesure de la poursuivre.

(14) Dans le cas d'une médiation au titre de l'article 170.1 de la Loi, lorsque celle-ci est annulée en application de l'alinéa (12)*e*) en raison de l'absence de l'ensemble des créanciers qui l'ont demandée :

*a*) l'opposition à la libération du failli faite par chacun de ces créanciers pour les motifs mentionnés aux alinéas 173(1)*m*) ou *n*) de la Loi est réputée retirée;

*b*) il est réputé y avoir entente sur les questions en cause dans la médiation pour l'application du paragraphe 170.1(3) de la Loi.

(15) Il est entendu que la médiation est réputée avoir échoué pour l'application des paragraphes 68(10) ou 170.1(3) de la Loi si :

*a*) dans le cas d'une médiation au titre de l'article 68 de la Loi, elle est annulée en application de l'un des alinéas (12)*a*) à *g*);

the issues submitted to mediation are deemed to have not been thereby resolved for the purposes of subsection 68(10) or 170.1(3), as the case may be, of the Act.

(16) If a mediation is cancelled, the mediator shall send to the Division Office and the parties a notice of the cancellation, in prescribed form, setting out the grounds for the cancellation.

(17) No mediator or party to a mediation shall disclose to the public any confidential information concerning an issue submitted to mediation, unless the disclosure is

(*a*)  required by law; or

(*b*)  authorized by the person to whom the confidential information relates.

(18) If agreement is reached by all parties at the mediation, a mediation settlement agreement, in prescribed form and including all terms and conditions of the settlement reached, must be signed by the parties, and the mediator shall send copies of the agreement to the Division Office and the parties. The agreement is binding on the parties, subject to any subsequent court order.

(19) All payments made by a bankrupt under a mediation settlement agreement must be made to the trustee and deposited into the estate account.

(20) If the parties fail to reach agreement at the mediation, the mediator shall issue a notice in prescribed form to the effect that the issues submitted to mediation under subsection 68(6) or (7) or 170.1(1), as the case may be, of the Act were not resolved, and shall send that notice to the Division Office and the parties.

SOR/98-240, s. 1; SOR/2007-61, s. 25(E); SOR/2009-218, s. 17.

## ORDER FOR PAYMENT

**106.** (1) A trustee who makes an application to the court under subsection 68(10) of the Act shall immediately send to the Division Office a copy of the application, and of any order of the court made under that subsection.

(2) A creditor who, pursuant to a court order made under subsection 38(1) of the Act, makes an application

*b*)  dans le cas d'une médiation au titre de l'article 170.1 de la Loi, elle est annulée autrement qu'en application de l'alinéa (12)*e*).

(16) En cas d'annulation de la médiation, le médiateur envoie au bureau de division et aux parties un avis motivé à cet effet, établi en la forme prescrite.

(17) Le médiateur et les parties à la médiation ne peuvent divulguer au public aucun renseignement confidentiel concernant la médiation, sauf dans les cas suivants :

*a*)  ils y sont tenus par la loi;

*b*)  ils ont obtenu le consentement de la personne visée par le renseignement confidentiel.

(18) Si les parties en arrivent à une entente dans le cadre de la médiation, cette entente, établie en la forme prescrite et précisant les modalités convenues, est signée par chacune d'elles; le médiateur en envoie copie au bureau de division et aux parties. Cette entente lie les parties, sous réserve de toute ordonnance ultérieure du tribunal.

(19) Les paiements faits par un failli dans le cadre d'une entente de médiation sont versés au syndic et déposés dans le compte de l'actif.

(20) Si les parties ne parviennent pas à une entente dans le cadre de la médiation, le médiateur émet un avis, en la forme prescrite, portant que la médiation demandée pour l'application des paragraphes 68(6) ou (7) ou 170.1(1) de la Loi a échoué, et envoie cet avis au bureau de division et aux parties.

DORS/98-240, art. 1; DORS/2007-61, art. 25(A); DORS/2009-218, art. 17.

## ORDONNANCE DE PAIEMENT

**106.** (1) Le syndic qui présente une demande au tribunal en vertu du paragraphe 68(10) de la Loi envoie sans délai au bureau de division une copie de cette demande et de l'ordonnance rendue par le tribunal en vertu de ce paragraphe, le cas échéant.

(2) Le créancier qui, par suite d'une ordonnance rendue par le tribunal en application du paragraphe 38(1) de

*C.R.C., ch. 368 — 16 avril 2014*

to the court under subsection 68(10) of the Act shall immediately send to the Division Office a copy of the application, and of any order of the court made under the latter subsection.

SOR/98-240, s. 1; SOR/2007-61, s. 65(E).

**106.1 to 106.3** [Repealed, SOR/98-240, s. 1]

PREFERENCES AND TRANSFERS AT
UNDERVALUE

[SOR/2009-218, s. 18]

**107.** The registrar may

(*a*) in the Province of Quebec, if an immovable or any right relating to it is the object of litigation under sections 91 to 99 of the Act, authorize the plaintiff to apply for the registration of a notice of advance registration in the appropriate register after a copy of the demand signed by the plaintiff's advocate is filed with the court; and

(*b*) in any other province, if real property or any interest relating to it is the object of litigation under sections 91 to 99 of the Act, issue a certificate of *lis pendens* after a copy of the statement of claim signed by the plaintiff's barrister or solicitor is filed with the court, and, if the plaintiff is unsuccessful in whole or in part, issue a certificate of disallowance.

SOR/98-240, s. 1; SOR/2007-61, s. 26; SOR/2009-218, s. 19.

MEETINGS OF CREDITORS

**108.** (1) For the purposes of paragraph 155(*d.1*) of the Act, the notice of the first meeting of creditors must be sent to the persons referred to in subsection 102(1) of the Act at least 10 days before the day of the meeting.

(2) If a bankrupt cannot speak fluently in the official language in which the meeting of creditors is being conducted, the trustee shall arrange for the services of an interpreter approved by the chairperson of the meeting.

SOR/98-240, s. 1; SOR/2007-61, s. 63(E); SOR/2009-218, s. 20.

la Loi, présente une demande à celui-ci en vertu du paragraphe 68(10) de la Loi envoie sans délai au bureau de division une copie de cette demande et de l'ordonnance rendue par le tribunal en vertu de ce dernier paragraphe, le cas échéant.

DORS/98-240, art. 1; DORS/2007-61, art. 65(A).

**106.1 à 106.3** [Abrogés, DORS/98-240, art. 1]

TRAITEMENT PRÉFÉRENTIEL ET OPÉRATIONS
SOUS-ÉVALUÉES

[DORS/2009-218, art. 18]

**107.** Le registraire peut :

a) dans la province de Québec, lorsqu'un immeuble ou un droit s'y rattachant font l'objet d'un litige aux termes des articles 91 à 99 de la Loi, autoriser, sur dépôt auprès du tribunal d'une copie de la demande signée par l'avocat du demandeur, le demandeur à requérir l'inscription d'un avis de préinscription au registre approprié;

b) dans les autres provinces, lorsqu'un bien réel ou un intérêt s'y rattachant font l'objet d'un litige aux termes des articles 91 à 99 de la Loi, délivrer un certificat de litispendance sur dépôt auprès du tribunal d'une copie de la demande signée par l'avocat du demandeur et, en cas de rejet partiel ou total de la demande, délivrer un certificat de rejet.

DORS/98-240, art. 1; DORS/2007-61, art. 26; DORS/2009-218, art. 19.

ASSEMBLÉE DES CRÉANCIERS

**108.** (1) Pour l'application de l'alinéa 155*d.1*) de la Loi, l'avis de la première assemblée des créanciers est envoyé aux personnes visées au paragraphe 102(1) de la Loi au moins dix jours avant la date de l'assemblée.

(2) Lorsque le failli ne peut parler couramment celle des langues officielles dans laquelle se déroule l'assemblée des créanciers, le syndic retient pour l'assemblée les services d'un interprète agréé par le président de celle-ci.

DORS/98-240, art. 1; DORS/2007-61, art. 63(A); DORS/2009-218, art. 20.

*C.R.C., c. 368 — April 16, 2014*

**109.** If a partnership is bankrupt, the creditors of the partnership and of each bankrupt partner shall be convened collectively for the first meeting of creditors.

SOR/98-240, s. 1; SOR/2007-61, s. 63(E).

**109.1** [Repealed, SOR/98-240, s. 1]

**110.** A bankrupt who is required by a trustee to attend a meeting of creditors other than the first meeting, and who resides more than 100 km from the place of the meeting, is entitled to be paid, out of the estate, reasonable expenses for travel, accommodation and meals.

SOR/98-240, s. 1.

### CROWN'S SECURITY

**111.** For the purposes of subsection 87(1) of the Act, a "prescribed system of registration" referred to in that subsection is a system of registration of securities that is available to Her Majesty in right of Canada or a province and to any other creditor holding a security, and is open to the public for inspection or for the making of searches.

SOR/98-240, s. 1.

### NOTICE OF DIVIDEND

**112.** The notice of dividend that is received by a creditor is sufficient notice of admission of the claim.

SOR/98-240, s. 1.

### NOTICE OF DISALLOWANCE OR OF VALUATION

**113.** The notice of disallowance or notice of valuation provided by a trustee under subsection 135(3) of the Act to a person whose claim, right to a prior rank, or security has been disallowed or on which a valuation has been made, in whole or in part, must be served, or sent by registered mail or courier.

SOR/85-325, s. 1; SOR/87-380, s. 1; SOR/98-240, s. 1; SOR/2007-61, s. 27(E).

**113.1 to 113.6** [Repealed, SOR/98-240, s. 1]

**109.** En cas de faillite d'une société de personnes, les créanciers de la société et de chacun des associés faillis sont convoqués collectivement à la première assemblée des créanciers.

DORS/98-240, art. 1; DORS/2007-61, art. 63(A).

**109.1** [Abrogé, DORS/98-240, art. 1]

**110.** Le failli à qui le syndic a enjoint d'assister à une assemblée des créanciers autre que la première a droit, s'il réside à plus de 100 km du lieu de cette assemblée, aux frais raisonnables engagés pour son déplacement, son hébergement et ses repas, lesquels sont payés sur l'actif.

DORS/98-240, art. 1.

### GARANTIE OU SÛRETÉ DE LA COURONNE

**111.** Est visé pour l'application du paragraphe 87(1) de la Loi tout système d'enregistrement des garanties ou sûretés qui est accessible à Sa Majesté du chef du Canada ou d'une province et aux autres créanciers détenant des garanties ou sûretés et qui est mis à la disposition du public aux fins de consultation ou de recherche.

DORS/98-240, art. 1.

### AVIS DE DIVIDENDE

**112.** L'avis de dividende reçu par le créancier vaut notification de l'admission de sa réclamation.

DORS/98-240, art. 1.

### AVIS DE REJET OU D'ÉVALUATION

**113.** L'avis de rejet ou l'avis d'évaluation donné par le syndic, conformément au paragraphe 135(3) de la Loi, à l'intéressé dont la réclamation, le droit à un rang prioritaire ou la garantie ou la sûreté a été rejeté ou évalué, en tout ou en partie, est soit signifié, soit envoyé par courrier recommandé ou par service de messagerie.

DORS/85-325, art. 1; DORS/87-380, art. 1; DORS/98-240, art. 1; DORS/2007-61, art. 27(A).

**113.1 à 113.6** [Abrogés, DORS/98-240, art. 1]

## BANKRUPT PARTNERSHIPS

**114.** A partnership that is bankrupt shall submit to the trustee a statement of its partnership affairs, verified by one of the partners or by the manager in charge of the partnership affairs, and each bankrupt partner shall submit a statement of their own personal affairs.

SOR/81-646, s. 5; SOR/98-240, s. 1.

## EXAMINATIONS

**115.** Examinations, other than those under section 159 or 161 of the Act, shall be held before a registrar, before a person who is qualified to hold examinations for discovery, examinations of judgment debtors or examinations of debtors after judgment or before any other person that the court may, on *ex parte* application, order, and shall be conducted in accordance with the rules of court in civil cases.

SOR/85-167, s. 1; SOR/85-1162, s. 1(E); SOR/90-83, s. 1; SOR/92-579, s. 29; SOR/96-473, s. 1; SOR/98-240, s. 1; SOR/2005-284, s. 8; SOR/2007-61, s. 28.

**116.** (1)  An examination shall be held

(*a*) in the bankruptcy district or division in which the person to be examined

    (i)  resides,

    (ii)  was served with the appointment for examination, or

    (iii)  resided or carried on business on the day of the bankruptcy; or

(*b*) at any place that the court may, on *ex parte* application, order.

(2)  The court may, on application, set the time of an examination.

SOR/92-579, s. 30; SOR/98-240, s. 1; SOR/2007-61, s. 29(E).

**117.** The official receiver shall, before conducting an examination referred to in section 159 or 161 of the Act, send a notice of examination, in prescribed form, to the person to be examined.

SOR/92-579, s. 30; SOR/98-240, s. 1.

## SOCIÉTÉ DE PERSONNES EN FAILLITE

**114.** La société de personnes en faillite soumet au syndic un bilan attesté par un des associés ou par le gestionnaire responsable des affaires de celle-ci, et chaque associé failli soumet un bilan personnel.

DORS/81-646, art. 5; DORS/98-240, art. 1.

## INTERROGATOIRES

**115.** Les interrogatoires, sauf ceux prévus aux articles 159 et 161 de la Loi, se déroulent devant le registraire, devant toute personne autorisée à mener des interrogatoires préalables, des interrogatoires du débiteur après jugement ou des interrogatoires de débiteurs judiciaires ou devant toute autre personne que le tribunal désigne par ordonnance sur demande *ex parte*, et sont tenus conformément aux règles du tribunal applicables aux instances civiles.

DORS/85-167, art. 1; DORS/85-1162, art. 1(A); DORS/90-83, art. 1; DORS/92-579, art. 29; DORS/96-473, art. 1; DORS/98-240, art. 1; DORS/2005-284, art. 8; DORS/2007-61, art. 28.

**116.** (1)  Tout interrogatoire est tenu, selon le cas :

*a*) dans le district ou la division de faillite où la personne interrogée :

    (i)  soit réside,

    (ii)  soit a reçu signification de la convocation pour interrogatoire,

    (iii)  soit résidait ou exerçait son activité le jour de sa mise en faillite;

*b*) au lieu que le tribunal fixe sur demande *ex parte*.

(2)  Le tribunal peut, sur demande, fixer les date et heure de tout interrogatoire.

DORS/92-579, art. 30; DORS/98-240, art. 1; DORS/2007-61, art. 29(A).

**117.** Avant la tenue de l'interrogatoire visé aux articles 159 ou 161 de la Loi, le séquestre officiel envoie à la personne visée un avis de convocation établi en la forme prescrite.

DORS/92-579, art. 30; DORS/98-240, art. 1.

*C.R.C., c. 368 — April 16, 2014*

## DISCHARGE OF BANKRUPTS

**118.** Any person opposing the discharge of a bankrupt under the Act must file that opposition with the court, together with any applicable fee provided by the tariff.

SOR/92-579, s. 30; SOR/98-240, s. 1.

**119.** The court may, on an application for the discharge of a bankrupt, summon the bankrupt to appear for examination.

SOR/92-579, s. 30; SOR/98-240, s. 1; SOR/2007-61, s. 30.

**120.** (1) If an order of discharge is made conditional on the bankrupt's consenting to judgment in favour of the trustee for the whole or any part of the balance of the bankrupt's debts, the judgment shall be filed in the court in the bankruptcy district or division in which the order of discharge is granted.

(2) If the bankrupt does not give the consent referred to in subsection (1) within 10 days after the date of the conditional order of discharge, the court may, on application by the trustee, revoke the conditional order of discharge or make any other order that the court considers appropriate.

SOR/92-579, s. 30; SOR/98-240, s. 1; SOR/2007-61, ss. 31(E), 63(E).

**121.** If a bankrupt applies to the court to modify the terms of an order of discharge pursuant to subsection 172(3) of the Act, the bankrupt shall send a notice of the time and place of the hearing of the application, at least 10 days before the day of the hearing, to the trustee, the Division Office and every creditor who has proved their claim, at their latest known address.

SOR/92-579, s. 30; SOR/98-240, s. 1; SOR/2007-61, s. 63(E).

## TRUSTEE REPORT

**121.1** (1) For the purposes of subsection 170(1) of the Act, the circumstances in which the trustee shall prepare a report are the following:

(*a*) the bankrupt has surplus income;

(*b*) an opposition to the discharge of the bankrupt has been made;

## LIBÉRATION DU FAILLI

**118.** Toute personne qui s'oppose à la libération du failli sous le régime de la Loi dépose un avis d'opposition auprès du tribunal, accompagné du paiement représentant les frais applicables prévus au tarif.

DORS/92-579, art. 30; DORS/98-240, art. 1.

**119.** Le tribunal peut, sur réception d'une demande de libération du failli, assigner celui-ci pour interrogatoire.

DORS/92-579, art. 30; DORS/98-240, art. 1; DORS/2007-61, art. 30.

**120.** (1) Lorsqu'une ordonnance de libération est subordonnée à la condition que le failli consente au jugement en faveur du syndic pour tout ou partie du solde des dettes du failli, le jugement est déposé au tribunal de la division de faillite ou du district dans lequel l'ordonnance de libération a été accordée.

(2) Si le failli ne donne pas son consentement dans les 10 jours suivant la date de l'ordonnance, le tribunal peut, à la demande du syndic, révoquer l'ordonnance de libération ou rendre l'ordonnance qu'il estime indiquée.

DORS/92-579, art. 30; DORS/98-240, art. 1; DORS/2007-61, art. 31(A) et 63(A).

**121.** Le failli qui demande au tribunal de modifier l'ordonnance de libération en application du paragraphe 172(3) de la Loi envoie au syndic, au bureau de division et à chaque créancier ayant prouvé sa réclamation, à sa dernière adresse connue, un avis indiquant les date, heure et lieu de l'audition de la demande, au moins 10 jours avant la date de celle-ci.

DORS/92-579, art. 30; DORS/98-240, art. 1; DORS/2007-61, art. 63(A).

## RAPPORT DU SYNDIC

**121.1** (1) Pour l'application du paragraphe 170(1) de la Loi, les circonstances dans lesquelles le syndic prépare un rapport sont les suivantes :

*a*) le failli dispose d'un revenu excédentaire;

*b*) il y a eu opposition à la libération du failli;

*c*) le failli a déjà fait faillite sous le régime du droit canadien ou de tout pays prescrit;

(*c*) the bankrupt has been bankrupt on a previous occasion under the laws of Canada or any prescribed jurisdiction; or

(*d*) a court hearing of the discharge is required.

(2) The report shall be prepared

(*a*) in the case of an individual who is eligible for an automatic discharge and who has never before been bankrupt under the laws of Canada or any prescribed jurisdiction,

   (i) during the eighth month after the date of the bankruptcy, or

   (ii) during the twentieth month after the date of the bankruptcy, if the individual is required to make payments under section 68 of the Act;

(*b*) in the case of an individual who is eligible for an automatic discharge and who has been bankrupt once before under the laws of Canada or any prescribed jurisdiction,

   (i) during the twenty-third month after the date of the bankruptcy, or

   (ii) during the thirty-fifth month after the date of the bankruptcy, if the individual is required to make payments under section 68 of the Act; and

(*c*) in the case of an individual who is not eligible for an automatic discharge, not less than 10 days and not more than 60 days before the date of the hearing of the application for discharge.

SOR/2009-218, s. 21.

## PUBLIC RECORDS

**122.** (1) For the purposes of subsection 11.1(1) of the Act, the Superintendent,

(*a*) in keeping or causing to be kept a public record of each proposal, shall keep the files relating to it for at least 10 years after the date on which a certificate of full performance of the proposal is given pursuant to section 65.3 or 66.38 of the Act;

*d*) le tribunal doit tenir une audience sur la libération.

(2) Le rapport est préparé :

*a*) s'il vise un particulier admissible à une libération d'office qui fait faillite pour la première fois sous le régime du droit canadien ou de tout pays prescrit :

   (i) soit au cours du huitième mois qui suit la date de la faillite,

   (ii) soit au cours du vingtième mois qui suit la date de la faillite, s'il est tenu de faire des versements au titre de l'article 68 de la Loi;

*b*) s'il vise un particulier admissible à une libération d'office qui a déjà fait faillite une fois sous le régime du droit canadien ou de tout pays prescrit :

   (i) soit au cours du vingt-troisième mois qui suit la date de la faillite,

   (ii) soit au cours du trente-cinquième mois qui suit la date de la faillite, s'il est tenu de faire des versements au titre de l'article 68 de la Loi;

*c*) s'il vise un particulier qui n'est pas admissible à une libération d'office, au plus tôt le soixantième jour et au plus tard le dixième jour qui précède la date d'audition de la demande de libération.

DORS/2009-218, art. 21.

## REGISTRES PUBLICS

**122.** (1) Pour l'application du paragraphe 11.1(1) de la Loi, le surintendant :

*a*) lorsqu'il conserve ou fait conserver un registre public des propositions, y conserve chaque dossier se rattachant à une proposition pendant au moins les 10 ans suivant la date de la remise, en application des articles 65.3 ou 66.38 de la Loi, du certificat d'exécution intégrale de la proposition;

(*b*) in keeping or causing to be kept a public record of each bankruptcy of an individual, shall keep the files relating to it

(i) for at least 10 years after the date on which the trustee of the bankrupt's estate is discharged under subsection 41(2) of the Act, or is deemed to be discharged pursuant to these Rules, and

(ii) if the bankrupt has not been granted an absolute order of discharge under subsection 172(1) of the Act at the end of the period referred to in subparagraph (i), until the bankrupt has been granted that order;

(*c*) in keeping or causing to be kept a public record of each bankruptcy of a corporation, shall keep the files relating to it for at least 10 years after the date on which the trustee of the bankrupt's estate is discharged under subsection 41(2) of the Act;

(*d*) in keeping or causing to be kept a public record of each licence issued to a trustee, shall keep the files relating to it for at least 30 years after the date of expiry of the licence;

(*e*) in keeping or causing to be kept a public record of each appointment or designation by the Superintendent of a person to administer consumer proposals, shall keep the files relating to it for at least 30 years after the date on which the appointment or designation ceases to have effect; and

(*f*) in keeping or causing to be kept a public record of each notice sent to the Superintendent by a receiver pursuant to subsection 245(1) of the Act, shall keep the files relating to it for at least 10 years after the date on which the notice is received by the Superintendent.

(2) For the purposes of subsection 11.1(2) of the Act, the Superintendent shall keep or cause to be kept any other records relating to the administration of the Act

*b*) lorsqu'il conserve ou fait conserver un registre public des faillites des particuliers, y conserve chaque dossier se rattachant à une telle faillite :

(i) pendant au moins les 10 ans suivant la date de la libération, selon le paragraphe 41(2) de la Loi, du syndic à l'égard de l'actif du failli, ou la date de sa libération présumée selon les présentes règles,

(ii) dans le cas où le failli n'a pas obtenu une ordonnance de libération absolue en application du paragraphe 172(1) de la Loi pendant la période prévue au sous-alinéa (i), tant que cette ordonnance n'est pas rendue;

*c*) lorsqu'il conserve ou fait conserver un registre public des faillites des personnes morales, y conserve chaque dossier se rattachant à une telle faillite pendant au moins les 10 ans suivant la date de la libération, selon le paragraphe 41(2) de la Loi, du syndic à l'égard de l'actif du failli;

*d*) lorsqu'il conserve ou fait conserver un registre public des licences délivrées aux syndics, y conserve chaque dossier se rattachant à la délivrance d'une licence pendant au moins les 30 ans suivant la date d'expiration de la licence;

*e*) lorsqu'il conserve ou fait conserver un registre public des nominations ou désignations d'administrateurs effectuées par le surintendant pour les propositions de consommateur, y conserve chaque dossier se rattachant à une nomination ou à une désignation pendant au moins les 30 ans suivant la fin du mandat de l'administrateur;

*f*) lorsqu'il conserve ou fait conserver un registre public des avis expédiés au surintendant par les séquestres au titre du paragraphe 245(1) de la Loi, y conserve chaque dossier se rattachant à un tel avis pendant au moins les 10 ans suivant la date de la réception de l'avis par le surintendant.

(2) Pour l'application du paragraphe 11.1(2) de la Loi, le surintendant conserve ou fait conserver les autres dossiers qu'il estime indiqués concernant l'application

*C.R.C., ch. 368 — 16 avril 2014*

that the Superintendent deems advisable, for at least six years after the date on which they are opened.

SOR/92-579, s. 30; SOR/98-240, s. 1; SOR/2007-61, ss. 32(E), 63(E).

de la Loi pendant au moins les six ans suivant la date de leur ouverture.

DORS/92-579, art. 30; DORS/98-240, art. 1; DORS/2007-61, art. 32(A) et 63(A).

## RATE OF LEVY

**123.** (1) Subject to subsection (2) and (3), the rate of levy payable on all payments, pursuant to section 147 of the Act, is

(*a*) five per cent, if the amount of payments is $1,000,000 or less;

(*b*) five per cent of the first $1,000,000, plus one and one-quarter per cent of the amount in excess of $1,000,000, if the amount of payments exceeds $1,000,000 but is not more than $2,000,000; or

(*c*) five per cent of the first $1,000,000, one and one-quarter per cent of the second $1,000,000, plus one-quarter of one per cent of the amount in excess of $2,000,000, if the amount of payments exceeds $2,000,000.

(2) The rate of levy payable in a proposal is

(*a*) five per cent, if the amount of payments is $1,000,000 or less;

(*b*) five per cent of the first $1,000,000, plus one and one-quarter per cent of the amount in excess of $1,000,000, if the amount of payments exceeds $1,000,000 but is not more than $2,000,000; or

(*c*) five per cent of the first $1,000,000, one and one-quarter per cent of the second $1,000,000, plus zero per cent of the amount in excess of $2,000,000, if the amount of payments exceeds $2,000,000.

(3) The rate of levy payable for an estate under summary administration is

(*a*) 100 per cent, if the amount of payments is $200 or less; or

## TAUX DE PRÉLÈVEMENT

**123.** (1) Sous réserve des paragraphes (2) et (3), le taux de prélèvement effectué, conformément à l'article 147 de la Loi, sur tout paiement est de :

*a*) cinq pour cent, dans le cas des paiements d'au plus 1 000 000 $;

*b*) cinq pour cent pour le premier million de dollars et un et un quart pour cent pour le montant en sus de 1 000 000 $, dans le cas des paiements supérieurs à 1 000 000 $ mais ne dépassant pas 2 000 000 $;

*c*) cinq pour cent pour le premier million de dollars, un et un quart pour cent pour le deuxième million de dollars et un quart pour cent pour le montant en sus de 2 000 000 $, dans le cas des paiements supérieurs à 2 000 000 $.

(2) Dans le cas où les paiements sont faits dans le cadre d'une proposition, le taux du prélèvement est de :

*a*) cinq pour cent, dans le cas des paiements d'au plus 1 000 000 $;

*b*) cinq pour cent pour le premier million de dollars et un et un quart pour cent pour le montant en sus de 1 000 000 $, dans le cas des paiements supérieurs à 1 000 000 $ mais ne dépassant pas 2 000 000 $;

*c*) cinq pour cent pour le premier million de dollars, un et un quart pour cent pour le deuxième million de dollars et zéro pour cent pour le montant en sus de 2 000 000 $, dans le cas des paiements supérieurs à 2 000 000 $.

(3) Dans le cas où les paiements sont faits dans le cadre de l'administration sommaire d'un actif, le taux de prélèvement est de :

*a*) cent pour cent, dans le cas des paiements d'au plus 200 $;

(*b*) 100 per cent of the first $200 plus zero per cent of the amount in excess of $200, if the amount of payments exceeds $200.

(4) The rate of levy set out in subsection (3) applies to all estates under summary administration for which the final statement of receipts and disbursements has been received by the Division Office on or after the date of coming into force of that subsection.

SOR/92-579, s. 30; SOR/98-240, s. 1; SOR/2001-155, s. 1; SOR/2007-61, s. 63(E).

### SECURED CREDITORS AND RECEIVERS

**124.** The notice of intention to enforce a security pursuant to subsection 244(1) of the Act shall be in prescribed form and shall be served, or sent by registered mail or courier, or, if agreed to by the parties, by electronic transmission.

SOR/98-240, s. 1; SOR/2005-284, s. 9.

**125.** The statement required by subsection 246(1) of the Act to be prepared by a receiver after taking possession or control of property of an insolvent person or a bankrupt must contain the following information:

(*a*) the name of each creditor of the insolvent person or bankrupt, the amount owing to each creditor and the total amount owing to the creditors;

(*b*) a list of the property in the possession or under the control of the receiver, and the book value of each item; and

(*c*) the receiver's intended plan of action during the receivership, to the extent that such a plan has been established.

SOR/98-240, s. 1.

**126.** For the purposes of subsection 246(2) of the Act, interim reports relating to a receivership must be prepared by the receiver at least once every six months and must include

(*a*) the interim statement of receipts and disbursements, in prescribed form;

*b*) cent pour cent pour les deux cents premiers dollars et zéro pour cent pour le montant en sus de 200 $, dans le cas des paiements supérieurs à 200 $.

(4) Le taux de prélèvement fixé au paragraphe (3) s'applique à toute administration sommaire dont l'état définitif des recettes et des débours est reçu par le bureau de division à la date d'entrée en vigueur de ce paragraphe ou après cette date.

DORS/92-579, art. 30; DORS/98-240, art. 1; DORS/2001-155, art. 1; DORS/2007-61, art. 63(A).

### CRÉANCIERS GARANTIS ET SÉQUESTRES

**124.** Le préavis de mise à exécution d'une garantie ou d'une sûreté aux termes du paragraphe 244(1) de la Loi est établi sur un formulaire prescrit par le surintendant et il est, soit signifié, soit envoyé par courrier recommandé, par service de messagerie ou, si les parties y consentent, par transmission électronique.

DORS/98-240, art. 1; DORS/2005-284, art. 9.

**125.** La déclaration visée au paragraphe 246(1) de la Loi que le séquestre établit après avoir pris possession ou contrôle de tout ou partie des biens d'une personne insolvable ou d'un failli contient les renseignements suivants :

*a*) le nom de tous les créanciers de la personne insolvable ou du failli, le montant dû à chacun d'eux et le montant total dû à l'ensemble des créanciers;

*b*) la liste des biens dont le séquestre a pris la possession ou le contrôle et la valeur comptable de chacun d'eux;

*c*) le plan d'action que le séquestre entend suivre pendant la durée de son mandat, s'il a établi un tel plan.

DORS/98-240, art. 1.

**126.** Pour l'application du paragraphe 246(2) de la Loi, les rapports provisoires supplémentaires portant sur le mandat du séquestre sont établis par celui-ci au moins tous les six mois et contiennent :

*a*) l'état provisoire des recettes et des débours, établi en la forme prescrite;

(*b*) the statement of all property of which the receiver has taken possession or control that has not yet been sold or realized; and

(*c*) information about the anticipated completion of the receivership.

SOR/98-240, s. 1.

**127.** The final report and statement of accounts that are required by subsection 246(3) of the Act to be prepared by a receiver immediately after completion of their duties as receiver must contain the following information:

(*a*) the final statement of receipts and disbursements;

(*b*) details of the manner of distribution of the proceeds realized from the property of which the receiver had taken possession or control; and

(*c*) details of the disposition of any property of which the receiver had taken possession or control and that is not accounted for in the final statement of receipts and disbursements.

SOR/98-240, s. 1; SOR/2007-61, ss. 33(F), 65(E).

## TRUSTEE'S FEES AND DISBURSEMENTS IN SUMMARY ADMINISTRATION

**128.** (1) The fees of the trustee for services performed in a summary administration are calculated on the total receipts remaining after deducting necessary disbursements relating directly to the realization of the property of the bankrupt, and the payments to secured creditors, according to the following percentages:

(*a*) 100 per cent on the first $975 or less of receipts;

(*b*) 35 per cent on the portion of the receipts exceeding $975 but not exceeding $2,000; and

(*c*) 50 per cent on the portion of the receipts exceeding $2,000.

(2) A trustee in a summary administration may claim, in addition to the amount set out in subsection (1),

(*a*) the costs of counselling referred to in subsection 131(2);

*b*) le relevé de tous les biens dont il a pris la possession ou le contrôle et qui n'ont pas encore été vendus ou réalisés;

*c*) les renseignements concernant l'achèvement prévu du mandat du séquestre.

DORS/98-240, art. 1.

**127.** Le rapport définitif et l'état de comptes établis par le séquestre conformément au paragraphe 246(3) de la Loi dès la fin de son mandat contiennent les renseignements suivants :

*a*) l'état définitif des recettes et des débours;

*b*) des précisions sur le mode de distribution du produit tiré des biens dont il a pris la possession ou le contrôle;

*c*) le détail relatif à la disposition de tout bien dont il a pris la possession ou le contrôle et qui n'est pas mentionné dans l'état définitif des recettes et des débours.

DORS/98-240, art. 1; DORS/2007-61, art. 33(F) et 65(A).

## HONORAIRES ET DÉBOURS DU SYNDIC EN CAS D'ADMINISTRATION SOMMAIRE

**128.** (1) Les honoraires du syndic pour les services fournis dans le cas d'une administration sommaire sont calculés sur le total des recettes après déduction, d'une part, des débours nécessaires directement liés à la réalisation des biens du failli et, d'autre part, des paiements aux créanciers garantis, selon les pourcentages suivants :

*a*) 100 pour cent des premiers 975 $ ou moins des recettes;

*b*) 35 pour cent de la partie des recettes en sus de 975 $ jusqu'à 2 000 $;

*c*) 50 pour cent de la partie des recettes en sus de 2 000 $.

(2) Dans le cas d'une administration sommaire, le syndic peut réclamer, en plus du montant visé au paragraphe (1) :

(*b*) the fee for filing an assignment referred to in paragraph 132(*a*);

(*c*) the fee payable to the registrar under paragraph 1(*a*) of Part II of the schedule;

(*d*) the amount of applicable federal and provincial taxes for goods and services; and

(*e*) a lump sum of $100 in respect of administrative disbursements.

(3) A trustee in a summary administration may withdraw from the bank account used in administering the estate of the bankrupt, as an advance on the amount set out in subsection (1),

(*a*) $250, at the time of the mailing of the notice of bankruptcy;

(*b*) an additional $250, thirty days after the date of the bankruptcy; and

(*c*) an additional $250, four months after the date of the bankruptcy.

(4) Subsections (1) to (3) apply to bankruptcies in respect of which proceedings are commenced on or after September 30, 1997 and the accounts are taxed on or after April 30, 1998.

SOR/98-240, s. 1.

## ADMINISTRATOR'S FEES AND EXPENSES IN A CONSUMER PROPOSAL

**129.** (1) For the purposes of paragraph 66.12(6)(*b*) of the Act, the fees and expenses of the administrator of a consumer proposal that must be provided for in a consumer proposal are as follows:

(*a*) $750, payable on filing a copy of the consumer proposal with the official receiver;

(*b*) $750, payable on the approval or deemed approval of the consumer proposal by the court;

*a*) les frais des consultations prévus au paragraphe 131(2);

*b*) les honoraires applicables au dépôt d'une cession, prévus à l'alinéa 132*a*);

*c*) les honoraires payables au registraire selon l'alinéa 1*a*) de la partie II de l'annexe;

*d*) les taxes provinciales et fédérales sur les produits et services qui s'appliquent;

*e*) la somme forfaitaire de 100 $ pour les débours au titre des frais administratifs.

(3) Dans le cas d'une administration sommaire, le syndic peut prélever du compte en banque servant à l'administration de l'actif du failli, à titre d'avance sur le montant visé au paragraphe (1) :

*a*) la somme de 250 $, au moment de la mise à la poste de l'avis de faillite;

*b*) une somme additionnelle de 250 $, le trentième jour suivant la date de la faillite;

*c*) une somme additionnelle de 250 $, à l'expiration du quatrième mois suivant la date de la faillite.

(4) Les paragraphes (1) à (3) s'appliquent aux faillites à l'égard desquelles les procédures sont engagées le 30 septembre 1997 ou après cette date et la taxation des comptes est effectuée le 30 avril 1998 ou après cette date.

DORS/98-240, art. 1.

## HONORAIRES ET DÉPENSES DE L'ADMINISTRATEUR D'UNE PROPOSITION DE CONSOMMATEUR

**129.** (1) Pour l'application de l'alinéa 66.12(6)*b*) de la Loi, les honoraires et les dépenses de l'administrateur d'une proposition de consommateur à prévoir dans celle-ci sont les suivants :

*a*) un montant de 750 $ payable lors du dépôt auprès du séquestre officiel d'une copie de la proposition de consommateur;

*C.R.C., ch. 368 — 16 avril 2014*

(*c*) 20 per cent of the moneys distributed to creditors under the consumer proposal, payable on the distribution of the moneys;

(*d*) the costs of counselling referred to in subsection 131(1);

(*e*) the fee for filing a consumer proposal referred to in paragraph 132(*c*);

(*f*) the fee payable to the registrar under paragraph 3(*b*) of Part II of the schedule; and

(*g*) the amount of applicable federal and provincial taxes for goods and services.

(2) Subsection (1) applies to consumer proposals in respect of which proceedings are commenced on or after April 30, 1998.

SOR/98-240, s. 1.

## APPLICATION OF SUMMARY ADMINISTRATION PROVISIONS

**130.** For the purposes of subsections 49(6) and (8) of the Act, the amount is $15,000.

SOR/98-240, s. 1; SOR/2009-218, s. 22.

## MISCELLANEOUS FEES

**131.** (1) For the purposes of paragraph 66.12(6)(*b*) of the Act, the fees and expenses in respect of counselling are $85 per session if counselling is provided on an individual basis, and $25 per person per session if counselling is provided on a group basis.

(2) For the purposes of subsection 157.1(1) of the Act, the costs of counselling are $85 per session if counselling is provided on an individual basis, and $25 per person per session if counselling is provided on a group basis.

SOR/98-240, s. 1; SOR/2007-61, s. 63(E).

*b*) un montant de 750 $ payable lors de l'approbation, effective ou présumée, de la proposition de consommateur par le tribunal;

*c*) un montant représentant 20 pour cent des sommes distribuées aux créanciers aux termes de la proposition de consommateur, payable au moment de la distribution;

*d*) les frais des consultations prévus au paragraphe 131(1);

*e*) les frais applicables au dépôt d'une proposition de consommateur, prévus à l'alinéa 132*c*);

*f*) les honoraires payables au registraire selon l'alinéa 3*b*) de la partie II de l'annexe;

*g*) les taxes provinciales et fédérales sur les produits et services qui s'appliquent.

(2) Le paragraphe (1) s'applique aux propositions de consommateur à l'égard desquelles les procédures sont engagées le 30 avril 1998 ou après cette date.

DORS/98-240, art. 1.

## APPLICATION DE DISPOSITIONS RELATIVES À L'ADMINISTRATION SOMMAIRE

**130.** Pour l'application des paragraphes 49(6) et (8) de la Loi, le montant est de 15 000 $.

DORS/98-240, art. 1; DORS/2009-218, art. 22.

## HONORAIRES DIVERS

**131.** (1) Pour l'application de l'alinéa 66.12(6)*b*) de la Loi, les honoraires et dépenses se rapportant aux consultations sont de 85 $ par séance de consultation individuelle et de 25 $ par personne pour chaque séance de consultation en groupe.

(2) Pour l'application du paragraphe 157.1(1) de la Loi, les frais des consultations sont de 85 $ par séance de consultation individuelle et de 25 $ par personne pour chaque séance de consultation en groupe.

DORS/98-240, art. 1; DORS/2007-61, art. 63(A).

**132.** (1) The total fee to file all documents relating to an estate with the official receiver is as follows:

(*a*) $75 for an estate under summary administration in respect of an individual bankrupt who has never before been bankrupt under the laws of Canada or of any jurisdiction prescribed under section 168.1 of the Act and, in the case of any other bankruptcy, $150, payable at the time of filing an assignment under subsection 49(3) of the Act or at the time of the making of a bankruptcy order under subsection 43(6) of the Act;

(*b*) in the case of a proposal made by an insolvent person, $150, payable at the time of filing a copy of the proposal pursuant to subsection 62(1) of the Act;

(*c*) in the case of a consumer proposal made by a consumer debtor, $100, payable at the time of filing a copy of the consumer proposal pursuant to paragraph 66.13(2)(*d*) of the Act; and

(*d*) if the official receiver directs, pursuant to subsection 49(8) of the Act, that subsection 49(6) of the Act ceases to apply in respect of a bankrupt, $75, payable at the time of the official receiver's direction.

(2) The fees set out in paragraphs (1)(*a*), (*c*) and (*d*) apply to all documents filed on or after the coming into force of those paragraphs.

SOR/98-240, s. 1; SOR/2001-155, s. 2; SOR/2007-61, s. 34.

**133.** For the purposes of subsection 11.1(1) of the Act, the fee payable for each request for information contained in the public record is $8.

SOR/98-240, s. 1.

**134.** (1) For the purposes of subsection 13.2(1) of the Act, the fee payable by an applicant for a licence to act as a trustee is $300.

(2) For the purposes of subsection 13.2(2) of the Act, the annual fee payable by a trustee is $850.

**132.** (1) Les frais forfaitaires de dépôt, auprès du séquestre officiel, de tous les documents concernant un actif sont les suivants :

*a*) dans le cas de l'administration sommaire d'un actif d'un particulier qui fait faillite pour la première fois sous le régime du droit canadien ou de tout pays prescrit en application de l'article 168.1 de la Loi, 75 $ ou, dans le cas de toute autre faillite, 150 $, à payer lors du dépôt d'une cession aux termes du paragraphe 49(3) de la Loi ou lorsqu'une ordonnance de faillite est rendue aux termes du paragraphe 43(6) de la Loi;

*b*) dans le cas d'une proposition faite par une personne insolvable, 150 $, payables lors du dépôt d'une copie de la proposition aux termes du paragraphe 62(1) de la Loi;

*c*) dans le cas d'une proposition de consommateur faite par un débiteur consommateur, 100 $, payables lors du dépôt d'une copie de la proposition aux termes de l'alinéa 66.13(2)*d*) de la Loi;

*d*) dans le cas où le séquestre officiel ordonne, conformément au paragraphe 49(8) de la Loi, que cesse de s'appliquer au failli le paragraphe 49(6) de la Loi, 75 $, payables au moment où est ordonnée cette mesure.

(2) Les frais forfaitaires fixés aux alinéas (1)*a*), *c*) et *d*) s'appliquent au dépôt de documents fait à la date d'entrée en vigueur de ces alinéas ou après cette date.

DORS/98-240, art. 1; DORS/2001-155, art. 2; DORS/2007-61, art. 34.

**133.** Pour l'application du paragraphe 11.1(1) de la Loi, les droits payables pour chaque demande de renseignements figurant au registre public sont de 8 $.

DORS/98-240, art. 1.

**134.** (1) Pour l'application du paragraphe 13.2(1) de la Loi, les droits payables par le postulant pour l'obtention d'une licence de syndic sont de 300 $.

(2) Pour l'application du paragraphe 13.2(2) de la Loi, les droits annuels payables par le syndic sont de 850 $.

(3) For the purposes of paragraph 13.2(4)(*a*) of the Act, the penalty amount that must be paid by a trustee is $100.

SOR/98-240, s. 1; SOR/2001-155, s. 3.

**135.** For the purposes of subsection 120(5) of the Act, the fees per meeting that may be paid to an inspector, to be determined on the net receipts as calculated by subtracting the payments to secured creditors from the amount of total receipts received by the trustee, are as follows:

(*a*) $10, if the estate has net receipts of less than $10,000;

(*b*) $20, if the estate has net receipts of $10,000 or more but less than $50,000;

(*c*) $30, if the estate has net receipts of $50,000 or more but less than $100,000; or

(*d*) $40, if the estate has net receipts of $100,000 or more.

SOR/98-240, s. 1; SOR/99-416, s. 1; SOR/2007-61, s. 63(E).

**136.** For the purposes of subsection 245(1) of the Act, the fee that accompanies the notice sent to the Superintendent is $70.

SOR/98-240, s. 1.

**136.1** (1) The fee payable by a creditor who applies for payment of a dividend pursuant to subsection 154(2) of the Act is $30 for each dividend applied for.

(2) The fee set out in subsection (1) applies to all applications for dividends made on or after the coming into force of that subsection.

SOR/2001-155, s. 4.

## PRESCRIBED DATE

**137.** For the purposes of paragraphs 136(1)(*h*) and (*j*) of the Act, the prescribed date is November 30, 1992.

SOR/98-240, s. 1.

---

(3) Pour l'application de l'alinéa 13.2(4)*a*) de la Loi, le montant de la pénalité payable par le syndic est de 100 $.

DORS/98-240, art. 1; DORS/2001-155, art. 3.

**135.** Pour l'application du paragraphe 120(5) de la Loi, les honoraires que peut recevoir l'inspecteur pour chaque assemblée, calculés sur les recettes nettes qu'on obtient en soustrayant les paiements aux créanciers garantis du montant des recettes totales reçues par le syndic, sont de :

*a*) 10 $, dans le cas d'un actif comportant des recettes nettes de moins de 10 000 $;

*b*) 20 $, dans le cas d'un actif comportant des recettes nettes de 10 000 $ ou plus et de moins de 50 000 $;

*c*) 30 $, dans le cas d'un actif comportant des recettes nettes de 50 000 $ ou plus et de moins de 100 000 $;

*d*) 40 $, dans le cas d'un actif comportant des recettes nettes de 100 000 $ ou plus.

DORS/98-240, art. 1; DORS/99-416, art. 1; DORS/2007-61, art. 63(A).

**136.** Pour l'application du paragraphe 245(1) de la Loi, les droits accompagnant l'avis donné au surintendant sont de 70 $.

DORS/98-240, art. 1.

**136.1** (1) Les frais forfaitaires payables par un créancier sur présentation d'une demande de dividende visée au paragraphe 154(2) de la Loi sont de 30 $ pour chaque dividende réclamé.

(2) Les frais forfaitaires fixés au paragraphe (1) s'appliquent à toute demande de dividende présentée à la date d'entrée en vigueur de ce paragraphe ou après cette date.

DORS/2001-155, art. 4.

## DATE PRESCRITE

**137.** Pour l'application des alinéas 136(1)*h*) et *j*) de la Loi, la date prescrite est le 30 novembre 1992.

DORS/98-240, art. 1.

*C.R.C., c. 368 — April 16, 2014*

NOTICE RELATED TO FOREIGN PROCEEDING

**138.** For the purposes of paragraph 276(*b*) of the Act, the notice must contain the following information:

(*a*) the name and contact information of the foreign representative;

(*b*) the name of the debtor and the name under which the debtor carries on business in Canada, if any;

(*c*) the following information respecting the order, namely

(i)  the name of the court that made it,

(ii)  the legislative provision under which it was made, and

(iii)  the date on which it was made;

(*d*) the country in which the foreign proceeding is filed;

(*e*) whether the proceeding is a foreign main or foreign non-main proceeding; and

(*f*) the name and contact information of legal counsel for the foreign representative.

SOR/2009-218, s. 23.

AVIS CONCERNANT LA RECONNAISSANCE D'UNE INSTANCE ÉTRANGÈRE

**138.** Pour l'application de l'alinéa 276*b*) de la Loi, les renseignements que doit contenir l'avis sont les suivants :

*a*) le nom et les coordonnées du représentant étranger;

*b*) le nom du débiteur et, s'il y a lieu, le nom sous lequel il fait affaires au Canada;

*c*) relativement à l'ordonnance :

(i)  le nom du tribunal qui l'a rendue,

(ii)  la disposition législative en vertu de laquelle elle a été rendue,

(iii)  la date à laquelle elle a été rendue;

*d*) le pays dans lequel l'instance étrangère est déposée;

*e*) une indication du caractère principal ou secondaire de l'instance étrangère;

*f*) le nom et les coordonnées du conseiller juridique du représentant étranger.

DORS/2009-218, art. 23.

*C.R.C., ch. 368 — 16 avril 2014*

SCHEDULE
*(Section 1 and paragraphs 128(2)(c) and 129(1)(f))*

PART I

# [Repealed, SOR/2010-97, s. 1]

PART II

FEES PAYABLE TO COURT OFFICERS

Fees Payable to the Registrar

*Bankruptcy*

1.  The trustee shall pay the registrar, at the time of the opening of a file or at any later date determined by the registrar,

   (*a*) for all Court services to be rendered to the trustee in a summary administration bankruptcy, a single fee of ........................................................................................................................................................... $ 50

   (*b*) for all Court services to be rendered to the trustee in a bankruptcy other than a summary administration bankruptcy, a single fee of .................................................................................................................... $150

2.  No fee shall be paid by the trustee if

   (*a*) a summary administration bankruptcy file is caused to be opened by a person other than the trustee and a fee is paid pursuant to paragraph 4(*f*) for an opposition to the discharge of the bankrupt; or

   (*b*) the debtor has become bankrupt following a bankruptcy order made under subsection 43(6) of the Act, has filed an assignment under subsection 50(4.1) of the Act or is deemed to have made an assignment under subsection 50.4(8) or (11), paragraph 57(*a*) or subsection 61(2) or 63(4) of the Act.

*Proposal*

3.  The trustee or the administrator shall pay the registrar, at the opening of a file or at any later date determined by the registrar,

   (*a*) for all Court services to be rendered to the trustee in a general scheme proposal (Division I of Part III of the Act), a single fee of ................................................................................................................ $150

   (*b*) for all Court services to be rendered to the administrator in a consumer proposal (Division II of Part III of the Act), a single fee of ........................................................................................................................ $ 50

*Bankruptcy and proposal*

4.  A person other than the trustee or the administrator shall pay a fee to the registrar for the following services:

   (*a*) an application for a bankruptcy order ................................................................................................. $150

   (*b*) a motion for the appointment of an interim receiver .......................................................................... $ 50

   (*c*) a motion made under section 248 or 249 of the Act ......................................................................... $ 50

   (*d*) a motion for substituted service ........................................................................................................ $ 10

   (*e*) any other motion

      (i) in an ordinary bankruptcy or a proposal under Division I of Part III of the Act ................................. $ 50

      (ii) in a summary bankruptcy or a proposal under Division II of Part III of the Act .............................. $ 10

   (*f*) any written dispute or opposition ..................................................................................................... $ 50

*C.R.C., c. 368 — April 16, 2014*

(*g*)  taxing a receiver's accounts under subsection 248(2) of the Act ............................................................. $ 50

(*h*)  taxing a bill of legal services costs for

(i)  a bill of $500 or more, but not exceeding $3,000 .............................................................................. $ 25

(ii)  a bill in excess of $3,000 ............................................................................................................... $ 50

*Other services*

5.      The fees payable for all other services, including proceedings before the Court of Appeal, name searches and the issuance of a subpoena or a certificate, shall be those in effect within each province or territory.

6.      No fee shall be charged for the filing of a document or report by the Official Receiver or the Superintendent of Bankruptcy.

FEES AND DISBURSEMENTS PAYABLE TO THE BAILIFF

7.      The fees and disbursements payable to the bailiff shall be those in effect within  each province or territory.

PART III

SCALE OF TRUSTEE'S DISBURSEMENTS FOR WORK IN OTHER THAN SUMMARY ADMINISTRATION

The trustee shall, in other than summary administrations, be entitled to be paid his disbursements, and in taxing such disbursements the taxing officer may allow as disbursements the following:

1.  For taking possession, verifying the bankrupt's statement of affairs, and making an inventory of his assets and a list of his liabilities:

The actual disbursements of the trustee in connection with the said work.

2.  For preparing and mailing to all creditors the following documents:

(*a*)  notice of first meeting,

(*b*)  documents accompanying notice of first meeting,

(*c*)  explanatory circular letter,

(*d*)  statement of assets and liabilities,

(*e*)  minutes of first meeting or synopsis thereof,

(*f*)  interim report from statement,

(*g*)  notice of application for discharge,

(*h*)  notice of application to pass accounts,

(*i*)  statement of receipts and disbursements,

(*j*)  dividend sheet,

(*k*)  other documents necessary or desirable in the opinion of the taxing officer to inform the creditors,

the cost of printing plus postage or if it is less,

(*l*)  on the first 100 notices and other documents, $0.07 per folio,

(*m*)  on the next 200 notices and other documents, $0.05 per folio,

(*n*)  on any excess over 300 notices and other documents, $0.02 per folio,

plus postage.

3.  Printed proof of debt and proxy forms at cost:

If the court considers that the amount of remuneration allowed to the trustee is sufficient to compensate him adequately for all services rendered to the estate, the court may disallow the foregoing disbursements either in whole or in part.

*C.R.C., ch. 368 — 16 avril 2014*

If a court officer performs a service for which no fee is provided in this tariff, the court may allow a fee in an amount equal to the fee in this tariff for the service most nearly analogous or comparable to the services rendered, or if no fee can be found herein applicable to the particular service rendered, according to the tariff in effect in other civil matters in the court.

No disbursements are payable to trustees in respect of

(*a*) collection notices,

(*b*) notices of sale,

(*c*) notices under section 120,

(*d*) notices respecting goods in storage,

(*e*) notices of stay of proceedings,

(*f*) any other notice that is not sent to all creditors.

SOR/78-389, s. 6; SOR/96-473, ss. 2 to 4; SOR/98-240, s. 2; SOR/2007-61, ss. 35 to 39, 40(F), 41, 42, 43(F), 44(F), 45, 46(F), 47(F), 48, 49(E), 50(E), 51 to 53, 54(F), 55 to 58, 59(E), 60 to 62, 63(E), 64, 66(F), 67; SOR/2009-270, s. 1; SOR/2010-97, s. 1.

*C.R.C., c. 368 — April 16, 2014*

ANNEXE
*(article 1 et alinéas 128(2)c) et 129(1)f)*

PARTIE I

## [Abrogée, DORS/2010-97, art. 1]

PARTIE II

HONORAIRES PAYABLES AUX FONCTIONNAIRES DU TRIBUNAL

Honoraires payables au registraire

*Faillite*

1. Le syndic paie au registraire, à l'ouverture du dossier ou à toute date ultérieure fixée par celui-ci :

   *a)* pour tous les services judiciaires fournis dans le cadre d'une administration sommaire, un droit unique de .......................................................................................................................................... 50 $

   *b)* pour tous les services judiciaires fournis autrement que dans le cadre d'une administration sommaire, un droit unique de ........................................................................................................................ 150 $

2. Une dispense de paiement des droits est accordée au syndic dans les cas suivants :

   *a)* un dossier d'administration sommaire est ouvert sur l'initiative d'une personne autre que lui et un droit a été payé en vertu de l'alinéa 4*f)* pour une opposition à la libération du failli;

   *b)* le débiteur a été mis en faillite à la suite d'une ordonnance de faillite rendue en vertu du paragraphe 43(6) de la Loi, a déposé une cession conformément au paragraphe 50(4.1) de la Loi ou est réputé avoir fait une cession selon les paragraphes 50.4(8) ou (11), l'alinéa 57*a)* ou les paragraphes 61(2) ou 63(4) de la Loi.

*Proposition*

3. Le syndic ou l'administrateur paie au registraire à l'ouverture du dossier ou à toute date ultérieure fixée par celui-ci :

   *a)* dans le cas du syndic, pour tous les services judiciaires fournis dans le cadre d'une disposition d'application générale (section I de la partie III de la Loi), un droit unique de .................................... 150 $

   *b)* dans le cas de l'administrateur, pour tous les services judiciaires fournis dans le cadre d'une proposition de consommateur (section II de la partie III de la Loi), un droit unique de ........................................ 50 $

*Faillite et proposition*

4. Une personne autre que le syndic ou l'administrateur paie au registraire pour les services suivants :

   *a)* requête en vue d'une ordonnance de faillite ............................................................................ 150 $

   *b)* requête ou motion pour la nomination d'un séquestre intérimaire ............................................ 50 $

   *c)* requête ou motion selon les articles 248 ou 249 de la Loi ...................................................... 50 $

   *d)* requête ou motion pour mode spécial de signification ............................................................ 10 $

   *e)* toute autre requête ou motion :

       (i) dans une faillite ordinaire ou une proposition visée à la section I de la partie III de la Loi ............... 50 $

       (ii) dans une faillite sommaire ou une proposition visée à la section II de la partie III de la Loi ............ 10 $

   *f)* toute contestation ou opposition écrite ................................................................................. 50 $

*C.R.C., ch. 368 — 16 avril 2014*

   *g)*  taxation des comptes du séquestre selon le paragraphe 248(2) de la Loi ................................................... 50 $

   *h)*  taxation d'un mémoire de frais pour services juridiques :

      (i)  mémoire de 500 $ ou plus, mais ne dépassant pas 3 000 $ ............................................................... 25 $

      (ii)  mémoire de plus de 3 000 $ ...................................................................................................... 50 $

*Autres services*

5.    Les honoraires payables pour tous les autres services, notamment les procédures devant la Cour d'appel, la recherche concernant une dénomination, la délivrance d'une assignation ou d'un certificat, sont ceux en vigueur dans chaque province ou territoire.

6.    Aucuns honoraires ne sont réclamés pour la production de documents ou de rapports par le séquestre officiel ou le surintendant des faillites.

HONORAIRES ET DÉBOURS DU HUISSIER

7.    Les honoraires et débours payables au huissier sont ceux en vigueur dans chaque province ou territoire.

PARTIE III

TARIF DES DÉBOURS DU SYNDIC POUR D'AUTRES TRAVAUX QUE L'ADMINISTRATION SOMMAIRE

Dans d'autres cas que les administrations sommaires, le syndic a droit au paiement de ses déboursés, et, en taxant ces déboursés, l'officier taxateur peut allouer comme déboursés ce qui suit :

1. Pour prendre possession, vérifier le bilan du failli et dresser un inventaire de son actif ainsi qu'un relevé détaillé de son passif :

Les déboursés réels du syndic à l'égard de cette besogne.

2. Pour préparer et adresser, par la poste, à tous les créanciers, les documents suivants :

*a)* avis de première assemblée,

*b)* documents accompagnant avis de première assemblée,

*c)* lettre circulaire explicative,

*d)* relevé de l'actif et du passif,

*e)* procès-verbal de la première assemblée ou un résumé,

*f)* rapports et relevés intérimaires,

*g)* avis de demande de libération,

*h)* avis de demande d'approbation des comptes,

*i)* relevé des recettes et déboursés,

*j)* bordereau de dividende,

*k)* autres documents qui sont, selon l'avis de l'officier taxateur, nécessaires ou opportuns pour renseigner les réanciers,

le coût de l'impression et du port, ou, s'il est moindre,

*l)* pour les 100 premiers avis et autres documents, 0,07 $ par folio,

*m)* pour les 200 avis suivants et autres documents, 0,05 $ par folio,

*n)* pour toute quantité dépassant 300 avis et autres documents, 0,02 $ par folio,

le port en sus.

3. Le coût réel des formules imprimées de preuve de réclamation et de procuration :

Lorsque le tribunal estime que le montant de la rémunération allouée au syndic suffit à le rétribuer raisonnablement pour tous les services qu'il a rendus à l'actif, le tribunal peut rejeter les déboursés précités, soit en totalité, soit en partie.

*C.R.C., c. 368 — April 16, 2014*

Lorsqu'un fonctionnaire du tribunal rend un service pour lequel aucun honoraire n'est prévu dans le présent tarif, le tribunal peut accorder des honoraires d'un montant égal aux honoraires du présent tarif pour le service le plus analogue ou comparable possible aux services rendus, ou lorsqu'on ne peut trouver dans le présent tarif aucun honoraire applicable aux services particuliers rendus, des honoraires selon le tarif en vigueur dans d'autres causes civiles devant le tribunal.

Aucun déboursé n'est payable aux syndics à l'égard

*a)* des avis de perception,

*b)* des avis de vente,

*c)* des avis prévus à l'article 120,

*d)* des avis relatifs aux marchandises en entrepôt,

*e)* des avis de suspension d'instances,

*f)* de tout autre avis qui n'est pas envoyé à tous les créanciers.

DORS/78-389, art. 6; DORS/96-473, art. 2 à 4; DORS/98-240, art. 2; DORS/2007-61, art. 35 à 39, 40(F), 41, 42, 43(F), 44(F), 45, 46(F), 47(F), 48, 49(A), 50(A), 51 à 53, 54(F), 55 à 58, 59(A), 60 à 62, 63(A), 64, 66(F) et 67; DORS/2009-270, art. 1; DORS/2010-97, art. 1.

*C.R.C., ch. 368 — 16 avril 2014*

SCHEDULE II
[Repealed, SOR/85-167, s. 3]

ANNEXE II
[Abrogée, DORS/85-167, art. 3]

*C.R.C., c. 368 — April 16, 2014*

| SCHEDULE III | ANNEXE III |
|---|---|
| [Repealed, SOR/98-240, s. 3] | [Abrogée, DORS/98-240, art. 3] |

TAB 13

*Changes to legislation:* There are outstanding changes not yet made by the legislation.gov.uk editorial team to Insolvency Act 1986. Any changes that have already been made by the team appear in the content and are referenced with annotations. (See end of Document for details)



# Insolvency Act 1986

## 1986 CHAPTER 45

### Part IV

### Winding Up of Companies Registered under the Companies Acts

### Chapter V

### Provisions Applying to both kinds of Voluntary Winding Up

**107    Distribution of company's property.**

Subject to the provisions of this Act as to preferential payments, the company's property in a voluntary winding up shall on the winding up be applied in satisfaction of the company's liabilities pari passu and, subject to that application, shall (unless the articles otherwise provide) be distributed among the members according to their rights and interests in the company.

---

**Annotations:**

**Modifications etc. (not altering text)**

C1    S. 107 restricted (6.3.2008) by The Regulated Covered Bonds Regulations 2008 (S.I. 2008/346), reg. 46, **Sch. para. 2(2)**

**Changes to legislation:**
There are outstanding changes not yet made by the legislation.gov.uk editorial team to
Insolvency Act 1986. Any changes that have already been made by the team appear in the
content and are referenced with annotations.

**Changes and effects yet to be applied to :**

–    First Group of Parts amendment to earlier affecting provision SI 2006/3107 art. 3
     Sch. by S.I. 2013/472 Sch. 2 para. 117
–    Third Group of Parts applied (with modifications) in part by S.I. 2012/3013 Sch.
     para. 1(2)(c)(3)-(7)

**Changes and effects yet to be applied to the whole Act associated Parts and Chapters:**

–    Act amendment to earlier affecting provision SI 2011/245 reg. 8(7) 9 15 16-21 24 25
     Sch. 1-4 by S.I. 2013/472 Sch. 2 para. 198(i)-(n)
–    Act modified by S.I. 2013/1046 rule 205(2)-(4)
–    Act modified by S.I. 2013/3208 rule 206
–    Act specified provisions applied (with modifications) by 2013 c. 33 Sch. 6 para. 5
     Table 2
–    Blanket amendment words substituted by S.I. 2011/1043 art. 3 4
Whole provisions yet to be inserted into this Act (including any effects on those
provisions):
–    Pt. 12-19 applied (with modifications) by S.I. 2014/229 art. 4(c) Sch. 3
–    s. 55J(1) modified by SI 1995/1442 reg. 49(2) (as substituted) by S.I. 2013/472 Sch.
     2 para. 12(c)(i)
–    s. 55L(2) modified by SI 1995/1442 reg. 49(2) (as substituted) by S.I. 2013/472 Sch.
     2 para. 12(c)(i)
–    s. 55M(2) modified by SI 1995/1442 reg. 49(2) (as substituted) by S.I. 2013/472
     Sch. 2 para. 12(c)(i)
–    s. 246A applied (with modifications) S.I. 2013/1388 Sch. 2 para. 3 5 Pt. 3 Table
–    s. 246B applied (with modifications) S.I. 2013/1388 Sch. 2 para. 3 5 Pt. 3 Table
–    s. 398A and crossheading inserted by 2013 c. 24 s. 71(1)

**Commencement Orders yet to be applied to the Insolvency Act 1986**
Commencement Orders bringing legislation that affects this Act into force:
–    S.I. 2003/333 art. 2 Sch. commences (2002 c. 29)
–    S.I. 2010/2169 art. 4 Sch. commences (2010 c. 29)
–    S.I. 2011/2329 art. 3 commences (2011 c. 5)

TAB 14



CANADA

CONSOLIDATION

CODIFICATION

# Income Tax Act

# Loi de l'impôt sur le revenu

R.S.C. 1985, c. 1 (5th Supp.)

S.R.C. 1985, ch. 1 (5ᵉ suppl.)

<table>
<tr><td>

NOTE

Application provisions are not included in the consolidated text; see relevant amending Acts.

</td><td>

NOTE

Les dispositions d'application ne sont pas incluses dans la présente codification; voir les lois modificatives appropriées.

</td></tr>
</table>

Current to April 16, 2014

À jour au 16 avril 2014

Last amended on January 1, 2014

Dernière modification le 1 janvier 2014

Published by the Minister of Justice at the following address:
http://laws-lois.justice.gc.ca

Publié par le ministre de la Justice à l'adresse suivante :
http://lois-laws.justice.gc.ca

(B) in any other case, the taxpayer or a partnership of which the taxpayer is a member made reasonable efforts to determine arm's length transfer prices or arm's length allocations in respect of the transaction, and to use those prices or allocations for the purposes of this Act, and

(iii) the total of all amounts, each of which is the portion of the taxpayer's transfer pricing capital setoff adjustment or transfer pricing income setoff adjustment for the year that can reasonably be considered to relate to a particular transaction, where

(A) the transaction is a qualifying cost contribution arrangement in which the taxpayer or a partnership of which the taxpayer is a member is a participant, or

(B) in any other case, the taxpayer or a partnership of which the taxpayer is a member made reasonable efforts to determine arm's length transfer prices or arm's length allocations in respect of the transaction, and to use those prices or allocations for the purposes of this Act,

is greater than

(*b*) the lesser of

(i) 10% of the amount that would be the taxpayer's gross revenue for the year if this Act were read without reference to subsection 247(2), subsections 69(1) and 69(1.2) and section 245, and

(ii) $5,000,000.

Contemporaneous documentation

(4) For the purposes of subsection 247(3) and the definition "qualifying cost contribution arrangement" in subsection 247(1), a taxpayer or a partnership is deemed not to have made reasonable efforts to determine and use arm's length transfer prices or arm's length allocations in respect of a transaction or not to have participated in a transaction that is a qualifying cost contribution arrangement, unless the taxpayer or the partnership, as the case may be,

(*a*) makes or obtains, on or before the taxpayer's or partnership's documentation-due date for the taxation year or fiscal period, as

prend part le contribuable ou une société de personnes dont il est un associé,

(B) dans les autres cas, le contribuable ou une société de personnes dont il est un associé a fait des efforts sérieux pour déterminer les prix de transfert de pleine concurrence ou les attributions de pleine concurrence relativement à l'opération et pour les utiliser pour l'application de la présente loi,

(iii) le total des montants représentant chacun la partie du redressement compensatoire de capital ou du redressement compensatoire de revenu du contribuable pour l'année qu'il est raisonnable de considérer comme se rapportant à une opération donnée si :

(A) l'opération est un arrangement admissible de participation au coût auquel prend part le contribuable ou une société de personnes dont il est un associé,

(B) dans les autres cas, le contribuable ou une société de personnes dont il est un associé a fait des efforts sérieux pour déterminer les prix de transfert de pleine concurrence ou les attributions de pleine concurrence relativement à l'opération et pour les utiliser pour l'application de la présente loi;

*b*) le moins élevé des montants suivants :

(i) 10% du montant qui représenterait le revenu brut du contribuable pour l'année s'il n'était pas tenu compte du paragraphe (2), des paragraphes 69(1) et (1.2) ni de l'article 245,

(ii) 5 000 000 $.

(4) Pour l'application du paragraphe (3) et de la définition de «arrangement admissible de participation au coût» au paragraphe (1), un contribuable ou une société de personnes est réputé ne pas avoir fait d'efforts sérieux pour déterminer et utiliser les prix de transfert de pleine concurrence ou les attributions de pleine concurrence relativement à une opération ou ne pas avoir pris part à une opération qui est un arrangement admissible de participation au coût, à moins d'avoir à la fois :

Documentation ponctuelle

*a*) établi ou obtenu, au plus tard à la date limite de production qui lui est applicable pour

*Income Tax — April 16, 2014*

the case may be, in which the transaction is entered into, records or documents that provide a description that is complete and accurate in all material respects of

(i) the property or services to which the transaction relates,

(ii) the terms and conditions of the transaction and their relationship, if any, to the terms and conditions of each other transaction entered into between the participants in the transaction,

(iii) the identity of the participants in the transaction and their relationship to each other at the time the transaction was entered into,

(iv) the functions performed, the property used or contributed and the risks assumed, in respect of the transaction, by the participants in the transaction,

(v) the data and methods considered and the analysis performed to determine the transfer prices or the allocations of profits or losses or contributions to costs, as the case may be, in respect of the transaction, and

(vi) the assumptions, strategies and policies, if any, that influenced the determination of the transfer prices or the allocations of profits or losses or contributions to costs, as the case may be, in respect of the transaction;

(*b*) for each subsequent taxation year or fiscal period, if any, in which the transaction continues, makes or obtains, on or before the taxpayer's or partnership's documentation-due date for that year or period, as the case may be, records or documents that completely and accurately describe each material change in the year or period to the matters referred to in any of subparagraphs 247(4)(*a*)(i) to 247(4)(*a*)(vi) in respect of the transaction; and

(*c*) provides the records or documents described in paragraphs 247(4)(*a*) and 247(4)(*b*) to the Minister within 3 months after service, made personally or by registered or certified mail, of a written request therefor.

l'année d'imposition ou l'exercice, selon le cas, au cours duquel l'opération est conclue, des registres ou des documents contenant une description complète et exacte, quant à tous les éléments importants, de ce qui suit :

(i) les biens ou les services auxquels l'opération se rapporte,

(ii) les modalités de l'opération et leurs rapports éventuels avec celles de chacune des autres opérations conclues entre les participants à l'opération,

(iii) l'identité des participants à l'opération et les liens qui existent entre eux au moment de la conclusion de l'opération,

(iv) les fonctions exercées, les biens utilisés ou apportés et les risques assumés dans le cadre de l'opération par les participants,

(v) les données et méthodes prises en considération et les analyses effectuées en vue de déterminer les prix de transfert, l'attribution des bénéfices ou des pertes ou la participation aux coûts, selon le cas, relativement à l'opération,

(vi) les hypothèses, stratégies et principes éventuels ayant influé sur l'établissement des prix de transfert, l'attribution des bénéfices ou des pertes ou la participation aux coûts relativement à l'opération ;

*b*) pour chaque année d'imposition ou exercice ultérieur où se poursuit l'opération, établi ou obtenu, au plus tard à la date limite de production qui lui est applicable pour l'année ou l'exercice, selon le cas, des registres ou des documents contenant une description complète et exacte de chacun des changements importants dont les éléments visés aux sous-alinéas *a*)(i) à (vi) ont fait l'objet au cours de l'année ou de l'exercice relativement à l'opération ;

*c*) fourni les registres ou documents visés aux alinéas *a*) et *b*) au ministre dans les trois mois suivant la signification à personne ou par courrier recommandé ou certifié d'une demande écrite les concernant.

TAB 15



CANADA

CONSOLIDATION

# Patent Act

R.S.C., 1985, c. P-4

CODIFICATION

# Loi sur les brevets

L.R.C. (1985), ch. P-4

Current to April 16, 2014

Last amended on June 26, 2013

À jour au 16 avril 2014

Dernière modification le 26 juin 2013

Published by the Minister of Justice at the following address:
http://laws-lois.justice.gc.ca

Publié par le ministre de la Justice à l'adresse suivante :
http://lois-laws.justice.gc.ca

*Patent — April 16, 2014*

granted a patent, he shall refuse the application and, by registered letter addressed to the applicant or his registered agent, notify the applicant of the refusal and of the ground or reason therefor.

R.S., c. P-4, s. 42.

à obtenir la concession d'un brevet, il rejette la demande et, par courrier recommandé adressé au demandeur ou à son agent enregistré, notifie à ce demandeur le rejet de la demande, ainsi que les motifs ou raisons du rejet.

S.R., ch. P-4, art. 42.

Appeal to Federal Court

**41.** Every person who has failed to obtain a patent by reason of a refusal of the Commissioner to grant it may, at any time within six months after notice as provided for in section 40 has been mailed, appeal from the decision of the Commissioner to the Federal Court and that Court has exclusive jurisdiction to hear and determine the appeal.

R.S., 1985, c. P-4, s. 41; R.S., 1985, c. 33 (3rd Supp.), s. 16.

Appel à la Cour fédérale

**41.** Dans les six mois suivant la mise à la poste de l'avis, celui qui n'a pas réussi à obtenir un brevet en raison du refus ou de l'opposition du commissaire peut interjeter appel de la décision du commissaire à la Cour fédérale qui, à l'exclusion de toute autre juridiction, peut s'en saisir et en décider.

L.R. (1985), ch. P-4, art. 41; L.R. (1985), ch. 33 (3ᵉ suppl.), art. 16.

## GRANT OF PATENTS

Contents of patent

**42.** Every patent granted under this Act shall contain the title or name of the invention, with a reference to the specification, and shall, subject to this Act, grant to the patentee and the patentee's legal representatives for the term of the patent, from the granting of the patent, the exclusive right, privilege and liberty of making, constructing and using the invention and selling it to others to be used, subject to adjudication in respect thereof before any court of competent jurisdiction.

R.S., 1985, c. P-4, s. 42; R.S., 1985, c. 33 (3rd Supp.), s. 16.

## OCTROI DES BREVETS

Contenu du brevet

**42.** Tout brevet accordé en vertu de la présente loi contient le titre ou le nom de l'invention avec renvoi au mémoire descriptif et accorde, sous réserve des autres dispositions de la présente loi, au breveté et à ses représentants légaux, pour la durée du brevet à compter de la date où il a été accordé, le droit, la faculté et le privilège exclusif de fabriquer, construire, exploiter et vendre à d'autres, pour qu'ils l'exploitent, l'objet de l'invention, sauf jugement en l'espèce par un tribunal compétent.

L.R. (1985), ch. P-4, art. 42; L.R. (1985), ch. 33 (3ᵉ suppl.), art. 16.

## FORM AND TERM OF PATENTS

Form and duration of patents

**43.** (1) Subject to section 46, every patent granted under this Act shall be issued under the seal of the Patent Office, and shall bear on its face the filing date of the application for the patent, the date on which the application became open to public inspection under section 10, the date on which the patent is granted and issued and any prescribed information.

Validity of patent

(2) After the patent is issued, it shall, in the absence of any evidence to the contrary, be valid and avail the patentee and the legal representatives of the patentee for the term mentioned in section 44 or 45, whichever is applicable.

R.S., 1985, c. P-4, s. 43; R.S., 1985, c. 33 (3rd Supp.), s. 16; 1993, c. 15, s. 42.

## FORME ET DURÉE DES BREVETS

Délivrance

**43.** (1) Sous réserve de l'article 46, le brevet accordé sous le régime de la présente loi est délivré sous le sceau du Bureau des brevets. Il mentionne la date de dépôt de la demande, celle à laquelle elle est devenue accessible au public sous le régime de l'article 10, celle à laquelle il a été accordé et délivré ainsi que tout renseignement réglementaire.

Validité

(2) Une fois délivré, le brevet est, sauf preuve contraire, valide et acquis au breveté ou à ses représentants légaux pour la période mentionnée aux articles 44 ou 45.

L.R. (1985), ch. P-4, art. 43; L.R. (1985), ch. 33 (3ᵉ suppl.), art. 16; 1993, ch. 15, art. 42.

# TAB 16

**IRS Revenue Ruling 59-60**

**Rev. Rul. 59-60, 1959-1 CB 237 -- IRC Sec. 2031 (Also Section 2512.)** (Also Part II, Sections 811(k), 1005, Regulations 105, Section 81.10.)

*Reference(s):* Code Sec. 2031 Reg § 20.2031-2

In valuing the stock of closely held corporations, or the stock of corporations where market quotations are not available, all other available financial data, as well as all relevant factors affecting the fair market value must be considered for estate tax and gift tax purposes. No general formula may be given that is applicable to the many different valuation situations arising in the valuation of such stock. However, the general approach, methods, and factors which must be considered in valuing such securities are outlined.

Revenue Ruling 54-77, C.B. 1954-1, 187, superseded.

**Full Text:**

**Section 1. Purpose.**

The purpose of this Revenue Ruling is to outline and review in general the approach, methods and factors to be considered in valuing shares of the capital stock of closely held corporations for estate tax and gift tax purposes. The methods discussed herein will apply likewise to the valuation of corporate stocks on which market quotations are either unavailable or are of such scarcity that they do not reflect the fair market value.

**Sec. 2. Background and Definitions.**

.01 All valuations must be made in accordance with the applicable provisions of the Internal Revenue Code of 1954 and the Federal Estate Tax and Gift Tax Regulations. Sections 2031(a), 2032 and 2512(a) of the 1954 Code (sections 811 and 1005 of the 1939 Code) require that the property to be included in the gross estate, or made the subject of a gift, shall be taxed on the basis of the value of the property at the time of death of the decedent, the alternate date if so elected, or the date of gift.

.02 Section 20.2031-1(b) of the Estate Tax Regulations (section 81.10 of the Estate Tax Regulations 105) and section 25.2512-1 of the Gift Tax Regulations (section 86.19 of Gift Tax Regulations 108) define fair market value, in effect, as the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts. Court decisions frequently state in addition that the hypothetical buyer and seller are assumed to be able, as well as willing, to trade and to be well informed about the property and concerning the market for such property.

.03 Closely held corporations are those corporations the shares of which are owned by a relatively limited number of stockholders. Often the entire stock issue is held by one family. The result of this situation is that little, if any, trading in the shares takes place. There is, therefore, no established market for the stock and such sales as occur at irregular intervals seldom reflect all of the elements of a representative transaction as defined by the term "fair market value."

**Sec. 3. Approach to Valuation.**

.01 A determination of fair market value, being a question of fact, will depend upon the circumstances in each case. No formula can be devised that will be generally applicable to the multitude of different valuation issues arising in estate and gift tax cases. Often, an appraiser will find wide differences of opinion as to the fair market value of a particular stock. In resolving such differences, he should maintain a

reasonable attitude in recognition of the fact that valuation is not an exact science. A sound valuation will be based upon all the relevant facts, but the elements of common sense, informed judgment and reasonableness must enter into the process of weighing those facts and determining their aggregate significance.

.02 The fair market value of specific shares of stock will vary as general economic conditions change from "normal" to "boom" or "depression," that is, according to the degree of optimism or pessimism with which the investing public regards the future at the required date of appraisal. Uncertainty as to the stability or continuity of the future income from a property decreases its value by increasing the risk of loss of earnings and value in the future. The value of shares of stock of a company with very uncertain future prospects is highly speculative. The appraiser must exercise his judgment as to the degree of risk attaching to the business of the corporation which issued the stock, but that judgment must be related to all of the other factors affecting value.

.03 Valuation of securities is, in essence, a prophesy as to the future and must be based on facts available at the required date of appraisal. As a generalization, the prices of stocks which are traded in volume in a free and active market by informed persons best reflect the consensus of the investing public as to what the future holds for the corporations and industries represented. When a stock is closely held, is traded infrequently, or is traded in an erratic market, some other measure of value must be used. In many instances, the next best measure may be found in the prices at which the stocks of companies engaged in the same or a similar line of business are selling in a free and open market.

**Sec. 4. Factors To Consider.**

.01 It is advisable to emphasize that in the valuation of the stock of closely held corporations or the stock of corporations where market quotations are either lacking or too scarce to be recognized, all available financial data, as well as all relevant factors affecting the fair market value, should be considered. The following factors, although not all- inclusive are fundamental and require careful analysis in each case:

(a) The nature of the business and the history of the enterprise from its inception.

(b) The economic outlook in general and the condition and outlook of the specific industry in particular.

(c) The book value of the stock and the financial condition of the business.

(d) The earning capacity of the company.

(e) The dividend-paying capacity.

(f) Whether or not the enterprise has goodwill or other intangible value.

(g) Sales of the stock and the size of the block of stock to be valued.

(h) The market price of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter.

.02 The following is a brief discussion of each of the foregoing factors:

(a) The history of a corporate enterprise will show its past stability or instability, its growth or lack of growth, the diversity or lack of diversity of its operations, and other facts needed to form an opinion of the degree of risk involved in the business. For an enterprise which changed its form of organization but carried on the same or closely similar operations of its predecessor, the history of the former enterprise should be considered. The detail to be considered should increase with approach to the required date of

appraisal, since recent events are of greatest help in predicting the future; but a study of gross and net income, and of dividends covering a long prior period, is highly desirable. The history to be studied should include, but need not be limited to, the nature of the business, its products or services, its operating and investment assets, capital structure, plant facilities, sales records and management, all of which should be considered as of the date of the appraisal, with due regard for recent significant changes. Events of the past that are unlikely to recur in the future should be discounted, since value has a close relation to future expectancy.

(b) A sound appraisal of a closely held stock must consider current and prospective economic conditions as of the date of appraisal, both in the national economy and in the industry or industries with which the corporation is allied. It is important to know that the company is more or less successful than its competitors in the same industry, or that it is maintaining a stable position with respect to competitors. Equal or even greater significance may attach to the ability of the industry with which the company is allied to compete with other industries. Prospective competition which has not been a factor in prior years should be given careful attention. For example, high profits due to the novelty of its product and the lack of competition often lead to increasing competition. The public's appraisal of the future prospects of competitive industries or of competitors within an industry may be indicated by price trends in the markets for commodities and for securities. The loss of the manager of a so-called "one-man" business may have a depressing effect upon the value of the stock of such business, particularly if there is a lack of trained personnel capable of succeeding to the management of the enterprise. In valuing the stock of this type of business, therefore, the effect of the loss of the manager on the future expectancy of the business, and the absence of management-succession potentialities are pertinent factors to be taken into consideration. On the other hand, there may be factors which offset, in whole or in part, the loss of the manager's services. For instance, the nature of the business and of its assets may be such that they will not be impaired by the loss of the manager. Furthermore, the loss may be adequately covered by life insurance, or competent management might be employed on the basis of the consideration paid for the former manager's services. These, or other offsetting factors, if found to exist, should be carefully weighed against the loss of the manager's services in valuing the stock of the enterprise.

(c) Balance sheets should be obtained, preferably in the form of comparative annual statements for two or more years immediately preceding the date of appraisal, together with a balance sheet at the end of the month preceding that date, if corporate accounting will permit. Any balance sheet descriptions that are not self-explanatory, and balance sheet items comprehending diverse assets or liabilities, should be clarified in essential detail by supporting supplemental schedules. These statements usually will disclose to the appraiser (1) liquid position (ratio of current assets to current liabilities); (2) gross and net book value of principal classes of fixed assets; (3) working capital; (4) long-term indebtedness; (5) capital structure; and (6) net worth. Consideration also should be given to any assets not essential to the operation of the business, such as investments in securities, real estate, etc. In general, such nonoperating assets will command a lower rate of return than do the operating assets, although in exceptional cases the reverse may be true. In computing the book value per share of stock, assets of the investment type should be revalued on the basis of their market price and the book value adjusted accordingly. Comparison of the company's balance sheets over several years may reveal, among other facts, such developments as the acquisition of additional production facilities or subsidiary companies, improvement in financial position, and details as to recapitalizations and other changes in the capital structure of the corporation. If the corporation has more than one class of stock outstanding, the charter or certificate of incorporation should be examined to ascertain the explicit rights and privileges of the various stock issues including: (1) voting powers, (2) preference as to dividends, and (3) preference as to assets in the event of liquidation.

(d) Detailed profit-and-loss statements should be obtained and considered for a representative period immediately prior to the required date of appraisal, preferably five or more years. Such statements should show (1) gross income by principal items; (2) principal deductions from gross income including major prior items of operating expenses, interest and other expense on each item of long-term debt, depreciation and depletion if such deductions are made, officers' salaries, in total if they appear to be reasonable or in detail if they seem to be excessive, contributions (whether or not deductible for tax purposes) that the nature of its business and its community position require the corporation to make, and taxes by principal items,

including income and excess profits taxes; (3) net income available for dividends; (4) rates and amounts of dividends paid on each class of stock; (5) remaining amount carried to surplus; and (6) adjustments to, and reconciliation with, surplus as stated on the balance sheet. With profit and loss statements of this character available, the appraiser should be able to separate recurrent from nonrecurrent items of income and expense, to distinguish between operating income and investment income, and to ascertain whether or not any line of business in which the company is engaged is operated consistently at a loss and might be abandoned with benefit to the company. The percentage of earnings retained for business expansion should be noted when dividend-paying capacity is considered. Potential future income is a major factor in many valuations of closely-held stocks, and all information concerning past income which will be helpful in predicting the future should be secured. Prior earnings records usually are the most reliable guide as to the future expectancy, but resort to arbitrary five-or-ten-year averages without regard to current trends or future prospects will not produce a realistic valuation. If, for instance, a record of progressively increasing or decreasing net income is found, then greater weight may be accorded the most recent years' profits in estimating earning power. It will be helpful, in judging risk and the extent to which a business is a marginal operator, to consider deductions from income and net income in terms of percentage of sales. Major categories of cost and expense to be so analyzed include the consumption of raw materials and supplies in the case of manufacturers, processors and fabricators; the cost of purchased merchandise in the case of merchants; utility services; insurance; taxes; depletion or depreciation; and interest.

(e) Primary consideration should be given to the dividend-paying capacity of the company rather than to dividends actually paid in the past. Recognition must be given to the necessity of retaining a reasonable portion of profits in a company to meet competition. Dividend-paying capacity is a factor that must be considered in an appraisal, but dividends actually paid in the past may not have any relation to dividend-paying capacity. Specifically, the dividends paid by a closely held family company may be measured by the income needs of the stockholders or by their desire to avoid taxes on dividend receipts, instead of by the ability of the company to pay dividends. Where an actual or effective controlling interest in a corporation is to be valued, the dividend factor is not a material element, since the payment of such dividends is discretionary with the controlling stockholders. The individual or group in control can substitute salaries and bonuses for dividends, thus reducing net income and understating the dividend-paying capacity of the company. It follows, therefore, that dividends are less reliable criteria of fair market value than other applicable factors.

(f) In the final analysis, goodwill is based upon earning capacity. The presence of goodwill and its value, therefore, rests upon the excess of net earnings over and above a fair return on the net tangible assets. While the element of goodwill may be based primarily on earnings, such factors as the prestige and renown of the business, the ownership of a trade or brand name, and a record of successful operation over a prolonged period in a particular locality, also may furnish support for the inclusion of intangible value. In some instances it may not be possible to make a separate appraisal of the tangible and intangible assets of the business. The enterprise has a value as an entity. Whatever intangible value there is, which is supportable by the facts, may be measured by the amount by which the appraised value of the tangible assets exceeds the net book value of such assets.

(g) Sales of stock of a closely held corporation should be carefully investigated to determine whether they represent transactions at arm's length. Forced or distress sales do not ordinarily reflect fair market value nor do isolated sales in small amounts necessarily control as the measure of value. This is especially true in the valuation of a controlling interest in a corporation. Since, in the case of closely held stocks, no prevailing market prices are available, there is no basis for making an adjustment for blockage. It follows, therefore, that such stocks should be valued upon a consideration of all the evidence affecting the fair market value. The size of the block of stock itself is a relevant factor to be considered. Although it is true that a minority interest in an unlisted corporation's stock is more difficult to sell than a similar block of listed stock, it is equally true that control of a corporation, either actual or in effect, representing as it does an added element of value, may justify a higher value for a specific block of stock.

(h) Section 2031(b) of the Code states, in effect, that in valuing unlisted securities the value of stock or securities of corporations engaged in the same or a similar line of business which are listed on an exchange

should be taken into consideration along with all other factors. An important consideration is that the corporations to be used for comparisons have capital stocks which are actively traded by the public. In accordance with section 2031(b) of the Code, stocks listed on an exchange are to be considered first. However, if sufficient comparable companies whose stocks are listed on an exchange cannot be found, other comparable companies which have stocks actively traded in on the over-the- counter market also may be used. The essential factor is that whether the stocks are sold on an exchange or over-the-counter there is evidence of an active, free public market for the stock as of the valuation date. In selecting corporations for comparative purposes, care should be taken to use only comparable companies. Although the only restrictive requirement as to comparable corporations specified in the statute is that their lines of business be the same or similar, yet it is obvious that consideration must be given to other relevant factors in order that the most valid comparison possible will be obtained. For illustration, a corporation having one or more issues of preferred stock, bonds or debentures in addition to its common stock should not be considered to be directly comparable to one having only common stock outstanding. In like manner, a company with a declining business and decreasing markets is not comparable to one with a record of current progress and market expansion.

## Sec. 5. Weight To Be Accorded Various Factors.

The valuation of closely held corporate stock entails the consideration of all relevant factors as stated in section 4. Depending upon the circumstances in each case, certain factors may carry more weight than others because of the nature of the company's business. To illustrate:

(a) Earnings may be the most important criterion of value in some cases whereas asset value will receive primary consideration in others. In general, the appraiser will accord primary consideration to earnings when valuing stocks of companies which sell products or services to the public; conversely, in the investment or holding type of company, the appraiser may accord the greatest weight to the assets underlying the security to be valued.

(b) The value of the stock of a closely held investment or real estate holding company, whether or not family owned, is closely related to the value of the assets underlying the stock. For companies of this type the appraiser should determine the fair market values of the assets of the company. Operating expenses of such a company and the cost of liquidating it, if any, merit consideration when appraising the relative values of the stock and the underlying assets. The market values of the underlying assets give due weight to potential earnings and dividends of the particular items of property underlying the stock, capitalized at rates deemed proper by the investing public at the date of appraisal. A current appraisal by the investing public should be superior to the retrospective opinion of an individual. For these reasons, adjusted net worth should be accorded greater weight in valuing the stock of a closely held investment or real estate holding company, whether or not family owned, than any of the other customary yardsticks of appraisal, such as earnings and dividend paying capacity.

## Sec. 6. Capitalization Rates.

In the application of certain fundamental valuation factors, such as earnings and dividends, it is necessary to capitalize the average or current results at some appropriate rate. A determination of the proper capitalization rate presents one of the most difficult problems in valuation. That there is no ready or simple solution will become apparent by a cursory check of the rates of return and dividend yields in terms of the selling prices of corporate shares listed on the major exchanges of the country. Wide variations will be found even for companies in the same industry. Moreover, the ratio will fluctuate from year to year depending upon economic conditions. Thus, no standard tables of capitalization rates applicable to closely held corporations can be formulated. Among the more important factors to be taken into consideration in deciding upon a capitalization rate in a particular case are: (1) the nature of the business; (2) the risk involved; and (3) the stability or irregularity of earnings.

## Sec. 7. Average of Factors.

Because valuations cannot be made on the basis of a prescribed formula, there is no means whereby the various applicable factors in a particular case can be assigned mathematical weights in deriving the fair market value. For this reason, no useful purpose is served by taking an average of several factors (for example, book value, capitalized earnings and capitalized dividends) and basing the valuation on the result. Such a process excludes active consideration of other pertinent factors, and the end result cannot be supported by a realistic application of the significant facts in the case except by mere chance.

**Sec. 8. Restrictive Agreements.**

Frequently, in the valuation of closely held stock for estate and gift tax purposes, it will be found that the stock is subject to an agreement restricting its sale or transfer. Where shares of stock were acquired by a decedent subject to an option reserved by the issuing corporation to repurchase at a certain price, the option price is usually accepted as the fair market value for estate tax purposes. See Rev. Rul. 54-76, C.B. 1954-1, 194. However, in such case the option price is not determinative of fair market value for gift tax purposes. Where the option, or buy and sell agreement, is the result of voluntary action by the stockholders and is binding during the life as well as at the death of the stockholders, such agreement may or may not, depending upon the circumstances of each case, fix the value for estate tax purposes. However, such agreement is a factor to be considered, with other relevant factors, in determining fair market value. Where the stockholder is free to dispose of his shares during life and the option is to become effective only upon his death, the fair market value is not limited to the option price. It is always necessary to consider the relationship of the parties, the relative number of shares held by the decedent, and other material facts, to determine whether the agreement represents a bonafide business arrangement or is a device to pass the decedent's shares to the natural objects of his bounty for less than an adequate and full consideration in money or money's worth. In this connection see Rev. Rul. 157 C.B. 1953-2, 255, and Rev. Rul. 189, C.B. 1953-2, 294.

**Sec. 9. Effect on Other Documents.**

Revenue Ruling 54-77, C.B. 1954-1, 187, is hereby superseded.

# TAB 17

# U. S. TREASURY DEPARTMENT
### BUREAU OF INTERNAL REVENUE

# REGULATIONS 86

RELATING TO THE

# INCOME TAX

UNDER THE

## REVENUE ACT OF 1934



UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1935

For sale by the Superintendent of Documents, Washington, D. C. - - - - - - - - - Price 35 cents (Paper cover)

The bond shall be conditioned upon the return as income, by any person receiving any payment in satisfaction of such obligations, of the same proportion of such payment as would be returnable as income by the decedent if he had lived and had received such payment. The bond shall be executed by a surety company holding a certificate of authority from the Secretary of the Treasury as an acceptable surety on Federal bonds, shall be subject to the approval of the Commissioner, and must be filed at the time of filing the return of the decedent for the year of his death. See section 1126 of the Revenue Act of 1926 (paragraph 31 of the Appendix to these regulations), providing that where a bond is required by law or regulations, in lieu of surety or sureties there may be deposited bonds or notes of the United States.

See section 117 as to the limitation on capital losses sustained by corporations and the limitation as to both capital gains and capital losses of individuals.

SEC. 45. ALLOCATION OF INCOME AND DEDUCTIONS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate gross income or deductions between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

ART. 45-1. Determination of the taxable net income of a controlled taxpayer.—(a) *Definitions.*—When used in this article—

(1) The term "*organization*" includes any organization of any kind, whether it be the sole proprietorship, a partnership, a trust, an estate, or a corporation (as each is defined or understood in the Act or these regulations), irrespective of the place where organized, where operated, or where its trade or business is conducted, and regardless of whether domestic or foreign, whether exempt, whether affiliated, or whether a party to a consolidated return.

(2) The terms "*trade*" or "*business*" include any trade or business activity of any kind, regardless of whether or where organized, whether owned individually or otherwise, and regardless of the place where carried on.

(3) The term "*controlled*" includes any kind of control, direct or indirect, whether legally enforceable, and however exercisable or exercised. It is the reality of the control which is decisive, not its form nor the mode of its exercise. A presumption of control arises if income or deductions have been arbitrarily shifted.

(4) The term "*controlled taxpayer*" means any one of two or more organizations, trades, or businesses owned or controlled directly or indirectly by the same interests.

(5) "*Group*" or "*group of controlled taxpayers*" means the organizations, trades, or businesses owned or controlled by the same interests.

(6) The term "*true net income*" means, in the case of a controlled taxpayer, the net income (or, as the case may be, any item or element affecting net income) which would have resulted to the controlled taxpayer, had it in the conduct of its affairs (or, as the case may be, in the particular contract, transaction, arrangement, or other act) dealt with the other member or members of the group at arm's length. It does not mean the income, the deduction, or the item or element of either, resulting to the controlled taxpayer by reason of the particular contract, transaction, or arrangement, the controlled taxpayer, or the interests controlling it, choose to make (even though such contract, transaction, or arrangement be legally binding upon the parties thereto).

(b) *Scope and purpose.*—The purpose of section 45 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true net income from the property and business of a controlled taxpayer. The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the net income from the property and business of each of the controlled taxpayers. If, however, this has not been done, and the taxable net incomes are thereby understated, the statute contemplates that the Commissioner shall intervene, and, by making such distributions, apportionments, or allocations as he may deem necessary of gross income or deductions, or of any item or element affecting net income, between or among the controlled taxpayers constituting the group, shall determine the true net income of each controlled taxpayer. The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.

Section 45 and this article apply to the case of any controlled taxpayer, whether such taxpayer makes a separate or a consolidated return. If a controlled taxpayer makes a separate return, the determination is of its true separate net income. If a controlled taxpayer is a party to a consolidated return, the true consolidated net income of the affiliated group and the true separate net income of the controlled taxpayer are determined consistently with the principles of a consolidated return.

TAB 18

63 USLW 2544, 31 Fed.R.Serv.3d 392, 33 U.S.P.Q.2d 1771

47 F.3d 1128
United States Court of Appeals,
Federal Circuit.

ABBOTT LABORATORIES, Plaintiff–Appellee,

v.

DIAMEDIX CORPORATION,
Proposed Intervenor–Appellant,

v.

ORTHO DIAGNOSTIC SYSTEMS,
INC., Defendant–Appellee.

No. 94–1345.   |   Feb. 7, 1995.

Exclusive licensees of patents relating to immunoassay systems used to test blood for the presence of hepatitis virus brought patent infringement action against competitor, and patentee filed motion to intervene. The United States District Court for the Northern District of Illinois, Charles R. Norgle, Sr., J., denied patentee's motion, and it appealed. The Court of Appeals, Bryson, Circuit Judge, held that exclusive licensee did not have statutory right to bring action for patent infringement without joining patentee.

Reversed and remanded.

West Headnotes (8)

**[1]    Patents**
👉 Persons entitled to sue

Exclusive licensee of patent did not have statutory right to bring action for patent infringement without joining patentee, where patentee retained substantial interest under patents; patentee retained right to make and use for its own benefit, products embodying inventions claimed in patents, as well as right to sell such products to end users, to parties with whom patentee had preexisting contracts, and to preexisting licensees, and exclusive license was made subject to prior licenses granted by patentee. 35 U.S.C.A. §§ 100(d), 271, 281.

90 Cases that cite this headnote

**[2]    Patents**
👉 Persons entitled to sue

Right to sue for patent infringement is ordinarily incident of legal title to patent; licensee may obtain sufficient rights in patent to be entitled to seek relief from infringement, but to do so, it must ordinarily join patent owner. 35 U.S.C.A. §§ 100(d), 271, 281.

18 Cases that cite this headnote

**[3]    Patents**
👉 As to third persons

Patent licensee, who has no right to exclude others from making, using, or selling licensed products, has no legally recognized interest that entitles it to bring or join patent infringement action. 35 U.S.C.A. §§ 100(d), 271, 281.

24 Cases that cite this headnote

**[4]    Patents**
👉 New parties and change of parties

Federal joinder rule permitted patentee to intervene in patent infringement action brought by exclusive licensee, where owner retained interest in patents, and disposition of licensee's suit could either prejudice patentee's interests or expose alleged infringer to risk multiple litigation or obligations, depending on whether owner would be held to be in privity with licensee, unless bound by judgment against licensee. Fed.Rules Civ.Proc.Rule 19, 28 U.S.C.A.

24 Cases that cite this headnote

**[5]    Patents**
👉 Defendants

Patentee that does not voluntarily join action prosecuted by its exclusive licensee can be joined as defendant or, in proper case, made involuntary plaintiff if it is not subject to service of process. Fed.Rules Civ.Proc.Rule 19(a), 28 U.S.C.A.

31 Cases that cite this headnote

63 USLW 2544, 31 Fed.R.Serv.3d 392, 33 U.S.P.Q.2d 1771

[6] **Patents**

👉 Defendants

When patent owner retains substantial propriety interest in patent and wishes to participate in infringement action, court must allow it to do so. Fed.Rules Civ.Proc.Rule 19(a), 28 U.S.C.A.

Cases that cite this headnote

[7] **Patents**

👉 Persons entitled to sue

Whether "control" clause of patent licensing agreement, providing that "the party who brings suit shall control the prosecution," gave licensee right to control patentee's conduct as party in patent infringement case was issue for district court to determine as part of that court's responsibility to govern pretrial and trial proceedings in case over which it presided.

26 Cases that cite this headnote

[8] **Patents**

👉 Original utility

4,474,878, 4,642,285. Cited.

Cases that cite this headnote

**Attorneys and Law Firms**

*1129 Daniel E. Reidy, Jones, Day, Reavis & Pogue, Chicago, IL, argued for plaintiff-appellee. With him on the brief was Kevin G. McBride, Allison J. Zousmer and Sandra B. Weiss, of counsel.

George H. Gerstman, Gerstman, Ellis & McMillin, Ltd., Chicago, IL, argued for proposed intervenor-appellant. With him on the brief was Terrence W. McMillin.

Harry J. Roper and Raymond N. Nimrod, Roper & Quigg, Chicago, IL, were on the brief for defendant-appellee.

Before RICH, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and BRYSON, Circuit Judge.

**Opinion**

BRYSON, Circuit Judge.

Diamedix Corporation appeals from an order denying its motion to intervene in a patent infringement action. The action was brought by Abbott Laboratories, which held a license from Diamedix, against a third party, Ortho Diagnostic Systems, Inc. We conclude that the district court should have permitted Diamedix to join the lawsuit as a party-plaintiff. The order of the district court denying the motion to intervene is therefore reversed.

**I**

United States Patents Nos. 4,474,878 (the '878 patent) and 4,642,285 (the '285 patent) were issued in 1984 and 1987, respectively, and assigned to appellant Diamedix Corporation. The two patents relate to immunoassay systems used to test blood for the presence of the hepatitis virus.

Prior to 1988, Diamedix granted eight non-exclusive licenses under the '878 and '285 patents. In August 1988, following a dispute with appellee Abbott Laboratories over alleged infringement of the patents, Diamedix entered into a "license agreement" with Abbott. In exchange for annual royalty payments, Abbott received a worldwide license to make, use, and sell products incorporating the inventions claimed in the patents. The license was exclusive to Abbott and its affiliates, but was subject to the rights previously granted to Diamedix's other licensees. In addition, the agreement reserved to Diamedix the right to make and use products that exploited the patents, as well as the right to sell such products to Diamedix's previous licensees, to Abbott's sublicensees, to end users, and to certain other parties to fulfill Diamedix's existing contractual obligations. The agreement was to remain in effect for the life of the patents unless Abbott decided to terminate it earlier. The agreement was not assignable by either party without the consent of the other.

In addition to those general terms, the agreement contained a clause addressing the rights of the parties in suits against third parties for infringement of the patent rights. That clause provided as follows:

> If any patent included in PATENT RIGHTS is infringed, Abbott shall have the right, but not the

63 USLW 2544, 31 Fed.R.Serv.3d 392, 33 U.S.P.Q.2d 1771

obligation, to bring suit to suppress such infringement against any unlicensed third party. However, if such infringement continues and DIAMEDIX requests ABBOTT in writing to bring such suit, and ABBOTT declines to bring such suit against such infringer within six (6) months of such request, DIAMEDIX shall have the right to bring such suit. The party who brings suit shall control the prosecution and any settlements thereof provided, however, Abbott shall not prejudice or impair the PATENT RIGHTS in connection with such prosecution or settlements and shall not enter into any settlement which would result in DIAMEDIX receiving less than one percent (1%) of the net sales of the third party's infringing products. The other party shall be entitled to be represented therein by counsel of its own selection at its own expense.

**\*1130** In January 1994, Abbott filed an action in the United States District Court for the Northern District of Illinois charging appellee Ortho Diagnostic Systems, Inc., with infringing the '878 and '285 patents. Ortho denied the allegations of infringement, asserted as an affirmative defense that the patents are invalid, and claimed that Abbott is barred from seeking relief because of its delay in bringing suit.

Because Abbott did not join Diamedix as a party to the lawsuit, Diamedix promptly filed a motion to intervene and a complaint as plaintiff-intervenor alleging that Ortho had infringed its rights under the two patents. In its motion, Diamedix argued that it was entitled to intervene under Fed.R.Civ.P. 24(a)(2) based on its rights as legal owner of the patents. In the alternative, Diamedix moved to be permitted to intervene under Fed.R.Civ.P. 24(b). Diamedix also suggested that as the holder of legal title to the patents, it might be required to participate in order to give the district court jurisdiction over the suit. Ortho supported Diamedix's motion to intervene, on the ground that Diamedix retained a significant interest in the patents-in-suit under its agreement with Abbott and might be an indispensable party under Fed.R.Civ.P. 19(b).

The district court denied Diamedix's motion to intervene, based on its conclusion that Diamedix's interests in the lawsuit were adequately represented by Abbott. The court explained that Diamedix and Abbott share the common goals of enforcing the patent rights against Ortho and maximizing the recovery of monetary damages. Diamedix argued that Abbott has an incentive not to defend the validity of the patents with great vigor, since a decision invalidating the patents would free Abbott from its royalty obligations. Diamedix pointed out that shortly after entering into the licensing agreement, Abbott had requested reexamination of the '878 and '285 patents by the Patent and Trademark Office (PTO), urging that all of the claims of those patents were unpatentable in light of prior art. The district court dismissed Diamedix's contention, however, noting that under the agreement with Diamedix, Abbott had the obligation not to "prejudice or impair the patent rights," and that there was no reason to believe that Abbott would fail to honor its obligation in the action against Ortho. In addition, the court concluded that as a practical matter Diamedix's intervention "would be nothing more than a paper entry into the clerk's docket," because Abbott had the right under the licensing agreement to control the prosecution of any infringement action that it initiated.

Diamedix took an immediate appeal from the order denying its motion to intervene. This court stayed the action in the district court pending the resolution of the appeal.

## II

**[1]**    The parties to this appeal have focused principally on whether intervention should have been granted under Fed.R.Civ.P. 24 and, in particular, whether the district court properly denied intervention on the ground that Abbott adequately represents Diamedix's interests in the infringement action. We believe, however, that this case can best be resolved by addressing a related but logically antecedent question: whether a licensee such as Abbott has the statutory right to bring an action for infringement without joining the patent owner, Diamedix. Because we conclude that Abbott may pursue its infringement action against Ortho only if Diamedix is permitted to join that action, we hold that the district court should have ordered Diamedix to be joined as a party.

### A

The Patent Act of 1952 provides that a civil action for infringement may be brought by "a patentee." 35 U.S.C. § 281. The statute defines "patentee" to include the party to whom the patent was issued and the successors in title to the patent, 35 U.S.C. § 100(d), and has been interpreted to require that a suit for infringement ordinarily be brought by a party holding legal title to the patent. See Arachnid, Inc. v. Merit Indus., Inc., 939 F.2d 1574, 1578–79, 19 USPQ2d 1513, 1517–18 (Fed.Cir.1991). Parties not holding title to the patent have been accorded the right to sue (or "standing") in certain circumstances, **1131 but only upon joining or attempting to join the patent owners.

In Waterman v. Mackenzie, 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923 (1891), the Supreme Court addressed the question of the right to sue for infringement under a predecessor patent statute. The Court stated that an assignment by the patent owner of the whole of the patent right, or of an undivided part of the right, or of all rights in a specified geographical region, gives an assignee the right to bring an action for infringement in his own name. Any less complete transfer of rights, the Court explained, is a license rather than an assignment. If the patent owner grants only a license,

> the title remains in the owner of the patent; and suit must be brought in his name, and never in the name of the licensee alone, unless that is necessary to prevent an absolute failure of justice, as where the patentee is the infringer, and cannot sue himself. Any rights of the licensee must be enforced through or in the name of the owner of the patent, and perhaps, if necessary to protect the rights of all parties, joining the licensee with him as a plaintiff.

Id. at 255, 11 S.Ct. at 335.

Thirty-five years later, in Independent Wireless Tel. Co. v. Radio Corp. of Am., 269 U.S. 459, 46 S.Ct. 166, 70 L.Ed. 357 (1926), the Supreme Court applied the teaching of Waterman in a case in which an exclusive licensee sought to enforce the patent rights against an alleged infringer. The Court rejected the argument that the licensee could sue for infringement without joining the patent owner. "The presence of the owner of the patent as a party is indispensable not only to give jurisdiction under the patent laws," the Court held, "but also, in most cases, to enable the alleged infringer to respond in one action to all claims of infringement for his act, and thus either to defeat all claims in the one action, or by satisfying one adverse decree to bar all subsequent actions." 269 U.S. at 468, 46 S.Ct. at 169.

The Court recognized an exception to that rule for cases in which the owner of a patent refuses or is unable to be joined as a co-plaintiff with the exclusive licensee in an infringement action. In such a case, the Court held, "the licensee may make [the patent owner] a party defendant by process and he will be lined up by the court in the party character which he should assume." 269 U.S. at 468, 46 S.Ct. at 169. A patentee, the Court explained, "holds the title to the patent in trust for [the exclusive] licensee, to the extent that he must allow the use of his name as plaintiff in any action brought at the instance of the licensee in law or in equity to obtain damages for the injury to his exclusive right by an infringer or to enjoin infringement of it." Id. at 469, 46 S.Ct. at 169–70. The Court emphasized, however, that before the exclusive licensee can sue in the patent owner's name, the patent owner must be given an opportunity to join the infringement action. Id. at 473–74, 46 S.Ct. at 171.

[2] [3] Based on the analysis in Waterman and Independent Wireless Tel. Co., this court has recognized the following principles: The right to sue for infringement is ordinarily an incident of legal title to the patent. A licensee may obtain sufficient rights in the patent to be entitled to seek relief from infringement, but to do so, it ordinarily must join the patent owner. And a bare licensee, who has no right to exclude others from making, using, or selling the licensed products, has no legally recognized interest that entitles it to bring or join an infringement action. See Arachnid, Inc. v. Merit Indus., Inc., 939 F.2d at 1579 & n. 7, 19 USPQ2d at 1517 & n. 7 (one seeking damages for infringement ordinarily must have legal title to the patent during the infringement, but an exclusive licensee may join an infringement suit as co-plaintiff with patentee); Kalman v. Berlyn Corp., 914 F.2d 1473, 1481–82, 16 USPQ2d 1093, 1099–1100 (Fed.Cir.1990) (non-exclusive licensee has no standing to sue for infringement); Weinar v. Rollform Inc., 744 F.2d 797, 806–07, 223 USPQ 369, 374–75 (Fed.Cir.1984) (licensee with exclusive right to sell licensed products may sue for and obtain relief from infringement in conjunction with patent owner), cert. denied, 470 U.S. 1084, 105 S.Ct. 1844, 85 L.Ed.2d 143 (1985).

Abbott does not take issue with these principles. Rather, it argues that Diamedix is not required to be joined in this action because the agreement between Abbott and **1132 Diamedix transferred all substantial rights under the patents

63 USLW 2544, 31 Fed.R.Serv.3d 392, 33 U.S.P.Q.2d 1771

to Abbott. We disagree. Although the agreement effected a broad conveyance of rights to Abbott, Diamedix retained substantial interests under the '878 and '285 patents, and Abbott therefore does not have an independent right to sue for infringement as a "patentee" under the patent statute.

Diamedix retained the right to make and use, for its own benefit, products embodying the inventions claimed in the patents, as well as the right to sell such products to end users, to parties with whom Diamedix had pre-existing contracts, and to pre-existing licensees. Abbott's exclusive license was also made subject to prior licenses granted by Diamedix. Moreover, although Abbott was given the right of first refusal in suing alleged infringers, the agreement provides that if Diamedix asks Abbott to bring suit against an alleged infringer and Abbott declines to do so, Diamedix has the right to prosecute its own infringement action; thus, although Abbott has the option to initiate suit for infringement, it does not enjoy the right to indulge infringements, which normally accompanies a complete conveyance of the right to sue. In addition, even if Abbott exercises its option to sue for infringement, it is obligated under the agreement not to "prejudice or impair the patent rights in connection with such prosecution or settlement." Finally, the parties appear to have contemplated that Diamedix could participate in a suit brought by Abbott, because the agreement provides that Diamedix is "entitled to be represented therein by counsel of its own selection at its own expense."

In light of the various rights that Diamedix retains under the agreement, Abbott must be considered a licensee, not an assignee. Under *Waterman* and its successors, Abbott therefore may not sue on its own for infringement.

In arguing to the contrary, Abbott relies principally on this court's decision in *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.,* 944 F.2d 870, 20 USPQ2d 1045 (Fed.Cir.1991). In that case, the court found that the patent grantee, Marowsky, did not have to be joined as a party to the infringement suit brought by Vaupel. The court reached that conclusion, however, only after finding that Marowsky had transferred all substantial rights under the patent to Vaupel.

The only rights retained by Marowsky with respect to the domestic patent were a veto right on sublicensing by Vaupel, a reversionary right in the patent in the event of bankruptcy or termination of production by Vaupel, and a right to receive infringement damages. The sublicensing veto constituted only a minor derogation of the patent rights, the court held, and the right to receive infringement damages was merely a form of deferred compensation under the agreement. As to Marowsky's reversionary right, the court noted that *Waterman* had made clear that a transfer does not lose its character as an assignment simply because it is liable to be defeated by nonperformance of a condition subsequent. 944 F.2d at 875, 20 USPQ2d at 1049.

The *Vaupel* court emphasized that Marowsky had granted Vaupel not only an exclusive license to make, use, and sell the licensed products, but also the exclusive right to sue for infringement of the patent rights. The court found that the transfer of the exclusive right to sue was "particularly dispositive" of the question whether Vaupel was authorized to bring suit without joining Marowsky. See 944 F.2d at 875– 76, 20 USPQ2d at 1049.

In this case, Diamedix has retained a significantly greater interest in the patents than Marowsky retained in *Vaupel*. Unlike in *Vaupel,* Diamedix retained a limited right to make, use, and sell products embodying the patented inventions, a right to bring suit on the patents if Abbott declined to do so, and the right to prevent Abbott from assigning its rights under the license to any party other than a successor in business.

Those retained rights are the sort that are commonly held sufficient to make a patent owner who grants an exclusive license a necessary party to an infringement action brought by the licensee. See, e.g., Grantham v. McGraw–Edison Co., 444 F.2d 210, 213–16, 170 USPQ 69, 71–73 (7th Cir.1971) (licensing owner retained right to sue infringers **\*1133** if the licensee refused to do so); Agrashell, Inc. v. Hammons Prods. Co., 352 F.2d 443, 446–47, 147 USPQ 347, 349 (8th Cir.1965) (licensing owner retained right to make, use, and sell products described and claimed in the patent, and right to sue for infringement if the licensee declined to do so); Pfizer Inc. v. Elan Pharmaceutical Research Corp., 812 F.Supp. 1352, 27 USPQ2d 1161 (D.Del.1993) (licensing owner retained, inter alia, right to market patented product); Raber v. Pittway Corp., 23 USPQ2d 1313, 1314–15, 1992 WL 219016 (N.D.Cal.1992) (license subject to rights of prior licensees and limits imposed on licensee's power of assignment), aff'd mem., 996 F.2d 318 (Fed.Cir.1993); Refac Int'l Ltd. v. Visa USA Inc., 16 USPQ2d 2024, 2028, 1990 WL 130032 (N.D.Cal.1990) (limits imposed on licensee's power of assignment); Calgon Corp. v. Nalco Chem. Co., 726 F.Supp. 983, 13 USPQ2d 1529 (D.Del.1989) (same); Erbamont, Inc. v. Cetus Corp., 720 F.Supp. 387, 392–96,

**Abbott Laboratories v. Diamedix Corp., 47 F.3d 1128 (1995)**

63 USLW 2544, 31 Fed.R.Serv.3d 392, 33 U.S.P.Q.2d 1771

12 USPQ2d 1344, 1349–51 (D.Del.1989) (licensing owner retained right to bring suit if licensee refused). We therefore conclude that Abbott does not have a sufficient interest in the '878 and '285 patents to sue, on its own, as the "patentee" entitled by 35 U.S.C. § 271 to judicial relief from infringement.

## B

[4]   While Diamedix's joinder is required as a matter of statutory standing, it is consistent with the policies underlying Fed.R.Civ.P. 19, the federal joinder rule. Rule 19(a) provides that a person who can be joined as a party should be joined if (1) the person's absence would make it impossible to grant complete relief to the parties, or (2) the person claims an interest in the subject matter of the action and is so situated that the disposition of the action in his absence could impede his ability to protect that interest or leave any of the parties subject to a substantial risk of incurring multiple or inconsistent obligations.

Diamedix retains interests in the patents, and the disposition of Abbott's suit against Ortho could either prejudice Diamedix's interests or expose Ortho to the risk of multiple litigation or obligations, depending in part on whether Diamedix would be held to be in privity with Abbott and thus bound by any judgment against Abbott. Moreover, Abbott may labor under some disadvantages, not applicable to Diamedix, that would make its defense of the patents more difficult. For example, Diamedix may not be chargeable either with Abbott's delay in bringing suit, which Ortho has pleaded as a defense, or with the statements of Abbott's agent in urging the invalidity of the '878 and '285 patents before the PTO, which might compromise Abbott's defense of the patents in this lawsuit, see *Universal Am. Barge Corp. v. J–Chem, Inc.,* 946 F.2d 1131, 1142 (5th Cir.1991). The purpose of Rule 19—to avoid multiple suits or incomplete relief arising from the same subject matter—is thus served by joinder, which permits Diamedix's dispute with Ortho to be adjudicated along with Abbott's. See *Vaupel,* 944 F.2d at 875–876, 20 USPQ2d at 1049.

[5]   [6]   That is not to say that if a patentee in Diamedix's position declines to participate, the action cannot go forward. A patentee that does not voluntarily join an action prosecuted by its exclusive licensee can be joined as a defendant or, in a

proper case, made an involuntary plaintiff if it is not subject to service of process. *See* Fed.R.Civ.P. 19(a); *Independent Wireless Tel. Co.,* 269 U.S. at 468–74, 46 S.Ct. at 169–71; *Philadelphia Brief Case Co. v. Specialty Leather Prods. Co.,* 145 F.Supp. 425, 111 USPQ 180 (D.N.J.1956), *aff'd,* 242 F.2d 511, 113 USPQ 100 (3d Cir.1957). For purposes of this case, however, we need only decide that when a patent owner retains a substantial proprietary interest in the patent and wishes to participate in an infringement action, the court must allow it to do so.

## III

[7]   Although we conclude that Diamedix is entitled to participate in this case as a party, the nature of its participation is another matter. The agreement between Abbott and Diamedix provides that "[t]he party who brings suit shall control the prosecution." As Abbott points out, it negotiated and paid for that right of control under the licensing agreement. At oral argument of this case, **\*1134** however, Diamedix's counsel made clear that Diamedix envisions participating actively in the lawsuit and does not regard the "control" clause of the agreement as imposing a significant restraint on its participation.

We refrain from commenting on the extent to which the "control" clause will give Abbott the right to control Diamedix's conduct as a party in the case. The task of refereeing disputes over the breadth of the "control" clause will necessarily fall to the district court as part of the court's responsibility to govern the pretrial and trial proceedings in cases over which it presides. Regardless of the role Diamedix is ultimately permitted to play in light of the "control" clause, however, we are persuaded that it should have been allowed to join the case as a party.

The order of the district court denying Diamedix's motion to intervene is reversed, and the case is remanded to the district court for further proceedings in accordance with this opinion.

*REVERSED AND REMANDED.*

## Parallel Citations

63 USLW 2544, 31 Fed.R.Serv.3d 392, 33 U.S.P.Q.2d 1771

---

End of Document

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 19

Case 09-10138-MFW   Doc 13460-3   Filed 05/02/14   Page 105 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

2008 WL 2037592
Only the Westlaw citation is currently available.
United States Bankruptcy Court,
District of Columbia.

In re GREATER SOUTHEAST COMMUNITY
HOSPITAL CORP. I, et al., Debtors.
Sam J. Alberts, Trustee for The
DCHC Liquidating Trust, Plaintiff,
v.
HCA Inc., et al., Defendants.

Bankruptcy No. 02–02250.   |   Adversary
No. 04–10366.   |   May 12, 2008.

**Attorneys and Law Firms**

Dana Foster, Jeffrey E. Schmitt, Lucius B. Lau, Sam J.
Alberts, White & Case LLP, Washington, DC, for Plaintiff.

Jeffrey W. Kilduff, Lani R. Miller, Stephen Dudley Brody,
William T. Buffaloe, O'Melveny & Myers LLP, Washington,
DC, for Defendants.

**Opinion**

***MEMORANDUM DECISION CONSTITUTING***
***THE COURT'S FINDINGS OF FACT***
***AND CONCLUSIONS OF LAW***

S. MARTIN TEEL, JR., Bankruptcy Judge.

*Table of Contents*

I. FACTUAL AND PROCEDURAL BACKGROUND.................................................

II. JURISDICTION, VENUE, AND STANDING.......................................................

III. THE MERITS OF ALBERTS' FRAUDULENT CONVEYANCE CLAIM................

A.    Applicable Legal Standard.........................................................................

B.    Findings of Fact...........................................................................................

  1.    Fair market value..................................................................................

    a.    Market approach..............................................................................

      (i)    Guideline transactions.............................................................

      (ii)   Guideline public companies.....................................................

    b.    Cost approach................................................................................

      i.    Real property.............................................................................

        (1)    Highest and best use..........................................................

          (A)    Highest and best use as vacant.

          (B)    Highest and best use as
improved...................................

        (2)    Value..........................................................................

          (A)    Value of Reese Hospital site as
vacant.........................................

Case 09-10138-MFW   Doc 13460-3   Filed 05/02/14   Page 106 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

(B)          Value of Reese Hospital site as
improved.....................................

ii.                Equipment.........................................................................................

iii.               Net working capital.........................................................................

iv.              Humana Contract.............................................................................

(1)          There is no evidence that the Humana Contract existed on the Transfer Date............

(2)          There is no evidence that the Humana Contract was assigned to Reese Corp..........

(3)          The PAA should not be deducted from the value of Reese Hospital..........................

v.                Summary..................................................................................

c.         Income approach.................................................................................

i.          Projected earnings...............................................................................

(A)          M & P Projections.....................

(B)          Reese Projections.....................

(I)          Timing of the projections........................................................          91

(II)         Starting point for projections........................................................          102

(III)        Problems at Reese Hospital.......................................................          110

(IV)        Specific Assumptions.................................................................          114

(C)          Demchick Projections................

(I)          Turnaround Scenario.................................................................          119

(II)         Strategic Growth Scenario.........................................................          124

(D)          Modified projections...................

ii.                Net cash flow....................................................................................

(A)          Depreciation and amortization...

(B)          Income taxes...............................

(C)          Net working capital....................

(D)          Capital expenditures..................

(E)          Final net cash flow.....................

Case 09-10138-MFW   Doc 13460-3   Filed 05/02/14   Page 107 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

iii.　　　　Weighted average cost of capital.................................................................

(A)　　Discount rate (cost of equity).....

(I)　　Risk-free rate.............................................................. 153

(II)　　Equity risk premium.................................................... 154

(III)　　Industry risk premium................................................. 155

(IV)　　Risk premium for size................................................. 156

(IV)　　Specific company risk premium.................................... 158

(B)　　After–tax cost of debt.................

(C)　　Debt–to–equity ratio...................

(D)　　Final WACC calculation.............

iv.　　　　Terminal value........................................................................................

v.　　　　Present value of net cash flow and terminal value.........................................

vi.　　　　Non–operating and excess assets................................................................

vii.　　　　Final business enterprise value...................................................................

d.　　Other indications of value.......................................................................

e.　　Reconciliation.......................................................................................

2.　　　　Good faith.............................................................................................

C.　　Conclusions of Law.................................................................................

IV. CONCLUSION..............................................................................................

Table of Contents I. FACTUAL AND PROCEDURAL BACKGROUND ..................................... 3 II. JURISDICTION, VENUE, AND STANDING .................................... 8III. THE MERITS OF ALBERTS' FRAUDULENT CONVEYANCE CLAIM .................. 16 A. Applicable Legal Standard ..................................... 20 B. Findings of Fact ........................................... 22 1. Fair market value ......................................... 23 a. Market approach ........................................ 24 (i) Guideline transactions .......................... 25 (ii) Guideline public companies ..................... 30 b. Cost approach .......................................... 32 i. Real property ..................................... 35 (1) Highest and best use ...................... 36 (A) Highest and best use as vacant .... 38 (B) Highest and best use as improved .. 45 (2) Value ....................................... 47 (A) Value of Reese Hospital site as vacant .... 47 (B) Value of Reese Hospital site as improved ........................ 49 ii. Equipment ....................................... 61 iii. Net working capital ............................. 66 iv. Humana Contract ................................. 69 (1) There is no evidence that the Humana Contract existed on the Transfer Date .... 71 (2) There is no evidence that the Humana Contract was assigned to Reese Corp ...... 77 (3) The PAA should not

Case 09-10138-MFW   Doc 13460-3   Filed 05/02/14   Page 108 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

be deducted from the value of Reese Hospital .................. 79 v. Summary .......................................... 80 c. Income approach ........................................ 81 i. Projected earnings .............................. 81 (A) M & P Projections ................. 83 (B) Reese Projections ................. 84 (I) Timing of the projections ....... 91 (II) Starting point for projections ...... 102 (III) Problems at Reese Hospital ......... 110 (IV) Specific Assumptions ...... 114 (C) Demchick Projections .............. 119 (I) Turnaround Scenario 119 (II) Strategic Growth Scenario ......... 124 (D) Modified projections .............. 134 ii. Net cash flow .................................. 142 (A) Depreciation and amortization ..... 143 (B) Income taxes ...................... 144 (C) Net working capital ............... 144 (D) Capital expenditures .............. 145 (E) Final net cash flow ............... 149 iii. Weighted average cost of capital ................ 150 (A) Discount rate (cost of equity) .... 151 (I) Risk-free rate ..... 153 (II) Equity risk premium 154 (III) Industry risk premium .......... 155 (IV) Risk premium for size ......... 156 (IV) Specific company risk premium ..... 158 (B) After"tax cost of debt ............ 159 (C) Debt"to"equity ratio .............. 162 (D) Final WACC calculation ............ 162 iv. Terminal value ............................. 164 v. Present value of net cash flow and terminal value .......................................... 169 vi. Non"operating and excess assets ................ 172 vii. Final business enterprise value ................ 175 d. Other indications of value ............................. 176 e. Reconciliation .......................................... 178 2. Good faith ................................................ 180 C. Conclusions of Law ........................................... 191 IV. CONCLUSION ....................................................... 192

***1** The plaintiff Sam J. Alberts, trustee for the DCHC Liquidating Trust (the "Trust"), initiated this adversary proceeding to avoid and recover certain allegedly fraudulent transfers (the "Reese Transfers") from Michael Reese Medical Center Corporation ("Reese Corp."), as well as other debtors in this jointly administered bankruptcy case (collectively the "Debtors"), to defendants HCA Inc. ("HCA"), Galen Hospital Illinois, Inc. ("GHI"), and Western Plains Capital, Inc. ("Western," and collectively the "Defendants") under the Illinois Uniform Fraudulent Transfer Act, 740 Ill. Comp. Stat. 160/1 et seq. (1990) (the "IUFTA"), pursuant to 11 U.S.C. § 544.[1] The court heard testimony and received into evidence numerous exhibits and deposition excerpts over the course of a five-week long trial commencing on January 19, 2007. Having carefully considered the evidence presented by the parties, the controlling legal principles, and the court's prior rulings in this proceeding, the

court concludes that final judgment should be entered in favor of the Defendants for the reasons that follow.

# I. FACTUAL AND PROCEDURAL BACKGROUND

The following facts are no longer at issue.[2] Reese Corp. was formed as a wholly-owned subsidiary of Doctors Community Hospital Corporation ("DCHC"), a privately-held healthcare management company organized under the laws of Delaware. On July 8, 1998, Reese Corp. entered into an asset purchase agreement (the "APA") with GHI, a corporate subsidiary of fellow defendant HCA, for the purchase of Columbia Michael Reese Hospital and Medical Center ("Reese Hospital"). Also on July 8, 1998, Grant Hospital Corporation, another subsidiary of DCHC, signed a separate asset purchase agreement with Columbia Grant Hospital Inc. for the purchase of Grant Hospital.

On November 9, 1998, the parties signed the "Sixth Amendment" to the APA—the last such document signed prior to the purchase of the hospital. The sale of both hospitals closed on November 12, 1998 (the "Transfer Date"). At that time, various lenders to Reese Corp. wired funds to a Wachovia bank account owned by C/HCA Capital, LP (the "Capital LP"). The Capital LP consisted of a general partner, C/HCA Capital, GP, Inc. (the "Capital GP"), and a limited partner, Western. Western owned the Capital GP at the time of the Reese Transfers and merged into a single entity with the Capital GP in December of 2000. The Capital LP ceased to exist in that same month.

On November 20, 2002, DCHC filed for chapter 11 relief along with the other Debtors, including Reese Corp. After protracted proceedings lasting almost 18 months, the Debtors achieved confirmation of their second amended plan of reorganization (the "Plan") on April 5, 2004. Section 6.6 of the Plan provides for the creation of the Trust, which is charged with liquidating certain assets of the Debtors and distributing the proceeds to certain classes of creditors. Among the assets transferred to the Trust were fraudulent conveyance and other actions authorized under chapter 5 of the Bankruptcy Code.

***2** Acting in his capacity as trustee, Alberts initiated the instant adversary proceeding on November 18, 2004. After amending his complaint twice, Alberts moved for summary judgment on March 9, 2006. That motion was granted in part and denied in part in an oral decision dated April 4, 2006. The

court subsequently entered an order reciting that Reese Corp. transferred at least $66,048,840.00 towards the purchase of Reese Hospital.

Alberts filed a motion for partial summary judgment on July 27, 2006, on the discrete issue of whether the Second Amended Complaint was barred by the IUFTA's statute of repose. *See* 740 Ill. Comp. Stat. § 160/10 (extinguishing any action brought under § 160/5(a)(1) or § 160/5(a)(2) of the IUFTA that is not brought "within 4 years after the transfer was made or the obligation was incurred"). HCA and GHI responded by filing both an opposition and a cross-motion for summary judgment. The very next day, Alberts filed a motion to amend his complaint a third time to include Western as a defendant. The court granted Alberts leave to add Western as a party in a decision and order entered on October 12, 2006.

On December 6, 2006, the court entered a memorandum decision and accompanying order resolving in part the motion for partial summary judgment filed by Alberts and the cross-motion for summary judgment filed by HCA and GHI. *HCA I, supra* n. 2. The balance of those motions was decided in a memorandum decision and order entered on January 3, 2007, regarding the parties' responses to a separate order to show cause arising out of the court's earlier memorandum decision. *HCA II, supra* n. 2. The court entered yet another memorandum decision and order partially resolving a separate motion for summary judgment filed by GHI and HCA on January 3, 2007. *HCA III, supra* n. 2. In that decision, the court fixed the value of the Reese Transfers at $68,048,840.00, a $2 million increase over the court's prior oral decision. Also on January 3, 2007, the court entered a memorandum decision granting Alberts's motion to exclude certain expert reports furnished out of time by the Defendants, but denying Alberts's other motions *in limine. See generally Alberts v. HCA Inc. (In re Greater Southeast Cmty. Hosp. Corp. I),* 365 B.R. 315 (Bankr.D.D.C.2007).

The court heard argument on a variety of matters on January 3, 2007, and January 4, 2007, in an effort to resolve as many outstanding issues as possible prior to the commencement of trial. Of particular note, the court supplemented its January 3, 2007, memorandum decision by concluding that there was a genuine dispute of material fact as to the value of the property and rights received by Reese Corp. in return for the Reese Transfers. The court also denied a motion for summary judgment filed by Western and awarded summary judgment *sua sponte* to Alberts with respect to Western's affirmative defense under the IUFTA's statute of repose. *HCA*

*IV, supra* n. 2. Finally, the court denied the Defendants' motion to exclude one of Alberts' witnesses, Robert Wilson, from testifying and ordered further briefing and evidence with respect to their motion to exclude Alberts' other expert, Neil Demchick, insofar as that motion sought to prevent Demchick from testifying about a purchase accounting entry made by DCHC after Reese Corp.'s purchase of Reese Hospital to reflect losses anticipated on a provider contract with Humana purportedly assigned to Reese Corp. from GHI (the "Humana Contract").

**\*3** Trial commenced on January 19, 2007. Alberts called former DCHC president Paul Tuft, former DCHC vice-presidents Mel Redman, Erich Mounce, and Donna Talbot, and expert witnesses Robert Wilson and Neil Demchick to the stand. [3] The Defendants filed a motion for judgment on partial findings pursuant to Fed.R.Civ.P. 52(c) (as incorporated by Fed. R. Bankr.P. 7052) at the close of Alberts's case-in-chief, which the court denied without prejudice to renewal at the close of trial by way of oral decision. The Defendants presented only former HCA and GHI vice-president Gregg Gerken and expert witnesses Michael Kimmel, James Yerges, and Kevin Moss. [4] Over the course of the trial, the court also conducted an evidentiary hearing to determine whether Demchick should be permitted to testify as to the purchase accounting entry made by DCHC to reflect anticipated losses on the Humana Contract. The court ultimately concluded that he should not be allowed to testify on that discrete issue.

## II. JURISDICTION, VENUE, AND STANDING

The court has subject-matter jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(b). This is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(H), and the parties have expressly consented to the entry of a final order by this court. [5] This court is the appropriate venue for Alberts' suit pursuant to 28 U.S.C. § 1409(a).

The court has previously concluded that Alberts has standing to bring this suit as a representative of the estate pursuant to 11 U.S.C. §§ 544(b) and 1123. *HCA I,* 365 B.R. at 300–01. On the petition date, the Internal Revenue Service (the "IRS") held a contingent claim against DCHC that arose in 2002, long after the Reese Transfers were made. Standing in the shoes of the IRS as a creditor under 11 U.S.C. § 544(b), Alberts defeated the Defendants' statute of limitations

Case 09-10138-MFW   Doc 13460-3   Filed 05/02/14   Page 110 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

defense. *Id.* at 299–312. Notwithstanding the court's prior ruling that Alberts was acting as the representative of the bankruptcy estate, the Defendants argue for the first time in their post-trial brief that Alberts lacks standing under Article III of the Constitution to pursue this action because NCFE's bankruptcy was responsible for Reese Corp.'s insolvency at the time that the IRS's contingent claim arose. (Defs.Br.54–59.) [6] Their arguments in this regard are misguided.

" 'No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.' " *Raines v. Byrd,* 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) (quoting *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 37, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)). " 'Article III standing ... enforces [that] requirement.' " *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 126 S.Ct. 1854, 1861, 164 L.Ed.2d 589 (2006) (quoting *Elk Grove,* 542 U.S. at 11). "To meet the standing requirements of Article III, '[a] plaintiff must allege *personal injury* fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Raines,* 521 U.S. at 818 (quoting *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)) (emphasis supplied by the Court in *Raines* ). If, as the court concludes below, the Defendants' contention that NCFE's bankruptcy was the intervening cause of Reese Corp.'s insolvency is an affirmative defense, then the claims pled by Alberts satisfied Article III requirements. Even disregarding the issue of which party was responsible for addressing the issue in its pleading, the evidence shows that Alberts satisfied Article III requirements.

**\*4** A fraudulent transfer harms both existing and future creditors by reducing the amount of assets available for distribution to creditors where the debtor-transferor is insolvent and therefore unable to pay all creditors in full. *See Official Comm. of Asbestos Claimants of G–I Holding, Inc. v. Heyman,* 277 B.R. 20, 33 (S.D.N.Y.2002) (asbestos claimants' committee had standing to bring action to avoid and recover fraudulent transfer because claims reserve might not be sufficient to cover all asbestos claims, thereby causing such claimants to suffer "injury in fact"). Consequently, a creditor or estate representative usually establishes an injury "fairly traceable" to the challenged transfer by satisfying the elements of the applicable fraudulent transfer statute. *See* part III, *infra.* Once those elements are established, the burden shifts to the transferee to demonstrate that "the transfer did not (1) reduce the *res* that would have been available to

any creditor or creditors, (2) 'hinder, delay, or defraud' any creditor or creditors, [ ] *or* (3) have any other adverse impact on any creditor or creditors generally." *Bear, Stearns Sec. Corp. v. Gredd,* 275 B.R. 190, 196 (S.D.N.Y.2002) ( "*Bear Stearns* ") (emphasis added). [7]

If Reese Corp. *was* rendered insolvent by the Reese Transfers, the Defendants cannot carry their burden with respect to harm. There is simply no question that the Reese Transfers depleted assets of Reese Corp. that would have been available to pay other creditors had the transfers not taken place. Nor is there any question that if the assets acquired by Reese Corp. in exchange for the Reese Transfers had not been worth the purchase price, Reese Corp.'s insolvency in November of 2002 would have been a result of its decision to spend all of the money that it borrowed from NCFE and HCA towards the purchase of Reese Hospital. By transferring every asset at its disposal in return for a hospital whose worth did not match its price, Reese Corp. would have ensured its own insolvency for years to come. [8]

The motive for Reese Corp.'s decision to seek bankruptcy relief is irrelevant. The harm arising from a fraudulent transfer is the depletion of the debtor's assets at a time when the debtor cannot pay its creditors in full, not the response taken by the debtor in response to that inability. Even if Reese Corp. had never filed for chapter 11 relief, the IRS would still have had every right to bring an action under the IUFTA on November 20, 2002. Standing in the IRS's shoes, Alberts was entitled to assert his fraudulent conveyance claims for the benefit of the bankruptcy estate, and thus for the benefit of creditors other than just the IRS. *See Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV,* 229 F.3d 245 (3d Cir.2000).

Nor does it matter that the debt owed to the IRS might have been paid in a matter of weeks if not days had Reese Corp. avoided bankruptcy. Section 544(b) places the representative of the estate in the shoes of any unsecured creditor as of the petition date, *HCA I,* 365 B.R. at 300 n. 11, and the IRS could have brought an action under the IUFTA on November 20, 2002, notwithstanding the likelihood that its claim would be satisfied later and its (hypothetical) suit rendered moot as a consequence. "Even if the IRS ... claims had been paid in full mere hours after commencement of the case, that would not alter the estate representative's ability to invoke § 544(b)." *Id.* at 293 (citation omitted). Reese Corp.'s intention to pay the IRS does not alter the fact that the any fraudulent transfer made by Reese Corp. in acquiring Reese Hospital four years

Case 09-10138-MFW   Doc 13460-3   Filed 05/02/14   Page 111 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

prior deprived the IRS of the certainty of recovery on its contingent claim until it received payment.

**\*5** Alberts has standing to pursue this action. The Defendants' arguments to the contrary are without merit.

### III. THE MERITS OF ALBERTS'S FRAUDULENT CONVEYANCE CLAIM

The basis for Alberts's suit is 11 U.S.C. § 544(b), which provides in pertinent part that the representative of the debtor's estate "may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title." Alberts contends, and has endeavored to prove at trial, that the Defendants have violated § 5(a)(1) of the IUFTA (Counts I and II of the Complaint), 740 Ill. Comp. Stat. 160/5(a)(1) (addressing actual fraud against existing or future creditors), § 5(a)(2) of the IUFTA (Counts III and IV of the Complaint), *id.* at 160/5(a)(2) (addressing constructive fraud against existing or future creditors), and even § 6(a) of the IUFTA (Counts V and VI of the Complaint), *id.* at 160/6(a) (addressing constructive fraud against creditors whose claims arose prior to the allegedly fraudulent transfer).

The court has already decided many of the legal and factual questions raised in this adversary proceeding by way of memorandum and oral decision. These issues include:

- *Value of the Subject Transfers.* The value of the Reese Transfers is at least $68,048,840.00, of which $2,000,000.00 was transferred in exchange for Reese Corp.'s delay in closing on the purchase of Reese Hospital. *Id.* at 29.

- *Arm's–Length Negotiations.* The Reese Transfers were the result of arm's-length negotiations between the parties. *HCA III,* slip op. at 28–29.

- *Alberts's Standing as Representative of the Estate.* Alberts is a "representative of the estate" for purposes of 11 U.S.C. § 1123, which confers upon him the statutory authority to pursue causes of action under 11 U.S.C. § 544(b). *HCA I,* 365 B.R. at 300–01; *see also* n. 6, *supra.*

- *Existence of Unsecured Creditor on Petition Date.* The IRS held an unsecured contingent claim for taxes on

wages to be paid to Reese Hospital employees as of the petition date, thus giving Alberts standing to pursue this action under § 544(b). *Id.* at 306–12; *HCA II,* 2007 WL 80812, at ——2–3; *see also* n.6, *supra.*

- *Statute of Repose.* The statute of repose set forth in § 10 of the IUFTA, 740 Ill. Comp. Stat. 160/10, does not apply in this case because Alberts derives his standing from a governmental creditor (the IRS), and the claims of governmental creditors cannot be extinguished by statutes of repose or limitation (other than those established by Congress) pursuant to the Supreme Court's ruling in *United States v. Summerlin,* 310 U.S. 414, 60 S.Ct. 1019, 84 L.Ed. 1283 (1940). *HCA I,* 365 B.R. at 301–06; *HCA II,* 2007 WL 80812, at ——2–3. Moreover, Alberts's claims against Western relate back to the date of the filing of his first complaint against HCA and GHI because there is an identity of interests between the Defendants. *HCA IV,* 365 B.R. at 332–33.

- **\*6** • *Counts V–VI of the Complaint.* Final judgment in favor of the Defendants is appropriate with respect to Counts V–VI of the Complaint. *HCA I,* 365 B.R. at 313–15.

Additionally, the court may now decide the following legal and factual issues addressed but not resolved in prior decisions and not contested at trial:

- *Initial Transferee.* In a prior memorandum decision, the court declined to grant summary judgment in favor of Alberts with respect to whether the Capital LP was the initial transferee of the Reese Transfers until Western had an opportunity to present evidence that GHI did not have a "positive daily cash balance" when the Capital LP credited its account for the Reese Transfers, and therefore was not contractually obligated to apply that credit towards amounts owed to the Capital LP. *HCA IV,* 365 B.R. at 328–31, 333, and n. 12. Western presented no evidence in this regard at trial; consequently, the court concludes as a factual matter that Western, as the successor-in-interest to the Capital LP, is the "initial transferee" of the Reese Transfers for purposes of 11 U.S.C. § 550 in accordance with the reasoning set forth in *HCA IV.*

- *Counts I, II, and IV of the Complaint.* In a prior memorandum decision, the court declined to grant summary judgment in favor of the Defendants with respect to Counts I, II, and IV of Alberts's second

Case 09-10138-MFW    Doc 13460-3    Filed 05/02/14    Page 112 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

amended complaint even though Alberts had not produced any evidence that Reese Corp. had engaged in actual fraud (an element of Counts I and II) or that Debtors other than Reese Corp. were involved in the Reese Transfers, as alleged in Counts II, IV, and VI of the second amended complaint, because the Defendants did not put Alberts on notice that he needed to address these issues in response to the Defendants' cross-motion for summary judgment. *HCA I,* 365 B.R. at 313 n. 40. [9] Alberts presented no evidence of actual fraud by Reese Corp. at trial, nor did he prove that any debtor other than Reese Corp. transferred any assets to the Defendants. Final judgment in favor of the Defendants is therefore appropriate with respect to Counts I, II, and IV of the Complaint. [10]

Based on these findings, the only count in the Complaint requiring further analysis by the court is Count III, which seeks to recover the Reese Transfers pursuant to § 5(a)(2) of the IUFTA. The statute reads in pertinent part:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation ... without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>
> (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

**\*7** 740 Ill. Comp. Stat. 160/5(b).

As the plaintiff in this proceeding, Alberts has the burden of proving these elements by a preponderance of the evidence. *In re Zeigler,* 320 B.R. 362, 374 (Bankr.N.D.Ill.2005) ("The movant has the burden of proving fraud in law by a preponderance of the evidence."). Thus, to prevail on Count III of his Complaint, Alberts must show that (1) Reese Corp. did not receive "reasonably equivalent value" for the Reese Transfers and that (2) Reese Corp. was insolvent at the time of the Reese Transfers or as a result of the Reese Transfers. Because the court concludes that Alberts has failed

to demonstrate by a preponderance of the evidence that Reese Corp. did not receive reasonably equivalent value for the Reese Transfers for the reasons set forth below, it need not rule with respect to the issue of insolvency.

**A. *Applicable Legal Standard***
The court has expounded in prior decisions about the meaning of the term "reasonably equivalent value" for purposes of § 5(a)(2) of the IUFTA. As the court explained in *HCA III:*

> "What constitutes 'reasonably equivalent value' for purposes of the [IUFTA] has not been defined by Illinois case law," *Helms v. Roti (In re Roti),* 271 B.R. 281, 303 (Bankr.N.D.Ill.2002). Consequently, "[r]easonably equivalent value is interpreted the same way under both [11 U.S.C.] § 548 and the [IUFTA] because the term, as used in the [IUFTA], is derived from § 548(a)(2)." *Official Comm. of Unsecured Creditors of Crystal Med. Products, Inc. v. Pedersen & Houpt (In re Crystal Med. Products, Inc.),* 240 B.R. 290, 300 (Bankr.N.D.Ill.1990).
>
> "The test used to determine reasonably equivalent value in the context of a fraudulent conveyance [as contemplated by § 548] requires the court to determine the value of what was transferred and to compare it to what was received." *Barber v. Golden Seed Co., Inc.,* 129 F.3d 382, 387 (7th Cir.1997). In addition to comparing the fair market value of the challenged transfer against the fair market value of the consideration received in exchange for the transfer, courts determine whether these values are reasonably equivalent by looking for "the existence of an arm's-length relationship between the debtor and the transferee" and good faith on the part of the transferee. *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors (In re R.M.L., Inc.),* 92 F.3d 139, 149 (3d Cir.1996). The issue "must be evaluated as of the date of the transaction." *Daley v. Chang (In re Joy Recovery Tech. Corp.),* 286 B.R. 54, 75 (Bankr.N.D.Ill.2002).

*HCA III,* slip op. at 7–8.

Alberts argues that the Defendants' good faith in receiving the Reese Transfers is irrelevant to the court's determination as to whether Reese Corp. received "reasonably equivalent value" for those transfers. (Pl. Br. 27–32; Pl. Reply 32.) [11] The court agrees with Alberts that the "fair market value of the consideration received in exchanged for the transfer" is far and away the most important factor in determining whether the transferor received "reasonably equivalent value"

Case 09-10138-MFW Doc 13460-3 Filed 05/02/14 Page 113 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

for the transfer, *see Heritage Bank Tinley Park v. Steinberg (In re Grabill Corp.),* 121 B.R. 983, 994 (Bankr.N.D.Ill.1990) ( "Fair market value at the time of the transfer should control."), but "the concept of 'reasonably equivalent value' under fraudulent transfer law is not, legally, identical to fair market value," *In re Commercial Fin. Services, Inc.,* 350 B.R. 559, 576 (Bankr.N.D.Okla.2005) (citing *BFP v. Resolution Trust Corp.,* 511 U.S. 531, 537, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994)).[12] Good faith has a place in the court's consideration of the "totality of the circumstances" surrounding the Reese Transfers, albeit a minimal one.

**B.** *Findings of Fact*
**\*8** In a previous memorandum decision, the court held that there is no genuine dispute of material fact that the Reese Transfers were the result of arm's-length negotiations between the parties. *HCA III,* slip op. at 27–28. Thus, the only factual findings required by the court with respect to reasonably equivalent value are those concerning the fair market value of Reese Hospital as compared to the value of the Reese Transfers and the good faith of Reese Corp. and the Defendants in entering into the transaction that led to the Reese Transfers.

**1.** *Fair market value*
"The test used to determine reasonably equivalent value in the context of a fraudulent conveyance requires the court to determine the value of what was transferred and to compare it to what was received." *Barber v. Golden Seed Co., Inc.,* 129 F.3d 382, 387 (7th Cir.1997). The term "fair market value" refers to "the amount at which the property would change hands between a willing buyer and a willing seller, when the former is not under compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of the relevant facts." Jay E. Fishman et al., *PPC's Guide to Business Valuations* ¶ 201.4 (15th ed.2005) (quoting Internal Revenue Service Ruling 59–60).[13] There are three basic methodologies employed for determining the fair market value of a business: (1) the "market" approach, (2) the "net asset" or "cost" approach, and (3) the "income" approach. *Id.* at ¶ 203.2; Shannon P. Pratt et al., *Valuing a Business: The Analysis and Appraisal of Closely Held Companies,* at 45 (4th ed.2000).

**a.** *Market approach*
Under the market approach, a company's value can be estimated by identifying and analyzing recent sales of comparable assets. Fishman et al., *supra,* ¶ 203.4. There are two distinct valuation methods: (1) the guideline transaction method and (2) the guideline public company method. *Id.* at ¶¶ 203.4, 600.3. The guideline transaction method values the subject company by comparing transactions involving companies with similar characteristics to the subject company. *Id.* at ¶ 600.4. The guideline public company method values the subject company using the market price of the common stock of publicly traded companies that have similar characteristics to the subject company. *Id.* at ¶ 600.4.

The market approach requires a thorough search for comparable transactions and companies and equally thorough analysis and adjustment of the guideline data. *Id.* at ¶ 203.4. Comparable transactions or comparable public companies need not be identical to the subject sale or subject company but must provide a reasonable basis for comparison to the subject company. The challenges are identifying "truly comparable" companies and transactions and obtaining adequate information about those companies and transactions. *Id.* at ¶ 600.8. (Trial Tr. 2184:17–24, Feb. 7, 2007 (Demchick, N.).) Even if true comparables can be identified, the market approach leads to reliable and accurate estimates of value only if adequate data on those comparables exist. Fishman et al., *supra,* ¶ 600.8.

**\*9** After reviewing testimony and documentary evidence by Demchick on behalf of Alberts and by Moss on behalf of the Defendants, the court agrees with Alberts that there are no truly comparable transactions or public companies from which the court can derive an accurate and reliable fair market value for Reese Hospital using the market approach.

**(i)** *Guideline transactions*
The guideline transaction method values Reese Hospital by comparing transactions involving companies with similar characteristics to Reese Hospital. Characteristics or measurements used to determine comparability of transactions include (1) revenue, (2) income, (3) EBITDA (earnings before income taxes, depreciation and amortization), and (4) number of beds in the hospital. (Trial Tr. 2148:8–10, Feb. 7, 2007 (Demchick, N.).)

Demchick determined that there were inadequate comparable transactions from which he could calculate the market value for Reese Hospital. Demchick searched a number of databases, including Irving, Levin and Associates, Pratt Stats., BIZ Comps., and the IBA Database, to identify

Case 09-10138-MFW    Doc 13460-3    Filed 05/02/14    Page 114 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

potentially comparable private sales of hospitals. [14] (Trial Tr. 2185:6–13, Feb. 7, 2007 (Demchick, N.).) He "searched for hospital-related transactions or general and surgical hospitals between the years of 1996 and 1999, with revenues between 50 million and 300 million." (Trial Tr. 2185:9–13, Feb. 7, 2007 (Demchick, N.).) This range is sufficiently broad to cover any potentially comparable transactions.

This search yielded a pool of 329 transactions, which Demchick then reviewed for comparability. Demchick eliminated most of the hospital sales because one or more of the following factors was present: (1)the purchase price was not available; (2) the income of the purchased entity was not available; (3) the hospital was not in an urban area, (4) the purchase involved multiple entities rather than a single hospital; (5) the EBITDA measure was not available; or (6) the company had a positive EBITDA measure. (Trial Tr. 2188:3–2190–17, Feb. 7, 2007 (Demchick, N.).) EBITDA is a measure of profitability of a company. Demchick excluded transactions where the company's EBITDA measure was not available or was positive because Reese Hospital had a negative EBITDA measure at the time of the Reese Transfers.

After eliminating transactions on the basis of these measures, only one potentially comparable transaction remained, the purchase of Coney Island Hospital, which Demchick analyzed even though "it wouldn't be enough to really come to a meaningful conclusion related to market value." (Trial Tr. 2191:1–2, Feb. 7, 2007 (Demchick, N.).) Demchick ultimately excluded Coney Island as a comparable sale because the $67.1 million purchase price listed in Irving Levin and Associates actually included $25 million of capital improvements paid for by the buyer rather than the seller, thereby reducing the actual purchase price of Coney Island Hospital to $42.1 million, which is significantly lower than the $68,480,048 paid for the Reese Transfers.

 **\*10**  In contrast to Demchick, Moss determined that the market approach value of Reese Hospital as of November 12, 1998, was between $74 and $90 million. Like Demchick, he used private hospital sales data from Irving Levin and Associates and other private transaction databases to identify comparable transactions from which he estimated the market approach value of Reese Hospital as of November 12, 1998. But unlike Demchick, Moss determined that purchases of companies with positive EBITDA margins constituted comparable transactions even though Reese Hospital had a negative EBITDA at the time of transfer. [15]  According to Moss, purchases of positive

EBITDA companies were properly considered comparable transactions because hospital purchasers in 1998 were not as concerned with profitability as acquiring market share and revenue for future potential.

After identifying purportedly comparable transactions, Moss calculated a price-to-revenue multiplier for each transaction by dividing the purchase price by the revenue of the purchased entity. He then multiplied a range of these multipliers—from the 25th percentile to the 75th percentile—by Reese Hospital's approximately $150,000,0000 in revenue to calculate a range of values for Reese Hospital.

Moss also calculated price-to-revenue multipliers for purchases of companies of EBITDA margins of less than 2% of net revenue, on the basis that less than 2% EBITDA was an indication of poor financial performance. [16]  Moss testified that the .44 price-to-revenue multiple he calculated for the lower 25th percentile of those companies with EBITDA margins at less than 2 percent would be an appropriate revenue multiple to use to calculate a value for Reese Hospital. (Trial Tr. 3545:14–23, 3546:21–24, Feb. 20, 2007 (Moss, K.).) Moss also testified that his market approach value for Reese Hospital is based on a .45 to .55 revenue multiplier. [17]  (Trial Tr. 3547:21–24, Jan. 20, 2007 (Moss, K.).) Applying the .44 multiplier, the market approach value of Reese Hospital is $66,000,000 (or .44 x $150,000,000 revenues), well below Moss' $74 to $90 million estimate of the market approach value for Reese Hospital. [18]  A .5 price-to-revenue multiple would yield a $75 million market approach value for Reese Hospital.

The court does not credit Moss's market approach value because he failed to identify truly comparable transactions from which the court can derive a reliable value for Reese Hospital. The market approach does not require the identification of transactions identical to the sale of Reese Hospital in order to reliably calculate its market value. Indeed, identical transaction data would be difficult if not impossible to identify in such a specific context as this. But the guideline transactions used to calculate a value for Reese Hospital must involve companies with characteristics similar enough to Reese Hospital such that there is a reasonable basis for the comparison between the companies and there must exist adequate data about those transactions from which the court can derive a market approach value for Reese Hospital. Here, as Demchick determined, there are no hospital-related transactions which involve companies with characteristics sufficiently similar to Reese Hospital

Case 09-10138-MFW   Doc 13460-3   Filed 05/02/14   Page 115 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

to warrant a comparison under the market approach. By including sales of companies that had positive EBITDA measures in his analysis while Reese Hospital had a negative EBITDA, Moss used transactions that were not adequately comparable to the sale of Reese Hospital. The price-to-revenue multiples calculated by Moss are therefore not a reliable indicator of the market value of Reese Hospital.

**(ii)** *Guideline public companies*

 **\*11** The guideline public companies method values the subject company using the market price of the common stock of publicly traded companies that have similar characteristics to the subject company. Proper guideline companies are companies that provide a reasonable basis for comparison to the company being valued.

Alberts again contends that there are insufficient comparables from which to derive a value for Reese Hospital under the market approach. According to the Defendants and Moss, the market value of certain publicly traded guideline companies provides an understanding of the upper boundary for pricing in the market. But Moss selected seven publicly traded companies for his guideline company analysis that have no similar characteristics to Reese Hospital and are therefore inadequate comparables. These companies include HCA, Tenet Healthcare, Healthcare Management Associates, Universal Health Services, Quorum Healthgroup, Paracelsus Healthcare, and Province Healthcare. [19]

These companies, which are among the largest hospital companies in the nation, are not even remotely comparable to Reese Hospital. Their revenues range from $585 million to $20.6 billion, and they are diversified companies that own non-hospital operations. Moreover, each had positive EBITDA measures during the relevant time period, and collectively averaged an EBITDA margin of 16.7%. Most experienced positive trends in revenue and net income between 1997 and 1998. Reese Hospital, in contrast, was a single hospital operation with a negative EBITDA and operating losses at the time of the transfer. It had revenues of just $150 million in 1998. The court concludes that none of the publicly traded companies analyzed by Moss share similar characteristics with Reese Hospital. Thus, there are no public companies that are sufficiently comparable to Reese Hospital to provide adequate guideline data for calculating the market value of Reese Hospital as of the Transfer Date.

Because no comparable guideline transactions or guideline companies exist, the court concludes that the market approach does not lead to an accurate or reliable value for Reese Hospital.

**b.** *Cost approach*

The cost approach value of a business is based on the net aggregate value of its underlying assets. Fishman et al., *supra,* ¶ ¶ 203.21, 701.1. This approach focuses on the value of a company's assets in a hypothetical sale rather than on a company's earnings potential, which is the focus of the income approach. Fishman et al., *supra,* ¶ 701.2. One of two valuation methods generally applies: (1) going concern value (which assumes that fair market value would be paid for the assets), or (2) liquidation value. *Id.* at ¶¶ 701.3, 701.6. The value of the business is determined by adjusting the company's assets and liabilities to their appraised fair market values or appraised liquidation values, depending on the valuation method used. *Id.* at ¶ 203.22.

 **\*12** As a preliminary matter, the court concludes that going concern value, and not the liquidation value, is the proper measure of Reese Hospital's value under the cost approach. A company's net asset value under the going concern approach is the sum of the fair market values of each of its underlying assets. Fishman et al., *supra,* ¶¶ 203.21, 701.1. Liquidation value equals the present value of "the net proceeds from liquidating the company's assets and paying off liabilities." Fishman et al., *supra,* ¶ 701.1. Liquidation value is appropriate when the company's current and projected net cash flows from continuing operations "are low compared to net assets, and the company is worth more *dead* than *alive* " or "are low enough that its liquidation value is almost equal to its going concern value." Fishman et al., *supra,* ¶ 701.6 (emphasis in original).

Alberts contends that Reese Hospital was on its deathbed and that therefore Reese Hospital's liquidation value applies under the cost approach. [20] Reese Hospital's accurate cost approach value is not its liquidation value, but the value of the assets as part of a going concern. Pursuant to established principles of business valuation, a liquidation analysis should be used only when the company would be worth more dead than alive. Fishman et al., *supra,* ¶ 701.6. Reese Hospital, despite declining revenues, was not on its deathbed on November 12, 1998. Reese Hospital was worth more as a going concern than in liquidation, as is demonstrated by the income approach discussed later.

Case 09-10138-MFW    Doc 13460-3    Filed 05/02/14    Page 116 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

Accordingly, a hypothetical prospective purchaser of Reese Hospital, utilizing the cost approach to valuation, would have looked to the value of the assets in place as part of a going concern that would continue. In other words, such a hypothetical purchaser would ask what it would cost to replicate the assets it was purchasing, namely, the fair market values of the assets, not what the purchaser would receive if it liquidated the assets.

The court calculates that under the going concern cost approach, the value of what Reese Corp. acquired in purchasing Reese Hospital was approximately $57,985,984 as of November 12, 1998. The assets included in this calculation are: (i) real property ($25,307,763); (ii) equipment ($12,000,000); and (iii) net working capital ($20,678,221) (which includes a right to a refund to which Reese Corp. was entitled should the amount it paid for net working capital exceed the actual net working capital). The court also concludes as a factual matter that $24,700,000 should *not* be deducted from the value of Reese Hospital as a result of a purchase accounting adjustment made by Reese Corp. and DCHC in connection with the Humana managed care contract. The derivations of the values of Reese Hospital's real estate, equipment, and net working capital, and the basis for rejecting the Humana contract accounting adjustment are set forth below.

#### i. *Real property*

**\*13**  To calculate the value of the real estate of Reese Hospital under the cost approach, the court compared the highest and best use of the property as if it were vacant to the highest and best use of the property as improved to determine which use held more value. The highest and best use is that which generates the largest income for the property or earns the highest price in the market. The court estimated values for Reese Hospital's real property at its highest and best use as vacant and as improved. The court then assumed that the property would be put to the use that yielded the highest value. In summary:

- Reese Hospital could be used for its highest and best use in a vacant state (residential development) only if the existing improvements were first demolished. Because the costs of demolition exceeded the amount that would be paid for the land after such demolition, a purchaser would not buy Reese Hospital to put it to that use.

- The value of Reese Hospital as improved, put to its highest and best use of continued institutional use, was determined by examining what it would cost a hypothetical rational purchaser to replicate the hospital improvements on comparable land that could be acquired at the cheapest price for such institutional use.

These approaches and conclusions are discussed in greater detail below.

To calculate the values for the property at its highest and best use as vacant and as improved, the court reviewed and relied on the written expert reports and testimony of Robert A. Wilson from Real Estate Counselors, International, Inc. ("RECI") and Matthew W. Kimmel of Deloitte Financial Advisory Services LLP ("Deloitte"). In addition to the testimony and expert reports prepared by Wilson and Kimmel, the court also reviewed and relied on two written appraisals performed by David S. Felsenthal of Valuation Counselors Group, Inc. ("Valuation Counselors"). [21]

#### (1) *Highest and best use*

The highest and best use of the land as vacant and as improved must satisfy four criteria. The highest and best use must be (1) physically possible, (2) legally permissible, (3) financially feasible, and (4) maximally productive. Appraisal Inst., *The Appraisal of Real Estate* 307 (12th ed.2001). These criteria are typically considered sequentially. *Id.* This means that the court must consider whether a use is physically possible and legally permissible before considering whether a use is financially feasible and maximally productive. *Id.* A financially feasible use cannot be the highest and best use of a property if that use is legally prohibited. *Id.*

The highest and best use of land must be physically possible. Whether a use is physically possible depends on the physical characteristics of the site that might affect its highest and best use. *Id.* at 313. Uses may be limited by physical characteristics such as size, shape, accessibility, topography, and availability of utilities. *Id.* To test the physical possibility of a property's use as improved, the court must also consider the size, design, location and function of the improvements. *Id.* at 317.

 **\*14**  The highest and best use of land must also be legally permissible. Whether a use is legally permissible turns on the zoning, deed restrictions, building codes and environmental restrictions. *Id.* at 311. The court may consider the reasonable

Case 09-10138-MFW    Doc 13460-3    Filed 05/02/14    Page 117 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

probability that the zoning of a property could be changed in order to achieve the highest and best use of the property. *Id.* To test the highest and best use of the property as improved, the court also considers whether Reese Hospital as improved conforms with existing legal requirements. *Id.* at 316.

A proposed or existing use must also be financially feasible in order to qualify as the highest and best use. Financially feasible uses are physically possible and legally permissible uses which produce an income or return to the owner of the subject property equal to or greater than the amount needed to satisfy operating expenses, financial obligations, and capital amortization. *Id.* at 313–314. The court tests the financial feasibility of Reese Hospital as improved by considering whether there is market demand for Reese Hospital in its current state and whether the existing use has a positive return on the investment. *Id.* at 318.

Finally, the highest and best use must be the maximally productive use of the subject property. A maximally productive use as vacant and as improved is the financially feasible use which produces the highest price or value to the property. *See id.* at 314 ("Of the financially feasible uses, the highest and best use is the use that produces the highest residual land value consistent with the market's acceptance of risk and with the rate of return warranted by the market for that use."). Possible highest and best use conclusions for improved property include continued use, renovation, addition, conversion and demolition.

**(A)** *Highest and best use as vacant*
The court concludes that the highest and best use of the Reese Hospital site as vacant as of the Transfer Date was residential use. Residential use was physically possible, legally permissible, financially feasible and maximally productive on November 12, 1998.

Wilson testified on behalf of the Trust that the highest and best use of the land as vacant on the Transfer Date was continued use as a hospital, primarily because of his opinion that it would be highly unlikely that a developer could successfully re-zone the property from institutional use to residential use. Kimmel testified on behalf of the Defendants that residential use was the highest and best use of the Reese Hospital site as vacant on the Transfer Date.

The physical attributes of the Reese Hospital property, as vacant, permit a broad range of physically possible uses, including residential use. Reese Hospital is located on a large

parcel of land. According to the Plat of Survey prepared by the National Survey Service, the Reese Hospital property is 1,625,293 square feet or about 37.3116 acres. [22] The site consists of multiple lots separated by streets. The property also has generally level terrain. And its urban location and proximity to major roads provide good accessibility. All utilities including gas, electricity, water, sewage and telephone are readily available. These physical attributes are all favorable for residential development. The court therefore concludes that residential use of the Reese Hospital site as vacant was physically possible as of the Transfer Date.

**\*15**  Residential use must also be legally permissible in order to qualify as the highest and best use of the Reese Hospital property as vacant. The Defendants contend that residential development was legally permissible on the Transfer Date under existing zoning at the Reese Hospital site limited only by the minimum green space, maximum land coverage, and 1.5 floor-to-area ("FAR") restrictions. [23] Alberts disagrees, asserting that the zoning permitted general residential development only for purposes of housing nurses and medical interns and residents. [24]

The court concludes as a factual matter that the existing zoning permitted residential development only for housing certain hospital employees. Before October 11, 1962, the Reese Hospital site was zoned "General Residential District." On October 11, 1962, the zoning was reclassified to "Residential Planned Development (Institutional)" and permitted housing expressly for nurses, interns, and medical residents. (Pl.Ex. 223 at TRUST/HCA–02119.) On June 6, 1984, the city reclassified the zoning to "Michael Reese Hospital and Medial Center, Institutional Planned Development No. 1," which was the zoning in place on November 12, 1998. (*Id.* at TRUST/HCA–021132.) The zoning permitted hospitals, medical offices, administrative buildings and residential developments. Notably, the city removed the word "residential" from the title of the most recent amendment to the zoning, perhaps to eliminate confusion about permissible land uses on the Reese Hospital site. The Reese Hospital site has never had residences other than for nurses, interns and medical residents, and there has never been any general residential development on the property. The city could have specifically included general residential development as a permissible land use in the zoning documents had it intended for the Reese Hospital site to be used in that way.

Case 09-10138-MFW   Doc 13460-3   Filed 05/02/14   Page 118 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

Even though the existing zoning did not permit residential use, the court may consider for purposes of a highest and best use determination whether "there [was] a reasonable probability that the zoning could be changed" at for the Reese Hospital site to permit residential use. Appraisal Inst., *supra*, at 311. Consideration of a zoning change includes an analysis of the surrounding properties and their existing zoning classifications and land uses. *Id.*

The Defendants argue that a change in zoning for the Reese Hospital site to permit residential development was reasonably probable because the city was re-zoning land classified for other uses to permit residential use. (Trial Tr. 3253:22–25, Feb. 15, 2007 (Kimmel, M.) ("We did see, when looking at comparable transactions that land was being re-zoned from either manufacturing or other classes of zoning to residential.").) Alberts disagrees, relying on Wilson's testimony that reclassification of the Reese Hospital site to permit residential development, while possible, would be highly unlikely because (1) city approval of such changes has been historically low; (2) the city would be opposed to non-institutional development of the site as result of political pressures; and (3) the cost of securing the zoning change would be more than the increase in the value of the land. The court finds Wilson's opinion less persuasive than Kimmel's because Wilson did not research or rely on the results of actual re-zoning applications. (Trial Tr. 1355:23–25, Jan. 29, 2007 (Wilson, R.).) Rather, he relied on what he could recollect anecdotally from newspaper reports over the years and two projects with which his company was involved. (Trial Tr. 1356:1–1356:23, Jan. 29, 2007 (Wilson, R.).) [25]

**\*16** A zoning change would have been reasonably probable, assuming the Reese Hospital property were vacant. Surrounding properties to the south and west of the Reese Hospital site were zoned for residential use as of the Transfer Date. There was, moreover, an increasing demand for residential development in the neighborhood on or around the Transfer Date. The court therefore concludes that residential use was a legally permissible use of the Reese Hospital site as vacant as of November 12, 1998, given the reasonable probability of obtaining a reclassification of the zoning to permit residential development.

Residential development must be a financially feasible use and the maximally productive use of the Reese Hospital site, as vacant. According to Kimmel, a financially feasible and maximally productive use of the Reese Hospital site as vacant would be residential development given the strong demand

for residential development in the neighborhood. (Defs. Ex. JZ (Expert Report of Matthew G. Kimmel, Exhibit 3, at 25, Aug. 16, 2006).) The demand for commercial construction or a hospital facility in November 1998 was insufficient to justify either commercial or institutional use as maximally productive. *Id.*

Wilson disagreed. He testified that the unusually large size of the Reese Hospital site would require five to ten years to develop and sell for residential purposes such that the costs to a residential developer of carrying this land until fully developed were too large to justify residential development as a financially feasible and maximally productive use. According to Wilson, office, retail, and industrial uses were likewise not financially feasible due to lack of market demand in the area. In 1998, the neighborhood was an inferior location, as compared with other areas in the city, for office, retail and industrial space. In Wilson's view, there would have most likely been interest from institutional users given the large size of the site but he could not quantify market demand from institutional users or the financial feasibility of any hospital project at the Reese Hospital site. (*See* Pl.Ex. 210 (Appraisal of Robert A. Wilson, Real Estate Counselors International, Inc. p. 61)(Jul. 21, 2006).)

Based on market data and land development trends in the area, the court concludes there would have been a strong interest in developing the Reese Hospital site, if vacant, for residential use as of November 12, 1998. The court also concludes that there was not sufficient demand to develop the Reese Hospital site as a hospital as compared with the demand for residential development at the time. Residential use was therefore not only a financially feasible use but also the maximally productive use of the Reese Hospital site, if vacant.

Having determined that, if the property *were* vacant, residential use is physically possible, legally permissible, financially feasible and the maximally productive use of the Reese Hospital site, the court concludes that the highest and best use of the Reese Hospital site as vacant as of the Transfer Date was residential use.

**(B)** *Highest and best use as improved*
 **\*17** The court must next determine the highest and best use of the Reese Hospital site, as improved, as of November 12, 1998, again considering the four criteria described above. The highest and best use of a property as improved may be continuation of the existing use. Appraisal Inst., *supra,*

Case 09-10138-MFW   Doc 13460-3   Filed 05/02/14   Page 119 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

at 315. Both Kimmel and Wilson testified that the highest and best use of the Reese Hospital site as improved as of November 12, 1998, was continued use as a hospital and medical center. The court agrees. The use of the land as a hospital and medical center was physically possible on the Transfer Date. Reese Hospital was also a legally permissible use on the Transfer Date. The existing zoning permitted institutional development, including use of the property as a hospital and medical center. All plans for development of the land were submitted to and approved by the city before construction. Reese Hospital was thus a legally conforming use of the underlying land as of November 12, 1998.

The use of the site, as improved, was also financially feasible and maximally productive on the Transfer Date. Reese Hospital has been treating patients for decades. Its long-term existence demonstrates a reasonably certain level of financial feasibility and continued demand for its improvements' use as a hospital and medical center. Its neighborhood, as compared with other areas in the city, was an inferior location for other uses, such that the continued use of the improvements as a hospital and medical center is also maximally productive. Because the continued use of Reese Hospital as a hospital and medical center was physically possible, legally permissible, financially feasible and maximally productive as of November 12, 1998, the highest and best use of the Reese Hospital property as improved was continued use as a hospital and medical center.

**(2)** *Value*

Having determined the highest and best use of Reese Hospital's real property as vacant (residential use) and as improved (current use as a hospital and medical center), the court must next estimate values for the use of the Reese Hospital site, as vacant and as improved. Assuming the property would be put to use at its highest value, the value of Reese Hospital's land for purposes of the cost approach is the higher of the values of the land as vacant and as improved.

**(A)** *Value of Reese Hospital site as vacant*

The value of the Reese Hospital site as vacant is equal to the value of the land less the costs of any demolition and abatement. *See* Appraisal Inst., *supra*, at 309 n. 3. Comparable land sales are used to estimate the value of the land. Proper comparable land sales should have the same highest and best use as vacant as the subject property. [26] Because the Reese Hospital site's highest and best use as vacant is residential use, proper comparable land sales are those purchased for

residential development. The value calculation is based on sales price per square foot, the most common measure of price and value in the market. The price per square foot multiplied by the total number of square feet of the Reese Hospital site is equal to the value of the Reese Hospital site as vacant.

**\*18** The value of the land after being rendered vacant and put to residential use as of November 12, 1998 was $11.70 per square foot or $19,016,000 (rounded) ($11.70 per square foot x 1,625,293 total square feet). This is derived by utilizing Kimmel's calculation that the land was worth $11.70 per square foot (a figure that favors Alberts), without deciding whether Wilson's higher figure was more accurate, and utilizing Wilson's calculation that the land consisted of 1,625,293 square feet.

The court must next estimate the costs of demolition and abatement necessary to vacate the Reese Hospital site and deduct those costs from the value estimated for the land if vacant for residential use. Kimmel did not think it necessary to calculate and deduct costs of demolition or environmental abatement. The court disagrees.

Valuation of the highest and best use of the land as vacant necessarily assumes that any physical impediments to such use (for example, a gorge running through the property) have been eliminated. Eliminating existing improvements must be taken into account, otherwise the contemplated highest and best use of the property as vacant would not be physically possible. Costs of demolition as well as the cost of curing any environmental problems, *e.g.,* the removal of underground storage tanks, the abatement of asbestos, should be deducted from the value that results once the property is vacant. *See* Appraisal Inst., *supra*, at 309 n. 3.

Felsenthal estimated the costs of demolition and asbestos abatement. (Pl.Ex. 107 at CBIZ2999 (An Appraisal of Michael Reese Hospital and Medical Center by David Felsenthal, Valuation Counselors Group).) Felsenthal projected that building demolition and asbestos abatement would cost $22,790,000 in total, $4,800,00 for building demolition (or $3.00 per square foot x 1, 610, 695 square feet in gross building area) and $17,990,000 for asbestos abatement. The court credits Felsenthal's estimation because his analysis of these costs is thorough and conservative in comparison to the alternatives. After deducting costs in the amount of $22,790,000, the value of the Reese Hospital site for residential use is a negative $3,774,000.

Case 09-10138-MFW    Doc 13460-3    Filed 05/02/14    Page 120 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

**(B)** *Value of Reese Hospital site as improved*

To determine the value of the Reese Hospital property as improved as of November 12, 1998, the court estimates the value of the land and the value of the improvements as of that date. The value of the land as vacant for institutional use is estimated using comparable land sales. The value of the improvements is estimated by calculating the cost to replace the existing improvements as of the valuation date, or the replacement cost of new improvements, plus entrepreneurial profit, less depreciation. The value of the land plus the value of the improvements equals the value of the real estate.

The value of the land as vacant for institutional use (without adjusting for the costs of immediately making the land vacant because the existing improvements would continue in place) [27] is the appropriate land value (when deriving the value of the property *as improved* ), and that value is derived by using comparable sales of land for institutional use (not pricier sales of land for residential use). The court credits the testimony of Wilson that the land as vacant *for institutional use* should be valued at $5.85 per square foot or $9,500,000 (rounded), [28] based on roughly comparable land sales. [29]

**\*19**  Defying common sense, Kimmel opined that the value of the land as if it were vacant and put to residential use (without adjusting that value for the costs of demolition) should be utilized as the land value, even though the value of the site as improved and used for institutional purposes is what is being considered in this branch of the valuation analysis. A rational purchaser thinking of buying Reese Hospital would have explored how much it would cost to buy a comparable alternative site for hospital use and to put in place comparable hospital improvements. If that purchaser intended to use Reese Hospital as improved, he would rely on the cost of land for comparable purposes, and disregard the value of land for residential purposes: he would not pay more than what he would pay for replicating a comparable hospital elsewhere. [30] Kimmel explained that the buildings would eventually become obsolete and be demolished, and so it was appropriate to use the value of the land as vacant for residential purposes. But in an interim use approach, the property put to an interim use before being converted to highest and best use must take into account "different anticipated demolition costs" that apply to the subject property. *See* Appraisal Inst., *supra,* at 324. Kimmel's approach, as already noted, did not take into account demolition costs.

After estimating the value of the land, the court estimates the current cost of replacing the improvements on the Reese Hospital site. The improvements include buildings, a parking garage, and site improvements. To calculate the value of the improvements to the land, the court made a preliminary determination as to the replacement cost of each improvement on the property (including site improvements), added in projected entrepreneurial profit, then made a preliminary determination as to the amount of depreciation for each improvement and subtracted the amount of depreciation from the replacement cost for each improvement to arrive at a final value for each improvement.

The replacement cost for improvements is estimated using the Marshall Valuation Service, which is a tool used to estimate building costs for a particular point in time and depreciation rates over a given period of time. Wilson, Kimmel, and Felsenthal all relied on the Marshall Valuation Service in deriving figures for the replacement costs and depreciation rates. Their replacement cost and depreciate rate calculations based on the Marshall Valuation Service are not universally identical, but this is not unusual. (Trial Tr. 1403:19–21, Jan. 29, 2007 (Wilson, R.) ("[ N] o two appraisers [ are] going to look at these same buildings and same information and come up with the exact same calculation.").) So the court analyzed the sets of replacement cost figures and depreciation rates as follows.

In determining the replacement cost of each building, the court compared three sets of figures: the figures contained within the Wilson Report, the figures contained within the Kimmel Report, and the figures contained within the two Felsenthal Reports. These were the only appraisal reports that set forth a calculation for each individual improvement.

**\*20**  In comparing these figures to determine the replacement cost for each improvement, the court concludes that the figures derived by Felsenthal are more accurate than the figures derived by both Wilson and Kimmel for several reasons. First, Felsenthal's analysis is much more contemporaneous with the valuation date than either Wilson's or Kimmel's. Felsenthal completed his reports on March 5, 1998, and February 11, 1999, whereas Wilson completed his report on June 21, 2006, and Kimmel completed his report on August 16, 2006.

Felsenthal's figures for the improvements are also more reliable than Wilson's figures because Felsenthal used the same value for the individual improvements in two separate

Case 09-10138-MFW   Doc 13460-3   Filed 05/02/14   Page 121 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

reports—one for HCA and one for DCHC—thus refuting the suggestion made by Alberts at trial that Felsenthal inflated his value of the property to ensure that the value matched the purchase price of Reese Hospital (at least with respect to the property's improvements). Wilson, on the other hand, has a strong incentive to provide the lowest value for the improvements in support of Alberts's case.

Felsenthal's figures for the improvements are more accurate than Kimmel's for a number of additional reasons. Felsenthal used cost replacement values from the 1998 edition of the Marshall Valuation Service, whereas Kimmel used various editions of the service from later years and then used a primitive regression analysis to arrive at a conclusion as to the value of the improvements in 1998. Kimmel used a variety of multipliers (*e.g.,* local area multiplier, height multiplier, area multiplier) that were not used by any other appraisers, thus calling into question the propriety of this practice. And finally, the cost replacement value for improvements as calculated by Kimmel is much higher than any other calculation of value, suggesting that it is a statistical outlier and should not be credited. His calculation is 186% higher than Wilson's calculation, 36% higher than Felsenthal's calculation, and 51% higher than the average of the other three reports surveyed.

In comparing these figures to determine the replacement cost for each improvement, the court also assumed that the figures derived by Wilson were more accurate than the figures derived by Kimmel because (1) Wilson's conclusions were much closer to those reached by Felsenthal than the conclusions reached by Kimmel (Wilson's total replacement cost value was 18% lower than that of Felsenthal, whereas Kimmel's total replacement cost value was 36% higher than that of Felsenthal); (2) Wilson's conclusions were much closer to those reached in the other reports surveyed than the conclusions reached by Kimmel (Wilson's total replacement cost value was 3% lower than the mean of the conclusions reached in the other reports, whereas Kimmel's total replacement cost value was 51% higher than the mean of the conclusions reached in the other reports); and (3) Kimmel's methodology differs in significant ways from the methodology used in every other report.

 **\*21**  Consequently, in determining the replacement cost for those improvements that were appraised by Wilson and Kimmel but not by Felsenthal, the court credits the conclusions of value reached by Wilson, but applied a multiplier of 1.18 to account for the anticipated discrepancy

between the value reached by Wilson and the value that would have been reached by Felsenthal.

In deciding the amount of entrepreneurial profit to add to the cost replacement value of the improvements, the court concludes as a factual matter that the profit rate should be 10% of the cost replacement value of the improvement, per Kimmel's testimony, because this appears to be the rate used in other appraisal reports surveyed. Wilson's testimony that the rate should be 3% of the cost replacement value of the improvement due to the non-profit nature of most hospitals is not credible for a number of reasons. First, Michael Reese was a for-profit hospital. Second, Alberts fails to suggest any logical reason why a contractor would be willing to accept less of a profit based on the level of profitability of the enterprise serving as her client. Finally, other appraisal reports surveyed applied an entrepreneurial profit rate of 10% of the replacement cost of the improvements at the property. Based on the foregoing conclusions of fact, the court's replacement cost calculations inclusive of entrepreneurial profit but before depreciation are set forth below.[31]

In determining the rate of depreciation for each improvement, the court applies the rates used by Wilson, Kimmel, and Felsenthal where they agree with each other, the rates used by Wilson and Kimmel where they agree with each other but not with Felsenthal's rates, the rates used by Wilson and Felsenthal where they agree with each but not Kimmel's rates, and the rates used by Kimmel and Felsenthal where they agree with each other but not Wilson's rates. When all three reports differed as to the depreciation rate for a particular improvement, the court, in all but one instance, applies the rate used by Kimmel because his depreciation analysis was more thorough than that of Wilson (*e.g.,* Wilson used the *chronological age* of an improvement in determining its life expectancy rather than its *effective age* ) and the rates used by Felsenthal tended to be lower than any other depreciation analysis conducted by other appraisers.[32] The lone exception to this rule was with respect to the parking deck, where the court credits Felsenthal's depreciation rate (52%) instead of the depreciation rate used by Kimmel (47%) because Kimmel admitted under cross-examination at trial that he did not consider the functional obsolescence of the parking garage caused by its excess number of lots. (Trial Tr. 3616:12–3620:11, Feb. 21, 2007 (Kimmel, M.).) Wilson did not provide a depreciation rate for the parking deck.

Based on the foregoing factual conclusions, the court's findings regarding the value for each improvement are below.

Case 09-10138-MFW    Doc 13460-3    Filed 05/02/14    Page 122 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

| Building | Replacement Cost | Depreciation | Net Value |
|----------|-----------------|--------------|-----------|
| Power Plant | $759,330.00 | 96% | $30,373.20 |
| Laundry Building | $1,241,460.00 | 100% | $0.00 |
| Bensinger General Services | $3,896,640.00 | 94% | $233,798.40 |
| Main Hospital | $36,992,340.00 | 100% | $0.00 |
| Linear Accelerator | $3,937,158.50 | 96% | $157,486.34 |
| Klein & Kundstadter Building | $29,476,260.00 | 86% | $4,126,676.40 |
| Meyer House | $10,873,170.00 | 100% | $0.00 |
| Florsheim Professional Building | $2,347,290.00 | 100% | $0.00 |
| Rothschild Center | $20,161,350.00 | 100% | $0.00 |
| Mandel Clinic | $6,661,710.00 | 100% | $0.00 |
| Siegel Institute | $2,662,110.00 | 90% | $266,211.00 |
| Florsheim Library | $2,067,120.00 | 100% | $0.00 |
| Cummings Research Pavilion | $3,190,770.00 | 96% | $127,630.80 |
| Linear Accelerator Addition | $1,218,356.02 | 91% | $109,652.04 |
| Kaplan Surgical Wing | $10,971,180.00 | 93% | $767,982.60 |
| Kaplan Pavilion | $18,776,340.00 | 98% | $375,526.80 |
| Singer Pavilion | $9,478,260.00 | 98% | $189,565.20 |
| Friend Pavilion | $2,654,190.00 | 98% | $53,083.80 |
| Levinson Building | $4,134,240.00 | 98% | $82,684.80 |
| Blum Pavilion | $6,703,290.00 | 81% | $1,273,625.10 |
| Wexler Pavilion | $1,194,930.00 | 96% | $47,797.20 |
| Baumgarten Pavilion | $19,094,130.00 | 96% | $763,765.20 |
| Dreyfus Research Lab | $11,291,940.00 | 91% | $1,016,274.60 |
| Laz Chapman | $1,849,320.00 | 94% | $110,959.20 |
| Acute Care Center | $1,573,313.50 | 80% | $314,662.70 |
| Bensinger Park Field House | $153,259.70 | 96% | $6,130.39 |

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Case 09-10138-MFW Doc 13460-3 Filed 05/02/14 Page 123 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

| | | | |
|---|---|---|---|
| Administrative Center | $4,944,060.00 | 77% | $1,137,133.80 |
| Parking Deck | $8,324,800.00 | 52% | $3,995,904.00 |
| Other Site Improvements | $2,586,798.50 | 76% | $620,831.64 |
| Total | $229,215,116.22 | 93% | **$15,807,755.21** |

**\*22** Finally, the value of the land is added to the value of the improvements to calculate a final valuation for the real estate of Reese Hospital. Here the value of the Reese Hospital site as improved for institutional use is $25,307,763 ($9,500,000 + $15,807,755).

The court concludes as a factual matter that the highest and best use of the land is as improved because the value of Reese Hospital as improved is greater than the value of the land as vacant. The value of Reese Hospital as improved is $25,307,763. The value of Reese Hospital as vacant is -$3,774,000, after subtracting the costs of demolition and asbestos abatement. The highest and best use of the Reese Hospital site as of November 12, 1998, was continued use as a hospital and medical center because that use returns a higher price in the market and is therefore the maximally productive use of the land. The court therefore finds that the real estate at Reese Hospital under the cost approach was worth $25,307,763 on November 12, 1998.

**ii. *Equipment***

Reese Hospital's equipment (which includes furniture) is the second asset included in the computation of Reese Hospital's net asset value under the cost approach. The court finds as a factual matter that the fair market value of Reese Hospital's equipment as of November 12, 1998, was $12,000,000. The parties could be viewed as having stipulated that Reese Hospital's equipment was worth $12,000,000 on the Transfer Date, Pl. Facts ¶ 213; Defs. Facts ¶ 216; Defs. Br. at 20 ("both sides estimate the value of the equipment at $12,000,000"), and the court thought that issue had been put to rest in the parties' closing arguments in open court. However, after the trial, the Defendants have contended that the record supports a finding of a $19,000,000 value for the equipment. (Defs. Facts ¶¶ 169–170, 176–177; Defs. Rebuttal at 126.) The court views the evidence supporting a $19,000,000 value as not persuasive in the face of overwhelming evidence supporting the $12,000,000 value.

Both Alberts and the Defendants introduced documentary evidence at trial that supports a finding that Reese Hospital's

equipment was worth $12,000,000 on the Transfer Date. (Pl.Ex. 214 at TRUST/HCA–029153 (Memo from Donna Talbot to Lance Poulson Re: Orderly Liquidation Value —Reese/Grant Orderly Liquidation Appraisals)(Sept. 18, 1998); Pl.Ex. 233 at CBIZ2167 (An Appraisal of Michael Reese Hospital and Medical Center as of November 30, 1998) (Feb. 11, 1999); Defs. Ex. WJ (An Appraisal of Michael Reese Hospital and Medical Center as of November 30, 1998) (Feb. 11, 1999).)

Neither Alberts nor the Defendants presented independent valuations of Reese Hospital's equipment, choosing instead to rely primarily on existing equipment appraisals by Felsenthal and Valuation Counselors. However, both parties presented testimony that clearly pointed to $12,000,000 as being the accurate appraised value of the equipment as of the Transfer Date. Demchick testified on behalf of the Trust that $12,000,000 appeared to be the "appropriate amount to use" for the fair market value of the equipment when calculating the value of Reese Hospital under the cost approach. (Trial Tr. 1871:3–1873:8, Feb. 1, 2007 (Demchick, N.); Trial Tr.1941:6–1946:25, Feb. 6, 2007 (Demchick, N.).) Equipment appraisals by Felsenthal at Valuation Counselors and Ernst & Young form the basis of Demchick's conclusion. (Trial Tr.1941:6–1946:25, Feb. 6, 2007 (Demchick, N.); Pl. Facts ¶ 213 n. 66.) I n a letter dated September 16, 1998, Felsenthal appraised the orderly liquidation value of Reese Hospital's equipment as of June 1, 1998, at $12,000,000. (Pl.Ex. 214 at TRUST/HCA–029153; Trial Tr.1942:6–12, Feb. 6, 2007 (Demchick, N.).) By orderly liquidation value, Felsenthal did not mean that $12,000,000 is the value the equipment would earn in a 30–day liquidation sale. Rather, he meant that $12,000,000 is the value the equipment would earn in a sale that would occur within six to twelve months from the valuation date, which is a typical fair market value period. In a report dated February 11, 1999, Felsenthal estimated the market value of Reese Hospital's equipment as of November 30, 1998, at $12,000,000. (Pl.Ex. 233 at CBIZ2167.)

**\*23** Demchick also noted that a document from Valuation Counselors' production in this litigation denotes an original cost of equipment totaling approximately $19,000,000 and

Case 09-10138-MFW   Doc 13460-3   Filed 05/02/14   Page 124 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

a reproduction cost totaling approximately $12,000,000. (Pl.Ex. 403 at CBIZ1098; Trial Tr.1942:13–1943:7, Feb. 6, 2007 (Demchick, N.).) Finally, Demchick considered a memo prepared by Ernst & Young during an audit of Reese Hospital which estimates the fair market value of the equipment at $10.8 million and which is dated December 31, 1998. [33] (Pl.Ex. 12 at EY 794 (DCHC–Grant and Reese Sale Leaseback Memo)(Dec. 31, 1998); Trial Tr.1945:14– 24, Feb. 6, 2007 (Demchick, N.).) After considering all of these valuations of Reese Hospital's equipment, Demchick testified that $12,000,000 "seemed most appropriate" as the fair market value of Reese Hospital's equipment.

Moss, on behalf of the Defendants, likewise testified that the fair market value of Reese Hospital's equipment was $12,000,000. (Trial Tr. 3548:15–22, Feb. 20, 2007 (Moss, K.); Trial Tr. 3817:18–20, Feb. 22, 2007 (Moss, K.).) Kimmel, also on behalf of the Defendants, conducted a technical review of Valuation Counselors' appraisal of Reese Hospital as of November 30, 1998, and determined that "the methodology used to value the [equipment] of Michael Reese as of November 30, 1998, was acceptable and consistent with industry peers." (Defs. Ex. JZ at 22–24 (Expert Report of Matthew G. Kimmel).) And like Demchick, neither Moss nor Kimmel conducted any independent valuation of the equipment, relying instead on information contained in existing appraisal documents. (Trial Tr. 3569:16–18, Feb. 20, 2007 (Moss, K.).); Trial Tr. 3236:11–17, Feb. 15, 2007 (Kimmel, M.); Defs. Ex. WJ (showing that the fair market value of Reese Hospital's equipment as of November 30, 1998, at $12,000,000).)

In suggesting that the evidence also supports a finding by the court that the equipment was worth as much as $19,000,000. Defendants point to an appraisal of the equipment prepared by Valuation Counselors on July 9, 1998, appraising the fair market value of the equipment at $19,160,000 as of June 1, 1998. (Defs. Ex. PW at TRUST/HCA–171734–TRUST/ HCA171736 (Appraisal of Equipment at Michael Reese Hospital and Medical Center)(Jul. 9.1998).) Defendants' suggestion conflicts not only with their experts' testimony but also with their contemporaneous stipulation that the equipment was worth $12,000,000 on the transfer date. (Defs. Facts ¶ 216.)

The court agrees with the analyses of the witnesses at the trial that of all the equipment appraisals in the record, Felsenthal's report dated February 11, 1999, most accurately values Reese Hospital's equipment as of the Transfer Date out of all the equipment appraisals in the record. (Pl.Ex. 233 at CBIZ2167.) This particular appraisal values the equipment as worth $12,000,000 as of November 30, 1998, which is closest in time to the Transfer Date, and does so utilizing an appropriate cost approach. (Kimmel's technical review of this appraisal approves the valuation methodology applied by Felsenthal in this appraisal.) In contrast, Valuation Counselors' report dated July 9, 1998, values the equipment as of June 1, 1998, more than five months prior to the Transfer Date, and is therefore too remote in time to be an accurate indicator of the fair market value of Reese Hospital's equipment as of the Transfer Date. Moreover, it is not clear that the July 9, 1998, report utilized an appropriate cost approach methodology (as it defined fair market value in continued use as "including installation and assuming earnings support the value reported," a definition not employed in other reports, thus suggesting that it may have not have been a pure cost approach valuation, but instead a hybrid approach that takes into account the value of future income). Finally, the report is inconsistent with a document prepared by Valuation Counselors in February 1999 (Pl.Ex.403) totaling the original cost of the equipment as slightly over $19,000,000 (a value that would not likely have continued after acquisition because of depreciation, as indicated by the same document's estimate that reproduction cost would be only $12,452,440.

*24 The July 9, 1998, appraisal report was prepared for DCHC, not the Defendants, and, accordingly, the $19,000,000 valuation in that report would have no bearing on the issue of whether the Defendants proceeded in good faith in the sale of Reese Hospital (other than that they permitted DCHC to have access to permit an appraisal to be conducted). However, it is evidence that Reese Corp. may have viewed the equipment as worth $19,000,000 in deciding to purchase Reese Hospital, and thus bears on its good faith.

In conclusion, the value of the equipment as of the Transfer Date was $12,000,000 under a cost approach.

### iii. *Net working capital*

Net working capital acquired by Reese Corp. is the third asset included in the computation of the net value, under the cost approach, of the assets acquired by Reese Corp. in exchange for the Reese Transfers. As discussed in more detail below, under the terms of the APA, the parties arrived at an estimated value of approximately $20,600,000 for the net working capital of Reese Hospital, and GHI agreed to pay Reese Corp. for any shortfall in that estimate. [34] That obligation is part

Case 09-10138-MFW    Doc 13460-3    Filed 05/02/14    Page 125 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

of the value the Defendants transferred to Reese Corp. in exchange for the Reese Transfers, and, accordingly, it must be included as part of the net working capital received by Reese Corp. When it is included, the combined value of Reese Hospital's actual net working capital and the value of GHI's obligation to refund any shortfall equals $20,678,221.

Alberts argues that the value of the net working capital was approximately $14,400,000. (Pl. Facts ¶ 213; Trial Tr.1940:12–25, Feb. 6, 2007 (Demchick, N.).) Defendants contend that the correct fair market value of the net working capital was approximately $20,600,000, which is the amount Reese Corp. paid for net working capital on November 12, 1998. (Pl.Ex. 10 at HCA/MR–05072 (Closing Statement—Purchase and Sale of Michael Reese Hospital and Medical Center)(Nov. 12, 1998)("Closing Statement"); Defs. Facts ¶ 339; Defs. Br. at 20.) Reese Hospital's actual net working capital, as determined post-closing by PriceWaterhouseCoopers ("PWC"), was approximately $14,400,000, which is $6.2 million short of the $20,600,000 estimate contained in the APA.[35] Because the Defendants were obligated to refund that $6.2 million, and that obligation is a category of working capital acquired by Reese Corp. in exchange for the Reese Transfers, the Defendants are correct that the net working capital acquired by Reese Corp. equals approximately $20,600,000.[36]

The question is not whether the $6.2 million should be included in the calculation of the value of *Reese Hospital's* net working capital acquired by Reese Corp. The net working capital received by Reese Corp. in exchange for the Reese Transfers includes both *Reese Hospital's* net working capital and *Reese Corp.'s* new item of net working capital, namely, GHI's obligation to make up any shortfall in the estimated value of Reese Hospital's net working capital. The court finds that the fair market value of the net working capital acquired by Reese Corp. on the Transfer Date includes the value of GHI's obligation to refund $6.2 million to Reese Corp. as a result of PWC's post-closing reconciliation. The fair market value of the net working capital acquired by Reese Corp. on November 12, 1998, was thus $20,678,221, the amount stated on the closing statement for the purchase of Reese Hospital.

#### iv. *Humana Contract*

**\*25** At the time of Reese Hospital's acquisition in November 1998, GHI and Reese Hospital served patients covered by Humana insurance in connection with a managed care provider contract between Humana and GHI (the "Humana Contract"). After Reese Corp. acquired Reese Hospital on November 12, 1998, Reese Hospital continued to treat Humana patients, operating under the terms of the Humana Contract. (Trial Tr. 536:16–5376:1, Jan. 23, 2007 (Mounce, E.).)

The Humana Contract was important to Reese Hospital's operations because it constituted a significant component of Reese Hospital's business. (Trial Tr. 544:6–9, 551:10–12, Jan. 23, 2007 (Mounce, E.); Trial Tr. 2790:7–9, Feb. 12, 2007 (Gerken, G.); Trial Tr. 931:18–20, Jan. 25, 2007 (Talbot, D.).) But the cost to treat a Humana patient exceeded the reimbursement Reese Hospital would receive from Humana. (Trial Tr. 931:25–932:15, Jan. 25, 2007 (Talbot, D.).) The reimbursement rates were so low that Reese Hospital sustained ongoing losses as a result of the contract. (Trial Tr. 579:6–580:23, Jan. 23, 2007 (Mounce, E.); Trial Tr. 931:25–932:15, Jan. 25, 2007 (Talbot, D.).)

DCHC made a $24.7 million purchase accounting adjustment ("PAA") with respect to Reese Corp. in its financial statements for the year ending December 31, 1998, to reflect losses anticipated as a result of treating Humana patients according to the terms and rates of the Humana Contract. (Pl.Ex. 100 (Audited Consolidated Financial Statements of DCHC for the years ending December 31, 1997 and 1998) ("The excess over fair value of the net assets for Michael Reese in the amount of $24.4 million was provided for as an impairment of long-lived assets under FAS 121 in 1998."); *see also* Pl.Ex. 163 (Work papers for the audited consolidated financial statements for DCHC for the years ending December 31, 1997 and 1998)(same).) Those financial statements were audited by Ernst & Young (although no formal audit opinion ever issued). On January 30, 2007, this court granted in part Defendants' motion *in limine* to exclude Alberts's expert, Neil H. Demchick, from opining that the $24.7 million PAA taken by DCHC should be deducted from the value of Reese Hospital. (Trial Tr. 1567:14–1576:25, Jan. 30, 2007 (Teel, J.).)

Alberts persists in arguing that $24.7 million should be deducted from the value of Reese Hospital as a result of the PAA made by DCHC and Reese Corp. to account for losses on the Humana Contract. (Pl. Facts ¶ 223.) The court disagrees. The court concludes as a factual matter that: (1) there is no evidence that the Humana Contract was still in existence at the time of the transfer; (2) there is no evidence in the record that the Humana Contract was assigned to Reese Corp. as part of the transfer; and (3) blind reliance should

Case 09-10138-MFW    Doc 13460-3    Filed 05/02/14    Page 126 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

not be placed on the adjustment (even if it had been valid) when there is no persuasive evidence that a hypothetical purchaser of Reese Hospital on the Transfer Date (in contrast to a green shade-wearing accountant focused on arcane accounting procedures) would have viewed the accounting adjustment as reflecting a dollar-for-dollar reduction in the value of Reese Hospital.

**(1) *There is no evidence that the Humana Contract existed on the Transfer Date***

**\*26**  There is no evidence that the Humana Contract was still in existence on November 12, 1998. By the terms of the contract and a subsequent amendment, the contract expired on or about September 30, 1998, and therefore did not exist on the Transfer Date. Reese Corp. could not assume an expired contract. The testimony of DCHC's Mounce that the Humana Contract had not expired was ambiguous at best and reveals that DCHC and Reese Corp. decided to continue to operating under the terms of the Humana Contract, without any proof that the contract still existed, as part of its strategy to negotiate more favorable reimbursement rates with Humana.

The original contract executed by Humana and GHI contained a three-year term commencing on March 1, 1993. (Pl.Ex. 1128 at TRUST/HCA 011607–TRUST/HCA 011608 (Hospital Services Agreement between GHI and Humana § 4.1).) Humana and GHI executed subsequent amendments to the original contract, most of which amended service rates. (Pl.Ex. 1130 at TRUST/HCA 011588–TRUST/HCA–011591(Amendment to Hospital Services Agreement between Humana and GHI, effective Jan. 1, 1995); Pl.Ex. 1129 at TRUST/HCA 011587 (Amendment to Hospital Services Agreement between Humana and GHI, effective Aug. 1, 1995); Pl.Ex. 1132 at TRUST/HCA 011584–TRUST/HCA 011586(Amendment to Hospital Services Agreement between Humana and GHI, effective Sept. 1, 1995), Pl Ex. 1131 at TRUST/HCA 011582–TRUST/HCA 011583(Amendment to Hospital Services Agreement between Humana and GHI, effective Feb. 1, 1997).)

One amendment to the Humana Contract executed by Humana and GHI extended the original contract term for two years beginning on January 1, 1996. [37] The factual record also indicates that the Humana Contract provided for a "runoff period" of nine months after expiration or termination of the contract, during which Reese Hospital, still owned by GHI, would continue to provide services to Humana patients under the contract's terms. (Pl.Ex. 1128 at TRUST/HCA

011607–TRUST/HCA 011608 (Hospital Services Agreement between GHI and Humana § 4.3).) Both Gregg Gerken, Vice President of Development for HCA, and Erich Mounce, Senior Vice President of Corporate Development at DCHC and DCHC's due diligence coordinator for the acquisition of Reese Hospital, affirmatively testified that the Humana Contract provided for such a "runoff period." (Trial Tr. 2925:1–6, 2926:20–2927:1, Feb. 14, 2007 (Gerken, G.); Trial Tr. 692:15–693:2, Jan. 24, 2007 (Mounce, E.).)

Based on the original contract and its subsequent amendment, the court concludes that the Humana Contract expired on or about January 1, 1998, and that the runoff period ended on or about September 30, 1998. The court further concludes that the written evidence indicates that the contract had expired on or about September 30, 1998, and therefore did not exist on the Transfer Date. Reese Corp. could not assume an expired contract.

But even if the evidence does not identify with certainty the exact date of the contract's expiration, the record does not show that the Humana Contract existed on the Transfer Date. Testimony by Mounce reveals that DCHC and Reese Corp. decided to continue to operating under the terms of the Humana Contract, without any proof that the contract still existed, as part of its strategy to negotiate more favorable reimbursement rates with Humana.

**\*27**  While conducting due diligence, DCHC repeatedly requested documentation from HCA in support of a valid, unexpired contract between GHI and Humana. [38] But DCHC never received proof of a valid, unexpired contract between GHI and Humana as of the Transfer Date. (Trial Tr. 612:24–613:19, Jan. 23, 2007 (Mounce, E.).)

HCA and DCHC executives provided conflicting testimony as to whether the contract expired. Gerken of HCA testified that the Humana Contract had expired by November 12, 1998, when DCHC and Reese Corp. acquired Reese Hospital. (Trial Tr. 27906:5–8, Feb. 12, 2007 (Gerken, G.).) He further testified that Reese Hospital continued to see Humana patients and operate under the terms of the contract after it had expired. (Trial Tr. 2796:13–18, Feb. 12, 2007 (Gerken, G.).)

Mounce of DCHC testified that Reese Corp. operated under the Humana contract post-acquisition. (Trial Tr. 537:20–25; 536:16–537:1, Jan. 23, 2007 (Mounce, E.).) According to Mounce's initial and somewhat unclear testimony, DCHC received substantiation of an unexpired contract between

Case 09-10138-MFW   Doc 13460-3   Filed 05/02/14   Page 127 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

GHI and Humana prior to closing. (Trial Tr. 542:19–546:19, Jan. 23, 2007 (Mounce, E.).) Although the Humana Contract expired at the end of 1998, it was somehow "assigned" to DCHC in January 1999, only meaning that Reese Corp. continued to operate under the terms of that contract on a month-to-month basis until a new one could be negotiated,(Trial Tr. 611:23–612:1, Jan. 23, 2007 (Mounce, E.)). However, Mounce clarified that in fact DCHC did not receive a document showing an unexpired contract; rather, DCHC received comfort that Reese Hospital could continue to operate under existing terms of Humana's expired contract with GHI until a new contract could be negotiated:

Q: You have never seen, putting aside the belief, you have never seen a document that said—other than your early due diligence where you found expired contracts, you never found a contract that said it hadn't expired after the date set forth in your earlier memo, which was #97 or into #98, Early #98, January #98. You have never seen that document have you?

A: Let's see I'm pretty confident that I have seen documents renewing it up through the end of #97 and pricing moving on to #98, but to cover the period between the close and the 12/31/99, I just don't remember seeing the document.

Q: Isn't it fact that you got comfort that Humana would continue the relationship informally until such time as you could negotiate as the new owner a new managed care contract. Isn't that what happened?

A: I think that we got comfort that the pricing would stay in place through the end of #98 and they would assign the old contract to us in #99 and we would operate under that contract until we renegotiated a new contract.

(Trial Tr. 612:24–613:19, Jan. 23, 2007 (Mounce, E.).)

The court finds as a factual matter that DCHC never received proof of an existing, unexpired contract between GHI and Humana. Rather, DCHC decided to continue operating under the terms of the Humana Contract as part of its strategy to attempt to negotiate more favorable reimbursement rates from Humana. (Trial Tr. 551:19–555:1, Jan. 23, 2007 (Mounce, E.); Trial Tr. 2796:13–24, Feb. 12, 2007 (Gerken, G.); *see also* Trial Tr. 987:3–8, Jan. 25, 2007 (Talbot, D.) (noting that DCHC hoped to renegotiate the Humana Contract).)

**\*28** Humana was a significant component of Reese Hospital's business, but because the reimbursement rates for Humana patients were so low, DCHC claims it was faced with the decision either to refuse to operate under the Humana Contract rates and therefore lose additional business or to renegotiate it. (Trial Tr. 552:1–24, Jan. 23, 2007 (Mounce, E.).) DCHC was reluctant to cease operating under the terms of the Humana Contract notwithstanding the low reimbursement rates because the lost business would be significant and extend beyond Humana patients. (*Id.*) Mounce testified that had DCHC ceased operating under the terms of the Humana Contract, some overhead costs of the hospital that were covered would no longer be covered. (*Id.*) In addition, there was the likely possibility that Reese Hospital would not only lose the physicians treating Humana patients, but also any other business those physicians had at Reese Hospital. (*Id.*) DCHC viewed the existing relationship between Humana and Reese Hospital as an opportunity to negotiate higher reimbursement rates, which would in turn improve Reese Hospital's operation results and increase its revenues. (Trial Tr. 580:16:23, Jan. 23, 2007 (Mounce, E.); Trial Tr. 608:6–11, Jan. 24, 2007 (Mounce, E.).) Indeed DCHC and Reese Corp. representatives contacted Humana to begin negotiating increased rates before the Transfer Date. (Trial Tr. 726:22–728:12, Jan. 24, 2007 (Mounce, E.).) DCHC therefore continued to operate under the terms of the expired Humana Contract not because it was contractually obligated to do so but because it hoped to leverage existing business with Humana in its negotiations with Humana for better reimbursement rates.

**(2) *There is no evidence that the Humana Contract was assigned to Reese Corp.***

There is no evidence that the contract was assigned to Reese Corp. as part of the transfer. Pursuant to section 3.03 of the APA, HCA was required to list all contracts assigned to Reese Corp. on Schedule 3.03. (Trial Tr. 2795: 1–5, Feb. 12, 2007 (Gerken, G.); Defs. Ex. JY at HCA/MR–04556 (APA § 3.03).) Section 3.03 of the APA, entitled "Contracts," provides:

Schedule 3.03 sets forth a *complete and accurate* list of all Contracts. There are no other contracts to which Seller is a party or by which Seller or the Assets are bound that are material to the condition (financial or other), business or results of operation of the Business or the Assets. Seller has delivered to Buyer true, correct and complete copies of all of the Contracts

Case 09-10138-MFW Doc 13460-3 Filed 05/02/14 Page 128 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

listed on Schedule 3.03, including all
amendments and supplements thereto.

(Defs. Ex. JY at HCA/MR–04556 (APA § 3.03)(emphasis
added).) The Humana Contract was not listed on Schedule
3.03 to the Reese Hospital APA. [39] (Defs. Ex. JY at HCA/
MR–4629 to HCA/MR–4683 (APA Schedule 3.03); Trial Tr.
2795:1–2796:8; 2798:17–2800:24, Feb. 12, 2007 (Gerken,
G.).) The plain terms of the APA therefore do not show that
HCA assigned the Humana Contract to Reese Corp. To the
contrary, it appears that HCA did not assign the Humana
Contract to Reese Corp., likely because that contract had
already expired and no longer existed.

**\*29** Although Mounce testified that Reese Corp. acquired
the Humana Contract and continued to operate under the
terms of that contract, (Trial Tr. 549:14–19, Jan. 23, 2007
(Mounce, E.), Trial Tr. 551:19–25, Jan. 23, 2007 (Mounce,
E.)), he could not mean that it was assumed as a legally
binding contract on both parties. It was never established
that an unexpired contract between Humana and GHI was
assigned to Reese Corp. or that Reese Corp. legally assumed
a Humana Contract. Rather, Reese Hospital merely continued
to operate under the terms of an expired Humana Contract
post-acquisition on a month to month basis. That contract was
acquired or assigned to Reese Corp. only in that colloquial
sense. The court therefore concludes as a factual matter that
the evidence does not show that the Humana Contract was
assigned to Reese Corp.

### (3) *The PAA should not be deducted from the value of Reese Hospital*

Finally, the court concludes as a factual matter that the $24.7
million PAA recorded in the unaudited consolidated financial
statements for the year ending December 31, 1998 for DCHC
and Reese Corp. should not be deducted from the value of
Reese Hospital.

Financial accounting standards permit a company to account
for losses on a long-term contract that would be sustained
over a number of years in year one. (Taylor Dep. 155:22–
156:9, May 31, 2006)0; Trial Tr. 940:16–941:25, Jan. 25,
2007 (Talbot, D.).) The losses are recorded as a purchase
accounting adjustment. A purchase accounting adjustment
is permitted under financial accounting standards if three
requirements are satisfied: (1)the contingency existed on the
purchase date; (2) the losses were likely to occur in the future;
and (3) the losses could be reasonably estimated.

DCHC and Reese Corp. recorded the PAA in connection with
losses anticipated as a result of operating under the terms of
the Humana Contract at Reese Hospital. Because this court
has determined that there is no evidence that the Humana
Contract existed on the Transfer Date, the first requirement,
that the contingency existed on the purchase date, is not
satisfied.

The $24.7 million deduction, moreover, is just an accounting
adjustment that does not reflect the assets of Reese Hospital
from the perspective of a hypothetical purchaser and as such,
should not be part of the net asset value calculation for Reese
Hospital. From an accounting perspective, the accounting
entry may or may not have been appropriate (assuming the
contract was in existence and was assumed by Reese Corp.),
but from the perspective of a hypothetical purchaser, the old
expired Humana contract terms under which Reese Hospital
was operating on November 12, 1998, was a factor affecting
future cash flows, and the income approach to valuation is the
appropriate vehicle for determining the effect of the existing
relationship with Humana on the value of Reese Hospital.

The court therefore concludes that the PAA should not be
deducted from the value of Reese Hospital under the cost
approach.

### v. *Summary*

**\*30** Based on the foregoing findings, the court concludes
that the total cost approach value of Reese Hospital as
of the Transfer Date using the net asset value method is
$57,985,984, or the sum of its underlying assets: real estate as
improved ($25,307,763); equipment ($12,000,000); and net
working capital ($20,678,221).

### c. *Income approach*

"Under the income approach, the [valuation consultant]
estimates the future ownership benefits and discounts those
benefits to present value using a rate suitable for the
risks associated with realizing those benefits." Fishman et
al., *supra*, ¶ 203.3. There are two possible methods for
reaching such an estimate: the "discounted future returns" or
"discounted cash flow" method, and the "capitalized returns
method." *Id.* ¶ ¶ 203.9–203.11. "Many authorities recognize
that the most reliable method for determining the value of
a business is the discounted cash flow ('DCF') method." *Lippe
v. Bairnco Corp.,* 288 B.R. 678, 689 (S.D.N.Y.2003).

Case 09-10138-MFW   Doc 13460-3   Filed 05/02/14   Page 129 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

**i.** *Projected earnings*

The first step in determining the value of a business enterprise under a DCF analysis is projecting the earnings before interest and taxes ("EBIT") of the business in question. Fishman et al., *supra,* ¶¶ 500.2, 505.27. These projections must be reasonable and based on reliable data. *Id.* ¶ 505.2. Moreover, the "forecasts ... should not be used to demonstrate earnings capacity or cash-generating ability far in excess of what the company has actually been able to realize in the past." *Id.* ¶ 505.26.

In reaching its findings of fact with respect to the reasonably projected earnings for Reese Corp. as of the Transfer Date, the court considered five sets of projections: two versions of a set of projections prepared by McGladrey & Pullen, LLP in the early part of 1998 (the "M & P Projections"), (Pl.Ex.224), that was supplemented and amended in part by a report prepared in April of 1998 (the "M & P Report"), (Pl.Ex.236), a set of projections prepared by Donna Talbot on September 20–21, 1998 (the "Reese September Projections"), (Pl.Ex.300), a second set of projections prepared by Talbot on October 22, 1998 (the "Reese October Projections," [40] and collectively with the Reese September Projections the "Reese Projections"), (Pl.Ex.222), and two sets of projections prepared by Neil Demchick in connection with his expert report rendered in this proceeding (collectively the "Demchick Projections"). (Pl.Ex.209.) Kevin Moss, the Defendants' expert witness on this issue, relied upon the Reese October Projections in determining a business enterprise value for Reese Hospital. (Trial Tr. 3494:24–3495:2, Feb. 20, 2007 (Moss, K.).)

The court carefully reviewed all of these projections, as well as the testimony pertaining thereto by Talbot, Demchick, Moss, and James Yerges, the Defendants' expert witness on the issue of insolvency, and the deposition testimony of former Reese Hospital chief executive officer Kenneth Bauer. Having done so, the court concludes as a factual matter that none of these projections offer a totally realistic picture of the reasonably anticipated future earnings for Reese Corp. as of November 12, 1998. Each set of projections suffers from one or more serious defects that prevents the court from taking them at face value.

**(A)** *M & P Projections*

 **\*31**  The M & P Projections provide arguably the most objective assessment of Reese Corp.'s future earnings because these projections were prepared by outside consultants and not in connection with this litigation. (*See* Trial Tr. 3017:2–3018:3, Feb. 14, 2007 (Yerges, J.) (describing the M & P Report as "a very thoughtful and detailed plan")); Pl. Rebuttal ¶ 384 ("[p]laintiff does not dispute that the M & P Report was 'detailed and thoughtful' ").) Unfortunately, the projections suffer from two glaring deficiencies. First, they are based on Reese Hospital's financial performance through 1997, and do not take into account the massive downturn in revenue that occurred in 1998 prior to the sale. (Trial Tr.2072:4–2073:2, Feb. 6, 2007 (Demchick, N.).) This renders the projections hopelessly outdated.

Second, the M & P Projections do not provide the level of detail necessary to ensure their accuracy. Donna Talbot identified this weakness in the M & P Projections in her testimony:

> As I recall, we had several meetings with RGAG, DCHC, and McGladrey and Pullen representatives as we reviewed their business plan; and I didn't like the way that their financial model was building revenue because I didn't think it was detailed enough and I wanted to build the revenue from the bottom up looking at the different reimbursement methodologies and the different pay [o]rs.

(Trial Tr. 971:19–25, Jan. 25, 2007 (Talbot, D.).) [41] Similarly, Paul Tuft criticized the McGladrey Report for containing "pretty basic, almost hospital management–101 type stuff." (Trial Tr. 109:21–23, Jan. 19, 2007 (Tuft, P.).)

In short, the M & P Projections and the McGladrey Report are too far removed from the Transfer Date and too generalized to provide a reasonable forecast of Reese Corp.'s earnings as of the Transfer Date. These documents are useful only insofar as they provide information that supports or contradicts other projections submitted to the court.

**(B)** *Reese Projections*

Donna Talbot created the Reese Projections based on the financial model provided by the M & P Projections and the M & P Report. (Trial Tr. 973:2–6, Jan. 25, 2007 (Talbot, D.).) These projections incorporated the historical data presented in those earlier documents, (Trial Tr. 973:2–4, Jan. 25, 2007 (Talbot, D.)), but were more specific than the M & P Projections. (Trial Tr. 971:19–25, Jan. 25, 2007 (Talbot,

Case 09-10138-MFW   Doc 13460-3   Filed 05/02/14   Page 130 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

D.).) The Reese Projections also made adjustments to reflect changes to the business plan for Reese Hospital made by DCHC, NCFE, and RGAG (the "Reese Management Team"). (Trial Tr. 973:7–12, 978:8–13, Jan. 25, 2007, 1718:10–1719:3, Jan. 30, 2007 (Talbot, D.).)

These projected business changes, the so-called "Strategic Assumptions," were last set forth in a November 4, 1998, document prepared by Donna Talbot (Pl.Ex.115). The Strategic Assumptions fall into three basic categories. The first category consists of assumptions that volume in particular departments or units at Reese Hospital would increase as a result of capital expenditures. These assumptions included:

*32   • An assumption that a new emergency room ("ER") would be built, [42] leading to an increase in ER volume of 25%, (Trial Tr. 980:4–18, Jan. 25, 2007, 1714:25–1715:8, Jan. 30, 2007 (Talbot, D.); Pl.Ex. 115); [43]

• An assumption that the pediatric unit would grow 10% per year and the obstetrics/gynecology ("OB/GYN") department would grow 5% per year as a result of increased marketing, (Trial Tr. 982:18–983:2, Jan. 25, 2007, 1716:9–13, Jan. 30, 2007 (Talbot, D.); Pl. Exs. 115, 1015 at TRUST/HCA–013437) [44] and

• An assumption that the hospital would purchase new cardiac catheterization equipment, [45] which would double the cardiac catheterization volume at Reese Hospital. (Trial Tr. 984:9–11, Jan. 25, 2007, 1715:25–1716:4, Jan. 30, 2007 (Talbot.D.); Pl.Ex. 115.) [46]

The second category of assumptions centers around the recruitment of physicians, which would presumably drive up patient volume and revenue. These assumptions include:

• An assumption that ambulatory surgeries would increase by 14.4%, or 698 additional surgeries per year, (Trial Tr. 981:6–19, Jan. 25, 2007; 1596:18–1597:5, Jan. 30, 2007 (Talbot, D.); Pl. Exs. 115, 1015 at TRUST/HCA–013435–TRUST/HCA–013436); and

• An assumption that the rehabilitation exempt unit at Reese Hospital would increase 15% per year up to a 90% occupancy rate. (Trial Tr. 1092:16–1093:7, Jan. 25, 2007, 1597:6–16, 1674:11–16, 1714:7–8, Jan. 30, 2007 (Talbot, D.); Pl. Exs. 115, 1015 at TRUST/HCA–013438.) [47]

In addition to these very specific assumptions, the Reese Management Team assumed that total patient days at Reese Hospital would be at most 91% of total patient days at the hospital for 1996 for the balance of 1998, 97.82% of the 1996 figures in 1999, 105% of the 1996 figures in 2000, 112% of the 1996 figures in 2001, and 119% of the 1996 figures in 2002. (Trial Tr. 1580:24–1581:12, 1734:5–19, Jan. 30, 2007 (Talbot, D.); Pl.Ex. 115.) [48]

The third category of assumptions relates to proposed operational or management changes that would either cut costs or improve the rate of return on Reese Hospital's charges. These assumptions include:

• An assumption that the ratio of employees, full-time equivalents ("FTEs"), to adjusted patient stay would be reduced, such that salaries and wages, benefits, and contract labor expenses would constitute no more than 42% of net patient revenue effective January 1, 1999, (Trial Tr. 878:2–13, 973:25–974:9, Jan. 25, 2007 (Talbot, D.); Pl.Ex. 115);

• An assumption that improved training in and oversight of coding techniques would result in a higher Medicare case mix index of 1.4, (Trial Tr. 1586:7–1588:20, Jan. 30, 2007 (Talbot, D.); Pl. Exs. 115, 300 at TRUST/HCA–007589; [49]

• An assumption that the psychiatric unit at Reese Hospital would be bifurcated into a "geri-psych cost[–]based unit" and a diagnosis-related group ("DRG") unit, thereby resulting in an increase in disproportionate share ("DSH") payments, (Trial Tr. 1093:11–22, Jan. 25, 2007 (Talbot, D.); Pl.Ex. 115; Defs. Ex. QH at TRUST/HCA–175847); and

*33   • An assumption that certain costs incurred by HCA, including management fees, "MIS" costs, insurance costs, bad debt collection expense recovery costs, and costs associated with HCA's "national branding campaign" could be reduced or eliminated altogether, (Trial Tr. 870:8–11, 974:10–19, 1069:18–1070:22, Jan. 25, 2007, 1698:2–11, Jan. 30, 2007 (Talbot, D.); Pl. Exs. 144A at TRUST/HCA–007667, 1016 at TRUST/HCA–007175, TRUST/HCA–007629). [50]

Alberts concedes that most of these assumptions are reasonable in the abstract. (Pl. Rebuttal ¶¶ 399–401, 410.)

Case 09-10138-MFW   Doc 13460-3   Filed 05/02/14   Page 131 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

Instead, he argues, first, that the *timing* of the assumptions is unreasonable because it appears from the Reese October Projections [51] that all of the assumptions—including those dependent on capital contributions—are projected to go into effect as of the Transfer Date. (Pl. Facts ¶¶ 173–74, 180–81; Pl. Rebuttal ¶¶ 399–401, 410.) [52] Moreover, he contends that the Reese Management Team failed to account for the steep decline in revenue at the hospital in 1998. (Pl. Facts ¶ 172.) Alberts further asserts that the Reese Projections failed to take into account "the existing problems and challenges at Reese Hospital," (*Id.* ¶ 175), including the hospital's "reliance on declining government reimbursement rates, certain third-party managed care providers with ever-reducing reimbursement rates, union labor, as well as increased competition," (*Id.* ¶ 176). Finally, Alberts challenges the reasonableness of two specific assumptions: the assumption that the case-mix index for Medicare coding could be improved to 1.4, (Pl. Rebuttal ¶ 401(g)), and the assumption that salaries and wages, benefits, and contract labor expenses would account for only 42% of net patient revenue by January 1, 1999, (Pl. Facts ¶ 177). [53]

### (I) *Timing of the projections*

The court agrees with the first criticism made by Alberts. Donna Talbot testified that at least one strategic assumption (namely, the assumption that salaries and wages, benefits, and contract labor would cost no more than 42% of net patient revenue by January 1, 1999) was "phased" into the Reese Projections, (Trial Tr. 1585:14–22, Jan. 30, 2007 (Talbot.D.)), and the Reese September Projections suggest that other strategic assumptions were "phased" in as well, (Pl.Ex. 300 at TRUST/HCA–007585). But she provided no rationale as to how the Reese Management Team determined the amount of improvement that would be made in the last forty-nine days of 1998, nor did she explain why the baseline for volume at Reese should be calculated as a percentage of 1996 patient days as of the Transfer Date when volume was much smaller in 1998.

In any event, the Reese September Projections, which served as the basis for the Reese October Projections, clearly project immediate increases in volume based on operational changes that could not have gone into effect in 1998. (Pl.Ex. 300 at TRUST/HCA–007585.) Neil Demchick hit this particular nail on the head in his trial testimony:

**\*34** [T]here are a number of strategic assumptions that suggested that there were things that were going to be done to [ ] improve the revenue position at [Reese Hospital], and the linear accelerator was an example of one, the moving of the emergency room is [an] example of another, cardiac cath lab is another, and that even though those would all take time to put into place, the revenue was included in the projections immediately from the time of the transaction, beginning in 1998 and carried forward through 1999.

(Trial Tr. 4313:7–18, March 1, 2007 (Demchick, N.).)

The Defendants assert that the volume increases projected by the Reese Management Team could have been accomplished without any capital expenditures notwithstanding the Reese Management Team's conclusions to the contrary. [54] They rely almost exclusively on the testimony of expert witness Kevin Moss to support this dubious proposition. (Defs. Rebuttal ¶¶ 174A–174G.) Moss testified at trial that the volume increases projected by the Reese Management Team could be accomplished quickly because "the main drivers in the cash flow" are "the volume of what the physicians admit to the facilities" and "controlling the expenses that are being incurred on the ancillaries," and "[t]hose two things can occur very quickly." (Trial Tr. 3527:1–4, 22–23, Feb. 20, 2007 (Moss, K.).) There are many problems with this testimony. First and foremost, Moss is *not* an expert in hospital operations. (Trial Tr. 3400:14–20, 3401:4–8, Feb. 20, 2007, 3711:10–23, Feb. 21, 2007, 3869:6–13 (Moss, K.).) Although Moss testified that he performed the same type of analysis that an operations consultant would have performed in ascertaining the reasonableness of the Reese Projections, (Trial Tr. 3869:14–22, Feb. 22, 2007 (Moss, K.)), he was not qualified as an expert in hospital operations, (*see* Trial Tr. 3406:3–5, Feb. 20, 2007 (Moss, K.) (qualifying Moss "as an expert in the area of valuation of hospitals" generally)), [55] and the court does not credit his testimony to the extent that he purports to be one. [56]

Second, Moss did not actually testify that the inevitable delay caused in implementing those Strategic Assumptions requiring capital expenditures would have no effect on the Reese Projections. To the contrary, Moss acknowledged on

Case 09-10138-MFW    Doc 13460-3    Filed 05/02/14    Page 132 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

the witness stand that "[t]here would be a small timing difference" caused by the delay between Reese Corp.'s takeover of the hospital and the effectuation of the Reese Management Team's business plan, (Trial Tr. 3526:6–7, Feb. 20, 2007 (Moss, K.)), but did not adjust the Reese Projections because he "didn't have the information to calculate" the effects of that difference, (Trial Tr. 3526:7, Feb. 20, 2007 (Moss, K.)). Moss further testified that even though certain Strategic Assumptions, such as the strategic assumption regarding ER volume, required capital expenditures to go into effect, (Trial Tr. 3528:6–21, Feb. 20, 2007 (Moss, K.)), and even though he did not know when those strategic assumptions would go into effect, (Trial Tr. 3529:6–18, Feb. 20, 2007 (Moss, K.)), he accepted the Reese Projections at face value because "the projections were done annually" and he couldn't "pinpoint when in the year" any of the Strategic Assumptions would go into effect, (Trial Tr. 3529:3–5, Feb. 20, 2007 (Moss, K.)). This does not suggest that the Reese Projections were correct, but rather that Moss lacked the information necessary to correct them. [57]

**\*35**  Third, the court does not believe that Reese Hospital could have swelled the ranks of its physicians to the degree contemplated by the Reese Projections within six weeks of the Transfer Date. Kenneth Bauer testified at his deposition that Reese Hospital had long suffered from "town-and-gown issues" because the hospital "had a long history of being an academic center that was dominated by the academic physicians." (Bauer Dep. 42:17–22, June 14, 2006.) [58] Bauer specifically criticized the notion that ambulatory surgery volume would increase immediately by 698 surgeries per year:

> Q. No. 5 says "Reese Ambulatory Surgeries will increase 698 surgeries per year or 14.4%. ASU represents 24.79 percent of 1997 outpatient revenue." Are you familiar with that assumption?
>
> A. Yes.
>
> Q. Was that reached?
>
> A. I don't believe that it was. And if you'll recall the previous discussion we had about the inadequate primary care base and the need for that to ultimately channel patients to surgeons, and the low surgery volume of the institution, all of those factors play into this situation here.

> Q. So was this a reasonable assumption to make?
>
> A. It's a reasonable assumption if you can expand the primary care base. *Can you do that in the course of two months? No. Over time can you do that? Yes.*
>
> Q. How much time?
>
> A. *I would say a couple of years.*

(Bauer Dep. 98:12–99:4, June 14, 2006 (emphasis added).) Dr. Enrique Beckmann also noted the "difficulty in recruiting and retention of qualified personnel" at Reese Hospital. (Beckmann Dep. 44:4–5, Apr. 12, 2006.) This was just one component of "a steady ratcheting down" of the hospital's condition "over the course of two-and-a-half decades." (Beckmann Dep. 71:6–7, Apr. 12, 2007.) [59] Beckmann noted that it was impossible for Reese Hospital to expand its outpatient volume because the hospital had lost its network of clinics years earlier when Reese Hospital was sold by Humana, (Beckmann Dep. 74:15–75:9, Apr. 12, 2007) [60]—testimony consistent with the testimony of Kenneth Bauer, (Bauer Dep. 37:10–38:2, June 14, 2006). [61]

Moreover, even those Strategic Assumptions regarding physician recruitment depended at least in part on capital expenditures. Again, this point was made by Kenneth Bauer in his deposition testimony:

> If you were trying to attract a community physician to bring his patients to your hospital and he has a choice of going to Michael Reese or Mercy Hospital, which is within half a mile, or two or three other hospitals that are within two to three miles, a number of factors come into play as to why he chooses to go to one place or another. Some of the primary ones are can he get in, see his patients, and get out really quickly so that he minimizes his time investment because his time is his revenue.

> Another factor is if he sends patients to a particular institution and he ends up getting nothing but complaints from those patients, he runs the risk of losing those patients for his practice because he took them one place or another. And so it's a matter of institutions competing against each other to create an environment where physicians can care for their patients timely, efficiently, and with good patient satisfaction in the outcome.

**\*36**  (Bauer Dep. 51:8–52:1, June 14, 2006.)

Case 09-10138-MFW    Doc 13460-3    Filed 05/02/14    Page 133 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

In contrast to the firsthand knowledge of Reese Hospital's situation at the time of the Transfer Date held by Bauer and Beckmann, Moss lacked the information necessary to draw any conclusions as to how quickly Reese Hospital could recruit physicians:

THE COURT: How would you ascertain, if you were assigned the task of forming an opinion, as to whether the volume projections were reasonable?

THE WITNESS: Are you asking me what I would do in a situation where it was not a valuation back in 1998, but if today, I were going into a facility?

THE COURT: No, in 1998.

THE WITNESS: Okay. The difficult thing about 1998 is we can look at the market environment. I can look at the information in the McGladrey report. I can look at how many physicians can admit to the hospital, and I know that we are in a large market, but I can't actually go in and talk to the doctors. I can't do a ZIP code analysis on the hospital and look at case rates per thousand for different types of health issues that people have and figure out where am I losing patients in my service area and where are they going to another hospital because I don't have that level of detail. When you have that level of detail, you can identify very quickly where you can go to get more volume, because you know who the important physicians are based on that analysis; but in this case, what we have is we just have a large market with ample opportunity to pick up revenue if the management team does focus on the physicians themselves and taking care of their physician relationships.

...

THE COURT: Is there anything additional you could have done to ascertain the reasonableness of the volume projections in preparing your report? Could you have turned to your operational folks at Deloitte and had them give you assistance in evaluating the reasonableness of the projections?

THE WITNESS: The problem had to do with the time period that has passed. The operational people would want more detail than was available. They would want billing information, and I didn't have that type of billing information.

(Trial Tr. 3867:15–3868:14, 3869:3–13, Feb. 22, 2007 (Moss, K.).)

Moss could only determine that in November of 1998 there was "a large market with ample opportunity to pick up revenue," (Trial Tr. 3868:12, Feb. 22, 2007 (Moss, K.)), by "look[ing] at the size of the market and the number of doctors and the capacity within the facility to provide that volume," (Trial Tr. 3869:15–17, Feb. 22, 2007 (Moss, K.)). [62] But the mere fact that a hospital *could* recruit physicians and cut costs does not mean that it is reasonable to project that this particular hospital *would* have done so as a result of any specific operational changes, let alone those changes actually planned by the Reese Management Team.

Tellingly, the Defendants' own expert witness on the issue of insolvency, James Yerges, testified that a turnaround of a hospital's operations "doesn't happen overnight," (Trial Tr. 3069:13, Feb. 14, 2007 (Yerges, J.)), and that the turnaround plan at Reese Hospital would "take what remains in 1998 and all of 1999," (Trial Tr. 3069:16, Feb. 14, 2007 (Yerges, J.)). The court does not credit the testimony of Moss insofar as he asserts that Reese Hospital could have reached the cash flow figures set forth in the Reese Projections in six weeks. [63]

**(II) *Starting point for projections***

**\*37** The court also agrees with Alberts that the Reese Projections are defective because they do not account for the severe downturn in revenue at Reese Hospital in 1998. Implicit in the court's conclusion that the Reese Projections should have accounted for the delay in implementing the Reese Management Team's turnaround plan is the notion that the projections should have used the actual profits and losses for the hospital in 1998 as a baseline from which volume, revenue, and cash flow would "ramp up" as the turnaround plan went into effect. The Reese Projections did not do this: they used the historic figures for the hospital as a "starting off point," (Trial Tr. 1718:16, Jan. 30, 2007 (Talbot, D.)), modified those figures to reflect the Reese Management Team's Strategic Assumptions, (Trial Tr. 978:4–13, Jan. 25, 2007, 1718:17–18, Jan. 30, 2007 (Talbot, D.)), and, in an attempt to account for the downturn in 1998, then "capped" the total number of patient days arising out of those assumptions by a percentage of the actual patient days for the hospital in 1996, (Pl.Ex.300). [64]

Case 09-10138-MFW Doc 13460-3 Filed 05/02/14 Page 134 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

Alberts asserts, and Neil Demchick testified at trial, that the Reese Management Team used Reese Hospital's financial performance in 1997 as the starting point for its projections, (Pl. Facts 172; Trial Tr.2065:10–2066:9, Feb. 6, 2007 (Demchick, N.)), but Donna Talbot testified that the Reese Management Team "took the three year historical data that we got from HCA and then the stump period data ... through August of 1998" as the "starting point" for the Reese Projections, (Trial Tr. 1666:21–23, Jan. 30, 2007 (Talbot, D.)). [65] These positions are not as irreconcilable as they might seem. The 1998 patient days total projected in the Reese September Projections corresponds to 90.81% of the patient days at the hospital in 1996, [66] reflecting the Strategic Assumption to that effect by the Reese Management Team. (Pl. Exs. 115, 300 at TRUST/HCA–0075883–TRUST/HCA–0075885.) [67] This "cap" of 91% was set based on the Reese Management Team's consideration of the patient day data for the months leading up to Transfer Date and was intended to reflect the drop-off in volume at the hospital in 1998. (Trial Tr. 1581:5–19, 1735:6–9, Jan. 30, 2007 (Talbot, D.).) In that sense, Talbot is correct when she states that the Reese Projections incorporate the "stump period data" for 1998.

At the same time, all of the figures set forth in the Strategic Assumptions reference 1997 data. For example, the Strategic Assumption that the rehabilitation unit at Reese Hospital would "increase 15% per year" translates into a projection that there will be 360 Medicare cases in 1998 on an annualized basis, a 15% increase over the 313 Medicare cases at the hospital in 1997. (Pl.Ex. 300 at TRUST/HCA–007584.) Similarly, the Strategic Assumptions regarding growth in inpatient and outpatient volume are converted into percentages of growth over 1997 figures and then applied to those figures to arrive at annualized projections for 1998. (Pl.Ex. 300 at TRUST/HCA–007583–TRUST/HCA–007585.) In other words, the Reese Management Team used 1997 data as a jumping off point for all of their projections, and then curtailed those projections only to the extent that the figures projected exceeded the cap on patient days.

**\*38** Such a process is obtuse under the best of circumstances. It would be defensible to the extent that the cap placed on the projections accurately reflects the state of affairs at the hospital as of the Transfer Date, but the cap does not do so. In this case, the percentage of 1996 patient days used as a cap in the Reese Projections for 1998(91%) actually results in a *higher* figure than the actual number of patient days for Reese Hospital in 1997 (92,192 days, or 86.10% of the 1996 figure of 107,075). (Pl.Ex. 300 at TRUST/HCA–

007585.) Moreover, the cap on patient days does not affect any projections regarding outpatient cases, which outstrip the actual number of inpatient cases in both 1996 and 1997. (Pl.Ex. 300 at TRUST/HCA–007583–TRUST/HCA–007585.) [68] Consequently, the Reese Projections forecast net revenue at Reese Hospital in the days immediately following Reese Corp.'s takeover of the hospital that, annualized, would have exceeded not only Reese Hospital's actual performance in 1997, but its performance in 1996 as well. [69]

These assumptions are unreasonable. Assuming that the "cap" on patient days reflects the average of the inpatient, rehabilitative, and psychiatric volume as of November 1, 1998, and the projected volume in those units on December 31, 1998 (to account for the "ramp up" in volume over that period of time), and that the Reese Management Team anticipated that volume would be stable throughout 1999, [70] the annualized number of patient days at Reese Hospital as of November 1 would have to equal 83.80% of the patient days total for 1996—a figure almost identical to the patient days total of 1997 (86% of the patient days for 1996). [71] Given that the Reese Management Team knew "[t]hat the volumes were declining" at Reese Hospital as the year progressed and knew "that the [patient] days were continuing to decline even though [the team] didn't have the financial statements," (Trial Tr. 865:6–7, Jan. 25, 2007, 1720:18–19, Jan. 30, 2007 (Talbot, D.); *see also* 1735:8–9, Jan. 30, 2007 (Talbot, D.) ("I think we knew where the days were going.")), it makes no sense for the team to have assumed that patient days would be almost if not precisely at 1997 levels upon Reese Corp.'s arrival.

Similarly, if one assumes that the annualized projected number of outpatient cases at Reese Hospital for 1998 represents the average of the actual number of cases in 1998 pre-transfer and the annualized projected number of cases as of December 31, 1999, then the actual number of cases at Reese Hospital prior to November 1, 1998, would have been 104,161 (the result of (108,519\*2)–112,877), [72] or 2,150 cases more than Reese Hospital had in 1997. Even more disturbing, applying the same methodology to the projected net patient service revenue figures for the hospital results in a "starting point" in net patient service revenue of $166,043,698.81—approximately $15 million more than the actual annualized net patient service revenue figure for Reese Hospital as of November 1, 1998.

Case 09-10138-MFW    Doc 13460-3    Filed 05/02/14    Page 135 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

**\*39** These numbers are damning to any defense of the Reese Projections' reasonableness. Either the Reese Management Team assumed full operational turnaround at the hospital as of Reese Corp.'s first day in control of the hospital—a self-evidently absurd notion—or they assumed that the numbers would "ramp up" from figures that do not remotely reflect the realities at Reese Corp. as of the Transfer Date. Either way, the Reese Projections are flawed in their inception and cannot be taken at face value.

### (III) *Problems at Reese Hospital*

Alberts argues that the Reese Projections did not take into account certain looming obstacles for success at Reese Hospital, such as a decline in governmental reimbursement rates due to the Balanced Budget Act of 1997, Pub.L. No. 105–33, 111 Stat. 251 (1997) (the "BBA"), a decline in reimbursement rates in certain third-party insurance contracts, union difficulties, and increased competition. He is correct in one respect: the Reese Projections do not predict any decrease in the reimbursement rates for its contract with Humana, and, in one instance, appear to predict an increase in the reimbursement rate. (Pl.Ex. 300 at TRUST/HCA–007620–TRUST/HCA–007621.) [73] The Reese Projections are unreasonable to the extent that they predict an increased reimbursement rate for outpatient services performed on Humana patients because Reese Corp. lacked the necessary leverage to negotiate a better contract with Humana. (Trial Tr. 440:23–442:14, Jan. 23, 2007 (Redman, M.) ("we had no negotiating power").) Although a hypothetical purchaser would likely have assumed that there was some chance of renegotiating the Humana terms, the court assumes in Alberts's favor that the purchaser would not have utilized an increased reimbursement rate for outpatient services performed on Humana patients in its projections of revenues because Humana would always have the upper-hand in any negotiations with Reese Hospital due to its relationship with Mercy Hospital. (This assumption results in understating the value of Reese Hospital because a hypothetical purchaser would likely assign some value to the chance of renegotiating the Humana terms, [74] but, even so, the value the court ultimately determines for what Reese Corp. received exceeds the Reese Transfers. Accordingly, for ease of analysis, the court assigns zero value to the prospect of renegotiating the Humana terms, without actually deciding what value that prospect would have.)

The other criticisms levied by Alberts are unfounded. The Reese September Projections predict lower reimbursement rates for inpatient services performed on Medicare patients, thereby reflecting the predicted effects of the BBA. (*See* Pl.Ex. 300 at TRUST/HCA–007589 (projecting decline from \$355.23 to \$304.78 for capital diagnostic related group ("DRG") code of 1.0).) [75] And while Donna Talbot testified that Reese Hospital did not improve its collection practices as much as expected due in part to the difficulties involved with dealing with a group of unionized employees, (Trial Tr. 987:19–990:16, Jan. 25, 2007 (Talbot, D.)), she also testified that hospital management could have fired those employees and used outside contractors with much better results at the outset of Reese Corp.'s management but decided not to do so because management wanted to be "compassionate" to Reese Hospital's employees, (Trial Tr. 1073:13–1075:9, Jan. 25, 2007 (Talbot, D.)). [76] Finally, the court has already reviewed the testimony of Kevin Moss regarding the potential for volume increases in the market, which suggests that Reese Hospital could have met its volume and revenue targets if it had executed an operationally sound turnaround plan. (Trial Tr. 3868:8–14, Feb. 22, 2007 (Moss, K.) ("what we have is ... a large market with ample opportunity to pick up revenue").)

### (IV) *Specific assumptions*

**\*40** Alberts challenges the reasonableness of the Reese Management Team's Strategic Assumptions that Reese Hospital could improve its Medicare case mix index from 1.36 to 1.4 and that salary-related expenses could be limited to an amount not exceeding 42% of net patient revenue by January 1, 1999. (Pl. Facts ¶ 177; Pl. Rebuttal ¶ 401(g).) [77] The projected improvement in the Medicare case mix index was premised on the notion that new management could teach Reese Hospital employees better coding techniques. (Trial Tr. 1586:5–1588:20, Jan. 30, 2007 (Talbot, D.); Bauer Dep. 96:15–97:1 (June 14, 2006).) This assumption does not strike the court as unreasonable on its face, and Alberts points to no evidence suggesting to the contrary. The court therefore finds as a factual matter that this was a reasonable assumption (subject to the court's earlier findings regarding the manner in which this assumption was implemented in the Reese Projections).

The Strategic Assumption regarding salary-related expenses is a different story. As Neil Demchick pointed out at trial, the percentage of revenue allocated for such expenses in the

Case 09-10138-MFW   Doc 13460-3   Filed 05/02/14   Page 136 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

Reese Projections is lower than that allocated in the M & P Projections, and the M & P Report noted that the level of FTEs at Reese Hospital was already below industry standards and that management would expect, at best, to achieve only modest cost savings related to staffing level changes. (Trial Tr.2054:17–2055:2, Feb. 6, 2007 (Demchick, N.); Pl.Ex. 236 at TRUST–HCA–027715.) Kenneth Bauer poured more cold water on this assumption:

> If you look at the comparative statistics across the industry, if you look at salaries, wages and benefits on a hospital-wide basis, 42 percent allocated to salaries, wages and benefits is the absolute low end of the range. It is representative of the most efficient operating institutions in the country. Many of the Columbia HCA hospitals operate at near that level. The range extends from 42 percent to more typically into the 48, 49 percent with a number of institutions even operating at the 52 to 55 percent range.

> Specifically[,] when you're looking at a 45–acre campus and 27–some buildings in a very inefficient environment, my observation would be to go to the most efficient operating pattern in the space of six weeks of operation is not a realistic assumption.

(Bauer Dep. 95:4–18, June 14, 2006.)

Bauer was not the only witness to testify about the unique inefficiencies plaguing Reese Hospital. Donna Talbot testified at length about the unique challenges presented by the size of Reese Hospital's campus and its impact on the Reese Management Team's salary-related Strategic Assumptions:

> Q. Was there anything that you found unique about the campus of that Michael Reese Hospital?

> A. It was a huge campus. It was very odd to me that, you know, you had all these overhead functions, like medical records, IT, accounting, that literally were a mile from the main hospital building where administration was. They had several different buildings stretched out through the campus where patient care was related, and you know, you would have, like, central supply and pharmacy downstairs into one of those tunnels, and they would have to distribute all of these things, you know, to all these different buildings. It was really unlike anything I had ever seen before. Just from a size perspective.

**\*41**  ...

Q. Did that layout cause problems once the hospital was purchased?

A. Yes, it did.

Q. What were those problems?

A. It was a lot more costly than we had anticipated. We had had a plan to consolidate the campus and ran into some problems with that. Some of the old buildings had asbestos in it, which obviously is a concern. But I don't think we really realized the impact on the number of full-time equivalents that would be required because of the sheer size of the campus. From a security perspective, a housekeeping perspective, you know. It was really, I think more than we had imagined.

Q. So those problems were not realized until after the sale occurred, is that correct?

A. That's—I mean, we obviously recognized it was a huge campus. I just don't think—I think as we looked at, you know—one of our big assumptions was we were going to reduce the number of full-time equivalents so that the ratio of salaries to net revenue was more comparable to what you would see in the industry. And as we looked at reducing these FTEs, you know, we would make reductions in housekeeping, security, I don't think we realized how many people we would have to keep on board simply because of the size of the facility.

I mean, you just think about transporting patients to X-ray and lab, you know, in a facility that size, you know, there are costs associated with that, having the place cleaned. I don't think we really understood the true cost of that.

(Trial Tr. 876:25–878:13, Jan. 25, 2007 (Talbot, D.).)

Talbot returned to this issue later in her testimony:

> First of all, as I indicated before, the cost of operating at Michael Reese far exceeded what we estimated. We understood that, you know, we had a big campus and it was sprawled over, but I don't think we really understood, you know, how many more FTEs it took to run a campus of that size.

> ...

Case 09-10138-MFW    Doc 13460-3    Filed 05/02/14    Page 137 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

Q. When you were creating the strategic assumptions, Ms. Talbot, were you taking into account, at that point in time, that this is a very large campus?

A. We understood it was a very large campus. I don't think we—what we didn't understand was we knew it would add cost. We didn't understand how much it would add cost. I don't think that we adequately factored in the size of the campus and what that would do; the fact that it required more FTEs than a majority of the departments, just by how far they had to travel to get from one place to another.

(Trial Tr. 987:12–17, Jan. 25, 2007, 1728:10–20, Jan. 30, 2007 (Talbot, D.).)

Taken together, this testimony suggests that a reasonable purchaser would have known of the difficulties in cutting the FTE-to-patient ratio at Reese Hospital as a result of the size of the hospital's campus and the sprawl of its facilities, but that the Reese Management Team failed to take these difficulties into account fully in preparing the Reese Projections. The court therefore agrees with Alberts that the Reese Management Team's Strategic Assumption regarding salary-related expenses is unreasonable.

### (C) *Demchick Projections*

 **\*42**  Finally, the court rejects the Demchick Projections. Demchick provided two very different set of projections. The first set assumed that Reese Hospital would only be able to return to its 1996 level of performance after one year (the "Turnaround Scenario"). The second, more optimistic set of projections is based on the assumption that Reese Hospital could reach the revenue figures projected by the Reese Management Team after a year's delay (the "Strategic Growth Scenario"). These projections are largely not rooted in any kind of operational reality; consequently, neither set of projections carries any weight with the court.

### (I) *Turnaround Scenario*

Demchick's Turnaround Scenario differs from the Reese Projections in four ways:

- It eliminates all of the capital expenditures included in the Strategic Assumptions, leaving only $2.5 million to be spent in 1998 and $9 million to be spent in 1999 for computer upgrades, (Trial Tr. 2108:8–16, Feb. 7, 2007 (Demchick, N.); Pl.Ex. 209 ¶ 61(b));

- It uses the projected personnel expenses set forth in the M & P Projections; *i.e.,* 45% of net patient service revenue, (Trial Tr.2083:12–14, Feb. 6, 2007 (Demchick, N.); Pl.Ex. 209 ¶ 61(a)(2));

- It projects that Reese Corp. will be able to return Reese Hospital to 1996 revenue levels by 2000, (Trial Tr.2083:14–21, Feb. 6, 2007 (Demchick, N.); Pl.Ex. 209 ¶ 60(a)); and

- It projects fixed expenses totaling $26,375,000.00 for 1999, (Trial Tr. 2106:18–25, Feb. 6, 2007 (Demchick, N.)).

With the possible exception of the use of the M & P projected personnel expenses, none of these "adjustments" improve the Reese Projections in any way. Given that Demchick himself concedes that the Reese Management Team's Strategic Assumptions are reasonable in the abstract, it makes no sense to pretend that those strategies for growth would not be available to a hypothetical purchaser, as the Turnaround Scenario appears to contemplate. [78] Nor does it make any sense to project fixed expenses for 1999 simply by "look[ing] and focus [ing]" on the historic averages at Reese Hospital and picking "whichever was the lower amount on the averages of 1995 to 1998 or 1995 to 1997," as Demchick testified. (Trial Tr. 2101:16–18, Feb. 6, 2007 (Demchick, N.).) [79]

Indeed, the Turnaround Scenario is flawed in its very conception because it assumes that Reese Hospital would return to its 1996 level of performance by the year 2000 when, in fact, such a "scenario" is highly unlikely. [80] If, as the Turnaround Scenario contemplates, a hypothetical purchaser would not infuse capital into Reese Hospital, it stands to reason that the hospital would *never* be able to return to its 1996 level of performance because the same conditions that led to the decline in the hospital's performance (the changed emphasis in the health care industry from inpatient to outpatient care, the drift of Humana-associated physicians to Mercy, the deterioration of the facilities on campus, *etc.*) would persist. A hypothetical purchaser might be able to implement cost-cutting measures that would stem or even partially reverse the negative cash flow at Reese Hospital in the months immediately preceding the sale of the hospital, but it could not have stopped the "steady ratcheting down"

Case 09-10138-MFW    Doc 13460-3    Filed 05/02/14    Page 138 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

of the hospital's condition "over the course of two-and-a-half decades." (Beckmann Dep. 71:6–7, Apr. 12, 2007.)

**\*43** On the other hand, if a hypothetical purchaser were able to expend new capital in the service of a sound turnaround plan, one would not expect the revitalized hospital, with new management, a different business plan, and improved facilities and equipment, to post earnings exactly or even approximately equal to the earnings posted by the hospital years prior except by coincidence. The hospital's net earnings might be more or less than the totals from 1996, but they would be different one way or the other because the hospital itself would be different. Either way, Demchick's use of 1996 figures is arbitrary. [81]

Demchick could have allayed the court's concerns by demonstrating that there was an operational basis for concluding that the revenue projected for Reese Hospital in 1999 should match the revenue collected in 1996. But Demchick is, if anything, even less credible than Kevin Moss in terms of operational expertise. Aside from "a bit of consulting work that related not to actual turnarounds but to some strategic restructuring initiatives at two other hospitals," (Trial Tr. 2369:13–16, Feb. 8, 2007 (Demchick, N.)), Neil Demchick has no experience whatsoever in the area of hospital operations, (Trial Tr. 2369:11–2370:1, Feb. 8, 2007 (Demchick, N.)). Demchick's lack of operational expertise in the hospital arena makes his arbitrary decision to project a return to 1996 revenue levels even more suspect.

The Turnaround Scenario is really nothing more than a thought-experiment. Its assumptions are arbitrary and its projections unrealistic. The court finds as a factual matter that the projections arising from the Turnaround Scenario are unreasonable and unreliable for purposes of determining the fair market value of Reese Hospital as of the Transfer Date.

## (II) *Strategic Growth Scenario*

The differences between the Reese Projections and Demchick's Strategic Growth Scenario are more extensive. They include:

- An adjustment to the projected amount of capital expenditures whereby such expenditures are spread out evenly over the course of 1999 and 2000, (Trial Tr. 2127:10–2128:3, Feb. 7, 2007 (Demchick, N.));

- An adjustment to the projected amount of revenue increases and expense decreases whereby the increases

and decreases projected to occur in 1999 in the Reese Projections occur in 2000, with 1999 serving as a mid-point, (Trial Tr.2084:7–12, Feb. 6, 2007 (Demchick, N.));

- An adjustment of projected salary-related expenses whereby such expenses are projected to consume 45% of total net revenue at Reese Hospital instead of 42% of net patient service revenue as projected by the Reese Management Team, (Trial Tr.2092:13–15, Feb. 6, 2007 (Demchick, N.));

- An adjustment to projected sales and use tax expenses whereby such taxes are projected to consume 1.2% of net patient service revenue, (Trial Tr.2096:7–2097:25, Feb. 6, 2007 (Demchick, N.));

- An adjustment to the projected amount of bad debt whereby such expense is projected to consume 3.6% of net patient service revenue, (Trial Tr.2098:22–24, Feb. 6, 2007 (Demchick, N.));

**\*44** • An adjustment to projected costs for repairs and maintenance, rents and leases, and utilities whereby such expenses are projected to be lower than the figures set forth in the Reese Projections, (Trial Tr. 2101:16–2103:24, Feb. 6, 2007 (Demchick, N.)); and

- An adjustment to projected other operating expenses whereby such expenses are projected to consume $3.2 million in 1999, (Trial Tr. 2105:13–16, Feb. 6, 2007 (Demchick, N.)).

Unlike his Turnaround Scenario, Demchick's Strategic Growth Scenario is rooted in a sound premise. The evidence in the record overwhelmingly indicates that it would take at least a year for Reese Corp. to implement the Reese Management Team's turnaround plan and begin to reap the benefits of that plan. Donna Talbot "believed it was going to take at least a year" for the operations at the hospital to turn around. (Trial Tr. 973:10–14, Jan. 25, 2007 (Talbot, D.); *see also* Trial Tr. 1084:5–8, Jan. 25, 2007 (Talbot, D.) ("It was my belief, based on what we were trying to accomplish that, *over the period of a year,* we would be able to implement our turn around plan, positively cash flow and begin rebuilding it to what it used to be." (emphasis added.)); Trial Tr. 1666:13–16, Jan. 30, 2007 (Talbot, D.) ("Q. Now, in your mind, at this period in time, how long did you think it would take to turn around the hospital again? A. As I recall, it was about a year.").) Mel Redman "believed it would take us two or three years to effect any kind of turn around," but

Case 09-10138-MFW    Doc 13460-3    Filed 05/02/14    Page 139 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

admitted that "[i]n Scottsdale, in our corporate office, we would close the doors and doubt it if we could ever do that...." (Trial Tr. 439:20–440:4, Jan. 23, 2007 (Redman, M.).) James Yerges, the Defendants' own expert witness, testified that "it is reasonable to expect that it would take 14 months for this turn around to be complete." (Trial Tr. 3214:12–14, Feb. 15, 2007 (Yerges, J.).) [82]

The court agrees with Demchick that the benefits of the Strategic Assumptions should have been spread out over the course of 1999 to account for the inevitable delay in implementing the Reese Management Team's business plan. But the manner in which this delay has been incorporated into the Reese Projections by Demchick in his Strategic Growth Scenario is too imprecise to be accepted wholesale. Demchick did not attempt to parse the Reese Projections unit-by-unit to adjust the volume projections that drive the projected revenue figures for Reese Hospital, nor did he distinguish between Strategic Assumptions that could be accomplished quickly (such as improvements in Medicare case mix coding or bifurcation of the psychiatric unit) [83] and those that could not (such as relocation of the ER). He simply took the revenue figures projected by the Reese Management Team for 1999, determined the rate of growth from an annualized 1998 figure to that projected rate and the rate of reduction in variable expenses as a percentage of net patient service revenue using the same two sets of figures, and divided the rate of growth in revenue and reduction in variable expenses as a percentage of net patient service revenue in half to reach projected figures for 1999 and assumed 100% of that growth would be accomplished in 2000. (Trial Tr. 2126:15–2127:3, Feb. 6, 2007, 2476:3–2477:25, Feb. 8, 2007 (Demchick, N.); Pl.Ex. 209 ¶ 62(b).)

**\*45** There are two major problems with this practice. The first is that it fails to provide for any improvement at Reese Hospital whatsoever in 1998. [84] This is a major oversight because, as Donna Talbot testified at trial, much of the downturn in cash flow at the hospital over the course of 1998 was caused by the fact that the hospital had been on the market for so long. (Trial Tr. 869:2–9, 1084:23–1086:5, Jan. 25, 2007 (Talbot, D.).) Indeed, the Reese Management Team used 1996 figures as the starting point for their patient day projections precisely because they believed that Reese Hospital's year in ownership limbo artificially depressed the hospital's performance in late 1997 and 1998.

This analysis is reasonable. As Kevin Moss explained in his direct testimony:

> The hospital facility was up for sale, it can create uncertainty with respect to the doctors and that can cause declines within the facility. And that's something that is very commonly seen within the industry and it's something that certainly was having an impact on this hospital facility at that point in time.

(Trial Tr. 3433:2–9, Feb. 20, 2007 (Moss, K.).) [85] The court has little regard for Moss's testimony that Reese Hospital could have reached the revenue figures set forth in the Reese Projections, but that does not mean that a hypothetical purchaser of Reese Hospital should not have expected to make *any* improvements in the hospital's operations during the "stump period" of 1998.

The second major flaw in Demchick's Strategic Growth Scenario is that it assumes that a twelve-month delay in reaching the Reese Management Team's Strategic Assumptions would translate into a twelve-month delay in reaching the revenue and expense figures (as modified by Demchick) set forth in the Reese Projections. This is not necessarily so, particularly with respect to variable expenses. For example, there is no reason why it would take a full year for Reese Corp. to improve the collection practices at Reese Hospital to the point where bad debts would consume only 3.6% of net patient service revenue as opposed to the 6.2% figure projected by Demchick. (Pl.Ex. 209 at Ex. H–1.) For that matter, there is no reason why all of the expenses labeled "variable" by Demchick should be calculated as a percentage of net patient service revenue when the Reese Projections contain much more detailed formulae for calculating many of those expenses at an operational level. (Pl.Ex. 300 at TRUST/HCA–007628, TRUST/HCA–007630.) [86]

The court also disagrees with Demchick's adjustment of the Reese Management Team Strategic Assumption regarding salary-related expenses from the 42% figure (as a percentage of net patient service revenue) assumed by the Reese Management Team to a much higher figure for 2000 (45% of total net revenue, or 47.07% of net patient service revenue). [87] By simply declining to hire new FTEs in 1999 and 2000, [88] the hospital would have projected salaries totaling $68,162,245.73, [89] contract labor totaling $2,105,655.00 (using Demchick's percentage

Case 09-10138-MFW    Doc 13460-3    Filed 05/02/14    Page 140 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

of total net revenue), [90] and employee benefits totaling $13,632,449.15, [91] for a grand total of $83,900,349.88. That amounts to 41.68% of net patient service revenue or 39.85% of total net revenue, figures right in line with the Reese Management Team's expectations.

**\*46** The court does not mean to suggest that Reese Hospital could have increased its volume to the levels projected by the Reese Management Team or even by Demchick without hiring additional FTEs. Indeed, the court agrees with Demchick that the Strategic Assumption regarding salary-related expenses as a percentage of net patient service revenue is unreasonable. But that does not mean that the court accepts Demchick's 45% figure as reasonable, either. If HCA had been able to limit Reese Hospital's salary-related expenses to 45% of net patient service revenue, as it did in 1996, (Pl. Exs. 137 at HCA/MR 08017; 219 at Ex. J), it stands to reason that a well conceived, properly executed turnaround plan would eventually produce even better results.

Demchick's Strategic Growth Scenario has some good ideas (delay the growth projected by the Reese Management Team to account for the delay in implementation of the team's turnaround plan, adjust projected salary-related expenses to reflect more reasonable expectations, *etc.*), but it executes those ideas in very poor fashion. Some of the adjustments, such as the decision to project bad debts as 6.2% of total net revenue in 1999 or the decision to project salary-related expenses as 45% of total net revenue for 2000, seem more the product of a desire to achieve a lower projected EBITDA figure for the hospital than an objective analysis of the reasonableness of the Reese Management Team's Strategic Assumptions. The court finds that the projections derived from this scenario are unreasonable and should not be used in determining the business enterprise value of Reese Hospital as of the Transfer Date.

**(D)** *Modified projections*

The court's findings of fact with respect to the M & P, Reese, and Demchick Projections leave it with two options. First, the court could conclude that there are no credible projections from which it can derive a business enterprise value, and that the court's conclusion with respect to the fair market value of Reese Hospital on November 12, 1998, under the income approach should be that no such value can be ascertained. The court would then be left to determine the hospital's fair market value using the "cost" and "market" approaches to valuation, or to rule that a hypothetical purchaser would have

relied largely on a discounted cash flow valuation, and that, absent a reliable DCF valuation, Alberts has not proven what a hypothetical purchaser would have paid for Reese Hospital.

The more arduous choice would be to credit the Reese Projections in part and then modify the projections consistent with the evidence presented at trial—to attempt, as best the court can, to correct the Reese Management Team's mistakes. This approach is fraught with peril, for the court is a simple factfinder, not a hospital operations expert, and the Reese Projections "ha[ve] a lot of detail behind them." (Trial Tr. 3479:19–20, Feb. 20, 2007 (Moss, K.).) The court is not an appraiser and has no desire to play that role for purposes of this proceeding.

**\*47** Nevertheless, the court finds that it can and should make certain adjustments to the Reese Projections in this instance. It would be inappropriate for the court to rule against Alberts on this dispositive factual issue simply because it is time consuming for the court to make proper factual findings. And the projections, while dense, are intelligible and susceptible to modification; *i.e.,* the court can incorporate its factual findings with respect to the Strategic Assumptions that informed the projections into the projections themselves. Under the circumstances, modifying the Reese Projections to reflect the court's factual findings with respect to the Reese Management Team's Strategic Assumptions yields the fairest and most honest factual findings that the court can make.

The court therefore finds as a factual matter that the Reese Management Team Strategic Assumptions are reasonable subject to the specific factual findings listed below in summary form, and adopts the Reese Projections as reasonable business projections for Reese Hospital as of the Transfer Date as modified below:

- For the reasons set forth in the court's discussion of the Reese Projections, the court finds as a factual matter that a hypothetical purchaser would use (properly) annualized 1998 figures as the starting point for its projections.

- Based on the testimony of Donna Talbot and Kevin Moss, the court finds as a factual matter that a well-conceived, properly executed turnaround plan put into effect on November 12, 1998, would have returned Reese Hospital to its 1997 level of volume by the end of the "stump period" in 1998. (Trial Tr. 869:2–9, 1084:23–1086:5, Jan. 25, 2007 (Talbot, D.); 3433:2–9, 3435:22–3436:14, Feb. 20, 2007 (Moss, K.).) The court therefore

Case 09-10138-MFW   Doc 13460-3   Filed 05/02/14   Page 141 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

finds as a factual matter that a hypothetical purchaser would have projected net patient service revenue at Reese Hospital for the "stump period" of 1998 as a prorated average of the annualized figures for 1998 (based on the last 1998 data available before the Transfer Date, the October 31, 1998, year-to-date data) and the actual figures from 1997. [92]

- Based on the testimony of Donna Talbot, Mel Redman, and James Yerges, the court finds as a factual matter that it would have taken eighteen months from January 1, 1999, for Reese Hospital to have achieved the Reese Management Team's Strategic Assumptions with respect to volume growth except insofar as volume growth was predicated on the relocation of the ER. (Trial Tr. 973:10–14, 1084:5–8, Jan. 25, 2007, 1666:13–16, Jan. 30, 2007 (Talbot, D.); Trial Tr. 439:20–440:4, Jan. 23, 2007 (Redman, M.); Trial Tr. 3214:12–14, Feb. 15, 2007 (Yerges, J.).) The court therefore finds as a factual matter that a hypothetical purchaser would have reduced the volume increases projected by the Reese Management Team to account for this eighteen-month delay.

  - For the reasons set forth in the court's discussion of the Reese Projections, the court finds as a factual matter that it would have taken one year from January 1, 1999, for Reese Corp. to have relocated the ER. *See* part III.B.1.c.i.(B), *supra.* The court therefore finds as a factual matter that a hypothetical purchaser would not have included the upward adjustments for volume anticipated to occur as a result of the ER relocation until 2000.

  - **\*48** • For the reasons set forth in the court's discussion of the Reese Projections, *see* part III.B.1.c.i.(B), *supra,* the court finds that it was unreasonable for the Reese Management Team to have expected to be able to renegotiate its payment arrangement with Humana at better rates. The court therefore finds as a factual matter that a hypothetical purchaser would not have projected an increased reimbursement rate for Humana cases in the outpatient unit.

  - Based on the deposition testimony of Ken Bauer, the court concludes as a factual matter that a reasonable purchaser would not have spent any money on marketing Reese Hospital during the "stump period" of 1998. (Bauer Dep. 104:5–22,

June 14, 2006.) The court therefore finds that a hypothetical purchaser would not have projected any expenses for marketing in the "stump period" of 1998.

- As a corollary to the findings set forth above, the court finds as a factual matter that a reasonable purchaser would have spent the amounts contemplated in the Reese Management Team Strategic Assumptions for marketing over an eighteen-month period beginning on January 1, 1999. The court therefore finds that a hypothetical purchaser would project marketing expenses for 1999 equal to a prorated amount of the expenses set forth in the Reese Management Team Strategic Assumptions and for 2000 would have projected an average of the prorated amount of such expenses and the monthly expenses projected by the Reese Management Team to occur in 2000.

- Based on the lack of any evidence presented at trial suggesting that Reese Corp. could have renegotiated the costs of the insurance contracts held by Reese Hospital for the "stump period" of 1998, the court finds as a factual matter that the insurance rates for the hospital would have remained the same during that time frame. The court therefore finds that a hypothetical purchaser would not have projected lower insurance rates for Reese Hospital during the "stump period" of 1998.

- For the reasons set forth above, the court finds as a factual matter that a hypothetical purchaser would use (properly) annualized 1998 figures as the starting point in determining the number of projected equivalent inpatient days ("EIPDs") for 1998. Given the absence of any evidence in the record that would allow the court to calculate an annualized figure of EIPDs for 1998, the court finds as a factual matter that the most accurate estimation of the annualized number of EIPDs at Reese Hospital as of the Transfer Date is a figure reflecting 87.25% of the EIPDs for 1997. [93] The court therefore finds as a factual matter that a hypothetical purchaser would use 87.25% of the actual 1997 EIPD figures for Reese Hospital as its starting point in determining projected EIPDs for 1998.

Case 09-10138-MFW   Doc 13460-3   Filed 05/02/14   Page 142 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

• For the reasons set forth above, the court finds as a factual matter that it would have taken eighteen months from January 1, 1999, for Reese Hospital to have achieved the Reese Management Team's Strategic Assumptions with respect to EIPD growth. (Trial Tr. 973:10–14, 1084:5–8, Jan. 25, 2007, 1666:13–16, Jan. 30, 2007 (Talbot, D.); Trial Tr. 439:20–440:4, Jan. 23, 2007 (Redman, M.); Trial Tr. 3214:12–14, Feb. 15, 2007 (Yerges, J.).) The court therefore finds as a factual matter that a hypothetical purchaser would have reduced the volume increases projected by the Reese Management Team to account for this eighteen-month delay.

    **\*49** • For the reasons set forth in the court's discussion of the Reese Projections, *see* part III.B.1.c.i.(B), *supra,* the court finds as a factual matter that a well-conceived, properly executed turnaround plan would have been able to reduce variable expenses at Reese Hospital, but that this plan would not have been fully effective until January 1, 1999. The court therefore finds as a factual matter that a hypothetical purchaser would have reasonably projected any decrease in costs-per-patient at Reese Hospital for the "stump period" of 1998 as a prorated average of the annualized figures for 1998 (based on year-to-date figures as of October 31, 1998) and the Reese September Projections for the last three months of 1998.

• For the reasons set forth in the court's discussion of the Reese and Demchick Projections, the court finds as a factual matter that a well conceived, properly executed turnaround plan could have reduced the FTE-to-patient ratio at Reese Hospital to a greater extent than that projected by McGladrey & Pullen, but to a lesser extent than that

projected by the Reese Management Team, *see* part III.B.C.1.i.(B)-(C), *supra,* and that the salaries for any given year would never be less than the cost of maintaining the salaries of the existing number of FTEs as of the Transfer Date in any event. The court therefore finds as a factual matter that a hypothetical purchaser would reasonably project that once the turnaround plan was fully implemented, salaries and wages at Reese Hospital would be the larger of (1) 35.31% of net patient service revenue or (2) the costs of maintaining, as of the anticipated transfer date, the number of FTEs set forth in the Reese September Projections at the hours per pay period and wage rate per hour (plus periodic inflation) set forth in those same projections. (Pl.Ex. 300 at TRUST/HCA–007627). [94]

• For the reasons set forth in the court's discussion of the Reese and Demchick Projections, the court finds as a factual As a corollary to this finding, the court finds as a factual matter that projected salaries for the "stump period" in 1998 would match the salaries projected for the last three months in 1998 in the Reese September Projections once those projections were prorated for the shorter "stump period" in 1998.

Based on these specific factual findings, the court finds as a factual matter that a hypothetical purchaser would reasonably project the following revenue for Reese Hospital from November 12, 1998, through December 31, 2002: [95]

    **\*50** Further, the court finds as a factual matter that a hypothetical purchaser would reasonably project the following expenses for Reese Hospital from November 12, 1998, through December 31, 2002:

| | 11/12/98–12/31/98 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| **Fixed Costs** | | | | | |
| Repairs & Maintenance | $698,672.94 | $4,830,090.24 | $4,974,992.95 | $5,124,242.74 | $5,277,970.02 |
| Rents & Leases | $400,391.09 | $3,071,979.12 | $3,164,138.49 | $3,259,062.65 | $3,356,834.53 |
| Utilities | $649,887.30 | $5,382,047.55 | $5,543,508.97 | $5,709,814.24 | $5,881,108.67 |
| Other Professional Fees | $33,483.33 | $256,899.17 | $264,606.14 | $272,544.33 | $280,720.66 |

Case 09-10138-MFW    Doc 13460-3    Filed 05/02/14    Page 143 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

| | | | | | |
|---|---|---|---|---|---|
| Marketing Expense | $0.00 | $1,442,000.00 | $831,725.00 | $178,190.00 | $183,535.70 |
| Other Taxes (Real Estate) | $ 193,229.03 | $1,482,539.85 | $1,527,016.05 | $1,572,826.53 | $1,620,011.33 |
| Insurance | $1,147,723.29 | $4,202,400.00 | $4,397,255.40 | $4,602,083.47 | $4,817,431.00 |
| Depreciation & Amortization | $3,194,800.00 | $9,083,000.00 | $10,652,000.00 | $11,120,000.00 | $11,586,000.00 |
| Other Operating Expenses | $5 66,960.63 | $4,276,492.50 | $4,567,270.48 | $4,871,957.72 | $4,950,447.21 |
| Total Fixed Expenses | $6,885,147.61 | $34,027,448.43 | $35,922,513.48 | $36,710,721.67 | $37,954,059.10 |
| Variable Costs | | | | | |
| Salaries & Wages | $8,704,816.44 | $66,176,937.60 | $68,162,245.73 | $71,567,842.03 | $75,771,054.67 |
| Contract Labor | $597,047.68 | $2,965,946.75 | $3,302,514.89 | $3,697,745.36 | $3,914,915.66 |
| Employee Benefits | $1,784,922.61 | $13,235,387.52 | $13,632,449.15 | $14,313,568.41 | $15,154,210.93 |
| Professional Fees | $1,682,837.25 | $12,140,340.00 | $13,970,585.96 | $15,981,141.90 | $17,593,340.68 |
| Supplies & Other | $2,742,195.97 | $23,798,567.97 | $26,227,299.52 | $28,783,622.88 | $30,599,332.50 |
| Other Taxes (Sales & Use) | $119,317.72 | $915,455.76 | $942,919.43 | $971,207.02 | $976,033.81 |
| Contract Services | $3,046,059.83 | $20,594,805.75 | $22,640,133.19 | $24,715,409.65 | $26,221,712.32 |
| Bad Debts | $1,306,567.77 | $5,749,399.46 | $6,401,826.77 | $7,167,969.27 | $7,588,947.43 |
| Total Variable Costs | $19,983,765.28 | $145,576,840.81 | $155,279,974.64 | $167,198,506.51 | $177,819,548.00 |
| Total Operating Expenses | $26,868,912.89 | $179,604,289.24 | $191,202,488.12 | $203,909,228.18 | $215,773,607.11 |

Combining these projections, the court finds as a factual matter that a hypothetical purchaser would reasonably project the following EBIT for Reese Hospital from November 12, 1998, through December 31, 2002:

| | 11/12/98–12/31/98 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| Total Net Revenue | $21,042,620.31 | $171,168,697.88 | $191,330,031.12 | $214,039,339.64 | $226,441,798.62 |
| Total Operating Expenses | $26,868,912.89 | $179,604,289.24 | $191,202,488.12 | $203,909,228.18 | $215,773,607.11 |
| EBIT | -$5,826,292.58 | -$8,435,591.36 | $127,543.00 | $10,130,111.47 | $10,668,191.52 |

Case 09-10138-MFW   Doc 13460-3   Filed 05/02/14   Page 144 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

### ii. *Net cash flow*

**\*51**  The second step in determining the enterprise value of a business is to ascertain its net cash flow for each of the years in which projections are made. To arrive at this figure, the factfinder must add projected depreciation and amortization to and subtract projected income taxes, net working capital expenditures, and capital expenditures from the projected EBIT. Fishman et al., *supra*, ¶¶ 505.25, 505.39–505.43 & Ex. 5–20. (Trial Tr. 2120:18–2121:12, Feb. 6, 2007 (Demchick, N.); Defs. Ex. JV at Ex. 2–8–2–9.) The court addresses each of these components of the net cash flow equation in turn.

### (A) *Depreciation and amortization*

Moss and Demchick provided different projections for depreciation and amortization in their respective DCF analyses. Moss adopted the Reese Management Team projected figures as his own; Demchick created his own figures supposedly "based upon Reese projections," (Pl.Ex. 209 at Ex. I n. 5), but they are actually much smaller in amount, (Pl.Ex. 209 at Ex. I (projecting $5,894,390.00 in depreciation and amortization for 1999 as compared with the $9,056,000.00 projected by the Reese Management Team)). In the absence of any evidence in the record as to the lack of reasonableness of the Reese Projections with respect to depreciation and amortization, [97] the court finds as a factual matter that these projections are reasonable and adopts them for purposes of the court's findings of fact with respect to the projected net cash flow at Reese Hospital.

### (B) *Income taxes*

"The company's expected federal and state tax rates should be used" in projecting income taxes for the business subject to valuation. Fishman et al., *supra*, ¶ 505.25. The Illinois corporate income tax during the years for which the court's projections have been made was 4.8%, 35 Ill. Comp. Stat. 5/201 (1990), and the federal rate was 34% for taxable income between $335,000.00 and $10,000,000.00 and 35% for taxable income between $10,000,000.00 and $15,000,000.00. Fishman et al., *supra*, at Ex. 5–18. The court therefore finds as a factual matter that a hypothetical purchaser would reasonably project state and federal income taxes totaling 38.80% of the projected EBIT for Reese Hospital in 2002. [98]

### (C) *Net working capital*

Both Moss and Demchick provided projections for capital that would need to be invested at Reese Hospital to ensure a sufficient amount of net working capital to finance accounts receivable, inventory, and the like on a forward-going basis. (Trial Tr. 2121:2–7, Feb. 6, 2007 (Demchick, N.).) (Neither expert reduced the projected net working capital requirements by the approximately $20,600,000 net working capital that Reese Corp. purchased from HCA. That $20,600,000 is taken into account by the court in the reconciliation process.) Demchick based his projections for net working capital off of the historic average of net working capital required as a percentage of total net revenue. (Pl.Ex. 209 at Ex. O.) Moss used a percentage of total net revenue "based on [the] guideline companies median level." (Defs. Ex. JV at Ex. 2– Ex. 6.) Moss gives no explanation as to which companies he used as a guideline, and in any event Demchick's method of determining the projected net working capital demands of the hospital reflects more faithfully the idiosyncracies of Reese Hospital. The court therefore finds as a factual matter that a hypothetical purchaser would reasonably project net working capital infusions to be the difference between the prior year's net working capital and 10% of the total net revenue for the year in which the projection of net working capital is made.

### (D) *Capital expenditures*

**\*52**  Demchick and Moss also differed with respect to projected capital expenditures to made over the course of the five years following the Transfer Date. Moss's projections, "based on projections from Doctors Community Healthcare Corporation," (Defs. Ex. JV at Ex. 6 n. 3), contemplate $9,730,000.00 in capital expenditures in the "stump period" of 1998, $15,800,000.00 in capital expenditures in 1999, and $4,000,000.00 in annual expenditures thereafter. (Defs. Ex. JV at Ex. 2–Ex. 6.) Demchick projects capital expenditures in the amount of $3,036,986.00 in 1998, $19,350,000.00 in 1999, $10,350,000.00 in 2000, and $4,000,000.00 in the years thereafter, (Pl.Ex. 209 at Ex. N–1.)

Neither of these projections strike the court as reasonable. Added together, Moss's projected capital expenditures total $37,530,000.00. This is $6.67 million *less* than the capital expenditures contemplated in the Reese Management Team Strategic Assumptions. [99] Even if one were to assume that Reese Corp. would not make an expenditure of $4 million in 1998, the capital expenditures projected by Moss do not meet the requirements of the Strategic Assumptions.

Case 09-10138-MFW   Doc 13460-3   Filed 05/02/14   Page 145 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

Demchick's projections are no better. His Turnaround Scenario assumes that, except for computer upgrades, all capital expenditures will be spent evenly over the course of 1999 and 2000. (Trial Tr. 2127:11–2128:21, Feb. 6, 2007 (Demchick, N.); Pl.Ex. 209 at Ex. N–1.) This projection is unreasonable: a hypothetical purchaser with sufficient capital to purchase Reese Hospital would expend capital as quickly as possible to achieve operational turnaround more quickly, and would presumably prioritize some projects (*e.g.,* purchasing new cardiac catheterization equipment) over others (*e.g.,* the construction of an SNF unit). The Strategic Assumptions contain just this sort of prioritization. (*See* Pl.Ex. 115 (assuming that some expenditures will be made in 1998 and others in 1999).)

Moreover, both Moss and Demchick project capital expenditures for projects that were not included in the Reese Projections without modifying those projections to account for the benefits one would expect from the omitted projects. (Trial Tr. 3485:19–3486:17, Feb. 20, 2007 (Moss, K.) ("Q.... [D]id you include the six million as part of the capital expenditures on Exhibit 6 to your report? A. The six million is in there. Q.... [D]o the ... DCHC projections account for the increased revenue resulting from that capital expenditure? A. No, you do not see those projections."); *compare* Pl.Ex. 209 at Ex. N–1 (projecting expenditures for, *inter alia,* 25–bed SNF unit) *with* Trial Tr. 4249:20–4250:5, March 1, 2007 (Demchick, N.) ("For the skilled nursing facility, the strategic assumptions are silent as to whether it's included or not. But if we look through the projections, there does not appear to be any indication that it is included.").) This is manifestly unreasonable. A hypothetical purchaser would not want to expend capital on projects so speculative that the purchaser cannot even project any benefits arising from those projects. Capital expenditures of this nature should have been removed from the expert witness' projections.

**\*53** The court therefore finds as a factual matter that neither Kevin Moss nor Neil Demchick accurately projected the capital expenditures that a hypothetical purchaser would reasonably project for the years following the Transfer Date. Instead, the court finds that the expenditures contemplated in the Strategic Assumptions are reasonable and has created its own projections for capital expenditures based on those assumptions with the following modifications:

- For the reasons set forth above, the court finds as a factual matter that a hypothetical purchaser would not reasonably project capital expenditures towards the acquisition of a linear accelerator and 25–bed SNF unit

in 1999. *See* discussion, *supra.* Therefore, the court does not include these expenditures in its calculation of projected capital expenditures.

- The court finds as a factual matter that it would have taken until the end of 1999 for a hypothetical purchaser to relocate the ER at Reese Hospital because a project of that size and complexity would take approximately one year to complete at a minimum. (*See* Bauer Dep. 53:19–25, June 14, 2006 (describing the ER relocation project as a project that "would have required a major renovation of existing space").) The court therefore finds as a factual matter that a hypothetical purchaser would reasonably project capital expenditures totaling the amount contemplated in the Strategic Assumptions to be spread out over the "stump period" of 1998 and all of 1999.

- For the same reason, the court finds as a factual matter that it would have taken until the end of 1999 for a hypothetical purchaser to complete cosmetic enhancements to Reese Hospital, and therefore finds as a factual matter that a hypothetical purchaser would reasonably project capital expenditures totaling the amount contemplated in the Strategic Assumptions to be spread out over the "stump period" of 1998 and all of 1999. *See* discussion, *supra.*

- Based on the agreement of the parties that the Reese Management Team contemplated annual capital expenditures of $4 million in addition to the expenditures listed in the Strategic Assumptions, (Defs. Ex. JV at Ex. 2–Ex.6; Pl.Ex. 209 at Ex. N1), the court finds as a factual matter that a hypothetical purchaser would reasonably project miscellaneous capital expenditures equal to the prorated amount projected by the Reese Management Team for 1998 ($536,986.30) and miscellaneous expenditures totaling the amount projected by the team ($4,000,000.00) thereafter.

Based on the Reese Management Team's Strategic Assumptions as modified above, the court finds as a factual matter that a hypothetical purchaser would have projected capital expenditures totaling $4,769,595.00 in 1998, [100] $16,967,391.30 in 1999, [101] and $4,000,000.00 every year thereafter.

### (E) *Final net cash flow*

Case 09-10138-MFW   Doc 13460-3   Filed 05/02/14   Page 146 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

Based on the specific factual findings set forth above, the court finds as a factual matter that a hypothetical purchaser would reasonably project the following net cash flow adjustments for Reese Hospital from November 12, 1998, through December 31, 2002:

| | 11/12/98–12/31/98 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| Depreciation & Amortization | $3,194,800.00 | $9,083,000.00 | $10,652,000.00 | $11,120,000.00 | $11,586,000.00 |
| Income Taxes | $0.00 | $0.00 | $0.00 | $0.00 | -$4,139,258.31 |
| Net Working Capital | -$21,937.09 | -$1,442,264.86 | -$2,016,133.32 | -$2,270,930.85 | -$1,240,245.90 |
| Capital Expenditures | -$4,769,595.00 | -$16,967,391.30 | -$4,000,000.00 | -$4,000,000.00 | -$4,000,000.00 |
| Total Cash Flow Adjustments | -$1,596,732.09 | -$9,326,656.17 | $4,635,866.68 | $4,849,069.15 | $2,206,495.79 |

**\*54** Combining these figures to the projected EBIT for Reese Hospital calculated above, *see* part III.B.1.c.i, *supra*, the court finds as a factual matter that a hypothetical purchaser would reasonably project the following net cash flow at Reese Hospital from November 12, 1998, through December 31, 2002:

| | 11/12/98–12/31/98 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| EBIT | -$5,826,292.58 | -$8,435,591.36 | $127,543.00 | $10,130,111.47 | $10,668,191.52 |
| Total Cash Flow Adjustments | -$1,596,732.09 | -$9,326,656.17 | $4,635,866.68 | $4,849,069.15 | $2,206,495.79 |
| Net Cash Flow | -$7,423,024.67 | -$17,762,247.53 | $4,763,409.68 | $14,979,180.61 | $12,874,687.31 |

### iii. *Weighted average cost of capital*

The next step in the court's determination of the business enterprise value of Reese Hospital under the income approach is to determine the appropriate discount rate to apply to the projected net cash flow set forth above. "[A] discount rate represents the total expected rate of return (stated as a percentage) that a buyer (or investor) would demand on the purchase price of an ownership interest in an asset (such as U.S. Treasury bills) given the level of risk inherent in that ownership interest." Fishman et al., *supra*, ¶ 501.2. "A company's forecasted net cash flows or earnings are discounted to a present value at the discount rate." *Id.* ¶ 501.3.

Both Demchick and Moss went beyond formulating a discount rate to apply to the projected net cash flow at Reese Hospital by considering both the cost of equity (the discount rate) and the cost of debt to arrive at a weighted average cost of capital, or "WACC." As Neil Demchick explained at trial, "[i]f you were doing an equity value, you would only look at the cost of the equity, but because we are doing a business enterprise value, it is the weighted average cost of capital, which is a weighing of the cost of equity and the cost of debt." (Trial Tr. 2109:5–9, Feb. 6, 2007 (Demchick, N.).) The cost of debt must be adjusted by the applicable tax rate to arrive at an after-tax cost of debt. Shannon P. Pratt et al., *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* 185 (4th ed.2000). The cost of capital and after-tax cost of debt is then weighted and averaged to arrive at the WACC. *Id.*

### (A) *Discount rate (cost of equity)*

"[T]here are two primary techniques for determining a company's discount rate—the build-up method and the [capital asset pricing model ('CAPM')] method, which is based on guideline company data." Fishman, et al., *supra*, ¶ 502.1. Demchick used the buildup method to derive a discount rate; Moss chose the CAPM method. (*See* Trial Tr. 2108:17–2119:16, 2129:15–2130:13, Feb. 6, 2007 (Demchick, N.) (explaining the process whereby Demchick

Case 09-10138-MFW    Doc 13460-3    Filed 05/02/14    Page 147 of 180

*In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)*

arrived at his discount rate); Trial Tr. 3500:14–3502:12, Feb. 20, 2007 (Moss, K.) (explaining the process whereby Moss arrived at his discount rate); *see also* Pl.Ex. 209 at Ex. M–1 (showing the calculations made by Demchick to reach a discount rate); Defs. Ex. JV at Ex. 2–Ex. 8 (showing the calculations made by Moss to reach a discount rate).) The build-up method is "[t] he most commonly used method for the smaller, closely held company," Fishman et al., *supra*, ¶ 502.1, whereas "[a] method based on guideline company data [*i.e.*, the CAPM method] should be used instead of the build-up method whenever valid guideline company data can be found," *Id.* ¶ 503.1.

**\*55**  In this case, the build-up method is the appropriate method to determine the discount rate to be applied to the projected net cash flow at Reese Hospital because the companies used by Moss as guidelines for his CAPM method are not truly comparable to Reese Hospital. The build-up method requires the valuation consultant to determine the appropriate risk-free rate of return for a hypothetical investor, add a premium for extra risk assumed by the investor in purchasing equity, then add or subtract risk premiums from the resultant average market return for the business's industry and size, as well as for any other relevant risk factors. *Id.* ¶ 502.1, Ex. 5–7.

**(I)** *Risk-free rate*

"The risk-free rate of return is the return an investor could obtain from a low-risk guaranteed investment." *Id.* ¶ 502.4. Demchick used a risk-free rate of 5.50% in calculating his discount rate. (Pl.Ex. 209 at Ex. M–1.) Moss used a risk-free rate of 5.46% in calculating his discount rate using the CAPM method. (Defs. Ex. JV at Ex. 2–Ex. 8.) [102]

"Most consultants use the 20–year U.S. Treasury yield to maturity as of the valuation date as the risk free rate because it most closely corresponds to the time horizon of many equity holders in closely held companies." *Id.* The risk-free rate of return for the 20–year Treasury Bill, Constant Maturity Rate as of November 12, 1998, was 5.46%. Federal Reserve Statistical Release H.15 Selected Interest Rates, http://www.federalreserve.gov/releases/h15/19981116/. The court therefore finds as a factual matter that the appropriate risk-free rate in calculating a discount rate is 5.46 percent. [103]

**(II)** *Equity risk premium*

"The equity risk premium is the extra return earned by an average equity investor in excess of the return on long-term Treasury securities." Fishman et al., *supra* ¶ 502.7. Demchick used an equity risk premium of 7.80%. (Pl.Ex. 209 at Ex. M–1.) Moss used an equity risk premium of 5.88% in calculating his discount rate using the CAPM method. (Defs. Ex. JV at Ex. 2–Ex. 8.) Demchick arrived at his equity risk premium by relying on data set forth in *Stocks, Bonds, Bills and Inflation 1998 Yearbook,* Ibbotson Associates, Inc. (1998) (the "Ibbotson 1998 Yearbook"). (Trial Tr. 2110:21–2111:12, Feb. 6, 2007 (Demchick, N.); Pl.Ex. 209 at Ex. M–1 n. 2.) Moss arrived at his equity risk premium by relying on internal rates used at his accounting firm, Deloitte Financial Advisory Services, LLP. (Defs. Ex. JV at Ex. 2–Ex. 8.)

As Neil Demchick correctly noted at trial, the Ibbotson yearbook "is sort of the Bible," (Trial Tr. 2111:10, Feb. 6, 2007 (Demchick, N.)), for determining equity risk premiums. *See* Fishman et al, *supra*, ¶ 502.7 (recommending use of the Ibbotson yearbook). Moss himself relies on data provided by the Ibbotson 1998 Yearbook in determining the appropriate size premium to use in calculating the discount rate. *See* part III.B.1.c.iii.A.(IV), *infra*. The court prefers "the most used well-known and widely used" source for determining equity risk premiums, Fishman et al., *supra*, ¶ 502.7, over the internal rates used at Kevin Moss's place of employment. The court therefore finds as a factual matter that the appropriate equity risk premium to be used in calculating the discount rate is 7.80 percent.

**(III)** *Industry risk premium*

**\*56**  Having determined the risk-free rate of return and the equity risk premium, the court must now determine the extent to which the average market return obtained by adding those rates should be adjusted to account for an industry risk premium. Fishman et al., *supra*, ¶ 502.18. "Industry risk represents the risks in the company's industry compared to the market as a whole." *Id.* ¶ 502.20. The industry risk premium takes into account the fact that "some industries have higher-than-average risk for investors, and other industries have lower-than-average risk." *Id.*

Demchick adjusted his average market return by subtracting 3.63% as a size premium. He explained that he reduced his average market return by this amount because "the health care industry is actually an industry that is not seen as [being as] risky as other industries or as the market as a

Case 09-10138-MFW   Doc 13460-3   Filed 05/02/14   Page 148 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

whole," (Trial Tr. 2112:24–2113:1, Feb. 6, 2007 (Demchick, N.)), and specifically took the figure of 3.63% from the Ibbotson 1998 Yearbook, (Trial Tr. 2113:1–10, Feb. 6, 2007 (Demchick, N.)). Moss did not provide an industry risk premium adjustment as part of his CAPM analysis. *See* n. 98, *supra.*

Demchick's analysis is sound, contradicts his client's interest in inflating the discount rate as much as possible, and is not disputed by any evidence in the record. The court therefore finds that the average market return calculated by adding the appropriate risk-free rate of return to the appropriate equity risk premium should be reduced 3.63% to account for the appropriate industry risk premium.

### (IV) *Risk premium for size*

The average market return should also be adjusted for a risk premium relating to the size of the company that is being valued. Fishman et al., *supra*, ¶ 502.18. Both Demchick and Moss cited Ibbotson as the source for their respective size adjustments, but they arrived at different figures. Demchick used a size premium adjustment of 3.30%, (Pl.Ex. 209 at Ex. M–1), whereas Moss used a size premium adjustment of 5.40% in calculating his discount rate using the CAPM method, (Defs. Ex. JV at Ex. 2–Ex. 8).

The court agrees with both experts that the Ibbotson 1998 Yearbook is "[a] good starting point for determining a risk premium for the size of a company." Fishman et al., *supra*, ¶ 502.26. The Ibbotson 1998 Yearbook provides size premiums for companies according to the amount of their market capitalization. Ibbotson 1998 Yearbook, *supra*, at Table 7–6. Different size premiums are used depending upon the decile of market capitalization into which the company being valued falls. *Id.* The tenth, or lowest, decile assigned a size premium is reserved for companies with $130,402,000.00 in market capitalization or less. *Id.* at Table 7–5.

The Reese Management Team anticipated that Reese Hospital would receive equity contributions in the amount of $10 million in 1999. (Pl.Ex.115.) Although it is logical to assume that a hypothetical purchaser with more capital would be willing to invest more money than that in the hospital, it is not reasonable to assume that such a purchaser would invest more than twice the hospital's purchase price anytime soon after purchasing it. The court therefore finds as a factual matter that the average market return calculated by adding the

appropriate risk-free rate of return to the appropriate equity risk premium should be increased 5.36% to account for the appropriate risk premium for size. [104]

### (V) *Specific company risk premium*

**\*57** The final adjustment that the court needs to make is for risk factors specific to Reese Hospital. Fishman et al., *supra*, ¶ 502.19. "The determination of other risk factors ... that should be considered in building up a ... discount rate involves a great deal of judgment—perhaps more so than any other rate component." *Id.* ¶ 502.33. Based on the projections arising from his Strategic Growth Scenario, Demchick used a specific company risk premium of 12% to create a discount rate for his Turnaround Scenario. (Trial Tr. 2129:15–2130:11, Feb. 6, 2007 (Demchick, N.); Pl.Ex. 209 at Ex. M–1.) [105] Moss used a specific company risk premium of 23% to create a discount rate for the DCHC Projections using the CAPM method. (Defs. Ex. JV at Ex.2–Ex.8.)

Moss's specific company risk premium of 23% reflects the comparatively higher probability that Reese Hospital would fail to meet the projections made by the Reese Management Team, whereas Demchick's lower premium of 12% reflects his modification to those projections by delaying revenue growth and expense reductions over the course of one year. The court's findings of fact with respect to projected EBIT at Reese Hospital are even more conservative than Demchick's Strategic Growth Scenario in most respects (*e.g.,* the court finds as a factual matter that it would have taken Reese Hospital eighteen months to reach the volume levels projected by the Reese Hospital Team, whereas Demchick assumed that it would take the hospital one year to reach the revenue), but are less conservative in others (*e.g.,* the court finds as a factual matter that Reese Hospital would have been able to reduce its salary-related expenses to lower levels than those assumed by Demchick). Given that Demchick testified that his specific company risk premium was probably too low, (Trial Tr. 2130:8–9, Feb. 6, 2007 (Demchick, N.)), the court finds as a factual matter that the average market return calculated by adding the appropriate risk-free rate of return to the appropriate equity risk premium should be increased by 13.50%, slightly more than the adjustment made by Demchick, to account for the appropriate specific company risk premium.

### (B) *After-tax cost of debt*

Case 09-10138-MFW Doc 13460-3 Filed 05/02/14 Page 149 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

The court has already found as a factual matter that the appropriate income tax rate to be applied to the cost of debt is 0% for the years 1998–2001 and 38.8% for 2002. *See* part III.B.1.c.ii.B, *supra.* The only remaining question is whether the pre-tax cost of debt should be the 12.00% figure used by Demchick, (Pl.Ex. 209 at Ex. M–1), the 7.30% figured used by Moss, (Defs. Ex. JV at Ex. 2–Ex. 8), or a different figure altogether.

The court finds as a factual matter that the 7.30% figure used by Moss is the appropriate pre-tax cost of debt to use in calculating the WACC. This figure is based on Moody's Baa corporate bond rate on November 12, 1998. (Defs. Ex. JV at Ex. 2–Ex. 8.) Demchick, in contrast, admitted under cross-examination that he based his cost of debt on the interest rate charged by NCFE. (Trial Tr. 2313:7–10, Feb. 7, 2007 (Demchick, N.) ("Q.... Now your pretax cost of debt, that I believe you selected based on the NCFE lending rate? A. Yes."); *see also* Pl.Ex. 209 at Ex. 54 (describing the cost of debt as "based upon" the "NCFE interest rate").) [106] Demchick's use of the actual interest rate charged by NCFE was in error, as Kevin Moss explained at trial:

**\*58**  Q. Simply focusing on the borrowing rate, what is reflected there is 7.3 percent and the source is Moody's B corporate bond rate as of November 12, 1998. Why did you select that borrowing rate for your cost of debt capital?

A. When doing the analysis, we are looking at what the typical buyer would do. We are looking at the financing of the typical buyer in the market. The discount rate is a blending of the equity rate and the debt rate. In this case, the market data shows that the companies that were capitalized out there, the public companies were 60 percent equity, 40 percent debt.

So, this 7.3 percent is based on somebody coming in and capitalizing this business with 40 percent debt.

Q. Why did you choose the Moody's B rate?

A. The Moody's B rate represents a rate that is not a junk quality of debt, but still a good quality debt rate. If you look at these assets, just to give you a feel for the Reese business, what this implies is a 40 percent debt load on the facility.

So, let's just say the facility is worth $80 million. That is the enterprise value for the facility, okay. An $80 million facility, it is easy to do the math on 40 percent debt on

that. That is going to be $32 million. So, four times the eight gets you to [$]32 million in debt. So, what the valuation analysis implies here and what is used in the capital structure is it assumes that the typical buyer, they pay an $80 million price. They finance it [$]32 million with debt and the rest is financed with equity.

Now, can they put [$] 32 million in debt on this facility at a B double A rate?

Well, the facility has [$]29 million in accounts receivable. It has roughly another five million in supplies [and] inventory and then you get to the personal property and the real estate values. So, there is ample collateralizable value there to have a B double A rate for somebody looking at purchasing the facility.

(Trial Tr. 3512:15–3513:25, Feb. 20, 2007 (Moss, K.))
The court has already found as a factual matter that the fair market value of the net assets at Reese Hospital approximates $57,985,984. *See* part III. B.1.b.v, *supra.* This implies that the assets at Reese Hospital could have been used as collateral to support a purchase price as high as $134,002,320.19. [107] Any purchaser with a reasonable amount of investment capital could afford to purchase the hospital; therefore, the court finds as a factual matter that the Moody's Baa rate as of November 12, 1998, is the appropriate cost of debt to be used in calculating the WACC to be applied to the projected net cash flow at Reese Hospital.

### (C) *Debt-to-equity ratio*
Demchick and Moss used similar, though not identical, debt-to-equity ratios in crafting their respective WACCs. Demchick relied on "levels of the industry during the time period per www.estatementstudies.com" to arrive at an applicable debt-to-equity ratio of 43.1% to 56.9 percent. (Pl.Ex. 209 at Ex. M–1.) Moss relied on "comparable company research" to arrive at a similar ratio of 40% to 60 percent. (Defs. Ex. JV at Ex. 2–Ex. 8.) In the absence of any evidence in the record as to which companies Moss used as his guidelines in formulating his debt-to-equity ratio, the court finds as a factual matter that Demchick's ratio of 43.1% debt to 56.9% equity is appropriate.

### (D) *Final WACC calculation*
**\*59**  Based on the foregoing factual findings, the court finds as a factual matter that the following calculation represents the appropriate cost of equity to apply to the projected net

cash flows at Reese Hospital from the "stump period" of 1998 through 2002:

| | |
|---|---|
| Risk–Free Rate | 5.46% |
| Equity Risk Premium | + 7.80% |
| Average Market Return | 13.26% |
| Industry Premium Adjustment | −3.63% |
| Size Premium Adjustment | 5.36% |
| Specific Company Risk Premium Adjustment | + 13.50% |
| Cost of Equity | 28.49% |

The court further finds as a factual matter that the following calculation represents the appropriate after-tax cost of debt to apply to the projected net cash flows at Reese Hospital from the "stump period" of 1998 through 2002:

| | 11/13/98–2001 | 2002 |
|---|---|---|
| Pre–Tax Cost of Debt | 7.30% | 7.30% |
| Income Tax Rate | x (1—0.00%) | x (1—38.80%) |
| After Tax Cost of Debt | 7.30% | 4.47% |

Applying the appropriate debt-to-equity ratio to the cost of equity and after tax cost of debt, the court finds as a factual matter that the following calculation represents the appropriate equity portion of WACC and debt portion of WACC to apply to the projected net cash flows at Reese Hospital from the "stump period" of 1998 through 2002:

| | 11/13/98–2001 | 2002 |
|---|---|---|
| Cost of Equity | 28.49% | 28.49% |
| Percent of Equity | x 56.90% | x 56.90% |
| Equity Portion of WACC | 16.21% | 16.21% |
| After Tax Cost of Debt | 7.30% | 4.47% |
| Percent of Debt | x 43.10% | x 43.10% |
| Debt Portion of WACC | 3.15% | 1.93% |

Combining these weighted figures, the court finds as a factual finding that the following calculation represents the appropriate WACC to apply to the projected net cash flows at Reese Hospital from the "stump period" of 1998 through 2002:

| | 11/13/98–2001 | 2002 |
|---|---|---|

Case 09-10138-MFW   Doc 13460-3   Filed 05/02/14   Page 151 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

| | | |
|---|---|---|
| Equity Portion of WACC | 16.21% | 16.21% |
| Debt Portion of WACC | + 3.15% | + 1.93% |
| WACC | 19.36% | 18.14% |

#### iv. *Terminal value*

The fourth step in the court's determination of the business enterprise value of Reese Hospital using the income approach is to ascertain a terminal value for the hospital. Fishman et al., *supra*, ¶¶ 505.3, 505.45, Ex. 5–20. The terminal value of a company is the value of the company as of "the first full year after the company reaches a stabilized level of growth and sustainable profit margins." *Id.* ¶ 505.45. Although "[s]everal methods can be used to estimate the value of a company during the terminal year," *id.* at ¶ 505.46, "the one that is most often used by valuation consultants[ ] is the capitalization of the terminal year operations based on the Gordon Model." *Id.* The Gordon Model derives the terminal value of a company by dividing the terminal net cash flow (the first net cash flow resulting from a stabilized level of growth) by the discount rate less long-term growth. *Id.* at ¶¶ 505.46.

**\*60** Kevin Moss used a different method for determining the terminal value of Reese Hospital. He multiplied the terminal EBITDA by a market multiple of five to arrive at a terminal value. (Trial Tr. 2502:23–3503:1, Feb. 20, 2007 (Moss, K.); Defs. Ex. JV at Ex. 2–9, Ex. 2–Ex. 6.) Moss explained his decision to use an EBITDA multiple as follows:

> I know that normally in an income approach, people think of, well, you have the discount rate that goes the whole period of the cash flows. The terminal value is the discount rate minus some growth assumption and that is the value of the business. But the problem you have in a business like this is it's looking very different four years from now. If I used a high discount rate over the life of the entire business, you come up with a value that doesn't make sense in 2002 for the business.
>
> ...
>
> From amongst the three methods you can use in the income approach, in this situation, I think it was preferable to do it this way and that's why I did it like this. The multiples in the market are very well known. I guess one important thing that people miss in a multiple is a market multiple is just the inverse of that cap rate that I mentioned. So,

market multiples are impacted by risk and growth. Cap rates are just that. They are risk and growth. Those are the two factors that go into the cap rate.

So, when you develop your cap rate, you use your market data. A cap rate would be the economic information showing the three percent growth. You would be calculating a discount rate using [CAPM] and [CAPM] is driven off of market data. Your growth is driven off of market data. A market multiple is the same thing. It's working off of market data. What are investors paying and what are their views with respect to risk and growth?

On a hospital, in a hospital that is a profitable hospital facility, it's generating a decent margin like the rest of the industry, which is what we show Reese doing in 2002. You can get a five times EBITDA multiple on this facility.

So, I did it that way because it is a cleaner depiction of value.

(Trial Tr. 3504:4–12, 3509:5–3510:3, Feb. 20, 2007 (Moss, K.).)

While the court recognizes that the market multiple method is a procedure "commonly used to estimate the terminal value," Pratt et al., *supra*, at 186, it finds as a factual matter that the market multiple method is not the appropriate way to determine the terminal value in this particular case. First, "[t]he market multiple brings a major element of the market approach into the income approach," *id.* at 187, and "[m]any valuation analysts prefer to keep the income approach and market approach as discrete from each other as possible," *id.* Moreover, Moss testified that "a market multiple is just the inverse of [a] cap[italization] rate," (Trial Tr. 3509:9–10, Feb. 20, 2007 (Moss, K.)), and that a market multiple has to be adjusted to capture the risk in attaining the terminal net cash flow, (Trial Tr. 3510:4–15, Feb. 20, 2007 (Moss, K.) ("A hospital that is profitable from the get go would be seven times EBITDA for a big, profitable hospital. The hospital that we have here in 2002 was valued using a five times EBITDA multiple. So, there is a 30 percent discount in value right there."). This suggests that a market multiple is really

Case 09-10138-MFW    Doc 13460-3    Filed 05/02/14    Page 152 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

just an easier way of making the same calculation performed (with more rigor) by the Gordon Model. (*See, e.g.,* Trial Tr. 3511:10–3512:10, Feb. 20, 2007 (Moss, K.) (explaining that the "five times EBITDA multiple" used by Moss was the standard multiple that he personally used when advising investment bankers in the late 1990s); Defs. Ex. JV at Ex. 2–9 (explaining that EBITDA multiple was based on "observed EBITDA multiples for publicly traded healthcare providers and private hospital transactions").)

**\*61**  The court therefore finds as a factual matter that the Gordon Model is the appropriate method for determining the terminal value of Reese Hospital. The court does, however, recognize the point made by Moss that the market multiple method has value as a "sanity check" for the figure derived through the Gordon Model. (Trial Tr. 3511:25–3512:4, Feb. 20, 2007 (Moss, K.).) The court therefore finds as a factual matter that it is appropriate to determine the implied EBITDA multiple arising from the terminal value calculated using the Gordon Model as a "sanity check" on the Gordon Model approach.

Unlike Moss, Neil Demchick used the Gordon Model to arrive at his terminal value. (Trial Tr. 2314:23–2316:22,

Feb. 7, 2007 (Demchick, N.); Pl.Ex. 209 at Exs. G, H.) He assumed long-term growth of five percent for his Strategic Growth Scenario. (Trial Tr. 2482:23–2483:5, Feb. 7, 2007 (Demchick, N.); Pl.Ex. 209 at Ex. H.) However, the court has already found that the long-term growth in volume projected in the Reese October Projections provides a more accurate gauge of the long-term growth to be expected at Reese Hospital. *See* part III.B.1.c.i.(D), *supra*. The court has therefore calculated long-term growth of EBIT based on the 7% long-term growth in volume projected by Reese Corp. Compared to 2001, the terminal year 2002 shows approximately a 5.31% growth in EBIT, representing the presumed long-term growth in revenues. As noted previously, in calculating the terminal value, the terminal net cash flow must be divided by the discount rate less long-term growth. Accordingly, the court reduced the WACC figure (of approximately 18.14%) by the presumed long-term growth of revenues (of approximately 5.31%), to arrive at a rate of 12.82 % to be used in computing the terminal value.

Based on these findings of fact, the court finds as a factual matter that the following calculation represents the appropriate terminal value for Reese Hospital:

| | |
|---|---:|
| Terminal Net Cash Flow | $12,874,687.31 |
| Adjusted Discount Rate for Terminal Net Cash Flow | ÷ 12.82% |
| Terminal Value | $100,390,116.02 |

### v. Present value of net cash flow and terminal value

The penultimate step in determining the business enterprise value of Reese Hospital as of the Transfer is to determine the present value of the projected net cash flows and projected terminal value of the hospital. Fishman et al., *supra*, ¶¶ 505.3, 505.50, Ex. 5–20. The present value is determined by dividing the full value (*i.e.,* the discounted projected net cash flows and capitalized terminal value) by 100% of that net cash flow or terminal value plus the applicable discount or capitalization rate raised to a pre-determined discount period exponentially. *Id.* ¶ 505.51. "Whenever a company's terminal value is estimated using the Gordon Model, ... it should be discounted back to a present value using the same term as the last year of the forecast." *Id.* ¶ 505.52.

**\*62**  Demchick calculated his discount period by dividing the days in the "stump period" of 1998(49) by the total number of days in the year (365) and then adding one period for every

year thereafter. (Trial Tr. 2316:24–2317:11, Feb. 7, 2007 (Demchick, N.).) Moss, on the other hand, used a mid-year discounting convention to arrive at a discount period. (Trial Tr. 3740:24–3741:11, Feb. 21, 2007 (Moss, K.).) This method "assumes that annual cash flows or earnings are received, on average, at the middle of each period." Fishman et al., *supra,* ¶ 505.58.

The court finds as a factual matter that it is appropriate to use a mid-year discounting convention in determining the present value of the projected net cash flow and terminal value for Reese Hospital. As Kevin Moss pointed out at trial, "[t]he cash flows in a hospital facility are fairly evenly distributed throughout the year." (Trial Tr. 3844:16–17, Feb. 21, 2007 (Moss, K.).) The most effective way to reflect this steady stream of cash is to use the mid-year convention. Fishman et al., *supra,* ¶ 505.58.

Case 09-10138-MFW    Doc 13460-3    Filed 05/02/14    Page 153 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

The court does not, however, adopt Moss's discount period methodology *in toto.* Moss applied his mid-year convention to a terminal value derived from a market multiple, *see* part III.B.1.c.iv, *supra,* whereas the court has found as a factual matter that the Gordon Model is the appropriate way to determine the terminal value for Reese Hospital. *Id.* The use of a mid-year convention requires that the court alter its calculation of the terminal value because the Gordon Model "assumes that cash flows will be received at the end of each year, which is inconsistent with the preceding mid-year discounting technique." Fishman et al., *supra,* ¶ 505.61. The calculation should be modified by multiplying the terminal net cash flow by 100% plus the WACC raised to the ½ power before dividing the resulting figure by the WACC less long-term growth.

The court therefore finds as a factual matter that the appropriate discount period to be applied to the calculation for determining the present value of the net cash flow and terminal value projected for Reese Hospital is .07 for the "stump period" in 1998, [108] .64 for 1999, [109] 1.64 for 2000, 2.64 for 2001, 3.64 for 2002, and 4.14 for the terminal value. The court further finds that the following calculation represents the terminal value at Reese Hospital using the modified Gordon Model:

Combining these findings, the court finds as a factual matter that the following calculation represents the present value of the projected net cash flows at Reese Hospital from November 13, 1998, through December 31, 2002:

| | 11/13/98–12/31/98 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| Net Cash Flow | -$7,423,024.67 | -$17,762,247.53 | $4,763,409.68 | $14,979,180.61 | $12,874,687.31 |
| Discount Factor | $\div (1 + 19.36\%)^{0.07}$ | $\div (1 + 19.36\%)^{0.64}$ | $\div (1 + 19.36\%)^{1.64}$ | $\div (1 + 19.36\%)^{2.64}$ | $\div (1 + 18.14\%)^{3.64}$ |
| Present Value of Net Cash Flows | -$7,331,646.61 | -$15,860,431.89 | $3,563,581.79 | $9,388,766.96 | $7,018,763.88 |

**\*63** The court further finds as a factual matter that the following calculation represents the present value of the terminal value:

| | |
|---|---|
| Terminal Value (under modified Gordon Model) | $109,114,564.17 |
| Discount Factor | $\div (1 + 18.14\%)^{4.14}$ |
| Present Value of Terminal Value | $54,728,670.52 |

### vi. *Non-operating and excess assets*

The last step in determining the final business enterprise value of Reese Hospital under the income approach is to add the non-operating and excess assets purchased by Reese Corp. in exchange for the Reese Transfers. *Id.* ¶ 505.65. Moss anticipated income from the sale of excess land at the Reese Hospital campus in the amount of $6.65 million based upon the valuation performed by Kimmel. (Trial Tr. 3516:1–10, Feb. 20, 2007 (Moss, K.); Defs. Ex. JV at Ex. 2–Ex. 6). Demchick estimated the value of excess land at the Reese Hospital campus to be at most $5 million. (Trial Tr. 2178:18–2179:5, Feb. 7, 2007 (Demchick, N.); Pl.Ex. 209 at 60.)

The court does not credit either witness's testimony in this regard. As Robert Wilson explained in his expert testimony, any unused land at the Reese Hospital campus would ordinarily be classified as "surplus," *i.e.,* unsaleable land, "because it's all ... under [the] institutional zoning classification [used] to run [the] hospital facility." (Trial Tr. 1273:3–6, Jan. 26, 2007 (Wilson, R.); *see also* Trial Tr. 1275:24–1276:13, Jan. 26, 2007 (Wilson, R.) ("[F]or land to be excess ..., it has to be ... something that we can market ... and they'll recognize it as valuable land and pay something for it.... Surplus land is just ... a little extra acre maybe in the back of the property or to the side that nobody

Case 09-10138-MFW    Doc 13460-3    Filed 05/02/14    Page 154 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

would be interested in...."').) Nor could the surplus land at the Reese Hospital campus be re-zoned into separate parcels for residential use, for such a procedure would almost certainly cause the remainder of the institutionally-zoned property at the Reese Hospital campus to be in violation of the green-space and "footprint" requirements of that zoning. (*See* Trial Tr. 1253:15–20, Jan. 26, 2007 (Wilson, R.) (explaining that "the actual footprints of the buildings" on the developed part of the Reese Hospital campus "probably cover[ed] ... almost 25 percent of the site, and then with [the] parking area it's probably over 50 percent").) A purchaser seeking to sell surplus land at Reese Hospital would therefore need to both parcel out the surplus land under a residential zoning scheme and alter the zoning restrictions on the remainder of the property to realize any income through the sale of the surplus property—a process which strikes the court as unlikely given the difficulties and delays appurtenant to the rezoning process. (*See* Trial Tr. 1254:4–1255:12, Jan. 26, 2007 (Wilson, R.) (describing the zoning process in Chicago as "a nine-step process of review" several plans and studies that can take anywhere from "194 days ... up to five years" to complete).)

**\*64**  But if Moss and Demchick erroneously swelled the business enterprise value of Reese Hospital by considering the surplus real estate at the Reese Hospital campus as an asset to be sold, they committed a far greater error to the detriment of the hospital's value by failing to consider the assets purchased by Reese Corp. in the form of the net working capital sold to Reese Corp. at the time of the hospital's purchase. *See* part III.B.1.b.iii, *supra.* The court has already concluded that this net working capital, when considered in tandem with the Defendants' reconciliation guarantee, necessarily equaled the amount paid for the net working capital, *i.e.,* $20,678,221. *Id.* These assets must be added to the value of Reese Hospital as if normally capitalized to fully reflect the business enterprise value of the hospital. Fishman et al., *supra* ¶ 505. 65(e). [110]

### vii. *Final business enterprise value*

Based on these findings, the court finds as a factual matter that the following calculation represents the final business enterprise value for Reese Hospital using the income approach:

| | |
|---|---|
| Present Value of 11/13/98–12/31/98 Net Cash Flow | -$7,331,646.61 |
| Present Value of 1999 Net Cash Flow | -$15,860,431.89 |
| Present Value of 2000 Net Cash Flow | $3,563,581.79 |
| Present Value of 2001 Net Cash Flow | $9,388,766.96 |
| Present Value of 2002 Net Cash Flow | + $7,018,763.88 |
| Total Present Value of Projected Net Cash Flows | -$3,220,965.87 |
| Present Value of Modified Terminal Value | + $54,728,670.52 |
| Value As If Normally Capitalized | $51,507,704.65 |
| Non–Operating and Excess Assets | $20,678,221.00 |
| Total Business Enterprise Value | $72,185,925.65 |

#### d. *Other indications of value*

The court concludes that the offer made by Physicians, Hospitals and Healthcare Centers, Inc. ("PHHC") to purchase

Reese Hospital is not reliable indicator of value for Reese Hospital.

PHHC, through Dr. Roberto Diaz, a physician and owner and officer of PHHC, offered to purchase both Reese Hospital and

Case 09-10138-MFW   Doc 13460-3   Filed 05/02/14   Page 155 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

Grant Hospital for $95 million plus net working capital on or about February 18, 1998. [111] This figure is not a reliable indicator of value for Reese Hospital because the court cannot accurately derive a separate value for Reese Hospital from PHHC's combined offer to purchase both hospitals.

Moreover, PHHC, was never actually interested in purchasing Reese Hospital, and the offer lacks reliability as a value for Reese Hospital on this basis as well. Diaz emphasized in deposition testimony that PHHC only bid on Reese Hospital because it wanted to buy Grant Hospital, and the two hospitals were a package deal. (Diaz Dep. 38:1–5, Dec. 6, 2005 ("[W]hat I remember of this deal is my main interest was Grant Hospital. However, if I remember correctly, they would not sell Grant Hospital as an individual hospital. It was a package deal."); Diaz Dep. 38:12–14, Dec. 6, 2005 ("[G]iven the nature of how the bid process was, you couldn't really separate the two.").)

**\*65** An October 22, 1998 proposal from Zevco Enterprises, Inc. ("Zevco") for the sale and leaseback of all of Reese Corp.'s and Grant Corp.'s assets, purportedly for the purpose of providing a cash infusion to Reese Corp. and Grant Corp., is likewise an unreliable value indicator. (Pl.Ex.213.) Zevco proposed to purchase both hospitals' real property and improvements as well as equipment and personal property for $48 million, $9 million of which was attributable to Grant Hospital assets. Zevco's $39 million sale/leaseback proposal for Reese Hospital's assets does not imply a negative value for Reese Hospital because Zevco did not intend by its proposal to establish a value for Reese Hospital. The purpose of the proposal was to provide a cash infusion to Reese Corp. and does not purport to present a value for Reese Hospital. The court therefore concludes as a factual matter that Zevco's financing offer should not be relied upon in formulating a value for Reese Hospital.

### e. *Reconciliation*

"The process of reconciliation is the analysis of the alternative valuation indications in order to arrive at a final value estimate." Pratt et al., *supra,* at 439. The court has determined that the value of Reese Hospital was approximately $57,895,984 using the cost approach, *see* part III.B.1.b.v, *supra,* and approximately $72,186,000 (rounded to the nearest thousandth) using the income approach, *see* part III.B.1.c.vii, *supra.* Although there is an approximate gap of $14,431,000 between these two conclusions, the values are not unduly inconsistent with each other. Even

"[e]xperienced analysts expect to derive a range of value indications when alternative valuation approaches are used." Pratt et al., *supra,* at 441. "These alternative indications, then, imply the reasonable range of values for the subject business," *id.,* and "provide mutually supportive evidence as to the final value estimate," *id.*

"An intuitively appealing method of concluding the value estimate" is "(1) to use a subjective but informed judgment and decide on a percentage weight to assign to the indications of each meaningful valuation approach or method and (2) to base the final value estimate on a weighted average of the indications of the various methods." *Id.* at 445. "If the income available for distribution to the business owner is the primary value driver, then it may be appropriate that one or more methods within the income approach dominate the value conclusion." *Id.* at 443. In this case the court finds as a factual matter that it is appropriate to give greater weight to its income approach determination than to its cost approach determination precisely because a hypothetical purchaser would reasonably expect to earn income based on the hospital's operation rather than accumulate wealth through the acquisition of its assets. Kevin Moss summed this point up nicely in his trial testimony:

> The cost approach is something that, if you look at the valuation texts, often refers to it as a floor on the value. So if the cost approach value comes out lower than the income and market approach, what it implies is that the income and market approach are more appropriate indicators of value.

**\*66** So, for instance, a technology company, to use an extreme example, you could have a cost approach that indicated they just had a few hard assets and nothing more, but on a market and income approach, they could be worth millions of dollars. In that case, you would not look at the cost approach. You would look at your earnings driven approach as the income and market approaches.

> So, part of the reconciliation of approaches is to look at the income and market approach and see if they are in excess of the cost approach. If they are in excess of the cost approach, it just indicates that there is potentially some type of intangible asset in the business like work force, physician relationships, certificates of need, or it could also indicate that, you know, there is something wrong in the values in your cost approach. Maybe it didn't come up with a correct value on one of the hard asset categories.

(Trial Tr. 3588:8–3589:4, Feb. 20, 2007 (Moss, K.).)

Case 09-10138-MFW    Doc 13460-3    Filed 05/02/14    Page 156 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

Based on the trial testimony of Kevin Moss and the guidelines for reconciliation set forth above, the court finds as a factual matter that it is appropriate to explicitly weight its determinations of value for Reese Hospital heavily in favor of the income approach. The court therefore finds as a factual matter that the following calculation represents the fair market value of Reese Hospital as of the Transfer Date:

($57,985,984 x .25) + ($72,185,925.65 x .75) = $68,635,940.24

Thus, the court finds as a factual matter that the fair market value of Reese Hospital as of the Transfer Date is **$68,635,940.24.**

**2. *Good faith***
As explained above, the good faith component of reasonably equivalent value has a place in the court's consideration of the "totality of the circumstances" surrounding the purchase of Reese Hospital. This court has already determined that the APA was the result of arm's length negotiations between the parties. *HCA III,* slip op. 27–28 (Bankr.D.D.C. Jan. 3, 2007). The remaining question is whether Reese Corp. and the Defendants acted in good faith in entering into the APA.

Alberts contends that the Defendants acted in bad faith in connection with the sale of Reese Hospital while the Defendants maintain that there is no evidence of bad faith. The court concludes as a factual matter that the purchase of Reese Hospital was conducted in good faith, and that Alberts has failed to offer any evidence of bad faith.

Alberts argues that the Defendants intentionally failed to disclose to Reese Corp. the magnitude of Reese Hospital's financial losses, specifically by failing to provide financial information for Reese Hospital after August 1998 and by restricting DCHC's ability to conduct due diligence in late September 1998. According to Alberts, if DCHC could have had access to Reese Hospital's financial information for September and October 1998, DCHC would have known that the financial condition of the hospital had further declined and may have decided not to buy Reese Hospital.

**\*67** The court concludes that there is no evidence demonstrating that the Defendants concealed or otherwise failed to disclose financial and operating information for Reese Hospital in bad faith. DCHC executives testified that they were aware of the financial condition of Reese Hospital

and the fact that Reese Hospital was sustaining losses in 1998. DCHC bought Reese Hospital because it was an under-performing hospital. (Trial Tr. 193:11–25, Jan. 22, 2007 (Tuft, P.); Trial Tr. 72:4–6, Jan. 19, 2–7 (Tuft, P.)("The mission of DCHC was to acquire hospitals, primarily in urban areas, and primarily hospitals that were underperforming.").) DCHC executives had a business plan for turning around Reese Hospital and were confident that they understood what it would take to improve the hospital's financial performance.

That the financial performance of Reese Hospital may have further declined before the transaction closed is not unusual and did not surprise DCHC representatives. DCHC executives testified that uncertainty associated with a pending sale may have an adverse effect on many aspects of hospital operations, including the financial performance of a hospital. (Trial Tr. 201:15–19, Jan. 22, 2007 (Tuft, P.); Trial Tr. 1085:2–6 Jan. 25, 2007 (Talbot, D.); *see also* Trial Tr. 3433–3437, 3796:1–11, Feb. 20, 2–7 (Moss, K.).) Because there were closing delays, it is no surprise then that uncertainty about the future of Reese Hospital may have resulted in additional financial losses.

Although Reese Hospital's financial information for September and October may have revealed additional losses, there is no evidence that HCA concealed or refused to provide such information. To the contrary, DCHC executives Talbot and Mounce testified that HCA never refused their requests for information. Talbot, who coordinated DCHC's financial review of Reese Hospital, does not recall specifically asking HCA for Reese Hospital's financials for September of 1998. (Trial Tr. 1670:4–5, 24–25, Jan. 30, 2007 (Talbot, D.).) And DCHC likely would not have received October financials before closing due to an approximately fifteen-day period between the closing of the month and the availability of financials for the prior month. [112] Additionally, there is no evidence indicating that DCHC would have decided not to buy Reese Hospital had DCHC reviewed the September and October financials.

There is also no evidence indicating that DCHC or Reese Corp. were denied access to Reese Hospital's financial and operating information during due diligence or otherwise. HCA granted DCHC full access to information about Reese Hospital from execution of the letter of intent in February of 1998 through closing on November 12, 1998, consistent with the requirements in the APA. (*See* Pl.Ex. 2 (APA § 5.01).) [113] And Reese Corp. represented and warranted to GHI that it had full access to and had inspected and investigated to its

Case 09-10138-MFW   Doc 13460-3   Filed 05/02/14   Page 157 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

satisfaction the financial and operating information of Reese Hospital. (*See* Pl.Ex. 2 (APA § 4.08).) [114]

**\*68** The initial due diligence period commenced sometime in February of 1998 and was complete when the parties signed the APA in July of 1998. After securing the necessary regulatory approvals for the sale by the end of August, NCFE asked to refresh its due diligence regarding the accounts receivable and assets of the hospital. This due diligence occurred in September of 1998. DCHC also requested information from HCA beyond the initial due diligence period.

DCHC executives had full access to the hospital and its management, employees, doctors, and documents during this entire time period. Mounce and Talbot testified that they always received the information they requested of HCA, and that they were never denied information. (Trial Tr. 624:5–7, Jan. 24, 2007 (Mounce, E.) ("QUESTION: And ultimately you believe that you had obtained everything you had asked for? ANSWER: Correct, I do, sir."); Trial Tr. 1670:6–8, Jan. 30, 2007 (Talbot, D.)("THE COURT: You don't recall being refused anything either? THE WITNESS: No, I don't."); Trial Tr. 670: Jan. 24, 2007 (Mounce, E.) ("But if I ever needed something, I'm sure that I could have gotten it from Greg Gerken or I did, because I was never specifically told, 'You couldn't have ..., something")".) And the record does not show that HCA ever provided DCHC false information. (Trial Tr. 138:18–21, Jan. 22, 2007 (Tuft, P.) ("THE COURT: [ D] id you ever determine that any of the information that had been given to you by HCA was false information? THE WITNESS: I never did."); Trial Tr. 624:8–10, Jan. 24, 2007 (Mounce, E.) ("QUESTION: You don't believe you were ever provided any false information correct? ANSWER: No, Sir.").)

The record indicates that beginning in late September 1998, HCA did exercise a greater degree of control over *how* DCHC accessed information about Reese Hospital. On September 29, 1998, DCHC told HCA it would be unable to close on September 30, 1999 as required by an amendment to the APA. HCA was uncertain whether the transaction would ever close, and according to Gerken, that uncertainty combined with DCHC's unfettered access to Reese Hospital was interfering with management of the hospital. (Trial Tr. 2771:4–12, Feb. 12, 2007 (Gerken, G.).) So HCA asked DCHC to run due diligence requests through Gerken's office. Gerken also asked the then-CEO of Reese Hospital to stop providing information to DCHC employees and representatives absent Gerken's authorization. (Pl.Ex. 998 (E-mail from Gregg Gerken to Rich

West, Scott Winslow re: Sale of Hospitals to DCHC, Sept. 29, 1998).) This request was in place for only a short period of time until HCA and DCHC negotiated another extension of time for closing. HCA continued to grant DCHC requests for information during this time and up to closing. (Trial Tr. 2962:13–2963:15, Feb. 14, 2007 (Gerken, G.).)

In this instance, HCA justifiably wanted to exercise some control over how DCHC accessed information about Reese Hospital. Closing had already been delayed, and HCA did not have full confidence that the sale would go through. DCHC had previously enjoyed more than full access to information about Reese Hospital; it had enjoyed unfettered access. (Trial Tr. 670:19–20, Jan. 25, 2007 (Mounce, E.) ("We didn't have free access like we did, the willy-nilly thing that we talked about before.").) HCA was not restricting access to or preventing disclosure of critical financial information. HCA was simply trying to bring order to the manner in which DCHC requested information about Reese Hospital in an effort to minimize any negative consequences the ongoing due diligence and pending sale had on the management and operation of Reese Hospital. The court therefore concludes that the factual record does not support a finding of lack of good faith on the basis that HCA withheld or concealed financial information from DCHC or restricted DCHC's access to information.

**\*69** Alberts additionally argues that the Defendants acted in bad faith by insisting on an inflated amount of net working capital in order to receive a higher purchase price for Reese Hospital. The court declines to find any absence of good faith here because HCA and DCHC acted at all times in accordance with the APA's procedures for finalizing net working capital. GHI and Reese Corp. contractually agreed to postpone a final determination of net working capital until after closing, and GHI and Reese Corp. followed the post-closing procedures set forth in the APA. They submitted their dispute over the amount of net working capital to PWC for a final determination. PWC determined that Reese Corp. overpaid by $6.2 million. GHI refunded the excess amount to Reese Corp. as expressly required by the APA. The fact that HCA and DCHC may have disagreed over the amount of net working capital transferred or the methodology for calculating the accounts receivable component of net working capital does not equate to bad faith. Whatever concerns existed over the appropriateness of applying one calculation methodology or another are irrelevant, as the APA bound the parties to a course of action which involved review of the net working capital calculation by an independent third

Case 09-10138-MFW   Doc 13460-3   Filed 05/02/14   Page 158 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

party. And the Defendants could not have been motivated to artificially inflate the net working capital because the APA provided for the refund to Reese Corp. of any overpayment. The court therefore concludes as a factual matter that Alberts has failed to show that the net working capital was not calculated in good faith.

Alberts additionally argues that the Defendants took advantage of DCHC's relative inexperience in purchasing and running a hospital as large as Reese Hospital in bad faith. The court concludes as a factual matter that the record does not support a finding of bad faith on this basis. Although Reese Hospital may have been the largest hospital purchased by DCHC at that time in terms of size and revenues, DCHC executives were sophisticated and experienced professionals in the healthcare industry, some having worked in the field for decades. DCHC executives had successfully turned around distressed hospitals and were confident they could do the same with Reese Hospital. Throughout due diligence, Reese Corp. was represented by outside counsel at two major law firms, advised by independent consultants McGladrey & Pullen, and assisted by investment banking firms. Thus, whatever new challenges DCHC faced due to the size of Reese Hospital, DCHC executives were not naive and inexperienced in matters of finance and acquisitions or in the industry such that HCA could have taken advantage of them.

Finally, Alberts asserts that HCA entered into the transaction with DCHC in bad faith knowing that DCHC had difficulty securing financing for the purchase. The court again declines to find any lack of good faith. First, DCHC and Reese Corp. represented and warranted to GHI that it had the financial ability to consummate the transaction. (Pl.Ex. 2 (APA § 4.06).) [115] Although NCFE, which was providing most of the purchase financing to Reese Corp., was characterized by Tuft as "more expensive" than other potential lenders, it was nonetheless highly-rated by Duff & Phelps Credit Rating Co., a nationally recognized debt-rating agency. And NCFE conducted due diligence and committed to financing the purchase. [116] HCA reasonably believed that Reese Corp. would be able to close the deal based on financing Reese Corp. obtained from NCFE, at least as of July 1998 when the APA was signed. Gerken of HCA testified that HCA was generally aware that NCFE was financing Reese Corp.'s purchase of Reese Hospital. Gerken also testified that he believed NCFE was a "well regarded financing institution primarily providing financing in the health care sector" whose "securities were investment grade rated by certain rating

agencies including Duff & Phelps." (Trial Tr. 2779:12–16, Feb. 12, 2007 (Gerken, G.).)

**\*70** HCA was more than likely not aware that DCHC would have any challenges or issues financing the purchase of Reese Hospital until after the APA was signed in July 1998. HCA did know that Reese Corp.'s closing delays in September and October were connected to financing issues. Gerken testified that HCA was aware that Reese Corp. was unable to close at the end of September at least in part because NCFE was still raising funds to finance the purchase. (See Pl.Ex. 943 (Letter from Greg Gerken to Paul Tuft)(Sept. 30, 1998) ("Confirming our conversation yesterday afternoon, you have advised me that you are experiencing further additional delays with respect to your financing and will not be able to fund your acquisition of [Reese Hospital] today, September 30, 1998, as required under the [APA]."); Pl Ex. 1072.) Gerken also testified that he held a favorable view of NCFE as a financing institution at that time and that his view did not change despite the closing delays.

In response to Reese Corp.'s closing delays, HCA acted in good faith. HCA agreed to provide extensions to DCHC upon learning that DCHC would be unable to close at the end of August, at the end of September, and again at the end of October. The court has already concluded that $2 million of the value of the Reese Transfers was in exchange for Reese Corp.'s delay in closing on the purchase of the hospital. HCA also agreed to provide $17,500,000 worth of seller financing for the Reese Transfers, $14,000,000 of which is attributable to the purchase of Reese Hospital, upon learning from DCHC that the financing it had secured from NCFE was insufficient. (See Defs. Ex. CS (Promissory Note Secured by Mortgages (Grant and Michael Reese Properties) Nov. 12, 1998); Defs. Ex. DT at HCA/MR–20626 (Fifth Amendment to the Asset Purchase Agreement between Reese Corp. and GHI, Sept. 30, 1998)(amending section 2.01 to provide for $14,000,000 in seller financing).) But this does not constitute bad faith. Seller financing is not unusual, and HCA loaned to Reese Corp. on fair and reasonable terms. HCA's loan included a fixed 8.5% interest rate and was secured by mortgages on the property. (See Defs. Ex. DT at HCA/MR–20626 (Fifth Amendment to the Asset Purchase Agreement between Reese Corp. and GHI, Sept. 30, 1998).)

The totality of the evidence demonstrates that the Defendants acted in good faith. The court concludes that HCA afforded DCHC full access to financial and operating information and fulfilled all requests for such information up through

Case 09-10138-MFW   Doc 13460-3   Filed 05/02/14   Page 159 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

closing. The evidence does not indicate that HCA concealed information or provided false information about state of Reese Hospital's financial affairs. The court also finds that there is no evidence that the Defendants acted in bad faith by extending the closing date and by providing seller financing on reasonable terms to allow DCHC and Reese Corp. to secure sufficient financing to close the deal. Given the lack of evidence of bad faith, the court concludes that the sale was conducted in good faith.

## C. *Conclusions of Law*

**\*71** Based on the foregoing findings of fact, the court concludes as a matter of law that Reese Corp. received reasonably equivalent value for the Reese Transfer. All three of the factors used to make this determination—whether the transaction was made at arm's length, the fair market value of the property received as compared to the value of the property transferred, and the intentions of the parties in making the transfers—favor the Defendants. If anything, the court's findings of fact with respect to the fair market value

of Reese Hospital as of the Transfer Date suggest that Reese Corp. received *more* than reasonably equivalent value for the Reese Transfers, not less. The court's findings of facts are complex, but the legal conclusion to be drawn from those findings is not difficult. Alberts has not demonstrated by a preponderance of the evidence that Reese Corp. did not receive reasonably equivalent value in exchange for the Reese Transfers. His sole remaining count in this proceeding is therefore infirm, and judgment must be rendered in favor of the Defendants.

## IV. CONCLUSION

Based on the foregoing findings of fact and conclusions of law, the court will award final judgment with costs in favor of the Defendants.

Final judgment follows.

### Footnotes

1 The allegations underlying this proceeding are set forth in their final form in the Third Amended Complaint. (D.E. No. 259, filed November 1, 2006 (the "Complaint" or "Compl.").) The affirmative defenses and counterclaims raised by the Defendants are pled in their final form in Defendant Galen Hospital Illinois, Inc.'s Answer to Second Amended Complaint; Counterclaims for Damages and Set Off, (D.E. No. 61, filed August 5, 2005); Defendant HCA Inc.'s Answer to Second Amended Complaint; Counterclaims for Damages and Set Off, (D.E. No. 62, filed August 5, 2005); and Defendant Western Plains Capital, Inc.'s Answer to Third Amended Complaint. (D.E. No. 327, filed December 4, 2006. The affirmative defenses raised by Alberts in response to the Defendants' counterclaims are pled in their final form in the Plaintiff's Reply to Counterclaims of Galen Hospital Illinois, Inc., (D.E. No. 63, filed August 23, 2005); and Plaintiff's Reply to Counterclaims of HCA, Inc. (D.E. No. 64, filed August 23, 2005.)

   In addition to these foundational pleadings, the court reviewed the following documents in arriving at its findings of fact and conclusions of law: the Defendants' Revised Pre–Trial Statement, (D.E. No. 449, filed January 17, 2007); the Plaintiff's Amended Pretrial Statement, (D.E. No. 450, filed January 17, 2007); the Plaintiff's Proposed Findings of Fact, (D.E. No. 538, filed April 10, 2007 (the "Pl. Facts")); the Plaintiff's Amended Post–Trial Brief Addressing Legal Issues and Proposed Conclusions of Law, (D.E. No. 540, filed April 10, 2007 (the "Pl. Br.")); the Defendants' Post–Trial Brief, (D.E. No. 557, filed May 24, 2007 (the "Defs. Br.")); the Defendants' Proposed Findings of Fact, (D.E. No. 558, filed May 24, 2007 (the "Defs. Facts")); the Defendants' Rebuttal of Plaintiff's Proposed Findings of Fact, (D.E. No. 559, filed May 25, 2007 (the "Defs. Rebuttal")); the Plaintiff's Reply to Defendants' Post–Trial Brief, (D.E. No. 573, filed July 6, 2007 (the "Pl. Reply")); and the Plaintiff's Rebuttal to Defendants' Proposed Findings of Fact, (D.E. No. 575, filed July 9, 2007 (the "Pl. Rebuttal")).

2 Unless otherwise noted, the facts set forth above are either deemed to be admitted or were found to be subject to summary judgment pursuant to various memorandum decisions entered by the court in December of 2006 and January of 2007. *See generally Alberts v. HCA Inc. (In re Greater Southeast Cmty. Hosp. Corp. I), 365 B.R. 293 (Bankr.D.D.C.2006)* ( "*HCA I* "); *Alberts v. HCA Inc. (In re Greater Southeast Cmty. Hosp. Corp. I),* Case No. 02–02250, Adv. Pro. No. 04–10366, 2007 WL 80812 (Bankr.D.D.C. Jan.3, 2007)* ("*HCA II* "); *Alberts v. HCA Inc. (In re Greater Southeast Cmty. Hosp. Corp. I),* Case No. 02–02250, Adv. Pro. No. 04–10366 (Bankr.D.D.C. Jan. 3, 2007) ("*HCA III* "); *Alberts v. HCA Inc. (In re Greater Southeast Cmty. Hosp. Corp. I), 365 B.R. 322 (Bankr.D.D.C.2007)* ("*HCA IV* ").

3 Alberts also introduced excerpts from the deposition testimony of the following witnesses: Carl George (Senior Vice President of Development, HCA); David Hill (Legal Counsel for Development, HCA); Tom Ramsey (Senior Real Estate Consultant, HCA); Benjamin Burns (Litigation Counsel, HCA); Jim Childress (Assistant Vice President of Tax, HCA); Dr. Roberto Diaz (President of Physicians Hospitals and Health Care Centers, Inc.); Laurie Taylor (Principal, Ernst & Young); David Felsenthal (formerly with

Case 09-10138-MFW   Doc 13460-3   Filed 05/02/14   Page 160 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

Valuation Counselors Group); Thomas Barry (Cain Bros.); Dr. Enrique Beckmann (CEO of Michael Reese Hospital); and Ken Bauer (former CEO of Michael Reese Hospital).

**4**   The Defendants also introduced excerpts from the deposition testimony of the following witnesses: Carl George (Senior Vice President of Development, HCA); David Hill (Legal Counsel for Development, HCA); Tom Ramsey (Senior Real Estate Consultant, HCA); Benjamin Burns (Litigation Counsel, HCA); Jim Childress (Assistant Vice President of Tax, HCA); Dr. Roberto Diaz (President of Physicians Hospitals and Health Care Centers, Inc.); Laurie Taylor (Principal, Ernst & Young); Lance Poulsen (President and founder of NCFE); Cindy Sehr (Outside Counsel for DCHC); David Felsenthal (formerly with Valuation Counselors Group); Thomas Barry (Cain Bros.); Dr. Enrique Beckmann (CEO of Michael Reese Hospital); and Ken Bauer (former CEO of Michael Reese Hospital).

**5**   Arguably, the parties retained their right to Article III adjudication of the "private right" causes of action at issue here even though Congress has designated fraudulent transfer actions as "core" proceedings, *see Granfinanciera, S.A. v. Nordberg,* 492 U.S. 31, 36, 40–64 (1989) (Seventh Amendment right to jury trial applies to fraudulent conveyance actions brought by chapter 11 trustee "notwithstanding Congress' designation of fraudulent conveyance actions as 'core proceedings' "); *In re Tex. Gen. Petroleum Corp.,* 52 F.3d 1330, 1336 (5th Cir.1995) ( "Whether an Article III court is necessary involves the same inquiry as whether a litigant has a Seventh Amendment right to a jury trial."), although the matter is complicated by the Defendants' decision to file counterclaims in this adversary proceeding, *see Langenkamp v. Culp,* 498 U.S. 42, 44, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990) (defendant submits itself to equity jurisdiction of bankruptcy court by filing proof of claim, thereby depriving itself of Seventh Amendment right to jury trial); *Peachtree Lane Associates, Ltd. v. Granader,* 175 B.R. 232, 236–38 (N.D.Ill.1994) ("Several well reasoned, post-*Langenkamp* opinions have held that the filing of a counterclaim in an adversary proceeding instituted by a chapter 11 trustee or debtor-in-possession qualifies as filing a 'claim[,]' thereby triggering the 'public rights' process of allowance and disallowance of claims and the restructuring of the debtor-creditor relationship."). *But see Beard v. Braunstein,* 914 F.2d 434, 441–42 (3d Cir.1990) (defendant did not waive right to jury trial by filing mandatory counterclaim); *NDEP Corp. v. Handl–It, Inc. (In re NDEP Corp.),* 203 B.R. 905, 909–13 (D.Del.1996) ("this [c]ourt finds that a party does not waive its right to a jury trial or its right to object to jurisdiction and venue when it brings counterclaims that ... are permissive"). To resolve this potential problem, the court entered an order on August 9, 2007, directing the parties to file a joint statement indicating whether they unanimously consented to the entry of a final judgment by this court and, if no such consent could be reached, to file supplemental post-trial briefs addressing the issue. (D.E. No. 578.) The parties entered a joint statement of consent one week later. (D.E. No. 580, filed August 16, 2007.)

**6**   Alberts argues that the court's prior determination that he is a representative of the estate constitutes the law of the case with respect to standing. (Pl. Reply 8.) He is mistaken. There are really "two strands" of federal standing jurisprudence: "Article III standing, which enforces the Constitution's case-or-controversy requirement, ... and prudential standing, which embodies 'judicially self-imposed limits on the exercise of federal jurisdiction.' " *Elk Grove Unified Sch. Dist. v. Newdow,* 542 U.S. 1, 11, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004) ("*Elk Grove* ") (quoting *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). "[T]he prudential principles of standing under Article III and the trustee's powers under the [B]ankruptcy [C]ode are coextensive...." *In re Cannon,* 277 F.3d 838, 853 (6th Cir.2002). Thus, "if a trustee [or other representative of the estate] has no power to assert a claim because it is not one belonging to the bankrupt estate [or a claim conferred upon the representative of the estate by another provision of the Bankruptcy Code], then he also fails to meet the prudential limitation that the legal rights asserted must be his own." *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 118 (2d Cir.1991).

The Defendants' prior arguments about standing revolved around whether Alberts could invoke § 544(b) as a legal and equitable matter, *i.e.,* whether Alberts had "prudential" standing in this case. That specific issue was resolved in Alberts's favor by the court's memorandum decision entered on December 6, 2006. *HCA I,* 365 B.R. at 300–01. The instant dispute concerns "Article III" standing, a jurisdictional question which the court must consider even at this extremely late stage in the case. *Steffan v. Perry,* 41 F.3d 677, 697 n. 20 (D.C.Cir.1994).

**7**   *Bear Stearns* concerned an avoidance action brought pursuant to § 548 of the Bankruptcy Code, but the same basic principle (*i.e.,* that the transferee bears the burden of showing that some other event caused the injury of a depleted *res* and an inability to pay creditors in full once proximate cause is established by the estate representative) applies with equal force under Illinois case law. *See Wehmeier v. UNR Indus., Inc.,* 213 Ill.App.3d 6, 157 Ill.Dec. 251, 572 N.E.2d 320, 337–38 (Ill.App.Ct.1991) (holding that the assertion of an intervening event is an affirmative defense); *Mich. Ave. Nat'l Bank v. State Farm Ins. Companies,* 83 Ill.App.3d 507, 39 Ill.Dec. 42, 404 N.E.2d 426, 431 (Ill.App.Ct.1980) ("the burden [is] on the defendants to raise and prove [an] affirmative defense").

**8**   One could argue that Reese Corp. would have been rendered insolvent just by borrowing money from NCFE and HCA because it was so thinly capitalized that the fees and interest arising from the debt owed to these lenders would have exceeded Reese Corp.'s assets (less the amounts borrowed from the lenders, which is offset against the assets, as the initial debt owed, to compute net assets before such fees and interest). Arguably, the incurrence of these obligations by Reese Corp. constituted fraudulent transfers in their own right. But any nominal insolvency that might have resulted from the fees and interest charged by Reese Corp.'s lenders would

Case 09-10138-MFW   Doc 13460-3   Filed 05/02/14   Page 161 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

not have displaced any insolvency arising upon Reese Corp.'s acquisition of Reese Hospital. Subsequent debts arising as a result of the purchase of Reese Hospital were "reasonably foreseeable" consequences of the purchase and therefore not intervening events absolving the participants in any underlying fraudulent transfer of wrongdoing. *Parsons v. Carbondale Twp.,* 217 Ill.App.3d 637, 160 Ill.Dec. 454, 577 N.E.2d 779, 786 (Ill.App.Ct.1991); *see also Coan v. Andersen (In re Andersen),* 166 B.R. 516, 525 n. 10 (Bankr.D.Conn.1994) (recognizing "the right of a future creditor to set aside a constructively fraudulent conveyance if the debtor's then-existing debts were not paid before the future creditor's obligation was created, or if then-existing debts were paid off by the incurring of additional debt rather than from the debtor's earnings").

9   The counts in the Complaint (the third amended complaint) mirror the counts listed in the second amended complaint.

10   This analysis furnishes an additional basis for dismissing Count VI (dismissed on other grounds already as mentioned above).

11   Alberts suggests that the framers of the Uniform Fraudulent Transfer Act intended to do away with any inquiry into the good faith of the transferee when they drafted their model statute, (Pl.Br.29–30), yet the drafters intentionally lifted the phrase "reasonably equivalent value" from the Bankruptcy Code. Uniform Fraudulent Transfer Act, prefatory note (1984). "If anything is clear from the various uses of the word 'value' in the Code, it is that Congress did not mean fair market value when it used the term reasonably equivalent value." *Bundles v. Baker,* 856 F.2d 815, 824 (7th Cir.1988), *abrogated in part on other grounds by BFP v. Resolution Trust Corp.,* 511 U.S. 531, 540, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994).

12   The court's position with respect to this issue is well within the norm. *See, e.g., Beneficiaries under the Third Amendment to Fruehauf Trailer Corp. Retirement Plan No. 003 (In re Fruehauf Trailer Corp.),* 444 F.3d 203, 213 (3d Cir.2006) (holding that determination of "reasonably equivalent value" requires court to look to "the 'totality of the circumstances,' including ... the transferee's good faith"); *Creditor's Comm. of Jumer's, Castle Lodge, Inc. (In re Jumer's Castle Lodge, Inc.),* 338 B.R. 344, 354 (C.D.Ill.2006) (same); *Grochocinski v. Knippen (In re Knippen),* 355 B.R. 710, 726 (Bankr.N.D.Ill.2006) (same); *Pereira v. Wells Fargo Bank, N.A. (In re Gonzalez),* 342 B.R. 165, 173 (Bankr.S.D.N.Y.2006) (same); *Kapila v. WLN Family Ltd. P'ship (In re Leneve),* 341 B.R. 53, 56–57 (Bankr.S.D.Fla.2006) (same); *Kaler v. Red River Commodities, Inc. (In re Sun Valley Products, Inc.),* 328 B.R. 147, 156–57 (Bankr.D.N.D.2005) (same); *Jones v. Williams (In re McDonald),* 265 B.R. 632, 636 (Bankr.M.D.Fla.2001) (same); *Salven v. Munday (In re Kemmer),* 265 B.R. 224, 232 (Bankr.E.D.Cal.2001) (same); *Cohen v. Un–Ltd. Holdings, Inc. (In re Nelco, Ltd.),* 264 B.R. 790, 813–14 (Bankr.E.D.Va.1999) (same); *Samson v. U.S. West Communications, Inc. (In re Grigonis),* 208 B.R. 950, 956 (Bankr.D.Mont.1997) (same).

13   In an order entered on April 30, 2007, the court took judicial notice of, *inter alia,* the *sixteenth* edition to PPC's Guide to Business Valuations. (D.E. No. 546.) Unfortunately, the court was unable to obtain a copy of that more recent edition, and must use the *fifteenth* edition instead. To the extent that the sixteenth edition differs materially from the fifteenth edition with respect to any of the valuation principles discussed herein, the court will reconsider its findings of fact and conclusions of law at the appropriate time.

14   Irving Levin and Associates is a firm that specializes in gathering and publishing information about hospital-related transactions. Pratt Stats., BIZ Comps., and the IBA databases gather information related to sales of closely-held businesses.

15   *See* Defs. Ex. JV (Expert Report of Kevin B. Moss, CFA at 10, Aug. 16, 2006)(9.6% is the median EBITDA of Moss's pool of comparable transactions).

16   *See* Defs. Ex. JV (Expert Report of Kevin B. Moss, CFA at 14, Aug. 16, 2006)("I have included a summary of price to revenue multiples from transactions where the purchased hospitals have EBITDA margins of less than 2.0 percent of net revenue. Michael Reese had negative EBITDA margins in 1998 and slightly negative EBITDA margins in 1997. I have included transactions where the target had slightly positive EBITDA margins as comparable indications of hospitals with poor financial performance.").

17   Moss's expert report and testimony indicate that he used a .4 to .6 multiplier range based on his combined analysis of the guideline public companies approach (discussed later) and the guideline transactions approach, and that the appropriate EBITDA multiplier under the guideline transactions method is .45 to .55.

18   Moss testified that the guideline public company valuation method provides the upper boundary for pricing of Reese Hospital under the market approach.

19   Moss calculated that the market prices for these companies was on average 1.2 times revenue. He calculated this multiplier by (1) calculating the market value of invested capital ("MVIC") for each company, (2) dividing the MVIC for each company by its revenue, and (3)calculating the average multiplier after excluding Health Management Associates (4.99 MVIC/revenue) and Province Healthcare (2.68 MVIC/revenue) as too high to include in the calculation. To calculate the MVIC of these companies, Moss first calculated the market value of their equity by multiplying stock price by the number of shares outstanding. He then added their debt to the market value of equity to calculate MVIC. MVIC divided by revenue yields the multiplier for each company. (Trial Tr. 3541:9–14 (Moss, K.).)

20   Pl. Br. at ¶ 75, *citing Heilig–Meyers Co. v. Wachovia Bank, N.A. (In re Heilig–Myers Co.),* 319 B.R. 447, 457–58 (Bankr.E.D.Va.2004); *Gillman v. Scientific Research Prods. Inc. of Delaware (In re Mama D'Angelo, Inc.),* 55 F.3d 552, 555–56 (10th Cir.1995) (noting that a company is on deathbed if only "nominally extant"); *Fryman v. Century Factors, Factor For New Wave*

Case 09-10138-MFW   Doc 13460-3   Filed 05/02/14   Page 162 of 180

*In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)*

*(In re Art Shirt Ltd., Inc.),* 93 B.R. 333, 341 (E.D.Pa.1988) (determining that a company is on deathbed if it is "wholly inoperative, defunct or dead on its feet"); *cf. In re Taxman Clothing Co., Inc.,* 905 F.2d 166, 170 (7th Cir.1990) (holding that the company was not on its deathbed because "the assets that it could realize on in the ordinary course of its business exceeded the expenses of realizing on them, plus its (other) liabilities").

21 The court reviewed other appraisals of the property in the record, specifically those prepared by First Real Estate Services, Ltd., Wellspring Valuation, Ltd., Prime Appraisal, LLC, and a separate appraisal prepared by Real Estate Counselors, Inc. on July 18, 2003, but concludes that these reports were either too generalized to be useful or too remote in time to be relied upon in formulating values of the real estate at Reese Hospital.

22 Wilson and Kimmel disagree over the exact square footage of the Reese Hospital site. Wilson relied on a Plat of Survey prepared by the National Survey Service, Inc. on April 17, 1998, which describes the size of the site as 1,625,293 square feet. Kimmel relied on assessment records provided by the Cook County Assessor Office which describe the size of the site at 1,659,142 square feet. The court credits the Plat of Survey prepared by the National Survey Service and concludes that Reese Hospital is 1,625,293 square feet or about 37.3116 acres.

23 The existing zoning on November 12, 1998 contained the following restrictions: (1)a minimum green space requirement of 30%; (2) a maximum land coverage restriction of 31% on average; and (3) a 1.5 maximum floor-to-area ("FAR") ratio restriction for the property. The 1.5 FAR restriction means that the total square footage of any buildings on the property can constitute only 1.5 times the square footage of the entire parcel. (Pl.Ex. 233 at TRUST/HCA 21137.)

24 Kimmel testified that re-zoning of the site for residential purposes was not necessary because the existing zoning classification permitted limited residential development. (Trial Tr. 3256:13–18 (Kimmel, M.).) But Kimmel did not verify whether the residential development permitted by the existing zoning classification was limited to residences for nurses, medical residents and other medical staff at Reese Hospital. (Trial Tr. 3671:17–3672:1, Feb. 21, 2007 (Kimmel, M.))("THE COURT: But doesn't it connote that the property, if used for residential, will be used for an institutional residential purpose? THE WITNESS: I guess one could interpret it that way. THE COURT: And you didn't get an opinion from a lawyer as to what this zoning would be interpreted as meaning, is that correct? THE WITNESS: I did not get an opinion from an attorney.").)

25 Wilson also conceded that a zoning change for the Reese Hospital site as of the Transfer Date was *possible,* but that does not necessarily equate to *reasonably probable.* (Trial Tr. 1357:14–24, Jan. 29, 2007(Wilson, R.).)

26 *See* Appraisal Inst., *supra,* at 334 ("Regardless of how physically similar a potential comparable sale is to the subject site, if the comparable site does not have the same highest and best use as though vacant as the subject, the transaction does not qualify as a comparable sale and should be dismissed from further consideration in the analysis of the subject property.").

27 Both experts assumed that the property would be used indefinitely for institutional purposes, and made no prediction as to when the improvements would eventually be demolished. They thus made no adjustment for the costs of demolition in valuing the property *as improved.* Contrary to Kimmel's testimony, the court concludes that in appraising real estate, such costs are a relevant factor if there is a likelihood of eventual demolition. All other things being equal, a purchaser would likely be willing to pay slightly more for Hospital X if it were exactly comparable to Reese Hospital except that future demolition costs of Hospital X's improvements would be lower and would not come close to exceeding the value of the land once rendered vacant. But that does not materially affect the valuation analysis of the Reese Hospital property, *as improved,* because the existing improvements (whether at Reese Hospital or an alternative site) would likely be used indefinitely. The time value of money renders the costs of demolition in the distant future relatively insignificant compared to the costs that demolition as of the date of purchase would entail, and the uncertainty on this record of when there would be reason to demolish the improvements makes the issue too speculative to make any precise adjustment to value based on this consideration. If the property continued to be used for institutional purposes, it is not clear that all buildings would have to be demolished. In any event, such an adjustment to value would not affect the court's conclusion that it should generally reject the cost approach valuation of Reese Hospital in favor of the higher income approach valuation.

28 Wilson's report indicates that the market price of the land as vacant for institutional use should be **$5.75** per square foot, resulting in a rounded total value of $9,350,000. (Pl.Ex. 210 (Appraisal of Michael Reese Hospital and Medical Center as of November 12, 1998 at 73(Jul. 21, 2006)).) But at trial, Wilson testified that after correcting a mathematical error made while adjusting one of the comparable land sales, the market price of the land as vacant for institutional use should be **$5.85** per square foot, resulting in a rounded total value of $9,500,000. (Trial Tr. 1300:1–12, Jan. 29, 2007 (Wilson, R.); Pl.Ex. 1140.)

29 In searching for comparable land sales, Wilson found no sales with institutional zoning, and resorted to sales of property zoned for industrial and commercial use (with adjustments as warranted). That approach is acceptable under principles of real estate appraisal. Appraisal Inst., *supra,* at 437.

30 To quote Kimmel, "[ t] he Cost Approach is based on the principle of substitution, which states that no rational buyer would pay more for a property than the amount for obtaining a comparable site and constructing improvements of equal desirability and utility, assuming no undue delay." Defs. Ex. JZ at 28 (Expert Report of Matthew G. Kimmel). Such a purchaser would not pay

Case 09-10138-MFW    Doc 13460-3    Filed 05/02/14    Page 163 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

residential-purpose-zoned land prices for land to construct a hospital when cheaper institutional-purpose-zoned land is available. That a purchaser of Reese Hospital might realize that Reese Hospital's land could be converted to residential use once the improvements were demolished would not result in a higher price: as already discussed, it would cost more to demolish the improvements than the land would be worth when vacant and zoned residential.

31    The court's replacement cost calculations do not include an additional 5% to account for "soft costs," contrary to Kimmel's testimony, because the Marshall Valuation Service already accounts for most "soft costs" and the remaining costs identified by Kimmel under cross-examination are of a de minimis character. (Trial Tr. 3607:11–3608:16, Feb. 21, 2007 (Kimmel, M.).)

32    Felsenthal calculated the overall depreciation rate at Michael Reese to be 87% of the value of the improvements. Wilson and Kimmel calculated the overall depreciation rate to be 92%, and the other three appraisal reports calculated depreciation rates ranging from 90–95%, with a mean of 91.67 percent. These figures strongly suggest that Felsenthal's depreciation rate was unduly low.

33    The court gives that appraisal no weight. DCHC sold equipment to NCFE under a sale/leaseback agreement for $10.8 million as part of the financing arrangement for Reese Hospital. (Pl.Ex. 12 at EY 793 (DCHC–Grant and Reese Sale Leaseback Memo)(Dec. 31, 1998).) The proceeds from the sale financed the acquisition of Reese and Grant Hospitals. The memo analyzes the proper means for accounting for the sale/leaseback transaction and indicates a fair market value of the equipment of $10.8 million. Nothing in the record suggests how Ernst & Young arrived at that value, and thus that valuation is not worthy of consideration.

34    The closing statement for the purchase of Reese Hospital reflects $20,678,221 in estimated Net Working Capital.

35    Net accounts receivable were the most significant component of the net working capital calculation for the purchase of Reese Hospital, as they were the largest of Reese Hospital's current assets at the time. (Trial Tr. 880:24–881:11, Jan. 25, 2007 (Talbot, D.).) The $14,400,000 of actual working capital may not have been collected immediately, but the record does not permit a finding regarding the amount of delay. Even if it did, the lower value arising from a presumably relatively short collection delay (that is, the lesser value as of the date of closing of dollars collected in the future versus dollars acquired at closing) would not materially affect the outcome. Alberts bore the burden of proof in this regard, and failed to adduce evidence to show the appropriate reduction.

36    On November 24, 1999, within eight days of the final determination by PWC, GHI paid amounts due to Reese Corp. via wire transfer after offsetting part of the amount due for payment owed by Reese Corp. to GHI for ongoing information technology services that GHI provided to Reese Hospital in the year after the transfer. The value of GHI's refund obligation ought to be lowered slightly, from the precise amount of $6,249,437.00, to account for the time value of money based on the foreseeable delay in the PWC reconciliation process and the receipt of the refund, but the adjustment would not materially affect the valuation analysis. Utilizing a generous 6% discount rate, for example, and applying that to an estimated one-year period for PWC to complete the reconciliation process and the refund to be received, would result in a reduction of the value of the refund obligation by less than $400,000, a figure that would not materially alter the overall value of what Reese Corp. acquired for the Reese Transfers. In any event, Alberts bore the burden of proof, but did not introduce evidence as to the appropriate amount of the reduction of value.

37    (Pl.Ex. 1090 at Trust/HCA–192–062 to TRUST/HCA–192–067(Amendment to Agreement between Humana and GHI)("The effective date of this Amendment shall be January 1, 1996 and it shall remain in effect for two years, subject to the termination provisions of the Agreement); *see also* Defs. Ex. BL at HCA/MR 10042 (Letter to Ms. Sandra McRee, Vice President of Operations, HCA and Mr. Ronald Dedic, Chief Financial Officer, Reese Hospital)(Sept. 20, 1996)(noting that the Humana Contract runs through the end of 1997).)

38    (Trial Tr. 602:12–24, Jan. 23, 2007 (Mounce, E.); Trial Tr. Feb. 12, 2007 (Gerken, G.); Defs. Ex. UH at TRUST/HCA–005502 and TRUST/HCA–005509)(Memo from Erich Mounce to Gregg Gerken re: Reese due diligence follow-up))(Apr. 2, 1998)(noting that the current Humana contract provided by HCA to DCHA for due diligence purposes shows that it expired as of January 27, 1998); Defs. Ex. UG at TRUST/HCA–005493 to TRUST/HCA–005494 (Letter from Eric Mounce to Gregg Gerken re: outstanding due diligence issues)(Apr. 14, 1998)("Still awaiting ... receipt of copy of any Humana contract that has not expired."); Defs. Ex. UF at TRUST/HCA005486–TRUST/HCA–005487 (Memo from Erich Mounce to Gregg Gerken re: Reese due diligence follow-up)(Apr. 21, 1998)(noting second request for an unexpired Humana contract).)

39    Further, DCHC did not include the Humana Contract on its final listing of contracts to review prior to assumption by Reese Corp. (Defs. Ex. VP (Memo from Erich Mounce to Gregg Gerken re: final listing of contracts)(Jun. 25, 1998)(final listing of contracts that DCHC had to review prior to assumption did not include the Humana Contract).)

40    There are actually two sets of Reese October Projections: one that assumes the sale of Grant Hospital and Reese Hospital's home health agency by December 31, 1998, and one that does not. (*Compare* Pl.Ex. 144A at TRUST EXPERT 010791 *with id.* at TRUST EXPERT 010797.) Given that even the Defendants' expert witness was unwilling to adopt the former projections, (Trial Tr. 3493:3–21, Feb. 20, 2007 (Moss, K.)), the court finds as a factual matter that it would be unreasonable for a hypothetical purchaser to use these projections in placing a value on Reese Hospital. The court's references to the Reese October Projections are therefore meant to refer only to those projections assuming no sale of Grant or the hospital's home health agency by December 31, 1998.

Case 09-10138-MFW   Doc 13460-3   Filed 05/02/14   Page 164 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

41    Talbot later criticized the M & P Projections for failing to "break ... out" the various sources of revenue identified in the Reese September Projections. (Trial Tr. 1590:24–1591:2, Jan. 30, 2007 (Talbot, D.).)

42    The cost of the new ER was estimated between $2.5 million, (Pl. Ex. 115), and $5.5 million. (Trial Tr. 569:8–12, Jan. 23, 2007 (Mounce, E.).)

43    There is some indication in the record that ER volume could be increased in part simply by decreasing patient wait times. (Bauer Dep. 49:2–50:4, June 14, 2006; Pl. Exs. 236 at TRUST–HCA–027738, 1015 at TRUST/HCA–013434.) But the primary cause of the ER's perceived inefficiency was its distant location, and the prerequisite for any meaningful growth in volume was its relocation. (Bauer Dep. 53:9–17, June 14, 2006; Trial Tr. 980:4–18, Jan. 25, 2007, 1714:25–1715:8 (Talbot, D.) (basis for projected 25% increase in ER volume "was that through the relocation of the emergency room, that it would be a place that would, you know, [become] medically more appealing to the consumer to come to and also for the ambulance drivers"); Pl. Exs. 236 at TRUST–HCA–027745, TRUST–HCA–027749, 1015 at TRUST/HCA–013434.)

44    Former Reese Corp. president Bryan Breckenridge also testified before the Illinois Health Facilities Planning Board (the "Illinois Health Board") that Reese Corp. would increase the volume of its OB/GYN program in part because of the "present recruiting activities of two new OB[/]GYNs." (Pl.Ex. 1015 at TRUST–HCA–013437.) Breckenridge further testified that pediatric volume would increase in part because Reese Corp. had initiated "discussions with a large tertiary provider or two in [the] marketplace about enhancing the pediatric services at Michael Reese," (Pl.Ex. 1015 at TRUST–HCA–013437–TRUST/HCA–013438), and that providing "clinics into the community to reach out to the young families" there "would also be a factor" in the company's assumption that pediatric volume would increase. (Pl.Ex. 1015 at TRUST/HCA–013438.) Donna Talbot made clear at trial, however, that growth in both the OB/GYN and pediatric programs would be driven primarily if not exclusively by "a marketing program that would try to attract pregnant women into the facility." (Trial Tr. 982:18–983:2, Jan. 25, 2007 (Talbot, D.); *see also* Trial Tr. 1716:10–13, Jan. 30, 2007 (Talbot, D.) ("The OB/GY[N], pediatrics was related to the increased marketing dollars focused on bringing the mothers into Michael Reese, the expectant mothers.")

45    The Defendants baldly assert that "the Reese Projections do not specifically tie immediate cardiac cath volume increases to the capital expenditure in 1998," (Defs. Rebuttal ¶ 174G), but the Strategic Assumptions and testimony by Donna Talbot and Dr. Enrique Beckmann suggest otherwise. (Trial Tr. 984:9–11, Jan. 25, 2007 (Talbot, D.) (assumption that cardiac catheterization volume would double was based on feeling that "if we purchased a new piece of cardiac cath equipment, [ ] the physicians would be more attracted to Michael Reese because of the new equipment"); Beckmann Dep. 72:13–1, Apr. 12, 2006 (goal of increased cardiac catheterization volume in 1998 was not met "[b]ecause that required a capital outlay that was never implemented"); Pl.Ex. 300 ("$1,200,000 will be spent at Reese on Cardiac Cath equipment, Reese Cardiac Catheterization volume will double").)

46    Other assumptions of this nature *not* included in the Reese Projections were that (1) a new linear accelerator would be built in 1999, increasing revenue by 10 percent, (Trial Tr. 1716:4–5, Jan. 30, 2007 (Talbot, D.); Pl.Ex. 115), (2) Reese Hospital would open a twenty-five-bed skilled nursing facility ("SNF") in the second quarter of 1999, (Trial Tr. 1081:16–18, Jan. 25, 2007 (Talbot, D.); Pl.Ex. 115), and (3) Reese Corp. would develop assisted and senior living on the hospital's campus, (Trial Tr. 1081:3–9, Jan. 25, 2007 (Talbot, D.); Pl.Ex. 115). The court concludes as a factual matter that it would be unreasonable to project any future returns from these expenditures based on the Reese Management Team's calculation that the projects were too costly and time-consuming to implement right away. (Trial Tr. 1676:14–1677:4, Jan. 30, 2007 (Talbot, D.).)

47    Another assumption of this nature *not* included in the Reese Projections was that Reese Corp. would "[r]ecruit two neurosurgeons from the University of Illinois," which would "double [the] current volume" in neurosurgery. (Pl.Ex.115.) The court concludes as a factual matter that it would be unreasonable to project any future returns from the recruitment of these neurosurgeons because such a projection was evidently too speculative for the Reese Management Team to include such returns in the Reese Projections.

48    Plaintiff's Exhibit 115, prepared November 14, 1998, lists the percentage of 2006 revenues to be achieved for 2000 through 2002 as 1.05%, 1.12%, and 1.19%. Obviously what was meant was that revenues would increase by factors of 1.05, 1.12, and 1.19.

49    There is a potential discrepancy between the Strategic Assumptions and the Reese Projections with respect to this assumption. The Strategic Assumptions list the case mix index for Reese Hospital as of April of 1998 as 1.29, whereas the Reese Projections list the case mix index for Reese Hospital as 1.36 for 1998. (Pl. Exs. 115, 300 at TRUST/HCA–007589.) The court finds as a factual matter that the case mix index listed in the Reese Projections is the better indicator of the actual case mix index at Reese Hospital as of the Transfer Date because the projections appear to incorporate financial information received by Reese Corp. after April of 1998. (Trial Tr. 1580:15–17, Jan. 30, 2007 (Talbot, D.).)

50    Other assumptions of this nature *not* included in the Reese Projections were that (1) Reese Corp. would successfully convert its contractual arrangement with Humana (based on the fallacious assumption that such a contract was in place and assigned to Reese Corp. into a "global risk contract," (Trial 585:5–21, Jan. 23, 2007 (Mounce, E.); Pl.Ex. 115), (2) Reese Hospital would decrease its ancillary utilization of Humana patients, (Trial Tr. 649:22–650:20, Jan. 23, 2007 (Mounce, E.); Pl.Ex. 115), and that (3) the hospital would "[t]rim back teaching programs based on analysis of high cost programs," (Pl.Ex. 115).

Case 09-10138-MFW   Doc 13460-3   Filed 05/02/14   Page 165 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

51   The Reese September Projections posit a hypothetical 1998 in which Reese Corp.'s turnaround plan was in effect as of January 1, 1998. (Trial Tr.2065:10–2066:9, Feb. 6, 2007 (Demchick, N.).) Presumably, this is why Kevin Moss and James Yerges relied on the Reese October Projections even though the Reese September Projections were much more detailed.

52   In point of fact, the projections assume operational growth at Reese Hospital as of November *1*, 1998; *i.e.*, eleven days before Reese Corp. assumed control of hospital. Although it would have made sense for the Reese Management Team to project earnings for the entire month of November at the time that the Reese Projections were made, the projections should have at least been modified by Kevin Moss and James Yerges to reflect the actual Transfer Date.

53   Alberts also disputes the reasonableness of the Reese Management Team's assumption that it could renegotiate its managed care contract with Humana, (Pl. Facts ¶¶ 182–86), but this assumption was not (with one minor exception discussed below) factored into the Reese Projections, (Trial Tr. 1663:15–1664:7, 1703:15–1704:2, 1706:2–15, 1741:15–18, Jan. 30, 2007 (Talbot, D.); Pl.Ex. 300), which renders Alberts's objection moot. The Court discusses the contract between HCA and Humana at greater length in its findings of fact with respect to the "cost approach" to valuation. *See* part III.B.1.b.iv, *supra*.

54   The Defendants also assert that "there is not, in any event, a 25% increase in emergency room revenue calculated in the projections for 1998," (Pl. Rebuttal ¶ 174B), that "there is no 25% increase in ambulatory surgery revenue calculated in the projections for 1998," (*Id.* ¶ 174C), and that "there is no 15% increase in rehabilitation exempt unit revenue calculated in the projections for 1998," (*Id.* ¶ 174D), but all of these assumptions concerned growth in *volume*, not growth in *revenue*, (Pl.Ex.300).

55   Moss clarified the scope of his expertise during his direct examination as follows:

> So ... I've done a lot of work with respect to joint ventures, whether it's surgery centers and for those types of things. But really, pairing up with the consulting people[,] and it's going in and looking at someone's business operations and do you improve them, and what should they change and what's the economic benefit. *And my side of that is the financial side. It's looking at the cash flows and does it make sense for the entity to go through this process, to do the transformation.*

(Trial Tr. 3401:2–10, Feb. 20, 2007 (Moss, K.) (emphasis added).)

56   There is very little evidence in the record concerning the operational analysis that went into the Strategic Assumptions. Donna Talbot identified Dr. Enrique Beckmann and Cheryl LaCoste as the members of the Reese Management Team with the strongest operational background, (Trial Tr. 1688:20–21, Jan. 25, 2007, 1756:4–16, Jan. 30, 2007 (Talbot, D.)), yet neither of these witnesses appeared at trial, and LaCoste was apparently never even deposed. Moreover, Beckmann was a career physician who had never risen higher than department head at Reese Hospital prior to his participation in the Reese Management Team, (Trial Tr. 1688:1–22, Jan. 30, 2007 (Talbot, D.); Beckmann Dep. 14:8–15:4, Apr. 12, 2006), and who had only "a somewhat removed view of what was ... happening at the hospital," (Beckmann Dep. 48:7–8, Apr. 12, 2006). The idea that Beckmann served as the *de facto* operations expert for the team only undermines the court's confidence in the Strategic Assumptions that underlie the Reese Projections.

57   Moss "could not tell" if volume increases predicated on the construction of a new ER were included in the Reese Projections for 1998, (Trial Tr. 3529:21, Feb. 20, 2007 (Moss, K.)), even though it is plain from the face of the Reese September Projections that they were, (Pl.Ex. 300 at TRUST/HCA–007585). Moss attempted to excuse his ignorance on this point by opining that "[t] he cash flows in [19] 98 from a valuation standpoint were not that material," (Trial Tr. 3530:6–7, Feb. 20, 2007 (Moss, K.)), but even if that were true, the court would still expect a more careful analysis from an expert witness of his pedigree.

58   The Defendants object to the admission of this testimony into evidence on the grounds that the witness lacks personal knowledge of the events described in his testimony and that the document referred to in the testimony is hearsay. This objection is overruled because Bauer testified based on his own personal recollection, not Exhibit 1 to his declaration, and because Bauer, the former CEO of Reese Hospital, (Bauer Dep. 17:6, June 14, 2006), testified that he "made very overt efforts to work with community physicians," (Bauer Dep. 43:2–3, June 14, 2006), thereby demonstrating personal knowledge and laying a foundation for his testimony regarding the problems with physician recruitment at Reese Hospital. (The Defendants' objection to Bauer's testimony that he was CEO at Reese Hospital as irrelevant is overruled because the testimony is obviously relevant, else the court would not have cited it.)

59   The Defendants object to the admission of this testimony into evidence, but do not provide any grounds for their objection. The objection is overruled.

60   The Defendants object to the admission of this testimony into evidence on the grounds that the testimony is irrelevant. It is not, and the objection is overruled.

61   The Defendants object to the admission of this testimony into evidence on the grounds that the question preceding the testimony calls for speculation and that the answer lacks foundation and is hearsay. These objections are overruled as moot because the court cites Bauer's testimony only to show that the testimony is not contrary to Beckmann's explanation.

62   An earlier colloquy between the court and Moss reinforces this conclusion:

> THE COURT: The bottom line is you did not attempt to go into the projections that were made by Doctors Community Healthcare Corporation.... You did not attempt to determine their reasonableness beyond general familiarity with what had occurred in the market with which you had familiarity.

Case 09-10138-MFW Doc 13460-3 Filed 05/02/14 Page 166 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

THE WITNESS: Your Honor, in looking at the projections, I benchmarked the projections against the industry data to determine if the relative ratios were consistent with the industry information.

So, that would be testing things like the salaries expense, you know, wages and payroll, looking at the other items, the other line items they had on the income statement. So, I did that.... The projections themselves, though, most of the line items in those projections drive, somehow, off of the volume that is in the projections.

THE COURT: And it is as to the volumes that you assumed that the projections were reasonable on the part of DCHC?

THE WITNESS: That is correct, Your Honor.

...

THE COURT: ... [Y]ou explain that based on an analysis, none of the revenues as a function of inpatient and outpatient volumes appear unreasonable.

THE WITNESS: That is correct.

THE COURT: So, you did not attempt to ascertain whether the inpatient and outpatient volumes were reasonable. You simply looked at those volumes and tested the revenues as a function of those and determined that the revenue projections were reasonable, and you tested the expenses as a function of revenues and determined that the expenses were a reasonable projection; correct?

THE WITNESS: Correct.

(Trial Tr. 3865:2–3867:10, Feb. 22, 2007 (Moss, K.).) 101

63 In support of his position that the Reese Projections could be reached in a matter of weeks, Moss provided the following example:

There is actually an example of that within the industry, Allegheny East, which were the Pittsburgh hospitals of Allegheny.

My recollection is that I saw some information where they were losing roughly 25 million a month is what I recall, so a substantial loss. Those facilities were purchased about the time of this transaction with Reese. In the 10K of the buyer, which would have been only a month and a half later, in their 10K, they disclosed that they had already had the facilities operating at break even.

(Trial Tr. 3527:10–19, Feb. 20, 2007 (Moss, K.).)

Assuming for the moment that Moss's offhand "recollection" is accurate, the court does not see how the fact that one other hospital apparently went from monthly losses of $25 million to break even in a six-week period establishes the reasonableness of projecting that this particular hospital would have done the same. The question Moss was supposed to address was whether the Reese Projections were reasonable, not whether they were possible.

64 The Reese Management Team used the 1996 patient days figure instead of the 1997 figure because "the hospital announced their intention to sell [Reese Hospital] in 1997 and this announcement had a negative impact on volume." (Pl.Ex. 115; Trial Tr. 1582:2–7, Jan. 30, 2007 (Talbot, D.).) But the sale of Reese Hospital was announced in *December* of 1997, by which time any impact of the announcement on the volume at Reese Hospital for that year would have been marginal at best. (Pl. Facts ¶ 23; Defs. Rebuttal ¶ 23.) The use of 1996 data when 1997 data regarding patient days was available is yet another flaw in the Strategic Assumptions and Reese Projections.

65 Talbot could not recall or explain why she did not incorporate the Reese Hospital financial statement for September of 1998 into the Reese Projections, (Trial Tr. 1670:21–1671:1, 1735:10–1736:3, Jan. 30, 2007 (Talbot, D.)), but she agreed that she was "not too focused" on the performance of Reese Hospital in "the most immediate several months" preceding the Transfer Date because she "had the history upon which [she] would be relying before the uncertainty that arose upon the announcement of the sale of Michael Reese," (Trial Tr. 1735:10–15, Jan. 30, 2007 (Talbot, D.)).

66 The total number of patient days projected for 1998 in the Reese September Projections is 97,220, or 90.80% of the 107,075 patient days experienced in 1996; however, when the patient days projected for each unit in Reese Hospital are added together, they yield a slightly larger number of 97,238, or 90.81% of the 1996 patient day total.

67 Similarly, the 1999 patient days projected in the Reese September Projections total 97.82% of the patient days at Reese Hospital in 1996 as stated in the Strategic Assumptions. (Pl.Ex.115.)

68 The court reached the conclusion that the patient days totals for 1996 and 1997 and patient days projections for 1998 and 1999 do not include outpatient cases by adding the patient days totals and projections for each unit in Reese Hospital. Presumably, patient days are not recorded for outpatient services because outpatient services are by definition events of less than one day.

69 The court determined that the Reese September Projections forecast an annualized net patient service revenue figure of $178,883,210.94 by replicating the unit-specific worksheets created as part of those projections and adding the values produced by those worksheets. The actual net patient service revenues for the hospital in 1996 and 1997 were $171,435,208.00 and $155,125,064.00, respectively. (Pl. Exs. 137 at HCA/MR 08017 (listing total net revenue for 1996 at $174,299,798.00, of which all but $2,864,590.00 came from net patient service revenue); 136 at HCA/MR 08014 (listing total net revenue for 1997 at $157,855,735.00, of which all but $2,730,671.00 came from net patient service revenue).) The court's calculations for 1998 of $178,883,210.94 in projected annualized revenues based on projected post-acquisition performance vary somewhat from the total net patient service

Case 09-10138-MFW   Doc 13460-3   Filed 05/02/14   Page 167 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

revenue figures set forth in the Reese Projections, (Pl.Ex. 300 at TRUST/HCA–007580 (projecting net patient service revenue of $45,063,000.00 for the last three months of 1998, or $182,755,500.00 annualized)); Pl.Ex. 144A at TRUST EXPERT 010801 (projecting net patient service revenue of $30,042,000 for the last two months of 1998, also $182,755,500.00 when annualized)), but the differences relate to minor computational discrepancies within the Reese Projections, not differences in methodology or underlying assumptions, and the court finds as a factual matter that the projections are unreasonable to the extent that they project excessive amounts of revenue as a result of computational errors or because the Reese Management Team rounded up sub-totals of revenue.

70   The Strategic Assumptions increase the cap for projected patient days by seven percent every year beginning in 2000, presumably to account for long-term growth at the hospital. This suggests that the Reese Management Team believed that the 97.82% cap assumed for 1999 is intended to reflect a consistent volume of patients throughout 1999: if the 1999 cap merely represented an average between a lower figure at the beginning of the year and a higher figure at the end of the year, the cap for 2000 would be seven percent above the later (and higher) value, not the average of the two figures. The fact that the end value for 1999 is the same as the average for 1999 necessarily means that the Reese Management Team anticipated that the start value, end value, and average value in 1999 would all be the same.

71   The court arrived at the percentage of 83.80% by reversing the normal process for arriving at an average. The process may be represented by the following equation: x=(y*2)-z, where "x" equals annualized total patient days for 1998 (using November 1, 1998 projected volume)expressed as a percentage of 1996 patient days, "y" equals annualized projected total patient days for 1998 (using average volumes for November and December 1998) expressed as a percentage of 1996 patient days, and "z" equals 1999 patient days (the volume projected to be reached by December 31, 1998) expressed as a percentage of 1996 patient days.

72   In that calculation, 108,519 is the annualized projected number for 1998, and 112,877 is the projected number at December 31, 1999. When 104,161 and 112,877 are averaged, the result is 108,519.

73   Neil Demchick also testified that the Reese Projections were unreasonable in part because they did not take into account the competition from nearby Mercy Hospital, (Trial Tr. 2385:19–24, Feb. 8, 2007 (Demchick, N.)), but as Dr. Enrique Beckmann noted in his deposition, "if they've [*i.e.,* Mercy Hospital and Reese Hospital] been able to exist for 125 years, side by side, both of them providing very valuable services to the community and being viable enough to stay longer than most institutions can stick around in the world, then I don't know what the argument is valid," (Beckmann Dep. 169:1–9, Feb. 1, 2007).

74   Erich Mounce testified that the Reese Management Team "believed that we would be able to renegotiate [the Humana] contract to a much higher *per diem* and obtain some [carve] outs," (Trial Tr. 580:19–21, Jan. 23, 2007 (Mounce, E.)), because he "had been very successful in renegotiating contracts," (Trial Tr. 580:18–19, Jan. 23, 2007 (Mounce, E.)). *See also* Trial Tr. 583:5–16, Jan. 23, 2007 (Mounce, E.) ("[W]e believed under a new ownership ... that we would be able to get it up to that market rate. We had been very successful before doing that ..." and there is no "reason to believe that a buyer in the market of this hospital would have taken any different view ... of what could be achieved with respect to the Humana contracts."); Trial Tr. 614:3–7, Jan. 23, 2007 (Mounce, E.) (felt Reese Corp. could negotiate new rates very quickly after November 12, 1998). (Donna Talbot testified similarly.) But the court finds this belief somewhat unreasonable because, as Melvin Redman made clear in his direct testimony, Humana always had the upper-hand in any negotiations with Reese Corp. due to its relationship with Mercy Hospital, Reese Hospital's nearby neighbor and primary competitor. (Trial Tr. 475:23–476:11, Jan. 23, 2007 (Redman, M.).) A hypothetical purchaser of Reese Hospital would likely have realized that Humana would have the upper-hand in any negotiations due to that relationship with Mercy Hospital, and would have taken that into account in projecting future revenues. It is difficult to say, however, whether a purchaser would ascribe absolutely no value to the chance of successful renegotiations with Humana. Both Talbot and Mounce had experience in the health field, and the court is not inclined to treat their view of the possibility of renegotiation with Humana as totally unreasonable.

75   It is difficult for the court to assess whether the Reese September Projections adequately reflect the changes wrought by the BBA given the admission by Neil Demchick under cross-examination that he had not quantified the expected effect of the BBA. (Trial Tr. 2377:15–20, Feb. 8, 2007 (Demchick, N.).) As the burden of proof with respect to this issue rests with Alberts, the court finds as a factual matter that the adjustments made to DRG coding rates in the Reese September Projections adequately address the changes reasonably predicted to occur as a result of the BBA. For the same reason, the court rejects Demchick's testimony that, in part, the Reese Projections were unreasonable because they did not take into account the costs of operating as a teaching hospital. (Trial Tr.1904:11–17, Feb. 1, 2007 (Demchick, N.).)

76   Alberts argues that the Reese Management Team should not have projected increased collections because the team did not plan to outsource the collections department at the outset of the ownership transfer, but rather believed unreasonably that it could improve the collections practices of in-house employees. (Pl. Rebuttal ¶ 422(i)(iv) (citing Trial Tr. 990:20–24, Jan. 25, 2007 (Talbot, D.)).) Ultimately, it does not matter whether the strategy to reach this projection adopted by the Reese Management Team was reasonable so long as the projection was reasonable based on what an objective purchaser with a reasonable strategy for improving collections practices at Reese Hospital could have achieved. In this case, a reasonable purchaser would have adopted Talbot's outsourcing

Case 09-10138-MFW    Doc 13460-3    Filed 05/02/14    Page 168 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

strategy from the beginning, thereby improving the collections practices at Reese Hospital in a manner commensurate with the Reese Projections.

77  In his rebuttal testimony, Neil Demchick asserted that the Reese Projections included volume increases in the rehab unit that could only be explained by recourse to the Reese Management Team's Strategic Assumption that a new linear accelerator would be purchased, thereby increasing volume in the rehab unit by 10% per year, even though this projected growth was supposed to be omitted from the Reese Projections. (Trial Tr. 4249:15–25, March 1, 2007 (Demchick, N.).) Demchick bases this opinion on the 10.65% increase in outpatient Medicare and Humana net patient service revenue from 1997 to 1999 in the Reese September Projections. (Trial Tr. 4251:18–23, March 1, 2007 (Demchick, N.).) This projected increase of 10.65% is actually the result of separate assumptions made by the Reese Management Team regarding growth in outpatient volume as a result of the relocation of the ER and projected increase in the number of ambulatory surgeries at Reese Hospital, and has nothing to do with the omitted Strategic Assumption regarding the procurement of a linear accelerator. (*See* Pl.Ex. 300 at TRUST/HCA–007585 (projecting 10.65202% increase in outpatient revenue in 1999 as a result of increases in ER volume and ambulatory surgeries).)

78  Neil Demchick states in his expert report (the "Demchick Report") that the Turnaround Scenario "best reflect[s] a valuation of the hospital that is being purchased, Reese, before significant changes to operations planned by DCHC beyond simply the 'turnaround.' " (Pl.Ex. 209 ¶ 61(a).) That is not the appropriate way to project earnings for a business enterprise where a reasonable purchaser would make operational changes (at least some of which would almost always require the infusion of capital) to the business once the purchaser assumed control of the business. *See* Fishman et al., *supra* ¶ 505.6 (explaining that the business projections used in determining the enterprise value of a business using the DCF approach should be "based on the actual conditions that exist now and that are expected to exist in the future").

79  Demchick testified that he used the lowest historical average because he "tried to be more conservative" in his approach, (Trial Tr. 2101:20–21, Feb. 6, 2007 (Demchick, N.)), but the net effect of his approach—focusing solely on historic expense totals with respect to fixed expenses while using different historic information in projecting revenue and variable expenses—is to create an arbitrary mishmash of numbers that does not and could not reflect the market conditions in the area surrounding the hospital at the time of the Reese Transfers or the operational reality of the hospital as of the Transfer Date.

80  Demchick indicated at trial and in his expert report that he used Reese Hospital's 1996 figures as the target revenue for his Turnaround Scenario because he assumed that Reese Hospital would "be able to return to the level that HCA was operating the hospital at in 1996, which was before the decline started, or even to the 1997 level plus about 3 percent per year in patient revenues." (Trial Tr.2083:12– 21, Feb. 6, 2007 (Demchick, N.); *see also* Pl.Ex. 209 ¶ 61(a).) As the court previously indicated, the sale of Reese Hospital was not announced until December of 1997, so any effect that the announcement of the sale would have had on the hospital's performance that year would be minuscule at best. The point is moot in any event because a hypothetical purchaser armed with the Reese Management Team turnaround plan would not have decided by fiat that revenue at the hospital would reach a specific total from a prior year and then reverse engineer its projections to reach that goal, but rather would have projected increases in volume and cuts in expenses based on operational assumptions and calculated net earnings accordingly.

81  Demchick admitted at trial that he created the Turnaround Scenario under the assumption that the purchaser of the hospital would not undertake many of the turnaround strategies devised by the Reese Management Team because it would lack the cash to do so and because "that would be new things that [the purchaser] would do." (Trial Tr. 1897:3–18, Feb. 1, 2007 (Demchick, N.).) But a reasonable purchaser lacking sufficient capital to turn Reese Hospital into a profitable business would not have purchased the hospital in the first place, which is why a valuation expert should not consider whether the purchaser would be able to fund those capital expenditures that would make the hospital profitable. (Trial Tr. 2483:9–19, Feb. 20, 2007 (Moss, K.).) Rather, the capital expenditures necessary to make the purchased business profitable are subtracted from the business' projected EBITDA as part of the calculation of a projected net cash flow for the business, which is then discounted and added to the business' discounted terminal value to arrive at a final business enterprise value. *See* part III.B.1.c.ii.(D), *infra*.

82  Paul Tuft, the former DCHC and Reese Corp. CEO who negotiated the purchase of Reese Hospital, gave the most optimistic assessment as to how quickly the Reese Management Team's turnaround plan would take. He felt that it would take six to 12 months to turn the hospital around. (Trial Tr. 94:14–22, 148:15–19, Jan. 19, 2007, 226:5–8, Jan. 22, 2007 (Tuft, P.).)

83  As the Defendants correctly point out, there is no evidence in the record suggesting that it was unreasonable for the Reese Management Team to assume that the bifurcation of the psychiatric unit could occur as soon as the transfer of ownership to Reese Hospital was complete. (Defs. Rebuttal ¶ 174A.) Ken Bauer testified that the bifurcation of the unit did not occur until May of 1999, (Bauer Dep. 97:8–15, June 14, 2006), but that means only that Reese Corp. did not implement this part of its turnaround plan for six months, not that a hypothetical purchaser could not have implemented this strategy right away.

84  Demchick assumed that Reese Corp. would not be able to improve the operations at Reese Hospital during the "stump period" in 1998, so he ascribed a *pro rata* portion of Reese Hospital's actual profits and losses from January 1, 1998, through November 12, 1998, to that time period. (Trial Tr. 1850:22–1851:25, Feb. 1, 2007 (Demchick, N.).) He testified that he made this assumption because that

Case 09-10138-MFW  Doc 13460-3  Filed 05/02/14  Page 169 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

period coincides with "the holidays, and we didn't expect that a lot would be happening during the last 7 week period." (Trial Tr. 2120:8–10, Feb. 6, 2007 (Demchick, N.).) This assumption is unreasonable. A reasonable purchaser would implement its turnaround plan as soon as possible because of the financial situation at the hospital as of the Transfer Date. A purchaser would not have waited until the new year to make those changes necessary to improve the hospital's performance.

Demchick also erred in annualizing Reese Hospital's 1998 profits and losses by using data that would not have been available to a hypothetical purchaser as of the Transfer Date. (Trial Tr. 1853:19–1854:3, Feb. 1, 2007 (Demchick, N.).) He should have annualized the hospital's performance through October 31, 1998, and then used a *pro rata* amount of that annualized number for his projections. (Trial Tr. 1854:1–3, Feb. 1, 2007 (Demchick, N.).) Demchick's flawed methodology reduced the annualized total net revenue at Reese Hospital by approximately $5 million. (*Compare* Trial Tr. 1850:22–1851:9, Feb. 1, 2007 (Demchick, N.) ("Q. [H]ow did you come up with the annualized revenue of [$]145,200,000? A. What we did is, ... [ w ] e decided the most appropriate way to annualize it was to look at December 31st, 1998, and then basically back down to November 12th.") *with* Trial Tr. 2469:12–15, Feb. 8, 2007 (Demchick, N.) ("Q. Well, let's look at the—if you do that math, [$]125,466,154 times 365 over 304, I'll represent to you that you get [$]150,641,928. A. Okay.").) Demchick attempted to justify his use of a lower annualized revenue figure for 1998 by asserting that "December is a slower month" for Reese Hospital than the rest of the year, (Trial Tr. 2469:3–11, Feb. 8, 2007 (Demchick, N.)), but the court does not find this unsupported *post hoc* explanation credible for the reasons set forth above.

85   Moss expanded on this point later on in his testimony:

When it's known that a facility is on the market, typically, a transaction can occur fairly quickly when a hospital is put on the market. And as you can see by the large volume of transactions that have been out there, it was an active market, so you could put a hospital up for sale and move out of it fairly quickly and so you could have a seamless transition with your physicians. When we've had a protracted sale, the physicians become concerned. Physicians are people that, you know, they want to know where they're admitting their patients, how they're going to be cared for, what equipment and support will be provided for them. They want to make sure it's a good place for their patients and a good place for them to operate.

And during the time period when you have uncertainty with these facilities, they have admitting rights at other hospitals and they can send their patients to other facilities. And that's what happens to hospitals when you have this protracted sales process, it can damage volume.

(Trial Tr. 3435:22–3436:14, Feb. 20, 2007 (Moss, K.).)

86   Demchick noted that the Reese Management Team calculated bad debt as a percentage of accounts receivable rather than as a percentage of net patient service revenue, a practice that he "questioned ... a little bit," (Trial Tr.2098:17, Feb. 6, 2007 (Demchick, N.)), but given Demchick's lack of operational expertise in the health care arena and the extensive operational experience of the Reese Management Team, (*see* Trial Tr. 2370:2–2373:16, Feb. 8, 2007 (Demchick, N.) (establishing the eighty-six years of cumulative healthcare experience held by the Reese Management Team)), the court questions whether Demchick is really in a position to critique the Reese Projections in this manner. Moreover, the percentage of accounts receivable that the Reese Management Team used in calculating bad debts was 20%, which amounts to 3.4% of Reese Hospital's net patient service revenue, or 0.02% less than the bad debt expense calculated by Demchick. (Trial Tr.2098:11–12, 22–24, Feb. 6, 2007 (Demchick, N.).) The difference is so minuscule as to be irrelevant.

87   Demchick calculated variable expenses as a percentage of total net revenue (*i.e.,* net patient service revenue plus other operating revenue) rather than as a percentage of net patient service revenue. (Trial Tr.2088:18–2089:11, Feb. 8, 2007 (Demchick, N.); Pl.Ex. 209 at Ex. J.) He provided no explanation for this deviation from the methodology employed by the Reese Management Team.

88   It is unclear whether the Reese Management Team intended to lay off FTEs upon the transfer of Reese Hospital or simply believed that they could maintain the same number of FTEs as there were on the Transfer Date after patient volume started to grow. (*Compare* Trial Tr. 878:5–11, Jan. 25, 2007 (Talbot, D.) ("one of our big assumptions was we were going to reduce the number of full-time equivalents") *with* Pl.Ex. 300 at TRUST/HCA–007627 (projecting salaries for 1998 and 1999 using the 1997 figure for total FTEs at Reese Hospital).)

89   The court arrived at this figure by using the methodology set forth in the Reese September Projections, (Pl.Ex. 300 at TRUST/HCA–007627), with inflation added for the year 2000.

90   The Reese September Projections do not set forth a discernible methodology for calculating contract labor, forcing the court to use Demchick's method instead.

91   The court used the Reese Management Team's methodology for calculating employee benefits rather than Demchick's method. Demchick projected employee benefits as totaling $14,739,587.00 in 2000, (Pl.Ex. 209 at Ex. H), which would lead to a revised total of $85,007,487.73. That amounts to 42.23% of net patient revenue as projected by Demchick for 2000 or 40.38% of total net revenue as projected by Demchick for 2000.

Case 09-10138-MFW   Doc 13460-3   Filed 05/02/14   Page 170 of 180

*In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)*

92    The court would have preferred to craft projections averaging the volume levels at Reese Hospital between the Transfer Date of November 12, 1998, year-to date figure annualized for 1998, and 1997, but the Transfer Date year-to-date numbers were not included in the record, and likely would not have been available to a hypothetical purchaser.

93    The court arrived at the discount percentage of 87.25% as follows. First, the court determined the difference between 1996 EIPDs totals and 1997 EIPDs totals as a percentage decrease: the result of this calculation is 11.59 percent. The court then multiplied this figure by 110% to account for the increasingly steep decline of the hospital's performance in 1998. (This latter percentage was determined by calculating the decline in net patient service revenue from 1996 to 1997, comparing the difference in revenue to the difference in EIPDs totals for the two years, and then using the same ratio of percentage decline in net patient service revenue to percentage decline in EIPDs totals from 1996 to 1997 to arrive at an estimated percentage decline in EIPDs in 1998 using the percentage decline in net patient service revenue from 1997 to the annualized figure for 1998.) The court subtracted the result (12.75%) from 100 to arrive at a percentage (87.25%) of 1997 EIPDs totals for 1998.

94    The 35.31% figure represents the average of the percentage of net patient service revenue projected to be consumed by salaries and wages in 1999 in the second version of the M & P Projections (approximately 36.87%) and the percentage of net patient service revenue projected to be consumed by salaries and wages in 1999 in the Reese October Projections (33.75%).

95    The calculations made by the court to arrive at the figures listed below were made on Excel spreadsheets that are not easily appended to the pdf version of this memorandum decision that is being signed electronically for entry by the clerk. The court will therefore list only the final results of those calculations in these findings of fact and conclusions of law, but will transmit to the parties the spreadsheets and will direct the clerk of the court to maintain a disk containing the spreadsheets as an exhibit in the proceeding (incorporated by reference into this memorandum decision), and to post the spreadsheets on the court's website so that they are available to the public for viewing.

|  | 11/12/98–12/31/98 | 1999 | 2000 | 2001 | 2002[96] |
|---|---|---|---|---|---|
| Net Patient Service Revenue | $20,005,551.26 | $162,587,960.45 | $181,038,031.12 | $202,703,867.02 | $214,608,759.36 |
| Other Operating Revenue | $1,037,069.04 | $8,580,737.42 | $10,292,000.00 | $11,335,472.63 | $11,833,039.26 |
| Total Net Revenue | $21,042,620.31 | $171,168,697.88 | $191,330,031.12 | $214,039,339.64 | $226,441,798.62 |

96    Projections should be made only "until a stabilized level of operations (growth and sustainable profit margins) is achieved." Fishman et al., *supra*, ¶ 505.27. "This level will usually be reached when future operations are not expected to differ from normal operations ... except as a result of normal growth." *Id.* Under the court's projections, that year is 2001. However, the court must also calculate a terminal value and a terminate net cash flow for Reese Hospital, which requires the projection of revenue and expenses for the year following the first year of stabilized operations at the hospital, *i.e.,* 2002. *See* part III.B.1.c.iv., *infra.*

97    Demchick never explained why he deviated so sharply from the Reese Projections, though he did describe his projections as an "averaging" that "is not really relevant to the ultimate answer" of Reese Hospital's business enterprise value because "when you look at the valuation, it is not a cash flow item, so it gets added back." (Trial Tr. 2104:16–20, Feb. 6, 2007 (Demchick, N.).) This answer is not entirely correct: depreciation and amortization is considered a fixed expense that is deducted from a business's total net revenue as part of the EBIT calculation, so the lower the depreciation and amortization, the higher the business's EBIT will be, which, in turn, means that the income taxes on that EBIT (assuming the EBIT is positive) will be higher, as well. *See* part IIIB.1.c.ii.E, *infra.*

98    There are no projected income taxes for Reese Hospital in the years 1998–2001 because there are projected net operating losses for the hospital in 1998 and 1999 that carry over through 2001. (*See* Trial Tr. 2120:18–24, Feb. 6, 2007 (Demchick, N.) explaining that net operating losses are carried over from one year to the next in determining whether there is taxable income for a particular year).

99    The Reese Management Team assumed that $1.2 million would be spent on cardiac catheterization equipment in 1998, $2.5 million would be spent on computer upgrades in 1998 and $9 million spent in 1999, $6 million would be spent on a linear accelerator in 1999, $2.5 million would be spent to relocate the ER in 1998, $1 million would be spent on a 25–bed SNF unit in 1999, $2 million would be spent on cosmetic enhancements in 1998, and $4 million would be spent each year for miscellaneous needs. (Pl.Ex. 115; *see also* Trial Tr. 1890:12–15, Feb. 1, 2007, Demchick, N.) (explaining that the Reese Management Team projected $4 million in capital expenditures every year in addition to the expenditures contemplated in the Strategic Assumptions); Defs. Ex. JV at Ex. 2–Ex.6 (projecting $4 million in annual expenditures every year after 1999).) These expenditures total $44.2 million (1.2+2.5+9+6+2.5+1+2+4+4+4+4+4=44.2).

100    The court reached this figure by adding $1,200,000.00 projected for cardiac catheterization equipment, $2,500,000.00 projected for computer upgrades, $295,893.72 projected for relocation of the ER (as modified by the court), $236,714.98 projected for cosmetic enhancements (as modified by the court), and $536,986.30 for miscellaneous expenditures (as modified by the court).

101    The court reached this figure by adding $9,000,000.00 projected for computer upgrades, $2,204,106.28 projected for relocation of the ER (as modified by the court), $1,763,285.02 projected for cosmetic enhancements (as modified by the court), and $4,000,000.00 for miscellaneous expenditures.

Case 09-10138-MFW   Doc 13460-3   Filed 05/02/14   Page 171 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

102   The CAPM method "is applied in almost the same manner as the build-up method except that adjustments are made based on comparing the company being valued to the average guideline company rather than to the average S & P 500 company." Fishman et al., *supra*, ¶ 503.5. This adjustment is made by multiplying the equity risk premium, discussed later, by a beta value that reflects market volatility. *Id.* ¶ 503.10, Ex. 5–12. Consequently, there is no need for an industry adjustment (discussed later) to the average return derived from adding the risk-free investment rate to the modified equity risk premium, as there often is when using the build-up method. *Id.* ¶ 502.21.

103   Demchick testified at trial that his risk-free rate of 5.50% "relates to the ten year treasury bond rate," (Trial Tr. 2110:11–13, Feb. 6, 2007 (Demchick, N.)), but his expert report cites the 20–year rate as its source even though it uses the percentage provided by the ten year rate, (Pl.Ex. 209 at Ex. M1). This suggests that Demchick either rounded up the 20–year rate or accidentally calculated his discount rate using the ten year rate instead.

104   Demchick asserted in his expert report that he used a 3.3% size premium because he expected capitalization at Reese Hospital to be "below $261 million." (Pl.Ex. 209 at Ex. M–1.) He therefore used a size premium assigned to the aggregation of the ninth and tenth deciles by Ibbotson. Ibbotson 1998 Yearbook, *supra*, at Table 7–6. But there is no reason why Demchick should have expected capitalization to rise above the tenth decile, and as a consequence no reason why he should not have used the size premium for that decile rather than the size premium for the aggregated ninth and tenth deciles.

      As best the court can tell, Moss simply rounded up the size premium for companies in the tenth decile in the Ibbotson 1998 Yearbook to arrive at his size premium of 5.4 percent. The court sees no reason why the number should have been rounded up in such fashion, and declines to do so in finding the appropriate size premium as a factual matter.

105   Demchick used a specific company risk premium of 8% in determining a discount rate for use in his Turnaround Scenario. (Trial Tr. 2113:15–2114:20, Feb. 6, 2007 (Demchick, N.).) He used a higher premium for purposes of his Strategic Growth Scenario because that scenario assumed greater revenue growth and net cash flows than the Turnaround Scenario, and therefore was less likely to occur. (Trial Tr. 2130:2–11, Feb. 6, 2007 (Demchick, N.; Pl.Ex. 209 at Ex. M.)

106   Demchick suggested at trial that his 12% cost of debt reflected the lack of assets at the hospital. (Trial Tr. 2551:17–2552:16, Feb. 9, 2007 (Demchick, N.).) Even if the court were willing to credit this change in his approach, it would still reject the cost of debt selected by Demchick because the assets held by Reese Hospital would be more than sufficient to finance the purchase of the hospital assuming that the purchaser was able to invest a reasonable (*i.e.*, market average) amount of capital. *See* discussion, *infra*.

107   The court ascertained this amount by dividing the value of Reese Hospital's net assets by the percentage of the purchase price that a reasonable purchaser would finance through debt (in this case, 43.1% of the purchase price (*see* part III.B.1.c.iii.(C), *infra* )).

108   The court arrived at this figure by means of the following calculation: 49 (representing the number of days in the "stump period" of 1998) ÷ 365 (representing the number of days in the year) ÷ 2 (to account for the mid-year convention). (Trial Tr. 3520:4–10, Feb. 20, 2007 (Moss, K.))

109   The court arrived at this figure by means of the following calculation: 49 (representing the number of days in the "stump period" of 1998) ÷ 365 (representing the number of days in the year) + .5 (to account for the mid-year convention). (Trial Tr. 3520:11–14, Feb. 20, 2007 (Moss, K.).)

| | |
|---|---|
| Terminal Net Cash Flow | $12,874,687.31 |
| WACC | x (1 + 18.14%)½ |
| Modified Terminal Net Cash Flow | $13,993,567.80 |
| Capitalization Rate ÷ 12.82% | |
| Terminal Value (under modified Gordon Model) | $109,114,564.17 |

110   Theoretically, the net working capital purchased by Reese Corp. could be included in the income stream for the projections used by the court to determine the value of Reese Hospital as if it were normally capitalized. After all, a reasonable purchaser would not expect to collect the revenues generated from its post-transaction operations immediately, but rather would depend on the income stream from the net working capital until post-transaction revenues began to trickle in. Alternatively, it could be argued that the net working capital purchased by Reese Corp. as a non-operating asset, should be considered separately as the court has done, but that as a consequence the court should project no revenue whatsoever for Reese Hospital until the hospital began to collect on its accounts receivables.

      Ultimately, neither approach is feasible. There is no information in the record from which the court can ascertain the average delay in the hospital's collection of accounts receivables, and thus no way to incorporate the income stream from the net working capital into the court's projections. Further, financial projections used to calculate a discounted cash flow must be made in compliance with generally accepted accounting principles, Fishman et al., *supra* ¶ 505.8, and those principles require that income be recorded on an accrual basis rather than on a cash basis. Finally, if the court were to project Reese Hospital's income on a collection (as opposed to an accrual) basis, it would need to include additional projected value in the form of the (uncollected) accounts receivable held by Reese Hospital's owner at the end of the terminal year, which would cancel out any shortfall in initial income for the hospital's owner.

Case 09-10138-MFW    Doc 13460-3    Filed 05/02/14    Page 172 of 180

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

111    HCA did not accept PHHC's offer because they had already signed a letter of intent from DCHC on February 17, 1998. (Trial Tr. 2753:8–13, 2756:13–23, Feb. 12, 2007 (Gerken, G.).)

112    HCA, moreover, was obligated by the APA to provide monthly financials within thirty, not fifteen, days of the end of the prior month.

113    GHI agreed in section 5.01 of the APA to provide Reese Corp. full and complete access to the books and records of Reese Hospital until the closing date. Section 5.01 provides:

> Between the date of this Agreement and the Closing Date, Seller shall afford to the officers and authorized representatives and agents of Buyer full and complete access to and the right to inspect the plant, properties, books and records of Seller relating to the Assets, and will furnish Buyer with such additional financial and operating data and other information as to the business and properties of Seller relating to the Assets as Buyer may from time to time reasonably request without regard to where such information may be located.

114    Section 4.08 of the APA provides: "Buyer has had full and free access to and has inspected and investigated to its satisfaction the Business of Seller, the Assets, and the Hospital." (Pl Ex. 2.)

115    Section 4.06 of the APA provides: "Buyer has or will have by Closing the financial ability to consummate the transactions contemplated by this Agreement." (Pl.Ex. 2 (APA § 4.06).)

116    NCFE financed the majority of Reese Corp.'s purchase of Reese Hospital. Of the $68,048,840 purchase price, NCFE provided Reese Corp. approximately $43,308,357 in accounts receivable financing and approximately $10,800,000 for equipment sale/leaseback financing.

---

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.    68

# TAB 20

434 F.3d 1336
United States Court of Appeals,
Federal Circuit.

ASPEX EYEWEAR, INC., Manhattan Design
Studio, Inc., Contour Optik, Inc., and Asahi
Optical Co., Ltd., Plaintiffs–Appellants,

v.

MIRACLE OPTICS, INC. and VIVA
OPTIQUE, INC., Defendants–Appellees.

No. 04–1265.    |    Jan. 10, 2006.

**Synopsis**

**Background:** Alleged owner of patent for magnetized eyeglass frames sued competitors for infringement. The United States District Court for the Central District of California, Lourdes G. Baird, Senior Judge, dismissed for lack of standing, and alleged owner appealed.

**[Holding:]** The Court of Appeals, Lourie, Circuit Judge, held that transfer of patent rights for limited portion of patent term was license, rather than assignment, and thus did not deprive transferor of standing to sue for infringement, regardless of extent of rights transferred.

Vacated and remanded.

West Headnotes (7)

**[1]**    **Federal Courts**
    👈  Standing

    Question of standing to sue is jurisdictional one that is reviewed de novo.

    Cases that cite this headnote

**[2]**    **Patents**
    👈  Persons entitled to sue

    Patentee may transfer title to patent by assignment, and assignee may be deemed effective patentee for purposes of standing to sue

another for patent infringement in its own name.

35 U.S.C.A. §§ 100(d), 281.

12 Cases that cite this headnote

**[3]**    **Patents**
    👈  Persons entitled to sue

    While patent licensee normally does not have standing to sue for infringement without joinder of patentee, exclusive license may be tantamount to assignment for purpose of creating standing if it conveys to licensee all substantial rights to patent at issue.

    38 Cases that cite this headnote

**[4]**    **Patents**
    👈  Construction and Operation of Assignments and Grants

    **Patents**
    👈  Construction and Operation of Licenses

    In determining whether agreement to transfer rights to patent amounts to assignment or mere license, court ascertains intention of parties and examines substance of what was granted.

    9 Cases that cite this headnote

**[5]**    **Patents**
    👈  Construction and Operation of Assignments and Grants

    **Patents**
    👈  Persons entitled to sue

    Transfer of rights to patent for eyeglass frames for limited portion of patent term was license, rather than assignment, and thus did not deprive transferor of standing to sue for infringement, regardless of extent of rights transferred.

    17 Cases that cite this headnote

**[6]**    **Patents**
    👈  Complainants

    For same policy reasons that patentee must be joined in any lawsuit involving his or her patent, there must be joinder of any exclusive licensee.



10 Cases that cite this headnote

[7]    **Patents**
⬅ **Original utility**

**Patents**
⬅ **Reissue**

5,568,207, 6,109,747. Cited.
37,545. Cited.

Cases that cite this headnote

**Attorneys and Law Firms**

*1337 Michael A. Nicodema, Greenberg Traurig, LLP, of New York, New York, argued for plaintiffs-appellants. With him on the brief was Barry J. Schindler.

Jeffrey A. Schwab, Abelman, Frayne & Schwab, of New York, New York, argued for defendants-appellees. With him on the brief were Michael Aschen and Anthony J. DiFilippi. Of counsel were Mark N. Hurvitz and David B. Abel, Squire, Sanders & Dempsey LLP, of Los Angeles, California.

Before LOURIE, Circuit Judge, ARCHER, Senior Circuit Judge, and GAJARSA, Circuit Judge.

**Opinion**

LOURIE, Circuit Judge.

Aspex Eyewear, Inc. and Contour Optik, Inc. appeal from the decision of the United States District Court for the Central District of California dismissing their action against Miracle Optics, Inc. and Viva Optique, Inc. on the ground that neither Aspex nor Contour had standing to sue for infringement of U.S. Patent 6,109,747. [1] *Aspex Eyewear, Inc. v. Miracle Optics, Inc.,* No. 01–10396 (C.D.Cal. Feb.6, 2004) ("*Decision* "). Because we conclude that Contour was the owner of the '747 patent when the original complaint was filed, and *1338 thus it had standing to sue in this action, we vacate the district court's dismissal. Given this conclusion, we remand for the court to redetermine whether all necessary parties to this action were joined.

**BACKGROUND**

The primary issue in this appeal is whether the district court correctly determined that appellant Contour transferred all substantial ownership rights to the '747 patent to nonparty Chic Optic, Inc., in which case Contour lacked standing to sue for infringement, or whether it merely granted Chic a license to that patent, in which case Contour was still the owner of the patent and had standing to sue. On August 29, 2000, the '747 patent issued in the name of David Yinkai Chao as inventor and Contour as assignee. The '747 patent claims an eyeglass combination having, *inter alia,* an auxiliary eyeglass frame that houses specialized lenses (*e.g.,* sunglasses) and attaches onto a traditional eyeglass frame. A key feature of the patented combination is the placement of magnetic studs on the traditional eyeglass frame to improve the auxiliary eyeglass frame's attachment onto the traditional eyeglass frame.

On March 20, 2001, Contour and Chic executed an agreement entitled "Distribution and License Agreement" (the "Contour/ Chic agreement"). Neither party disputes that under the terms of the agreement, Contour granted Chic certain rights under the '747 patent. Among these were (1) the exclusive right to make, use, and sell in the United States products covered by the patent, (2) the first right to commence legal action against third parties for infringement of the patent and the right to retain any award of damages from actions initiated by Chic, and (3) a virtually unfettered right to sublicense all of its rights to a third party. Under the terms of the agreement, Contour retained the right to commence legal action against third parties for infringement of the patent if Chic refused to do so within 30 days of receiving notice of infringement, and the option to contribute up to 50% of the litigation expenses incurred in any patent infringement action brought by Chic in exchange for the right to receive a *pro rata* share of any subsequent award arising from such an action. Most significantly, for purposes of this appeal, the agreement also contained a clause providing that the agreement would expire on March 6, 2003, and in no event later than March 16, 2006, if Chic exercised its one option to extend, after which all of the rights under the '747 patent that the agreement initially granted Chic would terminate. [2]

On April 5, 2001, Chic and Aspex executed a sublicense agreement entitled "License Agreement" (the "Chic/Aspex agreement"). In that agreement, Chic granted to appellant Aspex all of its rights under the '747 patent, including the exclusive right to make, use, and sell products covered by the patent, and the right to sue for infringement of the patent.

Just prior to the grant of the sublicense, however, on March 28, 2001, Aspex and Contour filed a complaint against appellee Miracle for infringement of the '747 patent. [3] Subsequently, the parties each filed **1339** motions for partial summary judgment. *Decision,* slip op. at 3. The court denied Miracle's motion for partial summary judgment of invalidity of claim 12 and granted Contour's and Aspex's motion for partial summary judgment of literal infringement of claim 12. *Id.* On February 6, 2004, the court granted Miracle's and Viva's motion to dismiss the action on the ground that neither Contour nor Aspex had standing to sue for infringement of the patent. *Id., slip op. at 26.*

According to the district court, neither Contour nor Aspex possessed the "rights of the patentee" when the original complaint was filed, and thus each lacked standing to sue. Regarding Aspex's claim of standing, because a party's standing to sue must exist at the time an original complaint is filed, the court determined that Aspex could not have had standing to sue since its agreement with Chic providing it with certain rights was executed eight days after the original complaint was filed. Moreover, the court concluded that the amended complaint, filed on April 9, 2002, could not cure this defect in standing because an amended complaint must be based on facts existing at the time of the filing of the original complaint. *Id., slip op. at 13–14.*

In reaching its decision, the court also rejected Aspex's contention that, at the time the original complaint was filed, it possessed the right to sue through a prior, implied contract with Chic. Citing our decision in *Enzo APA & Son v. Geapag A.G.,* 134 F.3d 1090, 1093 (Fed.Cir.1998), the court recognized that although "a license may be written, verbal, or implied, if the license is to be considered a virtual assignment to assert standing, it must be in writing." *Decision,* slip op. at 13. The court concluded that Aspex could not have been a "virtual" assignee of the '747 patent through an implied contract at the time the original complaint was filed, and thus that it did not have standing to bring this action.

The district court finally held that Contour did not have standing to sue because it had already transferred to Chic all substantial ownership interests in the '747 patent at the time the original complaint was filed. The court was persuaded by Chic's possession of "the right to sue [for infringement of the '747 patent], an unfettered right to sublicense [the patent to third parties], and the exclusive right to make, use, and practice the '747 patent in the United States." *Id., slip op. at 25.* The court also determined that the agreement's

term clause, which gave Contour a "reversionary interest," although a factor weighing in favor of the agreement being a license rather than an assignment, was not dispositive. *Id., slip op. at 19.* According to the court, "if the agreement transfers the other substantial rights to the patent, the court may not find that a 'hard' transfer [date] alone mandates a finding that the agreement is a license rather than an assignment." *Id.*

The district court entered final judgment on May 4, 2004. Aspex and Contour timely appealed to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## DISCUSSION

**[1]  [2]**  An issue of standing to sue is a jurisdictional one that we review *de novo. See Rite–Hite Corp. v. Kelley Co.,* 56 F.3d 1538, 1551 (Fed.Cir.1995) (en banc) (citations omitted). Under 35 U.S.C. § 281, "[a] patentee shall have remedy by civil action for infringement of his patent." **1340** The term "patentee" encompasses "not only the patentee to whom the patent was issued but also the successors in title to the patentee." 35 U.S.C. § 100(d) (2000). A patentee may transfer title to a patent by assignment, and the assignee may be deemed the effective patentee under 35 U.S.C. § 281 for purposes of holding standing to sue another for patent infringement in its own name. *Prima Tek II, L.L.C. v. A–Roo Co.,* 222 F.3d 1372, 1377 (Fed.Cir.2000).

**[3]  [4]**  While a licensee normally does not have standing to sue without joinder of the patentee, an exclusive license may be tantamount to an assignment for purposes of creating standing if it conveys to the licensee all substantial rights to the patent at issue. *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.,* 944 F.2d 870, 875 (Fed.Cir.1991); *see also Waterman v. Mackenzie,* 138 U.S. 252, 256, 11 S.Ct. 334, 34 L.Ed. 923 (1891) ("Whether a transfer of a particular right or interest under a patent is an assignment or a license does not depend upon the name by which it calls itself, but upon the legal effect of its provisions."). To determine whether an agreement to transfer rights to a patent at issue amounts to an assignment or a license, we must ascertain the intention of the parties and examine the substance of what was granted. *Vaupel,* 944 F.2d at 874 (explaining that the court must examine whether the agreements transferred all substantial rights to the patent at issue and whether the surrounding circumstances indicated an intent to do so).

## A. *Contour's Standing to Sue*

On appeal, appellants argue that Contour did not transfer to Chic all substantial rights to the '747 patent, and thus that Chic was merely a licensee without standing to sue. As principal support for their position, appellants cite the provision of the Contour/Chic agreement concerning the term of the license, which provides that the agreement will expire on March 6, 2003, and in no event later than March 16, 2006. According to appellants, the existence of a term limit to the license is a dispositive fact in its favor because of its public policy ramifications. That provision creates the risk of multiple lawsuits if Contour were not joined as a necessary party under Federal Rule of Civil Procedure 19 in any infringement action involving the '747 patent. Appellants further assert that because the potential full term of the Contour/Chic agreement is significantly shorter than the term remaining on the '747 patent once the agreement expires,[4] the risk of multiple lawsuits is heightened. Finally, appellants distinguish the term provision contained in the Contour/Chic agreement from the reversionary interests that we found to be minor in prior decisions, *viz., Vaupel,* 944 F.2d at 874, and *Prima Tek II,* 222 F.3d at 1378–79. According to appellants, the reversionary interests in those agreements did not have a "hard" termination date. Since the "licensees" of the *Vaupel* and *Prima Tek II* agreements held the patent rights for an indefinite period of time, appellants argue that the same public policy concern was not implicated in those cases.

Appellants also contend that Contour retained the right to sue for infringement, which undercuts the district court's finding of an assignment. Although the Contour/Chic agreement gives Chic the right to sue for past infringement, appellants assert that it did not transfer Contour's **\*1341** right to sue for present and future infringement. Appellants further argue that Contour could bring its own suit for infringement if Chic did not take action within 30 days of receiving notice of infringement, and Contour's retention of that right weighs in favor of finding the Contour/Chic agreement to be a license, not an assignment.

Finally, appellants contend that the court did not give enough weight to Contour's control over Chic's ability to assign its rights to the '747 patent. Appellants point to paragraph 19.1 in the Contour/Chic agreement, which states: "[no] right or license hereunder may be assigned or otherwise transferred nor any duty or obligation delegated, either in whole or in part, by operation of law or otherwise, by CHIC without CONTOUR's prior written consent, unless the said assignment is made to an Affiliate of CHIC's." Appellants contend that such control and veto power over subsequent assignments by Chic is another important ownership right to the '747 patent that Contour did not transfer to Chic, and hence argues for its retained ownership of the patent.

Appellees respond that Contour had transferred all substantial rights to the '747 patent by the time the complaint was filed. Citing the Supreme Court's *Waterman* decision, appellees argue that the mere fact that the Contour/Chic agreement contained a reversionary interest does not preclude a finding of assignment. According to appellees, until the reversionary interest is triggered, an exclusive licensee continues to possess all substantial ownership rights in a patent. Accordingly, appellees argue that until Chic's rights to the '747 patent expire in 2006, Chic, not Contour, is the effective owner of the patent. Appellees also contend that the agreement in *Vaupel* contained a reversionary interest, but we still concluded that the transfer of the patent rights there was an assignment.

Appellees also contest the assertion that the Contour/Chic agreement did not give Chic the right to sue for present or future infringements during the term of the agreement. As support for that argument, appellees cite paragraph 11.2 of the agreement: "CHIC and its authorized exclusive sublicensees may, at its own expense, take and maintain of [sic] all reasonable measures, including litigation and seeking preliminary injunctive and all other available relief, to enforce the '747 Patent against and to abate and/or prevent infringements of its rights under the Agreement." According to appellees, the plain meaning of this language is that Chic can sue for past, present, and future infringement of the '747 patent.

Lastly, appellees contend that paragraph 19.1 of the agreement, which requires Contour's written permission before Chic can assign its rights under the agreement to a third party, is not meaningful to this issue. Appellees argue that the more relevant provision is paragraph 4.4, which gives Chic the virtually unfettered authority to sublicense all of its rights to the '747 patent to any third party of its choosing. According to appellees, this unrestricted sublicense right is precisely the type of ownership interest that this court in *Prima Tek II,* 222 F.3d at 1379–80, found to be consistent with an effective assignment.

[5]    We agree with appellants that the Contour/Chic agreement did not constitute a transfer from Contour to Chic

of all substantial rights to the '747 patent, and hence it was not an assignment. The essential issue regarding the right to sue on a patent is who owns the patent. The landmark Supreme Court case of *Waterman v. Mackenzie,* 138 U.S. 252, 255, 256, 11 S.Ct. 334, 34 L.Ed. 923 (1891), held that if a transfer of patent rights, regardless whether it is through an agreement entitled **\*1342** a license or an assignment, includes "the exclusive right to make, use, and vend" the patented invention, the assignee has standing to bring suit in its own name. The case law of one of our predecessor courts has followed *Waterman* by articulating the "all substantial rights" standard and requiring a determination whether a particular transfer of rights falls on one side or the other of that line. *See Bell Intercontinental Corp. v. United States,* 180 Ct.Cl. 1071, 381 F.2d 1004, 1011 (1967). Other decisions of this court have continued to draw that line. But, at bottom, the question is "who owns the patent"? Does the transfer or retention of certain rights amount to an assignment of the patent or not? A key factor has often been where the right to sue for infringement lies. *See, e.g., Prima Tek II,* 222 F.3d at 1380.

To be sure, Contour has transferred to Chic certain rights that are often associated with ownership of a patent. As the district court correctly recognized, Chic received (1) the exclusive right to make, use, and sell products covered by the patent; (2) the right to sue for infringement of the patent; and (3) a virtually unrestricted authority to sublicense its rights under the agreement. Those provisions themselves strongly favor a finding of an assignment, not a license.

Moreover, Contour's attempts to detract from those rights are not persuasive. Contour transferred to Chic more than the right to sue only for past infringement. Paragraph 11.2 gave Chic the right to "abate and/or prevent infringements." Such language contemplates the grant of the right at least to sue to enjoin future infringements during the term of the agreement. We also agree with the district court that Contour's right to participate in lawsuits initiated by Chic during the term of the agreement is insignificant since that participation is limited to monetary contributions and receipts; Contour does not have a right to make decisions on litigation strategy. In addition, we agree with the district court that the agreement minimizes the significance of any right to sue that Contour may have had since it retained "no supervisory or veto power over Chic's grant of sublicenses." *Decision,* slip op. at 21. Furthermore, given its virtually unfettered right to sublicense, Chic's limited ability to assign its rights to unaffiliated third parties is not controlling.

However, the dominant factor in the Contour/Chic agreement on which we differ with the district court's otherwise well-reasoned opinion is the provision limiting the term of the license. Chic's rights, however substantial in other respects, are unquestionably valid for only a limited period of time, ending no later than March 16, 2006. *See supra* n. 2. As of March 16, 2006, Contour, absent an amendment of the agreement, will regain all of the rights under the '747 patent that it had previously transferred to Chic. It is thus the unquestioned owner of the patent, and, whatever rights Chic had up until 2006, it is clear that Chic never had all substantial rights to the patent, *i.e.,* it never was the effective owner of the patent. Barring the '747 patent being invalid or unenforceable, as of March 16, 2006, Chic will have possessed its rights for approximately five years, in contrast to Contour's sole and exclusive rights for the remainder of the patent term. *See supra* n. 4. Chic never had effective ownership of the '747 patent. It was not a situation in which Chic had an exclusive license with all substantial rights that was only defeasible in the event of a default or bankruptcy, or some other condition subsequent. [5] By **\*1343** having rights for only a limited portion of the patent term, it simply did not own the patent. It was merely an exclusive licensee without all substantial rights. The '747 patent was never assigned; it was exclusively licensed for only a fixed period of years, which does not meet the all substantial rights standard. Thus, we hold that the Contour/Chic agreement was a license, not an assignment, and Contour was the owner of the patent when the complaint was filed and entitled to sue.

Our conclusion that the termination provision in the Contour/Chic agreement precludes a finding that the agreement was an assignment is consistent with the policy concerns that we expressed in *Vaupel.* In *Vaupel,* while considering the importance of an agreement's right to sue provision, we noted the public policy in favor of preventing multiple lawsuits on the same patent against the same accused infringer. 944 F.2d at 875–76. That policy favors finding Chic not to be the effective owner of the '747 patent. If we were to consider Chic the assignee of the patent under the Contour/Chic agreement, as appellants recognize, it is possible that Chic could assert that patent against an accused infringer during the term of the agreement without Contour's participation in the lawsuit, and Contour could later assert the patent against the same accused infringer once the agreement expired. After all, the six-year limitation on damages could encompass a period when Chic, according to the district court's holding, and Contour both had rights to sue under the patent.

As we expressed in *Evident Corp. v. Church & Dwight Co., Inc.,* 399 F.3d 1310, 1314 (Fed.Cir.2005), another policy consideration is to prevent a party with lesser rights from bringing a lawsuit that may put the licensed patent at risk of being held invalid or unenforceable in an action that did not involve the patentee. That policy counsels against allowing Chic, who only putatively had rights under the patent for a limited time, to bring a patent infringement action without Contour, who would own the patent rights for a much longer period of time, and thereby unilaterally jeopardize Contour's future enjoyment of the '747 patent.

The cases cited by appellees in its argument that a reversionary interest alone should not compel us to conclude that the Contour/Chic agreement is a license, and not an assignment, are readily distinguishable. As we have stated, this case involves more than a reversionary clause. Moreover, none of the cases that appellees cite, *Vaupel,* 944 F.2d at 874 (termination provision triggered only in the case of bankruptcy), *Prima Tek II,* 222 F.3d at 1378–79 (agreement provided for one-year renewals, but otherwise, the agreement did not contain a fixed termination date), or *Waterman,* 138 U.S. at 261, 11 S.Ct. 334 (patentee could regain rights to the patent by paying off a mortgage), addressed an agreement with a definite termination date, as is the case here. [6] On the contrary, in each of the agreements in appellees' cited cases, the term of the agreement existed potentially for the life of the respective patents, and it was presumable that the transferred patent would never return to the assignor. That is not the case here.

We therefore vacate the district court's decision that Contour lacked standing to bring this action in view of our conclusion **\*1344** that Contour was the owner of the '747 patent when the original complaint was filed.

## B. *Joinder of Necessary Party*

[6] However, a further inquiry awaits us concerning whether the district court's dismissal was proper. Even though the lawsuit was properly brought in the name of the owner of the patent, we must still determine whether the action as brought by appellants included all necessary parties. For the same policy reasons that a patentee must be joined in any lawsuit involving his or her patent, there must be joinder of any exclusive licensee. *See Independent Wireless Tel. Co. v. Radio Corp.,* 269 U.S. 459, 466, 46 S.Ct. 166, 70 L.Ed. 357 (1926) (stating that both the owner and the exclusive

licensee are generally necessary parties in an action in equity). Appellants assert that all of the necessary parties to this action were parties to the original complaint since Contour was the patentee and Aspex was the exclusive licensee of the '747 patent. According to appellants, Aspex obtained an exclusive license through a prior implied or oral sublicense agreement with Chic that matured contemporaneously upon later execution of the written Contour/Chic agreement. Appellants contend that all of the rights that were conveyed to Chic by the Contour/Chic agreement were also passed on to Aspex. Even if Aspex had not acquired its exclusive license before the original complaint was filed, appellants argue that Aspex had acquired sufficient standing through the Chic/Aspex agreement, which was executed before the amended complaint was filed.

In its decision, the district court did not consider whether Aspex was an exclusive licensee with the right to sue, either through an implied license or the later Chic/Aspex agreement. The court determined only that Aspex was not an assignee of the '747 patent when the original complaint was filed. Once the court determined that Contour was not the patentee at the time the complaint was filed, the only way a dismissal could have been avoided was if Chic had transferred to Aspex all of its rights under the patent through a written agreement prior to the filing of the complaint, which the court found had not occurred. However, now that we have concluded that Contour was the effective patentee when the complaint was filed, whether Aspex or Chic was an exclusive licensee at that time is an issue that must be decided. If the license between Chic and Aspex was not effective at the time of the original complaint, then Chic was a necessary party and it has not been joined. If Aspex was an exclusive licensee at the proper time, then Chic was not a necessary party and Aspex was in fact a proper plaintiff.

However, we leave the question of Aspex's status for the district court to decide. As the district court has already recognized, determining whether an assignment or a license was granted involves different analyses. For example, an assignment must be in writing, while a license can be implied. *Enzo,* 134 F.3d at 1093. Determining whether there was an implied license between Chic and Aspex prior to the filing of the complaint may involve a factual determination. As an appellate court, we decline to undertake that inquiry in the first instance. We also leave it for the district court to determine whether Chic, if it was a necessary party to this action, could have been joined. Thus, we remand for the

Aspex Eyewear, Inc. v. Miracle Optics, Inc., 434 F.3d 1336 (2006)

77 U.S.P.Q.2d 1456

district court to determine whether all necessary parties to this action were joined, or could have been joined.

### CONCLUSION

We vacate the district court's decision dismissing this action on the ground that neither Contour nor Aspex had standing to **\*1345** sue for infringement of the '747 patent, and remand for further proceedings consistent with this opinion.

### COSTS

No costs.

### *VACATED AND REMANDED*

**Parallel Citations**

77 U.S.P.Q.2d 1456

Footnotes

1    In addition to the '747 patent, the original complaint also asserted infringement of U.S. Patent 5,568,207, which later issued as U.S. Reissue Patent 37,545. The original complaint also named as plaintiffs Manhattan Design Studio, Inc. ("MDS") and Asahi Optical Co., Ltd. After the district court entered final judgment on the '545 patent under Federal Rule of Civil Procedure 54(b), MDS and Asahi ceased to participate in the action involving the '747 patent.

2    Paragraph 3.1 of the Contour/Chic agreement, which the district court identified as conferring a "reversionary interest," states: "Unless terminated earlier as hereinafter provided, the Term of this Agreement shall commence on the Effective Date and, shall end on March 6, 2003. CHIC shall have the option to extend the Terms for another three (3) years from March 16, 2003, upon written notice to CONTOUR on or before September 1, 2002."

3    The original complaint also included the '207 patent and had as additional plaintiffs MDS and Asahi. *See supra* n. 1. The court added appellee Viva Optique, Inc. as a defendant on December 4, 2003.

4    Contour claims that the '747 patent expires in 2017. The filing date for the application leading to the '747 patent was April 28, 1997. Accordingly, under 35 U.S.C. § 154, absent a patent term extension, the '747 patent will apparently expire 20 years later, subject to any terminal disclaimer.

5    We also note that we are not presented with the situation in which a patent was effectively assigned and ownership changed for a period of time, after which by separate agreement it was to be reassigned in the future to the original patentee.

6    In *Prima Tek II,* we expressly stated that we were leaving unanswered the question whether an agreement with a "hard" termination date could convey to a licensee standing to sue. 222 F.3d at 1378.

---

End of Document      © 2014 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.    7