TAB 21



1978 CarswellNfld 26, 15 Nfld. & P.E.I.R. 301

▷

1978 CarswellNfld 26, 15 Nfld. & P.E.I.R. 301

Bowater Newfoundland Ltd. v. Newfoundland & Labrador Hydro

Bowater Newfoundland Limited Appellant v. Newfoundland and Labrador Hydro Respondent

Supreme Court of Newfoundland, Court of Appeal

Morgan, J.A., Gushue, J.A., Furlong, C.J.N.

Judgment: February 20, 1978
Docket: Doc. 299

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Counsel: *Leonard Martin, Q.C.* for the Appellant.

*P.J. Lewis, Q.C.* for the Respondent.

Subject: Contracts

Contracts --- Construction and interpretation — Resolving ambiguities

In interpreting a contract, the deed must be read as a whole in order to ascertain the true meaning of its several clauses. If a clause in a contract is followed by a later clause which destroys the obligation created by the earlier clause, the earlier clause prevails. But if the later clause does not destroy but only qualifies the earlier, the two must be read together. The rule that words must be construed in their ordinary popular sense has been departed from when that meaning would create some inconsistency with the rest of the contract or make a provision totally repugnant to the intention of the parties.

**Judgment of *Morgan, J.A.*:**

1       This is an appeal from the decision of Noel J. dated November 5th 1976 on a case stated by a Board of arbitrators pursuant to the Judicature Act R.S.N. 1970 Ch 187, Part VI, as amended by the Judicature (Amendment) Act 1974 Ch 57.

1978 CarswellNfld 26, 15 Nfld. & P.E.I.R. 301

2     By an agreement as of January 1st 1969 made between the parties hereto, wherein the respondent is described as the Commission and the appellant the Customer, the respondent agreed to supply and the appellant agreed to purchase 18,000 kilowatts of electrical power monthly for use in its paper mill facilities, subject to the terms and conditions set forth in the said agreement. A dispute having arisen as to the amount properly payable by the appellant in respect of the power and energy used by it during the month of December 1975, the matter was subsequently referred to the Trial Division of this Court for the opinion of the Court on the following question:

   Whether or not upon a proper construction of the said agreement the Customer is entitled to a reduction in the amount of the account submitted to it by the Commission for the month of December 1975.

3     The relevant facts, not in dispute, are as follows: On November 30, 1975 the appellant's mill operations were suspended in part by reason of a strike of its employees. As a result of the partial suspension of its operations the appellant did not require the full amount of 18000 kilowatts of electrical power during the month of December 1975 and requested the respondent to amend its billing account for that month to reflect the cost of the amount of electrical power actually used. This the respondent refused to do and the appellant paid the amount billed pending settlement of the dispute.

4     The appellant's claim to a reduction of the agreed monthly payment of $57,600.00 is based on the covenants contained in Clause 1 of the agreement, and Section J of Schedule "A".

5     Clause 1 of the agreement provides:

**1. AMOUNT OF POWER**

   Subject to the other provisions hereof, the Commission agrees to deliver and the Customer agrees to purchase from the Commission eighteen thousand (18,000) kilowatts of electrical power.

   Upon the expiration or determination of a contract for electrical power or energy to be supplied or provided directly or indirectly by a subsidiary or associated company of the Customer to any person, firm or corporation (hereinafter referred to as a "Purchaser") or the failure, neglect or refusal of a Purchaser either to renew or extend such a contract, or to enter into a new contract therefor, and the Commission shall as a result thereof thereafter supply or provide electrical power or energy directly or indirectly to such a Purchaser, then and as often as the same shall happen the Customer shall forthwith on notice given by the Customer to the Commission thereafter be relieved of the obligation to take and the liability to pay for an amount of electrical power or energy hereunder equal to the amount of any excess generating capacity of such subsidiary or associated company created as a result of the Commission supplying electrical power or energy to such a Purchaser.

6     Section J of Schedule "A" incorporated as part of the agreement by Clause 9, provides:

**J. TEMPORARY SUSPENSION OF AGREEMENT**

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1978 CarswellNfld 26, 15 Nfld. & P.E.I.R. 301

> If, at any time during the term of this agreement, the operation of the works of either party is suspended in whole or in part by reason of war, rebellion, civil disturbance, strikes, serious epidemic, fire or other fortuitous event, then such party will not be liable to the other party to purchase or, as the case may be, to supply power and energy hereunder until the cause of such suspension has been removed. In every such event, the party whose operations are so suspended shall use all reasonable diligence to remove the cause of the suspension.

7     When construed in isolation from the other provisions of the agreement, Section J of Schedule "A" would appear to relieve the appellant of its covenant to pay for 18000 kilowatts of power while its operations are suspended in whole or in part by reason of strikes. In that event it would only be required to pay for the power used during the strike period.

8     It is unquestionable that the object of interpretations of all written instruments is to ascertain the intention of the parties thereto as expressed in the instrument itself. To ascertain the true intention of the parties, however, one must look at each provision in the context in which it is found and, in construing it, regard must be had to the language used in that and other parts of the document to avoid inconsistency. As stated by Lord Watson in *Chamber Collier Co. v. Troyerould* (1915) 1 Ch. 268 at p. 272:

> The deed must be read as a whole in order to ascertain the true meaning of its several clauses, and the words of each clause should be so interpreted as to bring them into harmony with the other provisions of the deed if that interpretation does no violence to the meaning of which they are naturally susceptible.

9     In Clause 1 the appellant covenants to purchase (18000) kilowatts of power. Under Section J the appellant is relieved of its liability to purchase that amount of power in whole or in part in the event its operations are suspended by reason of a strike. In view of the language used in other parts of the agreement the meaning to be given the word 'purchase' is of importance in construing these two provisions.

10     The ordinary or commercial meaning of "Purchase" is "to obtain or acquire by payment of money or its equivalent". This implies a twofold obligation, the one - to take, the other - to pay for. This distinction is noted in the second paragraph of Clause 1 wherein it is provided that on the happening of certain specified events, the customer (appellant) shall be "*relieved of the obligation to take and the liability to pay for*", certain amounts of power. Thus it is clear that by agreeing to *purchase* (18000) kilowatts of power as stated in the first paragraph of Clause 1 the appellant undertook to take and pay for that amount of power, subject however to any reductions within the provisions of paragraph 2 of the same clause and other later sections.

11     To expound the true purport of Section J regard must be had to the language used in the agreement as a whole and more specifically in Clause 4 of the agreement and Section K of Schedule "A" as well as that used in Clause 1 (supra).

12     Clause 4 and Section K read as follows:

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1978 CarswellNfld 26, 15 Nfld. & P.E.I.R. 301

### 4. MINIMUM MONTHLY PAYMENT

Subject to any reductions by virtue of Article 1 hereof, and calculated pursuant to Articles 2 and 3 hereof, the minimum monthly payment shall be fifty seven thousand six hundred dollars ($57,600.00) during each and every month of the term of this agreement. This payment is to be made for the right to use the Commission's power service and the Customer agrees to make this payment whether it uses the service or not, provided that the provisions of Article K of Schedule A shall only apply when the Commission is unable to deliver power and energy under the terms of this agreement.

### K. REBATES

If the supply of power and energy hereunder is interrupted or curtailed in accordance with Articles H, I, or J hereof, and such interruption or curtailment lasts for a period of one (1) hour or longer, the Commission shall, on the request of the Customer, allow a proportionate reduction in the payment for the right to use and for the use of the Commission's power service. The reduction in payment shall be determined in the following manner:

> 1. For total interruption the amount used as basis shall be the amount of the billing demand for the month on which the Customer would otherwise be required to pay.

> 2. For partial interruptions the amount used as basis shall be the amount of the said billing demand less the average amount in kilowatts of power taken by the Customer during the interruption.

> 3. In every case the kilowatts to be used for adjustment shall be the amounts used as basis averaged over the whole month in the ratio of the length of time of the interruption to the total time in the month.

13    Other than the language used in Clause 1 the agreement is silent with respect to the appellant's obligation to take the agreed amount of power. In subsequent clauses provision is made for payment, not for the taking of the power, but for "the right to use and the use of the Commission's power service". For this service the appellant is called upon to make a minimum monthly payment of $57,600.00 or such lesser amounts as may be calculated in accordance with the provisions of Clause 1. It is specifically provided by Clause 4 that this minimum amount is to be paid "*for the right to use the Commission's power service and the Customer agrees to make this payment whether it uses the service or not*".

14    The answer to the question under consideration, then, turns on the meaning to be given the word "purchase" as used in Section J.

15    That Section provides inter alia, that if the appellant's operations are suspended by reason of strikes it shall not be liable to purchase power and if the respondent's operations are likewise suspended it shall be under no liability to supply power. In the latter event provision is made by Section K for a "proportionate reduction in the payment for the right to use and for the use of the Commission's power and service". The basis on which such a reduction is to be calculated is also provided. However Section K contains no provision for a reduction in payment if the appellant's operations are suspended and the provisions of that section are specifically excluded therefrom. It is significant that

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1978 CarswellNfld 26, 15 Nfld. & P.E.I.R. 301

Section K contemplates a rebate or "reduction in payment" only in the event of an interruption in the supply of power by the respondent even though Section J is referred to therein along with Section H and I.

16      If Section J were construed as meaning that, in the event of a strike, causing a suspension of operations, the appellant would not be liable to take or to pay for power, then, such a construction would make Section J inconsistent with Clause 4. That clause unequivocally states that payment is to be made whether the services are used or not. Thus the provision of Section J, coming after Clause 4, would have to be rejected. This principle was enunciated by Lord Wrenbury in *Forbes v. Git* (1922) 1 AC 256 at p. 259:

> If in a deed an earlier clause is followed by a later clause which destroys altogether the obligation created by the earlier clause, the later clause is to be rejected as repugnant and the earlier clause prevails. ...But if the later clause does not destroy but only qualifies the earlier, then the two are to be read together and effect is to be given to the intention of the parties as disclosed by the deed as a whole.

17      The rule that words must be construed in their ordinary popular sense has been departed from when that meaning would create some inconsistency with the rest of the instrument or make a provision totally repugnant to the real intention of the parties as gathered from the instrument as a whole. This rule of construction was enunciated by Lord Wensleydale in *Grey v. Pearson* (1857) 6 HL Cas 61; (1843-60) All Eng Rep 21 at p. 36:

> I have been long and deeply impressed with the wisdom of the rule, not I believe universally adopted - at least, in the courts of law in Westminster Hall, that in construing wills, and indeed statutes, and all written instruments, the grammatical and ordinary sense of the words is to be adhered to, unless that would lead to some absurdity or some repugnance or inconsistency with the rest of the instrument, in which case the grammatical and ordinary sense of the words may be modified so as to avoid that absurdity or inconsistency, but no further.

18      It is apparent then that the rule as to repugnancy is to be applied only as a last resort when there is no reasonable way to construe the offending provision so as to bring it into harmony with the true intention of the parties as gathered from the document as a whole.

19      In this case the clear intention of the parties as gathered from the agreement as a whole was to provide for a minimum monthly payment by the appellant to the respondent whether or not any power was used. If the word "purchase" found in section J were to be given its ordinary commercial meaning of "to take and pay for", that section would have to be construed so as to relieve the appellant of its obligation to take and its liability to pay for power in the event its operations were suspended by reason of a strike. Such a construction would make section J wholly inconsistent with and repugnant to the clear unequivocal language found in clause 4.

20      By adopting the rule enunciated by Lord Wensleydale in *Grey v. Pearson*, supra, that repugnancy can be avoided by modifying the meaning to be attributed to the word "purchase" in that context. Clearly the concept of "liability to pay for" was not meant by the parties and a more restricted meaning should be given that word. To bring section J into harmony with the other provisions of that deed and thus give effect of the intentions of the parties as gathered from the agreement as a whole the word purchase has to be interpreted as referring to the acquisition or taking only. This interpretation does not do violence to the meaning of which that word is naturally susceptible.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1978 CarswellNfld 26, 15 Nfld. & P.E.I.R. 301

21      For the above reasons I respectfully agree with the learned trial Judge that the appellant is not entitled to the reduction sought.

22      I would accordingly dismiss the appeal with costs.

**Judgment of *Gushue, J.A.*:**

23      I have perused the judgment of my brother Morgan and agree, for the reasons stated by him, that the appeal must be dismissed. While at first glance Section J appears to be an overriding provision of the contract available to both parties, study of the agreement as a whole makes it apparent that to construe it as such would obviously do far more violence to the otherwise expressed intent of the parties than to place the more restrictive interpretation on it.

24      It is clear that the intent of the agreement was to ensure that the appellant would receive each month 18,000 kilowatts of electrical power without any reduction so as to further ensure that the operation of its paper mill would not be adversely affected. A clearly beneficial rate for this power was agreed upon and, as set out in Clause 4, payment for this *right to receive* the power was to be made whether the power was used or not. Clause 2 also refers to "the right to use and for the use of the Commission's power service", and that payment by the appellant "entitled" it to take energy up to 18,000 kilowatts. Further the reference in Clause 4 to the provisions of Article K, i.e., "Rebates", only applying when the respondent was unable to deliver power, even though Article J is mentioned along with Articles H & I in Article K, is in my view most significant.

25      Thus, to place the normal meaning of "taking and paying for" on the word "purchase" in Clause J would obviously make this clause directly contradictory to the various other sections of the agreement already referred to and to the intent of the parties as it otherwise appears throughout the contract. I agree that this should not be the case.

26      The appeal is dismissed, with costs.

**Judgment of *Furlong, C.J.N.*:**

27      On January 1, 1969 the Newfoundland and Labrador Power Commission entered into an agreement with Bowater Newfoundland Limited for the supply of electrical power and energy for its paper mill. The Commission agreed to deliver and Bowaters agreed to purchase 18,000 kilowatts of electrical power.

28      The contract calls for the payment of $3.20 per kilowatt per month for 18,000 kilowatts or a total monthly payment of $57,600.00. On November 30, 1975 Bowaters' operations were interrupted because of a strike and they consequently reduced the amount of power taken from the Commission by one half, that is to 9,000 kilowatts per month. The appellant formally notified the respondents on the 17th of December, 1975 of the interruption in its operations, claiming a reduction in its monthly account by virtue of clause J of Schedule A of the agreement to which I will refer in greater detail. The respondent refused to agree to the reduction in payment and on January 16, 1976 the appellant paid the monthly amount of $57,600.00 but disclaiming its obligation to do so and requesting a return of

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1978 CarswellNfld 26, 15 Nfld. & P.E.I.R. 301

$28,800.00.

29      A dispute having arisen between the parties, it was submitted to arbitration under the terms of the agreement. Before the arbitration proceedings commenced the parties obtained from Mr. Justice Noel an order referring the matter by way of a case stated for the opinion of the Court. The question upon which the opinion of the Court was sought was "whether or not upon a proper consideration of the said agreement the customer is entitled to a reduction in the account of the amount submitted to it by the Commission for the month of December 1975". Mr. Justice Noel found that Bowaters was not entitled to a reduction and directed that judgment be entered for the plaintiff accordingly.

30      It is from this judgment that Bowaters Nfld. Ltd. now appeal claiming in essence that the learned trial Judge erred in law in construing the agreement between the parties to mean that clause "J" of Schedule A, or any other conditions did not relieve the appellant of its obligation to take and pay for a minimum amount of electrical energy at a specified rate.

31      The only clauses of the agreement pertinent to this appeal are as follows:

**1. AMOUNT OF POWER**

Subject to the other provisions hereof, the Commission agrees to deliver and the Customer agreed to purchase from the Commission eighteen thousand (18,000) kilowatts of electrical power.

Upon the expiration or determination of a contract for electrical power or energy to be supplied or provided directly or indirectly by a subsidiary or associated company of the Customer to any person, firm or corporation (hereinafter referred to as a "Purchaser") or the failure, neglect or refusal of a Purchaser either to renew or extend such a contract, or to enter into a new contract therefor, and the Commission shall as a result thereof thereafter supply or provide electrical power or energy directly or indirectly to such a Purchaser, then and as often as the same shall happen the Customer shall forthwith on notice given by the Customer to the Commission thereafter be relieved of the obligation to take and the liability to pay for an amount of electrical power or energy hereunder equal to the amount of any excess generating capacity of such subsidiary or associated company created as a result of the Commission supplying electrical power or energy to such a Purchaser.

**2. PRICE OF POWER AND ENERGY**

The price to be paid each month for the right to use and for the use of the Commission's power service as covered by this Agreement shall be three dollars and twenty cents ($3.20) per kilowatt per month. The above payment shall entitle the Customer to take energy up to one hundred per cent (100%) monthly load factor without additional charge therefor.

**4. MINIMUM MONTHLY PAYMENT**

Subject to any reductions by virtue of Article 1 hereof, and calculated pursuant to Articles 2 and 3 hereof, the

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1978 CarswellNfld 26, 15 Nfld. & P.E.I.R. 301

minimum monthly payment shall be fifty seven thousand six hundred dollars ($57,600.00) during each and every month of the term of this agreement. This payment is to be made for the right to use the Commission's power service and the Customer agrees to make this payment whether it uses the service or not, provided that the provisions of Article K of Schedule A shall only apply when the Commission is unable to deliver power and energy under the terms of this agreement.

**9. SCHEDULE "A"**

Schedule "A" attached hereto applies to all power and energy hereunder and forms part of this agreement.

**J. TEMPORARY SUSPENSION OF AGREEMENT**

If, at any time during the term of this agreement, the operation of the works of either party is suspended in whole or in part by reason of war, rebellion, civil disturbance, strikes, serious epidemic, fire or other fortuitous event, then such party will not be liable to the other party to purchase or, as the case may be, to supply power and energy hereunder until the cause of such suspension has been removed. In every such event, the party whose operations are so suspended shall use all reasonable diligence to remove the cause of the suspension.

**K. REBATES**

If the supply of power and energy hereunder is interrupted or curtailed in accordance with Articles H, I or J hereof, and such interruption or curtailment lasts for a period of one (1) hour or longer, the Commission shall, on the request of the Customer, allow a proportionate reduction in the payment for the right to use and for the use of the Commission's power service. The reduction in payment shall be determined in the following manner:

1. For total interruption the amount used as basis shall be the amount of the billing demand for the month on which the Customer would otherwise be required to pay.

2. For partial interruptions the amount used as basis shall be the amount of the said billing demand less the average amount in kilowatts of power taken by the Customer during the interruption.

3. In every case the kilowatts to be used for adjustment shall be the amounts used as basis averaged over the whole month in the ratio of the length of time of the interruption to the total time in the month.

**L. PAYMENT OF ACCOUNTS**

The Commission will render its accounts monthly and the Customer shall make payment in lawful money of Canada at the Commission's office in St. John's, Newfoundland, or in such other place as the Commission may designate, within twenty (20) days of the date of rendering such accounts, without deduction for any claim or counterclaim which the Customer may have or claim to have against the Commission arising under this agreement or otherwise. All payments in arrears after the said twenty days (20) shall bear interest at the rate of six (6%)

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1978 CarswellNfld 26, 15 Nfld. & P.E.I.R. 301

per cent per annum.

If the Customer is in default for over thirty (30) days in paying any amount due the Commission hereunder, then, without prejudice to its other recourses and without liability therefor, the Commission shall be entitled after ten (10) days written notice to the Customer of its intention to do so, to suspend the supply of power and energy to the Customer until the said amount is paid. If the supply is so suspended, the Customer shall not be relieved of its obligation hereunder, including the payment of the minimum monthly payment as stipulated in Article 4 of the agreement.

32    Martin, Q.C., counsel for the appellant, submitted that in determining the merits of the appeal there are two principal questions to be decided by us: - whether or not the full amount of the December 1975 account was properly due under the terms of the contract; and if this amount was not properly due should the appellant be shut off from the reduction in the amount under Article 4 because of the restriction of the provisions of clause K are only applicable when the respondent is unable to supply the power. Should it be found that the full amount was properly due then of course the second question, that is the entitlement to rebate will not arise.

33    The appellant's case rests heavily on Clause J which provides that either party whose operations have been suspended by reason of, inter alia, strikes, "from liability to the other party to pruchase or, as the case may be, to supply power and energy hereunder until the cause of such suspension has been removed". The appellant's argument is that the governing Article in the contract is Article 1 and specifically the introductory phrase "subject to the other provisions hereof". Counsel claims that this was substantially disregarded by the learned trial Judge who simply took Article 1 as being an agreement to supply power on the one hand and to purchase the power on the other hand. It is argued that the separation of these mutual obligations tends to over simplify the position and to obscure the application of the other provisions of the contract. Specifically the other provisions which Mr. Martin refers to are of course clause J in the schedule and Article 4 in the contract itself.

34    In other words the sum and substance of the appellant's argument it seems to me is that because Bowaters are said to have agreed to 'purchase' power from the Commission that in event of the suspension, such as the one that occurred in November 1975 they are entitled to all the benefits in clause K by way of rebates for the power which they were unable to use because of the suspension of their works.

35    In his judgment Noel, J. very properly in my view, pointed out the declaration in Article 4 that "This payment is to be made for the right to use the Commission's power service and the customer agrees to make this payment whether it uses the service or not..."

36    In reply to all this P.J. Lewis, Q.C. argued succinctly that the document must speak for itself and that if read together there is no conflict whatsoever between the articles in the contract and the clauses in the schedule. He further said that Article 1 does not lend itself to any modification as any modification would do violence to the contractual obligations of the parties. He claims that Article 4 calls for a minimum monthly payment irrespective of any other circumstance. Mr. Lewis asks us to accept his description of the agreement as a "take and pay" contract arguing that this type of contract was a reasonable one and not unusual in the Hydro Electric world providing a stability of income favourably looked upon by finance houses who are invited to provide large sums of money for the construction of

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1978 CarswellNfld 26, 15 Nfld. & P.E.I.R. 301

these expensive undertakings.

37     At the outset of his argument Mr. Martin disagreed with this concept of a "take and pay" contract and suggested that the Court should reject Mr. Lewis's arguments as being totally irrelevant and in fact not supported by any evidence.

38     I find this point unimportant in arriving at the true intention of the parties to the contract. If that intention was to provide for minimum payment and this is viewed with favor by the financiers or if the intention of the party was less favourable on monies and consequently less attractive to the financial world it makes no difference in the proper interpretation of what the parties have attempted to express in specific language. That they failed in their attempt to be specific, at all events to be sufficiently specific to enable each party to clearly understand what its obligation is, is clear. It is this inability to reconcile their opposing views that brings the matter into this arena at all.

39     It goes without saying that this contract must be read as a whole and any effort to sever one part from the other must be rejected. The Schedule is as much a part of the agreement between the parties as is the main contract. For example Paragraph 1 can only be read, because of its introduction if for no other reason, to show that the specific obligations of the Commission to provide electrical power and the coordinate obligation of Bowaters to take this power is the core of the agreement. I have purposely at this stage used the phrase 'to take the power' rather than to use the word 'purchase' which has been the cause of much of this dispute and which I will deal with. Martin, Q.C. has said that the case depends on Clause J but whilst one can agree with this one cannot pluck a single clause out of the agreement as though it had an existence all of its own in no way dependent upon the other provisions of the contract.

40     If one reads the contract as a whole one can gradually fit the several clauses together rather as one completes a jigsaw puzzle. No one clause, or piece of the puzzle, can stand on its own but all must fit together so as to form a complete contract or a complete picture as the case may be.

41     In endeavouring to complete this jigsaw puzzle I have examined each and every article of the contract and clause of the schedule carefully to see whether or not they are necessary to express what I believe to have been the intention of the parties. For my part I have reached the conclusion that the simple intention of the parties is this; that the Hydro Commission would provide Bowaters with electrical power and energy and that Bowaters would pay for this and that that payment was for the actual electrical power (as though it were a commodity) and for the use of the production and transmission facilities of the Commission. I have come to the opinion that Bowaters agreed to make a minimum monthly payment and that this payment was only to be reduced if the Commission took over from Bowaters or its subsidiary companies power which Bowaters was selling them and this sale to be reflected in the amount which they would have to pay the Commission.

42     It seems to me that this whole action has been bedeviled by the unfortunate use of the word "purchase" for which many meanings can be found and we are asked to endorse several different meanings. With some daring I venture to express a view as to what the word means in this present context. The learned trial Judge took the view that purchase as used by the parties meant "to accept", "to acquire" or "to receive" the electrical power. He expressed the view that it was used in contrast to the other word "supply" which of course was the obligation of the Commission. I think that Mr. Justice Noel was right in his conclusion that the agreement provided for supply and acceptance of power

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1978 CarswellNfld 26, 15 Nfld. & P.E.I.R. 301

by the respective parties though I am not wholly in agreement with his definition of the word "purchase".

43      I am satisfied that the ordinary meaning of the word "purchase" implies an act of sale on the part of a vendor and acceptance on the part of a vendee and that simple buying and selling must of necessity include the giving of consideration from one to the other. What I am saying is that there must be some element of payment either in money or other consideration passing between the parties. If there was no such consideration the transaction is transformed into a gift when wholly different considerations come into play.

44      I am unable to agree with the argument advanced by Mr. Martin that a fair reading of Clause J would show a clear intention that, in the event of a strike and close down of the operations of Bowaters, Bowaters would be under no obligation to make the minimum monthly payment under the agreement. I think all of this means that Bowaters though obliged to pay their minimum monthly payment for the use of the facilities of the Commission, are under no obligation to receive into their distribution system any electrical energy or power which they are unable to use.

45      I think the agreement between the parties can simply be reduced to an agreement that as long as the Commission is not prevented by outside events from supplying power the customer has to pay a minimum monthly amount of $57,600.00. If the customer does suffer a work suspension it makes no difference to its liability to pay the minimum amount and as Bowaters are excluded from the benefits of Clause K in these circumstances then a suspension of its operations does not relieve it of its liability and it is not entitled to any reduction, or to the rebate it now claims.

46      I am satisfied that the learned trial Judge arrived at the right conclusion even though he and I might have proceeded on the journey to it by different routes. This appeal must be dismissed with costs.

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

TAB 22

COURT OF APPEAL

**BRITISH NYLON SPINNERS LD**
v.
**IMPERIAL CHEMICAL INDUSTRIES LD**

*See authoritative, annotated version at* [1953] 1 Ch. 19[*]

[1952 B. No. 3747.]

**COUNSEL:** T. G. Roche for the plaintiffs.
Rodger Winn for the defendants.

**SOLICITORS:** J. W. Ridsdale; Bristows, Cooke & Carpmael.

**JUDGES:** Evershed M.R., Denning and Romer L.JJ.

**DATES** 1952 Oct. 15, 16

International law – Jurisdiction – English contract to grant patent licences – Order by foreign court directing cancellation of rights under English contract – Injunction preventing obedience to foreign court order – Extraterritorial jurisdiction.

The defendants, an English corporation, were ordered by a foreign court, to whose jurisdiction they were subject, to cancel an existing agreement with a foreign company and to reassign to that company certain patents and rights thereunder previously assigned to the defendants for registration in the United Kingdom. They were also forbidden by the same order to make any disposition of the assigned patents unless they obtained from the grantee under such disposition an undertaking to hold them subject to a condition which involved the free import into any country – including the United Kingdom – of goods manufactured in accordance with the assigned patents.

Prior to the making of the order of the foreign court, the defendants had entered into a contract in England with the plaintiffs, an independent English corporation not subject to the jurisdiction of the foreign court, to grant them licences to exercise and practise all the inventions covered by the assigned patents within defined territories. At the date of the said order, the patents had not been formally registered, and no licences had been granted under the English contract.

After the making of the said order, the plaintiffs issued a writ against the defendants, requiring specific performance of their contract, and asked for an injunction to restrain the defendants from reassigning the patents in obedience to the foreign court order. Upjohn J. granted an interlocutory injunction until judgment in the action or further order.

On appeal by the defendants:–

Held, continuing the injunction, that in so far as the foreign court order asserted an extraterritorial jurisdiction, the effect and intention of which was to destroy or qualify statutory rights under an English contract vested in an English national who was not subject to the jurisdiction of the foreign court, the courts would not, despite the comity of nations, recognize such extraterritorial jurisdiction and would intervene to restrain the defendants from obeying the order.

Decision of Upjohn J. affirmed.

INTERLOCUTORY appeal from Upjohn J.

By an agreement made on December 31, 1946, the defendants, Imperial Chemical Industries Ld. and an American corporation, du Pont de Nemours & Co. Inc., the latter agreed to assign to the [*20] defendants certain patents and applications for patents scheduled to the agreement, such assigned patents to be registered as British patents in the United Kingdom.

On March 5, 1947, the defendants entered into a contract in England with the plaintiffs, British Nylon Spinners Ld., an English corporation. The plaintiffs claimed that under this contract they had a licence or the right to be granted a licence to exercise and practise within a defined field all the inventions covered by the patents and applications for patents in the schedule to the agreement of December 31, 1946, between the defendants and the American corporation.

In June, 1952, the plaintiffs asked the defendants' solicitors to execute formal licences under the assigned patents to enable the plaintiffs to register them, and were informed that, owing to the existence of legal proceedings in the United States, the defendants could not execute any documents relating to the patents in question.

On July 30, 1952, in the United States District Court of New York, his Honour Sylvester J. Ryan delivered a final judgment in an action brought by the United States of America against the defendants, du Pont de Nemours & Co. Inc., and others under the anti-trust law known as the Sherman Act: United States of America v. Imperial Chemical Industries Ld. and Others. 1 The plaintiffs were not parties to those proceedings.

By a clause in that judgment the United States court ordered that the agreement of December 31, 1946, between the defendants and du Pont de Nemours & Co. Inc. be cancelled, and that the defendants should reconvey within 90 days all the patent rights assigned to them under that agreement.

Other clauses in the judgment2 forbade any disposition of

> 1 U.S. District Court for the Southern District of New York [1952] Civil Action No. 24-13.

> 2 "IX. Patents and Technology. (4) Until June 30, 1977 … du Pont and ICI shall (a) grant to any person (including du Pont and ICI) making written request therefor, in consideration of a reasonable royalty, an unrestricted, non-exclusive immunity under any foreign counterpart of any existing or new patent to import into any foreign country any common chemical product lawfully manufactured in the United States. …"

> (13) Du Pont and ICI shall not … (b) make any disposition of foreign patents or rights thereunder, which deprives them of the power or authority to issue the grants of immunity required by this judgment, unless the defendant requires in writing … that the purchaser, assignee of licensee agrees to receive and hold its rights subject to any grant or grants of immunity given by the defendant pursuant to the provisions of this judgment. …"

[*21] foreign patents by the defendants unless they obtained from the grantee an undertaking in writing to hold licences subject to the right of American manufacturers to import goods manufactured in accordance with the patents freely into any foreign country.

The plaintiffs thereupon issued a writ claiming declarations as to their rights to licences, and asking for an order that the defendants should execute formal grants of those licences, and for specific performance of the contract of March 5, 1947. They also asked for an injunction to restrain the defendants from assigning or dealing with or parting with any of the patent rights in question in obedience to the order of the United States court.

British Nylon Spinners v Imperial Chemical Ltd.

On August 13, 1952, Upjohn J. granted an interlocutory injunction to restrain the defendants from assigning the patents until judgment or further order.

The defendants appealed.

Rodger Winn for the defendants. The English patents assigned to the defendants by the agreement of December, 1946, would give them the right to keep out of the United Kingdom articles manufactured in accordance with the patents. The intended effect of the judgment is to forbid the defendants in personam from exercising that right; and if they do so they will be amenable to penalties for contempt of court.

[EVERSHED M.R. The American court assumes jurisdiction in personam against a party amenable to its jurisdiction to compel it by contract to modify the rights which the law of another country confers on it in that other country. Moreover, the order is to take effect notwithstanding the plaintiffs' rights. If they have in equity a right to specific performance against the defendants, does not the order in form purport to interfere with the municipal law of England? We may have to consider to what extent we concede on grounds of the comity of nations extraterritorial jurisdiction to interfere with English patent rights.]

That puts the case very forcefully and may make my submissions irrelevant. It is submitted:

> (1) It is a general principle of English law that if one man has granted or agreed to grant a right to another in respect of some particular property, whether real or personal, and is evicted by title paramount before performance, he will either be free of his obligation or at the least it cannot be specifically enforced [*22] against him; a bailee is for instance free from obligation to a bailor if goods are taken from him by title paramount.

> (2) The English courts will refrain from ordering a party to a contract to do anything illegal by the proper law of the contract, which, it is submitted, is here American law. The obligation on the defendants does not arise merely ex contractu but has been imposed on them by a court of competent jurisdiction to which jurisdiction they are subject by virtue of their contract with the American company.

[DENNING L.J. But the order overrides and cancels the contract. The American court would assume jurisdiction even if the contract were governed by English law!]

Yes; it is conceded that the order tears up and abrogates the whole contract; it does not enforce a contract either specifically or by a grant of damages.

[ROMER L.J. It may be that another principle applies, namely, that these courts will pay no regard to the operation in this country of any foreign law of a confiscatory nature. The American court order has confiscated without compensation the right at present vested in the plaintiffs to come and ask for specific performance. Though they might get monetary damages, such damages might not be proper compensation.]

If the effect of the American order be that persons taking a licence under these patents will take it free from the rights already granted to the plaintiffs, it would be confiscatory to that extent: see *New Ixion Tyre and Cycle Co. v. Spilsbury*. 3

(3) The defendants have only contracted to grant licences and by implication not to assign the patents away before doing so. They have not contracted not to assign the patents nor to remain indefinitely entitled nor that their title as assignees would remain unassailable. No authority is needed for this submission.

[EVERSHED M.R. The court is anxious to show proper respect for a superior court of a

friendly nation which is attempting to enforce its own proper legislation. It might be opportune to vary the order of Upjohn J. to apply in the event of steps being taken against the defendants in New York.]

The American courts expressed a similar desire to show respect for these courts. But if the court holds that there is here something amounting to confiscation, it would be in accordance with traditional practice not to give effect to that part of the foreign judgment. This is only an interlocutory step, and it may be that

    3 [1898] 2 Ch. 137.

[*23] the status quo should be preserved, for once the patents have been reassigned the position cannot be remedied vis-à-vis the plaintiffs save by money, which, it is conceded, may not be proper compensation.

T. G. Roche for the plaintiffs. As for the purposes of this motion the existence of the contract between the parties is conceded, the plaintiffs have established a prima facie case that a breach is intended. The plaintiffs' contract is one made between two English companies in England, and its proper law is English. Under it the plaintiffs have equitable rights in English patents enforceable against the world if there be notice of them. Indeed, there are remarks obiter by a judge of this court that they may even be legal rights, but in view of the registration provisions, and the fact that at the time of the American court's order the patents were not registered here, that question is not clear beyond doubt. It is, however, clear that the plaintiffs have an enforceable right against the present defendants.

[EVERSHED M.R. Can the plaintiffs protect themselves by registering notice under the Patent Acts or by registering this action as a "lis pendens"?]

No; there must be an instrument to register. It was an implied term of the contract that the defendants would not put it out of their power to grant a licence. The defendants are now threatening to get rid of the legal estate and receive back a licence with conditions attached. They are thus clearly in breach, or are threatening breach, of their contractual duties. If they assign the patents to the American company the plaintiffs' rights will be gone for ever.

An Act of a foreign legislature – here the Sherman Act of Congress – cannot have extraterritorial effect in this country so as to deprive English subjects of their rights under English contracts with other English subjects. A fortiori, an order of one of the courts of that foreign country cannot affect the plaintiffs' rights in England.

[EVERSHED M.R. I am not satisfied that the present injunction should extend, e.g., to Australia or any other country covered by agreement between the plaintiffs and defendants. You may have to proceed in all those countries.]

The plaintiffs at present have no rights in any other country, but only a contractual right in England to specific performance by the defendants. So far as the contractual rights outside England are concerned, the court presumes that the law of those other [*24] countries is the same as that of England, until the contrary is proved.

It is submitted that, if the injunction in its present form is continued, the English courts can investigate all the relevant matters; if not, the patents will have gone to an American corporation in no way subject to the court's jurisdiction. The only obstacle to maintaining the status quo is the order of the American court.

The provision in the judgment as to the applicability of the judgment4 was intended to cover the present eventuality. The judge there used the words "U.S. Government" as meaning "State"; an Act of the general law forbids the defendants from doing an act, and the court of competent jurisdiction in England says that they shall not forbid it. The

latter is thus "an action taken in compliance with the law" of this country, and therefore it cannot be intended to proceed against the defendants for that action. The injunction should be continued without variation.

Winn replied.

EVERSHED M.R. stated the facts and continued:– This is an interlocutory matter, and, therefore, it is inappropriate for the court to say more about the case, or the merits of the case, than is necessary to make clear the grounds of the conclusion which it reaches. It is plain that there is here a question of the comity which subsists between civilized nations. In other words, it involves the extent to which the courts of one country will pay regard and give effect to the decisions and orders of the courts of another country. I certainly should be the last to indicate any lack of respect for any decision of the district courts of the United States. But I think that in this case there is raised a somewhat serious question, whether the order, in the form that it takes, does not assert an extraterritorial jurisdiction which the courts of this country cannot recognize, notwithstanding any such comity. Applied conversely, I conceive that the American courts would likewise be slow (to say the least) to recognize an assertion on the part of the British courts of jurisdiction extending (in effect) to the business affairs of persons and corporations in the United States.

> 4 "3. No provision of this judgment shall operate against ICI for action in compliance with any law of the United States Government or of any foreign government or instrumentality thereof to which ICI is at the time being subject and concerning matters over which under the law of the United States such foreign government or instrumentality thereof has jurisdiction."

[*25] Having said that much, I must make one reference to a passage in the second of the opinions which his Honour delivered, dated May, 1952. It is plain that the judge considered this matter most carefully, and indeed, as Upjohn J. pointed out, expressed his own doubts whether, in giving effect, as he felt it his duty to do, to the implications of the Sherman Act, he might not be going beyond the normally recognized limits of territorial jurisdiction. He said: "It is not an intrusion on the authority of a foreign sovereign for this court to direct that steps be taken to remove the harmful effects on the trade of the United States." If by that passage the judge intended to say (as it seems to me that he did) that it was not an intrusion on the authority of a foreign sovereign to make directions addressed to that foreign sovereign or to its courts or to nationals of that foreign Power effective to remove (as he said) "harmful effects on the trade of the United States," I am bound to say that, as at present advised, I find myself unable to agree with it.

Questions affecting the trade of one country may well be matters proper to be considered by the government of another country. Tariffs are sometimes imposed by one country which obviously affect the trade of another country, and the imposition of such tariffs is a matter for the government of the particular country which imposes them. And if that observation of the judge were conversely applied to directions designed to remove harmful effects on the trade, say, of Great Britain or British nationals in America, I should myself be surprised to find that it was accepted as not being an intrusion on the rights and sovereign authority of the United States.

On the other hand, there is no doubt that it is competent for the court of a particular country, in a suit between persons who are either nationals or subjects of that country or are otherwise subject to its jurisdiction, to make orders in personam against one such party – directing it, for example, to do something or to refrain from doing something in another country affecting the other party to the action. As a general proposition, that would not be open to doubt. But the plaintiffs in this case (unlike Imperial Chemical Industries) are neither subjects nor nationals of the United States, nor were they parties to the proceedings before his Honour, nor are they otherwise subject to his jurisdiction.

What the precise relationship, commercially or otherwise, is between the plaintiffs and the defendants we have not at this stage of the proceedings considered at all, and I proceed on the assumption (and I am not to be taken as hinting that the contrary [*26] is the fact) that the plaintiffs are an independent trade corporation and entitled to be treated as independent of Imperial Chemical Industries Ld. Being so independent, they have beyond question, according to the laws of England, certain rights, certain choses in action, by virtue of the contract of 1947, which the courts of this country, in pursuance of the laws which the courts of this country claim to be entitled to administer, will in this country protect and enforce. Broadly, the right which they have may be described as their right under the contract, being an English contract made between English nationals and to be performed in England, to have it performed and, if necessary, to have an order made by the courts of this country for its specific performance. That is a right – it might be said, a species of property, seeing particularly that it is related to patents – which is English in character and is subject to the jurisdiction of the English courts; and it seems to me that the plaintiffs have at least established a prima facie case for saying that it is not competent for the courts of the United States or of any other country to interfere with those rights or to make orders, observance of which by our courts would require that our courts should not exercise the jurisdiction which they have and which it is their duty to exercise in regard to those rights.

But I think that the matter goes somewhat further. The subject-matter of the contract of December, 1946, is a number of English and Commonwealth patents. An English patent is a species of English property of the nature of a chose in action and peculiar in character. By English law it confers certain monopoly rights, exercisable in England, on its proprietor. A person who has an enforceable right to a licence under an English patent appears therefore to have at least some kind of proprietary interest which it is the duty of our courts to protect. And, certainly so far as the English patents are concerned, it seems to me, with all deference to his Honour's judgment, to be an assertion of an extraterritorial jurisdiction which we do not recognize for the American courts to make orders which would destroy or qualify those statutory rights belonging to an English national who is not subject to the jurisdiction of the American courts.

As regards the patents other than the English patents – Australian, Indian, New Zealand, South African, Irish or other – a possible distinction can, of course, be drawn, since the patents in those countries are a species of property in those countries, and an effective right to use those patents would, if necessary, have [*27] to be asserted in those countries. But no special point has been made before us as regards those Australian and other non-English patents; and, indeed, for present purposes I do not understand that it is suggested, if the injunction goes as regards the English patents, that it should not go to the full extent of the patents in the schedule. We must, in the absence of some evidence to the contrary, assume that the law in these other countries is the same as it is here; and, as I have already said, apart from what I might call the particular rights quoad the particular non-English patents, there remains the general contractual right which relates to all the patents and is derived from the English contract of December, 1946.

I think it undesirable that I should say more, except to reaffirm the proposition that the courts of this country will, in the natural course, pay great respect and attention to the superior courts of the United States of America; but I conceive that it is none the less the proper province of these courts, when their jurisdiction is invoked, not to refrain from exercising that jurisdiction if they think that it is their duty so to do for the protection of rights which are peculiarly subject to the protection of the English courts. In so saying, I do not conceive that I am offending in any way against the principles of comity which apply between the two countries; and, like Upjohn J., I take some comfort from the doubts which Judge Sylvester Ryan himself entertained about the extent to which this order might, if carried to its logical conclusion, go.

One final word: I suggested to Mr. Winn that it might be right to include in the order

some express reservation of the defendants" right to apply to discharge the injunction if some change took place in the circumstances, particularly if some steps of a penal character were taken against the defendants in the American courts. But, on reflection, it seems unnecessary to make any addition to the order to that effect, for the order is (as all interlocutory orders of this kind are expressed to be) only "until judgment or further order." It will therefore, I think, suffice to say that in dismissing this appeal (as in my judgment we should) we do not in any way prejudice the right of the defendants, if any of the events that I have indicated should occur – and there is no evidence before us as to what might happen – to apply to the judge for a discharge of the injunction, either as to the whole of the subject-matter of the agreement of December, 1946, or as to some of the patents for example, the non-English patents – or otherwise as they may be advised.

[*28] DENNING L.J. I agree. It would be a serious matter if there were a conflict between the orders of the courts of the United States and the orders of these courts. The writ of the United States does not run in this country, and, if due regard is had to the comity of nations, it will not seek to run here. But, as I read this judgment of the United States court, there is a saving clause which prevents any conflict, because although Imperial Chemical Industries has been ordered to do certain acts by the United States court, nevertheless there is a provision which says that nothing in the judgment shall operate against the company for action taken in complying with the law of any foreign government or instrumentality thereof to which the company is for the time being subject. With that saving clause, I hope that there will be no conflict between the orders.

ROMER L.J. I also agree, and there is nothing that I wish to add.

Appeal dismissed.

* Copyright duration in Canada is 50 years. *This document is in the public domain in and for Canada and only the proprietary format has been removed*. See "Copyright Law in Canada". The subject matter of this judgment remains of vital political, diplomatic and juridical importance today.

01222692

# TAB 23

2012-1 Trade Cases P 77,932, 2012 Copr.L.Dec. P 30,271, 103 U.S.P.Q.2d 1200

683 F.3d 32
United States Court of Appeals,
Second Circuit.

BROADCAST MUSIC, INC., Petitioner–Appellant,

v.

DMX INC., Respondent–Appellee.
United States of America, Plaintiff,
American Society of Composers, Authors
and Publishers, Defendant–Appellant,

v.

THP Capstar Acquisition Corp., now
known as DMX, Inc., Applicant–Appellee.

Docket Nos. 10–3429–cv, 11–127–cv.    |    Argued:
June 16, 2011.    |    Decided: June 13, 2012.

**Synopsis**
**Background:** Performing-rights organization petitioned for
determination of reasonable fees and terms for adjustable-
fee blanket license (AFBL) to commercial music service,
pursuant to consent decree. The United States District Court
for the Southern District of New York, Louis L. Stanton,
J., set licensing fees for public performance of copyrighted
music. Organization appealed. Music service provider
brought action against performing rights organization (PRO),
seeking determination as to reasonable licensing rate for pre-
programmed music. The United States District Court for the
Southern District of New York, Denise Cote, 756 F.Supp.2d
516, set licensing fees for public performance of copyrighted
music. Organization appealed.

**Holdings:** The Court of Appeals, Chin, Circuit Judge, held
that:

[1] consent decree for setting licensing fees for public
performance of copyrighted music permitted blanket licenses
subject to adjustable carve-outs to account for direct
licensing;

[2] proposed flat-fee blanket license would not reflect music's
fair market value;

[3] proposed blanket license with static carve-out would not
reflect music's fair market value; and

[4] royalty rate for music to be licensed from PROs, set by
district courts pursuant to consent decrees, was reasonable.

Affirmed.

West Headnotes (14)

**[1]**   **Federal Civil Procedure**
  👉 Construction and operation

Consent decree for setting licensing fees
for public performance of copyrighted music
permitted blanket licenses subject to adjustable
carve-outs to account for direct licensing;
request for blanket license subject to carve-
out constituted request not for new type of
license, but for blanket license with different
fee basis, over which district court had rate-
setting authority and which performing rights
organization (PRO) had to offer.

3 Cases that cite this headnote

**[2]**   **Federal Civil Procedure**
  👉 Construction and operation

Consent decrees are construed basically as
contracts.

Cases that cite this headnote

**[3]**   **Federal Civil Procedure**
  👉 Construction and operation

When the language of a consent decree is
unambiguous, deference is paid to the plain
meaning of the decree's language.

1 Cases that cite this headnote

**[4]**   **Federal Civil Procedure**
  👉 Construction and operation

A consent decree's scope must be discerned
within its four corners, and not with respect to
what might satisfy one of the parties' purposes.

Cases that cite this headnote

**[5]**  **Evidence**
    🔑 Grounds for admission of extrinsic evidence

**Evidence**
    🔑 Showing purpose of writing

**Federal Civil Procedure**
    🔑 Construction and operation

When the language of a consent decree is ambiguous, a court may consider, inter alia, extrinsic evidence to determine the parties' intent, including the purpose of the provision and the overall context of the decree.

1 Cases that cite this headnote

**[6]**  **Federal Courts**
    🔑 Judgment by confession or consent

A district court's interpretation of a consent decree is reviewed de novo and its factual findings are reviewed for clear error.

2 Cases that cite this headnote

**[7]**  **Federal Civil Procedure**
    🔑 Construction and operation

Royalty rate for music to be licensed from performing rights licensing organization (PRO), set by district court pursuant to consent decree, is reviewed for reasonableness; fundamental to the concept of reasonableness is a determination of what an applicant would pay in a competitive market, taking into account the fact that the PRO, as a monopolist, exercises disproportionate power over the market for music rights.

Cases that cite this headnote

**[8]**  **Federal Civil Procedure**
    🔑 Construction and operation

Benchmarks, or agreements reached after arms' length negotiation between other similar parties in the industry, are often used by a court in determining the fair market value of the music pursuant to a consent decree; when assessing whether another agreement provides a valid benchmark, a district court must consider whether the other agreement dealt with a comparable right, whether it involved similar

parties in similar economic circumstances, and whether it arose in a sufficiently competitive market.

Cases that cite this headnote

**[9]**  **Federal Courts**
    🔑 Intellectual property

A district court's findings of fact relating to the benchmark agreements as to fair market value of copyrighted music, including whether they were formed in a freely competitive market, are reviewed for clear error.

Cases that cite this headnote

**[10]**  **Federal Civil Procedure**
    🔑 Construction and operation

When setting licensing fees for public performance of copyrighted music pursuant to a consent decree, adjustments to the benchmark to best approximate the fair market value of the music may be based on factual findings, but also may contain legal conclusions that the Court of Appeals reviews de novo.

Cases that cite this headnote

**[11]**  **Federal Civil Procedure**
    🔑 Construction and operation

In determining appropriate rate pursuant to a consent decree for license granted by performing rights organization (PRO) to music service provider that sold pre-programmed music to business establishments, proposed flat-fee blanket license would not reflect music's fair market value; proposed license would have given provider no credit whatsoever for its direct licensing program, and would have set royalty rate far above any yet paid by licensee.

Cases that cite this headnote

**[12]**  **Federal Civil Procedure**
    🔑 Construction and operation

In determining appropriate rate pursuant to a consent decree for license granted by performing rights organization (PRO) to music

service provider that sold pre-programmed music to business establishments, proposed blanket license with static carve-out would not reflect music's fair market value; provider's license fee would been higher than if it had engaged in no such program, and provider would have borne full cost of its direct licenses by paying annual administrative fee.

1 Cases that cite this headnote

[13]  **Federal Civil Procedure**
👉 **Construction and operation**

Royalty rate for music to be licensed from performing rights licensing organizations (PROs), set by district court pursuant to consent decree, was reasonable, since rate was comparable to music service provider's direct license rates, and yet it provided additional floor fee that guaranteed some compensation to PROs regardless of extent to which provider used their repertory, per-location royalty pool was reasonable benchmark, and rate courts reasonably incorporated direct licenses to extent they were relied upon by licensees.

Cases that cite this headnote

[14]  **Federal Civil Procedure**
👉 **Construction and operation**

When a court determines the fair market value of copyrighted music pursuant to a consent decree, the four factors that guide the selection of a benchmark are a comparable right, similar parties, similar economic circumstances, and whether the rate would be set in a sufficiently competitive market.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*35** Seth P. Waxman (Jonathan E. Nuechterlein, Catherine M.A. Carroll, Eric F. Citron, on the brief), Wilmer Cutler Pickering Hale and Dorr LLP, WA, District of Columbia; Marvin L. Berenson, Joseph J. DiMona, Broadcast Music, Inc., New York, NY, for Broadcast Music, Inc.

Theodore B. Olson (Amir C. Tayrani, Dace C. Martinez, Jennifer L. Conn, on the brief), Gibson, Dunn & Crutcher LLP, WA, District of Columbia; Joan M. McGivern, Richard H. Reimer, Samuel Mosenkis, ASCAP, New York, NY; Christopher J. Glancy, I. Fred Koenigsberg, Stefan M. Mentzer, White & Case LLP, New York, NY, for American Society of Composers, Authors and Publishers.

R. Bruce Rich (Benjamin E. Marks, Todd D. Larson, on the brief), Weil, Gotshal & Manges LLP, New York, NY; Christopher S. Harrison, Christopher Harrison, PLLC, Austin, TX, for DMX, Inc.

Christine A. Varney, Assistant Attorney General; Robert B. Nicholson, Robert J. Wiggers, Daniel McCuaig, Matthew J. Bester, Attorneys, U.S. Department of Justice, WA, District of Columbia, for Amicus Curiae United States in BMI v. DMX, Inc.

Christopher J. Glancy, I. Fred Koenigsberg, Stefan M. Mentzer, Scott E. Hershman, White & Case LLP, New York, NY; Joan M. McGivern, Richard H. Reimer, ASCAP, New York, NY; Catherine E. Stetson, Hogan Lovells U.S. LLP, WA, District of Columbia; Ira M. Feinberg, Hogan Lovells U.S. LLP, New York, NY, for Amicus Curiae American Society of Composers, Authors and Publishers in BMI v. DMX, Inc.

Bruce G. Joseph, Wiley Rein LLP, WA, District of Columbia, for Amici Curiae Television Music License Committee, LLC, et al. in ASCAP v. DMX, Inc.

Robert B. Nicholson, Robert J. Wiggers, Daniel McCuaig, Matthew J. Bester, Attorneys, U.S. Department of Justice, WA, District of Columbia, for Amicus Curiae United States in ASCAP v. DMX, Inc.

Before: PARKER, CHIN, and LOHIER, Circuit Judges.

**Opinion**

CHIN, Circuit Judge:

In 1941, the United States brought an antitrust action against the American Society of Composers, Authors and Publishers ("ASCAP"). The suit resulted in a consent decree that provided certain protections for prospective music licensees. Where, for example, ASCAP and a prospective licensee have reached an impasse over fees, under the consent decree, either may petition the United States District Court for the Southern District of New York to set a "reasonable" licensing fee. In

Case 09-10138-MFW    Doc 13460-4    Filed 05/02/14    Page 25 of 88

Broadcast Music, Inc. v. DMX Inc., 683 F.3d 32 (2012)
2012-1 Trade Cases P 77,932, 2012 Copr.L.Dec. P 30,271, 103 U.S.P.Q.2d 1200

1966, the United States entered into a similar antitrust consent decree with Broadcast Music, Inc. ("BMI").

In these parallel cases, separate petitions were filed in the Southern District of New York requesting the court to set a "reasonable" rate after ASCAP and BMI were unable to agree on licensing fees with DMX, Inc. ("DMX"), a provider of background/foreground music ("BG/FG music"). In both cases, the district court (Louis L. Stanton, *J.,* in *BMI* and Denise Cote, *J.,* in *ASCAP* ) adopted DMX's proposals. BMI and ASCAP appeal. We affirm.

**\*36   BACKGROUND**

**1. *The Facts*** [1]

**a. *ASCAP and BMI***

ASCAP and BMI are "performing-rights organizations" ("PROs"). *See generally BMI v. CBS,* 441 U.S. 1, 4–5, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979) ( "*CBS* "). ASCAP was created in 1914 by music creators and publishers as an unincorporated membership association. BMI was founded by broadcasters in 1939. Each represents hundreds of thousands of songwriters, composers, and publishers who hold copyrights in millions of musical works. They negotiate, implement, and enforce agreements with licensees that grant the right to perform their members' copyrighted songs. They collect license fees and remit royalties to the copyright holders. Together, ASCAP and BMI license the music performance rights to most domestic copyrighted music in the United States. *See id.* at 5, 99 S.Ct. 1551. [2] ASCAP and BMI have traditionally offered "blanket licenses," or licenses that grant access to a PRO's entire repertory in exchange for a flat annual fee unaffected by the extent to which its music is performed.

In 1941 and 1964, the United States filed separate antitrust complaints against ASCAP and BMI for unlawfully monopolizing the licensing of performing rights. *See United States v. BMI,* 275 F.3d 168, 171–72 (2d Cir.2001) ( "AEI"). The government alleged, *inter alia,* that ASCAP and BMI's blanket licenses, the only type of license offered when the suits were brought, constituted "an illegal restraint of trade[,] and that arbitrary prices were being charged as the result of an illegal copyright pool." *CBS,* 441 U.S. at 10, 99 S.Ct. 1551. The government sought to enjoin ASCAP and BMI's exclusive licensing powers and require them to offer different forms of licensing. *Id.* at 10–11, 99 S.Ct.

1551. Settlement of these complaints led to the entry of two separate, but largely similar, consent decrees that continue to "substantially control[ ]" ASCAP and BMI's licensing practices, *id.* at 11, 99 S.Ct. 1551, and minimize the "danger of unreasonable activity" caused by ASCAP and Supp.2d 206, 211–12 (S.D.N.Y.2010). BMI's market power, *K–91, Inc. v. Gershwin Pub. Corp.,* 372 F.2d 1, 4 (9th Cir.1967). *See United States v. ASCAP,* 1940–43 Trade Cas. (CCH) ¶ 56,104 (S.D.N.Y.1941), *amended,* No. Civ.A. 42–245, 1950 WL 42273, 1950–51 Trade Cas. (CCH) ¶ 62,595 (S.D.N.Y. July 17, 1950) ("ASCAP Decree"); *United States v. BMI,* 1966 Trade Cas. (CCH) ¶ 71,941 (S.D.N.Y.1966), *amended,* No. 64–CIV–3787, 1994 WL 901652, 1996–1 Trade Cas. (CCH) ¶ 71,378 (S.D.N.Y. Nov. 18, 1994) ("BMI Decree").

In 2001, ASCAP and the government agreed to a new consent decree (the "AFJ2"). *See United States v. ASCAP,* No. 41–1395, 2001 WL 1589999, 2001–02 Trade Cas. (CCH) ¶ 73,474 (S.D.N.Y. June 11, 2001). The AFJ2 defines four types of licenses: blanket licenses, per-program licenses, per-segment licenses, and through-to-the-audience licenses. *See AFJ2,* §§ II(E), (J), (K), (S). [3]

**\*37**   Both the AFJ2 and the BMI Decree include a "rate court" mechanism under which the United States District Court for the Southern District of New York has jurisdiction to determine reasonable license fees when the parties to a licensing transaction are unable to reach agreement. *See AFJ2,* § IX(A); BMI Decree, § XIV(A); *see also infra* note 13.

**b. *DMX***

DMX, formerly known as THP Capstar Acquisition Corp., is a leading commercial music service provider. It was formed on June 3, 2005. It supplies BG/FG music to thousands of locations, including restaurants, shopping centers, hotels, retail stores, and similar public venues. [4] DMX does not offer particular songs; rather, DMX music designers select songs based on the general genre and feel of a particular program. DMX typically delivers or uses approximately 150,000 of its available musical compositions each year. These works are owned or controlled by more than 14,000 different publishers.

DMX provides music programming to its customers through "off-premise" and "on-premise" delivery mechanisms. Off-premise delivery involves the transmission of music to customers via direct broadcast satellite signals to the establishment's sound system. On-premise delivery involves

2012-1 Trade Cases P 77,932, 2012 Copr.L.Dec. P 30,271, 103 U.S.P.Q.2d 1200

the on-site transmission of music to customers through a proprietary DMX device that is installed at the customer location. Both off- and on-premise DMX customers have access to a wide array of programming. DMX's off-premise data reflects the frequency with which particular works are performed. In contrast, DMX's on-premise data identifies which works were distributed, but not their relative frequency. DMX also offers "select" and "signature" service. Select service offers all or some of DMX's various channels sorted by musical category. Signature service involves music programming designed for the specific customer.

DMX's main BG/FG music industry competitors are Muzak LLC ("Muzak"), Music Choice, Inc. ("Music Choice"), PlayNetwork, Inc. ("PlayNetwork"), and Trusonic, Inc. ("Trusonic"). In recent years, music consultants who utilize digital media devices and online music services to create **\*38** programming for businesses have also created increased competition in the BG/FB music industry. Increased industry competition and the national economic downturn have also reduced DMX's revenue and the fees that it charges its customers. From 2005 to 2010, DMX's average per-customer monthly revenue declined by 37 percent. From 2008 to 2010, the rates DMX charged its customers declined by 25 percent.

In 2006, DMX began a direct licensing campaign, contracting directly with individual music composers and their publishers. DMX pursued direct licenses, in part, to reduce the cost of business primarily associated with ASCAP and BMI's blanket licenses. DMX hired Music Reports Incorporated, a company specializing in high-volume music license administration, to assist in the design and implementation of its direct licensing campaign.

By late 2010, DMX had signed 850 direct licenses, covering more than 7,000 separate music catalogs and hundreds of thousands of songs. DMX's direct licenses typically provide each publisher with a pro rata share of an annual $25 per-location royalty pool. This $25 amount represents all annual royalty payments attributable to each physical location at which a DMX program is performed. Each publisher's pro rata share is calculated from its percentage of plays on DMX's off-premise channels as a proxy for plays across DMX's entire service. DMX's direct licenses also include a "most-favored-nations clause" that ensures that each publisher's royalties are calculated using the same pro rata allocation methodology.

In 2007, DMX obtained a direct license from Sony/ATV Music Publishing ("Sony")—one of the industry's

largest music publishers—that contained the same royalty allocation as all of DMX's other direct licenses: a pro rata share of the annual $25 per-location royalty pool. DMX believed that signing a major music publisher like Sony, or one of its competitors (Universal Music Publishing Group ("Universal"), EMI Music Publishing ("EMI"), or Warner–Chappell Music Publishing ("Warner–Chappell")), was necessary for a successful direct licensing program. DMX thus made substantial efforts to attract Sony, offering a royalty advance of $2.4 million and an administrative payment of $300,000. According to DMX, the advance was "the price to be paid if DMX was to break through the powerful status quo and pioneer a new licensing paradigm." Brief of Applicant–Appellee (DMX) at 19, *ASCAP v. DMX*, No. 11–127–cv (2d Cir. April 29, 2011). In 2009, DMX's license with Sony was extended through 2012. Since 2007, DMX has continued to increase the frequency with which it plays Sony music.

### c. *ASCAP's Agreements with Other BG/FG Music Providers*

In 2005, ASCAP entered into a blanket license agreement with Muzak (the "ASCAP–Muzak Agreement"), the largest BG/FG music service provider in the United States. The ASCAP–Muzak Agreement provided that, from 2005 through 2009, Muzak would pay ASCAP a flat annual fee of approximately $6.8 million or an effective annual per-location fee of $41.21.[5] The ASCAP–Muzak Agreement also provided that Muzak's annual fee would not increase if its subscriber base grew at an annual rate of 8 percent or less. If the annual growth rate of Muzak's subscriber base was greater than 8 percent, Muzak agreed to pay ASCAP an additional **\*39** annual per-location fee of $41 for each location in excess of the allotted 8 percent growth allowance. In effect, the ASCAP–Muzak Agreement's growth provision provided that if, over the course of its five-year license term, Muzak increased its subscriber base at an annual rate of precisely 8 percent, then Muzak's per-location annual fee would drop to $28.05, averaging $32.52 for the five-year term. Muzak also agreed to pay ASCAP a lump sum to settle all claims arising prior to 2005, including claims for past due royalties. On April 24, 2009, as a result of Muzak's lack of growth and then-pending bankruptcy, ASCAP agreed to reduce Muzak's annual fee.

ASCAP also entered into agreements similar to the Muzak–ASCAP Agreement with Music Choice, PlayNetwork, and Trusonic that covered varying time periods between 1999

2012-1 Trade Cases P 77,932, 2012 Copr.L.Dec. P 30,271, 103 U.S.P.Q.2d 1200

and 2010. These agreements included annual per-location rates between $41 and $45. Under these agreements, Music Choice, PlayNetwork, and Trusonic also paid ASCAP substantial lump sums to resolve past disputes.

**d. *BMI's Agreements with Other BG/FG Music Providers***
From 1994 to 2004, Muzak paid BMI an annual per-location fee of approximately $12 to $14. In 2004, BMI and Muzak entered into a traditional blanket licensing agreement (the "BMI–Muzak Agreement") whereby Muzak agreed to pay BMI a base fee of $30 million over the five-year license period beginning in 2004 and ending in 2009. This five-year fee translated into an annual per-location fee of $36.36. [6] The BMI–Muzak Agreement took into account approximately $5 million that BMI alleged Muzak owed for retroactive license fees. Like the ASCAP–Muzak Agreement, the BMI–Muzak Agreement provided that Muzak's annual per-location fee would be maintained unless the number of Muzak locations grew at a rate greater than 8 percent per year. If Muzak grew at an annual rate of precisely 8 percent, Muzak could eventually obtain an annual per-location fee of $24.75. [7]

BMI offered the $36.36 rate and a license similar to the BMI–Muzak Agreement to DMX's other competitors; PlayNetwork and Trusonic accepted BMI's offer.

**2. *Proceedings Below***

**a. *ASCAP v. DMX***
On June 3, 2005, DMX requested an "adjustable-fee blanket license" ("AFBL"), or a "blanket license with a carve-out," from ASCAP. An AFBL is essentially a blanket fee reduced to account for music directly licensed from music publishers and owners that also appear within the PRO's repertoire. *BMI v. DMX*, 726 F.Supp.2d 355, 355 (S.D.N.Y.2010). ASCAP and DMX, however, could not agree on a license fee. On July 25, 2006, pursuant to the AFJ2, ASCAP applied to the district court (the "*ASCAP* rate court") to set a reasonable rate for DMX's requested license. ASCAP presented two fee proposals to the *ASCAP* rate court and maintained **\*40** that a blanket license with a carve-out for direct licensing was not a reasonable fee structure.

First, ASCAP proposed a blanket license with no carve-out for DMX's direct licensing program. This first proposal offered a flat fee calculated by multiplying an annual per-location rate by the number of locations and then by the number of years of the license. ASCAP argued that this

proposal was proportionate to the fees Muzak agreed to pay ASCAP.

Specifically, for the period beginning June 5, 2005 and ending December 31, 2009, ASCAP proposed a flat fee of $15,677,777 for all performances of all works in the ASCAP repertory. ASCAP calculated this figure by multiplying the annual per-location rate used in the ASCAP–Muzak Agreement ($41.21) by 83,000, the number of DMX customer locations in 2005, and then by 4 and 7/12 years, the length of the period from June 5, 2005 to December 31, 2009. In addition, for the period from 2010 through 2012, ASCAP proposed an annual per-location rate of $49, to be adjusted for inflation. To arrive at this rate, ASCAP divided the annual flat fee of $3,420,606 by 69,000, the number of DMX customer locations in 2009.

Second, in the alternative, ASCAP proposed a "blanket license with a static credit," or "carve-out," based on the fees Muzak agreed to pay ASCAP and on a portion of the payments DMX made to its direct licensors in 2009. ASCAP's second proposal offered the same flat fee proposed in the first option, reduced by a discount and then increased by an administrative fee. Under this proposal, ASCAP's suggested flat fee of $15,677,777 or $3,420,606 per year would be reduced by a credit for payments that DMX made to ASCAP members for performances of their works licensed through direct licenses. The credit was calculated by reducing the amount DMX paid for directly-licensed music first by 10 percent to account for the portion of those payments intended to compensate publishers for mechanical rights, and second by an additional 50 percent to identify those royalties that were paid to publishers for compositions not within the ASCAP repertory. The credit, however, would be offset by an additional administration charge of $25,000 per year for expenses that ASCAP would incur in implementing the carve-out license. Because DMX did not begin its direct license program until 2006, the administrative fees would be applicable only from 2007 through 2009. Accordingly, ASCAP's total proposed license fee of $15,410,096 constituted the blanket rate of $15,677,777, reduced by the carve-out-credit and the administrative fee of $75,000 for the applicable three-year period.

Further, for the 2010 through 2012 period, ASCAP proposed the same blanket rate as its first proposal—$49 per-location, adjusted for inflation—in addition to the $25,000 yearly administrative charge. For this period, under ASCAP's second

2012-1 Trade Cases P 77,932, 2012 Copr.L.Dec. P 30,271, 103 U.S.P.Q.2d 1200

proposal, DMX would receive an annual $230,000 credit, adjusted for inflation, to account for the amount of royalties DMX paid its direct licensors in 2009; fluctuations in DMX's direct licensing would not affect its credit.

DMX contended that ASCAP's agreements with other BG/FG providers did not reflect the competitive market and, for the years following 2009, counter-proposed a blanket license with a carve-out incorporating the extent to which it relied on direct licenses. DMX's proposal involved: (1) a "floor fee" reflecting the minimum amount that DMX would be obligated to pay ASCAP even if all of the ASCAP-affiliated music that DMX performed was directly licensed; (2) an "unbundled music fee," or the "pure" value of the performance **\*41** rights for ASCAP music performed by DMX; and (3) the share of all DMX performances of ASCAP-affiliated music licensed to DMX solely by ASCAP (the "share licensed via ASCAP"). Combined, the floor fee and the unbundled music fee equaled the blanket fee, or the maximum amount to which ASCAP would be entitled under DMX's proposal.

DMX contemplated the following rate formula: the sum of the floor fee plus the unbundled music fee multiplied by the share licensed via ASCAP. [8] By multiplying the unbundled music fee and the share licensed via ASCAP, DMX would pay ASCAP an amount that varied depending on the extent to which DMX subscribers actually played ASCAP works that were also directly licensed.

Specifically, DMX proposed a floor fee of $3 per location and an unbundled music fee of $10.74 per location. DMX, drawing from ASCAP's records, contended that the $3 floor fee represented the combination of $2.14 for expenses specific to BG/FG music service and $0.86 for general overhead expenses. DMX calculated the $10.74 unbundled music fee first by reducing the annual $25 per-location royalty pool from the direct license agreements by 10 percent to account for the direct license agreements' grant of mechanical and public performance rights. DMX then further reduced the resulting $22.50 per-location fee to reflect ASCAP's 48 percent share of total performances on the DMX network.

On December 1, 2010, following a five-day bench trial, the *ASCAP* rate court (Cote, *J.*) issued an opinion and order adopting DMX's proposal to set the final rate. *In re Application of THP Capstar Acquisition Corp.*, 756 F.Supp.2d 516 (S.D.N.Y.2010) ("*ASCAP* "). The court rejected ASCAP's first proposal because it found that the Muzak Agreement was "not a reliable benchmark." *Id.* at

543. Specifically, the *ASCAP* rate court found that: (1) the 2005–2009 license on which ASCAP relied was only one part of a much larger transaction settling existing disputes and resolving issues relating to an eleven-year period; (2) "it is dangerous to rely on a per [-]location fee" extrapolated from the starting point of a flat fee deal that allowed expected growth in locations and contemplated a possible decline in the effective rate from $41.21 to $28.05 over the license term; (3) DMX refused to enter a license premised on the same formula; and (4) economic conditions in the industry had changed since ASCAP and Muzak entered into their agreement. *Id.* at 539–43. With respect to ASCAP's second proposal, the *ASCAP* rate court found that: (1) ASCAP failed to show that a $41.21 rate for the pre–2010 period or a $49 rate for 2010 was an "appropriate base from which to construct the blanket rate"; (2) ASCAP's proposed flat fee for 2006–2009 did not account for DMX's substantial loss of customer locations during that period; (3) the "dollar-for-dollar" carve-out-credit ASCAP proposed did not reasonably reflect DMX's direct license initiative, would discourage DMX from continuing with its direct licensing program, and represented a windfall to ASCAP members who did not directly contract with DMX; and (4) ASCAP failed to provide sufficient evidence to support its proposed $25,000 annual surcharge **\*42** for administering the credits. *Id.* at 542–43.

On December 20, 2010, the *ASCAP* rate court entered judgment setting the specific terms of the rate. Adopting DMX's proposal, the *ASCAP* rate court set a floor fee of $3, a blanket fee of $13.74, and an unbundled music fee of $10.74. [9] The resulting annual per-location fee was set at $13.74 (the blanket fee) minus the product of $10.74 (the unbundled music fee) and a direct license ratio of 48 percent. The direct license ratio was set as the total number of ASCAP works transmitted by DMX's off-premise service for which DMX has a direct license with at least one publisher of the work (pro-rated to reflect the ownership shares of the directly-licensed ASCAP-affiliated publisher), divided by the total number of ASCAP works transmitted by DMX's off-premise service (pro-rated to reflect the share of the song's ownership affiliated with ASCAP).

**b.** *BMI v. DMX*

On June 3, 2005, DMX requested an AFBL from BMI. The parties commenced negotiations but were unable to reach agreement. On January 10, 2008, BMI petitioned the district court (the "*BMI* rate court") to determine a reasonable fee. BMI did not dispute DMX's entitlement to an AFBL. DMX

2012-1 Trade Cases P 77,932, 2012 Copr.L.Dec. P 30,271, 103 U.S.P.Q.2d 1200

and BMI agreed that the AFBL fee should include: (1) a full blanket rate, or the amount DMX would pay if it used no directly-licensed BMI music; (2) a floor fee that DMX would pay even if it directly licensed all the BMI music it used; and (3) a crediting mechanism for calculating DMX's discount off the full blanket fee for each directly-licensed music performance. The parties, however, disagreed as to how to value these components.

BMI proposed a rate with a blanket fee calculation based on the blanket license agreement it first entered into with Muzak (the "BMI–Muzak Agreement")—and later made with other BG/FG providers—for the 2004–2009 period. BMI proposed a total blanket fee of $41.81 per location. To arrive at this fee, BMI increased its proposed annual per-location fee of $36.36 by 15 percent to account for the additional costs of an AFBL and the "option value" the AFBL provides over the traditional blanket license.

DMX proposed a blanket license rate with BMI that incorporated its direct licensing program into its proposed fee structure; this proposal was nearly identical to the one DMX proposed in *ASCAP*. Specifically, DMX proposed a blanket fee of $11.32 per location, representing an unbundled music fee for the rights to perform the works in BMI's repertoire and a floor fee to compensate BMI for the value of its services and the benefits of a blanket license. DMX, referencing approximately 550 direct licenses with music publishers as benchmarks, proposed a share of an annual $25 per-location royalty pool equivalent to $10—40 percent of $25—to represent the portion of DMX's music performances drawn exclusively from BMI's repertoire.

On July 26, 2010, following a ten-day bench trial, the *BMI* rate court (Stanton, *J.*) rejected the BMI–Muzak Agreement as a benchmark for the value of DMX's AFBL. *BMI, 726 F.Supp.2d at 359.* The court adopted DMX's proposal and entered judgment setting a final annual per-location blanket fee of $18.91, an annual per-location floor fee of $8.66, [10] and a direct **43** licensing ratio to be calculated using DMX's off-premise performances as a proxy for all of its performances. *Id.* at 364.

These appeals followed.

### DISCUSSION

**[1]** On appeal, ASCAP and BMI principally argue that the district court in both cases set an unreasonable fee for their respective licenses with DMX by incorporating the extent to which DMX relied on direct licenses. First, ASCAP argues that direct licenses should not be factored into its licensing rate structure with DMX because a rate structure with an adjustable carve-out for direct licenses conflicts with the AFJ2 and is unreasonable. [11] Second, ASCAP, in the alternative, and BMI both argue that direct licenses should only be marginally incorporated into their licensing fee structures with DMX. They argue that the district court in both cases erred by using DMX's direct licensing agreements with music publishers as benchmarks for their respective licensing fees and that their licenses with DMX's competitors should have been adopted as benchmarks because they were more accurate valuations of their services and more indicative of the "competitive market."

We first discuss ASCAP's contention that a rate structure with an adjustable carve-out conflicts with the AFJ2; we then discuss the district court's rejection of ASCAP and BMI's proposals and the reasonableness of the rates set by the district court.

### I. *The AFJ2*

ASCAP contends that a rate structure with an adjustable carve-out conflicts with the AFJ2. ASCAP argues, *inter alia,* that by defining certain licenses and not defining a blanket license with an adjustable carve-out, the AFJ2 excludes the latter. The *ASCAP* rate court rejected this argument.

**[2]    [3]    [4]    [5]    [6]**    Consent decrees are construed "basically as contracts." *AEI, 275 F.3d at 175* (internal citations and quotation marks omitted). When the language of a consent decree is unambiguous, deference is paid to the plain meaning of the decree's language. *Id.* The decree's scope must be discerned within its four corners, and not with respect to what might satisfy one of the parties' purposes. *Id.* When the language of a decree is ambiguous, however, a court may consider, *inter alia,* extrinsic evidence to determine the parties' intent, including the purpose of the provision and the overall context of the decree. *Id.* We review the district court's interpretation of a consent decree *de novo* and its factual findings for clear error. *Id.*

The AFJ2 defines four types of licenses: blanket, per-program, per-segment, and through-to-the-audience licenses. *See supra* note 3 and accompanying text. In addition,

2012-1 Trade Cases P 77,932, 2012 Copr.L.Dec. P 30,271, 103 U.S.P.Q.2d 1200

section V of the AFJ2 discusses "Through–to–the–Audience Licenses," section VI discusses "Licensing," and section VII discusses "Per–Program and Per–Segment Licenses." *See* AFJ2 §§ V, VI, VII. Section VII(C) provides: "Nothing in th[e AFJ2] shall prevent ASCAP and any music user from agreeing on any other form of license." AFJ2, § VII(C). Thus, although the AFJ2 defines types of licenses that ASCAP could provide to DMX, on its face, the AFJ2 plainly permits other forms **\*44** of licenses and does not preclude blanket licenses with adjustable carve-outs.

Although we did not expressly address this issue in *AEI*, BMI raised a similar argument in that case. *AEI,* 275 F.3d at 176. There, we explained that a request for a blanket license subject to a carve-out constitutes "a request not for a new type of license, but for a blanket license with a different fee basis, over which the district court has rate-setting authority and which [the PRO] must offer." *Id.* at 171, 175–77; *see also United States v. ASCAP,* 309 F.Supp.2d 566, 581 (S.D.N.Y.2004)) ("Muzak") (concluding that "the present AFJ2 may be construed to permit the issuance of a blanket license with a fee structure that reflects direct licensing arrangements previously entered into by applicants" and "the existence of such direct licensing relationships may and will be considered by this Court in a rate court proceeding"). We rejected the contention, then advanced by BMI, that the BMI Decree "applie[d] only to those licenses specifically mentioned in the BMI Decree, and to the traditional blanket license with its traditional per premise fee structure." *AEI,* 275 F.3d at 176. Our reasoning in AEI applies with equal force here.

Accordingly, the district court correctly rejected ASCAP's contention that the AFJ2 does not permit a rate structure that features an adjustable carve-out. As the ASCAP rate court correctly determined:

> [The AFJ2] is an antitrust consent decree providing a mechanism for the setting of reasonable license fees in a unique market in which ASCAP indisputably exercises market power. While ASCAP may be unwilling to offer a blanket license with a carve-out for a direct licensing program, the terms of AFJ2, the decisions interpreting and applying AFJ2, and the record evidence from this trial

each indicate that such a license is appropriate and justified here.

*ASCAP,* 756 F.Supp.2d at 541. We thus hold that the AFJ2 permits blanket licenses subject to carve-outs to account for direct licensing, and we reject ASCAP's claim that a blanket license with an adjustable carve-out conflicts with the AJF2.

## II. *The Rates*

### A. *Applicable Law*

Under the AFJ2 and the BMI Decree, ASCAP and BMI are required "to grant to any music user making a written request therefor a non-exclusive license to perform all of the works in the ASCAP repertory." AFJ2, § VI; *see* BMI Decree, § IV(A). [12] If the parties are unable to reach agreement, after prescribed periods of negotiations, either party may apply to the district court for a determination of a reasonable fee. AFJ2, § IX(A); *see* BMI Decree, § XIV(A). [13] In these rate **\*45** court proceedings, the burden proof is on the PRO to establish the reasonableness of the fee it seeks. AFJ2, § IX(B); *see* BMI Decree, § XIV(A). [14] If the PRO establishes that its requested rate is reasonable, then the district court shall adopt it. *See* AFJ2, § IX(D); BMI Decree, § XIV(A). [15] If the PRO is unable to establish that its requested rate is reasonable, then the rate court shall determine a reasonable fee based on all the evidence, including a proposal from the music user. AFJ2, § IX(D); *see* BMI Decree, § XIV(A).

 [7]  [8]  We review rates set by the district court for reasonableness. *United States v. BMI,* 426 F.3d 91, 96 (2d Cir.2005) ("*Music Choice*"). "Fundamental to the concept of 'reasonableness' is a determination of what an applicant would pay in a competitive market, taking into account the fact that [the PRO], as a monopolist, 'exercise[s] disproportionate power over the market for music rights.' " *United States v. ASCAP,* 627 F.3d 64, 76 (2d Cir.2010) ( "*RealNetworks*") (quoting *Music Choice,* 426 F.3d at 91). Benchmarks, or agreements reached after arms' length negotiation between other similar parties in the industry, are often used by the rate court in determining the fair market value of the music. *See id.* In assessing whether another agreement provides a valid benchmark, the district court must consider whether the other agreement dealt with a comparable right, whether it involved similar parties in similar economic circumstances, and whether it arose in a sufficiently competitive market. *See Music Choice,* 426 F.3d at 95.

Broadcast Music, Inc. v. DMX Inc., 683 F.3d 32 (2012)
2012-1 Trade Cases P 77,932, 2012 Copr.L.Dec. P 30,271, 103 U.S.P.Q.2d 1200

**[9]** **[10]** We review for clear error the district court's findings of fact relating to the benchmark agreements, including whether they were formed in a freely competitive market. *See id.* at 96 (benchmarks); *ASCAP v. Showtime/The Movie Channel, Inc., 912 F.2d 563, 569 (2d Cir.1990)* (freely competitive market). Adjustments to the benchmark "to best approximate the fair market value of the music may be based on factual findings, but also may contain legal conclusions that we review **\*46** *de novo*." *Music Choice, 426 F.3d at 96.*

**B.** *Application*

Under the AFJ2 and the BMI Decree, the district court, in both cases, had the authority to set a reasonable rate for DMX's licenses with ASCAP and BMI if ASCAP and BMI did not satisfy their burden of proving that their proposals were reasonable. *See* AFJ2, § IX(B); BMI Decree, § XIV(A). For the reasons set forth below, we hold that it was not clearly erroneous for the *ASCAP* and *BMI* rate courts to find that the ASCAP–Muzak and BMI–Muzak Agreements (together, the "Muzak Agreements") did not reflect rates that would be set in a competitive market. *See Music Choice, 426 F.3d at 96.* We also hold that, in both cases, the district court reasonably rejected ASCAP and BMI's proposals and adopted DMX's recommended benchmarks to set the licensing fees. *See id.* Finally, we hold that rate courts can take direct licenses into account in setting rates between commercial music service providers and PROs. We first discuss the district court's rejection of ASCAP and BMI's proposals; we then discuss the reasonableness of the rates set by the rate courts.

### i. *ASCAP and BMI's Proposed Benchmarks*

The district court reasonably rejected ASCAP and BMI's benchmarks in both cases. Although Muzak and DMX are both commercial music service providers and the Muzak Agreements involved rights comparable to those at issue in this case (the right to public performance), Muzak and DMX's respective market positions and the economic circumstances surrounding their negotiations with ASCAP and BMI differ markedly. The rate courts did not err, much less clearly err, in holding that the Muzak Agreements did not involve similar parties in similar economic circumstances and did not reflect rates that would arise in a sufficiently competitive market. *See id.* at 95. In both cases, the district court, after making detailed findings of fact and carefully considering the issues, properly rejected ASCAP and BMI's overall proposals as

unreasonable because they did not reflect rates that would be set in a competitive market. *See id.*

**[11]** First, ASCAP and BMI's proposed benchmarks did not account for DMX's substantial and growing direct licensing program—an economic circumstance that distinguishes DMX's position from that of Muzak. Indeed, ASCAP's first proposal would have charged a flat fee for the first four years and seven months of the license and an annual per-location fee for the remaining two years of the license period. ASCAP's second proposal of a "blanket license with a static carve-out" used the same per-location annual fee as the first proposal, reduced by a credit equal to a fraction of the amount that DMX paid for directly-licensed music, plus an annual blanket administrative fee of $25,000. Finally, BMI proposed an annual per-location blanket fee of $41.81 based upon its five-year, $30 million license fee with Muzak. If DMX's licensing rates with ASCAP and BMI did not meaningfully account for its direct licenses, DMX would effectively pay twice for musical works covered by a PRO and its direct licensing program. These facts, however, were not factored into ASCAP's first proposal or BMI's only proposal, and their inclusion into ASCAP's second proposal was effectively negligible.

Second, as the district court found in both cases, ASCAP and BMI failed to show that the rates in their respective agreements with Muzak excluded additional **\*47** costs—such as, for example, the resolution of audit and back-pay disputes, and the incorporation of growth allowances—independent of the value of ASCAP and BMI's grants to perform their members' copyrighted music. Indeed, ASCAP and BMI's proposals were extrapolated from agreements with Muzak for nearly $35 and $30 million that spanned the course of five years. ASCAP and BMI's proposals then winnowed down these lump sums by Muzak's average number of locations to arrive at annual per-location rates of $41.21 and $36.36—rates that were respectively proposed to increase to $49 to account for time and inflation and to $41.81 to account for the "option value" of an AFBL over a traditional blanket license. Additionally, the Muzak Agreements contained growth terms that had the potential to reduce Muzak's projected costs over the period of the license term, and both agreements resolved claims that either party could have had against the other prior to the agreement date, unless, in BMI's case, rate court proceedings were initiated. Thus, based on the evidence presented at trial, the district court, in both instances, reasonably found that ASCAP and

2012-1 Trade Cases P 77,932, 2012 Copr.L.Dec. P 30,271, 103 U.S.P.Q.2d 1200

BMI's respective rates with Muzak accounted for more than per-location licensing fees.

[12] Finally, the district court also found that ASCAP and BMI's benchmarks did not reflect a sufficiently competitive market and their proposals therefore did not reflect rates that would be set in a competitive market. *See id.* In both instances, the district court was entitled to find that the Muzak Agreements, upon which ASCAP and BMI's proposals were based, were less competitively set than they would have been if Muzak regularly used direct licensing or if music rights were more "scattered among numerous performing rights societies." *Showtime,* 912 F.2d at 570. With respect to ASCAP's second proposal, based on the testimony of ASCAP's Chief Economist, it was not clearly erroneous for the district court to find that a static carve-out structure was anti-competitive and "inequitable" because it would effectively require DMX to pay more in total licensing fees and create incentives for DMX to abandon its direct licensing campaign. *See ASCAP,* 756 F.Supp.2d at 544–45. With respect to BMI, based on the evidence presented at trial, it was not clearly erroneous for the district court to conclude that DMX's competitors "had no realistic opportunity freely to negotiate the future fees for their licenses." *BMI,* 726 F.Supp.2d at 359. As the *BMI* rate court found, commercial music service providers who refused BMI's $36.36 rate and form license and proceeded to rate court faced the risk of retroactive payment claims from BMI because BMI had expressly reserved its right to seek such payments in any rate court proceeding. *Id.*

Accordingly, the district court in both cases reasonably found that ASCAP and BMI did not sustain their burdens of proving that their proposals were reasonable. No legal error contributed to these findings, and the findings, supported by the record, were not clearly erroneous. *See Showtime,* 912 F.2d at 571. In both instances, the district court thus had the authority to set a reasonable rate for DMX's licenses.

### ii. *The Rates Set By the District Court*

[13] The *ASCAP* and *BMI* rate courts essentially set rates comparable to DMX's direct license rates while providing an additional floor fee that guaranteed some compensation to ASCAP and BMI regardless of the extent to which DMX used their repertory. The rates set by the *ASCAP* and *BMI* rate courts and the use of DMX's direct licenses as benchmarks were reasonable for the following reasons.

***48** First, the rates set by the district court reasonably compensated ASCAP and BMI for their services. As the *ASCAP* rate court found: "[DMX's] proposal acknowledges that [PROs] provide[ ] important services to both its members and to music users." *ASCAP,* 756 F.Supp.2d at 549. Indeed, the floor fee established by both the *ASCAP* and *BMI* rate courts compensated ASCAP and BMI for their licensing and overhead costs; the floor fee established by the *ASCAP* rate court was based on ASCAP's own records. Inclusion of the floor fee into the fee structure also ensured that ASCAP and BMI would be compensated for the value of their services regardless of the extent to which DMX played ASCAP or BMI works that were also directly licensed. That the rates set by the *ASCAP* and *BMI* rate courts were comparatively lower than those historically obtained by ASCAP and BMI is of no moment given ASCAP and BMI's longstanding market power and the industry's changing economic landscape.

[14] Second, the annual $25 per-location royalty pool was not an unreasonable benchmark for DMX's per-location licensing fees with ASCAP and BMI. It reflected the competitive market, was an appropriate valuation of the right to publicly perform the licensed musical works, and was consistent with the four factors that guide the selection of a benchmark (a comparable right, similar parties, similar economic circumstances, and whether the rate would be set in a sufficiently competitive market). *See Music Choice,* 426 F.3d at 95. The right in question—the right to public performance—was comparable. The parties were also similarly situated. Hundreds of music publishers and administrators agreed to the annual $25 per-location royalty pool, and thus, the *ASCAP* rate court did not err in finding that the "collective decisions [of hundreds of publishers and administrators] to execute direct licenses [were] comparable to the decision [a PRO] makes in entering a license." *ASCAP,* 756 F.Supp.2d at 550. While the economic circumstances of direct licensors differ from those of ASCAP and BMI, these differences were balanced by the additional compensation that PROs received under the district court's rate formulas and "the degree of competition that the direct licenses inject into th[e] marketplace." *Id.* Accordingly, in both cases, the district court did not err in finding that, for rights to publicly perform licensed musical works, direct licenses were more reflective of rates that would be set in a competitive market than blanket fees imposed by PROs on BG/FG music providers.

Third, based on the evidence presented at trial, it was not clearly erroneous for the *ASCAP* and *BMI* rate courts to find

Broadcast Music, Inc. v. DMX Inc., 683 F.3d 32 (2012)

2012-1 Trade Cases P 77,932, 2012 Copr.L.Dec. P 30,271, 103 U.S.P.Q.2d 1200

that DMX's advance to Sony was a "cost of entry into the market" that DMX paid to sign at least one major music publisher into its new direct licensing program. *See id.* at 551–52; *BMI*, 726 F.Supp.2d at 361. To support this finding, the *ASCAP* rate court explained that the Sony agreement with DMX was confidential and there was no evidence that any other direct licensor found the advance to be surprising, demanded a similar advance, or contended that the annual $25 per-location royalty pool should be increased to account for the advance. *ASCAP*, 756 F.Supp.2d at 552.

Fourth, in light of the evolving commercial music market, the rate courts reasonably incorporated direct licenses to the extent they are relied upon by licensees like DMX. Direct licenses, and their incorporation into licensing fee structures, foster fair pricing and competition within the music licensing market, thereby advancing the very purpose of the AFJ2 and the BMI Decree. The rates set by the district court, as the *ASCAP* court found, "allow[ ] the appropriate incentives for DMX to continue **\*49** and to expand its direct licensing program." *Id.* at 549. We have already noted that if the *ASCAP* and *BMI* rate courts had not taken DMX's direct licenses into account, DMX would have had to pay twice to use the same musical works, and, more substantially, direct licensing within the commercial music industry would be discouraged.

The AFJ2 and the BMI Decree were established as a result of the government's antitrust challenges to ASCAP and BMI's licensing practices. Their purpose was to, in part, promote free competition in the music licensing industry and minimize the "danger of unreasonable activity" resulting from ASCAP and BMI's market power and potential restraints on trade. *See K–91*, 372 F.2d at 4; *accord Showtime*, 912 F.2d at 570. The rate court mechanism must be considered within this context. *See Showtime*, 912 F.2d at 570. The ability of users of music rights to avail themselves of a reasonable rate through the rate court mechanism when ASCAP and BMI's market power might otherwise subject them to unreasonably high fees "would have little meaning if that court were obliged to set a 'reasonable' fee solely or even primarily on the basis of the fees [a PRO] had successfully obtained from other users." *Id.* "The disinfectant [of the rate courts] need not be a placebo." *Id.*

Accordingly, we hold that the district court did not err in setting DMX's licensing rates with ASCAP and BMI and that the rates set by the district court were reasonable.

## CONCLUSION

For the reasons set forth above, we AFFIRM the judgments of the district court.

### Parallel Citations

2012-1 Trade Cases P 77,932, 2012 Copr.L.Dec. P 30,271, 103 U.S.P.Q.2d 1200

---

Footnotes

1    The facts are largely undisputed and drawn primarily from the trial record and district court opinions.

2    SESAC, Inc. ("SESAC") is a third, substantially smaller, PRO. *See In re Application of MobiTV, Inc.*, 712 F.Supp.2d 206, 211–12 (S.D.N.Y. 2010).

3    Section II of the AFJ2 ("Definitions") defines the following licenses:

(E) "Blanket License" means a non-exclusive license that authorizes a music user to perform ASCAP music, the fee for which does not vary depending on the extent to which the music user in fact performs ASCAP music.

(J) "Per-program license" means a non-exclusive license that authorizes a broadcaster to perform ASCAP music in all of the broadcaster's programs, the fee for which varies depending upon which programs contain ASCAP music not otherwise licensed for public performance;

(K) "Per-segment license" means a non-exclusive license that authorizes a music user to perform any or all works in the ASCAP repertory in all segments of the music user's activities in a single industry, the fee for which varies depending upon which segments contain ASCAP music not otherwise licensed for public performance.

2(S) "Through–to–the–Audience License" means a license that authorizes the simultaneous or so-called 'delayed' performances of ASCAP music that are contained in content transmitted or delivered by a music user to another music user with whom the licensee has an economic relationship relating to that content[.]

AFJ2, §§ II(E), (J), (K), (S).

4    Under the AFJ2, BG/FG music service is defined as: a service "that transmits performances of music to subscribers and that furnishes to those subscribers equipment not otherwise available to the general public that enables subscribers to make the transmitted

2012-1 Trade Cases P 77,932, 2012 Copr.L.Dec. P 30,271, 103 U.S.P.Q.2d 1200

performances on their premises. A [BG/FG] music service does not include radio or television stations or networks, cable television networks or systems, persons that transmit renditions of music to private homes, apartments, or hotel or motel guest rooms, or persons that transmit renditions of music to subscribers that charge admission." AFJ2, § II(D).

5  The ASCAP–Muzak Agreement's annual per-location fee of $41.21 was calculated by dividing its flat annual fee by the number of Muzak's commercial subscriber locations.

6  When BMI and Muzak entered into the BMI–Muzak Agreement, Muzak had 165,000 commercial subscriber locations. The annual per-location fee of $36.36 was thus calculated by dividing $30 million by 5 years and then by 165,000 locations.

7  This figure was calculated by dividing $30 million by 5 and then by 242,439. The 242,439 figure was calculated by increasing Muzak's 165,000 commercial subscriber locations by 8 percent each year over the course of 5 years, representing the number of projected commercial subscriber locations Muzak would have if it continued to grow at percent over 5 years.

8  DMX's proposed rate formula can also be described as the product of the difference between the blanket fee and the floor fee multiplied by the difference between 1 and the share licensed via ASCAP and then subtracted from the blanket fee. One minus the share licensed via ASCAP is equivalent to dividing the total number of ASCAP works transmitted by DMX for which DMX has a direct license by the total number of ASCAP works transmitted by DMX.

9  The floor fee was calculated by subtracting the unbundled music fee from the blanket fee.

10  The floor fee included three components: (1) $6.18 in overhead costs, equal to 17 percent of BMI's per-location income of $36.36; (2) $2.38 in routine costs per location; and (3) $0.10 in initial development costs. *Id.* at 364.

11  BMI did not dispute—in the rate court proceeding or on appeal—that DMX was entitled to a blanket license with a carve-out. *Id.* at 355–56.

12  The BMI Decree provides that BMI is "enjoined and restrained from: (A) Failing to grant permission, on the written request of all writers and publishers of a musical composition including the copyright proprietor thereof, allowing such persons to issue to a music user making direct performances to the public a non-exclusive license permitting the making of specified performances of such musical composition by such music user directly to the public, provided that the defendant shall not be required to make payment with respect to performances so licensed." BMI Decree, § IV(A).

13  The AFJ2 provides:

    If the parties are unable to reach agreement within sixty (60) days from the date when the request for a license is received by ASCAP, or within sixty (60) days of ASCAP's request for information, whichever is later, the music user may apply to the Court for a determination of a reasonable fee retroactive to the date of the written request for a license.... If the parties are unable to agree upon a reasonable fee within ninety (90) days from the date when ASCAP advises the music user of the fee that it deems reasonable or requests additional information from the music user, and if the music user has not applied to the Court for a determination of a reasonable fee, ASCAP may apply to the Court for the determination of a reasonable fee....

    AFJ2, § IX(A).

    The BMI Decree similarly provides:

    If the parties are unable to agree upon a reasonable fee within sixty (60) days from the date when defendant advises the applicant of the fee which it deems reasonable, the applicant may forthwith apply to this Court for the determination of a reasonable fee.... If the parties are unable to agree upon a reasonable fee within ninety (90) days from the date when defendant advises the applicant of the fee which it deems reasonable and no such filing by applicant for the determination of a reasonable fee for the license requested is pending, then defendant may forthwith apply to this Court for the determination of a reasonable fee....

    BMI Decree, § XIV(A).

14  The AFJ2 provides: "In any such proceeding, the burden of proof shall be on ASCAP to establish the reasonableness of the fee it seeks...." AFJ2, § IX(B).

    The BMI Decree provides: "In any such proceeding, defendant shall have the burden of proof to establish the reasonableness of the fee requested by it." BMI Decree, § XIV (A).

15  The AFJ2 provides: "Should ASCAP not establish that the fee it requested is reasonable, then the Court shall determine a reasonable fee based upon all the evidence." AFJ2, § IX(D).

    The BMI Decree provides: "Should defendant not establish that the fee requested by it is a reasonable one, then the Court shall determine a reasonable fee based upon all the evidence." BMI Decree, § XIV(A).

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 24

**H**

1995 CarswellOnt 31, 29 C.B.R. (3d) 33, 22 B.L.R. (2d) 210

Central Capital Corp., Re

Re CENTRAL CAPITAL CORPORATION; Re Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended

Re appeal from disallowance of claims of JAMES W. McCUTCHEON, CENTRAL GUARANTY TRUST COMPANY (as trustee for registered retirement savings plan of JAMES W. McCUTCHEON) and CONSOLID-ATED S.Y.H. CORPORATION by PEAT MARWICK THORNE INC. (administrator of certain assets of CENTRAL CAPITAL CORPORATION)

Ontario Court of Justice (General Division — Commercial List)

Feldman J.

Judgment: January 9, 1995[FN*]
Docket: Doc. B28/93

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Counsel: *Bryan Finlay, Q.C.*, and *Jim Buhlman*, for James McCutcheon and Central Guaranty Trust Company.

*James Grout* and *Aida Van Wees*, for Consolidated S.Y.H. Corporation.

*T.J. O'Sullivan* and *P.G. Macdonald*, for unsecured creditors of Central Capital Corporation.

*N. Saxe*, for Peat Marwick Thorne Inc.

*G. Rubenstein*, for Central Capital Corporation (excused at opening of motion).

Subject: Corporate and Commercial; Insolvency

Bankruptcy --- Proving claim — Provable debts — Claims of director, officer or shareholder of bankrupt corporation

Corporations --- Arrangements and compromises — Under Companies' Creditors Arrangement Act — Arrangements — Effect of arrangement — General

Corporations — Arrangements and compromises — Companies' Creditors Arrangement Act — Claims — Preferred shares having right of retraction — Company unable to redeem shares because of insolvency — Preferred shareholders claiming that right constituted debt and claim provable — Administrator denying claims and de-

1995 CarswellOnt 31, 29 C.B.R. (3d) 33, 22 B.L.R. (2d) 210

cision upheld on appeal — Preferred shareholders having no claim under plan of arrangement — Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36.

An order was made declaring that the *Companies' Creditors Arrangement Act* ("CCAA") applied to CCC and staying all proceedings against CCC. Under the reorganization, the most valuable assets of CCC were trans-ferred to a new company. CCC's creditors were entitled to receive shares and debentures in the new company to reflect some of their outstanding debt. The balance of the debt and equity claimants, including the shareholders of CCC, received common shares in CCC, which now lacked its most valuable assets.

Some of the preferred shares had a right of retraction attached to them; that is, the shareholders had a right to re-quire the company to redeem the shares at a fixed price and on a certain date; the company was then obliged to redeem, provided it met certain legislated solvency tests at that date. The appellants held those shares and ar-gued that the retraction right constituted a future contingent liability of CCC and was, therefore, a debt provable in bankruptcy. Even though CCC was prohibited from making payment to redeem the shares because of insolv-ency, it was not relieved of its obligation to redeem. The administrator denied their claims and the preferred shareholders appealed.

**Held:**

The appeals were dismissed.

Since the preferred shares remained as shares until they were redeemed, the preferred shareholders were not creditors and had no claims provable. Under the right of retraction, CCC's obligation to pay all or part of the re-demption price for deposited shares was contingent on compliance with applicable law, which in this case meant the solvency tests set out in the *Canada Business Corporations Act*. Since no payment could be made until the tests were met, until then, there was no present obligation to pay. CCC was obligated to retain the shares and re-deem them if and when the tests were met. Until that time, there was no debt that could be enforced by court ac-tion that would result in a money judgment. The right of retraction also could not be considered a contingent claim. Until the shares were actually redeemed by payment, they remained outstanding shares.

The case turned on whether the right of retraction itself created a debt on the date the company became obligated to redeem, even if the company could not actually redeem by payment on that date, or a contingent future debt, and not on whether the preferred shares themselves with the right of retraction were actually debt documents. Even though a right of retraction at the option of the preferred shareholder is less common than the usual right of the company to redeem at its option, that right is one of the incidents or provisions attaching to the preferred shares; it does not, however, change the nature of those shares from equity to debt.

**Cases considered:**

*Canada Deposit Insurance Corp. v. Canadian Commercial Bank*, [1992] 3 S.C.R. 558, 16 C.B.R. (3d) 14, 5 Alta. L.R. (3d) 193, 97 D.L.R. (4th) 385, 7 B.L.R. (2d) 113, *(sub nom. Canada Deposit Insurance Corp. v. Canadian Commercial Bank (No. 2))* 143 N.R. 321, 131 A.R. 321, 25 W.A.C. 321 — *considered*

*East Chilliwack Agricultural Co-operative, Re* (1989), 74 C.B.R. (N.S.) 1, 42 B.L.R. 236, 58 D.L.R. (4th) 11 (B.C. C.A.), reversing (1988), 70 C.B.R. (N.S.) 52, 39 B.L.R. 20 (B.C. S.C.) — *distinguished*

*Olympia & York Developments Ltd., Re* (1993), *(sub nom. Olympia & York Developments Ltd. v. Royal Trust Co.)* 18 C.B.R. (3d) 176, 102 D.L.R. (4th) 149 (Ont. Gen. Div.) — *referred to*

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellOnt 31, 29 C.B.R. (3d) 33, 22 B.L.R. (2d) 210

**Statutes considered:**

Bankruptcy Act, R.S.C. 1985, c. B-3 —

s. 121

Canada Business Corporations Act, R.S.C. 1985, c. C-44 —

s. 34

s. 35

s. 36

s. 40

s. 40(3)

s. 42

Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36.

Cooperative Association Act, R.S.B.C. 1979, c. 66 —

s. 15

Appeals from denial of claims by administrator under *Companies' Creditors Arrangement Act* plan of reorganization.

*Feldman J.*:

1    As part of a plan of arrangement of Central Capital Corporation under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended, the most valuable assets of the company were transferred to a Newco, and creditors of Central Capital were entitled to receive shares and debentures in Newco to reflect the quantity of their outstanding debt. Under the plan, the balance of the debt and equity claimants including shareholders of Central Capital received common shares in Central Capital, now minus the most valuable assets.

2    The appellants in this matter were holders of millions of dollars worth of preferred shares of Central Capital, which shares had attached to them a right of retraction, meaning a right to require the company to redeem the shares at a fixed price and on a certain date, which the company is obliged to do essentially as long as it meets certain legislated solvency tests at that date. The appellants made a claim to the administrator to participate in Newco on the basis that their preference shares with the retraction right constituted a debt owed by the company, and they are therefore creditors entitled to claim and participate in Newco. The administrator denied the claims, leaving them as common shareholders of Central Capital.

3    On this motion, the issue is whether the appellants were creditors of Central Capital on June 15, 1992, the effective date, and therefore entitled to participate with other creditors in Newco.

**Facts**

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellOnt 31, 29 C.B.R. (3d) 33, 22 B.L.R. (2d) 210

4    The facts for the purpose of this motion are set out in an agreed statement of facts.

5    Mr. McCutcheon and his R.R.S.P. received Series "B" Senior Preferred Shares of Central Capital as part of the consideration for the sale to the company of Class "B" Voting Shares of Canadian General Securities Limited in 1987. The sale price for 161,000 shares of Canadian General Securities Limited was $400 per share, plus for each share, 7 Series "B" Senior Preferred Shares of Central Capital, or if they could not be authorized in time, an additional $175 per share. When Mr. McCutcheon deposited his Series B Senior Preferred Shares for retraction on July 1, 1992, the redemption amount including the redemption price of $25 per share plus accrued dividends from July 1, 1991 was $10,913,593.69. The redemption amount for the shares in his R.R.S.P. was $697,526.68.

6    Consolidated S.Y.H. Corporation (formerly Scottish and York Holdings Limited) sold to Central Capital the shares of Central Canada Insurance Services Limited, Eaton Insurance Company, Scottish & York Insurance Co. Limited and Victoria Insurance Company of Canada in consideration of the issuance of 60,116,000 Junior Preferred Series A Shares and 9,618,560 Junior Preferred Series B Shares. In its proof of claim submitted to the administrator, Consolidated S.Y.H. claimed the amount of $72,388,836 as the amount that would be owing to it on the date of retraction of its shares.

7    The provisions attaching to the Series B Senior Preferred Shares are contained in a certificate of amendment of the articles of the company, and include a preferred dividend and a right of retraction. The retraction right for the Series "B" Senior Preferred Shares is set out in art. 4 of the Provisions of those shares as follows:

**Retraction Privilege**

*4.1 Retraction of Series B Senior Preferred Shares*

Each holder of Series B Senior Preferred Shares shall be entitled, subject to and upon compliance with the provisions of this Section 4, to require the Corporation to redeem all or any part of the Series B Senior Preferred Shares registered in the name of that holder on July 1, 1992 (the "Retraction Date") at a price equal to $25.00 per share, plus all accrued and unpaid dividends thereon calculated to but excluding the Retraction Date (the whole being referred to for the purpose of these provisions as the "Retraction Price").

*4.2 Procedure*

(a) The Corporation shall itself or through the transfer agent for the time being of the Series B Senior Preferred Shares, at least 60 and not more than 90 days prior to the Retraction Date, give written notice of the right provided for in Section 4.1 to each person who is at the date of the giving of such notice a registered holder of Series B Senior Preferred Shares. Such notice shall set out the Retraction Price, the particulars of the procedure to be followed by any holder wishing to exercise such right, including the date (the "Deposit Date"), which shall be not later than the close of business on the date 30 days prior to the Retraction Date, on or before which any shares to be redeemed must be tendered, the place and manner of exercise of such right as hereinafter set out. Such notice shall also contain a brief statement of the terms, if any, on which any Series B Senior Preferred Shares may be converted into shares of Additional Series as provided in Section 5, a description of the material attributes of such additional shares and the place or places at which the holders of Series B Senior Preferred Shares may present and surrender such shares for conversion. Each holder of Series B Senior Preferred Shares who elects to require the Corporation to redeem all or any Series B Senior Preferred Shares registered in the name of that holder must, following receipt of such notice and

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellOnt 31, 29 C.B.R. (3d) 33, 22 B.L.R. (2d) 210

prior to the close of business on the Deposit Date, deposit the certificate or certificates representing the Series B Senior Preferred Shares which that holder desires to have redeemed with the Corporation, with the retraction panel on the certificates duly completed and signed, at its registered office, at any place where the Series B Senior Preferred Shares may be transferred or at such other place or places in Canada as shall be specified in writing by the Corporation to the holders of the Series B Senior Preferred Shares in the afore-mentioned written notice. Any such certificates received by the Corporation at its registered office or other-wise deposited in accordance with such notice at any place other than a transfer office of the transfer agent shall be forthwith delivered to the transfer agent.

(b) If a holder of Series B Senior Preferred Shares wishes to tender pursuant to the above retraction priv-ilege a part only of the Series B Senior Preferred Shares represented by any share certificate or certificates, the holder may deposit the certificate or certificates with the Corporation, with the retraction panel on the certificates duly completed and signed. If less than all of the Series B Senior Preferred Shares represented by any certificate or certificates so endorsed are to be redeemed, the Corporation shall issue and deliver to such holder, at the expense of the Corporation, a new share certificate representing the Series B Senior Pre-ferred Shares which are not being tendered for redemption.

### 4.3 Redemption Subject to Applicable Law

(a) If the redemption by the Corporation of all Series B Senior Preferred Shares required to be redeemed on the Retraction Date under this Section 4 would be contrary to applicable law or the rights, privileges, re-strictions and conditions attaching to any shares of the Corporation ranking prior to the Series B Senior Pre-ferred Shares, the Corporation shall redeem only the maximum number of Series B Senior Preferred Shares (rounded to the next lower multiple of 1,000 shares) which the Corporation determines it is then permitted to redeem. Such redemption will be made pro rata (disregarding fractions of shares) from each holder of tendered Series B Senior Preferred Shares according to the number of Series B Senior Preferred Shares tendered for redemption by each such holder and the Corporation shall issue and deliver to each such holder a new share certificate, at the expense of the Corporation, representing the Series B Senior Preferred Shares not redeemed by the Corporation. Thereafter, the Corporation shall redeem at the Retraction Price on each succeeding Dividend Payment Date such further number of Series B Senior Preferred Shares which have been deposited by holders thereof in accordance with Section 4.1 (excluding the provisions thereof as to the timing of deposit) on or before the 30th day preceding each such Dividend Payment Date, which is the less-er of (i) the number of Series B Senior Preferred Shares so deposited, and (ii) the maximum number of such Series B Senior Preferred Shares (rounded, except for the final redemption of any number of shares less than 1,000, to the next lower multiple of 1,000 shares and selected pro rata (disregarding fractions of shares) from each holder of Series B Senior Preferred Shares so tendered according to the number of Series B Seni-or Preferred Shares so tendered by each such holder) which the Corporation determines it is then permitted to redeem, and so on until all Series B Senior Preferred Shares which have been deposited for redemption under this Section 4 have been redeemed. The Corporation shall be under no obligation to give any notice to the holders of Series B Senior Preferred Shares in respect of the redemptions provided for in this Section 4.3 except for the notice provided for in paragraph (b) of Section 4.4.

(b) If the directors of the Corporation have acted in good faith in making any of the determinations referred to above as to the number of Series B Senior Preferred Shares which the Corporation is permitted at any time to redeem, the Corporation shall have no liability in the event that any such determination proves inac-curate.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellOnt 31, 29 C.B.R. (3d) 33, 22 B.L.R. (2d) 210

### 4.4 Election Irrevocable

(a) Subject to paragraph (b) of this Section 4.4, the election of any holder to require the Corporation to redeem any Series B Senior Preferred Shares shall be irrevocable upon receipt by the transfer agent for the Series B Senior Preferred Shares of the certificates for the shares to be redeemed and the signification of election of the holder as aforesaid.

(b) To the extent that payment of the Retraction Price is not made by the Corporation on or before the Retraction Date, the Corporation shall forthwith after that date notify each holder who has not received payment for his deposited Series B Senior Preferred Shares of the holder's right to require the Corporation to return all (but not less than all) of the holder's deposited share certificates to the holder (and the Corporation shall return such certificates on the request of the holder) and of the holder's rights under Section 4.3 hereof.

### 4.5 Not affecting Dividends

The inability of the Corporation to effect a redemption in whole on the Retraction Date or a subsequent Dividend Payment Date shall not affect or limit the obligation of the Corporation to pay any dividends accrued or accruing on the Series B Senior Preferred Shares from time to time not redeemed and remaining outstanding.

### 4.6 Payment and Retraction Procedure

Subject to Section 4.3, the Corporation shall redeem on the Retraction Date all of the Series B Senior Preferred Shares tendered pursuant to the above retraction privilege at the Retraction Price and except as otherwise specifically provided in this Section 4, redemptions under this Section 4 shall comply with and be subject to those provisions of paragraphs (b) to (f) inclusive of Section 3.3 not inconsistent herewith.

8      Article 3 is the provision for redemption at the option of the company. Article 3.3(e), which by art. 4.6 is made applicable to retractions if not inconsistent with art. 4, provides:

3.3(e) From and after the date fixed for redemption, the Series B Senior Preferred Shares called for redemption shall cease to be entitled to dividends or any other participation in the assets of the corporation and the holders thereof shall not be entitled to exercise any of their other rights as shareholders in respect thereof unless payment of the price fixed for redemption shall not be made upon presentation and surrender of the share certificates representing such shares in accordance with the foregoing provisions, in which case the rights of such holders shall remain unaffected.

9      One of the rights of the Series B Senior Preferred Shares is the right to vote for the election of two directors in the event that the company fails to make eight quarterly dividends. By art. 4.5 specifically, dividends continue to accrue on shares not redeemed in accordance with the retraction and "remaining outstanding".

10      Finally by art. 7 of the Provisions, on liquidation, dissolution or winding up of the corporation, the holders of the Series B Senior Preferred Shares are entitled to receive from the assets $25 per share plus all unpaid dividends in priority to lower ranking shareholders, and are not entitled to any further distribution of assets.

11      The provisions attaching to the Series A and B Junior Preferred Shares are essentially similar to those for the Series B Senior Preferred except that the retraction date is any time after September 27, 1994.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellOnt 31, 29 C.B.R. (3d) 33, 22 B.L.R. (2d) 210

12      All of the retraction privileges are made subject to applicable law, which for the purposes of Central Capital, a *Canada Business Corporations Act*, R.S.C. 1985, c. C-44 corporation, means subject to s. 36 of the CBCA which provides:

> 36.(1) [Redemption of shares.] Notwithstanding subsection 34(2) or 35(3), but subject to subsection (2) and to its articles, a corporation may purchase or redeem any redeemable shares issued by it at prices not exceeding the redemption price thereof stated in the articles or calculated according to a formula stated in the articles.
>
> (2) [Limitation.] A corporation shall not make any payment to purchase or redeem any redeemable shares issued by it if there are reasonable grounds for believing that
>
> (*a*) the corporation is, or would after the payment be, unable to pay its liabilities as they become due; or
>
> (*b*) the realizable value of the corporation's assets would after the payment be less than the aggregate of
>
> (i) its liabilities, and
>
> (ii) the amount that would be required to pay the holders of shares that have a right to be paid, on a redemption or in a liquidation, rateably with or prior to the holders of the shares to be purchased or redeemed.

Section 42 similarly restricts the declaration or payment of dividends:

> 42. [Dividends.] A corporation shall not declare or pay a dividend if there are reasonable grounds for believing that
>
> (*a*) the corporation is, or would after the payment be, unable to pay its liabilities as they become due; or
>
> (*b*) the realizable value of the corporation's assets would thereby be less than the aggregate of its liabilities and stated capital of all classes.

13      In December 1991, Central Capital stopped paying interest and principal on its unsecured loans, and from that time it was insolvent.

14      On April 23, 1992, Central Capital gave the required 60-day notice to the Series B Senior Preferred shareholders of their right to redeem on July 1, 1992, but advised that although they could tender their shares by May 29, 1992, the company would not be redeeming as any such redemption would be contrary to law in light of the current financial position of the company.

15      James McCutcheon and Central Guaranty deposited their shares as required.

16      On application of its lenders, an order was made in this court on June 15, 1992 declaring that the *Companies' Creditors Arrangement Act* applied to Central Capital and staying all proceedings against the company. On July 9, 1992, a further order was made whereby certain significant assets of the company would be transferred to Canadian Insurance Group Limited (CIGL), a newco, and the administrator was authorized to enter into a Subscription and Escrow Agreement with creditors of Central Capital whereby they could exchange a portion of their indebtedness for shares and debentures to be issued by CIGL. The administrator was to supervise the calling for claims of creditors. Central Capital was authorized to file a plan of arrangement with its secured and

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

unsecured creditors and with its shareholders to provide for the restructuring of its debt and equity in accordance with the order. In respect of Central Capital shares, the order provided that the CCAA plan would provide for the conversion of all outstanding preference, common and subordinated voting shares into 10% of a new class of common shares to be created with the remaining 90% to be held by creditors of Central Capital. The July 9 order was made without prejudice to the rights of these appellants to claim as creditors of Central Capital.

17    No preferred shares were redeemed on July 1, 1992, and on July 20 Central Capital notified the holders of the Series B Senior Preferred Shares of their right to require the company to return the share certificates. James McCutcheon and Central Guaranty did not exercise that right.

18    On July 31, 1992, a further order of this court set June 15, 1992 as the date as at which all claims of creditors would be made and approved the proof of claim form. The claim is defined in the Restated Subscription and Escrow Agreement as follows:

"Claim" means any indebtedness, liability or obligation of any kind of CCC that, if unsecured, would be a debt provable in bankruptcy within the meaning of the Bankruptcy Act (Canada), as amended as of the date hereof.

19    Consolidated SYH did not have an opportunity to deposit its preferred shares for redemption because the earliest date for doing so in September, 1994 was well after the completion of the implementation of the plan of arrangement.

20    All of the appellants submitted claims to the administrator by the designated date, and their claims were denied. These appeals were brought in accordance with an order of September 22, 1992 approving the first report of the administrator which contained the appeal procedure.

21    By order of December 18, 1992, the CCAA plan was approved by the court and was made binding on all shareholders. On or about January 1, 1993, articles of reorganization in the form authorized by the sanction order were filed and a certificate of reorganization was issued. Pursuant to those articles, all common and preferred shares including those owned by the appellants were converted to a new class of common shares and the existing common and preferred shares were deleted from the Articles of Incorporation of Central Capital.

**The Positions of the Parties**

*1. James McCutcheon and Central Guaranty*

22    These appellants deposited their Series B Senior Preferred Shares for redemption in accordance with art.4 of the Provisions attaching to those shares before May 29, 1992. The deposit was irrevocable, and on July 1, 1992, the company was obliged to redeem those shares at the fixed redemption price. The company was restricted from actually paying for the shares on that date because it did not meet the solvency requirements of the CBCA, and therefore of art.4, which makes the retraction right "subject to applicable law", but the inability of the company to pay does not derogate from its obligation to pay and therefore from the characterization of that obligation on that date as a debt.

23    Furthermore, in assessing the nature of the entire transaction whereby the preference shares were issued in partial consideration for the sale of the shares of the insurance company to Central Capital, that transaction should be characterized as a loan, and not as an investment in capital. The loan earned a return in the form of the

1995 CarswellOnt 31, 29 C.B.R. (3d) 33, 22 B.L.R. (2d) 210

quarterly cumulative dividends attached to the shares, and was repayable if called by the lender, on July 1, 1992.

### *2. Consolidated S.Y.H.*

24      This appellant's position is that its right to require Central Capital to retract its Series A and B Junior Preferred Shares on or after September 27, 1994 is a "claim provable" within the meaning of s.121 of the *Bankruptcy Act*, R.S.C. 1985, c.B-3 in accordance with the definition of "claim" in the Restated Subscription and Escrow Agreement.

25      Section 121 provided:

121(1) All debts and liabilities, present or future, to which the bankrupt is subject at the date of the bankruptcy or to which he may become subject before his discharge by reason of any obligation incurred before the date of the bankruptcy shall be deemed to be claims provable in proceedings under this Act.

(2) The court shall, on the application of the trustee, determine whether any contingent claim or any unliquidated claim is a provable claim, and, if a provable claim, it shall value the claim, and the claim shall after that valuation be deemed a proved claim to the amount of its valuation.

(3) A creditor may prove a debt not payable at the date of the bankruptcy and may receive dividends equally with the other creditors, deducting only thereout a rebate of interest at the rate of 5 per cent per annum computed from the declaration of a dividend to the time when the debt would have become payable according to the terms on which it was contracted.

(4) Where a proposal is made before a bankruptcy, the claims provable shall be determined as of the date of the filing of the proposal.

26      The appellant's position is that the retraction right constitutes a future contingent liability of the company and is therefore a debt provable in bankruptcy. Although the company is prohibited from making payment to redeem the shares, the company is not relieved of its obligation to redeem. This appellant also says that the restrictions on redemption based on solvency are not applicable in the context of a restructuring.

### *3. The Unsecured Creditors*

27      The unsecured creditors oppose the position that the appellants as preferred shareholders should be entitled to claim as creditors and thereby share in the significant assets together with the creditors. Their position is that the retraction right does not create a debt provable in bankruptcy. Furthermore, the appellants' interest in the company is in the nature of an investment in capital and therefore an equity interest, not a loan or debt interest.

28      In the case of Consolidated S.Y.H., because Central Capital was reorganized before the retraction date, no obligation to retract ever arose nor was it triggered. In the alternative, if the retraction rights amount to a claim, they are contingent claims only which must be valued at 0 because no payment can be made on them if the company is insolvent, and there is no prospect of the company becoming legally obligated to pay such claim, or in the further alternative, the appellants are at most "subordinated creditors" as defined in the Restated Subscription and Escrow Agreement.

29      These last two alternative submissions are somewhat problematic in light of the agreed statement of facts, para.2:

1995 CarswellOnt 31, 29 C.B.R. (3d) 33, 22 B.L.R. (2d) 210

**Issue**

2. Do the Appellants, or any of them, have claims provable against CCC within the meaning of the Bankruptcy Act (Canada), as amended as of the date of the Restated Subscription and Escrow Agreement. If the Appellants or any of them have provable claims, then the proof of any claim of any Appellant that has a claim provable is to be allowed as filed and the appeal from the disallowance allowed, and the Appellants, or any of them, whose claim is allowed, are to participate in the Plan of Arrangement of CCC as a senior creditor.

*4. The Administrator*

30    The administrator took no position before the court but had taken its position by denying the claims of the appellants.

**Analysis**

*Is there a debt provable in bankruptcy?*

31    A definition of "debt" in *Black's Law Dictionary*, 1990, 6th ed., at p.409 is:

A sum due by certain and express agreement. A specified sum of money owing to one person from another, including not only obligation of debtor to pay but right of creditor to receive and enforce payment.

32    The retraction right is clearly created in such a way that the obligation of the company to pay all or any part of the redemption price for deposited shares is contingent on compliance with applicable law which means the solvency tests set out in the CBCA. Because no payment can be made by the company unless the solvency requirements are met, until then there is no present obligation to pay.

33    The company's obligation is to retain the shares that have not been returned to the holder at its request, and to redeem them by paying the redemption price when and if the solvency conditions are met. Until that time there is no debt that can be enforced by action resulting in a money judgment.[FN1] The only action that might be brought would be for a declaration of the obligation of the company to make payment in accordance with the terms of the share provisions.

34    The retraction right cannot be considered to be a contingent claim because until the shares are actually redeemed by payment, they remain outstanding as shares. This is clear from the terms of the share provisions including art.4.5 which refers to the shares not redeemed "and remaining outstanding" as maintaining their rights to dividends, and art.4.6 which incorporates art.3.3(e) which provides that unredeemed shares maintain all of their rights unaffected.

35    Counsel for Mr. McCutcheon submitted that art.3.3(e) is inconsistent with art.4 and therefore inapplicable to the retraction procedure, because the election to deposit the shares for retraction is irrevocable by the preferred shareholders, therefore they have irrevocably given up their rights as shareholders. However, the effect of the irrevocable election is that the shares remain deposited and will be redeemed as soon as such redemption is not contrary to law. That does not affect their status in the interim which is governed by art.3.3(e).

36    If this were a contingent claim in the sense of a future debt provable in bankruptcy, then any preferred shareholder whose shares have a fixed value on wind-up or dissolution of the company could be said to have a

1995 CarswellOnt 31, 29 C.B.R. (3d) 33, 22 B.L.R. (2d) 210

contingent claim to the value of those shares, contingent on a wind-up and on the company having sufficient funds on wind-up to redeem those shares. This is directly contrary to the principle referred to in Houlden and Morawetz, *Bankruptcy and Insolvency Law of Canada*, 3rd ed., vol.1, p.5-34 [G§28]:

> If a person contributes capital to a business, even though that person is not a partner in the business and may have received no share of the profits, he cannot prove his claim in bankruptcy in competition with the creditors of the business. Although such a claimant may have a valid claim for the return of the investment funds, he cannot rank *pari passu* with the unsecured creditors. He would likely have an equitable right to share in the distribution of the assets but only at such time as the remaining unsecured creditors have been paid in full. It is of the utmost importance to determine the basis of the infusion of the monies: *Canada Deposit Insurance Corp. v. Cdn. Commercial Bank* (1987), 67 C.B.R. (N.S.) 136, reversed on other grounds, ... [1992] 3 S.C.R. 558 ..., applying *Laronge Realty Ltd. v. Golconda Investment Ltd.* (1986), 63 C.B.R. (N.S.) 76 ... (C.A.).

37     It is the two factors: (1) the solvency condition precedent to the obligation of the company to redeem, together with (2) the continued life of the shares as shares until the actual redemption takes place, which distinguish this case from *Re East Chilliwack Agricultural Co-operative* (1989), 74 C.B.R. (N.S.) 1 (B.C. C.A.), a case relied on by the appellants as determinative of the case at bar.

38     There the appellants had been members of a co-operative association. The co-operatives were governed by legislation. Pursuant to s.15 of the *Cooperative Association Act*, an association could redeem its own shares subject to its rules. The Agricultural Co-operative provided in its rules that a member could withdraw from the co-op by giving notice in writing. Then [at p.5] "[u]pon notice of withdrawal being given *membership in the Co-op shall cease* (emphasis added) and thereupon the shares of such member shall be redeemed, provided that the proceeds of redemption of such shares and any loans owing to such member arising from the operation of Rule 8.09, may be held for a period not exceeding five (5) years."

39     The members had two payment options upon redemption, the first to be paid in five equal instalments over the succeeding five years, the second to be paid at the end of five years with interest. At the date of the proposal in that case there were 156 members with shares under redemption.

40     The chambers judge had found that the redeeming shareholders were only entitled to money if the co-op had earnings. However, the Court of Appeal majority could find no authority in support of this finding and rejected it. The only possible reference may be the fact noted by the dissenting Justice in the Court of Appeal that dividends could only be declared out of profits.

41     The majority relied on the fact that the appellants ceased to be shareholders when they delivered the notice of withdrawal, and that thereafter their only interest in the co-op was for payment of the redemption amount. Therefore when the payments became due, they were owed by the co-operative and the appellants could sue for them if the co-operative failed to pay. The court held that the appellants were entitled to rank as unsecured creditors of the co-op.

42     In this case, the company is precluded from making payment unless the solvency tests are satisfied, plus the appellants remain shareholders of Central Capital until the shares are actually redeemed by payment. They retain their right to accruing dividends, and other rights. These two critical differences distinguish the present case from the decision in *East Chilliwack*, where the shareholders' status changed when they delivered their notices of redemption from shareholders to creditors. In this case, the status of the preferred shareholders does not

change until they are redeemed by payment, at which time they have no further relationship with Central Capital.

43    The appellants also submit that the purpose of the CBCA restrictions on redemption is to prevent a preference in an insolvency situation, but that that concern is overridden once the court is involved in a restructuring or reorganization of the entire capitalization of the company allowing the company to carry on and not be wound up. Therefore in a restructuring situation the solvency restrictions for redemption can be ignored. This was done by Blair J. in *Re Olympia & York Developments Ltd.* (1993), 102 D.L.R. (4th) 149 (Ont. Gen. Div.) at p.163, where certain shares were to be redeemed by an insolvent company as part of a larger arrangement approved by the court. However, this is quite different from ignoring conditions specifically attaching to preference shares for the purpose of interpreting the nature of the rights contained in those shares.

44    The appellants are concerned that their right of retraction attaching to the preferred shares was eliminated by the orders implementing the Restated Subscription and Escrow Agreement and the Plan of Arrangement. However, any remedy for that concern would have been in the proceedings resulting in those orders, including any appeals.

45    Once the claims procedure was approved by the court, then the nature of the claim of each claimant is to be considered based on the facts applicable to that claim. There is no basis to ignore or read out the condition precedent for payment of the redemption price on retraction contained in the Provisions attaching to the preferred shares, for the purpose of determining the nature and extent of the retraction right and whether it constitutes a claim provable in bankruptcy.

46    Analyzing in another way whether the appellants have a contingent claim, the concept of a contingent claim should be considered in the context of the *Bankruptcy Act* in which it is found. It is difficult to postulate that a future obligation to pay which can only arise if the company is solvent at a point in time in the future could be a legitimate contingent future claim under the *Bankruptcy Act*, which in most cases is invoked because of the insolvency of the debtor, and crystallizes that insolvent state. In other words such a contingency is so remote as to be virtually non-existent. That was certainly the case with Central Capital in June, 1992.

47    The remoteness of the contingency is the basis for the alternative submission on behalf of the creditors that if the appellants do have a claim it can have no value. Because I have held that they have no claim, there is no need to deal with this alternative.

48    Finally, both sides put strong reliance on the Supreme Court of Canada decision in *Canada Deposit Insurance Corp. v. Canadian Commercial Bank*, [1992] 3 S.C.R. 558 which dealt with the characterization of the interest of certain institutions which provided funds to the Canadian Commercial Bank to try to prevent its failure. When the bank ultimately had to be wound up, the character of the interest of those institutions as debt or equity had to be determined in order to rank their claim in the winding up of the bank as either creditors or investors.

49    In that case, the documentation which was put in place when the monies were provided did not state specifically whether the monies were a loan or an infusion of capital. The circumstances surrounding the transaction were unique. However, the court recognized that it had characteristics of both debt and equity, which "duality is apparently quite common in loan participation agreements." (p.589) The court identified the arrangement as "one of a hybrid nature, combining elements of both debt and equity but which, in substance, reflects a debtor-creditor relationship." (p.590)

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1995 CarswellOnt 31, 29 C.B.R. (3d) 33, 22 B.L.R. (2d) 210

50     The various series of preferred shares of Central Capital are clearly characterized as preferred shares and the provisions applicable to them are set out in the articles of the company.

> Preferred shares have been called "compromise securities" as having an intermediate position between common shares and debt. The hope has been that preferred would take on some of the characteristics of both debt and common shares, and theoretically at least, this can be achieved. ... the company cannot issue "secured" preferred shares in the sense that shares cannot have a right to a return of capital which is equal or superior to the rights of creditors. Preferred shareholders are risk-takers who are required to invest capital in the business and who can look only to what is left after creditors are fully provided for. ... In short, a preferred shareholder always remains a shareholder.

> Grover and Ross, *Materials on Corporate Finance*, p.47/48/49, ch.11 Equity.

Although the right of retraction at the option of the preferred shareholder may be less common than the usual right of the company to redeem at its option, that right is one of the incidents or provisions attaching to the preferred shares, but does not change the nature of those shares from equity to debt. The parties have characterized the transaction as a share transaction. The court would require strong evidence that they did not intend that characterization in order to hold that they rather intended a loan.

51      In my view, this case turns on whether the right of retraction itself creates a debt on the date the company becomes obligated to redeem even if it cannot actually redeem by payment on that date, or a contingent future debt on the same analysis, not on whether the preferred shares themselves with the right of retraction are actually debt documents.

52     Because the preferred shares remain in place as shares until the actual redemption, the appellants are not creditors and have no claim provable under the *Bankruptcy Act* (Canada), and the appeals are therefore dismissed. The parties may address the issue of costs either orally or in writing if they are not able to agree on that matter.

*Appeals dismissed.*

FN* The corrigenda issued by the court on January 16 and 24, 1995 have been incorporated herein.

> FN1 It is interesting to compare the scheme set out in s.40 of the CBCA for purchase of its shares by a corporation pursuant to a contract. Such a contract is specifically enforceable, subject to the defence by the company that to buy the shares would put it in breach of similar solvency tests set out in ss.34 and 35 dealing with a corporation's ability to purchase its own shares. Section 40(3) deals with the status of the contracting party pending enforcement of the contract:(3) [Status of contracting party.] Until the corporation has fully performed a contract referred to in subsection (1), the other party retains the status of a claimant entitled to be paid as soon as the corporation is lawfully able to do so or, in a liquidation, to be ranked subordinate to the rights of creditors but in priority to the shareholders.

The contracting party is not made a creditor, but is entitled to be paid out ahead of shareholders because of the outstanding contract claim.

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

# TAB 25

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

**H**

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

Central Capital Corp., Re

Re CENTRAL CAPITAL CORPORATION; Re Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended

Re appeal from disallowance of claims of JAMES W. McCUTCHEON, CENTRAL GUARANTEE TRUST COMPANY, as trustee for Registered Retirement Savings Plan of JAMES W. McCUTCHEON and CONSOL-IDATED S.Y.H. CORPORATION by PEAT MARWICK THORNE INC., Administrator of certain assets of CENTRAL CAPITAL CORPORATION

ROYAL BANK OF CANADA, BANCA COMMERCIALE ITALIANA OF CANADA, CREDIT LYONNAIS CANADA, DAI-ICHI KANGYO BANK (CANADA), PRUDENTIAL ASSURANCE COMPANY LIMITED, PRUDENTIAL GLOBAL FUNDING, INC., SANWA BANK CANADA, BANK OF TOKYO CANADA, TORONTO-DOMINION BANK, WESTDEUTSCHE LANDESBANK GIROZENTRALE, BACOB SAVINGS BANK s.c., BANCA NAZIONALE DEL LAVORO OF CANADA, BANCO DI ROMA (LONDON), COM-MERZBANK INTERNATIONAL S.A., CREDIT COMMERCIAL DE FRANCE, CREDIT COMMUNAL DE BELGIQUE S.A., CREDIT SUISSE (LUXEMBOURG) S.A., DG BANK LUXEMBOURG S.A., KREDIET-BANK NV (BELGIUM), NIPPON TRUST BANK LIMITED, OLFRN INVESTMENT (PANAMA) INC., PAUL REVERE LIFE INSURANCE, RBC FINANCE B.V., SCOR REINSURANCE COMPANY OF CANADA, SOCIÉTÉ GÉNÉRALE, BANK OF TOKYO, LTD., CHIBA BANK LTD., DAI-ICHI KANGYO BANK, LTD. (ATLANTA), HOKURIKU BANK LTD., JOROKU BANK LTD., KYOWA SAITAMA BANK (CHICAGO), LAURENTIAN BANK OF CANADA, LAURENTIAN GROUP CORPORATION AND IMPERI-AL LIFE ASSURANCE COMPANY OF CANADA, LONG-TERM CREDIT BANK OF JAPAN, LTD., MARI-TIME LIFE ASSURANCE COMPANY, MITSUBISHI TRUST AND BANKING CORPORATION, SANWA BANK, LIMITED (LONDON), SHOKO CHUKIN BANK (NEW YORK) and TOHO BANK, LTD. v. CENT-RAL CAPITAL CORPORATION

Ontario Court of Appeal

Finlayson, Weiler and Laskin JJ.A.

Heard: August 17, 1995
Judgment: February 7, 1996
Docket: Docs. CA C21479, C21477

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Counsel: *Bryan Finlay, Q.C.*, and *John M. Buhlman*, for James W. McCutcheon and Central Guaranty Trust.

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

*James H. Grout* and *Anne Sonnen*, for Consolidated S.Y.H. Corporation.

*Terence J. O'Sullivan* and *Paul G. Macdonald*, for unsecured creditors of Central Capital Corporation.

*Neil C. Saxe*, for Peat Marwick Thorne Inc.

Subject: Corporate and Commercial; Insolvency

Corporations — Arrangements and compromises — Companies' Creditors Arrangement Act — Claims — Preferred shares having right of retraction — Company unable to redeem shares because of insolvency — Preferred shareholders claiming that right constituted debt and claim provable — Administrator denying claims and decision upheld on appeal — Preferred shareholders having no claim under plan of arrangement — Further appeal dismissed — Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36.

An order was made declaring that the *Companies' Creditors Arrangement Act* applied to CCC and staying all proceedings against CCC. Under the reorganization, the most valuable assets of CCC were transferred to a new company. CCC's creditors were entitled to receive shares and debentures in the new company to reflect some of their outstanding debt. The balance of the debt and equity claimants, including the shareholders of CCC, received common shares in CCC, which now lacked its most valuable assets.

Some of the preferred shares had a right of retraction. The preferred shareholders argued that the right of retraction constituted a future contingent liability of CCC and was, therefore, a debt provable in bankruptcy. Even though CCC was prohibited by its insolvency from making payments to redeem the shares, it was not relieved of its obligation to redeem. The administrator denied their claims, and the preferred shareholders appealed. Their appeals were dismissed upon a finding that the preferred shares remained shares until they were redeemed; therefore, the preferred shareholders were not creditors and had no claims provable.

The preferred shareholders appealed.

**Held:**

The appeals were dismissed.

**Per Finlayson J.A. (dissenting)**

The preferred shares were the equivalent of vendor shares because they were received in exchange for the transfer of assets to CCC. By deferring the realization of the purchase price of their assets to the agreed dates, the preferred shareholders extended credit to CCC. In return for extending credit, the preferred shareholders agreed to receive dividends calculated in advance, but payable when declared by the board of directors. Therefore the substance of the transaction created a debt owed to the preferred shareholders. The fact that the preferred shareholders had rights as shareholders in CCC up to the time when the retraction clauses were exercisable did not affect their right to enforce payment of the retraction price when it became due. There was no reason why the preferred shareholders should not be treated as both shareholders and creditors.

**Per Weiler J.A.**

The trial judge was correct in determining that the relationship between the shareholders and CCC was a share-

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

holder relationship. The shareholders continued to be shareholders after the retraction date and remained shareholders at the time of CCC's reorganization. The preferred shares were part of CCC's capital and were always shown as shareholders' equity on CCC's books.

Under s. 36 of the *Canada Business Corporations Act*, a corporation's ability to redeem its redeemable shares is subject to its articles and a solvency requirement. CCC's articles provided for the redemption of all preferred shares on or after the retraction date; however, they stated that the redemption could be carried out only if not "contrary to law." Because CCC could not comply with the solvency requirements of s. 36 on the retraction date, any redemption would be "contrary to law." Therefore, CCC's obligation to redeem its shares was not absolute.

Although there was a right to receive payment, the effect of the solvency provision meant that there was no right to enforce payment. Therefore, the promise to pay the amount owing on the shares in the retraction provision was not one that could be proved as a claim. The retraction amounts did not constitute a debt or liability within the meaning of s. 121 of the *Bankruptcy and Insolvency Act*.

**Per Laskin J.A. (concurring)**

The relationship between the preferred shareholders and CCC had the characteristics of both debt and equity; however, in substance the preferred shareholders were shareholders and not creditors of CCC. Neither the existence nor the exercise of the retraction rights turned them into creditors. The preferred shareholders agreed to take preferred shares instead of another type of instrument, such as a bond or debenture, which clearly would have made them creditors. There was no evidence to support the preferred shareholders' contention that by taking the preferred shares they were extending credit to CCC by deferring payment of the purchase price. Further, the shares were recorded in the financial statements of CCC as "capital stock". The amount CCC might be required to pay upon the preferred shareholders' exercise of their retraction rights was not recorded as debt.

Under s. 36(2) of the *Canada Business Corporations Act*, an insolvent corporation is prohibited from redeeming shares. Further, the share conditions attached to the preferred shareholders' shares provided that they could not be redeemed if to do so would be "contrary to applicable law", that being s. 36(2) in this case. To find that the preferred shareholders had provable claims would defeat the purpose of s. 36(2).

**Cases considered:**

*By Finlayson J.A. (dissenting)*

*Canada Deposit Insurance Corp. v. Canadian Commercial Bank*, 5 Alta. L.R. (3d) 193, 16 C.B.R. (3d) 154, 97 D.L.R. (4th) 385, 7 B.L.R. (2d) 113, [1992] 3 S.C.R. 558, *(sub nom. Canada Deposit Insurance Corp. v. Canadian Commercial Bank (No. 3))* 143 N.R. 321, 131 A.R. 321, 25 W.A.C. 321 — *considered*

*East Chilliwack Agricultural Co-op., Re* (1989), 42 B.L.R. 236, 74 C.B.R. (N.S.) 1, 58 D.L.R. (4th) 11 (B.C. C.A.) — *considered*

*Exchange Banking Co., Re; Flitcroft's Case* (1882), 21 Ch. D. 519 (C.A.) — *referred to*

*Fairhall v. Butler*, [1928] S.C.R. 369, [1928] 3 D.L.R. 161 — *referred to*

*By Weiler J.A.*

*Canada Deposit Insurance Corp. v. Canadian Commercial Bank*, 5 Alta. L.R. (3d) 193, 16 C.B.R. (3d) 154,

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. *Royal Bank v. Central Capital Corp.*) 88 O.A.C. 161

97 D.L.R. (4th) 385, 7 B.L.R. (2d) 113, [1992] 3 S.C.R. 558, (sub nom. *Canada Deposit Insurance Corp. v. Canadian Commercial Bank (No. 3))* 143 N.R. 321, 131 A.R. 321, 25 W.A.C. 321 — *distinguished*

*East Chilliwack Agricultural Co-op., Re* (1989), 42 B.L.R. 236, 74 C.B.R. (N.S.) 1, 58 D.L.R. (4th) 11 (B.C. C.A.) — *distinguished*

*Farm Credit Corp. v. Holowach (Trustee of)*, 86 A.R. 304, 59 Alta. L.R. (2d) 279, [1988] 5 W.W.R. 87, 68 C.B.R. (N.S.) 255, 51 D.L.R. (4th) 501 (C.A.), leave to appeal to S.C.C. refused 100 A.R. 395 (note), 66 Alta. L.R. (2d) xlviii (note), [1989] 4 W.W.R. lxx (note), 73 C.B.R. (N.S.) xxviii (note), 60 D.L.R. (4th) vii (note), 102 N.R. 236 (note) — *considered*

*Imperial General Properties Ltd. v. R.*, (sub nom. *R. v. Imperial General Properties Ltd.)* [1985] 2 S.C.R. 228, 85 D.T.C. 5500, [1985] 2 C.T.C. 299, 31 B.L.R. 77, (sub nom. *Imperial General Properties Ltd. v. Minister of National Revenue*) 62 N.R. 137, (sub nom. *R. v. International General Properties Ltd.)* 21 D.L.R. (4th) 741 — *referred to*

*McClurg v. Minister of National Revenue*, [1991] 1 C.T.C. 169, 119 N.R. 101, 50 B.L.R. 161, (sub nom. *R. v. McClurg)* 91 D.T.C. 5001, [1991] 2 W.W.R. 244, (sub nom. *McClurg v. Canada)* 76 D.L.R. (4th) 217, [1990] 3 S.C.R. 1020 — *referred to*

*Nelson v. Rentown Enterprises Inc.*, 16 Alta. L.R. (3d) 212, 109 D.L.R. (4th) 608, [1994] 4 W.W.R. 579 (C.A.), affirming (1992), 5 Alta. L.R. (3d) 149, 96 D.L.R. (4th) 586, [1993] 2 W.W.R. 71, 7 B.L.R. (2d) 319, 134 A.R. 257 (Q.B.) — *referred to*

*Porto Rico Power Co., Re*, 27 C.B.R. 75, [1946] S.C.R. 178, (sub nom. *International Power Co. v. McMaster University)* [1946] 2 D.L.R. 81 — *considered*

*Reference re Debt Adjustment Act, 1937 (Alberta)*, 24 C.B.R. 129, [1943] 1 W.W.R. 378, [1943] A.C. 356, [1943] 1 All E.R. 240, [1940] 2 D.L.R. 1 (P.C.) — *referred to*

*Vachon v. Canada (Employment & Immigration Commission)*, [1985] 2 S.C.R. 417, 57 C.B.R. (N.S.) 113, 23 D.L.R. (4th) 641, (sub nom. *Vachon v. Canada Employment)* 63 N.R. 81 — *referred to*

*By Laskin J.A. (concurring)*

*Canada Deposit Insurance Corp. v. Canadian Commercial Bank*, 5 Alta. L.R. (3d) 193, 16 C.B.R. (3d) 154, 97 D.L.R. (4th) 385, 7 B.L.R. (2d) 113, [1992] 3 S.C.R. 558, (sub nom. *Canada Deposit Insurance Corp. v. Canadian Commercial Bank (No. 3))* 143 N.R. 321, 131 A.R. 321, 25 W.A.C. 321 — *distinguished*

*East Chilliwack Agricultural Co-op., Re* (1989), 42 B.L.R. 236, 74 C.B.R. (N.S.) 1, 58 D.L.R. (4th) 11 (B.C. C.A.) — *distinguished*

*Farm Credit Corp. v. Holowach (Trustee of)*, 86 A.R. 304, 59 Alta. L.R. (2d) 279, [1988] 5 W.W.R. 87, 68 C.B.R. (N.S.) 255, 51 D.L.R. (4th) 501 (C.A.) [leave to appeal to S.C.C. refused 100 A.R. 395 (note), 66 Alta. L.R. (2d) xlviii (note), [1989] 4 W.W.R. lxx (note), 73 C.B.R. (N.S.) xxviii (note), 60 D.L.R. (4th) vii (note), 102 N.R. 236 (note)] — *referred to*

*Laronge Realty Ltd. v. Golconda Investments Ltd.* (1986), 7 B.C.L.R. (2d) 90, 63 C.B.R. (N.S.) 76 (C.A.) —

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

*referred to*

*Meade (Debtor), Re; Ex parte Humber v. Palmer (Trustee)*, [1951] 2 All E.R. 168, [1951] Ch. 774 (D.C.) — *referred to*

*Mountain State Steel Foundries, Inc. v. Commissioner*, 284 F.2d. 737, 60-2 U.S. Tax Cas. (CCH) P 9797, 6 A.F.T.R. 2d (P-H) P 5910 (4th Cir. 1960) — *referred to*

*National Bank für Deutschland v. Blucher, (sub nom. Blucher v. Canada (Custodian))* [1927] S.C.R. 420, [1927] 3 D.L.R. 40 — *distinguished*

*Nelson v. Rentown Enterprises Inc. (1992), 5 Alta. L.R. (3d) 149, 96 D.L.R. (4th) 586, [1993] 2 W.W.R. 71, 7 B.L.R. (2d) 319, 134 A.R. 257* (Q.B.), affirmed *16 Alta. L.R. (3d) 212, 109 D.L.R. (4th) 608, [1994] 4 W.W.R. 579* (C.A.) — *referred to*

*Patricia Appliance Shops Ltd., Re (1922), 2 C.B.R. 466, 52 O.L.R. 215, [1923] 3 D.L.R. 1160* (S.C.) — *referred to*

*Robinson v. Wangemann*, 75 F.2d 756 (5th Cir. Tex. 1935) — *considered*

*Trevor v. Whitworth (1887), 12 App. Cas. 409*, [1886-90] All E.R. Rep. 46 (H.L.) — *considered*

*Wolff v. Heidritter Lumber Co., 112 N.J. Eq. 34, 163 A. 140* (Ch. 1932) — *referred to*

**Statutes considered:**

Assignments and Preferences Act, R.S.O. 1990, c. A.33.

Bankruptcy Act, R.S.C. 1970, c. B-3 [R.S.C. 1985, c. B-3] —

s. 95(1) [R.S.C. 1985, c. B-3, s. 121(1)]

Bankruptcy and Insolvency Act, R.S.C. 1985, c. B-3 —

s. 2 "claim provable in bankruptcy"

s. 2 "corporation"

s. 2 "creditor"

s. 95

s. 96

s. 101

s. 121

s. 121(1)

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

Canada Business Corporations Act, R.S.C. 1985, c. C-44 —

s. 2 "liability"

s. 25(3)

s. 34

s. 34(2)

s. 35

s. 36

s. 36(1)

s. 36(2)

s. 39

s. 40

s. 40(1)

s. 40(3)

s. 42

s. 173

s. 191

s. 191(7)

Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 —

s. 12(1)

s. 20

Cooperative Association Act, R.S.B.C. 1979, c. 66.

Fraudulent Conveyances Act, R.S.O. 1990, c. F.29.

Law of Property Act, R.S.A. 1980, c. L-8.

Appeals from judgment reported at (1995), 29 C.B.R. (3d) 33, 22 B.L.R. (2d) 210 (Ont. Gen. Div. [Commercial List]) dismissing appeals from denial of claims by administrator under *Companies' Creditors Arrangement Act* plan of reorganization.

***Finlayson J.A.*** **(dissenting):**

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

1    The appellant James W. McCutcheon and Central Guarantee Trust Company as Trustee for the Registered Retirement Savings Plan of James W. McCutcheon (hereinafter sometimes referred to collectively as "Mc-Cutcheon") and the appellant Consolidated S.Y.H. Corporation ("SYH") appeal from the order of The Honourable Madam Justice Feldman of the Ontario Court (General Division) dated January 9, 1995 [reported at 29 C.B.R. (3d) 33]. Feldman J. dismissed appeals from decisions dated January 20, 1993 and February 16, 1993 of the respondent Peat Marwick Thorne Inc., in its capacity as Interim Receiver, Manager and Administrator ("Administrator") of certain assets of Central Capital Corporation ("Central Capital"). The Administrator disallowed Proofs of Claim submitted by the appellants with respect to a Plan of Arrangement under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 ("*CCAA*"). Leave to appeal the order of Feldman J. was granted on March 17, 1995 by The Honourable Mr. Justice Houlden.

**Overview of the Proceedings**

2    These appeals arise out of the insolvency of Central Capital which in and prior to December 1991 defaulted under its obligations to various unsecured lenders, note holders and subordinated debt holders. In early December of 1991, Central Capital advised its creditors that, pending implementation of new financial arrangements, it had decided to discontinue payment of all interest and principal due under outstanding loans, with the exception of indebtedness due under secured notes issued to The Royal Trust Company. In an Agreed Statement of Facts, which was prepared by the parties for the purposes of appeals from the disallowances of the Administrator, it was agreed that at all material times since in or prior to December 1991, Central Capital was insolvent. It had a total unsecured debt of $1,577,359,000 and, among other things:

(a) it was unable to pay its liabilities as they became due; and

(b) the realizable value of its assets was less than the aggregate of its liabilities.

3    By Notice of Application issued June 12, 1992, thirty-nine of the creditors commenced an application pursuant to the *CCAA* for an order declaring the following: that Central Capital was a debtor company to which the *CCAA* applied; that Peat Marwick Thorne Inc. be appointed Administrator of the property, assets and undertaking of Central Capital; that a stay of proceedings against Central Capital, except with leave of the court, be granted and; that the applicants be authorized and permitted to file a plan of compromise or arrangement under the *CCAA*.

4     By order of Houlden J. made June 15, 1992, Central Capital was declared to be a company to which the *CCAA* applied and all proceedings against Central Capital were stayed. By further order of Houlden J. made July 9, 1992, it was provided, among other things, that:

(a) Peat Marwick Thorne Inc. was appointed Administrator, Interim Receiver and Manager of such of the undertaking, property and assets of Central Capital as necessary for the pur pose of effecting the transaction described in the order pursuant to which specified significant assets of Central Capital would be transferred to a newly incorporated company called Canadian Insurance Group Limited ("CIGL");

(b) the Administrator was authorized to enter into and carry out a Subscription and Escrow Agreement with creditors of Central Capital pursuant to which creditors of Central Capital would be entitled to elect to exchange a portion of the indebtedness owing to them by Central Capital for shares and debentures to be issued by CIGL;

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

(c) the Administrator was authorized and directed to supervise the calling for claims of creditors of Central Capital who elected to exchange a portion of the indebtedness from Central Capital for shares and debentures to be issued by CIGL as aforesaid; and

(d) Central Capital was authorized and permitted to file with the court a formal plan of compromise or arrangement with Central Capital's secured and unsecured creditors and shareholders in accordance with the *CCAA* and the *Canada Business Corporations Act*, R.S.C. 1985, c. C-44 (the "*CBCA*"), which would provide for the restructuring and reorganization of the debt and equity of Central Capital in the manner set out in the said order.

5    According to the Agreed Statement of Facts, the order of Houlden J. was made without prejudice to the rights of the appellants to assert claims as creditors in the CIGL transaction. Pursuant to the terms of the July 9, 1992 order, all claims of creditors of Central Capital who wished to participate in CIGL were required to be submitted to the Administrator by September 8, 1992, or such other date fixed by the court. The Administrator received claims from various persons who wished to participate, including the claims submitted by the appellants herein.

6    The Administrator disallowed the claims of McCutcheon and SYH by Notices of Disallowance dated January 20, 1993 and February 16, 1993 in which various reasons were cited as to why the appellants did not qualify as creditors. The effect of this disallowance was that McCutcheon and SYH could participate only as shareholders in the plan of compromise and arrangement under the *CCAA* to be put forward by Central Capital. In dismissing the appeals from this disallowance, Feldman J. found that the appellants were not creditors because they did not have a claim provable under the *Bankruptcy Act* (Canada), R.S.C. 1985, c. B-3 ("*Bankruptcy Act*").

### Issue

7    The Agreed Statements of Facts set out the issue in the appeal in the following language:

Do the appellants, or any of them, have claims provable against CCC [Central Capital] within the meaning of the *Bankruptcy Act (Canada)*, as amended as of the date of the Restated Subscription and Escrow Agreement? If the appellants, or any of them, have provable claims, then the proof of claim of any appellant that has a claim provable is to be allowed as filed and the appeal from the disallowance allowed, and the appellants, or any of them, whose claim is allowed, are to participate in the Plan of Arrangement of Central Capital as a senior creditor.

8    The determination of this issue was deferred by Houlden J.'s order of October 27th, 1992. He ordered therein that preferred shareholders who had filed claims against Central Capital as creditors were not permitted to vote at the meeting of creditors called to consider the Plan of Arrangement "... but such is without prejudice to the rights of those claimants to prosecute their claims as filed". The last paragraph in the order ended:

For greater certainty, the validity of any claim filed by a preferred shareholder shall not be affected by the terms of this paragraph.

### Overview of the Restructuring of Central Capital

9    The order of Houlden J. of July 9, 1992 directed the restructuring of Central Capital under the *aegis* of the

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

court. The order, and others that would follow, contemplated that the restructuring would take place in two stages. The first stage involved the transfer to the Administrator of certain major assets of Central Capital to a company to be incorporated called Central Insurance Group Limited (CIGL). This company is frequently referred to in the documentation and the reasons of Feldman J. as "Newco". CIGL was then to be owned by those Central Capital creditors who chose to participate in the reorganization by accepting a reduction in their debts due from Central Capital and exchanging this reduced indebtedness for debentures in CIGL. Subscription for debentures by this means additionally entitled the creditors to subscribe for shares in CIGL. Our understanding from counsel is that the assets transferred to CIGL included the assets acquired by Central Capital from the appellant in purchase agreements described later in these reasons.

10    The court approved a Subscription and Escrow Agreement setting out this arrangement. In order to participate, the creditors were required to file with the Administrator of Proof of Claim in the prescribed form along with other documents confirming the creditor's intention to reduce its claim against Central Capital and to subscribe for debentures and shares of CIGL. Claims were to be based on Central Capital's indebtedness to creditors as of June 15, 1992, the date of the court-ordered stay of proceedings. This transaction was completed on October 1, 1992 and resulted in CIGL being owned by the creditors of Central Capital in exchange for a reduction in Central Capital's unsecured debt in the amount of $603,000.000.

11    The second stage of the restructuring involved a Plan of Arrangement under the *CCAA*. That plan as put forward by Central Capital recognized four classes of creditors, only one of which, namely that of "Senior Creditors", could apply to the appellants. The Plan of Arrangement, as amended, provided that Central Capital would issue to Senior Creditors *pro rata* on the basis of their senior claims of secured promissory notes in the aggregate principal amount of $20,000,000 of secured debt, which were to be known as first secured notes. A similar arrangement was made for the issuance of $1,000,000 of second secured promissory notes to subordinated creditors. Senior and subordinated creditors included any creditor whose claim had been allowed under the CIGL claims procedure in the first stage, to the extent of that creditor's reduced claim.

12    The Plan of Arrangement also called for the creation of a new class of shares in Central Capital to be called the Central New Common Shares. Central Capital would issue to the above Senior and Subordinated Creditors ninety percent of the new share capital of Central Capital in extinguishment of the balance of their debt. The Central Capital shareholders of all classes would have their existing shares converted into the remaining ten percent of the Central New Common Shares. All of the existing preferred and common shares would be cancelled upon implementation of the plan.

13    The amended Plan of Arrangement was ultimately voted on and approved by all four classes of creditors of Central Capital. On December 18, 1992, Houlden J. sanctioned this plan of arrangement under the *CCAA*. He authorized and directed Central Capital to apply for Articles of Reorganization pursuant to s. 191 of the *CBCA*, so as to authorize the creation of the Central New Common Shares for implementation of the amended Plan of Arrangement. He also lifted the stays of proceedings affecting Central Capital and its ability to carry on business as of January 1, 1993.

14    The effect of the amended Plan of Arrangement after approval was that all remaining debts and obligations owed by Central Capital to its creditors on or before June 15, 1992 were extinguished and all outstanding and unissued shares of any kind in Central Capital were cancelled and replaced by Central New Common Shares. Central Capital was then free to carry on business. It was no longer insolvent.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

**Facts as They Relate to the Claim of McCutcheon**

15      By a Share Purchase Agreement dated June 15, 1987 between Central Capital and Gormley Investments Limited ("Gormley") and Heathley Investments Limited ("Heathley"), Central Capital agreed to purchase all Class "B" Voting Shares of Canadian General Securities Limited ("CGS") that were owned by Gormley and Heathley. James W. McCutcheon and his brother, who were the sole shareholders of Gormley, represented to Central Capital that CGS owned substantially all of the shares of Canadian Insurance Sales Limited, which in turn owned substantially all of the shares in a number of operating insurance, credit and trust companies. The consideration for the purchase of the CGS shares was $575 per share. The vendors were to be paid $400 per share in cash on closing and were to receive seven Series B Senior Preferred Shares of Central Capital. These shares contained a retraction clause entitling the holder to retract each preferred share on July 1, 1992 for $25. Failing issuance of the shares by Central Capital, the vendors were to receive an additional $175 for each CGS share. The Share Purchase Agreement and later the Articles of Central Capital further provided that the holders of Series B Senior Preferred Shares were entitled to receive dividends as and when declared by the directors of Central Capital out of monies of the corporation properly applicable to the payment of dividends and in the amount of $1.90625 per share per annum (being 7 5/8% per annum on the stated capital of $25 per share) payable in equal quarterly payments. No dividends were in fact declared.

16      The Certificate of Amendment for Central Capital dated July 30, 1987, and the Articles of Amendment setting out the provisions attaching to the Series B Senior Preferred Shares contain all the terms and conditions governing the said shares. I am setting out below a description of those that are relevant to this appeal.

17      Pursuant to Article 4.1 of the Senior Series B Provisions, each holder of Series B Senior Preferred Shares was entitled, subject to and upon compliance with the provisions of Article 4, to require Central Capital to redeem all or any part of the Series B Senior Preferred Shares registered in the name of that holder on July 1, 1992 at a price equal to $25 per share, plus all accrued and unpaid dividends thereon, calculated to but excluding the Retraction Date.

18      Article 4.2 of the Senior Series B Provisions sets out the procedure for retraction of the shares. Article 4.3 of the Senior Series B Provisions provides that if the redemption by Central Capital of all of the Series B Senior Preferred Shares required to be redeemed on the Retraction Date would be contrary to applicable law or the rights, privileges, restrictions and conditions attaching to any shares of Central Capital ranking prior to Series B Senior Preferred Shares, then Central Capital shall redeem only the maximum number of Series B Senior Preferred Shares which it determined was permissible to redeem at that time. Article 4.3 provides the mechanism for a *pro rata* redemption from each holder of the tendered Series B Senior Preferred Shares and redemption of the tendered Series B Senior Preferred Shares by Central Capital at further dates.

19      Article 4.4(a) provides that subject to Section 4.4(b), the election of any holder to require Central Capital to redeem any Series B Senior Preferred Shares shall be irrevocable upon receipt by the transfer agent of the Certificates for the shares to be redeemed and the signification of election of the holder of the Series B Senior Preferred Shares.

20      Article 4.4(b) of the Senior Series B Provisions provides that if the retraction price is not paid by Central Capital, Central Capital shall forthwith notify each holder of the Series B Senior Preferred Shares who has not received payment for his deposited shares of the holder's right to require Central Capital to return all (but not less than all) of the holder's deposited Share Certificates and the holder's rights under Article 4.3 outlined above.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom.
Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

21      Article 4.5 of the Senior Series B Provisions provides that the inability of Central Capital to effect a re-
demption shall not affect or limit the obligation of Central Capital to pay any dividends accrued or accruing on
the Series B Senior Preferred Shares from time to time not redeemed and remaining outstanding.

22      Article 7 of the Series Senior B Provisions provides that in the event of the liquidation, dissolution or
winding-up of Central Capital, whether voluntary or involuntary, or any other distribution of assets of Central
Capital among its shareholders for the purposes of winding up its affairs, the holders of the Series B Senior Pre-
ferred Shares shall be entitled to receive, from the assets of Central Capital, $25 per Series B Senior Preferred
Shares, plus all accrued and unpaid dividends thereon, to be paid prior to payment to junior ranking sharehold-
ers. Upon payment of such amounts, the holders of the Series B Senior Preferred Shares shall not be entitled to
share in any further distribution of assets of Central Capital.

23      A Notice of Retraction Privilege was sent by Central Capital to the holders of Series B Senior Preferred
Shares with a cover letter dated April 23, 1992. The letter stated, among other things, that Central Capital would
not redeem any shares because the redemption of such shares would be contrary to applicable law in the context
of Central Capital's then current financial situation. McCutcheon and Central Guaranty Trust deposited for re-
demption 406,800 and 26,000 Series B Senior Preferred Shares, respectively, in accordance with the Senior
Series B Provisions and the Notice of Retraction Privilege. The shares were deposited on May 28, 1992, with
Montreal Trust Company of Canada, pursuant to the Notice of Retraction Privilege. The shares were properly
tendered for redemption in the manner and within the time required by Central Capital's Articles of Amendment.

24      Central Capital did not pay the redemption price on July 1, 1992 and on July 20, 1992 it notified each
holder of Series B Senior Preferred Shares of its right to require Central Capital to return all of the holder's de-
posited Share Certificates as required by Article 4.4(b) of the Senior Series B Provisions. McCutcheon and Cent-
ral Guaranty Trust did not exercise that right.

25      Pursuant to the terms of Houlden J.'s order of July 9, 1992 directing the restructuring of Central Capital,
McCutcheon submitted to the Administrator, as a creditor of Central Capital, Proofs of Claim dated September
3, 1992 and September 4, 1992, respectively. McCutcheon claimed the amount of $10,913,593.69 in respect of
his Series B Senior Preferred Shares tendered for redemption. Central Guaranty Trust claimed the amount of
$697,526.68 in respect of its tendered 26,000 Series B Senior Preferred Shares. McCutcheon also executed and
submitted the Restated Subscription and Escrow Agreement and other documents electing to participate in
CIGL. These claims were completed and submitted in the prescribed form and within the time required by
Houlden J.'s order.

26      As was previously noted, these claims were disallowed by the Administrator. The substance of the Ad-
ministrator's reasons for disallowance was that the ability of Central Capital to redeem these preference shares is
restricted by the provisions of the *CBCA* and it would be contrary to applicable law to redeem the shares in the
context of Central Capital's financial position. The relevant provision of the *CBCA* provides:

**Redemption of shares.**

*36.* (1) Notwithstanding subsection 34(2) or 35(3), but subject to subsection (2) and to its articles, a corpora-
tion may purchase or redeem any redeemable shares issued by it at prices not exceeding the redemption
price thereof stated in the articles or calculated according to a formula stated in the articles.

**Limitation.**

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

(2) A corporation shall not make any payment to purchase or redeem any redeemable shares issued by it if there are reasonable grounds for believing that

(*a*) the corporation is, or would after the payment be, unable to pay its liabilities as they become due; or

(*b*) the realizable value of the corporation's assets would after the payment be less than the aggregate of

(i) its liabilities, and

(ii) the amount that would be required to pay the holders of shares that have a right to be paid, on a redemption or in a liquidation, rateably with or prior to the holders of the shares to be purchased or redeemed.

Evidently, the Administrator equated redemption by the corporation with the right of retraction by the preferred shareholder. It agreed with Central Capital's position that once it became insolvent in December of 1991, Central Capital no longer had the ability to redeem the shares tendered for retraction and thus McCutcheon was restricted to exercising what rights it might have as a shareholder.

**Facts as They Relate to the Claim of SYH**

27      Pursuant to an Agreement of Purchase and Sale made as of June 30, 1989, as amended, Scottish & York Holdings Limited (the predecessor to SYH) sold to Central Capital the shares of Central Canada Insurance Services Limited, Eaton Insurance Company, Scottish & York Insurance Co. Limited and Victoria Insurance Company of Canada (collectively the "Insurance Companies"), except for certain preference shares held by the directors of those corporations. In consideration of this transfer, Central Capital issued to Scottish & York Holdings Limited 60,116,000 Series A Junior Preferred Shares and 9,618,560 Series B Junior Preferred Shares.

28      The Articles of Central Capital provided that it would pay on each dividend payment date prior to the fifth anniversary of this issue, as and when declared by the directors out of the assets of the corporation properly applicable to the payment of dividends, a dividend of $.08 for each outstanding Series A Junior Preferred Share. The dividend was payable quarterly by the issuance of .02 Series Junior Preferred Shares for every outstanding Series A Junior Preferred Share. No dividends were in fact declared.

29      The Articles also provided that Central Capital was obligated to retract the Series A Junior Preferred Shares and Series B Junior Preferred Shares, at the option of the holders of those shares, on the fifth anniversary of their issuance. The retraction price was $1.00 per share plus all accrued and unpaid dividends. Payment of the retraction price of these shares by Central Capital was subject to the provisions of the *CBCA*, which governs the affairs of Central Capital. For the purposes of this appeal, I believe that we can treat the balance of the provisions relating to these preferred shares as being the same as those governing the McCutcheon Series B Senior Preferred Shares.

30      Given that the operative date for proving claims against Central Capital was June 15, 1992, the retraction date governing the preferred shares of SYH was some two years removed. Notwithstanding, on September 8, 1992 SYH executed and delivered to the Administrator a Proof of Claim, a Counterpart of the Restated Subscription and Escrow Agreement, an initial Share Subscription and an Instrument of Claims Reduction Form, all in the prescribed form and within the time required. The claim was that SYH was holding or entitled to hold the following shares of Central Capital:

(a) 60,116,000 Junior Preferred Series A shares;

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

(b) 9,618,560 Junior Preferred Series B shares;

(c) 4,611,095 Junior Preferred Series B shares accrued to June 15th, 1992 but not yet issued to SYH;

for a total of 74,345,655 shares, each having a retraction value of $1.00. However, because of some adjustments in favour of Central Capital to the purchase price of the shares sold by SYH to Central Capital under the June 30, 1989 Agreement of Purchase and Sale, the net claim as of June 15, 1992 was reduced from $74,345,655 to $72,388,836.

31      By Notice of Disallowance dated January 20, 1993, the Administrator disallowed the claim by SYH to subscribe for debentures and common shares to be issued by CIGL. The reasons for the disallowance are similar to those provided for disallowing the claims of McCutcheon. The Administrator found that SYH's right to re-quire Central Capital to retract the Series A and B Junior Preferred Shares only arose on the expiry of the fifth anniversary of their issuance and that Central Capital was precluded from retracting those shares by virtue of its insolvency and the provisions of the *CBCA*. Hence SYH, like McCutcheon, was limited to exercising what other rights it might have as a shareholder.

**Analysis**

32      Although the factual groundwork is necessary for putting in perspective the sole issue before the court, the final question confronting us is a narrow one. Did the retraction clauses in the appellants' shares create a debt owed by Central Canada as of June 15, 1992 within the meaning of the *Bankruptcy Act*? I think that they did.

33      It is agreed that the operative section of the *Bankruptcy Act* is s. 121(1). It reads as follows:

*121*.(1) All debts and liabilities, present or future, to which the bankrupt is subject at the date of the bank-ruptcy or to which he may become subject before his discharge by reason of any obligation in curred before the date of the bankruptcy shall be deemed to be claims provable in proceedings under this Act.

There was no bankruptcy in this case and thus the relevant date was agreed to be June 15, 1992. The obligations of Central Capital to the appellants were incurred before that date, and so the only question becomes whether the obligations created a debt between the appellants and Central Capital.

34      What then is a debt? All the parties turn to *Black's Law Dictionary*, quoting different editions. The fol-lowing is from the Sixth Edition (1990), at p. 403:

**Debt.**

A sum of money due by certain and express agreement. A specified sum of money owing to one person from another, including not only the obligation of debtor to pay but right of creditor to receive and enforce payment. ...

A fixed and certain obligation to pay money or some other valuable thing or things, either in the present or in the future.

35      The above is consistent with what is defined as a debt by *Jowitt's Dictionary of English Law*, 2nd ed. (1977), at p. 562:

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

A debt exists when a certain sum of money is owing from one person (the debtor) to another (the creditor). Hence "debt" is properly opposed to unliquidated damages; to liability, when used in the sense of an inchoate or contingent debt; and to certain obligations not enforceable by ordinary process. "Debt" denotes not only the obligation of the debtor to pay, but also the right of the creditor to receive and enforce payment.

And finally, *The Shorter Oxford Dictionary*, 3rd ed. (1973), at p. 497:

**Debt**

*1.* That which is owed or due; anything (as money, goods or service) which one person is under obligation to pay or render to another.

*2.* A liability to pay or render something; the being under such liability.

36      I have no difficulty in finding that the claims of the appellants in the case under appeal fall within all of the above definitions. As will be discussed herein, concern was expressed in this case over whether or not the appellants as creditors were entitled to "receive and enforce payment" on the "debt" because of the insolvency of Central Capital on June 15, 1992. I will deal with the specific arguments relating to the effect of insolvency on this particular indebtedness in due course, but for the moment I am content to observe that the above definitions contemplate only that the creditor's right to recover is the reciprocal of the debtor's obligation to pay. For every debtor there must be a creditor. There may be cases where it is difficult to identify the person who in law may receive and enforce payment, but this is not such a one.

37      With great respect to the judge of first instance and to the submissions of counsel for the unsecured creditors, I believe that the fundamental error that has been made in these proceedings arises from the conception that the preferred shares in question can either be debt instruments or equity participation instruments, but they cannot have the attributes of both. Feldman J. had this to say at p. 48 of her judgment:

Although the right of retraction at the option of the preferred shareholder may be less common than the usual right of the company to redeem at its option, that right is one of the incidents or provisions attaching to the preferred shares, but does not change the nature of those shares from equity to debt. The parties have characterized the transaction as a share transaction. The court would require strong evidence that they did not intend that characterization in order to hold that they rather intended a loan.

In my view, this case turns on whether the right of retraction itself creates a debt on the date the company becomes obligated to redeem even if it cannot actually redeem by payment on that date, or a contingent future debt on the same analysis, not on whether the preferred shares themselves with the right of retraction are actually debt documents.

Because the preferred shares remain in place as shares until the actual redemption, the appellants are not creditors and have no claim provable under the *Bankruptcy Act* (Canada), and the appeals are therefore dismissed.

38      As I read these reasons, the learned judge is in effect stating that these instruments are preferred shares in the corporation because the parties have so described them. In the first place, I do not think that describing the documents as preferred shares is conclusive as to what instrument the parties thought they were creating. In the second place, it is not what the parties call the documents that is determinative of their identity, but rather it is

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

what the facts require the court to call them. The character of the instrument is revealed by the language creating it and the circumstances of its creation. Although these instrument may "remain in place as shares" until they are actually redeemed, they also contain a specific promise to pay at a specified date. This is the language of debt. I cannot accept the proposition that a corporate share certificate cannot create a corporate debt in addition to the certificate holder's rights as a shareholder.

39      The rules relating to the competing rights of shareholders and creditors of an insolvent corporation have become so regulated by governmental action that one can readily lose sight of the common law basis for making a distinction. To understand the difference in treatment, we must re-examine what a share of a corporation represents. Initially, a share is issued by the corporation to raise share capital. The price of the share is money or the promise of money. Accordingly, an individual share is one of a number of separate but integral parts of the authorized capital of a corporation. Even though it is the shareholders who contribute to the capital of the corporation, the capital remains the property of the corporation. The shareholders, however, as owners of the shares of capital, effectively control the corporation. They have the responsibility of managing its affairs through their control over the board of directors and in popular terminology are considered to be the owners of the corporation. However, the corporation is a separate entity in law, and if in the course of carrying out its business it incurs debts to third parties, those debts are those of the corporation. A corporation is an intangible and its capital therefore represents its substance to third parties having business dealings with the corporation. A preferred share is simply a share of a class of issued shares which contains a preference over other classes of shares, whether preferred or common: see Sutherland, *Fraser and Stewart on Company Law of Canada*, 6th ed. (1993), at pp. 157 and 195 for further discussion.

40      The rights of shareholders are conveniently summarized by R.M. Bryden in his chapter, "The Law of Dividends", contained in Ziegel ed., *Studies in Canadian Company Law* (1967), at p. 270:

> The purchaser of a share in a business corporation acquires three basic rights: he is entitled to vote at shareholders' meetings; he is entitled to share in the profits of the company when these are declared as dividends in respect of the shares of the class of which his share forms a part, and he is entitled, upon the winding-up of the corporation, to participate in the distribution of the assets of the company that remain after creditors are paid. A fourth right which should be noted is the right to transfer ownership in his share, whereby the owner for the time being may realize upon the increase in value of the company's assets, or its favourable prospects, by selling his share at a price reflecting the buyer's estimation of the value of the rights he will acquire. Unless the shareholder chooses to sell his share, he can realize a return upon his investment only through receipt of dividends or by the return of his capital upon an authorized reduction of capital or winding up.

41      Shareholders are variously characterized as entrepreneurs, investors or risktakers and as such they have the opportunities of benefitting from the successes of the corporation and suffering from its failures. While the corporation is an operating entity, the shareholders receive their rewards, if they are any, through the payment of dividends declared from time to time by the board of directors. While the source of these dividends is not restricted to surplus funds, the result of the payment of the dividend must not result in a return of capital to the shareholders. The classic justification for this rule was stated by Sir George Jessel, Master of the Rolls in *Re Exchange Banking Co.; Flitcroft's Case* (1882), 21 Ch. D. 519 (C.A.), at 533-4:

> The creditor has no debtor but that impalpable thing the corporation, which has no property except the assets of the business. The creditor ... gives credit to that capital, gives credit to the company on the faith of

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

the representation that the capital shall be applied only for the purposes of the business, and he has therefore a right to say that the corporation shall keep its capital and not return it to the shareholders. ...

42      Creditors, on the other hand, do not have an ownership or equity interest in the corporation. They are third parties who have loaned money or otherwise advanced credit to the corporation. They look to the company for payment in accordance with the terms of the contract creating the indebtedness. They are also restricted in their recovery to the amounts stipulated in the terms of indebtedness. They are entitled to payment regardless of the financial circumstances of the debtor corporation and accordingly are not restricted to receiving payment of the debt from surplus. They can be paid out of assets or through the creation of further indebtedness. It is imma-terial how the corporation records this indebtedness in its internal books. In some circumstances the indebted-ness could properly reflect the acquisition of property from a creditor as a capital asset. This does not, however, convert the creditor into an investor. The vendor of the property remains a creditor and retains priority over shareholders in the event of a bankruptcy or insolvency.

43      In my view, the reasons under appeal do not reflect a sensitivity to the circumstances which gave rise to the issuance of the preference shares. The shares were not issued by Central Capital to the general public in or-der to raise capital and do not represent an investment by the public in the capital of the corporation. They were issued to specific persons as payment for the acquisition of specified assets. While the corporation was author-ized by its Articles of Incorporation to issue preferred shares generally, the shares issued to the appellants were structured to meet the requirements of the appellants as vendors of the controlling interest in the operating com-panies that Central Capital was acquiring. In my view, these preference shares are the equivalent of vendor shares in that the appellants received them in exchange for the transfer of assets to Central Capital.

44      In the case of McCutcheon, the retraction provision in the preferred shares represented only partial pay-ment of an agreed value for the assets, but in the case of SYH, they represented the full value. In both cases, the agreed value as reflected in the retraction price was guaranteed by Central Capital to be retractable at a fixed price at a predetermined date. By postponing the obligation to pay the purchase price in this way, Central Capit-al was using the retraction provisions of the preference shares as a vehicle for the financing of its expanding as-set base. The appellants, for their part, deferred the realization of the purchase price of their assets to the agreed dates and thereby extended credit to the corporation. In return for extending credit for some or all of the selling price, the appellants agreed to receive dividends calculated in advance but payable as and when declared by the board of directors.

45      Thus, in looking at the substance of the transaction that led to the issuance of the preference shares, it ap-pears to me that the retraction clauses were promises by Central Capital to pay fixed amounts on definite dates to the appellants. They evidenced a debt to the appellants. The fact that the appellants as holders of the prefer-ence shares had rights as shareholders in the corporation up to the time when the retraction clauses were exercis-able did not affect their right to enforce payment of the retraction price when it became due.

46      The validity of an analysis directed to the substance of the transaction is supported by *Canada Deposit Insurance Corp. v. Canadian Commercial Bank*, [1992] 3 S.C.R. 558, a judgment of the Supreme Court of Canada delivered by Iacobucci J. The case involved a number of corporations constituting a support group which entered into an arrangement to provide emergency financial assistance to Canadian Commercial Bank ("CCB"). On the ultimate failure of the bank, the issue arose as to whether the monies advanced to CCB under this support arrangement were in the nature of a loan or in the nature of a capital investment. I find instructive to our situation Iacobucci J.'s observation at pp. 590-1:

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

As I see it, the fact that the transaction contains both debt and equity features does not, in itself, pose an insurmountable obstacle to characterizing the advance of $255 million. Instead of trying to pigeonhole the entire agreement between the Participants and CCB in one of two categories, I see nothing wrong in recognizing the arrangement for what it is, namely, one of a hybrid nature, combining elements of both debt and equity but which, in substance, reflects a debtor-creditor relationship. Financial and capital markets have been most creative in the variety of investments and securities that have been fashioned to meet the needs and interests of those who participate in those markets. It is not because an agreement has certain equity features that a court must either ignore these features as if they did not exist or characterize the transaction on the whole as an investment. There is an alternative. It is permissible, and often required, or desirable, for debt and equity to co-exist in a given financial transaction without altering the substance of the agreement. Furthermore, it does not follow that each and every aspect of such an agreement must be given the exact same weight when addressing a characterization issue. Again, it is not because there are equity features that it is necessarily an investment in capital. This is particularly true when, as here, the equity features are nothing more than supplemen tary to and not definitive of the essence of the transaction. When a court is searching for the *substance* of a particular transaction, it should not too easily be distracted by aspects which are, in reality, only incidental or secondary in nature to the main thrust of the agreement. [Emphasis in original.]

47    I have no difficulty in finding that the appellants' preferred shares with their retraction clauses are of "a hybrid nature, combining elements of both debt and equity". As to the equity component, the appellants are shareholders prior to exercising their retraction rights in that they have the right to vote in certain circumstances and have a right to receive dividends when and if they are declared by the board of directors. The debt component is more significant however. The shares were not issued to investors, but to vendors of property. The vendors were entitled to receive a fixed sum at a specified time in payment therefor. Pending payment, the vendors were entitled to receive dividends which were the equivalent of interest on the unpaid balance.

48    I can think of no reason why the holders of these preferred shares should not be treated as both shareholders and creditors. It does not concern me that these appellants act as shareholders before their retraction rights are exercisable. Nor do I see any hardship to other creditors of Central Capital arising from the ability of these appellants to claim as creditors in the restructuring of the company given that the appellants are unpaid with respect to substantial assets sold to the corporation and now transferred on the restructuring to GIGL.

49    Much was made in argument of the fact that the retraction amounts could not be paid on the retraction dates. In the case of McCutcheon, the corporation was insolvent and subject to court administration on the due date of July 1, 1992. In the case of SYH, the retraction date did not arrive before the reorganization was complete.

50    The narrow issue of the effect of insolvency on a debt has been dealt with by the British Columbia Court of Appeal in *Re East Chilliwack Agricultural Co-op.* (1989), 74 C.B.R. (N.S.) 1. In this case, the appellants were one-time members of three co-operative associations. The rules of the co-operatives permitted a member to withdraw upon written notice to the board of directors to that effect. The member was entitled to elect to have his shares redeemed either in equal instalments over five years or in one payment with interest at the end of five years. In April of 1987, the superintendent of co-operatives, under the authority of the *Cooperative Association Act*, R.S.B.C. 1979, c. 66, suspended the co-operatives' right to redeem their shares until their financial situation was no longer impaired. The three co-operatives subsequently went bankrupt and a two-fold issue came before the bankruptcy court: (1) whether those members whose notices of withdrawal had been accepted by the board of directors but who had not yet received the value of the shares were entitled to rank as unsecured creditors,

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

and (2) whether those who had delivered notices that had not been accepted were to be treated as unsecured creditors. The court of first instance found that the members were shareholders and answered both questions in the negative. That judge was reversed on appeal with the majority of the court deciding that the answer to both questions was yes. Hutcheon J.A. for the majority stated at p. 13:

> I shall use Mr. Neels [a co-operative member] as my example. According to R. 3.06 he ceased to be a share-holder in May 1983. In May 1984 the Agricultural Co-operative owed him the first of five payments, or $686.40. I know of no principle of law that would support the proposition that Neels could not sue for that amount if the Agricultural Co-operative failed to pay in May 1984. Of course, the superintendent of co-operatives has power under s. 15(2) to suspend payments if, in his opinion, the financial position of the co-operative was impaired. Subject to that power, the position of Neels and the Agricultural Co-operative would be that of ordinary creditor and debtor. In my opinion, the order made by the judge cannot be sustained on the first ground.

From this case, I extract the proposition that the fact of an insolvency, whether declared or not, does not change the nature of the relationship between debtor and creditor. It continues notwithstanding the inability of the debtor to pay or the creditor to collect.

51     It appears to me, with deference, that the issue of the effect of Central Capital's insolvency on the character of the retraction payments is something of a red herring. The contest in this appeal is between those who are conceded to be unsecured creditors and those whose claim to such status is contested. In both cases, any right to payment was suspended by Central Capital's announcement in December of 1991 that it was insolvent and that it had suspended all payments of principal and interest to unsecured creditors. This course of action was not freely chosen but was required by law. Any payments to creditors after the date of insolvency would be voidable at the instance of creditors on the basis that they were fraudulent preferences. In addition to ss. 95 and 96 of the *Bankruptcy Act* dealing with fraudulent preferences generally, there is provincial legislation in the form of the *Fraudulent Conveyances Act*, R.S.O. 1990, c. F.29, and the *Assignments and Preferences Act*, R.S.O. 1990, c. A.33, that would be applicable. Counsel for the unsecured creditors maintains that the right to redeem shares, including preference shares was postponed by s. 36(2) of the *CBCA, supra*. I am not certain that s. 36(2) applies to the retraction provisions of the appellants' preference shares as opposed to the redemption privileges of Central Capital, but in my opinion the point is irrelevant to this appeal. Once Central Capital acknowledged its insolvency, it could neither redeem its shares nor honour its retraction obligations. The whole purpose for the creditors applying to the court for a stay of Central Capital's obligations, including those of the acknowledged unsecured creditors, was to arrange for a scheme of payments to all creditors that could not be subject to attack as preferences. There is no suggestion on the evidence before us that the claims of unsecured creditors accepted by the Administrator were claims that had crystallized prior to the insolvency of Central Capital. Nor is it suggested that any creditors were rejected because some or all of their claims were not payable until after the date of the insolvency. The fact of insolvency, by itself, does not provide a rational basis for distinguishing the claims of the appellants from those of other unsecured creditors.

52     Much also was made of the provision in the Articles authorizing the shares in question, which states that if the obligation to redeem "would be contrary to applicable law", then Central Capital "shall redeem only the maximum number of [shares] it is then permitted to redeem". Counsel for the unsecured creditors submits that the reference to "applicable law" is to s. 36 of the *CBCA*. The reference certainly embraces the *CBCA*, but it is not restricted by its terms to that statute. For example, "applicable law" would also capture s. 101 of the *Bankruptcy Act*, which provides for penalties against directors and shareholders where insolvent companies redeem

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

shares or pay dividends.

53    There was no evidence led as to why this provision was placed in the Articles and the share certificates. It appears to be a standard clause in all the preference shares issued by the corporation and not just those that were adapted to the appellants' situations where specific retraction clauses were drafted to satisfy the particular asset acquisitions. For my part, I have difficulty in understanding how a consideration of this provision assists the process of determining the underlying character of the retraction obligations. The statement is so self-evident that it is almost banal. I can only assume that the statement was included in the share provisions of a corporation marketing its securities world-wide so as to inform purchasers that legal restrictions in this jurisdiction apply to the company's right to redeem shares.

54     In summary then regarding the insolvency argument, these various statutes prohibit payments of any kind to shareholders by an insolvent company. As I understand it, counsel does not question that when a dividend has been lawfully declared by a corporation, it is a debt of the corporation and each shareholder is entitled to sue the corporation for his proportion: see *Fraser and Stewart, supra,* at p. 220 for a list of authorities. However, once a company is insolvent it cannot make payments to shareholders or creditors so long as it continues to be insolvent. On the other hand, nowhere in the *CBCA* or else where will we find authority for the proposition that once a corporation is insolvent, it is no longer obliged to pay its debts. The obligation is postponed until the insolvency is corrected or the corporation makes an accommodation with its creditors and obtains a release with or without the assistance of the various statutes dealing with insolvency.

55    The existence of provisions prohibiting payment to shareholders and creditors on insolvency does not in anyway assist the determination of whether the retraction obligations at issue in this appeal constitute a debt or a return of capital at the time they are payable. Speaking of the obligation to honour the retraction in terms of the corporation redeeming its shares also introduces the wrong emphasis. The corporation is not redeeming the shares at its option as contemplated by most redemptions. It is being forced to redeem them because of a prior contractual obligation for which the preferred shareholder gave good consideration. It is for this reason that I question whether s. 36 of the *CBCA* is the appropriate reference point. This is not the type of payment which concerned Jessel M.R. in *Flitcroft's Case, supra.*

56     At the risk of over simplifying this case, it appears to me that many of the arguments made against the appellants' claims to be creditors of Central Capital are impermissible in the context of the Agreed Statement of Facts. The issue in appeal is frozen in time by the stipulation that the court is to determine if these retraction clauses created a debt within the meaning of the *Bankruptcy Act* on June 15, 1992. The arguments against the appellants' claims also ignore that debts under s. 121(1) of the *Bankruptcy Act* need not be payable at the date of the bankruptcy (or June 15, 1992 in our scenario). They need only come beneath the broad umbrella of "debts and liabilities, present and future, to which [Central Capital] is subject" on June 15, 1992. The fact that the debts could not be paid after June 15, 1992, does not mean that they were not provable claims pursuant to s. 121 of the *Bankruptcy Act.* Moreover, assuming the retraction clauses created a debt payable on a future date, neither the order of Houlden J. nor the restrictions in the Articles creating the shares themselves purported to extinguish that debt.

57    There is nothing in either the Articles of Central Capital or in the law that excuses the obligation to pay the retraction amounts. Rather, discharge of the obligation is simply postponed until the cessation of the disabling event of insolvency. Article 4.3 of the Senior Series B Provisions provides the mechanism for future redemption of tendered shares that are not redeemed because such redemption would be contrary to law. Article

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom.
Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

4.5 provides that the inability to effect a redemption does not affect the obligation to pay dividends accrued or accruing on the unredeemed shares.

58      So far as SYH is concerned, the retraction price was not payable until the fifth anniversary of the June 1989 sale of assets. Therefore, no issue of the effect of insolvency arose in 1992. The orders of Houlden J. of June 15 and July 9, 1992 changed the rules of the game. If this appellant is a creditor, it does not have to wait until the retraction date. It can claim as a creditor now. It did and the claim was disallowed. However, if this court holds that the claim should have been allowed, then in accordance with the narrow issue put to us, SYH is entitled to be accepted as a full creditor in the entire reorganization of Central Capital.

59      An additional factor raised by counsel during argument was that Article 7, *supra*, provides that in the event of the liquidation, dissolution or winding-up of Central Capital, whether voluntary or involuntary, or any other distribution of assets among its shareholders for the purpose of winding up its affairs, the holders of these preferred shares are entitled to recover "from the assets of Central Capital" the retraction price plus all accrued and unpaid dividends thereon. Such amount is to be paid prior to payment to junior ranking shareholders. The Article further provides that "[u]pon payment of such amounts, the holders of [the preferred shares] shall not be entitled to share in any further distribution of assets of [Central Capital]". Because it is trite law that shareholders are entitled to recover from assets only after all ordinary creditors have been paid in full, counsel for the unsecured creditors submits that the fact that the clause contemplates priorities between shareholders on a winding up or a liquidation of assets is clear evidence that they were shareholders only.

60      I have two responses to this submission. The first is the obvious, that we are not dealing with this contemplated event. We are dealing with a reorganization in which the parties have put a single question to the court: are the appellants creditors? Consideration of issues of priority or the valuation of claims have been taken away by the narrow scope of the agreed question. If the answer to the question posed is yes, then in accordance with the Agreed Statement of Facts, the appellants are entitled to have their claims as creditors allowed under the Subscription and Escrow Agreement and to participate in the Amended Plan of Arrangement as Senior Creditors. If the answer is no, they are to be treated as the Administrator has treated them: they are not creditors at all and are restricted to receiving Central New Common Shares under the Amended Plan of Arrangement.

61      My second response is that counsel for the unsecured creditors misses the significance of the clause. He assumes that there will be a deficiency in all circumstances leading up to a liquidation, dissolution or winding up that will necessitate a *pro rata* distribution, first to creditors and then to shareholders of all classes. However, the clause does not say that those with retraction rights are not creditors. It says that the retraction amounts are to be paid out of assets, not suplus. Once the retraction amounts have been paid in full, the appellants are not entitled to share in any further distribution. This contemplates a surplus after all creditors, including the appellants, have been paid in full. Accordingly, far from classifying the appellants as shareholders, the clause provides that they are not entitled to be treated as shareholders under a winding up or liquidation but only as creditors.

62      Finally, with respect to SYH's claims, it was submitted that these claims were so contingent as to be virtually non-existent. The claims anticipate a retraction date as of June 15, 1992 was some two years into the future. Upon approval of the Amended Plan of Arrangement of December 18, 1992, the shares of SYH were cancelled and replaced by a new issue of shares, the Central New Common Shares. Counsel relied upon the finding of Feldman J. that there was then no discernable basis upon which the retraction could occur. Once again, with respect, this conclusion misses the point. Following the final order of Houlden J. approving the Amended Plan of Arrangement, all the shares *and* all the debts of Central Capital disappeared. There was thereafter no dis-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

cernable basis upon which any event contemplated by any debt or share instruments could occur. We are only concerned with the status of shareholders and creditors as of June 15, 1992.

63    Based on the reasons set out above, I have concluded that the retraction amounts do fall within the definition of debts and liabilities, present or future, to which Central Capital was subject on June 15, 1992. This does not apply to undeclared dividends however, because until a dividend is declared no action on behalf of a shareholder lies to enforce its payment: see *Fairhall v. Butler*, [1928] S.C.R. 369 at 374. If undeclared dividends have been claimed by any of the appellants they should be disallowed. In all other respects the claims should be allowed.

64    Accordingly, I would allow the appeals, set aside the order of Feldman J. and order that the appellants have provable claims that are to be allowed by the Administrator. The record does not disclose what order if any Feldman J. made as to costs. Certainly the appellants are entitled to their costs of this appeal. If the parties are unable to agree with respect to any other disposition of costs, I would suggest that they submit their positions to the court in writing.

**Weiler J.A.:**

65    I have had the benefit of reading the reasons of Finlayson J.A. and for the reasons which follow I respectfully disagree with his conclusion that the appellants are entitled to prove a claim pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (the "*CCAA*").

66    Section 12(1) of the *CCAA* requires that persons wishing to participate in a reorganization have claims which would be provable in bankruptcy. Section 121(1) of the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3, states that "[a]ll debts and liabilities, present or future ... shall be deemed to be claims provable in proceedings under this Act."

67    In order to decide whether the obligation of Central Capital to redeem the preferred shares of the appellants is a claim provable in bankruptcy, it is necessary to characterize the true nature of the transaction. The court must look to the surrounding circumstances to determine whether the true nature of the relationship is that of a shareholder who has equity in the company or whether it is that of a creditor owed a debt or liability by the company: *Canada Deposit Insurance Corp. v. Canadian Commercial Bank*, [1992] 3 S.C.R. 558. In this case, the decision is not an easy one. Where, as here the agreements between the parties are reflected in the articles of the corporation, it is necessary to examine them carefully to characterize the true relationship. It is not disputed that if the true nature of the relationship is that of a shareholder-equity relationship after the retraction date and at the time of the reorganization, then the appellants do not have a claim provable in bankruptcy. Consequently, they will not have a claim under the *CCAA*.

68    As I see it, three main questions need to be addressed:

(1) Was Feldman J. correct in characterizing the relationship between Central Capital and the companies owned by James McCutcheon ("McCutcheon"), and between Central Capital and Scottish and York Holdings Limited (the predecessor of S.Y.H., hereinafter referred to as "SYH"), as a shareholder relationship?

(2) Did the nature of the relationship change after the retraction date for redeeming the shares of McCutcheon or, in the case of SYH, at the time of the reorganization?

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

(3) If the nature of the relationship is not a shareholder-equity relationship, are the appellants entitled to prove a claim under the *CCAA*.?

69    In addition, the appellants raise the question of whether they have a right to prove a claim for dividends, which have accrued but have not yet been declared payable. The price to be paid by Central Capital to Mc-Cutcheon on the retraction date, July 1, 1992, was $25 per share plus *all accrued and unpaid dividends thereon*. The dividends are therefore part of the retraction price. Similar provisions apply to SYH.

70    The reasons of Finlayson J.A. contain a comprehensive statement of the background to the litigation and I will therefore only refer to the facts in a summary fashion.

71    James McCutcheon and his brother sold their shares in Central Guarantee Trust Company to Central Capital Corporation ("Central Capital"), a trust company, for $575 a share. They received $400 per share in cash. The balance of $175 owing on each share was paid through the issue of seven preferred shares in Central Capital, with each share having a par value of $25. Following this transaction, McCutcheon purchased his brother's shares. These preferred shares, known as Senior Series B Preferred Shares, were to be listed on the Toronto Stock Exchange. These shares carried with them a retraction privilege. The shareholder had the right to have his shares redeemed by Central Capital on July 1, 1992, for $25 a share, provided that such redemption would not be "contrary to law in the context of the Corporation's current financial position." McCutcheon chose not to sell his shares.

72    Scottish & York Holdings Limited (the predecessor to SYH) sold its shares in certain insurance companies which it owned to Central Capital. Central Capital paid for these shares by the issue of Series A Junior Preferred Shares. These shares were not listed on a stock exchange. SYH had the right to have its shares redeemed by Central Capital on or after September 1994 at a price of $1 per share, subject to the provisions of the *Canada Business Corporations Act*, R.S.C. 1985, c. C-44 (the "*CBCA*").

73    It should be noted that the right of retraction was not unique to these two classes of shareholders. Even common shareholders had the right to have their shares retracted under certain circumstances.

74    By December 1991, Central Capital was unable to pay its liabilities as they became due and its total liabilities greatly exceeded the value of its assets. As a result, the various banks and subordinated debtholders, collectively referred to as the lenders, had a choice to make. Inasmuch as the definition of a corporation in s. 2 of the *Bankruptcy and Insolvency Act* precludes a creditor from bringing a petition against a trust company, they could either wind up Central Capital under the *Winding-up Act*, R.S.C. 1985, c. W-11, or they could try to restructure Central Capital under the *CCAA*. In a winding up or liquidation, the trustee would sell the company's assets, either piecemeal or as a going concern, to third parties. The proceeds from the sale would then be distributed to those who proved a claim according to set priority rules. In a reorganization, existing fixed amounts owed to Central Capital's creditors would be traded for new claims and ownership interests in the reorganized corporation which would remain a going concern. The lenders chose to reorganize.

75    Two transactions were involved. In the Consolidated Insurance Group Limited transaction, or "CIGL transaction", Central Capital transferred some of its significant assets to a newly incorporated company, CIGL. Thirty-nine creditors of Central Capital then elected to exchange a portion of Central Capital's debt owing to them for equity in this newly incorporated company. In the second transaction, common shares were issued for the remaining assets of Central Capital. The creditors of Central Capital were given 90 per cent of the common shares of the reorganized company. The balance of 10 per cent was allocated to the shareholders of Central Cap-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

ital. All of the preferred, common and subordinate voting shares in Central Capital were then converted into these "new" common shares. The reorganization was subsequently approved by the creditors and sanctioned by the Court as required by the Act, but this approval was given without prejudice to any claims that McCutcheon and SYH might have.

76    McCutcheon's position was that the right to have his shares retracted accrued before the reorganization, and that his exercise of this right of retraction in May 1992 constituted a present debt or liability entitling him to rank as a creditor in the CIGL transaction and in the reorganized Central Capital. SYH's position was that the right to have its shares retracted in 1994 created a future debt or liability and thus a provable claim. The administrator of Central Capital disallowed both claims. McCutcheon and SYH appealed the administrator's decision to Feldman J. In dismissing their appeals, she held that the appellants were shareholders and that the right of retraction attaching to the shares did not change the nature of the shares from equity into debt.

**1. Was Feldman J. correct in characterizing the agreement between Central Capital and the companies owned by McCutcheon, and between Central Capital and SYH, as creating a shareholder relationship between the parties?**

77    Feldman J. analyzed the transaction and came to the conclusion that it was an equity transaction.

78    Finlayson J.A. is of the opinion that the nature of this transaction is different and that Feldman J. erred in not showing sensitivity to the fact that she was dealing with the sale of a business by its owners. He is of the opinion that the shares issued by Central Capital are the equivalent to "vendor shares" in that the appellants received them in exchange for the transfer of assets to Central Capital. He does not see the transaction as being either a contribution to capital by McCutcheon and SYH or as a return of capital. Although the transaction has debt and equity features, Finlayson J.A. is of the opinion that the true nature of the transaction is that of a debt owing by Central Capital to McCutcheon and SYH for the shares in their companies.

79    My analysis of the transaction is that when McCutcheon sold his shares in Central Guaranty and took back preferred shares in Central Capital as part payment, he transferred part of his capital investment from a smaller entity to a larger entity. Similarly, SYH transferred its investment in the shares of the insurance companies for shares in the larger entity of Central Capital. Both appellants could look to a larger asset base than before to generate a return on their capital. Until the retraction date, McCutcheon chose to take the risk of continuing his investment in Central Capital, which offered the prospect of a stable, yet relatively high, annual return through the receipt of 7-5/8 per cent dividends. Because the shares traded on the Toronto Stock Exchange, he would have had the option of realizing upon his investment by selling his shares for what they would bring on the open market, but he did not do so. In the case of SYH, although these shares were not required to be publicly listed, the corporation's articles did not restrict their transfer. The corporation's articles indicate that these shares had some preference over other shares with respect to the right to receive dividends and in the distribution of assets after creditors are paid on a liquidation. As preferred shareholders, McCutcheon and SYH did not have a voice in company affairs unless the company failed to pay the dividends it had promised to pay. This is quite typical: see Welling, *Corporate Law in Canada*, 2nd ed. (1991) at p. 604; Ziegel et al, *Cases and Materials on Partnership and Canadian Business Corporations*, 2nd ed. (1989) at p. 1198. Risk taking, profit sharing, transferability of investment, and the right to participate in a share of the assets on a liquidation after the creditors have been paid are the hallmarks of a shareholder: see R.M. Bryden, "The Law of Dividends" contained in Ziegel ed., *Studies in Canadian Company Law* (1967) at p. 270. In my opinion, Feldman J. was correct that the true nature of the relationship between the parties initially was that of an equity transaction.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

**2. Did the nature of the relationship change after the retraction date for McCutcheon's shares and did the reorganization trigger a right of redemption respecting SYH's shares?**

80      Ordinarily, shareholders cannot realize on their investment in a company except by transferring their shares. The retraction privilege attaching to the shares gives the preferred shareholders the option of realizing on their investment other than by transferring their shares to a third party.

81      Feldman J. found that McCutcheon continued to be a shareholder after the retraction date and that he remained a shareholder at the time of the reorganization. She found SYH's claim to be too remote inasmuch as the retraction date not yet arrived at the time of the reorganization.

82      The appellants argue that Feldman J. erred in this conclusion. They submit that although McCutcheon and SYH may have been shareholders initially, this relationship changed. Upon McCutcheon's exercise of his right to have the corporation pay him the retraction price of his shares, he ceased to be a shareholder. When Central Capital failed to pay him, he became a creditor of the corporation. In the case of SYH, it is submitted that when the lenders opted to reorganize the company, they, in effect, triggered the obligation to redeem SYH's shares.

*(a) Nature of the transaction's relationship to the capital structure of the corporation*

83      Section 25(3) of the *CBCA* states that shares shall not be issued until the consideration for the shares is fully paid either in cash or with property having a fair market value equivalent to the shares issued. Therefore, by issuing preferred shares with a fixed par value, Central Capital paid McCutcheon for his shares of Central Guaranty and paid SYH for the shares of the insurance companies that Central Capital received. Central Capital could not issue preferred shares *except* as full payment for the shares it received. The preferred shares were part of the capital of Central Capital and the preferred shares were always shown as shareholders' equity on Central Capital's books. The capital of the corporation is representative of the assets available to pay creditors. If, on the date for redemption of McCutcheon's shares, or on the date of reorganization in the case of SYH, the shares are redeemed, the amount paid must be deducted from the stated capital of the corporation s. 39 *CBCA*. Consequently, the total assets that Central Capital will have available to pay the lenders and other creditors outside the corporation will be reduced. A reduction of capital by the redemption of redeemable shares is permitted under the *CBCA* but only where the requirements of s. 36 are met.

*(b) Section 36 of the CBCA*

84      Section 36 of the *CBCA* makes the ability of a corporation to redeem its redeemable shares subject to (1) its articles and (2) a solvency requirement. For ease of reference s. 36 is reproduced below.

*36.*(1) Notwithstanding subsection 34(2) or 35(3) [both of which deal with a corporation's acquisition of its own shares in other circumstances], but *subject to subsection (2) and to its articles*, a corporation may purchase or redeem any redeemable shares issued by it at prices not exceeding the redemption price thereof stated in the articles or calculated according to a formula stated in the articles.

(2) A corporation shall not make any payment to purchase or redeem any redeemable shares issued by it if there are reasonable grounds for believing that

(*a*) the corporation is, or would after the payment be, unable to pay its liabilities as they become due; or

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

(*b*) the realizable value of the corporation's assets would after the payment be less than the aggregate of

(i) its liabilities, and

(ii) the amount that would be required to pay the holders of shares that have a right to be paid, on a redemption or in a liquidation, rateably with or prior to the holders of shares to be purchased or redeemed. [Emphasis added.]

85      There is no dispute that Central Capital was unable to redeem McCutcheon's shares on the retraction date. Nor could it redeem SYH's shares on the date of the reorganization. The appellants agree that the effect of s. 36 renders the agreement between themselves and Central Capital unenforceable. It is the position of the appellants, however, that s. 36 does not extinguish a debt or liability which they say has been created. The appellants rely on the decision in *Re East Chilliwack Agricultural Co-op.* (1989), 74 C.B.R. (N.S.) 1 (B.C. C.A.) in support of their position that a debt or liability is created notwithstanding the solvency requirements of s. 36 respecting payment. The appellants' submission does not take into consideration the major differences between the decision in *East Chilliwack* and the present situation relating to the timing, effect of the solvency requirements and the provisions in the articles governing the relationship of the parties.

1) In *East Chilliwack*, farmers who owned shares in an agricultural co-operative gave notice to the co-op of their intention to have their shares redeemed. After the notices had been given, the superintendent of co-operatives suspended the right of the co-op to redeem its shares. Here, the request to redeem the shares by McCutcheon and the retraction date occurred after Central Capital had sent out a notice that it would not be able to redeem the shares due to its financial position. SYH had no right to demand that its shares be retracted until the retraction date, which was some two years after the date of Central Capital's insolvency.

As in the instant case, the issue in *East Chilliwack* was whether the farmers were entitled to rank with the creditors of the co-op. Hutcheon J.A., with Toy J.A. concurring, held that they were entitled to be treated as creditors.

At the outset of his reasons, Hutcheon J.A. noted, at p. 11, that the effect of the superintendent's suspension on the farmers' rights was not argued on appeal and that the court had been asked to determine the status of the farmers without regard to the suspension.

Here, the effect of Central Capital's inability to redeem its shares due to insolvency is very much in issue and cannot be ignored. Although the articles provide for the redemption of all of the shares held by McCutcheon and SYH on or after the retraction date, the articles also state that Central Capital will only redeem so many of its shares as would not be "contrary to law." Pursuant to s. 36(1) of the *CBCA*, a corporation may purchase or redeem redeemable shares, but the corporation is prohibited from doing so if the corporation is unable to pay its liabilities as they become due or if the assets of the corporation are less than the total of its liabilities and the amount required for the redemption. Because Central Capital could not comply with the solvency requirements, redemption would be "contrary to law."

2) In *East Chilliwack, supra*, at p. 13, the rules of the co-op provided that upon the giving of a notice of redemption, the farmer giving it ceased to be a shareholder. Central Capital's articles do not state that a request for redemption of the holder's shares terminates his status as a shareholder. McCutcheon continued to have the right to receive dividends pursuant to Article 4.5 while his shares were not redeemed. In effect, so long as Central Capital was unable to redeem the shares but had profits, McCutcheon continued to be en-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

titled to a share of the profits through the declaration of dividends. If the dividends remained unpaid for eight consecutive quarters then, pursuant to Article 8, McCutcheon had the right to receive notice of, and to attend, each meeting of shareholders at which directors were to be elected and was entitled to vote for the election of two directors. The articles relating to the preferred shares held by SYH contain a similar provision. The result of insolvency as envisaged by the articles was that McCutcheon and SYH would continue as shareholders.

3) In *East Chilliwack, supra*, Hutcheon J.A. held, at p. 13, that, subject to the power of the superintendent of co-operatives, the farmer's position would be that of an ordinary creditor.

Here, the terms attaching to McCutcheon's shares do not give him that right. Instead, he is given the right to continue to receive dividends so long as the company cannot pay him. The articles relating to the shares held by SYH contain a similar provision. In addition, Article 4.3(b), respecting the retraction of the shares, indicates that if the directors have acted in good faith in making a determination that the number of shares the corporation is permitted to redeem is zero, then the *corporation* is not liable in the event this determination proves inaccurate. This would hardly be the position *vis à vis* an ordinary creditor.

4) Article 8 and a similar provision in the articles relating to the shares held by SYH provide that upon a sale of all or a substantial part of the company's undertaking, the preferred shareholders have a right to receive notice of and to be present at the meeting called to consider this sale. The farmers in *East Chilliwack* do not appear to have had any similar right.

5) Article 7 provides that in the event of a liquidation, dissolution or winding-up of the Corporation the preferred shareholders have a right to receive $25 per Series B Senior Preferred Share before the corporation pays any money or distributes assets to shareholders in any class subordinate or junior to the Series B Senior Preferred Shares. Similarly, SYH, as the holder of Series A and B Junior Preferred shares has the right, upon the dissolution or winding up of the corporation, to receive a sum equivalent to the redemption amount for each series junior preferred share. This right is subject to the rights of shares ranking in priority to the shares of these series, but is ahead of the rights of the holders of common shares.

Nothing in the articles concerning the retraction date affects the right of McCutcheon and SYH to participate in Central Capital's liquidation. The participation of the farmer in *East Chilliwack* ceased once he had given notice to redeem. Article 4.4 of Central Capital provides that once the shares have been tendered for retraction this election is irrevocable on the part of the holder. In the event that payment of the retraction price was not made, however, the holder had the right to have all deposited share certificates returned. Central Capital offered to return McCutcheon's shares to him, but he refused. Because McCutcheon retained all the rights and privileges of a preferred shareholder after the retraction date, the fact that he refused to take back his share certificates cannot alter the true nature of the relationship. The refusal was merely evidence of a dispute concerning what the relationship was. SYH also retained its full status as a shareholder until the date of the reorganization. This was not the situation in *East Chilliwack*.

86      By way of summary, on the date of the reorganization McCutcheon and SYH had not ceased to be preferred shareholders of Central Capital. The rights attaching to their retractable preferred shares entitled them to continue to share in the profits of the company when these were declared as dividends, to vote at shareholders meetings to elect directors so long as dividends remained unpaid for a specified period of time, and, on a winding up of the company, to participate in the distribution of assets that remained after the creditors were paid ac-

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

cording to the ranking of the series of their shares. The company's obligation to redeem its shares was not absolute. Instead, the articles provided for what was realistically a "best efforts" buy-back based on solvency and continuation as a shareholder to the extent a buy-back could not take place. In *East Chilliwack*, because the farmer ceased to be a shareholder, the articles do not appear to make any provision for continued participation or for the postponement of payment depending on the solvency of the co-op.

### (c) Evidence of a debtor-creditor relationship is lacking in the articles

87       Looked at another way, after the retraction date and at the time of the reorganization, the common features of a debtor-creditor relationship are not in evidence in Central Capital's articles. The agreements between the parties contain no express provisions that the redemption of the shares is in repayment of a loan. The corporation was not obliged to create any fund or debt instrument to ensure that it could redeem the shares on the retraction date. There is no indemnity in the event that the money is not repaid on the retraction date. There is no provision for the payment of any interest after the retraction date in the event that the money is not repaid on the retraction date. There is no provision that after the retraction date and in the event of insolvency, the appellants would have the right to have the company wound up. (See *Imperial General Properties Ltd. v. R., (sub nom. R. v. Imperial General Properties Ltd.)* [1985] 2 S.C.R. 288, for a case where the articles of the company contained this right.) There is no provision that upon a winding up or insolvency the parties are entitled to rank *pari passu* with the creditors as was the case in *Canada Deposit Insurance Corp. v. Canadian Commercial Bank, supra*.

### (d) The effect of the reorganization

88       Finlayson J.A. is of the view that it is immaterial that the articles provide, in the event of the liquidation, dissolution or winding-up of the company, that the appellants are only entitled to rank after the creditors but ahead of the junior ranking shareholders. In his view, this provision is irrelevant because we are not dealing with a liquidation but with a reorganization. He finds it significant that, like debtors, the preferred shareholders are not entitled to participate in any surplus once they have been paid. I am of the view that this provision in the articles is significant. It represents a clear indication that the holders of the retractable shares were not to be dealt with on the same footing as ordinary creditors even after the retraction date. Instead, they were to be dealt with as shareholders, albeit an elevated class. Under the *CBCA* all shares carry equal rights. Words used in the articles to differentiate a class of shares are nothing more than authorized deviations from this statutory position of equality: Welling, *supra*, at p. 683.

89       The appellants submit that a winding-up or liquidation is not the same as a reorganization. This is true. Both, however, are methods of dealing with insolvency. Both are methods for secured creditors to enforce their claims by seizing the assets in which they hold security interests. If the value of the corporation as a going concern exceeds the liquidation value of the assets, it is in the interest of all the debt holders that the corporation be preserved as a going concern. The purpose of both a liquidation and a reorganization is to permit the rehabilitation of the insolvent person unfettered by debt: *Vachon v. Canada (Employment & Immigration Commission)*, [1985] 2 S.C.R. 417. By virtue of s. 20 of the *CCAA*, arrangements under the Act mesh with the reorganization provisions of the *CBCA* so as to affect the company's relations with its shareholders. Shareholders have no right to dissent to a reorganization: s. 191(7), *CBCA*. On a reorganization, among other things, the articles may be amended to alter or remove rights and privileges attaching to a class of shares and to create new classes of shares: s. 173, *CBCA*. These statutory provisions provide a clear indication that, on a reorganization, the interests of all shareholders, including shareholders with a right of redemption, are subordinated to the interests of the creditors. Where the debts exceed the assets of the company, a sound commercial result militates in favour

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

of resolving this problem in a manner that allows creditors to obtain repayment of their debt in the manner which is most advantageous to them.

90      The similarities between a liquidation and a reorganization, together with the express statement in the articles of Central Capital with respect to what is to happen on a winding-up, dictate that the interests of the holders of retractable shares, McCutcheon and SYH, are subordinated to the creditors and they are not entitled to claim under the *CCAA* equally with the creditors. This position is also consistent with the provisions of the *Bankruptcy and Insolvency Act* and the *Winding-up Act*. In the case of an insolvency where the debts to creditors clearly exceed the assets of the company, the policy of federal insolvency legislation appears to be clear that shareholders do not have the right to look to the assets of the corporation until the creditors have been paid.

### Dividends

91      Although dividends were payable on the shares of McCutcheon and SYH, no dividends were in fact declared. The appellants contend that the dividends, which have accrued but which were not declared, are a debt or liability because they were stipulated to be part of the retraction price.

92      Article 7 of Central Capital respecting McCutcheon's shares states that in the event of liquidation, dissolution or winding up of the corporation, the shareholders are entitled to receive not only the $25 per Series B preferred share, but "all accrued and unpaid dividends thereon, whether or not declared ... before any amount is paid by the Corporation or any assets of the Corporation are distributed to the holders of any shares ... ranking as to capital junior to the Series B Senior preferred Shares."

93      It is trite law that a dividend may only be declared if a company is solvent. For corporations governed by the *CBCA*, it appears that the common law tests for solvency have all been subsumed or overruled: *McClurg v. Minister of National Revenue, (sub nom. R. v. McClurg)* [1991] 2 W.W.R. 244 (S.C.C.) at 259, 260.

94      Section 42 of the *CBCA* provides:

A corporation shall not declare or pay a dividend if there are reasonable grounds for believing that

(*a*) the corporation is, or would after the payment be, unable to pay its liabilities as they become due; or

(*b*) the realizable value of the corporation's assets would thereby be less than the aggregate of its liabilities and stated capital of all classes.

95      Section 42 prevents the corporation from declaring or paying a dividend when it does not meet certain solvency requirements. There was no declaration of a dividend in the present case. Any obligation to pay a dividend as part of the retraction price cannot therefore be enforced when the company is insolvent. Dividends which have accrued but which are unpaid are not considered to be a debt because, on reading the articles as a whole, the provision for payment is not one which is made independant of the ability to pay: see Welling, *supra*, at p. 689, citing *Re Porto Rico Power Co.*, [1946] S.C.R. 178, where it was held there was no guarantee of payment and hence the accrued but unpaid dividends were not a debt. Instead, accrued but unpaid dividends are considered to be akin to a return of capital. Making these accrued dividends part of the retraction price does not alter this.

96      By way of analogy to the treatment of dividends, it could be said that until the company has declared it will redeem the shares which are tendered to it the obligation to redeem them is not a debt or liability. The

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

promise to pay in the articles of Central Capital is not made independent of any ability to pay.

97     In the event that I am wrong in my conclusion that the true nature of the relationship is one of equity, I shall now consider the position in the event that a debt has been created.

**3. If the nature of the relationship is not an equity relationship are the appellants entitled to be claimants under the CCAA.?**

98     The parties agree that the effect of s. 36 renders the agreement to redeem their preferred shares unenforceable. It is the position of the appellants, however, that s. 36 does not extinguish Central Capital's obligation to repay them. Their position is that Central Capital's obligation to repay them is a contingent liability and therefore gives them a claim provable in bankruptcy, bringing them under s. 12(1) of the *CCAA*.

**The Meaning of Debt**

99     Debt is defined in a very broad manner in *Black's Law Dictionary*, 6th ed. (1990) at p. 403. It is the position of the appellants that this definition of "debt" is broad enough to include McCutcheon's right to have Central Capital redeem his shares. In the case of SYH, it is submitted that the right to redemption constitutes a future liability. It is the appellants' position that Feldman J. erred in holding that to have a provable claim, McCutcheon and Central Capital must be able to obtain a judgment against Central Capital for the retraction price and be entitled to seek payment on the judgment. Finlayson J.A. agrees with the appellant's position.

100     Debt is defined in *Black's Law Dictionary, supra*, as:

A sum of money due by certain and express agreement. A specified sum of money owing to one person from another, including not only obligation of debtor to pay but right of creditor to receive and enforce payment.

A fixed and certain obligation to pay money or some other valuable thing or things, either in the present or in the future. In a still more general sense, that which is due from one person to another, whether money, goods, or services. In a broad sense, any duty to respond to another in money, labour, or service; it may be even a moral or honorary obligation, unenforceable by legal action. Also, sometimes an aggregate of separate debts, or the total sum of the existing claims against person or company. Thus we speak of the "national debt", the "bonded debt" of a corporation, etc.

101     It will be readily apparent that in *Black's* the term "debt" is defined in two distinct ways. In order to constitute a debt as defined in the first paragraph, the obligation must be enforceable. In the second paragraph debt is defined more broadly as any duty or obligation even if unenforceable by legal action. Feldman J. considered the first portion of the definition in her reasons. If the first portion of the definition applies, no debt is created because the obligation is not enforceable under the *CBCA*. The appellants rely on the second portion of the definition. They also rely on the definition of of the word "liability" in *Black's* which is also defined very broadly.

102     In one sense, support for the position of the appellants is found in s. 40 of the *CBCA*. Section 40 states that a contract with a corporation providing for the purchase of shares of the corporation is specifically enforceable against the corporation except to the extent that the corporation cannot perform the contract without being in breach of ss. 34 or 35. Section 34 contains the solvency requirements concerning the redemption by a com-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

pany of its own shares other than those carrying a right of redemption. Section 35 deals with shares which have been issued to settle or compromise a debt. In s. 2, "liability" is defined as including "a *debt* of a corporation arising under section 40 ... ."

103      Section 40 does not include any reference to the obligation of a company to repurchase redeemable shares under s. 36. As a result s. 36 is not incorporated by reference into the definition of liability. While it might be suggested that this is a legislative oversight, the omission is also consistent with the position that only the articles of the corporation govern the relationships between the company and the holders of the retractable shares under s. 36. I have already stated my opinion that the articles of Central Capital do not make the obligation to redeem the shares a debt or, for that matter, a liability. Moreover, even if a provision like s. 40 is implied with respect to redeemable preferred shares, it would also be necessary to imply a provision like s. 40(3) which states that in the event of liquidation where the company has not performed its contract to redeem, the other party is entitled to be ranked subordinate to the rights of creditors but in priority to the shareholders. This is a clear expression of legislative intention that on insolvency the claim of those entitled to have their shares redeemed should not be placed on the same footing with the claims of creditors but should rank subordinate to them: see *Nelson v. Rentown Enterprises Inc.*, [1994] 4 W.W.R. 579 (Alta. C.A.), adopting the reasons of Hunt J. at (1992), 96 D.L.R. (4th) 586 (Alta. Q.B.). Policy reasons would again militate in favour of the result being the same on a reorganization.

### Claims in Bankruptcy

104      Even if the broader definitions of a debt or liability in *Black's* are adopted, the appellants still do not have a claim provable in bankruptcy.

105      Persuasive authority already exists to the effect that in order to be a provable claim within the meaning of s. 121 of the *Bankruptcy and Insolvency Act* the claim must be one recoverable by legal process: *Farm Credit Corp. v. Holowach (Trustee of)*, [1988] 5 W.W.R. 87 (Alta. C.A.) at 90, leave to appeal to the Supreme Court of Canada dismissed at [1989] 4 W.W.R. lxx (note).

106      In *Holowach*, the seven members of the court were dealing with a situation in which some persons borrowed money from a mortgagee and mortgaged certain lands as security for repayment of the loan. The mortgagors then made an assignment in bankruptcy. The mortgagee filed a proof of claim for the full amount of the deficiency, that is, the amount of the indebtedness less the value of the land which the mortgagee was permitted to purchase. The Alberta *Law of Property Act*, R.S.A. 1980, c. L-8, precluded deficiency claims against individuals in foreclosure actions, although the effect of the legislation was not to extinguish or satisfy the debt. The mortgagee argued that it had a claim provable in bankruptcy under s. 95(1), now s. 121(1), of the *Bankruptcy and Insolvency Act*. The court rejected this argument, holding that a provable claim must be one recoverable by legal process. In coming to its conclusion, the court relied on *Reference re Debt Adjustment Act, 1937 (Alberta)*, [1943] 1 All E.R. 240 (P.C.), and a number of decisions at the trial level which are collected at p. 91 of the decision.

107      Here, the contract to repurchase the shares, while perfectly valid, is without effect to the extent that there is a conflict between the corporation's promise to redeem the shares and its statutory obligation under s. 36 of the *CBCA* not to reduce its capital where it is insolvent. As was the case in the *Holowach* decision, this statutory overlay renders Central Capital's promise to redeem the appellants' preferred shares unenforceable. Although there is a right to receive payment, the effect of the solvency provision of the *CBCA* means that there is

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

no right to enforce payment. Inasmuch as there is no right to enforce payment, the promise is not one which can be proved as a claim.

108      It could be suggested that the decision in *Holowach* can be distinguished from the instant case on the basis that in *Holowach* the claim is made unenforceable forever by statute whereas under the *CCAA* the claim is unenforceable only so long as the corporation does not meet the solvency requirements of s. 36 of the *CBCA*. I do not believe this is a valid distinction for three reasons. First, the relevant date for determining any contingent liability is not the future but the past, namely, September 8, 1992, the date by which proofs of claim had to be submitted. On that date, Central Capital was insolvent. Second, it is only because the lenders were willing to convert their debt obligations into equity in the reorganization that Central Capital is now solvent. Central Capital is not the same company and its liabilities are not the same. The redeemable shares no longer exist. Third, in order to be profitable, the assets of a company must be managed. Any value in the assets after the insolvency of the company is, in this case, due to the new management and not to the preferred shareholders extending credit to the company by having their claim for redemption postponed.

109      Even if Central Capital's obligation to redeem the shares of the appellants created a debt or liability, the appellants do not have a claim provable within the meaning of s. 121 of the *Bankruptcy and Insolvency Act*.

## Conclusion

110      I would dismiss the appeal. For the reasons I have given, the retraction amounts do not constitute a debt or liability within the meaning of s. 121 of the *Bankruptcy and Insolvency Act*. Even if I am wrong in my conclusion and a debt or liability is created, it is not a claim within the meaning of the *CCAA*. This is a case of first impression. For these reasons, I would not award any costs of this appeal.

*Laskin J.A.* **(concurring):**

111      I have read the reasons of my colleagues Justice Finlayson and Justice Weiler. Like Justice Weiler, I would affirm the decision of the motions judge, Feldman J., and dismiss these appeals. I prefer, however, to state my own reasons for upholding the position of the unsecured creditors of Central Capital Corporation.

## The Issue

112      The application was argued before Madam Justice Feldman on an agreed statement of facts. My colleagues have summarized the relevant facts and important provisions of the documents. Each appellant holds preferred shares of Central Capital and each appellant's shares contain a right of retraction — a right to require Central Capital to redeem the shares on a fixed date and for a fixed price. The retraction date for the appellants James McCutcheon and Central Guarantee Trust Company (collectively McCutcheon) was July 1, 1992, and before that date McCutcheon exercised his right of retraction and tendered his shares for redemption. The retraction date for the appellant S.Y.H. Corporation was September 1994 and although it could not render its shares for redemption, it did file a proof of claim with the Administrator of Central Capital. The Administrator disallowed each appellant's claim and Feldman J. dismissed appeals from the Administrator's decisions.

113      The issue on these appeals is whether McCutcheon and S.Y.H. Corporation "have claims provable against Central Capital Corporation within the meaning of the *Bankruptcy Act (Canada)* as amended as of the date of the Restated Subscription and Escrow Agreement." Under the *Bankruptcy Act*, R.S.C. 1985, c. B-3, s. 2,

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

a claim provable "includes any claim or liability provable in proceedings under this Act by a creditor" and a creditor "means a person having a claim, preferred, secured or unsecured, provable as a claim under this Act." Section 121(1) of the *Bankruptcy Act* further defines claims provable as follows:

*121.* (1) All debts and liabilities, present or future, to which the bankrupt is subject at the date of the bankruptcy or to which he may become subject before his discharge by reason of any obligation incurred before the date of the bankruptcy shall be deemed to be claims provable in proceedings under this Act.

114     The date of the Restated Subscription and Escrow Agreement is May 1992.[FN1] By then, and indeed since December 1991, Central Capital had been insolvent and therefore was prohibited by s. 36(2) of the *Canada Business Corporations Act*, R.S.C. 1985, c. C-44, from making any payment to redeem the appellants' shares.

115     On June 15, 1992, Houlden J. provided that Central Capital could be reorganized under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 and he stayed proceedings against it. Houlden J.'s order of July 9, 1992, which approved the restructuring of Central Capital, was made without prejudice to the right of the appellants to assert claims as creditors. Thus the question for this court is whether the appellants' retraction rights created debts of Central Capital in May, 1992. In other words were McCutcheon and S.Y.H. Corporation creditors of Central Capital in May, 1992? If they were creditors, then like the other unsecured creditors of Central Capital, they can elect to take shares in the newly incorporated company, Canadian Insurance Group Limited; if they were not creditors, then they remain shareholders of Central Capital under the restructuring plan.

116     This is a question of characterization. I will address the question first, by considering the "substance" of the relationship between each appellant and the company; and second by considering s. 36(2) of the *Canada Business Corporations Act, supra.* In brief I conclude:

(1) Although the relationship between each appellant and the company has characteristics of debt and equity, in substance both McCutcheon and S.Y.H. Corporation are shareholders, not creditors of Central Capital. Neither the existence of their retraction rights nor the exercise of those rights converts them into creditors;

(2) Finding that the appellants were creditors of Central Capital would defeat the purpose of s. 36(2) of the statute.

### I. The Relationship between the Appellants and Central Capital

117     Preferred shares have been called "compromise securities" and even "financial mongrels": Grover and Ross, *Materials and Corporate Finance* (1975), at p. 49. Invariably the conditions attaching to preferred shares contain attributes of equity and, at least in an economic sense, attributes of debt. Over the years financiers and corporate lawyers have blurred the distinction between equity and debt by endowing preferred shareholders with rights analogous to the rights of creditors. One example is the right of redemption — the right of the corporation to compel preferred shareholders to sell their shares back to the corporation. Another example, and it is the case before us, is the right of retraction — the right of shareholders to compel the corporation to buy back their shares on a specific date for a specific price.

118     I acknowledge, therefore, that redeemable or retractable preferred shares are somewhat different from conventional equity capital. What makes the appeals before us difficult is that although the appellants appear to hold equity, their right of retraction appears to be a basic characteristic of a debtor-creditor relationship. See

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

Grover and Ross, *supra*, at pp. 47-49; Buckley, Gillen and Yalden, *Corporations: Principles and Policies*, 3rd ed. (1995), at pp. 938-940.

119    If the certificate or instrument contains features of both equity and debt — in other words if it is hybrid in character — then the Court must determine the "substance" of the relationship between the holder of the certificate and the company. This is the lesson of Justice Iacobucci's judgment in *Canada Deposit Insurance Corp. v. Canadian Commercial Bank*, [1992] 3 S.C.R. 558. In that case the Supreme Court of Canada had to determine whether the financial assistance given by several lending institutions to try to rescue the Canadian Commercial Bank was "in the nature of a loan" or "in the nature of a capital investment." Justice Iacobucci discussed his approach to the problem at pp. 590-591 of his judgment:

> As I see it, the fact that the transaction contains both debt and equity features does not, in itself, pose an insurmountable obstacle to characterizing the advance of $255 million. Instead of trying to pigeonhole the entire agreement between the Participants and CCB in one of two categories, I see nothing wrong in recognizing the arrangement for what it is, namely, one of a hybrid nature, combining elements of both debt and equity but which, in substance, reflects a debtor-creditor relationship. Financial and capital markets have been most creative in the variety of investments and securities that have been fashioned to meet the needs and interests of those who participate in those markets. It is not because an agreement has certain equity features that a court must either ignore these features as if they did not exist or characterize the transaction on the whole as an investment. There is an alternative. It is permissible, and often required, or desirable, for debt and equity to co-exist in a given financial transaction without altering the substance of the agreement. Furthermore, it does not follow that each and every aspect of such an agreement must be given the exact same weight when addressing a characterization issue. Again, it is not because there are equity features that it is necessarily an investment in capital. This is particularly true when, as here, the equity features are nothing more than supplementary to and not definitive of the essence of the transaction. When a court is searching for the *substance* of a particular transaction, it should not too easily be distracted by aspects which are, in reality, only incidental or secondary in nature to the main thrust of the agreement.

120    In determining the substance of the relationship, as in any other case of contract interpretation, the court looks to what the parties intended. In *CDIC v. CCB, supra*, Iacobucci J. put this proposition as follows at p. 588:

> As in any case involving contractual interpretation, the characterization issue facing this Court must be decided by determining the intention of the parties to the support agreements. This task, perplexing as it sometimes proves to be, depends primarily on the meaning of the words chosen by the parties to reflect their intention. When the words alone are insufficient to reach a conclusion as to the true nature of the agreement, or when outside support for a particular characterization is required, a consideration of admissible surrounding circumstances may be appropriate.

121    In these appeals what the parties intended is reflected mainly in the share purchase agreements and the conditions attaching to the appellants' shares, but also in the articles of incorporation and in the way Central Capital recorded the appellants' shares in its financial statements. These documents indicate that in substance the appellants are shareholders of Central Capital, not creditors. I rely on the following considerations to support my conclusion:

122    (i) Both appellants agreed to take preferred shares instead of some other instrument — for example, a bond or debenture — that would obviously have made them creditors. The appellant McCutcheon sold shares of

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

one corporation (Canadian General Securities Limited) for cash and for shares of another corporation (Central Capital). Neither the share purchase agreements nor the share conditions support McCutcheon's contention that in taking preferred shares he was extending credit to Central Capital by deferring payment of the purchase price. He made an investment in the capital of Central Capital, no doubt because of the attractive dividend rate, the income tax advantages of preferred shares and "sweeteners" such as conversion privileges. Unlike Finlayson J.A., I place little weight on what he termed "the unique nature of the transaction". McCutcheon transferred assets to acquire his preferred shares rather than acquiring them with cash. But he nonetheless decided to invest in Central Capital and to take the risk and the profits (through dividends) of his investment.

123       Similarly, S.Y.H. Corporation exchanged its equity investment in four insurance companies for an equity investment in Central Capital. It too chose equity not debt. None of the contractual documents indicates that the appellants' retraction rights were intended to trigger an obligation on the part of Central Capital to repay a loan. Moreover, as Weiler J.A. points out, neither the share purchase agreements nor the share conditions provides for interest if Central Capital fails to honour its retraction obligations.

124       (ii) The senior preferred shares and junior preferred shares that the appellants own were part of the authorized capital of Central Capital before the appellants acquired them.

125       (iii) The appellants' shares were recorded in the financial statements of Central Capital as "capital stock," along with the company's issued and outstanding common shares, class "A" shares and warrants. The amount Central Capital might be obligated to pay the appellants if they exercised their retraction rights was not recorded as debt (even contingent debt) in the company's financial statements.

126       (iv) Both appellants had the right to receive dividends on their shares and McCutcheon had the right to vote his shares for the election of directors of Central Capital if dividends remained unpaid for a specified time. These rights — to receive dividends and to vote — are well recognized rights of shareholders. And these rights continue, even after the retraction dates, until the appellants' shares are redeemed.

127       (v) The preferred share conditions provide that on a liquidation, dissolution or winding up, the holders rank with other shareholders and therefore, implicitly, behind creditors. The appellant McCutcheon, who holds senior preferred shares, would rank behind creditors but ahead of the holders of subordinate classes of shares; the appellant S.Y.H. Corporation, which holds junior preferred shares, would rank behind senior preferred shareholders but ahead of common shareholders.

128       These provisions in the preferred share conditions also state that on payment of the amount owing to them the appellants "shall not be entitled to share in any further distribution of assets of the corporation." Finlayson J.A. interprets this to mean that the appellants "are not entitled to be treated as shareholders under a winding up or a liquidation but only as creditors." I disagree. These are typical preferred share provisions, which limit the recovery of the holders but do not treat them as creditors: *Sutherland et al., Fraser & Stewart Company Law of Canada*, 6th ed. (1993), at p. 198. At least on a liquidation, dissolution or winding up, the preferred share conditions evidence that the appellants would be treated not as creditors but as shareholders. In *CDIC v. CCB, supra*, Iacobucci J. placed considerable weight on a provision in the Participation Agreement stating that each participant "shall rank *pari passu* with the rights of the depositors." No such provision exists in this case. Indeed the share conditions I have referred to state the opposite.

129       Of course, Central Capital was reorganized, not liquidated, dissolved or wound up and the preferred share conditions are silent about what occurs on a reorganization. Still these conditions shed light on what the

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

parties intended on the reorganization. Section 12(1) of the *Companies' Creditors Arrangement Act, supra*, defines claim as "any indebtedness, liability or obligation of any kind that, if unsecured, would be a debt provable in bankruptcy within the meaning of the *Bankruptcy Act*." The question the court has been asked to answer is the same question that would arise on a liquidation. It is illogical to conclude that the appellants could claim only as shareholders on a liquidation and yet can claim as creditors on the reorganization. Whether Central Capital's financial difficulties led to a liquidation or a reorganization, the issue is the same and the analysis and the result should also be the same.

130    The appellants argue, however, that they are shareholders only until they exercise their retraction rights but once they exercise these rights they become creditors. I do not agree with this argument. The share conditions provide that even after exercising their retraction rights, the appellants continue to be entitled to dividends and to vote until their shares are redeemed. In other words, they continue to enjoy the rights of shareholders. Moreover, if when the appellants exercised their retraction rights the company were insolvent and were to be subsequently liquidated (or dissolved or wound up), the appellants would rank as shareholders on the liquidation. And as I have indicated above the result should be no different on the reorganization.

131    It seems to me that these appellants must be either shareholders or creditors. Except for declared dividends, they cannot be both. Once they are characterized as shareholders, their rights of retraction do not create a debtor-creditor relationship. These rights enable them to call for the repayment of their capital on a specific date (and at an agreed upon price) provided the company is solvent. Ordinarily shareholders have to recoup their investment by selling their shares to third parties. If they have retraction rights, however, they can compel the company (if solvent) to repay their investment at a given time for a given price. But the right of retraction provides for the return of capital not for the repayment of a loan. Certainly the *Canada Business Corporations Act* treats a redemption of shares as a return of capital because s. 39 of the statute requires a company on a redemption to deduct from its stated capital account an amount equal to the value of the shares redeemed. The shares redeemed are then either cancelled or returned to the status of authorized but unissued shares.

132    Putting it differently, a preferred shareholder exercising a right of retraction on the terms that exist here must rank behind the company's creditors. Grover and Ross make this point more generally in their *Materials and Corporate Finance, supra*, at pp. 48-49:

On the other hand, the company cannot issue "secured" preferred shares in the sense that shares cannot have a right to a return of capital which is equal or superior to the rights of creditors. Preferred shareholders are risk-takers who are required to invest capital in the business and who can look only to what is left after creditors are fully provided for. Thus, in the absence of statutory authorization, the claims of shareholders cannot be secured by a lien on the corporate assets. They rank behind creditors but before common shareholders (if specified) on a voluntary or involuntary dissolution of the company.

133    Admittedly there is little authority in Canada on the issue confronting this court. Some of the cases that the respondent relies on — for example, *Re Patricia Appliance Shops Ltd. (1922), [1923] 3 D.L.R. 1160* (Ont. S.C.), *Laronge Realty Ltd. v. Golconda Investments Ltd. (1986), 63 C.B.R. (N.S.) 76* (B.C. C.A.), and even *Re Meade (Debtor); Ex parte Humber v. Palmer (Trustee)* [1951], 2 All E.R. 168 (P.C.) — are of limited assistance because the shareholders in those cases did not have retraction rights.

134    Perhaps the closest case — and the appellants rely heavily on it — is the judgment of the British Columbia Court of Appeal in *Re East Chilliwack Agricultural Co-op. (1989), 74 C.B.R. (N.S.) 1*. In that case a

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

majority of the court (Craig J.A. dissenting) held that a withdrawing member of a co-operative association who elected to have his shares redeemed in instalments over a five-year period should be treated on the subsequent bankruptcy of the association as an ordinary creditor rather than as a shareholder. I decline to apply *East Chilliwack* for three reasons. First, because the case was decided in 1989, the British Columbia Court of Appeal did not have the benefit of the Supreme Court of Canada's reasons in *CDIC v. CCB, supra*. In *East Chilliwack* Hutcheon J.A., writing for the majority did not focus on what the parties intended when the member contracted with the co-operative. Instead he only considered the relationship between the member and the co-operative after the member had withdrawn. I do not think his approach is consistent with Justice Iacobucci's judgment in *CDIC v. CCB, supra*.

135       Second, there are important factual differences between *East Chilliwack* and the appeals before us. Justice Weiler has referred to these factual differences in her reasons. The most important of these differences are the following: in *East Chilliwack* the rules of the association provided that a member had to withdraw from the association to trigger the right of redemption, whereas the appellants' share conditions provide that they continue to be shareholders of Central Capital until their shares are redeemed; in *East Chilliwack* the member elected to withdraw and redeem his shares when the association was solvent whereas when the appellant McCutcheon exercised his right of retraction Central Capital was insolvent; and in *East Chilliwack* Hutcheon J.A. expressly stated that he was not considering the effect of the superintendent's power to suspend payments if the financial position of the co-operative was impaired, whereas the effect of the statutory prohibition against Central Capital making payment, found in s. 36(2) of the *Canada Business Corporations Act*, is in issue in these appeals.

136       Third, the decision in *East Chilliwack* is at odds with most of the American case law and I favour the American approach. When a company repurchases shares by instalment and bankruptcy intervenes, the prevailing American position is that the shareholder's claim is deferred to the claims of ordinary creditors. The decision of the Fifth Circuit Court of Appeals in *Robinson v. Wangemann*, 75 F.2d 756 (Tex. 1935) is frequently cited. The facts of that case are virtually identical to the facts in *East Chilliwack*. A company had agreed to repurchase a stockholder's stock by instalments. Although the company was solvent when the agreement was made it went bankrupt before the repurchase was completed. The stockholder sought to prove as an ordinary creditor for the unpaid purchase price. Foster, Circuit Judge, writing for a unanimous court rejected the stockholder's claim at p. 757:

> A transaction by which a corporation acquires its own stock from a stockholder for a sum of money is not really a sale. The corporation does not acquire anything of value equivalent to the depletion of its assets, if the stock is held in the treasury, as in this case. It is simply a method of distributing a proportion of the assets to the stockholder. The assets of a corporation are the common pledge of its creditors, and stockholders are not entitled to receive any part of them unless creditors are paid in full. When such a transaction is had, regardless of the good faith of the parties, it is essential to its validity that there be sufficient surplus to retire the stock, without prejudice to creditors, at the time payment is made out of assets.

137       At the heart of *Robinson v. Wangemann* is the finding that the selling stockholder is not a creditor in the sense of a person who loans money to a corporation, and therefore is not entitled to parity with the general creditors. The principle in *Robinson v. Wangemann* seeks to protect creditors by refusing to permit selling stockholders, who were risk investors, to withdraw their capital on the same terms as general creditors in the event of insolvency. Section 40(3) of the *Canada Business Corporations Act* — a section to which I shall return when considering s. 36(2) of the same statute — codifies the principle in *Robinson v. Wangemann* for share repurchases,

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

though not for share redemptions. See also Blumberg, *The Law of Corporate Groups* (1989), at pp. 205-210 and see *contra Wolff v. Heidritter Lumber Co.*, 163 A. 140 (N.J. Ch. 1932).

138    Quite apart from the instalment purchase price cases, American courts have often grappled with the question whether preferred stockholders can claim as creditors of the corporation. Although there are cases going both ways, most appear to come to the same conclusion as I do. The American cases are collected in Bjor and Solheim, *Fletcher Cyclopedia of the Law of Private Corporations* (1995), revised vol. 11 and in Bjor and Reinholtz, *Fletcher Cyclopedia of the Law of Private Corporations* (1990), revised vol. 15A. In volume 11 the authors of the text indicate — as did the Supreme Court of Canada in *CDIC v. CCB* — that "[w]hether or not the holder of a particular instrument or certificate is to be regarded as a shareholder or a creditor is a question of interpretation, and depends on the terms of the contract as evidenced by the instrument, the articles of incorporation, and the statutes of the state. The nature of the transaction is to be determined by the real substance and effect of the contract rather than by the name given to the obligations or its form ..." (at p. 566).

139    And in volume 15A the authors state at pp. 290 and 292 that even the arrival of a fixed redemption date does not change a preferred stockholder into a creditor:

Holders of preferred stock of a corporation, in the absence of express provision to the contrary, are stockholders and not creditors of the corporation, except for dividends declared. They have no lien upon, and are not entitled to, any of the assets of the corporation when it becomes insolvent, until all debts are paid. Furthermore, there is authority that the status of a preferred stockholder is not changed to that of creditor, even though a dividend is guaranteed. Indeed it is beyond the power of a corporation to issue a class of stock, the holders of which are entitled to preference over general creditors.

. . . . .

Even where preferred stock has a fixed redemption date, arrival of that date does not change the status of a preferred stockholder to that of a creditor. (pp. 290, 292)

140    I agree with these statements. I therefore conclude first that the appellants, in substance, were shareholders of Central Capital not creditors; and second that neither the existence nor the exercise of their retraction rights turned them into creditors.

## II. Provable Claims and Section 36(2) of the Canada Business Corporations Act

141    In May 1992 Central Capital was insolvent. It was unable to pay its liabilities as they became due and the realizable value of its assets was less than the aggregate of its liabilities. Because it was insolvent it was prohibited by s. 36(2) of the *Canada Business Corporations Act* from redeeming the appellants' shares. Section 36(2) of the statute provides:

(2) A corporation shall not make any payment to purchase or redeem any redeemable shares issued by it if there are reasonable grounds for believing that

(*a*) the corporation is, or would after the payment be, unable to pay its liabilities as they become due; or

(*b*) the realizable value of the corporation's assets would after the payment be less than the aggregate of

(i) its liabilities, and

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

> (ii) the amount that would be required to pay the holders of shares that have a right to be paid, on a redemption or in a liquidation, rateably with or prior to the holders of the shares to be purchased or redeemed.

142    As well, the appellants' share conditions provide that they are not permitted to redeem their shares if to do so would be "contrary to applicable law," in this case s. 36(2) of the statute.

143    To hold that the appellants have provable claims would defeat the purpose of s. 36(2) of the *Canada Business Corporations Act*. At common law a company could not repurchase its own shares on the open market or in the language of *Trevor v. Whitworth* (1887), 12 App. Cas. 409 (H.L.), a company could not "traffick in its own shares." The obvious reason was to prevent companies from using their assets to destroy the claims of their creditors. Modern corporate statutes, such as the *Canada Business Corporations Act*, modified the rule in *Trevor v. Whitworth* to permit repurchases provided the company's creditors would not be prejudiced. Thus the legislation insisted that the company could not repurchase its own shares unless it satisfied stated solvency tests. And so, s. 34(2) of the *Canada Business Corporations Act* provides:

> (2) A corporation shall not make any payment to purchase or otherwise acquire shares issued by it if there are reasonable grounds for believing that

> (*a*) the corporation is, or would after the payment be, unable to pay its liabilities as they become due; or

> (*b*) the realizable value of the corporation's assets would after the payment be less than the aggregate of its liabilities and stated capital of all classes.

144    In *Nelson v. Rentown Enterprises Inc.* (1992), 96 D.L.R. (4th) 586 (Alta. Q.B.), affirmed (1994), 109 D.L.R. (4th) 608 (Alta. C.A.), Hunt J. of the Alberta Queen's Bench wrote at p. 589:

> The policy behind the s. 34(2) limitation upon a corporation's power to purchase its own shares seems obvious. It is intended to ensure that one or more shareholders in a corporation do not recoup their investments to the detriment of creditors and other shareholders. It has been observed that:

> > Corporate power to purchase its own stock has been frequently abused. Done by corporations conducting faltering businesses, it has been employed to create preferences to the detriment of creditors and of the other stockholders.

> (*Mountain State Steel Foundries, Inc. v. C.I.R., supra, at p. 741* [284 F.2d 737 (1960)].)

> Modern business statues permit these share purchases to take place provided that the position of creditors and other shareholders is protected, by virtue of the application of the s. 34(2) tests.

145    Redemptions of preferred shares, unlike repurchases, were always permitted at common law as long as they were not made in contemplation of bankruptcy. But the solvency test in s. 36(2) of the *Canada Business Corporations Act* has the same purpose as the solvency test in s. 34(2): to prevent redemptions if they would allow the company to prejudice the claims of creditors. See Buckley *et al., Corporations: Principles and Policies, supra*, at pp. 968-71. To hold that the appellants' retraction rights gave rise to provable claims in the face of s. 36(2), thereby allowing the appellants to rank equally with the unsecured creditors, would undermine the purpose of the section. If a claim in a bankruptcy or reorganization proceeding is unenforceable under the statute, the claim is not entitled to recognition on a parity with the claims of unsecured creditors: See *Blumberg, supra*, at pp. 205-6; and *Farm Credit Corp. v. Holowach (Trustee of)* (1988), 68 C.B.R. (N.S.) 255 (Alta. C.A.).

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

146     I draw comfort in this conclusion from s. 40 of the *Canada Business Corporations Act*. Section 40(1) provides that a contract with a corporation for the purchase of its shares is specifically enforceable against the corporation "except to the extent that the corporation cannot perform the contract without thereby being in breach of section 34 ..." Section 40(3) then states:

>    (3) Until the corporation has fully performed a contract referred to in subsection (1), the other party retains the status of a claimant entitled to be paid as soon as the corporation is lawfully able to do so or, in a liquidation, to be ranked subordinate to the rights of creditors but in priority to the shareholders.

147     In other words, the section recognizes that if a company contracts to repurchase its shares but is prohibited from doing so because it is insolvent, the vendor of the shares is not a creditor and on a liquidation ranks subordinate to the rights of creditors. The shareholder cannot be repaid at the expense of the company's creditors. Although s. 40 does not expressly apply to s. 36, I think that the rationale for s. 40(3) applies to redemptions as well as to repurchases. Whether a repurchase or a redemption, the shareholder is not a creditor and is subordinate to the rights of creditors. More simply the shareholder does not have a provable claim.

148     The appellants rely on *National Bank für Deutschland v. Blucher*, *(*sub nom. *Blucher v. Canada (Custodian))* [1927] 3 D.L.R. 40 (S.C.C.)*, but in my view this case does not assist them. In *Blucher* dividends were declared on stock but payment of the dividends was suspended during World War I. The Supreme Court of Canada held at p. 43 that "[t]he right of recovery was in suspense during the war, but the debt nevertheless existed." In that case, however, the dividend was declared before the suspension of payment took place. Moreover, as Justice Finlayson points out in his reasons, courts have always accepted the proposition that when a dividend is declared it is a debt on which each shareholder can sue the corporation.

149     Holding that the appellants do not have provable claims accords with sound corporate policy. On the insolvency of a company the claims of creditors have always ranked ahead of the claims of shareholders for the return of their capital. Case law and statute law protect creditors by preventing companies from using their funds to prejudice creditors' chances of repayment. Creditors rely on these protections in making loans to companies. Permitting preferred shareholders to be turned into creditors by endowing their shares with retraction rights runs contrary to this policy of creditor protection.

150     I would dismiss these appeals. I would not make any cost order. I am grateful to all counsel for their assistance on this interesting and difficult problem.

*Appeals dismissed.*

FN1 There is a discrepancy in the materials before this court on the relevant date for establishing a claim provable against Central Capital: S.Y.H. Corporation used May, 1992, the date of the Restated Subscription and Escrow Agreement whereas McCutcheon and the unsecured creditors of Central Capital Corporation used June 15, 1992, the date of the court-ordered stay of proceedings against Central Capital. I have used the May 1992 date but nothing turns on the use of this date as opposed to the June 15, 1992 date.

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works