TAB 26

17 Collier Bankr.Cas.2d 556, 16 Bankr.Ct.Dec. 615, Bankr. L. Rep. P 71,933

824 F.2d 725
United States Court of Appeals,
Ninth Circuit.

In re COMPUTER
COMMUNICATIONS, INC., Debtor.

COMPUTER COMMUNICATIONS,
INC., Plaintiff-Appellee,
v.
CODEX CORPORATION, Defendant-Appellant.

No. 86-6120.    |    Argued and Submitted
March 5, 1987.    |    Decided Aug. 7, 1987.

Debtor brought action against party to joint marketing and development agreement which unilaterally terminated contract to purchase computer equipment from debtor after debtor filed petition for reorganization under Chapter 11. The United States District Court for the Central District of California, William J. Rea, J., affirmed the Bankruptcy Court's determination that party violated automatic stay, and party appealed. The Court of Appeals, Tang, Circuit Judge, held that unilateral termination of contract violated automatic stay.

Affirmed.

West Headnotes (4)

[1]    **Courts**
 In General;  Retroactive or Prospective Operation

Party could not challenge jurisdiction of bankruptcy court which entered judgment nearly two months before Supreme Court's *Northern Pipeline* decision questioning exercise of judicial authority by bankruptcy courts, though party raised jurisdiction issue prior to judgment, in that *Northern Pipeline* had only prospective application.

3 Cases that cite this headnote

[2]    **Courts**
In General;  Retroactive or Prospective Operation

Because *Northern Pipeline* case, questioning exercise of judicial authority by bankruptcy courts, had only prospective application, standard of appellate review for cases decided before *Northern Pipeline* remained the same as before.

6 Cases that cite this headnote

[3]    **Bankruptcy**
Contracts, Grant or Renewal

Unilateral termination of joint marketing and development agreement due to debtor's declaration of bankruptcy violated automatic stay, even if terminating party was entitled to terminate agreement under state law, in that contractual clause allowing for termination upon either party's declaration of bankruptcy was void. Bankr.Code, 11 U.S.C.A. §§ 362, 365(e)(2), 541(c)(1).

68 Cases that cite this headnote

[4]    **Bankruptcy**
Contempt

Party who violates automatic stay may be held in contempt and court may award damages to compensate debtor for actual loss suffered. Bankr.Code, 11 U.S.C.A. § 362.

51 Cases that cite this headnote

**Attorneys and Law Firms**

**\*725**  Peter Flynn and Myron M. Cherry, argued, Cherry & Flynn, Chicago, Ill., David M. Stern and Andrew S. Pauly, Stern & Miller, Santa Monica, Cal., for plaintiff-appellee.

Harvey M. Grossman, Los Angeles, Cal., and Paul F. Ware, Jr., Boston, Mass., for defendant-appellant.

Appeal from the United States District Court for the Central District of California.

Before TANG, ALARCON and KOZINSKI, Circuit Judges.

Case 09-10138-MFW    Doc 13460-5    Filed 05/02/14    Page 3 of 74

In re Computer Communications, Inc., 824 F.2d 725 (1987)

17 Collier Bankr.Cas.2d 556, 16 Bankr.Ct.Dec. 615, Bankr. L. Rep. P 71,933

**Opinion**

TANG, Circuit Judge:

Codex Corporation (Codex) appeals a judgment of the district court affirming the bankruptcy court's determination that Codex violated the Bankruptcy Code's automatic stay provision, 11 U.S.C. § 362 (1982), and breached its contract with Computer Communications, Inc. (CCI). Codex unilaterally terminated its contract to purchase computer equipment from CCI after CCI filed a petition for reorganization under Chapter 11.

**I**

Codex designs and manufactures communications equipment and networks used for transmitting information between complex computer systems. CCI is a manufacturer **\*726** of computer equipment and software. In April 1979, Codex and CCI entered into a "Joint Marketing and Development Agreement." The heart of the Agreement provided that Codex would make minimum quarterly purchases of equipment and software from CCI for incorporation in Codex's products. The parties executed an Amended Agreement on November 4, 1980 for a term of four years commencing April 1979. The Agreement provided for enhanced price discounts retroactive to April 1979. It contained the usual provisions for invoicing, payment, delivery, performance and warranty. The value of the purchases under the Agreement aggregated $12.5 million. CCI agreed to provide technical support, training, and to make spare parts available. The Agreement also provided for co-development of a "single line interface system" (SLI) which would permit CCI products to operate with Codex products. Codex agreed to pay CCI up to $75,000 for the development of SLI in six incremental payments. Finally, the Agreement stipulated that certain events, including bankruptcy, constituted default; established termination procedures; and stated that Massachusetts law governed the Agreement.

On November 6, 1980, two days after the parties executed the Amended Agreement, CCI filed a petition under Chapter 11 of the Bankruptcy Code. On December 30, 1980, Codex notified CCI that it was terminating the Agreement pursuant to ¶ 4.6.4 which provides:

> In the event of the appointment of a trustee, receiver or liquidator for all or a major portion of the property of either party, the commission by either party of any act of bankruptcy as defined in the United States Bankruptcy Act, as amended, the filing by either party of any voluntary petition in bankruptcy, ... that party shall be in default upon actual notice to the other party of such event, and the other party may terminate this Agreement as provided in paragraph 4.6.2 or 4.6.3, as the case may be.

Codex failed to make its minimum purchase for the quarter ending December 31, 1980, and has failed to make its quarterly minimum purchase every quarter since.

CCI filed suit in bankruptcy court on January 30, 1981 for injunctive relief and damages asserting that Codex had wrongfully repudiated the contract and had violated the automatic stay provision of the Bankruptcy Code, 11 U.S.C. § 362.

On February 23, 1981, Codex notified CCI that it was terminating purchases of equipment from CCI pursuant to ¶ 4.6.1 of the Agreement. This clause provides:

> In the event Codex gives CCI written notice at any time that Codex elects to terminate its obligation to purchase any Equipment pursuant to this Agreement, including the Minimum Commitment, (the "Codex Notice") then any obligation of Codex to purchase any Equipment pursuant to this Agreement, including the Minimum Commitment, shall thereupon terminate. Within sixty (60) days of the Codex Notice, but not thereafter based upon the Codex Notice, CCI may elect to terminate this Agreement by giving Codex written notice of CCI's election to terminate this Agreement (the "CCI Notice"). In the event CCI timely elects to terminate this Agreement based upon the Codex Notice: (i) this Agreement shall terminate; (ii) within one hundred and twenty days (120) of the CCI Notice or such

additional period reasonably required to determine such amount, Codex shall pay to CCI an amount equal to ten percent (10%) of the portion which has not been ordered by Codex of the Minimum Commitment, reflecting the discount provided in Exhibit D, for the Buying Year in which the Codex Notice is given; provided, however, that such payment shall not be less than One Hundred Thousand Dollars ($100,000) and shall not be greater than Four Hundred Thousand Dollars ($400,000)....

After Codex answered, CCI moved for partial summary judgment on the grounds that Codex's termination violated the automatic stay provision of 11 U.S.C. § 362; and that the bankruptcy default clause in the agreement, ¶ 4.6.4, was void under 11 U.S.C. § 365(e) (1982) (prohibiting termination of most executory contracts and leases). In response, Codex argued that, **\*727** under 11 U.S.C. § 365(e)(2) (state law exception), the contract was not subject to assumption by the trustee in bankruptcy and therefore, the automatic stay provision did not bar termination.

The bankruptcy court granted CCI's motion for summary judgment from the bench on April 30, 1981 and proceeded to hold a trial on the breach and damages issues. The findings and conclusions filed May 6, 1982 held that 11 U.S.C. § 365(e)(1) made the bankruptcy default clause unenforceable, the automatic stay of 11 U.S.C. § 362 prohibited Codex from unilaterally terminating the Agreement under either ¶ 4.6.1 or ¶ 4.6.4, Codex should have applied to the court for relief from the automatic stay, and Codex willfully violated the automatic stay. The court awarded general damages of $4,750,000 plus $250,000 in punitive damages.

Codex appealed to the district court pursuant to the transitional provisions of the Bankruptcy Amendments and Federal Judgeship Act of 1984. The district court affirmed the general damage award and reversed the punitive damage award. Codex timely appeals.

## II

### A. *Subject Matter Jurisdiction*

**[1]** On June 28, 1982, the Supreme Court in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.* held that the broad grant of jurisdiction to the bankruptcy courts contained in § 241(a) of the Bankruptcy Reform Act violated Article III of the Constitution. 458 U.S. 50, 87, 102 S.Ct. 2858, 2880, 73 L.Ed.2d 598 (1982) (plurality); *id.* at 91, 102 S.Ct. at 2881 (Rehnquist, J. concurring). The majority stated that since the grant of authority challenged in *Northern Pipeline* was not severable from the remaining grant of authority in § 241(a), no purported exercise of judicial authority by the bankruptcy court under § 241(a) was valid. *See id.* at 87 n. 40, 102 S.Ct. at 2880 n. 40 (plurality opinion); *id.* at 91-92, 102 S.Ct. at 2881-2882 (Rehnquist, J., concurring). The majority explicitly limited its holding to prospective effect, however, and stayed its judgment until October 4, 1982. *Id.* at 88, 102 S.Ct. at 2880 (plurality); *id.* at 92, 102 S.Ct. at 2882 (Rehnquist, J., concurring). The bankruptcy court in this case entered judgment nearly two months before *Northern Pipeline* was decided.

Codex argues that it should be permitted to challenge the jurisdiction of the bankruptcy court despite the prospective effect of *Northern Pipeline.* The basis of Codex's argument is that the Supreme Court failed to define what it meant by "prospectively" but cited *Insurance Corp. of Ireland, Ltd. v. Compagnie Des Bauxites De Guinee,* 456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1981), and *Chicot County Drainage Dist. v. Baxter State Bank,* 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329 (1940), in support of the ruling. *Northern Pipeline,* 458 U.S. at 88 n. 41, 102 S.Ct. at 2880 n. 41. These cases bar retroactive application because it would conflict with principles of res judicata. Codex argues that res judicata problems do not arise in this case because Codex raised the jurisdiction issue prior to judgment. It argues that the Supreme Court merely intended to prevent attempts to reopen judgments or raise jurisdictional challenges for the first time on appeal of currently pending bankruptcy cases.

We reject Codex's interpretation of *Northern Pipeline* and sustain the bankruptcy court's jurisdiction. In holding that *Northern Pipeline* would apply prospectively, the Supreme Court explained that "retroactive application would ... surely visit substantial injustice and hardship upon those litigants who relied upon the Act's vesting of jurisdiction in the bankruptcy courts." *Id.* at 88, 102 S.Ct. at 2880. The litigants in this case so relied. Furthermore, the Court cited *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), in support of prospective application in addition to the cases emphasized by Codex. *Buckley v. Valeo* did not rely on a

res judicata analysis but instead accorded *de facto* validity to prior administrative actions to allow for uninterrupted enforcement while Congress adopted valid legislation. *Id.* at 142, 96 S.Ct. at 693. **\*728** This reasoning applies equally to the case at bar. Finally, this and other circuits have construed *Northern Pipeline* to validate judgments entered by bankruptcy courts before October 4, 1982. *See In re Burley,* 738 F.2d 981, 984 (9th Cir.1984); *In re Jones,* 804 F.2d 1133, 1137 (10th Cir.1986). In *In re Jones,* the Tenth Circuit rejected an argument similar to the one advanced by Codex.

> Wilson further contends that it contested the validity of jurisdiction prior to the decision in *Northern Pipeline.* The record supports this contention.... In light of this assertion by Wilson that jurisdiction was lacking, arguably the plaintiff's reliance on jurisdiction would be tenuous here. However, the *Northern Pipeline* opinion makes no distinction between those cases where one of the litigants raised the jurisdictional issue before the decision and those cases where one raised the issue after the decision.

804 F.2d at 1137. The plain meaning of the statement "our decision today shall apply only prospectively," *Northern Pipeline,* 458 U.S. at 88, 102 S.Ct. at 2880, forecloses a ruling that the bankruptcy court lacked subject matter jurisdiction.

**B.** *Standard of Review*
The Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98-353, 98 Stat. 333, significantly changed the standard of review of bankruptcy decisions. Prior to the Act, a district court reviewed all bankruptcy court findings of fact for clear error and conclusions of law de novo. *See, e.g., In re American Mariner Indus., Inc.,* 734 F.2d 426, 429 (9th Cir.1984). The Act mandates de novo review of all bankruptcy court decisions except those that are essentially bankruptcy matters such as administration of the bankrupt estate. 28 U.S.C. § 157 (Supp. II 1984). [1] The district court in this case reviewed the findings and conclusions of the bankruptcy court under the traditional standard. It held that the prospective application of *Northern Pipeline* mandated such review. Codex argues that the court erred because the prospective application articulated in *Northern Pipeline* applies to jurisdiction not standard of review. Codex argues

that the court should have reviewed the bankruptcy court's decision de novo as the question is essentially one of contract law.

[2]    *Northern Pipeline* implicitly mandates continuance of the traditional standard of review. In striking down the statute, the court cited the deferential standard of review as one of its infirmities. *Northern Pipeline,* 458 U.S. at 85, 102 S.Ct. at 2878. However, it validated the bankruptcy court's authority to enter final judgments on all matters in pending cases. *Id.* at 88, 102 S.Ct. at 2880. It follows that such judgments should be reviewed under the traditional standard.

Because this court is in as good a position as the district court to review the findings of the bankruptcy court, we independently review the bankruptcy court's decision. *In re Pizza of Hawaii, Inc.,* 761 F.2d 1374, 1377 (9th Cir.1985). We review the bankruptcy court's findings of fact under the clearly erroneous standard and its conclusions of law de novo. *Id.*

**C.** *Automatic Stay*
[3]    11 U.S.C. § 362 provides that the filing of a bankruptcy petition automatically stays "any act to obtain possession of property of the estate...." 11 U.S.C. § 362(a)(3). The courts below held that the automatic stay prohibited Codex from unilaterally terminating the Agreement. We agree. Even if Codex had a valid reason for terminating the Agreement, it still was required to petition the court for relief from the automatic stay under § 362(d).

**\*729** An examination of the legislative history and overall statutory scheme supports our conclusion. According to the legislative history, the purpose of the automatic stay is to give the debtor a breathing spell from creditors, to stop all collection efforts, and to permit the debtor to attempt repayment or reorganization. S.Rep. No. 989, 95th Cong., 2d Sess. 54-55, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5840-41. Congress intended the scope of the stay to be broad. "All proceedings are stayed, including arbitration, license revocation, administrative, and judicial proceedings. Proceeding in this sense encompasses civil actions as well, and all proceedings even if they are not before governmental tribunals." H.R.Rep. No. 595, 95th Cong., 2d Sess. 340 *reprinted in* 1978 U.S.Code Cong. & Admin.News 5963, 6297.

11 U.S.C. § 541 (1982) defines property of the estate. It neither explicitly includes or excludes contract rights. The

Case 09-10138-MFW Doc 13460-5 Filed 05/02/14 Page 6 of 74

In re Computer Communications, Inc., 824 F.2d 725 (1987)

17 Collier Bankr.Cas.2d 556, 16 Bankr.Ct.Dec. 615, Bankr. L. Rep. P 71,933

definition includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). The legislative history states that the scope for this paragraph is broad. "It includes all kinds of property, including tangible or intangible property [and] causes of action...." H.R.Rep. No. 595 at 367, *reprinted in* 1978 U.S.Code Cong. & Admin.News at 6323. This court has held that insurance contracts are embraced in the statutory definition of "property." *In re Minoco Group of Companies, Ltd.,* 799 F.2d 517, 519 (9th Cir.1986).

The automatic stay does not permanently prohibit a party from retrieving property from the possession of the bankrupt estate. Section 362(d) provides that upon notice and hearing, the court shall grant relief from the stay. Congress intended the relief proceeding to be a summary one in which the only issues will be the "lack of adequate protection, the debtor's equity in the property, and the necessity of the property to an effective reorganization of the debtor, or the existence of other cause for relief from the stay." S.Rep. No. 989 at 55, *reprinted in* 1978 U.S.Code Cong. & Admin.News at 5841.

Codex argues that the trial court erred because the contract was not property of the estate. It asserts that 11 U.S.C. § 365 (1982), pertaining to executory contracts and unexpired leases, sanctioned its termination of the contract. Section 365 provides that a trustee may assume or reject any executory contract or unexpired lease of the debtor. The contract, argues Codex, never became property of the estate because the trustee did not and could not assume it. An executory contract is one in which performance remains due to some extent on both sides. S.Rep. No. 989 at 58, *reprinted in* 1978 U.S.Code Cong. & Admin.News at 5844. Section 365(e) generally prohibits exercise of bankruptcy termination clauses in such contracts:

(1) Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified ... at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on-

———————

(B) The commencement of a case under this title....

11 U.S.C. § 365(e). Subparagraph (2), however, creates an exception where "applicable law excuses a party, other

than the debtor, to such contract or lease from accepting performance from or rendering performance to the trustee or an assignee of such contract or lease...." 11 U.S.C. § 365(e)(2)(A)(i). Codex argues that Massachusetts law excused it from accepting performance from an assignee for three reasons: 1) the Agreement was a personal service contract; 2) even if it was not a personal service contract, it was a contract based on "a relation of personal confidence," *see Paper Products Machine Co. v. Safepack Mills,* 239 Mass. 114, 122, 131 N.E. 288, 290 (1921); *In re Beverages Int'l, Ltd.,* 61 B.R. 966, 974 (Bankr.D.Mass.1986); and 3) assignment of the contract would have revealed Codex's trade secrets.

The bankruptcy court held that § 365(e)(2) did not permit Codex to terminate the contract unilaterally finding that **\*730** the Amended Agreement was not a contract for personal services. Likewise, the district court concluded that the contract was almost entirely for the sale of goods. We need not reach that question, however, because we hold that even if § 365(e)(2) allowed Codex to terminate the contract, § 362 automatically stayed termination. *See In re Minoco Group of Companies, Ltd.,* 799 F.2d at 519 (the right to cancel an insurance policy is stayed under section 362(a)(3)).

Codex argues that, since executory contracts do not automatically vest in the bankrupt estate, but must be assumed by the executor, they are not automatically stayed. Codex cites *Collier on Bankruptcy,* which states "[p]resumably the automatic stay of section 362, which prohibits a creditor from terminating or accelerating after the petition, will not apply to these special kinds of contracts or leases." 2 *Collier on Bankruptcy* ¶ 365.06[1] (15th ed. 1987). Codex also cites several cases that follow the *Collier* analysis. *See In re Tonry,* 724 F.2d 467, 469 (5th Cir.1984); *In re Bofill,* 25 B.R. 550, 552 (Bankr.S.D.N.Y.1982); *In re New Town Mall,* 17 B.R. 326, 329 (Bankr.D.S.D.1982).

We find this argument unavailing. The version of 11 U.S.C. § 541 in effect at the time [2] plainly stated that a contract comes within the definition of "property of the estate" despite non-assignability or the existence of a bankruptcy default clause.

[A]n interest of the debtor becomes property of the estate ... notwithstanding any provision-

(A) that restricts or conditions transfer of such interest by the debtor; or

In re Computer Communications, Inc., 824 F.2d 725 (1987)

17 Collier Bankr.Cas.2d 556, 16 Bankr.Ct.Dec. 615, Bankr. L. Rep. P 71,933

(B) that is conditioned on the insolvency or financial condition of the debtor, or the commencement of a case under this title, or the appointment of or the taking possession by a trustee ... and that affects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

11 U.S.C. § 541(c)(1). Codex argues that even if § 541(c)(1) overrides the contract, it does not override Massachusettes law. We read the introductory phrase, "notwithstanding any provision," broadly to include not only contract provisions but also any provision of non-bankruptcy law. *See Matter of Neavear, 674 F.2d 1201, 1205-06 & n. 12 (7th Cir.1982)* (social security benefits are "property of the estate" under section 541(c)(1)(A) even though they are expressly "not ... transferable or assignable" under 42 U.S.C. § 207); *In re Dawson, 13 B.R. 107, 108-09 (M.D.Ala.1981)* (disability benefits made non-assignable by state law were "property of the estate" under § 541(c)). We note that Congress recently clarified the statute and it now states "notwithstanding any provision in an agreement, transfer instrument, *or applicable nonbankruptcy law....*" 11 U.S.C. § 541(c)(1) (Supp. II 1984) (emphasis added). Neither are we persuaded by the interpretation in *Collier on Bankruptcy*. We agree with the analysis of the bankruptcy court in *In re Wegner Farms Co., 49 B.R. 440 (Bankr.N.D.Iowa 1985)*, which held that even if, under section 365(e), a bonding agreement cannot be assumed by the debtor, it must be terminated pursuant to the terms of the automatic stay provision.

The only authority Merchants cites in support of this proposition is 2 *Collier on Bankruptcy* ¶ 365.05[1] (15th ed. 1985) where it is stated: "Presumably the automatic stay of section 362, which prohibits a creditor from terminating or accelerating after the petition, will not apply to these special kinds of contracts or leases." The Court concludes this exposition on the interplay between section 362 and 365 is incorrect for several reasons.

*In re Wegner Farms Co., 49 B.R. at 444.* The reasons stated by the *Wegner* court include; first, the fact that no executory contract exception is listed among the stay exemptions in section 362(b); second, the court noted that elsewhere in the code, Congress expressly overrode the stay provision but did not do so in § 365; and finally, the court concluded that "not exempting **\*731** this brand of executory contracts

is consistent with the purposes and policies underlying the staying of actions against a debtor postpetition." *Id.* at 445.

The legislative history emphasizes that the stay is intended to be broad in scope. Congress designed it to protect debtors and creditors from piecemeal dismemberment of the debtor's estate. The automatic stay statute itself provides a summary procedure for obtaining relief from the stay. All parties benefit from the fair and orderly process contemplated by the automatic stay and judicial relief procedure. Judicial toleration of an alternative procedure of self-help and post hoc justification would defeat the purpose of the automatic stay. Accordingly, we affirm the bankruptcy and district courts on the ground that Codex violated the automatic stay by unilaterally terminating the contract and do not reach the question of whether this contract is non-assignable under Massachusetts law.

### D. *Damages*

[4] We may affirm the courts below on any ground supported by the record. *Smith v. Block, 784 F.2d 993, 996 n. 4 (9th Cir.1986)*; *United States v. County of Humboldt, 628 F.2d 549, 551 (9th Cir.1980)*. The automatic stay of § 362 barred Codex from unilaterally terminating the Agreement. Even if Codex had some reason for terminating the Agreement as a matter of contract law, it violated bankruptcy law by failing to obtain relief from the automatic stay. A party who violates the automatic stay may be held in contempt and the court may award damages to compensate the other party for actual loss suffered. *See Matter of Walters, 41 B.R. 511, 516-17 (W.D.Mo.1984)*; *Matter of DePoy, 29 B.R. 471, 480 (N.D.Ind.1983)*; *In re Lowry, 25 B.R. 52, 56-57 (E.D.Mo.1982)*; *In re Miller, 22 B.R. 479, 482 (D.Md.1982)*; *In re Cusanno, 17 B.R. 879, 882 (E.D.Pa.1982)*; *Campbell v. Gerace, 13 B.R. 575, 577 (S.D.Ohio 1981)*; *but see Crowe & Assoc. v. Bricklayers and Masons Union Local No. 2, 20 B.R. 225, 229 (E.D.Mich.1982), aff'd on other grounds, 713 F.2d 211 (6th Cir.1983)*. We hold that awarding damages to CCI for Codex's violation of the automatic stay was within the discretion of the bankruptcy court. *Id.* [3]

Finally, Codex argues that the bankruptcy court erred in awarding damages because: 1) CCI failed to establish a right to lost profits as a lost volume seller, 2) CCI failed to assume the Agreement prior to trial, 3) CCI failed to prove its costs necessary for a determination of lost profits, and 4) CCI failed to establish its lost profits with reasonable certainty. Both courts below observed that most of these arguments are

Case 09-10138-MFW Doc 13460-5 Filed 05/02/14 Page 8 of 74

In re Computer Communications, Inc., 824 F.2d 725 (1987)

17 Collier Bankr.Cas.2d 556, 16 Bankr.Ct.Dec. 615, Bankr. L. Rep. P 71,933

actually attacks on the underlying judgment. The bankruptcy court concluded that CCI's manufacturing costs were 41% to 45% of the sales price of the Amended Agreement and awarded damages in the amount of approximately 41% of the minimum purchase amount required under the Agreement. Codex also challenges the amount of the damage award as excessive because: 1) the award does not reflect the fact that ¶ 4.6.1 permits Codex to limit purchases, 2) there is no guarantee that the reorganization would be successful, 3) CCI failed to mitigate its damages and 4) the damage award should have been discounted. We will affirm an award of damages unless it is clearly unsupported by the evidence or grossly excessive, monstrous, or shocking to the conscience. *Stinnett v. Damson Oil Corp.,* 813 F.2d 1394, 1398 (9th Cir.1987). We find the damage award reasonable.

### III

We affirm the judgment of the district court sustaining the decision of the bankruptcy court. Codex violated the automatic stay statute by terminating its contract unilaterally rather than applying for relief from the bankruptcy court. The bankruptcy **\*732** court properly awarded damages to CCI for its injury resulting from Codex's violation of bankruptcy law.

AFFIRMED.

### Parallel Citations

17 Collier Bankr.Cas.2d 556, 16 Bankr.Ct.Dec. 615, Bankr. L. Rep. P 71,933

Footnotes

1    The statute provides:

   In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.

   28 U.S.C. § 157(c)(1).

2    Congress amended § 541 in 1984.

3    In 1984, Congress amended the statute to provide:

   an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

   11 U.S.C. § 362(h) (Supp. II 1984). We do not rely on this section because it was not in effect when this action was filed.

End of Document                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 27

# Computershare Trust Company of Canada v. Crystallex International Corporation, 2009 71007 (ON SC)

2009-12-16

**COURT FILE NO.:** CV-08-00007890-00CL

**DATE:** 20091216

## ONTARIO

## SUPERIOR COURT OF JUSTICE

**Commercial List**

APLICATION UNDER s. 241 of the *Canada Business Corporations Act*,

R.S.C. 1985, c. C-44, as amended, and Rule 14.05(3) of the

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194



**B E T W E E N:**                                    )
                                                      )
COMPUTERSHARE TRUST COMPANY OF      )    *Robert W. Staley*, *Derek J. Bell* and *Gavin*
CANADA, in its capacity as Trustee for the            *Finlayson*, for the Applicant
Holders of 9.375% Senior Unsecured Notes of      )
Crystallex International Corporation due December
23, 2011                                          )

                                                      )

                                                      )

|  |  |  |
|---|---|---|
| Applicant | ) | |
| | ) | |
| | ) | |
| - and - | ) | |
| | ) | |
| | ) | |
| CRYSTALLEX INTERNATIONAL CORPORATION | ) | |
| | ) | |
| | ) | *Markus Koehnen* and *Amanda Klein*, for the Respondent |
| | )))) | |
| Respondent | | |
| | ) | |
| | ) | **HEARD:** December 3, 4 and 7, 2009 |

**NEWBOULD J.**

[1]        Crystallex International Corporation ("Crystallex") is a publicly traded company listed on the TSX and the AMEX. It has the right to exploit the Las Cristinas mine property in Venezuela under a mining operation agreement dated September 26, 2002 made with Corporacion Venezolana de Guayana ("CVG") a wholly owned Venezuelan government corporation (the "CVG Contract"). The CVG contract is for twenty years but contemplates two further ten-year extensions.

[2]        In December 2004 Crystallex raised $100 million[1] to be used in the development of the Las Cristinas project by selling units consisting of a senior unsecured $1,000 note and 65 common shares. The Notes mature on December 30, 2011.

[3]        At the time of the issuance of the Notes, the required mining permits had not yet been obtained. The prospectus for the Notes dated December 17, 2004 stated that Crystallex currently expected to receive the permit and approvals necessary to commence the development of the Las Cristinas project during the first quarter of 2005. That did not occur. On April 14, 2008 the application for the permit was formally denied. An appeal

process was taken, unsuccessfully. In the fall of 2008 and in January 2009, statements were made by the government of Venezuela, including President Chavez, that Venezuela was "taking back" the mine at Las Cristinas.

[4]    The trustee for the Noteholders brings this application seeking relief as the result of the inability of Crystallex to develop the Las Cristinas project as a result of the necessary permits not being issued. The Noteholders make three claims. First, they claim that there has been a "Project Change of Control" as defined in the indentures under which the Notes were issued and as such Crystallex is required to purchase the Notes at a price of 102% of par value plus accrued interest. Second, they claim that Crystallex is in default of the Note indentures by failing to use the proceeds of the Notes solely to fund the development of the mine, rendering the Notes immediately due and payable. Third, they claim that Crystallex is acting in an oppressive manner in the way in which it has reacted to the failure of the necessary permit being issued. They request an order under section 241 of the *Canada Business Corporations Act*, appointing a receiver over all of the assets of Crystallex, or in the alternative, restraining Crystallex from dissipating any further assets in connection with the Las Cristinas project and requiring Crystallex to commence arbitration against Venezuela.

[5]    In my view, for the reasons that follow, the application of the Noteholders should be dismissed.

## Las Cristinas Project

[6]    In early 1991, CVG called for bids to develop the Las Cristinas deposits. Placer Dome Inc. was the winning bidder and entered into a joint venture agreement with CVG through a joint venture company to explore and develop the gold mineral in the deposits. No gold was produced by the joint venture. In July 2001, Placer assigned its interest in the joint venture to Vannessa Ventures Ltd. In November 2001, CVG terminated the joint venture contract for cause and took possession of the Las Cristinas deposits and related assets. In March 2002, the Ministry of Energy and Mines declared the joint venture contract terminated and it repossessed the assets on behalf of Venezuela. In April 2002, by presidential decree, the Venezuelan government reserved for itself through the Ministry of Energy and Mines the direct exploration and exploitation rights of the gold mineral in the Las Cristinas deposits and granted to the Ministry the right to contract with CVG for the work required to carry out such exploration and exploitation.

[7]    In May 2002, the Ministry of Energy and Mines and CVG entered into an agreement pursuant to which the Ministry granted to CVG the rights to explore and exploit the Las Cristinas deposits and enter into operation agreements with third parties for such purposes.

[8]    On September 17, 2002, Crystallex and CVG executed the CVG contract under which CVG authorized Crystallex :

. . . to make all the investments and works necessary to reactivate and execute in its totality the Mining Project of CRISTINA 4, CRISTINA 5, CRISTINA 6 and CRISTINA 7, design, construct the plant, operate it, process the gold material for its subsequent commercialization and sale . . . .

[9]    The CVG contract also requires Crystallex to fulfill an employment plan and program for the social development of the region, including the contracting of employees, assuming the maintenance, supply and other expenses for the local medical hospital to serve both the personnel for the project as well as the community, constructing at least thirty homes in the local community, installing a drinking water treatment plant, constructing sewage systems, improving and paving roads in the vicinity and  maintaining scholarships and internships for

students.

[10]      Under the CVG contract, it is the responsibility of CVG, and not Crystallex, to obtain the required environmental and mining permits. This was understandable as the president of CVG was the Minister of Mines and Energy.

[11]      Under Venezuelan mining law, all mineral deposits belong to Venezuela and are assets of public domain. Crystallex does not have any property rights in the lands or mineral deposits. Crystallex's interests are derived from the CVG contract, a mine operation agreement.

## Issuance of Notes

[12]      Under the offering, which closed in December 2004, 100,000 units of Crystallex were sold at a price of $1,000 per unit. Each unit comprised $1,000 principal amount of senior unsecured notes and 65 common shares of Crystallex. The Notes mature on December 30, 2011 and bear interest at the rate of 9.35%. All interest payments have been made to date.

[13]      The Notes are direct unsecured obligations of Crystallex ranking senior to debt which is convertible into common shares of the corporation, junior to project indebtedness incurred with respect to the Las Cristinas project and equally with all unsecured and unsubordinated indebtedness of Crystallex. At the time of the offering, Crystallex had cash of approximately US $65 million and bank indebtedness of approximately $6.5 million.

[14]      The net proceeds of the offering after expenses and underwriting fees were approximately $95.5 million, and according to the prospectus were to fund a portion of the costs of developing the Las Cristinas project, with $32.5 million being used for construction contracts, $30 million being used for equipment and the balance for additional purchase orders and service contracts awarded under an EPCM contract.

[15]      The net proceeds of the offering were deposited and held with the trustee for the Noteholders at the time, CIBC Mellon Trust Company, under an escrow agreement. The escrowed funds were to be deposited into two pools, one pool equal to the interest payable on the first three interest payments due on the Notes and the other pool equal to the balance of the escrow funds. With respect to the latter pool, the escrow agent was to release funds from that pool to pay approved capital budget expenditures that were specifically contemplated by the feasibility studies or the project control budget. There is no issue but that the funds were properly disbursed by the escrow agent, including the purchase of equipment for the project.

[16]      Other than Mr. Hope, the affiant of affidavits sworn on behalf of the applicants, the Noteholders have not disclosed when they purchased their notes. Mr. Hope is the manager and controlling mind of Outrider Management, LLC, an American hedge fund. The Outrider Fund began buying its notes in October 2005, after President Chavez had announced that he was taking Las Cristinas from Crystallex. The Outrider Fund is a debt fund that specializes in emerging markets.

[17]      In the summer of 2008 the group of Noteholders represented by the solicitors for the applicant took steps to replace CIBC Mellon Trust Company with Computershare Trust Company of Canada, which commenced this application in December 2008.

## Change of Control Issue

### (i) Trust provisions

[18]        There are two trust indentures, being a Trust Indenture and a First Supplemental Trust Indenture, both made as of December 23, 2004. They are to be read together. The First Supplemental Trust Indenture contains a change of control provision in section 4.2, which requires Crystallex to purchase the Notes at 102% of par upon the occurrence of a Project Change of Control if requested to do so by a Noteholder.   A Project Change of Control is defined as:

**Project Change of Control** means the occurrence of any transaction as a result of which the Corporation ceases to beneficially own, directly or indirectly, at least a majority interest in the Las Cristinas Project assets.

[19]        The Trust Indenture defines the Las Cristinas Project as follows:

**Las Cristinas Project** means the acquisition, exploration, development and exploitation of the mineral deposits located in the areas of the gold mineral concession known as Cristinas 4, 5, 6, and 7 in the Municipality of Sifontes, Bolivar State, Venezuela

[20]        The "Las Cristinas Project assets" is not a defined term. It is agreed that the "assets" include the CVG Contract. As Mr. Staley put it in argument, the "asset" must be the ability to acquire, explore, develop and exploit the mineral deposits, which language is taken from the definition of Las Cristinas Project, and the ability of Crystallex to do so is derived from the CVG Contract.

**(ii)  Contention of Noteholders**

[21]        The Noteholders contend that as a result of the refusal of the applicable Ministry to issue a required environmental permit and events that followed, there has been a "transaction" as a result of which there has been a Project Change of Control requiring their Notes to be acquired under section 4.2. The facts they rely on are as follows:

> (a)        In August 2004, Crystallex initiated the process for obtaining the required mining permit by submitting an environmental impact study to the CVG and the Ministry of the Environment and Natural Resources.
>
> (b)        On March 14, 2008, the Ministry of the Environment and Natural Resources advised CVG that it was denying a request for the necessary permit.
>
> (c)        On May 12, 2008, Crystallex filed a legal rebuttal entitled a Motion for Reconsideration to the denial of the permit, and stated publicly that it anticipated that CVG would be filing their rebuttal in due course. CVG did not do so.
>
> (d)        On May 30, 2008 Crystallex received notice from the Ministry of the Environment and Natural Resources that the legal rebuttal filed by Crystallex had been denied.
>
> (e)        On June 16, 2008 Crystallex filed an appeal with the Minister of the Environment and Natural Resources. The Minister had 90 days in which to issue a decision on the appeal. According to the evidence, the failure of the Minister to

decide on the appeal within the 90 day period is treated as a deemed denial.

(f)      On September 19, 2008, President Chavez was quoted by Reuters "We are taking back big mines, and one of them I one of the biggest in the world. And do you know what it is? It's gold, its gold." This was taken by Reuters to be a reference to Las Cristinas.

(g)      On November 11, 2008 the Minister of Industry and Mines, also the president of CVG, was quoted in a government press release on matters, including "He also confirmed that, by 2009, the State will take back, operate and manage the Las Cristinas mine, previously owned by Cristalex., an international company.." It stated that Las Cristinas has one of the largest gold deposits in the world, with 31 million ounces of gold worth $35 billion.

(h)      On November 28, 2008, Crystallex filed a notice of investment dispute with the Government of Venezuela under the Canada-Venezuelan Bilateral Investment Treaty. It stated that the measures taken by the Minister have caused Crystallex to suffer significant economic loss and damage and constituted a unilateral and fundamental violation of the legal framework applicable to Crystallex's investment in the Las Cristinas project as well as a breach of the treaty.

(i)      On January 13, 2009, President Chavez, in a speech delivered to the National Assembly of Venezuela, said:

> In addition, the Government of Venezuela will proceed this year with the operation and control of the Las Cristinas gold deposit, one of Latin America's biggest gold deposits, located in the southeast corner of Venezuela, in Bolivar State at Kilometer 88.   Las Cristinas is estimated to contain approximately 35.2 million ounces of gold, which translates into 1,094 metric tons of estimated reserves, 24.5 million ounces (762 tons) of which are classified as proven reserves.

> The Venezuelan Government will then control 30 billion dollars, which is the current estimated value of the deposit.   The project will be divided into five concessions: Cristina IV, Cristina V, Cristina VI, Cristina VII, and Brisas del Cuyuni.  This project, under socialist control, will promote economic growth and national development.

> In 2008, in the mining sector, together with Russia, we created VenRus, a Russian and Venezuelan company, which is a joint venture to operate the Las Cristinas deposits.

### (iii)  Was there a change of control?

[22]      A trust indenture is a contract and normal principles of contract interpretation apply to its construction.  In interpreting a contract, the goal is to determine the intent of the parties by reference to the words that they chose.  The plain meaning of the words is to be given effect, read harmoniously and in the context of other provisions of the contract, and in light of the factual matrix as a whole.  Interpretations that give effect to all the terms of a contract should be preferred over interpretations that render one or more terms superfluous or ineffective.  A commercial contract should be interpreted in a manner that accords with sound commercial

principles, good business sense and that does not result in absurdities.

[23]        A trust indenture such as this is not a contract of adhesion and the doctrine of *contra proferentum* has no application to it. In *Casurina Partnership Ltd. v. Rio Algom Ltd.* 2004 30309 (ON CA), (2004), 40 B.L.R. (3d) 112 (Ont. C.A.) at paras. 35-36, leave to appeal to the S.C.C. denied, [2004] S.C.C.A. No. 105, Feldman J.A. stated the following, which is apt to this case:

The respondents point out that there is no basis to suggest that the trust indenture is a contract of adhesion or that its terms were not negotiated as part of the underwriting process at the time the debentures were issued. The appellants, as purchasers of the debentures in the market, purchased the debentures subject to the terms of the trust indenture. However, they had the opportunity to consider their prospective purchase in the context of the terms governing the debentures and on that basis must have made a decision whether to invest or not. That is not a contract of adhesion.

[24]        The first issue is whether there was a transaction within the meaning of the definition of change of control. The definition again for ease of reference is:

**Project Change of Control** means the occurrence of any transaction as a result of which the Corporation ceases to beneficially own, directly or indirectly, at least a majority interest in the Las Cristinas Project assets.

[25]        The Noteholders contend that the denial of the necessary permit constituted a transaction. They submitted a definition of transaction from the Oxford English Dictionary as:

"2. The action of passing or making over a thing from one person etc. to another; transference".

[26]        They contend that the denial of a permit was a transference to Venezuela of the right of Crystallex under the CVG Contract to develop and exploit the Las Cristinas project and that it was not necessary that there be more than the Government, i.e. more than one person to the transaction.

[27]        That definition, however, as pointed out by Mr. Koehnen, is stated in Oxford to be obsolete and one that was used only in the 17th century. The two current definitions are;

3. The action of transacting or fact of being transacted; the carrying on or completion of business etc. 4. That which is or has been transacted, esp. a piece of business; a deal.

[28]        In my view, the ordinary meaning of the word transaction requires more than one party to the action in question, and the denial of a permit by the Ministry of the Environment and Natural Resources and the failure of the Minister to respond to the appeal cannot amount to a transaction within the meaning of the trust indenture.

[29]        The Noteholders also contend that the statements of various Government officials, including President Chavez, that the mine will be taken from Crystallex amount to an expropriation of Crystallex's interests and therefore constitute a transaction whereby it has lost its interest in the CVG Contract. Assuming an expropriation could amount to a transaction, a threat of expropriation could not in my view amount to an expropriation.

[30]        Even if there were a transaction, the issue would then be whether as a result Crystallex has ceased "to beneficially own, directly or indirectly, at least a majority interest in the Las Cristinas Project assets". The Noteholders contend this to be the case. They rely on a definition of "beneficial interest" from Black's Law

Dictionary as:

Profit, benefit, or advantage resulting from a contract, or the ownership of an estate as distinct from the legal ownership or control.

[31]       The Noteholders say that Crystallex has lost the benefit or advantage of the CVG Contract to extract gold from the mine and thus has lost its "beneficial interest" in the Las Cristinas project. They read the definition of Project Change of Control to mean:

**Project Change of Control** means the occurrence of any transaction as a result of which the Corporation ceases to … own, directly or indirectly, at least a majority interest in the Las Cristinas Project assets <u>for its benefit</u>.

or

**Project Change of Control** means the occurrence of any transaction as a result of which the Corporation ceases to … own, directly or indirectly, <u>for its benefit</u> at least a majority interest in the Las Cristinas Project assets.

rather than the definition in the trust indenture:

**Project Change of Control** means the occurrence of any transaction as a result of which the Corporation ceases to beneficially own, directly or indirectly, at least a majority interest in the Las Cristinas Project assets.

[32]       In my view, the Noteholders interpretation of the Project Change of Control definition in the trust indenture is incorrect. The Project Change of Control provision does not refer to a loss of a "beneficial interest" in the asset but rather refers to an ownership interest in the assets. The word "beneficially" is an adverb to distinguish the concept of "beneficially own" from the concept of "legally own". Its purpose is to make clear that there would not be a Project Change of Control if the transaction in question resulted in a change of the legal title to the asset in question, i.e. the CVG contractual rights, but not the beneficial or equitable title to that asset.

[33]       The CVG Contract is in full force and effect. This is not really disputed. CVG confirmed in a letter to Crystallex dated March 2, 2009 that the CVG Contract "is fully valid" "and has not been revoked or replaced."

[34]       Crystallex refers to evidence that during the negotiation of the Trust Indenture, Stikeman Elliott, acting for the underwriters whose interests would include trying to negotiate terms favourable to Noteholders that would make the Notes more marketable, tried to include a term that would have required Crystallex to redeem the bonds if Crystallex did not receive its environmental permit by March 31, 2005. Crystallex rejected this.

[35]       Crystallex contends that this fact may be taken into account in interpreting the change of control provision in the trust indenture. In my view, it may not. Unless there is ambiguity in a contract, extrinsic evidence of prior negotiations is not admissible. See *Craighampton Investments Ltd. v. Ayerswood Developments Ltd.* (1984), 4 O.A.C. 124 and *Toronto Dominion Bank v. Leigh Instruments Ltd.* 1998 14806 (ON SC), (1998), 40 B.L.R. (2d) 1 at para 405 ( per Winkler J.); aff'd 50 B.L.R. (2d) 64 (Ont. C.A.). In my view, there is no ambiguity. The contract can be construed by its terms. If there were an ambiguity, the evidence would be admissible and it would tend to an interpretation that the change of control provision does not include the refusal of the permit.

[36]      The Noteholders rely on the cases of *R. v. Tener*, 1985 76 (SCC), [1985] 1 S.C.R. 533 and *Manitoba Fisheries Ltd. v. The Queen*, 1978 22 (SCC), [1979] 1 S.C.R. 101 and submit they stand for the proposition that denial of an environmental permit can constitute expropriation.

[37]      Even if Canadian law were applicable, *Tener* and *Manitoba Fisheries* do not assist the Noteholders. In *Tener*, the claimants owned mineral rights to property but were denied a permit to mine them. It was held that under the applicable legislation, they were entitled to compensation even though they still had ownership rights to the minerals. Estey J stated:

The denial of access to these lands occurred under the Park Act and amounts to a recovery by the Crown of a part of the right granted to the respondents in 1937. This acquisition by the Crown constitutes a taking from which compensation must flow. Such a conclusion is consistent with this Court's judgment in *Manitoba Fisheries Ltd. v. The Queen*, 1978 22 (SCC), [1979] 1 S.C.R. 101. In that case the Province had established a Crown corporation with a commercial monopoly in the export of fish from Manitoba and other participating provinces. The establishment of the Crown corporation had the effect of putting Manitoba Fisheries out of business. This Court held that the Province's actions deprived Manitoba Fisheries of its goodwill as a going concern and that the goodwill so taken by the Crown entitled the company to compensation despite the fact that they retained their physical assets, as those assets had been rendered virtually useless. Similarly in this case, the respondents are left with the minerals. (underlining added)

[38]      Therefore, those cases if applied to the situation in which Crystallex finds itself would mean that even if the ability of Crystallex to exploit the mineral assets in Venezuela can be said to have been expropriated, it would entitle Crystallex to compensation even although its beneficial ownership in the assets had not been lost. The principle of those cases does not mean that Crystallex would have lost its beneficial ownership of its rights.

[39]      The notice of investment dispute filed by Crystallex with the Government of Venezuela was under the Canada-Venezuelan Bilateral Investment Treaty. That treaty, along with other principles of international law, would govern any arbitration that Crystallex commenced. The treaty requires fair and equitable treatment of investors by Venezuela and provides for no expropriation or measures having an effect equivalent to expropriation except under due process of law and with prompt and adequate compensation.

**(iv)  Conclusion on change of control issue**

[40]      Crystallex continues to beneficially own its interest in the Las Cristinas assets and thus there has been no change of control within the meaning of the trust indenture requiring Crystallex to acquire the Notes under section 4.2 of the First Supplemental Trust Indenture.

**Section 5.1 and use of the proceeds of the Notes**

**(i)  Indenture terms**

43.  Section 5.1 of the First Supplemental Trust Indenture provides that Crystallex is to use the proceeds of the Notes to fund the development of the Las Cristinas project. It provides:

**5.1  Use of Proceeds**

The Corporation shall use the net proceeds of the Series 1 Notes to fund the development of the Las Cristinas Project, which funding may include the provision of cash collateral security for Branch Indebtedness.

[41]      Section 7.1(d) of the Trust Indenture makes it an event of default if there has been a failure by Crystallex to perform any covenant if such failure continues for 60 days after written notice thereof has been given to Crystallex by the Trustee of the Noteholders or Noteholders holding at least 25% of the aggregate principal amount of the Notes outstanding. Section 7.2 provides that if there has been an event of default, the Trustee shall within 10 days give notice to the Noteholders. Section 7.3 provides that if an event of default occurs, the Trustee or Noteholders holding at least 25% of the aggregate principal amount of the Notes outstanding may declare the principal of the Notes and any unpaid interest to be due and payable immediately.

**(ii)   Sale of equipment**

[42]      Crystallex used $30 million of the proceeds of the Notes to purchase mining equipment for the project.  In October 2009, Crystallex sold some mining equipment described as generic, non-project specific equipment with a book value of $22.1 million for $11.3 million.  The Noteholders take the position that the proceeds of the sale have not been used in the project and thus Crystallex is in breach of the covenant in section 5.1.

[43]      The uncontradicted evidence of Mr. Fung, the Chairman and CEO of Crystallex, is that the equipment sold is generic in nature and can easily be replaced and it will not impede development of the Las Cristinas project if the permit is granted.

[44]      The sale of equipment took place in the following circumstances. The Crystallex financial statements for the six months ended June 30, 2009 stated that the company had positive working capital of $5.439 million including cash and cash equivalents of $13.381 million and that management estimated the funds would be sufficient to meet the company's obligations and budgeted expenditures into the fourth quarter of 2009, but might not be sufficient to cover its obligations falling due in January 2010. It stated that the company had a number of financing options available and it listed some, including selling equity, selling equipment and negotiating with the Noteholders to decrease its obligations to them, particularly interest costs.

[45]      On August 21, 2009, counsel for the Noteholders wrote to counsel for Crystallex advising that the Noteholders would treat any sale of equipment that did not enure to the benefit of the Noteholders as being an act of oppression and/or breach of the Indentures.[2]

[46]      On September 21, 2009, Crystallex advised the Noteholders that the Company intended to sell certain equipment.   The Noteholders threatened to bring an injunction to stop the planned sale, on the basis that it would constitute a default under the Indenture. The parties settled the matter and a court order of Campbell J. dated October 7, 2009 was obtained that provided that the proceeds of the sale would be distributed as follows:

    (a)    The first $4.3 million was to be paid to Crystallex for its own account and purposes.

    (b)    The next $4.6875 million was to be paid to counsel for the Noteholders to be held in trust and released to the Noteholders on the earlier of a court order ordering $102 million to be paid to the Noteholders or January, 2010 when the next interest payment is due to the Noteholders.

(c)     The balance is to be held by Crystallex in escrow and not to be used by Crystallex or any person until December 14, 2009.

[47]     The equipment was sold under three contracts dated either October 2 or 6, 2009. When they closed is not in the record. Of the equipment sold, $8.6 million came from equipment originally purchased from funds advanced by the Noteholders and $3.2 came from other funds. The Noteholders say the expenditure of the first two amounts referred to in the order of Campbell J. will breach the trust indenture. To be accurate, these amounts should be reduced to reflect the percentage of assets sold that were acquired in the first place with funds from the Noteholders (8.6/11.8 or 72.88%), resulting in $ 3.13 million under para (a) and $3.42 million under para (b) that is complained of by the Noteholders.

**(iii)   Was there a breach of section 5.1?**

[48]     The Noteholders contend that section 5.1 requires the proceeds of the Notes to be used to fund the "development" of the project, and that while the funds advanced by them went into the project, i.e. were used to fund the development, it would be a breach of the covenant if equipment purchased with money from the issuance of the Notes were later sold and the proceeds were not used for development of the project, which they assert is the case. They further contend that paying them back interest on their Notes from the proceeds of sale of the equipment bought with their funds cannot be considered to be using the funds for the development of the project.

[49]     Any term relied on by the Noteholders preventing Crystallex from selling the equipment and using the proceeds from the sale must be express or implied. It is not express. What is express is that the proceeds of the Notes were to be released from escrow on certain terms, which terms were followed. The trust indentures are silent as to what use can be made of funds if any equipment is later sold.

[50]     Can such a term be implied? A term may be implied in a contract to give business efficacy to the contract or otherwise meet the "officious bystander" test. See *Canadian Pacific Hotels Ltd. v. Bank of Montreal*, 1987 55 (SCC), [1987] 1 S.C.R. 711 at para. 52 and *Charles P. Rowen & Associates Inc. v. Ciba-Geigy Canada Ltd*. 1994 1585 (ON CA), (1994), 19 O.R. (3d) 205 (C.A.) in which Galligan J.A. stated:

There are a number of tests which have been adopted in the cases for determining whether a term ought to be implied into a contractual relationship. One of them is found in the judgment of Lerner J. in *Woeller v. Orfus* reflex, (1979), 27 O.R. (2d) 298 at pp. 307-08, 106 D.L.R. (3d) 115 (H.C.J.):

Scrutton, L.J. in *Reigate v. Union Manufacturing Co. (Ramsbottom) Ltd*. et al., [1918] 1 K.B. 592 (C.A.) at p. 605, stated:

The first thing is to see what the parties have expressed in the contract; and then an implied term is not to be added because the Court thinks it would have been reasonable to have inserted it in the contract. A term can only be implied if it is necessary in the business sense to give efficacy to the contract; that is, if it is such a term that it can confidently be said that if at the time the contract was being negotiated some one had said to the parties, "What will happen in such a case", they would both have replied, "Of course, so and so will happen; we did not trouble to say that, it is too clear." Unless the Court comes to some such conclusion as that, it ought not to imply a term which the parties themselves have not expressed.

In *Alpha Trading Ltd. v. Dunnshaw-Patten Ltd.*, supra, Brandon L.J. at p. 490 adopted what has been called the officious bystander test:

Various tests have been propounded from time to time with regard to the implication of terms in a contract. The officious bystander is one of the tests which have been used. It seems to me that the officious bystander, looking over the shoulders of Mr. Brodie and Mr. Marchant Lane, as they made the contract which they did, and asking himself whether the defendants could make a contract with Muellers and then break it without incurring any liability to the plaintiffs, would have answered, "No, that cannot be what is intended. It must be intended that, if they make the contract, after having had the buyer introduced to them, they will perform it and enable the agent to earn his remuneration."

[51]      I have more than a considerable doubt that in the circumstances of what occurred in this case, it can be implied that the trust indenture prohibits the sale of equipment and the use that can be made of the money. It could perhaps be argued that a term should be implied that in circumstances in which the project were still alive in the sense that a permit had been granted that Crystallex could not sell a portion of the equipment purchased with money from the Noteholders that would render Crystallex unable to perform its obligations under the CVG Contract. I would not, however, imply a term and find that it was intended in the circumstances in which Crystallex now finds itself that approximately 10% of the equipment purchased with the funds from the proceeds of the Notes, equipment that is generic and easily replaceable, could not be sold and the proceeds used for general corporate purposes for the Las Cristinas project, which is the only business of Crystallex. It would be difficult to say that such a term was necessary to give business efficacy to the contract, or that the parties would say "Of course we intended that; we did not trouble ourselves to state that in the trust indenture; it is too clear".

[52]      I am not prepared to imply a term in the trust indentures that would prevent Crystallex from selling the equipment that it did, or using the proceeds as provided for in the consent order of October 7, 2009. That is sufficient to dispose of the claim of a breach of section 5.1.

[53]      In any event, on my view of the evidence, the Noteholders have not established that any of the money going to Crystallex under para. (a) of the order of Campbell J. for its own account and purposes has not, or will not, be spent on the development of the Las Cristinas project in accordance with the trust indentures.

[54]      The Noteholders rely on a very narrow interpretation of the word "development" in section 5.1 which requires Crystallex to use the funds raised to "fund the development" of the Las Cristinas project. They assert in their factum that "development", in connection with mining, means "to uncover the body or area which is to be the subject matter of the extraction process". It is "the preparation of the deposit or mining site for actual mining." They contend that expenses relating to management, supervisory and administrative capacities cannot be described as "development" expenditures, particularly when a company is not actually undertaking any actual development. They rely for this proposition on *International Nickel Co. of Canada v. Canada (Minister of National Revenue)*, [1971] F.C. 213 (T.D.) and *Johnson's Asbestos Corp. v. M.N.R.*, [1966] Ex.C.R. 212.

[55]      These cases are of no assistance to the Noteholders. They are tax cases that dealt with what expenditures could be deducted for income tax purposes as "development" expenses. The issue in those cases was whether expenses in building a townsite for miners could be said to be "development expenses incurred in searching for minerals in Canada" within the meaning of the *Income Tax Act*. These cases have no application to a consideration of what was intended by the trust indentures governing the rights of the Noteholders.

[56]      The Las Cristinas Project is defined in the trust indentures to mean the acquisition, exploration,

development and exploitation of the mineral deposits located in the areas of the gold mineral concession known as Cristinas 4, 5, 6, and 7. Crystallex's right to do that is pursuant to the CVG Contract which requires it to do many things, including making all the investments and works necessary to reactivate and execute in its totality the mining project, design, construct the plant, operate it and process the gold material for its subsequent commercialization and sale. The CVG contract also requires Crystallex to fulfill an employment plan and program for the social development of the region, including the contracting of employees, assuming the maintenance, supply and other expenses for the local medical hospital to serve both the personnel for the project as well as the community, constructing at least thirty homes in the local community, installing a drinking water treatment plant, constructing sewage systems, improving and paving roads in the vicinity and  maintaining scholarships and internships for students.

[57]    Section 6.1 (d) of the Trust Indenture contains a covenant of Crystallex to "carry on and conduct its …business in a proper…manner and in accordance with good business practice and diligently maintain, use and operate its … properties so as to preserve and protect the earnings, incomes ... and profits thereof". Section 6.1 (e) contains a covenant that Crystallex shall "duly observe and conform to all … covenants, terms and conditions upon or under which any … of its property or rights are held". These covenants are broad enough to require Crystallex to comply with the terms of the CVG Contract. Any other interpretation would not give the Noteholders the protection of a covenant of Crystallex to properly carry out the CVG Contract. The obligation of Crystallex in section 5.1 to fund the development of the Las Cristinas project must be read taking these provisions into account. To suggest that the money raised by the Notes could only be used to uncover and mine the minerals ignores commercial reality and the terms of the CVG Contract and trust indentures.

[58]    The Noteholders say that development has ceased as a result of the denial of the permit. They point to a statement in the Crystallex 2008 annual report that says "If and when the Company is in a position to commence development activities at Las Cristinas, it will determine its overall funding requirements to cover the period through to commercial production". This statement does not literally mean that there has been no production, and the next sentence expressly states that the funding requirement will include the balance of capital required to complete the development. The Noteholders contend that the statement, however, makes clear there is no development currently taking place. Therefore they contend that the money from the sale of equipment bought with their funds cannot possibly be used in the development of the project.

[59]    This statement cannot mean that no funds are being spent pursuant to the CVG contract. The evidence is quite to the contrary. In the Management Discussion and Analysis (MD&A) dated May 21, 2009 that accompanied the 2008 annual report, it was reported that cash used for capital expenditures for the Las Cristinas project was $28.1 million in 2008 and $26.9 million in 2007, and that the majority of the expenditures in 2008 represented ongoing costs for administering, securing and maintaining the Las Cristinas camp and for storage costs for long lead time equipment stored outside of Venezuela. That would mean that at least $14 million, and perhaps more, was used for those purposes. The statement also stated that the company had construction activities related to restarting work on the medical facility and sewage treatment plant as part of the company's obligation under the CVG Contract, and that the estimated cost to complete both projects was approximately $1.5 million.

[60]    The MD&A also stated "In order to remain in compliance with the MOC [the CVG Contract], Crystallex continues to employ personnel at site, maintain and operate the Las Cristinas camp and complete the two remaining social infrastructure projects, namely a sewage treatment plant and a medical facility. Employing personnel at site and operating the camp requires providing security, catering and housekeeping services, staff

transportation to and from the site, maintenance of temporary power facilities and the main access road, as well as various general and administrative functions".

[61]     In his affidavit of February 12, 2009 Mr. Fung described the kind of expenditure that Crystallex has been making under the CVG Contract. It includes hiring 149 people to provide security to the property covering approximately 9,600 acres, security that is required as the gold is alluvial and a target for illegal miners. They are currently managing 1,300 prosecutions relating to illegal mining.

[62]     It is quite apparent that Crystallex has or will spend far more under the CVG Contract than the $3.13 million that was paid to Crystallex under para. (a) of the order of Campbell J. from the proceeds of the sale of equipment paid for by funds from the issuance of the Notes. Counsel for the Noteholders filed in argument an analysis of Crystallex expenditures from the end of June, 2008 to the end of September, 2009 taken from the Crystallex quarterly statements. It discloses total cash expenditures of $56.6 million, including $14.06 million for interest to the Noteholders. Of the balance of $42.54 million, $25.14 million constituted capitalized Las Cristinas payments, and $17.40 million constituted non-capitalized payments. The expenditures of $28.1 million referred to in the 2008 MDA were also capitalized, and the fact that capitalized expenditures on the Las Cristinas project continue to be made in the order of magnitude disclosed by the statements, which is not surprising given the evidence of Mr. Fung as to the ongoing obligations, there is no basis to assume that the $3.13 million paid to Crystallex under para (a) of the order of Campbell J. has not or will not be used for the Las Cristinas project pursuant to the CVG Contract and required by the Trust Indenture provisions I have referred to, including sections 6.1 (d) and (e).

[63]     The Noteholders assert that on the cross-examination of Mr. Luis Felipe Cottin, the Executive President of Crystallex in Venezuela, Mr. Cottin admitted that the only remaining spending for the CVG Contract as at December 31, 2008 was $1.5 million dollars. That is not a fair reading of the evidence. Mr. Cottin was discussing only the social spending required, not the total spending required by the CVG Contract, and the translation of what he said in Spanish was that "we are close to 95 percent compliance of the social projects that we have contracted."

[64]     The Noteholders also complain that Crystallex refused to produce financial information as to what has been spent in 2007 and 2008 and, while Campbell J. refused an order that it be produced because of a "proportionality concern", he said that it is possible that an adverse inference could be drawn if it turns out the evidence is relevant. I do not think there is any basis for any adverse inference to be made that the $3.1 million was not or will not be spent on the project. What the Noteholders requested was a detailed statement of every expenditure made in respect of Las Cristinas and the CVG Contract in 2007 and 2008. What use a disclosure of every line by line expenditure over two years would be is not apparent. The financial disclosure made by Crystallex in its financial statements and other documents complies with the requirements of the TSX, the AMEX, the OSC, the SEC and corporate law. These financial statements disclose what has been spent and for what purposes. Mr. Hope, the affiant of affidavits sworn on behalf of the Noteholders, made clear in his cross-examination that the request for line by line expenditures is nothing more than a fishing expedition into irrelevant hypothetical matters.

[65]     With respect to the interest to be paid to the Noteholders from the sale of equipment as provided in the consent order of Campbell J. of October 7, 2009, the trust indentures did not contain any provisions preventing that and I would not imply a term in the trust indentures preventing that from occurring.

[66]     Apart from the first three interest payments that were to be made from the proceeds of the Notes, as

provided in the First Supplementary Trust Indenture, the trust indentures did not provide where the funds were to come from to make the remaining interest payments. The factual matrix at the time of the trust indentures, which may be looked at, was to some extent described in the prospectus. The prospectus disclosed that the earnings coverage ratio for Crystallex for the prior two years was less than one-to-one, which meant that Crystallex could not service its debt. The prospectus stated that in order to develop the Las Cristinas project, Crystallex would have to raise significant additional financing, which might include more debt or equity financing, and there was no assurance that it would be available on acceptable terms, or at all. Thus it was not known where the funds would come from to pay interest on the Notes after the first three payments.

[67]      It cannot be said that it was so clear that it need not have been stated that in the circumstances in which Crystallex now finds itself, Crystallex could not use the proceeds of the sale of equipment to make the next interest payment on the Notes. I would not imply such a term.

[68]      In any event, it hardly lies in the mouth of the Noteholders who negotiated for such payment to complain that the payment they negotiated amounts to a breach of the trust indenture entitling them to repayment now of all the entire indebtedness on the Notes. The Noteholders, having taken the position that they would view any sale of equipment that did not enure to their benefit as a breach of the trust indentures, can hardly now complain when the payment of interest is to their benefit. It is a classic *High Trees* situation.

[69]      The order of Campbell J. provides that the provision regarding the proceeds of the equipment sale does not constitute an admission by either party of any fact, and all parties reserve their rights with respect to all available arguments. Whatever that means, it does not mean that the fact of the payment agreed to be made to the Noteholders is without prejudice to the rights of the parties. It is being relied on by the Noteholders to assert their claim to a breach of section 5.1. If the provision in the order meant that the fact of the negotiated payment was without prejudice, the payment could not be relied on by the Noteholders.

[70]      The fact is that the Noteholders agreed to the payment of interest. They cannot now complain of it.

**(iv)   Conclusion on section 5.1 issue**

[71]      In my view, the Noteholders have not established a breach of section 5.1 of the First Supplemental Trust Indenture that would entitle them to an order that the Notes now be redeemed in full.

**Oppression Claim**

**(i)   Relevant principles**

[72]      The Noteholders allege that the actions of Crystallex in responding to the denial of the permit have amounted to oppression within the meaning of section 241(2) of the Canada Business Corporations Act R.S., 1985, c. C-44. It contends that Crystallex's behaviour has been oppressive, has been unfairly prejudicial to the Noteholders and has unfairly disregarded their interests.

[73]      The general principles relevant to an oppression action are well known and need not be repeated in detail here. They were spelled out most recently in *BCE Inc. v. 1976 Debentureholders*, 2008 SCC 69 , [2008] 3 S.C.R. 560. *BCE* stated the following principles that need be considered:

(a)      Oppression is an equitable remedy that gives a court broad, equitable jurisdiction to enforce not just what is legal but what is fair.  Courts should look at business realities, not merely narrow legalities.

(b)      The duty of the directors to act in the best interests of the corporation comprehends a duty to treat individual stakeholders affected by corporate actions equitably and fairly.  There are no absolute rules.  In each case, the question is whether, in all the circumstances, the directors acted in the best interests of the corporation.

(c)      One should look first to the concept of reasonable expectations.  If a breach of a reasonable expectation is established, one must go on to consider whether the conduct complained of amounts to "oppression", "unfair prejudice" or "unfair disregard" as set out in s. 241(2) of the *CBCA*.

(d)      Factors that emerge from the case law that are useful in determining whether a reasonable expectation exists include: general commercial practice; the nature of the corporation; the relationship between the parties; past practice; steps the claimant could have taken to protect itself; representations and agreements; and the fair resolution of conflicting interests between corporate stakeholders.

(e)      In determining whether a stakeholder expectation is reasonable, the court may consider whether the claimant could have taken steps to protect itself against the prejudice it claims to have suffered.

[74]      With respect to determining the reasonable expectations of persons who are debentureholders,  which is equally applicable to the Noteholders in this litigation who are also referred to by the parties as bondholders, the trial judge in *BCE*,  Silcoff J. stated:

There are fundamental conceptual differences between shareholders and debentureholders and their respective rights and obligations. Shareholder rights and obligations are generally governed by statute. …

Debentureholders, by contrast, generally purchase debentures that have been issued pursuant to trust indentures and prospectuses that define the rights and obligations of the issuers, the trustees and the debentureholders.

Debentureholders' reasonable expectations must be assessed on an objective basis and, absent other compelling reasons, must derive from the Trust Indentures themselves and the relevant prospectuses issued in connection with the debt offerings in question. They form the primary source of the Contesting Debentureholders' expectations and must be read carefully to determine whether their expectations were reasonable.

The reasonable expectations of debentureholders in general … are more limited than those of shareholders who have not had the opportunity of negotiating adequate protection themselves.

[75]      Silcoff J. noted that the debentureholders in *BCE* knew or ought to have known about the risk of which they were complaining  He said:

LBO risk was certainly a known phenomenon to the 1996 and 1997 Debentureholders. They should

have foreseen the risk involved in purchasing these debentures without adequate event risk covenants. If they were not prepared to manage that risk, they should have taken appropriate steps to protect themselves. They chose not to and must accept the consequences of their decisions.

[76]    The Supreme Court of Canada upheld this reasoning in BCE. It stated:

The trial judge emphasized that the arrangement preserved the contractual rights of the debentureholders as negotiated. He noted that it was open to the debentureholders to negotiate protections against increased debt load or the risks of changes in corporate structure, had they wished to do so.

We find no error in these conclusions. The arrangement does not fundamentally alter the debentureholders' rights. The investment and the return contracted for remain intact. Fluctuation in the trading value of debentures with alteration in debt load is a well-known commercial phenomenon. The debentureholders had not contracted against this contingency.

[77]    The business judgment rule is important in considering the actions of the board of Crystallex in this case. It was dealt with extensively in *Maple Leaf Foods Inc. v. Schneider Corp*. 1998 5121 (ON CA), (1998), 42 O.R. (3d) 177 by Weiler J.A. She stated:

The mandate of the directors is to manage the company according to their best judgment; that judgment must be an informed judgment; it must have a reasonable basis. If there are no reasonable grounds to support an assertion by the directors that they have acted in the best interests of the company, a court will be justified in finding that the directors acted for an improper purpose.

and

The law as it has evolved in Ontario … has the … requirements that the court must be satisfied that the directors have acted reasonably and fairly. The court looks to see that the directors made a reasonable decision not a perfect decision. Provided the decision taken is within a range of reasonableness, the court ought not to substitute its opinion for that of the board even though subsequent events may have cast doubt on the board's determination. As long as the directors have selected one of several reasonable alternatives, deference is accorded to the board's decision: Paramount, supra, at p. 45; Brant Investments, supra, at p. 320; *Thermadel Foundation v. Third Canadian General Investment Trust Ltd.* 1998 973 (ON CA), (1998), 38 O.R. (3d) 749 at p. 754 (C.A.). This formulation of deference to the decision of the Board is known as the "business judgment rule". The fact that alternative transactions were rejected by the directors is irrelevant unless it can be shown that a particular alternative was definitely available and clearly more beneficial to the company than the chosen transaction: Brant Investments, supra, at pp. 314-15.

### (ii)    Contention of the Noteholders and Crystallex

[78]    Mr. Bell said in oral argument that the oppression claim could be summarized in one sentence. He said:

Given the five year history of chasing the permit, after the permit was denied and the rebuttal to the permit was denied, and the appeal to the Minister failed, the bondholders had a reasonable expectation that

Crystallex would not spend $60 million of the "creditors recovery" pursuing a high risk and improbable outcome, when a tangible and real strategy existed to get Crystallex on a path to recovery of real value to the stakeholders.

[79]    What the Noteholders want is that Crystallex now sell off its assets and commence arbitration against the Government of Venezuela. Through their counsel, they have asserted this position for some time before the litigation commenced and afterwards. They argue that the steps Crystallex has taken are not reasonable and not protected by the business judgment rule.

[80]    Crystallex says that the directors have been faced with a difficult situation with risks involved in whatever they do and they have made reasonable decisions and taken reasonable steps with the help of appropriate legal advice. In doing so, they have considered the position of all stakeholders, including the Noteholders, and have made decisions in the best interests of Crystallex.

### (iii)   Analysis of reasonable Noteholders expectations

[81]    In my view, the Noteholders have not established a reasonable expectation that Crystallex would do anything in particular, including doing what the Noteholders contend should be done, i.e. stop spending money, sell assets and pursue arbitration.

[82]    The information available to the Noteholders who purchased their Notes from Crystallex at the time of their issuance consisted of company statements and the prospectus. At the annual general meeting on June 1, 2004, Crystallex said it expected to receive final permits in the fourth quarter of 2004 and be in commercial production in the first quarter of 2006. In a press release of November 9, 2004, one month before the issuance of the Notes, Crystallex said it was now at an advanced stage of the permitting phase and based on the current schedule, looked forward to the project commencing production in the first half of 2006. In the prospectus dated December 17, 2004 Crystallex said it currently expected to receive the permit and approvals necessary to commence development during the first quarter of 2005.

[83]    Nowhere in the prospectus was there any discussion as to the steps that Crystallex might take in the event of a delay or denial of the permit. There was, however, plenty of warning that delay or denial of a permit was a possibility. In the prospectus, prospective purchasers were warned of the history of the property, including the prior expropriation of the site from Placer Dome, the fact that permits were required for virtually every aspect of the project, that it was possible there could be changes to the laws and regulations or their interpretation that could have a significant impact on the operations of Crystallex. The prospectus warned that Crystallex's activities might be adversely affected by political instability which could result in delays or the inability to obtain necessary government permits or the deprivation of contractual rights, including expropriation without fair compensation. It warned that Crystallex could not assure whether the necessary permits would be obtainable on acceptable terms or in a timely manner or at all.

[84]    Thus there could be no expectation of persons who bought Notes at the time of their issuance in December 2004 as to what Crystallex would do if faced with a delay or denial of a necessary permit. Even when the permit was denied, Crystallex did not state what particular action it would take. In its press release of May 12, 2008 announcing the denial of the permit, it stated what the appeal procedures were and said that if at the end of these processes the answer was still negative, Crystallex "has a number of legal avenues to pursue both in and out of Venezuela in order to protect its shareholders' rights." No expectation could have been taken by the Noteholders that any particular course of action, such as stopping spending of money and commencing

arbitration, would be taken.

[85]      Other than Mr. Hope, the affiant of affidavits sworn on behalf of the applicants, the Noteholders have not disclosed when they purchased their notes. Mr. Hope is the manager and controlling mind of Outrider Management, LLC, an American hedge fund that specializes in emerging markets. The Outrider Fund began buying its notes in October 2005. One month before that, President Chavez said in a televised speech that he was reclaiming the Las Cristinas mine and was "going to build a national mining company there." Mr. Hope knew about this speech before Outrider bought any bonds. There is certainly no objective basis to conclude that Mr. Hope had any reasonable expectation as to what Crystallex would do in the face of the denial of the permit.

[86]      *BCE* makes clear, both in the Supreme Court of Canada and at the trial level, that a factor in considering the reasonable expectations of the Noteholders is what steps they could have taken to protect themselves from known risks. Likewise, as stated by Feldman J.A. in *Casurina Partnership Ltd. v. Rio Algom Ltd*, *supra*, purchasers of the Notes had the opportunity to consider their prospective purchase in the context of the terms governing the debentures and on that basis decide whether or not to invest.

[87]      Apart from the warnings of the risks provided in the prospectus, information regarding political risk in Venezuela was widely available. News sources had reported on President Chavez's violent past, nationalist rhetoric, attacks on economic reform, negative attitude towards business, anti-democratic behaviour, threats to take over the National Bank of Venezuela if it did not surrender foreign currency reserves to him, and accusations of espionage and terrorist sabotage against foreign companies.

[88]      In the face of this, no protection against these risks was provided in the trust indentures. On her cross-examination, the Noteholders' expert, Marlene Puffer, stated that bondholders know that their interests may not align with the interests of shareholders and this difference of view makes contractual protection critical. She stated that the Noteholders should have reviewed the terms of the trust indenture before buying and if they did not like its contractual protections, they could have insisted that a covenant be added or could have decided not to buy the Notes.

[89]      Ms. Puffer stated that the trust indentures in this case could have contained protection for the Noteholders by providing for redemption if the permit were delayed or denied. During the negotiations of the trust indentures, Stikeman Elliott, acting for the underwriters whose interests would include trying to negotiate terms that would make the Notes marketable, tried to include a term that would have required Crystallex to redeem the bonds if Crystallex did not receive its environmental permit by March 31, 2005. Crystallex rejected this. The Noteholders knew or ought to have known that without this protection, it would be up to the board of directors of Crystallex to determine how long to pursue a permit and what to do in case of refusals.

[90]      When the bonds were issued, the prospectus disclosed that Crystallex's ability to pay even interest on the bonds depended on its ability to raise more money in the future. Crystallex raised several hundred million dollars after the Notes were issued. Ms. Puffer acknowledged that the Noteholders could have protected themselves by requiring a sinking fund into which a portion of these funds when later raised could be set aside and held in trust for the Noteholders. This would have protected the Noteholders against the risk of Crystallex pursuing the permit or other alternatives when they felt the repayment of their principal was at risk.

[91]      There were other clauses that could have protected the Noteholders, such as a put option allowing the Noteholders to demand repayment on specific dates that would allow a Noteholders to reassess the company's financial condition and decide whether their interests were sufficiently aligned with those of the company to

continue holding the Notes.   This too would have protected Noteholders against the risk that the permit was not obtained within a time frame acceptable to them and against the risk that Crystallex would pursue the permit longer than Bondholders wanted.

[92]     The Noteholders accepted the risks without the kind of protection discussed. The Noteholders' bond expert Ms. Puffer agreed on cross-examination that the use of covenants comes at a cost.  The more covenant protection the trust indenture contains, the lower the interest rate on a bond or note.  The greater the risk that shareholders will take actions that will benefit them at the expense of bondholders, the higher the yield on the bond or note.

[93]     The effective yield of the Crystallex Notes at the time of issue, taking into account the common notes issued with the Notes, was 14.32%.  This was 10.42% higher than U.S. treasury notes of equivalent duration. This was also a full 4% higher than the yield associated with the lowest form of rated junk bonds. The yield of a bond or note is the prime measure of risk.  The true yield for the any Noteholder who acquired Notes after the initial issue depends on the price they paid.  Outrider bought at prices as low as 25 cents on the dollar, with a yield on those bonds therefore of 37.5%.

[94]     The Noteholders knew they were accepting a large risk in acquiring the Notes. The effective yield on their Notes told them that, as did the express warnings in the prospectus. This is an important factor in considering what their reasonable expectations were. These were sophisticated investors well aware of the risks with no indication of what Crystallex would do if and when faced with a denial of the permit and a threat of expropriation.

[95]     The argument of the Noteholders is clothed in the language of reasonable expectations, but in reality their complaint is that they do not like the choices that the directors of Crystallex have made in dealing with the problem. The Noteholders would prefer that the directors make choices that the Noteholders perceive to be in their interest. This ignores a fundamental tenet of corporate law. The directors' fiduciary duties are to the corporation only. Directors in acting in the best interests of the corporation may be obliged to consider the impact of their decisions on corporate stakeholders, such as the Noteholders in this litigation. Sometimes the reasonable expectations of a stakeholder coincide with what is in the best interests of the corporation. However, where that is not the situation, it is important to understand that the directors owe their duty to the corporation and not to stakeholders, and that the reasonable expectation of stakeholders is simply that the directors act in the best interests of the corporation. See *BCE*, *supra*, at para 66.

[96]     In my view, the Noteholders have not established any reasonable expectation on their part that would provide an oppression remedy under s. 241(2) of the *CBCA*.

**(iv)  Analyses of the reasonableness of the actions of the Crystallex directors**

[97]     In any event, I am satisfied that the directors of Crystallex have acted in good faith, that their actions and decision have been reasonable and made on an informed basis and, where appropriate, after taking professional advice. The directors are protected in this case by the business judgment rule. No one alternative considered by the board of directors has been shown to be definitely available and clearly more beneficial to the company than other alternatives pursued by the directors.

[98]     The directors have had an obligation to consider appropriate ways out of the difficult predicament in which Crystallex finds itself. In doing so the directors have been required to weigh and balance risks.

[99]    Crystallex submits, and I accept, that the directors have balanced various risks at every stage.  Over the course of the litigation, the landscape has shifted and the directors have been required to reassess the situation on numerous occasions.  They have done so by informing themselves, obtaining appropriate advice, balancing the risks associated with various courses of action and choosing from a spectrum of reasonable alternatives.  The directors received legal advice on their duties to the Noteholders in light of requests made on behalf of the Noteholders. The directors considered the interests of both the Noteholders and the shareholders, including those shareholders who have invested in a new financing after the issuance of the Notes. The directors were advised and considered the fact that it could not let the threat of a Noteholder lawsuit influence their judgment about what was in the best interests of the corporation. All of this was appropriate and reasonable.

#### (v)  Conclusion on oppression

[100]    The Noteholders claim for oppression has not been made out. They have not established a reasonable expectation that should be protected by relief. The directors of Crystallex have acted in an informed reasonable manner and are protected by the business judgment rule.

### Appendix A

[101]    Much of the factual circumstances involved in this case are covered by a confidentiality order. In coming to my conclusion I have reviewed the evidence and arguments submitted by both the Noteholders and Crystallex. I will set out further reasons in a separate document, Appendix A to these reasons, to be held by the parties subject to the terms of the protective order made by Campbell J. dated March 19, 2009 and not to be disclosed without court order.

### Order

[102]    This application is dismissed. Crystallex is entitled to its costs of this application. If the parties are unable to agree on costs. Crystallex may make written submissions with 10 days and the Noteholders shall have 10 days to respond.

NEWBOULD J.

**Released:**    December 16, 2009

**COURT FILE NO.:**  CV-08-00007890-00CL

**DATE:**  20091216

# ONTARIO

## SUPERIOR COURT OF JUSTICE

### Commercial List

**B E T W E E N:**

COMPUTERSHARE TRUST COMPANY OF
CANADA, in its capacity as Trustee for the Holders of
9.375% Senior Unsecured Notes of Crystallex
International Corporation due December 23, 2011

Applicant

- and -

CRYSTALLEX INTERNATIONAL CORPORATION

Respondent

## REASONS FOR JUDGMENT

NEWBOULD J.

Released:          December 16, 2009

[1] All dollars in these reasons are US dollars.

[2] The factum of the Noteholders states that on August 21, 2009, counsel for the Noteholders gave notice to Crystallex that the Noteholders would treat any sale of the equipment that did not enure to the benefit of the Noteholders as being a further act of oppression and/or breach of the Indentures. The letter from Bennett Jones does not expressly use the words "enure to the benefit of the Noteholders" in discussing a sale, but I think the statement in the factum of the Noteholders is a fair reading of the purport of the letter. The letter complained that until very shortly before, the Noteholders had been expecting to negotiate in a way that would advance their interests.

- Decision No. 1435/00, 2001 ONWSIAT 433
- Bornhorst Welding Ltd. v. Zwingli, 2007 SKQB 154
- Faci v. Canada (Public Safety and Emergency Preparedness), 2011 FC 693

<<<    |    >>>



# TAB 28

1995 CarswellOnt 1169, [1995] O.J. No. 3993, 37 C.B.R. (3d) 237

1995 CarswellOnt 1169
Ontario Court of Justice (General Division), In Bankruptcy

Confederation Treasury Services Ltd., Re

1995 CarswellOnt 1169, [1995] O.J. No. 3993, 37 C.B.R. (3d) 237

# Re bankruptcy of CONFEDERATION TREASURY SERVICES LIMITED

Farley J.

Heard: December 8, 1995
Judgment: December 12, 1995
Docket: Doc. 31-205220

Counsel: *Lyndon A.J. Barnes*, *Gordon Marantz* and *Tristram Mallett*, for UBS Limited and Arm's Length Creditors Committee of Confederation Treasury Services Limited.
*Harry Fogul*, for Province of Ontario.
*Ronald N. Robertson, Q.C.*, and *Edmond Lamek* for UBS Limited.
*William G. Horton* and *Daniel V. Macdonald*, for U.S. rehabilitator of Confederation Life Insurance Company.
*Benjamin Zarnett* and *Gale Rubenstein*, for Peat Marwick Thorne Inc., agent to Superintendent of Financial Institutions, provisional liquidator of Confederation Life Insurance Company.
*Bruce Leonard* and *John R. Sandrelli* for National Organization of Life and Health Insurance Guaranty Associations.
*Charles F. Scott* and *Ulli Streit* for Compcorp.
*L.A. Wittlin*, for Deloitte & Touche Inc., monitor of Confederation Life Ins. Co. pursuant to *Companies' Creditors Arrangement Act*.

Subject: Corporate and Commercial; Insolvency

## Related Abridgment Classifications

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

## Headnote

Trustees — Appointment — Motion for replacement nominee for trustee — Petitioning creditor bringing motion to have proposed nominee replaced — Other parties opposing nominee as being party that had done extensive forensic investigation on behalf of group of creditors — Motion granted — No evidence to suggest on-going relationship between creditors' group and nominee — No evidence to show that nominee could not fulfil duties in impartial manner — Nominee already familiar with complex case.

In complex proceedings under the *Companies' Creditors Arrangement Act* ("CCAA"), the stay was lifted for the purpose of hearing a motion for a replacement nominee for the trustee. The proposed replacement nominee had done extensive forensic investigation on behalf of a group of creditors in the CCAA proceedings. Other parties opposed the substitution, fearing that the proposed replacement nominee would not be impartial in the bankruptcy proceedings, given its involvement on behalf of the creditors' group in the CCAA proceedings.

## Held:

The motion was granted.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1995 CarswellOnt 1169, [1995] O.J. No. 3993, 37 C.B.R. (3d) 237

There was no evidence of an on-going relationship between the proposed nominee and the creditors' group that would influence the nominee from its neutral, impartial role as trustee acting in the best interests of the estate. The nominee was familiar with and knowledgeable about the complex and complicated case and there was no reason to disqualify it. To appoint another trustee would cause a significant delay as that trustee became acquainted with the case and a significant duplication of expense.

**Table of Authorities**

**Cases considered:**

*Batteries Included, Inc., Re* (1987), 67 C.B.R. (N.S.) 123 (Ont. S.C.) — *considered*

*Bryant, Isard & Co., Re* (1923), 4 C.B.R. 41, 24 O.W.N. 597 (S.C.) — *considered*

*Cadillac Fairview Inc., Re* (February 9, 1995), Doc. B348/94, Farley J. (Ont. Gen. Div. [Commercial List]) — *referred to*

*Drash, Re* (1930), 11 C.B.R. 402, 38 O.W.N. 295 (C.A.) — *referred to*

*Environdyne Industries, Re,* 150 B.R. 1008 (Bankr. N.D. Ill. 1993) — *referred to*

*Ethier, Re* (1991), 7 C.B.R. (3d) 268 (Ont. Bktcy.) — *referred to*

*Federal Trust Co. v. Frisina* (1976), 28 C.B.R. (N.S.) 201, 20 O.R. (2d) 32, 86 D.L.R. (3d) 591 (S.C.) — *considered*

*Gauthier Lumber Ltd., Re* (1960), 1 C.B.R. (N.S.) 127 (Que. S.C.) — *referred to*

*I. Caron Ltd. v. Robin Hood Mills Ltd.* (1935), 17 C.B.R. 101 (Que. S.C.) — *referred to*

*Lamb, Re; Ex parte Board of Trade,* 1 Mans. 373, 9 R. 636, [1894] 2 Q.B. 805 (C.A.)*considered*

*Martin, Re* (1888), 5 Morr. 129, 21 Q.B.D. 29 — *referred to*

*Micro-Time Management Systems, Re,* 102 B.R. 602 (Bankr. E.D. Mich. 1989) — *referred to*

*Orzy, Re* (1923), 3 C.B.R. 737, 53 O.L.R. 323 at 327, [1924] 1 D.L.R. 250 (C.A.) — *referred to*

*Prince Edward Island v. Bank of Nova Scotia* (1988), 70 C.B.R. (N.S.) 209, 72 Nfld. & P.E.I.R. 191, 223 A.P.R. 191, 2 T.C.T. 4090 (P.E.I. T.D.), reversed (1989), 77 C.B.R. (N.S.) 113, 81 Nfld. & P.E.I.R. 295, 255 A.P.R. 295, 2 T.C.T. 4304 (P.E.I. C.A.) — *considered*

*Quinte Nurseries Ltd., Re* (1982), 41 C.B.R. (N.S.) 156 (Ont. S.C.) — *referred to*

*REA Holding Corp., Re,* 4 Bankr. Ct. Dec. 1249 (Bankr. S.D.N.Y. 1979), reversed 2 B.R. 733 (1980) — *considered*

*R.J. Nicol Construction Ltd. (Trustee of) v. Nicol* (1995), 30 C.B.R. (3d) 90, 77 O.A.C. 395 (C.A.) — *referred to*

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

*Reed, Re* (1980), 34 C.B.R. (N.S.) 83, 28 O.R. (2d) 790, 111 D.L.R. (3d) 506 (C.A.) — *referred to*

*Rizzo Shoes (1989) Ltd., Re* (1995), 29 C.B.R. (3d) 270 (Ont. Gen. Div. [Commercial List]) — *referred to*

*Sharby v. N.R.S. Elgin Realty Ltd. (Trustee of)* (1991), 55 C.C.E.L. 305, 41 E.T.R. 193, 3 O.R. (3d) 129 (Gen. Div.) — *referred to*

*Shaw Co., Re*, 3 C.B.R. 198, 16 Sask. L.R. 275, [1922] 3 W.W.R. 119, 68 D.L.R. 616 (K.B.) — *considered*

*Tannis Trading Inc. v. Camco Food Services Ltd. (Trustee of)* (1988), 67 C.B.R. (N.S.) 1, 63 O.R. (2d) 775, 49 D.L.R. (4th) 128 (S.C.) — *considered*

*W.T. Grant, Re*, 4 B.R. 53 (Bankr. S.D.N.Y. 1980) — *considered*

*W.T. Grant Co. 1, Re*, 699 F.2d 599 (2d. Cir. N.Y. 1983) [cert. denied *Cosoff v. Rodman*, 464 U.S. 822, 70 L. Ed. 2d 97, 104 S. Ct. 89, 52 U.S.L.W. 3262 (1983)] — *referred to*

*Western Canada Beverage Corp., Re* (1993), 22 C.B.R. (3d) 10 (B.C. S.C.) — *referred to*

**Statutes considered:**

Bankruptcy and Insolvency Act, R.S.C. 1985, c. B-3 —

s. 13.3

s. 13.3(2)

s. 14

s. 14.04

s. 43(9)

s. 102(5)

s. 163

Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36.

Motion for order replacing nominee for trustee.

*Farley J.*:

UBS Limited — "UBS"

Arm's Length Creditors Committee — "ALC Committee"

Confederation Treasury Services Limited — "Treasury"

Province of Ontario — "Ontario"

1995 CarswellOnt 1169, [1995] O.J. No. 3993, 37 C.B.R. (3d) 237

U.S. Rehabilitator of Confederation Life Insurance Company — "Rehabilitator"

National Organization of Life and Health Insurance Guaranty Associations — "NOLA"

Confederation Life Insurance Company — "CLIC"

Peat Marwick Thorne Inc. Agent to the Superintendent of Financial Institutions, Provisional Liquidator of CLIC — "Liquidator"

Deloitte & Touche Inc. — "Deloitte"

Richter & Partners Inc. — "Richter"

BDO Dunwoody Ltd. — "Dunwoody"

Doane Raymond Ltd. — "Doane"

*Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3 as amended — "BIA"

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 — "CCAA"

1    Houlden J.A. is supervising the Treasury CCAA proceedings; he lifted the stay for the purpose of my hearing this motion regarding a replacement nominee for the trustee. It is expected that he will lift the stay generally on Dec. 15, 1995 or shortly thereafter once all pressing matters regarding the CCAA proceedings have been dealt with by him. It would then appear that everyone's expectation and desire is that Treasury immediately thereafter be placed in bankruptcy.

2    UBS (the replacement petitioning creditor in the bankruptcy proceedings) moved to amend the petition to nominate Richter as trustee in bankruptcy in place of Deloitte. It also sought a receiving order against Treasury (appointing Richter as trustee) effective immediately following the termination of the CCAA proceedings. As regards the latter motion, it would seem to me that this should be more appropriately dealt with once the CCAA proceedings have terminated. Mr. Barnes argued on behalf of UBS and the ALC Committee; he was supported by Mr. Robertson also acting for UBS and by Mr. Fogul on behalf of Ontario. Deloitte took no part of the argument; it had previously indicated that it was not willing to stand for appointment as trustee (either as sole trustee or in some joint or shared responsibility capacity) unless it had the endorsement of all three major stakeholders — the ALC Committee, Rehabilitator and Liquidator. The ALC Committee was opposed to Deloitte having a role as trustee. Instead it wished to have Richter, a firm which had done extensive forensic investigation on its behalf in the CCAA proceedings, the investigation being essentially of document review but no interviews or examinations. The substitution of Richter as the trustee nominee was opposed by the remaining participants — Mr. Horton for the Rehabilitator, Mr. Zarnett for the Liquidator, Mr. Leonard for NOLA and Mr. Scott for Compcorp; they preferred that Dunwoody or Doane be the substitute since they submitted that Richter was not impartial in the bankruptcy proceedings given its involvement for the ALC Committee in the CCAA proceedings.

3    The Rehabilitator has tabled a motion which obstensively was to be heard at the same time as this motion for an order:

1. Declaring that the bankruptcy of [Treasury] shall proceed in accordance with the provisions of the Protocol which is attached as Appendix A [to that motion record].

2. In the alternative, declaring that section 69.3(1) of [BIA] does not operate with respect to the [Rehabilitator's] claims against [Treasury] as set forth in the draft Statement of Claim attached as Appendix "B" [to that motion record] (the "Ontario Proceedings").

3. In the further alternative granting the [Rehabilitator] leave to issue and proceed in the Ontario Proceedings; and

4. such further and other relief as to this Honourable Court seems just.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1995 CarswellOnt 1169, [1995] O.J. No. 3993, 37 C.B.R. (3d) 237

This motion was certainly premature since the stay had not been lifted for that purpose and it presupposed that the trustee in bankruptcy (once Treasury were declared bankrupt) would be preempted from this motion. I found this quite puzzling, especially since this matter had been previously informally canvassed and the same concerns expressed. This motion was adjourned to a more appropriate time once all interested parties had been canvassed. This overall battle amongst the stakeholders has been fought since the beginning of the CCAA proceedings some sixteen months ago. Despite this intimate, intensive and extensive involvement it was candidly volunteered by the Rehabilitator that the matter was complicated beyond any comprehension and that it could not be even described after all this time. Thus in the Michigan material there were claims advanced by the Rehabilitator on the basis of eleven separate (and distinct) grounds. It would not seem that the Rehabilitator is estopped from pleading in the alternative: see (*Sharby v. N.R.S. Elgin Realty Ltd. (Trustee of)* (1991), 3 O.R. (3d) 129 (Gen. Div.) at pp. 140-1), at least at this stage of the proceedings.

4     I would also note that the estate is of the magnitude of some $630 million dollars, all of which except approximately $30 million dollars (plus or minus a very wide allowance) is in the form of "cash". Thus while the major percentage of the estate has been liquidated, it is clear that there is a sizeable absolute amount of the number of various types of assets to be gathered in, subject to of course assorted disputes. If this latter role were hived off, it would comprise a major bankruptcy estate by itself.

5     It would appear that Richter, Dunwoody and Doane are willing to be considered as nominees. Deloitte has removed itself from the running, based upon its unfulfilled condition. Other firms are conflicted out.

6     Perhaps it is the fact that

(a) the major stakeholders have been warring in a very negative sense for over a year.

(b) the potential losses for each are quite sizeable, in the hundreds of millions, when each with moral legitimacy looks upon their own "ultimate" situation as an innocent who has been mugged,

(c) there is a great deal of money ($630 million dollars odd) which may be recovered out of the estate.

(d) under certain scenarios it is conceivable that a stakeholder could obtain a benefit before the others and under other scenarios the stakeholder might be shut out from that estate.

(e) tactics may appear at first glance to give more relief (or inflict a negative relief upon the others) than strategies,

(f) stakeholders may be unsure of their comparative positions and interests despite ample opportunity to reflect upon same,

(g) some undisclosed factor(s) or

(h) a combination of some or all of the foregoing,

which has resulted in all concerned attempting to introduce a lot of colour and atmosphere plus premature arguments into these proceedings. I would not think that helpful in the long run, neither for these proceedings in general nor for the interest of the stakeholders so advancing this tinged view of things and trying to set the stage for future battles. However on reflection I trust that counsel and their clients will appreciate that this is unproductive.

7     The ALC Committee and specifically UBS appear to represent creditors of Treasury who loaned funds to Treasury in a commercial situation, taking the benefits of that loan together with its commercial risk. The other side may to some degree or other have claims against the $630 million dollars which may be in the nature of property or trust claim (or something similar) which I will hereafter describe as a proprietary claim which would take some or all of the $630 million dollars out of the estate (and thus away from the potential dividend to be shared amongst the creditors). There also seems to be the possibility of a claim which although a "creditor claim" within the estate is advanced on the basis that it should enjoy a priority and be paid out before the "ordinary" creditor claims, this priority not being of a temporal nature but rather of a preference nature. I think it fair to observe that the rights and entitlements advanced are not so clear cut that, at least at this stage, it would be inappropriate for any

1995 CarswellOnt 1169, [1995] O.J. No. 3993, 37 C.B.R. (3d) 237

trustee to acquiesce and hand over the funds. Unless there is some compromise achieved, it is painfully obvious that there will be litigation. This litigation may be as to a dispute between the trustee and someone claiming that it has a proprietary right which takes assets out of the estate (see the comments of Goodman J.A. in *R.J. Nicol Construction Ltd. (Trustee of) v. Nicol (1995), 30 C.B.R. (3d) 90* (Ont. C.A.) at p. 94 or it may be a dispute amongst creditors within the estate (see the views of Ferguson J.A. in *Re Orzy (1923), 3 C.B.R. 737* (Ont. C.A.) at p. 741 and of Hodgins J.A. at p. 738) or a combination thereof. While the trustee would have an active role in the proprietary claim dispute, it would seem to me on a casual observation of the trustee's role in a dispute between creditors in the estate would primarily be that of a true stakeholder (i.e. in its "original" sense of someone who merely holds the stakes being wagered or fought over as opposed to the "modern" additional sense used by the participants here of someone who claims to have a stake in the outcome of these proceedings) and, as may possibly be required, ensure that the participants observe the rules of the game, even if only on a report basis to the court or by asking for advice and directions.

8     In this regard and regard and generally the trustee is an officer of the court. As stated in *Houlden and Morawetz, Bankruptcy Law in Canada* (3rd ed. 1995) at pp. 1-61/2:

> The trustee is an officer of the court and should impartially represent the interests of creditors: *Re Roy (1963), 4 C.B.R. (N.S.) 275* (Que. S.C.). He should act equitably and, as far as possible, hold an even hand between competing interests of various classes of creditors: *Re Reed (1980), 34 C.B.R. (N.S.) 83*, reversing *32 C.B.R. (N.S.) 203* (Ont. C.A.). In bringing proceedings, such as an application to set aside a fraudulent preference, he should not adopt an adversarial or hostile role: *Touche Ross Ltd. v. Weldwood of Canada Sales Ltd. (1983), 48 C.B.R. (N.S.) 83*, additional reasons at *49 C.B.R. (N.S.) 284* (Ont. S.C.). Rather, he should present the relevant facts to the court in a dispassionate, non-adversarial manner, and leave the matter to the court for decision.
>
> . . . . .
>
> The trustee's obligation is to act for the benefit of the general body of creditors, not just the benefit of unsecured creditors. He must not, therefore, act in a manner which is prejudicial and unfair to the interests of secured creditors: *Re Bell's Ltd.: Bank of Montreal v. Touche Ross Ltd.*, 60 C.B.R. (N.S.) 224, [1986] 4 W.W.R. 211, 48 Sask. R. 241 (Sask. Q.B.).
>
> A trustee in bankruptcy does not function as an agent of the creditors in the ordinary sense, but as an administrative official required by law to gather in and realize on the assets of the bankrupt, and then to divide the proceeds among those entitled thereto in accordance with the scheme set out in the Bankruptcy Act: *Clarkson Co. v. Muir (1982), 43 C.B.R. (N.S.) 259, 53 N.S.R. (2d) 609, 109 A.P.R. 609 (C.A.).*

9     Mr. Barnes submitted that there were two issues before me — firstly that there was no legal impediment against Richter acting as trustee since there was nothing to prevent a person from becoming such merely because of an association of a nature such as here, where Richter has been acting as a forensic investigator for the ALC Committee (which includes representation of UBS) and secondly that Richter is an appropriate person to nominate (and appoint) in the circumstances.

10     I would observe that Richter does not appear on the material before me to have a problem of possible disqualification pursuant to s. 13.3. of BIA. If there were any potential conflict of interest as set forth in that section, it should disclosed at the time of appointment and at the first meeting of creditors if it falls within s. 13.3(2).

11     S. 43(9) BIA provides that:

> On a receiving order being made, the court shall appoint a licensed trustee as trustee of the property of the bankrupt, having regard, as far as the court deems just, to the wishes of the creditors.

S. 102(5) BIA states:

> The purpose of the first meeting of creditors shall be to consider the affairs of the bankrupt, to affirm the appointment of the trustee or substitute another in place thereof, to appoint inspectors and to give such directions to the trustee as the creditors may see fit with reference to the administration of the estate.

See also s. 14 and s. 14.04 of BIA. I did not find it helpful for Mr. Fogul to point out that Ontario could lead a move to appoint Richter as trustee at the first meeting of creditors if it were not so appointed as trustee upon the receiving order being made since such action would be, to my mind, quite inappropriate if I were to determine in this motion that Richter were for some reason "disqualified" in the circumstances.

12    In *Re Quinte Nurseries Ltd.* (1982), 41 C.B.R. (N.S.) 156 (Ont. S.C.) at p. 160 Saunders J. observed:

> The choice of trustee is for the creditors and, in my opinion, the nominee of the petitioning creditor should be appointed pending the first meeting of creditors when the final determination will be made.

I would be of the view that Registrar Ferron's opening words in *Re Batteries Included, Inc.* (1987), 67 C.B.R. (N.S.) 123 (Ont. S.C.) at p. 123:

> The court is not bound to appoint a trustee named in the petition by the petitioning creditor, nor is the official receiver required to appoint a trustee named by the debtor as the assignee in an assignment.

must be taken in context. In that case he went on to examine the various reasons why he appointed another trustee than the one nominated by the petitioning creditor (recognizing this was an interim appointment until the first meeting of creditors). He observed at p. 124:

> I chose to appoint Yale, Kline, Geary Limited as the trustee in place of Collins Barrow Limited, named in the petition for several reasons, none of which have anything to do with competency and integrity.

> In my opinion, in this instance Yale, with whom the debtor filed its assignment, is in a better position to administer the estate. That firm has already been involved in a watching brief for a secured creditor, and has a fairly extensive knowledge of the debtor company.

> In addition Yale has identified the company's assets and liabilities, and has in fact prepared a preliminary statement of affairs which accompanied the assignment. That work will not now have to be duplicated.

> Further, four creditors of the debtor have expressed a preference for Yale, I suppose because of the above factors, and their wishes should at least be given some standing in the matter.

> Finally, there is a suggestion that the debt owing to petitioning creditor is disputed. It seems to me that it would not be appropriate in these circumstances to appoint Collins Barrow Limited as trustee because of the potential for conflict.

This fits within the philosophy of *Re Drash* (1930) 38 O.W.N. 295 (C.A.) at p. 296. See also *I. Caron Ltd. v. Robin Hood Mills Ltd.* (1935), 17 C.B.R. 101 (Que. S.C.) at p. 102.

13    Houlden J.A. for the court in *Re Reed* (1980), 34 C.B.R. (N.S.) 83 (Ont. C.A.) said at p. 86:

> ... Unless this inquiry is carried out, the credit union may be dealt with unfairly. A trustee in bankruptcy should act equitably and so far as possible hold an even hand between the competing interests of various classes of creditors. As James L.J. said in *Re Condon; Ex parte James* (1874), 9 Ch. App. 609 at 614 (L.JJ.):

> > I am of opinion that a trustee in bankruptcy is an officer of the Court. He has inquisitorial powers given him by the Court, and the Court regards him as its officer, and he is to hold money in his hands upon trust for its equitable distribution among the creditors.

See also my view in *Re Rizzo Shoes (1989) Ltd.* (1995), 29 C.B.R. (3d) 270 (Ont. Gen. Div. [Commercial List]) at pp. 277-8 including my observation:

I think it also fair to observe that in deciding whether or not the trustee has acted properly the court must be careful to judge the trustee's conduct in light of the circumstances as they existed at the time the trustee performed the act or made the decision: see *Cocks v. Chapman*, [1896] 2 Ch. 763 at 777 (C.A.).

14    A trustee may be removed for cause: see *Houlden and Morawetz, supra*, at p. 1-52 where the authors observe:

"Cause" means misconduct, fraud, dishonesty, becoming bankrupt or otherwise incapable of acting as a trustee: *Re Herman* (1930), 11 C.B.R. 239 at 246. Cause is not, however, restricted to dishonest conduct; misconduct short of dishonesty is sufficient: *Re Bryant Isard* (1923), 4 C.B.R. 41, 24 O.W.N. 597 (S.C.).

Cause exists: (a) if there is conduct showing that it is no longer fit that a person should continue as trustee; (b) if there is a danger to the estate property; (c) if there is a want of reasonable fidelity; (d) if circumstances prevent the creditors from working in harmony with the trustee; (e) if the trustee cannot act impartially; (f) if there has been an excess of power by the trustee; (g) if there has been a lack of *bona fides* by the trustee; or (h) if there has been unreasonable conduct by the trustee in relation to the bankrupt estate. The main principle upon which the jurisdiction of the court is exercised in ordering the removal of the trustee, is the welfare of the creditors and of the bankrupt estate. The trustee must not undertake a duty and put himself in a position that is in conflict with his duty as trustee, or act in a manner that is inconsistent with that duty. If the trustee has placed himself in a position of conflict, he cannot continue as trustee; he must resign or be removed by the court; *Re Commonwealth Investors Syndicate Ltd.* (1986), 61 C.B.R. (N.S.) 147, 69 B.C.L.R. 346 (S.C.), additional reasons at (1986), 62 C.B.R. (N.S.) 308 (B.C.S.C.). In the *Commonwealth* case, the trustee was removed because he had improperly delayed the winding up of the bankrupt estate for several years.

. . . . .

Even if a trustee is not dishonest, the court, if it is of the opinion that he has not acted in the best interests of creditors and that he cannot act in concord with the inspectors, may remove him and appoint a new trustee: *Re Gauthier Lumber Ltd.; Vanasse Tire Ltd. v. Tardif* (1960), 1 C.B.R. (N.S.) 127 (Que. S.C.).

Where a trustee wishes to be relieved of its duties as trustee in bankruptcy, the court can appoint a substitute under s. 14.04. "Cause", in s. 14.04, embraces a trustee who is incapable of acting for any reason: *Re Philip's Manufacturing Ltd.* (1992), 16 C.B.R. (3d) 127 (B.C.S.C.). Where it would be difficult for a trustee to act impartially and impossible for it to sue itself, a substitute trustee will be appointed: *Re Philip's Manufacturing Ltd.*, supra.

In *Re Bryant, Isard & Co., supra*, Fisher J. was quite caustic with his comments about the actions of the trustee, he said at p. 52 [C.B.R.]:

I find the trustee guilty of misconduct and abuse of his office in making these payments and retaining the cheques.

. . . . .

The trustee who is an officer of the Court, has no right to make free with creditors' moneys committed to his charge.

However he did not remove the trustee, although he sanctioned the trustee with making the estate good on the inappropriate payment and indicated that his order was without prejudice to the creditors removing the trustee. Fisher J. in doing so observed at p. 53:

The Court, on an application to remove a trustee for cause, exercises a judicial discretion. The sole question for me to determine in this case is whether there is in the evidence submitted, sufficient cause shewn that the trustee, J.L. Thorne, is unfit to be continued as trustee in the administration of this estate. The estate is a large one, with many important and complicated business problems to solve before the estate can be finally wound up, and while it is the duty of the Court to vindicate the law but in doing so to abstain if possible from injury to those who are vitally, and beneficially interested, to inflict a needless injury on them and vindicate some legal principle should be avoided. Here to transfer the administration

of the estate would involve the necessity of a large additional expense, and delay. Therefore, notwithstanding my findings, I will not adopt the extreme course of removing the trustee from office for the following reasons:

(1) It would add to the great expense already incurred in this estate.

(2) The trustee is conversant with the estate, and is in a much better position than a new trustee would be in assisting the Crown authorities in the pending criminal proceedings against N.P. Bryant, and also in the civil actions awaiting trial; and

(3) The creditors at the meeting of December 4, 1922, and the inspectors at the meeting in May, 1923, were not in favour of removing the trustee, and counsel representing Ottawa, Toronto and Montreal creditors urged before me that it the wish of their clients that the trustee should not be removed, but if what has come to light on this application should lead the creditors to change their opinions they have power to do so under the Act. An authorized trustee, as I have pointed out, is an officer of the Court and must administer the estate in his charge in accordance with *The Bankruptcy Act*.

So to in appointing a trustee the Court is exercising a judicial discretion. No one should take too lightly the burdens and responsibility of securing such an appointment. The appointment is not a franchise to make money (although a trustee should be rewarded for its efforts on behalf of the estate) nor to favour one party or one side. The trustee is an impartial officer of the Court; woe be to it if it does not act impartially towards the creditors of the estate. Miquelon J. in *Re Gauthier Lumber Ltd.* (1960), 1 C.B.R. (N.S.) 127 (Que. S.C.) said at pp. 135-6:

On ne peut certes pas affirmer que l'intimé a été malhonnête. Par ailleurs, la Cour ne peut non plus dire qu'il a été un gérant impartial, chargé qu'il était par la loi, de protéger les intérêts de tous les créanciers. Les créanciers garantis sont généralement en état de se protéger et leurs intérêts sont assez souvent contraires à ceux des créanciers ordinaires. Ce sont ceux-ci que le syndic représente d'abord et ils ont droit à ce que la conduite d'un syndic solt au-dessus de tout soupçon.

15    McQuaid J. in *Prince Edward Island v. Bank of Nova Scotia* (1988), 70 C.B.R. (N.S.) 209 (P.E.I. T.D.) reversed on other grounds (1989), 77 C.B.R. (N.S.) 113 (P.E.I. C.A.) had concerns about the propriety of appointing a former privately appointed receiver-manager as trustee. His concerns would appear to be expressed as part of his decision in an obiter fashion when he said at p. 220:

It is clear that, immediately upon his appointment, the trustee in bankruptcy is in full, complete and exclusive control of the bankrupt business and all of the assets thereof, to the total exclusion of the owner, operator or manager of the business. I think it may be said that those erstwhile functionaries, whatever their capacity might have been, become functus upon that appointment. This would clearly include any receiver-manager who might have been in place at the time of the bankruptcy.

It is the duty of the trustee, who is an officer of the court, to represent impartially the interests of all creditors; he is obligated to hold an even hand as between competing classes of creditors; he must act for the benefit of the general body of creditors; he is not an agent of the creditors, but an administrative official required by law to gather in and realize on the assets of the bankrupt and to divide the proceeds in accordance with the scheme of the *Bankruptcy Act* among those entitled. And perhaps most importantly, he must conduct himself in such a manner as to avoid any conflict, real or perceived, between his interest and his duty.

*While it may not be incompatible with the scheme of the Bankruptcy Act, or, indeed, with the role of the trustee in bankruptcy, the propriety of appointing the former receiver-manager as trustee is a matter of serious import. The two functions are certainly incompatible, if not in actual conflict.*

As in this instance, the receiver-manager is, in fact, the nominee of the major creditor, put into place as the watchdog on behalf of that creditor, essentially to preserve and hopefully to realize upon the assets of the business for the benefit of that creditor albeit as the agent of the company. That is normal, prudent business practice, not to be criticized, and something which happens regularly in the world of commerce.

1995 CarswellOnt 1169, [1995] O.J. No. 3993, 37 C.B.R. (3d) 237

> On the other hand, the trustee, who is in actuality an officer of the court, rather than a single creditor's nominee, must represent all creditors, and ensure that conflicting interests are resolved equitably. He must not only act without interest or bias, but must be clearly perceived to be acting without interest or bias.

> That perception may be difficult to maintain when he who yesterday was the man of a single creditor must today act, and be seen to act, as the man of all creditors. (Emphasis added).

As seen by the emphasized words he recognizes that such an appointment may not be incompatible with the BIA or the role of a trustee. It would appear on a reading of the case that McQuaid J. was concerned about there were aspects in which as a receiver-manager representing the interests of a secured creditor the firm in question was not recognizing various aspects which it should have as trustee. For instance he states at pp. 221-2:

> ... It is inconceivable to me that Doane Raymond would not know that Doane Raymond was sitting on a cash deposit representing the assets of the firm whose bankruptcy it was administering.

> I find it equally difficult to believe that "the funds realized from the sale by the Receiver [i.e., the corporate entity of Doane Raymond] of the assets of Island Jewellers were paid to the Bank without the participation or consent of the Trustee in Bankruptcy [i.e., the corporate entity of Doane Raymond]". Is the local office that large that the right hand does not know what the left hand is doing?

16    In *Federal Trust Co. v. Frisina* (1976), 20 O.R. (2d) 32 (S.C.) Galligan J. raised the question of perception or appearances as to a court appointed receiver-manager (i.e. one which was appointed by the court and not privately) when he observed at p. 35:

> Whatever may be required of a person whom a Court will appoint as receiver-manager of a property I think that such a person must be reasonably competent to perform the duties entrusted to him and must be disinterested and impartial so as to be able to deal with the rights of all persons with an interest in the property in a fair and even-handed manner. It ought to be remembered that a receiver-manager appointed by the Court under s. 19 of the *Judicature Act*, becomes an officer of the Court and is therefore very different from a person appointed manager by a mortgagee in possession. That person is simply the agent of the mortgagee.

> I think it follows that not only must the receiver-manager appointed by the Court be impartial, disinterested and able to deal with the rights of all interested parties in a fair and even-handed manner, but he ought to appear to have those qualities.

> A good part of the argument on the motion was taken up with a discussion of the relative competence of Geisel and Lousbury. If all else were equal, it would seem to me to be sensible to appoint that person whom the Court thought to be the more competent. In this case, it seems that both have sufficient competency to perform the duties of a receiver-manager, but because of the view I take of the case it is unnecessary for me to weigh the relative competence of them.

> The evidence discloses two facts that in my opinion seriously mar the appearance of impartiality and disinterestedness which I think Geisel ought to have if he is to be appointed the receiver-manager. I do not intend to cast aspersions upon him by suggesting that, in fact, he would not act impartially and be disinterested, but I do not think he ought to be appointed if circumstances exist which would raise in the mind of a reasonable and intelligent man a real apprehension that he lacked impartiality and disinterestedness.

However it is important to appreciate that the test here is of a reasonable and intelligent man, i.e. one who is objective and who has been informed of all material facts. However in that case it was determined that the receiver-manager in question, as an officer of the court would not pass muster on such an objective test since he had a close and direct business relationship with the second mortgagee applicant as he owed that trust company five million dollars and further that he owned a building which would be in direct competition for tenants with the building which was the subject of the receivership.

17      Thus there would appear to be healthy objective reasons for scepticism about the impartiality appearances in both *Federal Trust* and *Prince Edward Island, supra*, based on actual financial competition and *Federal Trust* and the incapatibility of simultaneously being involved in several roles in *Prince Edward Island*.

18      I think it instructive to read *Tannis Trading Inc. v. Camco Food Services Ltd. (Trustee of)* (1988), 67 C.B.R. (N.S.) 1 (Ont. S.C.) in conjunction with Dr. Morawetz's annotation found at pp. 2-3 of that report. In that case CCL was an audit client of the trustee's organization, which was found to be "an important and valued relationship" (p. 6). At that same page it was determined that "the claims [of the estate] against CCL ... are crucial to the administration of the estate". Saunders J. went on to say at pp. 6-7:

> It appears that the trustee and the inspectors feel that the trustee has acted impartially and will continue to do so. It is likely that such will be the case. That, however, is not the test. In a situation such as this, the court must consider from an objective point of view whether it would be difficult for the trustee to act with impartiality: see *Re Shaw Co.*, 16 Sask. L.R. 275, 3 C.B.R. 198, [1922] 3 W.W.R. 119, 68 D.L.R. 616 (K.B.). In my opinion, the answer in this particular case is clearly in the affirmative. The trustee is, in effect, suing its own client. On the particular facts, I am of the opinion that there is a potential for a conflict of interest and, perhaps more importantly, there is an appearance of conflict. An unsecured creditor seeks the removal of the trustee. There is no suggestion that the request is not bona fide. In my opinion, in the special circumstances of this case, the trustee ought to stand aside or be replaced.

Dr. Morawetz observed at pp. 2-3:

> In ordering that the trustee should be removed, the court relied on the judgment of the Saskatchewan Court of King's Bench in the case of *Re Shaw Co.*, 16 Sask. L.R. 275, 3 C.B.R. 198, [1922] 3 W.W.R. 119, 68 D.L.R. 616, which in turn, relied on the English case of *Re Lamb*, [1894] 2 Q.B. 805, 64 L.J.Q.B. 71 at 74 (C.A.), and held that the court must consider from an objective point of view whether it would be difficult for the trustee to act with impartiality. The court was of the opinion, that there was a potential for a conflict of interest and, perhaps more importantly, there was an appearance of conflict.

> The judgment in the *Shaw Co.* case is very short, and no reference was made to one of the leading Ontario cases, *Re Bryant, Isard & Co.; Ex parte Higginson* (1923), 24 O.W.N. 597, 4 C.B.R. 41 (S.C.). In that case the court considered the removal of a trustee from office to be an extreme course and refused to remove the trustee because: it would add to the great expense already incurred in the estate; a new trustee would not be as conversant with the estate as the present trustee; and neither the inspectors nor the creditors were in favour of removing the trustee. Although in the *Bryant, Isard* case the court did not remove the trustee, the order was made without prejudice to the rights of the creditors to remove the trustee and appoint another in its place if so advised.

See also *Re Ethier* (1991), 7 C.B.R. (3d) 268 (Ont. Bktcy.) at p. 273.

19      In *Shaw, supra*, it should be noted at p. 199 that the trustee had as some (material) shareholders (and a director) persons who were making large claims in the estate of the bankrupt company. As for *Lamb, supra*, the trustee was a creditor of two estates which were in competition with each other as to ownership of the only asset of value as A.L. Smith L.J. said at pp. 820-1:

> Now, what is the salient point in this case? If a man has a pecuniary interest in the success of one estate which is the creditor of another estate, and he has no pecuniary interest in the success of the other estate, and he is called upon to act for both, it seems to me that a prima facie case is made out that he is placed in a difficulty as regards acting with impartiality between the two. It is obvious — everybody knows it who has any knowledge of life — that when a man has a pecuniary interest, his mind is naturally warped in favour of his own interest. It is human nature, and no one can doubt it. Beyond all question Mr. Gregson has a pecuniary interest as a creditor to the amount of 3,000*l*. in the success of Emerson's estate. As regards Lamb's estate he as a creditor has a pecuniary interest of only 400*l*., and it is said that Emerson's estate is a creditor of Lamb's estate. Standing in this position between the two estates, can it be said with truth that Mr. Gregson's connection with Emerson's estate is not such as to make it difficult for him to act with impartiality towards Lamb's creditors? This is the real question, and that question my brother Vaughan Williams did not put to himself. If he had done so, I think he would have answered it in the same way as I am now doing. We are not suggesting that Mr. Gregson is not a gentleman

1995 CarswellOnt 1169, [1995] O.J. No. 3993, 37 C.B.R. (3d) 237

of probity — not a word has been said about that — but the question is, whether upon the facts of the case the objection of the Board of Trade to his appointment as trustee of Lamb's estate was a valid objection. In my judgment it was.

20     I think it instructive to recall what Cave J. said in *Re Martin* (1888), 21 Q.B.D. 29 at p. 33:

The objection which is taken here is the third of those objections, namely, that the connection of this trustee with, or his relation to, the bankrupt or his estate makes it difficult for him to act with impartiality in the interests of the creditors generally. It is not easy to lay down any general rule, and indeed it is a question of fact with regard to which it is, to my mind, impossible to lay down any accurate general rule. Every case must depend more or less upon its circumstances, and, having regard to the expressions in the Act, one must see whether the facts are such as to lead to the conclusion that the trustee's connection with or relation to the bankrupt or his estate makes it difficult for him to act with impartiality.

21     Is there such a problem for Richter in these circumstances? I think not if one looks at the situation well informed and objectively. As Tysoe J. in *Re Western Canada Beverage Corp.* (1993), 22 C.B.R. (3d) 10 (B.C. S.C.) stated at p. 18:

... It has become fashionable to allege conflicts of interest but the Court will not act out of fashion.

It should almost go without saying (and would not be said but for the unfortunate wrangling history of this case) that once Richter were appointed trustee it bears allegiance to the creditors of the estate as an officer of the Court. It is not beholden to any of the creditors on an individual (or segregated) basis and certainly not to UBS, Ontario or the ALC Committee. Its loyalty is to the creditors as they are found — be it UBS, Ontario, other creditors represented by the ALC Committee, the Rehabilitator or Liquidator — as a collective group. So long as it does so then it will not have a problem with impartiality or conflict of interest.

22     NOLA submitted in its factum that it recommends the appointment of an independent, impartial trustee, citing at p. 6 thereof:

See 11 U.S.C. s 101(14) (E). *In re Micro-Time Management Systems Inc.*, 102 B.R. 602 (Bankr. E.D.Mich. 1989) (Bankruptcy trustee held disqualified because of professional relationship with and consultant work for a major creditor of estate); *In re Envirodyne Industries Inc.*, 150 B.R. 1008, 1019 (Bankr. N.D. Ill. 1993) ("The key issue is whether the [allegedly disinterested] firm's interest in maintaining the client relationship with Salomon, the substantial party-in-interest, could impair the firm's ability to act with impartiality, even unconscious impartiality.")

This was responded to by American counsel (Chaim Fortgang) for the ALC Committee who faxed a submission as follows:

In ¶17 of the factum of [NOLA], counsel cites two U.S. Cases for the proposition that under U.S. Law, representation of a creditors' Committee would be a basis to disqualify a professional from acting as trustee or as a professional for a trustee. The cases cited do not so hold at all. They stand for the proposition that prior representation of a *target* in a potential litigation against the target would disqualify a professional from acting on behalf of the estate, because he could not be expected to vigorously pursue a former client. The law in the U.S. clearly permits counsel for a creditors' committee to become counsel to a Trustee after the creditors' committee has been disbanded.

In a case remarkably similar to the instant situation a contested secured claimant objected to counsel for the creditors' committee functioning as counsel for the trustee. It was alleged inter alia, by the contested secured creditor, that counsel for the creditors' committee advised against a settlement of litigation involving subordinating the claim of the secured creditor proposed by the secured creditor and thus was not disinterested.

The court noted that disqualification motions are often used for purely tactical reasons and the impending conflict between the secured creditor and counsel was not a basis for disqualifying counsel for the trustee.

The objecting party argued that the bankruptcy Code intended to disqualify any person who in the slightest degree had some interest or relationship that would color the independent and impartial attitude required by the Code. Thus counsel should be disqualified. The court disagreed and said "It is *clear* that a law firm's prior representation of a Creditors' committee

does not disqualify it from representing a trustee in bankruptcy." In a REA Holding Corporation 4 BCD 1249 (Bkptcy S.D.N.Y. 1979). In re W.T. Grant 4 B.R. (53 Bkptcy S.D.N.Y. 1980).

The Court further observed "Indeed, their previous familiarity with this case through their preparations on behalf of the creditors' committee will station this firm in a position where further delay and expense should be eliminated which might otherwise have been incurred if another law firm were brought into this case by the trustee to investigate the underlying events and transactions."

Counsel to NOLA apparently does not appreciate the distinction between having represented an individual creditor with an adverse interest which may be a basis for disqualification and having represented a creditors' committee (which *is* the estate) which *can not* be a basis for disqualification.

23   I have a number of varying observations concerning these submissions. While I appreciate that there are foreign elements in this matter, including American elements, what we have here is the nomination and appointment of a trustee for a bankrupt estate in Canada pursuant to BIA. That process if governed by Canadian law and a Canadian statute. That is not to say that judges of our court are chauvinistic or xenophobic. To the contrary, we will consider foreign jurisprudence in context and specifically where there appears to be a gap in our jurisprudence. As I said however in another case: *Re Cadillac Fairview*, unreported, released Feb. 9, 1995 at p. 7 for somewhat different purposes:

Recognizing that this is a *CCAA* proceeding which will be governed by Canadian law, perhaps it would be highly desirable for Canadian counsel for all stakeholders to ensure that their clients (and their non-Canadian counsel) appreciate some of the differences between our reorganization law and procedures and that with which they may be more familiar.

When I speak of taking foreign cases in context, one of the most obvious aspects is to consider whether foreign statute law is substantially different in essential elements. However it may be appropriate, keeping in mind that the U.S. legislation has a detailed overwhelming impact on these American cases to review how that jurisdiction views potential conflict situations.

24   Further I would observe that it is unfortunate that it was left up to this court to determine that *REA, supra*, had been ruled upon by the U.S. District Court (S.D.N.Y.) on January 14, 1980 (2 B.R. 733) and the case remanded back to the Bankruptcy Court for reconsideration (as to which see Bankr. L.Rep. (CCH) P67 483, 22 Collier Bankr. Cas. (MB) 1051 (Bankr. S.D.N.Y. 1980)). However it appears to me that this appellate decision was based upon a question of failure to disclose potential conflict of interest and not upon the fact of co-counsel's prior involvement with the creditors' committee in superseded chapter XI proceedings which had been found by the Bankruptcy Court not to conflict with its present role in the bankruptcy proceedings. The prior involvement with that creditors' committee did not appear to trouble the appellate court. As Galgay J. (the bankruptcy judge) said at p. 1253:

The law firm served as counsel to the Official Creditors' Committee during the REA Chapter XI proceeding but at no point in the REA proceeding did Whitman & Ransom represent any particular railroad or airline. The role of counsel to an official creditors' committee is not adverse to or in conflict with the role of counsel to a bankruptcy trustee if liquidation should subsequently ensue.

25   In *Grant, supra*, decided a month after the release of the appellate decision in *REA*, Galgay J. said at pp. 82-3:

... It is also asserted that WGM's role as co-counsel to the Chapter XI Creditors' Committee constitutes a disqualification factor.

[34] This Court recently had the opportunity to review the factors to be considered in entertaining a motion to disqualify attorneys for a trustee in re REA Holding Corp., 4 Bankr.Ct.Dec. 1249 (S.D.N.Y. 1979). The disqualification of both a trustee and his co-counsel was sought upon alleged conflicts of interest which prevented them from adequately representing the interests of the bankrupt estate. Among the alleged conflicts cited was the fact that the counsel for the trustee had represented the Creditors' Committee during the Chapter XI case that preceded an adjudication in bankruptcy and the retention of such counsel by the trustee. In considering that motion I was guided by the teachings of Emle Industries, Inc.

V. Patentex, Inc., 478 F.2d 562 (2d Cir. 1973). Emle admonishes courts to recognize their "responsibility to preserve a balance, delicate though it may be, between an individual's right to his own freely chosen counsel and the need to maintain the highest ethical standards of professional responsibility." 4 Bankr.Ct.Dec. at 1253 (citation omitted). Additionally, I noted the difficulties involved in evaluating the claims asserted in the perspective of the guidelines provided by United States v. Standard Oil Company, 136 F.Supp. 345, 367 (S.D.N.Y. 1955), which states:

When dealing with ethical principles, it is apparent that we cannot paint with broad strokes. The lines are fine and must be so marked. Guideposts can be established when virgin ground is being explored, and the conclusion in a particular case can be reached only after painstaking analysis of the facts of precise application of precedent.

I concluded and reaffirm that "(t)he role of counsel to an official creditors' committee is not adverse to or in conflict with the role of counsel to a bankruptcy trustee if liquidation should subsequently ensue." 4 Bankr.Ct.Dec. at 1253.

In the appeal decision of Re W.T. Grant Co. 1, 699 F.2d 599 (2d. Cir. N.Y. 1983) Friendly J. in dismissing the appeal said at p. 613:

We see no reason to disagree with Judge Galgay's reaffirmation, 4 B.R. at 83, of his conclusion in In re REA Holding Corp., 4 Bankr.Ct.Dec. 1249, 1253 (Bankr.S.D.N.Y. 1979), vacated and remanded on other grounds, 2 B.R. 733 (S.D.N.Y. 1980), that "[t]he role of counsel to an official creditors' committee is not adverse to or in conflict with the role of counsel to a bankruptcy trustee if liqui dation should subsequently ensue." WGM's previous representation of one or more of the banks or their subsidiaries in unrelated matters is scarcely a ground for disqualification. There is no contention that WGM regularly served any of the banks in bankruptcy cases, and their having done so in one or more unrelated cases would not prevent a vigorous assertion of the claims of the subordinated debentureholders against the banks. On an issue of this sort particular weight should be given to the conclusion of the Bankruptcy Judge, who had abundant opportunities to observe the activities of WGM over many months and concluded "that the Trustee's attorneys have served him and the creditors of the bankrupt estate with vigor, objectivity and independence."

26    I think it appropriate to take a look at the fact situations in *Micro-Time* and *Envirodyne, supra*. In both there would appear to be a problem with ongoing relationships of significance with creditors who may be adverse in interest to the bankrupt estate. In *Envirodyne* at pp. 1018-9 Schwartz C.J. said:

... Judge Schmetterer based the American Printers decision, in part, on the reasoning in re Amdura Corp., 121 B.R. 862 (Bankr.D.Colo. 1990). In Amdura, a firm seeking to be employed as debtor's counsel represented the debtor's primary secured lender on an ongoing basis in matters unrelated to the bankruptcy case. The debtor commenced the bankruptcy case as result of its inability to reach an accommodation with the lender. A partner of the firm testified that other counsel would have to be employed to investigate and prosecute a potential suit against the lender because the firm would not "bite the hand that feeds it." In re Amdura, 121 B.R. at 867. During the February 10 hearing, Mr. Millstein argued that the facts in this case do not justify disqualifying Cleary, Gottlieb because, unlike the creditor in Amdura, Salomon is not the primary secured creditor in this case. Mr. Millstein apparently believes that the relative size of the creditor's claim vis-a-vis the estate's total debt is necessarily relevant to whether Debtors' counsel may continue to maintain a relationship with that creditor without violating the tests of Sec. 327(a).

Counsel's argument is not persuasive. The key issue is whether the firm's interest in maintaining the client relationship with Salomon, a substantial party-in-interest, could impair the firm's ability to act with impartiality, even unconscious impartiality. The Amdura opinion correctly focuses on the law firm's ability to act impartially as the debtor's representative in all matters. The court in Amdura does not consider the relative size of the creditor's claim in a vacuum, but in conjunction with the creditor's status as a major client of the firm. Amdura, 121. B.R. at 869.

The court must remain cognizant of the fact that Salomon is an insider, a 64% owner, and a substantial creditor of the Debtor Envirodyne. The negotiation of a plan of reorganization likely will necessitate negotiation with Salomon, a "substantial

client" of Cleary, Gottlieb. Given these facts in this case, the Debtors' interests and the interests of the creditor body as a whole are not best represented at a negotiation table by a lawyer who faces a substantial client on the other side. (FN14)

27    In *Micro-Time* Rhodes J. stated at pp. 607-8:

[4] The facts in this case are essentially the same as those in re Gray, 64 B.R. 505 (Bankr.E.D.Mich.1986). Although the trustee and the accountants for the trustee are not prepetition creditors of the estate, Bohl's work for Comerica does present a potential, if not an actual, conflict of interest. Comerica was a major creditor of Micro-Time. The amount of its debt was very strongly disputed and there had been an adverse relationship between the principal of the debtor (Kirkland) and Comerica. When the trustee was appointed, it was clear that a successful resolution of Micro-Time's dispute with Comerica would be a necessary prerequisite to any successful chapter 11 reorganization of Micro-Time. Any hint of any prior or ongoing relationship between Comerica and Bohl would create at least the appearance of impropriety. This is sufficient under the case law and section 101(13) to disqualify John C. Bohl, Jr. as trustee and Parker, Bohl & Associates as accountants for the trustee.

Like the accounting firm in Gray, Bohl did not disclose his potentially disqualifying relationship with Comerica in either the trustee's declaration of disinterest or in the affidavit he submitted when he applied for approval to appoint Parker, Bohl & Associates as accountants for the trustee. Instead, Bohl swore in his affidavit that "To the best of my knowledge neither our firm nor any member thereof ... holds any interest adverse to the matters upon which we are to be engaged. Neither I nor any member of my firm has any relationship or interest in the above named debtor or any other parties of interest therein." These statements were false; Bohl had an ongoing relationship with Comerica.

*Micro-Time* and *Envirodyne* illustrate quite different concerns than the situation prevailing here. There is no suggestion of an ongoing relationship with the ALC Committee side which would possibly influence Richter from its neutral, impartial role as trustee, acting in the best interests of the estate.

28    Thus given that Richter is the preference of the petitioning creditor (and of the ALC Committee which appears to represent apparently unchallenged major creditors); it has the advantage of being quite familiar with and knowledgeable of the situation from its prior involvement as forensic investigator; the proprietary claims have been acknowledged as complex and difficult to describe; those advancing proprietary claims have had the advantage of advice from their own forensic investigators; it does not appear on the material before me that Richter has any ongoing relationship with any creditor and particularly not with any creditor or claimant which may have an adverse position to the estate, it would not seem to me appropriate to disqualify Richter as the nominee for trustee in place of Deloitte in the petition by UBS, but rather it would seem that Richter was adequately qualified to act as trustee. This result would avoid the estate taking a significant period of time to catch up with potential slippage exposure if the litigation heats up quickly and a duplication of expense for another firm to come to the same position as Richter now is on the learning curve. On a practical basis, given what is at stake in relation to the funds already expended as to Richter's investigation, I do not see this duplication as a major factor but certainly it is a reasonable factor to consider. To their credit the Rehabilitator and the Liquidator have acknowledged that they in essence expect a fair fight in the proprietary claim situation against a trustee which is adequately and well prepared; they were not opposing Richter on the basis of knocking out a worthy opponent. The Liquidator had no concern about Richter being hired as a consultant by any trustee; I understand the Rehabilitator's attitude to have been the same. They were concerned, I take it, that Richter was beholden to the ALC Committee and the creditors it represented. As discussed, that relationship is at an end and Richter must be indifferent to all creditors, whomsoever they may be. Certainly this aspect of neutrality must be demonstrated throughout the trusteeship, including any s. 163 examinations.

29    In the result I see no impediment to Richter replacing Deloitte as the nominee for trustee in the UBS petition order accordingly.

30    As a postscript I would observe that my secretary and the manager of the Commercial List/Bankruptcy Office were bombarded with calls yesterday and today as to when my decision was going to be released and why it had not been then released. Counsel have advised that they had not done so. It may be that these enquiries were made by persons who were trading

1995 CarswellOnt 1169, [1995] O.J. No. 3993, 37 C.B.R. (3d) 237

in or arbitraging claims. Such behaviour is not only inappropriate, but also counterproductive (looking at their self interest of having the decision as early as possible).

*Motion granted.*

---

**End of Document**
Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 29

**Consolidated-Bathurst Export Limited**
(*Plaintiff*) *Appellant*;

and

**Mutual Boiler and Machinery Insurance
Company** (*Defendant*) *Respondent.*

1979: March 13; 1979: December 21.

Present: Martland, Ritchie, Pigeon, Dickson, Beetz,
Estey, and McIntyre JJ.

ON APPEAL FROM THE COURT OF APPEAL FOR
QUEBEC

*Insurance — Interpretation of insurance contracts —
Definition of accident — Direct and consequential
damages.*

The appellant, a manufacturer of paper products, was
required to shut down part of its facilities because of the
failure of three heat exchangers and thereby suffered a
loss of $158,289.24 of which $15,604.44 was direct
damage to the tubes in the heaters. The respondent is
the insurer under a policy issued in respect of certain
property of the appellant including these heat exchang-
ers. The respondent resists the appellant's claim for the
above mentioned loss on the basis that the damage was
caused by corrosion of the tubes inside the heat
exchangers and this risk was specifically excluded from
the coverage provided by the policy of insurance. This
position was adopted in both the Superior Court and the
Court of Appeal. Hence the appeal of the plaintiff to
this Court.

*Held* (Martland, Ritchie and McIntyre JJ. dissent-
ing): The appeal should be allowed.

*Per* Pigeon, Dickson, Beetz and Estey JJ.: The issue is
whether the loss occasioned by the corrosion of the heat
exchangers is recoverable under the terms of the policy.
The heart of the argument is that while the definition of
accident in the policy does not include the event of
corrosion or similar events such as "wear and tear,
deterioration, depletion, or erosion of material" the defi-
nition does include, in the appellant's submission, events
which succeed and which may be due to the event of
corrosion.

In interpreting an insurance contract, effect must first
be given to the intention of the parties, to be gathered
from the words they have used, just as in any other
contract. Step two is the application, when ambiguity is
found, of the *contra proferentem* doctrine by which any
doubt as to the meaning and scope of the excluding or
limiting term is to be resolved against the party who has
inserted it and who is now relying on it. Even apart from

**Exportations Consolidated Bathurst Limitée**
(*Demanderesse*) *Appelante*;

et

**Mutual Boiler and Machinery Insurance
Company** (*Défenderesse*) *Intimée.*

1979: 13 mars; 1979: 21 décembre.

Présents: Les juges Martland, Ritchie, Pigeon, Dickson,
Beetz, Estey et McIntyre.

EN APPEL DE LA COUR D'APPEL DU QUÉBEC

*Assurance — Interprétation des contrats d'assurance
— Définition d'accident — Dommages directs et
indirects.*

L'appelante, un fabricant de produits du papier, a dû
fermer une partie de son usine en raison de la panne de
trois échangeurs de chaleur, ce qui lui a occasionné une
perte de $158,289.24, dont $15,604.44 de dommages
directs aux tubes des échangeurs. L'intimée est l'assu-
reur aux termes d'une police relative à certains biens de
l'appelante, y compris ces échangeurs de chaleur. L'inti-
mée conteste la réclamation de l'appelante pour la perte
susmentionnée au motif que les dommages résultent de
la corrosion des tubes à l'intérieur des échangeurs de
chaleur et que ce risque est spécifiquement exclu de la
protection offerte par la police d'assurance. La Cour
supérieure et la Cour d'appel ont toutes deux adopté
cette position. La demanderesse se pourvoit donc devant
cette Cour.

*Arrêt* (les juges Martland, Ritchie et McIntyre sont
dissidents): Le pourvoi est accueilli.

*Les juges Pigeon, Dickson, Beetz et Estey*: La ques-
tion est de savoir si la perte causée par la corrosion des
échangeurs de chaleur est garantie par les clauses de la
police. Le cœur de l'argument est que bien que la
définition du mot accident dans la police ne comprenne
pas le cas de la corrosion ou des cas semblables tels que
«l'usure normale, la détérioration, l'épuisement ou l'éro-
sion du matériel», la définition inclut, aux dires de
l'appelante, ce qui suit la corrosion et qui peut en
résulter.

Dans l'interprétation d'un contrat d'assurance, tout
comme dans n'importe quel autre contrat, il faut
d'abord donner effet à l'intention des parties qui se
dégage des mots qu'elles ont employés. La deuxième
étape est l'application, lorsqu'il y a ambiguïté, de la
doctrine *contra proferentem*; elle prévoit que le doute
quant au sens et à la portée de la clause d'exclusion ou
limitative sera résolu contre la partie qui l'a introduite et

this doctrine the normal rules of construction lead a court to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract. There is no dispute that the heat exchangers were covered by the insurance contract. There is also no serious dispute that corrosion of the tubes inside the heat exchanger, probably caused by the presence of sea water, was the effective cause of the breakdown of the heat exchanger. The insurer, as was its right, sought in the terms of the contract to limit its exposure to accidental loss and did so by seeking to confine the definition of accident. To interpret "corrosion" as that word is employed in the definition of accident in the manner sought by the respondent would be to eliminate from the insurance coverage any and all loss suffered by the insured mill operator by reason of the intervention of the condition of corrosion. Such an interpretation would necessarily result in a substantial nullification of coverage under the contract.

*Per* Martland, Ritchie and McIntyre JJ., *dissenting*: While the policy here covers damage to property other than the object itself, the coverage is limited to indemnity in respect of loss or damage to property of the insured <u>directly</u> caused to an object by an accident as that word is defined in the policy. Therefore an interpretation which would result in affording coverage to the insured for <u>consequential</u> damages whether it was due to corrosion or otherwise cannot be adopted. The only "direct" damage to any object in the appellant's plant was the damage to the tubes themselves and the plain language of the insuring agreement in defining "accident" appears to contemplate and exclude from coverage the very event which happened here, namely, damage being caused to an object which was the property of the insured as a result of "corrosion of ... material".

[*Indemnity Insurance Company of North America v. Excel Cleaning Service*, [1954] S.C.R. 169, followed; *Pense v. Northern Life Assurance Co.* (1907), 15 O.L.R. 131, aff'd (1908), 42 S.C.R. 246; *Stevenson v. Reliance Petroleum Ltd.; Reliance Petroleum Ltd. v. Canadian General Insurance Co.*, [1956] S.C.R. 936; *Cornish v. Accident Insurance Co.* (1889), 23 Q.B. 453 (C.A.) referred to.]

APPEAL from a judgment of the Court of Appeal of Quebec affirming a judgment of the Superior Court. Appeal allowed, Martland, Ritchie and McIntyre JJ. dissenting.

qui cherche maintenant à l'invoquer. Même indépendamment de cette doctrine, les règles normales d'interprétation amènent une cour à rechercher une interprétation qui, vu l'ensemble du contrat, tend à traduire et à présenter l'intention véritable des parties au moment où elles ont contracté. Il n'est pas contesté que les échangeurs de chaleur sont protégés par le contrat d'assurance. Il n'est pas non plus sérieusement contesté que la corrosion des tubes à l'intérieur des échangeurs de chaleur, probablement causée par la présence d'eau de mer, a été la cause réelle de leur panne. Comme il en a le droit, l'assureur a cherché dans les termes du contrat à limiter sa protection à la perte accidentelle, ce qu'il a fait en essayant de restreindre la définition d'accident. Interpréter la «corrosion» au sens où ce mot est employé dans la définition d'accident, comme le désire l'intimée, équivaudrait à éliminer de la protection de l'assurance toutes les pertes subies par l'assurée en raison de la présence de corrosion. Pareille interprétation entraînerait nécessairement la suppression d'une partie importante de la protection prévue au contrat.

*Les juges* Martland, Ritchie et McIntyre, *dissidents*: Bien que la police en l'espèce garantisse les dommages à des biens autres que l'objet lui-même, la garantie est limitée à une indemnité relativement à la perte des biens de l'assurée ou aux dommages subis par eux résultant <u>directement</u> d'un accident au sens donné à ce mot par la définition de la police. En conséquence, on ne peut adopter une interprétation qui protégerait l'assurée des dommages <u>indirects</u> qu'ils aient été causés par la corrosion ou par autre chose. Les seuls dommages «directs» à un objet quelconque dans l'usine de l'appelante sont ceux subis par les tubes eux-mêmes et les termes clairs employés dans le contrat d'assurance pour définir le mot «accident» prévoient l'événement même qui s'est produit ici, savoir, les dommages causés à un objet appartenant à l'assurée suite à la «corrosion du ... matériel», et l'excluent de la garantie.

[Jurisprudence: *Indemnity Insurance Company of North America c. Excel Cleaning Service*, [1954] R.C.S. 169, arrêt suivi; *Pense v. Northern Life Assurance Co.* (1907), 15 O.L.R. 131, conf. par (1908), 42 R.C.S. 246; *Stevenson c. Reliance Petroleum Ltd.; Reliance Petroleum Ltd. c. Canadian General Insurance Co.*, [1956] R.C.S. 936; *Cornish v. Accident Insurance Co.* (1889), 23 Q.B. 453 (C.A.).]

POURVOI à l'encontre d'un arrêt de la Cour d'appel du Québec qui a confirmé un jugement de la Cour supérieure. Pourvoi accueilli, les juges Martland, Ritchie et McIntyre étant dissidents.

*Guy Desjardins, Q.C.,* for the appellant.

*Marcel Cinq-Mars, Q.C.,* for the respondent.

The reasons of Martland, Ritchie and McIntyre JJ. were delivered by

RITCHIE J. (*dissenting*)—This is an appeal from a judgment of the Court of Appeal of the Province of Quebec affirming the judgment rendered at trial by Mr. Justice Bisson and dismissing the claim of the appellant against its insurer for damage sustained to its property located at a plant which it operated at New Richmond in the Province of Quebec, where it was engaged in the manufacture of paper and paper and wood products.

By reason of their malfunction, direct damage was caused to several tubes in the heaters employed for the heating of bunker "C" fuel with the consequence that temporary closing of the plant became necessary. The appellant's claim in this action encompasses not only the direct damage done to the tubes, but the consequential loss allegedly sustained because of the breakdown of the tubes.

I have had the privilege of reading the reasons for judgment prepared for delivery by my brother Estey in this case, but as I reach a different conclusion concerning the risk insured against by the policy in question, I have found it necessary to express my views separately.

The appellant's claim is made pursuant to the terms of an insurance agreement with the respondent which was in force at the time of the events above referred to whereby the respondent agreed

In consideration of the Premium the Company does hereby agree with the named Insured respecting loss from an Accident, as defined herein, as follows:

. . .

1. ... To pay the Insured for loss or damage to property of the Insured directly caused by such Accident *to an Object*, or if the Company so elects, to repair or replace such damaged property; ...

(The italics are my own.)

The objects covered by the policy are defined in the 1st Schedule thereof as follows:

*Guy Desjardins, c.r.,* pour l'appelante.

*Marcel Cinq-Mars, c.r.,* pour l'intimée.

Version française des motifs des juges Martland, Ritchie et McIntyre rendus par

LE JUGE RITCHIE (*dissident*)—Il s'agit d'un pourvoi à l'encontre d'un arrêt de la Cour d'appel de la province de Québec qui confirme le jugement rendu en première instance par le juge Bisson et rejette la réclamation de l'appelante contre son assureur pour dommages à ses biens situés dans une usine qu'elle exploite à New Richmond dans la province de Québec, où elle fabrique du papier et des sous-produits du papier et du bois.

Suite à leur mauvais fonctionnement, des dommages directs ont été causés à plusieurs tubes dans les échangeurs de chaleur utilisés pour chauffer du mazout lourd de catégorie «C», ce qui a nécessité la fermeture temporaire de l'usine. La réclamation de l'appelante dans cette action comprend non seulement les dommages directs aux tubes, mais la perte indirecte présumément subie suite à l'avarie des tubes.

J'ai eu l'avantage de lire les motifs de jugement préparés par mon collègue le juge Estey dans cette affaire mais, puisque je parviens à une conclusion différente quant au risque assuré par la police en question, j'ai jugé nécessaire d'exposer mon point de vue séparément.

La réclamation de l'appelante est fondée sur un contrat d'assurance qu'elle a conclu avec l'intimée et qui était en vigueur au moment des événements susmentionnés et aux termes duquel l'intimée

[TRADUCTION] Eu égard au paiement de la prime la Compagnie convient par la présente avec l'Assurée désignée, relativement à la perte résultant d'un accident, tel que défini dans la présente:

. . .

1. ... D'indemniser l'Assurée pour la perte de ses biens ou les dommages subis par eux, résultant directement d'un accident *à un objet* ou, si la Compagnie le préfère, de réparer ou de remplacer lesdits biens endommagés; ...

(Les italiques sont de moi.)

Les objets protégés par la police sont définis comme suit dans la première annexe:

The Objects covered under this Schedule are of the type designated as follows:

1. Any metal fired or metal unfired pressure valve; and

2. Any piping, on or between premises of the Insured, connected with such vessel and which contains steam or other heat transfer medium or condensate thereof, air, refrigerant, or boiler feedwater between the feed pump or injector and a boiler, together with the valves, fittings, separators and traps on all such piping.

What is insured against by this agreement in my opinion is damage to the property of the insured "directly caused to an "object" by an "accident" as that word is defined in the policy. While the policy covers damage to property other than the object itself, it only covers that damage when it has been directly caused by "accident" to an "object". I am satisfied that the tubes were "objects" within the meaning of the above definition and that damage directly caused to the tubes would have been covered by the insurance agreement had it not been for the terms of the definition of "accident" contained therein which reads as follows:

C. Definition of Accident—As respects any Object covered under this Schedule, 'Accident' shall mean any sudden and accidental occurrence to the Object, or a part thereof, which results in damage to the Object and necessitates repair or replacement of the Object or part thereof; but Accident shall not mean (a) *depletion, deterioration, corrosion, or erosion of material,* (b) wear and tear (c) leakage at any valve, fitting, shaft seal, gland packing, joint or connection, (d) the breakdown of any vacuum tube, gas tube or brush, (e) the breakdown of any structure or foundation supporting the Object or any part thereof, nor (f) the functioning of any safety device or protection device.

(The italics are my own.)

Both the trial judge and the Court of Appeal were satisfied that the damage to the tubes was occasioned by corrosion and this conclusion is supported by the fact that quantities of salt water did flow through the pipes. Expert evidence was called on behalf of the appellant directed to supporting the submission that the damage was caused by an hydraulic hammer effect of sudden

[TRADUCTION] Les objets protégés par cette annexe sont de la catégorie désignée comme suit:

1. Toute soupape de métal soumise ou non soumise à la flamme; et

2. Toute tuyauterie dans l'usine de l'assurée ou entre ces bâtiments, reliée à un tel récipient et qui contient de la vapeur ou un autre moyen d'échange de chaleur ou condensat de celle-ci, air, réfrigérant ou eau d'alimentation de chaudière entre la pompe d'alimentation ou l'injecteur et une chaudière, ainsi que les soupapes, accessoires, séparateurs et purgeurs de toute ladite tuyauterie.

A mon avis, sont assurés par cette convention les dommages aux biens de l'assurée «causés directement» à un «objet» par un «accident» au sens donné à ce mot par la définition de la police. Bien que la police garantisse les dommages à des biens autres que l'objet lui-même, elle ne les garantit que lorsqu'il ont été causés directement par un «accident» à un «objet». Je suis convaincu que les tubes sont des «objets» au sens de la définition susmentionnée et que les dommages directement causés aux tubes auraient été garantis par le contrat d'assurance n'eût été les termes de la définition d'«accident» y contenue dont voici le texte:

[TRADUCTION] C. Définition d'accident—En ce qui concerne un objet garanti par cette Annexe, «accident» signifie un événement soudain et accidentel touchant l'objet, ou une partie de celui-ci, qui l'endommage et en nécessite la réparation ou le remplacement total ou partiel; mais accident ne signifie pas a) *l'épuisement, la détérioration, la corrosion ou l'érosion du matériel,* b) l'usure normale, c) la fuite d'un raccord, d'un calage, d'un joint d'étanchéité, d'un presse-étoupe, d'un joint ou d'un contact, d) l'avarie d'un tube à vide, d'un tube à gaz ou d'une brosse, e) l'avarie d'une structure ou d'une fondation soutenant l'objet ou une partie de celui-ci, ni f) le fonctionnement d'un dispositif de sécurité ou de sûreté.

(Les italiques sont de moi.)

Le juge de première instance et la Cour d'appel étaient convaincus que les dommages aux tubes ont été causés par la corrosion et cette conclusion est confirmée par le fait qu'une grande quantité d'eau salée a circulé dans les tuyaux. Un témoin expert a été cité par l'appelante pour appuyer la prétention que les dommages ont été causés par un effet de coup de bélier d'origine soudaine qui a

origin which placed an inordinate strain on the pipes and tubes causing them to break. This evidence was, however, not accepted either at trial or in the Court of Appeal and I do not find it necessary to discuss it. In the result it has been concurrently found at trial and on appeal that corrosion was the cause of the damage to the tubes and pipes and it follows from the terms of the "definition of accident" that this damage is not insured against by the policy in question.

It was contended also that even if the coverage afforded by the policy did not include damage by "depletion, deterioration, corrosion" or "wear and tear" within the meaning of the definition of "accident", it was nevertheless effective to make the insurer responsible for consequential loss suffered by the insured as a result of a sudden rupture of the heat exchanger, whether due to corrosion or not. In view of the fact that the coverage is limited to indemnity in respect of loss or "damage to property of the insured <u>directly</u> caused by such accident to an Object", I cannot adopt an interpretation which would result in affording coverage to the insured for <u>consequential</u> damage whether it was due to "corrosion" or otherwise. In my opinion, the only "direct" damage to any object in the appellant's plant was the damage to the tubes themselves and the plain language of the insuring agreement in defining "accident" appears to me to contemplate and exclude from coverage the very event which happened here, namely, damage being caused to an object which was the property of the insured as a result of "corrosion of ... material".

It has been suggested that the language employed in the policy should be construed against the insurance company which was the author of it in accordance with the *contra proferentem* rule which is frequently invoked in the construction of insurance contracts when it is found that all other rules of construction fail to assist the Court in determining the true meaning of the policy.

In this regard my brother Estey has made reference to the reasons for judgment of Cartwright J., as he then was, in *Stevenson v. Reliance Petroleum Limited; Reliance Petroleum Limited*

imposé une pression excessive dans les tuyaux et les tubes, causant leur rupture. Cependant, cette preuve n'a pas été acceptée en première instance ni en Cour d'appel et je n'estime pas nécessaire de l'examiner. Finalement, il a été jugé en première instance et en appel que la corrosion était la cause des dommages aux tubes et aux tuyaux et il découle des termes de la «définition d'accident» que ces dommages ne sont pas assurés par la police en question.

On a également prétendu que même si la protection accordée par la police ne comprenait pas les dommages causés par «l'épuisement, la détérioration, la corrosion» ou «l'usure normale» au sens de la définition d'«accident», elle rendait néanmoins l'assureur responsable de la perte indirecte subie par l'assurée suite à la rupture soudaine de l'échangeur de chaleur, qu'elle ait ou non été causée par la corrosion. Étant donné que la garantie est limitée à une indemnité relativement à la perte des biens de l'assurée ou aux «dommages subis par eux résultant <u>directement</u> d'un accident à un objet», je ne peux adopter une interprétation qui protégerait l'assurée des dommages <u>indirects</u> qu'ils aient été causés par la «corrosion» ou par autre chose. A mon avis, les seuls dommages «directs» à un objet quelconque dans l'usine de l'appelante sont ceux subis par les tubes eux-mêmes et les termes clairs employés dans le contrat d'assurance pour définir le mot «accident» prévoient, selon moi, l'événement même qui s'est produit ici, savoir, les dommages causés à un objet appartenant à l'assurée suite à la «corrosion du ... matériel», et l'excluent de la garantie.

On a avancé que les termes employés dans la police devraient être interprétés contre la compagnie d'assurances qui en est l'auteur, conformément à la règle *contra proferentem* qui est fréquemment invoquée dans l'interprétation des contrats d'assurance lorsque la cour arrive à la conclusion qu'aucune autre règle d'interprétation ne lui permet d'établir le sens réel de la police.

A cet égard, mon collègue le juge Estey a fait référence aux motifs du juge Cartwright, alors juge puîné, dans *Stevenson c. Reliance Petroleum Limited; Reliance Petroleum Limited c. Canadian*

*v. Canadian General Insurance Company*[1] where he said at p. 953:

The rule expressed in the maxim, *verba fortius accipiuntur contra proferentem*, was pressed upon us in argument, but resort is to be had to this rule only when all other rules of construction fail to enable the Court of construction to ascertain the meaning of a document.

It will however be seen from what I have said that I do not find it necessary to resort to this rule in the interpretation of the policy here at issue.

My brother Estey has, however, adopted the view that in construing the policy and particularly the definition of accident contained therein in the manner adopted in these reasons and in those of the majority of the Court of Appeal, the result is to "largely, if not completely, nullify the purpose for which the insurance was sold" which is "a circumstances to be avoided so far as the language used will permit". In this regard reliance is placed on the judgment of this Court in *Indemnity Insurance Company of North America v. Excel Cleaning Service*[2], at pp. 177-178, but with the greatest respect I am unable to relate the circumstances of that case to those with which we are here concerned.

The *Excel Cleaning Service* case was one in which an "on location cleaning service" business was covered by a property damage liability policy insuring it for damage to property caused by accident arising out of its work. This policy however contained an exclusion relating "to damage to or destruction of property owned, rented, occupied or used by or in the care, custody and control of the insured", and the insurer contended that a wall to wall carpet fixed to the floor of a house where the insured was employed which was damaged was "in the care, custody and control of the insured" and therefore excluded from the coverage. Consistent with this reasoning all of the customer's belongings on which the insured was working were similarly exclusions which would have meant that the policy afforded no coverage whatever for the business of the insured. It was in this connection that this Court said, at pp. 177-178:

*General Insurance Company*[1] où il est dit à la p. 953:

[TRADUCTION] Les plaidoiries ont insisté sur la règle exprimée dans la maxime *verba fortius accipiuntur contra proferentem*, mais il faut recourir à cette règle seulement lorsque aucune autre règle d'interprétation ne permet à la Cour de s'assurer du sens d'un document.

Ce que j'ai dit indique toutefois que je n'estime pas nécessaire de recourir à cette règle pour interpréter la police examinée ici.

Toutefois, mon collègue le juge Estey est d'avis qu'en interprétant la police et en particulier la définition du mot accident y contenue de la manière adoptée dans les présents motifs et dans ceux de la majorité de la Cour d'appel, on [TRADUCTION] «annulerait en grande partie, sinon totalement, l'objet de l'assurance» ce qui constitue «une situation qui doit être évitée, dans la mesure où les termes employés le permettent». A cet égard, on s'appuie sur l'arrêt de cette Cour, *Indemnity Insurance Company of North America c. Excel Cleaning Service*[2], aux pp. 177 et 178, mais, avec égards, je ne puis établir un rapport entre les circonstances de cette affaire et celles de la présente.

Dans l'affaire *Excel Cleaning Service* une entreprise de «service de nettoyage à domicile» était protégée par une police d'assurance responsabilité civile pour les dommages matériels causés par un accident survenant dans l'exécution de ses travaux. Cette police contenait cependant une exclusion relative [TRADUCTION] «aux dommages ou à la destruction des biens appartenant à l'assurée, loués, occupés, utilisés par celle-ci ou sous sa responsabilité, sa garde et son contrôle». L'assureur a prétendu qu'une moquette couvrant le plancher d'une maison où l'assurée avait travaillé et qui avait été endommagée était sous «sa responsabilité, sa garde ou son contrôle» et donc exclue de la garantie. Selon ce raisonnement, tous les biens du client sur lesquels l'assurée travaillait étaient aussi exclus, ce qui aurait signifié que la police n'offrait absolument aucune protection à l'entreprise de l'assurée. C'est à ce sujet que la Cour a dit aux pp. 177 et 178:

---

[1] [1956] S.C.R. 936.
[2] [1954] S.C.R. 169.

[1] [1956] R.C.S. 936.
[2] [1954] R.C.S. 169.

Such a construction [as advanced by the insurer] would largely, if not completely, nullify the purpose for which the insurance was sold—a circumstance to be avoided, so far as the language used will permit.

I am respectfully of the opinion that this case involves a very different situation from the one with which we are here concerned. The construction sought to be placed on the Excel Cleaning Service Policy would have meant that although it purported to be a property damage liability policy covering the insured's business, it in fact insured nothing whereas the present policy affords insurance "for loss or damage to property of the insured" directly caused by an accident as defined therein. The meaning assigned to the word "accident" in the policy does not constitute an exclusion from the coverage but is rather a part of the definition of the risk insured against.

For all these reasons, as well as for those stated by Mr. Justice Turgeon, I would dismiss this appeal with costs.

The judgment of Pigeon, Dickson, Beetz and Estey JJ. was delivered by

ESTEY J.—The appellant operates a manufacturing facility for the production of paper products, including paper boxes, at New Richmond, Quebec, and the respondent is the insurer under a policy of insurance issued in respect of certain property of the appellant including the property with which this action is concerned, being three heat exchangers. The heat exchangers in question are described by the trial judge as follows:

[TRANSLATION] The parts of this system with which we are particularly concerned are three heat exchangers, a type of pipe measuring fifteen feet long with an interior diameter of ten inches.

Within each of these three exchangers there are 102 tubes thirteen feet long, with an exterior diameter of 5/8 inch and a metal casing measuring 1/16 inch, or .065 inch.

Inside each exchanger at the ends the 102 pipes pass through a tubular metal plate one inch thick.

Further, the 102 tubes of each exchanger are themselves divided into three groups of 34 tubes each, so that oil flowing in the tubes passes around the exchanger

[TRADUCTION] Une telle interprétation [celle de l'assureur] annulerait en grande partie, sinon totalement, l'objet de l'assurance—une situation qui doit être évitée, dans la mesure où les termes employés le permettent.

Je suis respectueusement d'avis que cette affaire-là porte sur une situation très différente de celle qui nous occupe ici. L'interprétation qu'on a voulu donner à la police d'Excel Cleaning Service aurait signifié que, bien qu'elle se veuille une police d'assurance responsabilité civile pour les dommages matériels protégeant l'entreprise de l'assurée, cette police n'assurait en fait rien, alors que la présente police offre une assurance à [TRADUCTION] «l'assurée pour la perte de ses biens ou les dommages à eux causés» résultant directement d'un accident suivant la définition de ce mot dans la police. Le sens donné au mot «accident» dans la police ne constitue pas une exclusion de la garantie mais est plutôt une partie de la définition du risque assuré.

Pour tous ces motifs, de même que pour ceux énoncés par le juge Turgeon, je suis d'avis de rejeter ce pourvoi avec dépens.

Version française du jugement des juges Pigeon, Dickson, Beetz et Estey rendu par

LE JUGE ESTEY—L'appelante exploite une usine de fabrication de produits du papier, y compris des boîtes de carton, à New Richmond (Québec) et l'intimée est l'assureur aux termes d'une police d'assurance relative à certains biens de l'appelante, y compris les biens qui font l'objet de cette action, savoir, trois échangeurs de chaleur. Le juge de première instance décrit les échangeurs de chaleur en ces termes:

Les pièces qui nous intéressent plus particulièrement dans ce système sont trois échangeurs de chaleur, sorte de tuyaux mesurant quinze pieds de long avec un diamètre inférieur de dix pouces.

A l'intérieur de chacun des ces trois échangeurs, on retrouve 102 tubes de treize pieds de longueur, d'un diamètre extérieur de 5/8 de pouce et dont la paroi métallique mesure 1/16 de pouce ou .065 pouce.

A chacune de leurs extrémités, à l'intérieur de l'échangeur, les 102 tuyaux pénètrent dans une plaque tubulaire métallique d'un pouce d'épaisseur.

D'autre part, les 102 tubes de chaque échangeur sont eux-mêmes divisés en trois groupes de 34 tubes chacun, de façon à ce que l'huile s'écoulant dans les tubes fasse

three times and is heated to the right level before emerging and being directed towards the boilers as a fuel.

Steam circulates in the exchangers, passing in through the left end immediately to the right of the tubular plate and emerging at the right end, just as it strikes the other tubular plate.

Each exchanger is sealed at each end by a lid.

As the exchanger measures fifteen feet and the tubes thirteen feet, it follows that a space of one foot remains at each end between the tubular plate and the lid closing the exchanger.

The whole apparatus forms a sealed unit, which it was established cannot be opened without causing a break-down and considerable damage.

Due to the failure of these heat exchangers, the appellant was required to shut down part of their facilities and thereby suffered a loss which the parties have agreed amounted to $158,289.24. This sum is set out in the Plaintiff's Declaration and includes "Direct Damage Loss" of $15,604.44. The insurer resists the appellant's claim on the basis that the damage was caused by corrosion of the tubes inside the heat exchanger and this risk was specifically excluded from the coverage provided by the policy of insurance. The material provisions of the policy of insurance issued by the respondent are as follows:

### INSURING AGREEMENT

In consideration of the Premium the Company does hereby agree with the named Insured respecting loss from an Accident, as defined herein, as follows:

COVERAGE A—PROPERTY OF THE INSURED

1. ACTUAL CASH VALUE—To pay the Insured for loss of or damage to property of the Insured directly caused by such Accident to an Object, or if the Company so elects, to repair or replace such damaged property; and

The definition of accident as employed in the above excerpt is as follows:

As respects any Object covered under this Schedule, "Accident" shall mean any sudden and accidental occurrence to the Object, or a part thereof, which results in damage to the Object and necessitates repair or

trois fois le circuit de l'échangeur pour être chauffée à point avant d'en sortir pour se diriger comme combustible vers les bouilloires.

Quant à la vapeur, elle circule dans les échangeurs, pénétrant par l'extrémité de gauche immédiatement à droite de la plaque tubulaire, pour en ressortir à l'extrémité de droite, tout juste au moment où elle frappe l'autre plaque tubulaire.

Chaque échangeur est scellé à chacune des deux extrémités par un couvercle.

L'échangeur mesurant quinze pieds, et les tubes, treize pieds, il faut en conclure qu'il reste un espace d'un pied à chaque extrémité entre la plaque tubulaire et le couvercle qui ferme l'échangeur.

Le tout forme une unité scellée dont on a établi qu'il ne saurait être question de l'ouvrir sans la démanteler et y causer des dommages considérables.

En raison de la panne de ces échangeurs de chaleur, l'appelante a dû fermer une partie de son usine, ce qui lui a occasionné une perte évaluée par les parties à $158,289.24. Ce montant est détaillé dans la déclaration de l'appelante et comprend la «perte directe» de $15,604.44. L'assureur conteste la réclamation de l'appelante au motif que les dommages résultent de la corrosion des tubes à l'intérieur des échangeurs de chaleur et que ce risque est spécifiquement exclu de la protection offerte par la police d'assurance. Les clauses essentielles de la police d'assurance délivrée par l'intimée sont les suivantes:

[TRADUCTION]

### CONVENTION D'ASSURANCE

Eu égard au paiement de la prime la Compagnie convient par la présente avec l'Assurée désignée, relativement à la perte résultant d'un accident, tel que défini dans la présente:

GARANTIE A—BIENS DE L'ASSURÉE

1. VALEUR RÉELLE—D'indemniser l'Assurée pour la perte de ses biens ou les dommages subis par eux, résultant directement d'un accident à un objet ou, si la Compagnie le préfère, de réparer ou remplacer lesdits biens endommagés; et

Voici la définition du mot accident employé dans l'extrait ci-dessus:

[TRADUCTION] En ce qui concerne un objet garanti par cette Annexe, «accident» signifie un événement soudain et accidentel touchant l'objet, ou une partie de celui-ci, qui l'endommage et en nécessite la réparation ou le

replacement of the Object or part thereof; but Accident shall not mean (a) depletion, deterioration, corrosion, or erosion of material, (b) wear and tear, (c) leakage at any value, fitting, shaft seal, gland packing, joint or connection, (d) the breakdown of any vacuum tube, gas tube or brush, (e) the breakdown of any structure or foundation supporting the Object or any part thereof, nor (f) the functioning of any safety device or protective device.

The employees of the appellant became aware of the failure of the heat exchangers when small fuel oil spots were noticed on linerboard being produced in the mill. The source of the oil was traced to the boiler and hence to the heat exchangers where a number of ruptured tubes were discovered.

The appellant advanced two main submissions:

(a) that the damage was caused by hydraulic hammer effect; and,

(b) alternatively, that the damage was caused by corrosion and that the terms of the policy do not exclude damage thus occasioned.

The learned trial judge found that the damage was caused by corrosion and discusses the contribution of pressure changes as follows:

[TRANSLATION] There is no doubt that the damage occurred suddenly, but the phenomenon which led up to it, namely the chemical process of corrosion, was not of a sudden and accidental nature, so that it could not be regarded as an "accident".

On December 4, 1968 some occurrence, probably a fall in the steam pressure in the heat exchanger, caused a failure in certain oil tubes, which moreover apparently broke in a relatively short space of time.

The fact remains, however, that corrosion was the cause of the damage.

The majority of the Court of Appeal found the damage was the result of corrosion and thereby excluded from policy coverage. Turgeon J.A. dealt with the hydraulic hammer theory as follows:

[TRANSLATION] This was a possibility, not a probability, mentioned by appellant's expert witness Mahoney in his examination in chief. However, when he was

remplacement total ou partiel; mais accident ne signifie pas a) l'épuisement, la détérioration, la corrosion ou l'érosion du matériel, b) l'usure normale, c) la fuite d'un raccord, d'un calage, d'un joint d'étanchéité, d'un presse-étoupe, d'un joint ou d'un contact, d) l'avarie d'un tube à vide, d'un tube à gaz ou d'une brosse, e) l'avarie d'une structure ou d'une fondation soutenant l'objet ou une partie de celui-ci, ni f) le fonctionnement d'un dispositif de sécurité ou de sûreté.

Les employés de l'appelante se sont aperçus de la panne des échangeurs de chaleur lorsqu'ils ont remarqué des taches d'huile sur les feuilles de carton en voie de fabrication à l'usine. La source de l'huile a été retracée dans la chaudière et de là dans les échangeurs de chaleur où l'on a découvert un certain nombre de tuyaux fissurés.

Voici les deux prétentions principales de l'appelante:

a) que les dommages ont été causés par l'effet d'un coup de bélier; et,

b) subsidiairement, que les dommages ont été causés par la corrosion et que les termes de la police n'excluent pas les dommages ainsi causés.

Le savant juge de première instance a jugé que les dommages avaient été causés par la corrosion et discute ainsi de l'effet de la chute de pression:

Que le dommage se soit manifesté de façon soudaine, cela ne fait aucun doute, mais le phénomène qui l'a entraîné c'est-à-dire le processus chimique de la corrosion ne s'est pas réalisé de façon soudaine et accidentelle, de sorte qu'on ne peut dire qu'il y a un «accident».

Le 4 décembre 1968, un événement, vraisemblablement la chute de pression de vapeur d'eau dans l'échangeur de chaleur, a provoqué la rupture de certains tubes d'huile, qui se seraient d'ailleurs rupturés à plus ou moins brève échéance.

Mais il n'en reste pas moins que la cause du dommage a été la corrosion.

La majorité de la Cour d'appel a jugé que les dommages avaient été causés par la corrosion et qu'ils étaient donc exclus de la protection de la police. Le juge Turgeon a traité ainsi de la théorie du coup de bélier:

Il s'agit là d'une possibilité invoquée par l'expert Mahoney de l'appelante à son interrogatoire en chef, non d'une probabilité. Cependant, lorsqu'il fut contre-

1979 CanLII 16 (SCC)

cross-examined, he admitted that he could not provide any direct evidence that a "hydraulic hammer" effect was produced, or that there was excessive pressure, or that the safety valves did not operate effectively.

Dissenting from the majority, Kaufman J.A. appears to have adopted in part the hydraulic hammer theory as being a "trigger" which precipitated the leaks in the tubes. The learned justice went on to state:

But where, as here, the pressure suddenly increased, it will not do for the insurer to point to the corrosion and say that, sooner or later, the tubes would have burst anyway.

Thus it will be seen that in both courts below the cause of the damage was found to be corrosion of the tubes which both courts went on to conclude was a risk or peril not covered by the insurance contract.

The issue is simply, therefore, whether the admitted loss suffered by the appellant and which was occasioned by the corrosion of the heat exchangers is a loss recoverable under the above-quoted terms of the policy of insurance issued by the respondent to the appellant. This leaves the alternative submission advanced by the appellant, namely that the term of the contract of insurance covers the damages suffered by the appellant. The heart of this argument is that while the definition of accident does not include the event of corrosion or similar events such as "wear and tear, deterioration, depletion, or erosion of material", the definition does include, in the appellant's submission, events which succeed and which may be due to the event of corrosion. Thus the insurer would not be liable under the contract for the cost of repairing or replacing any insured property damaged by "depletion, deterioration, corrosion, wear and tear, etc.", but would be responsible for any consequential loss to the insured following the sudden rupture of the heat exchanger whether or not it be due to "corrosion" or "wear and tear", etc.

In the preliminary provisions setting up the coverage under the policy of insurance, the definition of accident is, of course, fundamental, and strip-

interrogé, il a admis qu'il ne pouvait fournir aucune preuve directe qu'il se serait produit un «hydraulic hammer» ni qu'il y avait eu une pression excessive, ni enfin que les valves de sécurité n'avaient pas fonctionné adéquatement.

Le juge Kaufman, dissident, a retenu en partie la théorie que le coup de bélier a joué comme «déclic» qui a accéléré les fuites dans les tubes. Le savant juge a poursuivi:

[TRADUCTION] Mais lorsque, comme en l'espèce, la pression augmente soudainement, l'assureur ne peut accuser la corrosion et dire que, dans un avenir plus ou moins rapproché, les tubes auraient éclaté de toute façon.

Il est donc clair que les deux cours d'instance inférieure ont conclu que la cause des dommages était la corrosion des tubes qui, selon elles, n'est pas un risque ou un péril garanti par le contrat d'assurance.

Donc, la question est simplement de savoir si la perte que l'on admet avoir été subie par l'appellante et qui a été causée par la corrosion des échangeurs de chaleur est une perte garantie par les clauses précitées de la police d'assurance délivrée par l'intimée à l'appelante. Ceci laisse la prétention subsidiaire de l'appelante, savoir, que les clauses du contrat d'assurance garantissent les dommages qu'elle a subis. Le cœur de cet argument est que bien que la définition du mot accident ne comprenne pas le cas de la corrosion ou des cas semblables tels que «l'usure normale, la détérioration, l'épuisement ou l'érosion du matériel», la définition inclut, aux dires de l'appelante, ce qui suit la corrosion et qui peut en résulter. Ainsi, l'assureur ne serait pas responsable en vertu du contrat du coût des réparations ou du remplacement d'un bien assuré endommagé par «épuisement, détérioration, corrosion, usure normale etc.», mais le serait de toute perte indirecte subie par l'assurée après la rupture soudaine de l'échangeur de chaleur, qu'elle soit ou non causée par la «corrosion» ou «l'usure normale» etc.

Dans les dispositions préliminaires sur la garantie accordée par la police d'assurance, la définition d'accident est, bien sûr, fondamentale et, si l'on ne

ping out the words not here relevant, the definition reads as follows:

Accident shall mean a sudden and accidental occurrence to the object ... but accident shall not mean ... corrosion ...

Some light may be thrown on this interpretation difficulty by reference to a latter portion of the policy of insurance headed "Exclusions". The following excerpts illustrate the drafting technique employed in the policy where risks are to be excluded from its coverage:

### EXCLUSIONS

This policy does not apply to

1. **WAR DAMAGE**—Loss from an Accident <u>caused directly or indirectly</u> by

    (a) Hostile or warlike action, including action in hindering, combating or defending against an actual, impending or expected attack, by

. . .

2. **NUCLEAR HAZARDS**—Loss, <u>whether it be direct or indirect, proximate or remote,</u>

    (a) From an Accident <u>caused directly or indirectly</u> by nuclear reaction ...

    (b) From nuclear reaction, nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, <u>caused directly or indirectly by, contributed to or aggravated by an Accident;</u>

. . .

3. **MISCELLANEOUS PERILS**—Loss under Coverages A and B from

. . .

    (b) An Accident <u>caused directly or indirectly by fire</u> or from the use of water or other means to extinguish fire;

. . .

    (d) Flood <u>unless an Accident ensues and the Company shall then be liable only for loss from such ensuing Accident;</u>

. . .

(Emphasis added.)

Thus it may be argued that when the draftsman wished to exclude consequences from an event, the words "directly or indirectly" were employed. Had

retient que les mots pertinents à l'espèce, la définition devient:

Accident signifie un événement soudain et accidentel touchant l'objet ... mais accident ne signifie pas ... la corrosion ...

L'examen d'un chapitre de la police que l'on trouve plus loin et qui est intitulé «Exclusions» peut jeter un peu de lumière sur cette difficulté d'interprétation. Les extraits suivants illustrent la technique de rédaction utilisée dans la police lorsque des risques en sont exclus:

[TRADUCTION]
### EXCLUSIONS

Cette police ne s'applique pas aux

1. **AVARIES CAUSÉES PAR LA GUERRE**—La perte résultant d'un accident <u>causé directement ou indirectement</u> par

    a) une action hostile ou belliqueuse, comprenant une manœuvre de diversion, de combat ou de défense contre une attaque réelle, imminente ou prévue, par

. . .

2. **DANGERS NUCLÉAIRES**—La perte, <u>qu'elle soit directe ou indirecte, immédiate ou éloignée,</u>

    a) résultant d'un accident <u>causé directement ou indirectement</u> par une réaction nucléaire ...

    b) résultant d'une réaction nucléaire, d'une radiation nucléaire ou d'une contamination radioactive, qu'elles soient ou non contrôlées, <u>causées directement ou indirectement, entraînées ou aggravées par un accident;</u>

. . .

3. **RISQUES DIVERS**—La perte en vertu des garanties A et B résultant

. . .

    b) d'un accident <u>causé directement ou indirectement par le feu</u> ou l'usage de l'eau ou d'un autre moyen d'extinction du feu;

. . .

    d) l'inondation, <u>à moins qu'un accident s'ensuive, et la Compagnie sera alors seulement responsable de la perte résultant d'un tel accident subséquent;</u>

. . .

(C'est moi qui souligne.)

On peut donc prétendre que lorsque le rédacteur a voulu exclure les conséquences d'un événement, il a employé les mots «directement ou indirecte-

1979 CanLII 16 (SCC)

this technique been adopted in the primary coverage provisions excerpted above, it would have read;

Accident does not mean that which directly or indirectly results from corrosion.

Alternatively, if the consequences of corrosion were intended by the parties to be beyond the protection of the contract, such circumstances would have been included under the heading "Exclusions" as a subparagraph comparable to one of those set out above.

At best, one must conclude that the definition of accident, including as it does the reference to corrosion, leaves two clear alternative interpretations open. Firstly, the definition may not include an event relating to corrosion. Secondly, the definition may exclude only the cost of making good the corrosion itself.

Insurance contracts and the interpretative difficulties arising therein have been before courts for at least two centuries, and it is trite to say that where an ambiguity is found to exist in the terminology employed in the contract, such terminology shall be construed against the insurance carrier as being the author, or at least the party in control of the contents of the contract. This is, of course, not entirely true because of statutory modifications to the contract, but we are not here concerned with any such mandated provisions. Meredith J.A. put the proposition in *Pense v. Northern Life Assurance Co.*[3] at p. 137:

There is no just reason for applying any different rule of construction to a contract of insurance from that of a contract of any other kind; and there can be no sort of excuse for casting a doubt upon the meaning of such a contract with a view to solving it against the insurer, however much the claim against him may play upon the chords of sympathy, or touch a natural bias. In such a contract, just as in all other contracts, effect must be given to the intention of the parties, to be gathered from the words they have used. A plaintiff must make out from the terms of the contract a right to recover; a defendant must likewise make out any defence based upon the agreement. The onus of proof, if I may use such a term in reference to the interpretation of a writing, is, upon each party respectively, precisely the same. We are all, doubtless, insured, and none insurers,

ment». Si cette technique avait été adoptée dans les dispositions de garantie de base citées précédemment, le texte aurait été:

Accident ne signifie pas ce qui résulte directement ou indirectement de la corrosion.

Subsidiairement, si les parties ne désiraient pas que les conséquences de la corrosion soient visées par le contrat, ces circonstances auraient été incluses sous le tire «Exclusions» dans un alinéa comparable à l'un de ceux que j'ai cités.

Au mieux, il faut conclure que la définition d'accident, qui mentionne effectivement la corrosion, laisse deux interprétations possibles évidentes. Premièrement, la définition peut n'inclure aucun événement relié à la corrosion. Deuxièmement, la définition peut exclure seulement ce qu'il en coûte pour réparer la corrosion elle-même.

Les contrats d'assurance et les difficultés d'interprétation qu'ils posent ont été examinés par les cours depuis au moins deux siècles, et c'est un truisme de dire que lorsque l'on conclut que le texte du contrat est ambigu, il doit être interprété contre l'assureur qui est l'auteur, ou du moins la partie qui a la haute main sur le contenu du contrat. Ceci n'est pas entièrement vrai, bien sûr, à cause des modifications au contrat imposées par la loi, mais aucune de ces dispositions imposées n'est en litige ici. Dans l'arrêt *Pense v. Northern Life Assurance Co.*[3] à la p. 137, le juge Meredith de la Cour d'appel a formulé la proposition que:

[TRADUCTION] Il n'y a aucune raison valable pour appliquer à un contrat d'assurance une règle d'interprétation différente de celle applicable à un contrat d'une autre nature; et il ne peut y avoir aucune sorte d'excuse pour jeter le doute sur le sens de pareil contrat en vue de l'interpréter contre l'assureur, quel grand soit le parti pris naturel ou la sympathie que peut éveiller la demande d'indemnité qu'on lui adresse. Dans ce contrat, tout comme dans tous les autres, il faut donner effet à l'intention des parties qui se dégage des mots qu'elles ont employés. Un demandeur doit pouvoir établir son droit de recouvrer une indemnité d'après les termes du contrat; un défendeur doit de même établir une défense fondée sur la convention. Le fardeau de la preuve, si je peux utiliser cette expression à l'égard de l'interprétation d'un écrit, est exactement le même pour chaque

[3] (1907), 15 O.L.R. 131.

[3] (1907), 15 O.L.R. 131.

and so, doubtless, all more or less affected by the natural bias arising from such a position; and so ought to beware lest that bias be not counteracted by a full apprehension of its existence.

(Adopted in this Court in 1908[4].)

Such a proposition may be referred to as step one in the interpretative process. Step two is the application, when ambiguity is found, of the *contra proferentem* doctrine. This doctrine finds much expression in our law, and one example which may be referred to is found in *Cheshire and Fifoot's Law of Contract* (9th ed.), at pp. 152-3:

> If there is any doubt as to the meaning and scope of the excluding or limiting term, the ambiguity will be resolved against the party who has inserted it and who is now relying on it. As he seeks to protect himself against liability to which he would otherwise be subject, it is for him to prove that his words clearly and aptly describe the contingency that has in fact arisen.

This Court applied the doctrine in *Indemnity Insurance Company of North America v. Excel Cleaning Service[5]* where at pp. 179-180 it was stated:

> It is, in such a case, a general rule to construe the language used in a manner favourable to the insured. The basis for such being that the insurer, by such clauses, seeks to impose exceptions and limitations to the coverage he has already described and, therefore, should use language that clearly expresses the extent and scope of these exceptions and limitations and, in so far as he fails to do so, the language of the coverage should obtain
> ... Furthermore, the language of Lord Greene in *Woolfall & Rimmer, Ltd.* v. *Moyle*, [1942] 1 K.B. 66 at 73, is appropriate. He there states:
>
>> I cannot help thinking that, if underwriters wish to limit by some qualification a risk which, prima facie, they are undertaking in plain terms, they should make it perfectly clear what that qualification is.

As has already been stated, this is, of course, the second phase of interpretation of such a contract. Cartwright J., as he then was, stated in *Stevenson*

partie respectivement. Nous sommes tous, très probablement, assurés et non assureurs et donc, très probablement, plus ou moins influencés par le parti pris naturel qui se dégage d'une telle position; aussi, faut-il prendre garde aux effets de ce parti pris en prenant entièrement conscience de son existence.

(Adoptée par cette Cour en 1908.[4])

On peut qualifier pareille proposition de première étape du processus d'interprétation. La deuxième étape est l'application, lorsqu'il y a ambiguïté, de la doctrine *contra proferentem*. Cette doctrine est souvent exposée dans notre droit et on peut citer à titre d'exemple ce qu'en dit *Cheshire and Fifoot's Law of Contract* (9ᵉ éd.), aux pp. 152 et 153:

> [TRADUCTION] S'il y a le moindre doute quant au sens et à la portée de la clause d'exclusion ou limitative, l'ambiguïté sera résolue contre la partie qui l'a introduite et qui cherche maintenant à l'invoquer. Puisqu'elle cherche à se protéger contre une responsabilité à laquelle elle serait autrement assujettie, il lui incombe de prouver que les mots qu'elle a employés décrivent clairement et convenablement l'éventualité qui s'est en fait produite.

Cette Cour a appliqué la doctrine dans *Indemnity Insurance Company of North America c. Excel Cleaning Service[5]* où elle a dit, aux pp. 179 et 180:

> [TRADUCTION] C'est, dans un tel cas, une règle générale que de donner aux termes employés une interprétation qui soit favorable à l'assuré. Le fondement de cette règle est que l'assureur cherche par de semblables clauses à imposer des exceptions et des restrictions à la protection qu'il a déjà décrite et, par conséquent, doit employer des termes qui expriment clairement l'étendue et l'importance de ces exceptions et restrictions, et, dans la mesure où il omet de le faire, ce sont les termes décrivant la protection qui doivent prévaloir ... De plus, les paroles de lord Greene dans *Woolfall & Rimmer, Ltd. v. Moyle*, [1942] 1 K.B. 66 à la p. 73, sont appropriées. Il a dit:
>
>> Je ne peux m'empêcher de penser que si les assureurs désirent limiter par quelque condition un risque qu'à première vue, ils acceptent en des termes clairs, ils devraient très nettement l'énoncer.

Comme je l'ai déjà dit, il s'agit bien sûr de la deuxième étape de l'interprétation d'un tel contrat. Le juge Cartwright, alors juge puîné, a dit dans

---

[4] (1908), 42 S.C.R. 246.
[5] [1954] S.C.R. 169.

[4] (1908), 42 R.C.S. 246.
[5] [1954] R.C.S. 169.

v. *Reliance Petroleum Limited; Reliance Petroleum Limited v. Canadian General Insurance Company*[6] at p. 953:

The rule expressed in the maxim, *verba fortius accipiuntur contra proferentem*, was pressed upon us in argument, but resort is to be had to this rule only when all other rules of construction fail to enable the Court of construction to ascertain the meaning of a document.

Lindley L.J. put it this way:

In a case on the line, in a case of real doubt, the policy ought to be construed most strongly against the insurers; they frame the policy and insert the exceptions. But this principle ought only to be applied for the purpose of removing a doubt, not for the purpose of creating a doubt, or magnifying an ambiguity, when the circumstances of the case raise no real difficulty.

*Cornish v. Accident Insurance Company*[7], at p. 456.

Even apart from the doctrine of *contra proferentem* as it may be applied in the construction of contracts, the normal rules of construction lead a court to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract. Consequently, literal meaning should not be applied where to do so would bring about an unrealistic result or a result which would not be contemplated in the commercial atmosphere in which the insurance was contracted. Where words may bear two constructions, the more reasonable one, that which produces a fair result, must certainly be taken as the interpretation which would promote the intention of the parties. Similarly, an interpretation which defeats the intentions of the parties and their objective in entering into the commercial transaction in the first place should be discarded in favour of an interpretation of the policy which promotes a sensible commercial result. It is trite to observe that an interpretation of an ambiguous contractual provision which would render the endeavour on the part of the insured to obtain insurance protection nugatory, should be avoided. Said another way, the courts should be loath to support a construction which would either enable the insurer to pocket the premium without risk or

*Stevenson c. Reliance Petroleum Limited; Reliance Petroleum Limited c. Canadian General Insurance Company*[6] à la p. 953:

[TRADUCTION] Les plaidoiries ont insisté sur la règle exprimée dans la maxime *verba fortius accipiuntur contra preferentem*, mais il faut recourir à cette règle seulement lorsque aucune autre règle d'interprétation ne permet à la Cour de s'assurer du sens d'un document.

Le lord juge Lindley l'a dit en ces termes:

[TRADUCTION] Dans un cas limite, lorsqu'il y a un doute réel, il faut interpréter la police de façon plus stricte contre les assureurs; ils conçoivent la police et introduisent les exceptions. Mais ce principe ne doit être appliqué que pour écarter un doute et non pour en créer un ou grossir une ambiguïté, lorsque les circonstances de l'affaire ne soulèvent aucune difficulté réelle.

*Cornish v. Accident Insurance Company*[7], à la p. 456.

Même indépendamment de la doctrine *contra proferentem* dans la mesure où elle est applicable à l'interprétation des contrats, les règles normales d'interprétation amènent une cour à rechercher une interprétation qui, vu l'ensemble du contrat, tend à traduire et à présenter l'intention véritable des parties au moment où elles ont contracté. Dès lors, on ne doit pas utiliser le sens littéral lorsque cela entraînerait un résultat irréaliste ou qui ne serait pas envisagé dans le climat commercial dans lequel l'assurance a été contractée. Lorsque des mots sont susceptibles de deux interprétations, la plus raisonnable, celle qui assure un résultat équitable, doit certainement être choisie comme l'interprétation qui traduit l'intention des parties. De même, une interprétation qui va à l'encontre des intentions des parties et du but pour lequel elles ont à l'origine conclu une opération commerciale doit être écartée en faveur d'une interprétation de la police qui favorise un résultat commercial raisonnable. C'est un truisme de faire remarquer que l'on doit éviter une interprétation d'une clause contractuelle ambiguë qui rendrait futile l'effort déployé par l'assuré pour obtenir la protection d'une assurance. En d'autres mots, les cours devraient être réticentes à appuyer une interprétation qui permettrait soit à l'assureur de toucher une prime sans risque soit à l'assuré d'obtenir une

the insured to achieve a recovery which could neither be sensibly sought nor anticipated at the time of the contract.

The *Cornish* case, *supra*, illustrates a course generally taken when such contracts reach the courts. There the court was interpreting an insurance contract in the light of the death of the insured while crossing a railway track. The policy included an exception from insured risks resulting from "exposure of the insured to obvious risk of injury". Lindley L.J., in the course of judgment, stated:

The words are "exposure of the insured to obvious risk of injury." These words suggest the following questions: Exposure by whom? Obvious when? Obvious to whom? It is to be observed that the words are very general. There is no such word as "wilful," or "reckless," or "careless"; and to ascertain the true meaning of the exception the whole document must be studied and the object of the parties to it must be steadily borne in mind. The object of the contract is to insure against accidental death and injuries, and the contract must not be construed so as to defeat that object, nor so as to render it practically illusory. A man who crosses an ordinary crowded street is exposed to obvious risk of injury; and, if the words in question are construed literally, the defendants would not be liable in the event of an insured being killed or injured in so crossing, even if he was taking reasonable care of himself. Such a result is so manifestly contrary to the real intention of the parties that a construction which leads to it ought to be rejected. But, if this be true, a literal construction is inadmissible, and some qualification must be put on the words used. (at p. 456)

An example of the application of the same principles is found in the *Indemnity Insurance Company of North America v. Excel Cleaning Service*, *supra*, where, at pp. 177-8, it was concluded:

Such a construction [as advanced by the insurer] would largely, if not completely, nullify the purpose for which the insurance was sold—a circumstance to be avoided, so far as the language used will permit.

The appellant, as the owner and operator of a large forest products facility, sought insurance protection of the machinery employed in the plant in its industrial processes. There is no dispute that the heat exchangers in question were covered by the insurance contract. There is also no serious dispute, at least by the time the litigation had

indemnité que l'on n'a pas pu raisonnablement rechercher ni escompter au moment du contrat.

L'arrêt *Cornish*, précité, illustre la ligne de conduite généralement suivie lorsque pareils contrats sont soumis aux tribunaux. La cour y interprète un contrat d'assurance dans le contexte du décès de l'assuré survenu alors qu'il traversait une voie ferrée. La police comportait une exception aux risques assurés en cas de [TRADUCTION] «risques évidents de blessures pris par l'assuré». Dans le cours de son jugement, le lord juge Lindley a dit:

[TRADUCTION] Les mots sont «risques évidents de blessures pris par l'assuré». Ces mots suggèrent les questions suivantes: Risques pris par qui? Évidents: quand et pour qui? Il faut remarquer que ces mots sont très généraux. Il n'y a aucun mot tel que «intentionnel» ou «téméraire» ou «négligent»; et pour s'assurer du sens réel de l'exception, il faut examiner le document dans son ensemble et garder toujours à l'esprit l'objet qu'avaient les parties à ce contrat. L'objet du contrat est d'assurer contre la mort ou les blessures accidentelles, et le contrat ne doit pas être interprété d'une manière telle qu'il détruise cet objet, ou le rende pratiquement illusoire. Un homme qui traverse une rue ordinairement encombrée s'expose à des risques évidents de blessures; et, si l'on interprète littéralement les mots en question, les défendeurs ne seront pas responsables si l'assuré est tué ou blessé en traversant, même s'il a été raisonnablement prudent. Pareil résultat est si manifestement contraire à l'intention réelle des parties que l'on doit rejeter une interprétation qui y mène. Mais, si cela est vrai, une interprétation littérale est irrecevable et il faut assortir les mots employés de certaines réserves. (à la p. 456)

On trouve un exemple de l'application des mêmes principes dans *Indemnity Insurance Company of North America c. Excel Cleaning Service*, précité, où l'on a conclu aux pp. 177 et 178:

[TRADUCTION] Une telle interprétation [celle de l'assureur] annulerait en grande partie, sinon totalement, l'objet de l'assurance—une situation qui doit être évitée, dans la mesure où les termes employés le permettent.

L'appelante, en qualité de propriétaire et d'exploitant d'une grande usine de produits forestiers, a voulu assurer la machinerie utilisée dans l'usine à des fins industrielles. Il n'est pas contesté que les échangeurs de chaleur en question sont protégés par le contrat d'assurance. Il n'est pas non plus sérieusement contesté, du moins lorsque le litige

reached this Court, that corrosion of the tubes inside the heat exchanger, probably caused by the presence of sea water, was the effective cause of the breakdown of the heat exchanger, and the consequential release of oil into the processed steam. The insurer, as was its right, sought in the terms of the contract to limit its exposure to accidental loss and did so by seeking to confine the definition of accident. If a court were to accept the submissions of the respondent, that loss suffered by the insured by reason of the failure of a machine due to wear and tear and the consequential downtime of the plant was excluded by the definition of accident, then the insured would have purchased, by its premiums, no coverage for what may well be the most likely source of loss, or certainly a risk pervasive through much of the plant. Similarly, to interpret corrosion as that word is employed in the definition of accident in the manner sought by the respondent would be to eliminate from the insurance coverage any and all loss suffered by the insured mill operator by reason of the intervention of the condition of corrosion. Such an interpretation would necessarily result in a substantial nullification of coverage under the contract. It may well be argued by insurers that the premium will reflect such a narrowed coverage. There is no evidence that such is the case here.

It may also be argued by the insurance industry that applying the more favourable construction to this ambiguous provision will be to unnecessarily and unfairly burden the carrier. The carrier under this policy has at least two defensive mechanisms which it can readily call to its aid: firstly, the right of inspection which was exercised here both before and during the contract; and secondly, the right to terminate in the event the insurance carrier determines that the condition of the insured machinery is such as to make it impractical to extend coverage in the manner required by the contract.

I therefore would allow the appeal, set aside the judgment at trial and of the Court of Appeal and direct the entry of judgment in favour of the appellant in the amount of $158,289.24 with interest from the 1st of April, 1969, as claimed (it

est venu devant cette Cour, que la corrosion des tubes à l'intérieur des échangeurs de chaleur, probablement causée par la présence d'eau de mer, a été la cause réelle de leur panne et de la fuite consécutive d'huile dans l'eau de condensation. Comme il en a le droit, l'assureur a cherché dans les termes du contrat à limiter sa protection à la perte accidentelle, ce qu'il a fait en essayant de restreindre la définition d'accident. Si une cour devait accepter la prétention de l'intimée, que la perte subie par l'assurée en raison de la panne de la machinerie causée par l'usure normale et que l'immobilisation consécutive de l'usine étaient exclues par la définition d'accident, alors l'assurée n'aurait obtenu, par ses primes, aucune garantie pour ce qui peut bien être la source de perte la plus vraisemblable, ou certainement un risque constant dans presque toute l'usine. De même, interpréter la corrosion au sens où ce mot est employé dans la définition d'accident, comme le désire l'intimée, équivaudrait à éliminer de la protection de l'assurance toutes les pertes subies par l'assurée en raison de la présence de corrosion. Pareille interprétation entraînerait nécessairement la suppression d'une partie importante de la protection prévue au contrat. Il est possible que des assureurs prétendent que la prime sera fixée en fonction d'une garantie aussi limitée. Il n'y a aucune preuve à cet effet en l'espèce.

Il est également bien possible que l'industrie des assurances prétende qu'appliquer l'interprétation la plus favorable à cette disposition ambiguë va imposer un fardeau inutile et injuste à l'assureur. L'assureur en vertu de cette police peut invoquer au moins deux mécanismes de défense pour lui venir facilement en aide: premièrement, le droit d'inspection qui a été exercé en l'espèce, avant et pendant le contrat; et, deuxièmement le droit de mettre fin au contrat si l'assureur est d'avis que l'état de la machinerie est tel qu'il est impossible d'accorder la garantie de la manière stipulée au contrat.

Je suis donc d'avis d'accueillir le pourvoi, d'infirmer le jugement de la cour de première instance et l'arrêt de la Cour d'appel et d'ordonner que l'appelante a le droit de recouvrer $158,289.24 avec intérêt à compter du 1er avril 1969, tel que

being the date of submission of claim and which date has not been contested in any court in these proceedings), together with costs throughout. In the event the parties are in disagreement as to whether the "Direct Damage" in the amount of $15,604.44 mentioned above is, in fact, repairs of the actual corrosion damage and should not therefore, on the basis of these reasons be included in judgment granted, the matter shall be determined on application to a Judge of the Superior Court.

*Appeal allowed with costs*, MARTLAND, RITCHIE *and* McINTYRE JJ. *dissenting.*

*Solicitors for the appellant: Desjardins, Ducharme, Desjardins & Bourque, Montreal.*

*Solicitors for the respondent: Martineau, Walker, Allison, Beaulieu, MacKell & Clermont, Montreal.*

demandé (soit la date du dépôt de la réclamation, date qui n'a été contestée devant aucune cour dans les présentes procédures), et les dépens dans toutes les cours. Si les parties ne s'entendent pas sur la question de savoir si les dommages-intérêts pour la «perte directe» au montant de $15,604.44 susmentionné s'appliquent en fait à la réparation des dommages causés par la corrosion et ne devraient donc pas être inclus dans les dommages-intérêts accordés, compte tenu des présents motifs, elles devront s'adresser à un juge de la Cour supérieure pour faire trancher cette question.

*Pourvoi accueilli avec dépens, les juges* MARTLAND, RITCHIE *et* McINTYRE *étant dissidents.*

*Procureurs de l'appelante: Desjardins, Ducharme, Desjardins & Bourque, Montréal.*

*Procureurs de l'intimée: Martineau, Walker, Allison, Beaulieu, MacKell & Clermont, Montréal.*

1979 CanLII 10 (SCC)

TAB 30

CoreBrace LLC v. Star Seismic LLC, 566 F.3d 1069 (2009)
91 U.S.P.Q.2d 1209

566 F.3d 1069
United States Court of Appeals,
Federal Circuit.

COREBRACE LLC, Plaintiff–Appellant,

v.

STAR SEISMIC LLC, Defendant–Appellee.

No. 2008–1502.    |    May 22, 2009.

**Synopsis**

**Background:** Owner of patent directed to a brace for use in the fabrication of earthquake-resistant steel-framed buildings brought action against licensee of patent alleging breach of patent license agreement and patent infringement. The United States District Court for the District of Utah, Dale A. Kimball, J., dismissed owner's claims. Owner appealed.

**[Holding:]** The Court of Appeals, Lourie, Circuit Judge, held that licensee did not breach license by contracting with third parties to have the licensed products made for its own use.

Affirmed.

West Headnotes (6)

**[1]    Patents**

    Assignments and sublicenses

Under Utah law, as predicted by the district court, licensee of patent directed to a brace for use in the fabrication of earthquake-resistant steel-framed buildings did not breach license granting it a nonexclusive right to "make, use, and sell" licensed products by contracting with third parties to have the licensed products made for its own use, even though the license stated that licensee could not "assign, sublicense, or otherwise transfer" its rights to any party except an affiliated, parent, or subsidiary company, absent a clear intent in the contract to exclude "have made" rights.

4 Cases that cite this headnote

**[2]    Courts**

    Particular questions or subject matter

The question whether a motion to dismiss for failure to state a claim was properly granted in a patent infringement suit is a purely procedural question not pertaining to patent law, to which the Court of Appeals for the Federal Circuit applies the rule of the regional circuit.

25 Cases that cite this headnote

**[3]    Contracts**

    What law governs

The appropriate law for construing the terms of a contract is the law of the jurisdiction identified in the contract.

Cases that cite this headnote

**[4]    Patents**

    Construction and Operation of Licenses

Under Utah law, as predicted by the district court, the right to "make, use, and sell" a product inherently includes the right to have it made by a third party, absent a clear indication of intent to the contrary.

2 Cases that cite this headnote

**[5]    Contracts**

    Construction as a whole

**Contracts**

    Language of contract

Under Utah law, in construing a contract a court first looks to the plain language within the four corners of the agreement to determine the intentions of the parties, and attempts to harmonize the provisions in the agreement.

Cases that cite this headnote

**[6]    Patents**

    Original utility

7,188,452. Not Infringed.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*1070** Charles L. Roberts, Workman Nydegger, of Salt Lake City, UT, argued for plaintiff-appellant. With him on the brief were L. David Griffin, Matthew A. Barlow, and Chad E. Nydegger. Of counsel on the brief was Mark E. Wilkey, Core–Brace, LLC, of West Jordan, UT.

H. Dickson Burton, TraskBritt, PC, of Salt Lake City, UT, argued for defendant-appellee. With him on the brief were Brick G. Power, and Casey K. McGarvey.

Before LOURIE, FRIEDMAN, and PROST, Circuit Judges.

**Opinion**

LOURIE, Circuit Judge.

CoreBrace LLC ("CoreBrace") appeals from the judgment of the United States District Court for the District of Utah dismissing its claims for breach of a patent license agreement and for patent infringement. *See Corebrace LLC v. Star Seismic LLC,* No. 2:08–cv–11, 2008 U.S. Dist. Lexis 55471 (D.Utah July 18, 2008). Because the court did not err in concluding that Star Seismic LLC's ("Star's") license to make, use, and sell the patented product carried with it an implied license to have the product made by a third party, we affirm.

**BACKGROUND**

CoreBrace owns U.S. Patent 7,188,452 ("the #452 patent"), which is directed to a brace for use in the fabrication of earthquake-resistant steel-framed buildings. On June 10, 2007, Star and the inventor of the #452 patent entered into a "Non–Exclusive License Agreement" ("License"), by which Star received a license under the #452 patent; the inventor later transferred his interest to CoreBrace. The License grants Star a nonexclusive right to "make, use, and sell" licensed products. It does not explicitly provide a right to have the licensed product made by a third party. The License does state that Star may not "assign, sublicense, or otherwise transfer" its rights to any party except an affiliated, parent, or subsidiary company. It also reserves to CoreBrace "all rights not expressly granted to [Star]." However, it provides that Star owns any technological improvements "by a third party whose services have been contracted by [Star]."

Star used third-party contractors to manufacture licensed products for its own use. CoreBrace contends that such use of third parties was a breach of the License because Star lacked the right to have a third party make products for Star. On January 4, 2008, CoreBrace sent a letter to Star stating that the License was terminated. The License provides that it can be terminated if it is breached, after written notice of the breach and after a thirty-day opportunity to cure. CoreBrace has not alleged that it provided notice of a breach or that it gave Star thirty days to cure such breach.

On January 4, 2008, the same day that it sent the termination letter, CoreBrace sued Star for breach of the License due to Star's use of third-party contractors and for patent infringement based on Star's use of patented products under a terminated License. Star moved to dismiss the **\*1071** complaint under Fed.R.Civ.P. 12(b)(6) for failure to state a claim, and the district court granted Star's motion. The court held that Star did not breach the License by having third-party contractors make the licensed products. According to the court, under *Carey v. United States,* 164 Ct.Cl. 304, 326 F.2d 975 (1964), a patent licensee's right to "make" an article includes the right to engage others to do all of the work connected with its production. The court also relied on similar reasoning in *Advanced Micro Devices, Inc. v. Intel Corp.,* 9 Cal.4th 362, 36 Cal.Rptr.2d 581, 885 P.2d 994 (1994). The court further reasoned that, even when a license prohibits sublicensing, as in this case, "have made" rights are granted unless they are expressly prohibited. The court distinguished *Intel Corp. v. U.S. International Trade Commission,* 946 F.2d 821 (Fed.Cir.1991), as a case that was primarily about "foundry" rights, or a licensee's rights to make a product and sell it under a third party's name, and as having been based on the parol evidence of the parties' intent in that case not to grant such foundry rights. The court also examined the License and, based on its apparent acknowledgement of third-party manufacturers, concluded that nothing in the License precluded Star from having a third party manufacture the licensed product for Star. Thus, the court held that Star had the right to have a third party manufacture the licensed product for it.

The court then held that, even if Star had breached the License, CoreBrace did not properly terminate it because CoreBrace failed to follow the License's termination provisions. CoreBrace had conceded that it had not followed the termination provisions, but had argued that Star's breach of the License was incurable, so notice was not required prior to termination. According to the court, however, Star's

alleged breach was not incurable, as CoreBrace could have notified Star that it should make the product itself, cease using a third party, or have the third party obtain a license. Such action, according to the court, would not have been impossible or futile. Furthermore, the court found that the alleged breach did not frustrate the purpose of the License, as the inventor collected a royalty from Star on each product, no matter who manufactured it. Thus, according to the court, CoreBrace should have followed the prescribed procedure for terminating the License, and the failure to properly terminate it meant that Star retained its rights under the License.

Finally, the court held that, because the License was neither breached nor terminated, Star could not have infringed the patent under which it was licensed. CoreBrace timely appealed the district court's dismissal. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## DISCUSSION

[1] CoreBrace argues that the district court erred in holding that the License was not breached. The License reserves to CoreBrace all rights not expressly granted, and, according to CoreBrace, the district court found that "have made" rights were not expressly granted. CoreBrace also asserts that "have made" rights are not inherent in the right to make, use, and sell, as a licensee can make the product itself rather than having it made by a third party. Thus, CoreBrace argues that Star did not have the right to have a third party make the products.

CoreBrace also argues that the court improperly distinguished Intel and relied on *Advanced Micro* and *Carey* to hold that a prohibition on "have made" rights must be explicit. According to CoreBrace, in **\*1072** *Intel*, this court held that "have made" rights were restricted by the reservation of rights clause in the license. CoreBrace asserts that *Advanced Micro* is inapposite because the ruling was on appeal from an arbitrator. CoreBrace also argues that *Carey* is inapposite because the exclusive license in that case granted the right to sublicense, which, according to CoreBrace, includes the right to "have made."

Finally, CoreBrace argues that, although certain provisions in the License mention "third parties," the License also mentions specific third parties, not including third-party manufacturers. Thus, according to CoreBrace, the License would have mentioned third-party manufacturers if the parties had intended for such manufacturers to be permitted. Although the License mentions third parties in general whose services have been contracted for by Star, CoreBrace argues that those third parties might be architects, contractors, or others with a connection to Star, rather than manufacturers.

Star responds that the grant of a right to "make, use, and sell" inherently includes the right to have others make the product, as the Court of Claims held in *Carey.* Star also asserts that the facts of *Intel* differ from this case, as the question in *Intel* was whether the licensee could operate as a foundry, *i.e.,* make the product for a third party and sell it under the third party's name. Moreover, according to Star, the decision in *Intel* was based on strong parol evidence and applied the law of a different circuit. Furthermore, Star argues that the California Supreme Court later concluded in *Advanced Micro* that "have made" rights are included in a license to "make, use, and sell" unless they have been expressly excluded.

Star also argues that the License specifically provides that Star may contract with third parties to exercise its rights, which necessarily includes contracting with third-party manufacturers. Moreover, according to Star, the License requires Star to provide its supply and service contracts for inspection, implying that such supply and service contracts, including manufacturing contracts, are permissible.

[2] [3] We conclude that in granting the 12(b)(6) motion the district court correctly determined that Star was entitled to have contractors make the licensed product and did not breach the patent license in doing so. "The question ... whether a Rule 12(b)(6) motion was properly granted is a purely procedural question not pertaining to patent law, to which this court applies the rule of the regional [ ] circuit," in this case the Tenth Circuit. *Gen. Mills, Inc. v. Kraft Foods Global, Inc.,* 487 F.3d 1368, 1373 (Fed.Cir.2007) (quotation marks omitted). "Because the sufficiency of a complaint is a question of law, [the Tenth Circuit] review[s] *de novo* the district court's grant of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), applying the same standards as the district court." *Sunrise Valley, LLC v. Kempthorne,* 528 F.3d 1251, 1254 (10th Cir.2008) (quotation marks omitted). "A complaint is subject to dismissal for failure to state a claim if the allegations, taken as true, show the plaintiff is not entitled to relief." *Jones v. Bock,* 549 U.S. 199, 215, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). The appropriate law for construing the terms of a contract is the law of the jurisdiction identified in the contract, in this case Utah law. *See Rash v. J.V. Intermediate, Ltd.,* 498 F.3d 1201, 1206 (10th Cir.2007).

[4] [5] Star did not breach the License by contracting with third parties to have the licensed products made for it. The right to "make, use, and sell" a product inherently includes the right to have it made by a third party, absent a clear **\*1073** indication of intent to the contrary. No Utah Supreme Court case has addressed the scope of a right to "make, use, and sell" a product. However, "[w]here the state's highest court has not addressed the issue presented, the federal court must determine what decision the state court would make if faced with the same facts and issue." *Id.* at 1206 (quotation marks omitted). Utah follows general principles of contract law, which we will apply here. *See Cent. Fla. Invs., Inc. v. Parkwest Assocs.,* 40 P.3d 599, 605 (Utah 2002). Under Utah law, "we first look to the plain language within the four corners of the agreement to determine the intentions of the parties, and we attempt to harmonize the provisions in the ... agreement." *Id.* In addition, other courts have addressed the scope of the right to "make, use, and sell" a product, and we will look to them to guide our decision.

In *Carey,* the Court of Claims, one of our predecessor courts, whose decisions bind us, *see South Corp. v. United States,* 690 F.2d 1368, 1370–71 (Fed.Cir.1982), held that a license to "produce, use, and sell" a product inherently includes the right to have it made by a third party. The court stated that a license to produce, use, and sell "is not restricted to production by the licensee personally or use by him personally or sales by him personally. It permits him to employ others to assist him in the production, and in the use and in the sale of the invention. Nor need he take any personal part in the production." *Carey,* 326 F.2d at 979. Thus, "his license permits him to engage others to do all the work connected with the production of the article for him." *Id.*; *see also Advanced Micro,* 36 Cal.Rptr.2d 581, 885 P.2d at 1009 n. 15 (" '[H]ave-made' rights—the right of a licensee to have a chip made for it by a third party foundry —were not expressly excluded under the 1982 contract, and in the absence of any finding by the arbitrator we cannot say they were not included in the contractual right to make and sell a licensed product."). Thus, one of our predecessor courts and the California Supreme Court have both persuasively held that a "have made" right is implicit in a right to make, use, and sell, absent an express contrary intent. We consider that the Utah Supreme Court would therefore likely arrive at the same conclusion were it to consider the issue.

CoreBrace argues that the situation in *Carey* was different from the situation in this case because that license was exclusive and included a right to sublicense, which itself

would inherently include a right to have the product made. We disagree. The court in *Carey* did not base its conclusion on exclusivity or the right to sublicense, but the right to "produce, use, and sell." The court specifically stated that "[a] licensee having the right to produce, use and sell might be interested only in using the article or in selling it; in order to use it or sell it, the article must be produced; to have it produced, his license permits him to engage others" to produce it for him. *Carey,* 326 F.2d at 979. None of that logic relies on the licensee's right to sublicense; in other words, a right to have made is not a sublicense, as the contractor who makes for the licensee does not receive a sublicense from the licensee. *See Cyrix Corp. v. Intel Corp.,* 77 F.3d 1381, 1387–88 (holding that Cyrix's exercise of its expressly granted "have made" rights did not amount to a sublicense). The contractor cannot make or use for anyone other than the licensee or sell to third parties. Similarly, regarding the distinction between having an exclusive and nonexclusive license, a nonexclusive licensee who could make, use, and sell would still be entitled to have a product made for itself by another party in order to use or sell the product without making it, even if **\*1074** the patent owner granted other licenses. The distinction between an exclusive license and a nonexclusive license has no relevance to how a licensee obtains the product it is entitled to make, use, and sell. Thus, the logic of the holding in *Carey* is not limited to exclusive licenses or licenses that include a right to sublicense.

We also agree with Star that *Intel* is inapposite to this case. *Intel* was a special facts case. There, Intel sued Atmel for patent infringement, as Atmel was using Sanyo, a licensee, as a foundry for an allegedly infringing product of Atmel's design, *i.e.,* Atmel had Sanyo manufacture the product, and Atmel sold it under Atmel's own name. Atmel argued that Intel's license to Sanyo included foundry rights, which would have allowed Atmel to sell the licensed product under its own name because it was manufactured by Sanyo. *Intel,* 946 F.2d at 826. Thus, the sole issue was whether the license to Sanyo granted such foundry rights. In determining that Sanyo did not have the right under the license to act as a foundry, we discussed two provisions of the license, a reservation of rights clause and Intel's grant to Sanyo of the right to make, use, and sell only "Sanyo" products. *Id.* at 826 n. 9. We determined that Sanyo had no foundry rights under the contract, holding that the addition of the word "Sanyo" to limit the products covered under the license was intended to exclude foundry rights. *Id.* at 826–28. Otherwise, it would be tantamount to granting Sanyo a right to sublicense, a right it did not have. All Sanyo had was the right to manufacture for its own purposes.

CoreBrace LLC v. Star Seismic LLC, 566 F.3d 1069 (2009)

91 U.S.P.Q.2d 1209

In determining that the "Sanyo" limitation excluded foundry rights, we addressed "have made" rights. Unlike in this case, both parties in *Intel* agreed that Sanyo's license excluded "have made" rights. *Id.* at 287, 36 Cal.Rptr.2d 581, 885 P.2d 994. However, the parties disputed the textual source for such exclusion: whether it was the "Sanyo" limitation or the reservation of rights clause. Atmel argued that the "Sanyo" limitation was intended to exclude only "have made" rights, rather than foundry rights. *Id.* The administrative law judge of the International Trade Commission found that "have made" rights were excluded, not because of the "Sanyo" limitation, but because of the reservation of rights clause. *Id.* at 827–28. After first acknowledging the administrative law judge's reasoning, we stated another reason for denying "have made" rights, *viz.*, that "have made" rights were also precluded by the "Sanyo" limitation, as were foundry rights. *Id.* at 828. Thus, we did not base our holding in *Intel* on a determination that the reservation of rights clause precluded "have made" rights, but instead on a determination that the entire contract, including the "Sanyo" limitation, precluded "have made" rights. Because *Intel* was a case about foundry rights, rather than "have made" rights, and because our holding relied on the "Sanyo" limitation, we do not find *Intel* persuasive or controlling in this case. Instead, the *Carey* holding and reasoning control here.

CoreBrace argues that the reservation of rights clause in the License precludes an interpretation that the License includes "have made" rights. According to CoreBrace, because the License reserves to CoreBrace "[r]ights not expressly granted to [Star]," the License could not have implicitly granted "have made" rights to Star. We disagree. Because the right to "make, use, and sell" a product *inherently* includes the right to have it made, "have made" rights are included in the License and not excluded by the reservation of rights clause. A grant of a right to "make, use, and sell" a product, without more, inherently includes a right to have a third party make the product. A clear intent **\*1075** shown in a contract to exclude "have made" rights can negate what would otherwise be inherent. In this case, however, CoreBrace has failed to show a clear intent to exclude "have made" rights from the License. In fact, other provisions of the License appear to contemplate that Star may have the product made by a third party. For example, the License provides that Star owns any improvements to the technology "by a third party whose services have been contracted by [Star]." Although, as CoreBrace argues, that third party might be other than a manufacturer, nothing in the License precludes it from being a third-party manufacturer. In fact, a likely party to improve the licensed technology is the manufacturer, so a third party who improves the technology is likely to be a third-party manufacturer. Similarly, the License requires Star to allow an "audit of its books and records relating to manufacturing ... [and] supply contracts." Those provisions indicate that the parties contemplated that third parties might manufacture the licensed products and supply them to Star.

Most importantly, nothing in the License indicates an intent to exclude "have made" rights. CoreBrace argues that the License's provision requiring Star to indemnify CoreBrace for all claims "arising out of [Star's] manufacture" demonstrates an intent that no third party manufacture the products. According to CoreBrace, if "have made" rights had been intended, the License would have required indemnification for all claims arising out of third parties' manufacture as well. However, that vague reference does not show a clear intent to exclude "have made" rights, especially in light of the provisions indicating that third parties might be involved in supplying goods and improving the technology in order for Star to exercise its rights under the License. CoreBrace has not pointed to any provision in the License that shows a clear intent to exclude "have made" rights from its grant.

We therefore hold that Star did not breach the License by contracting with third parties to have the licensed products made for its own use. As for CoreBrace's argument that the district court erred in holding that CoreBrace had failed to adequately terminate the License, the issue is moot because the license was not breached. CoreBrace was not entitled to terminate the license, and thus the License has not been terminated. Thus, Star cannot have infringed CoreBrace's patent under which it was licensed.

We have considered CoreBrace's remaining arguments and find them unpersuasive.

### CONCLUSION

Accordingly, the judgment of the district court dismissing the case for failure to state a claim is affirmed.

*AFFIRMED*

**Parallel Citations**

91 U.S.P.Q.2d 1209

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.