# TAB 31

45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

419 F.3d 195
United States Court of Appeals,
Third Circuit.

In re: OWENS CORNING, a Delaware
Corporation Credit Suisse First Boston, as Agent
for the prepetition bank lenders, Appellant.

No. 04–4080.    |    Argued Feb. 7,
2005.    |    Opinion filed Aug. 15, 2005.
|    As Amended Aug. 23, 2005, Sept. 2,
2005, Oct. 12, 2005 and Nov. 1, 2007.

**Synopsis**
**Background:** Chapter 11 debtor-parent corporation and its
subsidiaries, the manufacturers of asbestos products, filed
motion for substantive consolidation, and bank consortium
objected. The United States District Court for the District of
Delaware, John P. Fullam, J., 316 B.R. 168, granted motion
for substantive consolidation, and appeal was taken.

[Holding:] The Court of Appeals, Ambro, Circuit Judge, held
that lower court should not have permitted the "deemed"
consolidation of Chapter 11 estates of corporate-debtor-
borrowers and related corporate entities that guaranteed their
loan obligations, to extent that consolidation was sought as
sword, primarily to disadvantage lender by depriving it of
guarantees for which it had bargained.

Reversed.

West Headnotes (22)

**[1]    Bankruptcy**
     Finality
    Court of Appeals applies broader concept of
    finality when deciding whether order entered
    in bankruptcy proceeding is "final order," from
    which appeal will lie. 28 U.S.C.A. § 1291.

    4 Cases that cite this headnote

**[2]    Bankruptcy**
         Decisions Reviewable
    Four factors that Court of Appeals considers in
    deciding whether it should exercise jurisdiction
    over bankruptcy appeal are as follows: (1) impact
    on assets of bankruptcy estate; (2) necessity for
    further fact-finding on remand; (3) preclusive
    effect of Court's decision on merits of further
    litigation; and (4) interests of judicial economy.
    28 U.S.C.A. § 1291.

    5 Cases that cite this headnote

**[3]    Bankruptcy**
         Finality
    As general rule, bankruptcy court order
    substantively consolidating different estates is
    "final order," from which appeal will lie as of
    right, as order which has profound effect on
    assets of consolidated entities, which appellate
    court can review without necessity of additional
    fact-finding, which clearly will have preclusive
    effect in subsequent litigation, and which is best
    reviewed immediately in order to serve interest
    of judicial economy. 28 U.S.C.A. § 1291.

    6 Cases that cite this headnote

**[4]    Bankruptcy**
         Finality
    District court's order substantively consolidating
    assets and liabilities of debtor-borrowers and the
    subsidiaries that guaranteed their obligations on
    loan, in anticipation of plan of reorganization
    that was to be filed in Chapter 11 case, was
    "final order," from which appeal would lie as of
    right, although order would be implemented only
    when plan was confirmed and payment became
    obligatory thereunder. 28 U.S.C.A. § 1291.

    5 Cases that cite this headnote

**[5]    Bankruptcy**
         Transfer and Consolidation of Cases
**Bankruptcy**
         Equitable powers and principles
    Substantive consolidation of bankruptcy estates
    is construct of federal common law, emanating
    from equity.

In re Owens Corning, 419 F.3d 195 (2005)

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 3 of 379

45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

**[6]    Bankruptcy**

👉 Transfer and Consolidation of Cases

When debtors are substantively consolidated, they are merged into a single survivor which is left with all of the cumulative assets and liabilities, except for inter-entity liabilities, which are erased; result is that claims of creditors against separate debtors morph to claims against the consolidated survivor.

21 Cases that cite this headnote

**[7]    Bankruptcy**

👉 Grounds and objections; factors considered

Substantive consolidation of debtors' estates cannot be justified vis-a-vis the claims of objecting creditor that relied on separateness of debtor entities.

5 Cases that cite this headnote

**[8]    Bankruptcy**

👉 Transfer and Consolidation of Cases

**Bankruptcy**

👉 Equitable powers and principles

Bankruptcy courts must respect entity separateness, absent compelling circumstances calling equity, and possibly substantive consolidation, into play.

4 Cases that cite this headnote

**[9]    Bankruptcy**

👉 Transfer and Consolidation of Cases

**Bankruptcy**

👉 Fraudulent conveyances in general

**Bankruptcy**

👉 Inequitable conduct

Harms that substantive consolidation addresses are nearly always those caused when debtors, and entities that they control, disregard separateness; harms caused by creditors typically are remedied by fraudulent transfer avoidance or equitable

subordination claims. Bankr.Code, 11 U.S.C.A. §§ 510(c), 548.

9 Cases that cite this headnote

**[10]    Bankruptcy**

👉 Grounds and objections; factors considered

Mere benefit to administration of bankruptcy case is insufficient basis for calling substantive consolidation into play.

Cases that cite this headnote

**[11]    Bankruptcy**

👉 Transfer and Consolidation of Cases

Substantive consolidation of bankruptcy estates is extreme and imprecise remedy, and court should employ this "rough justice" remedy only rarely and as matter of last resort after considering and rejecting other remedies.

2 Cases that cite this headnote

**[12]    Bankruptcy**

👉 Grounds and objections; factors considered

While substantive consolidation of bankruptcy estates may be used defensively in order to remedy identifiable harms caused by entangled affairs, it may not be used offensively, such as with primary purpose of disadvantaging tactically a group of creditors in plan process, or so as to alter creditor rights.

12 Cases that cite this headnote

**[13]    Bankruptcy**

👉 Grounds and objections; factors considered

What must be proven, absent consent, concerning the entities for whom substantive consolidation is sought is (1) that prepetition they disregarded separateness so significantly that their creditors relied on breakdown of entity borders and treated them as one legal entity; or (2) that postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors.

In re Owens Corning, 419 F.3d 195 (2005)

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 4 of 379

45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

10 Cases that cite this headnote

**[14]    Bankruptcy**

&#128073;  Grounds and objections;  factors considered

When substantive consolidation is ordered based
on debtor-entities' prepetition disregard of their
separateness, with result that their creditors
began to treat them as single entity, rationale
for consolidating debtors' estates is to protect
prepetition expectations of creditors.

15 Cases that cite this headnote

**[15]    Bankruptcy**

&#128073;  Grounds and objections;  factors considered

When substantive consolidation is ordered based
on the scrambled nature of debtors' assets and
liabilities, rationale for consolidating debtors'
estates is at bottom one of practicality because,
without consolidation and in light of difficulties
of unscrambling assets and liabilities which have
been hopelessly commingled, all creditors will
be worse off, and there is threat that bankruptcy
case will be operated solely for benefit of
bankruptcy professionals.

2 Cases that cite this headnote

**[16]    Bankruptcy**

&#128073;  Proceedings;  evidence

Proponents of substantive consolidation bear
burden of showing one of the two rationales on
which such consolidation may be premised.

Cases that cite this headnote

**[17]    Bankruptcy**

&#128073;  Grounds and objections;  factors considered

**Bankruptcy**

&#128073;  Proceedings;  evidence

Prima facie case exists for substantive
consolidation of bankruptcy estates where, based
upon parties' prepetition dealings, a proponent
proves corporate disregard creating contractual
expectations of creditors that they were dealing
with debtors as one indistinguishable entity;

creditor proponents of consolidation must
show that they actually and reasonably relied
on debtors' supposed unity, while creditor
opponents can defeat this prima facie showing if
they can prove that they are adversely affected
and actually relied upon debtors' separate
existence.

4 Cases that cite this headnote

**[18]    Bankruptcy**

&#128073;  Particular cases

District court should not have substantively
consolidated Chapter 11 estates of corporate-
debtor-borrowers and related corporate entities
that guaranteed their loan obligations, where
lender had relied on debtors' separateness in
insisting on guarantees from affiliated entities
that, unlike debtor-borrowers, had no potential
exposure on asbestos claims, where there was
no hopeless commingling of debtors' assets and
liabilities but only the risk of some inaccuracies
in separating them, and where consolidation
that was sought was not true substantive
consolidation, but a deemed consolidation that
would operate primarily to disadvantage lender
by depriving it of guarantees for which it had
bargained.

12 Cases that cite this headnote

**[19]    Bankruptcy**

&#128073;  Grounds and objections;  factors considered

Commingling of assets and liabilities of debtor-
entities justifies the substantive consolidation of
their estates only when separately accounting
for assets and liabilities of these distinct entities
will reduce recovery of every creditor, i.e.,
when every creditor will benefit from the
consolidation; moreover, this benefit should be
from cost savings that make assets available,
rather than from shifting of assets to benefit one
group of creditors at another's expense.

2 Cases that cite this headnote

**[20]    Bankruptcy**

&#128073;  Grounds and objections;  factors considered

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 5 of 379

In re Owens Corning, 419 F.3d 195 (2005)
45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

Neither the impossibility of perfection in untangling affairs of debtor-entities nor likelihood of some inaccuracies in efforts to do so is sufficient to justify substantive consolidation of debtors' estates.

Cases that cite this headnote

[21]    **Bankruptcy**
👉 Grounds and objections; factors considered

Substantive consolidation of bankruptcy estates should be used defensively to remedy identifiable harms, not offensively to achieve advantage over one group in plan negotiation process nor as "free pass" to spare debtors or any other group from proving challenges, like fraudulent transfer claims.

5 Cases that cite this headnote

[22]    **Bankruptcy**
👉 Transfer and Consolidation of Cases

**Bankruptcy**
👉 Equitable powers and principles

Substantive consolidation of bankruptcy estates is at its core an equitable remedy, and its exercise must lead to equitable result.

4 Cases that cite this headnote

**Attorneys and Law Firms**

**\*198** Martin J. Bienenstock, (Argued), John J. Rapisardi, Richard A. Rothman, Timothy E. Graulich, Weil, Gotshal & Manges LLP, New York, NY, Ellen R. Nadler, Jeffrey S. Trachtman, Kenneth H. Eckstein, Philip S. Kaufman, Kramer, Levin, Naftalis & Frankel LLP, New York, NY, Roy T. Englert, Jr., Robbins, Russell, Englert, Orseck & Untereiner LLP, Washington, DC, Rebecca L. Butcher, Adam G. Landis, Richard S. Cobb, Landis, Rath & Cobb LLP, Wilmington, DE, for (Appellant) Credit Suisse First Boston Corp., as Agent for the prepetition bank lenders.

Alexandra A.E. Shapiro, Mitchell A. Seider, Alan Leavitt, Latham & Watkins LLP, New York, NY, Amanda P. Biles, Latham & Watkins LLP, Reston, Virginia, for (Amicus-

appellants) The Loan Syndications and Trading Association, Inc. and Clearing House Association L.L.C.

Richard M. Kohn, Andrew R. Cardonick, Goldberg, Kohn, Bell, Black, Rosenbloom & Moritz Ltd., Chicago, IL, Jonathan N. Helfat, Otterbourg, Steindler, Houston & Rosen, P.C., New York, NY, for (Amicus-appellant) Commercial Financial Association.

Robert K. Rasmussen, Milton Underwood Professor of Law, Vanderbilt Law School, Nashville, TN, for (Amicus-appellants) Robert K. Rasmussen, Barry Adler, Susan Block–Lieb, G. Marcus Cole, Marcel Kahan, Ronald J. Mann, and David A. Skeel, Jr.

Adam H. Isenberg, Saul Ewing LLP, Philadelphia, PA, Norman L. Pernick, J. Kate Stickles, Saul Ewing LLP, Wilmington, DE, Charles O. Monk, II, (Argued), Joseph M. Fairbanks, Henry R. Abrams, Dan Friedman, Saul Ewing LLP, Baltimore, MD, for (Appellee) Owens Corning, a Delaware Corporation; CDC Corp.; Engineered Yarns American Inc.; Exterior Systems Inc.; Falcon Foam Corp.; Fibreboard Corp.; HomeExperts; Integrex; Integrex Professional Services; Integrex Testing Systems; **\*199** Integrex Supply Chain Solutions LLC; Integrex Ventures LLC; Jefferson Holdings Inc.; Owens–Corning Fiberglass Technology Inc.; Owens–Corning HT, Inc.; Owens–Corning Overseas Holdings, Inc.; Owens–Corning Remodeling Systems, LLC; Soltech, Inc.

Elihu Inselbuch, Caplin & Drysdale, Chartered, New York, NY, Peter Van N. Lockwood, Nathan D. Finch, Walter B. Slocombe, Caplin & Drysdale, Chartered, Washington, DC, Marla R. Eskin, Campbell & Levine, LLC, Wilmington, DE, for (Appellee) Official Committee of Unsecured Creditors.

Michael J. Crames, Jane W. Parver, Edmund M. Emrich, Andrew A. Kress, Kaye Scholer LLP, New York, NY, James L. Patton, Jr., Joseph M. Barry, Young, Conaway, Stargatt & Taylor LLP, Wilmington, DE, for (Appellee) James J. McMonagle, Legal Representative for Future Claimants.

J. Andrew Rahl, (Argued), John B. Berringer, John H. Doyle, III, Howard Ressler, Dennis J. Artese, Anderson, Kill & Olick, P.C., New York, NY, Francis A. Monaco, Jr., Monzack & Monaco P.A., Wilmington, DE, for (Appellee) Official Representatives of the Bondholders and Trade Creditors f/k/a Official Committee of Unsecured Creditors of Owens Corning.

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 6 of 379

In re Owens Corning, 419 F.3d 195 (2005)
45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

Howard A. Rosenthal, Alan R. Gordon, Pelino & Lentz P.C., Philadelphia, PA, Laurence J. Kaiser, Law Office of Laurence J. Kaiser, New York, NY, for (Amicus-appellee) Commercial Law League America.

Before ROTH, AMBRO and FUENTES, Circuit Judges.

**Opinion**

### OPINION OF THE COURT

AMBRO, Circuit Judge.

We consider under what circumstances a court exercising bankruptcy powers may substantively consolidate affiliated entities. Appellant Credit Suisse First Boston ("CSFB") is the agent for a syndicate of banks (collectively, the "Banks") [1] that extended in 1997 a $2 billion unsecured loan to Owens Corning, a Delaware corporation ("OCD"), and certain of its subsidiaries. This credit was enhanced in part by guarantees made by other OCD subsidiaries. The District Court granted a motion to consolidate the assets and liabilities of the OCD borrowers [2] and guarantors in anticipation of a plan of reorganization.

The Banks appeal and argue that the Court erred by granting the motion, as it misunderstood the reasons for, and standards for considering, the extraordinary remedy of substantive consolidation, and in any event did not make factual determinations necessary even to consider its use. Though we reverse the ruling of the District Court, we do so aware that it acted on an issue with no opinion on point by our Court and differing rationales by other courts.

While this area of law is difficult and this case important, its outcome is easy with the facts before us. Among other problems, the consolidation sought is "deemed." Should we approve this non-consensual arrangement, the plan process would proceed as though assets and liabilities of separate entities were merged, but in fact they remain separate with the twist that the guarantees to the Banks are eliminated. From this we conclude that the **\*200** proponents of substantive consolidation request it not to rectify the seldom-seen situations that call for this last-resort remedy but rather as a ploy to deprive one group of creditors of their rights while providing a windfall to other creditors.

### I. Factual Background and Procedural History

#### A. Owens Corning Group of Companies

OCD and its subsidiaries (which include corporations and limited liability companies) comprise a multinational corporate group. Different entities within the group have different purposes. Some, for example, exist to limit liability concerns (such as those related to asbestos), others to gain tax benefits, and others have regulatory reasons for their formation.

Each subsidiary was a separate legal entity that observed governance formalities. Each had a specific reason to exist separately, each maintained its own business records, and intercompany transactions were regularly documented. [3] Although there may have been some "sloppy" bookkeeping, two of OCD's own **\*201** officers testified that the financial statements of all the subsidiaries were accurate in all material respects. Further, through an examination of the subsidiaries' books, OCD's postpetition auditors (Ernst & Young) have eliminated most financial discrepancies, particularly with respect to the larger guarantor subsidiaries.

#### B. The 1997 Credit Agreement

In 1997 OCD sought a loan to acquire Fibreboard Corporation. At this time OCD faced growing asbestos liability and a poor credit rating that hindered its ability to obtain financing. When CSFB was invited to submit a bid, it included subsidiary guarantees in the terms of its proposal. The guarantees gave the Banks direct claims against the guarantors for payment defaults. They were a "credit enhancement" without which the Banks would not have made the loan to OCD. All draft loan term sheets included subsidiary guarantees.

A $2 billion loan from the Banks to OCD closed in June 1997. The loan terms were set out primarily in a Credit Agreement. Among those terms were the guarantee provisions and requirements for guarantors, who were defined as "present or future Domestic Subsidiar[ies] ... having assets with an aggregate book value in excess of $30,000,000." Section 10.07 of the Agreement provided that the guarantees were "absolute and unconditional" and each "constitute[d] a guarant[ee] of payment and not a guarant[ee] of collection." [4] A "No Release of Guarantor" provision in § 10.8 stated that "the obligations of each guarantor ... shall not be reduced, limited or terminated, nor shall such guarantor be discharged

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 7 of 379

In re Owens Corning, 419 F.3d 195 (2005)
45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

from any such obligations, for any reason whatsoever," except payment and performance in full or through waiver or amendment of the Credit Agreement. Under § 13.05 of the Credit Agreement, a guarantor could be released only through (i) the unanimous consent of the Banks for the guarantees of Fibreboard subsidiaries or through the consent of Banks holding 51% of the debt for other subsidiaries, or (ii) a fair value sale of the guarantor if its cumulative assets totaled less than 10% of the book value of the aggregate OCD group of entities.

CSFB negotiated the Credit Agreement expressly to limit the ways in which OCD could deal with its subsidiaries. For example, it could not enter into transactions with a subsidiary that would result in losses to that subsidiary. Importantly, the Credit Agreement contained provisions designed to protect the separateness of OCD and its subsidiaries. The subsidiaries agreed explicitly to maintain themselves as separate entities. To further this agreement, they agreed to keep separate books and financial records in order to prepare separate financial statements. The Banks were given the right to visit each subsidiary and discuss business matters directly with that subsidiary's management. The subsidiaries also were prohibited from merging into OCD because both entities were required to survive a transaction under § 8.09(a)(ii)(A) of the Credit Agreement. This provision also prohibited guarantor subsidiaries from merging with other subsidiaries unless there would be no effect on the guarantees' value.

## C. Procedural History

On October 5, 2000, facing mounting asbestos litigation, OCD and seventeen of its **\*202** subsidiaries (collectively, the "Debtors") filed for reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 *et seq.* [5] Twenty-seven months later, the Debtors and certain unsecured creditor groups (collectively, the "Plan Proponents") proposed a reorganization plan (as amended, the "Plan") predicated on obtaining "substantive consolidation" of the Debtors along with three non-Debtor OCD subsidiaries. [6] Typically this arrangement pools all assets and liabilities of the subsidiaries into their parent and treats all claims against the subsidiaries as transferred to the parent. In fact, however, the Plan Proponents sought a form of what is known as a "deemed consolidation," under which a consolidation is deemed to exist [7] for purposes of valuing and satisfying creditor claims, voting for or against the Plan, and making distributions for allowed claims under it. Plan § 6.1. Yet "the Plan would not result in the merger of or the transfer or commingling of any

assets of any of the Debtors or Non–Debtor Subsidiaries, ... [which] will continue to be owned by the respective Debtors or Non–Debtors." Plan § 6.1(a). Despite this, on the Plan's effective date "all guarantees of the Debtors of the obligations of any other Debtor will be deemed eliminated, so that any claim against any such Debtor and any guarantee thereof ... will be deemed to be one obligation of the Debtors with respect to the consolidated estate." Plan § 6.1(b). Put another way, "the Plan eliminates the separate obligations of the Subsidiary Debtors arising from the guarant[e]es of the 1997 Credit Agreement." Plan Disclosure Statement at A–9897.

The Banks objected to the proposed consolidation. Judge Alfred Wolin held a hearing on this objection. [8] He was subsequently recused from the Debtors' bankruptcy proceedings in light of *In re Kensington Int'l Ltd.,* 368 F.3d 289 (3d Cir.2004), and Judge John Fullam was designated by the Chief Judge of our Court to replace him. Judge Fullam reviewed the transcripts and exhibits of the hearing, ordered additional briefing and on October 5, 2004, granted the consolidation motion in an order accompanied by a short opinion. *In re Owens Corning,* 316 B.R. 168 (Bankr.D.Del.2004).

Judge Fullam concluded that there existed "substantial identity between ... OCD and its wholly-owned subsidiaries." *Id.* at 171. He further determined that "there [was] simply no basis for a finding that, in extending credit, the Banks relied upon the separate credit of any of the subsidiary guarantors." *Id.* at 172. In Judge Fullam's view, it was "also clear that substantive consolidation would greatly simplify and expedite the successful completion of this entire bankruptcy proceeding. **\*203** More importantly, it would be exceedingly difficult to untangle the financial affairs of the various entities." *Id.* at 171. As such, he held substantive consolidation should be permitted, as not only did it allow "obvious advantages ... [, but was] a virtual necessity." *Id.* at 172. In any event, Judge Fullam wrote, "[t]he real issue is whether the Banks are entitled to participate, *pari passu,* with other unsecured creditors, or whether the Banks' claim is entitled to priority, in whole or in part, over the claims of other unsecured creditors." *Id.* But this issue, he stated, "cannot now be determined." *Id.*

CSFB appeals on the Banks' behalf.

## II. Appellate Jurisdiction

In re Owens Corning, 419 F.3d 195 (2005)

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 8 of 379

45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

The Plan Proponents moved to dismiss the appeal of the District Court's order granting consolidation on the ground that it is not a "final decision" from which an appeal may be taken pursuant to 28 U.S.C. § 1291. [9] We denied that motion prior to oral argument in this case and noted that our reasoning would follow in this opinion.

[1]    Recognizing the "protracted nature of many bankruptcy proceedings, and the waste of time and resources that might result if immediate appeal [is] denied," *United States Trustee v. Gryphon at the Stone Mansion, Inc.,* 166 F.3d 552, 556 (3d Cir.1999), "[w]e apply a broader concept of 'finality' when considering bankruptcy appeals under § 1291 than we do when considering other civil orders under the same section." *In re Marvel Entm't Group, Inc,* 140 F.3d 463, 470 (3d Cir.1998). *See also Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV,* 229 F.3d 245, 250 (3d Cir.2000) (noting that we impose a "relaxed standard" of finality because of unique considerations in bankruptcy cases); 16 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 3926.2 at 274 (2d ed.1996) (describing the "Third Circuit's especially flexible approach to bankruptcy finality"). Particularly relevant to our case is that "[t]o delay resolution of discrete claims until after final approval of a reorganization plan ... would waste time and resources, particularly if the appeal resulted in reversal of a bankruptcy court order necessitating re-appraisal of the entire plan." *Clark v. First State Bank* (*In re White Beauty View, Inc.*), 841 F.2d 524, 526 (3d Cir.1988). We have also stressed that "issues central to the progress of the bankruptcy petition, those 'likely to affect the distribution of the debtor's assets, or the relationship among the creditors,' should be resolved quickly." *Century Glove, Inc. v. First Am. Bank,* 860 F.2d 94, 98 (3d Cir.1988) (quoting *Southeastern Sprinkler Co., Inc. v. Meyertech Corp.* (*In re Meyertech* ), 831 F.2d 410, 414 (3d Cir.1987)).

[2]    [3]    We consider four factors in determining whether we should exercise jurisdiction over a bankruptcy appeal: "(1) [t]he impact on the assets of the bankrupt estate; (2) [the][n]ecessity for further fact-finding on remand; (3) [t]he preclusive effect of [the Court's] decision on the merits of further litigation; and (4) [t]he interest of judicial economy." *Buncher,* 229 F.3d at 250. All four factors weigh heavily in favor of our jurisdiction to consider the appeal of an order granting substantive consolidation. We thus join the four Courts of Appeal that have exercised jurisdiction in this context. *Alexander v. Compton* (*In re Bonham* ), 229 F.3d

750, 762 (9th Cir.2000); *First Nat'l Bank of El* **\*204** *Dorado v. Giller* (*In re Giller* ), 962 F.2d 796, 797–98 (8th Cir.1992); *Eastgroup Props. v. S. Motel Ass'n,* 935 F.2d 245, 248 (11th Cir.1991); and *Union Sav. Bank v. Augie/Restivo Baking Co., Ltd.* (*In re Augie/Restivo Baking Co., Ltd.*), 860 F.2d 515, 516–17 (2d Cir.1988).

First, substantive consolidation has a profound effect on the assets of the consolidated entities. *See, e.g., Nesbit v. Gears Unlimited,* 347 F.3d 72, 86–87 (3d Cir.2003). Second, there is no need for additional fact-finding to assess the propriety of an order granting substantive consolidation. In this case, for example, Judge Fullam reached his decision after a thirteen-day evidentiary hearing was held by Judge Wolin, and after Judge Fullam reviewed "the transcript of the testimony, and ... the voluminous documentary record compiled in the course of the hearing, and [had] the benefit of post-trial briefing and argument." *In re Owens Corning,* 316 B.R. at 169. Third, a substantive consolidation order clearly has a preclusive effect on the merits of further litigation. In this case, the order precludes at least the Banks from asserting any right compromised or eliminated by virtue of the substantive consolidation. Last, the interests of judicial economy are best served by an immediate review of a substantive consolidation order. A later reversal of such an order risks rendering meaningless any proceedings premised on the viability of a plan that calls for a consolidation (even if for only a temporary period).

[4]    Having concluded that we generally have jurisdiction to review appeals of substantive consolidation orders, we inquire whether anything is "different" about this case. The Plan Proponents argue that

> [t]he District Court Order lacks finality because it will be implemented, if at all, only following approval of a disclosure statement, the solicitation and vote of creditors as to the terms of the Proposed Plan, and, assuming the requisite vote, final confirmation of the Proposed Plan, before which creditors other than the Bank Debt Holders shall be given the opportunity to contest substantive consolidation. [Bankruptcy Code] § 1129. Thus, the District Court Order is conditioned upon plan confirmation.... The District Court Order has no present impact

on the Debtors' estates and does not change the status quo.

Plan Proponents' Mot. to Dismiss at 10. In support of this contention, the Plan Proponents rely primarily on *In re A.S.K. Plastics, Inc.,* No. Civ. A. 04–2701, 2004 WL 1903322 (E.D.Pa. Aug. 24, 2004). Yet the conclusion that the Court lacked jurisdiction in *A.S.K. Plastics* was premised on the fact that "[u]nder no reasonable construction of the law could the Order's *conditional* consolidation be viewed as effect[ing] a 'practical termination' of anything." *Id.* at *2 (emphasis in original). That order "emphasized [that] ... [w]hen a final reorganization plan [was] submitted to the Bankruptcy Court, [the party appealing the order] [was] free to object to consolidation." *Id.* In effect, the *A.S.K. Plastics* order was designed to postpone consideration of the substantive consolidation issue until the plan confirmation stage.

That is not our case. For the Banks the District Court's determination is hardly conditional. It concluded "that substantive consolidation should be permitted." *In re Owens Corning,* 316 B.R. at 172. It made no provision for the Banks to reassert their objection to substantive consolidation at the plan confirmation stage; the order is final against them and is thus a practical termination of the substantive consolidation litigation.

*205 Lastly, we address the Plan Proponents' argument that a substantive consolidation order must immediately take effect in order to be final for purposes of our jurisdiction. What they ignore is that the order approving substantive consolidation is the foundation on which the Plan is built. To assert that the actual substantive consolidation can only be implemented in conjunction with the effectiveness of an approved plan puts form over function. As the Banks point out, "[t]here is no support for the proposition that final orders lose their finality because of a delay in implementation." CSFB Opp'n to Mot. to Dismiss at 13. Certainly, decisions resolving most disputes (notably, disputes over the validity and value of claims) are not implemented until a plan is confirmed and payment under the plan becomes obligatory. Yet we exercise jurisdiction to review many of these decisions before that "final" order issues. *See, e.g., Hefta v. Official Comm. of Unsecured Creditors (In re Am. Classic Voyages Co.),* 405 F.3d 127 (3d Cir.2005). No reason exists for us to vary that routine here.

We conclude readily that we have appellate jurisdiction to consider the Banks' appeal under 28 U.S.C. § 1291.

### III. Substantive Consolidation

[5] [6] Substantive consolidation, a construct of federal common law, emanates from equity. It "treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities (save for inter-entity liabilities, which are erased). The result is that claims of creditors against separate debtors morph to claims against the consolidated survivor." *Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health Ventures, Inc.),* 402 F.3d 416, 423 (3d Cir.2005). Consolidation restructures (and thus revalues) rights of creditors and for certain creditors this may result in significantly less recovery.

While we have not fully considered the character and scope of substantive consolidation, we discussed the concept in *Nesbit,* 347 F.3d at 86–88 (surveying substantive consolidation case law for application by analogy to the Title VII inquiry of when to consolidate employers for the purpose of assessing a discrimination claim), and *In re Genesis Health Ventures,* 402 F.3d at 423–24 (examining, *inter alia,* whether a "deemed" consolidation for voting in connection with, and distribution under, a proposed plan of reorganization is a substantive consolidation for purposes of calculating U.S. Trustee quarterly fees under 28 U.S.C. § 1930(a)(6)). Other courts, including the Supreme Court itself in an opinion that spawned the concept of consolidation, have holdings more on point than heretofore have we. We begin with a survey of key cases, drawing from them when substantive consolidation may apply consistent with the principles we perceive as cabining its use, and apply those principles to this case.

### A. History of Substantive Consolidation

The concept of substantively consolidating separate estates begins with a commonsense deduction. Corporate disregard [10] as a fault may lead to corporate disregard as a remedy.

Prior to substantive consolidation, other remedies for corporate disregard were (and remain) in place. For example, where a subsidiary is so dominated by its *206 corporate parent as to be the parent's "alter ego," the "corporate veil" of the subsidiary can be ignored (or "pierced") under state law. Kors, *supra,* at 386–90 (citing as far back as I. Maurice Wormser, *Piercing the Veil of Corporate Entity,* 12 Colum. L.Rev. 496 (1912)). Or a court might mandate that the assets transferred to a corporate subsidiary be turned over to its

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 10 of 379

In re Owens Corning, 419 F.3d 195 (2005)

45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

parent's trustee in bankruptcy for wrongs such as fraudulent transfers, Kors, *supra,* at 391, in effect bringing back to the bankruptcy estate assets wrongfully conveyed to an affiliate. If a corporate parent is both a creditor of a subsidiary and so dominates the affairs of that entity as to prejudice unfairly its other creditors, a court may place payment priority to the parent below that of the other creditors, a remedy known as equitable subordination, which is now codified in § 510(c) of the Bankruptcy Code. *See generally id.* at 394–95.

Adding to these remedies, the Supreme Court, little more than six decades ago, approved (at least indirectly and perhaps inadvertently) what became known as substantive consolidation. [11] *Sampsell v. Imperial Paper & Color Corp.,* 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293 (1941). In *Sampsell* an individual in bankruptcy had transferred assets prepetition to a corporation he controlled. (Apparently these became the corporation's sole assets.) When the bankruptcy referee ordered that the transferred assets be turned over by the corporation to the individual debtor's trustee, a creditor of the non-debtor corporation sought distribution priority with respect to that entity's assets. In deciding that the creditor should not be accorded priority (thus affirming the bankruptcy referee), the Supreme Court turned a typical turnover/fraudulent transfer case into the forebear of today's substantive consolidation by terming the bankruptcy referee's order (marshaling the corporation's assets for the benefit of the debtor's estate) as "consolidating the estates." *Id.* at 219, 61 S.Ct. at 907.

Each of these remedies has subtle differences. "Piercing the corporate veil" makes shareholders liable for corporate wrongs. Equitable subordination places bad-acting creditors behind other creditors when distributions are made. Turnover and fraudulent transfer bring back to the transferor debtor assets improperly transferred to another (often an affiliate). Substantive consolidation goes in a direction different (and in most cases further) than any of these remedies; it is not limited to shareholders, it affects distribution to innocent creditors, and it mandates more than the return of specific assets to the predecessor owner. It brings all the assets of a group of entities into a single survivor. Indeed, it merges liabilities as well. "The result," to repeat, "is that claims of creditors against separate debtors morph to claims against the consolidated survivor." *In re Genesis Health Ventures,* 402 F.3d at 423. The bad news for certain creditors is that, instead of looking to assets of the subsidiary with whom they dealt, they now must share those assets with all creditors of

all consolidated entities, raising the specter for some of a significant distribution diminution.

Though the concept of consolidating estates had Supreme Court approval, Courts of Appeal (with one exception) were slow to follow suit. *Stone v. Eacho (In re Tip Top Tailors, Inc.),* 127 F.2d 284 (4th Cir.1942), *cert. denied,* 317 U.S. 635, 63 S.Ct. 54, 87 L.Ed. 512 (1942), was the first to

**\*207** pick up on *Sampsell's* new remedy. [12] Little occurred thereafter for more than two decades, until the Second Circuit issued several decisions—*Soviero v. National Bank of Long Island,* 328 F.2d 446 (2d Cir.1964); *Chemical Bank New York Trust Co. v. Kheel (In re Seatrade Corp.),* 369 F.2d 845 (2d Cir.1966); *Flora Mir Candy Corp. v. R.S. Dickson & Co. (In re Flora Mir Candy Corp.),* 432 F.2d 1060 (2d Cir.1970); and *James Talcott, Inc. v. Wharton (In re Continental Vending Machine Corp.),* 517 F.2d 997 (2d Cir.1975)—that brought substantive consolidation as a remedy back into play and premise its modern-day understanding.

Other Circuit Courts fell in line in acknowledging substantive consolidation as a possible remedy. *See, e.g., FDIC v. Hogan (In re Gulfco Inv. Corp.),* 593 F.2d 921, 927–28 (10th Cir.1979); *Pension Benefit Guar. Corp. v. Ouimet Corp.,* 711 F.2d 1085, 1092–93 (1st Cir.1983), *cert. denied,* 464 U.S. 961, 104 S.Ct. 393, 78 L.Ed.2d 337 (1983); *Drabkin v. Midland–Ross Corp. (In re Auto–Train Corp.),* 810 F.2d 270, 276 (D.C.Cir.1987); *Eastgroup,* 935 F.2d at 248; *In re Giller,* 962 F.2d at 799; *First Nat'l Bank of Barnesville v. Rafoth (In re Baker & Getty Fin. Servs., Inc.),* 974 F.2d 712, 720 (6th Cir.1992); *Reider v. FDIC (In re Reider),* 31 F.3d 1102, 1105–07 (11th Cir.1994); and *In re Bonham,* 229 F.3d at 771.

The reasons of these courts for allowing substantive consolidation as a possible remedy span the spectrum and often overlap. For example, *Stone* and *Soviero* followed the well-trod path of alter ego analysis in state "pierce-the-corporate-veil" cases. *Stone,* 127 F.2d at 287–89; *Soviero,* 328 F.2d at 447–48. *Accord In re Gulfco Inv. Corp.,* 593 F.2d at 928–29. *Kheel* dealt with, *inter alia,* the net-negative practical effects of attempting to thread back the tangled affairs of entities, separate in name only, with "interrelationships ... hopelessly obscured." 369 F.2d at 847. *See also, e.g., In re Augie/Restivo,* 860 F.2d at 518–19. *In re Continental Vending Machine* balanced the "inequities" involved when substantive rights are affected against the "practical considerations" spawned by "accounting difficulties (and expense) which may occur where the interrelationships of the corporate group are highly complex,

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 11 of 379

In re Owens Corning, 419 F.3d 195 (2005)

45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

or perhaps untraceable." 517 F.2d at 1001. *See also, e.g., In re Auto–Train,* 810 F.2d at 276; *Eastgroup,* 935 F.2d at 249; *In re Giller,* 962 F.2d at 799; *In re Reider,* 31 F.3d at 1107–08. *See generally* Kors, *supra,* at 402–06.

Ultimately most courts slipstreamed behind two rationales— those of the Second Circuit in *Augie/Restivo* and the D.C. Circuit in *Auto–Train.* The former found that the competing "considerations are merely variants on two critical factors: (i) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit, **\*208** ... or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors...." *In re Augie/Restivo,* 860 F.2d at 518 (internal quotation marks and citations omitted). *Auto–Train* touched many of the same analytical bases as the prior Second Circuit cases, but in the end chose as its overarching test the "substantial identity" of the entities and made allowance for consolidation in spite of creditor reliance on separateness when "the demonstrated benefits of consolidation 'heavily' outweigh the harm." *In re Auto–Train,* 810 F.2d at 276 (citation omitted).

Whatever the rationale, courts have permitted substantive consolidation as an equitable remedy in certain circumstances.[13] No court has held that substantive consolidation is not authorized,[14] though there **\*209** appears nearly unanimous consensus that it is a remedy to be used "sparingly." *In re Augie/Restivo,* 860 F.2d at 518; *see also In re Bonham,* 229 F.3d at 767 (explaining that "almost every other court has noted [that substantive consolidation] should be used 'sparingly' ") (citing *In re Flora Mir,* 432 F.2d at 1062–63).[15]

**\*210  B. Our View of Substantive Consolidation**

[7]    Substantive consolidation exists as an equitable remedy. But when should it be available and by what test should its use be measured? As already noted, we have commented on substantive consolidation only generally in *Nesbit,* 347 F.3d at 86–88, and *In re Genesis Health Ventures,* 402 F.3d at 423–24. The latter nonetheless left little doubt that, if presented with a choice of analytical avenues, we favor essentially that of *Augie/Restivo. Id.* at 423. The *Auto–Train* approach (requiring "substantial identity" of entities to be consolidated, plus that consolidation is "necessary to avoid some harm or realize some benefit," 810 F.2d at 276) adopts, we presume, one of the *Augie/Restivo* touchstones for substantive consolidation while adding the low bar of avoiding some harm or discerning some benefit by consolidation. To us

this fails to capture completely the few times substantive consolidation may be considered and then, when it does hit one chord, it allows a threshold not sufficiently egregious and too imprecise for easy measure. For example, we disagree that "[i]f a creditor makes [a showing of reliance on separateness], the court may order consolidation ... if it determines that the demonstrated benefits of consolidation 'heavily' outweigh the harm." *Id.* at 276 (citation omitted); *see also Eastgroup,* 935 F.2d at 249. If an objecting creditor relied on the separateness of the entities, consolidation cannot be justified *vis-à-vis* the claims of that creditor.[16]

In assessing whether to order substantive consolidation, courts consider many factors (some of which are noted in *Nesbit,* 347 F.3d at 86–88 nn. 7 & 9). They vary (with degrees of overlap) from court to court. Rather than endorsing any prefixed factors, in *Nesbit* we "adopt[ed] an intentionally open-ended, equitable inquiry ... to determine when substantively to consolidate two entities." *Id.* at 87. While we mentioned that "in the bankruptcy context the inquiry focuses primarily on financial entanglement," *id.,* this comment primarily related to the hopeless commingling test of substantive consolidation. But when creditors deal with entities as an indivisible, single party, "the line between operational and financial [factors] may be blurred." *Id.* at 88. We reiterate that belief here. Too often the factors in a checklist fail to separate the unimportant from the important, or even to set out a standard to make the attempt. *Accord* Br. of Law Professors[17] as *Amici Curiae* at 11–12. This often results in rote following of a form containing factors where courts tally up and spit out a score without an eye on the principles that give the rationale for substantive consolidation (and why, as a result, it should so seldom be in play). *Id.* **\*211** ("Differing tests with a myriad of factors run the risk that courts will miss the forest for the trees. Running down factors as a check list can lead a court to lose sight of why we have substantive consolidation in the first instance ... and often [to] fail [to] identify a metric by which [it] can ... [assess] the relative importance among the factors. The ... [result is] resort to ad hoc balancing without a steady eye on the ... [principles] to be advanced....").

[8]    [9]    [10]    [11]    [12]    What, then, are those principles? We perceive them to be as follows.

(1) Limiting the cross-creep of liability by respecting entity separateness is a "fundamental ground rule[ ]." Kors, *supra,* at 410. As a result, the general expectation of state law and of the Bankruptcy Code, and thus of commercial

In re Owens Corning, 419 F.3d 195 (2005)    Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 12 of 379

45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

markets, is that courts respect entity separateness absent compelling circumstances calling equity (and even then only possibly substantive consolidation) into play.

(2) The harms substantive consolidation addresses are nearly always those caused by *debtors* (and entities they control) who disregard separateness.[18] Harms caused by creditors typically are remedied by provisions found in the Bankruptcy Code (*e.g.,* fraudulent transfers, §§ 548 and 544(b)(1), and equitable subordination, § 510(c)).

(3) Mere benefit to the administration of the case (for example, allowing a court to simplify a case by avoiding other issues or to make postpetition accounting more convenient) is hardly a harm calling substantive consolidation into play.

(4) Indeed, because substantive consolidation is extreme (it may affect profoundly creditors' rights and recoveries) and imprecise, this "rough justice" remedy should be rare and, in any event, one of last resort after considering and rejecting other remedies (for example, the possibility of more precise remedies conferred by the Bankruptcy Code).

(5) While substantive consolidation may be used defensively to remedy the identifiable harms caused by entangled affairs, it may not be used offensively (for example, having a primary purpose to disadvantage tactically a group of creditors in the plan process or to alter creditor rights).

[13] [14] [15] The upshot is this. In our Court what must be proven (absent consent) concerning the entities for whom substantive consolidation is sought is that (i) prepetition they disregarded separateness so significantly that their creditors relied on the breakdown of entity borders and treated them as one legal entity,[19] or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors.[20]

*212 [16] [17] Proponents of substantive consolidation have the burden of showing one or the other rationale for consolidation. The second rationale needs no explanation. The first, however, is more nuanced. A *prima facie* case for it typically exists when, based on the parties' prepetition dealings, a proponent proves corporate disregard creating

contractual expectations of creditors[21] that they were dealing with debtors as one indistinguishable entity. Kors, *supra,* at 417–18; Christopher W. Frost, *Organizational Form, Misappropriation Risk, and the Substantive Consolidation of Corporate Groups,* 44 Hastings L.J. 449, 457 (1993). Proponents who are creditors must also show that, in their prepetition course of dealing, they actually and reasonably relied on debtors' supposed unity. Kors, *supra,* at 418–19. Creditor opponents of consolidation can nonetheless defeat a *prima facie* showing under the first rationale if they can prove they are adversely affected and actually relied on debtors' separate existence.[22]

### C. Application of Substantive Consolidation to Our Case

[18] With the principles we perceive underlie use of substantive consolidation, the outcome of this appeal is apparent at the outset. Substantive consolidation fails to fit the facts of our case and, in any event, a "deemed" consolidation cuts against the grain of all the principles.

To begin, the Banks did the "deal world" equivalent of "Lending 101." They loaned $2 billion to OCD and enhanced the credit of that unsecured loan indirectly by subsidiary guarantees covering less than half the initial debt. What the Banks got in lending lingo was "structural seniority"— a direct claim against the guarantors (and thus against their assets levied on once a judgment is obtained) that other creditors of OCD did not have. This kind of lending occurs every business day. To undo this bargain is a demanding task.

### 1. NO PREPETITION DISREGARD OF CORPORATE SEPARATENESS

Despite the Plan Proponents' pleas to the contrary, there is no evidence of the prepetition disregard of the OCD entities' separateness. To the contrary, OCD (no less than CSFB) negotiated the 1997 lending transaction premised on the separateness of all OCD affiliates. Even today no allegation exists of bad faith by anyone concerning the loan.[23] In this context, OCD and the other Plan Proponents cannot now ignore, or have us ignore, the very ground rules OCD put in place. Playing by these rules means that obtaining the guarantees of separate entities, made separate *213 by OCD's choice of how to structure the affairs of its affiliate group of companies, entitles a lender, in bankruptcy or out, to look to any (or all) guarantor(s) for payment when the time comes. As such, the District Court's conclusions of "substantial identity" of OCD and its subsidiaries, and the

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 13 of 379

In re Owens Corning, 419 F.3d 195 (2005)
45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

Banks' reliance thereon, are incorrect. For example, testimony presented by both the Banks and the Debtors makes plain the parties' intention to treat the entities separately. CSFB presented testimony from attorneys and bankers involved in negotiating the Credit Agreement that reflected their assessment of the value of the guarantees as partially derived from the separateness of the entities. As OCD concedes, these representatives "testified that the guarant[e]es were ... intended to provide 'structural seniority' to the banks," and were thus fundamentally premised on an assumption of separateness. Debtors Ans. Br. at 26.

In the face of this testimony, Plan Proponents nonetheless argue that the Banks intended to ignore the separateness of the entities. In support of this contention, they assert, *inter alia,* that because the Banks did not receive independent financial statements for each of the entities during the negotiating process, they must have intended to deal with them as a unified whole. Because the Banks were unaware of the separate financial makeup of the subsidiaries, the argument goes, they could not have relied on their separateness. [24]

This argument is overly simplistic. Assuming the Banks did not obtain separate financial statements for each subsidiary, they nonetheless obtained detailed information about each subsidiary guarantor from OCD, including information about that subsidiary's assets and debt. Moreover, the Banks knew a great deal about these subsidiaries. For example, they knew that each subsidiary guarantor had assets with a book value of at least $30 million as per the terms of the Credit Agreement, that the aggregate value of the guarantor subsidiaries was over $900 million and that those subsidiaries had little or no debt. Additionally, the Banks knew that Fibreboard's subsidiaries (including the entities that became part of ESI) had no asbestos liability, would be debt-free post-acquisition and had assets of approximately $700 million.

Even assuming the Plan Proponents could prove prepetition disregard of Debtors' corporate forms, we cannot conceive of a justification for imposing the rule that a creditor must obtain financial statements from a debtor in order to rely reasonably on the separateness of that debtor. Creditors are free to employ whatever metrics **\*214** they believe appropriate in deciding whether to extend credit free of court oversight. We agree with the Banks that "the reliance inquiry is not an inquiry into lenders' internal credit metrics. Rather, it is about the *fact* that the credit decision was made in reliance on the existence of separate entities...." CSFB Opening Br. at 31 (emphasis in original). [25] Here there is no serious dispute as to that fact.

## 2. NO HOPELESS COMMINGLING EXISTS POSTPETITION

There also is no meaningful evidence postpetition of hopeless commingling of Debtors' assets and liabilities. Indeed, there is no question which entity owns which principal assets and has which material liabilities. Likely for this reason little time is spent by the parties on this alternative test for substantive consolidation. It is similarly likely that the District Court followed suit.

[19]    The Court nonetheless erred in concluding that the commingling of assets will justify consolidation when "the affairs of the two companies are so entangled that consolidation *will be beneficial." In re Owens Corning, 316 B.R. at 171* (emphasis added). As we have explained, commingling justifies consolidation only when separately accounting for the assets and liabilities of the distinct entities will reduce the recovery of *every* creditor—that is, when every creditor will benefit from the consolidation. Moreover, the benefit to creditors should be from cost savings that make assets available rather than from the shifting of assets to benefit one group of creditors at the expense of another. Mere benefit to some creditors, or administrative benefit to the Court, falls far short. The District Court's test not only fails to adhere to the theoretical justification for "hopeless commingling" consolidation—that no creditor's rights will be impaired—but also suffers from the infirmity that it will almost always be met. That is, substantive consolidation will nearly always produce some benefit to some in the form of simplification and/or avoidance of costs. Among other things, following such a path misapprehends the degree of harm required to order substantive consolidation.

But no matter the legal test, a case for hopeless commingling cannot be made. Arguing nonetheless to the contrary, Debtors assert that "it would be practically impossible and prohibitively expensive in time and resources" to account for the voluntary bankruptcies of the separate entities OCD has created and maintained. Debtors Ans. Br. at 63. In support of this contention, Debtors rely almost exclusively on the District Court's findings that

> it would be exceedingly difficult
> to untangle the financial affairs of
> the various entities ... [and] there
> are ... many reasons for challenging
> the accuracy of the results achieved
> [in accounting efforts thus far]. For

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 14 of 379

In re Owens Corning, 419 F.3d 195 (2005)

45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

example, transfers of cash between subsidiaries and parent did not include any payment of interest; and calculations of royalties are subject to question.

*In re Owens Corning,* 316 B.R. at 171. Assuming *arguendo* that these findings are correct, they are simply not enough to establish that substantive consolidation is warranted.

[20]    Neither the impossibility of perfection in untangling the affairs of the entities nor the likelihood of some inaccuracies in efforts to do so is sufficient to justify consolidation. We find *R 2 Investments, LDC v. World Access, Inc.* ( **\*215** *In re World Access, Inc.*), 301 B.R. 217 (Bankr.N.D.Ill.2003), instructive on this point. In *World Access* the Court noted that the controlling entity "had no uniform guidelines for the recording of intercompany interest charges" and that the debtors failed to "allocate overhead charges amongst themselves." *Id.* at 234. The Court held, however, that those accounting shortcomings were "merely imperfections in a sophisticated system of accounting records that were conscientiously maintained." *Id.* at 279. It ultimately concluded that "all the relevant accounting data ... still exist[ed]," that only a "reasonable review to make any necessary adjustments [was] required," and, thus, that substantive consolidation was not warranted. *Id.*

The record in our case compels the same conclusion. At its core, Debtors' argument amounts to the contention that because intercompany interest and royalty payments were not perfectly accounted for, untangling the finances of those entities is a hopeless endeavor. Yet imperfection in intercompany accounting is assuredly not atypical in large, complex company structures. For obvious reasons, we are loathe to entertain the argument that complex corporate families should have an expanded substantive consolidation option in bankruptcy. And we find no reason to doubt that "perfection is not the standard in the substantive consolidation context." *Id.* We are confident that a court could properly order and oversee an accounting process that would sufficiently account for the interest and royalty payments owed among the OCD group of companies for purposes of evaluating intercompany claims—dealing with inaccuracies and difficulties as they arise and not in hypothetical abstractions.

On the basis of the record before us, the Plan Proponents cannot fulfill their burden of demonstrating that Debtors'

affairs are even tangled, let alone that the cost of untangling them is so high relative to their assets that the Banks, among other creditors, will benefit from a consolidation. [26]

## 3. OTHER CONSIDERATIONS DOOM CONSOLIDATION AS WELL

Other considerations drawn from the principles we set out also counsel strongly against consolidation. First of all, holding out the possibility of later giving priority to the Banks on their claims does not cure an improvident grant of substantive consolidation. Among other things, the prerequisites for this last-resort remedy must still be met no matter the priority of the Banks' claims.

[21]    Secondly, substantive consolidation should be used defensively to remedy identifiable harms, not offensively to achieve advantage over one group in the plan negotiation process (for example, by deeming assets redistributed to negate plan voting rights), nor a "free pass" to spare Debtors or any other group from proving challenges, like fraudulent transfer claims, that are liberally brandished to scare yet are hard to show. If the Banks are so vulnerable to the fraudulent transfer challenges Debtors have teed up (but have not swung at for so long), then the game should be played to the finish in that arena. [27]

**\*216** But perhaps the flaw most fatal to the Plan Proponents' proposal is that the consolidation sought was "deemed" (*i.e.,* a pretend consolidation for all but the Banks). If Debtors' corporate and financial structure was such a sham before the filing of the motion to consolidate, then how is it that post the Plan's effective date this structure stays largely undisturbed, with the Debtors reaping all the liability-limiting, tax and regulatory benefits achieved by forming subsidiaries in the first place? In effect, the Plan Proponents seek to remake substantive consolidation not as a remedy, but rather a stratagem to "deem" separate resources reallocated to OCD to strip the Banks of rights under the Bankruptcy Code, favor other creditors, and yet trump possible Plan objections by the Banks. Such "deemed" schemes we deem not Hoyle.

### IV. Conclusion

[22]    Substantive consolidation at its core is equity. Its exercise must lead to an equitable result. "Communizing" assets of affiliated companies to one survivor to feed all creditors of all companies may to some be equal (and

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 15 of 379

In re Owens Corning, 419 F.3d 195 (2005)
45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

hence equitable). But it is hardly so for those creditors who have lawfully bargained prepetition for unequal treatment by obtaining guarantees of separate entities. *Accord Kheel, 369 F.2d at 848* (Friendly, J., concurring) ("Equality among creditors who have lawfully bargained for different treatment is not equity but its opposite...."). No principled, or even plausible, reason exists to undo OCD's and the Banks' arms-length negotiation and lending arrangement, especially when to do so punishes the very parties that conferred the prepetition benefit—a $2 billion loan unsecured by OCD and guaranteed by others only in part. To overturn this bargain, set in place by OCD's own pre-loan choices of organizational form, would cause chaos in the marketplace, as it would make this case the Banquo's ghost of bankruptcy.

With no meaningful evidence supporting either test to apply substantive consolidation, there is simply not the nearly "perfect storm" needed to invoke it. Even if there were, a "deemed" consolidation—"several zip (if not area) codes away from anything resembling substantive consolidation," *In re Genesis Health Ventures, 402 F.3d at 424*—fails even to qualify for consideration. Moreover, it is here a tactic used as a sword and not a shield.

We thus reverse and remand this case to the District Court.

### Parallel Citations

45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

Footnotes

1    Though CSFB is the named appellant, the real parties in interest are the Banks (which include CSFB). Thus, unless the context requires otherwise, CSFB and the Banks are referred to interchangeably in this opinion.

2    For ease of reference, we refer hereinafter solely to OCD as the borrower.

3    For example, Owens–Corning Fiberglass Technology, Inc. ("OCFT") was created as an intellectual property holding company to which OCD assigned all of its domestic intellectual property. OCFT licensed this intellectual property back to OCD in return for royalty payments. OCFT also entered into licensing agreements with parties outside of the OCD family of companies. This structure served to shield OCD's intellectual property assets (valued at over $500 million) from liability. OCFT operated as an autonomous entity. It prepared its own accounting and financial records and paid its own expenses from its separate bank accounts. OCFT had its own employees working at its Summit, Illinois plant, which contained machinery and equipment for research and development.

     IPM, Inc. ("IPM") was incorporated as a passive Delaware investment holding company by OCD to consolidate the investments of its foreign subsidiaries. IPM shielded the foreign subsidiaries' investments from OCD liability and likewise shielded OCD from the liability of those foreign subsidiaries. OCD transferred ownership of its foreign subsidiaries to IPM and entered into a revolving loan agreement under which IPM loaned dividends from those subsidiaries to OCD. OCD paid interest on this revolving loan. IPM, like OCFT, entered into agreements with parties unaffiliated with the OCD group and operated as an autonomous entity. IPM also prepared its own accounting and financial records and paid its own expenses from its separate bank accounts. IPM's officers oversaw all investment activity and maintained records of investment activity in IPM subsidiaries.

     Both OCFT and IPM operated outside of OCD's business units. Neither company received administrative support from OCD and both paid payroll and business expenses from their own accounts. Although summaries of their accounting ledgers were entered into OCD's centralized cash management system, the underlying records were created and maintained by the subsidiaries, not OCD. OCFT and IPM even had their own company logos and trade names.

     Integrex was formed by OCD as an asbestos liability management company. For OCD's asbestos liability, Integrex ultimately processed only settled asbestos claims. The company also provided professional services (such as litigation management and materials testing) to the public. It had its own trade name and trademarked logo, its own business unit and its own financial team for business planning, and began several startup businesses that ultimately failed.

     As discussed at Section I(B), *infra*, in 1997 OCD acquired Fibreboard Corporation. Subsequently, OCD formed Exterior Systems, Inc. ("ESI") as a separate entity after several subsidiaries of Fibreboard merged in 1999 in order to shield itself from successor liability for Fibreboard's asbestos products. Although the directors and managers of ESI and OCD overlapped, ESI observed corporate formalities in electing its directors and appointing its officers. In addition, it filed its own tax returns and kept its own accounting records. ESI held substantial assets, including over $1 billion in property, 20 factories, and between 150 and 180 distribution centers.

4    This standard guarantee term means simply that, once the primary obligor (here OCD) defaults, the Banks can proceed against the guarantors directly and immediately without first obtaining a judgment against OCD and collecting against that judgment to determine if a shortfall from OCD exists.

5    For convenience we refer hereinafter simply to "Bankruptcy Code § ___" when citing to a Code section.

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 16 of 379

*In re Owens Corning*, 419 F.3d 195 (2005)
45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

6  As the Plan's consolidation provisions affected so significantly voting on the Plan and the manner of proceeding at any confirmation hearing, the Plan Proponents filed a motion for a ruling on consolidation in anticipation of those events. "While not a routine procedure, it is not at all unusual for a plan proponent, or a plan opponent, to seek a determination prior to the plan confirmation hearing as to the legitimacy of a particular provision of a proposed plan." *In re Stone & Webster, Inc.,* 286 B.R. 532, 542 (Bankr.D.Del.2002) (Walsh, J.).

7  "[A]ll assets and liabilities of each Subsidiary Debtor ... *will be treated as though* they were merged into and with the assets and liabilities of OCD...." Plan § 6.1(b) (emphasis added).

8  Pursuant to 28 U.S.C. § 157(d), Judge Wolin withdrew the reference of, *inter alia,* the consolidation motion to the Bankruptcy Court, thus making the District Court the judicial forum for the motion to proceed.

9  This provision, rather than 28 U.S.C. § 158(d), applies when the reference to a bankruptcy court is withdrawn.

10 A term used by Mary Elisabeth Kors in her comprehensive and well-organized article entitled *Altered Egos: Deciphering Substantive Consolidation,* 59 U. Pitt. L.Rev. 381, 383 (1998) (hereinafter "Kors").

11 The actual term was not used in a reported case until 1975. *See James Talcott, Inc. v. Wharton (In re Continental Vending Machine Corp.),* 517 F.2d 997, 1004 n.3 (2d Cir.1975).

12 Another case oft-mentioned, and preceding both *Sampsell* and *Stone,* is *Fish v. East,* 114 F.2d 177 (10th Cir.1940). Determining that a corporate subsidiary was simply the parent's "instrumentality," *id. at 191,* the Tenth Circuit affirmed the turnover of the subsidiary's assets to the parent. Though asserting that a "corporate entity may be disregarded where not to do so will defeat public convenience, justify wrong or protect fraud," *id.,* "consolidation" was not mentioned. Indeed, as creditors of the subsidiary in *Fish* were given first priority as to its assets, *id.,* a complete consolidation did not occur. *Accord* Kors, *supra,* at 391 ("true consolidation" occurs only when creditors of consolidated entities share *pari passu* ).

   A case from our Court—*In re Pittsburgh Rys. Co.,* 155 F.2d 477 (3d Cir.1946), *cert. denied sub nom. Phila. Co. v. City of Pittsburgh,* 329 U.S. 731, 67 S.Ct. 90, 91 L.Ed. 632 (1946)—cited *Stone, id. at 484–85 n. 15,* in granting the request of the City of Pittsburgh to exercise bankruptcy jurisdiction over non-debtor companies controlled by the debtor Pittsburgh Railways Company. While guided by the practical need to "strip [ ] off" corporate "cloak[s]," *id. at 484,* in reorganizing Pittsburgh's transportation system, our Court pointed out that "[t]he reorganization court cannot indefinitely be called upon to provide ... unification," *id. at 481.* In so doing, it emphasized that "we are in no way passing upon the fairness of any plan [of reorganization]." *Id. at 485; see also id. at 481.*

13 Indeed, they have not restricted the remedy to debtors, allowing the consolidation of debtors with non-debtors, *see, e.g., In re Bonham,* 229 F.3d at 765 (explaining that "[c]ourts have permitted the consolidation of non-debtor and debtor entities in furtherance of the equitable goals of substantive consolidation") (citing *In re Auto–Train,* 810 F.2d at 275; *In re Tureaud,* 59 B.R. 973, 974, 978 (N.D.Okla.1986); *In re Munford, Inc.,* 115 B.R. 390, 395–96 (Bankr.N.D.Ga.1990)); *Soviero,* 328 F.2d 446, and in some cases consolidation retroactively (known also as *nunc pro tunc* consolidation), *see, e.g., In re Bonham,* 229 F.3d at 769–71; *In re Baker & Getty Fin. Servs.,* 974 F.2d at 720–21; *Kroh Bros. Development Co. v. Kroh Bros. Management Co. (In re Kroh Bros. Development Co.),* 117 B.R. 499, 502 (W.D.Mo.1989); *see also Auto–Train,* 810 F.2d at 277 (acknowledging that *nunc pro tunc* consolidations can occur, though not in that case).

   In addition, though we do not permit the consolidation sought in this case, no reason exists to limit it under the right circumstances to any particular form of entity. (Indeed, this case involves corporations and limited liability companies.) *Accord* 2 *Collier on Bankruptcy* ¶ 105.09[1] [c] (15th rev. ed.2005).

14 *See In re Bonham,* 229 F.3d at 765 (explaining that "the equitable power [of substantive consolidation] undoubtedly survived enactment of the Bankruptcy Code" and noting that "[n]o case has held to the contrary"); *but see In re Fas Mart Convenience Stores, Inc.,* 320 B.R. 587, 594 n. 3 (Bankr.E.D.Va.2004) (noting "there is persuasive academic argument that there is no authority in bankruptcy law for substantive consolidation") (citing Daniel B. Bogart, *Resisting the Expansion of Bankruptcy Court Power Under Section 105 of the Bankruptcy Code: The All Writs Act and an Admonition from Chief Justice Marshall,* 35 Ariz. St. L.J. 793, 810 (2003); J. Maxwell Tucker, *Grupo Mexicano and the Death of Substantive Consolidation,* 8 Am. Bankr.Inst. L.Rev. 427 (2000) (hereinafter "Tucker")).

   Since the Supreme Court's decision in *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999) (federal district courts lack the equitable power to enjoin prejudgment transfers of assets, as such an equitable remedy did not exist at the time federal courts were created under the Judiciary Act of 1789), some argue that substantive consolidation, judge-made law not expressly codified in the Bankruptcy Code adopted in the late 1970s, does not qualify as an available equitable remedy. *See, e.g.,* Tucker, *supra* at 442–45. This argument has two facets. The first is that bankruptcy courts are limited to exercising only the equitable remedies extant at the time of the adoption of the Judiciary Act of 1789. As substantive consolidation is a relatively recent remedy nowhere contemplated in 1789, *Grupo Mexicano* by analogy bars substantive consolidation just as it does prejudgment preliminary injunctions forbidding asset transfers. *Id.* The second (and corollary) facet of the argument is that, as substantive consolidation is not specifically authorized in the Bankruptcy Code, authority to confer it

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 17 of 379

In re Owens Corning, 419 F.3d 195 (2005)

45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

can exist, if at all, only in § 105(a) of the Bankruptcy Code (bankruptcy courts "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title"). Even if § 105(a) "constitutes a direct, fresh grant of supplemental power to the bankruptcy courts, independent of the judicial power granted to the federal courts under title 28 [of the United States Code]," *id.* at 447, it can only implement powers already expressed in the provisions of the Bankruptcy Code. *Id.* at 447–48. *See In re Combustion Eng'g, Inc.,* 391 F.3d 190, 236 (3d Cir.2004) ("The general grant of equitable power contained in § 105(a) ... must be exercised within the parameters of the Code itself."); *In re Kmart Corp.,* 359 F.3d 866, 871 (7th Cir.2004) ("[T]he power conferred by § 105 is one to implement rather than override."). But for joint spouse estates in Bankruptcy Code § 302, consolidation is permitted only in the context of a confirmed plan of reorganization and the requirements that entails. Tucker, *supra,* at 449 (citing to, *inter alia,* Bankruptcy Code § 1123(a)(5)(C)).

The first facet of the argument is, at the outset, premature. Consolidating estates (indeed, consolidating debtor and non-debtor entities) traces to the Supreme Court's *Sampsell* decision in 1941. 313 U.S. at 219, 61 S.Ct. 907. What the Court has given as an equitable remedy remains until it alone removes it or Congress declares it removed as an option. *See In re Stone & Webster,* 286 B.R. at 540 (quoting *Official Comm. of Asbestos Claimants v. G–I Holdings, Inc.* (*In re G–I Holdings, Inc.*), Adv. No. 01–3065(RG) (Bankr.D.N.J. March 12, 2001) (Hearing Tr. at 71–2)).

In addition, at the core of *Grupo Mexicano* was the extent of general, unarticulated equity authority in the federal courts (which, the Court held, can only be justified by reference to 1789 equity authority). It was *not* a bankruptcy case. The extensive history of bankruptcy law and judicial precedent renders the issue of equity authority in the bankruptcy context different to such a degree as to make it different in kind. Notably, in the only two instances in which the word "bankruptcy" appears in Justice Scalia's majority opinion in *Grupo Mexicano,* he uses the *existence* of court authority in the bankruptcy context as a reason to support the conclusion that the district court did not have the authority under generalized equity powers to implement the remedy it imposed. First, he pointed out that *"[t]he law of fraudulent conveyances and bankruptcy was developed to prevent [the] conduct [at issue]; an equitable power to restrict a debtor's use of his unencumbered property before judgment was not." Grupo Mexicano,* 527 U.S. at 322, 119 S.Ct. at 1970 (emphasis added). Second, he stressed that finding the authority to justify the District Court's remedy in generalized equity power would "add[ ], through judicial fiat, a new and powerful weapon to the creditor's arsenal[;] the new rule could radically alter the balance between debtor's and creditor's rights *which has been developed over centuries through many laws- including those relating to bankruptcy, fraudulent conveyances, and preferences." Id.* at 331, 119 S.Ct. at 1974 (emphasis added). In short, the Court's opinion in *Grupo Mexicano* acknowledged that bankruptcy courts *do* have the authority to deal with the problems presented by that case. One way to conceptualize this idea is to recognize that, had the company in *Grupo Mexicano* been in bankruptcy, the bankruptcy court would have had the authority to implement the remedy the district court lacked authority to order under general equity power outside the bankruptcy context.

As for the argument's second facet, it begins with a concession. Bankruptcy Code § 1123(a)(5)(C)'s very words allow for "consolidation of the debtor with one or more persons" pursuant to a plan "[n]otwithstanding any otherwise applicable non-bankruptcy law." *Accord* Tucker, *supra,* at 448–49. *See also In re Stone & Webster,* 286 B.R. at 540–43. Whether § 105(a) allows consolidation outside a plan is an issue we need not address—though that arguably is what the Plan Proponents propose by moving for a "deemed" consolidation—because, as we note below, consolidation, no matter how it is packaged, cannot pass muster in this case.

In this context, we also need not address the argument, made in the *Amicus Curiae* Brief of the Commercial Finance Association, that substantive consolidation fails the "best interests test" of Bankruptcy Code § 1129(a)(7) (a requirement for plan confirmation that each creditor that does not vote to accept the plan must receive or retain property under the plan at least equal to its recovery in a Bankruptcy Code Chapter 7 liquidation). *See generally In re Stone & Webster,* 286 B.R. at 544–46.

15    Thus we disagree with the assertion of a "liberal trend" toward increased use of substantive consolidation—*e.g., Eastgroup,* 935 F.2d at 248 (describing "a 'modern' or 'liberal' trend toward allowing substantive consolidation") (citing *In re Murray Indus., Inc.,* 119 B.R. 820, 828 (Bankr.M.D.Fla.1990); *In re Vecco Constr. Indus., Inc.,* 4 B.R. 407, 409 (Bankr.E.D.Va.1980)).

16    This opens the question whether a court can order partial consolidation (such a consolidation order "could provide that ... [a creditor relying on separateness] would receive a distribution equal to what [it] would have received absent consolidation and that the remainder of the assets and liabilities be consolidated."). Kors, *supra,* at 450–51. Because this theoretical issue is not before us— and in any event (i) facts bringing it to the fore are unlikely, *id.* at 451 ("If circumstances lead one party to rely on the single status of the one debtor, it is unlikely that other creditors are relying on the joint status of the two entities, especially as reliance must be reasonable."), and (ii) may present practical concerns depending on the facts of a particular case—we do not decide it in this case.

17    They are Robert K. Rasmussen of Vanderbilt Law School, Barry Adler of the NYU School of Law, Susan Block–Leib of Fordham University School of Law, G. Marcus Cole of Stanford Law School, Marcel Kahan of the NYU School of Law, Ronald J. Mann of the University of Texas Law School, and David A. Skeel, Jr. of the University of Pennsylvania School of Law.

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 18 of 379

In re Owens Corning, 419 F.3d 195 (2005)

45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

18   Though creditors conceivably can cause debtors to conflate separate organizational forms, the specter of lender liability (which came to the fore in only the last two decades) makes this theoretical possibility all the more remote.

19   This rationale is meant to protect in bankruptcy the prepetition expectations of those creditors. *Accord* Kors, *supra,* at 419. The usual scenario is that creditors have been misled by debtors' actions (regardless whether those actions were intentional or inadvertent) and thus perceived incorrectly (and relied on this perception) that multiple entities were one.

20   This rationale is at bottom one of practicality when the entities' assets and liabilities have been "hopelessly commingled." *In re Gulfco Inv. Corp.,* 593 F.2d at 929; *In re Vecco Constr. Indus.,* 4 B.R. at 410. Without substantive consolidation all creditors will be worse off (as Humpty Dumpty cannot be reassembled or, even if so, the effort will threaten to reprise *Jarndyce and Jarndyce,* the fictional suit in Dickens' *Bleak House* where only the professionals profited). With substantive consolidation the lot of all creditors will be improved, as consolidation "advance[s] one of the primary goals of bankruptcy—enhancing the value of the assets available to creditors ...—often in a very material respect." Kors, *supra,* at 417 (citation omitted).

21   "[T]ort and statutory claimants, who, as involuntary creditors, by definition did not rely on anything in becoming creditors," Kors, *supra,* at 418, are excluded, leaving only those creditors who contract with an entity for whom consolidation is sought.

22   As noted already, *supra* n. 16, we do not decide here whether such a showing by an opposing creditor defeats totally the quest for consolidation or merely consolidation as to that creditor.

23   The bondholders do claim certain Banks misled them in purchasing OCD debt subsequent to the 1997 loan. But we know of no claim of wrong by the Banks in connection with the 1997 transaction.

24   Debtors make a similar argument on the basis of the Banks' failure to exercise their right to monitor the entities independently. For much the same reasoning that follows in the text, we reject that argument as well.

     We reject outright Debtors' claim that the Banks' alleged reliance on corporate separateness fails because they did not obtain a third-party legal opinion from counsel that substantive consolidation was unlikely to occur were OCD or the guarantors subject to bankruptcy. By custom and practice this type of counsel opinion is requested and given for newly formed entities whose "special purpose" is to obtain structured financing (*i.e.,* where "a defined group of assets ... [are] structurally isolated, and thus serve as the basis of a financing...." Committee on Bankruptcy and Corporate Reorganization of The Association of the Bar of the City of New York, *Structured Financing Techniques,* 50 Bus. Law. 527, 529 (1995)). It is customarily not given (nor even requested) for entities in existence for any significant period of time or set up for other than a structured financing transaction. *See* Tribar Opinion Committee, *Opinions in the Bankruptcy Context: Rating Agency, Structured Financing, and Chapter 11 Transactions,* 46 Bus. Law, 717, 726 & n. 42 (1991).

25   Further, a creditor's lack of diligence is relevant only insofar as it bears on the credibility of its assertion of reliance on separateness.

26   For example, we simply cannot imagine that it would cost Debtors even 1% of the Banks' asserted $1.6 billion claim to account for the allegedly incalculable intercompany interest and royalty payments.

27   The same sentiment applies to the argument of the bondholders that, subsequent to the 1997 loan to OCD, the Banks defrauded them in connection with a prospectus distributed with respect to a sale of OCD bonds underwritten by some of the Banks. If the bondholders have a valid claim, they need to prove it in the District Court and not use their allegations as means to gerrymander consolidation of estates.

---

**End of Document**                                   © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 32

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 20 of 379

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

2012 ONCA 404
Ontario Court of Appeal

Crystallex International Corp., Re

2012 CarswellOnt 7329, 2012 ONCA 404, 216 A.C.W.S. (3d)
550, 293 O.A.C. 102, 4 B.L.R. (5th) 1, 91 C.B.R. (5th) 207

# In the Matter of the Companies' Creditors
# Arrangement Act, R.S.C. 1985, c.C-36 as amended

And In the Matter of a Plan of Compromise or Arrangement of Crystallex International Corporation

D. O'Connor A.C.J.O., R.A. Blair, Alexandra Hoy JJ.A.

Heard: May 11, 2012

Judgment: June 13, 2012 [*]
Docket: CA C55434, C55435

Proceedings: affirming *Crystallex International Corp., Re* (2012), 2012 ONSC 538, 2012 CarswellOnt 968, 89 C.B.R. (5th) 303 (Ont. S.C.J. [Commercial List]); additional reasons at *Crystallex International Corp., Re* (2012), 2012 CarswellOnt 9479, 2012 ONCA 527 (Ont. C.A.)

Counsel: Richard B. Swan, S. Richard Orzy, Derek J. Bell, Emrys Davis for Appellant, Computershare Trust Company of Canada

Andrew J.F. Kent, Markus Koehnen, Jeffrey Levine for Respondent, Crystallex International Corporation

Barbara L. Grossman for Tenor Capital Management Company, L.P. and Affiliates

Robert Frank for Forbes & Manhattan Inc., Aberdeen International Inc.

David Byers for Monitor Ernst & Young Inc.

Subject: Insolvency

## Related Abridgment Classifications

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

## Headnote

**Bankruptcy and insolvency --- Companies' Creditors Arrangement Act — General principles — Jurisdiction — Single judge**

Section 11.2 of the Companies Creditors Arrangement Act does not restrict the ability of the supervising judge, where appropriate, to approve the grant of a charge securing financing before a plan is approved that may continue after the company emerges from CCAA protection.

**Bankruptcy and insolvency --- Companies' Creditors Arrangement Act — Appeals**

Corporation moved for approval of DIP financing and management incentive plan against wishes of noteholders — Supervising judge found there could be no meaningful recovery, and therefore no successful restructuring, without financing of arbitration which was corporation's biggest asset — Appeal by noteholders dismissed — Supervising judge was in the best position to balance the interests of all stakeholders — Appellate court should not interfere where question is one of weight to be given to particular factors rather than failure to consider factors or correctness.

**Bankruptcy and insolvency --- Companies' Creditors Arrangement Act — Arrangements — Approval by creditors**

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

C Corp. sought court approval for agreement with T LP providing debtor in possession (DIP) financing — Agreement was opposed by C's noteholders who proposed their own DIP financing — Agreement with T LP approved — Appeal by noteholders dismissed — Supervising judge correct in finding agreement was not "plan of arrangement" or "compromise" requiring vote.

**Bankruptcy and insolvency --- Companies' Creditors Arrangement Act — Initial application — Miscellaneous**

C Corp. sought court approval for agreement with T LP providing management incentive plan (MIP) — Agreement was opposed by C's noteholders who had own proposed plan — Agreement with T LP approved — Appeal by noteholders dismissed — Supervising judge correctly held that independent committee had applied business judgment.

**Table of Authorities**

**Cases considered by *Alexandra Hoy J.A.*:**

*Air Canada, Re* (2004), 2004 CarswellOnt 469, 47 C.B.R. (4th) 169 (Ont. S.C.J. [Commercial List]) — considered

*Calpine Canada Energy Ltd., Re* (2007), 2007 CarswellAlta 1050, 2007 ABQB 504, 35 C.B.R. (5th) 1, 415 A.R. 196, 33 B.L.R. (4th) 68 (Alta. Q.B.) — referred to

*Calpine Canada Energy Ltd., Re* (2007), 35 C.B.R. (5th) 27, 410 W.A.C. 25, 417 A.R. 25, 2007 ABCA 266, 2007 CarswellAlta 1097, 80 Alta. L.R. (4th) 60, 33 B.L.R. (4th) 94 (Alta. C.A. [In Chambers]) — referred to

*Cliffs Over Maple Bay Investments Ltd. v. Fisgard Capital Corp.* (2008), 2008 BCCA 327, 2008 CarswellBC 1758, 83 B.C.L.R. (4th) 214, 296 D.L.R. (4th) 577, 434 W.A.C. 187, 258 B.C.A.C. 187, 46 C.B.R. (5th) 7, [2008] 10 W.W.R. 575 (B.C. C.A.) — distinguished

*Computershare Trust Co. of Canada v. Crystallex International Corp.* (2009), 65 B.L.R. (4th) 281, 2009 CarswellOnt 7997 (Ont. S.C.J. [Commercial List]) — referred to

*Computershare Trust Co. of Canada v. Crystallex International Corp.* (2010), 70 B.L.R. (4th) 45, *(sub nom. Crystallex International Corp. v. Crystallex Corp.)* 263 O.A.C. 137, 2010 CarswellOnt 3374, 2010 ONCA 364 (Ont. C.A.) — referred to

*Computershare Trust Co. of Canada v. Crystallex International Corp.* (2011), 2011 CarswellOnt 10305, 2011 ONSC 5748 (Ont. S.C.J. [Commercial List]) — referred to

*Crystallex International Corp., Re* (2011), 2011 ONSC 7701, 2011 CarswellOnt 15034 (Ont. S.C.J. [Commercial List]) — referred to

*Grant Forest Products Inc., Re* (2009), 2009 CarswellOnt 4699, 57 C.B.R. (5th) 128 (Ont. S.C.J. [Commercial List]) — considered

*Imperial Oil Ltd. v. R.* (2006), *(sub nom. Imperial Oil Ltd. v. Minister of National Revenue)* 353 N.R. 201, [2007] 1 C.T.C. 41, 2006 SCC 46, 2006 CarswellNat 3176, 2006 CarswellNat 3177, *(sub nom. Imperial Oil Ltd. v. Canada)* 2006 D.T.C. 6660 (Fr.), *(sub nom. Imperial Oil Ltd. v. Canada)* 2006 D.T.C. 6639 (Eng.), *(sub nom. Inco Ltd. v. Canada)* 273 D.L.R. (4th) 450, *(sub nom. Imperial Oil Ltd. v. Canada)* [2006] 2 S.C.R. 447 (S.C.C.) — considered

**WestlawNext CANADA** Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

*Ivaco Inc., Re* (2006), 2006 C.E.B. & P.G.R. 8218, 25 C.B.R. (5th) 176, 83 O.R. (3d) 108, 275 D.L.R. (4th) 132, 2006 CarswellOnt 6292, 56 C.C.P.B. 1, 26 B.L.R. (4th) 43 (Ont. C.A.) — considered

*New Skeena Forest Products Inc., Re* (2005), 7 M.P.L.R. (4th) 153, [2005] 8 W.W.R. 224, *(sub nom. New Skeena Forest Products Inc. v. Kitwanga Lumber Co.)* 210 B.C.A.C. 247, *(sub nom. New Skeena Forest Products Inc. v. Kitwanga Lumber Co.)* 348 W.A.C. 247, 2005 BCCA 192, 2005 CarswellBC 705, 9 C.B.R. (5th) 278, 39 B.C.L.R. (4th) 338 (B.C. C.A.) — considered

*Stelco Inc., Re* (2005), 253 D.L.R. (4th) 109, 75 O.R. (3d) 5, 2 B.L.R. (4th) 238, 9 C.B.R. (5th) 135, 2005 CarswellOnt 1188, 196 O.A.C. 142 (Ont. C.A.) — referred to

*Ted Leroy Trucking Ltd., Re* (2010), *(sub nom. Century Services Inc. v. Canada (A.G.))* [2010] 3 S.C.R. 379, [2010] G.S.T.C. 186, 12 B.C.L.R. (5th) 1, *(sub nom. Century Services Inc. v. A.G. of Canada)* 2011 G.T.C. 2006 (Eng.), *(sub nom. Century Services Inc. v. A.G. of Canada)* 2011 D.T.C. 5006 (Eng.), *(sub nom. Leroy (Ted) Trucking Ltd., Re)* 503 W.A.C. 1, *(sub nom. Leroy (Ted) Trucking Ltd., Re)* 296 B.C.A.C. 1, 2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, 409 N.R. 201, *(sub nom. Ted LeRoy Trucking Ltd., Re)* 326 D.L.R. (4th) 577, 72 C.B.R. (5th) 170, [2011] 2 W.W.R. 383 (S.C.C.) — considered

*Timminco Ltd., Re* (2012), 2012 CarswellOnt 1466, 2012 ONSC 948, 95 C.C.P.B. 222, 86 C.B.R. (5th) 171 (Ont. S.C.J. [Commercial List]) — considered

**Statutes considered:**

*Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3
Generally — referred to

*Bankruptcy Code*, 11 U.S.C.
Chapter 15 — referred to

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36
Generally — referred to

s. 6(1) — referred to

s. 11 — considered

s. 11.2 [en. 1997, c. 12, s. 124] — considered

s. 11.2(1) [en. 2005, c. 47, s. 128] — considered

s. 11.2(4) [en. 2005, c. 47, s. 128] — considered

s. 11.2(4)(a) [en. 2005, c. 47, s. 128] — considered

s. 11.2(4)(d) [en. 2005, c. 47, s. 128] — considered

s. 11.5(1) [en. 1997, c. 12, s. 124] — considered

*Interpretation Act*, R.S.C. 1985, c. I-21
s. 14 — considered

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 23 of 379

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

APPEALS from judgment reported at *Crystallex International Corp., Re* (2012), 2012 ONSC 538, 2012 CarswellOnt 968, 89 C.B.R. (5th) 303 (Ont. S.C.J. [Commercial List]) and *Crystallex International Corp., Re* (2012), 2012 ONSC 2125, 2012 CarswellOnt 4577 (Ont. S.C.J. [Commercial List]), granting orders approving agreement for debtor in possession financing, management incentive plan, extension of stay, and approval of actions of Monitor.

*Alexandra Hoy J.A.:*

## I. Overview

1    The primary issue in these appeals is the scope of financing the supervising judge can or should approve, without the sanction of creditors, while a company is under the protection of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA").

2    The respondent Crystallex International Corporation ("Crystallex") is a Canadian mining company. Its principal asset was the right to develop Las Cristinas in Venezuela, which is one of the largest undeveloped gold deposits in the world. Crystallex obtained this right through a contract with the Corporacion Venezolana de Guayana (the "CVG"), a state-owned Venezuelan corporation. On February 3, 2011, after Crystallex spent over $500 million on developing Las Cristinas, the CVG sent Crystallex a letter to "unilaterally rescind" the contract for reasons of "expediency and convenience". There is no suggestion in these proceedings that the rescission was due to any mismanagement by Crystallex.

3    As a result of the cancellation of the contract, Crystallex was unable to pay its $100 million in senior 9.375 per cent notes due December 23, 2011 (the "Notes"). It sought and, on December 23, 2011 obtained, protection under the CCAA.

4    At present, Crystallex's only asset of significance is an arbitration claim for US $3.4 billion against the government of Venezuela in relation to the cancellation of the contract. The arbitration claim is the "pot of gold" in the CCAA proceeding.

5    The appellant Computershare Trust Company of Canada, in its capacity as Trustee for the holders of the Notes (the "Noteholders"), appeals, with leave, three orders made by the supervising judge in the CCAA proceeding: (i) the January 20, 2012 CCAA Bridge Financing Order (with reasons released January 25, 2012 and reported at 2012 ONSC 538 (Ont. S.C.J. [Commercial List]) ) (the "Bridge Financing Reasons")) authorizing Crystallex to obtain bridge financing of $3.125 million (the "Bridge Loan") from the respondent Tenor Special Situations Fund, L.P. ("Tenor L.P."); (ii) the April 16, 2012 CCAA Financing Order authorizing Crystallex to obtain $36 million of what the supervising judge characterized as Debtor in Possession ("DIP") financing from Tenor Special Situation Fund I, LLC ("Tenor") (the "Tenor DIP Loan"); and (iii) the April 16, 2012 Management Incentive Plan Approval Order approving a Management Incentive Plan ("MIP") designed to ensure the retention of key executives until the arbitration is completed. The supervising judge's reasons for the CCAA Financing Order and Management Incentive Plan Approval Order are reported at 2012 ONSC 2125 (Ont. S.C.J. [Commercial List]) (the "DIP Financing Reasons").

6    Among other conditions, the Tenor DIP Loan, due December 31, 2016, entitles Tenor to 35 per cent of the net proceeds of the arbitration in addition to interest, provides governance rights that may continue after Crystallex exits from CCAA protection, and requires Tenor's approval to a range of options that might customarily be offered to unsecured creditors in seeking to negotiate a plan of compromise or arrangement.

7    Substantially all of the creditors opposed the approval of the Bridge Loan, the Tenor DIP Loan and the MIP. Crystallex represents that it hopes to negotiate a plan of arrangement or compromise with the Noteholders and other creditors before the current stay until July 30, 2012 expires.

8    The bulk of the $36 million Tenor DIP Loan comprises financing to pursue the arbitration claim, which may continue after the period of CCAA protection.

## II. The Legislative Framework

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    4

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

9     The CCAA was amended effective September 18, 2009 to add the following provisions regarding the grant of a charge to secure financing required by the debtor:

**Interim financing**

11.2 (1) On application by a debtor company and on notice to the secured creditors who are likely to be affected by the security or charge, a court may make an order declaring that all or part of the company's property is subject to a security or charge — in an amount that the court considers appropriate — in favour of a person specified in the order who agrees to lend to the company an amount approved by the court as being required by the company, having regard to its cash-flow statement. The security or charge may not secure an obligation that exists before the order is made.

. . .

**Factors to be considered**

(4) In deciding whether to make an order, the court is to consider, among other things,

(a) the period during which the company is expected to be subject to proceedings under this Act;

(b) how the company's business and financial affairs are to be managed during the proceedings;

(c) whether the company's management has the confidence of its major creditors;

(d) whether the loan would enhance the prospects of a viable compromise or arrangement being made in respect of the company;

(e) the nature and value of the company's property;

(f) whether any creditor would be materially prejudiced as a result of the security or charge; and

(g) the monitor's report referred to in paragraph 23(1)(b), if any. [1]

Prior to the enactment of these provisions, the court relied on its general authority under the CCAA to approve DIP financing: see Lloyd W. Houlden, Geoffey B. Morawetz & Janis P. Sarra, *The 2012 Annotated Bankruptcy and Insolvency Act* (Toronto: Carswell, 2011), at p. 1175.

## III. The Background

### A. Events Prior to the CCAA Filings

10     Crystallex has filed a Request for Arbitration pursuant to the Canada-Venezuela Bilateral Investment Treaty, claiming $3.4 billion plus interest for the loss of its investment in Las Cristinas. The hearing of the arbitration is scheduled for November 11, 2013.

11     Crystallex's most significant liability is its debt to the Noteholders. In addition to amounts owed to the Noteholders, Crystallex has other liabilities of approximately CAD $1.2 million and approximately US $8 million.

12     The current Noteholders are hedge funds, some of whom purchased Notes after Venezuela announced its intention to expropriate Las Cristinas at prices as low as 25 cents on the dollar.

13     The relationship between Crystallex and the current Noteholders is hostile. Crystallex and the Noteholders have been in litigation since 2008. Prior to the maturity date of the Notes, the Noteholders twice, unsuccessfully, brought court proceedings against Crystallex alleging that an event had occurred which accelerated Crystallex's obligation to pay the Notes. Those

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

proceedings were also heard by the supervising judge: see *Computershare Trust Co. of Canada v. Crystallex International Corp.* (2009), 65 B.L.R. (4th) 281 (Ont. S.C.J. [Commercial List]), aff'd 2010 ONCA 364, 263 O.A.C. 137 (Ont. C.A.); and *Computershare Trust Co. of Canada v. Crystallex International Corp.*, 2011 ONSC 5748 (Ont. S.C.J. [Commercial List]).

### B. Commencement of Proceedings under the CCAA and Chapter 15

14    On December 22, 2011, one day prior to the maturity of the Notes, Crystallex and the Noteholders filed competing CCAA applications. The Noteholders' application contemplated that all existing common shares would be cancelled, an equity offering would be undertaken, and if, or to the extent, the equity proceeds were insufficient to pay out the Noteholders, the Notes would be converted to equity.

15    Crystallex sought authority to file a plan of compromise and arrangement, the authority to continue to pursue the arbitration in Venezuela, and the authority to pursue all avenues of interim financing or a refinancing of its business and to conduct an auction to raise financing. In his supporting affidavit sworn December 22, 2011, Robert Fung, Crystallex's Chairman and Chief Executive Officer, indicated that Crystallex wished to have all claims stayed against it until the arbitration settled or Crystallex realized the arbitration award. Crystallex had already received an unsolicited offer of financing from Tenor Capital Management.

16    It was (and is) expected that, if the arbitration is successful and the award is collected, there will be more than enough to pay the creditors and a significant amount will be available to shareholders.

17    On December 23, 2011, the supervising judge made an order granting Crystallex's CCAA application (the "Initial Order"). In his reasons released December 28, 2011, he explained that the Noteholders' proposal was not a fair balancing of the interests of all stakeholders: 2011 ONSC 7701 (Ont. S.C.J. [Commercial List]), at para. 26. The Noteholders did not appeal the Initial Order.

18    Crystallex obtained an order under chapter 15 of the United States Bankruptcy Code from the United States Bankruptcy Court for the District of Delaware, among other things giving effect to the Initial Order in the United States as the main proceeding.

### C. Crystallex Develops a DIP Auction Process

19    Paragraph 12 of the Initial Order authorized Crystallex to pursue all avenues of interim financing or a refinancing of its business or property, subject to the requirements of the CCAA and court approval, to permit it to proceed with an orderly restructuring. It further provided:

> Without limiting the foregoing, the Applicant may conduct an auction to raise interim or DIP financing pursuant to procedures approved by the Monitor and using such professional assistance as the Applicant may determine with the consent of the Monitor. If such approved procedures are followed to the satisfaction of the Monitor then the best offer as determined by the Applicant pursuant to the approved procedures shall be afforded the protection of the *Soundair* principles so that it will be too late to make topping offers thereafter and such offers will not be considered by this Court.

20    Crystallex hired an independent financial advisory firm, Skatoff & Company, LLC, and developed a set of procedures to govern the solicitation of bids to provide financing to Crystallex. The Monitor, Ernst & Young Inc., approved the bid procedures. The bid procedures indicated that Crystallex's objective was to obtain financing of not less than $35 million, net of costs, that, on completion of the CCAA and U.S. Chapter 15 reorganization proceedings, would roll into financing maturing not sooner than December 31, 2014. The bid deadline was February 1, 2012.

### D. The Bridge Loan

21    On January 20, 2012, the supervising judge considered competing proposals from Tenor L.P. and the Noteholders to provide bridge financing. Tenor L.P. offered $3.125 million with interest at 10 per cent per annum. The Noteholders offered $3 million with interest at 1 per cent per annum.

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

22      The board of Crystallex, taking into account advice received from Mr. Skatoff, recommended the Tenor L.P. offer. Mr. Skatoff was concerned that the Noteholders' objective may have been to defeat the larger DIP financing process so that they could ultimately impose financing terms on Crystallex. It was also his view that Crystallex should avoid entering into an important financial relationship with a hostile party.

23      The supervising judge approved Tenor L.P.'s offer.

### E. The Noteholders Object to the DIP Auction Process

24      On January 20, 2012, the Noteholders brought a cross-motion to modify the DIP auction process then underway, which they severely criticized. They objected to the amount sought, the term, and the lender back-end entitlement a successful DIP lender could acquire. In their view, Crystallex was inappropriately seeking financing in excess of amounts required until a compromise or plan of arrangement could be arrived at between Crystallex and its creditors. Given their existing position in Crystallex, the Noteholders also objected to being required to sign a non-disclosure agreement containing a standstill provision in order to be a qualified bidder.

25      The supervising judge held that if the Noteholders wished to be considered as a qualified bidder, they would have to sign a non-disclosure agreement: Bridge Financing Reasons, at para. 27. As to their other concerns, he wrote, at para. 29:

> In my view these objections are premature and it is not necessary for me to consider their strength at this stage. The time for filing bids from qualified bidders has not yet expired and what bids will be received is unknown. It is when a successful bidder has been chosen and the DIP facility is before the court for approval that these issues raised by the Noteholders would be more appropriately dealt with. Until then, there is no factual foundation for judgment to be passed on the bid procedures for the DIP facility for which Crystallex will seek approval.

### F. Competing DIP Financing Offers: The Tenor DIP Loan and the Noteholders' Offer

26      The bidders who responded to the request for DIP financing included three hedge funds that hold approximately 77 per cent of the Notes and Tenor.

27      Those hedgefund Noteholders proposed a loan of $10 million with a simple interest rate of 1 per cent repayable on October 15, 2012.

28      The supervising judge described Tenor's proposed terms in the DIP Financing Reasons:

[23] The Tenor DIP facility contains the following material financial terms:

> (a) Tenor will advance $36 million to Crystallex due and payable on December 31, 2016. This period for the loan is based on Crystallex's arbitration counsel's assessment of the likely timing of a decision from the arbitral tribunal and collection of the award.

> (b) The advances will be in four tranches, being $9 million upon execution of the loan documentation and approval of the facility by court order in Ontario, the second being $12 million upon any appeal of the Ontario court order approving the facility being dismissed and upon a U.S court order approving the facility, the third being $10 million when Crystallex has less than $2.5 million in cash and the fourth being $5 million when Crystallex again has less than $2.5 million in cash.

> (c) The loans are to be used to (i) repay an interim bridge loan of $3.25 million advanced by Tenor with court approval of January 20, 2012 and payable on April 16, 2012, (ii) fees and expenses in connection with the facility, (iii) general corporate expenses of Crystallex including expenses of the restructuring proceedings and of the arbitration in accordance with cash flow statements and budgets of Crystallex approved by Tenor from time to time.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

(d) Crystallex will pay Tenor a $1 million commitment fee.

(e) $35 million of the loan amount will bear PIK interest (payment in kind, meaning it is capitalized and payable only upon maturity of the loan or upon receipt of the proceeds of the arbitration) at the rate of 10% per annum compounded semiannually.

(f) Tenor will receive additional compensation equal to 35% of the net proceeds of any arbitral award or settlement, conditional upon the second tranche of the loan being advanced. Net proceeds of the award or settlement is defined as the amount remaining after payment of principal and interest on the DIP loan, taxes and proven and allowed unsecured claims against Crystallex, including the noteholders, the latter of which will have a special charge for the unsecured amounts owing. Alternatively, Tenor can convert the right to additional compensation to 35% of the common shares of Crystallex. This conversion right is apparently driven by tax considerations.

[24] The Tenor DIP facility also provides for the governance of Crystallex to be changed to give Tenor a substantial say in the governance of Crystallex. More particularly:

(a) Crystallex shall have a reduced five person board of directors, being two current Crystallex directors, two nominees of Tenor and an independent director selected by agreement of Crystallex and Tenor.

(b) The independent director shall be chair of the board of directors and shall not have a second-casting or tie-breaking vote.

(c) The independent director shall be appointed a special managing director and shall have all the powers of the board of directors to (i) the conduct of the reorganization proceedings in Canada and in the U.S. and the efforts of Crystallex to reorganize the pre-filing claims of the unsecured creditors, (ii) any matters relating to the rights of Crystallex and Tenor as against the other under the facility, (iii) the administration of the MIP to the extent not otherwise delegated to the bonus pool committee under the MIP, and (iv) to retain any advisor in respect of these matters. The special manager shall first consult with a non-board advisory panel, consisting of the three Crystallex directors who will step down from the board, and consider in good faith their recommendations.

(d) With respect to matters that may not at law be delegable to the special managing director, he will be required to obtain board approval. If the Tenor nominees use their votes to block that approval, Tenor will forfeit its 35% additional compensation.

[25] The Tenor DIP facility contains proscribed rights of Tenor in the event of default. Tenor may seize and sell assets other than the arbitration proceeding (i.e. any cash and unsold mining equipment). It may not sell the arbitration claim. If there is a default before any arbitration award, Tenor would have the right to apply to court to have the Monitor or a Canadian receiver and manager appointed to take control of the arbitration proceedings. If such application were not granted, Tenor would be entitled to exercise the rights and remedies of a secured creditor pursuant to an order, the loan documentation or otherwise at law.

29      Mr. Skatoff recommended, and the board of Crystallex agreed, to accept the Tenor DIP Loan. Mr. Skatoff indicated, in an affidavit sworn March 20, 2012, that he had recommended that the board reject the Noteholders' offer of a $10 million loan for 6 months because Crystallex could not be assured that it could borrow the balance of the required funds at the expiry of that period on the same terms as the Tenor DIP Loan.

### *G. The Noteholders' Further, Competing Offer to Allay Mr. Skatoff's Concerns*

30      In his affidavit on behalf of the Noteholders, sworn March 27, 2012, Mr. Mattoni responded to Mr. Skatoff's concern by committing that the Noteholders would be prepared to,

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

... provide financing to Crystallex on the same terms as the [Tenor DIP Loan], in the event that prior to October 1, 2012, the Court orders that such long-term financing is appropriate and necessary. The Noteholders would reserve their complete and unfettered ability as creditors to continue to oppose stay extensions or attempts to secure such long-term financing outside of a Plan of compromise (including, specifically, financing to the extent contemplated by the Proposed Loan), but they will provide it if it is ordered by the Court on the same basis as currently proposed with Tenor...

*H. The Noteholders' Proposed Plan*

31     Prior to the April 5, 2012 hearing, the Noteholders proposed a plan to indicate a good faith intention to bargain. They did not seek approval of this proposed plan at the April 5, 2012 hearing.

32     The plan's terms included that the Noteholders would provide a $10 million loan on the terms described above; exchange their debt for approximately 58 per cent of the equity; provide $35 million to Crystallex in exchange for 22.9 per cent of the equity; and provide incentives to management at a lesser level than the MIP. Their proposed plan left approximately 14 per cent of the equity for the existing shareholders.

*I. The Management Incentive Plan*

33     The Noteholders had criticized the independent directors of Crystallex as not being sufficiently independent. As a result, the independent directors of Crystallex comprising the compensation committee retained Jay Swartz, a partner of Davies Phillips Vineberg, to determine, from the perspective of an independent director, what an appropriate MIP would be. He in turn retained an independent national executive compensation consulting firm to provide expert advice. Mr. Swartz opined that the overall compensation proposal for the establishment of the bonus pool for the benefit of Crystallex's management was reasonable in the circumstances. The independent directors of Crystallex comprising the compensation committee approved the MIP.

34     At para. 102 of the DIP Financing Reasons, the supervising judge described the MIP:

In sum, a pool of money, consisting of up to 10% of the net proceeds of the arbitration up to $700 million and 2% of any further net proceeds, after all costs and charges, including the amounts owing to noteholders, is to be set aside and money in this pool may be paid to the beneficiaries of the MIP, depending on the determination of an independent committee. The amounts to be allocated to participants by the compensation committee are discretionary and could be nil. No one will be entitled to any particular amount. Members of the compensation committee will not be eligible for any payments.

35     The MIP sets out a number of factors to be considered by the compensation committee in exercising its discretion. They include the amount and speed of recovery, the amount of time and energy expended by the individual, and the opportunity cost to the individual in staying with Crystallex.

36     In the view of the Noteholders, the MIP is too generous. They proposed that management receive 5 per cent through an equity participation in any after tax award. They also took issue with the range of persons eligible under the MIP.

*J. The April 5, 2012 motion*

37     On April 5, 2012, Crystallex sought orders approving, among other things, the Tenor DIP Loan and the MIP. The Noteholders as well as Forbes & Manhattan Inc. and Aberdeen International Inc., creditors owed approximately $2.5 million by Crystallex, opposed both the Tenor DIP Loan and the MIP. The one shareholder who attended opposed the MIP.

38     The supervising judge approved the Tenor DIP Loan and the MIP. [2] He also extended the stay until July 30, 2012.

*K. Events since April 5, 2012*

39     Tenor made the first, $9 million advance under the Tenor DIP Loan. The Bridge Loan was repaid out of the first advance.

WestlawNext. CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

40    At the hearing of this appeal, the Monitor advised that Crystallex would require further funds before the anticipated release of this court's decision. Crystallex accepted Tenor's offer to advance a further $4 million to Crystallex, on the same terms as the first, $9 million tranche of the Tenor DIP Loan. Accordingly, this further advance does not entitle Tenor to participate in any arbitration proceeds, or trigger any change in the governance of Crystallex. If the Noteholders' appeal succeeds, the additional amounts advanced by Tenor are, like the first tranche, to be immediately repaid with interest at the rate of 1 per cent per annum, and the Noteholders shall fund the repayment. No commitment fee is payable in respect of this additional advance.

## IV. The Supervising Judge's Reasons

### A. The Bridge Loan

41    The supervising judge noted, at para. 5 of the Bridge Financing Reasons, that Tenor L.P.'s bridge financing proposal was "really short-term DIP financing". With respect to the boards' recommendation — based on Mr. Skatoff's advice — that Tenor L.P.'s proposal be approved, he wrote, at para. 12:

> This was a business judgment protected by the business judgment rule so long as it was a considered and informed judgment made honestly and in good faith with a view to the best interests of Crystallex. See *Re Stelco Inc.* (200[5]), 9 C.B.R. (5th) 135 (Ont. C.A.) regarding the rule and its application to CCAA proceedings. I see no grounds for concluding that the decision of Crystallex to prefer the Tenor bridge financing proposal is not protected by the business judgment rule or that I should not give it appropriate deference. [Citation corrected.]

42    The supervising judge noted, at para. 13, that "the Monitor has no basis to say that the business judgment exercised by the Crystallex board of directors was unreasonable". The supervising judge accordingly approved the Bridge Loan.

43    Mr. Skatoff expressed concern that the Noteholders' objective in offering bridge financing on such advantageous terms (interest at the rate of 1 per cent, as opposed to the 10 per cent in the Tenor L.P. offer) was to undermine the DIP auction process. The supervising judge observed, at para. 14:

> Whether Mr. Skatoff is correct in his concerns, it seems to me that the relatively minor extra cost involving the Tenor proposed bridge financing for at most a few months must be weighed against the risk of harm to the longer-term DIP financing auction process, and that for the sake of that process, it is preferable not to run the risks that Mr. Skatoff is concerned about.

### B. The Tenor DIP Loan

44    The substance of the supervising judge's reasons for approving the Tenor DIP Loan — as set out in the DIP Financing Reasons — may be summarized as follows.

> i. The exercise of business judgment by the board of directors of Crystallex in approving the Tenor DIP Loan is a factor that can be taken into account by the court in considering whether to make an order under s. 11.2(1) of the CCAA (at para. 35).

> ii. The Tenor DIP Loan did not amount to a plan of arrangement or compromise. Notably, it did not take away the rights of the Noteholders as unsecured creditors to apply for a bankruptcy order or to vote on a plan of compromise or arrangement. A vote of the creditors was therefore not required (at para. 50). In coming to this conclusion, the supervising judge relied on *Calpine Canada Energy Ltd., Re*, 2007 ABQB 504, 415 A.R. 196 (Alta. Q.B.), leave to appeal refused, 2007 ABCA 266, 417 A.R. 25 (Alta. C.A. [In Chambers])).

> iii. Crystallex intended to negotiate a plan of compromise or arrangement with the Noteholders during the stay extension until July 30, 2012 (paras. 48, 126). The Tenor DIP Loan is therefore distinguishable from the financing rejected by the court in *Cliffs Over Maple Bay Investments Ltd. v. Fisgard Capital Corp.*, 2008 BCCA 327, 296 D.L.R. (4th) 577 (B.C. C.A.), because in that case the debtor did not have an intention to propose an arrangement or compromise to its creditors.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

iv. Because the Tenor DIP Loan involves the grant of a financial interest in part of the assets of Crystallex, it is appropriate to consider the *Soundair* factors in deciding whether to approve it (at para. 59). Crystallex conducted a robust competitive bidding process (at para. 39).

v. Mr. Skatoff's evidence was that the Noteholders' proposed six month facility "would seriously erode the chances of Crystallex obtaining third party financing in October" (at para. 90). Counsel for Computershare had said during argument on the motion that the Noteholders "were not prepared to agree to such a $35 million facility at this time but only at some future time as the $10 million facility they now proposed became due" (at para. 27). While it would have been preferable if the Noteholders had been willing to lend on the basis of the terms of the Tenor DIP facility, "it was made clear during argument that the noteholders were not prepared at this time to do so" (at para. 91).

vi. As to the enumerated factors in s. 11.2(4):

(a) Given that Crystallex intends, if possible, to negotiate an acceptable plan of arrangement or compromise, the length of time during which Crystallex is expected to be subject to the CCAA proceedings is not a determinative factor. The financing will be required to pursue the arbitration (at para. 62) and, as the supervising judge noted, "the only way any of the creditors will receive any substantial cash payment is from the proceeds of the arbitration" (at para. 47);

(b) The management of the business and affairs of Crystallex "are a reasonable compromise between Crystallex and Tenor designed to protect the interests of the stakeholders, including the noteholders" (at para. 73). The fact that Tenor is given substantial governance rights does not in itself mean that the DIP Tenor Loan should not be approved. Tenor does not have the right to conduct the reorganization proceedings or the arbitration proceeding. Moreover, under s. 11.5(1) of the CCAA, the court may remove a director whom it is satisfied is unreasonably impairing or is likely to unreasonably impair the possibility of a viable compromise or arrangement being made. Arguably, a court could remove a Tenor nominee under this section without triggering an event of default under the Tenor DIP Loan (at paras. 63-71);

(c) While the Noteholders expressed "extreme displeasure" at Crystallex's management's delay in commencing arbitration proceedings, they do not oppose management having a continuing role in the arbitration (at para. 72);

(d) The Noteholders' argument that the terms of the Tenor DIP Loan — in particular, the fact that the refusal of the court to grant a stay or a bankruptcy are events of default, the grant of a 35 per cent interest in the arbitration proceeds, and the limits on the type of restructuring that can be concluded without the approval of Tenor — will effectively prevent any plan of arrangement was rejected (at paras. 74-82). While, as the Monitor points out, the introduction of a third party, Tenor, with consent rights to certain actions will add complexity to the negotiation of a CCAA plan (at para. 93), the Tenor DIP Loan would enhance the prospects of a viable compromise or arrangement (at para. 83):

... Crystallex requires additional financing to pay its expenses and continue the arbitration. A DIP loan allows the company to have the arbitration financed, which if it were not at this stage would impair the arbitration and perhaps the attitude of Venezuela towards the arbitration claim, and as such enhances the viability of a CCAA plan. I have not accepted the argument of the noteholders that the loan would prevent a plan of arrangement.

(e) The supervising judge noted that Crystallex's principal asset is its US $3.4 billion arbitration claim against Venezuela (at para. 12); and

(f) In considering the Noteholders' complaints of prejudice in the context of what the market is demanding for a DIP loan and in all the circumstances, the creditors have not been materially prejudiced by the Tenor DIP Loan (at para. 84).

*C. The Management Incentive Plan*

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

45    The supervising judge considered the Noteholders' objections to the quantum and method for providing an incentive to management, the inclusion of certain persons in the MIP, and the approval of the MIP before the negotiation of a plan.

46    In the DIP Financing Reasons, the supervising judge observed, at para. 109, that whether employee retention provisions should be ordered in a CCAA proceeding was a matter of discretion. He noted that the provisions of the MIP had been approved by an independent committee of the board of directors with impressive qualifications, relying on the opinion of Mr. Swartz. In providing that opinion, Mr. Swartz indicated that the absolute amount of the bonus pool could be very substantial and, in allocating it, the compensation committee "may have to carefully consider the absolute amounts to be paid to each member of the Management Group in order to satisfy its fiduciary duties": see DIP Financing Reasons, at para. 108. The supervising judge also noted that Mr. Swartz had retained an independent national executive compensation consulting firm to provide expert advice.

47    Citing *Grant Forest Products Inc. (Re)* (2009), 57 C.B.R. (5th) 128 (Ont. S.C.J. [Commercial List]) (st]) and *Timminco Ltd., Re*, 2012 ONSC 948 (Ont. S.C.J. [Commercial List])), the supervising judge wrote, at para. 112 of the DIP Financing Reasons, "I see no reason why the business judgment rule is not applicable, particularly when the provisions of the MIP have been approved by an independent committee of the board." He further noted, at para. 115, what appears to be the practice of approving employee retention plans before any plan has been negotiated and, at para.105, that the Tenor DIP Loan was conditional on the approval of a MIP acceptable to Crystallex and Tenor.

48    As to who should be eligible to participate in the MIP, at para. 117, the supervising judge noted that the independent committee had exercised its business judgment on the matter and that the participants were known to Mr. Swartz. Having reviewed the evidence, the supervising judge could not "say that any of the persons included in the MIP should not be there".

## V. The Parties' Submissions

### A. The Noteholders' Submissions

49    The Noteholders frame their opposition to the Tenor DIP Loan on a number of bases.

50    They argue that s. 11.2, titled "Interim financing", only permits a supervising judge to approve financing to meet the debtor's needs while it is developing a plan to present to its creditors.

51    The Noteholders also argue that the supervising judge's finding that the Tenor DIP Loan would enhance the prospects of a viable compromise or arrangement was unreasonable because it resulted from an error of principle, namely an improper focus on the fact that it provided financing for the arbitration.

52    The Noteholders submit that the supervising judge misapprehended the evidence in finding that the Noteholders were not willing to match the Tenor DIP Loan, and this error affected the outcome of the motion.

53    They argue that the supervising judge erred in deferring to the business judgment of the directors of Crystallex in approving both the Bridge Loan and the Tenor DIP Loan. They argue that directors always make a recommendation and, if Parliament had thought this was a relevant factor, it would have specifically enumerated it in s. 11.2(4) of the CCAA.

54    They argue that the supervising judge erred in principle in focusing on what was the most expedient way to fund the arbitration (as opposed to Crystallex's needs while negotiating a plan with the Noteholders) and, in doing so, committed the same error as the motion judge in *Cliffs Over Maple Bay*.

55    The Noteholders' position is that the Tenor DIP Loan is effectively an arrangement, in the guise of a financing, and Crystallex is misusing the CCAA to impose a restructuring without the requisite creditor approval.

56    The Noteholders submit that this court should order Crystallex to accept the Noteholders' "matching" DIP loan offer.

57    They also renew their objections to the MIP.

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

### B. Crystallex's Submissions

58    Crystallex argues that the Noteholders' appeal with respect to the Bridge Loan is moot because the loan has been advanced, spent and repaid.

59    As to the Tenor DIP Loan, it argues that approving it was within the discretion of the supervising judge, the supervising judge exercised his discretion on a wide variety of findings of fact, capable of evidentiary support in the record, and there is no basis for this court to intervene. It relies on *Ted Leroy Trucking Ltd., Re*, 2010 SCC 60, [2010] 3 S.C.R. 379 (S.C.C.) [*Century Services*], which recently addressed the broad discretionary jurisdiction of a supervising judge under the CCAA. Crystallex also points to *Air Canada (Re)* (2004), 47 C.B.R. (4th) 169 (Ont. S.C.J. [Commercial List]), as an instance where exit financing was approved before a plan had been approved by creditors.

### C. Tenor's Submissions

60    Tenor argues that "interim financing" in the heading to s. 11.2 of the CCAA does not mean "short term", but rather refers to the interval between two points or events, and s. 11.2 does not contain anything that would fetter the discretion of the supervising judge to select an "end point" beyond the expected conclusion of a plan. It argues that the duration of the Tenor DIP Loan is tailored to Crystallex's unique circumstance: all stakeholders acknowledge that the arbitration must be pursued in order for there to be meaningful recovery. In any event, it argues, marginal notes, such as the heading "interim financing" in s. 11.2, are not part of the statute, and their value is limited when a court must address a serious problem of statutory interpretation, citing the *Interpretation Act*, R.S.C. 1985, c. I-21, s. 14, and *Imperial Oil Ltd. v. R.*, 2006 SCC 46, [2006] 2 S.C.R. 447 (S.C.C.), at para. 57.

61    Moreover, Tenor submits, the supervising judge was in the best position to perform the careful balancing of interests required to facilitate a successful restructuring.

## VI. Analysis

### A. The Appeal from the Bridge Financing Order

62    The Noteholders did not strongly pursue their appeal of the Bridge Financing Order. The relief sought at the conclusion of the hearing related to the Tenor DIP Loan and not the Bridge Loan. The Bridge Loan was disbursed, spent and repaid. I agree with the respondents that the Noteholders' appeal with respect to the Bridge Loan is moot. I will therefore confine my analysis to the Tenor DIP Loan and the MIP.

### B. The Appeal from the Tenor DIP Financing Order

#### (1) Century Services Inc. v. Canada (Attorney General)

63    The Supreme Court of Canada had occasion to interpret the CCAA for the first time in *Century Services*. It used that opportunity to make clear that the CCAA gives the courts broad discretionary powers. Those powers must, however, be exercised in furtherance of the CCAA's purposes: para. 59. Section 11, in particular, was drafted in broad language which provides that a supervising judge "may, subject to the restrictions set out in this Act ... make any order that it considers appropriate in the circumstances". [3] For the majority in *Century Services*, Deschamps J. wrote:

[69] The *CCAA* also explicitly provides for certain orders...

[70] The general language of the *CCAA* should not be read as being restricted by the availability of more specific orders. However, the requirements of appropriateness, good faith, and due diligence are baseline considerations that a court should always bear in mind when exercising *CCAA* authority. Appropriateness under the *CCAA* is assessed by inquiring whether the order sought advances the policy objectives underlying the *CCAA*. The question is whether the order will usefully further efforts to achieve the remedial purpose of the *CCAA* — avoiding the social and economic losses resulting from

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

liquidation of an insolvent company. I would add that appropriateness extends not only to the purpose of the order, but also to the means it employs. Courts should be mindful that chances for successful reorganizations are enhanced where participants achieve common ground and all stakeholders are treated as advantageously and fairly as the circumstances permit.

64    It is with the Supreme Court's interpretation of the scope of judicial discretion under the CCAA in mind that I turn to s. 11.2 and the question of whether it permits a supervising judge to approve financing that may continue for a significant period after CCAA protection ends, without the approval of creditors.

*(2) Section 11.2 of the CCAA*

65    Section 11.2 is headed "Interim Financing". Headings may be used as an aid in interpreting the meaning of a statute: R. Sullivan, *Sullivan on the Construction of Statutes*, 5th ed. (Markham: LexisNexis Canada Inc., 2008), at p. 394, "Interim" generally means temporary or provisional: *Canadian Oxford Dictionary*, 2d ed. The weight to be given to a heading depends on the circumstances.

66    I agree with the Noteholders that s. 11.2 contemplates the grant of a charge, the primary purpose of which is to secure financing required by the debtor while it is expected to be subject to proceedings under the CCAA. A further purpose, however, is to enhance the prospects of a plan of compromise or arrangement that will lead to a continuation of the company, albeit in restructured form, after plan approval.

67    Section 11.2(4)(a) directs the court to consider the period during which the debtor is expected to be subject to proceedings under the CCAA. It stops short of confining the financing to the period that the debtor is subject to the CCAA. Section 11.2(4) (d) directs the court to consider if the financing would enhance the prospects of a viable compromise or arrangement.

68    Having regard to the broad remedial purpose of the CCAA and the broad residual authority of a supervising judge described in *Century Services*, in my view section 11.2 does not restrict the ability of the supervising judge, where appropriate, to approve the grant of a charge securing financing before a plan is approved that may continue after the company emerges from CCAA protection. Indeed, although in very different circumstances, financing to be available on the debtor's emergence from CCAA protection (sometimes called "exit financing") was approved before a plan was approved in *Air Canada*.[4] Both *Century Services* and section 11.2, however, in my view, signal that it would be unusual for a court to approve exit financing where opposed by substantially all of the creditors. Exit or post-plan financing is often a key element, or a pre-requisite, of the plan voted on by creditors.

69    The question becomes whether the unique facts of this case permitted the supervising judge to approve "interim financing" that was of such duration and structure that it could well outlast the CCAA protection period. This court should not substitute its decision for that of the supervising judge. I must ask this question through the lens of the applicable standard of review.

*(3) Standard of review*

70    Appellate review of a discretionary order under the CCAA is limited. Intervention is justified only for an error in principle or the unreasonable exercise of discretion: *Ivaco Inc. (Re)* (2006), 83 O.R. (3d) 108 (Ont. C.A.), at para. 71. An appellate court should not interfere with an exercise of discretion "where the question is one of the weight or degree of importance to be given to particular factors, rather than a failure to consider such factors or the correctness, in the legal sense, of the conclusion": *New Skeena Forest Products Inc., Re*, 2005 BCCA 192, 39 B.C.L.R. (4th) 338 (B.C. C.A.), at para. 26.

*(4) The supervising judge did not err in principle or unreasonably exercise his discretion*

71    As detailed below, I conclude that there is no basis for interfering with the supervising judge's exercise of discretion in approving the Tenor DIP Loan.

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

72    Most significantly, in this case, the supervising judge found there could be no meaningful recovery, and therefore no successful restructuring, without the financing of the arbitration. Although the Noteholders characterized the Tenor DIP Loan as "exit financing", it furthered the remedial purpose of the CCAA. To that extent, it is appropriate in the first sense used by Deschamps J. in *Century Services*, even though it may well outlast the period of CCAA protection. The supervising judge's focus on the fact that the Tenor DIP Loan provided financing for the arbitration was not, in the circumstances, an error of principle.

73    In my view, the Noteholders' real argument is that the *means* by which the Tenor DIP Loan was approved were not appropriate. Ideally, a CCAA supervising judge is able to assist creditors and debtors in coming to a compromise. The creditors and Crystallex have not "achieved common ground" on a very significant matter. Effectively, the Noteholders argue that the creditors have not been treated as advantageously and fairly as the circumstances permit. They are the senior creditors and their offer to provide DIP financing on terms they argue matched those of the Tenor DIP Loan was not accepted. With sufficient financing in place to fund the arbitration, their leverage in negotiating a share of the arbitration proceeds has been reduced. Moreover, the Noteholders argue, the supervising judge erred in applying the business judgment rule, and, contrary to *Cliffs Over Maple Bay*, involuntarily stayed their rights during what they characterize as a restructuring. I consider each of these arguments below.

**a. The Noteholders' competing DIP loan offer**

74    The Noteholders point to their affidavit on the April motion indicating they would submit to an order to advance funds on the same terms as the Tenor DIP Loan "in the event that prior to October 1, 2012, the Court orders that such longterm financing is appropriate and necessary". The supervising judge wrote that it would have been a preferable outcome if the Noteholders had been prepared to lend at the time of the April motion on the terms of the Tenor DIP facility: DIP Financing Reasons, at para. 91. The Noteholders argue that: they were prepared to advance funds on the terms of the Tenor DIP Loan, if so ordered; the supervising judge misapprehended the evidence; and, given the supervising judge's comment that it would have been preferable if the Noteholders had been prepared to lend, that misapprehension affected the outcome of the motion.

75    The supervising judge's comment at para. 91 of the DIP Financing Reasons makes his real concern clear. There, he stated that "at this time" the Noteholders were not prepared to lend on the terms of the Tenor DIP Loan. The Noteholders' view as of April 5, 2012 was that such long-term financing was not necessary, as the $10 million they offered to advance at that time met Crystallex's then cash requirements. The Noteholders reserved their rights to continue to oppose the approval of long term financing before they had come to an agreement with Crystallex about their entitlement, as creditors. Further hearings, and further arguments, were required. The supervising judge found, at para. 83 of the DIP Financing Reasons, that not putting sufficient financing in place to finance the arbitration "at this stage" would impair the arbitration. There was no suggestion from counsel for the Noteholders that on April 5, 2012 the Noteholders were prepared to waive the condition permitting them to continue to oppose the approval of long term financing. I am not satisfied that the supervising judge clearly misapprehended the evidence.

**b. Loss of leverage**

76    In Crystallex's view, a reduction of the Noteholders' leverage was desirable. It points to the Noteholders' competing CCAA application, seeking to cancel all of the shareholders' equity, which the supervising judge rejected as not fairly balancing the interests of all stakeholders. The Noteholders' plan, subsequently proposed, would entitle them to 46 per cent of the equity in return for giving up their Notes, which Crystallex also views as excessive. [5]

77    Crystallex argues that the Noteholders are not contractually entitled to convert their Notes to equity, and should therefore not be entitled to do so. Moreover, they argue, in the event of bankruptcy, the Noteholders would only be entitled to recover their principal and interest at the statutory rate of 5 per cent under the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3, and, if the arbitration is realized, they will be entitled to the higher rate of interest they are contractually entitled to under the Notes. As Deschamps J. noted at para. 77 of *Century Services*, participants in a reorganization "measure the impact of a reorganization against the position they would enjoy in liquidation".

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 35 of 379

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

78      The Noteholders counter that, contractually, they were entitled to be repaid on December 23, 2011 and, since they were not, and Crystallex proposes to defer repayment for several years and repay the Notes only if the arbitration is successful, the long delay entitles them to some equity participation. Moreover, contractually, Crystallex is restricted from incurring the Tenor DIP Loan, which will be senior to the Notes.

79      Crystallex points to the terms of the Initial Order, affording the "best offer" the protection of the *Soundair* principles, and providing that "topping offers" would not be considered by the court. Crystallex points out that the Noteholders did not appeal the Initial Order and argues that accepting the Noteholders' matching offer would offend the *Soundair* principles. In Crystallex's view, the Noteholders were treated fairly.

80      In turn, the Noteholders argue that the Initial Order authorized Crystallex to conduct an auction to raise *interim or DIP financing* pursuant to procedures approved by the Monitor. Since the outset, the Noteholders maintained their objection that the auction process sought more than interim or true DIP financing. The supervising judge deferred consideration of their objections until the DIP facility was before the court for approval.

81      The Noteholders are sophisticated parties. They pursued a strategy. It ultimately proved less successful than hoped. It appears that the supervising judge would have been prepared to approve the advance of funds to Crystallex by the Noteholders, on the terms of the Tenor DIP Loan, notwithstanding the *Soundair* principles, had the Noteholders agreed to do so, without condition, on April 5, 2012.

82      The facts of this case are unusual: there is a single "pot of gold" asset which, if realized, will provide significantly more than required to repay the creditors. The supervising judge was in the best position to balance the interests of all stakeholders. I am of the view that the supervising judge's exercise of discretion in approving the Tenor DIP Loan was reasonable and appropriate, despite having the effect of constraining the negotiating position of the creditors.

### c. The business judgment rule

83      The supervising judge held that in addition to the factors in s. 11.2(4) of the CCAA, he could take into account the exercise or lack thereof of business judgment by the board of directors of a debtor corporation in considering DIP financing: DIP Financing Reasons, at paras. 32-35. He cited *Stelco Inc. (Re)* (2005), 75 O.R. (3d) 5 (Ont. C.A.), as authority for this proposition. [6]

84      The fact that a debtor's board of directors recommends interim financing is not a determinative factor, and in some cases may not be a material factor, in considering whether to make an order under s. 11.2. It would be unusual if the board did not recommend the financing for which the debtor seeks approval.

85      *Stelco* should not be read as authority for the principle that the recommendation of the directors of a debtor under CCAA protection is entitled to deference in evaluating whether financing should be approved under s. 11.2 of the CCAA where the factors outlined in s. 11.2(4) have not been complied with. In *Stelco*, the debtor did not seek court approval of a recommendation of the board. In the case of interim financing, the court must make an independent determination, and arrive at an appropriate order, having regard to the factors in s. 11.2(4). It may consider, but not defer to, and is not fettered by, the recommendation of the board.

86      The weight given by the supervising judge to the business judgment of the board of directors of Crystallex in recommending the Tenor DIP Loan is not, however, a basis for this court to interfere with his decision: *New Skeena Forest Products Inc., Re*, at para. 26.

### d. Cliffs Over Maple Bay is distinguishable

87      In *Cliffs Over Maple Bay*, the debtor was the developer of a 300 acre site intended to include residential units, a golf course and a hotel. The debtor obtained protection under the CCAA and sought approval of financing that would permit it to

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

complete material parts of the development. It believed that the proceeds generated from the sale of units thus completed would be sufficient to fund the remaining portions of the development and that, if the development were completed, there would be sufficient sale proceeds to satisfy all of the debtor's obligations.

88    The motion judge approved the financing; the mortgagees of the development appealed. The British Columbia Court of Appeal noted, at para. 35, that it was not suggested that the debtor intended to propose an arrangement or compromise to its creditors before embarking on its restructuring plan. The court allowed the appeal, writing:

> [37] ... DIP financing should not be authorized to permit the debtor company to pursue a restructuring plan that does not involve an arrangement or compromise with its creditors ...

> [38] ... What the Debtor Company was endeavouring to accomplish in this case was to freeze the rights of all of its creditors while it undertook its restructuring plan without giving the creditors an opportunity to vote on the plan. The CCAA was not intended, in my view, to accommodate a non-consensual stay of creditors' rights while a debtor company attempts to carry out a restructuring plan that does not involve an arrangement or compromise upon which the creditors may vote.

89    I agree with the supervising judge that this case can be distinguished from *Cliffs Over Maple Bay*, which turned on the court's finding that the debtor did not intend to negotiate a plan with its creditors.

90    While Mr. Fung initially indicated that Crystallex's plan was to stay creditors' claims until the arbitration was settled or realized, his more recent evidence was that approval of the Tenor DIP Loan does not preclude further discussions about a plan with the creditors. In submissions before the supervising judge, and again before this court, counsel for Crystallex reiterated that Crystallex intended to exit from CCAA protection as soon as a plan was negotiated with the creditors and approved, and that Crystallex intended to negotiate a plan by the expiry of the stay on July 30, 2012. The supervising judge found that Crystallex intended to negotiate a plan with its creditors. There is some basis in the record for such a conclusion.

*(5) The Tenor DIP Loan is not an arrangement*

91    An arrangement or compromise cannot be imposed on creditors unless it has been approved by a majority in number representing two thirds in value of the creditors: see s. 6(1) of the CCAA.

92    The supervising judge rejected the argument that the Tenor DIP Loan was a plan of arrangement or compromise and therefore required the approval of the creditors. He held, at para. 50 of the DIP Financing Reasons:

> A "plan of arrangement" or a "compromise" is not defined in the CCAA. It is, however, to be an arrangement or compromise between a debtor and its creditors. The Tenor DIP facility is not on its face such an arrangement or compromise between Crystallex and its creditors. Importantly the rights of the noteholders are not taken away from them by the Tenor DIP facility. The noteholders are unsecured creditors. Their rights are to sue to judgment and enforce the judgment. If not paid, they have a right to apply for a bankruptcy order under the BIA. Under the CCAA, they have the right to vote on a plan of arrangement or compromise. None of these rights are taken away by the Tenor DIP.

93    I agree. While the approval of the Tenor DIP Loan affected the Noteholders' leverage in negotiating a plan, and has made the negotiation of a plan more complex, it did not compromise the terms of their indebtedness or take away any of their legal rights. It is accordingly not an arrangement, and a creditor vote was not required. In this case it was within the discretion of the supervising judge to approve the Tenor DIP Loan.

## C. The Appeal from the Management Incentive Plan Approval Order

94    In my view, the supervising judge did not err in principle or unreasonably exercise his discretion in approving the MIP. I see no basis for this court to intervene.

95    As the supervising judge noted, employee retention provisions are frequently authorized before a plan is negotiated. The supervising judge was alive to the exceptionally large amounts that might be paid to beneficiaries of the MIP (including Mr.

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

Fung) in this case. The supervising judge took specific note of the issues that the Noteholders had raised in the past regarding the extent to which the independent committee of the board that recommended the MIP was truly independent, and the steps taken by that committee to address those concerns.

96     The recommendation of an independent committee of the board that has obtained expert advice is entitled to more weight in the consideration of a MIP than is the recommendation of the board in the consideration of whether financing should be approved under s. 11.2 of the CCAA. The CCAA does not list specific factors to be considered by the court in the case of a MIP. Moreover, the board would have the best sense of which employees were essential to the success of its restructuring efforts.

97     In addition to considering the recommendation of the independent committee of the board and Mr. Swartz, the supervising judge also reviewed the evidence to consider whether any persons had been included in the MIP who should not have been. He did not rely solely on the board's recommendation.

## VII. Disposition

98      Accordingly, I would dismiss the appeals of the CCAA Bridge Financing Order, the CCAA Financing Order, and the Management Incentive Plan Approval Order.

## VIII. Costs

99     If the parties cannot agree, I would order that Crystallex and Tenor provide their submissions on the issue of costs within 14 days, and that the Noteholders, if so advised, provide their submissions in response within 10 days thereafter. No reply submissions are to be provided without leave.

**_D. O'Connor A.C.J.O._:**

I agree

**_R.A. Blair J.A._:**

I agree

*Appeals dismissed.*

Footnotes

*        Additional reasons at *Crystallex International Corp., Re (2012), 2012 CarswellOnt 9479, 2012 ONCA 527* (Ont. C.A.).

1        Paragraph 23(1)(b) provides that the monitor shall "review the company's cash-flow statement as to its reasonableness and file a report with the court on the monitor's findings".

2        The MIP was approved subject to an amendment (agreed to by Crystallex) to provide that the value of any stock options ultimately realized by participants of the MIP would be deducted from the amount of any bonus awarded under the MIP on a tax neutral basis.

3        The full text of section 11 is as follows:

        11. Despite anything in the *Bankruptcy and Insolvency Act or the Winding-up and Restructuring Act*, if an application is made under this Act in respect of a debtor company, the court, on the application of any person interested in the matter, may, subject to the restrictions set out in this Act, on notice to any other person or without notice as it may see fit, make any order that it considers appropriate in the circumstances.

4        In *Air Canada*, Farley J. approved a "global restructuring agreement" which included a commitment of an existing creditor to provide exit financing of approximately US $585 million on the company's emergence from CCAA. DIP financing was in place; the financing at issue was clearly recognized as exit financing. The restructuring agreement was not opposed by substantially all of the creditors. Nor was it argued that it adversely affected the ability of the creditors and the debtor to negotiate a compromise or arrangement.

5        The Noteholders proposed that they receive 22.9 per cent of the equity for the $36 million needed for the arbitration and 58 per cent of the equity in return for giving up their Notes, for a total of approximately 81 per cent of the equity. Assuming that the Noteholders

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

sought a maximum total entitlement of 81 per cent, if they advanced the $36 million on the terms of the Tenor DIP Loan, as they now seek to do, the amount of equity on conversion of their notes would be 46 per cent. See the DIP Financing Reasons, at para. 77.

6      An incorrect citation for *Stelco*  was given in the DIP Financing Reasons, at para. 33.

---

**End of Document**

Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 33

# COURT OF APPEAL FOR ONTARIO

CITATION: Downey v. Ecore International Inc., 2012 ONCA 480
DATE: 20120706
DOCKET: C54648

2012 ONCA 480 (CanLII)

Feldman, Simmons and Cronk JJ.A.

BETWEEN

Paul Downey

Plaintiff
(Respondent/Cross-Appellant)

and

Ecore International Inc.

Defendant
(Appellant/Respondent to Cross-Appeal)

L. David Roebuck and Mark Hines, for the appellant/respondent to cross-appeal

Timothy M. Lowman and Patrick J. Cotter, for the respondent/cross-appellant

Heard: April 12, 2012

On appeal and cross-appeal from the order of Justice John S. Fregeau of the Superior Court of Justice, dated November 8, 2011, with reasons reported at 2011 ONSC 6617.

**Cronk J.A.:**

**I.    Overview**

[1]    Ecore International Inc. ("Ecore") appeals from the dismissal of its motion for an order staying or dismissing an Ontario action commenced against it by the

Page:  2

respondent, Paul Downey ("Downey").  Ecore requested that the action be
dismissed for want of jurisdiction of the Ontario Superior Court of Justice based
on a forum selection clause ("FSC") in favour of the Pennsylvania courts, as
found in a written confidentiality agreement between the parties ("Confidentiality
Agreement").

[2]    The narrow issue on appeal is whether the motion judge erred by
concluding that the Confidentiality Agreement fails to bind Downey for lack of
consideration.  Should Ecore succeed on its appeal, Downey cross-appeals,
contending that the Confidentiality Agreement is unenforceable because it
applied only "during or after" his employment with Ecore.  As Downey was never
an employee of Ecore, he argues that a necessary precondition to the operation
of the Confidentiality Agreement was not satisfied.

[3]    For the reasons that follow, I would allow the appeal and dismiss the
cross-appeal.

## II.    Facts

[4]    Ecore, formerly known as Dodge-Regupol Inc. ("DRI"),[1] is a Pennsylvania-
based manufacturer of recycled rubber and a wide array of rubber-related
products.  Downey is a professional engineer licensed and resident in Ontario.

---

[1] Prior to 2008, Ecore carried on business under the name of DRI. For convenience, DRI is treated in
these reasons as being one and the same as Ecore.

Page:  3

### (1) Genesis of the Contracts

[5]    In the 1990s, Downey was employed by one of Ecore's competitors in Toronto.   By 1999, he was seeking a new position in a senior business development or sales and marketing position, with the hope of a later transition to general management.

[6]    In August and September 1999, Downey had discussions with the President of Ecore, Art Dodge, regarding a potential role for him with Ecore.  On September 9, 1999, Dodge wrote to Downey, enclosing an "employment proposal" and offering him employment with Ecore in the position of "Business Development Manager – Industrial Products".   The letter indicates that Dodge anticipated Downey relocating to Pennsylvania in early 2001 or sooner.   The letter states: "given your history and industry knowledge, coincident with your joining the company and as a condition of your employment, we will require you to sign an Employee Confidentiality Agreement."

[7]    Downey responded to Dodge on September 10, 1999 with a counter-proposal.   He suggested various changes to the compensation arrangements outlined by Dodge and proposed that the parties operate, "albeit temporarily for the next 12 – 18 months as a business-to-business relationship rather than an employer-employee one".   Downey described this arrangement as "necessary given Canadian tax law".   He included a draft consulting agreement prepared by

2012 ONCA 480 (CanLII)

Page:  4

his lawyer, which contemplated that Downey's services would be provided to Ecore through his company, CSR Industries Inc. ("CSR"). The draft agreement provided that CSR would execute a copy of Ecore's standard confidentiality agreement.

[8]    Dodge replied to Downey on the same day with a modified proposal that accepted some, but not all, of Downey's suggested compensation arrangements, and that accepted all other terms and conditions in Downey's counter-proposal.

### (2) Consulting Agreement

[9]    CSR and Ecore executed a consulting agreement on September 14, 1999 ("Consulting Agreement"). The agreement is between Ecore as the "Client" and CSR as the "Consultant". Downey is not a named party to the Consulting Agreement. However, as will be discussed below, he is described in the terms of the agreement as "a Key Person of the Consultant".

[10]   The Consulting Agreement provides that CSR will provide defined "Services", including acting as Ecore's "Manager Business Development – Industrial Products" and sitting as a member of Ecore's management team. Additional services to be provided by CSR include "the investigation and development of new business opportunities within industrial market segments".

[11]   Section 3 requires Ecore to pay CSR an annual fee of $132,000 CDN, payable in weekly amounts, for the Services provided under the Agreement, as

2012 ONCA 480 (CanLII)

Page:  5

well as various bonuses in 2000. After 2000, CSR would be considered for participation in all company-wide bonus distributions.

[12]    Section 5 of the Consulting Agreement describes the relationship between Ecore and CSR as follows:

> The Consultant's relationship with the Client as created by this Agreement is that of an independent contractor for the purposes of the *Income Tax Act* (Canada) and any similar provincial taxing legislation. It is intended that the Consultant shall have general control and direction over the manner in which its services are to be provided to the Client under this Agreement. Nothing contained in this Agreement shall be regarded or construed as creating any relationship (whether by way of employer/employee, agency, joint venture, association or partnership) between the parties other than as an independent contractor as set forth herein.

[13]    Section 7 recognizes Downey's role as CSR's "Key Person":

> 7.    Key Person
>
> (a)    The parties acknowledge that Paul Downey is a Key Person of the Consultant and is integral to the successful performance of the Services by the Consultant under this Agreement. It is acknowledged by the Consultant that Paul Downey will perform all services of the Services, unless the Client otherwise consents in writing.

[14]    Section 8 requires CSR to execute a confidentiality agreement:

> 8.    Confidential Information
>
> The Consultant will execute a copy of the Client's standard confidentiality agreement, and said confidentiality agreement, upon execution, will form part of this agreement.

2012 ONCA 480 (CanLII)

Page:  6

### (3) Confidentiality  Agreement

[15]    On Downey's first day of work with Ecore on October 4, 1999, Ecore asked

him to sign its standard form confidentiality agreement, backdated to October 1,

1999.    Downey executed the agreement in his personal capacity on or about

October  4, 1999.

[16]    The Confidentiality Agreement is between Ecore, which is referred to as

"Company", and Downey, who is referred to as "Employee". CSR is not a named

party to the agreement and is not referenced in the document.

[17]    The preambles to the Confidentiality Agreement include this clause :

> BACKGROUND:  Company  is  prepared  to  engage
> Employee for employment with Company. Employee will
> be  granted  access  to  confidential  and  proprietary
> information of the Company as part of his employment.
> Employee is entering into this Agreement to grant to the
> Company   protections   regarding   the   Company's
> proprietary   information.   The   parties   of   [sic]   this
> Agreement agree and intend to be legally bound by the
> covenants  as set forth in this Agreement.

[18]  Section  1   of   the   Confidentiality   Agreement   defines   "Proprietary

Information", while s.  2  obliges Downey to accept  and hold  all Proprietary

Information  as  secret  and  confidential  and  not  to  use  it  for  his  own  benefit, but

only for the benefit of Ecore.

[19]    Section 3 of the Confidentiality Agreement contains the FSC at issue in

this proceeding.   The pertinent  part of the FSC states:

2012 ONCA 480 (CanLII)

2012 ONCA 480 (CanLII)

> Employee hereby consents to the exclusive jurisdiction in the courts of the Commonwealth of Pennsylvania and of the United States situate in the Commonwealth of Pennsylvania, in connection with any action or suit to enforce this Agreement, that relates to this Agreement, that arises out of or in any way relates to the Company's business relations with Employee.

[20]   Section 4 of the Confidentiality Agreement provides that "[a]ll inventions or discoveries which relate to [Ecore's] Proprietary Information shall be the exclusive property of the Company."   This section obliges Downey to execute any instruments that Ecore deems necessary to confirm its exclusive rights to any invention or discovery under applicable intellectual property law.

[21]   Section 5 of the Confidentiality Agreement states:

> This Agreement shall not constitute an employment agreement between Company and Employee, and, in the absence of written agreement to the contrary, Employee shall, at all times, be considered an employee at will. This Agreement shall apply during and after the Employee's employment with Employer.

### (4) Assignment Agreement

[22]   Sometime in 2000, Downey invented a new form of impact sound insulation for use in the construction of flooring systems.   He disclosed the inventions to Ecore in 2000. Downey believed that his inventions could lead to a new Ecore product line.

[23]   In a written agreement, dated October 10, 2001, Downey assigned all his rights, title and interest in the inventions to Ecore ("Assignment Agreement").

Page:  8

Downey acknowledged in the Assignment Agreement that he received "valuable consideration" from Ecore.

### (5) Subsequent Events

[24]    In 2008, Ecore asked Downey to sign an "Amended and Restated Confidentiality Agreement" that sought to create joint and several obligations on the part of Downey and CSR.   Downey declined to do so.

[25]    In February 2011, Downey commenced an action in Ontario against Ecore, alleging that it failed to honour an oral promise to "reasonably compensate" him for his assignment of the insulation inventions.   Downey alleges in his claim that the inventions were made by him alone using public source materials information and without the use of any Proprietary Information of Ecore.   Downey seeks damages or, in the alternative, rescission of his assignment of the inventions and an accounting of profits by Ecore.

[26]    In response to this action, Ecore terminated the Consulting Agreement effective July 2011.   Ecore also moved under Rule 21 of the *Rules of Civil Procedure*, R.R.O. 1990, Reg. 194, to stay or dismiss Downey's action on the ground that the Pennsylvania courts have exclusive jurisdiction over it pursuant to the FSC in the Confidentiality Agreement.

2012 ONCA 480 (CanLII)

Page:  9

2012 ONCA 480 (CanLII)

### III.    Motion Judge's Decision

[27]    The motion judge reviewed the circumstances leading to the execution of the Consulting and Confidentiality Agreements and the terms of both contracts. He found that, at Downey's request, the Consulting Agreement was between CSR and Ecore, rather than Ecore and Downey, because this structure was "advantageous to [Downey] from a Canadian tax perspective" and was "for his advantage" (at para. 30). He also found that while it was contemplated that "Downey's position or status might change to that of an employee of Ecore", this never happened.

[28]    As for the Confidentiality Agreement, the motion judge found that while CSR was obliged under the Consulting Agreement to execute the agreement, it did not do so. Instead, as requested by Ecore, Downey signed the Confidentiality Agreement in his personal capacity. The motion judge correctly held that Downey was bound by the FSC in the Confidentiality Agreement only if that agreement was a valid contract to which Downey was personally bound.   He concluded, at para. 34, that the Confidentiality Agreement "fails for lack of consideration". The motion judge found that "it is CSR, not Downey, who is the party to the Consulting Agreement. The confidential information is provided to CSR, and the compensation, pursuant to the terms of the agreement, was to flow to CSR".

[29]    The motion judge summarized his conclusion this way, at para. 37:

2012 ONCA 480 (CanLII)

> Downey never received consideration for executing the Confidentiality Agreement and is not personally bound by its terms, including the FSC contained therein. The jurisdiction of this court to hear Downey's action against Ecore is therefore not ousted by the FSC contained in the Confidentiality Agreement dated October 1, 1999.

[30]  Although this conclusion was dispositive of Ecore's motion, the motion judge went on to consider the other issues raised by the parties concerning the enforceability of the Confidentiality Agreement against Downey.  He held that: (1) the subject matter of Downey's action against Ecore falls within the scope of the FSC in the Confidentiality Agreement since the action arises out of and relates to Ecore's business relations with Downey (at paras. 38-41); and (2) Downey failed to show sufficient strong cause to avoid the enforcement of the FSC in the Confidentiality Agreement (at paras. 42-45). Downey did not challenge these additional findings before this court.

[31]  The motion judge's reasons for dismissing Ecore's motion are summarized in this succinct passage from his reasons, at para. 46:

> The FSC in the Confidentiality Agreement should be enforced, and the stay of proceedings would be granted, but for the finding that the Confidentiality Agreement fails to bind Downey personally for lack of consideration.

Page:  11

2012 ONCA 480 (CanLII)

**IV.    Issues**

[32]    There is one issue on the appeal: did the motion judge err by concluding that the Confidentiality Agreement, including the FSC, is unenforceable against Downey for lack of consideration?

[33]    If the motion judge so erred, the only issue on the cross-appeal is whether the Confidentiality Agreement is unenforceable against Downey on the alternative basis that a necessary precondition to its operation – Downey's employment with Ecore – was never satisfied.

**V.    Analysis**

**(1)    The Appeal**

[34]    Ecore's basic position is that the motion judge erred by concluding that the Confidentiality Agreement is unenforceable against Downey by reason of a failure of consideration.

[35]    Ecore submits that s. 8 of the Consulting Agreement evidences the parties' intentions that Ecore was to receive a confidentiality covenant that bound Downey personally as the Key Person. In addition, Ecore argues that the consideration for signing the Confidentiality Agreement was provided by the monies and benefits that flowed through CSR to Downey.   Ecore also submits that consideration is found in the expressed premise of the Confidentiality Agreement that Downey would be granted access to Ecore's confidential

2012 ONCA 480 (CanLII)

information and that he was entering into the agreement to grant Ecore protection in respect of that information.

[36]   For the reasons that follow, I agree with Ecore that the motion judge erred by holding that the Confidentiality Agreement "fails" and is unenforceable against Downey due to a lack of consideration.

### (i)  Principles of Contractual Interpretation

[37]   I begin with the well-established principles of contractual interpretation.  As the courts have repeatedly affirmed, the aim of contractual interpretation is to determine the intentions of the parties in accordance with the language used in the written document, having regard to the context in which the contract was signed: see *Dumbrell v. Regional Group of Companies* (2007), 85 O.R. (3d) 616 (C.A.), at paras. 47-56; *Salah v. Timothy's Coffees of the World Inc.*, 2010 ONCA 673, 268 O.A.C. 673, at para. 16; and *SeaWorld Parks & Entertainment LLC v. Marineland of Canada Inc.*, 2011 ONCA 616, 282 O.A.C. 339, at para. 16.

[38]   The contours of the exact bargain between the parties may sometimes require consideration of more than one contract. Nonetheless, the same principles of contractual interpretation apply.   In *Salah*, at para. 16, Winkler C.J.O. provided this instructive overview of the applicable principles:

> When interpreting a contract, the court aims to determine the intentions of the parties in accordance with the language used in the written document and presumes that the parties have intended what they have

Page:  13

said.  The court construes the contract as a whole, in a manner that gives meaning to all of its terms, and avoids an interpretation that would render one or more of its terms ineffective.  In interpreting the contract, the court must have regard to the objective evidence of the "factual matrix" or context underlying the negotiation of the contract, but not the subjective evidence of the intention of the parties.  The court should interpret the contract so as to accord with sound commercial principles and good business sense, and avoid commercial absurdity.  If the court finds that the contract is ambiguous, it may then resort to extrinsic evidence to clear up the ambiguity.  *Where a transaction involves the execution of several documents that form parts of a larger composite whole – like a complex commercial transaction – and each agreement is entered into on the faith of the others being executed, then assistance in the interpretation of one agreement may be drawn from the related agreements.* [Citations omitted; Emphasis added.]

### (ii)  The Wording of the Agreements and the Factual Matrix in this Case

[39]    The motion judge's factual finding that CSR was the recipient of Ecore's Proprietary Information led to his conclusion that the Confidentiality Agreement fails for lack of consideration.   In my view, this finding is not consistent with the wording of the Consulting and Confidentiality Agreements, having regard to the factual matrix in which these agreements were made. Nor, with respect, does the motion judge's interpretation of the effect of these agreements accord with sound commercial principles or good business sense.

[40]    From the outset of the parties' dealings, as revealed by Dodge's initial letter to Downey dated September 9, 1999, Ecore contemplated that Downey,

2012 ONCA 480 (CanLII)

Page:  14

personally, would join its "team" and sit as a member of its management group. Consistent with that view, Ecore's position was that Downey would be required to personally commit to protect Ecore's Proprietary Information as a condition of his relationship with Ecore.

[41]   There was no evidence on the motion to suggest that Ecore resiled from its initial position after Downey and his lawyer converted the original employment proposal into a proposed consulting arrangement with CSR.   Indeed, both the wording of s. 5 of the Consulting Agreement and the motion judge's findings confirm that Downey proposed this arrangement solely as a means of advantaging his Canadian income tax position.   The arrangement with CSR was simply a tax device that, in the motion judge's words, was implemented "at Downey's request and for his advantage" (at para. 30).   This business reality is a critical component of the factual context in which the Consulting and Confidentiality Agreements were signed.

[42]   Moreover, the transaction between the parties was effected by the execution of both contracts.   The Consulting Agreement was entered on the faith of the Confidentiality Agreement being executed.   Consequently, these related contracts must be read together and, as Winkler C.J.O. explained in *Salah*, assistance in the interpretation of each agreement may be drawn from the other.

2012 ONCA 480 (CanLII)

2012 ONCA 480 (CanLII)

[43]   That the two agreements together constitute a composite whole is suggested by the language of the agreements themselves.   Section 8 of the Consulting Agreement provides for the execution of Ecore's standard form confidentiality agreement by the Consultant. It further states that, upon execution, the confidentiality agreement would form part of the Consulting Agreement.

[44]   The Consulting Agreement does not specifically address the provision or protection of Ecore's Proprietary Information, nor does it refer to the intended recipient of that information.   Instead, it confirms that Downey, in his personal capacity, is a "Key Person of the Consultant and is integral to the successful performance of the Services by the Consultant under this Agreement". CSR explicitly acknowledged that Downey would perform all Services, as defined in the Consulting Agreement, unless Ecore otherwise consented in writing.

[45]   The Confidentiality Agreement fills in the gaps in the Consulting Agreement about the provision and protection of Ecore's Proprietary Information. It specifically addresses the disclosure of this information, providing not only that Downey "will be granted access to [Ecore's] confidential and proprietary information" but, also, that Downey was entering into the Confidentiality Agreement to "grant to [Ecore] protections regarding [Ecore's] proprietary information".   It confirms that Downey intended "to be legally bound by the covenants as set forth in this Agreement", which include the confidentiality covenants and acknowledgements set out in the body of the agreement.

2012 ONCA 480 (CanLII)

[46]   It is true, as the motion judge recognized, that CSR never signed a confidentiality agreement and that it was not a named party to the Confidentiality Agreement signed by Downey. However, when the Consulting Agreement and Confidentiality Agreement are read together, the terms of these agreements reveal the parties' intentions that Ecore's Proprietary Information was to be protected in the hands of the person who was to actually receive that information – Downey. It was only reasonable for the parties to intend that Downey – who was then employed by a known competitor of Ecore – would be subject to the terms of the Confidentiality Agreement. He was the person defined in s. 7 of the Consulting Agreement as the actual provider of all the consulting services to Ecore. Indeed, Downey admitted in cross-examination that he was the person who would get Ecore's information if a contract was entered into with Ecore.

[47]   The motion judge erred in finding that Ecore accepted that CSR would receive both the Proprietary Information and the benefits flowing from Downey's relationship with Ecore. The wording of the agreements and the overall factual matrix reveals that the *de facto* relationship between the parties was between Ecore and Downey. It was Downey, not CSR, who committed to perform the consulting services. And it was Downey who would receive the benefits arising from the relationship with Ecore, whether directly or through the corporate vehicle of CSR.

2012 ONCA 480 (CanLII)

[48]    Two further comments by the motion judge require mention. The motion judge observed, at para. 32, that the Consulting Agreement could have required that both CSR and Downey sign the Confidentiality Agreement. He also commented that it was "[o]f significance" that, in 2008, Ecore asked Downey to sign an amended Confidentiality Agreement that would have bound both CSR and Downey.

[49]    In my view, with respect, these observations are beside the point. The fact that the Consulting Agreement did not require both CSR and Downey to sign the Confidentiality Agreement is explained by the factual matrix in which the agreements were made. At least for the purposes of the Confidentiality Agreement, the parties understood and intended that CSR and Downey were one and the same.

[50]    In addition, I view the 2008 effort to restate the Confidentiality Agreement as nothing more than a failed attempt by Ecore to formally commit CSR to the contractual protections it already enjoyed with Downey under the Confidentiality Agreement.

[51]    An additional point telling against the motion judge's interpretation of the interaction between the Consulting Agreement and the Confidentiality Agreement is that it fails "to accord with sound commercial principles and good business sense, and [to] avoid commercial absurdity": *Salah*, at para. 16.   On the motion

2012 ONCA 480 (CanLII)

judge's approach to the interpretation of the two agreements, the Confidentiality Agreement serves no meaningful purpose.  The motion judge viewed CSR as the recipient of Ecore's Proprietary Information. If this were the case, it would have served no logical purpose for Ecore to ask Downey to personally commit to protect Proprietary Information that he never received.

[52]   Moreover, on the motion judge's findings, neither Downey nor CSR is bound by the Confidentiality Agreement.  Downey is not bound because, in the motion judge's view, there was no consideration for the agreement.  And CSR is not bound because it is not a party to the agreement.   On this interpretation, Ecore is deprived of the very protection of its intellectual property for which it bargained.

[53]   Such a result is inconsistent with the parties' demonstrated intentions at the time they entered into the Consulting and Confidentiality Agreements.   It is also inconsistent with sound commercial principles and good business sense. An interpretation of the Consulting and Confidentiality Agreements that occasions such a commercially absurd result is to be avoided:  *Salah*, at para. 16.

[54]   I therefore conclude that, properly interpreted, the intent of the parties in entering into their contractual arrangements was to require the execution of a confidentiality agreement that bound Downey personally. That s. 8 of the Consulting Agreement required CSR to execute such a confidentiality agreement

Page:  19

does not relieve against the parties' joint objective. To conclude otherwise, as the motion judge did, would deprive Ecore of any protection of its Proprietary Information from the intended and actual recipient of that information. This unjust result would permit form to triumph over substance.

### (iii) Confidentiality Agreement is Supported by Valid Consideration

[55]   It follows from this analysis that the motion judge erred by concluding that Downey's execution of the Confidentiality Agreement was unsupported by valid consideration. The motion judge rejected Ecore's suggestion that "the consideration received by Downey for executing the Confidentiality Agreement is the provision of confidential information by Ecore to the consultant, allowing the 'services' of the Consulting Agreement to be provided, thereby allowing the compensation contemplated in that agreement to flow" (at para. 34).  According to the motion judge, at para. 35:

> [T]his submission overlooks the fact that it is CSR, not Downey, who is the party to the Consulting Agreement. The confidential information is provided to CSR, and the compensation ... was to flow to CSR.  I am mindful that some of the funds owing to CSR pursuant to the Consulting Agreement were paid to Downey personally. However, [Ecore] cannot unilaterally change the parties to the Consulting Agreement by choosing who they pay. Further, the record suggests that these funds were treated by Downey as revenue of CSR.

[56]   In my opinion, the motion judge's conclusion that the Confidentiality Agreement fails for lack of consideration ignores the mutual promises contained

2012 ONCA 480 (CanLII)

in the Confidentiality Agreement. In particular, the motion judge failed to consider the "BACKGROUND" preamble to the Confidentiality Agreement, which reads:

> Employee will be granted access to confidential and proprietary information of the Company as part of his employment.  Employee is entering into this Agreement to grant to the Company protections regarding the Company's proprietary information.  The parties of [*sic*] this Agreement agree and intend to be legally bound by the covenants as set forth in this Agreement.

[57]    The mutual promises contained in this provision constitute a *quid pro quo* that formed the basis for the Confidentiality Agreement: Downey would be granted access to Ecore's Proprietary Information, which was necessary to allow him to perform the Services under the Consulting Agreement, and the information so disclosed would be subject to confidentiality protections in favour of Ecore. Contrary to the parties' original expectations, Downey never became an Ecore employee but instead continued to use his corporate vehicle for income tax purposes. However, the fact remains that Downey received Ecore's Proprietary Information.

[58]    In my view, the mutual promises contained in the Confidentiality Agreement afford good and valid consideration for Downey's execution of that agreement. This is sufficient to legally bind the parties in accordance with their express intentions as set out in the preamble to the agreement, quoted above. It was these promises and their fulfillment that permitted Downey, both personally and through CSR, to realize the benefits of the Consulting Agreement – benefits

he would not have received without executing the Confidentiality Agreement to which he was personally bound.

### (iv) Conclusion

[59]    I therefore conclude, contrary to the motion judge's ruling, that Downey's execution of the Confidentiality Agreement was supported by valid consideration. It follows that the Confidentiality Agreement, including the FSC, is fully enforceable against Downey.

### (2)    The Cross-Appeal

[60]    On his cross-appeal, Downey invokes s. 5 of the Confidentiality Agreement, which provides in part: "This Agreement shall apply *during and after* the Employee's employment with Employer" (emphasis added). Downey submits that even if he did receive valid consideration for entering into the Confidentiality Agreement, it is nonetheless unenforceable against him since he never became an Ecore employee. The motion judge did not need to consider this alternative argument, having accepted that the Confidentiality Agreement was unenforceable against Downey due to a lack of consideration.

[61]    I do not read s. 5 of the Confidentiality Agreement in the manner urged by Downey. The material language of this provision – that the Confidentiality Agreement was to apply "during and after" Downey's employment with Ecore – simply confirms that Downey's confidentiality obligations were to survive the

2012 ONCA 480 (CanLII)

2012 ONCA 480 (CanLII)

termination of his relationship with Ecore. This makes commercial sense given the purpose of the agreed protections for Ecore's Proprietary Information.  It was precisely when Downey's relationship with Ecore fell apart, that those protections would be needed by Ecore.

[62]   It is telling, in this regard, that the relevant language in s. 5 does not provide that the Confidentiality Agreement or Downey's confidentiality covenants were to apply *only* if Downey was an employee of Ecore or that his employment by Ecore was a condition precedent to the triggering of those covenants.   This language also accords with common and business sense. If Ecore's Proprietary Information was disclosed to Downey – in any capacity – the protection of that information was of vital concern to Ecore.

## VI.   Disposition

[63]   For the reasons given, I am persuaded that the motion judge erred in his interpretation of the Confidentiality Agreement. That agreement forms part of a single transaction between Ecore, Downey and CSR, constituted by both the Consulting and the Confidentiality Agreements. The interpretation of each agreement is informed by the other.   It is only when the two agreements are read together, in accordance with the principles of contractual interpretation referenced above, that the intentions of the parties and the true business reality of their relationship emerge.

Page: 23

[64]    Accordingly, I would allow the appeal, dismiss the cross-appeal, set aside the motion judge's order and substitute in its stead an order staying Downey's Ontario action on the basis of the FSC in the Confidentiality Agreement.

[65]    Ecore is entitled to its costs of the appeal and the cross-appeal, in the agreed amount of $13,000, inclusive of all disbursements and taxes.

Released:

"JUL -6 2012"              "E.A. Cronk J.A."
"KF"                       "I agree K. Feldman J.A."
                           "I agree Janet Simmons J.A."

2012 ONCA 480 (CanLII)

# TAB 34

1902 CarswellOnt 124

Ontario Chambers

Duncombe Estate, Re

1902 CarswellOnt 124, 1 O.W.R. 153, 3 O.L.R. 510

# Re Duncombe

Lount, J.

Judgment: February 24, 1902

Counsel: *W. A. Wilson*, St. Thomas, for the executors.
*J. M. Clark, K.C.*, for Mary Duncombe.
*J. R. Cartwright, K.C.*, for the Attorney-General.
*A. M. Stewart*, for the official guardian.
*M. F. Muir*, Brantford, for Mrs. Chapin.

Subject: Estates and Trusts

**Related Abridgment Classifications**

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**

Life Insurance — Preferred Beneficiary — Will — Bequest of Half of Estate, Including Policies — Construction of — Trust.

Application by executors under rule 938 for construction of clause 5 of will of Thomas Wallace Duncombe, who died, without issue, of the 2nd October, 1901, leaving him surviving Mary Duncombe, his widow. Three policies of insurance upon the life of the testator are in question: one for $1,000, payable to his wife at his death; one for $5,000, for the benefit of his wife, the beneficiary, providing, however, that at his death an annuity of $250 per year for twenty years should be paid to his wife, the beneficiary; and one for $1,000, payable at his death to his legal heirs. Clause 5 of the will is as follows: — "I give and bequeath unto my dear wife, Mary Duncombe, my household furniture and one-half of my estate, including the policies of insurance made payable to her upon my death."

*Lount, J.*:

1      *Held*, that the moneys accruing under the third policy form part of the estate, but, as to the first two policies, a trust was created in favour of the wife, a preferred beneficiary, and the trust remained in her favour up to his death, and the moneys payable under these policies formed no part of his estate. Order declaring accordingly. Costs of all parties out of the estate.

End of Document                    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 35

**Novopharm Limited**   *Appellant*

*v.*

**Eli Lilly and Company and Eli Lilly Canada Inc.**   *Respondents*

and

**The Minister of National Health and Welfare**   *Respondent*

and between

**Apotex Inc.**   *Appellant*

*v.*

**Eli Lilly and Company and Eli Lilly Canada Inc.**   *Respondents*

and

**The Minister of National Health and Welfare**   *Respondent*

INDEXED AS: ELI LILLY & CO. *v.* NOVOPHARM LTD.

File Nos.: 25402, 25348.

1998: January 21; 1998: July 9.

Present: L'Heureux-Dubé, Gonthier, Cory, McLachlin, Iacobucci, Major and Bastarache JJ.

ON APPEAL FROM THE FEDERAL COURT OF APPEAL

*Patents — Infringement — Sublicensing — Licensee agreeing to supply patented medicine to unlicensed third party — Licence expressly prohibiting sublicensing — Breach of licence terms grounds for termination of licence — Whether supply agreement between licence holder and third party a sublicence or having legal effect of creating a sublicence.*

*Agency — Supply agreement — Licensed party to obtain patented bulk medicine for unlicensed party —*

**Novopharm Limited**   *Appelante*

*c.*

**Eli Lilly and Company et Eli Lilly Canada Inc.**   *Intimées*

et

**Le ministre de la Santé nationale et du Bien-être social**   *Intimé*

et entre

**Apotex Inc.**   *Appelante*

*c.*

**Eli Lilly and Company et Eli Lilly Canada Inc.**   *Intimées*

et

**Le ministre de la Santé nationale et du Bien-être social**   *Intimé*

RÉPERTORIÉ: ELI LILLY & CO. *c.* NOVOPHARM LTD.

Nᵒˢ du greffe: 25402, 25348.

1998: 21 janvier; 1998: 9 juillet.

Présents: Les juges L'Heureux-Dubé, Gonthier, Cory, McLachlin, Iacobucci, Major et Bastarache.

EN APPEL DE LA COUR D'APPEL FÉDÉRALE

*Brevets — Contrefaçon — Sous-licence — Titulaire d'une licence acceptant de fournir un médicament breveté à un tiers non titulaire d'une licence — Licence interdisant expressément d'accorder une sous-licence — Violation des conditions de la licence justifiant son annulation — L'accord d'approvisionnement intervenu entre le titulaire d'une licence et un tiers constitue-t-il une sous-licence ou a-t-il pour effet juridique de créer une sous-licence?*

*Mandat — Accord d'approvisionnement — Partie titulaire d'une licence devant obtenir un médicament breveté en vrac auprès d'une partie non titulaire d'une*

*Whether licensed party acting as agent of unlicensed party in carrying out contractual obligations.*

*Patents — Notice of allegation (NOA) — Proper date for assessing NOA.*

*Jurisdiction — Declaratory relief — Whether declaration should issue as to patent holder's failure to show notice of allegation unjustified or that it was entitled to terminate compulsory licence — Whether appropriate to declare that supply agreement not constituting sublicence or transfer of compulsory licence.*

*Patents — Medicine — Reformulation of patented product — Bulk medicine reformulated into final-dosage form — Whether reformulation of patented product amounting to infringement of patent.*

Eli Lilly and Co. ("Eli Lilly") owned the Canadian patents for nizatidine and for its manufacturing process. It alone held a notice of compliance (NOC) to produce and market certain final-dosage forms of the medicine. Novopharm held a compulsory licence, obtained under the *Patent Act* (the "Act") as it existed prior to February, 1993, which permitted it to use the patented process to make nizatidine for the preparation or production of medicine and to import and/or sell medicine made by the process. The licence stipulated that it was non-transferable, prohibited Novopharm from granting any sublicence, and provided Eli Lilly with the option to terminate the licence upon any breach of its terms.

In anticipation of the 1993 amendments to the Act, which radically altered the procedures for the issuance of NOCs and eliminated the compulsory licensing regime entirely, Novopharm and Apotex entered a "supply agreement" in November, 1992. The agreement provided that, where one party held a licence for a patented medicine for which the other did not, the licensed party would obtain, at the request and direction of the unlicensed party, specified quantities of that medicine, and supply it to the unlicensed party at cost plus a four per cent royalty. In April, 1993, Apotex commenced efforts to obtain a NOC for certain final-dosage forms of nizatidine, and issued a notice of allegation ("NOA") alleging that no claim for nizatidine or for its use would be infringed. In support of this allegation, Apotex relied upon the licence issued to Novopharm and the "mutual understanding" with Novopharm. On the same date, Apotex notified Novopharm of its intention to request

*licence — La partie titulaire d'une licence agit-elle à titre de mandataire de la partie non titulaire en remplissant des obligations contractuelles?*

*Brevets — Avis d'allégation (ADA) — Date pertinente pour évaluer l'ADA.*

*Compétence — Jugement déclaratoire — Un jugement déclaratoire devrait-il être rendu au sujet de l'omission du titulaire du brevet de démontrer que l'ADA n'était pas fondé ou qu'il avait le droit d'annuler la licence obligatoire? — Convient-il de déclarer que l'accord d'approvisionnement ne constitue ni une sous-licence ni une cession de licence obligatoire?*

*Brevets — Médicament — Préparation sous une autre forme d'un produit breveté — Médicament en vrac préparé sous forme posologique définitive — La préparation sous une autre forme du produit breveté constitue-t-elle une violation de brevet?*

Eli Lilly and Co. ("Eli Lilly") possédait les brevets canadiens relatifs à la nizatidine et à son procédé de fabrication. Elle seule détenait un avis de conformité (ADC) qui l'autorisait à produire et à mettre en marché le médicament sous certaines formes posologiques définitives. Novopharm détenait une licence obligatoire, délivrée en vertu de la *Loi sur les brevets* (la «Loi») en vigueur avant février 1993, qui l'autorisait à recourir au procédé breveté pour fabriquer de la nizatidine aux fins de la préparation ou de la production de médicaments, et d'importer et de vendre les médicaments obtenus grâce à ce procédé. La licence prévoyait qu'elle était incessible, interdisait à Novopharm d'accorder une sous-licence et conférait à Eli Lilly la faculté de l'annuler en cas de violation de ses conditions.

En prévision des modifications devant être apportées à la Loi en 1993, qui ont modifié radicalement la procédure de délivrance des ADC et aboli complètement le régime de licences obligatoires, Novopharm et Apotex ont conclu un «accord d'approvisionnement» en novembre 1992. Cet accord prévoyait que, lorsqu'une partie détenait, à l'égard d'un médicament breveté, une licence non détenue par l'autre partie, la partie titulaire de la licence se procurerait, à la demande et sur l'ordre de la partie non titulaire, certaines quantités de ce médicament et le fournirait à la partie non titulaire au prix coûtant auquel s'ajouterait une redevance de quatre pour cent. En avril 1993, Apotex s'est efforcée d'obtenir un ADC pour certaines formes posologiques définitives de nizatidine et a déposé un avis d'allégation («ADA») dans lequel elle prétendait qu'aucune revendication pour la nizatidine elle-même ou pour son utilisation ne serait contrefaite. À l'appui de cette allégation, Apotex invo-

Novopharm to supply it with nizatidine. However, Apotex also indicated that, because it did not yet have a NOC to permit it to market nizatidine in Canada, it could not provide Novopharm with any specifics as to its requirements, but that it would advise in due course as to the required quantity and the manufacturer from whom the nizatidine should be purchased.

Eli Lilly and Eli Lilly Canada Inc. ("Eli Lilly Canada") brought an application (*Eli Lilly and Co. v. Apotex Inc.*, S.C.C., No. 25348 (*Apotex #1*)), under s. 6(1) of the *Patented Medicines (Notice of Compliance) Regulations* (the "Regulations"), for an order prohibiting the Minister from issuing a NOC to Apotex at all or, alternatively, until after December 31, 1997, ten years after the issuance of the NOC to Eli Lilly Canada, which, under the amended *Patent Act*, would be the first date on which Apotex, without a NOC, would be entitled to import nizatidine for consumption in Canada. On July 15, 1993, Eli Lilly purported to exercise its option to terminate Novopharm's compulsory licence, alleging that Novopharm had breached the terms of the licence by granting a sublicence to Apotex. Novopharm denied this allegation, stating that the commercial agreement into which it had entered with Apotex did not constitute a sublicence or any transfer of rights under the licence. The Federal Court — Trial Division found that the supply agreement between Novopharm and Apotex did not constitute a sublicence but nonetheless granted the prohibition order on the grounds that, because the reformulation of nizatidine for consumption in Canada would infringe Eli Lilly's patent, the NOA was not justified. The Federal Court of Appeal dismissed Apotex's appeal, but on the grounds that the agreement did constitute a sublicence.

In July 1993, Novopharm issued a NOA in support of its own application for a NOC in relation to nizatidine and relied on its own compulsory licence as the basis for the non-infringement of the patents. Eli Lilly and Eli Lilly Canada brought an application before the Federal Court — Trial Division (*Eli Lilly and Co. v. Novopharm Ltd.*, S.C.C., No. 25402 (the *Novopharm* proceeding)), requesting a prohibition order to enjoin the Minister from issuing the requested NOC to Novopharm on the grounds that Novopharm's licence had been terminated and that Novopharm could not, therefore, obtain the bulk medicine in a non-infringing way. The application

quait la licence délivrée à Novopharm et l'«entente mutuelle» intervenue avec cette dernière. Le même jour, Apotex a signifié à Novopharm son intention de demander à cette dernière de lui fournir de la nizatidine. Cependant, Apotex a aussi indiqué que, parce qu'elle ne disposait toujours pas d'un ADC lui permettant de mettre en marché la nizatidine au Canada, elle ne pouvait pas donner à Novopharm les détails de ses exigences, mais qu'elle lui communiquerait en temps utile la quantité requise et l'identité du fabricant auquel la substance devrait être achetée.

Eli Lilly et Eli Lilly Canada Inc. ("Eli Lilly Canada") ont présenté, en application du par. 6(1) du *Règlement sur les médicaments brevetés (avis de conformité)* (le «Règlement»), une demande d'ordonnance (*Eli Lilly and Co. c. Apotex Inc.*, C.S.C., nᵒ 25348 (*Apotex nᵒ 1*)) interdisant au Ministre de délivrer un ADC à Apotex ou, subsidiairement, de le lui délivrer avant le 31 décembre 1997, soit dix ans après la délivrance de l'ADC à Eli Lilly Canada, qui, aux termes de la nouvelle *Loi sur les brevets*, représenterait la première date à laquelle Apotex aurait le droit, sans ADC, d'importer la nizatidine pour fins de consommation au Canada. Le 15 juillet 1993, Eli Lilly a voulu exercer sa faculté d'annuler la licence obligatoire de Novopharm pour le motif que Novopharm avait violé les conditions de la licence en accordant une sous-licence à Apotex. Novopharm a nié cette allégation, affirmant que l'accord commercial intervenu entre elle et Apotex ne constituait ni une sous-licence ni une cession de droits aux termes de la licence. La Cour fédérale, Section de première instance, a statué que l'accord d'approvisionnement entre Novopharm et Apotex n'était pas une sous-licence, mais a néanmoins accordé l'ordonnance d'interdiction en faisant valoir que, parce que la préparation de la nizatidine sous une autre forme pour fins de consommation au Canada violerait les brevets d'Eli Lilly, l'ADA n'était pas fondé. La Cour d'appel fédérale a rejeté l'appel d'Apotex, mais pour le motif que l'accord en question constituait une sous-licence.

En juillet 1993, Novopharm a déposé un ADA à l'appui de sa propre demande d'ADC relativement à la nizatidine, et a invoqué sa propre licence obligatoire pour dire qu'il n'y avait pas eu de violation des brevets en cause. Eli Lilly et Eli Lilly Canada ont présenté à la Cour fédérale, Section de première instance, une demande d'ordonnance d'interdiction (*Eli Lilly and Co. c. Novopharm Ltd.*, C.S.C., nᵒ 25402 (*Novopharm*)) visant à empêcher le Ministre de délivrer l'ADC demandé à Novopharm, pour le motif que la licence de cette dernière avait été annulée et que Novopharm ne pouvait donc pas obtenir le médicament en vrac d'une

was dismissed at trial but this decision was reversed by the Federal Court of Appeal.

The issue common to both appeals is whether the agreement between Apotex and Novopharm constituted a sublicence, such as to justify Eli Lilly's purported termination of Novopharm's compulsory licence. If it did, then the NOAs issued by both Novopharm and Apotex were not justified and the requested prohibition order should issue. Each appeal also raises other discrete issues. Specifically, in the *Novopharm* proceeding, this Court is asked to determine: (1) whether the Federal Court of Appeal erred in applying its decision in *Apotex #1* to the *Novopharm* appeal, whether as *res judicata* or otherwise; (2) whether Novopharm's NOA was not justified, regardless of whether its compulsory licence was terminated by breach, because the licence did not permit the activities which the NOA proposed; and (3) whether the Federal Court had the jurisdiction to grant declaratory relief on a limited judicial review proceeding of this type. In *Apotex #1*, it is further alleged that, apart from the primary issue of infringement, Apotex's proposed reformulation into final-dosage form would itself constitute an infringement of the patents held by Eli Lilly, and that the prohibition order should therefore have issued regardless of whether or not the supply agreement constituted a sublicence.

*Held*: The appeals should be allowed.

A sublicence amounts to a grant by a licensee of certain licensed rights to a third party, the sublicensee. By the grant of a licence, the patentee grants to the licensee the right to act in a certain way *vis à vis* the patented article, a right which, but for the licence, the licensee would not enjoy. Thus, for Novopharm to have granted a sublicence to Apotex, it must have granted, either expressly or impliedly, the right to do something which Apotex would otherwise be prohibited from doing, and which Novopharm was permitted to do only by virtue of its compulsory licence. This may have been accomplished either by virtue of some express provision or provisions of the agreement, or by virtue of its actual legal effect (even if this runs contrary to the subjective intentions of the parties).

The ultimate goal of contractual interpretation should be to ascertain the true intent of the parties at the time of entry into the contract. The contractual intent of the parties is to be determined by reference to the words they

manière n'emportant pas contrefaçon. La demande a été rejetée en première instance, mais cette décision a été infirmée par la Cour d'appel fédérale.

La question commune aux deux pourvois est de savoir si l'accord d'approvisionnement entre Apotex et Novopharm est une sous-licence, de manière à justifier l'annulation voulue par Eli Lilly de la licence obligatoire de Novopharm. Dans l'affirmative, les ADA déposés par Novopharm et Apotex n'étaient pas fondés et il y a lieu de rendre l'ordonnance d'interdiction demandée. Chaque pourvoi soulève également d'autres questions distinctes. Plus précisément, dans l'affaire *Novopharm*, notre Cour est appelée à décider (1) si la Cour d'appel fédérale a commis une erreur en appliquant à l'affaire *Novopharm* son arrêt *Apotex nº 1*, que ce soit à titre de chose jugée ou pour un autre motif, (2) si l'ADA de Novopharm était non fondé, peu importe que sa licence obligatoire ait ou non été annulée pour cause de violation, parce que la licence n'autorisait pas les activités proposées dans l'ADA, et (3) si la Cour fédérale avait compétence pour rendre un jugement déclaratoire dans le cadre d'une telle procédure de contrôle judiciaire limité. Dans *Apotex nº 1*, il est aussi allégué que, outre la question principale de la contrefaçon, la préparation sous forme posologique définitive proposée par Apotex constituerait elle-même une violation des brevets d'Eli Lilly et qu'il y a donc lieu de rendre une ordonnance d'interdiction peu importe que l'accord d'approvisionnement constitue ou non une sous-licence.

*Arrêt*: Les pourvois sont accueillis.

Une sous-licence représente l'attribution par le titulaire d'une licence de certains droits conférés par celle-ci à un tiers, le titulaire de la sous-licence. Par l'attribution d'une licence, le breveté accorde au titulaire de cette licence le droit d'agir d'une certaine façon relativement à l'article breveté, droit dont le titulaire de la licence ne jouirait pas sans celle-ci. Ainsi, pour que Novopharm ait accordé une sous-licence à Apotex, elle doit avoir, expressément ou implicitement, accordé à Apotex le droit de faire quelque chose qu'il lui aurait par ailleurs été interdit de faire et que Novopharm n'aurait été autorisée à faire qu'en vertu de sa licence obligatoire. Cela peut avoir été accompli soit en vertu d'une seule ou de plusieurs dispositions explicites de l'accord, soit en vertu de son effet juridique réel (même s'il est contraire aux intentions subjectives des parties).

L'interprétation du contrat devrait viser en définitive à vérifier l'intention véritable des parties au moment de conclure le contrat. L'intention des parties contractantes doit être déterminée en fonction des mots qu'elles ont

used in drafting the document, possibly read in light of the surrounding circumstances which were prevalent at the time. Evidence of one party's subjective intention has no independent place in this determination. It is unnecessary to consider any extrinsic evidence at all when the document is clear and unambiguous on its face. Here, there was no ambiguity to the contract entered into between Apotex and Novopharm and further interpretive aids were therefore unnecessary. The evidence as to the subjective intentions of the principals at the time of drafting was thus inadmissible by virtue of the parol evidence rule especially since it did not go to the circumstances surrounding the making of the contract.

Nothing in the wording of the document suggested that the parties intended to grant sublicences to each other. Rather, every indication was that they intended to establish a commercial arrangement whereby the unlicensed party would enjoy the right to require the licensed party to use its various licences for the benefit of the unlicensed party by acquiring, potentially at the direction of the unlicensed party, and subsequently reselling to the unlicensed party, various patented medicines. While no express words of grant are required to create a sublicence, clearly the supply agreement, to have this character, must have transferred to Apotex more than simply the right to compel Novopharm to use its licence in a given way. But there was no indication that Apotex acquired any other independent rights under the compulsory licence. In fact, such an interpretation would be inconsistent with the combined effect of certain express provisions of the agreement.

To prove the existence of a sublicence, it must be established that the agreement was, in substance if not form, more than merely an elaborate arrangement under which future contracts for purchase and sale might be completed. The sale of a licensed article, while it does transfer to the purchaser the rights of use and alienation, does not have the automatic effect of constituting the purchaser a sublicensee; thus, the fact that a third party enjoys these rights cannot alone be indicative of the existence of a sublicence. Any number of ways exist in which a licensee can sell a licensed article to a third party with the complete range of ordinary incidents of ownership, without constituting that party a sublicensee. The rights of use and alienation can only be determinative of the existence of a sublicence where there has been no sale of the licensed article to the third party. In such a case, a right of use could only be derived from a sublicence of some type. Where the rights of the unli-

employés en rédigeant le document, éventuellement interprétés à la lumière des circonstances du moment. La preuve de l'intention subjective d'une partie n'occupe aucune place indépendante dans cette décision. Il n'est pas nécessaire de prendre en considération quelque preuve extrinsèque que ce soit lorsque le document est, à première vue, clair et sans ambiguïté. En l'espèce, le contrat intervenu entre Apotex et Novopharm ne comportait aucune ambiguïté et aucun autre outil d'interprétation n'était donc nécessaire. La preuve relative aux intentions subjectives des mandants au moment de la rédaction était donc irrecevable en vertu de la règle d'exclusion de la preuve extrinsèque, étant donné, particulièrement, qu'elle ne touchait pas les circonstances de la signature du contrat.

Rien dans le texte du document ne laissait supposer que les parties voulaient s'accorder mutuellement des sous-licences. Tout indiquait au contraire qu'elles voulaient créer une entente commerciale en vertu de laquelle la partie non titulaire d'une licence aurait le droit de demander à la partie titulaire d'utiliser ses diverses licences à son profit pour acquérir, peut-être sur son ordre, divers médicaments brevetés, pour ensuite les lui revendre. Bien qu'il ne soit pas nécessaire de prévoir expressément la création d'une sous-licence, il est évident que, pour constituer une sous-licence, l'accord d'approvisionnement doit avoir cédé à Apotex davantage que le simple droit d'obliger Novopharm à utiliser sa licence d'une certaine manière. Cependant, rien n'indiquait qu'Apotex acquérait d'autres droits indépendants conférés par la licence obligatoire. En réalité, pareille interprétation serait incompatible avec l'effet conjugué de certaines dispositions explicites de l'accord.

Pour prouver l'existence d'une sous-licence, il faut établir que l'accord était, sur le plan du fond sinon de la forme, plus qu'une entente détaillée aux termes de laquelle de futurs contrats de vente pourraient être signés. Bien qu'elle transfère à l'acquéreur les droits d'utilisation et d'aliénation, la vente d'un article autorisé n'a pas automatiquement pour effet de faire de l'acheteur un titulaire de sous-licence; par conséquent, le fait qu'un tiers jouisse de ces droits ne saurait indiquer en soi l'existence d'une sous-licence. Il existe un certain nombre de manières dont le titulaire d'une licence peut vendre un article autorisé à un tiers avec l'éventail complet des attributs ordinaires de la propriété, sans pour autant faire de ce dernier un titulaire de sous-licence. Les droits d'utilisation et d'aliénation ne peuvent être déterminants quant à l'existence d'une sous-licence que lorsqu'il n'y a eu aucune vente au tiers de l'article autorisé. En pareil cas, un droit d'utilisation ne pourrait

ELI LILLY & CO. *v.* NOVOPHARM LTD.

censed party are derived from a sale of licensed material, it would be misleading to rely on the rights of use and alienation as a basis for the conclusion that a sublicence has been or is to be granted. This situation was plainly contemplated by the supply agreement here, under which the only way Apotex could acquire bulk nizatidine was by purchasing it from Novopharm, not directly from Novopharm's supplier.

Further, because legitimate transfers were to take place between separate entities, dealing at arm's length, the contemplated transactions could not be characterized, *ex ante*, as shams. While it was theoretically possible that the agreement could be implemented in an infringing way, it had not yet been implemented at all and thus any suggestion of infringement was speculative. The agreement did not, on its face or in its actual legal effect, amount to a sublicence.

The degree of control likely to be exercised by Apotex over the acquisition of nizatidine would not result in a situation where Novopharm in reality would be acting as Apotex's agent. Nor would Novopharm, because of its allegedly standing in the shoes of Apotex, become an unlicensed entity. Under the supply agreement, any contractual relations that might be established for the purchase of nizatidine would be between Novopharm and the third-party supplier. Apotex would not be a party to the contract; Novopharm would not be entering into the contract "on behalf of" Apotex in any sense. The notion of an agent's entering into contractual relations with the third party is inimical to the entire concept of agency, which contemplates the agent's binding the principal, not itself, to contractual relations and obligations.

Given that the agreement was properly characterized as a supply agreement and given that the agreement had not been implemented at the material time, it was not necessary to decide if the Federal Court of Appeal erred in applying its decision in *Apotex #1* to its decision in *Novopharm*.

Since the appropriate date for assessment of a NOA, where a prohibition order is sought by a patentee, is the date of hearing and not the date on which the NOA was issued (see *Merck Frosst Canada Inc. v. Canada (Minister of National Health and Welfare*, S.C.C., No. 25419 (*Apotex #2*)), Novopharm's NOA was not premature and therefore unjustified. Pursuant to s. 39.14 of the *Patent Act*, it was entitled to manufacture the medicine

découler que d'une sous-licence quelconque. Quand les droits de la partie non titulaire d'une licence découlent de la vente d'une substance autorisée, il serait trompeur de se fonder sur les droits d'utilisation et d'aliénation pour conclure qu'une sous-licence a été ou va être accordée. En l'espèce, cette situation était nettement envisagée par l'accord d'approvisionnement aux termes duquel la seule façon dont Apotex pouvait acquérir de la nizatidine en vrac était auprès de Novopharm et non pas directement auprès du fournisseur de Novopharm.

En outre, parce que des cessions légitimes devaient avoir lieu entre des entités distinctes qui n'avaient entre elles aucun lien de dépendance, les opérations envisagées ne pouvaient pas être qualifiées *ex ante* de subterfuges. S'il était théoriquement possible que l'accord soit exécuté d'une manière emportant contrefaçon, il n'avait toujours pas été exécuté et toute proposition selon laquelle il y avait contrefaçon était conjecturale. Cet accord ne constituait une sous-licence ni à première vue ni en vertu de son effet juridique réel.

Le contrôle qu'Apotex exercerait vraisemblablement sur l'acquisition de nizatidine ne ferait pas en sorte que Novopharm se trouverait, en réalité, à agir en qualité de mandataire d'Apotex. Novopharm ne deviendrait pas non plus une entité non titulaire d'une licence parce qu'elle semblerait avoir pris la place d'Apotex. Aux termes de l'accord d'approvisionnement tout rapport contractuel qui pourrait être établi pour l'achat de nizatidine serait entre Novopharm et le tiers fournisseur. Apotex ne serait pas partie au contrat; Novopharm ne conclurait pas le contrat «pour le compte» d'Apotex de quelque manière que ce soit. L'idée qu'un mandataire établisse un rapport contractuel avec le tiers va à l'encontre du concept même de mandat, qui suppose que le mandataire lie le mandant et ne se lie pas lui-même par des rapports et des obligations contractuels.

Étant donné que l'accord a été qualifié à juste titre d'accord d'approvisionnement et qu'il n'avait pas été exécuté à l'époque pertinente, il n'était pas nécessaire de décider si la Cour d'appel fédérale a commis une erreur en appliquant son arrêt *Apotex nº 1* à l'affaire *Novopharm*.

Puisque la date appropriée pour évaluer un ADA, lorsqu'une ordonnance d'interdiction est demandée par le breveté, est celle de l'audition et non celle du dépôt de l'ADA (voir *Merck Frosst Canada Inc. c. Canada (Ministre de la Santé nationale et du Bien-être social)*, C.S.C., nº 25419 (*Apotex nº 2*)), l'ADA de Novopharm n'était pas prématuré et n'était donc pas non fondé. Selon l'art. 39.14 de la *Loi sur les brevets*, Novopharm

itself or through Canadian agents seven years after the date of the issue of the first NOC to Eli Lilly Canada. As this seven-year period had expired before the date the application was heard, Novopharm was entitled, as of the date of hearing, to manufacture or have made the drug for its own use, for sale for consumption in Canada. The NOA did not specify that the nizatidine was to be imported and not produced in Canada, and so, at the date of hearing, there existed at least one non-infringing way for Apotex to obtain the necessary medicine.

In light of its other findings, it was not necessary for the Court to grant declaratory relief to the effect that Eli Lilly failed to show either that the NOA was not justified, or that it was entitled to terminate the compulsory licence. Moreover, in light of the limited nature of these judicial review proceedings, it would be inappropriate for this Court to declare conclusively, and for purposes other than those of these appeals, that the supply agreement did not constitute a sublicence or a transfer of the compulsory licence from Novopharm to Apotex. Accordingly, the requested declaratory relief was denied.

Absent express conditions to the contrary, a purchaser of a licensed article is entitled to deal with the article as he or she sees fit, so long as such dealings do not infringe the rights conferred by the patent. The reformulation of nizatidine into final-dosage form would not have the effect of creating a new article, such as to infringe Eli Lilly's patent. Rather, reformulation is more akin to repackaging the substance into a commercially usable form, which is not a violation of any rights under the patents. The right of use and sale which Apotex would acquire inherently, through its acquisition of nizatidine from Novopharm, encompasses the right to use and sell things produced with this nizatidine, including capsules in final-dosage form. This is, in reality, the only practical use of bulk medicine in the hands of a purchaser, which may explain why reformulation was implicitly contemplated by the compulsory licence held by Novopharm. Apotex therefore would not infringe the patents held by Eli Lilly simply by selling the medicine in the form contemplated by the NOA. This is particularly so when the exclusive rights enjoyed by the patentee under the patent are limited, in essence, to the formulation of bulk medicine according to the patented process. Nothing in the reformulation process can be seen as infringing upon this right. Thus, in the absence of some express prohibition in the compulsory licence, the right to reformulate should be seen as inherent to the

aurait le droit de fabriquer le médicament elle-même ou par l'intermédiaire de mandataires canadiens sept ans après la date de délivrance du premier ADC à Eli Lilly Canada. Vu que ce délai de sept ans avait expiré avant la date d'audition de la demande, Novopharm avait, à la date de l'audition, le droit de fabriquer ou de faire fabriquer le médicament pour son propre usage, dans le but de le vendre à des fins de consommation au Canada. L'ADA ne précisait pas que la nizatidine devait être importée et non produite au Canada et ainsi, à la date de l'audition, Apotex disposait d'au moins un moyen n'emportant pas contrefaçon d'obtenir le médicament requis.

Compte tenu de ses autres conclusions, il n'était pas nécessaire à la Cour d'accorder un jugement déclarant qu'Eli Lilly n'avait pas démontré que l'ADA n'était pas fondé ou qu'elle avait le droit d'annuler la licence obligatoire. En outre, en raison de la nature limitée des présentes procédures de contrôle judiciaire, il ne conviendrait pas que notre Cour déclare péremptoirement, et à des fins autres que celles des présents pourvois, que l'accord d'approvisionnement ne constituait ni une sous-licence ni une cession de la licence obligatoire de Novopharm à Apotex. En conséquence, le jugement déclaratoire demandé a été refusé.

En l'absence de conditions contraires expresses, l'acheteur d'un article autorisé a le droit d'en disposer à son gré pourvu que, ce faisant, il ne viole pas les droits conférés par le brevet. La préparation de la nizatidine sous forme posologique définitive n'aurait pas pour effet de créer un nouvel article de manière à violer le brevet d'Eli Lilly. La préparation sous une autre forme s'apparente plutôt davantage à un nouveau conditionnement de la substance sous une forme commercialement utilisable, ce qui ne viole aucun droit conféré par les brevets. Le droit d'utilisation et de vente qui est inhérent à l'acquisition par Apotex de la nizatidine de Novopharm englobe le droit d'utiliser et de vendre les choses produites au moyen de cette nizatidine, y compris les gélules sous forme posologique définitive. Cela représente, en réalité, le seul usage pratique qu'un acheteur peut faire du médicament en vrac, ce qui peut expliquer pourquoi la préparation sous une autre forme était implicitement envisagée par la licence obligatoire de Novopharm. Apotex ne violerait donc pas les brevets d'Eli Lilly simplement en vendant le médicament sous la forme envisagée par l'ADA. Cela est particulièrement vrai lorsque les droits exclusifs conférés au breveté par le brevet sont limités essentiellement à la préparation du médicament en vrac suivant le procédé breveté. Le procédé de préparation sous une autre forme ne peut aucunement être considéré comme violant ce droit. Ainsi, en

purchaser's right to deal with licensed material as he or she sees fit. Eli Lilly accordingly failed in its various efforts to establish that Apotex's NOA was not justified and that a prohibition order should thus be issued.

l'absence de quelque interdiction expresse dans la licence obligatoire, le droit de préparation sous une autre forme devrait être considéré comme inhérent au droit de l'acheteur de disposer à son gré de la substance autorisée. En conséquence, malgré ses divers efforts en ce sens, Eli Lilly n'a pas réussi à établir que l'ADA d'Apotex n'était pas fondé et qu'il y avait donc lieu de rendre une ordonnance d'interdiction.

**Cases Cited**

**Jurisprudence**

**Distinguished:** *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 227 USPQ 233 (1985); **referred to:** *Apotex Inc. v. Merck Frosst Canada Inc.*, [1998] 2 S.C.R. 193; *Glaxo Wellcome Inc. v. Canada (Minister of National Health and Welfare)* (1997), 75 C.P.R. (3d) 129; *David Bull Laboratories (Canada) Inc. v. Pharmacia Inc.*, [1995] 1 F.C. 588; *Consolidated-Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance Co.*, [1980] 1 S.C.R. 888; *Merck & Co. v. Apotex Inc.* (1994), 59 C.P.R. (3d) 133, rev'd in part [1995] 2 F.C. 723; *Carey v. United States*, 326 F.2d 975 (1964); *Howard and Bullough, Ld. v. Tweedales and Smalley* (1895), 12 R.P.C. 519; *Lampson v. City of Quebec* (1920), 54 D.L.R. 344; *Joy Oil Co. v. The King*, [1951] S.C.R. 624; *Indian Molybdenum Ltd. v. The King*, [1951] 3 D.L.R. 497; *Badische Anilin und Soda Fabrik v. Isler*, [1906] 1 Ch. 605; *Gillette v. Rea* (1909), 1 O.W.N. 448; *Betts v. Willmott* (1871), L.R. 6 Ch. App. 245; *Intel Corp. v. ULSI System Technology Inc.*, 995 F.2d 1566 (1993); *Cyrix Corp. v. Intel Corp.*, 77 F.3d 1381 (1996); *Merck Frosst Canada Inc. v. Canada (Minister of National Health and Welfare)* (1994), 55 C.P.R. (3d) 302; *National Phonograph Co. of Australia, Ltd. v. Menck*, [1911] A.C. 336; *Libbey-Owens-Ford Glass Co. v. Ford Motor Co. of Canada, Ltd.*, [1970] S.C.R. 833, aff'g [1969] 1 Ex. C.R. 529; *Rucker Co. v. Gavel's Vulcanizing Co.* (1985), 7 C.P.R. (3d) 294.

**Distinction d'avec l'arrêt:** *E.I. du Pont de Nemours & Co. c. Shell Oil Co.*, 227 USPQ 233 (1985); **arrêts mentionnés:** *Apotex Inc. c. Merck Frosst Canada Inc.*, [1998] 2 R.C.S. 193; *Glaxo Wellcome Inc. c. Canada (Ministre de la Santé nationale et du Bien-être social)* (1997), 75 C.P.R. (3d) 129; *David Bull Laboratories (Canada) Inc. c. Pharmacia Inc.*, [1995] 1 C.F. 588; *Exportations Consolidated Bathurst Ltée c. Mutual Boiler and Machinery Insurance Co.*, [1980] 1 R.C.S. 888; *Merck & Co. c. Apotex Inc.* (1994), 59 C.P.R. (3d) 133, inf. en partie par [1995] 2 C.F. 723; *Carey c. United States*, 326 F.2d 975 (1964); *Howard and Bullough, Ld. c. Tweedales and Smalley* (1895), 12 R.P.C. 519; *Lampson c. City of Quebec* (1920), 54 D.L.R. 344; *Joy Oil Co. c. The King*, [1951] R.C.S. 624; *Indian Molybdenum Ltd. c. The King*, [1951] 3 D.L.R. 497; *Badische Anilin und Soda Fabrik c. Isler*, [1906] 1 Ch. 605; *Gillette c. Rea* (1909), 1 O.W.N. 448; *Betts c. Willmott* (1871), L.R. 6 Ch. App. 245; *Intel Corp. c. ULSI System Technology Inc.*, 995 F.2d 1566 (1993); *Cyrix Corp. c. Intel Corp.*, 77 F.3d 1381 (1996); *Merck Frosst Canada Inc. c. Canada (Ministre de la Santé nationale et du Bien-être social)* (1994), 55 C.P.R. (3d) 302; *National Phonograph Co. of Australia, Ltd. c. Menck*, [1911] A.C. 336; *Libbey-Owens-Ford Glass Co. c. Ford Motor Co. of Canada, Ltd.*, [1970] R.C.S. 833, conf. [1969] 1 R.C. de l'É. 529; *Rucker Co. c. Gavel's Vulcanizing Co.* (1985), 7 C.P.R. (3d) 294.

**Statutes and Regulations Cited**

**Lois et règlements cités**

*Food and Drug Regulations*, C.R.C., c. 870, s. C.08.004.
*Patent Act*, R.S.C., 1985, c. P-4, s. 39(4), 39.11 [ad. c. 33 (3rd Supp.), s. 15], 39.14 [*idem*].
*Patent Act Amendment Act, 1992*, S.C. 1993, c. 2, s. 11(1).
*Patented Medicines (Notice of Compliance) Regulations*, SOR/93-133, ss. 4(1), 5, 6, 7.

*Loi de 1992 modifiant la Loi sur les brevets*, L.C. 1993, ch. 2, art. 11(1).
*Loi sur les brevets*, L.R.C. (1985), ch. P-4, art. 39(4), 39.11 [aj. ch. 33 (3e suppl.), art. 15], 39.14 [*idem*].
*Règlement sur les aliments et drogues*, C.R.C., ch. 870, art. C.08.004.
*Règlement sur les médicaments brevetés (avis de conformité)*, DORS/93-133, art. 4(1), 5, 6, 7.

**Authors Cited**

Fox, Harold G. *The Canadian Law and Practice Relating to Letters Patent for Inventions*, 4th ed. Toronto: Carswell, 1969.

Fridman, G. H. L. *The Law of Contract in Canada*, 3rd ed. Scarborough, Ont.: Carswell, 1994.

Melville, Leslie W. *Forms and Agreements on Intellectual Property and International Licensing*, vol. 1, 3rd ed. rev. New York: West Group, 1997 (loose-leaf updated August 1997, release 29).

APPEAL (*Eli Lilly and Co. v. Novopharm Ltd.*, S.C.C., No. 25402) from a judgment of the Federal Court of Appeal (1996), 67 C.P.R. (3d) 377, 197 N.R. 291, [1996] F.C.J. No. 576 (QL), allowing an appeal from a judgment of McGillis J. (1995), 60 C.P.R. (3d) 181, 91 F.T.R. 161, [1995] F.C.J. No. 238 (QL), granting an application for judicial review and prohibiting the Minister from issuing a notice of compliance. Appeal allowed.

APPEAL (*Eli Lilly and Co. v. Apotex Inc.*, S.C.C., No. 25348) from a judgment of the Federal Court of Appeal (1996), 66 C.P.R. (3d) 329, 195 N.R. 378, [1996] F.C.J. No. 425 (QL), dismissing an appeal from a judgment of McGillis J. (1995), 60 C.P.R. (3d) 206, 91 F.T.R. 181, [1995] F.C.J. No. 237 (QL), dismissing an application for judicial review. Appeal allowed.

*Harry B. Radomski*, *Richard Naiberg* and *David Scrimger*, for the appellant Apotex Inc.

*Donald N. Plumley*, *Q.C.*, *Mark Mitchell* and *Stephanie Chong*, for the appellant Novopharm Limited.

*Anthony G. Creber* and *David Watson*, *Q.C.*, for the respondents Eli Lilly and Company and Eli Lilly Canada Inc.

The judgment of the Court was delivered by

IACOBUCCI J. — A single agreement entered into by Novopharm Limited ("Novopharm") and Apotex Inc. ("Apotex"), competitors in the pharmaceutical industry, has given rise to litigation

**Doctrine citée**

Fox, Harold G. *The Canadian Law and Practice Relating to Letters Patent for Inventions*, 4th ed. Toronto: Carswell, 1969.

Fridman, G. H. L. *The Law of Contract in Canada*, 3rd ed. Scarborough, Ont.: Carswell, 1994.

Melville, Leslie W. *Forms and Agreements on Intellectual Property and International Licensing*, vol. 1, 3rd ed. rev. New York: West Group, 1997 (loose-leaf updated August 1997, release 29).

POURVOI (*Eli Lilly and Co. c. Novopharm Ltd.*, C.S.C., n° 25402) contre un arrêt de la Cour d'appel fédérale (1996), 67 C.P.R. (3d) 377, 197 N.R. 291, [1996] A.C.F. n° 576 (QL), qui a accueilli l'appel d'un jugement du juge McGillis (1995), 60 C.P.R. (3d) 181, 91 F.T.R. 161, [1995] A.C.F. n° 238 (QL), qui avait fait droit à une demande de contrôle judiciaire et interdit au Ministre de délivrer un avis de conformité. Pourvoi accueilli.

POURVOI (*Eli Lilly and Co. c. Apotex Inc.*, C.S.C., n° 25348) contre un arrêt de la Cour d'appel fédérale (1996), 66 C.P.R. (3d) 329, 195 N.R. 378, [1996] A.C.F. n° 425 (QL), qui a rejeté l'appel d'un jugement du juge McGillis (1995), 60 C.P.R. (3d) 206, 91 F.T.R. 181, [1995] A.C.F. n° 237 (QL), qui avait rejeté une demande de contrôle judiciaire. Pourvoi accueilli.

*Harry B. Radomski*, *Richard Naiberg* et *David Scrimger*, pour l'appelante Apotex Inc.

*Donald N. Plumley*, *c.r.*, *Mark Mitchell* et *Stephanie Chong*, pour l'appelante Novopharm Limited.

*Anthony G. Creber* et *David Watson*, *c.r.*, pour les intimées Eli Lilly and Company et Eli Lilly Canada Inc.

Version française du jugement de la Cour rendu par

LE JUGE IACOBUCCI — Un seul et même accord intervenu entre Novopharm Limited («Novopharm») et Apotex Inc. («Apotex»), des concurrents dans l'industrie pharmaceutique, est à l'ori-  [1]

resulting in no fewer than three appeals to this Court. In addition to the two instant cases, which I shall refer to as "*Novopharm*" and "*Apotex #1*", reasons in *Apotex Inc. v. Merck Frosst Canada Inc.*, [1998] 2 S.C.R. 193 ("*Apotex #2*"), are also being released today. The issue common to all three is whether the agreement in question constitutes a simple supply agreement, as alleged by the two parties to the agreement, or, as alleged by the various respondents, a sublicence to exercise the rights acquired by Novopharm pursuant to compulsory licences obtained prior to recent changes to the legislative regime which governs patented medicines. This determination is key to the resolution of the issues in these appeals because, as shall be discussed, the grant of a sublicence by Novopharm could justify the termination by the patentee of the compulsory licence in question and render the supply agreement useless.

2   Owing to the intertwining nature of the lower court decisions in *Novopharm* and *Apotex #1*, I shall deal with these two appeals in one set of reasons. In addition to the common issue of interpretation, each case raises a number of other issues, which I shall endeavour to deal with appropriately as they arise.

I.  Background

A.  *The Patents and the Compulsory Licence*

3   Prior to February, 1993, there existed in Canada a compulsory licensing regime with respect to patents for pharmaceuticals. Under s. 39(4) of the *Patent Act*, R.S.C., 1985, c. P-4, as it then existed, in respect of any patent intended or capable of being used for medicine or for the preparation or production of medicine, any person could make an application for a licence:

gine d'une litige ayant entraîné pas moins de trois pourvois devant notre Cour. Outre les deux présents pourvois, que je vais appeler «*Novopharm*» et «*Apotex n° 1*», des motifs sont également déposés aujourd'hui dans l'affaire *Apotex Inc. c. Merck Frosst Canada Inc.*, [1998] 2 R.C.S. 193 («*Apotex n° 2*»). La question litigieuse commune aux trois pourvois est de savoir si l'accord en cause est un simple accord d'approvisionnement, comme le prétendent les deux parties qui l'ont signé, ou s'il s'agit, comme l'allèguent les divers intimés, d'une sous-licence permettant d'exercer les droits que Novopharm a acquis en vertu de licences obligatoires obtenues avant les récentes modifications apportées au régime législatif applicable aux médicaments brevetés. La décision à ce sujet est la clef de la solution des questions en litige dans ces pourvois parce que, comme nous le verrons, l'attribution d'une sous-licence par Novopharm pourrait justifier l'annulation, par le breveté, de la licence obligatoire en cause et rendre inutile l'accord d'approvisionnement.

Comme les décisions des tribunaux d'instance inférieure dans les affaires *Novopharm* et *Apotex n° 1* se recoupent, je vais statuer sur ces deux pourvois dans les mêmes motifs. Outre la question commune d'interprétation, chacun de ces pourvois soulève un certain nombre d'autres questions que je vais m'efforcer de régler de manière appropriée au fur et à mesure qu'elles se présenteront.

I.  Contexte

A.  *Les brevets et la licence obligatoire*

Avant février 1993, il y avait, au Canada, un régime de licences obligatoires applicable aux brevets portant sur des médicaments. Aux termes du par. 39(4) de la *Loi sur les brevets*, L.R.C. (1985), ch. P-4, en vigueur à l'époque, une personne pouvait présenter une demande de licence à l'égard d'un brevet portant sur une invention destinée à des médicaments ou à la préparation ou à la production de médicaments, ou susceptible d'être utilisée à de telles fins:

**39.** . . .

(4) . . .

(*a*) where the invention is a process, to use the invention for the preparation or production of medicine, import any medicine in the preparation or production of which the invention has been used or sell any medicine in the preparation or production of which the invention has been used, or

(*b*) where the invention is other than a process, to import, make, use or sell the invention for medicine or for the preparation or production of medicine. . . .

According to the terms of s. 39(4), the Commissioner of Patents was obliged to grant to the applicant a licence to do the things specified in the application unless there existed a good reason not to grant such licence.

These appeals relate to two Canadian patents owned by Eli Lilly and Company ("Eli Lilly") in respect of the medication nizatidine: one in respect of the medicine itself and one in respect of the process by which the medicine is made. On December 31, 1987, the Department of National Health and Welfare granted a notice of compliance ("NOC") to Eli Lilly Canada Inc. ("Eli Lilly Canada"), pursuant to s. C.08.004 of the *Food and Drug Regulations*, C.R.C., c. 870, thereby permitting Eli Lilly Canada to market 150 mg and 300 mg final-dosage form capsules of nizatidine for consumption in Canada. To date, no other company has been issued a NOC in respect of nizatidine.

On January 17, 1990, Novopharm applied under s. 39(4) of the *Patent Act* for a compulsory licence under the patents owned by Eli Lilly. The application was vigorously contested by Eli Lilly, but, it was found that none of the objections constituted a valid reason to refuse the application and the Commissioner of Patents accordingly granted the licence, as he was obliged to do under the Act as it then existed. The licence, which, unless validly terminated by Eli Lilly (a very contentious issue in the instant appeals), is still in force, permits Novopharm to use the patented process to make nizatidine for the preparation or production of

**39.** . . .

(4) . . .

*a*) lorsque l'invention consiste en un procédé, utiliser l'invention pour la préparation ou la production de médicaments, importer tout médicament dans la préparation ou la production duquel l'invention a été utilisée ou vendre tout médicament dans la préparation ou la production duquel l'invention a été utilisée;

*b*) lorsque l'invention consiste en autre chose qu'un procédé, importer, fabriquer, utiliser ou vendre l'invention pour des médicaments ou pour la préparation ou la production de médicaments . . .

Selon le par. 39(4), le commissaire aux brevets était tenu d'accorder au requérant ou demandeur une licence pour faire les choses spécifiées dans la demande, sauf s'il avait de bonnes raisons de ne pas accorder une telle licence.

Les présents pourvois concernent les deux brevets canadiens relatifs au médicament nizatidine, que possède Eli Lilly and Company («Eli Lilly»): l'un pour le médicament lui-même, l'autre pour le procédé de fabrication du médicament. Le 31 décembre 1987, le ministère de la Santé nationale et du Bien-être social a délivré un avis de conformité («ADC») à Eli Lilly Canada Inc. («Eli Lilly Canada»), conformément à l'art. C.08.004 du *Règlement sur les aliments et drogues*, C.R.C., ch. 870, autorisant ainsi Eli Lilly Canada à mettre en marché pour fins de consommation au Canada des gélules de nizatidine sous forme posologique définitive de 150 mg et de 300 mg. Jusqu'à maintenant, aucune autre société n'a obtenu un ADC à l'égard de la nizatidine.

Le 17 janvier 1990, Novopharm a présenté, conformément au par. 39(4) de la *Loi sur les brevets*, une demande de licence obligatoire en vertu des brevets d'Eli Lilly. La demande a été vigoureusement contestée par Eli Lilly, mais il a été jugé qu'aucune des objections soulevées ne représentait une raison valable de rejeter la demande et le commissaire aux brevets a donc accordé la licence, comme la Loi l'obligeait à le faire à l'époque. La licence, qui est toujours en vigueur, à moins d'être annulée validement par Eli Lilly (point fort controversé dans les présents pourvois), permet à Novopharm de recourir au procédé breveté pour fabri-

medicine, and to import and/or sell medicine made by the process. It also permits Novopharm to make, use, sell and import either or both of the invention for medicine and the invention for the preparation or the production of medicine. The royalty rate to be paid by Novopharm to Eli Lilly Canada on sales of the medicine in final-dosage form is fixed at six percent of the selling price. The Commissioner of Patents, in a decision dated October 21, 1991, found that the licence is not restricted to the forms of medicine listed by Novopharm in its application, as such "would place unnecessary limits on [Novopharm's] operations under the licence".

6    Certain other specific terms and conditions of the licence are also relevant. Paragraph 1 contains terms and conditions pertaining to the calculation of royalties for the sale of nizatidine to arm's length purchasers and contemplates the sale of the medication by Novopharm in both final-dosage and bulk forms, stipulating royalty rates for each. Novopharm is also required, under paragraphs 3 and 4, to obtain quarterly statements showing the descriptions, quantities, net selling prices and royalty computations resulting from the operations of arm's length purchasers of the medicine, non-arm's length purchasers of the medicine in final-dosage form, and any subsequent non-arm's length purchasers from the latter.

7    Paragraph 9 of the licence, which is of paramount importance to this appeal, provides Eli Lilly with the option to terminate the licence upon any breach of its terms by Novopharm by giving notice in writing. In the event that Novopharm fails to rectify the breach within 30 days, the licence is terminated automatically. However, under paragraph 10, if Novopharm disputes the breach by written notice to Eli Lilly, the licence is not terminated pending adjudication by the courts or arbitration as agreed upon by the parties. Finally, paragraph 12 stipulates that the licence is non-transferable, and

quer de la nizatidine aux fins de la préparation ou de la production de médicaments, et d'importer et de vendre les médicaments obtenus grâce à ce procédé. Elle autorise également Novopharm à fabriquer, utiliser, vendre et importer l'invention pour des médicaments de même que l'invention pour la préparation ou la production de médicaments. La redevance due par Novopharm à Eli Lilly Canada pour la vente du médicament sous forme posologique définitive est fixée à six pour cent du prix de vente. Dans une décision en date du 21 octobre 1991, le commissaire aux brevets a conclu que la licence ne se limite pas aux formes de médicament énumérées par Novopharm dans sa demande, étant donné que [TRADUCTION] «cela restreindrait indûment les activités [de Novopharm] en vertu de la licence».

Certaines autres modalités particulières de la licence sont aussi pertinentes. L'article 1 énonce les modalités de calcul de la redevance pour les ventes de nizatidine à des acquéreurs sans lien de dépendance et prévoit la vente par Novopharm du médicament sous forme posologique définitive et en vrac, fixant le taux de la redevance pour l'une et l'autre forme. Aux termes des articles 3 et 4, Novopharm est aussi obligée de se procurer des états trimestriels qui donnent la description, la quantité, le prix de vente net et les montants de redevance découlant des activités des acquéreurs, sans lien de dépendance, du médicament, des acquéreurs, avec lien de dépendance, du médicament sous forme posologique définitive et de tout acquéreur subséquent ayant un lien de dépendance avec ces derniers.

L'article 9 de la licence, qui revêt une importance primordiale en l'espèce, confère à Eli Lilly la faculté d'annuler la licence par préavis écrit, dans le cas où Novopharm en violerait les conditions. Si jamais Novopharm ne remédie pas à la violation dans un délai de 30 jours, la licence est annulée automatiquement. Toutefois, suivant l'article 10, si Novopharm conteste l'existence de la violation au moyen d'un avis écrit à Eli Lilly, la licence demeure en vigueur en attendant qu'une décision soit prise par une cour de justice ou à la suite d'une procédure d'arbitrage convenue par les parties.

that Novopharm is prohibited from granting "any sublicence".

## B. *The Supply Agreement Between Novopharm and Apotex*

On November 27, 1992, Novopharm and Apotex entered into what they described as a "supply agreement", in anticipation of proposed changes to the *Patent Act*, then embodied in Bill C-91. It was expected that this bill, if passed, would both eliminate the then-existing compulsory licensing regime and threaten the existing licences and licence applications of both companies. The agreement was drafted, apparently without the advice of counsel, by Dr. Bernard Sherman, the president of Apotex, and Mr. Leslie Dan, the president of Novopharm, and reads as follows:

WHEREAS THE Federal Government has introduced Bill C-91 which, if passed, would eliminate compulsory licensing under the Patent Act,

AND WHEREAS Apotex and Novopharm have various licences and licence applications pending which are threatened by Bill C-91,

AND WHEREAS, depending on the cut-off dates that will pertain when Bill C-91 is finalized, it is expected that the parties hereto each may hold valid licences for products for which the other may not hold valid licences, details of which cannot be predicted at this time,

AND WHEREAS for their mutual benefit in relation to other competitors, the parties wish to ensure that they have available for use licences on the maximum number of products,

AND WHEREAS the parties have thus agreed that they will share their rights under licences for any product for which only one of the parties may hold a useable licence,

NOW THEREFORE in consideration of the premises and the mutual covenants and other good and valuable consultations, receipt of which is hereby acknowledged, the parties hereto agree as follows:

Finalement, l'article 12 prévoit que la licence est incessible et qu'il est interdit à Novopharm d'accorder [TRADUCTION] «une sous-licence».

## B. *L'accord d'approvisionnement entre Novopharm et Apotex*

Le 27 novembre 1992, Novopharm et Apotex ont conclu ce qu'elles ont appelé un «accord d'approvisionnement» en prévision des modifications proposées à la *Loi sur les brevets* dans le projet de loi C-91. On s'attendait à ce que, s'il était adopté, ce projet de loi éliminerait le régime de licences obligatoires alors existant et compromettrait les licences existantes et les demandes de licence des deux sociétés. Le président d'Apotex, Bernard Sherman, et le président de Novopharm, Leslie Dan, ont rédigé l'accord sans recourir, semble-t-il, aux services d'un conseiller juridique. Voici le texte de cet accord:

[TRADUCTION] ATTENDU QUE le gouvernement fédéral a déposé le projet de loi C-91 qui, s'il est adopté, aura pour effet de supprimer l'octroi de licences obligatoires aux termes de la Loi sur les brevets;

ATTENDU QU'Apotex et Novopharm sont titulaires de différentes licences et qu'elles ont présenté différentes demandes de licence qui sont compromises par le projet de loi C-91;

ATTENDU QUE, selon les dates limites qui s'appliqueront une fois la version finale du projet de loi C-91 adoptée, il est prévu que chacune des parties aux présentes pourra détenir des licences valides à l'égard de certains produits, à l'exclusion de l'autre, plus de précisions ne pouvant actuellement être données à ce sujet;

ATTENDU QUE, dans leur intérêt commun face aux autres concurrents, les parties souhaitent prendre des mesures afin de pouvoir utiliser des licences visant le plus de produits possible;

ATTENDU QUE les parties ont convenu de partager leurs droits aux termes de licences à l'égard de tout produit pour lequel une seule d'entre elles détient une licence utilisable.

En contrepartie de ce qui précède, des engagements pris de part et d'autre et par ailleurs à titre onéreux, LES PARTIES AUX PRÉSENTES CONVIENNENT DE CE QUI SUIT:

ELI LILLY & CO. *v.* NOVOPHARM LTD.       *Iacobucci J.*

1. At any time subsequent to the date upon which Bill C-91 or any Bill derived therefrom is enacted and proclaimed, for any product for which one party (hereinafter the "licensed" party) shall hold a useable licence and the other party (hereinafter called the "unlicensed party") shall not, the licensed party shall, at the request of the unlicensed party, use its licence for the benefit of the unlicensed party in the manner hereinafter set out.

2. In the event that the licence is a licence to import, the licensed party shall import from such source, in such quantity, and on such terms as the unlicensed party shall direct, and shall resell the imported goods to the unlicensed party at the cost thereof together with such royalties as shall be payable under the terms of the licence.

3. In the event that the licence is a licence to manufacture in Canada, the licensed party shall enter into such contracts with Canadian chemical manufacturers as the unlicensed party shall direct for the manufacture of the relevant material and shall sell the manufactured materials to the unlicensed party at the cost thereafter together with such royalties as shall be payable under the terms of the licence.

4. In the event that the licensed party has a source of material from which it imports or in the event that the licensed party is producing the material under a licence to manufacture, and in the event that it is not possible for the unlicensed party to find another source from which to import, or at which to arrange for the manufacture of material, then the licensed party shall supply material to the unlicensed party from the licensed party's source at a price equal to the fair market price of the material together with such royalties as shall be payable under the terms of the licence. Any disagreement as to fair market price shall be settled by binding arbitration.

5. In addition to the payments provided for in paragraphs 2, 3 and 4 hereof, the unlicensed party shall pay to the licensed party a fee equal to 4% of the unlicensed party's net sales of product covered by any unexpired patent included in the licensed party's licence and purchased from the licensed party.

Within 60 days of the end of each quarter year the unlicensed party shall deliver to the licensed party payment of the fee on sales made during the previous quarter along with a statement certified by an independent auditor setting out the quantities sold, the net dollar sales, and the fee payable thereon.

1. À tout moment après l'adoption et la proclamation du projet de loi C-91 ou de tout projet de loi qui en découle, pour tout produit à l'égard duquel une partie (ci-après la «partie titulaire d'une licence») détient une licence utilisable et l'autre partie (ci-après la «partie non titulaire») n'en détient pas, la partie titulaire d'une licence, à la demande de la partie non titulaire, utilise sa licence au bénéfice de cette dernière suivant les modalités énoncées aux présentes.

2. Dans le cas d'une licence d'importation, la partie titulaire d'une licence se conforme aux instructions de la partie non titulaire quant à la source, à la quantité et aux conditions de l'importation et revend la marchandise importée à la partie non titulaire au prix coûtant majoré de la redevance payable aux termes de la licence.

3. Dans le cas d'une licence de fabrication au Canada, la partie titulaire d'une licence conclut des contrats avec des fabricants canadiens de produits chimiques selon les instructions de la partie non titulaire pour la fabrication de la substance en cause et vend les substances fabriquées à la partie non titulaire au prix coûtant majoré de la redevance payable aux termes de la licence.

4. Lorsque la partie titulaire d'une licence dispose d'une source d'importation de la substance ou si elle fabrique cette substance en application d'une licence de fabrication et que la partie non titulaire ne peut trouver une autre source d'importation de la substance ou un endroit où prendre des arrangements pour la fabrication de celle-ci, la partie titulaire d'une licence fournit la substance à la partie non titulaire à partir de la source dont elle dispose, à un prix égal au juste prix de la substance sur le marché, majoré de la redevance due aux termes de la licence. Tout désaccord concernant le juste prix du marché est réglé par voie d'arbitrage obligatoire.

5. En sus des paiements exigés aux articles 2, 3 et 4, la partie non titulaire verse à la partie titulaire d'une licence des droits équivalant à 4 % de ses ventes nettes d'un produit acheté à cette dernière et couvert par un brevet non expiré visé par la licence de la partie titulaire d'une licence.

Au plus tard 60 jours après l'expiration d'un trimestre, la partie non titulaire remet à la partie titulaire d'une licence les droits payables sur les ventes réalisées au cours du trimestre précédent ainsi que des états vérifiés par un vérificateur indépendant qui précisent les quantités vendues, les ventes nettes en dollars et les droits exigibles à leur égard.

6. The licensed party shall comply with the terms of the licence.

7. The licensed party shall not be excused from performing any act as directed by the unlicensed party pursuant to paragraphs 2 or 3 or 4 hereof, on the grounds that there is doubt as to whether or not the licence has remained in force or permits the requested acts, nor on the basis of litigation or threatened litigation by the patentee, provided that the unlicensed party shall undertake to defend any lawsuit against the licensed party resulting from such act and hold the licensed party harmless for the costs of such lawsuit any damage award arising therefrom.

8. For greater clarity, the foregoing paragraphs shall not be limiting, and the licensed party shall cooperate fully with the unlicensed party and follow the directions of the unlicensed party to enable the unlicensed party to enjoy the use of the licence to the same extent that would be possible if the unlicensed party itself held such licence, so long as the licensed party is held harmless from any such use.

9. The unlicensed party shall resell any product purchased from the licensed party only under its own label and shall not sell the product for resale under a label other than that of the unlicensed party.

10. Neither party will engage in preventing or blocking the accessability [*sic*] of HPB clearance of any raw material affecting present and future pharmaceutical products.

11. This agreement shall expire on December 31, 1994 unless extended by mutual agreement.

12. Notwithstanding paragraph 11 hereof, if Bill C-91 is passed into law with an amendment that permits companies to continue to apply for and obtain compulsory licenses for any product for which a licence was issued to any one or more licence [*sic*] prior to December 20, 1991, then this agreement shall be terminated.

13. Notwithstanding paragraph 11 hereof, in relation to any specific licence in respect of which the unlicensed party shall have on or before December 31, 1994, advised the licensed party of an intention to utilize such licence, this agreement shall continue in force until expiry of the last patent covered by such licence.

On February 15, 1993, most of the provisions of the *Patent Act Amendment Act, 1992*, S.C. 1993,

6. La partie titulaire d'une licence se conforme aux conditions de la licence.

7. La partie titulaire d'une licence n'est pas dispensée d'accomplir un acte conformément aux instructions données par la partie non titulaire en application des articles 2, 3 ou 4 pour le motif qu'un doute subsiste quant à savoir si la licence est toujours valide ou permet l'acte en question, non plus que sur le fondement d'une contestation, actuelle ou éventuelle, de la part du breveté, dans la mesure où la partie non titulaire s'engage à assurer la défense de la partie titulaire d'une licence dans le cadre de toute poursuite judiciaire intentée contre celle-ci en raison de l'acte accompli et à la dédommager des frais de justice qu'elle engage et des dommages-intérêts auxquels elle est condamnée.

8. Il est entendu que les articles qui précèdent ne sont pas limitatifs et que la partie titulaire d'une licence collabore pleinement avec la partie non titulaire et se conforme aux instructions de cette dernière afin de lui permettre d'utiliser la licence tout comme si elle en était elle-même titulaire, dans la mesure où la partie titulaire d'une licence est protégée quant aux actes ainsi accomplis.

9. La partie non titulaire revend tout produit acheté à la partie titulaire d'une licence uniquement sous sa propre étiquette et elle s'interdit de vendre le produit en vue de sa revente sous une autre étiquette que la sienne.

10. Les parties s'abstiennent de faire obstacle à l'obtention d'une autorisation de la DGPS visant toute substance à l'état brut relative à des produits pharmaceutiques existants ou ultérieurs.

11. Le présent accord expire le 31 décembre 1994, sauf prorogation avec le consentement des parties.

12. Malgré l'article 11, si le projet de loi C-91 est adopté à l'issue d'un amendement qui permet aux sociétés de continuer de demander et d'obtenir des licences obligatoires à l'égard de tout produit pour lequel une licence a été délivrée à un ou plusieurs titulaires avant le 20 décembre 1991, le présent accord est résilié.

13. Malgré l'article 11, en ce qui concerne toute licence particulière à l'égard de laquelle la partie non titulaire informe la partie titulaire d'une licence, au plus tard le 31 décembre 1994, de son intention d'utiliser cette licence, le présent accord demeure en vigueur jusqu'à l'expiration du dernier brevet visé par cette licence.

Le 15 février 1993, la plupart des dispositions de la *Loi de 1992 modifiant la Loi sur les brevets*,

9

c. 2, were proclaimed into force. On March 12, 1993, the *Patented Medicines (Notice of Compliance) Regulations*, SOR/93-133 (the "Regulations"), came into force and radically altered the procedures governing the issuance of NOCs, strengthening the monopoly position of the patentee by eliminating the compulsory licensing scheme and curtailing the ability of generic drug companies to obtain approval to market a patented medicine until the expiry of all relevant product and use patents. The new NOC regime is lucidly summarized in the following excerpt from the judgment of Teitelbaum J. in *Glaxo Wellcome Inc. v. Canada (Minister of National Health and Welfare)* (1997), 75 C.P.R. (3d) 129 (F.C.T.D.), at pp. 131-32:

A NOC, which formally authorizes a drug to be sold, is issued by the Minister after a drug manufacturer has complied on two fronts. The first element of compliance concerns the overall safety and efficacy of the drug: (see regulation C.08.004 of the *Food and Drug Regulations*, C.R.C. 1978, c. 870). The second element of compliance figures on the drug manufacturer's non-infringement of certain patents embodied in the drug. This second, rather more unexpected, patent-related requirement came into existence after changes to the compulsory licensing regime. Formerly, under a compulsory license, a generic drug manufacturer could obtain a licensed supply of a patented drug from the patent owner. The NOC process did not then concern itself with questions of patent infringement. However, with the abolition of compulsory licenses under the *Patent Act Amendment Act, 1992*, . . . (the "*Patent Act*") the regime for obtaining NOCs also changed. Generic drug manufacturers now seeking NOCs must file what is called a Notice of Allegation under Section 5 of the *Regulations*.

.    .    .

In effect, under Subsection 5(3) of the *Regulations*, in a "Notice of Allegation", the generic drug manufacturer, "the second person", signals its compliance with the patents embodied in a medicine. Under Section 4 of the

L.C. (1993), ch. 2, sont entrées en vigueur par proclamation. Le 12 mars 1993, le *Règlement sur les médicaments brevetés (avis de conformité)*, DORS/93-133 (le «Règlement»), est entré en vigueur et a modifié radicalement la procédure régissant la délivrance des ADC en renforçant le monopole exercé par le breveté, en abolissant le régime de licences obligatoires et en réduisant la capacité des fabricants de médicaments génériques d'obtenir l'autorisation de mettre en marché un médicament breveté avant l'expiration de tous les brevets pertinents visant un produit et une utilisation. Le nouveau régime d'ADC est résumé avec clarté dans l'extrait suivant des motifs rédigés par le juge Teitelbaum dans l'affaire *Glaxo Wellcome Inc. c. Canada (Ministre de la Santé nationale et du Bien-être social)* (1997), 75 C.P.R. (3d) 129 (C.F. 1re inst.), aux pp. 131 et 132:

Le ministre délivre un avis de conformité, lequel autorise officiellement la vente d'un médicament, après que le fabricant de ce médicament a rempli deux conditions. La première condition concerne la sécurité et l'efficacité générales du médicament (voir l'article C.08.004 du *Règlement sur les aliments et drogues*, C.R.C. 1978, ch. 870). La seconde condition concerne la non-infraction par le fabricant du médicament de certains brevets incorporés dans le médicament. Cette seconde condition plutôt inattendue qui se rapporte au brevet a été créée après que des changements eurent été apportés au régime d'octroi de licences obligatoires. Auparavant, le fabricant de médicaments génériques qui détenait une licence obligatoire pouvait obtenir du breveté la fourniture sous licence d'une certaine quantité d'un médicament breveté. La procédure de délivrance de l'avis de conformité ne se préoccupait alors pas de questions de contrefaçon de brevet. Toutefois, par suite de l'abolition du régime d'octroi de licences obligatoires décrétée par la *Loi de 1992 modifiant la Loi sur les brevets* [. . .] (la «*Loi sur les brevets*»), le régime d'obtention d'un avis de conformité a également été modifié. Les fabricants de médicaments génériques qui cherchent à obtenir un avis de conformité doivent maintenant déposer ce qu'on appelle un avis d'allégation, conformément à l'article 5 du *Règlement*.

.    .    .

De fait, aux termes du paragraphe 5(3) du *Règlement*, dans un «avis d'allégation», le fabricant du médicament générique, «la seconde personne», indique qu'il respecte les brevets incorporés dans le médicament qu'il

*Regulations*, the patent owner or licensee, usually a brand name drug manufacturer like the applicants, submits a list of the patents that contain claims for the medicine itself or for the use of the medicine. Under Section 3 of the *Regulations*, the Minister compiles the patent lists into a public document called the "Patent Register".

As required under s. 4(1) of the new Regulations, Eli Lilly Canada submitted a patent list, dated April 6, 1993, to the Minister of National Health and Welfare, which included the patents for nizatidine for which it held the NOC.

Apotex commenced efforts to obtain a NOC for 150 mg and 300 mg capsules of nizatidine under the new scheme, and accordingly sent a letter to Eli Lilly Canada, dated April 28, 1993, which constituted a Notice of Allegation ("NOA") as required by s. 5(3)(*b*) of the Regulations. In the NOA, Apotex alleged that no claim for the patented medicine itself or for the use of the medicine would be infringed by its making, constructing, using or selling the specified nizatidine capsules. In support of this allegation, Apotex relied upon the licence issued to Novopharm for nizatidine and upon the "mutual understanding" whereby Novopharm, the licensed party, would supply Apotex with raw materials obtained pursuant to its licence. Apotex stated that it had given Novopharm notice of its intention to obtain nizatidine, and undertook not to obtain, use, or sell any nizatidine other than from Novopharm until such time as the patents had expired.

The letter of intention referred to, also dated April 28, 1993, indicated that, because Apotex did not yet have a NOC to permit it to market nizatidine in Canada, it could not provide Novopharm with any specifics as to its requirements, but that it would advise in due course as to the required quantity and the manufacturer from whom the nizatidine should be purchased. Although Apotex did apparently locate a source for the nizatidine, it

fabrique. Aux termes de l'article 4 du *Règlement*, le propriétaire du brevet ou le titulaire d'une licence, habituellement le fabricant d'un médicament d'origine comme les requérantes, soumet une liste des brevets qui comportent des revendications pour le médicament en soi ou des revendications pour l'utilisation du médicament. Aux termes de l'article 3 du *Règlement*, le ministre inscrit les listes de brevets dans un registre public appelé «registre des brevets».

Conformément au par. 4(1) du nouveau règlement, Eli Lilly Canada a soumis au ministre de la Santé nationale et du Bien-être social une liste de brevets, en date du 6 avril 1993, qui incluait les brevets relatifs à la nizatidine pour laquelle un ADC lui avait été délivré. [10]

Apotex s'est efforcée d'obtenir un ADC fondé sur le nouveau régime pour les gélules de 150 mg et de 300 mg de nizatidine, et a donc fait parvenir à Eli Lilly Canada une lettre datée du 28 avril 1993, qui constituait un avis d'allégation («ADA») au sens de l'al. 5(3)*b*) du Règlement. Dans cet ADA, Apotex prétendait qu'aucune revendication pour le médicament breveté lui-même ou pour l'utilisation du médicament ne serait contrefaite advenant l'utilisation, la fabrication, la construction ou la vente par elle des gélules de nizatidine en cause. À l'appui de cette allégation, Apotex invoquait la licence délivrée à Novopharm pour la nizatidine et l'«entente mutuelle» aux termes de laquelle Novopharm, la titulaire de la licence, fournirait à Apotex les substances à l'état brut obtenues en vertu de sa licence. Apotex a précisé qu'elle avait avisé Novopharm de son intention d'obtenir la nizatidine et s'est engagée à s'abstenir d'obtenir, d'utiliser ou de vendre de la nizatidine ne provenant pas de Novopharm, jusqu'à l'expiration des brevets. [11]

Dans la lettre d'intention mentionnée, elle aussi datée du 28 avril 1993, il était indiqué que, comme Apotex ne disposait toujours pas d'un ADC lui permettant de mettre en marché la nizatidine au Canada, elle ne pouvait pas donner à Novopharm les détails de ses exigences, mais qu'elle lui communiquerait en temps utile la quantité requise et l'identité du fabricant auquel la substance devrait être achetée. Bien qu'Apotex ait apparemment [12]

had not, by the date of the hearing of this appeal, disclosed the identity of the source to Novopharm, and the evidence remained sealed as confidential information.

13 Eli Lilly and Eli Lilly Canada brought an application, under s. 6(1) of the Regulations, for an order prohibiting the Minister from issuing a NOC to Apotex at all or, alternatively, until after December 31, 1997, ten years after the issuance of the NOC to Eli Lilly Canada, which, under s. 39.11 of the *Patent Act*, would be the first date on which Apotex, without a NOC, would be entitled to import the patented medicine for consumption in Canada. This application forms the basis of the litigation in *Apotex #1*, upon which I shall elaborate shortly.

14 On July 15, 1993, Eli Lilly purported to exercise its option to terminate Novopharm's compulsory licence by providing 30 days' notice in writing to Novopharm. In support of the notice of termination, Eli Lilly alleged that Novopharm had breached the terms of the licence by granting a sublicence to Apotex. Novopharm denied this allegation, stating that the commercial agreement into which it had entered with Apotex did not constitute a sublicence or any transfer of rights under the licence. Novopharm apprised the Commissioner of Patents of the purported termination and its having disputed the allegations of breach.

## C. *The Novopharm Proceeding*

15 On July 30, 1993, Novopharm issued a NOA in support of its own application for a NOC in relation to 150 mg and 300 mg capsules of nizatidine. It relied on its own compulsory licence as the basis for the non-infringement of the patents owned by Eli Lilly. On September 15, 1993, Eli Lilly and Eli Lilly Canada brought an application before the Federal Court — Trial Division, requesting a prohibition order to enjoin the Minister from issuing the requested NOC to Novopharm, on the grounds that Novopharm's licence had been terminated and

trouvé une source pour la nizatidine, elle n'en avait pas communiqué l'identité à Novopharm à la date de l'audition du présent pourvoi, et la preuve est demeurée sous scellés en tant que renseignement confidentiel.

Eli Lilly et Eli Lilly Canada ont présenté, en application du par. 6(1) du Règlement, une demande d'ordonnance interdisant au Ministre de délivrer un ADC à Apotex ou, subsidiairement, de le lui délivrer avant le 31 décembre 1997, soit dix ans après la délivrance de l'ADC à Eli Lilly Canada, qui, aux termes de l'art. 39.11 de la *Loi sur les brevets*, représenterait la première date à laquelle Apotex aurait le droit, sans ADC, d'importer le médicament breveté pour fins de consommation au Canada. Cette demande est à l'origine du litige dans *Apotex n⁰ 1*, sur lequel je vais revenir un peu plus loin.

Le 15 juillet 1993, Eli Lilly a voulu exercer sa faculté d'annuler la licence obligatoire de Novopharm en lui donnant un préavis écrit de 30 jours. À l'appui de son avis d'annulation, Eli Lilly a allégué que Novopharm avait violé les conditions de la licence en accordant une sous-licence à Apotex. Novopharm a nié cette allégation, affirmant que l'accord commercial intervenu entre elle et Apotex ne constituait ni une sous-licence ni une cession de droits aux termes de la licence. Elle a prévenu le commissaire aux brevets de l'annulation projetée et de sa contestation des allégations de violation.

## C. *L'affaire Novopharm*

Le 30 juillet 1993, Novopharm a déposé un ADA à l'appui de sa propre demande d'ADC relativement aux gélules de 150 mg et de 300 mg de nizatidine. Elle a invoqué sa propre licence obligatoire pour dire qu'il n'y avait pas eu de violation des brevets d'Eli Lilly. Le 15 septembre 1993, Eli Lilly et Eli Lilly Canada ont présenté à la Cour fédérale, Section de première instance, une demande d'ordonnance d'interdiction visant à empêcher le Ministre de délivrer l'ADC demandé à Novopharm, pour le motif que la licence de cette

that Novopharm could not, therefore, obtain the bulk medicine in a non-infringing way.

Meanwhile, Eli Lilly also brought a separate application in the Ontario Court of Justice (General Division), seeking a declaration that Novopharm's licence was terminated by virtue of its granting a sublicence to Apotex, contrary to the terms of the licence. Forget J. found that that court had concurrent jurisdiction with the Federal Court — Trial Division to grant the relief sought, but, applying the convenient forum test, held that the matter ought to be decided by the Federal Court in the context of the prohibition proceedings. Eli Lilly and Eli Lilly Canada then brought an interlocutory motion in the Federal Court to amend the originating notice of motion by adding a claim for declaratory relief. Pinard J. dismissed the motion, stating that, in dealing with the originating notice of motion (i.e., the prohibition application), the Court had jurisdiction to make an incidental finding that the compulsory licence in question had been terminated, which would be sufficient to justify an order prohibiting the Minister from issuing a NOC.

On July 20, 1993, Mr. Dan of Novopharm wrote to Dr. Sherman of Apotex, stating that the two companies did not have an agreement to transfer licences or to sublicence, and asking Apotex to refrain from claiming in its applications for NOCs that licences would be transferred. He confirmed that the supply agreement contemplated that Novopharm would supply Apotex, as a third party customer, with specific licensed products, but stipulated that Novopharm never intended to create a sublicence, given that such would be "contrary to the standard conditions of all compulsory licenses". Dr. Sherman responded by letter the next day, stating that Apotex had never suggested that any transfer of rights or sublicensing would occur, only that Novopharm would be supplying materials to Apotex, as a third-party purchaser.

dernière avait été annulée et que Novopharm ne pouvait donc pas obtenir le médicament en vrac d'une manière n'emportant pas contrefaçon.

Entre-temps, Eli Lilly a, de son côté, saisi la Cour de justice de l'Ontario (Division générale) d'une demande de jugement déclarant que la licence de Novopharm était annulée parce qu'elle avait accordé une sous-licence à Apotex, contrairement aux conditions de la licence. Le juge Forget a conclu que la cour où il siégeait et la Cour fédérale du Canada, Section de première instance, avaient compétence concurrente pour accorder le redressement demandé, mais appliquant le critère du *forum conveniens*, il a décidé que l'affaire devait être tranchée par la Cour fédérale dans le cadre des procédures relatives à la demande d'ordonnance d'interdiction. Eli Lilly et Eli Lilly Canada ont alors déposé devant la Cour fédérale une requête interlocutoire en vue de modifier l'avis de requête par l'ajout d'une demande de jugement déclaratoire. Le juge Pinard a rejeté la requête en affirmant que, en examinant l'avis de requête (c'est-à-dire la demande d'interdiction), la cour avait compétence pour conclure, de manière accessoire, que la licence obligatoire en question avait été annulée, ce qui suffirait à justifier une ordonnance interdisant au Ministre de délivrer un ADC.

16

Le 20 juillet 1993, M. Dan, de Novopharm, a écrit à M. Sherman, d'Apotex, pour l'informer que les deux sociétés n'avaient conclu aucun accord de cession de licences ou d'attribution de sous-licences, et pour demander à Apotex de s'abstenir de préciser dans ses demandes d'ADC que des licences seraient cédées. Il a confirmé que l'accord d'approvisionnement prévoyait que Novopharm fournirait certains produits autorisés à Apotex, en tant que tiers client, mais il a précisé que Novopharm n'avait jamais eu l'intention de créer une sous-licence, vu que cela serait [TRADUCTION] «contraire aux conditions types de toutes les licences obligatoires». Le lendemain, M. Sherman a répondu, par lettre, qu'Apotex n'avait jamais laissé entendre que des droits seraient cédés ou que des sous-licences seraient accordées, mais seulement que Novopharm fournirait des substances à Apotex, en tant que tiers acquéreur.

17

18    Mr. Dan also filed an affidavit concerning his intentions as to the nature of the agreement with Apotex. On cross-examination, he testified that Novopharm and Apotex had intended to create a supply agreement, and that the statement in the preamble as to sharing of rights was improperly worded. He further testified that Apotex had not yet requested Novopharm to supply it with nizatidine, but that, if and when a request was made to obtain nizatidine from a foreign source, it would be Novopharm which would approach various sources, obtain quotations, import the bulk material, and finally sell it to Apotex on the terms agreed upon with the supplier. He stated that, if there was only one supplier for a given medicine, the accepted commercial practice would be that "if we have access, they should have access". Also, responding to a question concerning provisions of the *Patent Act* which would prohibit the importation and manufacture of nizatidine until December 31, 1997 and December 31, 1994, respectively, Mr. Dan asserted that "[w]e have to abide by the regulations".

19    McGillis J. of the Federal Court — Trial Division dismissed Eli Lilly's application for judicial review, finding that the agreement between Novopharm and Apotex did not constitute a sublicence, that the licence, therefore, could not be terminated on that ground by Eli Lilly, and, accordingly, that Eli Lilly had failed to prove that Novopharm's notice of allegation was not justified. This decision was reversed by a unanimous panel of the Federal Court of Appeal, which, relying on its earlier decision in *Apotex #1*, *infra*, held that a sublicence had in fact been conferred by virtue of the supply agreement.

D. *The Apotex #1 Proceeding*

20    In cross-examination on the hearing of the application for a prohibition order in *Apotex #1*, the background of which is detailed above, Dr. Sherman of Apotex testified that the supply agreement with Novopharm did not enable Apotex to import or manufacture nizatidine, but only to require

Monsieur Dan a également déposé un affidavit au sujet de ses intentions quant à la nature de l'accord avec Apotex. Au cours de son contre-interrogatoire, il a témoigné que Novopharm et Apotex avaient voulu créer un accord d'approvisionnement et que l'énoncé du préambule quant au partage des droits était mal formulé. Il a ajouté qu'Apotex n'avait pas encore demandé à Novopharm de lui fournir de la nizatidine, mais que, si jamais une demande était faite en vue d'obtenir de la nizatidine auprès d'une source étrangère, ce serait Novopharm qui s'adresserait à différentes sources, obtiendrait des propositions de prix, importerait la substance en vrac pour enfin la vendre à Apotex aux conditions convenues avec le fournisseur. Il a précisé que, dans le cas où il n'y aurait qu'un seul fournisseur d'une substance donnée, la pratique commerciale reconnue serait la suivante: [TRADUCTION] «si nous avons accès, ils devraient avoir accès». De même, interrogé au sujet des dispositions de la *Loi sur les brevets* qui interdiraient l'importation et la fabrication de nizatidine jusqu'au 31 décembre 1997 et au 31 décembre 1994 respectivement, M. Dan a répondu: [TRADUCTION] «[n]ous devons nous conformer au règlement».

Le juge McGillis de la Cour fédérale, Section de première instance, a rejeté la demande de contrôle judiciaire présentée par Eli Lilly, concluant que l'accord entre Novopharm et Apotex n'était pas une sous-licence, qu'Eli Lilly ne pouvait donc pas annuler la licence pour ce motif et, en conséquence, qu'Eli Lilly n'avait pas prouvé que l'avis d'allégation de Novopharm n'était pas fondé. Cette décision a été infirmée par une formation unanime de la Cour d'appel fédérale, qui, s'appuyant sur son arrêt antérieur *Apotex n° 1*, *infra*, a décidé que l'accord d'approvisionnement avait en réalité conféré une sous-licence.

D. *L'affaire Apotex n° 1*

Lors de son contre-interrogatoire pendant l'audition de la demande d'ordonnance d'interdiction dans l'affaire *Apotex n° 1*, dont le contexte est exposé en détail plus haut, M. Sherman, d'Apotex, a témoigné que l'accord d'approvisionnement conclu avec Novopharm permettait non pas à Apotex

Novopharm to import or manufacture the medicine under the terms of its licence and to sell the material to Apotex. He testified that Apotex would in fact be acquiring the nizatidine from Novopharm and, if the NOC were granted, formulating it into 150 mg and 300 mg capsules for sale in Canada. He was of the view that this would not constitute an infringement of Eli Lilly's patents, given that no further licence would be necessary once the licensed material was purchased from Novopharm. However, he did appear to make reference at one point to Apotex's "having rights" under the licence.

Relying on her analysis in *Novopharm*, McGillis J. of the Federal Court — Trial Division found that the supply agreement between Novopharm and Apotex did not constitute a sublicence. Nonetheless, she granted the prohibition order on the basis that Apotex's allegations of non-infringement were not justified, as its formulation of nizatidine capsules for consumption in Canada would infringe Eli Lilly's patents.

The Federal Court of Appeal, Pratte J.A. dissenting, dismissed Apotex's appeal, but on different grounds. It found that, despite the parties' apparent intention to avoid conferring sublicences on one another, this was in fact the legal effect of the written contract which they had completed. Therefore, Novopharm's licence was properly terminated and thus Apotex had no non-infringing means by which to obtain the nizatidine. While it was not necessary to decide the question, it was nevertheless unanimously held, contrary to the view of McGillis J., that Apotex's reformulation of nizatidine into final-dosage form would not have infringed the patents.

## II.  Relevant Statutory Provisions

*Patent Act*, R.S.C., 1985, c. P-4

**39.11** (1) Subject to this section but notwithstanding anything in section 39 or in any licence granted under that section, no person shall under a licence granted under that section in respect of a patent for an invention

d'importer ou de fabriquer de la nizatidine, mais seulement de demander à Novopharm d'importer ou de fabriquer le médicament conformément à sa licence et de vendre la substance à Apotex. Il a déclaré qu'Apotex acquerrait en fait de la nizatidine auprès de Novopharm et que, si l'ADC était délivré, elle en ferait des gélules de 150 mg et de 300 mg destinées à la vente au Canada. Il était d'avis que cela ne violerait pas les brevets d'Eli Lilly étant donné qu'aucune autre licence ne serait nécessaire une fois que la substance autorisée serait achetée à Novopharm. Toutefois, il a paru mentionner, à un moment donné, qu'Apotex «avait des droits» en vertu de la licence.

Se fondant sur son analyse dans l'affaire *Novopharm*, le juge McGillis de la Cour fédérale, Section de première instance, a statué que l'accord d'approvisionnement entre Novopharm et Apotex n'était pas une sous-licence. Néanmoins, elle a accordé l'ordonnance d'interdiction pour le motif que les allégations de non-contrefaçon d'Apotex n'étaient pas fondées, puisque sa préparation de gélules de nizatidine pour fins de consommation au Canada violerait les brevets d'Eli Lilly. [21]

La Cour d'appel fédérale (le juge Pratte étant dissident) a rejeté l'appel d'Apotex, mais pour des raisons différentes. Elle a conclu que, malgré l'intention apparente des parties d'éviter de s'accorder mutuellement des sous-licences, tel était en réalité l'effet juridique du contrat écrit qu'elles avaient passé. En conséquence, la licence de Novopharm avait été annulée à bon droit et Apotex ne disposait donc d'aucun moyen n'emportant pas contrefaçon d'obtenir de la nizatidine. Même s'il n'était pas nécessaire de trancher cette question, il a été néanmoins décidé à l'unanimité que, contrairement au point de vue du juge McGillis, la préparation par Apotex de la nizatidine sous forme posologique définitive n'aurait pas violé les brevets. [22]

## II.  Les dispositions législatives pertinentes

*Loi sur les brevets*, L.R.C. (1985), ch. P-4 [23]

**39.11** (1) Sous réserve des autres dispositions du présent article et par dérogation à l'article 39 ou à toute licence délivrée sous son régime, il est interdit de se prévaloir d'une licence, peu importe la date de délivrance,

pertaining to a medicine, regardless of when the licence was granted, have or exercise any right,

    (*a*) where the invention is a process, to import the medicine in the preparation or production of which the invention has been used, if the medicine is for sale for consumption in Canada; or

    (*b*) where the invention is other than a process, to import the invention for medicine or for the preparation or production of medicine, if the medicine is for sale for consumption in Canada.

    (2) The prohibition under subsection (1) expires in respect of a medicine

           .   .   .

    (*c*) ten years after the date of the notice of compliance that is first issued in respect of the medicine where that notice of compliance is issued after June 27, 1986.

**39.14** (1) Notwithstanding anything in section 39 or in any licence granted under that section, where the notice of compliance that is first issued in respect of a medicine is issued after June 27, 1986, no person shall, under a licence granted under that section in respect of a patent for an invention pertaining to the medicine, have or exercise any right,

    (*a*) where the invention is a process, to use the invention for the preparation or production of medicine, or

    (*b*) where the invention is other than a process, to make or use the invention for medicine or for the preparation or production of medicine

for sale for consumption in Canada, until the expiration of seven years after the date of that notice of compliance.

*Patented Medicines (Notice of Compliance) Regulations,* SOR/93-133

    5. (1) Where a person files or, before the coming into force of these Regulations, has filed a submission for a notice of compliance in respect of a drug and wishes to compare that drug with, or make a reference to, a drug that has been marketed in Canada pursuant to a notice of compliance issued to a first person in respect of which a patent list has been submitted, the person shall, in the submission, with respect to each patent on the patent list,

accordée sous son régime relativement à un brevet portant sur une invention liée à un médicament pour revendiquer ou exercer le droit, si l'invention est un procédé, d'importer pour vente au Canada le médicament dans la préparation ou la production duquel l'invention a été utilisée, ou, si elle n'est pas un procédé, d'importer l'invention pour des médicaments ou pour la préparation ou la production de médicaments pour vente à la consommation au Canada.

    (2) L'interdiction est levée à l'expiration des délais suivants:

           .   .   .

    *c*) dix ans après la délivrance du premier avis de conformité, si elle survient après le 27 juin 1986.

**39.14** (1) Par dérogation à l'article 39 ou à toute licence délivrée sous son régime, lorsque le premier avis de conformité pour le médicament est délivré après le 27 juin 1986, il est interdit de se prévaloir d'une licence accordée sous le régime de cet article relativement à un brevet portant sur une invention liée à un médicament pour revendiquer ou exercer le droit d'utiliser l'invention si elle est un procédé, pour la préparation ou la production de médicaments pour vente à la consommation au Canada ou, si elle n'est pas un procédé, de réaliser ou d'utiliser celle-ci pour des médicaments ou pour la préparation ou la production de médicaments pour telle vente. L'interdiction est levée à l'expiration des sept ans qui suivent la délivrance du premier avis de conformité en cause.

*Règlement sur les médicaments brevetés (avis de conformité),* DORS/93-133

    5. (1) Lorsqu'une personne dépose ou, avant la date d'entrée en vigueur du présent règlement, a déposé une demande d'avis de conformité à l'égard d'une drogue et souhaite comparer cette drogue à une drogue qui a été commercialisée au Canada aux termes d'un avis de conformité délivré à la première personne et à l'égard duquel une liste de brevets a été soumise ou qu'elle souhaite faire un renvoi à la drogue citée en second lieu, elle doit indiquer sur sa demande, à l'égard de chaque brevet énuméré dans la liste:

(*a*) state that the person accepts that the notice of compliance will not issue until the patent expires; or

(*b*) allege that

(i) the statement made by the first person pursuant to paragraph 4(2)(*b*) is false,

(ii) the patent has expired,

(iii) the patent is not valid, or

(iv) no claim for the medicine itself and no claim for the use of the medicine would be infringed by the making, constructing, using or selling by that person of the drug for which the submission for the notice of compliance is filed.

(2) Where, after a second person files a submission for a notice of compliance, but before the notice of compliance is issued, a patent list is submitted or amended in respect of a patent pursuant to subsection 4(5), the second person shall amend the submission to include, in respect of that patent, the statement or allegation that is required by subsection (1).

(3) Where a person makes an allegation pursuant to paragraph (1)(*b*) or subsection (2) the person shall

(*a*) provide a detailed statement of the legal and factual basis for the allegation; and

(*b*) serve a notice of the allegation on the first person and proof of such service on the Minister.

6. (1) A first person may, within 45 days after being served with a notice of an allegation pursuant to paragraph 5(3)(*b*), apply to a court for an order prohibiting the Minister from issuing a notice of compliance until after the expiration of one or more of the patents that are the subject of an allegation.

(2) The court shall make an order pursuant to subsection (1) in respect of a patent that is the subject of one or more allegations if it finds that none of those allegations is justified.

(3) The first person shall, within the 45 days referred to in subsection (1), serve the Minister with proof that an application referred to in that subsection has been made.

(4) Where the first person is not the owner of each patent that is the subject of an application referred to in subsection (1), the owner of each such patent shall be made a party to the application.

*a*) soit une déclaration portant qu'elle accepte que l'avis de conformité ne sera pas délivré avant l'expiration du brevet;

*b*) soit une allégation portant que, selon le cas:

(i) la déclaration faite par la première personne aux termes de l'alinéa 4(2)*b*) est fausse,

(ii) le brevet est expiré,

(iii) le brevet n'est pas valide,

(iv) aucune revendication pour le médicament en soi ni aucune revendication pour l'utilisation du médicament ne seraient contrefaites advenant l'utilisation, la fabrication, la construction ou la vente par elle de la drogue faisant l'objet de la demande d'avis de conformité.

(2) Lorsque, après le dépôt par la seconde personne d'une demande d'avis de conformité mais avant la délivrance de cet avis, une liste de brevets est soumise ou modifiée aux termes du paragraphe 4(5) à l'égard d'un brevet, la seconde personne doit modifier la demande pour y inclure, à l'égard de ce brevet, la déclaration ou l'allégation exigée par le paragraphe (1).

(3) Lorsqu'une personne fait une allégation visée à l'alinéa (1)*b*) ou au paragraphe (2), elle doit:

*a*) fournir un énoncé détaillé du droit et des faits sur lesquels elle se fonde;

*b*) signifier un avis d'allégation à la première personne et une preuve de cette signification au ministre.

6. (1) La première personne peut, dans les 45 jours suivant la signification d'un avis d'allégation aux termes de l'alinéa 5(3)*b*), demander au tribunal de rendre une ordonnance interdisant au ministre de délivrer un avis de conformité avant l'expiration de un ou plusieurs des brevets visés par une allégation.

(2) Le tribunal rend une ordonnance en vertu du paragraphe (1) à l'égard du brevet visé par une ou plusieurs allégations si elle (*sic*) conclut qu'aucune des allégations n'est fondée.

(3) La première personne signifie au ministre, dans la période de 45 jours visée au paragraphe (1), la preuve que la demande visée à ce paragraphe a été faite.

(4) Lorsque la première personne n'est pas le propriétaire de chaque brevet visé dans la demande mentionnée au paragraphe (1), le propriétaire de chaque brevet est une partie à la demande.

7. (1) The Minister shall not issue a notice of compliance to a second person before the latest of

(*a*) the expiration of 30 days after the coming into force of these Regulations,

(*b*) the day on which the second person complies with section 5,

(*c*) subject to subsection (3), the expiration of any patent on the patent list that is not the subject of an allegation,

(*d*) subject to subsection (3), the expiration of 45 days after the receipt of proof of service of a notice of any allegation pursuant to paragraph 5(3)(*b*) in respect of any patent on the patent list,

(*e*) subject to subsections (2), (3) and (4), the expiration of 30 months after the receipt of proof of the making of any application referred to in subsection 6(1), and

(*f*) the expiration of any patent that is the subject of an order pursuant to subsection 6(1).

(2) Paragraph (1)(*e*) does not apply if at any time, in respect of each patent that is the subject of an application pursuant to subsection 6(1),

(*a*) the patent has expired; or

(*b*) the court has declared that the patent is not valid or that no claim for the medicine itself and no claim for the use of the medicine would be infringed.

(3) Paragraphs (1)(*c*), (*d*) and (*e*) do not apply in respect of a patent if the owner of the patent has consented to the making, constructing, using or selling of the drug in Canada by the second person.

(4) Paragraph (1)(*e*) ceases to apply in respect of an application referred to in subsection 6(1) if the application is withdrawn or is finally dismissed by the court.

(5) A court may shorten or extend the time limit referred to in paragraph (1)(*e*) in respect of an application where the court has not yet made an order pursuant to subsection 6(1) in respect of that application and where the court finds that a party to the application failed to reasonably cooperate in expediting the application.

7. (1) Le ministre ne peut délivrer un avis de conformité à la seconde personne avant la plus tardive des dates suivantes:

*a*) la date qui suit de 30 jours la date d'entrée en vigueur du présent règlement;

*b*) la date à laquelle la seconde personne se conforme à l'article 5;

*c*) sous réserve du paragraphe (3), la date d'expiration de tout brevet énuméré dans la liste de brevets qui n'est pas visé par une allégation;

*d*) sous réserve du paragraphe (3), la date qui suit de 45 jours la réception de la preuve de signification de l'avis d'allégation visé à l'alinéa 5(3)*b*) à l'égard de tout brevet énuméré dans la liste de brevets;

*e*) sous réserve des paragraphes (2), (3) et (4), la date qui suit de 30 mois la date à laquelle est faite une demande au tribunal visée au paragraphe 6(1);

*f*) la date d'expiration de tout brevet faisant l'objet d'une ordonnance rendue aux termes du paragraphe 6(1).

(2) L'alinéa (1)*e*) ne s'applique pas si, à l'égard de chaque brevet visé par une demande au tribunal aux termes du paragraphe 6(1):

*a*) soit le brevet est expiré;

*b*) soit le tribunal a déclaré que le brevet n'est pas valide ou qu'aucune revendication pour le médicament en soi ni aucune revendication pour l'utilisation du médicament ne seraient contrefaites.

(3) Les alinéas (1)*c*), *d*) et *e*) ne s'appliquent pas à l'égard d'un brevet si le propriétaire de celui-ci a consenti à ce que la seconde personne utilise, fabrique, construise ou vende la drogue au Canada.

(4) L'alinéa (1)*e*) cesse de s'appliquer à l'égard de la demande visée au paragraphe 6(1) si celle-ci est retirée ou est rejetée par le tribunal de façon définitive.

(5) Le tribunal peut abréger ou proroger le délai visé à l'alinéa (1)*e*) à l'égard d'une demande lorsqu'elle (*sic*) n'a pas encore rendu d'ordonnance aux termes du paragraphe 6(1) à l'égard de cette demande et qu'elle (*sic*) constate qu'une partie à la demande n'a pas collaboré de façon raisonnable au traitement expéditif de celle-ci.

III. Judicial History

A. *Novopharm Ltd. v. Eli Lilly and Co.*

(1) Federal Court — Trial Division (1995), 60 C.P.R. (3d) 181

As a preliminary matter, McGillis J. considered the nature of the proceedings before the court. She observed that an application for prohibition under s. 6(1) of the *Regulations* is a judicial review proceeding which is intended to determine expeditiously whether a NOC should be issued. In this connection, she referred to *David Bull Laboratories (Canada) Inc. v. Pharmacia Inc.*, [1995] 1 F.C. 588 (C.A.), where Strayer J.A. held that the issues to be decided in such proceedings are of a limited or preliminary nature, only for the limited purpose above stated, and that, if a full trial of validity or infringement issues is required, it is to be obtained in the usual way, by commencing an action.

Turning to the question of whether the allegations of non-infringement made by Novopharm in requesting the NOC were justified, McGillis J. noted that, since Novopharm's position was premised on its licence, the key issue was the proper interpretation to be given the November, 1992 agreement between Apotex and Novopharm. If the agreement was in substance a sublicence, then the licence would have been properly terminated by Eli Lilly, and Novopharm would have been left with no non-infringing way in which to obtain the medication for which the NOC was requested.

Relying on the decision of this Court in *Consolidated-Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance Co.*, [1980] 1 S.C.R. 888, McGillis J. identified the task at hand (at p. 197) as ascertaining the "true intent of the parties at the time of the entry into the contract". She rejected the submissions by Eli Lilly that the evidence of Mr. Dan, both in his affidavit and his cross-examination, as to his intention at the time the supply agreement was drafted, was inadmissible on the basis of the parol evidence rule. In her view,

III. Historique des procédures judiciaires

A. *Novopharm Ltd. c. Eli Lilly and Co.*

(1) Cour fédérale, Section de première instance (1995), 60 C.P.R. (3d) 181

À titre préliminaire, le juge McGillis a étudié la nature des procédures dont la cour était saisie. Elle a fait observer qu'une demande d'interdiction fondée sur le par. 6(1) du *Règlement* est une procédure de contrôle judiciaire visant à déterminer promptement s'il y a lieu de délivrer un ADC. À cet égard, elle a cité l'affaire *David Bull Laboratories (Canada) Inc. c. Pharmacia Inc.*, [1995] 1 C.F. 588 (C.A.), dans laquelle le juge Strayer a statué que les questions qui doivent être examinées dans le cadre de ces procédures sont de nature limitée ou préliminaire, et ne doivent l'être qu'à la seule fin limitée mentionnée précédemment et que, si un examen complet des questions de validité ou de contrefaçon est nécessaire, il faut procéder de la façon habituelle en intentant une action.

Quant à la question de savoir si les allégations de non-contrefaçon que Novopharm a faites en demandant l'ADC étaient fondées, le juge McGillis a souligné que, puisque le point de vue de Novopharm était fondé sur sa licence, la question clé qui se posait était celle de l'interprétation à donner à l'accord de novembre 1992 intervenu entre Apotex et Novopharm. Si l'accord était essentiellement une sous-licence, la licence aurait alors été annulée à bon droit par Eli Lilly, et Novopharm n'aurait disposé d'aucun moyen n'emportant pas contrefaçon d'obtenir le médicament pour lequel l'ADC était demandé.

Invoquant l'arrêt de notre Cour *Exportations Consolidated Bathurst Ltée c. Mutual Boiler and Machinery Insurance Co.*, [1980] 1 R.C.S. 888, le juge McGillis a affirmé (à la p. 197) qu'il incombait alors de décider quelle était «l'intention véritable des parties au moment où elles ont contracté». Elle a repoussé les arguments d'Eli Lilly voulant que le témoignage de M. Dan, à la fois dans son affidavit et en contre-interrogatoire, concernant l'intention qu'il avait au moment de la rédaction de l'accord d'approvisionnement soit inadmissible

Mr. Dan was entitled to tender direct evidence concerning his intention at the time of drafting. As to the exchange of letters between Mr. Dan and Dr. Sherman, McGillis J.A. declined to rule on their admissibility, inasmuch as even if they were admissible, she would have accorded them no weight on the basis that they were written to clarify the intent of the parties long after the supply agreement had been signed, and apparently only in response to the threatened termination of the licence held by Novopharm.

27    With regard to the intentions of Mr. Dan at the time of drafting, McGillis J. concluded on the basis of his direct evidence that he intended to enter into a supply agreement with Apotex. However, she recognized (at p. 199) the need to examine the agreement as a whole in order to determine whether the words used by the parties reasonably expressed their intent, bearing in mind that "a sublicence could only have been created if Novopharm granted some or all of its rights under the licence to Apotex". In her view, at p. 199, the true nature of the agreement was that of "a supply agreement dressed up to look like a sublicence". In other words, despite the presence in the supply agreement of wording which might tend to suggest the conferral of a sublicence, the actual operative provisions of the agreement did not amount to the granting of any of Novopharm's licensed rights to Apotex.

28    In the view of McGillis J., the plain fact that the supply agreement contemplated Novopharm's entering into contracts with third parties at the direction of Apotex did not itself amount to a sublicence. Indeed, if the licensed rights had in fact been sublicensed to Apotex, Novopharm's continued involvement in the transactions would have been unnecessary. On balance, McGillis J. was of the view that none of the provisions of the agreement conferred any of Novopharm's licensed rights upon Apotex, and that paragraph 6, by stipulating that the licensed party must comply with the terms of its licence, including the prohibition

compte tenu de la règle d'exclusion de la preuve extrinsèque. Selon elle, M. Dan pouvait présenter une preuve directe concernant l'intention qu'il avait à l'époque de la rédaction. Quant aux lettres échangées entre M. Dan et M. Sherman, le juge McGillis a refusé de se prononcer sur leur admissibilité vu que, même si ces lettres avaient été admissibles, elle ne leur aurait accordé aucune importance pour le motif qu'elles ont été rédigées dans le but de clarifier l'intention des parties longtemps après la signature de l'accord et, apparemment, seulement pour répondre à la menace d'annulation de la licence détenue par Novopharm.

Quant aux intentions de M. Dan à l'époque de la rédaction, le juge McGillis a statué, sur la foi de sa preuve directe, qu'il avait voulu conclure un accord d'approvisionnement avec Apotex. Toutefois, elle a reconnu (à la p. 199) la nécessité d'examiner l'accord dans son ensemble afin de déterminer si les termes employés par les parties traduisaient raisonnablement leur intention, en gardant à l'esprit qu'«une sous-licence n'aurait pu voir le jour que si Novopharm avait accordé tous ses droits aux termes de la licence, ou certains d'entre eux, à Apotex». Quant à la nature véritable de l'accord, elle a estimé, à la p. 199, qu'il s'agissait d'un «accord d'approvisionnement déguisé en sous-licence». Autrement dit, malgré la présence, dans l'accord d'approvisionnement, de termes qui pouvaient laisser croire à l'attribution d'une sous-licence, le dispositif de cet accord n'équivalait pas à l'attribution à Apotex de droits que Novopharm possédait en vertu de sa licence.

De l'avis du juge McGillis, le simple fait que l'accord d'approvisionnement prévoyait que Novopharm conclurait des contrats avec des tiers sur l'ordre d'Apotex n'était pas en soi une attribution de sous-licence. En réalité, si les droits conférés par la licence avaient été cédés sous forme de sous-licence à Apotex, la participation de Novopharm aux opérations n'aurait plus été nécessaire. Tout bien pesé, le juge McGillis était d'avis qu'aucune des dispositions de l'accord ne conférait à Apotex les droits que Novopharm possédait en vertu de sa licence, et que l'article 6, en stipulant que le titulaire d'une licence doit se conformer aux

against sublicensing, strongly suggested that the parties did not intend to create a sublicence.

Therefore, McGillis J. found that no sublicence was granted by Novopharm to Apotex. In her view, this interpretation served to promote the true intent of the parties at the time of entry into the supply agreement and to produce a sensible commercial result from their perspective, which she viewed as an important interpretive goal, based on *Consolidated-Bathurst*, *supra*. Indeed, she stated that to find that a sublicence had been created would have defeated the parties' entire objective in entering into the supply agreement, as the compulsory licences could then have been terminated by the patentees. She also stipulated that, even had she not considered the extrinsic evidence given by Mr. Dan as to his intention, she would have reached the same conclusion based on the plain wording of the agreement as a whole. On this basis, McGillis J. concluded that Eli Lilly and Eli Lilly Canada had failed to establish, on a balance of probabilities, that the allegation of Novopharm in its NOA was not justified within the meaning of s. 6(2) of the Regulations. Accordingly, she dismissed the application for a prohibition order.

As to the question of whether the licence had been terminated, McGillis J. declined jurisdiction to decide this matter, despite the earlier orders of Forget J. and Pinard J. She felt bound by the subsequent ruling in *David Bull Laboratories*, *supra*, that the court lacks jurisdiction, in the context of a judicial review proceeding to determine an application for a prohibition order of this kind, to determine ancillary or incidental questions which pertain solely to the rights of two private parties. However, in the event that she was wrong in this conclusion, she expressed the opinion that her finding that Novopharm had not granted a sublicence to Apotex necessarily led to the conclusion that the licence had not been breached.

conditions de sa licence, notamment à l'interdiction d'attribuer une sous-licence, laisse fortement entendre que les parties n'avaient pas l'intention de créer une sous-licence.

En conséquence, le juge McGillis a décidé que Novopharm n'avait accordé aucune sous-licence à Apotex. À son avis, cette interprétation contribuait à promouvoir l'intention véritable des parties au moment de la conclusion de l'accord d'approvisionnement et à engendrer un résultat commercial raisonnable à leur point de vue, qu'elle percevait comme un objectif d'interprétation important, compte tenu de l'arrêt *Consolidated Bathurst*, précité. En fait, elle a dit que la conclusion qu'une sous-licence avait été créée aurait contrecarré en entier l'objectif que les parties poursuivaient en concluant l'accord d'approvisionnement, étant donné que les brevetés auraient alors pu annuler les licences obligatoires. Elle a également précisé que, même si elle n'avait pas pris en considération la preuve extrinsèque de M. Dan quant à l'intention qu'il avait, elle serait arrivée à la même conclusion, compte tenu du texte clair de l'accord dans son ensemble. Le juge McGillis a conclu, pour ce motif, qu'Eli Lilly et Eli Lilly Canada n'avaient pas établi, selon la prépondérance des probabilités, que l'allégation de Novopharm, dans son ADA, n'était pas fondée au sens du par. 6(2) du Règlement. Elle a donc rejeté la demande d'ordonnance d'interdiction.

Quant à savoir si la licence avait été annulée, le juge McGillis s'est déclarée non compétente pour trancher cette question, en dépit des ordonnances antérieures des juges Forget et Pinard. Elle se sentait liée par l'arrêt subséquent *David Bull Laboratories*, précité, selon lequel la cour n'a pas compétence, dans le contexte d'une procédure de contrôle judiciaire relative à une demande d'ordonnance d'interdiction de cette nature, pour trancher des questions accessoires ou incidentes qui portent uniquement sur les droits de deux parties privées. Cependant, au cas où elle aurait tort de tirer cette conclusion, elle a exprimé l'avis que sa décision que Novopharm n'avait pas accordé une sous-licence à Apotex menait nécessairement à la conclusion que la licence n'avait pas été violée.

29

30

(2) <u>Federal Court of Appeal</u> (1996), 67 C.P.R. (3d) 377

31     In oral reasons delivered from the bench, Stone J.A. (MacGuigan and McDonald JJ. A. concurring) dismissed the appeal. The appeal was heard three weeks after the hearing of the appeal in *Apotex #1*, *infra*, and at the hearing, the court invited submissions as to the possible application of that decision to the outcome of the instant appeal. Eli Lilly argued that the decision was dispositive, in that the court there held that the supply agreement contravened the sublicensing prohibition in the compulsory licence, and that, by notice, Eli Lilly had succeeded in terminating the licence. For its part, Novopharm argued that the decision should not be applied because the facts of the instant appeal differed materially from the facts in the previous case, and also because, while a decision on a prohibition order application binds the parties to the specific litigation, it has little precedential value for other cases.

32     The court held that, while the previous decision was not *res judicata*, it was nonetheless binding on the court unless it could be distinguished on its facts or was manifestly wrong owing to the failure of the court to consider a relevant legal rule. The latter was not alleged. As to the former, while the court recognized that there were some factual differences and that some of the evidence which was before the court in *Apotex #1* was not part of the record in the instant case, the same compulsory licence and the same supply agreement were at issue and in evidence in both cases. To the extent that it was unaffected by evidence unique to its own record, the analysis of the supply agreement in *Apotex #1* could therefore be applied to *Novopharm*. While it was true that paragraph 6 of the supply agreement required Novopharm to act in compliance with the terms of its licence, the court concluded that this clause was to be read together with the other clauses of the agreement, leading to the conclusion that a sublicence had

(2) Cour d'appel fédérale (1996), 67 C.P.R. (3d) 377

Dans des motifs oraux prononcés à l'audience, le juge Stone (avec l'appui des juges MacGuigan et McDonald) a rejeté l'appel. Cet appel a été entendu trois semaines après l'audition de l'appel *Apotex nᵒ 1*, *infra*, et à l'audience, la cour a invité les parties à présenter des arguments sur l'application possible de cet arrêt à l'issue de l'appel dont elle était saisie. Eli Lilly a fait valoir que l'arrêt était décisif en ce sens que la cour y avait décidé que l'accord d'approvisionnement transgressait l'interdiction, stipulée dans la licence obligatoire, d'accorder une sous-licence et qu'Eli Lilly avait réussi à annuler la licence au moyen d'un préavis. Novopharm a soutenu, pour sa part, qu'il n'y avait pas lieu d'appliquer l'arrêt parce que les faits de l'appel différaient sensiblement de ceux de l'affaire antérieure et aussi parce que, bien qu'une décision sur une demande d'ordonnance d'interdiction lie les parties au litige en cause, elle a peu de valeur comme précédent.

La cour a décidé que, bien que la décision antérieure n'ait pas eu valeur de chose jugée, elle la liait néanmoins, sauf si elle pouvait faire l'objet d'une distinction fondée sur ses faits ou si elle était manifestement erronée en raison de l'omission de tenir compte d'une règle de droit pertinente. Ce dernier argument n'a pas été avancé. Quant au premier, bien que la cour ait reconnu que les faits étaient différents à certains égards et que certains éléments de preuve soumis à la cour dans *Apotex nᵒ 1* ne faisaient pas partie du dossier dans l'affaire qui l'occupait, la même licence obligatoire et le même accord d'approvisionnement étaient en cause et avaient été soumis en preuve dans les deux cas. Dans la mesure où elle n'était pas influencée par des éléments de preuve propres à l'affaire, l'analyse de l'accord d'approvisionnement dans *Apotex nᵒ 1* pouvait donc être appliquée à *Novopharm*. Même s'il était vrai que l'article 6 de l'accord d'approvisionnement obligeait Novopharm à se conformer aux conditions de sa licence, la cour a décidé que cette clause devait être interprétée de concert avec les autres clauses de l'accord, ce qui l'a amenée à conclure qu'une sous-

indeed been granted. Accordingly, the appeal was allowed.

B. *Apotex Inc. v. Eli Lilly and Co.*

(1) Federal Court — Trial Division (1995), 60 C.P.R. (3d) 206

In this proceeding, the basis for Eli Lilly's claim of non-justification was that Novopharm's licence for nizatidine had been terminated by virtue of its grant of a sublicence to Apotex, and that Apotex therefore had no non-infringing way of obtaining the bulk nizatidine in order to formulate the capsules that were the subject of the NOC request. Alternatively, it was argued that the formulation of the capsules would itself constitute an infringement of Eli Lilly's patent rights.

In concluding in *Novopharm*, *supra*, that the arrangement between Apotex and Novopharm was not a sublicence but merely a supply agreement, McGillis J. had considered the evidence of Mr. Dan of Novopharm concerning his intent at the time he drafted the agreement with Dr. Sherman. While this evidence was not part of the record in the instant matter, McGillis J. had indicated in *Novopharm* that she would have reached the same conclusion even without considering that evidence. Accordingly, she was of the view that her conclusion as to the nature of the agreement in *Novopharm* applied equally to the case at bar.

Turning, then, to the question of whether the formulation of capsules from the bulk material would infringe Eli Lilly's patent rights, McGillis J. considered the decision of MacKay J. in *Merck & Co. v. Apotex Inc.* (1994), 59 C.P.R. (3d) 133 (F.C.T.D.), and agreed with his conclusion that this processing activity would in fact constitute an infringement, as "an unlicensed third party purchaser acquires none of the exclusive rights granted to a patentee merely by virtue of the fact that he has purchased bulk material from a licensed supplier" (p. 218).

licence avait de fait été accordée. En conséquence, l'appel a été accueilli.

B. *Apotex Inc. c. Eli Lilly and Co.*

(1) Cour fédérale, Section de première instance (1995), 60 C.P.R. (3d) 206

Dans cette instance, Eli Lilly a prétendu que l'allégation n'était pas fondée parce que la licence que Novopharm détenait à l'égard de la nizatidine avait été annulée en raison de son attribution d'une sous-licence à Apotex et parce qu'Apotex ne disposait donc d'aucun moyen n'emportant pas contrefaçon d'obtenir de la nizatidine en vrac pour préparer les gélules visées par la demande d'ADC. Subsidiairement, elle a soutenu que la préparation des gélules violerait elle-même les droits que possédait Eli Lilly en vertu de ses brevets.

En concluant, dans *Novopharm*, précité, que l'entente entre Apotex et Novopharm était non pas une sous-licence mais un simple accord d'approvisionnement, le juge McGillis avait tenu compte du témoignage de M. Dan, de Novopharm, quant à l'intention qu'il avait au moment de rédiger l'accord avec M. Sherman. Même si ce témoignage ne faisait pas partie du dossier dont elle était alors saisie, le juge McGillis avait indiqué, dans *Novopharm*, qu'elle aurait tiré la même conclusion même indépendamment de celui-ci. En conséquence, elle estimait que sa conclusion sur la nature de l'accord, à laquelle elle en était arrivée dans *Novopharm*, s'appliquait également à l'affaire dont elle était saisie.

Quant à la question de savoir si la préparation de gélules à partir de la substance en vrac violerait les droits qu'Eli Lilly possédait en vertu de ses brevets, le juge McGillis a examiné la décision du juge MacKay dans l'affaire *Merck & Co. c. Apotex Inc.* (1994), 59 C.P.R. (3d) 133 (C.F. 1re inst.), et a souscrit à sa conclusion que cette activité de transformation constituerait en fait de la contrefaçon car «un tiers acquéreur non titulaire d'une licence n'acquiert aucun des droits exclusifs accordés à un breveté du simple fait qu'il a acheté la matière en vrac à un fournisseur qui est lui-même titulaire d'une licence» (p. 218).

33

34

35

36     Therefore, McGillis J. found that Eli Lilly had established, on a balance of probabilities, that the allegation of non-infringement made by Apotex in its notice of allegation was not justified within the meaning of s. 6(2) of the Regulations. Accordingly, she allowed the application for judicial review and prohibited the Minister from issuing a NOC to Apotex until after the expiry of Eli Lilly's patents.

(2) Federal Court of Appeal (1996), 66 C.P.R. (3d) 329

(a) *MacGuigan J.A. (Robertson J.A. concurring)*

37     In reviewing the facts and the evidence, MacGuigan J.A. observed that, on several occasions, Dr. Sherman had emphasized that all decisions under the supply agreement would be made by Apotex and communicated to Novopharm. Apotex's stated intention was to deal with a Canadian manufacturer, independent of Novopharm, and it in fact refused to communicate to Novopharm the identity of this manufacturer until such was convenient for Apotex. But Dr. Sherman insisted that Novopharm, not Apotex, would purchase the material and sell it to Apotex, within the terms of its licence.

38     MacGuigan J.A. noted that the conclusion of McGillis J. in *Novopharm* as to the proper characterization of the Apotex-Novopharm agreement was premised, to some extent, on the evidence of Mr. Dan as to his intention at the time the agreement was drafted. He observed not only that this evidence did not form part of the record in the case before him, but also that any direct evidence as to the intention of the parties was to be excluded from consideration under the parol evidence rule. In his view, the question as to the meaning of the agreement was a legal one which was to be determined from its text. Although McGillis J. had made clear that she would have reached the same conclusion even absent the extrinsic evidence, MacGuigan J.A. observed that she also appeared to have been influenced in her decision by two particular legal propositions: that a sublicence could

En conséquence, le juge McGillis a conclu qu'Eli Lilly avait établi, selon la prépondérance des probabilités, que l'allégation de non-contrefaçon d'Apotex contenue dans l'avis d'allégation n'était pas fondée au sens du par. 6(2) du Règlement. Par conséquent, elle a fait droit à la demande de contrôle judiciaire et a interdit au Ministre de délivrer un ADC à Apotex avant l'expiration des brevets d'Eli Lilly.

(2) Cour d'appel fédérale (1996), 66 C.P.R. (3d) 329

a) *Le juge MacGuigan (avec l'appui du juge Robertson)*

Au cours de son examen des faits et de la preuve, le juge MacGuigan a fait observer que M. Sherman avait souligné, à maintes reprises, que toutes les décisions fondées sur l'accord d'approvisionnement seraient prises par Apotex et communiquées à Novopharm. L'intention explicite d'Apotex était de faire affaire avec un fabricant canadien, indépendant de Novopharm, et, en fait, Apotex a refusé de communiquer à Novopharm l'identité de ce fabricant jusqu'à ce qu'il lui convienne de le faire. Mais M. Sherman a insisté pour que ce soit Novopharm, et non Apotex, qui achète la substance et la vende à Apotex, conformément aux conditions de sa licence.

Le juge MacGuigan a souligné que la conclusion que le juge McGillis a tirée, dans *Novopharm*, sur la bonne façon de qualifier l'accord entre Apotex et Novopharm reposait, jusqu'à un certain point, sur le témoignage de M. Dan quant à l'intention au moment de la rédaction de l'accord. Il a fait observer non seulement que ce témoignage ne faisait pas partie du dossier dont il était saisi, mais encore que, en vertu de la règle d'exclusion de la preuve extrinsèque, toute preuve directe relative à l'intention des parties ne pouvait pas être prise en considération. À son avis, la question du sens de l'accord était une question de droit qui devait être résolue en fonction du texte de cet accord. Quoique le juge McGillis ait précisé qu'elle en serait venue à la même conclusion même en l'absence de la preuve extrinsèque, le juge MacGuigan a fait remarquer que sa décision semblait avoir été

only have been created if Novopharm had granted some or all of its rights under the licence to Apotex, and that, when interpreting a contract, courts should favour an interpretation which promotes a sensible commercial result: see *Consolidated-Bathurst, supra.*

MacGuigan J.A. relied on the decision of the Delaware Supreme Court in *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 227 USPQ 233 (1985) ("*du Pont*"), which, although it dealt with somewhat different facts, considered what was in his view essentially the same type of transaction, that is, one in which the patented product was produced not for the licensed party but for an unlicensed party. In that case, the court, relying on *Carey v. United States*, 326 F.2d 975 (Ct. Cl. 1964), held that the test for a sublicence is whether the production of the licensed item is by or for the use of the original licensee or the alleged sublicensee, and concluded that the application of this test revealed a sublicence in a situation where an unlicensed party purported to manufacture a patented item as the agent of the licensee, only to purchase the item from the licensee immediately upon its manufacture, each transfer of property being nothing more than a paper transaction.

In the view of MacGuigan J.A., a similar form of "legerdemain" occurred in the present case. He found that, under the supply agreement, the separate contracts between Novopharm and its suppliers and Novopharm and Apotex were to be maintained only to avoid a direct contractual link between Apotex and the suppliers. He viewed this as a matter of form only. Because Apotex was in reality the directing mind, with Novopharm using its licence for Apotex's benefit, he found that the arrangement between the two was, contrary to the view of McGillis J., "a sublicence dressed up to look like a supply agreement" (p. 338). While he

influencée par deux thèses juridiques en particulier: celle voulant qu'une sous-licence ne puisse avoir été créée que si Novopharm avait cédé à Apotex une partie ou l'ensemble de ses droits aux termes de la licence, et l'autre thèse selon laquelle, les tribunaux devraient, en interprétant un contrat, privilégier une interprétation qui favorise un résultat commercial raisonnable: voir *Consolidated Bathurst*, précité.

Le juge MacGuigan s'est appuyé sur l'arrêt de la Cour suprême du Delaware *E.I. du Pont de Nemours & Co. c. Shell Oil Co.*, 227 USPQ 233 (1985) («*du Pont*»), qui, malgré un contexte factuel quelque peu différent, portait essentiellement, selon lui, sur le même genre d'opération en ce sens que le produit breveté était fabriqué non pour le titulaire de la licence mais pour une partie non titulaire de la licence. Dans cette affaire, invoquant la décision *Carey c. United States*, 326 F.2d 975 (Ct. Cl. 1964), décidé que le critère applicable à une sous-licence consiste à déterminer si la production de l'article autorisé est faite par le titulaire de la licence originale ou destinée à son propre usage, ou encore si elle est destinée à celui du prétendu titulaire d'une sous-licence. Elle a jugé que l'application de ce critère révélait l'existence d'une sous-licence dans un cas où une partie non titulaire d'une licence était censée fabriquer un article breveté à titre de mandataire du titulaire de la licence, pour ensuite acheter cet article au titulaire de la licence immédiatement après sa fabrication, chaque cession du droit de propriété n'étant rien de plus qu'une opération fictive.

Selon le juge MacGuigan, un tel «tour de passe-passe» a eu lieu dans le cas qui nous occupe. Il a conclu que, d'après l'accord d'approvisionnement, les contrats distincts entre Novopharm et ses fournisseurs et entre Novopharm et Apotex ne devaient être maintenus que pour faire en sorte qu'il n'y ait aucun lien contractuel direct entre Apotex et les fournisseurs. Il percevait cela comme une question de forme seulement. Étant donné qu'Apotex était, en réalité, l'âme dirigeante et que Novopharm se servait de sa licence au profit d'Apotex, il a statué que, contrairement au point de vue du juge McGillis, l'accord intervenu entre les deux était

39

40

recognized that the <u>subjective</u> intention of the parties was to avoid creating a sublicence, he found that this was at odds with the <u>objective</u> intention of the document they executed. The legal effect of the contract, in other words, was to create a sublicence.

41    MacGuigan J.A. also found that, in accordance with his reading of *Consolidated-Bathurst, supra,* any consideration of whether this interpretation would promote a "sensible commercial result" must be accorded only a "tertiary status", behind the "primary" rule of interpretation — the objective analysis of the actual words used by the parties — and the application of the *contra proferentum* doctrine to interpret any ambiguity against the drafting party. In his view, at p. 338, the primary rule governed in the present case, as there was no ambiguity in "the words they used, as I interpret the reality behind them".

42    Therefore, MacGuigan J.A. dismissed Apotex's appeal, finding that Novopharm's licence had been properly terminated by Eli Lilly. Although he found it unnecessary to decide the issue of infringement by formulation, he stated that he would have agreed with the reasons of Pratte J.A. on the matter.

(b) *Pratte J.A., dissenting*

43    Pratte J.A. differed from the majority on the issue of contractual interpretation. In his view, there was nothing obscure in the text of the supply agreement such as to require further interpretation. Although both the intention and the effect of the contract was to afford the parties, as far as possible, the same benefits they would have obtained under mutual sublicences, the supply agreement did not provide for the granting of any sublicence. As to Eli Lilly's contention that the agreement did not disclose the true nature of the arrangement — that each party would give sublicences to each other and then, for the sake of appearances, act as the sublicensee's agent in procuring the drug —

«une sous-licence déguisée en accord d'approvisionnement» (p. 338). Tout en reconnaissant que l'intention <u>subjective</u> des parties était d'éviter la création d'une sous-licence, il a conclu que cela contrastait avec l'intention <u>objective</u> du document qu'elles avaient signé. En d'autres termes, le contrat a eu pour effet juridique de créer une sous-licence.

Le juge MacGuigan a aussi statué que, selon son interprétation de l'arrêt *Consolidated Bathurst,* précité, tout examen de la question de savoir si cette interprétation favoriserait un «résultat commercial raisonnable» ne doit occuper qu'une «troisième place», derrière la «première» règle d'interprétation — l'analyse objective des termes utilisés par les parties — et l'application de la règle *contra proferentem,* qui consiste à interpréter toute ambiguïté d'un texte au détriment de la partie qui l'a rédigé. Selon lui (à la p. 338), la première règle s'appliquait en l'espèce étant donné qu'il n'y avait aucune ambiguïté dans «les mots qu'[elles] ont utilisés, selon l'interprétation que je donne à la réalité qu'ils dissimulent».

Le juge MacGuigan a donc rejeté l'appel d'Apotex, concluant qu'Eli Lilly avait annulé à bon droit la licence de Novopharm. Même s'il jugeait inutile de trancher la question de la contrefaçon découlant de la préparation, il a affirmé qu'il aurait souscrit aux motifs du juge Pratte sur ce point.

b) *Le juge Pratte, dissident*

Le juge Pratte a exprimé son désaccord avec les juges majoritaires sur la question de l'interprétation du contrat. Il a estimé qu'il n'y avait rien d'obscur dans le texte de l'accord d'approvisionnement, qui n'avait donc pas besoin d'être interprété davantage. Même si le contrat avait à la fois pour but et pour effet d'accorder aux parties, dans la mesure du possible, les mêmes avantages qu'elles auraient obtenus en s'accordant mutuellement des sous-licences, l'accord d'approvisionnement ne prévoyait pas l'attribution de sous-licences. Quant à l'argument d'Eli Lilly selon lequel les parties n'avaient pas dévoilé la nature véritable de l'accord — que chaque partie accorderait des sous-

there was, in the view of Pratte J.A. at p. 342, "absolutely no evidence that the parties ever intended to enter into such a surrealistic arrangement". In his view, Eli Lilly had not succeeded in proving that the arrangement was a sham merely by showing that the parties could have obtained the same advantages by entering into a different agreement. Therefore, he concluded that Novopharm had not breached the terms of its licence.

Turning to the question of non-infringement by Apotex's actual activities, Pratte J.A. was of the view, at pp. 342-43, that "Apotex, by purchasing from Novopharm bulk nizatidine manufactured or imported by that company under its compulsory licence, would acquire the right to use that drug and, as an incident of that right, the right to make capsules from it". He found that, by selling a patented article, a patentee transfers the ownership of that article to the purchaser. The patentee no longer has any right with respect to the article, and the purchaser, as the new owner, "has the exclusive right to possess, use, enjoy, destroy or alienate it" (p. 343) without fear of infringing the vendor's patent. The patentee, in other words, has impliedly renounced his exclusive right of use and sale. In the view of Pratte J.A., with whom the majority concurred on this point, the same principles apply to the sale of a patented article by a licensee who is entitled by the licence to sell without restrictions, and therefore, Apotex was entitled to make capsules from the nizatidine obtained from Novopharm without infringing Eli Lilly's patent. For these reasons, Pratte J.A. would have allowed the appeal.

## IV. Issues

As I have already stated, the issue common to both appeals is whether the supply agreement between Apotex and Novopharm constituted a sublicence, such as to justify the termination by Eli Lilly of Novopharm's compulsory licence for nizatidine. If it did, then the NOAs issued by both

licences à l'autre et alors, pour sauver les apparences, agirait à titre de mandataire du titulaire de la sous-licence en obtenant le médicament —, il n'y avait, selon le juge Pratte (à la p. 342), «absolument aucune preuve que les parties aient jamais eu l'intention de conclure un arrangement aussi surréaliste». À son avis, Eli Lilly n'avait pas réussi à prouver que l'entente était un subterfuge en montrant simplement que les parties auraient pu obtenir les mêmes avantages en signant une entente différente. Par conséquent, il a conclu que Novopharm n'avait pas violé les conditions de sa licence.

Quant à savoir si les activités réelles d'Apotex 44 n'emportaient pas contrefaçon, le juge Pratte était d'avis, aux pp. 342 et 343, qu'«Apotex, en achetant de Novopharm de la nizatidine en vrac fabriquée ou importée par cette société en vertu de sa licence obligatoire, acquerrait le droit d'utiliser ce médicament et, accessoirement, le droit de fabriquer des gélules à partir de celui-ci». Il a conclu que, si le titulaire d'un brevet vend l'objet breveté, il cède à l'acheteur le droit de propriété relatif à cet article. Le titulaire du brevet ne jouit plus d'aucun droit à l'égard de cet objet, et l'acheteur, à titre de nouveau propriétaire, «jouit du droit exclusif de posséder cet objet, de l'utiliser, d'en jouir, de le détruire ou de l'aliéner» (p. 343), sans crainte de violer le brevet du vendeur. Autrement dit, le titulaire du brevet a renoncé implicitement à son droit exclusif d'usage et de vente. Selon le juge Pratte, à l'avis duquel ont souscrit les juges majoritaires sur ce point, les mêmes principes s'appliquent à la vente d'un article breveté par le titulaire d'une licence qui, en vertu de cette dernière, est autorisé à vendre sans restriction et, en conséquence, Apotex avait le droit de fabriquer des gélules à partir de la nizatidine obtenue de Novopharm sans violer le brevet de Lilly. Pour ces motifs, le juge Pratte aurait accueilli l'appel.

## IV. Les questions en litige

Comme nous l'avons vu, la question commune 45 aux deux pourvois est de savoir si l'accord d'approvisionnement entre Apotex et Novopharm est une sous-licence, de manière à justifier l'annulation par Eli Lilly de la licence obligatoire accordée à Novopharm relativement à la nizatidine. Dans

Novopharm and Apotex were not justified and the requested prohibition order should issue. However, each appeal also raises other discrete issues, which I shall consider in turn.

l'affirmative, les ADA déposés par Novopharm et Apotex n'étaient pas fondés et il y a lieu de rendre l'ordonnance d'interdiction demandée. Toutefois, chaque pourvoi soulève d'autres questions distinctes que je vais examiner à tour de rôle.

46    Specifically, in the *Novopharm* proceeding, this Court is asked to determine: (1) whether the Federal Court of Appeal erred in applying its decision in *Apotex #1* to the *Novopharm* appeal, whether as *res judicata* or otherwise; (2) whether Novopharm's NOA was not justified, regardless of whether its compulsory licence was terminated by breach, because the licence did not permit the activities which it proposed; and (3) whether the Federal Court had the jurisdiction to grant declaratory relief on a limited judicial review proceeding of this type. In *Apotex #1*, it is further alleged that, apart from the primary issue of infringement, Apotex's proposed reformulation of the nizatidine into final-dosage form would itself constitute an infringement of the patents held by Eli Lilly, and that the prohibition order should therefore have issued regardless of whether or not the supply agreement constituted a sublicence.

Plus précisément, dans le pourvoi *Novopharm*, notre Cour est appelée à décider (1) si la Cour d'appel fédérale a commis une erreur en appliquant à l'affaire *Novopharm* son arrêt *Apotex nº 1*, que ce soit à titre de chose jugée ou pour un autre motif, (2) si l'ADA de Novopharm était non fondé, peu importe que sa licence obligatoire ait ou non été annulée pour cause de violation, parce que la licence n'autorisait pas les activités qui y étaient proposées, et (3) si la Cour fédérale avait compétence pour rendre un jugement déclaratoire dans le cadre d'une telle procédure de contrôle judiciaire limité. Dans *Apotex nº 1*, il est aussi allégué que, outre la question principale de la contrefaçon, la préparation de la nizatidine sous forme posologique définitive proposée par Apotex constituerait elle-même une violation des brevets d'Eli Lilly et qu'il y a donc lieu de rendre une ordonnance d'interdiction peu importe que l'accord d'approvisionnement constitue ou non une sous-licence.

V.  Analysis

V.  Analyse

A.  *The Agreement Between Apotex and Novopharm*

A.  *L'accord entre Apotex et Novopharm*

47    The primary argument advanced by Eli Lilly is that the supply agreement constituted the grant of a sublicence by Novopharm to Apotex in direct violation of paragraph 12 of Novopharm's compulsory licence for nizatidine. It is undisputed that such a breach would, pursuant to paragraph 8 of the licence, entitle Eli Lilly to terminate the licence, which would in turn preclude Novopharm from manufacturing, using, importing or selling nizatidine without infringing Eli Lilly's patent. In this event, neither Novopharm's nor Apotex's NOA would be justified.

Le principal argument avancé par Eli Lilly veut que l'accord d'approvisionnement représente l'attribution d'une sous-licence par Novopharm à Apotex, ce qui est directement contraire à l'article 12 de la licence obligatoire de Novopharm à l'égard de la nizatidine. Tous s'accordent pour dire qu'une telle violation donnerait à Eli Lilly, en vertu de l'article 8 de la licence, le droit d'annuler la licence, ce qui aurait pour effet d'empêcher Novopharm de fabriquer, d'utiliser, d'importer ou de vendre de la nizatidine sans violer le brevet d'Eli Lilly. Dans un tel cas, ni l'ADA de Novopharm ni celui d'Apotex ne seraient fondés.

### (1)  The Nature of a Sublicence

Relatively little argument was directed at defining what a sublicence is. As a general matter, a sublicence amounts to a grant by a licensee of certain licensed rights to a third party, the sublicensee. That is, the licensee in effect transfers or licenses some or all of his or her rights to the sublicensee, which means that the sublicence has similar incidents to the primary licence, including the right to exercise independently certain rights enjoyed by the licensee pursuant to its licence. It has been said, in fact, that "a sublicence is simply another name for the indirect granting of a licence": see Leslie W. Melville, *Forms and Agreements on Intellectual Property and International Licensing*, vol. 1 (3rd ed. rev. 1997 (loose-leaf)), at § 3.18.

To understand the nature of a sublicence, then, it is first necessary to appreciate the nature of a licence. In Harold G. Fox, *The Canadian Law and Practice Relating to Letters Patent for Inventions* (4th ed. 1969), the concept is expressed as follows (at p. 285):

A licence, even though exclusive, does not give the licensee all the rights of the patentee. A licence does not set up rights as between the licensee and the public, but only permits him to do acts that he would otherwise be prohibited from doing. He obtains merely a right of user. But a licence is a grant of a right and does not merely confer upon the licensee a mere interest in equity. A licence is the transfer of a beneficial interest to a limited extent, whereby the transferee acquires an equitable right in the patent. A licence prevents that from being unlawful which, but for the licence, would be unlawful; it is a consent by an owner of a right that another person should commit an act which, but for that licence, would be an infringement of the right of the person who gives the licence. A licence gives no more than the right to do the thing actually licensed to be done. [Emphasis added.]

In other words, by the grant of a licence, the patentee grants to the licensee the right to act in a certain way *vis à vis* the patented article, a right which, but for the licence, the licensee would not enjoy. The licensee's rights, however, are not nec-

### (1)  La nature d'une sous-licence

On a soumis relativement peu d'arguments au sujet de la définition d'une sous-licence. En général, une sous-licence représente l'attribution par le titulaire d'une licence de certains droits conférés par celle-ci à un tiers, le titulaire de la sous-licence. Autrement dit, le titulaire de la licence cède effectivement la totalité ou une partie de ses droits au titulaire de la sous-licence, ce qui signifie que la sous-licence comporte des attributs semblables à ceux de la licence principale, dont le droit d'exercer de façon indépendante certains droits que la licence confère à son titulaire. En réalité, on a dit qu'[TRADUCTION] «une sous-licence est simplement un autre nom donné à l'attribution indirecte d'une licence»: voir Leslie W. Melville, *Forms and Agreements on Intellectual Property and International Licensing*, vol. 1 (3ᵉ éd. rév. 1997 (feuilles mobiles)), au § 3.18.

Pour comprendre la nature d'une sous-licence, il est donc nécessaire de commencer par saisir la nature d'une licence. Dans Harold G. Fox, *The Canadian Law and Practice Relating to Letters Patent for Inventions* (4ᵉ éd. 1969), le concept est exprimé ainsi (à la p. 285):

[TRADUCTION] Une licence, quoiqu'exclusive, ne confère pas à son titulaire tous les droits du breveté. Elle n'investit pas son titulaire de droits opposables au grand public, mais lui permet seulement de faire ce qui lui serait par ailleurs interdit de faire. Il n'obtient qu'un droit d'usage. Mais une licence est une attribution d'un droit et ne fait pas que conférer à son titulaire un simple intérêt en *equity*. Une licence représente une cession de droit à titre bénéficiaire dans une certaine mesure, par laquelle le cessionnaire acquiert un droit en *equity* sur le brevet. Une licence empêche d'être illégal ce qui, sans elle, serait illégal; elle est un consentement du titulaire d'un droit à ce qu'une autre personne accomplisse un acte qui, sans la licence, violerait le droit de la personne qui accorde la licence. Une licence confère tout au plus le droit de faire la chose qu'elle permet vraiment de faire. [Je souligne.]

En d'autres termes, par l'attribution d'une licence, le breveté accorde au titulaire de cette licence le droit d'agir d'une certaine façon relativement à l'article breveté, droit dont le titulaire de la licence ne jouirait pas sans celle-ci. Toutefois, les droits du

48

49

essarily equivalent to those of the patentee; rather, they are limited to, and qualified by, the express terms of the licence.

50    Moreover, I should note, as an aside, that, unless the intention is expressed or implied in the licence, a licensee is not at liberty to grant a sublicence without the permission of the licensor: see, for example, *Howard and Bullough, Ld. v. Tweedales and Smalley* (1895), 12 R.P.C. 519, at p. 528. This may be viewed as an effort by the law to protect the property rights of the owner of the property, notwithstanding that the exclusive nature of these rights has been compromised by the granting of a licence. Thus, even without the express prohibition against sublicensing in the compulsory licence, Novopharm would not have been permitted to grant a sublicence to Apotex. The effect of the express prohibition, however, in the context of this licence as a whole, is that the grant of a sublicence by Novopharm would occasion a breach which could lead to the termination of the compulsory licence at the instance of Eli Lilly.

51    For Novopharm to have granted a sublicence to Apotex by means of the supply agreement, it must have transferred some or all of its rights under its compulsory licence to Apotex. Simply put, the question comes down to this: did Novopharm grant to Apotex, either expressly or impliedly, the right to do something which Apotex would otherwise be prohibited from doing, and which Novopharm was permitted to do only by virtue of its compulsory licence for nizatidine? This may have occurred in one of two ways: either some express provision or provisions, apparent on the face of the agreement, may reveal that the intentions of the parties was to create a sublicensing arrangement, or the legal effect of the document may be such that a sublicence was created in spite of the parties' contrary intentions. I will examine each of these possibilities in turn.

titulaire d'une licence n'équivalent pas nécessairement à ceux du breveté; ils sont plutôt limités aux conditions explicites de la licence et nuancés par celles-ci.

De plus, je devrais souligner, en passant, que, sauf si cette intention est explicite ou implicite dans la licence, le titulaire de cette dernière n'est pas libre d'accorder une sous-licence sans la permission du donneur de licence: voir, par exemple, *Howard and Bullough, Ld. c. Tweedales and Smalley* (1895), 12 R.P.C. 519, à la p. 528. Cela peut-être perçu comme une tentative de la loi de protéger les droits de propriété du titulaire du bien, même si l'attribution d'une licence a compromis la nature exclusive de ces droits. Ainsi, même si la licence obligatoire n'interdisait pas expressément d'accorder une sous-licence, Novopharm n'aurait pas été autorisée à accorder une sous-licence à Apotex. Toutefois, il découle de l'interdiction expresse, compte tenu de la licence dans son ensemble, que l'attribution d'une sous-licence par Novopharm engendrerait une violation susceptible d'entraîner l'annulation de la licence obligatoire à la demande d'Eli Lilly.

Pour que Novopharm ait accordé une sous-licence à Apotex au moyen de l'accord d'approvisionnement, elle doit lui avoir cédé une partie ou la totalité des droits qu'elle possédait en vertu de sa licence obligatoire. Il s'agit simplement de savoir si Novopharm a, expressément ou implicitement, accordé à Apotex le droit de faire quelque chose qu'il lui aurait par ailleurs été interdit de faire et que Novopharm n'aurait été autorisée à faire qu'en vertu de sa licence obligatoire relative à la nizatidine. Cela a pu se produire de deux manières: soit qu'une seule ou plusieurs dispositions explicites, qui se dégagent à la lecture de l'accord, puissent révéler que les parties avaient l'intention de créer une entente de sous-licence, soit que l'effet juridique du document peut être tel qu'une sous-licence a été créée malgré les intentions contraires des parties. Je vais examiner chacune de ces possibilités à tour de rôle.

### (2) Contractual Interpretation and the Intentions of the Parties

In order to ascertain whether the supply agreement conferred or had the effect of conferring a sublicence upon Apotex, it is first necessary to consider the proper approach to the interpretation of such a contract, and, in particular, the evidence which may be considered in this respect. In *Consolidated-Bathurst*, *supra*, at p. 901, Estey J., writing for himself and Pigeon, Dickson, and Beetz JJ., offered the following analysis:

> Even apart from the doctrine of *contra proferentem* as it may be applied in the construction of contracts, the normal rules of construction lead a court to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract. Consequently, literal meaning should not be applied where to do so would bring about an unrealistic result or a result which would not be contemplated in the commercial atmosphere in which the insurance was contracted. Where words may bear two constructions, the more reasonable one, that which produces a fair result, must certainly be taken as the interpretation which would promote the intention of the parties. Similarly, an interpretation which defeats the intentions of the parties and their objective in entering into the commercial transaction in the first place should be discarded in favour of an interpretation . . . which promotes a sensible commercial result.

From this passage emerge a number of important principles of contractual interpretation. Not all of these, however, apply to the instant appeal. One which surely does not is the doctrine of *contra proferentem*. *Contra proferentem* operates to protect one party to a contract from deviously ambiguous or confusing drafting on the part of the other party, by interpreting any ambiguity against the drafting party. When both parties are in agreement as to the proper interpretation of the contract, however, it is not open to a third party to assert that *contra proferentem* should be applied to interpret the contract against <u>both</u> contracting parties. Indeed, a third party has no basis at all upon which to rely upon *contra proferentem*: see G. H. L. Fridman, *The Law of Contract in Canada* (3rd ed. 1994), at p. 471. Therefore, I would, as a prelimi-

### (2) Interprétation des contrats et intentions des parties

Pour vérifier si l'accord d'approvisionnement a conféré ou a eu pour effet de conférer une sous-licence à Apotex, il faut tout d'abord décider quelle est la méthode d'interprétation qui convient pour ce type de contrat et, en particulier, quelle preuve peut être prise en considération à cet égard. Dans *Consolidated Bathurst*, précité, à la p. 901, le juge Estey fait l'analyse suivante, en son propre nom et en celui des juges Pigeon, Dickson et Beetz:

> Même indépendamment de la doctrine *contra proferentem* dans la mesure où elle est applicable à l'interprétation des contrats, les règles normales d'interprétation amènent une cour à rechercher une interprétation qui, vu l'ensemble du contrat, tend à traduire et à présenter l'intention véritable des parties au moment où elles ont contracté. Dès lors, on ne doit pas utiliser le sens littéral lorsque cela entraînerait un résultat irréaliste ou qui ne serait pas envisagé dans le climat commercial dans lequel l'assurance a été contractée. Lorsque des mots sont susceptibles de deux interprétations, la plus raisonnable, celle qui assure un résultat équitable, doit certainement être choisie comme l'interprétation qui traduit l'intention des parties. De même, une interprétation qui va à l'encontre des intentions des parties et du but pour lequel elles ont à l'origine conclu une opération commerciale doit être écartée en faveur d'une interprétation [. . .] qui favorise un résultat commercial raisonnable.

Un certain nombre de principes importants en matière d'interprétation des contrats se dégagent de ce passage. Toutefois, ils ne s'appliquent pas tous au présent pourvoi. Un principe qui ne s'applique sûrement pas est la règle *contra proferentem*. Cette règle a pour effet de protéger une partie à un contrat contre les conditions ambiguës ou déroutantes introduites d'une façon détournée par l'autre partie, en privilégiant une interprétation de l'ambiguïté au détriment de la partie qui les a rédigées. Toutefois quand les deux parties s'entendent sur la façon d'interpréter le contrat, il n'est pas loisible à un tiers d'affirmer que la règle *contra proferentem* devrait être appliquée pour interpréter le contrat au détriment des <u>deux</u> parties contractantes. En fait, un tiers n'a aucune raison d'invoquer la règle *contra proferentem*: voir G. H. L. Fridman,

52

53

nary matter, reject the suggestion that the doctrine should apply to read any ambiguity in the contract against the drafting parties, in this case both Novopharm and Apotex.

54    The trial judge appeared to take *Consolidated-Bathurst* to stand for the proposition that the ultimate goal of contractual interpretation should be to ascertain the true intent of the parties at the time of entry into the contract, and that, in undertaking this inquiry, it is open to the trier of fact to admit extrinsic evidence as to the subjective intentions of the parties at that time. In my view, this approach is not quite accurate. The contractual intent of the parties is to be determined by reference to the words they used in drafting the document, possibly read in light of the surrounding circumstances which were prevalent at the time. Evidence of one party's subjective intention has no independent place in this determination.

55    Indeed, it is unnecessary to consider any extrinsic evidence at all when the document is clear and unambiguous on its face. In the words of Lord Atkinson in *Lampson v. City of Quebec* (1920), 54 D.L.R. 344 (P.C.), at p. 350:

> . . . the intention by which the deed is to be construed is that of the parties as revealed by the language they have chosen to use in the deed itself. . . . [I]f the meaning of the deed, reading its words in their ordinary sense, be plain and unambiguous it is not permissible for the parties to it, while it stands unreformed, to come into a Court of justice and say: "Our intention was wholly different from that which the language of our deed expresses. . . ."

56    When there is no ambiguity in the wording of the document, the notion in *Consolidated-Bathurst* that the interpretation which produces a "fair result" or a "sensible commercial result" should be adopted is not determinative. Admittedly, it would be absurd to adopt an interpretation which is clearly inconsistent with the commercial interests of the parties, if the goal is to ascertain their true

*The Law of Contract in Canada* (3ᵉ éd. 1994), à la p. 471. En conséquence, je suis d'avis, à titre préliminaire, de repousser la proposition selon laquelle cette règle devrait s'appliquer de manière à interpréter toute ambiguïté du contrat au détriment des parties qui l'on rédigé, en l'occurrence tant Novopharm qu'Apotex.

Le juge de première instance semble avoir considéré que, d'après l'arrêt *Consolidated Bathurst*, l'interprétation du contrat devrait viser en définitive à vérifier l'intention véritable des parties au moment de conclure le contrat et que, ce faisant, le juge des faits peut admettre des éléments de preuve extrinsèques concernant les intentions subjectives des parties à ce moment-là. À mon avis, cela n'est pas tout à fait exact. L'intention des parties contractantes doit être déterminée en fonction des mots qu'elles ont employés en rédigeant le document, éventuellement interprétés à la lumière des circonstances du moment. La preuve de l'intention subjective d'une partie n'occupe aucune place indépendante dans cette décision.

En fait, il n'est pas nécessaire de prendre en considération quelque preuve extrinsèque que ce soit lorsque le document est, à première vue, clair et sans ambiguïté. Pour reprendre les propos de lord Atkinson dans *Lampson c. City of Quebec* (1920), 54 D.L.R. 344 (C.P.), à la p. 350:

> [TRADUCTION] . . . l'intention qu'il faut rechercher en interprétant l'acte est celle des parties telle qu'elle se dégage des termes qu'elles ont utilisés dans l'acte lui-même. [. . .] [S]i la signification de l'acte, selon le sens ordinaire des mots qui y sont employés, est claire et sans ambiguïté, il n'est pas permis aux parties à cet acte, aussi longtemps qu'il n'est pas modifié, de venir affirmer devant une cour de justice: «Notre intention était tout à fait différente de celle qui est exprimée par les termes de l'acte . . .»

Quand le texte du document est sans ambiguïté, l'idée exprimée dans *Consolidated Bathurst*, selon laquelle il y a lieu de retenir l'interprétation qui assure un «résultat équitable» ou un «résultat commercial raisonnable», n'est pas déterminante. Certes, il serait absurde d'adopter une interprétation nettement incompatible avec les intérêts commerciaux des parties, si l'objectif est de vérifier leur

contractual intent. However, to interpret a plainly
worded document in accordance with the true con-
tractual intent of the parties is not difficult, if it is
presumed that the parties intended the legal conse-
quences of their words. This is consistent with the
following dictum of this Court, in *Joy Oil Co. v.
The King*, [1951] S.C.R. 624, at p. 641:

. . . in construing a written document, the question is not
as to the meaning of the words alone, nor the meaning
of the writer alone, but the meaning of the words as
used by the writer.

In my view, there was no ambiguity to the con-
tract entered into between Apotex and Novopharm.
No attempt was made to disguise the true purpose
of the arrangement, or the circumstances surround-
ing its drafting. Clearly, the agreement was meant
to minimize the deleterious effects of the amend-
ments to the *Patent Act*, which were expected to
and did eventually place severe restrictions on the
former scheme of compulsory licensing, by maxi-
mizing the access of each party to as wide a variety
of patented medicines as possible. This was to be
accomplished by obliging each party to obtain
such material for the other in the event that one
party possessed a licence which the other lacked
and could no longer readily obtain. All of this is
evident on a plain reading of the recitals to the
supply agreement. Leaving aside the question of
circumventing the legislation, which has no bear-
ing on the interpretation of the contract, the par-
ties' intentions are clear on the face of the agree-
ment. Accordingly, it cannot properly be said, in
my view, that the supply agreement contains any
ambiguity that cannot be resolved by reference to
its text. No further interpretive aids are necessary.

More specifically, there is no need to resort to
any of the evidence tendered by either Apotex or
Novopharm as to the subjective intentions of their
principals at the time of drafting. Consequently, I
find this evidence to be inadmissible by virtue of
the parol evidence rule: see *Indian Molybdenum*

véritable intention au moment de contracter. Tou-
tefois, il n'est pas difficile d'interpréter un docu-
ment clair conformément à l'intention véritable
des parties contractantes, si l'on présume que les
parties voulaient les conséquences juridiques des
mots qu'elles ont employés. Cela est conforme à
l'opinion incidente de notre Cour dans *Joy Oil Co.
c. The King*, [1951] R.C.S. 624, à la p. 641:

[TRADUCTION] . . . en interprétant un document, il s'agit
non pas de chercher à comprendre ce que les mots seule-
ment veulent dire, ni ce que le rédacteur seulement a
voulu dire, mais plutôt de chercher ce que les mots
employés par le rédacteur veulent dire.

À mon sens, le contrat intervenu entre Apotex et    57
Novopharm ne comporte aucune ambiguïté.
Aucune tentative n'a été faite pour camoufler l'ob-
jet véritable de l'entente ou les circonstances ayant
entouré sa rédaction. De toute évidence, l'accord
visait à réduire au minimum les effets préjudi-
ciables des modifications apportées à la *Loi sur les
brevets*, qui étaient censées imposer, et ont imposé
en définitive, des restrictions considérables au
régime antérieur de licences obligatoires, en por-
tant au maximum l'accès de chaque partie à la plus
grande variété possible de médicaments brevetés.
Cela a été fait en obligeant chaque partie à obtenir
de telles substances pour l'autre partie dans le cas
où cette partie possédait une licence que l'autre
n'avait pas et ne pourrait plus facilement acquérir.
Tout cela ressort du texte clair des considérants de
l'accord d'approvisionnement. Mis à part la ques-
tion de contourner la loi, qui n'a rien à voir avec
l'interprétation du contrat, les intentions des par-
ties ressortent clairement à la lecture de l'accord.
En conséquence, j'estime qu'on ne saurait affirmer
à juste titre que l'accord d'approvisionnement
comporte des ambiguïtés que son texte même ne
permet pas de résoudre. Aucun autre outil d'inter-
prétation n'est nécessaire.

Plus précisément, il n'est pas nécessaire de    58
recourir à l'un ou l'autre élément de preuve soumis
par Apotex ou Novopharm relativement aux inten-
tions subjectives de leurs mandants au moment de
rédiger l'accord. Par conséquent, j'estime que cette
preuve est irrecevable en vertu de la règle d'exclu-

*Ltd. v. The King*, [1951] 3 D.L.R. 497 (S.C.C.), at pp. 502-3.

59      Moreover, even if such evidence were required, that is not the character of the evidence tendered in this case, which sheds no light at all on the surrounding circumstances. It consisted only of the subjective intentions of the parties: Mr. Dan's subjective intention at the time of drafting and Dr. Sherman's subjective intention to implement the agreement in a certain way.

60      Therefore, I am of the opinion that the trial judge erred, in the *Novopharm* proceeding, in considering the evidence of Mr. Dan as to his intention at the time the contract was made. However, I am also cognizant of her clear statement that she would have reached the same conclusion even without considering the evidence and thus I would not reject her interpretation of the supply agreement for this reason alone. Appropriately, McGillis J. did not appear to consider the evidence of Dr. Sherman in *Apotex #1*, although the same cannot be said for MacGuigan J.A. in his disposition of that case. Indeed, he seemed to have been influenced heavily by this evidence, which necessarily casts doubt on the validity of his conclusions.

61      Having established that no extrinsic evidence is admissible, what does the text of the agreement say about the intentions of the parties? Despite the somewhat strident submissions to the contrary by Eli Lilly, one thing which it most assuredly does not say is that, pursuant to its terms, Apotex is entitled to the independent use of any compulsory licence owned by Novopharm for its own benefit. Nor does it say that Apotex is entitled to exercise any right enjoyed by Novopharm pursuant to any such licence. Rather, it simply provides, in paragraph 1, that Novopharm will, at the direction of Apotex, "use its licence for the benefit of" Apotex. To my mind, this does not satisfy the definition of a sublicence, as previously set out. The only right acquired by Apotex pursuant to this provision is the right to require Novopharm to exercise its licensed rights in a particular way, that is, to

sion de la preuve extrinsèque: voir *Indian Molybdenum Ltd. c. The King*, [1951] 3 D.L.R. 497 (C.S.C.), aux pp. 502 et 503.

De plus, même si cette preuve était nécessaire, telle n'est pas la nature de la preuve soumise en l'espèce, qui n'élucide aucunement les circonstances de la rédaction. Elle ne concernait que les intentions subjectives des parties: l'intention subjective de M. Dan au moment de la rédaction et l'intention subjective de M. Sherman d'exécuter l'accord d'une certaine manière.

En conséquence, je suis d'avis que le juge de première instance a commis une erreur, dans l'affaire *Novopharm*, en tenant compte du témoignage de M. Dan quant à l'intention qu'il avait au moment de conclure le contrat. Toutefois, je reconnais aussi qu'elle a affirmé clairement qu'elle aurait tiré la même conclusion même indépendamment de ce témoignage, et je ne rejetterais donc pas son interprétation de l'accord d'approvisionnement pour ce seul motif. À juste titre, le juge McGillis n'a pas paru tenir compte du témoignage de M. Sherman dans *Apotex nº 1*, bien qu'on ne puisse pas en dire autant du juge MacGuigan dans la façon dont il a statué sur cette affaire. En fait, il a semblé avoir été fortement influencé par ce témoignage, ce qui met nécessairement en doute la validité de ses conclusions.

Une fois qu'il est établi qu'aucune preuve extrinsèque n'est recevable, que dit le texte de l'accord au sujet de l'intention des parties? Malgré les arguments contraires quelque peu percutants avancés par Eli Lilly, une chose que l'accord ne dit sûrement pas c'est qu'Apotex a le droit d'utiliser de manière indépendante, à son propre profit, toute licence obligatoire que possède Novopharm. Il ne dit pas non plus qu'Apotex a le droit d'exercer tout droit conféré à Novopharm par une telle licence. Il ne fait plutôt que prévoir, à l'article 1, que Novopharm va, sur l'ordre d'Apotex, «utilise[r] sa licence au bénéfice» d'Apotex. À mon sens, cela ne correspond pas à la définition de la souslicence, donnée précédemment. Le seul droit acquis par Apotex, en vertu de cette disposition, est celui de demander à Novopharm d'exercer d'une certaine manière les droits que lui confère sa

enable it to set in motion and benefit from Novopharm's exercise of its own rights to obtain and sell certain patented medicines. Apotex acquires no right to obtain these medicines independently of Novopharm. Indeed, it remains abundantly clear that Novopharm is still the only party actually entitled to act pursuant to the licence.

Thus, it is really of no consequence that the agreement gives Apotex the right to direct Novopharm as to who should make the medicine, from whom it should be purchased, and at what price, or that Novopharm is contractually obliged to follow these directions. Nor does it matter that Novopharm is to receive a royalty for supplying to Apotex the licensed materials so obtained. In some ways, these provisions create nothing more than an elaborate agreement to agree. That is, the agreement sets out a procedure by which the unlicensed party may require the licensed party to enter into another agreement, one of purchase and sale, the specific terms of which may be set substantially by the unlicensed party except that the licensed party is always entitled to the same rate of return: four percent of the cost of the material sold. In this way, the royalty does no more than assure the licensed party a certain margin of profit in consideration of its role in these anticipated future transactions. The arguments of the respondent notwithstanding, I do not see how this can be indicative of either an intention to confer, or the actual conferral of, a sublicence.

It is true that, in the recitals, the parties refer to a mutual intention to "share their rights", which itself might well be taken to suggest an intention to create a sublicence. However, this provision must be read in light of the rest of the agreement, which clearly discloses the intention not to create a sublicence. In particular, the requirement in paragraph 6 that the licensed party comply with the terms of its licence militates against the conclusion that the parties intended by the agreement to grant sublicences to one another. It simply would not be

licence, c'est-à-dire de manière à l'habiliter à déclencher l'exercice par Novopharm de ses propres droits d'obtenir et de vendre certains médicaments brevetés, et à profiter de cet exercice. Apotex n'acquiert aucun droit d'obtenir ces médicaments indépendamment de Novopharm. En fait, il reste tout à fait clair que Novopharm est toujours la seule partie ayant réellement le droit d'agir conformément à la licence.

Ainsi, il est vraiment sans importance que l'accord donne à Apotex le droit de dire à Novopharm qui devrait fabriquer le médicament, à qui il devrait être acheté et à quel prix, ou que Novopharm soit tenue, en vertu du contrat, de suivre ces directives. Il n'importe pas non plus que Novopharm doive toucher une redevance pour la fourniture à Apotex des substances autorisées ainsi obtenues. À certains égards, ces dispositions créent tout au plus un engagement détaillé à conclure un accord. Autrement dit, l'accord établit une procédure par laquelle la partie non titulaire de la licence peut contraindre la partie titulaire de la licence à conclure un autre contrat, à savoir un contrat de vente, dont les conditions précises peuvent être fixées en grande partie par la partie non titulaire, sauf que la partie titulaire de la licence a toujours droit au même taux de rendement: quatre pour cent du prix de la substance vendue. De cette façon, la redevance ne fait que garantir à la partie titulaire de la licence une certaine marge bénéficiaire en contrepartie de son rôle dans ces futures opérations prévues. Malgré les arguments de l'intimée, je ne vois pas comment cela peut indiquer soit l'intention d'attribuer une sous-licence, soit l'attribution réelle d'une sous-licence. 62

Il est vrai que, dans les considérants, les parties parlent d'une volonté commune de «partager leurs droits», ce qui pourrait bien être interprété en soi comme une intention de créer une sous-licence. Cependant, cette disposition doit être interprétée en fonction du reste de l'accord, qui révèle clairement l'intention de ne pas créer une sous-licence. En particulier, la condition, à l'article 6, que la partie titulaire d'une licence se conforme aux conditions de sa licence milite contre la conclusion que les parties voulaient, par cet accord, s'accorder 63

possible for Novopharm to grant a sublicence while still complying with the terms of its compulsory licence for nizatidine, given the express prohibition in that licence against the conferral of sublicences. On the evidence, there is no reason to conclude that Novopharm intended to breach both the supply agreement and its compulsory licence by granting a sublicence to Apotex.

64    Moreover, I do not read paragraph 7 of the agreement, which provides that "[t]he licensed party shall not be excused from performing any act as directed by the unlicensed party . . . on the grounds that there is doubt as to whether or not the licence . . . permits the requested acts" (emphasis added), provided also that the unlicensed party is obliged to defend the licensed party from any ensuing litigation, as either permitting or requiring the conferral of a sublicence in this case. If paragraph 6 is to have any meaning at all, it must at least be seen as prohibiting acts which would be in clear violation of the licence held by the licensed party. I can conceive of no clearer violation than the conferral of a sublicence. There is no "doubt" as to whether the licence permits such an act; rather, it is expressly prohibited by paragraph 12 of the licence. Consequently, I do not believe that paragraph 7 has any application in the circumstances; certainly, it does not oust the effect of paragraph 6.

65    Paragraph 8, which requires the licensed party to "cooperate fully with the unlicensed party and follow the directions of the unlicensed party to enable the unlicensed party to enjoy the use of the licence to the same extent that would be possible if the unlicensed party itself held such licence" (emphasis added), is admittedly an unusual and arguably unfortunately worded clause. Indeed, if anyone were to question whether the supply agreement was actually drafted without the benefit of counsel, as asserted by both Novopharm and Apotex, this paragraph would stand as cogent evidence in support of that claim. However, it too must be read in light of the rest of the agreement, which simply

mutuellement des sous-licences. Il serait simplement impossible à Novopharm d'accorder une sous-licence tout en respectant les conditions de sa licence obligatoire relative à la nizatidine, étant donné l'interdiction expresse qui y est faite d'attribuer des sous-licences. D'après la preuve, il n'y a aucune raison de conclure que Novopharm a voulu violer à la fois l'accord d'approvisionnement et sa licence obligatoire en accordant une sous-licence à Apotex.

En outre, selon moi, à l'article 7 de l'accord, qui prévoit que «[l]a partie titulaire d'une licence n'est pas dispensée d'accomplir un acte conformément aux instructions données par la partie non titulaire [. . .] pour le motif qu'un doute subsiste quant à savoir si la licence [. . .] permet l'acte en question» (je souligne), pourvu également que la partie non titulaire soit tenue d'assurer la défense de la partie titulaire de la licence dans le cadre de toute poursuite judiciaire qui peut s'ensuivre, ne permet pas ou n'exige pas l'attribution d'une sous-licence en l'espèce. Pour que l'article 6 ait un sens, il doit à tout le moins être interprété comme interdisant les actes qui contreviendraient clairement à la licence de la partie qui en est titulaire. Je ne puis imaginer de violation plus claire que l'attribution d'une sous-licence. Il n'y a aucun «doute» quant à savoir si la licence permet un tel acte; il est interdit expressément par l'article 12 de la licence. En conséquence, je ne crois pas que l'article 7 soit applicable dans les circonstances; il n'écarte certes pas l'effet de l'article 6.

L'article 8 qui oblige la partie titulaire d'une licence à «collabore[r] pleinement avec la partie non titulaire et [à] se conforme[r] aux instructions de cette dernière afin de lui permettre d'utiliser la licence tout comme si elle en était elle-même titulaire» (je souligne) est certes une clause inhabituelle et, pourrait-on soutenir, rédigée de façon malencontreuse. En effet, si quelqu'un devait douter que l'accord d'approvisionnement a vraiment été rédigé sans l'aide d'un conseiller juridique, comme l'ont fait valoir Novopharm et Apotex, cet article tendrait fortement à corroborer cette assertion. Toutefois, il doit lui aussi être interprété en fonction du reste de l'accord, qui ne permet sim-

does not permit the unlicensed party to "enjoy the use of the licence" in the active sense, that is, to actually use it. Rather, it permits only underlined indirect enjoyment: the enjoyment of the licensed party's use of the licence. It is certainly true that the licensed party is obliged to follow the directions of the unlicensed party and to take all legal steps possible to enable the unlicensed party to benefit from the existence of the license, when requested. However, this stops short of actually permitting the unlicensed party to exercise licensed rights independently of the licensed party, which is the essence of a sublicence.

In short, I can find nothing in the wording of the document to suggest that the parties intended to grant sublicences to each other. Rather, every indication is that they intended to establish a commercial arrangement whereby the unlicensed party would enjoy the right to require the licensed party to use its various licences for the benefit of the unlicensed party by acquiring, potentially at the direction of the unlicensed party, and subsequently reselling to the unlicensed party, various patented medicines. Indeed, it is worth noting that the creation of sublicences really would not have been in the parties' commercial interests, as this would have justified the termination of the various compulsory licences held by each company and thereby not only rendered the supply agreement itself useless but also jeopardized the business operations of both. While it is true, as submitted by Eli Lilly, that no express words of grant are required to create a sublicence, clearly the supply agreement, to have this character, must have transferred to Apotex more than simply the right to compel Novopharm to use its licence in a given way. But it is apparent that, in the context of the agreement as a whole, this is all that was meant by sharing rights.

### (3) The Legal Effect of the Supply Agreement

Eli Lilly contends that the legal effect of the agreement was that a sublicence was granted by

plement pas à la partie non titulaire d'une licence d'«utiliser la licence» au sens actif, c'est-à-dire de l'utiliser réellement. Il ne permet plutôt qu'une utilisation underlined indirecte: tirer profit de l'utilisation de la licence par la partie qui en est titulaire. Il est sûrement vrai que la partie titulaire d'une licence est tenue de suivre les directives de la partie non titulaire et de faire toutes les démarches juridiques possibles pour permettre à cette dernière de profiter de l'existence de la licence, à sa demande. Toutefois, cela ne va pas jusqu'à permettre à la partie non titulaire d'une licence d'exercer les droits conférés par la licence indépendamment de la partie qui en est titulaire, ce qui représente l'essence d'une sous-licence.

66  Bref, je ne trouve rien dans le texte du document qui laisse supposer que les parties voulaient s'accorder mutuellement des sous-licences. Tout indique au contraire qu'elles voulaient créer une entente commerciale en vertu de laquelle la partie non titulaire d'une licence aurait le droit de demander à la partie titulaire d'utiliser ses diverses licences à son profit pour acquérir, peut-être sur son ordre, divers médicaments brevetés, pour ensuite les lui revendre. En fait, il vaut la peine de souligner que la création de sous-licences n'aurait pas vraiment été commercialement avantageuse pour les parties, car cela aurait justifié l'annulation des diverses licences obligatoires détenues par chaque société, et aurait ainsi non seulement rendu inutile l'accord d'approvisionnement lui-même, mais encore compromis les opérations commerciales des deux sociétés. S'il est vrai, comme le soutient Eli Lilly, qu'il n'est pas nécessaire de prévoir expressément la création d'une sous-licence, il est évident que, pour constituer une sous-licence, l'accord d'approvisionnement doit avoir cédé à Apotex davantage que le simple droit d'obliger Novopharm à utiliser sa licence d'une certaine manière. Mais il appert que, dans le contexte de l'ensemble de l'accord, l'expression «partager leurs droits» ne signifiait rien de plus.

### (3) L'effet juridique de l'accord d'approvisionnement

67  Eli Lilly prétend que l'accord a eu pour effet juridique d'entraîner l'attribution mutuelle de

each party to the other, despite what they may have intended. In light of the foregoing analysis, however, I do not see how this argument can be sustained. Apotex and Novopharm intended to create a specific type of supply agreement, not a sublicence, and I believe they succeeded in doing so. However, to the extent that Eli Lilly's argument may be premised upon some confusion as to the distinction between a sublicence and an ordinary agreement of purchase and sale, that distinction does merit some brief examination at this stage.

### (i) *Sublicence Versus Purchase and Sale*

68    By virtue of its compulsory licence, Novopharm is entitled to manufacture and/or import bulk nizatidine, subject to the temporal restrictions imposed by the *Patent Act*, and to sell the nizatidine so obtained to Apotex or any other third party. Apotex, having acquired the nizatidine from Novopharm, would then be free to use it in any way that did not infringe the patents held by Eli Lilly. Thus, no sublicence could have been created by an agreement that was confirmatory of these rights and simply conferred upon Apotex the additional right to require Novopharm to acquire and sell to it bulk nizatidine at a certain rate. In other words, to prove the existence of a sublicence, it must be established that the agreement was, in substance if not form, more than merely an elaborate arrangement under which future contracts for purchase and sale might be completed.

69    As I have said, a sublicence requires the conferral of licensed rights by a licensee upon a third party, the sublicensee. This may create some confusion between a sublicence and an ordinary contract of purchase and sale, though, as a third party may acquire similar rights under each of these arrangements. That is, just as a sublicensee can obtain the rights to use and sell a patented article if this right is enjoyed by the licensee and transferred accordingly, so too is the sale by a licensee of a patented article presumed to give the purchaser the right "to use or sell or deal with the goods as the purchaser pleases": see *Badische Anilin und Soda Fabrik v. Isler*, [1906] 1 Ch. 605, at p. 610; see

sous-licences par les parties, malgré l'intention qu'elles ont pu avoir. Compte tenu de l'analyse qui précède, je ne vois cependant pas comment cet argument peut être retenu. Apotex et Novopharm voulaient créer un certain type d'accord d'approvisionnement et non pas une sous-licence, et je crois qu'elles sont parvenues à le faire. Toutefois, dans la mesure où l'argument d'Eli Lilly peut reposer sur une certaine confusion quant à la distinction entre une sous-licence et un contrat de vente ordinaire, il convient, à ce stade, d'examiner brièvement cette distinction.

### (i) *Sous-licence versus contrat de vente*

En vertu de sa licence obligatoire, Novopharm a le droit de fabriquer ou d'importer de la nizatidine en vrac, ou de faire les deux, à la condition de respecter les délais prescrits par la *Loi sur les brevets*, et de vendre la nizatidine ainsi obtenue à Apotex ou à tout autre tiers. Après avoir acquis la nizatidine de Novopharm, Apotex était ensuite libre de l'utiliser d'une manière qui ne violait pas les brevets d'Eli Lilly. Par conséquent, aucune sous-licence n'aurait pu être créée par un accord qui confirmait ces droits et accordait simplement à Apotex le droit supplémentaire de demander à Novopharm d'acquérir et de lui vendre de la nizatidine en vrac à un certain tarif. En d'autres mots, pour prouver l'existence d'une sous-licence, il faut établir que l'accord était, sur le plan du fond sinon de la forme, plus qu'une entente détaillée aux termes de laquelle de futurs contrats de vente pourraient être signés.

Je le répète, pour qu'il y ait sous-licence, il doit y avoir attribution par le titulaire d'une licence à un tiers, titulaire de la sous-licence, des droits conférés par la licence. Cela peut cependant générer une certaine confusion entre une sous-licence et un contrat de vente ordinaire, vu qu'un tiers peut acquérir des droits semblables en vertu de chacune de ces ententes. Autrement dit, tout comme le titulaire d'une sous-licence peut obtenir le droit d'utiliser et de vendre un article breveté si le titulaire de la licence possède ce droit et le lui cède en conséquence, de même la vente par le titulaire d'une licence d'un article breveté est présumée conférer à l'acheteur le droit [TRADUCTION] «d'utiliser, de

also *Gillette v. Rea* (1909), 1 O.W.N. 448 (H.C.); *Betts v. Willmott* (1871), L.R. 6 Ch. App. 245. In other words, unless otherwise stipulated in the licence, a licensee is generally entitled to pass to a purchaser the right to use or resell the patented article without fear of infringing the patent.

But the sale of a licensed article obviously does not have the automatic effect of constituting the purchaser a sublicensee, and thus the fact that a third party enjoys rights of use and alienation cannot alone be indicative of the existence of a sublicence. Indeed, as Apotex points out, both the case law and common sense disclose any number of ways in which a licensee can sell a licensed article to a third party with the complete range of ordinary incidents of ownership, without constituting that party a sublicensee. These range from the ordinary casual purchase to the licensee's manufacturing, at the purchaser's instigation and direction, and according to the purchaser's own design specifications, products which incorporate the subject matter of the licence: see *Intel Corp. v. ULSI System Technology Inc.*, 995 F.2d 1566 (Fed. Cir. 1993).

Thus, practically speaking, the rights of use and alienation can only be determinative of the existence of a sublicence in cases in which it is clear that no transfer of property rights has occurred, i.e., that there has been no sale of the licensed article to the third party. In such a case, a right of use could only be derived from a sublicence of some type, and an untrammelled right of alienation could not be enjoyed at all, as it would be impossible for a third party to transfer good title without first having any proprietary right in the article. Where the rights of the unlicensed party are derived from a sale of licensed material, however, it would be misleading to rely on the rights of use and alienation as a basis for the conclusion that a sublicence has been or is to be granted.

In the present case, it is plainly the latter situation which is contemplated by the supply agree-

vendre ou d'aliéner les marchandises à son gré»: voir *Badische Anilin und Soda Fabrik c. Isler*, [1906] 1 Ch. 605, à la p. 610; voir aussi *Gillette c. Rea* (1909), 1 O.W.N. 448 (H.C.); *Betts c. Willmott* (1871), L.R. 6 Ch. App. 245. En d'autres termes, sauf stipulation contraire de la licence, le titulaire de celle-ci a généralement le droit de céder à un acheteur le droit d'utiliser ou de revendre l'article breveté sans crainte de violer le brevet.

70

Mais, de toute évidence, la vente d'un article autorisé n'a pas automatiquement pour effet de faire de l'acheteur un titulaire de sous-licence et, par conséquent, le fait qu'un tiers jouisse de droits d'utilisation et d'aliénation ne saurait indiquer en soi l'existence d'une sous-licence. En réalité, comme Apotex le souligne, il existe, selon la jurisprudence et le bon sens, un certain nombre de manières dont le titulaire d'une licence peut vendre un article autorisé à un tiers avec l'éventail complet des attributs ordinaires de la propriété, sans pour autant faire de ce dernier un titulaire de sous-licence. Cela va de l'achat imprévu ordinaire à la fabrication par le titulaire d'une licence, à la demande et sur l'ordre de l'acheteur, et suivant ses propres spécifications, de produits qui incorporent l'objet de la licence: voir *Intel Corp. c. ULSI System Technology Inc.*, 995 F.2d 1566 (Fed. Cir. 1993).

71

Ainsi, en pratique, les droits d'utilisation et d'aliénation ne peuvent être déterminants quant à l'existence d'une sous-licence que lorsqu'il est évident qu'il n'y a eu aucune cession de droits de propriété, c'est-à-dire qu'il n'y a eu aucune vente au tiers de l'article autorisé. En pareil cas, un droit d'utilisation ne pourrait découler que d'une sous-licence quelconque et il ne pourrait pas y avoir de droit d'aliénation illimité, car il serait impossible à un tiers de céder un titre valable sans d'abord posséder un droit de propriété sur l'article. Toutefois, quand les droits de la partie non titulaire d'une licence découlent de la vente d'une substance autorisée, il serait trompeur de se fonder sur les droits d'utilisation et d'aliénation pour conclure qu'une sous-licence a été ou va être accordée.

72

Dans la présente affaire, c'est clairement la dernière situation qu'envisage l'accord d'approvision-

ment between Novopharm and Apotex. Under the agreement, any right Apotex might enjoy to sell nizatidine would obviously emanate from its first having purchased such material from Novopharm. As I have stated, the possibility that the material might be acquired by Novopharm at and subject to Apotex's direction is of no consequence. What is important, rather, is that the supply agreement in no way permits Apotex to exercise rights licensed to Novopharm in order to manufacture, or otherwise acquire independently, patented material for which it is not itself licensed. If the agreement were in substance a sublicence, Novopharm's involvement would be entirely unnecessary; Apotex could deal directly with the manufacturer or exporter of the material, or manufacture the drugs itself. But no such rights in fact exist under the supply agreement.

73    A number of recent U.S. cases support the view that establishing the existence of a sublicence in situations analogous to the one before us will typically depend on demonstrating that the unlicensed party is exercising the licensee's right to manufacture or import the licensed material. For example, in *Intel*, *supra*, it was held that the sale of microchips by the licensee, Hewlett-Packard ("HP"), to a third party, ULSI, did not constitute a sublicence, notwithstanding that the chips were built by HP according to the design and specifications of ULSI and were then resold by ULSI. The court in that case did acknowledge, however, that HP's empowering ULSI to make the chips itself would have constituted a sublicence.

74    In the instant appeals, the Federal Court of Appeal relied on *du Pont*, *supra*, for the proposition that, in effect, a sublicence is created whenever a patented product is made for the benefit of the unlicensed party rather than the licensee. However, with respect, I view *du Pont* as readily distinguishable from the cases before us, and do not, in any event, believe that it stands for the legal prin-

nement entre Novopharm et Apotex. Aux termes de l'accord, tout droit que pourrait posséder Apotex de vendre de la nizatidine émanerait, de toute évidence, de son achat préalable de cette substance à Novopharm. Comme nous l'avons vu, la possibilité que la substance puisse être acquise par Novopharm, sur l'ordre ou sous réserve des directives d'Apotex, est sans importance. Ce qui importe, c'est plutôt que l'accord d'approvisionnement ne permet nullement à Apotex d'exercer les droits conférés par la licence à Novopharm pour fabriquer ou autrement acquérir indépendamment la substance brevetée pour laquelle elle ne détient elle-même aucune licence. Si l'accord était essentiellement une sous-licence, la participation de Novopharm serait totalement inutile; Apotex pourrait négocier directement avec le fabricant ou l'exportateur de la substance, ou fabriquer elle-même les médicaments. Mais l'accord d'approvisionnement ne confère en fait aucun droit de cette nature.

Un certain nombre de précédents américains récents étayent le point de vue selon lequel, pour établir l'existence d'une sous-licence dans des situations analogues à celle qui nous occupe, il faut habituellement démontrer que la partie non titulaire d'une licence exerce le droit de la partie titulaire de la licence de fabriquer ou d'importer la substance autorisée. Par exemple, dans l'affaire *Intel*, précitée, il a été décidé que la vente de micropuces par le titulaire d'une licence, Hewlett-Packard («HP»), à un tiers, ULSI, ne constituait pas une sous-licence, même si les puces étaient fabriquées par HP conformément aux devis et aux spécifications de USLI, puis revendues par USLI. La cour a cependant reconnu dans cette affaire qu'en permettant à ULSI de fabriquer les puces elle-même, HP lui aurait alors accordé une sous-licence.

Dans les présents pourvois, la Cour d'appel fédérale s'est appuyée sur la décision *du Pont*, précitée, pour affirmer qu'en fait une sous-licence est créée chaque fois qu'un produit breveté est fabriqué au profit de la partie non titulaire d'une licence plutôt que de la partie titulaire de la licence. Toutefois, en toute déférence, j'estime qu'il est facile d'établir une distinction entre l'af-

ciple propounded. In *du Pont*, it was more significant that the unlicensed party actually manufactured the licensed article, allegedly as the agent of the licensee, only then to "purchase" the article from the licensee immediately upon its manufacture. This arrangement was characterized by the Delaware Supreme Court as a sham, and rightfully so. The only factor which distinguished it from an overt situation of an unlicensed party's manufacturing a patented article strictly for its own benefit was a series of paper transactions carried out between a subsidiary corporation and its parent for the purpose of obscuring the true character of the arrangement.

But the situation is manifestly different in a case where the manufacturer and the end user are embodied in two different legal *personnae*, and legitimate transfers of property do, in fact, take place. In *Cyrix Corp. v. Intel Corp.*, 77 F.3d 1381 (Fed. Cir. 1996), the licensed party agreed to supply a third party with microprocessors which it was entitled to manufacture pursuant to a licence conferred upon it by the patentee. The licensed party, in turn, had the processors made by another corporation (affiliated but not a subsidiary), which then sold them to the licensed party for resale to the third party. It was argued that this arrangement constituted in essence a sublicence granted by the licensed party to the third-party manufacturer, and that the licensed party's "have made" rights under the licence extended only to the manufacture of goods for its own benefit. The court rejected this argument, finding that the licensed party was entitled to have the licensed products made by an agent and to resell them as it saw fit. It distinguished *du Pont*, *supra*, on the basis that the manufacturer and the end user were two completely separate entities, and so the arrangement could not be characterized as a sham.

In my view, *Cyrix* is much more closely analogous than *du Pont* to the instant appeal, a case in

faire *du Pont* et celles dont nous sommes saisis, et je ne crois pas, de toute façon, qu'elle permet de faire valoir le principe de droit préconisé. Dans *du Pont*, ce qui a été plus significatif c'est que la partie non titulaire d'une licence fabriquait réellement l'article autorisé, censément à titre de mandataire du titulaire de la licence, pour ensuite «acheter» cet article au titulaire de la licence immédiatement après sa fabrication. Cette entente a été qualifiée, à juste titre, de subterfuge par la Cour suprême du Delaware. Le seul facteur qui différenciait cette situation du cas patent de la partie non titulaire d'une licence qui fabrique un article breveté strictement à son propre profit était une série d'opérations fictives réalisées entre une filiale et sa société mère dans le but de masquer la nature véritable de l'entente.

Mais la situation est manifestement différente lorsque le fabricant et l'utilisateur final sont deux personnes morales distinctes et que des cessions légitimes de droit de propriété ont effectivement lieu. Dans *Cyrix Corp. c. Intel Corp.*, 77 F.3d 1381 (Fed. Cir. 1996), la partie titulaire d'une licence s'était engagée à fournir à un tiers des microprocesseurs qu'elle avait le droit de fabriquer en vertu d'une licence que lui avait accordé le breveté. La partie titulaire de la licence avait, à son tour, fait fabriquer les processeurs par une autre société (associée mais non une filiale) qui les lui a vendues pour qu'elle les revende au tiers. On a soutenu que cette entente était essentiellement une sous-licence accordée au tiers fabricant par la partie titulaire de la licence, et que les droits de cette dernière de «faire fabriquer» en vertu de la licence ne visaient que la fabrication de marchandises à son propre profit. La cour a rejeté cet argument, concluant que la partie titulaire d'une licence avait le droit de confier à un mandataire la fabrication des produits autorisés et de les revendre à son gré. Elle a établi une distinction d'avec l'affaire *du Pont*, précitée, en faisant valoir que le fabricant et l'utilisateur final étaient deux entités complètement distinctes, de sorte que l'entente ne pouvait pas être qualifiée de subterfuge.

À mon avis, *Cyrix* ressemble beaucoup plus que *du Pont* à la présente affaire, où il est question de

75

76

which two arm's-length companies, one licensed and the other unlicensed, have contracted for the prospective purchase and sale of patented goods. They have agreed that the licensed party, in this case Novopharm, will, at and according to the direction of the unlicensed party, Apotex, either manufacture or import the goods, acquire property rights in them, and sell them to Apotex. The only real difference is that, where in *Cyrix* the licensee presumably had the chips made on such terms as would ensure that a profit would be earned on the agreement of purchase and sale previously completed with the third party, in the present circumstances, the profit of which Novopharm is assured is based not on its arrangement with its supplier, but from the guaranteed four percent royalty payable by Apotex. This distinction alone cannot transform the supply agreement into a sublicence.

77    Because the supply agreement has not yet been implemented, the evidence certainly does not establish that this is a case where the unlicensed party is manufacturing the goods itself, as in *du Pont*. Consequently, I need not decide whether a sublicence would be granted in this hypothetical situation. Indeed, it has not been argued, and I cannot simply presume that the supply agreement has been or is intended to be carried out in this manner. Moreover, I note again that the supply agreement expressly provides, in paragraph 6, that the licensed party must comply with the terms of the licence, which, *inter alia*, precludes it from granting sublicences. Therefore, while it is theoretically possible that this arrangement could someday be implemented in a way that would result in the grant of a sublicence, it must be presumed for the present purposes that, if the agreement is ever actually acted upon, the parties will act in accordance with the law.

78    Pursuant to the terms of the contract as it stands, Apotex is simply permitted to direct Novopharm to the third party manufacturer which it favours and with whom it has negotiated terms, which would

deux sociétés sans lien de dépendance, l'une titulaire d'une licence et l'autre non titulaire d'une licence, qui ont conclu un accord en vue de l'achat et de la vente éventuels de marchandises brevetées. Elles ont convenu que la partie titulaire d'une licence, en l'occurrence Novopharm, allait, sur l'ordre et suivant les directions d'Apotex, la partie non titulaire d'une licence, fabriquer ou importer les marchandises, acquérir les droits de propriété relatifs à celles-ci et les vendre à Apotex. La seule différence véritable réside dans le fait que, tandis que dans *Cyrix*, le titulaire d'une licence a vraisemblablement fait fabriquer les puces à des conditions qui garantiraient la réalisation d'un bénéfice sur le contrat de vente signé antérieurement avec le tiers, dans le cas qui nous occupe, le bénéfice que Novopharm est assurée de réaliser n'est pas fondé sur l'entente qu'elle a conclue avec son fournisseur, mais découle de la redevance garantie de quatre pour cent que doit verser Apotex. Cette distinction ne saurait à elle seule transformer l'accord d'approvisionnement en une sous-licence.

Comme l'accord d'approvisionnement n'a pas encore été exécuté, la preuve n'établit certainement pas qu'il s'agit d'un cas où la partie non titulaire d'une licence fabrique elle-même les marchandises, comme dans *du Pont*. En conséquence, je n'ai pas à décider si une sous-licence serait accordée dans cette situation hypothétique. En réalité, on n'a pas fait valoir, et je ne saurais simplement présumer, que l'accord d'approvisionnement a été ou est destiné à être exécuté de cette manière. De plus, je souligne encore une fois que cet accord prévoit expressément, à l'article 6, que la partie titulaire d'une licence doit se conformer aux conditions de la licence, qui lui interdisent notamment d'accorder des sous-licences. Par conséquent, s'il est théoriquement possible que cette entente soit un jour exécutée d'une manière qui entraînerait l'attribution d'une sous-licence, il faut présumer, pour les présentes fins, que, si l'accord est jamais exécuté, les parties agiront conformément à la loi.

Aux termes du contrat tel que rédigé, Apotex est simplement autorisée à guider Novopharm vers le tiers fabricant qu'elle préfère et avec qui elle a négocié des conditions, obligeant ainsi Novopharm

then oblige Novopharm to deal with that manufacturer and acquire the patented medicine on the terms negotiated. Despite this considerable degree of control by Apotex, it remains the case that separate entities are involved, that Apotex is in no way ultimately responsible for the supply of the goods that Novopharm will eventually sell to it, and that a legitimate and *de facto* transfer of property must occur between Novopharm and the third party before any proprietary rights can be acquired by Apotex. Therefore, only if Apotex's designation of a preferred source or manufacturer would <u>necessarily</u> render it a sublicensee of Novopharm would the agreement between the two companies amount to a breach of the terms of the compulsory licence. Since it is possible for Apotex to exercise this contractual right without the benefit of licensed rights transferred to it by Novopharm, it would be incorrect to say that the supply agreement necessarily infringes the licence.

As I have already made clear, Apotex enjoys no rights of its own under the licence as a consequence of the supply agreement with Novopharm, regardless of the parties' apparent intention to "share their rights". At bottom, the agreement amounts to nothing more than an agreement to agree, a mutual obligation for the parties to enter into future contractual arrangements with one another. Neither the text of the agreement nor the manner in which the parties purported to implement it supports the conclusion that it is in substance a sublicence.

### (4) The Agency Argument

In the alternative, Eli Lilly submitted that the supply agreement ought to be interpreted as a sublicence because the degree of control likely to be exercised by Apotex over the acquisition of nizatidine would result in a situation where Novopharm in reality would be acting as Apotex's agent. Novopharm would not be acting on its own behalf in the acquisition but rather on behalf of Apotex, which would imply that Apotex has acquired licensed rights from Novopharm. As a variation on this theme, it is suggested that Novopharm would in effect be unlicensed to make

à traiter avec ce fabricant et à acquérir le médicament breveté aux conditions négociées. Malgré l'importance du contrôle exercé par Apotex, il n'en reste pas moins que des entités distinctes sont en cause, qu'Apotex n'est aucunement responsable, en fin de compte, de la fourniture des marchandises que Novopharm lui vendra éventuellement et qu'une cession de biens légitime et de fait doit survenir entre Novopharm et le tiers pour qu'Apotex puisse acquérir des droits de propriété. Par conséquent, c'est seulement si la désignation par Apotex d'une source ou d'un fabricant qu'elle préfère en faisait <u>nécessairement</u> la titulaire d'une sous-licence accordée par Novopharm, que l'accord entre les deux sociétés violerait les conditions de la licence obligatoire. Étant donné qu'Apotex peut exercer ce droit contractuel sans jouir des droits conférés par une licence qui lui seraient cédés par Novopharm, il serait inexact de dire que l'accord d'approvisionnement viole nécessairement la licence.

79

Comme je l'ai déjà précisé, l'accord d'approvisionnement conclu avec Novopharm ne confère à Apotex aucun droit qui lui soit propre en vertu de la licence, peu importe l'intention apparente des parties de «partager leurs droits». Au fond, l'accord n'est rien de plus qu'un engagement à conclure un accord, une obligation mutuelle des parties à conclure, à l'avenir, des contrats entre elles. Ni le texte de l'accord ni la manière dont les parties étaient censées l'exécuter ne justifient de conclure qu'il constitue essentiellement une sous-licence.

### (4) L'argument du mandat

80

Subsidiairement, Eli Lilly a soutenu que l'accord d'approvisionnement devait être considéré comme une sous-licence parce que le contrôle qu'Apotex exercerait vraisemblablement sur l'acquisition de nizatidine ferait en sorte que Novopharm se trouverait, en réalité, à agir en qualité de mandataire d'Apotex. En procédant à cette acquisition, Novopharm agirait non pas pour son propre compte mais pour celui d'Apotex, ce qui impliquerait que cette dernière aurait obtenu de Novopharm des droits conférés par une licence. Dans le même ordre d'idées, on affirme que, en réalité, Novo-

these acquisitions because it would be standing in the shoes of Apotex, an unlicensed entity. The latter submission, then, stands as an alternative to the sublicence argument, and remains even if the supply agreement is not considered a sublicence.

81      To my mind, both forms of this argument must fail, for one very simple reason. It is abundantly clear that, under the supply agreement, any contractual relations that might be established for the purchase of nizatidine would be between Novopharm and the third-party supplier. Apotex would not be a party to the contract; Novopharm would not be entering into the contract "on behalf of" Apotex in any sense. The notion of an agent's entering into contractual relations with the third party is inimical to the entire concept of agency, which contemplates the agent's binding the principal, not itself, to contractual relations and obligations. The completion of a contract between Novopharm and a third-party supplier would prevent the formation of an agency relationship because, even if contemplated, such a relationship could not be embodied by a transaction which resulted in the completion of a contract between the third party and the agent rather than the principal.

### (5)  Conclusion as to the Nature of the Supply Agreement

82      The arrangement entered into by Apotex and Novopharm is not a sublicence. Regardless of the level of control that might be exercised by Apotex over arranging and facilitating the acquisition of licensed materials for its own benefit, no actual acquisition is itself possible without the involvement of Novopharm. The agreement does not grant Apotex the right to do independently of Novopharm anything which only Novopharm is licensed to do, nor does it purport or disclose any contractual intent to do so. In other words, no licensed rights are transferred by Novopharm to Apotex. Thus, the substance of the arrangement, while perhaps resulting in an unconventional commercial situation, is ultimately inconsistent with the grant of a sublicence. To the extent that the

pharm ne serait pas autorisée à faire ces acquisitions parce qu'elle se trouverait à prendre la place d'Apotex qui n'est pas titulaire d'une licence. Le dernier argument est donc un argument subsidiaire par rapport à l'argument de la sous-licence et il subsiste même si l'accord d'approvisionnement n'est pas considéré comme une sous-licence.

À mon sens, cet argument doit être rejeté sous ses deux formes, pour une raison très simple. Il est tout à fait clair qu'aux termes de l'accord d'approvisionnement tout rapport contractuel qui pourrait être établi pour l'achat de nizatidine serait entre Novopharm et le tiers fournisseur. Apotex ne serait pas partie au contrat; Novopharm ne conclurait pas le contrat «pour le compte» d'Apotex de quelque manière que ce soit. L'idée qu'un mandataire établisse un rapport contractuel avec le tiers va à l'encontre du concept même de mandat, qui suppose que le mandataire lie le mandant et ne se lie pas lui-même par des rapports et des obligations contractuels. La signature d'un contrat entre Novopharm et un tiers fournisseur empêcherait la formation d'un rapport mandant-mandataire parce que, même si un tel rapport était envisagé, il ne pourrait pas être réalisé par une opération aboutissant à un contrat entre le tiers et le mandataire plutôt que le mandant.

### (5)  Conclusion sur la nature de l'accord d'approvisionnement

L'entente conclue entre Apotex et Novopharm n'est pas une sous-licence. Peu importe l'importance du contrôle qu'Apotex pourrait exercer sur les mesures prises pour organiser et faciliter l'acquisition à son propre profit des substances autorisées, aucune acquisition réelle n'est possible sans la participation de Novopharm. L'accord ne confère pas à Apotex le droit de faire indépendamment de Novopharm quelque chose que seule Novopharm est autorisée à faire, et il n'implique pas ou ne traduit pas l'intention des parties contractantes de conférer un tel droit. Autrement dit, Novopharm ne cède à Apotex aucun droit conféré par sa licence. Ainsi, bien qu'il en résulte peut-être une situation peu conventionnelle sur le plan commercial, l'entente est, en fin de compte, essentielle-

Federal Court of Appeal held otherwise, it was, with respect, in error.

That is not to say, however, that it would be impossible to implement the agreement in such a manner as to create a sublicence. For example, while I need not decide this hypothetical issue, I would again observe that, if the domestic supplier from which Apotex directed Novopharm to obtain the nizatidine were found to be Apotex itself, the agreement would likely be seen as a sham, just as in *du Pont*, *supra*. Similarly, if Novopharm were to be less than vigilant in enforcing the terms of the agreement and permit Apotex to contract directly with a third party supplier for the purchase of nizatidine, this relaxation of terms might well be shown to result in the effective conferral of a sublicence. But these are hypotheticals, not our facts. Indeed, there can be no possible evidence in this case of the manner in which the agreement was implemented by the parties because, at the time of the hearing, it had not been implemented at all. On the other hand, if the agreement has subsequently been implemented so as to create a sublicence, or if it is so implemented in the future, it would certainly then be open to the patentee to move to terminate the compulsory licence or to seek whatever other relief might be appropriate under the *Patent Act* or otherwise. However, this has no bearing on the justification of the NOAs here at issue.

Accordingly, I would emphasize that the conclusions reached in this case should not be taken to characterize every supply agreement similar to the one here at issue as insulating the parties to it from any allegation of sublicensing. Rather, this decision is to be substantially confined to its facts: a case in which an agreement has been entered into between companies dealing at arm's length, which is not on its face a sublicence, and which had not been implemented at any time material to the litigation. Depending on the implementation of the agreement, the identities of the parties, or any number of other distinguishing factors, it is

ment incompatible avec l'attribution d'une sous-licence. Dans la mesure où la Cour d'appel fédérale a conclu le contraire, elle a, en toute déférence, commis une erreur.

Cependant, cela ne signifie pas qu'il serait impossible d'exécuter l'accord de manière à créer une sous-licence. Par exemple, quoique je n'aie pas à trancher cette question hypothétique, je ferais observer une fois de plus que, si le fournisseur canadien auprès duquel Apotex a demandé à Novopharm de se procurer la nizatidine se trouvait à être Apotex elle-même, l'accord serait vraisemblablement considéré comme un subterfuge, tout comme dans l'affaire *du Pont*, précitée. De même, si Novopharm devait manquer de vigilance en exécutant l'accord et permettre à Apotex de contracter directement avec le tiers fournisseur pour acheter la nizatidine, il pourrait bien se révéler que cet assouplissement des conditions entraînerait en fait l'attribution d'une sous-licence. Mais ce sont là des hypothèses et non pas les faits dont nous sommes saisis. À vrai dire, la manière dont l'accord a été exécuté par les parties est absolument impossible à prouver en l'espèce, parce qu'à la date de l'audience il n'avait toujours pas été exécuté. En revanche, si l'accord a été exécuté par la suite de manière à créer une sous-licence, ou s'il l'est à l'avenir, il sera certainement loisible au breveté de demander l'annulation de la licence obligatoire ou tout autre redressement qui pourrait convenir en vertu de la *Loi sur les brevets* notamment. Toutefois, cela n'a rien à voir avec le caractère fondé des ADA en cause dans la présente affaire.

En conséquence, je soulignerais qu'il ne faudrait pas interpréter les conclusions tirées en l'espèce comme prévoyant que tout accord d'approvisionnement semblable à celui qui nous occupe protège les parties à cet accord contre toute allégation d'attribution d'une sous-licence. La présente décision doit plutôt être limitée pour l'essentiel à ses faits: une affaire dans laquelle un accord a été conclu entre deux sociétés sans lien de dépendance, qui, à première vue, n'est pas une sous-licence et qui n'avait pas été exécuté à quelque époque pertinente relativement au litige. Tout dépendant de l'exécution de l'accord, de l'identité des parties ou

83

84

entirely possible that a different result might be reached on the specific facts of another case.

### B. *Other Issues in the Novopharm Appeal*

#### (1) Did the Federal Court of Appeal Err in Applying its Decision in *Apotex #1* to its Decision in *Novopharm*?

85    Novopharm submits that, even if the supply agreement were properly interpreted by the Federal Court of Appeal as conferring a sublicence upon Apotex, it nonetheless should not be considered a sublicence for the purposes of the *Novopharm* appeal. The reason advanced for this distinction is that nothing on the face of the agreement can be seen as constituting a sublicence and, whereas the conclusion of the court in *Apotex #1* may have been premised in part on Dr. Sherman's evidence as to the manner in which Apotex expected the agreement to be implemented, no steps had actually been taken to implement the agreement. Thus, it is argued that, while it might have been open to the court to grant the requested prohibition order in *Apotex #1* if Dr. Sherman's proposed implementation would have resulted in the conferral of a sublicence, this evidence was not before the court in *Novopharm* and, in fact, was inconsistent with Mr. Dan's evidence as to his understanding of the agreement. To the extent that the Federal Court of Appeal failed to take into consideration this material evidentiary difference, it is suggested, this constituted an error of law.

86    It is certainly true that each case must be considered on its own facts, and I have already expressed the view that the implementation of the agreement in a certain way might well result, hypothetically, in the creation of a sublicence. As such, I agree that it would have been inappropriate for the Federal Court of Appeal to apply its decision in the first appeal to the second, whether as *res judicata* or otherwise, without considering any material factual differences which might have existed between the two cases. However, in light of my earlier conclusion as to the character of the supply agreement,

d'un certain nombre d'autres facteurs distinctifs, il se pourrait fort bien que les faits particuliers d'une autre affaire donnent lieu à un résultat différent.

### B. *Autres questions en litige dans le pourvoi Novopharm*

#### (1) La Cour d'appel fédérale a-t-elle commis une erreur en appliquant son arrêt *Apotex n⁰ 1* à l'affaire *Novopharm*?

Novopharm soutient que, même si la Cour d'appel fédérale avait eu raison d'interpréter l'accord d'approvisionnement comme attribuant une sous-licence à Apotex, cet accord ne devrait pas cependant être considéré comme une sous-licence aux fins du pourvoi *Novopharm*. On fait valoir, à l'appui de cette distinction, que l'accord ne peut pas être considéré, à première vue, comme une sous-licence et que, tandis que la conclusion de la cour dans *Apotex n⁰ 1* peut avoir reposé en partie sur le témoignage de M. Sherman au sujet de la manière dont Apotex s'attendait à ce que l'accord soit exécuté, aucune mesure n'avait encore été prise pour l'exécuter. On soutient donc que, alors qu'il aurait pu être loisible à la cour d'accorder l'ordonnance d'interdiction demandée dans *Apotex n⁰ 1* si l'exécution proposée par M. Sherman avait entraîné l'attribution d'une sous-licence, la cour ne disposait pas de ce témoignage dans *Novopharm* et, en fait, celui-ci était incompatible avec le témoignage de M. Dan quant à sa compréhension de l'accord. Dans la mesure où la Cour d'appel fédérale n'a pas tenu compte de cette différence majeure sur le plan de la preuve, cela, affirme-t-on, constitue une erreur de droit.

Il est sûrement vrai que chaque cas doit être examiné en fonction de ses propres faits, et j'ai déjà exprimé l'avis que l'exécution de l'accord d'une certaine manière pourrait bien entraîner hypothétiquement la création d'une sous-licence. Pour ce motif, je suis d'accord pour dire qu'il n'aurait pas convenu que la Cour d'appel fédérale applique au second pourvoi son arrêt dans le premier pourvoi, que ce soit à titre de chose jugée ou autrement, sans prendre en considération toute différence factuelle importante qui pouvait exister entre les deux affaires. Toutefois, vu ma conclusion antérieure sur

together with the fact that the agreement had not been implemented at the material time, it is not necessary to decide this issue. None of the parol evidence considered by the Federal Court of Appeal has had any bearing on the conclusions I have reached.

### (2)  Was Novopharm's Notice of Allegation Premature and Therefore not Justified?

Even the unequivocal conclusion as to the character of the supply agreement does not put the *Novopharm* matter to rest. Still to be determined is whether, as alleged by Eli Lilly, Novopharm's NOA was not justified regardless of whether its compulsory licence for nizatidine was successfully terminated.

Pursuant to s. 39.11(2)(*c*) of the *Patent Act*, Novopharm was prohibited from importing, under its compulsory licence, medicine in respect of which a previous NOC had been granted after June 27, 1986, until 10 years after the date of the issuance of that NOC. While this section was repealed by the *Patent Act Amendment Act, 1992*, s. 11(1) of that Act provides that licences granted under the former s. 39 prior to December 20, 1991, continue in effect according to their terms, and ss. 39 to 39.14 of the former Act continue to apply to such licences as if those sections had not been repealed.

A NOC in respect of nizatidine was granted to Eli Lilly Canada on December 31, 1987. Accordingly, it is submitted by Eli Lilly that Novopharm's NOA, which was issued on July 30, 1993, could not have been justified before December 31, 1997, the first date on which it would have been entitled, under its compulsory licence, to import nizatidine. Thus, Eli Lilly argues that, even if no sublicence was granted and the termination of Novopharm's licence was not therefore justified, Novopharm would nonetheless have infringed Eli Lilly's patents if it had received a NOC for nizatidine, as it had no non-infringing way in which to obtain the bulk medicine.

la nature de l'accord d'approvisionnement et compte tenu du fait que cet accord n'avait pas été exécuté à l'époque pertinente, il n'est pas nécessaire de statuer sur ce point. Aucun des éléments de preuve extrinsèque examinés par la Cour d'appel fédérale n'a eu quelque influence que ce soit sur les conclusions que j'ai tirées.

### (2)  L'avis d'allégation de Novopharm était-il prématuré et donc non fondé?

Même la conclusion sans équivoque sur la nature de l'accord d'approvisionnement ne met pas fin à l'affaire *Novopharm*. Il reste à décider si, comme l'allègue Eli Lilly, l'ADA de Novopharm n'était pas fondé indépendamment de la question de savoir si on avait réussi à annuler sa licence obligatoire pour la nizatidine.

Selon l'al. 39.11(2)*c*) de la *Loi sur les brevets*, il était interdit à Novopharm d'importer, en vertu de sa licence obligatoire, un médicament à l'égard duquel un ADC avait été délivré après le 27 juin 1986, jusqu'à l'expiration d'un délai de 10 ans après la date de délivrance de cet ADC. Bien que cette disposition ait été abrogée par la *Loi de 1992 modifiant la Loi sur les brevets*, le par. 11(1) de cette loi prévoit que les licences accordées en vertu de l'ancien art. 39, avant le 20 décembre 1991, restent valides dans les limites de leurs conditions, et que les art. 39 à 39.14 de la loi antérieure s'appliquent à elles comme s'ils n'avaient pas été abrogés.

Un ADC relatif à la nizatidine a été délivré à Eli Lilly Canada le 31 décembre 1987. En conséquence, Eli Lilly soutient que l'ADA de Novopharm qui a été déposé le 30 juillet 1993 n'aurait pas pu être fondé avant le 31 décembre 1997, la première date à laquelle elle aurait eu le droit, en vertu de sa licence obligatoire, d'importer de la nizatidine. Eli Lilly fait donc valoir que, même si aucune sous-licence n'a été accordée et que l'annulation de la licence de Novopharm n'était donc pas fondée, Novopharm aurait néanmoins violé les brevets d'Eli Lilly si elle avait reçu un ADC à l'égard de la nizatidine, car elle ne disposait d'aucun moyen n'emportant pas contrefaçon d'obtenir le médicament en vrac.

90     However, this submission appears to ignore the fact that Novopharm's NOA does not seem to disclose any specific intention to import the nizatidine. Rather, the request was for a NOC to make, construct, use, and/or sell nizatidine in 150 mg and 300 mg capsules. No mention was made of how Novopharm proposed to obtain the bulk medicine, and no evidence was led to suggest that it was to be imported. Indeed, while Mr. Dan acknowledged in his written answers to undertakings on cross-examination that, at the time of the hearing, Novopharm's suppliers were located outside of Canada, he also indicated that Novopharm was aware of the prohibition against its importing nizatidine before December 31, 1997, and intended to abide by the relevant provisions of the *Patent Act*. Further, he indicated that Novopharm might locate a Canadian supplier between December 31, 1994, and December 31, 1997, and expressly disavowed any intention to import nizatidine prior to the latter date.

Toutefois, cet argument ne tient apparemment pas compte du fait que l'ADA de Novopharm ne semble pas révéler l'intention précise d'importer de la nizatidine. Il s'agit plutôt d'une demande d'ADC pour la fabrication, l'exécution, l'utilisation ou la vente de gélules de 150 mg et de 300 mg de nizatidine. Il n'y est pas fait état de la manière dont Novopharm se propose d'obtenir le médicament en vrac et on n'a produit aucun élément de preuve laissant entendre qu'il devrait être importé. En fait, quoique M. Dan ait reconnu, dans ses réponses écrites à des engagements en contre-interrogatoire, qu'au moment de l'audition les fournisseurs de Novopharm étaient à l'étranger, il a aussi indiqué que Novopharm savait qu'il lui était interdit d'importer de la nizatidine avant le 31 décembre 1997 et qu'elle avait l'intention de respecter les dispositions pertinentes de la *Loi sur les brevets*. En outre, il a indiqué que Novopharm pourrait trouver un fournisseur canadien entre le 31 décembre 1994 et le 31 décembre 1997, et il a expressément nié toute intention d'importer de la nizatidine avant cette dernière date.

91     Pursuant to s. 39.14 of the *Patent Act*, Novopharm was entitled to use the patented invention for the preparation or production of medicine — that is, to manufacture the medicine itself or through Canadian agents — after the expiration of seven years after the date of the issue of the first NOC to Eli Lilly Canada. This seven-year period expired on December 31, 1994, and while Novopharm served its NOA on Eli Lilly Canada on July 30, 1993, the application was not heard until January 30, 1995. Thus, as of the date of hearing, Novopharm was entitled to manufacture or have made the drug for its own use, for sale for consumption in Canada.

Selon l'art. 39.14 de la *Loi sur les brevets*, Novopharm avait le droit d'utiliser l'invention brevetée pour préparer ou produire un médicament — c'est-à-dire pour fabriquer le médicament elle-même ou par l'intermédiaire de mandataires canadiens — à l'expiration des sept années suivant la date de délivrance du premier ADC à Eli Lilly Canada. Ce délai de sept ans a expiré le 31 décembre 1994 et, bien que Novopharm ait signifié son ADA à Eli Lilly Canada le 30 juillet 1993, la demande n'a été entendue que le 30 janvier 1995. Par conséquent, Novopharm avait, à la date de l'audition, le droit de fabriquer ou de faire fabriquer le médicament pour son propre usage, dans le but de le vendre à des fins de consommation au Canada.

92     In *Apotex #2*, *supra*, the companion to the instant appeals, I have held that the appropriate date for assessment of a NOA, where a prohibition order is sought by a patentee, is the date of hearing and not the date on which the NOA was issued. Accordingly, I cannot conclude that Novopharm's NOA was premature and therefore not justified. As

Dans *Apotex n° 2*, précité, l'affaire connexe aux présents pourvois, j'ai décidé que la date appropriée pour évaluer un ADA, lorsqu'une ordonnance d'interdiction est demandée par le breveté, est celle de l'audition et non celle du dépôt de l'ADA. En conséquence, je ne puis conclure que l'ADA de Novopharm était prématuré et donc non

of the date of hearing, it did indeed have a non-infringing way to obtain bulk nizatidine, and, in the absence of evidence to the contrary, I presume that its intention was, as Mr. Dan asserted, to operate within the restrictions of the *Patent Act* by obtaining the medicine either from a Canadian supplier or not at all.

(3) Jurisdiction to Grant Declaratory Relief

The final issue to be determined with respect to the *Novopharm* appeal is whether this Court has the jurisdiction, on a summary judicial review proceeding concerning an application for a prohibition order against the issuance of a NOC, to grant declaratory relief. Specifically, Novopharm asks that this Court declare: (1) that Eli Lilly has failed to show that the notice of allegation was not justified; (2) that Eli Lilly has failed to show that it was entitled to terminate the compulsory licence; and (3) that the supply agreement does not constitute a sublicence or a transfer of the compulsory licence from Novopharm to Apotex.

In my view, the first two requests are unnecessary. The finding that the supply agreement was not a sublicence necessarily leads to the conclusion, at least for the purposes of this appeal, that Eli Lilly was not entitled to terminate Novopharm's compulsory licence. Indeed, no other breach was alleged, such as to trigger paragraph 9 of the licence. Similarly, this finding, in combination with the finding that Novopharm's NOA was not premature, leads to the conclusion that Eli Lilly has failed to show that the NOA was not justified. I can see no reason to grant what would be superfluous declaratory relief on these issues, when all that is necessary is to determine whether or not the Federal Court of Appeal erred by granting the prohibition orders as requested.

As for the third request, I am of the view that it would be inappropriate for this Court to grant the requested relief in light of the nature of these proceedings. As McGillis J. correctly observed, the

fondé. À la date de l'audition, elle disposait en réalité d'un moyen n'emportant pas contrefaçon d'obtenir de la nizatidine en vrac et, en l'absence de preuve contraire, je présume qu'elle avait l'intention, comme l'a affirmé M. Dan, de respecter les restrictions de la *Loi sur les brevets* en se procurant exclusivement le médicament chez un fournisseur canadien.

(3) Compétence pour accorder un jugement déclaratoire

La dernière question qui doit être tranchée en ce qui concerne le pourvoi *Novopharm* est de savoir si, dans le cadre d'une procédure sommaire de contrôle judiciaire relative à une demande d'ordonnance interdisant la délivrance d'un ADC, notre Cour a compétence pour accorder un jugement déclaratoire. Plus précisément, Novopharm demande à notre Cour de déclarer (1) qu'Eli Lilly n'a pas démontré que l'avis d'allégation n'était pas fondé, (2) qu'Eli Lilly n'a pas démontré qu'elle avait le droit d'annuler la licence obligatoire, et (3) que l'accord d'approvisionnement ne constitue ni une sous-licence ni une cession de la licence obligatoire de Novopharm à Apotex. [93]

À mon avis, les deux premières demandes sont inutiles. La conclusion que l'accord d'approvisionnement n'était pas une sous-licence nous amène nécessairement à conclure, du moins pour les fins du présent pourvoi, qu'Eli Lilly n'avait pas le droit d'annuler la licence obligatoire de Novopharm. En fait, on n'a allégué l'existence d'aucune autre violation susceptible de déclencher l'application de l'article 9 de la licence. De même, cette conclusion, conjuguée à celle que l'ADA de Novopharm n'était pas prématuré, amène à conclure qu'Eli Lilly n'a pas démontré que l'ADA n'était pas fondé. Je ne vois aucune raison d'accorder ce qui serait un jugement déclaratoire superflu à l'égard de ces questions, quand il suffit de décider si la Cour d'appel fédérale a commis une erreur en rendant les ordonnances d'interdiction demandées. [94]

Quant à la troisième demande, j'estime qu'il ne conviendrait pas que notre Cour accorde le redressement demandé étant donné la nature des présentes procédures. Comme le juge McGillis l'a fait [95]

summary judicial review that is to be conducted on an application for a prohibition order under the Regulations is highly fact-specific and is generally considered to be binding only on the parties in the specific litigation. This is only appropriate, given the limited nature of the proceedings, the question that is to be answered, and the record generated for this limited purpose. In *Merck Frosst Canada Inc. v. Canada (Minister of National Health and Welfare)* (1994), 55 C.P.R. (3d) 302 (F.C.A.), at pp. 319-20, Hugessen J.A. made this point in the following terms, with which I agree:

In determining whether or not the allegations are "justified" (s. 6(2)), the court must then decide whether, on the basis of such facts as have been assumed or proven, the allegations would give rise in law to the conclusion that the patent would not be infringed by the respondent.

In this connection, it may be noted that, while s. 7(2)(*b*) seems to envisage the court making a declaration of invalidity or non-infringement, it is clear to me that such declaration could not be given in the course of the s. 6 proceedings themselves. <u>Those proceedings, after all, are instituted by the patentee and seek a prohibition against the Minister; since they take the form of a summary application for judicial review, it is impossible to conceive of them giving rise to a counterclaim by the respondent seeking such a declaration. Patent invalidity, like patent infringement, cannot be litigated in this kind of proceeding.</u> [Emphasis added.]

96     This point was reinforced more recently by Strayer J.A. in *David Bull Laboratories*, *supra*, at p. 600:

If the Governor in Council had intended by these Regulations to provide for a final determination of the issues of validity or infringement, a determination which would be binding on all private parties and preclude future litigation of the same issues, it surely would have said so. <u>This Court is not prepared to accept that patentees and generic companies alike have been forced to make their sole assertion of their private rights through the summary procedure of a judicial review application.</u> As the Regulations direct that such issues as may be adjudicated at this time must be addressed through such a process, this is a fairly clear indication that these issues must be of a limited or preliminary

observer à juste titre, le contrôle judiciaire sommaire auquel donne lieu une demande d'ordonnance d'interdiction fondée sur le Règlement dépend énormément des faits de l'espèce et est généralement considéré comme ne liant que les parties au litige. Cela est seulement indiqué vu la nature limitée des procédures, la question à trancher et le dossier constitué à cette fin limitée. Dans *Merck Frosst Canada Inc. c. Canada (Ministre de la Santé nationale et du Bien-être social)* (1994), 55 C.P.R. (3d) 302 (C.A.F.), aux pp. 319 et 320, le juge Hugessen a fait la remarque suivante, à laquelle je souscris:

Pour décider si les allégations sont «fondées» (paragraphe 6(2)), la Cour doit examiner si, à la lumière de ces faits tels qu'ils sont présumés ou prouvés, ces allégations engageraient en droit à conclure que le brevet ne serait pas contrefait par la partie intimée.

À ce sujet, il y a lieu de noter que si l'alinéa 7(2)*b* semble prévoir que la Cour rend un jugement déclarant que le brevet n'est pas valide ou qu'il n'est pas contrefait, il ne fait aucun doute que ce jugement déclaratoire ne peut être rendu dans le cadre de la procédure fondée sur l'article 6 elle-même. <u>Cette procédure est après tout engagée par le breveté pour demander une interdiction contre le ministre; puisqu'elle revêt la forme d'un recours sommaire en contrôle judiciaire, il est impossible de concevoir qu'elle puisse donner lieu à une demande reconventionnelle de la part de l'intimé en vue de pareil jugement déclaratoire. L'invalidité de brevet, tout comme la contrefaçon de brevet, n'est pas une question relevant d'une procédure de ce genre.</u> [Je souligne.]

Cette remarque a été renforcée plus récemment par le juge Strayer dans l'arrêt *David Bull Laboratories*, précité, à la p. 600:

Si, en prenant ce Règlement, le gouverneur en conseil avait eu l'intention de prévoir le prononcé d'une décision définitive sur la validité et la contrefaçon d'un brevet, qui lierait toutes les parties privées et empêcherait tout litige ultérieur visant les mêmes questions, il l'aurait sûrement exprimée. <u>Le tribunal n'est pas disposé à accepter l'hypothèse voulant que les brevetés et les sociétés génériques soient forcés de faire valoir leurs droits privés uniquement au moyen de la procédure sommaire de demande de contrôle judiciaire.</u> Étant donné que le Règlement dispose que les questions qui peuvent être tranchées à cette étape seront examinées dans le cadre d'une telle procédure, il est donc assez

nature. If a full trial of validity or infringement issues is required this can be obtained in the usual way by commencing an action. [Emphasis added.]

While the relief requested of the Federal Court of Appeal in these cases touched on issues pertaining to the infringement and/or invalidity of the actual patents, not the effect of an external agreement, I believe that the reasoning involved is also applicable to the *Novopharm* appeal. The nature of the inquiry on this judicial review proceeding requires only a determination as to whether or not the NOA was justified in the circumstances of this case. While this necessarily entails a decision as to whether, in these particular circumstances, the supply agreement constituted a sublicence and thus justified the termination of the licence, this is not to be taken as a final decision on the nature of the agreement for all purposes. For this Court to make a binding declaration concerning the private rights and obligations of the parties to the agreement would go well beyond the limited scope of the proceeding. Accordingly, I would deny the declaratory relief requested by Novopharm.

### C. *Other Issues in the Apotex #1 Appeal*

#### (1) Would the Reformulation of Nizatidine by Apotex into Final-dosage Form Infringe the Patent Held by Eli Lilly?

Even assuming that the supply agreement did not constitute a sublicence, that Novopharm's licence remains in force, and that Apotex is therefore able to purchase bulk nizatidine under the supply agreement as a third-party purchaser, the possibility remains that the use to which Apotex proposes, in its NOA, to put the drug would infringe Eli Lilly's patent. In this vein, Eli Lilly submits that the Federal Court of Appeal erred in holding that the formulation of final-dosage capsules by Apotex would not infringe the patent. Specifically, it is submitted that the rights of use and sale that are inherent in the unrestricted

clair que ces questions sont obligatoirement de nature limitée ou préliminaire. Si l'instruction complète des questions de validité et de contrefaçon est nécessaire, on peut procéder de la façon habituelle en intentant une action. [Je souligne.]

Même si le redressement demandé à la Cour d'appel fédérale dans ces affaires concernait des questions touchant la violation ou l'invalidité des brevets eux-mêmes, et non pas l'effet d'un accord externe, je crois que le raisonnement adopté est aussi applicable au pourvoi *Novopharm*. La nature de l'examen relatif à la présente procédure de contrôle judiciaire exige seulement de décider si l'ADA était fondé dans les circonstances de la présente affaire. Bien que pour répondre à cette question il faille nécessairement décider si, dans ces circonstances particulières, l'accord d'approvisionnement constituait une sous-licence et justifiait donc l'annulation de la licence, ce ne doit pas être interprété comme une décision définitive sur la nature de l'accord à toutes fins. En rendant un jugement déclaratoire sur les droits et les obligations privés des parties à l'accord, notre Cour irait bien au-delà de la portée limitée de la procédure. En conséquence, je suis d'avis de refuser le jugement déclaratoire demandé par Novopharm. [97]

### C. *Autres questions en litige dans le pourvoi Apotex n⁰ 1*

#### (1) La préparation par Apotex de la nizatidine sous forme posologique définitive violerait-elle le brevet d'Eli Lilly?

Même en supposant que l'accord d'approvisionnement ne constituait pas une sous-licence, que la licence de Novopharm est toujours valide et qu'Apotex peut donc acheter de la nizatidine en vrac, en vertu de l'accord d'approvisionnement, à titre de tiers acquéreur, il demeure possible que l'utilisation qu'Apotex propose, dans son ADA, de faire du médicament viole le brevet d'Eli Lilly. Dans la même veine, Eli Lilly soutient que la Cour d'appel fédérale a commis une erreur en décidant que la préparation par Apotex des gélules sous forme posologique définitive ne violerait pas le brevet. Plus précisément, on fait valoir que les [98]

purchase of a licensed article do not permit the making of a new article.

99     In the Federal Court of Appeal, Pratte J.A., with whom the majority agreed on this point, disposed of this argument in the following concise and useful passage, at p. 343 with which I agree:

If a patentee makes a patented article, he has, in addition to his monopoly, the ownership of that article. And the ownership of a thing involves, as everybody knows, "the right to possess and use the thing, the right to its produce and accession, and the right to destroy, encumber or alienate it". . . . If the patentee sells the patented article that he made, he transfers the ownership of that article to the purchaser. This means that, henceforth, the patentee no longer has any right with respect to the article which now belongs to the purchaser who, as the new owner, has the exclusive right to possess, use, enjoy, destroy or alienate it. It follows that, by selling the patented article that he made, the patentee impliedly renounces, with respect to that article, to [*sic*] his exclusive right under the patent of using and selling the invention. After the sale, therefore, the purchaser may do what he likes with the patented article without fear of infringing his vendor's patent.

The same principles obviously apply when a patented article is sold by a licensee who, under his licence, is authorized to sell without restrictions. It follows that, if Apotex were to purchase bulk Nizatidine manufactured or imported by Novopharm under its licence, Apotex could, without infringing Lilly's patents, make capsules from that substance or use it in any other possible way. [Emphasis added.]

100     Perhaps the principles underlying this well-founded statement of the law merit some brief elaboration at this stage. As I have already noted in connection with the distinction between a sublicence and an ordinary agreement of purchase and sale of a patented or licensed article, the sale of a patented article is presumed to give the purchaser the right "to use or sell or deal with the goods as the purchaser pleases": see *Badische Anilin und Soda Fabrik v. Isler*, *supra*, at p. 610. Unless otherwise stipulated in the licence to sell a patented

droits d'utilisation et de vente inhérents à l'achat sans restriction d'un article autorisé ne permettent pas de fabriquer un nouvel article.

Le juge Pratte de la Cour d'appel fédérale, avec l'appui de la majorité sur ce point, a répondu, à la p. 343, à cet argument dans le passage concis et utile ci-après, auquel je souscris:

Si le titulaire d'un brevet fabrique un objet breveté, il a, outre ce monopole, la propriété de cet article. Et la propriété d'une chose implique, comme chacun sait, [TRADUCTION] «le droit de posséder la chose et de l'utiliser, le droit de jouir des produits et des accessoires de la chose, ainsi que le droit de la détruire, de la grever ou de l'aliéner» [. . .] Si le titulaire du brevet vend l'objet breveté qu'il a fabriqué, il cède à l'acheteur le droit de propriété relatif à cet article. Cela signifie qu'à partir de ce moment, le titulaire du brevet ne jouit plus d'un droit quelconque à l'égard de l'objet qui appartient maintenant à l'acheteur, lequel, à titre de nouveau propriétaire, jouit du droit exclusif de posséder cet objet, de l'utiliser, d'en jouir, de le détruire ou de l'aliéner. Il s'ensuit qu'en vendant l'objet breveté qu'il a fabriqué, le titulaire du brevet renonce implicitement, pour ce qui est de cet objet, au droit exclusif qu'il possède d'utiliser et de vendre l'invention en vertu du brevet. Par conséquent, après la vente, l'acheteur peut faire ce qu'il veut de l'objet breveté sans craindre de contrefaire le brevet de son vendeur.

Les mêmes principes s'appliquent manifestement lorsqu'un article breveté est vendu à un titulaire de licence qui, en vertu de cette dernière, est autorisé à vendre sans restriction. Il s'ensuit que si Apotex devait acheter de la nizatidine en vrac fabriquée ou importée par Novopharm en vertu de sa licence, Apotex pourrait, sans contrefaire les brevets de Lilly, fabriquer des gélules à partir de cette substance ou l'utiliser de toute autre manière possible. [Je souligne.]

Peut-être convient-il d'expliquer brièvement les principes qui sous-tendent cet énoncé légitime du droit. Comme je l'ai déjà fait remarquer au sujet de la distinction entre une sous-licence et un contrat de vente ordinaire d'un article breveté ou autorisé, la vente d'un article breveté est présumée conférer à l'acheteur le droit [TRADUCTION] «d'utiliser, de vendre ou d'aliéner les marchandises à son gré»: voir *Badische Anilin und Soda Fabrik c. Isler*, précité, à la p. 610. Sauf stipulation contraire de la licence autorisant la vente d'un article breveté, le

article, the licensee is thus able to pass to purchasers the right to use or resell the article without fear of infringing the patent. Further, any limitation imposed upon a licensee which is intended to affect the rights of subsequent purchasers must be clearly and unambiguously expressed; restrictive conditions imposed by a patentee on a purchaser or licensee do not run with the goods unless they are brought to the attention of the purchaser at the time of their acquisition: see *National Phonograph Co. of Australia, Ltd. v. Menck*, [1911] A.C. 336 (P.C.).

Therefore, it is clear that, in the absence of express conditions to the contrary, a purchaser of a licensed article is entitled to deal with the article as he sees fit, so long as such dealings do not infringe the rights conferred by the patent. On this score, Eli Lilly alleges that the reformulation of nizatidine would in this case exceed the scope of the rights obtained by the purchaser because it would constitute not simply the resale of the material purchased, but rather, the creation of a new article in violation of Eli Lilly's patent. However, I can find no basis, either in the evidence or in the case law cited by Eli Lilly, for this submission. In my view, the reformulation of nizatidine into final-dosage form does not have the effect of creating a new article. Rather, it is more akin to repackaging the substance into a commercially usable form, which I do not view as violating any rights under the patents.

No specific evidence was led in the instant appeal concerning the nature of the process by which bulk medicine is reformulated into final-dosage form. However, in *Merck & Co. v. Apotex Inc.*, *supra*, at p. 155, MacKay J. offered a useful summary of the process. While it is possible that the process employed in the reformulation of nizatidine may differ slightly from the reformulation of the medicine at issue in that case, namely enalapril maleate, the gist of MacKay J.'s description is nonetheless apposite: the basic patented compound at issue, that is, the bulk medicine produced by the patentee or licensee, remains unchanged through-

titulaire de cette licence est ainsi en mesure de céder aux acheteurs le droit d'utiliser ou de revendre l'article en cause sans crainte de violer le brevet. En outre, toute restriction imposée au titulaire d'une licence, qui est destinée à toucher les droits des acheteurs subséquents, doit être exprimée clairement et sans équivoque; les conditions restrictives imposées par un breveté à un acheteur ou au titulaire d'une licence ne sont pas rattachées aux marchandises sauf si elles sont portées à l'attention de l'acheteur au moment de l'acquisition de ces dernières: voir *National Phonograph Co. of Australia, Ltd. c. Menck*, [1911] A.C. 336 (C.P.).

Par conséquent, il est clair que, en l'absence de conditions contraires expresses, l'acheteur d'un article autorisé a le droit d'en disposer à son gré pourvu que, ce faisant, il ne viole pas les droits conférés par le brevet. À cet égard, Eli Lilly allègue qu'en l'espèce la préparation de la nizatidine sous une autre forme irait au-delà de la portée des droits obtenus par l'acheteur parce qu'elle reviendrait non pas simplement à revendre la substance achetée, mais plutôt à créer un nouvel article contrairement au brevet qu'elle détient. Toutefois, j'estime que cet argument n'est justifié ni par la preuve, ni par la jurisprudence citée par Eli Lilly. À mon avis, la préparation de la nizatidine sous forme posologique définitive n'a pas pour effet de créer un nouvel article. Elle s'apparente plutôt davantage à un nouveau conditionnement de la substance sous une forme commercialement utilisable, ce qui, à mon sens, ne viole aucun droit conféré par les brevets. [101]

Aucun élément de preuve particulier n'a été produit en l'espèce au sujet de la nature du procédé par lequel le médicament en vrac est préparé sous forme posologique définitive. Toutefois, dans l'affaire *Merck & Co. c. Apotex Inc.*, précitée, à la p. 155, le juge MacKay a fait un résumé utile du procédé. Bien qu'il soit possible que le procédé employé pour préparer la nizatidine sous une autre forme diffère légèrement de celui utilisé pour la préparation sous une autre forme du médicament en cause dans cette affaire, à savoir le maléate d'énalapril, l'essentiel de la description qu'en a fait le juge MacKay est néanmoins pertinent: le com- [102]

out the reformulation process. It exists in the same chemical form in the final-dosage product as in the bulk product. However, the two products are substantially different, in that the bulk form is essentially a powder without other form or shape, while the final-dosage form is a coloured tablet, consisting of the bulk medicine and other ingredients and shaped in a form associated with a particular dosage. Indeed, in the view of MacKay J., the process so described was such a significant transformation that the final-dosage form of enalapril maleate sold by Apotex was not protected by s. 56 of the *Patent Act*, which authorizes the use and sale of a "specific" patented article by a party who purchased, constructed, or acquired the article before the patent application became open to the inspection of the public. In other words, MacKay J. was unwilling to accept that the final-dosage form was the same "specific article" as the bulk enalapril maleate purchased by Apotex prior to the date on which Merck's patent application became open for inspection.

103    However, this conclusion was rejected by the Federal Court of Appeal, in a judgment reported at [1995] 2 F.C. 723. At p. 738, MacGuigan J.A., writing for a unanimous court, expressed the view that "the right to use or sell the 'specific article, etc.' is independent of the form in which the invention is purchased: any form of the invention may be used or sold within the immunity conferred by s. 56" (emphasis in original). In so holding, MacGuigan J.A. relied on the following statement of Hall J. in *Libbey-Owens-Ford Glass Co. v. Ford Motor Co. of Canada, Ltd.*, [1970] S.C.R. 833, at p. 839, affirming the judgment of Thurlow J. (as he then was) in the court below (reported at [1969] 1 Ex. C.R. 529):

    The question in this case is with respect to the extent of the meaning of "using" and it arises because with respect to "vending" the right of the owner of the spe-

posé de base breveté en cause, c'est-à-dire le médicament en vrac produit par le breveté ou le titulaire d'une licence, reste inchangé pendant tout le processus de préparation sous une autre forme. Il existe, dans le produit sous forme posologique définitive, sous la même forme chimique que dans le produit en vrac. Toutefois, les deux produits sont fondamentalement différents du fait que le produit en vrac est essentiellement une poudre informe alors que, sous forme posologique définitive, il s'agit d'un comprimé coloré qui est composé du médicament en vrac et d'autres ingrédients et dont la forme correspond à un dosage donné. En fait, le juge MacKay a estimé que le procédé ainsi décrit représentait une transformation tellement importante que le maléate d'énalapril sous forme posologique définitive vendu par Apotex n'était pas protégé par l'art. 56 de la *Loi sur les brevets*, lequel permet l'utilisation et la vente de l'article «spécifique» breveté par la personne qui l'a acheté, exécuté ou acquis avant que la demande de brevet devienne accessible à l'inspection du public. Autrement dit, le juge MacKay n'était pas disposé à admettre que la forme posologique définitive était le même «article spécifique» que le maléate d'énalapril en vrac acheté par Apotex avant la date à laquelle la demande de brevet de Merck est devenue accessible à l'inspection.

    Toutefois, cette conclusion a été rejetée par la Cour d'appel fédérale dans un arrêt publié à [1995] 2 C.F. 723. À la page 738, le juge MacGuigan a exprimé l'avis, au nom de la cour à l'unanimité, que «le droit d'utiliser ou de vendre l'«article» etc., ne dépend pas de la forme sous laquelle l'invention est achetée: l'invention sous toutes ses formes peut être utilisée ou vendue avec l'immunité conférée par l'article 56» (souligné dans l'original). En tirant cette conclusion, le juge MacGuigan s'est appuyé sur l'énoncé suivant du juge Hall dans *Libbey-Owens-Ford Glass Co. c. Ford Motor Co. of Canada, Ltd.*, [1970] R.C.S. 833, à la p. 839, confirmant le jugement du juge Thurlow (plus tard Juge en chef) (publié à [1969] 1 R.C. de l'É. 529):

    Dans cette affaire, la question a trait à l'étendue du sens à donner au terme «utiliser», et elle se pose parce que, en ce qui a trait au terme «vendre», le droit du pro-

cific machine or other thing is expressed as that of vending it, not as that of vending its output. However, it is obvious that in the case of a machine designed for the production of goods, there would really be no worthwhile protection allowed by s. 58 [now s. 56] if the owner could not put it to the only use for which it is usable without being liable for infringement. [Emphasis added.]

Accordingly, MacGuigan J.A. concluded, at p. 741, that:

The use and sale of the product of a machine, particularly if production is the only possible use of the machine, is accorded protection under section 56 as a use of the machine itself. . . . In my view, use must be given the same sense in the case of a chemical invention. [Emphasis added.]

The *Merck & Co. v. Apotex Inc.* decision highlights the fact that there is really no commercial use for bulk medicine other than its reformulation into final-dosage form, for consumption by the ultimate consumer. In order to realize any utility from the acquisition, then, the purchaser must take steps to convert it into this commercially usable form. In my view, MacGuigan J.A.'s conclusion that the right to use and sell an article includes the right to use and sell things produced with the article, though reached in the specific context of a s. 56 defence, applies with equal force to the case at bar. That is, the right of use and sale which Apotex would acquire inherently, through its acquisition of nizatidine from Novopharm, must be seen as encompassing the right to use and sell things produced with this nizatidine, including capsules in final-dosage form. It follows, therefore, that Apotex would not infringe the patents held by Eli Lilly simply by selling the medicine in the form contemplated by the NOA. This is particularly so when, as in the case at bar, the exclusive rights enjoyed by the patentee under the patent are limited, in essence, to the formulation of bulk medicine according to the patented process. Noth-

priétaire de la machine spécifique, ou autre chose, est exprimé comme étant celui de la vendre, et non celui de vendre sa production. Cependant, dans le cas d'une machine conçue pour la production de biens, il est évident que l'art. 58 [56] n'accorderait vraiment aucune protection valable si le propriétaire ne pouvait en faire le seul usage auquel elle peut servir, sans se rendre coupable de contrefaçon. [Je souligne.]

En conséquence, le juge MacGuigan a conclu, à la p. 741: [104]

L'utilisation et la vente du produit d'une machine, en particulier si la production est le seul usage possible auquel la machine peut servir, sont protégées par l'article 56 à titre d'utilisation de la machine elle-même. [. . .] À mon avis, il faut attribuer le même sens à l'utilisation dans le cas d'une invention chimique. [Je souligne.]

La décision *Merck & Co. c. Apotex Inc.* met en évidence le fait qu'il n'y a vraiment, pour le médicament en vrac, aucun autre usage commercial que sa préparation sous forme posologique définitive destinée au consommateur. Pour que son acquisition ait quelque utilité, l'acheteur doit donc prendre les mesures pour le transformer sous cette forme commercialement utilisable. À mon avis, la conclusion du juge MacGuigan selon laquelle le droit d'utiliser et de vendre un article inclut celui d'utiliser et de vendre les choses produites au moyen de cet article, quoiqu'elle ait été tirée dans le contexte particulier d'un moyen de défense fondé sur l'art. 56, s'applique avec la même vigueur dans le cas qui nous occupe. En d'autres termes, le droit d'utilisation et de vente qui est inhérent à l'acquisition par Apotex de la nizatidine de Novopharm doit être interprété comme englobant le droit d'utiliser et de vendre les choses produites au moyen de cette nizatidine, y compris les gélules sous forme posologique définitive. Il s'ensuit donc qu'Apotex ne violerait pas les brevets d'Eli Lilly simplement en vendant le médicament sous la forme envisagée par l'ADA. Cela est particulièrement vrai lorsque, comme en l'espèce, les droits exclusifs conférés au breveté par le brevet sont limités essentiellement à la préparation du médicament en vrac suivant le procédé breveté. Le procédé de préparation sous une autre forme ne [105]

ing in the reformulation process can be seen as infringing upon this right.

106    Any doubt as to this conclusion of non-infringement must, in my view, be eliminated by an examination of Novopharm's compulsory licence, which specifically contemplates the sale of the licensed material in bulk form by providing a formula for calculating royalties on product thus sold. As I see it, because there is no other practical use for bulk medicine, this must also be taken to contemplate and implicitly permit the reformulation of the product by the purchaser into final-dosage form. This conclusion is only reinforced, in my view, by the fact that the contemplated royalty rates are based on the amounts received by subsequent purchasers in consideration of the sale of final-dosage forms to the retail trade. Had the Commissioner of Patents intended to restrain such use of the medication, he would have provided for this expressly, or, at least, would not have specifically delineated the procedure that is to compensate the patentee for such use.

107    Therefore, Eli Lilly is incorrect to assert that the reformulation proposed by Apotex would either have to be carried out pursuant to a sublicence granted by Novopharm, which would justify the termination of Novopharm's compulsory licence and, therefore, the sublicence, or would be entirely unauthorized and infringe Eli Lilly's patents. The better view, as I have stated, is that the right to reformulate is premised on the inherent right of an owner of property to deal with that property as he or she sees fit. In the absence of some express term in the compulsory licence, prohibiting purchasers of bulk nizatidine from Novopharm from reformulating it into final-dosage form, the weight of the case law supports the view that Apotex, having validly acquired the bulk medicine, would be free to reformulate it for resale without fear of infringing any right under Eli Lilly's patents.

108    I would emphasize, however, that this conclusion is in no way premised upon, and should not be

peut aucunement être considéré comme violant ce droit.

Tout doute concernant cette conclusion de non-contrefaçon doit, selon moi, être dissipé par l'examen de la licence obligatoire de Novopharm, qui prévoit explicitement la vente en vrac de la substance autorisée, en établissant une formule de calcul des redevances sur le produit ainsi vendu. Si je comprends bien, étant donné l'absence de tout autre usage pratique pour le médicament en vrac, la licence doit aussi être interprétée comme envisageant et permettant implicitement la préparation par l'acheteur du produit sous forme posologique définitive. Cette conclusion est seulement renforcée, à mon sens, par le fait que les taux de redevance prévus sont fixés en fonction des montants perçus par les acquéreurs subséquents pour la vente aux détaillants des produits sous forme posologique définitive. Si le commissaire aux brevets avait voulu restreindre cette utilisation du médicament, il l'aurait dit expressément ou, du moins, il n'aurait pas énoncé explicitement la méthode de rémunération du breveté pour cette utilisation.

En conséquence, Eli Lilly a tort d'affirmer que la préparation sous une autre forme proposée par Apotex devrait être réalisée conformément à une sous-licence accordée par Novopharm, ce qui justifierait l'annulation de la licence obligatoire de Novopharm et, par conséquent, de la sous-licence, ou encore serait absolument interdite et violerait les brevets qu'elle détient. Il vaut mieux considérer, je le répète, que le droit de préparation sous une autre forme est basé sur le droit inhérent du propriétaire d'un bien d'en disposer à son gré. En l'absence, dans la licence obligatoire, de quelque condition expresse interdisant aux acheteurs de nizatidine en vrac de Novopharm de préparer le médicament sous forme posologique définitive, la jurisprudence penche en faveur du point de vue selon lequel Apotex, après avoir validement acquis le médicament en vrac, serait libre de le préparer sous une autre forme pour le revendre sans crainte de violer quelque droit conféré par les brevets d'Eli Lilly.

Je soulignerais, toutefois, que cette conclusion n'est aucunement fondée sur les règles établies

taken to have any bearing on, the well-established rules concerning the acceptable limits on the repair of a patented article: see, for example, *Rucker Co. v. Gavel's Vulcanizing Ltd.* (1985), 7 C.P.R. (3d) 294 (F.C.T.D.). Here, we are not considering the repair of a patented article, but its resale in a somewhat different form. I would also add that I am unconvinced by the authorities cited by Eli Lilly in support of the proposition that the rights of the purchaser do not include the right to reformulate.

In light of the foregoing, I am in agreement with Pratte J.A. and the majority of the Federal Court of Appeal, and conclude that the reformulation of the bulk nizatidine into final-dosage form would not infringe Eli Lilly's patent. Accordingly, I conclude that Eli Lilly has failed in its various efforts to establish that Apotex's NOA was not justified and that a prohibition order should thus be issued.

VI. <u>Disposition</u>

A. *Novopharm Ltd. v. Eli Lilly and Co.*

For the foregoing reasons, I would allow the appeal, set aside the judgment of the Federal Court of Appeal, and restore the judgment of the Federal Court — Trial Division, with costs to the appellant throughout. However, I would deny the appellant's request for declaratory relief.

B. *Apotex Inc. v. Eli Lilly and Co.*

Also for the foregoing reasons, and after a full consideration of the factual differences existing between the two appeals considered herein, I would allow the appeal, set aside the judgment of the Federal Court of Appeal, and dismiss the application for an order of prohibition. The appellant shall have its costs throughout.

concernant les limites acceptables de la réparation d'un article breveté et qu'elle ne doit pas être interprétée comme ayant un rapport avec ces règles: voir, par exemple, *Rucker Co. c. Gavel's Vulcanizing Ltd.* (1985), 7 C.P.R. (3d) 294 (C.F. 1ʳᵉ inst.). En l'espèce, il est question non pas de la réparation d'un article breveté, mais de sa revente sous une forme quelque peu différente. J'ajouterais également que je ne suis pas convaincu par la jurisprudence citée par Eli Lilly à l'appui de son assertion que les droits de l'acheteur ne comprennent pas le droit de préparation sous une autre forme.

Compte tenu de ce qui précède, je suis d'accord avec le juge Pratte et avec la Cour d'appel fédérale à la majorité, et je conclus que la préparation de la nizatidine en vrac sous forme posologique définitive ne violerait pas le brevet d'Eli Lilly. En conséquence, je statue donc que, malgré ses divers efforts en ce sens, Eli Lilly n'a pas réussi à établir que l'ADA d'Apotex n'était pas fondé et qu'il y avait donc lieu de rendre une ordonnance d'interdiction. [109]

VI. <u>Dispositif</u>

A. *Novopharm Ltd. c. Eli Lilly and Co.*

Pour les motifs qui précèdent, je suis d'avis d'accueillir le pourvoi, d'infirmer l'arrêt de la Cour d'appel fédérale et de rétablir le jugement de la Cour fédérale, Section de première instance, avec dépens en faveur de l'appelante dans toutes les cours. Toutefois, je suis d'avis de refuser la demande de jugement déclaratoire de l'appelante. [110]

B. *Apotex Inc. c. Eli Lilly and Co.*

Également pour les motifs qui précèdent, et après examen complet des différences factuelles entre les deux pourvois dont nous sommes saisis en l'espèce, je suis d'avis d'accueillir le pourvoi, d'infirmer l'arrêt de la Cour d'appel fédérale et de rejeter la demande d'ordonnance d'interdiction. L'appelante a droit à ses dépens dans toutes les cours. [111]

*Appeals allowed with costs.*

*Solicitors for the appellant Apotex Inc.: Goodman, Phillips & Vineberg, Toronto.*

*Solicitors for the appellant Novopharm Limited: Ridout & Maybee, Toronto.*

*Solicitors for the respondents Eli Lilly and Company and Eli Lilly Canada Inc.: Gowling, Strathy & Henderson, Ottawa.*

*Pourvois accueillis avec dépens.*

*Procureurs de l'appelante Apotex Inc.: Goodman, Phillips & Vineberg, Toronto.*

*Procureurs de l'appelante Novopharm Limited: Ridout & Maybee, Toronto.*

*Procureurs des intimées Eli Lilly and Company et Eli Lilly Canada Inc.: Gowling, Strathy & Henderson, Ottawa.*

# TAB 36

Elliott v. Billings Twp. S. Bd.


[1960] O.R. 583


ONTARIO

[COURT OF APPEAL]

PORTER, C.J.O., SCHROEDER and MORDEN, JJ.A.

31ST OCTOBER 1960


 Contracts -- Interpretation -- Apparently conflicting clauses
-- Reconciliation.

 A contract for bus transportation of pupils entered into
pursuant to a resolution of the school board that the
plaintiff's bus be hired for 3 years on a year to year contract
-- this being the second yearly contract under the resolution
-- contained a clause stipulating the operative period of the
contract during the period of the school year of the particular
year fixed under the High Schools Act, R.S.O. 1950, c. 165, s.
6, and another clause under which the agreement was to be
deemed to continue in force until terminated, inter alia, on
one month's notice expiring on 31st August or 31st December in
any year.  The apparent conflict between these two clauses
could be reconciled by construing the first clause as simply
stipulating the period during which the actual transportation
of pupils was to be performed and leaving the matter of the
expiry of the agreement to be governed by the second clause.
In that manner full effect could be given to all the terms of
the agreement and the rejection of the stipulation as to
possible termination of the agreement on 31st August in any
year would be avoided.  The agreement was thus a contract for a
year certain and thereafter until terminated in the manner
stipulated.

1960 CanLII 155 (ON CA)

Per Morden, J.A., dissenting:  The first clause governs the duration of the agreement and the dates in it being inserted in writing in a printed form must be given more weight than the printed words in the second clause dealing with termination. The fact that some part of the second clause thus becomes inapplicable to the particular contract is immaterial because the written words express the intent of the parties in respect of the particular agreement and if the contract had been for a different period the inapplicable words in the printed clause might then have been applicable.

 THIS was an appeal by the school board from the judgment of Thompson, J., 7th April 1960, in favour of the plaintiff for $1,400 and costs.

 The plaintiff under an agreement dated 20th September 1955, contracted to supply a bus and driver for the transportation of pupils under the jurisdiction of the board.  This contract or agreement purported to be entered into under a resolution of the board, 30th November 1954, that the plaintiff's bus be hired for 3 years on a year to year contract.  There had been an agreement entered into in 1954 and in 1955 a new agreement was executed apparently on the grounds that provincial grants for transportation were made on a yearly basis.  The relevant agreement provided in cl. 2 that the contract commenced 6th September 1955 and ended 30th June 1956 and then by cl. 13 that the agreement should be deemed to continue in force till terminated inter alia on the 31st December or 31st August in any year on one months prior notice.  The agreement in question was on a printed form supplied by the department the dates in cl. 2 being filed in in writing.  The plaintiff's contention was that in the circumstances the agreement was for a term certain of a year and thereafter until terminated under cl. 13. The plaintiff also alleged a breach of this contract in that the board had hired another operator to provide transportation and thereby deprived him of the right to earn compensation which he would have been entitled to earn but for the alleged breach.  The defendant's contention was that the contract was for a term certain stated in cl. 2 and that cl. 13 provided only for termination between the dates mentioned in cl. 2.

W.J. Anderson, Q.C., for the board appellant:  The contract
was for a fixed period but terminated 30th June 1956 and that
cl. 13 should be read in conjunction with cl. 2. Paragraph 13
provided for a means of termination of the contract within the
definite period of one school year.  Clause 2 states when the
contract should commence and when the contract should end.
Clause 13 should be construed as if the word deemed did not
have any particular significance.  Stress should be put on the
word continue.  The contract should continue unless terminated
by any of the conditions in cl. 13 which would occur during the
contract term of one year.  Clause 3 (c) (d) clearly show that
the contract can be terminated on the happening of a certain
event.  The trial Judge has not dealt with the real question
which is termination of the contract.  I submit the contract
terminated at the end of the school year and it could have
terminated before the end of the school year if the parties had
acted under cl. 13.  At any rate the governing clause is cl. 2
and not cl. 13.

R.N. Starr, Q.C., for the plaintiff:  The effect of cl. 13
should not be disregarded. The word contract should not be
construed in its strict legal meaning.  When the word contract
is used in this document it should be read to mean a contract
as part of the whole agreement. The contract may have been for
one year but the agreement in the broader sense continued after
the term of one year and could only be terminated in accordance
with cl. 13, i.e. on notice.  The agreement is to continue
until terminated by cl. 13.  In other words the agreement could
continue indefinitely, but the contract of carriage is for the
school year.  You must interpret the words used in the manner
that will best carry out the plain meaning of the document and
the intentions of the parties.

Anderson, Q.C., in reply.

J.J.L.
Cur. adv. vult.

W.J. Anderson, Q.C., for the board appellant.

R.N. Starr, Q.C., for the plaintiff.


SCHROEDER, J.A.:-- The plaintiff, a garage operator who resided at Kagawong, Manitoulin, had entered into a contract in writing bearing 20th September 1955, under the terms of which he had agreed to provide a school bus and driver for the transportation of pupils residing in a school area under the jurisdiction of the defendant board, driving them from Kagawong school to the Gore Bay high school, and returning them to the said area on each school day within a specified period of the year.  For this service the defendant agreed to compensate the plaintiff at the rate of $478.60 for each month in which the said transportation services were provided.

The plaintiff's claim against the defendant was for the recovery of damages for breach of contract.  He alleged that while the contract was still in force the defendant entered into another contract with the owner and operator of another bus and hereby deprived him of the right to earn the compensation which he would have earned but for the alleged breach.

The defense presented at the trial was that the contract was, by its terms, fully completed and ended 30th June 1956, and that the new contract made with the plaintiff's successor was entered into only after the contractual relationship between the parties had ceased to exist. Other defences were pleaded and urged at the trial but they are not now relied upon and need not be mentioned.

Prior to the date of the contract in question, earlier contracts having the same object had been entered into between the parties commencing in the year 1949.  Between that year and 1954 the agreements were in substantially the same terms.  A printed form which was evidently provided by the department of education was used for the purpose.  In 1954, a new form was introduced and was adapted by the parties for their use in connection with the contract for the year 1954-5, as well as the year 1955-6.  It is the latter contract with which we are concerned in the case at bar.  The relevant clauses are 1, 2,

1960 CanLII 155 (ON CA)

3, 4 and 13.  I refer first to cll. 1, 3 and 4, which relate
specifically to the services which the plaintiff had undertaken
to provide

   1.  The operator shall transport to and from Kagawong
school and Gore Bay high each school day all pupils
designated by the board, from the section of high school
district who are in attendance at the school during the
period covered by this contract, the estimated number being
20 pupils.

   3.  The operator shall use a motor vehicle properly
licensed and insured as required by the Public Vehicles Act
and the regulations thereunder.

   4.  The operator shall follow a route of 22 miles, being a
total daily mileage of 88 miles, described as follows....

 The substantial issue between the parties is as to the period
of duration of the contract. Clauses 2 and 13 are relevant to
this issue and are reproduced hereunder

   2.  This contract shall commence 6th September 1955, and
terminate 30th June 1956. 13.  This agreement shall be deemed
to continue in force until terminated as follows ....

 (b) on the 31st December in any year or on the 31st August in
any year provided that written notice to that effect be given
by either party to the other at least one month prior to the
date of such termination; or

 Before entering into the agreement the defendant board passed
a resolution 30th November 1954, in the following terms

 That F. Elliott's bus be hired for 3 years on year to year
contract.

The defendant did not at any time purport to give a notice of
termination in accordance with the provisions of cl. 13 and the
plaintiff therefore contends that when the defendant board
entered into an agreement with the third party, the agreement

1960 CanLII 155 (ON CA)

upon which he bases his claim was in full force and effect.
The conclusions of the learned trial Judge were expressed in
the following passage extracted from his reasons for judgment.

   I think that its true interpretation and meaning is that in
   the first instance it is for a fixed term, from 6th September
   1955 to 30th June 1956; and that upon the termination thereof
   and thereafter it was to continue in force indefinitely and
   until terminated in the manner and by the means alternatively
   provided by cl. 13.  I conclude further that it could not be
   terminated pursuant to cl. 13 (b) during the fixed term, but
   that it could at any time be brought to an end under (a) and
   (c).

   The disposition of the present appeal depends upon the proper
   construction to be placed upon the words of the contract
   under review.

   It is a cardinal rule of construction that a contract is to
   be construed with reference to its object and the whole of its
   terms.  It follows that the intention of the parties is to be
   ascertained from a consideration of the whole context, and the
   construction which produced the greatest harmony and the least
   inconsistency is that which ought to prevail: A.-G. v. Sillem
   (1864), 2 H. & C. 431, at pp. 515-6-7.  The latter case
   involved the construction of a statute but the same rule of
   interpretation is applicable to contracts.  Further, a contract
   like a statute ought to be so construed that if it can be
   prevented, no clause, sentence or word shall be superfluous,
   void or insignificant:  Reg. v. Oxford (Bp.) (1879), 4 Q.B.D.
   245, at p. 261, applied by Robertson, C.J.O., in Brown Bros. v.
   Popham, [1940] O.R. 102.

   In Barton v. Fitzgerald (1812), 15 East. 530, Lord
   Ellenborough, C.J. stated

   It is a true rule of construction that the sense and meaning
   of the parties in any particular part of an instrument may be
   collected ex antecedentibus et consequentibus; every part of
   it may be brought into action in order to collect from the
   whole one uniform and consistent sense, if that may be done.

We can only look, however, to the sense and meaning of the
parties as they are to be collected from the deed itself.

It is the contention of the appellant that the contract was for
a fixed period, terminating 30th June 1956, as provided in cl.
2, and that the provisions of cl. 13 should be construed as
providing for termination of the agreement in certain events
prior to the said date of termination.  It is argued on its
behalf that the construction placed upon the agreement by the
learned trial Judge was open to the objection that the effect
which he gave to cl. 13 created a repugnancy between that
paragraph and the provisions of cl. 2, and required the
interpolation into cl. 13 of the word thereafter or a word of
similar signification.  Counsel for the appellant further
submitted that these 2 clauses could be construed without
rejecting any part of the agreement or adding anything thereto,
if the view to be taken that the contract was for a fixed
period terminating 30th June 1956, and that the provisions of
cl. 13 were designed to devise a method of determining the
contract in certain events which might occur prior to 30th June
1956.  This construction, however, is open to the criticism
that it leaves unresolved the term contained in cl. 13 (b)
providing for termination of the contract by a written notice
to be given by either party to the other at least one month
prior to the 31st August in any year.  If the contract was for
the fixed period extending from 6th September 1955 to 30th June
1956, the power to terminate the agreement by a written notice
given one month prior to the 31st December, would be
meaningful, but not so the provision enabling the agreement to
be brought to an end by notice given one month prior to the
31st August, hence it would appear to have been contemplated
that the agreement might extend beyond the 30th June 1956.
Furthermore the words in any year would have to be rejected as
surplusage.

 As stated, the agreement between the parties was expressed on
a printed form which was evidently made available to school
boards by the department of education.  This form contains, on
the second page, columns for the insertion of information
required by the department for grant purposes and they do not
concern the person who undertakes to provide transportation for

1960 CanLII 155 (ON CA)

the pupils.  It would seem that such grants are made by the
department on a yearly basis, and this may account for the fact
that the parties entered into separate agreements for the years
1954-5 and for the years 1955-6.  It is nihil ad rem that the
incongruity mentioned above would not arise if the period
covered by cl. 2 had not been for approximately 10 months but
for a substantially longer time.  Be that as it may, that
clause refers to a specific period commencing 6th September
1955 and ending 30th June 1956, and whatever its true effect
may be, the entire agreement must be construed in the light of
that express stipulation.

 The immediate object of the agreement was to provide for the
transportation of pupils attending the schools specified
therein and who were under the jurisdiction of the defendant
board during the period of the 1955-6 school year, namely,
between the 6th September 1955, and the 30th June 1956.  It is
not without significance that the document is described on its
face as an agreement for transportation.  In cl. 13 it is again
referred to as this agreement. In references to the document on
p. 2 the word agreement is again used.  As contrasted with this
term in cl. 2 the word contract is employed.  It is contended
by counsel for the respondent that the word contract was not
used in its strict technical legal sense but rather more
loosely to designate the contract period, or more precisely,
the period during which the transportation services, undertaken
by the plaintiff, were to be performed; and that a period
corresponding with the school year was to be equally applicable
to any subsequent year covered by the parties' agreement.

 During the argument of the appeal this construction commended
itself to my mind as a highly reasonable one, and further
reflection has not altered my opinion.  The fact that the dates
mentioned in cl. 2 correspond with the opening and closing
dates of the school year as defined by the High Schools Act, s.
61, strongly supports this contention.  If cl. 2 be so
construed then the period of duration of the contract can be
determined by resorting to the provisions of cl. 13 only.  The
contract can then be looked upon as one which came into force
on the date of its execution and delivery and which was to
continue in force until terminated in accordance with the terms

1960 CanLII 155 (ON CA)

of cl. 13, subject, of course, to the terms of cl. 2 which
provide for the commencement of the transportation services on
the 6th September 1955.  As to that provision, the contract was
intended to have and would have a retrospective effect.  The
agreement can thus be interpreted as a harmonious whole without
doing violence to any of its terms and without the
interpolation or elimination of any of them.  It is true that
the school year would begin and end on different dates in
subsequent years but that creates no difficulty.  There can be
no doubt that the pupils were only to be conveyed on school
days during the school year, the precise period of which would
be readily ascertainable by reference to the High Schools Act,
s. 61.

 In the result, therefore, I have reached the conclusion that
judgment in appeal was right and I would dismiss the appeal
with costs.

 MORDEN, J.A.:-- I have read the reasons given by my brother
Schroeder for dismissing this appeal but with every respect for
his views, I cannot agree with his conclusions.

 The issue between the parties is a narrow one -- involving
the proper construction of a written agreement for transporting
pupils attending a high school under the jurisdiction of the
defendant board.  The parties, beginning in 1949, executed
somewhat similar agreements annually.  The minute book of the
board contains a resolution, which was passed 30th November
1954, in these words

 That F. Elliott's bus be hired for 3 years on year to year
 contract.

The written agreement for the previous year was dated the same
date as this resolution. The agreement in question, except for
the dates, is in the same terms as agreement dated 30th
November 1954.  Its provisions so far as they are material to
the issue are set out in my brother's reasons.  It is evident,
and undisputed, that the parties did not enter into a 3 year

agreement upon a year to year basis, whatever that may mean.

 In view of the argument advanced in this Court by the
respondent's counsel, it is important to examine with care the
allegations made by the parties in their pleadings with respect
to proper interpretation of termination provision of the
agreement.  The plaintiff pleaded that the agreement was for
one school year and thereafter unless terminated pursuant to
terms of cl. 13 of the said contract.  In its statement of
defence, the board alleged that the contract was by its terms
terminated and fully completed and ended 30th June 1956, and
thereafter no relationship, contractual or otherwise, existed
between the plaintiff and the defendant.  The learned trial
Judge, for considered reasons, accepted the interpretation
pleaded by the plaintiff.

 Upon the argument of this appeal, the plaintiff's counsel
advanced a new interpretation -- that the agreement continued
in force until terminated in accordance with cl. 13 and only by
way of alternative argument did he support the interpretation
stated in his pleading which had found favour with the learned
trial Judge.  As I read my brother Schroeder's reasons, he
accepts what I term the new interpretation.  Rule 147 provides
that

 Where the contents of any document are material, it shall be
 sufficient in any pleading to state the effect thereof as
 briefly as possible, without setting out the whole or any
 part thereof.

The effect of the corresponding English Rule (O. XIX, r. 21) is
described by Odgers, Pleading & Practice, 14th ed., p. 159, as
follows

   Wherever the contract sued on is contained in a written
 instrument, the pleader should shortly state what he
 conceives to be its legal effect; ... It will be for the
 defendant, if he disputes the legal effect attributed to it
 by the plaintiff, to state his own version of the document.

Bramwell, L.J., in Philipps v. Philipps (1878), 4 Q.B.D. 127,

at p. 131, in discussing the objects of the rules of pleading
stated one of them in these words

  It is that the plaintiff may state what his case is for the
  information of the defendant, and that the plaintiff may be
  tied down to it and not spring a new case on the defendant.

Counsel for the appellant did not raise any objection to this
departure from the statement of claim and I will therefore
assume that the plaintiff is entitled at this late stage to
advance for the first time a new interpretation of the
agreement.  However in these circumstances, a Court should
consider it with caution and perhaps with some scepticism.

 In my considered opinion the agreement was to continue for a
fixed period -- the term mentioned in cl. 2 -- from 6th
September 1955, until 30th June 1956, but was subject to
earlier termination during that period by the operation of cl.
13.  This interpretation gives full effect to the plain and
ordinary meaning of the language of cl. 2 which I conceive to
be expressed intention of the parties. Mr. Starr, in his able
presentation, submitted, first, that this construction made
superfluous the words in cl. 13 providing for termination by
one month's notice on the 31st August in any year.  I agree
with that statement but not the conclusion he asks us to draw
from it.  There was no legal obstacle to the parties entering
into a contract for a period of more than 10 months.  They
could have made a transportation contract for, say, 2 or 5 or
10 years.  If they had, there would have been a period or
periods at which the words which were admittedly superfluous to
this contract would have been appliable.  There is ample
authority justifying a Court in rejecting words, provided that
the intention of the parties is plain, notwithstanding their
presence in the written document.  In Gwyn v. Neath Canal Nav.
(1868), L.R. 3 Ex. 209, Kelly, C.B., said, at p. 215

  The result of all the authorities is, that when a Court of
  law can clearly collect from the language within the 4
  corners of the deed, or instrument in writing, the real
  intentions of the parties, they are bound to give effect to
  it by supplying anything necessarily to be inferred from the

terms used, and by rejecting as superfluous whatever is
repugnant to the intention so discerned.

This general principle is particularly applicable to documents
which are in a printed form and there is a possible conflict
between the written and printed terms.  The agreement which was
the subject of debate upon this appeal is on a printed form
prepared by the department of education and distributed, I
assume, to hundreds of school boards in this Province.  But if
it is said (and I do not agree) that the written dates
appearing in cl. 2 conflict with the printed dates in cl. 13,
then I say that more weight is to be given to the written words
because they were selected by the parties themselves than to
the printed words which were provided not only for these
parties but for all other similar bodies entering
transportation contracts, even to the extent of disregarding
these printed words:  Glynn v. Margetson & Co., [1893] A.C.
351, Templin v. Alles, [1944] 1 D.L.R. 733, Addis v. Burrows,
[1948] 1 K.B. 444, at p. 449, Metal Stampings v. Standard
Life Ass. Co., [1951] O.W.N. 625, Elliott v. Dobson, [1954]
O.R. 185, and Sze Hai Tong Bk. v. Rambler Cycle Co., [1959]
A.C. 576, at p. 587.

 If the termination date is to be ascertained without any
reference to cl. 2, then, as Mr. Starr appreciated, some
meaning and effect must be given to that paragraph.  He
submitted that it only described the period of carriage of the
pupils and in support of this he referred us to the use of the
word contract in some parts of the document which he contrasted
with the word agreement used in other parts and argued that
they had different meanings.  In legal and lay parlance these
words are commonly used to mean the same thing.  With all
respects to the skill of the unknown draughtsman, I would
hesitate a long time before I would attribute to him and to the
parties to this agreement an intention to employ these words in
the same document, which was apparently in general use
throughout Ontario, with different meanings.

 There are several serious objections in my view to
interpreting cl. 2 as defining merely the period of carriage of
the pupils in any year.  First, several words would have to be

read into this paragraph to give it this special meaning.
Secondly, the words each school day during the period covered
by this contract appearing in cl. 1 clearly define the period
of carriage.  Another objection to this interpretation of cl. 2
is the fact that the dates appearing in it apply to only one
school year, the one ending 30th June 1956.  They could not
properly describe any subsequent school year.  If the paragraph
was intended to describe the period of carriage in all the
years included in a contract of this nature, very different
language would have been used.  The school year and holidays
for high schools are defined with precision by the High Schools
Act, s. 61.

 In my opinion, cl. 2 sets by its very language the beginning
and end of the operation of this agreement.  If the contrary
view is to be accepted, then operators and school boards who
wished to fix a definite termination date at the time the
agreement was made, would have to make several important
alterations in the printed parts of this general form.  If the
agreement is to be interpreted as the respondent now contends,
then it would never come to an end by its own terms, but
require for its termination some subsequent action by one or
both of the parties under cl. 13.  Bearing in mind the general
use of this form, such an interpretation would have, in my
respectful opinion, results surprising and perhaps highly
inconvenient to the parties.  I cannot accept the view that the
department by distributing this form intended that all
transportation contracts were to be of indefinite duration.

 For these reasons, I would allow the appeal and dismiss the
action, both with costs.

                                        Appeal dismissed.

                              Morden, J.A., dissenting.

# TAB 37

52 Fed.Cl. 774
United States Court of Federal Claims.

FIRST FEDERAL SAVINGS
BANK OF HEGEWISCH, Plaintiff,
v.
The UNITED STATES, Defendant.

No. 93–162C.    |    Originally Filed July 3,
2002.    |    Reissued for Publication July 8, 2002.

Savings and loan brought suit against the United States,
alleging that passage of the Financial Institutions Reform,
Recovery, and Enforcement Act of 1989 (FIRREA) breached
agreements it made with the government in connection
with the acquisition of a failing thrift. Government
filed counterclaims asserting special plea in fraud claim
and claim for rescission. On cross-motions for summary
judgment on contractual liability, plaintiff's motion to dismiss
counterclaims and affirmative defenses, and defendant's
cross-motion for summary judgment as to its counterclaims
and affirmative defenses, the Court of Federal Claims,
Futey, J., held that: (1) contract was formed between the
government and thrift, whereby thrift could use purchase
method of accounting and record supervisory goodwill
for merger with ailing thrift, and contract was breached
by passage of FIRREA; (2) government did not establish
special plea in fraud claim based on defalcation and alleged
misrepresentations of plaintiff's chief financial officer; and
(3) government was not entitled to rescission.

Plaintiff's motion for partial summary judgment grant;
plaintiff's motion to dismiss granted in part and denied in part;
defendant's cross-motions denied.

West Headnotes (13)

[1]    **Building and Loan Associations**
        👉 Rights, powers, duties, and liabilities of
        receiver in general

Merger agreement, assistance agreement, and
certain documents incorporated by integration
clause formed a contract between the
government and thrift, whereby thrift could
use purchase method of accounting and record
supervisory goodwill for merger with ailing

thrift, and contract was breached by passage of
the Financial Institutions Reform, Recovery, and
Enforcement Act of (FIRREA) which precluded
use of supervisory goodwill for regulatory
reporting purposes. Federal Deposit Insurance
Act, § 2[1] et seq., 12 U.S.C.A. § 1811 et seq.

5 Cases that cite this headnote

[2]    **United States**
        👉 Tolling

The doctrine of equitable tolling allows the court
to abate the effect of a statute of limitations when
the proper circumstances require such an action.

1 Cases that cite this headnote

[3]    **United States**
        👉 Tolling

Unique circumstances of *Winstar* litigation, and
special case management procedures identified
in the omnibus case management order (CMO),
warranted equitable tolling of any statute of
limitations that might apply to government's
special plea in fraud counterclaim in *Winstar*
case.

2 Cases that cite this headnote

[4]    **United States**
        👉 Making or Presentation of False Claims and
        Other Offenses Relating to Claims

To establish special plea in fraud that claimant
committed fraud during the performance of
a contract, government must establish: (1)
misrepresentation of a material fact; (2) intent
to deceive or a reckless state of mind; (3)
justifiable reliance on the misrepresentation by
the government; and (4) injury to the government
through reliance. 28 U.S.C.A. § 2514.

11 Cases that cite this headnote

[5]    **Corporations and Business Organizations**
        👉 Corporation acts through officers or agents

Generally, a corporation can only act through
its agents, and when they are clothed with

the authority to act for it, the corporation is responsible for their acts.

Cases that cite this headnote

**[6]**   **Corporations and Business Organizations**
👈 Acting within scope of employment or authority

If a corporate employee is acting outside of his or her actual or apparent authority, the corporation is generally not liable for employee's actions.

2 Cases that cite this headnote

**[7]**   **Corporations and Business Organizations**
👈 Fraud

Generally, the fraud of an officer of a corporation is imputed to the corporation when the officer's fraudulent conduct was (1) in the course of his employment and (2) for the benefit of the corporation.

3 Cases that cite this headnote

**[8]**   **United States**
👈 Making or Presentation of False Claims and Other Offenses Relating to Claims

Defalcation by chief financial officer of thrift, which consisted of embezzlement, misappropriated funds through unauthorized loans, and extortion, could not be imputed to thrift for purposes of government's special plea in fraud counterclaim in *Winstar* suit, where thrift did not benefit from the defalcation in any way. 28 U.S.C.A. § 2514.

1 Cases that cite this headnote

**[9]**   **Building and Loan Associations**
👈 Rights, powers, duties, and liabilities of receiver in general

Although assistance agreement and other documents which governed supervisory merger did not expressly require that acquiring thrift operate acquired thrift in a safe and sound manner, it was inherent in agreement between the government and acquiring thrift that acquired thrift be managed in such a way.

1 Cases that cite this headnote

**[10]**   **United States**
👈 Penalties and actions therefor

Government failed to establish special plea in fraud counterclaim against thrift which brought *Winstar* suit, based on defalcation or alleged misrepresentations by thrift's chief financial officer; defalcation could not be imputed to thrift, and government failed to prove that officer misrepresented a material fact. 28 U.S.C.A. § 2514.

2 Cases that cite this headnote

**[11]**   **Cancellation of Instruments**
👈 Nature and scope of remedy
**Contracts**
👈 Contracts subject to rescission

The remedy of rescission allows a party to seek disaffirmance of a contract and the return to the status quo that existed before the transaction was executed.

1 Cases that cite this headnote

**[12]**   **Contracts**
👈 Contracts subject to rescission
**Contracts**
👈 Restoration of former status of parties

Rescission as a contract remedy is limited to situations where it is possible to return the parties to the status quo ante.

1 Cases that cite this headnote

**[13]**   **Building and Loan Associations**
👈 Rights, powers, duties, and liabilities of receiver in general

Government was not entitled to rescission of supervisory merger agreement on ground that fraud perpetrated by acquiring thrift render assistance agreement void ab initio; government did not establish any fraud, and even if it had, rescission involving dissolution of merger would be impossible and wholly irresponsible.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*775** Theodore A. Shapero, Chicago, Illinois, attorney of record for plaintiff and Mark A. Rabinowitz, co-counsel, Chicago, Illinois.

Edward P. Sullivan, Department of Justice, Washington, D.C., with whom was Deputy Assistant Attorney General Stuart E. Schiffer, for defendant. David M. Cohen, Director, and Jeanne E. Davidson, Assistant Director. Jeffrey T. Infelise, Trial Attorney.

**Opinion**

*OPINION and ORDER* [1]

FUTEY, Judge.

This *Winstar*-related case is before the court on the parties' cross-motions for summary judgment on contractual liability, plaintiff's motion to dismiss defendant's counterclaims and affirmative defenses, and defendant's cross-motion for summary judgment as to its counterclaims and affirmative defenses. Defendant's counterclaims are based on the special plea in fraud statute and rescission.

With respect to contractual liability, plaintiff maintains that agreements it made with defendant during plaintiff's acquisition of a failing thrift created a contract that allowed plaintiff to utilize certain favorable accounting principles. Plaintiff maintains defendant breached this contract when it enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA). Notwithstanding **\*776** the United States Supreme Court's (Supreme Court) decision in *United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), defendant argues it never entered into a contract with plaintiff because their negotiations were regulatory in nature, not contractual. Defendant also alleges that plaintiff's actions pre- and post-FIRREA did not reflect a contractual relationship between the parties.

In addition, defendant asserts plaintiff's complaint should be dismissed because plaintiff perpetrated fraud against the government for a nine-year period. Said fraud is premised on a defalcation committed by one of plaintiff's employees. Defendant also asks the court to rescind any contract it had with plaintiff and to order plaintiff to return the $2 million it received as assistance when it acquired the failing thrift. Plaintiff seeks dismissal of defendant's counterclaims because defendant filed them after the statute of limitations expired. Plaintiff also contends defendant cannot satisfy the requisite elements necessary for proving fraud and rescission. Moreover, plaintiff believes defendant's affirmative defenses should be stricken because they are wholly conclusory.

*Factual Background*

Plaintiff is a savings and loan association located in Chicago, Illinois, the accounts of which are insured by the Savings Association Insurance Fund (SAIF) as administered by the Federal Deposit Insurance Corporation (FDIC). Prior to May 1982, plaintiff was a state-chartered savings and loan institution, which operated on the southeast side of Chicago. In May 1982, plaintiff became a federally insured, mutual savings and loan association or "thrift."

As this case is considered a "*Winstar*-related" case, it is unnecessary to revisit the history of the savings and loan crisis. This has been exhaustively done in prior opinions such as *Winstar* itself. *See, e.g., Winstar,* 518 U.S. at 843–856, 116 S.Ct. 2432; *Bluebonnet Sav. Bank, F.S.B. v. United States,* 47 Fed.Cl. 156, 158 (2000) (*Bluebonnet II*), *aff'd, in part,* 266 F.3d 1348, 1354–55 (Fed.Cir.2001). Only the facts relevant to this particular case, therefore, are set forth here.

**I. The Lansing Acquisition**

Lansing Federal Savings & Loan Association (Lansing) was a federally chartered mutual association located in Lansing, Illinois. In 1982, Lansing was a failing thrift institution insured by the Federal Savings and Loan Insurance Corporation (FSLIC). During the summer of 1982, a FSLIC supervisory agent contacted at least ten associations in the Chicago area, including plaintiff, concerning a possible assisted merger with Lansing. Plaintiff's attorney sent the supervisory agent a letter dated May 25, 1982, expressing plaintiff's interest in merging with Lansing on the condition that: (1) the acquisition be accomplished under the purchase method of accounting and Lansing's assets be "marked to market;" [2] (2) for a period of thirty-five years, the Federal Home Loan Bank Board (FHLBB) would forbear from including operating losses on acquired assets, capital losses

upon disposition of acquired assets and acquired scheduled items, and liabilities for the net worth calculation; (3) for a period of one year, FHLBB would forbear from including Lansing's liquidity deficiency and aggregate net withdrawals in the liquidity calculation; and (4) for a period of five years, FSLIC would indemnify plaintiff for expenses and attorney's fees incurred in connection with any litigation challenging the merger or arising from Lansing's undisclosed liabilities or scheduled items. After further discussions with FSLIC, plaintiff submitted a bid to FHLBB for the proposed acquisition of Lansing on August 23, 1982. The cover letter attached to this bid stated, in pertinent part:

   **\*777** First Federal Savings of Hegewisch hereby submits its bid to acquire Lansing Federal Savings and Loan Association, utilizing purchase accounting method of acquisition and FSLIC capital assistance. [3]

On December 13, 1982, plaintiff entered into a merger agreement (Merger Agreement) with Lansing. On December 16, 1982, FSLIC's Director, H. Brent Beesley, issued a memorandum to FHLBB recommending the approval of the merger between Lansing and plaintiff. FHLBB approved the merger by resolution on December 20, 1982. Plaintiff entered into an assistance agreement (Assistance Agreement) with FSLIC and Lansing on December 30, 1982. The effective date of the merger was January 7, 1983.

The Assistance Agreement, in Paragraph D of the Recitals, stated:

   The CORPORATION [FSLIC] has decided, pursuant to § 406(f) of the National Housing Act, as amended, 12 U.S.C. § 1729(f), to provide financial assistance as set forth in this Agreement, having determined that the MERGING ASSOCIATION [Lansing] is in danger of default and that the amount of such assistance would be less than the losses the CORPORATION would sustain upon the liquidation of the MERGING ASSOCIATION through a receivership accompanied by the payment of insurance of accounts. [4]

Section 19 added, in part:

This Agreement, together with any interpretation thereof or understanding agreed to in writing by the parties, constitutes the entire agreement between the parties ... in connection herewith, excepting only the Merger Agreement and any resolutions or letters issued contemporaneously herewith by the Federal Home Loan Bank Board or the CORPORATION, provided, however, that in the event of any conflict, variance, or inconsistency between this Agreement and the Merger Agreement, the provisions of this Agreement shall govern and be binding on all parties insofar as the rights, privileges, duties, obligations, and liabilities of the CORPORATION are concerned. [5]

Section 19 of the Assistance Agreement contained an integration clause which incorporated by reference the Merger Agreement, certain contemporaneous resolutions issued by FHLBB, and a letter from FHLBB to plaintiff that guaranteed certain accounting forbearances with respect to the intangible assets that could be recognized in the transaction.

On December 30, 1982, FHLBB adopted Resolution No. 82–891, which included, in pertinent part:

   for purposes of regulatory reporting, Hegewisch shall account for the merger as a purchase using one of the following methods of accounting: 1) regulatory accounting principles prescribed for insured institutions, in which case any goodwill or similar item resulting from the merger shall be amortized over a period of no more than 35 years under the straight line method; or 2) generally accepted accounting principles, consistently applied, in use in the savings and loan industry at the time of the bid proposal on August 23, 1982.

   ....

RESOLVED FURTHER, That the Bank Board finds that the merger of Lansing with and into Hegewisch is instituted for supervisory reasons. [6]

In addition, FHLBB Memorandum 31b expressly provided that the goodwill resulting from the merger could be recognized as an asset subject to amortization.

Plaintiff elected to use the purchase method of accounting for the merger with Lansing. Plaintiff's auditors at the time, Ernst & Whinney, concluded that Lansing's liabilities exceeded its assets by $8,543,277 on a marked to market basis. Pursuant to the purchase method of accounting, therefore, plaintiff recorded $8,543,277 in supervisory **778** goodwill, which it planned to amortize over thirty-five years on a straight line basis. Plaintiff actually amortized the supervisory goodwill from 1983 until the enactment of FIRREA on August 9, 1989.

When enacted, FIRREA: (1) abolished FSLIC and transferred its functions to other agencies; (2) created SAIF, managed by FDIC; (3) abolished FHLBB; and (4) created the Office of Thrift Supervision (OTS) in the Department of Treasury. It also provided, in part, that tangible capital cannot include supervisory goodwill, and that only limited amounts of core capital may consist of supervisory goodwill. These amounts would be phased out by 1994. It further stated that supervisory goodwill must be amortized for a period not to exceed twenty years.

On November 8, 1989, OTS published minimum capital regulations pursuant to FIRREA that excluded supervisory goodwill from capital for regulatory reporting purposes. As a result of the provisions of FIRREA and the OTS capital regulations, plaintiff argues it can no longer satisfy the mandatory minimum capital requirements and cannot come into compliance with said requirements in the foreseeable future.

## II. David Orchowski's Defalcation

At the time of the Lansing negotiations, David J. Orchowski was the son-in-law of plaintiff's chairman of the board, Vincent Ginalski, and the husband of the president, Ann Capanna. From 1986 to 1991, he served as plaintiff's chief financial officer and executive vice president. He also served as vice president, controller and treasurer of plaintiff for several years prior to 1986.

In September 1991, Mr. Orchowski turned himself in to the Federal Bureau of Investigation (FBI) in Chicago, Illinois, admitting that he had defrauded plaintiff over a period of nine years, beginning in mid–1982. His fraudulent activity began several months prior to FSLIC's execution of the Assistance Agreement and the completion of FHLBB's September

1982 regulatory examination of plaintiff. The total amount he embezzled during his fraud scheme was approximately $100,000. He also misappropriated other funds, primarily through his activities involving the making of unauthorized loans. In addition, he altered existing loans and paid extortion to borrowers who threatened to reveal his unlawful activities. Plaintiff's total losses from Mr. Orchowski's actions neared $10 million. Plaintiff subsequently recovered all of these losses from the customers involved, bonding company, auditors, and Mr. Orchowski.

Mr. Orchowski was charged in a criminal information proceeding with a violation of 18 U.S.C. § 1344 (1990 Supp.) for one count of bank fraud. He plead guilty in 1992 to willfully misapplying funds belonging to, and under the custody and control of, plaintiff. In conjunction with his guilty plea, he entered a plea agreement where he admitted the following: (1) beginning in approximately June 1982, he made no less than sixty unauthorized loans with funds belonging to plaintiff; (2) many of the loans were extended to individuals who had applied to plaintiff for loans but had been turned down due to reasons relating to credit risk, loan purpose, or plaintiff's loan policies; (3) he failed to obtain properly executed loan documentation for many of the unauthorized loans; and (4) he failed to perfect plaintiff's security interest in collateral for the loans. As a result of his guilty plea, he was sentenced to thirty-one months in prison and ordered to pay restitution to plaintiff. On November 9, 1991, plaintiff filed a civil action against Mr. Orchowski alleging, among other things, a breach of fiduciary duty.

Mr. Orchowski's activities caused the OTS to implement several enforcement actions against him. For example, the OTS issued a "Stipulation and Consent to Issuance of Order of Prohibition" to Mr. Orchowski barring him from further participation, in any manner, in plaintiff's affairs. He also was prohibited from acting as a director or officer in any other financial institution without the prior written approval of the Regional Director of the Central Region of the OTS. In addition, the OTS issued a Cease and Desist Order (C & D Order) against plaintiff [7] requiring it to complete a comprehensive analysis **779** and assessment of its management structure and staffing requirements. The OTS required this study because, after conducting a formal investigation of the defalcation, it concluded that a lack of proper oversight by the board of directors and plaintiff's senior management contributed, in part, to Mr. Orchowski's ability to carry out his fraud over a sustained period of time. The OTS also cited the negligence of plaintiff's accountant,

Deloitte & Touche, as a significant contributing factor in plaintiff's failure to detect the defalcation.

## III. Pending Litigation

Plaintiff filed a complaint on March 22, 1993, listing seven counts against the government including breach of contract, Fifth Amendment takings and due process violations, as well as requesting damages and restitution. On October 29, 1997, plaintiff filed a short-form motion for partial summary judgment in accordance with the court's omnibus case management order (CMO). Defendant filed a motion to dismiss Counts I, III, IV, V, VI and VII on November 15, 1999, and filed a cross-motion for summary judgment with respect to Count I on December 6, 1999. There is also a series of short briefs that were filed in response to the court's order to show cause why summary judgment should not be entered in this case, in light of the court's decision in *California Fed'l Bank, FSB v. United States,* 39 Fed.Cl. 753 (1997). The court appended an order to that opinion requiring defendant to respond in all cases where the plaintiffs had filed a motion for summary judgment. This generated a series of responsive briefs.

Judge Loren Smith transferred this case to the undersigned judge on December 15, 2000. In a departure from the CMO, which asked defendant to not file answers and counterclaims in the *Winstar* cases until after the short-form motions for partial summary judgment were decided, the court allowed defendant to file its answer and counterclaim in an order dated June 7, 2001. Defendant filed this document under seal on June 13, 2001. Defendant's counterclaim is based on the defalcation involving approximately $10 million in unauthorized loans and misappropriations committed by Mr. Orchowski. Defendant's counterclaim contains two counts— Count I is a special plea in fraud claim based on 28 U.S.C. § 2514 (1994) and Count II is a claim for rescission of the Assistance Agreement in response to the alleged fraud. On August 8, 2001, plaintiff filed a motion to dismiss Counts I and II of defendant's counterclaim. Defendant responded by filing a cross-motion for summary judgment on Counts I and II.

Also on August 8, 2001, plaintiff moved for leave to amend its complaint to include a reliance damages theory.[8] The court granted this request on October 17, 2001. Plaintiff filed its first amended complaint on January 16, 2002, to include factual allegations necessary to establish reliance damages for its breach of contract claim. The damages that plaintiff

now seeks are: (1) lost profits; (2) the costs of substituting replacement capital for the supervisory capital it lost when defendant breached the contract; (3) restitution of defendant's benefit or restitution of plaintiff's cost of performance under the contract; and (4) reliance damages.

Defendant filed an answer to plaintiff's first amended complaint on February 12, 2002. This document included the same counterclaims defendant set forth in its first answer. On March 1, 2002, plaintiff filed a motion to dismiss Counts I and II of defendant's counterclaim. This motion was just a reiteration of plaintiff's previous motion to dismiss these counts, which it filed on August 8, 2001. An oral argument addressing the breach of contract issues and defendant's counterclaims was held on May 15, 2002, in Washington, D.C.

### *Discussion*

The court presently has before it plaintiff's motion for partial summary judgment on liability, defendant's corresponding cross-motion, plaintiff's motion to dismiss the two counts of defendant's counterclaim, and defendant's corresponding cross-motion for summary judgment as to its counterclaims *\*780 and affirmative defenses.[9] The two main issues are contractual liability and defendant's special plea in fraud claim. As this court has previously discussed, "it is ultimately impossible to divorce the two." *Anderson v. United States,* 47 Fed.Cl. 438, 442 (2000). They are intertwined because the scope of the contract is critical to the issue of whether the court should grant defendant's summary judgment motion based on fraud. *Id.*

## I. Contractual Liability

[1]    Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jay v. Sec'y, DHHS,* 998 F.2d 979 (Fed.Cir.1993). A fact is material if it might significantly affect the outcome of the suit under the governing law. *Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. 2505. The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party demonstrates an absence of a genuine issue of material fact,

the burden then shifts to the opposing party to show that a genuine issue exists. *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1563 (Fed.Cir.1987). Alternatively, if the moving party can show that there is an absence of evidence to support the opposing party's case, the burden then shifts to the opposing party to proffer such evidence. *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. The court must resolve any doubts about factual issues in favor of the party opposing summary judgment, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefits of all favorable inferences and presumptions run. *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The fact that both parties have moved for summary judgment does not relieve the court of its responsibility to determine the appropriateness of summary disposition. *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987)). A cross-motion is a party's claim that it alone is entitled to summary judgment. *A Olympic Forwarder, Inc. v. United States,* 33 Fed.Cl. 514, 518 (1995). It does not follow that if one motion is rejected, the other is necessarily supported. *Id.* Rather, the court must evaluate each party's motion on its own merit and resolve all reasonable inferences against the party whose motion is under consideration. *Id.* (citing *Corman v. United States,* 26 Cl.Ct. 1011, 1014 (1992)).

Plaintiff maintains the Merger Agreement, Assistance Agreement and certain documents incorporated by the integration clause formed a contractual relationship with defendant. Plaintiff contends its bid to merge with Lansing specifically proposed to FHLBB that plaintiff would use the purchase method of accounting and would record supervisory goodwill for the merger. Plaintiff asserts that throughout the entire negotiation process with Lansing, FSLIC and FHLBB it was understood and articulated, orally and in writing, that plaintiff would be able to record as supervisory goodwill the amount by which the market value of Lansing's liabilities exceeded the market value of its assets. Plaintiff argues it was also agreed that it could amortize this goodwill over a long period of time, such as thirty to forty years, as reflected in the bid. Plaintiff maintains that no acquirer would have merged with Lansing without financial assistance from FSLIC and FHLBB. In addition, plaintiff asserts defendant is raising arguments that the Supreme Court specifically rejected in *Winstar.*

Defendant contends the Assistance Agreement, by its terms, did not promise that purchase method accounting could be used or **\*781** that special regulatory treatment would be afforded to plaintiff for the supervisory goodwill that resulted from the Lansing acquisition. Defendant also asserts the Assistance Agreement did not provide plaintiff with direct cash assistance from FSLIC. Instead, FSLIC agreed that plaintiff could debit certain amounts from a special reserve account established by FSLIC to offset current or future liabilities associated with Lansing's operations. Plaintiff debited nearly $2 million from this account. Defendant further maintains that all documents integrated into the Assistance Agreement, such as the Merger Agreement and certain resolutions by FHLBB, did not contain any contractual guarantees to plaintiff with respect to the purchase method of accounting or the regulatory treatment of supervisory goodwill.

### A. *The Winstar scenario*

Since this case has been characterized as *Winstar*-related, it is necessary to review the Supreme Court's decision in that seminal case. [10] Three separate causes of action were heard by the Supreme Court at that time, with *Winstar* serving as the lead case. Glendale Federal Bank, FSB (Glendale) and The Statesman Group, Inc. were the two other thrifts involved. *Winstar,* 518 U.S. at 858, 116 S.Ct. 2432. Plaintiff asserts the facts of Glendale's acquisition are most closely related to the present case. [11]

First Federal Savings and Loan Association of Broward County (Broward) approached Glendale in September 1981 about a possible merger. *Id.* at 861, 116 S.Ct. 2432. At the time, Broward had liabilities exceeding its assets by over $734 million. *Id.* Glendale was both profitable and well-capitalized, with a net worth of $277 million. *Id.* After preliminary negotiations, Glendale submitted a merger proposal to FHLBB that "assumed the use of the purchase method of accounting to record supervisory goodwill arising from the transaction, with an amortization period of 40 years." *Id.* FHLBB ratified the merger's "Supervisory Action Agreement" (SAA), on November 19, 1981. *Id.*

The SAA said nothing about supervisory goodwill, but it did contain an integration clause incorporating contemporaneous resolutions and letters, as well as the merger agreement. *Id.* One of the incorporated documents was Resolution 81–710, which referred to two additional documents including:

(1) a letter from Glendale's accountant identifying the use of goodwill and amortization periods to be recorded in Glendale's books and (2) a stipulation that goodwill would be amortized in accordance with Memorandum 31b. *Id.* Memorandum 31b allowed Glendale to use the purchase method of accounting and to recognize goodwill as an asset subject to amortization. *Id.*

The Supreme Court in *Winstar* concluded that these documents were enough to create a contractual relationship between Glendale and the government. Indeed, the court commented that "[w]e accordingly have no reason to question the Court of Appeal's conclusion that 'the government had an express contractual obligation to permit Glendale to count the supervisory goodwill generated as a result of its merger with Broward as a capital asset for regulatory capital purposes.' " *Id.* at 864, 116 S.Ct. 2432 (quoting *Winstar,* 64 F.3d 1531, 1540 (Fed.Cir.1995)); *see also Bluebonnet Sav. Bank, F.S.B. v. United States,* 43 Fed.Cl. 69 (1999) (*Bluebonnet I*).

The Glendale acquisition, therefore, consisted of four basic elements that the Supreme Court believed formed a contractual relationship: (1) a merger proposal that indicated purchase method accounting to record supervisory goodwill; (2) an assistance agreement, which said nothing about supervisory goodwill; (3) an integration clause in the assistance agreement that incorporated contemporaneous resolutions, letters, and the merger agreement; and (4) the actual contemporaneous resolutions and letters that indicated purchase method accounting for supervisory goodwill and amortization periods. **\*782** All four of these elements exist in the present case.

Specifically, plaintiff sent FSLIC's supervisory agent a letter concerning the merger that expressed plaintiff's desire to use the purchase method of accounting. Plaintiff then entered into an assisted transaction with FSLIC and Lansing. The Assistance Agreement did not specifically mention supervisory goodwill, however, Section 19 contained an integration clause that incorporated by reference the Merger Agreement, certain contemporaneous resolutions issued by FHLBB, and a letter from FHLBB to plaintiff guaranteeing certain accounting forbearances. One of the FHLBB resolutions included was No. 82–891, which allowed plaintiff to use either regulatory accounting principles or GAAP. Plaintiff elected to use the purchase method of accounting under GAAP so it could record $8,543,277 in supervisory goodwill, which it planned to amortize over thirty-five years on a straight-line basis. This supervisory goodwill

helped plaintiff satisfy the mandatory regulatory capital requirements. But for defendant's enactment of FIRREA, plaintiff could have continued to satisfy these requirements. The court believes this case is exactly like the scenario set forth in *Glendale* and explained in *Winstar.* [12]

## B. *Defendant's attempt to distinguish this case from the Winstar scenario*

Defendant provides an extensive list of reasons, however, as to why plaintiff did not enter a contractual relationship with the government in spite of the *Winstar* decision: (1) the government did not make contractual guarantees; (2) the government's actions refute the notion of a contract; (3) regulatory action alone does not create contractual rights; (4) plaintiff did not evince contractual intent; (5) plaintiff's actions prior to FIRREA showed no indication of a contractual relationship; (6) plaintiff's actions subsequent to FIRREA revealed no indication of a contractual relationship; (7) it was not irrational for plaintiff to acquire Lansing absent a contract with the government; and (8) any agreement with the government terminated before the enactment of FIRREA. [13] Some of these arguments were expressly rejected by the Supreme Court in *Winstar,* or by decisions of the United States Court of Appeals for the Federal Circuit (Federal Circuit). *See, e.g., California Fed'l Bank,* 39 Fed.Cl. at 762–63 (rejecting the argument that any contractual relationship terminated when the assistance agreement expired, which was prior to FIRREA). Indeed, defendant admits that some of the issues it raises "may be deemed decided by previous decisions of this Court." [14] Because the **\*783** court believes the present case fits squarely within the *Winstar* scenario, the court will only briefly address defendant's arguments and its attempt to relitigate what the Supreme Court has already established.

First, defendant maintains that nowhere in the four corners of the Assistance Agreement, the Merger Agreement, and the documents integrated into the Assistance Agreement is plaintiff promised the right to count supervisory goodwill for regulatory capital purposes and to use the purchase method of accounting. Instead, defendant argues that all it guaranteed was that plaintiff could debit FSLIC's special reserve account for: (1) capital loss coverage on real estate operations of Lansing up to $1.6 million; (2) capital loss coverage on Lansing's service corporation investment up to $1.4 million; and (3) $100,000 maximum coverage for undisclosed liabilities of Lansing. Defendant seems to ignore, however, Resolution 82–891 and FHLBB Memorandum

31b. Resolution 82–891, which was incorporated into the Assistance Agreement, states that regulatory accounting principles allow goodwill to be amortized over thirty-five years. Memorandum 31b expressly provides that the goodwill resulting from the merger could be recognized as an asset subject to amortization. [15] The Supreme Court concluded in *Winstar* that Memorandum 31b permits the use of "the purchase method of accounting and to recognize goodwill as an asset subject to amortization." 518 U.S. at 862, 116 S.Ct. 2432. Defendant's argument is therefore unconvincing.

Defendant also contends that its promise to permit plaintiff to use supervisory goodwill for regulatory capital compliance purposes, was regulatory in nature, not contractual, because there are no internal memoranda from the regulators discussing any contracts with plaintiff. Defendant adds that the performance of a regulatory function does not create a contract. The Supreme Court expressly rejected this argument in *Winstar* as "fundamentally implausible" because the integration clause in the Assistance Agreement incorporated the FHLBB resolutions and letters "not as statements of background rules, but as part of the 'agreements and understandings' between the parties." *Id.* at 863, 116 S.Ct. 2432. The Supreme Court also rejected defendant's additional argument that plaintiff assumed the risk of any change in regulatory capital requirements. The Supreme Court stated "it would have been irrational ... for [plaintiffs] to stake its very existence upon continuation of current policies without seeking to embody those policies in some sort of contractual commitment." *Id.* at 863, 116 S.Ct. 2432. The court does not agree with defendant's argument.

In addition, defendant maintains that plaintiff's actions pre- and post-FIRREA did not evince contractual intent or a contractual relationship. This argument too is unpersuasive because plaintiff made clear at the time of the negotiations that it wanted to use the purchase method of accounting and that the recording of supervisory goodwill was key to the transaction. After the merger, plaintiff began amortizing the goodwill, and defendant allowed plaintiff to treat it as an asset when calculating regulatory capital. [16] Also, contrary to defendant's assertions, plaintiff's conversion from a federal savings bank to a state-chartered bank four years after the enactment of FIRREA is not convincing evidence that plaintiff had no contractual relationship with defendant. [17]

**\*784** With respect to the rationality of plaintiff's acquisition of Lansing, defendant asserts that it was completely reasonable for plaintiff to enter the transaction without a

contractual commitment from defendant for the regulatory treatment of goodwill. Defendant emphasizes the special reserve account established by FSLIC and the small amount of goodwill-a "mere" $8 million-to support this claim that the Lansing purchase was attractive even without contractual guarantees. It seems, however, that the reserve account served only as a means of reimbursement for any losses plaintiff experienced from the disposition of Lansing's assets. It was not simply a "direct cash payment" that lowered the risk of the transaction, thus making the acquisition more appealing as defendant has argued.

Also, defendant's claim that the Lansing transaction did not result in much supervisory goodwill and, therefore, did not create a significant risk to plaintiff ignores the facts of this particular case. The "mere" $8 million may seem small and insignificant compared to the approximately $798 million of supervisory goodwill in *Glendale Federal Bank, FSB v. United States,* 43 Fed.Cl. 390, 405 (1999). The acquiring bank in *Glendale,* however, was large with a net worth of $277 million at the time of its merger with a failing thrift. *Id.* at 393. Prior to the merger in the present case, plaintiff had a net worth of only approximately $2.6 million, and it was a small, family-owned financial institution. The amount of supervisory goodwill at stake should be considered in light of the size and assets of the acquiring institution. What may seem insignificant to a large bank like Glendale could be deemed quite expensive and a significant risk for a small institution like plaintiff. Defendant's argument is therefore unconvincing. [18]

Finally, defendant contends that any contractual relationship between the parties terminated in 1985 when the Assistance Agreement expired. Defendant admits, however, that this particular argument "may conflict with previous decisions of this Court in other cases." [19] Defendant is correct that this argument has been previously rejected. *See Winstar,* 64 F.3d at 1542; *California Fed'l Bank,* 39 Fed.Cl. at 762–63. Defendant's promise to permit plaintiff to treat goodwill as a capital asset was not founded solely upon the Assistance Agreement, because it was also reflected in the FHLBB resolutions. The contractual relationship, therefore, did not end with the termination of the Assistance Agreement.

Defendant's attempt to distinguish this case from the *Winstar* scenario fails. The circumstances of the Lansing acquisition are exactly like the transaction involved in *Glendale.* The court concludes that the present case falls within the *Winstar* scenario and that the parties were bound by a

contract premised on the Assistance Agreement, the Merger Agreement, and the documents integrated into the Assistance Agreement, including the FHLBB resolution. Said contract allowed plaintiff to use the purchase method of accounting to record supervisory goodwill and to include said goodwill for regulatory capital compliance purposes.

## II. Defendant's Counterclaims

Plaintiff and defendant, therefore, were bound by a contractual relationship. Defendant is liable for breaching this contract when it enacted FIRREA unless it can establish that Mr. Orchowski's fraudulent activities preclude plaintiff from asserting a claim against the government. Defendant raises two counterclaims based on Mr. Orchowski's actions: (1) special plea in fraud and (2) rescission. Defendant also asserts numerous affirmative defenses it believes justify dismissing plaintiff's complaint. Plaintiff has responded by filing a motion to dismiss the **\*785** special plea in fraud claim because the statute of limitations has expired. Plaintiff also believes that both of defendant's counterclaims fail to state a claim upon which relief may be granted. With respect to the affirmative defenses, plaintiff asks the court to strike them because they are not sufficiently plead and are wholly conclusory. Defendant has cross-moved for summary judgment on its counterclaims and affirmative defenses.

### A. *Plaintiff's motion to dismiss*

Plaintiff moves to dismiss Count I of defendant's counterclaims for lack of subject-matter jurisdiction [20] and both Counts for failure to state a claim upon which relief may be granted. The distinction between the two has been established by the Federal Circuit. *See Gould, Inc. v. United States,* 67 F.3d 925 (Fed.Cir.1995); *Spruill v. Merit Systems Protection Board,* 978 F.2d 679 (Fed.Cir.1992); *Do–Well Machine Shop, Inc. v. United States,* 870 F.2d 637 (Fed.Cir.1989). "A dismissal for lack of subject matter jurisdiction essentially means that the subject-matter of the dispute is one that the court is not empowered to hear and decide." *McAfee v. United States,* 46 Fed.Cl. 428, 431 (2000) (citing *Gould, Inc.,* 67 F.3d at 929). "In contrast, a dismissal for failure to state a claim is a decision on the merits which focuses on whether the complaint contains allegations that, if proven, are sufficient to entitle a party to relief." *Id.* In order to determine whether the allegations state a cause of action upon which relief may be granted, and to decide issues of fact arising in the controversy, the court must assume jurisdiction over a claim. *Id.* (citing *Do–Well Machine Shop, Inc.,* 870 F.2d at 639.).

In ruling on a motion to dismiss for lack of subject-matter jurisdiction, the court must accept as true the counterclaim's undisputed factual allegations and construe them in a light most favorable to defendant. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Hamlet v. United States,* 873 F.2d 1414, 1415 (Fed.Cir.1989); *Farmers Grain Co. v. United States,* 29 Fed.Cl. 684, 686 (1993). If the undisputed facts reveal any possible basis on which defendant may prevail, the court must deny the motion. *Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683; *W.R. Cooper Gen. Contractor, Inc. v. United States,* 843 F.2d 1362, 1364 (Fed.Cir.1988). If the motion challenges the truth of the jurisdictional facts alleged in the complaint, however, the court may consider relevant evidence in order to resolve the factual dispute. *Rocovich v. United States,* 933 F.2d 991, 994 (Fed.Cir.1991). "The court should 'look beyond the pleadings and decide for itself those facts, even if in dispute, which are necessary for a determination of [the] jurisdictional merits.' " *Farmers Grain,* 29 Fed.Cl. at 686 (citing *Raymark Industries, Inc. v. U.S.,* 15 Cl.Ct. 334, 335 (1988)). Defendant bears the burden of establishing subject-matter jurisdiction for its counterclaims. *KVOS, Inc. v. Associated Press,* 299 U.S. 269, 57 S.Ct. 197, 81 L.Ed. 183 (1936); *Rocovich,* 933 F.2d at 993.

The court will dismiss defendant's counterclaims under RCFC 12(b)(6) for failure to state a claim upon which relief may be granted only if it appears beyond a doubt that defendant has not alleged facts sufficient to support its claim. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Mostowy v. United States,* 966 F.2d 668, 672 (Fed.Cir.1992). Also, the court must accept as true the counterclaim's undisputed factual allegations and should construe them in a light most favorable to defendant. *Papasan v. Allain,* 478 U.S. 265, 283, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (citing *Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683); *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991). Furthermore, all that is required to withstand a motion to dismiss is " 'a short and plain statement of the claim' that will give the [plaintiff] fair notice of what [defendant]'s claim is and the grounds upon which it rests." *Gould, Inc.,* 935 F.2d at 1276 (citing *Conley,* 355 U.S. at 47, 78 S.Ct. 99).

### 1. Statute of limitations

Plaintiff contends defendant's special plea in fraud claim should be dismissed because the six-year statute of limitations for filing **\*786** such a counterclaim has expired. Plaintiff

asserts that defendant knew of the defalcation since 1991, but did not file its counterclaim until ten years later in June 2001. Plaintiff believes the applicable statute of limitations is set forth in 28 U.S.C. § 2501 (1994). Defendant argues that its special plea in fraud claim is not subject to any statute of limitations, especially the one established in 28 U.S.C. § 2501. Defendant maintains that 28 U.S.C. § 2415 can be interpreted as stating that there is no statute of limitations for a special plea in fraud counterclaim.

Section 2501 provides, in pertinent part:

> Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues.

28 U.S.C. § 2501. The Court of Federal Claims has issued inconsistent decisions on whether a special plea in fraud counterclaim is subject to this statute of limitations. In *SGW, Inc. v. United States,* 20 Cl.Ct. 174, 181 (1990) and *TS Infosystems, Inc. v. United States,* 36 Fed.Cl. 570, 574 (1996) this court concluded that 28 U.S.C. § 2501 does apply to a special plea in fraud claim asserted by the government, and, therefore, the statute of limitations is six years. This court came to the opposite conclusion, however, in various other cases where it found that a special plea in fraud claim is not subject to *any* statute of limitations. *Jana, Inc. v. United States,* 34 Fed.Cl. 447, 452 (1995); *Erie Basin Metal Prods., Inc. v. United States,* 138 Ct.Cl. 67, 75, 150 F.Supp. 561 (1957); *Goggin v. United States,* 138 Ct.Cl. 279, 284, 152 F.Supp. 78 (1957). The Federal Circuit has not decided this issue.

This conflict in the caselaw is not problematic because the court believes that under either view defendant's claim is not barred by a limitations period. Of course, if the court agrees with *Jana* and its predecessors, no statute of limitations would apply because this court concluded that a special plea in fraud claim is not subject to a filing period. If the court follows *SGW* and *TS Infosystems,* the statute of limitations would presumably have expired in 1997, *if* no other factors were involved. [21] Defendant did not file until June 6, 2001.

This conclusion would ignore, however, the unique circumstances this court established to administer the approximately 120 *Winstar*-related cases. For example, this specific case was stayed from April 27, 1993 until 1996, when the Supreme Court rendered its opinion in *Winstar.* Following

this decision, then Chief Judge Smith issued the CMO to create special case management procedures for the *Winstar*-related cases. The CMO stated, in part:

> This Order applies to all *Winstar*-related cases ("*Winstar* cases" or "cases"), including any claims, *special pleas in fraud,* defenses, affirmative defenses, setoffs, *counterclaims,* or any other issues raised in those cases ....
>
> ....
>
> This Order is intended to supplement, and not to replace, any Rule of the United States Court of Federal Claims, *except as inconsistent with this Order.*
>
> ....
>
> Following the exchange of core documents, any plaintiff may file a motion for partial summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims, regarding two liability-related issues only .... The defendant need not identify any defenses of any kind, counterclaims, setoffs, pleas in fraud, etc. ("defenses") in responding to the motions, and the failure to assert those defenses in its response will not constitute a waiver.
>
> ....
>
> *The defendant shall not file an answer to the complaint in any case, and no defenses or arguments of any kind shall be deemed waived by reason of the defendant's not having filed an answer to any complaint.* In addition, no allegation shall be deemed admitted, nor shall defendant be estopped from denying any allegation, **\*787** by reason of not having filed an answer to any complaint. [22]

The court interprets the CMO to specifically grant defendant the opportunity to withhold filing its answer and counterclaims until after the short-form motions for partial summary judgment are decided. Indeed, defendant sought permission from the court to be released from this requirement so that it could file its answer and counterclaim. The court granted defendant this relief in an order dated June 7, 2001. [23]

**[2]  [3]**   The doctrine of equitable tolling allows the court to abate the effect of a statute of limitations when the proper circumstances require such an action. *TS Infosystems,* 36 Fed.Cl. at 573 (citing *Bailey v. Glover,* 21 Wall. 342, 88 U.S. 342, 347–48, 22 L.Ed. 636 (1874)); *see also Tyger Constr. Co. v. United States,* 28 Fed.Cl. 35, 51 (1993). The court

believes the unique circumstances of the *Winstar* litigation, and the special case management procedures identified in the CMO, permit the court to equitably toll any statute of limitations that may apply to defendant's special plea in fraud counterclaim. The court relies on two previous *Winstar*-related cases when formulating this conclusion. Both *Anderson* and *Landmark Land Co., Inc. v. United States,* 46 Fed.Cl. 261 (2000) (*Landmark II*) contained special plea in fraud counterclaims. [24] These two cases do not specifically address the connection between the CMO and a possible tolling of the statute of limitations, nevertheless, they do provide circumstantial support for the court's conclusion.

In *Landmark,* the alleged fraud was perpetrated between 1986 and 1991. 46 Fed.Cl. at 274–75. The plaintiff filed its case in 1995. The defendant did not file its counterclaim until 1999. This court had to grant the defendant leave to file said counterclaim, presumably in response to the requirements of the CMO. *Landmark Land Co., Inc. v. United States,* 44 Fed.Cl. 16, 18 (1999) (*Landmark I*). In *Anderson,* the alleged fraud occurred in 1989. 47 Fed.Cl. at 447. The plaintiffs filed their complaint in 1991. This court granted the defendant leave to file its answer and special plea in fraud counterclaim on April 22, 1998. Both of these cases addressed fraud that occurred in the late 1980's, a complaint filed in the early 1990's, and a counterclaim filed by this court's leave at the end of the 1990's.

The plaintiffs evidently did not assert a statute of limitations defense in *Landmark* and *Anderson.* The court believes, however, that the relationship between the time of the fraud and the filing of the complaints and counterclaims, as well as the fact that the defendant asked for leave to file its answers and counterclaims, is significant. Indeed, it seems to indicate that the CMO made filing the counterclaims unnecessary until after the short-form motions were decided, thus tolling any statute of limitations that may have applied. [25]

Moreover, the court believes that applying a six-year statute of limitations to the government's special plea in fraud claim would greatly restrict this important defense designed to protect the government from fraudulent claims. Such a limitation would allow plaintiffs to wait until the six-year time period expired before filing their fraudulent **\*788** claims. The government would then be precluded from asserting a valid special plea in fraud defense. Indeed, the government can not assert this counterclaim before there is a claim against it. *See* 28 U.S.C. § 2514 ("A *claim against the United States shall be forfeited* ... by any person who corruptly practices ...

fraud against the United States ...."). The court believes that 28 U.S.C. § 2514 was not designed to be limited by a statute of limitations, which plaintiffs could strategically manipulate. *See O'Brien Gear & Machine Co. v. United States,* 219 Ct.Cl. 187, 210, 591 F.2d 666 (1979) (concluding that the special plea in fraud statute intended for every suit brought in the Court of [Federal] Claims to be subject to the forfeiture provided, on commission of the specified fraud). The court concludes, therefore, that defendant's counterclaim in the present case is timely.

In addition, plaintiff's briefs do not make clear whether it believes defendant's rescission claim should also be restricted by a six-year statute of limitations. The court asked plaintiff's counsel this question at oral argument, and he indicated that the rescission claim is subject to the six-year period. [26] For the reasons just discussed referencing the CMO and the special circumstances surrounding the *Winstar*-related cases, the court concludes that defendant's rescission claim is not time barred. The court further discusses the timeliness of defendant's rescission claim below.

## 2. Failure to state a claim

Plaintiff also argues that Counts I and II of defendant's counterclaim fail to state a claim upon which relief may be granted. Defendant disagrees and has filed a cross-motion for summary judgment as to its counterclaims and affirmative defenses. Plaintiff relies on numerous documents when discussing its failure to state a claim argument and when challenging defendant's cross-motion.

RCFC 12(b) provides that a motion to dismiss for failure to state a claim may be treated as a motion for summary judgment under RCFC 56 if "matters outside the pleading are presented to and not excluded by the court." RCFC 12(b); *Rockefeller Center Properties v. United States,* 32 Fed.Cl. 586, 589 n. 6 (1995). Plaintiff has submitted a detailed appendix with its reply brief to supplement the already voluminous appendix filed by defendant. Plaintiff relies upon these appendices many times when presenting its arguments for failure to state a claim. For example, plaintiff directs the court to various questionnaires and letters when challenging defendant's claim that plaintiff made numerous misrepresentations to the government. [27] Plaintiff also cites documents to prove that it recovered all of its losses from the defalcation. [28] In addition, plaintiff emphasizes examination

reports prepared by the OTS.[29] All of these citations are set forth in the section of plaintiff's brief discussing its motion to dismiss for failure to state a claim. Since plaintiff clearly relies on more than just the pleadings, and for efficiency reasons, the court chooses to treat plaintiff's motion to dismiss for failure to state a claim as a motion for summary judgment. The court will consider plaintiff's arguments below in conjunction with defendant's cross-motion for summary judgment.

### 3. Defendant's affirmative defenses

Defendant lists numerous affirmative defenses in its answer to plaintiff's complaint: (1) fraud in the performance of the contract; (2) common law fraud; (3) forfeiture; (4) failure to satisfy material conditions precedent; (5) estoppel; (6) unjust enrichment; (7) illegality and violation of public policy; (8) prior material breach; (9) failure to mitigate damages; (10) failure of consideration; (11) unclean hands; (12) laches; and (13) assumption of risk. Plaintiff moves to strike all of these defenses because they are wholly conclusory and insufficiently plead.

**\*789** The United States Court of Federal Claims requires only notice pleadings pursuant to RCFC 8. This rule is identical to its counterpart under the federal rules, which is equally applicable to the pleading of affirmative defenses. Fed.R.Civ.P. 8; *Conley,* 355 U.S. at 47, 78 S.Ct. 99; *Int'l Fidelity Ins. Co. v. United States,* 27 Fed.Cl. 107, 110 (1992); *Harris v. Sec'y, U.S. Dept. of Veterans Affairs,* 126 F.3d 339, 343 (D.C.Cir.1997). Defenses may be plead in general terms and provide merely fair notice of the nature of the defense. RCFC 8, Fed.R.Civ.P. 8; *see also Al–Kurdi v. United States,* 25 Cl.Ct. 599, 604 (1992). The "fair notice" pleading requirement is met if defendant sufficiently articulates the defense so that plaintiff is not a victim of unfair surprise. *Int'l Fidelity,* 27 Fed.Cl. at 110.

Even under the liberal notice pleading of the federal rules, however, "an allegation must include either direct or inferential allegations respecting all material elements of the claim asserted." *MAN Roland, Inc. v. Quantum Color Corp.,* 57 F.Supp.2d 576, 579 (N.D.Ill.1999) (citing *Perkins v. Silverstein,* 939 F.2d 463, 466 (7th Cir.1991)). Thus, "[i]f an affirmative defense is insufficient on its face or comprises no more than 'bare bones conclusory allegations,' it must be stricken." *Codest Eng'g v. Hyatt Int'l Corp.,* 954 F.Supp. 1224, 1228 (N.D.Ill.1996).

After carefully reviewing defendant's affirmative defenses, the court concludes that they satisfy the liberal pleading requirements established by RCFC 8. Plaintiff's request to strike said defenses is therefore denied.

### B. *Summary judgment*

Defendant moves for summary judgment on its special plea in fraud and rescission counterclaims, as well as on some of its affirmative defenses. The court is treating plaintiff's motion to dismiss defendant's counterclaims for failure to state a claim as a motion for summary judgment.

### 1. Special plea in fraud

**[4]**  Defendant's special plea in fraud counterclaim is premised on 28 U.S.C. § 2514, which states:

> A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.

> In such cases the United States Court of Federal Claims shall specifically find such fraud or attempt and render judgment of forfeiture.

In general, the government asserts this counterclaim to challenge the presentment of a fraudulent claim, however, a special plea in fraud is not confined to this scenario. *Anderson,* 47 Fed.Cl. at 444. Defendant may also assert its special plea in fraud if the alleged fraud was practiced during the performance of the contract at issue. *Id.; UMC Electronics Co. v. United States,* 43 Fed.Cl. 776, 790 (1999); *Supermex v. United States,* 35 Fed.Cl. 29, 39–40 (1996). Defendant must prove its fraud claim by clear and convincing evidence. *Glendale Fed'l Bank, FSB v. United States,* 239 F.3d 1374, 1379 (Fed.Cir.2001) (quoting *Commercial Contractors, Inc. v. United States,* 154 F.3d 1357, 1362 (Fed.Cir.1998)).

The parties dispute the elements that defendant must establish when asserting its special plea in fraud counterclaim. Defendant believes it only needs to show that plaintiff made fraudulent statements or omissions, and that it intended to deceive the government. Plaintiff maintains that defendant must prove justifiable reliance and actual damages in addition to showing fraudulent statements and an intent to deceive. Plaintiff therefore believes defendant must establish the four elements of common law fraud, which are: (1) misrepresentation of a material fact; (2) intent to deceive

or a reckless state of mind; (3) justifiable reliance on the misrepresentation by the deceived party; and (4) injury to the party deceived through reliance. *Landmark II,* 46 Fed.Cl. at 274 (quoting *BMY–Combat Sys. v. United States,* 38 Fed.Cl. 109, 128 (1997) (citations omitted)).

It is understandable that the parties dispute the elements of a special plea in fraud counterclaim because the Court of Federal **\*790** Claims has not settled on an established rule. Sometimes this court has held that defendant only must prove plaintiff's knowledge of fraudulent statements and an intent to deceive. *Crane Helicopter Services, Inc. v. United States,* 45 Fed.Cl. 410, 432 (1999); *Glendale,* 43 Fed.Cl. at 400; *Supermex,* 35 Fed.Cl. at 42. In other cases this court has required defendant to prove all four elements of common law fraud. *Landmark II,* 46 Fed.Cl. at 274; *BMY–Combat Sys.,* 38 Fed.Cl. at 128; *Communication Equip. & Contracting Co., Inc. v. United States,* No. 72–88C, 1991 WL 288912, at \*6 (Cl.Ct. Aug. 23, 1991). In at least one case, this court has not discerned any clear elements for proving a special plea in fraud claim. *Anderson,* 47 Fed.Cl. at 438.

Considering the type of fraud at issue-either in the presentment of a claim or during the performance of a contract-does not clear up this discrepancy. The decisions of this court have not consistently found that fraud in the presentment of a claim requires only two elements, for example, and fraud during the performance of a contract requires four. The Federal Circuit has stated on two different occasions, however, that when alleging fraud in the presentment of a claim, defendant only needs to prove an intent to deceive and plaintiff's knowledge that the submitted claims were false. *Glendale,* 239 F.3d at 1379; *Young–Montenay, Inc. v. United States,* 15 F.3d 1040, 1042 (Fed.Cir.1994). The Federal Circuit has not commented on whether the same is required to prove fraud that occurred during the performance of a contract.

Defendant relies heavily on *Supermex* to establish that it only must prove plaintiff's intent to deceive and knowledge of a fraudulent statement, however, this case makes clear the discrepancy just described:

> While it is apparent that the elements of knowledge and intent to deceive are prerequisites to a Special Plea in Fraud, it is not clear that the elements of justifiable reliance and actual damages are also prerequisites to establishing a Special Plea in Fraud

pursuant to 28 U.S.C. § 2514. This court believes that *in the instant case,* 28 U.S.C. § 2514 can be invoked without the need to prove either justifiable reliance by the sovereign or specific evidences of injury to the sovereign.

35 Fed.Cl. at 42 (emphasis added).

After careful consideration of the parties' arguments and the uncertainty in the existing case law, the court concludes that the circumstances of the existing case require defendant to prove all four elements of common law fraud to assert its special plea in fraud claim. The court reaches this conclusion because defendant is alleging fraud that occurred during the performance of the contract, not in the presentation of a claim. As the Federal Circuit seems to have concluded, when the alleged fraud is related to the presentment of a claim, all defendant needs to prove is that plaintiff knew the submitted claim was false and that plaintiff intended to defraud the government by submitting the claim. *Glendale,* 239 F.3d at 1379. This makes sense because it is the claim itself that is allegedly fraudulent, so it is important to discern plaintiff's state of mind for making such a claim. There is no need to establish the government's reliance in this instance because it is the claim itself that is being examined. This is unlike the situation where the fraud occurs during the performance of a contract, and defendant relies on this fraud as assurance that plaintiff is properly adhering to the contract. The harm the government incurs from the presentment of a fraudulent claim is plaintiff's breach of the public trust. *Supermex,* 35 Fed.Cl. at 42.

In contrast, fraud that is committed during the performance of the contract is not necessarily as obvious or well-defined. Finding said fraud depends more on the court's interpretation of the relevant circumstances. Under this scenario, it seems necessary to have defendant prove its reliance on the alleged fraud and an injury related to it. Otherwise defendant could avoid numerous contractual claims by citing potentially fraudulent events occurring during performance that are completely unrelated to the contract, even though in reality said fraud was never directed towards defendant and defendant in no way suffered from it. The court believes this loose interpretation of the special plea in fraud statute might deter private parties **\*791** from filing valid claims, thus tarnishing the integrity of the procurement process. The court is not willing to adopt such an interpretation.

Defendant must therefore prove the four elements of common law fraud to establish its clam that plaintiff committed fraud during the performance of the contract. Again, these elements are: (1) misrepresentation of a material fact; (2) intent to deceive or a reckless state of mind; (3) justifiable reliance on the misrepresentation by the deceived party; and (4) injury to the party deceived through reliance. *Landmark II,* 46 Fed.Cl. at 274 (quoting *BMY–Combat Sys.,* 38 Fed.Cl. at 128 (citations omitted)). In its attempt to establish its counterclaim, defendant maintains that Mr. Orchowski's defalcation deceived federal regulators and breached the terms of the Assistance Agreement. Defendant believes Mr. Orchowski's fraudulent actions should be imputed to plaintiff. In addition, defendant argues that plaintiff's failure to discover Mr. Orchowski's defalcation proves that it did not operate Lansing in a safe and sound manner.

Plaintiff contends the court should not impute Mr. Orchowski's activities to it because his actions were adverse to its interests. Plaintiff also asserts that defendant cannot prove its special plea in fraud claim because it cannot show how the government was harmed by Mr. Orchowski's actions. Furthermore, plaintiff emphasizes that it recovered all of the money it lost from Mr. Orchowski's actions, and that it was back in compliance with the regulatory capital requirements within a year after discovering the defalcation.

### a. Imputation

Before addressing the specific elements of defendant's special plea in fraud claim, the court must examine the underlying issue related to all four elements-whether Mr. Orchowski's actions can be imputed to plaintiff. Defendant argues that they should, while plaintiff maintains it is not responsible for his actions because they were adverse to plaintiff's interests. Defendant relies heavily on this court's decisions in *Anderson,* 47 Fed.Cl. 438, and *Wagner Iron Works v. United States,* 146 Ct.Cl. 334, 174 F.Supp. 956 (1959) to support its assertions.

**[5]    [6]**    In general, a corporation can only act through its agents, "and when they are clothed with the authority to act for it, the corporation is responsible for their acts." *Id.,* 146 Ct.Cl. at 337–38, 174 F.Supp. 956 (citing *Gleason v. Seaboard Air Line Ry. Co.,* 278 U.S. 349, 49 S.Ct. 161, 73 L.Ed. 415 (1929); *Standard Surety & Cas. Co. of New York v. Plantsville Nat'l Bank,* 158 F.2d 422 (2d Cir.1946); *Ralston Purina Co. v. Novak,* 111 F.2d 631 (8th Cir.1940)). This does not mean, however, that every action an employee takes is

automatically imputed to the corporation. If the employee is acting outside of his or her actual or apparent authority, for example, the corporation is generally not liable for said actions. *Id.* In addition, many courts follow the rule that if the employee's actions are adverse to the corporation's interests, and the corporation does not benefit from said actions, the corporation is not liable for them. *See, e.g., Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.,* 267 F.3d 340, 359 (3d Cir.2001); *In re Payroll Express Corp.,* 186 F.3d 196, 207 (2d Cir.1999); *Martin Marietta Corp. v. Gould, Inc.,* 70 F.3d 768, 771–72 (4th Cir.1995). Indeed, the Restatement (Second) of Agency § 282 (1957) provides:

> (1) A principal is not affected by the knowledge of an agent in a transaction in which the agent secretly is acting adversely to the principal and entirely for his own or another's purposes, except as stated in Subsection (2).

> (2) The principal is affected by the knowledge of an agent who acts adversely to the principal:

> (a) if the failure of the agent to act upon or to reveal the information results in a violation of a contractual or relational duty of the principal to a person harmed thereby;

> (b) if the agent enters into negotiations within the scope of his powers and the person with whom he deals reasonably believes him to be authorized to conduct the transaction; or

> (c) if, before he has changed his position, the principal knowingly retains a benefit **\*792** through the act of the agent which otherwise he would not have received.

**[7]**    The above-stated principles have led courts to conclude that the general rule of imputation is that the fraud of an officer of a corporation is imputed to the corporation when the officer's fraudulent conduct was "(1) in the course of his employment and (2) for the benefit of the corporation." *Official Comm. Unsecured Creditors, 267 F.3d at 358. See also Vitale v. Aetna Cas. & Sur. Co.,* 814 F.2d 1242, 1247 (8th Cir.1987); *Rochez Bros., Inc. v. Rhoades,* 527 F.2d 880, 884 (3d Cir.1975); *Standard Oil Co. of Tex. v. United States,* 307 F.2d 120, 127 (5th Cir.1962); *In re Cendant Corp. Securities Litigation,* 109 F.Supp.2d 225, 233 (D.N.J.2000). The court believes this is a good summary of the law for imputation and will therefore follow this test. [30]

Defendant alleges in its briefs two types of fraudulent conduct that Mr. Orchowski performed that it believes the court should impute to plaintiff. This conduct is: (1) the defalcation

itself and (2) alleged misrepresentations Mr. Orchowski made to the government to conceal his illegal activities.

### 1.) Defalcation

**[8]** With respect to the defalcation, Mr. Orchowski plead guilty for his conduct related to this fraudulent act. Specifically, he turned himself in to the FBI in September 1991, admitting that he had defrauded plaintiff over a period of nine years. The total amount he embezzled from plaintiff was approximately $100,000. He also misappropriated other funds, primarily through his activities involving the making of unauthorized loans. In addition, he altered existing loans and paid extortion to borrowers who threatened to reveal his unlawful activities. Plaintiff's total losses from his actions neared $10 million. He was subsequently charged in a criminal information proceeding with a violation of 18 U.S.C. § 1344 for one count of bank fraud. He plead guilty in 1992 to willfully misapplying funds belonging to, and under the custody and control of, plaintiff. He entered a plea agreement where he admitted the following: (1) making no less than sixty unauthorized loans with funds belonging to plaintiff; (2) many of these loans were extended to individuals who plaintiff previously had denied based on their credit risk, loan purpose, or plaintiff's loan policies; (3) failing to obtain properly executed loan documentation for many of the unauthorized loans; and (4) failing to perfect plaintiff's security interest in collateral for the loans. He was sentenced to thirty-one months in prison and ordered to pay restitution to plaintiff. Plaintiff recovered all losses it incurred as a result of the defalcation.

Arguably, some of these actions were performed in the course of business because Mr. Orchowski made loans, albeit unauthorized ones, which plaintiff is in the business of doing. Nevertheless, clearly none of the activities Mr. Orchowski plead guilty to benefitted plaintiff, which is the second aspect of the imputation test the court has adopted. The court does not believe that embezzlement, misappropriated funds through unauthorized loans, and extortion benefitted plaintiff in any way. [31] Defendant's argument that the defalcation should be imputed to plaintiff, therefore, is unpersuasive. [32]

**\*793** This conclusion is premised on the court's belief that plaintiff should not be held liable for Mr. Orchowski's actions when said actions were adverse to plaintiff's interests. In response to this theory, which plaintiff espoused in its briefs and at oral argument, defendant contends this court made

clear in *Anderson* that this jurisdiction does not recognize the adverse interest exception. [33] Defendant relies on a sentence in the *Anderson* decision that states "this circuit has not traditionally recognized the exception." 47 Fed.Cl. at 448. Defendant is interpreting this phrase to mean much more than it actually does.

Indeed, a previous decision in this court is not binding precedent on a latter case. *Tech. For Communications Int'l v. United States,* 22 Cl.Ct. 711, 713 (1991). The fact that this court did not choose to apply the adverse interest exception in *Anderson,* therefore, does not prohibit the court from deciding otherwise in the present case. The Federal Circuit, whose decisions bind this court, has never expressly stated that it refuses to adopt the adverse interest exception. Instead, it seems that based on the facts of each particular case, this court has not utilized said exception. For example in *Wagner,* which defendant cites heavily throughout its briefs, this court stated that "[i]f Wagner alone had been guilty of fraud, there might be some merit in plaintiff's argument." 146 Ct.Cl. at 338, 174 F.Supp. 956. This court was referring to the president and majority stockholder of the plaintiff corporation, Mr. A.A. Wagner, and the fact that his fraudulent actions alone may not have been enough to grant the defendant's special plea in fraud claim, because his acts were committed against the company. *Id.* The same is true in *Anderson* where this court stated that the main reason it was not adopting the adverse interest exception was because "although some of the criminal acts were done to benefit Mr. Paul personally, other fraudulent acts, including lying to federal banking regulators, were done ostensibly to advance the criminal schemes being carried out *to benefit the bank.*" 47 Fed.Cl. at 448 (emphasis added). The court believes that in the present case, Mr. Orchowski was the lone fraudulent actor and his conduct in no way benefitted the bank. The court chooses to adopt the adverse interest exception, therefore, and concludes that Mr. Orchowski's defalcation cannot be imputed to plaintiff. [34]

### 2.) Misrepresentations

Moreover, defendant alleges that Mr. Orchowski made knowing misrepresentations to the government to conceal his illegal activities, including: (1) providing false information to regulators when preparing plaintiff's responses to management questionnaires that were part of its annual regulatory examination; (2) submitting false reasons as to why the so-called Harris Bank NOW account could not be reconciled according to an annual audit; (3) providing

material misrepresentations to OTS concerning the status of a loan for one of plaintiff's customers; and (4) possibly inflating and distorting plaintiff's balance sheet with respect to goodwill. Defendant also argues that Mr. Orchowski was the "point man" for negotiations to acquire Lansing, and that he purposefully concealed his fraud so that he could persuade defendant that plaintiff was a safe and sound institution. Defendant believes all of these actions are imputable to plaintiff.

With respect to the management questionnaires plaintiff submitted to FHLBB, Mr. Orchowski was not the person who actually prepared them. Indeed, Mr. Ginalski was responsible for their completion. Defendant alleges that Mr. Orchowski "initialed" them so they are fraudulent, since he did not mention his defalcation. The court does not agree with this argument.

**\*794** Since the questionnaires were not actually filled out by Mr. Orchowski, the court would have to conclude that the actual preparer, Mr. Ginalski, intended to hide the defalcation in order for them to serve as misrepresentations to the government. A review of the documents reveals that this did not occur. One of the questionnaires requested the identity of "any director, officer, employee, attorney, or agent, who has since the last examination, embezzled, abstracted, misapplied or otherwise misused, any funds or other assets for which the institution was accountable." [35] Plaintiff answered "None" to this question when it was submitted in 1984. Defendant argues this was deceptive because Mr. Orchowski was committing fraud at that time, however, defendant is misinterpreting this query. The question plainly seeks to identify improprieties that plaintiff had discovered. Plaintiff did not learn of Mr. Orchowski's fraud until 1991. Defendant has conceded this fact. [36]

Defendant also refers to plaintiff's responses to two other questionnaires requesting plaintiff to describe: (1) "details of each oral or written agreement not recorded on the institution's permanent records which affects the financial condition of the institution"; and (2) "any current or former director, officer, employee, attorney, or agent of the institution who has (or has been suspected of having) misused, embezzled, abstracted, or wilfully misapplied any funds or property, real or personal, of the institution or subsidiaries." [37] Defendant emphasizes that the answers to these questions were "N/A." Again, defendant seems to misinterpret the meaning of these questions. Clearly they ask

for information known to plaintiff at that time, and they do not serve as a warranty that no such circumstances existed.

As for plaintiff's letter to the Federal Home Loan Bank of Chicago regarding the reconciliation of the Harris NOW Account, defendant alleges it contains misrepresentations of why the account could not be reconciled. The letter states, in part:

> The bank account in question was the Harris Bank NOW Clearing Account. It was found that this account was being charged for cash letter items which did not belong to First Federal Savings of Hegewisch.

> First Federal Savings of Hegewisch personnel with the help of Accounts people at Harris Bank, have identified this problem and have taken the necessary steps to prevent such occurrences from happening in the future.

> WE, the Board of Directors of First Federal Savings of Hegewisch, hope that we have addressed fully the comment that has been brought forth in the Management letter from Deloitte, Haskins, and Sells and assure you that the necessary steps have been taken to correct the problem. Comments or recommendations by the Federal Home Loan Bank of Chicago would be welcomed. [38]

The court does not believe this statement was misleading at the time it was made, based on the fact that plaintiff was not aware of the defalcation at that time. Therefore, the letter did not serve as a misrepresentation to defendant.

In regards to the letter Mr. Orchowski purportedly sent to OTS regarding a loan transaction, the copy of the letter before the court is a mere draft and is unsigned. [39] There is nothing in the documents presented to the court that indicates this letter was actually sent to OTS. In addition, the letter does not appear to contain any misrepresentations concealing Mr. Orchowski's fraudulent activities. This document also does not serve as proof that misrepresentations were made.

Defendant also relies on a statement by plaintiff's vice president that Mr. Orchowski may have inflated the Lansing goodwill figure **\*795** through his unauthorized activities. This statement in no way proves that the figure was indeed inflated. Moreover, it does not reflect an actual misrepresentation made to the government. Defendant's citation to this statement is unpersuasive because it is founded wholly on speculation.

Finally, defendant asserts that Mr. Orchowski was the "point man" for negotiations with the government during the Lansing acquisition. Defendant maintains that he concealed his defalcation at the time, and lead defendant into believing that plaintiff operated in a safe and sound manner. Defendant believes he was acting on behalf of plaintiff and that this misrepresentation should be imputed to plaintiff.

Defendant has provided some evidence that Mr. Orchowski was a contact person for plaintiff during the Lansing acquisition,[40] however, defendant has not established Mr. Orchowski's actual involvement in the negotiations. It is apparent that the negotiations were mainly handled by Mr. Ginalski, plaintiff's chairman of the board at the time. Defendant also has not stated what exact misrepresentations Mr. Orchowski made to defendant about the safety and soundness of plaintiff.[41] Thus, just as the court concluded with the various misrepresentations discussed above, it is unnecessary to determine whether Mr. Orchowski's actions should be imputed for these instances because defendant cannot show that these misrepresentations were actually made.[42]

Accordingly, the court concludes that Mr. Orchowski's fraudulent actions cannot be imputed to plaintiff because his fraud was committed against plaintiff, not the government. In no way did plaintiff benefit from said fraud. In addition, defendant has not established that Mr. Orchowski misrepresented information to the government.[43]

### b. Scope of the contract

 [9]    Another central issue the court needs to address before examining the specific elements of fraud is whether the contract between the parties required plaintiff to operate Lansing in a safe and sound manner. In their briefs and at oral argument, the parties disputed whether the contract between them explicitly required plaintiff to manage Lansing in this way. Defendant cited various provisions of the Assistance Agreement to support its claim that plaintiff was contractually bound to do so.[44]

The court has concluded that the scope of the contract was to allow plaintiff to use the purchase method of accounting to record supervisory goodwill and to include said goodwill for regulatory capital compliance purposes. After careful review of the Assistance Agreement and the other documents

in which the contract is comprised, the court does not believe that the contract *expressly* required plaintiff to operate Lansing in a safe and sound manner. Nevertheless, the court believes it was inherent in the agreement between the parties that plaintiff manage Lansing in this way. Indeed, plaintiff agrees that it should operate safely and **\*796** soundly.[45] Therefore, the court agrees with defendant that there was a safety and soundness requirement, which must be taken into account when examining the specific elements for fraud.[46]

### c. Analysis of elements of fraud

 [10]    The court's conclusion on imputation simplifies the analysis of the four elements of fraud defendant must establish to prove its claim. The first element is a misrepresentation of material fact. The court determined in the above analysis that Mr. Orchowski did not provide misrepresentations to the government. The court also decided that plaintiff was not liable for Mr. Orchowski's defalcation. Defendant, therefore, cannot prove by clear and convincing evidence that plaintiff made a misrepresentation of material fact related to Mr. Orchowski's actions.

In addition, defendant argues that, not only did Mr. Orchowski individually deceive the government during the negotiations for the Lansing acquisition,[47] but plaintiff also lead defendant into believing that it had strong management and was operated in a safe and sound manner. Defendant alleges it never would have approved plaintiff for the Lansing merger if it knew the defalcation was occurring. Defendant ignores the fact, however, that plaintiff was unaware of the defalcation at the time of the negotiations.[48] Also, Mr. Orchowski's actions are not imputable to plaintiff. In addition, the court believes that plaintiff did have strong management and was operated in a safe and sound manner, as evident in plaintiff's typically favorable OTS ratings and the fact that plaintiff is still an existing thrift, even after the enactment of FIRREA. Indeed, as discussed below, the negative OTS rating plaintiff received after the discovery of the defalcation quickly rebounded the following year to a favorable mark. Also, plaintiff was able to recover the money it lost from the defalcation. The court finds defendant's argument unconvincing.

The second element is an intent to deceive the government. Defendant fails to satisfy this requirement too because it has not shown that Mr. Orchowski misrepresented information to

the government and that his actions are imputed to plaintiff. Defendant also has not established any separate intent by plaintiff to conceal Mr. Orchowski's actions. Defendant has conceded that plaintiff was unaware of the defalcation.[49]

The third element for a special plea in fraud claim is justifiable reliance on the misrepresentations by the deceived party. As just discussed, defendant has not established any misrepresentations, so this element fails for that reason alone. Defendant also claims that it relied on plaintiff to run the thrift in a safe and sound manner and that plaintiff failed to do so. Again, this argument has already been rejected by the court.

The final element defendant must prove is an injury it received based on the reliance. Defendant is unable to establish any harm because it was plaintiff and its customers who were subjected to Mr. Orchowski's fraud, not defendant. Also, the contract between the parties is to ensure the continuing success of Lansing, which was a failing thrift. Plaintiff merged with Lansing to guarantee its survival. Even during Mr. Orchowski's defalcation plaintiff was a viable thrift, and it remains so today. In addition, after plaintiff learned of the defalcation, it was able to **\*797** recover the full amount of its losses from Mr. Orchowski's activities.

Moreover, defendant admits that "the Lansing branches have consistently been Hegewisch's most profitable branches."[50] Also, contrary to defendant's assertions, it appears that plaintiff did not fall out of compliance with the regulatory capital requirements as a result of the defalcation.[51] The FDIC did give plaintiff the lowest safety rating after the defalcation was discovered, but prior to this, and within a year after it, plaintiff enjoyed very favorable examination reports and ratings. Indeed, the OTS Examination Report dated August 21, 1992, which is less than one year after the defalcation's discovery, commented that plaintiff's "overall financial condition has stabilized and is considered satisfactory."[52] It also stated that plaintiff's "board of directors ... and management have demonstrated effective supervision and administration of the institution's affairs since the defalcation."[53] Thus, the court concludes defendant was not harmed by the defalcation.[54]

Defendant has therefore failed to show by clear and convincing evidence that: (1) Mr. Orchowski made misrepresentations to the government; (2) plaintiff would be responsible for any such misrepresentations; (3) plaintiff intended to deceive the government; (4) defendant relied

on Mr. Orchowski's fraudulent acts; and (5) defendant was harmed by the defalcation. Defendant is unable to establish its special plea in fraud claim.

## 2. Rescission

Defendant's second counterclaim is for rescission of the Assistance Agreement, an action that would return the $2 million FSLIC paid plaintiff from the special reserve account. Defendant believes the Assistance Agreement is void *ab initio* because plaintiff defrauded the government. Plaintiff argues that defendant's rescission claim is untimely because it was filed ten years after defendant learned of the defalcation. Plaintiff also maintains that a contract should not be rescinded if both parties cannot be returned to the *status quo ante.*

**[11]  [12]** "The remedy of rescission allows a party to seek disaffirmance of a contract and the return to the status quo that existed before the transaction was executed." *First Hartford Corp. Pension Plan & Trust v. United States,* 42 Fed.Cl. 599, 616 (1998) (citing *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 850 F.Supp. 1199, 1212 (S.D.N.Y.1994), *aff'd* 57 F.3d 146 (2d Cir.1995)). Rescission is "limited to situations where it is possible to return the parties to the *status quo ante.*" *Dairyland Power Coop. v. United States,* 27 Fed.Cl. 805, 813 (Fed.Cl.1993).

With respect to plaintiff's timeliness issue, this fails for the same reasons discussed above for plaintiff's argument that defendant's special plea in fraud claim is time barred. The defalcation occurred in 1991. Plaintiff filed its complaint on March 22, 1993. On April 27, 1993, this court stayed the proceedings in this case pending the disposition of *Winstar.* The CMO entered on September 18, 1996, after the disposition of *Winstar,* clearly stated that defendant need not raise defenses or counterclaims until after plaintiff's short-form motion for partial summary judgment is decided. The court excepted defendant from this requirement in an order dated June 7, 2001. Thus, defendant's rescission counterclaim cannot be disregarded merely because it was filed in 2001.

**\*798** **[13]** Defendant's rescission claim does fail, however, for other reasons. Defendant argues that the fraud perpetrated by plaintiff renders the Assistance Agreement void *ab initio.* Defendant contends the ordinary rules of rescission, such as returning the parties to the *status quo ante,* do not apply when there is fraud. It is true that generally, "a Government contract tainted by fraud or wrong-doing, is void *ab initio,*" rather than merely voidable. *Godley v. United States,* 5 F.3d 1473, 1475 (Fed.Cir.1993) (citing *J.E.T.S.,*

*Inc. v. United States,* 838 F.2d 1196, 1200 (Fed.Cir.1988), cert. denied, 486 U.S. 1057, 108 S.Ct. 2825, 100 L.Ed.2d 926 (1988)). Nevertheless, defendant has not established any fraud committed by plaintiff. Defendant's argument is therefore legally insufficient.

Moreover, even if defendant could establish fraud, the court believes it is impossible to return the parties to the *status quo ante* at this point. Plaintiff could feasibly repay defendant the $2 million debited from the special reserve account. It would be impossible and wholly irresponsible, however, to dissolve the merger between plaintiff and Lansing-an action rescission also mandates in this case. *See Dairyland Power,* 27 Fed.Cl. at 813 (rescission requires returning both parties to the *status quo ante*). Plaintiff has successfully operated Lansing since its acquisition. Such an action would not be in the best interest of the parties involved.

**3. Arguments based on defendant's affirmative defenses**

Defendant discusses three of its affirmative defenses in its cross-motion for summary judgment, all of which are premised on defendant successfully proving its special plea in fraud claim. As just discussed, the court concludes that defendant cannot establish this claim. This decision precludes defendant's assertion set forth in these three affirmative defenses. The court will, therefore, only briefly describe these defenses.

**a. Federal common law fraud**

Defendant argues that plaintiff's fraud (premised on the belief that Mr. Orchowski's actions can be imputed to plaintiff) frustrated strong public policy. Specifically, defendant maintains that when a contractor misrepresents its status or condition to procure a government contract or to cause the government to perform pursuant to a pre-existing contract, as plaintiff allegedly did here, and the misrepresentation frustrates the public policy objectives of the government, the contract is voidable or subject to voidness. Defendant's public policy argument lacks merit because, in the absence of actual fraud, the alleged violation of some vague public policy does not render a contract void. *J.E.T.S., Inc.,* 838 F.2d at 1199–1201. Without proving fraud, defendant cannot assert this public policy argument.

**b. Common law conflict of interest principles**

Defendant also asserts that OTS concluded during its special examination of plaintiff in 1991 that Mr. Orchowski's actions constituted a violation of the conflict of interest principles. Defendant maintains the OTS determined that his personal financial interests were in direct contravention to OTS's paramount interest in the prevention and elimination of practices and conditions that adversely affected the thrift's safety and soundness. Defendant believes its contract with plaintiff is unenforceable because Mr. Orchowski's conflict of interest is imputed to plaintiff. As discussed above, defendant's imputation argument is unpersuasive. Thus, its conflict of interest argument is also unconvincing.

**c. Prior material breach**

In addition, defendant argues that Mr. Orchowski's fraud began prior to defendant's enactment of FIRREA, and thus, plaintiff is precluded from asserting defendant's breach of contract because plaintiff was the first to breach. Again, this argument fails because Mr. Orchowski's actions cannot be imputed to plaintiff. Also, defendant is unable to establish the fraud upon which plaintiff's supposed material breach is founded.

*Conclusion*

For the above-stated reasons, plaintiff's short-form motion for partial summary judgment on contractual liability is GRANTED because the parties had a contractual relationship that allowed plaintiff to use the purchase **\*799** method of accounting and to include supervisory goodwill for regulatory capital compliance purposes. The enactment of FIRREA breached this contract. Defendant's corresponding cross-motion for summary judgment on Count I of plaintiff's complaint is DENIED.

In addition, plaintiff's motion to dismiss defendant's counterclaims and affirmative defenses consists of three arguments: (1) lack of subject-matter jurisdiction because the statute of limitations has expired; (2) failure to state a claim upon which relief may be granted; and (3) a request to strike defendant's affirmative defenses because they are insufficiently plead and wholly conclusory. The part of plaintiff's motion that addresses subject-matter jurisdiction is

DENIED because there is no statute of limitations that applies to defendant's counterclaims. With respect to plaintiff's failure to state a claim argument, the court has decided to treat this part of plaintiff's motion as a motion for summary judgment, because plaintiff relies on more than just the pleadings. This part of plaintiff's motion is GRANTED because defendant has failed to establish the elements of its special plea in fraud and rescission counterclaims. Plaintiff's request to strike defendant's affirmative defenses, however, is DENIED because defendant has sufficiently plead said

defenses. Moreover, defendant's corresponding cross-motion for summary judgment on its counterclaims and affirmative defenses [55] is DENIED.

Furthermore, the parties shall submit a joint status report discussing further proceedings by Monday, August 5, 2002.

IT IS SO ORDERED.

## Footnotes

1    This opinion was originally filed under seal on July 3, 2002, pursuant to a protective order issued June 7, 2001. The parties agreed to the withdrawal of the protective order in a telephonic conference held on July 8, 2002. This Opinion and Order, therefore, is being reissued for publication as of this date.

2    In 1982, the rules established by applicable generally accepted accounting principles (GAAP) provided that, in mergers and acquisitions which used the purchase method of accounting, the book value of the assets and liabilities of an acquired thrift institution should be adjusted to fair market value or "marked to market" at the time of the acquisition. GAAP also provided that any excess in the cost of the acquisition (which included any liabilities assumed by the acquirer) over the fair market value of the acquirer assets should be separately recorded on the acquirer's institution's books as "goodwill"-an intangible, non-earning asset that may be amortized on a straight-line basis over a period of up to forty years.

3    Defendant's Cross–Motion For Summary Judgment As To Counterclaims And Affirmative Defenses (Def.'s Cross–Mot. on Countercl.), Appendix (App.) at 11.

4    *Id.* at 104–05.

5    *Id.* at 139.

6    *Id.* at 147–48.

7    The C & D Order was issued with plaintiff's consent.

8    Plaintiff also sought permission to amend its expert report, which the court allowed.

9    Defendant's motion to dismiss Counts II–VII of plaintiff's complaint is not addressed in this opinion because the briefing is not complete. Arguments relating to Counts III–VII have been stayed until the court rules on plaintiff's breach of contract claim.

10    The court believes it is no longer necessary, however, to set forth a dissertation of the complete circumstances of *Winstar* and its progeny, as this analysis has been explained numerous times by other opinions of this court. *See, e.g., Bluebonnet II,* 47 Fed.Cl. at 158.

11    Transcript of Oral Argument (Tr.) at 28.

12    Defendant admitted in its response to the court's order to show cause filed June 10, 1998, that the court's December 22, 1997 opinion addressing cross-cutting issues could be interpreted as holding that a contract regarding the use of goodwill to satisfy FHLBB's minimum capital requirements is created by: (1) a document submitted to FHLBB or a supervisory agent that mentions purchase method accounting and (2) a second document generated by the government that recognizes the use of the purchase method of accounting to record the transaction. Response Of The United States To The Court's Order To Show Cause at 20. If this is the correct interpretation, defendant conceded that "[g]iven that documents of this type exist in this case, we can offer no reason why, if our interpretation of the Court's ruling is correct, the Court should not hold that a contract regarding the use of goodwill to satisfy the Government's minimum capital requirements exists in this case." *Id.* Defendant expressed at oral argument, however, that then Chief Judge Loren Smith coerced it into making this concession so it should be ignored. Tr. at 37. Indeed, defendant asked the court to overturn Judge Smith's previous decision *binding this case. Id.* at 38. Although decisions of the Court of Federal Claims in other cases are not precedential, the court will adhere to the rulings made by a judge previously assigned to this specific case. Thus, the court will not attempt to revisit the conclusions reached by Judge Smith.

13    Defendant also attempted to raise new arguments in its proposed findings of uncontroverted fact in support of its cross-motion for summary judgment as to liability filed on April 15, 2002. Indeed, defendant seems to have misunderstood the court's request for findings of fact on liability, because defendant used this opportunity to basically file another brief, under the guise of statements of fact, setting forth alternative arguments against plaintiff's claim. The court will mention these new issues only briefly, as they were not properly presented to this court. In addition, the court finds the arguments unpersuasive.

14    Defendant's Opposition To Plaintiff's Short–Form Motion For Partial Summary Judgment On Liability, And Defendant's Cross–Motion For Partial Summary Judgment (Def.'s Mot.) at 10 n.5.

15    Memorandum 31b was not specifically integrated into the Assistance Agreement, however, its applicability does not depend upon express incorporation. By its own terms, it automatically applies to "accounting, under generally accepted accounting principles, for goodwill arising in the acquisition of a savings and loan association." Defendant's Reply To Plaintiff's Response In Opposition To Government's Cross–Motion For Summary Judgment Regarding Count I Of Plaintiff's Complaint, Exhibit F (Memorandum 31b), at 1.

16    At oral argument, defendant raised the issue that plaintiff did not submit a letter explaining which accounting method it was going to follow, as required, so it is precluded from claiming there was a contract. Tr. at 50. This specific argument was rejected by then Chief Judge Smith in his common issue decision filed on December 22, 1997, which governs this case. *California Fed'l Bank, 39 Fed.Cl. at 770.* The court agrees with Judge Smith's ruling.

17    As plaintiff's counsel explained at oral argument, by the time plaintiff converted into a state-chartered bank it could no longer use supervisory goodwill because FIRREA had phased it out. Tr. at 17. Defendant's argument that plaintiff would not have converted into a state-chartered bank if the goodwill had any value is a complete "red herring."

18    At oral argument, defendant's counsel tried very hard to characterize the Lansing acquisition as a "sweetheart deal" with no risk to plaintiff. Tr. at 42. After reviewing the facts of this case, the court agrees with plaintiff that the acquisition posed a significant risk and that it would not have been rational for plaintiff to acquire Lansing without the contractual guarantees governing the treatment of goodwill.

19    Def.'s Mot. at 23 n.12.

20    Plaintiff's statute of limitations argument is a basis for asserting lack of subject-matter jurisdiction. *Burton v. United States,* 22 Cl.Ct. 706, 709 (1991).

21    Defendant learned of the defalcation in 1991. Under plaintiff's theory for the six-year statute of limitations, defendant needed to file its counterclaim by 1997.

22    Order dated September 18, 1996 (emphasis added).

23    In fact, plaintiff opposed discovery on the defalcation for awhile, apparently to hinder defendant's ability to file a counterclaim. Tr. at 132.

24    *Glendale* also addressed a special plea in fraud claim, but the court deems this opinion inapplicable to its statute of limitations analysis because the CMO specifically stated that it did not apply to *Glendale. See* Order dated September 18, 1996 ("this Order does not apply to *Glendale Federal Bank, FSB v. United States,* No. 90–772C").

25    The plaintiffs in *Landmark* and *Anderson* did not challenge the counterclaims based on the statute of limitations, nevertheless, the court presumably would have *sua sponte* addressed this jurisdictional issue if it was indeed relevant. *See* RCFC 12(h)(3) ("Whenever it appears by suggestion of the parties *or otherwise* that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." (emphasis added)); *Arctic Corner, Inc. v. United States,* 845 F.2d 999, 1000 (Fed.Cir.1988) ("A court may and should raise the question of its jurisdiction *sua sponte* at any time it appears in doubt."); *Cupey Bajo Nursing Home, Inc. v. United States,* 36 Fed.Cl. 122, 132 (1996).

26    Tr. at 101.

27    Plaintiff's Reply Brief In Support Of Its Motion To Dismiss Counts I And II Of Government's Counterclaim And Affirmative Defenses And Response To Government's Cross–Motion For Summary Judgment (Pl.'s Reply on Countercl.) at 13–14 (citing App. at 179, 188–189, 196–197, 209–210, 215–216, 296).

28    *Id.* at 19 (citing App. at 249, 442–447).

29    *Id.* at 20 (citing App. at 528–530, 596–597, 639, 641).

30    The court notes the parties' debate on whether Illinois law on imputation should apply. The court discusses this argument in more detail below while addressing the adverse interest exception. Specifically, the court chooses to follow the law of imputation as generally explained by the federal courts. *See Clearfield Trust Co. v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943) (concluding that if the rights and duties of the parties derive sufficiently from a federal source, then federal common law may be held to govern aspects of the case. This federal common law can be derived from state law, as long as there is uniformity between the states.). Illinois law, however, is in accordance with the court's analysis.

31    In addition, Mr. Orchowski was not the chief executive officer (CEO) of plaintiff, unlike the perpetrator in *Anderson,* who was the controlling shareholder and CEO. 47 Fed.Cl. at 447. This is one example of how *Anderson* is distinguishable from this case.

32    The court notes defendant's argument that Mr. Orchowski's conviction proves that plaintiff committed fraud against the government and collaterally estops plaintiff from challenging defendant's fraud claim. This argument fails because Mr. Orchowski never plead guilty to, and never was convicted of, defrauding *the government.* All of his actions were found to have been committed against plaintiff.

33    Tr. at 136.

34    As mentioned above, plaintiff argues that Illinois' law for imputation, which expressly follows the adverse interest exception, applies to this case. Defendant asserts that Illinois law is inapposite. The court does not need to decide this issue because it believes the adverse interest exception applies to the circumstances of this case-pursuant to the previous holdings of this court and other federal jurisdictions. The court would come to the same conclusion if Illinois law applied. It is therefore unnecessary to examine this choice of law issue because the same result would be reached by this court under Illinois law and the previous holdings of the federal courts.

35    Def.'s Cross–Mot. on Countercl., App. at 179.

36    Defendant's Proposed Findings Of Uncontroverted Facts In Support Of Its Cross–Motion For Summary Judgment As To Counterclaims And Affirmative Defenses (Def.'s Facts) at 18, ¶ 91.

37    Def.'s Cross–Mot. on Countercl., App. at 209–210.

38    *Id.* at 188–89.

39    *Id.* at 215–16.

40    *Id.* at 437–40.

41    As discussed below, the court believes plaintiff was operated in a safe and sound manner. The low ratings that resulted from the discovery of the defalcation only lasted for a short period of time. Also, plaintiff is still an existing, viable thrift.

42    One final issue defendant raises in connection to imputation is that Mr. Orchowski's actions were within his apparent authority, and thus, plaintiff is bound by them. This argument fails because the court has concluded that the defalcation was not in the best interest of plaintiff and did not benefit plaintiff. Also, plaintiff did not authorize Mr. Orchowski to embezzle money or make illegal loans. In addition, defendant cannot successfully prove that Mr. Orchowski made any misrepresentations to defendant.

43    Defendant suggested at oral argument that plaintiff knew about the defalcation earlier than 1991, but concealed this knowledge and did nothing to remedy the situation. Tr. at 143. Defendant relies on a report by the FDIC that incorporates a letter from plaintiff's counsel suggesting that familial relationships clouded the management's perspective on the issue. The court is not persuaded by defendant's argument because it is based on nothing more than a third party's speculative view of the circumstances. Also, defendant concedes in its findings of fact that plaintiff's management was unaware of the defalcation. Def.'s Facts at 18, ¶ 91.

44    Tr. at 156.

45    *Id.* at 178.

46    The court notes plaintiff's assertion at oral argument that the Assistance Agreement expired in 1985, and therefore, any safety and soundness requirement encompassed in it also terminated at that time. *Id.* at 177. The court does not agree with this argument because it believes that inherent in the contract was the requirement for plaintiff to manage Lansing in a safe and sound manner. The court has concluded that the contract was based on more than just the Assistance Agreement. Thus, notwithstanding the Assistance Agreement's expiration in 1985, the contract requirements continued to govern the parties' relationship.

47    An argument the court has already rejected.

48    Indeed, plaintiff asserts that, at most, it was guilty of negligence because it did not discover the defalcation on its own. Plaintiff's Motion To Dismiss Counts I And II Of Government's Counterclaim And Affirmative Defenses at 3. Defendant has not asserted a negligence claim.

49    Def.'s Facts at 18, ¶ 91.

50    Def.'s Cross–Mot. on Countercl. at 44.

51    *Id.,* App. at 249.

52    Pl.'s Reply on Countercl., App. at 596.

53    *Id.*

54    At oral argument, defendant's counsel argued that the harm it experienced was a breach of the public trust, a frustration of government policy objectives, and the loss of the $2 million plaintiff debited from the special reserve account. Tr. at 125. The court has concluded that Mr. Orchowski's actions cannot be imputed to plaintiff, that plaintiff did not misrepresent information to defendant, and that plaintiff was operated in a safe and sound manner. Therefore, there was no breach of the public trust or frustration of government policy objectives. In addition, plaintiff properly debited the $2 million in assistance per the terms of the contract.

55    Defendant has moved for summary judgment on three of its affirmative defenses: (1) federal common law fraud; (2) common law conflict of interest; and (3) prior material breach.

---

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 38

Case 09-10138-MEW    Doc 13460-6    Filed 05/02/14    Page 169 of 379

Flintkote Co. v. General Acc. Assur. Co. of Canada, Not Reported in F.Supp.2d (2009)

2009 WL 3568644
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial
staff and not assigned editorial enhancements.**

United States District Court,
N.D. California.

The FLINTKOTE COMPANY, Plaintiff,

v.

GENERAL ACCIDENT ASSURANCE
COMPANY OF CANADA, et al., Defendants.

No. C 04-1827 MHP.    |    Oct. 27, 2009.

**Attorneys and Law Firms**

Marc S. Maister, Michael Richard Fehner, Irell & Manella,
LLP, Newport Beach, CA, for Plaintiff.

Bonnie Margaret Ross, Jesse Frank Ruiz, Archie Stirling
Robinson, Robinson & Wood, Inc., San Jose, CA, for
Defendants.

Opinion

*MEMORANDUM & ORDER*

**Re: Defendant's Motion for
Application of Canadian Law**

MARILYN HALL PATEL, District Judge.

 **\*1**  In this action, which was filed in May 2004,
plaintiff The Flintkote Company ("Flintkote") alleged that
defendant Aviva Insurance Company of Canada ("Aviva"),
the successor-in-interest to General Accident Assurance
Company of Canada ("General Accident"), failed to defend
or indemnify Flintkote for claims covered under a primary
insurance policy. The court has ruled on several motions.
It has found that Flintkote was a named insured under the
policy and that Aviva violated its contractual obligations to
Flintkote. Defendant now moves the court to apply Ontario
law to two questions: whether a particular letter, the contents
of which might bear on the question of whether Flintkote is
a "named insured" under the policy, should be admitted into
evidence; and which method of allocation to apply among
Flintkote's insurance policies. Having considered the parties'

arguments and submissions, the court enters the following
memorandum and order.

**BACKGROUND**

**I. *The Policy***
Plaintiff Flintkote, presently headquartered in San Francisco,
is a company that formerly mined and sold asbestos
and asbestos-based products. Defendant Aviva, based in
Toronto, is the successor-in-interest to, among others,
General Accident, which issued general liability policies to
two Flintkote Canadian subsidiaries: The Flintkote Company
of Canada Limited ("Flintkote Canada") and The Flintkote
Mines Limited ("Flintkote Mines"). In 2004, Flintkote sought
bankruptcy protection as a result of the large volume of
asbestos-related litigation that arose in response to findings
that exposure to asbestos fibers can have severe long-term
health consequences. Flintkote brought the present action
in order to secure declaratory relief related to the scope
of coverage under its policy with Aviva and to obtain
indemnification, on behalf of itself and its other insurance
carriers, for money paid out as a result of past litigation.

The insurance policy at issue, number L-90-5010 ("the
policy"), was a commercial general liability policy in force
between 1958 and 1961. The policy obligates General
Accident to pay on behalf of the insured sums arising
from third-party bodily injury, property damage or products
liability claims against the insured. *See* Docket No. 297
(Ross. Dec.), Exh. A at TR0000045. The policy also obligates
General Accident to defend or indemnify the insured with
respect to lawsuits falling within the ambit of the coverage.
*See id.* The policy provides that the "Name of Insured"
includes "THE FLINTKOTE COMPANY OF CANADA
LIMITED and/or THE FLINTKOTE MINES LIMITED and/
or Subsidiary or Affiliated corporation or corporations now
existing or hereafter created as their respective interests may
appear." *Id.* at TR0000041. Additionally, the policy states,
"This policy shall apply to occurrences occurring anywhere
in the World, provided suit is brought in the Dominion of
Canada or the United States of America, its territories or
possessions." *Id.* at TR0000047.

 **\*2**  On October 12, 1982, Flintoke's risk manager gave notice
of the first claim against the policy to Marsh & McLennan of
Toronto, Flintkote's insurance broker. [1] *See* Docket No. 376
(Chen Dec .), Exh. 1. Neither General Accident nor Marsh
& McLennan had a copy of the policy. Flintkote forwarded
a copy to Marsh & McLennan on December 8, 1982. *Id.,*

Case 09-10138-MEW    Doc 13460-6    Filed 05/02/14    Page 170 of 379

Flintkote Co. v. General Acc. Assur. Co. of Canada, Not Reported in F.Supp.2d (2009)

Exh. 2. The copy of the policy Flintkote furnished included a letter dated May 23, 1958, from Eric Lawrence at General Accident in Toronto to C.D. Milling at Marsh & McLennan in Toronto ("the 1958 letter"). Lawrence's letter delivered the policy and stated, "This letter will confirm that the above-numbered policy is primary insurance applying to Canadian operations." Ross Dec., Exh. A at TR0000045.

## II. *Relevant Prior Decisions*

In January 2006, deciding a motion for summary judgment brought by Flintkote, this court concluded that the policy term "Affiliated corporations" included plaintiff The Flintkote Company, and that The Flintkote Company was therefore a "named insured." *Flintkote Co. v. Gen. Accident Assurance Co.,* 410 F.Supp.2d 875, 894 (N.D.Cal.2006) (Patel, J.); Docket No. 89 ("Order of January 2006"). In arguing that motion, Aviva raised the question of whether Canadian contract interpretation rules should apply to the instant action. Aviva's entire discussion of the issue read as follows:

> The subject policy was issued to Canadian insureds through a Canadian broker, Marsh. The contract was made in Canada. Under Canadian law, this contract is to be interpreted with respect to this issue according to the laws of Ontario. Section 123 of the Insurance Act of Ontario. (See Declaration of Judith Gold, ¶ 7, and Exhibit 7 thereto, and Request for Judicial Notice.) Aviva's research has disclosed that in the area of contract interpretation, there is slight or no difference between the laws of Ontario, and the laws of California. Because it is assumed the Court has more familiarity with California law than it has with Canadian law, Aviva has cited California law. Aviva's references to California law should not be construed as a waiver of Aviva's right to rely upon Canadian law under other circumstances.

Docket No. 64 (Def.'s Opp. to Pl.'s Mot. re: "Named Insured" Issue) at 7:20-8:5. The court noted in its order:

> The parties dispute whether Canadian law or California law should govern interpretation of the policy, but defendants

concede that there are no material differences in the two bodies of law for purposes of deciding the instant motions. [Endnote.] The court will therefore apply California law.

> [Endnote:] Defendants somewhat confusingly include "Choice of Law" sections in their briefs in opposition, suggesting that the choice of law may have bearing on the resolution of the motions. In the same section, however, defendants note that "there is slight or no difference between the laws of Ontario, and the laws of California." As defendants have stated no cognizable argument based on choice of law, the court will assume that California law governs for purposes of deciding the instant motions.

**\*3**    410 F.Supp.2d at 880.

In March 2007, the court granted Flintkote's motion for summary judgment on Flintkote's claim for declaratory relief with respect to pending and future asbestos claims and on Flintkote's breach of contract claim with respect to the past paid asbestos claims. The court denied Aviva's partial motion for summary judgment that Flintkote's claims were barred by the applicable statutes of limitations. The court found that Flintkote had properly tendered its claims to Aviva through its various notices and communications. *Flintkote Co. v. Gen. Accident Assurance Co.,* 480 F.Supp.2d 1167, 1176 (N.D.Cal.2007) (Patel, J.); Docket No. 159. As regards the application of the policy's "other insurance" clause, the court noted: "The parties agree that interpretation and application of the 'other insurance' clause of the policy is appropriately left for the damages phase of this action. Accordingly, the court will entertain arguments on this issue at that time." Docket No. 159 at 11.

In August 2008, the court again ruled on cross-motions for partial summary judgment. It ruled that: (1) Flintkote is directly harmed by Aviva's failure to pay on past claims insofar as other insurance is prematurely exhausted and is unavailable to pay on future claims; (2) under recently executed settlement agreements containing undisputed assignments, as well as under the Wellington Agreement and others like it, Flintkote has the authority to assert claims on behalf of its other insurers to recover amounts those insurers paid in lieu of Aviva; and (3) the claims of the other insurers are equitably tolled. The court also adopted a pro rata by per occurrence standard to determine damages, as described in detail in the court's order. *Flintkote Co. v. Gen. Accident Assurance Co.,* 2008 WL 3270922 (N.D.Cal. Aug.6, 2008) (Patel, J.); Docket No. 244 ("August 2008 Order"). In its

Case 09-10138-MEW   Doc 13460-6   Filed 05/02/14   Page 171 of 379

Flintkote Co. v. General Acc. Assur. Co. of Canada, Not Reported in F.Supp.2d (2009)

briefing papers on these motions, Aviva never raised a choice of law issue and, indeed, relied upon California law. *See* Docket No. 202 (Def.'s Opp. to Pl.'s Mot. to Streamline Damages) at 7-15. Aviva did not cite a single Canadian case. *See id.* at iii-iv.

In September 2008, the court appointed a Special Master. The scope of his duties was described as follows:

> The Special Master shall review the provisions and/or policies at issue in light of the Court's August 6, 2008 Order. The Special Master shall issue a report and recommendation on the issues of which policies in dispute are general excess policies and which policies in dispute are specific excess policies in light of the August 6, 2008 Order, and which specific excess policies share defense and indemnity obligations with Aviva (including all issues regarding whether a policy drops down and shares with Aviva, including whether lower-level general excess policies or lower-level policies issued by insolvent insurers prevent higher-level specific excess policies from dropping down, whether an otherwise specific excess policy that attaches upon a certain amount of "loss" but excludes other insurance from its definition of covered loss would share with Aviva, and whether Aviva can share defense costs with a specific excess policy in which the ultimate net loss definition excludes defense costs if other insurance exists). The Special Master may review and/ or report on any additional disputes pursuant to the consent of both parties or further order of this Court.

**\*4**  Docket No. 257 at 1. The parties stipulated to the selection of the Honorable Harry W. Low (Ret.) to serve as Special Master. Justice Low had previously served as Insurance Commissioner of the State of California and as a Justice of the California Court of Appeal. Low reviewed well over one hundred insurance policies, determining on a policy-by-policy basis, *inter alia,* which policies shared with Aviva and which dropped down. He applied California law

to reach his conclusions. He completed his final report on November 13, 2008. *See* Docket No. 260, Exh. A. The court adopted the Special Master's report and recommendations on February 11, 2009, rejecting Aviva's objections to the Special Master's findings. *See* Docket No. 278 (hearing transcript) at 26. Aviva relied exclusively upon California law in framing its objections. *See* Docket No. 262.

Currently remaining for adjudication are Flintkote's claim for bad faith and the final determination of damages for Flintkote's claims. Aviva filed the instant motion for application of Canadian law on August 31, 2009. Oral argument was heard on October 7, 2009.

### *LEGAL STANDARDS*

#### I. *Choice of Law*

In a diversity action, a federal district court applies the choice of law rules of the state in which it sits. *Abogados v. AT & T, Inc.,* 223 F.3d 932, 934 (9th Cir.2000) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). "A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing." Fed.R.Civ.P. 44.1. To determine whether a party has given reasonable notice of its intent to invoke foreign law, a court should: (1) consider the stage which the case has reached at the time of notice; (2) evaluate the reason proffered by the party for the failure to give earlier notice; and (3) consider the importance to the case as a whole of the issue of foreign law. *See APL Co. Pte. Ltd. v. UK Aerosols Ltd. .,* 582 F.3d 947, 2009 WL 2988511, at *6-8 (9th Cir. Sep.21, 2009). "Where no authority, or insufficient authority, is presented by the parties about foreign law, a court may conclude that the parties have acquiesced in the application of the law of the forum." *Hatfield v. Halifax PLC,* 564 F.3d 1177, 1184 (9th Cir.2009) (quoting *Interpol Ltd. v. Char Yigh Marine (Panama) S.A.,* 890 F.2d 1453, 1458 (9th Cir.1989)).

#### II. *Law of the Case*

"The law of the case doctrine precludes a court from reconsidering an issue that it has already resolved. Issues that a district court determines during pretrial motions become law of the case." *United States v. Phillips,* 367 F.3d 846, 856 (9th Cir.2004) (footnotes omitted). The doctrine is not a limitation on a tribunal's power, but rather a guide to discretion. *United States. v. Alexander,* 106 F.3d 874, 876 (9th Cir.1997). "A court may have discretion to depart from

the law of the case where: 1) the first decision was clearly erroneous; 2) an intervening change in the law has occurred; 3) the evidence on remand is substantially different; 4) other changed circumstances exist; or 5) a manifest injustice would otherwise result. Failure to apply the doctrine of the law of the case absent one of the requisite conditions constitutes an abuse of discretion." *Id.* (citation omitted).

### DISCUSSION

**\*5** On this motion Aviva requests an order applying Ontario law with the result that The Flintkote Company is found not to be a named insured under the policy. Aviva states that in so doing it is requesting the application of Ontario evidence law to the question of the 1958 letter's admissibility. Alternatively, Aviva requests an order deciding that Ontario's law applies to the allocation among Flintkote's policies, which would purportedly result in the application of a time-on-risk method of allocation. [2]

Aviva argues that, despite the lengthy analysis of the purported differences between California and Canadian contract law found in its briefs, *see, e.g.,* Docket No. 296 (Def.'s Mot.) at 7:9-12:12, 12:17-12:27, 13:4-14:2, Aviva is actually requesting the application of Canadian evidence law, not contract law. [3] The court understands Aviva's theory to be that if the 1958 letter were admitted, this court would find that The Flintkote Company is not a named insured under the policy. As noted, the letter states, "This letter will confirm that the above numbered policy is primary insurance applying to Canadian operations." Ross Dec., Exh. A at TR0000045. In Aviva's view, this sentence confirms that the parties intended the policy at issue to cover only Flintkote Canada and Flintkote Mines, not The Flintkote Company.

Flintkote responds, *inter alia,* that law of the case doctrine compels denial of the instant motion. On October 28, 2005, Flintkote filed an objection to admission of the 1958 letter as evidence. Aviva responded, relying exclusively upon the Federal Rules of Evidence. *See* Docket No. 86 (Def.'s Response to Pl.'s Objections). The court determined that the letter was inadmissible hearsay. Order of January 2006 at 11. Thus, the admissibility of the letter has already been decided. Prior to the decision, Aviva had an opportunity to argue Canadian law should apply but instead chose to rely on the Federal Rules of Evidence. The court has already decided the issue; therefore, law of the case doctrine requires a denial of the motion. A court has the discretion to depart from the law of the case under certain circumstances. *See Alexander,*

*106 F.3d at 876.* Here, no such circumstance obtains, and Aviva has not contended that such a circumstance obtains except insofar as it has simply expressed disagreement with the court's earlier decision.

The relevant authorities on choice of law also support denial of Aviva's motion. "Under California's choice of law rules, a California court 'will apply its own rule of decision unless a party litigant timely invokes the law of a foreign state.' " *Hatfield,* 564 F.3d at 1184 (quoting *Hurtado v. Superior Court,* 11 Cal.3d 574, 581, 114 Cal.Rptr. 106, 522 P.2d 666 (1974)). Aviva argues that the instant motion is timely and gives reasonable notice because it has been filed before pretrial hearings or trial. *See DP Aviation v. Smiths Indus. Aerospace & Defense Sys. Ltd.,* 268 F.3d 829, 848 (9th Cir.2001) (noting first consideration of foreign law may sometimes be appropriate after trial or even on appeal). Indeed, Aviva gave notice in 2005 that it might subsequently invoke Canadian law for purposes other than contract interpretation. *See* Def.'s Opp. to Pl.'s Mot. re: "Named Insured" Issue at 7:20-8:5. Yet, subsequent to making this reservation, Aviva argued for admissibility of the 1958 letter using only California law. [4] Aviva did not "timely invoke[ ] foreign law ... at the first opportunity when the issue became material." *See APL,* 582 F.3d 947, 2009 WL 2988511, at \*7. Aviva had an opportunity to invoke foreign law while advancing its evidentiary arguments regarding the 1958 letter, and it failed to do so. [5] Nor has Aviva offered *any* explanation why it did not give notice of its intent to rely upon foreign law at the time the issue of the letter's admissibility was adjudicated. *See id.* Nor was the evidentiary issue an isolated one, separate from the issues that had already been decided. *See id.* The issue has already been argued by the parties relying upon California law and decided by the court using California law. It is hard to imagine a clearer case in which the invocation of foreign law is untimely.

**\*6** Even if the instant evidentiary motion were timely, it would still be denied. "Most evidentiary rules are procedural in nature, and the Federal Rules of Evidence ordinarily govern in diversity cases." *Feldman v. Allstate Ins. Co.,* 322 F.3d 660, 666 (9th Cir.2003) (citing *Erie R.R. v. Tomkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)) (citation and internal quotation marks omitted). State evidentiary rules are applied only when they are " 'intimately bound up' " with the rights and obligations being asserted, *Wray v. Gregory,* 61 F.3d 1414, 1417 (9th Cir.1995) (quoting *Erie,* 304 U.S. at 78), or when they "in fact serve substantive state policies and are more properly rules of substantive law

Case 09-10138-MEW Doc 13460-6 Filed 05/02/14 Page 173 of 379

Flintkote Co. v. General Acc. Assur. Co. of Canada, Not Reported in F.Supp.2d (2009)

within the meaning of *Erie*," *id.* (quoting 19 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 4512, at 194-95 (1985)). In *Wray,* the Ninth Circuit deferred to the evidentiary rules used by Nevada's medical malpractice screening panel where Nevada had established an integrated scheme for handling medical malpractice claims. The court found that federal courts' application of the Federal Rules of Evidence in derogation of the state rules would encourage forum shopping and undermine Nevada's scheme for dealing with this substantive area of the law. *Id.* at 1417-18. Similarly, the *Feldman* court held a provision of the California Penal Code that made taping a confidential conversation a crime to limit the admissibility of illegally intercepted conversations, even where the Federal Rules of Evidence would allow the evidence to be admitted. 322 F.3d at 666-67. The court found that the California statute embodied a substantive interest in the privacy of California citizens and was accordingly to be treated as substantive law for *Erie* purposes. *Id.* at 667. By contrast, Aviva has not shown that Ontario evidentiary law, under which Aviva purports the 1958 letter would be admissible, is intimately bound up with Aviva's rights or serves the substantive policies of Ontario. Aviva has shown only that Ontario may have a procedural rule that differs from the federal procedural rule. This does not provide grounds to subordinate the Federal Rules of Evidence to Ontario law. [6]

Aviva has also moved the court, should the court deny Aviva's motion pertaining to the "named insured" issue, to consider applying Ontario law to the allocation among Flintkote's policies. A separate choice of law inquiry is made with respect to each issue in a case. *Beech Aircraft Corp. v.*

*Superior Court,* 61 Cal.App.3d 501, 518, 132 Cal.Rptr. 541 (1976). Here too Aviva seeks to relitigate an issue that has already been litigated at great length and decided. Aviva specifically seeks "an Order that Ontario's law applies to the allocation among Flintkote's policies, such that the time on risk method is applied." Def.'s Mot. at 21. As noted above, Aviva has already had an opportunity to argue for the time-on-risk method. It briefed the issue extensively and relied exclusively on U.S. law. *See* Def.'s Opp. to Pl.'s Mot. to Streamline Damages at 7-15. Applying California law, the court rejected Aviva's argument: "Aviva argues for a per-occurrence method of apportionment, but further asks the court to consider the length of time the Aviva policy was in effect. Effectively, Aviva argues that a 'time-on-risk' system of coverage ought to be adopted.... [T]he court rejects Aviva's argument and adopts the standard pro rata method of apportionment according to per occurrence limits." August 2008 Order at 23-24. Aviva's instant motion fails as to the allocation issue for the same reasons it fails as the "named insured" issue. Aviva is simply trying to get a second lick from the lollipop. No litigant is entitled to relitigate an issue under the laws of various jurisdictions until it achieves its desired result. [7]

## CONCLUSION

**\*7** For the foregoing reasons, defendant's motion for the application of Canadian law is DENIED.

IT IS SO ORDERED.

Footnotes

1   The risk manager was employed by Genstar Corporation, which had taken over Flintkote by that time.

2   For the reasons discussed in this memorandum and order, the court does not reach the merits of Aviva's assertions pertaining to the content of relevant Canadian law.

3   Aviva apparently recognizes that it agreed to the application of California contract law in 2005, representing that "in the area of contract interpretation, there is slight or no difference between the laws of Ontario, and the laws of California." Def.'s Opp. to Pl.'s Mot. re: "Named Insured" Issue at 7:26-28.

4   As noted, the court remarked in its March 2007 order that interpretation and application of the "other insurance" clause would be left for the damages phase of the action. Aviva suggests that its instant motion is therefore timely because the litigants are now in the damages phase. This argument ignores the fact that the damages issue to which Aviva seeks to apply Canadian law was decided in August 2008. The court's March 2007 remark cannot be read to suggest that Aviva can raise the same issue *ad infinitum* as long as the action is still in the damages phase.

5   Aviva's assertion that the law of the case doctrine does not apply because the court "has never considered the issue of whether Canadian law applies," Docket No. 401 (Reply) at 6, is sophistry. The issue presented by the instant motion is not whether Canadian law applies in some abstract sense but whether it applies to the named insured and allocation issues. *See id.* at 14. The court has considered those issues, as described above.

6    Even if the 1958 letter were admissible, it would hardly provide a silver bullet. The supposed evidence of the parties' intent is embodied in one sentence lacking both context and unambiguous language conveying an understanding that the policy would *exclusively* cover only Flintkote Canada and Flintkote Mines.

7    Aviva argues that Flintkote has not been prejudiced by the timing of Aviva's motion. The court cannot agree. Flintkote briefed a motion using California law; it should not be required to brief a second motion on the same issue under different law due to Aviva's failure to timely invoke foreign law. Moreover, the court has devoted significant resources to deciding issues involving apportionment of damages. The interest in conservation of scarce judicial resources militates against allowing a party to relitigate an issue that has already been adjudicated.

---

**End of Document**                                   © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 39

C
[1888 H. 5725.]

**\*461 Heap v Hartley**


Court of Appeal

L.    Cotton, Fry,  and Lopes

1889 Aug. 2, 3, 5


Patent—Exclusive License for limited Time and Area—Right of Licensee to sue—Non—joinder of Patentee—Effect of License—Registration—Sub—Purchase—User within Area of patented Article purchased outside Area—Notice— Patents, Designs, and Trade Marks Act, 1883 (46 & 47 Vict. c. 57), ss. 23, 36, 87 .

An exclusive license is a leave to do a thing, and a contract not to allow anyone else to do the thing; but, unless coupled with a grant, it confers no more than any other license any interest or property in the thing, and the licensee has no title to sue in his own name.

A patentee of machinery, by deed duly registered under the Patents, Designs, and Trade Marks Act, 1883, s. 23 , granted to the Plaintiff the full and exclusive license to use and exercise the patented invention within a specified district for a limited period, and covenanted during that period not to sell or to grant any license to exercise or use the invention to any **\*462** other person in the same district; and in case the patent should be infringed, he covenanted to take all necessary proceedings for defending the same, and that in default of his so doing it should be lawful for the Plaintiff to take such proceedings in his (the patentee's) name.

The patentee afterwards sold two of the patented machines to firms outside the specified district, and these firms sold them to the Defendants, who used

them within the district; and it was in dispute whether or not the Defendants had actual notice of the exclusive license at the time of their purchase.

Upon an action brought in the County Palatine Court of *Lancaster* by the Plaintiff in his own name, and without joining the patentee, against the Defendants, it was *held* by the Vice-Chancellor, in dismissing the action, first, that registration under the Patents, Designs, and Trade Marks Act was not notice to all the world; secondly, that upon the evidence the Defendants had no actual notice of the exclusive license at the time of their purchase; thirdly, that the Defendants, being purchasers for value without notice, were not affected by the license; and fourthly, that it was doubtful whether an action for infringement of rights under a license could be brought by an exclusive licensee in his own name, without joining the patentee as co-Plaintiff:—

by the Court of Appeal, in dismissing the appeal, first, that actual notice had not been proved against the Defendants; secondly, that the exclusive license, being simply an authority to do lawfully that which would otherwise have been unlawful, and not being a license coupled with or equivalent to a grant, did not entitle the licensee to sue in his own name without joining the patentee; and this being so, that it was immaterial to consider the effect of registration under the Act of 1883.

THIS was an appeal from a decision of the Vice-Chancellor of the County Palatine Court of *Lancaster* given on the 18th of July, 1888, in an action by *Charles Heap* , claiming as assignee or exclusive licensee for a particular district, of a patent, an injunction to restrain the Defendants *Israel Hartley* and Edward Hartley from using the invention described in the patent, or any colourable imitation thereof, within the district, or from otherwise infringing the rights of the Plaintiff in the patent, and for damages, an account, inspection and costs.

© 2014 Thomson Reuters.

(1889) 42 Ch. D. 461
(1889) 42 Ch. D. 461 (1889) 42 Ch. D. 461
**(Cite as: (1889) 42 Ch. D. 461)**

The invention was for improvements "in gig mills employed in the finishing of woven fabrics," and the letters patent for it were granted to *Charles Edward Moser* on the 30th of September, 1885, and were numbered 11,640 of 1885.

By indenture dated the 15th of November, 1886, *Moser* granted to the Plaintiff "the full and exclusive license to use and exercise the said patented invention at all places as well **\*463** within the borough of *Rochdale* as within the districts of the local boards of *Norden, Wardle* , and *Littleborough* , and *Milnrow* , according to the said invention, for the term of two years"; and covenanted that, subject to a right on his part to sell the invention, and to grant licenses to certain specified firms to use the same for their individual use without power of resale or transfer, he, *Moser* , would not "during the said period of two years either sell the said patented invention or grant or give any license or authority to exercise or use the same to any company, persons or person carrying on or having a place of business" in the district to which the license extended; and further, that in case the said letters patent or any extension or renewal thereof should be infringed, *Moser* should forthwith, after notice of such infringement, at his own cost, take all necessary proceedings for effectually protecting and defending the same, and in default of his so doing it should be lawful for the Plaintiff at his own cost, but in *Moser's* name, to take all necessary proceedings for effectually protecting and defending the same.

This deed was registered at the Patent Office on the 27th of November, 1886, and the period of two years mentioned therein was extended to four years by indenture dated the 12th of September, 1887, which was registered at the Patent Office on the 30th of September, 1887.

Early in the year 1888, *Moser* sold one of the machines made under his patent, which were known as "raising machines," to the *Victoria Raising Company* of *Manchester* , and another to Messrs. *Scott & Whitworth* also of *Manchester* . These two machines were on or before the 17th of February,

1888, bought from the *Victoria Raising Company* and *Scott & Whitworth* by the Defendants *Israel* and *Edward Hartley* for the purpose of a business which they carried on, or were about to carry on, in partnership at the *Victoria Mills, Littleborough* , within the district to which the Plaintiff's license extended. And these machines were temporarily put up by the Defendants in a room in the Dearnley Mills, also within the district, where *Stephen Hartley* , a brother of *Israel Hartley* , carried on business.

This having come to the knowledge of the Plaintiff, his solicitors wrote to the Defendants on the 23rd of February, 1888, that **\*464** the purchase and user of these machines was an infringement of the Plaintiff's right as exclusive licensee within the district, and that if such user was continued proceedings would be taken against the Defendants.

The user was continued. This action was brought on the 2nd of May, 1888, and on the 10th the Plaintiff gave notice of motion for an injunction and inspection.

The evidence as to whether the Defendants before they bought the two machines had actual notice of the exclusive license granted to the Plaintiff for the district was of a conflicting character. On the part of the Plaintiff there was some evidence that at an interview between *Stephen Hartley, Israel Hartley* , and a workman named *Lord* , on the 29th of October, 1887, mention was made of "raising machines," and that on the same day Stephen Hartley wrote to *Moser* for one of his raising machines, afterwards receiving an answer from *Moser* , dated the 31st of October, 1887, that he was unable to send the machine, as he had given the Plaintiff the exclusive use of his patent for a certain time in *Stephen Hartley's* district; and further, that at another interview between *Stephen Hartley, Israel Hartley* , and *Lord* and his wife, in January, 1888, when mention was made of an agreement between *Moser* and the Plaintiff, one of the *Hartleys* said, "It is true enough." This was, however, denied by *Israel Hartley* in his evidence in reply, and there

© 2014 Thomson Reuters.

was no cross-examination upon the question of actual notice to the Defendants of the Plaintiff's exclusive license. This evidence is also referred to in the judgments of *Cotton* and *Fry* , L.JJ.

The motion was heard by the Vice-Chancellor of the County Palatine on the 13th of July, 1888, and having been by consent treated as the trial of the action, the Vice-Chancellor held, first, that registration, under the *Patents, &c., Act* , 1883, of an exclusive license was not in itself notice to all the world that such a license had been granted; secondly, that, upon the evidence, the Defendants had no actual notice of the exclusive license at the time of their purchase of the machines; and thirdly, that the Defendants, being purchasers for value without notice, were not affected by the prior grant of the license to the Plaintiff. And his Honour dismissed the action, and expressed a doubt **\*465** whether an action to restrain an infringement of rights under an exclusive license could be brought and maintained by the licensee in his own name without joining the patentee as a co-Plaintiff.

The Plaintiff appealed.

*Moulton* , Q.C., and *Staffurth* , for the Appellant:—

A patentee is, according to sect. 46 of the Patents, &c., Act, 1883, "the person for the time being entitled to the benefit of a patent." An exclusive licensee for a particular district, whose license is duly registered under sects. 23 and 87 of the same Act, is *quâ* ; that district, and during the term of the license, in the position of a person to whom the patentee has given his monopoly and all his beneficial rights. He is practically an assignee *pro tanto* of the patent, and is entitled to maintain an action for infringement of his rights within the district, in his own name, and without joining the patentee: Patents, &c., Act, 1883, s. 36 ; Renard v. Levinstein [1] ; Newby v. Harrison [2] ; Hassall v. Wright [3] ; Derosne v. Fairie [4] . Again, a patent is severable, and the assignee of a severed portion of the patent may sue for an infringement affecting that part without joining one who has an interest in another part:

Dunnicliff v. Mallet [5] ; Hassall v. Wright .

The patentee could not give other licenses in derogation of his own exclusive grant, and would not be entitled himself to infringe his own patent within the district.

The register has given notice to all the world of the rights of the exclusive licensee, and the Defendants with such notice have infringed those rights by using the patented invention within the district without the leave of the licensee. The permission of the patentee would be of no avail, for every license he grants must be subject to the rights already on the register. If *Moser* , when he sold these machines to the Defendants, had given them an express license to use them all over the kingdom, that license would have been a nullity as to this district, for as to that district **\*466** he could give no rights whatever. He, however, gave no such license or permission. The Plaintiff is the only person injured, and the only necessary Plaintiff, and the non-joinder of the patentee cannot defeat the action. If, however, there is a want of necessary parties, the objection should have been taken before. Moreover, actual notice to the Defendants is not necessary, because by the patent law the right to restrain an infringement is independent of notice, and the Defendants have infringed this patent within the district covered by the license. But upon the facts there was actual notice and knowledge of the Plaintiff's rights by the Defendants.

[They also cited Webber v. Lee [6] ; Muskett v. Hill [7] .]

*Cozens-Hardy* , Q.C., and *Maberly* , for the Respondents:—

[COTTON, L.J.:—You may confine yourselves to the question of actual notice.]

The writ simply seeks an injunction for infringement of patent; there is no claim for conspiring with *Moser* to procure goods within the district. The original purchasers from whom we bought ac-

quired their machines without any notice of the Appellant's rights as licensee, and no one who buys through an innocent person can be fixed with notice. There is no allegation of contrivance, collusion, or fraud, and even if the Respondents had notice, it was merely notice that the Appellant was licensed to do something within a limited area and time, which he could not have done without that licence. But in fact there is no evidence of any notice sufficient to bind the conscience of the Defendants.

*Staffurth* , in reply, referred to De Mattos v. Gibson 8 ; Messageries Impériales v. Baines &N(4); Catt v. Tourle 9 ; Werderman v. Société Générale d'Electricité ; 10 ; Holroyd v. Marshall 11 .

COTTON, L.J.:—

The last point argued by Mr. *Moulton* was that of notice, but I think it advisable to deal with that question first, because it **\*467** ought to be disposed of before we come to the question of whether an exclusive licensee can sue for an infringement of a patent.

The Vice-Chancellor has held that the Plaintiff has not made out that on which his title depended, viz., that the Defendants bought this machine with notice of the agreement which had been entered into between the Plaintiff and the patentee. In my opinion that is so; and it was for the Plaintiff to make that out, not as something which occurred incidentally, but as being the very foundation of his right to relief, unless he could establish that an exclusive licensee can, as such and independently of notice, sue a man for infringement of a patent. I will deal with that presently, but to my mind the title of the Plaintiff to relief depends upon notice, and therefore it was for him to make out to the satisfaction of the Court that the Defendants had notice. I agree that the case is one of some little suspicion, but that is not enough. The Plaintiff in this action did not originally raise any case of actual notice, but notice has come in incidentally, and in a rather awkward sort of way. The Plaintiff stated, and supported by affidavits, the agreement that was made between the patentee and himself. Then in answer to those affidavits the Defendant said, "I had no notice of this," but in cross-examination he said, "Oh, I do recollect something about it, which was mentioned to me by *Stephen Hartley* ." What is strongest against the Defendants on this point is a joint affidavit by a workman named *Lord* and his wife. But that was answered by an affidavit of one of the Defendants, and there was no cross-examination at all as regards the matters upon which the Plaintiff might have relied in order to shew notice either as to those affidavits of the *Lords* , or as to the answer by the Defendant. To my mind this is rather a striking circumstance, and in my opinion it would be wrong merely upon that, as to which there was no cross-examination, and no opportunity therefore of the Defendants giving any explanation, to hold that they had notice of the agreement that was made between the patentee and the Plaintiff.

That being so, we come to the simple question whether an exclusive licensee for a particular district can sue in his own name a person acting in alleged violation of his rights under the license, without proving as against such person notice of those **\*468** rights? My opinion is that the licensee cannot so sue. It is said that this is an exclusive license, and must be construed just in the same manner as if it had been a grant of a patent right for a limited period and for a limited space. But it is a very different thing; and some of the cases that have been referred to shew clearly the distinction between licenses which amount to a grant and licenses which do not do so. One of those cases is the ice case ( Newby v. Harrison 12 ), and there the Vice-Chancellor shews that where there is only a license which does not entitle the licensee to take anything away, or to acquire any property, then the license simply remains a license, that is, an authority from the person who grants it to the person who receives it, enabling him to do lawfully that which without the license he could not do; and that where there is a license which not only enables the licensee to do something lawfully which otherwise he could not do, but also enables him to acquire

© 2014 Thomson Reuters.

something or to take away something, like game, or ice, in consequence of the license, then the license amounts to a grant. That is pointedly put in the judgment of Lord *Hatherley* , then Vice-Chancellor, in this way 13 :—"With regard to the word 'license,' there is some little ambiguity. It is, however, well defined in the case of Muskett v. Hall 14 , and I prefer stating it in the language there cited by Chief Justice *Tindal* to giving my own. It is thus stated:—'A dispensation or license properly passes no interest, but only makes an action lawful which without it had been unlawful; as a license to go beyond the seas, to hunt in a man's park, to come into his house, are only actions which, without license, had been unlawful; but a license to hunt in a man's park and carry away the deer killed to his own use, to cut down a tree in a man's ground and to carry it away the next day after to his own use, are licenses as to the acts of hunting and cutting down; but as to carrying away the deer killed and the tree cut down, they are grants.' So here, a license to enter upon a canal and take the ice is a mere license; and the right of carrying it away is a grant of the ice so to be carried away." So that points out the distinction between a license and a grant, and in my opinion the license in this case, although it is an exclusive license, and for a **\*469** limited time, can in no way be considered as a grant of the letters patent, but is simply a license to do that which without that license would be a violation of the monopoly of the patentee.

That this exclusive license was not intended to be a grant to the licensee of any right to sue is, I think, clear from the fact that there is in it a conditional contract that if there was any infringement either within or without the district, then the patentee would allow the licensee to use his (the patentee's) name, in order to sue the infringer. What is granted may be put thus:—"You may use this within this particular district for this particular time. I do not give you any right which will enable you to sue, but if there is any one who is violating my patent right, and therefore infringing the right which I have given to you, or doing that even without infringing the

right, because he may do it outside; having regard to the license which I have granted, I will allow you to use my name, in order to sue the person who has committed such an act." If in this case any act had been done in violation of the agreement between the licensee and the patentee, then the licensee would have had the right to sue the patentee, but it is not alleged that there was any such violation. All that is contended is that an exclusive license is equivalent to a grant, and that the licensee may, without the concurrence of the patentee, or without there having been any violation of the agreement between the patentee and himself, sue the person who is infringing the rights conferred by the license. In my opinion that is wrong. That is turning that which is merely a license into something very different, namely, a grant of the whole letters patent, and in my opinion, therefore, the Plaintiff fails. I do not think it is necessary to go into the questions argued by Mr. *Moulton* as to the effect of the Patent Act , because if he cannot sue except in the name of the patentee, it is immaterial to consider whether the Act, by sect. 87 , does render what these Defendants have done within the district an infringement or not, or an infringement against the patentee. If the Plaintiff cannot sue then it is immaterial to consider the question whether this is to be considered as a right which the patentee could not grant, and therefore as an infringement against the patentee. **\*470**

In my opinion the judgment was right, and the appeal must be dismissed.

FRY, L.J.:—

I am of the same opinion. The Plaintiff in this case sues under an exclusive license to use a certain invention for a certain time, and within a limited district. He sues a person who he says is using that patented invention within the district, and without his license. Now he puts his case in a two-fold manner. He says: "In the first place, as exclusive licensee, I am in the position of an assign of the letters patent for that district and for that term, and as an assign of letters patent, I have a right to restrain

© 2014 Thomson Reuters.

any person who is infringing within the district."
That argument appears to be based on an entire er-
ror with regard to the nature of a license. An ex-
clusive license is only a license in one sense; that is
to say, the true nature of an exclusive license is
this. It is a leave to do a thing, and a contract not to
give leave to anybody else to do the same thing.
But it confers like any other license, no interest or
property in the thing. A license may be, and often
is, coupled with a grant, and that grant conveys an
interest in property, but the license pure and simple,
and by itself, never conveys an interest in property.
It only enables a person to do lawfully what he
could not otherwise do, except unlawfully. I think,
therefore, that an exclusive licensee has no title
whatever to sue.

Then, in the second place, the Plaintiff puts his case
in this way. He says: "The exclusive license implies
a contract not to grant to anybody else within the
district. The Defendants took these machines with
notice of that contract, and it would be unconscien-
tious to allow them to use machines in such a man-
ner as to violate the contract of which they had no-
tice." Had they, then, notice of the contract? In my
opinion that is not proved. I agree that there are
many circumstances of suspicion; many circum-
stances which might make an investigation of the
matter reasonable; many circumstances which I
think the Plaintiff, if he had been minded, might
have probed into far more deeply than he has ever
attempted to do in this case. But, in fact, he did not
launch his case upon the ground of notice. That, I
**\*471** think, is not his true cause of action as he per-
ceived it, and understood it at the time he began his
action; and on such ragged evidence as there is of
notice he has entirely failed to satisfy me.

Therefore I agree with the Lord Justice that this ap-
peal fails.

LOPES, L.J.:—

I am of the same opinion. I do not desire to add
anything.(W. W. K.)

1. 2 H. & M. 628 .

2. 1 J. & H. 393 .

3. Law Rep. 10 Eq. 509 .

4. 1 Webs. Pat. Cas. 155.

5. 7 C. B. (N.S.) 209 .

6. 9 Q. B. D. 315 .

7. 5 Bing. N. C. 694 .

8. 4 De G. & J. 276 .

9. Law Rep. 4 Ch. 654 .

10. 19 Ch. D. 246 .

11. 10 H. L. C. 191 .

12. 1 J. & H. 393 .

13. 1 J. & H. 398 .

14. 5 Bing. N. C. 694 .

END OF DOCUMENT

© 2014 Thomson Reuters.

# TAB 40

147 Fed.Appx. 248
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter See
Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued
on or after Jan. 1, 2007. See also Third Circuit
LAR, App. I, IOP 5.7. (Find CTA3 App. I, IOP 5.7)
United States Court of Appeals,
Third Circuit.

In re: HECHINGER INVESTMENT
COMPANY OF DELAWARE, Debtor,
Hechinger Litigation Trust, not individually,
but solely as indenture trustee a/
k/a HSBC Bank USA, Appellant,
v.
Bankboston Retail Finance, Inc., individually
and as agent for lenders under Credit Agreement
dated as of September 26, 1991, Credit Agreement
dated as of December 31, 1998, and Amended
and Restated Credit Agreement dated March
18, 1999; General Electric Capital Corporation,
Intervenor-Defendant in District Court,
Hechinger Liquidation Trust, Appellant.

No. 04-2112.   |   Argued June 30,
2005.   |   Decided July 29, 2005.

**Synopsis**
**Background:** Liquidation trust brought adversary
proceeding against lenders seeking "equitable lien" in
property of debtor and its subsidiaries and equitable
subordination. The United States District Court for the
District of Delaware, Sue L. Robinson, Chief Judge,
dismissed proceeding, 2004 WL 724960. Trust appealed.

**Holdings:** The Court of Appeals, Van Antwerpen, Circuit
Judge, held that:

[1] district court's factual findings provided basis for review,
and

[2] district court's valuation determination was not clearly
erroneous.

Affirmed.

West Headnotes (3)

[1]    **Federal Civil Procedure**
       🔑 Sufficiency

       District court's factual findings with regard to
       value of acquired company were sufficient to
       indicate factual basis for ultimate conclusion
       of whether debt assumed by debtor during
       particular transaction caused breach of negative
       pledge clause in prior indenture, and thus basis
       for review had been provided, where court stated,
       inter alia, that there was uncontroverted evidence
       of professional advice and opinions with respect
       to compliance with terms of clause, it was
       uncontroverted that independent audit confirmed
       post-merger valuation, and there was absence of
       showing of fraud or bad faith with respect to
       both debtor's valuation and auditor's independent
       audit of that valuation.

       Cases that cite this headnote

[2]    **Corporations and Business Organizations**
       🔑 Actions

       District court's valuation determination of
       acquired company was not clearly erroneous,
       which afforded great weight to contemporary
       valuation made by debtor in resolving issue
       of whether debt assumed by debtor during
       particular transaction caused breach of negative
       pledge clause in prior indenture, where valuation
       was confirmed by outside auditor and was further
       corroborated by independent contemporaneous
       evidence which included, inter alia, fact
       that debtor and its counsel made multiple
       representations to lenders that transaction had
       not breached indenture's negative pledge clause.

       Cases that cite this headnote

[3]    **Corporations and Business Organizations**
       🔑 Actions

District court's valuation determination of acquired company was not clearly erroneous, which rejected $10 million valuation proposed by liquidation trust in resolving issue of whether debt assumed by debtor during particular transaction caused breach of negative pledge clause in prior indenture, where trust's valuation omitted other non-cash consideration made in conjunction at the time, including 30 percent ownership in company, in form of warrant, that would have arisen from that transaction, subtenant in approximately 100 sites where rental obligation would have otherwise arisen, and $10.7 million promissory note.

1 Cases that cite this headnote

**\*250** On Appeal from the United States District Court for the District of Delaware. (D.C. No. 00-CV-973). District Judge: Honorable Sue L. Robinson.

**Attorneys and Law Firms**

Mark Minuti, Michael Bonkowski, Saul Ewing LLP, Wilmington, DE, David M. Friedman, David E. Ross, (Argued), Howard W. Schub, Andrew K. Glenn, Ian D. Katz, Marvin Peguese, Kasowitz, Benson, Torres & Friedman LLP, New York, NY, for Appellant Hechinger Litigation Trust.

Teresa K.D. Currier, Peter J. Duhig, Klett Rooney Lieber & Schorling, Wilmington, DE, Paul S. Samson, (Argued), Jeffrey D. Ganz, Craig J. Ziady, Riemer & Braunstein LLP, Boston, MA, for Appellee Fleet Retail Finance, Inc.

Clay J. Pierce, Salans, New York, NY, Michael Kip Maly, (Argued), Winston & Strawn LLP, San Francisco, CA, Stephen M. Miller, Carl N. Kunz, III, Morris, James, Hitchens & Williams LLP, Wilmington, DE, for Appellee General Electric Capital Corporation.

Before FUENTES, SMITH and VAN ANTWERPEN, Circuit Judges.

**Opinion**

### OPINION OF THE COURT

VAN ANTWERPEN, Circuit Judge.

Appellant Hechinger Litigation Trust appeals from the March 31, 2004 judgment of the District Court entering judgment in favor of Appellees BankBoston Retail Finance, Inc. and General Electric Capital Corporation. The District Court had jurisdiction pursuant to 28 U.S.C. §§ 157(b)(2) and § 1334(b). We have jurisdiction pursuant to 28 U.S.C. § 1291 and will affirm.

## I.

Because we write only for the parties who are familiar with the factual and procedural background of this lawsuit, we need not recite the history of this case at length. In the proceedings below, pursuant to the governing indenture's negative pledge clause and the purchase money exception to that clause, the District Court instructed the parties to submit evidence addressing whether the assets and liabilities of Builders Square exceeded some $153 million of debt that Hechinger assumed during the 1997 merger between Hechinger and Builders Square (the "transaction"). The District Court then held a three-day bench trial to determine the fair market value of Builders Square. Through experts, the parties presented retrospective valuations created for purposes of the trial. The parties also presented contemporaneous evidence of the valuation of Builders Square dating to 1997. Specifically, Appellant claimed Builders Square assets and liabilities had a fair market value of $10 million, evidenced, they claimed, by the cash paid to acquire Builders Square at the start of the 1997 transaction. Appellees, in turn, presented evidence of Hechinger's 1997 valuation of Builders Square assets and liabilities pursuant to GAAP purchase accounting rules. That valuation led Hechingers to conclude that Builders Square had a fair market value of $260 million. This purchase accounting valuation was confirmed by an outside accounting firm, KPMG. Appellant did not argue before the District Court or this Court that either the Hechinger valuation or the KPMG audit were improper or otherwise in error, and Appellees independently presented evidence that the 1997 transaction was negotiated at arm's length, conducted in good faith, and employed sufficient due diligence. Upon reviewing the parties' evidence, the District Court, on the basis of Appellee's 1997 valuation evidence, determined that the value of Builders Square in 1997 was greater than $153 **\*251** million. It accordingly determined that the 1997 transaction had not breached the negative pledge clause and dismissed all claims against Appellees in an opinion dated March 28, 2004 and judgment dated March 31, 2004. This appeal followed.

## II.

This Court exercises plenary review over a district court's selection of a valuation standard. *See, e.g., Amerada Hess Corp. v. C.I.R.,* 517 F.2d 75, 82 (3d Cir.1975). Once a standard is applied, a valuation is a question of fact that this Court reviews only for clear error. *See id.* Clear error, in turn, exists "only if [a finding] is completely devoid of a credible evidentiary basis...." *Shire U.S., Inc. v. Barr Labs., Inc.,* 329 F.3d 348, 352 (3d Cir.2003). As long as a district court's evidentiary determination is "plausible in light of the record," we may not reverse, even if convinced that we "would have weighed the evidence differently." *Anderson v. City of Bessemer,* 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). *See also Interfaith Comm. Org. v. Honeywell Intern., Inc.,* 399 F.3d 248, 254 (3d Cir.2005), *cert. denied,* 545 U.S. 1129, 125 S.Ct. 2951, 162 L.Ed.2d 869 (2005) (summarizing clear error review).

[1]    With these standards in mind, we have reviewed the District Court's March 28, 2004 opinion dismissing Appellant's claims. We find no error of law or fact for substantially those reasons set forth in the District Court's opinion. As the District Court correctly concluded, the fundamental question in this case is whether or not the debt assumed by Hechinger during the 1997 transaction caused a breach of the 1992 indenture. Dispositive to this question of breach, as the District Court also correctly concluded, is the fact that, under the indenture's purchase money exception to the negative pledge clause, breach was an impossibility absent a finding that the assets and liabilities of Builders Square at the time of the transaction were less than $153 million. The analysis, then, collapses to two fairly straightforward inquires: (1) did the District Court make a finding of fact with respect to the valuation of Builders Square; and (2), if so, was that finding clearly erroneous?

At oral argument, the parties invited us to decide that the District Court had not made a finding as to the Builders Square valuation. Based on our review of the District Court's thorough opinion, we decline such invitation. At a minimum, paragraphs 17, 21 and 30 of that opinion accurately summarize and reflect not only the indenture's governing language-the negative pledge clause and the purchase money exception-but also the parties' voluminous contemporary and retrospective valuation evidence. Paragraph 30 then sets forth multiple summary statements about the cumulative valuation

and breach evidence as it existed in 1997, specifically that there was (1) "uncontroverted" evidence of "professional advice and opinions with respect to *compliance* with the terms of the Negative Pledge" (emphasis added); (ii) that "[i]t is uncontroverted that post-merger, Hechinger valued Builders Square's net assets and liabilities at $260 million under GAAP fair market value standards for purchase accounting"; (iii) that "[i]t is also uncontroverted that an independent audit confirmed the post-merger valuation"; and (iv) that there was "the absence of a showing of fraud or bad faith" with respect to both Hechinger's valuation and KPMG's independent audit of that valuation. We believe that these articulations plainly satisfy the requirements for findings of fact. As the Supreme Court has stated, a district court's findings need only be "sufficient to indicate the factual basis for the ultimate conclusion." *Kelley v. Everglades* **\*252** *Drainage Dist.,* 319 U.S. 415, 422, 63 S.Ct. 1141, 87 L.Ed. 1485 (1943) (per curiam). And as this Court has stated, findings of fact will be deemed sufficient provided they "allow us to ascertain what evidence the District Judge accepted as credible or what he rejected ... and to provide a basis for review of the District Judge's finding[s]...." *Chalfant v. Wilmington Trust,* 574 F.2d 739, 751 (3d Cir.1978) (Garth, J. and Van Dusen, J., dissenting) (internal quotation omitted). We are satisfied here that the District Court's factual summary in its opinion is sufficiently comprehensive to satisfy these standards.

[2]    We therefore turn to the question of whether the District Court's valuation determination was clear error. It was not. " 'Fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.' " *Amerada Hess Corp.,* 517 F.2d at 83 (quoting *United States v. Cartwright,* 411 U.S. 546, 551, 93 S.Ct. 1713, 36 L.Ed.2d 528 (1973)) (internal quotation omitted). We have reviewed the evidentiary record and, in light of this definition, we find no error in the District Court affording great weight to the contemporaneous 1997 valuation made by Hechinger. This valuation was confirmed by an outside auditor and was further corroborated by independent contemporaneous evidence in the record. This included the fact that (1) Hechinger and its counsel made multiple representations to Appellees' predecessors that the 1997 transaction had not breached the indenture's negative pledge clause; (2) Hechinger found the valuation sufficiently reliable to submit it to the United States Securities and Exchange Commission for use in public filings; and (3) the Liquidation Trustee for Appellant, who was also both the former head of financial planning at

Hechinger and its Chief Financial Officer, testified that he himself did not know of a breach of the negative pledge clause by Hechinger at any time, including during the 1997 transaction.

[3]    Similarly, we find no error in the District Court's decision to remain unpersuaded by Appellant's claim that "$10 million in cash" constituted the fair market value of Builders Square in 1997. Our review of the record shows that Appellant's purported $10 million valuation omits other non-cash consideration made in conjunction at the time, including (1) a thirty percent ownership in the company that would arise from the 1997 transaction, in the form of a warrant; (2) a subtenant in approximately 100 sites where a rental obligation would otherwise arise; and (3) a $10.7 million promissory note. While the value of these additional consideration components is not clear, they cast significant doubt upon Appellant's asserted valuation. For all of these reasons, we conclude that the District Court's valuation finding was manifestly correct, and therefore not clearly erroneous.

We have considered the remaining issues raised by the parties and conclude that no discussion is necessary in light of the District Court's valuation finding and its conclusion that the indenture was not breached.

### III

For the foregoing reasons, we will affirm the March 31, 2004 judgment of the District Court.

**Parallel Citations**

2005 WL 1793503 (C.A.3 (Del.))

---

**End of Document**                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 41

1973 CarswellNat 189
Federal Court — Trial Division

Henderson v. Minister of National Revenue

1973 CarswellNat 189, [1973] C.T.C. 636, [1973] F.C.J. No. 800, 73 D.T.C. 5471

# Jack N Blinkoff and Janet Beach Henderson, Executors of the Estate of AM Collings Henderson, deceased, Appellants, and Minister of National Revenue, Respondent

The Bank of New York, Appellant, and Minister of National Revenue, Respondent

Bank of New York v. Minister of National Revenue

Cattanach, J

Judgment: September 6, 1973

Proceedings: on appeal from assessments of the Minister of National Revenue

Counsel: *J M Rolland* for Appellants Blinkoff and Henderson.
*Stuart Thom*, QC for The Bank of New York.
*J A Scollin*, QC and *M Peterson* for the Respondent.

Subject: Securities; Estates and Trusts; Tax — Miscellaneous

**Related Abridgment Classifications**

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**

    **Estates --- Estate tax and succession duties — Taxable property — Situs — Securities**

    **Estates --- Estate tax and succession duties — Valuation — Securities**

    **Estates --- Estate tax and succession duties — Payments — Liability for payment — Personal representative**

Succession duty — Federal — Dominion Succession Duty Act, RSC 1952, c 89 — 6(1)(b), (2), 13, 23, 24, 49 — Canada-US Succession Duty Convention — Article II(f) — Valuation of mining shares — Valuation of share purchase warrants — Meaning of "fair market value" — Situs of share purchase warrants — Liability of executors — Meaning of "executor"; "executor de son tort" — Assessment of executor in personal capacity.

The deceased died in 1957 resident and domiciled in the State of New York. Among his assets were a large number of shares in two Canadian mining companies, "Campbell Chibougamau" and "Chibougamau Mining" and also some share purchase warrants, which were physically situate in New York, issued by Campbell Chibougamau.

In issue in the appeal by the executors was the determination of the fair market value of the shares and share purchase warrants and also the situs of the warrants. On the valuation question, which reduced itself to the valuation of the Campbell Chibougamau shares, the closing market price on the date of death was $10 $^7/_8$ and, in recognition of the depressing effect

Henderson v. Minister of National Revenue, 1973 CarswellNat 189

1973 CarswellNat 189, [1973] C.T.C. 636, [1973] F.C.J. No. 800, 73 D.T.C. 5471

the sale of the deceased's substantial holdings would have on the market if sold all at once, the Minister considered the fair market value of these shares to be $8 each, representing a discount of about 26%. The executors contended that the market price was not indicative of "fair market value" because the market was not in possession of accurate information concerning the ore reserves, that it was being manipulated by the deceased, and that it was under the influence of a "transient boom".

As to the situs of the share purchase warrants, the executors contended that since title passed on delivery their situs was where they were physically located, in New York, not in Canada. The Minister, on the other hand, considered them "rights in or over shares" within Article II of the Canada-US Convention, thus classifying them as shares and placing their situs in Canada.

In the second appeal, the bank contested an assessment against it personally under section 49 of the Act for an amount of unpaid duty up to the value of the deceased's property that had been under its control and had been transferred to beneficiaries without payment of duty. The grounds for this appeal were that an assessment was not the proper vehicle for recovering an amount from an executor under section 49, that the bank, being without a grant of probate in Canada, was not an "executor" within the meaning of the Act, that a foreign executor could not be required to furnish funds to pay a domestic tax, and that the assessment was for an excessive amount.

**HELD:**

In the appeal by the executors, on the question of valuation of the mining shares:

(i) there was no evidence that the deceased had been manipulating the market and even if he had been, that alone would not make the fair market value to be other than the price at which the shares were being traded;

(ii) there was no evidence that the optimistic estimate of ore reserves had had any dominating impact on the market; and

(iii) the consistency of the market around the time of the deceased's death indicated it to be the best guide to fair market value and ruled out the allegation of a transient boom.

The appellant's methods of valuing the shares were less appropriate than the method adopted by the Minister and the appeal in this respect was dismissed.

On the question of situs, a share purchase warrant was not a "right in or under a share" within Article II of the Convention and its situs therefore fell to be determined, under the Convention, by the law of Canada. A share purchase warrant, being a negotiable instrument, had its situs where physically situate. Here the situs was in New York and therefore beyond the reach of the Act. The appeal was allowed in this respect.

On the appeal by the bank:

(i) the effect of section 49 was to impose a liability for the duty upon the executor in the instant circumstances and the Minister was entitled to raise an assessment against the bank under section 24;

(ii) the bank by its actions had constituted itself an executor *de son tort* and therefore an "executor" as defined by the Act and, as such, it acted in a representative capacity and was personally liable for duty under section 49;

(iii) the bank was liable for "all duties" and not merely the duty on the particular bequest which it had paid out; and

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1973 CarswellNat 189, [1973] C.T.C. 636, [1973] F.C.J. No. 800, 73 D.T.C. 5471

(iv) a foreign executor could be liable for Canadian taxes in Canada and that liability could be enforced in Canada against assets in Canada.

Although the appeal by the bank was dismissed on the main points the assessment was to be varied in other respects as agreed by the Minister.

**Table of Authorities**

**Cases referred to:**

*Untermyer Estate* v *Attorney-General for British Columbia*, [1929] S.C.R. 84;

*Dobieco Limited* v *MNR*, [1963] Ex. C.R. 348, [1963] C.T.C. 143, 63 D.T.C. 1063;

*Lawson* v *MNR*, [1965] 1 Ex. C.R. 64, [1964] C.T.C. 245, 64 D.T.C. 5147;

*Johnson's Asbestos Corp* v *MNR*, [1966] Ex. C.R. 212, [1965] C.T.C. 165, 65 D.T.C. 5089;

*Pellatt's Case* (1867), LR 2 Ch App 527;

*Brassard v. Smith*, [1925] A.C. 371;

*Webb, Hale & Co* v *The Alexandria Water Company (Limited)* (1905), 21 T.L.R. 572;

*Crosby* v *Prescott*, [1923] S.C.R. 446;

*Secretary of State of Canada and Custodian* v *Alien Property Custodian for the United States*, [1931] S.C.R. 169;

*New York Breweries Company v. Attorney General*, [1899] A.C. 62;

*Cook* v *Dodds*, [1903] 6 O.L.R. 608;

*United States of America* v *Harden*, [1963] S.C.R. 366;

*Hunt et al* v *The Queen*, [1967] 1 Ex. C.R. 101, [1966] C.T.C. 474, 66 D.T.C. 5322.

*Cattanach, J:*

1    The two appeals indicated in the above styles of cause came before the Court contemporaneously pursuant to an order dated June 23, 1970 given by the President of the Exchequer Court of Canada, now the Chief Justice of the Federal Court of Canada, whereby it was ordered that both appeals be tried together on common evidence.

2    The first appeal is that of the executors of the estate of A M Collings Henderson from the duty assessed by notice dated July 3, 1953 under section 23 of the *Dominion Succession Duty Act*, RSC 1952, c 89. Broadly speaking the issue in this appeal is the determination of the value for duty of shares in two mining companies and the situs and value of share warrants held by the deceased at the time of his death.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1973 CarswellNat 189, [1973] C.T.C. 636, [1973] F.C.J. No. 800, 73 D.T.C. 5471

3    The second appeal is that of the Bank of New York from an assessment dated March 28, 1966 against the bank personally in its capacity as executor of the estate under section 49 of the *Dominion Succession Duty Act* (*supra*) in respect of unpaid duties that had been assessed against the estate. At this time the bank is no longer an executor of the estate having resigned in 1963 and which resignation was accepted by the Surrogate Court of the appropriate jurisdiction.

4    Again broadly speaking, the issues in the second appeal are threefold, (1) the validity of the assessment as such, (2) the legal liability of the Bank of New York to pay the amount so assessed or any amount, and (3) the amount of the unpaid duties assessed, which in turn is dependent on the value of the shares held by the deceased at the time of his death the determination of which is the issue in the first appal.

5    Counsel for the respondent were the same in both appeals but the appellants in the first appeal and the appellant in the second appeal were represented by different counsel.

6    The appeals were not consolidated nor was it requested that they should be.

7    It was agreed among counsel that the outcome of the estate evaluation in the appeal of the executors and the resultant determination of the amount of succession duty payable in Canada will be accepted as determinative of that same issue in the appeal of the Bank of New York with respect to its personal liability.

8    With respect to the issues of the validity of the assessment and the liability of the Bank of New York to pay the amount assessed or any amount, counsel for the bank intimated that he would call evidence, which he subsequently did.

9    It was therefore proposed that the hearing of evidence and argument in the appeal of the Bank of New York on the matters other than the determination of the value of the shares and share warrants for estate tax purposes, which was the sole issue in the appeal of the executors, should be deferred until the conclusion of the appeal of the executors.

10    I acceded to that proposal because, in my view, it was in accordance with the order of the Chief Justice dated June 30, 1970 and the spirit thereof. The issue common to both appeals was the determination of the value of the shares and share warrants held by the deceased at the time of his death for estate tax purposes. Counsel for the Bank of New York agreed that the determination of that issue in the appeal of the executors would be accepted as a determination of that issue in the appeal of the bank. In respects other than that issue common to both appeals, the interests of the respective appellants were not coincidental but were separate and readily susceptible of segregation. Accordingly the appeals were heard and conducted on that basis and it follows that these reasons will be given in the same manner.

11    Therefore I turn first to the appeal of the executors.

12    Prior to trial the parties by their counsel agreed upon the following Statement of Facts:

1. Collings Henderson (Henderson) died on February 2nd, 1957.

2. Henderson at the date of his death owned 471,984 and 6/8ths shares of Campbell Chibougamau Mines Limited ("Campbell Chibougamau") and 56,234 warrants to purchase Campbell Chibougamau shares at $4.00 per share.

3. The Minister of National Revenue on August 2nd, 1959, assessed duty against the Henderson Estate in the sum of $1,703,250.88 and in doing so placed a value of $8.00 per share on the shares of Campbell Chibougamau and valued the share purchase warrants at $4.00 per warrant.

4. Henderson also owned 288,384 shares of Chibougamau Mining and Smelting Company ("Chibougamau Mining"), which the Minister valued at $2.65 per share in assessing the Henderson Estate. It has been agreed for the purposes of trial that the value of the Chibougamau Mining shares be adjusted in relation to their listed market price as at February 2nd, 1957, in the same proportion as the value of the Campbell Chibougamau shares is adjusted, if at all.

**WestlawNext**® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1973 CarswellNat 189, [1973] C.T.C. 636, [1973] F.C.J. No. 800, 73 D.T.C. 5471

5. Campbell Chibougamau is a public company incorporated under the laws of Quebec on March 10th, 1950. Initially the stock traded over the counter and eventually in 1952 it was listed and traded on the Toronto Stock Exchange, the Canadian Stock Exchange (then known as the Montreal Curb Market), and the American Stock Exchange. On February 1st, 1957, which was a Friday, Campbell Chibougamau closed at $10 $^7$/8ths on the Toronto Stock Exchange.

6. On February 2nd, 1957, there were 3,029,985 issued, allotted and outstanding shares of Campbell Chibougamau.

7. Campbell Chibougamau was incorporated for the purpose of acquiring exploring and developing mining claims in the Chibougamau area of northern Quebec. For the first few years Campbell Chibougamau was engaged in exploration on such claims and in the period 1952-1955 development work followed the discovery of the Merrill Island Mine, production commencing on May 29, 1955. The history of the activities of Campbell Chibougamau and its financial affairs are reported in a series of annual and semi-annual reports commencing with a report for the year ended May 31st, 1953.

8. During his life Henderson was the Chairman of the Board of Campbell Chibougamau from its incorporation and had responsibility for arranging financing for the company. Henderson maintained his office in New York and it was from New York that most of the financing of the company was arranged.

9. Shortly after the incorporation of Campbell Chibougamau an agreement was entered into among E O D Campbell and others including a nominee of Henderson providing an arrangement whereby certain optioned shares of Campbell Chibougamau would be taken down under the agreement through the syndicate thereby organized. Of the initial 3,000,000 issued shares all, except 360,375 which went to Consolidated Chibougamau Gold Fields Limited in exchange for mining claims, were taken down through the syndicate. Some of these shares were then sold to the public at the times and prices stipulated by Henderson who under the syndicate agreement controlled the sale of all the shares. The syndicate agreement is dated April 25th, 1950.

10. Under the agreement, the syndicate became entitled to take down shares under option as follows:

```
  400,000 shares @ 60c per share
1,800,000 shares @ $1.00 per share
  439,000 shares @ no cost after the initial 400,000 shares were taken down.
```

11. The syndicate, at the direction of Henderson, took down all the shares under option prior to April 1953. All of these shares were taken down either by brokerage houses pursuant to Henderson's direction, or by E O D Campbell. Subsequently, the shares were either held in margin accounts under syndicate control, or transferred into accounts of individuals who were part of the syndicate agreement. Mr Henderson at all times controlled the sale by the syndicate to the public of all shares so taken down.

12. In 1953, Henderson commenced litigation against E O D Campbell for the purpose of enforcing the provision of the syndicate agreement relating to sale of syndicate shares. E O D Campbell was selling such shares without Henderson's authorization. The litigation was eventually settled in March 1955 on the basis that Henderson took over E O D Campbell's stock.

13. Henderson himself retained shares of Campbell Chibougamau as part of the syndicate and from 1955 until his death the number of shares of Campbell Chibougamau he personally owned remained about constant. Although Henderson's personal holdings of Campbell Chibougamau remained more or less constant, he bought and sold shares of Campbell in the market up to the time of his death. From available stock broking records some of his buying and selling is indicated below:

| | Bought | | Sold | |
|---|---|---|---|---|
| | ------ | | ---- | |
| 1951 | 41,700 @ $1.70 - $2.50 | | 155,400 @ $ 2.05 - $ 2.70 | |
| 1952 | 58,900 @ $2.00 - $2.95 | | 49,750 @ $ 2.20 - $ 3.25 | |

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

```
1953 76,500 @ $2.20 - $4.00          191,065 @ $ 2.28 - $ 4.60
1954 12,600 @ $2.00 - $3.75            3,900 @ $ 2.75 - $ 2.80
1955 14,400 @ $7.25 - $9.00          --
1956 --                               16,100 @ $18.00 - $28.00 1/8
```

14. It appears from the records of the three above-mentioned stock exchanges that the trading of Campbell Chibougamau shares during the years 1955-1958 was as follows:

```
1955  --  2,214,200
1956  --  2,803,667
1957  --  2,596,405
1958  --  3,529,733
```

15. Annexed hereto and marked as Exhibit "A" is a graph which illustrates the prices at which the shares of Campbell Chibougamau were trading on the stock market from the listing of the shares of the company until the end of 1958 on a monthly basis. It can be noted that the shares of Campbell Chibougamau rose from a market price of between $2.00 and $3.00 after the market was initially established to a high of $28.95 in 1956 before they started to fall in price.

16. Campbell Chibougamau started to produce copper concentrate on May 29th, 1955. In doing so, during the first year of operation, it milled its highest grade ore (2.95%). In succeeding years the grade of ore milled was lower (ie 2.38% in 1957 and 2.07% in 1958).

17. Prior to 1957, Campbell Chibougamau discovered and owned three ore bodies known as the Main Mine (Merrill Island Group), Cedar Bay Mine and Koko Creek Mine. Of these three the largest ore body was the Main Mine and it is from this mine that ore was mined prior to 1958.

18. In February 1956, Newlund Mines (Can. Co.) held 45 claims as part of a group of 437 claims in the Chibougamau area. The 45 claims were assigned under an option to New York and Honduras Rosario Mining Co and they in turn commenced exploration on the 45 claims. Chibougamau Mining had 50 neighbouring claims on which they were carrying out geophysical and magnetometer surveys. Yorcan Explorations Limited was incorporated on April 30th, 1956. Ownership of Yorcan was approximately 50% by Chibougamau Mining, 25% by New York and Honduras Rosario Mining Company and the remainder by Newlund and other interests. New York and Honduras Rosario Mining Company is an American company with long experience in the mining industry. The principal purpose of Yorcan was to explore the 95 claims previously mentioned. In the winter of 1956, Yorcan drilled approximately 25 holes on Lake Chibougamau, none of which were subsequently found to contribute to the Henderson ore body. Also in 1956, Campbell Chibougamau was carrying on surface exploration and diamond drilling in an area adjacent to the Yorcan holdings. This area was known as the "K" group and consisted of 2,006 acres held by Chibougamau Venture Ltd. At this time it was worked under the exclusive control of Campbell Chibougamau and was later acquired by Campbell Chibougamau. During 1956, Campbell Chibougamau drilled fifteen holes, three of which gave favourable indications that further drilling was warranted in the area of the three holes. The holes and the dates of completion were as follows:

```
K-8 completed April 7th, 1956
K-11 completed April 12th, 1956
K-12 completed April 20th, 1956
```

Annexed hereto and marked as Exhibit "B" is a table listing the results of the drill holes. Also annexed hereto and marked as Exhibit "C" is a copy of a map indicating all the drilling which was done in discovering the Henderson Mine.

1973 CarswellNat 189, [1973] C.T.C. 636, [1973] F.C.J. No. 800, 73 D.T.C. 5471

19. As a result of the above favourable indications arising on the border of Yorcan and Campbell Chibougamau property, a joint exploration program was carried on in the winter of 1957. Prior to the death of A M Collings Henderson on February 2nd, 1957, the following holes had been drilled to completion and were among the holes which contributed to the discovery and delineation of the Henderson ore body. The holes and dates of completion are as follows:

```
T-23 completed January 12th, 1957
T-24 completed January 12th, 1957
T-27 completed January 21st, 1957
T-26 completed January 25th, 1957
T-33 completed January 27th, 1957
T-32 completed January 28th, 1957
```

(See Exhibit "B")

20. In the Semi-Annual Report for the period ended December 31st, 1956, the president of Campbell Chibougamau, in a letter to the shareholders dated February 15th, 1957, discusses the drilling program that was being carried on in conjunction with Yorcan under the heading "Activities in the Chibougamau Area". The stated indications from the drilling done as of that date, was that "underground development is warranted". No mention is made of probable ore reserves and the letter also indicates that some of the ore body was still unexplored. The following holes were mentioned in the letter:

```
T-33 completed January 27th, 1957
T-37 completed February 7th, 1957
T-38 completed February 18th, 1957
T-39 completed February 14th, 1957
T-45 completed February 9th, 1957
T-46 completed February 16th, 1957
T-47 completed February 13th, 1957
```

(See Exhibit "B") The last six of the above holes were all completed after Mr Henderson's death on February 2nd, 1957. The following holes which were completed shortly after Mr Henderson's death also contributed to the ore body:

```
T-34 completed February 3rd, 1957
T-35 completed February 3rd, 1957
T-36 completed February 6th, 1957
```

Drilling continued over the whole of the winter of 1957 and many more holes were drilled which also contributed to the Henderson ore body's discovery.

21. In the Annual Report of Campbell Chibougamau for the year ended June 30th, 1957, the chief geologist, Dr S E Malouf, gave a report dated June 30th, 1957, which indicated the probable ore reserves in the Henderson ore body. An independent consulting geologist, Dr J E Gill, studied the ore body and recommended that it be integrated as a unit. On July 22nd, 1957, Campbell Chibougamau entered into an agreement with Yorcan to purchase all the assets of Yorcan, in return for 506,667 shares of Campbell Chibougamau. The price of the Campbell stock at that time was $9.00 per share. The agreement was ratified by the stockholders of Campbell Chibougamau on October 30th, 1957, when the price per share was $5.50.

22. The following is a table of the sales of shares of Campbell Chibougamau made by the executors from the Henderson Estate after Henderson's death and the prices received therefor which are within the range that such shares traded at the time of sale.

AVERAGE

1973 CarswellNat 189, [1973] C.T.C. 636, [1973] F.C.J. No. 800, 73 D.T.C. 5471

```
YEAR    SHARES              TOTAL           PRICE
----    ------              -----           -------
1957    20,845      $    95,915.90      $4.60
1958    123,000     $   779,173.18      $6.33
1959    107,940     $   831,895.44      $7.70
1960    108,760 6/8  $   657,563.62     $6.08
1961    42,814      $   328,929.88      $7.68
        -----------  -------------
        403,359 6/8  $2,693,478.02
```

23. The parties have agreed that the share purchase warrants owned by Henderson at the date of his death were in the form of a certificate which has been agreed upon. It is also agreed that the certificates were physically located in the State of New York at the date of Mr Henderson's death.

13      In paragraph 4 of the Agreed Statement of Facts the parties agreed that the value of shares held by the deceased in Chibougamau Mining should be adjusted in relation to their listed market price as at February 2, 1957, the date of the death of Henderson, in the same proportion as the value of the Campbell Chibougamau shares is adjusted, if the value of these shares should be adjusted. This agreement has the effect of narrowing the issues between the parties to (1) the value of the shares of Campbell Chibougamau as at the date of Henderson's death for estate tax purposes, rather than evaluation of shares in the two mining companies, and (2) the situs and value of share purchase warrants in Campbell Chibougamau.

14      Under the *Dominion Succession Duty Act* it is the statutory duty of the Minister to assess the succession duty payable under the Act (section 23) which is payable with respect to the succession of all property situated in Canada (section 6) and by virtue of subsection 6(2) shares in the capital stock of a corporation incorporated in Canada are deemed to be property situated in Canada. This manner of determining the situs of shares is confirmed in the Schedule to the *Canada-United States of America Tax Convention Act*, as amended. There is no issue between the parties as to the situs of the shares but only with respect to the situs of the share purchase warrants.

15      The succession duty, so to be assessed, is on the "aggregate net value" of the property of the deceased as at the date of his death.

16      In paragraph 2(a) of the *Dominion Succession Duty Act* "aggregate net value" is defined as follows:

2. In this Act,

(a) "aggregate net value" means the fair market value as at the date of death, of all the property of the deceased, wherever situated, together with the fair market value, as at the said date, of all such other property wherever situated, mentioned and described in section 3, as deemed to be included in a succession or successions, as the case may be, from the deceased as predecessor, after the debts, encumbrances and other allowances are deducted therefrom as authorized by subsection (9) or section 7 and by section 8:

                                    . . . . .

17      Subsection 34(1) of the Act provides:

34. (1) Subject to the provisions of this Act, the fair market value of the property included in any succession for the purpose of duty shall be ascertained by the Minister in such manner and by such means as he thinks fit, and, if he authorizes a person to inspect any property and report to him the value thereof for the purposes of this Act, the person having the custody or possession of that property shall permit the person so authorized to inspect it at such reasonable times as the Minister thinks necessary.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1973 CarswellNat 189, [1973] C.T.C. 636, [1973] F.C.J. No. 800, 73 D.T.C. 5471

18    This is what the Minister did. He placed a value of $8 per share on the shares of Campbell Chibougamau as at February 2, 1957. It is quite obvious how he arrived at the amount of $8 per share. February 2, 1957 was a Saturday and the stock exchanges were closed on that day. The closing price of Campbell Chibougamau on the Toronto Stock Exchange on Friday, February 1, 1957 was $10.78 [*sic*] per share. The deceased held 471,984 6/8 shares out of 3,029,985 issued shares which is a very large holding. No prudent shareholder would place the whole of such a large holding on the market at one time. To do so would result in an inevitable depression of the market. It is only reasonable to suppose that, if the shares were to be disposed of, they would have been fed into the market gradually as the market was capable of absorbing them without undue disturbance. To do otherwise would be to require the shares to be sold at a sacrifice or dumping value. On the other hand to dispose of the shares to best advantage requires time. The Minister allowed a discount from $10.78 to $8 per share or approximately 26% by some rule of thumb to offset that inconvenience, delay and uncertainty in realizing upon the shares. This is the amount that the Minister ascertained to be the "fair market value" per share.

19    This the appellants dispute. On their behalf two expert witnesses were called one of whom expressed the opinion that the "fair market value" per share at February 2, 1957 was $3.27 and the other that it was between $2.25 to $2.75.

20    Accordingly the first issue in the appeal of the executors is the determination of the fair market value of 471,984 6/8 shares of Campbell Chibougamau as at February 2, 1957.

21    The statute does not define the expression "fair market value", but the expression has been defined in many different ways depending generally on the subject matter which the person seeking to define it had in mind. I do not think it necessary to attempt an exact definition of the expression as used in the statute other than to say that the words must be construed in accordance with the common understanding of them. That common understanding I take to mean the highest price an asset might reasonably be expected to bring if sold by the owner in the normal method applicable to the asset in question in the ordinary course of business in a market not exposed to any undue stresses and composed of willing buyers and sellers dealing at arm's length and under no compulsion to buy or sell. I would add that the foregoing understanding as I have expressed it in a general way includes what I conceive to be the essential element which is an open and unrestricted market in which the price is hammered out between willing and informed buyers and sellers on the anvil of supply and demand. These definitions are equally applicable to "fair market value" and "market value" and it is doubtful if the use of the word "fair" adds anything to the words "market value".

22    In my opinion the discussion of the meaning of the expression by Mr Justice Mignault in delivering the unanimous judgment of the Supreme Court of Canada in *Untermyer Estate* v *Attorney-General for British Columbia*, [1929] S.C.R. 84, is a most useful guide to the meaning of the words "fair market value" as used in the *Dominion Succession Duty Act* as applicable to shares listed on a stock exchange. He said at page 91:

> We were favoured by counsel with several suggested definitions of the words "fair market value." The dominant word here is evidently "value," in determining which the price that can be secured on the market — if there be a market for the property (and there is a market for shares listed on the stock exchange) — is the best guide. It may, perhaps, be open to question whether the expression "fair" adds anything to the meaning of the words "market value," except possibly to this extent that the market price must have some consistency and not be the effect of a transient boom or a sudden panic on the market. The value with which we are concerned here is the value at Untermyer's death, that is to say, the then value of every advantage which his property possessed, for these advantages, as they stood, would naturally have an effect on the market price. Many factors undoubtedly influence the market price of shares in financial or commercial companies, not the least potent of which is what may be called the investment value created by the fact — or the prospect as it then exists — of large returns by way of dividends, and the likelihood of their continuance or increase, or again by the feeling of security induced by the financial strength or the prudent management of a company. The sum of all these advantages controls the market price, which, if it be not spasmodic or ephemeral, is the best test of the fair market value of property of this description.

> I therefore think that the market price, in a case like that under consideration, where it is shown to have been consistent, determines the fair market value of the shares. I do not lose sight of the fact that mining operations are often of a speculative character, that there is always a danger of depletion, and that a time will sooner or later arrive when no more minerals

1973 CarswellNat 189, [1973] C.T.C. 636, [1973] F.C.J. No. 800, 73 D.T.C. 5471

will be available, unless other properties are secured to keep up the supply. But all these elements have an effect on the price of the shares on the stock exchange, and no doubt they were fully considered by the purchasers of the stock at the then prevailing prices.

23    In commenting upon the first paragraph of the passage quoted above I said in *Dobieco Limited* v  *Minister of National Revenue*, [1963] Ex. C.R. 348 at 365, [1963] C.T.C. 143 at 157, 63 D.T.C. 1063 at 1071:

In the quoted passage Mignault, J treats the market price not as the fair market value, but as the best evidence of fair market value. The price at which the shares were selling on the stock market might be regarded as *prima facie* evidence of the fair market value, although not necessarily conclusive if rebutted by satisfactory evidence to the contrary.

24    As I understood the argument by counsel for the appellants, he accepted the basic premise in the *Untermyer* case (*supra*) as I have stated it above but sought to establish by the evidence adduced by him that the price at which the shares of Campbell Chibougamau traded on the stock exchange on February 2, 1957 was not the best guide to "fair market value" for three reasons, (1) that the prices of the shares on the stock exchange were going through a period of a "transient boom" which is typical of the shares of a mining company in the first year of its production, (2) that the market was not in possession of accurate and reliable information respecting the ore reserves, and (3) that there was some evidence from which it could be inferred that the deceased was supporting or manipulating the market.

25    It is a cardinal rule of legal interpretation of a statute that, if it be possible, effect must be given to every word used therein. I have said that the definitions and comments on the expressions "market value" and "fair market value" are synonymous and for that reason it seemed doubtful if any great significance should be attached to the introduction of the word "fair" but not to do so offends against the canon of construction that I have just mentioned.

26    Help can be obtained from the remarks of Mignault, J in the *Untermyer* case (*supra*) which I have quoted above but portions of which I shall repeat for emphasis:

... It may, perhaps, be open to question whether the expression "fair" adds anything to the meaning of the words "market value," except possibly to this extent that the market price must have some consistency and not be the effect of a transient boom or a sudden panic on the market. ...

Later he said:

The sum of all these advantages controls the market price, which, if it be not spasmodic or ephemeral, is the best test of the fair market value ...

Still later he said:

I therefore think that the market price, in a case like that under consideration, where it is shown to have been consistent, determines the fair market value of the shares. ...

27    The recurrent thought in these extracts is that the market price must have the element of consistency which precludes the existence of a transient boom or sudden panic and that the market price should be realistic rather than "ephemeral". If the undue stresses contemplated by Mignault, J are present then those influences will result in a volatile rather than a consistent market and accordingly I would conclude that a market price subject to such influences cannot be considered as the "fair" market value, which it would be otherwise, and that this is the significance attributed by Mr Justice Mignault in the use of the word "fair" before the words "market value".

28    That being so it remains to be considered if the market price of the shares in the present appeal is within the exception contemplated by Mr Justice Mignault for any one of the three reasons outlined by counsel for the appellants or a combination thereof.

29    I propose to consider those reasons in the reverse order to that in which they were submitted by counsel.

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1973 CarswellNat 189, [1973] C.T.C. 636, [1973] F.C.J. No. 800, 73 D.T.C. 5471

30      The third reason is that the deceased exercised control over the market.

31      From the Agreed Statement of Facts it is evident from the syndicate agreement that the deceased and the syndicate of which he was the dominant member had an option on 2,600,000-odd shares of an authorized capital stock of 3,000,000 shares. The remaining free floating shares were exchanged for mining claims some of which developed into the main mine of the company. Under this agreement the deceased had control over the sale of shares initially. In addition he controlled the take down of 80% of the shares and Campbell 20%. As the result of the settlement of a law suit between them the deceased assumed the option of Campbell. By April 1953 all shares had been taken down and at the date of his death the deceased personally owned and exercised a form of control over 1,500,000 shares out of the total 3,000,000 outstanding shares.

32      It is also clear that during the years 1955 and 1956 the deceased was buying and selling shares on the market while his ownership of shares in the company remained constant. The evidence of the extent of the buying and selling by the deceased is neither conclusive nor satisfactory.

33      The inference sought to be drawn from the foregoing is that the deceased supported a declining market by buying and assisting a rising market by buying and selling. However this is only an inference and is not supported by evidence. Similarly there is a suggestion of "wash trading" by the deceased but again there is no evidence of that fact.

34      In my view what these facts do establish is that the deceased as promoter of the company owned and controlled over 50% of the shares in the company and he controlled the management and therefore was in the position to and had the opportunity of controlling the market. The evidence establishes nothing more than that.

35      In *Lawson* v *Minister of National Revenue*, [1965] 1 Ex. C.R. 64, [1964] C.T.C. 245, 64 D.T.C. 5147, an issue to be resolved was the determination of a closing inventory consisting of shares in a mining company at the lower of cost to the taxpayer or the fair market value in accordance with subsection 14(2) of the *Income Tax Act*. The appellant attempted to show that the market value of shares was less than the cost to the appellant. This contention was based on the hypothesis that, if what was being bought and sold on the market has an intrinsic value less than the price at which it is being bought and sold, the market value is the intrinsic value and not the amount that is being paid in the market.

36      In rejecting the appeal on this ground I said at page 67 [247, 5149]:

... I am of the view that market value is the amount being paid by those who buy and sell at arm's length in the open market and that no evidence was introduced to establish that the prices listed in the Toronto Stock Exchange did not fairly represent that price. Evidence that members of the general public were being incited to buy the shares of this company in an operation of gambling at prices far in excess of any sensible valuation, by the appellant's carefully planned programme of direct and indirect publicity and market operations, does not make the amounts paid by them any less the market price of the shares that they were buying.

37      It will be noted that the expression used in subsection 14(2) of the *Income Tax Act* is "fair market value" which is the identical expression used in the *Dominion Succession Duty Act*. While the same words used in different statutes may receive different constructions that is predicated upon the self-same set of words being used with reference to a different set of circumstances, different subject matter and different legislative object. The *Income Tax Act* and the *Dominion Succession Duty Act* are not strictly statutes *in pari materia* yet they both have the ultimate objective of imposing a tax based upon the fair market value of an asset. Therefore, in this instance, I can see no logical reason for ascribing other than a uniform meaning to the words "fair market value" as used in the *Dominion Succession Duty Act* and as used in subsection 14(2) of the *Income Tax Act* and that is, as I have said before, the common understanding of those words.

38      In the extract quoted from the *Lawson v. MNR* case (*supra*) the words "market value" were used in a sense synonymous with the words "fair market value". In the *Lawson* case there was evidence of market manipulation. It was held in that case that these circumstances of which there was evidence did not detract from the price of the shares as listed in the exchange being the market value of the shares.

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1973 CarswellNat 189, [1973] C.T.C. 636, [1973] F.C.J. No. 800, 73 D.T.C. 5471

39    Assuming that there had been conclusive evidence of market manipulation by the deceased in the present instance, which I have found that there was not, then upon the reasoning adopted in the *Lawson* case, this does not make the fair market value other than the price at which the shares were being traded on the exchange.

40    The second reason advanced as to why the price at which the shares were being traded on the exchange as at the date of the death of the deceased was that accurate and reliable information as to the ore reserves of the company was not available to the persons who constituted the market. This argument is based upon the proposition that for the stock market to reflect the fair market value there must be a fair market and that for the market to be fair there should be ready access to the information that is essential to the determination of the worth of the company.

41    In 1956 a well known firm of brokers issued a circular dated March 21, 1956 in which it was stated that the proved reserves in wholly owned and leased ore bodies of the Merrill Island group totalled some 18 million tons of ore averaging 2.9 to 3.2% copper with additional values in gold and silver. It was also indicated that the tonnage below the 1,150 foot level might be as large.

42    The financial statements of the company for the years 1955 and 1956 do not make any reference to figures for ore reserves. All that was said about the ore reserves in the 1956 annual report was that they were very gratifying.

43    Subsequent to the issue of that report queries came to the company from shareholders as to the actual ore reserves. Accordingly the company circulated a letter reproducing excerpts from the chairman's address to the annual meeting reading as follows:

Questions will be asked regarding ore reserves, I shall anticipate them now, confining the estimate ore reserves only to tonnage proven and to those indicated as a result of diamond drilling and cross cutting. The sum total of Campbell's holdings in Chibougamau at the main shaft Cedar Bay and Kokko Creek thus far considered proven and indicated as outlined below is 9,940,000 tons averaging 2.22 per cent copper, and .056 gold, based on present mill tonnage. This indicates in excess of 15 years of reserves.

44    In the 1957 annual report these estimates of ore reserves were reduced to between 5 and $5\frac{1}{2}$ million tons with not so high a grade. This downward revised estimate of the ore reserves came out just after the death of Mr Henderson. This revised estimate of reserves was based upon a report of the chief geologist for the company. An expert geologist called on behalf of the appellants expressed the view that the method of calculation of ore reserves used by the company in its 1957 report was optimistic. It was also pointed out that the conjectured future profit of $3.02 per share was overly optimistic and was never realized. One of the principal reasons for the failure to realize that estimated profit was a pronounced fall in copper prices.

45    On the other hand the broker's letters above referred to and others written at the same time were written well before the material date of February 2, 1957, the date of Mr Henderson's death. At that time potential investors had available to them cards issued by the *Financial Post* which gave a proper factual estimate of the company.

46    It is difficult, if not impossible, to assess the influence that the inaccuracies in the estimates of ore reserves and the optimistic forecasts of the company's future earnings may have had on the market price. In assessing the market price there are many factors present in the mind of an investor and many imponderables. Mining companies do not restrict themselves to one particular ore body that they have discovered. They recognize that a mine as a wasting asset and that it will be depleted. Accordingly they are constantly searching for other sources of supply. This is the essence of good management in a mining company.

47    During this period there was a substantial volume of sales at a reasonably constant level. Those who sold were undoubtedly satisfied with the market price they received and those who bought undoubtedly thought that they had made a good buy. This is the function of the market which cannot be ignored.

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

48    The suggestion is that the estimate of the ore reserves, which in 1957 had been made at between 5 and 5 $^1/_2$ million tons was overly optimistic as was the projection of future earnings. There were reserves in that neighbourhood. There was no suggestion that Mr Henderson was guilty of outright fraud. At the most he was guilty of excessive puffing.

49    That being so the buyers and sellers who constitute the market are free to put their own valuation on the shares and in so doing they place their own valuation on the sum total of all advantages over disadvantages and their evaluation constitutes the fair market value.

50    It has been established that, while Mr Henderson may have bought and sold shares, his holding in the company remained constant. He was the person possessed of the most extensive information about the company's ore reserves and future prospects and with that knowledge he did not see fit to get out but rather continued to hold his shares.

51    What I am obliged to assess is the fair market value and not the correct or absolutely right market value.

52    I accept that the estimate of the ore reserves in the letter of the broker dated March 21, 1956 was grossly exaggerated but it was reduced to a more realistic figure in 1957 which may have been inaccurate.

53    However it has not been established to my satisfaction that the optimistic estimate of ore reserves had a direct impact in the market to the exclusion of other factors present to the minds of traders.

54    The third and final reason advanced by the appellants in support of their position that the market price on the stock exchange is not the best guide to the fair market value is that the company at that time was in a period of transient boom.

55    This reason is predicated upon the statement of Mr Justice Mignault in the *Untermyer* case (*supra*) when he said:

   ... It may, perhaps, be open to question whether the expression "fair" adds anything to the meaning of the words "market value," except possibly to this extent that the market price must have some consistency and not be the effect of a transient boom or a sudden panic on the market. ...

56    If the shares in the company are subject to a transient boom then the market lacks the element of consistency which is a condition to the market price being the best evidence of fair market value.

57    The appellants therefore seek to rebut the presumption that the market price of shares traded on the exchange is not the best evidence of fair market value by bringing themselves within the exception contemplated by Mignault, J that the presumption does not apply when the shares are subject to the effect of a transient boom.

58    In *Johnson's Asbestos Corp* v *Minister of National Revenue*, [1966] Ex. C.R. 212, [1965] C.T.C. 165, 65 D.T.C. 5089, Jackett, P considered the meaning of the phases or activities of mining preceding the delivery of ore to the pit head. They are fourfold, (1) prospecting, (2) exploration, (3) development, and (4) extraction or production. He then found the meaning of those words in the jargon of mining engineers to be,

   (1) "prospecting" — the initial stage of locating the site of a possible mining operation;

   (2) "exploration" — in general terms, is the operation of testing for the existence and extent of an ore body and includes prospecting;

   (3) "development" of a mine, in general terms, means to uncover the body or area which is to be the subject matter of the extraction process; development is the preparation of the deposit or mining site for actual mining;

   (4) the meaning of "production" or "extraction" in general terms is the removal of the ore to the pit head.

59    It is my understanding that in addition to extracting ore the company also operated a refining mill.

WestlawNext. CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

60    Mr Mars, an expert witness called on behalf of the appellants, accepted the foregoing stages but combined the prospecting and exploratory stages as one. He stated in paragraph 20 of his affidavit filed under Rule 482, as follows:

> From my experience in analysing mining stocks, I have observed that they tend to follow a pattern which involves several phases.

61    At this point I might interject to point out that the phases contemplated by the witness are the phases outlined by Jackett, CJ as the phases of a mining operation on which phases this witness superimposes the pattern of prices in the stock market.

62    He continues,

> Typically in the first phase, one expects during the exploratory stage leading up to the proving of a copper ore body, considerable stock market activity of a speculative nature.

63    Again I would interject to point out that during the prospecting and exploration stages leading to the discovery of its main mine the shares of Campbell Chibougamau were not listed and accordingly there is no evidence of the market price at that time.

> In the second phase, during development and construction, the stock market tends to be more stable.

64    During this stage the evidence indicates that the shares of the company from 1951 to the beginning of 1955 were reasonably stable at about $4 per share.

> Thirdly, as production commences, the price will often rise to reflect early operational results which may be significantly better than those which can be sustained on a permanent basis. This phase is a *transient boom*, (italics are mine) the magnitude of which will vary depending upon other factors such as the trend of metal prices. Eventually the stock market can be sustained on a permanent basis and will then be more likely to reflect the fair market value of the stock in question. I have studied a graph of the market prices of the shares of Campbell Chibougamau from the establishment of a market for such shares in 1951 and in my opinion at the date of Mr Henderson's death the stock market was still within the third phase of transient boom. In my view, the rise of copper prices during 1955 and early 1956, together with the initial profits of the Company which could not be sustained, contributed to this phase in the case of the shares of Campbell Chibougamau.

65    The main mine of the company came into production on May 29, 1955.

66    Exhibit "A" to the Agreed Statement of Facts is a graph of the monthly high and low prices on the Toronto Stock Exchange for the shares of Campbell Chibougamau from March 31, 1952, the date of the first listing, until December 1958. This graph indicates that the shares followed the pattern described by this witness.

67    From March 31, 1956 until January 1955, that is during the development stage, the market price of the shares was reasonably constant at about $4 per share or slightly below. In January 1955 the shares began a precipitous rise to a high of $29 per share in April 1956 and May 1956. In June 1955 when the mine came into production the shares were trading at about $12 per share. From a high of $29 in May 1956 the shares began to fall to about $12 per share in February 1957 with a period of recovery to $22 per share in September and October 1956. The price of the shares remained comparatively constant at about $12 per share from February 1, 1957 until June 1957 when they began a decline to about $7 per share. From September 1957 the price per share remained at about $6 per share but between September 1958 to November 1958 they traded at about $10 per share.

68    It was established that the market for copper is a very volatile one subject to rapid fluctuations dependent upon the demand for this commodity. The time when the mine came into production in 1955 coincided with a rise in copper prices. Added to this the profits for the company in its first year of production, that is the year ending June 30, 1956 was $2.29 per share. For the financial year ending June 30, 1957 the profit declined to 26 cents per share.

69    The substantial profit per share for the financial year ending June 30, 1956 was attributed to the fact that the ore milled was of high grade, some 633,000 ore milled tons at a grade of 2.95%. In the next year the grade of ore was 2.38%, then declining

in successive years to 2.07% and 1.97%. In 1960 and 1961 the grade of ore rose due to the fact that a newly discovered ore body came into production.

70     It is customary in the mining trade to high grade the ore in the first years of production.

71     In the June 30, 1956 year 13 months production was brought into income for that year.

72     Furthermore profits were calculated on the basis of estimated sale prices rather than actual sales. This is not a reprehensible accounting practice but it does have the effect of driving profits down in subsequent years if the price of copper should decline.

73     Also the company had stockpiled some 128,000 tons of ore from the preproduction tax-exempt period to which no cost was attributed.

74     It was therefore submitted that for these reasons the profits for the first year of production were inflated and that there are factors which would increase the magnitude of the transient boom which Mr Mars concludes that the company was in on February 2, 1957, the date of Mr Henderson's death.

75     The question which arises is whether the circumstances above described and what Mr Mars describes as a transient boom coincides with the meaning of the words "transient boom" used by Mr Justice Mignault in the *Untermyer* case (*supra*), the pertinent extract I repeat for convenience, which is "that the market price must have some consistency and not be the effect of a transient boom or sudden panic".

76     I do not think that the words "transient boom" in the context in which they are used by Mr Mars are synonymous with these same words in the context of Mr Justice Mignault's statement. In the latter context the words "transient boom" are used in association with the words "sudden panic" as being diametric opposites. In my view the adjective "transient" as used by Mr Justice Mignault must take its meaning from the use of the words "sudden panic" and that being so it must mean a sudden or unusual circumstance not normally contemplated and which will pass away quickly.

77     On the contrary the various stages through which a mining company passes, as were described by Mr Mars, are the usual stages through which it must pass from the very nature of things. Accordingly the prices for which shares of a mining company are traded on the market are the usual market fluctuations due to the economic factors through which a mining company must pass coupled with other factors which habitually affect the price at which shares in mining companies are traded.

78     There was extensive trading in the shares of Cambell Chibougamau both before and after the death of Mr Henderson. In 1955, 2,214,200 shares were traded, in 1956, 2,803,667, in 1957, 2,596,405, and in 1958, 3,529,733.

79     In November and December 1956 and January 1957, the three months prior to Mr Henderson's death, some 600,000 shares were traded at prices averaging out to $13.78 per share and in the three months following his death, that is February, March and April 1957 500,000 shares were traded at prices averaging out to $11.45 per share. Over this six-month period there was an element of consistency present which, in my view, makes the market price the best guide to the fair market value.

80     In short, I am of the opinion that the appellants have not discharged the onus cast upon them to successfully rebut the presumption that such is the case for the reasons I have expressed.

81     In the circumstances of this particular appeal I therefore think that the market price, as at the death of Mr Henderson on February 2, 1957, determines the fair market value of the shares in Campbell Chibougamau held by him at that date, that is $10.78 per share.

82     The Minister did not assess the fair market value of the shares at the list price of $10.78 per share at which they were traded on the exchange on February 2, 1957 but rather he assessed the value at $8 per share. In doing so the Minister obviously recognized, because Mr Henderson owned 471,984 6/8 shares, that the estate would have difficulty in marketing such a large block of shares. To do so would make the measure of valuation a sacrifice or dumping value rather than the fair market value.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1973 CarswellNat 189, [1973] C.T.C. 636, [1973] F.C.J. No. 800, 73 D.T.C. 5471

83    What is under appeal is the assessment. Accordingly if I conclude that the fair market value of the shares is $8 per share or more then the assessment by the Minister shall not be disturbed. That would only follow if it is found that the fair market value per share is less than $8.

84    It is the submission on behalf of the appellants based upon the opinions of two experts called on their behalf that the market value of the shares was substantially less than $8 per share. Dr Buffam expressed the opinion that the fair market value as at February 2, 1957 was between $2.25 and $2.75 per share and Mr Mars thought it to be $3.27 per share.

85    In reaching these conclusions Dr Buffam did so following an application of the Hoskold formula and Mr Mars did so by following a variation thereof known as the present valuation method. As I understand the Hoskold formula it is an application of a mathematical calculation to the known ore reserve and in the result it is a determination of the value of the specific ore body.

86    In applying the Hoskold formula Dr Buffam found the valuation of the shares of Campbell Chibougamau to have been $3.39 per share with copper at 30 cents per pound in November 1957. In applying the present value method he reached a value of 46 cents per share as at November 1957. He concluded that since there was no difference between the value of the shares as at November 1957 and February 1957 the fair market value was in the range of $2.25 to $2.75 per share.

87    Dr Buffam had calculated the value of shares based upon the Hoskold theory to have been 67 cents with the copper price at 25 cents per pound and by the present value method to have been 46 cents per share, but he conceded an allowance should be made for the estimated future price of copper and for the speculative value of the shares. From the value of the shares that he found at 46 cents or 67 cents and his opinion of fair market value at $2.75 he must have multiplied these values between 5 and 6 times.

88    In Mr Mars's calculations to arrive at a value of $3.27 per share he used the same variables as in the Hoskold formula, which are basically ore reserves, price of copper, mill capacity and interest rates.

89    It is my conclusion that the Hoskold formula and the present value method are useful in determining the intrinsic value. As was stated in the *Lawson* case (*supra*) the fact that a commodity has an intrinsic value does not make that intrinsic value the fair market value.

90    Cambell Chibougamau recognized that a mining company possessed of only one ore body can expect that that ore body will be depleted and accordingly it was engaged actively in other explorations. There was a copper property in Mexico and current exploration of another ore body which became the Henderson mine and entered the production stage in 1960. Dr Buffam in making his estimate disregarded the Henderson ore body because in his opinion as a highly qualified geologist that ore body had not been sufficiently delineated as at the date of Mr Henderson's death. However the results of diamond drilling, though not as extensive as Dr Buffam would have wished to make an accurate estimate of the ore body, were known shortly prior to Mr Henderson's death and sufficient information was then available to justify an optimistic estimate of that discovery.

91    If my recollection of Mr Mars's evidence is correct he disregarded the Henderson ore body.

92    It appears to me that as at February 2, 1957 the company was concurrently in the production stage with respect to the main mine and in the exploration stage with respect to the Henderson ore body with the reaction in the market to those factors which Mr Mars described as "considerable stock market activity of a speculative nature", during the exploration stage.

93    I therefore conclude that the methods of estimating the fair market value of the shares adopted by the appellants are less appropriate than the method adopted by the Minister in assessing the appellant as he did.

94    I am confirmed in this conclusion by other circumstances.

95    The first such circumstance which I have previously mentioned was that for the three months prior and subsequent to Mr Henderson's death, a period of six months, there was a consistently large volume of trading at an average price of $12.62 per share.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1973 CarswellNat 189, [1973] C.T.C. 636, [1973] F.C.J. No. 800, 73 D.T.C. 5471

96    There were two methods available to the executors to dispose of the shares, if they should conclude it was obligatory upon them to do so, first the shares could have been sold *en bloc* to another mining company or secondly they could be disposed of on the market gradually so as not to have a depressive effect on the market.

97    The evidence of an executor was that attempts were made to sell the entire block of shares held by the deceased to other mining companies but that those attempts were unsuccessful. There was evidence to the effect that established mining companies are reluctant to purchase the properties of other established mining companies, their preference being to get in at an earlier stage. Added to this copper prices were declining. The significant factor is that the price asked by the executors of the deceased's total holding was $8 per share. The price of $8 is exactly that at which the Minister assessed the shares and not the fair market value not put forward by the appellants within the range between $2.25 and $2.75 and $3.27.

98    On April 30, 1956 a company known as Yorcan Exploration Limited was incorporated to explore some 95 mining claims. Yorcan was 50% owned by Campbell Chibougamau and the remaining 50% by other interests. Because of favourable indications arising on the border of the properties of these two companies an arrangement was made for a programme of joint exploration carried out through the winter of 1957. On July 22, 1957 the company entered into an agreement with Yorcan to purchase the assets of Yorcan in exchange for some 500,000-odd shares of the company at a price of $9 per share. There is no evidence that this was not a bona fide arrangement from which it follows that $9 per share was a realistic price.

99    In paragraph 22 of the Agreed Statement of Facts it is disclosed that the executors disposed of 403,359 6/8 shares in Campbell Chibougamau in the years 1957 to 1961 inclusive at the respective average prices per share of $4.60, $6.33, $7.70, $6.08 and $7.68, an overall average of approximately $6.48 per share.

100    I fully appreciate that the fair market value must be assessed as at the date of the deceased's death on February 2, 1957 and that at later dates different circumstances may well prevail. I have referred to the average prices at which the shares were actually disposed of at subsequent dates merely as a quick means of testing the estimates of the fair market value by the contending parties. The actual sale prices at subsequent dates are far in excess of the estimate of fair market value put forward by the appellants and are more approximate to the price of $8 per share which the Minister concluded to be the fair market value and assessed the estate accordingly.

101    Therefore I dismiss the appellants' appeal against the assessment respecting fair market value of the shares in Campbell Chibougamau as at February 2, 1957.

102    The other issue in the appeal of the executors against the assessment is with respect to 56,234 warrants to purchase an equal number of shares in Campbell Chibougamau at $4 per share which the Minister has assessed at a value of not less than $4 per warrant on the basis that such warrants had a situs in Canada. The appellants contend that the said warrants to purchase shares did not have a situs in Canada and accordingly should be excluded from assets subject to tax as situate in Canada and that in any event the warrants were worthless.

103    Obviously if the shares of Campbell Chibougamau could be purchased on the stock exchange at a price of $4 per share or less then the share purchase warrants would be valueless. On the other hand if the shares of the company were trading on the exchange at prices in excess of $4 per share then the value of the share warrants would be the difference between $4 and the higher price at which the shares were traded.

104    In view of the Minister's assessment of the shares at a fair market value of not less than $8 per share, which assessment I have concluded should not be varied for the reasons I have given, it follows likewise that the Minister's assessment of the share purchase warrants at a value of $4 per warrant as at February 2, 1957 should not be varied.

105    Accordingly there remains the sole issue of the situs of the share purchase warrants.

106    The share purchase warrants were in the possession of the deceased at the date of his death and were physically situated in the State of New York.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    17

1973 CarswellNat 189, [1973] C.T.C. 636, [1973] F.C.J. No. 800, 73 D.T.C. 5471

107     Paragraph 6(1)(b) of the *Dominion Succession Duty Act* provides as follows:

6. (1) Subject to the exemptions mentioned in section 7, there shall be assessed, levied and paid at the rates provided for in the First Schedule duties upon or in respect of the following successions, that is to say,

(b) where the deceased was at the time of his death domiciled outside of Canada, upon or in respect of the succession to all property situated in Canada.

108     Subsection (2) of section 6 provides:

6. (2) For the purposes of this Act, shares in the capital stock of a corporation incorporated in Canada are deemed to be property situated in Canada.

109     Respecting the shares in Campbell Chibougamau by virtue of foregoing provisions they are situated in Canada but different considerations apply to the share purchase warrants.

110     There is a distinction between a share warrant and a share purchase warrant.

111     A company if authorized by its charter may issue share warrants which make the bearer of such warrant absolutely entitled to the shares in respect of which the share warrant is issued. What happens is that fully paid shares are issued by the company to a shareholder. However instead of the shareholder taking a share certificate as evidence of his title to the share he may exchange that certificate for a share warrant or he might be given a share warrant rather than a share certificate. The bearer of a share warrant is entitled upon surrender of the share warrant to be registered as a shareholder. The holder of a share warrant may be entitled to vote depending upon the conditions attaching to the share warrant.

112     The principal difference between a share certificate and a share warrant is that the transferee of a share certificate only perfects his title when the transfer is registered in the company's share register. On the other hand the bona fide holder of a share warrant acquires a title free from equities immediately. Accordingly, a share warrant is a negotiable instrument which passes by delivery free from equities.

113     With respect to share warrants, shares have been issued by the company.

114     A share purchase warrant is a certificate which entitles the bearer on surrender of the certificate, on, after or before dates specified, to purchase from the treasury of the company the number of shares stated in the warrant at the price therein provided.

115     The basic difference between a share warrant and a share purchase warrant is that in a share warrant share capital has actually been issued and funds acquired by the company, instead of a share certificate the holder gets a share warrant, whereas on a share purchase warrant no capital shares have been issued by the company. The bearer of a share purchase warrant is not a shareholder, rather he has the option to become a shareholder in that he may purchase the number of shares at the price as is specified in the option. On its part the company undertakes to hold in its treasury sufficient shares to discharge its obligations under the share purchase warrants outstanding.

116     The share purchase warrants owned by the deceased at the date of his death were in the form agreed upon in paragraph 23 of the Agreed Statement of Facts. It is unquestionably a share purchase warrant as described above rather than a share warrant in that it entitles the bearer to purchase a specified number of shares of the par value of $1 each in Campbell Chibougamau for $4 per share, to be exercised by presentation of the share purchase warrant together with a certified cheque in payment of the subscription price to the company's transfer agent at Montreal, PQ on or before December 1, 1960. It is specifically stated in the conditions attaching to the warrant that title to the warrant shall pass by delivery. The warrant is signed by the company by its president and is countersigned by the transfer agent.

117     There is no indication in the attestation clause that the warrant was executed under the corporate seal.

1973 CarswellNat 189, [1973] C.T.C. 636, [1973] F.C.J. No. 800, 73 D.T.C. 5471

118    There is no doubt in my mind that a share warrant, which is a document issued by a company instead of a share certificate, must be under the corporate seal and I would have expected that a share purchase warrant is also the type of document which should be executed under the corporate seal.

119    A document under seal is a specialty and the general rule is that a specialty has the situs where it is physically situated. It is impossible to determine from the photocopy of the warrant appended to the Agreed Statement of Facts if the warrant was executed under the seal. It has not been established in evidence that the share purchase warrants were so executed and accordingly I must decide the matter in the assumption that they were not so executed.

120    The situs of share purchase warrants is not dealt with in the *Dominion Succession Duty Act*, applicable in the present appeals, as is the situs of shares.

121    In Schedule B to an *Act to amend the Canada-United States of America Tax Convention Act, 1943 and the Canada-United States of America Tax Convention Act, 1944*, 14 Geo VI, c 27, the title and preamble to which indicates the object of the Convention to be "the avoidance of double taxation and the prevention of fiscal evasion in the case of estate taxes and succession duties", it is provided in Article II as follows:

Where a person dies a citizen of the United States of America or domiciled in the United States of America or Canada, the situs of any rights or interests, legal or equitable, in or over any of the following classes of property, which for the purposes of tax form or are deemed to form part of the estate of such person or pass or are deemed to pass on his death, shall, for the purposes of the imposition of tax and for the purposes of the credit to be allowed under Article V, be determined exclusively in accordance with the following rules, but in cases not within such rules the situs of such rights or interests shall be determined for these purposes in accordance with the laws in force in the other contracting State: ...

122    Paragraph (f) of Article II reads as follows:

(f) Shares, stock, bonds, debentures or debenture stock in a company (including any such property held by a nominee, whether the beneficial ownership is evidenced by scrip certificates or otherwise) shall be deemed to be situated at the place where the company is incorporated; ...

123    The argument on behalf of the appellants was, as I understood it, that because share purchase warrants are not mentioned in paragraph (f) it is not a case within the rules enumerated and, therefore, the situs of such warrants is to be determined in accordance with the law of Canada, the "other contracting State". Following that premise it was then submitted that the situs of share purchase warrants is where they can be effectively dealt with and since title passes by delivery they can be effectively dealt with where they are physically located, that is, in the State of New York.

124    The rival contention on behalf of the Minister was, as I understood it, that under Article II of the Convention the situs of "any rights or interests, legal or equitable, in or over ..." the class of property set forth in paragraph (f), that is, "shares", shall be deemed to be situate at the place where the company was incorporated. It was the contention that the share purchase warrants constituted such a right in or over shares in the company.

125    I do not accept the construction of Article II advanced on behalf of the Minister. The share purchase warrants give the holder the right to have shares issued to him to the number specified in the warrant upon presentation of the warrant to the transfer agent together with payment of the subscription price on a date prior to December 1, 1960.

126    The rule in *Pellatt's Case* (1867), LR 2 Ch App 527, is that for shares to be issued there must be a subscription therefor and that offer is accepted by an allotment of shares and communication of that allotment to the subscriber. The right which the share purchase warrants in the present appeal bestow in the holders thereof is the right to subscribe for shares in accordance with the terms of the warrant whereas the company on its part warrants that such shares will be available from its authorized capital when application is made. However until subscription and allotment is made and communicated to the subscriber no

1973 CarswellNat 189, [1973] C.T.C. 636, [1973] F.C.J. No. 800, 73 D.T.C. 5471

shares come into existence. That being so the share purchase warrant does not confer rights on its holder in or over shares but only the right to have shares issued. It is a right in itself and property in itself.

127    I think that the words "any rights or interests, legal or equitable, in or over ..." in the initial language of Article II refers to rights or interests of a proprietary nature, either legal or equitable, with respect to the classes of property as are set forth subsequently in the Article. This is the construction and meaning to be ascribed to those words in the introductory portion of Article II in view of the fact that the rules which follow are complete with respect to the categories and situs of property to the exclusion of reference elsewhere. The category of property is set forth with certainty and the situs of that class of property is set forth with equal certainty.

128    Paragraph (f) refers to "shares, stock, bonds, debentures or debenture stock in a company". It does not include share warrants or share purchase warrants. (I might add parenthetically that this omission was corrected in subsequent legislation and also that "fair market" value of shares as comprising the aggregate net value of an estate was subsequently amended to be the price at which shares are traded on an exchange.)

129    Because paragraph (f) does not include share purchase warrants the situs of such warrants falls to be determined by the law of Canada.

130    That being so it was then contended on behalf of the Minister that the share purchase warrant is an option. For that option to be exercised certain acts must be done by the holder at the office of the company's transfer agent in Montreal, PQ. If the company did not perform its obligation to the bearer of the share purchase warrant, assuming that all conditions precedent were complied with, then the bearer is entitled to specific performance which would be enforced where the company is resident and domiciled, which is in the Province of Quebec. In effect it is contended that the share purchase warrant is a simple contract which has its situs in the country where it can be enforced which is the residence of the company.

131    With respect to the situs of shares the leading decision is that the situs of the share certificate is not the situs of the shares of which the certificate is evidence of the title but that the situs is the location of the transfer register.

132    The Privy Council, in *Brassard v. Smith*, [1925] A.C. 371, said with respect to the situs of shares:

This is, in their Lordships' opinion, the true test: Where can the shares be effectively dealt with? The answer in the case of these shares is in Nova Scotia only and that solves the question.

The shares in question in the Privy Council decision were shares in the Royal Bank of Canada whose head office was in the Province of Quebec and were part of the estate of a deceased who died intestate in Nova Scotia. The validity of a claim for duty for succession duties in Quebec depended upon the shares being actually situated in that province. The *Bank Act* provided that the bank might maintain a registry office in Nova Scotia at which shares of holders thereof within the province "shall be registered and at which, and not elsewhere, except as hereinafter provided, such shares may be validly transferred". Pursuant to that authority the bank opened a registry office in Nova Scotia.

133    However share certificates, share warrants and share purchase warrants are different things.

134    A share certificate is in no sense a contractual document and even though it is required to be issued under the corporate seal it is not a deed. The holder's legal right depends not on the certificate but upon entry in the share register. A share certificate is not a negotiable instrument whereas a share warrant or a share purchase warrant is.

135    The basic characteristics of negotiable instruments are that instruments when payable to bearer or endorsed in blank are transferable from hand to hand so that the right to maintain an action upon the instrument passes by the delivery of the instrument only in addition to the rights bestowed on a holder for value.

136    Because a share warrant and a share purchase warrant passes the right to maintain an action thereon merely by delivery, these documents are negotiable instruments. (See *Webb, Hale & Co v The Alexandria Water Company (Limited)* (1905), 21 T.L.R. 572.)

1973 CarswellNat 189, [1973] C.T.C. 636, [1973] F.C.J. No. 800, 73 D.T.C. 5471

137      While it is a well settled doctrine that simple contract obligations of a debtor have a situs where the debtor resides, there is an exception to this rule in the case of negotiable instruments. This exception is based on the circumstance that the debt evidenced by an instrument transferable by delivering is capable of being reduced into possession of the instrument itself and that when such an instrument in the hands of bearer the bearer's title to the debt due upon the instrument is assimilated to a chattel. (See Duff, J in *Crosby* v *Prescott*, [1923] S.C.R. 446.) The rule with respect to the situs of negotiable instruments is where the instrument is physically situate.

138      In the present appeal the share purchase warrants, being physically situated in the State of New York, have their situs in that state even though the obligations under the document are to be performed by the company through its transfer agent in Quebec.

139      In *Secretary of State of Canada and Custodian* v *Alien Property Custodian for the United States*, [1931] S.C.R. 169, the Supreme Court of Canada considered the question of the situs of shares of the Canadian Pacific Railway and bearer share warrants of Imperial Oil Limited. The bearer share warrants were warrants declaring that the bearer is entitled to a specified number of shares in the capital stock of Imperial Oil Limited.

140      Mr Justice Duff (as he was then) said at page 195:

> On the question of the situs of two other groups of securities, those of the Canadian Pacific Railway Company and of the Imperial Oil Limited, special points are made which are not without their weight. As to the Imperial Oil Limited, the provision quoted from the Supplementary Letters Patent makes it perfectly clear that the benefit of the obligation passes with the delivery of the instrument. The analogy of negotiable instruments, strictly so called, is pertinent, and indeed, seems to be almost, if not quite, complete. Such instruments have their situs where they are physically situated. There also is the situs of the obligation.

141      On the same page he dealt with the situs of the shares in the Canadian Pacific Railway. He said that the shares, for the purpose of determining the incidence of succession duty, had their situs at the branch office where they were registered and at which they could only be validly transferred. He followed *Brassard v. Smith* (*supra*) and, in applying the principle there enumerated, he said at page 195:

> ... in the case of the Canadian Pacific Railway Company's shares, the place for perfecting the legal title and thereby completing the disposition was New York. This also is not without its application to the Imperial Oil securities. The place of effective disposition was the place where the warrant was.

142      The warrants were physically situated in the State of New York and were described on page 174 as follows:

> Bearer Share Warrants issued by the Imperial Oil Company and transferable by delivery without anything further having to be done, either in Canada or the United States, to perfect title.

143      It is true that if the bearer of the share warrants wished to become a registered shareholder he was obliged to present the share warrant to the registry office to become registered as a shareholder and receive in exchange therefor share certificates, but that does not alter the fact that title to the share warrants passed upon delivery.

144      Mr Justice Lamont said at page 182:

> ... The share warrants of the Imperial Oil Company, being payable to bearer, were property wherever they were physically situate, for they could be effectively dealt with there. ...

145      The characteristic common to the bearer share warrants of Imperial Oil Limited and the share purchase warrants which are the subject of the present appeal which make them analogous to "negotiable instruments, strictly so called", is that the benefit of the obligations covered by both such documents passes with delivery of the documents.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

146      The share purchase warrants issued by Campbell Chibougamau therefore have a situs where the instruments were physically situated which, in accordance with the Agreed Statement of Facts, is in the State of New York.

147      Accordingly I allow the appeal in this respect and refer the assessment back to the Minister in order that the warrants to purchase shares of Campbell Chibougamau held by the deceased shall be excluded from the assets of the estate situated in Canada and so not subject to tax under the *Dominion Succession Duty Act*.

148      In the result the appeal by the executors with respect to the issue of the determination of the value for duty of the shares held by the deceased, A M Collings Henderson, in Campbell Chibougamau Mines Limited as at the date of his death on February 2, 1957 is dismissed and in accordance with the agreement between the parties as set forth in paragraph 4 of the Agreed Statement of Facts, the appeal with respect to the issue of the determination of the value for duty of the shares held by the deceased, A M Collings Henderson, in Chibougamau Mining and Smelting Co, Inc, as at the date of his death on February 2, 1957 is also dismissed.

149      The appeal by the executors with respect to the inclusion of the warrants to purchase shares in Campbell Chibougamau Mines Limited held by the deceased at the date of his death as assets of the estate is allowed.

150      The Minister of National Revenue shall be entitled to his taxable costs attributable to the issue with respect to the determination of the value for duty of the shares held by the deceased in Campbell Chibougamau Mines Limited.

151      The executors as appellants shall be entitled to their taxable costs attributable to the issue with respect to the inclusion of the share purchase warrants in Campbell Chibougamau Mines Limited, on which issue they were successful, such costs to be set off against the costs recoverable by the Minister of National Revenue.

152      I now turn to the appeal of the Bank of New York from the assessment of the Minister dated March 28, 1966 against the bank personally in its capacity as an executor of the estate of the late A M Collings Henderson in respect of unpaid duties that had been assessed against the estate.

153      The relevant facts, with respect to which there is no dispute, are set forth in the statement of claim and may be summarized as follows:

154      A M Collings Henderson died resident and domiciled in the State of New York on February 2, 1957.

155      By his last will and testament made on January 13, 1950 he appointed his wife, Janet Beach, his attorney, business associate and friend Jack N Blinkoff and the Bank of New York, the appellant herein, the executors and trustees thereunder. All of the executors resided and were domiciled in New York.

156      The will was probated in the Surrogate Court of the County of New York on April 2, 1957. The probate was not resealed in any province of Canada, nor was there any ancillary grant of any nature in Canada.

157      In January 1958 the executors prepared and filed a form prescribed by the *Dominion Succession Duty Act*, RSC 1952, c 89, as amended by SC 1957, c 22, being a schedule of assets and declaring the assets of the estate to have an aggregate net value of $1,201,883.92 and the assets situate in Canada to have an aggregate value of approximately $737,000.

158      Among the assets disclosed in the schedule thereto the deceased at the time of his death was the owner of 471,984 6/8 shares of Campbell Chibougamau Mines Limited, 288,384 shares of Chibougamau Mining & Smelting Co Inc and warrants to purchase 56,234 shares of the par value of $1 each in Campbell Chibougamau Mines Limited at $4 per share.

159      The Minister fixed the fair market value of the shares in Campbell Chibougamau at $8 per share at the date of the death of the deceased for assessment purposes. The Minister fixed the fair market value of the shares in Chibougamau Mining & Smelting Co, Inc at $2.65 per share at the date of the death of the deceased for assessment pur poses, and the Minister assessed the estate on the basis that the share purchase warrants had their situs in Canada and had a value of $4 for each share covered thereby.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1973 CarswellNat 189, [1973] C.T.C. 636, [1973] F.C.J. No. 800, 73 D.T.C. 5471

160     It will be recalled that the issue in the appeal of the executors was the determination of the value of the shares in Campbell Chibougamau and in Chibougamau Mining & Smelting Co, Inc for duty purposes and the situs and value for duty of the share purchase warrants.

161     Certificates for 128,845 6/8 shares in Campbell Chibougamau were held in Canada in Canadian accounts as were certificates for 87,666 shares in Chibougamau Mining & Smelting Co, Inc.

162     Certificates for 87,350 shares in Campbell Chibougamau were held in Canada in Canadian accounts in New York and certificates for 142,857 shares in Chibougamau Mining & Smelting Co, Inc were similarly held.

163     Certificates for 255,789 shares in Campbell Chibougamau and certificates for 57,861 shares in Chibougamau Mining & Smelting Co, Inc were held in US accounts in New York.

164     The share purchase warrants were situated physically in New York State.

165     There is no question, as it was conceded readily by all parties, that the shares in Campbell Chibougamau and Chibougamau Mining & Smelting Co, Inc had their situs in Canada.

166     For the reasons I expressed in the appeal of the executors I concluded that the Minister's determination of the fair market value of the shares of Campbell Chibougamau should not be disturbed. Because of the agreement between the parties expressed in paragraph 4 of the Agreed Statement of Facts neither should there be any adjustment of the Minister's valuation of the shares in Chibougamau Mining & Smelting Co, Inc.

167     I also concluded that the Minister's valuation of the share purchase warrants for assessment purposes should not be varied but I did conclude that the situs of the share purchase warrants was in the State of New York and accordingly that those warrants should be excluded from assets subject to tax in Canada because they were not property situated in Canada.

168     While the question of the valuation of the shares in two mining companies and the value and situs of the share purchase warrants is an issue common to the appeal of the executors and the appeal of the Bank of New York, it was agreed among counsel that the determination of the assets subject to succession duty in Canada and the valuation thereof for succession duty purposes in the appeal of the executors would be accepted as determinative of that issue in the appeal of the Bank of New Nork.

169     Succession duty returns similar to the returns prepared and filed by the executors under the *Dominion Succession Duty Act* were also filed under *The Succession Duty Act* of Ontario and the Quebec *Succession Duties Act*.

170     By a notice of assessment dated August 2, 1969 the Minister considered the aggregate net value of the assets to the value of $3,771,008.03 to be Canadian assets and succession duties in the amount of $1,703,250.88 were claimed thereon.

171     The Province of Ontario adopted the share values fixed by the Minister and by an instrument dated April 11, 1960 advised the executors that Ontario duties were in the amount of $357,659.34.

172     In the notice of assessment dated March 28, 1966 and served on the Bank of New York it is indicated that an amount of $428,227.10 has been paid on account leaving a balance of duty in the amount of $1,275,023.78 payable in three annual instalments.

173     In paragraph 19 of the Statement of Claim it is alleged that duties in the amount of $212,448.10 have been paid to the Province of Ontario. In accordance with section 12 of the *Dominion Succession Duty Act* 50% of the duty payable to the Province of Ontario is deductible from the duty payable under the *Dominion Succession Duty Act*.

174     In paragraph 13 of his statement of defence the Minister concedes and states that he is prepared to allow in computing the duty payable a deduction in the amount of one half of the duties paid to the Province of Ontario. However he denied the amount alleged to have been paid to Ontario thereby putting the amount in issue. Evidence was not adduced establishing that

1973 CarswellNat 189, [1973] C.T.C. 636, [1973] F.C.J. No. 800, 73 D.T.C. 5471

amount but in the prayer to his statement of defence the Minister asked that the appeal be allowed and the assessment referred back in order to allow a deduction of one half of the provincial duties paid to Ontario. It was my understanding that counsel would agree on the amount of the taxes so paid, which amount can be proven readily.

175     The Bank of New York during the period it was an executor and trustee of the estate carried all cash and securities received in the course of the administration of the estate in a trust ledger under the heading "Trust Account of the Estate of A M Collings Henderson".

176     Under the will of the deceased the principal beneficiaries were Mr Henderson's widow, Janet B Henderson, his son Bruce C C Henderson, and his daughter Antoinette E C Henderson. However there were other lesser bequests including an amount of $5,000 to Janet Beach Henderson, a bequest of the deceased's wearing apparel to his brother and his other personal effects to his son. The wearing apparel and personal effects were declared to have a value of $115 and were in the custody of Janet Henderson. The wearing apparel was delivered by her to the children of the deceased's brother who had predeceased him and the other personal effects were given by her to the deceased's son. The Bank denies that the wearing apparel and other personal effects were at any time in its control, or subject to control or disposition by it.

177     After the deceased's death his widow was without funds to meet her current living expenses. Accordingly on January 31, 1961 a cheque of the Bank of New York, termed an "official" cheque which I understand to be a draft issued by the bank authorizing the payee to draw on the funds of the bank, was given to the widow in the amount of $5,000 in payment of the legacy to her in that amount under the deceased's will. The amount of this cheque was charged to the trust account entitled "Trust Account of the Estate of A M Collings Henderson".

178     Save as aforesaid the beneficiaries under the will of the deceased derived no benefit thereunder during the period the bank was an executor.

179     Subsequent to this payment of $5,000 by the bank to the widow on January 31, 1961 the bank became very anxious about its position. I understood its concern to be primarily what assets of the estate it should make available to the Department of National Revenue for payment of Canadian succession duties. The bank consulted an independent legal adviser and as a consequence of that advice it applied to the Surrogate Court of the County of New York for leave to resign as executor and trustee of the estate. That leave was granted by order dated December 19, 1963 and the probate issued to the bank was revoked as of that date. This order was not applicable to the other two executors and trustees who continued in that capacity.

180     On March 30, 1966 a document entitled "Succession Duties — Notice of Assessments" dated March 28, 1966 and addressed to the Bank of New York was received by the bank. This document was received in evidence as Exhibit I. It refers to the duties payable being in the amount of $1,703,250.88 and that $428,227.10 had been paid on account leaving a balance due in the amount of $1,275,023.78. The document bears this endorsement:

> This assessment is for the tax payable by you pursuant to sec. 49 of the Dominion Succession Duty Act RSC 1952, c 89, since you delivered or transferred property of A M Collings Henderson, deceased, to Janet Beach Henderson, successor, without either first paying all of the duties assessed and levied under the Dominion Succession Duty Act, as evidenced by a Notice of Assessment dated 6 Aug, 1959, which you were liable to pay in your representative capacity as an executor of the estate of A M Collings Henderson, deceased, or without furnishing security satisfactory to the Minister of National Revenue.

181     This endorsement refers to facts in the present appeal and closely parallels the language of section 49 of the Act which reads as follows:

> 49. Before delivering or transferring any property of the deceased or any interest in such property to any heir, legatee, donee or other successor, the executor shall first pay all the duties assessed and levied under the Act to the extent to which he is liable in his representative capacity or shall furnish security satisfactory to the Minister for the payment of such duties, and any executor who acts in contravention of this provision is personally liable for the duties, and in addition is liable to a penalty equivalent to double the amount of such duties.

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1973 CarswellNat 189, [1973] C.T.C. 636, [1973] F.C.J. No. 800, 73 D.T.C. 5471

182    It is quite apparent that the Minister seeks to render the Bank of New York personally liable for the balance of the unpaid duties but he does not invoke nor seek to recover a penalty equivalent to double the amount of such duties.

183    The bank disputes its liability first on the ground that the assessment as evidenced by Exhibit I is a nullity.

184    As I understood the contention of counsel for the bank it was that liability under section 49 of the Act is not the proper subject matter of assessment, that the technique of proceeding by way of assessment is inappropriate and is not in contemplation of the general scheme of the Act nor is there any statutory authority for such an assessment. Further he contended that assessment is an administrative or ministerial act and since liability under section 49 involves a judicial or quasi judicial process the assessment is invalid. He submitted that, since there might be a debt due, the proper remedy would be for the Minister to proceed by way of a suit for debt.

185    Secondly he contended that if the first submission was decided adversely to his client's interest then the bank was not an executor within the meaning of and therefore not subject to the provisions of the *Dominion Succession Duty Act*. Basically I understand this submission to be that judgment cannot be given against a foreign executor who has not taken out an ancillary grant of letters probate in Canada. Therefore if the bank is not an executor it cannot be liable in its representative capacity. If the acts of the bank constituted it an executor *de son tort*, which counsel for the bank denied being the case, it was then his contention that an executor *de son tort* has no representative capacity, but that an executor *de son tort* is only liable to the extent of the value of the assets which he administered in Canada.

186    In the event that it should be resolved that the Bank of New York was effectively assessed and that it was an executor the third contention on behalf of the appellant is that it is under no liability in its representative capacity because foreign executors cannot be required to send assets from the foreign jurisdiction to pay a tax imposed by the domestic jurisdiction.

187    As an ancillary point counsel for the bank contended that the tax under the *Dominion Succession Duty Act* is a tax on a succession and because the bank paid a legacy of $5,000 the executor should be required to pay duties assessed and levied on that succession to the exclusion of other successions. In this context it may be appropriate to point out that the plural is used in the title to Exhibit I, "Succession Duties Notice of Assessments". If this is so he then points out that since $428,227.10 had been paid for duties and that the duty on a succession of $5,000 would be approximately $2,280 that the duty on this particular succession has been paid although he was frank to admit that no amount had been allocated to or identified as a payment of duty on this succession. He also cited this circumstance as a further example of a decision of a judicial nature being made and that the technique of assessment is inappropriate therefor.

188    The fourth ground advanced on behalf of the appellant was that assuming (1) the assessment was not a nullity, (2) the appellant was an executor within the meaning of the *Dominion Succession Duty Act* and (3) the appellant is liable to tax, then the assessment is for an excessive amount. The basis of this contention I understood to be that, at the time of the assessment the value of the assets had not been determined, that credit in respect of duties payable to the Province of Ontario has not been assessed and determined so that the calculation of the credit to which the appellant is entitled to is unknown for which reasons the liability of the Bank is unknown to the Minister until the liability of the estate has been determined and accordingly the assessment was premature. It was my recollection of the conclusion drawn from the foregoing by counsel for the appellant that the assessment should be struck out. This is contrary to the relief sought in paragraph 20(3) of the statement of claim which is a declaration that the liability of the appellant is limited to (1) the amount transferred by the appellant to the beneficiaries to which I have referred immediately above, (2) that the balance of the duties owing by the estate should be reassessed in accordance with the determination of the value of the assets of the estate which were situated in Canada, which was the issue in the appeal of the executors, and (3) by deducting one half of the provincial duties paid by the estate from the duty otherwise payable which the Minister in paragraph 13 of his statement of defence readily concedes and is prepared to allow in respect of duties paid to the Provinces of Quebec and Ontario.

189    It was admitted that there are assets still in the hands of the executors available for payment of duties. I assume that admission to refer to assets in the hands of the continuing executors but it is not clear if those assets are physically situated

1973 CarswellNat 189, [1973] C.T.C. 636, [1973] F.C.J. No. 800, 73 D.T.C. 5471

in Canada although I assume them to be. They are 53,000 shares of Campbell Chibougamau, 31,661 shares of Chibougamau Mining and an amount slightly in excess of $30,000 held by the National Trust Company.

190    It is obvious that even with the exclusion of the share purchase warrants from the assets of the estate as not subject to tax in Canada, and the credit to be allowed for duties paid to the provinces, the proceeds from the assets available in Canada will not be sufficient to satisfy the unpaid balance of duties and that the Minister seeks to recover the deficiency from the bank under section 49 of the Act.

191    The first contention on behalf of the appellant is that the assessment dated March 28, 1966 made by the Minister is a nullity, in that assessment for duties under section 49 is not authorized by the Statute, and that the Minister in making the assessment was acting in an administrative or ministerial capacity and as such could not make judicial or quasi judicial decisions.

192    If the assessment is a nullity, as contended by the appellant, it is void from the outset and the appellant would be entitled to the relief sought in paragraph 20(1) of its statement of claim, that is a declaration that the assessment is null and void.

193    The object of an assessment is the ascertainment of the amount of the aggregate net value of all the property of the deceased, wherever situated, passing on his death, from which is computed the duty payable, and the fixation of the liability therefor in accordance with the provisions of the statute.

194    Assuming that assessment is the proper method of fixing liability for duties payable under section 49 of the Act, then the appellant has the right of appeal under section 37 to establish that the amount of the duty is erroneous and that it is not liable therefor.

195    In fixing liability under section 49 the Minister, of necessity, must make certain assumptions. The first of these assumptions must be that the appellant is an executor, second that the executor transferred property of the deceased to an heir without first paying or providing for the payment of the duties for which the executor is liable in its representative capacity and thirdly the amount of the personal liability of the executor under section 49.

196    The position taken by the appellant is that the Minister is precluded from determining those conditions precedent to liability because each determination involves a decision of a judicial or quasi judicial nature and the function of the Minister is administrative.

197    The assessment by the Minister is an administrative act. There is an appeal provided for in the Statute from that administrative act. Before the Minister can perform the assessment process he is obliged to make the assumptions from which liability follows.

198    In my view the statute contemplates that the Minister shall do so and provides for an appeal against those assumptions not being in accordance with the statutory provisions.

199    I therefore conclude that if the Minister is required to make decisions of a judicial or quasi judicial nature as in the assessment process, the statute requires that he shall do so and provides an appeal to correct any error which may have been made by the Minister with respect to the applicability of the provisions of the Act.

200    The persons who are liable for the duty under the Act are set forth in section 13 which reads:

13. (1) Every successor is liable for the duty by this Act levied upon or in respect of the succession to him, and the duty in respect of any gift or disposition *inter vivos* to a successor is also payable by and may be recovered from the executor of the property of the deceased, but such liability shall be in his capacity as executor only and for an amount not exceeding the value of the interest of the successor in the property administered by the executor.

(2) Subject to subsection (1), all the duties assessed and levied under this Act shall be payable by and may be recovered from the executor of the property of the deceased, but the liability of any executor under this subsection shall be a liability in his capacity as executor only and for an amount not exceeding the value of the property administered by him.

1973 CarswellNat 189, [1973] C.T.C. 636, [1973] F.C.J. No. 800, 73 D.T.C. 5471

. . . . .

201     The successor is liable but the duty shall be payable by and is recoverable from the executor who is liable therefor in his capacity as executor and only to the extent of the property administered by him.

202     The successor is required to file a statement of assets with the Minister.

203     Section 23 then provides:

23. (1) After examination of the statement or statements so made and delivered the Minister shall assess the duty or duties payable under this Act and shall send notice of such assessment by registered mail to the executor and such notice shall be deemed to be notice of all persons liable for payment of the duties imposed by this Act.

(2) Where there is no executor liable or accountable for any duty or duties, notice of assessment shall be sent by registered mail to the successor.

. . . . .

204     This is the provision for assessment and notice thereof.

205     Under paragraph 59(2)(a) regulations may be made prescribing forms and the use thereof.

206     Such a regulation was made prescribing the use of form SD-7 as the notice of assessment under section 23 of the Act.

207     In assessing the appellant as he did the Minister utilized form SD-7 but supplemented the information with the following typewritten language, which I have quoted before but which I repeat for convenience:

This assessment is for the tax payable by you pursuant to sec. 49 of the Dominion Succession Duty Act RSC 1952, c. 89, since you delivered or transferred property of A. M. Collings Henderson, deceased, to Janet Beach Henderson, successor, without either first paying all of the duties assessed and levied under the Dominion Succession Duty Act, as evidenced by a Notice of Assessment dated 6 Aug., 1959, which you were liable to pay in your representative capacity as an executor of the estate of A. M. Collings Henderson, deceased, or without furnishing security satisfactory to the Minister of National Revenue.

208     There is no form of notice of assessment prescribed in the regulations for the notification of an assessment under section 49 of the Act.

209     Form SD-7 was utilized. There is no magic in the form. Because no form was provided in the regulations for an assessment under section 49 it does not follow that there is no right to assess. The substance of the assessment was endorsed upon the form.

210     Section 24 provides:

24. Subject to the provisions of section 36 and notwithstanding any prior assessment, or if no assessment has been made, the executor and the other person or persons liable for any duties payable under this Act continue to be liable for the said duties and to be assessed therefor and the Minister may at any time assess, re-assess, or make additional assessments upon any persons, and in respect of any property the subject-matter of a succession, for duties, interest and penalties.

. . . . .

211     The exception referred to in section 36 does not apply.

212     It is provided that "the executor and the other person or persons liable for any duties payable under this Act" shall continue to be liable for the duties. There is no reference to the executor being liable in a representative capacity only.

213     The section continues to provide that the Minister may at any time "assess, re-assess, or make additional assessments upon any persons ... for duties, interest and penalties".

1973 CarswellNat 189, [1973] C.T.C. 636, [1973] F.C.J. No. 800, 73 D.T.C. 5471

214      The word "persons" as used in the context is a broad and uninhibited use of that word. It is not restricted to the "successors". If the Legislature had so intended it could have said so as it does elsewhere in the Act. Therefore an executor is included in the word "persons".

215      The question to be resolved is whether the "duties" for which an executor is personally liable, if the executor should contravene section 49, are "duties" coincident with the "duties" in section 24 for which the Minister may assess "any persons".

216      For convenience I repeat section 49 which reads:

> 49. Before delivering or transferring any property of the deceased or any interest in such property to any heir, legatee, donee or other successor, the executor shall first pay all the duties assessed and levied under this Act to the extent to which he is liable in his representative capacity or shall furnish security satisfactory to the Minister for the payment of such duties, and any executor who acts in contravention of this provision is personally liable for the duties, and in addition is liable to a penalty equivalent to double the amount of such duties.

217      Section 49 is ranged under the heading, "Prohibitions and Penalties". The heading indicates the general object of the provisions following and the heading may be referred to in order to determine the sense of a section under that heading.

218      On behalf of the appellant it was contended that the imposition of a liability on an executor personally for the duties is a penalty and as such is not the proper subject of assessment but is recoverable by other means.

219      In the sense that the executor becomes personally liable for the duties the section is penalizing in result.

220      However one word in the heading under which 49 is ranged is "Prohibitions". The executor is prohibited from transferring any property to an heir without first paying or providing security for the payment of the duties exigible. If the executor fails to do so then the executor becomes personally liable for the duty. This constitutes an additional source to which the Exchequer can look for payment. That being so the purport of the section is merely to render another person liable for the duty.

221      The executor is liable for the duties and in addition is liable to a "penalty" equivalent to double the amount of the duties. It is this double amount of the duties that is the penalty. The Minister has not sought to impose that penalty on the appellant. What the Minister is seeking is to exact the duties from the appellant.

222      In my view section 49 imposes a liability for the duties upon the executor when the circumstances contemplated by the section exist. That being so the Minister is entitled to assess the appellant accordingly pursuant to section 24 of the Act.

223      Because of the conclusion I have reached that it is a liability for duty imposed on the executor, I do not have to consider whether a penalty is the proper subject matter of assessment, but if it were incumbent upon me to do so it would appear to me that the language of several sections of the Act, such as sections 24, 57 and 58 contemplate an assessment being made "for duties, interest and penalties".

224      Part VIII of the Act sets forth the remedies available to the Crown to recover duties.

225      Section 57 provides that "all duties, interest, penalties and costs assessed or imposed or ordered to be paid" under the provisions of the Act shall be deemed a debt due and recoverable as such, that is by suit for debt.

226      This is a remedy for the Crown to obtain judgment and execution thereupon but it does not obviate the assessment process which is a condition precedent to the debt arising.

227      Section 58 provides a further method of recovery. First there shall be determination of all duties, interest and penalties payable under the Act. This must be done by an assessment by the Minister.

228      Then all duties remaining unpaid after four months from the date of mailing of the "Notice of Assessments" may be certified by the Deputy Minister.

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1973 CarswellNat 189, [1973] C.T.C. 636, [1973] F.C.J. No. 800, 73 D.T.C. 5471

229    When the certificate is registered with the Exchequer Court it is the same as a judgment for the recovery of a debt and execution may be effected to the amount of the certification.

230    By subsection (3) of section 58 where such certificate is registered with respect of the liability of an executor, execution shall be against the property administered by the executor "unless he has been guilty of contravening section 49 in which case it may be executed against property owned by him personally".

231    The exception in subsection 58(3) is to preserve the personal liability imposed on the executor under section 49.

232    I do not construe the words "guilty of contravening section 49" as meaning that there must have been a prosecution and conviction therefor but rather as meaning that the executor as a question of fact delivered property of the deceased to an heir without first paying the duty thereon for which he is liable or has provided security therefor.

233    While it is not an issue before me it has been suggested that it is grossly unfair that an executor may be required to pay duties and cannot recover those duties from the estate. If the statute so provides, that is an end to the matter, but in view of my conclusion that section 49 imposes on the executor a liability to pay the duty personally it is, nevertheless, a duty required to be paid by the executor and it would appear that by section 15 the executor is entitled to deduct or recover the duty so paid from the assets of the estate.

234    In the result I have concluded that the assessment made by the Minister is not a nullity and should not be declared null and void. The assessment is valid until demonstrated by the appellant to have been erroneous as to the amount of the assessment or the assumptions made by the Minister in assessing the appellant as he did.

235    The appellant in effect contends that the assumptions of the Minister were an error in that the appellant is not an executor within the meaning of that word as used in the *Dominion Succession Duty Act* and even if the appellant is an executor it is not liable in a representative capacity.

236    For the proposition that the appellant is not an executor within the meaning of that word as used in the statute, counsel for the appellant relied upon a statement of the Earl of Halsbury, LC in *New York Breweries Company v. Attorney General*, [1899] A.C. 62.

237    New York Breweries Company, the appellant, was a company incorporated in England with its head office in London. It carried on a brewing business in New York. Clausen a citizen of New York and domiciled there died having by his will appointed two persons in New York his executors. Probate of the will was granted in New York to these two men, but they took no probate or administration in England. Clausen was the registered holder of shares in the company and of debentures. The executors appointed in New York requested the company to transfer to them all of Clausen's shares and debentures and to pay to them the interest and dividends due. The company, after notice to the Inland Revenue authorities and in order to test the question paid to the executors the interest and dividends then payable in respect of Clausen's shares and debentures and transferred in their books into the names of the executors two shares and a debenture then standing in Clausen's name.

238    It was held that the company had made itself an executor *de son tort*, that it had "taken possession of and administered" part of the testator's estate and, under the applicable English legislation that it was liable to penalties and to deliver an account and pay such duty as would have been payable if probate had been obtained in England.

239    Lord Halsbury said at page 68:

... It is idle to suggest that in the Taxing Acts, where they are dealing with English finance, the words "executor" or "administrator", which terms we use popularly as applicable to a person who fills that character, to whatever country he belongs, are used in those statutes in any other sense than as meaning an English executor or an English administrator ...

240    Later at page 71 Lord Halsbury said,

1973 CarswellNat 189, [1973] C.T.C. 636, [1973] F.C.J. No. 800, 73 D.T.C. 5471

... Then, my Lords, the learned judge goes on: "They have simply done that which the common law of England gives them the right to do, namely, to pay an executor." They have done nothing of the sort. The learned judge must forgive me for saying, when he says they have paid the executor, they have done no such thing. They have paid a person whom the learned judge calls an executor, but who is not an executor within the meaning of this Act; and when the learned judge says that they "have simply done that which the common law of England gives them the right to do, namely, to pay an executor without asking him for proof of his title by the production of the probate," I am afraid he forgets for a moment that what was done here was done with the full knowledge that the person whom they paid, not only was not an executor, but had given distinct notice that he never intended to become an executor within the meaning of the English law. ...

241    What Lord Halsbury has said is that the executors appointed under the law of New York were not executors within the meaning of the English statutes.

242    It may well be that Lord Halsbury's remarks, being made with respect to English legislation, are not applicable to legislation enacted by the Parliament of Canada.

243    There is no legislation whereby an executor can be appointed under federal jurisdiction. Executors and administrators are appointed by grant of letters probate or letters of administration under legislation enacted by the provinces of Canada. That being so an executor would be a person so appointed but that might well also apply to a person who is validly appointed by a jurisdiction other than a province of Canada, and who purports to administer assets of a deceased situated in Canada under that authority without obtaining letters probate in a province of Canada where the assets are situated.

244    Because of the view I take of the matter it is not necessary for me to resolve that question.

245    The word "executor" is defined in paragraph 2(f) of the *Dominion Succession Duty Act* as meaning

the executor or administrator of a deceased person, and includes an executor *de son tort*.

246    An executor *de son tort* is one who takes upon himself the office of executor by intrusion, not being so constituted by the deceased and in the absence of that constitution not being substituted by competent authority to act as administrator.

247    An act of intermeddling with a deceased's assets makes a person an executor *de son tort*.

248    Here the appellant assumed control over all of the assets of the deceased, A M Collings Henderson, that were situated in Canada. The appellant completed the schedules of assets required to be filed with the Department of National Revenue and signed such forms as executor. It directed and consented to the sale in Canada of some 600,000 shares in Campbell Chibougamau held by the deceased and which were situated in Canada. It engaged counsel in Canada to act on its behalf as executor in Canada.

249    In my opinion the appellant by its acts has constituted itself an executor *de son tort* of the deceased's assets in Canada.

250    Because the definition of an executor in paragraph 2(f) of the Act includes an executor *de son tort*, it follows that the appellant is an executor within the meaning of that word as used in the statute.

251    The question which follows from that conclusion is whether an executor *de son tort* can be liable for duties in a representative capacity.

252    Counsel for the appellant contends that he cannot because he is not a representative but an interloper.

253    Under section 13 of the Act the successor is liable for the duty in respect of the succession to him. That duty shall be recoverable from the executor of the property of the deceased but such liability shall be in his capacity as executor only and not for an amount exceeding the value of the interest of the successor in the property administered by him.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1973 CarswellNat 189, [1973] C.T.C. 636, [1973] F.C.J. No. 800, 73 D.T.C. 5471

254    It is trite law that a foreign executor cannot be sued in his official character in a jurisdiction in which he has not taken out letters probate or letters of administration but this is subject to the exception that when the foreign executor is found to be an executor *de son tort* he can be sued.

255    In *Cook v Doods*, [1903] 6 O.L.R. 608, the defendant who had intermeddled with the assets of an estate, was held liable to a creditor of the deceased for the amount of that indebtedness to be paid out of the goods of the deceased, and failing such goods, out of the defendant's goods.

256    Meredith, CJ said at pages 611 and 612:

> It was long ago settled that a creditor, if he finds that some one has intermeddled with the personal estate of his deceased debtor, is not bound to enquire whether that person is the lawful personal representative of the debtor, but may sue him as executor, naming him as executor generally, and on proof, if the executorship is denied, either of a grant of probate to the defendant or of his having intermeddled with the personal property of the deceased in such a way as to constitute him executor *de son tort* will be entitled to recover against the defendant as executor of the debtor; and if the defendant has not pleaded *plene administravit*, or, having pleaded it, has failed upon his plea, the judgment will be for the recovery of the debt and costs to be levied of the goods and chattels of the deceased in the hands of the defendant to be administered, and if he has not so much thereof in his hands to be administrated, then of his (the defendant's) own goods and chattels.

257    It will be noted that the creditor was not bound to enquire if he was the lawful personal representative of the deceased. By that I presume is meant, that the defendant was named as executor in the deceased's will and had taken out letters probate. All that was necessary was that the plaintiff sue the defendant as an executor generally. On proof that the defendant was an executor *de son tort* the plaintiff was entitled to recover from the defendant as executor.

258    The concept of executor *de son tort* is based upon estoppel so that one acting as an executor is faced with the consequences of so acting.

259    It seems to me that the status to act as an executor flows from a person being named to that capacity in the will of the deceased. If the person so named obtains letters probate of the will he is confirmed in the capacity of executor and is generally immune from personal liability. He acts as executor and the very concept of an executor is that he acts as a representative.

260    If a person is named in a will as an executor and assumes the responsibility of so acting without first obtaining letters probate, I fail to follow how he cannot be said to be acting other than an executor but he is subject to personal liability in the administration of the estate. Having acted as an executor he has subjected himself to being treated as such and acts in that capacity as a representative of the deceased either rightly or wrongly.

261    The definition of executor in the *Dominion Succession Duty Act* includes an executor *de son tort*. Because an executor acts in a representative capacity and an executor *de son tort* is an executor, I fail to follow how an executor *de son tort* is not acting in a representative capacity and liable for succession duties in that capacity as he would have drawn that liability upon himself personally by intermeddling in the assets of the estate and thereby becoming an executor *de son tort*.

262    Having concluded that the appellant is an executor *de son tort* and that as an executor *de son tort* the appellant could and did act in a representative capacity it follows that under section 49 of the Act the appellant is personally liable for the payment of duties.

263    The question which follows from this conclusion is to what duties is the appellant personally liable.

264    Counsel for the appellant submitted that the appellant is liable only in respect of the duty payable upon the succession of the widow to the $5,000 legacy which was paid to her by the appellant and which would be in the approximate amount of $2,500. He further submitted that this approximate amount of $2,500 was included in the amount of $428,227.10 paid by the executor to the Department on account of the duties, although he is frank to admit that no part of the amount paid on account of duties was identified or allocated as being applicable to duty on this particular succession of the $5,000 legacy.

Henderson v. Minister of National Revenue, 1973 CarswellNat 189

1973 CarswellNat 189, [1973] C.T.C. 636, [1973] F.C.J. No. 800, 73 D.T.C. 5471

265     It is true that every successor is liable for the duty in respect of the particular succession to him, which presupposes a levy of duty on each succession, but under subsection 13(2) all duties assessed and levied under the Act are payable by and recoverable from the executor.

266     Under section 49 the executor is obligated, before transferring any property to an heir, to "pay all the duties assessed and levied under this Act". If an executor does not fulfil that obligation then the executor "is personally liable for the duties" and to a penalty equivalent to double the amount of "such duties".

267     The significant words are "all the duties". In my view the meaning of the section is clear. The executor, by contravening the prohibition from transferring any property of the deceased under his administration to a successor without first having paid all of the duties assessed and levied under the Act or furnished satisfactory security therefor, then draws upon himself personally the liability to pay "all the duties" and not only the duty on the amount of the particular succession which he has paid out.

268     Counsel for the appellant next contended, if the appellant is an executor and is liable for the duties in its representative capacity, which I have found to be the case in both circumstances, then the appellant is not liable for Canadian duties. He argued that because the appellant is a foreign executor, the Canadian taxes cannot be enforced against the executor in the foreign jurisdiction.

269     That premise is undisputable. In *United States of America* v *Harden*, [1963] S.C.R. 366, Mr Justice Cartwright referred to the well established rules (i) that a foreign state is precluded from suing in this country for taxes due under the law of the foreign state and (ii) that in a foreign judgment there is no merger of the original cause of action, it remains a claim for foreign taxes.

270     The converse is equally so. The Canadian Government cannot go to the foreign jurisdiction and there sue a person found in that jurisdiction for taxes for which he has been declared to be liable in Canada.

271     From this premise counsel for the appellant argued that because the appellant is not "liable" for Canadian taxes in New York State it cannot be liable in this jurisdiction.

272     There is a fallacy in this logic. The appellant is not liable in the State of New York for Canadian taxes because a judgment therefor cannot be enforced there. That does not detract from the fact that the appellant can be liable for Canadian taxes in Canada and that liability can be enforced in Canada against assets in Canada.

273     This was clearly stated by the present Chief Justice of this Court in *Hunt et al* v *The Queen*, [1967] 1 Ex. C.R. 101, [1966] C.T.C. 474, 66 D.T.C. 5322, where he said at page 103 [476, 5323-4]:

The situation is that the Estate has been validly made subject to tax under and by virtue of Canadian law but a judgment for the tax is enforceable only in Canada as, of course, the Courts of another country will not lend their assistance to enforce payment of taxes owing to the Government of Canada. The Government of Canada can only enforce payment of this tax debt, therefore, if it can find property of the Estate subject to execution in Canada.

274     The Chief Justice then found that shares of the estate were situated in Quebec and were therefore validly seized under a writ of *fieri facias* issuing out of this Court.

275     This Court is not precluded from determining the liability to tax of a foreign executor simply because there may be no assets in Canada against which a judgment for the tax can be enforced.

276     In paragraph 20 of its statement of claim the appellant claims as follows:

20. The Appellant therefore claims

   1) a declaration that the purported assessment is null and void;

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1973 CarswellNat 189, [1973] C.T.C. 636, [1973] F.C.J. No. 800, 73 D.T.C. 5471

2) in the alternative, a declaration that it is not liable to pay any amount under s 49 of The Dominion Succession Duty Act;

3) in the further alternative a declaration that the liability of the Appellant, if any, under s 49 of The Dominion Succession Duty Act is limited either

i) to the amount transferred by the Appellant in contravention thereof, or

ii) to the balance of the duties owing by the Estate which duties should be re-assessed after amending the value of the assets of the Estate situated in Canada and subject to tax under the Act by

a) reducing the fair market value of the shares of Campbell Chibougamau Mines Limited owned by the Estate from $8 per share to not more than $2.25 per share;

b) reducing the fair market value of the shares of Chibougamau Mining & Smelting Co Inc owned by the Estate from $2.65 per share to not more than 92c per share;

c) excluding the warrants to purchase shares of Campbell Chibougamau Mines Limited owned by the Estate from the assets situated in Canada subject to tax under the Act;

and by deducting one half the provincial duties paid by the Estate from the duty otherwise payable;

4) its costs of this Appeal.

277     For the reasons above expressed I decline the declaration that the assessment herein is null and void as prayed for in paragraph 20(1).

278     I also decline a declaration that the appellant is not liable to pay any amount under section 49 of the *Dominion Succession Duty Act* as prayed for in paragraph 20(2) and I also decline a declaration that the liability of the appellant under section 49 is limited to the amount of $5,000 transferred by the appellant to a beneficiary in contravention of section 49 as prayed for in paragraph 20(3)(i).

279     I shall not declare that the liability of the appellant shall be reduced by a reduction in the fair market value of the shares of Campbell Chibougamau Mines Limited and Chibougamau Mining & Smelting Co, Inc owned by the estate from the respective amounts of $8 per share and $2.65 per share as found by the Minister to have been the fair market value to lesser amounts, all as prayed for in paragraph 20(3)(ii)(a) and (b) of the statement of claim.

280     I decline to do so because I have found in the appeal by the executors (as contrasted with the appeal of the Bank of New York) that the valuation by the Ministers should not be disturbed. It was agreed among the parties that the determination of this issue in the appeal of the executors would be accepted as determinative of this same issue on the appeal of the Bank of New York.

281     With respect to paragraph 20(3)(ii)(c) of the statement of claim I have found in the appeal of the executors that the situs of the warrants to purchase shares in Campbell Chibougamau Mines Limited do not have a situs in Canada and should be excluded from the computation of tax on assets of the estate situated in Canada.

282     Accordingly there shall be a declaration to that effect.

283     Further the appellant claims under paragraph 20(3) of its statement of claim that there shall be deducted from the duty otherwise payable one half of the duty paid to the Province of Ontario.

284     Paragraph 13 of the Minister's statement of defence is as follows:

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1973 CarswellNat 189, [1973] C.T.C. 636, [1973] F.C.J. No. 800, 73 D.T.C. 5471

13. With reference to paragraph 19 of the Statement of Claim, the Respondent does not admit that $212,448.10 has been paid to the Province of Ontario, but concedes and is prepared to allow in computing the duty otherwise payable, an amount in respect of any duty paid to the Province of Quebec and to the Province of Ontario, calculated in accordance with the formula set forth in subsection (2) of section 12 of the *Dominion Succession Duty Act*.

WHEREFORE the Respondent prays:

(a) the appeal be allowed and the assessment referred back to the Respondent for the purpose of allowing as a deduction, one half of the provincial duties paid to either the Province of Ontario or the Province of Quebec;

(b) dismissing the appeal in every other respect with costs payable to the Respondent.

285    In assessing the appellant as he did the Minister did not allow a credit calculated in accordance with section 12 of the *Dominion Succession Duty Act*.

286    The appellant is entitled to the relief sought in paragraph 20(3) of its statement of claim.

287    This is admitted by the Minister but the amount of duty paid to the Province of Ontario is in dispute. No evidence was adduced in this respect. I should think that the amount so paid is readily ascertainable but it has been pointed out to me that, while the authorities of the Province of Ontario have accepted the valuation of the assets of the estate in Canada found by the Minister of National Revenue, the Province has not assessed the estate. If this is so then the duty payable by the estate has not been determined and accordingly the amount of the deduction is not ascertainable. Unless this amount can be agreed upon by the parties it may be that a reference should be directed to ascertain this amount.

288    The Minister, in his prayer for relief asks that the appeal be allowed and the assessment referred back to allow a deduction of one half of the Provincial duties paid, but that in all other respects the appeal should be dismissed with costs. The reason the Minister does this is for the obvious reason that if he asked that the appeal be dismissed he would be asking to deprive the appellant of relief to which he concedes it is entitled. Because the Minister has admitted the appellant's right to relief in this respect it follows that the appellant is not entitled to its costs in this respect.

289    It is my present view that because the appellant was successful only with respect to the issue as to the situs of the share purchase warrants it is entitled to its costs attributable to that issue only and that the Minister should be entitled to his costs with respect to all other issues upon which he has been successful. The issue of the situs of the share warrants was determined in the appeal of the executors, which by agreement was accepted as determinative of this issue in the appeal of the Bank of New York. Therefore there would be no costs attributable to this issue incurred at the trial.

290    In accordance with Rule 337 I would direct that Counsel for the Minister shall prepare a draft of an appropriate judgment to implement the conclusions herein.

291    If counsel for the appellant is in agreement with the form of the draft judgment and that it conforms to my conclusions as expressed above then counsel for the Minister may move for judgment in writing under Rule 324 without the necessity of counsel appearing.

292    However if such consent is not forthcoming the matter may be spoken to.

---

**End of Document**                     Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# TAB 42

23 Fla. L. Weekly Fed. C 939

677 F.3d 1068
United States Court of Appeals,
Eleventh Circuit.

HOLSTON INVESTMENTS, INC. B.V.I.,
Albert P. Hernandez, Plaintiffs–Appellees,

v.

LANLOGISTICS CORP., Defendant–Appellant.

Nos. 10–13442, 11–11122.   |   April 17, 2012.

**Synopsis**
**Background:** Former shareholders of company sued company's owner after it sold company, along with two others, to third party, alleging breach of their right of first refusal respecting sale of company. The United States District Court for the Southern District of Florida, No. 1:08-cv-21569-FAM, Federico A. Moreno, Chief Judge, granted summary judgment to shareholders, and company appealed.

**Holdings:** The Court of Appeals held that:

[1] as a matter of first impression in the circuit, a dissolved corporation has no principal place of business, for purposes of diversity jurisdiction;

[2] dissolved corporation was only a citizen of Delaware, and this diversity jurisdiction existed; and

[3] district court prematurely decided a disputed issue of material fact in granting summary judgment.

Affirmed in part, reversed in part, and remanded.

West Headnotes (10)

**[1]    Federal Courts**
         🗝 Jurisdiction
         Whether a court has subject-matter jurisdiction to hear a matter is a question of law that Court of Appeals reviews de novo.

         6 Cases that cite this headnote

**[2]    Federal Courts**
         🗝 Questions of Law in General
         A court's application of law to facts receives de novo review.

         2 Cases that cite this headnote

**[3]    Federal Courts**
         🗝 Summary judgment
         Court of Appeals reviews the district court's grant of summary judgment de novo, applying the same legal standards as the district court.

         2 Cases that cite this headnote

**[4]    Federal Courts**
         🗝 Purpose of diversity jurisdiction
         Congress extends the benefits and safeguard of federal courts to provide a separate forum for out-of-state citizens against the prejudices of local courts and local juries. 28 U.S.C.A. § 1332(a)(1).

         Cases that cite this headnote

**[5]    Federal Courts**
         🗝 Time as of which jurisdiction determined; change of citizenship pending suit
         Diversity jurisdiction is determined at the time the complaint was filed. 28 U.S.C.A. § 1332(a).

         1 Cases that cite this headnote

**[6]    Federal Courts**
         🗝 Coplaintiffs and Codefendants;  Complete Diversity
         To meet the requirements of diversity jurisdiction, the citizenship of each plaintiff must be different from that of each defendant. 28 U.S.C.A. § 1332(a).

         2 Cases that cite this headnote

**[7]    Federal Courts**
         🗝 Place of business

Holston Investments, Inc. B.V.I. v. LanLogistics Corp., 677 F.3d 1068 (2012)

23 Fla. L. Weekly Fed. C 939

A dissolved corporation has no principal place of business, for purposes of diversity jurisdiction. 28 U.S.C.A. § 1332(c)(1).

Cases that cite this headnote

[8]    **Federal Courts**
       👉 Corporations and Other Organizations

       **Federal Courts**
       👉 Place of business

Dissolved corporation was only a citizen of Delaware, where it was incorporated, and not a citizen of Florida, where it had maintained its corporate headquarters, for purposes of diversity jurisdiction in shareholders' suit alleging breach of their right of first refusal respecting the sale of the corporation, where corporation dissolved and formally withdrew from business before suit was filed. 28 U.S.C.A. § 1332(c)(1).

Cases that cite this headnote

[9]    **Corporations and Business Organizations**
       👉 Agreements for transaction

The determination of the purchase price of a company in a package purchase requires that the fair market value of the company be considered, for purposes of party's exercise of right of first refusal respecting sale of company.

Cases that cite this headnote

[10]   **Federal Civil Procedure**
       👉 Corporations and business organizations

       **Federal Courts**
       👉 Need for further evidence, findings, or conclusions

By deciding as a matter of law that the purchase price of company that owner sold, along with two others, to third party was $450,000, the district court prematurely decided a disputed issue of material fact in granting summary judgment to company's shareholders in their suit alleging owner breached their right of first refusal respecting sale of company, warranting remand for factual findings regarding the fair market value of each entity sold in the package deal to identify the percentage of the $3.5

million purchase price used to purchase the company; owner had not had an opportunity to present evidence on the fair market value of the company and the two others it sold or possible tax incentives for allocating $450,000 of the purchase price to the company.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*1069** Jamie Zysk Isani, Marty Steinberg, Thomas Richard Julin, Hunton & Williams, LLP, Adriana Riviere–Badell, Kobre & Kim, Christopher N. Johnson, Gray Robinson, PA, Miami, FL, for Plaintiffs–Appellees.

Christopher N. Bellows, Jose A. Casal, Michael Edward Garcia, Rebecca M. Plasencia, Holland & Knight, LLP, Miami, FL, for Defendant–Appellant.

Appeals from the United States District Court for the Southern District of Florida.

Before TJOFLAT, PRYOR and FAY, Circuit Judges.

**Opinion**

PER CURIAM:

LanLogistics Corp. raises two issues on appeal. The first issue requires us to determine the citizenship of a dissolved corporation for purposes of diversity jurisdiction. The second issue involves whether summary judgment was appropriately entered where there may have been a genuine issue of material fact. We affirm the district court's holding as to the first issue, but reverse and remand for factual findings on the second issue.

**I.**

LanLogistics owned a company named LanBox Inc., which facilitates delivery of consumer purchases between customers in the United States, Latin America, and Europe. In 2007, LanLogistics sold LanBox and two other companies to Paul Gartlan ("Gartlan"). Gartlan paid $3.5 million for the three companies. The parties allocated $450,000 of the purchase price to LanBox.

LanLogistics's sale of LanBox breached a contract it previously formed with Holston Investments Inc. B.V.I. ("Holston"). In 2004, LanLogistics had promised Holston a right of first refusal, but LanLogistics never gave Holston an opportunity to match Gartlan's offer to purchase LanBox.

Alleging diversity jurisdiction, Holston sued in federal court. Holston is a citizen of Florida. LanLogistics was incorporated in Delaware and maintained its corporate headquarters in Miami, Florida, but by the time Holston filed suit, LanLogistics had dissolved and formally forfeited its authority **\*1070** to conduct business in Florida.[1]

After two years of litigation and final judgment had been entered on behalf of Holston, LanLogistics challenged the district court's subject-matter jurisdiction and moved to vacate the judgment. In support, LanLogistics asserts it is a citizen of Florida, like Holston, and that the parties are therefore not diverse under 28 U.S.C. § 1332.

## II.

**[1]** **[2]** **[3]** Whether a court has subject-matter jurisdiction to hear a matter is a question of law that we review *de novo. Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1340 (11th Cir.2011). A court's application of law to facts also receives *de novo* review. *United States v. Frank*, 599 F.3d 1221, 1228 (11th Cir.2010), *cert. denied,* ——— U.S. ———, 131 S.Ct. 186, 178 L.Ed.2d 112 (2010). Similarly, "[w]e review the district court's grant of summary judgment *de novo,* applying the same legal standards as the district court." *McCormick v. City of Fort Lauderdale,* 333 F.3d 1234, 1242–43 (11th Cir.2003) (citation omitted). "Summary judgment is appropriate if the evidence establishes 'no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " *Id.* at 1243 (citing Fed.R.Civ.P. 56(c)).

## III.

**[4]** Federal courts have subject-matter jurisdiction over civil actions in which: (1) "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs"; and (2) the action is between "citizens of different States." 28 U.S.C. § 1332(a)(1). Congress extends the benefits and safeguard of federal courts to "provide a separate forum for out-of-state citizens against the prejudices of local courts and

local juries." S.REP. NO. 1830, at 3 (1958), *reprinted in* 1958 U.S.C.C.A.N. 3099, 3101–02.

**[5]** **[6]** Diversity jurisdiction is determined at the time the complaint was filed. *See Smith v. Sperling,* 354 U.S. 91, 93 n. 1, 77 S.Ct. 1112, 1 L.Ed.2d 1205 (1957) ("[J]urisdiction, once attached, is not impaired by a party's later change of domicile."). To meet the jurisdictional requirements of § 1332(a), the citizenship of each plaintiff must be different from that of each defendant. *Owen Equip. & Erection Co. v. Kroger,* 437 U.S. 365, 373, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978). "[A] corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business ...." 28 U.S.C. § 1332(c)(1). The issue here is whether a dissolved or inactive corporation has a principal place of business. The Eleventh Circuit has not decided this issue, and the circuits that have disagree.

The Second Circuit has held that, for purposes of analysis under § 1332, a corporation's principal place of business must be identified regardless of whether the corporation is defunct. *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.,* 933 F.2d 131, 141 (2d Cir.1991). The rule recognizes that when a corporation closes its doors and winds up its business, it might still have a local presence that would alleviate concerns about local bias. Finding citizenship in the state where a corporation last conducted business ensures **\*1071** federal jurisdiction will not be extended to corporations to which Congress had no intention of providing the benefit. *Id.*

The Third Circuit has also adopted a bright-line rule, but it rejects the idea that a court should strain to identify a principal place of business when one may not exist. In the Third Circuit, a dissolved or inactive corporation is a citizen only of the state in which it was incorporated. *Midlantic Nat'l Bank v. Hansen,* 48 F.3d 693, 696 (3d Cir.1995).

The Fourth and Fifth Circuits prefer the flexibility of a facts and circumstances test. *Harris v. Black Clawson Co.,* 961 F.2d 547, 551 (5th Cir.1992); *see also Athena Auto., Inc. v. DiGregorio,* 166 F.3d 288, 291 (4th Cir.1999). In those circuits, the extent of a corporation's local character drives the determination as to whether a principal place of business exists for purposes of federal jurisdiction. There, a corporation's last place of business is instructive but not dispositive. "[W]here a corporation has been inactive in a state for a substantial period of time ... that state is not the

corporation's principal place of business ...." *Harris*, 961 F.2d at 551 (footnotes omitted).

A recent decision by the Supreme Court is also relevant to this determination. In *Hertz Corp. v. Friend,* the Supreme Court held that simple jurisdictional tests are preferable even if application of the rule occasionally cuts against the basic rationale of § 1332. 559 U.S. 77, 130 S.Ct. 1181, 1193–94, 175 L.Ed.2d 1029 (2010).

> Complex jurisdictional tests complicate a case, eating up time and money as the parties litigate, not the merits of their claims, but which court is the right court to decide those claims. Complex tests produce appeals and reversals, encourage gamesmanship, and, again, diminish the likelihood that results and settlements will reflect a claim's legal and factual merits.

*Id.* at 1193 (citations omitted). The Court also reasoned that, because courts have an independent obligation to determine whether subject-matter jurisdiction exists, courts require "straightforward rules under which they can readily assure themselves of their power to hear a case." *Id.* Accordingly, the Court announced a simple rule wherein a corporation's principal place of business is determined based on where the corporation's "nerve center" is located.

[7]    Considering the jurisdictional tests in the various circuits and the guidance of the Supreme Court in *Hertz*, we join the Third Circuit in holding a dissolved corporation has no principal place of business. This bright-line rule may open federal courts to an occasional corporation with a lingering local presence, but undeserved access to a fair forum is a small price to pay for the clarity and predictability that a bright-line rule provides. Moreover, in our opinion, the Third Circuit rule aligns most closely with the Supreme Court's analysis in *Hertz*. By contrast, for example, the Second Circuit's rule focuses not on a corporation's nerve center but where business was last conducted. Conceivably, under that rule a corporation could be considered a citizen of a state in which it was not a citizen before dissolution.

[8]    Here, LanLogistics dissolved and formally withdrew from business before Holston filed suit. Under the rule we adopt today, LanLogistics is therefore only a citizen of Delaware, and this court has subject-matter jurisdiction.

## IV.

[9]    In a supplemental summary judgment order the district court held as a matter of law that the purchase price of LanBox was $450,000. In its analysis, the district court rejected LanLogistics's argument **\*1072** that, under the reasoning in *Pantry Pride Enterprises., Inc. v. Stop & Shop Cos., Inc.,* 806 F.2d 1227, 1231 (4th Cir.1986), the determination of the purchase price of a company in a package purchase requires that the fair market value of the company be considered. We find the reasoning in *Pantry Pride* persuasive and the district court's holding in error.

In *Pantry Pride,* the Fourth Circuit rejected the price allocated to a lease in a package purchase because the listed price represented neither the market value nor the actual value the parties placed on the lease. *Id.* In that case, a lessor had a right of first refusal option on a lease of a supermarket. *Id.* at 1228. The lessor sued when the lessee offered to sell the lease and various equipment as part of a package deal to a third party but refused to sell the lessor the lease at the price allocated in the package deal. *Id.* The court held that the lessor could exercise its right of first refusal but not at the artificially low price allocated to the lease in the package agreement. It found that the low price was allocated to the lease for tax purposes, and the lessor would enjoy a windfall if allowed to purchase the lease at the artificial price. *Id.* at 1231. The lessor was only entitled to purchase the lease at a fair price offered by a third party, but the artificial price allocated to the lease bore little relation to its worth. *Id.*

Requiring as a matter of law that the price allocated in a package purchase be used as the price for these types of claims may also discourage commerce or allow parties to destroy contractual rights. If first refusal rights could be exercised only at the price allocated in a contract, then buyers would be forced to allocate high prices to assets that are subject to rights of first refusal. *Id.* The inability to manipulate purchase prices for tax purposes ultimately may act as a restraint on alienation. *Id.* "The tax consequences of the transaction for the parties to a sale should not vary because some third party may possess a first refusal right." *Id.* Additionally, by inflating the price assigned to the subject of a first-refusal option, parties could defeat a contractual right of first refusal. *Id.* at 1231–32. While parties should be allowed to allocate prices for tax purposes, in a package deal, manipulated price

**Holston Investments, Inc. B.V.I. v. LanLogistics Corp., 677 F.3d 1068 (2012)**

23 Fla. L. Weekly Fed. C 939

allocations should not be determinative as to agreements between those who extend or hold first-refusal options.

 **[10]**   Because the issue of LanBox's purchase price was disputed and the fair market value of LanBox and the other companies in the package deal should have been considered, summary judgment was improper. By deciding the issue on summary judgment before LanLogistics had an opportunity to present evidence on the fair market value of the companies or possible tax incentives for its purchase price allocation, the district court prematurely decided a disputed issue of material fact. *See Holly v. Clairson Indus., L.L.C., 492 F.3d 1247, 1264 (11th Cir.2007)* (finding that it was error for the district court to grant summary judgment when there were genuine issues of material fact). Therefore, the district court's supplemental

summary judgment order is reversed and remanded. On remand, a determination should be made regarding the fair market value of each company in the package deal to identify the percentage of the $3.5 million purchase price used to purchase LanBox.

The district court is AFFIRMED in part and REVERSED in part. The case is remanded for determination of the purchase price and calculation of damages.

**AFFIRMED IN PART AND REVERSED IN PART.**

**Parallel Citations**

23 Fla. L. Weekly Fed. C 939

---

Footnotes

1       LanLogistics dissolved in Delaware on December 27, 2007. By January 16, 2008, the Florida Secretary of State processed and filed documents withdrawing LanLogistics's authority to transact business in Florida. Holston filed this lawsuit on June 6, 2008—more than four months after LanLogistics lost its ability to conduct business in Florida.

---

          © 2014 Thomson Reuters. No claim to original U.S. Government Works.

 © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 43

2002 CarswellOnt 3839, [2002] O.J. No. 4309, [2002] O.T.C. 486, 118 A.C.W.S. (3d) 9

2002 CarswellOnt 3839
Ontario Superior Court of Justice

Imoney Corp. v. Quebecor Communications Inc.

2002 CarswellOnt 3839, [2002] O.J. No. 4309, [2002] O.T.C. 486, 118 A.C.W.S. (3d) 9

# Imoney Corp., Plaintiff/Defendant by Counterclaim and Quebecor Communications Inc., Defendant/Plaintiff by Counterclaim

Hoy J.

Heard: May 30, 2002
Judgment: May 31, 2002
Docket: 01-CV-217455CM3

Counsel: *Joseph M. Steiner*, for Plaintiff/Defendant by Counterclaim
*Teresa J. Walsh*, for Defendant/Plaintiff by Counterclaim

Subject: Civil Practice and Procedure; Corporate and Commercial; Public

**Related Abridgment Classifications**

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**

**Arbitration --- Submission or agreement to arbitrate — Parties — General**

**Arbitration --- Relation to court proceedings — Stay of court proceedings — Whether matter within terms of arbitration clause**

**Table of Authorities**

**Cases considered by *Hoy J.*:**

*Brio Beverages (B.C.) Inc. v. Koala Beverages Ltd.*, 1998 CarswellBC 2573, 114 B.C.A.C. 247, 186 W.A.C. 247, 58 B.C.L.R. (3d) 178, [1999] 6 W.W.R. 219 (B.C. C.A.) — referred to

*Greenwood Shopping Plaza Ltd. v. Neil J. Buchanan Ltd. (No. 1), (*sub nom. *Greenwood Shopping Plaza Ltd. v. Beattie)* [1980] 2 S.C.R. 228, 111 D.L.R. (3d) 257, 32 N.R. 163, 39 N.S.R. (2d) 119, 10 B.L.R. 234, [1980] I.L.R. 1-1243, 71 A.P.R. 119, 1980 CarswellNS 26, 1980 CarswellNS 80 (S.C.C.) — considered

*Linden Gardens Trust Ltd. v. Lenesta Sludge Disposals Ltd.*, [1993] 3 All E.R. 417, (*sub nom. *St. Martin's Property Corp. v. Sir Robert McAlpine Ltd.)* [1994] 1 A.C. 85 (U.K. H.L.) — referred to

*London Drugs Ltd. v. Kuehne & Nagel International Ltd.* (1992), [1993] 1 W.W.R. 1, [1992] 3 S.C.R. 299, (*sub nom. *London Drugs Ltd. v. Brassart)* 143 N.R. 1, 73 B.C.L.R. (2d) 1, 43 C.C.E.L. 1, 13 C.C.L.T. (2d) 1, (*sub nom. *London Drugs Ltd. v. Brassart)* 18 B.C.A.C. 1, (*sub nom. *London Drugs Ltd. v. Brassart)* 31 W.A.C. 1, 97 D.L.R. (4th) 261, 1992 CarswellBC 913, 1992 CarswellBC 315 (S.C.C.) — referred to

2002 CarswellOnt 3839, [2002] O.J. No. 4309, [2002] O.T.C. 486, 118 A.C.W.S. (3d) 9

**Statutes considered:**

*Arbitration Act, 1991*, S.O. 1991, c. 17
 s. 7(1) — considered

*Courts of Justice Act*, R.S.O. 1990, c. C.43
 s. 106 — considered

**Rules considered:**

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194
 R. 1.03 "proceeding" — considered

 R. 21.01(3)(c) — considered

 R. 39.01(4) — referred to

*Hoy J.*:

1  This is a motion by the defendant Quebecor Communications Inc. ("Quebecor") to stay the plaintiff Imoney Corp.'s ("Imoney") motion for summary judgment in this action.

**Background**

2  Canoe Inc. ("Canoe"), an indirect subsidiary of Quebecor, and Imoney entered into an asset purchase agreement (the "APA") pursuant to which Imoney sold its financial services website operations and related assets to Canoe. $20 million of the purchase price was paid by the issuance of convertible, retractable preferred shares of Canoe (the "Preferred Shares").

3  The APA contains a clause requiring the "Parties" to settle "Disputes" by arbitration. A Dispute is defined as "any controversy, dispute, claim, question or difference [which] arises with respect to the matters covered by this Agreement". "Agreement" is defined to mean the APA, including all schedules and all instruments supplementing or amending the APA. Parties is defined as Canoe and Imoney, collectively.

4  The APA provided that it was a condition of closing for the benefit of Imoney that Quebecor deliver and sign a put agreement substantially in the form attached to the APA as a schedule. In connection with the closing, Quebecor and APA executed the Put Agreement. Under the Put Agreement, Quebecor "irrevocably" granted to Imoney the right to require Quebecor to purchase the Preferred Shares if they could not be redeemed as a matter of corporate law or, if redeemable at law, they were not redeemed following exercise by Imoney of the retraction right. Quebecor agreed to pay the "complete" purchase price of the Preferred Shares on closing. Canoe is not a party to the Put Agreement. The Put Agreement was subsequently amended at Quebecor's request to provide that Imoney would not exercise the retraction right, but could instead require Quebecor to purchase all of the Preferred Shares. The Put Agreement contains a comprehensive "entire agreement" clause and an attornment clause pursuant to which Quebecor and Imoney irrevocably submitted "to the non-exclusive jurisdiction of the courts of Ontario with respect to any matter arising hereunder or related hereto".

5  Imoney gave notice to Quebecor under the Put Agreement, requiring it to purchase the Preferred Shares. Quebecor refused to pay, alleging that Imoney had breached representations and warranties under the APA. Imoney sued Quebecor for specific performance of the Put Agreement. Quebecor filed a statement of defence and counterclaim based upon breach of representation and warranty. Imoney subsequently brought a motion for summary judgment. About two months after Quebecor filed its responding motion record in respect of that motion, "Canoe/Quebecor" gave notice to Imoney requiring arbitration pursuant to s.12.8 of the APA of its claims based on alleged breaches by Imoney of representations and warranties under the

2002 CarswellOnt 3839, [2002] O.J. No. 4309, [2002] O.T.C. 486, 118 A.C.W.S. (3d) 9

APA. It then brought this motion to stay Imoney's motion for summary judgment. While Canoe/Quebecor's notice requiring arbitration refers only to its claims in respect of breaches of representations and warranties, Quebecor's position, as reflected in its motion materials, its that Imoney's claim in respect of the Put Agreement should also be resolved in that arbitration.

**Issue**

6      The issue before me is whether I should stay Imoney's summary judgment motion pursuant to s.7(1) of the *Arbitration Act*, s.106 of the *Courts of Justice Act* or Rule 21.03(c). (Quebecor referred to Rule 21.03(c) in its motion record, but not in its factum or oral submissions.)

**Analysis**

***The Arbitration Act***

7      Section 7(1) of the *Arbitration Act* provides as follows:

If a party to an arbitration agreement commences a proceeding in respect of a matter to be submitted to arbitration under the agreement, the court in which the proceeding is commenced shall, on the motion of another party to the arbitration agreement, stay the proceeding.

8      Quebecor and Imoney agree that the APA constitutes an arbitration agreement. The threshhold question is whether Quebecor is a "party" to the APA, and therefore has status to bring this motion under s.7(1) of the *Arbitration Act*. Quebecor was not an initial party to the APA. The APA provides that it is not assignable by either party, "without the prior written consent of the other party, which consent shall not be unreasonably withheld". Quebecor acknowledges that Canoe has not actually assigned its rights under the APA to Quebecor. Quebecor sought consent to assignment by letter sent to Imoney's counsel only about three weeks ago, after Imoney had filed its factum in respect of the summary judgment motion raising the issue of consent. Imoney requested a copy of the proposed assignment and that Quebecor set out the reasons or purpose of the proposed assignment. Quebecor had not responded when I heard this motion. Quebecor now says the direction dated as of May 31, 2001, referred to below, constitutes the proposed assignment.

9      Quebecor argues that for the purposes of s.7(1) of the *Arbitration Act* it should be considered a party to the APA because it is a "*de facto* assignee" of Canoe's rights under the APA. Quebecor says it became a "*de facto* assignee" because, pursuant to the agreement between Imoney and Quebecor amending the Put Agreement, Quebecor relieved Canoe of the liability associated with the Preferred Shares.

10      Quebecor also points to the direction, referred to above, dated "as of May 31, 2001" from Canoe to Quebecor, whereby, in consideration of Quebecor's covenant to assume all financial liability relating to the Preferred Shares, Canoe agrees to transfer to Quebecor any and all claims it may have against Imoney for misrepresentations under the APA *once* Imoney consents to the transfer. May 31, 2000 pre-dates the put amending agreement and any assertion by Quebecor of misrepresentations under the APA, as well as the statement of claims and statement of defence and counterclaim in this action. The direction is an exhibit to Quebecor's counsel's assistant's affidavit, filed as supplementary motion material in February 2002. The direction purports to have been signed by Mr. Simard on behalf of Canoe. There is no explanation as to why Mr. Simard did not attest to its execution and delivery in his own affidavit filed on this motion. Imoney argues the direction is not admissible in evidence on this matter as the affiant did not specify the source of her information regarding the document and the fact of her belief that the document is authentic as required by Rule 39.01(4). Nothing turns on this direction. Quebecor only says that it constitutes a proposed form of assignment.

11      I do not accept that Quebecor became a party to the APA for the purposes of s.7(1) of the Arbitration Agreement by relieving Canoe of the liability associated with the Preferred Shares. There is no authority for the concept of a "defacto assignee". Canoe specifically agreed in the APA that it could not assign its rights under the APA without Imoney's consent, not to be unreasonably withheld. An attempted assignment of contractual rights in breach of a contractual prohibition is ineffective unless the prohibition is void as being contrary to public policy: *Linden Gardens Trust Ltd. v. Lenesta Sludge Disposals Ltd.*,

[1993] 3 All E.R. 417 (U.K. H.L.) and *Brio Beverages (B.C.) Inc. v. Koala Beverages Ltd.* (1998), [1999] 6 W.W.R. 219 (B.C. C.A.). Quebecor has not convinced me that the restriction on assignment in the APA is contrary to public policy.

12    (1980), 111 D.L.R. (3d) 257 (S.C.C.) Counsel for Quebecor referred briefly to *Greenwood Shopping Plaza Ltd. v. Beattie* (1980), 111 D.L.R. (3d) 257 (S.C.C.), and argued that although not a party to the APA, Quebecor should be entitled to the benefit of the representations and warranties made under the APA and to invoke the arbitration clause in the APA as a third party beneficiary. Counsel for Quebecor has not pointed me to anything in the APA which suggests that it was the intention of Canoe and Imoney that Quebecor have the benefit of its provisions. In fact, the evidence is that at Quebecor's insistence it did not become a party to the APA. In my view, Quebecor does not fall within the narrow exceptions to the doctrine of privity of contract outlined in *Greenwood* and the more recent Supreme Court of Canada decision in *London Drugs Ltd. v. Kuehne & Nagel International Ltd.* (1992), 97 D.L.R. (4th) 261 (S.C.C.).

13    For the above reasons, I have concluded Quebecor does not have status to bring this motion under s.7(1) of the *Arbitration Act*.

### S.106, Courts of Justice Act

14    The fact that Quebecor is not a party to the APA does not affect its ability to bring a motion under s.106 of the *Courts of Justice Act*. Section 106 provides as follows:

> A court on its own initiative or on motion by any person, whether or not a party, may stay any proceeding in the court on such terms as are considered just.

15    Imoney argues that this court does not have jurisdiction under s.106 because a motion for summary judgment is not a "proceeding". Imoney says the *Rules of Civil Procedure* define a "proceeding" as an action or an application, and a motion for summary judgment is neither. Black's Law Dictionary says "proceeding" may refer not only to a complete remedy but also to a mere procedural step that is part of a larger action. A motion for summary judgment can be dispositive of an action; in my view, the term "proceeding" in s.106 includes a motion for summary judgment and the court has jurisdiction.

16    The question is whether the court should exercise that jurisdiction. I have concluded it should not. The summary judgment motion seeks specific performance of the Put Agreement. In the Put Agreement, Quebecor and Imoney specifically attorned to the "non-exclusive jurisdiction of the courts of Ontario with respect to any matter arising hereunder or related hereto". The arbitration provision is in the APA. Only Canoe or Imoney can invoke it and only with respect to claims arising with respect to matters covered by the APA. Non-performance by Quebecor under the Put Agreement between Quebecor and Imoney is not a matter covered by the APA between Canoe and Imoney. While the form of the Put Agreement was a schedule to the APA, once delivered, it became an independent document, with an independent dispute resolution procedure. In the comprehensive entire agreement clause in the Put Agreement, Quebecor agrees that in entering into the Put Agreement it did not rely on any representations or warranties not expressly made in the Put Agreement or in the agreements delivered pursuant to it. The APA was not delivered pursuant to the Put Agreement.

17    The use of the word 'irrevocable' to describe Imoney's right under the Put Agreement, and the unusual and clearly intended addition of the word "complete" before the reference to the purchase price to be paid by Quebecor for the Preferred Shares make clear the parties' intentions that Quebecor's obligations under the Put Agreement are not conditional upon non-breach of representation and warranty by Imoney under the APA.

### Rule 21.03(c)

18    Rule 21.03(c) provides that, "A defendant may move before a judge to have an action stayed or dismissed on the ground that, ... (c) another proceeding is pending in Ontario or another jurisdiction between the same parties in respect of the same subject matter; or ..."

Imoney Corp. v. Quebecor Communications Inc., 2002 CarswellOnt 3839

2002 CarswellOnt 3839, [2002] O.J. No. 4309, [2002] O.T.C. 486, 118 A.C.W.S. (3d) 9

19     There is no proceeding pending between Imoney and Quebecor with respect to the subject matter of the summary judgment motion.

**Conclusion**

20     For the above reasons, Quebecor's motion is dismissed and I will proceed to hear Imoney's motion for summary judgment. I propose that counsel make submissions as to costs following disposition of the motion for summary judgment.

End of Document          Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 44

407 B.R. 463
United States Bankruptcy Court,
S.D. New York.

In re GENERAL MOTORS CORP., et at., Debtors.

No. 09–50026 (REG).   |   July 5, 2009.

**Synopsis**

**Background:** Motion was filed for approval of proposed sale of assets of bankrupt automobile manufacturer outside the ordinary course of its business to government-sponsored purchaser. Variety of objections were raised, including objection that sale amounted to improper sub rosa Chapter 11 plan.

**Holdings:** The Bankruptcy Court, Robert E. Gerber, J., held that:

[1] "good business reason" existed for allowing debtor to sell its assets immediately to purchaser sponsored by government, rather than having to wait for confirmation of plan;

[2] government-sponsored purchaser had to be deemed as acting in "good faith";

[3] proposed sale was not an impermissible "sub rosa plan";

[4] "debt" that debtor owed to government, for financing that government had made available in order to keep manufacturer afloat until it could enter bankruptcy and to assist it with its reorganization, could not be restructured as "equity," so as to prevent government from credit-bidding amount of debt;

[5] government's claim could not be equitably subordinated;

[6] debtor's assets could be sold free and clear of successor liability claims;

[7] Chapter 11 plan confirmation requirement, which prevented court from confirming proposed plan unless it provided for "continuation after its effective date of payment of all retiree benefits," was not implicated in connection with sale outside the ordinary course;

[8] debtor did not have to choose between either assuming its dealer agreements and assigning them to purchaser or rejecting them outright but could seek to ameliorate effects of immediate rejection and to provide dealers with softer landing by negotiating deferred termination agreements;

[9] court could not utilize its equitable power to enter "necessary or appropriate" orders, in order to force purchaser to assume certain liabilities of the old debtor-manufacturer based on court's notions of equity;

[10] any objection to use of Troubled Asset Relief Program (TARP) funds in connection with financing that government had provided to debtor was moot; and

[11] debtor's shareholders were not parties aggrieved, with ability to challenge proposed sale.

Sale approved.

West Headnotes (48)

**[1]**   **Bankruptcy**

👉 Time for sale;  emergency and sale outside course of business

Sale outside the ordinary course of business may be used to dispose of all or the bulk of Chapter 11 debtor's assets, outside context of Chapter 11 reorganization plan. 11 U.S.C.A. §§ 363(b), 1123(b)(4).

Cases that cite this headnote

**[2]**   **Courts**

👉 Particular questions or subject matter

While opinion of one bankruptcy judge in judicial district is not, strictly speaking, binding on another, it is practice of bankruptcy court to grant great respect to earlier bankruptcy court precedents from same district.

2 Cases that cite this headnote

**[3]**   **Bankruptcy**

👉 Time for sale;  emergency and sale outside course of business

Even entirety of Chapter 11 debtor's business may be sold, without waiting for plan confirmation, in connection with sale outside the ordinary course of business, if there is good business reason for doing so. 11 U.S.C.A. § 363(b).

2 Cases that cite this headnote

**[4]    Bankruptcy**
👉 Time for sale; emergency and sale outside course of business

In deciding whether there is "good business reason" for allowing Chapter 11 debtor to sell all or substantially all of its assets prior to confirmation of plan, in connection with sale outside the ordinary course of business, bankruptcy court should consider all of the salient factors pertaining to proceeding and act to further diverse interests of debtor, creditors and equity holders. 11 U.S.C.A. § 363.

1 Cases that cite this headnote

**[5]    Bankruptcy**
👉 Time for sale; emergency and sale outside course of business

In deciding whether there is "good business reason" for allowing Chapter 11 debtor to use, sell or lease the bulk of its assets prior to confirmation of plan, in connection with sale outside the ordinary course of business, bankruptcy court may consider the following nonexclusive factors: (1) proportionate value of assets to estate as whole; (2) amount of elapsed time since the filing; (3) likelihood that plan of reorganization will be proposed and confirmed in near future; (4) effect of proposed disposition on future plans of reorganization; (5) proceeds to be obtained from the disposition vis-a-vis any appraisals of property; (6) which of the alternatives of use, sale or lease the proposal envisions; (7) whether property is increasing or decreasing in value; (8) whether estate has the liquidity to survive until confirmation of plan; (9) whether the sales opportunity will still exist at time of plan confirmation and, if not, the likelihood of satisfactory alternative sales

opportunities or a stand-alone plan alternative that is equally desirable, or better, for creditors; and (10) whether there is material risk that, if court defers the sale, the patient will die on operating table. 11 U.S.C.A. § 363(b).

2 Cases that cite this headnote

**[6]    Bankruptcy**
👉 Time for sale; emergency and sale outside course of business

In deciding whether there is "good business reason" for allowing Chapter 11 debtor to sell all or substantially all of its assets prior to confirmation of plan, in connection with sale outside the ordinary course of business, bankruptcy court must consider whether those opposing the sale have produced some evidence that sale is not justified. 11 U.S.C.A. § 363(b).

Cases that cite this headnote

**[7]    Bankruptcy**
👉 Time for sale; emergency and sale outside course of business

Chapter 11 debtor, as part of sale outside the ordinary course of business, may not enter into transaction that would amount to a *sub rosa* plan of reorganization or an attempt to circumvent Chapter 11 requirements for confirmation of plan of reorganization. 11 U.S.C.A. § 363(b).

1 Cases that cite this headnote

**[8]    Bankruptcy**
👉 Time for sale; emergency and sale outside course of business

If proposed sale of Chapter 11 debtor's assets outside the ordinary course of its business has proper business justification which has potential to lead toward confirmation of plan and is not to evade plan confirmation process, then transaction may be authorized. 11 U.S.C.A. § 363(b).

1 Cases that cite this headnote

**[9]    Bankruptcy**

🗝 Time for sale; emergency and sale outside course of business

**Bankruptcy**

🗝 Sale or liquidation

Under bankruptcy statute dealing with sales outside the ordinary course of business, Chapter 11 debtor may sell substantially all of its assets as going concern and later submit plan of liquidation providing for distribution of proceeds of the sale, where, for example, there is need to preserve "going concern" value because revenues are not sufficient to support continued operation of debtor's business and there are no viable sources for financing. 11 U.S.C.A. § 363(b).

1 Cases that cite this headnote

**[10]    Bankruptcy**

🗝 Time for sale; emergency and sale outside course of business

"Good business reason" existed for allowing automobile manufacturer that had filed for Chapter 11 relief to sell its assets immediately to purchaser sponsored by the United States government as transaction outside the ordinary course, rather than having to wait for confirmation of plan, where government financing that allowed manufacturer to operate was set to expire if sale was not completed, where there were no other available sources of financing, and where only alternative was liquidation of manufacturer's business in which unsecured creditors would receive nothing. 11 U.S.C.A. § 363(b).

Cases that cite this headnote

**[11]    Bankruptcy**

🗝 Time for sale; emergency and sale outside course of business

After determining that requisite sound business justification existed for a proposed sale of all or substantially all of Chapter 11 debtor's assets outside the ordinary course of its business, court's inquiry then turned to whether the routine requirements for any sale outside the ordinary course were met, and to whether "business

judgment rule" had been satisfied. 11 U.S.C.A. § 363(b).

1 Cases that cite this headnote

**[12]    Bankruptcy**

🗝 Time for sale; emergency and sale outside course of business

**Bankruptcy**

🗝 Notice

**Bankruptcy**

🗝 Adequacy of price; appraisal

In order to authorize sale outside the ordinary course of business, court must be satisfied (1) that notice has been given to all creditors and interested parties; (2) that sale contemplates a fair and reasonable price; and (3) that purchaser is proceeding in good faith. 11 U.S.C.A. § 363(b).

Cases that cite this headnote

**[13]    Bankruptcy**

🗝 Time for sale; emergency and sale outside course of business

**Bankruptcy**

🗝 Notice

**Bankruptcy**

🗝 Adequacy of price; appraisal

Proposed sale outside the ordinary course of assets of bankrupt automobile manufacturer to purchaser sponsored by the United States government complied with statutory requirements that such a sale could be approved only on appropriate "notice" and on "fair and reasonable" terms, where proposed sale was extensively publicized and notice was given to interested parties, where no other, much less a better, offer had been received, and where proponents of sale had obtained fairness opinion from reputable advisors. 11 U.S.C.A. § 363(b).

Cases that cite this headnote

**[14]    Bankruptcy**

🗝 Time for sale; emergency and sale outside course of business

**Bankruptcy**

👈 Effect of want of stay; conclusiveness of sale

Government-sponsored purchaser of assets of bankrupt automobile manufacturer had to be seen as acting in "good faith," not only for purpose of deciding whether sale could proceed as sale outside the ordinary course of debtor-manufacturer's business but for purpose of triggering statutory protection for purchaser's expectations in finality of sale, where proposed sale was the result of intense arm's-length negotiations, and there was no evidence of any efforts to take advantage over other bidders, of whom there were none. 11 U.S.C.A. § 363(b, m).

1 Cases that cite this headnote

**[15]    Bankruptcy**

👈 Sale or Assignment of Property

**Bankruptcy**

👈 Effect of want of stay; conclusiveness of sale

"Good faith" of purchaser of debtor's assets is shown by integrity of his conduct during course of sales proceedings; when there is lack of such integrity, "good faith" finding may not be made, for purpose of triggering statutory protection for good faith purchaser's expectations in finality of sale. 11 U.S.C.A. § 363(m).

Cases that cite this headnote

**[16]    Bankruptcy**

👈 Effect of want of stay; conclusiveness of sale

Purchaser of debtor's assets cannot be found to have acted in "good faith," for purpose of bankruptcy statute protecting good faith purchaser's expectations in finality of sale, if purchaser has engaged in fraud, colluded with other bidders or trustee, or attempted to take grossly unfair advantage of other bidders. 11 U.S.C.A. § 363(m).

1 Cases that cite this headnote

**[17]    Bankruptcy**

Time for sale; emergency and sale outside course of business

Decision by bankrupt automobile manufacturer's board of directors to accept offer to sell debtor-manufacturer's assets to government-sponsored purchaser on terms offered, which were only terms available to it, and to avoid only other alternative of Chapter 7 liquidation, in which it was estimated that debtor's assets would be sold for less than 10% of $82 billion at which they were booked, an amount woefully inadequate to satisfy its roughly $172 billion in debt, not only passed muster under the business judgment test applicable to such transactions outside the ordinary course, but would withstand ab initio review. 11 U.S.C.A. § 363(b).

Cases that cite this headnote

**[18]    Bankruptcy**

👈 Time for sale; emergency and sale outside course of business

Requirements of business judgment rule, as applied in connection with proposed sale of debtor's assets outside the ordinary course of its business, entail the following: (1) a business decision; (2) disinterestedness; (3) due care; (4) good faith; and possibly (5) no abuse of discretion or waste of corporate assets. 11 U.S.C.A. § 363(b).

Cases that cite this headnote

**[19]    Bankruptcy**

👈 Time for sale; emergency and sale outside course of business

Proposed sale outside the ordinary course of assets of bankrupt automobile manufacturer to purchaser sponsored by the United States government was not an impermissible "sub rosa plan"; sales agreement did not dictate terms of Chapter 11 plan of reorganization by attempting to restructure rights of creditors of estate, but merely brought in value. 11 U.S.C.A. § 363(b).

Cases that cite this headnote

**[20]    Bankruptcy**

👉 Time for sale;  emergency and sale outside
course of business

Chapter 11 debtor and bankruptcy court should
not be able to short circuit requirements for
confirmation of Chapter 11 plan by establishing
terms of plan sub rosa in connection with sale
of debtor's assets outside ordinary course of its
business. 11 U.S.C.A. § 363(b).

2 Cases that cite this headnote

[21]    **Bankruptcy**
👉 Time for sale;  emergency and sale outside
course of business

Proposed sale outside the ordinary course
of debtor's business may be objectionable
when aspects of transaction dictate terms of
ensuing plan or constrain parties in exercising
their confirmation rights, such as by placing
restrictions on creditors' rights to vote on plan.
11 U.S.C.A. § 363(b).

1 Cases that cite this headnote

[22]    **Bankruptcy**
👉 Time for sale;  emergency and sale outside
course of business

Proposed sale outside ordinary course of Chapter
11 debtor's business may be objectionable as
"sub rosa plan" if the sale itself seeks to allocate
or dictate distribution of sale proceeds among
different classes of creditors. 11 U.S.C.A. §
363(b).

2 Cases that cite this headnote

[23]    **Bankruptcy**
👉 Time for sale;  emergency and sale outside
course of business

Proposed sale of Chapter 11 debtor's assets
outside ordinary course of its business does not
"dictate terms" of subsequent plan, so as to be
objectionable as "sub rosa plan," simply because
sales proceeds are insufficient to permit dividend
to certain class of creditors. 11 U.S.C.A. §
363(b).

Cases that cite this headnote

[24]    **Bankruptcy**
👉 Time for sale;  emergency and sale outside
course of business

Proposed sale of Chapter 11 debtor's assets
outside ordinary course of its business is not
objectionable as "sub rosa plan" based solely on
fact that purchaser is to assume some, but not all,
of debtor's liabilities, or because some contract
counterparties' contracts will not be assumed. 11
U.S.C.A. § 363(b).

Cases that cite this headnote

[25]    **Bankruptcy**
👉 Claims by insiders and by attorneys in
excess of value

Factors that bankruptcy courts consider in
deciding whether secured debt should be
recharacterized as equity are as follows:
(1) names given to the instruments, if
any, evidencing indebtedness; (2) presence or
absence of fixed maturity date and schedule of
payments; (3) presence or absence of a fixed
rate of interest and interest payments; (4) source
of repayments; (5) adequacy or inadequacy of
capitalization; (6) identity of interest between
creditor and stockholder; (7) security, if any, for
the advances; (8) corporation's ability to obtain
financing from outside lending institutions; (9)
extent to which advances were subordinated to
claims of outside creditors; (10) extent to which
advances were used to acquire capital assets;
and (11) presence or absence of sinking fund to
provide repayments.

Cases that cite this headnote

[26]    **Bankruptcy**
👉 Claims by insiders and by attorneys in
excess of value
**Bankruptcy**
👉 Manner and Terms

"Debt" that bankrupt automobile manufacturer
owed to the federal government, for financing
that government had made available in order

to keep manufacturer afloat until it could enter bankruptcy and to assist it with its reorganization, could not be restructured as "equity," so as to prevent government from credit-bidding amount of that debt in connection with sale of debtor-manufacturer's assets outside the ordinary course to purchaser sponsored by government, where financing was fully documented as a secured loan, complete with intercreditor agreements to address priority issues with other secured lenders, had interest terms, albeit at better than market rates, and maturity terms, and had separate equity features, providing for warrants to accompany the debt instruments.

Cases that cite this headnote

[27]  **Bankruptcy**
      👉 Inequitable conduct

Party seeking to equitably subordinate a claim must first prove the following: (1) that holder of claim engaged in inequitable conduct; (2) that this inequitable conduct resulted in injury to creditors or conferred an unfair advantage on claimant; and (3) that equitable subordination is not inconsistent with provisions of the Bankruptcy Code. 11 U.S.C.A. § 510.

Cases that cite this headnote

[28]  **Bankruptcy**
      👉 Inequitable conduct
      **Bankruptcy**
      👉 Manner and Terms

Federal government's claim against bankrupt automobile manufacturer, for financing that government had made available in order to keep manufacturer afloat until it could enter bankruptcy and to assist it with its reorganization, could not be equitably subordinated to other debt, so as to prevent government from credit-bidding amount of that debt in connection with sale of debtor-manufacturer's assets outside the ordinary course to purchaser sponsored by government, given complete lack of evidence of any inequitable conduct by government in advancing funds to

help thousands of creditors, citizens, employees of manufacturer and employees of suppliers that depended on manufacturer. 11 U.S.C.A. § 510.

Cases that cite this headnote

[29]  **Corporations and Business Organizations**
      👉 Exceptions to Successor Non-Liability

As general rule, purchaser of assets does not assume liabilities of the seller unless the purchaser expressly agrees to do so or an exception to this rule exists.

2 Cases that cite this headnote

[30]  **Corporations and Business Organizations**
      👉 Assumption of or Succession to Transferor's Debts and Liabilities

Successor liability is equitable exception to general rule that purchaser of assets does not assume liabilities of the seller.

2 Cases that cite this headnote

[31]  **Bankruptcy**
      👉 Adequate protection;  sale free of liens

Term "interest," as used in bankruptcy statute providing for sale of estate assets free and clear of any interest in such assets possessed by entity other than estate, was broad enough to include successor liability claims, so as to authorize assets of a bankrupt automobile manufacturer to be sold free and clear of successor liability claims. 11 U.S.C.A. § 363(f).

3 Cases that cite this headnote

[32]  **Bankruptcy**
      👉 Adequate protection;  sale free of liens

Term "interest," as it is used in bankruptcy statute providing for sale of estate assets free and clear of any interest in such assets possessed by an entity other than estate, includes more than just liens. 11 U.S.C.A. § 363(f).

Cases that cite this headnote

**[33]**    **Bankruptcy**

👈 Adequate protection;  sale free of liens

Congress's use of the word "interest," in bankruptcy statute providing for sale of estate assets free and clear of any interest in such assets possessed by entity other than estate, while elsewhere providing in Chapter 11 provision that "property dealt with by the plan is free and clear of all claims and interests," was not indication that term "interest," as used in the former provision, should not be interpreted to include claims; provisions were disparate provisions, and no conclusion could be drawn from this variance in terminology between them. 11 U.S.C.A. §§ 363(f), 1141(c).

Cases that cite this headnote

**[34]**    **Courts**

👈 Particular questions or subject matter

Bankruptcy judge presiding over Chapter 11 case of automobile manufacturer would follow the decisions of other bankruptcy judges in the same district, in absence of plain error, in recognition of the importance of predictability in commercial bankruptcy cases.

3 Cases that cite this headnote

**[35]**    **Courts**

👈 Previous Decisions as Controlling or as Precedents

Stare decisis is particularly important in commercial bankruptcy cases.

1 Cases that cite this headnote

**[36]**    **Bankruptcy**

👈 Order of court and proceedings therefor in general

Language in order approving proposed sale of assets of bankrupt automobile manufacturer to government-sponsored purchaser free and clear of successor liability claims would be modified, for benefit of holders of future asbestos claims that had not yet sustained any injuries due to their exposure to asbestos, to clarify that

injunction against pursuit of successor liability claims against purchaser of debtor's assets would be enforceable only "to the fullest extent constitutionally permissible." 11 U.S.C.A. § 363(f).

3 Cases that cite this headnote

**[37]**    **Bankruptcy**

👈 Adequate protection;  sale free of liens

**Bankruptcy**

👈 Rights and liabilities of purchasers, and right to purchase

While, pursuant to order approving proposed sale of assets of bankrupt automobile manufacturer to government-sponsored purchaser free and clear of successor liability claims, purchaser could not be held liable, as successor in interest, for the environmental liabilities of the old debtor-manufacturer, purchaser would be liable from day that it received any such properties for its own environmental responsibilities going forward. 11 U.S.C.A. § 363(f).

4 Cases that cite this headnote

**[38]**    **Bankruptcy**

👈 Time for sale;  emergency and sale outside course of business

**Bankruptcy**

👈 Rights and liabilities of purchasers, and right to purchase

**Bankruptcy**

👈 Collective bargaining agreements

Bankruptcy statute dealing with responsibilities of Chapter 11 trustee or debtor-in-possession with respect to retiree benefits of debtor's retired workers imposed such responsibilities only on trustee or debtor-in-possession, not on purchaser outside the ordinary course of Chapter 11 debtor's assets, which had no liability to retirees unless it assumed them. 11 U.S.C.A. §§ 363(b), 1114.

1 Cases that cite this headnote

**[39]**    **Bankruptcy**

    Time for sale; emergency and sale outside course of business

Chapter 11 plan confirmation requirement, which prevented court from confirming proposed plan unless it provided for "continuation after its effective date of payment of all retiree benefits," was not implicated in connection with sale outside the ordinary course of assets of bankrupt car manufacturer, where court had already determined that proposed sale was not sub rosa plan. 11 U.S.C.A. §§ 363(b), 1129(a)(13).

2 Cases that cite this headnote

[40] **Bankruptcy**
    Order of court and proceedings therefor in general

Automobile dealers' association which did not represent any of dealers with which debtor/car manufacturer had relationships, but which actually represented competing dealers and which had filed amicus brief opposing proposed sale of debtor's assets outside the ordinary course to government-sponsored purchaser, lacked standing to have its comments deemed an objection to proposed sale. 11 U.S.C.A. § 363(b).

Cases that cite this headnote

[41] **Bankruptcy**
    Debtor's Contracts and Leases
**Bankruptcy**
    Assumption, Rejection, or Assignment

Chapter 11 debtor, in connection with a proposed sale of its automobile manufacturing business to purchaser sponsored by federal government, did not have to choose between either assuming its dealer agreements and assigning them to purchaser or rejecting them outright but could seek to ameliorate effects of immediate rejection and to provide dealers with softer landing by negotiating deferred termination agreements, without fear that these deferred termination agreements would be subject to collateral attack based upon claims of coercion. 11 U.S.C.A. §§ 363(b), 365.

3 Cases that cite this headnote

[42] **Bankruptcy**
    Equitable powers and principles
**Bankruptcy**
    Time for sale; emergency and sale outside course of business
**Bankruptcy**
    Rights and liabilities of purchasers, and right to purchase

Bankruptcy court, in connection with proposed sale outside the ordinary course of assets of bankrupt automobile manufacturer to purchaser sponsored by the United States government, could not utilize its equitable power to enter "necessary or appropriate" orders, in order to force purchaser to assume certain liabilities of the old debtor-manufacturer based on court's notions of equity. 11 U.S.C.A. § 105(a).

3 Cases that cite this headnote

[43] **Bankruptcy**
    Equitable powers and principles

Bankruptcy court is not free to use its equitable powers to circumvent the Bankruptcy Code. 11 U.S.C.A. § 105(a).

Cases that cite this headnote

[44] **Bankruptcy**
    Carrying out provisions of Code

Bankruptcy judges, in exercise of their power to enter "necessary or appropriate" orders, are not free to do whatever feels right. 11 U.S.C.A. § 105(a).

Cases that cite this headnote

[45] **Bankruptcy**
    Amount secured; partial security

"Equal and ratable" provision in indenture for bonds, which provided for enhancement of status of unsecured bondholders to that of secured creditors if liens were thereafter placed on certain manufacturing facilities owned by

bankrupt issuer of bonds, was not triggered, in connection with prepetition secured financing that issuer received from federal government where, pursuant to terms of financing agreement, transaction did not place lien on certain excluded collateral, which was defined to include anything that would trigger "equal and ratable" provision; accordingly, bondholders were not entitled to be treated as secured creditors in issuer's Chapter 11 case.

Cases that cite this headnote

**[46]    Bankruptcy**
👈 Time for sale; emergency and sale outside course of business

**Bankruptcy**
👈 Manner and Terms

**Federal Courts**
👈 Government property, facilities, and funds

Any objection to use of Troubled Asset Relief Program (TARP) funds in connection with financing that government had provided to troubled automobile manufacturer was moot after government had used such TARP funds to provide financing, not only before, but after commencement of manufacturer's Chapter 11 case pursuant to post-petition financing order of bankruptcy court; party who had raised no objection to use of TARP funds in connection with post-petition financing order could not belatedly raise issue as basis to object to government's being able to credit-bid the debt associated with financing that it had previously provided in connection with sale of debtor-manufacturer's assets outside ordinary course to purchaser sponsored by government. 11 U.S.C.A. § 363(b).

Cases that cite this headnote

**[47]    Bankruptcy**
👈 Order of court and proceedings therefor in general

Unsecured creditor opposed to proposed sale of assets of bankrupt automobile manufacturer outside the ordinary course of business on credit bid by federal government did not have standing to object to government's use of Troubled Asset Relief Program (TARP) funds in connection with financing that underlay its credit bid; even assuming that proposed sale somehow injured unsecured creditor, despite undisputed evidence that manufacturer's assets were worth tens of billions of dollars less than its liabilities, and that alternative to proposed sale would be Chapter 7 liquidation in which creditor would receive nothing, creditor could not show that any such injury was fairly traceable to government's use of TARP funds. 11 U.S.C.A. § 363(b).

Cases that cite this headnote

**[48]    Bankruptcy**
👈 Order of court and proceedings therefor in general

Bankrupt automobile manufacturer's shareholders were not parties aggrieved, with ability to challenge proposed sale of manufacturer's assets outside the ordinary course of business to government-sponsored purchaser, where only alternative to proposed sale was Chapter 7 liquidation, in which it was estimated that debtor's assets would be sold for less than 10% of $82 billion at which they were booked, an amount woefully inadequate to satisfy its roughly $172 billion in debt. 11 U.S.C.A. § 363(b).

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*471** Appearances: [1]

Weil, Gotshal & Manges LLP, by Harvey R. Miller (argued), Stephen Karotkin (argued), Joseph H. Smolinsky (argued), New York, NY, for Debtors and Debtors in Possession.

Kramer Levin Naftalis & Frankel LLP, by Kenneth H. Eckstein (argued), Thomas Moers Mayer (argued), Robert Schmidt, Jeffrey S. Trachtman, New York, NY, for the Official Committee of Unsecured Creditors.

Lev L. Dassin, Acting United States Attorney for the Southern District of New York, by David S. Jones (argued), Jeffrey

S. Oestericher, Matthew L. Schwartz (argued), Joseph N. Cordaro, and Cadwalader, Wickersham & Taft LLP, by John J. Rapisardi, New York, NY, Counsel to the United States of America.

Cleary Gottlieb Steen & Hamilton, by James L. Bromley (argued), Avram E. Luft, Cohen, Weiss and Simon LLP, by Babette A. Ceccotti (argued), New York, NY, for The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL–CIO.

Patton Boggs LLP, by Michael P. Richman (argued), Mark A. Salzberg (pro hac vice) (argued), James C. Chadwick (pro hac vice), Melissa Iachan, New York, NY, for The Unofficial Committee Of Family & Dissident GM Bondholders.

The Coleman Law Firm, by Steve Jakubowski (argued), Elizabeth Richert, Chicago, IL, for Individual Tort Litigants Callan Campbell, Kevin Junso, Edwin Agosto, Kevin Chadwick, and Joseph Berlingieri.

Schnader Harrison Segal & Lewis LLP, by Barry E. Bressler (pro hac vice) (argued), Richard A. Barkasy (pro hac vice), Benjamin P. Deutsch. New York, NY, for Ad Hoc Committee of Consumer Victims of General Motors.

Stutzman, Bromberg, Esserman & Plifka P.C. by Sander L. Esserman (pro hac vice) (argued), Robert T. Brousseau (pro hac vice), Peter D'Apice, Jo E. Hartwick (argued), Dallas, TX, for Ad Hoc Committee of Asbestos Personal Injury Claimants.

Orrick, Herrington & Sutcliffe LLP, by Roger Frankel (argued), Richard H. Wyron, Washington, D.C., by Lorraine S. McGowen, Alyssa D. Englund, New York, NY, counsel to the Unofficial GM Dealers Committee.

Kennedy, Jennik & Murray, P.C., by Thomas M. Kennedy (argued), Susan M. Jennik, New York, NY, for IUE–CWA.

Nebraska Attorney General Jon Bruning, by Leslie C. Levy, Karen Cordry (argued), Lincoln, NE, for the State of Nebraska and on behalf of the Ad Hoc Committee of State Attorneys General.

Oliver Addison Parker, Lauderdale By The Sea, FL, pro se.

N.W. Bernstein & Associates, LLC, by: Norman W. Bernstein (argued), Rye Brook, NY, for the Trustees of Environmental Conservation and Chemical Corporation Site Trust Fund.

Caplin & Drysdale Chartered, by Elihu Inselbuch, Esq., Rita C. Tobin, Esq., New York, NY, by Peter Van N. Lockwood, Esq., Ronald E. Reinsel, Esq. (pro hac vice) (argued), Washington, D.C., for Mark Buttita, personal representative of Salvatore Buttita.

Vedder Price P.C., by Michael J. Edelman, Michael L. Schein (argued), Erin Zavalkoff–Babej, New York, NY, for Export Development Canada.

**\*472** Robinson Brog Leinwand Greene, Genovese & Gluck, P.C., by Russell P. McRory (argued), Fred B. Ringel, Mitchell Greene, Robert R. Leinwand, New York, NY, and Myers & Fuller P.A., by Richard Sox (pro hac vice), Shawn Mercer (pro hac vice), Robert Byerts (pro hac vice), Tallahassee, FL, for the Greater New York Automobile Dealers Association.

Gibson, Dunn & Crutcher LLP, by David Feldman (argued), Matthew J. Williams, Adam H. Offenhartz, New York, NY, for Wilmington Trust Company, Indenture Trustee.

Kelley, Drye & Warren LLP, by David E. Retter, Pamela Bruzzese–Szczygiel, Jennifer A. Christian (argued), New York, NY, for Law Debenture Trust Company of New York, as Proposed Successor Indenture Trustee.

New York State Department of Law by Susan Taylor (argued). Albany, NY, for Environmental Protection Bureau.

Levy Ratner, P.C., New York, NY, by Suzanne Hepner, for United Steelworkers.

Gorlick Kravitz & Listhaus P.C., by Barbara Mehlsack, New York, NY, for International Union of Operating Engineers Locals 18S, 101S, and 832S.

Farella Braun & Martel LLP, by Neil A. Goteiner (argued), Dean M. Gloster (pro hac vice), Nan E. Joesten (pro hac vice), San Francisco, CA, for General Motors Retirees Association.

Public Citizen Litigation Group, by Adina H. Rosenbaum, Allison M. Zieve, Washington, DC, for Center for Auto Safety, Consumer Action, Consumers for Auto Reliability and Safety, National Association of Consumer Advocates, and Public Citizen.

Otterbourg, Steindler, Houston & Rosen, P.C., by Jonathan N. Helfat, Steven B. Soll, New York, NY, for GMAC LLC.

Attorneys for the State of Texas, by J. Casey Roy (argued), Austin, TX, on behalf of the Texas Dep't of Transportation, Motor Vehicle Division.

In re General Motors Corp., 407 B.R. 463 (2009)

51 Bankr.Ct.Dec. 225

Diana G. Adams, by Diana G. Adams, Linda A. Riffkin, Tracy Hope Davis, Andrew D. Velez–Rivera, Brian Shoichi Masumoto, New York, NY, United States Trustee.

**Opinion**

**DECISION ON DEBTORS' MOTION FOR APPROVAL OF (1) SALE OF ASSETS TO**

VEHICLE ACQUISITION HOLDINGS LLC; (2) ASSUMPTION AND ASSIGNMENT OF RELATED EXECUTORY CONTRACTS; AND (3) ENTRY INTO UAW RETIREE SETTLEMENT AGREEMENT

ROBERT E. GERBER, Bankruptcy Judge.

## TABLE OF CONTENTS

Findings of Fact.................................................................................... ........ 475

1.  Background............................................................................................... 475

2.  GM's Dealer Network.............................................................................. 475

3.  GM's Suppliers........................................................................................ 476

4.  GM's Financial Distress.................................................................. ........ 476

5.  U.S. Government Assistance..................................................................... 476

6.  GM's First Quarter Results...................................................................... 479

7.  The 363 Transaction......................................................................... ........ 479

8.  The Liquidation Alternative.............................................................. ........ 481

9.  Fairness of the Transaction...................................................................... 481

10. Specifics of the Transaction.................................................................... 481

    (a)  Acquired and Excluded Assets.................................................... ........481

    (b)  Assumed and Excluded Liabilities...............................................481

    (c)  Consideration...............................................................................482

    (d)  Ownership of New GM.................................................................482

    (e)  Other Aspects of Transaction......................................................483

    (f)  The Proposed Sale Order.............................................................483

11. Contingent Liabilities....................................................................... ........ 483

12. Agreement with UAW.............................................................................. 484

13. Need for Speed........................................................................................ 484

14. Ultimate Facts................................................................................. ........ 485

Discussion............................................................................................... ........ 486

1.   Sale Under Section 363.....................................................................................................486

     (a)   Utilization of Section 363...........................................................................................486

     (b)   Compliance with Standards for Approval of Section 363 Sales..........................493

     (c)   "Sub Rosa" Plan.........................................................................................................495

     (d)   Recharacterization or Subordination of U.S. Treasury Debt.............................498

     (e)   Asserted Inability to Credit Bid...............................................................................499

2.   Successor Liability Issues...........................................................................................499

     (a)   Textual Analysis.........................................................................................................501

     (b)   Caselaw.........................................................................................................................503

3.   Asbestos Issues...............................................................................................................506

4.   Environmental Issues....................................................................................................507

5.   Splinter Union Retiree Issues.....................................................................................509

6.   Dealer Issues....................................................................................................................512

7.   ECC Trust..........................................................................................................................516

8.   "Equally and Ratably" Issues......................................................................................517

9.   Unauthorized Use of TARP Funds Issues................................................................518

10.  Cure Objections...............................................................................................................519

11.  UAW Settlement Objections.........................................................................................519

12.  Stockholder Objections..................................................................................................520

13.  Miscellaneous Objections..............................................................................................520

Conclusion.....................................................................................................................................520

**\*473** In this contested matter in the jointly administered chapter 11 cases of Debtors General Motors Corporation and certain of its subsidiaries (together, "**GM**"), the Debtors move for an order, pursuant to section 363 of the Bankruptcy Code, approving GM's sale of the bulk of its assets (the "**363 Transaction**"), pursuant to a "Master Sale and Purchase Agreement" and related documents (the "**MPA**"), to Vehicle Acquisitions Holdings LLC (the "**Purchaser**")[2]—a purchaser sponsored by the U.S. Department of the Treasury (the "**U.S. Treasury**")—free and clear of liens, claims, encumbrances, and other interests. The Debtors also seek approval of the assumption and assignment of the executory contracts that would be needed by the Purchaser, and of a settlement with the United Auto Workers ("**UAW**") pursuant to an agreement (the "**UAW Settlement Agreement**") under which GM would satisfy obligations to an estimated 500,000 retirees.

GM's motion is supported by the Creditors' Committee; the U.S. Government (which has advanced approximately $50 billion to GM, and is GM's largest pre–and post-petition creditor); the Governments of Canada and Ontario (which ultimately will have advanced about $9.1 billion); the UAW (an affiliate of which is GM's single largest unsecured creditor); **\*474** the indenture trustees for GM's approximately $27 billion in unsecured bonds; and an ad hoc committee representing holders of a majority of those bonds.

But the motion has engendered many objections and limited objections, by a variety of others. The objectors include, among others, a minority of the holders of GM's unsecured bonds (most significantly, an ad hoc committee of three of them (the "**F & D Bondholders Committee**"), holding approximately .01% of GM's bonds),[3] who contend, among other things, that GM's assets can be sold only under a chapter 11 plan, and that the proposed section 363 sale amounts to an impermissible "*sub rosa*" plan.

Objectors and limited objectors also include tort litigants who object to provisions in the approval order limiting successor liability claims against the Purchaser; asbestos litigants with similar concerns, along with concerns as to asbestos ailments that have not yet been discovered; and non-UAW unions ("**Splinter Unions**") speaking for their retirees, concerned that the Purchaser does not plan to treat their retirees as well as the UAW's retirees.

On the most basic issue, whether a 363 sale is proper, GM contends that this is exactly the kind of case where a section 363 sale is appropriate and indeed essential—and where under the several rulings of the Second Circuit and the Supreme Court in this area, GM's business can be sold, and its value preserved, before the company dies. The Court agrees. GM cannot survive with its continuing losses and associated loss of liquidity, and without the governmental funding that will expire in a matter of days. And there are no options to this sale—especially any premised on the notion that the company could survive the process of negotiations and litigation that characterizes the plan confirmation process.

As nobody can seriously dispute, the only alternative to an immediate sale is liquidation—a disastrous result for GM's creditors, its employees, the suppliers who depend on GM for their own existence, and the communities in which GM operates. In the event of a liquidation, creditors now trying to increase their incremental recoveries would get nothing.

Neither the Code, nor the caselaw—especially the caselaw in the Second Circuit—requires waiting for the plan confirmation process to take its course when the inevitable consequence would be liquidation. Bankruptcy courts have the power to authorize sales of assets at a time when there still is value to preserve—to prevent the death of the patient on the operating table.

Nor can the Court accept various objectors' contention that there is here a *sub rosa* plan. GM's assets simply are being sold, with the consideration to GM to be hereafter distributed to stakeholders, consistent with their statutory priorities, under a subsequent plan. Arrangements that will be made by the Purchaser do not affect the distribution of the *Debtor's* property, and will address wholly different needs and concerns—arrangements that the Purchaser needs to create a new GM **\*475** that will be lean and healthy enough to survive.

Issues as to how any approval order should address *successor liability* are the only truly debatable issues in this case. And while textual analysis is ultimately inconclusive and caselaw on a nationwide basis is not uniform, the Court believes in *stare decisis;* it follows the caselaw in this Circuit and District in holding that to the extent the Purchaser has not voluntarily agreed to accept successor liability, GM's property—like that of Chrysler, just a few weeks ago—may be sold free and clear of claims.

Those and other issues are addressed below. GM's motion is granted. The following are the Court's Findings of Fact, Conclusions of Law, and bases for the exercise of its discretion in connection with this determination.

### Findings of Fact[4]

After an evidentiary hearing,[5] the Court makes the following Findings of Fact.

### 1. Background

GM is primarily engaged in the worldwide production of cars, trucks, and parts. It is the largest Original Equipment Manufacturer ("**OEM**") in the U.S., and the second largest in the world.

GM has marketed cars and trucks under many brands—most of them household names in the U.S.—including

Buick, Cadillac, Chevrolet, Pontiac, GMC, Saab, Saturn, HUMMER, and Opel. It operates in virtually every country in the world.

GM maintains its executive offices in Detroit, Michigan, and its major financial and treasury operations in New York, New York. As of March 31, 2009, GM employed approximately 235,000 employees worldwide, of whom 163,000 were hourly employees and 72,000 were salaried. Of GM's 235,000 employees, approximately 91,000 are employed in the U.S. Approximately 62,000 (or 68%) of those U.S. employees were represented by unions as of March 31, 2009. The UAW represents by far the largest portion of GM's U.S. unionized employees, representing approximately 61,000 employees.

As of March 31, 2009, GM had consolidated reported global assets and liabilities of approximately $82 billion, and $172 billion, respectively. However, its assets appear on its balance sheet at book value, as contrasted to a value based on any kind of valuation or appraisal. And if GM had to be liquidated, its liquidation asset value, as discussed below, would be less than 10% of that $82 billion amount.

While GM has publicly traded common stock, no one in this chapter 11 case has seriously suggested that GM's stock is "in the money," or anywhere close to that. By any standard, there can be no doubt that GM is insolvent. In fact, as also discussed below, if GM were to liquidate, its unsecured creditors would receive nothing on their claims.

### 2. GM's Dealer Network

Substantially all of GM's worldwide car and truck deliveries (totaling 8.4 million vehicles in 2008) are marketed through independent retail dealers or distributors. **\*476** GM relies heavily on its relationships with dealers, as substantially all of its retail sales are through its network of independent retail dealers and distributors.

The 363 Transaction contemplates the assumption by GM and the assignment to New GM of dealer franchise agreements relating to approximately 4,100 of its 6,000 dealerships, modified in ways to make GM more competitive (as modified, "**Participation Agreements**"). But GM cannot take all of the dealers on the same basis. At the remaining dealer's option, GM will either reject those agreements, or assume modified agreements, called "**Deferred Termination Agreements.**"

The Deferred Termination Agreements will provide dealers with whom GM cannot go forward a softer landing and orderly termination. GM is providing approximately 17 months' notice of termination.

As of the time of the hearing on this motion, approximately 99% of the continuing dealers had signed Participation Agreements and 99% of the dealers so affected had signed Deferred Termination Agreements.

The agreements of both types include waivers of rights that dealers would have in connection with their franchises. In accordance with a settlement with the Attorneys General of approximately 45 states (the "**AGs**"), the Debtors and the Purchaser agreed to modifications to the Purchase Agreement and the proposed approval order under which (subject to the more precise language in the proposed order) the Court makes no finding as to the extent any such modifications are enforceable, and any disputes as to that will be resolved locally.

### 3. GM's Suppliers

As the nation's largest automobile manufacturer, GM uses the services of thousands of suppliers—resulting in approximately $50 billion in annual supplier payments. In North America alone, GM uses a network of approximately 11,500 suppliers. In addition, there are over 600 suppliers whose sales to GM represent over 30% of their annual revenues. Thus hundreds, if not thousands, of automotive parts suppliers depend, either in whole or in part, on GM for survival.

### 4. GM's Financial Distress

Historically, GM was one of the best performing OEMs in the U.S. market. But with the growth of competitors with far lower cost structures and dramatically lower benefit obligations, GM's leadership position in the U.S. began to decline. At least as a result of that lower cost competition and market forces in the U.S. and abroad (including jumps in the price of gasoline; a massive recession (with global dislocation not seen since the 1930s); a dramatic decline in U.S. domestic auto sales; and a freeze-up in consumer and commercial credit markets), GM suffered a major drop in new vehicle sales and in market share—from 45% in 1980 to a forecast 19.5% in 2009.

The Court does not need to make further factual findings as to the many causes for GM's difficulties, and does not do so.

Observers might differ as to the causes or opine that there were others as well, and might differ especially with respect to which causes were most important. But what is clear is that, especially in 2008 and 2009, GM suffered a steep erosion in revenues, significant operating losses, and a dramatic loss of liquidity, putting its future in grave jeopardy.

### 5. U.S. Government Assistance

By the fall of 2008, GM was in the midst of a severe liquidity crisis, and its ability to continue operations grew more and more **\*477** uncertain with each passing day. As a result, in November 2008, GM was compelled to seek financial assistance from the U.S. Government.

The U.S. Government understood the draconian consequences of the situation—one that affected not just GM, but also Chrysler, and to a lesser extent, Ford (the "**Big Three**"). And the failure of any of the Big Three (or worse, more than one of them) might well bring grievous ruin on the thousands of suppliers to the Big Three (many of whom have already filed their own bankruptcy cases, in this District, Delaware, Michigan and elsewhere); other businesses in the communities where the Big Three operate; dealers throughout the country; and the states and municipalities who looked to the Big Three, their suppliers and their employees for tax revenues.

The U.S. Government's fear—a fear this Court shares, if GM cannot be saved as a going concern—was of a systemic failure throughout the domestic automotive industry and the significant harm to the overall U.S. economy that would result from the loss of hundreds of thousands of jobs [6] and the sequential shutdown of hundreds of ancillary businesses if GM had to cease operations.

Thus in response to the troubles plaguing the American automotive industry, the U.S. Government, through the U.S. Treasury and its Presidential Task Force on the Auto Industry (the "**Auto Task Force**"), implemented various programs to support and stabilize the domestic automotive industry —including support for consumer warranties and direct loans. Thus at GM's request in late 2008, the U.S. Treasury determined to make available to GM billions of dollars in emergency secured financing in order to sustain GM's operations while GM developed a new business plan. At the time that the U.S. Treasury first extended credit to GM, there was absolutely no other source of financing available. No

party other than Treasury conveyed its willingness to loan funds to GM and thereby enable it to continue operating.

The first loan came in December 2008, after GM submitted a proposed viability plan to Congress. That plan contemplated GM's shift to smaller, more fuel-efficient cars, a reduction in the number of GM brand names and dealerships, and a renegotiation of GM's agreement with its principal labor union. As part of its proposed plan, GM sought emergency funding in the form of an $18 billion federal loan.

But the U.S. Government was not of a mind to extend a loan that large, and after negotiations, the U.S. Treasury and GM entered into a term loan agreement on December 31, 2008 (the "**Treasury Prepetition Loan**"), that provided GM up to $13.4 billion in financing on a senior secured basis. Under that facility, GM immediately borrowed $4 billion, followed by $5.4 billion less than a month later, and the remaining $4 billion on February 17, 2009.

At the time this loan was made, GM was in very weak financial condition, and the loan was made under much better terms than could be obtained from any commercial lender—if any lender could have been found at all. But the Court has no doubt whatever, and finds, that the Treasury Prepetition Loan was intended to be, and was, a loan and not a contribution of equity. As contrasted with other TARP transactions that involved the U.S. Treasury making direct investments in troubled **\*478** companies in return for common or preferred equity, the U.S. Treasury structured the Treasury Prepetition Loan as a loan with the only equity received by the U.S. Treasury being in the form of two warrants. The agreement had terms and covenants of a loan rather than an equity investment. The U.S. Treasury sought and received first liens on many assets, and second liens on other collateral. The transaction also had separate collateral documents. And the U.S. Treasury entered into intercreditor agreements with GM's other senior secured lenders in order to agree upon the secured lenders' respective prepetition priorities.

The Court further finds, as a fact or mixed question of fact and law, looking at the totality of the circumstances, that there was nothing inequitable about the way the U.S. Treasury behaved in advancing these funds. Nor did the U.S. Treasury act inequitably to GM's creditors, who were assisted, and not injured, by the U.S. Treasury's efforts to keep GM alive and to forestall a liquidation of the company.

GM had provided a business plan to Congress under which GM might restore itself to profitability, but it was widely perceived to be unsatisfactory. The U.S. Treasury required GM to submit a proposed business plan to demonstrate its future competitiveness that went significantly farther than the one GM had submitted to Congress. As conditions to the U.S. Treasury's willingness to provide financing, GM was to:

> (i) reduce its approximately $27 billion in unsecured public debt by no less than two-thirds;
>
> (ii) reduce its total compensation to U.S. employees so that by no later than December 31, 2009, such compensation would be competitive with Nissan, Toyota, or Honda in the U.S.;
>
> (iii) eliminate compensation or benefits to employees who had been discharged, furloughed, or idled, other than customary severance pay;
>
> (iv) apply, by December 31, 2009, work rules for U.S. employees in a manner that would be competitive with the work rules for employees of Nissan, Toyota, or Honda in the U.S.; and
>
> (v) make at least half of the $20 billion contribution that GM was obligated to make to a VEBA [7] Trust for UAW retirees ("**VEBA Trust**") in the form of common stock, rather than cash.

Thereafter, in March 2009, Treasury indicated that if GM was unable to complete an effective out-of-court restructuring, it should consider a new, more aggressive, viability plan under an expedited Court-supervised process to avoid further erosion of value. In short, GM was to file a bankruptcy petition and take prompt measures to preserve its value while there was still value to save.

The Treasury Prepetition Loan agreement (whose formal name was "Loan and Security Agreement," or "**LSA**") provided that, if, by March 31, 2009, the President's designee hadn't issued a certification that GM had taken all steps necessary to achieve long-term viability, then the loans due to Treasury would become due and payable 30 days thereafter. And on March 30, the President announced that the viability plan proposed by GM was not **\*479** satisfactory, and didn't justify a substantial new investment of taxpayer dollars.

But rather than leaving GM to simply go into liquidation, the President stated that the U.S. Government would provide assistance to avoid such a result, *if* GM took the necessary additional steps to justify that assistance—including reaching agreements with the UAW, GM's bondholders, and the VEBA Trust. The conditions to federal assistance required substantial debt reduction and the submission of a revised business plan that was more aggressive in both scope and timing.

As an alternative to liquidation, the President indicated that the U.S. Treasury would extend to GM adequate working capital for a period of another 60 days to enable it to continue operations. And as GM's largest secured creditor, the U.S. Treasury would negotiate with GM to develop and implement a more aggressive and comprehensive viability plan. The President also stated that GM needed a "fresh start to implement the restructuring plan," which "may mean using our [B]ankruptcy [C]ode as a mechanism to help [it] restructure quickly and emerge stronger." The President explained:

> What I'm talking about is using our existing legal structure as a tool that, with the backing of the U.S. Government, can make it easier for General Motors ... to *quickly* clear away old debts that are weighing [it] down so that [it] can get back on [its] feet and onto a path to success; a tool that we can use, even as workers stay on the job building cars that are being sold.
>
> What I'm not talking about is a process where a company is simply broken up, sold off, and no longer exists. We're not talking about that. And what I'm *not talking about is a company that's stuck in court for years, unable to get out.* [8]

The U.S. Treasury and GM subsequently entered into amended credit agreements for the Treasury Prepetition Loan to provide for an additional $2 billion in financing that GM borrowed on April 24, 2009, and another $4 billion that GM borrowed on May 20, 2009. The funds advanced to GM under the Treasury Prepetition Loan—ultimately $19.4 billion in total (all on a senior secured basis)—permitted GM to survive through the date of the filing of its bankruptcy case.

On June 1, 2009 (the "**Filing Date**"), GM filed its chapter 11 petition in this Court.

### 6. GM's First Quarter Results

On May 8, 2009, about three weeks before the Filing Date, GM announced its first quarter 2009 results. They presented a grim financial picture, and equally grim trends. Specifically:

(a) GM's total net revenue decreased by $20 billion (or 47.1%) in the first three months of 2009, as compared to the corresponding period in 2008;

(b) Operating losses increased by $5.1 billion from the prior quarter;

(c) During this same period, GM had negative cash flow of $9.4 billion;

(d) Available liquidity deteriorated by $2.6 billion; and

(e) Sales by GM dealers in the U.S. fell to approximately 413,000 vehicles in that first quarter—a decline of approximately 49% as compared to the corresponding period in 2008.


### 7. The 363 Transaction

As noted above, in connection with providing financing, Treasury advised GM **\*480** that, if an out-of-court restructuring was not possible, [9] GM should consider the bankruptcy process. That would enable GM to implement a transaction under which substantially all GM's assets would be purchased by a Treasury-sponsored purchaser (subject to any higher or better offer), in an expedited process under section 363 of the Code.

Under this game plan, the Purchaser would acquire the purchased assets; create a New GM; and operate New GM free of any entanglement with the bankruptcy cases. If the sale could be accomplished quickly enough, before GM's value dissipated as a result of continuing losses and consumer uncertainty, the 363 sale would thereby preserve the going concern value; avoid systemic failure; provide continuing employment; protect the many communities dependent upon the continuation of GM's business, and restore consumer confidence.

To facilitate the process, the U.S. Treasury and the governments of Canada and Ontario (through their Export Development Canada ("**EDC**")) [10] agreed to provide DIP financing for GM through the chapter 11 process. But they would provide the DIP financing *only* if the sale of the purchased assets occurred on an *expedited* basis. That condition was imposed to:

(i) preserve the value of the business;

(ii) restore (or at least minimize further loss of) consumer confidence;

(iii) mitigate the increasing damage that GM itself, and the industry, would suffer if GM's major business operations were to remain in bankruptcy; and

(iv) avoid the enormous costs of financing a lengthy chapter 11 case.

Treasury also agreed to provide New GM with adequate post-acquisition financing.

Importantly, the DIP financing to be furnished by the U.S. Treasury and EDC is the only financing that is available to GM. The U.S. Treasury (with its Canadian EDC co-lender) is the only entity that is willing to extend DIP financing to GM. Other efforts to obtain such financing have been unsuccessful. Absent adequate DIP financing, GM will have no choice but to liquidate. But the U.S. Government has stated it will not provide DIP financing without the 363 Transaction, and the DIP financing will come to an end if the 363 Transaction is not approved by July 10. Without such financing, these cases will plunge into a liquidation.

Alternatives to a sale have turned out to be unsuccessful, and offer no hope of success now. In accordance with standard section 363 practice, the 363 Transaction was subject to higher and better offers, but none were forthcoming. The Court finds this hardly surprising. Only the U.S. and Canadian Governmental authorities were prepared to invest in GM—and then not so much by reason of the economic merit of the purchase, but rather to address the underlying societal interests in preserving jobs and the North American auto industry, the thousands of suppliers to that industry, and the health of the communities, in the U.S. and Canada, in which GM operates.

In light of GM's substantial secured indebtedness, approximately $50 billion, the only entity that has the financial wherewithal and is qualified to purchase the **\*481** assets—and the only entity that has stepped forward to make such a purchase—is the U.S. Treasury-sponsored Purchaser. But the Purchaser is willing to proceed only under an expedited sale process under the Bankruptcy Code.


### 8. The Liquidation Alternative

In connection with its consideration of alternatives, GM secured an analysis (the "**Liquidation Analysis**"), prepared by AlixPartners LLP, of what GM's assets would be worth

in a liquidation. The Liquidation Analysis concluded that the realizable value of the assets of GM (net of the costs of liquidation) would range between approximately $6 billion and $10 billion. No evidence has been submitted to the contrary. This was in the context of an assumed $116.5 billion in general unsecured claims, though this could increase with lease and contract rejection claims and pension termination claims.

While the Liquidation Analysis projected some recoveries for secured debt and administrative and priority claims, it concluded that there would be *no recovery whatsoever* for unsecured creditors. The Court has no basis to doubt those conclusions. The Court finds that in the event of a liquidation, unsecured creditors would recover nothing.

### 9. Fairness of the Transaction

Before the 363 Transaction was presented for Court approval, GM's Board of Directors (the "**Board**") (all but one of whose members were independent, and advised by the law firm of Cravath, Swaine & Moore), received a fairness opinion, dated May 31, 2009 (the "**Fairness Opinion**"), from Evercore Group L.L.C. ("**Evercore**").

The Fairness Opinion's conclusion was that the purchase price was fair to GM, from a financial point of view. No contrary evidence has been submitted to the Court.

### 10. Specifics of the Transaction

The sale transaction, as embodied in the MPA and related documents, is complex. Its "deal points" can be summarized as follows:

#### (a) Acquired and Excluded Assets

Under the Sale, New GM will acquire all of Old GM's assets, with the exception of certain assets expressly excluded under the MPA (respectively, the "**Purchased Assets**" and the "**Excluded Assets**"). The Excluded Assets chiefly consist of:

(i) $1.175 billion in cash or cash equivalents;

(ii) equity interests in certain Saturn and other entities;

(iii) certain real and personal property;

(iv) bankruptcy avoidance actions;

(v) certain employee benefit plans; and

(vi) certain restricted cash and receivables.

#### (b) Assumed and Excluded Liabilities

Old GM will retain all liabilities except those defined in the MPA as "**Assumed Liabilities.**" The Assumed Liabilities include:

(i) product liability claims arising out of products delivered at or after the Sale transaction closes (the "***Closing***");

(ii) the warranty and recall obligations of both Old GM and New GM;

(iii) all employment-related obligations and liabilities under any assumed employee benefit plan relating to employees that are or were covered by the UAW collective bargaining agreement;

and—by reason of an important change that was made in the MPA after the filing of the motion—

> **\*482** (iv) broadening the first category substantially, *all* product liability claims arising from accidents or other discrete incidents arising from operation of GM vehicles occurring subsequent to the closing of the 363 Transaction, *regardless of when the product was purchased.*

The liabilities being retained by Old GM include:

(i) product liability claims arising out of products delivered prior to the Closing (to the extent they weren't assumed by reason of the change in the MPA after the filing of objections);

(ii) liabilities for claims arising out of exposure to asbestos;

(iii) liabilities to third parties for claims based upon "[c]ontract, tort or any other basis";

(iv) liabilities related to any implied warranty or other implied obligation arising under statutory or common law; and

(v) employment-related obligations not otherwise assumed, including, among other obligations, those arising out of the employment, potential employment, or termination of any individual (other than an employee

covered by the UAW collective bargaining agreement) prior to or at the Closing.

### (c) Consideration

Old GM is to receive consideration estimated to be worth approximately $45 billion, plus the value of equity interests that it will receive in New GM. It will come in the following forms:

(i) a credit bid by the U.S. Treasury and EDC, who will credit bid the majority of the indebtedness outstanding under their DIP facility and the Treasury Prepetition Loan;

(ii) the assumption by New GM of approximately $6.7 billion of indebtedness under the DIP facilities, plus an additional $1.175 billion to be advanced by the U.S. Treasury under a new DIP facility (the "**Wind Down Facility**") whose proceeds will be used by Old GM to wind down its affairs;

(iii) the surrender of the warrant that had been issued by Old GM to Treasury in connection with the Treasury Prepetition Loan;

(iv) 10% of the post-closing outstanding shares of New GM, plus an additional 2% if the estimated amount of allowed prepetition general unsecured claims against Old GM exceeds $35 billion;

(v) two warrants, each to purchase 7.5% of the post-closing outstanding shares of New GM, with an exercise price based on a $15 billion equity valuation and a $30 billion equity valuation, respectively; and

(vi) the assumption of liabilities, including those noted above.

### (d) Ownership of New GM

Under the terms of the Sale, New GM will be owned by four entities.

(i) Treasury will own 60.8% of New GM's common stock on an undiluted basis. It also will own $2.1 billion of New GM Series A Preferred Stock;

(ii) EDC will own 11.7% of New GM's common stock on an undiluted basis. It also will own $400 million of New GM Series A Preferred Stock;

(iii) A New Employees' Beneficiary Association Trust ("**New VEBA**") will own 17.5% of New GM's common stock on an undiluted basis. It also will own $6.5 billion of New GM's Series A Preferred Stock, and a 6–year warrant to acquire 2.5% of New GM's common stock, with an exercise price based on $75 billion total equity value; and

**\*483** (iv) Finally, if a chapter 11 plan is implemented as contemplated under the structure of the Sale transaction, Old GM will own 10% of New GM's common stock on an undiluted basis. In addition, if the allowed prepetition general unsecured claims against Old GM exceed $35 billion, Old GM will be issued an additional 10 million shares, amounting to approximately 2% of New GM's common stock. Old GM will also own the two warrants mentioned above.

### (e) Other Aspects of Transaction

New GM will make an offer of employment to all of the Sellers' non-unionized employees and unionized employees represented by the UAW. Substantially all of old GM's executory contracts with direct suppliers are likely to be assumed and assigned to New GM.

After the Closing, New GM will assume all liabilities arising under express written emission and limited warranties delivered in connection with the sale of new vehicles or parts manufactured or sold by Old GM.

One of the requirements of the U.S. Treasury, imposed when the Treasury Prepetition Loan was put in place, was the need to negotiate a new collective bargaining agreement which would allow GM to be fully competitive, and "equitize"—*i.e.,* convert to equity—at least one half of the obligation GM had to the UAW VEBA. Ultimately GM did so. New GM will make future contributions to the New VEBA that will provide retiree health and welfare benefits to former UAW employees and their spouses. Also, as part of the 363 Transaction, New GM will be the assignee of revised collective bargaining agreements with the UAW, the terms of which were recently ratified—though contingent upon the approval of the entirety of these motions.

### (f) The Proposed Sale Order

Though GM's request has been narrowed, as noted above, to provide that New GM will assume liability for product liability claims arising from operation of GM vehicles

occurring after the closing of the 363 Transaction (regardless of when the product was purchased), GM asks this Court, as in the *Chrysler* case, to authorize the Sale free and clear of all other "liens, claims, encumbrances and other interests," including, specifically, "all successor liability claims."

To effectuate this result, GM has submitted a proposed order to the Court (the "**Proposed Sale Order**") that contains provisions directed at cutting off successor liability except in the respects where successor liability was contractually assumed.

First, the Proposed Sale Order contains a finding—and a decretal provision to similar effect—that the Debtors may sell the Purchased Assets free and clear of all liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability.

Second, the Proposed Sale Order would enjoin all persons (including "litigation claimants") holding liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability, from asserting them against New GM or the Purchased Assets. [11]

### 11. Contingent Liabilities

Certain types of GM liabilities are contingent and difficult to quantify. GM's most recent quarterly report noted present valued contingent liabilities of $934 million for product liability, $627 million **\*484** for asbestos liability, $307 million for other litigation liability, and $294 million for environmental liability.

### 12. Agreement with UAW

Workers in the U.S. do not have government provided healthcare benefits of the type that the employees of many of GM's foreign competitors do. Over the years, GM and the other members of the Big Three committed themselves to offer many of those healthcare benefits, resulting in decreased competitiveness and enormous liabilities. GM tried to reduce the costs of healthcare benefits for its employees, but these costs continued to substantially escalate. Many of these costs were in the form of obligations to pay healthcare costs of union employees on retirement.

In 2007 and 2008, GM settled various controversies with respect to its healthcare obligations by entering into an agreement (the "**2008 UAW Settlement Agreement**"), generally providing that responsibility for providing retiree

healthcare would permanently shift from GM to a new plan that was independent of GM. GM would no longer have to pay for the benefits themselves, but instead would have to make specified contributions aggregating approximately $20.56 billion to be made by GM into the VEBA Trust. The 2008 UAW Settlement Agreement, therefore, fixed and capped GM's obligations—but in a very large amount.

As part of the 363 Transaction, the Purchaser and the UAW have reached a resolution addressing the ongoing provision of those benefits. New GM will make contributions to the New VEBA, which will have the obligation to fund the UAW retiree health and welfare benefits. And under the "**UAW Retiree Settlement Agreement,**" New GM will put value into the New VEBA, which will then have the obligation to fund retiree medical benefits for the Debtors' retirees and surviving spouses represented by the UAW (the "**UAW– Represented Retirees**").

New GM will also assume modified and duly ratified collective bargaining agreements entered into by and between the Debtors and the UAW.

### 13. Need for Speed

GM and the U.S. Treasury say that the 363 Transaction must be approved and completed quickly. The Court finds that they are right.

Absent prompt confirmation that the sale has been approved and that the transfer of the assets will be implemented, GM will have to liquidate. There are no realistic alternatives available.

There are no merger partners, acquirers, or investors willing and able to acquire GM's business. Other than the U.S. Treasury and EDC, there are no lenders willing and able to finance GM's continued operations. Similarly, there are no lenders willing and able to finance GM in a prolonged chapter 11 case.

The continued availability of the financing provided by Treasury is expressly conditioned upon approval of this motion by July 10, and prompt closing of the 363 Transaction by August 15. Without such financing, GM faces immediate liquidation.

The Court accepts as accurate and truthful the testimony by GM CEO Fritz Henderson at the hearing:

Q. Now, if the U.S. Treasury does not fund on July 10th and the sale order is not entered by that date, what options are there for GM at that point?

A. Well, if they don't continue, we would liquidate. [12]

**\*485** The July 10 deadline is important because the U.S. Treasury, like GM itself, has been very concerned about the business status of the company in a bankruptcy process. [13] GM did worse than expected in fleet sales in June, as fleet sales customers pulled back their orders because they didn't know their status in the bankruptcy. Although the company did *better* on retail sales than expected in June, it did so for a number of reasons, one of which was the expectation that the chapter 11 case would move quickly, and that the company, in the 363 process, would be successful. [14] And results were "still terrible." [15]

Even if funding were available for an extended bankruptcy case, many consumers would not consider purchasing a vehicle from a manufacturer whose future was uncertain and that was entangled in the bankruptcy process.

Thus the Court agrees that a lengthy chapter 11 case for the Debtors is not an option. It also agrees with the Debtors and the U.S. Government that it is not reasonable to expect that a reorganization plan could be confirmed in the next 60 days (*i.e.,* 90 days from the Filing Date).

The Auto Task Force talked to dozens of experts, industry consultants, people who had observed General Motors for decades, management, and people who were well versed in the bankruptcy process as part of its planning and work on this matter. None of them felt that GM could survive a traditional chapter 11 process. The Auto Task Force learned of views by one of the leading commentators on GM that GM would be making a tragic mistake by pursuing a bankruptcy filing. It became clear to the Auto Task Force that a bankruptcy with a traditional plan confirmation process would be so injurious to GM as to not allow for GM's viability going forward. [16]

The Court accepts this testimony, and so finds. A 90 day plan confirmation process would be wholly unrealistic. In fact, the notion that a reorganization with a plan confirmation could be completed in 90 days in a case of this size and complexity is ludicrous, especially when one is already on notice of areas of likely controversy.

*14. Ultimate Facts*

The Court thus makes the following findings of ultimate facts:

1. There is a good business reason for proceeding with the 363 Transaction now, as contrasted to awaiting the formulation and confirmation of a chapter 11 plan.

2. There is an articulated business justification for proceeding with the 363 Transaction now.

3. The 363 Transaction is an appropriate exercise of business judgment.

4. The 363 Transaction is the only available means to preserve the continuation of GM's business.

5. The 363 Transaction is the only available means to maximize the value of GM's business.

6. There is no viable alternative to the 363 Transaction.

7. The only alternative to the 363 Transaction is liquidation.

8. No unsecured creditor will here get less than it would receive in a liquidation.

9. The UAW Settlement is fair and equitable, and is in the best interests **\*486** of both the estate and UAW members.

10. The secured debt owing to the U.S. Government and EDC (both post-petition and, to the extent applicable, prepetition) is not subject to recharacterization as equity or equitable subordination, and could be used for a credit bid.

11. The Purchaser is a purchaser in good faith.

### *Discussion*

The substantive objections break down into a number of categories by concept, and the Court thus considers them in that fashion.

### *1. Sale Under Section 363*

Determining the propriety of the 363 Transaction requires confirming that section 363 can be utilized for the sale of this much of GM's assets before confirmation of a reorganization plan; that the necessary showings for approval of any section 363 sale have been made; that the 363 Transaction is not a

"*sub rosa* " plan; and that various related issues have been satisfactorily resolved. The Court considers these in turn.

### (a) Utilization of Section 363

[1]   The F & D Bondholders, bondholder Oliver Addison Parker ("**Parker**") and several other objectors contend that by disposing of so much of its assets in a single section 363 sale, GM improperly utilizes section 363. Implicit in that argument is the contention that even under the facts here, section 363 cannot be used to dispose of all or the bulk of a debtor's assets, and that such can be achieved only by means of a reorganization plan. The Court disagrees.

As usual, the Court starts with textual analysis. With exceptions not relevant here, section 363 of the Bankruptcy Code provides, in relevant part:

> (b)(1) The trustee, [17] after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate....

Notably, section 363 has no carveouts from its grant of authority when applied in cases under chapter 11. Section 363 does not provide, in words or substance, that it may not be used in chapter 11 cases for dispositions of property exceeding any particular size, or where the property is of such importance that it should alternatively be disposed of under a plan. Nor does any other provision of the Code so provide.

Then, section 1123 of the Code—captioned "Contents of plan," a provision in chapter 11 which sets forth provisions that a chapter 11 reorganization plan *must* do or contain, and *may* do or contain—provides, as one of the things that a plan *may* do:

> provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests.... [18]

But neither section 363 nor section 1123(b)(4) provides that resort to 1123(b)(4) is the *only* way by which all or substantially all of the assets can be sold in  **\*487** a chapter 11 case. Most significantly, neither section 1123(b)(4) nor any other section of the Code trumps or limits section 363, which by its plain meaning permits what GM here proposes to do.

[2]   However, the issue cannot be addressed by resort to "plain meaning" or textual analysis alone. GM's ability to sell the assets in question under section 363 is governed by an extensive body of caselaw. Bankruptcy courts in this Circuit decide issues of the type now before the Court under binding decisions of the U.S. Supreme Court and the Second Circuit Court of Appeals, each of which (particularly the latter) has spoken to the issues here. And bankruptcy courts also look to other bankruptcy court decisions, which, in this District and elsewhere, have dealt with very similar facts. While an opinion of one bankruptcy judge in this District is not, strictly speaking, binding on another, it is the practice of this Court to grant great respect to the earlier bankruptcy court precedents in this District, [19] particularly since they frequently address issues that have not been addressed at the Circuit level.

Here this Court has the benefit of the decisions of Bankruptcy Judge Gonzalez in the *Chrysler* chapter 11 cases [20]—affirmed by the Second Circuit, for substantially the reasons Judge Gonzalez set forth in his opinion—on facts extraordinarily similar to those here. [21] Even more importantly, this Court also has the benefit of the Second Circuit's decisions in *Lionel,* [22] *LTV,* [23] *Financial News Network,* [24] *Gucci,* [25] and *Iridium,*  **\*488**  [26] which confirm that section 363 sales of major assets may be effected before confirmation, and lay out the circumstances under which that is appropriate. And this Court also can draw upon the Supreme Court's decision in *Piccadilly Cafeterias,* [27] which, while principally addressing other issues, recognized the common practice in chapter 11 cases of selling the bulk of a debtor's assets in a section 363 sale, to be followed by confirmation of a liquidating plan.

In *Chrysler,* Judge Gonzalez discussed at great length the evolution of the law in this area and its present requirements, [28] and this Court need not do so in comparable length. Judge Gonzalez, and the Second Circuit affirming him, dealt with the exact issue presented here: whether under Bankruptcy Code section 363, the bulk of the assets of an estate can be sold before confirmation. As Judge Gonzalez noted, *Lionel*—upon whose standards all of the cases considering pre-confirmation section 363 sales have been based—speaks directly to whether assets of a bankruptcy estate can be sold "out of the ordinary course of business and prior to acceptance and outside of any plan of reorganization." [29]

The *Lionel* court expressly recognized that section 363(b) "seems on its face to confer upon the bankruptcy judge virtually unfettered discretion" to authorize sales out of the ordinary course. [30] And the *Lionel* court further declared that "a bankruptcy judge must not be shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative power granted him under the Code," [31] and that:

> To further the purposes of Chapter 11 reorganization, a bankruptcy judge must have substantial freedom to tailor his orders to meet differing circumstances. This is exactly the result a liberal reading of § 363(b) will achieve. [32]

Nevertheless, the Circuit considered it inappropriate to authorize use of section 363(b) to the full extent that section 363(b)'s plain language—with its absence of any express limitations—would suggest. Instead, the Circuit established a standard that was in substance one of common law, but grounded in the overall structure of the Bankruptcy Code. The Second Circuit "reject[ed] the requirement that only an emergency permits the use of § 363(b)." [33] But it also "reject[ed] the view that § 363 grants the bankruptcy judge carte blanche." [34] Concerned that such a construction would "swallow[ ] up Chapter 11's safeguards," [35] the *Lionel* court established the more nuanced balancing test that the lower courts in this Circuit have applied for more than 25 years. The Circuit declared:

> The history surrounding the enactment in 1978 of current Chapter 11 and the logic underlying it buttress our conclusion that *there must be some articulated business justification,* other than appeasement **\*489** of major creditors, for using, selling or leasing property out of the ordinary course of business before the bankruptcy judge may order such disposition under section 363(b). [36]

It went on to say that:

> Resolving the apparent conflict between Chapter 11 and § 363(b) does not require an all or nothing approach. Every sale under § 363(b) does not automatically short-circuit or side-step Chapter 11; nor are these two statutory provisions to be read as mutually exclusive. Instead, if a

> bankruptcy judge is to administer a business reorganization successfully under the Code, then ... some play for the operation of both § 363(b) and Chapter 11 must be allowed for. [37]

And it went on to set forth the rule for which *Lionel* is remembered:

> The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing *a good business reason* to grant such an application. [38]

[3]   With no less than five decisions from the Circuit holding similarly [39]—not counting the Circuit's recent affirmance of *Chrysler*—it is plain that in the Second Circuit, as elsewhere, [40] even the entirety of a debtor's business may be sold without waiting for confirmation when there is a good business reason for doing so. Likewise, in *Piccadilly Cafeterias,* the Supreme Court, while principally addressing a different issue, [41] recognized the use of **\*490** section 363 sales under which all or substantially all of a debtor's assets are sold. The Supreme Court stated:

> Chapter 11 bankruptcy proceedings ordinarily culminate in the confirmation of a reorganization plan. *But in some cases, as here, a debtor sells all or substantially all its assets under § 363(b)(1) before seeking or receiving plan confirmation.* In this scenario, the debtor typically submits for confirmation a plan of liquidation (rather than a traditional plan of reorganization) providing for the distribution of the proceeds resulting from the sale. [42]

[4]   [5]   [6]   In making the determination as to whether there is a good business reason to effect a 363 sale before confirmation, the *Lionel* court directed that a court should consider all of the "salient factors pertaining to the proceeding" and "act to further the diverse interests of the debtor, creditors and equity holders." [43] It then set forth a nonexclusive list to guide a court in its consideration of the issue:

> (a) the proportionate value of the asset to the estate as a whole;

(b) the amount of elapsed time since the filing;

(c) the likelihood that a plan of reorganization will be proposed and confirmed in the near future;

(d) the effect of the proposed disposition on future plans of reorganization;

(e) the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property;

(f) which of the alternatives of use, sale or lease the proposal envisions; and "most importantly perhaps," [44]

(g) whether the asset is increasing or decreasing in value. [45] Importantly, the *Lionel* court also declared that a bankruptcy court must consider if those opposing the sale produced some evidence that the sale was not justified. [46]

As the *Lionel* court expressly stated that the list of salient factors was not exclusive, [47] this Court might suggest a few more factors that might be considered, along with the preceding factors, in appropriate cases:

(h) Does the estate have the liquidity to survive until confirmation of a plan?

(i) Will the sale opportunity still exist as of the time of plan confirmation?

(j) If not, how likely is it that there will be a satisfactory alternative sale opportunity, or a stand-alone plan alternative that is equally desirable (or better) for creditors? And

(k) Is there a material risk that by deferring the sale, the patient will die on the operating table?

Each of the factors that the *Lionel* court listed, and the additional ones that this Court suggests, go to the ultimate questions that the *Lionel* court identified: Is there an "articulated business justification" and a "good business reason" for proceeding with the sale without awaiting the final confirmation of a plan.

**\*491** **[7]** **[8]** **[9]**  As discussed in Section 1(c) below, a debtor cannot enter into a transaction that "would amount to a *sub rosa* plan of reorganization" or an attempt to circumvent the chapter 11 requirements for confirmation of a plan of reorganization. [48] If, however, the transaction has "a

proper business justification" which has the potential to lead toward confirmation of a plan and is not to evade the plan confirmation process, the transaction may be authorized. [49] Thus as observed in *Chrysler:*

> A debtor may sell substantially all of its assets as a going concern and later submit a plan of liquidation providing for the distribution of the proceeds of the sale. This strategy is employed, for example, when there is a need to preserve the going concern value because revenues are not sufficient to support the continued operation of the business and there are no viable sources for financing. [50]

As further observed in *Chrysler,* several sales seeking to preserve going concern value have recently been approved in this district, and going back further, many more have been, as debtors not infrequently could not survive until a plan could be confirmed. In addition to *BearingPoint,* which Judge Gonzalez expressly noted, many other 363 sales have been approved in chapter 11 cases on this Court's watch, after appropriate consideration of *Lionel* and its progeny. In *Our Lady of Mercy Hospital,* [51] for example, the hospital was sold as a going concern before it ran out of money, saving about 2,300 jobs and a critical supplier of medical services in the Bronx.

In *Adelphia,* [52] a sale under a *plan* was originally proposed by the debtors, but a section 363 sale had to be effected instead, when intercreditor disputes made it impossible to confirm a plan in time to save the sale opportunity, and more than $17 billion in sale proceeds nearly was lost. [53] Anyone with a knowledge of chapter 11 cases in this District can well understand why none of Harry Wilson's advisors thought that GM could survive a normal plan confirmation process.

**[10]**  After *Lionel, LTV, FNN, Gucci, Iridium* and, of course, *Chrysler,* it is now well established that a chapter 11 debtor may sell all or substantially all its assets pursuant to section 363(b) prior to confirmation of a chapter 11 plan, when the court finds a good business reason for doing so. And here the Court has made exactly such a finding. In fact, it is hard to imagine circumstances that could more strongly justify an immediate 363 sale. As the Court's Findings of Fact set forth at length, GM, with no liquidity of its own and the need to quickly address consumer and fleet owner doubt, does not have the luxury of selling its business under a plan.

And if that is not by itself enough, the U.S. Treasury's willingness to fund GM is contingent upon the approval of the 363 Transaction by July 10. The Court fully understands the unwillingness of the Government to keep funding GM indefinitely—especially to await the resolution of disputes amongst creditors trying to maximize their recoveries. If the 363 Transaction is disapproved, GM will lose its funding **\*492** and its liquidity on July 10, and its only alternative will be liquidation.[54]

In its summation, the F & D Bondholders Committee stated that it was not inclined to second guess *GM's* view that it had to proceed with a 363 sale, given GM's lack of alternatives, but that the *Court* should step in to tell everyone that a 363 sale was unacceptable. The premise underlying this contention was that the U.S. Government's July 10 deadline was just posturing, and that the Court should assume that the U.S. Government cares so much about GM's survival that the U.S. Government would never let GM die.

The Court declines to accept that premise and take that gamble. The problem is not that the U.S. Treasury would walk away from GM if this Court took an extra day or so to reach its decision. The problem is that if the 363 Transaction got off track, especially by the disapproval the F & D Bondholders Committee seeks, the U.S. Government would see that there was no means of early exit for GM; that customer confidence would plummet; and that the U.S. Treasury would have to keep funding GM while bondholders (and, then, perhaps others) jousted to maximize their individual incremental recoveries. The Court fully takes Harry Wilson at his word.

In another matter in the *Adelphia* cases, this Court was faced with quite similar circumstances. The Government had the ability to effect a forfeiture of Adelphia assets, and even to indict Adelphia (as a corporation, in addition to the Rigases), which would destroy most, if not all, of Adelphia's value. The Government had indicted Arthur Andersen, with those exact consequences, but many Adelphia creditors argued that the Government would never do it again. And they objected to an Adelphia settlement that paid $715 million to the Government, to forestall all of those potential consequences, among others. This Court approved the settlement, and its determination was affirmed on appeal. This Court stated:

> Would the DoJ have indicted Adelphia, with the threat to the recoveries for innocent stakeholders that such an indictment would have

entailed? One would think not, but the DoJ had done **\*493** exactly that to Arthur Andersen, with those exact consequences. It was at least prudent for Adelphia's Board to protect the entity under its stewardship from its destruction, and to avoid taking such a gamble.[55]

This Court further stated that "[o]nce more, the Adelphia Board cannot be faulted for declining to bet the company on what would be little more than a guess as to the decision the DoJ would make."[56]

GM's counsel noted in summation that the F & D Bondholders Committee was expecting this Court to play Russian Roulette, and the comparison was apt. So that the F & D Bondholders Committee could throw GM into a plan negotiation process, the Court would have to gamble on the notion that the U.S. Government didn't mean it when it said that it would not keep funding GM. There is no reason why any fiduciary, or any court, would take that gamble. This is hardly the first time that this Court has seen creditors risk doomsday consequences to increase their incremental recoveries, and this Court—which is focused on preserving and maximizing value, allowing suppliers to survive, and helping employees keep their jobs—is not of a mind to jeopardize all of those goals.

Thus there is more than "good business reason" for the 363 Transaction here. The Creditors' Committee in this case put it better than this Court could:

> The simple fact is that there are no other viable bids—indeed no serious expressions of interest—to purchase GM's assets and no other feasible way for GM to restructure its business to remain viable. The current transaction is the only option on the table. The Court is thus faced with a clear choice: to approve the proposed sale transaction, preserve the going-concern value of the Debtors' businesses, and maximize substantial value for stakeholders (despite the pain that this course will inflict on numerous innocent parties), or reject the transaction and precipitate the dismantling and liquidation of GM

to the detriment of all involved. *Preventing this harm serves the core purposes of the Bankruptcy Code and constitutes a strong business justification under Section 363 of the Code to sell the debtors' assets outside of a plan process.* [57]

While because of the size of this case and the interests at stake, GM's chapter 11 case can hardly be regarded as routine, GM's proposed section 363 sale breaks no new ground. This is exactly the type of situation where under the Second Circuit's many holdings, there is good business reason for an immediate sale. GM does not have the luxury to wait for the ultimate confirmation of a plan, and the only alternative to an immediate sale is liquidation.

*(b) Compliance with Standards for Approval of Section 363 Sales*

[11]    [12]    With the Court having concluded that the requisite sound business justification exists for a proposed sale of the type proposed here, the inquiry turns to whether the routine requirements for any section 363 sale, and appropriate exercise of the business judgment rule, have been satisfied. The court must be satisfied that (i) notice has been given to all **\*494** creditors and interested parties; (ii) the sale contemplates a fair and reasonable price; and (iii) the purchaser is proceeding in good faith. [58]

[13]    These factors are all satisfied here. Notice was extensively given, and it complied with all applicable rules. As to the sufficiency of the purchase price, the Court is equally satisfied. No other, much less better, offer was received, and the GM Board even secured a fairness opinion from reputable advisors, expressing the opinion that the consideration was, indeed, fair.

[14]    Finally, the Court has found that the Purchaser has acted in good faith, and as mixed questions of fact and law, the Court now determines (i) that this legal requirement for a sale has been satisfied, and (ii) that the Purchaser is entitled to a good faith purchaser finding—matters that are relevant to the determination under *Betty Owens Schools* and the other cases articulating like requirements, and also to the section 363(m) finding that the U.S. Government understandably desires. In ruling that the U.S. Government has indeed acted in good faith, for both of the purposes for which that ruling is relevant,

the Court sees no basis for finding material differences in the standard.

[15]    [16]    While the Bankruptcy Code does not define the "good faith" that protects transactions pursuant to section 363(m) (or, for that matter, the "good faith" that courts require in approving section 363 sales in the first place), the Second Circuit has explained that:

Good faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings; where there is a lack of such integrity, a good faith finding may not be made. A purchaser's good faith is lost by 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.' [59]

Here there is no proof that the Purchaser (or its U.S. and Canadian governmental assignors) showed a lack of integrity in any way. To the contrary, the evidence establishes that the 363 Transaction was the product of intense arms'—length negotiations. And there is no evidence of any efforts to take advantage of other bidders, or get a leg up over them. In fact, the sad fact is that there *were no* other bidders.

Thus, the Court finds that the Purchaser is a good faith purchaser, for sale approval purposes, and also for the purpose of the protections section 363(m) provides.

[17]    [18]    The Court additionally determines that it finds GM to be in compliance with the requirements of the business judgment rule, commonly used in consideration of 363 sales in this District and elsewhere. [60] As noted in this Court's decision in *Global Crossing,* and Judge Mukasey's decision in *Integrated Resources,* that rule **\*495** entails "(1) a business decision, (2) disinterestedness, (3) due care, (4) good faith, and (5) according to some courts and commentators, no abuse of discretion or waste of corporate assets." [61]

Here the Court finds it unnecessary to state, one more time, all of the facts that support a finding that such requirements have been satisfied. The GM Board's decision would withstand *ab initio* review, far more than the business judgment test requires. [62]

*(c) "Sub Rosa" Plan*

[19]    The F & D Bondholders, Parker and other objectors also contend that by proposing the 363 Transaction, GM has

proposed the implementation of a forbidden "*sub rosa* " plan. The Court disagrees.

**[20]    [21]    [22]**    While neither section 363 nor any other provision of the Code defines or otherwise mentions "*sub rosa* " plans, or provides that they are impermissible, caselaw (including caselaw in this Circuit and District) recognizes the impropriety of *sub rosa* plans in instances in which they genuinely exist.[63] The idea underlying the prohibition against *sub rosa* plans appears in *Braniff,* the case from which the prohibition emerged. It is that "the debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets."[64] A proposed 363 sale may be objectionable, for example, when aspects of the transaction dictate the terms of the ensuing plan or constrain parties in exercising their confirmation rights,[65] such as by placing restrictions on creditors' rights to vote on a plan.[66] A 363 sale may also may be objectionable as a *sub rosa* plan if the sale itself seeks to allocate or dictate the distribution of sale proceeds among different classes of creditors.[67]

But none of those factors is present here. The MPA does not dictate the terms of a plan of reorganization, as it does not attempt to dictate or restructure the rights of the creditors of this estate. It merely brings in value. Creditors will **\*496** thereafter share in that value pursuant to a chapter 11 plan subject to confirmation by the Court. A transaction contemplating that does not amount to a *sub rosa* plan.[68]

**[23]**    In the *TWA* chapter 11 case,[69] substantially all of the airline's assets were sold to American Airlines, in a 363 sale. There too the contention was made that the 363 sale was a *sub rosa* plan. Judge Walsh rejected the contention. He explained:

It is true, of course, that TWA is converting a group of volatile assets into cash. It may also be true that the value generated is not enough for a dividend to certain groups of unsecured creditors. *It does not follow, however, that the sale itself dictates the terms of TWA's future chapter 11 plan.* The value generated through the Court approved auction process reflects the market value of TWA's assets and the conversion of the assets into cash is the contemplated result under § 363(b).[70]

Here the objectors principally base their arguments on things the *Purchaser* intends to do. They complain of the Purchaser's intention, in connection with the 363 Transaction, to

(i) be assigned substantially all executory contracts with direct suppliers,

(ii) make offers of employment to all of the Debtors' nonunionized employees and employees represented by the UAW, and

(iii) be assigned a modified collective bargaining agreement with the UAW, including an agreement to contribute to the New VEBA to fund retiree medical benefits for UAW members and their surviving spouses.

But these do not give rise to a *sub rosa* plan when the first is merely an example of an element of almost *every* 363 sale (where purchasers designate the contracts to be assumed and assigned), and the second and third are actions by the *Purchaser.*

The Court senses a disappointment on the part of dissenting bondholders that the Purchaser did not choose to deliver consideration to them in any manner other than by the Purchaser's delivery of consideration to GM as a whole, pursuant to which bondholders would share like other unsecured creditors—while many supplier creditors would have their agreements assumed and assigned, and new GM would enter into new agreements with the UAW and the majority of the dealers. But that does not rise to the level of establishing a *sub rosa* plan. The objectors' real problem is with the decisions of the Purchaser, not with the Debtor, nor with any violation of the Code or caselaw.

**[24]**    Caselaw also makes clear that a section 363(b) sale transaction is not objectionable as a *sub rosa* plan based on the fact that the purchaser is to assume *some,* but not all, of the debtor's liabilities, or because some contract counterparties' contracts would not be assumed. As Judge Walsh observed in *TWA:*

[N]othing in § 363 suggests that disparate treatment of creditors, such as is likely to occur here, disqualifies a transaction from court approval. The purpose of a § 363(b) sale is to transform **\*497** assets ... into cash in an effort to maximize value. *Distribution of the value generated in accordance with § 1129 and other*

> priority provisions occurs and is
> intended to occur subsequent to the
> sale.

He further stated:

> The treatment of creditors in a § 363(b)
> context is dictated by the fair market
> value of those assets of the debtor that
> the purchaser in its business judgment
> elects to purchase. A purchaser cannot
> be told to assume liabilities that do not
> benefit its purchase objective. *Thus,
> the disparate treatment of creditors
> occurs as a consequence of the sale
> transaction itself and is not an attempt
> by the debtor to circumvent the
> distribution scheme of the Code.* [71]

Last, but hardly least, the *sub rosa* plan contention was
squarely raised, and rejected, in *Chrysler,* [72] which is directly
on point and conclusive here.

The *Chrysler* transaction was structured in a fashion very
similar to that here, with a combination of sale proceeds to be
provided to the seller, assignments of contracts with suppliers,
taking on seller employees, and contribution to a VEBA.
Judge Gonzalez rejected the contention that the transaction
amounted to a *sub rosa* plan. He noted that:

> (i) there was no attempt to allocate sale proceeds away from
> the objectors (there, first lien lenders); [73]

> (ii) the fact that counterparties whose executory contracts
> were being assumed and assigned under section 365, at
> the election of the purchaser, gave counterparties a *Code-
> authorized* "more favorable treatment," which neither
> violated the priority rules nor transformed the sale into a
> *sub rosa* plan; [74]

> (iii) the purchaser's ability to choose which contracts it
> considered valuable did not change that result; [75]

> (iv) in negotiating with groups essential to its viability
> (such as its workforce) the purchaser was free to provide
> ownership interests in the new entity as it saw fit; [76] and
> that

> (v) the purchaser's allocation of value in its own enterprise
> did not elevate its measures into a *sub rosa* plan. [77]

In connection with the last two points, Judge Gonzalez made
a critically important point—that the allocation of value by
the purchaser did not affect the *debtor's* interest. In that
connection, Judge Gonzalez observed:

> In negotiating with those groups
> essential to its viability, New Chrysler
> made certain agreements and provided
> ownership interests in the new entity,
> which was neither a diversion of
> value from the Debtors' assets nor
> an allocation of the proceeds from
> the sale of the Debtors' assets. *The
> allocation of ownership interests in
> the new enterprise is irrelevant to the
> estates' economic interests.* [78]

Similarly, Judge Gonzalez noted that what the UAW, the
VEBA and the U.S. Treasury would be getting in New
Chrysler was not on account of any entitlements any of them
might have in the case before him. He observed:

> **\*498** In addition, the UAW,
> VEBA, and the Treasury are not
> receiving distributions on account
> of their prepetition claims. Rather,
> consideration to these entities is being
> provided under separately-negotiated
> agreements with New Chrysler. [79]

As in *Chrysler* and *TWA,* the Court rules that the 363
Transaction does not constitute an impermissible *sub rosa*
plan.

### (d) Recharacterization or Subordination of U.S. Treasury Debt

The F & D Bondholders and Bondholder Parker contend that
some or all of the U.S. Government's secured debt should
be recharacterized as equity—or, alternatively, equitably
subordinated to unsecured debt—as a predicate for their next
contention that it cannot be used as the basis for a credit bid.
The Court disagrees with each contention.

In another of its decisions in the *Adelphia* chapter 11 cases, [80]
this Court likewise considered allegations that a secured

lender's debt should be recharacterized as equity. In doing so, the Court applied standards articulated by the Fourth Circuit and Sixth Circuit in the *Dornier Aviation* [81] and *AutoStyle Plastics* [82] cases, which in turn had been based on tax law precedent.

[25]   Factors listed in those cases are:

(1) the names given to the instruments, if any, evidencing the indebtedness;

(2) the presence or absence of a fixed maturity date and schedule of payments;

(3) the presence or absence of a fixed rate of interest and interest payments;

(4) the source of repayments;

(5) the adequacy or inadequacy of capitalization;

(6) the identity of interest between the creditor and the stockholder;

(7) the security, if any, for the advances;

(8) the corporation's ability to obtain financing from outside lending institutions;

(9) the extent to which the advances were subordinated to the claims of outside creditors;

(10) the extent to which the advances were used to acquire capital assets; and

(11) the presence or absence of a sinking fund to provide repayments. [83]

[26]   Here the Court finds that GM was inadequately capitalized at the time the loans were made; that GM could not obtain financing from outside lending institutions, and that the record does not show the presence of a sinking fund to provide repayments—three of the eleven factors that would suggest recharacterization. But of the remainder, every single factor supports finding that this was genuine debt. Among other factors, as noted in the Court's Findings of Fact above, this **\*499** transaction was fully documented as a loan; was secured debt, complete with intercreditor agreements to address priority issues with other secured lenders; had interest terms (albeit at better than market rate) and maturity terms, and, significantly, had *separate* equity features—providing for warrants to accompany the debt instruments. The Court

has previously found, as a fact and mixed question of fact and law, that the Prepetition Secured Debt was, in fact, debt, and the Court now determines that as a conclusion of law. [84]

[27]   [28]   Likewise, the Court disagrees with contentions (principally by bondholder Parker) that the secured debt held by the U.S. Treasury (and, presumably, EDC) should be equitably subordinated. The Court addressed the development of the law of equitable subordination (and its first cousin, equitable disallowance) in its decision in *Adelphia–Bank of America,* and need not discuss it in comparable length here. It is sufficient for the purposes of this decision to say that as originally stated in the famous case of *Mobile Steel,* [85] a party seeking to establish equitable subordination must prove that (i) the holder of the claim being subordinated engaged in inequitable conduct; (ii) the inequitable conduct resulted in injury to creditors or conferred an unfair advantage on the claimant; and (iii) equitable subordination is not inconsistent with the provisions of the Bankruptcy Code. [86] None of those factors has been established here.

First the Court finds that none of the U.S. Treasury, the Government of Canada, the Government of Ontario, or EDC acted inequitably in any way. They advanced funds to help thousands of creditors, citizens, employees of GM, and employees of suppliers and others. Their efforts to ensure that they were not throwing their money away in a useless exercise, and were expecting GM to slim down so it could survive without governmental assistance, are hardly inequitable; they were common sense.

Similarly, the Court finds no harm to creditors; without the challenged efforts, GM would have had to liquidate. Nor was there any special benefit to any of the Government entities.

Finally, treating the governmental lenders as lenders is hardly inconsistent with the provisions of the Bankruptcy Code. There is, in short, no basis for equitable subordination here.

### *(e) Asserted Inability to Credit Bid*
In light of the conclusions reached in the preceding section, the U.S. Treasury and EDC may, if they choose, assign their secured debt to the Purchaser, and there is then no reason why the Purchaser may not credit bid.

### *2. Successor Liability Issues*

Many objectors—including the Ad Hoc Committee of Consumer Victims (the "**Consumer Victims Committee**"), individual accident litigants ("the **Individual Accident Litigants**"), and attorneys for asbestos victim litigants (collectively, "the **Asbestos Litigants**") object to provisions in the proposed sale order that would limit any "successor liability" that New GM might have. Successor liability claims normally are for money damages—as, for example, **\*500** the claims by the Individual Accident Litigants are. If permitted, such claims would be asserted against the successor in ownership of property that was transferred from the entity whose alleged wrongful acts gave rise to the claim.

[29]   [30]   "As a general rule, a purchaser of assets does not assume the liabilities of the seller unless the purchaser expressly agrees to do so or an exception to the rule exists." [87]   Successor liability is an equitable exception to that general rule. [88]   Successor liability depends on state law, and the doctrines vary from state to state, [89]   but generally successor liability will not attach unless particular requirements imposed by that state have been satisfied. [90]

If a buyer cannot obtain protection against successor liability, "it may pay less for the assets because of the risk." [91]   When the transfer of property takes place in a 363 sale, and the buyer has sought and obtained agreement from the debtor that the sale will be free and clear, the bankruptcy court is invariably asked to provide, in its approval order, that the transferee does not assume liability for the debtor's pre-sale conduct.

Such a request was likewise made here. Under the proposed order, in its latest form, New GM would voluntarily assume liability for warranty claims, and for product liability claims asserted by those injured after the 363 Transaction—even if the vehicle was manufactured before the 363 Transaction. But New GM would not assume any Old GM liabilities for injuries or illnesses that arose before the 363 Transaction. And the proposed order has a number of provisions making explicit findings that New GM is not subject to successor liability for such matters, and that claims against New GM of that character are enjoined. [92]

[31]   The issues as to the successor liability provisions in the approval order are the most debatable of the issues now before **\*501** the Court. Textual analysis is ultimately inconclusive as to the extent to which a 363 order can bar successor liability claims premised upon the transfer of property, and cases on a nationwide basis are split. But principles of *stare decisis*

dictate that under the caselaw in this Circuit and District, the Court should, and indeed must, rule that property can be sold free and clear of successor liability claims.

*(a) Textual Analysis*

As before, the Court starts with textual analysis. Section 363(f) provides, in relevant part:

> The trustee may sell property under subsection (b) ... of this section free and clear of any interest in such property of an entity other than the estate, only if—
>
>> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>>
>> (2) such entity consents;
>>
>> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>>
>> (4) such interest is in bona fide dispute; or
>>
>> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

Application of section 363(f)'s authority to issue a "free and clear" order with respect to a successor liability claim turns, at least in the first instance, on whether such a claim is an "interest in property." But while "claim" is defined in the Code, [93]   neither "interest" nor "interest in property" is likewise defined.

So in the absence of statutory definitions of either "interest" or "interest in property," what can we discern from the text of the Code as to what those words mean?

[32]   First, we know that "interest" includes more than just a lien. Subsection (f)(3) makes clear that "interest" is broader, as there otherwise would be no reason for (f)(3) to deal with the subset of interests where "such interest is a lien." *Collier* observes that:

> Section 363(f) permits the bankruptcy court to authorize a sale free of "any interest" that an entity has in property of the estate. Yet the Code does not define the concept of "interest," of which the property may be sold free.

Certainly a lien is a type of "interest" of which the property may be sold free and clear. This becomes apparent in reviewing section 363(f)(3), which provides for particular treatment when "such interest is a lien." *Obviously there must be situations in which the interest is something other than a lien;* otherwise, section 363(f)(3) would not need to deal explicitly with the case in which the interest is a lien. [94]

Second, we know that an "interest" is something that may accompany the transfer of the underlying property, and where bankruptcy policy, as implemented by the drafters of the Code, requires specific provisions to ensure that it *will not* follow the transfer.

The Individual Accident Litigants contend that here the Court should presume that "equivalent words have equivalent meaning when repeated in the same statute." [95] But while that is often a useful aid **\*502** to construction, we cannot do so here. That is because "interest" has wholly different meanings as used in various places in the Code, [96] and assumptions that they mean the same thing here are unfounded.

Thus, those in the bankruptcy community know, upon considering the usage of "interest" in any particular place in the Code, that "interest" means wholly different things in different contexts:

(i) a nondebtor's *collateral*—as used, for example, in consideration of adequate protection of an interest under sections 361 and 362(d)(1), use of cash collateral under section 363(c)(2), or in many 363(f) situations, such as where a creditor has a lien;

(ii) *a legal or equitable ownership of property*—as used, for example, in section 541 of the Code, or in other section 363(f) situations, where a nondebtor asserts competing ownership, a right to specific performance, or the like—or, quite differently,

(iii) *stock* or other equity in the debtor, *as contrasted to debt*—as used, for example, in section 1111 ("[a] proof of claim or interest is deemed filed under section 501"), or where a reorganization plan is to establish classes of claims and interests, under sections 1122 and 1123.

[33] The Individual Accident Litigants place particular emphasis on section 1141(c) of the Code, asking this Court to compare and contrast it. They argue that

In contrast, § 1141(c) of the Bankruptcy Code provides that "property dealt with by the plan is free and clear of all *claims and interests ... in* the debtor." (Emphasis added). Section 363 and 1141(c) are two mechanisms for transfer of estate property (one through a sale, the other through a plan). The difference between the words chosen by Congress in these two closely related sections shows that Congress did not intend a sale under § 363(f) to be free and clear of "*claims,*" but only of "*interests in* such property" because " 'it is generally presumed that Congress actions intentionally and purposely' when it 'includes particular language in one section of a statute but omits it in another.' " [97]

But this is not an apt comparison, since when "interests" is used in section 1141(c), it is used with the wholly different definition of (iii) above—*i.e.,* as stock or another type of equity—in contrast to the very different definitions in (i) and (ii) above, which are ways by which "interests in property" may be used in section 363(f).

Thus, as Lubben suggests, and the Court agrees, in section 1141 "interest" matches up with "equity," and "claim" matches up with debt. [98] Section 1141 is of no assistance in determining whether litigation rights transmitted through transfers **\*503** of property fall within the meaning of "interests in property." Section 1141 does not provide a yardstick by which section 363(f)'s meaning can be judged.

So where does textual analysis leave us? It tells us that "interest" means more than a lien, but it does not tell us how much more. Textual analysis does not support or foreclose the possibility that an "interest in property" covers a right that exists against a new party solely by reason of a transfer of property to that party. Nor does textual analysis support or foreclose the idea that an "interest" is a right that travels with the property—or that it would do so unless the Code cut it off. Ultimately textual analysis is inconclusive. Neither the Code nor interpretive aids tells us how broadly or narrowly—in the particular context of section 363(f)—"interest in property" should be deemed to be defined. [99]

*(b) Caselaw*

Therefore, once again—as in the Court's earlier consideration of *Lionel* and its progeny and the cases establishing the judge-made law of *sub rosa* plans—the Court must go beyond the words of the Code to the applicable caselaw.

Viewed nationally, the caselaw is split in this area, both at the Circuit Court level and in the bankruptcy Courts. Some courts have held that section 363(f) provides a basis for selling free and clear of successor liability claims, [100] and others have held that it does not. [101]

**\*504** But the caselaw is *not* split in this Circuit and District. In *Chrysler,* Judge Gonzalez expressly considered and rejected the efforts to impose successor liability. And more importantly, the Second Circuit, after hearing extensive argument on this issue along with others, affirmed Judge Gonzalez's *Chrysler* order for substantially the reasons Judge Gonzalez set forth in his *Chrysler* decision.

This Court has previously noted how *Chrysler* is so closely on point, and this issue is no exception. Judge Gonzalez expressly considered it. In material reliance on the Third Circuit's decision in *TWA,* "the leading case on this issue," Judge Gonzalez held that *TWA:*

> makes clear that such tort claims are interests in property such that they are extinguished by a free and clear sale under section 363(f)(5) and are therefore extinguished by the Sale Transaction. The Court follows *TWA* and overrules the objections premised on this argument.... [I]n personam claims, including any potential state successor or transferee liability claims against New Chrysler, as well as in rem interests, are encompassed by section 363(f) and are therefore extinguished by the Sale Transaction. [102]

**[34]** **[35]** This Court has already noted its view of the importance of *stare decisis* in this district, [103] and feels no differently with respect to this issue. This Court follows the decisions of its fellow bankruptcy judges in this district, in the absence of plain error, because the interests of predictability in commercial bankruptcy cases are of such great importance. Apart from the underlying reasons that have caused *stare*

*decisis* to be embedded in American decisional law, *stare decisis* is particularly important in commercial bankruptcy cases because of the expense and trauma of any commercial bankruptcy, and the need to deal with foreseeable events, by pre-bankruptcy planning, to the extent they can be addressed. Likewise, litigation, while a fact of life in commercial bankruptcy cases, takes money directly out of the pockets of creditors, and predictability fosters settlements, since with predictability, parties will have an informed sense as to how any disputed legal issues will be decided.

Though for all of these reasons, this Court would have followed *Chrysler* even if that case had no subsequent history, we here have a hugely important additional fact. The Circuit affirmed *Chrysler, and* for "substantially for the reasons stated in the opinion below."

Those two matters are somewhat different, and each merits attention. Appellate courts review judgments (or orders), not statements in opinions. [104] With the Circuit having affirmed, application of that principle would not, in the absence of more, necessarily suggest agreement with any reasoning Judge Gonzalez utilized in reaching his conclusion. But it would necessarily support agreement with his bottom line—at least on matters that were argued to the Circuit on appeal. Otherwise, the Circuit would not have affirmed.

Here, of course, there is more—because the Circuit did not simply affirm without opinion, but it stated, as part of its order, that Judge Gonzalez's decision was affirmed "for substantially the reasons stated in the opinions below." While that might hint that the Circuit generally agreed with Judge Gonzalez's reasoning as **\*505** well, it does not compel that conclusion. At this point, the Court concludes merely that the Circuit agreed with Judge Gonzalez's successor liability issues bottom line.

But that alone is very important. One of the matters argued at length before the Circuit on the appeal was successor liability, both with respect to present claims [105] and unknown future claims. [106] They were hardly trivial elements of the appeal, and were a subject of questioning by members of the panel. [107] If the Circuit did not agree with Judge Gonzalez's conclusions on successor liability, after so much argument on that exact issue, it would not have affirmed.

Thus the Court has, at the least, a judgment by the Second Circuit that 363(f) may appropriately be invoked to sell free

and clear of successor liability claims. The claims sought to be preserved here are identical to those in *Chrysler.* And *Chrysler* is not distinguishable in any legally cognizable respect. [108] On this issue, it is not just that the Court feels that it *should* follow *Chrysler.* It *must* follow *Chrysler.* The Second Circuit's *Chrysler* affirmance, even if reduced solely to affirmance of the judgment, is controlling authority. [109]

This Court fully understands the circumstances of tort victims, and the fact that if they prevail in litigation and cannot look to New GM as an additional source of recovery, they may recover only modest amounts on any allowed claims —if, as is possible, they do not have other defendants who can also pay. [110] But the law in this Circuit and District is clear; the Court will permit GM's assets to pass to the purchaser free and clear of successor liability claims, and in that connection, will issue the requested findings and associated **\*506** injunction. [111]

### 3. Asbestos Issues

[36]  The Asbestos Litigants raise the same successor liability issues just addressed, and additionally advance the interests of future victims of asbestos ailments (though their counsel do not represent any); *future* victims would not yet know that they have any asbestos ailments, or to whom they might look to bring litigation, if necessary. The Asbestos Litigants' concerns as to a sale free and clear of asbestos liability claims, like those of tort litigants, have already been discussed, and the Court, while also sympathetic to asbestos victims, must rule similarly.

But the Court must separately address the separate issues concerning asbestos ailments, in light of the reality that those ailments may take many years to be discovered, during which asbestos victims would not know that they should be filing claims.

The Asbestos Litigants object to GM's effort to "channel all present and future asbestos personal injury claims to Old GM and to shield New GM from 'successor liability' claims ... without the appointment of a future claims representative and the other express requirements mandated by Congress in 11 U.S.C. § 524(g)." [112] But that overstates, in material part, what GM is trying to do. It is unnecessary to "channel" present asbestos injury claims to GM, as that is where they already are, and belong. And New GM has not yet done anything wrong, if it ever will. So the bulk of the Asbestos Litigants' contention is simply a variant of the successor liability issues that the Court just addressed, and must be decided the same way.

Where there *is* a separate issue is claims for *future* injuries that people exposed to asbestos might suffer when they don't yet know of their ailments or the need to sue or assert a claim. The Court refers to those as "**Future Claims,**" while noting that they are not yet "claims" as defined in the Bankruptcy Code. Efforts to deal with such circumstances led to the enactment of section 524(g) of the Code, which *inter alia* authorizes injunctions, under a reorganization plan, to enjoin actions against nondebtors by those who have a right of recovery from a trust created to address their claims, in accordance with more detailed provisions set out in section 524(g). (Those provisions also include the appointment of a future claims representative.)

The Debtors ask for findings that New GM will not be deemed to be a successor of Old GM, and ask for an injunction barring those holding Future Claims, like others, from pursuing New GM. The Asbestos Litigants contend that such an injunction would walk, talk and quack like a section 524(g) injunction, and that it thus is impermissible. The Debtors respond that we do not yet have a request to approve a plan, and that these issues are now premature—better to be considered if and when they ever ask for a 524(g) injunction.

The Court does not have to decide these issues now, except in a modest way. The Asbestos Litigants' counsel represent only individuals with *present* asbestos ailments, and do not represent future claimants. Thus the Court has material difficulty in seeing how they have standing to assert *other's* needs and concerns, or how they **\*507** would be persons aggrieved, on any appeal, if the Court ruled adversely to them on future claims issues.

By the same token, the Court fully recognizes that the notice given on this motion was not fully effective, since without knowledge of an ailment that had not yet manifested itself, any recipient would be in no position to file a present claim. [113]

This objection raises classic standing *and* ripeness issues. And, in addition, the Court does not know if anyone in the future would have a legally valid objection as to the requested injunction—especially if Old GM were still in existence, and a claim could be filed with Old GM. The Court is doubtful that it should be erecting barriers to GM's ability to

reorganize by creating hurdles at the behest of people who lack standing, but at the same time, is not of a mind to do anything that might be constitutionally suspect. The Future Claims issues, in the Court's view, are best addressed here by adding language to the injunction paragraph to which objection has been made, applicable (only) to asbestos claims and demands, making the injunction enforceable "to the fullest extent constitutionally permissible." That limitation should address both sides' legitimate future claims concerns. The Court's order will read accordingly.

*4. Environmental Issues*

[37]    Certain objectors—most notably, New York's Attorney General (the "**New York AG**"), who enforces New York's environmental laws, and the St. Regis Mohawk Tribe (the "**Tribe**") in upstate New York (together, the "**Environmental Matters Objectors**")—have voiced concerns as to whether any approval order would too broadly release either Old GM or New GM from their respective duties to comply with environmental laws and cleanup obligations. Objections of this character were a matter of concern to this Court as well, but they were addressed —very well, in this Court's view—by amendments to the proposed order that were made after objections were due. The additional language provides that:

> Nothing in this Order or the MPA releases, nullifies, or enjoins the enforcement of any Liability to a governmental unit under Environmental Laws or regulations (or any associated Liabilities for penalties, damages, cost recovery, or injunctive relief) that any entity would be subject to as the owner, lessor, or operator of property after the date of entry of this Order. Notwithstanding the foregoing sentence, nothing in this Order shall be interpreted to deem the Purchaser as the successor to the Debtors under any state law successor liability doctrine with respect to any Liabilities under Environmental Laws or regulations for penalties for days of violation prior to entry of this Order. Nothing in this paragraph should be construed to create for any governmental unit any

> substantive right that does not already exist under law.[114]

Another paragraph goes on to say:

> Nothing contained in this Order or in the MPA shall in any way (i) diminish the obligation of the Purchaser to comply with Environmental Laws, or (ii) diminish the obligations of the Debtors to comply with Environmental Laws consistent with their rights and obligations **\*508** as debtors in possession under the Bankruptcy Code. The definition of Environmental Laws in the MPA shall be amended to delete the words "in existence on the date of the Original Agreement." For purposes of clarity, the exclusion of asbestos liabilities in section 2.3(b)(x) of the MPA shall not be deemed to affect coverage of asbestos as a Hazardous Material with respect to the Purchaser's remedial obligations under Environmental Laws.[115]

Especially collectively, they make it quite clear that neither Old GM nor New GM will be relieved of its duty to comply with environmental laws.

Those changes deal with much, but not all, of the Environmental Matters Objectors' concerns. The remaining objections, however, must be overruled.

The Environmental Matters Objectors understandably would like New GM to satisfy cleanup obligations that were the responsibility of Old GM, on theories of successor liability. For reasons articulated in the Court's "Successor Liability Issues" discussion in Section 2 above, however, the property may be sold free and clear of such claims.

Indeed, further reinforcing that view (as well as the Court's decision to follow *Chrysler* ) is this Court's decision, seven years ago, in *Mag. Corp.*[116] There, upon the sale of property with substantial environmental issues, this Court was faced with the exact same issue—to what extent could that property be sold free and clear of environmental claims under 363(f). This Court ruled that one had to make a distinction. Under section 363(f), there could be no successor liability imposed on the purchaser for the seller MagCorp's monetary obligations related to cleanup costs, or any other obligations that were obligations of the seller. But the purchaser would have to comply with its environmental responsibilities starting with the day it got the property, and if the property required remediation as of that time, any such remediation would be the buyer's responsibility:

When you are talking about free and clear of liens, it means you don't take it subject to claims which, in essence, carry with the property. It doesn't absolve you from compliance with the law going forward. [117]

Those same principles will be applied here. Any Old GM properties to be transferred will be transferred free and clear of successor liability, [118] but New GM will be liable from the day it gets any such properties for its environmental responsibilities going forward. And if the State of New York (or, to the extent it has jurisdiction, the Tribe) feels a need to cause any acquirer of Old GM property to engage in remedial action because of environmental issues existing even at the outset of the acquirer's ownership, nothing in this Court's order will stand in its way.

*509  5. Splinter Union Retiree Issues

Three unions—the IUE, the Steelworkers, and the Operating Engineers (referred to by all parties as the "**Splinter Unions**") also have filed an objection. The Splinter Unions submit affidavits from many of their retirees, describing, in moving detail, their difficulties in getting by, and how decreased medical benefits would directly impact them. The hardship would be particularly great on those not yet eligible for Medicare, as the U.S. does not yet have comparable medical insurance for those below the qualifying age, if it ever will.

[38]    But fully acknowledging, as one must, the hardship that the Splinter Union Retirees would suffer, the legal issue before this Court is whether section 1114 of the Code applies to a transaction of the type we have here, and whether a purchaser of assets must assume liabilities that it does not want to voluntarily assume. The answer to each of those questions must be "no."

The Splinter Unions understandably rely on section 1114 of the Code, a provision that was added to the Code to provide additional rights as to retiree insurance benefits, most significantly, medical and life insurance (for the purposes of this discussion, "**Retiree Benefits**"). Generally speaking, section 1114 attempts to balance the needs and concerns of retirees with the reality that large legacy Retiree Benefits obligations not infrequently can impair debtors' ability to reorganize, and that chapter 11 debtors often cannot afford to pay Retiree Benefits as they were previously offered.

While section 1114 is too long to quote here in full, it provides, in substance, for a procedure that must be complied with before a chapter 11 debtor can modify or not pay Retiree Benefits. Modifying or ending benefits requires a motion to be approved by the bankruptcy court. Prior to filing such a motion, the debtor or trustee must first make a proposal to the retirees' representative—usually their union, if there is one, or alternatively a committee to act on their behalf.

The proposal is supposed to provide "for those necessary modifications in the retiree benefits that are necessary to permit the reorganization of the debtor and assure [ ] that all creditors, the debtor and all of the affected parties are treated fairly and equitably...." The parties are then "to confer in good faith in attempting to reach mutually satisfactory modifications of such retiree benefits."

If agreement is not forthcoming, the motion may proceed further. Under section 1114(g) (with exceptions and provisos not relevant here):

The court shall enter an order providing for modification in the payment of retiree benefits if the court finds that—

(1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (f);

(2) the authorized representative of the retirees has refused to accept such proposal without good cause; and

(3) such modification is necessary to permit the reorganization of the debtor and assures that all creditors, the debtor, and all of the affected parties are treated fairly and equitably, and is clearly favored by the balance of the equities....

Here GM has stated that before Old GM stops paying or modifies Retiree Benefits, it will comply with section 1114. But as a practical matter, Old GM will be liquidating, and it will not be able to keep making these payments very much longer. After that, even if Old GM makes a proposal in good faith (as the Court assumes it will), *510  the Splinter Union retirees may well be left with unsecured claims, with the relatively low recoveries on their unsecured claims that all other unsecured creditors will receive, and with the delays in getting distributions on allowed claims that are an unfortunate reality of the bankruptcy process.

And New GM has not agreed to assume liability for the Splinter Union Retiree Benefits. [119] It declined to do so,

while going further for other unions, especially the UAW, because with very limited exceptions, the Splinter Unions no longer have active employees working for GM, and the U.S. Treasury—triaging its ability to undertake obligations, and trying to make New GM as lean and as viable as possible— allocated its available money to spend it only where necessary to build a new and stronger GM. [120]

With that by way of backdrop, the Court considers the legal issues. The Splinter Unions argue in substance, that the 363 Transaction constitutes a forbidden *sub rosa* plan. But this contention has previously been addressed. The remaining issue is the extent, if any, to which special 1114 rights for retirees make an otherwise permissible transaction impermissible.

Once more the Court starts with textual analysis, and looks to the words of the statute. The most relevant portions of section 1114 are the portions that impose the continuing duties to pay retiree benefits; not to end or modify them; and to negotiate with unions or other retiree representatives before changing them. Apropos the first (the continuing duty to pay), section 1114(e) is relevant. It provides, in relevant part:

(e)(1) Notwithstanding any other provision of this title, *the debtor in possession, or the trustee if one has been appointed under the provisions of this chapter* (hereinafter in this section "trustee" shall include a debtor in possession), shall timely pay and shall not modify any retiree benefits, except that—

(A) the court, on motion of the trustee or authorized representative, and after notice and a hearing, may order modification of such payments, pursuant to the provisions of subsections (g) and (h) of this section, or

(B) the trustee and the authorized representative of the recipients of those benefits may agree to modification of such payments,

after which such benefits as modified shall continue to be paid by the *trustee*. [121]

Thus, under the words of the statute, these are duties imposed upon the trustee (which includes, by express reference, the debtor in possession)—not anyone else.

With respect to the second (the duty not to end or modify), the relevant portion is that same section 1114(e) ("the debtor in **\*511** possession, or the trustee if one has been appointed ...

shall not modify any retiree benefits"). Once more, the duty not to end or modify is not statutorily imposed on anyone else.

With respect to the third (the duty to negotiate before filing a motion to modify benefits) the relevant portion is 1114(f):

(f)(1) Subsequent to filing a petition and prior to filing an application seeking modification of the retiree benefits, the *trustee* shall—

(A) make a proposal to the authorized representative of the retirees....

Here too, by the words of the Code, the duty is imposed upon the trustee.

Finally, the Court notes that section 363 is silent with respect to any need to first comply with section 1114 before effecting a section 363 sale.

Turning beyond textual analysis to the caselaw, the Court has seen nothing to establish a violation of law. The Splinter Unions cite no authority holding or suggesting that a purchaser of assets from an entity with section 1114 obligations must assume the debtor seller's duty to comply with section 1114's provisions. Nor do they cite such law considering section 1113 of the Code, which, while dealing with collective bargaining agreements, imposes similar duties.

On the other hand, *Chrysler* is helpful, though it did not expressly address this issue. In considering a closely similar transaction, Judge Gonzalez did not find there to be section 1114 impediments, even for non-UAW retirees. [122]

The Splinter Unions argue that "section 1114 cannot be ignored in the § 363 process," [123] but that is not what GM is asking the Court to do. GM acknowledges its duties to comply with section 1114, and so far as the record reflects, has not failed in any of its duties in that respect so far. If, in the future, GM does not comply with its section 1114 duties (or is perceived to be failing to comply in that regard), the Splinter Unions, or anyone else with standing, could of course bring that to the Court's attention. But the Splinter Union's real objection is that the Purchaser is not volunteering to comply with section 1114, and under the words of the statute, the Purchaser is not within the zone of persons upon whom section 1114 places duties.

[39]   The Splinter Unions note that there is another arguably relevant provision of the Code that must be considered, section 1129(a)(13). Section 1129 sets forth the requirements for confirmation of a chapter 11 plan, and the provisions in its subsection (a) include a list of requirements for confirmation of any chapter 11 plan. Section 1129(a) provides, in relevant part:

*512   (a) The court shall confirm a plan only if all of the following requirements are met:

...

(13) The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of this title, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of this title, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

There can be no doubt that compliance with section 1129(a)(13), along with the other 15 subsections of section 1129(a), is a requirement for confirmation of a plan. But the Court has already addressed arguments of this character, as raised by bondholders in different contexts. The Court is not here considering confirmation of a plan; it is considering a section 363 transaction, and because there is a good business reason for selling the assets now, and there is not here a *sub rosa* plan, requirements of section 1129, including section 1129(a)(13), do not apply.

The Court fully realizes that UAW retirees will get a better result, after all is said and done, than Splinter Union Retirees will, but that is not by reason of any violation of the Code or applicable caselaw. It is because as a matter of reality, the Purchaser needs a properly motivated workforce to enable New GM to succeed, requiring it to enter into satisfactory agreements with the UAW—which includes arrangements satisfactory to the UAW for UAW retirees. And the Purchaser is not similarly motivated, in triaging its expenditures, to assume obligations for retirees of unions whose members, with little in the way of exception, no longer work for GM.

The Court has also considered the Splinter Unions' point that in pre-bankruptcy planning, GM and the U.S. Treasury focused on the duties to Splinter Union Retirees, and made a conscious decision that Splinter Union retirees would not be offered as good a deal as others. But the Court cannot find that there was any "conspiracy" in that regard, nor that

there was any intention to disregard applicable law. The U.S. Treasury, in making hard decisions about where to spend its money and make New GM as viable as possible, made business decisions that it was entitled to make, and the fact that there were so few Splinter Union employees still working for GM was an understandable factor in that decision. The Court's responsibility is not to make fairness judgments as to those decisions, but merely to gauge those decisions under applicable law.

The Splinter Unions' objection must be overruled.

### 6. Dealer Issues

As noted, the 363 Transaction contemplates that GM's present dealer network of about 6,000 dealers will be made more efficient, continuing approximately 4,100 of its dealers, and ending its relationship, though not instantly, with approximately 1,900 others.[124] In cooperation with State AGs, and the Unofficial Dealers Committee[125] (the "**Dealer Committee**"), GM and the Purchaser agreed on additional language *513 in the sale order for the protection of dealers, and the AGs and the Dealer Committee withdrew their objections to the sale. However, a local dealers association, the Greater New York Automobile Dealers Association (the "**New York Dealers Association**"), seeking to be heard as an *amicus,* filed a brief contending that the Participation Agreements and Deferred Termination Agreements that more than 99% of GM dealers entered into were coerced and unlawful.

[40]   Initially, the Court deals with a matter of standing, to which it became more sensitive, after oral argument, upon rereading the New York Dealers Association's *amicus* brief. The New York Dealers Association does not purport to speak for a single identified GM dealer. It does not seek standing under section 1109. It speaks only as an *amicus.* And in addition, the main thrust of the New York Dealers Association *amicus* brief is not the protection of *GM* dealers. It is the protection of their *competitors.* The interests of *GM* dealers were the subject of the negotiations with the Dealer Committee and the AGs, and resolved to their satisfaction. While the New York Dealers Association objection professes to be speaking for the interests of GM dealers, its principal thrust is very different; it is to protect the interests of others who are competing with GM and (especially since it is a dealers' organization), competing with GM dealers.[126]

Under these circumstances, the Court must note the lack of standing and that the New York Dealers Association may be heard as nothing more than as an *amicus;* note that the New York Dealers Association does not have section 1109 rights; and note that at least seemingly, if not plainly, the New York Dealers Association has interests largely adverse to those whom it is professing to help. [127]

**[41]** Then, turning to the merits of the New York Dealers Association arguments (assuming that, as *amicus,* it has any standing to make them), any objection that the New York Dealers Association might make—though it never says that it is making an "objection"—would have to be overruled, and to the extent it is making an objection, it *is* overruled. While the Court understands the unattractive choices that many dealers had to face, the Court cannot go so far as to hold that these agreements were "coerced" or are unlawful—even if (as the Court assumes, without deciding) those dealer rights could not be so modified outside of bankruptcy.

Implementation of federal bankruptcy policy permits debtors, for the benefit of the creditor body as a whole, to alter creditors' and contract counterparties' contractual rights. Corporate reorganization, by its nature, requires parties in interest to consider unattractive choices. One of the relevant rights in bankruptcy is the right of a debtor to reject an executory contract with its contract counterparty, for the benefit of the debtor's other creditors. All concerned with GM's future knew that GM had to slim down and improve its dealer network, and that this required modifying dealer agreements before they were assumed and assigned—a process **\*514** that led to the Participation Agreements. Similarly, as an alternative to simply leaving dealers who would otherwise be terminated in the lurch, GM proposed giving them a soft landing, in exchange for waivers of other rights—a process that led to the Deferred Termination Agreements. Those offers secured widespread acceptance; 99% of the continuing dealers accepted, and 99% of the dealers who eventually would be terminated took the offer.

The alternative, in each case was rejection. Contract counterparties do not have to accept what they are offered, and they may elect to stand on their rights. But here GM was not obligated, as a matter of law, to choose between leaving its dealer contracts unmodified or rejecting them. It could, if it wished, offer its contract counterparties deals that would more appropriately meet each side's needs and concerns, without fear that such deals would be subject to collateral attack by reason of assertions of coercion.

Directly on point are comments this Court made at the bankruptcy court level, and Judge Kaplan made at the district court level, in the *Adelphia* chapter 11 cases. There, in connection with the DoJ Settlement discussed above, [128] Adelphia agreed to provide $715 million to the United States Government (on behalf of both the DoJ and the SEC) in exchange for dropping threats of indictment and forfeiture, and settling claims that might otherwise have been pursued by the SEC. The settlement was attacked by Adelphia creditors, who charged that it was the result of unlawful coercion. In the same decision to which this Court previously referred, this Court disagreed, and on appeal, so did Judge Kaplan.

This Court stated:

> [W]here the "coercion" results from differences in bargaining power, as a consequence of law or fact, or governmentally granted authority and discretion (such as the authority and discretion we grant to prosecutors, to achieve a common good), that is a wholly different kind of "coercion." As one of the banks' counsel aptly noted in argument on this motion, it is what we call "leverage." [129]

Judge Kaplan, affirming, agreed—even going so far as to quote the language this Court just used—and continued:

> What the appellants characterize as coercion was no different in principle than the pressure that leads the overwhelming majority of defendants in criminal cases to plead guilty— the risk that a conviction after trial will result in a harsher sentence than is likely to be imposed following a guilty plea. Yet guilty pleas in such circumstances rightly are considered voluntary and uncoerced in any relevant sense. [130]

For decades, counterparties to executory contracts with bankruptcy debtors have known that their agreements could be rejected, and debtors and contract counterparties have negotiated deals as alternatives to that scenario. When they have been so negotiated (with all knowing that the

debtor has the option to reject if the existing deal is not modified to its satisfaction), that has never been regarded as unlawful coercion. Rather, it has been recognized as an appropriate use of the leverage that Congress has given to debtors for the benefit of all of the other creditors who are not contract counterparties, **515** and for whom the restructuring of contractual arrangements is important to any corporate restructuring.

The Court's observation in questioning at oral argument, with respect to dealer contract modifications, that "no good deed goes unpunished" (perhaps naively thinking at the time that the New York Dealers Association was advocating the interests of *GM* dealers) was, as it probably sounded, an indication of frustration with the New York Dealers Association's argument. And what the Court could have said then, and what it is saying now, is that the *last* thing bankruptcy courts should be doing is to be forcing debtors and their contract counterparties into situations where rejection is the only lawful alternative, subjecting other creditors to dilution on their recoveries by running up rejection damages, and subjecting contract counterparties to the full hardships of an executory contract rejection. There is no basis in law or fact for holding that these contractual modifications were unlawfully "coerced." Disapproving contractual modifications of the type here would be squarely inconsistent with the goals of corporate reorganization.

As a practical matter, modifications negotiated by the Dealers Committee and the AGs mooted out many, if not all, of the New York Auto Dealers' complaints about the loss of dealer protection laws. To the extent they did not, however, the Court notes that Judge Gonzalez dealt with these same contentions in another decision in *Chrysler*. After concluding that Chrysler's rejection of dealership agreements constituted a valid exercise of business judgment, Judge Gonzalez found that the state franchise laws at issue, like those at issue here, frustrated the purposes of (and, thus, were preempted by) section 365.[131] To the extent that laws of the type relied upon by the New York Dealers Association—either state or federal—impair the ability to reject, or to assume and assign, they must be trumped by federal bankruptcy law. And to the extent that nonbankruptcy law prohibits debtors and their contract counterparties from finding mutually satisfactory less draconian alternatives to rejection, it likewise must be trumped.

As Judge Gonzalez explained:

Specifically and by no means exclusively, statutory notice periods of, *e.g.,* 60 or 90 days before termination clearly frustrate § 365's purpose to allow a debtor to reject a contract as soon as the debtor has the court's permission (and there is no waiting period under the Bankruptcy Rules). Buy-back requirements also frustrate § 365's purpose to free a debtor of obligations once the debtor has rejected the contract. Good cause hearings frustrate § 365's purpose of giving a bankruptcy court the authority to determine whether a contract may be assumed or rejected. Strict limitations on grounds for nonperformance frustrate § 365's purpose of allowing a debtor to exercise its business judgment and reject contracts when the debtor determines rejection benefits the estate. So-called "blocking rights," which impose limitations on the power of automobile manufacturers to relocate dealers or establish new dealerships or modify existing dealerships over a dealer's objection, frustrate § 365's purpose of giving a debtor the power to decide which contracts **516** it will assume and assign or reject by allowing other dealers to restrict that power.[132]

Judge Gonzalez also made clear that 28 U.S.C. § 959(b), on which the New York Dealers Association's *amicus* brief heavily relies, did not alter the Court's "preemption analysis," because that provision "does not de-limit the precise conditions on contract rejection"—particularly where, as in *Chrysler* and here, the pertinent state laws concern "consumer convenience and costs and the protection of local businesses, rather than a concern over public safety."[133]

To the extent that the New York Auto Dealers Association complains that GM gets a "competitive advantage over others not in bankruptcy,"[134] that likewise is a complaint with respect to federal bankruptcy policy, which gives companies a chance to reorganize and shed burdensome obligations to

achieve a greater good. That GM's reorganization will make New GM and GM dealers more competitive is not a bad thing; it is exactly the point.

The New York Auto Dealers' Association lacks standing to have its comments deemed to be an objection. To the extent that its *amicus* comments can be deemed to constitute an objection, any such objection is overruled.


### 7. ECC Trust

The Environmental Conservation and Chemical Corporation Site Trust Fund (the "**ECC Trust**") has also filed a limited objection. The ECC Trust was created as a means to implement a consent decree that GM and other parties entered into with the United States and the State of Indiana to clean up hazardous materials at the EnviroChem Superfund Site in Zionsville, Indiana (the "**Zionsville Site**"). The consent decree was approved in 1991 by the United States District Court for the Southern District of Indiana. Under the authority of the consent decree, the Trustee for the ECC Trust issued an assessment on April 20, 2009, requiring GM to pay approximately $63,000 into the ECC Trust. Shortly before the due date, GM notified the ECC Trust that it would not be paying its share, and filed its chapter 11 petition shortly thereafter.

The ECC Trust requests that this Court, using its "equitable powers," require that the Purchase Agreement be modified such that the ECC Trust's claim be designated an "Assumed Liability." Unfortunately, the Court cannot do that.

This Court need not, at this juncture, decide the vast majority of the issues presented by the parties at oral argument—including, especially, whether a consent decree is considered a contract or a judicial decree for enforcement purposes, and **\*517** whether this particular consent decree created a monetary obligation, which would be regarded like any other unsecured claim, or was in fact a mandatory injunction to clean up the Site.

For now it is sufficient to note that the ECC Trust's present rights are against *Old GM*. Under the ECC Trust's best case scenario, as argued, the ECC Trust may be able to secure equitable relief against Old GM. But whether the ECC Trust can enforce an injunction against Old GM, or must instead live with an unsecured claim, is an issue for another day.

**[42]    [43]    [44]**    Whatever the ECC Trust's rights are against Old GM, there is no basis for this Court to use its

"equitable powers" to force the Purchaser to assume this liability. This Court has found that the Purchaser is entitled to a free and clear order. The Court cannot create exceptions to that by reason of this Court's notions of equity. As this Court noted in another of its *Adelphia* decisions, it is not free to use its equitable powers to circumvent the Code. [135] Decisions of the Second Circuit make it clear that, even with the presence of section 105(a), bankruptcy judges are not free to do whatever feels right. [136]

Insufficient justification has been provided for this Court to force the Purchaser to assume this liability, in the face of section 363(f)'s explicit language allowing the sale of property "free and clear" of such liabilities. The Court is aware that the requested relief would have a very modest impact on the Purchaser, but is nevertheless required to issue a principled decision.


### 8. "Equally and Ratably" Issues

**[45]**    Pro se unsecured bondholders Parker and Radha R.M. Narumanchi raise objections that they should be treated as secured creditors, and have not been. They contend that the indenture for their bonds (the 1995 issue, whose indenture trustee, represented by skilled counsel, did not raise a similar objection) had an "equal and ratable clause," boosting their bonds to secured debt status if liens were threatened to be put on certain manufacturing facilities. They then contend that when the 2008 Prepetition Financing was put in place, it triggered their equal and ratable clauses, making them secured.

The Court agrees that the bonds have an equal and ratable clause. But it cannot agree that it was triggered. The 2008 Prepetition Financing Documents expressly carved out from the grant of the security interest under those documents any instance **\*518** where it would trigger, *inter alia*, the equal and ratable clause.

The 2008 Prepetition Financing granted the U.S. Treasury a lien, subject to exceptions not applicable here, on a wide array of property. But it expressly did not put a lien on what it called "**Excluded Collateral.**" [137] Excluded Collateral included, among other things:

> (v) any Property, including any debt or Equity Interest and any manufacturing plan or facility which is located within the continental United States, to the extent that the grant of a security interest therein to secure the Obligations *will*

*result in a lien, or an obligation to grant a lien, in such Property to secure any other obligation.* [138]

Thus when liens were granted in favor of the U.S. Treasury in December 2008, the U.S. Treasury was not granted a lien on any of the Excluded Collateral—including, as relevant here, anything that would trigger the equal and ratable clause. [139]


### 9. Unauthorized Use of TARP Funds Issues

Bondholder Parker (so far as the Court can tell, the only one of the 850 objectors) objects to the 363 Transaction on the additional ground that the U.S. Government was not authorized to use TARP funds to assist the auto industry, and hence that the 363 Transaction is unlawful. The Court agrees with the United States Attorney that the issue of the U.S. Treasury's lending authority now is moot, and that Mr. Parker lacks standing to raise the issue. Thus the Court does not need to reach the third issue.

 **[46]**    First, the Court agrees that the objection is moot. The 363 Transaction does not involve any expenditure of TARP funds. It simply involves a credit bid by the Purchaser—as an assignee of secured debt held by EDC (as to whom no objection is made) and the U.S. Treasury—of amounts due on previous loans under the U.S. Treasury Prepetition Loan and the DIP Financing Facility.

No party objected to the use of TARP funds in connection with the DIP Financing Facility, or when GM got the assistance it did before the filing of GM's chapter 11 case. And the Court approved the DIP Financing Facility after full hearing and notice. It was *then* that the U.S. Treasury became a lender, not now. Complaints that the U.S. Treasury should not have lent the money to GM are now moot.

 **[47]**    Second, the Court once more agrees with the United States Attorney that Mr. Parker lacks standing to challenge the U.S. Government's lending authority here. Judge Gonzalez addressed this exact issue in *Chrysler–Standing,* [140] the second of the two decisions that were affirmed by the Circuit.

The Court does not need to repeat all of the elements of Judge Gonzalez's analysis in *Chrysler–Standing,* nor what this Court has stated previously with respect to the importance of *stare decisis,* or its compliance  **\*519**  with decisions of the Second Circuit. Here, as in *Chrysler–Standing,* an unsecured creditor like Mr. Parker does not establish the injury-in-fact necessary to establish constitutional standing under Article III

because "all holders of unsecured claims are receiving no less than what they would receive in a liquidation." [141]    And even assuming that the 363 Transaction itself injured bondholders like Mr. Parker (though it is difficult to see how, since without the 363 Transaction, GM would have to liquidate), Mr. Parker cannot demonstrate standing because he cannot show that any such injury is "fairly traceable" to the Government's use of TARP funds, as opposed to the 363 Transaction itself.

As Judge Gonzalez explained in *Chrysler–Standing,* "[i]f a non-governmental entity were providing the funding in this case, the [objectors] would be alleging the same injury.... In this light, it is not the actions of the lender that the [objectors] are challenging but rather the transaction itself. Specifically, the [objectors'] alleged injury is not fairly traceable to the U.S. Treasury's actions because the [objectors] would suffer the same injury regardless of the identity of the lender." [142]

Under these circumstances, the Court need not address Mr. Parker's third point. This objection is overruled.


### 10. Cure Objections

Many contract counterparties—more than 500—voiced objections to GM's estimated cure amounts, generally expressing different perceptions as to the exact amounts GM owes them. These differences would eventually have to be resolved, since to assume an executory contract (and GM is assuming thousands of them), most prepetition defaults would have to be cured.

GM proposed a mechanism for fixing the cure amount entitlements—an amalgam of exchanges of information, negotiation, ADR, and court determination, if needed. Significantly, while many parties had differing views as to the amounts to which they were entitled, none voiced objections to the method GM proposed. As those counterparties will remain eligible for their full legal entitlements, the Court finds the proposed mechanism fully satisfactory, and it is unnecessary and inappropriate to rule on all of the cure amount issues here.


### 11. UAW Settlement Objections

Approximately 56 UAW retirees—somewhat numerous in number, but a miniscule portion of the estimated 500,000 covered under the UAW Settlement Agreement—object to the UAW Settlement Agreement. In general, they express (understandable) disappointment with a settlement that

results in a reduction of their health benefits. But they do not articulate objections legally cognizable under the law.

The Curson testimony, in particular, evidences the sensitivity to member and retiree needs and concerns of the UAW leadership. As discussed at considerable length above, the UAW had to make very hard decisions as to concessions it would make on behalf of its members and retirees to preserve GM's viability—and to avoid a liquidation that would be disastrous for the people the UAW was trying to help. The UAW was successful in preserving an acceptable level of core medical benefits. And as the UAW properly observes in its brief, if the UAW had not done as well as it did, its agreement would not have been ratified.

 **\*520** Given the alternatives, it is easy to find that the UAW settlement is fair and equitable, from the perspective of both the GM estate and UAW members. It falls well within the range of reasonableness from GM's perspective, and is fair, reasonable and in the best interest of the UAW retirees.

*12. Stockholder Objections*

 **[48]** Many GM stockholders, understandably disappointed that the 363 Transaction will leave them with no recovery, have voiced objections. Once again, the Court is sensitive to their concerns, but cannot help them. GM is hopelessly insolvent, and there is nothing for stockholders now. And if GM liquidates, there will not only be nothing for stockholders; there will be nothing for unsecured creditors.

Under those circumstances, GM stockholders cannot claim to be aggrieved by the transactions before the Court here.

*13. Miscellaneous Objections*

The Court cannot lengthen this decision further by specifically addressing any more of the approximately 850 objections that were raised on this motion. The Court has canvassed them and satisfied itself that no material objections other than those it has specifically addressed were raised and have merit. To the extent those objections were not expressly addressed in this decision, they are overruled.

*Conclusion*

The 363 Transaction is approved. The Court is entering an order in accordance with this Decision.[143]

**Parallel Citations**

51 Bankr.Ct.Dec. 225

Footnotes

1    Principal participants are shown here. A full listing will be posted when practicable.

2    When discussing the mechanics of the 363 Transaction, the existing GM will be referred to as "**Old GM,**" and the Purchaser will be referred to as "**New GM.**"

3    When it filed its objection, the F & D Bondholders Committee, identifying itself as the "Family & Dissident" Bondholders Committee, said it was "representing the interests of" 1,500 bondholders, with bond holdings "believed to exceed $400 million." (F & D Bondholder Comm. Obj. at 1). But even after it filed the second of its Fed.R.Bankr.P.2019 statements, it identified no other bondholders for whom it was speaking, or provide the holdings, purchases and sales information for any others that Rule 2019 requires. Under these circumstances, the Court must consider that the committee speaks for just those three bondholders.

4    To avoid making this lengthy decision even longer, the Court has limited its citations in its Findings of Fact to those matters where they are most useful.

5    In accordance with the Court's Case Management Order # 1, direct testimony was presented by affidavit and cross-examination and subsequent questioning proceeded live. After cross-examination, the Court found all witnesses credible, and takes their testimony as true.

6    More than 500,000 workers are employed by companies in the U.S. that manufacture parts and components used by automakers.

7    GM has used trusts qualified as "voluntary employee beneficiary associations" under the Internal Revenue Code (each, a "**VEBA**"), to hold reserves to meet GM's future obligations to provide healthcare and life insurance benefits ("**OPEB**") to its salaried and hourly employees upon retirement. In substance, the employer makes contributions to the VEBA, and the VEBA funds the health benefits to the retirees.

8    Emphasis added.

9    GM tried to accomplish an out-of-court restructuring, as suggested, but was unsuccessful.

10  The Canadian EDC participation was sizeable—approximately $3 billion with approximately an additional $6 billion to be provided later.

11  Proposed Sale Order ¶ 8.

12  Audio Recording of Testimony of June 30, 2009.

13  *Id.* at 85.

14  *Id.* at 85–86.

15  *Id.* at 103.

16  Audio Recording of Testimony of July 1, 2009.

17  In all respects relevant here, where (as here, and as is the norm) the debtor remains in possession and the court has not ordered otherwise, the debtor has the rights of the trustee. *See* Bankruptcy Code section 1107(a) ("Subject to ... such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights, other than the right to compensation ... of a trustee serving in a case under this chapter.").

18  Section 1123(b)(4).

19  *See, e.g., In re Adelphia Communications Corp.,* 359 B.R. 65, 72 n. 13 (Bankr.S.D.N.Y.2007) ("This Court has been on record for many years as having held that the interests of predictability in this District are of great importance, and that where there is no controlling Second Circuit authority, it follows the decisions of other bankruptcy judges in this district in the absence of clear error.").

20  *See In re Chrysler LLC,* 405 B.R. 84 (Bankr.S.D.N.Y.2009) (*"Chrysler* "), and 405 B.R. 79 (Bankr.S.D.N.Y.2009) ("*Chrysler–Standing* ") (Gonzalez, J.), *aff'd for substantially the reasons stated in the opinions below,* No. 09–2311–bk (2d Cir. June 5, 2009) ("*Chrysler–Circuit* "), *temporary stay vacated and further stay denied,* ––– U.S. ––––, 129 S.Ct. 2275, 173 L.Ed.2d 1285 (2009).

21  Though the similarities between this case and *Chrysler* are many, there is a noteworthy difference, as that case had one issue not before the Court here. In *Chrysler,* Judge Gonzalez had to analyze rights of participants in a secured lending facility who quarreled with their administrative agent's decision to consent to a sale free and clear of secured creditor claims and interests. *See Chrysler,* 405 B.R. at 100–104. Here there was no objection by secured creditors, other than a single limited objection by a secured creditor with a lien on property to be transferred, looking for adequate protection as part of the sale. Here the objecting bondholders are holders of *unsecured* debt, and thus lack the greater rights that secured creditors have in bankruptcy cases. Of course, the *Chrysler* case never really concerned, as some asserted, an assault on secured creditors' rights; it merely involved dissident minority participants in a secured lending facility being bound by the actions of their agent, pursuant to contractual agreements with the agent that they or their predecessors had agreed to.

22  *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, (2d Cir.1983) ("*Lionel* ").

23  *Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. LTV Corp. (In re Chateaugay Corp.),* 973 F.2d 141 (2d Cir.1992) ("*LTV* ").

24  *Consumer News & Bus. Channel P'ship v. Fin. News Network Inc. (In re Fin. News Network Inc.),* 980 F.2d 165 (2d Cir.1992) ( "*FNN* ").

25  *Licensing By Paolo, Inc. v. Sinatra (In re Gucci),* 126 F.3d 380 (2d Cir.1997) ("*Gucci* ").

26  *Motorola v. Comm. of Unsecured Creditors (In re Iridium Operating LLC),* 478 F.3d 452 (2d Cir.2007) ("*Iridium* ").

27  *Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.,* 554U.S. 33, 128 S.Ct. 2326, 2331 n. 2, 171 L.Ed.2d 203 (2008) ( "*Piccadilly Cafeterias* ").

28  *See Chrysler,* 405 B.R. at 94–96.

29  *Id.* at 94.

30  722 F.2d at 1069.

31  *Id.*

32  *Id.*

33  *Id.*

34  *Id.*

35  *Id.*

36  *Id.* at 1070 (emphasis added).

37  *Id.* at 1071,

38  *Id.* (emphasis added).

39  *See Lionel; LTV,* 973 F.2d at 143–44 ("In *Lionel,* we adopted a rule that 'requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application,' " and, quoting *Lionel,* reiterating that "First and foremost is the notion that a bankruptcy judge must not be shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative power granted him under the Code," and that "a bankruptcy judge must

have substantial freedom to tailor his orders to meet differing circumstances."); *FNN,* 980 F.2d at 169 (in considering sale outside of a plan of reorganization, "a bankruptcy judge must not be shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative power granted him under the [Bankruptcy] Code"); *Gucci,* 126 F.3d at 387 ("A sale of a substantial part of a Chapter 11 estate ... may be conducted if a good business reason exists to support it."); *Iridium,* 478 F.3d at 466 ("In this Circuit, the sale of an asset of the estate under § 363(b) is permissible if the judge determining [the] § 363(b) application expressly find[s] from the evidence presented before [him or her] at the hearing [that there is] a good business reason to grant such an application.").

40    *See, e.g., In re Decora Indus.,* No. 00–4459, 2002 WL 32332749, at *3 (D.Del. May 20, 2002) (Farnan, J.) (approving a 363 sale, finding a "sound business purpose" where "the Court understands the precarious financial and business position of Debtors"; their only source of outside financing was a DIP facility that would soon expire, with no source of alternative financing, and where the alternatives were either the proposed sale transaction or termination of business operations and liquidation).

*See also* 3 COLLIER ON BANKRUPTCY ¶ 363.02[3] (15th ed. rev.2009) ( "*Collier* ") (While sales of substantial portions of a debtor's assets under section 363 must be scrutinized closely by the court, "[i]t is now generally accepted that section 363 allows such sales in chapter 11, as long as the sale proponent demonstrates a good, sound business justification for conducting the sale before confirmation (other than appeasement of the loudest creditor), that there has been adequate and reasonable notice of the sale, that the sale has been proposed in good faith, and that the purchase price is fair and reasonable.").

41    There the issue involved the debtor's entitlement to the "stamp-tax" exemption of Bankruptcy Code section 1146, after a 363 sale of the entirety of the debtor's assets and confirmation of a plan distributing the proceeds of the earlier 363 sale.

42    128 S.Ct. at 2331 n. 2 (emphasis added).

43    722 F.2d at 1071.

44    *Id.*

45    *Id.* at 1071.

46    *Id.*

47    *Id.* ("This list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge."); *accord Iridium,* 478 F.3d at 466 n. 21.

48    *See Chrysler,* 405 B.R. at 95–96.

49    *Id.* at 96.

50    *Id.* (citations omitted).

51    No. 07–10609(REG), ECF # 284.

52    No. 02–41729(REG).

53    *See In re Adelphia Commc'ns Corp.,* 368 B.R. 140, 169 (Bankr.S.D.N.Y.2007) ("Adelphia–Confirmation") (describing the history).

54    Thus the Court needn't spend extensive time in individualized discussion of each of the more specific factors articulated in *Lionel,* and by this Court, as aids in determining "good business reason." Where the proportionate value of the assets being sold is high, as they are here, Factor (a) (proportionate value of the assets to the estate as a whole) suggests that the situation be given close factual scrutiny—which the Court has attempted to do, in its rather lengthy Findings of Fact above—but at most Factor (a) tips only mildly against approval here. The same is true with respect to Factor (b) (elapsed time since the filing)—since where the need is most pressing, it would be foolhardy to wait. Factors (d) (effect on reorganization), (e) (proceeds to be realized), and (f) (which alternative is proposed) are inapplicable or favor immediate sale, as the Court finds that a standalone plan of reorganization is not possible, that the sale would not change distribution priorities in any ultimate plan, and there are no opportunities to realize greater value. And all of the other factors weigh *heavily* in favor of approval. Factor (g) (whether the asset is increasing or decreasing in value), expressly stated by the Circuit to be most important, *compels* and not just favors immediate sale. So do Factors (h) (lack of liquidity); (i) (no alternative sale opportunity later); (j) (same, along with no stand-alone plan alternative); and (k) the certainty or near certainty that in the absence of this sale, the patient will indeed die on the operating table. (If it matters, the same conclusion follows even if one does not consider the additional factors this Court suggested.)

The Court also notes the critically important absence of proof tending to support a contrary finding, as also required by *Lionel. See Lionel,* 722 F.2d at 1071. Opponents of the sale have produced no evidence that the sale is *not* justified.

55    *In re Adelphia Commc'ns Corp.,* 327 B.R. 143, 166 (Bankr.S.D.N.Y.2005) ("*Adelphia Settlement–Bankruptcy* "), *aff'd* 337 B.R. 475 (S.D.N.Y.2006) (Kaplan, J.)("*Adelphia Settlement–District* "), *appeal dismissed,* 222 Fed.Appx. 7 (2d Cir.2006), *cert. denied,* 552 U.S. 941, 128 S.Ct. 114, 169 L.Ed.2d 244 (2007).

56    *Adelphia Settlement–Bankruptcy,* 327 B.R. at 167.

57    Creditors' Comm. Ltd. Obj. ¶ 3 (emphasis added).

58    *See, e.g., In re Betty Owens Sch., Inc.,* 1997 WL 188127, at *4 (S.D.N.Y. Apr.17, 1997) (Leisure, J.), citing *In re Del. & Hudson Ry. Co.,* 124 B.R. 169, 176 (D.Del.1991) (Longobardi, J.). *See also* Judge Farnan's more recent decision *in Decora Industries,* 2002 WL 32332749, at *2.

59    *Gucci,* 126 F.3d at 390 (quoting *In re Rock Indus. Mach. Corp.,* 572 F.2d 1195, 1198 (7th Cir.1978)); *accord id.* (noting also that the relevant fraudulent, collusive actions are those "specifically intended to affect the sale price or control the outcome of the sale."); *Chrysler,* 405 B.R. at 106 (same).

60    *See In re Global Crossing Ltd.,* 295 B.R. 726, 742–44 (Bankr.S.D.N.Y.2003), relying heavily on *Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.),* 147 B.R. 650 (S.D.N.Y.1992) (Mukasey, C.J.).

61    *Global Crossing,* 295 B.R., at 743.

62    When the Court considers "disinterestedness," it looks to the disinterestedness of GM's Board and management, and particularly its Board, which is the ultimate decision maker for any corporation. The Court heard no evidence that either the Board or management chose the sale opportunity over any other alternative either because of a conflict of interest, or because the Government told them to. The Court finds instead that GM's Board and management took the pending opportunity to save the company because it was the only responsible alternative available.

Finally, the U.S. and Canadian governments did not become "insiders" skewing any disinterestedness analysis by reason of their assistance to GM. *See Chrysler,* 405 B.R. at 107 ("Nor did the Governmental Entities control the Debtors in that regard [with respect to the *Chrysler* sale transaction] or become 'insiders' of the Debtors.").

63    *See Iridium,* 478 F.3d at 466 (citing *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.),* 700 F.2d 935, 940 (5th Cir.1983); *Chrysler,* 405 B.R. at 95–96).

64    700 F.2d at 940.

65    *See Abel v. Shugrue (In re Ionosphere Clubs, Inc.),* 184 B.R. 648, 654 & n. 6 (S.D.N.Y.1995).

66    *See Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.),* 119 F.3d 349, 354 (5th Cir.1997).

67    *See Contrarian Funds, LLC v. Westpoint Stevens Inc. (In re Westpoint Stevens Inc.),* 333 B.R. 30, 51 (S.D.N.Y.2005) (Swain, J.).

68    *See In re Naron & Wagner, Chartered,* 88 B.R. 85, 88 (Bankr.D.Md.1988) (the "sale proposed here is not a *sub rosa* plan because it seeks only to liquidate assets, and the sale will not restructure [the] rights of creditors.").

69    *See In re Trans World Airlines, Inc.,* 2001 WL 1820326, at *11 (Bankr.D.Del. Apr.2, 2001) (Walsh, J.).

70    2001 WL 1820326, at *12 (emphasis added).

71    2001 WL 1820326, at *11 (emphasis added).

72    *See* 405 B.R. at 97–100.

73    *Id.* at 98.

74    *Id.* at 99.

75    *Id.*

76    *Id.*

77    *Id.* at 99–100.

78    *Id.* at 99 (emphasis added).

79    *Id.* As he further observed, the UAW in *Chrysler* was providing substantial consideration to New Chrysler in the form of "unprecedented modifications" to the UAW's collective bargaining agreement. *Id.* at 100. The record supports a similar finding here.

80    *See Adelphia Commc'ns Corp. v. Bank of America (In re Adelphia Commc'ns Corp.),* 365 B.R. 24, 73–75 (Bankr.S.D.N.Y.2007) ( "*Adelphia–Bank of America* "), *aff'd as to all but an unrelated issue, 390 B.R. 80 (S.D.N.Y.2008)* (McKenna, J.).

81    *In re Official Comm. of Unsecured Creditors for Dornier Aviation (North America), Inc.,* 453 F.3d 225, 233–34 (4th Cir.2006).

82    *In re AutoStyle Plastics, Inc.,* 269 F.3d 726, 749–50 (6th Cir.2001).

83    *See Adelphia–Bank of America,* 365 B.R. at 74 (citing, *inter alia, Dornier Aviation* and *AutoStyle* ).

84    There is no basis for recharacterizing the $33 billion that was the subject of the DIP loans provided by the U.S. Treasury and EDC. These were presented to the Court as loans, seeking approval for post-petition financing under section 364 of the Code.

85    *Benjamin v. Diamond (In re Mobile Steel Co.),* 563 F.2d 692 (5th Cir.1977).

86    *Id.* at 700.

87    3 *Collier* at ¶ 363.06[7].

88    *Id.*

89    *Id.*

90    *See id.*

91    *Id.* Whether the U.S. and Canadian Governments would have lent and ultimately bid a lesser amount here is doubtful, but this consideration provides the context for deciding legal issues that presumably will extend beyond this case.

92    The principal provisions in the proposed order provide, in relevant part:

> Except for the Assumed Liabilities, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Purchased Assets shall be transferred to the Purchaser in accordance with the MPA, and, upon the Closing, shall be free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever ... including rights or claims based on any successor or transferee liability....

> Proposed Order ¶ 7.

> ... [A]ll persons and entities ... holding liens, claims, encumbrances, and other interests of any kind or nature whatsoever, including rights or claims based on any successor or transferee liability, against or in a Seller or the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Sellers, the Purchased Assets, the operation of the Purchased Assets prior to the Closing, or the 363 Transaction, are forever barred, estopped, and permanently enjoined from asserting against the Purchaser, its successors or assigns, its property, or the Purchased Assets, such persons' or entities' liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability.

> Proposed Order ¶ 8. Similar provisions are in the MPA.

93    *See* Section 101(5) of the Code.

94    3 *Collier* at ¶ 363.06[1] (emphasis added).

95    Indiv. Accident Litigants Br. 4, *quoting Cohen v. de la Cruz,* 523 U.S. 213, 220, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998).

96    *See* Postings of Stephen Lubben, Professor at Seton Hall Law School, to Credit Slips, *http://www.creditslips. org/creditslips/2009/06/ claim-or-interest.html* (June 13, 2009, 8:25 PM EST); and *http://www.creditslips.org/creditslips/2009/06/claim–or–interest–part– 2.html* (June 14, 2009, 6:42 PM EST). Blogs are a fairly recent phenomenon in the law, providing a useful forum for interchanges of ideas. While comments in blogs lack the editing and peer review characteristics of law journals, and probably should be considered judiciously, they may nevertheless be quite useful, especially as food for thought, and may be regarded as simply another kind of secondary authority, whose value simply turns on the rigor of the analysis in the underlying ideas they express.

97    Indiv. Accident Litigants Br. 4.

98    *See* Posting of Stephen Lubben, Professor at Seton Hall Law School, to Credit Slips, *http://www.creditslips. org/creditslips/2009/06/ claim-or-interest.html* (June 13, 2009, 8:25 PM EST).

99    The Individual Accident Litigants also place heavy reliance on *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979), *see* Indiv. Accident Litigants Br. 8, suggesting that *Butner* requires deference to state law that might impose successor liability and that this would require excluding successor liability damages claims from any definition of "interest." But the Court cannot agree. First, when quoted in full, *Butner* (whose bottom line was that the issue of whether a security interest extended to rents derived from the property was governed by state law) stated:

> The Bankruptcy Act does include provisions invalidating certain security interests as fraudulent, or as improper preferences over general creditors. Apart from these provisions, however, Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.

> 440 U.S. at 54, 99 S.Ct. 914. *Butner* further stated (in language the Individual Accident Litigants did not quote):

> Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.

> *Id.* at 55, 99 S.Ct. 914. But the *Butner* court laid out principles by which we determine what is property of the estate; it did not address the different issue of whether a state may impose liability on a transferee of estate property by reason of something the debtor did before the transfer. Moreover, *Butner* noted that provisions of the Code can and do sometimes trump state law. And section 363(f), for as much or as little as it covers, is exactly such a provision. In fact, 363(f) is a classic example of an instance where a "federal interest requires a different result." *Butner* neither supports nor defeats either party's position here.

100   *See, e.g., Chrysler,* 405 B.R. at 111; *In re Trans World Airlines, Inc.,* 322 F.3d 283, 288–90 (3d Cir.2003) ("*TWA* "); *United Mine Workers of Am.1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.),* 99 F.3d 573, 581–82 (4th Cir.1996).

101   *See, e.g., Michigan Empl. Sec. Comm. v. Wolverine Radio Co., Inc. (In re Wolverine Radio Co.),* 930 F.2d 1132, 1147–48 (6th Cir.1991); *Precision Indus., Inc. v. Qualitech Steel SBQ, LLC (In re Qualitech Steel Corp.),* 327 F.3d 537, 545–46 (7th Cir.2003); *Fairchild Aircraft Corp. v. Cambell (In re Fairchild Aircraft Corp.),* 184 B.R. 910, 918 (Bankr.W.D.Tex.1995), *vacated as moot on equitable grounds,* 220 B.R. 909 (Bkrtcy.W.D.Tex.1998).

> *See also Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr.N.D.Ohio 1987) (concluding that 363(f) could not be utilized, but that section 105(a) could be used to effect 363 sale free and clear of claims).

102    405 B.R. at 111.

103    *See* 486–87, n. 19 above.

104    *See, e.g., O'Brien v. State of Vermont (In re O'Brien)*, 184 F.3d 140, 142 (2d Cir.1999); *Mangosoft, Inc. v. Oracle Corp.*, 525 F.3d 1327, 1330 (Fed.Cir.2008).

105    *See* Tr. of Arg. before Second Circuit, No. 09–2311 (2d Cir. June 5, 2009) ("2d Cir. Arg. Tr.") at 17–22 (current tort claims); 47–49 (current tort claims); 60–62 (current tort claims).

106    2d Cir. Arg. Tr. at 22–26 (future and, to a limited extent, current, product liability claims); 26–29 (current and future asbestos claims); 45–46 (future asbestos and tort claims); 62–64 (future asbestos claims).

107    This Court has previously noted that it is hesitant to draw too much from the questions judges ask in argument. *See In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 636 n. 44 ("Thoughts voiced by judges in oral argument do not always find their way into final decisions, often intentionally and for good reason.") Thus the Court does not rely on anything that was said in the way of questions in the *Chrysler* appeal for the purpose of trying to predict the Circuit's thinking or leanings. This Court looks to the *Chrysler* argument questioning solely for the purpose of noting the issues that were before the Circuit, and that got its substantive attention.

108    The Court cannot agree with the suggestion that *Chrysler* is distinguishable because the purchaser there, Fiat, was a commercial entity, and that the purchaser here is an entity formed by the U.S. and Canadian Governments. We are talking about an issue of statutory interpretation here, and the Code makes no distinction in that regard.

109    *Collier* states that "[a]lthough some courts have limited the term ["interest in property," as used in section 363(f) ] to *in rem* interests in the property, the trend seems to be in favor of a broader definition that encompasses other obligations that may flow from ownership of the property." 3 *Collier* at ¶ 363.06[1]. Though *Collier* is of course consistent with this Court's conclusion, the Court regards the caselaw holdings in this Circuit and District as more important.

110    They may have resort to dealers, and the proposed sale motion also contemplates that New GM will indemnify dealers for losses of this type, whenever the claims arose. While this would seemingly greatly reduce the number of instances where a plaintiff cannot recover meaningful amounts if liability is established, the Court does not suggest that it will cover all of them.

111    Findings and an injunction of the character requested were issued in each of *Chrysler* and *TWA*. *See Chrysler*, No. 09–50002 (Bankr.S.D.N.Y. June 1, 2009) (Order Granting 363 Sale ¶¶ W–BB, 9–23); *TWA*, 322 F.3d at 286–87.

112    Asbestos Br. at 2.

113    *See Chrysler* Arg. Tr. at 46, 47, 72–73 (colloquy, principally with Judge Sack, with respect to this issue). Once more, the Court does not read those questions as telegraphing any views or decision of the Circuit as to these issues, but rather as helping this Court focus on matters worthy of consideration.

114    Proposed Order ¶ 61

115    *Id.* ¶ 62.

116    Tr. of Hr'g, *In re Magnesium Corporation of America*, No. 01–14312, 2002 WL 32772333 (Bankr.S.D.N.Y. June 4, 2002) (ECF # 290).

117    *Id.* at 129.

118    The Court understands that the Purchaser does not want the Massena site and that it will not be transferred to New GM, but it is unclear to the Court whether Old GM will want to sell the Massena site to someone else or abandon it. Certainly, if the Purchaser does not wish to take the Massena site, it does not have to. If Old GM wishes to abandon the Massena site, the Environmental Matters Objectors, or some of them, will have rights to be heard, and may have substantive future rights. The Court does not decide any of those additional issues at this time.

119    New GM has offered to assume the liability to provide Retiree Benefits to a certain extent, but in, dramatically reduced amount. Its proposal in that regard was unacceptable to the Splinter Unions and a counterproposal by the Splinter Unions has not been accepted. On July 2, the Court approved settlements between GM and other non-UAW unions under which New GM would assume Retiree Benefits for them, but again in dramatically reduced amounts.

120    The obligations in question are very sizeable—more than $3 billion in retiree health care and hundreds of millions more for retirement life insurance. Splinter Union Obj. ¶ 4. Those large figures show why the Splinter Unions care about the issue, and why New GM feels that it cannot assume those obligations when such a small number of Splinter Union members will be working for New GM.

121    Section 1114(e) (emphasis added).

122    With respect to section 1114 matters and related issues, he stated:

> The objecting retirees represented by the UAW objected to the modification of retiree benefits under the settlement agreement between New Chrysler and the UAW, but those objections are overruled because the UAW was the objectors' authorized

representative under section 1114, and the modifications were negotiated in good faith pursuant to that section. The objecting retirees not represented by the UAW whose benefits are adversely impacted may have unsecured claims against the Debtors' estates, but the purchased assets are sold free and clear of those potential unsecured claims. For those reasons, their objections to the Sale Motion are overruled. Further, the Court finds that if the Sale Motion were not approved, which would likely result in the Debtors' liquidation, there would likely be no value to distribute any retirees, all of whom would be unsecured creditors. 405 B.R.at 110.

123    Splinter Union Obj. ¶ 79.

124    Henderson Decl. ¶¶ 92–93.

125    The Unofficial GM Dealers Committee was formed prior to the filing of GM's chapter 11 case by the GM National Dealer Council in coordination with the National Automobile Dealers Association. It was formed to act as a voice for the dealer body's collective interests in connection GM's restructuring efforts. Its members sell and service vehicles under GM brands in locations all over the country.

126    See, e.g., N.Y. Auto Dealers Obj. at ¶¶ 19, 20 ("GM seeks, through this proceeding, to gain advantage over other manufacturers."); id. ("Permitting GM in bankruptcy, to ignore state dealer laws upsets the competitive balance among GM and every other automotive manufacturer.").

127    It also at least seemingly would not be a person aggrieved with standing to appeal, but that is an issue for the appellate courts.

128    See discussion at 492–93, above.

129    Adelphia Settlement–Bankruptcy, 327 B.R. at 166.

130    Adelphia Settlement–District, 337 B.R. at 477.

131    See In re Old Carco LLC, 406 B.R. 180, 199–206 (Bankr.S.D.N.Y.2009); see also id. at 205–06 ("Where a state law 'unduly impede[s] the operation of federal bankruptcy policy, the state law [will] have to yield' ") (quoting In re City of Vallejo, 403 B.R. 72, 77 (Bankr.E.D.Cal.2009)).

132    406 B.R. at 205–06; see also Vallejo, 403 B.R. at 77 (holding that "Congress enacted section 365 to provide debtors the authority to reject executory contracts. This authority preempts state law by virtue of the Supremacy Clause [and] the Bankruptcy Clause.") (internal citation omitted).

133    406 B.R. at 202–05. See also 406 B.R. at 204 ("In sum, the Dealer Statutes ... are concerned with protecting economic or commercial interests and are thus preempted by the Bankruptcy Code notwithstanding 28 U.S.C. § 959(b)") (citing In re Baker & Drake, Inc., 35 F.3d 1348, 1353 (9th Cir.1994)); id. at 206 n. 32 (stating that "state law protections cannot be used to negate the Debtors' rejection powers under § 365.... 'The requirement that the debtor in possession continue to operate according to state law requirements imposed on the debtor in possession (i.e., § 959(b)) does not imply that its powers under the Code are subject to the state law protections.' ") (quoting In re PSA, Inc., 335 B.R. 580, 587 (Bankr.D.Del.2005) (emphasis in original)).

134    N.Y. Auto Dealers Obj. ¶ 20.

135    See In re Adelphia Commc'ns Corp., 336 B.R. 610, 664 (Bankr.S.D.N.Y.2006).

136    See, e.g., In re Momentum Mfg. Corp., 25 F.3d 1132, 1136 & n. 4 (2d Cir.1994) ("It is well settled that bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process.... We have repeatedly emphasized the importance of the bankruptcy court's equitable power." But "[t]his power is not unlimited. Thus, a bankruptcy court may not exercise this power in contravention of provisions of the Code."); In re Joint Eastern & Southern District Asbestos Litig., 982 F.2d 721, 751 (2d Cir.1992) ("Asbestos Litigation") ("[A] reorganization is assuredly governed by equitable considerations, but that guiding principle is not a license to courts to invent remedies that overstep statutory limitations."); see also In re Aquatic Dev. Group, Inc., 352 F.3d 671, 680 (2d Cir.2003) (Straub, J., concurring) ("Aquatic Development") ("[T]his Court has repeatedly cautioned that 105(a) 'does not "authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity." ' "), quoting In re Dairy Mart Convenience Stores, Inc., 351 F.3d 86, 92 (2d Cir.2003) ("Dairy Mart "), in turn quoting U.S. v. Sutton, 786 F.2d 1305, 1308 (5th Cir.1986).

137    See 2008 Prepetition Agreement Section 4.01 (proviso generally providing that collateral would not include "Excluded Collateral," a term defined elsewhere in that agreement).

138    Id. Section 1.01—"Excluded Collateral" (v) ( "Definitions") (emphasis added).

139    It does not matter if, as Parker suggested but did not prove, the U.S. Treasury unintentionally or even intentionally recorded a mortgage or UCC–1 covering the property mentioned in the equal and ratable clause. Doing so would only have perfected a lien, assuming that one was granted in the first place. Here there was no grant of any lien, and perfecting such a nonexistent lien would be meaningless.

140    See 405 B.R. at 83.

141    Chrysler–Standing, 405 B.R. at 83.

142    Id.

51 Bankr.Ct.Dec. 225

143    The order entered by the Court differs from the revised proposed order submitted by the Debtors in a few respects: The order entered by the Court adds this Decision to the places where Findings of Fact are set forth and where Conclusions of Law may be found. It adds "to the fullest extent constitutionally permissible" in connection with the injunction as to successor liability claims, to address notice or other due process issues that might otherwise exist with respect to future asbestos claims or "demands" as discussed above. And like the order entered by Judge Gonzalez in *Chrysler,* the order shortens the Fed.R.Bankr.P. 6004(h) and 6006(d) periods, but still provides 4 days, so as to avoid effectively precluding any appellate review.

---

**End of Document**                                     © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 45

76 A.F.T.R.2d 95-7640, 94-2 USTC P 50,443, Bankr. L. Rep. P 76,085...

167 B.R. 436
United States Bankruptcy Court,
W.D. Texas,
San Antonio Division.

In re James Lee KNOBEL and
Leigh Jae Knobel, Debtors.

Bankruptcy No. 91–53542–C.    |    April 5, 1994.

Chapter 7 trustee moved for determination of tax liability. The Bankruptcy Court, Leif M. Clark, J., held that each estate, in debtors' jointly filed Chapter 7 case, was entitled to personal exemption and standard deduction, as individual deemed to be married filing separately.

So ordered.

West Headnotes (8)

[1]    **Internal Revenue**
       👉 Deduction for Personal Exemptions

Unless bankruptcy court orders substantive consolidation, each estate in jointly filed bankruptcy case is entitled to personal exemption and standard deduction, as individual deemed to be married filing separately, in calculating estates' respective taxable incomes. Bankr.Code, 11 U.S.C.A. § 302; 26 U.S.C.A. §§ 1398, 6012(a)(9).

4 Cases that cite this headnote

[2]    **Bankruptcy**
       👉 Joint Cases

Joint filing results in two bankruptcy estates, absent order of substantive consolidation by bankruptcy court. Bankr.Code, 11 U.S.C.A. § 302.

Cases that cite this headnote

[3]    **Bankruptcy**
       👉 Transfer and Consolidation of Cases

Absent order of substantive consolidation by bankruptcy court, joint administration of two or more estates has absolutely no impact on legal rights and obligations of debtors, creditors or trustee.

1 Cases that cite this headnote

[4]    **Bankruptcy**
       👉 Grounds and Objections; Factors Considered

While joint bankruptcy cases generally will be administered jointly, substantive consolidation is not typically granted unless party seeks it and there is proper justification. Bankr.Code, 11 U.S.C.A. § 302(b).

Cases that cite this headnote

[5]    **Bankruptcy**
       👉 Grounds and Objections; Factors Considered

That marital property laws of domiciliary state of debtors filing joint petition proscribe a community property regime may provide significant justification for substantive consolidation, in whole or in part. Bankr.Code, 11 U.S.C.A. § 302(b).

3 Cases that cite this headnote

[6]    **Bankruptcy**
       👉 Proceedings; Evidence

While community property laws may lead bankruptcy court to conclude that separate estates created by joint bankruptcy petition should be substantively consolidated, mere fact that debtors' domiciliary state prescribes a community property regime will not support further conclusion that debtors' estates are de facto consolidated; consolidation must be sought by party and determined to be appropriate by court. Bankr.Code, 11 U.S.C.A. § 302(b).

4 Cases that cite this headnote

[7]    **Internal Revenue**
       👉 Estates, Trusts, and Beneficiaries

Separate, individual bankruptcy estates constitute two taxable entities under the Internal Revenue Code, entitled to the benefits and burdens of that status. 26 U.S.C.A. § 1 et seq.

1 Cases that cite this headnote

[8]    **Internal Revenue**

👉 Deduction for Personal Exemptions

Bankruptcy estate is itself an individual, for federal income tax purposes, which is entitled to one personal exemption and one standard deduction, based on status of married person filing separately. 26 U.S.C.A. §§ 1398(c), 6012(a)(9).

Cases that cite this headnote

**Attorneys and Law Firms**

*437 David T. Cain, San Antonio, TX, for debtors.

John Patrick Lowe, Uvalde, TX, Trustee.

A. Ellouise Niblo, Dallas, TX, for U.S.

**Opinion**

## DECISION AND ORDER ON TRUSTEES' MOTION FOR DETERMINATION OF TAX LIABILITY

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for consideration the chapter 7 trustee's Motion for Determination of Tax Liability for the Period January 1, 1992 through December 31, 1992. After consideration of the parties' memoranda and oral argument, and the relevant authorities, the court concludes that a joint filing under section 302 of the Bankruptcy Code produces two estates, each of which, absent an order of the court substantively consolidating the estates, are individual taxable entities (deemed married filed separately), entitled each to one personal exemption and one standard deduction. The following constitutes the court's findings of fact and conclusions of law. FED.R.BANKR.P. 7052.

*Jurisdictional Statement*

This is a core proceeding under 28 U.S.C.A. § 157(b)(2)(B) (West 1993). This court has jurisdiction over this matter pursuant to 28 U.S.C.A. § 1334(b) and 11 U.S.C.A. § 505(a)(1) (West 1993).

*Statement of Facts*

The facts are not in dispute. James and Leigh Knobel (the "Knobels" or the "Debtors") filed a petition for relief under chapter 7 of the Bankruptcy Code, 11 U.S.C.A. §§ 101 et seq. (West 1993 & Supp.1994), on September 19, 1991. As a married couple, the Knobels chose to file "jointly" pursuant to section 302 of the Bankruptcy Code. So filing, they paid one filing fee; their case was assigned one case number; a single trustee was appointed; and the Internal Revenue Service ("IRS") assigned only one "employer identification number" ("EIN"). In accordance with Rule 1015(a) of Local Court Rules of the United States Bankruptcy Court for the Western District of Texas, the Knobels' case was, for procedural purposes only, jointly administered. [1]

The case was originally listed as a "no asset" case. Subsequently, on February 10, 1992, the trustee filed a notice of assets, assets about which the Debtors had been less than forthcoming. The Debtors failure to cooperate with the trustee in administering their estates ultimately led to denial of the Debtors' discharge. Notwithstanding the denials of discharge, the trustee continued to administer the *found* assets for the benefit of the Debtors' creditors.

Administration of the estates gave rise to taxable income in 1992. The trustee timely filed a Form 1041 (fiduciary tax return) for the tax year January 1, 1992 through December 31, 1992, under the EIN assigned to the case by the IRS. The Form 1041 indicated a total tax liability for the tax period of $312—$156 on behalf of the estate of Mr. Knobel and $156 on behalf of the estate of Mrs. Knobel. That tax liability was derived on the basis of two separate estates, each taking one standard deduction and one personal exemption, and was determined on the basis of a married person filing separately. This calculation was set forth on two Forms 1040 filed by the trustee with his fiduciary Form 1041; [2] *438 one filed on behalf of the estate of Mr. Knobel and one on behalf of the estate of Mrs. Knobel. Pursuant to section 505(b) of

In re Knobel, 167 B.R. 436 (1994)

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 287 of 379

76 A.F.T.R.2d 95-7640, 94-2 USTC P 50,443, Bankr. L. Rep. P 76,085...

the Bankruptcy Code, the "hurry up" provision, the trustee requested from the IRS a "prompt" determination of any unpaid tax liability. By letter dated April 2, 1993, the trustee was advised by the IRS that the trustee's Form 1041 and attached Forms 1040 had been selected for examination.

Upon examination, the IRS challenged the trustee's determination of tax liability. After adjusting the tax returns to reflect one estate entitled to only *one* personal exemption, 26 U.S.C.A. § 151 (West 1988 & Supp.1994), and *one* standard deduction, 11 U.S.C.A. § 63(c) (West 1988 & Supp.1994), the IRS determined that the Debtors' *estate* underpaid its tax liability by $794.

The trustee brought the instant motion for resolution of this dispute. The trustee relies on the allegedly unambiguous language of section 302 of the Bankruptcy Code and sections 1398 and 6012(a)(9) of the Internal Revenue Code ("IRC"), 26 U.S.C.A. § 1398 (West 1988 & Supp.1994). Under section 302 of the Bankruptcy Code, the trustee contends, a joint filing by a married couple creates two estates that remain separate and distinct (taxable) entities until and unless a determination is made by the court that the separate estates should be *substantively* consolidated. Notes the trustee, mere joint administration pursuant to Local Rule 1015(a) does not consolidate the estates for *substantive* purposes, *i.e.,* it does not result in the disregard of legal boundaries of ownership and liability, it serves only as a tool to ease the time and cost of administration of related cases. Because the Knobels' estates have never been substantively consolidated by order of this court, the trustee concludes that the estates remain two separate taxable entities under sections 6012(a)(9) and 1398(c) of the IRC and each is entitled to a personal exemption and a standard deduction (as a married person filing separately) in calculation of its taxable income.

Beyond what the trustee asserts is the plain language of the Bankruptcy Code and the IRC, the trustee looks to section 522(m) of the Bankruptcy Code by way of analogy for the proposition that a joint filing does not result, *ipso facto,* in the collapse of the individual integrity of each debtor (or by extension, one would suppose, their respective estates). Subsection (m) of section 522 of the Bankruptcy Code, which concerns entitlement to bankruptcy exemptions, provides "[s]ubject to the limitation subsection (b), this section shall apply separately with respect to each debtor in a joint case." 11 U.S.C.A. § 522(m). Thus, each debtor in a joint case is entitled to claim certain property as exempt. While the trustee's observation here is valid, because the focus of section

522(m) is the debtors, not their estates, the analogy is not apposite to the court's current inquiry.

The IRS looks away from section 302 to section 541(a)(2)[3] of the Bankruptcy Code and section 1398(g) of the IRC, which the IRS contends support its argument that only one estate and one taxable entity is created upon the filing of a joint petition under section 302 of the Bankruptcy Code. The IRS **\*439** also asserts that payment of only one filing fee, the assignment of only one case number, the assignment of only one employer identification number and the appointment of only one trustee, support a finding of only one estate. Further, the IRS suggests that the very treatment of the alleged estates by the trustee and the court effects a *de facto* substantive consolidation. In short, the IRS opines that to accept the trustee's argument elevates form over substance, and invites abuse of both the IRC and the Bankruptcy Code.

### Discussion

[1]   Neither the parties' nor the court's own research has uncovered a published decision that addresses the issue whether a joint bankruptcy filing creates one taxable entity or two for purposes of determining entitlement to personal exemptions and deductions from income. This appears to be a veritable case of first impression.[4]

### One Estate or Two?

Section 302 of the Bankruptcy Code provides for the joint filing of a petition for relief under title 11.[5] As the statute states, debtors availing themselves of such relief need file only one petition, and need pay only one filing fee. Consequently, only one case number is assigned, only one trustee is appointed and only one tax identification number is assigned by the IRS. *See, e.g., In re Crowell,* 53 B.R. 555 (Bankr.M.D.Tenn.1985). Section 302 of the Bankruptcy Code effects a change from prior law under the Bankruptcy Act of 1898 insofar as the Bankruptcy Act made no express provision for the filing of joint petitions. Indeed, for a significant portion of this century married women were not qualified to file bankruptcy—not because they were not considered "persons" under the Bankruptcy Act,[6] but rather because, under common law, and under the laws of most states, women could not incur debt or own personal property. *See generally* 1 COLLIER ON BANKRUPTCY § 4.11 (14th ed. 1974). For example, inability to incur debts excluded

In re Knobel, 167 B.R. 436 (1994)

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 288 of 379

76 A.F.T.R.2d 95-7640, 94-2 USTC P 50,443, Bankr. L. Rep. P 76,085...

women from petitioning under Chapter XI of the Bankruptcy Act, as a debtor under that chapter had to have unsecured debts which the debtor was obligated to pay. *See generally* 8 COLLIER ON BANKRUPTCY §§ 321–324, at ¶ 4.06[5] (14th ed. 1978). Moreover, in community property states, like Texas, where the husband was charged under state law with management of the community estate, only the husband could bring the community property into bankruptcy, as the wife generally could not convey an interest in community property except to the husband or as an agent for him. *See generally* 4 COLLIER ON BANKRUPTCY ¶ 70.17 [11] at 193 & 195 (14th ed. 1978).

By 1979, when the Bankruptcy Code was enacted, those obstacles to a married woman's **\*440** participation in the community and in the commercial world at large had been removed. Thus, capable of incurring debt, owning property (instead of *being* property) and conveying community property, married women, too, could avail themselves of the relief available under the bankruptcy laws. Provision for joint filings under the Bankruptcy Code acknowledges the changed times. [7]

While a married couple may file jointly under the Bankruptcy Code, the filing does not disregard that the filing consists of two individuals—it does not return us to days past. The Bankruptcy Code recognizes the property regimes established under the law of the debtors' domiciliary state, including community property regimes where such are in place. *See* 11 U.S.C.A. §§ 541(a) & 726(c); *In re Ageton*, 14 B.R. 833, 835–36 (Bankr. 9th Cir.1981); *see also Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) (interests in property determined under state law); *In re Crowell*, 53 B.R. 555, 557 (Bankr.M.D.Tenn.1985) ("To determine the effect of a joint petition requires an examination of the property interests of each estate separately."). Thus, in a community property state, like Texas, property owned by one or both of the spouses may include the separate property of the wife, the separate property of the husband, "special" or sole management community property of the wife and of the husband which is liable for the individual debts of the non-manager spouse, and jointly owned community property. [8]

[2]   [3]   [4]   That there are two estates each consisting of each spouses' respective separate property and sole management community property plus the community's interest in joint community property is supported by the very section that recognizes joint petitions. [9] *Section 302(b)* provides:

After the commencement of a joint case, the court shall determine the extent, if any, to which the debtors' estates shall be consolidated.

11 U.S.C.A. § 302(b). This provision has been consistently interpreted to signify that a joint filing results in two estates, absent an order of substantive consolidation by the court. *See In re Chandler*, 148 B.R. 13 (Bankr.E.D.N.C.1992). "Absent a court Order to consolidate, joint administration has absolutely no impact on the legal rights and obligations of the Debtors[s], Creditors, or the Trustee." *In re McCulley*, 150 B.R. 358, 360 (Bankr.M.D.Pa.1993); *see also In re Scholz*, 57 B.R. 259 (Bankr.N.D.Ohio 1986); *In re Crowell*, 53 B.R. 555, 557 (Bankr.M.D.Tenn.1985); *Ohio v. Wilkinson*, 24 B.R. 474 (Bankr.S.D.Ohio 1982). Thus, while joint cases generally "will be administered jointly, unless there is an objection [,] [c]onsolidation, ..., is not typically granted unless a party seeks it and there is proper justification." **\*441** 1 NORTON BANKR. L. & PRAC.2d § 19.11 & n. 85, at 19–23 (Clark Boardman Callaghan 1993) (*citing In re Coles*, 14 B.R. 5 (Bankr.E.D.Pa.1981)). Hence, the legislative admonition that " "[t]his section ... is not a license to consolidate in order to avoid other provisions of the title to the detriment of either the debtors or their creditors. It is designed primarily for ease of administration." " *In re Birch*, 72 B.R. 103, 106 (Bankr.D.N.H.1987) (*quoting* 2 COLLIER ON BANKRUPTCY § 302.05 (15th ed. 1987) (*quoting* H.R.Rep. No. 595, 95th Cong., 1st Sess. 321 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 32 (1978) 1978 U.S.C.C.A.N. 5787, 5818, 6277–78)). [10] *See also In re Stuart*, 31 B.R. 18 (Bankr.D.Conn.1983).

[5]   That a joint filing occurs in a community property regime, like Texas, does not make superfluous or nugatory the effect of a joint filing under *section 302(a)*, or the directive of subsection (b). That is to say, a court is not relieved from determining and an interested party is not relieved from requesting a determination under *section 302(b)* that the estates of a married couple who have filed jointly should be consolidated, or merged, to create a single pot from which all creditors will share. *In re Ageton*, 14 B.R. at 835–36. However, that marital property laws of the domiciliary state of jointly filed debtors prescribe a community property regime may provide significant justification for substantive consolidation, in whole or in part. [11] *See In re Barnes*, 14 B.R. 788, 791 (Bankr.N.D.Tex.1981).

In re Knobel, 167 B.R. 436 (1994)

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 289 of 379

76 A.F.T.R.2d 95-7640, 94-2 USTC P 50,443, Bankr. L. Rep. P 76,085...

Section 541(a)(2) of the Bankruptcy Code, relied on by the IRS, is a codification of pre-Code law with respect to treatment of community property in the context of a bankruptcy filing by one spouse. *See, e.g., Hannah v. Swift,* 61 F.2d 307, 310 (9th Cir.1932); *In re Jeffery,* 2 B.R. 197 (Bankr.S.D.Tex.1980). It does not, as the IRS suggests, negate the existence of two estates. Commented the Ninth Circuit Bankruptcy Appellate Panel in *In re Ageton,* "[a] fair read of [sections 302, 541(a)(2) and 726(c) ] *does not* support the presumption that all of the property will be administered in one estate. What it does support is that community property from both estates will be segregated pending allowance of claims." *In re Ageton,* 14 B.R. at 836 (emphasis added). [12]

Further, the IRS's position fails in light of the statute itself, as well as when considered against the back drop of its implications. First, the very language of section 541(a)(2) anticipates a debtor and a non-debtor spouse. Even recognizing that the singular includes the plural, 11 U.S.C.A. § 102, absent legalization of polygamy, such construction is absurd in this context. Second, *de facto* substantive consolidation upon the mere filing of a joint case under **\*442** section 302 of the Bankruptcy Code [13] would raise serious constitutional questions. While state created rights are affected regularly in the course of the bankruptcy process, *de facto* consolidation would reshuffle parties' rights to seek payment from one asset pool or another—from the community only, or from one spouse plus the community —without notice or a hearing. For example, an unsecured creditor who agreed to look solely to the separate assets of one spouse who happened to be individually solvent would be highly disappointed to learn that upon a joint filing she would be required to share the riches of her debtor's separate estate with those who could look only to an insolvent community. *See D'Avignon v. Palmisano,* 34 B.R. 796, 799 (D.Vt.1986). Precisely because of its potential to adversely and dramatically effect a creditor's rights, sound practice necessitates that those potentially affected have notice and an opportunity to be heard. *See, e.g., Drabkin v. Midland–Ross Corp. (In re Auto–Train Corp.),* 810 F.2d 270, 277 (D.C.Cir.1987). As the *Auto–Train* court noted, "[b]efore ordering consolidation, a court must conduct a searching inquiry to ensure that consolidation yields benefits offsetting the harm it inflicts on objecting parties." *Id.* at 276 (citing *In re Snider Bros., Inc.,* 18 B.R. 230, 237–38 (Bankr.D.Mass.1982)). This is so "because every [debtor] is likely to have a different debt-to-asset ratio, [and] consolidation almost invariably redistributes wealth among the creditors of the various [debtors]." *Id.* [14]

[6]    Thus, the court concludes that while community property laws may lead a court to conclude that the separate estates created by a joint filing should be substantively consolidated, they do not support further a conclusion that the debtors' estates are *de facto* consolidated. Consolidation has been sought by no party to this matter or by the Debtors in this case. Absent such a determination by this court, there remain two bankruptcy estates, each of which is entitled to all of the benefits and burdens of that status.

### One Taxable Entity or Two?

[7]    While the court concludes that a joint filing under section 302 of the Bankruptcy Code creates two bankruptcy estates, that determination does not necessarily dictate the treatment of the estates under the IRC. In this case, however, the two statutory compilations peacefully co-exist. Separate, individual bankruptcy estates under the Bankruptcy Code constitute two taxable entities under the IRC, entitled to the benefits and burdens of that status.

The United States has long taken the position that a bankruptcy estate is a taxable entity separate and apart from the bankrupt individual. *Williams v. United States,* 667 F.2d 1108, 1110 (4th Cir.1981); *see also In re Turboff,* 93 B.R. 523, 525 (Bankr.S.D.Tex.1988); *In re Goff,* 57 B.R. 442, 443–44 (Bankr.W.D.Tex.1985); GEN.COUNS.MEM. 24,617, 1945–1 C.B. 235); Rev.Rul. 72–387, 1972–2 C.B. 632. [15]    Although the decisions were not uniform, most courts agreed with the IRS and found bankruptcy estates subject to taxation. *See, e.g., In re O'Neill,* 667 F.2d at 1110 (citing cases); *In re Goff,* 57 B.R. at 443–44. It was not until enactment of the Bankruptcy Tax Act of 1980, Pub.L. No. 96–589, 94 Stat. 3389 (1980), however, that the government's position was backed by a comprehensive statutory scheme that governed taxation of individual bankruptcy estates. *See* 26 U.S.C.A. § 6012(a)(9) (West 1989 & Supp.1994); 26 U.S.C.A. § 1398 **\*443** (West 1988 & Supp.1994); *see also In re Pflug,* 146 B.R. 687, 689 (Bankr.E.D.Va.1992) ( "Section 1398 of the Bankruptcy Tax Act of 1980 was enacted to provide the *first* comprehensive treatment of individual debtors in chapter 7 cases."); *Feldman v. Maryland Nat'l Bank (In re Wills),* 46 B.R. 333 (Bankr.D.Md.1985); H.R.Rep. No. 833, 96th Cong., 2d Sess. 19 (1980); [16]  S.Rep. No. 1035, 96th Cong., 2d Sess. (1980) U.S.Code Cong. & Admin.News 1980, 7017. The rationale for treating the individual debtor and the bankruptcy estate as separate entities for tax purposes was explained in the legislative history of the Bankruptcy Tax Act of 1980:

[T]he individual may obtain new assets or earn wages after transfer of the pre-bankruptcy property to the trustee and thus derive income independent of that derived by the trustee from the transferred assets of the bankruptcy estate as in chapter 7 and exempt property may be used to make payments to creditors, and hence the bankruptcy law does not create the same dichotomy between after-acquired assets of the individual debtor and assets of the bankruptcy estate as in chapter 7 or chapter 11 cases.

H.R.Rep. No. 833, 96th Cong., 2d Sess. 19 n. 2 (1980). Section 6012 of the IRC, which dictates who is responsible for filing federal tax returns, was amended in 1980 to provide that in individual chapter 7 and chapter 11 cases [17] the fiduciary of the estate is responsible for filing a return on behalf of the estate. Section 6012(a)(9) of the IRC provides:

**6012. Persons required to make returns of income**

(a) **General Rule.**—Returns with respect to income taxes under subtitle shall be made by the following:

(9) *Every estate of an individual under chapter 7 or 11 of title 11 of the United States Code (relating to bankruptcy) the gross income of which for the taxable year is not less than the sum of the exemption amount plus the basic standard deduction under section 63(c)(2)(D).*

26 U.S.C.A. § 6012(a)(9) (emphasis added). [18] Section 6012(b)(3) and (b)(4) of the IRC rest **\*444** the burden to file tax returns on the fiduciary in an individual chapter 7 or chapter 11 case, be it the trustee or the debtor in possession. 26 U.S.C.A. § 6012(b) (West 1989 & Supp.1994); *see also In re Pflug,* 146 B.R. at 689 ("[A] chapter 7 bankruptcy trustee has a general obligation to file tax returns on behalf of a bankruptcy estate that realizes the threshold amount of gross income required to trigger the filing of a return."); *Feldman v. Maryland Nat'l Bank (In re Wills),* 46 B.R. 333 (Bankr.D.Md.1985) (court notes that even though attributes, exemptions and deductions may negate any tax liability, the trustee remains obligated to file a return if the estate's income exceeds the threshold amount and allow the IRS the opportunity to assess the estate's tax obligation). Section 1398 of the IRC, also added in 1980, sets forth "[r]ules relating to individuals' title 11 cases," and applies to any case under chapter 7 or chapter 11 in which the debtor is an individual. 26 U.S.C.A. § 1398(a). Subsection (c) of

section 1398 provides particularly for the computation and payment of taxes in individual title 11 cases:

(c) **Computation and payment of tax; basic standard deduction.**

(1) **Computation and payment of tax.**—Except as otherwise provided in this section, the taxable income of an estate shall be computed in the same manner as for an individual. The tax shall be computed on such taxable income and shall be paid by the trustee.

(2) **Tax rates.**—The tax on the taxable income of the estate shall be determined under subsection (d) of section (1).

(3) **Basic standard deduction.**—In the case of an estate which does not itemize deductions, the basic standard deduction for the estate for the taxable year shall be the same as for a married individual filing a separate return for such year.

26 U.S.C.A. § 1398(c) (West 1988 & Supp.1994).

**[8]**    It is clear from sections 6012(a)(9) and 1398 of the IRC, together with the historical taxation of bankruptcy estates, the legislative history and the case law, that the focus of the taxing authority is the "estate." While "estate" is not defined under the IRC in this context, the court concludes that the "estate" referred to in sections 6012(a)(9) and 1398 is the bankruptcy estate as defined under section 541 of the Bankruptcy Code. *See Samore v. Olson (In re Olson),* 930 F.2d 6, 8 (8th Cir.1991); *In re Joplin,* 882 F.2d at 1509–11; *In re Turboff,* 93 B.R. at 525. The clear import from sections 1398(c) and 6012(a)(9) of the IRC is that the estate is entitled to one personal exemption and one standard deduction, based on the status of a married person filing separately in calculating its taxable income. Indeed, an estate is not required to file a tax return or be liable for income taxes unless its gross income exceeds a threshold amount which equals the exemption amount plus the standard deduction amount. *See In re Pflug,* 146 B.R. at 689; *see also* note 2 *supra* (the IRS's own instructions for filing returns on behalf of individual chapter 7 and chapter 11 cases state that a return only need be filed if the estate's income for the taxable year is $5,300 or more). Notwithstanding, the IRS contends that subsection (g) of section 1398 deprives the estate of deductions under section 63 of the IRC and exemptions under section 151 of the IRC that otherwise would be available to a married person filing separately. Section 1398(g) of the IRC provides a list of tax attributes

76 A.F.T.R.2d 95-7640, 94-2 USTC P 50,443, Bankr. L. Rep. P 76,085...

to which the estate succeeds. Even accepting the IRS's position that section 1398(g) provides an exclusive list, [19] each estate's entitlement to a personal **445 exemption and a standard deduction is not affected. Personal exemptions under section 151 of the IRC and standard deductions under section 63(c) of the IRC are not tax attributes in the strict sense; they are not personal to the debtor and do not flow from the debtor to the estate. *See generally In re Luster,* 981 F.2d 277, 279 (7th Cir.1992) (in a Bankruptcy Act case, the court noted that the trustee and the debtor were competitors for tax attributes existing at the petition date). Section 1398(g) was intended to clarify "how tax attributes are to be allocated between the estate and the debtor." H.R.Rep. 833, 96th Cong., 2d Sess. 19 (1980). There is no division of personal exemptions and standard deductions between the debtor and the estate. *See* 26 U.S.C.A. §§ 1398(c)(3) & 6012(a)(1). Indeed, section 1398(c)(1) of the IRC states that the estate is to be treated as an *individual* (as opposed to a partnership, a corporation, a trust), not as the individual *debtor. Compare* 26 U.S.C.A. §§ 1398(e) and 1398(g) *with* 1398(c). Moreover, that a bankruptcy estate need not file a federal income tax return unless its gross income at least equals the sum of the exemption amount and the standard deduction amount, 26

U.S.C.A. § 6012(a)(9), also supports the estate's entitlement to these deductions from gross income. Accordingly, the court concludes each estate in a jointly filed case, unless the court orders substantive consolidation, is entitled to a personal exemption and a standard deduction, as an individual deemed to be married filing separately, in calculating their respective taxable income.

### Conclusion

For the foregoing reasons the court concludes that the trustee correctly deducted for each estate a standard deduction and a personal exemption to determine the adjusted income and the taxable income, respectively, and the tax liabilities of these estates.

So **ORDERED.**

### Parallel Citations

76 A.F.T.R.2d 95-7640, 94-2 USTC P 50,443, Bankr. L. Rep. P 76,085, 8 Tex.Bankr.Ct.Rep. 220

---

Footnotes

1    Local Rule 1015(a) provides:

[Federal Rule of Bankruptcy Procedure] 1015(b) notwithstanding, the estates of married debtors who file a joint petition shall be jointly administered and no separate Order will be entered. A Debtor, Trustee, or other party in interest may move to have the two estates separately administered, for cause shown.

BANKR.W.D.TEX.CT.R. 1015(a).

2    The fiduciary Form 1041 is merely a conduit. As the IRS's 1992 filing instructions for the Form 1041 stated:

The fiduciary must file Form 1041 for the estate of an individual involved in bankruptcy proceedings under chapter 7 or 11 of title 11 ... if the estate has gross income for the tax year of $5,300 or more. Form 1041 is used ONLY as a transmittal for **Form 1040,** U.S. Individual Income Tax Return. Figure the tax for the bankruptcy estate on Form 1040 by using the tax rate schedule for a married person filing separately.

Department of Treas. *1992 Instructions for Form 1041* at 2 (U.S. Gov't Printing Office: 1992 0—315–209).

3    Section 541(a)(2) provides:

(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

* * * * * *

(2) All interests of the debtor and the debtor's spouse in community property as of the commencement of the case that is—

(A) under the sole, equal, or joint management and control of the debtor; or

(B) liable for an allowable claim against the debtor, or for both an allowable claim against the debtor and an allowable claim against the debtor's spouse, to the extent that such interest is so liable.

11 U.S.C.A. § 541(a)(2).

4    While the court writes for the first time on this issue, the court does not write necessarily on a clean slate, as the significance of joint filings has been much discussed. *See Ageton v. Cervenka (In re Ageton),* 14 B.R. 833 (Bankr. 9th Cir.1981); *Chan v. Austin Bank of Chicago (In re Chan),* 113 B.R. 427 (N.D.Ill.1990); *In re McCulley,* 150 B.R. 358 (Bankr.M.D.Pa.1993); *In re Chandler,* 148 B.R. 13 (Bankr.E.D.N.C.1992); *In re Pflug,* 146 B.R. 687 (Bankr.E.D.Va.1992); *American State Bank v. Montgomery (In re Montgomery),* 86 B.R. 948, 960 (Bankr.N.D.Ind.1988); *In re Birch,* 72 B.R. 103 (Bankr.D.N.H.1987); *In re McAlister,* 56 B.R. 164 (Bankr.D.Or.1985);

76 A.F.T.R.2d 95-7640, 94-2 USTC P 50,443, Bankr. L. Rep. P 76,085...

*In re Masterson,* 55 B.R. 648 (Bankr.W.D.Pa.1985); *In re Crowell,* 53 B.R. 555 (Bankr.M.D.Tenn.1985); *Feldman v. Maryland Nat'l Bank (In re Wills),* 46 B.R. 333 (Bankr.D.Md.1985); *In re Arnold,* 33 B.R. 765 (Bankr.E.D.N.Y.1983); *In re Stuart,* 31 B.R. 18 (Bankr.D.Conn.1983); *In re Barnes,* 14 B.R. 788 (Bankr.N.D.Tex.1981); *In re Howard,* 6 B.R. 220 (Bankr.S.D.Ohio 1980); *see also In re Mehr,* 153 B.R. 430 (Bankr.D.N.J.1993).

5    Section 302, entitled "Joint Cases" provides:

(a) A joint case under a chapter of this title is commenced by the filing with the bankruptcy court of a single petition under such chapter by an individual that may be a debtor under such chapter and such individual's spouse. The commencement of a joint case under a chapter of this title constitutes an order for relief under such chapter.

(b) After the commencement of a joint case, the court shall determine the extent, if any, to which the debtors' estates shall be consolidated.

11 U.S.C.A. § 302 (West 1993 & Supp.1994).

6    In fact, to erase any doubt, "women" were included in the definition of "persons" eligible to file for bankruptcy protection under the Bankruptcy Act. 11 U.S.C. § 1(23) (1938) [repealed] ("persons shall include corporations, except where otherwise specified, and officers, partnerships, and women, ...").

7    Recognition of joint filings also "is posited on the assumption that in most consumer cases, married debtors are jointly liable on their debts and jointly hold most of their property." *In re Stuart,* 31 B.R. 18, 19 (Bankr.D.Conn.1983) (citing H.R.Rep. No. 595, 95th Cong., 1st Sess. 321 (1977); S.Rep. No. 989, 2d Sess. 32 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5818, 6277–78).

8    Under Texas law most all property acquired or possessed by a spouse during a marriage is presumed community property. TEX.FAM.CODE ANN. §§ 5.01 (marital property), 5.02 (presumption), 5.21 (separate property), 5.22 (community property; general rules) (West 1983). Similarly, all liabilities incurred during the marriage are presumed to be incurred by the community. TEX.FAM.CODE ANN. §§ 4.031 (spousal liability) & 5.61 (rules of marital property liability). A spouse is not personally liable for community debt, absent a showing of agency, joint venture, or implied or express assumption of liability. *See* TEX.FAM.CODE ANN. §§ 4.031 & 5.61; *Cockerham v. Cockerham,* 527 S.W.2d 162 (Tex.1975).

9    When a married couple files a joint petition in Texas, under section 541(a)(2) of the Bankruptcy Code into each spouse's estate goes the separate property of the respective spouse and "all interests of the debtor and the debtor's spouse in community property as of the commencement of the case that is under the sole, equal, or joint management and control of the debtor; or liable for an allowable claim against the debtor, or for both an allowable claim against the debtor and an allowable claim against the debtor's spouse, to the extent that such interest is so liable." 11 U.S.C. § 541(a)(2). Thus, into each estate falls the debtor's and her spouse's interest in community property—a result that makes segregation of property less than practical, and which may in the average case warrant substantive consolidation.

10    Few courts actually have addressed the issue of substantive consolidation in the context of section 302(b). Those courts that have, however, impose an exacting burden on the party seeking consolidation. *See Chan v. Austin Bank of Chicago (In re Chan),* 113 B.R. 427 (N.D.Ill.1990) (consolidation warranted where the couple's affairs are so intermingled that their assets and liabilities may not be separated); *In re Birch,* 72 B.R. 103 (Bankr.D.N.H.1987) ("consolidation deemed appropriate where 'their affairs are so intermingled that their respective assets and liabilities cannot be separated' "); *In re Scholz,* 57 B.R. 259 (Bankr.N.D.Ohio 1986).

11    Substantive consolidation is not an all or nothing-at-all proposition. Rather, a "hybrid" form of consolidation has evolved that allows for less than complete consolidation where dictated by the facts of the particular case. *See generally* 1 NORTON BANKR.L. & PRAC.2d § 20.11 (Clark Boardman Callaghan 1993). Hybrid consolidation may be particularly useful where community property is at issue, as a joint filing otherwise creates the anomalous situation of both estates comprised of all of the community's interest in jointly managed community property. In a chapter 7 case, such a fictional division further frustrates compliance with section 726(c) of the Bankruptcy Code, which directs the trustee to marshal each estate's community assets for payment of community creditors, before the debtor's separate property is tapped. 11 U.S.C.A. § 726(c).

12    The *Ageton* court recognized, as does this court, that "[c]onsolidation of cases involving joint debtors in community property states may be a practical necessity in light of §§ 541(a)(2) and 726(c)." *In re Ageton,* 14 B.R. at 835. Practical considerations notwithstanding, the *Ageton* court concluded that the statute means what it says—until and unless consolidation is ordered, there remain two estates subject to administration in a joint case.

13    The rule proposed by the IRS would apply in every joint case, in every state whether under a community property regime or not.

14    The issue in *Auto–Train* was not the propriety of consolidation, rather it was whether a presumably correct order of consolidation could be issued *nunc pro tunc.* Where a *nunc pro tunc* order is sought, the *Auto–Train* court concluded that courts must engage in an "additional and slightly different balancing process before using its equitable *nunc pro tunc* powers to give a consolidation order retroactive effect." *Id.*

15    Prior to 1980, bankruptcy estates of individuals were deemed separate taxable entities under subchapter J of the IRC, which by its terms imposed taxes on the income of estates and any kind of property held in trust. *See United States v. States Farm Fire & Casualty*

*Co. (In re Joplin,* 882 F.2d 1507, 1510 (10th Cir.1989) (citing *Williams v. United States,* 667 F.2d at 1110). More fundamentally, taxation of bankruptcy estates was considered appropriate because "all income from whatever source derived" is taxable under the IRC. 26 U.S.C.A. § 61. *Id.*

16    The report of the House of Representatives noted:

> At present, there are no rules in the Internal Revenue Code specifying a taxable entity apart from the individual debtor; and, if so, how tax attributes are to be allocated between the estate and the debtor. This has resulted in uncertainty and litigation concerning Federal income tax liability of the bankruptcy estate and the debtor.

> H.R.Rep. No. 833, 96th Cong., 2d Sess. 19 (1980).

17    In corporate and partnership cases under chapter 7 or chapter 11 and individual chapter 13 cases a separate taxable estate, apart from the debtor, is not deemed to arise. *See* 26 U.S.C.A. §§ 1398(a) & 1399 (West 1988 & Supp.1994).

18    Section 63(c)(2)(D) of the IRC provides:

> (c) **Standard deduction.**—For purposes of this subtitle—

> (1) **In general.**—Except as otherwise provided in this subtitle, the term "standard deduction" means the sum of—

>> (A) the basic standard deduction, and

>> (B) the additional standard deduction.

> (2) **Basic standard deduction.**—For the purposes of paragraph (1), the basic standard deduction is—

> * * * * * *

>> (D) $2,500 in the case of a married individual filing a separate return.

> 26 U.S.C.A. § 63(c)(2)(D) (West 1988 & Supp.1994). Section 151 of the IRC, which sets forth allowances of deductions for personal exemptions, provides in part:

>> (a) **Allowance of deductions.**—In the case of an individual, the exemptions provided by this section shall be allowed as deductions in computing taxable income.

>> (b) **Taxpayer and spouse.**—An exemption of the exemption amount for the taxpayer; and an additional exemption of the exemption amount for the spouse of the taxpayer if a joint return is not made by the taxpayer and his spouse, and if the spouse, for the calendar year in which the taxable year of the taxpayer begins, has no gross income and is not a dependent of another taxpayer.

> * * * * * *

>> (d) **Exemption amount.**—For purposes of this section—

>> (1) **In general.**—Except as otherwise provided in this subsection, the term "exemption amount" means $2,000.

> 26 U.S.C.A. § 151 (West 1988 & Supp.1993).

19    The IRS relies on *In re Luster,* 981 F.2d 277 (7th Cir.1992), and *In re Mehr,* 153 B.R. 430 (Bankr.D.N.J.1993) for this proposition. Unfortunately for the IRS, while both are interesting cases, they are inapposite, at best, to the IRS's position. *Luster,* although decided over a decade after the enactments of the Bankruptcy Code and the Bankruptcy Tax Act of 1980, was decided under the Bankruptcy Act. The issue before the Seventh Circuit, in a consolidated appeal, was whether net operating loss carryforwards ("NOLs") were property of a debtor's estate under the Bankruptcy Act. Because the debtors' estates realized significant gains on the sales of property, to avoid federal taxation, the trustee sought to avail the estates of the debtors' NOLs. While the Bankruptcy Code, 11 U.S.C.A. § 346(i), and the Bankruptcy Tax Act of 1980, 26 U.S.C.A. § 1398(g), address the post petition status of tax attributes, the Bankruptcy Act and the pre–1980 IRC did not. Thus, the focus of the Seventh Circuit's inquiry was the transferability of an individual's NOLs. *In re Luster,* 981 F.2d at 279. Finding the attribute to be nonalienable outside of bankruptcy, the court discerned no bankruptcy policy that would support a contrary determination.

*Mehr* concerned the special onetime exclusion, available to persons over fifty five years of age, of up to $125,000 of the gain on the sale or exchange of the taxpayer's residence of at least five years. 26 U.S.C.A. § 121. The trustee sold the debtors primary asset, their residence, and the estate realized a gain in excess of $125,000. Seeking to avoid the estate's recognition of the gain, in reliance on section 121 of the IRC the trustee excluded $125,000 of the gain on the estate's tax return. The IRS disallowed the section 121 exclusion, and the bankruptcy court agreed. The court noted that exclusions from income are strictly construed; therefore, the taxpayer must point to a specific provision of the IRC that allows the exclusion. *In re Mehr,* 153 B.R. at 433. Looking to section 121 of the IRC, assuming the estate was a taxpayer within the meaning of section 121, the court concluded that the estate could not avail itself of the exclusion because it was not fifty five years of age and had not resided in the home for at least five years. *Id.* Next, the court looked to section 1398(g) of the IRC, which the court found of no assistance to the estate. Section 1398(g), the court held, provides an exclusive list of tax attributes to which the estate succeeds; section 121 was not included. While *Mehr* presents interesting issues, for the reasons stated herein, it does not compel the result urged by the IRS. *Rueter v. Robertson (In re Rueter),* 158 B.R. 163 (N.D.Cal.1993), not cited by the IRS, teaches a similar lesson. There, the court held that passive activity loss carryovers were not passed on to the estate upon the debtor's bankruptcy filing—section 1398(g) provides an exclusive list of tax attributes which pass to the estate.

76 A.F.T.R.2d 95-7640, 94-2 USTC P 50,443, Bankr. L. Rep. P 76,085...

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 46

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x
                                                                :
In re:                                                          :        Chapter 11 Case No.
                                                                :
**LEHMAN BROTHERS HOLDINGS INC., et al.**      :        **08-13555 (JMP)**
                                                                :
                    Debtors.                              :        **(Jointly Administered)**
                                                                :
----------------------------------------------------------------x

**DEBTORS' DISCLOSURE STATEMENT**
**FOR THIRD AMENDED JOINT CHAPTER 11 PLAN**
**OF LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED**
<u>**DEBTORS PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE**</u>

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310-8000
Fax: (212) 310-8007

Attorneys for Debtors and
Debtors in Possession

Dated:  August 31, 2011
New York, New York

B.      **Rationale Underlying Plan Treatment of Claims**

1.      **Description of the Plan and Compromise of Substantive Consolidation and Related Issues**

a.      **Substantive Consolidation of the Debtors and Their Affiliates**

The most highly controverted legal issue in the Debtors' Chapter 11 Cases is whether the Debtors and certain or all of their Affiliates should be substantively consolidated (i.e. merged to constitute a single entity of pooled assets and liabilities or be administered as separate distinct independent legal entities).  Recoveries to most creditors would vary widely as between the two polar extremes.  Certain creditors that would benefit under one of the two extremes have asserted arguments in favor of or against substantive consolidation.

Substantive consolidation is an equitable remedy and would result in the creation of a common pool of assets that all holders of Allowed Claims would share in based upon their respective legal rights.  All of the entities in a substantively consolidated group are merged. Other than Secured Claims, intercompany Claims, joint and several liability Claims, guarantee Claims and subsidiary equity or ownership interests are eliminated.  Consequently, a creditor of one of the substantively consolidated entities is treated as a creditor of the substantively consolidated entity, and issues of individual corporate ownership of property and individual corporate liability on obligations are no longer pertinent.

Substantive consolidation is a unique equitable remedy and pursuant to legal precedent is to be used sparingly.  The proponent of substantive consolidation bears a heavy burden of proof to establish that it would be appropriate to apply the doctrine of substantive consolidation.

In the perspective of the strong convictions of each of the Ad Hoc Group and the Non-Con Plan Proponents as to the applicability of the doctrine and the significant amount of Claims at stake, if either of the Ad Hoc Plan or the Non-Con Plan is pursued, full prosecution of litigation of this issue would result.  The litigation would be extremely fact-intensive, consume a substantial amount of money and Distributions to creditors would be significantly delayed. Therefore, the Plan proposes a compromise that would eliminate the necessity of such complex litigation.  The Plan does not substantively consolidate the Debtors.  However, as to Claims against LBHI, the Plan provides that a portion of the Distributions on Claims that would be eliminated if LBHI and its Affiliates are substantively consolidated is automatically reallocated to holders of claims that would exist following the substantive consolidation and receive a larger recovery in that scenario.  As to Claims against the Participating Subsidiary Debtors, the Plan provides that a portion of the Distributions on Claims that would be eliminated or receive a lesser recovery if LBHI and the Participating Subsidiary Debtors were substantively consolidated is also automatically reallocated to holders of Claims against LBHI that would exist following the substantive consolidation and receive a larger recovery in that scenario.  The Debtors believe that the compromise included in the Plan balances the risks and provides an equitable solution that is reasonable, fair and efficient means to resolve and avoid the vexatious, multifaceted and protracted litigation and delay that might otherwise occur.

58

**b.**      **Description of Settlement and Compromise Regarding Substantive Consolidation Included in the Plan**

The Plan includes a compromise of substantive consolidation and related issues. The Plan provides for a reallocation of a portion of Distributions from certain classes of creditors that would receive a lower distribution if the Debtors were substantively consolidated to creditors that would benefit from substantive consolidation of the Debtors. The amount of Distributions that are subject to the reallocation in the Plan reflects the joint determination by the Debtors' and the Creditors' Committee that there is a material risk that substantive consolidation might be directed if fully litigated. To avoid that risk, a compromise of the issue is appropriate and in the best interests of all economic stakeholders. The Debtors propose a reallocation of a portion of Distributions based upon at least a 20% risk of substantive consolidation.

The Plan provides that a portion of the Distribution to each holder of (i) an Allowed Senior Third-Party Guarantee Claim and Third-Party Guarantee Claim against LBHI and (other than those of the Racers Trusts) (ii) an Allowed General Unsecured Claim (excluding those of the Racers Trusts against LBSF) against each of the Participating Subsidiary Debtors, a General Unsecured Claim of Designated Entities (i.e. the Racers Trusts and Fenway[12]) against LCPI and an Affiliate Claim (excluding Affiliate Claims of LBHI) against each Participating Subsidiary Debtor (collectively, the "Contributing Classes"), will automatically be reallocated to holders of Senior Unsecured Claims and General Unsecured Claims against LBHI. The portion of Distributions that will be reallocated for each Contributing Class (other than Classes for Claims of Designated Entities) is calculated by using a weighted average of recoveries under two scenarios: (1) estimated recoveries in a plan that does not provide for substantive consolidation of LBHI and the Participating Subsidiary Debtors ("Non-Con Scenario") and (2) estimated recoveries in a Plan that provides for the substantive consolidation of LBHI and the Participating Subsidiary Debtors ("SubCon Scenario"). To give effect to the settlement of the relative risks of substantive consolidation, the calculations of the recovery amounts in the Non-Con Scenario are weighed at 80% and in the SubCon Scenario are weighed at 20%. The reallocation percentage for each Class is calculated in the following manner: (A) (i) the estimated distribution calculated in accordance with the Non-Con Scenario, *minus* (ii) the sum of the weighted recoveries calculated in accordance with the Non-Con Scenario and the SubCon Scenario, *divided* by (B) the estimated amount distributable in accordance with the Plan prior to any reallocation.

For Affiliate Claims against the Participating Subsidiary Debtors and Guarantee Claims for which a Participating Subsidiary Debtor is the primary obligor, the estimated recoveries if LBHI and the Participating Subsidiary Debtors were substantively consolidated would be zero, since such Claims would be eliminated. Therefore, the above calculation provides for a 20% reallocation by holders of such Claims. Holders of General Unsecured Claims against Participating Subsidiary Debtors would receive a distribution under either scenario, therefore, the above mechanism provides for varying reallocation percentages for Claims against the Participating Subsidiary Debtors depending on the estimated Distributions in the two scenarios. Due to the different amount of assets and liabilities of each Participating Subsidiary Debtor, holders of Claims against some Participating Subsidiary Debtors would be

---

[12] The Fenway Claim means the Claim asserted by LBHI in connection with the Fenway transaction, which shall be Allowed in accordance with Section 6.5(h) of the Plan.

# TAB 47

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                                 :

In re                            :     Chapter 11 Case No.
                                   :

**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*   :     **08-13555 (JMP)**
                                 :

            **Debtors.**          :     **(Jointly Administered)**
                                 :
-------------------------------------------------------------------x

**ORDER CONFIRMING MODIFIED THIRD AMENDED JOINT CHAPTER 11**
**PLAN OF LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED DEBTORS**

Lehman Brothers Holdings Inc. and its affiliated debtors,[1] (collectively, the

"Debtors"), each having proposed and filed the Third Amended Joint Chapter 11 Plan of Lehman

Brothers Holdings Inc. and its Affiliated Debtors, dated August 31, 2011 (as subsequently

supplemented, amended or modified, including by the Plan Supplement, the "Plan")[2] and the

Disclosure Statement for the Plan, dated August 31, 2011 (as amended, the "Disclosure

Statement"); and the Court having entered the *Amended Order (I) Approving the Proposed*

*Disclosure Statement and the Form and Manner of Notice of the Disclosure Statement Hearing,*

*(II) Establishing Solicitation and Voting Procedures, (III) Scheduling a Confirmation Hearing,*

*and (IV) Establishing Notice and Objection Procedures for Confirmation of the Debtors' Joint*

*Chapter 11 Plan,* dated September 1, 2011 [ECF No. 19631] (the "Disclosure Statement Order");

---

[1] The Debtors are: Lehman Brothers Holdings Inc., LB 745 LLC, PAMI Statler Arms LLC, Lehman Brothers Commodity Services Inc., Lehman Brothers Special Financing Inc., Lehman Brothers OTC Derivatives Inc., Lehman Brothers Derivatives Products Inc., Lehman Commercial Paper Inc., Lehman Brothers Commercial Corporation, Lehman Brothers Financial Products, Inc., Lehman Scottish Finance L.P., CES Aviation LLC, CES Aviation V LLC, CES Aviation IX LLC, East Dover Limited, Luxembourg Residential Properties Loan Finance S.a.r.l., BNC Mortgage LLC, Structured Asset Securities Corporation, LB Rose Ranch LLC, LB 2080 Kalakaua Owners LLC, Merit LLC, LB Somerset LLC, and LB Preferred Somerset LLC.

[2] Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to such terms in the Plan, a copy of which is annexed hereto as Exhibit A. Any term used in the Plan or this Confirmation Order that is not defined in the Plan or this Confirmation Order, but that is defined in title 11 of the United States Code (the "Bankruptcy Code") or the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

Creditors' Committee, the Ad Hoc Group,[3] certain of the Non-Con Plan Proponents[4] and certain

Foreign Affiliates (as defined below), each of which is a sophisticated party and represented by

counsel that is recognized as being knowledgeable and experienced in the field of complex

chapter 11 cases.  The Global Settlement is a result of good faith arms'-length negotiations.  The

Global Settlement is consistent with section 1123(b)(3) of the Bankruptcy Code.

      (i)    <u>Substantive Consolidation.</u>

      a.    The Debtors and the Creditors' Committee have conducted

a thorough factual and legal analysis to determine whether the substantive consolidation of the

Debtors and their Affiliates is appropriate.  The facts and analysis set forth in the Disclosure

Statement, the Debtors' Memorandum of Law In Support of the Global Settlement, and the

Suckow Declaration, reflect that there are facts that support and facts that militate against the

substantive consolidation of the Debtors and their Affiliates based upon the law in this

jurisdiction.  There is a possibility that if litigated to final judgment, a court may find that the

substantive consolidation of the Debtors and their affiliates, including their Foreign Affiliates, is

appropriate.

      b.    The Global Settlement gives due consideration to the

strengths and weaknesses of potential arguments that have been made for and against substantive

---

[3] The Ad Hoc Group consists of California Public Employees' Retirement System, Canyon Capital Advisors LLC, City of Costa Mesa, City of Fremont, County of San Mateo, Fiduciary Counselors Inc., Fir Tree, Inc., Gruss Asset Management, L.P., Owl Creek Asset Management, L.P., on behalf of the funds it manages or advises, Paulson & Co. Inc., Perry Capital LLC, on behalf of one or more investment funds for which it or an affiliate acts as investment advisor or general partner, Taconic Capital Advisors L.P. and Vallejo Sanitation and Flood Control District.

[4] The Non-Con Plan Proponents are Angelo, Gordon & Co., L.P., Contrarian Capital Management, LLC, Credit Agricole CIB, Credit Suisse International, Cyrus Capital Partners, LP, D. E. Shaw Composite Portfolios, L.L.C., D. E. Shaw Oculus Portfolios, L.L.C., Deutsche Bank AG, Goldentree Asset Management, LP, Goldman Sachs Bank USA (successor by merger to Goldman Sachs Capital Markets, L.P.), Goldman Sachs International, Hayman Capital Management, LP, Knighthead Capital Management, LLC, Mason Capital Management LLC, Morgan Stanley & Co. International plc., Morgan Stanley Capital Services Inc., Mount Kellett Capital Management, Oaktree Capital Management, L.P., The Royal Bank of Scotland plc, Serengeti Asset Management LP, Silver Point Capital, L.P., State Street Bank and Trust Company, and York Capital Management Global Advisors, LLC.

13

consolidation.  Litigation regarding substantive consolidation of the Debtors would require vast amounts of discovery and investigation into the operations of Lehman prior to the Commencement Date, would be extraordinarily complex and costly for all parties involved, and would significantly delay Distributions to all Creditors.

c.      The Plan Adjustment, which is a key element of the Global Settlement, ensures that recoveries to all Creditors are within the range of possible litigated outcomes and fall between the estimated Distributions to each Class if the Participating Debtors and their affiliates were substantively consolidated or if the Participating Debtors had strict non-consolidation plans.

(ii)      Characterization of Intercompany Claims.

a.      Prior to the Commencement Date, the Debtors and their Affiliates entered into tens of thousands of transactions daily involving billions of dollars.  The transactions were recorded on Lehman's general ledger.  The Debtors reviewed a sampling of the transactions between Debtors and considered the relevant legal standards for the recharacterization of indebtedness as equity interests.  Based on the facts and analysis set forth in the Disclosure Statement, the Debtors' Memorandum of Law In Support of the Global Settlement, and the Cohn Declaration, there is a risk that certain portions of the intercompany balances owed to LBHI by the Subsidiary Debtors could be recharacterized as equity contributions if such matter were litigated to final judgment.

b.      The Global Settlement gives due consideration to the strengths and weaknesses of potential arguments for and against the recharacterization of intercompany balances.  Litigation regarding characterization of a vast number of intercompany balances would be extremely time consuming and expensive, and would delay Distributions to all Creditors.

# TAB 48

407 B.R. 576
United States District Court,
D. Delaware.

In re NEW CENTURY TRS HOLDINGS,
INC., a Delaware corporation, et al., Debtors.
Gregory J. Schroeder, et al., Appellants,

v.

New Century Liquidating Trust, et al., Appellees.

Bank. No. 07–10416 (KJC).    |    Civ.
No. 08–546–SLR.    |    June 16, 2009.

**Synopsis**
**Background:** Confirmation hearing was held on joint
liquidating Chapter 11 plan proposed by debtors, and
objections were filed on theory that plan would effect an
improper substantive consolidation of debtors' estates, that
plan improperly discriminated between creditors in same
class, that plan failed to satisfy "best interests of creditors"
test, and that compromises included in plan were not fair
and equitable. The Bankruptcy Court, Kevin J. Carey, J., 390
B.R. 140, entered order overruling objections, and objectors
appealed.


**Holdings:** The District Court, Sue L. Robinson, J., held that:

[1] appeal from unstayed plan confirmation order was not
equitably moot;

[2] proposed Chapter 11 plan that aggregated various debtor
entities into different debtor classes, and that required
creditors with claims against debtors that had been placed
within same class to compete against each other for payment
of their claims from consolidated pool of assets, effected an
improper "substantive consolidation" of debtors and could
not be confirmed; and

[3] plan unfairly discriminated in favor of certain creditors
without consent of other creditors in class.


Reversed and remanded.

West Headnotes (26)

**[1]    Bankruptcy**

          Moot Questions

Under doctrine of equitable mootness,
bankruptcy appeal should be dismissed as
equitably moot if affording appellant the relief he
seeks would be inequitable.

Cases that cite this headnote


**[2]    Bankruptcy**

          Moot Questions

In deciding whether equitable mootness doctrine
applies, bankruptcy appellate court must
determine whether relief sought by appellant
would be inequitable in context of the case before
it.

Cases that cite this headnote


**[3]    Bankruptcy**
          Effect of Want of Stay;  Conclusiveness of
Sale

**Bankruptcy**
          Moot Questions

In deciding whether the relief sought on
bankruptcy appeal would be inequitable and,
thus, whether equitable mootness doctrine
applies, bankruptcy appellate courts consider the
following factors: (1) whether a reorganization
plan has been substantially consummated; (2)
whether a stay has been obtained; (3) whether
relief requested would affect rights of parties not
before court; (4) whether relief requested would
affect success of plan; and (5) public policy of
affording finality to bankruptcy judgments.

1 Cases that cite this headnote


**[4]    Bankruptcy**
          Moot Questions

Factors that bankruptcy appellate courts consider
in deciding whether an appeal is equitably moot

are given varying weight, depending on the circumstances.

Cases that cite this headnote

**[5]**    **Bankruptcy**
👉 Moot Questions

Even assuming that equitable mootness doctrine applies on appeal from order confirming liquidating Chapter 11 plan, factors bearing on whether appeal from plan confirmation order is equitably moot cannot be given same weight in reorganizing and liquidating Chapter 11 cases.

2 Cases that cite this headnote

**[6]**    **Bankruptcy**
👉 Moot Questions

Two countervailing considerations inform bankruptcy appellate court's exercise of discretion in deciding whether to dismiss appeal from plan confirmation order as equitably moot: the public policy served by encouraging non-adverse third parties to rely on finality of bankruptcy confirmation orders, on the one hand, and need to preserve meaningful right of appeal, on the other.

Cases that cite this headnote

**[7]**    **Bankruptcy**
👉 Moot Questions

If "equitable mootness" bar is too low, i.e., if equitable mootness factors swing too easily in favor equitable mootness, right of appeal becomes meaningless and instruction to apply equitable mootness doctrine cautiously and on limited scope is contravened.

Cases that cite this headnote

**[8]**    **Bankruptcy**
👉 Effect of Want of Stay; Conclusiveness of Sale

**Bankruptcy**
👉 Moot Questions

Even assuming that equitable mootness doctrine applied on appeal from order that confirmed liquidating Chapter 11 plan, appeal from bankruptcy court's unstayed plan confirmation order would not be dismissed as "equitably moot," where plan, while substantially consummated, had not proceeded to point where there had been distribution to any creditor class, where plan could be unraveled without much difficulty, and without prejudice to any non-adverse third parties who had detrimentally relied thereon, and where there was nothing in record to suggest that undoing debtors' current liquidation plan would affect debtors' ability to liquidate in future under different plan.

4 Cases that cite this headnote

**[9]**    **Bankruptcy**
👉 Effect of Want of Stay; Conclusiveness of Sale

**Bankruptcy**
👉 Moot Questions

Mere fact that debtors' liquidating Chapter 11 plan had been substantially consummated, and that reversal of unstayed plan confirmation order would necessitate the unraveling of plan, was not factor weighing in favor of dismissal of appeal from plan confirmation order, as equitably moot; it did not appear that reversal of plan would result in great difficulty or inequity.

1 Cases that cite this headnote

**[10]**    **Bankruptcy**
👉 Effect of Want of Stay; Conclusiveness of Sale

**Bankruptcy**
👉 Moot Questions

Ordinarily, existence or absence of stay is critical factor for bankruptcy appellate court in deciding whether to dismiss appeal from plan confirmation order as equitably moot.

Cases that cite this headnote

**[11]**    **Bankruptcy**

☞ Effect of Want of Stay;  Conclusiveness of
Sale

**Bankruptcy**

☞ Moot Questions

Mere fact that bankruptcy court order confirming debtors' liquidating Chapter 11 plan had not been stayed was not factor weighing in favor of dismissal of appeal from that order as equitably moot, where plan had not gone freely forward and it did not appear that any distribution to creditors had been made, and where those plan components that had gone forward were not those on which non-adverse third parties had detrimentally relied.

Cases that cite this headnote

**[12]**   **Bankruptcy**

☞ Moot Questions

Equitable mootness doctrine protects interests of non-adverse third parties who are not before bankruptcy appellate court, but who have acted in reliance on plan as implemented.

Cases that cite this headnote

**[13]**   **Bankruptcy**

☞ Moot Questions

Effect of relief requested on plan's success, as factor bearing on whether appeal from plan confirmation order is equitably moot, is concerned with whether requested relief will affect re-emergence of debtor as revitalized entity or, in liquidating Chapter 11 case, with whether requested relief will affect debtor's ability to liquidate.

Cases that cite this headnote

**[14]**   **Bankruptcy**

☞ Moot Questions

Public policy of affording finality to bankruptcy court judgments is factor weighing in favor of equitable mootness when non-adverse third parties have acted in detrimental reliance on finality of bankruptcy plan confirmation orders to such a degree that reversing those orders

would discourage future detrimental reliance by similarly situated parties.

Cases that cite this headnote

**[15]**   **Bankruptcy**

☞ Moot Questions

In reorganization context, finality of bankruptcy judgments is significant factor in deciding whether appeal from plan confirmation order is equitably moot, since multiple parties, including non-adverse third parties, have acted in detrimental reliance on debtor's emerging from bankruptcy as contemplated by reorganization plan; however, when parties have not relied to their detriment on finality, which is often the case in liquidation context, this factor does not weigh in favor of equitable mootness.

Cases that cite this headnote

**[16]**   **Bankruptcy**

☞ Conclusions of Law;  De Novo Review

**Bankruptcy**

☞ Clear Error

On appeal, district court applies "clearly erroneous" standard to bankruptcy court's findings of fact and a plenary standard to its legal conclusions. Fed.Rules Bankr.Proc.Rule 8013, 11 U.S.C.A.

Cases that cite this headnote

**[17]**   **Bankruptcy**

☞ Clear Error

Factual finding is "clearly erroneous" when reviewing court, on entire evidence, is left with definite and firm conviction that mistake has been committed. Fed.Rules Bankr.Proc.Rule 8013, 11 U.S.C.A.

Cases that cite this headnote

**[18]**   **Bankruptcy**

☞ Conclusions of Law;  De Novo Review

**Bankruptcy**

☞ Clear Error

With respect to mixed questions of law and fact, district court must accept bankruptcy court's findings of historical or narrative fact unless clearly erroneous, but exercises plenary review of bankruptcy court's choice and interpretation of legal precepts and its application of those precepts to historical facts. Fed.Rules Bankr.Proc.Rule 8013, 11 U.S.C.A.

Cases that cite this headnote

**[19]    Bankruptcy**
　　🔑 Conclusions of Law;  De Novo Review

On appeal from district court's decisions in its bankruptcy appellate capacity, the Court of Appeals effectively reviews on de novo basis bankruptcy court opinions.

Cases that cite this headnote

**[20]    Bankruptcy**
　　🔑 Transfer and Consolidation of Cases

**Bankruptcy**
　　🔑 Equitable Powers and Principles

"Substantive consolidation" is equitable remedy, that is used, essentially, to address harms caused by debtors, and their related entities, disregarding their separateness and/or otherwise entangling their affairs.

Cases that cite this headnote

**[21]    Bankruptcy**
　　🔑 Transfer and Consolidation of Cases

Substantive consolidation treats separate legal entities as if they were merged into single survivor left with all the cumulative assets and liabilities, save for inter-entity liabilities, which are erased; result is that claims against separate debtors morph into claims against the consolidated survivor.

2 Cases that cite this headnote

**[22]    Bankruptcy**
　　🔑 Transfer and Consolidation of Cases

Substantive consolidation of bankruptcy estates is extreme and imprecise, works "rough justice," and is to be used sparingly.

1 Cases that cite this headnote

**[23]    Bankruptcy**
　　🔑 Grounds and Objections;  Factors Considered

Substantive consolidation is appropriate only when parties consent, when entities to be consolidated disregarded their separateness prepetition to such a significant extent that their creditors relied on breakdown of entity borders and treated them as one legal entity, or when their assets and liabilities are so scrambled postpetition that separating them is prohibitive and hurts all creditors.

Cases that cite this headnote

**[24]    Bankruptcy**
　　🔑 Reorganization Cases

**Bankruptcy**
　　🔑 Provisions for Satisfaction of Claims;  Relation to Recovery in Liquidation

Proposed Chapter 11 plan that aggregated various debtor entities into different debtor classes, and that required creditors with claims against debtors that had been placed within same class to compete against each other for payment of their claims from consolidated pool of assets, effected an improper "substantive consolidation" of debtors and could not be confirmed, though plan did not provide for erasure of inter-entity liabilities.

2 Cases that cite this headnote

**[25]    Bankruptcy**
　　🔑 Equality of Treatment Within Classes

Proposed Chapter 11 plan is not confirmable, if claims within same class are not receiving same treatment, and if holders of those claims being treated less favorably have not consented to the discrimination. 11 U.S.C.A. § 1123(a)(4).

**[26]    Bankruptcy**
👉 Provisions for Satisfaction of Claims;
Relation to Recovery in Liquidation

**Bankruptcy**
👉 Unsecured Creditors and Equity Holders,
Protection Of

Multi-debtor protocol which Chapter 11 debtors
had negotiated with creditors holding the same
claim against more than one debtor, and which
was included in joint liquidating plan that debtors
had proposed, which required such creditors to
waive the claims that they had to distribution in
one class in exchange for a 130% distribution
on claim that they possessed in other class,
unfairly discriminated in favor of these creditors
and against other creditors in class from which
130% distribution was made without these
other creditors' consent, in violation of plan
confirmation requirement; it did not matter that
overall effect on creditors receiving this 130%
distribution may have been negative, and that
creditors receiving this 130% distribution may
have consented to this "negative" treatment. 11
U.S.C.A. § 1123(a)(4).

Cases that cite this headnote

**Attorneys and Law Firms**

**\*579** Joseph H. Huston, Jr., Esquire, and Maria Aprile
Sawczuk, Esquire, of Stevens & Lee, P.C., Wilmington, DE,
and Robert J. Keach, Esquire, and D. Sam Anderson, Esquire,
of Bernstein, Shur, Sawyer & Nelson, P.A., of Portland, ME,
for Appellants.

Bonnie Glantz Fatell, Esquire, and David W. Carickhoff,
Esquire, of Blank Rome LLP, Wilmington, DE, and Mark
T. Power, Esquire, Mark S. Indelicato, Esquire, Don D.
Grubman, Esquire, and Joseph Orbach, Esquire, of Hahn &
Hessen LLP, New York, NY, for Appellees.

**Opinion**

**MEMORANDUM OPINION**

SUE L. ROBINSON, District Judge.

**I. INTRODUCTION**

In April 2007, New Century TRS Holdings, Inc. ("TRS
Holdings") and its affiliates **\*580** (collectively, "debtors" [1])
filed chapter 11 bankruptcy petitions. In March 2008, debtors
filed a liquidation plan. In July 2008, over objections raised
by the Ad Hoc Committee of Beneficiaries of the New
Century Financial Corporation Deferred Compensation Plan
and/or Supplemental Executive Retirement/Savings Plan
(collectively, along with Gregory J. Schroeder, Michelle
Park, Martin Warren, Steve Holland, and Nabil Bawa,
"appellants"), the bankruptcy court confirmed the liquidation
plan.

Pending before the court are appellants' appeal [2] (D.I.1) of
the plan confirmation and the motion to dismiss filed by New
Century Liquidating Trust and Alan M. Jacobs as Liquidating
Trustee and Plan Administrator for New Century Warehouse
Corporation's (collectively, "appellees") (D.I.13). For the
reasons that follow, appellees' motion to dismiss is denied
and the bankruptcy court issuances that are the subject of the
appeal (Bk.D.I.8254, 8255, 8596, 8626) are reversed.

**II. BACKGROUND**

**A. Debtors' Business and the Events Leading to
Bankruptcy**

Debtors were in the business of originating, servicing, and
purchasing mortgage loans (as well as selling mortgage loans)
through whole loan sales and securitizations. (Bk. D.I. 8254
at 3) Founded in 1995, [3] TRS Holdings grew rapidly from
its **\*581** inception. (*Id.* at 8) In 1996, its first year of
operation, TRS Holdings originated $357 million in mortgage
loans. (*Id.*) Ten years later, in 2006, TRS Holdings originated
approximately $60 billion in mortgage loans; between April
2005 and December 2006, TRS Holdings funded more than
$200 million in loans almost every business day. (*Id.*) Prior to
the bankruptcy filings, TRS Holdings had grown to employ
over 7,200 people, had a market capitalization of over $1
billion (as of February 2007), had its equity securities traded
on the New York Stock Exchange, had credit facilities of
$17.4 billion to finance its activities, and was the second

largest originator of subprime residential mortgage loans. (*Id.*)

In February and March 2007, debtors experienced a swift reversal of fortune. On February 7, 2007, TRS Holdings announced that it must restate its loan repurchase losses in its previously-filed financial statements for quarters ended March 31, June 30, and September 30, 2006, and that it expected to post both a fourth quarter loss and a loss for all of 2006; this announcement precipitated multiple securities class action lawsuits against the company. (*Id.* at 6) On March 2, 2007, TRS Holdings announced that it could not file its 2006 Form 10–K without unreasonable effort and expense, which caused the New York Stock Exchange to announce the de-listing of the company's stock on March 13, 2007. (*Id.* at 7) These announcements led warehouse lenders to cut off funding for loans originated by debtors and to replace debtors as the mortgage loan servicer. (*Id.*) Under those circumstances, debtors were able to fund only a portion of their loan originations. (*Id.*) Ultimately, by the end of March 2007, debtors found themselves with obligations in excess of $7 billion and insufficient liquidity to satisfy those obligations. (*Id.* at 7, 9)

**B. Bankruptcy Proceedings and the Plan**

On April 2, 2007, debtors filed voluntary chapter 11 bankruptcy petitions.[4] (*Id.* at 1) On April 9, 2007, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Creditors' Committee"), which consisted of seven creditors holding claims of various types against different individual debtors. (*Id.* at 10 n. 12) Debtors, the Creditors' Committee, and other creditor groups began negotiating a chapter 11 plan. (*See id.* at 9–10)

On June 20, 2007, appellants filed an adversary proceeding against debtors, Wells Fargo Bank, N.A. as Trustee ("Wells Fargo"), the Compensation Committee of the Board of Directors of New Century Financial Corporation as Plan Administrator (the "Compensation Committee"), and the Creditors' Committee concerning amounts that appellants had contributed under deferred compensation plans while in debtors' employ. (*Id.* at 27) In January 1999, TRS Holdings had created a trust (the "Deferred Compensation Trust"), with Wells Fargo as Trustee, to be used in conjunction with The New Century Financial Corporation Deferred Compensation Plan and/or The New Century Financial Corporation Supplemental Executive Retirement/Savings Plan (the "Deferred **\*582** Compensation Plans").[5] (*Id.*

at 23, 27) Appellants and other eligible employees had contributed funds under the Deferred Compensation Plans. (*Id.*) In the adversary proceeding, appellants have sought a declaration that the Deferred Compensation Plans are not "top hat" plans as defined by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"),[6] and that the Deferred Compensation Trust, therefore, is not an asset of the bankruptcy estates that can be used to satisfy other creditors' claims.[7] (*Id.* at 27–28)

On February 2, 2008, after extensive negotiations (Bk. D.I. 8254 at 9), debtors and the Creditors' Committee filed a joint chapter 11 liquidation plan and corresponding disclosure statement. (Bk. D.I. 4804 and 4805) On March 18, 2008, debtors filed an amended joint liquidation plan ("the first amended plan"). (*See* Bk. D.I. 5405) That same day, the bankruptcy court approved the disclosure statement, established procedures for voting on the first amended plan, and scheduled a hearing on plan confirmation. (*See* Bk. D.I. 5396) On April 18, 2008, appellants filed an objection to plan confirmation. (Bk.D.I.6338)

On April 23, 2008, debtors filed a second amended joint liquidation plan (the "second amended plan" or "plan"). (*See* Bk. D.I. 6412) The plan separates the sixteen debtors into three groups (each, a "Debtor Group") to facilitate the distributions to the unsecured creditors. (*Id.* at 10) The first Debtor Group, the Holding Company Debtors, consists of real estate investment entities that typically held residual interests in securitization trusts, owned stock in the Operating Company Debtors, and provided overall direction and management to the Operating Company Debtors.[8] (*Id.* at 11) The second Debtor Group, the Operating Company Debtors, were generally entities that conducted debtors' business operations, including originating, purchasing, and selling loans and servicing loans for third parties.[9] (*Id.*) The final Debtor Group consists only of New Century Warehouse Corporation ("Access Lending"), which was acquired by TRS Holdings in **\*583** early 2006 and was a subsidiary that provided warehouse financing to independent mortgage companies. (*Id.*)

The plan classifies claims based upon the three Debtor Groups. (*Id.*) Claims against the Holding Company Debtors are placed in classes HC1 through HC13, with appellants assigned to class HC3b along with holders of other unsecured claims against NCFC. (*Id.* at 11–13) Claims against the Operating Company Debtors are placed in classes OP1

through OP12. (*Id.* at 13–14) Claims against Access Lending are placed in classes AL1 through AL3. (*Id.* at 14)

The plan provides for the distribution of the net cash available from the assets of debtors in each Debtor Group to the holders of unsecured claims against debtors in that Debtor Group. (*Id.* at 14–15) Cash available for distribution to unsecured creditors in each Debtor Group is calculated based on the gross proceeds obtained from disposing of that Debtor Group's assets minus amounts for allowed administrative, priority, and secured claims, expenses of administering the Debtors' estates during the chapter 11 proceedings, and expenses of the liquidating trust established by the plan. (*Id.*)

The plan provides for certain protocols that affect the amount of each claimant's distribution, including the Multi–Debtor Claim Protocol, the Intercompany Claim Protocol, and the EPD/Breach Claim Protocol. [10] (*Id.* at 15–19) The Multi–Debtor Claim Protocol adjusts the distribution amount for creditors holding allowed unsecured claims for which more than one debtor is jointly and/or severally liable. (*Id.* at 15) For instance, under the Multi–Debtor Claim Protocol, unsecured creditors with claims for which Holding Company Debtors NCFC and NC Credit are jointly and/or severally liable will receive 130% of the amount of their claims against NCFC and 0% of the amount of their claims against NC Credit. (*Id.* at 15–16) Similarly, unsecured creditors with claims for which NCMC and other Operating Company Debtors are jointly and/or severally liable will receive 130% of the amount of their claim against NCMC and 0% of the amount of their claim against the other Operating Company Debtors. (*Id.* at 16)

The Intercompany Claim Protocol addresses claims held by one debtor against another debtor by adjusting the distribution amount based on the merits of each debtor's intercompany claims. [11] (*Id.*) First, claims against other debtors within the same Debtor Group receive 0% of the claim amount. (*Id.*) Second, in recognition of NC Capital's potential intercompany claims against NCMC, EPD/Breach claimants with claims against NC Capital will receive 50% of the amount of their claims against the Operating Company Debtors. (*Id.* at 17) Finally, NCFC will receive 50% of the amount of its claims against NCMC in recognition that the NCMC's debt owed to NCFC could be recharacterized as equity in NCFC. (*Id.* at 17–18)

The EPD/Breach Claim Protocol is used to calculate the amount of damages for EPD/Breach Claims and is interrelated with other compromises in the plan. [12]   **584** (*Id.* at 18–19) For example, where the EPD/Breach Protocol generates a claim amount that is disputed as too high or too low, the dispute is resolved consistent with the compromise on the allocation of Litigation Proceeds (as defined in the plan) among the EPD/Breach claimants and other classes of creditors. [13] (*Id.* at 19) Pursuant to that compromise, the EPD/Breach claimants with claims against NC Capital receive 45% of the net Litigation Proceeds, the Holding Company Debtors receive 27.5% of the net Litigation Proceeds, and the Operating Company Debtors (excluding those with EPD/Breach Claims against NC Capital) receive 27.5%. (*Id.* at 24–25)

On the date debtors filed their petitions, debtors had approximately $62 million of cash in their operating accounts. (*Id.* at 19) After filing, debtors generated an additional $230.4 million through asset sales; under the plan, those proceeds are assets of the Operating Company Debtors. (*Id.* at 19–20) The plan provides for the transfer of debtors' remaining assets (including capital stock in Access Lending but not Access Landing's assets [14]) into a liquidating trust. (*Id.* at 20) The liquidating trust is for the benefit of holders of unsecured claims against the Holding Company Debtors and holders of unsecured claims against the Operating Company Debtors. (*Id.*)

The plan provides that debtors' assets will be divided between the Holding Company Debtors and the Operating Company Debtors for purposes of distribution. [15] (*Id.*) The Holding Company assets, as asserted on the respective bankruptcy schedules, consist mostly of intercompany receivables, the Carrington Interests, [16] and the Deferred Compensation Trust. [17] (*Id.* at 21–22) The Operating Company assets include proceeds from the sales of debtors' servicing business and mortgage loans not   **585** subject to repurchase. [18] (*Id.* at 24)

On April 23, 2008, the same day the plan was filed, debtors' claims agent filed a declaration reporting the voting results for the first amended plan. (Bk.D.I.6406) Every class of creditors entitled to vote accepted the first amended plan except class HC3b, which includes appellants. (Bk. D.I. 8254 at 25) Of the 203 votes cast against the first amended plan, 200 were cast by appellants. [19] (*Id.*)

On April 24 and 25, 2008, the bankruptcy court conducted a two-day hearing on plan confirmation. (*Id.* at 2) At the hearing and in post-hearing briefs, appellants raised several arguments against plan confirmation, including that: (i) the plan provides for substantive consolidation of the debtors in violation of *In re Owens Corning*, 419 F.3d 195 (3d Cir.2005); and (ii) the plan does not comply with 11 U.S.C § 1123(a)(4) (as required by § 1129(a)(1)) because, by operation of the Multi–Debtor Claim Protocol, it provides for disparate treatment of claims within the same class. (*Id.;* Bk. D.I. 6645)

On July 2, 2008, the bankruptcy court issued an opinion overruling appellants' objections (the "confirmation opinion") and ordered the plan proponents to draft an order to be entered confirming the plan. (Bk.D.I.8254, 8255) On July 15, 2008, the bankruptcy court entered the plan proponents' confirmation order. (Bk.D.I.8596) On July 23, 2008, to correct a typographical error in that order (*see* Bk. D.I. 8624), the bankruptcy court issued an amended confirmation order. (Bk.D.I.8626) On July 14 and July 24, 2008, appellants timely appealed the confirmation opinion and the related confirmation orders. (Bk.D.I.8563, 8628)

On July 29, 2008, appellants filed a motion to stay the confirmation order pending appeal (the "stay motion"). (Bk.D.I.8673) On August 22, 2008, the bankruptcy court denied the stay motion but imposed on the New Century Liquidating Trust (the "liquidating trust") a duty to provide appellants thirty days written notice of its intent to distribute any funds to classes HC1, HC3a, HC3b, HC5, HC7, HC8, HC10a, HC10b, HC11, and HC13. (Bk.D.I.8847)

### C. Implementation of the Plan

The plan had become effective on August 1, 2008 (the "effective date"). [20] (D.I. 14 at attch. 1, ¶ 5) On the effective date, [21] the liquidating trust was created with Alan M. Jacobs as trustee. (*Id.* at attch. 1, ¶ 6) Also on that date, the Creditors' Committee was dissolved; the Plan Advisory Committee (the "PAC") was formed; debtors' officers and directors ceased serving and were replaced by Jacobs; [22] debtors' assets **\*586** were distributed to the liquidating trust; and NCFC's outstanding common and preferred stock, as well as all notes, securities, and indentures, were cancelled. [23] (*Id.* at attch. 1, ¶¶ 6–12) Approximately 127,000 parties received notice concerning the effective date. (*Id.* at attch. 1, ¶ 16)

Since the effective date, the liquidating trust has entered into contracts with a temporary legal staffing agency and an information technology contractor and has extended a short-term lease. (*Id.* at attch. 1, ¶ 15) Funds spent pursuant to these contracts total approximately $1.3 million. (*Id.* at attch. 1, ¶ 17) The liquidating trust further spent funds as follows: $142,720 as a premium on a one-year bond covering the liquidating trust's assets; $10,640 as a premium on a one-year bond covering Access Lending's assets; $311,400 as a three-year premium on an Errors and Omissions insurance policy covering the liquidating trust, Jacobs as plan administrator and trustee, and the PAC and its members; and approximately $5.65 million for professionals, including counsel, financial advisors, and accountants. [24] (*Id.*)

Claims have been settled and distributions made after the plan was confirmed, including the following: (1) on July 31, 2008, Credit Suisse First Boston Mortgage Capital LLC reached a settlement with debtors and the Creditors Committee fixing and allowing certain claims and determining its distribution class while waiving other claims; (2) on August 28, 2008, the liquidating trust paid approximately $1.84 million to SPI Litigation Direct LLC ("SPI") in settlement of claims arising out of SPI's work for the debtors; (3) on October 23, 2008, Natixis Real Estate Capital Inc. reached a settlement with the liquidating trust fixing and allowing certain claims and determining its distribution class while waiving other claims; (4) on October 29, 2008, the liquidating trust paid approximately $46,000 to Fidelity National Information Services in settlement of administrative claims; (5) on November 25, 2008, the liquidating trust paid $66,000 to AT & T, Inc., and its affiliated entities in settlement of administrative claims; (6) on December 12, 2008, the liquidating trust paid $120,000 to Wells Fargo in settlement of administrative claims; (7) on December 19, 2008, the liquidating trust paid $181,000 to GMAC Commercial Finance LLC in settlement of administrative claims; and (8) on December 29, 2008, the liquidating trust paid $2.6 million to a group of employees in settlement of WARN Act claims and other claims arising out of their termination. [25] (*Id.* at attch. 1,¶21)

### III. DISCUSSION

### A. Analysis of Equitable Mootness

[1] [2]    Under the doctrine of equitable mootness, a bankruptcy appeal should be dismissed as equitably moot if affording the appellant the relief he seeks "would be

inequitable." **\*587** *In re PWS Holding Corp.,* 228 F.3d 224, 236 (3d Cir.2000) (citing *In re Continental Airlines,* 91 F.3d 553, 559 (3d Cir.1996)). Whether the relief sought would be inequitable depends on context. Thus, in deciding whether the doctrine applies, a court must determine whether the relief sought would be inequitable in the context of the case before it.

**[3]    [4]**    In determining whether the relief sought would be inequitable and, hence, whether the doctrine should apply, courts in the Third Circuit are to consider the following factors:

> (1) whether the reorganization plan has been substantially consummated, (2) whether a stay has been obtained, (3) whether the relief requested would affect the rights of parties not before the court, (4) whether the relief requested would affect the success of the plan, and (5) the public policy of affording finality to bankruptcy judgments.

*Continental,* 91 F.3d at 560. Courts are to give these factors "varying weight, depending on the circumstances." [26] *PWS Holding,* 228 F.3d at 236.

**[5]**    Here, the circumstances are that of a chapter 11 liquidation, and the court must apply the above factors with that liquidation context in mind. [27] This means that the court, in determining whether the relief sought in this case would be inequitable, cannot indiscriminately follow *Continental* and its progeny. [28] This is because the guidance in those decisions concerning how to apply the above factors invokes considerations and employs examples that are relevant to reorganizations but not as much to liquidations. For example, unraveling a substantially consummated reorganization plan can be difficult and inequitable—difficult in that it requires reversing multiple, often complex, future-looking transactions (securing financing, issuing equity, contracting with producers and/or suppliers, etc.) and inequitable in that it shifts the tables on non-adverse third parties **\*588** (such as investors, financiers, etc.) who have acted in reliance on the debtor emerging from bankruptcy in accordance with the particulars of the reorganization plan. *See, e.g., Zenith,* 329 F.3d at 344–46. Thus, in a reorganization context, it makes sense to treat the unraveling of the plan as a significant fact weighing in favor of finding the appeal equitably moot.

*See generally id.* However, it makes less sense to treat the unraveling of the plan with such significance in a liquidation context, since (in that context) the plan transactions tend to be discrete and relatively simple transactions aimed at disposing of the debtor's assets in the short term (sale or disposal of assets, services contracts to sustain the debtor through liquidation, etc.) and the non-adverse third parties transacting with the debtor are not doing so with any particular interest in debtor's future condition, let alone relying on debtor's future condition as contemplated by the particulars of any chapter 11 plan. Accordingly, in light of the foregoing and in keeping with the equitable nature of this inquiry, the court exercises its discretion in assigning weight to the facts of this case.

**[6]    [7]    [8]**    Two countervailing considerations inform the court's exercise of discretion. On the one hand, public policy is served by encouraging non-adverse third parties to rely on the finality of bankruptcy confirmation orders. *Continental,* 91 F.3d at 565. Since applying the doctrine brings finality, this suggests that there should be a low bar for applying the doctrine and that the court should construe facts accordingly. On the other hand, however, even while encouraging reliance on finality, the court must preserve a meaningful right of appeal. If the equitable mootness bar is too low, that is, if equitable mootness factors swing too easily in favor equitable mootness, the right of appeal becomes meaningless and the instruction to apply the doctrine "cautiously" and on a "limited" scope, *PWS Holding,* 228 F.3d at 236, is contravened.

**1. Substantial consummation**

**[9]**    To determine whether the substantial consummation factor weighs in favor of equitable mootness, the court first looks to whether the bankruptcy code's definition of "substantial consummation" has been satisfied. *Zenith,* 329 F.3d at 343–44. The bankruptcy code defines "substantial consummation" as the:

> (A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan.

11 U.S.C. § 1101(2). If this definition has been satisfied, the court may then look to whether a successful appeal would unravel the plan, *see id. at 344–45,* although, in the liquidation context, that fact has diminished significance. Indeed, where the plan that has been substantially consummated can be "reversed without great difficulty and inequity," this factor does not weigh in favor of equitable mootness. *See Nordhoff, 258 F.3d at 186.*

In this case, the bankruptcy code's definition of substantial consummation has been satisfied: debtors' assets [29] have been **\*589** transferred to the liquidating trust for disposition and distributions have commenced. It is also true that the relief appellants seek would unravel the plan, at least in part, since appellants seek on appeal to undo the plan's debtor groups and protocols.

It does not appear from the record, however, that reversing the plan would result in "great difficulty or inequity." Certain events are the natural and inevitable consequences of a liquidation, *e.g.,* the discharge of employees, cancellation of equity and debts, transfer of assets to the liquidating trustee, and asset sales, to name a few. Indeed, the only aspects of plan implementation that arguably need to be reversed are the relatively few distributions that have occurred, [30] but these are not sufficient to establish "great difficulty and inequity." Accordingly, this factor does not weigh in favor of equitable mootness.

### 2. Obtaining a stay

**[10]**   Ordinarily, "[t]he existence or absence of a stay is a critical factor in determining whether to dismiss an appeal under the doctrine of equitable mootness." *In re Grand Union Co., 200 B.R. 101, 105* (citing *Continental, 91 F.3d at 561–63).* This is so because where no stay has been obtained, the plan goes forward, and it can be difficult to undo the acts of non-adverse third parties proceeding under the plan without prejudicing those non-adverse third parties. *See generally Continental, 91 F.3d at 561–63; In re Highway Truck Drivers & Helpers Local Union # 107, 888 F.2d 293, 297 (3d Cir.1989).*

**[11]**   In this case, however, while no stay has been obtained, the plan has not gone forward freely, at least in part because of the bankruptcy court's imposition of a notice requirement; indeed, it appears from the record that no creditor class has received distributions. Moreover, the plan components that

have gone forward are not those on which non-adverse third parties have detrimentally relied. [31] Under the circumstances here, then, appellants' failure to obtain a stay has not resulted in the advanced implementation with which this factor is typically concerned. Thus, this factor does not weigh in favor of equitable mootness.

### 3. Rights of non-adverse third parties

**[12]**   Equitable mootness "protects the interests of non-adverse third parties who are not before the reviewing court but who have acted in reliance upon the plan as implemented." *Continental, 91 F.3d at 562* (quoting *In re Manges, 29 F.3d 1034, 1039 (5th Cir.1994)* (quotation marks omitted)). As has been discussed, the record does not establish that non-adverse parties have relied on the particulars of the current liquidation plan in such a way as to make a reversal of confirmation inequitable. Accordingly, this factor does not weigh in favor of equitable mootness.

### 4. Affect on the plan's success

**[13]**   As articulated in *Continental* and its progeny, this factor is ultimately concerned with whether an appellant's requested **\*590** relief "would affect the re-emergence of the debtor as a revitalized entity." *Nordhoff, 258 F.3d at 189* (quotation marks omitted). The analogous concern in the liquidation context would be whether the appellant's requested relief would affect the debtor's ability to liquidate. Because nothing in the record suggests that undoing the current liquidation plan will affect debtors' ability to liquidate in the future under a different plan, this factor does not weigh in favor of equitable mootness.

### 5. Public policy of affording finality to bankruptcy judgments

**[14]**   **[15]**   This factor weighs in favor of equitable mootness where non-adverse third parties have acted in detrimental reliance on the finality of bankruptcy confirmation orders to such a degree that reversing those orders would discourage future detrimental reliance by similarly situated parties. *See Continental, 91 F.3d at 565.* In the reorganization context, the finality of bankruptcy judgments is significant because multiple parties, including non-adverse third parties, have acted in detrimental reliance on the debtor emerging from bankruptcy as contemplated by the reorganization plan. *See Continental, 91 F.3d at 565.* Thus, the public policy favoring finality is allowed to trump the countervailing consideration of preserving a meaningful right of appeal from erroneous

plan confirmations. Where parties have not relied to their detriment on finality, which is often the case in the liquidation context, this factor does not weigh in favor of equitable mootness.

In this case, there is no record that any non-adverse third party changed its position in reliance on finality to the degree that reversing the appeal here would discourage similarly situated parties from transacting business with a liquidating debtor. Accordingly, this factor does not weigh in favor of equitable mootness.

Having found that none of the equitable mootness factors weigh in favor of applying the doctrine in this case, the court denies appellees' motion to dismiss.

**B. Analysis of the Appeal on the Merits**

**1. Standard of review on appeal**

[16]   [17]   [18]   [19]   This court has jurisdiction to hear an appeal from the bankruptcy court pursuant to 28 U.S.C. § 158(a). In undertaking a review of the issues on appeal, the court applies a clearly erroneous standard to the bankruptcy court's findings of fact [32] and a plenary standard to that court's legal conclusions. See *Am. Flint Glass Workers Union v. Anchor Resolution Corp.,* 197 F.3d 76, 80 (3d Cir.1999). With mixed questions of law and fact, the court must accept the bankruptcy court's "finding of historical or narrative facts unless clearly erroneous, but exercise[s] 'plenary review of the [bankruptcy] court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.' " *Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635, 642 (3d Cir.1991) (citing *Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 101–02 (3d Cir.1981)). The district court's appellate responsibilities are further informed by the directive of the United States Court of Appeals for the Third Circuit, which effectively reviews on a de novo **\*591** basis bankruptcy court opinions. See *In re Hechinger,* 298 F.3d 219, 224 (3d Cir.2002); *In re Telegroup,* 281 F.3d 133, 136 (3d Cir.2002).

**2. Questions presented**

Appellants present five questions on appeal, two of which the court addresses here: [33] (1) does the plan provide for substantive consolidation inconsistent with *In re Owens Corning,* 419 F.3d 195 (3d Cir.2005); and (2) does the plan discriminate among members of class HC3b in violation of 11 U.S.C. § 1123(a)(4)? The court addresses these in order.

**3. Substantive consolidation**

[20]   [21]   [22]   [23]   Substantive consolidation is an equitable remedy. *In re Owens Corning,* 419 F.3d at 210. It is used, essentially, to address the harms caused by debtors (and their related entities) disregarding their separateness and/or otherwise entangling their affairs. See *id.* In function, substantive consolidation " 'treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities (save for inter-entity liabilities, which are erased). The result is that claims against separate debtors morph into claims against the consolidated survivor.' " *Id.* at 205 (quoting *Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health Ventures, Inc.),* 402 F.3d 416, 423 (3d Cir.2005)). The pooling of assets in a consolidated survivor, and the resulting increased competition among creditors for a share of those assets, means that certain creditors may recover significantly less in a substantive consolidation scenario. See *id.* Because substantive consolidation is "extreme ... and imprecise," it works " 'rough justice' " and is to be used sparingly. *Id.* at 210. Indeed, in the Third Circuit, substantive consolidation is appropriate only where the parties consent or where the proposed-to-be-consolidated entities "(i) prepetition disregarded separateness so significantly [that] their creditors relied on the breakdown of entity borders and treated them as one legal entity or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." *Id.*

[24]   The question raised on appeal is whether the plan, by aggregating multiple debtors into debtor groups to resolve claims, effects a substantive consolidation. As the bankruptcy court points out, the plan here does not call for the typical case of substantive consolidation where multiple separate entities are merged into a single entity and inter-entity liabilities are erased; instead of many-into-one, the plan calls for many-into-three, and the inter-entity liabilities are not erased. Typical or not, however, the many-into-three framework still presents the same potential inequities for creditors as would be presented in the many-into-one framework, namely that creditors face increased competition for a consolidated pool of assets and a re-valued claim that is less precise than if the creditors were dealing with debtors individually. This is the "rough justice" against which *Owens Corning* warns and, because it is effected by aggregating multiple debtors into one or more debtor groups, it falls within the definition of substantive consolidation.

It is true that the aggregation in this case was not accompanied by erasure of inter-entity liabilities and was achieved by compromise settlement. These facts, however, are not meaningful grounds for **\*592** differentiating the instant case from the typical substantive consolidation scenario because they do not eliminate the aggregation's potentially deleterious effects on creditors, which is the main concern expressed in *Owens Corning* with respect to substantive consolidation and the reason why *Owens Corning* limits the use of substantive consolidation to only a few scenarios. Thus, these differences are not sufficient to place the aggregation in this case outside the definition of substantive consolidation. The bankruptcy court erred, then, in concluding that the plan did not effect a substantive consolidation and, as the record does not show that substantive consolidation is warranted in this case consistent with *Owens Corning,* the plan confirmation must be reversed.

### 4. Disparate treatment of class members in the same class

 **[25]**    To be confirmable, a plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). Courts are to enforce this provision according to its plain language. *See Hartford Underwriters Ins. Co. v. Union Planters,* 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000). Accordingly, if claims within the same class are not receiving the same treatment, and the holders of those claims being treated less favorably have not consented to the discrimination, the plan is not confirmable.

 **[26]**    The question raised on appeal is whether the plan, by providing 100% of the determined distribution amount on some claims in class HC3b (the "100% claims") and 130% on other claims in class HC3b whose holders have relinquished claims in class HC10b (the "130% claims"), treats all claims in class HC3b the same or, in the alternative, discriminates with the holders' consent. The bankruptcy court concluded that the plan discriminates with consent, reasoning that the holders of the 130% claims, instead of insisting on receiving 100% of the determined distribution for their HC3b claims and 100% of the determined distribution for their HC10b claims (a total distribution of 200%), consented to less favorable treatment in the form of receiving 0% on their HC10b claims and 130% on their HC3b claims (a total distribution of 130%). The problem, however, is that consent

to less favorable treatment in class HC10b only excuses disparate treatment of claims in that class. It is inapposite to the treatment of claims in class HC3b. The treatment of claims in class HC3b is a separate matter, and it is clear that the plan treats the 100% claims in that class less favorably than the 130% claims without the holders'—or at least appellants'—consent. Thus, the bankruptcy court erred in finding that the plan was in compliance with § 1123(a)(4), and the plan confirmation must be reversed. [34]

### IV. CONCLUSION

For the aforementioned reasons, the court denies debtors' motion to dismiss (D.I.13), reverses the bankruptcy court's issuances that are the subject of this appeal (Bk.D.I.8254, 8255, 8596, 8626), and remands the case. An appropriate order shall issue.

### ORDER

At Wilmington this 16th day of June, 2009, having reviewed the appeal filed by **\*593** filed by Gregory J. Schroeder, Michelle Park, Martin Warren, Steve Holland, Nabil Bawa, and the Ad Hoc Committee of Beneficiaries of the New Century Financial Corporation Deferred Compensation Plan and/or Supplemental Executive Retirement/Savings Plan and the motion to dismiss the appeal filed by New Century Liquidating Trust and Alan M. Jacobs as Liquidating Trustee and Plan Administrator for New Century Warehouse Corporation (collectively, "appellees") and the papers filed in connection therewith;

IT IS ORDERED that:

1. Appellees' motion to dismiss (D.I.13) is denied.

2. The bankruptcy court issuances that are the subject of the appeal (Bk.D.8254, 8255, 8596, 8626) are reversed.

3. The case is remanded to the bankruptcy court for further proceedings consistent with the memorandum opinion issued this same day.

### Parallel Citations

51 Bankr.Ct.Dec. 211

**Footnotes**

1     "Debtors" are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. Ill Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; and NCoral, L.P., a Delaware limited liability partnership. (Bk. D.I. 8254 at 1 n. 1) "Debtors" also include New Century Warehouse Corporation (a/k/a Access Lending), a California corporation, which filed its voluntary chapter 11 petition on August 3, 2007. (*Id.*) In total, there are sixteen debtors-in-possession. (*Id.* at 10)

2     Appellants at one time had two appeals pending, but the earlier-filed appeal has been consolidated with the instant appeal by order of the court. (D.I.9)

3     Formed as a Delaware corporation in 1995, the entity formerly known as New Century Financial Corporation ("NCFC") was the parent corporation of the other debtor entities. (Bk. D.I. 8254 at 21) In 2004, in anticipation of NCFC being reorganized into a Maryland real estate investment trust ("REIT") for federal income tax purposes, New Century REIT, Inc. (a Maryland corporation with REIT status) and its wholly-owned subsidiary, NC Merger Sub, Inc. (a Delaware corporation), were established. (*Id.*) On October 1, 2004, to effect the reorganization, NC Merger Sub was merged into NCFC, and NCFC's name was changed to New Century TRS Holdings, Inc. ("TRS Holdings"). (*Id.*) TRS Holdings, the surviving corporation, was now a wholly-owned subsidiary of New Century REIT, Inc., with New Century REIT, Inc., taking the name of "New Century Financial Corporation." (*Id.*) After the merger and reorganization, debtors' general ledger system identified the entity now known as New Century Financial Corporation as "REIT," but continued to identify TRS Holdings as NCFC, its former name. (*Id.*) The court herein refers to the entity formerly known as NCFC and now known as TRS Holdings as TRS Holdings.

4     Measured by the value of pre-petition assets, debtors' bankruptcy filing was the largest chapter 11 filing in 2007 and, as of February 29, 2008, the ninth-largest ever. (Bk. D.I. 8254 at 9 n. 11)

5     As of December 31, 2006, the Deferred Compensation Trust contained more than $43 million. (Bk. D.I. 8254 at 27)

6     ERISA defines a "top hat" plan as "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated individuals." 29 U.S.C. § 1051(2)

7     Appellants argue in the adversary proceeding that, if the Deferred Compensation Plans are not top hat plans subject to ERISA, then any employee contributions "never inure[d] to the benefit of any employer and [have been] held for the exclusive purpose of providing benefits to participants in the [compensation] plan and their beneficiaries and defraying reasonable expenses of administering the [compensation] plan." (Bk. D.I. 8254 at 28 n. 23 (quoting 29 U.S.C. § 1103(c)(1))) In the alternative, appellants argue that the terms of the Deferred Compensation Plans and the Deferred Compensation Trust provide that the Deferred Compensation Trust is available only to general creditors of NCFC. (*Id.* at 28)

8     The Holding Company Debtors consist of NCFC, TRS Holdings, New Century Credit Corporation ("NC Credit"), and NC Residual IV Corporation ("NC Residual IV"). (Bk. D.I. 8254 at 14)

9     The Operating Company Debtors consist of New Century Mortgage Corporation ("NCMC"), NC Capital Corporation ("NC Capital"), Home123 Corporation ("Home123"), NC Asset Holding, L.P. ("NC Asset Holding"), NC Deltex, LLC ("NC Deltex"), New Century REO Corporation ("NC REO"), New Century REO II Corporation ("NC REO II"), New Century REO III Corporation ("NC REO III"), NC Residual III Corporation ("NC Residual III"), New Century Mortgage Ventures, LLC ("NCM Ventures"), and NCoral, L.P. ("NCoral"). (Bk. D.I. 8254 at 11)

10     The plan provides that certain provisions may not "be stricken, altered, or invalidated," including provisions related to the Multi–Debtor Claim and Intercompany Protocols and the treatment and classification of claims. (*See* Bk. D.I. 6412 at 105)

11     These claims appear on debtors' books and records, but there are no promissory notes or instruments evidencing the debt. (Bk. D.I. 8254 at 16)

12     The plan defines an "EPD/Breach Claim" as a claim "arising under an agreement between one or more of the Debtors and a loan buyer or securitization party for (i) breach of representation or warrant under such agreement made by one or more of the Debtors

or (ii) a right under such an agreement to resell a loan to one or more of the Debtors based on a payment default by the borrower on such loan." (Bk. D.I. 8254 at 18)

13    Under the plan, "Litigation Proceeds" are the net proceeds generated from any litigation (except those proceeds belonging to Access Lending) and include any net proceeds from avoidance actions and suits arising out of the need to restate 2006 financial statements. (Bk. D.I. 8254 at 24)

14    Access Lending's assets consist primarily of proceeds from the liquidation of its assets in April 2007 and the cash in its operating account as of the petition date. (Bk. D.I. 8254 at 20 n. 18)

15    During plan negotiations, issues arose over which debtors owned which assets. (Bk. D.I. 8254 at 20–21) These issues stemmed primarily, with respect to the Holding Company Debtors especially, from the 2004 reorganization involving NCFC and TRS Holdings discussed *supra* in footnote 3. (*See id.* at 21)

16    The Carrington Interests are two different partnership interests owned by debtors—one is a general partnership interest valued by debtors at approximately $8 million, and the other is a limited partnership interest valued by the debtors at approximately $42.5 million. (Bk. D.I. 8254 at 22) Debtors' accounting records show that the Carrington Interests are owned by TRS Holdings, but other documents after the 2004 reorganization make ownership unclear. (*Id.*) Income from the limited partnership interest is presently being realized by NCFC, but NCMC advanced the money that TRS Holdings used to purchase the interest. (*Id.*) The Creditors' Committee has asserted that NCMC, by virtue of its having funded the purchase, should be entitled to that interest. (*Id.*)

17    The confusion over whether NCFC or TRS Holdings owned the Carrington Interests and the Deferred Compensation Trust led to the decision to aggregate the assets of the Holding Company Debtors for purposes of distribution. (Bk. D.I. 8254 at 22)

18    It was further agreed during plan negotiations that NCMC would receive any potential tax refunds owed to debtors. (Bk. D.I. 8254 at 24)

19    For reasons not made clear in the bankruptcy court's confirmation order or in the parties' briefs on appeal, the bankruptcy court and the parties treat the voting results on the first amended plan as applicable to the second amended plan.

20    On July 28, 2008, in preparation for the plan taking effect, all of Access Lending's stock was transferred to the liquidating trust, which then became the sole shareholder of Access Lending. (D.I. 14 at attach. 1, ¶ 10)

21    As of the effective date, the Holding Company Debtors had no cash with which to pay their share of administrative expenses. (D.I. 14 at attach. 1, ¶ 24) As part of plan compromises, between the effective date and December 31, 2008, the Operating Company Debtors paid $5.6 million to cover the Holding Company Debtors' share. (*Id.*)

22    Debtors also ceased having employees. (D.I. 14 at attach. 1, ¶ 7)

23    Jacobs speculates that these cancellations precipitated significant tax events in 2008 for equity holders and creditors. (D.I. 14 at attach. 1, ¶ 13)

24    Jacobs avers that the liquidating trust has distributed approximately $21.12 million in payment of professional fees and other pre-effective date administrative claims (D.I. 14 at attach. 1, ¶ 20), but he fails to clarify the allocation between professional fees and administrative claims or whether the $5.65 million in post-effective date professional fees is included in the $21.12 million figure.

25    The bankruptcy court approved each of these settlements. (*See* D.I. 14 at attach. 1, ¶ 21) The liquidating trust also entered into settlements not requiring the bankruptcy court's approval, including settlements with Bloomington Associates 2005 LLC, the Ohio Attorney General, and various taxing authorities. (*Id.* at attach. 1, ¶ 22)

26    The *PWS Holding* court goes on to state that "the foremost consideration is whether the reorganization plan has been substantially consummated," *PWS Holding,* 228 F.3d at 236, but, as discussed hereafter, that statement does not necessarily hold true in the liquidation context.

27    It is reasonable to question whether the equitable mootness doctrine, as articulated by the Third Circuit, even applies in the liquidation context. The court in *In re Zenith Electronics Corp.* stated that "[t]he underlying purpose of the doctrine is to 'prevent[ ] a court from unscrambling complex bankruptcy **reorganizations** when the appealing party should have acted before the plan became extremely difficult to retract.' " 329 F.3d 338, 345 (3d Cir.2003) (quoting *Nordhoff Investments, Inc. v. Zenith Electronics Corp.,* 258 F.3d 180, 185 (3d Cir.2001)) (emphasis added). Similarly, the court in *Continental,* in listing factors for determining whether the doctrine should apply, expressly referred to "reorganization." *See Continental,* 91 F.3d at 560. Likewise, the courts in *Nordhoff, PWS Holding,* and *Zenith* discussed the doctrine applying in a reorganization context. *See generally Nordhoff,* 258 F.3d at 185–90; *PWS Holding,* 228 F.3d at 235–37; *Zenith,* 329 F.3d at 343–47.

    That said, the express focus on reorganization in these cases can reasonably be attributed to the fact that reorganization plans were at issue in each. Moreover, the court is not aware of any reason why it should be concerned with inequitable appellate relief in a reorganization context but not in a liquidation context. Accordingly, the court assumes, as have other courts in the Third Circuit, that the equitable mootness doctrine may apply in a liquidation context. *See In re Nellson Nutraceutical, Inc.,* 2008 WL 4532514 (D.Del. Oct.9, 2008); *In re Reading Broadcasting, Inc.,* 2008 WL 3540212 (E.D.Pa. Aug.8, 2008).

28    "*Continental* and its progeny" refers to *Continental* and *PWS Holding,* both cited previously, as well as *Nordhoff Investments, Inc. v. Zenith Electronics Corp., 258 F.3d 180 (3d Cir.2001),* and *In re Zenith Electronics Corp., 329 F.3d 338 (3d Cir.2003).*

29    Appellants argue that not all or substantially all of debtors' assets have been transferred to the liquidating trust because it has not yet been determined whether debtors had rights to the amounts contributed under the Deferred Compensation Plans, which is a significant asset. Appellees counter, and the court agrees, that appellants' argument on this point misses the mark. Whatever rights debtors had with respect to those amounts (even if they had no rights) were transferred as of the effective date, thus satisfying the requirement that all or substantially all assets be transferred.

30    For example, distributions to administrative and WARN Act claimants.

31    The cancellation of debt and equity may have had tax implications for non-adverse third parties, as Jacobs speculates. However, the record does not establish that a successful appeal would create such difficulty with respect to tax filings as to render the appeal inequitable. Accordingly, the court gives no weight to this speculation.

32    "A factual finding is clearly erroneous when 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *In re CellNet Data Sys., Inc.,* 327 F.3d 242, 244 (3d Cir.2003) (citing *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)).

33    The court does not address appellants' three additional questions since resolving the two questions listed here is sufficient to instruct the parties and the bankruptcy court on remand as to the strictures governing subsequent iterations of the plan.

34    While the court appreciates the complexity of dealing with the tangle of debtor entities involved at bar, nonetheless, there are limits to what equity alone can accomplish. The Third Circuit has established those limits in *Owens Corning* and, while it is the final arbiter of how those limits apply to any individual fact scenario, this court declines to further expand the scope of equitable powers given a bankruptcy court in these circumstances.

---

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 49

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 320 of 379

In re Plassein Intern. Corp., 377 B.R. 126 (2007)

377 B.R. 126
United States Bankruptcy Court,
D. Delaware.

In re PLASSEIN INTERNATIONAL
CORPORATION, et al., (n/k/a
PL Liquidation Corp.), Debtors.

No. 03–11489 (KG).    |    Oct. 17, 2007.

**Synopsis**

**Background:** In case converted from Chapter 11 to Chapter 7, after debtors were more successful than expected in recovering preferences for distribution to creditors, dispute arose concerning interpretation of court-approved settlement agreement between Chapter 7 trustee and agent representing group of lenders that provided postpetition financing to debtors during their Chapter 11 proceedings. Lenders' agent moved for summary judgment on its interpretation of the settlement agreement.

**Holdings:** The Bankruptcy Court, Kevin Gross, J., held that:

[1] under Delaware law, trustee's position on the preference recoveries was correct, that is, the estate was entitled to retain the first $1.1 million of preference recoveries, and preference recoveries in excess of $1.1 million were to be distributed to lenders' agent after deduction of the fees and expenses incurred in recovering the preference payments;

[2] trustee was not required to reserve the $270,000.00 escrow held to indemnify lenders' agent for claims of asset purchaser; and

[3] "cash on hand" was not a "recovery" subject to distribution pursuant to the settlement agreement.

So ordered.

West Headnotes (9)

**[1]    Compromise and Settlement**
👈 Construction of Agreement

Under Delaware law, in interpreting a settlement agreement, the court must determine the parties' intention from the express language of the agreement and construe their intention from the entire agreement, giving effect to all of the provisions.

Cases that cite this headnote

**[2]    Contracts**
👈 Existence of ambiguity

Under Delaware law, a contract is "ambiguous" only when the provisions in controversy are fairly susceptible to different interpretations or may have two or more different meanings.

Cases that cite this headnote

**[3]    Contracts**
👈 Application to Contracts in General

Under Delaware law, in the absence of an ambiguity, a court should not look outside the four corners of the contract and the contract's clear and unequivocal language.

Cases that cite this headnote

**[4]    Contracts**
👈 Intention of Parties

Under Delaware law, the objective intent of the parties is a court's paramount consideration in construing a contract.

Cases that cite this headnote

**[5]    Contracts**
👈 Subject, object, or purpose as affecting construction
**Contracts**
👈 Language of contract
**Contracts**
👈 Extrinsic circumstances

Under Delaware law, in ascertaining the intent of the parties to a contract, the court considers not only the language in the contract, but also the circumstances surrounding the making of

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 321 of 379

In re Plassein Intern. Corp., 377 B.R. 126 (2007)

the contract, the motives of the parties, and the purposes which they sought to accomplish.

Cases that cite this headnote

[6]    **Contracts**
    👉 Language of contract

    **Contracts**
    👉 Extrinsic circumstances

Under Delaware law, the intention of the parties to a contract is to be determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction.

Cases that cite this headnote

[7]    **Bankruptcy**
    👉 Compromises, Releases, and Stipulations

Under Delaware law, pursuant to court-approved settlement agreement between Chapter 7 trustee and lenders' agent, the estate was entitled to retain the first $1.1 million of trustee's preference recoveries, and recoveries in excess of $1.1 million were to be distributed to lenders' agent after deduction of fees and expenses incurred in recovering preferences; though lenders' agent would have imposed all costs and expenses on trustee's portion of recoveries, such interpretation resulted in an unworkable and clearly unintended result, as settlement agreement was definitive that trustee was first entitled to receive "up to ... $1,100,000 of gross recoveries," and if lenders' agent were correct, trustee would not receive $1.1 million, bulk of settlement proceeds would be paid instead to lenders' agent, and court would have to ignore plain language providing that lenders' agent's receipt of up to $3.1 million, after trustee's receipt of $1.1 million, was "of net recoveries."

Cases that cite this headnote

[8]    **Bankruptcy**
    👉 Compromises, Releases, and Stipulations

Under Delaware law, pursuant to court-approved settlement agreement between Chapter 7 trustee and lenders' agent, trustee was no longer

required to reserve the $270,000.00 escrow held to indemnify lenders' agent for claims of asset purchaser; given the execution of general releases by and among the estate, asset purchaser, and certain taxing authorities, any and all claims that asset purchaser had against the estate, including those claims regarding asset purchaser's obligation to pay certain tax liabilities, were released, there were no claims left that could be subject to the indemnification, and there were thus no circumstances for which the estate would be required to provide indemnification to lenders' agent.

Cases that cite this headnote

[9]    **Bankruptcy**
    👉 Compromises, Releases, and Stipulations

Under Delaware law, lenders' agent was not entitled to the "cash on hand" held by Chapter 7 trustee at the time of the parties' court-approved settlement agreement; although lenders' agent asserted an interest in the "cash on hand" pursuant to the security interest granted it pre- and postpetition, following court's approval of the settlement agreement the right of lenders' agent to distribution from the estate was governed by the settlement agreement, not any preexisting security interests, and "cash on hand" was not a "recovery" subject to distribution pursuant to the settlement agreement, as the right of lenders' agent to receive distribution from "recoveries" only included the proceeds from future recoveries.

Cases that cite this headnote

**Attorneys and Law Firms**

*128 Kerri K. Mumford, Adam G. Landis, Landis Rath & Cobb LLP, Richard H. Cross, Jr., Cross & Simon, LLC, Wilmington, DE, for Debtors.

**Opinion**

*MEMORANDUM OPINION* [1]

KEVIN GROSS, Bankruptcy Judge.

The Court has been asked to resolve a dispute involving the interpretation of a settlement agreement which the Court previously approved. The decision will determine the funds available for distribution to creditors.

## I. BACKGROUND [2]

Plassein International Corp. and affiliated companies ("Debtors" or "Estate") [3] *129 filed these cases in May 2003. In connection with the filing, Debtors filed a motion to sell substantially all of their assets to Exopack–Ontario, Inc. ("Exopack"). Fleet Capital Corporation, as agent for a group of lenders ("Fleet") [4] agreed to finance the Debtors during their Chapter 11 proceedings to effectuate the sale to Exopack. [5] Consummating a sale with Exopack was difficult and highly contentious, with numerous revisions to the Purchase and Sale Agreement ("APA"), resulting in a substantial reduction in the purchase price from approximately $60,000,000 to approximately $20,000,000. Ultimately, in September 2003, the Court entered an Order approving the sale to Exopack and authorizing the Debtors to pay all of the proceeds of the sale to Fleet. [Docket No. 635]. In October 2003, the cases were converted to cases under Chapter 7, and the Court appointed an interim trustee. [Docket No. 729]. The Estate was administratively insolvent. Fleet was asserting a priority administrative claim in the approximate amount of $16,000,000, and there were unpaid Chapter 11 professional fees aggregating almost $3,000,000. [Affidavit of William A. Brandt, Jr., Trustee, dated July 24, 2007] ("Trustee Affidavit"), ¶ 2. [Docket No. 1632]

In December 2003, the creditors elected William A. Brandt, Jr., as Trustee. His election was disputed, and the Court resolved the disputed election by Order, dated February 4, 2004, confirming the election [Docket No. 915]. The Trustee inherited a bitter dispute among Fleet, the Estate and the Estate's professionals over the amount of Chapter 11 professional fees and whether the proceeds of the sale paid to Fleet could be surcharged for the professional fees. [Trustee Affidavit ¶ 3]. In addition, the purchaser, Exopack, was making claims ("the Exopack Claim") under the APA for alleged breaches of various representations and warranties and was asserting a claim to certain proceeds of the sale that were held in escrow and additional claims for damages above

the holdback against the Estate and Fleet. [Docket No. 1028; Trustee Affidavit ¶ 2].

Upon his appointment, the Trustee assumed the obligation to pursue the Section 506(c) claim against Fleet and to resolve the professional fees disputes. Ultimately, the Trustee, through mediation, resolved the objections to fees and the Section 506(c) claim relating to those fees. Through the Trustee's efforts, a compromise was reached whereby the professionals agreed to certain reductions in their fees and Fleet agreed to pay those fees from the proceeds of the sale. [Trustee Affidavit ¶ 3]. The Trustee then addressed the Exopack Claim, and negotiated a compromise among the Estate, Exopack and Fleet whereby Exopack released certain claims against Fleet, and the Estate and *130 Fleet released certain of the holdback funds to Exopack. When Exopack refused to honor its obligations under the settlement terms to pay certain taxes, the Trustee commenced an adversary proceeding. [6] The parties settled the adversary proceeding with Exopack paying the Trustee the amount due for taxes, thereby enabling the Trustee to pay all outstanding taxes. Fleet compensated the Trustee in the sum of $50,000 for his expenses in obtaining the recovery from Exopack.

Having resolved the unpaid professional fees issues and the Exopack Claim, the Trustee then entered into discussions with Fleet to resolve the Trustee's potential claims against Fleet, including a claim that Fleet's liens could be avoided as fraudulent conveyances. Those negotiations ultimately resulted in the settlement agreement that is the subject matter of the present dispute. *See infra*, at pp. 130–32.

On January 23, 2007, the Trustee filed a motion seeking authority to make an interim distribution to creditors other than Fleet ("Interim Distribution Motion") [D.I. 1557], which proposed to pay the expenses of administration and to make an interim distribution to unsecured creditors. On February 21, 2007, Fleet filed an objection to the Interim Distribution Motion ("Objection") [D.I. 1573]. In addition, Fleet filed a Motion to Compel Trustee to Perform Under the Settlement Agreement ("Motion to Compel") [D.I. 1574]. On March 14, 2007, the Trustee and the Agent entered into a Consent Order, partially resolving the Motion to Compel, pursuant to which the Trustee paid Fleet $1 million and Fleet adjourned the Motion to Compel. [D.I. 1595].

### *The Settlement Agreement between the Trustee and Fleet*

At the time the cases were converted, several contested matters and adversary proceedings were pending against Fleet. On March 3, 2005, all of the pending matters were settled pursuant to a settlement agreement between the Trustee and Fleet ("Settlement Agreement") which the Court approved. [D.I. 1132]. The Settlement Agreement provided that Fleet waive its priority administrative claim, waive any secured claim, and the Estate agreed to grant Fleet an allowed unsecured claim of $23,675,045.65. Fleet further agreed to pay the Estate the sum of $3,100,000 and waive any right to any distribution as an unsecured creditor from the $3,100,000 [7] paid, plus waive any right to a distribution from the first $1.1 million of preference recoveries. [Settlement Agreement ¶ 4(b)]. In exchange and after it received the $1.1 million, the Estate agreed to pay Fleet any net recoveries up to $3,100,000, [8] and then share equally any subsequent net recoveries above $3.1 million.

The relevant provisions of the Settlement Agreement are as follows:

### Section 2.

**Scope of Settlement.** [T]his [Settlement] Agreement is intended to globally settle with prejudice any and all claims (pre-petition and post-petition) the Trustee and the Debtors' estates **\*131** have or may have.... Without limiting the generality of the foregoing, this [Settlement] Agreement will completely resolve and be deemed as a settlement with prejudice of ... claims for ... the liquidation, collection and disbursement of other estate assets, No further claims can be asserted, whether direct or indirect, against any or all of Agent, Lenders and Heller, their respective professionals and advisors, or against any proceeds received by any of them from any Plassein entity, and/or any representative thereof. [9]

### Section 3.

**Settlement Payment.** Lenders shall pay to the Trustee the amount of Three Million and 00/100 Dollars ($3,000,000.00) and Heller shall pay to the Trustee the amount of One Hundred Thousand and 00/100 Dollars ($100,000.00) in cash upon approval of the Agreement by the Court by a final order (together, the "Settlement Payment").

### Section 4.

**Distribution of Estate Property.** Distribution of property of the Debtors' estates by the Trustee shall be as follows:

a. the Settlement Payment plus any amounts to be retained by the Debtors' estates described in Paragraphs 4.b, 4.c, 4.d, 4.e and 13.d below shall be used to pay allowed administrative claims of the Debtors' estates and creditors other than the Lenders and Heller in the order of priority pursuant to Bankruptcy Code § 726 or other order of the Court that is not inconsistent herewith;

b. up to One Million One Hundred Thousand and 00/100 Dollars ($1,100,000.00) of gross preference recoveries pursuant to Bankruptcy Code §§ 547 and 550 shall be distributed to creditors of the Debtors' estates other than Lenders and Heller in the order of priority pursuant to Bankruptcy Code § 726 or other order of this Court that is not inconsistent herewith. Gross preference recoveries in excess of $1,100,000.00 shall be distributed to the Lenders pursuant to 4(c) below;

c. subject to 4(a) and above, the Agent on behalf of the Lenders shall receive the sum of Three Million One Hundred Thousand and 00/100 Dollars ($3,100,000.00) of net recoveries from any source. Recoveries by the Trustee in excess of the amount payable to the Lenders in accordance with the sub-section (c) shall be distributed to creditors of the Debtors' estates and to the Lenders as provided below;

d. after the Lenders have received the sum of Three Million One Hundred Thousand and 00/100 Dollars ($3,100,000.00) (and subject to 4(b) above), except as provided in paragraph 4(g) hereof, all further net recoveries (funds available for distribution to creditors pursuant to Bankruptcy Code § 726(a)(2)) shall be divided and distributed by the Trustee 50% to the Lenders and the remaining 50% to the creditors of the Debtors' estates other than Lenders and Heller, or in accordance with other order of the Court that is not inconsistent herewith; and

e. once allowed claims of unsecured creditors of the Debtors, other than the Lenders' and Heller, are paid in full, including, without limitation, the allowed claims of the Senior Sub–Debt and Junior Sub–Debt, as defined below, the balance **\*132** of any funds available for

distribution pursuant to Bankruptcy Code § 726(a) (2) shall be paid to the Lenders. Conversely, once the Lenders' Allowed Unsecured Claim, and Heller Unsecured Claim, both as defined below, are paid in full, any funds available for distribution pursuant to Bankruptcy Code § 726(a)(2) shall be distributed to allowed claims of the other unsecured creditors until paid in full, and then to equity.

Fleet paid $3.1 million to the Trustee, constituting the full Settlement Payment. As a result of the Settlement Agreement, the Debtors' estates had a potential fund of $4.2 million, with $3.1 million in hand, plus the first preference recoveries of $1.1 million to be collected, available to pay allowed administrative claims and to make distributions to creditors.

### Preference Recoveries

The Trustee collected $2,445,519 from preference actions. In collecting the preferences, Debtors incurred counsel fees of approximately $593,852, plus costs (including mediators' fees). The Trustee also incurred the fees and expenses of his consultant, Development Specialists, Inc., in excess of $200,000 in fees, plus expenses.

### Jurisdiction and Venue

The Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. This Court is the proper venue for this motion under 28 U.S.C. §§ 1408 and 1409. This motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The statutory predicates for the relief Fleet seeks is Bankruptcy Code § 105(a).

## II. DISCUSSION

The parties find themselves in a good faith disagreement over the interpretation of terms of the Settlement Agreement they negotiated to resolve a highly contentious relationship. As is not uncommon, the dispute over the Settlement Agreement arose when the Debtors were more successful than expected in recovering funds for distribution and the meaning of provisions of the Settlement Agreement was no longer merely an academic exercise. The parties agree that at the time they negotiated the Settlement Agreement, everyone believed that there would be little, if any, money from preference recoveries to be distributed and therefore the provisions of the Settlement Agreement at issue here would not come into play. Instead, the Trustee's vigorous efforts resulted in funds worth a fight.

Fleet has moved for summary judgment on its interpretation of the Settlement Agreement. The Trustee in its opposition to the Motion argued that if the Court were to determine that there was an ambiguity in the Settlement Agreement, the Court should deny the Motion because genuine issues of material fact would exist. Nonetheless, at oral argument both parties agreed that an evidentiary hearing would be wasteful of time and money and, in effect, have asked the Court to resolve the dispute by interpreting the Settlement Agreement. Fleet and the Trustee therefore agree that disposition of their dispute by summary judgment is both useful and appropriate.

The Trustee and Fleet agree on the applicable legal precepts, namely: [10]

[1]    (a) The Court must determine the parties' intention from the express language of the agreement. *133 *E.I. du Pont de Nemours and Co. v. Shell Oil Co.,* 498 A.2d 1108 (Del.1985); *Radio Corp. of America v. Philadelphia Storage Battery Co.,* 6 A.2d 329 (Del.1939); *Pennwalt Corp. v. Plough Inc.,* 676 F.2d 77, 80 (3d. Cir.1982); and construe their intention from the entire agreement, giving effect to all of the provisions. *State v. Dabson,* 217 A.2d 497 (Del.1966); *Bamdad Mechanic Co. v. United Technologies Corp.,* 586 F.Supp. 551 (D.Del.1984).

[2]    [3]    A contract is ambiguous only when the provisions in controversy are fairly susceptible to different interpretations or may have two or more different meanings. *See Rhone–Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.,* 616 A.2d 1192 (Del.1992). The Court should not look outside the four corners of the contract and the clear and unequivocal language in the absence of an ambiguity. Here, the parties agree the Settlement Agreement is not ambiguous. They disagree, however, on what it means and ask the Court to tell them.

The parties' interpretations of the Settlement Agreement leave little, if any, middle ground, as the following recitations of the parties' respective interpretations of the Settlement Agreement reveal the gulf between them.

### Preference Recoveries

#### Fleet's Position

The Settlement Agreement required the Trustee to distribute to Fleet gross preference recoveries in excess of $1.1 million. Paragraph 4 of the Settlement Agreement is the distribution mechanism to which Fleet points to support its argument [11]:

**Distribution of Estate Property.** Distribution of property of the Debtors' estates by the Trustee shall be as follows:

a. The Settlement Payment plus any amounts to be retained by the Debtors' estates ... shall be used to pay allowed administrative claims of the Debtors' estates and creditors other than [Fleet] ...;

b. Up to One Million One Hundred Thousand and 00/100 Dollars ($1,100,000.00) of gross preference recoveries ... shall be distributed to creditors of the Debtors' estates other than [Fleet]....Gross preference recoveries in excess of $1,100,000.00 shall be distributed to the Lenders pursuant to 4(c) below [limited to the sum of $3.1 million from gross preference recoveries and net proceeds from any other source];

c. Subject to 4(a) [excluding amounts to be retained by the estate] and (b) [limited to gross preference recoveries in excess of $1.1 million] [Fleet] shall receive the sum of Three Million One Hundred Thousand and 00/100 Dollars ($3,100,000.00) of net recoveries from any source.

d. after [Fleet] has received the sum of Three Million One Hundred Thousand and 00/100 Dollars ($3,100,000.00) ... all further net recoveries (funds available for distribution to creditors pursuant to

Bankruptcy Code § 726(a)(2)) shall be divided and distributed by the Trustee 50% to [Fleet] and the remaining 50%, to the creditors of the Debtors' estates other than [Fleet].

The Settlement Agreement allocates the risk of administrative expenses, including, without limitation, the costs of collection of the preference recoveries, to the Estate. If the Trustee collects in excess of $1.1 million of gross preference recoveries, then the Estate has a fund of $4.2 million to "pay allowed administrative claims of the  **\*134**  Debtors' estates and creditors other than [Fleet] in the order of priority pursuant to Bankruptcy Code § 726 or other order of the Court that is not inconsistent" with the Settlement Agreement.

The Trustee collected $2,445,519 of gross preference recoveries. Pursuant to the Settlement Agreement the Trustee retains for the estates the first $1.1 million of the gross preference recoveries. Settlement Agreement at ¶ 4(b). The Trustee disburses "gross preference recoveries in excess of $1,100,000.00 ... to [Fleet]." Settlement Agreement at ¶ 4.b. This leaves $1,345,519 in gross preference recoveries that belong to [Fleet] under the Settlement Agreement in excess of the $1.1 million allocated to the Estate.

In addition to the gross preference recoveries to which Fleet is entitled, the Settlement Agreement obligates the Trustee to disburse to Fleet the net recoveries from all other sources, including a $50,000 escrow relating to the insurance retainage, described more fully in Paragraph 13(a) of the Settlement Agreement. In addition to the insurance retainage escrow, Fleet is entitled to distribution from the following sources:

| | |
|---|---|
| Refunds | $ 78,899 |
| Turnover from prior trustee | $ 45,014 |
| Bank accounts | $142,563 |
| Interest | $ 59,009 |

Fleet therefore is entitled to gross preference recoveries in excess of $1.1 million in the amount of not less than $1,345,519, other net recoveries and proceeds in an amount to be determined, funding of a reserve in the amount of $270,000 (see discussion of the Exopack Settlement, below) pursuant to paragraphs 7 and 8 of the Settlement Agreement, and accounting for expenses.

### Trustee's Position

Fleet asserts it is entitled to the gross preference recoveries in excess of $1.1 million. In support of that position, Fleet relies upon Paragraph 4(b) of the Settlement Agreement. However, Fleet's reading of Paragraph 4(b) is far too narrow and fails to give effect to all language of the paragraph. Paragraph 4(b) of the Settlement Agreement provides that

In re Plassein Intern. Corp., 377 B.R. 126 (2007)

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 326 of 379

gross preference recoveries in excess of $1.1 million are to be distributed to Fleet "**pursuant to Paragraph 4(c).**" *(emphasis added).* Paragraph 4(c) provides that Fleet receives net recoveries from any source up to the first $3.1 million. Reading Paragraphs 4(b) and 4(c) together, it is clear that the gross preference recoveries in excess of $1.1 million are to be distributed pursuant to Paragraph 4(c) after the costs to the Estate are deducted. From that net recovery, the first $3.1 million is disbursed to Fleet.

The reason the term "gross preference recoveries" is used in Paragraph 4(b) is because if net recoveries were provided for in Paragraph 4(b) and the net balance was then disbursed pursuant to Paragraph 4(c), those net recoveries would be subject to a second charge for expenses of the Estate. Thus, Paragraph 4(b) used the term "net recoveries" to avoid a double assessment against gross recoveries in excess of $1.1 million. [Trustee Affidavit ¶ 12].

Fleet's reading of Paragraph 4(b) of the Settlement Agreement ignores the words "pursuant to 4(c) below." Fleet incorrectly interprets Paragraph 4(b) as independently requiring disbursement of gross proceeds to Fleet without regard to Paragraph 4(c). Such an interpretation is inconsistent with the language and fails to give full effect and meaning to the language.

As noted, when the Settlement was being negotiated, it was the parties' expectation that preference recoveries would be less than $1.1 million. [Trustee Affidavit ¶ 9]. It was only through the extraordinary **\*135** effort of the Trustee and his counsel that the Estate recovered $2,345,519. [Trustee Affidavit ¶ 10]. In order to make this recovery, the Estate incurred expenses for counsel fees of $593,852, plus costs. In addition, DSI provided services to the Trustee with a fair value in excess of $200,000 by providing all the financial analysis needed to successfully prosecute the preference claims. [Trustee Affidavit ¶ 11]. The Estate, if Fleet prevails, loses the fees and associated costs incurred to recover $2,345,519. Paragraphs 4(b) and 4(c) must be read together in which case the Settlement Agreement clearly and unambiguously provides that the preference recoveries in excess of $1.1 million are to be distributed to Fleet after deduction of expenses.

Therefore, the distribution due Fleet for the preference recoveries is $1,345,519, less the interim distribution to Fleet of $1,100,000, less costs and expenses.

## II. RULING

The Trustee and Debtors agree on one thing, namely, that there are no disputes on the facts and an evidentiary hearing would be a wasteful exercise. The Court agrees with the parties that there are no disputed facts and summary judgment is appropriate. F.R. Civ. P. 56(c); *In re LaRoche Industries, Inc.,* 284 B.R. 406, 408 (Bankr.D.Del.2002). Instead, they have asked the Court to tell them what their Settlement Agreement means. The parties also agree that the Settlement Agreement is unambiguous and, therefore, the Court may properly interpret the Settlement Agreement using the rules of construction of contracts: applying the express language, determining the parties' agreement from the entirety of the agreement, and giving effect to each term so no provision is useless.

[4] [5] [6] In this case, in addition to the rules of construction discussed earlier (pp. 9–10) the Court will employ another rule of construction to determine the objective intent of the parties which is, as the Third Circuit Court of Appeals has indicated, "a court's paramount consideration" in construing a contract. *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1009 (3d Cir.1980). In *Mellon,* the Third Circuit, quoting from *O'Bryan v. O'Bryan,* 67 Conn.App. 51, 787 A.2d 15, 18 (2001), stated:

> In ascertaining intent, we consider not only the language in the contract but also the circumstances surrounding the making of the contract, the motives of the parties and the purposes which they sought to accomplish.... The intention of the parties to a contract is to be determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction.

The Court's interpretation of the Settlement Agreement is necessarily premised upon the circumstances and situation extant when the parties settled their differences.

Discussions between the Trustee and Fleet to resolve the Trustee's potential claims against Fleet, including a fraudulent conveyance claim to avoid Fleet's liens, resulted in the Settlement Agreement. The specific terms of the Settlement Agreement make it clear that the Trustee and Fleet intended to

settled all of their claims against one another. See Settlement Agreement, ¶ 2, which provides:

> 2. Scope of Settlement. Except as specifically provided below, this Agreement is intended to globally settle with prejudice any and all claims (pre-petition and post-petition) the Trustee and the Debtors' estates have or may have against: [Fleet].... Without limiting **\*136** the generality of the foregoing, this Agreement will completely resolve and be deemed as a settlement with prejudice of the Avoidance Action and Surcharge Motion, all adversary proceedings, contested matters and other core case issues and claims among the parties and their respective professionals and advisors, which includes, without limitation, objections to the allowance of claims of the Agent and Lenders....

The foregoing "release" language clearly evidences that Fleet was buying peace for all lenders for any claims by Debtors whatsoever. Of further significance in determining the intent behind the Settlement Agreement is that at the time they were negotiating the Settlement Agreement, Debtors and Fleet thought that preference recoveries would be less than $1.1 million. Instead, the Trustee's efforts led to the recovery of more than double the expected amount, or $2,345,519. In achieving the larger than anticipated recovery, the Trustee incurred attorney's fees of $593,852, costs and $200,000 in fees payable to DSI for its analysis of preference claims.

Therefore, the Court's determination of the intent of the parties which leads to the interpretation of the Settlement Agreement flows from a relatively few salient facts.

1. The Trustee was preparing to challenge Fleet's liens as avoidable fraudulent conveyances.

2. The Trustee and Fleet entered into settlement negotiations to settle completely the Trustee's potential claims against Fleet.

3. The negotiations resulted in the Settlement Agreement which, in addition to the economic terms, provided for the Trustee's release of Fleet on very broad terms. Settlement Agreement, ¶ 5.

4. The settlement negotiations took place when the preference recoveries were expected to be substantially less than $1.1 million.

The Settlement Agreement provided significant benefits to Fleet. In addition to a potential distribution at issue here, Fleet received a release from liability, avoided litigation over its liens and obtained an allowed unsecured claim of $23,675,045.65. Fleet also received indemnification and the turn over of funds held in escrow totaling approximately $256,000.

### a. Preference Recoveries

[7]    In achieving the greater than expected preference recoveries, the Trustee incurred attorneys' fees of $593,852, plus costs, including mediator fees. Trustee Affidavit ¶ 11. If Fleet's position on the Settlement Agreement is correct, the distribution from the preference recoveries would be as follows:

| | |
|---|---|
| Preference Recoveries | $2,345,519 |
| Creditors' Gross Share | $1,100,000 |
| Less Expenses [12] | {$ 593,852   } |
| Creditors' Net Share | $ 506,148 |
| Fleet's Share | $1,245,519 |

On the other hand, if the Trustee is correct, the distribution would be:

| | |
|---|---|
| Preference Recoveries | $2,345,519 |

In re Plassein Intern. Corp., 377 B.R. 126 (2007)

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 328 of 379

| | |
|---|---|
| Creditors' Share | $1,100,000 |
| Less Expenses | {$ 593,852  } |
| Fleet's Share | $ 651,667 |

The difference in recovery is substantial depending on against whom the costs and expenses are applied. Fleet would impose all of the costs and expenses on the Trustee's portion of the preference recoveries, i.e., the $1,100,000 payable under the Settlement Agreement, meaning that Fleet rather than the creditors would enjoy the gross recovery amount.

**\*137** Fleet's interpretation results in an unworkable and clearly unintended result. The Settlement Agreement is definitive that the Trustee is first entitled to receive "up to ... $1,100,000 of *gross* recoveries". Settlement Agreement ¶ 4(b) *[emphasis added]*. If Fleet is correct, the Trustee would not receive $1.1 million and the bulk of the settlement proceeds would be paid, really refunded, to Fleet. In order to adopt Fleet's suggested interpretation, the Court would have to ignore the plain language in the Settlement Agreement that Fleet's receipt of up to $3.1 million—after the Trustee's receipt of $1.1 million "of *gross* preference recoveries" (Settlement Agreement ¶ 4(b)) is "of *net* recoveries...." *Id.* at ¶ 4(c) *[emphasis added]*.

It is therefore clear from the Settlement Agreement itself that the Trustee's position on the preference recoveries is correct.

### b. *Exopack*

**[8]**    The Court earlier in this decision *(see* Background at pp. 1–4) referred to the asset sale to Exopack and the litigation that resulted from the sale. When Fleet and the Trustee entered into the Settlement Agreement (i.e., March 3, 2005), the litigation between the Estate and Exopack was pending. In the Settlement Agreement, the Trustee and Fleet addressed the possibility that Exopack would recover on its claim against the Estate. Paragraph 7 of the Settlement Agreement requires the Trustee to reserve $270,000 to secure the Trustee's indemnification of Fleet with respect to certain claims by Exopack. The indemnification provided for in Paragraph 8 of the Settlement Agreement [13] is only for claims which are not direct claims by Exopack against Fleet. Thus,

the indemnification is only for those claims Exopack may have against the Debtors and indirectly against Fleet. [14]

On September 11, 2006, the Court approved a settlement among the Estate, certain Taxing Authorities and Exopack [Docket No. 1538] which resulted in an exchange of general releases by and among the Estate, Exopack and the taxing authorities fully and completely releasing any and all claims that Exopack had against the Estate, including those claims regarding Exopack's obligation to pay certain tax liabilities. [Docket No. 1538].

Fleet received notice of the settlement with Exopack and did not file an objection. Additionally, Fleet was a party to an appeal which was settled as part of the Exopack settlement, and Fleet joined in the dismissal of that appeal. Notwithstanding Fleet's participation, Fleet did not seek to participate in the settlement or request a release, nor did Fleet raise any issues with the Trustee with respect to the release until after the Court approved the Exopack settlement. [15]

**\*138**    Accordingly, there are no claims left that could be subject to the indemnification. The Trustee has fully and completely resolved all disputes with Exopack as evidenced by the exchanges of the general releases. The only Exopack claims that could exist would be direct claims between Exopack and Fleet, and for such claims the Trustee did not provide indemnification.

Therefore, the Trustee is not required to maintain the reserve to secure the indemnification because there are no circumstances for which the Estate would be required to provide indemnification to Fleet.

### c. *Cash on Hand*

**[9]**    Fleet has identified additional sum to which it believes it is entitled.

| | |
|---|---|
| Refunds | $ 78,889 |
| Turnover from prior trustee | $ 45,014 |

| Bank accounts | $142,563 |
| Interest | $ 59,000 |
| Total | $325,466 |

The primary issue which Fleet's claim to the foregoing amounts raises is its entitlement to "Cash on Hand" which the Trustee held at the time the parties entered into the Settlement Agreement ("Cash on Hand"). The Trustee counters that Fleet is entitled under the Settlement Agreement only to its portion of proceeds from future recoveries. The Cash on Hand is not a "recovery" according to the Trustee and therefore is not payable under the Settlement Agreement.

Before entering into the Settlement Agreement, the Estate held Cash on Hand of $266,476, plus $73,525 that had been paid by Fleet to make professional fee payments in connection with certain settlements the Trustee had reached with some of the professionals who had been employed while the cases were pending under Chapter 11. [Trustee Affidavit ¶ 5]. Fleet asserted an interest in the Cash on Hand pursuant to the security interest granted Fleet pre—and post-petition. [Trustee Affidavit ¶ 5]. Upon the approval of the Settlement Agreement, Fleet's right to distribution from the Estate was governed by the Settlement Agreement and not preexisting security interests. The Settlement Agreement clearly contemplated that it was to be a global resolution of all claims by Debtors against Fleet and Fleet against the Estate. Thus, the Settlement Agreement provided that "[e]xcept as specifically provided below, this [Settlement] Agreement is intended to globally settle with prejudice any and all claims (pre-petition and post-petition) ... (c) [Fleet's] Claims against the several [Debtors'] Estates arising or relating to such financial accommodations or otherwise...." Settlement Agreement at ¶ 2. Fleet waived any additional secured and priority claim it may have had. Fleet's rights to receive distributions were to be governed solely by the Settlement Agreement. Settlement Agreement, ¶ 6. [16]

"Net recoveries" as used in Paragraph 4(c) of the Settlement Agreement does not include the Cash on Hand because the Cash on Hand did not constitute a recovery. Fleet's right to receive a distribution from "recoveries" only includes the proceeds from future recoveries.

**\*139** The Cash on Hand is to be available to pay the expenses of the Estate, including professional fees incurred. The Cash on Hand was not as a result of actions taken by the

Trustee to "recover" an asset [Trustee Affidavit ¶ 5], and the parties never contemplated that the Estate would pay over to Fleet the Cash on Hand. [Trustee Affidavit ¶ 8]. Construing the Settlement Agreement as having Fleet pay the Estates $3.1 million while maintaining a claim against the Cash on Hand is illogical. The correct reading of the Settlement Agreement and that which gives effect to the intent of the parties is that the Cash on Hand was an asset of the Debtors free and clear of the claims of Fleet and not a "recovery" subject to distribution pursuant to Paragraph 4 of the Settlement Agreement. [Trustee Affidavit ¶ 8].

The Court agrees with the Trustee. If Fleet is correct, its $3.1 million payment was, in part, merely an advance to be reimbursed in the future from sums certain. Fleet exchanged its lien on the "Cash on Hand" for the benefits of the Settlement Agreement. Those benefits included the possibility of recoveries, not the certainty of "Cash on Hand." Fleet is therefore not entitled to "Cash on Hand."

#### d. *Miscellaneous Issues and Rulings*

Fleet also seeks the following payments from the Trustee:

a. An accounting of a $50,000 escrow the Trustee collected. The Trustee shall provide the accounting.

b. Release from San Bernadino of $ 80,000 held in escrow by the taxing authority, and payment to Fleet. Settlement Agreement, ¶ 13(b). The Trustee has received $81,005.69 and shall pay to Fleet the released escrow funds.

c. Recovery from Europackaging. The Settlement Agreement requires the Trustee to pay Fleet from any recovery against Europackaging. Settlement Agreement, ¶ 13(d). The Trustee collected $91,483, and is entitled to reimbursement of fees and expenses. It is unclear what amount of fees and expenses are appropriate. The Trustee shall provide Fleet with an accounting of the fees and expenses attributable to the Europackaging matter and if the Trustee and Fleet are unable to agree on an appropriate amount, the dispute shall be submitted to the Court to resolve.

In re Plassein Intern. Corp., 377 B.R. 126 (2007)

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 330 of 379

### e. *Accounting*

The Court's decision that the Settlement Agreement results in a payment of net preference recoveries means that Fleet is entitled to an accounting of the professional fees and expenses attributable to the gross recoveries. The Court directs the parties to confer about a schedule for the accounting, any objections for fees and expenses and a hearing, if necessary, to present those objections, and to submit an agreed upon scheduling order.

The Court will issue an Order in conformity with the rulings in this Opinion.

### ORDER

The Court having carefully considered the Motion of Fleet Capital Corporation, Agent, to Compel Trustee to Perform Under Settlement Agreement (D.I. 1574), Motion of Fleet Capital Corporation for Summary Judgment Granting Motion to Compel Trustee to Perform Under Settlement Agreement (D.I. 1629), ("the Motions"), the Trustee's Memorandum in Opposition to the Motions (D.I. 1632), the related pleadings and documents, and having heard oral argument, for the reasons stated in the accompanying written opinion ("the

Opinion"), IT IS ORDERED that the Motions are granted in part and denied in part, and more specifically as follows:

**\*140** 1. Fleet Capital Corporation's (for itself and as agent) ("Fleet") share of preference recoveries, after the Estate retains the first $1.1 million of preference recoveries, is net of the Estate's fees and expenses incurred in recovering the preference payments.

2. The Trustee is not required to reserve the $270,000 escrow held to indemnify Fleet for claims of Exopack–Ontario, Inc.

3. Fleet is entitled to receive "Cash on Hand" only to the extent it is distributed to general unsecured creditors and on a *pari passu* basis with other unsecured creditors.

4. The Trustee shall pay to Fleet $81,005.69 released by the San Bernadino taxing authority.

5. The Trustee shall pay to Fleet the recovery from Exopackaging, less fees and expenses incurred, and shall provide an accounting of such fees and expenses.

6. The Trustee shall account to Fleet for the fees and expenses incurred in the recovery of preference payments on a schedule the parties will negotiate.

7. The Trustee shall make the foregoing payments when he makes the next distribution to other unsecured creditors.

Footnotes

1    This Memorandum Opinion constitutes the findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052, made applicable to this matter by Federal Rule of Bankruptcy Procedure 9014.

2    The cases were assigned to the author of this Opinion on April 18, 2006, subsequent to most of the recited significant events.

3    The Debtors are PL Liquidation Corp., f/k/a Plassein International Corp., PL Liquidation of Martin, Inc., f/k/a Plassein International Martin, Inc., PL Liquidation of Ontario, LLC, f/k/a Plassein International of Ontario, LLC, PL Liquidation of Salem, Inc., f/k/a Plassein International of Salem, Inc., PL Liquidation of Spartanburg, Inc., f/k/a Plassein International of Spartanburg, Inc., PL Liquidation of Thomasville, Inc., f/k/a Plassein International of Thomasville, Inc., and PL Liquidation of Tfilms, Inc., f/k/a Teno Films, Inc., a wholly-owned subsidiary of Thomasville, Inc.

4    The group of lenders consisted of Fleet Capital Corporation, Fleet National Bank, Heller Financial, Inc., Wachovia Bank, N.A., and Citizens Bank of New Hampshire. The Court's reference to "Fleet" will include the group of lenders including Fleet, for itself and as agent.

5    On May 16, 2003, the Court entered an interim order ("Interim Order") granting the Debtors authority to incur post-petition secured debt (Interim Order at ¶ 1), and granting Fleet liens on all property of the estates other than avoidance actions (Interim Order at ¶ 5), deemed such liens perfected (Interim Order at ¶ 7), acknowledged the Debtors' pre-petition obligations to, and liens of, the Agent under the pre-petition credit documents (Interim Order at ¶¶ F–1, M, 5, 9, 12, 14, 15, 20 and 23), and granted the Agent super-priority administrative claims (Interim Order at ¶ 10). Thereafter, the Court entered a series of eleven additional interim orders, all of which granted Fleet the same or similar relief provided in the Interim Order.

6    *William A. Brandt, Jr., as the Chapter 7 Trustee v. Exopack–Ontario, Inc., et al.,* Adv. Proc. No. 05–30165(KG).

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 331 of 379

In re Plassein Intern. Corp., 377 B.R. 126 (2007)

7     The payment was $3,000,000 from Fleet and $100,000 from Heller Financial to resolve certain related claims against Heller Financial. For the sake of clarity, the Court will refer only to "Fleet."

8     At the time of the Settlement, the best estimate of likely preference recoveries was less than $1,100,000. Thus, it was contemplated that any distribution to Fleet would be first from recoveries from non-preference claims. [Trustee Affidavit ¶ 9].

9     The Settlement Agreement provides that all claims against Fleet are settled. It does not constitute a waiver and release of claims against the Estate or the assertion of liens against property of the Estate.

10    The Settlement Agreement provides that Delaware law governs in any dispute. Settlement Agreement, ¶ 18.

11    The recitation of Paragraph 4 is lifted from Fleet's submission and with Fleet's editing states Fleet's interpretation.

12    The expenses are an estimate at this time. The Court's calculations are for illustrative purposes and do not represent findings or a conclusion of the actual amount.

13    Paragraph 8 provides, in part, that:

      8. Indemnification by Trustee. The Trustee shall indemnify, defend and hold [Fleet] ... harmless of and from any and all claims, causes, suits, proceedings and appeals asserted or commenced or continued by Exopack, ...; provided, however, that the Trustee shall not be liable or obligated to indemnify or defend [Fleet], with respect to any direct claim (as opposed to an indirect or derivative claim by or through the Debtors' estates) asserted by [Fleet] ...; provided however, if any such alleged direct claim is determined to be derivative or otherwise within the scope of the indemnity above, then the Trustee and Debtors' estates shall then be liable to indemnify for any amount finally determined to be due to Exopack....

14    At the closing on the sale of the Debtors' assets, all the proceeds were paid to Fleet. Thus, if any senior lien was established, the payment would have to be made by Fleet.

15    Despite the Trustee's request that Exopack release Fleet, Exopack has yet to do so. The Court has reviewed the docket and it appears that Fleet has not taken any action to determine if it has any accountability to Exopack.

16    Paragraph 6 provides:

      6. Waiver of Priority, Net Claim. [Fleet] hereby waives the priority of any claim [Fleet] may have, with all of [Fleet's] remaining claims being allowed general unsecured claim having priority in distribution pursuant to Bankruptcy Code § 726(a)(2) in the amount of $23,675,045.65 ("Lenders Allowed Unsecured Claim").

---

                                           © 2014 Thomson Reuters. No claim to original U.S. Government Works.

 © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 50

In re Vitro S.A.B. de CV, 701 F.3d 1031 (2012)

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 333 of 379

57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386

701 F.3d 1031
United States Court of Appeals,
Fifth Circuit.

In the Matter of VITRO S.A.B. DE C.V., Debtor.
Ad Hoc Group of Vitro Noteholders, Appellant,
v.
Vitro S.A.B. de C.V., Appellee.
In the Matter of Vitro S.A.B. de CV, Debtor.
Vitro S.A.B. de C.V., Appellant,
v.
Ad Hoc Group of Vitro Noteholders;
Wilmington Trust, National Association,
solely in its capacity as indenture trustee;
U.S. Bank National Association, Appellees.
In the Matter of Vitro S.A.B. de C.V., Debtor.
Fintech Investments, Limited, Appellant,
v.
Ad Hoc Group of Vitro Noteholders;
Wilmington Trust, National Association,
solely in its capacity as indenture trustee;
U.S. Bank National Association, Appellees.

Nos. 12–10542, 12–10689 and
12–10750.    |    Nov. 28, 2012.

**Synopsis**
**Background:** Mexican holding company filed Chapter 15 petition for recognition of its Mexican bankruptcy proceeding as foreign main proceeding. Ad hoc group of noteholders objected to petition. The United States Bankruptcy Court for the Northern District of Texas, Harlin DeWayne Hale, J., granted petition, and noteholders appealed. The District Court, A. Joe Fish, Senior District Judge, 470 B.R. 408, affirmed, and noteholders appealed. In separate proceeding, foreign representatives moved for post-recognition relief in nature of enforcement of judgment entered by Mexican court, which not only modified debts owed by foreign debtor, but novated and extinguished guarantees of foreign debtor's indebtedness by its nondebtor subsidiaries. The Bankruptcy Court, Harlin DeWayne Hale, J., 473 B.R. 117, denied motion, and foreign representatives appealed directly to the Court of Appeals, where appeal was consolidated with prior appeal by noteholders.

**Holdings:** The Court of Appeals, King, Circuit Judge, held that:

[1] individuals were not disqualified from serving as "foreign representatives" of company that was the subject of Mexican reorganization proceeding merely because they were designated as representatives by company's board of directors, and not officially appointed by Mexican court;

[2] as matter of apparent first impression, court had to consider availability of post-recognition relief first under provision of Chapter 15 authorizing "any appropriate relief," before employing provision authorizing "additional assistance";

[3] unavailability of non-debtor releases in reorganization cases under United States bankruptcy law did not necessarily mean that foreign representatives of debtor that was reorganizing under Mexican law could not obtain enforcement of such releases; but

[4] bankruptcy court did not abuse its discretion in denying enforcement motion.

Affirmed.

West Headnotes (32)

[1]    **Bankruptcy**
        Conclusions of law;  de novo review
       **Bankruptcy**
        Clear error
       Court of Appeals reviews district court's affirmance of bankruptcy court decision by applying same standard of review that district court applied, and reviews bankruptcy court's findings of fact for clear error and its conclusions of law, and determinations on mixed questions of law and fact, de novo. Fed.Rules Bankr.Proc.Rule 8013, 11 U.S.C.A.

       Cases that cite this headnote

[2]    **Bankruptcy**

In re Vitro S.A.B. de CV, 701 F.3d 1031 (2012)

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 334 of 379

57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386

 Conclusions of law; de novo review

**Bankruptcy**
 Clear error

On direct appeal from bankruptcy court, the Court of Appeals reviews bankruptcy court's findings of fact for clear error and its conclusions of law, and determinations on mixed questions of law and fact, de novo. Fed.Rules Bankr.Proc.Rule 8013, 11 U.S.C.A.

Cases that cite this headnote

[3]    **Bankruptcy**
 Discretion

On appeal in bankruptcy case, the Court of Appeals reviews denial of declaratory or injunctive relief for abuse of discretion.

Cases that cite this headnote

[4]    **Bankruptcy**
 Discretion

Bankruptcy court's decision whether to grant comity to foreign proceedings is reviewed for abuse of discretion.

2 Cases that cite this headnote

[5]    **Bankruptcy**
 Cases Ancillary to Foreign Proceedings

Central to Chapter 15 is concept of comity.

1 Cases that cite this headnote

[6]    **Courts**
 Comity between courts of different countries

**International Law**
 Public policy and comity in general

"Comity" is the recognition which one nation allows within its territory to legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to rights of its own citizens, or of other persons who are under protections of its laws.

1 Cases that cite this headnote

[7]    **International Law**
 Public policy and comity in general

Comity is not rule of law, but one of practice, convenience, and expediency.

Cases that cite this headnote

[8]    **Bankruptcy**
 Cases Ancillary to Foreign Proceedings

Chapter 15 provides for broad range of relief, including ability to sue and be sued in United States courts, to apply directly to United States court for relief, to commence non-Chapter 15 case, and to intervene in any United States case to which foreign debtor is party.

Cases that cite this headnote

[9]    **Bankruptcy**
 Cases Ancillary to Foreign Proceedings

It is not necessary that the result achieved in foreign bankruptcy proceeding be identical to that which would be had in the United States in order for court to grant relief in Chapter 15 case ancillary to foreign bankruptcy proceeding; it is sufficient if the result is comparable. 11 U.S.C.A. §§ 1507(a), 1521(a).

Cases that cite this headnote

[10]   **Bankruptcy**
 Cases Ancillary to Foreign Proceedings

In order for court to grant relief in Chapter 15 case ancillary to foreign bankruptcy proceeding, foreign laws need not be identical to their counterparts under laws of the United States; it is enough that they are not repugnant to United States laws and policies. 11 U.S.C.A. §§ 1507(a), 1521(a).

Cases that cite this headnote

[11]   **Bankruptcy**
 Cases Ancillary to Foreign Proceedings

57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386

Whether any relief should be granted under Chapter 15 is separate question from whether foreign proceeding will be recognized by United States bankruptcy court.

Cases that cite this headnote

**[12]** **Bankruptcy**
    🔑 Cases Ancillary to Foreign Proceedings

Federal court's recognition of representatives appointed in course of foreign bankruptcy or liquidation proceeding is matter of comity; it is an acknowledgment of validity of foreign proceeding.

1 Cases that cite this headnote

**[13]** **Bankruptcy**
    🔑 Cases Ancillary to Foreign Proceedings

Duly recognized foreign representative has capacity to sue and be sued in the United States and to apply directly to United States court for relief, and is entitled to the comity and cooperation of all United States courts. 11 U.S.C.A. § 1509.

1 Cases that cite this headnote

**[14]** **Bankruptcy**
    🔑 Cases Ancillary to Foreign Proceedings

Statutory requirements for recognition of foreign insolvency proceeding as either a foreign main, or foreign nonmain, proceeding are to be strictly construed in keeping with fact that recognition is not rubber stamp exercise, and even in absence of objection, courts must undertake their own jurisdictional analysis and grant or deny recognition under Chapter 15 as the facts of each case warrant. 11 U.S.C.A. § 1517.

Cases that cite this headnote

**[15]** **Bankruptcy**
    🔑 Cases Ancillary to Foreign Proceedings

Individuals were not disqualified from serving as "foreign representatives" of company that was the subject of Mexican reorganization proceeding merely because they were designated

as representatives by company's board of directors, and not officially appointed by Mexican court, especially where Mexican court had power to enjoin these individuals from acting as foreign representatives but chose not to do so and thereby gave the representatives its tacit approval. 11 U.S.C.A. § 101(24).

Cases that cite this headnote

**[16]** **Statutes**
    🔑 Plain Language; Plain, Ordinary, or Common Meaning

Courts interpret statutes according to their plain meaning.

Cases that cite this headnote

**[17]** **Bankruptcy**
    🔑 Cases Ancillary to Foreign Proceedings

Representatives appointed by company that was in process of reorganizing its business in concurso proceeding brought under Mexican law, as representatives of foreign debtor that retained broad control over its affairs pursuant to provisions of Mexican law, had requisite administrative power over reorganization of debtor's business, as required for them to qualify as "foreign representatives," regardless of whether company possessed all the powers accorded to Chapter 11 debtor-in-possession under United States bankruptcy law. 11 U.S.C.A. § 101(24).

Cases that cite this headnote

**[18]** **International Law**
    🔑 Public policy and comity in general

In applying principles of comity, court takes into account the interests of United States, interests of the foreign state or states involved, and mutual interests of family of nations in just and efficiently functioning rules of international law.

1 Cases that cite this headnote

**[19]** **Bankruptcy**
    🔑 Cases Ancillary to Foreign Proceedings

Chapter 15 provides courts with broad, flexible rules to fashion relief appropriate for effectuating its objectives in accordance with comity.

1 Cases that cite this headnote

**[20]    Bankruptcy**
👉 Cases Ancillary to Foreign Proceedings

Mere fact that foreign representative requests relief that would be available under law of the foreign proceeding, but not in the United States, is not grounds for denying comity.

Cases that cite this headnote

**[21]    Bankruptcy**
👉 Cases Ancillary to Foreign Proceedings

In deciding whether to grant post-recognition relief to foreign representatives of debtor that is subject of foreign main, or of foreign nonmain, proceeding pending in another country, when relief requested is not a type of relief specifically identified as being among types of "any appropriate relief" available upon recognition, bankruptcy court should first consider whether relief requested comes within scope of broad statutory phrase "any appropriate relief" by interpreting that phrase as referring to relief available under Chapter 15's predecessor, § 304; it is only if court determines that requested relief was not formerly available under § 304 and not currently provided for under United States law that it should consider whether the relief would be appropriate as "additional assistance" under separate provision of Chapter 15. 11 U.S.C.A. §§ 1507, 1521(a); 11 U.S.C.(2000 Ed.) § 304.

2 Cases that cite this headnote

**[22]    Bankruptcy**
👉 Cases Ancillary to Foreign Proceedings

Relief under section of Chapter 15 authorizing "additional assistance" to foreign representative if recognition is granted is of nature more extraordinary than that provided under separate section of Chapter 15 authorizing court to grant "any appropriate" post-recognition relief, including seven specifically identified categories

of relief, and as result, test for obtaining "additional assistance" under this earlier section of Chapter 15 is more rigorous. 11 U.S.C.A. §§ 1507, 1521.

2 Cases that cite this headnote

**[23]    Bankruptcy**
👉 Cases Ancillary to Foreign Proceedings

While section of Chapter 15 authorizing "additional assistance" to foreign representative if recognition is granted is intended to be "catchall" provision, it cannot be used to circumvent restrictions present in other parts of Chapter 15, nor to provide relief otherwise available under other provisions. 11 U.S.C.A. § 1507.

1 Cases that cite this headnote

**[24]    Bankruptcy**
👉 Cases Ancillary to Foreign Proceedings

Foreign representatives, in seeking enforcement of plan of reorganization that was previously approved in concurso proceeding under Mexican law, which provided for discharge of its non-debtor subsidiaries' obligations on their guarantees of foreign debtor's indebtedness to noteholders, were not merely seeking to "stay the commencement or continuation" of "proceeding concerning the debtor's assets, rights, obligations or liabilities," or to "entrust the distribution of all or part of the debtor's assets," but were seeking to permanently enjoin lawsuits against subsidiaries and to affect their assets, so that relief was not among that specifically identified as being included in the "any appropriate relief" available to foreign representatives following recognition of Mexican proceeding. 11 U.S.C.A. § 1521(a)(1), (b).

2 Cases that cite this headnote

**[25]    Bankruptcy**
👉 Cases Ancillary to Foreign Proceedings

Foreign representatives, in seeking enforcement of plan of reorganization that was previously approved in concurso proceeding under Mexican

law, which provided for discharge of its non-debtor subsidiaries' obligations on their guarantees of foreign debtor's indebtedness to noteholders, were not seeking relief which was previously available under predecessor law to Chapter 15, or which was currently provided for under United States law, as being in nature of non-consensual, non-debtor release through bankruptcy; accordingly, relief was available, if at all, only under section of Chapter 15 authorizing "additional assistance" to foreign representatives. 11 U.S.C.A. §§ 1507, 1521(a).

2 Cases that cite this headnote

[26] **Bankruptcy**
  👈 Cases Ancillary to Foreign Proceedings

Even assuming that relief sought by foreign representatives of debtor that was reorganizing its business in concurso proceeding under Mexican law, being in nature of non-consensual release of subsidiaries that had not filed for bankruptcy on their guarantees of debtor's indebtedness, was available under section of Chapter 15 authorizing court to grant "any appropriate" post-recognition relief, bankruptcy court did not abuse its discretion in denying such relief, upon determination that concurso plan did not provide for appropriate balance among interests of debtor, its creditors, and its subsidiaries/guarantors. 11 U.S.C.A. §§ 1521(a), 1522.

1 Cases that cite this headnote

[27] **Bankruptcy**
  👈 Cases Ancillary to Foreign Proceedings

Unavailability of non-debtor releases in reorganization cases under United States bankruptcy law did not necessarily mean that foreign representatives of debtor that was reorganizing under Mexican law could not obtain enforcement of such releases, which were included in its concurso plan, under section of Chapter 15 authorizing "additional assistance" to foreign representative, which was intended to provide relief not otherwise available under

the Bankruptcy Code or United States law. 11 U.S.C.A. § 1507.

1 Cases that cite this headnote

[28] **Bankruptcy**
  👈 Cases Ancillary to Foreign Proceedings

Bankruptcy court did not abuse its discretion in denying, as form of "additional assistance" allegedly available following recognition of reorganization proceedings that were pending in Mexico, foreign representatives' request for entry of order enforcing the concurso plan previously approved by Mexican court, which purported to release debtor's subsidiaries of any liability that they otherwise had on their guarantees of debtor's indebtedness, despite fact that subsidiaries had not themselves filed for bankruptcy, that affected creditors had not consented to plan, and that affected creditors were not given any alternative means to recover and would receive only tiny fraction of what was owed to them. 11 U.S.C.A. § 1507(b)(4).

Cases that cite this headnote

[29] **Bankruptcy**
  👈 Cases Ancillary to Foreign Proceedings

Chapter 15's "public policy" exception is narrow provision, that is intended to be invoked only under exceptional circumstances concerning matters of fundamental importance for the United States. 11 U.S.C.A. § 1506.

1 Cases that cite this headnote

[30] **Bankruptcy**
  👈 Cases Ancillary to Foreign Proceedings

Key determination required of court to decide whether relief under Chapter 15 is barred on "public policy" grounds is whether the procedures used in foreign proceeding meet fundamental standards of fairness applicable in the United States. 11 U.S.C.A. § 1506.

Cases that cite this headnote

[31] **Bankruptcy**

In re Vitro S.A.B. de CV, 701 F.3d 1031 (2012)

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 338 of 379

57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386

🔑 Cases Ancillary to Foreign Proceedings

In deciding whether Chapter 15's narrow "public policy" exception applies as bar to relief, bankruptcy court need not engage in independent determination on propriety of individual acts of foreign court. 11 U.S.C.A. § 1506.

Cases that cite this headnote

[32]  **Bankruptcy**
🔑 Cases Ancillary to Foreign Proceedings

Even the absence of certain procedural or constitutional rights in foreign proceeding will not itself be a bar to grant of relief in a Chapter 15 case ancillary to foreign proceeding under Chapter 15's narrow "public policy" exception. 11 U.S.C.A. § 1506.

Cases that cite this headnote

**Attorneys and Law Firms**

*1036 Jeff Philipp Prostok, Forshey & Prostok, L.L.P., Fort Worth, TX, Allan S. Brilliant, Dechert, L.L.P., New York City, G. Eric Brunstad, Jr. (argued), Matthew Joseph Delude, Collin O'Connor Udell, Dechert, L.L.P., Hartford, CT, for Ad Hoc Group of Vitro Noteholders.

Andrew M. Leblanc (argued), Milbank, Tweed, Hadley & McCloy, L.L.P., Washington, DC, David Mark Bennett, Katharine Battaia Clark, Cassandra Ann Sepanik, Thompson & Knight, L.L.P., Dallas, TX, Alan J. Stone, Jeremy C. Hollembeak, Milbank, Tweed, Hadley & McCloy, L.L.P., New York City, for Vitro S.A.B. de CV.

Kevin K. Russell, Goldstein & Russell, P.C., Washington, DC, for Government of the United Mexican States, Amicus Curiae.

Jeff Philipp Prostok, Forshey & Prostok, L.L.P., Fort Worth, TX, Sanford M. Litvack, Hogan Lovells US, L.L.P., New York City, for Wilmington Trust, Nat. Ass'n.

Jason S. Brookner, Cameron Phair Pope, Andrews Kurth, L.L.P., Houston, TX, Jeanne P. Darcey, Kevin M. Colmey, Richard Hiersteiner, Amy A. Zuccarello, Sullivan & Worcester, Boston, MA, Jeff Philipp Prostok, Forshey & Prostok, L.L.P., Fort Worth, TX, for U.S. Bank Nat. Ass'n.

Lindsee P. Granfield (argued), Cleary, Gottlieb, Steen & Hamilton, L.L.P., New York City, Briana Leigh Cioni, Sander L. Esserman, Stutzman, Bromberg, Esserman & Plifka, P.C., Dallas, TX, for Fintech Investments, Limited.

Appeals from the United States Bankruptcy Court for the Northern District of Texas.

Before KING, SMITH and BARKSDALE, Circuit Judges.

**Opinion**

KING, Circuit Judge:

Consolidated before us are three cases relating to the Mexican reorganization proceeding of Vitro S.A.B. de C.V., a corporation organized under the laws of Mexico. The Ad Hoc Group of Vitro Noteholders, a group of creditors holding a substantial amount of Vitro's debt, appeal from the district court's decision affirming the bankruptcy court's recognition of the Mexican reorganization proceeding and Vitro's appointed foreign representatives under Chapter 15 of the Bankruptcy Code. Vitro and one of its largest third-party creditors, Fintech Investments, Ltd., each appeals directly to this court the bankruptcy court's decision denying enforcement of the Mexican reorganization plan because the plan would extinguish the obligations of non-debtor guarantors. For the following reasons, we affirm the district court's judgment recognizing the Mexican reorganization proceeding and the appointment of the foreign representatives. We also affirm the bankruptcy court's order denying enforcement of the Mexican reorganization plan.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

**A. Vitro S.A.B. de C.V. and the 2008 Financial Crisis**

Vitro S.A.B. de C.V. ("Vitro") is a holding company that, together with its subsidiaries, constitutes the largest glass manufacturer in Mexico. Originally incorporated *1037 in 1909, Vitro operates manufacturing facilities in seven countries, as well as distribution centers throughout the Americas and Europe, and exports its products to more than 50 countries worldwide. Vitro employs approximately 17,000 workers, the majority of whom work in Mexico. Between February 2003 and February 2007, Vitro borrowed a total of approximately $1.216 billion, predominately from United States investors. Vitro's indebtedness is evidenced by three series of unsecured notes. The first series was issued on October 22, 2003 and consisted of $225 million aggregate

In re Vitro S.A.B. de CV, 701 F.3d 1031 (2012)

57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 339 of 379

principal amount of 11.75% notes due 2013; the second and third series were issued on February 1, 2007, and consisted of $300 million of 8.625% notes due 2012 and $700 million of 9.125% notes due 2017 (collectively the "Old Notes").

Payment in full of the Old Notes was guaranteed by substantially all of Vitro's subsidiaries (the "Guarantors"). The guaranties provide that the obligations of the Guarantors will not be released, discharged, or otherwise affected by any settlement or release as a result of any insolvency, reorganization, or bankruptcy proceeding affecting Vitro. The guaranties further provide that they are to be governed and construed under New York law and include the Guarantors' consent to litigate any disputes in New York state courts. The guaranties state that "any rights and privileges that [Guarantors] might otherwise have under the laws of Mexico shall not be applicable to th[e] Guarant[ies]."

In the latter half of 2008, Vitro's fortunes took a turn for the worse when the global financial crisis significantly reduced demand for its products. Vitro's operating income declined by 36.8% from 2007 to 2008, and an additional 22.3% from 2008 to 2009. In February of 2009, Vitro announced its intention to restructure its debt and stopped making scheduled interest payments on the Old Notes.

**B. Vitro Restructures Its Obligations**

After Vitro stopped making payments on the Old Notes, it entered into a series of transactions restructuring its debt obligations. On December 15, 2009, Vitro entered into a sale leaseback transaction with Fintech Investments Ltd. ("Fintech"), one of its largest third-party creditors, holding approximately $600 million in claims (including $400 million in Old Notes). Under the terms of this agreement, Fintech paid $75 million in exchange for the creation, in its favor, of a Mexican trust composed of real estate contributed by Vitro's subsidiaries. This real estate was then leased to one of Vitro's subsidiaries to continue normal operations. The agreement also gave Fintech the right to acquire 24% of Vitro's outstanding capital or shares of a sub-holding company owned by Vitro in exchange for transferring Fintech's interest in the trust back to Vitro or its subsidiaries.

Partly as a result of these transactions, Vitro generated a large quantity of intercompany debt. Previously, certain of Vitro's operating subsidiaries directly and indirectly owed Vitro an aggregate of approximately $1.2 billion in intercompany debt. As a result of a series of financial transactions in December of 2009, that debt was wiped out and, in a reversal of roles,

Vitro's subsidiaries became creditors to which Vitro owed an aggregate of approximately $1.5 billion in intercompany debt. Despite requests by holders of Old Notes, Vitro did not disclose these transactions. In August of 2010, Fintech purchased claims by five banks holding claims against Vitro and its subsidiaries and extended the maturity of various promissory notes issued by Vitro's subsidiaries. Pursuant **\*1038** to a "Lock-up Agreement" completed between Fintech and Vitro, Fintech also agreed not to transfer any debt it held in Vitro unless such transfer was in line with the terms of that agreement.

Only in October of 2010, approximately 300 days after completing the transactions with its subsidiaries, did Vitro disclose the existence of the subsidiary creditors. This took the transactions outside Mexico's 270–day "suspicion period," during which such transactions would be subject to additional scrutiny before a business enters bankruptcy.

**C. Vitro Commences a *Concurso* Proceeding in Mexican Court**

Between August 2009 and July 2010, Vitro engaged in negotiations with its creditors and submitted three proposals for reorganization. Each was rejected by creditors. After the last proposal, the Ad Hoc Group of Vitro Noteholders (the "Noteholders"), a group of creditors holding approximately 60% of the Old Notes, issued a press release "strongly recommend[ing]" that all holders of the Old Notes deny consent to any reorganization plan that the Noteholders had not approved. On November 1, 2010, Vitro disclosed its intention to commence a voluntary reorganization proceeding in Mexico, together with a pre-packaged plan of reorganization. On December 13, 2010, Vitro initiated in a Mexican court a *concurso* proceeding under the Mexican Business Reorganization Act, or *Ley de Concursos Mercantiles* ("LCM"). [1]

The Mexican court initially rejected Vitro's filing on January 7, 2011, because Vitro could not reach the 40% creditor approval threshold necessary to file a *concurso* petition without relying on intercompany claims held by its subsidiaries. On April 8, 2011, that decision was overruled on appeal and Vitro was then declared to be in bankruptcy, or *concurso mercantil.* Pursuant to Mexican law, Javier Luis Navarro Velasco was appointed as *conciliador.* [2]

The *conciliador* was tasked with filing an initial list of recognized claims and mediating the creation of a

57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386

reorganization plan. The *conciliador* did so, and on August 5, 2011, filed a proposed final list of recognized creditors, which included those subsidiaries holding intercompany debt. The *conciliador* then negotiated terms of a reorganization plan between Vitro and the recognized creditors to submit to the Mexican court for approval. Throughout this process, the parties were apparently in frequent contact with the Mexican court on an ex parte basis.

**1. Terms of the *Concurso* Plan**

On December 5, 2011 the *conciliador* submitted to the Mexican court a proposed restructuring plan (the "*Concurso* plan" or "Plan") substantially identical to the one Vitro had originally proposed. Under the **\*1039** terms of the Plan, the Old Notes would be extinguished and the obligations owed by the Guarantors would be discharged. Specifically, the Plan provides that:

> [O]nce this Agreement is approved by the Court ... this Agreement ... will substitute, pay, replace and terminate the above obligations, instruments, securities, agreements and warranties in which were agreed upon Approved Credits and, therefore ... will terminate personal guarantees granted a third and/or direct and indirect subsidiaries [sic] of Vitro with regards to the obligations, instruments, securities and agreements that gave rise to the Approved Credits.

The Plan further provides that Vitro would issue new notes payable in 2019 (the "New 2019 Notes"), with a total principal amount of $814,650,000. The New 2019 Notes would be issued to Vitro's third-party creditors (not including those subsidiaries holding intercompany debt, who would forgo their *pro rata* share of the Plan's consideration and instead receive other promissory notes). The New 2019 Notes would bear a fixed annual interest rate of 8.0%, but would "not have ... payments of principal during the first 4 (years) years [sic] ... and from the fifth year of operation and until the seventh year ... will have repayments or payments of [a] total principal amount of $23,960,000.00 USD ... payable semiannually on June 30 and December 31 of each year and the remaining balance upon due date." The New 2019 Notes would also "be unconditionally and supportively guaranteed for each of the Guarantors." Payment under the New 2019 Notes would go into a third-party payment trust, which

would deliver payment to those creditors who had consented to the Plan. A second trust would be created to pay non-consenting creditors upon their written agreement to the terms of the Plan. In addition to the New 2019 Notes, Vitro would also provide to the holders of the Old Notes $95,840,000 aggregate principal amount of new mandatory convertible debt obligations ("MCDs") due in 2015 with an interest rate of 12%, convertible into 20% equity in Vitro if not paid at full maturity. Finally, the Plan also provided cash consideration of approximately $50 per $1000 of principal of Old Notes.

**2. The *Concurso* Plan is Approved**

Under Mexican law, approval of a reorganization plan requires votes by creditors holding at least 50% in aggregate principal amount of unsecured debt. As distinguished from United States law, Mexico does not divide unsecured creditors into interest-aligned classes, but instead counts the votes of all unsecured creditors, including insiders, as a single class. As a result, although creditors holding 74.67% in aggregate principal amount of recognized claims voted in favor of the plan, over 50% of all voting claims were held by Vitro's subsidiaries in the form of intercompany debt. The 50% approval threshold could not have been met without the subsidiaries' votes. After the initial approval, the LCM provides a period during which objecting creditors can veto the plan. A veto requires agreement by recognized creditors holding a minimum of 50% in aggregate principal amount of debt or by recognized creditors numbering at least 50% of all unsecured creditors. As only 26 of the 886 recognized creditors sought to veto the *Concurso* plan, and as those creditors held less than 50% of the aggregate recognized debt, the veto failed. [3]

The Mexican court approved the *Concurso* plan on February 3, 2012. On February 23, 2012, the Plan went into effect, **\*1040** and Vitro issued New 2019 Notes and MCDs and paid restructuring cash into two third-party payment trusts, one for consenting creditors and the other for non-consenting creditors. The *Concurso* plan approval order has been appealed, and such appeal has been accepted by, and is currently pending in, the Mexican judicial appellate system; no stay of effectiveness of the *Concurso* plan was entered. [4]

**D. Objecting Creditors Resist Enforcement**

While objecting to the *concurso* proceeding in Mexico, creditors dissatisfied with Vitro's reorganization efforts attempted to collect on the Old Notes and guaranties in

Case 09-10138-MFW   Doc 13460-6   Filed 05/02/14   Page 341 of 379

57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386

a variety of ways. By April 2010, Vitro had received acceleration notices for all the Old Notes. On November 17, 2010, involuntary Chapter 11 petitions were filed against fifteen Guarantors domiciled in the United States. [5] Various holders of Old Notes also commenced two substantially identical lawsuits in New York state court against Vitro and 49 Guarantors, resulting in orders of attachment with respect to any property located in New York.

Parallel to the *concurso* proceeding, in August 2011, Wilmington Trust, National Association ("Wilmington"), the indenture trustee for the Old Notes due in 2012 and 2017, filed suit in New York state court against various of the Guarantors, seeking a declaratory judgment confirming the Guarantors' obligations under the related indentures. The state court granted partial summary judgment in Wilmington's favor on December 5, 2011. The court held that New York law applied to the dispute and that under the unambiguous terms of the relevant Old Notes, "any non-consensual release, discharge or modification of the obligations of the Guarantors ... is prohibited." *Wilmington Trust v. Vitro Automotriz, S.A. De C.V.*, 33 Misc.3d 1231, 943 N.Y.S.2d 795 (table), 2011 WL 6141025, at *6 (N.Y.Sup.Ct. Dec. 5, 2011). The court went on to find, however, that "whether such prohibitive provisions may be modified or eliminated by applicable Mexican laws is not at issue here." *Id.* at *5. [6] A separate suit brought by U.S. Bank National Association ("U.S. Bank"), the indenture trustee for the Old Notes due in 2013, achieved the same outcome.

### E. Vitro Commences a Chapter 15 Proceeding in the United States

On October 29, 2010, Vitro's Board of Directors appointed Alejandro Sanchez–Mujica to act as Vitro's foreign representative. **\*1041** On April 14, 2011, Sanchez–Mujica commenced a Chapter 15 proceeding in United States bankruptcy court by filing a petition for recognition of the Mexican *concurso* proceeding. [7] The petition was originally filed in the United States Bankruptcy Court for the Southern District of New York, but, on May 13, 2011, by motion of objecting creditors, venue was transferred to the United States Bankruptcy Court for the Northern District of Texas. Because Sanchez–Mujica could not leave Mexico—a result of certain travel restrictions imposed by the Mexican court because of his role in Vitro's restructuring—Vitro filed a supplemental petition to recognize Javier Arechavaleta–Santos, another appointee of Vitro's Board of Directors, as "co-foreign representative." [8] The bankruptcy court, over

objections, held that the Mexican reorganization proceeding was a "foreign main proceeding" and approved the petition confirming Sanchez–Mujica and Arechavaleta–Santos as foreign representatives pursuant to 11 U.S.C. § 1515 and § 1517. [9] The United States District Court for the Northern District of Texas affirmed the bankruptcy court's order. *In re Vitro, S.A.B. de C.V.*, 470 B.R. 408 (N.D.Tex.2012) (*Vitro I*). That decision has been appealed, Case No. 12–10542, and is one of the cases consolidated in this appeal.

On March 2, 2012, Vitro's foreign representatives filed a motion in bankruptcy court entitled "Motion of Foreign Representatives of Vitro S.A.B. de C.V. for an Order Pursuant to 11 U.S.C. §§ 105(a), 1507 and 1521 to (I) Enforce the Mexican Plan of Reorganization of Vitro S.A.B. de C.V., (II) Grant a Permanent Injunction, and (III) Grant Related Relief" (the "Enforcement Motion"). The Noteholders, Wilmington, and U.S. Bank (collectively, the "Objecting Creditors") objected, and the matter proceeded to trial on June 4, 2012. Following a four-day trial, in which hundreds of exhibits were presented and several witnesses testified, the bankruptcy court denied the Enforcement Motion. *In re Vitro, S.A.B. de C.V.*, 473 B.R. 117 (Bankr.N.D.Tex.2012) (*Vitro II*). As part of that ruling, the court also denied Vitro's motion to enjoin the Objecting Creditors from initiating litigation against the Guarantors. [10] To permit Vitro time to appeal, the bankruptcy court did, however, extend a previously issued temporary restraining order. Vitro and Fintech have appealed the bankruptcy court's decision, which has been certified for direct appeal, and Case Nos. 12–10689 (Vitro's appeal) and 12–10750 (Fintech's appeal) were subsequently consolidated with the other case before us. [11] Vitro subsequently sought, and was **\*1042** granted on June 28, 2012, an order by this court staying the expiration of the bankruptcy court's temporary restraining order.

### II. STANDARD OF REVIEW

**[1]** **[2]** **[3]** **[4]** We review a district court's affirmance of a bankruptcy court's decision by applying the same standard of review that the district court applied. *In re Martinez*, 564 F.3d 719, 725–26 (5th Cir.2009). Accordingly, questions of fact are reviewed for clear error and conclusions of law are reviewed de novo. *Id.* at 726. Mixed questions of law and fact are reviewed de novo. *In re McLain*, 516 F.3d 301, 307 (5th Cir.2008). We review a bankruptcy court's decision on direct appeal under the same standards. By contrast,

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 342 of 379

*In re Vitro S.A.B. de CV, 701 F.3d 1031 (2012)*
57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386

"[w]e review a denial of declaratory or injunctive relief for abuse of discretion." *In re Schimmelpennick,* 183 F.3d 347, 353 (5th Cir.1999). A court's decision to grant comity is also reviewed for abuse of discretion. *Int'l Transactions, Ltd. v. Embotelladora Agral Regiomontana, SA de CV,* 347 F.3d 589, 593 (5th Cir.2003) (applying abuse of discretion standard to review district court's grant of comity to Mexican bankruptcy court's ex parte order); *see also In re Qimonda AG Bankr. Litig.,* 433 B.R. 547, 556 (E.D.Va.2010).

### III. CHAPTER 15

The dispute before us arises under Chapter 15 of the Bankruptcy Code and broadly involves two issues: recognition of the foreign representatives and enforcement of the *Concurso* plan. As to the first, on April 14, 2011, Sanchez–Mujica and Arechavaleta–Santos, as co-foreign representatives, filed a petition seeking recognition of the *concurso* proceeding under Chapter 15. The Noteholders objected that Sanchez–Mujica and Arechavaleta–Santos were not properly appointed as foreign representatives because they were not appointed by the Mexican court and because Vitro did not have the powers of a debtor in possession. The bankruptcy court granted recognition of the *concurso* proceeding as a foreign main proceeding under 11 U.S.C. § 1517. On appeal, the district court affirmed, holding that it was sufficient that Sanchez–Mujica and Arechavaleta–Santos were authorized as co-foreign representatives in the context of a foreign bankruptcy proceeding and that Vitro retained sufficient control over its business to be a debtor in possession. The Noteholders appeal, raising substantially the same arguments before us that they raised in the lower courts.

Because recognition of a proceeding under Chapter 15 is a precondition for the more substantive relief Vitro seeks in the Enforcement Motion, we will resolve the recognition issue first. We hold that the bankruptcy court and the district court correctly interpreted Chapter 15 as not requiring official court appointment. We further find that the term "foreign representatives" was intended to include debtors in possession, including those that may not meet Chapter 11's definition of debtors in possession, and that Vitro retained enough authority over its affairs to be a debtor in possession and could thus appoint Sanchez–Mujica and Arechavaleta–Santos as foreign representatives. Accordingly, we affirm the district court's ruling affirming the bankruptcy court's order.

We then address the Enforcement Motion. On March 2, 2012, Vitro's co-foreign representatives filed a motion seeking "to 1) give full force and effect in the United States to the *Concurso* Approval Order, 2) **\*1043** grant a permanent injunction prohibiting certain actions in the United States against Vitro SAB, as well as its non-debtor subsidiaries, and 3) grant certain related relief." *Vitro II,* 473 B.R. at 120–21 (quotation marks omitted). The bankruptcy court denied relief under 11 U.S.C. §§ 1507, 1521, and 1506 because approval of the Plan would extinguish claims held by the Objecting Creditors against the subsidiaries. *Id.* at 131. Vitro and Fintech appeal this decision solely on the issue of whether the bankruptcy court erred as a matter of law in refusing to enforce the *Concurso* plan because the Plan novated guaranty obligations of non-debtor parties. While the relief available under Chapter 15 may, in exceptional circumstances, include enforcing a foreign court's order extinguishing the obligations of non-debtor guarantors, Vitro has failed to demonstrate that comparable circumstances were present here. Because Vitro has not done so, we affirm the bankruptcy court's decision denying the Enforcement Motion.

### A. Chapter 15 of the United States Bankruptcy Code

This case concerns a foreign bankruptcy proceeding for which recognition and enforcement are sought under Chapter 15 of the United States Bankruptcy Code. Chapter 15 was enacted in 2005 to implement the Model Law on Cross–Border Insolvency ("Model Law") formulated by the United Nations Commission on International Trade Law ("UNCITRAL"), and replaced former 11 U.S.C. § 304.[12] *See In re Ran,* 607 F.3d at 1020; *In re Iida,* 377 B.R. 243, 256 (B.A.P. 9th Cir.2007).[13] It was intended "to provide effective mechanisms for dealing with cases of cross-border insolvency," 11 U.S.C. § 1501(a), as well as to be "the exclusive door to ancillary assistance to foreign proceedings," thus "concentrat[ing] control of these questions in one court." H.R.Rep. No. 109–31, pt. 1, at 110 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 178. It was also intended to increase legal certainty, promote fairness and efficiency, protect and maximize value, and facilitate the rescue of financially troubled businesses. 11 U.S.C. § 1501(a).

[5]  [6]  [7]  Central to Chapter 15 is comity. Comity is the "recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons **\*1044** who are under the protections of its

In re Vitro S.A.B. de CV, 701 F.3d 1031 (2012)

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 343 of 379

57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386

laws." *Hilton v. Guyot,* 159 U.S. 113, 164, 16 S.Ct. 139, 40 L.Ed. 95 (1895). "It is not a rule of law, but one of practice, convenience, and expediency." *Overseas Inns S.A. P.A. v. United States,* 911 F.2d 1146, 1148 (5th Cir.1990) (quotation marks and citation omitted). Within the context of Chapter 15, however, it is raised to a principal objective. Section 1501(a) begins by listing, as one of Chapter 15's goals, the furtherance of cooperation between domestic and foreign courts in cross-border insolvency cases. Section 1508 goes on to provide that Chapter 15's provisions shall be interpreted by considering "its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions." 11 U.S.C. § 1508. Comity considerations are explicitly included in the introduction to § 1507, and § 1509(b)(3) further provides that our courts "shall grant comity or cooperation to the foreign representative" of a foreign proceeding.

Such a foreign representative must first petition a United States bankruptcy court for recognition of a foreign proceeding. 11 U.S.C. §§ 1504, 1515. Chapter 15 defines such a foreign proceeding as:

> [A] collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23).

Only after a United States court recognizes a proceeding can "the foreign representative ... apply directly to a court in the United States for appropriate relief in that court." 11 U.S.C. § 1509(b)(2); *see also United States v. J.A. Jones Constr. Grp., LLC,* 333 B.R. 637, 638 (E.D.N.Y.2005).

**[8]** Chapter 15 provides for a broad range of relief. This includes the ability to sue and be sued in United States courts, to apply directly to a United States court for relief, to commence a non-Chapter 15 case, and to intervene in any United States case to which the debtor is a party. *In re Condor Ins. Ltd.,* 601 F.3d 319, 324 (5th Cir.2010). Section 1520 also provides for certain automatic relief upon recognition

of a foreign main proceeding, like the one here, including an automatic stay and the power to prevent transfers of the debtor's property. A bankruptcy court is also empowered under § 1521(a) to "grant any appropriate relief" necessary to "effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors." Finally, § 1507(a) gives a court authority to provide "additional assistance," subject to certain restrictions imposed by Chapter 15 and § 1507(b).

**[9]** **[10]** In considering whether to grant relief, it is not necessary that the result achieved in the foreign bankruptcy proceeding be identical to that which would be had in the United States. It is sufficient if the result is "comparable." *In re Schimmelpenninck,* 183 F.3d at 364; *Overseas Inns,* 911 F.2d at 1149; *see also In re Sivec SRL,* 476 B.R. 310, 324 (Bankr.E.D.Okla.2012) ("The fact that priority rules and treatment of claims may not be identical is insufficient to deny a request for comity."); *In re Qimonda AG,* 462 B.R. 165, 184 n. 17 (Bankr.E.D.Va.2011); *In re Petition of Garcia Avila,* 296 B.R. 95, 112 (Bankr.S.D.N.Y.2003). "[T]he foreign laws need not be identical to their counterparts under the laws of the United States; they merely must not be repugnant to our laws and policies." *In re Schimmelpenninck,* 183 F.3d at 365.

*1045 **[11]** But as discussed, whether any relief under Chapter 15 will be granted is a separate question from whether a foreign proceeding will be recognized by a United States bankruptcy court. The consolidated cases before us arise from decisions addressing each of these issues. We first turn to whether Vitro's co-foreign representatives were properly recognized.

**B. Recognition of Foreign Representatives**

**[12]** **[13]** After initiation of a foreign bankruptcy proceeding, a "foreign representative" may petition a United States court to recognize the proceeding under Chapter 15. Chapter 15 defines a "foreign representative" as "a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24). "A federal court's recognition of representatives appointed in the course of a foreign bankruptcy or liquidation proceeding is a matter of comity—it is an acknowledgment of the validity of the foreign proceeding." *Reserve Int'l Liquidity Fund, Ltd. v. Caxton Int'l Ltd.,* No. 09 Civ. 9021(PGG), 2010 WL 1779282, at *5 (S.D.N.Y. Apr. 29, 2010) (citing *Finanz AG Zurich v.*

In re Vitro S.A.B. de CV, 701 F.3d 1031 (2012)

57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386

*Banco Economico S.A.,* 192 F.3d 240, 246 (2d Cir.1999)). A duly recognized foreign representative has the capacity to sue and be sued in the United States and to apply directly to a United States court for relief, and a foreign representative is entitled to the comity and cooperation of all United States courts. 11 U.S.C. § 1509.

Three requirements, contained in § 1517, must be met before a foreign proceeding will be recognized:

> (a) Subject to section 1506, after notice and a hearing, an order recognizing a foreign proceeding shall be entered if—
>
>> (1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502;
>>
>> (2) the foreign representative applying for recognition is a person or body; and
>>
>> (3) the petition meets the requirements of section 1515.

11 U.S.C. § 1517.

Section 1515, in turn, provides the following procedural requirements:

> (a) A foreign representative applies to the court for recognition of a foreign proceeding in which the foreign representative has been appointed by filing a petition for recognition.
>
> (b) A petition for recognition shall be accompanied by—
>
>> (1) a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;
>>
>> (2) a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or
>>
>> (3) in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.
>
> (c) A petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.
>
> (d) The documents referred to in paragraphs (1) and (2) of subsection (b) shall be translated into English. The **\*1046** court may require a translation into English of additional documents.

11 U.S.C. § 1515.

**[14]**    These requirements are to be strictly construed in line with our holding that the requisite analysis is not a "rubber stamp exercise," and that "[e]ven in the absence of an objection, courts must undertake their own jurisdictional analysis and grant or deny recognition under Chapter 15 as the facts of each case warrant." *In re Ran,* 607 F.3d at 1021.

Neither Sanchez–Mujica nor Arechavaleta–Santos, the recognized foreign representatives in this case, was appointed by a foreign court or tribunal. Both were voted into their positions by Vitro's Board of Directors. The bankruptcy court recognized the *concurso* proceeding under Chapter 15 and the district court affirmed, holding that whether a given individual could act as a foreign representative was a matter of United States law, and that it was unnecessary for a foreign representative to be appointed by a court. The court's holding rested on its analysis of § 101(24)'s language and cases applying that subsection, which showed that it was sufficient for a foreign representative to be authorized in the context of a foreign bankruptcy proceeding. *Vitro I,* 470 B.R. at 411–13. The district court further determined that Vitro was the Mexican equivalent of a "debtor in possession," able to administer its own reorganization, and was thus able to appoint a foreign representative under Chapter 15. *Id.* at 412. [14]

On appeal, the Noteholders argue that the individuals appointed here do not satisfy Chapter 15's definition of "foreign representatives" for two reasons. First, neither was "authorized in a foreign proceeding," because neither was appointed by a foreign court or administrative tribunal. 11 U.S.C. § 101(24). In support, the Noteholders rely on § 101(23)'s definition of "foreign proceeding," as well as 11 U.S.C. §§ 1515(a), 1515(b)(1)-(2), and 1509(b)(2). Second, the Noteholders argue that even if Chapter 15 did not require such an appointment, the foreign representatives still did not qualify for their positions because they did not have the authority "to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24).

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 345 of 379

In re Vitro S.A.B. de CV, 701 F.3d 1031 (2012)
57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386

Vitro responds that the plain language of § 101(24) does not require court appointment and that this conclusion is support by both Chapter 15's legislative history and UNCITRAL's Model Law. Vitro further argues that § 101(24) was intended to apply to a "debtor in possession," like Vitro, and thus it had the power to appoint individuals as foreign representatives of the *concurso* proceeding.

Because the district court correctly interpreted § 101(24), defining foreign representatives **\*1047** as having been appointed in the context of a foreign proceeding, and because Vitro, as a debtor in possession, met the requirements of that subsection, we affirm the district court's decision. We address each of these points in turn.

**1. Authorized in a Foreign Proceeding**

[15]    The Noteholders point to numerous parts of Chapter 15 that allegedly show that a foreign court must explicitly authorize individuals or bodies to act as representatives. Contrary to the Noteholders' interpretation, we do not find that any of Chapter 15's provisions requires action by a foreign tribunal.

[16]    We interpret statutes according to their plain meaning. *Gaddis v. United States,* 381 F.3d 444, 472 (5th Cir.2004). Section 101(24)—defining the term "foreign representative"—is wholly devoid of any statement that a foreign representative must be judicially appointed. The definition's requirement that a representative be "authorized in a foreign proceeding" is certainly compatible with appointment by a foreign court, but it is hardly necessary. As the district court observed, it would be equally compatible with a requirement that an individual be appointed "in the context of" a foreign proceeding. *Vitro I,* 470 B.R. at 411. It could also mean during, or in the course of, a foreign proceeding.

The other provisions the Noteholders identify suffer from the same defect. Section 1515(a) provides that "[a] foreign representative applies to the court for recognition of a foreign proceeding in which the foreign representative has been appointed" and requires that a petition for recognition be accompanied by either, 1) "a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative," 2) "a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative," or 3) other evidence "of such foreign proceeding and of the

appointment of the foreign representative." 11 U.S.C. § 1515. None of these provisions states who has the official authority to appoint a foreign representative. At best, they provide the context in which a foreign representative should be appointed. By comparison, § 1509(b)(2) states that if a court grants recognition to a foreign proceeding, it shall grant "comity or cooperation" to the foreign representative. Although use of the word "comity" connotes recognition of another judicial proceeding, the word "cooperation" suggests a much broader meaning.

Caselaw supports our interpretation. To be sure, foreign representatives have been appointed by foreign tribunals in many cases. One such case was *In re Grand Prix Associates, Inc.,* where the court specifically held that § 1517(a) was satisfied where the purported foreign representative was able to present an order by the foreign court appointing it as the foreign representative of the business entities in question. No. 09–16545(DHS), 2009 WL 1410519, at \*5 (Bankr.D.N.J. May 18, 2009); *see also In re Innua Canada Ltd.,* No. 09–16362(DHS), 2009 WL 1025090, at \*4–5 (Bankr.D.N.J. Apr. 15, 2009) (receivership order entered by Canadian court stated foreign representative had capacity to commence Chapter 15 proceeding); *In re Oversight,* 385 B.R. at 534 (Spanish insolvency court had power to appoint foreign representative for Chapter 15 purposes); *In re Basis Yield Alpha Fund (Master),* 381 B.R. 37, 46 n. 30 (Bankr.S.D.N.Y.2008); *In re Tri–Cont'l Exch. Ltd.,* 349 B.R. 627, 632 (Bankr.E.D.Cal.2006). But the district court identified numerous cases cited by the bankruptcy **\*1048** court that, although not binding, demonstrate that recognition is routinely granted to petitioners appointed by Mexican debtors to serve as foreign representatives. *Vitro I,* 470 B.R. at 412 (listing cases). [15]

The Mexican court's actions make it equally apparent that Sanchez–Mujica and Arechavaleta–Santos were properly appointed. It is undisputed that the Mexican court had the power to enjoin Sanchez–Mujica and Arechavaleta–Santos from acting as foreign representatives. Yet, when presented with a motion requesting such an order, the Mexican court denied it in full. The Mexican court also refused to declare the *conciliador* to be the only person authorized to act as foreign representative. In deciding not to enjoin the foreign representatives' conduct, the Mexican court gave the representatives its tacit approval. [16]

Finally, our decision is informed by consideration of the Model Law, and reports by the UNCITRAL Working Group

In re Vitro S.A.B. de CV, 701 F.3d 1031 (2012)

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 346 of 379

57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386

on Insolvency Law ("Working Group"). 11 U.S.C. § 1501(a) (purpose of Chapter 15 is to incorporate the Model Law); *see also In re Tri–Cont'l Exch. Ltd.,* 349 B.R. at 633 (treating as persuasive authority the Guide to Enactment of the UNCITRAL Model Law on Cross–Border Insolvency); *In re Condor,* 601 F.3d at 326–27 & nn. 37–40 (discussing and citing Working Group).

The definition of foreign representatives in § 101(24) closely follows the language of Model Law Article 2(d). [17] In drafting this definition, the Working Group expressly rejected the requirement that a foreign representative be "[specifically] authorized by statute or other order of court (administrative body) to act in connection with a foreign proceeding." UNCITRAL Rep. of the Working Group on Insolvency Law on the Work of the Eighteenth Session, ¶ 111, U.N. Doc. A/CN.9/419 (Dec. 1, 1995), *available at* http://www.uncitral.org/uncitral/en/commission/working_groups/5Insolvency.html (Dec. 1995 Rep.) (alteration in original). That definition was rejected because of concerns that "the expressions would be unfamiliar and might have the unintended effect of being unduly restrictive, since the list would inevitably be incomplete." *Id.* ¶ 112. The Working Group also declined to include the word "specifically" because "it would be unusual for a State to appoint an insolvency representative specifically to act abroad." *Id.* ¶ 113. This supports our conclusion that the Noteholders' proposed interpretation **\*1049** —which would require exactly such an appointment—is wrong. [18]

Accordingly, we conclude that Sanchez–Mujica and Arechavaleta–Santos are not disqualified from serving as foreign representatives merely because they were not the subject of an official court appointment.

## 2. Power to Administer the Reorganization or Liquidation of a Debtor's Assets or Affairs

[17]    Having determined that Chapter 15 does not require a foreign representative to be appointed by court order, we still must address whether Sanchez–Mujica's and Arechavaleta–Santos' appointments comport with the remainder of § 101(24). In particular, § 101(24) requires that a foreign representative have the authority "to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24). Vitro does not argue that Sanchez–Mujica and Arechavaleta–Santos have the authority to represent the *concurso* proceeding, and we therefore do

not address that prong of § 101(24). [19] The only remaining question is whether they had administrative power over the reorganization of Vitro's business.

The district court held that Vitro could appoint its own foreign representatives because, under Mexican law, a debtor continues to manage its business during a *concurso* proceeding, making it akin to a "debtor in possession." *Vitro I,* 470 B.R. at 412. [20] The Working Group clearly intended to include foreign representatives of proceedings in which a debtor in possession remains in control of its assets. Dec. 1995 Rep. ¶ 115. The National Bankruptcy Review Commission, created by Congress in 1994 to make recommendations on improving bankruptcy law and procedure, in its review of the Model Law, reached the same conclusion. Nat'l Bankr.Rev. Comm'n, *Bankruptcy: The Next Twenty Years, Nat'l Bankr. Rev. Comm'n Final Rep.,* (1997), *available at* http://govinfo.library.unt.edu/nbrc/reportcont.html (Nat'l Bankr. Comm'n).

The Noteholders, however, challenge whether Vitro can be classified as a debtor in possession, and argue that such power is reserved for the *conciliador* in a *concurso* proceeding. The Noteholders also point out that under Chapter 11, a debtor in possession has the rights, powers, and duties of a Chapter 11 trustee, which include the right to negotiate, file, and seek confirmation of a plan of reorganization, and that Vitro lacked this authority. [21]

**\*1050**    The Noteholders' argument fails for relying exclusively on Chapter 11's definition of a debtor in possession. The Working Group's decision to include debtors in possession was not made on the basis of how United States law defined the term. Rather, the Working Group understood debtors in possession to include those cases "in which the debtor remained in control of its assets and could technically be regarded as exercising administration type of functions, although under the supervision of a judicial or administrative authority." Dec. 1995 Rep. ¶ 115. The UNCITRAL Practice Guide on Cross–Border Insolvency Cooperation similarly defines debtor in possession to mean "a debtor in reorganization proceedings, which retains full control over the business, with the consequence that the court does not appoint an insolvency representative." UNCITRAL, Practice Guide on Cross–Border Insolvency Cooperation 5 (July 1, 2009), *available at* http://www.uncitral. org/pdf/english/texts/insolven/Practice_Guide_Ebook_eng.pdf. At least one court has understood foreign representatives to include debtors in possession, including those in "debtor-in-

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 347 of 379

57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386

possession reorganization proceedings in Latin American countries." *In re Cenargo Int'l, PLC,* 294 B.R. 571, 598 n. 31 (Bankr.S.D.N.Y.2003) (internal quotation marks and citation omitted). We likewise hold that under Chapter 15 the correct analogy is not to whether a debtor meets Chapter 11's definition of a "debtor in possession," but whether it meets that definition originally envisioned by the drafters of the Model Law and incorporated into § 101(24). *See* 11 U.S.C. § 1508 (Chapter 15 to be interpreted by consideration of its international origin, and consistent with application of similar foreign statutes); Nat'l Bankr. Comm'n, *supra,* at 357 (definitions in Model Law are "carefully constructed to include the United States Chapter 11 proceeding (and similar debtor in possession reorganization proceedings in Latin America and elsewhere)").

Here, there is little doubt that Vitro met that definition. Vitro has presented extensive evidence that it retained broad control over its affairs, pursuant to various provisions of the LCM. *See* Ley de Concursos Mercantiles [LCM] [Bankruptcy Law], Diario Oficial de la Federación [DO], *as amended,* 12 de mayo de 2000, art. 74 (debtor will be entrusted with enterprise's management throughout conciliation stage unless court grants *conciliador's* request to remove debtor to protect the estate); *id.* art. 84 (debtor retains ability to litigate pending claims under *conciliador's* supervision). Commentary on the LCM agrees that a board of directors generally remains in control and possession of its business during a *concurso* proceeding. *See* Jonathan Graham–Canedo, *Comparative Analysis of Bankruptcy Legal Provisions from Mexico and the United States: Which Legal System is More Attractive?,* 6 DePaul Bus. & Com. L.J. 19, 27 (Fall 2007).

We further observe that if Vitro were not permitted to proceed as a debtor in possession, with the power to appoint foreign representatives, it is unclear who would. Any other potential candidate would be susceptible to the same attacks raised by the Noteholders. For example, in a *concurso* proceeding the *conciliador* **\*1051** acts as mediator between the debtor and creditors. A *visitador* only inspects the debtor's accounting books and records and determines whether the debtor meets the LCM's liquidity standard. The *sindico* is a receiver charged with liquidating the business and selling its assets if a plan is not reached within a specific period of time. None of these individuals possesses the full authority the Noteholders argue is required under § 101(24).

Accordingly, we conclude that Vitro had the powers of a debtor in possession for purposes of § 101(24) and affirm the

district court's decision affirming the bankruptcy court's order that Sanchez–Mujica and Arechavaleta–Santos are properly appointed foreign representatives under Chapter 15.

## C. Enforcement of the Plan

### 1. Vitro's Request for Relief

In the Enforcement Motion, Vitro sought broad relief pursuant to 11 U.S.C. §§ 105(a), 1507, and 1521. Specifically, Vitro sought an order giving full force and effect in the United States to the Mexican court's order approving the *Concurso* plan. Vitro further sought a permanent injunction prohibiting certain actions in the United States against itself and its non-debtor subsidiaries, specifically:

> [A] permanent injunction enjoining all persons from initiating or continuing any suit, action, extra-judicial proceeding or other proceeding (including [already commenced actions in New York state court]) or any enforcement or collection process (including pursuant to any judgment, notices of attachment or [levies, restraining notices, or similar documentation]) in any jurisdiction within the United States or its territories ... against Vitro SAB and/or the Old Guarantors ... or their Property ... except as permitted under the *Concurso* Plan or the *Concurso* Approval Order ....

If Vitro were to succeed in obtaining all the relief that it requested, actions, executions, attachments, or other collection or enforcement processes currently pending against Vitro or its subsidiaries would be "permanently stayed, suspended, discharged, and dismissed." Judgments already rendered against it or its subsidiaries would be declared "null and void and of no further force or effect." Moreover, any entity having withheld payment to Vitro or its subsidiaries as a result of Vitro's default would immediately remit such payments to the applicable party. Finally, Vitro and its subsidiaries would be released from all liabilities with respect to any claims discharged under the *Concurso* plan. Of course, the bankruptcy court could grant some, but not all, of the relief requested.

57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386

The bankruptcy court held that the *Concurso* plan "which extinguishes the guarantee claims of the Objecting Creditors that were given under an indenture issued in the United States against non-debtor entities that are subsidiaries of Vitro, should not be accorded comity to the extent it provides for the extinguishment of the non-debtor guarantees of the indentures." *Vitro II,* 473 B.R. at 132. The bankruptcy court specifically denied enforcement under §§ 1507, 1521, and 1506. It denied relief under § 1507 because the Mexican court's approval order did "not provide for the distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by Title 11 [of the Bankruptcy Code]." *Id.* "The *Concurso* plan provides drastically different treatment in that the noteholders receive a fraction of the amounts owed under the indentures from Vitro SAB and their rights against the other obligors are cut off." *Id.* Relief under § 1521 was inappropriate **\*1052** because the Mexican court's approval order "neither sufficiently protects the interests of creditors in the United States, nor does it provide an appropriate balance between the interests of creditors and Vitro SAB and its non-debtor subsidiaries." *Id.* Finally, the relief sought would not be allowed under Chapter 15 because "the protection of third party claims in a bankruptcy case is a fundamental policy of the United States" and "the *Concurso* plan does not recognize and protect such rights." *Id.*

The circumstances under which the Plan was approved and the treatment creditors received raise many questions that are not before us about whether such a plan could be enforced under Chapter 15. The bankruptcy court explicitly dealt with some of these questions, while flagging others for our consideration without itself reaching them. Thus, for example, the bankruptcy court considered whether, as alleged by the Objecting Creditors, the Mexican judicial system and the *concurso* proceeding were corrupt, and should not be granted comity for this reason. Addressing the Objecting Creditors' expert—Dr. Stephen D. Morris—who testified to a series of "suspicious circumstances" and "red flags" in the *concurso* proceeding, the bankruptcy court held that, although the witness was knowledgeable and qualified to speak on corruption in Mexico generally, his analysis of what impact such corruption had on this proceeding was unpersuasive. The bankruptcy court therefore concluded that it "ha[d] not seen evidence that the Mexican Proceeding [was] the product of corruption, or that the LCM itself is a corrupt process," and rejected the Objecting Creditors' argument. *Id.* at 130. The bankruptcy court reached a similar conclusion as to whether, as argued by the Objecting Creditors, enforcement would have an adverse impact on credit markets. The court

ultimately concluded that, while testimony by Dr. Elaine Buckberg, a former economist at the International Monetary Fund, was credible, her testimony did not quantify the negative effects of enforcing the Plan, and thus the court could not conclude that enforcement would adversely affect credit markets. *Id.* The bankruptcy court also considered, but rejected, the argument that relief should not be granted because the Mexican proceeding was "unfair." *Id.* at 130–31. The bankruptcy court observed that although there had been ex parte meetings, such meetings were had by both sides and were, in fact, common in Mexico. *Id.* at 131. Responding to the Objecting Creditors' allegations that they were not permitted to raise certain arguments in the Mexican court and that the *conciliador* was biased, the bankruptcy court held that such arguments were better left for the Mexican court system.[22] *Id.*

The bankruptcy court did not reach two other arguments it described as "[p]ossibl[y] [m]eritorious [o]bjections." *Id.* at 132. These were that insiders were allowed to vote in favor of the Plan, and that the *Concurso* plan violates the absolute priority rule. Other arguments the bankruptcy court did not explicitly address, but which might be subsumed under its other holdings, are that the *Concurso* plan imposed a kind of "death trap" provision that precluded non-consenting creditors from recovering anything. Another such argument is that Mexico's single-class voting made no distinctions between creditors with adverse interests. Finally, a third **\*1053** such argument challenges the propriety of Vitro's orchestrating a balance transfer of several billion dollars between itself and its subsidiaries, turning those subsidiaries into creditors, prior to entering into the *concurso* proceeding and failing promptly to disclose the existence of these newly minted insider creditors.

We need not concern ourselves with the vast majority of these issues, as Vitro and Fintech have framed their appeal in terms of only one:

> Whether the Bankruptcy Court erred as a matter of law when, after it concluded that the *Concurso* Approval Order was the product of a process that was not corrupt or unfair to the Appellees, it refused to enforce the *Concurso* Approval Order solely because the *Concurso* plan novated guarantee obligations of non-debtor parties and replaced them with new

In re Vitro S.A.B. de CV, 701 F.3d 1031 (2012)

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 349 of 379

57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386

obligations of substantially the same
parties?

The issue Vitro and Fintech identify underpins the bankruptcy
court's entire opinion. As that court summarized, "the
*Concurso* plan approved in this instance ... extinguishes the
guarantee claims of the Objecting Creditors that were given
under an indenture issued in the United States against non-
debtor entities that are subsidiaries of Vitro .... Such order
manifestly contravenes the public policy of the United States
and is also precluded from enforcement under §§ 1507,
1521 and 1522 of the Bankruptcy Code," and would not be
accorded comity. *Id.* at 133.

## 2. Chapter 15's Framework for Granting Relief

 **[18]**   **[19]**   As already discussed, "[a] central tenet of
Chapter 15 is the importance of comity in cross-border
insolvency proceedings." *In re Cozumel Caribe, S.A. de C.V.,*
482 B.R. 96 (Bankr.S.D.N.Y.2012). "The extent to which the
law of one nation, as put in force within its territory, whether
by executive order, by legislative act, or by judicial decree,
shall be allowed to operate within the dominion of another
nation, depends upon what our greatest jurists have been
content to call the comity of nations." *Hilton,* 159 U.S. at 164,
16 S.Ct. 139. In applying the principles of comity, we "take[ ]
into account the interests of the United States, the interests of
the foreign state or states involved, and the mutual interests of
the family of nations in just and efficiently functioning rules
of international law." *In re Artimm, S.r.L.,* 335 B.R. 149, 161
(Bankr.C.D.Cal.2005). Accordingly, Chapter 15 provides
courts with broad, flexible rules to fashion relief appropriate
for effectuating its objectives in accordance with comity. *See
In re Bear Stearns High–Grade Structured Credit Strategies
Master Fund, Ltd.,* 389 B.R. 325, 333–34 (S.D.N.Y.2008);
*In re SPhinX, Ltd.,* 351 B.R. 103, 112 (Bankr.S.D.N.Y.2006)
("[C]hapter 15 maintains—and in some respects enhances
—the 'maximum flexibility,' that section 304 provided
bankruptcy courts ... in light of principles of international
comity and respect for the laws and judgments of other
nations." (citation omitted)).

 **[20]**   Given Chapter 15's heavy emphasis on comity, it is
not necessary, nor to be expected, that the relief requested by
a foreign representative be identical to, or available under,
United States law. *In re Metcalfe & Mansfield Alternative
Investments,* 421 B.R. 685, 697 (Bankr.S.D.N.Y.2010) ("The
relief granted in the foreign proceeding and the relief
available in a U.S. proceeding need not be identical."); *see*

*also Artimm,* 335 B.R. at 160 n. 11. We have previously
cautioned that the mere fact that a foreign representative
requests relief that would be available under the law of
the foreign proceeding, but not in the United States, is not
grounds for denying **\*1054** comity. *See In re Condor,* 601
F.3d at 327.

Nevertheless, Chapter 15 does impose certain requirements
and considerations that act as a brake or limitation on comity,
and preclude granting the relief requested by a foreign
representative. In this case, the bankruptcy court rested on
three of Chapter 15's sections, §§ 1521, 1507, and 1506, each
of which it found precluded the relief Vitro sought. *Vitro II,*
473 B.R. at 133. Vitro's appeal predominantly rests on finding
relief under § 1507 and, only in the alternative, under § 1521.
Vitro argues that it would be inappropriate to deny its request
for comity under § 1507, simply because the relief might not
meet the requirements of § 1521. The Objecting Creditors,
in turn, argue extensively that the relief Vitro requests, to
the extent it is available at all, must fall under § 1521(a)(1)
and (b), and that the bankruptcy court was correct to deny
enforcement because of the limitations imposed by § 1522.

Thus, while comity should be an important factor in
determining whether relief will be granted, we are compelled
by the bankruptcy court's decision and the parties' arguments
to get into the weeds of Chapter 15 to determine whether a
foreign representative may independently seek relief under
either § 1521 or § 1507, and whether a court may itself
determine under which of Chapter 15's provision such relief
would fall. Both appear to be questions of first impression.

 **[21]**   We conclude that a court confronted by this situation
should first consider the specific relief enumerated under §
1521(a) and (b). If the relief is not explicitly provided for
there, a court should then consider whether the requested
relief falls more generally under § 1521's grant of any
appropriate relief. We understand "appropriate relief" to be
relief previously available under Chapter 15's predecessor, §
304. Only if a court determines that the requested relief was
not formerly available under § 304 should a court consider
whether relief would be appropriate as "additional assistance"
under § 1507. [23]

We start by acknowledging that "[t]he relationship between
§ 1507 and § 1521 is not entirely clear." *In re Toft,* 453 B.R.
at 190; *see also In re Atlas Shipping A/S,* 404 B.R. at 741. [24]
This leaves litigants uncertain as to which provision they
should rely on for relief. Indeed, Vitro itself acknowledges

that its decision to seek relief under § 1507 and, only in the alternative, § 1521 was motivated, in part, by the fact that every other foreign representative requesting enforcement of a *concurso* plan under Chapter 15 has cited both § 1507 and § 1521.

**\*1055** Section 1521(a) empowers a court to "grant any appropriate relief" at the request of the foreign representative when necessary to "effectuate the purpose of [Chapter 15] and to protect the assets of the debtor or the interests of the creditors." 11 U.S.C. § 1521(a). In addition, § 1521 lists a series of non-exclusive forms of relief. These include:

(1) staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a);

(2) staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a);

(3) suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a);

(4) providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;

(5) entrusting the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to the foreign representative or another person, including an examiner, authorized by the court;

(6) extending relief granted under section 1519(a); and

(7) granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a).

11 U.S.C. § 1521(a).

Additionally, under § 1521(b), "the court may, at the request of the foreign representative, entrust the distribution of all or part of the debtor's assets located in the United States to the foreign representative ... provided that the court is satisfied that the interests of creditors in the United States are sufficiently protected." Section 1522 provides an important limiting factor: relief under § 1521 may be granted "only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected," and a court

may impose appropriate conditions on relief. 11 U.S.C. § 1522(a)-(b).

Unlike § 1521's "any appropriate relief" language, § 1507 gives courts the authority to provide "additional assistance." Section 1507 "was added to the Bankruptcy Code because Congress recognized that Chapter 15 may not anticipate all of the types of relief that a foreign representative may require and which would otherwise be available to such foreign representative." 8 Collier on Bankruptcy ¶ 1507.01 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2012) (Collier). [25] A court determining whether to provide additional assistance under § 1507 considers the factors listed under subsection (b), [26] which provides that:

(b) In determining whether to provide additional assistance under this title or under other laws of the United States, the court shall consider whether such additional assistance, consistent with principles of comity, will reasonably assure

**\*1056**  1) just treatment of all holders of claims against or interests in the debtor's property;

2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

3) prevention of preferential or fraudulent dispositions of property of the debtor;

4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and

5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 1507(b). [27]
We are thus faced with two statutory provisions that each provide expansive relief, but under different standards. To clarify our resolution of requests for relief under Chapter 15 we adopt the following framework for analyzing such requests.

First, because § 1521 lists specific forms of relief, a court should initially consider whether the relief requested falls under one of these explicit provisions. *In re Read,* 692 F.3d

In re Vitro S.A.B. de CV, 701 F.3d 1031 (2012)

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 351 of 379

57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386

1185, 1191 (11th Cir.2012) (specific terms prevail over the general (quoting *D. Ginsberg & Sons, Inc. v. Popkin,* 285 U.S. 204, 208, 52 S.Ct. 322, 76 L.Ed. 704 (1932))); *see also* 1 Collier, *supra,* ¶ 13.07[2]; Ranney–Marinelli, *Overview, supra,* at 317 (arguable that foreign representatives should be bound by those provisions specifically providing the relief sought). Other courts have held that, where the requested relief is explicitly provided for under § 1521, it is unnecessary to consider § 1507. *In re Atlas Shipping A/S,* 404 B.R. at 740 ("Whatever the outer bounds of discretionary relief chapter 15 allows, this case does not push the boundaries. The relief sought by the foreign representative is expressly provided for in §§ 1521(a)(5) and 1521(b). The Court need not venture into the area of 'additional assistance,' 'consistent with principles of comity' under § 1507."); *In re Int'l Banking Corp. B.S.C.,* 439 B.R. 614, 626 n. 10 (Bankr.S.D.N.Y.2010).

Second, if § 1521(a)(1)-(7) and (b) does not list the requested relief, a court should decide whether it can be considered "appropriate relief" under § 1521(a). This, in turn, requires consideration of whether such relief has previously been provided under § 304. *See In re Condor,* 601 F.3d at 329 (observing that avoidance actions under foreign law were permitted under § 304 and reading § 1521(a)(7) to permit such relief). This latter consideration aligns with Congress's intent that § 1521 was not intended to "expand or reduce the **\*1057** scope of relief" previously available under other provisions, including § 304. H.R.Rep. No. 109–31, pt. 1, at 116. A court should also consider whether the requested relief would otherwise be available in the United States. *Cf. Artimm,* 335 B.R. at 160 n. 11 (section 1507 authorizes relief beyond that provided for in Bankruptcy Code or United States law).

**[22]    [23]**    Third, only if the requested relief appears to go beyond the relief previously available under § 304 or currently provided for under United States law, *Artimm,* 335 B.R. at 160 n. 11, should a court consider § 1507. *See* H.R.Rep. No. 109–31, pt. 1, at 109 ("Subsection (2) [of § 1507] makes the authority for additional relief (*beyond that permitted under section*[ ] ... *1521,* below) subject to the conditions for relief heretofore specified in United States law under section 304 ....." (emphasis added)). This approach recognizes that relief under § 1507 "is in nature more extraordinary" than that provided under § 1521, as a result of which "the test for granting that relief is more rigorous." Leif M. Clark, *Chapter 15 Bankruptcy Strategies: Leading Bankruptcy Experts on Understanding the Filing Process and Achieving Successful Outcomes in Cross–Border Insolvency Cases—Advice for Handling Cross–*

*Border Bankruptcy Cases Effectively* (Aspatore Sept. 2012), *available at* 2012 WL 3279175, at \*10. It also acknowledges that, while § 1507's broad grant of assistance is intended to be a "catch-all," it cannot be used to circumvent restrictions present in other parts of Chapter 15, nor to provide relief otherwise available under other provisions. *In re Int'l Banking Corp. B.S.C.,* 439 B.R. at 626 n. 10;   1 Collier, *supra,* ¶ 13.07[2] n. 34 (section 1507 should not be used "to eviscerate limitations placed within chapter 15 itself").

We believe this framework provides foreign representatives with the clearest path by which to seek Chapter 15 relief. *See* Clark, *supra,* at \*10 (advising attorneys to consult § 1507 if the relief under § 1521 is insufficiently broad). This framework also conforms to Congress's intent that courts should not deny Chapter 15 relief for failure to meet the requirements of § 1507, which, in any case, "is not to be the basis for denying or limiting relief otherwise available under this chapter." H.R.Rep. No. 109–31, pt. 1, at 109; *see also* Ranney–Marinelli, *Overview, supra,* at 316 n. 267. Under this framework, courts will also "not construe the range of relief under § 1507 to be bound by the same limitations that apply in § 1521," with the exception of those limitations specifically provided for. Clark & Goldstein, *Sacred Cows, supra,* at 529.

At the same time, this approach means that, by first considering § 1521 relief—which we deem co-extensive with that previously available under § 304—courts begin their analysis in familiar territory. Ranney–Marinelli, *Overview, supra,* at 317 n. 274 (noting that, compared to other sections, § 1507's standard of proof is unclear). This prevents all-encompassing applications of § 1507 and avoids prematurely expanding the reach of Chapter 15 beyond current international insolvency law. H.R. Rep. No. 109–31, pt. 1, at 109 (purpose of § 1507 is "to permit the further development of international cooperation begun under section 304"); Clark & Goldstein, *Sacred Cows, supra,* at 529 (whether a "court [would] ever dare to employ § 1507 as a substitute for (or worse, an end-around of) § 1521" is an open question).

### 3. Availability of Relief under § 1521 and § 1507

Applying our analytic framework to Vitro's request for relief, the bankruptcy **\*1058** court did not err in denying relief. Sections 1521(a)(1)-(7) and (b) do not provide for discharging obligations held by non-debtor guarantors. Section 1521(a)'s general grant of "any appropriate relief" also does not provide the necessary relief because our precedent has interpreted the Bankruptcy Code to foreclose such a release, and because

57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386

when such relief has been granted, it has been granted under § 1507, not § 1521. Even if the relief sought were theoretically available under § 1521, the facts of this case run afoul of the limitations in § 1522. Finally, although we believe the relief requested may theoretically be available under § 1507 generally, Vitro has not demonstrated circumstances comparable to those that would make possible such a release in the United States, as contemplated by § 1507(b)(4).

### (a) Step 1: Section 1521's enumerated provisions

[24]    The bankruptcy court denied relief under § 1521(b) and § 1522(a), observing that "[o]ne could argue that Vitro SAB, as a holding company, is trying to achieve, through its *Concurso* plan, an entrustment of the distribution of the assets of its non-debtor U.S. subsidiaries without sufficiently protecting the Objecting Creditors." *Vitro II,* 473 B.R. at 132. Vitro concedes that § 1507, on which it primarily relies, does not explicitly provide for a "discharge" of non-debtors, and thus injunctive relief is a necessary by-product of granting enforcement, but Vitro argues that this fact alone does not mean that it must satisfy the requirements of § 1522. [28] The Objecting Creditors respond that the relief Vitro seeks is addressed by § 1521(a)(1) and (b), and thus Vitro is bound by the limitations in § 1521 and § 1522 that any relief must ensure that the interests of creditors and other interested parties are sufficiently protected.

Contrary to the Objecting Creditors' assertion and the bankruptcy court's finding, the requested relief is not available under any of § 1521's specific provisions because none of the types of relief enumerated under § 1521(a) or § 1521(b) matches the type of relief Vitro seeks. The closest provision is § 1521(a)(1), which provides for "staying the commencement or continuation of an individual action or proceeding *concerning* the debtor's assets, rights, obligations or liabilities." 11 U.S.C. § 1521(a)(1) (emphasis added). [29] But Vitro is not merely seeking a stay. Rather, Vitro seeks to permanently enjoin actions brought against its subsidiaries and, moreover, to discharge obligations and liabilities owed by those subsidiaries. We reject the bankruptcy court's suggestion to treat the assets of Vitro's subsidiaries as Vitro's **\*1059** "assets" for this purpose. *In re Guyana Dev. Corp.,* 168 B.R. 892, 905 (Bankr.S.D.Tex.1994) ("As a general rule, property of the estate includes the debtor's stock in a subsidiary but not the assets of the subsidiary."). As the Objecting Creditors repeatedly remind us, most of Vitro's subsidiaries have not gone into bankruptcy. Vitro's

subsidiaries are also its creditors. Thus, there is no basis to conclude that § 1521(a)(1) adequately responds to the type of relief Vitro seeks. [30]

For substantially the same reason, we reject the bankruptcy court's suggestion that § 1521(b) applies. Section 1521(b) provides that "the court may, at the request of the foreign representative, entrust the distribution of all or part of the debtor's assets located in the United States to the foreign representative ... provided that the court is satisfied that the interests of creditors in the United States are sufficiently protected." Because the subsidiaries' assets are not Vitro's, § 1521(b) does not apply. [31]

### (b) Step 2: Section 1521(a)'s
### grant of "any appropriate relief"

[25]    Having determined that none of the enumerated forms of relief listed under § 1521 provides the range of relief Vitro seeks, we proceed to consider whether the relief sought fits into the court's more general power to grant "any appropriate relief." We conclude that the requested relief falls outside § 1521(a)'s grant of authority for two reasons.

First, the relief Vitro seeks, a non-consensual, non-debtor release through a bankruptcy proceeding, is generally not available under United States law. Indeed, this court has explicitly prohibited such relief. *In re Pac. Lumber Co.,* 584 F.3d 229, 251–52 (5th Cir.2009) (discharge of debtor's debt does not affect liability of other entities on such debt and denying non-debtor release and permanent injunction); *In re Zale Corp.,* 62 F.3d 746, 760 (5th Cir.1995) ("Section 524 prohibits the discharge of debts of nondebtors."). Because our law prohibits the requested discharge, a request for such relief more properly falls under § 1507, which was included to address such circumstances.

Second, our conclusion is bolstered by the fact that in the one case where a foreign proceeding's non-debtor discharge **\*1060** was approved by a United States court, it was under § 1507, not § 1521. In *Metcalfe,* the court recognized that "a third-party non-debtor release 'is proper only in rare cases.' " 421 B.R. 685, 694 (Bankr.S.D.N.Y.2010) (quoting *In re Metromedia Fiber Network, Inc.,* 416 F.3d 136, 141 (2d Cir.2005)). The court nevertheless found that approval was not precluded under § 1507. *Id.* at 697. [32]

In re Vitro S.A.B. de CV, 701 F.3d 1031 (2012)

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 353 of 379

57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386

**[26]**  Finally, we note that the bankruptcy court's decision was proper under § 1522, which requires that the relief contemplated under § 1521 balance the interests of the creditors and debtors. *See In re Tri–Cont'l Exch. Ltd.,* 349 B.R. at 637 (analysis of § 1522 "emphasize[s] the need to tailor relief and conditions so as to balance the relief granted to the foreign representative and the interests of those affected by such relief, without unduly favoring one group of creditors over another"). Because the bankruptcy court also found that the *Concurso* plan did not provide for an appropriate balance among the interests of Vitro, its creditors, and the Guarantors under § 1521 and § 1522, we observe that even were we to agree that the requested relief is provided for under § 1521, the bankruptcy court did not abuse its discretion in denying it. Because the reasons for which the bankruptcy court denied relief under § 1521 are largely identical, however, we jointly address those reasons under our discussion of § 1507. We proceed to consider whether, as Vitro and Fintech argue, the relief was available under § 1507, and whether the bankruptcy court properly denied it.

#### (c) Step Three: Section 1507's "additional assistance"

The bankruptcy court denied relief under § 1507 because the Plan "does not provide for the distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by Title 11," contrary to § 1507(b)(4). *Vitro II,* 473 B.R. at 132.

> Under a Chapter 11 plan, the noteholders would receive their distribution from the debtor and would be free to pursue their other obligors, in this case the non-debtor guarantors. The *Concurso* plan provides drastically different treatment in that the noteholders receive a fraction of the amounts owed under the indentures from Vitro SAB and their rights against the other obligors are cut off.

*Id.*

Vitro challenges the bankruptcy court's holding predominantly on the ground that it accorded insufficient weight to comity. The Objecting Creditors point to disparities between the *Concurso* plan and a similar proceeding in United States bankruptcy court. They also assert that the Mexican court's disregard for a relevant decision in New York state court precludes extending comity to its decision.

We conclude that § 1507 theoretically provides for the relief Vitro seeks because it was intended to provide relief not otherwise available under United States law. But the devil is in the details, and in this case, the bankruptcy court correctly determined that relief was precluded by § 1507(b)(4). Under that provision, the bankruptcy court had to consider whether the relief requested was comparable to that available under the Bankruptcy Code. We conclude below that, although a non-consensual, non-debtor discharge would not be available in this circuit, it could be available in other circuits. We also hold **\*1061** that because Vitro has failed to show the presence of the kind of comparable extraordinary circumstances that would make enforcement of such a plan possible in the United States, the bankruptcy court did not abuse its discretion in denying relief.

##### *i. Availability of non-consensual, non-debtor discharges under § 1507*

This court has previously foreclosed the type of relief sought here in the context of a United States bankruptcy proceeding. We acknowledge, however, that our view on this subject is not universally shared by our sister circuits. Although § 1521 relief is precluded by our prior holdings, relief may nevertheless be appropriate under § 1507 which, as discussed above, was included under Chapter 15 to permit the expansion of relief previously available under § 304. We begin by analyzing release of nondebtors under United States bankruptcy law.

*In re Pacific Lumber Co.* concerned a proposed plan that would "release [ ] [owners and guarantors] from liability ... related to proposing, implementing, and administering the [reorganization] plan." 584 F.3d at 251. Quoting 11 U.S.C. § 524(e)'s language that the "discharge of a debt of the debtor does not affect the liability of any other entity on ... such debt," we went on to reject the guarantors' argument that "the release clause is part of their bargain because without the clause neither company would have been willing to provide the plan's financing." *Id.* at 251–52 (quotation marks omitted). This conclusion was consistent with prior rulings from this circuit that "seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions." *Id.* at 252; *see also In re Bigler LP,* 442 B.R. 537, 546 (Bankr.S.D.Tex.2010); *In re Pilgrim's Pride Corp.,* No. 08–

In re Vitro S.A.B. de CV, 701 F.3d 1031 (2012)

57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386

45664–DML–11, 2010 WL 200000, at *5 (Bankr.N.D.Tex. Jan. 14, 2010).

Other circuits agree. *See In re Lowenschuss,* 67 F.3d 1394, 1401 (9th Cir.1995) ("This court has repeatedly held, without exception, that § 524(e) precludes bankruptcy courts from discharging the liabilities of non-debtors."); *In re W. Real Estate Fund, Inc.,* 922 F.2d 592, 600–02 (10th Cir.1990); *In re Jet Fla. Sys., Inc.,* 883 F.2d 970, 972–73 (11th Cir.1989). Those circuits not in agreement nevertheless prohibit such releases in all but the rarest of cases.

In *Metromedia,* for example, the court expressed great reluctance in approving non-debtor releases. 416 F.3d at 141. It observed that the Bankruptcy Code expressly authorizes such releases only under 11 U.S.C. § 524(g), a provision authorizing such release upon satisfaction of specific conditions in the context of asbestos cases. *Id.* at 142. That court also noted that the release of non-debtors "is a device that lends itself to abuse" because it "may operate as a bankruptcy discharge arranged without a filing and without the safeguards of the [Bankruptcy] Code." *Id.* "No case has tolerated nondebtor releases absent the finding of circumstances that may be characterized as unique," and such releases have been appropriate only in "rare cases." *Id.* at 141–42. The *Metromedia* court elaborated that "[a] nondebtor release in a plan of reorganization should not be approved absent the finding that truly unusual circumstances render the release terms important to success of the plan," focusing on considerations such as whether: "the estate received substantial consideration ...; the enjoined claims were channeled to a settlement fund rather than extinguished ...; the enjoined claims would indirectly impact the debtor's reorganization by way of indemnity or contribution .... and the plan otherwise provided **\*1062** for the full payment of the enjoined claims .... [or] the affected creditors consent[ed]." *Id.* at 142–43 (internal citations and quotation marks omitted).

Similarly, in *In re Dow Corning Corp.,* the court observed that enjoining a non-consenting creditor's claim against a non-debtor is a "dramatic measure" and instructed courts to approve such a release only when the following seven factors are present:

> (1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against

the debtor or will deplete the assets of the estate; (2) The non-debtor has contributed substantial assets to the reorganization; (3) The injunction is essential to reorganization, namely the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor; (4) The impacted class, or classes, has overwhelmingly voted to accept the plan; (5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction; (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full and; (7) The bankruptcy court made a record of specific factual findings that support its conclusions.

280 F.3d 648, 658–61 (6th Cir.2002).

Other courts have imposed similar restrictions on enjoining third-party claims against non-debtors. *See In re Specialty Equip. Cos.,* 3 F.3d 1043, 1044–49 (7th Cir.1993) (section 524(e) does not bar granting release to third parties where release is consensual and non-coercive and would bind only those creditors voting in favor of the plan); *In re A.H. Robins Co., Inc.,* 880 F.2d 694, 701–02 (4th Cir.1989) (enjoining suits where plan was overwhelmingly approved, late claimants were given opportunity to recover, reorganization hinged on debtor being free from claims against parties with indemnity or contribution claims against it, and creditors who opted out would have had their claims fully satisfied by staying within settlement agreement).

[27] The decisions of these courts demonstrate disagreement among the circuits as to when, if ever, a non-debtor discharge is appropriate. We conclude that, although our court has firmly pronounced its opposition to such releases, relief is not thereby precluded under § 1507, which was intended to provide relief not otherwise available under the Bankruptcy Code or United States law. *See Artimm,* 335 B.R. at 160 n. 11.

### *ii. Appropriateness of non-consensual, non-debtor discharges under § 1507*

In re Vitro S.A.B. de CV, 701 F.3d 1031 (2012)

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 355 of 379

57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386

**[28]**  Having determined that the relief Vitro seeks is theoretically available under § 1507, we turn to whether the bankruptcy court abused its discretion in determining that such relief was not appropriate in this case. The bankruptcy court held a four-day trial, involving hundreds of exhibits and testimony by witnesses from both sides. It concluded that the requested relief did not substantially conform to the order of distribution under Title 11 because the *Concurso* plan provided creditors with a substantially reduced recovery, while cutting off their ability to pursue relief against the Guarantors.

Vitro contends that the bankruptcy court incorrectly denied enforcement because the *Concurso* plan did not provide creditors with exactly what they would **\*1063** have received under Chapter 11.[33] Vitro further challenges the applicability of § 1507(b)(4) because the bankruptcy court based its decision on the discharge of non-debtors' obligations, and not the distribution of Vitro's property. Finally, Vitro argues that whatever concerns this case implicates, the bankruptcy court erred in concluding that they outweighed the interests of comity.[34],[35]

The Objecting Creditors respond that the evidence presented at trial demonstrated that, under the *Concurso* plan, they would recover only around 40% of the Old Notes' value, while Vitro's shareholders would retain equity interests worth $500 million.[36] They also point to various **\*1064** parts of the Plan that do not conform with Chapter 11. These include that guarantor obligations cannot be discharged over the objections of creditors, creditors would not have been grouped for voting purposes into a single class together with parties having adverse interests, and insider votes would not count towards the Plan's approval. The Objecting Creditors further argue that comity does not weigh in favor of enforcement of this plan because the Mexican court, which approved it, ignored a ruling by a New York state court holding that the indentures expressly prohibited modification of the Guarantors' obligations.

We conclude that the evidence Vitro presented at trial does not support the presence of circumstances comparable to those necessary for effectuating the release of non-debtor guarantors in those of our sister circuits that allow such a release. *See In re Schimmelpenninck,* 183 F.3d at 364.

We begin our analysis, as we must, by considering comity. 11 U.S.C. § 1507 (court may grant "additional assistance ... consistent with principles of comity"). In revising Chapter

15's predecessor, § 304, Congress elevated comity from a factor under § 304(c) to the introductory text of § 1507 "to make it clear that it is the central concept to be addressed." H.R.Rep. No. 109–31, pt. 1, at 109. Vitro is thus correct to focus its argument on comity, and we agree with Vitro that comity is the rule under Chapter 15, not the exception. It is thus necessary to first address the Objecting Creditors' most direct challenge to that principle, namely that the Mexican court failed to extend comity to the decision of a New York state court on issues central to this case. *See United States ex rel. Saroop v. Garcia,* 109 F.3d 165, 170 (3d Cir.1997) (reciprocity is condition for honoring foreign country's judicial decrees); *Remington Rand Corp.–Del. v. Bus. Sys. Inc.,* 830 F.2d 1260, 1273 (3d Cir.1987) (describing comity as a "two-way street").[37]

The New York state court addressed a declaratory judgment action brought by Wilmington, which sought a confirmation of Vitro's obligations under the indentures. *Wilmington Trust,* 2011 WL 6141025, at \*1. The state court carefully parsed the issues before it and determined that "any declaratory relief in this court can only be in the context of determining the rights and obligation of the parties under the Indentures." *Id.* at \*5. The court next determined that the indentures were governed by New York law and that "pursuant to the relevant provisions of the Indentures ... any non-consensual ... release, discharge or modification of the Guarantors' obligations is prohibited." *Id.* The court was clear, however, that its authority went no further. "Whether such rights and obligations can or cannot be novated, substituted, released or modified under the Mexican bankruptcy law is an issue for the Mexican Court." *Id.* To remove all doubt, the court explicitly stated that "granting a declaratory judgment in favor of [the Objecting Creditors], to the extent stated herein, will not interfere with the Mexican Court proceeding, which is the proper jurisdiction to determine the issues that may arise in connection with the approval of the Concurso Plan, pursuant to applicable Mexican law." *Id.* The court concluded by stating that "whether any Concurso Plan that is ultimately approved by the Mexican Court may be enforced in the United States is an issue for the federal **\*1065** courts, including the Bankruptcy Court." *Id.*

The Mexican court was presented with the opportunity to consider the New York decision and its impact on the *concurso* proceeding. Although the Mexican court does not appear to have provided specific reasons, we infer from its decision that it did not find that the indentures precluded Mexican law from novating the obligations contained therein.

In re Vitro S.A.B. de CV, 701 F.3d 1031 (2012)

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 356 of 379

57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386

Because the New York court explicitly set aside this issue for the Mexican court, reciprocity was not offended by the Mexican court's subsequent decision of that very issue. We thus do not view this as a ground for denying comity. Our decision comports with the approach adopted by the court in *Metcalfe,* which, while recognizing that a third-party non-debtor release might be inappropriate under United States law, left it to the Canadian courts to determine whether they had the jurisdiction to grant such relief. 421 B.R. at 697–700.

We next consider whether the bankruptcy court erred in basing its decision on § 1507(b)(4). [38] Section 1507(b)(4) provides that a court should consider whether to grant additional assistance to a foreign representative by considering the "distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title." Vitro asserts that the bankruptcy court's opinion was based on the distribution of non-debtor's property, that of Vitro's subsidiaries, and thus § 1507(b)(4) is inapplicable. But the focus of § 1507(b)(4) is on the plan of distribution, and Vitro ignores that the Plan it seeks to enforce premises distribution of its assets on the discharge of obligations owed by non-debtors who are also Vitro's creditors. The respective amounts that Vitro pays under the Plan to the Objecting Creditors and to its subsidiaries are inescapably dependent on the discharge of the non-debtor Guarantors. That the detriment of this distribution falls on the Objecting Creditors, whose rights are extinguished in exchange for their distribution under the Plan, in no way subtracts from the fact that the release affects how the proceeds of Vitro's property are distributed.

We turn finally to whether the evidence Vitro has presented in favor of comity and enforcement so outweighed the bankruptcy court's concerns under § 1507(b)(4) that it was an abuse of discretion for the bankruptcy court to deny relief. Vitro's primary witness was its foreign representative, Sanchez–Mujica. He testified that the *conciliador* persuaded Vitro to offer more favorable terms to third-party creditors in the *Concurso* plan. These included a 5% increase—from 15% to 20%—of the equity available on default under the MCDs, and that consent payments, previously made to only some of the creditors, be extended to all consenting creditors. But this hardly shows that the result of the *concurso* proceeding is in line with what would be available under Chapter 11, much less that this case features the unique circumstances that would warrant a general release of the non-debtor subsidiaries. Sanchez–Mujica also testified that over 74% of recognized creditors approved the plan. But this ignores that

recognized creditors holding over 50% of all unsecured debt who voted in favor of the Plan were Vitro subsidiaries.

Vitro's second witness, Luis Mejan—an expert in Mexican bankruptcy law—was **\*1066** cross-examined at trial, and his expert report and expert rebuttal were introduced in lieu of direct examination. Mejan's expert report provides a comprehensive breakdown of the LCM and how it operates in the *concurso* context. This merely establishes, however, that the LCM is a process comparable to that of the United States, a fact which no party seriously disputes. The bankruptcy court also had to consider whether the results yielded under the LCM, on the facts of this case, were comparable to the result likely in the United States. *See In re Treco,* 240 F.3d at 159 ("A court must consider the effect of the difference in the law on the creditor in light of the particular facts presented."); *In re Sivec SRL,* 476 B.R. at 324 ("The fact that priority rules and treatment of claims may not be identical is insufficient to deny a request for comity. What this Court must consider is the effect of that difference on the creditor in light of the existing facts."). Mejan's expert report extensively describes Mexican law, but does not explain how the results achieved in this case would compare to those in a United States bankruptcy proceeding. When asked if he had considered "whether other plans that had been approved or enforced in the United States were comparable to Vitro in terms of what happened in the Mexican proceedings," Mejan conceded that he "did not conduct a specific search in order to make [that] comparison." [39] This failure is especially troubling given Vitro's request for relief which, under United States law, would not be available in this circuit, and would only be available under the narrowest of circumstances in some of our sister circuits. [40]

In summary, although extensive testimony was taken before the bankruptcy court that the LCM's legal framework is substantially in accordance with our own, this does not end the analysis of whether to grant comity. *See In re Treco,* 240 F.3d at 158–61 (bankruptcy court abused its discretion by affording comity to Bahamian bankruptcy proceeding without considering effects on creditor's claim). The bankruptcy court correctly observed that we have "largely foreclosed non-consensual non-debtor releases and permanent injunctions outside of the context of mass tort claims being channeled toward a specific pool of assets." *Vitro II,* 473 B.R. at 131. There appears little doubt that, under United States law, non-debtor releases, while possible in other circuits, are only appropriate in extraordinary circumstances. To that end, Vitro was required to show that

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 357 of 379

something comparable to such circumstances was present here. The mere fact that the *concurso* proceeding complied with the relevant provisions of the LCM is not, in itself, sufficient. **\*1067** Were it otherwise, we would be treating the extraordinary relief available under § 1507 with the casual indifference we have already rejected in the context of recognition determinations under Chapter 15. *See In re Ran,* 607 F.3d at 1021 (recognition determination is not a "rubber stamp exercise"). We would also be disregarding the considerations and safeguards Congress included in § 1507(b).

To that end, we observe that many of the factors that might sway us in favor of granting comity and reversing the bankruptcy court to that end are absent here. Vitro has not shown that there existed truly unusual circumstances necessitating the release. To the contrary, the evidence shows that equity retained substantial value. The creditors also did not receive a distribution close to what they were originally owed. Moreover, the affected creditors did not consent to the Plan, but were grouped together into a class with insider voters who only existed by virtue of Vitro reshuffling its financial obligations between it and its subsidiaries. It is also not the case that the majority of the impacted group of creditors, consisting predominantly of the Objecting Creditors, voted in favor of the Plan. Nor were non-consenting creditors given an alternative to recover what they were owed in full. [41]

Vitro cannot rely on the fact that a substantial majority of unsecured creditors voted in favor of the Plan. Vitro's majority depends on votes by insiders. To allow it to use this as a ground to support enforcement would amount to letting one discrepancy between our law and that of Mexico (approval of a reorganization plan by insider votes over the objections of creditors) make up for another (the discharge of non-debtor guarantors). *Cf. CIBC Bank & Trust Co. (Cayman) Ltd.,* 886 F.Supp. at 1114. [42]

Vitro argues that there would be financial chaos as a result of the Plan not being enforced. We are aware of the adverse consequences that may ensue from the decision not to enforce the Plan. But Vitro's reasoning seeks to justify a prior bad decision on the basis that not enforcing it now would lead to further negative consequences. [43] Worse, the harm from those consequences would predominantly affect Vitro, the party responsible for bringing about this state of affairs in the first place. Vitro cannot propose a plan that fails to substantially comply with our order of distribution and

then defend such a plan by **\*1068** arguing that it would suffer were it not enforced. Vitro's two-wrongs-make-a-right reasoning is unpersuasive.

Those cases Vitro points to in which a similar discharge of non-debtor obligations was allowed are inapposite. The closest factual analog to this case is the bankruptcy court's decision in *Metcalfe.* As here, the central issue in *Metcalfe* was "[t]he enforceability of the non-debtor release and injunction on private civil actions in the United States" contained in a Canadian court order approving a restructuring plan. 421 B.R. at 687–88 n. 1. Recognizing that "a third-party non-debtor release 'is proper only in rare cases,' " *id.* at 694 (quoting *Metromedia,* 416 F.3d at 141), the court nevertheless found that approval was not precluded under § 1507, *id.* at 697. The only explanation the court provided was that the non-debtor release and injunction provisions "treat[ed] all claimants in the Canadian Proceedings similarly" and that "[n]o objections ha[d] been lodged that inclusion of these provisions adversely affects any claimant's treatment against any of the debtors' property." *Id.* The bankruptcy court distinguished *Metcalfe* because, in that case, "there was near unanimous approval of the plan by the creditors, who were not insiders of the debtor .... the plan was negotiated between the parties and there appears not to have been a timely objection .... [and] the release was not complete like the one in the present case." *Vitro II,* 473 B.R. at 131.

We agree that *Metcalfe* is distinguishable. The fact that the Plan approved here was the result of votes by insiders holding intercompany debt means that, although under *Metcalfe* non-debtor releases may be enforced in the United States under Chapter 15, the facts of this case exceed the scope of that decision. We further observe that in that case the Canadian court's decision to approve the non-debtor release "reflect[ed] similar sensitivity to the circumstances justifying approving such provisions," a sensitivity we find absent in the Mexican court's approval of the Plan. 421 B.R. at 698. The Canadian court's decision was also the result of "near-cataclysmic turmoil in the Canadian commercial paper market following the onset of the global financial crisis." *Id.* at 700. As already discussed, Vitro's evidence on this point largely emphasizes the turmoil only Vitro would be exposed to.

Vitro also relies on our decision in *Republic Supply Co. v. Shoaf,* 815 F.2d 1046 (5th Cir.1987). In that case, "we address[ed] the question whether [the] bankruptcy court's confirmation order which, beyond the statutory grant of the [Bankruptcy] Code, expressly released a third-party

In re Vitro S.A.B. de CV, 701 F.3d 1031 (2012)

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 358 of 379

57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386

guarantor, [was] to be given *res judicata* effect." *Id.* at 1047. We held that once a reorganization plan passed the appeal stage it could not be challenged even though it violated the Bankruptcy Code's prohibition on such discharges. *Id.* at 1050. Aside from the fact that *Republic Supply Co.* was a case about the effects of res judicata and has been distinguished for not addressing the legality of non-debtor releases, *see In re Pacific Lumber Co.,* 584 F.3d at 252 n. 27, we have also emphasized the "limited nature" of that decision, *In re Applewood Chair Co.,* 203 F.3d 914, 918 (5th Cir.2000). For example, *Republic Supply Co.* involved a reorganization plan in which a third-party guarantor and creditor were specifically discharged. 815 F.2d at 1051–54. We have distinguished other cases for including general, as opposed to specific, releases. *Applewood Chair,* 203 F.3d at 919. As a result, *Republic Supply Co.* provides no guidance where, as here, we are confronted not by a specific release, but by a general release of all the non- **\*1069** debtor subsidiaries. *See id.*[44], [45]

On the basis of the foregoing analysis, we hold that Vitro has not met its burden of showing that the relief requested under the Plan—a non-consensual discharge of non-debtor guarantors—is substantially in accordance with the circumstances that would warrant such relief in the United States. In so holding, we stress the deferential standard under which we review the bankruptcy court's determination. It is not our role to determine whether the above-summarized evidence would lead us to the same conclusion. Our only task is to determine whether the bankruptcy court's decision was reasonable. *See Friends for Am. Free Enter. Ass'n v. Wal–Mart Stores, Inc.,* 284 F.3d 575, 578 (5th Cir.2002) (" 'Generally, an abuse of discretion only occurs where no reasonable person could take the view adopted by the trial court.' " (quoting *Dawson v. United States,* 68 F.3d 886, 896 (5th Cir.1995))); *Bear Stearns,* 389 B.R. at 333 (relief under § 1521 and § 1507 is largely discretionary). Having reviewed the record and relevant caselaw, we conclude that the bankruptcy court's decision was reasonable.

**4. Section 1506's Bar to Relief**

The bankruptcy court concluded that "the protection of third party claims in a bankruptcy case is a fundamental policy of the United States" and held that even if Chapter 15 relief were appropriate, it would be barred under § 1506 because "the *Concurso* plan does not recognize and protect such rights." *Vitro II,* 473 B.R. at 132.

**[29]    [30]    [31]    [32]** Section 1506 provides that "[n]othing in [Chapter 15] prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506. The narrow public policy exception contained in § 1506 "is intended to be invoked only under exceptional circumstances concerning matters of fundamental importance for the United States." *In re Ran,* 607 F.3d at 1021. "The key determination required by this Court is whether the procedures used in [the foreign proceeding] meet our fundamental standards of fairness." *Metcalfe,* 421 B.R. at 697. A court need not engage in an "independent determination about the propriety of individual acts of a foreign court." *Id.* Furthermore, even the absence of certain procedural or constitutional rights will not itself be a bar under § 1506. *See In re Ephedra Prods. Liab. Litig.,* 349 B.R. 333, 336 (S.D.N.Y.2006) ("Federal courts have enforced against U.S. citizens foreign judgments rendered by foreign courts for whom the very idea of a jury trial is foreign.").

As already discussed, this court holds that the Bankruptcy Code precludes non-consensual, non-debtor releases. *In re Pac. Lumber Co.,* 584 F.3d at 252. Nevertheless, not all our sister circuits agree, and we recognize that the relief potentially available under § 1507 was intended to be expansive. At the same time, § 1506 was intended to be read narrowly, a fact that does not sit well with the bankruptcy court's broad description of the fundamental **\*1070** policy at stake as "the protection of third party claims in a bankruptcy case." *Vitro II,* 473 B.R. at 132. Because we conclude that relief is not warranted under § 1507, however, and would also not be available under § 1521, we do not reach whether the *Concurso* plan would be manifestly contrary to a fundamental public policy of the United States.[46]

**IV. CONCLUSION**

For the aforementioned reasons, we AFFIRM in all respects the judgment of the district court affirming the order of the bankruptcy court in No. 12–10542, and we AFFIRM the order of the bankruptcy court in Nos. 12–10689 and 12–10750. The temporary restraining order originally entered by the bankruptcy court, the expiration of which was stayed by this court, is VACATED, effective December 14, 2012. Each party shall bear its own costs.

In re Vitro S.A.B. de CV, 701 F.3d 1031 (2012)
57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 359 of 379

## Parallel Citations

57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386

### Footnotes

1   A *concurso* proceeding is the Mexican equivalent of a voluntary judicial reorganization proceeding under United States law.

2   A *conciliador* is an individual appointed by the *Instituto Federal de Especialistas de Concursos Mercantiles*—the Federal Institute of Specialists of Insolvency Procedures—to serve as a quasi-judicial officer with certain responsibilities in a *concurso* proceeding, including filing an initial list of recognized claims, mediating a plan, and, if necessary to protect the debtor's estate, managing the debtor's business. A *conciliador's* pay is based on the number of recognized claims in a *concurso* proceeding, a fact the Noteholders argue encouraged him to recognize intercompany claims. The Noteholders also point out that, in this case, the *conciliador's* law firm provided legal services to Vitro since 2001, and that the *conciliador* retained, as his financial advisor, a firm that also acted as Vitro's internal auditor.

3   Of the creditors resisting veto of the Plan, approximately 360 were Vitro employees to each of whom Vitro had issued a note in the amount of $1,000 prior to the Plan's filing.

4   Letters submitted to this court demonstrate that substantially all of the issues relating to enforcement of the Plan before us are also being appealed in Mexican courts.

5   This matter proceeded to trial on March 31, 2011. As a result of this proceeding, four of Vitro's subsidiaries requested permission to sell substantially all their assets. Vitro's subsidiaries continued resisting the Noteholders' efforts and, initially, received favorable judgments that they were generally paying their debts as they became due or that no demand for payment had been made at the time the involuntary proceedings were commenced. That decision was appealed and, on August 28, 2012, the United States District Court for the Northern District of Texas held that the bankruptcy court erred in its findings and vacated that court's order.

6   Wilmington and other creditors then sought a temporary restraining order directing the Guarantors to withdraw their consent to the *Concurso* plan. The state court granted the TRO, but that order was stayed by the bankruptcy court on the basis that the TRO interfered with Vitro's rights in a lockup agreement between it and its subsidiaries, and the *concurso* proceeding. That order was separately appealed and is before another panel of this court, Case No. 11–11239.

   Objecting creditors also took further legal action to resist Vitro's reorganization efforts, including involuntary *concurso* proceedings in Mexico.

7   This filing actually constituted Vitro's second filing of a petition for recognition under Chapter 15. Vitro first filed such a petition on December 14, 2010 but, by agreement of the parties, withdrew that petition after the Mexican court initially denied Vitro's entry into *concurso mercantil*.

8   The travel restrictions on Sanchez–Mujica were later lifted, permitting him to travel to the United States and testify at trial.

9   A "foreign main proceeding" is "a foreign proceeding pending in the country where the debtor has the center of its main interests," 11 U.S.C. § 1502(4), and is to be distinguished from a foreign nonmain proceeding, which is "a foreign proceeding ... pending in a country where the debtor has an establishment," *id.* § 1502(5). Depending on whether a proceeding is a foreign main or a foreign nonmain, certain Chapter 15 relief will be automatic or discretionary. *See In re Ran,* 607 F.3d 1017, 1026 (5th Cir.2010).

10   Previously, on June 24, 2011, the bankruptcy court had issued a preliminary injunction in Vitro's favor to protect its assets, but denied such relief as to the guarantors.

11   Although brought under separate case numbers, the only substantive difference between the cases is that Vitro is the appellant in Case No. 12–10689, while Fintech is the appellant in Case No. 12–10750.

12   As Professor Jay Lawrence Westbrook has previously explained, the Model Law, along with the European Union Insolvency Regulation ("EU Regulation"), and the American Law Institute's Principles of Cooperation in Transnational Insolvency Cases Among Members of the North American Free Trade Agreement ("ALI Principles"), was a response to international trade and "the growth of multinational enterprise," as well as "the increased incidence of multinational financial failure." Jay Lawrence Westbrook, *Multinational Enterprises in General Default: Chapter 15, the ALI Principles, and the EU Insolvency Regulation,* 76 Am. Bankr. L.J. 1, 1–2 (2002). Of the three, the EU Regulation "served as the source of some of the key concepts adopted in both the Model Law and the ALI Principles." *Id.* at 2. The ALI Principles, by contrast, were the last to be approved, and thus "in some important respects represent the next generation of reform." *Id.*

13   While § 304 has been replaced by Chapter 15, caselaw applying that section remains relevant to evaluating requests for relief. *See In re Atlas Shipping A/S,* 404 B.R. 726, 738 (Bankr.S.D.N.Y.2009); Leif M. Clark & Karen Goldstein, *Sacred Cows: How to Care for Secured Creditors' Rights in Cross–Border Bankruptcies,* 46 Tex. Int'l L.J. 513, 524 (2011) ("Not surprisingly, the case law

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 360 of 379

In re Vitro S.A.B. de CV, 701 F.3d 1031 (2012)
57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386

under former § 304 is still relevant to the interpretation of Chapter 15, especially as it concerns the remedies available to a foreign representative once recognition has been granted.").

14    The district court was skeptical of whether Sanchez–Mujica and Arechavaleta–Santos, as co-foreign representatives, could properly constitute a person or body under 11 U.S.C. § 101(24) and § 1517(a)(2). *Vitro I,* 470 B.R. at 410 n. *. The source for this skepticism is unclear, and neither the parties nor the district court explores the matter further. Because § 101(41) provides that "[t]he term 'person' includes individual, partnership, and corporation," there is little doubt that Sanchez–Mujica and Arechavaleta–Santos, both natural persons, qualify as a "person or body." This is especially so because the Bankruptcy Code utilizes the word "includes" in a non-limiting capacity. 11 U.S.C. § 102(3). This means that § 101(41) potentially includes an even broader range of entities. *See In re Oversight & Control Comm'n of Avanzit, S.A.,* 385 B.R. 525, 540 (Bankr.S.D.N.Y.2008) (holding oversight commission was person or body within meaning of § 1517(a)).

15    The Noteholders point out that none of these decisions entailed a challenge to the foreign representatives' appointment. While correct, in the context of the issue above, this fact does not diminish their persuasive value. Assuming the Noteholders' interpretation was correct, and a foreign representative had to show it was appointed by a foreign tribunal to receive Chapter 15 relief, it would be irrelevant whether another party objected because the court would still need to determine whether the appointment was correct as a threshold matter prior to granting recognition. *See In re Ran,* 607 F.3d at 1021.

16    The *conciliador* also submitted a letter to the bankruptcy court, as a party in interest, to the effect that he agreed with the appointment of Sanchez–Mujica and Arechavaleta–Santos.

17    Article 2(d) provides that a foreign representative is "a person or body, including one appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of the foreign proceeding." UNCITRAL, UNCITRAL Model Law on Cross–Border Insolvency with Guide to Enactment, art. 2(d) (1997), *available at* http://www.uncitral. org/pdf/english/texts/insolven/insolvency-e.pdf (Model Law Guide). The only change in 11 U.S.C. § 101(24) is the addition of the words "including a person or body appointed," in lieu of the original "including one appointed."

18    For the same reason, we are not persuaded by the Noteholders' argument that their interpretation would result in a more objective and predictable appointment process.

19    The Noteholders argue that our understanding of § 101(24) would allow parties to appoint competing foreign representatives, but that concern is invalid. The number of parties who are authorized to "administer the reorganization of a debtor's assets" is necessarily limited. As we have said, we do not opine on the limits of authorization to "act as a representative," because that issue is not pertinent here.

20    Under Chapter 11, the term "debtor in possession" refers to the debtor itself, unless an entity is serving as the debtor's trustee pursuant to 11 U.S.C. § 322. "A debtor in possession stands in the shoes of the bankruptcy trustee, generally having the same rights, powers, duties and functions, with certain exceptions." *Soto–Rios v. Banco Popular de Puerto Rico,* 662 F.3d 112, 115 n. 2 (1st Cir.2011) (citing 11 U.S.C. § 1107(a)).

21    The Noteholders raise a number of additional arguments that are ultimately unavailing. The Noteholders argue that, assuming Vitro could act as its own foreign representative, it could not appoint others to that role. The Noteholders also argue that Vitro's appointment fails because it occurred prior to the *concurso* filing and because the appointment creates a conflict of interest between Vitro and its creditors. Finally, they repeatedly point out that the foreign representatives lacked the expertise necessary to serve in that role, and that they abdicated their responsibilities by ceding decision-making authority to United States counsel. The Noteholders cite no pertinent authority in support of these contentions.

22    The Objecting Creditors' briefs reiterate many of the factual allegations they made in the bankruptcy court, without addressing the bankruptcy court's holdings on those allegations. Because we affirm the bankruptcy court's ultimate holding denying enforcement to the Plan, we do not address those allegations further.

23    Although this approach—first considering relief under § 1521(a) and (b) and then proceeding to § 1507—has not been explicitly mandated in this circuit, this three-step approach, as we explain below, finds support in the statutory language and in Congress's express intent in crafting § 1507.

24    *See generally* Alesia Ranney–Marinelli, *Overview of Chapter 15 Ancillary and Other Cross–Border Cases,* 82 Am. Bankr. L.J. 269, 317 (2008) ("What is not clear is whether a foreign representative can pick and choose which section to proceed under in order to take advantage of different standards for affording relief or burdens of proof."); George W. Shuster, Jr., *The Trust Indenture Act and International Debt Restructurings,* 14 Am. Bankr. Inst. L.Rev. 431, 455 ("Because it is unclear where section 1521 ends and where section 1507 begins, it is also unclear which of these paths the court will follow—whether it will consider entry of an order enforcing a foreign discharge as 'appropriate relief' under section 1521 or as 'additional assistance' under section 1507.").

25    The Model Law's analog to § 1507 "was designed to insure access to relief that might be available under law other than the insolvency law." 8 Collier, *supra,* ¶ 1507.01.

**26**  These factors are identical to those formerly found under § 304(c), with the exception that comity has been elevated from a factor to the introductory text.

**27**  Because of § 1521's broad reach, § 1507's scope is uncertain. *See* Lesley Salafia, *Cross–Border Insolvency Law in the United States and Its Application to Multinational Corporate Groups,* 21 Conn. J. Int'l L. 297, 322 (2006) (section 1507 "might not have been necessary," given expansive relief available under other parts of Chapter 15); 8 Collier, *supra,* ¶ 1507.01 ("In light of this display of [§ 1521's] weaponry, it is not clear what section 1507 adds to the arsenal."). Scholarly commentary has speculated that § 1507 was merely intended to incorporate § 304's jurisprudence. 8 Collier, *supra,* ¶ 1507.01. Further muddying § 1507's role is that, although § 304(c)'s factors are included under § 1507, a court may nevertheless consider those factors under § 1521. "It would be anomalous to suggest that in determining whether creditor interests are sufficiently protected for purposes of ... [§] 1521, a court could not consider evidence of procedural or substantive prejudice to non-domestic creditors in the foreign proceeding or a significant deviation between the distribution scheme in the foreign proceeding and the distribution scheme prescribed by the Code." Paul L. Lee, *Ancillary Proceedings under Section 304 and Proposed Chapter 15 of the Bankruptcy Code,* 76 Am. Bankr. L.J. 115, 193 (2002).

**28**  Vitro also argues that § 1521 only applies during the pendency of a foreign insolvency proceeding, and not after the foreign court approves a reorganization plan, and Vitro cites in support *In re Daewoo Logistics Corp.,* 461 B.R. 175, 179–80 (Bankr.S.D.N.Y.2011). That case only states that "relief may be available after close of the foreign proceeding under section 1507." *Id.* at 180. It does not create a categorical rule and § 1521 does not include such a limitation.

**29**  Scholarly commentary has suggested that § 1521(a)(1)'s use of the word "concerns" "indicates that a stay of actions against someone other than the debtor or the debtor's assets is a possibility," including "a stay of litigation against a third party with indemnification rights against the debtor, or with shared liability ... on the theory that the litigation so stayed *concerns* the debtor's rights, obligations or liabilities." 1 Collier, *supra,* ¶ 13.07[2] & n. 37 (emphasis in original). However, the situation in this case is different. The worry is not that Vitro will be harmed by creditors collecting from the subsidiaries who will in turn come looking for Vitro. Instead, Vitro's subsidiaries are guarantors, and thus it was Vitro's defaulting on its obligations which now endangers the subsidiaries by triggering the guaranties.

**30**  We are aware that under the older § 304(b)(1) a bankruptcy court could "enjoin actions against the debtor with regard to property *involved* in such foreign proceeding" and that "against the debtor" has been understood to include non-debtors "when failure to enjoin the action would jeopardize the success of the bankruptcy process or cause irreparable harm to the debtor's estate and its creditors." *In re Schimmelpennink,* 183 F.3d at 362 (internal quotation marks and citation omitted). However, under 11 U.S.C. § 362(a)(1), which includes the same "against the debtor" language as § 304(b), stays against non-debtors were reserved for "very limited situations." *Matter of S.I. Acquisition, Inc.,* 817 F.2d 1142, 1147 (5th Cir.1987). Moreover, unlike in a case such as *In re Schimmelpennink,* we are not dealing with creditors attempting to recover on a debt under an alter ego and single business enterprise theory. 183 F.3d at 363. Instead, the Objecting Creditors are trying to recover from the subsidiaries under guaranties that were triggered only as a result of Vitro's default. Vitro is not seeking a temporary injunction, but a permanent discharge of the Guarantors' obligations. Vitro itself points out that injunctive relief is only incidental to the broader relief it seeks.

**31**  We also note that the Enforcement Motion does not seek relief under § 1521(b). Instead, the Enforcement Motion refers to § 1521(a)(1), (a)(2), (a)(5), and (a)(7). Neither Vitro's nor Fintech's brief argues how these other provisions would apply and they actually appear to present reasons for why the requested relief might not be available under § 1521.

**32**  While we agree with the bankruptcy court that *Metcalfe* is ultimately distinguishable, *Vitro II,* 473 B.R. at 131, we nevertheless find it instructive in determining which part of Chapter 15 would provide the requested relief.

**33**  Vitro also argues that the bankruptcy court erred in treating § 1507(b)'s subsections as prongs of a test, as opposed to mere considerations, and did not consider the totality of the circumstances. Although it is not necessary for a plan to meet all § 1507(b) factors, *see In re Bd. of Dirs. of Telecom Arg. S.A.,* 528 F.3d 162, 169 n. 7 (2d Cir.2008) (noting that "Chapter 15 dispenses with the explicit requirement that courts consider the five factors listed in § 304(c) [now § 1507(b)] as part of an application for recognition of foreign insolvency proceedings"), failure to meet any one of these can suffice to deny enforcement, *see In re Treco,* 240 F.3d at 158–61 (denying enforcement because of violation of § 304(c)(4) (now § 1507(b)(4))).

**34**  Fintech also argues that failure to enforce the Plan would encourage investors to resort to litigation, instead of negotiating compromises with a debtor in bankruptcy. Given our very limited holding on the facts of this case we find this to be a slight risk. Even were it otherwise, we are bound to apply the statutory provisions of Chapter 15 faithfully irrespective of whether the effect will be to spur further litigation.

**35**  The parties dispute whether we need to consider the traditional factors of comity. In *International Transactions, Ltd.* we enumerated five requirements that would make a foreign court's judgment on a matter conclusive in federal court. 347 F.3d at 594. Section 1507 explicitly incorporates comity, however, and thus, given our reasoning above, we assume that comity would be granted were the Plan to also reasonably address the concerns enumerated in § 1507(b)(1)-(4). *See In re Treco,* 240 F.3d at 158 (observing that § 304(c) (now § 1507(b)) supplants federal common law analysis).

In re Vitro S.A.B. de CV, 701 F.3d 1031 (2012)

Case 09-10138-MFW    Doc 13460-6    Filed 05/02/14    Page 362 of 379

57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386

36    The Objecting Creditors' briefs largely omit any discussion of how the distributions under the *Concurso* plan, including the New 2019 Notes, the MCDs, and the cash consideration, resulted in this amount. The Objecting Creditors' witness, Dan Gropper, a managing director of one of the Noteholders, testified as a fact witness on this issue. Gropper was uncertain of what worth, for example, the MCDs, which convert into 20% equity in Vitro upon Vitro's default, would have, given the questionable value of equity in a defaulting company. The bankruptcy court made no specific factual findings in his regard, and thus we are left with the court's more general observation that creditors would, under the Plan, receive a fraction of what they would have received under the Old Notes.

The Objecting Creditors also make much of testimony by their expert witness, Dr. Joseph W. Doherty, that there was only a 10,000 to 1 chance that Vitro would have received a distribution in United States bankruptcy court like that resulting from the *concurso* proceeding. But this calculation was not based on any case-by-case comparison between Vitro and other bankruptcies. Instead, it was based on a sample of cases drawn from an incomplete database of bankruptcy proceedings, which, at the time, contained 108 relevant cases, of which 37 involved any distributions of equity. Doherty himself admitted that the database was still in the process of being compiled and presently contained only cases with information easily available on the Public Access to Court Electronic Records database ("PACER"). Statistical evidence of this variety is, to say the least, of limited value when considering the complexities of bankruptcy proceedings of this scale. The bankruptcy court acknowledged that Doherty testified as to "[t]he wide variance in return to creditors from what would be expected in a Chapter 11 plan," but only found that testimony "credible," without making any specific factual findings, and only made his credibility finding within the scope of arguments the court did not reach.

37    We found the discussion on this issue in the amicus curiae brief filed by the United Mexican States of assistance.

38    Because the bankruptcy court did not discuss whether § 1507(b)(1)-(3) weighed in favor of, or against, granting relief, and because we find that relief was properly denied on other grounds, we do not reach the Objecting Creditors' argument that the *Concurso* plan violated § 1507(b)'s other subsections.

39    Mejan's rebuttal report also seeks to undermine the Objecting Creditors' claim that there is a debate in the Mexican legal community as to whether insiders are allowed to vote. Regardless of whether such a debate exists, or whether the LCM permits it or not, it is surely the case that in the United States insider voters cannot themselves push through a plan where there is a class of dissenting creditors. *See CIBC Bank & Trust Co. (Cayman) Ltd. v. Banco Cent. do Brasil,* 886 F.Supp. 1105, 1114 (S.D.N.Y.1995) (citing 11 U.S.C. § 1129(a)(10)) (Bankruptcy Code "prevents 'insiders' from voting on whether a reorganization plan will be accepted by a class of impaired creditors"). As we have explained previously, the Bankruptcy Code requires that at least one impaired class of creditors approve a plan, where the class is made up of claims that are substantially similar or share the impaired creditors' interests. *In re Save Our Springs (S.O.S.) Alliance,* 632 F.3d 168, 174 (5th Cir.2011).

40    Vitro also called as a rebuttal witness Claudio Del Valle, Vitro's chief financial and restructuring officer. That witness testified as to the amount of default interest recognized in the *concurso* proceeding.

41    Vitro stresses that the Objecting Creditors are sophisticated parties, and that many noteholders did not purchase notes until after Vitro had defaulted, the implication being that creditors knew what they were getting into. As a preliminary matter, it appears to us that all the parties involved are "sophisticated." We also do not understand why an investor's background should excuse a plan's failure to substantially adhere to our law's order of distribution.

We similarly reject the argument that because the Objecting Creditors participated in the *concurso* proceeding they are now estopped from resisting Vitro's Chapter 15 action. Chapter 15's protections address a separate set of concerns beyond what may have been litigated in a foreign proceeding.

42    For the same reasons we conclude that, even if § 1521 did provide the broad relief Vitro seeks, enforcement of this Plan would be precluded under § 1522 for failing to provide an adequate "balance between relief that may be granted to the foreign representative and the interests of the persons that may be affected by such relief." *In re Int'l Banking Corp. B.S.C.,* 439 B.R. at 626 (quoting Model Law Guide, *supra,* ¶ 161); *see also In re Sivec SRL,* 476 B.R. at 323.

43    Sanchez–Mujica's declaration only states that "Vitro's business, as well as those who have an interest in seeing Vitro's business succeed, such as its customers and creditors, will continue to suffer immense harm" if the Plan is not enforced.

44    Presumably, Vitro is arguing that the Mexican court's decision is the prior action and, thus, the bankruptcy court and this court are required to recognize that foreign court's holding and confer it res judicata effect. Such reasoning conflates the difference between a foreign ruling and the bankruptcy court's decision to grant relief pursuant to Chapter 15, and is rejected.

45    The other cases Vitro and Fintech cite in support appear to have involved consensual agreements between the parties and are thus inapposite.

46    For the same reason, we do not reach the Objecting Creditors' arguments that the Plan violates a fundamental public policy for infringing on the absolute priority rule, the Contract Clause of the United States Constitution, U.S. Const. art. I, § 10, cl. 1, the Trust Indenture Act of 1939, 15 U.S.C. §§ 77aaa, *et seq.,* or the interests of the United States in protecting creditors from so called "bad faith schemes."

**In re Vitro S.A.B. de CV, 701 F.3d 1031 (2012)**

57 Bankr.Ct.Dec. 79, Bankr. L. Rep. P 82,386

---

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 51

46 S.Ct. 166

Supreme Court of the United States.

INDEPENDENT WIRELESS TELEGRAPH CO.

v.

RADIO CORPORATION OF AMERICA.

No. 87.    |    Argued Oct. 23,
1925.    |    Decided Jan. 11, 1926.

On a Writ of Certiorari to the United States Circuit Court of Appeals for the Second Circuit.

Suit by the Radio Corporation of America against the Independent Wireless Telegraph Company, wherein the De Forest Radio Telephone & Telegraph Company was made coplaintiff without its consent. Decree of District Court (297 F. 518), dismissing bill, was reversed by Circuit Court of Appeals (297 F. 521), and defendant brings certiorari. Affirmed.

**Attorneys and Law Firms**

**167   *460   Mr. Wm. H. Davis, of New York City, for petitioner.

Mr. John W. Davis, of New York City, for respondent.

**Opinion**

Mr. Chief Justice TAFT delivered the opinion of the Court.

The Radio Corporation, a corporation of Delaware, filed a bill in equity in the Southern district of New York, joining with itself the De Forest Radio Telephone & Telegraph Company, also of Delaware, as coplaintiff, against the Independent Wireless Telegraph Company of Delaware and the American Telephone & Telegraph Company of New York. The case made in the bill was this:

*461   Lee De Forest invented and received patents Nos. 841,387 and 879,532, dated in 1908 and 1909, for devices for amplifying feeble electric currents and certain new and useful improvements in space telegraphy. After giving limited licenses of the American Telephone & Telegraph Company, he assigned the patents to the De Forest Radio Telephone & Telegraph Company. On March 16, 1917, the De Forest Company, by writing duly recorded, gave an exclusive license to make, use, and sell the devices for the

life of the patents to the Western Electric Company, reserving to itself nonexclusive, nontransferable, and personal rights to make, use, and sell them for defined purposes. The Western Electric Company then assigned all that it thus received from the De Forest Company to the American Telephone Company. The American Telephone Company, on July 1, 1920, made a contract with the General Electric Company, by which they exchanged rights in various patents owned or controlled by each, including these rights in the De Forest patents. Some seven months prior, on November 20, 1919, the General Electric Company had granted to the Radio Corporation, the plaintiff, an exclusive license to use and sell for 'radio purposes'-i. e., 'for transmission or reception of communication by what are known as electric magnetic waves except by wire'-all inventions owned by the General Electric Company or thereafter acquired by it. The American Telephone Company subsequently confirmed in the Radio Corporation these after-acquired rights in the De Forest patents. Thus there came from the De Forest Company to the Radio Corporation exclusive rights to use and sell in the United States, for radio purposes, apparatus for transmission of messages, and especially for use between ship and shore for pay.

The defendant, the Independent Wireless Company, has bought the same apparatus, with the lawful right to use it in the amateur and experimental field only. The *462 apparatus thus bought bears a label with such a limitation on its use. The charge in the bill is that the Independent Company is using the apparatus, or the part of it called 'radio tubes,' in the commercial radio field between ship and shore for pay, and thus is violating the Radio Corporation's rights in this field. An injunction is prayed, and an accounting of profits and all damages to the plaintiffs and the American Telephone Company, as their interests shall appear.

The twenty-fifth averment of the bill is:
'That 'the plaintiff, the De Forest Radio Telephone & Telegraph Company, as hereinbefore alleged, has certain rights in the patents in suit herein; that before filing this bill of complaint, said De Forest Radio Telephone & Telegraph Company, was requested to consent to join, as a coplaintiff, herein, but declined; that said De Forest Radio Telephone & Telegraph Company is not within the jurisdiction of the court and therefore cannot be made a defendant herein; and that therefore to prevent a failure of justice, and to enable the plaintiff Radio Corporation of America to protect its exclusive rights under the patents in suit, said De Forest Radio Telephone & Telegraph Company is made a plaintiff herein without its consent.'

46 S.Ct. 166, 70 L.Ed. 357

After securing an order for a bill of particulars, compliance with which disclosed the various agreements referred to in the bill and and facts relevant thereto, the Independent Wireless Telegraph Company, defendant, moved that the court dismiss the bill of complaint, upon the following ground:

> 'That the De Forest Radio Telephone & Telegraph Company, the owner of the patent in suit, has not joined in this litigation as a party plaintiff by duly signing and verifying the bill of complaint herein, and the plaintiff Radio Corporation of America is not such a licensee under the patents as to permit it to sue alone in its own name, in the name of the owner of the patents in suit, or to **\*463** sue in the name of the owner of the patents, joining itself as a licensee under the patents.'

The District Court sustained the motion and dismissed the bill, in the view that it was bound by decisions of this court to hold that the De Forest Company was the owner of the patent and an indispensable party, and, being out of the jurisdiction, could not be made a party defendant by service or joined as a party plaintiff against its will. 297 F. 518. The Circuit Court of Appeals, on appeal, reversed the District Court, held that the De Forest Company was properly made coplaintiff by the Radio Corporation, and remanded the case for further proceedings. 297 F. 521. We have brought the case here on certiorari. Section 240, Judicial Code (Comp. St. s 1217).

The respondent, in its argument to sustain the ruling of the Circuit Court of Appeals, presses two points. The first is that by the contract between the De Forest Company and the Western Electric Company title to the patent was vested in the Western Electric Company, and from it by assignment in the American Telephone & Telegraph Company; that the latter is a party defendant, **\*\*168** having declined to be a plaintiff, and so satisfies the requirement of the presence in such a suit as a party of the owner of the patent. The difficulty the respondent meets in this suggestion is that its bill avers that what the American Telephone Company acquired from the De Forest Company was a license, so called in the contract creating it, and the making of the De Forest Company a party plaintiff to the bill was necessarily on the theory that it, and not the American Telephone Company, is the owner of the patent. The contracts between the corporations involved in the

transfer of rigths under the patent are long and complicated, and in order to be fully understood require some knowledge of the new radio field. The court is loath to depart, if it could, from the theory on which the bill was framed and both courts have acted, unless required to do so.

 **\*464**  The question for our consideration then is: Can the Radio Company make the De Forest Company a coplaintiff against its will under the circumstances of the case?

Section 4919, R. S. (Comp. St. s 9464), is as follows:

> 'Damages for the infringement of any patent may be recovered by action on the case, in the name of the party interested, either as pattentee, assignee, or grantee. And whenever in any such action a verdict is rendered for the plaintiff, the court may enter judgment thereon for any sum above the amount found by the verdict as the actual damages sustained, according to the circumstances of the case, not exceeding three times the amount of such verdict, together with the costs.'

In Goodyear v. Bishop, 10 Fed. Cas. 642, No. 5,558, a suit for damages for infringement had been brought in the name of the patentee by a licensee under the fourteenth section of the Patent Act of 1836 (5 Stat. 357, c. 357), which contained language similar to section 4919. The defendant moved with the consent of the patentee to discontinue the suit. It was contended that, as the patentee had stipulated with the licensee to sue infringers, his remedy was on the covenant. Mr. Justice Nelson, at the circuit, denied the motion. He said that a suit at law to protect the patent right was properly brought in the name of the patentee, that the license was sufficient to give the protection sought, and that the covenant by the patentee did not take from the licensee the remedy by use of the patentee's name to proceed directly against the wrongdoer. The same ruling was made in Goodyear v. McBurney, 10 Fed. Cas. 699, No. 5,574.

These cases were decided in 1860 by a justice of this court, and no case is cited to us questioning their authority. Indeed, the cases have been since referred to a number of times with approval by distinguished patent judges. **\*465** Mr. Justice Blatchford, while Circuit Judge, in Nelson v. McMann, 17 Fed. Cas. 1325, 1329, No. 10,109; Mr. Justice Gray, while Chief Justice of the Supreme Judicial Court of Massachusetts,

46 S.Ct. 166, 70 L.Ed. 357

in Jackson v. Allen, 120 Mass. 64, 77; Judge Lowell, in Wilson v. Chickering (C. C.) 14 F. 917, 918; Judge Shipman, in Brush-Swan Co. v. Thomson Co. (C. C.) 48 F. 224, 226. The term 'action on the case' and the phrase 'in the name of the party interested, either as patentee, assignee, or grantee' in section 4919 were evidently construed to constitute a remedy at law like the suit at common law on a chose in action in the name of the assignor in which the assignment gave the assignee the right as attorney of the assignor to use the latter's name. Lectures on Legal History, Ames, 213. See, also, Eastman v. Wright, 6 Pick. 316; Pickford v. Ewington, 4 Dowling, P. C. 458; McKinney v. Alvis, 14 Ill. 33.

But section 4919 applied by its terms only to actions on the case at law to which the licensee was not a necessary and hardly a proper party. This is a bill in equity. The remedy for violation of an exclusive licensee's interest in equity under the patent laws is found in section 4921, R. S., which is as follows:

'The several courts vested with jurisdiction of cases arising under the patent laws shall have power to grant injunctions according to the course and principles of courts of equity, to prevent the violation of any right secured by patent, on such terms as the court may deem reasonable; and upon a decree being rendered in any such case for an infringement, the complainant shall be entitled to recover, in addition to the profits to be accounted for by the defendant, the damages the complainant has sustained thereby; and the court shall assess the same or cause the same to be assessed under its direction. And the court shall have the same power to increase such damages, in its discretion, as is given to increase the damages **\*466** found by verdicts in actions in the nature of actions of trespass upon the case.'[1]

[1] There is no express authority given to the licensee to use the name of the patent owner in equity as we have seen that he can under section 4919 in suits at law. The presence of the patentee or his assignee in the equity suit, however, it has been held, is just as essential to obtaining an injunction, or an accounting of profits or damages, under the patent laws, as it is in an action on the case for damages at law. Indeed both the owner and the exclusive licensee are generally necessary parties in the action in equity. Waterman v. Mackenzie, 138 U. S. 252, 11 S. Ct. 334, 34 L. Ed. 923; Littlefield v. Perry, 21 Wall. 205, 223, 22 L. Ed. 577; Paper Bay Cases, 105 U. S. 766, 26 L. Ed. 959; **\*\*169** Birdsell v. Shaliol, 112 U. S. 485, 486, 5 S. Ct. 244, 28 L. Ed. 768.

[2] It is urged on behalf of the respondent that in equity the real party in interest, the exclusive licensee whose contract rights are being trespassed upon by the infringer, should be able without the presence of the owner of the patent to obtain an injunction and damages directly against the infringer. We recognize that there is a tendency in courts of equity to enjoin the violation of contract rights which are invaded by strangers in a direct action by the party injured, instead of compelling a roundabout resort to a remedy through the covenant, express or implied, of the other contracting party. But such a short cut, however desirable, is not possible in a case like this. A suit without the owner of the patent as a plaintiff, if maintainable, would not be a suit under section 4921 of the patent laws, but only an action in equity, based on the contract rights of the licensee under the license and a **\*467** stranger's violation of them. There would be no jurisdiction in courts of the United States to entertain it, unless by reason of diverse citizenship of the parties, which does not exist in this case. Hill v. Whitcomb, 12 Fed. Cas. 182, 185, No. 6,502; Wilson v. Sandford, 10 How, 99, 101, 13 L. Ed. 344; Albright v. Teas, 106 U. S. 613, 1 S. Ct. 550, 27 L. Ed. 295, and cases cited.

[3] What remedies, then, can equity afford in a case like this? Waterman v. Mackenzie, 138 U. S. 252, 11 S. Ct. 334, 34 L. Ed. 923, involved the question whether a grant from the owner of the patent of the exclusive right to make and sell, but not to use, was an assignment under the statute, entitling the grantee in his own name to sue an infringer in equity, and it was held that it was not. Mr. Justice Gray, speaking for the court, at page 255 (11 S. Ct. 335), said:

> 'In equity, as at law, when the transfer amounts to a license only, the title remains in the owner of the patent; and suit must be brought in his name, and never in the name of the licensee alone, unless that is ncessary to prevent an absolute failure of justice, as where the patentee is the infringer, and cannot sue himself. Any rights of the licensee must be enforced through or in the name of the owner of the patent, and perhaps, if necessary to protect the rights of all parties, joining the licensee with him as a plaintiff. Rev. Stat. s 4921; Littlefield v. Perry, 21 Wall. 205, 223 (22 L. Ed. 577); Paper Bag Cases, 105 U. S. 766, 771 (26 L. Ed. 959); Birdsell v. Shaliol, 112 U. S. 485-487 (5 S. Ct. 244, 28 L. Ed. 768).

46 S.Ct. 166, 70 L.Ed. 357

And see Renard v. Levinstein, 2 Hem. & Mil. 628.'

Littlefield v. Perry, 21 Wall. 205, 22 L. Ed. 577, was a suit for infringement by one to whom was granted an exclusive right to make, use, and vend by the patent owner. The court held that it was an assignment under the statute, but further held that even if it were only an exclusive license, the suit might be maintained under the patent laws, because the patentee who had been privy to the alleged **\*468** infringement had been made a party defendant with the infringer. This court said at page 223:

> 'A mere licensee cannot sue strangers who infringe. In such case redress is obtained through or in the name of the patentee or his assignee. Here, however, the patentee is the infringer, and, as he cannot sue himself, the licensee is powerless, so far as the courts of the United States are concerned, unless he can sue in his own name. A court of equity looks to substance rather than form. When it has jurisdiction of parties, it grants the appropriate relief, without regard to whether they come as plaintiff or defendant. In this case the person who should have protected the plaintiff against all infringements has become himself the infringer. He held the legal title to his patent in trust for his licensees. He has been faithless to his trust, and courts of equity are always open for the redress of such a wrong. This wrong is an infringement. Its redress involves a suit, therefore, arising under the patent laws, and of that suit the Circuit Court has jurisdiction.'

The presence of the owner of the patent as a party is indispensable, not only to give jurisdiction under the patent laws, but also in most cases to enable the alleged infringer to respond in one action to all claims of infringement for his act, and thus either to defeat all claims in the one action, or by satisfying one adverse decree to bar all subsequent actions.

[4] If the owner of a patent, being within the jurisdiction, refuses or is unable to join an exclusive licensee as coplaintiff,

the licensee may make him a party defendant by process, and he will be lined up by the court in the party character which he should assume. This is the necessary effect of the decision in littlefield v. Perry, supra. See, also, Brammer v. Jones, 4 Fed. Cas. 11, No. 1,806; Gamewell Telegraph Co. v. Brooklyn (C. C.) 14 F. 255; Waterman v. Shipman, 55 F. 982, 986, 5 C. C. A. 371;   **\*469** Libbey Glass Co. v. McKee Glass Co. (D. C.) 216 F. 172, affirmed Id. (C. C. A.) 220 F. 672; Hurd v. Goold, 203 F. 998, 122 C. C. A. 298. This would seem to be in accord with general equity practice. Waldo v. Waldo, 52 Mich. 91, 17 N. W. 709; Id., 52 Mich. 94, 17 N. W. 710. A cestui que trust may make an unwilling trustee a defendant in a suit to protect the subject of the trust. Porter v. Sabin, 149 U. S. 473, 478, 13 S. Ct. 1008, 37 L. Ed. 815; Brun v. Mann, 151 F. 145, 153, 80 C. C. A. 513, 12 L. R. A. (N. S.) 154; Monmouth Co. v. Means, 151 F. 159, 165, 80 C. C. A. 527; Eastman v. Wright, 6 Pick. 312, 316.

It seems clear, then, on principle and authority, that the owner of a patent, who grants to another the exclusive right to make, use, or vend the invention, which does not constitute a statutory assignment, holds the title to the patent in trust for such a licensee, to the extent that he must allow the use  **\*\*170** of his name as plaintiff in any action brought at the instance of the licensee in law or in equity to obtain damages for the injury to his exclusive right by an infringer, or to enjoin infringement of it. Such exclusive licenses frequently contain express covenants by the patent owner and licensor to sue infringers, that expressly cast upon the former the affirmative duty of initiating and bearing the expense of the litigation. But, without such express covenants, the implied obligation of the licensor to allow the use of his name is indispensable to the enjoyment by the licensee of the monopoly which by personal contract the licensor has given. Inconvenience and possibly embarrassing adjudication in respect to the validity of the licensor's patent rights, as the result of suits begun in aid of the licensee, are only the equitable and inevitable sequence of the licensor's contract, whether express or implied.

But suppose the patentee and licensor is hostile, and is out of the jurisdiction where suit for infringement must be brought, what remedy is open to the exclusive licensee? The matter has been given attention by courts dealing with patent cases. In Wilson v. Chickering, supra, at page 918, an exclusive licensee brought a bill in equity to  **\*470** enjoin infringement without joining the owner of the patent. A demurrer was sustained, with 30 days to amend. Judge Lowell, after saying that a mere licensee cannot generally, in equity, sue in equity without joining the patentee, said:

'I do not, however, intend to be understood that the plaintiff will be without remedy if he cannot find the patentee, or if the latter is hostile. The statute does not abridge the power of a court of equity to do justice to the parties before it, if others who cannot be found are not absolutely necessary parties, as in this case the patentee is not. At law the plaintiff could use the name of a patentee in an action, and perhaps he may have the right in equity under some circumstances. The bill gives no explanation of his absence; but it was said in argument that he is both out of the jurisdiction and hostile. If so, no doubt there are methods known to a court of equity by which the suit may proceed for the benefit of the only person who is entitled to damages.'

In Renard v. Levinstein, 2 Hem. & Mil. 628, before Vice Chancellor Page Wood, afterwards Lord Hatherly, an exclusive licensee brought suit to enjoin infringement by a stranger, and made the patentees who were a foreign firm coplaintiffs. There was no objection to this action. No specific authority for this appeared, but it seems to have been implied from the relation of the exclusive licensee and the owner of the patent. It has some significance here in the fact that it was apparently referred to by Mr. Justice Gray, in Waterman v. Mackenzie, supra, as indicating what could be done in an English court of equity to enable the licensee to secure protection in the name of the owner of the patent.

In the case of Brush-Swan Electric Co. v. Thomson-Houston (C. C.) 48 F. 224, the Brush-Swan Company in Connecticut sued the Thomson-Houston Company in equity for infringing the former's rights as an exclusive *471 licensee for the sale of a device made under a patent owned by the Brush Electric Company of Cleveland, Ohio. The Brush-Swan Company made the Brush Electric Company a coplaintiff. The Cleveland company appeared for the purpose of asking that its name be stricken out as a party complainant, because the bill had been filed without its consent. The motion to strike out the coplaintiff's name was denied by Judge Shipman, on the ground that as the patent owner, being without the jurisdiction, could not be served with process, there would otherwise be absolute failure of justice. The judge said that

prima facie there was an implied power in the exclusive licensee under such circumstances to make the patent owner a party plaintiff. The same conclusion was approved by the Ninth Circuit Court of Appeals in Brush Electric Co. v. California Electric Co., 52 F. 945, 3 C. C. A. 368, before McKenna and Gilbert, Circuit Judges, and Knowles, the District Judge, affirming the same case in 49 F. 73, and by the same court in Excelsior Co. v. Allen, 104 F. 553, 44 C. C. A. 30, and in Excelsior Co. v. The City of Seattle, 117 F. 140, 143, 144, 55 C. C. A. 156. In Hurd v. Goold Co., 203 F. 998, 122 C. C. A. 298, before the Circuit Court of Appeals of the Second Circuit (Lacombe, Coxe, and Noyes, Judges), Hurd, who was the exclusive licensee, joined with himself two corporations who held the legal title to the patent. The corporations had been enjoined in the Sixth circuit from maintaining suits for infringement. The Second Circuit Court of Appeals held that Hurd was entitled to present his licensors, that is, the owners of the patent-as coplaintiffs, even against their will and in spite of their protects. This doctrine was approved by the same court in Radio Corporation v. Emerson, 296 F. 51, 54. See, also, McKee Glass Co. v. Libbey Glass Co., 220 F. 672, 136 C. C. A. 314 (3d C. C. A.), affirming same (D. C.) 216 F. 172; Chisholm v. Johnson, 106 F. 191, 212; Owatonna Mfg. Co. v. Fargo (C. C.) 94 F. 519, 520.

*472 It is objected to the relevancy of these authorities that not one of them actually presents the case here. In all of them it is said the owner or patentee was within the jurisdiction of the court and could be served, or else had come into the jurisdiction voluntarily to move for leave to withdraw as a party. As the court had the owner before it, and the owner was in duty bound to become a party, the court could prevent the withdrawal. Here the owner is not in the jurisdiction and does not come in. It is the defendant, **171 the alleged infringer, which objects to using the name of the owner as plaintiff without its consent.

We think the cases cited go beyond the defendant's interpretation of them, and do hold that, if there is no other way of securing justice to the exclusive licensee, the latter may make the owner without the jurisdiction a coplaintiff without his consent in the bill against the infringer. Equity will not suffer a wrong without a remedy. 1 Pomeroy's Equity Jurisprudence (4th Ed.) ss 423, 424. While this maxim is, of course, not of universal application, it justifies the short step needed to hold that in an equity suit under section 4921, where otherwise justice to the exclusive licensee would fail, he may make the owner of the patent a coplaintiff in his bill under section 4921, in analogy to the remedy given him in an action

on the case at law for damages under section 4919, for the two sections are plainly in pari materia.

In so doing, equity does no more than courts of law did, at one period in their history, as we have seen, in implying in the assignee of a chose in action a power of attorney to maintain an action in the name of the assignor in order to assure to the assignee the benefits of his assignment. Where the assignor attempted to interfere with the exercise of the power of attorney by collection of the assignee's claim, or where for any technical reason the remedy through the exercise of implied power of attorney **\*473** was unavailable, equity intervened to lend aid to the assignee and secure a recovery for his benefit. See Lenox v. Roberts, 2 Wheat. 373, 4 L. Ed. 264; Hammond v. Messenger, 9 Sim. 327; Roberts v. Lloyd, 1 De G. & J. 208; Hodge v. Cole, 140 Mass. 116, 2 N. E. 774; Hughes v. Nelson, 29 N. J. Eq. 547; Hayes v. Hayes, 45 N. J. Eq. 461, 17 A. 634.

The objection by the defendant that the name of the owner of the patent is used as a plaintiff in this suit without authority is met by the obligation the owner is under to allow the use of his name and title to protect all lawful exclusive licensees and sublicensees against infringers, and by the application of the maxim that equity regards as done which ought to be done. Camp v. Boyd, 229 U. S. 530, 559, 33 S. Ct. 785, 57 L. Ed. 1317; United States v. Colorado Anthracite Co., 225 U. S. 219, 223, 32 S. Ct. 617, 56 L. Ed. 1063; Craig v. Leslie, 3 Wheat. 563, 578, 4 L. Ed. 460. The court should on these grounds refuse to strike out the name of the owner as coplaintiff, put in the bill under proper averment by the exclusive licensee.

The owner beyond the reach of process may be made coplaintiff by the licensee, but not until after he has been requested to become such voluntarily. If he declines to take any part in the cause, though he knows of its imminent pendency and of his obligation to join, he will be bound by the decree which follows. We think this result follows from the general principles of res judicata. In american Bell Telephone Co. v. National Telephone Co. (C. C.) 27 F. 663, heard before Judges Pardee and Billings, the question was whether the National Telephone Company was bound by a decree in favor of the Bell Company for infringement against a Pittsburgh company claiming under a license from the National Company. The National Company, under a contract upon notice to defend its license, took control of the case, but, becoming dissatisfied with a preliminary ruling of the court, withdrew its counsel and evidence from the case. The National Company was held bound on the authority **\*474**

of the case of Robbins v. Chicago, 4 Wall. 657, 18 L. Ed. 427. When Robbins was building a store in Chicago by an independent contractor, an areaway adjoining the street was left open. A passer-by fell in and was injured. He sued the city, and recovered judgment for $15,000. Robbins had been previously warned by the city of the danger of the unprotected area, and had notice of the accident and of the pendency of the suit, but did not become a party. The city then sued Robbins, and was given a judgment against him for the amount of the recovery against the city. This court, in sustaining the result, held that parties bound by the judgment in such a case included all who were directly interested in the subject-matter, who had knowledge of the pendency of the suit and a right to take part therein, even if they refused or neglected to appear and avail themselves of this right. Lovejoy v. Murray, 3 Wall. 1, 19, 18 L. Ed. 129; Plumb v. Goodnow, 123 U. S. 560, 8 S. Ct. 216, 31 L. Ed. 268; Robertson v. Hill, 20 Fed. Cas. 944, No. 11,925; Miller v. Liggett (C. C.) 7 F. 91.

By a request to the patent owner to join as coplaintiff, by notice of the suit after refusal and the making of the owner a coplaintiff, he is given a full opportunity, by taking part in the cause, to protect himself against any abuse of the use of his name as plaintiff, while, on the other hand, the defendant, charged with infringement, will secure a decree saving him from multiplicity of suits for infringement. Of course, a decree in such a case would constitute an estoppel of record against the patent owner, if challenged, only after evidence of the exclusive license, the request to join as coplaintiff, and the notice of the suit.

There is nothing in the case of Crown Co. v. Nye Tool Works, 261 U. S. 24, 43 S. Ct. 254, 67 L. Ed. 516, which conflicts with this conclusion. That case was brought by the plaintiff, a licensee, to establish as a principle of patent practice that a transfer by an owner of a patent to another, conferring only the right to sue a third for past and future infringements **\*475** of the patent, without the right to make, use, and vend the patented article was an assignment of the patent under **\*\*172** section 4898, R. S. (Comp. St. s 9444). We declined so to hold. There was no offer to make the owner of the patent a party, nor were there any facts showing that the owner would not join as coplaintiff or was not in the jurisdiction. The appellant stood solely upon his right to sue as an assignee of the patent and was defeated.

We hold that the De Forest Company was properly joined as a coplaintiff by the Radio Corporation upon the twenty-fifth averment of the bill. This makes it unnecessary for us to consider the argument on behalf of the appellee that the

46 S.Ct. 166, 70 L.Ed. 357

American Telephone Company was the owner of the patent, instead of the De Forest Company.

Decree affirmed.

**Parallel Citations**

46 S.Ct. 166, 70 L.Ed. 357

Footnotes

1    Section 4921 was amended by Act March 3, 1897, c. 391, s 6, 29 Stat. 694 (Comp. St. s 9467), adding a six-year limitation on actions under it, and by Act Feb. 18, 1922, c. 58, s 8, 42 Stat. 392 (Comp. St. Ann. Supp. 1923, s 9467), allowing expert evidence as to damages and requiring notice of litigation to Commissioner of Patents for record by indorsement on file wrapper of patents involved. The amendments do not affect the question here.

**End of Document**                                        © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 52

2013 WL 3354390
Only the Westlaw citation is currently available.
United States District Court, N.D. California
San Jose Division

Innovus Prime, LLC, Plaintiff,

v.

Panasonic Corporation and Panasonic
Corporation of North America, Inc., Defendant.

Case No. C–12–00660–RMW    |    July 2, 2013

**Attorneys and Law Firms**

John Wade Carpenter, Law Offices of John W. Carpenter,
LLC, New Orleans, LA, for Plaintiff

Adam C. Hemlock, David L. Yohai, Weil Gotshal and
Manges LLP, New York, NY, Christopher J. Cox, Weil
Gotshal & Manges, Redwood Shores, CA, for Defendants

**Opinion**

**ORDER GRANTING PLAINTIFF'S MOTION
TO STRIKE AND GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

**[Re Docket Nos. 53, 64]**

RONALD M. WHYTE, United States District Judge

**\*1**  Defendants Panasonic Corporation and Panasonic
Corporation of North America, Inc. (collectively
"Panasonic") move for summary judgment that they do not
infringe U.S. Patent No. 5,280,350 ( "#350 Patent"). Plaintiff
Innovus Prime, LLC ("Innovus") acquired the #350 Patent on
April 17, 2011, as the fourth owner in a chain of assignees.
Panasonic relies on a 1982 non–assertion agreement between
itself and the original owner of the # 350 Patent ("1982
Agreement") as the basis for its authority to practice the
invention of the #350 Patent for the duration of the patent's
term. Because the court concludes that the 1982 Agreement
authorized Panasonic to practice the patented invention for
the life of the #350 Patent (which is now expired), and for
the reasons explained below, the court GRANTS Panasonic's
motion for summary judgment of noninfringement.

**I. BACKGROUND**

The United States Patent and Trademark Office issued the
#350 Patent on January 18, 1994 to U.S. Philips Corporation,
a subsidiary of N.V. Philips Gloeilampenfabrieken, currently
doing business as Koninklijke Philips Electronics ("Philips").
The #350 Patent relates to an apparatus for processing picture
signals for television.

On December 20, 1982, Philips entered into an agreement
with Panasonic whereby each party agreed not to assert
against the other any patents relevant to "audio and video
products" that were filed (or entitled to priority) before
January 1, 2005. [1] Watanabe Decl., Ex. 1 at 1, Dkt. No. 53–4
("1982 Agreement"). There is no dispute that the #350 Patent
is relevant to a video product and was filed before 2005, and
thus was subject to the 1982 Agreement between Philips and
Panasonic (at least before the patent was assigned). In 2007,
Philips and Panasonic entered into a new agreement in which
they clarified the definitions of "audio and video products" in
the 1982 Agreement (to include six new products that did not
exist in 1982). Watanabe Decl., Ex. 2 at 1, 6 Dkt. No. 53–5
("2007 Agreement").

On February 1, 2008, Philips assigned its interest in the
#350 Patent to NXP B.V., "subject to all existing rights,
commitments, licenses, non-assertion agreements and the like
made by Assignor, [Philips] and/or its affiliates under said
Patent Rights and to any extensions of term and/or renewal
thereof." Yohai Decl., Ex. 3 at Reel 021411, Frame 0447,
Dkt. No. 53–9 ("1st Assignment"). On February 7, 2010,
approximately two years following the assignment from
Philips, NXP B.V. assigned all rights to the #350 Patent to
NXP Holding 1 B.V. (Now Trident Microsystems (Far East)
LTD). Yohai Decl., Ex. 4 at Reel 023928, Frame 0496, 0502–
0506, Dkt. No. 53–10 ("2nd Assignment"). In April 2011,
Trident Microsystems (Far East) assigned all its rights to the
#350 Patent to plaintiff Innovus Prime, LLC ("Innovus").
Yohai Decl., Ex. 5 at Reel 026156, Frame 0365–59, Dkt. No.
53–11 ("3rd Assignment"). The #350 Patent expired shortly
thereafter, in August 2011. 35 U.S.C. § 154(c) (twenty years
from the filing date).

**\*2**  In August 2011, Innovus initially brought a patent
infringement action against Panasonic and three other
defendants alleging infringement of the #350 Patent.
However, the court dismissed Panasonic from the case on
misjoinder grounds. On February 9, 2012, Innovus filed

the instant patent infringement action against Panasonic. Panasonic moves for summary judgment of noninfringement based on its non-assertion rights under the 1982 and 2007 Agreements.

## II. ANALYSIS

### A. Evidentiary Rulings on Innovus's Motions to Strike

Innovus moves to strike portions of the declarations submitted by Panasonic in support of their motion for summary judgment on the basis that they contain parol evidence, are not supported by personal knowledge, and make legal conclusions. [2] Dkt. Nos. 56 and 64. [3] Innovus also moved for an expedited hearing on the motion to strike in conjunction with the present motion for summary judgment. Dkt. No. 65. [4]

Civil Local Rule 7–3(a) provides that "[a]ny evidentiary and procedural objections to the motion must be contained within the brief or memorandum" filed in opposition to the motion. Innovus improperly filed its motion separately on two occasions, Dkt. Nos. 56 and 64, but the court nevertheless considers the motions under Federal Rule of Civil Procedure ("Rule") 56(e) because the court agrees that the contested portions of the declarations make impermissible legal conclusions and are improper.

Under Rule 56(e), an affidavit "must be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Any affidavit which does not conform to these specifics must be stricken. Civil Local Rule 7–5(b) further provides that

> [a]n affidavit or declaration may contain only facts, must conform as much as possible to the requirements of FRCivP 56(e), and must avoid conclusions and argument. Any statement made upon information or belief must specify the basis therefore. An affidavit or declaration not in compliance with this rule may be stricken in whole or in part.

Civ. L.R. 7–5(b). An affidavit is conclusory if the facts contained are speculative or in the form of legal conclusions, but not if they are based on the affiant's recollection of the

events. See *Orsini v. O/S SeaBrooke O.N.,* 247 F.3d 953, 960 n.4 (9th Cir. 2001).

Those who participate in the negotiations of contracts are entitled to testify as to their interpretation of ambiguous terms, however their testimony "must be grounded in ... the parties' expressed intent and understanding during the course of negotiations, rather than simply the witness's own subjective interpretation of the contract." *Onyx Pharma., Inc. v. Bayer Corp.,* 863 F.Supp.2d 894, 897–98 (N.D. Cal. 2011). The court finds that the contested portions of the declarations are nothing more than impermissible subjective interpretations of the meaning of the 1982 and 2007 Agreements. The Agreements speak for themselves, and the court strikes the contested portions of the declarations.

### B. Choice of Law

**\*3**  The parties disagree on whether this dispute should be governed by the laws of the United States or the laws of England and Wales. Innovus contends that English law applies because Article 6.10 of the 2007 Agreement provides that "the applicable substantive law of the Agreement shall be the laws of England and Wales." Panasonic asserts that the #350 Patent is governed exclusively by the 1982 Agreement which contains no choice of law language. Panasonic further argues that this is a question of patent licensing and exhaustion which is to be governed exclusively by United States federal law.

The interpretation of contracts for rights under patents and patent licenses is "generally governed by state law." *Rhone–Poulenc Agro, S.A. v. DeKalb Genetics Corp.,* 284 F.3d 1323, 1327–28 (Fed. Cir. 2002); *see also Int'l Nutrition Co. v. Horphag Research LTD,* 257 F.3d 1324, 1329 (Fed. Cir. 2001) ("A contractual agreement to apply French law as to ownership is just as valid as an agreement to apply the law of a particular state."); *Hilgraeve Corp. v. Symantec Corp.,* 265 F.3d 1336, 1341 (Fed. Cir. 2001) (resolving a contractual licensing dispute under Ontario law).

In contrast to issues of pure contract interpretation, however, federal law applies to both substantive and procedural issues "intimately involved in the substance of enforcement of the patent right." *Arma Refrigeration, Inc. v. Quadlus, Inc.,* 172 F.3d 852, 855 (Fed. Cir. 1999). The Federal Circuit has explained that the effect of *a patent assignment* under a contract, as opposed to the interpretation of contract terms themselves, is an issue unique to patent law that is governed by federal law. *See Sky Tech v. SAP AG,* 576 F.3d 1374, 1379

Fed. Cir. 2009) ("Usually, federal law is used to determine the validity and terms of an assignment...."); *DDB Tech., LLC v. MLB Adv. Media, LP,* 517 F.3d 1284, 1290 (Fed. Cir. 2008) (The determination of whether a patent assignment clause creates automatic assignment or obligation to assign is treated as a matter of federal law.).

Here, the parties do not dispute whether the #350 Patent is an audio-video product subject to the 1982 Agreement, or the meaning of any other terms in the 1982 Agreement. Instead, the parties' dispute whether the mutual non-assertion agreement between Philips and Panasonic affected later assignees' patent rights. The effect of the assignments in this case on Panasonic's non-assertion rights is an issue unique to patent law that is "intimately involved in the substance of the enforcement" of the #350 Patent. *See Sky Tech,* 576 F.3d at 1379. Therefore, this dispute is governed by United States federal law.

The court does not agree with Innovus that the choice of law provision in the 2007 Agreement requires this dispute to be resolved under the laws of England and Wales. As discussed *infra,* the 2007 Agreement does not expressly limit or supersede the rights provided in the 1982 Agreement.[5] Regardless of whether the 2007 Agreement affects the 1982 Agreement, however, this dispute centers on the effect of Philip's *assignment* as opposed to general contract interpretation, and United States federal law applies.

## C. Effect of the Assignments of the #350 Patent on Panasonic's Non–Assertion Rights

**\*4** The relevant inquiry is whether the covenant not to sue between Philips and Panasonic affected later assignees' patent rights. After examining the 1982 Agreement, the 2007 Agreement, and the chain of assignments, this court concludes that Innovus is bound by the terms of the 1982 Agreement.

### 1. The parties' arguments

Panasonic asserts that the unambiguous language of the 1982 Agreement and the long history of the parties' operations under the agreement illustrate that the parties both created and intended to create an unconditional covenant not to sue for all audio and video patents issued before January 1, 2005, which extended for the full lives of the patents covered. Panasonic argues that, under *TransCore, LLC v. Electric Transaction*

*Consultants Corporation,* 563 F.3d 271 (Fed. Cir. 2009), unconditional covenants not to sue are equivalent to a non-exclusive license, and that all assignees of patents are bound by prior licenses. Therefore, Panasonic insists that Innovus, a subsequent assignee of the #350 Patent covered by the 1982 Agreement, does not possess the right to sue Panasonic for infringing the #350 Patent.

Innovus counters that the 2007 Agreement is controlling and expressly limits the effect of the non-assertion agreement to the first assignment. According to Innovus, the 2007 Agreement creates nothing more than a conditional covenant not to sue (conditioned on the patent being an audio or video patent issued before January 1, 2005), which is not equivalent to a license, and *is not transferable* to subsequent assignees. At oral argument, Innovus relied on *Hilgraeve Corp. v. Symantec Corp.* to support this proposition. 265 F.3d 1346 (concluding that a covenant-not-to sue "does not grant a *transferable* license to the patent."). Innovus attempts to distinguish this case from *TransCore* on the grounds that the parties in *TransCore* were the initial signatories of the covenant not to sue, whereas Innovus is the fourth assignee after the agreement. Finally, Innovus contends that the terms of the 2007 Agreement indicate that Panasonic's non-assertion rights were not automatically transferable by assignment because: (1) the 2007 Agreement did not expressly provide that the non-assertion agreement would be automatically binding on future assignees, but rather (2) provided for indemnification in the event that the non-assertion agreement was not *contractually extended* to future assignees.

In response, Panasonic argues that the 2007 Agreement supplements, but does not supersede, the 1982 Agreement, to include six new products not at issue here. Under the 1982 Agreement, as modified by the 2007 Agreement, Panasonic contents that it obtained the unconditional right not to be sued for the full life of the #350 Patent. Panasonic further rebukes Innovus's attempts to distinguish *TransCore,* asserting that the principle in *TransCore*—that a license and a covenant not to sue are both "authorizations"—is not negated by an assignment. Finally, Panasonic replies that any contractual clause expressly providing for automatic assignment of the covenant not to sue would be redundant because the #350 Patent could not be transferred free of the covenant as a matter of law.

### 2. Unconditional covenants not to sue are equivalent to non-exclusive licenses

**\*5** Under federal law, there is no substantive difference between an unconditional covenant not to sue and a non-exclusive license. *TransCore,* 563 F.3d at 1276 ("The real question, then, is not whether an agreement is framed in terms of a 'covenant not to sue' or a 'license.' That difference is one of form, not substance–both are properly viewed as 'authorizations.' "). In *TransCore,* the Federal Circuit held that the patentee's covenant-not-to sue authorized the covenantee, Mark IV, to sell the patented invention to the defendant, Electronic Transaction Consultants ("ETC"). *Id.* at 1274. The court reasoned that the covenant not to sue "authorize[d] all acts that would otherwise be infringements: making, using, offering for sale, selling, or importing." *Id.* Thus, for the purposes of patent exhaustion, the court held that the patentee's rights were exhausted with respect to the patented articles sold to ETC by the Mark IV. *Id.*

A patent license is nothing more than a promise by the patent owner not to sue the licensee. *See TransCore,* 536 F.3d at 1276; *see also De Forest Radio Tel. & Tel. Co. v. United States,* 273 U.S. 236, 242 (1927) ("As a license passes no interest in the monopoly, it has been described as a mere waiver of the right to sue by the patentee."). No particular language or form is necessary to give a license its effect, "[a]ny language ... from which [one] may properly infer that the owner consents to his use of the patent in making or using it, or selling it ... constitutes a license." *De Forest Radio,* 273 U.S. at 241. Here, although Philip's "authorization" to Panasonic was in the form of a covenant not to sue, it had the same substantive effect of a non-exclusive license. *See TransCore,* 526 F.3d at 1274; *De Forest Radio,* 273 U.S. at 241–42. The issue is whether Philips could assign the # 350 Patent free and clear of the covenant not to sue Panasonic.

It is a longstanding principle that an assignee of a patent takes the patent subject to prior licenses. *Keystone Type Foundry v. Fastpress Co.,* 272 F. 242, 245 (2d Cir. 1921); *see also L.L. Brown Paper Co. v. Hydroiloid, Inc.,* 118 F.2d 674, 677 (2d Cir. 1941) ("The assignee of a patent taking title subsequent to the granting of a license under patent receives no more than the former owner's interest, including the usual rights of a patent owner diminished by the licensee's right to use the patented process within scope of its license."). Patent owners cannot transfer an interest greater than what they possess, so assignees "take[ ] a patent subject to the legal encumbrances

thereon." *Datatreasury Corp. v. Wells Fargo & Co.,* 522 F.3d 1368, 1372–72 (Fed. Cir. 2008) (explaining that agreements involving the actual use of the patent "run with the patent" and are binding on subsequent owners, but holding that arbitration clauses in license agreements do not involve actual use and do not run with the patent). Thus, assignment results in the assignee "stepping into the shoes with regard to the rights that the assignor held and not in an expansion of those rights." *Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.,* 247 F.3d 44, 60 (3d Cir. 2001); *see also Epistar Corp. v. Int'l Trade Comm'n,* 566 F.3d 1321, 1333 (Fed. Cir. 2009) ("Black letter contract law states that the assignment of a contract to an assignee ... only changes the obligated party, not the scope of the obligation."). Assignment transfers assignor's contract rights, "leaving them in full force and effect." *Medtronic,* 247 F.3d at 60. In sum, "one cannot convey what one does not own." *TransCore,* 563 F.3d at 1275.

This occurs whether or not an assignee had notice. A subsequent assignee "takes title to the patent subject to such licenses, of which he must inform himself as best he can at his own risk." *Jones v. Berger,* 58 F. 1006, 1007 (C.C.D. Md. 1893); *see also V–Formation, Inc. v. Benetton Group SpA,* No. 02–2259, 2006 WL 650374, at \*7 (D.Colo. Mar. 10, 2006) (extending this reasoning to covenants not to sue). In *V–Formation,* K–2 Corporation entered into a covenant not to sue with defendant Benetton Group, which included the two patents at issue. *Id.* at \* 1. K–2 later *assigned* all of its rights to those two patents to V–Formation, Inc. (to settle a separate litigation). *Id.* at \*2. V–Formation was unaware of K–2's covenant not to sue Benetton. *Id.* The issue, like the issue here, was whether V–Formation (assignee) could sue Benetton (recipient of covenant not to sue). The court held that V–Formation could not sue Benetton for infringement, because K–2 did not possess the right to sue Benetton, and K–2 *could not have assigned this right* to V–Formation. *Id.* at \*5. The court reasoned that "upholding the covenant not to sue ... does not deprive V–Formation of its ownership interest in the patents; it merely limits its right to sue one entity (Benetton) for infringement." *Id.* at \*8. The court also held that V–Formation's lack of knowledge of the covenant not to sue did not entitle it to bring suit. *Id.* at \*7 ("The court does not agree that that the doctrine of 'bona fide purchaser' as urged by V–Formation precludes Benetton from asserting the covenant not to sue as a defense in this case."). This case is analogous to the situation here.

### 3. *Hilgraeve*

**\*6**  At oral argument, Innovus relied on *Hilgraeve* for the proposition that the covenant not to sue in this case is *not transferable* in the same way as a license would be. In *Hilgraeve,* the patent owner, Hilgraeve Corp., granted a covenant not to sue to covenantee Delrina, Corp. with respect to patents for software. 265 F.3d at 1345. The covenant was contained in a Technology Transfer Agreement transferring Hilgraeve's *copyrights* in that software to Delrina. Id. at 1340, 1345. Delrina subsequently licensed its intellectual property rights to defendant Symantec Corp. Id. at 1340. Hilgraeve sued Symantec for patent infringement, and Symantec argued as one of its defenses to infringement that it had obtained a license to the patent at issue from Delrina. Id. at 1344. The Federal Circuit rejected Symantec's argument on the grounds that "Delrina ... itself never acquired a transferable license to practice the [patent in suit], and Delrina ... therefore could not sub-license the [patent in suit]." Id. The court first concluded that the Technology Transfer Agreement did not transfer any rights to the patent, only the copyrights. Id. at 1345. The court also held that the covenant not to sue with respect to the patents did "not grant a *transferable* license to the patent." Id. at 1346 (emphasis in original).

Unlike the situation in *Hilgraeve,* here, Panasonic is not attempting to convey a license to anyone. Instead, Panasonic is merely seeking *not to be sued,* the right which is possesses under the 1982 and 2007 Agreements. While it is true that Panasonic may not be able to *grant a license* to the # 350 Patent to a third party, it is not attempting to do so. The question is whether Philips can convey the right to sue Panasonic, a right which it does not possess, to *assignees*.

### 4. Application

The 1982 Agreement between the Panasonic and Philips was a mutual agreement that neither party would assert patent rights for video and audio patents filed or entitled to a priority date before January 1, 2005 against the other. 1982 Agreement at 1 ("It has always been understood between us that ... neither [Panasonic] nor Philips shall assert against the other any patent rights."). The language of the 1982 Agreement is clear that the covenant not to sue extended "for the respective full lives of the patent rights concerned." 1982 Agreement at 2. The #350 Patent issued to Philips on January 18, 1994, and is thus a covered patent under the Agreements.

The agreement between the parties, regardless of the formal language used, unconditionally authorized Panasonic to make, use, or sell the invention of the #350 Patent for the full life of the patent, and thus has the same effect as a license. *See TransCore,* 563 F.3d at 1276; *De Forest Radio,* 273 U.S. at 241–42. Nothing in the 2007 Agreement affects Panasonic's non-assertion rights with respect to the #350 Patent. The 2007 Agreement, by its terms, is a formal supplement to the 1982 Agreement, to aid the parties in the interpretation of the term "audio and video products" under the 1982 Agreement with respect to six new product categories. 2007 Agreement at 1 ("WHEREAS, the Parties have been engaged in a dispute regarding the interpretation of the term 'audio and video products' under the Original Agreement with respect to the Six Product Categories."). Nothing in the 2007 Agreement explicitly alters or is inconsistent with the scope of the rights defined in the 1982 Agreement. [6]  The #350 Patent was issued in 1994, under the first five year continuation of the 1982 Agreement, it was not one of the six disputed products, and it is therefore covered by the 1982 Agreement. Thus, the covenant not to sue with respect to the #350 Patent began on its issuance in 1994 and extended for the life of the patent.

**\*7**  In addition to the unambiguous language of the contract, the parties have operated for years as if consenting to each other's use, without any objection. *See also Old Colony Trust Co. v. Omaha,* 23 U.S. 100, 118 (1913) ("The practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed to have great, if not controlling influence."). The parties' conduct bolsters what the plain and unambiguous language of the contract creates: an implied non-exclusive license.

While this court understands the unfairness that may arise from an assignee not being on notice of a prior covenant not to sue or license, it is well settled that assignees take a patent subject to any prior licenses. *See In re Cybernetic Servs.,* 252 F.3d 1039, 1052 (9th Cir. 2001). And licenses are not required to be recorded any more than covenants not to sue. *See id.* (holding that security interests that do not involve transfers of rights do not need to be recorded as they are "a 'mere license' ... [and] not an 'assignment, grant or conveyance' within the meaning of 25 U.S.C. § 261"; *see also Keystone,* 272 F. at 245 (" [I]t had long passed into the text-books that ... an assignee acquired title subject to prior licenses of which the assignee must inform himself as best he can, and at his own risk."). The assignee's duty to inform himself of encumbrances on the patent rights exists regardless of the

formal definition of the agreement as a covenant not to sue. As such, the fact that Innovus is a fourth generation assignee does not change the fact that Innovus did not acquire the right to sue Panasonic under the #350 Patent because neither Philips nor any later assignee could "convey what [it] does not own." *TransCore,* 563 F.3d at 1275.

Moreover, the first assignment, from Philips to NXP B.V., specifically states that the Assignee, NXP B.V., took the patent

> subject to Assignor [Philips] retaining a royalty free, world wide, nonexclusive, irrevocable and unrestricted license ... and further subject to all existing rights, commitments, licenses, non-assertion agreements and the like made by the Assignor ... and/or its affiliates under said Patent Rights and to any extension of term and/or renewals thereof.

1st Assignment at Reel 021411, Frame 0447. Thus, NXP B.V. expressly took the patent subject not only to Philip's continued license, but also subject to Panasonic's non-assertion rights. A patent owner cannot transfer an interest greater than what it possesses. *TransCore,* 563 F.3d at 1275; *Epistar,* 566 F.3d at 1321. Because Philips never possessed the right to sue Panasonic, Philips could not convey that right to NXP B.V., NXP B.V. could not convey that right to NXP Holdings, and NXP Holdings could not convey that right to Innovus. All of these assignments are available as a matter of public record, including the first assignment from Philips to NXP B.V., which contains the express limitations on the rights transferred and should have put Innovus on notice of the non–assertion rights (although notice is not required, as explained *supra*).

The court is also not persuaded that the analysis changes in view of: (1) the absence of an explicit clause in the 1982 or 2007 Agreements binding all future assignees; (2) Article 6.5.4 of the 2007 Agreement; or (3) Article 4 of the 2007 Agreement. First, the court agrees with Panasonic that any explicit clause in the 1982 or 2007 Agreements binding all future assignees to the non-assertion agreement would be redundant because, as explained, Philips could not convey the right to sue Panasonic in any event.

**\*8** Second, Article 6.5.4 of the 2007 Agreement only confirms that Philips did not possess the right to sue

Panasonic. The provision states that nothing in either Agreement "shall be construed as: conferring by implication, estoppel or otherwise, upon any Party hereunder, any license or other right under any Patent, except the *non-assertion rights* expressly granted herein." 2007 Agreement, Article 6.5.4 (emphasis added). This plain language is clear that the clause was not intended to limit the continued application of the covenant not to sue.

Finally, neither does Article 4 of the 2007 Agreement—which refers to what should be done in the event of acquisition of subsidiaries, divestiture of business, and transfer of patent rights falling within the scope of the agreement—change the analysis. Article 4.4 requires that, in the event of transfer of rights, each party should

> contractually require the entity acquiring said Patents to continue to provide the rights granted under the [1982] Agreement and this Agreement to the other Party. In the event that a Party transfers one or more of the Patents but fails to comply with the requirements of this ... said Party shall indemnify and hold harmless the other Party.

This clause merely reiterates what the law already requires: subsequent parties are bound by the existing agreement. At most, this clause provides a guarantee of notice to the future assignee, ideally to avoid lawsuits like the instant one.[7] Similarly, the letter from NXP B.V., the first assignee, to Panasonic merely acknowledged that they would continue to honor the non-assertion agreement with respect to the #350 Patent. Watanabe Decl., Ex. 3 Dkt. No. 53–3 ("NXP B.V. Letter"). As explained, however, this acknowledgment does not change the fact that Philips could not convey the right to sue Panasonic, a right which it did not possess.

Therefore, whether the Philips–Panasonic agreement is referred to as a "non-exclusive license" or a "covenant not to sue," under either name, it took away Philip's right to exclude Panasonic from practicing the invention of the #350 Patent. Philips, then, could not convey the right to exclude Philips to NXP B.V. and so on, to Innvus. Innovus does not possess the right to sue Panasonic for infringement of the #350 Patent.[8]

### III. ORDER

For the foregoing reasons, defendant's motion for summary judgment is GRANTED.

Footnotes

1    The original agreement initially covered patents filed or entitled to priority before January 1, 1990, but pursuant to its terms, the agreement automatically extended for five year periods until one party elected not to extend and gave the requisite notice. On October 22, 2003, Philips elected not to renew the 1982 Agreement and it thus expired as of January 1, 2005.

2    Specifically, with regard to the Watanabe Declaration, Innovus asks the court to strike the second sentence of ¶ 5, the entirety of ¶ 6, the second and third sentences of ¶ 7, and the entirety of ¶ 8. With regard to the Peters Declaration, Innovus asks the court to strike the first sentence of ¶ 3 and the entirety of ¶¶ 4–7.

3    Innovus filed the same motion on two occasions: (1) once in conjunction with its opposition brief, and (2) again one week later accompanied by a motion to expedite.

4    The court considers Innovus's motion to strike in conjunction with the present motion for summary judgment.

5    The plain language of the 2007 Agreement makes clear that the choice of law provision only applies to the 2007 Agreement. *Compare* 2007 Agreement, Article 6.10 ("The applicable substantive law of *the Agreement* shall be the laws of England and Wales") (emphasis added) *with* 2007 Agreement, Articles 6.2–6.9 (all of which contain either "of *this* Agreement *and* the [1982] Agreement" or "of *this* Agreement *or* the [1982] Agreement") (emphases added).

6    Specifically, Article 5 of the 2007 Agreement refers to "Interpretation of the Original Agreement," and Article 2 states: "[t]he parties confirm and agree that the Six Product Categories are within the scope ... [of] the [1982] Agreement." This clearly indicates that the 2007 Agreement acknowledges the Original Agreement to still be in effect and not superseded. Moreover, nothing in Article 5 alters any of the parties' non-assertion rights.

7    Innovus alleges that under English law's purposive interpretation of contracts, it would be a breach of contract for Philips or any later assignee transfer the patent without a limitation written into the assignment. Whether Philips is in breach of contract, however, does not change the fact that the Philips could not convey the right to sue Panasonic.

8    Panasonic also argues that Innovus's patent rights were exhausted. The court concludes that a patent exhaustion analysis is not required to reach the conclusion that Innovus does not possess the right to sue Panasonic.