TAB 53

248 F.3d 1333
United States Court of Appeals,
Federal Circuit.

INTELLECTUAL PROPERTY
DEVELOPMENT, INC., Plaintiff–Appellee,
v.
TCI CABLEVISION OF CALIFORNIA,
INC., Defendant–Appellant.

No. 00–1236.    |    Decided May 7, 2001.

Exclusive licensee of patent for certain wired broadcasting systems brought patent infringement suit against telecommunications firm, and firm counterclaimed, seeking declaratory judgment on issues of noninfringement, invalidity, and unenforceability. After motion to dismiss initial complaint based on lack of standing was denied, and complaint was amended to add patentee as a party plaintiff, the United States District Court for the Central District of California, Mariana R. Pfaelzer, J., granted motion by licensee and patentee to voluntarily dismiss their claims with prejudice, and to dismiss counterclaims without prejudice. Firm appealed. The Court of Appeals, Gajarsa, Circuit Judge, held that: (1) firm had standing to appeal dismissal; (2) statement of non-liability filed in connection with motion for voluntary dismissal divested court of jurisdiction to consider declaratory judgment claims; (3) licensee, who had been granted fewer than all rights in patent, had standing to bring patent infringement suit individually; and (4) licensee was properly allowed to join patentee as party plaintiff.

Affirmed.

West Headnotes (30)

[1]  **Federal Courts**
        Standing
     Whether a party has standing to sue is a question of law that Court of Appeals reviews de novo.

     2 Cases that cite this headnote

[2]  **Federal Courts**

        Persons Entitled to Seek Review or Assert Arguments;  Parties;  Standing
     A party that receives all it has sought generally is not aggrieved by the judgment and cannot appeal from it.

     1 Cases that cite this headnote

[3]  **Patents**
        Parties entitled to allege error
     District court order granting exclusive patent licensee's motion to dismiss its patent infringement claims against telecommunications firm with prejudice, and counterclaims asserted by telecommunications firm without prejudice, did not address fully all avenues of potential infringement liability on part of telecommunications firm, and thus, telecommunications firm had standing to appeal district court's dismissal of complaint and counterclaims, and decision to allow licensee to add patentee as a party plaintiff.

     13 Cases that cite this headnote

[4]  **Federal Civil Procedure**
        Label or theory of motions
     A motion's substance, rather than its linguistic form, determines its nature and thus its legal effect.

     Cases that cite this headnote

[5]  **Declaratory Judgment**
        Counterclaim for declaratory relief in other action
     A declaratory judgment counterclaim may only be brought to resolve an actual controversy, which must be extant at all stages of review, and not merely at the time the complaint is filed. 28 U.S.C.A. § 2201(a).

     7 Cases that cite this headnote

[6]  **Declaratory Judgment**
        Claim of infringement as condition precedent

Statement of non-liability filed by patentee, and exclusive patent licensee, in connection with their motion to voluntarily dismiss patent infringement claims against telecommunications firm, estopped patentee, licensee, and any successors in interest from asserting liability against firm for infringement of patent in question, and thus divested court of jurisdiction to consider telecommunications firm's counterclaim for declaratory judgment on issues of noninfringement, invalidity, and unenforceability, even though firm could be required to indemnify an entity that potentially could be held liable in a different case for infringing patent.

20 Cases that cite this headnote

**[7]**   **Declaratory Judgment**
  👉   Infringement of patents

**Declaratory Judgment**
  👉   Claim of infringement as condition precedent

In suits for declaratory judgments regarding patent rights, a two-part justiciability test applies, under which there must be both (1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit, and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity.

10 Cases that cite this headnote

**[8]**   **Patents**
  👉   Nature of ownership of patents

**Patents**
  👉   Assignability of patents

A patent is a bundle of rights which may be divided and assigned, or retained in whole or in part.

1 Cases that cite this headnote

**[9]**   **Patents**
  👉   Construction and Operation of Assignments and Grants

To determine whether a patent transfer agreement conveys all substantial rights under a patent to a transferee, or fewer than all of those rights, a court must assess the substance of the rights transferred and the intention of the parties involved; in making such a determination, it is helpful to consider rights retained by the grantor in addition to rights transferred to the grantee.

4 Cases that cite this headnote

**[10]**   **Patents**
  👉   Construction and Operation of Licenses

Agreement under which patentee granted "exclusive license" to make, use, and sell invention claimed in patent, but patentee retained right in certain circumstances to require licensee to obtain patentee's consent to proceed with litigation, right in other circumstances to be fully informed and consulted with regard to litigation, and right to prevent licensee from assigning its benefit under agreement without prior written consent, effected a transfer of fewer than all substantial rights in patent.

20 Cases that cite this headnote

**[11]**   **Patents**
  👉   Rights and liabilities of assignees and grantees

Title of agreement transferring rights under a patent is not determinative of the nature of the rights transferred under the agreement, and actual consideration of the rights transferred is the linchpin of such a determination.

2 Cases that cite this headnote

**[12]**   **Patents**
  👉   Rights and liabilities of assignees and grantees

A transferee that receives all substantial patent rights from a transferor would never need consent from the transferor to file suit, because such an assignment essentially transfers title in the patent to the transferee. 35 U.S.C.A. § 100(d).

4 Cases that cite this headnote

**[13]** **Patents**

🔑 Persons entitled to sue

Exclusive licensee of fewer than all rights in patent for certain wired broadcasting systems had standing under Patent Act, and thus under Article III, to bring patent infringement suit; alleged infringement resulted in injury directly traceable to competitor's allegedly infringing conduct, and was redressable in an infringement suit. U.S.C.A. Const. Art. 3, § 2, cl. 1; 35 U.S.C.A. § 281.

2 Cases that cite this headnote

**[14]** **Patents**

🔑 Construction and Operation of Assignments and Grants

**Patents**

🔑 Persons entitled to sue

A grant of all substantial rights in a patent amounts to an assignment–that is, a transfer of title in the patent–which confers constitutional standing on the assignee to sue another for patent infringement in its own name. 35 U.S.C.A. § 261.

12 Cases that cite this headnote

**[15]** **Patents**

🔑 Persons entitled to sue

A nonexclusive license or "bare" license in a patent–a covenant by the patent owner not to sue the licensee for making, using, or selling the patented invention and under which the patent owner reserves the right to grant similar licenses to other entities–confers no constitutional standing on the licensee under the Patent Act to bring suit, or even to join a suit with the patentee because a nonexclusive or bare licensee suffers no legal injury from infringement. 35 U.S.C.A. § 261.

41 Cases that cite this headnote

**[16]** **Patents**

🔑 Rights, Remedies, and Liabilities of Licensees

An exclusive licensee receives more substantial rights in a patent than a nonexclusive licensee, but receives fewer rights than an assignee of all substantial patent rights.

3 Cases that cite this headnote

**[17]** **Federal Civil Procedure**

🔑 In general; injury or interest

The actual or threatened injury required by Article III to confer standing may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing. U.S.C.A. Const. Art. 3, § 2, cl. 1.

Cases that cite this headnote

**[18]** **Federal Civil Procedure**

🔑 In general; injury or interest

**Federal Civil Procedure**

🔑 Causation; redressability

Article III standing requires a party invoking federal jurisdiction to establish three elements: first, plaintiff must have suffered an injury in fact, which is an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical, there must be a causal connection between the injury and the conduct complained of, in that the injury is fairly traceable to the challenged action and not the result independent action of some third party not before the court, and finally, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. U.S.C.A. Const. Art. 3, § 2, cl. 1.

3 Cases that cite this headnote

**[19]** **Patents**

🔑 Complainants

A patentee who grants the exclusive right to make, use, or vend, which does not constitute a statutory assignment, must allow the use of his name as plaintiff in any action brought by the licensee to obtain damages for the injury to his exclusive right.

13 Cases that cite this headnote

**[20]    Patents**

　　👈 Complainants

Exclusive licensee which had been granted fewer than all rights in patent for certain wired broadcasting systems, and which had initially brought patent infringement suit in its own name, could properly add patentee as a party plaintiff in infringement suit.

Cases that cite this headnote

**[21]    Patents**

　　👈 Nature of license

**Patents**

　　👈 Complainants

Owner of a patent, who grants to another the exclusive right to make, use, or vend the invention, which does not constitute a statutory assignment, holds title to the patent in trust for such licensee, to the extent that he must allow the use of his name as plaintiff in any action brought at the instance of the licensee in law or in equity to obtain damages for the injury to his exclusive right by an infringer, or to enjoin infringement of it.

15 Cases that cite this headnote

**[22]    Patents**

　　👈 Complainants

As a general rule, patent owner should be joined, either voluntarily or involuntarily, in any patent infringement suit brought by an exclusive licensee having fewer than all substantial patent rights.

9 Cases that cite this headnote

**[23]    Patents**

　　👈 Complainants

Unlike a patent assignee that may sue in its own name, an exclusive licensee having fewer than all substantial patent rights who seeks to enforce its

rights in a patent generally must sue jointly with the patent owner.

6 Cases that cite this headnote

**[24]    Patents**

　　👈 Complainants

General principle that a patent owner must be joined, either voluntarily or involuntarily, in any infringement suit brought by an exclusive licensee having fewer than all substantial rights, is prudential rather than constitutional.

28 Cases that cite this headnote

**[25]    Federal Civil Procedure**

　　👈 In general;  injury or interest

In addition to the three-prong Article III standing test, standing doctrine embraces judicially self-imposed limits, known as prudential limits, on the exercise of jurisdiction. U.S.C.A. Const. Art. 3, § 2, cl. 1.

1 Cases that cite this headnote

**[26]    Patents**

　　👈 Persons entitled to sue

**Patents**

　　👈 Complainants

As a prudential principle, an exclusive licensee having fewer than all substantial patent rights possesses standing under the Patent Act to bring infringement action as long as it sues in the name of, and jointly with, the patent owner and meets the Article III standing requirements; this principle holds true except in extraordinary circumstances, such as where the infringer is the patentee and cannot sue itself. U.S.C.A. Const. Art. 3, § 2, cl. 1; 35 U.S.C.A. § 281.

30 Cases that cite this headnote

**[27]    Patents**

　　👈 Complainants

A patent owner's agreement to be bound by judgments cannot circumvent general rule that a

patent owner must ordinarily be joined with an exclusive licensee in a patent infringement suit.

1 Cases that cite this headnote

[28] **Patents**
👉 Complainants

When an exclusive licensee files a patent infringement suit, the presence of the owner of a patent as a party is indispensable to give jurisdiction under the patent laws.

1 Cases that cite this headnote

[29] **Patents**
👉 Complainants

A patent owner may be joined as a party by an exclusive licensee under the patent who has brought an infringement suit.

7 Cases that cite this headnote

[30] **Patents**
👉 Original utility

4,135,202. Cited.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1336** David Zaslowsky, and Robin L. Filion, Baker & McKenzie, of New York, NY, argued for plaintiff-appellee. On the brief were David Zaslowsky, and James David Jacobs. Of counsel was Frank M. Gasparo.

Scott F. Partridge, Baker Botts L.L.P., of Houston, Texas, argued for defendant-appellant. With him on the brief was Roger S. Donley. Also on the brief were Neil P. Sirota, of New York, NY; and David G. Willie, and Samir A. Bhavsar, of Dallas, TX.

Before LOURIE, SCHALL, and GAJARSA, Circuit Judges.

**Opinion**

GAJARSA, Circuit Judge.

TCI Cablevision of California, Inc. ("TCI–California") appeals the January 27, 2000 order of the United States District Court for the Central District of California, No. 99–CV–2982 (C.D.Cal. Jan. 27, 2000). The district court granted the motion filed by Intellectual Property Development, Inc. ("IPD") and Communications Patents Ltd. ("CPL") to dismiss its complaint against TCI–California with prejudice and to dismiss TCI–California's counterclaims without prejudice. We affirm.

**BACKGROUND**

CPL, a United Kingdom limited company, is the assignee of United States Patent No. 4,135,202 ("the #202 patent"), which issued in 1979. The #202 patent covers certain wired broadcasting systems. CPL entered liquidation on May 12, 1993. On June 30, 1993, acting through a liquidator, CPL and IPD entered into an agreement that granted IPD numerous rights in the #202 patent.

The agreement accords IPD "an exclusive license, to make, use, and sell the inventions, the right to grant sublicenses, the right to collect monies, damages and/or royalties for past infringement and the right to bring legal action to collect the same." Further, the agreement provides:

> [IPD] shall be entitled to take action under the ['202 patent] in [IPD's] own name to prevent infringement, or to collect damages for past infringement, or to defend proceedings for revocation in circumstances where [CPL] is not a necessary party to that action (a "Sole Action") **\*1337** provided that [IPD] notifies [CPL] in writing.... [IPD] shall keep [CPL] fully informed and consult with [CPL] about the conduct of the Sole Action. [IPD] shall not without the prior written consent of [CPL], which shall not be unreasonably withheld, settle or agree to any compromise.... In the event that [CPL] may be a necessary party to any litigation or legal action under the ['202 patent] (a "Joint Action") [IPD] shall not proceed with the Joint Action without the prior written consent of [CPL].

58 U.S.P.Q.2d 1681

[CPL] reserves the right to withdraw consent to the Joint Action proceeding at any time up to termination of the Joint Action.... [IPD] further agrees to pay [CPL] fifty percent (50%) of the net profit of [IPD] derived from ... realisations [sic] realised [sic] such as but not limited to litigation.

The rights CPL granted to IPD are subject to a nonexclusive license in the # 202 patent that CPL previously granted to Cabletime Limited, Cabletime Systems Ltd., and their customers (collectively "Cabletime") on October 3, 1991. Additionally, the agreement provides that CPL maintains the right to "assign all [of its] rights and obligations" under the agreement and further allows CPL to prevent IPD from assigning its benefits under the agreement to a third party without prior written consent from CPL.

On September 1, 1994, IPD filed a suit against UA–Columbia Cablevision of Westchester, Inc. ("UA–Westchester") and Tele Communications, Inc. ("TCI") in the United States District Court for the Southern District of New York (the "New York case"). IPD asserted that UA Westchester and TCI infringed the # 202 patent prior to its expiration on January 16, 1996. TCI is the parent company of both UA–Westchester and the appellant in the case at issue-TCI-California. On May 15, 1995, TCI filed a motion to dismiss the New York case on the grounds that IPD lacked standing, or alternatively, because CPL was an indispensable party. Subsequently, by letter, CPL agreed to be bound by any judgment in the New York case. On September 8, 1995, the judge in the New York case determined that IPD maintained standing to bring the suit in its own name. A *Markman* hearing, construing the claims of the patent, was held in the New York case in June, 1997. *Intellectual Prop. Dev., Inc. v. UA–Columbia Cablevision of Westchester, Inc.,* No. 94–6296, 1998 WL 142346 (S.D.N.Y. Mar.26, 1998).

Prior to filing the suit at issue, IPD offered, and TCI declined to accept, an agreement to toll the damage limitation period for all TCI subsidiaries. Subsequently, IPD filed suit against twelve TCI subsidiaries (the "1999 cases"), alleging infringement of the #202 patent. This case is one of the twelve 1999 cases; it was filed in the United States District Court for the Central District of California on March 4, 1999. In this action, TCI–California counterclaimed, seeking declaratory judgment on the issues of noninfringement, invalidity, and unenforceability of the #202 patent.

On April 6, 1999, IPD filed a motion with the Judicial Panel for Multi-district Litigation ("JPML") to consolidate the 1999 cases and the New York case. On April 19, 1999, while the motion to consolidate was pending before the JPML, TCI–California moved to dismiss this case pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, or alternatively, based on IPD's failure to join an indispensable party-CPL-under Federal Rule of Civil Procedure 19(b). On May 26, 1999, the district court issued an order (the "May 26, 1999 order") in which it granted TCI California's motion to dismiss for "lack of standing." The court, however, delayed signing the order to allow IPD to amend its complaint to add **\*1338** CPL as a party plaintiff and thereby rectify its "lack of standing." On May 28, 1999, TCI–California brought a motion for reconsideration of the May 26, 1999 order. Thereafter, IPD amended its complaint to add CPL as a party on June 21, 1999.

The district court, on June 28, 1999, denied TCI–California's motion for reconsideration and also clarified its May 26, 1999 order. The court stated that in the May 26, 1999 order, it had not held "that [IPD] lacked any element of constitutional standing so as to deprive the [c]ourt of jurisdiction over this case." It explained that "IPD made an adequate showing on the three elements required by the Constitution for standing to exist: a legally cognizable injury, a causal connection between the injury and the conduct and redressability of the injury." The court also indicated that it "found IPD to be an exclusive licensee that alleged a legally cognizable injury" and therefore noted that "[t]he [c]ourt's use of the words 'lack of standing' in the May 26 [, 1999] Order referred to a prudential limitation on IPD's right to bring suit without joining the patentee." That is, the court determined that the rights retained by the patent owner, CPL, are "of the type that make a patent owner who granted an exclusive license a necessary party to an infringement action brought by the licensee." Therefore, the court concluded by indicating that in its May 26, 1999 order it recognized that as an exclusive licensee, IPD did not have standing to sue in its own name and consequently the court required joinder of the patent owner, CPL.

On August 19, 1999, the JPML consolidated the 1999 cases and the New York case and transferred them to the United States District Court for the Central District of California, where this case was pending, for joint pretrial proceedings. IPD subsequently entered into tolling agreements with several

TCI subsidiaries, which resulted in the stipulated dismissal of all of the 1999 cases other than the case at bar. [1]

IPD and CPL, on December 27, 1999, filed a motion to voluntarily dismiss this case with prejudice pursuant to Federal Rule of Civil Procedure 41(a) and to dismiss TCI–California's counterclaims for lack of subject matter jurisdiction. IPD and CPL attached a "Statement of Non Liability" to this motion, which provides: "[TCI–California] has no liability to CPL or IPD or any successors-in-interest to the #202 patent for infringement of the # 202 patent and CPL and IPD and any successors-in-interest to the #202 patent will not sue [TCI–California] for infringement of the #202 patent." IPD and CPL further requested, in accordance with JPML Rule 7.6, that the district court suggest to the JPML that it remand the New York case to the United States District Court for the Southern District of New York. [2]

On January 27, 2000, the district court granted IPD and CPL's motion for voluntary dismissal, which effected the dismissal of its complaint with prejudice and the dismissal of TCI–California's counterclaims for lack of subject matter jurisdiction without prejudice. TCI–California appeals the district court's failure to dismiss the initial complaint-filed solely by IPD-for lack of standing and its subsequent grant of the motion for voluntary dismissal.

## *1339  DISCUSSION

### A. Standard of Review

 **[1]**    Whether a party has standing to sue is a question of law that this court reviews de novo. Prima Tek II L.L.C. v. A–Roo Co., 222 F.3d 1372, 1376, 55 USPQ2d 1742, 1745 (Fed.Cir.2000). The legal effect of an agreement transferring patent rights is an issue of law that we review de novo. Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA, 944 F.2d 870, 873, 20 USPQ2d 1045, 1047 (Fed.Cir.1991).

### B. TCI–California's Standing to Appeal

IPD contends that TCI–California lacks standing to bring this appeal. It asserts that TCI–California was not aggrieved by the district court's grant of IPD and CPL's motion to dismiss this case. That is, IPD suggests that TCI–California seeks reversal of the district court's decision to grant IPD

leave to add CPL as a party, and based on such a reversal, seeks dismissal of this case predicated on a theory that IPD lacked adequate standing to bring suit against TCI–California without having filed jointly with CPL. Therefore, IPD contends that TCI–California seeks a judgment identical to the judgment effected by the district court's grant of the motion for voluntary dismissal, but for a different reason. [3]

 **[2]**   **[3]**    A party that receives all it has sought generally is not aggrieved by the judgment and cannot appeal from it. [4] Deposit Guar. Nat.'l Bank v. Roper, 445 U.S. 326, 333, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980); Zenith Elecs. Corp. v. United States, 875 F.2d 291, 293 (Fed.Cir.1989). The district court dismissed IPD and CPL's complaint alleging patent infringement with prejudice. TCI–California contends that this dismissal failed to redress fully its infringement liability concerns based on, inter alia, indemnity and direct liability to potential transferees of the patent rights. [5] TCI–California argues that it possesses these liability concerns because the district court's order failed to address the merits of TCI–California's counterclaims for declaratory judgment on the issues of invalidity and unenforceability. We determine that the district court's order dismissing the complaint with prejudice and TCI–California's counterclaims *1340  without prejudice fails to address fully all avenues of potential infringement liability. Therefore, TCI–California has standing to appeal the district court's dismissal of IPD and CPL's complaint with prejudice, its decision to allow IPD to amend its complaint to add CPL as a party plaintiff, and its dismissal without prejudice of TCI–California's counterclaims.

### C. Statement of Non–Liability

 **[4]**    On January 27, 2000, the district court granted IPD and CPL's motion to voluntarily dismiss this case. This motion was filed pursuant to Federal Rule of Civil Procedure 41(a) and included a statement of non-liability. The court's order granting the motion for voluntary dismissal fails to state explicitly whether it granted the motion based on Rule 41(a) or based on the statement of non-liability. [6] A motion's substance rather than its linguistic form determines its nature and thus its legal effect. Registration Control Sys., Inc. v. Compusystems, Inc., 922 F.2d 805, 808, 17 USPQ2d 1212, 1214 (Fed.Cir.1990); Super Sack Mfg. Corp. v. Chase Packaging Corp., 57 F.3d 1054, 1057, 35 USPQ2d 1139, 1142 (Fed.Cir.1995) (determining that Federal Rule of Civil

Procedure 41(a)(2), which the district court based its decision on, was inapplicable, but nevertheless determining that the trial court dismissed the case for lack of an actual controversy as required by Article III based on a statement of nonliability).

[5] [6] A declaratory judgment counterclaim may only be brought to resolve an "actual controversy." 28 U.S.C. § 2201(a) (1994). The actual controversy "must be extant at all stages of review, not merely at the time the complaint is filed." Preiser v. Newkirk, 422 U.S. 395, 401, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975). The burden rests on TCI–California in this case to establish "that jurisdiction over its declaratory judgment action existed at, and has continued since, the time the [counterclaim] was filed." International Med. Prosthetics Research Assocs. v. Gore Enter. Holdings, Inc., 787 F.2d 572, 575, 229 USPQ 278, 281 (Fed.Cir.1986).

In Super Sack, Super Sack sued Chase for allegedly infringing two of its patents. 57 F.3d at 1055, 35 USPQ2d at 1140. Chase denied infringement and filed a counterclaim seeking declaratory judgment on the issues of noninfringement and invalidity. Subsequently, in a motion to dismiss, Super Sack's counsel provided a statement indicating that "Super Sack will unconditionally agree not to sue Chase for infringement as to any claim of the patents-in-suit based upon the products currently manufactured and sold by Chase." Id. at 1056, 35 USPQ2d at 1141. In Super Sack, this court first determined that the promise not to sue extended only to products that Chase made, used, or sold on or before July 8, 1994–the date that Super Sack filed its motion to dismiss. Id. at 1056–57, 35 USPQ2d at 1141.

[7] The Super Sack court then recognized that in suits for declarations of patent rights, a two-part justiciability test applies:

> There must be both (1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit, and (2) **\*1341** present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity.

Id. at 1058, 57 F.3d 1054, 35 USPQ2d at 1142 (quoting BP Chems. Ltd. v. Union Carbide Corp., 4 F.3d 975, 978, 28 USPQ2d 1124, 1126 (Fed.Cir.1993)).

The Super Sack court stated with respect to the patents at issue in the statement of non-liability, "Super Sack is forever estopped by its counsel's statement of non-liability ... from asserting liability against Chase in connection with any products that Chase made, sold, or used on or before July 8, 1994." Id. at 1059, 35 USPQ2d at 1143. It continued, providing: "This estoppel, in turn, removes from the field any controversy sufficiently actual to confer jurisdiction over this case." Id. Consequently, the court determined, "[b]ecause Chase can have no reasonable apprehension that it will face an infringement suit on [the patents at issue] with respect to past and present products, it fails to satisfy the first part of our two-part test of justiciability." Id.

The Super Sack court then addressed Chase's assertion that Super Sack's promise failed to cover products Chase could make, use, or sell in the future. Id. at 1059–60, 35 USPQ2d at 1143–44. The court pointed out that the second part of the declaratory justiciability test for patent rights requires that the putative infringer's "present activity" place it at risk of infringement liability. Id. at 1059, 35 USPQ2d at 1143. Because Chase's present activity failed to place it at risk of infringement liability, the court determined that "[t]he residual possibility of a future infringement suit based on Chase's future acts is simply too speculative a basis for jurisdiction over Chase's counterclaim of invalidity." Id. at 1060, 35 USPQ2d at 1144. Therefore, the Super Sack court affirmed the district court's grant of Super Sack's motion to dismiss for lack of jurisdiction with prejudice. Id.

Like the statement of counsel in Super Sack, the statement of non-liability filed by IPD and CPL estops IPD, CPL, and any successors in interest to the # 202 patent from asserting liability against TCI–California for infringement of the #202 patent. Therefore, because TCI–California maintains no "reasonable apprehension" that it will face an infringement suit from IPD, CPL, or any successor in interest to the #202 patent, it fails to satisfy the first part of the justiciability test with respect to assertions of infringement by those parties.

TCI–California also contends that it could be required to indemnify an entity that potentially could be held liable in a different case for infringing the # 202 patent. If TCI–California's interests are affected by a different suit regarding the #202 patent, then TCI–California should join that action as a party, for example, pursuant to Federal Rule of Civil Procedure 19(a)(2)(i). [7] Further, part one of the declaratory justiciability test for patent rights requires action by the patent

owner that creates "reasonable apprehension" on the part of the declaratory plaintiff that it will face an infringement suit. [8] A suit filed against a different party, even if TCI–*1342 California could potentially be required to indemnify that party, is not a suit that TCI–California itself faces. Therefore, the district court correctly determined that it lacked jurisdiction despite TCI–California's indemnity concerns.

In sum, similar to the resolution in *Super Sack,* the statement of non-liability divested the district court of Article III jurisdiction, and therefore the district court properly granted the motion to dismiss IPD and CPL's complaint with prejudice and TCI–California's counterclaims without prejudice. [9] *See also Spectronics Corp. v. H.B. Fuller Co., Inc.,* 940 F.2d 631, 19 USPQ2d 1545 (Fed.Cir.1991) (affirming the district court's dismissal of an action filed by Spectronics under the Declaratory Judgment Act, 28 U.S.C. § 2201 (1988), alleging, *inter alia,* invalidity and non-infringement of a patent owned by Fuller because Fuller filed a covenant not to sue Spectronics for infringement of the patent at issue and therefore Fuller was "forever estopped from asserting the [patent at issue] against Spectronics").

### D. IPD's Standing in the District Court

While the district court correctly dismissed IPD and CPL's complaint with prejudice and TCI–California's counterclaims without prejudice, we possess jurisdiction to review the district court's decision to allow IPD to amend its complaint to add CPL as a party plaintiff.

### 1. Rights Transferred from CPL to IPD

[8] [9] A patent is "a bundle of rights which may be divided and assigned, or retained in whole or in part." *Vaupel,* 944 F.2d at 875, 20 USPQ2d at 1049. To determine whether a patent transfer agreement conveys all substantial rights under a patent to a transferee or fewer than all of those rights, a court must assess the substance of the rights transferred and the intention of the parties involved. *Id.* at 874, 20 USPQ2d at 1048.

[10] In making such a determination, it is helpful to consider rights retained by the grantor in addition to rights transferred to the grantee. *Id.* at 875, 20 USPQ2d at 1049. In the case at issue, under the CPL–IPD agreement, while IPD possesses an "exclusive license to make, use, and sell" the invention claimed in the #202 patent, CPL retains: (1) the right in

certain circumstances (when CPL is a "necessary" party) to require IPD to obtain its consent to proceed with litigation (which can be withdrawn "at any time" until termination of the litigation); (2) the right in other circumstances (when CPL is not a "necessary" party) to be fully informed and to be consulted with regard to litigation; (3) the right to assign "all [of its] rights and obligations" under the agreement; (4) the right to prevent IPD from assigning its benefit under the agreement to a third party without prior written consent from CPL; (5) the right to require its consent to settlements (which shall not be "unreasonably withheld"); and (6) the right to collect fifty percent of profits realized from litigation.

This court has addressed the issue of whether an agreement transfers all or fewer than all substantial patent rights on several occasions. In *Abbott Laboratories v. Diamedix Corp.,* 47 F.3d 1128, 33 USPQ2d 1771 (Fed.Cir.1995), this court determined that a transfer of certain, but not all, patent rights from Diamedix to Abbott constituted an exclusive license of fewer than all substantial patent rights rather than an assignment of all such rights. In that case, Diamedix retained the right to make and use the products *1343 claimed in the patents for its own benefit and the right to sell those products to parties with whom Diamedix maintained pre-existing contracts and licenses. *Id.* at 1132, 33 USPQ2d at 1774. While Abbott was given the right of first refusal to sue alleged infringers, Diamedix retained the right to bring its own infringement actions. That is, although Abbott possessed the right to initiate suit for infringement, it could not "indulge" or permit an infringement, which the *Abbott* court indicated normally accompanies a complete conveyance of the right to sue. *Id.* Diamedix also retained the right to prevent Abbott from assigning its rights under the license to any party other than a successor in business. *Id.* at 1132, 33 USPQ2d at 1775. Finally, the *Abbott* court noted that it appeared that Diamedix retained the right to participate in a suit brought by Abbott because the agreement provided that Diamedix is "entitled to be represented therein by counsel of its own selection at its own expense." *Id.* at 1132, 33 USPQ2d at 1774. For these reasons, the *Abbott* court held that Abbott was granted fewer than all substantial rights under the patents. *Id.* at 1133, 33 USPQ2d at 1775.

Conversely, in *Vaupel,* this court determined that an agreement transferring certain patent rights from Markowsky to Vaupel constituted an assignment of all substantial rights in the patent at issue. 944 F.2d 870, 20 USPQ2d 1045. Markowsky retained: (1) a veto right on sublicensing by Vaupel; (2) the right to obtain patents on the invention in other

countries; (3) a reversionary right to the patent in the event of bankruptcy or termination of production by Vaupel; and (4) a right to receive infringement damages. *Id.* at 875, 944 F.2d 870, 20 USPQ2d at 1049. The *Vaupel* court stated that it found "particularly dispositive" the agreement provision that transferred the right to sue for infringement of the patent at issue subject only to the obligation to *inform* Markowsky. *Id.*

This court recently determined in *Speedplay, Inc. v. Bebop, Inc.,* 211 F.3d 1245, 53 USPQ2d 1984 (Fed.Cir.2000), that an agreement transferring certain patent rights constituted an assignment of all substantial rights in the patents at issue. The agreement in *Speedplay* effected a transfer from Bryne and Zoumaras to Speedplay of the exclusive right to manufacture, have manufactured, distribute, market, use and sell products covered by the patents at issue. 211 F.3d at 1250, 53 USPQ2d at 1987. Bryne and Zoumaras, however, retained the option to initiate legal action against an alleged infringer in their own name, but only if Speedplay failed to bring such a suit within three months. *Id.* at 1251, 53 USPQ2d at 1987. Yet, the agreement at issue in *Speedplay* did not grant Bryne and Zoumaras the right to participate in an infringement action brought by Speedplay, nor did it limit Speedplay's management of any such action. *Id.* at 1251, 53 USPQ2d at 1988. This court determined that Bryne and Zoumaras's right to sue an infringer was illusory because Speedplay could render that right nugatory by granting the alleged infringer a royalty-free sublicense. *Id.* Indeed, the *Speedplay* court concluded, "Speedplay ... controls enforcement of [the patent at issue] for all practical purposes." *Id.* Finally, while Speedplay could not assign its interest without consent from Bryne and Zoumaras, the agreement provided that such consent "shall not be withheld unreasonably." The court deemed this provision not significantly restrictive of the scope of Speedplay's patent rights. [10] *Id.* at 1252, **1344** 53 USPQ2d at 1988.

 [11]   Guided by the aforementioned jurisprudence, we must assess the agreement at issue in this case, weighing the rights in the #202 patent transferred to IPD against those retained by CPL, to determine whether CPL assigned all substantial rights in the #202 patent to IPD or conveyed fewer than all such rights. The title of the agreement at issue, which uses the term "license" rather than the term "assignment," is not determinative of the nature of the rights transferred under the agreement; actual consideration of the rights transferred is the linchpin of such a determination. *See Speedplay,* 211 F.3d at 1250, 53 USPQ2d at 1986 ("A party that has been granted all substantial rights under the patent is considered the owner

regardless of how the parties characterize the transaction that conveyed those rights.").

Under the agreement at issue, IPD is granted the right to "make, use, and sell" the invention claimed in the #202 patent. The agreement fails to suggest that CPL continues to possess similar rights as this court found salient in *Abbott.* While this right transferred to IPD is substantial, every other pertinent factor weighs in favor of finding that the agreement is an exclusive license of fewer than all substantial rights in the #202 patent. [11]

In both *Vaupel* and *Speedplay,* contrary to *Abbott,* the transferees effectively obtained the sole right to sue other parties for infringement. The right to sue in *Vaupel,* which was deemed "particularly dispositive," was only subject to an obligation to *inform* the transferor of any impending litigation. 944 F.2d at 875, 20 USPQ2d at 1049. In *Speedplay,* this court determined that the transferors' right to sue an infringer was illusory. 211 F.3d at 1251, 53 USPQ2d at 1988. Further, in *Mentor H/S, Inc. v. Medical Device Alliance,* 240 F.3d 1016, 1018, 57 USPQ2d 1819, 1820 (Fed.Cir.2001), this court deemed the transferee of patent rights to be an exclusive licensee of fewer than all substantial rights rather than an assignee of all of those rights in large part because the transferor retained the first opportunity to sue alleged infringers; that is, the transferee could only file such suits if the transferor failed to file a suit.

 [12]   Pursuant to the agreement in the case at bar, CPL retains differing rights depending on whether it is a "necessary" party. The agreement fails to elucidate cogently the definition of "necessary." Yet, it suffices to recognize that in certain circumstances-when CPL is a "necessary" party-CPL must consent to litigation and can withdraw that consent at any time. That is, CPL can permit infringement when it is a "necessary" party, which is relevant to a finding that CPL granted IPD fewer than all substantial rights in the # 202 patent. Indeed, a transferee that receives all substantial patent rights from a transferor would never need consent from the transferor to file suit because such an assignment essentially transfers title in the patent to the transferee. 35 U.S.C. § 100(d) (1994). Further, even if CPL is not a "necessary party" to a suit, IPD must keep CPL fully informed, and consult with CPL, as to any litigation pertaining to the patents at issue in the agreement. [12]

 **1345**  CPL also retains the right to prevent IPD from assigning its benefits to a third party without first receiving

CPL's consent. The *Abbott* court indicated that limits on a transferee's assignment rights weigh in favor of finding that an agreement constitutes a transfer of fewer than all substantial rights in a patent. 47 F.3d at 1132, 33 USPQ2d at 1775. Similarly, while the *Vaupel* court found that the agreement at issue in that case constituted an assignment of all substantial patent rights, it nevertheless recognized that a restriction on a transferee's right to assign is a substantial right reserved by the transferor. 944 F.2d at 875–76, 20 USPQ2d at 1049–50; *see also Prima Tek II,* 222 F.3d at 1380, 55 USPQ2d at 1748 ("A licensee's right to sub-license is an important consideration in evaluating whether a license agreement transfers all substantial rights."). We also recognize that limits on the assignment of rights are a factor weighing in favor of finding a transfer of fewer than all substantial rights in the #202 patent.

In light of CPL's right to permit infringement in certain cases, the requirement that CPL consent to certain actions and be consulted in others, and the limits on IPD's right to assign its interests in the #202 patent, we find that the CPL IPD agreement at issue transfers fewer than all substantial rights in the #202 patent from CPL to IPD.

## 2. Article III and Prudential Standing Requirements

[13]  Standing in a patent infringement case is derived from the Patent Act, which provides: "A patentee shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281 (1994). The term "patentee" comprises "not only the patentee to whom the patent was issued but also the successors in title to the patentee." 35 U.S.C. § 100(d) (1994).

[14]  [15]  [16]  A grant of all substantial rights in a patent amounts to an assignment-that is, a transfer of title in the patent-which confers constitutional standing on the assignee to sue another for patent infringement in its own name. 35 U.S.C. § 261 (1994); *Waterman v. Mackenzie,* 138 U.S. 252, 256, 11 S.Ct. 334, 34 L.Ed. 923 (1891); *Ortho Pharm. Corp. v. Genetics Inst., Inc.,* 52 F.3d 1026, 1030, 34 USPQ2d 1444, 1446 (Fed.Cir.1995). Conversely, a nonexclusive license or "bare" license-a covenant by the patent owner not to sue the licensee for making, using, or selling the patented invention and under which the patent owner reserves the right to grant similar licenses to other entities-confers no constitutional standing on the licensee under the Patent Act to bring suit or even to join a suit with the patentee because a nonexclusive (or "bare") licensee suffers no legal injury from infringement. *Ortho,* 52 F.3d at 1031, 34 USPQ2d at 1447; *Rite–Hite Corp. v. Kelley Co., Inc.,* 56 F.3d 1538, 1552, 35 USPQ2d 1065,

1074–75 (Fed.Cir.1995). It is clear that IPD is an exclusive licensee rather than a non-exclusive or "bare" licensee. An exclusive licensee receives more substantial rights in a patent than a nonexclusive licensee, but receives fewer rights than an assignee of all substantial patent rights. For example, an exclusive licensee could receive the exclusive right to practice an invention within a given limited territory. *Rite–Hite,* 56 F.3d at 1552, 35 USPQ2d at 1074 (citing *Independent Wireless Tel. Co. v. Radio Corp. of Am.,* 269 U.S. 459, 468–69, 46 S.Ct. 166, 70 L.Ed. 357 (1926)).

As stated earlier, IPD is an exclusive licensee that has some, but fewer than all, substantial rights in the #202 patent. **\*1346** TCI–California argues that CPL should have been a required party to the district court suit at the outset of the litigation. That is, TCI–California contends that as an exclusive licensee having fewer than all substantial rights in the #202 patent, IPD lacked Article III standing to bring suit in its own name and could not create standing, and thus jurisdiction, by simply joining CPL rather than by dismissing the case and refiling jointly with CPL. Therefore, TCI California asserts that the district court judge improperly allowed IPD to amend its complaint to add CPL as a party plaintiff.

[17]  TCI–California points out that the Supreme Court has stated: "The actual or threatened injury required by Article III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing....' " *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (quoting *Linda R.S. v. Richard D.,* 410 U.S. 614, 617 n. 3, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973)). Because the Patent Act creates the sole remedy for infringement of a patent and because the Patent Act indicates that only "patentees" and "assignees" shall have a remedy for patent infringement, *see* 35 U.S.C. §§ 281 and 100(d), TCI California contends that, under *Warth,* only a "patentee" or an "assignee" (and not an "exclusive licensee" having fewer than all substantial patent rights) possesses Article III standing to bring a patent infringement suit. Further, TCI–California cites a footnote in *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 571 n. 4, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), for the proposition that a constitutional standing defect cannot be cured by joinder. That is, TCI–California asserts that federal jurisdiction must exist at the time an action is filed.

[18]  Article III standing requires a party invoking federal jurisdiction to establish three elements. *Lujan,* 504 U.S. at 560–61, 112 S.Ct. 2130. First, the plaintiff "must have

suffered an injury in fact-an invasion of a legally protected interest which is (a) concrete and particularized and (b) 'actual or imminent, not conjectural or hypothetical.' " *Id.* at 560 (citations omitted). Second, "there must be a causal connection between the injury and the conduct complained of-the injury has to be 'fairly ... trace [able] to the challenged action of the defendant and not ... th[e] result [of] the independent action of some third party not before the court.' " *Id.* (citations omitted). Third, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' " *Id.* (citation omitted).

TCI–California is correct in its assertion that Article III standing to sue in this case derives solely from the Patent Act. Section 281 of title 35 of the United States Code provides: "A patentee shall have remedy by civil action for infringement of his patent." A "patentee" includes "not only the patentee to whom the patent was issued but also the successors in title [assignees] to the patentee." 35 U.S.C. § 100(d). This statutory language, however, fails to limit Article III standing to patentees and assignees. As discussed above, IPD is an exclusive licensee having fewer than all substantial rights in the #202 patent. To determine whether IPD possesses constitutional standing, we must consider whether IPD meets each *Lujan* factor.

[19]    A party such as IPD that has the right to exclude others from making, using, and selling an invention described in the claims of a patent is constitutionally injured by another entity that makes, uses, or sells the invention. Indeed, the Supreme Court has stated that a patent owner that grants "the exclusive right to make, use, or vend [a patented invention], which does not constitute a statutory assignment **\*1347** ... must allow the use of his name as plaintiff in any action brought by the licensee ... to obtain damages for the *injury to his exclusive right.*" *Independent Wireless,* 269 U.S. at 469, 46 S.Ct. 166 (emphasis added).

Further, IPD's injury is directly related to the allegedly infringing conduct of TCI–California. This relationship meets the "fairly traceable" standard for causation described in *Lujan.* Finally, IPD's injury is redressable because, if successful in an infringement suit against TCI California, IPD could recover damages pursuant to 35 U.S.C. § 284 and could prohibit TCI–California from further making, using and selling its allegedly infringing products under 35 U.S.C. § 283. Indeed, this court has awarded damages to exclusive licensees as compensation for patent infringement injuries. *Weinar v. Rollform, Inc.,* 744 F.2d 797, 807–08, 223 USPQ

369, 374–75 (Fed.Cir.1984). In sum, IPD meets the three-pronged *Lujan* test for Article III standing.

[20]    Moreover, it was proper for IPD, as an exclusive licensee of fewer than all substantial rights in the #202 patent, to add CPL as a party plaintiff. The Supreme Court addressed the right to sue for patent infringement under a predecessor patent statute in *Independent Wireless,* a case involving an exclusive licensee (as distinguished from an assignee) that sought to obtain an injunction and damages against an alleged patent infringer without joining the patent owner to the suit. 269 U.S. at 466, 46 S.Ct. 166. The Court stated:

> The presence of the owner of the patent as a party is indispensable, not only to give jurisdiction under patent laws, but also in most cases to enable the alleged infringer to respond in one action to all claims of infringement for his act, and thus either to defeat all claims in the one action, or by satisfying one adverse decree to bar all subsequent actions.

*Id.* at 468, 46 S.Ct. 166.

The *Independent Wireless* Court recognized an exception to this rule in circumstances where a patent owner refuses, or is unable, to be joined as a co-plaintiff with an exclusive licensee. *Id.* In such cases, "the licensee may make [the patent owner] a party defendant by process [that is, involuntarily], and he will be lined up by the court in the party character he should assume." *Id.*

[21]    The *Independent Wireless* Court then explained that:

> [T]he owner of a patent, who grants to another the exclusive right to make, use, or vend the invention, which does not constitute a statutory assignment, holds title to the patent in trust for such licensee, to the extent that he must allow the use of his name as plaintiff in any action brought at the instance of the licensee in law or in equity to obtain damages for the injury to his exclusive right by an infringer, or to enjoin infringement of it.

*Id.* at 469, 46 S.Ct. 166.

**[22]**   **[23]**   As a general rule, in accordance with *Independent Wireless,* this court adheres to the principle that a patent owner should be joined, either voluntarily or involuntarily, in any patent infringement suit brought by an exclusive licensee having fewer than all substantial patent rights. *Prima Tek II,* 222 F.3d at 1377, 55 USPQ2d at 1746; *Abbott Labs.,* 47 F.3d at 1131, 33 USPQ2d at 1774; *Rite–Hite,* 56 F.3d at 1552, 35 USPQ2d at 1074; *Mentor H/S,* 240 F.3d at 1017, 57 USPQ2d at 1820; *Textile Prods.,* 134 F.3d at 1484, 45 USPQ2d at 1635. That is, unlike an assignee that may sue in its own name, an exclusive licensee having fewer than all substantial patent rights (that is not subject to an exception) that seeks to enforce **\*1348** its rights in a patent generally must sue jointly with the patent owner. *Ortho,* 52 F.3d at 1030, 34 USPQ2d at 1447.

**[24]**   **[25]**   The general principle set forth in *Independent Wireless* requiring that a patent owner be joined, either voluntarily or involuntarily, in any infringement suit brought by an exclusive licensee having fewer than all substantial rights is prudential rather than constitutional. *Prima Tek II,* 222 F.3d at 1377, 55 USPQ2d at 1746. In addition to the three-prong Article III standing test delineated in *Lujan,* standing doctrine embraces judicially self-imposed limits, known as prudential limits, on the exercise of jurisdiction. [13] *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984).

**[26]**   **[27]**   **[28]**   As a prudential principle, an exclusive licensee having fewer than all substantial patent rights possesses standing under the Patent Act as long as it sues in the name of, and jointly with, the patent owner and meets the *Lujan* requirements. *Prima Tek II,* 222 F.3d at 1377, 55 USPQ2d at 1746; *Abbott,* 47 F.3d at 1131, 33 USPQ2d at 1774. This principle holds true except in extraordinary circumstances, such as where the infringer is the patentee and cannot sue itself. *Ortho,* 52 F.3d at 1030, 34 USPQ2d at 1447 (citing *Waterman,* 138 U.S. at 255, 11 S.Ct. 334). [14] Indeed, the Supreme Court in *Independent Wireless* recognized that when an exclusive licensee files a patent infringement suit, "the presence of the owner of a patent as a party is indispensable ... to give jurisdiction under the patent laws...." 269 U.S. at 468, 46 S.Ct. 166.

### 3. IPD's Joinder of CPL

**[29]**   TCI–California argues that because IPD, an exclusive licensee having fewer than all substantial rights in the #202

patent, initially filed this suit in its own name, the district court lacked jurisdiction and therefore could not grant IPD leave to amend its complaint to add CPL as a party. However, this court has recognized the principle that a patent owner may be joined by an exclusive licensee. For example, in *Abbott,* an exclusive licensee having fewer than all substantial patent rights brought a patent infringement suit in its own name. 47 F.3d at 1129, 33 USPQ2d 1771. Thereafter, the patent owner filed a motion to intervene. *Id.* at 1130, 33 USPQ2d at 1773. This court determined that the patent owner's "joinder [was] required as a matter of statutory standing." *Id.* at 1133, 33 USPQ2d at 1775. Yet, the court did not dismiss the case for lack of jurisdiction and require that the patent owner and exclusive licensee jointly refile. Rather, the court reversed the district court's denial of the motion to intervene. [15] *Id.* at 1134, 33 USPQ2d at 1776.

**\*1349**   TCI–California cites footnote four of the Supreme Court's *Lujan* decision for the proposition that a standing defect cannot be cured by joinder of a party to a suit. TCI California's reliance on this footnote is misplaced. In *Lujan,* the Supreme Court determined that the plaintiffs lacked constitutional standing because they failed to assert a sufficiently imminent injury and because their claimed injury was not redressable. *Id.* at 563–71, 112 S.Ct. 2130. As discussed above, IPD met the constitutional requirements for standing from the outset of its suit. Therefore, the cited portion of *Lujan* is inapposite.

### CONCLUSION

For the reasons set forth in this opinion, we affirm the district court's order, which effected dismissal of the complaint filed by IPD and CPL with prejudice and dismissal of TCI–California's counterclaims without prejudice.

*AFFIRMED.*

### COSTS

Each party shall bear its own costs.

**Parallel Citations**

58 U.S.P.Q.2d 1681

Footnotes

1    IPD and TCI–California did not enter into a tolling agreement.

2    On June 12, 2000, the district court granted IPD's request to suggest to the JPML that it remand the New York case to the United States District Court for the Southern District of New York.

3    A judgment vacating this decision and ordering the district court to dismiss this case for inadequate standing in the first instance, when IPD filed the suit alone, would require IPD and CPL to refile jointly a suit against TCI–California. The filing date of a patent infringement suit against TCI–California affects potential damages recovery. 35 U.S.C. § 286 (1994) ("[N]o recovery shall be had for any infringement committed more than six years prior to the filing of the complaint or counterclaim for infringement in the action.").

4    If this court determined, which it does not, that the district court should have dismissed this case in the first instance for lack of standing when the suit was brought by IPD alone, then that dismissal would likely have been without prejudice. *Textile Prods. Inc. v. Mead Corp.,* 134 F.3d 1481, 1486, 45 USPQ2d 1633, 1637 (Fed.Cir.1998). That is, IPD could have subsequently jointly filed a suit against TCI–California with CPL. The district court's grant of the motion for voluntary dismissal filed by IPD and CPL effected a prejudicial dismissal with respect to infringement. Therefore, TCI–California seeks a judgment effectuating a non-prejudicial dismissal of the infringement claims against it rather than a prejudicial dismissal of those claims. While dismissal of a patent infringement suit without prejudice would generally be considered "worse" for a party that is an alleged patent infringer than dismissal of such claims with prejudice, circumstances such as the ones at issue fail to automatically divest this court of jurisdiction.

5    This case differs from *Penda Corp. v. United States,* 44 F.3d 967, 33 USPQ2d 1200 (Fed.Cir.1994), which concerned indirect third-party indemnity liability.

6    Federal Rule of Civil Procedure 41(a)(2) provides that if a counterclaim has been pled by a defendant prior to service upon the defendant of the plaintiff's motion to dismiss, the action shall not be dismissed against the defendant's objection unless the counterclaim can remain pending for independent adjudication by the court. Fed.R.Civ.P. 41(a)(2). The record in this case fails to indicate whether the strictures of this rule were met in this case. Regardless, this case turns on the statement of non-liability, not on dismissal pursuant to Rule 41.

7    Federal Rule of Civil Procedure 19(a)(2)(i) provides: "A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if ... the person claims an interest relating to the subject matter of the action and is so situated that the disposition of the action in the person's absence may [ ] as a practical matter impair or impede the person's ability to protect that interest...."

8    We recognize that "apprehension" also may apply to a declaratory plaintiff's customers as discussed in *Arrowhead Industrial Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 6 USPQ2d 1685 (Fed.Cir.1988).

9    It is of no consequence to the case at issue that *Super Sack* concerned a declaratory counterclaim for noninfringement and invalidity while TCI–California counterclaimed for declaratory judgment on the issues of noninfringement, invalidity, and unenforceability.

10   Other rights retained by Bryne and Zoumaras in *Speedplay* are not relevant to the case at issue.

11   As discussed in *Vaupel,* CPL's right to receive infringement damages is "merely a means of compensation under the agreement." 944 F.2d at 875, 20 USPQ2d at 1049. We consider CPL's right to receive infringement damages a neutral factor.

12   While CPL must consent to settlement of a litigation by IPD, that consent cannot be "unreasonably withheld." In *Speedplay,* a consent requirement pertaining to assignment rights that could not be "unreasonably withheld" was deemed not significantly restrictive of the scope of Speedplay's patent rights. 211 F.3d at 1251–52, 53 USPQ2d at 1988. Therefore, we find this factor to be neutral.

13   For example, the Supreme Court has held that a "plaintiff must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth,* 422 U.S. at 499, 95 S.Ct. 2197. Additionally, even in circumstances where a plaintiff has alleged a constitutionally redressable injury, the Supreme Court has refrained from "adjudicating 'abstract questions of wide public significance' which amount to 'generalized grievances' ... most appropriately addressed in the representative branches." *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 475, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (quoting *Warth,* 422 U.S. at 499–500, 95 S.Ct. 2197). The Supreme Court has also required a plaintiff's complaint to fall within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

14   It is noted that a patent owner's agreement to be bound by judgments cannot circumvent the rule of *Independent Wireless* that the patent owner must ordinarily be joined with an exclusive licensee in a patent infringement suit. *Prima Tek II,* 222 F.3d at 1380–81, 55 USPQ2d at 1748–49.

15   This court has indicated that even appellate-level amendments to correct jurisdictional defects may be appropriate to allow an exclusive licensee to join the patent owner. *Mentor H/S,* 240 F.3d at 1019, 57 USPQ2d at 1821 (citing *Newman–Green, Inc. v. Alfonzo–Larrain,* 490 U.S. 826, 836, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989), for the proposition that "appellate-level amendments to correct jurisdictional defects" are appropriate under rare circumstances).

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 54

58 Bankr.Ct.Dec. 230, 108 U.S.P.Q.2d 1942

737 F.3d 14
United States Court of Appeals,
Fourth Circuit.

Michael JAFFÉ, Insolvency
Administrator, Plaintiff–Appellant,

v.

SAMSUNG ELECTRONICS COMPANY, LIMITED;
Infineon Technologies AG; International Business
Machines Corporation; Hynix Semiconductor, Inc.;
Intel Corporation; Nanya Technology Corporation;
Micron Technology, Defendants–Appellees.
United States of America, Amicus Curiae,
Verband Insolvenzverwalter Deutschlands
E.V., Amicus Supporting Appellant,
The Federation of German Industries, a/k/
a Bundesverband Der Deutschen Industrie;
Intellectual Property Owners Association;
Semiconductor Industry Association; Chamber
of Commerce of the United States of America;
National Association of Manufacturers; Business
Software Alliance, Amici Supporting Appellees.

No. 12–1802.   |   Argued: Sept.
17, 2013.   |   Decided: Dec. 3, 2013.

## Synopsis

**Background:** Following entry of order granting foreign representative's petition for recognition of pending German insolvency proceeding of manufacturer of memory chips for computers, foreign representative moved for determination as to inapplicability to foreign debtor of provision of the Bankruptcy Code that prevented debtors from unilaterally terminating the rights of licensees of their intellectual property by rejecting licensing agreements, so as to allow foreign representative to reject licenses for debtor's United States patents and to compel licensees to negotiate new licensing agreements at more favorable rates. Semiconductor manufacturers with which foreign debtor had executed various joint venture and patent cross-licensing agreements objected. The bankruptcy court, Robert G. Mayer, J., 2009 WL 4060083, granted the foreign representative's motion, and objectors appealed. The district court, 433 B.R. 547, affirmed in part and remanded in part. On remand, the United States Bankruptcy Court for the Eastern District of Virginia, Stephen S. Mitchell, J., 462 B.R. 165, entered order denying motion, and foreign representative appealed. The United

States District Court for the Eastern District of Virginia, T.S. Ellis III, J., 470 B.R. 374, certified issue for direct appeal to the Court of Appeals. The Court of Appeals authorized the direct appeal.

**Holdings:** The Court of Appeals, Niemeyer, Circuit Judge, held that:

[1] bankruptcy court was required, even without specific request by recognized foreign representative, to ensure sufficient protection of creditors and foreign debtor when it granted discretionary relief to representative;

[2] requirement for sufficient protection of the "interests of the creditors and other interested entities, including the debtor" warranted particularized balancing; and

[3] bankruptcy court reasonably exercised its discretion in balancing interests of patent portfolio cross-licensees against interests of foreign debtor.

Affirmed.

Wynn, Circuit Judge, filed opinion concurring in the judgment:

West Headnotes (5)

**[1]   Bankruptcy**

⚖ Cases Ancillary to Foreign Proceedings

In case ancillary to foreign proceeding, bankruptcy court was required, even without specific request by recognized foreign representative, to ensure sufficient protection of creditors and foreign debtor when it granted discretionary relief to representative, among which was privilege to have bankruptcy court entrust him with "administration or realization of all or part of the assets of [debtor] within the territorial jurisdiction of the United States," specifically identifying debtor's United States patents as among the United States assets he sought to control. 11 U.S.C.A. §§ 365, 1521, 1522.

Cases that cite this headnote

**[2]    Bankruptcy**

   ☞ Cases Ancillary to Foreign Proceedings

When granting discretionary relief to a recognized foreign representative in a case ancillary to foreign proceeding, requirement for sufficient protection of the "interests of the creditors and other interested entities, including the debtor" warranted particularized balancing; the provision for public policy exceptions was an additional, more general protection of United States interests that could be evaluated apart from the particularized analysis of the sufficient protection requirement. 11 U.S.C.A. § 1522(a).

Cases that cite this headnote

**[3]    Bankruptcy**

   ☞ Cases Ancillary to Foreign Proceedings

In a case ancillary to a foreign proceeding, a bankruptcy court must ensure that the discretionary relief a recognized foreign representative requests does not impinge excessively on any one entity's interests, which implies that each entity must receive at least some protection; the analysis required to protect creditors and other interested persons therefore logically is best done by balancing the respective interests based on the relative harms and benefits in light of the circumstances presented, thus inherently calling for application of a balancing test. 11 U.S.C.A. §§ 1521, 1522.

Cases that cite this headnote

**[4]    Bankruptcy**

   ☞ Cases Ancillary to Foreign Proceedings

In a case ancillary to a foreign proceeding, a United States bankruptcy court, in considering a recognized foreign representative's request for discretionary relief, must consider the costs that awarding such relief would impose on others under the rule provided by the substantive law of the State where the foreign insolvency proceeding is pending; the governing

provision anticipates particularized protection. 11 U.S.C.A. §§ 1506, 1522.

Cases that cite this headnote

**[5]    Bankruptcy**

   ☞ Cases Ancillary to Foreign Proceedings

In case ancillary to foreign proceeding, bankruptcy court reasonably exercised its discretion in balancing interests of patent portfolio cross-licensees against interests of foreign debtor and finding that application of provision that limited trustee's ability to unilaterally reject licenses to debtor's intellectual property by giving licensees option to retain their rights under licenses was necessary to ensure licensees under debtor's United States patents were sufficiently protected; hardship to foreign debtor of depriving it of opportunity to negotiate new licensing agreements at higher rates was outweighed by substantial detriment to licensees that had made very substantial investments in research and manufacturing facilities. 11 U.S.C.A. §§ 365(n), 1522(a).

Cases that cite this headnote

**Attorneys and Law Firms**

***16  ARGUED:** Jeffrey A. Lamken, MoloLamken LLP, Washington, D.C., for Appellant. William H. Pratt, Kirkland & Ellis LLP, New York, New York, for Appellees. Mark R. Freeman, United States Department of Justice, Washington, D.C., for Amicus Curiae the United States of America. **ON BRIEF:** Robert K. Kry, MoloLamken LLP, Washington, D.C., for Appellant. Jennifer M. Selendy, John P. Del Monaco, New York, New York, Timothy Muris, Daniel A. Bress, Washington, D.C., William E. Devitt, Dennis J. Abdelnour, Kirkland & Ellis LLP, Chicago, Illinois; Stephen E. Leach, Leach Travell Britt, P.C., Tysons Corner, Virginia, for Appellees Infineon Technologies AG, Samsung Electronics Company, Limited, and International Business Machines Corporation. Lawrence A. Katz, Leach Travell Britt, P.C., Tysons Corner, Virginia; Theodore G. Brown, III, Kilpatrick Townsend & Stockton LLP, Menlo Park, California, for Appellee Hynix Semiconductor, Inc. Joseph E. Mais, Timothy J. Franks, Phoenix, Arizona, John K.

58 Bankr.Ct.Dec. 230, 108 U.S.P.Q.2d 1942

Roche, Washington, D.C., Alan D. Smith, Perkins Coie LLP, Seattle, Washington, for Appellee Intel Corporation. Marc Palay, Geneva, Switzerland, Jonathan Cohn, Sidley AustiN LLP, Washington, D.C., for Appellee Nanya Technology Corporation. Maurice Horwitz, New York, New York, M. Jarrad Wright, Adam P. Strochak, Washington, D.C., Alfredo R. Perez, Houston, Texas, Jared Bobrow, Weil, Gotshal & Manges LLP, Redwood Shores, California, for Appellee Micron Technology. Christopher J. Wright, Timothy J. Simeone, Wiltshire & Grannis, LLP, Washington, D.C., for Amicus Verband Insolvenzverwalter Deutschlands E.V. Neil H. MacBride, United States Attorney, Office of the United States Attorney, Alexandria, Virginia; Stuart F. Delery, Acting Assistant Attorney General, Robert M. Loeb, Civil Division, United States Department of Justice, Washington, D.C., for Amicus Curiae the United States of America. Richard F. Phillips, Kevin H. Rhodes, Intellectual Property Owners Association, Washington, D.C.; Jeffrey K. Sherwood, Gary M. Hoffman, Megan S. Woodworth, Dickstein Shapiro LLP, **17** Washington, D.C., for Amicus Intellectual Property Owners Association. Timothy J. Coleman, Freshfields Bruckhaus Deringer LLP, Washington, D.C., for Amicus Federation of German Industries. David Isaacs, Semiconductor Industry Association, Washington, D.C., for Amicus Semiconductor Industry Association; Paul D. Clement, D. Zachary Hudson, Bancroft PLLC, Washington, D.C., for Amici Semiconductor Industry Association, Chamber of Commerce of the United States of America, National Association of Manufacturers, and Business Software Alliance; Robin S. Conrad, National Chamber Litigation Center, Washington, D.C., for Amicus Chamber of Commerce of the United States of America; Quentin Riegel, National Association of Manufacturers, Washington, D.C., for Amicus National Association of Manufacturers; Timothy A. Molino, BSA/The Software Alliance, Washington, D.C., for Amicus Business Software Alliance.

Before NIEMEYER, WYNN, and FLOYD, Circuit Judges.

**Opinion**

Affirmed by published opinion. Judge NIEMEYER wrote the opinion, in which Judge FLOYD joined. Judge WYNN wrote a separate opinion concurring in Parts I, II, and III and the judgment.

NIEMEYER, Circuit Judge:

This appeal presents the significant question under Chapter 15 of the U.S. Bankruptcy Code of how to mediate between the United States' interests in recognizing and cooperating with a foreign insolvency proceeding and its interests in protecting creditors of the foreign debtor with respect to U.S. assets, as provided in 11 U.S.C. §§ 1521 and 1522.

Qimonda AG, a German corporation that manufactured semiconductor devices and was, for a brief time, one of the world's largest manufacturers of dynamic random access memory ("DRAM"), filed for insolvency in Munich, Germany, in January 2009. The principal assets of Qimonda's consisted of some 10,000 patents, about 4,000 of which were U.S. patents. These patents were subject to cross-license agreements with Qimonda's competitors, as was common in the semiconductor industry to avoid infringement risks caused by the "patent thicket" resulting from the overlapping patent rights of some 420,000 patents in the semiconductor industry.

Ancillary to the German insolvency proceeding, Dr. Michael Jaffé, the insolvency administrator appointed by the Munich court, filed an application in the Bankruptcy Court for the Eastern District of Virginia under Chapter 15 of the U.S. Bankruptcy Code, petitioning the U.S. court to recognize the German insolvency proceeding as a "foreign main proceeding" in order to obtain an array of privileges available under Chapter 15. Among other relief, Jaffé specifically requested that the bankruptcy court entrust to him, pursuant to 11 U.S.C. § 1521(a)(5), the administration of all of Qimonda's assets within the territorial jurisdiction of the United States, which largely consisted of the 4,000 U.S. patents.

Contemporaneously with the Chapter 15 proceeding, Jaffé sent letters to licensees of Qimonda's patents under its cross-license agreements, declaring that, under § 103 of the German Insolvency Code, the licenses granted under Qimonda patents "are no longer enforceable," including the licenses under the company's 4,000 U.S. patents. As Jaffé later indicated to the bankruptcy court, he intended to re-license Qimonda's patents for the benefit of Qimonda's creditors, replacing licenses paid for in-kind with cross-licenses with licenses paid for with cash through royalties.

The bankruptcy court entered an order recognizing the German insolvency proceeding **18** as a foreign main proceeding and a separate order granting Jaffé the discretionary relief he requested under § 1521(a)(5). But, following a four-day evidentiary hearing, it conditioned the §

1521 relief with the requirement that Jaffé afford the licensees of Qimonda's U.S. patents the treatment they would have received in the United States under 11 U.S.C. § 365(n), which limits a trustee's ability to reject unilaterally licenses to the debtor's intellectual property by giving licensees the option to retain their rights under the licenses. After balancing the interests of Qimonda's estate with the interests of the licensees of its U.S. patents, the bankruptcy court concluded that the application of § 365(n) was necessary to ensure, as required by § 1522(a), that the licensees were "sufficiently protected," even though it would adversely affect Qimonda's estate. The bankruptcy court also concluded, pursuant to 11 U.S.C. § 1506, that allowing Jaffé to cancel unilaterally Qimonda's licenses of U.S. patents "would be manifestly contrary to the public policy of the United States," recognizing "a fundamental U.S. public policy promoting technological innovation," which would be undermined if it failed to apply § 365(n) to the licenses under Qimonda's U.S. patents.

In this direct appeal from the bankruptcy court, Jaffé challenges both of these conclusions, arguing that the court erred in its construction of Chapter 15 and abused its discretion in applying it.

We conclude that the bankruptcy court properly recognized that Jaffé's request for discretionary relief under § 1521(a) required it to consider "the interests of the creditors and other interested entities, including the debtor" under § 1522(a) and that it properly construed § 1522(a) as requiring the application of a balancing test. Moreover, relying on the particular facts of this case and the extensive record developed during the four-day evidentiary hearing, we also conclude that the bankruptcy court reasonably exercised its discretion in balancing the interests of the licensees against the interests of the debtor and finding that application of § 365(n) was necessary to ensure the licensees under Qimonda's U.S. patents were sufficiently protected. Accordingly, we affirm.

**I**

### The German insolvency proceeding

Qimonda AG filed an application to open a preliminary insolvency proceeding in the Munich Insolvency Court on January 23, 2009, which was converted to a final proceeding on April 1, 2009. Upon converting the proceeding to a final one, the court appointed Dr. Michael Jaffé to serve as the estate's insolvency administrator, a position akin to a

bankruptcy trustee under U.S. law. Subsequently, Qimonda ceased all manufacturing operations and began to liquidate its estate. The principal assets of the estate consisted of its approximately 10,000 patents, including about 4,000 U.S. patents. Most of these patents covered products or processes related to DRAM, but some covered other types of semiconductor technology.

### The "patent thicket" and the practice of cross-licensing

At the time Qimonda opened its insolvency proceeding, its patents were subject to numerous cross-license agreements with other semiconductor manufacturers, including Infineon Technologies AG (from which Qimonda had spun off in 2006), Samsung Electronics Company, International Business Machines Corporation ("IBM"), Intel Corporation, Hynix Semiconductor, Inc., Nanya Technology Corporation, and Micron Technology, Inc. While some of these cross-license agreements were designed to facilitate specific joint ventures, **\*19** most simply reflected the strategy widely adopted in the semiconductor industry in response to infringement risks arising from the industry's "patent thicket"—a term used to describe "a dense web of overlapping intellectual property rights." Carl Shapiro, Navigating the Patent Thicket: Cross Licenses, Patent Pools, and Standard Setting, *in 1 Innovation Policy and the Economy* 119, 120 (Adam B. Jaffé et al. eds., 2001). As the bankruptcy court in this case aptly explained and all parties agreed, there are so many patents implicated by any new semiconductor product that "it would be all but impossible to design around each and every" one. *In re Qimonda AG,* 462 B.R. 165, 175 (Bankr.E.D.Va.2011). "Indeed, such is the number of potentially applicable patents that it is not always possible to identify which ones might cover a new product...." *Id.*

The problem of the patent thicket is exacerbated by the enormous costs incurred to bring a new semiconductor product to market. According to one expert, the price of building a new semiconductor fabrication facility can now exceed $5 billion. These sunk costs could create a classic "holdup" problem if a new product were ultimately found to infringe someone else's patent, with the patent's owner being able to extract a substantially higher royalty after the investment had been made than if a license had been negotiated beforehand. Thus, to avoid this holdup premium and enhance their design freedom, competitors in the semiconductor industry have routinely entered into broad, non-exclusive cross-license agreements with each other, "sometimes with the addition of equalizing payments (either up-front payments or so-called running royalties) to account

for differences in the size and breadth of the respective patent portfolios." *In re Qimonda AG,* 462 B.R. at 175.

Consistent with this industry practice, Qimonda had patent cross-license agreements with nearly every other major semiconductor manufacturer at the time it opened its insolvency proceeding.

### The Chapter 15 proceeding

Jaffé commenced this Chapter 15 proceeding on June 15, 2009, for recognition of the German insolvency proceeding as a "foreign main proceeding" under 11 U.S.C. § 1517. Jaffé's petition identified Qimonda's known assets in the United States as including its "active patents and patent applications filed with the United States Patent and Trademark Office," and it sought relief designed to "give effect to the German Proceedings in the U.S., protect the U.S. Assets, and to prevent creditors in the U.S. from taking actions that [might] frustrate the German Proceedings." Jaffé also sought an order entrusting to him, under § 1521(a)(5), "[t]he administration or realization of all or part of the assets of [Qimonda] within the territorial jurisdiction of the United States" and further declaring that the "German Proceedings ... be granted comity and [be] given full force and effect" in the United States.

The bankruptcy court granted the relief Jaffé requested, entering an order granting recognition of the German insolvency proceeding as a "foreign main proceeding" under § 1517. At the same time, it also entered a separate Supplemental Order "grant[ing] further relief under 11 U.S.C. § 1521." The Supplemental Order made Jaffé "the sole and exclusive representative of Qimonda AG in the United States" and, as requested, specifically gave him the power to "administer the assets of Qimonda AG within the territorial jurisdiction of the United States." It authorized Jaffé "to examine witnesses, take evidence, seek production of documents, and deliver **20** information" concerning Qimonda. Finally, it specified that, "in addition to those sections [of the Bankruptcy Code] made applicable pursuant to § 1520," a number of other provisions of the Bankruptcy Code would be "applicable in this proceeding," including 11 U.S.C. § 365. That provision gives a bankruptcy trustee power to assume or reject any of the debtor's executory contracts. But one subsection, § 365(n), limits the trustee's ability to unilaterally reject licenses *to the debtor's intellectual property,* reserving to the licensees the option to elect to retain their rights under the licenses.

Shortly after the bankruptcy court entered its Supplemental Order, Jaffé began sending letters to companies that had cross-license agreements with Qimonda, invoking § 103 of the German Insolvency Code and declaring that the licenses under Qimonda's patents were "no longer enforceable." Section 103 of the German Insolvency Code, much like § 365 of the U.S. Bankruptcy Code, permits an insolvency administrator to decide whether to continue to perform the debtor's executory contracts. But, unlike § 365, which includes the § 365(n) exception, § 103 does not specifically address intellectual property licenses. In Jaffé's view, however, the licenses under Qimonda's patents fell within the scope of § 103, and it was his duty, as insolvency administrator, not to recognize them since they provided no useful compensation to Qimonda's estate.

After receiving these letters, Samsung and Elpida Memory, Inc., responded with letters, taking the position that 11 U.S.C. § 365(n) protected their licenses under Qimonda's U.S. patents and announcing that they were electing to retain their rights under the licenses.

The letters from Samsung and Elpida prompted Jaffé to move to amend the bankruptcy court's July 22, 2009 Supplemental Order to delete entirely its reference to § 365. Alternatively, Jaffé asked the court to add a proviso to the Supplemental Order specifying that "Section 365(n) applies only if the Foreign Representative rejects an executory contract pursuant to Section 365 (rather than simply exercising the rights granted to the Foreign Representative pursuant to the German Insolvency Code)." Several companies that had licenses under Qimonda's U.S. patents through cross-license agreements—namely, Infineon, Samsung, Micron, Nanya, IBM, Intel, and Hynix (hereafter, the "Licensees")—opposed Jaffé's motion to amend the Supplemental Order. [1]

By an opinion dated November 19, 2009, the bankruptcy court granted Jaffé's motion, stating that its inclusion of § 365 was "improvident." The court explained that consistent with Chapter 15's goal of "providing a systematic and consistent resolution to cross-border insolvencies," the fate of the patent cross-license agreements should be decided in the German insolvency proceeding by applying German law. The court accordingly amended its Supplemental Order to include the alternative proviso that Jaffé had requested as an amendment.

### The appeal to the district court and its remand order

The Licensees appealed the bankruptcy court's amended order to the district court, which thereafter remanded the case back to the bankruptcy court to consider 11 U.S.C. § 1522(a)'s requirement that the **\*21** bankruptcy court ensure that "the interests of the creditors and other interested entities, including the debtor, [were] sufficiently protected." The district court explained that § 1522(a) required the bankruptcy court "to balance the relief granted to the foreign representative and the interests of those affected by such relief, without unduly favoring one group of creditors over another." *In re Qimonda AG Bankr. Litig.,* 433 B.R. 547, 557 (E.D.Va.2010) (emphasis omitted) (quoting *In re Tri–Cont'l Exch. Ltd.,* 349 B.R. 627, 637 (Bankr.E.D.Cal.2006)). The court found it "unclear on [the] somewhat anemic record whether the Bankruptcy Court adequately balanced the parties' interests, as required by § 1522," noting that the bankruptcy court had not adequately explained why the application of § 365(n) would unduly prejudice Jaffé or, conversely, fully considered "whether cancellation of licenses for [Qimonda's U.S. patents] would put at risk [the Licensees'] investments in manufacturing or sales facilities in this country for products covered by the U.S. patents." *Id.* at 558.

As a separate basis for remand, the district court also found that the bankruptcy court had failed to consider "whether § 365(n) embodies the fundamental public policy of the United States, such that subordinating § 365(n) to German Insolvency Code § 103 is an action 'manifestly contrary to the public policy of the United States,' " under 11 U.S.C. § 1506. 433 B.R. at 565. The district court concluded that there were two primary circumstances in which a bankruptcy court should invoke § 1506: *first,* when "the foreign proceeding was procedurally unfair;" and *second,* when "the application of foreign law or the recognition of a foreign main proceeding under Chapter 15 would severely impinge the value and import of a U.S. statutory or constitutional right, such that granting comity would severely hinder United States bankruptcy courts' abilities to carry out ... the most fundamental policies and purposes of these rights." *Id.* at 568–69 (internal quotation marks omitted). Finding the application of that standard "unclear on [the] record," the court also directed the bankruptcy court on remand to consider "whether conditioning the applicability of § 365(n) was a prohibited action 'manifestly contrary to the public policy of the United States' under § 1506." *Id.* at 570–71.

*On remand to the bankruptcy court*

On remand, Jaffé filed papers in the bankruptcy court in which he committed to re-license Qimonda's patent portfolio to the Licensees at a reasonable and nondiscriminatory ("RAND") royalty. He stated that he was prepared to "enter into good faith negotiations" with the Licensees to set the royalty rates and, if necessary, to submit the rate amounts to arbitration before the World Intellectual Property Organization ("WIPO"). [2]

**\*22** In March 2011, the bankruptcy court held a four-day evidentiary hearing, receiving testimony regarding the likely effects of applying § 365(n) to licenses under Qimonda's U.S. patents. Jaffé testified at the hearing that a ruling applying § 365(n) would render "the central assets of [Qimonda's] estate, that is [its] U.S. patents ... largely worthless." He also said that such a ruling would "violate the principle of equal treatment of creditors under German law" by giving the Licensees preferential treatment over Qimonda's other creditors.

Jaffé also presented the expert testimony of Dr. William Kerr, an economist, who concluded that based on his review of existing licenses and licensing practices in the semiconductor industry, Qimonda's estate would receive approximately $47 million per year if Jaffé were allowed to re-license Qimonda's U.S. patents covering DRAM products at RAND terms. Observing that $47 million would represent a small fraction of what the Licensees spend on research and development every year, Kerr gave his opinion that "discontinuance of the cross-licenses at issue [and subsequent re-licensing at a RAND rate] would not unduly impair the function of the semiconductor industry or the [Licensees]."

By contrast, the Licensees' witnesses testified to the harm that would befall the Licensees, as well as the semiconductor industry as a whole, if the reference to § 365(n) were removed from the Supplemental Order. For example, Dr. Jerry Hausman, the Licensees' economist, gave his opinion that "[b]y destabilizing the system of licensing that has enabled the extraordinary success of the semiconductor industry and other industries, failure to apply Section 365(n) would reduce investment, innovation, and competition, which would harm U.S. productivity growth and U.S. consumers as well as worldwide productivity and consumers." Hausman also disputed Kerr's calculation of the likely RAND royalty rates, forecasting significantly higher sums and arguing that the holdup threat could not be eliminated. Moreover, in Hausman's view, Jaffé's offer to re-license the U.S. patents at RAND terms could not "provide adequate protection for the interests of the [Licensees]," in part because of the danger that

Jaffé would subsequently sell the patent portfolio to an entity that might itself file for bankruptcy, thus "extinguish[ing] the [Licensees'] licenses once again."

### The bankruptcy court's decision on remand

At the conclusion of the hearing, the bankruptcy court issued a memorandum opinion denying Jaffé's motion to amend the Supplemental Order and confirming "that § 365(n) applies with respect to Qimonda's U.S. patents." *In re Qimonda AG,* 462 B.R. at 185. The court assumed for the purpose of its analysis that Jaffé's interpretation of German law was correct and that § 103 of the German Insolvency Code would authorize him to terminate the Licensees' right to practice Qimonda's patents. With that assumption, the court concluded that "the balancing of debtor and creditor interests required by § 1522(a) ... weighs in favor of making § 365(n) applicable to Dr. Jaffé's administration of Qimonda's U.S. patents." *Id.* at 182.

Explaining its balancing analysis, the bankruptcy court recognized that its ruling would "result in less value. being realized by the Qimonda estate" but noted that Qimonda's patents would "by no means be rendered worthless." 462 B.R. at 182. On the other hand, the court found that a contrary ruling would create a "very real" "risk to the very substantial investment the [Licensees] ... [had] collectively made in research and manufacturing facilities in the United States in reliance on the design **\*23** freedom provided by the cross-license agreements." *Id.* at 182–83. The court acknowledged that Jaffé's offer to re-license Qimonda's patents on RAND terms would lessen the holdup risk, but observed that, because of the Licensees' "sunk costs, [they would] not have the option of avoiding royalties altogether by designing around the patent." *Id.* at 181–82.

As an independent ground for its decision, the bankruptcy court also concluded, under 11 U.S.C. § 1506, that "deferring to German law, to the extent it allows cancellation of the U.S. patent licenses, would be manifestly contrary to U.S. public policy." 462 B.R. at 185. Referencing the legislative history of Congress's enactment of the Intellectual Property Licenses in Bankruptcy Act, Pub.L. No. 100–506, 102 Stat. 2538 (1988), the court noted that § 365(n) resulted from Congress's determination "that allowing patent licenses to be terminated in bankruptcy would 'impose[ ] a burden on American technological development.' " *In re Qimonda AG,* 462 B.R. at 184 (quoting S.Rep. No. 100–505, at 1 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3200, 3200). Informed by this congressional policy choice, the court reasoned that

"[a]lthough innovation would obviously not come to a grinding halt if licenses to U.S. patents could be cancelled in a foreign insolvency proceeding, the court is persuaded by Professor Hausman's testimony that the resulting uncertainty would nevertheless slow the *pace* of innovation, to the detriment of the U.S. economy." *Id.* at 185. On this basis, the court concluded that "failure to apply § 365(n) under the circumstances of this case and this industry would 'severely impinge' an important statutory protection accorded licensees of U.S. patents and thereby undermine a fundamental U.S. public policy promoting technological innovation." *Id.*

The bankruptcy court thus held that "public policy, as well as the economic harm that would otherwise result to the [L]icensees, require[d] that the protections of § 365(n) apply to Qimonda's U.S. patents." 462 B.R. at 167–68.

### The direct appeal to the court of appeals

Jaffé appealed the bankruptcy court's ruling and sought from the district court a certification under 28 U.S.C. § 158(d)(2) for a direct appeal to this court. The district court concluded that the bankruptcy court's order qualified for certification, and, by order dated June 28, 2012, we authorized the direct appeal. *See* 28 U.S.C. § 158(d)(2).

## II

Congress enacted Chapter 15 of the Bankruptcy Code in 2005 as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109–8, 119 Stat. 23, stating that its purpose was "to incorporate the Model Law on Cross–Border Insolvency," which had been developed in 1997 by the United Nations Commission on International Trade Law ("UNCITRAL"), "so as to provide effective mechanisms for dealing with cases of cross-border insolvency." 11 U.S.C. § 1501(a); *see also* H.R.Rep. No. 109– 31, pt. 1, at 105 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 169. In this respect, Chapter 15 replaced former 11 U.S.C. § 304, which authorized bankruptcy courts to award appropriate relief in a case ancillary to a foreign proceeding but which was largely discretionary. *See* 11 U.S.C. § 304(c) (2000). Chapter 15 lists five specific objectives: (1) to encourage cooperation with "the courts and other competent authorities of foreign countries involved in cross-border cases;" (2) to increase "legal certainty for trade and investment;" (3) to promote the "fair and efficient administration of cross-border insolvencies" so as to **\*24** "protect[ ] the interests

of all creditors, and other interested entities, including the debtor;" (4) to protect and maximize "the value of the debtor's assets;" and (5) to facilitate "the rescue of financially troubled businesses." 11 U.S.C. § 1501(a); *see also* H.R.Rep. No. 109–31, pt. 1, at 105.

To further these stated objectives, Chapter 15 authorizes the representative of a foreign insolvency proceeding to commence a case in a U.S. bankruptcy court by filing a petition for recognition of the foreign proceeding. 11 U.S.C. §§ 1504, 1509(a), 1515. If the petition meets the requirements listed in § 1517, the court *must* enter an order granting recognition of the foreign proceeding. And if that foreign proceeding "is pending in the country where the debtor has the center of its main interests," it is recognized as a "foreign main proceeding." 11 U.S.C. § 1517(b)(1); *see also id.* § 1502(4). With the entry of an order recognizing a foreign main proceeding, the foreign representative of the proceeding automatically receives relief as stated in § 1520, including the automatic stay created by § 362 with respect to the debtor and its property within the United States and the ability to operate the debtor's business within the United States under § 363, as well as the right to sue and be sued and the right to "intervene in any proceedings in a State or Federal court in the United States in which the debtor is a party." *Id.* §§ 1520(a), 1509(b)(1), 1524. Moreover, the statute provides that following entry of a recognition order, "a court in the United States shall grant comity or cooperation to the foreign representative," thereby implementing a principal purpose of Chapter 15. *Id.* § 1509(b)(3).

Even before entry of the order granting recognition, § 1519 authorizes the bankruptcy court, on the foreign representative's request, to grant preliminary relief when "urgently needed to protect the assets of the debtor or the interests of the creditors." 11 U.S.C. § 1519.

In addition to the automatic relief that comes with the entry of an order granting recognition of a foreign main proceeding, § 1521 authorizes the bankruptcy court to grant discretionary relief. Specifically, § 1521 provides that "where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief." 11 U.S.C. § 1521(a). This discretionary relief may include "entrusting the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to the foreign representative," *id.* § 1521(a)(5), as well as "entrust[ing] the distribution of all or

part of the debtor's assets located in the United States to the foreign representative," *id.* § 1521(b). The bankruptcy court, however, may only grant discretionary relief under § 1521 if it determines that "the interests of the creditors and other interested entities, including the debtor, are sufficiently protected." *Id.* § 1522(a). It may also subject the discretionary relief it grants under § 1521 "to conditions it considers appropriate, including the giving of security or the filing of a bond." *Id.* § 1522(b).

Finally, all of the actions authorized in Chapter 15 are subject to § 1506, which provides that "[n]othing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506.

Chapter 15 thus authorizes an "ancillary" proceeding in a United States bankruptcy court that is largely designed to complement and assist a foreign insolvency **\*25** proceeding by, among other things, "bring[ing] people and property beyond the foreign main proceeding's jurisdiction into the foreign main proceeding through the exercise of the United States' jurisdiction." *In re ABC Learning Centres Ltd.,* 728 F.3d 301, 307 (3d Cir.2013); *see also* H.R.Rep. No. 109–31, pt. 1, at 106 ("Cases brought under chapter 15 are intended to be ancillary to cases brought in a debtor's home country ..."). This structure reflects "the United States policy in favor of a general rule that countries other than the home country of the debtor, where a main proceeding would be brought, should usually act through ancillary proceedings in aid of the main proceedings, in preference to a system of full bankruptcies (often called 'secondary' proceedings) in each state where assets are found." H.R.Rep. No. 109–31, pt. 1, at 108. Notwithstanding this general policy, Chapter 15 also expressly contemplates that "[a]fter recognition of a foreign main proceeding, a case under another chapter of [the Bankruptcy Code] may be commenced ... if the debtor has assets in the United States." 11 U.S.C. § 1528.

Thus, taken as a whole, Chapter 15—like the Model Law on which it was based—takes "several modest but significant" steps toward implementing "a modern, harmonized and fair framework to address more effectively instances of cross-border insolvency." UNCITRAL, Guide to Enactment of the UNCITRAL Model Law on Cross–Border Insolvency, *in Legislative Guide on Insolvency Law* 307, 307 (2005) (hereinafter, "Guide to Enactment").

### III

[1]    Jaffé contends that the bankruptcy court erred by employing § 1522(a)'s sufficient protection requirement to subject his "right to administer [Qimonda's] U.S. patents to the ... constraints imposed by § 365(n)," thus allowing the Licensees to elect to retain their license rights under Qimonda's U.S. patents, contrary to German law as he understands it. *In re Qimonda AG,* 462 B.R. at 183. The bankruptcy court limited the authority it conferred on Jaffé under § 1521(a)(5) by balancing the interests of the Licensees with the interests of Qimonda's estate under § 1522(a) and concluding that the Licensees should receive the protection of § 365(n). *Id.* at 180–83. In support of his challenge, Jaffé makes essentially three arguments: (1) that the district court and the bankruptcy court erred in even considering § 1522(a), because that section applies only to relief granted under § 1521, that the relief granted under § 1521 may be requested only by the foreign representative, and that he, as the foreign representative, never requested the inclusion of § 365(n) as part of the § 1521 relief; (2) that the bankruptcy court misunderstood the type of protection afforded by § 1522(a) by applying a test that balanced the debtor's interests and the creditors' interests instead of a test that placed all creditors on an equal footing; and (3) that in balancing the competing interests, the bankruptcy court overstated the risks to the Licensees, especially in view of Jaffé's offer to re-license Qimonda's patents to them, and failed to treat all creditors' interests equally. We address these points in order. [3]

### *26    A

First, Jaffé argues that both the bankruptcy court and the district court erred in even considering § 1522's sufficient protection requirement because § 1522(a) applies to relief that may be granted under § 1521, and § 1521(a), in turn, provides that "the court may, *at the request of the foreign representative,* grant any appropriate relief." (Emphasis added). He asserts that he "never asked the bankruptcy court to include § 365 in its Supplemental Order or sought other relief relating to § 365(n)" such that the Licensees would have the option to retain their licenses under Qimonda's U.S. patents. Thus, according to Jaffé, because application of § 365 was not specifically requested by him, the bankruptcy court's *sua sponte* inclusion of § 365 was legal error, the correction of which must precede any consideration of § 1522(a)'s sufficient protection requirement.

We believe that Jaffé's view of the relationship between § 1521(a) and § 1522(a) is too myopic. While it is true that Jaffé "never affirmatively requested rejection authority under § 365," he did request several forms of discretionary relief under § 1521, among which was the privilege, pursuant to § 1521(a)(5), to have the bankruptcy court entrust him with "[t]he administration or realization of all or part of the assets of [Qimonda] within the territorial jurisdiction of the United States," specifically identifying the company's U.S. patents among the U.S. assets he sought to control. And, as a prerequisite to awarding *any § 1521 relief,* the court was *required* to ensure sufficient protection of the creditors and the debtor. Section 1522(a) states this explicitly, providing in relevant part, "The court may grant relief *under section ... 1521 ... only if* the interests of the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a) (emphasis added). Additionally, the court was authorized to "subject" any § 1521 relief "to conditions it considers appropriate." *Id.* § 1522(b); *see also* H.R.Rep. No. 109–31, pt. 1, at 116 (describing § 1522 as "giv[ing] the bankruptcy court broad latitude to mold relief to meet specific circumstances, including appropriate responses if it is shown that the foreign proceeding is seriously and unjustifiably injuring United States creditors").

This is precisely what the bankruptcy court did here. It granted discretionary relief under § 1521 and, as mandated, considered the question of sufficient protection under § 1522(a). Upon such consideration, it conditioned its § 1521 relief on application of § 365(n), finding that such protection was appropriate in the circumstances presented.

To be sure, the bankruptcy court did not frame its *initial* inclusion of § 365 in the *27 Supplemental Order as a condition on the authority it was granting Jaffé under § 1521. Indeed, when initially faced with Jaffé's motion to amend, the court described the inclusion of § 365 as "improvident." But on the Licensees' appeal, the district court correctly recognized that it was incumbent on the bankruptcy court, on remand, to consider whether "the interests of the creditors and other interested entities, including the debtor, [would be] sufficiently protected" under § 1522(a) were the court to modify its earlier order so as to grant Jaffé control over the administration of Qimonda's U.S. patents without providing for the application of § 365(n) to the licenses on those patents. *See In re Qimonda AG Bankr. Litig.,* 433 B.R. at 557–58.

The bankruptcy court's consideration of § 1522(a) was thus undoubtedly appropriate when authorizing relief under § 1521.

**B**

**[2]**   Jaffé next contends that even if the bankruptcy court was correct to consider § 1522's sufficient protection requirement in granting § 1521 relief, the court nonetheless employed the wrong test in applying § 1522(a). He maintains that the bankruptcy court's "ruling fundamentally misunderst[ood] the 'interests' § 1522(a) protects" by failing to recognize that § 1522(a) is merely a procedural protection "designed to ensure that all creditors [could] *participate* in the bankruptcy distribution *on an equal footing* " and thus should not be used to protect parties from the substantive bankruptcy law that would otherwise apply in the foreign main proceeding. (Emphasis added.) He asserts that "[d]isregarding foreign law based on an open-ended balancing test under § 1522(a) is contrary to Chapter 15's basic design," which, according to Jaffé, requires U.S. courts to defer to foreign substantive law *except* only as allowed under § 1506, which provides a narrow exception when the court's action would otherwise violate "the most fundamental policies of the United States." H.R.Rep. No. 109–31, pt. 1, at 109. In sum, he argues (1) that the bankruptcy court erred by interpreting § 1522's sufficient protection requirement as incorporating a balancing test that could achieve a result that treated creditors differently and that would therefore be in tension with German law, and (2) that, to the extent § 1522(a) was implicated at all, the bankruptcy court should have limited its analysis to ensuring that the doors of the German insolvency proceeding would be open to the Licensees on *equal* footing with Qimonda's other creditors.

Jaffé's theory of how the sufficient protection requirement of § 1522(a) operates is not illogical. The text of the statute is broad and somewhat ambiguous regarding the test that courts should employ to determine "if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a). But we are not convinced that Jaffé's theory can fully be squared with the text or with Congress's intent in enacting the text.

**[3]**   Section 1522(a) requires the bankruptcy court to ensure the protection of *both* the creditors and the debtor. 11 U.S.C. § 1522(a). The provision thus requires the court to ensure that the relief a foreign representative requests under § 1521 does not impinge excessively on any one entity's interests, implying that each entity must receive at least some protection. And because the interests of the creditors and the interests of the debtor are often antagonistic, as they are here, providing protection to one side might well come at some expense to the other. The analysis required by § 1522(a) is therefore logically best done by balancing the respective **\*28** interests based on the relative harms and benefits in light of the circumstances presented, thus inherently calling for application of a balancing test.

We also find support for this interpretation in the Model Law on Cross–Border Insolvency, on which Chapter 15 was based. In enacting Chapter 15, Congress stated that it intended to codify the Model Law. *See* 11 U.S.C. § 1501(a). And, in doing so, it also indicated strongly that the Model Law, and the accompanying Guide to Enactment issued by UNCITRAL in conjunction with its adoption of the Model Law, should inform our interpretation of Chapter 15's provisions. Indeed, Chapter 15 provides that "[i]n interpreting this chapter, the court shall consider its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions." *Id.* § 1508; *see also* H.R.Rep. No. 109–31, pt. 1, at 109–10 ("Interpretation of this chapter on a uniform basis will be aided *by reference to the Guide* and the Reports cited therein, which explain the reasons for the terms used and often cite their origins as well.... To the extent that the United States courts rely on these sources, their decisions will more likely be regarded as persuasive elsewhere" (emphasis added)). Thus, the Model Law and its Guide to Enactment also provide relevant guidance in determining the appropriate meaning of Chapter 15's provisions.

The Guide to Enactment contains a number of paragraphs that bear directly on the question of how a court should assess the interests of others and protect them prior to granting the discretionary relief sought by a foreign representative. For example, the Guide acknowledges that the representative of a foreign main proceeding will "normally seek[ ] to gain control over all assets of the insolvent debtor." Guide to Enactment ¶ 158, at 347. But it stresses that the Model Law makes "[t]he 'turnover' of assets to the foreign representative discretionary," adding that "the Model Law contains several safeguards designed *to ensure the protection of local interests* before assets are turned over to the foreign representative." *Id.* ¶ 157, at 347 (emphasis added). Chief among those "safeguards" is Article 22 of the Model Law, which is largely codified as § 1522.[4] According to the Guide,

"The idea underlying [A]rticle 22 is that there should be a *balance between relief that may be granted to the foreign representative and the interests of the persons that may be affected by such relief.* This balance is essential to achieve the objectives of cross-border insolvency legislation." *Id.* ¶ 161, at 348 (emphasis added). The Guide to Enactment separately indicates that Article 22 is designed to "protect the interests of the **\*29** creditors (in particular local creditors), the debtor and other affected persons." *Id.* ¶ 35, at 314. Finally, the Guide states, "*[i]n addition to [Article 22's] specific provisions,*" Article 6 of the Model Law "*in a general way* provides that the court may refuse to take an action governed by the Model Law if the action would be manifestly contrary to the public policy of the enacting State." *Id.* ¶ 36, at 314 (emphasis added).

[4]    Informed by the Guide to Enactment's description of the relationship between Articles 22 and 6 of the Model Law (§§ 1522 and 1506 in the U.S. Bankruptcy Code), we do not share Jaffé's view that § 1506's public policy exception forecloses use of a balancing analysis under § 1522. Contrary to Jaffé's position, Chapter 15 does not require a U.S. bankruptcy court, in considering a foreign representative's request for discretionary relief under § 1521, to blind itself to the costs that awarding such relief would impose on others under the rule provided by the substantive law of the State where the foreign insolvency proceeding is pending. Instead, Chapter 15, like the Model Law, anticipates the provision of particularized protection, as stated in § 1522(a).

We therefore conclude, through interpretation of § 1522(a)'s text and consideration of Chapter 15's international origin, that the district court correctly interpreted § 1522(a)'s sufficient protection requirement as requiring a particularized balancing analysis that considers the "interests of the creditors and other interested entities, including the debtor," 11 U.S.C. § 1522(a), and, in this case in particular, a weighing of the interests of the foreign representative (the debtor) in receiving the requested relief against the competing interests of those who would be adversely affected by the grant of such relief (here, the Licensees). And we also agree that § 1506 is an additional, more general protection of U.S. interests that may be evaluated apart from the particularized analysis of § 1522(a).

In reaching this conclusion, we join the Fifth Circuit, which interpreted § 1522(a) similarly, based largely on the language in the Guide to Enactment. *See In re Vitro S.A.B. de C.V.,* 701 F.3d 1031, 1060, 1067 n. 42 (5th Cir.2012); *see also*

*In re Int'l Banking Corp. B.S.C.,* 439 B.R. 614, 626–27 (Bankr.S.D.N.Y.2010); *In re Tri–Cont'l Exch. Ltd.,* 349 B.R. 627, 637 (Bankr.E.D.Cal.2006).

## C

[5]    Finally, Jaffé contends that the bankruptcy court's balancing analysis, even if assumed appropriate, was flawed in implementation. He argues that the court dramatically overstated the risk to the Licensees' investments made in reliance on the cross-license agreements, especially in light of his offer to re-license Qimonda's U.S. patents to the Licensees at a RAND royalty rate. In this regard, he maintains that the court's balancing analysis failed to recognize that " § 1522(a) requires courts to protect the interests of *all* 'creditors and other interested entities, including the debtor'—not just one set of contracting parties."

The Licensees respond, arguing that "the bankruptcy court properly recognized that Dr. Jaffé's offer to relicense did not change the balance of harms" and that the bankruptcy court correctly "concluded that, without § 365(n) protection, the Licensees would face both the immediate harm of a hold-up and the future ... destabilization of the licensing regime in the semiconductor industry." They maintain that in light of the bankruptcy court's detailed findings and careful reasoning, Jaffé simply "cannot meet his heavy burden to demonstrate that the bankruptcy **\*30** court abused its discretion in its application of § 1522."

It should be noted that after hearing four days of evidence, the bankruptcy court considered the outcome of its balancing analysis to be a close one. But in the end it concluded, reasonably we believe, "that the balancing of debtor and creditor interests required by § 1522(a), Bankruptcy Code, weigh[ed] in favor of making § 365(n) applicable to Dr. Jaffé's administration of Qimonda's U.S. patents." *In re Qimonda AG,* 462 B.R. at 182. The court recognized Jaffé's claim that the "application of § 365(n) [would] result in less value. being realized by the Qimonda estate." *Id.* But it noted that "Qimonda's patent portfolio [would] by no means be rendered worthless" because the "U.S. patents [could] still be licensed to parties that [did] not already have a license, and Dr. Jaffé, to the extent permitted by German law, [would] be able to fully monetize the non-U.S. patents." *Id.* Additionally, the bankruptcy court found it significant that "[a]pplication of § 365(n) ... [would impose] no affirmative burden on Dr. Jaffé," *id.,* but instead would merely limit his ability—and,

importantly, the ability of the patents' subsequent owners—to bring infringement actions against the very entities that Qimonda had previously promised not to sue. *See Imation Corp. v. Koninklijke Philips Elecs. N.V.,* 586 F.3d 980, 987 (Fed.Cir.2009) (characterizing a patent cross-license agreement as essentially "a promise by the licensor not to sue the licensee" for infringement (citation omitted)).

In considering and weighing the Licensees' interests, the bankruptcy court largely credited their evidence indicating that entrusting Jaffé with the right to administer Qimonda's U.S. patents without making § 365(n) applicable to the preexisting licenses under those patents would have broad-ranging ill effects. It explained that "the risk to the very substantial investment the [Licensees]—particularly IBM, Micron, Intel, and Samsung—[had] collectively made in research and manufacturing facilities in the United States in reliance on the design freedom provided by the cross-license agreements, though not easily quantifiable, [was] nevertheless very real." *In re Qimonda AG,* 462 B.R. at 182–83. While the bankruptcy court acknowledged that the Licensees had been unable "to identify specific Qimonda patents implicated by the products they manufacture[d] and s[old]," it noted that the lack of such evidence was "not at all surprising, since the whole point of portfolio cross-licenses [was] to eliminate the necessity (and in some cases impossibility) of individually analyzing each and every patent that might possibly apply to determine if a new design infringe[d] on it." *Id.* at 181. Thus, although the bankruptcy court could not, in the course of its balancing analysis, make "a finding that cancellation of the [Licensees'] right to use Qimonda's U.S. patents would have a specific dollar impact on them," it did find that it "create[d] a substantial *risk* of harm," adding that "the *threat* of infringement litigation can be as damaging as an actual finding of infringement." *Id.*

We find the bankruptcy court's thorough examination of the parties' competing interests to have been both comprehensive and eminently reasonable.

Jaffé relies heavily on the mitigation that would result from his commitment to re-license Qimonda's patents to the Licensees on RAND terms, arguing that it would provide sufficient protection for their interests. Of course, his proposal—first mentioned after the district court's remand—does weigh in his favor by decreasing the Licensees' holdup risks. But just because the RAND proposal would reduce the Licensees' risks does not mean **\*31** that their interests would be sufficiently protected by Jaffé's promise to re-license. The

bankruptcy court expressly recognized this, explaining that "the hold-up risk is lessened by Dr. Jaffé's offer to re-license the patents on RAND terms," but emphasizing that "even if the WIPO expert determination process were to arrive at the same figure that would have been agreed to in an 'ex ante' scenario, the [Licensees], because of their sunk costs, [would] not have the option of avoiding royalties altogether by designing around the patent." *In re Qimonda AG,* 462 B.R. at 181–82. We conclude that the bankruptcy court's findings in this regard are not unreasonable and that the bankruptcy court was justified in its skepticism of Jaffé's claim that the Licensees' interests would now be "sufficiently protected" by his commitment not to charge them an exorbitant rate during their re-licensing negotiations.

Moreover, the bankruptcy court also noted that it remained an "open question" whether any new license issued by Jaffé on RAND terms would itself be secure, expressing its concern that

> Dr. Jaffé could still sell the underlying patents to a purchaser—whether a practicing entity or a 'troll'—that might itself file for insolvency under German law or transfer the patent to a special purpose entity for the purpose of having it file for insolvency under German law.

*Id.* at 181–82 n. 13. The court's recognition of this concern was also reasonable, as it is far from clear whether, having once facilitated the termination of license rights in a foreign insolvency proceeding, the genie could ever be put back into the bottle. Rather, as indicated by expert testimony that the bankruptcy court credited, it would seem all too likely that such a result would introduce a dangerous degree of uncertainty into a licensing system that plays a critically important role in the semiconductor industry, as well as other high-tech sectors of the global economy.

At bottom, we affirm the decision of the bankruptcy court, finding reasonable its exercise of discretion in conducting the balancing analysis under § 1522(a) and concluding that attaching the protection of § 365(n) was necessary when granting Jaffé the power to administer Qimonda's U.S. patents. *See In re Vitro S.A.B. de C.V.,* 701 F.3d at 1069 (noting in the course of affirming a bankruptcy court's decision not to enforce the reorganization plan adopted in a foreign main proceeding that "[i]t is not our role to determine whether the above-summarized evidence would lead us to the same conclusion" and adding that "*[o]ur only task is to determine whether the bankruptcy court's decision was reasonable*" (emphasis added)).

## IV

It is important, we think, to recognize, as Jaffé would have us do, the importance of Chapter 15 to a global economy, in which businesses needing bankruptcy protection increasingly have assets in various countries. In mimicking the U.N.'s Model Law on Cross–Border Insolvencies, Chapter 15 furthers a policy of the United States of cooperating with other countries in providing fair and efficient insolvency proceedings for such international businesses. Consistent with its stated purposes, Chapter 15 provides for the ready recognition of foreign insolvency proceedings, *see* 11 U.S.C. § 1517, and grants automatic relief to protect U.S. assets upon entry of an order granting recognition, *see id.* § 1520. It also provides for a broad range of discretionary relief under § 1521. Thus, it represents a full commitment of the United States to cooperate with foreign insolvency proceedings, as called for by the U.N.'s Model Law on **\*32** Cross–Border Insolvency. And at bottom, such cooperation will provide greater legal certainty for trade and business to the benefit of the global economy.

But the United States' commitment is not untempered, as is manifested in both Chapter 15 and the Model Law on which it was based. Thus, § 1522(a) requires that a bankruptcy court, when granting the discretionary relief authorized by § 1521, *ensure sufficient protection of creditors*, as well as the debtor. And at a more general level, § 1506, which covers any action under Chapter 15, authorizes a bankruptcy court to refuse to take an action that would be manifestly contrary to U.S. public policy.

In this case, it is sufficient for us to affirm the bankruptcy court, based on its application of § 1522(a). But in doing so, we understand that, by affirming the bankruptcy court's application of § 365(n) following its balancing analysis under § 1522(a), we also indirectly further the public policy that underlies § 365(n). The Senate Report accompanying the bill that became § 365(n) explicitly recognized that licensees have a strong interest in maintaining their right to use intellectual property following the licensor's bankruptcy and that to deny them that right would "impose[ ] a burden on American technological development that was never intended by Congress." S.Rep. No. 100–505, at 1. The Report added that "[t]he adoption of this bill will immediately remove

that burden and its attendant threat to the development of American Technology." *Id.* at 2.

In this case, the bankruptcy court, in weighing the respective interests of the Licensees and the debtor under § 1522(a), found that without the protection of 365(n), the risk of harm to the Licensees would be very real, impairing the "design freedom provided [them] by the cross-license agreements." *In re Qimonda AG*, 462 B.R. at 183. And as the bankruptcy court otherwise found, this potential harm to the Licensees would, in turn, threaten to "slow the pace of innovation" in the United States, to the detriment of the U.S. economy. *Id.* at 185. Thus, the court's findings, which were, to be sure, focused on the Licensees' interests, nonetheless necessarily furthered the public policy underlying § 365(n).

We thus recognize that by affirming the bankruptcy court, even though on its § 1522(a) analysis, we too necessarily further the public policy inherent in and manifested by § 365(n).

The judgment of the bankruptcy court is accordingly

*AFFIRMED.*

WYNN, Circuit Judge, concurring in the judgment:
The only question we need to address in this appeal concerns the bankruptcy court's discretion in ensuring that "the interests of the creditors and other interested entities, including the debtor, are sufficiently protected" under Chapter 15 of the Bankruptcy Code, 11 U.S.C. § 1522, and whether the bankruptcy court abused that discretion here. I agree with the majority opinion that in reviewing this issue, we look not to whether the record evidence "would lead us to the same conclusion" but that "[o]ur only task is to determine whether the bankruptcy court's decision was reasonable." *In re Vitro S.A.B. de C.V.*, 701 F.3d 1031, 1069 (5th Cir.2012). Accordingly, I am happy to concur in the language in Parts I, II, and III of the majority opinion that analyzes and addresses only this issue. I do not join in Part IV because it is unnecessary dictum.

**Parallel Citations**

58 Bankr.Ct.Dec. 230, 108 U.S.P.Q.2d 1942

Footnotes

1    Infineon, Samsung, Micron, Nanya, and Elpida originally objected to the motion, while IBM, Intel, and Hynix were later allowed to
     intervene as objectors. Elpida, which also had elected to enforce its licenses from Qimonda under § 365(n), subsequently reached a
     settlement with Jaffé and therefore is not an objecting Licensee.

2    RAND royalties are relatively common in high-tech industries because of the role played by standard-setting organizations, which
     help ensure the interoperability of products, among other functions. To avoid the holdup problem in this context, standard-setting
     organizations typically require their members to agree in advance to license any patent identified as necessary to a standard at
     RAND terms. Both Qimonda and the Licensees belong to such an organization. Nonetheless, the Federal Trade Commission has
     observed that "there is much debate over whether such RAND ... commitments can effectively prevent patent owners from imposing
     excessive royalty obligations on licensees," noting complaints by industry representatives that the term RAND is "vague and ill-
     defined-particularly with regard to what royalty rate is 'reasonable.' " Fed. Trade Comm'n, *The Evolving IP Marketplace: Aligning
     Patent Notice and Remedies with Competition* 192–93 (2011).

3    We note as well that the United States has appeared as *amicus curiae* to express its concern that the bankruptcy court overstepped its
     authority below. Specifically, it criticizes the bankruptcy court as "approach[ing] this case as though it were empowered to decide
     whether the Foreign Administrator should be permitted to reject appellees' license agreements" based on an erroneous assumption
     that it could "superimpose Section 365(n) on the operation of German insolvency law in a German proceeding." The United States
     therefore urges us to "reverse[ ] on the threshold ground that Section 365(n) cannot constrain the operation of German insolvency
     law in Germany."

     As already made clear, however, we take a different view of the scope of the bankruptcy court's holding. Rather than purporting
     to "constrain the operation of German insolvency law in Germany," the bankruptcy court conditioned its grant of power to Jaffé
     to "administer the assets of Qimonda AG *within the territorial jurisdiction of the United States* " with the limitation that he was
     taking the company's U.S. patents subject to the preexisting licenses, which he was obliged to treat in a manner consistent with §
     365(n). As a result, Jaffé is precluded from rejecting the U.S. patent licenses *as a matter of U.S. law.* Although this limitation may
     have indirect effects in the German proceeding, it does not represent an impermissible application of U.S. law extraterritorially,
     which we understand to be the main concern animating the United States' position in this case.

4    Article 22 of the Model Law provides in full:

        1. In granting or denying relief under article 19 or 21, or in modifying or terminating relief under paragraph 3 of this article,
        the court must be satisfied that the interests of the creditors and other interested persons, including the debtor, are adequately
        protected.

        2. The court may subject relief granted under article 19 or 21 to conditions it considers appropriate.

        3. The court may, at the request of the foreign representative or a person affected by relief granted under article 19 or 21, or
        at its own motion, modify or terminate such relief.

     Comparing Article 22 and § 1522 reveals that Congress relied heavily on the language of the Model Law. One of the few alterations
     that Congress made was to change "adequately" in Article 22(1) to "sufficiently" in § 1522(a)—a modification that the legislative
     history indicates was made in order "to avoid confusion with ... 'adequate protection,' " "a very specialized legal term in United
     States bankruptcy." H.R.Rep. No. 109–31, pt. 1, at 115.

---

End of Document                                          © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 55

*Indexed as:*
## Kentucky Fried Chicken Canada, a Division of Pepsi-Cola Canada Ltd. v. Scott's Food Services Inc.

**Between**
**Kentucky Fried Chicken Canada, a Division of Pepsi-Cola Canada**
**Ltd., plaintiff (respondent), and**
**Scott's Food Services Inc. and Scott's Hospitality Inc.,**
**defendants (appellants)**

[1998] O.J. No. 4368

114 O.A.C. 357

41 B.L.R. (2d) 42

83 A.C.W.S. (3d) 382

Docket No. C28208

Ontario Court of Appeal
Toronto, Ontario

**Moldaver, Goudge JJ.A. and Ferrier J. (ad hoc)**

Heard: May 4 and 5, 1998.
Judgment: November 2, 1998.

(29 pp.)

*Franchises -- Franchise agreement -- Interpretation -- Breach of agreement -- What constitutes --*
*Transfer of franchises -- Consent of franchisor.*

Appeal by Scott's Food Services from a trial judgment allowing Kentucky Fried Chicken's (KFC)
action for termination of a licensing agreement. Scott's was the largest KFC franchisee in the world.
Scott's Food was owned by Scott's Hospitality. Scott's Hospitality owned a school bus business as
well as the KFC franchise. In 1996, as part of a transaction with Laidlaw Inc., the shareholders of
Scott's Hospitality transferred its ownership of the franchise to Scott's Restaurants. The Sharehold-
ers then owned Scott's Restaurants which owned Scott's Food. Laidlaw purchased the shares of

Scott's Hospitality and acquired the school bus business. The change in ownership of the franchise was made without KFC's consent. In issue was whether the license agreement required Scott's to obtain KFC's consent to the change in ownership of the franchisee failing which KFC could terminate the contract. Also in issue was whether Scott's had failed to meet its obligations to enhance its KFC outlets. The trial judge found that consent to a change in ownership was required and that KFC had the right to terminate the agreement. The trial judge also found that Scott's failed to meet its obligation to enhance which was a material and substantive failure also entitling KFC to terminate the license agreement unless the outlets were enhanced within three months. Scott's appealed.

HELD: Appeal allowed. The contract, being a negotiated commercial document, was interpreted objectively and in accordance with sound commercial principles and good business sense. The contract did not give KFC a right to approve a change in the controlling shareholder of the franchisee, Scott's. Such a right would have meant a significant change in the agreement which had governed the franchise relationship since 1969. Prior to executing the agreement, KFC was told that Scott's would not agree to any restriction on changes of ownership in the franchisee. Furthermore, the standard "deemed transfer" language present in every other KFC franchise agreement, which provided for KFC's right to approve a change in shareholders of the franchisee, was conspicuously absent from the Scott's license agreement. The interpretation suggested by KFC resulted in a commercial absurdity. Scott's had bargaining power at least equal to that of KFC and sufficient power to achieve a contract with no restriction on the transferability of shares. Therefore, the license agreement could not be interpreted to give KFC a right to approve a change in the shareholders of Scott's. Consequently, KFC did not have the right to terminate the franchise. The appeal was also allowed on the enhancement issue. The franchise agreement did not give KFC a substantive right to terminate for failure by Scott's to discharge its enhancement obligations.

## Counsel:

Dennis R. O'Connor, Q.C., David Stockwood, Q.C., Nancy J. Spies and Timothy H. Mitchell, for the appellants.
David R. Byers, Katherine L. Kay and Christopher J. Cosgriffe, for the respondent.

---

The following judgment was delivered by

**1    GOUDGE J.A.**:-- This appeal was heard on May 4 and 5, 1998. This court's reasons for judgment were ready for release on July 9, 1998 when the parties contacted the court to request that this not be done. On the basis of the reasons given by the parties for this request, the court agreed to refrain from releasing its judgment until November 1, 1998 but made clear that the judgment would then be released unless prior to October 31, 1998 both parties notified the court in writing that the matter had been fully and finally settled and that the appellant wished to withdraw the appeal. This has not happened and these reasons are therefore being released.

**2**    The appellant Scott's Food is the largest Kentucky Fried Chicken ("KFC") franchisee in the world. Its franchise agreement (the "license agreement") with the respondent covers some four hundred outlets, approximately half of all KFC outlets in Canada.

**3**    Up until 1996, Scott's Food was owned by the appellant Scott's Hospitality whose other major business was a school bus operation. At that point, as part of a transaction with Laidlaw Inc. ("Laidlaw") in which Laidlaw acquired the school bus business, the shareholders of Scott's Hospitality replaced it as the sole shareholder of the franchisee with a new company, Scott's Restaurants. As a result, these shareholders then owned Scott's Restaurants which in turn owned Scott's Food. This change was made without the respondent's consent.

**4**    There were two main issues at trial. The second, which the parties call the enhancement issue, was whether, apart altogether from the corporate changes entailed by the Laidlaw transaction, Scott's Food had upgraded its outlets as required by its contract. At trial, Steele J. found that it had not. I will come in due course to the limited appeal taken from the judgment below on this issue.

**5**    The first and indeed the fundamental issue at trial, called the transfer issue, was whether the license agreement required the appellants (to whom I will refer jointly as "Scott's") to obtain the respondent's consent to the change in ownership of the franchisee failing which the respondent could terminate the agreement. Steele J. interpreted the contract as requiring consent, thereby giving the respondent the right to terminate since no consent was obtained. For the reasons that follow, I have come to the opposite conclusion and I would therefore allow the appeal on the transfer issue.

THE TRANSFER ISSUE

The Relevant Facts

**6**    The license agreement that is the subject of this litigation was signed on June 9, 1989, effective January 1, 1989. The respondent was the franchisor and the appellant Scott's Food the franchisee. The latter was a wholly-owned subsidiary of Scott's Hospitality which was not a party to the agreement.

**7**    At the time the license agreement was made, Scott's operated about one-half of all the KFC outlets in Canada and more than ten times as many as the next largest franchisee in the country. Unlike most franchisees, Scott's had very significant bargaining power in the negotiations which led up to the agreement.

**8**    For the purposes of the transfer issue, the critical paragraphs of the license agreement are the following:

    16.    Transfer

        16.1 The grant of the License hereunder is personal to Licensee. The grant of the License hereunder is based upon full disclosure in writing by the Licensee to KFC, and approval by KFC, of all directors and holders of majority control of the voting shares of Licensee and of any corporation or corporations which directly or indirectly (whether by means of any intermediate corporations or otherwise) own or control or have an interest in the shares of the Licensee. Licensee acknowledges that the restrictions provided in this Paragraph 16 are reasonable and necessary to protect the KFC System and the KFC Marks and are for the benefit and protection of all KFC licensees as well as KFC.

        16.2 Licensee agrees that it shall not sell, transfer, assign, encumber, sub-license or otherwise deal with this Agreement or its rights or interest hereunder (herein-

after referred to as "transfer"), without KFC's prior written consent and Licensee's compliance in all respects with the terms and conditions of this Paragraph 16. Any transfer or any attempt to do so, contrary to Paragraph 16 shall be a breach of this Agreement and shall be void but shall give KFC the right of termination as provided in Paragraph 17.2(d).

9    Paragraph 17.2(d) reads as follows:

17.2 KFC may, without prejudice to any other rights or remedies contained in this Agreement or at law or in equity, terminate the License upon immediate notice (or in the event advance notice is required by law, upon the giving of such notice) in the event that:

. . .

(d)    Licensee makes or permits a transfer contrary to the provision of Paragraph 16;

10    The history of Scott's as a KFC franchisee predates the license agreement by twenty years. It goes back to 1969 when Scott's Hospitality entered into an agreement to become a franchisee operating KFC outlets in Canada. The franchisor then was Col. Sanders Kentucky Fried Chicken Limited ("Colonel Sanders"), the owner of the KFC trademarks in Canada. This agreement was to run until January 1, 1994. It is noteworthy that it contained no clause like the current paragraph 16.1. It did not specify that the rights of Scott's Hospitality were personal to it, nor were there any provisions restricting the transfer of its shares. There was, however, a provision restricting the transfer of the license without the prior written consent of the franchisor.

11    By 1985, the franchisor had developed a standard franchise agreement ("the 1985 Agreement") containing certain restrictions on the transfer of shares in the franchisee which, at that point, were standard in all KFC franchise agreements in Canada except that with Scott's Hospitality.

12    While paragraph 16.1 of the 1985 Agreement reads identically to paragraph 16.1 in the license agreement, paragraph 16.2 of the 1985 Agreement when coupled with paragraph 16.4 contains significant differences. These two paragraphs are reproduced below, highlighting the words that do not appear in the license agreement:

16.2 The Franchisee agrees that it shall not sell, transfer, assign, encumber, sub-license or otherwise deal with this Agreement or its rights or interest hereunder (hereinafter referred to as "transfer"), and shall not suffer or permit any deemed sale, transfer or assignment of this Agreement or its rights or interest hereunder (hereinafter referred to as "deemed transfer" and more particularly defined in paragraph 16.4), without KFC's prior written consent and Franchisee's compliance in all respects with the terms and conditions of this Paragraph 16. Any transfer or deemed transfer, or any attempt to do so, contrary to this Paragraph 16 shall be a breach of this Agreement and shall be void but shall give KFC the right of termination as provided in paragraph 17.2(d).

16.4 For the purposes of this Paragraph 16, a deemed transfer of this Agreement or the rights and interest hereunder shall include:

(a)  ...
(b)  in the event that Franchisee is a corporation, any change (including but without limitation any issuance, sale, assignment, transfer, redemption or cancellation of, or conversion of any securities into, voting shares of the corporate Franchisee or any other corporation referred to in paragraph 16.1, or any amalgamation, merger or other reorganization of the corporate Franchisee or any such other corporation) in any of the holdings of voting shares referred to in paragraph 16.1; provided that, in the case of any such corporation the voting shares of which are listed and publicly traded on a stock exchange, no such change in any of the holdings of its voting shares shall constitute a deemed transfer unless, in the sole opinion of KFC, direct or indirect control of the corporate Franchisee would thereby be changed.

**13**    In 1987, Col. Sanders sold its entire interest in the KFC trademarks in Canada to Kentucky Fried Chicken's corporation ("KFC Corp." or "KFC") which held those rights for the rest of the world.

**14**    Just prior to this sale, by letter agreement dated July 16, 1987, KFC Corp. agreed that when the sale from Col. Sanders was concluded, it would grant Scott's Hospitality a ten-year renewal of the 1969 agreement. This letter agreement suggested no constraint on the transfer of shares of the franchisee.

**15**    Pursuant to the 1987 letter agreement, negotiations ensued between KFC and Scott's Hospitality. In these negotiations, Scott's Hospitality refused to agree to terms in the language of the 1985 agreement, just as it had previously refused to do with Col. Sanders. The Scott's representative made clear to KFC that Scott's would not agree to any restrictions on changes of ownership in the licensee.

**16**    The relative bargaining power of Scott's and KFC in these negotiations was the subject of some considerable attention at trial. The chief KFC negotiator testified that Scott's was at least the equal of KFC in bargaining power. The leading expert for KFC testified that it was unusual for a franchisee to be in such a position.

**17**    Because of these unique circumstances, the trial judge concluded that the evidence of the experts as to the usual practice in the franchising industry must be applied with caution. Ultimately, he found that Scott's had sufficient bargaining power to negotiate a contract in which there would be no restriction on the transferability of shares. The question he had to decide was whether the resulting license agreement contained such a restriction.

**18**    The first of the two Laidlaw transactions, which triggered the need to answer this question, began in January 1996 with an unsolicited offer from Laidlaw to purchase all of the shares of Scott's Hospitality. Laidlaw's intention was that following a successful takeover, it would sell off Scott's Food and retain the school bus business operated by Scott's Hospitality. Laidlaw's offer contained a condition that it be satisfied that there was no impediment to its disposing of the shares of Scott's Food to a third party without affecting the franchisee's rights under the license agreement. KFC was not prepared to give its consent to this transaction and indeed commenced this litigation in response. As a result, this Laidlaw proposal could not be completed within its time frame and hence it did not proceed.

**19**      Rather, a second Laidlaw transaction was structured in which Scott's Restaurants was incorporated as a subsidiary of Scott's Hospitality. Scott's Hospitality then transferred its shares in Scott's Food to Scott's Restaurants in exchange for shares of Scott's Restaurants which were dividended out to the shareholders of Scott's Hospitality. The shareholders of Scott's Hospitality thereby became the owners of Scott's Restaurants which, in turn, became the owner of the franchisee, Scott's Food. Laidlaw then purchased the shares of Scott's Hospitality thereby acquiring the school bus business.

**20**      KFC was kept fully informed of this transaction but continuously opposed it. Indeed, its consent was never expressly sought. The simple question at trial was whether that consent was required.

       The Judgment Below

**21**      The trial judge found that while Scott's Food as franchisee was bound by the license agreement, Scott's Hospitality was not bound by its terms. He concluded that Scott's Food was neither the alter ego nor the agent of Scott's Hospitality. The respondent does not contest this conclusion.

**22**      He then went on to his core finding on the transfer issue, namely, the construction of paragraph 16.1 of the license agreement. He construed that paragraph to contain a continuing obligation on the part of the franchisee to obtain approval of KFC to any transfer of the shares of either Scott's Food or its controlling shareholder. He put his findings in these terms:

> In my opinion the disclosure and approval of the directors and holders of majority control would be meaningless unless it was a continuing obligation and not merely at the time of execution. Based on good business sense section 16.1 must be construed as being a continuing obligation.
>
> ...
>
> In my opinion there is nothing in section 16 that prohibits or gives the right of approval to KFC of trading of shares of Scott's Food or Hospitality provided that there is no issue of a change of control.
>
> There are no clearly expressed words requiring the approval of KFC to any transfer of the shares of Scott's Food or its controlling shareholders. However section 16.1 referring to the grant being personal and the reference to the directors and holders of majority control of the shares of Scott's Food and the broad reference to any other corporations with control make it clear that any transfer of the controlling shares of Scott's Food or Hospitality are subject thereto. To interpret the section otherwise would defeat the personal aspect and not make good business sense and would be contrary to the generally accepted practice in the franchise industry.

**23**      He then moved directly and without elaboration to a finding that paragraph 16.2 prohibits a transfer or an attempted transfer of the license agreement without consent and since the first Laidlaw proposal was an attempted transfer and the second was an actual transfer, each breached

paragraph 16.2 and gave KFC the right to terminate the license agreement pursuant to paragraph 17.2(d).

Analysis

**24**    The question to be determined on the transfer issue is one of contractual interpretation: properly construed, does either paragraph 16.1 or paragraph 16.2 of the license agreement require KFC's consent to either Laidlaw transaction? The trial judge determined that this was not a case of ambiguity and on this basis, he declined to consider evidence of the subjective intentions of the parties which were not communicated to each other. Equally he excluded the various draft documents leading up to the license agreement. He did, however, consider the relationship between the parties and the custom of the industry, including the license agreements between the respondent and other franchisees in Canada, as part of the factual matrix that must be looked at in interpreting the agreement.

**25**    I agree with this approach. While the task of interpretation must begin with the words of the document and their ordinary meaning, the general context that gave birth to the document or its "factual matrix" will also provide the court with useful assistance. In the famous passage in Reardon Smith Line Ltd. v. Yngvar Hansen-Tangen, [1976] 1 W.L.R. 989 at 995-96 (H.L.) Lord Wilberforce said this:

> No contracts are made in a vacuum: there is always a setting in which they have to be placed. The nature of what is legitimate to have regard to is usually described as "the surrounding circumstances" but this phrase is imprecise: it can be illustrated but hardly defined. In a commercial contract it is certainly right that the court should know the commercial purpose of the contract and this in turn presupposes knowledge of the genesis of the transaction, the background, the context, the market in which the parties are operating.

**26**    The scope of the surrounding circumstances to be considered will vary from case to case but generally will encompass those factors which assist the court "... to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract." Consolidated Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance Co., [1980] 1 S.C.R. 888 at 901.

**27**    Where, as here, the document to be construed is a negotiated commercial document, the court should avoid an interpretation that would result in a commercial absurdity[1]. Rather, the document should be construed in accordance with sound commercial principles and good business sense[2]. Care must be taken, however, to do this objectively rather than from the perspective of one contracting party or the other, since what might make good business sense to one party would not necessarily do so for the other.

**28**    With these broad principles of interpretation in mind, I turn first to the construction to be given to paragraph 16.1 of the license agreement. Properly construed, does it give KFC the right to approve a change in the controlling shareholder of the franchisee? It is the second Laidlaw transaction that requires this question to be answered. Given that the first Laidlaw transaction was not proceeded with, KFC did not argue at trial or on appeal that it breached paragraph 16.1.

**29**    It is helpful at this point to set out the provision again:

> 16.1 The grant of the License hereunder is personal to Licensee. The grant of the License hereunder is based upon full disclosure in writing by the Licensee to KFC, and approval by KFC, of all directors and holders of majority control of the voting shares of Licensee and of any corporation or corporations which directly or indirectly (whether by means of any intermediate corporations or otherwise) own or control or have an interest in the shares of the Licensee. Licensee acknowledges that the restrictions provided in this Paragraph 16 are reasonable and necessary to protect the KFC System and the KFC Marks and are for the benefit and protection of all KFC licensees as well as KFC.

**30**      I have concluded that this clause does not give KFC a right to approve a change in the controlling shareholder of its franchisee Scott's Food. In other words, paragraph 16.1 does not extend to the second Laidlaw transaction. I say this for a number of reasons.

**31**      First, the license agreement was signed in 1989. The Laidlaw transactions occurred in 1996. The ordinary meaning of the language used in paragraph 16.1 suggests that the franchisor KFC had the right on entering the contract to know and approve the shareholders of the franchisee. There is nothing to suggest a right to approve a change in those shareholders some seven years later.

**32**      Second, such a right would mean a significant change from the agreement which had governed this franchise relationship since 1969 which clearly contained no such right. Moreover, Scott's had refused to enter into an agreement like the 1985 standard franchise agreement which did provide the franchisor with this right. The trial judge found that prior to executing the license agreement, KFC knew this and had been told that Scott's would not agree to any restriction on changes of ownership in the franchisee.

**33**      Third, the language of the 1985 standard franchise agreement is revealing. In 1989, when the license agreement was concluded, every other KFC franchise agreement in Canada expressly provided for the franchisor's right to approve a change in the shareholders of the franchisee. This was done not by means of paragraph 16.1 but rather through the "deemed transfer" language of paragraphs 16.2 and 16.4. Paragraph 16.1 in the license agreement ought not to be construed to provide the franchisor with this right where the identical language in the 1985 standard franchise agreement was clearly not intended to have that effect. The corollary to this is that the deemed transfer language which does provide this right to the franchisor in the 1985 standard franchise agreement is conspicuously absent from the license agreement.

**34**      Fourth, paragraph 16.1 extends the right of approval to the holders of majority control of the franchisee and any corporation which has an interest in the shares of the franchisee. If this language is read to give KFC a right to approve any subsequent change in the majority shareholder of the franchisee, it must also give KFC the right to approve a subsequent change in shareholder control of any corporation which owns any interest in the franchisee, even if it is only a single share. In argument, the respondent conceded that this would be a commercial absurdity. To find, as the trial judge did, that the franchisor's right of approval is limited to a change of control in the franchisee is, in my opinion, to read out of paragraph 16.1 the phrase "have an interest in". By contrast, to extend this right of approval to the majority shareholder and also to shareholders who have an interest in the shares of the franchisee does not create a commercial absurdity if that right applies simply at the point of entering the license agreement.

**35**    Fifth, paragraph 16.4 provides support for this interpretation. It requires the franchisee to seek KFC's consent to a transfer to a third party of the franchisee's interest under the license agreement. To allow an informed consent, this paragraph expressly obliges the franchisee to give KFC the same information about the shareholders of the third party that paragraph 16.1 provided concerning the franchisee. However, if paragraph 16.1 contained an ongoing right of KFC to be informed of and approve the shareholders of the party holding the franchise, paragraph 16.4 would be superfluous.

**36**    Finally, and with respect, it is my view that the three reasons offered by the trial judge for the opposite interpretation of paragraph 16.1 do not withstand scrutiny.

**37**    The first reason given by the trial judge was that the meaning I would accord to paragraph 16.1 would defeat the personal aspect of the license agreement. That paragraph certainly makes clear that the grant of the license is personal to the licensee. However, that licensee is clearly and expressly Scott's Food, not its controlling shareholder. A change in the latter leaves the licensee unchanged. Following the second Laidlaw transaction, the license is still granted personally to Scott's Food.

**38**    The second reason was that it would not make good business sense to read paragraph 16.1 so that it did not extend to a change in the shareholders of the franchisee. While this might not make good business sense from the perspective of the franchisor, it might well make good business sense for the franchisee. In my view, neither of these is helpful in the required task of contractual interpretation. Rather, in applying objectively the interpretive principle of what accords with sound commercial principles and good business sense, the key fact is that for twenty years, from 1969 to 1989, this franchise relationship operated with apparent viability without the right of approval contended for by the respondent. In light of this history, it cannot be concluded that the meaning I give to paragraph 16.1 would not make good business sense.

**39**    Finally, it was said that reading paragraph 16.1 as I do would be contrary to the generally accepted practice in the franchise industry. The fallacy in this reasoning is that, as the trial judge recognized, this was a very unusual franchising relationship. This franchisee appeared to have bargaining power at least equal to that of KFC and certainly sufficient power to achieve a contract with no restriction on the transferability of shares. By contrast, the trial judge found the industry standard to be that the franchisor has control over the franchisee. In these circumstances, the generally accepted industry practice is of little use in interpreting this particular license agreement.

**40**    Hence, I conclude that paragraph 16.1 of the license agreement cannot be construed to give KFC the right to approve a change in the shareholders of Scott's Food. This paragraph, therefore, was not breached when Scott's did not obtain KFC's approval of the second Laidlaw transaction.

**41**    It is next necessary to consider the proper interpretation to be given to paragraph 16.2 of the license agreement. It is helpful to reproduce this provision a second time:

> 16.2 Licensee agrees that it shall not sell, transfer, assign, encumber, sub-license or otherwise deal with this Agreement or its rights or interest hereunder (hereinafter referred to as "transfer"), without KFC's prior written consent and Licensee's compliance in all respects with the terms and conditions of this Paragraph 16. Any transfer or any attempt to do so, contrary to Paragraph 16 shall be a

breach of this Agreement and shall be void but shall give KFC the right of termination as provided in Paragraph 17.2(d).

**42**    The respondent's primary argument was that the second Laidlaw transaction engaged the last sentence of this paragraph. It was said to be a transfer contrary to paragraph 16.1 which, because of paragraph 16.2, triggered the right of termination in paragraph 17.2(d). Given the conclusion I have reached concerning paragraph 16.1, this argument must fail.

**43**    Apart altogether from paragraph 16.1, however, the respondent also argues that for the purposes of paragraph 16.2, the first Laidlaw transaction was an attempted transfer and the second was an actual transfer and that KFC's prior written consent was therefore required.

**44**    In my view, this argument also must fail. On the ordinary meaning of the words used in paragraph 16.2, it is the licensee Scott's Food that is constrained from dealing with its interest under the license agreement. Once the alter ego argument is dismissed, this paragraph simply cannot reach Scott's Hospitality, the shareholder of the franchisee. Nor does it reach the shareholders of Scott's Hospitality. Neither an attempted change nor an actual change in the shareholders of the franchisee constitutes the franchisee dealing with its interest under the license agreement.

**45**    This conclusion is assisted by examining the language of the counterpart paragraph 16.2 in the 1985 standard franchise agreement. The two Laidlaw transactions would be encompassed by that provision only because of the inclusion of the "deemed transfer" concept. As I have said, this concept is conspicuously absent from paragraph 16.2 of this license agreement.

**46**    The respondent argues that its proposed reading of paragraph 16.2 is consistent with good business sense and industry practice. However, as I have indicated in connection with the argument on paragraph 16.1, in the circumstances of this case, neither of these aids to interpretation requires that paragraph 16.2 be read to give KFC the right to consent to a change in the shareholders of its franchisee.

**47**    Finally, the respondent relies on GATX v. Hawker-Siddely Canada Inc. (1996), 27 B.L.R. (2d) 251 (Ont. Gen. Div.) to assert a broad meaning for the phrase "or otherwise deal with" as found in paragraph 16.2. That case is different from this one in that, there, the contracting party was clearly dealing indirectly with its interest under the agreement. Here, neither Laidlaw transaction involved the franchisee dealing in any way with its interest under the license agreement.

**48**    I therefore find that, properly construed, paragraph 16.2 does not give KFC the right to prior written consent to either Laidlaw transaction.

**49**    Given my conclusions about paragraphs 16.1 and 16.2 of the license agreement, it is unnecessary to deal with the appellant's alternative arguments: that paragraph 16.1 is limited to a change in ultimate control of the franchisee; that KFC could not have reasonably refused its approval of the second Laidlaw transaction; that a breach of paragraph 16.1 entitles KFC to terminate only if it was a fundamental breach of the license agreement; but in any event, for KFC to terminate would be a breach of its good faith duty under the license agreement; and finally, that the appellants are entitled to relief from forfeiture. Nor is it necessary to deal with the respondent's alternative argument that a breach of paragraph 16.1 allows it to terminate through direct resort to paragraph 17.3 of the license agreement.

**50**    Before leaving the transfer issue, the remaining matter required to be dealt with arises from the finding below that pursuant to paragraph 16.3 of the license agreement, KFC had a right of first refusal in the circumstances of both Laidlaw transactions. That paragraph reads in part as follows:

> 16.3 In the event that <u>Licensee receives</u> a bona fide offer, which <u>licensee is willing to accept</u>, from a third party to purchase or otherwise acquire any of the Licensee's rights and interest in this Agreement, ..., Licensee shall first offer to sell the same to KFC at the same price and on the same terms and conditions as in the third party's offer ... In the event that KFC so accepts such offer to sell, a binding agreement of purchase and sale shall thereby be constituted between Licensee and KFC at the said price and upon the said terms and conditions ... [Emphasis added.]

**51**    The reasons below reveal no analysis of the language in this paragraph by the trial judge in reaching his conclusion.

**52**    In my opinion, the ordinary meaning of the words used in the paragraph dictates the opposite conclusion -- that neither Laidlaw transaction triggered a right of first refusal. Neither an offer to purchase the shares of Scott's Hospitality nor an offer to change the controlling shareholder of Scott's Food is an offer which the franchisee receives or one which the franchisee can accept. The licensee cannot receive a takeover bid for the licensee's parent or for the licensee itself.

**53**    In summary, therefore, the appellant did not breach either paragraph 16.1 or paragraph 16.2 of the license agreement because of the Laidlaw transactions and KFC does not have the right to terminate the license agreement as a result. Nor did either Laidlaw transaction give KFC a right of first refusal.

**54**    I would accordingly allow the appeal on the transfer issue and set aside the declarations in paras. 1, 2, 3 and 4 of the judgment below. Instead, an order will go dismissing the claims for these declarations. Finally, I would set aside para. 13 of the judgment below and would grant the declaration sought therein.

THE ENHANCEMENT ISSUE

**55**    The other major issue at trial was whether Scott's Food had failed to meet its obligations to enhance its KFC outlets. These obligations are contained in the license agreement and the addendum to it, the Master Development Agreement, signed at the same time. The trial judge's two principal findings on this issue were that Scott's Food had failed to enhance its outlets as required by paragraph 7.2 of the Master Development Agreement and, secondly, because more than five to ten per cent of the outlets had not been enhanced as required, the failure was material and substantive, thereby entitling KFC to terminate the license agreement pursuant to paragraph 17.2(e) unless Scott's Food corrects the failure within three months. The appellants appeal neither of these findings. Indeed, they raise only two grounds of appeal in connection with the enhancement issue.

**56**    Firstly, they appeal the declaration that KFC is also entitled to terminate the license agreement pursuant to paragraphs 17.2(e) and 17.3 because Scott's Food's enhancement failures were breaches of paragraphs 3.2, 5 and 6 of the license agreement. While the judgment contains this declaration, the reasons for judgment do not reveal the basis upon which the declaration was made.

**57**    Second, they appeal the finding that to avoid KFC's right to terminate under paragraph 17.2(e), Scott's Food must, within three months, enhance all of its outlets, not just a sufficient number that the failure becomes less than material and substantive.

**58**    Turning to the first of these two grounds of appeal, it is helpful to set out paragraphs 17.2(e) and 17.3 of the license agreement:

> 17.2 KFC may, without prejudice to any other rights or remedies contained in this Agreement or at law or in equity, terminate the License upon immediate notice (or in the event advance notice is required by law, upon the giving of such notice) in the event that:
>
> . . .
>
> (e)    Licensee fails to satisfy, in a material and substantive manner, the requirements for enhancement and development contained in Articles 3.3, 3.4, 7.2 and 7.3 of the Addendum, provided that notice of any such failure is delivered to Licensee and Licensee shall not have corrected such failure within (3) months from the delivery of such notice.
>
> 17.3 The License will terminate on the termination date specified in any notice by KFC to Licensee (without any further notice of termination unless required by law), provided that (a) the notice is hand delivered or mailed at least thirty (30) days (or such longer period as may be required by law) in advance of the termination date, (b) the notice reasonably identifies one or more breaches or defaults in Licensee's obligations or performance hereunder, (c) the notice specifies the manner in which the breach(es) or default(s) are not fully remedied before, and as of, the termination date.

**59**    In my view, paragraph 17.2(e) deals explicitly and exhaustively with the enhancement obligations on the franchisee that, if not met, give KFC the right to terminate the license agreement. None of paragraphs 3.2, 5 or 6 of the license agreement is included in that list.

**60**    Moreover, as indicated by the trial judge, paragraph 17.3 merely sets out the procedure of formal notice. It does not accord to KFC a substantive right to terminate for any failure by Scott's Food to discharge its enhancement obligations. To so interpret paragraph 17.3 would fly in the face of paragraph 17.2 where the parties have carefully selected the enhancement obligations that, if breached, justify termination. Hence I would reverse the declaration that because the franchisee's enhancement failures breached paragraphs 3.2, 5 and 6 of the license agreement, KFC is entitled to terminate pursuant to paragraphs 17.2(e) and 17.3.

**61**    As to the second ground of appeal on the enhancement issue, paragraph 17.2(e) of the license agreement provides that failure in a material and substantive manner (my emphasis) to meet the franchisee's enhancement obligations as specified therein gives KFC the right to terminate if the failure is not corrected within three months. As I have said, the trial judge found that where more than five to ten per cent of the outlets fall below this required standard, Scott's Food was in substantial breach for the purposes of this paragraph. He went on to say this:

> ... KFC must give three months' notice from the date of this judgment to Scott's to allow it to remedy the default found in this decision on the enhancement issue. In other words, Scott's must be given three months in which to upgrade all of its remaining outlets to certification standards. If it chooses not to do so, it may close those stores under other termination procedures.

**62**     There is nothing in the actual judgment appealed from that requires the franchisee to enhance or close all of its remaining outlets to avoid termination. Hence, I propose to make no order on this ground of appeal.

**63**     However, in my opinion, if failure in a material and substantive manner to meet the enhancement requirements occurs when five to ten per cent of the outlets are below standard, correcting that failure means enhancing at least enough outlets so that there is no possibility of this line being crossed. This means that to correct that failure within three months, Scott's Food must ensure that no more than five per cent of its outlets are substandard. I would therefore not think it necessary that to correct the failure, the franchisee must sufficiently upgrade all its remaining outlets. To do so would make the correction incongruent with the failure contrary to what I think is meant by the final phrase of paragraph 17.2(e).

**64**     The view I have expressed is also consistent with paragraph 6.3 of the Master Development Agreement. It contemplates that the franchisee could operate outlets for a limited period of time even if they had not been enhanced to the required standard. This paragraph is inconsistent with a correction requirement that would compel the franchisee to properly enhance all of its remaining outlets.

**65**     In summary, I would allow the appeal on the enhancement issue. I would set aside the declaration in para. 9 of the judgment below and order that the claim for this declaration be dismissed.

COSTS

**66**     The trial judge ordered that there be no costs of the trial on the basis of paragraph 18.3 of the license agreement which required this result unless one party prevailed entirely, something that did not occur at this trial.

**67**     Before us, neither party sought to disturb this order and I do not do so. Both parties submitted that costs of the appeal should follow the result. I can see no reason why this should not happen.

**68**     In conclusion, I would allow the appeals with costs on the transfer issue and the enhancement issue in accordance with these reasons. The trial judgment is otherwise undisturbed.

GOUDGE J.A.
MOLDAVER J.A. -- I agree.
FERRIER J. (ad hoc) -- I agree.

cp/d/ln/aaa/DRS/qlgxc

1 City of Toronto v. W.H. Hotel Ltd. (1966), 56 D.L.R. (2d) 539 at 548 (S.C.C.).

2 Scanlon v. Castlepoint Development Corporation et al. (1992), 11 O.R. (3d) 744 at 770 (Ont. C.A.).

# TAB 56



Federal Court  Cour fédérale

2012 FC 748 (CanLII)

**Date: 20120614**

**Docket: T-299-05**

**Citation: 2012 FC 748**

Ottawa, Ontario, June 14, 2012

PRESENT:    The Honourable Mr. Justice Scott

BETWEEN:

CATHERINE LEUTHOLD

**Plaintiff**

**and**

CANADIAN BROADCASTING
CORPORATION
and
JERRY MCINTOSH

**Defendants**

## REASONS FOR JUDGMENT AND JUDGMENT

## I.    INTRODUCTION

[1]    Catherine Leuthold (Miss Leuthold), a professional photo journalist, is claiming an amount of $21,554,954.25 against the defendants the Canadian Broadcasting Corporation [CBC] and Jerry Mc Intosh (the Defendants), for copyright infringement.

2012 FC 748 (CanLII)

## II.    FACTS

### A.    The Parties

[2]    The Plaintiff, Miss Catherine Leuthold is a professional photo-journalist. On September 11, 2001 she was residing in New York City.

[3]    The Defendant, the CBC, is a corporation continued under the *Broadcasting Act*, SC 1991, c 11, [*Broadcasting Act*], carrying on business as a Canadian broadcaster with a principal place of business at 250 Front Street West, Toronto, Ontario, M5W 1E6.

[4]    The Defendant, Mr. Jerry Mc Intosh, was the Director of Independent Documentaries for News, Current Affairs and Newsworld referred to as CBC news and an employee of the CBC at the time of the alleged infringements.

### B.    The Production and the Copyrighted Works

[5]    In the months that followed the terrorist attacks on the World Trade Center [WTC], a documentary film entitled "As the Towers Fell" (the Production), was commissioned by the CBC from Newsco Productions Inc. The Production was directed by Desmond Smith.

2012 FC 748 (CanLII)

[6]      The Production was meant to portray how the attacks on the WTC unfolded through the eyes and reaction of journalists, cameramen and photographers who were on the scene on September 11, 2001.

[7]      The original plan called for a 30 minute Production. As shooting progressed the Production's duration evolved from 30 to 60 minutes and then to 90 minutes. It also became obvious that Newsco was incapable of handling the work and the CBC had to assign staff to, amongst others, clear the rights and assist in the editing of the Production (see transcript, testimony of Jerry Mc Intosh, February 9, 2012, page 7, lines 10 to 25 and page 8, lines 1 to 3; transcript, testimony of Rose Torriero, February 8, 2012, page 139, lines 12 to 17; transcript, testimony of Kathy Markou, February 8, 2012, page 201, lines 17 to 25 and page 202, lines 1 to 5; and Joint Book of Documents, Newsco contracts, tabs 18 to 20 inclusively).

[8]      Four versions of the Production were actually made and presented at various times on both the CBC main network and the Newsworld channel (Newsworld) (Joint Book of Documents, volume II, exhibit D-9):

| Date and time of presentation | Time of diffusion | Duration of documentary | Starting airing time of photographs | Number of seconds photographs are presented | Network |
|---|---|---|---|---|---|
| March 17, 2002 | 10:00 a.m. | 60 min | N/A | 18 | Main network |
| March 17, 2002 (Tape C) | 7:00 p.m. | 60 min | 19:14:45 19:14:53 19:16:16 19:22:03 19:22:11 | 18 | Newsworld |
| September 10, 2002 (Tape C, 1 of 2) | 8:00 p.m. | 90 min | 20:21:08 20:21:15 20:24:10 20:25:28 | 18 | Main network and Newsworld |
| September 11, 2002 (Tape A) | 1:00 a.m. | 90 min | 01:21:07 01:21:13 01:24:09 01:25:26 | 18 | Newsworld |
| September 7, 2003 (Tape C) | 10:00 p.m. | 120 min | 22:28:12 22:28:19 22:31:14 22:32:31 | 18 | Newsworld |
| September 8, 2003 (Tape A) | 1:00 a.m. | 120 min | 01:29:06 01:29:12 01:32:07 01:33:25 | 18 | Newsworld |
| September 14, 2003 (Tape B) | 12:00 p.m. | 60 | N/A | 0 | Newsworld |
| September 14, 2003 (Tape C) | 7:00 p.m. | 60 min | N/A | 0 | Newsworld |
| September 11, 2004 (Tape C) | 10:00 p.m. | 120 min | 22:28:45 22:28:52 22:31:47 22:33:05 | 18 | Newsworld |
| September 12, 2004 (Tape A) | 1:00 a.m. | 120 min | 01:27:59 01:28:05 01:31:00 01:32:18 | 18 | Newsworld |
| September 12, 2004 | 4:00 a.m. | 120 min | N/A | 18 | Newsworld |

2012 FC 748 (CanLII)

[9]     Included in tapes A and C of the Production were a number of Stills Photographs (the

Photographs) of the terrorist attacks on the WTC on September 11, 2001, taken by Miss Leuthold.

Miss Leuthold also appears in the Production.

[10]    Miss Leuthold is the owner of the copyright in the Photographs.

[11]    At all material times, the Defendants were aware that copyright subsisted in the

Photographs.

[12]    At all material times, the Defendants had no reason to believe that Miss Leuthold did not

own the copyright in the Photographs.

## C.      The Broadcasts of the Production and the Copyrighted Works

[13]    On March 19, 2002, Miss Leuthold sent a fax (the first license) permitting the CBC to

incorporate her Photographs of the 9/11 events in the Production and to broadcast the said

Photographs on Canadian television on the condition that they be used for the 9/11 Documentary

only (see Joint Book of Documents, volume I, tab 8, page 357). It reads:

> To: Douglas Arrowsmith
> From: Catherine Leuthold
>
> Douglas
>
> Got your email
>
> CBC may use my photographs of the WTC Disaster. Said
> Photographs used for 9.11 Documentary only. If the photographs are

2012 FC 748 (CanLII)

2012 FC 748 (CanLII)

used for advertising said Documentary, I, the photographer must be
financially compensated per prior mutual agreement.

Sincerely

"Catherine Leuthold"
 Signed

[14]    The parties disagree on the scope and conditions of this first License.

[15]    The Production was first broadcast on March 17, 2002, on the CBC Main Channel at 10:00

a.m. and the same day, on CBC's specialty service Newsworld at 7:00 p.m.

[16]    CBC's Newsworld is part of a programming undertaking which is wholly owned by the

CBC. Its operations result in the communication of works, newscasts and documentaries or other

subject matter to the Canadian public 24 hours continually.

[17]    In the ensuing days, employees of the CBC communicated with Miss Leuthold to obtain her

signature on a waiver.

[18]    The waiver was not signed and on June 20, 2002, Rose Torriero, a CBC employee, sent an

email to Miss Leuthold enquiring about the waiver (see Joint Book of Documents, volume I, tab 4,

page 23).

[19]    Over the following months Miss Leuthold negotiated with different persons working at the

CBC and Newsco (see Email chain, Joint Book of documents, volume I, tab 4, pages 10 to 91;

transcript, testimony of Catherine Leuthold, February 6, 2012, pages 78 and 79; transcript,

2012 FC 748 (CanLII)

testimony of Rose Torriero, February 8, 2012, pages 117 and 118; and transcript, testimony of

Kathy Markou, February 8, 2012, page 201, lines 23 to 25, and page 202, lines 1 to 5).

[20]    On September 5, 2002, Miss Leuthold, after a series of exchanges with Jerry McIntosh,

Desmond Smith and Rose Torriero, reached an understanding whereby the CBC agreed to pay her

the sum of $2,500.00 US for the usage of five photographs in a forthcoming broadcast.

[21]    On October 7, 2002, Miss Leuthold and the CBC signed the second License (the Stills

License), which reflected the agreement reached on September 5, 2002, permitting the CBC to

incorporate five photographs in the Production and to broadcast these on Canadian television for

one broadcast on CBC's Network & Regional TV stations, in return for compensation of $ 2,500.00

in US currency (see Joint Book of Documents, volume I, tab 2).

[22]    The Production was broadcast on September 10, 2002, on CBC's Main Channel and on the

same date on Newsworld at 8:00 p.m. (see Joint Book of Documents, volume II, exhibit D-9).

[23]    The Defendant, the CBC, transmitted the Production over its Newsworld cable channel on

the dates and times and for the duration, that appear in the above referenced table (see Joint Book of

Documents, volume II, exhibit D-9).

[24]    For each of the transmissions referred to in exhibit D-9, Newsworld transmitted the

Production by telecommunication to all Canadian distribution undertakings that carried the

Newsworld service on these respective dates.

[25]    The Defendants admit they had no authorization from Miss Leuthold for the six broadcasts on Newsworld referred to in exhibit D-9 but claim they were authorized to broadcast on Newsworld on March 17 and September 10, 2002.

[26]    The Defendants transmitted to all the Canadian distribution undertakings that have the right to carry the Newsworld service, the Production, which contained the Photographs belonging to Miss Leuthold; they, in turn, transmitted the Production to their respective subscribers.

[27]    Each transmission of the Production by the Defendant, the CBC, over its main channel was broadcasted in all Canadian time zones (5 in total), at their respective local time, directly or through the CBC's affiliated stations.

## III.    ISSUES

[28]    The parties have listed 6 issues to be determined by the Court:

1.    *Did the Defendants infringe the Plaintiff's (Miss Leuthold's) copyright on March 17, 2002, September 10 and 11, 2002, September 7 and 8, 2003 and September 11, and 12, 2004?*

2.    *In respect of each CBC broadcast and Newsworld transmission, did each participating affiliated station and Broadcasting Distribution Undertaking [BDU],*

2012 FC 748 (CanLII)

*as the case may be, infringe the Plaintiff's (Miss Leuthold's) copyright each time the Production was communicated to the public?*

3.  *If so, is the Defendant, the CBC, liable for such infringement by the affiliated stations and the BDUs?*

4.  *If there was copyright infringement by the Defendants, the affiliated stations or the BDUs, what remedies should be awarded to the Plaintiff (Miss Leuthold) in terms of damages, profits, injunctive relief, and delivery up?*

5.  *Is the Defendant Jerry McIntosh independently liable for any infringement of the Plaintiff's (Miss Leuthold's) copyright and, if so, what remedies should be awarded?*

6.  *Regardless of the Court's finding on liability, what measures of costs should be awarded given the conduct of the parties and outstanding offers to settle?*

## IV.    LEGISLATION

[29]    The applicable sections of the *Broadcasting Act* and the *Copyright Act*, RCS, 1985, c C-42, [*the Copyright Act*], are appended to this decision.

2012 FC 748 (CanLII)

2012 FC 748 (CanLII)

## V.    ANALYSIS

### 1.    *Did the Defendants infringe the Plaintiff's (Miss Leuthold's) copyright on March 17, 2002, September 10 and 11, 2002, September 7 and 8, 2003 and September 11, and 12, 2004?*

## A.    Miss Leuthold's Position

[30]    Miss Leuthold claims that artistic work is defined in the *Copyright Act*, and it includes photographs. The Defendants have admitted that she holds the copyright on the Photographs. Pursuant to subsection 3(1) of the *Copyright Act*, Miss Leuthold asserts that she is the sole owner of the rights to reproduce the Photographs and publicly present them as part of any cinematographic work, to communicate them to the public by telecommunication, and to authorize any of the foregoing.

[31]    Miss Leuthold also relies on the definition of "telecommunication" that is found in the *Copyright Act,* which specifies that "any transmission of signs, signals, writing, images or sounds or intelligence of any nature by wire, radio, visual, optical or other electromagnetic system" is a telecommunication".

[32]    Of particular importance, according to Miss Leuthold, is paragraph 2.4(1) *(c)* of the *Copyright Act*. That paragraph clearly states that "for the purposes of communication to the public by telecommunication, […] (c) where a person as part of (i) a network, within the meaning of the

2012 FC 748 (CanLII)

*Broadcasting Act*, whose operations result in the communication of works or other subject-matter to the public, or (ii) any programming undertaking whose operations result in the communication of works or other subject-matter to the public, transmits by telecommunication a work or other subject-matter that is communicated to the public by another person who is not a retransmitter of a signal within the meaning of subsection 31(1), the transmission and communication of that work or other subject-matter by those persons constitute a single communication to the public for which those persons are jointly and severally liable."

[33]    Miss Leuthold claims that the Defendants reproduced the Photographs without her consent and in a manner that is not permitted by the *Copyright Act*. The Defendants publicly presented the Photographs, as part of a cinematographic work, communicated them to the public by telecommunication and authorized the foregoing without her consent.

[34]    Miss Leuthold underlines the fact that the CBC had completed several broadcasts of the Production prior to signing the Licenses, although both Licenses authorized only a single broadcast.

[35]    Pursuant to subsection 27(2) of the *Copyright Act*, it is an act of infringement for any person to:

> (*a*) sell or rent out, (*b*) distribute to such an extent as to affect prejudicially the owner of the copyright, (*c*) by way of trade distribute, expose or offer for sale or rental, or exhibit in public, (*d*) possess for the purpose of doing anything referred to in paragraphs (*a*) to (*c*), or (*e*) import into Canada for the purpose of doing anything referred to in paragraphs (*a*) to (*c*), a copy of a work, sound recording or fixation of a performer's performance or of a communication signal that the person knows or should have known infringes copyright or would infringe copyright if it had been made in Canada by the person who made it.

2012 FC 748 (CanLII)

[36]     By reason of the aforesaid acts of the Defendants, Miss Leuthold claims to have suffered substantial damages, and would have continued to suffer damages if the Defendants had not ceased their infringing activities.

## B.     Position of the Defendants

[37]     The Defendants admit that the CBC did infringe Miss Leuthold's copyright in the Photographs but dispute the number of infringing communications to the public and the amount of damages claimed.

[38]     The Defendants contend that Miss Leuthold gave her permission to the CBC to use the Photographs for the initial broadcast of the Production on March 17, 2002. Said permission according to the Defendants, included Newsworld and all broadcasts in all time zones.

[39]     In September 2002, to commemorate the one-year anniversary of 9/11, the CBC did broadcast the Production.

[40]     On October 7, 2002, the Stills License which permitted the CBC's use of the Photographs in the September 2002 broadcast on CBC's Network and Regional TV stations was signed. It provided for the payment of $2,500.00 US to Miss Leuthold.

[41]    Another implicit term of this License, according to the Defendants, included the right to broadcast the Production in different time zones, being the time zones in which the various CBC Regional TV stations were located and on Newsworld.

[42]    Defendants further claim that the CBC's conduct, throughout its relationship and dealings with Miss Leuthold, has been in accordance with accepted business practices and was by no means highhanded, reprehensible or oppressive.

[43]    Finally, the CBC alleges to have acted in good faith with respect to the exercise of its rights.

## C.    Analysis

[44]    The parties hold different interpretations of the scope of the Licenses that govern their relationship. The Court must therefore determine the exact scope of the Licenses in order to properly assess the extent of the infringements, the damages and the compensation to which Miss Leuthold is entitled.

[45]    The Defendants submit that the March 17 and September 10, 2002 communications to the public, by means of broadcasts, were authorized under the two licenses that were executed and that Miss Leuthold was fairly compensated for these.

### *The March 17, 2002 Broadcast*

[46]    Miss Leuthold is claiming damages for the March 17, 2002 broadcasts based on her interpretation of the first license. She claims that the license was restricted to one broadcast in one time zone, on the CBC's main channel, which excluded regional stations, affiliates and Newsworld.

[47]    During her testimony she referred the Court to the email she forwarded to Desmond Smith after having received a draft waiver from Rose Torriero, a CBC employee entrusted to clear the rights she held in the Photographs. In that email she reminds Desmond Smith that this is not what she agreed to. That email is dated Monday March 25, 2002 (see transcript, testimony of Catherine Leuthold, February 6, 2012, page 79, line 11 to 25 and page 80, lines 1 to 25). She also referred the Court to Miss Torriero's response dated March 25, 2002 and the subsequent exchanges of emails in which she specified one broadcast (see Email chain, Joint Book of documents, volume I, tab 4).

[48]    Miss Leuthold testified never to have been aware of the existence of the CBC's distribution network (see transcript, testimony of Catherine Leuthold, page 90, lines 12 to 16). She cannot state for certain if she knew that the documentary had already aired when she was approached by the CBC in March of 2002 (see transcript, testimony of Catherine Leuthold, page 89, lines 2 to 25 and page 90, lines 1 to 10).

[49]    The Defendants affirm that Miss Leuthold gave her permission to use the Photographs for the initial broadcast of March 17, 2002. This, they claim, is apparent from the fax sent to Douglas Arrowsmith on March 19, 2002. They also claim that Miss Leuthold admitted that no compensation

2012 FC 748 (CanLII)

was due for the March 17, 2002 broadcast since she wrote in an email to Jerry Mc Intosh on September 4, 2002: "so you did get them for free the first go round, so its in your court" [emphasis added].

[50]     It is clear from the March 19 fax sent by Catherine Leuthold that the CBC's broadcast of March 17 was authorized by Catherine Leuthold, even though her permission was granted after the fact. As the Court reviews the term of that authorization there are no limits of any kind imposed upon the CBC except that "if the photographs are to be used for advertising said Documentary, I, the photographer must be financially compensated per prior mutual agreement." The Court cannot accept terms that are not written, there is no financial compensation to be paid unless the photographs are used to advertise the Documentary. Since they were not used to advertise the Production, there is no payment owed to Miss Leuthold for the March 17, 2002 broadcast by the CBC.

[51]     Furthemore, the concept of a one-time use or one broadcast first appears in the March 25, 2002 email from Catherine Leuthold to Rose Torriero (see Joint Book of Documents, tab 4, page 16). It is impossible for the Court to accept that this condition applied to the March 17th broadcast since there is no evidence on the record to establish that this restriction limiting the rights of the Defendant, the CBC, to one broadcast was discussed or even mentioned prior to that date or to the March 19, 2012 authorization.

*Is the March 17 Newsworld broadcast covered by the March 19, 2002 authorization?*

[52]    Miss Leuthold testified that to her the CBC "was a regular network like NBC, CBS, you know just regular T.V."; that Newsworld meant nothing to her at that time and that it was only much later that she understood what Newsworld meant (see transcript, testimony of Catherine Leuthold, February 6, 2012, page 92, lines 2 to 20). On the other hand, witnesses for the CBC testified that when clearing rights, the waivers or licenses always benefited Newsworld (see transcript, testimony of Rose Torriero, February 8, 2012, page 144, lines 1 to 18); and transcript, testimony of Kathy Markou, February 8, 2012, page 203, lines 6 to 25 and page 208, lines 6 to 21).

[53]    The Court weighs the evidence adduced as follows: Newsworld is included in the first license because Miss Leuthold did not impose any restrictions when she retroactively granted permission on March 19, 2002.

[54]    The same reasoning applies with respect to time zones and CBC affiliates and regional stations in regards to the scope of the first license.

*The September 10 broadcasts and the Stills License*

[55]    The Defendants submit that the reproduction of the Photographs that appear in the September 10, 2002 broadcasts were covered by the Stills License.

2012 FC 748 (CanLII)

[56]      The Court must determine the scope of the reproduction rights that were granted by Miss

Leuthold  when she executed the Stills  License in October 2002. That determination  calls for a

simultaneous  examination  of certain provisions  of the *Copyright Act* and the terms of the License

between the parties.


[57]      For the interpretation  of that License, the Court must turn to subsection 13(4) of the

*Copyright Act,* which provides that:

> 13 (4) The owner of the copyright in any work may assign the right,
> either wholly  or partially,  and either generally  or subject to
> limitations  relating to territory,  medium  or sector of the market or
> other limitations  relating  to the scope of the assignment,  and either
> for the whole  term of the copyright  or for any other part thereof,  and
> may grant any interest in the right by licence, but no assignment  or
> grant is valid unless it is in writing  signed by the owner of the right in
> respect of which the assignment  or grant is made, or by the owner's
> duly authorized  agent.


[58]      Miss Leuthold  granted the Defendants  the right to reproduce the Photographs in the

Production. By executing  the License, which was transmitted  and drafted in part by the CBC, Miss

Leuthold  did not grant any interest to the Defendants in her copyright.  She gave the Defendants the

right  to make one broadcast of the Production, which included  her Photographs. The meaning  of the

term "one broadcast", in the Stills  License, is ambiguous, and the parties differ on its significance.


[59]      The Court believes  that it is important  to reproduce the relevant  paragraphs of the License.

Stills  License

> The Canadian Broadcasting  Corporation (hereinafter  referred to as
> the "CBC" wishes to include  the 5 photographs of 911 created by
> Catherine J. Leuthold  (hereinafter  referred to as the "Stills"  in the
> CBC Documentary  "As the Towers Fell" (hereinafter  referred to as
> the "Production").

2012 FC 748 (CanLII)

Catherine J. Leuthold, 300 East 70th Street, New York, N.Y. 10021, (hereinafter referred to as "Licensor") hereby grants to CBC the non-exclusive and limited right to incorporate the Stills in the Production. CBC shall have the right (but not the obligation) to broadcast the Stills on Canadian television for one broadcast on CBC's Network & Regional TV stations **which it did on the anniversary of 9.11.02** [the remarks in bold were added by Miss Leuthold in her handwriting]

In consideration of the rights conferred herein, CBC agrees to pay Licensor a total fee of $2500.00US (two thousand and five hundred dollars in American currency), such fee payable upon full execution of both copies of this license.

Licensor is not a registered Canadian company for the Goods & Services Tax; therefore GST will not be paid in addition to the amount specified herein.

Licensor is the sole party entitled of the copyright and ownership of the Stills licensed herein and incorporated into the Production.

CBC shall be the sole copyright holder in the Production and in this capacity shall have the right to edit the Production as is required to accommodate broadcast.

Licensor warrants that it is fully empowered to grant the rights herein granted, and that there is no contract with any other person firm, or corporation which could in any way interfere with CBC's rights under this Licence. Licensor further warrants and represents that it has obtained and/or retained all consents and rights, including copyright, necessary to license the rights specified herein to CBC, without any limitations or restrictions **under the one-time usage fee** [the remarks in bold were added by Miss Leuthold in her handwriting]

Licensor shall indemnify CBC and hold it harmless from and against any and all loss, damages or expenses, including legal fees and disbursements which CBC may suffer or incur as a result of any claim, action or proceeding arising from a breach of any of the warranties or representations made by the Licensor in this Licence.

This Licence embodies the entire agreement between the parties with regard to the matters dealt with herein and no understandings or agreements, oral or written, exist between the parties except as herein

2012 FC 748 (CanLII)

2012 FC 748 (CanLII)

expressly set out. No modifications of this Licence shall be valid without the written consent of the parties hereto.

This Licence shall be governed by the laws of the Province of Ontario and of Canada and the parties hereto attorn to the exclusive jurisdiction of the courts of said province and country.

Acceptance of the terms and conditions of this Licence shall be attested to by the signatures of the parties of this Licence, and shall constitute a binding agreement between them.

Canadian Broadcasting Corporation:


"Kathy Markou"_____
Kathy Markou, Manager of Program Rights
Business Affairs

Date: Oct 7/02

Licensor:

"Catherine Leuthold"
Catherine Leuthold


## Preliminary motion


[60]    The Court must first deal with the motion presented by the Defendants to deny recognition of Mr. Jay Thompson to testify as an expert on behalf of Miss Leuthold. The Defendants, after a thorough cross-examination of Mr. Thompson, claim that he has no expertise in the clearing of rights existing pursuant to the *Copyright Act* but has expertise on the regulatory environment. According to the Defendants, the issue being the interpretation of a License granted under the *Copyright Act*, the expertise of Mr. Thompson cannot assist the Court in the interpretation of the Stills License because it is not relevant. Miss Leuthold, on the other hand, claims that Mr.

Thompson's knowledge of the regulatory environment can assist the Court in determining what the terms used in the License generally mean in the industry.

[61]     The Court allowed Mr. Thompson to testify subject to ruling on the Defendant's motion in this judgment. Having weighed the arguments of both parties the Court recognizes Mr. Thompson as an expert qualified to assist the Court in the interpretation of the meaning "to broadcast the Stills on Canadian television for one broadcast on the CBC's Network and Regional TV stations" because his knowledge of the licensing of broadcasters can possibly have some relevance in the final interpretation of the disputed phrase in the Stills License.

### What is the meaning of one broadcast?

[62]     Miss Leuthold claims that one broadcast essentially means one transmission in one time zone which started in Atlantic Canada (see transcript, final arguments, February 13, 2012, page 21, lines 18 to 25 and page 22). Therefore only the six regional stations located in Atlantic Canada were entitled to broadcast the Production, one time under the authorized "one time usage" as defined by Miss Leuthold.

[63]     Her interpretation is fundamentally based on her claim that she always insisted on one time usage in all the contracts she signed related to all her photographic work.

2012 FC 748 (CanLII)

[64]     According to the Defendants, the phrase "to broadcast the Stills on Canadian television for one broadcast on the CBC's Network and Regional stations" is more encompassing and it includes all the CBC affiliates in all time zones and Newsworld.

[65]     Defendants argue that it was impossible for Miss Leuthold to exclude Newsworld since she admitted not having known of its existence when she negotiated the Stills License (see transcript, testimony of Catherine Leuthold, February 6, 2012, page 168, lines 2 to 10).

[66]     They also contend that it was irrelevant to Miss Leuthold whether the Production was broadcasted over the air or by cable because she testified not having such preoccupation at the time she negotiated the Stills License, but only in 2003 when she negotiated terms for a broadcast on channel 5 in New York (see transcript, testimony of Catherine Leuthold, February 6, 2012, page 163, lines 12 to 23).

[67]     Miss Leuthold alleges that the Stills License covered one broadcast, for one time only, on the CBC network, which does not include the CBC Newsworld and the CBC's affiliated stations.

[68]     It is recognized that "other than in specific situations, which are subject to imperative provisions found in other statutes . . . there is a complete freedom [for the parties] to conclude any form of agreement, subject only to the general principles of the Act, as well as respect of fundamental rights and freedoms and public order" (see Normand Tamaro, *The 2012 Annotated Copyright Act*, Toronto, Carswell, 2012, at page 412 [Tamaro Annotated *Copyright Act*]). To put it in context, parties had complete freedom to negotiate the terms of the Stills License.

2012 FC 748 (CanLII)

[69]     The Ontario Court of Appeal held in *SimEx Inc v IMAX Corp*, [2005] OJ No 5389, at para 23, that:

> [23] To summarize, while the court strives to interpret a contract in a manner consistent with the intent of the parties, the parties are presumed to have intended the legal consequences of their words. The court will consider the context or factual matrix in which the contract was drafted, including commercial reasonableness, to understand what the parties intended. The court will not adopt an interpretation that is "clearly" commercially absurd. The court must also consider the contract as a whole. The various provisions "should be read, not as standing alone, but in light of the agreement as a whole and other provisions thereof": *Scanlon v Castlepoint Development Corp* (1992), 99 D.L.R. (4th) 153 (Ont CA) at 179. Where the contract is unambiguous, extrinsic evidence is inadmissible…

*Analysis time zones*

[70]     The Court rejects Miss Leuthold's interpretation that one broadcast in only one time zone is allowed by the Stills License because there is no specific term to that effect in the Stills License and more importantly, Miss Leuthold's own expert stated that each regional station broadcasts in its respective time zone (see transcript, testimony of Jay Thompson, February 7, 2012, page 160, lines 24 and 25 page 161, lines 1 to 18).

[71]     Miss Leuthold has failed to adduce any evidence to support her interpretation that only one time zone is covered by the Stills License. Two other witnesses also stated that it was common understanding in the industry that a Canadian broadcast, when it relates to a Canadian network, includes all time zones (see transcript, testimony of Rose Torriero, February 8, 2012, page 136, lines 1to 4; transcript, testimony of Kathy Markou, February 8, 2012, page 188, lines 8 to 23).

2012 FC 748 (CanLII)

*Is Newsworld covered by the Stills License?*

[72]     Mr. Jay Thompson prepared an expert report for Miss Leuthold to provide his opinion with respect to the interpretation of the sentence "to broadcast the Stills on Canadian television for one broadcast on CBC's Network and Regional TV stations" in the Stills License. Mr. Thompson also opined on whether the reference to the CBC's Network could reasonably be interpreted to include the CBC specialty television programming service Newsworld.

[73]     Mr. Thompson found that different categories of broadcasting services are regulated in different ways and are subject to different regulatory privileges and that the CBC must use the appropriate terminology according to the widely-accepted and understood regulatory meaning.

[74]     In Mr. Thompson's view, "the CBC is licensed by the CRTC to operate, amongst other broadcasting services, both English and French language television networks as well as various specialty programming undertakings such as CBC Newsworld. Specialty programming undertakings are not "networks" and, unless the term "Network" is used in their branded name, it would be wrong, inaccurate and confusing from a legal standpoint to refer to them as such" (see Mr. Jay Thompson's Expert Report, Tab 5 of the Trial record at page 121, paragraph 7).

[75]     Newsworld is included in the definition of Specialty Programming Undertakings (SPU) which is defined as "an undertaking for the transmission of programs, either directly by radio waves or other means of telecommunications or indirectly through a distribution undertaking, for reception

2012 FC 748 (CanLII)

by the public by means of broadcasting receiving apparatus" (see Mr. Jay Thompson's Expert

Report, Tab 5 of the Trial record at page 121). In other words, the SPU are more like program

originators and they are issued programming undertaking licenses. Consequently, he finds that

Newsworld is not a network or part of the CBC's network.

[76]    It is clear, from Mr. Thompson's perspective, that "the CBC Television Network – which

the Stills Licence refers to as "CBC's Network" – is a separate and distinct entity from CBC

Newsworld, and that the latter is not included as part of the former" (see Mr. Jay Thompson's

Expert Report, tab 5 of the trial record, page 122 at paragraph 12).

[77]    The sentence, in the Stills License, "to broadcast the Stills on Canadian television for one

broadcast on CBC's Network and Regional TV stations" would mean that Newsworld as a

Specialty Programming Undertaking [SPU] is not included in the License and therefore, would have

infringed the Plaintiff's copyright in the Stills for the 2002, 2003 and 2004 broadcasts.

[78]    In a decision dated January 6, 2000, the CRTC wrote, in paragraph 3, that:

> . . .
> Though their operations are based on commercial revenues and
> subscriber fees rather than primarily on public funding, and though
> Newsworld and RDI report to the Commission as distinct and
> separately licensed entities, there exists a healthy symbiosis between
> core and specialty services on both the French and English sides of
> the CBC. They cooperate and share personnel and equipment in an
> effort to maximize every production dollar available for the benefit
> of their viewers (see CRTC 2000-3 decision, expert Jay Thompson's
> Book of Authorities, volume I, tab 10).

2012 FC 748 (CanLII)

[79]    RDI and Newsworld also keep separate accounting "to ensure that specialty services funded largely through subscriber fees, are not underwritten by the CBC's parliamentary grants; tax dollars intended to fund the over-the-air radio and television services. This rationale is still valid and the Commission has re-imposed these conditions" (see CRTC 2000-3 decision, expert Jay Thompson's Book of Authorities,  volume I, tab 10, paragraph 25).

[80]    Even though the License does not prohibit Newsworld from sharing its content with the main services, the CRTC clearly distinguishes  Newsworld and the CBC from each other as they are subject to different regulations.  The sharing of resources does not mean that the CRTC considers the CBC and Newsworld as one entity.  The CRTC, in its decision, underlined  that "in the conditions  of licence imposed herein, the Commission clarifies  that while RDI and Newsworld may simulcast each other's programming,  they may not simultaneously  broadcast regular programming  with other CBC services  regardless of whether or not the programming  is originated  by them or by another CBC service" (CRTC 2000-3 decision, expert Jay Thompson's  Book of Authorities,  volume  I, tab 10 at paragraph 35). This, according to Mr. Thompson,  shows that Newsworld, as a SPU, is completely  different  from the CBC main-channel,  and its content must be differentiated.

[81]    The Court notes that the prohibition  applies only to a simultaneous  broadcasting of regular programming  with other CBC services.  Even if the September 10 broadcasts aired at 8:00 pm the Court notes that they were not regular  programming  as evidenced  in D-9.

[82]    The Defendants, on their part, rely on the testimony  of Rose Torriero, Kathy Markou and Jane Ward to substantiate their claim that Newsworld is covered by the Stills  License (see transcript,

2012 FC 748 (CanLII)

testimony of Rose Torriero, February 8, 2012, page 135, lines 1 to 18; transcript, testimony of

Kathy Markou, February 8, 2012, page 187, lines 9 to 21; and transcript, Janice Ward, February 7,

2012, page 65, lines 19 to 25 and page 66, line 1).

[83]    The parties have produced three (3) copies of contracts between the CBC and Newsco for

the production of the documentary film on the 9/11 events (see Joint Book of Documents, volume

II, tabs 18-20). The document produced under tab 19 indicates that Newsworld was part of the

agreement and that Desmond Smith, the producer and Newsco's representative, knew that

Newsworld would necessarily be entitled to broadcast the Production. In the course of his

negotiations with Miss Leuthold and subsequent interventions on her behalf, was Miss Leuthold

apprised of the fact that Newsworld would broadcast the production? There is no evidence to that

effect save one email.

[84]    Desmond Smith sent an email to Miss Leuthold on the 2nd day of September 2002, prior to

the agreement reached by Miss Leuthold with the CBC on September 5th, and wrote the following:

"the 85 minute, commercial free program entitled "As the Towers Fell: Minute by Minute with the

Journalists" will be broadcast in Canada on September 8th on the CBC Network at 8 p.m. and will

be seen in the USA wherever Newsworld International is carried" [emphasis added] (see Joint Book

of documents, volume I, tab 4, page 33). It appears, from that email, that Miss Leuthold would have

been informed at least minimally of some form of Newsworld involvement and did not take any

steps to exclude Newsworld.

[85]    The program aired on September 10 based on an email sent by Miss Leuthold to Rose

Torriero on September 5, 2002. It reads:

> Subject: re New York Photos.
> Ok Rose that's fine just make sure its one time usage and my credit
> is under each picture and its not for World Wide right. Thanks for
> your kind words and I appreciate it please send me info who to Bill
> and where to fax it to.
> Catherine Leuthold

[86]    The exact terms of the Still License were not finalized until October 2, 2002 and then signed

by Kathy Markou on October 7, 2002.

[87]    Counsel for Miss Leuthold argues that, in this case, the Stills License should be interpreted

in her favor based on the *contra proferentem* doctrine because the contract was drafted by the CBC.

He alleges that the onus was on the corporation to clearly indicate the scope of the License since

Miss Leuthold is the weaker party. According to Miss Leuthold, that license clearly meant one

usage, one transmission that was all. It was CBC's choice to make better use or not of that one

transmission. It chose to use it on the main channel in Atlantic Canada according to Miss Leuthold.

Therefore all other transmissions were excluded from the License and infringed on her rights.

[88]    Counsel for the Defendants respond that the evidence adduced clearly shows that the intent

of the parties prior to the broadcast was quite broad and that, in essence, it can be summed up as:

"One time usage for Canadian broadcast". More importantly, three witnesses testified that

Newsworld was always included when rights were cleared by the CBC (see transcript, testimony of

Rose Torriero, February 8, 2012, page 134, lines 22 to 25 and page 135, lines 1 to 18; transcript,

2012 FC 748 (CanLII)

testimony of Kathy Markou, February 8, 2012, page 187, lines 9 to 21; and transcript, testimony of Janice Ward, February 7, 2012, page 65, lines 19 to 25 and page 66, line 1).

[89]    The Court concludes that Newsworld is included in the expression for "One broadcast on CBC's Network & Regional TV stations" for the following reasons:

- Firstly, the evidence adduced by the Defendants clearly establishes that when clearing rights, the CBC always included Newsworld.

- Secondly, the only evidence to the contrary came from Mr. Thompson who based his opinion on the distinction the CRTC makes between the CBC and Newsworld. To this Court, that distinction may be correct, from a strict regulatory perspective, but it cannot apply to the clearing of rights. In fact, Mr. Thompson admitted in his testimony that in the industry, Newsworld is sometimes referred to as a Network, though inappropriately from a regulatory perspective. This admission contradicts in part his conclusion (see transcript, testimony of Jay Thompson, February 7, 2012, page 186, lines 14 to 25 and page 187, lines 1 to 23).

- It is trite law that when interpreting an ambiguous provision in a contract the Court may turn to industry usage. In this case, the evidence as to industry usage clearly favors the Defendants. Furthermore, in considering what is commercially sensible, the Court cannot accept Miss Leuthold's interpretation whereby the CBC would have agreed to terms that ran against their normal usage, that is to exclude Newsworld and affiliated stations.

2012 FC 748 (CanLII)

- Thirdly, Ms. Leuthold is asking this Court to apply the *contra proferentem* doctrine and construe the language employed in the stills License against its underwriter, the CBC. However, "resort is to be had to this rule only when all other rules of construction fail to enable the Court of construction to ascertain the meaning of a document" (see *Reliance Petroleum Limited v Canadian General Insurance Company*, [1956] SCR 936 at page 953; Consolidated Bathurst Export v Mutual Boiler and Machinery Insurance Co, [1980] 1 SCR 888; *Progressive Homes Ltd v Lombard General Insurance Co. of Canada*, 2010 SCC 33 [*Progressive*]). In *Progressive*, the Supreme Court of Canada made the following remarks:

> [23] Where the language of the insurance policy is ambiguous, the courts rely on general rules of contract construction (Consolidated-Bathurst, at pp. 900-902). For example, courts should prefer interpretations that are consistent with the reasonable expectations of the parties (Gibbens, at para. 26; Scalera, at para. 71; Consolidated-Bathurst, at p. 901), so long as such an interpretation can be supported by the text of the policy. Courts should avoid interpretations that would give rise to an unrealistic result or that would not have been in the contemplation of the parties at the time the policy was concluded (Scalera, at para. 71; Consolidated-Bathurst, at p. 901). Courts should also strive to ensure that similar insurance policies are construed consistently (Gibbens, at para. 27). These rules of construction are applied to resolve ambiguity. They do not operate to create ambiguity where there is none in the first place.
>
> [24] When these rules of construction fail to resolve the ambiguity, courts will construe the policy contra proferentem - against the insurer (Gibbens, at para. 25; Scalera, at para. 70; Consolidated-Bathurst, at pp. 899-901). One corollary of the contra proferentem rule is that coverage provisions are interpreted broadly, and exclusion clauses narrowly (Jesuit Fathers, at para. 28).

[90]    The rules of construction in this case can reasonably be supported to give the License its proper interpretation based on the industry usage.

2012 FC 748 (CanLII)

2012 FC 748 (CanLII)

[91]    The Court therefore concludes that the Stills License included Newsworld and the right to broadcast in all time zones to affiliates and regional television stations. Consequently, the September 10, 2002, broadcasts did not infringe on Miss Leuthold's copyright.

> **2.    *In respect of each CBC broadcast and Newsworld transmission, did each participating affiliated station and BDUs, as the case may be, infringe Plaintiff's (Miss Leuthold's) copyright each time the Production was communicated to the public?***

[92]    The Defendants admit that the CBC did broadcast the Production on Newsworld without authorization, on September 11, 2002, at 1:00 a.m., September 7, 2003, at 10:00 p.m., September 8th 2003, at 1:00 a.m., September 11, 2004, at 10:00p.m., September 12, 2004, at 1:00 a.m. and September 12, 2004, at 4:00 a.m. and that it is jointly and severally liable with the BDUs for these infringements. At trial, Counsel for the CBC made the following statements:

> Me LEBLANC: --- je veux que la position soit claire que la solidarité
> -- les BDU  -- ce que je vous dis là c'est que nous sommes solidaires avec les BDU; d'accord? Alors, pour cette communication unique.
>
> LA COUR: Pour ces communications uniques?
>
> Me LEBLANC: Les six ou huit.
>
> LA COUR: Oui, oui.
>
> Me LEBLANC: Tout à fait.
>
> LA COUR: C'est ce que j'avais compris ---
>
> Me LEBLANC: Absolument.

LA COUR: --- dans votre position.

Me LEBLANC: Absolument. Donc, on est solidaires de quoi? Bien, on est solidaires des dommages causés à Madame Leuthold. Quels sont ces dommages-là? La valeur de la licence. Je reviens à la jurisprudence.

Comment ensuite on va se répartir entre les BDU et Radio-Canada? Ça, ça nous regarde. Vous avez un contrat -- un contrat type qui est déposé, ça dit que c'est Radio-Canada, dans le contrat, qui va prendre en charge …

Mais là, je ne parle pas de la Loi, je parle du contrat.

Mais, nous, on est solidaires avec les BDU pour ces six communications et ce qu'on doit se poser comme question c'est, donc, d'accord on est solidaires des dommages de Madame Leuthold, pas de 700/800/300 communications techniques pour arriver au téléviseur du Canadien (see transcript, representations by Me Leblanc, February 14, 2012, pages 76 et 77).

[93]     Miss Leuthold, on the other hand, claims that each transmission by the BDUs constitutes a separate communication to the public that must be compensated.

[94]     The Court will deal with this issue in its answer to the fourth question.

### 3.     Is the Defendant, the CBC, liable for such infringement by the affiliated stations and the BDUs?

[95]     The Defendants acknowledged their joint and several liabilities with the BDUs (see transcript, representations by Me Leblanc, February 14, 2012, pages 76 and 77).

[96]    Newsworld's signal retransmitted by the BDUs infringed Plaintiff's copyright in the

photographs.

[97]    At trial, Counsel for the CBC argued that:

> Le BDU est le radiodiffuseur, est solidairement responsable de la
> communication au public. C'est pour cela que le producteur
> indépendant -- ou, dans ce cas ici, Radio-Canada -- libère les droits et
> libère les droits pour la communication au public jusqu'aux
> téléspectateurs.
>
> Sinon, regardez la situation: Pour 2,500$, Radio-Canada peut
> diffuser sur 'main channel' qui -- et vous avez la pièce aussi dans le
> 'Joint Book' -- a beaucoup plus de cotes d'écoute au Canada que
> Newsworld. Mais si Radio-Canada veut diffuser sur Newsworld le
> même documentaire, il faudrait que la Cour conclut que la licence
> librement négociée aurait été plus de 2.8$ millions parce que c'est ce
> qu'on vous dit: Pour différer une diffusion câblée au Canada, dans le
> cas de Radio-Canada, on vous dit qu'il y a -- je prends '732' mais le
> chiffre peut varier […]
>
> […]
> il faut donc -- Maître O'Connor vous amène à dire: Il faut donc
> négocier une licence avec chacun de ce[s] BDU là, ce qui fait que
> pour diffuser sur le câble -- et je vous soumets qu'en ce moment,
> toutes les stations qui diffusent sur le câble -- c'est la même
> technologie; c'est les mêmes BDU; ça peut varier dans le nombre --
> devraient donc payer des sommes avoisinant, je présume, les 2.8
> millions pour une diffusion à travers le Canada.
>
> C'est un résultat incongru et c'est un résultat incongru parce qu'il
> part d'une fausse prémisse. C'est-à-dire on va déterminer -- on va
> compenser en vertu des actes de contrefaçon sans se préoccuper de
> ce que vaut vraiment l'œuvre […]
>
> […]
>
> Ce n'est pas abstrait. On n'ajoute pas des dommages à chaque fois
> qu'on peut prouver qu'il y a eu, dans ce cas-ci, une communication
> additionnelle. Une communication publique, d'accord; c'est pour ça
> qu'on dit six ou huit, mais dans le chemin pour s'y rendre, là les
> BDU n'influencent pas parce que sinon, ça viendrait justement -- ça
> mènerait justement, je le dis avec beaucoup d'égard, à une situation

2012 FC 748 (CanLII)

2012 FC 748 (CanLII)

> qui serait inéquitable, qui ferait en sorte que, justement, les chiffres
> qui ont été avancés devant vous seraient des chiffres possibles pour
> une compensation (see transcript, representations by Me Leblanc,
> February 14, 2012, pages 16, 17 and 25).

[98]     Defendants argue that they have infringed Miss Leuthold's copyright on no more than 6 separate occasions. They refer to the definition of "broadcasting" and "meaning of other means of telecommunications" and allege that a broadcast is a transmission from the broadcaster to the Canadian public. For a production to be transmitted to the public, a number of BDUs will retransmit the broadcaster's signal to a certain number of Canadian subscribers. The Defendants submit that the process of retransmission to the public is technology neutral under the definition of "meaning of other means of telecommunication". According to them, this definition exists in the *Broadcasting Act* for the purpose of avoiding an infringement that would emanate from the technical retransmission of a distribution undertaking.

[99]     On the other hand, Miss Leuthold wants to be compensated for each transmission on the basis of the value of her five photographs. However, the Defendants contend that her claim runs counter to the general principle of the *Copyright Act*.

[100]   The Court's answer to the third question is the following: the Defendant, the CBC, is liable jointly and severally with the BDUs but only for the six communications to the public that infringed on Miss Lethold's copyright.

[101]   In order for the Court to assess the issue of damages, it must first determine on what basis to award the damages claimed by Miss Leuthold.

2012 FC 748 (CanLII)

***4.***     ***If there was copyright infringement by the Defendants, the affiliated stations or the BDUs, what remedies should be awarded to the Plaintiff (Miss Leuthold) in terms of damages, profits, injunctive relief, and delivery up?***

**A.     Miss Leuthold's position**

[102]   Miss Leuthold's position is summed up in the following document that was tabled by her counsel.

Alleged Infringement Damages Claim Summary

| Date/Time | Alleged Infringer | Nature of Alleged infringement | Reference (Copyright Act) | Damages SUS | Damages SC | CBC/Newsworld Remarks Liability |
|---|---|---|---|---|---|---|
| March 17, 2002 10:00 a.m. | CBC Network | 15 UTs | 3()() 2.4'()()(i) | Joint & Several | | 6 stns in Atlantic Canada within authorised one-time usage |
| | **Regional Stations** | | | | | |
| | Montreal (QB) CBMT 6 | CTP | 3()() | $2,500.00 | $3,969.50 | $3,969.50 |
| | London (ON) CBLN | CTP | 3()() | $2,500.00 | $3,969.50 | $3,969.50 |
| | Ottawa (ON) CBOT 4 | CTP | 3()() | $2,500.00 | $3,969.50 | $3,969.50 |
| | Toronto (ON) CBLT 5 | CTP | 3()() | $2,500.00 | $3,969.50 | $3,969.50 |
| | Windsor (ON) CBET 9 | CTP | 3()() | $2,500.00 | $3,969.50 | $3,969.50 |
| | Winnipeg (MN) CBWT 6 | CTP | 3()() | $2,500.00 | $3,969.50 | $3,969.50 |
| | Regina (SK) CKBT 9 | CTP | 3()() | $2,500.00 | $3,969.50 | $3,969.50 |
| | Saskatoon (SK) CBKST 11 | CTP | 3()() | $2,500.00 | $3,969.50 | $3,969.50 |
| | Edmonton (AL) CBXT 5 | CTP | 3()() | $2,500.00 | $3,969.50 | $3,969.50 |
| | Calgary (AL) CBRT 9 | CTP | 3()() | $2,500.00 | $3,969.50 | $3,969.50 |
| | Vancouver (BC) CBUT 2 | CTP | 3()() | $2,500.00 | $3,969.50 | $3,969.50 |
| | Whitehorse (YK) CFWH | CTP | 3()() | $2,500.00 | $3,969.50 | $3,969.50 |
| | Yellowknife (NWT) CFYK TV8 | CTP | 3()() | $2,500.00 | $3,969.50 | $3,969.50 |
| | **Affiliated Stations** | | | | | |
| | Thunder Bay (ON) CKPR-TV | CTP | 3()() | $2,500.00 | $3,969.50 | $3,969.50 |
| | Lloydminster (AL) CKSA-TV 2 | CTP | 3()() | $2,500.00 | $3,969.50 | $3,969.50 |
| | | | | **SUB-TOTAL CBC Network** | | **$59,542.50** |

2012 FC 748 (CanLII)

| | Newsworld | 72 UTs | 3()(6) 2.4(1)(e)(ii) | Joint & Several | | | |
|---|---|---|---|---|---|---|---|
| March 17, 2002/7:00 p.m. | Each distribution undertaking | CTP | 3()(6) 2.4(1)(e)(ii) | Joint & Several 2,500.00 | $3,969.50 | $2,905,674.00 | 732 BDUs. See pp. 518-532 |
| September 10, 2002 / 8:00 p.m. | CBC Network | 15 UTs CTP | 3()(6) 2.4(1)(e)(ii) | Joint & Several 2,500.00 | | | 6 stns in Atlantic Canada within authorised one-time usage |
| | **Regional Stations** | | | | | | |
| | Montreal (QB) CBMT 6 | CTP | 3()(6) | 2,500.00 | $3,930.00 | $3,930.00 | |
| | London (ON) CBLN | CTP | 3()(6) | 2,500.00 | $3,930.00 | $3,930.00 | |
| | Ottawa (ON) CBOT 4 | CTP | 3()(6) | 2,500.00 | $3,930.00 | $3,930.00 | |
| | Toronto (ON) CBLT 5 | CTP | 3()(6) | 2,500.00 | $3,930.00 | $3,930.00 | |
| | Windsor (ON) CBET 9 | CTP | 3()(6) | 2,500.00 | $3,930.00 | $3,930.00 | |
| | Winnipeg (MN) CBWT 6 | CTP | 3()(6) | 2,500.00 | $3,930.00 | $3,930.00 | |
| | Regina (SK) CKBT 9 | CTP | 3()(6) | 2,500.00 | $3,930.00 | $3,930.00 | |
| | Saskatoon (SK) CBKST 11 | CTP | 3()(6) | 2,500.00 | $3,930.00 | $3,930.00 | |
| | Edmonton (AL.) CBXT 5 | CTP | 3()(6) | 2,500.00 | $3,930.00 | $3,930.00 | |
| | Calgary (AL.) CBRT 9 | CTP | 3()(6) | 2,500.00 | $3,930.00 | $3,930.00 | |
| | Vancouver (BC) CBUT 2 | CTP | 3()(6) | 2,500.00 | $3,930.00 | $3,930.00 | |
| | Whitehorse (YK) CFWH | CTP | 3()(6) | 2,500.00 | $3,930.00 | $3,930.00 | |
| | Yellowknife (NWT) CFYK TV8 | CTP | 3()(6) | 2,500.00 | $3,930.00 | $3,930.00 | |
| | **Affiliated Stations** | | | | | | |
| | Kingston (ON) CKWS-TV | CTP | 3()(6) | 2,500.00 | $3,930.00 | $3,930.00 | No Stations Covered by Licence for One Broadcast |
| | Peterborough Bay (ON) CHEX-TV | CTP | 3()(6) | 2,500.00 | $3,930.00 | $3,930.00 | |
| | Thunder Bay (ON) CKPR-TV | CTP | 3()(6) | 2,500.00 | $3,930.00 | $3,930.00 | |
| | Brandon (MB) CKX | CTP | 3()(6) | 2,500.00 | $3,930.00 | $3,930.00 | |
| | Lloydminster (AL) CKSA-TV 2 | CTP | 3()(6) | 2,500.00 | $3,930.00 | $3,930.00 | |
| | Medicine Hat (AL) CHAT-TV 6 | CTP | 3()(6) | 2,500.00 | $3,930.00 | $3,930.00 | |
| | Dawson Creek (BC) CJDC-TV 5 | CTP | 3()(6) | 2,500.00 | $3,930.00 | $3,930.00 | |
| | Prince George (BC) CKPG-TV 2 | CTP | 3()(6) | 2,500.00 | $3,930.00 | $3,930.00 | |
| | Terrace (BC) CFTK-TV 3 | CTP | 3()(6) | 2,500.00 | $3,930.00 | $3,930.00 | |

SUB-TOTAL CBC Network    $86,460.00

| September 10, 2002 / 8:00 p.m. **Newsworld** | Newsworld | 732 UTs | 3()(f) 2.4()(e)(ii) | | | | 732 BDUs. See pp. 518-532 |
| | **Each distribution undertaking** | CTP | 3()(f) | Joint & Several $2,500.00 | $3,930.00 | $2,876,760.00 | |
| September 11, 2002 / 1:00 a.m. | Newsworld | 732 UTs | 3()(f) 2.4()(e)(ii) | | | | 732 BDUs. See pp. 518-532 |
| | **Each distribution undertaking** | CTP | 3()(f) | Joint & Several $2,500.00 | $3,930.00 | $2,876,760.00 | |
| September 7, 2003 / 10:00 p.m. | Newsworld | 712 UTs | 3()(f) 2.4()(e)(ii) | | | | 712 BDUs. See pp. 533-547 |
| | **Each distribution undertaking** | CTP | 3()(f) | Joint & Several $2,500.00 | $3,426.75 | $2,439,846.00 | |
| September 8, 2003 / 1:00 a.m. | Newsworld | 712 UTs | 3()(f) 2.4()(e)(ii) | | | | 712 BDUs. See pp. 518-532 |
| | **Each distribution undertaking** | CTP | 3()(f) | Joint & Several $2,500.00 | $3,426.75 | $2,439,846.00 | |
| September 11, 2004 / 10:00 p.m. | Newsworld | 807 UTs | 3()(f) 2.4()(e)(ii) | | | | 807 BDUs. See pp. 548-564 |
| | **Each distribution undertaking** | CTP | 3()(f) | Joint & Several $2,500.00 | $3,250.75 | $2,623,355.25 | |
| September 12, 2004 / 1:00 a.m. | Newsworld | 807 UTs | 3()(f) 2.4()(e)(ii) | | | | 807 BDUs. See pp. 548-564 |
| | **Each distribution undertaking** | CTP | 3()(f) | Joint & Several $2,500.00 | $3,250.75 | $2,623,355.25 | |
| September 12, 2004 / 4:00 a.m. | Newsworld | 807 UTs | 3()(f) 2.4()(e)(ii) | | | | 807 BDUs. See pp. 548-564 |
| | **Each distribution undertaking** | CTP | 3()(f) | Joint & Several $2,500.00 | $3,250.75 | $2,623,355.25 | |

**TOTAL Each distribution undertaking   Assumes it communicated all Newsworld transmi**   **$28,435.25**

2012 FC 748 (CanLII)

2012 FC 748 (CanLII)

| TOTAL | | | | | |
|---|---|---|---|---|---|
| **Regional Stations** | | | | | |
| Montreal (QB) CBMT 6 | CTP | 3(0)(0) | $2,500.00 | $7,899.50 | 6 stns in Atlantic Canada within authorised one-time usage |
| London (ON) CBLN | CTP | 3(0)(0) | $2,500.00 | $7,899.50 | |
| Ottawa (ON) CBOT 4 | CTP | 3(0)(0) | $2,500.00 | $7,899.50 | |
| Toronto (ON) CBLT 5 | CTP | 3(0)(0) | $2,500.00 | $7,899.50 | |
| Windsor (ON) CBET 9 | CTP | 3(0)(0) | $2,500.00 | $7,899.50 | |
| Winnipeg (MN) CBWT 6 | CTP | 3(0)(0) | $2,500.00 | $7,899.50 | |
| Regina (SK) CKBT 9 | CTP | 3(0)(0) | $2,500.00 | $7,899.50 | |
| Saskatoon (SK) CBKST 11 | CTP | 3(0)(0) | $2,500.00 | $7,899.50 | |
| Edmonton (AL) CBXT 5 | CTP | 3(0)(0) | $2,500.00 | $7,899.50 | |
| Calgary (AL) CBRT 9 | CTP | 3(0)(0) | $2,500.00 | $7,899.50 | |
| Vancouver (BC) CBUT 2 | CTP | 3(0)(0) | $2,500.00 | $7,899.50 | |
| Whitehorse (YK) CFWH | CTP | 3(0)(0) | $2,500.00 | $7,899.50 | |
| Yellowknife (NWT) CFYK TV8 | CTP | 3(0)(0) | $2,500.00 | $7,899.50 | |
| **Affiliated Stations** | | | | | |
| Kingston (ON) CKWS-TV | CTP | 3(0)(0) | $2,500.00 | $3,930.00 | No Stations Covered by Licence for One Broadcast |
| Peterborough Bay (ON) CHEX-TV | CTP | 3(0)(0) | $2,500.00 | $3,930.00 | |
| **Thunder Bay (ON) CKPR-TV** | CTP | 3(0)(0) | **$5,000.00** | **$7,899.50** | |
| Brandon (MB) CKX | CTP | 3(0)(0) | | $3,930.00 | |
| **Lloydminster (AL) CKSA-TV 2** | CTP | 3(0)(0) | **$5,000.00** | **$7,899.50** | |
| Medicine Hat (AL) CHAT-TV 6 | CTP | 3(0)(0) | $2,500.00 | $3,930.00 | |
| Dawson Creek (BC) CJDC-TV 5 | CTP | 3(0)(0) | $2,500.00 | $3,930.00 | |
| Prince George (BC) CKPG-TV 2 | CTP | 3(0)(0) | $2,500.00 | $3,930.00 | |
| Terrace (BC) CFTK-TV 3 | CTP | 3(0)(0) | $2,500.00 | $3,930.00 | |

TOTAL Newsworld Liability   $21,408,951.75

TOTAL CBC Network Liability   $146,002.50

Notes

UT means Unauthorised Transmission
CTP means Communication to the Public

2012 FC 748 (CanLII)

Calculation of Newsworld Revenues for Alleged Infringement

| Month | Revenues | Reference | Duration of Alleged Infringement | | Hours/Mins in month | % of Hours | Pro-rata Revenues |
|---|---|---|---|---|---|---|---|
| March, 2002 | $4,687,664 | Page 505 | | 00:60:00 | 744 / 44,640 | 0.00134409 | $6,301 |
| September, 2002 | $4,660,384 | Page 510 | 1:30:00 | x 2 = 3:00:00 | 720 / 43,200 | 0.00416667 | $19,418 |
| September, 2003 | $4,752,952 | Page 517 | 2:00:00 | x 2 = 4:00:00 | 720 / 43,200 | 0.05555556 | $26,405 |
| September, 2004 | $4,904,891 | TBC | 2:00:00 | x 3 = 6:00:00 | 720 / 43,200 | 0.00833333 | $40,874 |
| | | | | | | TOTAL: | $92,998 |

2012 FC 748 (CanLII)

[103]   Miss Leuthold relies on the definitions found in paragraphs 2.4(1) (*c*) and 3(1) (*f*) of the *Copyright Act*.

[104]   She also applies the definitions of broadcasting, broadcasting undertaking, distribution undertaking and network found in the *Broadcasting Act*.

[105]   In essence, her position is that each transmission should be compensated, whether it was aired by the CBC on the main channel or by a regional station or an affiliate or by a BDU relaying a signal received from Newsworld. Since each transmission by a BDU constitutes an infringement, she is therefore claiming $2,500.00 US or the equivalent in Canadian dollars at the exchange rate applicable at the time. In September 2003, the number of distribution undertakings stood at approximately 712, and in 2004 they were about 807 distribution undertakings (see Joint Book of Documents, volume II, pages 518 to 564). Therefore, each unauthorized transmission on Newsworld is assessed at $2,439,846.00 in 2003 and $2,623,355.25 in 2004. The damages for the broadcast on the main channel inclusive of regional stations and affiliates and taking into consideration the time zones are evaluated at $146,002.50 for the network, as defined by Miss Leuthold.

[106]   Miss Leuthold is also claiming $92,998.00 as her prorated share of Newsworld revenues generated during the period of the unauthorized broadcasts. In delimiting that amount the total length of each Production aired was taken into consideration. The September 2003 broadcast lasted 2 hours. Therefore, the amount claimed is based on the revenues for the total month derived from cable subscribers, divided by the total hours of broadcasting and the number of days in the month.

2012 FC 748 (CanLII)

[107]   Miss Leuthold also asserts that her contribution was more significant than any other participant on the Production since she was paid $2,500.00 US for one play whereas the BBC only received $20,000.00 for a worldwide license for five years. She argues that the total Production constitutes an infringement and not just the 18 seconds where the Photographs appear because she comments the Photographs during the Production and her appearance is significant.

[108]   Miss Leuthold is also asking the Court for bifurcation or an accounting of profits.

[109]   At trial her counsel amended Miss Leuthold's position with respect to punitive and exemplary damages. Miss Leuthold desisted from her claim of $15,000.00 for punitive damages but maintained her claim of $25,000.00 strictly for exemplary damages from defendant, the CBC, and $10,000.00 from Mr. Jerry Mc Intosh, based on their alleged callous behavior and the fact that it aired the Production on several occasions despite the limited rights granted under the Stills License.

B.      Defendants' position

[110]   The Defendants rely on the expert testimony of Elizabeth Klink. Mrs. Klink was recognized by the Court as an expert on the valuation of Stills. In order to assign a value to the Photographs she contacted the top three international photographic archive collections, Corbis Images, Getty Images and Associated Press. She negotiated Worldwide Rights directly with all three for photographs. She also dealt directly with the Canadian representative of Corbis. Her conclusion was that each

Photograph had an average value of $300.00 US in 2002 for use worldwide all media in perpetuity (see Trial Records, tab 4, page 113).

[111]   Citing *Hutton v Canadian Broadcating Corp. (CBC)* (1989), 29 CPR (3d) 398 at pages 450-451 confirmed by (1992) 41 CPR (3d) 45 (CA Alta) [*Hutton c Canadian Broadcasting Corp*], the Defendants claim that damages should be assessed on the basis of the amount that the defendant, the CBC, would have paid for the broadcasting rights. They further argue that, since it was customary for the plaintiff to grant licenses, then, the best measure of damages is the value of a license that would have been freely negotiated by the parties. Miss Leuthold at the time was selling the Photographs for $500.00 US each. They then refer to the Corbis site claiming that three of Miss Leuthold's Photographs can be obtained with unlimited worldwide rights for $350.00 Canadian per image (see Trial Records, Elizabeth Klink expert report, tab 4, page 108).

[112]   The Defendants also underline the importance of determining the value of compensation that should be awarded for the infringements not on the number of technical infringements that occurred but, on the six times Canadians were provided access to the Photographs because the two licenses negotiated, specifically entailed that all Canadians could view the Photographs.

[113]   It is also the Defendants' position that to compensate Miss Leuthold on the basis of the number of technical infringements is contrary to the definitions found in the *Broadcasting Act* where a broadcast is a transmission to the public independently of the apparatus used.

2012 FC 748 (CanLII)

[114]   Finally the Defendants claim that the proper amount to which Miss Leuthold is entitled is $875.00 US for Canadian broadcast rights based on Mrs. Klink's testimony.

**Objections**

[115]   In the course of Mrs. Klink's testimony, the Court took under advisement two objections from counsel representing the plaintiff, Miss Leuthold. The objections pertained to the admissibility of testimony by Mrs. Klink that contradicted statements made by Miss Leuthold with respect to the number of photographers that actually took pictures on 9/11 and the value of photographs in a more limited market such as Canada, for a shorter time frame than the assessment included in her report.

[116]   The Court rejects both objections raised by plaintiff, Miss Leuthold, because an expert witness can testify to varying parameters that influence the value of goods she was asked to appraise and can also rebut evidence introduced by another witness inasmuch as her testimony is based on personal knowledge, which was the case in this instance.

**C.    Analysis**

*Damages*

[117]   Under subsection 34(1) of the *Copyright Act*, "where copyright has been infringed, the owner of the copyright is, subject to this Act, entitled to all remedies by way of injunction, damages,

2012 FC 748 (CanLII)

accounts, delivery up and otherwise that are or may be conferred by law for the infringement of a right".

[118]   The Court has identified two questions that must be answered in order to properly compensate Miss Leuthold for the infringements of her copyright.

### *Compensation for each infringement or each communication to the public and basis for compensation.*

[119]   The parties disagree on the number of infringements that need to be compensated. This Court has determined that the licenses covered the transmissions of March 17, 2002 and September 10, 2002, on both the CBC network inclusive of affiliates and regional stations in all time zones and Newsworld.

### *1.    At issue is the entitlement to compensation for each individual communication by a BDU or should the compensation be based on each overall communication to the public?*

[120]   Miss Leuthold takes the position that the *Copyright Act* provides for compensation for each separate act of infringement.  Her counsel, citing from *Tamaro Annotated Copyright Act*, page 726, acknowledged that a basis for compensation as held in various cases and more particularly the case of *Webb & Knapp v Edmonton (City)* (1970), 44 Fox, where "the Court referred to an English decision, *Meikle v Maufe*, [1941] 3 All ER 144, where it was held that for breach of copyright,

specifically of architectural works, the starting point in assessing damages was the sum which might have been charged for a licence to use the copyright. From there, the surrounding circumstances should be taken into account as with the infringement of any proprietary right".

[121]   Counsels for the Defendants have also acknowledged that the amount paid for a license is a valid starting point. They cited *Hutton c Canadian Broadcasting Corp* and *Video Box Enterprises Inc v Peng*, 2004 FC 482, but they insist that, in the present case at issue are only six communications to the public and not the number of communications from each BDU.

[122]   In support of their position they claim that if the Court was to consider the technical means used this would be counter to the *Copyright Act* because compensation would vary not on the number of occasions the public saw the Production but on the means used to communicate the Production.

[123]   Defendants also allege that the theory developed by Miss Leuthold to the effect that each transmission by a BDU constitutes an infringement is contrary to the definitions in the *Broadcasting Act*.

[124]   Miss Leuthold, on the other hand, claims that each BDU should have negotiated a license with her. The amount of that license constitutes in her view a starting point. The Court should also consider a deterrent to discourage others from contravening her rights.

[125]   According to Miss Leuthold's counsel, if a distribution undertaking had approached Catherine Leuthold in isolation to obtain a license to communicate her Photographs to the public, the cost would have been $500.00 US per photograph. The value of a license is $2,500.00 US independently of the number of subscribers held by that BDU whether it would be 1000 or 1,2 million.

[126]   Miss Leuthold recognizes that the numbers derived from such a formula are impressive but according to her, the issue is solely that each infringement must be compensated. If Miss Leuthold had been paid a license fee for every infringement then, that total amount constitutes the appropriate compensation. Since the compensation is based on a license fee after the fact, the Court should not consider volume discounts or the fact that ultimately the CBC will be responsible for the total amount.

[127]   The Court rejects Miss Leuthold's position that damages should be awarded on the basis that each broadcasting undertaking should have negotiated a license which had a value of at least $2,500.00 US.

[128]   The *Copyright Act* is meant to properly compensate the owner of a copyright if his rights are infringed. In the present case the rights of Miss Leuthold were infringed. On six separate occasions her Photographs were viewed by Canadians for a duration of 18 seconds without her authorization. The Court will compensate Miss Leuthold for every one of the six communications to the Canadian public, but it cannot accept the principle that compensation must be awarded on the basis of each technical act of infringement because applying such a method runs counter to our reading of the

2012 FC 748 (CanLII)

*Broadcasting Act* with the *Copyright Act*. To this Court subparagraph 2.4(1)(*c*)(ii) of the *Copyright*

*Act* must be read in conjunction with the definition of broadcast in the *Broadcasting Act*. The

important factor to consider is the number of occasions the infringing broadcasts could be seen by

the public. In this instance there were six separate occasions lasting 18 seconds each where the

Canadian public who subscribe to cable could see the Photographs on Newsworld. The technical

means used to relay the infringing work has no bearing on the amount of compensation owed to

Miss Leuthold save for the revenues derived from the infringing broadcast. What is important in this

Court's opinion is to adequately compensate a copyright owner for the damage suffered. The

number of potential viewers bears some significance in terms of the value to be assigned to a

license.

[129]   Miss Leuthold's position also runs counter to the initial intent of the parties when they freely

negotiated the licenses. It is clear that when Miss Leuthold negotiated the licenses, the technical

means used by the Defendants to communicate her Photographs were never a consideration (see

transcript, testimony of Catherine Leuthold, February 6, 2012, page 90, lines 10 to 16; page 91, lines

12 to 25; and page 92, lines 1 to 20).

[130]   By analogy, should Miss Leuthold have opted for statutory compensation pursuant to

subsection 38.1(3) of the *Copyright Act*, her compensation would have been limited. The relevant

provision states that:

> 38.1(3) where
>
> (a) there is more than one work or other subject-matter in a single
> medium and

b) the awarding of even the minimum amount referred to in subsection (1) or (2) would result in a total award that, in the court's opinion , is grossly out of proportion to the infringement,

The court may award, with respect to each work or other subject matter, such lower amount than $500 or 200$, as the case may be, as the court considers just.

[131]   More importantly the jurisprudence holds that "even if the evidence to support a calculation on the above-mentioned basis is not available, damages will nevertheless be awarded based on the evidence available and drawing reasonable inferences, using common-sense. Copyright is said to be a property that is a wasting asset. When copyright infringement is established and actual loss or specific damages cannot be proven but, nevertheless, it is shown that damages resulted directly from the infringement, damages will be granted at large and "may be dealt with broadly and as a matter of common sense, without professing to be minutely accurate"" (*Intellectual Property Disputes: Resolutions & remedies*, Vol 2, Ronald E. Dimock, « Monetary Relief – Damages by Me François Grenier, Carswell, 2003, Toronto, at page 17-16; *Prism Hospital Software v Hospital Medical Records Institute*,[1994] BCJ No 1906 at para 665).


*What constitutes an appropriate compensation taking into consideration the facts and evidence adduced in this instance?*


[132]   The Court must first underline the fact that in Canada, copyright "is a creature of statute and the rights and remedies it provides are exhaustive" (see *Théberge v Galerie d'Art du Petit Champlain inc*, [2002] 2 SCR 336, 2002 SCC 34, at para 5; *Bishop v Stevens*, [1990] 2 SCR 467, at page 477; *Compo Co v Blue Crest Music Inc*, [1980] 1 SCR 357, at page 373).

[133]   It may, in certain instances, be more difficult to assess damages resulting from copyright infringement.  In his 2012 annotated *Copyright Act*, at page 727, Normand Tamaro makes a jurisprudential review of the general principal regarding quantum and quotes from a judgment rendered by the Superior Court of Québec:

> [36] Dans *Webb & Knapp v City of Edmonton* [(1970), 44 Fox Pat C 141 (SCC)] la Cour Suprême a reconnu que le droit d'auteur présente parfois un problème d'évaluation quant à la détermination du préjudice pécuniaire subi par le titulaire des droits, et se réfère à un arrêt anglais [*Meihle c Maufe*, [1941] 3 All E R 144] où le tribunal a statué que dans des cas de contrefaçon de plans d'une œuvre architecturale, il faut se demander ce qu'il en aurait coûté pour obtenir une licence pour utiliser les droits d'auteur de la manière dont ils ont été utilisés . . .

> [37] Il est souvent dit qu'en matière de droit d'auteur, les tribunaux n'ont pas besoin de déterminer les pertes et dommages avec précision ; c'est plutôt une matière relevant du sens commun.  En l'espèce, le Tribunal exercera son pouvoir discrétionnaire pour fixer les dommages payables . . . (see *Corp. de développement immobilier Intersite c Immobilière Versant III inc*, 2007 QCCS 4428 at paras 36-37).

[134]   Another general principle that applies can be stated as follows "the Copyright Act does not permit the person who has infringed the copyright of the owner to escape a condemnation for damages merely because they are impossible or difficult to prove. Damages can be granted for breach of the *Copyright Act* without the necessity to prove them and if damages are difficult to assess or cannot be evaluated "… the tribunal must do the best it can, although it may be that the amount awarded will really be a matter of guesswork'"' (see *U & R Tax Services Ltd v H & R Block Canada Inc* (1995), 62 CPR (3d) 257 (Fed TD) at para 46).

[135]   Furthermore, it has been recognized that material damages such as profits derived from the publication of infringing work, are generally difficult to assess. Nevertheless, in copyright matters

they need not be proven. The copyright owner is justified in assuring the protection of the property protected by the copyright. "The determination of damages [can be], to a large extent, […] a rough and ready one" (see *Slumber-Magic Adjustable Bed Co v Sleep-King Adjustable Bed Co.* (1984), 3 CPR (3d) 81 (BCSC) at para 30).

[136]   An important factor that warrants consideration in the present case is the basis on which the Court can assess the material damages. The discussions between the parties on the cost of a license can be used as an element to consider in deriving the amount to which Miss Leuthold is entitled. This "constitute[s] a basis for determining the compensatory damages" (see Normand Tamaro, *The 2012 Annotated Copyright Act*, at page 732; see also *Construction Denis Desjardins inc v Jeanson*, 2010 QCCA 1287; *Eros - Équipe de recherche opérationnelle en santé inc v Conseillers en gestion et infromatique C.G.I. inc*, 2004 FC 178 (FC) [*Eros*]).

[137]   The damages may also be assessed on the basis of the loss of profits in the various commercial markets in which the work could have been shown (see *École de conduite Tecnic Aubé inc v 1509 8858 Quebec Inc* (1986), 12 CIPR 284 (Que SC); see also the particular case of an infringement in respect of the publication of eight photographs in *Parker v Key Porter Books Ltd* (2005), 40 CPR (4th) 80 (SCJ)).

[138]   Fundamentally, the Court's discretion is broad but its assessment of damages must be based on common sense. "Any reasonable method can be used to calculate the damages that the plaintiff has suffered" (Ysolde Gendreau et David Vaver, "Canada", in *International Copyright Law and Practice*, vol 1, LexisNexis, 1988, at CAN-113).

[139]   Both parties have submitted that the discussions surrounding the licenses are a valid starting

point to assess the amount of compensation owed to Miss Leuthold. The Court agrees. Evidence

was adduced by Miss Leuthold that rights to use her photographs commanded a price ranging from

$185.00 to as much as $10,000.00 (see Joint Book of Document, volume II, tab 22, exhibit P-22).

In each instance Miss Leuthold insisted on proper credits and limited usage (see transcript,

testimony of Catherine Leuthold, February 6, 2012, page 101, lines 8 to 25 and page 102, lines 1 to

17).

[140]   The Defendants dispute the limited usage Miss Leuthold claims to have negotiated in all

instances, based on the expert report produced by Mrs. Elizabeth Klink that concluded that

worldwide rights for all media in perpetuity were valued at $500.00 US per Photograph. The report

also asserted that Corbis, who has represented Miss Leuthold since 2003, could grant worldwide

rights all media in perpetuity. This was denied by Miss Leuthold who testified that in her case, the

rights granted were always limited commercial use notwithstanding the language appearing on the

Corbis website or the standard Corbis agency agreement (see transcript, testimony of Catherine

Leuthold, February 6, 2012, page 185, lines 13 to 25; page 186, lines 1 to 7 and page 187, lines 2 to

7).

[141]   It is clear to the Court that Miss Leuthold's Photographs are valuable in that they generate a

certain amount of income annually. Miss Leuthold did not present any evidence as to what

percentage of her annual income is derived from the sale of rights to reproduce the Photographs; she

had no obligation to that effect under the *Copyright Act*. The $2,500.00 US paid by the Defendant, the CBC, is a valid basis from which to start. That fee was based on a limited usage.

[142]   The Court accepts Miss Leuthold's position that she always negotiated limits to the rights granted. It is obvious that by limiting the rights granted, Miss Leuthold maintains a limited access to her work hence protecting its commercial value.

[143]   Mrs. Klink states that she would not pay more than $500.00 US per photo unlimited worldwide right all media (Joint Trial Record, tab 4, page 113). While the Court takes into consideration that opinion, it must also determine what is an adequate compensation based on all the evidence adduced. When cross-examined by counsel for Miss Leuthold, Mrs. Klink acknowledged that she was not aware that Miss Leuthold had sold some Photographs to People Magazine, Le Monde, Newsweek for amounts ranging from $2,300.00 to $10,000.00 in 2001 but did confirm that the Photographs decreased in value further you are from the event (see transcript, testimony of Mrs. Klink, February 8, 2012, pages 80 and 81).

[144]   The Court assesses the damages at $3,200.00 US for each of the six unauthorized communication to the public on the basis that Miss Leuthold could have negotiated a higher license fee than the initial $2,500.00 in view of the repeated usage. The Court is also taking into consideration the amount received by Miss Leuthold for publication of her photographs in Der Spiegel and Le Monde. Though these are publications with a more limited distribution, the images can be viewed by more people for a longer length of time.

2012 FC 748 (CanLII)

*Proof of profits*

[145]  Subsection 35(2) of the *Copyright Act* provides that:

> In proving profits,
>
> *(a)*    the plaintiff shall be required to prove only receipts or revenues derived from the infringement; and
>
> *(b)*    the defendant shall be required to prove every element of cost that the defendant claims.

[146]  "The Copyright Act provides for a specific system of accounting at s 35(2), setting out the parameters within which the profits referred to in s 35(1) are calculated" (see Normand Tamaro, *The 2012 Annotated Copyright Act*, at page 756).

[147]  In this case the Court will not grant an accounting of profits for the following reason: there exists no causal link between the fee paid by Newsworld subscribers and the six unauthorized communications to the public that infringed on Miss Leuthold's rights.

[148]  The Court will only grant an accounting of profits where it finds a direct link between the infringements and the profits of the infringer. In the present case, there is no evidence on the record linking the revenues of Newsworld to the six unauthorized communications to the public. Newsworld revenues did not increase as a result of the six communications to the public (see transcript, testimony of Janice Ward, February 7, 2012, page 56, lines 1 to 25 and page 57, lines 1 to 15) (Joint Book of documents, volume II, tab 10, page 517 A).

2012 FC 748 (CanLII)

[149]   The evidence adduced on the revenues of Newsworld is the basis for the Defendants claim of $ 92,998.00 for the eight infringements alleged based on a prorated share of these revenues. The Court has concluded that only six unauthorized communications to the public infringed Miss Leuthold's rights. If we apply the formula used by Miss Leuthold but limit it to the actual length of time, the Photographs appeared on Newsworld during the months of September 2003 and 2004, which is 18 seconds rather than the full length of the Production, the amount payable for a pro-rata share of revenues is $66.00 for 2003 and $102.73 for 2004.

[150]   The Court grants these amounts because the revenues of Newsworld, though not linked to the infringement, are nonetheless generated from continuous programming airing on a 24 hour basis. The Photographs appearing in the Production occupied air time for 18 seconds. Miss Leuthold should be compensated as such.

[151]   At page 356, Volume I of the Joint Book of Documents, the Defendants have produced a summary of the publicity revenues generated from all the communications to the public. These publicity revenues totalize $6,960.00. The Defendants claim that these include revenues from two communications that did not include Miss Leuthold's Photographs. Consequently, an amount of $2,604.00 must be deducted, leaving a balance $4,356.00. If we consider that the Production cost at least $70,000.00 to produce, there are no profits to be apportioned in this instance and hence, no valid reason to order an accounting of profits (see Joint Book of documents, volume II, tabs 18 and 19).

2012 FC 748 (CanLII)

*Punitive and exemplary damages*

[152]   Miss Leuthold has modified her claim with respect to punitive and exemplary damages. She desisted from her claim of $15,000.00 for punitive damages but maintained her claim of $25,000.00 strictly for exemplary damages from Defendant, the CBC, and $10,000.00 from Jerry Mc Intosh, based on their alleged callous behavior and the fact that they aired the Production on several occasions despite the limited rights granted by the Stills License.

[153]   The Court underlines that, while they are often confused, there is a distinction between punitive and exemplary damages (see *Jelin Investments Ltd v Signtech Inc* (1990), 34 CPR (3d) 171 (Fed TD)). Exemplary damages go beyond full compensation of the Plaintiff and include a sum to penalize the Defendant. Punitive damages can be defined, on the other hand, as the granting of a more generous amount for an award of actual damages rather than a more moderate amount because of the reprehensible conduct of the Defendant.

> Punitive damages are awarded against a defendant in exceptional cases for "malicious, oppressive and high-handed" misconduct that "offends the court's sense of decency": Hill v. Church of Scientology of Toronto, [1995] 2 SCR 1130, at para 196. The test thus limits the award to misconduct that represents a marked departure from ordinary standards of decent behaviour. Because their objective is to punish the defendant rather than compensate a plaintiff (whose just compensation will already have been assessed) […] (see *Whiten v Pilot Insurance Co*, 2002 SCC 18 at para 36 [*Whiten*]).

[154]   The Supreme Court also wrote that "In *Vorvis*, . . . this Court held that punitive damages are recoverable in such cases provided the defendant's conduct said to give rise to the claim is itself "an actionable wrong" (p. 1106). The scope to be given this expression is the threshold question in this

case, i.e., is a breach of an insurer's duty to act in good faith an actionable wrong independent of the

loss claim under the fire insurance policy?" (see *Whiten* at para 78)

[155]   The Supreme Court adds:

> The more reprehensible the conduct, the higher the rational limits to
> the potential award. The need for denunciation is aggravated where,
> as in this case, the conduct is persisted in over a lengthy period of
> time (two years to trial) without any rational justification, and despite
> the defendant's awareness of the hardship it knew it was inflicting
> (indeed, the respondent anticipated that the greater the hardship to
> the appellant, the lower the settlement she would ultimately be forced
> to accept) (see *Whiten* at para 112).

[156]   Exemplary damages are only awarded with the objective "of punishment and deterrence"

(see *Quebec (Public Curator) v Syndicat national des employés de l'hôpital St-Ferdinand*, [1996]

SCJ No 90).

[157]   Miss Leuthold's counsel referred the Court to extracts from Normand Tamaro's *Annotated*

*Copyright Act*, at page 739, where the Author makes the point that "where the defendant's actions

constituted a callous disregard for the rights of the plaintiff". He argued that in this instance, the

conduct of Jerry McIntosh and the CBC does constitute such callous disregard for the rights of Miss

Leuthold.

[158]   The Defendants respond that exemplary damages are only awarded where the copyright was

infringed intentionally. They rely on *Eros*, cited above, where the Court stated that a plaintiff is only

allowed exemplary damages where fraud or a malicious intent are proven. Again citing *Hutton c*

*Canadian Broadcasting Corp.*, the Defendants claim that it stands for the principle that exemplary

damages are only granted in the presence of an outright counterfeiting coupled with the breach of an

interim injunction such as in *Pro Arts Inc v Campus Crafts Holdings Ltd* (1980), 110 DLR (3d) 366.

In sum, Defendants allege that such circumstances do not exist in the present case.

[159]   The evidence on the record does not lead to the granting of exemplary damages against the

CBC or Jerry Mc Intosh. It is clear that the six unauthorized communications to the public resulted

from an honest mistake which Mr. McIntosh admitted quite candidly in his testimony (see

transcript, testimony of Jerry Mc Intosh, February 9, 2012, page 17, lines 24 and 25; page 18, lines 1

to 16; page 23, lines 6 to 25 and page 24, lines 1 to 7).

[160]   There is no evidence on the record that can lead the Court to award exemplary damages.

### Injunction relief

[161]   There is no necessity to grant Miss Leuthold the injunction relief sought. CBC ceased to

broadcast the Production in 2005. The injunction would have no effect whatsoever (see *De*

*Montigny c Cousineau*, [1950] SCR 297 at page 304; *Durand and Cie v Patrie Publishing Co*,

[1960] SCR 649 at page 658) There is no probability of a repetition of the particular act complained

of (see *Canadian Performing Right Society Ltd v Canadian National Exhibition Association*, [1934]

OR 610 (HC)).

*Delivery-up*

[162]   The Plaintiff is entitled to delivery-up according to subsection 34(1) of the *Copyright Act*. It is useful to repeat the following passage from *Canada v James Lorimer & Co*, [1984] 1 FC 1065, at page 1073, on the issue of delivery-up:

> It likewise follows that, where the infringing work is found to include any substantial part of a work in which copyright subsists, the copyright owner is to be deemed owner of all copies of the infringing work and all production plates and is prima facie entitled to the assistance of the Court in gaining possession of them. The onus is on the infringer to establish grounds upon which the Court may properly exercise its discretion against granting such relief.... Those grounds must lie in the conduct of the copyright owner, not in the conduct or motives of the infringer.

[163]   Subsection 38(1) of the *Copyright Act* governs the right for the Plaintiff to recover all infringing material in possession of the Defendants. It is the infringer's burden to establish a reason why this Court should refuse this measure. This reason cannot be based on the infringer's behavior or motives (CBC's practice concerning its logger tapes and archives). In the present case delivery-up is ordered.

5.      *Is the Defendant, Jerry Mc Intosh, independently liable for any infringement of the Plaintiff's (Miss Leuthold's) copyright and, if so, what remedies should be awarded?*

## A.    Miss Leuthold's position

[164]    The Defendant, Jerry Mc Intosh, is the Director of Documentaries for CBC News. According to Miss Leuthold, Mr. Mc Intosh infringed her copyright in the Photographs by permitting eight unauthorized viewing of the Production by the Canadian public.

## B.    Position of the Defendants

[165]    The Defendants submit that there is no evidence of any infringement or authorization of infringement by Mr. Mc Intosh, either in his personal capacity or in his professional capacity. The allegations against him are frivolous, scandalous and vexatious.

## C.    Analysis

[166]    In the joint book of documents, the Defendants reproduced Mr. McIntosh's job description. That description entails to "[direct] and oversee all news and current affairs documentary programming and program development activities in order to attain the objectives of the English Television Network and CBC Newsworld and fulfill public expectations and corporate obligations" (see Joint Book of Documents, volume I, tab 8, page 339).

[167]    A director of CBC Documentary Unit also "directs and oversees the production of documentary programming…" (see Joint Book of Documents, volume I, tab 8, page 340) or News, current Affairs and Newsworld.

2012 FC 748 (CanLII)

[168]   The Court underlines the following passages from Mr. McIntosh's testimony:

> A.      I'm embarrassed by the mistake. I take responsibility for it. But I believe it was an honest mistake.
>
> We knew that Ms. Leuthold did not want her images in the documentary and I instructed a version be created without them and I felt comfortable and confident that that version was going to air on subsequent transmissions and I was shocked in 2004 to discover that we have aired the wrong tape. Physically somebody had gone to the library of hundreds of videotapes, pulled the wrong one. That's what happened.
>
> It's embarrassing. I'm not proud of it. But I admitted that to Ms. Leuthold in an email I sent to her and said let's straighten it out and we'll compensate you.
>
> Q.      The first time you learned of that mistake, you just said 2004, can you be more specific? When did you learn, the first time that - - -
>
> A.      It's a long time ago, so I don't remember precisely. It could have been an email from Catherine saying "What's up?", you know, "What's going on? How come my images are on CBC?" That's possible. It could have been possible that she called somebody else and they called me or - - -
>
> Q.      Okay.
>
> You've been director or director of documentary for how long - - or at that time you would have been for how long, in 2004?
>
> A.      I'd gone through a number of different kind of subtle changes in the job description, taking on additional responsibility, but for approximately 10 years.
>
> Q.      And up until you left the CBC in 2006, did that situation ever happen to you?
>
> A.      No. This is the first time I've ever encountered it.
>
> Q.      How many documentaries would you have been responsible for over the course of your duties?
>
> A.      Hundreds - - hundreds of documentaries.

2012 FC 748 (CanLII)

Q.      Have you ever been sued yourself or, to your knowledge,  the CBC, for infringement  of copyright in stills  or video footage?

A.      No. No.

. . .

THE WITNESS:  From my point of view, this — - this e-mail was me reaching the conclusion  that we were not going  to be able to get the unlimited  rights to broadcast Ms. Leuthold's  images.

She was intent on holding  as to one - -  one play only and that I was satisfied  with that for the one plan in September of 2002 and that, in subsequent  transmissions,  we were going  to air a documentary that contained  none of her images.

And I regretted that, at the time  because I would have preferred  to have the images  but that wasn't to be so we said: Okay, let's move on. We'll remove the images  and that'll  be it.

Q.      And you've testified  to the 60-minute  version that was prepared without  her stills.  You also testified  that there was a 90-minute  version that included  the stills.

Why were her stills  not taken out of that 90-minute  version?

A.      I don't have the answer to that. I don't know that.

I issued  instructions  to remove her - - her images  from the documentary.  It appears that in one case, the 60-minute  case, they were removed. The 90-minute  tape, obviously,  was not corrected and, inadvertently,  was transmitted.
(see transcript,  testimony  of Mr. Mc Intosh, February 9, 2012, page 18, lines  1 to 25, page 19, lines  1 to 23, page 23, lines  5 to 25 and page 24, lines  1 to 7)

[169]   In authorizing  the broadcast, Mr. McIntosh infringed  Plaintiff's  copyright  in the

Photographs.

2012 FC 748 (CanLII)

[170]   However, he is not liable for this infringement because the CBC is held responsible for the misconduct of its employees. Vicarious liability is "a theory that holds one person responsible for the misconduct of another because of the relationship between them. Although the categories of relationships in law that attract vicarious liability are neither exhaustively defined nor closed, the most common one to give rise to vicarious liability is the relationship between master and servant, now more commonly called employer and employee" (see *671122 Ontario Ltd v Sagaz Industries Canada Inc*, 2001 SCC 59 at para 25 [*Sagaz*]). More specifically, the master's tort theory "posits that the employer is vicariously liable for the acts of his employee because the acts are regarded as being authorized by him so that in law the acts of the employee are the acts of the employer" (see *Sagaz* at para 28).

[171]   Mr. McIntosh is not personally liable because it is clear from the evidence on the record that the unauthorized communications to the Canadian public were not the resultant of a deliberate act or the result of gross negligence.

6.      *Regardless of the Court's finding on liability, what measures of costs should be awarded given the conduct of the parties and outstanding offers to settle?*

[172]   Rules 419 to 421 of the *Federal Courts Rules*, SOR-98-106 [the *Rules*], deal with offers to settle. They complement Rules 400(3) and 409 which allow the Court and the assessment officers to take into account of written offers to settle in assessing cost.

[173]   Rule 420 of the *Federal Court Rules* prescribes costs consequences where a party obtains a judgment less favorable than a written offer to settle made by opposing party.

[174]   The Court will permit the parties to present their respective position with respect to cost at a special hearing to be set after the parties have received this judgment.

### Motion to amend

[175]   Counsel for Miss Leuthold presented a motion to amend his pleadings so that any amount awarded to Miss Leuthold in respect of an unauthorized communication to the public be based on the US dollar exchange rate applicable on the date of that communication to the public.

[176]   Counsel for the Defendants opposed that amendment on grounds that the pleadings were closed and that Miss Leuthold has failed to properly introduce evidence to the applicable exchange rate on the dates of the unauthorized communications to the public.

[177]   The Court rejects the amendment because it is contrary to Rule 75(2) of the *Federal Court Rules*. That Rule clearly states that amendments are not allowed during a hearing unless the purpose is to make the document accord with the issues at the hearing which is not the case in this instance, as the applicable exchange rate on the dates of the unauthorized communications to the public was never properly introduced in evidence.

2012 FC 748 (CanLII)

2012 FC 748 (CanLII)

# JUDGMENT

**THIS COURT**

1.    **ALLOWS** the Plaintiff's action;

2.    **DECLARES** that:

    i)    copyright subsist in the Photographs as defined in this judgment

    ii)    the plaintiff is the rightful owner of the copyright in the Photographs; and

    iii)    the copyright has been infringed by the Defendant, the Canadian Broadcasting Corporation, on six occasions that is on September 11, 2002, September 7, 2003, September 8, 2003, September 11, 2004, September 12, 2004 at 1:00 am and September 12, 2004, at 4:00 am, for which the Defendant, the Canadian Broadcasting Corporation, is jointly and severally liable with each broadcasting distribution undertaking that retransmitted the Photographs;

3.    **CONDEMNS** the Defendant, the Canadian Broadcasting Corporation, jointly and severally with each BDU, to pay total damages of $3,200.00 US dollars for each of the six unauthorized communications of the Photographs to the public, for a total of $19,200.00 US dollars;

4.     **CONDEMNS** the Canadian Broadcasting Corporation to pay an amount of $168.74 Canadian, plus interest, as such part of the revenue received by Newsworld from the unauthorized communication of the Photographs to the public on the dates above mentioned;

5.     **ORDERS** the defendant, the Canadian Broadcasting Corporation, to deliver up to the Plaintiff all copies of films, videos, disks or other tangible media containing the Photographs save for one copy of the final version of the Production to be retained by Defendant, the CBC, for archival purposes only;

6.     **ORDERS** the Defendant, the Canadian Broadcasting Corporation to erase all copies of the Photographs from all purely electronic media, and to provide to the Plaintiff, within fourteen days of judgment herein, an affidavit from an officer of the Defendant, the Canadian Broadcasting Corporation, that this order has been fully executed; and

7.     **RESERVES** its decision as to costs until the Court has heard the representation of the parties at a special hearing to be set in the weeks following receipt of this judgment.

"André F.J. Scott"
_____
Judge

2012 FC 748 (CanLII)

2012 FC 748 (CanLII)

**ANNEX**

**Sections 2 and 3(2) of the *Broadcasting Act*, SC 1991, c 11 read as follows:**

**L'article et le paragraphe 3(2) de la *Loi sur la radiodiffusion*, SC 1991, c 11 se lit comme suit:**

**Definitions**

**2.** (1) In this Act,

*"broadcasting"*
« radiodiffusion »

*"broadcasting"* means any transmission of programs, whether or not encrypted, by radio waves or other means of telecommunication for reception by the public by means of broadcasting receiving apparatus, but does not include any such transmission of programs that is made solely for performance or display in a public place;

*"broadcasting receiving apparatus"*
« récepteur »

*"broadcasting receiving apparatus"* means a device, or combination of devices, intended for or capable of being used for the reception of broadcasting;

*"broadcasting undertaking"*
« entreprise de radiodiffusion »

*"broadcasting undertaking"* includes a distribution undertaking, a programming undertaking and a network;

*"Commission"*
« Conseil »

*"Commission"* means the Canadian Radio-television and Telecommunications Commission established by the *Canadian Radio-television and Telecommunications Commission Act*;

**Définitions**

**2.** (1) Les définitions qui suivent s'appliquent à la présente loi.

« Conseil »
"Commission"

« Conseil » Le Conseil institué par la *Loi sur le Conseil de la radiodiffusion et des télécommunications canadiennes*.

« émission »
"program"

« émission » Les sons ou les images — ou leur combinaison — destinés à informer ou divertir, à l'exception des images, muettes ou non, consistant essentiellement en des lettres ou des chiffres.

« encodage »
"encrypted"

« encodage » Traitement électronique ou autre visant à empêcher la réception en clair.

« entreprise de distribution »
"distribution undertaking"
« entreprise de distribution »

Entreprise de réception de radiodiffusion pour retransmission, à l'aide d'ondes radioélectriques ou d'un autre moyen de télécommunication, en vue de sa

*"Corporation"*
« Société »

*"Corporation"* means the Canadian Broadcasting Corporation continued by section 36;

*"distribution undertaking"*
« entreprise de distribution »

*"distribution undertaking"* means an undertaking for the reception of broadcasting and the retransmission thereof by radio waves or other means of telecommunication to more than one permanent or temporary residence or dwelling unit or to another such undertaking;

*"encrypted"*
« encodage »

*"encrypted"* means treated electronically or otherwise for the purpose of preventing intelligible reception;

*"licence"*
« licence »

*"licence"* means a licence to carry on a broadcasting undertaking issued by the Commission under this Act;

*"Minister"*
« ministre »

*"Minister"* means such member of the Queen's Privy Council for Canada as is designated by the Governor in Council as the Minister for the purposes of this Act;

*"network"*
« réseau »

*"network"* includes any operation where control over all or any part of the programs or program schedules of one or more

réception dans plusieurs résidences permanentes ou temporaires ou locaux d'habitation, ou en vue de sa réception par une autre entreprise semblable.

*« entreprise de programmation »*
"programming undertaking"

*« entreprise de programmation »*
Entreprise de transmission d'émissions soit directement à l'aide d'ondes radioélectriques ou d'un autre moyen de télécommunication, soit par l'intermédiaire d'une entreprise de distribution, en vue de leur réception par le public à l'aide d'un récepteur.

*« entreprise de radiodiffusion »*
"broadcasting undertaking"

*« entreprise de radiodiffusion »*
S'entend notamment d'une entreprise de distribution ou de programmation, ou d'un réseau.

*«exploitation temporaire d'un réseau»*
"temporary network operation"

*« exploitation temporaire d'un réseau »* Exploitation d'un réseau en vue d'une certaine émission ou série d'émissions couvrant une période maximale de soixante jours.

*« licence »*
"licence"

*« licence »* Licence d'exploitation d'une entreprise de radiodiffusion, délivrée par le Conseil aux termes de la présente loi.

*« ministre »*
"Minister"

*« ministre »* Le membre du Conseil

2012 FC 748 (CanLII)

3

broadcasting undertakings is delegated to another undertaking or person;

*"program"*
« émission »

*"program"* means sounds or visual images, or a combination of sounds and visual images, that are intended to inform, enlighten or entertain, but does not include visual images, whether or not combined with sounds, that consist predominantly of alphanumeric text;

*"programming undertaking"*
« entreprise de programmation »

*"programming undertaking"* means an undertaking for the transmission of programs, either directly by radio waves or other means of telecommunication or indirectly through a distribution undertaking, for reception by the public by means of broadcasting receiving apparatus;

*"radio waves"*
« ondes radioélectriques »

*"radio waves"* means electromagnetic waves of frequencies lower than 3 000 GHz that are propagated in space without artificial guide;

*"temporary network operation"*
« exploitation temporaire d'un réseau »

*"temporary network operation"* means a network operation with respect to a particular program or a series of programs that extends over a period not exceeding sixty days.

privé de la Reine pour le Canada chargé par le gouverneur en conseil de l'application de la présente loi.

« *ondes radioélectriques* »
'radio waves"

« *ondes radioélectriques* » Ondes électromagnétiques de fréquences inférieures à 3 000 GHz transmises dans l'espace sans guide artificiel.

« *radiodiffusion* »
"broadcasting"

« *radiodiffusion* » Transmission, à l'aide d'ondes radioélectriques ou de tout autre moyen de télécommunication, d'émissions encodées ou non et destinées à être reçues par le public à l'aide d'un récepteur, à l'exception de celle qui est destinée à la présentation dans un lieu public seulement.

« *récepteur* »
"broadcasting receiving apparatus"

« *récepteur* » Appareil ou ensemble d'appareils conçu pour la réception de radiodiffusion ou pouvant servir à cette fin.

« *réseau* »
"network"

« *réseau* » Est assimilée à un réseau toute exploitation où le contrôle de tout ou partie des émissions ou de la programmation d'une ou plusieurs entreprises de radiodiffusion est délégué à une autre entreprise ou personne.

« *Société* »
"Corporation"

2012 FC 748 (CanLII)

2012 FC 748 (CanLII)

« *Société* » La Société Radio-Canada, visée à l'article 36.

**Meaning of "other means of telecommunication"**

**Moyen de telecommunication**

(2) For the purposes of this Act, *"other means of telecommunication"* means any wire, cable, radio, optical or other electromagnetic system, or any similar technical system.

(2) Pour l'application de la présente loi, sont inclus dans les moyens de télécommunication les systèmes électromagnétiques — notamment les fils, les câbles et les systèmes radio ou optiques — , ainsi que les autres procédés techniques semblables.

**Interpretation**

**Interprétation**

(3) This Act shall be construed and applied in a manner that is consistent with the freedom of expression and journalistic, creative and programming independence enjoyed by broadcasting undertakings.

(3) L'interprétation et l'application de la présente loi doivent se faire de manière compatible avec la liberté d'expression et l'indépendance, en matière de journalisme, de création et de programmation, dont jouissent les entreprises de radiodiffusion.

***Broadcasting Policy for Canada***

***Politique canadienne de radiodiffusion***

**Declaration**

**Déclaration**

**3.** (1) It is hereby declared as the broadcasting policy for Canada that

**3.** (1) Il est déclaré que, dans le cadre de la politique canadienne de radiodiffusion :

(*a*) the Canadian broadcasting system shall be effectively owned and controlled by Canadians;

*a*) le système canadien de radiodiffusion doit être, effectivement, la propriété des Canadiens et sous leur contrôle;

(*b*) the Canadian broadcasting system, operating primarily in the English and French languages and comprising public, private and community elements, makes use of radio frequencies that are public property and provides, through its

*b*) le système canadien de radiodiffusion, composé d'éléments publics, privés et communautaires, utilise des fréquences qui sont du domaine public et offre, par sa

5

programming, a public service essential to the maintenance and enhancement of national identity and cultural sovereignty;

(*c*) English and French language broadcasting, while sharing common aspects, operate under different conditions and may have different requirements;

(*d*) the Canadian broadcasting system should

(i) serve to safeguard, enrich and strengthen the cultural, political, social and economic fabric of Canada,

(ii) encourage the development of Canadian expression by providing a wide range of programming that reflects Canadian attitudes, opinions, ideas, values and artistic creativity, by displaying Canadian talent in entertainment programming and by offering information and analysis concerning Canada and other countries from a Canadian point of view,

(iii) through its programming and the employment opportunities arising out of its operations, serve the needs and interests, and reflect the circumstances and aspirations, of Canadian men, women and children, including equal

programmation essentiellement en français et en anglais, un service public essentiel pour le maintien et la valorisation de l'identité nationale et de la souveraineté culturelle;

*c*) les radiodiffusions de langues française et anglaise, malgré certains points communs, diffèrent quant à leurs conditions d'exploitation et, éventuellement, quant à leurs besoins;

*d*) le système canadien de radiodiffusion devrait :

(i) servir à sauvegarder, enrichir et renforcer la structure culturelle, politique, sociale et économique du Canada,

(ii) favoriser l'épanouissement de l'expression canadienne en proposant une très large programmation qui traduise des attitudes, des opinions, des idées, des valeurs et une créativité artistique canadiennes, qui mette en valeur des divertissements faisant appel à des artistes canadiens et qui fournisse de l'information et de l'analyse concernant le Canada et l'étranger considérés d'un point de vue canadien,

(iii) par sa programmation et par les chances que son fonctionnement offre en matière d'emploi, répondre aux besoins et aux intérêts, et refléter la condition et les

2012 FC 748 (CanLII)

6

rights, the linguistic duality and multicultural and multiracial nature of Canadian society and the special place of aboriginal peoples within that society, and

aspirations, des hommes, des femmes et des enfants canadiens, notamment l'égalité sur le plan des droits, la dualité linguistique et le caractère multiculturel et multiracial de la société canadienne ainsi que la place particulière qu'y occupent les peuples autochtones,

(iv) be readily adaptable to scientific and technological change;

(iv) demeurer aisément adaptable aux progrès scientifiques et techniques;

(*e*) each element of the Canadian broadcasting system shall contribute in an appropriate manner to the creation and presentation of Canadian programming;

*e*) tous les éléments du système doivent contribuer, de la manière qui convient, à la création et la présentation d'une programmation canadienne;

(*f*) each broadcasting undertaking shall make maximum use, and in no case less than predominant use, of Canadian creative and other resources in the creation and presentation of programming, unless the nature of the service provided by the undertaking, such as specialized content or format or the use of languages other than French and English, renders that use impracticable, in which case the undertaking shall make the greatest practicable use of those resources;

*f*) toutes les entreprises de radiodiffusion sont tenues de faire appel au maximum, et dans tous les cas au moins de manière prédominante, aux ressources — créatrices et autres — canadiennes pour la création et la présentation de leur programmation à moins qu'une telle pratique ne s'avère difficilement réalisable en raison de la nature du service — notamment, son contenu ou format spécialisé ou l'utilisation qui y est faite de langues autres que le français ou l'anglais — qu'elles fournissent, auquel cas elles devront faire appel aux ressources en question dans toute la mesure du possible;

(*g*) the programming originated by broadcasting undertakings should be of high standard;

*g*) la programmation offerte par les entreprises de radiodiffusion devrait être de haute qualité;

2012 FC 748 (CanLII)

(*h*) all persons who are licensed to carry on broadcasting undertakings have a responsibility for the programs they broadcast;

(*i*) the programming provided by the Canadian broadcasting system should

    (i) be varied and comprehensive, providing a balance of information, enlightenment and entertainment for men, women and children of all ages, interests and tastes,

    (ii) be drawn from local, regional, national and international sources,

    (iii) include educational and community programs,

    (iv) provide a reasonable opportunity for the public to be exposed to the expression of differing views on matters of public concern, and

    (v) include a significant contribution from the Canadian independent production sector;

(*j*) educational programming, particularly where provided through the facilities of an independent educational authority, is an integral part of the Canadian broadcasting system;

(*k*) a range of broadcasting services in English and in French shall be extended to all Canadians as resources become available;

*h*) les titulaires de licences d'exploitation d'entreprises de radiodiffusion assument la responsabilité de leurs émissions;

*i*) la programmation offerte par le système canadien de radiodiffusion devrait à la fois :

    (i) être variée et aussi large que possible en offrant à l'intention des hommes, femmes et enfants de tous âges, intérêts et goûts une programmation équilibrée qui renseigne, éclaire et divertit,

    (ii) puiser aux sources locales, régionales, nationales et internationales,

    (iii) renfermer des émissions éducatives et ommunautaires,

    (iv) dans la mesure du possible, offrir au public l'occasion de prendre connaissance d'opinions divergentes sur des sujets qui l'intéressent,

    (v) faire appel de façon notable aux producteurs canadiens indépendants;

*j*) la programmation éducative, notamment celle qui est fournie au moyen d'installations d'un organisme éducatif indépendant, fait partie intégrante du système canadien de radiodiffusion;

*k*) une gamme de services de radiodiffusion en français et en anglais doit être progressivement offerte à tous les Canadiens, au

2012 FC 748 (CanLII)

2012 FC 748 (CanLII)

(*l*) the Canadian Broadcasting Corporation, as the national public broadcaster, should provide radio and television services incorporating a wide range of programming that informs, enlightens and entertains;

(*m*) the programming provided by the Corporation should

    (i) be predominantly and distinctively Canadian,

    (ii) reflect Canada and its regions to national and regional audiences, while serving the special needs of those regions,

    (iii) actively contribute to the flow and exchange of cultural expression,

    (iv) be in English and in French, reflecting the different needs and circumstances of each official language community, including the particular needs and circumstances of English and French linguistic minorities,

    (v) strive to be of equivalent quality in English and in French,

    (vi) contribute to shared national consciousness and identity,

fur et à mesure de la disponibilité des moyens;

*l*) la Société Radio-Canada, à titre de radiodiffuseur public national, devrait offrir des services de radio et de télévision qui comportent une très large programmation qui renseigne, éclaire et divertit;

*m*) la programmation de la Société devrait à la fois :

    (i) être principalement et typiquement canadienne,

    (ii) refléter la globalité canadienne et rendre compte de la diversité régionale du pays, tant au plan national qu'au niveau régional, tout en répondant aux besoins particuliers des régions,

    (iii) contribuer activement à l'expression culturelle et à l'échange des diverses formes qu'elle peut prendre,

    (iv) être offerte en français et en anglais, de manière à refléter la situation et les besoins particuliers des deux collectivités de langue officielle, y compris ceux des minorités de l'une ou l'autre langue,

    (v) chercher à être de qualité équivalente en français et en anglais,

    (vi) contribuer au partage d'une conscience et d'une identité nationales,

2012 FC 748 (CanLII)

(vii) be made available throughout Canada by the most appropriate and efficient means and as resources become available for the purpose, and

(viii) reflect the multicultural and multiracial nature of Canada;

(*n*) where any conflict arises between the objectives of the Corporation set out in paragraphs (*l*) and (*m*) and the interests of any other broadcasting undertaking of the Canadian broadcasting system, it shall be resolved in the public interest, and where the public interest would be equally served by resolving the conflict in favour of either, it shall be resolved in favour of the objectives set out in paragraphs (*l*) and (*m*);

(*o*) programming that reflects the aboriginal cultures of Canada should be provided within the Canadian broadcasting system as resources become available for the purpose;

(*p*) programming accessible by disabled persons should be provided within the Canadian broadcasting system as resources become available for the purpose;

(*q*) without limiting any obligation of a broadcasting undertaking to provide the programming contemplated by paragraph (*i*), alternative television programming services in English and in French should be provided where necessary to ensure that the full range of programming contemplated by that paragraph is made available through the Canadian broadcasting system;

(vii) être offerte partout au Canada de la manière la plus adéquate et efficace, au fur et à mesure de la disponibilité des moyens,

(viii) refléter le caractère multiculturel et multiracial du Canada;

*n*) les conflits entre les objectifs de la Société énumérés aux alinéas *l*) et *m*) et les intérêts de toute autre entreprise de radiodiffusion du système canadien de radiodiffusion doivent être résolus dans le sens de l'intérêt public ou, si l'intérêt public est également assuré, en faveur des objectifs énumérés aux alinéas *l*) et *m*);

*o*) le système canadien de radiodiffusion devrait offrir une programmation qui reflète les cultures autochtones du Canada, au fur et à mesure de la disponibilité des moyens;

*p*) le système devrait offrir une programmation adaptée aux besoins des personnes atteintes d'une déficience, au fur et à mesure de la disponibilité des moyens;

*q*) sans qu'il soit porté atteinte à l'obligation qu'ont les entreprises de radiodiffusion de fournir la programmation visée à l'alinéa *i*), des services de programmation télévisée complémentaires, en anglais et en français, devraient au besoin être offerts afin que le système canadien de radiodiffusion puisse se

2012 FC 748 (CanLII)

(*r*) the programming provided by alternative television programming services should

    (i) be innovative and be complementary to the programming provided for mass audiences,

    (ii) cater to tastes and interests not adequately provided for by the programming provided for mass audiences, and include programming devoted to culture and the arts,

    (iii) reflect Canada's regions and multicultural nature,

    (iv) as far as possible, be acquired rather than produced by those services, and

    (v) be made available throughout Canada by the most cost-efficient means;

(*s*) private networks and programming undertakings should, to an extent consistent with the financial and other resources available to them,

    (i) contribute significantly to the creation and presentation of Canadian programming, and

    (ii) be responsive to the evolving demands of the public; and

conformer à cet alinéa;

*r*) la programmation offerte par ces services devrait à la fois :

    (i) être innovatrice et compléter celle qui est offerte au grand public,

    (ii) répondre aux intérêts et goûts de ceux que la programmation offerte au grand public laisse insatisfaits et comprendre des émissions consacrées aux arts et à la culture,

    (iii) refléter le caractère multiculturel du Canada et rendre compte de sa diversité régionale,

    (iv) comporter, autant que possible, des acquisitions plutôt que des productions propres,

    (v) être offerte partout au Canada de la manière la plus rentable, compte tenu de la qualité;

*s*) les réseaux et les entreprises de programmation privés devraient, dans la mesure où leurs ressources financières et autres le leur permettent, contribuer de façon notable à la création et à la présentation d'une programmation canadienne tout en demeurant réceptifs à l'évolution de la demande du public;

(*t*) distribution undertakings

    (i) should give priority to the carriage of Canadian programming services and, in particular, to the carriage of local Canadian stations,

    (ii) should provide efficient delivery of programming at affordable rates, using the most effective technologies available at reasonable cost,

    (iii) should, where programming services are supplied to them by broadcasting undertakings pursuant to contractual arrangements, provide reasonable terms for the carriage, packaging and retailing of those programming services, and

    (iv) may, where the Commission considers it appropriate, originate programming, including local programming, on such terms as are conducive to the achievement of the objectives of the broadcasting policy set out in this subsection, and in particular provide access for underserved linguistic and cultural minority communities.

**Further declaration**

(2) It is further declared that the Canadian broadcasting system constitutes a single system and that the objectives of the broadcasting policy set out in subsection (1)

*t*) les entreprises de distribution :

    (i) devraient donner priorité à la fourniture des services de programmation canadienne, et ce en particulier par les stations locales canadiennes,

    (ii) devraient assurer efficacement, à l'aide des techniques les plus efficientes, la fourniture de la programmation à des tarifs abordables,

    (iii) devraient offrir des conditions acceptables relativement à la fourniture, la combinaison et la vente des services de programmation qui leur sont fournis, aux termes d'un contrat, par les entreprises de radiodiffusion,

    (iv) peuvent, si le Conseil le juge opportun, créer une programmation — locale ou autre — de nature à favoriser la réalisation des objectifs de la politique canadienne de radiodiffusion, et en particulier à permettre aux minorités linguistiques et culturelles mal desservies d'avoir accès aux services de radiodiffusion.

**Déclaration**

(2) Il est déclaré en outre que le système canadien de radiodiffusion constitue un système unique et que la meilleure façon d'atteindre les

2012 FC 748 (CanLII)

2012 FC 748 (CanLII)

can best be achieved by providing for the regulation and supervision of the Canadian broadcasting system by a single independent public authority.

objectifs de la politique canadienne de radiodiffusion consiste à confier la réglementation et la surveillance du système canadien de radiodiffusion à un seul organisme public autonome.

**Sections 2, 3, subsection 13(4), section 27 and subsections 34(1) and 35(2) of the *Copyright Act*, RSC, 1985, c C-42, read as follows:**

**Les articles 2, 3, le paragraphe 13(4), l'article 27 et les paragraphes 34(1) et 35(2) de la Loi sur le droit d'auteur RSC, 1985, c C-42 se lisent comme suit:**

### Definitions

2. In this Act,

*"architectural work"*
« oeuvre architecturale »

*"architectural work"* means any building or structure or any model of a building or structure;

*"architectural work of art"*
*"architectural work of art"* [Repealed, 1993, c. 44, s. 53]

*"artistic work"*
« oeuvre artistique »

*"artistic work"* includes paintings, drawings, maps, charts, plans, photographs, engravings, sculptures, works of artistic craftsmanship, architectural works, and compilations of artistic works;

*"Berne Convention country"*
« pays partie à la Convention de Berne »

*"Berne Convention country"* means a country that is a party to the Convention for the Protection of Literary and Artistic Works concluded at Berne on September 9, 1886, or

### Définitions

2. Les définitions qui suivent s'appliquent à la présente loi.

« accessible sur le marché »
"commercially available"

« accessible sur le marché »
S'entend, en ce qui concerne une oeuvre ou de tout autre objet du droit d'auteur

a) qu'il est possible de se procurer, au Canada, à un prix et dans un délai raisonnables, et de trouver moyennant des efforts raisonnables;

b) pour lequel il est possible d'obtenir, à un prix et dans un délai raisonnables et moyennant des efforts raisonnables, une licence octroyée par une société de gestion pour la reproduction, l'exécution en public ou la communication au public par télécommunication, selon le cas.

« appareil récepteur »

any one of its revisions, including the Paris Act of 1971;

*"Board"*
« Commission »

*"Board"* means the Copyright Board established by subsection 66(1);

*"book"*
« livre »

*"book"* means a volume or a part or division of a volume, in printed form, but does not include

    (*a*) a pamphlet,

    (*b*) a newspaper, review, magazine or other periodical,

    (*c*) a map, chart, plan or sheet music where the map, chart, plan or sheet music is separately published, and

    (*d*) an instruction or repair manual that accompanies a product or that is supplied as an accessory to a service;

*"broadcaster"*
« radiodiffuseur »

*"broadcaster"* means a body that, in the course of operating a broadcasting undertaking, broadcasts a communication signal in accordance with the law of the country in which the broadcasting undertaking is carried on, but excludes a body whose primary activity in relation to communication signals is their retransmission;

*"choreographic work"*
« oeuvre chorégraphique »

*"choreographic work"* includes any work of

2012 FC 748 (CanLII)

*« appareil récepteur »*[Abrogée, 1993, ch. 44, art. 79]

*« artiste interprète »*

*« artiste interprète »*[Abrogée, 1997, ch. 24, art. 1]

*« artiste-interprète »*
French version only

*« artiste-interprète »* Tout artiste-interprète ou exécutant.

*« bibliothèque, musée ou service d'archives »*
"library, archive or museum"

*« bibliothèque, musée ou service d'archives »* S'entend :

    *a*) d'un établissement doté ou non de la personnalité morale qui :

        (i) d'une part, n'est pas constitué ou administré pour réaliser des profits, ni ne fait partie d'un organisme constitué ou administré pour réaliser des profits, ni n'est administré ou contrôlé directement ou indirectement par un tel organisme,

        (ii) d'autre part, rassemble et gère des collections de documents ou d'objets qui sont accessibles au public ou aux chercheurs;

    *b*) de tout autre établissement à but non lucratif visé par règlement.

2012 FC 748 (CanLII)

choreography, whether or not it has any story line;

*"cinematograph"*

*"cinematograph"* [Repealed, 1997, c. 24, s. 1]

*"cinematographic work"*
« oeuvre cinématographique »

*"cinematographic work"* includes any work expressed by any process analogous to cinematography, whether or not accompanied by a soundtrack;

*"collective society"*
« société de gestion »

*"collective society"* means a society, association or corporation that carries on the business of collective administration of copyright or of the remuneration right conferred by section 19 or 81 for the benefit of those who, by assignment, grant of licence, appointment of it as their agent or otherwise, authorize it to act on their behalf in relation to that collective administration, and

    (*a*) operates a licensing scheme, applicable in relation to a repertoire of works, performer's performances, sound recordings or communication signals of more than one author, performer, sound recording maker or broadcaster, pursuant to which the society, association or corporation sets out classes of uses that it agrees to authorize under this Act, and the royalties and terms and conditions on which it agrees to authorize those classes of uses, or

    (*b*) carries on the business of collecting and distributing royalties or levies payable pursuant to this Act;

« Commission »
"Board"

« Commission » La Commission du droit d'auteur constituée au titre du paragraphe 66(1).

« compilation »
"compilation"

« compilation » Les oeuvres résultant du choix ou de l'arrangement de tout ou partie d'oeuvres littéraires, dramatiques, musicales ou artistiques ou de données.

« conférence »
"lecture"

« conférence » Sont assimilés à une conférence les allocutions, discours et sermons.

« contrefaçon »
"infringing"

« contrefaçon »

    *a*) À l'égard d'une oeuvre sur laquelle existe un droit d'auteur, toute reproduction, y compris l'imitation déguisée, qui a été faite contrairement à la présente loi ou qui a fait l'objet d'un acte contraire à la présente loi;

    *b*) à l'égard d'une prestation sur laquelle existe un droit d'auteur, toute fixation ou reproduction de celle-ci qui a été faite contrairement à la présente loi ou qui a fait l'objet d'un acte contraire à la présente loi;

    *c*) à l'égard d'un enregistrement

*"collective work"*
« recueil »

*"collective work"* means
>    (*a*) an encyclopaedia, dictionary, year book or similar work,

>    (*b*) a newspaper, review, magazine or similar periodical, and

>    (*c*) any work written in distinct parts by different authors, or in which works or parts of works of different authors are incorporated;

*"commercially available"*
« accessible sur le marché »

*"commercially available"* means, in relation to a work or other subject-matter,

>    (*a*) available on the Canadian market within a reasonable time and for a reasonable price and may be located with reasonable effort, or

>    (*b*) for which a licence to reproduce, perform in public or communicate to the public by telecommunication is available from a collective society within a reasonable time and for a reasonable price and may be located with reasonable effort;

*"communication signal"*
« signal de communication »

*"communication signal"* means radio waves transmitted through space without any artificial guide, for reception by the public;

*"compilation"*
« compilation »

*"compilation"* means

sonore sur lequel existe un droit d'auteur, toute reproduction de celle-ci qui a été faite contrairement à la présente loi ou qui a fait l'objet d'un acte contraire à la présente loi;

*d*) à l'égard d'un signal de communication sur lequel existe un droit d'auteur, toute fixation ou reproduction de la fixation qui a été faite contrairement à la présente loi ou qui a fait l'objet d'un acte contraire à la présente loi.

La présente définition exclut la reproduction — autre que celle visée par l'alinéa 27(2)*e*) et l'article 27.1 — faite avec le consentement du titulaire du droit d'auteur dans le pays de production.

« débit »

« débit »[Abrogée, 1997, ch. 24, art. 1]

« déficience perceptuelle »
"perceptual disability"

« déficience perceptuelle »
Déficience qui empêche la lecture ou l'écoute d'une oeuvre littéraire, dramatique, musicale ou artistique sur le support original ou la rend difficile, en raison notamment :

>    *a*) de la privation en tout ou en grande partie du sens de l'ouïe ou de la vue ou de l'incapacité d'orienter le regard;

>    *b*) de l'incapacité de tenir ou de manipuler un livre;

2012 FC 748 (CanLII)

(*a*) a work resulting from the selection or arrangement of literary, dramatic, musical or artistic works or of parts thereof, or

(*b*) a work resulting from the selection or arrangement of data;

*"computer program"*
« programme d'ordinateur »

*"computer program"* means a set of instructions or statements, expressed, fixed, embodied or stored in any manner, that is to be used directly or indirectly in a computer in order to bring about a specific result;

*"copyright"*
« droit d'auteur »

*"copyright"* means the rights described in

(*a*) section 3, in the case of a work,

(*b*) sections 15 and 26, in the case of a performer's performance,

(*c*) section 18, in the case of a sound recording, or

(*d*) section 21, in the case of a communication signal;

*"country"*
« pays »

*"country"* includes any territory;

*"defendant"*
Version anglaise seulement

*"defendant"* includes a respondent to an application;

*"delivery"*

*c*) d'une insuffisance relative à la compréhension.

*« distributeur exclusif »*
"exclusive distributor"

*« distributeur exclusif »* S'entend, en ce qui concerne un livre, de toute personne qui remplit les conditions suivantes :

*a*) le titulaire du droit d'auteur sur le livre au Canada ou le titulaire d'une licence exclusive au Canada s'y rapportant lui a accordé, avant ou après l'entrée en vigueur de la présente définition, par écrit, la qualité d'unique distributeur pour tout ou partie du Canada ou d'unique distributeur pour un secteur du marché pour tout ou partie du Canada;

*b*) elle répond aux critères fixés par règlement pris en vertu de l'article 2.6.

Il est entendu qu'une personne ne peut être distributeur exclusif au sens de la présente définition si aucun règlement n'est pris en vertu de l'article 2.6.

*« droit d'auteur »*
"copyright"

*« droit d'auteur »* S'entend du droit visé :

*a*) dans le cas d'une oeuvre, à l'article 3;

*b*) dans le cas d'une prestation, aux articles 15 et 26;

2012 FC 748 (CanLII)

*"delivery"* [Repealed, 1997, c. 24, s. 1]

*"dramatic work"*
« oeuvre dramatique »

*"dramatic work"* includes

(*a*) any piece for recitation, choreographic work or mime, the scenic arrangement or acting form of which is fixed in writing or otherwise,

(*b*) any cinematographic work, and

(*c*) any compilation of dramatic works;

*"educational institution"*
« établissement d'enseignement »

*"educational institution"* means

(*a*) a non-profit institution licensed or recognized by or under an Act of Parliament or the legislature of a province to provide pre-school, elementary, secondary or post-secondary education,

(*b*) a non-profit institution that is directed or controlled by a board of education regulated by or under an Act of the legislature of a province and that provides continuing, professional or vocational education or training,

(*c*) a department or agency of any order of government, or any non-profit body, that controls or supervises education or training referred to in paragraph (*a*) or (*b*), or

(*d*) any other non-profit institution prescribed by regulation;

*"engravings"*
« gravure »

*c*) dans le cas d'un enregistrement sonore, à l'article 18;

*d*) dans le cas d'un signal de communication, à l'article 21.

« *droits moraux* »
"moral rights"

« *droits moraux* » Les droits visés au paragraphe 14.1(1).

« *enregistrement sonore* »
"sound recording"

« *enregistrement sonore* »
Enregistrement constitué de sons provenant ou non de l'exécution d'une oeuvre et fixés sur un support matériel quelconque; est exclue de la présente définition la bande sonore d'une oeuvre cinématographique lorsqu'elle accompagne celle-ci.

« *établissement d'enseignement* »
"educational institution"

« *établissement d'enseignement* » :

*a*) Établissement sans but lucratif agréé aux termes des lois fédérales ou provinciales pour dispenser de l'enseignement aux niveaux préscolaire, élémentaire, secondaire ou postsecondaire, ou reconnu comme tel;

*b*) établissement sans but lucratif placé sous l'autorité d'un conseil scolaire régi par une loi provinciale et qui dispense des cours d'éducation ou de formation permanente,

2012 FC 748 (CanLII)

*"engravings"* includes etchings, lithographs, woodcuts, prints and other similar works, not being photographs;

*"every original literary, dramatic, musical and artistic work"*
« toute oeuvre littéraire, dramatique, musicale ou artistique originale »

*"every original literary, dramatic, musical and artistic work"* includes every original production in the literary, scientific or artistic domain, whatever may be the mode or form of its expression, such as compilations, books, pamphlets and other writings, lectures, dramatic or dramatico-musical works, musical works, translations, illustrations, sketches and plastic works relative to geography, topography, architecture or science;

*"exclusive distributor"*
« distributeur exclusif »

*"exclusive distributor"* means, in relation to a book, a person who

> (*a*) has, before or after the coming into force of this definition, been appointed in writing, by the owner or exclusive licensee of the copyright in the book in Canada, as

>> (i) the only distributor of the book in Canada or any part of Canada, or

>> (ii) the only distributor of the book in Canada or any part of Canada in respect of a particular sector of the market, and

> (*b*) meets the criteria established by regulations made under section 2.6,

and, for greater certainty, if there are no

technique ou professionnelle;

*c*) ministère ou organisme, quel que soit l'ordre de gouvernement, ou entité sans but lucratif qui exerce une autorité sur l'enseignement et la formation visés aux alinéas *a*) et *b*);

*d*) tout autre établissement sans but lucratif visé par règlement.

« gravure »
"engravings"

« gravure » Sont assimilées à une gravure les gravures à l'eau-forte, les lithographies, les gravures sur bois, les estampes et autres oeuvres similaires, à l'exclusion des photographies.

« livre »
"book"

« livre » Tout volume ou toute partie ou division d'un volume présentés sous forme imprimée, à l'exclusion :

*a*) des brochures;

*b*) des journaux, revues, magazines et autres périodiques;

*c*) des feuilles de musique, cartes, graphiques ou plans, s'ils sont publiés séparément;

*d*) des manuels d'instruction ou d'entretien qui accompagnent un produit ou sont fournis avec des services.

« locaux »

2012 FC 748 (CanLII)

regulations made under section 2.6, then no person qualifies under this definition as an "exclusive distributor";

*"Her Majesty's Realms and Territories"*
*"Her Majesty's Realms and Territories"*[Repealed, 1997, c. 24, s. 1]

*"infringing"*
« contrefaçon »

*"infringing"* means

> (*a*) in relation to a work in which copyright subsists, any copy, including any colourable imitation, made or dealt with in contravention of this Act,

> (*b*) in relation to a performer's performance in respect of which copyright subsists, any fixation or copy of a fixation of it made or dealt with in contravention of this Act,

> (*c*) in relation to a sound recording in respect of which copyright subsists, any copy of it made or dealt with in contravention of this Act, or

> (*d*) in relation to a communication signal in respect of which copyright subsists, any fixation or copy of a fixation of it made or dealt with in contravention of this Act.

The definition includes a copy that is imported in the circumstances set out in paragraph 27(2)(*e*) and section 27.1 but does not otherwise include a copy made with the consent of the owner of the copyright in the country where the copy was made;

*"lecture"*
« conférence »

*"lecture"* includes address, speech and

"premises"

*« locaux »* S'il s'agit d'un établissement d'enseignement, lieux où celui-ci dispense l'enseignement ou la formation visés à la définition de ce terme ou exerce son autorité sur eux.

*« membre de l'OMC »*
"WTO Member"

*« membre de l'OMC »* Membre de l'Organisation mondiale du commerce au sens du paragraphe 2(1) de la *Loi de mise en oeuvre de l'Accord sur l'Organisation mondiale du commerce*.

*« ministre »*
"Minister"

*« ministre »* Sauf à l'article 44.1, le ministre de l'Industrie.

*« oeuvre »*
"work"

*« oeuvre »* Est assimilé à une oeuvre le titre de l'oeuvre lorsque celui-ci est original et distinctif.

*« oeuvre architecturale »*
"architectural work"

*« oeuvre architecturale »* Tout bâtiment ou édifice ou tout modèle ou maquette de bâtiment ou d'édifice.

*« oeuvre artistique »*
"artistic work"

*« oeuvre artistique »* Sont compris parmi les oeuvres artistiques les peintures, dessins, sculptures,

sermon;

*"legal representatives"*
« représentants légaux »

*"legal representatives"* includes heirs, executors, administrators, successors and assigns, or agents or attorneys who are thereunto duly authorized in writing;

*"library, archive or museum"*
«bibliothèque, musée ou service d'archives»

*"library, archive or museum"* means

(*a*) an institution, whether or not incorporated, that is not established or conducted for profit or that does not form a part of, or is not administered or directly or indirectly controlled by, a body that is established or conducted for profit, in which is held and maintained a collection of documents and other materials that is open to the public or to researchers, or

(*b*) any other non-profit institution prescribed by regulation;

*"literary work"*
« oeuvre littéraire »

*"literary work"* includes tables, computer programs, and compilations of literary works;

*"maker"*
« producteur »

*"maker"* means

(*a*) in relation to a cinematographic work, the person by whom the arrangements necessary for the making of the work are undertaken, or

oeuvres architecturales, gravures ou photographies, les oeuvres artistiques dues à des artisans ainsi que les graphiques, cartes, plans et compilations d'oeuvres artistiques.

« *oeuvre chorégraphique* »
"choreographic work"

« *oeuvre chorégraphique* » S'entend de toute chorégraphie, que l'oeuvre ait ou non un sujet.

« *oeuvre cinématographique* »
"cinematographic work"

« *oeuvre cinématographique* » Y est assimilée toute oeuvre exprimée par un procédé analogue à la cinématographie, qu'elle soit accompagnée ou non d'une bande sonore.

« *oeuvre créée en collaboration* »
"work of joint authorship"

« *oeuvre créée en collaboration* » Oeuvre exécutée par la collaboration de deux ou plusieurs auteurs, et dans laquelle la part créée par l'un n'est pas distincte de celle créée par l'autre ou les autres.

« *oeuvre d'art architecturale* »

« *oeuvre d'art architecturale* »[Abrogée, 1993, ch. 44, art. 53]

« *oeuvre de sculpture* »
« *oeuvre de sculpture* »[Abrogée, 1997, ch. 24, art. 1]

« *oeuvre dramatique* »
"dramatic work"

« *oeuvre dramatique* » Y sont

2012 FC 748 (CanLII)

2012 FC 748 (CanLII)

(*b*) in relation to a sound recording, the person by whom the arrangements necessary for the first fixation of the sounds are undertaken;

*"Minister"*
« ministre »

*"Minister"*, except in section 44.1, means the Minister of Industry;

*"moral rights"*
« droits moraux »

*"moral rights"* means the rights described in subsection 14.1(1);

*"musical work"*
« oeuvre musicale »

*"musical work"* means any work of music or musical composition, with or without words, and includes any compilation thereof;

*"perceptual disability"*
« déficience perceptuelle »

*"perceptual disability"* means a disability that prevents or inhibits a person from reading or hearing a literary, musical, dramatic or artistic work in its original format, and includes such a disability resulting from

(*a*) severe or total impairment of sight or hearing or the inability to focus or move one's eyes,

(*b*) the inability to hold or manipulate a book, or

(*c*) an impairment relating to comprehension;

*"performance"*
« représentation » ou « exécution »

assimilées les pièces pouvant être récitées, les oeuvres chorégraphiques ou les pantomimes dont l'arrangement scénique ou la mise en scène est fixé par écrit ou autrement, les oeuvres cinématographiques et les compilations d'oeuvres dramatiques.

« oeuvre littéraire »
"literary work"

« oeuvre littéraire » Y sont assimilés les tableaux, les programmes d'ordinateur et les compilations d'oeuvres littéraires.

« oeuvre musicale »
"musical work"

« oeuvre musicale » Toute oeuvre ou toute composition musicale — avec ou sans paroles — et toute compilation de celles-ci.

« pays »
"country"

« pays » S'entend notamment d'un territoire.

« pays partie à la Convention de Berne »
"Berne Convention country"

« pays partie à la Convention de Berne » Pays partie à la Convention pour la protection des oeuvres littéraires et artistiques, conclue à Berne le 9 septembre 1886, ou à l'une de ses versions révisées, notamment celle de l'Acte de Paris de 1971.

« pays partie à la Convention de Rome »

*"performance"* means any acoustic or visual representation of a work, performer's performance, sound recording or communication signal, including a representation made by means of any mechanical instrument, radio receiving set or television receiving set;

*"performer's performance"*
« prestation »

*"performer's performance"* means any of the following when done by a performer:

(*a*) a performance of an artistic work, dramatic work or musical work, whether or not the work was previously fixed in any material form, and whether or not the work's term of copyright protection under this Act has expired,

(*b*) a recitation or reading of a literary work, whether or not the work's term of copyright protection under this Act has expired, or

(*c*) an improvisation of a dramatic work, musical work or literary work, whether or not the improvised work is based on a pre-existing work;

*"photograph"*
« photographie »

*"photograph"* includes photo-lithograph and any work expressed by any process analogous to photography;

*"plaintiff"*
Version anglaise seulement

*"plaintiff"* includes an applicant;

*"plate"*
« planche »

"Rome Convention country"

« *pays partie à la Convention de Rome* » Pays partie à la Convention internationale sur la protection des artistes interprètes ou exécutants, des producteurs d'enregistrements sonores et des organismes de radiodiffusion, conclue à Rome le 26 octobre 1961.

« *pays partie à la Convention universelle* »
"UCC country"

« *pays partie à la Convention universelle* » Pays partie à la Convention universelle sur le droit d'auteur, adoptée à Genève (Suisse) le 6 septembre 1952, ou dans sa version révisée à Paris (France) le 24 juillet 1971.

« *pays signataire* »
"treaty country"

« *pays signataire* » Pays partie à la Convention de Berne ou à la Convention universelle ou membre de l'OMC.

« *photographie* »
"photograph"

« *photographie* » Y sont assimilées les photolithographies et toute oeuvre exprimée par un procédé analogue à la photographie.

« *planche* »
"plate"

« *planche* » Sont assimilés à une planche toute planche stéréotypée ou autre, pierre, matrice, transposition et épreuve négative, et tout moule

2012 FC 748 (CanLII)

2012 FC 748 (CanLII)

*"plate"* includes

> (*a*) any stereotype or other plate, stone, block, mould, matrix, transfer or negative used or intended to be used for printing or reproducing copies of any work, and

> (*b*) any matrix or other appliance used or intended to be used for making or reproducing sound recordings, performer's performances or communication signals;

*"premises"*
« locaux »

*"premises"* means, in relation to an educational institution, a place where education or training referred to in the definition "educational institution" is provided, controlled or supervised by the educational institution;

*"receiving device"*
*"receiving device"*[Repealed, 1993, c. 44, s. 79]

*"Rome Convention country"*
« pays partie à la Convention de Rome »

*"Rome Convention country"* means a country that is a party to the International Convention for the Protection of Performers, Producers of Phonograms and Broadcasting Organisations, done at Rome on October 26, 1961;

*"sculpture"*
« sculpture »

*"sculpture"* includes a cast or model;

*"sound recording"*
« enregistrement sonore »

ou cliché, destinés à l'impression ou à la reproduction d'exemplaires d'une oeuvre, ainsi que toute matrice ou autre pièce destinées à la fabrication ou à la reproduction d'enregistrements sonores, de prestations ou de signaux de communication, selon le cas.

*« prestation »*
"performer's performance"

*« prestation »* Selon le cas, que l'oeuvre soit encore protégée ou non et qu'elle soit déjà fixée sous une forme matérielle quelconque ou non :

> *a*) l'exécution ou la représentation d'une oeuvre artistique, dramatique ou musicale par un artiste-interprète;

> *b*) la récitation ou la lecture d'une oeuvre littéraire par celui-ci;

> *c*) une improvisation dramatique, musicale ou littéraire par celui-ci, inspirée ou non d'une oeuvre préexistante.

*« producteur »*
"maker"

*« producteur »* La personne qui effectue les opérations nécessaires à la confection d'une oeuvre cinématographique, ou à la première fixation de sons dans le cas d'un enregistrement sonore.

*« programme d'ordinateur »*
"computer program"

*"sound recording"* means a recording, fixed in any material form, consisting of sounds, whether or not of a performance of a work, but excludes any soundtrack of a cinematographic work where it accompanies the cinematographic work;

*"telecommunication"*
« télécommunication »

*"telecommunication"* means any transmission of signs, signals, writing, images or sounds or intelligence of any nature by wire, radio, visual, optical or other electromagnetic system;

*"treaty country"*
« pays signataire »

*"treaty country"* means a Berne Convention country, UCC country or WTO Member;
*"UCC country"*

« pays partie à la Convention universelle »

*"UCC country"* means a country that is a party to the Universal Copyright Convention, adopted on September 6, 1952 in Geneva, Switzerland, or to that Convention as revised in Paris, France on July 24, 1971;

*"work"*
« oeuvre »

*"work"* includes the title thereof when such title is original and distinctive;

*"work of joint authorship"*
« oeuvre créée en collaboration »

*"work of joint authorship"* means a work produced by the collaboration of two or more authors in which the contribution of one author is not distinct from the contribution of the other author or authors;

« *programme d'ordinateur* »
Ensemble d'instructions ou d'énoncés destiné, quelle que soit la façon dont ils sont exprimés, fixés, incorporés ou emmagasinés, à être utilisé directement ou indirectement dans un ordinateur en vue d'un résultat particulier.

« *radiodiffuseur* »
"broadcaster"

« *radiodiffuseur* » Organisme qui, dans le cadre de l'exploitation d'une entreprise de radiodiffusion, émet un signal de communication en conformité avec les lois du pays où il exploite cette entreprise; est exclu de la présente définition l'organisme dont l'activité principale, liée au signal de communication, est la retransmission de celui-ci.

« *recueil* »
"collective work"
« *recueil* »

> *a)* Les encyclopédies, dictionnaires, annuaires ou oeuvres analogues;

> *b)* les journaux, revues, magazines ou autres publications périodiques;

> *c)* toute oeuvre composée, en parties distinctes, par différents auteurs ou dans laquelle sont incorporées des oeuvres ou parties d'oeuvres d'auteurs différents.

« *représentants légaux* »
"legal representatives"

« *représentants légaux* » Sont

*"work of sculpture"*

*"work of sculpture"*[Repealed, 1997, c. 24, s. 1]

*"WTO Member"*
« membre de l'OMC »

*"WTO Member"* means a Member of the World Trade Organization as defined in subsection 2(1) of the *World Trade Organization Agreement Implementation Act*.

**Compilations**

2.1 (1) A compilation containing two or more of the categories of literary, dramatic, musical or artistic works shall be deemed to be a compilation of the category making up the most substantial part of the compilation.

**Idem**

(2) The mere fact that a work is included in a compilation does not increase, decrease or otherwise affect the protection conferred by this Act in respect of the copyright in the work or the moral rights in respect of the work.

Definition of *"maker"*

2.11 For greater certainty, the arrangements referred to in paragraph (*b*) of the definition *"maker"* in section 2, as that term is used in section 19 and in the definition *"eligible maker"* in section 79, include arrangements for entering into contracts with performers, financial arrangements and technical arrangements required for the first fixation of the sounds for a sound recording.

Definition of *"publication"*

2.2 (1) For the purposes of this Act,

compris parmi les représentants légaux les héritiers, exécuteurs testamentaires, administrateurs, successeurs et ayants droit, ou les agents ou fondés de pouvoir régulièrement constitués par mandat écrit.

« représentation »
« représentation », « exécution » ou « audition »[Abrogée, 1997, ch. 24, art. 1]

« représentation » ou « exécution »
"performance"

« représentation » ou « exécution »
Toute exécution sonore ou toute représentation visuelle d'une oeuvre, d'une prestation, d'un enregistrement sonore ou d'un signal de communication, selon le cas, y compris l'exécution ou la représentation à l'aide d'un instrument mécanique, d'un appareil récepteur de radio ou d'un appareil récepteur de télévision.

« royaumes et territoires de Sa Majesté »

« royaumes et territoires de Sa Majesté »[Abrogée, 1997, ch. 24, art. 1]

« sculpture »
"sculpture"

« sculpture » Y sont assimilés les moules et les modèles.

« signal de communication »
"communication signal"

« signal de communication » Ondes radioélectriques diffusées dans

*"publication"* means

    (*a*) in relation to works,

        (i) making copies of a work available to the public,

        (ii) the construction of an architectural work, and

        (iii) the incorporation of an artistic work into an architectural work, and

    (*b*) in relation to sound recordings, making copies of a sound recording available to the public,

but does not include

    (*c*) the performance in public, or the communication to the public by telecommunication, of a literary, dramatic, musical or artistic work or a sound recording, or

    (*d*) the exhibition in public of an artistic work.

**Issue of photographs and engravings**

(2) For the purpose of subsection (1), the issue of photographs and engravings of sculptures and architectural works is not deemed to be publication of those works.

**Where no consent of copyright owner**

(3) For the purposes of this Act, other than in respect of infringement of copyright, a work or other subject-matter is not deemed to be published or performed in public or communicated to the public by telecommunication if that act is done without the consent of the owner of the copyright.

**Unpublished works**

l'espace sans guide artificiel, aux fins de réception par le public.

*« société de gestion »* "collective society"

*« société de gestion »* Association, société ou personne morale autorisée — notamment par voie de cession, licence ou mandat — à se livrer à la gestion collective du droit d'auteur ou du droit à rémunération conféré par les articles 19 ou 81 pour l'exercice des activités suivantes :

    *a*) l'administration d'un système d'octroi de licences portant sur un répertoire d'oeuvres, de prestations, d'enregistrements sonores ou de signaux de communication de plusieurs auteurs, artistes-interprètes, producteurs d'enregistrements sonores ou radiodiffuseurs et en vertu duquel elle établit les catégories d'utilisation qu'elle autorise au titre de la présente loi ainsi que les redevances et modalités afférentes;

    *b*) la perception et la répartition des redevances payables aux termes de la présente loi.

*« télécommunication »* "telecommunication"

*« télécommunication »* Vise toute transmission de signes, signaux, écrits, images, sons ou renseignements de toute nature par fil, radio, procédé visuel ou optique, ou autre système électromagnétique.

*« toute oeuvre littéraire, dramatique, musicale ou artistique*

2012 FC 748 (CanLII)

2012 FC 748 (CanLII)

(4) Where, in the case of an unpublished work, the making of the work is extended over a considerable period, the conditions of this Act conferring copyright are deemed to have been complied with if the author was, during any substantial part of that period, a subject or citizen of, or a person ordinarily resident in, a country to which this Act extends.

**Telecommunication**

2.3 A person who communicates a work or other subject-matter to the public by telecommunication does not by that act alone perform it in public, nor by that act alone is deemed to authorize its performance in public.

**Communication to the public by telecommunication**

2.4 (1) For the purposes of communication to the public by telecommunication,

(*a*) persons who occupy apartments, hotel rooms or dwelling units situated in the same building are part of the public, and a communication intended to be received exclusively by such persons is a communication to the public;

(*b*) a person whose only act in respect of the communication of a work or other subject-matter to the public consists of providing the means of telecommunication necessary for another person to so communicate the work or other subject-matter does not communicate that work or other subject-matter to the public; and

(*c*) where a person, as part of

(i) a network, within the meaning of

*originale* »
"every original literary, dramatic, musical and artistic work"

« *toute oeuvre littéraire, dramatique, musicale ou artistique originale* » S'entend de toute production originale du domaine littéraire, scientifique ou artistique quels qu'en soient le mode ou la forme d'expression, tels les compilations, livres, brochures et autres écrits, les conférences, les oeuvres dramatiques ou dramatico-musicales, les oeuvres musicales, les traductions, les illustrations, les croquis et les ouvrages plastiques relatifs à la géographie, à la topographie, à l'architecture ou aux sciences.

**Compilations**

**2.1** (1) La compilation d'oeuvres de catégories diverses est réputée constituer une compilation de la catégorie représentant la partie la plus importante.
**Idem**

(2) L'incorporation d'une oeuvre dans une compilation ne modifie pas la protection conférée par la présente loi à l'oeuvre au titre du droit d'auteur ou des droits moraux.

Définition de « *producteur* »

**2.11** Il est entendu que pour l'application de l'article 19 et de la définition de « *producteur admissible* » à l'article 79, les opérations nécessaires visées à la définition de « *producteur* » à l'article 2 s'entendent des opérations liées à la conclusion des contrats

2012 FC 748 (CanLII)

the *Broadcasting Act*, whose operations result in the communication of works or other subject-matter to the public, or

(ii) any programming undertaking whose operations result in the communication of works or other subject-matter to the public,

transmits by telecommunication a work or other subject-matter that is communicated to the public by another person who is not a retransmitter of a signal within the meaning of subsection 31(1), the transmission and communication of that work or other subject-matter by those persons constitute a single communication to the public for which those persons are jointly and severally liable.

**Regulations**

(2) The Governor in Council may make regulations defining "programming undertaking" for the purpose of paragraph (1)(*c*).

**Exception**

(3) A work is not communicated in the manner described in paragraph (1)(*c*) or 3(1)(*f*) where a signal carrying the work is retransmitted to a person who is a retransmitter within the meaning of subsection 31(1).

**What constitutes rental**

2.5 (1) For the purposes of paragraphs 3(1)(*h*) and (*i*), 15(1)(*c*) and 18(1)(*c*), an arrangement, whatever its form, constitutes a rental of a computer program or sound recording if, and only if,

avec les artistes-interprètes, au financement et aux services techniques nécessaires à la première fixation de sons dans le cas d'un enregistrement sonore.

Définition de « *publication* »

**2.2** (1) Pour l'application de la présente loi, « *publication* » s'entend :

*a*) à l'égard d'une oeuvre, de la mise à la disposition du public d'exemplaires de l'oeuvre, de l'édification d'une oeuvre architecturale ou de l'incorporation d'une oeuvre artistique à celle-ci;

*b*) à l'égard d'un enregistrement sonore, de la mise à la disposition du public d'exemplaires de celui-ci.

Sont exclues de la publication la représentation ou l'exécution en public d'une oeuvre littéraire, dramatique, musicale ou artistique ou d'un enregistrement sonore, leur communication au public par télécommunication ou l'exposition en public d'une oeuvre artistique.

**Édition de photographies et de gravures**

(2) Pour l'application du paragraphe (1), l'édition de photographies et de gravures de sculptures et d'oeuvres architecturales n'est pas réputée être une publication de ces oeuvres.

**Absence de consentement du titulaire du droit d'auteur**

2012 FC 748 (CanLII)

(*a*) it is in substance a rental, having regard to all the circumstances; and

(*b*) it is entered into with motive of gain in relation to the overall operations of the person who rents out the computer program or sound recording, as the case may be.

## Motive of gain

(2) For the purpose of paragraph (1)(*b*), a person who rents out a computer program or sound recording with the intention of recovering no more than the costs, including overhead, associated with the rental operations does not by that act alone have a motive of gain in relation to the rental operations.

## Exclusive distributor

2.6 The Governor in Council may make regulations establishing distribution criteria for the purpose of paragraph (*b*) of the definition "exclusive distributor" in section 2.

## Exclusive licence

2.7 For the purposes of this Act, an exclusive licence is an authorization to do any act that is subject to copyright to the exclusion of all others including the copyright owner, whether the authorization is granted by the owner or an exclusive licensee claiming under the owner.

(3) Pour l'application de la présente loi — sauf relativement à la violation du droit d'auteur —, une oeuvre ou un autre objet du droit d'auteur n'est pas réputé publié, représenté en public ou communiqué au public par télécommunication si le consentement du titulaire du droit d'auteur n'a pas été obtenu.

## Oeuvre non publiée

(4) Quand, dans le cas d'une oeuvre non publiée, la création de l'oeuvre s'étend sur une période considérable, les conditions de la présente loi conférant le droit d'auteur sont réputées observées si l'auteur, pendant une partie importante de cette période, était sujet, citoyen ou résident habituel d'un pays visé par la présente loi.

## Télécommunication

**2.3** Quiconque communique au public par télécommunication une oeuvre ou un autre objet du droit d'auteur ne les exécute ni ne les représente en public de ce fait, ni n'est réputé, du seul fait de cette communication, autoriser une telle exécution ou représentation en public.

## Communication au public par telecommunication

**2.4** (1) Les règles qui suivent s'appliquent dans les cas de communication au public par télécommunication :

*a*) font partie du public les personnes qui occupent les locaux d'un même immeuble

2012 FC 748 (CanLII)

d'habitation, tel un appartement ou une chambre d'hôtel, et la communication qui leur est exclusivement destinée est une communication au public;

*b*) n'effectue pas une communication au public la personne qui ne fait que fournir à un tiers les moyens de télécommunication nécessaires pour que celui-ci l'effectue;

*c*) toute transmission par une personne par télécommunication, communiquée au public par une autre — sauf le retransmetteur d'un signal, au sens du paragraphe 31(1) — constitue une communication unique au public, ces personnes étant en l'occurrence solidaires, dès lors qu'elle s'effectue par suite de l'exploitation même d'un réseau au sens de la *Loi sur la radiodiffusion* ou d'une entreprise de programmation.

**Règlement**

(2) Le gouverneur en conseil peut, par règlement, définir « entreprise de programmation » pour l'application de l'alinéa (1) *c*).

**Restriction**

(3) La retransmission d'un signal à un retransmetteur au sens du paragraphe 31(1) n'est pas visée par les alinéas (1) *c*) et 3(1) *f*).

**Location**

**2.5** (1) Pour l'application des alinéas

2012 FC 748 (CanLII)

3(1)*h*) et *i*), 15(1)*c*) et 18(1)*c*), équivaut à une location l'accord — quelle qu'en soit la forme et compte tenu des circonstances — qui en a la nature et qui est conclu avec l'intention de faire un gain dans le cadre des activités générales du loueur de programme d'ordinateur ou d'enregistrement sonore, selon le cas.

**Intention du loueur**

(2) Il n'y a toutefois pas intention de faire un gain lorsque le loueur n'a que l'intention de recouvrer les coûts — frais généraux compris — afférents à la location.

**Distributeur exclusive**

**2.6** Le gouverneur en conseil peut, par règlement, fixer les critères de distribution pour l'application de la définition de « distributeur exclusif » figurant à l'article 2.

**Licence exclusive**

**2.7** Pour l'application de la présente loi, une licence exclusive est l'autorisation accordée au licencié d'accomplir un acte visé par un droit d'auteur de façon exclusive, qu'elle soit accordée par le titulaire du droit d'auteur ou par une personne déjà titulaire d'une licence exclusive; l'exclusion vise tous les titulaires.

**Copyright in works**

3. (1) For the purposes of this Act, "copyright", in relation to a work, means the sole right to produce or reproduce the work or any substantial part thereof in any material form whatever, to perform the work

**Droit d'auteur sur l'oeuvre**

**3.** (1) Le droit d'auteur sur l'oeuvre comporte le droit exclusif de produire ou reproduire la totalité ou une partie importante de l'oeuvre, sous une forme matérielle

32

or any substantial part thereof in public or, if the work is unpublished, to publish the work or any substantial part thereof, and includes the sole right

(*a*) to produce, reproduce, perform or publish any translation of the work,

(*b*) in the case of a dramatic work, to convert it into a novel or other non-dramatic work,

(*c*) in the case of a novel or other non-dramatic work, or of an artistic work, to convert it into a dramatic work, by way of performance in public or otherwise,

(*d*) in the case of a literary, dramatic or musical work, to make any sound recording, cinematograph film or other contrivance by means of which the work may be mechanically reproduced or performed,

(*e*) in the case of any literary, dramatic, musical or artistic work, to reproduce, adapt and publicly present the work as a cinematographic work,

(*f*) in the case of any literary, dramatic, musical or artistic work, to communicate the work to the public by

quelconque, d'en exécuter ou d'en représenter la totalité ou une partie importante en public et, si l'oeuvre n'est pas publiée, d'en publier la totalité ou une partie importante; ce droit comporte, en outre, le droit exclusif :

*a*) de produire, reproduire, représenter ou publier une traduction de l'oeuvre;

*b*) s'il s'agit d'une oeuvre dramatique, de la transformer en un roman ou en une autre oeuvre non dramatique;

*c*) s'il s'agit d'un roman ou d'une autre oeuvre non dramatique, ou d'une oeuvre artistique, de transformer cette oeuvre en une oeuvre dramatique, par voie de représentation publique ou autrement;

*d*) s'il s'agit d'une oeuvre littéraire, dramatique ou musicale, d'en faire un enregistrement sonore, film cinématographique ou autre support, à l'aide desquels l'oeuvre peut être reproduite, représentée ou exécutée mécaniquement;

*e*) s'il s'agit d'une oeuvre littéraire, dramatique, musicale ou artistique, de reproduire, d'adapter et de présenter publiquement l'oeuvre en tant qu'oeuvre cinématographique;

*f*) de communiquer au public, par télécommunication, une oeuvre littéraire, dramatique,

2012 FC 748 (CanLII)

telecommunication,

(*g*) to present at a public exhibition, for a purpose other than sale or hire, an artistic work created after June 7, 1988, other than a map, chart or plan,

(*h*) in the case of a computer program that can be reproduced in the ordinary course of its use, other than by a reproduction during its execution in conjunction with a machine, device or computer, to rent out the computer program, and

(*i*) in the case of a musical work, to rent out a sound recording in which the work is embodied,

and to authorize any such acts.

### Simultaneous fixing

(1.1) A work that is communicated in the manner described in paragraph (1)(*f*) is fixed even if it is fixed simultaneously with its communication.

### *Ownership of Copyright*

**13.** (4) The owner of the copyright in any work may assign the right, either wholly or partially, and either generally or subject to limitations relating to territory, medium or sector of the market or other limitations relating to the scope of the assignment, and either for the whole term of the copyright or for any other part thereof, and may grant any

musicale ou artistique;

*g*) de présenter au public lors d'une exposition, à des fins autres que la vente ou la location, une oeuvre artistique — autre qu'une carte géographique ou marine, un plan ou un graphique — créée après le 7 juin 1988;

*h*) de louer un programme d'ordinateur qui peut être reproduit dans le cadre normal de son utilisation, sauf la reproduction effectuée pendant son exécution avec un ordinateur ou autre machine ou appareil;

*i*) s'il s'agit d'une oeuvre musicale, d'en louer tout enregistrement sonore.

Est inclus dans la présente définition le droit exclusif d'autoriser ces actes.

### Fixation

(1.1) Dans le cadre d'une communication effectuée au titre de l'alinéa (1)*f*), une oeuvre est fixée même si sa fixation se fait au moment de sa communication.

### **Possession du droit d'auteur**

**13.** (4) Le titulaire du droit d'auteur sur une oeuvre peut céder ce droit, en totalité ou en partie, d'une façon générale ou avec des restrictions relatives au territoire, au support matériel, au secteur du marché ou à la portée de la cession, pour la durée complète ou partielle de la

2012 FC 748 (CanLII)

34

2012 FC 748 (CanLII)

interest in the right by licence, but no assignment or grant is valid unless it is in writing signed by the owner of the right in respect of which the assignment or grant is made, or by the owner's duly authorized agent.

### Infringement generally

**27.** (1) It is an infringement of copyright for any person to do, without the consent of the owner of the copyright, anything that by this Act only the owner of the copyright has the right to do.

### Secondary infringement

(2) It is an infringement of copyright for any person to

(*a*) sell or rent out,

(*b*) distribute to such an extent as to affect prejudicially the owner of the copyright,

(*c*) by way of trade distribute, expose or offer for sale or rental, or exhibit in public,

protection; il peut également concéder, par une licence, un intérêt quelconque dans ce droit; mais la cession ou la concession n'est valable que si elle est rédigée par écrit et signée par le titulaire du droit qui en fait l'objet, ou par son agent dûment autorisé.

### Règle générale

**27.** (1) Constitue une violation du droit d'auteur l'accomplissement, sans le consentement du titulaire de ce droit, d'un acte qu'en vertu de la présente loi seul ce titulaire a la faculté d'accomplir.

### Violation à une étape ultérieure

(2) Constitue une violation du droit d'auteur l'accomplissement de tout acte ci-après en ce qui a trait à l'exemplaire d'une oeuvre, d'une fixation d'une prestation, d'un enregistrement sonore ou d'une fixation d'un signal de communication alors que la personne qui accomplit l'acte sait ou devrait savoir que la production de l'exemplaire constitue une violation de ce droit, ou en constituerait une si l'exemplaire avait été produit au Canada par la personne qui l'a produit :

*a*) la vente ou la location;

*b*) la mise en circulation de façon à porter préjudice au titulaire du droit d'auteur;

*c*) la mise en circulation, la mise ou l'offre en vente ou en location, ou l'exposition en public, dans un but commercial;

2012 FC 748 (CanLII)

(*d*) possess for the purpose of doing anything referred to in paragraphs (*a*) to (*c*), or

(*e*) import into Canada for the purpose of doing anything referred to in paragraphs (*a*) to (*c*),

a copy of a work, sound recording or fixation of a performer's performance or of a communication signal that the person knows or should have known infringes copyright or would infringe copyright if it had been made in Canada by the person who made it.

**Knowledge of importer**

(3) In determining whether there is an infringement under subsection (2) in the case of an activity referred to in any of paragraphs (2)(*a*) to (*d*) in relation to a copy that was imported in the circumstances referred to in paragraph (2)(*e*), it is irrelevant whether the importer knew or should have known that the importation of the copy infringed copyright.

**Plates**

(4) It is an infringement of copyright for any person to make or possess a plate that has been specifically designed or adapted for the purpose of making infringing copies of a work or other subject-matter.

**Public performance for profit**

(5) It is an infringement of copyright for any person, for profit, to permit a theatre or other place of entertainment to be used for the performance in public of a work or other

*d*) la possession en vue de l'un ou l'autre des actes visés aux alinéas *a*) à *c*);

*e*) l'importation au Canada en vue de l'un ou l'autre des actes visés aux alinéas *a*) à *c*).

**Précision**

(3) Lorsqu'il s'agit de décider si les actes visés aux alinéas (2)*a*) à *d*), dans les cas où ils se rapportent à un exemplaire importé dans les conditions visées à l'alinéa (2)*e*), constituent des violations du droit d'auteur, le fait que l'importateur savait ou aurait dû savoir que l'importation de l'exemplaire constituait une violation n'est pas pertinent.

**Planches**

(4) Constitue une violation du droit d'auteur la confection d'une planche conçue ou adaptée précisément pour la contrefaçon d'une oeuvre ou de tout autre objet du droit d'auteur, ou le fait de l'avoir en sa possession.

**Représentation dans un but de profit**

(5) Constitue une violation du droit d'auteur le fait, dans un but de profit, de permettre l'utilisation d'un théâtre ou d'un autre lieu de

subject-matter without the consent of the owner of the copyright unless that person was not aware, and had no reasonable ground for suspecting, that the performance would be an infringement of copyright.

divertissement pour l'exécution en public d'une oeuvre ou de tout autre objet du droit d'auteur sans le consentement du titulaire du droit d'auteur, à moins que la personne qui permet cette utilisation n'ait ignoré et n'ait eu aucun motif raisonnable de soupçonner que l'exécution constituerait une violation du droit d'auteur.

**Presumptions respecting copyright and ownership**

**Droit d'auteur**

**34.1** (1) In any proceedings for infringement of copyright in which the defendant puts in issue either the existence of the copyright or the title of the plaintiff thereto,

(*a*) copyright shall be presumed, unless the contrary is proved, to subsist in the work, performer's performance, sound recording or communication signal, as the case may be; and

(*b*) the author, performer, maker or broadcaster, as the case may be, shall, unless the contrary is proved, be presumed to be the owner of the copyright.

**34.** (1) En cas de violation d'un droit d'auteur, le titulaire du droit est admis, sous réserve des autres dispositions de la présente loi, à exercer tous les recours — en vue notamment d'une injonction, de dommages-intérêts, d'une reddition de compte ou d'une remise — que la loi accorde ou peut accorder pour la violation d'un droit.

**Liability for infringement**

**Violation du droit d'auteur : responsabilité**

**35.** (2) In proving profits,

(*a*) the plaintiff shall be required to prove only receipts or revenues derived from the infringement; and

(*b*) the defendant shall be required to prove every element of cost that the defendant claims.

**35.** (2) Dans la détermination des profits, le demandeur n'est tenu d'établir que ceux provenant de la violation et le défendeur doit prouver chaque élément du coût qu'il allègue.

## FEDERAL COURT

## SOLICITORS OF RECORD

**DOCKET:**                          T-299-05

**STYLE OF CAUSE:**            CATHERINE LEUTHOLD
                                          v
                                          CANADIAN BROADCASTING
                                          CORPORATION
                                          and
                                          JERRY MCINTOSH

**PLACE OF HEARING:**        Montreal, Quebec

**DATE OF HEARING:**         February 6, 7 8, 9, 13 and 14, 2012

**REASONS FOR JUDGMENT**
**AND JUDGMENT:**              SCOTT J.

**DATED:**                           June 14, 2012

**APPEARANCES:**

Daniel O'Connor                                          FOR THE PLAINTIFF

Christian Leblanc                                        FOR THE RESPONDENTS

**SOLICITORS OF RECORD:**

Daniel O'Connor, Avocats                            FOR THE PLAINTIFF
Pointe-Claire, Québec

Myles J. Kirvan                                          FOR THE RESPONDENTS
Deputy Attorney General of Canada
Montréal, Québec

2012 FC 748 (CanLII)

TAB 57

281 B.R. 535
United States Bankruptcy Court,
D. Delaware.

In re LIDS CORPORATION, Debtor.

Lids Corporation, Plaintiff,

v.

Marathon Investment Partners, L.P., Defendant.

Bankruptcy No. 01–21 (MFW).    |    Adversary
No. 01–4758(MFW).    |    Aug. 6, 2002.

Chapter 11 debtor brought adversary proceeding to avoid, as preference, the security interest granted to creditor less than 90 days prepetition, and creditor defended solely on theory that debtor was solvent at time of transfer. The Bankruptcy Court, Mary F. Walrath, J., held that: (1) valuation evidence that was based for most part on book value of debtor's assets as reported according to generally accepted accounting principles (GAAP) was insufficient to rebut the statutory presumption of insolvency during 90-day preference period; (2) analyses conducted by transferee's expert using market multiple methodology and comparable transaction methodology were likewise insufficient to rebut debtor's presumptive insolvency; and (3) supposed non-financial indicators of debtor's solvency were not probative and were insufficient to rebut presumption.

Judgment for debtor.

West Headnotes (16)

**[1]** **Bankruptcy**
 Insolvency

**Bankruptcy**
 Preferences

In preference avoidance proceeding, transferee must present sufficient evidence that debtor was solvent on transfer date to rebut statutory presumption of insolvency, and where transferee fails to do so, debtor is entitled to rely on presumption to establish that it was insolvent. Bankr.Code, 11 U.S.C.A. § 547(f).

Cases that cite this headnote

**[2]** **Bankruptcy**
 Preferences

In preference avoidance proceeding, if transferee presents sufficient evidence to rebut statutory presumption of insolvency, burden of persuasion shifts to debtor to convince court that it was insolvent on relevant date. Bankr.Code, 11 U.S.C.A. § 547(f).

Cases that cite this headnote

**[3]** **Bankruptcy**
 Insolvency

As long as liquidation in bankruptcy is not clearly imminent on date of alleged preferential transfer, debtor must be valued as going concern for purpose of assessing its solvency. Bankr.Code, 11 U.S.C.A. § 547(b)(3).

1 Cases that cite this headnote

**[4]** **Bankruptcy**
 Insolvency

"Fair valuation" of debtor's assets, such as court must undertake in assessing whether debtor was insolvent at the time of alleged preferential transfer, is a market rather than distress value, in case where debtor is to be valued as going concern; however, valuation must be analyzed in realistic framework, considering amounts which can be realized in a reasonable time assuming a willing seller and willing buyer. Bankr.Code, 11 U.S.C.A. §§ 101(32)(A), 547(b)(3).

4 Cases that cite this headnote

**[5]** **Bankruptcy**
 Insolvency

"Fair valuation" of debtor's assets, such as court must undertake in assessing whether debtor was insolvent at the time of alleged preferential transfer, means that assets should be valued at sales price that a willing and prudent seller would accept from willing and prudent buyer if assets were offered in fair market and for reasonable period of time. Bankr.Code, 11 U.S.C.A. §§ 101(32)(A), 547(b)(3).

3 Cases that cite this headnote

**[6]**  **Bankruptcy**
   👈 Preferences

Valuation evidence that was based for most part on book value of Chapter 11 debtor's assets as reported according to generally accepted accounting principles (GAAP) was insufficient to rebut the statutory presumption of insolvency during 90-day preference period. Bankr.Code, 11 U.S.C.A. § 547(f).

3 Cases that cite this headnote

**[7]**  **Bankruptcy**
   👈 Insolvency

Although generally accepted accounting principles (GAAP) are relevant in assessing debtor's solvency/insolvency, for preference avoidance purpose, they are not determinative. Bankr.Code, 11 U.S.C.A. § 547(b)(3).

1 Cases that cite this headnote

**[8]**  **Bankruptcy**
   👈 Insolvency

Market multiple methodology, pursuant to which net revenues and earnings are multiplied by an appropriate range of risk-adjusted multiples to determine company's total enterprise value is an acceptable technique for determining debtor's solvency for preference avoidance purposes. Bankr.Code, 11 U.S.C.A. § 547(b)(3).

1 Cases that cite this headnote

**[9]**  **Bankruptcy**
   👈 Preferences

Analysis conducted by transferee's expert using the market multiple methodology was insufficient to rebut Chapter 11 debtor's presumptive insolvency during 90-day preference period, where expert's comparables were not truly comparable, involving companies that, unlike debtor, were profitable, and where net revenue multiples used by expert did not

account for profitability and skewed values upward. Bankr.Code, 11 U.S.C.A. § 547(b)(3).

3 Cases that cite this headnote

**[10]**  **Bankruptcy**
   👈 Insolvency

Comparable transaction methodology, which examines recent transactions where companies have been bought and sold on market, is an acceptable technique for determining debtor's solvency for preference avoidance purposes. Bankr.Code, 11 U.S.C.A. § 547(b)(3).

1 Cases that cite this headnote

**[11]**  **Bankruptcy**
   👈 Preferences

Analysis that transferee's expert conducted using a comparable transaction methodology did not suffice to rebut Chapter 11 debtor's presumptive insolvency during 90-day preference period, where comparable sales considered by expert were too old to be probative of debtor's value upon transfer date. Bankr.Code, 11 U.S.C.A. § 547(b)(3).

1 Cases that cite this headnote

**[12]**  **Bankruptcy**
   👈 Insolvency

Unlike debtor's assets, its debts must be measured at their face, and not at their market, value when evaluating debtor's solvency for preference avoidance purposes. Bankr.Code, 11 U.S.C.A. § 547(b)(3).

3 Cases that cite this headnote

**[13]**  **Bankruptcy**
   👈 Insolvency

Bankruptcy court must consider debtor's contingent liabilities along with its total debt, when assessing debtor's solvency for preference avoidance purposes; however, contingent liabilities must be limited to costs arising from foreseeable events that might occur while the debtor remains a going concern and do not

include costs associated with liquidation or dissolution of debtor, as such costs inherently contradict going concern classification of debtor. Bankr.Code, 11 U.S.C.A. § 547(b)(3).

1 Cases that cite this headnote

[14]    **Bankruptcy**
👉 Preferences

Supposed non-financial indicators of Chapter 11 debtor's solvency at time of alleged preferential transfer, including investors' contribution of $14.9 million in new money to debtor's business, debtor's opening of 14 new kiosks for its business, and financial statements prepared for debtor's board of directors, were not probative of value of debtor's assets or liabilities, and were insufficient to rebut statutory presumption of debtor's insolvency during 90-day preference period. Bankr.Code, 11 U.S.C.A. § 547(f).

2 Cases that cite this headnote

[15]    **Bankruptcy**
👉 Preferences

Schedules of assets and liabilities filed by debtor in connection with its Chapter 11 petition, that indicated debtor's assets exceeded its liabilities by roughly $10 million, were insufficient to rebut statutory presumption of debtor's insolvency during 90-day preference period, given that debtor's statements in schedules were based on book, rather than upon market, value of its assets. Bankr.Code, 11 U.S.C.A. § 547(f).

3 Cases that cite this headnote

[16]    **Bankruptcy**
👉 Preferences

Motions filed by debtor on first day of its Chapter 11 case, which sought authorization to pay certain vendors for goods in transit, approval of employee retention plan and adequate protection payments to secured creditor, were not probative of value of debtor's assets or liabilities, and were insufficient to rebut statutory presumption of debtor's insolvency during 90-day preference period. Bankr.Code, 11 U.S.C.A. § 547(f).

1 Cases that cite this headnote

**Attorneys and Law Firms**

*538 Michael R. Lastowski, Ralph N. Sianni, Duane Morris, LLP, Wilmington, DE, Paul D. Moore, Duane Morris, LLP, Boston, MA, for Debtor.

Robert Dehney, Jason Staib, Morris, Nichols, Arsht & Tunnell, LLP, Wilmington, DE, Jay R. Indyke, Kronish, Lieb, Weiner & Hellman, New York City, for Official Committee of Unsecured Creditors.

Henry A. Heiman, Heiman, Aber, Goldlust & Baker, Wilmington, DE, Anthony M. Feeherry, Goodwin Proctor, LLP, Boston, MA, for Marathon Investment Partners, LLP.

Opinion

## OPINION[1]

MARY F. WALRATH, Bankruptcy Judge.

This matter is before the Court on the Complaint of Lids Corporation ("Lids") to avoid a security interest granted to Marathon Investment Partners, L.P. ("Marathon") pursuant to sections 547 and 550 of the Bankruptcy Code. At trial, Marathon asserted that the security interest is not avoidable as a preference because Lids was not insolvent at the time. For the reasons set forth below, we find that Lids was insolvent at all relevant times, and, therefore, we conclude that the security interest is avoidable.

### I. *FACTUAL BACKGROUND*

Lids, founded in 1992, was a retail company that specialized in selling licensed logo sports caps and other brand name hats. From 1992 to 2000, Lids grew from a single kiosk to 388 stores in 47 states, and launched a website in October 2000 (Lids.com) which offered hats via the Internet. On September 26, 2000, Lids and Footstar, Inc.[2] announced a strategic alliance to offer Lids' products at Footstar locations. Under that agreement, Lids operated freestanding shops within Just For Feet superstores, and the companies shared Lids' sales revenues from these locations.

From 1998 through 2000, Lids spent roughly $53 million to fund losses of $22 million and to provide $31 million for expansion. Lids' business model was rapid expansion in pursuit of revenue growth. However, this rapid expansion was very costly and Lids was unable to produce positive cash flows. For fiscal year end ("FYE") 1998, Lids' earnings before interest, taxes, depreciation, and amortization ("EBITDA") was negative $1 million; for FYE 1999, EBITDA was negative $2.8 million; for the twelve months ending January 4, 2001, EBITDA was negative $6.7 million.

On September 13, 1996, Lids executed a credit agreement ("the Credit Agreement") with Fleet Retail Finance, Inc. **\*539** ("Fleet"). On April 22, 1999, in need of additional financing, Lids and Marathon executed a Warrant Purchase Agreement and a 12% Note due in 2004 for $2.5 million ("the Note"). By 2000, Lids was in violation of numerous covenants in its agreements with Fleet and Marathon. In May 2000, Lids requested a waiver of the covenant defaults from Marathon. On September 15, 2000, the First Amendment to the Note and Warrant Purchase Agreement and a Security Agreement were executed by Lids and Marathon. Under those agreements, the interest rate on the Note was increased to 14%, and Lids granted Marathon a security interest in all of its personal property. In exchange, Marathon waived Lids' covenant defaults. Marathon perfected its security interest in Lids' property on October 20, 2000.

During 2000, Lids needed an additional $30 million to continue operations and finance losses. However, Lids was only able to raise only $14.9 million. That same year, Lids began looking for potential buyers but was unsuccessful.

In October 2000, Lids hired James Marcum ("Marcum") as Chief Operating Officer to effectuate an organizational restructuring and bring Lids out of its financial downward spiral. After some extensive internal investigation, Marcum became seriously concerned about the financial condition of the company. In November 2000, Marcum prepared a presentation for Lids' Board of Directors. Based on the figures in the presentation, Marcum believed that there would be no availability under the Credit Agreement with Fleet by January 2001 and that, consequently, Lids would require a new credit facility.

On December 6, 2000, Fleet informed Lids that it would begin restricting the amount of credit available to Lids because of Lids' covenant defaults. Fleet began to decrease the amount of credit available to Lids on December 14, 2000.

Lids was unable to secure an alternate lender or locate a buyer and on January 4, 2001, Lids filed a voluntary petition under Chapter 11 of the Bankruptcy Code. After the filing, Lids maintained business as usual while it continued to search for a buyer. Only two buyers made offers for Lids: Hat World, Inc. ("Hat World") and Lids Acquisition, Inc. Ultimately, Hat World made the higher offer (approximately $16 million) and an order authorizing the sale of substantially all of Lids' assets to Hat World pursuant to section 363 of the Bankruptcy Code was entered on April 12, 2001. The sale closed on April 13, 2001.

On July 5, 2001, Lids filed a Complaint to avoid the security interest granted to Marathon. Marathon filed an Answer on August 9, 2001. On December 7, 2001, Lids and Marathon filed a Joint Pretrial Statement, and trial was held on December 10 and 11, 2001. Lids and Marathon filed Post–Trial Memoranda on January 22, 2002, and Reply Memoranda on January 31, 2002.

## II. *JURISDICTION*

This Court has jurisdiction over this matter as a core proceeding pursuant to 28 U.S.C. §§ 1334 and 157(b)(1), (b)(2)(A), (F), (K), and (O).

## III. *DISCUSSION*

This case is before the Court on Lids' Complaint to avoid the security interest granted to Marathon, pursuant to section 547(b) of the Bankruptcy Code, which provides that:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

**\*540** (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition;

. . . . .

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

11 U.S.C. § 547(b).

The parties have stipulated to all of the elements necessary to avoid the transfer of the security interest under section 547(b), except section 547(b)(3). Thus, the only issue is whether Lids was "insolvent" on October 20, 2000 ("the Valuation Date"), the date when Marathon perfected its security interest by filing financing statements with the appropriate government offices.

### A. "Insolvent" under the Bankruptcy Code

Section 101(32)(A) of the Bankruptcy Code defines "insolvent" as the "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation." 11 U.S.C. § 101(32)(A). This standard for solvency is typically called the "Balance Sheet Test." In re Trans World Airlines, Inc., 180 B.R. 389, 405 n. 22 (Bankr.D.Del.1994). However, this may be a misnomer because the Balance Sheet Test is based on a fair valuation and not based on Generally Accepted Accounting Principles ("GAAP"), which are used to prepare a typical balance sheet. Id.

Several different valuation methodologies are recognized as effective ways of determining the solvency of a company for purposes of section 547. See id. at 411 n. 28. However, we will only address the methodologies applied by the parties in this case. Both parties retained experts to value Lids as of the Valuation Date. Marathon retained Houlihan Lokey Howard & Zukin ("Houlihan"), and Lids retained Ernst & Young Corporate Finance, LLC ("EYCF"). Houlihan and EYCF used several different methodologies to value Lids.

### B. Presumption of Insolvency and Burden of Proof

[1]  [2]  Section 547(f) provides that "for the purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." 11 U.S.C. § 547(f). "A presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption." Fed.R.Evid. 301.[3] Therefore, Marathon must present sufficient evidence that Lids was solvent on the

Valuation Date to rebut the presumption created by section 547(f). If Marathon fails to present evidence to rebut the presumption, Lids is entitled to rely on the presumption to establish that it was insolvent. See 11 U.S.C. § 547(g). See also In re Old World Cone Company, 119 B.R. 473, 477 (Bankr.E.D.Pa.1990). However, if Marathon presents evidence that rebuts the presumption, then the burden of persuasion shifts to Lids to convince the Court that it was insolvent on the relevant date. See 11 U.S.C. § 547(g). See also *541 Trans World Airlines, 180 B.R. at 404; Old World Cone Company, 119 B.R. at 477.

### C. Marathon's Solvency Analysis

Marathon relies largely on Houlihan's financial analyses and conclusions and on other non-financial evidence to rebut the presumption that Lids was insolvent on the Valuation Date.

### 1. Balance Sheet Test

[3]  Lids and Marathon agree that the Balance Sheet Test is used to determine solvency for the purposes of section 547. See Trans World Airlines, 180 B.R. at 405 (solvency determined based on Balance Sheet Test). The parties also agree that Lids should be considered as a "going concern." A "going concern" is a commercial enterprise actively engaging in business with the expectation of indefinite continuance. BLACK'S LAW DICTIONARY 592 (7th ed.1999). As long as liquidation in bankruptcy is not clearly imminent on the Valuation Date, the company must be valued as a going concern. See e.g., In re Trans World Airlines, Inc., 134 F.3d 188, 193 (3d Cir.1998). As of the Valuation Date, Lids planned to continue operations as usual. Therefore, it must be valued as a going concern on that date.

#### a. Asset Valuation

[4]  [5]  As stated in section 101(32)(A), assets should be measured at a "fair valuation." 11 U.S.C. § 101(32)(A). In the context of a going concern, fair valuation of assets is:

> "market value" rather than "distress value," but ... the valuation must be analyzed "in a realistic framework" considering amounts that can be realized "in a reasonable time" assuming a "willing seller" and a "willing buyer."

Id. at 193–94. More specifically, "a fair valuation of assets contemplates a conversion of assets into cash during a

reasonable period of time." *Id.* at 194. The Third Circuit Court defined a "reasonable time" as:

> an estimate of the time that a typical creditor would find optimal: not so short a period that the value of the goods is substantially impaired via a forced sale, but not so long a time that a typical creditor would receive less satisfaction of its claim, as a result of the time value of money and typical business needs, by waiting for the possibility of a higher price.

*Id.* at 195. Therefore, assets should be valued at the sale price a willing and prudent seller would accept from a willing and prudent buyer if the assets were offered in a fair market for a reasonable period of time.

Houlihan prepared a report ("the Houlihan Report") of its analyses and conclusions regarding the value of Lids' assets as of the Valuation Date. In its report, Houlihan primarily relied on three valuation methodologies—adjusted balance sheet, market multiple, and comparable transaction—to establish the value of Lids' assets.

For the purposes of its solvency analysis, the Houlihan Report defines "fair value" as:

> the amount that may be realized if the Company's aggregate assets are sold as an entirety with reasonable promptness in an arm's length transaction under present conditions for the sale of comparable business enterprises, as such conditions can be reasonably evaluated by Houlihan Lokey.

(Exh. 66 at p. 1.)

Lids claims that the Houlihan Report fails to apply the correct definition of fair value, seemingly because Houlihan's definition did not include "fair market price." However, we find no indication that Houlihan **\*542** has applied the wrong standard of value. Fair market price is implicit in Houlihan's definition. Houlihan is not required to state explicitly that its definition of value is synonymous with fair market price if it is implicit in the definition.

### i. *Adjusted Balance Sheet*

[6] Houlihan and EYCF have each presented adjusted balance sheet values for Lids' assets. However, the parties offer remarkably different values. While Houlihan asserts that Lids' total assets range from $48,950,000 to $55,950,000, EYCF claims that Lids' assets were worth $17,524,000.

Houlihan's balance sheet is arranged in three categories labeled "GAAP as of October 2000," "Low Fair Value ('LFV')," and "High Fair Value ('HFV')." (Exh. 66 at p. 12.) The GAAP category reflects Lids' value calculated under GAAP. The LFV and HFV represent the range Houlihan has assigned to Lids' adjusted value. With only one exception, the LFV and HFV figures are identical to the figures in the GAAP category. The only adjustments made to the LFV and HFV figures on the balance sheet were to Lids' "Goodwill." The LFV estimate of Lids' goodwill is negative $65,000, while the HFV estimate is positive $6,935,000. However, the Houlihan Report does not contain any explanation of the adjustments made on the balance sheet.

Lids asserts that the balance sheet presented in the Houlihan Report fails to ascribe fair market value to Lids' assets. Lids claims that Houlihan simply adopted the GAAP figures as of October, 2000, without adjusting to reflect the fair market value of the assets, which was much less. Lids also asserts that attributing any value to Lids' goodwill is groundless because of Lids' history of accelerating losses.

EYCF prepared its own valuation, which differs substantially from the Houlihan Report. EYCF presented an adjusted balance sheet under "Scenario One: Sale of Assets Over a Reasonable Period of Time." Unlike the Houlihan Report, EYCF's balance sheet includes numerous adjustments to the book values assigned to assets and liabilities. This analysis starts with the book values and the estimated recoverable percent of each asset's value to determine the total fair market value of Lids' assets. For example, EYCF estimated that on sale of its inventory, Lids could recover 105% of its cost. The book value of Lids' inventory was $15,633,000 based on a valuation performed by Great American Appraisals & Valuation Services, LLC. Thus, EYCF estimated the fair market value of Lids' inventory to be $16,415,000. Applying the same methodology to the other assets, EYCF estimated the total value of Lids' assets to be $17,524,000.

[7]    Based on the evidence presented by both parties, we find Houlihan's balance sheet analysis unconvincing as to Lids' solvency. Houlihan's balance sheet simply reflects the book value of Lids' assets reported under GAAP. The only adjustment was a minor adjustment to the goodwill account. It is well established that although GAAP is relevant in section 547 solvency analysis, it is not determinative. *See e.g., Arrow Electronics, Inc. v. Justus (In re Kaypro),* 230 B.R. 400, 413 (9th Cir. BAP 1999) ("[T]here is no generally accepted accounting principle method for analyzing the insolvency of a company.... Although such principles are relevant, they are not controlling in insolvency determinations"); *In re Sierra Steel, Inc.,* 96 B.R. 275, 278 (9th Cir. BAP 1989) ("although GAAP are relevant, they are not controlling in insolvency determinations"); *In re Lease–A–Fleet, Inc.,* 155 B.R. 666, 679 (Bankr.E.D.Pa.1993) ("Courts are not required to rely upon GAAP standards when determining the issue of insolvency"); *In *543 re Joshua Slocum, Ltd.,* 103 B.R. 610, 623–24 (Bankr.E.D.Pa.1989) ("While GAAP principles do not control this court's determination of insolvency, we are inclined to accord weight to a company's treatment of its assets and liabilities according to GAAP"). Therefore, Houlihan's adoption of GAAP value for Lids' assets (without any adjustment to reflect market value) is not determinative of Lids' solvency.

We need not conclude that EYCF's valuation is correct. At a minimum though, the adjusted balance sheet presented by EYCF raises significant doubt about the validity of Houlihan's valuation. Therefore, we conclude that Houlihan's evidence

of valuation based largely on the book value of Lids' assets does not rebut the presumption that Lids was insolvent.

### ii. *Market Multiple Methodology*

Houlihan also applied a Market Multiple Methodology to value Lids' assets. Under this methodology, net revenues and earnings are multiplied by an appropriate range of risk-adjusted multiples to determine the company's total enterprise value. In its analysis, Houlihan selected multiples by bench marking certain publicly traded companies, using quantitative and qualitative factors.

[8]    The Market Multiple Methodology is an acceptable technique for determining solvency. *See, e.g., Covey v. Commercial Nat. Bank of Peoria,* 960 F.2d 657, 660 (7th Cir.1992); *Trans World Airlines,* 180 B.R. at 411 n. 28.

[9]    Houlihan selected the following comparable companies in its market multiples analysis: Finish Line, Inc., Wet Seat, Inc., Gadzooks, Inc., Reeds Jewelers, Inc., and several others. Houlihan chose these companies as comparables because they are specialty retailers, as is Lids. Houlihan calculated multiple ranges for net revenue and EBITDA for each of the comparable companies selected. Based on the multiples for the comparable companies, Houlihan selected a range of multiples to be applied to Lids for revenue and EBITDA as follows:

| LTM[4] Ended 10/31/00 | Representative Level (000's) | Multiple Range | Value (000's) | lines |
|---|---|---|---|---|
| TEV[5]/Revenue | $125,586 | 0.20x – 0.25x | $25,117 – 31,397 | |
| **Projected FYE 1/27/01** | | | | |
| TEV/Revenue | $130,206 | 0.15x – 0.20x | $19,531 – 26,041 | |
| **Projected FYE 1/26/02** | | | | |
| TEV/Revenue | $146,342 | 0.10x – 0.15x | $14,634 – 21,951 | |
| EBITDA | $ 5,513 | 4.0x – 5.0x | $22,052 – 27,566 | |
| **Concluded TEV** | | | **$20,000 – 27,000** | |

(Exh. 66 at p. 14.) Houlihan multiplied Lids' projected revenues and EBITDA by the appropriate ranges of multiples

to determine Lids' total enterprise value range. (However, Houlihan did not use EBITDA to estimate Lids' total enterprise value for LTM ended October 31, 2000, or Projected FYE January 27, 2001, because Lids' EBITDA was negative for those periods **\*544** and would not yield a positive total enterprise value.)

Lids asserts that Houlihan's application of the Market Multiple Methodology is flawed. Specifically, Lids contends that the companies selected by Houlihan as comparable are not similar to Lids because (i) the companies selected were profitable, while Lids was never profitable, (ii) the companies have proven business plans, while Lids' strategy has never yielded financial success, and (iii) the companies are established and performance is predictable, while Lids has consistently missed projections. Lids asserts Houlihan failed to consider how a buyer would discount the enterprise value of Lids based on these adverse factors.

Further, Lids asserts that the EBITDA multiples used in the Houlihan Report were inaccurate because the multiples used for Lids were greater than the mean and median multiples used for the other, more profitable and stable, companies. While the mean and median EBITDA multiples for the comparable companies were 3.8 and 3.6 respectively, Houlihan applied a range of 4.0 to 5.0 to Lids' projected EBITDA for FYE January 26, 2002.

Lids claims that Houlihan's use of net revenue multiples is also inappropriate because these multiples fail to account for profitability and improperly skew values upward. For example, a store may generate sales revenue, but operate at a substantial loss; the net revenue multiple counts the store's revenues, but fails to account for its losses. Lids asserts that a more pragmatic approach would include both revenues and profits.

Lids' expert, EYCF, also applied a Market Multiples Methodology to value Lids as of October 2000 (Exh. 69.) However, unlike Houlihan, EYCF did not use total EBITDA or net revenue in its analysis.

Instead, EYCF presented scenarios based on what buyers would do. In "Scenario 3: Hypothetical Sale of Profitable Stores," EYCF assumed a buyer would only purchase Lids' profitable stores. Based on this assumption, EYCF adjusted Lids' financial results to reflect only those stores. According to those adjusted figures, Lids' EBITDA for LTM October 2000 was $2.5 million. Applying a range of multiples (3.75 to 4.75) to Lids' adjusted EBITDA, and adding to that figure the expected return after the remaining stores are liquidated, EYCF estimated Lids' total asset value ranged from $10.4 million to $12.8 million.

Based on Lids' assertions and EYCF's market multiple analysis, we find Houlihan's market multiple asset valuation unconvincing. We are not persuaded that Houlihan's choice of multiples accurately reflects the comparable companies' values for the reasons asserted by Lids. We also find that Houlihan has improperly relied on Lids' projections to calculate value. Over the last few years, Lids has consistently failed to meet its projections; in 2000 alone, Lids' budget was revised three times to account for poor performance. Despite these revisions, Lids still missed its projections for 2000.

Furthermore, the Houlihan Report assumed that after October 31, 2000, when Lids' EBITDA was negative $6,299,000, the company would nonetheless turn around. Houlihan relied on Lids' projections that at FYE January 27, 2001, its EBITDA would increase to negative $3,456,000, and that at FYE January 26, 2002, its EBITDA would be positive $5,513,000. There is no evidence to support the assumption that such a dramatic change would occur. Therefore, any conclusions based on these projections are unconvincing. As a result, we conclude that Houlihan's Market Multiple Methodology **\*545** has failed to establish that Lids was solvent on the Valuation Date.

### iii. *Comparable Transaction Methodology*

Houlihan also used the Comparable Transaction Methodology to value Lids' assets, which examines recent transactions where companies have been bought and sold on the market.

**[10]** The Comparable Transaction Methodology is sufficient because this methodology is designed to yield the price the company would carry in the marketplace based on similar transactions. As one court has stated:

> To decide whether a firm is insolvent ... a court should ask: *What would a buyer be willing to pay for the debtor's entire package of assets and liabilities?* If the price is positive, the firm is solvent; if negative, insolvent.

*Id.* at 660 (emphasis added).

[11]    Houlihan valued Lids under the Comparable Transaction Methodology for LTM October 2000 using only a net revenue range of multiples developed from information on nineteen companies involved in transactions between 1995 and 2001. Houlihan multiplied Lids' net revenue for LTM October 2000 by the range of multiples (0.25x – 0.30x) to yield an estimated total enterprise value from $31 to $38 million.

Lids asserts that using net revenue multiples does not accurately reflect value because it fails to account for losses or profitability and skews values upward. Lids also claims that Houlihan's application of the Comparable Transaction Methodology is incorrect because Houlihan failed to account for the current economic environment and market conditions. The sales transactions considered by Houlihan occurred long ago, before market conditions changed.

EYCF also acknowledged the Comparable Transaction Methodology in its report. However, EYCF stated that it found no companies comparable to Lids based on the size, nature of the business, and profitability for the purposes of a comparable transaction analysis. Therefore, EYCF stated it could not conduct this type of analysis.

We conclude that Houlihan's Comparable Transaction analysis of Lids is unconvincing. The net revenue multiple used by Houlihan does not accurately reflect Lids' value, because it ignores the fact that Lids has never been profitable while comparing it to profitable companies. We also find that the sales considered by Houlihan are outdated. Most of the transactions considered in the Houlihan Report occurred several years ago, long before market conditions changed, for the worse. Thus, the comparable sales considered by Houlihan are too old to be probative of Lids' value as of October, 2000.

**b.** *Debt Valuation*

[12]    After determining the value of Lids, it is necessary to reduce that value by the liabilities which existed on the Valuation Date to determine if Lids was solvent. Section 101(12) defines "debt" as "liability on a claim." 11 U.S.C. § 101(12). Section 101(5)(A) defines "claim" as "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 11 U.S.C. § 101(5)(A). Unlike assets, debts are measured at their face value and not at market value. *See Trans World Airlines,* 134 F.3d at 196 (publicly traded debt is measured by face value, not market value). Debts are measured at face value because the language "at a fair valuation" in section 101(32)(A) applies only to the valuation **\*546** of assets; it does not apply to valuation of debts. *Id.* at 196.

[13]    Contingent liabilities must also be included in the total debt. However, "contingent liabilities must be limited to costs arising from foreseeable events that might occur while the debtor remains a going concern." *Id.* at 198. Contingent liabilities do not include costs associated with liquidation or dissolution of the debtor because such costs inherently contradict the going concern classification of the debtor. *Id.* Therefore, when conducting a balance sheet analysis, the fair market value of the assets is compared to the face value of the liabilities, including contingent liabilities.

Houlihan listed Lids' liabilities at $13,464,000 as of the Valuation Date. The figure is broken down in Houlihan's balance sheet as follows:

| Liability Account | Value | |
| --- | --- | --- |
| Current Portion of Long–Term Debt | $ 1,484,000 | lines |
| Short Term Borrowings | $ 9,662,000 | |
| Long Term Debt | $ 632,000 | |
| Subordinated Debt | $ 1,686,000 | |
| **Total** | **$13,464,000** | |

(Exh. 66 at p. 12.) Houlihan, however, excluded from its calculation "Other Non–Current Liabilities" of $1,477,000. [6] Additionally, Houlihan failed to account for additional contingent liabilities which EYCF added to Lids' balance sheet ($10,285,000 to $89,317,000) consisting of lease rejection and severance obligations. The latter were based on EYCF's assumption that a buyer would take only profitable stores thereby requiring Lids to liquidate the remaining stores.

Although we do not conclude that the contingent liabilities presented by EYCF are accurate, we conclude that Houlihan improperly valued Lids' debt by excluding the $1,477,000 in liabilities and failing to account for any contingent liabilities. Consequently, we conclude that the $13,464,000 in debt presented by Houlihan is not an accurate figure.

#### c. Houlihan's Conclusions

Based on the values Houlihan assigned to Lids' assets and debts, Houlihan concluded that Lids' assets exceeded debts by $12,738,000 to $19,738,000 on the Valuation Date. Marathon therefore asserts that Lids was solvent as of the Valuation Date. EYCF reached a much different conclusion regarding the value of Lids' assets and debts. Based on its analyses, EYCF estimated that Lids' debts exceeded assets by a range of $8.5 million to $107.5 million, making Lids deeply insolvent.

We conclude that the Houlihan Report does not rebut the presumption of insolvency imposed under section 547(f) because Houlihan's valuations are flawed and because EYCF's report raises serious doubts about the validity of Houlihan's assumptions. We are not convinced that the figures Houlihan has assigned to Lids' assets and debts accurately reflect Lids' value, and, therefore, we find that the Houlihan Report is not sufficient to rebut the presumption that Lids was insolvent on the Valuation Date.

#### 2. Non–financial Indicators

 [14]   In addition to the Houlihan Report, Marathon relies on several other factors which it asserts rebuts the presumption that Lids was insolvent on the Valuation Date. However, unlike the Houlihan Report, Marathon's other arguments are not based on the Balance Sheet Test. Instead, Marathon's arguments are **547** based primarily on inferences drawn from Lids' and others' conduct.

First, Marathon asserts that Lids was solvent in October 2000 because every party with a financial interest in Lids treated Lids as a solvent company. For example, Marathon asserts

that the contribution by Lids' investors' of $14.9 million in new money in 2000 is an indication that Lids was solvent. Further, Marathon claims that Lids was solvent because it was current with its vendors and continued business as usual with its vendors after the Valuation Date. Marathon also claims that Fleet's continued funding of overadvances on the credit line to Lids prior to and after October 2000, evidences that Lids was solvent on the Valuation Date.

Second, Marathon asserts that Lids was solvent on the Valuation Date because Lids conducted itself as a solvent company. For example, Marathon relies on financial statements prepared by Lids for its Board of Directors, which stated that assets exceeded liabilities in August, September, and October 2000. To further support its argument, Marathon notes that Lids opened 14 new kiosks in August 2000, started a website and added to its line of products, all of which it asserts evidences that Lids was solvent.

Lids disputes Marathon's arguments for several reasons. For example, Lids claims that Marathon's arguments based on Lids' financial statements which were prepared in accordance with GAAP are not determinative of value because GAAP is not controlling for the purposes of determining solvency under section 547(b)(3). Lids also asserts that Marathon has ignored evidence and misrepresented the facts and conduct of Lids and others.

We conclude that Marathon's arguments are based on a subjective evaluation of Lids' solvency rather than the objective test required by section 547(b). Lids' conduct and the conduct of third parties are not probative of the value of Lids' assets or liabilities. Marathon has cited no case to support the proposition that a company is solvent simply because other parties believe that it is solvent. Recent failures of companies which were touted by financial analysts as solvent point to the fallacy in Marathon's argument. Furthermore, Marathon has not cited any case to support its argument that Lids was solvent simply because it acted like it was or told others that it was. Marathon's arguments do not rebut the presumption that Lids was insolvent as of the Valuation Date.

Marathon also asserts that Lids was solvent as of the Valuation Date because it did not consider filing for bankruptcy until Fleet restricted its credit line in December 2000. Marathon relies on testimony that Lids filed for bankruptcy because it was unable to secure financing from its lenders and was unable to raise any capital. Based on this

testimony, Marathon concludes that because Lids filed for bankruptcy due to that cash crisis, Lids was not insolvent prior thereto on the Valuation Date. However, Lids contends that its crisis with Fleet existed long before the Valuation Date; Lids had been in default on the Fleet line since at least August 2000.

We find Marathon's argument here unconvincing. While Fleet's action restricting the credit available to Lids was the precipitating factor in Lids' filing for bankruptcy, it was not the only factor. Years of poor performance, inability to raise capital, lack of credit, and defaults on agreements with several lenders contributed to Lids' decision to file bankruptcy. Even if Lids' cash crisis did cause its bankruptcy, that does not prove that Lids was solvent until that moment. Many companies are insolvent long before bankruptcy is filed. In fact, section 547 assumes a debtor is **\*548** insolvent for at least 90 days before the bankruptcy petition is actually filed.

### 3. *Lids' Pleadings*

[15]    Marathon asserts that all of the initial pleadings filed in Lids' Chapter 11 case provide evidence that Lids was solvent when the petition was filed. Marathon cites Mr. Doyle's affidavit [7] which stated that Lids' assets exceeded liabilities by $10 million as of December 31, 2000. Marathon also notes that the Schedules of Assets and Liabilities filed with the Court evidence Lids' solvency. Lids responds that Mr. Doyle's affidavit and the Schedules were based on book

values, not market values. Lids argues that since GAAP-based financials do not determine solvency, Mr. Doyle's affidavit and the Schedules do not prove that Lids was solvent as of the Valuation Date.

As discussed previously, while it is well-established that GAAP may be relevant in section 547 solvency analysis, GAAP is not determinative. Therefore, the pleadings cited by Marathon do not prove that Lids was solvent as of the Valuation Date, and Marathon has failed to rebut the section 547(f) presumption of insolvency.

[16]    Marathon also asserts that various motions filed by Lids on the first day of this case (which sought authorization to pay certain vendors for goods already in transit, approval of an employee retention plan and adequate protection payments to a secured creditor) all evidence its solvency. These motions do not prove solvency; they simply evidence Lids' desire to keep its business operating until a buyer could be found. The motions provide no evidence of the fair value of Lids' assets and liabilities and, therefore, do not rebut the presumption of insolvency.

### IV. *CONCLUSION*

For the foregoing reasons, we find that Lids was insolvent at all relevant times, and, therefore, we conclude that the security interest granted to Marathon within 90 days of the Petition Date is avoidable pursuant to section 547 of the Bankruptcy Code.

---

Footnotes

1    This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052.

2    Footstar, Inc., had filed bankruptcy on November 4, 1999.

3    Federal Rule of Bankruptcy Procedure 9017 makes the Federal Rules of Evidence applicable in bankruptcy cases.

4    Last twelve months ("LTM").

5    Total Enterprise Value ("TEV")

6    The Accounts Payable amount of $18,757,000 and Current Liabilities amount of $2,514,000 were properly excluded because both the Market Multiple and Comparable Transactions Methods incorporate in their valuation the assumption of such debt.

7    John M. Doyle was Lids' Chief Financial Officer at the time the petition was filed.

---

**End of Document**    © 2014 Thomson Reuters. No claim to original U.S. Government Works.