TAB 58



[Home] [Databases] [World Law] [Multidatabase Search] [Help] [Feedback]

 OpenLaw

# United Kingdom House of Lords Decisions

 JISC

---

You are here: BAILII >> Databases >> United Kingdom House of Lords Decisions >> Linden Gardens Trust Ltd v Lenesta Sludge Disposals Ltd [1993] UKHL 4 (22 July 1993)
URL: *http://www.bailii.org/uk/cases/UKHL/1993/4.html*
Cite as: [1993] UKHL 4, [1994] AC 85, [1994] 1 AC 85, [1993] 3 All ER 417

---

[New search] [Buy ICLR report: [1994] 1 AC 85] [Help]

---

JISCBAILII_CASE_CONTRACT

Parliamentary Archives,
HL/PO/JU/18/253

## Linden Gardens Trust Limited (Respondents) v. Lenesta Sludge Disposals Limited and others (Appellants)

## St. Martin's Property Corporation Limited and others (Original Respondents and Cross-Appellants) v. Sir Robert McAlpine and Sons Limited (Original Appellants and Cross-Respondents)

JUDGMENT

Die Jovis 22° Julii 1993

Upon Report from the Appellate Committee to whom were referred the Causes Linden Gardens Trust Limited against Lenesta Sludge Disposals Limited and others and St. Martin's Property Corporation Limited and others against Sir Robert McAlpine and Sons Limited *et e contra,* That the Committee had heard Counsel as well on Monday the 8th as on Tuesday the 9th, Wednesday the 10th and Thursday the 11th days of February and Tuesday the 30th and Wednesday the 31st days of March last upon the Petitions and Appeals of McLaughlin & Harvey Plc of 15 Trench Road, Mallusk, Newtownabbey, Co. Antrim and Sir Robert McAlpine & Sons Limited

of Eaton Court, Maylands Avenue, Hemel Hempstead, Hertfordshire HP2 7DR and upon the Petition and Cross-Appeal of St Martin's Property Corporation Limited and St Martin's Property Investments Limited, both of Adelaide House, London Bridge, London EC4, praying that the matter of the Orders set forth in the Schedules thereto, namely Orders of Her Majesty's Court of Appeal of the 13th and the 14th days of February 1992, might be reviewed before Her Majesty the Queen in Her Court of Parliament and that the said Orders might be reversed, varied or altered or that the Petitioners might have such other relief in the premises as to Her Majesty the Queen in Her Court of Parliament might seem meet; as also upon the case of Linden Gardens Trust Limited, St. Martin's Property Corporation Limited and St. Martin's Property Investments Limited and Sir Robert McAlpine Limited lodged in answer to the said Appeals and the said Cross-appeal; and due consideration had this day of what was offered on either side in these Causes:

It is Ordered and Adjudged, by the Lords Spiritual and Temporal in the Court of Parliament of Her Majesty the Queen assembled, That the appeal by McLaughlin and Harvey plc be allowed and that the said Order of Her Majesty's Court of Appeal the 14th day of February 1992 complained of in the said Appeal be, and the same is hereby, **Set Aside** and that the Order of His Honour Judge Loyd Q.C. of the 9th day of October 1990 be, and the same is hereby, Restored, save that the preliminary issues be answered in the manner set out in the speech of Lord Browne-Wilkinson: And it is further Ordered, That the Respondents do pay or cause to be paid to the said Appellants the Costs incurred by them in the Court of Appeal and in respect of the said Appeal,

Judgment: 22 July 1993

## HOUSE OF LORDS

### LINDEN GARDENS TRUST LIMITED
### (RESPONDENTS)

v.

### LENESTA SLUDGE DISPOSALS LIMITED
### AND OTHERS
### (APPELLANTS)

### ST MARTIN'S PROPERTY CORPORATION LIMITED

*AND OTHERS*
*(ORIGINAL RESPONDENTS AND CROSS APPELLANTS)*

*v.*

*SIR ROBERT McALPINE AND SONS LIMITED*
*(ORIGINAL APPELLANTS AND CROSS-RESPONDENTS)*

Lord Keith of Kinkel
Lord Bridge of Harwich
Lord Griffiths
Lord Ackner
Lord Browne-Wilkinson

## LORD KEITH OF KINKEL

My Lords.

I have had the advantage of reading in draft the speech prepared by my noble and learned friend Lord Browne-Wilkinson, and also that prepared by my noble and learned friend Lord Griffiths.

I agree entirely with the reasoning which leads Lord Browne-Wilkinson to the conclusion that the appeal in the Linden Gardens case must be allowed, and the cross-appeal by St. Martin's Property Investments Limited dismissed.

As regards the appeal by McAlpines in which St. Martin's Property Corporation Limited are respondents I would dismiss that for the reasons given by Lord Browne-Wilkinson, and not upon the broader grounds favoured by Lord Griffiths. I have much sympathy with the view that where a building contractor is in breach of his contract he should not be relieved of liability to pay substantial damages for his breach merely by reason that the other contracting party had no proprietary interest in the works at the time when the

- 1 -

breach occurred. There is much force in the analysis that the party who contracted for the works to be done has suffered loss because he did not receive the performance he had bargained for and in order to remedy that has been required to pay for the defects to be put right by another builder. However, the matter was not fully explored in argument before your Lordships, and the possible effects upon other forms of commercial contract remain uncertain. While in some future case the view expressed by my noble

and learned friend Lord Griffiths may well prevail, the present case can be disposed of in favour of the respondents without the necessity of deciding upon its correctness.

## LORD BRIDGE OF HARWICH

My Lords.

      For the reasons given in the speech of my noble and learned friend Lord Browne-Wilkinson I would allow the appeal in the Linden Gardens case and dismiss both the appeal and the cross-appeal in the St. Martin's case. I would also answer the questions raised by the preliminary issues in each case in the terms proposed by my noble and learned friend and make the orders for costs which he proposes.

      In the McAlpine appeal I am much attracted by the broad principle favoured by my noble and learned friend Lord Griffiths, but am content from the purpose of the present proceedings to adopt the narrower ground for dismissal of the appeal on which Lord Browne-Wilkinson rests his decision.

## LORD GRIFFITHS

My Lords,

      I have had the advantage of reading the speech of Lord Browne-Wilkinson and agree that for the reasons he gives the first appeal should be allowed. In the second appeal I agree that for the reasons given by my Lord. St. Martin's Property Investments Limited (Investments) have no claim against Sir Robert McAlpine and Sons Limited (McAlpine). I also agree that for reasons which I can state quite shortly, St. Martin's Property Corporation Limited (Corporation) are entitled to recover substantial damages from McAlpine. Accordingly the appeal in the Linden Gardens case must be allowed and the cross-appeal by St. Martin's Property Investments Limited dismissed.

- 2 -

McAlpine have successfully resisted Corporation's claim to have assigned the benefit of the contract to Investments. It follows that throughout the performance of the contract McAlpine owed to Corporation a contractual duty to build the podium deck of sound materials and with all reasonable skill and care. Upon the assumption that McAlpine broke this contractual duty the normal measure of damages in such circumstances is the cost of remedying the defect in the building (see *East Ham Corporation* v. *Bernard Sunley & Sons Ltd.* [1966] A.C. 406). If the cost of remedying the defect in the podium deck was £800.000 Corporation would in my opinion be entitled to recover that sum from McAlpine.

It is however submitted that two factors prevent this normal and just result of McAlpine's breach of contract. The first ground upon which McAlpine resists the claim is that Corporation had transferred their building lease to Investments before the podium deck was built and thus had no proprietary interest in the property when the breach occurred. The second is that for financial reasons beneficial to Corporation and Investment. Investment reimbursed Corporation for the money that they paid for the repairs to the podium deck.

In my view neither of these considerations provide McAlpine with a defence to Corporation's claim. I cannot accept that in a contract of this nature, namely for work, labour and the supply of materials, the recovery of more than nominal damages for breach of contract is dependent upon the plaintiff having a proprietary interest in the subject matter of the contract at the date of breach. In everyday life contracts for work and labour are constantly being placed by those who have no proprietary interest in the subject matter of the contract. To take a common example, the matrimonial home is owned by the wife and the couple's remaining assets are owned by the husband and he is the sole earner. The house requires a new roof and the husband places a contract with a builder to carry out the work. The husband is not acting as agent for his wife, he makes the contract as principal because only he can pay for it. The builder fails to replace the roof properly and the husband has to call in and pay another builder to complete the work. Is it to be said that the husband has suffered no damage because he does not own the property? Such a result would in my view be absurd and the answer is that the husband has suffered loss because he did not receive the bargain for which he had contracted with the first builder and the measure of damages is the cost of securing the performance of that bargain by completing the roof repairs properly by the second builder. To put this simple example closer to the facts of this appeal - at the time the husband employs the builder he owns the house

but just after the builder starts work the couple are advised to divide their assets so the husband transfers the house to his wife. This is no concern of the builder whose bargain is with the husband. If the roof turns out to be defective the husband can recover from the builder the cost of putting it right and thus obtain the benefit of the bargain that the builder had promised to deliver. It was suggested in argument that the answer to the example I have given is that the husband could assign the benefit of the contract to the wife.

- 3 -

But what if, as in this case, the builder has a clause in the contract forbidding assignment without his consent and refuses to give consent as McAlpine has done. It is then said that neither husband nor wife can recover damages; this seems to me to be so unjust a result that the law cannot tolerate it.

The principal authority relied upon by McAlpine in support of the proposition that the contracting party suffers no loss if they did not have a proprietary interest in the property at the time of the breach was *The Albazero* [1977] A.C. 774. The situation in that case was however wholly different from the present. *The Albazero* was not concerned with money being paid to enable the bargain, i.e. the contract of carriage, to be fulfilled. The damages sought in *The Albazero* were claimed for the loss of the cargo, and as at the date of the breach the property in the cargo was vested in another with a right to sue it is readily understandable that the law should deny to the original party to the contract a right to recover damages for a loss of the cargo which had caused him no financial loss. In cases such as the present the person who places the contract has suffered financial loss because he has to spend money to give him the benefit of the bargain which the defendant had promised but failed to deliver. I therefore cannot accept that it is a condition of recovery in such cases that the plaintiff has a proprietary right in the subject matter of the contract at the date of breach.

The second ground upon which the recovery of damages is resisted is that Investments in fact reimbursed Corporation for the money they spent on the repairs. But here again in my view who actually pays for the repairs is no concern of the defendant who broke the contract. The court will of course wish to be satisfied that the repairs have been or are likely to be carried out but if they are carried out the cost of doing them must fall upon the defendant who broke his contract. Authority for this is to be found in *Jones v. Stroud District Council* [1986] 1 W.L.R. 1141. The case in fact was one in tort and not contract but the principle of whether or not it is a defence if someone else has paid for work for which the defendant would otherwise be liable must

apply to both ton and contract. The claim was for damages to a building which had suffered damage as a result of the defendant's negligence. In giving judgment Neill L.J. said, at p. 1150:

> "The plaintiffs failed to provide any documents relating to the work (of repairs) carried out by Marlothian Ltd. and there is no evidence that the plaintiffs have paid or are liable to pay any sum to Marlothian in respect of that work. It was submitted on behalf of the plaintiffs, however, that if the repairs were necessary and were carried out it was not to the point that the plaintiffs had not proved that they had paid for the repairs themselves. Our attention was drawn to *The Endeavour* (1890) 6 Asp. M.C. 511, where repairs to a vessel were carried out but before paying for them the plaintiff had gone bankrupt. It was there argued that the plaintiff could not claim the cost of the repairs because the sums recovered would only go to swell the creditors' funds. This argument was rejected and it was said, at p. 512:

- 4 -

> 'If somebody out of kindness were to repair the injury and make no charge for it. the wrongdoer would not be entitled to refuse to pay as part of the damages the cost of the repairs to the owner.'

> In my judgment, on the facts of this case this submission is correct."

There are many cases where a tortfeasor's liability has been temporarily discharged by payment by a third party on behalf of the plaintiff. A very common example occurs in personal injury cases where the cost of medical treatment is borne by a relative; but that has never been seen as a reason why that sum should not ultimately be paid by the defendant if he is found liable for the injuries. The law regards who actually paid for the work necessary as a result of the defendant's breach of contract as a matter which is raised inter alios acta so far as the defendant is concerned.

It will be seen that my reasons for holding that Corporation can recover damages are essentially those canvassed in the speech of Lord Browne-Wilkinson in the introduction to that part of his speech dealing with Corporation's claim for damages. Whilst I always welcome and find the views of academic writers most helpful, I am prepared even without the benefit of their views to adopt the direct route to the award of damages to Corporation.

## LORD ACKNER

My Lords.

For the reasons given in the speech of my noble and learned friend Lord Browne-Wilkinson I would allow the appeal in the Linden Gardens case and dismiss both the appeal and the cross-appeal in the St. Martin's case. I would also answer the questions raised by the preliminary issues in each case in the terms proposed by my noble and learned friend and make the orders for costs which he proposes.

## LORD BROWNE-WILKINSON

My Lords.

These appeals and cross-appeal arise in two separate actions which raise similar issues. In broad terms, those issues are. first, what is the effect of a contractual provision which prohibits a party from assigning the benefit of a contract and, second, can a building owner recover substantial damages

- 5 -

for breach of a building contract if he has parted with the property. The appeals relate to preliminary issues directed to be tried in both actions. As the cases have proceeded, certain of those issues have become irrelevant. I propose therefore to state shortly the facts of each case, then deal with the matters which fall for decision by this House and. at the end, indicate the answers which should in my view be given to the questions posed by the preliminary issues which have been directed.

### THE FACTS IN THE LINDEN GARDENS CASE

In 1979 Stock Conversion and Investment Trust Plc ("Stock Conversion") were the owners of a leasehold interest in the third to sixth floors inclusive of 130 Jermyn Street, London SW1. On 19 June 1979 Stock Conversion entered into a building contract with the second defendants, McLaughlin and Harvey Plc ("M & H") under which M & H were to remove blue asbestos from the property.

The contract was in the Joint Contract Tribunal Standard Form of Building Contract for use with approximate quantities private edition (1963 edition revised to July 1975) with amendments. Clause 17 of the contract provided as follows:-

> "17(1) The Employer shall not without the written consent of the Contractor assign this Contract.
>
>  (2) The Contractor shall not without the written consent of the Employer assign this Contract, and shall not without the written consent of the Architect (which consent shall not be unreasonably withheld to the prejudice of the Contractor) sub-let any portion of the Works.
>
> >        Provided that it shall be a condition in any sub-letting which may occur that the employment of the sub-contractor under the sub-contract shall determine immediately upon the determination (for any reason) of the Contractor's employment under this contract."

Lenesta Sludge Disposals Limited, the first defendants, were the nominated sub-contractors for the removal of the asbestos. They are of no significance in these appeals and I mention them only to explain their presence in the title to the action.

Practical completion of the works to be carried out by M & H took place on 25 March 1980. Subsequently, more asbestos which should have been removed by M & H was found in the premises. In February 1985 Stock Conversion entered into a contract with Ashwell Construction Company Limited (the third defendant) for the removal of such asbestos: such contract also contained a covenant against assignment. Practical completion of the

- 6 -

second contract took place in August 1985. and the cost was borne by Stock Conversion.

Meanwhile, on 1 April 1985 Stock Conversion assigned to Linden Gardens Trust Limited ("Linden Gardens") its leasehold interest in the third,

fifth and sixth floors of the property, subject to a licence back under which Stock Conversion continued to occupy the third floor. In December 1986 Stock Conversion surrendered its licence of the third floor and assigned its leasehold interest in the fourth floor to Linden Gardens. It is not suggested that Stock Conversion received anything less than the full market value of its leasehold interest or that any allowance was made in the price for the possibility that there might still be asbestos in the building.

This action was started on 3 July 1985 when Stock Conversion (which then still had an interest in the building) issued a writ against Lenesta Sludge as sole defendant.

Following the disposal by Stock Conversion of its whole interest in the property to Linden Gardens, on 14 January 1987 Stock Conversion executed a Deed of Assignment in favour of Linden Gardens. The Deed of Assignment recited that Stock Conversion had agreed with Linden Gardens to assign to them Stock Conversion's rights of action as pleaded in the High Court proceedings and incidental to the leasehold interest in the premises in consideration of one pound and provided as follows:

> "In pursuance of the said agreement and in consideration of the sum of One pound (£1) (the receipt of which sum the Assignors hereby acknowledge) the Assignors hereby assign to the Assignees.
>
> (a) all their rights of action as pleaded in the said proceedings or otherwise against Lenesta Sludge Disposal Limited:
>
> (b) all other rights of action currently vested in the Assignors which are or were incidental to their leasehold in the said premises."

M & H did not, as was required by clause 17(1) of the building contract, consent to such assignment: it is this lack of consent which is the basis of the problems which arise.

In 1987 and 1988 yet more asbestos was found in the premises. Further work was undertaken to remove this asbestos, the cost of which was borne by Linden Gardens. It is not asserted that Stock Conversion is under any liability to Linden Gardens to bear any part of these costs.

By a series of amendments, the action has been reconstituted: Linden Gardens has been substituted for Stock Conversion as the Plaintiff: Lenesta

Sludge remains as first defendant; M & H have been joined as second defendant; Ashwell Construction is the third defendant.

- 7 -

In the action as now constituted. Linden Gardens, as assignee, claims damages for breach by each of the defendants of their respective building contracts. The crucial points to be noticed are these. First. Stock Conversion which was the only party in a direct contractual relationship with each of the defendants is not a party to the action. Second, the purported assignment of the benefit of the building contract by Stock Conversion to Linden Gardens was made without the consent of the defendants. Third, any breach of contract by M & H occurred before Stock Conversion parted with its interest in the premises. Fourth, since Stock Conversion obtained from Linden Gardens the full market price for its interest in the premises on the assumption that the asbestos had been eradicated. Stock Conversion was not out of pocket by reason of the breaches save to the extent that it paid for the further works done in 1985.

The preliminary issues in this action were therefore directed to two questions. First, were Stock Conversion's rights under the contracts effectively assigned to Linden Gardens despite the fact that assignment of the building contracts by Stock Conversion was prohibited by the terms of those contracts? If so, second, could Linden Gardens as assignee recover damages for the cost of removing the asbestos after the date of the assignment, which cost was incurred not by Stock Conversion but by Linden Gardens'?

Judge John Lloyd Q.C. held that the assignment to Linden Gardens was ineffective and that, in any event, Linden Gardens could not recover for the cost of work executed after the date of the assignment: (1990) 52 B.L.R. 93. The Court of Appeal (Nourse and Staughton L.JJ. and Sir Michael Kerr) reversed the judge on both points: (1992) 57 B.L.R. 57. The Court of Appeal held that the Assignment was effective to transfer to Linden Gardens the causes of action for subsisting breaches of contract by M & H and Ashwell Construction and that the assignee could recover such damages as Stock Conversion could have recovered had there been no assignment. M & H appeal to this House. Ashwell Construction has not appealed.

<u>THE FACTS IN THE ST. MARTIN'S CASE</u>

In 1968 the first plaintiffs, St. Martin's Property Corporation Limited ("Corporation") began to develop a site at King Street, Hammersmith, London. The development was to include shops, offices, and flats. On 17

May 1968, Corporation entered into a written agreement with the local
authority whereby, upon completion of the development, Corporation would
be entitled to the grant of a 150 year lease of the site.

On 29 October 1974 Corporation entered into a building contract with
Sir Robert McAlpine and Sons Limited ("McAlpine") which incorporated the
Joint Contracts Tribunal, Standard Form of Building Contract, Private
Edition, With Quantities (1963 Edition revised July 1972). Clause 17 of such
contract was, for all practical purposes, in terms identical to those in clause
17 in the *Linden Gardens* case.

- 8 -

Corporation is a wholly owned subsidiary of St. Martin's Holdings
Limited which is itself wholly owned by the State of Kuwait. In the mid-
1970s a scheme was implemented for tax reasons whereunder all the property
interests of the State of Kuwait were to be vested in another wholly owned
subsidiary of St. Martin's Holdings Limited, the second Plaintiff, St. Martin's
Property Investments Limited ("Investments"). Pursuant to that scheme a
Deed of Assignment dated 25 March 1976 was executed under which
Corporation for full value assigned to Investments all Corporation's interests
in the property under the Agreement with the local authority of 17 May 1968.
It further purported to assign to Investments:

"the full benefit of all the contracts and engagements whatsoever
entered into by the Assignor and existing at the date hereof for the
construction of and completion of the Development."

As in the *Linden Gardens* case, the consent of McAlpine's to the assignment
of the benefit of the building contract was neither sought nor given. No
notice of the Assignment was given to McAlpine until ten years later on 3
March 1986.

At the time of the Assignment there were no subsisting relevant
breaches of the building contract. In November 1976 Investments appointed
Corporation to be its agent to manage the property and the development.
Practical completion of the works took place in 1980.

In 1981 part of the development, the podium deck, was found to be
leaking. It is alleged that this is due to breaches of contract by McAlpine
occurring after the date of assignment to Investment. Remedial works have
been carried out at a cost of some £800,000 plus VAT which, although
originally paid by Corporation, has been recovered by Corporation from

Investments.

In the action Corporation and Investments sue McAlpine for breach of contract. The following points should be noted. First, as in the *Linden Gardens* case, no consent to the Assignment was obtained. Second, unlike the *Linden Gardens* case the breaches of contract all took place after the date of the assignment, that is to say at a time when Corporation had no interest in the property. Third, unlike the *Linden Gardens* case, the original contracting party, Corporation, is a party to the action and is claiming substantial damages notwithstanding that Corporation is not out of pocket as a result of the McAlpine breaches.

Therefore the main issues which arise in this case are first, whether notwithstanding clause 17 of the building contract the assignment to Investments was effective. Second, whether Corporation is entitled to substantial damages for breach of contract. His Honour Judge Bowsher Q.C. held that the assignment to Investments was ineffective and that Corporation was only entitled to nominal damages. The appeal to the Court of Appeal

- 9 -

was heard at the same time as the appeal in the *Linden Gardens* case. The Court of Appeal held by a majority (Staughton L.J. dissenting) that the assignment was invalid, the case differing from the *Linden Gardens* case in that, at the date of the Assignment, there were no accrued causes of action which could be assigned. However the Court of Appeal held unanimously that Corporation was entitled to substantial damages. McAlpine appeal and Investments cross-appeal to this House.

## THE ISSUES

The two cases therefore raise, or potentially raise, the following issues:

1. Does clause 17(1) of the building contracts prohibit the purported assignment of the benefit of the building contracts?

2. Does clause 17(1) prohibit the assignment of causes of action for breaches of contract subsisting at the date of the Assignments?

3. Is a prohibition on assignment void as being contrary to public policy?

    4.  Even if the Assignments were validly prohibited, were they
effective to vest causes of action in the assignees?

    5.  If so, what is the measure of damages recoverable by the
assignees?

      6. If the assignments are ineffective, can the original contracting
party recover substantial damages?

I will deal with these issues in turn, save that on the view I take of the case
issue 5 does not arise since the assignments were invalid and ineffective to
vest any cause of action in the assignees.

      1. Does clause 17 prohibit the assignment of the benefit of
building contracts?

      Staughton L.J. (dissenting on this point) held that on its true
construction clause 17 did not prohibit the assignment by the employer of the
benefit of the building contract. It was urged before your Lordships on
behalf of Linden Gardens and Investments that his views were correct.

      The argument runs as follows. On any basis, clause 17 is unhappily
drafted in that it refers to an assignment of "the contract". It is trite law that
it is, in any event, impossible to assign "the contract" as a whole, i.e.
including both burden and benefit. The burden of a contract can never be
assigned without the consent of the other party to the contract in which event
such consent will give rise to a novation. Therefore one has to discover what

- 10 -

the panics meant by this inelegant phrase. It is said that the intention of the
parties in using the words "assign this contract" is demonstrated by clause
17(2) which prohibits both the assignment of the contract by the contractor
without the employer's consent and the sub-letting of any portion of the works
without the consent of the architect. In clause 17(2), the contractor is only
expressly prevented from sub-letting "any portion of the works." Yet it must
have been the party's intention to limit the contractor's rights to sub-let the
whole of the works. Accordingly, the words in clause 17(2) "assign this
contract" have to be read as meaning "sub-let the whole of the works." If
that is the meaning of the words "assign this contract" in clause 17(2) they
must bear the same meaning in clause 17(1), which accordingly only prohibits
the employer from giving substitute performance and does not prohibit the

assignment of the benefit of the contract.

Like the majority of the Court of Appeal. I am unable to accept this argument. Although it is true that the phrase "assign this contract" is not strictly accurate, lawyers frequently use those words inaccurately to describe an assignment of the benefit of a contract since every lawyer knows that the burden of a contract cannot be assigned: see, for example. *Nokes v. Doncaster Amalgamated Collieries Ltd.* [1940] A. C. 1014, 1019-1020. The prohibition in clause 17(2) against sub-letting "any portion of the Works" necessarily produces a prohibition against the sub-letting of the whole of the works: any sub-letting of the whole will necessarily include a sub-letting of a portion and is therefore prohibited. Therefore there is no ground for reading the words "assign this contract" in clause 17(1) as referring only to sub-letting the whole. Decisively, both clause 17(1) and (2) clearly distinguish between "assignment" and "sub-letting": it is therefore impossible to read the word "assign" as meaning "sub-let." Finally, I find it difficult to comprehend the concept of an employer "sub-letting" the performance of his contractual duties which consist primarily of providing access to the site and paying for the works.

Accordingly, in my view clause 17(1) of the contract prohibited the assignment by the employer of the benefit of the contract. This, by itself, is fatal to the claim by Investments (as assignee) in the *St. Martin's* case.

2. Does clause 17(1) prohibit the assignment of accrued rights of action?

The majority in the Court of Appeal drew a distinction between an assignment of the right to require future performance of a contract by the other party on the one hand and an assignment of the benefits arising <u>under</u> the contract (e.g. to receive payment due under it or to enforce accrued rights of action) on the other hand. They held that clause 17 only prohibited the assignment of the right to future performance and did not prohibit the assignment of the benefits arising under the contract, in particular accrued causes of action. Therefore, in the *Linden Gardens* case, where all the relevant breaches of contract by the contractors pre-dated the Assignment, an

- 11 -

assignment to *Linden Gardens* of the accrued rights of action for breach was not prohibited. In contrast, in the *St. Martin's* case, where all the breaches of contract occurred after the date of the Assignment, the majority of the Court of Appeal held that it was a breach of clause 17 to seek to transfer the

right to future performance.

This distinction between assigning the right to future performance of a contract and assigning the benefits arising under a contract was largely founded on a Note entitled "Inalienable Rights?" by Professor Goode ((1979) 42 M.L.R. 553) on *Helstan Securities Ltd. v. Hertfordshire County Council* [1978] 3 All E.R. 262. In that case a contract contained a clause prohibiting the contractor from assigning the contract "or any benefit therein or thereunder." The contractors assigned to the plaintiffs the right to a liquidated sum of money then alleged to be due to the contractors under the contract. Croom-Johnson J. held that the plaintiffs, as assignees, could not sue the employers to recover the sum of money.

In his Note, Professor Goode rightly pointed out that where a contract between A and B prohibits assignment of contractual rights by A. the effect of such a prohibition is a question of the construction of the contract. There are at least four possible interpretations, viz.,

1. that the term does not invalidate a purported assignment by A to C but gives rise only to a claim by B against A for damages for breach of the prohibition;

2. that the term precludes or invalidates any assignment by A to C (so as to entitle B to pay the debt to A) but not so as to preclude A from agreeing, as between himself and C, that he will account to C for what A receives from B: *In re Turcan* (1888) 40 Ch. D. 5;

3. that A is precluded not only from effectively assigning the contractual rights to C. but also from agreeing to account to C for the fruits of the contract when received by A from B;

4. that a purported assignment by A to C constitutes a repudiatory breach of condition entitling B not merely to refuse to pay C but also to refuse to pay A.

Professor Goode then expressed the view that construction (2) (being the *Helstan* case itself) was permissable and effective but that construction (3) to the extent that it purported to render void not only the assignment as between B and C but also as between A and C was contrary to law.

I am content to accept Professor Goode's classification and conclusions, though I am bound to say that I think cases within categories (1)

and (4) are very unlikely to occur. But Professor Goode's classification provides no warrant for the view taken by the majority of the Court of Appeal

- 12 -

in the present case: he does not discuss or envisage a case where a contractual prohibition against assignment is to be construed as prohibiting an assignment by A to C of rights of future performance but does not prohibit the assignment by A to C of "the fruits of performance" e.g., accrued rights of action or debts. Professor Goode only draws a distinction between the assignment of rights to performance and the assignment of rights under the contract in two connections: first in dealing with the effect of a prohibited assignment as between the assignor and the assignee (in categories (2) and (3)): secondly, in dealing with contracts for personal services. In the latter, he rightly points out that, although an author who has contracted to write a book for a fee cannot perform the contract by supplying a book written by a third party, if he writes the book himself he can assign the right to the fee - the fruits of performance. He expressly mentions that such right to assign the fruits of performance can be prohibited by the express terms of the contract.

However, although I do not think that Professor Goode's article throws any light on the true construction of clause 17, I accept that it is at least hypothetically possible that there might be a case in which the contractual prohibitory term is so expressed as to render invalid the assignment of rights to future performance but not so as to render invalid assignments of the fruits of performance. The question in each case must turn on the terms of the contract in question.

The question is to what extent does clause 17 on its true construction restrict rights of assignment which would otherwise exist? In the context of a complicated building contract, I find it impossible to construe clause 17 as prohibiting only the assignment of rights to future performance, leaving each party free to assign the fruits of the contract. The reason for including the contractual prohibition viewed from the contractor's point of view must be that the contractor wishes to ensure that he deals, and deals only, with the particular employer with whom he has chosen to enter into a contract. Building contracts are pregnant with disputes: some employers are much more reasonable than others in dealing with such disputes. The disputes frequently arise in the context of the contractor suing for the price and being met by a claim for abatement of the price or cross-claims founded on an allegation that the performance of the contract has been defective. Say that, before the final instalment of the price has been paid, the employer has assigned the benefits under the contract to a third party, there being at the

time existing rights of action for defective work. On the Court of Appeal's view, those rights of action would have vested in the assignee. Would the original employer be entitled to an abatement of the price, even though the cross-claims would be vested in the assignee? If so, would the assignee be a necessary party to any settlement or litigation of the claims for defective work, thereby requiring the contractor to deal with two parties (one not of his choice) in order to recover the price for the works from the employer? 1 cannot believe that the parties ever intended to permit such a confused position to arise.

- 13 -

Again, say that before completion of the works the employers assigned the land, together with the existing causes of action against the contractor, to a third party and shortly thereafter the contractor committed a repudiatory breach? On the construction preferred by the Court of Appeal, the right to insist on further performance, being unassignable, would have remained with the original employers whereas the other causes of action and the land would belong to the assignee. Who could decide whether to accept the repudiation, the assignor or the assignee?

These possibilities of confusion (and many others which could be postulated) persuade me that panics who have specifically contracted to prohibit the assignment of the contract cannot have intended to draw a distinction between the right to performance of the contract and the right to the fruits of the contract. In my view they cannot have contemplated a position in which the right to future performance and the right to benefits accrued under the contract should become vested in two separate people. I say again that that result could have been achieved by careful and intricate drafting, spelling out the parties' intentions if they had them. But in the absence of such a clearly expressed intention, it would be wrong to attribute such a perverse intention to the panics. In my judgment, clause 17 clearly prohibits the assignment of any benefit of or under the contract.

It follows that the purported assignment to Linden Gardens without the consent of the contractors constituted a breach of clause 17. The claim of Linden Gardens as assignee must therefore fail unless it can show that the prohibition in clause 17 was either void as being contrary to public policy or. notwithstanding the breach of clause 17, the Assignment was effective to assign the chose in action to Linden Gardens.

3. Is a prohibition on assignment void as being contrary to public

policy?

It was submitted that it is normally unlawful as being contrary to public policy to seek to render property inalienable. Since contractual rights are a species of property, it is said that a prohibition against assigning such rights is void as being illegal.

This submission faces formidable difficulties both on authority and in principle. As to the authorities, in *In re Turcan* (supra) a man effected an insurance policy which contained a term that it should not be assignable in any case whatever. He had previously covenanted with trustees to settle after-acquired property. The Court of Appeal held that although he could not assign the benefit of the policy so as to give the trustees the power to recover the money from the insurance company, he could validly make a declaration of trust of the proceeds which required him to hand over such proceeds to the trustees. This case proceeded, therefore, on the footing that the contractual restriction on assignment was valid. In *Helstan Securities* (supra) Croom-Johnson J. enforced such a prohibition. In *Reed Publishing Holdings Ltd. v.*

- 14 -

*King's Reach Investments* (unreported), 25 May 1983; Court of Appeal (Civil Division) Transcript No. 121 of 1983, the Court of Appeal had to consider an application to join as a party to an action an assignee of the benefit of a contract which contained a prohibition on such assignment. One of their grounds for refusing the application was that by reason of the prohibition the assignment was of no effect.

In none of these cases was the public policy argument advanced. But they indicate a long-term acceptance of the validity of such a prohibition which is accepted as part of the law in *Chitty on Contracts,* 26th ed. (1989). vol. 1, p. 883, para. 1413. We were referred to a decision of the supreme court of South Africa, *Paiges v. van Ryn Goldmines Estates Ltd.* 1920 A.D. 600 in which it was expressly decided that a term prohibiting a workman from assigning his wages was not contrary to public policy. In Scotland a covenant against assigning a lease of minerals (which was treated simply as a contract) was held not to infringe public policy: *Duke of Portland* v. *Baird and Co.* (1865) 4 M. 10. We were referred to certain cases in the United States, but they give no unequivocal guidance.

In the face of this authority, the House is being invited to change the law by holding that such a prohibition is void as contrary to public policy.

For myself I can see no good reason for so doing. Nothing was urged in
argument as showing that such a prohibition was contrary to the public interest
beyond the fact that such prohibition renders the chose in action inalienable.
Certainly in the context of rights over land the law does not favour restrictions
on alienability. But even in relation to land law a prohibition against the
assignment of a lease is valid. We were not referred to any English case in
which the courts have had to consider restrictions on the alienation of tangible
personal property, probably because there are few cases in which there would
be any desire to restrict such alienation. In the case of real property there is
a defined and limited supply of the commodity and it has been held contrary
to public policy to restrict the free market. But no such reason can apply to
contractual rights: there is no public need for a market in choses in action.
A party to a building contract, as I have sought to explain, can have a
genuine commercial interest in seeking to ensure that he is in contractual
relations only with a person whom he has selected as the other party to the
contract. In the circumstances, I can see no policy reason why a contractual
prohibition on assignment of contractual rights should be held contrary to
public policy.

        To avoid doubt, I must make it clear that I have been considering only
the validity of a restriction which prohibits assignments which have the effect
of bringing the assignee into direct contractual relations with the other party
to the contract. I have not been considering Professor Goode's category (3),
i.e. an attempt by contractual term to prevent one party making over the fruits
of the contract to a third party. Professor Goode expresses the view that if
the prohibition seeks to prevent the assignor from binding himself to pay over

                              - 15 -

such fruits to the assignee, such prohibition is pro tanto void. I express no
view on that point.

        4. Are the assignments (although prohibited) effective to transfer
the causes of action to the assignees?

        It was submitted that, even though the assignments were in breach of
clause 17. they were effective to vest the causes of action in the assignees, i.e.
Professor Goode's category 1. This argument was founded on two bases:
first, the decision in *Tom Shaw and Co. v. Moss Empires Ltd.* (1908) 25
T.L.R. 190: second, the fact that an assignment of a leasehold term in breach
of a covenant against assignment is effective to vest the term in the assignee.

In the *Tom Shaw* case an actor, B, was engaged by Moss Empires under a contract which prohibited the assignment of his salary. B assigned 10 per cent of his salary to his agent, Tom Shaw. Tom Shaw sued Moss Empires for 10 per cent of the salary joining B as second defendant. Moss Empires agreed to pay the 10 per cent of the salary to Tom Shaw or B as the court might decide i.e. in effect it interpleaded. Darling J. held, at p. 191. that the prohibition on assignment was ineffective: it could "no more operate to invalidate the assignment than it could to interfere with the laws of gravitation." He gave judgment for the plaintiffs against both B and Moss Empires, ordering B to pay the costs but making no order for costs against Moss Empires.

The case is inadequately reported and it is hard to discover exactly what it decides. Given that both B and Moss Empires were parties and Moss Empires was in effect interpleading, it may be that the words I have quoted merely indicate that as between the assignor, B, and the assignee Tom Shaw, the prohibition contained in the contract between B and Moss Empires could not invalidate B's liability to account to Tom Shaw for the monies when received and that, since B was a party, payment direct to Tom Shaw was ordered. This view is supported by the fact that no order for costs was made against Moss Empires. If this is the right view of the case, it is unexceptionable: a prohibition on assignment normally only invalidates the assignment as against the other party to the contract so as to prevent a transfer of the chose in action: in the absence of the clearest words it cannot operate to invalidate the contract as between the assignor and the assignee and even then it may be ineffective on the grounds of public policy. If on the other hand Darling J. purported to hold that the contractual prohibition was ineffective to prevent B's contractual rights against Moss Empires being transferred to Tom Shaw, it is inconsistent with authority and was wrongly decided.

In the *Helstan Securities* case Croom-Johnson J. did not follow the *Tom Shaw* case and held that the purported assignment in breach of the contractual provision was ineffective to vest the cause of action in the

- 16 -

assignee. That decision was followed and applied by the Court of Appeal in the *Reed Publishing Holdings* case (supra): see also *Turcan* (supra).

Therefore the existing authorities establish that an attempted assignment

of contractual rights in breach of a contractual prohibition is ineffective to transfer such contractual rights. I regard the law as being satisfactorily settled in that sense. If the law were otherwise, it would defeat the legitimate commercial reason for inserting the contractual prohibition viz. to ensure that the original parties to the contract are not brought into direct contractual relations with third parties.

As to the analogy with leases, I was originally impressed by the fact that an assignment of the term in breach of covenant is effective to vest the term in the assignee: *Williams v. Earle* (1868) L.R. 3 Q.B. 739, 750: *Old Grovebury Manor Farm Ltd. v. W. Seymour Plant Sales and Hire Ltd. (No. 2)* [1979] 1 W.L.R. 1397. However, Mr Kentridge in his reply satisfied me that the analogy is a false one. A lease is a hybrid, part contract, part property. So far as rights of alienation are concerned a lease has been treated as a species of property. Historically the law treated interests in land, both freehold and leasehold, as being capable of disposition and looked askance at any attempt to render them inalienable. However, by the time of Coke covenants against the assignment of leases had been held to be good, because the lessor had a continuing interest in the identity of the person who was his tenant: *Holdsworth, A History of English Law,* 2nd ed., vol. III. p. 85 and vol. VII, p. 281. The law became settled that an assignment in breach of covenant gave rise to a forfeiture, but pending forfeiture the term was vested in the assignee. In contrast, the development of the law affecting the assignment of contractual rights was wholly different. It started from exactly the opposite position viz. contractual rights were personal and not assignable. Only gradually did the law permitting assignment develop: *Holdsworth,* vol. VII, p. 520-521 and 531 etc. It is therefore not surprising if the law applicable to assignment of contractual rights differs from that applicable to the assignment of leases.

Therefore in my judgment an assignment of contractual rights in breach of a prohibition against such assignment is ineffective to vest the contractual rights in the assignee. It follows that the claim by Linden Gardens fails and the *Linden Garden* action must be dismissed.

## 5. What is the measure of damages recoverable by the assignee?

In view of my decision on the earlier issues, this issue does not arise for determination. I mention it only to explain that the Court of Appeal considered that the assignee was entitled to recover what the assignor could have recovered had there been no assignment. On that basis Staughton L.J. (who had held that the assignees in both actions could sue) had to consider what the assignors could have recovered.

- 17 -

### 6. What is the measure of damages in the claim by Corporation?

McAlpine accept that, since the attempted assignment by Corporation of its rights under the contract to Investments was ineffective. Corporation has retained those rights and is entitled to judgment against McAlpine for any breach of contract. But. McAlpine submits, Corporation is only entitled to nominal damages. Corporation has suffered no loss: it had parted with its interest in the property (and therefore with the works when completed) before any breach of the building contract: moreover Corporation received full value for that interest on its disposal to Investments. Therefore, it is said, neither of the plaintiffs has any right to substantial damages: Investments has incurred damage (being the cost of rectifying the faulty work) but has no cause of action; Corporation has a cause of action but has suffered no loss. If this is right, in the words of my noble and learned friend, Lord Keith of Kinkel in *G. U. S. Property Management Ltd. v. Littlewoods Mail Order Stores Ltd.*, 1982 S. L. T. 533, 538, "... the claim to damages would disappear...into some legal black hole, so that the wrongdoer escaped scot-free."

The Court of Appeal was able to avoid this result by reason of the continuing liability on Corporation to indemnify Investments against the cost of remedying the defects. McAlpine accepted, and still accept, that Corporation is liable to Investments in damages for Corporation's breach of contract in failing to obtain the consent of McAlpine to the assignment of the benefit of the building contract. The measure of the damages payable by Corporation to Investments for such breach would be the cost of remedying the defects since, if the Assignment had been valid, Investments could have recovered such cost from McAlpine. Therefore, the Court of Appeal held. Corporation have suffered substantial loss by reason of McAlpine's breach, such loss being the liability to indemnify Investments.

Attractive as this argument is. Mr Fernyhough for McAlpine has satisfied me that it is erroneous because the damage being claimed is too remote. The loss so identified as having been suffered by Corporation flows from the attempt by Corporation to assign the benefit of the building contract in breach of clause 17 of the contract. However the rule in *Hadley v. Baxendale* (1854) 9 Exch. 341 is formulated, in my judgment it is impossible to say that such damage arose naturally according to the usual course of things, or was in the contemplation of, or foreseeable by, McAlpine, or that McAlpine ought to have realised that such damage was "not unlikely". The contract for the breach of which damages are sought expressly prohibited Corporation from making such assignment. One party to a contract cannot be

liable for damages flowing from the doing of an act by the other party which
the contract itself expressly forbids.

It is therefore necessary to consider Mr Fernyhough's principle
argument in some detail. He starts from the well known proposition that the
measure of damages is generally "that sum of money which will put the party
who has been injured, or who has suffered, in the same position he would

- 18 -

have been in if he had not sustained the wrong for which he is now getting his
compensation or reparation:" *per* Lord Blackburn in *Livingstone v. Rawyards
Coal Company* (1880) 5 App.Cas. 25, 39. Since, before the date of any
breach of contract by McAlpine, Corporation had disposed of all its interest
in the property on which the building works were carried out. Corporation has
suffered no loss. Corporation received the full value of the property from
Investments. The measure of damages for defective performance of a
building contract is the diminution in value of the plaintiff's property, which
diminution is usually properly reflected by the cost of carrying out the repairs
necessary to effect reinstatement: *East Ham Corporation v. Bernard Sunley
& Sons Ltd.* [1966] A.C. 406. Since at the date of breach Corporation did not
own the property, Corporation suffered no loss by any diminution in its value
nor could Corporation carry out any works of reinstatement. Therefore, it
is said. Corporation has suffered no loss.

Mr Fernyhough accepted that central to his argument is the fact that
at the date of breach Corporation no longer owned the property. He
distinguished the decision in *Newton Abbot Development Co. Ltd. v. Stockman
Brothers* (1931) 47 T.L.R. 616 on that ground. In that case the plaintiffs, as
developers, had contracted with the defendants as contractors for the
construction of a number of houses. After completion of the works, the
plaintiffs had sold the houses to individual purchasers at a profit. Thereafter
defects due to faulty construction by the defendants appeared in the houses.
The plaintiffs, although under no legal liability to do so, had remedied these
defects. They were held entitled to recover from the defendants not the cost
of effecting the remedial work but the difference between the value of the
houses as they ought to have been completed and their actual value as in fact
completed. Mr Fernyhough explains this case on the basis that, although in
fact the plaintiff suffered no commercial loss, they were the owners of the
houses at the date of breach and therefore entitled to the diminution in value
of that property, the sale on by the plaintiffs being irrelevant as res inter alios
acta. In support of the proposition that only nominal damages are

recoverable by a plaintiff who has parted with ownership of the property at the date of breach, Mr Fernyhough further relied on two cases concerned with breach of contract for the carriage of goods. *Albacruz v. Albazero, The Albazero* [1977] A.C. 774 and *Obestain Inc.* v. *National Mineral Development Corporation Ltd. (The "Sanix Ace")* [1987] 1 Lloyd's Rep. 465.

This is a formidable, if unmeritorious, argument since it is apparently soundly based on principle and is supported by authority. In *The Albazero* the plaintiffs chartered the defendant's vessel for the carriage of oil. The carriage was covered by a bill of lading which named the plaintiffs as consignees. In the course of the voyage the vessel and cargo became a total loss. However on the day before that loss, the plaintiffs indorsed the bill of lading to a third party: the property in the goods and the right to sue the defendants were thereby vested in the third party. The plaintiffs, although having no property in the goods at the date of breach of the contract of

- 19-

carriage, sued the defendants for the full value of the goods. This House held that the plaintiffs were not entitled to substantial damages. Lord Diplock treated the general rule as being clear: a party who has no property in the goods at the date of breach has suffered no loss. However he recognised that there were exceptions to this general rule and I will consider those exceptions later.

Notwithstanding the apparent logic of Mr Fernyhough's submission, I have considerable doubts whether it is correct. A contract for the supply of goods or of work, labour and materials (a supply contract) is not the same as a contract for the carriage of goods. A breach of a supply contract involves a failure to provide the very goods or services which the defendant had contracted to supply and for which the plaintiff has paid or agreed to pay. If the breach is discovered before payment of the contract price, the price is abated by the cost of making good the defects: see as to sale of goods *Mondel* v. *Steel* (1841) 8 M. & W.858 and Sale of Goods Act 1979, section 53(1); as to building contracts *Modern Engineering (Bristol) Ltd. v. Gilbert-Ash (Northern) Ltd.* [1974] A.C. 689. Mr Fernyhough accepted that this right to abatement of the price does not depend on ownership by the plaintiff of the goods and it would be odd if the plaintiff's rights arising from breach varied according to whether the breach was discovered before or after the payment of the price. No such similar principle of abatement applies to freight charges: the freight charges have to be paid in full leaving the consignor to bring a separate action for damages for breach of the contract of carriage:

*Colonial Bank v. European Grain and Shipping Ltd. (The Dominique)* [1989]
A.C. 1056, 1067-1068.

In contracts for the sale of goods, the purchaser is entitled to damages
for delivery of defective goods assessed by reference to the difference between
the contract price and the market price of the defective goods, irrespective of
whether he has managed to sell on the goods to a third party without loss:
*Slater* v. *Hoyle & Smith Limited* [1920] 2 K.B. 11; see also as to non-delivery
*Williams Brothers v. Ed. T. Agius Limited* [1914] A.C. 510. In those cases
the judgments contained no consideration of the person in whom the property
in the goods was vested although it appears that some of the sub-contracts had
been made prior to the breach of contract.

If the law were to be established that damages for breach of a supply
contract were not quantifiable by reference to the beneficial ownership of
goods or enjoyment of the services contracted for but by reference to the
difference in value between that which was contracted for and that which is
in fact supplied, it might also provide a satisfactory answer to the problems
raised where a man contracts and pays for a supply to others, e.g., a man
contracts with a restaurant for a meal for himself and his guests or with a
travel company for a holiday for his family. It is apparently established that,
if a defective meal or holiday is supplied, the contracting party can recover
damages not only for his own bad meal or unhappy holiday but also for that

- 20 -

of his guests or family; see *Jackson v. Horizon Holidays Ltd.* [1975] 1
W.L.R. 1468 as explained in *Woodar Investment Development Ltd. v. Wimpey
Construction U.K. Ltd.* [1980] 1 W.L.R. 277, 283-284. 293-294. 297 and
300-301.

There is therefore much to be said for drawing a distinction between
cases where the ownership of goods or property is relevant to prove that the
plaintiff has suffered loss through the breach of a contract other than a
contract to supply those goods or property and the measure of damages in a
supply contract where the contractual obligation itself requires the provision
of those goods or services. I am reluctant to express a concluded view on
this point since it may have profound effects on commercial contracts which
effects were not fully explored in argument. In my view the point merits
exposure to academic consideration before it is decided by this House. Nor
do I find it necessary to decide the point since, on any view, the facts of this

case bring it within the class of exceptions to the general rule to which Lord Diplock referred in *The Albazero*.

In *The Albazero* Lord Diplock said (at p. 846B):

"Nevertheless, although it is exceptional at common law that a plaintiff in an action for breach of contract, although he himself has not suffered any loss, should be entitled to recover damages on behalf of some third person who is not a party to the action for a loss which that third person has sustained, the notion that there may be circumstances in which he is entitled to do so was not entirely unfamiliar to the common law and particularly to that part of it which, under the influence of Lord Mansfield and his successors. Lord Ellenborough and Lord Tenterden, had been appropriated from the law merchant.

"I have already mentioned the right of the bailee, which has been recognised from the earliest period of our law, to sue in detinue or trespass for loss or damage to his bailor's goods although he cannot be compelled by his bailor to do so and he is not himself liable to the bailor for the loss or damage: *The Winkfield* [1902] P.42. Nevertheless, he becomes accountable to his bailor for the proceeds of the judgment in an action by his bailor for money had and received. So too the doctrine of subrogation in the case of insurers, which was adopted from the law merchant by the common law in the eighteenth century, involved the concept of the nominal party to an action at common law suing for a loss which he had not himself sustained and being accountable to his insurer for the proceeds to the extent that he had been indemnified against the loss by the insurer. In this instance of a plaintiff being able to recover as damages for breach of contract for the benefit of a third person a loss which that person has sustained and he had not, the insurer is entitled to compel an assured to whom he has paid a total or partial indemnity to bring the action. A third example, once again in the field of mercantile law, is the right of an

- 21 -

assured to recover in an action on a policy of insurance upon goods the full amount of loss or damage to them, on behalf of anyone who may be entitled to an interest in the goods at the time when the loss or damage occurs, provided that it appears from the terms of the policy that he intended to cover their interest."

In addition, the decision in *The Albazero* itself established a further exception. This House was concerned with the status of a long-established principle based on the decision in *Dunlop v. Lambert* (1839) 6 Cl. & F. 600 that a consignor of goods who had parted with the property in the goods before the date of breach could even so recover substantial damages for the failure to deliver the goods. Lord Diplock (at p.847E) identified the rationale of that rule as being:

> "The only way in which I find it possible to rationalise the rule in *Dunlop v. Lambert* so that it may fit into the pattern of the English law is to treat it as an application of the principle, accepted also in relation to policies of insurance upon goods, that in a commercial contract concerning goods where it is in the contemplation of the parties that the proprietary interests in the goods may be transferred from one owner to another after the contract has been entered into and before the breach which causes loss or damage to the goods, an original party to the contract, if such be the intention of them both, is to be treated in law as having entered into the contract for the benefit of all persons who have or may acquire an interest in the goods before they are lost or damaged, and is entitled to recover by way of damages for breach of contract the actual loss sustained by those for whose benefit the contract is entered into."

In *The Albazero* it was held that the principle in *Dunlop v. Lambert* no longer applied to goods consigned under a bill of lading because both the property in the goods and the cause of action for breach of the contract of carriage passes to the consignee or indorsee by reason of the consignment or indorsement: therefore, since the consignee or indorsee will in any event be entitled to enforce the contract direct there is no ground on which one can impute to the parties an intention that the consignor is entering into the contract for the benefit of others who will acquire the property in the goods but no right of action for breach of contract.

However, this House was careful to limit its decision to cases of carriage by sea under a bill of lading, leaving in force the principle in *Dunlop v. Lambert* in relation to other contracts for the carriage of goods where such automatic assignment of the rights of action for breach does not take place. Lord Diplock. after the passage referring to the exceptions which I have already quoted, said (at p. 846G):

> "My Lords, in the light of these other exceptions, particularly in the field of mercantile law, to the general rule of English law that apart from nominal damages the plaintiff can only recover in an action for

- 22 -

breach of contract the actual loss he has himself sustained. I do not
think that the fact that the rule which it is generally accepted was laid
down by this House in *Dunlop v. Lambert*. 6 Cl. & F. 600 would add
one more exception would justify your Lordships in declaring the rule
to be no longer law. Nor do I think that the almost complete absence
of reliance on the rule by litigants in actions between 1839 and 1962
provides a sufficient reason for abolishing it entirely. The
development of the law of negligence since 1839 does not provide a
complete substituted remedy for some types of loss caused by breach
of a contract of carriage. Late delivery is the most obvious example
of these. The Bills of Lading Act 1855 and the subsequent
development of the doctrine laid down in *Brandt v. Liverpool, Brazil
and River Plate Steam Navigation Co. Ltd.* [1924] 1 K.B. 575, have
reduced the scope and utility of the rule in *Dunlop v. Lambert* . . .
where goods are carried under a bill of lading. But the rule extends
to all forms of carriage including carriage by sea itself where no bill
of lading has been issued, and there may still be occasional cases in
which the rule would provide a remedy where no other would be
available to a person sustaining loss which under a rational legal
system ought to be compensated by the person who has caused it.
For my part, I am not persuaded that your Lordships ought to go out
of your way to jettison the rule."

In my judgment the present case falls within the rationale of the
exceptions to the general rule that a plaintiff can only recover damages for his
own loss. The contract was for a large development of property which, to
the knowledge of both Corporation and McAlpine, was going to be occupied,
and possibly purchased, by third parties and not by Corporation itself.
Therefore it could be foreseen that damage caused by a breach would cause
loss to a later owner and not merely to the original contracting party,
Corporation. As in contracts for the carriage of goods by land, there would
be no automatic vesting in the occupier or owners of the property for the time
being who sustained the loss of any right of suit against McAlpine. On the
contrary, McAlpine had specifically contracted that the rights of action under
the building contract <u>could</u> not without McAlpine's consent be transferred to
third parties who became owners or occupiers and might suffer loss. In such
a case, it seems to me proper, as in the case of the carriage of goods by land,
to treat the parties as having entered into the contract on the footing that
Corporation would be entitled to enforce contractual rights for the benefit of

Linden Gardens Trust Ltd v Lenesta Sludge Disposals Ltd [1993] UKHL 4 (22 July 1993)

those who suffered from defective performance but who, under the terms of the contract, could not acquire any right to hold McAlpine liable for breach. It is truly a case in which the rule provides "a remedy where no other would be available to a person sustaining loss which under a rational legal system ought to be compensated by the person who has caused it."

Mr Fernyhough submitted that it would be wrong to distort the law in order to meet what he described as being an exceptional case. He said that this was a one-off or exceptional case since the development was sold before

- 23 -

any breach of contract had occurred and there was an express contractual prohibition on assignment. He submitted that to give Corporation a right to substantial damages in this case would produce chaos when applied to other cases where the contractors have entered into direct warranties with the ultimate purchasers of the individual parts of a development. I am not impressed by these submissions. I am far from satisfied that this is a one-off or exceptional case. We are concerned with standard forms of building contracts which prohibit the assignment of the benefit of building contracts to the ultimate purchasers. In the prolonged period of recession in the property market which this country has experienced many developments have had to be sold off before completion, thereby producing the risk that the ownership of the property may have become divided from the right to sue on the building contract at a date before any breach occurs. As to the warranties given by contractors to subsequent purchasers, they will not, in my judgment, give rise to difficulty. If, pursuant to the terms of the original building contract, the contractors have undertaken liability to the ultimate purchasers to remedy defects appearing after they acquired the property, it is manifest the case will not fall within the rationale of *Dunlop v. Lambert*, 6 Cl. & F. 600. If the ultimate purchaser is given a direct cause of action against the contractor (as is the consignee or indorsee under a bill of lading) the case falls outside the rationale of the rule. The original building owner will not be entitled to recover damages for loss suffered by others who can themselves sue for such loss. I would therefore hold that Corporation is entitled to substantial damages for any breach by McAlpine of the building contract.

7. The answer to the preliminary issues
The Linden Gardens Case

The preliminary issues directed were as follows:

"(1). Are the plaintiffs entitled by virtue of the deed of assignment pleaded at paragraph 1F. of the amended statement of claim to recover damages against the defendants in respect of the various causes of action and heads of loss pleaded

1.  where the loss was incurred by Stock Conversion prior to the said Deed of Assignment.

2.  where the loss was incurred by the plaintiffs subsequent thereto?

"(2). Were Stock Conversion precluded from lawfully assigning rights of action to the plaintiffs against second defendants by clause 17(1) of contract dated 19 July 1979 made between Stock Conversion and the second defendants? . . . "

Logically these questions should be posed in the opposite order. If, as I would hold, the benefit to the rights of action were not effectively assigned to

- 24 -

Stock Conversion at all. there can be no question of the defendants being liable to Stock Conversion for any loss whenever the breach occurred. I would therefore answer question 2 "yes" and question 1 "does not arise".

I would accordingly allow this appeal with costs both here and below.

The St. Martin's Case

The issues in this case are rather more complex and I will so far as necessary explain each issue.

" 1. Was the benefit of the contract dated 29 October 1974 between the first plaintiff (Corporation) and the defendant (McAlpine) validly assigned by the first plaintiff to the second plaintiff (Investments)?"

This is straightforward: the answer is "no."

"2. Was there an implied term in the deed of assignment dated 25 March 1976 and in the agency agreement dated 1976 and 1983

as pleaded in paragraph 7 and 7A of amended statement of claim?"

The statement of claim alleges that there were implied terms under which Corporation undertook to obtain McAlpine's consent to the assignment (paragraph 7) or to enforce the building contract for the benefit of Investments (paragraph 7A). Since these points would only be relevant if, contrary to my view, Corporation could claim damages by reference to obligations undertaken in the Deed of Assignment by Corporation to Investment, I would answer this issue "does not arise".

"3. On the assumption that the matters pleaded in paragraph 8 of the statement of claim are correct then

1.  Does the second plaintiff (Investments) have a valid claim against the defendants for damages, other than nominal damages, for breach of the contract dated 29 October 1974 as pleaded in paragraph 10 of the statement of claim?

2.  Does the first plaintiff (Corporation) have a valid claim against the defendant for damages, other than nominal damages, for breach of the contract dated 29 October 1974 as pleaded in paragraph 11 of the statement of claim?

(c) Does the first plaintiff (Corporation) have a valid claim for damages other than nominal damages for breach of

- 25 -

the contract dated 29 October 1974 as pleaded in paragraph 12 of the statement of claim?"

Questions (a) and (b) are self-explanatory. I would answer them (a) "no" (b) "yes." Question (c) raises the question whether Corporation can claim damages as constructive trustee for Investments or because of Corporation's liability to Investment under terms implied in the Deed of Assignment. Since in my judgment Corporation is entitled to substantial damages in any event, I would answer question (c) "does not arise", although, as I have explained. I would if necessary have answered it "no".

I would therefore dismiss the appeal by McAlpine and the cross-appeal by Investments, save that the order of the Court of Appeal be varied by substituting the answers to the issues which I have indicated. McAlpine's must pay the costs of the appeal to this House and Investments the costs of its own cross-appeal.

- 26 -

URL: *http://www.bailii.org/uk/cases/UKHL/1993/4.html*

TAB 59

*Indexed as:*

# Mahaffey (Re)

[1922] O.J. No. 153

52 O.L.R. 369

Ontario Supreme Court - High Court Division
Toronto Weekly Court

### Orde J.

May 17, 1922

*Will -- Devise of Farm to Son for Life -- Direction to Pay Debts, "Including Doctors' Bills, Nursing and Care" -- Claims of Daughters for Board and Lodging and Nursing of Testator -- Meaning of "Including" -- Relationship of Parties -- Absence of Evidence from which Contract to Pay might be Inferred.*

The testator, who died in April, 1921, aged 86 years, left a will dated in June, 1918, by which he gave his farm to his eon J. for life, upon the understanding that the son was to pay one of his (J's) sons $1,000 at majority, with remainder at J.'s death to J.'s other sons; he also directed J. "to pay all my just debts including doctors' bills, nursing and care to case of my illness, funeral expenses and also to put up a suitable monument over my grave;" he directed his executors to pay his daughter 5. $700 and his daughter M. $600; and the residue of his estate he gave equally to these two daughters. He had lived with his daughter M. from May, 1916, to July, 1917, and again from April, 1920, until his death in April, 1921, and with his daughter S. from July, 1917, to April, 1920. In February, 1921, the testator was, by order of the Court, declared incapable of managing his affairs. Each of the daughters made a claim upon the estate for maintenance, board, lodging, and nursing, during the periods mentioned, and these claims were allowed by the Judge of a Surrogate Court:

Held, on appeal, that the words of the will, "nursing and care in case of my illness," could not be extended so as to include the payment of any claim not in the nature of a debt of the testator; and, in any event, the direction had reference to nursing and care only during illness, and in a will made in June, 1918, could not have been intended to cover maintenance, board and lodging, for a period of 3 years before that date.

Meaning of "including" considered.

Held, also, that the relationship of the claimants to the testator brought their claims within the rule that, without some evidence that the services rendered were intended to be paid for, no contract or obligation to pay could be inferred; and, as in this case it was admitted that there was no arrangement or understanding with the claimants when their father went to live with them as to any payment for maintenance or services of any kind, their claims should not have been allowed.

Mercantile Trust Co. of Canada Limited v. Campbell (1918), 43 O.L.R. 57, distinguished.

---

**1**   An appeal by James Henry Mahaffey from an order of a Surrogate Court Judge.

**2**   March 3. The appeal was heard by ORDE J., in the Weekly Court, Toronto.

H. S. White, K.C., for the appellant.

L. V. O'Connor, for Sarah Elizabeth Stephenson.

J. E. Anderson, for Margaret Sloan.

**3**   May 17. ORDE J.:-- This is a motion by way of appeal, under the provisions of subsec. 6 of sec. 69 of the Surrogate Courts Act, R.S.O. 1914, ch. 62, from the order of His Honour Judge McMillan, one of the Judges of the Surrogate Court of the County of Victoria, upon the contestation, on behalf of the estate of John Mahaffey, deceased, by James Henry Mahaffey, one of the executors, of the respective claims of his two co-executors, Sarah Elizabeth Stephenson and Margaret Sloan. The learned Surrogate Court Judge allowed the claims, and James Henry Mahaffey now appeals.

**4**   John Mahaffey, a farmer in the county of Victoria, died on the 8th April, 1921, aged 86 years, leaving a will dated the 18th June, 1918, probate of which was duly granted to the three executors above named. By his will he directs his eon James Henry Mahaffey "to pay all my just debts including doctors' bills nursing and care in case of my illness funeral expenses and also to put up a suitable monument over my grave;" he gives his farm to James Henry Mahaffey for life upon the understanding that he is to pay to Thomas Mahaffey (a son of James Henry) $1,000 when he attains 21, with remainder at James Henry's death to the other sons of James Henry; he directs his executors to pay to his daughter Sarah Elizabeth Stephenson $700 and to his daughter Margaret Sloan $500; and the residue of his estate is given equally to Mrs. Stephenson and Mrs. Sloan.

**5**   The testator lived with his daughter Mrs. Sloan for two periods prior to his death, namely, from May, 1915, to July, 1917, and again from April, 1920, until his death in April, 1921, and with his

daughter Mrs. Stephenson during the intervening period between July, 1917, and April, 1920.

**6**    Mrs. Sloan's claim was for maintenance, board, lodging, attendance, and nursing for a total period of a little more than 3 years, for which she claimed $721, and an additional $39.40 for expenses connected with the funeral, less a sum of $58 received from the testator in his lifetime, leaving $702.40, the whole of which was allowed by the Surrogate Court Judge.

**7**    Mrs. Stephenson made a similar claim for maintenance, etc., for a period of 2 years and nearly 10 months, the sum claimed being $841.60, less a credit of $400, leaving $441.60 as her net claim. The Surrogate Court Judge thought the claim excessive and deducted $200, leaving $241.66, which he allowed.

**8**    In February, 1921, an order was made by Rose J., declaring John Mahaffey incapable of managing his affairs, under sec. 37 of the Lunacy Act, but Mahaffey died before a committee was appointed by the Local Master under the order.

**9**    Counsel for the claimants referred to the words "nursing and care in case of my illness," in the direction to James Henry Mahaffey to pay the testator's debts; as in some way strengthening their claims. The word "including," while often meaning "namely," is ordinarily construed as a word of extension, indicating an enlargement of or an addition to those things which would ordinarily be included within the definition of the word which it follows: Regina v. Kershaw (1856), 6 E. & B. 999, 1007; Regina v. Hermann (1879), 4 Q.B.D. 284; Re Duncombe (1902), 3 O.L.R. 510. But it is doubtful if the context here would really extend the words "nursing and care in case of my illness" so as to include the payment of any claim not in the nature of a debt of the testator. The inclusion of the doctor's bills, which would clearly be debts, indicates that the testator had in mind those expenses connected with his last illness which, not being claimed until after death, are not by many people regarded as quite in the same category as debts, but are frequently treated as if they were funeral or testamentary expenses. In any event the direction has reference only to nursing and care during illness, and in a will made in June, 1918, could hardly have been intended to-cover maintenance, board and lodging, for a period of 3 years prior to that date.

**10**    The relationship of the parties here brings the claims clearly within the rule that, without some evidence of an agreement that the services rendered were intended to be paid for, no contract or obligation to pay can be inferred: Redmond v. Redmond (1868), 27 U.C.R. 220; Iler v. Iler (1885), 9 O.R. 551; Peckham v. Depotty (1890), 17 A.R. 273, at p. 278; Mercantile Trust Co. of Canada Limited v. Campbell (1918), 43 O.L.R. 57, at p. 71. In some cases stress has been laid upon the question whether or not the person against whose estate the claim was made was in loco parentis to the claimant: see McGugan v. Smith (1892), 21 Can. S.C.R. 263; Murdoch v. West (1895), 24 Can. S.C.R. 305. Those were cases where the claimant, in each case a young person, had lived with and been supported by the deceased and the claims were made for services rendered to the deceased. There is necessarily a wide distinction in point of fact between such cases and one like the present, where the claim is for maintenance and services rendered for the parent who comes to reside with

his child. But the distinction is only one of fact, and in no way affects the rule as I have stated it. As put in Macdonell on Master and Servant, 2nd ed., p. 111, "the difficulty is one not of law, but of fact," and at p. 112 it is said: "Probably no clearer principle can be stated than that which is laid down in Davies v. Davies (1839), 9 C. & P. 87. There Williams J., in charging the jury said: 'Neither the services on the one hand, nor the board and lodging on the other, can be charged for, unless the jury are satisfied that there was a contract.'"

**11**    Now it is admitted by both claimants that there was no arrangement or understanding whatever when their father went to live with them as to any payment by him for maintenance or services of any kind. The testator's wife, who was Mrs. Sloan's stepmother, died in May, 1915, and almost immediately afterwards Mrs. Sloan took her father to live with her, because, as she said, there was no other place for him to go. Her sister, Mrs. Stephenson, was ill at the time. He stayed with her for 2 years and 2 months, during which period she had to look after him carefully, as owing to his age he required constant attention. She says he offered her money on several occasions, which she refused to take. On one occasion she kept $58, which he "gave" her, as she says. She adds that he said, "Maggie, I owe you this." She also says that he had often said that if he had money he would pay her. But I think it is clear that any such offers and the gift of the $58 were not made on any other footing than from a sense of moral obligation, and a desire. to help, such as an old man might naturally feel towards his daughter. Her husband, John Sloan, swears to a conversation he overheard in which the testator had said to Mrs. Sloan that he would pay her some day, but no time was mentioned nor what it was for which she was to be paid.

**12**    In July, 1917, Mahaffey apparently paid a visit to his other daughter, Mrs. Stephenson. No arrangement was made as to maintenance or board, but, as Mrs. Stephenson and her daughter Mrs. Fry say, "he just came on a visit and stayed and stayed and stayed." While with Mrs. Stephenson he gave her $400. She says that when he did this she told him she would apply it on his board and that he said, "Don't bother, that is a present for you." This is corroborated by her daughter. In April, 1920, he returned to Mrs. Sloan and remained with her till his death in the following April. There was no evidence of anything during that period from which an implied contract to pay could be inferred.

**13**    On the 16th February, 1921, Mrs. Sloan wrote her half-brother a letter which contains some important admissions. She complains bitterly to her brother about the fact that her sister Mrs. Stephenson had got $400 from her father, and says that she, Mrs. Sloan, was going "to lift his board so you will be all notified I am not going to keep him for nothing when he could give so much of his money to Sarah." And later in the letter she says, "I suppose you will be vexed, but I have to look out for myself. I should of (sic) made him pay from the first." It is impossible, in my judgment, to read this letter and at the same time find as a fact that Mrs. Sloan had ever had any idea that her father was staying with her on a paying basis. The letter was written a week after the lunacy order was made, and after that Mahaffey could not have bound himself by any bargain.

**14**    Mrs. Stephenson's claim rests on a more slender footing than that of Mrs. Sloan. The only

evidence from which it is suggested a contract may be inferred is what I have mentioned above. Her counsel relies on Mercantile Trust Co. of Canada Limited v. Campbell, 43 O.L.R. 57, as an authority in support of the contention that the payment of the $400 to Mrs. Stephenson was an acknowledgment of liability. But it was expressly stated to be a gift, and the deceased said nothing which could be construed as an admission of liability or as a promise to pay for his board. The Mercantile Trust Co. case is somewhat unusual and is really not a direct authority upon the question involved here. There the estate sought to recover, as belonging to the deceased, certain moneys which she had handed to her niece, and it was held that, as on the evidence the moneys had been placed in the hands of the niece to be expended for her aunt's care and benefit, she was entitled to retain out of such moneys the sums so expended. It is true the defendant was given the right to increase her claim on the reference, if so advised, to a sum in excess of the amount first claimed, but that was because, on the facts, the Court held that the aunt went to the defendant with the understanding that she would pay for her support. Here there is no such evidence, nor is there anything upon which to find that the $400 was other than a gift to Mrs. Stephenson.

**15**    The disposition of the estate under the twill has very little bearing on the question, except as disclosing the testator's attitude towards the three children. All that James Henry himself gets is a life-estate in the farm, which latter is said to be worth $4,000, and his life-estate is subject to the obligation to pay the debts, etc., and $1,000 to his son Thomas. The two legacies to the daughters and the gift to them of all the residue gives them, I understand, a fairly substantial share in the estate. It is true that James Henry's other sons get the farm at his death, but the testator may have had his reasons for malting them special objects of his bounty. The daughters were, married and had their own homes, and on the face of it there seems nothing unfair about the distribution.

**16**    The appeal from the order of the learned Surrogate Court Judge must therefore be allowed, and the claims of Mrs. Sloan and Mrs. Stephenson against the estate are disallowed, except that Mrs. Sloan is entitled to be paid the $39.40 expended by her as part of the funeral expenses, and is also entitled to be paid as a debt of the estate for the maintenance of her father for the period between the 8th February, 1921, when the lunacy order was made, and the y, day of his death, the 8th April, 1921, at $300 per annum, which for the two months would entitle her to $50. Her right to be compensated after that order rested upon an entirely different footing from her claim for compensation before it was made. The order will therefore provide for the payment to her by James Henry Mahaffey of those two sums of $39.40 and $50 respectively.

**17**    Under all the circumstances, I think there should be no order as to costs, either here or below.

qp/s/qlwlh/qlrpv

TAB 60

58 U.S.P.Q.2d 1596

247 F.3d 44
United States Court of Appeals,
Third Circuit.

MEDTRONIC AVE, INC.

v.

ADVANCED CARDIOVASCULAR

SYSTEMS, INC., Appellant.

No. 00–5230. | Argued Feb.
12, 2001. | Filed: April 17, 2001.

Manufacturer of coronary stent devices brought three separate patent infringement actions against competitor. After two of cases were transferred to court in which third case was pending, competitor moved to stay action, pending arbitration of whether provisions of settlement agreements between competitor and third medical device company, whose coronary catheter business line had been acquired by manufacturer while suits were pending, barred claims. The United States District Court for the District of Delaware, Sue L. Robinson, Chief Judge, denied motion. Competitor appealed. The Court of Appeals, Greenberg, Circuit Judge, held that: (1) Court of Appeals had jurisdiction over appeal pursuant to Federal Arbitration Act (FAA), and residual jurisdictional statute, and (2) manufacturer's claims, which had never been owned by third device company before its business line was acquired, did not come within scope of mutual release and covenant not to sue contained in third company's settlement agreements with competitor, rights under which had been assigned to manufacturer.

Affirmed.

West Headnotes (26)

**[1]**  **Federal Courts**
  Intellectual property

Court of Appeals for circuit in which district court was located had jurisdiction, pursuant to Federal Arbitration Act (FAA), and residual jurisdictional statute, over appeal from district court order denying motion to stay patent infringement suits in order to allow defendant to enforce arbitration clauses in agreements it had entered with company whose product line

had subsequently been acquired by plaintiff, which contained a release and covenant not to sue, even though Federal Circuit would have jurisdiction over any final decision in case; no final decision existed, appeal was not from an interlocutory order, and order was not appealable as one denying an interlocutory injunction. 9 U.S.C.A. § 16(a)(1)(A); 28 U.S.C.A. §§ 1292, 1294, 1295(a), 1338.

6 Cases that cite this headnote

**[2]**  **Federal Courts**
  Compromise and Settlement

Court of Appeals exercise plenary review over legal questions concerning the applicability and scope of an arbitration agreement.

9 Cases that cite this headnote

**[3]**  **Federal Courts**
  "Clearly erroneous" standard of review in general

To extent that district court predicated its decision regarding applicability and scope of an arbitration agreement, on findings of fact, standard of review applied by Court of Appeals is whether those findings were clearly erroneous.

10 Cases that cite this headnote

**[4]**  **Federal Courts**
  Contracts

When a district court interprets language contained in contracts, Court of Appeals reviews its determination under the clearly erroneous standard, but if district court engages in contract construction, Court of Appeals exercises plenary review.

11 Cases that cite this headnote

**[5]**  **Alternative Dispute Resolution**
  Constitutional and statutory provisions and rules of court
**Federal Courts**
  Alternative dispute resolution

By enacting Federal Arbitration Act (FAA), Congress provided a framework for the development of a body of uniform federal law governing contracts within its scope; therefore, if FAA is applicable, federal law applies in questions regarding the construction and enforcement of an arbitration clause, even in those cases in which the district court's jurisdiction is based on diversity of citizenship. 9 U.S.C.A. § 1 et seq.

3 Cases that cite this headnote

**[6]    Federal Courts**
          👈 Alternative dispute resolution in general

Although Federal Arbitration Act (FAA) creates federal substantive law regarding agreements to arbitrate, it does not create any independent federal-question jurisdiction. 9 U.S.C.A. § 4; 28 U.S.C.A. § 1331.

1 Cases that cite this headnote

**[7]    Federal Courts**
          👈 Alternative dispute resolution

If Federal Arbitration Act (FAA), applies, federal law, including general principles of contract law, determines whether there is a valid arbitration clause. 9 U.S.C.A. § 1 et seq.

2 Cases that cite this headnote

**[8]    Alternative Dispute Resolution**
          👈 Remedies and Proceedings for Enforcement in General

Federal Arbitration Act (FAA) allows litigants to obtain an order requiring a reluctant party to arbitrate a dispute in appropriate circumstances, as it directs the district court to order a party to arbitrate if it is satisfied that the making of the agreement for arbitration or the failure to comply therewith is not an issue. 9 U.S.C.A. § 4.

Cases that cite this headnote

**[9]    Alternative Dispute Resolution**
          👈 Arbitrability of dispute

Under Federal Arbitration Act (FAA), when one party refuses to arbitrate, the issue of whether the dispute is within the scope of the agreement requires district court resolution. 9 U.S.C.A. § 4.

4 Cases that cite this headnote

**[10]   Alternative Dispute Resolution**
          👈 Contractual or consensual basis

Arbitration is fundamentally a creature of contract, and thus, arbitrators have the authority to resolve disputes only if the parties have agreed to submit to arbitration.

3 Cases that cite this headnote

**[11]   Alternative Dispute Resolution**
          👈 Evidence

For a court to enter an order compelling arbitration, there must be sufficient evidence that the parties consented to arbitration in an express agreement.

1 Cases that cite this headnote

**[12]   Alternative Dispute Resolution**
          👈 Elements

While a court asked to stay proceedings pending arbitration must determine whether there is a valid agreement to arbitrate and, if so, whether the specific dispute falls within the substantive scope of that agreement, its function nevertheless is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator; in that instance, court's function is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract.

25 Cases that cite this headnote

**[13]   Alternative Dispute Resolution**
          👈 Disputes and Matters Arbitrable Under Agreement

In determining whether a claim falls within the scope of an arbitration agreement, court's focus is on the factual underpinnings of the claim, rather than the legal theory alleged in the complaint.

24 Cases that cite this headnote

**[14]    Alternative Dispute Resolution**
🔑 Merits of controversy

If a court determines that there is an agreement to arbitrate, and that the issue in dispute falls within the scope of the agreement, it must submit the matter to arbitration without ruling on the merits of the case.

21 Cases that cite this headnote

**[15]    Alternative Dispute Resolution**
🔑 Arbitration favored; public policy

**Alternative Dispute Resolution**
🔑 Construction in favor of arbitration

Federal policy favors arbitration, and thus, a court resolves doubts about the scope of an arbitration agreement in favor of arbitration.

9 Cases that cite this headnote

**[16]    Alternative Dispute Resolution**
🔑 Construction in favor of arbitration

**Alternative Dispute Resolution**
🔑 Evidence

There is a presumption of arbitrability, and an order to arbitrate should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.

21 Cases that cite this headnote

**[17]    Alternative Dispute Resolution**
🔑 Construction in favor of arbitration

While there is a presumption in favor of arbitrability, there is a limit as to how far a court should go in resolving a dispute in favor of arbitration, and while interpretive disputes should be resolved in favor of arbitrability, a compelling case for nonarbitrability should not be trumped by a flicker of interpretive doubt.

5 Cases that cite this headnote

**[18]    Release**
🔑 Nature and requisites in general

**Release**
🔑 Covenant not to sue as release

A "release" is a provision that intends a present abandonment of a known right or claim, while a "covenant not to sue," by contrast, also applies to future claims and constitutes an agreement to exercise forbearance from asserting any claim which either exists or which may accrue.

8 Cases that cite this headnote

**[19]    Alternative Dispute Resolution**
🔑 Persons affected or bound

**Alternative Dispute Resolution**
🔑 Disputes and Matters Arbitrable Under Agreement

Patent infringement claims asserted by manufacturer of coronary stent devices against competitor, which were pending at time manufacturer acquired coronary catheter business line of third medical device company, were never possessed by third company, so that claims were not within scope of settlement agreement entered in connection with prior patent infringement litigation between third company and competitor, which contained mutual releases between competitor and third company, and arbitration clause, and manufacturer was not bound by settlement agreement, rights under which had been assigned to manufacturer in connection with its acquisition of third company, to arbitrate dispute as to whether release barred its claims.

4 Cases that cite this headnote

**[20]    Release**
🔑 Scope and extent in general

A release usually will not be construed to bar a claim which had not accrued at the date of its execution, or a claim which was not known to the party giving the release.

8 Cases that cite this headnote

58 U.S.P.Q.2d 1596

**[21]    Release**

🗝 Covenant not to sue or execute

Patent infringement claims asserted by manufacturer of coronary stent devices against competitor, which were pending at time manufacturer acquired coronary catheter business line of third medical device company, and thus were never possessed by third company, did not come within scope of covenant not to sue entered by third company in connection with its settlement of prior patent infringement against competitor, rights under which had been assigned to manufacturer in connection with its acquisition of third company.

2 Cases that cite this headnote

**[22]    Assignments**

🗝 Nature and extent of rights of assignee in general

Absent a provision stating otherwise, assignment of a contract will result in the assignee stepping into the shoes of the assignor with regard to the rights that the assignor held, and not in an expansion of those rights to include those held by the assignee.

8 Cases that cite this headnote

**[23]    Assignments**

🗝 Rights of assignee as against debtor

An assignment does not modify the terms of the underlying contract; rather, it is a separate agreement between the assignor and the assignee which merely transfers the assignor's contract rights, leaving them in full force and effect as to the party charged.

10 Cases that cite this headnote

**[24]    Assignments**

🗝 Nature and extent of rights of assignee in general

Insofar as an assignment touches on the obligations of the other party to the underlying contract, the assignee simply moves into the shoes of the assignor.

9 Cases that cite this headnote

**[25]    Assignments**

🗝 Nature and extent of rights of assignee in general

An assignment is intended to change only who performs an obligation, not the obligation to be performed.

2 Cases that cite this headnote

**[26]    Assignments**

🗝 Nature and extent of rights of assignee in general

An assignee obtains only the right, title and interest of his assignor at the time of his assignment, and no more.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*47** Peter Buscemi, (argued), Richard S. Meyer, D. Michael Underhill, John H. Williamson, Mark A. Goodin, Morgan, Lewis & Bockius, Washington, DC, Attorneys for Appellee.

Frederick L. Cottrell, III, Jeffrey L. Moyer, Jennifer C. Bebko, **\*48** Richards, Layton & Finger, Wilmington, DE, Aldo A. Badini, (argued), Henry J. Ricardo, Carol A. Polizzi, Dewey Ballantine LLP, New York, NY, Richard A. Bardin, Craig B. Bailey, Fulwider Patton Lee & Utecht, LLP, Los Angeles, CA, Attorneys for Appellant.

Before SCIRICA, FUENTES, and GREENBERG, Circuit Judges.

**Opinion**

**OPINION OF THE COURT**

GREENBERG, Circuit Judge.

This matter is before the court on an appeal from an order of the district court dated September 30, 1999, denying American Cardiovascular Systems' ("ACS") motion for a stay of patent infringement litigation pending arbitration pursuant to 9 U.S.C. § 3. ACS sought a stay in this litigation brought by

Medtronic/Arterial Vascular Engineering, [1] Inc. ("AVE") so that it could enforce the arbitration clauses in two agreements containing a release and a covenant not to sue, respectively, into which ACS had entered with C.R. Bard, Inc. ("Bard"). After ACS and Bard executed these agreements, AVE, in 1998, purchased Bard's coronary catheter business. At that time Bard assigned the two agreements to AVE. AVE and ACS agree that the arbitration clauses are valid and that their provisions bind them, but AVE asserts that the claims it advances in this patent infringement litigation are outside the scope of the two agreements. The district court agreed with AVE and ACS appeals. We will affirm the district court's order denying the motion to stay the litigation pending arbitration because Bard never owned the claims involved in this litigation and, as a result, disputes regarding them are not subject to the arbitration provisions of either agreement. Thus, although AVE has stepped into Bard's shoes, inasmuch as it owes to ACS only obligations it derived from Bard, the arbitration clauses in the two agreements do not apply to AVE's separate claims involved here.


# I. BACKGROUND

ACS's coronary stent delivery systems consist of small pieces of stainless steel that are laser cut from a tube and affixed to a stent delivery catheter. The FDA-approved coronary stent is pre-mounted on a catheter that positions the stent in the appropriate region of the blood vessel. The balloon end of the catheter is inflated to expand the stent and place it against the vessel wall. The catheter then is withdrawn.


**(a) The 1992 Agreement**

Bard, a company involved in the development, manufacture and sale of medical devices, sued ACS in 1988, alleging infringement of certain of its patents for catheter technology. *See C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.*, No. SA CV 88–646 JSL, 1989 U.S. Dist. LEXIS 18439 (C.D.Cal. July 28, 1989); app. at 352–56. ACS then sued Bard in 1990, alleging infringement of several of ACS's patents for catheter technology, but Bard asserted counterclaims for infringement of Bard's catheter technology patents in that litigation. *See Advanced Cardiovascular Sys., Inc. v. C.R. Bard, Inc.*, No. C90–0503 FMS, 1992 WL 478215 (N.D.Cal. Dec. 22, 1992); app. at 293–351. In January 1992, ACS and Bard settled the actions through an agreement (the "1992 Agreement") in which they cross-licensed various catheter patents to each other and agreed to pay royalties.

**\*49** The 1992 Agreement contained mutual releases which provided that each party:

> on behalf of [itself and its] respective predecessors, successors, parents, subsidiaries, assigns, stockholders, officers, directors, attorneys, agents, employees and representatives hereby releases and discharges the other party, and its respective predecessors and successors, parents, subsidiaries and their respective assigns, stockholders, officers ... from any and all debts, claims, demands, damages, liabilities, obligations, causes of action, agreements, suits, sums of money, and rights, whether known or unknown, suspected or unsuspected, which are based on any actions or inaction occurring prior to the date of this Agreement and which the party now owns or holds, or at any time heretofore owned or held, by reason of any act, matter, cause or thing whatsoever [subject to certain exceptions not relevant here].

1992 Agreement ¶ 8; app. at 87–88.

The agreement also provided for arbitration to settle certain disputes:

> Any dispute between the parties concerning the construction, interpretation, and effect of this Agreement or any clause herein contained, or the rights and liabilities of the parties hereunder, or the coverage of any patent claims licensed herein, shall be resolved, if necessary, by binding arbitration in accordance with the commercial arbitration rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

1992 Agreement ¶ 15.a; app. at 92.

**(b) The 1998 Agreement**

In 1997 Bard sued ACS for infringement of certain of its patents for catheters based on actions not covered by the 1992 Agreement. *See C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc., 997 F.Supp. 556 (D.Del.1998)*; app. at 357–62. Then in 1998 Bard sued ACS again for infringement of its catheter patents. *See C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.*, No. 98–120(RRM) (D.Del.); app. at 363–67. To resolve these actions, Bard and ACS entered into a settlement agreement on or about April 4, 1998, in which ACS agreed to pay Bard $100,000,000, and the parties cross-licensed certain catheter patents to each other. This agreement did not contain any releases but did include mutual covenants not to sue which, with respect to Bard, provided as follows:

> Bard and its Affiliates covenant not to sue ACS and its Affiliates for any and all debts, claims, demands, and liabilities, whether known or unknown, suspected or unsuspected, which are based in any way on any and all of ACS's and its Affiliates past and current domestic and foreign angioplasty catheters including stent delivery catheters. For purposes of this section, "ACS's and its Affiliates past and current domestic and foreign angioplasty catheters including stent delivery catheters" shall mean ACS's and its Affiliates past and current domestic and foreign angioplasty catheters including stent delivery catheters and shall specifically exclude any future modifications to such products.

1998 Agreement ¶ 4.b; app. at 110.

The 1998 Agreement required ACS to deliver to Bard certain catalogues and materials which showed "current domestic and foreign angioplasty catheters including stent delivery catheters" to identify products exempted from suit by the Agreement. *See* app. at 110 (1998 Agreement ¶ 4.b). The ACS Coronary Stent Delivery **\*50** Systems, including the ACS RX Multi–Link and the ACS RX Multi–Link HP, were listed and pictured in the materials that ACS provided to Bard, and these products were the subject of the infringement action. *See* app. at 56–57. The U.S. and International Product Brochures ACS delivered listed the integrated stent delivery systems which consist of a stent mounted on a stent delivery catheter. *See* app. at 20–38.

In this 1998 Agreement, Bard and ACS also agreed to settle certain disputes by arbitration as provided in the following clause:

> Any dispute between the parties concerning the construction, interpretation, and effect of this Agreement or any clause herein contained, or the rights and liabilities of the parties hereunder, or the coverage of any patent claims licensed herein, shall be resolved, if necessary, by binding arbitration in accordance with the commercial arbitration rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

1998 Agreement ¶ 13; app. at 116.

**(c) Actions Between ACS and AVE and AVE's Purchase of Bard's Business**

During the period of its disputes with Bard, ACS also was involved in litigation with AVE. ACS first sued AVE in December 1997 in the Northern District of California, and AVE sued ACS on February 18, 1998, in the District of Delaware. AVE's complaint for patent infringement of its stent technology patents against ACS involves two ACS coronary stent delivery systems: the ACS RX Multi-link Stent Delivery System and the ACS RX Multi-link HP Stent Delivery System. AVE also has advanced various state law claims against ACS (including breach of contract, misappropriation of trade secrets, unfair competition, and wrongful acquisition of property and conversion) regarding the development of the stent delivery systems and events that occurred between 1989 and 1991. Then, in April 1998, ACS brought a second patent infringement action in the Northern District of California against AVE.

While these three actions were pending, on October 1, 1998, AVE purchased the assets of Bard's coronary catheter business which included its various catheter technology patents. *See* app. at 176. The 1992 Agreement allowed its assignment as long as the patents that were the subject of the Agreement were transferred, *see* app. at 95–96 (1992 Agreement ¶ 22), and the 1998 Agreement allowed its assignment in connection with a merger, consolidation or sale

of its stock or sale of the assets of its business. *See* app. at 119–20 (1998 Agreement ¶ 20). Accordingly, Bard assigned all of its rights and obligations under the two agreements to AVE.

On February 8, 1999, in response to AVE's action against it and after the California court transferred the two cases pending before it to Delaware, ACS moved to stay AVE's district court action, *Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, No. 98–80–SLR (D.Del.), pending arbitration of whether either the release in the 1992 Agreement or the covenant not to sue in the 1998 Agreement bars the action. In addition, ACS filed a demand for arbitration. Obviously, the demand for arbitration was somewhat unusual as ACS predicated it on provisions in agreements to which AVE was not a party when it brought the action. AVE opposed ACS's motion, arguing that Bard never owned AVE's claims against ACS for infringement of AVE's stent patents or the state law claims involved in the litigation **\*51** between AVE and ACS. AVE also argued that the Bard–ACS agreements did not cover these claims and that they were not subject to arbitration.

In March 1999, the district court held a hearing on ACS's motion and then, on September 30, 1999, denied the motion. *See* app. at 5 (Mem. Order at 1). The district court held that it could not interpret the release of all claims held by Bard in the 1992 Agreement or its undertakings in the 1998 Agreement as applying to separate claims held by Bard's assignee, AVE. *See* app. at 16 (Mem. Order at 12). The court stated that "[a]lthough catheters and stents may be bundled for marketing purposes, there can be no question but that catheters and stents involve different technology and patents and that AVE developed its stent technology independent of Bard [the assignor to AVE]." App. at 17 (Mem. Order at 13).

Subsequently, ACS made a motion to reargue its motion to stay the action pending arbitration or, in the alternative, for a stay pending appeal. On March 24, 2000, ACS withdrew its motion to reargue and filed an appeal from the district court's September 30, 1999 order. On March 31, 2000, ACS moved in this court to stay proceedings in the district court pending appeal, and, after AVE filed its opposition to ACS's motion, a motions panel of this court referred ACS's motion to the merits panel by an order dated May 5, 2000. ACS, however, has withdrawn the motion as the district court has stayed the proceedings before it.

**(d) Related Cases and Proceedings**

This case, *Medtronic AVE, Inc. v. Advanced Cardiovascular Systems, Inc.*, 98–80–SLR, has been consolidated with the two proceedings ACS brought against AVE in the Northern District of California and which the California court transferred to the District of Delaware, *Advanced Cardiovascular Systems, Inc. v. Arterial Vascular Engineering, Inc.*, No. 98–314, and *Advanced Cardiovascular Systems, Inc. v. Arterial Vascular Engineering, Inc.*, No. 98–316. Medtronic, Inc., AVE's parent company, also has sued ACS twice regarding infringement of Medtronic's stent patents. *See Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, No. 97–2459 JMR/FLN (D.Minn.); *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc. and Guidant Corp.*, No. 99–761 JMR/FLN (D.Minn.). ACS moved to stay the proceedings based on the arbitration clause in the 1998 Agreement between Bard and ACS. The district court denied ACS's motion, and the Court of Appeals for the Eighth Circuit affirmed. *See Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 221 F.3d 1343 (table), 2000 WL 637045 (8th Cir.2000). The court ruled that as the parent corporation of AVE, Medtronic, Inc. was not bound to the 1998 Agreement.

## II. DISCUSSION

**(a) Jurisdiction**

The district court had jurisdiction over this patent infringement case pursuant to 28 U.S.C. § 1331 and 1338(a). We conclude for the reasons we set forth that we have jurisdiction over the appeal of the denial of the motion to stay pending arbitration pursuant to 9 U.S.C. § 16(a)(1)(A) and 28 U.S.C. § 1294(1).

The parties in their primary briefs indicated, without substantial discussion, that this court has jurisdiction over this appeal under 9 U.S.C. § 16(a)(1)(A). We, however, questioned this point inasmuch as the district court's jurisdiction was based in whole or in part on 28 U.S.C. § 1338 so that under 28 U.S.C. § 1295(a) the United States Court of Appeals for the Federal **\*52** Circuit would have exclusive jurisdiction over an appeal from a "final decision" in this case. Accordingly, we directed the parties to file supplemental briefs on the jurisdictional point. In their supplemental briefs they have adhered to their position that we have jurisdiction.

 **[1]**    After considering these briefs we have determined that we have jurisdiction and thus we adjudicate this appeal on the merits. Our starting point is 9 U.S.C. § 16(a)(1)(A) which

makes the order in this case appealable. Section 16(a)(1) (A), however, does not indicate the court to which such an appeal may be taken. Thus, we examine the general statutes providing for the courts of appeals' jurisdiction. We conclude that section 1295(a) does not vest jurisdiction in the Court of Appeals for the Federal Circuit because this appeal is not from a "final decision." After all, rather than ending the litigation on the merits, *see John Hancock Mutual Life Ins. Co. v. Olick,* 151 F.3d 132, 135–36 (3d Cir.1998), "the order ensure[d] that [the] litigation will continue in the District Court." *Gulfstream Aerospace Corp. v. Mayacamas Corp.,* 485 U.S. 271, 275, 108 S.Ct. 1133, 1136, 99 L.Ed.2d 296 (1988); *see Aluminum Co. of Am. v. Beazer East, Inc.,* 124 F.3d 551, 557 (3d Cir.1997). Furthermore, we see no reason to regard the order as final under the collateral order doctrine as we are satisfied that even if it were not appealable under section 16(a)(1)(A), it effectively could be reviewed after entry of a final judgment in the district court. *See Coopers & Lybrand v. Livesay,* 437 U.S. 463, 468, 98 S.Ct. 2454, 2458, 57 L.Ed.2d 351 (1978); *Quiepo v. Prudential Bache Secs., Inc.,* 867 F.2d 721, 722 (1st Cir.1989). Thus, section 1295(a) does not vest jurisdiction in the Court of Appeals for the Federal Circuit over the current appeal in this case.

We also conclude that the Court of Appeals for the Federal Circuit could not have jurisdiction over this appeal under 28 U.S.C. § 1292(c) which vests it with exclusive jurisdiction over an appeal from an interlocutory order as described in 28 U.S.C. § 1292(a)(1) or (b) in cases in which it would have jurisdiction over an appeal from a final decision under section 1295. Plainly section 1292(b) cannot be applicable as the procedures for allowing an interlocutory appeal as set forth in that section have not been followed here.

Thus, we are left to consider only section 1292(a)(1) which deals, *inter alia,* and as possibly applicable here, with orders refusing to grant injunctions. Upon consideration of that subsection we are satisfied, in harmony with *Gulfstream,* 485 U.S. at 287–88, 108 S.Ct. at 1142–43, and in accordance with the weight of authority, that the order denying the stay should not be regarded as appealable as an order denying an interlocutory injunction under section 1292(a)(1). *See McLaughlin Gormley King Co. v. Terminix Int'l Co.,* 105 F.3d 1192, 1193–94 (8th Cir.1997); *Quiepo,* 867 F.2d at 722; *see also Cofab, Inc. v. Philadelphia Joint Bd. etc.,* 141 F.3d 105, 108–09 (3d Cir.1998).

In view of the foregoing analysis we come to the conclusion that the Court of Appeals for the Federal Circuit would not

have had jurisdiction if ACS had prosecuted this appeal to that court. That conclusion, however, in itself does not mean that we do have jurisdiction. After all, what we have held with respect to the Court of Appeals for the Federal Circuit's lack of jurisdiction under section 1295(a) would apply equally to us if we attempted to exercise jurisdiction under our usual source of jurisdiction, 28 U.S.C. § 1291, as that section, like section 1295(a), provides for jurisdiction only over appeals from "final decisions." Moreover, we no more can **\*53** exercise jurisdiction under section 1292(a)(1) by regarding the order denying the stay as an order denying an interlocutory injunction than could the Court of Appeals for the Federal Circuit under section 1292(c)(1) which incorporates that section. Thus, this case is the unusual one that finally turns on the residual jurisdictional statute, 28 U.S.C. § 1294(1), which provides, with exceptions that we hold are inapplicable, that an appeal from a reviewable decision of a district court "shall be taken to the ... court of appeals for the circuit embracing the district." Inasmuch as the appeal has been taken from the United States District Court for the District of Delaware, which is within this circuit, we have jurisdiction.

In reaching our result we have not overlooked the opinion of the Court of Appeals for the Seventh Circuit in *In re BBC International, Ltd.,* 99 F.3d 811 (7th Cir.1996), a case that we brought to the parties' attention when we requested the supplemental briefs. In *BBC,* the regional court of appeals held that it did not have jurisdiction to entertain a petition for a writ of mandamus pursuant to 28 U.S.C. § 1651(a) which authorizes courts of appeals "in aid of their respective jurisdictions" to issue writs. *Id.* at 812–13. In reaching its conclusion, the court indicated that the "[p]ower to issue writs of mandamus depends on [the] power to entertain appeals when the case ends," and it thus held that it did not have jurisdiction to issue the writ because any appeal from a final decision in the case would have to be taken to the Court of Appeals for the Federal Circuit. *Id.* at 813. Thus, for the court to determine whether it had jurisdiction to entertain a writ of mandamus it had to work backwards from its conclusion on the question of whether it would have jurisdiction at the time of a final decision.

Here, however, our methodology is different as we are deciding the case on the basis of what court has jurisdiction now. Thus, our analysis in no way is confined by a provision such as that in section 1651(a) that a court may issue writs "in aid" of its jurisdiction. Consequently, the circumstance that the Court of Appeals for the Federal Circuit will have exclusive jurisdiction over any appeal from a final decision

in this case does not require that we conclude differently than we do with respect to our jurisdiction over the appeal in this case at this time.

**(b) Standard of Review**

**[2]    [3]    [4]**    We exercise plenary review over the legal questions concerning the applicability and scope of an arbitration agreement. *See Harris v. Green Tree Fin. Corp.,* 183 F.3d 173, 176 (3d Cir.1999) (considering a district court's denial of a motion to compel arbitration and stay proceedings pending arbitration); *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 7 F.3d 1110, 1113 (3d Cir.1993). Nevertheless, to the extent that the district court predicated its decision on findings of fact, our standard of review is whether those findings were clearly erroneous.[2] **\*54** *See Kaplan v. First Options of Chicago, Inc.,* 19 F.3d 1503, 1509 (3d Cir.1994).

**(c) Court Decides Arbitrability of Dispute**

**[5]    [6]    [7]**    When Congress enacted the Federal Arbitration Act, 9 U.S.C. §§ 1–13, it provided a framework for the development of a body of uniform federal law governing contracts within its scope. Therefore, if the Arbitration Act is applicable, federal law applies in questions regarding the construction and enforcement of an arbitration clause, even in those cases in which the district court's jurisdiction is based on diversity of citizenship.[3] *See Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 3353, 87 L.Ed.2d 444 (1985); *Goodwin v. Elkins & Co.,* 730 F.2d 99, 108 (3d Cir.1984); *Becker Autoradio U.S.A., Inc. v. Becker Autoradiowerk,* 585 F.2d 39, 43 (3d Cir.1978). Accordingly, if the Arbitration Act applies, federal law, including general principles of contract law, determines whether there is a valid arbitration clause. *See First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995); *Mitsubishi,* 473 U.S. at 626, 105 S.Ct. at 3353; *Harris,* 183 F.3d at 178; *Goodwin,* 730 F.2d at 108.

**[8]    [9]    [10]    [11]**    In appropriate circumstances, 9 U.S.C. § 4 allows litigants to obtain an order requiring a reluctant party to arbitrate a dispute, as it directs the district court to order a party to arbitrate if it is "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not an issue." *PaineWebber Inc. v. Hartmann,* 921 F.2d 507, 510 (3d Cir.1990); *see Harris,* 183 F.3d at 178–79. But under section 4 when one party refuses to

arbitrate, the issue of whether the dispute is within the scope of the agreement requires district court resolution. *See AT&T Techs., Inc. v. Communication Workers of Am.,* 475 U.S. 643, 649, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986); *PaineWebber,* 921 F.2d at 510–11. There is an issue in dispute in those circumstances because arbitration is "fundamentally a creature of contract," *Kaplan,* 19 F.3d at 1512, and thus arbitrators have the authority to resolve disputes only if the parties have agreed to submit to arbitration. *See AT&T Techs.,* 475 U.S. at 648, 106 S.Ct. at 1418 (" '[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' "). Accordingly, for a court to enter an order compelling arbitration there must be sufficient evidence that the parties consented to arbitration in an express agreement. *See United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960); *Kaplan,* 19 F.3d at 1512; *PaineWebber,* 921 F.2d at 511; *Par–Knit Mills, Inc. v. Stockbridge Fabrics Co.,* 636 F.2d 51, 54 (3d Cir.1980).

**[12]    [13]    [14]**    While a court asked to stay proceedings pending arbitration must determine **\*55** whether there is a valid agreement to arbitrate and, if so, whether the specific dispute falls within the substantive scope of that agreement, "its function [nevertheless] is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract." *United Steelworkers of Am. v. American Mfg. Co.,* 363 U.S. 564, 567–68, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960); *see also United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 36–37, 108 S.Ct. 364, 370, 98 L.Ed.2d 286 (1987). To determine whether a claim falls within the scope of an arbitration agreement, the "focus is on the factual underpinnings of the claim rather than the legal theory alleged in the complaint." *Svedala Indus., Inc.,* Civ. No. 96–4538, 1996 WL 590861, at \*3 (E.D.Pa.1996), citing, *inter alia, Mitsubishi,* 473 U.S. at 622, n. 9, 105 S.Ct. at 3351 n. 9. If the court determines that there is an agreement to arbitrate and that the issue in dispute falls within the scope of the agreement, it must submit the matter to arbitration without ruling on the merits of the case. *See Beck v. Reliance Steel Prods. Co.,* 860 F.2d 576, 579 (3d Cir.1988).

**[15]    [16]    [17]**    However, federal policy favors arbitration and thus a court resolves doubts about the scope of an arbitration agreement in favor of arbitration. *See Moses H. Cone,* 460 U.S. at 24–25, 103 S.Ct. at 941; *First Liberty*

*Inv. Group v. Nicholsberg*, 145 F.3d 647, 653 (3d Cir.1998); *Kaplan*, 19 F.3d at 1512. There is a "presumption of arbitrability." *PaineWebber*, 921 F.2d at 511; *see Pritzker*, 7 F.3d at 1114–15; *Stateside Mach. Co. v. Alperin*, 591 F.2d 234, 240 (3d Cir.1979) ("doubtful issues regarding the applicability of an arbitration clause are to be decided in favor of arbitration."). An order to arbitrate "should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *United Steelworkers v. Warrior*, 363 U.S. at 582–83, 80 S.Ct. at 1353; *see also AT&T Techs.*, 475 U.S. at 650, 106 S.Ct. at 1419; *First Liberty Inv. Group*, 145 F.3d at 653; Schulte v. Prudential Ins. Co. of Am. (In re Prudential Ins. Co.), 133 F.3d 225, 231 (3d Cir.1998); *Sharon Steel Corp. v. Jewell Coal and Coke Co.*, 735 F.2d 775, 778 (3d Cir.1984) ("So long as the appellant's claim of arbitrability was plausible, interpretation of the contract should have been passed on to the arbitrator."). Yet there is a limit as to how far a court should go in resolving a dispute in favor of arbitration because, as we stated in *PaineWebber*, while interpretive disputes should be resolved in favor of arbitrability, "a compelling case for nonarbitrability should not be trumped by a flicker of interpretive doubt." *PaineWebber,* 921 F.2d at 513.

**(d) The 1992 Settlement Agreement and Release**

 **[18]**    **[19]**    As we have indicated, AVE does not dispute that it is bound by the agreements between ACS and Bard, including the arbitration clauses. Accordingly, the question for us to determine is whether the district court erred in holding that the dispute is not within the scope of the arbitration clauses. In the release [4] contained in the 1992 Agreement, each **\*56** party released the other party from demands, damages, liabilities, obligations, causes of action, agreements, suits, sums of money and rights, which were based on any actions or inaction occurring prior to the date of the agreement and which the party then owned or held. *See* app. at 87–88 (1992 Agreement ¶ 8). The agreement also provided for arbitration of "any dispute between the parties concerning the construction, interpretation and effect of this Agreement or any clause herein contained, or the rights and liabilities of the parties hereunder." App. at 92 (1992 Agreement ¶ 15.a).

But even if AVE predicates its claims on property interests extant prior to the date of the 1992 Agreement, inasmuch as Bard did not then own or hold the interests of AVE, Bard could not have agreed to release ACS from or arbitrate claims

relating to those interests. Accordingly, while it is true that when AVE accepted the assignment of the 1992 agreement from Bard it "step[ped] into [Bard's] shoes," *see Premier Dental Prod. Co. v. Darby Dental Supply Co.*, 794 F.2d 850, 853 (3d Cir.1986); *Professional Collection Consultants v. Hanada*, 62 Cal.Rptr.2d 182, 184, 53 Cal.App.4th 1016, 1018–19 (Cal.Ct.App.1997), the agreement to arbitrate cannot be applied to AVE's separate interests that Bard never owned. Therefore, although this litigation is extraordinarily complex, our resolution of it requires nothing more than the application of a rather straightforward principle.

ACS argues that *Svedala Industries*, 1996 WL 590861, supports the view that releases given by an assignor can bar independent, pre-existing claims of an assignee where the release explicitly applies to successors and assigns. It argues that, like AVE, the plaintiff in *Svedala* contended that the release could not bar its independent patent claims because the promisor did not hold rights to the patent at issue at the time of the release. In *Svedala*, two companies, Barmac and Tidco International, entered into a license agreement in 1988 regarding the #571 patent and related products that Barmac owned. The patent related to an impact breaking apparatus designed to reduce the size of certain minerals. Tidco and Svedala Industries, Inc. ("Svedala Inc.") were sister companies, as both were subsidiaries of Svedala Industries, AB ("Svedala AB"). *See Svedala*, 1996 WL 590861, at *1. In 1993, Tidco, Svedala Inc., and Svedala AB entered into a settlement agreement and mutual release with Kemper Equipment Inc. over certain disputes regarding the sales and operations of their respective crushing and screening equipment business and ancillary operations. *See id.* at *1.

The release agreement provided that the parties on behalf of themselves and their respective:

> predecessors, successors, heirs, assigns, ... subsidiaries, sister companies, parent companies and all persons, connected with them fully release and discharge the other and their respective predecessors, successors ... subsidiaries, sister companies, parent companies ... from any and all claims, demands, causes of action, obligations, damages and liabilities of any nature whatsoever, whether or not now known, suspected or claimed....

*Id.* at *1. About one year later in 1994 Tidco acquired Barmac. *See id.* at *2. Then in 1996, Tidco assigned the #571 patent Barmac previously owned to Svedala Inc. *See id.* at *2. Svedala Inc. then brought a lawsuit against Kemper and Rock Engineered for infringement of the #571 patent. Kemper and Rock Engineered moved to stay the proceedings and to compel arbitration. *See id.* at *2.

 **\*57**  The court rejected Svedala's argument that Svedala predicated on a contention that at the time of the 1993 release agreement it had no rights in the #571 patent and therefore had no patent infringement claim to release so that the matter did not fall within the arbitration clause. In rejecting the argument, the court reasoned, *inter alia,* that although Svedala Inc. did not have rights in the patent at the time of the release, Barmac did have rights in the patent at that time, and Tidco is the successor of Barmac [5] and is a sister company to the plaintiff Svedala Inc. *See id.* at *4. The release specified that it applied to all successors and sister companies and all persons connected with them, and Svedala Inc., in addition to being a party to the release, was a sister company of Tidco (a party to the release) and also later an assign. *See id.* at *1.

Obviously the situation in *Svedala* is completely distinguishable from that here. First of all, the plaintiff Svedala Inc. itself was a party to the broad 1993 release, whereas AVE was not a party to the 1992 release between Bard and ACS. Second, even if Svedala had not been a party to the release, Tidco was a party to the release and entered into it on behalf of its sister companies, of which Svedala was one. In this case, AVE was not bound to the release agreement between Bard and ACS through a relationship with either of the parties existing at the time of the execution of the release. Because the defendants in *Svedala* put forth evidence that they had made and offered for sale the accused infringing device prior to the time of the release, the fact that Svedala Inc. was a party to the release is relevant, even if the claim was unknown.

In contrast, in this case, although Bard was a party to the release and later assigned the contract to AVE, at the time of the release Bard did not own and, in fact, never owned the patents that are now the subject of the suit between AVE and ACS. This is a crucial difference because here, unlike in *Svedala*, the party seeking to invoke the arbitration clause is trying to apply the clause in an action on a patent that was not acquired from a party to the agreement to arbitrate. Thus, if AVE's action against ACS concerned patents that

Bard acquired after the date of the release and Bard assigned the contract containing that release to AVE, this case would be in a very different posture.

In another case that ACS cites to support its case, *Universal Studios Inc. v. Viacom Inc.,* 705 A.2d 579 (Del.Ch.1997), two parties entered into a joint venture agreement relating to the cable television business that included a non-compete provision requiring that the participants not engage in the same business as the joint venture. *See id.* at 583. Another party, Viacom, then bought the interests of one of the participants in the joint venture. This acquisition posed a problem because Viacom already was in the cable business. After complex negotiations and business developments that we need not describe, litigation ensued. The court held that the non-compete clause was effective with respect to Viacom. *See id.* at 590–91, 600.

*Universal Studios* is different from this case in that the parties there were involved in a joint venture and had signed a non-compete agreement and exclusivity agreement, and the purchaser of the interest of one joint venturer stepped into its shoes thereby becoming as subject to the non-compete provision of the joint venture agreement as to all its other provisions. Accordingly, the joint venture agreement **\*58** and the non-compete and exclusivity agreements gave rise to different fiduciary and contractual obligations and duties than those provided by a release or covenant not to sue which relate to obligations and claims of the parties subject to the agreement rather than claims of a third party. Thus, *Universal Studios* dealt with the obligations of a party to adhere to the terms of a joint venture when it acquired an interest in the venture. Accordingly, the factual pattern in *Universal Studios* is so distinct from that here that the case is not useful in resolving the controversy here.

*Reid v. Contel Cellular of Louisville, Inc.,* 208 F.3d 214 (table), 2000 WL 303005 (6th Cir.2000), is a more pertinent citation than *Svedala* and *Universal Studios.* In *Reid,* Contel acquired a portion of the business of McCaw Cellular, Reid's employer. Contel, however, though it hired other McCaw Cellular employees, did not hire Reid, according to Reid because of her physical handicap. Reid then filed an action under Kentucky law against Contel in state court which was removed to the district court. Reid, however, remained McCaw Cellular's employee.

Subsequently Reid left McCaw Cellular's employment and at that time received a severance package pursuant to which

she released McCaw Cellular and its successors and assigns from all possible claims. Contel then successfully moved for summary judgment on the ground that it was a "successor/assign" of McCaw Cellular. On appeal, the court of appeals reversed, indicating that "Contel's assignee status vis-a-vis McCaw extends only to the subject matter contained within the purchase agreement and that it is illogical to allow Contel to benefit as assignee from every release to which McCaw has been a party since the date of the purchase agreement." *Id.* at \*2.

We certainly agree with *Reid* because a contrary holding would have meant that the successor to a release could apply it to bar claims quite beyond anything the parties to the release could have contemplated. After all, a releasor giving a release to a second party hardly would anticipate that, as a result of an assignment, a third party could apply the release to a claim the releasor had against the third party than was quite independent of its claims against the second party. *Reid*, then, supports the result the district court reached in this case.

[20]   Moreover, a release usually will not be construed to bar a claim which had not accrued at the date of its execution or a claim which was not known to the party giving the release. *See Three Rivers Motors Co. v. Ford Motor Co., 522 F.2d 885, 895–96 (3d Cir.1975).* While it is true that cases ACS has cited support the view that a release can bar even unknown claims, these cases would be relevant only if it were Bard's unknown claims that AVE, stepping into Bard's shoes, wished to pursue against ACS. *See id. at 894–96* (holding that although ordinarily words of release will not be construed to bar unknown claim, parties intended to release accrued but unknown antitrust claims); *San Diego Hospice v. San Diego, 37 Cal.Rptr.2d 501, 504–05, 31 Cal.App.4th 1048, 1052–54 (Cal.Ct.App.1995).* Inasmuch as AVE seeks to assert claims that Bard never owned, the cases ACS cites are not relevant. Accordingly, it can be said with "positive assurance" that the claims in this case which AVE asserts against ACS are not within the scope of the release in the 1992 Agreement and that AVE thus is not bound to arbitrate disputes regarding them.

### (e) The 1998 Settlement and Covenant Not to Sue

[21]   The covenant not to sue in the 1998 Agreement provided:

> **\*59**   Bard and its Affiliates covenant not to sue ACS and its Affiliates for any and all debts, claims, demands, and liabilities, whether known or unknown, suspected or unsuspected, which are based in any way on any

and all of ACS's and its Affiliates past and current domestic and foreign angioplasty catheters including stent delivery catheters. For purposes of this section, "ACS's and its Affiliates past and current domestic and foreign angioplasty catheters including stent delivery catheters" shall mean ACS's and its Affiliates past and current domestic and foreign angioplasty catheters including stent delivery catheters and shall specifically exclude any future modifications to such products.

1998 Agreement ¶ 4.b; app. at 110. However, the covenant not to sue does not apply to AVE's separate claims that Bard never owned.

In *Spindelfabrik Suessen–Schurr Stahlecker & Grill v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft, 829 F.2d 1075, 1079 (Fed.Cir.1987),* defendant Schubert had entered into a license agreement with Murata Machinery, Ltd. ("Murata") in 1982. Under this agreement, Murata granted a nonexclusive license to its patents to Schubert. *See id.* In 1983, Suessen sued Schubert for infringement of Suessen's #946 patent, which dominated the Murata patents under which Schubert had a license. *See id.* at 1076. Suessen later bought Murata's technology and business from Murata in 1984. *See id.* at 1079. Schubert, in defense against Suessen's action, argued that it had an implied license under the Suessen #46 patent, as Schubert's actions were merely an exercise of its license under the 1982 agreement. *See id.* Schubert also claimed that when Suessen acquired the Murata patents, it "stepped in the shoes" of Murata and therefore was barred by legal estoppel from suing Schubert for practicing the licensed technology. *See id.*

The court rejected Schubert's argument for an implied license. *Id.* at 1080. Under the agreements at issue, Suessen had not made a promise not to sue under Suessen's separate patents, and treating it as such would be an overly broad interpretation. *See id.* at 1081. "[A] patent license agreement is in essence nothing more than a promise by the licensor not to sue the licensee.... Indeed, the patentee of X and his licensee, when making, using, or selling X, can be subject to suit under other patents." *Id.*

Similarly, in *ZapatA Industries Inc. v. W.R. Grace & Co., 51 U.S.P.Q.2d 1619, 1620, 1999 WL 667419 (S.D.Fla.1999),* ZapatA Industries Inc. ("ZapatA") and Advanced Oxygen Technologies, Inc. ("AOTI") settled disputes between them by entering into a license agreement in 1991 under which AOTI was to receive ownership of the oxygen technology and all rights in related patents issued or applied for by either

party and ZapatA was given licenses of all patents covering the oxygen technology and agreed to pay royalties to AOTI. *See id.* at 1622. In 1992, following a breach of contract dispute, ZapatA and AOTI entered a settlement agreement under which ZapatA agreed to assign all patents and patent applications to AOTI and the license agreement was amended and would remain in effect unless the parties agreed on a new one. The settlement agreement did not expand or amend the provisions of the license agreement in which each party had made the representation that as of August 1, 1991 (the date of the license agreement), the technology licensed to the other party did not infringe any third party patent rights. *See id.* at 1622–23. In 1991 and 1992, after the date of the license agreement between AOTI and ZapatA, W.R. Grace & Co. ("Grace")  **\*60**  independently obtained two patents (which AOTI never owned). *See id.* at 1623. In 1995, Grace acquired AOTI's oxygen scavenging technology and its patents, under which ZapatA was licensed by AOTI. The purchase agreement did not contain a provision that would release ZapatA or any other third party from liability for infringing the Grace patents. *See id.* at 1623.

ZapatA claimed but Grace denied that ZapatA had an "implied license" under the Grace patents because Grace assumed AOTI's warranty of non-infringement under the AOTI ZapatA settlement agreement. *See id.* at 1625. Consequently, ZapatA instituted an action seeking a declaration that Grace was precluded from enforcing its patents against ZapatA by reason of implied license and estoppel. Grace filed a motion for summary judgment on this issue because AOTI never owned the Grace patents or had any rights under those patents and therefore did not have any right under them to provide to ZapatA through the AOTI–ZapatA agreements. *See id.* The court stated: "ZapatA received nothing more from AOTI than a promise not to be sued by AOTI on AOTI's patents. That promise did not, and ... could not, apply to Grace's patents which AOTI never owned and never had any rights under. To the extent Grace assumed the license, it owed ZapatA nothing more than what AOTI had owed.... Grace's 'commitment' does not include a promise, express or implied, not to sue under Grace's own patents." *Id.* at 1626–27.

 **[22]   [23]   [24]   [25]   [26]**   While obviously *Schubert* and *ZapatA* involve facts distinct from those here, similar principles apply in this case. At the time of the 1998 Agreement, Bard and ACS contracted for a covenant not to sue. When AVE stepped into Bard's shoes, it had to adhere to the covenant not to sue on *Bard's* claims. But absent a

provision stating otherwise, assignment of a contract will result in the assignee stepping into the shoes of the assignor with regard to the rights that the assignor held and not in an expansion of those rights to include those held by the assignee. "An assignment does not modify the terms of the underlying contract. It is a separate agreement between the assignor and the assignee which merely transfers the assignor's contract rights, leaving them in full force and effect as to the party charged.... Insofar as an assignment touches on the obligations of the other party to the underlying contract, the assignee simply moves into the shoes of the assignor." *Citibank, N.A. v. Tele/Resources, Inc.*, 724 F.2d 266, 269 (2d Cir.1983). "[A]n assignment is intended to change only who performs an obligation, not the obligation to be performed." *Capitan Enter., Inc. v. Jackson*, 903 S.W.2d 772, 776 (Tex.App.—El Paso 1994). " 'An assignee obtains only the right, title and interest of his assignor at the time of his assignment, and no more.' " *Id.*, citing *State Fidelity Mortgage Co. v. Varner*, 740 S.W.2d 477, 480 (Tex.App.—Houston [1st Dist.] 1987). Thus, AVE did not by accepting the assignments from Bard limit its rights under the patents involved in this action which it did not obtain from Bard.

ACS argues that if Bard had acquired a new patent the day after the 1998 Agreement was executed, the agreement by its terms would have prevented Bard from asserting that new patent against the ACS products because the covenant not to sue is product based, not patent based. ACS maintains that the district court focused on the technology and the patents rather than the products. [6] *See* Br. of Appellant 23.  **\*61**  But the "stepping into the shoes" assignment means that even if Bard had obtained a new patent related to catheters the day after the Agreement was executed, AVE could not now sue ACS based on that patent if the covenant not to sue was interpreted to cover a patent that was obtained after the covenant not to sue was signed. [7] However, if AVE had acquired a new patent the day after the parties executed the 1998 Agreement, it still could sue on it because Bard never would have owned that patent and therefore the patent would not have been within the scope of the agreement.

### III. CONCLUSION

For the foregoing reasons, we will affirm the district court's order denying ACS's motion to stay the proceedings in the district court pending arbitration.

58 U.S.P.Q.2d 1596

**Parallel Citations**

58 U.S.P.Q.2d 1596

**Footnotes**

1     Medtronic, Inc. acquired AVE in January 1999 and thus AVE has been known as Medtronic AVE, Inc. since that time. The district court, by an order dated October 22, 1999, allowed the caption of the consolidated cases to be amended to reflect the name change.

2     When a district court interprets language contained in contracts we review its determination under the clearly erroneous standard. *See John F. Harkins Co. v. Waldinger Corp.*, 796 F.2d 657, 658 (3d Cir.1986). But if the district court engages in contract construction, we exercise plenary review. *See id.* at 659. "By 'interpretation of language' we determine what ideas that language induces in other persons. By 'construction of the contract,' as that term will be used here, we determine its legal operation—its effect upon the action of courts and administrative officials. If we make this distinction, then the construction of a contract starts with the interpretation of its language but does not end with it; while the process of interpretation stops wholly short of a determination of the legal relations of the parties." *Id.* at 659 (citing 3 Corbin, Corbin on Contracts, § 534 at 9 (1960)).

3     Although the Arbitration Act creates federal substantive law regarding agreements to arbitrate, it does not create any independent federal-question jurisdiction under 28 U.S.C. § 1331. 9 U.S.C. § 4 "provides for an order compelling arbitration only when the federal district court would have jurisdiction over a suit on the underlying dispute; hence, there must be diversity of citizenship or some other independent basis for federal jurisdiction before the order can issue.... Section 3 likewise limits the federal courts to the extent that a federal court cannot stay a suit pending before it unless there is such a suit in existence." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 26 n. 32, 103 S.Ct. 927, 942 n. 26, 74 L.Ed.2d 765 (1983).

4     A release is a provision that intends a present abandonment of a known right or claim. By contrast, "a covenant not to sue also applies to future claims and constitutes an agreement to exercise forbearance from asserting any claim which either exists or which may accrue...." *McMahan & Co. v. Bass*, 673 N.Y.S.2d 19, 21, 250 A.D.2d 460, 461 (1998).

5     We also note that the district court in *Svedala* apparently regarded Barmac as a predecessor of Tidco for purposes of the release. *See Svedala*, 1996 WL 590861, at *4.

6     The district court reasoned that there "can be no question but that catheters and stents involve different technology and patents and that AVE developed its stent technology independent of Bard. The plain and unambiguous language of the 1998 Agreement, therefore, demonstrates that the litigation at issue, involving stent technology, is not an arbitrable grievance under the 1998 Agreement." App. at 17 (Mem. Order at 13).

7     It is uncertain whether the covenant not to sue would be interpreted to cover a patent that was obtained after the covenant not to sue was signed inasmuch as the covenant covers claims that are based on ACS's and its Affiliates *past and current* domestic and foreign angioplasty catheters including stent delivery catheters, specifically excluding any future modifications to such products. Therefore, it is possible that a patent obtained after this agreement still would be based on a "past or current" catheter; however, it is also possible that a patent obtained after the agreement would not be considered based on such a catheter and could, for example, be considered a "future modification."

---

End of Document      © 2014 Thomson Reuters. No claim to original U.S. Government Works.