# TAB 61

499 F.3d 1332
United States Court of Appeals,
Federal Circuit.

Frank MORROW (on behalf of and as Trustee
for the General Unsecured Creditors' Liquidating
Trust of At Home Corporation, and on behalf
of and in the name of the At Home Liquidating
Trust of At Home Corporation), Plaintiff,
and
Hank M. Spacone (on behalf of and as
Trustee for the General Unsecured Creditors'
Liquidating Trust of At Home Corporation, and
on behalf of and in the name of the At Home
Liquidating Trust of At Home Corporation),
Plaintiff/Counterclaim Defendant–Appellant,
and
Jacquelyn Crawford (as Trustee for the
At Home Liquidating Trust of At Home
Corporation), Counterclaim Defendant–Appellant,
v.
MICROSOFT CORPORATION, Defendant/
Counterclaimant–Cross Appellant.

Nos. 2006–1512, 2006–1518, 2006–
1537.   |   Sept. 19, 2007.   |   Rehearing and
Rehearing En Banc Denied Nov. 16, 2007.*

**Synopsis**

**Background:** Trustee of liquidating trust established in bankruptcy proceeding for benefit of patentee's general unsecured creditors brought action against software company alleging infringement of patent relating to dynamic generation of hyperlinks in a source document to other topicly relevant documents. The United States District Court for the Northern District of California, 2006 WL 1600675 and 2006 WL 648740, Claudia Wilken, J., ruled that trust had standing had to sue under bankruptcy law, and granted software company's motion for summary judgment of noninfringement, and parties cross-appealed.

**[Holding:]** The Court of Appeals, Moore, Circuit Judge, held that liquidating trust lacked constitutional standing to sue for patent infringement.

Reversed and vacated.

Prost, Circuit Judge, filed dissenting opinion.

West Headnotes (12)

**[1]**   **Federal Courts**
   Standing

Standing is a legal question and jurisdictional issue that court reviews without deference. U.S.C.A. Const. Art. 3, § 2, cl. 1.

Cases that cite this headnote

**[2]**   **Patents**
   Nature of patent rights
   **Patents**
   Requisites and Validity of Assignments and Grants
   **Patents**
   Persons entitled to sue

Patent statutes govern the creation and protection of patent rights, how rights can be transferred, and the parties entitled to assert those rights. 35 U.S.C.A. §§ 100(d), 261, 281.

2 Cases that cite this headnote

**[3]**   **Bankruptcy**
   In general;  standing
   **Bankruptcy**
   Sale or Assignment of Property
   **Patents**
   Transfer on insolvency
   **Patents**
   Persons entitled to sue

Bankruptcy courts and courts of equity have the power to order assignment of legal title from the original patent owner to the receiver or trustee according to the requirements of the patent statutes, thus vesting the receiver or trustee with the right to bring suit for infringement. 35 U.S.C.A. §§ 100(d), 261, 281.

Cases that cite this headnote

**[4]** **Patents**

👉 Persons entitled to sue

Determination of standing to file patent infringement suit would be made under patent law principles in case in which bankruptcy proceedings led to a liquidation plan agreement, negotiated at arms-length between classes of interested parties, dividing the debtor's patent rights.

1 Cases that cite this headnote

**[5]** **Patents**

👉 Persons entitled to sue

For purposes of establishing standing to sue for patent infringement, constitutional injury in fact occurs when a party performs at least one prohibited action with respect to the patented invention that violates the legal right to exclude others from making, using, selling, or offering to sell the patented invention in the United States, or importing the invention. U.S.C.A. Const. Art. 3, § 2, cl. 1; 35 U.S.C.A. §§ 154, 271.

15 Cases that cite this headnote

**[6]** **Patents**

👉 Persons entitled to sue

A patentee who holds all the exclusionary rights and suffers constitutional injury in fact from infringement is one entitled to sue for patent infringement in its own name. U.S.C.A. Const. Art. 3, § 2, cl. 1; 35 U.S.C.A. §§ 154, 271.

11 Cases that cite this headnote

**[7]** **Patents**

👉 Construction and Operation of Assignments and Grants

**Patents**

👉 Persons entitled to sue

If a patentee transfers "all substantial rights" to the patent, that amounts to an assignment or a transfer of title, which confers constitutional standing on the assignee to sue for patent infringement in its own name alone; when a party holds all rights or all substantial rights, it alone has standing to sue for infringement. U.S.C.A. Const. Art. 3, § 2, cl. 1; 35 U.S.C.A. §§ 154, 271.

39 Cases that cite this headnote

**[8]** **Patents**

👉 Complainants

Parties that hold the exclusionary rights under the patent statutes can only enforce those rights through or in the name of the owner of the patent, and the patentee who transferred those exclusionary interests is usually joined to satisfy prudential standing concerns; however, when the patentee is the infringer, or the prudential concerns are not at play in a particular case, joinder of the patentee is not necessary. U.S.C.A. Const. Art. 3, § 2, cl. 1; 35 U.S.C.A. §§ 154, 271; Fed.Rules Civ.Proc.Rule 19, 28 U.S.C.A.

26 Cases that cite this headnote

**[9]** **Patents**

👉 Nature of ownership of patents

**Patents**

👉 Assignability of patents

A patent is a bundle of rights which may be retained in whole or in part, divided, and assigned. 35 U.S.C.A. § 261.

1 Cases that cite this headnote

**[10]** **Patents**

👉 Persons entitled to sue

Those that hold less than all substantial rights to the patent and lack exclusionary rights under the patent statutes lack constitutional standing to sue for patent infringement; such plaintiffs are not injured by a party that makes, uses, or sells the patented invention because they do not hold the necessary exclusionary rights, and the standing deficiency cannot be cured by adding the patent title owner to the suit. U.S.C.A. Const. Art. 3, § 2, cl. 1; 35 U.S.C.A. §§ 154, 271.

48 Bankr.Ct.Dec. 243, 84 U.S.P.Q.2d 1377

49 Cases that cite this headnote

**[11]** Patents

👉 Persons entitled to sue

Liquidating trust established in bankruptcy proceeding for benefit of patentee's general unsecured creditors lacked constitutional standing to sue for patent infringement since trust's interests in the patent did not include sufficient exclusionary rights such that it suffered an injury in fact from infringing activities; while trust held the right to sue parties for patent infringement except for the controlling shareholders, patent title holder held the right to sell the patent, grant exclusive and nonexclusive licenses, grant the right to sublicense, or transfer any of the rights that it held to another party. U.S.C.A. Const. Art. 3, § 2, cl. 1; 35 U.S.C.A. §§ 154, 271.

23 Cases that cite this headnote

**[12]** Patents

👉 Original utility

6,122,647. Cited.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*1334** Jason C. Kravitz, Nixon Peabody LLP, of Boston, MA, argued for plaintiff/counterclaim defendant-appellant. With him on the brief was Richard D. Rochford, Jr.

Brett J. Williamson, O'Melveny & Myers LLP, of Newport Beach, CA, for counterclaim defendant-appellant. Of counsel were Nathaniel L. Dilger and Mark S. Davies, of Washington, DC.

Frank E. Scherkenbach, Fish & Richardson P.C., of Boston, MA, argued for defendant/counterclaimant-cross appellant. With him on the brief were Kurt L. Glitzenstein, Craig R. Smith, and Charles H. Sanders. Of counsel on the brief was Isabella E. Fu, Microsoft Corporation, of Redmond, WA. Of counsel was Jennifer K. Bush, Fish & Richardson, PC, of San Diego, CA.

Before PROST, Circuit Judge, PLAGER, Senior Circuit Judge, and MOORE, Circuit Judge.

**Opinion**

Opinion for the court filed by Circuit Judge MOORE. Dissenting opinion filed by Circuit Judge PROST.

MOORE, Circuit Judge.

Spacone appeals the United States District Court for the Northern District of California's grant of Microsoft Corporation's (Microsoft) motion for summary judgment of noninfringement of claims 2, 8, 12, and 13 of U.S. Patent No. 6,122,647 (the #647 patent). Microsoft cross-appeals, asserting Spacone lacked standing to bring suit. We reverse the district court's determination that Spacone had standing to sue Microsoft for infringement of the #647 patent and vacate the judgment of noninfringement.

**BACKGROUND**

**I.**

At Home Corp. (AHC) was a provider of internet services over the cable television infrastructure but filed a petition for bankruptcy under Chapter 11 on September 28, 2001. After AHC filed for bankruptcy protection, two committees of creditors were appointed to represent each class of creditors' interests in the bankruptcy proceeding. In April 2002, after several days of mediation, the committees entered into **\*1335** a settlement of their claims against AHC. The committee settlement agreement was incorporated into a joint bankruptcy liquidation plan (liquidation plan). This liquidation plan was prepared for the purpose of liquidating AHC's assets in a manner amenable to the various creditors, and was confirmed by the United States Bankruptcy Court for the Northern District of California. It became effective on September 30, 2002.

Under the liquidation plan, three trusts were created—the General Unsecured Creditors' Liquidating Trust (GUCLT), the At Home Liquidating Trust (AHLT), and the Bondholders Liquidating Trust (BHLT). Morrow and Spacone were appointed as former and current trustees (respectively) for GUCLT. [1] The liquidation plan distributed certain assets and rights among the trusts. BHLT was given rights to

causes of actions against AHC's controlling shareholders, including AT & T Corporation, Comcast Corporation, and Cox Communications. GUCLT received the rights to all other causes of action (called "Estate Litigation"), including claims for misappropriation or infringement of AHC's intellectual property rights. AHLT (the "Plan Agent" in charge of conducting the administrative wind-down of the company's business) was given ownership rights in AHC's intellectual property, since all of the assets not distributed to BHLT or GUCLT were assigned to AHLT. Thus, AHLT received legal title to the #647 patent under the liquidation plan though it did not have the right to sue third parties for infringement of the patent. The liquidation plan and the associated agreements provided that AHLT's assets were to be managed for the benefit of the bondholders and the general creditors of BHLT and GUCLT.

## II.

Spacone, as the trustee of GUCLT, filed suit against Microsoft on October 22, 2003 alleging infringement of the #647 patent. The #647 patent, entitled "Dynamic Generation of Contextual Links in Hypertext Documents," relates to dynamic generation of hyperlinks in a source document to other documents that are topically relevant to the content of the source document or user-selected portion of that document. Spacone accused Microsoft's software applications that contain "Smart Tag Functionality," including those found in Microsoft Office XP® and Microsoft Office 2003®, of infringing several claims of the #647 patent. On November 12, 2003, Microsoft answered and asserted counterclaims against Spacone and Crawford (trustee for AHLT), seeking a declaration of noninfringement, invalidity, and unenforceability of the #647 patent.

Microsoft filed a motion for summary judgment contending that GUCLT lacked standing. In response, Spacone filed a cross-motion for summary judgment that standing existed, asserting he had standing to pursue this action as trustee of GUCLT or alternatively on behalf of and in the name of AHLT. The district court denied Microsoft's standing motion and granted Spacone's cross-motion, concluding that GUCLT had standing to sue under bankruptcy law principles and based on its trust beneficiary status. *Spacone v. Microsoft Corp.,* No. C 03–04739 CW, slip. op. (N.D.Cal. Aug. 10, 2004). Microsoft moved the district court to certify the standing order for interlocutory appeal, but the district court denied this motion.

*1336 On April 2, 2004, GUCLT filed a motion in the bankruptcy court requesting clarification of its rights under the liquidation plan approved by that court. GUCLT argued that it had the right to prosecute and settle patent infringement claims, the right to grant nonexclusive licenses to settle these claims, and the right to receive revenues generated from these settlement licenses. The bankruptcy court ruled in GUCLT's favor and BHLT appealed this ruling to the district court. The district court reversed the bankruptcy court, holding GUCLT did not have the right to grant licenses to settle Estate Litigation or receive licensing revenues. [2] The district court determined that GUCLT was not given ownership or licensing rights in the #647 patent under the liquidation plan, rather, AHLT was assigned the patent and had the exclusive right to license the patent and collect royalties from it.

The parties completed discovery, then cross-moved for summary judgment on the invalidity and infringement issues. On March 10, 2006, the district court denied Spacone's motion and granted Microsoft's motion for summary judgment of non-infringement and invalidity. *Spacone v. Microsoft Corp.,* 2006 WL 648740, No. C 03–04739 CW (N.D.Cal. Mar. 10, 2006). Spacone and Crawford then timely appealed to this court. Microsoft timely appealed the district court's determination of standing. We have jurisdiction over this appeal pursuant to 28 U.S.C. §§ 1295(a)(1), 2107(a), and Fed. R.App. 4(a).

## ANALYSIS

### I.

[1]    As a threshold matter, we must consider the district court's determination that bankruptcy principles govern the standing inquiry in this case. Standing is a legal question and jurisdictional issue that this court reviews without deference. *See Evident Corp. v. Church & Dwight Co.,* 399 F.3d 1310, 1313 (Fed.Cir.2005). The district court ruled that Spacone had standing to bring this infringement suit based on the special circumstances surrounding the trust relationship between GUCLT and AHC created through the bankruptcy proceedings. *SJ Opinion I,* slip op. at 9–11. Specifically, it noted that GUCLT's rights "arise out of bankruptcy law and trust relationships, rather than a traditional patent licensing relationship." *Id.* at 10. The court determined that GUCLT had a "proprietary interest" in the patent (1) as AHC's

successor for all purposes related to the Estate Litigation and had the power to pursue this litigation in AHC's name as if it had never gone bankrupt; and (2) as a trust beneficiary of the patent that AHLT holds in trust for GUCLT and BHLT and an equitable title holder for purposes of the Estate Litigation. *Id.* It did not analyze GUCLT's standing to bring this suit under patent law standing principles.

 **[2]**    The question as to how bankruptcy or trust law relationships affect the standing analysis in a patent infringement case is a question of first impression in this court. GUCLT and AHLT certainly gained rights to the #647 patent through the bankruptcy proceeding, but this suit against Microsoft was filed pursuant to and is governed by the patent laws. The patent statutes govern the creation and protection of patent rights, how rights can be transferred, and the parties entitled to assert those rights. *See* **\*1337** 35 U.S.C. §§ 100(d), 261, 281; *Crown Die & Tool Co. v. Nye Tool & Mach. Works,* 261 U.S. 24, 40, 43 S.Ct. 254, 67 L.Ed. 516 (1923). In *Crown Die,* the plaintiff asserted that it held sufficient interest in the patent for standing purposes as the beneficial owner of claims for past infringement in equity, though it did not hold legal title to the patent. 261 U.S. at 44, 43 S.Ct. 254. Quoting *Gayler v. Wilder,* 51 U.S. 477, 10 How. 477, 13 L.Ed. 504 (1850), the Court noted that a patent monopoly does not exist at common law but rather under congressional acts, and patent rights are not acquired unless authorized by and acquired in the manner prescribed by statute. *Crown Die,* 261 U.S. at 44, 43 S.Ct. 254. The Court stated that equitable rules "[were] not intended to set aside a policy and rule having its source in the patent statutes and cannot affect this case." *Id. Crown Die,* however, involved an assignment of patent rights rather than the disposition of patent rights through bankruptcy proceedings.

 **[3]**   **[4]**    The court in *Ball v. Coker,* 168 F. 304 (C.C.D.S.C.1909) considered the process by which receivers and trustees legitimately gain rights to patents in determining whether the receiver appointed in that case held sufficient rights to the patent to sue for infringement. The court noted that mere appointment of a receiver to manage and control a patent does not vest legal title enabling him to sue for infringement in his own name. *Id.* at 307 (citing 2 *Robinson on Patents* § 766). Rather, bankruptcy courts and courts of equity have the power to order assignment of legal title from the original owner to the receiver or trustee according to the requirements of the patent statutes, thus vesting the receiver or trustee with the right to bring suit for infringement. *Id.*

(citing *Stephens v. Cady,* 14 How. 528, 531, 14 L.Ed. 528 (1852) (copyright infringement case)). The court stated that

> [u]nder [the patent statutes] no person may bring suit for profits or damages for infringement who is not the patentee, or such assignee or grantee as the statute points out. The claim to recover profits or damages for this infringement cannot be severed from the title by an assignment or grant so as to give the right of action for such claim in disregard of the statute. Profits or damages for infringement cannot be sued for except on the basis of title as patentee, or as such assignee or grantee to the whole or part of the patent, and not on the basis merely of the assignment of a right to a claim for damages severed from such title.

*Id.* at 308. Thus, the patent statutes have long been recognized as the law that governs who has the right to bring suit for patent infringement, even when patent rights have been transferred as a result of bankruptcy or proceedings in equity.[3] In this case, bankruptcy proceedings led to a liquidation plan agreement negotiated at arms-length between classes of interested parties. Where parties have contractually divided patent rights, we have analyzed standing to file the infringement suit under patent law principles. *E.g., Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.,* 248 F.3d 1333 (Fed.Cir.2001); *Prima Tek II, LLC v. A–Roo Co.,* 222 F.3d 1372 (Fed.Cir.2000); *Abbott Labs. v.* **\*1338** *Diamedix Corp.,* 47 F.3d 1128 (Fed.Cir.1995). Accordingly, we must determine whether GUCLT has shown that it has standing to sue Microsoft for infringement under the patent statutes. *Sicom Sys., Ltd. v. Agilent Techs., Inc.,* 427 F.3d 971, 976 (Fed.Cir.2005) (stating the party bringing suit bears the burden of establishing that it has standing).

## II.

### A. Rights Transferred from AHC to GUCLT and AHLT

To determine whether GUCLT has standing, we must first understand its rights to the patent at the time this suit was initiated. AHC owned the patent before the effective date of the liquidation plan in September 2002.[4] After

the effective date, AHC ceased to exist and AHC's assets, rights, obligations, and causes of action were divided among GUCLT, BHLT, and AHLT. GUCLT was given the right to bring suit on the intellectual property assets against any party other than AHC's controlling shareholders. Since it has the right to sue, GUCLT has the exclusive right or duty to (1) decide, at its discretion, whether to investigate, pursue, or dismiss patent infringement actions (without consultation with AHLT and BHLT); (2) collect damages from infringement litigations; (3) incur any liability arising from claims or defenses of any infringement defendant; (4) incur all costs and expenses associated with such litigations; and (5) assume any litigation sanctions. In order to settle patent infringement litigation, AHLT's consent is required. Otherwise, AHLT has no oversight powers with respect to the suits of GUCLT, cannot unreasonably withhold its consent to settle, and is required to "fully and promptly cooperate, assist, and join in all such actions and execute any necessary papers for such actions." There is no indication, however, that GUCLT holds the right to make, use, or sell the invention of the #647 patent, much less the exclusive right to do any of these things with the patented technology. Additionally, GUCLT was not given the right to grant licenses or sublicenses under the patent or collect any licensing royalties.

All rights and assets not specifically transferred from AHC to GUCLT or BHLT under the liquidation plan were transferred to AHLT. It is undisputed that AHLT holds legal title to the #647 patent and all the "sticks" in the "bundle of rights" associated with the patent that were not specifically transferred to GUCLT. AHLT holds all rights to license the #647 patent to third parties and collect royalties from those licenses, royalties not shared with GUCLT and BHLT. AHLT also holds the exclusive right to make, use, and sell the patented technology—though it is contractually prohibited from exercising that right itself under the liquidation plan. AHLT may transfer any of its rights to the #647 patent to third parties with the consent of GUCLT and BHLT.

### B. Article III Standing Requirements

Given this disposition of patent rights between AHLT and GUCLT, to have standing GUCLT must meet both constitutional and prudential standing requirements. Article III of the constitution limits the judicial role in our system of government to the resolution of "cases" and "controversies." The standing inquiry enforces this constitutional restriction

on the power of the courts. To demonstrate the minimal constitutional standing requirements have been satisfied, "[a] **\*1339** plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Hein v. Freedom Religion Found., Inc.,* 551 U.S. 587, 127 S.Ct. 2553, 2555–56, 168 L.Ed.2d 424 (2007) (citing *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). These requirements have been described as the injury in fact, traceability, and redressability inquiries. But standing "often turns on the nature and source of the claim asserted.... Essentially, the standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *see also Int'l Primate Prot. League v. Admins. of Tulane Educ. Fund,* 500 U.S. 72, 76, 111 S.Ct. 1700, 114 L.Ed.2d 134 (1991) ( "[S]tanding is gauged by the specific common-law, statutory or constitutional claims that a party presents."); *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State,* 454 U.S. 464, 484, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) ("The requirement of standing 'focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated.' "). Since the patent statutes give rise to the right to sue others for patent infringement, they also define the nature and source of the infringement claim and determine the party that is entitled to judicial relief.

[5]    A "patentee" is entitled to bring a "civil action for infringement of his patent." 35 U.S.C. § 281, and the "patentee" includes the patentee to whom the patent was issued and the "successors in title to the patentee," 35 U.S.C. § 100(d). The "successor[ ] in title" is the party holding *legal title* to the patent. *See Enzo Apa & Son, Inc. v. Geapag A.G.,* 134 F.3d 1090, 1093 (Fed.Cir.1998); *Prima Tek II LLC v. A–Roo Co.,* 222 F.3d 1372, 1377 (Fed.Cir.2000) (noting the assignee of all substantial rights under the patent becomes the effective patentee and can sue in its own name for infringement). A patent grant bestows the legal right to exclude others from making, using, selling, or offering to sell the patented invention in the United States, or importing the invention. *See* 35 U.S.C. § 154; 35 U.S.C. § 271 (describing permitted and prohibited actions with respect to the exclusionary rights). This right to exclude is the legal interest created by statute. *Arachnid,* 939 F.2d at 1578. Constitutional injury in fact occurs when a party performs at least one prohibited action with respect to the patented

invention that violates these exclusionary rights. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (stating that constitutional injury arises from invasion of a legally protected interest which is concrete and particularized and actual or imminent rather than conjectural or hypothetical). The party holding the exclusionary rights to the patent suffers legal injury in fact under the statute. [5]

[6]    [7]    There are three general categories of plaintiffs encountered when analyzing the constitutional standing issue in patent infringement suits: those that can sue in their own name alone; those that can sue as long as the patent owner is joined in the suit; and those that cannot even participate as a party to an infringement suit. The first category includes plaintiffs that hold all legal rights to the patent as the patentee or assignee of all patent rights —the entire bundle of sticks. Unquestionably, **\*1340** a patentee who holds all the exclusionary rights and suffers constitutional injury in fact from infringement is one entitled to sue for infringement in its own name. Additionally, if a patentee transfers "all substantial rights" to the patent, [6] this amounts to an assignment or a transfer of title, which confers constitutional standing on the assignee to sue for infringement in its own name alone. *Intellectual Prop. Dev.,* 248 F.3d at 1345. When a party holds all rights or all substantial rights, it alone has standing to sue for infringement.

[8]    The second category of plaintiffs hold exclusionary rights and interests created by the patent statutes, but not all substantial rights to the patent. As the grantee of exclusionary rights, this plaintiff is injured by any party that makes, uses, sells, offers to sell, or imports the patented invention. *Evident,* 399 F.3d at 1313; *Intellectual Prop. Dev.,* 248 F.3d at 1346 ("A party such as IPD that has the right to exclude others from making, using, and selling an invention described in the claims of a patent is constitutionally injured by another entity that makes, uses, or sells the invention."). Parties that hold the exclusionary rights are often identified as exclusive licensees, because the grant of an exclusive license to make, use, or sell the patented invention carries with it the right to prevent others from practicing the invention. [7]

However, these exclusionary rights "must be enforced through or in the name of the owner of the patent," and the patentee who transferred these exclusionary interests is usually joined to satisfy prudential standing concerns. *Indep. Wireless Tel. Co. v. Radio Corp. of Am.,* 269 U.S. 459, 467, 469, 46 S.Ct. 166, 70 L.Ed. 357 (1926). The patentee is

joined for the purpose of avoiding the potential for multiple litigations and multiple liabilities and recoveries against the same alleged infringer. *Intellectual Prop. Dev.,* 248 F.3d at 1347 (indicating that joining the patentee satisfies a prudential not constitutional standing requirement); *Propat,* 473 F.3d at 1193; *Indep. Wireless,* 269 U.S. at 469, 46 S.Ct. 166 (stating that where there is no express covenant by the patent owner to sue infringers it is an implied obligation to allow use of the licensor's name, which is indispensable to the enjoyment of the patent monopoly). When the patentee is the infringer, or the prudential concerns are not at play in a particular case, joinder of the patentee is not necessary. This joinder analysis has been incorporated in Federal Rule of Civil Procedure 19. *See* Fed.R.Civ.P. 19, Advisory Committee Note to Subdivision (a) (1937); *Prima Tek II,* 222 F.3d at 1377.

[9]    [10]    The third category of plaintiffs includes those that hold less than all substantial rights to the patent and lack exclusionary rights under the patent statutes to meet the injury in fact requirement. **\*1341** They are not injured by a party that makes, uses, or sells the patented invention because they do not hold the necessary exclusionary rights. Plaintiffs in this category lack constitutional standing. [8] *See Sicom,* 427 F.3d at 976 ("A nonexclusive license confers no constitutional standing on the licensee to bring suit or even to join a suit with the patentee because a nonexclusive licensee suffers no legal injury from infringement." (internal citations omitted)). This standing deficiency cannot be cured by adding the patent title owner to the suit. *Propat,* 473 F.3d at 1189; *Intellectual Prop. Dev.,* 248 F.3d at 1348–49.

## C. Injury in Fact

[11]    Here, we are faced with the question of whether GUCLT holds the exclusionary rights and suffers constitutional injury in fact. Microsoft asserts that GUCLT lacks sufficient rights to be a party to this case. Spacone argues that AHLT merely holds "bare" legal title to the #647 patent in trust for the benefit of GUCLT and that GUCLT has standing to sue because it possesses partial equitable title to the #647 patent. The question is whether GUCLT's interests in the patent include sufficient exclusionary rights such that GUCLT suffers an injury in fact from infringing activities. If GUCLT holds all substantial rights, it can sue in its name alone. If GUCLT holds less than all substantial rights but sufficient exclusionary rights that it suffers injury in fact, it can sue as a co-party with the legal title holder AHLT. If it

Morrow v. Microsoft Corp., 499 F.3d 1332 (2007)

48 Bankr.Ct.Dec. 243, 84 U.S.P.Q.2d 1377

lacks injury in fact, GUCLT lacks standing to be a party to this case.

GUCLT holds the right to sue parties (except for the controlling shareholders) for patent infringement. Its inability to sue controlling shareholders is a limitation on this right, as is the requirement that AHLT approve the settlement of any suits brought by GUCLT. Thus, GUCLT's right to sue comes with restrictions. In *Vaupel,* this court indicated that the right to sue is an important right, and like GUCLT Vaupel held the exclusive right to sue for infringement, subject only to the obligation to inform Markowsky of the suit. But unlike GUCLT, Vaupel also held the exclusionary rights—an exclusive license (right to make, use, or sell the patented invention) along with the exclusive right license and the right to sublicense (subject to prior consent by Markowsky). The grant of this exclusive license and the right to sublicense constituted a transfer of the exclusionary rights to the patent to Vaupel. Within this context, Vaupel held all substantial rights as the "effective patentee" because it held the exclusionary rights and additional important patent rights including the right to bring a patent suit. *Vaupel, 944 F.2d at 875.* Vaupel could sue without joinder of Markowsky. In contrast, GUCLT lacks an exclusive license, the exclusive right to license, and the right to sublicense. These are important aspects of the exclusionary rights held by Vaupel.

Moreover, GUCLT's control with respect to infringement litigation does not lead to the conclusion that GUCLT suffers injury in fact from infringement. In *Sicom,* we held that Sicom lacked all substantial rights (it was not a category one plaintiff) because it did not have the right to settle litigation it initiated without prior written consent of the licensor, even though it had the right to sue *and* an **\*1342** exclusive license to the patent. *427 F.3d at 979.*

While GUCLT has been granted the right to sue infringers that are not controlling shareholders, AHLT is the patent title holder, holds the right to sell the patent, grant exclusive and nonexclusive licenses, grant the right to sublicense, or transfer any of the rights that AHLT holds to another party. The only limitations on AHLT's ability to control and transfer its patent rights is GUCLT's and BHLT's consent. In *Speedplay,* we noted that this type of consent requirement was not significantly restrictive of Speedplay's exclusionary patent rights, which included an exclusive license and the right to sublicense a potential infringer. *211 F.3d at 1252.* In this case the requirement that GUCLT and BHLT consent to transfer of rights to the #647 patent is not significantly

restrictive of AHLT's exclusionary rights. Nor does this consent requirement transfer to GUCLT any exclusionary rights to the patent. Moreover, there is no indication that AHLT is restricted as to the parties to whom it could transfer any of the exclusionary rights that it holds under the #647 patent. Thus, AHLT could grant an exclusive license to any party, which would transfer the right to exclude others from practicing the patented invention.

The problem for GUCLT and AHLT is that the exclusionary rights have been separated from the right to sue for infringement. The liquidation plan contractually separated the right to sue from the underlying legally protected interests created by the patent statutes—the right to exclude. For any suit that GUCLT brings, its grievance is that the exclusionary interests held by AHLT are being violated. GUCLT is not the party to which the statutes grant judicial relief. *See Warth, 422 U.S. at 500, 95 S.Ct. 2197.* GUCLT suffers no legal injury in fact to the patent's exclusionary rights. As the Supreme Court stated in *Independent Wireless,* the right to bring an infringement suit is "to obtain damages for the injury to his exclusive right by an infringer." *269 U.S. at 469, 46 S.Ct. 166; see also Sicom, 222 F.3d at 1381* ("Standing to sue for infringement depends entirely on the putative plaintiff's proprietary interest in the patent, not on any contractual arrangements among the parties regarding who may sue ..."); *Ortho, 52 F.3d at 1034* ("[A] right to sue clause cannot negate the requirement that, for co-plaintiff standing, a licensee must have beneficial ownership of some of the patentee's proprietary rights.").

The importance of AHLT's right to license third parties to our constitutional standing analysis is underscored by *Textile Productions.* This court determined that the transfer of the right to sue in that case did not provide standing to even participate in the suit because the agreement did not clearly manifest that the owner would refrain from granting a license to anyone else in the particular area of exclusivity. *Textile Productions, 134 F.3d at 1485.* We stated that the right to license third parties is an important patent right because implicit in the right to exclude is the right to waive that right; that is, to license activities that would otherwise be excluded. *See Id.; Prima Tek II, 222 F.3d at 1379.* GUCLT does not have the right to license or sublicense or otherwise forgive activities that would normally be prohibited under the patent statutes. We "pay particular attention to whether the agreement conveys in full the right to exclude" in order to find standing. *Id. at 1379–80.*

48 Bankr.Ct.Dec. 243, 84 U.S.P.Q.2d 1377

Even in *Propat,* this court found that Propat had no standing to participate in an infringement suit though it enjoyed the exclusive right to sue third parties for patent infringement, the right to grant licenses to third parties, and the right to enforce license agreements. **\*1343** 473 F.3d at 1191. Propat's right to license and sue third parties was subject to prior approval by the legal title holder Authentix—approval that could not be unreasonably withheld. Propat was also required to receive the consent of Authentix before it assigned rights or obligations under the agreement to another party. This court held that Authentix didnot assign all substantial rights to Propat and Propat could not even sue as a co-plaintiff with Authentix. *Propat,* 473 F.3d at 1189 (noting that even if Authentix was a party this would not ameliorate Propat's standing problem). Propat lacked sufficient exclusionary rights and therefore did not suffer statutory legal injury.

While GUCLT enjoys greater control over infringement litigation than did Propat, it lacks the important rights to grant and enforce licenses that Propat held. GUCLT lacks the right to waive the patent's exclusionary rights by waiving those rights in license or sublicense agreements.

Spacone asserts that this court's decision in *Evident* supports GUCLT's standing to bring suit now that AHLT is a party. We do not agree that GUCLT suffers the legal injury that entitles it to be a party to this infringement suit. In keeping with the decisions from this court, *Evident* stands for the proposition that a party with the rights of an exclusive licensee holds exclusionary rights and has standing to sue for infringement if the patentee joins the suit to satisfy any prudential concerns present in that case. *Evident,* 399 F.3d at 1314; *see also Propat,* 473 F.3d at 1193; *Intellectual Prop. Dev.,* 248 F.3d at 1345–46; *Textile Prods.,* 134 F.3d at 1484; *Abbott Labs.,* 47 F.3d at 1131. Unlike Evident, AHLT's participation as a third party defendant does not affect GUCLT's standing to bring this suit. To demonstrate entitlement to join as a *co-plaintiff* GUCLT must have the right to exclude others from making, using, or selling the invention in the United States. *See Ortho Pharm. Corp. v. Genetics Institute, Inc.,* 52 F.3d 1026, 1030–32 (Fed.Cir.1995).

Contrary to the dissent's suggestion, GUCLT's beneficial ownership interest as the future beneficiary of 45% of whatever assets are still held by AHLT when it completes its wind-down of AHC's business does not affect the outcome of our standing analysis. Indeed, there is no indication as to what, if any, assets will flow to GUCLT after AHLT completes its work. Regardless, whatever interests in the #647

patent may flow to GUCLT in the future are insufficient to convert its equitable future interests in the patent into full legal exclusionary interests as of the time this suit was initiated. In *Arachnid, Inc. v. Merit Indus., Inc.,* 939 F.2d 1574, 1577, 1578 n. 3 (Fed.Cir.1991), the plaintiff also asserted that it had standing to sue for damages as the equitable title holder to the patent because in equity it was the real owner of the patent rights. It asserted that this equitable interest met the standing requirements because another party held legal title to the patent. This court rejected this equitable interest-based standing argument. We stated that equitable title to the patent is insufficient to confer standing to sue for legal relief from infringement. *Id.* at 1579–80 (noting that the owner of equitable title may seek redress in a court of equity such as rescission of title transfer but cannot bring an action at law for infringement damages). Similarly, GUCLT lacks the exclusionary rights under the #647 patent and relies on its equitable interests in AHLT's assets. But GUCLT lacks legal injury in fact, and its beneficial interest in assets held by AHLT or the fact that AHLT has been brought into this case as a third party defendant does not cure GUCLT's constitutional standing deficiencies.

**\*1344** Only when a party holds the exclusionary rights to the patent but lacks all substantial rights may the party join the legal title owner in a suit to enforce patent rights. Joining the legal title holder only satisfies prudential standing requirements. It cannot cure constitutional standing deficiencies. Since GUCLT fails to meet constitutional standing requirements, it cannot be a party to this suit for patent infringement.

## CONCLUSION

Since GUCLT lacked standing to sue Microsoft for infringement of the #647 patent, the district court lacked jurisdiction. Thus, we will not consider the appealed infringement issues on the merits. We reverse as to standing and vacate the infringement rulings.

*REVERSED AND VACATED*

## COSTS

Each party shall bear its own costs for this appeal and cross-appeal.

**PROST**, Circuit Judge, dissenting.

The majority holds that, in a bankruptcy proceeding, separating the title to a patent from the right to sue for infringement extinguishes all standing to enforce the patent. Because I believe the General Unsecured Creditors' Liquidating Trust of At Home Corporation ("GUCLT") holds a sufficient bundle of rights to support co-plaintiff standing with the holder of legal title, I respectfully dissent.

Pursuant to the liquidation plan, three entities divided the interests and assets of the At Home Corporation ("AHC"). The At Home Liquidating Trust of At Home Corporation ("AHLT") received all assets of AHC, including the patent at issue in this case. Two additional trusts represent the unsecured creditors to AHC: the Bond Holders' Liquidating Trust of At Home Corporation ("BHLT") and the GUCLT. BHLT received the rights to causes of action against AHC's controlling shareholders; GUCLT received the rights to pursue all other causes of action—including infringement of intellectual property, including U.S. Patent No. 6,122,647 ("the patent"). As the liquidation plan stated, AHLT exists to manage the assets for the benefit of GUCLT and BHLT. Indeed, AHLT requires their consent to sell or otherwise dispose of the patent.

I agree with the majority insofar as it holds that GUCLT does not have standing to enforce the patent in its own name; it is not, as the majority describes, in the "first category" of plaintiffs—patentees and holders of all substantial rights. But the analysis does not end there. As it is apparent that AHLT, having assigned the right to sue, cannot enforce the patent alone, the only way to enforce the patent requires AHLT and GUCLT to act as co-plaintiffs. The majority opinion forecloses that option.

Plaintiffs in the majority's "second category" hold fewer than all substantial rights in the patent, and therefore may not sue in their name alone. They may still enforce the patent, but must do so in the patentee's name and may compel the patentee to join as a necessary party. *Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.,* 248 F.3d 1333, 1347–48 (Fed.Cir.2001). Further, as this court recognized in *Evident Corp. v. Church & Dwight Co.,* a defendant's counterclaims may bring the patentee into a case and provide the original "second category" plaintiff with the support required for standing. 399 F.3d 1310, 1314 (Fed.Cir.2005). While I agree that *Evident* may only apply to the "second category" of plaintiffs, I believe the majority errs by excluding GUCLT from that category.

If, as I would hold, GUCLT is properly considered a "category two" plaintiff, then **\*1345** it could have added AHLT to the suit either voluntarily or involuntarily to satisfy our prudential standing requirements. *See Intellectual Prop. Dev.,* 248 F.3d at 1347–48. GUCLT had no need to add AHLT, however, because Microsoft's counterclaims here brought AHLT into the case, thus satisfying our prudential requirements. *Evident,* 399 F.3d at 1314. While I accept the usefulness of the majority's attempt to clearly delineate our jurisprudence on standing, that attempt misses the mark by failing to correctly define the second category of plaintiffs.

The majority narrowly defines the second category without any reasoned basis. It describes "exclusionary rights and interests" as "created by the patent statutes," but does not elucidate why only patentees and exclusive licensees should enjoy such rights. Maj. op. at 1340. Indeed, the precedent cited seems to contradict the majority's strict categorizations. In *Intellectual Property Development,* this court extensively discussed the underpinnings of our standing requirements. In that case, we stated, "Article III standing to sue in [patent cases] derives solely from the Patent Act.... This statutory language, however, fails to limit Article III standing to patentees and assignees." *Intellectual Prop. Dev.,* 248 F.3d at 1346. Thus, our precedent clearly shows that while protectable legal interests may derive from the patent statutes, those statutes do not limit standing to patentees—thus allowing standing for the majority's "second category" of plaintiffs.

While the majority effectively treats the second category as occupied solely by exclusive licensees, that category may properly include other types of plaintiffs. In *Intellectual Property Development,* 248 F.3d at 1346, we clarified that determining standing of non-patentee parties requires analysis under the standard set forth in *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Specifically, a putative plaintiff must demonstrate (1) an injury in fact (invasion of a legal interest that is concrete and particularized, and actual or imminent injury); (2) a causal connection between the defendant's action and the injury; and (3) that it is likely a favorable decision would redress the injury. *Lujan,* 504 U.S. at 560–61, 112 S.Ct. 2130. No serious argument could contend that GUCLT does not satisfy the second two factors; thus—as the majority ostensibly recognizes—the key question regarding constitutional standing is whether or not GUCLT suffers an injury in fact from Microsoft's infringement. Rather than

meaningfully evaluating the injury to the plaintiff here, the majority simply falls back on the established boundary including exclusive licensees.

Looking at injury in fact as arising from a breach of exclusionary rights under the patent, the majority equates exclusionary rights with the right to practice and right to license. Maj. op. at 1341–42. Exclusive licensees have the right to enforce a patent because that is the only way to give meaning to their exclusivity. *Indep. Wireless Tel. Co. v. Radio Corp. of Am.,* 269 U.S. 459, 469, 46 S.Ct. 166, 70 L.Ed. 357 (1926). Although exclusionary rights are important to an exclusive license, it does not follow that *only* exclusive licenses (and patentees) may hold those rights. While *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.* recognized that an exclusive license includes exclusionary rights, it concerned the difference between an exclusive license and an assignment. 944 F.2d 870, 874 (Fed.Cir.1991). *Vaupel* does not stand for the proposition that a party requires an exclusive license to gain exclusionary rights.

The majority further looks to *Sicom Systems, Ltd. v. Agilent Technologies, Inc.* **\*1346** for the proposition that control over litigation is insufficient to confer standing for a non-patentee. 427 F.3d 971 (Fed.Cir.2005). Several problems cloud the comparison. First, the only issue in *Sicom* was whether or not the putative plaintiff could sue in its name alone, without adding the holder of legal title. *Id.* at 975. That is not the question here. Further, Sicom had the right to sue only for *commercial* infringement, leaving open a broad range of potential non-commercial infringers. *Id.* at 979. Under such an arrangement, "a single infringer could be vulnerable to multiple suits for any noncommercial infringement." *Id.* That is not the case here.

Focusing much attention on the right to grant licenses under the patent here, the majority concludes that without such a right, GUCLT is missing a key component of the so-called exclusionary rights necessary for standing.[1] If, as the majority states, AHLT could freely and exclusively license the target of GUCLT's litigation, it would eviscerate GUCLT's right to sue. None of the documents defining the outcome of bankruptcy, however, explicitly address the right to license the patent. A nonexclusive license is a covenant not to sue, *Ortho Pharm. Corp. v. Genetics Inst., Inc.,* 52 F.3d 1026, 1032 (Fed.Cir.1995), so separating the right to sue from the right to license without any basis in the parties' arrangement makes a distinction without a solid basis. Because the two concepts are so intertwined, I would recognize that the right to sue—explicitly assigned to GUCLT—includes the right to offer nonexclusive licenses to targets of litigation.

Moreover, any right that AHLT has regarding transfer of rights under the patent is subject to consent by GUCLT. Nothing in the Trust Agreement indicates that GUCLT cannot unreasonably withhold such consent, an omission that sharply contrasts with the requirement that AHLT consent to settlement of suit by GUCLT and not unreasonably withhold such consent. The arrangement clearly places less restriction on GUCLT and demonstrates that GUCLT is the party controlling litigation, including settlement of the litigation through licensing.

The majority looks to *Speedplay, Inc. v. Bebop, Inc.* as indicating that a requirement for consent by the grantor of rights does not restrict the rights granted. 211 F.3d 1245 (Fed.Cir.2000). But that case concerned a grantor reserving the right of consent—not to be unreasonably withheld—to ensure the economic value of the consideration it received. *Id.* at 1251–52. Here, without the requirement for reasonableness, GUCLT's consent more substantially restricts AHLT. The consent provision should ensure that AHLT cannot—as the majority would have it—negate GUCLT's right to sue by granting licenses.

*Speedplay* also stated that the only reasonable basis to withhold consent is when giving consent would harm the economic value of the patent. *Id.* Even if—contrary to the plain language here—GUCLT were required not to unreasonably withhold consent, if AHLT were to offer a license to a target of GUCLT's litigation against GUCLT's wishes, it would be reasonable under *Speedplay* for GUCLT to withhold consent. I believe, therefore, that whatever right to license the patent AHLT may **\*1347** hold, it does not interfere with GUCLT's right to enforce the patent.

The bankruptcy agreements also provide that GUCLT requires AHLT's consent prior to settling any litigation, not to be unreasonably withheld. Under *Speedplay,* the requirement that AHLT not unreasonably withhold such consent indicates a more limited impact on GUCLT's right to control litigation and enforce the patent. Moreover, while the majority recognizes that AHLT must "fully and promptly cooperate" with GUCLT's litigation efforts, it fails to give any meaningful weight to that requirement. Indeed, if AHLT must fully cooperate with GUCLT, then AHLT must exercise

its rights in the patent consistent with GUCLT's litigation goals. That includes refraining from licensing the targets of litigation unless GUCLT desired a license as part of a settlement deal. At such time, AHLT must cooperate by consenting to the settlement and offering a license as GUCLT directs.

The majority also places great emphasis on *Propat International Corp. v. RPost, Inc.,* believing it to control this case. 473 F.3d 1187 (Fed.Cir.2007). I disagree. In *Propat,* the plaintiff required the patent owner's permission in order to select litigation targets, *Id.* at 1194; here, GUCLT does not require AHLT's permission. I believe the selection of targets forms a major portion of the right to enforce a patent, and provides an important basis for distinguishing this case from *Propat.*

Further, the holder of title in *Propat* retained an economic interest in the patent; here, AHLT does not retain an economic interest where it holds title to the patent in trust for GUCLT and BHLT. Finally, in *Propat* this court viewed the right to transfer one's interest as an important indicium of a true ownership interest. *Id.* Here, we have no indication that GUCLT cannot freely assign its rights under the bankruptcy agreement. In almost every way, its rights exceed those of the bare licensee in *Propat.* In light of GUCLT's substantially greater interest here, I cannot agree that it does not hold a proprietary interest in the patent. Assigned the right to enforce the patent, GUCLT suffers an injury when a party infringes the patent and thus satisfies the *Lujan* standards for standing.

I would hold that GUCLT does suffer an injury in fact. First, GUCLT holds an equitable interest in the title to the patent as beneficiary to the AHLT. I agree with the majority that ownership of equitable title to a patent does not by itself provide sufficient interest to sustain standing to sue alone for damages. *See Arachnid, Inc. v. Merit Indus., Inc.,* 939 F.2d 1574, 1579 (Fed.Cir.1991). In *Arachnid,* however, the plaintiff wanted the court to impose a trust extending prior to the date on which a district court awarded ownership to the plaintiff. *Id.*

GUCLT's equitable ownership in the patent should play a relevant role in the analysis. Exclusive licensees have standing to sue in the patent owner's name in part because the patent owner holds title to the patent in trust for the exclusive licensee, as the majority admits. *Indep. Wireless Tel. Co. v. Radio Corp. of Am.,* 269 U.S. 459, 469, 46 S.Ct. 166, 70 L.Ed. 357 (1926). Here, AHLT *explicitly* holds the title in trust for

GUCLT and BHLT, providing stronger reason to consider injury to the interests of the beneficiaries. Infringement of the patent diminishes its value and directly reduces the benefit enjoyed by GUCLT. While the majority states that we cannot know what assets will flow to GUCLT from AHLT, that does not change the fact that GUCLT and BHLT are the sole beneficiaries of AHLT. Any harm to the value of AHLT's assets directly affects GUCLT, causing an injury in fact.

**\*1348** Moreover, GUCLT's interest does not stop with its equitable interest in title to the patent; it also received the explicit right to sue as part of the bankruptcy agreement. While the majority points to precedent disallowing standing based on right to sue clauses in license agreements, those cases do not dictate the result here. For example, in *Prima Tek II, L.L.C. v. A–Roo Co.* this court held that a right to sue clause in a license agreement cannot allow standing *by the licensee alone.* 222 F.3d 1372, 1381 (Fed.Cir.2000). I find *Prima Tek II* inapposite where GUCLT—as a "category two" plaintiff—has no need to support standing in its own name.

In *Ortho,* this court also concluded that a right to sue clause cannot provide a non-exclusive licensee with standing. 52 F.3d at 1034. The court, however, based its holding in part on the details of the case—Ortho wanted standing to pursue a second case against an infringer that had already lost a suit by the patentee. *Id.* at 1035. Here, the agreement plainly assigns the entire right to sue Microsoft to GUCLT, who in the present case would litigate next to the holder of legal title to the patent, AHLT. Such a situation presents none of the difficulties that arose in *Ortho.*

Supported by no precedent clearly on point, the majority chooses to close the door on GUCLT enforcing the patent with AHLT as a co-plaintiff. I would follow the opposite course, particularly in light of the various policy considerations that guide the courts on standing. Indeed, this case does not implicate the perils associated with a relaxed standing requirement—that multiple plaintiffs may subject a defendant to suit for the same conduct, or that the patentee may miss an opportunity to defend against invalidation. *Evident,* 399 F.3d at 1314; *see also Ortho,* 52 F.3d at 1031 (quoting *A.L. Smith Iron Co. v. Dickson,* 141 F.2d 3, 6 (2d Cir.1944)). On the contrary, the bankruptcy agreement here clearly specifies the actions that GUCLT may pursue, separating a small number of defendants subject to suit only by BHLT. Allowing co-plaintiff standing for GUCLT and AHLT would create no risk of multiple suits and would permit AHLT to ensure a full defense of the patent's

validity. Devoid of policy considerations, the majority opinion merely concludes that GUCLT lacks exclusionary rights. As explained, because the indicia of standing point the other way, I believe GUCLT does hold such an interest. Where GUCLT has received the right to enforce the patent and the patentee presently holds title in trust for GUCLT, infringement of the patent constitutes injury in fact.

While I do not read any precedent as directly governing the peculiar circumstances of this case, I also do not read any as precluding co-plaintiff standing for GUCLT. I believe

that, in denying all possibility for enforcing the patent, the majority opinion extends limitations on co-plaintiff standing without a reasoned basis. Accordingly, while neither GUCLT nor AHLT individually may pursue infringement litigation, I would not deprive the patent of all value. Because I would allow GUCLT and AHLT, as co-plaintiffs, standing to sue Microsoft, I respectfully dissent.

### Parallel Citations

48 Bankr.Ct.Dec. 243, 84 U.S.P.Q.2d 1377

### Footnotes

\*     Circuit Judge Gajarsa did not participate in the vote.

1     Frank A. Morrow was the trustee of GUCLT until April 14, 2005, when he was succeeded by Hank M. Spacone. Spacone was substituted into this action as the named plaintiff after assuming his position as trustee. For purposes of this opinion, references to Spacone are references to his predecessor or GUCLT, when applicable.

2     On August 19, 2005, GUCLT appealed this order to the Ninth Circuit. That appeal involves the issue of whether GUCLT has an independent right to license the intellectual property assets formerly held by AHC. *Spacone v. Williamson*, No. 05–16717 (9th Cir. filed Aug. 19, 2005).

3     35 U.S.C. § 261 provides that "applications for patent, patents, or any interest therein" are assignable "by an instrument in writing." The patent statutes allow the instrument that assigns "any interest" to take the form of a patent license or any other written instrument that transfers patent rights. The type of written instrument (e.g., license or assignment agreement, dissolution agreement, or merger agreement) and the factual context in which the instrument is created is irrelevant—this does not provide a basis for divorcing the standing analysis from the patent statutes.

4     The suit against Microsoft was filed in October 2003, after the effective date of the liquidation plan.

5     Though there are three constitutional standing inquiries—injury in fact, traceability, and redressability, we only discuss injury in fact, which is dispositive of this case.

6     The all substantial rights inquiry is a proxy for the statutory requirement that a party bringing an infringement suit have the interests of a patentee, including the exclusionary rights granted by the patent statutes and other important incidental rights, such as the right to assign those rights or vindicate them through enforcement proceedings. *See Sicom,* 427 F.3d at 976; *Prima Tek II,* 222 F.3d at 1378–79; *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.,* 944 F.2d 870, 875 (Fed.Cir.1991). The assignee becomes the "effective patentee."

7     But in determining whether a party holds the exclusionary rights, we determine the substance of the rights conferred on that party, not to the characterization of those rights as exclusive licenses or otherwise. *See Vaupel,* 944 F.2d at 874–75. For instance, an exclusive licensee who actually holds all substantial rights may sue in its own name alone for patent infringement.

8     As this court has stated previously, a patent is a bundle of rights which may be retained in whole or in part, divided and assigned. *Intellectual Prop. Dev.,* 248 F.3d at 1342 (citing *Vaupel,* 944 F.2d at 875); 35 U.S.C. § 261. While parties are free to assign some or all patent rights as they see fit based on their interests and objectives, this does not mean that the chosen method of division will satisfy standing requirements.

1     The majority's extensive reliance on GUCLT's inability to license the patent rests entirely on the district court's interpretation of the parties' agreements. As the majority notes, that issue is the subject of an appeal currently pending before the Ninth Circuit. An unsettled issue playing such a central role in the present case demands independent analysis, which the majority opinion lacks.

**End of Document**          © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 62

PRINTED AND
PUBLISHED IN
GREAT BRITAIN

41

No. 2.]    REPORTS OF PATENT, DESIGN, AND TRADE MARK CASES    [Vol. LIV.

Vol. LIV]                 24TH FEBRUARY, 1937                 [No. 2

IN THE HIGH COURT OF JUSTICE—CHANCERY DIVISION.

*Before* MR. JUSTICE CLAUSON.

January 22nd, 23rd and 24th, and February 11th, 1936.

IN THE COURT OF APPEAL.

5     *Before* LORDS JUSTICES SLESSER AND ROMER, AND MR. JUSTICE EVE.

June 18th and 19th, and July 7th, 1936.

NATIONAL CARBONISING CO., LD. *v.* BRITISH COAL DISTILLATION, LD.

*Licence under Patents—Covenant to communicate improvements—Patents*
*assigned—Action for declaration that assignees entitled to benefit of covenant—*
10  *Assignability—Construction of licence—Conduct of parties—Covenant held not*
*assignable, and no case of novation established—Action dismissed—Appeal to*
*Court of Appeal—Construction—Covenant held assignable—Appeal allowed.*

  *L & N., Ld. granted a licence under certain Patents to* Leicestershire L. & N.
C. D., Ld., *whose name was subsequently changed to* B. C. D. Ld.  *The licence*
20  *contained a covenant by the licensees to communicate improvements to the*
*licensors and permit them to use and work the same.*  L. & N. C. D., Ld.
*having gone into voluntary liquidation, the liquidator purported to assign the*
*Patents and the benefit of the licence to the Plaintiffs.  The Plaintiffs brought*
*an action against* B. C. D., Ld. *for a declaration that the Plaintiffs were entitled*
25  *to the benefit of the covenant, and they alleged that the Defendants were*
*possessed of an invention falling within the scope of the covenant and claimed*
*that the Defendants were bound to communicate the invention to them and*
*permit them to use and work the same.  The Plaintiffs contended that, as a*
*matter of construction of the licence, the benefit of the covenant had passed to*
· 30  *them, and also that by reason of the subsequent course of dealing between the*
D

42

*National Carbonising Co., Ld.* v. *British Coal Distillation Ld.*

*parties the Defendants were to be taken as having accepted the Plaintiffs as standing in the place of* L. & N. C. D., Ld. *The Defendants, whilst admitting that they were possessed of an invention falling within the scope of the covenant, denied both these contentions.*

Held by CLAUSON J., *that the covenant was not assignable, and that the rights of the Plaintiffs and Defendants had not been affected by any course of dealing or conduct occurring after the assignment of the Patents to the Plaintiffs. The action was dismissed with costs.* 5

*The Plaintiffs appealed to the Court of Appeal.*

Held, *that throughout the licence, including the covenant to communicate improvements, the word " patentee " must have been intended to mean the patentee and its assigns, and that the Plaintiffs were entitled to the benefit of the covenant. The appeal was allowed with costs.* 10

*Per* ROMER L.J.—*A licence under a patent is a grant of a right and does not merely confer upon the licensee an interest in equity.* 15

On the 28th of July, 1931, *L. & N. Coal Distillation, Ld.* granted a sole and exclusive licence within a certian area under certain Letters Patent, of which it was the proprietor, to *Leicestershire (L. & N.) Coal Distillation, Ld.*, whose name was subsequently changed to *British Coal Distillation, Ltd.* Clause 3 of the licence was as follows:— 20

" The licensee shall forthwith communicate to the patentee full particulars " of any improvements in the said inventions or of any further invention which " it may make discover or become entitled to in respect of the said process " (whether such improvement or invention be patented or not) and (without " expense to the patentee) shall give to the patentee or its proper officers full 25 " information and details thereof with all necessary plans drawings and designs " for demonstrating the exact mode of using or working the same and will " permit the patentee to use and work the same during the continuance of " this licence without payment of any further consideration than is provided for " by clause 11 hereof." 30

The other clauses of the licence, so far as they are material, are set out in the Judgments.

On the 24th of March, 1933, *L. & N. Coal Distillation, Ld.* having gone into voluntary liquidation, the liquidator purported to assign the Letters Patent and (*inter alia*) the benefit of the licence to *National Carbonising Co., Ld.* 35

On the 27th of February, 1935, *National Carbonising Co., Ld.* issued an Originating Summons under R.S.C. Order 54A for the determination of the question whether by virtue of the assignment of the 24th of March, 1933, they were entitled to call for the performance by *British Coal Distillation, Ld.* of the provisions of Clause 3 of the above-mentioned licence, and for a declaration 40 of their right to have communicated to them by *British Coal Distillation, Ld.*

*National Carbonising Co., Ld.* v. *British Coal Distillation Ld.*

full particulars of all improvements or further inventions in respect of the process referred to in the said licence and the right to use and work the same as therein provided.  The Summons came on for hearing on the 21st of May, 1935, before Mr. Justice LUXMOORE.  At the hearing *National Carbonising Co.,*

5   *Ld.* sought to rely, in addition to the question of construction, upon the conduct of the parties subsequent to the assignment to them, and the learned Judge expressed the view that the matter could not conveniently be dealt with upon Summons, and made no order thereon save that the costs should be reserved, with liberty to apply.

10      On the 25th of June, 1935, *National Carbonising Co., Ld.* commenced an action against *British Coal Distillation, Ld.,* claiming:—(1) A Declaration that the Plaintiffs were and had at all material times been entitled to receive and the Defendants bound to supply full particulars of any and all improvements or further inventions in respect of the L. & N. process as and when the

15   Defendants became entitled to the same and that the Plaintiffs were entitled to us and work the same as provided in Clause 3 of the Licence dated the 28th day of July, 1931.  (2) A Declaration that the invention the subject of Letters Patent No. 401,767 fell within the licence aforesaid and that the Plaintiffs were entitled to call for the performance of Clause 3 aforesaid in connection

20   therewith.  (3) An injunction to restrain the Defendants from dealing with Letters Patent No. 401,767 otherwise than in accordance with Clause 3 aforesaid.  (4) Further or other relief.  (5) Payment by the Defendants of the Plaintiffs' costs of this Action together with the costs of the former proceeding (1935 N. No. 392).

25      The Plaintiffs, by their Statement of Claim, alleged as follows:—(1) In or about the month of July, 1931, *L. & N. Coal Distillation, Ld.* were possessed of a process for the distillation of solid carbonaceous material and were the registered legal owners of certain Letters Patent relating thereto.  By a Licence dated the 28th day of July, 1931, the said *L. & N. Coal Distillation, Ld.* granted

30   to the Defendants by their then name of *Leicestershire (L. & N.) Coal Distillation, Ld.* a sole and exclusive licence in connection with the working of the said process and apparatus therefor within the Counties of Leicester, Derby, Nottingham, Warwick and Stafford.   The Plaintiffs would refer for the full contents thereof to the said licence, which formed Exhibit " A " to the Affidavit of *Arthur*

35   *Vaughan Cowell* sworn in the proceeding referred to in Paragraph 8 thereof on the 7th day of March, 1935, to which proceeding this Action was intended to be supplemental.  (2) Pursuant to the Special Resolution passed on the 16th day of June, 1932, and with the consent of the Board of Trade the name of the Defendants was changed from *Leicestershire (L. & N.) Coal Distillation, Ld.*

40   to their present name.   (3) Prior to the 30th day of May, 1932, the Defendants were possessed of an invention relating to a process and apparatus for the distillation of solid carbonaceous material being an improvement upon the process referred to in Paragraph 1 thereof, and on the 30th day of May, 1932, the Defendants together with one *Clifford Machen* an employee of the Defendants

45   applied for Letters Patent in connection therewith, which said Letters Patent were duly granted under No. 401,767.  (4) By Clause 3 of the Licence aforesaid the Defendants were bound to communicate forthwith to and permit the use by the said *L. & N. Coal Distillation, Ld.* of all improvements or further inventions to which the Defendants became entitled but the Defendants failed to communicate

50   the invention referred to in Paragraph 3 thereof to the said Company.  (5) In

44

No. 2.]     REPORTS OF PATENT, DESIGN, AND TRADE MARK CASES     [Vol. LIV.

*National Carbonising Co., Ld.* v. *British Coal Distillation Ld.*

or about the month of December, 1932, the said *L. & N. Coal Distillation, Ld.* went into voluntary liquidation and one *John Harold Senior* was appointed the Liquidator thereof.  (6) By a Deed of Assignment dated the 24th day of March, 1933, to which the Plaintiffs would refer for the full contents thereof the Plaintiffs acquired *inter alia* the rights of the said *L. & N. Coal Distillation, Ld.* in the 5 said Patents together with the benefit and burden of the Company's interest in the Licence referred to in Paragraph 1 thereof.  Notice of the said Assignment was given by the Plaintiffs to the Defendants by Letter dated the 15th day of May, 1933.  The said Assignment and Notice formed Exhibits " C " and " D " respectively to the aforesaid Affidavit of *Arthur Vaughan Cowell.*   (7) There- 10 after the Defendants accepted the benefit of the said Licence and had obtained particulars of improvements and details of and information concerning the same from the Plaintiffs, but by letters dated the 27th day of February, 1934, and the 29th day of January, 1935, the Defendants refused to give to the Plaintiffs information and details of the improvement made by the Defendants as set out 15 in Paragraph 3 thereof and wrongfully claimed that the Plaintiffs had no interest therein.  Thereunder the Plaintiffs would rely upon the matters set forth in the Affidavits of *Arthur Vaughan Cowell* sworn in the said proceeding on the 7th day of March and the 13th day of April, 1935, respectively and in the Exhibits thereto.  (8) By a proceeding commenced by Originating Summons (1935 N. 20 No. 392) by the Plaintiffs against the Defendants the Plaintiffs sought the determination of the question whether the Plaintiffs were entitled to call for the performance of the obligation referred to in Paragraph 4 thereof and prayed a Declaration of its right to receive full particulars of all improvements or further inventions possessed by the Defendants and of its right to use and work the 25 same.   (9) On the 21st day of May, 1935, the said Originating Summons came on for hearing before the Honourable Mr. Justice *Luxmoore* who made no Order thereon except that the costs thereof were reserved with liberty to apply in regard thereto either in the said proceeding or in any action that might be brought by the Plaintiffs in relation to the Licence referred to in Paragraph 1 30 thereof.

The Defendants, by their Defence, alleged as follows:—(1) They admitted that in or about the month of July, 1931, *L. & N. Coal Distillation, Ld.* were possessed of a process for the distillation of solid carbonaceous material and were the registered legal owners of certain Letters Patent relating thereto.  They 35 admitted the Licence dated the 28th July, 1931, referred to in paragraph 1 of the Statement of Claim, and would refer to the said Licence for the full terms and effect thereof.  They made no admission as to the Plaintiffs' intention that this action should be supplemental to the proceeding referred to in paragraph 8 of the Statement of Claim.  They denied that this action was or could be supple- 40 mental to the said proceeding.  (2) They admitted paragraph 2 of the Statement of Claim.  (3) They admitted that prior to the 30th May, 1932, they were possessed of an invention relating to a process and apparatus for the distillation of solid carbonaceous material.  They did not admit the allegation that the said invention was an improvement upon the process referred to in paragraph 1 of 45 the Statement of Claim, but were prepared to admit that the said invention was a further invention in respect of the said process within the meaning of Clause 3 of the said Licence.  They admitted that on the 30th May, 1932, they together with one *Clifford Machen*, one of their employees, applied for Letters Patent for their said invention, which said Letters Patent were duly granted under 50

*National Carbonising Co., Ld. v. British Coal Distillation Ld.*

No. 401,767. (4) The Defendants would refer to Clause 3 of the said Licence for the full terms and effect thereof. The invention referred to in paragraph 3 of the Statement of Claim was communicated to *L. & N. Coal Distillation, Ld.* on or about the 11th January, 1933. (5) They admitted that on or about the 4th November, 1932, the said *L. & N. Coal Distillation, Ld.* went into voluntary liquidation and one *John Harold Senior* was appointed the liquidator thereof. (6) They admitted that the Plaintiffs were party to a Deed of Assignment dated the 24th March, 1933, such Assignment being the Exhibit " C " to the affidavit of *Arthur Vaughan Cowell* referred to in paragraph 6 of the Statement of Claim. They did not admit that the terms or effect of the said Assignment were correctly or sufficiently set out in the said paragraph, and would refer to the said Assignment for the full terms and effect thereof. They admitted the Notice referred to in paragraph 6 of the Statement of Claim. (7) They did not admit any of the allegations contained in paragraph 7 of the Statement of Claim with the exception that they admitted writing letters to the Plaintiffs dated the 27th February, 1934, and 29th January, 1935. They would refer if necessary to the said letters for the full terms and effect thereof. (8) They admitted that an Originating Summons, 1935 N. No. 392) was issued by the Plaintiffs and would refer if necessary to the said Summons for the full terms and effect thereof. (9) They admitted that the said Originating Summons came on for hearing before the Honourable Mr. Justice *Luxmoore* on the 21st May, 1935, but did not admit that the directions given by Mr. Justice *Luxmoore* were correctly stated in paragraph 9 of the Statement of Claim. (10) Save as thereinbefore expressly admitted or otherwise dealt with they denied each and every allegation contained in the Statement of Claim as though the same were specifically set out and traversed. (11) The Plaintiffs were not entitled to the relief claimed or any relief.

The action came on for trial on the 22nd of January, 1936, before Mr. Justice CLAUSON.

*H. B. Vaisey*, K.C. and *G. H. Lloyd-Jacob* (instructed by *Slaughter & May*) appeared for the Plaintiffs; *R. F. Roxburgh*, K.C. and *G. W. Tookey* (instructed by *Nicholson Graham & Jones*) appeared for the Defendants.

Judgment was reserved and was delivered on the 11th of February, 1936.

**Clauson J.**—On the 28th of July, 1931, *L. & N. Coal Distillation, Ld.*, as owners of certain Patents, granted to the Defendants by their then name of *Leicestershire* (*L. & N.*) *Coal Distillation, Ld.* a licence to use the patented inventions within a certain limited area. The Defendants bound themselves by clause 3 of the licence to communicate to the Patentee *L. & N. Coal Distillation, Ld.* certain further inventions in respect of the process to which the Patents related and to permit the Patentee to work such further inventions during the term of the licence.

The Defendants have made a further invention which admittedly falls within the category of further inventions already mentioned, and obtained on the 30th of May, 1932, Letters Patent for that further invention, and *L. & N. Coal Distillation, Ld.* became entitled thereupon to require the Defendants to permit them to use that invention during the period of the licence.

In this state of facts *L. & N. Coal Distillation, Ld.* went into liquidation and by deed of the 24th of March, 1933, conveyed to the Plaintiffs the Patents which were the subject-matter of the licence of the 28th of July, 1931, and the benefit

*National Carbonising Co., Ld. v. British Coal Distillation Ld.*

and burden of that licence. That the effect of that assignment was to vest the original Patents in the Plaintiffs is beyond question. I have not to consider in this action what the position would be if the Defendants used the invention comprised in the original Patents and on being sued by the Plaintiffs for infringement set up the licence of 1931 as an answer. The question in this action is a 5 different one. It is whether the Plaintiffs are entitled to require the Defendants to communicate to them the new inventions within the category stated in clause 3 of the licence and to permit the Plaintiffs to use and work such new inventions.

The question that I have to decide turns on the true meaning and construction of the licence of the 28th of July, 1931, and in approaching that question I have 10 to remember certain points which are developed in the Judgments of Mr. Justice *Mathew*, the Appeal Court, and the House of Lords in the case of *Tolhurst* v. *Associated Portland Cement Manufacturers (1900) Ld.*, L.R. (1901) 2 K.B., page 811; (1902) 2 K.B., page 660, and (1903) A.C., page 414. Those points may be conveniently stated as follows: In considering how far the assignees of 15 one party to a contract are entitled to enforce a contract against the other party it is to be borne in mind (*a*) that the absence of any express reference in the contract to " assigns " is immaterial if on the true construction of the contract it is intended that the benefit of the contract is to be assignable (see *per* Lord *Halsbury*, [1903] A.C., at page 416; (*b*) that the existence in the contemplation 20 of the parties, exhibited in the contract as properly construed, of an element of skill or of personal confidence indicates that the party from whom skill is expected or in whom confidence is placed, is not to be free to call upon the other party to the contract to accept performance of the contract by a third party, or to be free to put such third party in his place vicariously to perform his obli- 25 gations under and to take the benefit of the contract (see *per* Lord *Macnaghten*, [1903] A.C., at page 417); (*c*) that in the absence of some clear provision to the contrary in the contract it is not to be supposed that the parties intend that either should be free by alienation of the benefit of the contract to increase the burden placed upon the other party (see *per* Lord *Lindley*, (1903) A.C., at page 30 423); or, in other language, the benefit of a contract cannot be assigned by one party if the result of the assignment would be to impose upon the other party a greater liability than he ever intended to assume (see *per* Mr. Justice *Mathew*, (1901) 2 K.B., at page 816); (*d*) that where the consideration moving from one party has been executed and nothing more remains but to enforce the obligation 35 of the contract against the party who has received the consideration, and it makes no difference to the party on whom the obligation lies whether he discharges it to the original obligee or to some person to whom the original obligee has assigned the benefit of the obligation, the assignee can enforce the obligation; but that this last statement is to be confined strictly to the case where the 40 consideration moving from the party, whose assignee seeks to enforce the contract, has been executed, and that, where there are mutual obligations still to be enforced and it is impossible to say that the whole consideration has been executed, the party against whom the contract is sought to be enforced may refuse to accept performance by the assignee of the other party, as performance 45 by the original party, and as fulfilling the original party's remaining obligations. This seems to appear from the statement of the law by Sir *Richard Henn Collins*, Master of the Rolls, in L.R. (1902) 2 K.B., at pages 668, 669.

Turning now to the document which I have to construe, I find the following points to be worthy of special notice: (A) There is no express mention of 50

Case 09-10138-MFW    Doc 13460-9    Filed 05/02/14    Page 22 of 177

47

No. 2.]    REPORTS OF PATENT, DESIGN, AND TRADE MARK CASES    [Vol. LIV.

*National Carbonising Co., Ld.* v. *British Coal Distillation Ld.*

assigns in the document, but clause 16 seems to indicate that, if the licensee goes into liquidation with a view to reconstruction, the Patentee is to be bound to accept the reconstructed company (that is, the licensee's assignee) as standing in the place of the licensee for the purposes of the document.  (B) The licence
5  is a grant of rights in respect of certain Letters Patent and the Patentee is by law, without any possible question, free to assign the Letters Patent, subject always to the rights granted to the licensee by the licence.  There would, however, be nothing illegal in the Patentee agreeing with the licensee to retain the Patents in his own hands either for a period or, indeed, for the whole life of
10  the Patents, and such an agreement would be perfectly valid between the parties whether contained in express words or implied.  (C) The licence is, for the period and within the area to which it relates, exclusive, and while no express power to assign is given, a power to sub-license is given.  (D) The considera-tion (omitting for the moment certain mutual covenants to which I shall have
15  to refer later) is of an unusual character.  It consists partly of fully paid shares in the capital of the licensee, that is, of a share in the profits and assets of the licensee, and for the rest of an arrangement under which the Patentee gets one-fourth of the royalties received on sub-licences by the licensee, while *per contra* the licensee gets one-fourth of the royalties received on sub-licences by
20  the Patentee in respect of the area outside the licence.  In truth this part of the consideration is really constituted by the entry of Patentee and licensee into a sort of partnership in assets and profits, the relative shares in profits varying infinitely according to the varying proportions of the two groups of royalties. The royalties the subject-matter of this rather remarkable arrangement include,
25  as I read the document, though it is by no means lucid on this point, royalties received in respect of improvements upon or new inventions in respect of the process to which the original Letters Patent relate.  (E) Clauses 2 and 3 of the licence work out a scheme under which each party to the licence is to com-municate to the other all improvements in and further inventions relating to
30  the process to which the Patents, subject-matter of the licence, relate, whether such improvements or further inventions be patented or not, and is to give the other party and its officers full information and details thereof with all necessary plans, etc., for demonstrating the mode of working, and is to permit the other party to use and work such improvements and inventions during the period of
35  the licence without further payment.  There is a proviso that the Patentees are not to be liable to act as consulting engineers for the design or erection of plants or to supply working drawings or plans of any auxiliary plant not covered by the Patents the subject of the licence, or by any further inventions which the Patentees may make, discover, or become entitled to, in respect of the said
40  process or plant.  (F) Clause 9 contains a provision restricting each party in regard to constructing or erecting plant for sub-licensees.

A detailed consideration of these features of the document leads me to the following conclusions.  First, that it is intended that, if the licensee goes into liquidation for reconstruction, the Patentee is to accept the reconstructed Com-
45  pany as the *alter ego* of the licensee, and the reconstructed Company is to step into the shoes of the licensee in every respect.  Secondly, that save to this extent there is nothing to indicate that either party can require the other to accept the performance of the contract by any assignee as a substitution for the performance by the party itself.  Thirdly, that the parties' tacit con-
50  templation, not, I admit, stated explicitly, is that during the life of the Patents

48

*National Carbonising Co., Ld.* v. *British Coal Distillation Ld.*

their respective relations to the subject-matter of the agreement shall remain unchanged, subject only to the event of a reconstruction of the licensee; in other words, it is implied that the Patentee shall retain and work the Patents. The intricate way in which the interests of the parties are commingled in regard to royalties seems to me to point strongly in this direction. Fourthly, the 5 provisions as to communication and use of improvements and new inventions seem to me to point strongly in the same direction, and all the more so because these provisions extend to unpatented improvements and inventions, a circumstance which seems to imply that the personality of the party to whom the communication is to be made is of real practical importance.    10

I need not refer again to the principles which I have stated as being recognised in *Tolhurst's* case. On the true construction of the document it appears to me that (subject still to the proviso as to the case of the reconstruction of the licensee) I must read " Patentee " and " Licensee " throughout as meaning in the strictest sense *L. & N. Coal Distillation, Ld.* and the Defendants.    15

As I have already stated, *L. & N. Coal Distillation, Ld.* have in fact assigned the Patents and the benefit of the licence to the Plaintiffs. This may give rise to various questions of difficulty, but the only question which I have to solve is whether as matters stand the Plaintiffs are entitled to require the Defendants to communicate with them and permit them to use certain new 20 inventions relating to the process which the Defendants have admittedly made. If the licence is to be construed as I have indicated above, the question must obviously be answered in the negative, and this action must fail, subject only to one further point.

It is suggested by the Plaintiffs that since the assignment by *L. & N. Coal* 25 *Distillation, Ld.* to the Plaintiffs the Defendants and the Plaintiffs have so acted that the Court ought to treat them as mutually bound to a contract in the terms of the licence with the substitution of the Plaintiffs for the Patentee therein named for all the purposes of the licence. It is, of course, possible that the parties may have so acted as to lead to this result, and I need not 30 consider narrowly whether the result is to be reached by applying some principle of estoppel or on some principle of substitution or novation. I am, however, clear on the correspondence and the facts that I cannot accede to this suggestion. [The learned Judge then referred to certain correspondence and meetings between the parties.] I am satisfied on the evidence and the 35 correspondence that nothing occurred at either of those meetings which either party intended, or understood, to operate so as to alter the legal position of the parties, whatever that might be.

Soon after this the relations between the Companies became acutely strained, though suggestions of negotiations for some entirely new arrangement were still 40 in the air.

It follows that I can see no ground upon which I can decide that the mutual rights of the Plaintiffs and the Defendants have been affected by any course of dealing or conduct which occurred after the Plaintiffs had taken the transfer which they took from the original Patentee.    45

*National Carbonising Co., Ld.* v. *British Coal Distillation Ld.*

The action will accordingly be dismissed, but I intimated when I reserved judgment that I would hear the parties as to the exact Order to be made as to costs. There is some question of the costs of an Originating Summons.

After a discussion, the action was dismissed with costs, including the
5 Defendants' costs of the Originating Summons.

The Plaintiffs appealed. The Appeal came on for hearing on the 18th of June, 1936, before Lords Justices SLESSER and ROMER and Mr. Justice EVE.

The same Counsel, instructed as before, appeared for the Appellants and Respondents.

10    *Vaisey* K.C. for the Appellants.—The main question arising on this appeal is whether the Plaintiffs have succeeded to the rights of *L. & N. Coal Distillation, Ld.* under the licence granted to the Defendants under their former name. There is no doubt that the licence was assigned to the Plaintiffs, in so far as it was capable of assignment. The case is closely analogous to *Tolhurst's* case
15 (*ubi supra*). I shall submit that the licence was intended to operate between the Patentee as licensor and the Defendant company as licensee. The second question arising is whether the course of dealing between the parties, to be gathered from the correspondence and the oral evidence, amounted to a novation or acceptance of the Plaintiffs as standing in the shoes of *L. & N. Coal Distilla-*
20 *tion, Ld.* The learned Judge has taken far too narrow a view of the licence, which I submit is a commercial document capable of assignment to a new patentee, and has held one part assignable and left the other part hanging in the air. The Defendants were granted a Patent for a further invention in May, 1932, and on the 4th of November, 1932, *L. & N. Coal Distillation, Ld.* went into
25 voluntary liquidation. The liquidator then assigned the Patents and the benefit of the licence to the Plaintiffs, and on the 15th of May, 1933, formal notice of the assignment was given by the Plaintiffs to the Defendants. Thereafter the Plaintiffs and the Defendants co-operated with one another. On the 27th of February, 1934, the Defendants notified the Plaintiffs of their contention that
30 the Plaintiffs were not entitled to be treated as assignees as regards clause 3 of the licence. A patent is assignable by express provision of section 71 of the Patents and Designs Acts, 1907 to 1932. [The licence of the 28th of July, 1931, was read.] Several of the clauses, including clause 3, are intended to apply to the Patentee for the time being, and I submit that the licence, at any rate
35 on the side of the Patentee, could be assigned as a whole. [The Pleadings were read, and *Tolhurst's* case (*ubi supra*) was referred to.] It is impossible to say that the Plaintiffs are bound to allow the Defendants facilities under the licence, while not receiving the corresponding benefit. In my submission the case is within *Tolhurst's* case and the Plaintiffs are entitled to the relief claimed.

40    **Slesser L.J.**—We should like to hear Mr. *Roxburgh* on the first point.
    *Roxburgh* K.C. for the Respondents.—Clause 2 of the licence could not be enforced as against assigns of the Patentee. If Mr. *Vaisey* were right, the element of reciprocity would be gone at the outset. Positive covenants do not run with property, though negative covenants may do so. If it is wrong to
45 write in the word " assigns " in clause 2, then *prima facie* it is wrong to put it in clause 3. Although the Patents may be assignable, it does not follow that the whole licence is assignable. On the authorities, the burden of such an

50

No. 2.]    REPORTS OF PATENT, DESIGN, AND TRADE MARK CASES    [Vol. LIV.

*National Carbonising Co., Ld.* v. *British Coal Distillation Ld.*

agreement does not pass. Clause 11 is certainly not binding on the Plaintiffs. There are scarcely any cases in which the word " assigns " will be read into an executory contract, because the result might be to increase the burden on the other party. *Tolhurst's* was a very exceptional case. In the present case the licence agreement was between a parent company and a subsidiary. What would 5 be the position if *L. & N. Coal Distillation, Ld.* had assigned the agreement to the Defendants' greatest trade rivals? The disclosure contemplated by clause 3 includes unpatented inventions, the communicaton of which is a very confidential matter. The assignees of the Patents are in the position of licensees under the covenant to communicate improvements. [**Slesser L.J.**—It looks as if 10 the last limb of clause 16 contemplates that the licensee's assignee may step in. Why should not the assignee of the Patentee do so?] The fact that in certain circumstances the licence could be assigned does not preclude the possibility that the obligation put upon the licensee by another clause cannot be assigned. The question is not whether the licence in whole or in part can be assigned, but 15 whether clause 3, being an obligation to disclose and to grant a licence, can be assigned. [**Romer L.J.**—If the licensee can assign, the personal element is gone.] That is only a permitted assignment. If the Patents were assigned while the original Patentee was still in existence, he could still carry out his obligations to the Defendants though not under some of the clauses, for instance 4, 5 20 or 6. There are two tests as to whether the words of assignability may be put into clause 3, namely, would putting the words in possibly increase the burden on the other party? If not, they ought to be put in unless there is a personal element present. [*Tolhurst's* case, L.R. (1903) A.C., at p. 423, *per* Lord *Lindley*, was referred to.] The competence of the party, to whom the disclosure 25 is made, to make use of it is a matter that has to be taken into account. Under Section 14 of the Patents and Designs Acts, 1907 to 1932, the Patents could be assigned for different localities. The Defendants would then have to disclose to several different parties, or as regards one Patent to one party and as regards a second Patent to another party. Importance attaches to the reciprocal nature 30 of the covenants in clauses 2 and 3. The agreement is a joint adventure. Clause 2 cannot be binding upon the Plaintiffs. [*Kemp* v. *Baerselman*, L.R. (1906) 2 K.B. 604, and *Dr. Jaeger's, etc., Co., Ld.* v. *Walker & Sons*, (1897) 77 L.T. 180, were referred to.] [**Romer, L.J.**—Even if there is a personal element, the parties can make the contract assignable. The cases all come to this, what is the 35 true construction of the document?] [**Slesser L.J.**—In this case the Patent itself is assignable. That is a distinction from the reported cases.] Even if the licence agreement is not assignable, the Defendants have an equitable right to a licence since the Plaintiffs have notice of the licence. It is questionable whether the licence amounts to an absolute or an equitable right. Such a complicated 40 royalty arrangement as the present cannot have contemplated numerous assignments to different parties. Under the Judicature Act the benefit of monetary payments can be assigned. If clause 3 were a covenant in the agreement having no relation to the Patents, the fact that it occurred in the licence would be no ground for saying that it was assignable with the Patents. [*British Waggon* 45 *Co.* v. *Lea & Co.*, (1880) L.R. 5 Q.B.D. 149, was referred to.] That is the only other case in which an executory contract was held to be assignable, and that was more a case of vicarious performance than of assignment. The principles of law applicable to the present case are to be found in *Tolhurst's* case (*ubi supra*), and I submit that they show that this clause is not assignable.    50

51

*National Carbonising Co., Ld.* v. *British Coal Distillation Ld.*

*Tookey* followed.—The learned Judge found that the parties contemplated that during the life of the Patents their respective relations to the subject-matter of the agreement should remain unchanged. If that is correct, the Defendants must succeed. Since the Patents are assignable, the parties may

5 have intended (1) that the licence should remain unassignable though the Patents were assigned, or (2) that the licence should be wholly assignable, or (3) that part of the licence should be assignable. Except in the second case, the Defendants must succeed. If any part of the licence is unassignable, that part must be clauses 2 and 3, by reason of their vitally personal character. A patent

10 licence, in my submission, is an absolute right. There were licences at common law before the Judicature Acts. [*Hindmarch's* Law of Patents (1846) was referred to.] [**Slesser L.J.**—I cannot see how it can be said that an action based on a licence would not lie at common law.] It has sometimes been suggested that a licence is a mere equitable right. [*New Ixion Tyre & Cycle Co., Ld.* v.

15 *Spilsbury* (1898) 15 R.P.C. 380, 567, was referred to.] The fact that an assignee· of a patent takes subject to a licence does not mean that he takes subject to all the conditions on which the licence was granted. If the licence were contained in two agreements and only the grant registered, a assignee would take subject only to the grant. He ought not to get the benefit of merely collateral

20 conditions. [*Hassall* v. *Wright* (1870) L.R. 10 Eq. 509, was referred to.] It would be quite wrong to hold the Defendants bound under clause 3 to communicate an invention and grant a licence to a third party. The Defendants cannot, in the absence of novation, enforce clause 2, and ought not to be bound under clause 3.

25 *Vaisey* K.C. replied.—Quite different considerations might have arisen if the licence had been contained in two documents. The question is one, not of law, but of intention. Clause 6 would be nonsense unless it applied to the Patentee for the time being. Clause 16 also indicates that the parties had assignees in mind. According to the Patents Act the Patentee could assign the Patents,

30 subject in the present case to the rights of the Defendants. If there is an equitable obligation to pay royalties, why should there not be an equitable obligation to disclose a new invention? The reasonable construction of the agreement is that the Plaintiffs are bound by it and have succeeded to all rights under it. Any other construction would produce capricious results and would

35 be unsatisfactory from a business point of view. [**Romer L.J.**—All that mattered to the licensee was that the licensor should have the Patents.] There was nothing in the agreement to prevent the licensors from closing their laboratories. I submit that the appeal should be allowed. As to relief, the first declaration claimed would be sufficient.

40 Judgment was reserved and was delivered on the 7th of July, 1936.

**Slesser L.J.**—In July, 1931, a company called *L. & N. Coal Distillation, Ld.*, were the registered legal owners of Letters Patent relating to the distillation of coal. On July 28th, 1931, they granted a sole and exclusive licence to the *Leicestershire (L. & N.) Coal Distillation, Ld.*, now, by change of name, the

45 Defendants, the *British Coal Distillation, Ld.*, to work the processes and apparatus within the counties of Leicester, Derby, Nottingham, Warwick and Stafford. This licence was of a peculiar kind containing reciprocal obligations and rights between the Patentee and the licensee. The consideration was stated to be the allotment and issue to the Patentee or its nominees of certain

52

*National Carbonising Co., Ld.* v. *British Coal Distillation Ld.*

deferred shares credited as fully paid up in the capital of the licensee.  In addition to granting the right to use and work the inventions with full power to grant sub-licences within the named counties, by clause 2 the Patentee was bound to communicate to the licensee any improvements in the inventions or further inventions which it might discover or become entitled to, and to 5 give to the licensee full information and details for demonstrating the exact mode of using or working the same, without the payment of any further consideration except one-fourth of all royalties or cash payments which might be received by the licensee in respect of the use of the inventions or any of them (this would include improvements and further inventions) in any district 10 within the area controlled by the licensee other than the county of Leicester.

There followed in clause 3 a complementary obligation upon the licensee to communicate to the Patentee its improvements or further inventions and an obligation to permit the Patentee to use and work the same during the continuance of the licence without payment of any further consideration other 15 than one-fourth of royalties and cash payments payable to, or received by, the Patentee in any district in Great Britain and Northern Ireland other than the named counties of the licensee.  This covenant, by clause 11, would include all royalties or cash payments payable to and received by the Patentee, whether under the original Patents or improvements or further inventions. 20

Clause 5, which deals with any action or proceeding for the revocation of the Letters Patent, puts an obligation upon each party to give the other notice in writing thereof, followed by an obligation to confer to consider the necessity or expediency of defending any action and arrangements as to the costs and expenses and indemnities, together with an express provision that the licensee 25 may, where necessary, use the name of the Patentee.  A similar provision in clause 6 deals with infringement, or threatened infringement, of the Letters Patent, and again it is provided that in any contemplated action the licensee may, where necessary, use the name of the Patentee.  These provisions are here set out because in this case it is argued, there being no reference to assigns in 30 the licence, that the licence was not assignable.

On the 24th of March, 1933, *L. & N. Coal Distillation, Ld.*, the Patentees, being in liquidation, the liquidator purported to assign the patent rights to the Plaintiffs, the *National Carbonising Co., Ld.*, including the inventions and Letters Patent and all rights thereunder and the benefits of the licences granted, 35 one of which was the licence of the 28th of July, 1931, from *L. & N.* to the *Leicestershire L. & N. Coal Distillation, Ld.*, now the Defendants.

The Statement of Claim asks for a declaration that the Plaintiffs are, and have at all material times been, entitled to receive, and the Defendants bound to supply, full particulars of improvements or further inventions under clause 3 40 of the licence of the 28th of July, 1931.  The Defendants admit that they are possessed of an invention which was a further invention within the meaning of clause 3 of the licence and that they had applied for Letters Patent for it which had been granted; but, as I have said, they deny the assignability of the licence which, in fact, is the sole issue in this case. 45

It is clear, in the first place, that the absence of any express reference in the contract to assigns is not conclusive if the true view is that it was intended that the benefit of the contract should be assignable.  In the words of Lord *Halsbury*,

53

No. 2.]        REPORTS OF PATENT, DESIGN, AND TRADE MARK CASES        [Vol. LIV.

*National Carbonising Co., Ld.* v. *British Coal Distillation Ld.*

Lord Chancellor, in *Tolhurst's* case, (1903) Appeal Cases, page 414, at page 416:
" The word ' assigns ' not being in the contract is immaterial if it is ascertained
" that the intention of the contract is that it should be assigned ".   In my
opinion such an intention is clearly expressed in the agreement for licence of
5   July 28th, 1931.   The assignment of the 24th of March, 1933, is primarily an
assignment of the inventions and Letters Patent and all rights therein, and the
assignment to the purchaser is said to be absolutely subject to and with the
benefit of the several licences which include the licence of the 28th of July, 1931.

So far as concerns the invention and the Patents, there can be no doubt that
10   patent right, being a recognised species of property, can be transferred from
the original patentee to any other person, and, so far as the licence is onerous
upon the patentee, the patentee, having divested himself of his rights to the
extent of depriving himself from enforcing them under the patent against the
licensee in respect of acts which fall within the terms of the licence, can only
15   assign the benefits of the patent under the limitation; but here, under the licence
agreement, the Patentee receives benefits; for example, the right to have com-
municated to him improvements or further inventions made by the licensee under
clause 3, and the right to use and work the same on the Patentee paying to the
licensee the sums stated in clause 11.   These benefits inure to the Patentee's
20   rights and in my view can properly be assigned along with the Patent itself.   It
is further significant that it is expressly provided under clauses 5 and 6, where
proceedings are necessary for the protection of the Letters Patent or any of
them, that the licensee may use the name of the Patentee.   If the argument of
the Respondents be right and the licence is not assignable with the original
25   Patents, there would be no provision thereafter whereby the licensee could use
the name of the assignee and, although a threat to the Patents might injure the
licensee, the licensee in such a case would be without a remedy and some of the
purposes of clauses 5 and 6 would be defeated, because thereby the licensee is
given an interest in the maintenance of the patent rights, under which by licence
30   he works, which may need protection.

It is argued for the licensee that there is here such dependence upon the
mutual personal confidence or personal skill to be exercised by the respective
parties to the licence as to prevent the inference arising that the parties intended
to make their right under the licence assignable.   I am unable to find any such
35   dependence.   There is no obligation upon the licensee to make any improve-
ments or further inventions, nor upon the Patentee, but only a mutual obliga-
tion to communicate them if they are made, with respective permission to use
and work and pay.   In this respect this case seems to me very distinguishable
from such authorities as *Dr. Jaeger's* case, (1897) 77 Law Times, page 180,
40   where it was held that the agreement required a certain degree of skill, knowledge
and supervision in its performance, and was therefore not assignable, or the
case of *Kemp* v. *Baerselman*, L.R. (1906) 2 King's Bench, page 604, where the
contract was with a specific manufacturer and was held to be personal in nature
and unassignable.

45   The learned Judge agrees that the effect of the assignment was to vest the
original Patents in the Plaintiffs, who were free by law to assign the Letters
Patent subject to the rights of the licensee, but he comes to the view that there
is constituted by the licence a sort of partnership in assets and profits.   He bases
his conclusion upon the view, among other matters, that it is implied that the

Case 09-10138-MFW   Doc 13460-9   Filed 05/02/14   Page 29 of 177

54

No. 2.]      REPORTS OF PATENT, DESIGN, AND TRADE MARK CASES      [Vol. LIV.

*National Carbonising Co., Ld.* v. *British Coal Distillation Ld.*

Patentee shall retain and work the Patents.  I can find no justification for this conclusion.  Certainly ther are no such words to be found to restrict the right of the Patentee to assign; and to assume such power would, in my opinion, do violence to the general right of a patentee to dispose of his patent as he wills.

Finally, the learned Judge relies upon a clause to which I have not referred, 5 clause 16, to the effect that " In the event of any order being made or any " resolution being passed for the winding-up of the licensee, except a resolution " for winding-up with a view to reconstruction, then and in any such event " the Patentee may forthwith by notice to the licensee determine this licence ". He says that by this it is intended that, if the licensee went into liquidation 10 for reconstruction, the Patentee was to accept the reconstructed company as the *alter ego* of the licensee, and that the reconstructed company was then to step into the shoes of the licensee in every respect.  In my view, the exception to the power of the Patentee, by notice, to determine the licence in the event of the winding-up of the licensee merely means that, if the winding-up be for 15 the purposes of reconstruction, the Patentee cannot, under clause 16, determine the licence.  But I do not agree that these words destroy the right of the Patentee to assign and, as for resolutions for winding-up other than with a view to reconstruction, clause 16 merely gives a power to the Patentee to determine the licence, which, if he elects, he need not use.  So that, even in that event, he is free to 20 assign the Patents and his rights under the licence, if he thinks fit; certainly there is nothing in clause 16 to prevent him.

I agree also with the additional reasons stated by Lord Justice *Romer* in his Judgment.

I think, therefore, that the learned Judge was wrong in coming to a con- 25 clusion in favour of the Respondents and that the Appellants are entitled to their first declaration (a), which is the only declaration they now claim.  The appeal, therefore, will be allowed with costs here and below.

**Romer L.J.**—The question to be determined on this appeal is whether in clause 3 of the licence of the 28th of July, 1931, the word " Patentee " is to be 30 read as meaning the Patentee and its assigns.  In answering this question the authorities to which our attention has been drawn do not, I think, afford any assistance; for they lay down no general principle applicable to the case, except perhaps this, that a contract which involves the exercise of personal skill on one side or the other, or which is based upon the confidence that one party 35 has in the other, is *prima facie* unassignable.  In all cases the question whether the particular contract is assignable or not is merely one of construc- tion.  " I cannot think ", said Lord *Macnaghten* in the leading authority upon the subject, " that any legal principle is involved in this case.  The case may " be of great importance to the parties.  From a legal point of view it is, I 40 " think, of no importance at all.  The question, as it seems to me, depends " simply and solely on the true meaning and effect of the contract ".  That was said of the case of *Tolhurst* v. *Associated Portland Cement Manufacturers*, L.R. (1903) Appeal Cases, page 416, and can be said equally truly of the present one.                                                                                           45

I therefore turn to the contract in the present case which is the licence of the 28th of July, 1931.  It is made between *L. & N. Coal Distillation, Ld.*, therein

*National Carbonising Co., Ld.* v. *British Coal Distillation Ld.*

called " the Patentee " of the one part and the Defendants by their then name
of the *Leicestershire (L. & N.) Coal Distillation, Ld.*, therein called " the
" licensee " of the other part. The Patentee was at that time engaged in a
process for the distillation of solid carbonaceous material and was the registered
5 owner of various Letters Patent, and had made applications for other Letters
Patent relating to the said process. The licensee appears to have been desirous
of exploiting the subject-matter of the inventions and applications within the
counties of Leicester, Derby, Nottingham, Warwick and Stafford, and by
clause 1 the Patentee accordingly granted to the licensee an exclusive licence
10 to use and work all the said inventions within the said counties during the
unexpired residue of the respective terms of the Letters Patent and any extension
and renewals thereof. The clause expressly authorised the licensee to grant
sub-licences in consideration of the payment of royalties or for other considera-
tion as thereinafter mentioned. Part of the consideration for the licence was
15 the allotment and issue to the Patentee or its nominees of fully paid shares in
the licensee.

So far as royalties were concerned it was provided (clause 7) that no royalty
or other sum should be payable by the licensee to the Patentee in respect of
the use of the invention in the County of Leicester but (clause 10) that the
20 licensee should pay the Patentee one-fourth of all royalties and cash payments
in lieu of royalties payable to and received by it in respect of the use of the
said inventions in any of the other of the said counties, it being agreed
(clause 8) that the royalty to be paid by any sub-licensees should be at the rate
of 6d. per ton of raw material treated under the inventions though such royalty
25 might from time to time be varied in such manner as the Patentee and licensee
should mutually determine. A corresponding obligation was imposed by
clause 11 on the Patentee to pay to the licensee one-fourth of all royalties and
cash payments in lieu of royalties payable to and received by it in respect of
the use of the inventions in any district within the area controlled by the
30 Patentee other than the five counties already mentioned. It would seem from
the contract that neither the Patentee nor the licensee intended themselves to
work the inventions, but to exploit them within their respective territories by
means of licences and sub-licences as the case might be.

Clause 5 provided that, if at any time during the continuance of the licence
35 any action or proceeding for the revocation of any of the said Letters Patent
should come to the knowledge of either of the parties thereto, such party should
forthwith give notice thereof to the other. In a certain event the licensee was
to be at liberty to defend any such proceedings and for that purpose the licensee
might, where necessary, use the name of the Patentee.

40 Clause 6 dealt with infringements or threatened infringements of any of the
Letters Patent and provided that, in the event therein mentioned, the licensee
might take action to prevent such infringements, and for that purpose the
licensee might, where necessary, use the name of the Patentee.

Clause 3, which is the important one for the present purpose, is in these
45 words: " The licensee shall forthwith communicate to the patentee full par-
" ticulars of any improvements in the said inventions or of any further inven-
" tion which it may make discover or become entitled to in respect of the said

56

*National Carbonising Co., Ld.* v. *British Coal Distillation Ld.*

" process (whether such improvement or invention be patented or not) and
" (without expense to the patentee) shall give to the patentee or its proper
" officers full information and details thereof with all necessary plans drawings
" and designs for demonstrating the exact mode of using or working the same
" and will permit the patentee to use and work the same during the continuance 5
" of this licence without payment of any further consideration than is pro-
" vided for by clause 11 hereof ".    By clause 2 a corresponding obligation had
been imposed upon the Patentee in favour of the licensee.

Finally, clause 16 is in these terms: " In the event of any of the royalties or
" other sums payable under the provisions of this deed being in arrear and 10
" remaining unpaid for a period of twenty-one days after the same shall
" become payable as hereinbefore provided whether or not demand therefor
" shall have been made by the patentee or if the licensee shall have committed
" or knowingly permitted a breach of any other of the covenants hereinbefore
" contained and on its part to be performed and observed and shall in the case 15
" of any such breach capable of being made good have failed to make good the
" same within twenty-one days after the licensee shall have been served with
" notice by the patentee requiring the licensee to make good such breach or in
" the event of any order being made or any resolution passed for the winding
" up of the licensee except a resolution for winding up with a view to recon- 20
" struction then and in any such event the patentee may forthwith by notice to
" the licensee determine this licence ".

Now, it is to be observed that the parties clearly contemplated that the
licensee company might go into voluntary liquidation with a view to recon-
struction and that in such event the benefit of the licence would be assigned 25
to the reconstructed company.    It is also clear that they contemplated the
possibility of the licensee company going into liquidation otherwise than with
a view to a reconstruction and that in such event the benefit of the licence
would be assigned unless the Patentee determined the licence; for, if this were
not so, the provisions of clause 16 relating to the winding up of the licensee 30
would be almost meaningless.    Every winding up involves the sale of the
company's assets, and the power to determine the licence in the event of a
winding up other than for the purposes of reconstruction must have been in-
serted in order to enable the Patentee, if he so desired, to prevent the licence
being sold.    In these circumstances it cannot be said that an assignment of the 35
licence was not contemplated by the parties.    The word " licensee " where
used in the licence must, therefore, be read as meaning the licensee and those
who might be its assigns in the event of a liquidation.

The next thing to be observed is that a patentee is fully entitled to assign
his rights under the Letters Patent to another and that this must be deemed to 40
have been known to the parties.    Such an assignment could not, of course,
defeat the rights of the licensee under the licence.    It was indeed suggested in
the argument for the Respondents that the licence only conferred some interest
in equity and that it would not prevail against the title of a purchaser of the
legal interest in the Letters Patent without notice of the licence.    No authority 45
was cited that in any way supports this extraordinary proposition and, in my
opinion, it is without any foundation.    It is said in *Hindmarch* on Patents that
a licence to use an invention comprised in a patent is in fact a grant of a right

Case 09-10138-MFW    Doc 13460-9    Filed 05/02/14    Page 32 of 177

57

No. 2.]        REPORTS OF PATENT, DESIGN, AND TRADE MARK CASES        [Vol. LIV.

*National Carbonising Co., Ld.* v. *British Coal Distillation Ld.*

by the patentee to the licensee and, until the present case, I have never heard any suggestion to the contrary. But though the licence would remain in full force after an assignment of the Patent the licensee would only continue to exercise it upon the terms as to payment of royalties and otherwise that are con-
5 tained in it. This being so, it would seem plain that, if the patentee is to be regarded as having the power of assigning the Patents and can only assign them subject to the rights of the licensee, he must also be regarded as having the power at the same time to assign the benefits accruing to him under the licence.

If then the parties had in their minds the possibility of an assignment of the
10 Patents by the Patentee, and we must I think assume this to have been the case, it is incredible that they did not intend the Patentee to have power to assign his right to be paid royalties under clause 10 and his power of agreeing the royalties to be charged under clause 8. In other words, I think that we are constrained to read the words " the Patentee " in clauses 8 and 10 as meaning
15 the Patentee and its assigns. If this be right, the word must have the same meaning in clause 16. The parties could not have intended that the power to determine the licence for non-payment of the royalties should be severed from the right to receive the royalties, or that a company that had ceased to have any interest in the Patents should be able to determine the licence. It seems plain,
20 moreover, that in clauses 5 and 6 of the licence the word " Patentee " must also be read as Patentee or its assigns; for after an assignment of the Patents the use of the Patentee's name would in no way help the licensee to resist revocation of the Patents or maintain an action for infringement. It would be the name of the assignee that the licensee would require to use for those purposes.

35 These considerations seem to lead inevitably to the conclusion that the word " Patentee " throughout the licence, and, therefore, in clause 3, must have been intended to mean the Patentee and its assigns. It was contended an behalf of the Respondents that this could not have been so in the case of clauses such as 2, 4 and 11, which impose obligations of a positive character upon the
25 Patentee, inasmuch as the obligations would not be enforceable against an assignee; but the fact that such obligations would not be directly enforceable against the assignee affords no reason for thinking that all the rights of the Patentee under the Patents are not assignable, for the Patentee's assignee could not enforce those rights except upon the terms of fulfilling the obligations
30 imposed upon the Patentee. The word " Patentee ", moreover, in a licence is commonly made in express terms to include the patentee, his executors, adminis-trators and assigns: (see *Key & Elphinstone's* Precedents in Conveyancing, 13th edition, volume 2, page 442) notwithstanding the fact that the licence imposes positive obligations upon the Patentee. It was further objected on behalf of
40 the Respondents that clauses 2 and 3 were based upon the confidence that each party reposed in the other and that the licensee could not, therefore, be asked to perform clause 3 in favour of any person or company other than the Patentees themselves. The licence, it was said, created a *quasi* partnership between the parties and the Respondents could not be compelled to have another *quasi*
45 partner thrust upon them; but I can find nothing in the licence that remotely resembles a partnership agreement. There was to be no co-operation between the parties in working the process or in exploiting the invention. The process was apparently to be worked not by the Patentee or licensee, but by their respective licensees and under-licensees. In granting these each party would

E

58

*National Carbonising Co., Ld. v. British Coal Distillation Ld.*

act independently of the other, the only matter in which they were to act in concert being any variation of the agreed royalty of sixpence per ton. I can see no reason whatever for thinking that the terms of the licence, so fas as they had to be performed by the Patentee, could not be just as satisfactorily 5 performed by an assignee of the Letters Patent. So long as the licensee company is paid its one-fourth share of the royalties received under the other licences granted by the Patentee, it is, I should have thought, a matter of complete indifference to that company who it is that grants the licences and by whom it is that the royalties are paid. 10

I therefore come to the conclusion that the word " Patentee " in clause 3 of the licence means the Patentee and its assigns. The benefits reserved to the Patentee by that clause are just as much part of the consideration accruing to the Patentee for the granting of the licence as is the share of the royalties payable under clause 10; and the Plaintiffs, as the assignees of the Patentee, are 15 in my judgment entitled to the benefit of both those considerations.

For these reasons I think that this appeal should be allowed with costs here and below and a declaration made as asked by paragraph (a) of the claiming part of the Statement of Claim.

**Eve J.**—The question involved in this appeal is purely one of construction 20 and, with all respects to the learned Judge, I prefer to his construction the construction arrived at by the Judgments which have just been read. The appeal, in my opinion, must be allowed.

**Slesser L.J.**—The appeal will be allowed, with costs here and below. I understand there is a question with regard to the costs of the Originating Summons. 25

After a discussion, the Order of *Clauson* J. as to the costs of the Originating Summons was allowed to stand.

Leave to appeal to the House of Lords was refused.

_____

IN THE HIGH COURT OF JUSTICE—CHANCERY DIVISION.

*Before* MR. JUSTICE CLAUSON. 30

June 30th, July 1st, 2nd, 3rd, 6th, 7th, 8th, 9th and 30th, 1936.

NORTON AND GREGORY LD. AND OTHERS *v.* JACOBS.

*Patent—Action for Infringement—Novelty—Subject-matter—Prior User—Insufficiency—Inutility—False Suggestion—Non-disclosure of best method—Counterclaim for threats—Patents held invalid and not infringed—Costs of new* 35 *issue raised in consequence of evidence given at trial—Patents ordered to be revoked.*

# TAB 63

NATIONAL TRUST CO. *v.* MEAD

**National Trust Company** *Appellant*

*v.*

**David Mead, Remai Financial Corp. and
Remai Construction (1981) Inc.** *Respondents*

INDEXED AS: NATIONAL TRUST CO. *v.* MEAD

File No.: 21157.

1990: February 23; 1990: August 16.

Present: Lamer C.J.* and Wilson, La Forest,
L'Heureux-Dubé, Gonthier, Cory and McLachlin JJ.

ON APPEAL FROM THE COURT OF APPEAL FOR
SASKATCHEWAN

*Mortgages — Action on covenant to pay — Individual assuming mortgage from corporation which had waived provincial statutory protection against being sued on covenant to pay — Provincial statute permitting only corporate mortgagors to waive protection — Whether individual assuming mortgage bound by waiver as a successor or assign of original corporate mortgagor — Whether assumption agreement effects a novation — The Limitation of Civil Rights Act, R.S.S. 1978, c. L-16, ss. 2, 40.*

The respondent Remai Construction (1981) Inc. ("Remai") granted a mortgage to the appellant National Trust as security for a loan to be applied in the construction of a condominium unit. Remai waived the protection of the Saskatchewan *Limitation of Civil Rights Act*, s. 2(1) of which provides that no action lies on the covenant to pay in a mortgage. Section 2(2)(d) extends this protection to subsequent purchasers who assume such a mortgage. Under s. 40(1) of the same Act agreements purporting to waive the protection of the Act are null and void, but s. 40(2) creates an exception to ss. 2 and 40(1) by permitting corporate mortgagors to waive the protection and provides that such a waiver is binding on the corporation's successors and assigns.

The respondent Mead purchased the condominium unit from Remai and executed an assumption of liability agreement in favour of National Trust which contained a covenant making Mead personally liable on the mort-

**National Trust Company** *Appelante*

*c.*

**David Mead, Remai Financial Corp. et
Remai Construction (1981) Inc.** *Intimés*

RÉPERTORIÉ: NATIONAL TRUST CO. *c.* MEAD

Nᵒ du greffe: 21157.

1990: 23 février; 1990: 16 août.

Présents: Le juge en chef Lamer* et les juges Wilson,
La Forest, L'Heureux-Dubé, Gonthier, Cory et
McLachlin.

EN APPEL DE LA COUR D'APPEL DE LA
SASKATCHEWAN

*Hypothèques — Action fondée sur l'engagement personnel de payer — Particulier prenant en charge une hypothèque consentie par une société qui avait renoncé à la protection accordée par une loi provinciale contre toute action fondée sur l'engagement personnel de payer — Loi provinciale ne permettant qu'aux sociétés débitrices hypothécaires de renoncer à cette protection — Le particulier qui prend en charge une hypothèque est-il lié par une renonciation en sa qualité de successeur ou de cessionnaire de la société qui était la débitrice hypothécaire originaire? — La convention de prise en charge opère-t-elle une novation? — The Limitation of Civil Rights Act, R.S.S. 1978, ch. L-16, art. 2, 40.*

L'intimée Remai Construction (1981) Inc. («Remai») a consenti à l'appelante National Trust une hypothèque en garantie d'un prêt devant être affecté à la construction d'une unité en copropriété. Remai a renoncé à la protection de *The Limitation of Civil Rights Act* de la Saskatchewan, dont le par. 2(1) dispose que l'engagement personnel de payer contenu dans un acte constitutif d'hypothèque ne donne lieu à aucun droit d'action. L'alinéa 2(2)d) étend cette protection aux acheteurs subséquents qui prennent en charge une telle hypothèque. Aux termes du par. 40(1), est nul et non avenu tout accord par lequel on prétend renoncer à la protection de la Loi, mais le par. 40(2) crée une exception à l'art. 2 et au par. 40(1) en permettant aux sociétés débitrices hypothécaires de renoncer à cette protection et prévoit qu'une telle renonciation lie leurs successeurs et cessionnaires.

L'intimé Mead a acheté l'unité en copropriété à Remai et a signé au profit de National Trust une convention d'acceptation de responsabilité contenant une clause rendant Mead personnellement responsable du

---

* Chief Justice at the time of judgment.

* Juge en chef à la date du jugement.

gage. The mortgage fell into arrears and National Trust brought an action against Remai and Mead for the full amount of the principal and interest owing. The action against Remai was later discontinued. The chambers judge granted an order *nisi* for sale of the property but refused to order personal judgment for the deficiency against Mead. The Court of Appeal dismissed National Trust's appeal.

The issues in this appeal are (1) whether the general protection extended to individuals under s. 2(1) prevails over the exception contained in s. 40(2) for corporations and their successors or assigns; (2) whether the particular wording of the assumption agreement releases Mead from liability on the personal covenant; and (3) whether the assumption agreement effects a novation.

*Held*: The appeal should be dismissed.

*Per* Lamer C.J. and Wilson, La Forest, L'Heureux-Dubé, Gonthier and Cory JJ.: Remai's exercise of its waiver under s. 40(2) of *The Limitation of Civil Rights Act* is not binding on Mead. Any exception to the principle in s. 2 that individual mortgagors be insulated from personal liability should be construed as narrowly as possible. The meaning of "successor" in s. 40(2) should be restricted to other corporations since the application of the s. 40(2) exception to "successors" was only intended to ensure liability on the personal covenant of a corporation which steps into the shoes of the original corporate mortgagor. While "assigns" would prima facie include individual assigns of corporate mortgagors, the purpose of this exception is to protect mortgagees who extend mortgages to corporations on condition that the latter provide a personal covenant and who then find that the corporation has unilaterally (and without the mortgagee's consent) assigned the mortgage to an individual on whom the personal covenant would not otherwise be binding under the Act. It is these "assigns" who must be bound by the personal covenant of the original corporate mortgagor if the mortgagee is to have the protection contemplated by s. 40(2). In this case the concern about the mortgagee's rights being unfairly defeated does not arise since National Trust freely entered into an assumption agreement with Mead. The fact that Mead assumed the mortgage by way of assumption agreement with National Trust means that

paiement de l'hypothèque. L'hypothèque est tombée en retard de paiement et National Trust a intenté contre Remai et Mead une action en paiement du montant intégral du capital et de l'intérêt dus. National Trust s'est par la suite désistée de l'action contre Remai. Le juge en chambre a rendu une ordonnance conditionnelle de vente du bien-fonds, mais a refusé d'accorder contre Mead un jugement personnel pour couvrir l'insuffisance. La Cour d'appel a rejeté l'appel interjeté par National Trust.

Le pourvoi soulève les questions de savoir (1) si la protection générale accordée aux particuliers aux termes du par. 2(1) l'emporte sur l'exception énoncée au par. 40(2) à l'égard des sociétés, de leurs successeurs et de leurs cessionnaires; (2) si le libellé particulier de la convention de prise en charge dégage Mead de toute responsabilité fondée sur l'engagement personnel; et (3) si la convention de prise en charge opère une novation.

*Arrêt*: Le pourvoi est rejeté.

*Le* juge en chef Lamer et les juges Wilson, La Forest, L'Heureux-Dubé, Gonthier et Cory: La renonciation faite par Remai en vertu du par. 40(2) de *The Limitation of Civil Rights Act* ne lie pas Mead. Toute exception au principe, posé par l'art. 2, que les particuliers débiteurs hypothécaires soient mis à l'abri de la responsabilité personnelle doit recevoir l'interprétation la plus restrictive possible. Le sens du terme «successeur» au par. 40(2) doit se limiter à d'autres sociétés, puisque l'application de l'exception prévue au par. 40(2) aux «successeurs» a pour seul objet d'assurer la responsabilité fondée sur l'engagement personnel d'une société qui prend la place de la société qui était la débitrice hypothécaire originaire. Bien que le mot «cessionnaires» comprenne à première vue les particuliers cessionnaires de sociétés débitrices hypothécaires, cette exception a pour objet la protection de créanciers hypothécaires qui consentent des hypothèques à des sociétés à condition que celles-ci s'engagent personnellement à payer, et qui découvrent par la suite que la société a unilatéralement (et sans le consentement du créancier hypothécaire) cédé l'hypothèque à un particulier qui, autrement, ne serait pas lié par l'engagement personnel aux termes de la Loi. Ce sont ces «cessionnaires» qui doivent être liés par l'engagement personnel de la société qui était la débitrice hypothécaire originaire si le créancier hypothécaire doit bénéficier de la protection envisagée par le par. 40(2). En l'espèce, le problème de l'anéantissement injuste des droits du créancier hypothécaire ne se pose pas étant donné que National Trust a librement conclu avec Mead une convention de prise en charge. Le fait que Mead a pris l'hypothèque en charge au moyen d'une convention de prise en charge intervenue avec National

NATIONAL TRUST CO. *v.* MEAD

he is entitled to the protection of s. 2(2)(d) of the Act, which is not subject to the waiver exception under s. 40(2).

The personal covenant set out in the assumption agreement is unenforceable against Mead. The wording of the agreement, in conjunction with the Act, is clearly capable of being construed as releasing Mead from any obligation to pay under the covenant. The agreement provides that Mead will be bound by all the terms of the mortgage "as though it had been originally made, executed and delivered to him as Mortgagor", in which case s. 2 would have applied, no exception under s. 40(2) would have been available, and the personal covenant would have been unenforceable pursuant to s. 40(1).

The assumption agreement did not effect a novation. The clause in the agreement stating that National Trust may at any time release the original mortgagor cannot be construed as a present release of Remai such as would be necessary to replace Remai with Mead as principal debtor. This conclusion is strengthened when the terms of the original mortgage are taken into consideration: the "no prejudice" clause confirms that there was no intention on the part of National Trust to release Remai. Taken together, these provisions are a strong indication that Mead's assumption of the debt was not accepted by National Trust in full consideration and substitution of Remai's obligation. The conduct of the parties does not negate that indication. National Trust's action in discontinuing its suit against Remai is equivocal, and cannot be construed as supporting an inference that the trust company was no longer looking to Remai for satisfaction of the debt. Discontinuance does not preclude a litigant from bringing the action at a later date, and thus does not constitute the kind of compelling circumstance necessary to found a novation.

*Per* McLachlin J.: Wilson J.'s conclusions and reasons were agreed with, subject to the comment that ss. 2(2)(d) and 40(2) of the Act involve a facial conflict which should be resolved by recourse to legislative intention.

## Cases Cited

By Wilson J.

**Considered:** *Canada Permanent Trust Co. v. Neumann* (1986), 8 B.C.L.R. (2d) 318; *Re Bank of Nova Scotia and Vancouver Island Renovating Inc.* (1986), 31 D.L.R. (4th) 560; *Prospect Mortgage Investment*

Trust lui donne droit à la protection de l'al. 2(2)d) de la Loi, lequel n'est pas assujetti à l'exception que constitue la renonciation prévue au par. 40(2).

On ne peut se prévaloir contre Mead de l'engagement personnel contenu dans la convention de prise en charge. Le libellé de la convention, combiné avec la Loi, admet manifestement une interprétation qui dégage Mead de toute obligation de payer fondée sur l'engagement personnel. La convention prévoit que Mead est lié par la totalité des conditions de l'hypothèque, «comme si c'était lui qui l'avait consentie et qui avait signé l'acte constitutif», auquel cas l'art. 2 se serait appliqué, aucune exception fondée sur le par. 40(2) n'aurait pu être invoquée et, suivant le par. 40(1), l'engagement personnel aurait été de nul effet.

La convention de prise en charge n'opère pas de novation. La clause de la convention stipulant que National Trust pouvait à n'importe quel moment dégager le débiteur hypothécaire originaire de ses engagements ne saurait s'interpréter comme le genre de décharge actuelle de Remai qui serait nécessaire pour que Mead soit substitué à Remai en tant que débiteur principal. Cette conclusion est renforcée quand on prend en considération les conditions de l'hypothèque primitive: la clause «de réserve de droits» confirme l'absence d'intention de la part de National Trust de dégager Remai de sa responsabilité. Prises ensemble, ces dispositions constituent une forte indication que National Trust n'a pas accepté la prise en charge de la dette par Mead en plein acquittement et en pleine substitution de l'obligation de Remai. La conduite des parties ne neutralise pas cette indication. Le fait que National Trust se soit désistée de son action contre Remai est équivoque et ne peut s'interpréter comme soutenant l'inférence selon laquelle la société de fiducie ne comptait plus sur Remai pour le paiement de la dette. Le désistement n'empêche pas une partie d'intenter l'action à une date ultérieure et, par conséquent, ne constitue pas le genre de circonstance déterminante qui est nécessaire pour fonder une novation.

*Le juge* McLachlin: Le juge McLachlin souscrit aux conclusions et aux motifs du juge Wilson, sous réserve de l'observation que l'al. 2(2)d) et le par. 40(2) de la Loi sont en conflit apparent et qu'on doit résoudre ce conflit en ayant recours à l'intention du législateur.

## Jurisprudence

Citée par le juge Wilson

**Arrêts examinés:** *Canada Permanent Trust Co. v. Neumann* (1986), 8 B.C.L.R. (2d) 318; *Re Bank of Nova Scotia and Vancouver Island Renovating Inc.* (1986), 31 D.L.R. (4th) 560; *Prospect Mortgage Invest-*

*Corp. v. Van-5 Developments Ltd.* (1985), 68 B.C.L.R. 12; **disapproved:** *Eaton Bay Trust Co. v. Ling* (1987), 45 D.L.R. (4th) 1; **referred to:** *Herold v. British American Oil Co.* (1954), 12 W.W.R. (N.S.) 333; *First City Trust Co. v. Friesen* (1985), 38 Sask. R. 220; *Canada Trustco Mortgage Co. v. Grover,* [1987] 2 W.W.R. 766; *Potash v. Royal Trust Co.,* [1986] 2 S.C.R. 351; *Disney Farms Ltd. v. Canadian Imperial Bank of Commerce,* [1984] 5 W.W.R. 285; *Polson v. Wulffsohn* (1890), 2 B.C.R. 39; *Central & Eastern Trust Co. v. Rosebowl Holdings Ltd.* (1981), 34 N.B.R. (2d) 308; *Central Trust Co. v. Bartlett* (1983), 30 R.P.R. 267; *Saskatchewan Trust v. Ross* (1985), 41 Sask. R. 121.

**Statutes and Regulations Cited**

*Limitation of Civil Rights Act,* R.S.S. 1978, c. L-16, ss. 2 [am. 1983-84, c. 44, s. 2], 40.
*Queen's Bench Rules of Saskatchewan,* rule 198(4).

APPEAL from a judgment of the Saskatchewan Court of Appeal (1988), 70 Sask. R. 11, [1988] 5 W.W.R. 365, 52 D.L.R. (4th) 159, affirming the refusal of Wright J. to order a personal judgment against the respondent in a mortgage action. Appeal dismissed.

*W. G. Turnbull,* for the appellant.

*Dale A. Canham,* for the respondents.

The judgment of Lamer C.J. and Wilson, La Forest, L'Heureux-Dubé, Gonthier and Cory JJ. was delivered by

WILSON J.—The issue in this case is the right of a mortgagee in the province of Saskatchewan to sue on the personal covenant. The parties contend that resolution of this issue depends upon the interpretation of the relevant statute, the construction of an assumption agreement, and the application of the principle of novation.

1. The Facts

The respondent Remai Construction (1981) Inc. ("Remai") granted a mortgage in the amount of $40,725 to the appellant National Trust Company ("National Trust") on June 28, 1984 as security for a loan to be applied in the construction of a condominium unit in Saskatoon. *The Limitation of Civil Rights Act,* R.S.S. 1978, c. L-16 ("the Act"), provides that a mortgagee's right to recover

*ment Corp. v. Van-5 Developments Ltd.* (1985), 68 B.C.L.R. 12; **arrêt critiqué:** *Eaton Bay Trust Co. v. Ling* (1987), 45 D.L.R. (4th) 1; **arrêts mentionnés:** *Herold v. British American Oil Co.* (1954), 12 W.W.R. (N.S.) 333; *First City Trust Co. v. Friesen* (1985), 38 Sask. R. 220; *Canada Trustco Mortgage Co. v. Grover,* [1987] 2 W.W.R. 766; *Potash c. Royal Trust Co.,* [1986] 2 R.C.S. 351; *Disney Farms Ltd. v. Canadian Imperial Bank of Commerce,* [1984] 5 W.W.R. 285; *Polson v. Wulffsohn* (1890), 2 B.C.R. 39; *Central & Eastern Trust Co. v. Rosebowl Holdings Ltd.* (1981), 34 N.B.R. (2d) 308; *Central Trust Co. v. Bartlett* (1983), 30 R.P.R. 267; *Saskatchewan Trust v. Ross* (1985), 41 Sask. R. 121.

**Lois et règlements cités**

*Limitation of Civil Rights Act,* R.S.S. 1978, ch. L-16, art. 2 [mod. 1983-84, ch. 44, art. 2], 40.
*Queen's Bench Rules of Saskatchewan,* règle 198(4).

POURVOI contre un arrêt de la Cour d'appel de la Saskatchewan (1988), 70 Sask. R. 11, [1988] 5 W.W.R. 365, 52 D.L.R. (4th) 159, confirmant le refus du juge Wright de rendre un jugement personnel contre l'intimé dans une action hypothécaire. Pourvoi rejeté.

*W. G. Turnbull,* pour l'appelante.

*Dale A. Canham,* pour les intimés.

Version française du jugement du juge en chef Lamer et des juges Wilson, La Forest, L'Heureux-Dubé, Gonthier et Cory rendu par

LE JUGE WILSON—Le litige vise le droit d'un créancier hypothécaire dans la province de la Saskatchewan d'intenter une action fondée sur l'engagement personnel de payer. Les parties soutiennent que c'est là une question dont la résolution dépend de l'interprétation de la loi applicable, de l'interprétation d'une convention de prise en charge et de l'application du principe de la novation.

1. Les faits

L'intimée Remai Construction (1981) Inc. («Remai») a consenti à l'appelante National Trust Company («National Trust») le 28 juin 1984 une hypothèque de 40 725 $ en garantie d'un prêt devant être affecté à la construction d'une unité en copropriété à Saskatoon. Aux termes de *The Limitation of Civil Rights Act,* R.S.S. 1978, ch. L-16 («la Loi»), le droit d'un créancier hypothé-

Case 09-10138-MFW   Doc 13460-9   Filed 05/02/14   Page 39 of 177

414        NATIONAL TRUST CO. *v.* MEAD   *Wilson J.*        [1990] 2 S.C.R.

the unpaid balance due on a mortgage is restricted to the land itself. Any personal covenant is void and unenforceable. The Act, however, permits corporate mortgagors to waive the protection provided by the Act and Remai did so in the present case.

On August 28, 1984, the respondent David Mead ("Mead") purchased the condominium unit from Remai and executed an Assumption of Liability Agreement ("Assumption Agreement") in favour of National Trust. The Assumption Agreement contained a covenant making Mead personally liable on the mortgage.

On October 1, 1986, the mortgage fell into arrears and two months later National Trust commenced an action against Remai and Mead jointly and severally for *inter alia* the full amount of the principal and interest owing. In its statement of defence, Remai alleged that the Assumption Agreement released it from its covenant to pay or alternatively constituted a novation which had the effect of discharging it from any further liability on the covenant. The action against Remai was discontinued.

Mead entered no statement of defence. National Trust then applied for an order *nisi* for sale and for personal judgment against Mead. Wright J. in chambers refused to order personal judgment for the deficiency but granted an order *nisi* for sale without recorded reasons. The Saskatchewan Court of Appeal dismissed National Trust's appeal. National Trust now appeals to this Court.

## 2. The Legislation

### *The Limitation of Civil Rights Act* provides:

**2**(1) Where land is hereafter sold under an agreement for sale in writing, or mortgaged whether by legal or equitable mortgage for the purpose of securing the purchase price or part of the purchase price of the land affected, or where a mortgage is hereafter given as collateral security for the purchase price or part of the purchase price of land, the vendor's or mortgagee's right

caire de recouvrer le solde impayé d'un prêt hypothécaire se limite au bien-fonds lui-même. Tout engagement personnel de payer est nul et sans effet. La Loi permet toutefois aux sociétés débitrices hypothécaires de renoncer à la protection qu'elle accorde, ce qu'a fait Remai en l'espèce.

Le 28 août 1984, l'intimé David Mead («Mead») a acheté l'unité en copropriété à Remai et a signé au profit de National Trust une convention d'acceptation de responsabilité («convention de prise en charge»). Cette convention contenait une clause rendant Mead personnellement responsable du paiement de l'hypothèque.

Le 1er octobre 1986, l'hypothèque est tombée en retard de paiement et, deux mois plus tard, National Trust a intenté contre Remai et Mead conjointement et solidairement une action visant notamment à l'obtention du paiement du montant intégral du capital et de l'intérêt dus. Dans sa défense, Remai alléguait que la convention de prise en charge la déliait de son engagement de payer ou, subsidiairement, qu'elle constituait une novation ayant pour effet de la libérer de toute autre obligation fondée sur son engagement personnel. National Trust s'est désistée de l'action contre Remai.

Mead n'a pas produit de défense. National Trust de son côté a présenté une demande visant à obtenir une ordonnance conditionnelle de vente et un jugement personnel contre Mead. Le juge Wright, siégeant en chambre, a refusé d'accorder un jugement personnel pour couvrir l'insuffisance, mais il a rendu une ordonnance conditionnelle de vente sans motifs consignés. La Cour d'appel de la Saskatchewan a rejeté l'appel interjeté par National Trust et celle-ci se pourvoit maintenant devant notre Cour.

## 2. Les textes législatifs

### *The Limitation of Civil Rights Act* dispose:

[TRADUCTION] **2**(1) Lorsqu'un bien-fonds se vend en exécution d'un contrat de vente écrit ou qu'il est grevé d'une hypothèque, en common law ou en *equity*, aux fins de garantir la totalité ou une partie du prix d'achat dudit bien-fonds, ou lorsqu'une hypothèque est consentie à titre de garantie accessoire de la totalité ou d'une partie du prix d'achat d'un bien-fonds, le droit du

to recover the unpaid balance due shall be restricted to the land sold or mortgaged and to cancellation of the agreement for sale or foreclosure of the mortgage or sale of the property, and no action shall lie on the covenant for payment contained in the agreement for sale or mortgage.

(1.1) The benefit of subsection (1) extends to and includes a mortgage that secures, or is given as collateral security for, the purchase price or part of the purchase price of the land, whether or not the mortgagee was the vendor of that land.

(2) The benefit of subsections (1) and (1.1) extends to and includes:

(a) the personal covenant of the purchaser contained in any assignment by the vendor of such an agreement for sale;

(b) the personal covenant of the assignee contained in any assignment by the purchaser of such an agreement for sale;

(c) the personal covenant of the mortgagor contained in an agreement extending any such mortgage;

(d) the personal covenant of a purchaser of lands subject to any such mortgage, to assume and pay the mortgage;

and no action lies on any such personal covenant.

**40**(1) Subject to subsection (2), every agreement or bargain, verbal or written, express or implied, that this Act or any provision thereof shall not apply or that any benefit or remedy provided by it shall not be available, or which in any way limits, modifies or abrogates or in effect limits, modifies or abrogates any such benefit or remedy, is null, void and of no effect, and moneys paid under or by reason of any such agreement or bargain are recoverable in any court of competent jurisdiction.

(2) A corporate body may in writing agree that this Act or any provision thereof shall have no application to:

(a) any mortgage, charge or other security for the payment of money made, given or created by it after March 25, 1959;

(b) any agreement or instrument entered into by it after March 25, 1959, involving the payment by it of money, or its liability to pay money;

vendeur ou du créancier hypothécaire de recouvrer le solde impayé devenu exigible ne porte que sur le bien-fonds vendu ou hypothéqué et ne permet que l'annulation du contrat d'achat, ou la forclusion ou la vente du bien-fonds. L'engagement de payer contenu dans le contrat de vente ou dans l'acte constitutif d'hypothèque ne donne lieu à aucun droit d'action.

(1.1) Le paragraphe (1) s'applique également à une hypothèque qui garantit, ou qui garantit accessoirement, la totalité ou une partie du prix d'achat du bien-fonds, que le créancier hypothécaire ait été ou non le vendeur de ce bien-fonds.

(2) Les paragraphes (1) et (1.1) s'appliquent également:

a) à l'engagement personnel pris par l'acheteur lors de la cession, faite par le vendeur, d'un tel contrat de vente;

b) à l'engagement personnel pris par le cessionnaire lors d'une cession, faite par l'acheteur, d'un tel contrat de vente;

c) à l'engagement personnel du débiteur hypothécaire contenu dans un accord reportant l'échéance d'une telle hypothèque;

d) à l'engagement personnel de l'acquéreur de biens-fonds grevés d'une telle hypothèque de prendre en charge et de payer cette hypothèque.

Ces engagements personnels ne donnent lieu à aucun droit d'action.

**40**(1) Sous réserve du paragraphe (2), est nul, non avenu et inopérant tout accord ou entente, écrit ou oral, exprès ou implicite, qui stipule l'inapplicabilité de la présente loi ou de quelqu'une de ses dispositions ou l'exclusion de tout avantage ou redressement y prévu, ou qui de quelque manière limite, modifie ou supprime un tel avantage ou redressement, ou qui a un tel effet. Toute somme versée en vertu ou en raison d'un tel accord ou entente est recouvrable devant un tribunal compétent.

(2) Une personne morale peut convenir par écrit de l'inapplicabilité de la présente loi ou de quelqu'une de ses dispositions:

a) à une hypothèque, charge ou autre garantie qui est destinée à assurer le paiement d'une somme d'argent et qu'elle a consentie, accordée ou créée postérieurement au 25 mars 1959;

b) à une entente ou à un acte, signé par elle postérieurement au 25 mars 1959, qui prévoit le paiement d'une somme d'argent par elle ou qui la rend responsable du paiement d'une telle somme;

Case 09-10138-MFW    Doc 13460-9    Filed 05/02/14    Page 41 of 177

416        NATIONAL TRUST CO. *v.* MEAD    *Wilson J.*        [1990] 2 S.C.R.

(c) any agreement or instrument renewing or extending or collateral to any such mortgage, charge, other security, agreement or instrument; or

(d) the rights, powers or remedities [*sic*] of any other person under any such mortgage, charge, other security, agreement or instrument;

and, notwithstanding anything in this Act, an agreement made by a corporate body under this subsection shall be binding upon the corporate body, its successors and assigns.

## 3. The Assumption Agreement

The relevant parts of the Assumption Agreement between National Trust (the Mortgagee) and Mead (the Purchaser) read as follows:

**WHEREAS** by a mortgage dated the 28th day of June, 1984 . . .

**AND WHEREAS** the Purchaser represents to the Mortgagee that he has purchased the said lands and premises and is now the owner thereof subject to the said mortgage.

**AND WHEREAS** the Purchaser has agreed to assume and covenant with the Mortgagee to pay to the Mortgagee the mortgage indebtedness now owing under the said mortgage.

**NOW THIS INDENTURE WITNESSETH** that in consideration of the premises and the sum of One Dollar ($1.00) now paid by the Mortgagee to the Purchaser, it is hereby agreed as follows:

1. The Purchaser covenants and agrees with the Mortgagee, that he will pay to it the said principal money now owing, and all monies that may be advanced hereafter with respect to the said mortgage, together with interest thereon, and that he will perform each and all of the covenants, conditions, and obligations in the said mortgage contained to be performed by the Mortgagor therein at the times and in the manner and in all respects as therein provided, and that he will be bound by each and all of the terms and covenants, conditions and obligations of the said mortgage as though it had been originally made, executed and delivered by him as Mortgagor.

AND THE PURCHASER HEREBY AUTHORIZES AND INSTRUCTS THE MORTGAGEE TO PAY TO THE MORTGAGOR NAMED IN THE SAID MORTGAGE OR TO HIS NOMINEE, THE

c) à une entente ou à un acte qui renouvelle ou proroge une telle hypothèque, une telle charge, une telle autre garantie, un tel accord ou un tel acte, ou qui leur est accessoire; ou

d) aux droits, pouvoirs ou recours pouvant être exercés par une autre personne en vertu d'une telle hypothèque, d'une telle charge, d'une telle autre garantie, d'une telle entente ou d'un tel acte.

De plus, indépendamment des termes de la présente loi, une entente conclue par une personne morale en vertu du présent paragraphe lie cette personne morale, ses successeurs et ses cessionnaires.

## 3. La convention de prise en charge

Les parties pertinentes de la convention de prise en charge intervenue entre National Trust (la créancière hypothécaire) et Mead (l'acheteur) portent:

[TRADUCTION] **CONSIDÉRANT** que par hypothèque en date du 28 juin 1984 [. . .]

**ET CONSIDÉRANT** que l'acheteur déclare à la créancière hypothécaire s'être porté acquéreur des terres et des locaux en question et être actuellement propriétaire de ceux-ci, sous réserve de ladite hypothèque.

**ET CONSIDÉRANT** que l'acheteur s'engage envers la créancière hypothécaire à prendre en charge la dette hypothécaire existant en vertu de ladite hypothèque et à lui rembourser le montant de cette dette.

**LE PRÉSENT ACTE CONSTATE** qu'en contrepartie du bien-fonds et de la somme d'un dollar (1 $) versée maintenant par la créancière hypothécaire à l'acheteur, les parties conviennent de ce qui suit:

1. L'acheteur s'engage envers la créancière hypothécaire à lui payer ledit montant du capital encore impayé et toutes sommes avancées en vertu de ladite hypothèque, ainsi que les intérêts courus. Il convient de remplir intégralement, aux époques et de la manière prescrites dans l'acte constitutif d'hypothèque et en parfaite conformité avec celui-ci, les engagements, les conditions et les obligations qui, aux termes dudit acte, incombent au débiteur hypothécaire. En outre, il se reconnaît lié par la totalité des modalités, engagements, conditions et obligations que comporte ladite hypothèque comme si c'était lui qui l'avait consentie et qui avait signé l'acte constitutif.

ET L'ACHETEUR AUTORISE PAR LES PRÉSENTES LA CRÉANCIÈRE HYPOTHÉCAIRE À PAYER AU DÉBITEUR HYPOTHÉCAIRE NOMMÉ DANS L'ACTE CONSTITUTIF D'HYPO-

**FULL PROCEEDS OF THE LOAN THEREBY SECURED.**

This Agreement shall extend to and bind and may be taken advantage of by the respective heirs, executors, administrators, successors and assigns as the case may be of each and every party hereto ... all covenants shall be joint and several; time shall be of the essence hereof; and all provisions hereof shall have effect notwithstanding any statute to the contrary.

### 4. The Courts Below

As mentioned, Wright J. hearing the case in chambers gave no recorded reasons for his order *nisi*.

Writing for the Saskatchewan Court of Appeal (1988), 70 Sask. R. 11, Cameron J.A. encapsulates the statutory scheme as follows at p. 12:

Ordinarily, a person who borrows money from another for the purpose of buying land and gives that other a mortgage upon the land to secure repayment of the loan, can have the land taken from him on foreclosure, if he defaults, but cannot be sued on his covenant to pay: **The Limitation of Civil Rights Act**, S.S. 1979, c. L-6, s. 2. That is subject, however, to an exception. A corporate borrower is empowered to agree when granting a mortgage that the statute will not apply to that mortgage: s. 40(2). And, according to the **Act**, an agreement or waiver of that sort binds both the corporation and its "successors and assigns".

After a review of the facts Cameron J.A. sought guidance from previous authority on the question whether a mortgagee is limited to its remedy against the land when an individual assumes a mortgage from a corporation which has waived the statutory protection of s. 2. He found the jurisprudence inconsistent on this point, noting that a great deal seemed to depend on the terms of the particular assumption agreement and whether it could be said to give rise to a novation.

**THÈQUE OU À LA PERSONNE PAR LUI DÉSIGNÉE LA TOTALITÉ DU PRODUIT DU PRÊT GARANTI PAR L'HYPOTHÈQUE ET LUI DEMANDE DE LE FAIRE.**

La présente convention vise et lie les héritiers, les exécuteurs, les administrateurs, les successeurs et les cessionnaires respectifs, selon le cas, de chacune des parties aux présentes, et leur profite, [ . . .]; tout engagement est pris conjointement et solidairement; les délais fixés par les présentes sont de rigueur; et toutes les stipulations des présentes s'appliquent indépendamment de toute disposition législative contraire.

### 4. Les juridictions inférieures

Comme je l'ai déjà mentionné, les motifs de l'ordonnance conditionnelle du juge Wright, qui a entendu la cause en cabinet, n'ont pas été consignés.

Écrivant au nom de la Cour d'appel de la Saskatchewan (1988), 70 Sask. R. 11, le juge Cameron résume ainsi le régime établi par la Loi, à la p. 12:

[TRADUCTION] D'ordinaire, une personne qui emprunte de l'argent à une autre afin de se porter acquéreur d'un bien-fonds et qui consent au prêteur en garantie du remboursement du prêt une hypothèque grevant ledit bien-fonds peut se voir enlever celui-ci pour cause de forclusion si elle se trouve en défaut, mais elle ne peut faire l'objet de poursuites fondées sur son engagement de payer: **The Limitation of Civil Rights Act**, S.S. 1979, ch. L-6, art. 2. Cette règle souffre toutefois une exception. En effet, il est loisible à une société emprunteuse qui consent une hypothèque de convenir que la Loi ne s'y applique pas: par. 40(2). Et, aux termes de la Loi, un accord ou une renonciation de ce genre lie à la fois la société et ses «successeurs et [ . . . ] cessionnaires».

Ayant passé en revue les faits, le juge Cameron a cherché dans la jurisprudence la réponse à la question de savoir si un créancier hypothécaire est limité à l'exercice de son recours contre le bien-fonds dans un cas où une personne prend en charge une hypothèque consentie par une société qui a renoncé à la protection accordée par l'art. 2 de la Loi. Le juge Cameron a constaté que la jurisprudence se contredisait sur ce point et a fait remarquer que les termes de la convention de prise en charge en litige ainsi que la réponse donnée à la question de savoir si cette convention pouvait être considérée comme opérant une novation semblaient y jouer un rôle important.

Case 09-10138-MFW    Doc 13460-9    Filed 05/02/14    Page 43 of 177

418         NATIONAL TRUST CO. *v.* MEAD    *Wilson J.*         [1990] 2 S.C.R.

He then considered the particular wording of the Assumption Agreement before him, especially the undertaking of Mead to perform all the covenants in the mortgage "as though it had been originally made, executed and delivered by him as Mortgagor". At pages 16-17, he found these words virtually dispositive of the matter before him:

The meaning of these words is clear. And if taken literally, so too is their effect. Had Mr. Mead been the original mortgagor he would have been entitled to the benefit of s. 2 of the **Act**, and would have been disabled by s. 40 from agreeing otherwise. Thus the effect of the words is to extend to him the benefit of the statute and, in turn, to limit National Trust to its remedy against the land. Even if this were uncertain, the result would not change, because the agreement falls to be construed contra proferentem—against the one who drew it and in favour of the one who made it. Hence the words have to be given the meaning most favourable to Mr. Mead.

The Saskatchewan Court of Appeal also based its decision on a finding that novation had occurred in the form of a substitution of Mead for Remai as mortgagor. Cameron J.A. drew the four elements necessary to establish a novation from *Herold v. British American Oil Co.* (1954), 12 W.W.R. (N.S.) 333 (Alta. S.C.) and *Canada Permanent Trust Co. v. Neumann* (1986), 8 B.C.L.R. (2d) 318 (C.A.) as follows:

(i)   The new debtor must assume the complete liability.

(ii)  The creditor must accept the new debtor as a principal debtor and not as an agent or guarantor.

(iii) The creditor must accept the new contract in full satisfaction and substitution for the old contract.

(iv)  The new contract must be made with the consent of the old debtor.

In this case Mead expressly assumed in clause 1 of the Assumption Agreement the complete liability under the mortgage. National Trust accepted him as principal debtor and gave valuable consideration. Mead undertook to repay the loan and agreed in clause 2 of the Agreement that if Na-

Il a examiné ensuite le libellé particulier de la convention de prise en charge dont il était question, et spécialement la promesse de Mead de s'acquitter de tous les engagements qu'il comportait l'hypothèque «comme si c'était lui qui l'avait consentie et qui avait signé l'acte constitutif». Aux pages 16 et 17, il conclut qu'il n'en fallait guère davantage pour régler la question dont il se trouvait saisi:

[TRADUCTION] Le sens de ces mots est clair. Et si on les prend littéralement, tel est également leur effet. Si M. Mead avait été le débiteur hypothécaire originaire, il aurait eu droit au bénéfice de l'art. 2 de la **Loi**, et l'art. 40 serait venu l'empêcher d'en convenir autrement. Aussi les mots en question ont-ils pour effet de le faire bénéficier de la loi et, par le fait même, de limiter National Trust à l'exercice de son recours contre le bien-fonds. Même s'il planait quelque doute à ce sujet, le résultat serait identique puisque la convention est à interpréter *contra proferentem*, c'est-à-dire au détriment de la partie qui l'a rédigée et au profit de l'autre partie. D'où il s'ensuit qu'il faut donner aux mots en cause le sens le plus favorable à M. Mead.

La Cour d'appel de la Saskatchewan a fondé son arrêt en outre sur la conclusion qu'il y avait eu novation sous la forme de la substitution de Mead à Remai en tant que débiteur hypothécaire. Le juge Cameron a tiré des décisions *Herold v. British American Oil Co.* (1954), 12 W.W.R. (N.S.) 333 (C.S. Alb.) et *Canada Permanent Trust Co. v. Neumann* (1986), 8 B.C.L.R. (2d) 318 (C.A.), les quatre éléments nécessaires pour qu'il y ait novation:

(i)   Le nouveau débiteur doit assumer totalement la responsabilité.

(ii)  Le créancier doit accepter le nouveau débiteur comme débiteur principal et non pas en qualité de mandataire ou de garant.

(iii) Le créancier doit accepter le nouveau contrat en pleine satisfaction et substitution de l'ancien contrat.

(iv)  Le nouveau contrat doit être conclu avec le consentement de l'ancien débiteur.

En l'espèce, Mead a assumé expressément dans la clause première de la convention de prise en charge la pleine responsabilité de l'hypothèque. National Trust l'a accepté à titre de débiteur principal et a donné une contrepartie de valeur. Mead s'est engagé à rembourser le prêt et a con-

tional Trust released Remai "from any or all of the covenants" contained in the mortgage, this would not affect his (Mead's) liability or National Trust's charge on the land. As between National Trust and Remai the Court of Appeal concluded that National Trust had discharged Remai. It premised this finding on National Trust's discontinuance of its action against Remai. The Court of Appeal also found that National Trust accepted the new arrangement in satisfaction of and in substitution for the old one based on the combination of the Assumption Agreement and National Trust's conduct in relation to Remai. Finally, Remai consented to the substitution of Mead as the new debtor. The court was therefore satisfied that the Assumption Agreement effected a novation and that the chambers judge was right in confining National Trust to its remedy against the land under s. 2(1) of the Act.

### 5. The Issues

The issues raised by this appeal are as follows:

A. Does the general protection extended to individuals under s. 2(1) of the Act prevail over the exception contained in s. 40(2) for corporations and their successors or assigns?

B. Does the particular wording of the Assumption Agreement release Mead from liability on the personal covenant?

C. Does the assumption agreement effect a novation?

### 6. Analysis

#### A. *Statutory Interpretation*

Section 2 of the Act provides that when land is mortgaged for purposes of securing the purchase price of land, the mortgagee's recovery rights are restricted to foreclosure and sale of the mortgaged land. No action on the personal covenant lies against the mortgagor for any deficiency. Section 2(2)(d) extends that protection to subsequent purchasers by sweeping within its ambit "the personal

venu à la clause 2 de la convention que si National Trust déliait Remai [TRADUCTION] «de l'un ou de l'ensemble des engagements» énoncés dans l'acte constitutif d'hypothèque, cela ne changerait rien à sa responsabilité (celle de Mead) ni à la charge de National Trust grevant le bien-fonds. En ce qui concerne les rapports entre National Trust et Remai, la Cour d'appel a conclu que cette dernière avait été dégagée de sa responsabilité par National Trust. Cette conclusion reposait sur le fait que National Trust s'était désisté de son action contre Remai. Se fondant sur la convention de prise en charge ainsi que sur la conduite de National Trust envers Remai, la Cour d'appel a conclu en outre que National Trust avait accepté le nouvel accord en satisfaction et en substitution de l'ancien. Finalement, Remai a donné son consentement à la substitution de Mead en tant que nouveau débiteur. La cour a été en conséquence convaincue que la convention de prise en charge opérait une novation et que c'est avec raison que le juge siégeant en cabinet avait limité National Trust à l'exercice de son recours contre le bien-fonds conformément au par. 2(1) de la Loi.

### 5. Les questions en litige

Le présent pourvoi soulève les questions suivantes:

A. La protection générale accordée aux particuliers aux termes du par. 2(1) de la Loi l'emporte-t-elle sur l'exception énoncée au par. 40(2) à l'égard des sociétés, de leurs successeurs et de leurs cessionnaires?

B. Le libellé particulier de la convention de prise en charge dégage-t-il Mead de toute responsabilité fondée sur l'engagement personnel?

C. La convention de prise en charge opère-t-elle une novation?

### 6. Analyse

#### A. *L'interprétation des dispositions législatives*

L'article 2 de la Loi porte que quand une hypothèque est consentie sur un bien-fonds afin de garantir le prix d'achat de celui-ci, les droits de recouvrement du créancier hypothécaire se limitent à la forclusion et à la vente du bien-fonds grevé. Aucune action fondée sur l'engagement personnel ne peut être intentée contre le débiteur hypothécaire en cas d'insuffisance. C'est là une

covenant of a purchaser of lands subject to any such mortgage, to assume and pay the mortgage".

On a plain reading of s. 2(2)(d) National Trust cannot recover from Mead on his personal covenant. This statutory intent is reinforced by s. 40(1) of the Act, which provides that agreements purporting to waive the protection of the Act are "null, void and of no effect".

Section 40(2), however, creates an exception to s. 2 and 40(1) of the Act by permitting corporate mortgagors to waive the protection. In its mortgage agreement with National Trust, Remai expressly waived the protection under s. 2 of the Act and gave a personal covenant on the mortgage. Under the terms of s. 40(2) such a waiver is binding upon "the corporate body, its successors and assigns". The question to be decided therefore is whether Mead is bound by the waiver as a successor or assign of Remai. The answer turns on the interaction between ss. 2 and 40(1) of the Act, which preclude enforcement of the personal covenant against an individual mortgagor, and s. 40(2) of the Act, which binds successors and assigns to a waiver of s. 2 by a corporate mortgagor.

As the Saskatchewan Court of Appeal points out, existing case law on the point is not very helpful. In *First City Trust Co. v. Friesen* (1985), 38 Sask. R. 220 (Q.B.), an individual assumed a mortgage from a corporate builder. MacLeod J. rejected an argument that s. 40(2) bound only corporate successors and assigns. At page 223 he states:

Whether the mortgagee can or cannot obtain personal judgment against the defendant Friesen depends on the terms of the assumption agreement. Without that agree-

protection que l'al. 2(2)d) accorde également aux acheteurs subséquents du fait qu'il englobe dans sa portée «l'engagement personnel de l'acquéreur de biens-fonds grevés d'une telle hypothèque de prendre en charge et de payer cette hypothèque».

Selon une interprétation littérale de l'al. 2(2)d), National Trust ne peut obtenir de Mead un recouvrement fondé sur l'engagement personnel de celui-ci. Cette intention du législateur se trouve renforcée par le par. 40(1) de la Loi, qui dispose que tout accord par lequel on prétend renoncer à la protection de la Loi est «nul, non avenu et inopérant».

Le paragraphe 40(2) crée toutefois une exception à l'art. 2 et au par. 40(1) de la Loi en permettant aux sociétés débitrices hypothécaires de renoncer à la protection. Dans la convention hypothécaire qu'elle a conclue avec National Trust, Remai a expressément renoncé à la protection de l'art. 2 de la Loi et s'est engagée personnellement à garantir l'hypothèque. Suivant les termes du par. 40(2), pareille renonciation lie la «personne morale, ses successeurs et ses cessionnaires». La question à trancher est donc de savoir si Mead est lié par la renonciation en tant que successeur ou cessionnaire de Remai. La réponse tient à l'interrelation de l'art. 2 et du par. 40(1) de la Loi, qui viennent empêcher qu'un particulier débiteur hypothécaire ne soit contraint de s'acquitter de son engagement personnel de payer, et du par. 40(2) de la Loi qui prévoit qu'une renonciation à l'application de l'art. 2 faite par une société débitrice hypothécaire lie ses successeurs et ses cessionnaires.

Ainsi que le fait remarquer la Cour d'appel de la Saskatchewan, la jurisprudence se révèle fort peu utile sur ce point. Dans l'affaire *First City Trust Co. v. Friesen* (1985), 38 Sask. R. 220 (B.R.), un particulier a pris en charge une hypothèque consentie par une société constructrice. Le juge MacLeod a rejeté l'argument selon lequel le par. 40(2) ne s'applique qu'aux successeurs et aux cessionnaires qui sont des personnes morales. Il dit, à la p. 223:

[TRADUCTION] Quant à savoir si la créancière hypothécaire peut ou non obtenir un jugement personnel contre le défendeur Friesen, cela dépend des conditions

ment, there would be no privity of contract between the mortgagee and Friesen, and personal judgment could only go against the defendant corporate body ....

I am satisfied that the position of persons such as Friesen, (that is, successors and assigns) was contemplated by the legislature, whose words must be accepted for what they say, without imposing an artificial construction on those words to benefit a person who, if different circumstances had prevailed, could have been able to invoke the protection of the statute as against the mortgagee.

In *Canada Trustco Mortgage Co. v. Grover*, [1987] 2 W.W.R. 766 (Sask. Q.B.), Wright J. (the chambers judge in the case at bar) rejected *First City* on the strength of this Court's judgment in *Potash v. Royal Trust Co.*, [1986] 2 S.C.R. 351. In *Potash* this Court was asked to interpret s. 10 of the federal *Interest Act*, R.S.C. 1970, c. I-18, which provided that individuals must be given the right to pay off a mortgage after five years. The respondent in that case entered into a renewal agreement after five years without paying off the mortgage and then proceeded to pay it off subsequent to entering into the renewal agreement. Although the Act did not specifically provide that a person could not waive its provisions, I stated for the Court at p. 373 that "I agree with counsel for Potash that s. 10(1) was enacted in the public interest and that the long standing rule against contracting out or waiver should apply to it." Wright J. does not expand his application of *Potash* to the facts of *Grover* but I assume that he took from it that, if parties cannot waive protective provisions in circumstances where the statute is silent, then where the statute expressly invalidates a waiver (e.g., s. 40(1) of the Act), any exception to that protection should be construed as narrowly as possible. The facts in *Grover* were for all intents and purposes the same as in the case at bar. Wright J. found that the applicant mortgagee was not entitled to judgment against the individual mortgagor to whom the mortgage had been assigned by the original corporate mortgagor.

*a* de la convention de prise en charge. En l'absence de cette convention, il n'y aurait pas de lien de droit contractuel entre la créancière hypothécaire et Friesen, et un jugement personnel ne pourrait être rendu alors que contre la personne morale défenderesse [. . .]

*b* Je suis convaincu que la situation de personnes comme Friesen (c'est-à-dire les successeurs et les cessionnaires) a été envisagée par le législateur, dont les paroles sont à prendre littéralement, sans leur imposer une interprétation artificielle afin de profiter à une personne qui, si les circonstances avaient été différentes, aurait pu invoquer la protection de la loi contre son créancier hypothécaire.

*c* Dans l'affaire *Canada Trustco Mortgage Co. v. Grover*, [1987] 2 W.W.R. 766 (B.R. Sask.), le juge Wright (le juge en chambre, en l'espèce) s'est fondé sur notre arrêt *Potash c. Royal Trust Co.*, [1986] 2 R.C.S. 351, pour rejeter la décision *First City*. Notre Cour était appelée dans l'affaire *Potash* à interpréter l'art. 10 de la *Loi sur l'intérêt*, S.R.C. 1970, ch. I-18, qui reconnaissait aux particuliers le droit de purger une hypothèque à l'expiration d'une période de cinq ans. L'intimé dans cette affaire-là, ayant conclu une convention de renouvellement au bout de cinq ans sans purger l'hypothèque, l'a purgée après la conclusion de la convention. Quoique la Loi n'exclue pas expressément la renonciation à l'application de ses dispositions, j'ai dit au nom de la Cour, à la p. 373: «Je suis d'accord avec l'avocat de Potash pour dire que le par. 10(1) a été adopté dans l'intérêt public et que la règle établie depuis longtemps qui interdit la renonciation doit s'y appliquer.» Le juge Wright n'applique pas l'arrêt *Potash* aux faits de l'affaire *Grover*, mais je présume qu'il en a déduit que, si des parties ne peuvent renoncer à des dispositions protectrices dans des circonstances où la Loi se tait à ce sujet, alors dans un cas où la Loi invalide expressément une renonciation (p. ex. le par. 40(1) de la Loi), toute exception à cette protection doit recevoir l'interprétation la plus restrictive possible. Les faits dans l'affaire *Grover* sont pratiquement identiques à ceux de la présente instance. Le juge Wright a décidé que la créancière hypothécaire requérante n'avait pas droit à ce qu'un jugement soit rendu contre le particulier débiteur hypothécaire auquel l'hypothèque avait été cédée par la société qui était la débitrice hypothécaire originaire.

I agree with Cameron J.A. that these cases are not of much assistance. I turn therefore to a consideration of the purpose of s. 2 of the Act. Section 2 protects individual mortgagors from being personally liable on a mortgage and restricts the mortgagee's remedy to the property. Individuals usually take out mortgages to secure residential houses or farms. Their home is typically the largest single asset they have. One can well imagine that once that is lost the individual in many instances has little else to seize and imposing the additional burden of personal liability would be onerous and perhaps futile. I note in passing that s. 2 was originally enacted by the Saskatchewan legislature in 1934 (S.S. 1934-35, c. 89, s. 4) at a time when many prairie farmers were "losing the farm" thanks to the notorious and disastrous effects of the "dustbowls" and the Depression.

Section 40 of the Act was enacted through a series of amendments to the statute between 1953 and 1961. The purpose in permitting corporate borrowers to waive the protection provided under the Act was, in my view, aptly described by Malone J. in *Disney Farms Ltd. v. Canadian Imperial Bank of Commerce*, [1984] 5 W.W.R. 285 (Sask. Q.B.) at pp. 287-88:

> Since 1965 the Limitation of Civil Rights Act [R.S.S. 1965, c. 103, s. 27] has permitted bodies corporate to waive the entire provisions thereof. A similar waiver provision is also found in the Saskatchewan Land Contracts (Actions) Act, R.S.S. 1978, c. L-3 [s. 5]. In my opinion, the purpose of these provisions is to facilitate corporate financing that otherwise may not be available if lenders could not realize upon their security on default by a corporate borrower. I am also of the opinion that the provisions of the Limitation of Civil Rights Act were primarily intended to benefit and protect individuals, as distinct from limited companies, who usually are more sophisticated in the management of their affairs and require larger amounts of capital to maintain their operations.

Je partage l'avis du juge Cameron de la Cour d'appel que ces décisions ne sont pas d'un très grand secours. Je passe en conséquence à l'examen de l'objet de l'art. 2 de la Loi. L'article 2 met les particuliers débiteurs hypothécaires à l'abri de la responsabilité personnelle relativement à une hypothèque et ne permet au créancier hypothécaire que l'exercice d'un recours contre le bien-fonds. Or, les particuliers consentent habituellement des hypothèques à titre de garanties afférentes à des maisons d'habitation ou à des fermes. Normalement, la maison représente leur bien le plus important. On peut donc bien s'imaginer que dans beaucoup de cas il ne restera à un particulier qui a perdu ce bien pas grand-chose d'autre susceptible de saisie et que lui imposer en outre la responsabilité personnelle serait pour lui une lourde charge et ne servirait peut-être à rien. Je fais remarquer en passant que l'art. 2 a été initialement adopté par le législateur de la Saskatchewan en 1934 (S.S. 1934-35, ch. 89, art. 4), époque où bien des agriculteurs des Prairies [TRADUCTION] «perdaient leur ferme» par les effets notoires et désastreux de la sécheresse et de la Dépression.

L'article 40 a été adopté au moyen d'une série de modifications apportées à la Loi entre 1953 et 1961. L'objet de l'autorisation donnée aux sociétés emprunteuses de renoncer à la protection offerte par la Loi est expliqué avec justesse, selon moi, par le juge Malone dans la décision *Disney Farms Ltd. v. Canadian Imperial Bank of Commerce*, [1984] 5 W.W.R. 285 (B.R. Sask.), aux pp. 287 et 288:

> [TRADUCTION] Depuis 1965, *The Limitation of Civil Rights Act* [R.S.S. 1965, ch. 103, art. 27] permet aux personnes morales de renoncer à l'application de toutes ses dispositions. On retrouve une disposition de renonciation analogue dans la *Saskatchewan Land Contracts (Actions) Act*, R.S.S. 1978, ch. L-3 [art. 5]. À mon avis, ces dispositions sont destinées à faciliter aux sociétés l'obtention d'un financement qui, autrement, leur serait peut-être refusé si les prêteurs ne pouvaient pas réaliser leur garantie en cas de défaut par une société emprunteuse. Je suis en outre d'avis que les dispositions de *The Limitation of Civil Rights Act* visent principalement à avantager et à protéger les particuliers, par opposition aux sociétés à responsabilité limitée qui, en règle générale, apportent à la gestion de leurs affaires un plus grand savoir-faire et qui ont besoin de capitaux plus importants pour continuer leurs opérations.

I think it is clear that the policy concerns animating the protection of individuals from personal liability for mortgage deficiencies are not particularly compelling when applied to corporations. The meaning to be attributed to the provisions of the Act should reflect these policy concerns. Thus, any exception to the principle in s. 2 that individual mortgagors be insulated from personal liability should be construed as narrowly as possible.

Turning to s. 40(2) of the Act, the provision states that if a corporation waives its protection, that waiver binds all successors and assigns "notwithstanding anything in this Act". When used in reference to corporations, a "successor" generally denotes another corporation which, through merger, amalgamation or some other type of legal succession, assumes the burdens and becomes vested with the rights of the first corporation. In terms of s. 40(2) of the Act it is understandable that a new corporation should be bound by the waiver of the old one since the new one is essentially supplanting the old one in all respects. Indeed, restricting the meaning of "successor" in s. 40(2) to other corporations makes sense in light of the policy driving the Act. In my view, the application of the s. 40(2) exception to "successors" was only intended to ensure liability on the personal covenant of a corporation which steps into the shoes of the original corporate mortgagor. It is apparent that Mead is not a "successor" to Remai here.

The word "assign" has, of course, a broader meaning. An "assign" is anyone to whom an assignment is made and presumably, but for the specific reference to "successors", would include both individuals and corporations. As between mortgagors, an assignment would be an agreement between the original mortgagor and his purchaser by which the latter would assume the mortgage debt in exchange for valuable consideration. Section 2(2)(b) of the Act specifically extends the protection of s. 2 to assignees of purchasers whereas s. 40(2) binds assigns of corporations who have

Je crois qu'il est évident que les préoccupations d'ordre public motivant la protection des particuliers contre la responsabilité personnelle pour l'insuffisance de garanties hypothécaires ne sont pas particulièrement impérieuses dans le cas de sociétés. Le sens prêté aux dispositions de la Loi devrait refléter ces préoccupations d'ordre public. Ainsi, toute exception au principe, posé par l'art. 2, que les particuliers débiteurs hypothécaires soient mis à l'abri de la responsabilité personnelle doit recevoir l'interprétation la plus restrictive possible.

Voilà qui nous amène au par. 40(2) de la Loi, qui porte que, si une société renonce à la protection à laquelle elle a droit, cette renonciation lie tous ses successeurs et cessionnaires «indépendamment des termes de la présente loi». Employé à l'égard de sociétés, le terme «successeur» désigne généralement une autre société qui, par fusion ou une autre forme de succession juridique, assume les obligations et acquiert les droits de la première société. Dans le contexte du par. 40(2) de la Loi, il est compréhensible qu'une nouvelle société soit liée par la renonciation faite par l'ancienne société puisque, essentiellement, la nouvelle se substitue à tous les égards à l'ancienne. De fait, quand on tient compte de l'intérêt public qui anime la Loi, il est logique de donner au terme «successeur» employé au par. 40(2) un sens qui se limite à d'autres sociétés. À mon avis, l'application de l'exception prévue au par. 40(2) aux «successeurs» avait pour seul objet d'assurer la responsabilité fondée sur l'engagement personnel d'une société qui prend la place de la société qui était la débitrice hypothécaire originaire. Il est évident que Mead n'est pas un «successeur» de Remai en l'espèce.

Le sens du mot «cessionnaire» est bien entendu plus large. «Cessionnaire» désigne en effet toute personne en faveur de laquelle une cession est faite et, n'eût été la mention expresse de «successeurs», comprendrait en principe à la fois les personnes physiques et les personnes morales. Dans le cas de débiteurs hypothécaires, une cession serait un accord entre le débiteur hypothécaire originaire et l'acheteur en vertu duquel ce dernier prendrait en charge la dette hypothécaire moyennant une contrepartie de valeur. L'alinéa 2(2)b) de la Loi accorde expressément la protection de l'art. 2 aux

waived s. 2 "notwithstanding anything in this Act". This would presumably include individual assigns of corporate mortgagors. It is my view, however, that the purpose of this exception is to protect mortgagees who extend mortgages to corporations on condition that the latter provide a personal covenant and who then find that the corporation has unilaterally (and without the mortgagee's consent) assigned the mortgage to an individual on whom the personal covenant would not otherwise be binding under the Act. It is those "assigns" who must be bound by the personal covenant of the original corporate mortgagor if the mortgagee is to have the protection contemplated by the section. This situation would arise where there is an assignment of the mortgage from a corporate mortgagor to an individual without an assumption agreement between the individual mortgagor and the mortgagee.

Where the mortgagee (in this case National Trust) has entered into an assumption agreement with the new mortgagor, however, the concern about the mortgagee's rights being unfairly defeated simply does not arise. National Trust was completely free in the present case to decide whether or not to let Mead assume the mortgage from Remai. If it saw itself as exposed to an undue risk if it could not sue on the personal covenant to recover a deficiency on the mortgage debt, it was at liberty to refuse to enter into the Assumption Agreement with Mead. It is noteworthy that while ss. 2(2)(a)-(d) extend the protection of the Act to circumstances of assignment, extension or assumption of a mortgage, s. 40(2) only binds successors and assigns to a waiver by a corporate body. There is no evidence on the record indicating whether Remai assigned its mortgage to Mead. Even if it had, however, the fact that Mead also assumed the mortgage by way of Assumption Agreement with National Trust entitles him to the benefit of s. 2(2)(d), which in turn is not subject to the waiver exception under s. 40(2). Remai's exercise of its

cessionnaires d'acheteurs tandis que le par. 40(2) lie les cessionnaires de sociétés ayant renoncé à l'application de l'art. 2 «indépendamment des termes de la présente loi». Cela comprendrait en principe les particuliers cessionnaires de sociétés débitrices hypothécaires. Je suis toutefois d'avis que cette exception a pour objet la protection de créanciers hypothécaires qui consentent des hypothèques à des sociétés à condition que celles-ci s'engagent personnellement à payer, et qui découvrent par la suite que la société a unilatéralement (et sans le consentement du créancier hypothécaire) cédé l'hypothèque à un particulier qui, autrement, ne serait pas lié par l'engagement personnel aux termes de la Loi. Ce sont ces «cessionnaires» qui doivent être liés par l'engagement personnel de la société qui était la débitrice hypothécaire originaire si le créancier hypothécaire doit bénéficier de la protection envisagée par l'article en question. Cette situation se présenterait dans le cas où une société débitrice hypothécaire cède l'hypothèque à un particulier sans qu'il n'y ait de convention de prise en charge entre le particulier débiteur hypothécaire et le créancier hypothécaire.

Toutefois, lorsque le créancier hypothécaire (en l'occurrence National Trust) a conclu une convention de prise en charge avec le nouveau débiteur hypothécaire, le problème de l'anéantissement injuste des droits du créancier hypothécaire ne se pose simplement pas. En l'espèce, National Trust avait toute liberté de décider si elle allait ou non permettre à Mead de prendre en charge l'hypothèque consentie par Remai. Si elle croyait courir un risque indu dans l'hypothèse où elle n'aurait pas la possibilité de prendre action, fondée sur l'engagement personnel, en recouvrement de toute insuffisance à l'égard de la dette hypothécaire, elle était libre de refuser de conclure la convention de prise en charge avec Mead. Il est à noter que, si les al. 2(2)a) à d) permettent de bénéficier de la protection de la Loi dans les cas de la cession, de la prorogation ou de la prise en charge d'une hypothèque, le par. 40(2) porte que seuls sont liés par une renonciation faite par une personne morale les successeurs et les cessionnaires. Aucun élément de preuve au dossier n'indique si Remai a cédé son hypothèque à Mead. Même dans ce cas cependant,

waiver under s. 40 of the Act does not therefore bind Mead.

B. *Assumption Agreement*

I am in general agreement with the reasoning of the Court of Appeal regarding the interpretation and effect of the Assumption Agreement. The wording of the Agreement, in conjunction with the Act, is clearly capable of being construed as releasing Mead from any obligation to pay under the personal covenant set out in the Agreement. It provides *inter alia* that Mead will be bound by all of the terms, covenants, conditions and obligations of the mortgage "as though it had been originally made, executed and delivered by him as Mortgagor." The Court of Appeal pointed out that had the Agreement been originally made, executed and delivered by Mead as mortgagor, s. 2 would have applied, no exception under s. 40(2) would have been available, and the personal covenant would have been unenforceable pursuant to s. 40(1). National Trust would have been restricted to its remedy against the land. The doctrine of *contra proferentem* would resolve any lingering ambiguity in Mead's favour.

National Trust submits that the doctrine of *contra proferentem* is inapplicable here because the construction put on the Agreement by the Court of Appeal would make the inclusion of the personal covenant pointless. It could have no effect. Since the Court should strive to give meaning to the parties' agreement, it should reject an interpretation that would render one of its terms ineffective.

In my view, the presence of s. 40(1) in the Act belies the claim made by National Trust that the ideal construction of the Agreement is one that gives effect to each and every one of its terms. Section 40(1) explicitly contemplates the inclusion of a personal covenant in a mortgage but states

le fait que Mead a en outre pris l'hypothèque en charge au moyen de la convention de prise en charge intervenue avec National Trust lui donne droit au bénéfice de l'al. 2(2)d), lequel n'est pas assujetti à l'exception que constitue la renonciation prévue au par. 40(2). La renonciation faite par Remai en vertu de l'art. 40 de la Loi ne lie donc pas Mead.

B. *La convention de prise en charge*

Je souscris d'une manière générale au raisonnement de la Cour d'appel en ce qui concerne l'interprétation et l'effet de la convention de prise en charge. Le libellé de la convention, combiné avec la Loi, admet manifestement une interprétation qui dégage Mead de toute obligation de payer fondée sur l'engagement personnel contenu dans la convention. Celle-ci prévoit notamment que Mead est lié par la totalité des modalités, des engagements, des conditions et des obligations énoncés dans l'hypothèque, «comme si c'était lui qui l'avait consentie et qui avait signé l'acte constitutif». La Cour d'appel a fait remarquer que si la convention avait été originairement conclue et signée par Mead en tant que débiteur hypothécaire, le par. 2 se serait appliqué, on n'aurait pu invoquer aucune exception fondée sur le par. 40(2) et, suivant le par. 40(1), l'engagement personnel aurait été de nul effet. L'unique recours de National Trust aurait été celui contre le bien-fonds. Le principe de *contra proferentem* aurait fait bénéficier Mead de toute ambiguïté qui pouvait subsister.

National Trust prétend que le principe de *contra proferentem* ne s'applique pas en l'espèce parce que l'interprétation donnée à la convention par la Cour d'appel rendrait inutile l'inclusion de l'engagement personnel. Il serait sans effet. Comme notre Cour doit s'efforcer de donner un sens à la convention intervenue entre les parties, il y a lieu de rejeter une interprétation par suite de laquelle l'une de ses conditions serait inopérante.

Selon moi, l'existence du par. 40(1) de la Loi réfute l'argument de National Trust voulant que l'interprétation idéale de la convention soit celle qui permette à chacune de ses conditions d'avoir un effet. Le paragraphe 40(1) envisage explicitement l'inclusion d'un engagement personnel dans

that such covenants are null, void and of no effect subject to the exception contained in s. 40(2) for corporate mortgagors. Although the closing paragraph of the Assumption Agreement states that "all provisions hereof shall have effect notwithstanding any statute to the contrary", this cannot be enforced by National Trust in face of the explicit prohibition in the statute against contracting out of its protection.

In the result, I think the Court of Appeal construed the Assumption Agreement correctly when it declared that the personal covenant was unenforceable against Mead. I do not find it necessary to invoke the doctrine of *contra proferentem* to buttress this conclusion.

## C. *Novation*

The respondent Mead has pleaded in the alternative that the Assumption Agreement effected a novation so that the old agreement with Remai was gone and the new agreement with Mead as mortgagor was substituted for it. If this were so Mead would unquestioningly be entitled to the protection of s. 2 of the Act. While it is not strictly necessary to decide this issue since I have already concluded that, as a matter of interpretation of the Assumption Agreement, Mead is not liable on the covenant, it may nevertheless be helpful if the Court were to try to resolve some of the confusion concerning the application of the doctrine of novation in a mortgage context.

The common law has long recognized that while one may be free to assign contractual benefits to a third party, the same cannot be said of contractual obligations. This principle results from the fusion of two fundamental principles of contract law: 1) that parties are able to make bargains with the parties of their own choice (freedom of contract); and 2) that parties do not have to discharge contractual obligations that they had no part in creating (privity of contract). Our law does, however, recognize that contractual obligations which a

un acte constitutif d'hypothèque, mais dit que ces engagements sont nuls, non avenus et inopérants, sous réserve de l'exception prévue au par. 40(2) pour les sociétés débitrices hypothécaires. Bien que la clause finale de la convention de prise en charge porte que «toutes les stipulations des présentes s'appliquent indépendamment de toute disposition législative contraire», National Trust ne saurait s'en prévaloir étant donné que la Loi interdit expressément toute renonciation contractuelle à sa protection.

En définitive, j'estime que la Cour d'appel a interprété correctement la convention de prise en charge en affirmant qu'on ne pouvait se prévaloir de l'engagement personnel contre Mead. Je ne crois pas qu'il soit nécessaire de recourir au principe de *contra proferentem* pour étayer cette conclusion.

## C. *La novation*

L'intimé Mead a fait valoir subsidiairement que la convention de prise en charge opérait une novation de sorte que l'ancienne convention avec Remai disparaissait pour être remplacée par la nouvelle convention conclue avec Mead en tant que débiteur hypothécaire. S'il en était ainsi, Mead aurait indubitablement droit à la protection de l'art. 2 de la Loi. Quoiqu'il ne soit pas strictement nécessaire de trancher ce point puisque j'ai déjà conclu que, en ce qui concerne l'interprétation de la convention de prise en charge, Mead n'a aucune responsabilité fondée sur l'engagement personnel, il serait peut-être utile néanmoins que la Cour fasse une tentative de dissiper dans une certaine mesure la confusion relative à l'application du principe de la novation dans un contexte hypothécaire.

Voilà longtemps que la common law reconnaît que si l'on peut être libre de céder à un tiers les avantages découlant d'un contrat, il n'en va pas de même des obligations contractuelles. C'est là un principe qui procède de la fusion de deux principes fondamentaux du droit des contrats: 1) celui selon lequel les parties peuvent contracter avec qui elles veulent (la liberté contractuelle); et 2) celui selon lequel les parties ne sont pas tenues de s'acquitter d'obligations contractuelles à la création desquelles elles n'ont pas participé (effets relatifs du contrat).

party has freely assumed may be extinguished in certain circumstances and the doctrine of novation provides one way of achieving this.

A novation is a trilateral agreement by which an existing contract is extinguished and a new contract brought into being in its place. Indeed, for an agreement to effect a valid novation the appropriate consideration is the discharge of the original debt in return for a promise to perform some obligation. The assent of the beneficiary (the creditor or mortgagee) of those obligations to the discharge and substitution is crucial. This is because the effect of novation is that the creditor may no longer look to the original party if the obligations under the substituted contract are not subsequently met as promised.

Because assent is the crux of novation it is obvious that novation may not be forced upon an unwilling creditor and, in the absence of express agreement, the court should be loath to find novation unless the circumstances are really compelling. Thus, while the court may look at the surrounding circumstances, including the conduct of the parties, in order to determine whether a novation has occurred, the burden of establishing novation is not easily met. The courts have established a three-part test for determining if novation has occurred. It is set out in *Polson v. Wulffsohn* (1890), 2 B.C.R. 39 as follows:

1. The new debtor must assume the complete liability;

2. The creditor must accept the new debtor as principal debtor and not merely as an agent or guarantor; and

3. The creditor must accept the new contract in full satisfaction and substitution for the old contract.

There has been some disagreement among courts across the country as to the weight to be attributed to these elements and it might be helpful to review some of the authorities. Indeed, such a review makes it clear that these three factors are

Notre droit reconnaît toutefois que les obligations contractuelles qu'une partie a librement assumées peuvent dans certaines circonstances être éteintes et le principe de la novation constitue un moyen d'y parvenir.

Une novation est une convention trilatérale qui opère l'extinction d'un contrat existant et qui y substitue un contrat nouveau. De fait, pour qu'une convention effectue une novation valide, la contre-partie convenable consiste en l'extinction de la dette primitive en échange d'une promesse de s'acquitter d'une obligation quelconque. Il est crucial que le bénéficiaire (le créancier, hypothécaire ou autre) de ces obligations donne son consentement à l'extinction et à la substitution. La raison en est que la novation a pour conséquence que le créancier ne peut plus s'adresser au débiteur originaire si par la suite on ne s'acquitte pas des obligations conformément au contrat substitué.

Puisque le consentement constitue l'élément essentiel de la novation, il est évident qu'on ne saurait imposer la novation à un créancier qui n'en veut pas et, en l'absence d'une entente expresse, un tribunal doit se montrer hésitant à conclure à la novation, à moins que les circonstances ne le commandent vraiment. Donc, bien que le tribunal puisse tenir compte des circonstances, y compris la conduite des parties, afin de déterminer s'il y a eu novation, il n'est pas facile de s'acquitter du fardeau de prouver la novation. Les tribunaux ont établi un critère comportant trois volets pour déterminer s'il y a eu novation. Ce critère, qui se trouve énoncé dans la décision *Polson v. Wulffsohn* (1890), 2 B.C.R. 39, est le suivant:

[TRADUCTION]

1. Le nouveau débiteur doit assumer totalement la responsabilité;

2. Le créancier doit accepter le nouveau débiteur comme débiteur principal et non pas simplement en qualité de mandataire ou de garant; et

3. Le créancier doit accepter le nouveau contrat en pleine satisfaction et substitution de l'ancien contrat.

Il existe un certain désaccord au sein des tribunaux du pays relativement au poids à attribuer à ces éléments, de sorte qu'il pourrait être utile d'examiner quelques décisions. En fait, il devient évident au terme d'un tel examen que ces trois

not the only ones to be considered. The courts are usually confronted with an amalgam from which they must distil their finding of fact as to whether novation has occurred or not.

I start with the conduct of the parties. In *Central & Eastern Trust Co. v. Rosebowl Holdings Ltd.* (1981), 34 N.B.R. (2d) 308 (C.A.), Rosebowl had granted a mortgage to Central with one Huestis acting as guarantor of the loan. Rosebowl subsequently sold the property to another party who assumed the mortgage. When Central subsequently informed Rosebowl as to the balance then due on the mortgage, Rosebowl advised Central that the mortgage had been assumed by its purchaser and that a new mortgage was being recorded. Thereafter, Central closed out Rosebowl's account. Approximately two years later the purchaser started to fall into arrears. Rosebowl was not informed of these defaults until Central decided to sell the property under the power of sale contained in the mortgage. Proceedings were brought against Rosebowl and Huestis when the sale resulted in a deficiency.

Rosebowl and Huestis submitted that Central took all the necessary steps to give effect to the sale and assumption of mortgage by the purchaser when it closed out Rosebowl's account as opposed to crediting it with the monthly instalments made by the purchaser. It was also stressed that Rosebowl's solicitor acted for the trust company when the equity of redemption was transferred. Ryan J.A., writing for the court, held that these circumstances were insufficient to establish a novation. He held that there was no express agreement to the effect that Central would accept the purchaser as principal debtor and give up its right of action against Rosebowl and Huestis nor did the evidence support an inference to that effect.

What if changes have been made to the terms of the original mortgage? In *Canada Permanent Trust Co. v. Neumann, supra,* the Neumanns joined together with another couple, the Mas, and granted a mortgage to Canada Permanent. Later

*a* facteurs ne sont pas les seuls qui soient pris en considération. Les tribunaux font habituellement face à une situation complexe d'où ils doivent tirer leur conclusion de fait quant à l'existence ou l'inexistence d'une novation.

Je prends comme point de départ la conduite des parties. Dans l'affaire *Central & Eastern Trust Co. v. Rosebowl Holdings Ltd.* (1981), 34 N.B.R. *b* (2d) 308 (C.A.), Rosebowl avait consenti une hypothèque à Central, le prêt étant garanti par un nommé Huestis. Rosebowl a par la suite vendu le bien-fonds à une autre partie, qui a pris l'hypothèque en charge. Quand Central a informé Rosebowl *c* du solde impayé de l'hypothèque, Rosebowl lui a fait savoir que l'hypothèque avait été prise en charge par l'acheteur et qu'on était en voie de faire enregistrer une nouvelle hypothèque. Ensuite, Central a clos le compte de Rosebowl. Environ deux *d* ans plus tard, l'acheteur commençait à prendre du retard dans ses versements. Rosebowl n'en a été mise au courant qu'au moment où Central a décidé de vendre le bien-fonds en vertu du pouvoir *e* de vente prévu dans l'acte constitutif d'hypothèque. Quand le produit de la vente s'est avéré insuffisant, une instance a été engagée contre Rosebowl et Huestis.

*f* Rosebowl et Huestis ont fait valoir que Central avait pris toutes les mesures pour donner effet à la vente et prise en charge de l'hypothèque par l'acheteur quand elle a clos le compte de Rosebowl plutôt que de le créditer des mensualités versées *g* par l'acheteur. On a souligné en outre que l'avocat de Rosebowl avait agi pour le compte de la société de fiducie lors du transfert du droit de rachat. Le juge Ryan, au nom de la Cour d'appel, a statué que ces circonstances ne suffisaient pas pour éta- *h* blir une novation. Il a conclu qu'il n'y avait pas de convention expresse portant que Central accepterait l'acheteur comme débiteur principal et renoncerait à son droit de poursuivre Rosebowl et Huestis; il a conclu en outre que la preuve ne justifiait *i* pas une inférence dans ce sens.

Or, qu'arrive-t-il si des modifications ont été apportées aux conditions de l'hypothèque primitive? Dans l'affaire *Canada Permanent Trust Co. v. Neumann,* précitée, les Neumann se sont joints à *j* un autre couple, les Ma, pour consentir une hypo-

wishing to absolve themselves of this liability, the Neumanns conveyed all their interest and title to the Mas in return for the latter's promise to assume sole liability for the mortgage debt. Canada Permanent was not a party to this transfer and did not specifically release the Neumanns from their debt. The Mas later entered into a modification agreement reducing the interest rate as well as the amount of the monthly instalments. The Neumanns were not aware of this agreement until the Mas defaulted and the trust company demanded payment. Canada Permanent brought suit against the Neumanns on their personal covenant. The trial judge allowed the action and granted judgment in an amount calculated in accordance with the modification agreement.

Carrothers J.A. allowed the Neumanns' appeal, finding that there had been a novation. He based his judgment on the fact that the modification agreement had altered the mortgage in several respects, holding at p. 321:

There cannot be two contracts of mortgage and two methods of calculating the mortgage debt existing in respect of the same mortgage at the same time. This is legally repugnant and can only be construed as a novation and an acceptance on the part of the trust company of the Mas exclusively as principal debtors, thus releasing the Neumanns of their obligation. These circumstances are, in my view, consistent with novation.

A different result on similar facts was reached in the case of *Central Trust Co. v. Bartlett* (1983), 30 R.P.R. 267 (N.S.C.A.). There, the equity of redemption in certain lands had been transferred several times. After each transfer the transferee entered into an assumption agreement with Central Trust providing that all remedies were reserved by the mortgagee. The final transferee renewed the mortgage at a much higher rate of interest than the rate in the original mortgage and subsequently fell into arrears. The property was sold and Central Trust sued Bartlett on his personal covenant for the deficiency. Bartlett argued, *inter alia*, that the mortgagee could be taken as impliedly releasing him from his obligations under

thèque à Canada Permanent. Par la suite, les Neumann, désireux de se libérer de cette charge, ont cédé en totalité leur droit et leur titre aux Ma en échange de la promesse de ces derniers de devenir seuls responsables de la dette hypothécaire. Canada Permanent n'était pas partie à cette cession et n'a pas expressément dégagé les Neumann de leur dette. Les Ma ont conclu ensuite une convention modificative portant réduction du taux d'intérêt et du montant des mensualités. Les Neumann ignoraient l'existence de cette convention jusqu'au moment où les Ma se sont trouvés en défaut et que la société de fiducie a revendiqué le paiement. Canada Permanent a intenté contre les Neumann une action fondée sur leur engagement personnel de payer. Le juge de première instance a accueilli l'action et a accordé une somme calculée en conformité avec la convention modificative.

Concluant à la novation, le juge Carrothers de la Cour d'appel a accueilli l'appel formé par les Neumann. Il a fondé son jugement sur le fait que la convention modificative était venue changer l'hypothèque à plusieurs égards. Il dit, à la p. 321:

[TRADUCTION] Il ne peut subsister parallèlement à l'égard de la même hypothèque deux contrats hypothécaires et deux méthodes de calculer la dette hypothécaire. Cela est juridiquement inadmissible et ne peut s'interpréter autrement que comme une novation et comme une acceptation des Ma par la société de fiducie en tant que seuls débiteurs principaux, les Neumann étant par le fait même dégagés de leur obligation. Ces circonstances, selon moi, sont compatibles avec l'existence d'une novation.

Des faits analogues ont conduit à une conclusion différente dans l'affaire *Central Trust Co. v. Bartlett* (1983), 30 R.P.R. 267 (C.A.N.-É.). Là, le droit de rachat afférent à certains biens-fonds avait fait l'objet de plusieurs cessions. À la suite de chaque cession, le cessionnaire a conclu avec Central Trust une convention de prise en charge dans laquelle la créancière hypothécaire se réservait tous ses recours. L'ultime cessionnaire a renouvelé l'hypothèque à un taux d'intérêt bien plus élevé que celui fixé pour l'hypothèque primitive et a fini par tomber en défaut. La propriété a été vendue et Central Trust a intenté contre Bartlett une action en paiement du solde fondée sur son engagement personnel. Bartlett a soutenu notamment que la

the mortgage by entering into a renewal agreement with another party on very different terms and without his consent. Hart J.A. rejected this argument at p. 272 and held that Bartlett continued to be liable for the original amount in the mortgage:

In no event could Mr. Bartlett become liable for any amount in excess of the amount he undertook to pay in accordance with the rate of interest set forth in his agreement. A tender of this amount would, I believe, end any further obligation he may have to the mortgagee under the assumption agreement. The mere extension of time to pay would not, in my view, be evidence of an intention to release the other persons liable to pay the mortgage debt.

In my view, significant changes in the terms of a mortgage effected without the consent of the original mortgagor constitute very strong evidence of novation. It is not necessary, of course, for a different contract to be brought into existence for a novation to take place. The essence of novation is the substitution of debtors. However, where significant changes in terms occur and the creditor has not applied to the original mortgagor for its consent, I believe this is a strong indication that the creditor is no longer looking to the mortgagor for payment.

This view has been expressed by the British Columbia Court of Appeal on a number of occasions: see especially *Re Bank of Nova Scotia and Vancouver Island Renovating Inc.* (1986), 31 D.L.R. (4th) 560 and *Eaton Bay Trust Co. v. Ling* (1987), 45 D.L.R. (4th) 1. In the *Vancouver Island* case the purchaser had entered into an agreement with the bank on substantially changed terms. When the purchaser fell into arrears the bank looked to Vancouver Island for the deficiency. The British Columbia Court of Appeal held that usually such changes in terms would support Vancouver Island's argument that there had been a novation. However, not so in this case because the guarantor of Vancouver Island's liability on the covenant acted as solicitor for the purchaser

créancière hypothécaire pouvait être considérée comme l'ayant implicitement dégagé de ses obligations découlant de l'hypothèque du fait d'avoir conclu avec une autre partie, sans le consentement de Bartlett, une convention de renouvellement dont les conditions étaient nettement différentes. Le juge Hart de la Cour d'appel rejette cet argument à la p. 272 et dit que Bartlett demeurait responsable du montant primitif de l'hypothèque:

[TRADUCTION] Dans aucun cas M. Bartlett ne pourrait devenir responsable d'une somme supérieure à celle qu'il s'est engagé à payer au taux d'intérêt prévu dans son contrat. S'il offrait cette somme, cela éteindrait, je crois, toute obligation qu'il pourrait avoir envers la créancière hypothécaire aux termes de la convention de prise en charge. La simple prorogation de l'échéance ne constitue pas, selon moi, une preuve de l'intention de décharger les autres personnes tenues de la dette hypothécaire.

À mon avis, des modifications importantes apportées aux conditions d'une hypothèque sans le consentement du débiteur hypothécaire originaire constituent une preuve très convaincante qu'il y a eu novation. La passation d'un contrat différent n'est pas, bien entendu, une condition sine qua non de la novation. La novation se caractérise essentiellement par la substitution de débiteurs. Toutefois, lorsque les conditions subissent des changements importants et que le créancier n'a pas demandé le consentement du débiteur hypothécaire originaire, je crois que c'est là une forte indication que le créancier ne cherche plus à se faire désintéresser par ce débiteur hypothécaire.

Cette même opinion a été exprimée à plusieurs reprises par la Cour d'appel de la Colombie-Britannique: voir spécialement *Re Bank of Nova Scotia and Vancouver Island Renovating Inc.* (1986), 31 D.L.R. (4th) 560, et *Eaton Bay Trust Co. v. Ling* (1987), 45 D.L.R. (4th) 1. Dans l'affaire *Vancouver Island*, l'acheteur avait conclu avec la banque une convention qui modifiait sensiblement les conditions de l'hypothèque. Quand l'acheteur s'est trouvé en défaut, la banque a tenté de recouvrer auprès de Vancouver Island le montant de l'insuffisance. La Cour d'appel de la Colombie-Britannique a dit que de telles modifications des conditions appuieraient normalement l'argument de Vancouver Island voulant qu'il y ait eu novation. Il n'en était cependant rien dans cette

and was therefore well aware of the amendments to the mortgage and must be taken to have expressly or impliedly consented to them.

I noted earlier that there are three requirements for an effective novation. The significance attached by some courts to changes in the mortgage terms has given rise to the suggestion that a fourth requirement should be added, namely the consent of the original debtor. Consent as an added element arose from the decision of Egbert J. in *Herold v. British American Oil Co.*, *supra*, a case dealing with a typical commercial contract. The *Herold* case has been followed in British Columbia: see *Eaton Bay Trust Co.*, *supra*; *Neumann*, *supra*; and *Prospect Mortgage Investment Corp. v. Van-5 Developments Ltd.* (1985), 68 B.C.L.R. 12 (C.A.). In *Neumann*, Lambert J.A. attempted to bring some clarity to the issue by drawing a distinction between those instances where what takes place is akin to the straightforward assignment of a simple debt and those instances where the burdens or benefits to one of the parties to the original contract have been altered. At pages 322-23 he said:

> In my opinion, in a case where the old debtors are co-covenantors on a straightforward mortgage of land so that they are simply debtors, the situation is comparable to the situation of the assignability of another simple debt, that is, the consent of the old debtor is not required. So in straightforward mortgage cases the fourth principle of novation referred to ... does not apply. In such a case the consent of the party being released is not a requisite of the complete novation. The situation may well be otherwise where both the burden and the benefits are being altered for one of the parties to the original contract.

In my view, if Lambert J.A. meant to suggest in this passage that the consent of the original debtor is required for a novation in cases where there

affaire-là parce que le garant de la responsabilité de Vancouver Island résultant de son engagement personnel de payer avait été l'avocat de l'acheteur et était en conséquence parfaitement au courant des modifications apportées à l'hypothèque et devait être considéré comme y ayant expressément ou implicitement consenti.

Je fais remarquer plus haut que trois exigences doivent être remplies pour qu'il y ait une novation valide. L'importance attachée par certains tribunaux aux modifications apportées aux conditions de l'hypothèque a fait qu'on a proposé d'ajouter une quatrième exigence, savoir le consentement du débiteur originaire. Le consentement en tant que nouvel élément tire son origine de la décision du juge Egbert dans l'affaire *Herold v. British American Oil Co.*, précitée, mettant en cause un contrat commercial typique. La décision *Herold* a été suivie en Colombie-Britannique: voir l'arrêt *Eaton Bay Trust Co.*, précité; l'arrêt *Neumann*, précité; et l'arrêt *Prospect Mortgage Investment Corp. v. Van-5 Developments Ltd.* (1985), 68 B.C.L.R. 12 (C.A.). Dans l'arrêt *Neumann*, le juge Lambert de la Cour d'appel tente d'élucider la question en faisant une distinction entre les cas dans lesquels il s'agit de quelque chose qui s'apparente à la simple cession d'une simple dette et les situations où les charges incombant à l'une des parties au contrat primitif ou les avantages lui revenant ont subi une modification. Aux pages 322 et 323, le juge Lambert dit:

> [TRADUCTION] À mon avis, lorsque les anciens débiteurs sont liés dans le cadre d'une simple hypothèque portant sur un bien-fonds de façon à ce qu'ils ne soient que des débiteurs ordinaires, cette situation est comparable à celle de la cessibilité d'une autre dette ordinaire, c'est-à-dire que le consentement de l'ancien débiteur n'est pas requis. Par conséquent, dans le cas d'une simple hypothèque le quatrième principe en matière de novation qui a été mentionné [. . .] ne joue pas. Dans un pareil cas, le consentement de la partie déchargée n'est pas nécessaire pour que la novation soit parfaite. Il se peut bien qu'il en soit autrement lorsqu'on modifie pour l'une des parties au contrat primitif à la fois la charge et les avantages conférés.

D'après moi, si le juge Lambert a voulu dire dans ce passage que le consentement du débiteur originaire est requis pour qu'il y ait novation dans

have been significant changes in the original mortgage terms, I think he must be in error. It seems to me that if the original mortgagor consents to the mortgage being assumed by his assignee on different terms, this would indicate rather that he considers himself to continue to be bound despite the assignment. Consent to changed terms, in other words, does not indicate novation but rather continuing liability. On the other hand, when changes in the terms have been effected without the knowledge or consent of the original mortgagor, that will be a strong indication in favour of novation.

With respect to the effect of assumption and renewal agreements, it would appear that some courts have come perilously close to holding that the execution of such agreements *per se* effects a novation. Thus, for example, in *Saskatchewan Trust v. Ross* (1985), 41 Sask. R. 121, Osborn J. of the Saskatchewan Queen's Bench held that a novation had been effected when the purchaser of the equity of redemption submitted all the documents regarding assumption of the mortgage in accordance with the request of the mortgagee. This, together with the mortgagee's failure to communicate in any way with the original mortgagor until the purchaser had been in default for several months, was sufficient in the court's view to establish a novation.

Other courts have come out strongly that the execution of an assumption agreement in and of itself is not sufficient to establish a novation. For example, in *Prospect Mortgage, supra*, Esson J.A. commented at p. 26:

> Because novation is essentially an issue of fact, it would be wrong in principle to say, as a generalization, that assumption agreements or extension agreements, or other particular classes of documents, do or do not create a novation. The question must be decided in each case having regard to all of the circumstances of which the language of the new contract is only one.

In my view, the execution of an assumption agreement does not *per se* effect a novation. As

des cas où des modifications importantes ont été apportées aux conditions de l'hypothèque primitive, il s'est trompé. Il me semble que si le débiteur hypothécaire originaire consent à ce que l'hypothèque soit prise en charge par son cessionnaire selon des modalités différentes, cela indique plutôt qu'il se considère encore lié en dépit de la cession. En d'autres termes, le consentement à la modification des conditions est indicatif non pas de novation mais bien de la responsabilité qui subsiste. Par ailleurs, quand des modifications des conditions interviennent à l'insu du débiteur hypothécaire originaire ou sans son consentement, c'est là une forte indication qu'il y a eu novation.

Pour ce qui est de l'effet de conventions de prise en charge et de renouvellement, il semble que certains tribunaux soient passés périlleusement près de statuer que la passation de telles conventions opère par le fait même une novation. Ainsi, par exemple, dans l'affaire *Saskatchewan Trust v. Ross* (1985), 41 Sask. R. 121, le juge Osborn de la Cour du Banc de la Reine de la Saskatchewan a décidé qu'il y avait eu novation lorsque l'acheteur du droit de rachat a remis, à la demande de la créancière hypothécaire, tous les documents concernant la prise en charge de l'hypothèque. Ce fait, combiné avec l'omission de la créancière hypothécaire de communiquer de quelque manière avec le débiteur hypothécaire originaire avant que l'acheteur ne soit en défaut depuis plusieurs mois, suffisait selon la cour pour établir la novation.

D'autres tribunaux ont dit catégoriquement que la conclusion d'une convention de prise en charge ne suffit pas par elle-même pour établir une novation. Par exemple, dans l'arrêt *Prospect Mortgage*, précité, le juge Esson affirme, à la p. 26:

> [TRADUCTION] Comme la novation constitue essentiellement une question de fait, on aurait tort en principe de prétendre, à titre de généralisation, que les conventions de prise en charge, les conventions de prorogation ou d'autres catégories particulières de documents opèrent ou n'opèrent pas la novation. Cette question est à trancher dans chaque cas en fonction de toutes les circonstances, les termes du nouveau contrat n'en étant qu'une.

À mon avis, la conclusion d'une convention de prise en charge n'opère pas en soi la novation.

Esson J.A. quite rightly noted, because novation is a question of fact, it would be wrong to hold that the execution of a document by itself would satisfy the doctrine. This is not to say, however, that such an agreement may not carry significant weight in determining whether a novation has taken place. Indeed, if the parties have directed their minds to setting out the terms of the debt relationship in writing, it seems to me that the terms of that agreement should conclude what the parties intended their relationship to be. In other words, in the absence of a written agreement or clear contractual language, the conduct of the parties may take on greater significance in elucidating the intent of the parties than when such an agreement has in fact been executed and is clear. Thus, the language of assumption agreements is deserving of careful scrutiny even although the subsequent conduct of the parties may also be factored into the Court's determination.

"No prejudice" clauses of various kinds have been considered by the courts with conflicting results. In *Central Trust Co. v. Bartlett, supra*, the equity of redemption in certain lands had been transferred several times. Each transferee executed an assumption agreement which contained a clause reserving all security taken by the mortgagee in respect of the mortgage. The court in that case held that since the assumption agreement specifically provided that Bartlett was not to be released, this negatived any finding of novation.

The British Columbia Court of Appeal first considered the effect of such clauses in *Prospect Mortgage, supra*. In that case the mortgage company attempted to hold Van-5 to its covenant after a sale of the mortgaged lands had resulted in a deficiency. When Van-5 purchased the property, it signed an agreement containing the following clause:

Ainsi que le fait remarquer le juge Esson, et en cela il a parfaitement raison, puisque la novation est une question de fait, on aurait tort de conclure que la seule signature d'un document satisferait à ce principe. Cela ne veut toutefois pas dire qu'une telle convention ne peut peser très lourd quand il s'agit de déterminer s'il y a eu novation. De fait, si les parties se sont donné la peine d'énoncer par écrit les conditions régissant les rapports engendrés par la dette, il me semble que les modalités de cet accord doivent être déterminantes quant à ce que les parties ont voulu que soit la nature de leurs relations. En d'autres termes, en l'absence de convention écrite ou de dispositions contractuelles explicites, la conduite des parties peut prendre, dans l'élucidation de leur intention, une importance plus grande qu'elle n'en a dans le cas où une telle convention a été conclue et où ses termes sont clairs. Aussi les termes de conventions de prise en charge méritent-ils un examen attentif, même si la conduite subséquente des parties peut également entrer en ligne de compte dans la détermination faite par le tribunal.

Différents types de clauses «de réserve de droits» ont été examinées par les tribunaux, qui sont arrivés à des résultats contradictoires. Dans l'affaire *Central Trust Co. v. Bartlett*, précitée, le droit de rachat afférent à certains biens-fonds avait fait l'objet de plusieurs cessions. Chaque cessionnaire avait signé une convention de prise en charge contenant une clause qui réservait toutes les garanties prises par la créancière hypothécaire à l'égard de l'hypothèque. La cour a dit dans cette affaire-là que, comme la convention de prise en charge stipulait expressément que Bartlett ne devait pas être dégagé de sa responsabilité, cela militait contre toute conclusion à la novation.

La Cour d'appel de la Colombie-Britannique a étudié l'effet de telles clauses pour la première fois dans l'arrêt *Prospect Mortgage*, précité. Dans cette affaire, la société créancière hypothécaire avait tenté de forcer Van-5 à respecter son engagement de payer quand le produit de la vente des biens-fonds hypothéqués s'était révélé insuffisant. Lors de l'achat du bien-fonds en question, Van-5 avait signé une convention renfermant la clause suivante:

Case 09-10138-MFW   Doc 13460-9   Filed 05/02/14   Page 59 of 177

434        NATIONAL TRUST CO. *v.* MEAD   *Wilson J.*        [1990] 2 S.C.R.

. . . the Covenantors further covenant and agree with the Mortgagee that the liability of the covenantors under this Mortgage shall not be released or affected in any manner whatsoever by any acts, omission or thing whatsoever done by or consented to by the Mortgagee or the Mortgagor except for the payment in full of the principal monies, interest and all other monies secured by this Mortgage.

Van-5 sold its interest to the purchasers who also signed an agreement with Prospect. By the terms of the agreement, the interest rate on the mortgage was to remain the same although the amount of the monthly payments was increased. The agreement also contained a "no prejudice" clause. Van-5 contended that it was no longer liable on the covenant since there had been a novation of the mortgage when it sold its interest to a subsequent purchaser who entered into an agreement on different terms. Esson J.A. held that the language of the modification agreement by itself did not effect a novation. Indeed, he noted that the language in fact expressed a contrary intention on the part of Prospect. Esson J.A. continued at p. 27:

On this issue, however, the language of the new agreement is not conclusive against the covenantors who, of course, are not parties to it. There are matters raised in the affidavits submitted by the covenantors which may be capable of establishing an intention by the creditor, notwithstanding the language of the agreement, to accept a new contract in full satisfaction of and in substitution for the old.

On this basis the court refused the petitioner's application for personal judgment and directed a trial of the novation issue.

The following year in *Re Bank of Nova Scotia and Vancouver Island Renovating Inc., supra,* Macfarlane J.A. of the same court took a very similar approach to Esson J.A. In that case both the original mortgage and the renewal agreement contained similar clauses to those in *Prospect Mortgage.* Macfarlane J.A. refused to treat these

[TRADUCTION] [. . .] les auteurs de l'engagement conviennent en outre avec la créancière hypothécaire que, mis à part le paiement intégral du capital, de l'intérêt et de toute autre somme garantie par la présente hypothèque, aucun acte ni aucune omission commis par la créancière ou le débiteur hypothécaires ou auxquels ils ont consenti ne dégage lesdits auteurs de l'engagement de leur responsabilité en vertu de la présente hypothèque ni n'a aucun autre effet sur cette responsabilité.

Van-5 a vendu son droit aux acheteurs, qui ont eux aussi signé une convention avec Prospect. Aux termes de la convention, le taux d'intérêt hypothécaire demeurait identique, mais les mensualités étaient augmentées. La convention comportait en outre une clause «de réserve de droits». Van-5 a fait valoir qu'elle n'avait plus aucune responsabilité fondée sur l'engagement de payer parce que l'hypothèque avait fait l'objet d'une novation quand elle avait vendu son droit à un acquéreur subséquent, qui a conclu une convention dont les modalités étaient différentes. Le juge Esson a statué que les termes de la convention modificative n'opéraient pas par eux-mêmes une novation. Il a fait remarquer en fait qu'ils exprimaient même l'intention contraire de la part de Prospect. Le juge Esson poursuit, à la p. 27:

[TRADUCTION] Sur cette question, toutefois, les termes de la nouvelle convention ne sont pas déterminants à l'endroit des auteurs de l'engagement, qui, bien entendu, n'y sont pas parties. Il est des points soulevés dans les affidavits produits par les auteurs de l'engagement dont on peut dégager, indépendamment du libellé de la convention, une intention chez la créancière hypothécaire d'accepter un nouveau contrat en pleine exécution et substitution de l'ancien contrat.

Sur ce fondement, la cour a rejeté la demande de la requérante en jugement personnel et a ordonné que la question de la novation fasse l'objet d'une instruction.

L'année suivante, dans l'affaire *Re Bank of Nova Scotia and Vancouver Island Renovating Inc.,* précitée, le juge Macfarlane de la même cour a adopté un point de vue fort semblable à celui du juge Esson. Il s'agit là d'une affaire où l'acte constitutif d'hypothèque primitif et la convention de renouvellement contenaient tous les deux des clauses semblables à celles en cause dans l'affaire *Prospect Mortgage.* Le juge Macfarlane a refusé

provisions as determinative and articulated the following rationale for his refusal at p. 565:

So far as the without prejudice clause in the renewal agreement is concerned, it is not binding on the mortgagors because the mortgagors were not parties to that agreement. The clause is, however, circumstantial evidence which may be looked at in considering whether it was the intention of the bank to accept Van Isle in the place of the Pearsons as mortgagors and to substitute the new agreement with Van Isle for the old agreement with the Pearsons. Similarly, the clause in the original mortgage entitled "Extension of Time" is a clause that can be looked at as circumstantial evidence in determining whether the original mortgagors are bound or not.

In the result the court looked to the conduct of the parties to determine the novation issue. It found that the intention of the bank was to deal with Van Isle alone and therefore the bank had to be taken as accepting the new contract in substitution for the old one.

The judgment of the same court in *Eaton Bay Trust Co. v. Ling, supra,* seems to be very much at odds with both of the previous decisions. In that case Lynch sold his property to Ling, who in turn assumed the mortgage at a higher interest rate with the mortgagee. Ling did not execute a formal assumption agreement and did not give Eaton Bay a personal covenant. Lynch's mortgage contained a "no prejudice" clause. When the mortgage fell into arrears, Eaton Bay sued Lynch on his personal covenant. Lynch argued that there had been a novation as the terms of the mortgage had been amended without his notice or consent.

Carrothers J.A. rejected Lynch's argument on the following grounds. He held that, in the usual course of events, material changes in terms would be a strong indication that there had been a novation of the mortgage. This, he held, was a consequence of the dual aspect of a mortgage, i.e. the pledge of land and the personal covenant. Carroth-

de considérer ces clauses comme déterminantes, motivant ainsi son refus, à la p. 565:

[TRADUCTION] En ce qui concerne la clause «sous toutes réserves» figurant dans la convention de renouvellement, elle ne lie pas les débiteurs hypothécaires parce que ces derniers n'ont pas été parties à cette convention. La clause constitue néanmoins une preuve circonstancielle dont on peut tenir compte en examinant si la banque a eu l'intention d'accepter Van Isle à la place des Pearson à titre de débiteur hypothécaire et de substituer à l'ancienne convention avec les Pearson la nouvelle intervenue avec Van Isle. De même, la clause portant la rubrique «Prorogation d'échéance» que contenait l'acte constitutif d'hypothèque primitif peut être considérée comme une preuve circonstancielle aux fins de déterminer si, oui ou non, les débiteurs hypothécaires originaires sont liés.

En définitive, la cour a tenu compte de la conduite des parties pour trancher la question de la novation. Elle a conclu que l'intention de la banque avait été de ne traiter qu'avec Van Isle et qu'elle devait en conséquence être considérée comme ayant accepté le nouveau contrat en substitution de l'ancien.

L'arrêt rendu par la même cour dans l'affaire *Eaton Bay Trust Co. v. Ling*, précitée, semble diamétralement opposé aux deux arrêts antérieurs. Dans cette affaire, Lynch avait vendu son bienfonds à Ling qui, lui, a pris en charge l'hypothèque consentie à la créancière hypothécaire, mais à un taux d'intérêt plus élevé. Ling n'a pas signé de convention de prise en charge en bonne et due forme ni ne s'est engagé personnellement envers Eaton Bay. L'hypothèque de Lynch contenait une clause «sous toutes réserves». Quand il prit du retard dans le paiement de l'hypothèque, Eaton Bay a engagé contre Lynch une action fondée sur son engagement personnel. Lynch a allégué la novation du fait que les conditions de l'hypothèque avaient été modifiées à son insu et sans son consentement.

Le juge Carrothers de la Cour d'appel a rejeté l'argument de Lynch pour les motifs suivants: Il a dit qu'en temps normal des changements substantiels dans les conditions constitueraient une forte indication qu'il y avait eu novation de l'hypothèque. Cela, a-t-il statué, résultait de la dualité de l'hypothèque, qui est une garantie portant sur un

ers J.A. referred to his own judgment in *Canada Permanent Trust Co. v. Neumann, supra*, for the proposition that it was legally repugnant to have two different mortgage debts. Notwithstanding the fact that material changes had been made to the original mortgage, the court went on to hold that there had been no novation in the circumstances. It viewed the "no prejudice" clause in the original mortgage as evidencing *in futuro* consent on the part of Lynch to the kind of alterations embraced by the renewal agreement between Eaton Bay and Ling.

I am in general agreement with the decisions in *Prospect Mortgage* and *Vancouver Island* but I am uneasy with the *Ling* decision. It seems to me that the notion of *in futuro* consent may work considerable inequities in some circumstances. Given the conduct of the mortgagee in that case, I would have been inclined to hold that a novation had been effected.

The Saskatchewan Court of Appeal applied four tests of novation in the present case and found that each of them had been met. The court noted that it was permitted to take all the circumstances into account. In doing so the court not only considered the language of the Assumption Agreement but as well took into account the fact that National Trust had discontinued its action against Remai. Cameron J.A. held that this action supported an inference that National Trust both accepted Mead as principal debtor and accepted the new contract in full satisfaction of and substitution for the old contract (the second and third tests).

The Assumption Agreement executed by Mead contained the following provision regarding release of Remai:

2. It is agreed that the Mortgagee may at any time and in such manner as it thinks fit release the Mortgagor named in the said mortgage from any or all of the covenants therein contained and that neither such release nor anything herein contained nor anything done

bien-fonds et qui comporte en même temps une garantie personnelle. Le juge Carrothers a invoqué son propre arrêt dans l'affaire *Canada Permanent Trust Co. v. Neumann*, précitée, à l'appui de la proposition selon laquelle la coexistence de deux dettes hypothécaires différentes était juridiquement inadmissible. Malgré le fait que des modifications substantielles avaient été apportées à l'hypothèque primitive, la cour a conclu qu'il n'y avait pas eu de novation dans les circonstances. Elle a vu la clause «de réserve de droits» comprise dans l'acte constitutif d'hypothèque primitif comme une preuve du consentement *in futuro* de Lynch au genre de modifications contenues dans la convention de renouvellement intervenue entre Eaton Bay et Ling.

J'approuve généralement les arrêts *Prospect Mortgage* et *Vancouver Island*, mais l'arrêt *Ling* me trouble. Il me semble en effet que la notion d'un consentement *in futuro* peut dans certaines circonstances être génératrice de grandes injustices. Compte tenu de la conduite de la créancière hypothécaire dans cette affaire-là, j'aurais incliné à conclure à la novation.

La Cour d'appel de la Saskatchewan a appliqué quatre critères afin de déterminer s'il y avait eu novation en l'espèce et a décidé que chacun de ces critères avait été rempli. La cour a fait remarquer qu'il était permis de tenir compte de toutes les circonstances. En ce faisant, la cour a pris en considération non seulement les termes de la convention de prise en charge, mais aussi le fait que National Trust s'était désistée de son action contre Remai. Le juge Cameron a dit qu'on pouvait en inférer que National Trust acceptait Mead comme débiteur principal et qu'elle acceptait le nouveau contrat en pleine satisfaction et substitution de l'ancien contrat (les deuxième et troisième critères).

La convention de prise en charge conclue par Mead contenait la clause suivante concernant la libération de Remai de sa responsabilité:

[TRADUCTION] 2. Il est convenu que la créancière hypothécaire peut à n'importe quel moment et de la manière qu'elle juge convenable dégager le débiteur hypothécaire nommé dans ledit acte constitutif d'hypothèque de l'un ou de l'ensemble des engagements y

pursuant hereto shall affect or be construed to affect the lien, charge or encumbrance of or conveyance effected by the said mortgage, or the priority thereof over other liens, charges, encumbrances, or conveyances, or, except as expressly provided by any such release of the Mortgagor, to release or affect the liability of the Purchaser or of any party or parties whomsoever who may now be or hereafter become liable to the Mortgagee under or on account of the said mortgage; nor shall anything herein contained or done in pursuance hereof affect or be construed to affect any other security or instrument, if any, held by the Mortgagee as security for the aforesaid mortgage indebtedness. [Emphasis added.]

The Court of Appeal construed this clause as effecting the release of Remai. With great respect, I think it was in error in so doing. In this provision Mead agrees with National Trust that National Trust is free in the future to release the original mortgagor and that, should it do so, Mead's liability would in no way be affected. Such a provision, in my opinion, does not effect a novation. Its effect, as I see it, is to preserve National Trust's remedies against both Remai and Mead until such time as National Trust releases Remai. It cannot itself be construed as a present release of Remai such as would be necessary in order to replace Remai with Mead as principal debtor.

This conclusion is, in my opinion, strengthened when the terms of the original mortgage are taken into consideration. That mortgage contained a "no prejudice" clause which read:

20. NO extension of time given by the Mortgagee to the Mortgagor or any one claiming under the Mortgagor, nor any other dealing by the Mortgagee with the owner of the equity of redemption in the Mortgaged Premises shall in any way affect or prejudice the rights of the Mortgagee against the Mortgagor or any other person liable for the payment of the moneys secured by this Mortgage. No forebearance by the Mortgagee to seek any remedy for breach of any covenant, agreement, provision or proviso contained in this Mortgage shall operate as a waiver of any rights or remedies of the

énoncés et que ni cette décharge, ni aucune disposition des présentes, ni aucun acte accompli en exécution des présentes ne touche ni ne doit s'interpréter comme touchant le privilège ou la charge résultant de ladite hypothèque, ou la cession effectuée par celle-ci ou la priorité qu'a cette hypothèque sur tout autre privilège, charge ou cession, ni, sauf disposition expresse d'une telle décharge du débiteur hypothécaire, n'écarte pas ni ne modifie, ni ne doit s'interpréter comme écartant ou modifiant, la responsabilité de l'acheteur ou de toute partie qui est maintenant ou qui pourra devenir responsable envers la créancière hypothécaire en vertu ou en raison de ladite hypothèque. De plus, aucune disposition des présentes ni aucun acte accompli en exécution des présentes ne touche ni ne doit s'interpréter comme touchant toute autre garantie ou tout autre acte, s'il en est, détenu par la créancière hypothécaire en garantie de la dette hypothécaire susdite. [Je souligne.]

La Cour d'appel a interprété cette clause comme dégageant Remai de sa responsabilité. Avec égards, je crois que c'est là une erreur de sa part. Dans cette clause Mead convient avec National Trust que celle-ci sera désormais libre de décharger le débiteur hypothécaire originaire et que, si elle le fait, cela ne changera en rien la responsabilité de Mead. Une telle disposition, selon moi, n'opère pas de novation. Son effet, à mon sens, est de maintenir les recours pouvant être exercés par National Trust à la fois contre Remai et contre Mead jusqu'à ce que National Trust dégage Remai de sa responsabilité. Elle ne saurait par elle-même s'interpréter comme le genre de décharge actuelle de Remai qui serait nécessaire pour que Mead soit substitué à Remai en tant que débiteur principal.

Cette conclusion est renforcée, à mon avis, quand on prend en considération les conditions de l'hypothèque primitive. Celle-ci contenait une clause «de réserve de droits» ainsi libellée:

[TRADUCTION] 20. AUCUNE prorogation d'échéance accordée par la créancière hypothécaire au débiteur hypothécaire ou à tout ayant cause de celui-ci, ni aucun autre arrangement intervenu entre la créancière hypothécaire et le titulaire du droit de rachat afférent au bien-fonds grevé de l'hypothèque ne préjudicie d'aucune manière aux droits de la créancière hypothécaire à l'égard du débiteur hypothécaire ou de toute autre personne tenue du paiement des fonds garantis par l'hypothèque. Aucune abstention de la créancière hypothécaire de demander un redressement pour le manquement à un

Mortgagee with respect to such or any subsequent or other breach. [Emphasis added.]

This clause confirms that there was no intention on the part of National Trust to release Remai. Taken together, these provisions are a strong indication that the assumption of the debt by Mead was not accepted by National Trust in full consideration and substitution of Remai's obligation. The question therefore becomes whether the conduct of the parties can negative that indication.

The action of National Trust in discontinuing its suit against Remai could be construed as supporting an inference that the trust company was no longer looking to Remai for satisfaction of the debt. Indeed, the Court of Appeal viewed it in that light. With respect, I think that the Court of Appeal erred in so doing. I think it attributed too much significance to the discontinuance of National Trust's action against Remai. While I appreciate that the Assumption Agreement contemplated that National Trust could release Remai "at any time and in such manner as it thinks fit", I believe that its conduct in discontinuing its action against Remai is equivocal, particularly in light of Rule 198(4) of the *Saskatchewan Queen's Bench Rules* which states that discontinuance of an action shall not be a defence to any subsequent action against the party. Since discontinuance does not preclude a litigant from bringing the action at a later date, it is not, in my view, an adequate basis on which to find an intention to release the original mortgagor. It does not constitute the kind of compelling circumstance necessary to found a novation.

No other circumstances were presented as indicating that novation occurred. Since I have found that there was no intention on the part of

engagement, à un accord, à une condition ou à une stipulation contenus dans le présent acte constitutif d'hypothèque n'a l'effet d'une renonciation à des droits ou à des recours pouvant être exercés par la créancière hypothécaire à l'égard de ce manquement ou de tout autre manquement. [Je souligne.]

Cette clause confirme l'absence d'intention de la part de National Trust de dégager Remai de sa responsabilité. Prises ensemble, ces dispositions constituent une forte indication que National Trust n'a pas accepté la prise en charge de la dette par Mead en plein acquittement et en pleine substitution de l'obligation de Remai. La question qui se pose est donc de savoir si la conduite des parties vient neutraliser cette indication.

Le fait que National Trust se soit désistée de son action contre Remai peut s'interpréter comme appuyant l'inférence selon laquelle la société de fiducie ne comptait plus sur Remai pour le paiement de la dette. C'est là d'ailleurs le point de vue qu'a adopté la Cour d'appel. Avec égards, je crois qu'en cela elle a eu tort. J'estime en effet qu'elle a attaché trop d'importance au désistement par National Trust de son action contre Remai. Bien que je me rende compte de ce que la convention de prise en charge envisageait que National Trust puisse dégager Remai de sa responsabilité «à n'importe quel moment et de la manière qu'elle juge[ait] convenable», je crois que son désistement de son action contre Remai est une conduite équivoque, surtout compte tenu du par. 198(4) des *Saskatchewan Queen's Bench Rules*, qui porte que le désistement d'une action ne peut être invoqué comme moyen de défense dans le cadre d'une action subséquente contre la même partie. Comme le désistement n'empêche pas une partie d'intenter l'action à une date ultérieure, il ne représente pas, selon moi, un fondement suffisant pour une conclusion à l'existence d'une intention de dégager le débiteur hypothécaire originaire de sa responsabilité. Il ne constitue pas le genre de circonstance déterminante qui est nécessaire pour fonder une novation.

Aucune autre circonstance n'a été alléguée comme indiquant qu'il y a eu novation. Puisque je conclus que National Trust n'a pas eu l'intention

National Trust to release Remai, it follows that the test for novation has not been met.

## 7. Disposition

I would dismiss the appeal on the combined interpretation of the Act and the Assumption Agreement. The respondent, David Mead, is entitled to his costs.

The following are the reasons delivered by

MCLACHLIN J.—I agree with Wilson J.'s conclusions and reasons, subject to the following comment. I view ss. 2(2)(d) and 40(2) of the Act as involving a facial conflict, which I would resolve by recourse to legislative intention, and in particular the intention of the legislature to benefit the non-corporate borrower.

*Appeal dismissed with costs.*

*Solicitors for the appellant: Pederson, Rourke, Pinch, Saskatoon.*

*Solicitors for the respondents: Rendek, McCrank, Halvorsen, Canham, Regina.*

de dégager Remai de sa responsabilité, il s'ensuit qu'on n'a pas satisfait au critère à appliquer pour qu'il y ait novation.

## 7. Dispositif

Je suis d'avis de rejeter le pourvoi en me fondant sur l'interprétation de la Loi et de la convention de prise en charge. L'intimé David Mead a droit à ses dépens.

Version française des motifs rendus par

LE JUGE MCLACHLIN—Je souscris aux conclusions et aux motifs du juge Wilson, sous réserve de l'observation suivante. Je considère que l'al. 2(2)d) et le par. 40(2) de la Loi sont en conflit apparent et je le résoudrais en ayant recours à l'intention du législateur et en particulier l'intention de la part de la législature d'avantager l'emprunteur individuel.

*Pourvoi rejeté avec dépens.*

*Procureurs de l'appelante: Pederson, Rourke, Pinch, Saskatoon.*

*Procureurs des intimés: Rendek, McCrank, Halvorsen, Canham, Regina.*

# TAB 64

862 F.Supp.2d 406
United States District Court,
E.D. Pennsylvania.

NORDETEK ENVIRONMENTAL, INC., et al.

v.

RDP TECHNOLOGIES, INC.

Civil Action No. 09–4714.   |   May 16, 2012.

## Synopsis

**Background:** Former shareholder and his company, which had allegedly obtained license in water treatment technology, brought action against family-owned corporation alleging claims for patent infringement, false designation of origin, false advertising, and trade infringement. Corporation counterclaimed for breach of fiduciary duty and breach of contract. Cross-motions for summary judgment were filed, plaintiffs moved to exclude expert, and corporation moved to hold former shareholder's wife in contempt and to stay arbitration.

**Holdings:** The District Court, Dalzell, J., held that:

[1] shareholder would not be collaterally estopped from challenging valuation on corporation's claim for compensatory damages;

[2] shareholder was not collaterally estopped from claiming that he did not violate his fiduciary duty to corporation;

[3] testimony estimating corporation's financial losses was inadmissible; and

[4] fact issues precluded summary judgment on corporation's claims for damages against former shareholder.

Plaintiffs' motion granted in part and denied in part; Defendants' motion granted in part and denied in part.

West Headnotes (22)

[1]    **Judgment**

🔑 Nature and requisites of former adjudication as ground of estoppel in general

Under Pennsylvania law, a plea of collateral estoppel is valid if 1) the issue decided in the prior adjudication was identical with the one presented in the later action, 2) there was a final judgment on the merits, 3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication, and 4) the party against whom it is asserted has had a full and fair opportunity to litigate the issue in question in a prior action.

Cases that cite this headnote

[2]    **Alternative Dispute Resolution**

🔑 Conclusiveness of Adjudication

Even if arbitrator credited expert's $1,325,000 valuation of corporation following former shareholder's alleged bad acts, under Pennsylvania law, former shareholder and his company would not be collaterally estopped from challenging valuation on corporation's claim for compensatory damages resulting from shareholder's alleged breach of fiduciary duties and breach of contract, where arbitrator explicitly noted that any determination respecting valuation was not necessary to final judgment.

Cases that cite this headnote

[3]    **Alternative Dispute Resolution**

🔑 Conclusiveness of Adjudication

Under Pennsylvania law, arbitrator's finding that former shareholder devised plan that was intended to harm corporation did not collaterally estop shareholder from claiming that he did not violate his fiduciary duty to corporation, where finding was not necessary to arbitrator's conclusions.

Cases that cite this headnote

[4]    **Alternative Dispute Resolution**

🔑 Matters concluded

Under Pennsylvania law, arbitrator's observation that corporation continued to be profitable

enterprise after former shareholder's actions did not collaterally estop corporation from claiming that it suffered damages from shareholder's alleged breach of fiduciary duties, where issue was not decided during arbitration.

Cases that cite this headnote

**[5]    Federal Civil Procedure**

🔑 Admissibility

Expert's testimony estimating corporation's financial losses resulting from former shareholder's alleged wrongful conduct using diminution of value approach was inadmissible on motion for summary judgment on corporation's breach of fiduciary duty and damages claims against shareholder; use of diminution in business value methodology to estimate losses by valuating corporation's post-injury worth at time of its maximum infirmity was not relevant to facts of case, and methodology was applied incorrectly. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[6]    Damages**

🔑 Nature and theory of compensation

**Damages**

🔑 Nature and Theory of Damages Additional to Compensation

Compensatory damages have as their purpose the desire to make the plaintiff whole, and punitive damages are a windfall to the recipients over and above compensatory damages to which they are entitled.

Cases that cite this headnote

**[7]    Evidence**

🔑 Matters directly in issue

Whether mitigation efforts can generally reduce damages awards is a question of law upon which experts are not qualified to opine. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[8]    Damages**

🔑 Duty of Person Injured to Prevent or Reduce Damage

Mitigation efforts do not reduce damages because any damages calculus assumes that reasonable efforts to mitigate have been made; thus, final damages are net of mitigation.

Cases that cite this headnote

**[9]    Damages**

🔑 Duty of Person Injured to Prevent or Reduce Damage

Where plaintiffs fail to make mitigation efforts, they cannot recover the quantum of damages that they might otherwise have averted; thus, under Pennsylvania law one injured by the tort of another is not entitled to recover damages for any harm that he could have avoided by the use of reasonable effort or expenditure after the commission of the tort. Restatement (Second) of Torts § 918(1).

Cases that cite this headnote

**[10]    Damages**

🔑 Duty of Person Injured to Prevent or Reduce Damage

Where a plaintiff has made reasonable efforts to mitigate damages, he may recover "mitigation damages" for any costs incurred in the course of these efforts plus the amount of any remaining loss; but awarding such a mitigating plaintiff damages for injury that was avoided or repaired through his efforts would do more than make him whole or return him to a position as nearly as possible equivalent to his position prior to the tort, it would, in short, award him a windfall.

Cases that cite this headnote

**[11]    Federal Civil Procedure**

🔑 Admissibility

When the ruling on admissibility turns on factual issues, at least in the summary judgment context, failure to hold an in limine hearing may be an

abuse of discretion. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

[12]    Federal Civil Procedure
        Corporations and business organizations

Genuine issue of material fact existed regarding whether former shareholder's actions caused damages to corporation, precluding summary judgment on corporation's claims for damages against former shareholder.

Cases that cite this headnote

[13]    Fraud
        Fiduciary or confidential relations

To allege a breach of fiduciary duty under Pennsylvania law, a plaintiff must establish that a fiduciary or confidential relationship existed between her and the defendants, and must also allege three elements: (1) that the defendant negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which he or she was employed, (2) that the plaintiff suffered injury, and (3) the defendant's failure to act solely for the plaintiff's benefit was a real factor bringing about plaintiff's injuries.

1 Cases that cite this headnote

[14]    Contracts
        Grounds of action

To state a breach of contract claim under Pennsylvania law, a plaintiff must allege (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages.

2 Cases that cite this headnote

[15]    Corporations and Business Organizations
        Fiduciary nature of relation

Former shareholder's position as secretary and treasurer of corporation placed him in fiduciary relationship with corporation under Pennsylvania law.

Cases that cite this headnote

[16]    Corporations and Business Organizations
        Good faith

Former shareholder breached fiduciary duty to corporation by intentionally failing to act in good faith and solely for benefit of corporation in all matters for which he was employed.

1 Cases that cite this headnote

[17]    Contracts
        Restriction of competition

Shareholder agreement, which mandated that for period of two years after date on which a shareholder's employment terminated, shareholder could not engage either directly or indirectly in any manner or capacity whatsoever in any business competitive with business of corporation, prohibited shareholder from competing against corporation.

Cases that cite this headnote

[18]    Federal Civil Procedure
        Corporations and business organizations

Genuine issue of material fact existed regarding whether corporation suffered damages from former shareholder's breach of contract, precluded summary judgment on corporation's breach of contract claim against shareholder under Pennsylvania law.

Cases that cite this headnote

[19]    Alternative Dispute Resolution
        Stay of Arbitration

        Federal Courts
        Writs in general

District court would not enjoin under All Writs Act arbitration between corporation and former shareholder regarding former shareholder's entitlement to payout under shareholder agreement; although court ruled that former shareholder and his company had waived any right to arbitrate claims pending

before court, no party asserted claim before court regarding shareholder's entitlement to payout. 28 U.S.C.A. § 1651(a).

Cases that cite this headnote

[20]     **Federal Courts**
         👈 Pendency and Scope of Prior Proceedings; First-Filed Rule

         **Federal Courts**
         👈 Injunction Against Proceedings

The first-filed rule encourages sound judicial administration and promotes comity among federal courts of equal rank; it gives a court the power to enjoin the subsequent prosecution of proceedings involving the same parties and the same issues already before another district court.

Cases that cite this headnote

[21]     **Contempt**
         👈 Nature and Elements of Contempt

         **Contempt**
         👈 Nature and grounds of power

Process of contempt is a severe remedy, and should not be resorted to where there is fair ground of doubt as to the wrongfulness of the defendant's conduct.

Cases that cite this headnote

[22]     **Federal Civil Procedure**
         👈 Contempt

There was no evidence that former shareholder's wife countermanded court's instruction to appear for additional day of deposition in proceedings with corporation, and thus finding of contempt for violation of order was not warranted.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*409**  Paul R. Fitzmaurice, Haddonfield, NJ, Joseph E. Chovanes, Malvern, PA, for Nordetek Environmental, Inc., et al.

**Opinion**

*MEMORANDUM*

DALZELL, District Judge.

As we noted in an earlier memorandum, *see Nordetek Envtl., Inc. v. RDP Tech., Inc.,* 677 F.Supp.2d 825 (E.D.Pa.2010), this case arises from the venom between two brothers, Paul G. ("Paul") and Richard ("Dick") Christy. Together for decades they ran a successful company, RDP Technologies, Inc. ("RDP"), before enmity between them led Paul to leave the company, start his own firm, Nordetek Environmental, Inc. ("Nordetek"), and attempt to compete against RDP—all in alleged violation of his fiduciary duties to his family's company and a non-competition provision in a shareholder agreement.

Thus it was that plaintiffs and counterclaim defendants Nordetek and Paul on October 14, 2009 filed suit against defendant and counterclaim plaintiff RDP, asserting claims for patent infringement, false designation of origin, false advertising, and trade infringement. They shortly thereafter filed a motion for preliminary injunction, to which RDP responded with its own preliminary injunction motion. After a hearing, we denied Nordetek and Paul's motion for preliminary injunction and granted RDP's motion for one. *Id.* After further briefing, we granted RDP's motion for summary judgment with respect to all of Nordetek and Paul's claims against it. Aug. 9, 2010 Order (docket entry # 110). But by this time RDP had filed counterclaims against Nordetek and Paul—including claims for breach of fiduciary duty and breach of contract—which the counterclaim defendants unsuccessfully moved to dismiss. Moreover, several months after the entry of our preliminary injunction against Paul, RDP moved to hold Paul in contempt for violating the injunction—a motion that we granted. June 11, 2010 Order (docket entry # 100).

After those battles this case settled into relative quiet for a time, as the parties first attempted (unsuccessfully) to mediate their claims before Judge Jacob P. Hart, and then participated in arbitration proceedings before our former colleague, the Hon. Edward N. Cahn, aimed at fixing a value of RDP to determine how much Paul's shares in RDP were worth at the time he resigned. Judge Cahn issued a decision in that arbitration about a year **\*410** ago and offered to help the parties mediate the rest of their claims. While the parties accepted this gracious offer, Judge Cahn's efforts at mediation were unavailing, leading us to set a schedule for discovery

and motion practice regarding the remaining counterclaims in this case.

RDP has now filed a motion for summary judgment with respect to its counterclaims for breach of fiduciary duty and breach of contract, a motion to hold Lisa Christy ("Lisa"), Paul's wife, in contempt and a motion to enjoin a second arbitration that Paul has initiated. Paul and Nordetek have filed a motion for summary judgment regarding seven of RDP's ten counterclaims, as well as a motion to preclude the expert testimony of J. Mark Penny that RDP has proffered.

RDP restricts its motion for summary judgment to a subset of its counterclaims explaining that it "is willing to liquidate the entirety of its damages to $5,165,000, *i.e.,* those resulting from Paul Christy's breaches of his fiduciary duty and contractual obligations." [1] RDP's Mot. Summ. J. ("RDP's MSJ") at 3 n. 2. With respect to liability for Paul's alleged breach of fiduciary duty, RDP argues that "collateral estoppel applies to findings made in arbitration proceedings, as well as in litigation," *id.* at 5, and suggests that since Judge Cahn found that Paul " 'devised a plan that was intended to harm RDP,' " *id.* at 8 (quoting Ex. 604 to RDP's MSJ ("Cahn Opinion") at 4), RDP is entitled to summary judgment on that claim. *Id.* at 10. RDP also points to evidence presented in the arbitration proceedings that it says demonstrates Paul's alleged breach. *Id.* at 9–10. With respect to liability for Paul's alleged breach of his noncompetition obligation, RDP notes that this Court has found that Paul competed with RDP, so that it is entitled to summary judgment on this claim as well. *Id.* at 11, Finally, with respect to damages, RDP argues that because (1) "Judge Cahn found that the value of RDP prior to a deduction for Paul Christy's bad acts was $6,490,000," *id.* at 14, (2) RDP's expert Edward Wilusz set "the value of RDP following Paul Christy's bad acts" at $1,325,000, *id.* at 15, and (3) "[a]fter hearing all of the evidence, Judge Cahn credited Wilusz's report, and rejected Paul Christy's challenges to it," *id.,* RDP is therefore "entitled to $5,165,000—the difference in RDP's value." *Id.*

As for Paul and Nordetek, they contend in their motion for summary judgment that "Judge Cahn found, and RDP is collaterally estopped from challenging, [that] RDP has not—and cannot—show any damages were caused to it by Paul Christy's conduct." Nordetek's Mot. Summ. J. ("Nordetek's MSJ") at 1. Since causation and damages "are both elements of [RDP's] Counts I–IV and VI–VIII," Paul and Nordetek argue that "RDP cannot establish the existence of the elements of its claims and summary judgment is

appropriate." *Id.* Paul and Nordetek further assert that "the only evidence of economic damages RDP has provided for any of its counterclaims rests entirely on Penny's unreliable and irrelevant expert opinion." *Id.* at 9. Since as counterclaim defendants they move for the preclusion of this testimony pursuant to **\*411** *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), Paul and Nordetek suggest that they are entitled to summary judgment.

As this canvass of these motions makes clear, the two pending motions for summary judgment and motion to preclude expert testimony involve related issues. We will thus examine these motions together, considering each pertinent issue in turn, before pivoting to resolve RDP's motions to hold Lisa in contempt and enjoin Paul's second arbitration.

## I. *The Parties' Arguments Respecting Collateral Estoppel*

We first consider the parties' respective efforts to use Judge Cahn's Opinion and Award to collaterally estop their opponents and secure summary judgment. We begin by reviewing the outlines of collateral estoppel doctrine in Pennsylvania.

[1]    As the Supreme Court of Pennsylvania explained in *Safeguard Mut. Ins. Co. v. Williams,* 463 Pa. 567, 345 A.2d 664, 668 (1975),

> [A] plea of collateral estoppel is valid if, 1) the issue decided in the prior adjudication was identical with the one presented in the later action, 2) there was a final judgment on the merits, 3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication, and 4) the party against whom it is asserted has had a full and fair opportunity to litigate the issue in question in a prior action.

While this language suggests that only four requirements need be met in order for the doctrine to apply, an array of case law makes clear that in addition "[t]he identical issue must have been necessary to final judgment on the merits." *Balent v. City of Wilkes–Barre,* 542 Pa. 555, 669 A.2d 309, 313 (1995). *See also, e.g., City of Pittsburgh v. Zoning Board of Adjustment of Pittsburgh,* 522 Pa. 44, 559 A.2d 896, 901 (1989) ("Collateral estoppel applies if ... the determination

in the prior proceeding was essential to the judgment.");
*Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 327 n.
5, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) ("Under the doctrine
of collateral estoppel ... the second action is upon a different
cause of action and the judgment in the prior suit precludes
relitigation of issues actually litigated and necessary to the
outcome of the first action."); *Witkowski v. Welch,* 173 F.3d
192, 203 n. 15 (3d Cir.1999) ("Some Pennsylvania courts
state that there are actually five—instead of four—elements
to the issue preclusion doctrine. The fifth element requires
that the determination of an issue in the prior case must have
been 'essential' to the previous judgment.... In any event,
the doctrine is essentially the same under either analysis.");
*Irizarry v. Office of General Counsel,* 934 A.2d 143, 151
(Pa.Commw.Ct.2007) ("If the parties to an action have had
an opportunity to appear and be heard in a prior proceeding
involving the same subject matter, all issues of fact which
were actually adjudicated in the former action and essential
to the judgment therein are concluded as between the parties.")
(quoted in RDP's MSJ Reply at 2).

RDP attempts to apply the doctrine of collateral estoppel
to bar Paul and Nordetek from challenging (1) Wilusz's
$1,325,000 valuation of RDP and (2) the contention that Paul
violated his fiduciary duty to RDP. Given the requirements of
the doctrine, there are at least two problems with RDP's first
application of the collateral estoppel doctrine.

To begin, though RDP claims that "Judge Cahn rejected all
challenges to Wilusz's $1,325,000 valuation," RDP's MSJ
at 13 n. 13 (citing Cahn Opinion at 7), and that "Judge
Cahn credited Wilusz's report" **\*412** as to "RDP's worth
after Paul Christy began competing—and after he convinced
Stephansen to purport to cancel RDP's license," *id.* at 15
(citing Cahn Opinion generally without pin citation), this
simply is not true. RDP points to *no* language from Judge
Cahn's Opinion and Award suggesting that he accepted
Wilusz's $1,325,000 valuation of RDP, and our own parsing
of the Opinion—including the passages RDP cites—reveals
no language even hinting at such acceptance. Indeed, as
we note below, Judge Cahn rejected the suggestion that he
determine RDP's value following Paul's alleged wrongful
conduct, and instead explained that he would "evaluate RDP
without any deduction for Paul's conduct and leave for
determination in Judge Dalzell's Court an assessment of the
damages allegedly caused by Paul both before and after his
resignation." Cahn Opinion at 7.

We are, in truth, puzzled by how RDP's counsel can so
confidently assert a proposition that finds no support in the
record and appears to be false. More seriously, this flat-footed
stance brings into play Fed.R.Civ.P. 11(b), which states that
"[b]y presenting to the court a pleading, written motion, or
other paper—whether by signing, filing, submitting, or later
advocating it—an attorney or unrepresented party certifies
that to the best of the person's knowledge, information,
and belief, formed after an inquiry reasonable under the
circumstances: ... (3) the factual contentions have evidentiary
support ...." [2]

 **[2]**   In any case, even if Judge Cahn *had* credited
Wilusz's $1,325,000 valuation, Paul and Nordetek would still
not be estopped from challenging this valuation—for any
determination respecting this valuation was not "necessary to
[Judge Cahn's] final judgment." *Balent,* 669 A.2d at 313. In
fact, Judge Cahn explicitly noted that he would *not* evaluate
the effect of Paul's acts on RDP's valuation and the passage
warrants quoting at length:

> My assignment is complicated by the
> fact that RDP has damage claims
> against Paul currently pending before
> Judge Dalzell.... I had originally
> intended, as confirmed by my remarks
> at Oral Argument, to include in
> my decision as to the value of
> RDP some consideration of Paul's
> acts to harm the company. I was
> going to weave into my decision
> Paul's acts up to September 18,
> 2009, the date of his resignation.
> That approach would leave for Judge
> Dalzell's determination an assessment
> of any damages caused by Paul
> after September 18, 2009. When I
> attempted to make decisions using that
> approach, I realized that it would be
> very difficult to segregate the impact
> of Paul's conduct before and after
> September 18, 2009. I also realized
> that Judge Dalzell, in his Order of
> August 9, 2010, ruled that Paul has
> waived any right to arbitrate RDP's
> claims. That is a compelling reason
> for me to abstain from an assessment
> of any of RDP's alleged damages.
> Consequently, I have changed my

approach and will evaluate RDP without any deduction for Paul's conduct and leave for determination in Judge Dalzell's Court an assessment of the damages allegedly caused by Paul both before and after his resignation.

Cahn Opinion at 6–7. Judge Cahn then reiterated that

> **\*413** Judge Dalzell and/or a jury will have the responsibility to assess any monetary damages in regard to RDP's claims against Paul. Paul is entitled to receive 43% of $6,490,000 in installments calculated in accordance with the Agreement. Judge Dalzell's Court will calculate the amount of damages Paul may owe to RDP for any harm he caused to RDP.

*Id.* at 8–9. Judge Cahn thus reached the following conclusions:

1. The Arbitrator has jurisdiction over this dispute pursuant to paragraph 15j of the Amended and Restated Shareholder Agreement.

2. The Arbitrator has in personam jurisdiction over the parties who have appeared personally and through counsel.

3. The valuation of RDP Technologies, Inc. as of September 17, 2009 is $6,490,000.

*Id.* at 9.

In sum, Judge Cahn's only conclusion on the merits arising out of the arbitration was that RDP was worth $6,490,000 prior to Paul's alleged wrongful conduct. We are at a loss to understand how the value of RDP *after* Paul's alleged wrongful conduct could possibly have been "necessary" to this conclusion. To the extent RDP claims that Judge Cahn could not accept Wilusz's *ex ante* valuation of RDP without relying upon Wilusz's opinion as a whole—including as to RDP's value after Paul's alleged conduct—such a contention neither finds support in Judge Cahn's Opinion nor makes sense as a matter of logic, given that Wilusz employed different methodologies and assumptions in arriving at the two valuations. *See* Cahn Opinion at 4 ("VMI produced a report that valued RDP at $5,900,000 prior to Paul's resignation and at $1,325,000 thereafter. VMI's assumption

in support of the lower evaluation is that any prospective purchaser would assume that Paul would compete with RDP and that RDP would lose the Tekkem license. Considering those assumptions, VMI's lower evaluation was based on a liquidation approach. VMI's higher evaluation was based on an income approach."). Thus, even if Judge Cahn accepted Wilusz's $1,325,000 valuation—and his Opinion betrays no hint that he did—such acceptance was not necessary to Judge Cahn's final judgment and thus cannot warrant applying the doctrine of collateral estoppel.

**[3]** RDP's second attempt to apply the collateral estoppel doctrine—to foreclose Paul from claiming that he did not violate his fiduciary duty to RDP—also fails, though for only one of the two reasons described above. Judge Cahn did find that

> Evidence consisting of emails, memoranda to and from attorneys and other documents establishes that Paul, after his return to Pennsylvania, devised a plan that was intended to harm RDP. The components of Paul's plan included fomenting a dispute between Tekkem and RDP by advising Tekkem that royalty payments were underreported and taking other actions calculated to disrupt the business of RDP. As of August 13, 2009, Paul's lawyers confirm his "plan to start your own company, salvage your relationships with licensors so that they will do business with your new entity, and compete against RDP."

*Id.* at 2–3. But if this matter had actually been decided in the prior arbitration, it was no more necessary to Judge Cahn's conclusions than the value of RDP following Paul's alleged wrongful conduct. RDP has not bothered to explain how Judge Cahn's finding that Paul devised a plan to harm RDP was a prerequisite to his conclusion that RDP was worth $6,490,000 as of September 17, 2009, "without any deduction **\*414** for Paul's conduct." *Id.* at 7. Such a finding is thus nothing more than dicta that does not bind Paul pursuant to the doctrine of collateral estoppel.

**[4]** As for Paul and Nordetek, they suggest that "Judge Cahn noted, and RDP though [*sic* ] its counsel confirmed, [that] RDP wasn't damaged and has recovered from Paul's actions," and that "Judge Cahn's findings are binding on RDP through collateral estoppel." Nordetek's MSJ at 5. In support of *this* claim, counterclaim defendants cite passages of the transcript of the arbitration proceedings before Judge Cahn wherein he explained that

I also think what's going to be urged on Judge Dalzell is that the company was—when Paul Christy did his acts following September 18th, he darn near ruined the company, and it was only through Richard Christy's Herculean efforts that the company was saved. Of course, in basic damage law you can only recover for what you lost. So even though Mr. Christy, Mr. Richard Christy, was lucky to salvage the company, it doesn't mean that Paul Christy gets short-changed. I need you to address that.

...

What you're suggesting is that I put a liquidation value on the company because on November 12th it was at death's door, but fortunately for Richard Christy, you got Judge Dalzell to correct those things and somehow you got Stephansen back on track. Now the company's pretty good.

Nordetek's MSJ at 4–5 (quoting Arbitration Tr., Vol. V, 2055–57). We can readily reject this supposed application of estoppel doctrine. Judge Cahn's musings on this point during a colloquy with counsel in the course of the proceedings cannot mean that this was an "issue *decided* in the prior adjudication." *Safeguard Mut. Ins. Co.,* 345 A.2d at 668 (emphasis added).

But Paul and Nordetek also note that in Judge Cahn's Opinion and Award he observed that

> [A]lthough it was necessary for Dick to obtain an injunction and contempt Order from Judge Dalzell in regard to Paul's competition and while it was necessary for Dick to engage in arbitration proceedings to confirm the Tekkem license, those events enabled RDP to survive and, according to the June 30, 2010 Financial Statements, continue as a profitable enterprise.

Nordetek's MSJ at 5 (quoting Cahn Opinion at 8). This observation comes closer to an actual determination respecting the health of RDP's ongoing operations. Moreover, it appears that Judge Cahn made this finding to demonstrate the validity of his conclusion respecting RDP's September 17, 2009 value, noting that "subsequent events are germane" to "evaluat[ing] an earlier appraisal," and that "the higher VMI liquidation was based on the assumptions that Paul would not compete and the Tekkem license would be retained." Cahn Opinion at 8. Even if this issue was actually decided

and necessary to Judge Cahn's judgment, however, it is far from a *finding* that RDP sustained no damages as a consequence of Paul's alleged wrongful conduct. Nordetek and Paul thus cannot employ Judge Cahn's observation that RDP "continue[d] as a profitable enterprise," *id.,* to collaterally estop RDP from claiming that it has suffered damages.

We will accordingly reject RDP's and Paul and Nordetek's attempts to apply the doctrine of collateral estoppel to Judge Cahn's decision in order to secure summary judgment.

## II. *Paul and Nordetek's Motion to Preclude Testimony*

[5]  Paul and Nordetek move "to preclude any and all evidence, whether testimonial **\*415** or otherwise, proffered by Defendant RDP Technologies, Inc.'s expert, J. Mark Penny". They contend that Penny estimates RDP's financial losses resulting from Paul's alleged wrongful conduct by "completely disregard[ing] RDP's actual business operations before and after September 18, 2009, which contradict his assumptions and conclusions." Nordetek's Mot. Preclude at 1. RDP responds that (1) Paul cannot challenge these assumptions, inasmuch as he must "adher[e] to the allegations he made in his complaint (as judicial estoppel requires him to do)," RDP's Resp. to Nordetek's Mot. Preclude at 5; and (2) "*Paul Christy's* own expert admitted that Penny's methodology was correct, that Penny's assumptions, facts and calculations were correct, that Paul Christy damaged RDP, and that Richard Christy's efforts to repair the damage Paul Christy did cannot be used to reduce RDP's damages." *Id.* at 6–7 (emphasis in original). RDP thus concludes that "this case presents the classic 'battle of the experts' in which each expert argues that the (permissible) methodology he selected is superior," *id.* at 16, and that under these circumstances preclusion of expert testimony is inappropriate. *Id.* at 17.

Fed.R.Evid. 702 provides that

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Interpreting this Rule, the Supreme Court has explained that a "trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert,* 509 U.S. at 589, 113 S.Ct. 2786. *See also Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ("We conclude that *Daubert's* general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."). The Supreme Court elaborated in *Daubert* that the condition enshrined in Rule 702(a) "goes primarily to relevance," quoting Chief Judge Becker for the proposition that " '[a]n additional consideration under Rule 702—and another aspect of relevancy—is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.' " *Daubert,* 509 U.S. at 591, 113 S.Ct. 2786 (quoting *United States v. Downing,* 753 F.2d 1224, 1242 (3d Cir.1985)). Importantly, the Supreme Court has emphasized that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

In Penny's expert report, he explains that

We have been asked to quantify the damages to RDP as a result of alleged wrongful acts of Paul Christy. In measuring damages, we considered three approaches: **\*416** 1) cost to cure, 2) measurement of lost profits and 3) diminution in value. The choice of approach is pragmatic, based on availability of data. In some instances, facts and circumstances favor one model over other approaches.

In this instance, for example, a cost to cure approach would entail gathering data about attorney's fees, time records of RDP personnel spent on this matter, ascribing an appropriate billing rate for RDP personnel time, and measuring the opportunity cost of time spent away from RDP's normal business. This type of calculation becomes difficult, in terms of reasonable certainty, however, when coming up with measures of RDP time spent (detailed time

records were not kept), billing rates and opportunity costs. Therefore, we did not utilize this approach.

With regard to a lost profits analysis, we note that RDP did not prepare projected income or cash flow statements. Consequently, it is difficult to map out differential scenarios reflecting anticipated income compared to scenarios reflecting interruption of RDP's established relationships and the loss of prospective new customers. For this reason, measurement of lost profits is problematic. Having ruled out two of three approaches, it is evident that the facts and circumstances of this matter lend themselves more readily to a diminution of value approach to damages measurement.

Under a diminution of value approach, damages are measured based upon comparison of the value of RDP without any deduction for harm arising from alleged wrongful acts to the value of RDP after accounting for the impact of the alleged damaging activity.

Ex. 25 to Nordetek's Mot. Preclude ("Penny Report") at 11. As Penny elaborates, a diminution of value approach requires the measurement of fair market value, which

involves consideration of three broad approaches to value, namely the market approach, the income approach and the asset-based approach.

Due to a lack of useful publicly-traded comparative companies and transaction data, Judge Cahn did not place reliance on expert valuations based on the market approach. In the instant case, the market approach is rendered even less viable due to the need to identify pricing data from a reasonably comparative company that was also similarly harmed. For this reason, we have not utilized a market-based approach in measuring the damaged value of RDP.

As previously noted, RDP's lack of projections makes lost profits analysis problematic. The lack of projections also makes projections of damaged cash flow scenarios difficult if not impossible to ascertain.... We do not have a historical record of RDP earnings which reflects cash flow generation ability absent the Tekkem license and with direct competition from Nordetek and Paul. Since the Slakers using Tekkem's intellectual property accounts for such a large portion of RDP sales, the profit making capability of RDP in a damaged scenario is not readily ascertainable.

Because both the market and income approaches do not provide a satisfactory means of estimating RDP's fair market value in a damaged scenario, we turn to the asset-based approach.

*Id.* at 12–13.

Based on Judge Cahn's Opinion, Penny "adopt[s] $6.49 million as a reasonable measure of the unharmed fair market value of the stockholders' equity of RDP." *Id.* at 12. Penny then notes that "RDP's book value of June 30, 2009 was approximately $2.1 million," *id.* at 13, and that its "net **\*417** tangible book value (excluding the book value of patents) [was] $1.32 million." *Id.* at 14. According to Penny, the differential between Judge Cahn's figure and this latter valuation represents "the unharmed value of intangible assets," namely "license agreements, customer relationships, backlog, experienced workforce, proprietary information and know-how, goodwill and the like." *Id.*

Next comes the critical step in Penny's analysis:

Without the Tekkem license, it follows that indicated aggregate intangible asset value of $5.17 million for RDP would be significantly, if not totally, impaired. Total impairment would result if RDP, stripped of its enabling asset, could not generate sufficient earnings from its remaining base of tangible and intangible assets to provide a fair return on its overhead or to operate at a scale necessary to employ the technical staff needed to participate in its business.

Without the Tekkem license and with competition from Paul, RDP faced the loss of its current and prospective bookings and the prospect of laying off its employees. In this case, the value of RDP's remaining asset base was stripped of its earnings capability. Without prospective earning capability, a prospective buyer would view the value of RDP's remaining intangible assets to be highly speculative. Consequently, a buyer would be unlikely to ascribe significant value to RDP's remaining intangible assets. Therefore, the fair market value of RDP equity interests would gravitate towards net tangible asset value, or lower, in a liquidation scenario.

*Id.* at 15. Penny concludes that "for purposes of calculating damages, the fair market value of RDP's aggregate equity interests, in a damaged state, without the Tekkem license, with competition from Paul and other harms caused by Paul's alleged wrongful acts, is reasonably measured at an amount

not greater than net tangible asset value of $1.32 million." *Id.* at 16–17.

Nordetek and Paul argue that Penny's expert report must be precluded for two reasons. First, they contend that "[a] diminution of value approach is deemed appropriate in two senarios: (1) the immediate destruction of a business; and (2) the 'slow death' of a business. As RDP's ongoing business operations demonstrate, neither scenario applies here." Nordetek's Mot. Preclude at 4. Second, they assert that

RDP's expert's analysis is based on two flawed factual assumptions. The first assumption is that RDP permanently lost its ability to sell and install Tekkem technology under an exclusive licensing agreement as of September 18, 2009. The second assumption was that Paul Christy would secure exclusive rights to the Tekkem technology and engage in direct competition, stripping away as much as 75% of RDP's business. Neither assumption came to fruition.

*Id.* at 2.

Taking up Nordetek and Paul's first set of arguments, we note that we, too, are dubious about the appropriateness of a diminution of value approach under the present circumstances—at least as RDP seeks to employ it. As Kenneth M. Kolaski and Mark Kuga explain, such an approach is appropriate "if a business is destroyed completely, for example by fire or because a defendant's actions were so harmful that a plaintiff is forced out of business," or where "the alleged bad acts of a defendant cause a business to lose profits over a period of time but then ultimately destroy the business concern"—a so-called "slow death" scenario. *Measuring* **\*418** *Commercial Damages Via Lost Profits or Loss of Business Value: Are These Measures Redundant or Distinguishable?,* 18 J.L. & Comm. 1, 5, 16 (1998). *See also* James R. Hitchner, *Financial Valuation: Applications and Models* 1033–34 (2d ed.2006) (noting that "[w]here an immediate destruction of the business occurs, diminution of value generally would be indicated as the most appropriate measure of damages," but that "[t]he measure of damages for a temporary impairment is considered lost profits," and "[t]he slow death of a business ... might use a combination of the two measures"). The obvious distinguishing feature of these two scenarios is that the value

of the damages incurred by the business-owner remains the same from the time of the business's death until the time damages are assessed by a court, since the business (presumably) remains dead throughout this period. There is thus no risk that a plaintiff will recover a windfall by receiving damages that *exceed* his actual loss. Where a business has not been destroyed completely or undergone a slow death, but instead sustained an injury from which it ultimately recovered in part, we could nonetheless imagine that the diminution in value approach *might* be applicable [3] —but only if the post-injury value of the business is determined at the time damages are assessed so that the diminution in value reflects the actual loss suffered.

[6]    Notably, RDP seeks to apply the diminution in business value approach to estimate its post-injury value—not at the time damages are assessed, but in the immediate aftermath of Paul's allegedly wrongful conduct—that is, at RDP's absolute nadir as a company, even though RDP concedes that Dick's "efforts to save RDP" were "ultimately successful." RDP's Resp. to Nordetek's Mot. Preclude at 17; *see also* RDP's MSJ at 18 ("There is no dispute that, as a result of the efforts of Richard Christy, and the injunction entered by this Court, RDP was able to retain most of the large contracts it was seeking."). Such an approach ignores, however, that compensatory damages "have as their purpose the desire to make the plaintiff whole," *Feingold v. Se. Pa. Transp. Auth.,* 512 Pa. 567, 517 A.2d 1270, 1276 (1986), and that punitive damages "are a windfall to the recipients over and above compensatory damages to which they are entitled." *In re Collins,* 233 F.3d 809, 812 (3d Cir.2000). Insofar as RDP attempts to employ a diminution in business value methodology to estimate its losses by valuing its post-injury worth at the time of its maximum infirmity—though it has since recovered some (if not all) of its financial health [4] —we do not believe that such a methodology is "relevant" to the facts of this case.

[7]    RDP's main argument in defense of this methodology is that attacks upon it "ignore[ ] *Paul Christy's* own expert's admission that Richard Christy's acts to repair Paul Christy's damage cannot reduce RDP's damages claim." RDP's Resp. to Nordetek's Mot. Preclude at 17 (emphasis in original). Of course, whether mitigation efforts can generally reduce damages awards is a question of law upon which **\*419** experts are not qualified to opine. More troubling, the principle that RDP enunciates—that a defendant is responsible for any damages avoided or repaired through a plaintiff's mitigation efforts—is simply wrong.

[8]    [9]    [10]    It is true that efforts to mitigate injury cannot reduce damages, but not for the reason that RDP contends. Mitigation efforts do not reduce damages because any damages calculus *assumes* that reasonable efforts to mitigate have been made. Thus, final damages are *net* of mitigation. Where plaintiffs fail to make such efforts, they cannot recover the quantum of damages that they might otherwise have averted. Thus, under Pennsylvania law " 'one injured by the tort of another is not entitled to recover damages for any harm that he could have avoided by the use of reasonable effort or expenditure after the commission of the tort.' " *Yost v. Union R. Co.,* 380 Pa.Super. 236, 551 A.2d 317, 322 (1988) (quoting Restatement (Second) of Torts § 918(1) (1979)). To be sure, where a plaintiff *has* made reasonable efforts to mitigate damages, he may recover "mitigation damages" for any costs incurred in the course of these efforts [5] plus the amount of any remaining loss. *See, e.g., All Seasons Services, Inc. v. Newnam,* 2006 WL 2052407, at \*9 (Pa.Com.Pl.2006); *Comdyne I, Inc. v. Corbin,* 908 F.2d 1142, 1149–50 (3d Cir.1990) (discussing analogous proposition in context of New Jersey law). But awarding such a mitigating plaintiff damages for injury that was avoided or repaired through his efforts would do more than make him whole or return him to " 'a position as nearly as possible equivalent to his position prior to the tort,' " *Trosky v. Civil Serv. Comm'n,* 539 Pa. 356, 652 A.2d 813, 817 (1995)—it would, in short, award him a windfall. Compensatory damages are not designed to function as such a lottery. [6]

Aside from inappropriate methodology, Penny's report is also infirm because it applies this methodology incorrectly. *Even if* we accept RDP's post-injury value should be determined at the time of its maximum depression—at best a dubious proposition—Penny does not appear to have actually calculated this value. Instead, Penny opines that "the fair market value of RDP's aggregate equity interests, in a damaged state, *without the Tekkem license,* with competition from Paul and other harms caused by Paul's alleged wrongful acts, is reasonably measured at an amount not greater that net tangible asset value of $1.32 million," Penny Report at 16–17 (emphasis added). His valuation is thus based on the assumption that RDP lost the Tekkem license.

**\*420** But RDP has presented no evidence that it ever *lost* this license, and its representations to this Court suggest that Paul's actions, at worst, placed a cloud upon the validity of this license that ultimately lifted. As we explained in our January 8, 2010 Opinion in this matter,

88 Fed. R. Evid. Serv. 545

Notwithstanding his receipt of RDP's wired funds, Stephansen [the owner of the Tekkem technology] wrote to Dick on October 2, 2009 and reiterated that the agreement had been terminated. He demanded that RDP stop using the Tekkem trademark and cease advertising Tekkem slakers. RDP's attorney responded on October 5 and explained RDP's view that Stephansen had not terminated the license.... It is also undisputed that [on October 13, 2009] Nordetek signed a putatively exclusive License Agreement with Stephansen.

*Nordetek Envtl.,* 677 F.Supp.2d at 835 (citations omitted). We noted at that time that "RDP is proceeding as though it still has a Tekkem license because it believes that Stephansen never properly terminated the 2001 License Agreement," *id.* at 836, and observed that "RDP is currently marketing Tekkem slakers and may well be doing so lawfully." *Id.* at 842 (emphasis omitted). *See also* Prelim. Inj. Hrg. Tr. at 93, Dec. 18, 2009 (Dick: "We have the TEKKEM License.... And our attorney says the determination was not valid and if we—have a worst case scenario, it is that the license goes nonexclusive."). In any event, the parties agree that on "February 11, 2010 ... RDP executed a new license agreement with Tekkem." Penny Report at 17; *see also* Nordetek's Mot. Preclude at 3 ("A February 11, 2010 agreement ... retroactively reinstated RDP's exclusive licensing agreement for the Tekkem technology.").

The core problem with Penny's analysis is that it equates RDP's *disputed* license to the Tekkem technology with having *no* license at all, thus failing to recognize that disputed title is *not* valueless. To the contrary, disputed title can be quite valuable. In patent litigation, for example, holders of disputed interests in intellectual property commonly sell those interests for prodigious sums to other parties who then litigate their entitlement to the patents in question. In fact, elementary statistical principles suggest that the expected value (E (V)) of a disputed license is not zero, but E(V) = $P_1 V_1 + P_2 V_2$, where $V_1$ equals the value of the license, $V_2$ equals the value of not having the license (presumably, zero), $P_1$ equals the probability that the claimant will retain the license, and $P_2$ equals the probability that the claimant will lose the license (presumably, $1-P_1$).[7] Penny's analysis assumes that

following Paul's wrongful conduct $P_1$ equaled zero from RDP's perspective, but he presents no explanation as to why this would be true.[8] Notably, RDP represented to us at **\*421** the time of the preliminary injunction hearing that this probability was *not* zero, and RDP's resolution of a licensing agreement with Stephansen a few months later demonstrates that this probability was in business reality non-zero. Even if we assume that RDP's compensatory damages can properly be calculated by taking its pre-injury value and subtracting the amount it was worth at its post-injury bottom—an approach that, as we have explained, appears here unjustified—Penny did not look to the right facts in calculating the latter value.

RDP's main retort in defense of Penny's application of his methodology is that "Penny can base his opinion on Paul Christy's allegations that RDP did not have the Tekkem license, that Nordetek did, and that Paul Christy was permitted to compete," RDP's Resp. to Nordetek's Mot. Preclude at 6, arguing that "[a]lthough Paul Christy may wish to disavow his prior allegations, he is estopped from doing so." *Id.* at 6 n. 8. There are at least two problems with this argument. To begin, our Court of Appeals has made it clear that "in our Circuit judicial estoppel is generally not appropriate where the defending party did not convince the District Court to accept its earlier position." *G–I Holdings, Inc. v. Reliance Ins. Co.,* 586 F.3d 247, 262 (3d Cir.2009). RDP appears to concede as much, noting that " 'a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory.' " RDP's Resp. to Nordetek's Mot. Preclude at 6 n. 8 (quoting *Krystal Cadillac–Oldsmobile GMC Truck, Inc. v. General Motors Corp.,* 337 F.3d 314, 319 (3d Cir.2003)). But RDP nowhere explains how Paul and Nordetek "gain[ed] an advantage" in this litigation by making the allegations that RDP now claims they are estopped from denying.

Second, if the doctrine of judicial estoppel were to apply to bar Paul and Nordetek from denying allegations made in their complaint, it would appear equally well to estop RDP from denying averments made in its own pleadings. In RDP's amended answer to Nordetek and Paul's complaint, it "denie[s] that the termination of the Stephansen license agreement has occurred." RDP's Am. Ans. to Nordetek's Am. Compl. ¶ 37 (docket entry # 109). If we were to accept RDP's distorted view of judicial estoppel, we would thus be left in the nonsensical position of obliging RDP to claim that it *had* the Tekkem license at the same time we required Nordetek

and Paul to claim that RDP did *not* have this license. Damages determinations do not take us through such a looking-glass.

In the final analysis, RDP suggests that even if we do not credit Penny's expert report, we should nonetheless not resort to the "drastic remedy" of precluding his opinion. RDP's Resp. to Nordetek's Mot. Preclude at 15. RDP contends that (1) it "does not have to prove the amount of damages it suffered with mathematical certainty," RDP's Resp. to Nordetek's MSJ at 4; (2) "[a]s the plaintiff on its counterclaims, RDP is entitled to select **\*422** the method used to quantify its damages," RDP's MSJ at 13; and (3) a motion to preclude expert testimony "cannot be granted absent a hearing during which the expert can be questioned regarding the bases of his opinions." RDP's Resp. to Nordetek's Mot. Preclude at 15.

However true RDP's first two contentions may be, this Court cannot abdicate its gatekeeping function under the Federal Rules of Evidence. *See Kumho Tire Co., Ltd.,* 526 U.S. at 158–59, 119 S.Ct. 1167 ("I join the opinion of the Court, which makes clear that the discretion it endorses—trial-court discretion in choosing the manner of testing expert reliability—is not discretion to abandon the gatekeeping function.") (Scalia, J., concurring). As our reasoning above demonstrates, Penny's report is not simply more uncertain than we would like. We also do not simply suggest that another methodology would be preferable to the one he used. Rather, our close reading of Penny's report reveals that his methodology is not appropriate to the particulars of this case. Perhaps more importantly, Penny's application of this methodology rested on unfounded and incorrect, but highly consequential, assumptions. We thus cannot conclude that expert testimony as defective as Penny's could "help the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702(a).

**[11]**  As for RDP's third point, it is true that "when the ruling on admissibility turns on factual issues ... at least in the summary judgment context, failure to hold such a hearing may be an abuse of discretion." *Padillas v. Stork–Gamco, Inc.,* 186 F.3d 412, 418 (3d Cir.1999). But our Court of Appeals has also stressed that "[a]n in limine hearing will obviously not be required whenever a *Daubert* objection is raised to a proffer of expert evidence. Whether to hold one rests in the sound discretion of the district court." *Id.* Here, we do not need further development of the factual record to determine that Penny's expert report is inadmissible. RDP concedes that Penny's report would result in its windfall

recovery of compensatory damages for injury that RDP averted or repaired, and Penny unambiguously states that his analysis is predicated on an assumption—*i.e.,* that RDP no longer had the Tekkem license—that simply was not true. Under these circumstances, Penny's report does not "fit" the facts of this case. We will thus grant Paul and Nordetek's motion to preclude Penny's expert testimony.

## III. *The Parties' Remaining Arguments for Summary Judgment*

As we have noted, the parties assert grounds in support of their motions for summary judgment that do not rest exclusively on the doctrine of collateral estoppel. Nordetek and Paul suggest that the preclusion of Penny's expert report means that RDP has not pointed to evidence supporting damages so that Nordetek and Paul are entitled to summary judgment on seven of RDP's counterclaims. RDP points to evidence in the record to claim that there is no genuine issue of fact in dispute regarding Paul's liability for breach of fiduciary duty and contract breach.

Under Fed.R.Civ.P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," where "[a] party asserting that there is a genuine dispute as to a material fact must support that assertion with specific citations to the record." *Bello v. Romeo,* 424 Fed.Appx. 130, 133 (3d Cir.2011). On a motion for summary judgment, "[t]he moving party first must show that no genuine **\*423** issue of material fact exists," *Adderly v. Ferrier,* 419 Fed.Appx. 135, 136 (3d Cir.2011) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)), whereupon "[t]he burden then shifts to the non-moving party to set forth specific facts demonstrating a genuine issue for trial." *Id.* " 'A disputed fact is "material" if it would affect the outcome of the suit as determined by the substantive law,' " *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.,* 650 F.3d 915, 925 (3d Cir.2011) (quoting *Gray v. York Newspapers, Inc.,* 957 F.2d 1070, 1078 (3d Cir.1992)), while a factual dispute is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Bialko v. Quaker Oats Co.,* 434 Fed.Appx. 139, 141 n. 4 (3d Cir.2011) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) (brackets omitted). We "draw all reasonable inferences in favor of the nonmoving party, and [we] may not make credibility determinations or weigh the

Case 09-10138-MFW   Doc 13460-9   Filed 05/02/14   Page 79 of 177

Nordetek Environmental, Inc. v. RDP Technologies, Inc., 862 F.Supp.2d 406 (2012)
88 Fed. R. Evid. Serv. 545

evidence." *Eisenberry v. Shaw Bros.,* 421 Fed.Appx. 239, 241 (3d Cir.2011) (quotation marks omitted).

 **[12]** Nordetek and Paul argue that "the only evidence of economic damages RDP has provided for any of its counterclaims rests entirely on Penny's unreliable and irrelevant expert opinion," and that "because RDP has failed to provide any evidence of actual financial damages, Paul Christy's motion for summary judgment as to RDP's claims for Counts I–IV and VI–VIII should be granted." Nordetek's MSJ at 9. While we will grant Nordetek and Paul's motion to preclude Penny's report, we cannot agree, drawing all reasonable inferences in RDP's favor, that RDP has failed to provide evidence that counterclaim defendants' alleged wrongful conduct caused it to sustain damages.

As we noted above, RDP may seek as damages costs that it incurred in mitigating injury Paul and Nordetek caused—which may include litigation costs, the costs of negotiating a new license with Stephansen, and the costs of recovering customers lost due to Paul's alleged malfeasance. Even if RDP lost no profits as a result of counterclaim defendants' alleged conduct, RDP may *still* prove damages by demonstrating that it incurred the above costs because of this alleged conduct. RDP expended obvious efforts in litigation and licensing as a consequence of Paul's allegedly wrongful conduct, and we thus draw the inference that these efforts were not cost-free. RDP has pointed to evidence in the record suggesting that its employees went to great lengths to keep customers nearly lost due to Paul's activities, *see* RDP's MSJ at 18, and we will similarly infer that these efforts carried a cost.

We therefore cannot conclude, as a matter of law, that there is no genuine dispute of material fact as to whether counterclaim defendants' alleged conduct caused damages to RDP. We will accordingly deny Paul and Nordetek's motion for summary judgment.

 **[13]**  **[14]** Turning to RDP's motion for summary judgment, it argues that evidence in the record demonstrates that Paul breached his fiduciary duty to RDP as well as a non-competition obligation. As Judge DuBois has explained, "[t]o allege a breach of fiduciary duty [under Pennsylvania law], a plaintiff must establish that a fiduciary or confidential relationship existed between her and the defendants," and must also allege three elements:

 (1) That the defendant negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which he or she was employed;

 **\*424**  (2) That the plaintiff suffered injury; and

 (3) The defendant's failure to act solely for the plaintiff's benefit was a real factor bringing about plaintiff's injuries.

*Baker v. Family Credit Counseling Corp.,* 440 F.Supp.2d 392, 414 (E.D.Pa.2006) (quoting Pa. S.S.J.I. § 4.16). To state a breach of contract claim under Pennsylvania law, a plaintiff must allege "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." *Omicron Systems, Inc. v. Weiner,* 860 A.2d 554, 564 (Pa.Super.2004) (brackets and quotation marks omitted).

 **[15]** RDP points to evidence in the record demonstrating that during Paul's employment with RDP he (1) created and delivered a spreadsheet to Stephansen indicating that RDP had not paid Stephansen what was owed under its licensing agreement; (2) plotted to bring about the termination of RDP's exclusive license to the Tekkem technology, including by forcing RDP into bankruptcy; (3) agreed to indemnify Stephansen and pay any attorney's fees arising from Stephansen's licensing dispute with RDP; and (4) planned to start his own company, secure the Tekkem license, and compete against RDP. *See* RDP's MSJ at 8–10 (citing exhibits). Nordetek and Paul make no effort to point to contradictory evidence in the record, instead focusing upon RDP's asserted failure to show damages. *See* Nordetek's Resp. to RDP's MSJ at 25 ("Both of RDP's counterclaims for breach of fiduciary duty and breach of contract require that RDP prove damages."). Paul's position as an officer at RDP, *see* RDP's MSJ at 7 (citing Ex. 16 to RDP's MSJ (describing Paul's position as Secretary–Treasurer and Director of RDP and offering his resignation))—which counterclaim defendants do not dispute—unquestionably placed him in a fiduciary relationship with RDP.

 **[16]** The evidence RDP cites demonstrates that Paul intentionally failed to act in good faith and solely for the benefit of RDP in all matters for which he was employed. RDP has thus established that Paul (1) had a fiduciary duty to RDP and (2) breached this duty.

In ruling on Nordetek and Paul's motion for summary judgment, we drew the inference in RDP's favor that it suffered an injury as a result of Paul's conduct. In ruling on RDP's motion, however, we must draw all reasonable inferences in counterclaim defendants' favor, and we are

88 Fed. R. Evid. Serv. 545

constrained to note that RDP has not yet pointed to any evidence that it suffered actual injury due to Paul's conduct or incurred costs in the course of its efforts to mitigate such injury. We will thus grant summary judgment in RDP's favor only with respect to the "duty" and "breach" elements of its fiduciary duty claim against Paul, leaving for trial the questions of injury and causation.

[17]    [18]    As for RDP's breach of contract claim against Paul, it points to the existence of a contract to which Paul was a party, RDP's MSJ at 10–11 (citing Ex. 1 to RDP's MSJ) ("Shareholder Agreement"), and notes that "Paul Christy breached that contract by competing against RDP." *Id.* at 11. On our January 8, 2010 Opinion, we explained that "[o]n the record before us, RDP is likely to succeed in showing that RDP and Nordetek (through Paul) are 'striving for [the same] custom'—because that is, in fact, what they are doing." *Nordetek Envtl.,* 677 F.Supp.2d at 842. As counterclaim defendants have presented no evidence that would undermine this conclusion, we now decide that, for the reasons given in our earlier Memorandum, Paul competed against RDP in violation of **\*425** the Shareholder Agreement, which mandated that

> For a period of two years after the date on which a Shareholder's employment terminates for any reason, that Shareholder shall not engage either directly or indirectly in any manner or capacity whatsoever (including principal, agent, partner, officer, director, shareholder, employee, consultant or otherwise) in any business competitive with the business of the Corporation in the United States, Canada or anywhere in the world that the Corporation is currently doing business, does business in the future or where the corporation is pursuing business possibilities.

Shareholder Agreement ¶ 9(b). As we noted in 2010, Paul violated this Agreement not only by seeking customers in competition with RDP, but "by getting the Tekkem license for Nordetek in the first place." *Nordetek Envtl.,* 677 F.Supp.2d at 842. But, for the reasons described above, we cannot conclude at this time that RDP has established that it suffered damages as a result of Paul's breach. We will thus grant summary judgment in RDP's favor on this claim only as to the elements

of "contract" and "breach," leaving the question of damages for trial.

#### IV. *RDP's Motion to Enjoin Arbitration Proceedings*

[19]    Turning to RDP's motion to enjoin arbitration, RDP notes that "[f]ive months after Judge Cahn rejected Paul Christy's request to require RDP to increase its payments, Paul Christy filed a second arbitration against RDP." RDP's Mot. Enjoin at 3. RDP argues that this "second arbitration is an attempt to evade both this Court's order that he waived his right to arbitrate the amount of damage he did to RDP, and Judge Cahn's" refusal to increase the payments RDP is currently making," *id.* (citations omitted), and that "[t]his Court should therefore enter an injunction protecting its judgment that 'plaintiffs waived any right to arbitrate' their claims, *see* Dkt. 110 at ¶ (mm), as well as its jurisdiction over those claims." *Id.* at 5.

RDP predicates its motion on the All Writs Act, which provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). RDP notes that the Supreme Court has " 'recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained.' " RDP's Mot. Enjoin at 4 (quoting *United States v. N.Y. Tel. Co.,* 434 U.S. 159, 172, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977)).

The Order we issued that RDP suggests must now be protected provides, *inter alia,* that "the plaintiffs waived any right to arbitrate." Aug. 9, 2010 Order at ¶¶ mm (docket entry # 110). The arbitration that RDP seeks to enjoin concerns "RDP Technologies' ('RDP') failure to pay Paul Christy, a minority shareholder in RDP who resigned as an employee from RDP on September 18, 2009, the amounts due to him in accordance with the Amended and Restated Shareholder Agreement and the Order entered on July 25, 2011 by the Philadelphia County Court of Common Pleas decreeing the value of RDP to be \$6,490,000 as of September 17, 2009." Ex. 643 to RDP's Mot. Enjoin at 2. RDP suggests that "[i]f the Court does not enter an injunction, and instead permits Paul Christy to prosecute his second arbitration, there is a possibility that the arbitrators will do exactly what this Court (and **\*426** Judge Cahn) have said the arbitrators cannot do, namely adjudicate the amount of damage Paul Christy did to RDP, and therefore the net amount RDP must pay Paul

Christy or that Paul Christy must pay RDP." RDP's Mot. Enjoin at 6–7.

[20]    Reading our August 9, 2010 Order in context, it is plain that we ruled only that Paul and Nordetek had waived any right to arbitrate the claims pending before this Court. No party has asserted before this Court any claim respecting Paul's entitlement to a payout under the Shareholder Agreement. We thus discern no conflict between Paul's second arbitration and our August 9, 2010 Order, especially because the scope of this arbitration appears to exclude any consideration of damages that Paul may owe RDP as a result of RDP's claims before this Court. As a result, we will deny RDP's motion to enjoin Paul's second arbitration pursuant to the All Writs Act. [9]

**V. *RDP's Motion to Sanction Lisa Christy***

[21]    Finally, RDP urges that Lisa Christy, Paul's wife, should "be held in contempt because she failed to truthfully answer the questions put to her during her deposition, and because the answers to questions she actually gave under oath were almost uniformly evasive." RDP's Mot. Sanctions at 2. As the Supreme Court noted in *California Artificial Stone Paving Co. v. Molitor,* 113 U.S. 609, 618, 5 S.Ct. 618, 28 L.Ed. 1106 (1885), "[p]rocess of contempt is a severe remedy, and should not be resorted to where there is fair ground of doubt as to the wrongfulness of the defendant's conduct."

[22]    While we did issue an Order in this matter instructing Lisa to "APPEAR for an additional day of deposition, lasting no longer than seven additional hours, and ... answer truthfully and completely all questions posed within the analysis outlined in this Order," Nov. 28, 2011 Order at ¶ 3 (docket entry # 148), our review of the deposition transcript does not suggest that Lisa countermanded this instruction. We will thus deny RDP's motion for contempt.

**ORDER**

AND NOW, this 16th day of May, 2012, upon consideration of counterclaim plaintiff RDP Technologies, Inc.'s ("RDP's") amended counterclaims (docket entry # 112), RDP's motion for summary judgment (docket entry # 142), RDP's motion to enjoin Paul G. Christy from pursuing arbitration (docket entry # 143), counterclaim defendants Paul G. Christy ("Paul") and Nordetek Environmental, Inc.'s ("Nordetek's") motion to preclude expert opinion testimony by J. Mark Penny

(docket entry **\*427** # 144), Paul and Nordetek's motion for summary judgment (docket entry # 145), RDP's motion for contempt against Lisa Christy (docket entry # 156), and any memoranda, responses, replies, and exhibits filed regarding these submissions, and upon the analysis set forth in the accompanying Memorandum, it is hereby ORDERED that:

1. Paul and Nordetek's motion to preclude expert testimony (docket entry # 144) is GRANTED;

2. The expert report of J. Mark Penny (exhibit 25 to docket entry # 144) is PRECLUDED pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999);

3. Paul and Nordetek's motion for summary judgment (docket entry # 145) is DENIED;

4. RDP's motion for summary judgment (docket entry # 142) is GRANTED IN PART to the extent set forth in the next paragraph;

5. RDP is GRANTED summary judgment on (1) the "contract" and "breach" elements of Count I of its amended counterclaims and (2) the "duty" and "breach" elements of Count IV of its amended counterclaims (docket entry # 112);

6. RDP's motion to enjoin Paul G. Christy from pursuing arbitration (docket entry # 143) is DENIED;

7. RDP's motion for contempt against Lisa Christy (docket entry # 156) is DENIED;

8. By May 29, 2012, RDP's counsel shall SHOW CAUSE why they should not be sanctioned pursuant to Fed.R.Civ.P. 11(c) for misrepresenting the contents of the Honorable Edward N. Cahn's March 29, 2011 Opinion and Award; and

9. By May 29, 2012, RDP shall ADVISE the Court as to the recommended disposition of its remaining counterclaims against Paul and Nordetek—including whether any of these claims are subject to disposition by jury—with leave granted to Paul and Nordetek to respond to this submission by June 11, 2012.

### ORDER

AND NOW, this 16th day of May, 2012, upon consideration of this Court's Memorandum of today and the accompanying Order, in which we direct the parties to brief us on the recommended disposition of counterclaim plaintiff RDP Technologies, Inc.'s remaining counterclaims, it is hereby

ORDERED that pending the Court's consideration of the submissions contemplated in paragraph 9 of our other Order of this date, the Clerk of Court shall TRANSFER this matter from our Active docket to the Civil Suspense docket.

**Parallel Citations**

88 Fed. R. Evid. Serv. 545

Footnotes

1    As this quotation makes clear, RDP now seeks only compensatory damages resulting from Paul's alleged wrongdoing, though it notes that it has also asserted claims against Paul that would entitle it to recoup "punitive damages resulting from the willful, malicious and outrageous nature of Paul Christy's conduct." RDP's MSJ at 3 n.2. But RDP is not shy about the fist in this glove: "In the event that RDP's motion for summary judgment [is] not granted in its entirety, RDP reserves the right to, and intends to, seek the maximum available damages on all of its claims at trial." *Id.*

2    We will accordingly order RDP's counsel to show cause why they should not be sanctioned pursuant to Rule 11(c). To avoid sanction, RDP's counsel must point to specific language from Judge Cahn's March 29, 2011 Opinion and Award in which he "reject[s] all challenges to Wilusz's $1,325,000 valuation" and "credit[s] Wilusz's report" with respect to this valuation. RDP's MSJ at 13 nn. 13, 15.

3    We make this observation not to suggest that such an approach would be appropriate, but only to emphasize that we do not *foreclose* such an application of this methodology.

4    We note that a logical consequence of RDP's approach is that if Paul's actions had robbed RDP of its value only for a split second, after which its value rebounded of its own accord to previous levels, RDP would nonetheless be entitled to its entire value in damages —though it would have incurred no real world loss.

5    In this case, such damages might include the costs of (1) pursuing litigation designed to negate Paul's allegedly wrongful conduct, (2) negotiating a new license with Stephansen after his purported revocation of RDP's prior license as a result of Paul's alleged fiduciary breach, and (3) recovering customers lost as a result of Paul's alleged efforts to harm RDP.

6    RDP argues that "Paul Christy's position is that, if he had literally shot his brother in the back of the head, and through good luck, the efforts of a fine surgeon, and a lot of hard work in rehab his brother survived and even thrived, his brother would not be entitled to recover damages unless he could prove he lost income during the period of his recovery." RDP's MSJ at 16 n. 15. Of course, under these hypothetical circumstances, Dick might well be entitled to recover damages for the costs of mitigation—*e.g.,* medical and rehabilitation bills-as well as damages for emotional distress and pain and suffering. The important point is that Dick would *not* be entitled to recover the value of his future earning stream in the form of compensatory damages under the counterfactual assumption that he had *not* recovered from his injury, when in fact he had.

7    To be sure, this formulation of the expected value oversimplifies matters to some extent since in reality we can envision more than two outcomes to a dispute over a license. Another plausible outcome, for example, might involve two claimants sharing a non-exclusive license. In the interests of clarity, we confine our analysis to the two-outcome case.

8    RDP notes that its other expert, Wilusz, "was very firm in testifying that, in light of Stephansen's purported termination of the Tekkem license, and given that Paul Christy was the main point of contact with Stephansen, after Paul Christy's resignation any potential buyer would assume that the Tekkem license had been cancelled no matter what RDP or Richard Christy might say." RDP's MSJ at 12 n. 10 (citations omitted). This insistence that a would-be buyer would ignore the strength of RDP's legal claim to the license and instead consider only who "was the main point of contact with Stephansen," flies in the face of economic logic. Moreover, given that this assertion is unsupported by any evidence that Wilusz or Penny ever consulted any actual potential buyer for RDP, it comes close to the *"ipse dixit"* that *Joiner,* 522 U.S. at 146, 118 S.Ct. 512, warns courts against crediting. Wilusz and Penny's opinions as to the valuelessness of RDP's disputed license is further belied by the evidence—that Paul and Nordetek introduced and that RDP does not challenge—demonstrating that during the time this license was disputed (between September 18, 2009 and February 12, 2010) RDP booked no less than six projects with a total value exceeding $3.5 million—four of which involved use of Tekkem lime slakers. *See* Nordetek's Mot. Preclude at 28 (citing Exs. 9G, 9I, 9J, 9K, and 9P to Nordetek's Mot. Preclude).

9    In a passing comment, RDP suggests that Paul's second arbitration "violat[es] the 'first filed rule.' " RDP's Mot. Enjoin at 3. As our Court of Appeals explained in *EEOC v. Univ. of Pennsylvania,* 850 F.2d 969, 971 (3d Cir.1988) (internal brackets, ellipsis, and quotation marks omitted), *aff'd,* 493 U.S. 182, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990), "[t]he first-filed rule encourages sound judicial administration and promotes comity among federal courts of equal rank. It gives a court 'the power' to enjoin the subsequent

88 Fed. R. Evid. Serv. 545

prosecution of proceedings involving the same parties and the same issues already before another district court." Given that (1) the issue of Paul's entitlement to a payout under the Shareholder Agreement has never been before this Court, and, in any event, (2) no other federal court has pending before it proceedings involving the same parties and the same issues as in this case, the first-filed rule does not apply here.

More importantly, our holding at this time does not foreclose RDP's right to invoke our equitable powers to prevent any windfall to Paul should the second arbitration produce a valuation before a damages verdict before us becomes final.

---

**End of Document**                                   © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 65

2012 WL 3778872
Only the Westlaw citation is currently available.
United States Bankruptcy Court,
D. Delaware.

In re CHAMPION ENTERPRISES,
INC., et al., Debtors.
The Official Committee of Unsecured Creditors
of Champion Enterprises, Inc., Plaintiffs,
v.
Credit Suisse, Individually and as Agent and Class
Representative for Various Participating Lenders
in the Debtors' Prepetition Lending Facility; Credit
Suisse (USA) LLC; The Lenders Listed in Exhibit
A; Mak Capital Fund LP; and Wells Fargo Bank,
N.A., as collateral agent pursuant to a collateral trust
agreement dated October 31, 2005, Defendants.

Bankruptcy No. 09–14019 (KG).   |   Adversary
No. 10–50514 (KG).   |   Aug. 30, 2012.

### Attorneys and Law Firms

Donna L. Harris, Pinckney, Harris & Weidinger, LLC, Wilmington, DE, Jonathan M. Landers, Jerome M. Congress, Anna C. Dover, Henry J. Kelston, Milberg LLP, New York, NY, for the Official Committee of Unsecured Creditors.

Robert S. Brady, Matthew B. Lunn, Margaret Whiteman Greecher, Rodney Square, Young Conaway Stargatt & Taylor, LLP., Wilmington, DE, Joseph T. Baio, Stephen B. Vogel, Teri Seigal, Wilkie Farr & Gallagher LLP, New York, NY, for CSAG.

Opinion

### OPINION

### Re: Dkt Nos. 436 & 447

KEVIN GROSS, United States Bankruptcy Judge.

### INTRODUCTION [1]

**\*1** The Court is issuing its Opinion following a brief trial with a voluminous record of documents and deposition designations. The adversary proceeding arises from the multi-debtor Chapter 11 bankruptcy cases of Champion Enterprises, Inc., Champion Home Builders Co., Inc., (together, "Champion") and affiliated entities. The plaintiff in the adversary proceedings is the Official Committee of Unsecured Creditors ("Plaintiff" or the "Committee"). [2] The Committee claims that defendant Credit Suisse AG, Cayman Islands Branch ("CSAG") [3] breached provisions of the Credit Agreement between and among Champion, its Lenders and CSAG as Administrative Agent. The alleged breaches consisted of assignments of Champion's senior debt to MAK Capital Fund LP ("MAK"). The Committee further alleges that CSAG also breached its duty of good faith and fair dealing. The Committee seeks damages and the disallowance of any claims by CSAG.

CSAG disputes the Committee's claims, contending it did not breach the Credit Agreement, the Committee is estopped from asserting claims because of the conduct Champion, that Champion released its claims and, in any event the Committee is unable to prove the alleged breaches caused any damage.

### JURISDICTION

The parties are in agreement, and the Court agrees, that the Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

### FINDINGS OF FACT

### CSAG'S BREACH

#### The Lending Group Provides Financing For Champion.

1. In 2005, a syndicated loan for Champion Home Builders Co. was established pursuant to a Credit Agreement, dated as of October 31, 2005, and a group of initial Lenders provided the funds sought by Champion. (Trial Ex. 1001 at 1.) CSAG served as the Administrative Agent under the Credit Agreement. (*Id.*) Champion's obligations to the Lenders were secured by first priority liens on substantially all of Champion's assets pursuant to a Pledge and Security Agreement, and by first priority liens on various real estate assets. (Trial Ex. 3208 at § 2. 1.)

2. On April 7, 2006, the parties executed an Amended and Restated Credit Agreement (as amended, supplemented, or otherwise modified, the "Credit Agreement" or "Agreement."). (Trial Ex. 1001 at 1.) Ultimately, Champion was indebted to the Lenders under the Credit Agreement for an amount exceeding $187 million (the "Champion Loans" or "Loans"). (Statement of Undisputed Facts No. 400.)

3. Section 12.11 of the Credit Agreement governs the sale and transfer of Champion Loans. The Agreement provides that "[e]ach Lender may assign, or sell participations in, its Loans, Letters of Credit and Commitments to one or more other Persons," under specified terms and conditions. (Trial Ex. 1001 at § 12.11.)

4. There were two ways that a registered owner of Champion Loans (a Lender) could dispose of its interests: (1) assign 100% of its interests in the Loans to an Eligible Assignee; or (2) "sell participations ... in all or a portion of such Lender's rights and/or obligations under" the Credit Agreement to a "Participant." (Id. at § 12.11(a), (b), (d).)

**\*2** 5. Assignments of all rights and obligations under the Credit Agreement were permitted to "Eligible Assignees." An Eligible Assignee was, "in the case of an assignment of a Term Loan or Synthetic Deposit, (I) a Lender, (ii) an Affiliate of a Lender, (iii) an Approved Fund or (iv) any other Person approved, unless an Event of Default has occurred and is continuing, by the Borrower (such approval of the Borrower not to be unreasonably withheld or delayed)." (Id. at 12.)

6. The Credit Agreement gave Champion the right to withhold consent to an assignment if it had a reasonable basis for doing so. (Id.; Trial Tr., February 14, 2012 ("Feb. 14 Tr."), 157:25–158:10.)

7. Section 12.11(b) provided Champion ten days after Champion received notice of the assignment or "Eligible Assignee," to reject the assignment after which point Champion's consent was "deemed" given:

> If the consent of the Borrower to an assignment or to an Eligible Assignee is required hereunder ... the Borrower shall be deemed to have given its consent ten days after the date notice thereof has been delivered by the assigning Lender (through the Administrative Agent or ClearPar, LLC) unless such consent is expressly

refused by the Borrower prior to such tenth day.

(Id. at § 12.11(b).)

8. As an alternative to an assignment, a Lender had the unfettered right to sell "participations" in Champion Loans to anyone. (Id. at § 12.11(d) ("Any Lender may, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (a 'Participant') in all or a portion of such Lender's rights and/or obligations under this Agreement.").)

9. In the sale of a participation, unlike an assignment, the selling Lender retained "the sole right to enforce [the] Agreement and to approve any amendment, modification or waiver of any provision of [the] Agreement." (Id.)

10. Participants were permitted to agree with the selling Lender that the Lender would not agree to certain amendments, modifications, or waivers "without the consent of the Participant." (Id.) Thus, although only Lenders could formally vote on any modification or waiver to the Credit Agreement, Participants were able to protect their interests by determining how the Lender would vote.

11. If notice and consent for an attempted assignment of a Lender's full interest to "any other Person" were not properly provided pursuant to § 12.11(b), the result was not a breach of the contract; rather, the assignment became the transfer of a Participation pursuant to § 12.11(d). (Id. at § 12.11(b) ("any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with [§ 12.11(a) and (b) ] shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with clause (d)").)

12. Chief Financial Officer Phyllis Knight ("Knight") was the officer at Champion responsible for managing and overseeing the Credit Agreement. (Feb. 14 Tr., 36:4–37:11.)

**\*3** 13. From the time that the credit facility was established in 2005, CSAG regularly provided notice to Champion about changes in the holders of Champion's senior secured debt via Lenders' lists and variance lists. (Id. at 146:21–147:7, 148:2–148:18.) Champion never complained about the parties' process of notice. (Id. at 147:8–147:9.) Knight testified that "[t]here had never been any disagreement about that process." (Id. at 58:9–59:9.) Champion never objected to

any entity becoming a Lender prior to February 2009. (*Id.* at 155:9–155:11.)

### *The Relevant Provisions of the Credit Agreement*

14. The Credit Agreement provides that any entity that is already a lender under the Credit Agreement (a "Lender") may, with the consent of CSAG, Administrative Agent, "assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement ..." Ex. 1001, § 12.11(a) at CS12389–90.

15. The Credit Agreement defines "Eligible Assignee" to mean:

(a) in the case of an assignment of a Term Loan or Synthetic Deposit, (I) a Lender, (ii) an Affiliate of a Lender, (iii) an Approved Fund or (iv) any other Person approved, unless an Event of Default has occurred and is continuing, by the Borrower (such approval of the Borrower not to be unreasonably withheld or delayed), and

(b) in the case of any assignment of the Revolving Loan Commitment, (I) a Revolving Loan Lender or, (ii) any other Person approved, unless an Event of Default has occurred and is continuing, by the Borrower (such approval of the Borrower not to be unreasonably withheld or delayed);

Ex. 1001 at CS12278.

16. CSAG was the Administrative Agent. CSAG would review the proposed documentation for assignments of interests in Champion bank debt, work with parties on both sides of the proposed transaction, provide its required consent to the assignment, and finalize the transaction. Deposition of Philip Ibsen ("Ibsen Dep.") 8:8–9:3, 11:4–13:4; Ex. 1001 at § 12.11(a), (b) and (c) (CS 12389–91).

17. Section 12.11(b) of the Credit Agreement states in relevant part "if the consent of the Borrower to an assignment or to an Eligible Assignee is required hereunder ... the Borrower shall be deemed to have given its consent ten days after the date notice thereof has been delivered by the assigning Lender (through the Administrative Agent [*i.e.,* Credit Suisse] or ClearPar, LLC) unless such consent is expressly refused by the Borrower prior to such tenth day." Ex. 1001 at CS12391.

18. The standard form of assignment agreement used by Champion and CSAG included a signature line for Champion. *See, e.g.,* Ex. 2239 at CS32399 (footnote to the signature line for Champion states: "Consent of the Borrower is required for assignments unless an Event of Default (as defined in the Credit Agreement) has occurred and is continuing"); Ibsen Dep. 6:21–7:21. If consent was not required, CSAG would typically inform the assignor to place "N/A" on Champion's signature line. Ex.2006 at CS29700–01; Ibsen Dep. 12:6–13:4.

**\*4** 19. If Champion denied consent to the assignment, the assignment would convert to another form of ownership, typically a participation, if the proposed assignee was willing to accept a participation rather than an assignment. Exs. 1001 at CS12391; 2029. A participant would have economic ownership of the secured debt but would not have the voting rights that a Lender would have. Trial Transcript ("Tr.") 2/14, 62:6–63:15.

### *Assignments to MAK*

20. On or about January 26, 2009, CSAG received a proposed assignment of Champion bank debt from Bank of America to MAK (the "January 30 assignment"). Ex.2005; Ibsen Dep. 11:4–8.

21. No event of default had occurred and was continuing at that time (Ibsen Dep. 14:19–23) and the parties are in agreement that MAK was neither a Lender, an affiliate of a Lender, or an "Approved Fund" under the Credit Agreement. Champion's consent was neither sought nor obtained by CSAG at that time. Ibsen Dep. 12:6–13:4; Tr. 2/14 37:22–38:24.

22. Rather, CSAG informed Bank of America that Champion's consent was not required and the assignment was closed effective January 30, 2009. Ex.2005 at CS29700–01; Ex.2006 at CS29700.

23. On February 2, 2009, Knight, received a variance analysis from CSAG that listed MAK as a new holder of a very small percentage (approximately 1.1%) of the Champion senior secured debt. Ex.2007; Trial Tr. 2/14, 37:22–38:15. CSAG did not request Champion's consent at this time and it did not occur to Knight that there might be some right to consent that had not been requested. Tr. 2/14, 38:16–39:9.

24. At the time Knight learned that MAK had become a Lender, MAK had been a significant equity holder of Champion for several years. Tr. 2/14, 39:10–13. Periodically MAK's representatives would contact Champion to obtain information about the Company but, as of February 2009, Knight did not know what MAK's purpose was in buying Champion's senior secured debt. Tr. 2/14, 39:14–24.

25. CSAG processed a number of other assignments of Champion debt to MAK during March and April of 2009 without seeking or obtaining Champion's consent. *See* Amended Proposed Pretrial Order, Statement of Facts which are Admitted and Require No Proof ("SOF") Nos. 32, 35, 39, 42; Tr. 2/14, 39:25–41:9.

26. At the time these assignments were made to MAK, Knight continued to have no knowledge with respect to any plans or strategies that MAK might have with respect to its purchases of Champion debt. Tr. 2/14, 40:24–41:3. There is no evidence that anyone at Champion management began to focus on what MAK's strategy might be with respect to Champion until the end of April or early May, 2009.

27. In its March 20, 2009 letter to shareholders, Champion announced its intention to sell certain of its operating assets to reduce its leverage. *See* Ex.2031 at CS03117.

28. On April 17, 2009, MAK wrote to Champion's CEO, William Griffiths ("Griffiths"), expressing concern about the asset sales strategy Champion had announced. Ex.2011; Tr. 2/14, 41:23–43:2. However, there is no evidence that Champion understood from this letter that MAK had the intent or the ability to actively challenge Champion's business plan. Griffiths testified that on receiving the letter he was not concerned because historically MAK was not a company that had made anything difficult for Champion. Deposition of William Griffiths ("Griffiths Dep.") 13:21–17:4.

 *5  29. On April 27, 2009, Champion received an updated Lender list from CSAG showing that MAK's ownership interest in Champion's senior secured debt had increased dramatically from the $2.4 million it owned in early February to approximately $17.9 million. This represented approximately 9.9 percent of all the senior secured debt holdings. Ex. 1010; Tr. 2/14, 43:5–21.

30. Upon receiving that information about MAK's increased holdings, Knight became concerned as to what MAK's strategy might be with respect to Champion. Knight testified

to a "growing concern" that MAK's dissatisfaction with Champion's asset sale strategy and the increase in MAK's holding of Champion's bank debt could eventually result in MAK's blocking Champion's planned asset sale Tr. 2/14, 44:1–9; Ex. 3025.

31. On May 8, 2009, MAK's counsel sent Champion a letter containing a more aggressive tone. On behalf of MAK, the letter stated that Champion required "immediate and comprehensive restructuring" and that "it is critical that a restructuring of the company not be premised on distressed sales of significant assets." Champion management then understood that MAK was pressing aggressively for a restructuring and opposing Champion's asset sale strategy. Ex.2015; Tr. 2/14, 45:13–46:25.

32. Shortly thereafter, Champion management began focusing on the fact that CSAG had never sought Champion's consent with respect to the MAK assignments. On May 11, 2009, Knight asked Tobias Jordan ("Jordan"), CSAG's relationship manager for the Champion credit facility, to:

> [P]lease tell me when MAK has picked up the pieces they hold ... and why the company wasn't asked to sign the required borrower consent with respect to these trades.

Ex.2017 at CS03369. Knight had realized that consent had been required with respect to the MAK assignments. Tr. 2/14, 47:7–48:8.

33. In response to Knight's May 11, 2009 email, Phillip Ibsen ("Ibsen"), the CSAG operations analyst who oversaw, approved, and finalized the MAK assignments (Ibsen Dep. at 8:8–9:3, 11:4–13:4), was asked by his superiors to review the definition of "Eligible Assignee" in the Credit Agreement and to determine whether "this assignment sale was approved by the borrower or if the assignee qualified under one of the other sections of the 'Eligible Assignee' definition." Ex.2017 at CS03368–69; Ibsen Dep. 16:10–18:19.

34. After reviewing the definition of "Eligible Assignee" and, among other things, determining that MAK was not an affiliate of an existing Lender, Ibsen concluded that Champion's consent had been required for the MAK assignments. Ibsen Dep. 18:20–23:20. As a result, on May 12, 2009, Ibsen forwarded the January 30, 2009 Assignment Agreement between Bank of America and MAK

to Champion's Treasurer, Kevin Goethals, together with an email in which he stated:

> This particular assignment would have been required to gain consent before closing but as previously mentioned there was an oversight on the wording per the [Credit Agreement].

**\*6** Ex.2023; Ibsen Dep. 24:3–25:18.

35. Knight responded the very same day (May 12, 2009) in an email that expressly refused to consent. Although the email did not contain the words "refuse to consent" Knight asserted in the email that it was unreasonable for CSAG to ask Champion in May to approve an assignment dated January 30, expressed concern as to whether the assignor was actually a Lender, and questioned whether the amount of Champion senior secured debt claimed by MAK or reported by CSAG could be correct because there was no prior request for consent. Both Knight and Ibsen testified that, at a minimum, Knight had refused to consent based on the information made available to her at that time. Tr. 2/14, 48:12–50:15; Ibsen Dep. at 26:4–28:15.

36. In subsequent correspondence with CSAG, Knight stated that she had expressly refused consent on May 12, 2009 and continued to refuse consent thereafter. For example, she stated that "immediately (and unequivocally) upon notice, I informed Mr. Jordan that we were not prepared to consent to the assignment." Ex.2022 at CHAMPION0000904; Tr. 2/14, 55:11–57:9, 57:19–58:8. *See also, e .g.,* Ex.2031 at CS03117 and Tr. 2/14, 50:16–52:4, in which Knight again repeated her statement that she had promptly refused consent.

37. Champion refused consent within 10 days of receiving notice from CSAG of its right to consent to the MAK assignments that occurred during the first two quarters of 2009.

38. Ibsen reported Knight's response to others at CSAG, including Jordan, in emails that again repeated Ibsen's understanding that both the original and the subsequent assignments to MAK required consent from Champion. Ex.2023 at CS03317–18; Ibsen Dep. at 29:23–30:6. Given Champion's refusal to consent, beginning May 14, 2009, additional assignments to MAK that CSAG received were put "on hold." Ex.2023 at CS03316.

39. On May 27, 2009, Knight sent an email to Jordan and William O'Daly of CSAG with reasons why Champion had refused and was continuing to refuse to consent to the MAK assignments. Ex.2031. In addition to referencing CSAG's May 12th request for Champion's consent to the initial MAK assignments and Champion's subsequent refusal, in this communication Knight placed CSAG on notice that MAK had begun aggressively opposing Champion's strategy of selling certain of its operating assets in order to reduce its leverage. In addition, Knight informed CSAG that Champion was opposed to the in-court restructuring that MAK was recommending, and that Champion's management was concerned that if MAK held a substantial portion of Champion debt, it might be able to block the more than 50% vote that Champion would need from the Lenders in order to carry out its strategy for reducing its leverage. Tr. 2/14, 52:5–55:10.

40. Subsequently, Jordan, the most senior member of the CSAG team dealing with Champion, orally confirmed to Knight CSAG's agreement that Champion's consent was required for the January 30 assignment from Bank of America to MAK. Ex.2032; Tr. 2/14, 60:16–61:8, 61:21–62:3.

**\*7** 41. Despite CSAG's acknowledgments between May 11 and early June 2009 that the MAK assignments had required consent, in the latter half of May 2009, CSAG's loan funding department continued to assign interests in Champion bank debt to MAK. Ibsen Dep. at 32:12–33:17; Ex.2024 at CS03220.

42. Subsequent to Champion's express refusal to consent, CSAG periodically disseminated interest and principal payments on Champion secured debt to MAK (*see, e.g.,* Ex.2045; Ibsen Dep. at 65:12–67:15), even though MAK was refusing to accept the status of participant. Ex.2029.

43. By early June 2009, MAK held at least $20.4 million of the senior secured debt, making it the largest single holder of Champion bank debt. Ex.2069.

44. No evidence was presented that Champion was in default with respect to any of its obligations under the Credit Agreement when the MAK assignments occurred during the first two quarters of 2009.

*CSAG's Reversal*

45. On June 19, 2009 CSAG changed its position on the consent issue. On that date Ibsen sent an email to Champion's Treasurer, drafted by CSAG's counsel, stating that Borrower consent was not required because Champion had not expressly refused consent during the ten days following May 12, 2009. Ex.2022; Tr. 2/14, 55:11–56:6; Ibsen Dep. 50:14–52:4. That communication stated in relevant part:

> On May 12, 2009 Credit Suisse requested that Champion consent to the assignment. As we received no express refusal from Champion regarding the assignment during the ten-day notice period prescribed under Section 12.11(b) of the credit agreement, it is our position that the assignment is effective. Ex.2036;

46. For the reasons stated herein, the Court finds that CSAG's position that Champion did not expressly refuse consent within ten days of May 12, 2009 is erroneous.

47. On June 23, 2009, Knight responded to Ibsen's June 19, 2009 email. Ex.2022 at CHAMPION0000904–05; Ex.2039 at CS10822–23; Tr. 2/14, 55:17–57:9, 57:19–58:8. In that letter Knight disagreed with Ibsen's statement that Champion had not refused consent within ten days of CSAG's May 12 notice of the need for Borrower consent. Knight further stated that, "[i]f, however, CSAG is actually contending that the assignment is effective, please note our stance that CSAG is in breach of the party's agreement, and we will reserve our rights against CSAG." *Id.* at CS10823.

48. On June 25, 2009, Ibsen responded to Knight's June 23, 2009 letter in a communication drafted by CSAG's counsel. Ibsen Dep. at 60:13–61:18; Ex.2043. In that letter, CSAG again based its position that Borrower consent was not required solely on the alleged ground that Champion had not expressly refused consent within ten days of "Credit Suisse's May 12, 2009 notice." Ex.2043 at CS10816.

49. During the latter part of June and throughout most of July 2009, CSAG and Champion continued to discuss their ongoing dispute over the consent issue. During that timeframe, the written communications sent by CSAG and its lawyers to Champion and its lawyers continued to rely on the position that Champion had not expressly refused consent on a timely basis. *See, e.g.,* Ex.2096.

*8 50. In July 2009, CSAG also began to claim that Champion was now in default with respect to certain covenants set forth in the Credit Agreement and that, as a result, CSAG was entitled to finalize the disputed MAK assignments.

51. On or about July 20, 2009, in response to a request from Knight for "the required documentation through which a consent for this transfer [to MAK] would be effective," counsel for CSAG stated:

> ... CS does not believe Borrower consent is required and does not plan on seeking it. Rather, simply as an accommodation to Champion ... CS is willing to delay closing on the assignment until Wednesday, barring some (currently) unforeseen event that would require CS to close the assignment earlier than that."

Ex.2096 at CS24999–25000; *see also* Exs.2097 (CSAG announced intention of finalizing MAK assignment without Champion's consent); 2117 (confirming that CSAG closed the MAK assignment without Champion's consent).

52. CSAG's decision to finalize the MAK assignments regardless of Champion's consent occurred as MAK threatened to bring legal action against CSAG if it did not finalize those assignments. On July 22, 2009 Michael A. Kaufman, the Managing Member of MAK, sent CSAG a letter setting forth MAK's position that CSAG's "failure ... to properly prepare the prior Assignment and Acceptances and any New Assignment Agreements has greatly diminished MAK Capital's ability to participate in certain decisions as a Lender and to otherwise influence the Borrower and has resulted in harm to MAK Capital's total investment in Champion beyond our inability to close these Loan transactions. CSAG must remedy this situation...." Ex. 2104 at MAK0000000712–13.

53. Within a day of CSAG's receipt of MAK's letter, CSAG agreed to close the outstanding assignments to MAK. Ex. 2105.

54. On learning that the disputed assignments had been closed, Knight emailed Champion's CEO and its counsel that "it is important that we confirm with Credit Suisse that despite Champion's not consenting to an assignment to MAK, CS has nonetheless effected the assignment, and they are now a

lender rather than a participant." Ex. 2117; Tr. 2/14, 80:19–23; 82:6–17.

### Champion's Default

55. CSAG contends that at the end of the second quarter of fiscal 2009, Champion was in default under certain of the covenants in the Credit Agreement and that as a result, an Event of Default had occurred and was continuing, and that under Section 12.11(b) of the Credit Agreement consent was no longer required as a prerequisite to closing the disputed assignments.

56. CSAG also argues, alternatively, that regardless of whether an Event of Default validated what had previously been assignments that were defective for lack of consent, plaintiff is estopped from contesting that position because Champion and its lawyers ultimately agreed that CSAG was correct and affirmatively consented to CSAG's closing the disputed assignments in late July 2009.

 **\*9** 57. There is no provision in the Credit Agreement that validates a defective assignment retroactively if an Event of Default occurs and is continuing at a date subsequent to execution of the assignment agreement.

58. The Credit Agreement provides that borrower consent is necessary "unless an event of default has occurred and is continuing." Thus, the event of default must already have occurred at the time the parties execute the assignment agreement. Ex. 1001 at CS12278.

59. Consistent with that contractual language, the standard form of assignment utilized by Champion/CSAG had a signature line for the borrower's consent, indicating that the effect of any Event of Default on the need for borrower consent was to be resolved at the time the assignment was fully executed. *See, e.g.,* Ex. 2239 at CS32399.

60. The evidence is insufficient to support a finding that an Event of Default had occurred and was continuing at the time that CSAG finalized the disputed assignments on or about July 23, 2009. The Lender Presentation that Champion disseminated in final form on July 28, 2009 did not state that Champion was already in default, but only that "Champion is not expected to be in compliance with either the minimum LTM EBITDA or minimum total liquidity covenant for the second quarter of 2009." Ex. 1028 at CHAMPION0027277.

Knight testified that Champion was not yet prepared to acknowledge that it was in default and that "you could make a case that ... it isn't final until the numbers are published." Tr. 2/14, 87:4–88:25; 189:15–190:19.

61. Both Knight and Griffiths testified that once Champion's second quarter ended, consent became a moot point because of the default issue. Tr. 2/14, 168:4–6; Griffiths Dep. 26:14–28:20. Such testimony conflicts with the contemporaneous conduct of Knight and Griffiths. When, after the disputed assignments were closed, CSAG demanded that Champion agree to sign a release that would relieve CSAG of any liability with respect to the MAK assignments, Knight expressed strong opposition to such a release. Ex. 2166; Tr. 137:13–139:20. Similarly, on August 3, 2009, Griffiths informed the Champion board that in order to obtain short-term covenant relief from the Lenders, "we will also be strong armed into signing a release with respect to the way CS let MAK into the lender group." Ex. 2154. It is clear that Knight and Griffiths continued to believe that Champion had a legitimate claim against CSAG concerning the MAK assignments even if Champion was in default under the Credit Agreement.

62. Knight's testimony was in stark conflict with her actions and statements at the time in issue. The Court finds that Knight's trial testimony supporting CSAG was not credible.

63. The evidence does not support a finding that Champion's lawyers told CSAG it could properly finalize the disputed assignments in July of 2009. Instead, when lawyers for CSAG opined that it was the custom within the lending industry that upon a borrower's default a participant immediately becomes a lender, Ronald Rose, a partner in the Dykema firm representing Champion ("Rose"), stated "this 'custom' is not contained in the Credit Agreement and seems to me to contradict it." Ex.2056.

 **\*10** 64. On July 20, 2009 Roger Scholten, Champion's general counsel ("Scholten"), stated his understanding that CSAG was about to take unilateral action to close the disputed assignments regardless of Champion's position on the issue. Scholten recommended to Rose that in discussions with CSAG's lawyers concerning the consent issue he should take the position that "it appears increasingly to be moot point in that CS has announced its intent to proceed without Champion's consent." Ex.2097.

65. CSAG did not rely on any consent from Champion in proceeding to finalize the disputed assignments in July 2009, because CSAG clearly announced its intention to finalize those assignments regardless of whether or not Champion consented.

66. On July 21, 2009 Rose informed CSAG's lawyers in an email that "we didn't disagree that the Loan Agreement, upon a default, allowed a conversion of participations to direct lender." Ex. 3063 at CHAMPION0032881. However, as Scholten testified, "there was still—in my mind, still a very good question regarding timing," so Champion and its lawyers recognized that it was an open question whether Champion would be in default until after the quarterly statements were required to be filed in mid-August. Deposition of Roger Scholten ("Scholten Dep."), 22:9–15, 18–24; 24:2–19; Tr. 2/14 87:4–88:25

67. CSAG also relies on a July 8, 2009 memorandum relaying comments by Gerald Lievois, another lawyer with the Dykema firm representing Champion. Mr. Lievois opined that the reference to an Event of Default in the Credit Agreement provision concerning borrower consent "clearly supports CS's position that once Champion is in default it could implement an assignment to MAK without Champion's approval." Ex. 3040. However, Mr. Lievois went on to state, as reported by Scholten, that he "agreed that the record regarding purported assignment is sufficiently clouded to continue to contest the assignment." *Id.* There is no evidence that MAK entered into any new assignment agreements. Rather, the record suggests that CSAG simply proceeded to finalize agreements that had been executed prior to any default, at a time when Champion's consent was required.

68. The evidence fails to support CSAG's contention that Champion affirmatively and voluntarily consented to CSAG's finalizing the disputed assignments during July 2009, or that Champion clearly expressed any agreement with CSAG that, given the facts as they existed in late July, the Credit Agreement permitted CSAG to immediately finalize those assignments.

69. Furthermore, CSAG did not rely on any agreement with Champion concerning the default issue in deciding to finalize the disputed assignments. To the contrary, as the Court has found, CSAG's counsel stated that CSAG was going to finalize those assignments with or without Champion's consent.

### *CSAG's Defenses of Waiver and Estoppel*

70. Prior to the initial MAK assignment, there were 197 assignments of Champion senior secured debt. (Stipulated Fact No. 19). CSAG never notified Champion that it had the right to consent with respect to any of those assignments (Stipulated Fact No. 20), and Champion never raised any issue concerning the right to consent with respect to any of those assignments. Tr. 2/14, 38:25–39:3.

**\*11** 71. There is no evidence that, after learning that those prior assignments had occurred, Champion management ever focused on whether there had been a right of consent with respect to any of those assignments. Therefore, there is no evidence that Champion ever formed an intent to waive the borrower consent provision with respect to any of those assignments.

72. The record does not establish whether, or to what extent, any of those prior assignments were made to entities as to which Champion had a right of consent.

73. At least 117 of the pre-MAK assignments were to affiliates of CSAG. Therefore, under the terms of the Credit Agreement, those assignments were made to eligible assignees and Champion would not have been entitled to exercise a right of consent.

74. No evidence was presented to show that the parties ever entered into any written or oral agreement to modify the Credit Agreement by eliminating the borrower consent provisions at issue in this case.

75. Prior to the MAK assignments, Champion and CSAG had engaged in a course of conduct through which, periodically, CSAG would send Champion an updated list of those entities holding Champion bank debt. It was through that process that CSAG would bring to Champion's attention any new holders of that debt. Tr. 2/14, 146:21–147:7.

76. Such conduct did not apprise Champion whether a new holder was or was not an eligible assignee. The process did not apprise Champion whether any assignment was subject to borrower consent.

77. Both under the Credit Agreement and in connection with the actual conduct of the parties, CSAG, not Champion, was the entity that was actively involved in reviewing the

documentation on proposed assignments and was the entity which, under the Credit Agreement, was to provide notice to Champion if the borrower consent provision was applicable to a proposed assignment.

78. Given CSAG's failure to alert Champion to its right to consent in connection with any of the prior assignments, and given the lack of any evidence that the parties ever actually communicated to each other that the borrower consent provision was being waived, CSAG lacked any reasonable basis to rely on the prior course of conduct as indicating any intent by Champion to waive its rights under the borrower consent provision in the Credit Agreement.

79. There was no evidence that at any time before the commencement of this litigation, CSAG took the position that Champion's rights under the borrower consent provision in the Credit Agreement had been waived by the prior course of conduct of the parties or that Champion was estopped from invoking its right to consent when CSAG belatedly requested consent on May 12, 2009.

80. Knight testified that she had no objection to MAK becoming a new holder of Champion bank debt at the time that CSAG processed assignments to MAK during January, March, and April, 2009. Tr. 2/14 153:22–154:7; 157:9–21. She also testified that during that timeframe she had no knowledge as to what purpose or strategy MAK may have had with respect to its investments in Champion secured debt. Tr. 2/14 39:21–14; 40:24–41:3. Prior to May 2009, CSAG never alerted Champion to its entitlement to consent to any of the MAK trades, and Knight testified that she gave no thought to whether there might be a right of consent at the time she learned MAK was a new holder. Tr. 2/14, 37:22–39:9; 39:25–41:9; 43:5–25.

 **\*12**  81. Champion never objected to any entity becoming a Lender prior to February 2009. (*Id.* at 155:9–155:11.)

82. On or about July 9, 2009, Knight began speaking with various Lenders to let them know that management was preparing the proposed amendment. Tr. 2/14, 94:15–95:18. Beginning on or about July 16, 2009, Knight provided the then current version of the written Lender Presentation to those Lenders holding particularly substantial amounts of the bank debt, and spoke with all of the significant lenders and reviewed with them the details of the proposal the Company was planning to make to the Lending Group. Tr. 2/14, 94:15–95:17. According to Knight, the lenders she talked to were initially "cordial and listening" and she was "not unhappy ... with the reaction that was coming through" regarding the Company's proposal for an 18–month amendment. Tr. 2/14, 98:8–98:14.

83. Jay Jacquin ("Jacquin") of Morgan Joseph, who participated in most of the calls that Champion had with its lenders in July 2009 regarding the Company's plan to propose an 18–month amendment, Jacquin Dep. 57:4–58:7, testified that the Lenders were "in listening mode" during the initial calls. The only negative reaction he recalled was from Daniel Wallitt ("Wallitt") of GE Capital, who expressed his belief that the Company "needed to do something to bring down the balance of the senior debt." Jacquin Dep. 57:4–58:24.

84. A number of the significant Lenders were initially supportive of the proposed amendment. These included Credit Suisse Asset Management jr. 2/14, 248:12–15), Fifth Third Bank jr. 2/14, 239:9–240:12), and CSAG itself (Deposition of David Smith ("Smith Dep.") at 36:16–23, Tr. 2/14 248:16–21.)

85. Wallitt of GE Capital, one of Champion's significant lenders, testified that although he opposed Champion's proposed amendment, "[i]t was still conceivable that the agent could find a way to cobble together a coalition of fifty-one percent yes votes." Tr. 2/14 235:24–236:7.

86. By early July 2009, MAK had become the largest holder of Champion bank debt, jr. 2/14, 79:14–79:16), and the Company viewed MAK as a threat to the Company and to the best interests of the secured creditors. Tr. 2/14, 97:20–98:7.

87. At the same time that the Lenders were being informed of Champion's proposed amendment, they were also learning that MAK had become a large holder of Champion debt and was proposing a restructuring that would be an alternative to the 18 month amendment. Knight was discussing this "MAK issue" with lenders as early as July 9, 2009. Tr. 2/14, 97:15–98:7.

88. GE Capital, one of Champion's largest lenders, learned of a potential MAK proposal on or before July 17, 2009 jr. 2/14, 229:12–230:14) *i.e.,* the day after he received a draft of the Lender Presentation. Ex.2081.

89. Thus, at the same time that Champion's lenders were considering the Company's proposal for an amendment to the Credit Agreement, they also learned that MAK who owned

approximately 50% of Champion's convertible debt and $20 million of Champion's senior secured debt, suggested that the Company undergo a restructuring which, according to the hedge fund, "could generate up to thirty million dollars of cash to reduce senior secured indebtedness." Tr. 2/14, 106:10–108:8; Ex.2050 at Champion0019962; Jacquin Dep. 54:5–56:14.

**\*13** 90. MAK's willingness to make a restructuring proposal for Champion was contingent on its becoming a Lender rather than remaining a participant. Ex.2029, Smith Tr. 92:8–93:24.

91. On May 22, 2009 CSAG informed MAK that Champion might not consent to the assignments and that "in the event that we not get consent, we will have to close via a participation." David Smith of MAK replied, "We are not interested in closing it on participation basis," a position that Smith confirmed at his deposition. Ex.2029; Smith Dep. 2/14, 92:8–93:24.

92. The importance MAK placed on being a Lender rather than a participant is evident from MAK's threat to sue CSAG unless it closed the disputed assignments. Ex. 2104 (CSAG's failure to properly process the assignments "has greatly diminished MAK Capital's ability to participate in certain decisions as a Lender and to otherwise influence the Borrower and has resulted in harm to MAK Capital's total investment in Champion beyond our inability to close these Loan transactions.").

93. There is no evidence that MAK mentioned its restructuring proposal to any of the Lenders until after CSAG finalized the disputed assignments. CSAG took that step and declared MAK to be a member of the Lending Group on or about July 23, 2009. Ex. 2105. As soon as that happened, MAK began contacting the Lenders about its proposal. For example, it was on that same day, July 23, 2009, that MAK first informed GE Capital of its desire to inject capital into Champion "to pay the banks down." Ex.2018, Tr. 2/14, 231:9–232:3. By July 24, 2009, MAK had contacted several of Champion's lenders directly. Tr. 2/14, 104:2–106:5.

94. Wallitt of GE Capital undertook to generate and organize opposition to the proposed 18 month amendment. Exs.2018, 2019; Tr. 2/14, 237:25–240:17. Wallitt emphasized that the MAK proposal was a "reason to slow the [amendment] process down" when it actively lobbied other significant lenders, including National City Bank and Comerica, to reject Champion's proposed amendment. Exs.2018, 2019; Tr.

2/14, 231:22–232:25. On July 23, 2009, Wallitt's colleague at GE Capital, Brent Chase, wrote in an email to Highland Capital, another significant Lender, that the possibility of MAK infusing capital into Champion was "another potential option to consider before we continue down an LT [long-term] amendment path." Ex.2019; Tr. 2/14, 233:3–14.

95. In communications with other Lenders, Wallitt also stressed the potential of a deal with MAK as a reason to vote against Champion's amendment request. Tr. 2/14, 248:22–249:8.

96. On July 31, 2009, Wallitt wrote to Francine Fulton and Lucas Barnett at Fifth Third Bank, emphasizing the possibility of a deal with MAK as his principal argument in his effort to persuade them to change their position and vote against the 18–month amendment. Ex. 2151.

97. Certain of Wallitt's emails confirm that MAK's status as a large holder of Champion debt, and not merely MAK's restructuring proposal, was impacting the Lender's consideration of Champion's proposed amendment.

**\*14** 98. In one email, Wallitt noted that "MAK was saying they were over the voting hurdle with CS" and testified to his belief that MAK's vote against the amendment would strengthen the chances that the proposed amendment would be rejected. Ex. 2112; Tr. 2/14 233:22–234:15.

99. Similarly, in Exhibit 2126, Wallitt responded to Morgan Joseph's statement that it was unaware the largest holders were voting "no" by saying, "Come on, you think MAK is voting yes? This process needs a reset."

100. Wallitt also testified that a further reason why he opposed any amendment that was not short-term was a concern that a longer term amendment would give MAK time to build a "blocking position" in the debt. Tr. 2/14, 44:10–45:12.

101. Jacquin testified that Wallitt told him that Wallitt would vote against the 18–month amendment because he "definitely preferred that Champion go look at a transaction that would result in a paydown of the senior debt." Jacquin Dep. 167:25–168:24.

102. On July 30, 2009, MAK circulated to Champion and to many of the significant Lenders a term sheet for a proposed restructuring that involved a cash infusion by MAK of $50

million into Champion. MAK's emails to significant Lenders attaching that term sheet represented that "our goal obviously is to make the banks whole"—an economic outcome that would be very favorable to the banks. In the same emails, MAK took the position that the banks should grant only a "4–8 week forbearance during which we get this taken care of," a position that clearly rejected Champion's proposed amendment. Exs. 2135, 2136, 2137. On July 31, 2009, referring to MAK's interest in investing $50 million in Champion, David Smith wrote: "We are not interested in entering into such discussions or making such an offer in conjunction with a six month extension." Ex. 2150.

103. During the last week of July 2009, Champion management became concerned that the Lending Group would not agree to the proposed 18–month amendment, (Tr. 2/14, 108:24–109:2), and began to discuss with lenders the alternative possibilities of a twelve-month or six-month amendment. Tr. 2/14, 110:10–111:11; Ex. 2133; Jacquin Dep. 81:20–82:11, Ex. 2168.

104. On August 5, 2009, the Champion Board of Directors was told: "Champion and Morgan Joseph believe a dialogue with the senior lenders for medium-term relief is the best path for all stakeholders at present and provide the senior lenders with the optimal path to a par recovery in cash." Jacquin Dep. 101:18–102:12, Ex. 2178 at 2188.

105. Wallitt testified that if no deal was made with MAK, he was open to the idea of a long-term amendment as an alternative. Tr. 2/14, 240:18–241:3. However, with MAK's proposal on the table, Wallitt opposed even a six-month amendment. On July 31, 2009, Wallitt wrote to several of members of the Lending Group, telling them that GE Capital "believe[d] strongly that [a six month amendment] is a mistake" because it would "undoubtedly kill" the possibility of a deal with MAK. Ex. 2158; Tr. 2/14, 241:4–22.

 *15  106. Wallitt testified that determining whether the MAK deal was real or illusory was one of the three main reasons GE Capital objected to the 18–month amendment. Tr. 2/14, 247:11–248:4.

107. Fraser Sullivan, another lender, also believed that it would be better to push Champion to make a deal with MAK than to give the Company a long-term amendment. Ex. 2158; Tr. 2/14, 242:6–22.

108. Champion management understood that the Lenders would not support the Company's proposal for an amendment if it would chill negotiations with MAK. A group of significant Lenders specifically told that to Knight. Tr. 2/14, 114:2–115:3.

109. Knight recognized in contemporaneous documentation that the potential availability of a transaction with MAK was adversely impacting the Lenders' willingness to support Champion's proposed amendment.

110. For example, Knight testified that, prior to July 24, 2009, Ramin Kamali of Credit Suisse Alternative Capital Markets, one of Champion's largest lenders, had been "receptive" to the Company's proposal for an 18–month amendment, but that, in a conversation on July 24, she observed that Kamali "was sounding a bit different about it." Tr. 2/14, 105:17–105:21. Following that conversation, Knight wrote in an e-mail: "As I think about Ramin's change of heart today it's almost certain that MAK has gotten to them with the promise of new capital." Tr. 2/14, 105:6–106:5; Ex. 2111. Explaining this e-mail, Knight testified: "It's not news we were concerned that if MAK was having conversations with people and talking about the potential for them to raise capital and provide some amount of paydown to the senior lenders that there might be a preference to go down that path rather than the path that the company was advocating." Tr. 2/14, 105:25–106:5.

111. The following day, again referring to Kamali, Knight wrote to Jordan at CSAG: "After further thought I strongly suspect his change of position has more to do with a discussion with MAK than with the upside potential. It seems they made the rounds and convinced lenders there is new capital that can come in. This is our fear and why we had hoped to keep them on the sidelines. If we'd had our way I think the amendment would have gotten done, but as of now it seems quite unlikely." Tr. 2/14, 115:4–116:7; Ex. 2119; Tr. 2/14, 234:23–25.

112. As Morgan Joseph summarized these events in a subsequent presentation to the Champion Board of Directors, "many of the senior lenders became very interested in the prospect of a cash paydown from MAK," Jacquin Dep. 66:16–67:24; Ex. 2152 at 4, and "[t]he allure of a principal reduction resulted in the senior lenders voting against the 18–month amendment." Jacquin Dep. 67:25–68:21; Ex. 2152 at 4.

113. According to Jacquin, who was extensively involved in discussions with the Lenders on Champion's behalf, Jacquin Tr. 56:6–58:24, 181:9–182: 11, the existence of a potential deal with MAK, including the possible reduction of loan principal, resulted in the senior lenders rejecting Champion's proposed 18–month amendment. Jacquin Dep. 70:5–71:2. While concerns about Champion's liquidity and the Company's declining financial performance also contributed to the Lenders' decision to reject Champion's request for an 18–month amendment, the potential for a cash paydown from MAK "had a significant impact" on that decision, (Jacquin Dep. 183:18–184:19), and had a similar impact on the Lenders' decision to reject the Company's proposal for a 6–month amendment. Jaquin Dep. 85:6–21, 71:21–2

 **\*16**  114. On August 19, 2009, James Decker ("Decker") of Morgan Joseph told the Champion Board that "the senior lenders had agreed to a 30–day waiver for the Company to pursue a transaction with MAK." Ex. 2202. Similarly, on August 7, 2009 Decker stated in an email that the lenders had rejected the amendment "in order to have us pursue MAK." Ex. 2183.

115. Knight testified at trial that the desire of the Lenders not to chill the discussions with MAK was not the only reason they rejected the Company's proposed 18 month amendment but "that was one of their reasons and it was probably an important reason." Tr. 2/14, 193:3–24.

116. The impact that MAK's presence in the Lending Group had on the amendment process was foreseeable and was, in fact, foreseen by Champion management which expressly informed CSAG of its concerns.

117. On May 27, 2009, Knight sent an email to CSAG explaining the rationale for Champion's refusal to consent to the MAK assignments. The email stated, in relevant part:

> Further, we wanted to make you aware of certain recent correspondence with respect to MAK Capital's stated ownership positions in both Champion's Senior Secured Facility and Convertible Notes and its desire that the company complete an in-court restructuring rather than pursue a strategy to repay its Senior Secured

Debt with cash generated from asset sales.

Ex.2031 at CS03118.

118. Knight's May 27, 2009 email referenced a letter from MAK to Champion in April 2009, "stating that, among other things, they felt that management's plan to sell assets was 'perilous' to the interest of stakeholders." *Id.* Knight then referenced a subsequent conference call in which "MAK indicated a strong preference for an in-court restructuring, and that they had interest in providing the company with debtor-in-possession financing." *Id.* While encouraging MAK to provide a written offer concerning such financing, Champion had informed MAK that "the company had no current intention to enter into discussions about any form of bankruptcy protection." *Id.* Indeed, during mid–2009 Champion's management repeatedly stated their position that an in-court restructuring (which would necessarily involve a bankruptcy) would be "value (and cash) destructive" to the Company. Tr. 94:8–14; Ex.2049 at CS01058 and 01070.

119. Knight further informed CSAG that MAK's counsel had sent a letter to Champion on May 8, 2009, which Knight characterized as using "an increasingly aggressive tone," That letter reported that MAK had increased its holdings of Champion bank debt to approximately $29.4 million and stated:

> MAK Capital believes that the Companies require immediate and comprehensive restructuring to avert further deterioration of the Companies' on-going businesses and the erosion and forfeiture of value ....it is critical that a restructuring of the Companies not be premised on distressed sales of significant assets.

Ex.2014 at CS10925. The position MAK took in this letter —i.e., that a restructuring was critical and that a policy of asset sales was inappropriate—was in direct opposition to the strategy that Champion was seeking to employ at the time, because Champion was seeking to sell assets and avoid an in-court restructuring. Griffiths Dep. 19; Knight at Tr. 2/14, 42:24–43:2.

 **\*17**  120. Furthermore, to implement that strategy, Champion would need an affirmative vote from Lenders representing more than 50% of total Lender interests in the

credit facility. Ex.2031 at CS03118. If MAK entered the Lending Group, it would be one of the largest holders of Champion bank debt, and could potentially use its voting power to block Champion from obtaining the required affirmative vote and, at minimum, was likely to have an influential voice among the other significant Lenders. Thus, Knight wrote:

> We will require a period of time to consider any request for borrower consent to a MAK Capital assignment. We have asked our counsel to review the company's interactions with MAK Capital to help us determine if the position that MAK has taken (i.e. that the company immediately commence an in-court restructuring rather than continue to pursue a plan for divestitures and debt retirement) constitutes a reasonable basis to withhold consent. This determination will include consideration of the fact that the company expects to require a further amendment to the credit agreement in the coming months, and that it requires the consent of a majority of its lenders in order to complete its targeted asset sales and repay its senior secured indebtedness. Until these issues are resolved, we will continue to withhold consent.

Ex.2031 at CS0118.

121. Based on the foregoing, the Court finds that:

a) The Lenders were informed of a potential transaction with MAK throughout the time they were evaluating the Company's proposals for amendments to the Credit Agreement;

b) The possibility of a transaction with MAK was a substantial factor in the decision of the Lending Group to reject the Company's requests for 18–month, 12–month and 6–month amendments and agree to only a 30–day amendment; and

C) However, Plaintiff did not prove that the Lending Group would have accepted rejected Champion's requests for 18–month, 12–month and 6–month amendments in the absence of a potential transaction with MAK, or that MAK would

not have made a similar proposal as a Participant had it been denied entry into the Lending Group.

### The Lenders' Decision to Reject Champion's Proposed Amendment

122. Champion management and Morgan Joseph believed that a decision by the Lenders to grant Champion only a 30–day amendment would have a negative impact on the company's liquidity. Tr. 2/14, 118:4–7. Morgan Joseph told the Champion Board of Directors that "the announcement of the company's second quarter results and the short-term waiver with the senior lenders, will undoubtedly exacerbate the company's liquidity position." Ex. 2152. Morgan Joseph believed the negative impact of an announcement concerning the Second Quarter results on the Company's vendors and customers would be reduced if the Company could "show outside constituencies that Champion had the support of the senior lender group," and that "all things being equal, a longer term amendment, whether 18 months or 6 months ... would be better received by the public than an amendment that's very short-term in nature." Jacquin Dep. 72:19–73:24; Ex. 2152 at 6

**\*18** 123. Champion, Morgan Joseph and the Lenders understood that the granting only a short-term, *i.e.,* 30–day, amendment would likely result in the Company having to file for bankruptcy in the next 60–90 days. Thus, on August 5, 2009, when Morgan Joseph recommended to the Board that the Company accept a short-term waiver rather than release financial results with no agreement in place, they also recommended that the Company begin working immediately to prepare for a Chapter 11 filing. Tr. 2/14, 118:11–119:19. Champion began planning for bankruptcy as soon as it realized it was going to obtain only a short-term waiver. Tr. 2/14, 198:2–5. By August 6, 2009, Loughlin Meghji

Company ("LM"), the Lenders' financial advisor, had been advised that Champion was talking about the need to begin planning for bankruptcy. Tr. 2/15, 128:4–22.

124. On August 12, 2009, Champion and the Lenders executed the Sixth Amendment to the Credit Agreement, providing for a 30–day waiver of default. Tr. 2/14, 121:1–4. The following day, Champion announced the agreement in a press release. Tr. 2/14, 121:5–23, Ex. 2287.

125. On August 19, 2009, Knight and Decker reported to the Board that the Company's liquidity forecast was deteriorating "[d]ue to anticipated further deterioration of the business resulting from the recent announcement concerning a potential restructuring, additional costs associated with the waiver agreement, the potential loss of business due to the inability to obtain bonding for specific projects and the costs of preparing for a potential Chapter 11 filing." As a result, there was a possibility that the Company might need to "take action within the next sixty days." Tr. 2/14, 120:24–123:4; Ex. 2202.

126. Knight testified at trial that "the lack of a long-term solution to the default was giving significant angst to the market, as—as we knew it would." Tr. 2/14, 125:15–20.

127. On August 27, 2009, Knight wrote in an e-mail to Bryan Matthews of CSAG: "As expected, we are under considerable pressure from vendors and customers and this is already evident in the liquidity numbers." Tr. 2/14, 126:10–21; Ex. 2207. Referring to this e-mail at trial, Knight explained: "[W]hat this e-mail to Bryan Matthews is about is we've—we've announced a thirty-day waiver in the middle of August and our vendors and our customers want to know what happens at the end of the thirty days." Tr. 2/14, 127:22–128:5. Because of that problem, "[W]e were seeing fallout in orders, seeing customers move away from us, seeing our vendors tighten terms, things that are not unexpected, I guess, in a distress situation like this, and it was pressuring the liquidity of the company." Tr. 2/14, 144:7–19.

128. On September 27, 2009, Knight again wrote to Matthews concerning Champion's worsening financial condition: "The deterioration in the [cash flow] was only related to the UK and we continue to have projects held up as a result of the parent company's situation. Unfortunately, much of what we told the lenders would happen to the business absent a longer-term waiver/amendment is happening, and more is sure to happen if there is a 'take it or leave it' attitude that continues to ignore the best advice of the people closest to the situation." Ex. 2216. Regarding this e-mail, Knight explained: "[I]t's exactly the type of thing we were talking about in seeking a longer-term amendment.... This is—this is one of the effects that we knew we would see, absent a solution to the default, that was longer term in nature. Absolutely." Tr. 2/14, 129:2–130:5.

*19  129. In her September 27, 2009 e-mail, Knight wrote the following, referring to the potential deal with MAK: "They may or may not be able to pull a deal off, but the

imminent filing and the short-term waiver have destroyed value, and they would certainly expect to put up less than their original offer, given these events." Ex. 2216. Knight testified that "it's been very clear from the start that [her] view was a longer-term amendment could have protected value." Tr. 2/14, 130:6–131:5. She confirmed that the Company's inability to get more than a 30–day waiver from the Lenders was "a contributing factor" to loss of value in the Company. Tr. 2/14, 130:25–132:8.

130. LM, the financial advisor the Lenders retained in August 2009, prepared reports to the Lenders that specifically highlight loss of revenue and additional expenses incurred by Champion as a result of its failure to obtain a longer term amendment and its consequent need to plan a bankruptcy. Exs. 2206, 2214. Testimony was received at trial concerning these reports from Defendant's expert witness, James Loughlin ("Loughlin"), who also led the LM team that advised the Lenders during the Fall of 2009. Tr. 2/15, 127:8–25.

131. In a report to the Lenders entitled "Initial Diligence Update as of August 26, 2009," LM informed the Lenders that Champion's August 11, 2009 cash flow forecast was vulnerable, in part because "the trade is concerned based on the recent waiver announcement." Ex. 2206 at CS13656. Loughlin testified at trial that his statement meant that Champion was concerned credit would tighten because of the short-term nature of the amendment. Tr. 2/15, 132:9–20. As a result of the trade's concern, LM adjusted Champion's projected cash balance down by $5.2 million for the period from August 24, 2009 through September 20, 2009. Tr. 129:23–134:13; Ex. 2206.

132. The concerns set forth in LM's August 26, 2009 report became a reality; *i.e.,* vendors actually did reduce credit limits because of the short term waiver, as management feared they would. Tr. 2/15, 139:18–141:7; Ex. 2214 at LMCO0003773. As a result, in a report to the Lenders on September 18, 2009, LM adjusted Champion's cash flow projections down by an additional $3.6 million for October 2009, under the heading "loss of trade confidence." Ex. 2214 at LMCO0003774.

133. In the same document, LM set forth a proposed DIP budget that was based on "the Company's forecast adjusted for the effects of bankruptcy." *Id.* at LMCO0003776. Among other things, that adjustment for the effects of bankruptcy reduced the Company's projected U.S. sales by 25% in weeks 1–2, 20% in weeks 3–4, 15% in weeks 5–6, 10% for the

remainder of 2009 and 7.5% for 2010. *Id.* at LMCO0003777. LM also projected bankruptcy related professional fees in the amount of $9.6 million during the period of September 2009 through March 2010, including $6.7 million through 2009. *Id.* at LMCO0003783.

### CAUSATION

**\*20** 134. The decline in business performance at Champion occurred well before July 2009. (Trial. Ex. 1060 at 2–3; Trial Tr., February 15, 2012 ("Feb. 15 Tr."), 96:6–96:11, 99:3–101:17.)

135. Champion's net sales declined 6.7% in 2007 and 18.9% in 2008. This decline was driven by declining real estate values, lower demand for Champion's products, and a lack of financing for manufactured homes. (Trial Ex. 1060 at 2.) These revenue declines translated into lower profit margins and, by 2008, operating income was not sufficient to cover Champion's cash needs and Champion's operating activities became cash flow negative. (*Id.*)

136. As a result, Champion failed to meet various financial covenants in October 2008 and Champion's Lenders provided an amendment replacing the leverage and coverage ratios with less stringent minimum adjusted EBITDA and minimum liquidity covenants. (*Id.* at 3, 5.)

137. In the spring of 2009, Champion's financial distress accelerated dramatically when revenue fell by 60% compared to the prior year and cash flow from operations was negative $34.4 million. (*Id.* at 3.)

138. By April 2009, Champion's senior debt and convertible notes were both trading at a significant discount. (Feb. 14 Tr., 182:21–183:4.)

139. The total enterprise value ("TEV") of Champion calculated using the value of the Company's debt and equity securities never exceeded the par value of the prepetition senior debt at any time after December 31, 2008. (Feb. 15 Tr., 94:10–94:23, 95:11–95:20, 96:6–97:23; Trial Ex. 1060 at 1, 4, 15.)

140. The market values of Champion's securities were (a) $908.8 million at December 29, 2007; (b) $480.4 million at January 3, 2009; and © $98 million at July 4, 2009. (Trial Ex. 1060 at 1, 4; Feb. 15. Tr., 99:13–100:11, 102:10–103:9.)

141. Due to the further deterioration in the real estate and housing markets and despite prior amendments to the Credit Agreement, as of July 4, 2009, Champion was not in compliance with its amended minimum liquidity and minimum twelve-month adjusted EBITDA covenants under the Credit Agreement. (*See* Trial Exs. 3207, 3079 at CHAMPION 0035147.)

142. After unsuccessfully attempting to sell Champion's Canadian operations and raise capital through other means, Champion sought an eighteen-month amendment waiving compliance with those covenants. (Trial Ex. 1028 at CHAMPION 0027277–84.)

143. Knight began soliciting Lenders' opinions regarding a possible eighteen-month amendment on or about July 16, 2009—at least eleven days after Champion's internal and external counsel had concluded that Champion would not be able to prevent MAK from becoming a Lender. (*See, e.g.,* Trial Exs. 3048, 3049, 3055; *see also* Trial Ex. 3040; Scholten Tr., 48:25–49:22.)

144. Champion did not formally request the eighteen-month amendment from the Lenders until July 29, 2009 (*see* Trial Ex. 3078)—eight days after Champion's counsel had agreed with CSAG's counsel that there was no contractual mechanism by which Champion could prevent MAK from becoming a Lender and after Champion consented to the propriety of recognizing MAK as a Lender. (*See* Trial Exs. 3063, 1027.)

**\*21** 145. Management understood from the outset that Champion's request for an eighteen-month amendment was an "unprecedented" and "aggressive" ask. (Feb. 14 Tr., 85:18–85:23, 102:15–103:19, 168:7–168:17.)

146. Knight testified that, at the time the Company's Lender presentation was disseminated (*see, e.g.,* Trial Exs. 1023, 3048, 3049), she knew that the forecasts contained within it may not be reliable. (Feb. 14 Tr., 90:16–91:1 (describing Champion's U.S. business as having "almost zero visibility"), 197:2–197:12 (same).)

147. Management's forecasts were historically unreliable and, in the summer of 2009, management was unable to accurately forecast Champion's short- or long-term prospects. (Feb. 14 Tr., 197:2–197:12, 90:16–91:1 (Knight testimony); Feb. 15 Tr., 39:2–40:16, 74:16–75:12, 75:18–76:2, 78:24–

81:2 (testimony of Jason Frank); Feb. 15 Tr., 114:17–114:19 (testimony of Loughlin); Trial Ex. 1060 at 5.)

148. Wallitt of General Electric Capital Corp.—a member of the informal Steering Committee of Lenders—testified that his review of Champion's financial information quickly revealed that "the company had lost the ability to forecast. The company was at ground zero of, you know, the housing crisis which was enveloping the entire U.S. economy." (Feb. 14 Tr., 214:1–214:10.) Champion's most recent forecasts had been especially bad:

> So not only were year-over-year sales down by over fifty percent[,] in [the first quarter of 2009] that we were analyzing, they missed their budget by what looks to be roughly thirty-three million dollars in round numbers, that's twenty percent, which again major red flag. You can't project or forecast your top line within twenty percent in the current quarter that you're in? How on earth are you going to forecast out six quarters? ... [I]t led me to ... draw the pretty fast conclusion that management could not project the business.

(Id. at 215:19–216:7.)

149. Although Champion's management's projections expected Champion to experience a "constant market share" in the months and years after July 2009, management's projections regarding sales growth were more than 20 times that which were predicted by IBIS, a prefabricated housing industry specialist. (Feb. 15 Tr., 60:5–63:21, 111:24–113:24.) IBIS had predicted in its report for 2009 that industry sales were expected to increase 3.9% over the next five years. (See Trial Ex. 3210 at 11.) Champion's management forecasted that its sales would grow by an average annual rate of 22.4% over that same period. (Feb. 15 Tr., 58:9–62:16.)

150. As of July 2009, Champion had no options for raising either debt or equity capital and its attempts to sell various business operations to raise cash had failed. (Feb. 14 Tr., 180:17–181:22; Trial Ex. 1060 at 5.)

151. The proposed eighteen-month amendment was overwhelmingly rejected by the Lenders for a variety of reasons, including concerns about the Company's "struggling" financial condition and liquidity, historical inability to meet its forecasts, and the deteriorating housing market. (Feb. 14 Tr., 193:13–193:24, 212:13–214:18, 218:24–219:20.)

**\*22** 152. Wallitt testified that GECC was unwilling to provide a medium- or long-term waiver and amendment to Champion because of his analysis of Champion's worsening financial performance and his sole desire to maximize the value of GECC's position in the Champion loans. (Id. at 211:14–211:20, 213:10–213:25.) Wallitt was also very concerned about the Company's cash "burn rate," a "major red flag" that required him to further investigate the Company's financial condition before granting any kind of relief. (Id. at 216:8–217:5; see also id. at 246:19–247:1 (advocating for a financial advisor to conduct diligence).)

153. During this same time, in late July and August, MAK's discussions with Champion culminated in a term sheet proposing a restructuring transaction in which MAK would provide new money to the Company. (See Trial Exs.2071, 2134.) Wallitt testified that the term sheet was "attractive" in the sense that it offered the potential for a cash pay down to Lenders. However, it was non-binding—not a formal proposal—and he was concerned about MAK's ability to bring the contemplated transaction to fruition. (Feb. 14 Tr., 223:5–224:22; see also Feb. 14 Tr., 112:14–112:21, 234:16–234:25.)

154. The existence of the MAK term sheet was only one of many issues considered by the Lenders, but not a primary concern. Wallitt testified that MAK's term sheet did not affect his analysis of the liquidity or financial strength of the Company, or of management's ability to forecast its business. (Id. at 219:21–220:10.) There is no evidence from other Lenders to the contrary.

154. The Lenders, in rejecting the 18–month amendment, were not "doing MAK's bidding" or promoting or encouraging MAK, but rather attempting to keep MAK "in check." Additional time could enable MAK to build a "blocking position" which—because MAK was both a junior and senior debt holder—could harm independent first lien Lenders like GE in a subsequent restructuring. (Id. at 225:1–225:15, 251:22–252:6.)

155. Champion's significant Lenders were opposed to the request. (See, e.g., id. at 171:18–171:22 (National City opposed the 18–month amendment); id. at 172:2–

172:21(Citizens Bank opposed the 18–month amendment); *id.* at 222:5–222:15 (Raven Asset Management opposed the 18–month amendment); *id.* at 242:1–242:22 (Fraser Sullivan opposed the 18–month amendment).)

156. After receiving this negative feedback, Champion opted to withdraw its request before ever drafting a formal amendment or putting it before the Lenders for a vote. (*Id.* at 193:6–193:12.)

***Sixth Amendment And Waiver To The Credit Agreement.***

157. On August 12, 2009, Champion, CSAG, and certain of the Lenders entered into the Sixth Amendment and Waiver to the Credit Agreement (the "Sixth Amendment"). (Trial Ex. 1002.) The Sixth Amendment waived Champion's compliance with certain provisions of the Credit Agreement for thirty days, until September 11, 2009. (*Id.*)

**\*23** 158. The Sixth Amendment also contained a release which provides, in part, that Champion and its successors

> unconditionally, freely, voluntarily and, after consultation with counsel and becoming fully and adequately informed as to the relevant facts, circumstances and consequences, knowingly releases, waives and forever discharges (and further agrees not to allege, claim or pursue) ... © any and all claims, whether known or unknown, under any oral or implied agreement with (or obligations or undertaking of any kind whatsoever of) any Lender Party which is different from or in addition to the express terms of this Amendment, the Credit Agreement and the other Loan Documents and (d) all other claims, rights, causes of action, counterclaims or defenses of any kind whatsoever, in contract or in tort, in law or in equity, whether known or unknown, direct of derivative, which [Champion] ... might otherwise have or may have against any Lender Party [which definition includes CSAG] on account of any conduct, condition, act, omission,

event, contract ... claim, right, cause of action, suit, damage, defense, circumstances or matter of any kind whatsoever which existed, arose or occurred at any time prior to the Sixth Amendment.

(*Id.* at § 7.8.)

Champion, CSAG, and certain of the Lenders subsequently entered into additional amendment and waiver agreements, each of which contained an identical release. These agreements were: the Seventh Amendment and Waver, dated September 2, 2009 (Trial Ex. 3007); the Waiver and Forbearance Agreement, dated October 5, 2009 (Trial Ex. 3008); the Waiver and Forbearance Extension Agreement, dated October 30, 2009 (Trial Ex. 3009); and the Eighth Amendment, dated November 8, 2009. (Trial Ex. 3010). Champion's board approved each of these subsequent amendments, knowing that they also contained releases. (Feb. 14 Tr., 179:2–179:9.)

159. Champion and its attorneys entered into negotiations with CSAG and its counsel concerning the terms of the Sixth Amendment generally and, in particular, whether a release would be included. (Feb. 14 Tr., 139:10–139:16; Scholten Tr., 69:17–70:6.)

160. According to Knight, CSAG was never uncooperative in connection with the Sixth Amendment. (Feb. 14 Tr., 184:4–184:18; Trial Ex. 3041.)

161. Champion succeeded in obtaining certain changes that it bargained for during these negotiations. (Scholten Tr., 69:20–70:6.)

162. The issue of the release proved to be a sticking point in the negotiations. (*Id.* at 31:20–32:7.) Although Champion did not want to provide a release (*see* Feb. 14 Tr., 139:10–139:20), CSAG was equally adamant that a release be included, on the understanding that a release is commonplace when distressed companies seek a waiver or forbearance from their lenders. (*Id.* at 139:17–140:22, 174:7–175:4.)

163. Champion's outside bankruptcy counsel concurred that releases are completely standard for distressed borrowers. He testified:

> **\*24** In distress situations, unless there was a very, very specific reason,

one would always see a demand for a release....That it was true in virtually all either forbearance agreements and amendments in connection with distress [ed] loans .... both of those forms of agreements would contain release provisions [releasing] the lender [and the lending agent] from all liability for its past act[s].

(Rose Tr., 48:16–50:3; *see also* Trial Ex. 3094; Scholten Tr., 57:6–57:21, 62:14–62:24.)

164. Upon receiving this advice from her counsel, Knight—who was initially resistant to a release—changed her position and conceded to the release. (Trial Ex. 3100; Feb. 14 Tr., 139:17–140:22, 174:7–175:4, 185:2–185:12.)

165. Champion's senior management and its board of directors considered and analyzed the proposed terms of the Sixth Amendment and other alternatives in detail and at length. (Scholten Tr., 59:4–62:24; Trial Exs. 1037, 3116, 3117.)

166. Champion's CEO, Mr. Griffiths, and CFO, Knight, were in favor of refusing to sign the Sixth Amendment containing the release and disclosing the default without having entered into a waiver agreement, while General Counsel Roger Scholten disagreed. (Scholten Tr., 59:4–60:12, 61:23–62:4; *see also* Trial Exs. 1037, 3116.) Knight testified that whether or not to accept the Sixth Amendment was a complex decision, not based solely on the release. (Feb. 14 Tr., 195:17–196:9.)

167. Champion's board of directors discussed the scope of the release and what the Company would be giving up by signing the Sixth Amendment; they concluded that the Company would be giving up little in exchange for a waiver of the default, and directed management to sign the Sixth Amendment. (Trial Exs. 2176; 2211 at CHAMPION 0036914; Feb. 14 Tr., 177:4–178:14, 118:11–119:12; *see also* Scholten Tr., 62:14–62:21 ("[The board] had a strong view, I believe, of obtaining the amendment and, therefore, directing management to negotiate and finalize the amendment"), 60:4–60:9.)

168. Champion's board of directors made this decision with full knowledge that, by executing the Sixth Amendment, Champion was waiving any and all claims that the Company may have had with respect to the MAK assignments. (Feb. 14

Tr., 178:7–178:17; Scholten Tr., 61:1–61:14, 62:14–62:24, 70:7–70:16, 70:21–71:13.)

169. At that time, Champion's board of directors also directed management to begin planning for bankruptcy as a result of the default. (Feb. 14 Tr., 119:14–119:23.)

170. In the second half of 2009, the "underpinnings" to management's forecasts set forth in the Lender presentation were proven wrong—the market had not stopped deteriorating. (Feb. 14 Tr., 131:19–132:8.)

171. The "terrible" housing market—not the short-term waiver granted in the Sixth Amendment—magnified Champion's financial distress, which had been in an increasingly downward spiral for months. (*Id.* at 130:6–132:8; *see also* Trial Ex. 1060 at 1–6 .)

**\*25** 172. Even if the Lenders had granted the 18–month amendment that the Company sought, Champion would have fallen out of compliance with the revised covenants contained in that amendment long before the end of the 18–month period. (Feb. 14 Tr., 176:4–176:10, 176:20–177:3; Trial Ex. 1060 at 6.)

173. Bankruptcy was necessary because the Company was running out of money as a result of deterioration in the housing market—not as a result of MAK's status as a Lender or the existence of MAK's term sheet. (Feb. 14 Tr., 226:24–227:17, 227:25–228:4, 257:14–258:4, 258:9–258:18; Trial Ex. 1060 at 7.)

174. After months of planning, on November 15, 2009 (the "Petition Date"), Champion filed voluntary petitions for relief pursuant to chapter 11 of the Bankruptcy Code and continued to operate and manage its businesses as debtors-in-possession. (Statement of Undisputed Facts No. 399.)

175. Pursuant to an Interim DIP Financing Order dated November 17, 2009 and a Final DIP Order dated January 6, 2010 (collectively, the "DIP Orders"), this Court authorized the Debtors to obtain $40 million of post-petition financing under a DIP Credit Agreement dated as of November 15, 2009. (Case No. 09–14019(KG), Docket Nos. 50, 244.) The DIP Orders further provided that the liens and security interests granted to the Lenders under and in connection with the prepetition Credit Agreement are valid, binding, perfected, enforceable, first-priority liens and security interests in the personal and real property described

as collateral under the Credit Agreement. The Court's DIP Orders also gave the Committee a deadline of February 18, 2010 to file claims challenging liens and interests under the prepetition Credit Agreement. (Case No. 09–14019(KG), Docket No. 244, at ¶ 21.)

176. With the Court's approval, the Debtors continued their prepetition efforts to locate buyers for their business, as they faced liquidation absent a sale. (*See* Case No. 09–14019(KG), Docket No. 273, ¶¶ 8–9, 13–14, 21.)

177. Morgan Joseph, the Company's financial advisors, had targeted 170 potential investors and received a total of twelve indications of interest in a sale process that spanned several months. (Jacquin Tr., 157:4–157:14.) Champion, despite the strenuous efforts by management and Morgan Joseph, did not receive any viable offers to purchase the company prior to the § 363 sale. (*See* Feb. 14 Tr., 180:17–181:22.)

178. At no time did any potential buyer express an interest in paying more than approximately $130 million for Champion. (Jacquin Tr., 113:3–114:5; Trial Ex. 1056.)

179. Ultimately, the Court approved a "stalking horse" bid led by three Lenders, and no qualified competing bids were submitted by the February 24, 2010 deadline. (*See* Case No. 09–14019(KG), Docket No. 385; *see also* Trial Ex. 3209, at 5–6.)

180. On March 2, 2010, the Court held the sale hearing, approved the sale, and authorized the parties to consummate the transaction pursuant to the terms of the asset purchase agreement, as amended, allowing certain of the Lenders to credit bid their prepetition claims against Debtors. (*See* Trial Ex. 3209; Case No. 09–14019(KG), Docket No. 517, ¶¶ E, F, I, L, 3.)

**\*26** 181. The sales process overseen by the Court was a thorough and arm's length market test, which represents the best evidence of Champion's fair market value at the time of the § 363 sale. (Feb. 15 Tr., 104:10–105:5; Trial Ex. 1060 at 11.)

182. Morgan Joseph agreed that the sale "achieve[d the] objective of getting the highest and best value for Champion." (Jacquin Tr., 158:19–159:4.)

183. The Lenders were entitled to recover the full amount of their secured claims—approximately $227 million (plus

interest)—before the unsecured creditors stood to recover anything. The $227 million amount included approximately $187 million of Champion Loans and $40 million owed pursuant to the DIP Credit Agreement. (Statement of Undisputed Facts No. 400; Docket Nos. 50, 244.) Plaintiff has put no evidence that any potential buyer of Champion was willing to offer anything close to the value of the Lenders' claims.

## CONCLUSIONS OF LAW

The Court has found that CSAG breached the Credit Agreement in allowing the MAK assignments. However, the Court cannot find proof and therefore cannot conclude that CSAG's actions resulted in loss to Champion and its creditors. Such a finding and conclusion would require a leap to conclusions unsupported by the record.

### A. *CSAG Breached the Credit Agreement*

Under applicable New York law, "an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Delta Mills, Inc. v. GMAC Commer. Fin. LLC (In re Delta Mills, Inc.),* 404 B.R. 95, 105 (Bankr.D.Del.2009) (quoting *First Investors Corp. v. Liberty Mut. Ins. Co.,* 152 F.3d 162, 168 (2d Cir.1998). CSAG breached the contract at issue, the Credit Agreement, by not obtaining consent for the MAK assignments prior to Champion's default.

### 1. The Borrower Consent Provision

Section 12.11(a) of the Credit Agreement provides in relevant part that any entity that is already a lender under the Credit Agreement may, with the consent of the Administrative Agent (*i.e.,* CSAG), "assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement ..." Ex. 1001 at CS12389–90. The Credit Agreement defines "Eligible Assignee" to mean, in relevant part:

(a) in the case of an assignment of a Term Loan or Synthetic Deposit, (I) a Lender, (ii) an Affiliate of a Lender, (iii) an Approved Fund or (iv) any other Person approved, unless an Event of Default has occurred and is continuing, by the Borrower (such approval of the Borrower not to be unreasonably withheld or delayed), and

(b) in the case of any assignment of the Revolving Loan Commitment, (i) a Revolving Loan Lender or, (ii) any other Person approved, unless an Event of Default has occurred and is continuing, by the Borrower (such approval of the Borrower not to be unreasonably withheld or delayed);

*Id.* at CS12278.

Section 12.11(b) further provides that "if the consent of the Borrower to an assignment or to an Eligible Assignee is required hereunder ... the Borrower shall be deemed to have given its consent ten days after the date notice thereof has been delivered by the assigning Lender (through the Administrative Agent [*i.e.,* Credit Suisse] or ClearPar, LLC) unless such consent is expressly refused by the Borrower prior to such tenth day." Ex. 1001 at CS12391. Therefore, CSAG was required to provide notice to Champion that the proposed assignment required Champion's consent. Notice that the assignment has occurred was not sufficient.

**\*27** The Court interprets the Credit Agreement to mean that whether consent was reasonably withheld was to be decided when notice was provided to Champion of its right to consent. What Champion might have discovered or concluded about MAK if CSAG had timely alerted Champion to the fact that MAK was not an eligible assignee and that Champion had the right to consent is totally speculative at this point in time. CSAG, not Champion, failed to comply with the Credit Agreement.

The Credit Agreement also made CSAG responsible for determining whether MAK was an "Eligible Assignee." Exs.2017, 2023. The form of the assignment agreement included a signature line for Champion, demonstrating that CSAG needed to determine whether borrower consent was necessary at the time the assignment agreement was executed, not at a later date. *See, e.g.,* Ex. 2239 at CS32399. It was not sufficient that CSAG advised Champion that the assignment had occurred.

**2. Champion's Consent Was Required for the MAK Assignments Made in the First Two Quarters of 2009**

On or about January 26, 2009, CSAG received a proposed assignment of Champion bank debt from Bank of America to MAK. Ex.2005; Ibsen Dep. 11:4–8. MAK was not an "Eligible Assignee" under the Credit Agreement, and Champion was not in default. Ibsen Dep. 12:6–13:4, 14:19–23; Tr. 2/14, 38:16–23. CSAG, contrary to the Credit

Agreement, told Bank of America that Champion's consent was not required, and closed the assignment on January 30, 2009. Ex.2005 at CS29700–01. CSAG thereby breached the Credit Agreement by failing to obtain Champion's consent.

Between March and April 2009, CSAG processed other assignments of Champion debt to MAK without seeking or obtaining Champion's consent. Only after the transactions occurred did Champion send lender lists that included MAK. Findings of Fact ("FOF") No. 29, *supra.* On May 8, 2009, MAK claimed ownership of approximately $29.5 million in Champion bank debt and began aggressively opposing Champion's plan for reducing its leverage through asset sales. Tr. 2/14, 45:13–46:25; Ex.2015 (FOF No. 31).

By May 11, 2009, Champion realized that CSAG had been required to obtain its consent for the MAK assignments, and asked CSAG why consent was not sought before the assignments were closed. Ex.2017 at CS03369; Tr. 2/14, 47:18–48:8. The next day, CSAG acknowledged that consent had been required and asked Champion to consent. Champion refused. Ex.2023; Ibsen Dep. 23:21–25:18; 26:4–28:15. Beginning May 14, 2009, additional assignments to MAK that CSAG received were put "on hold." Ex.2023 at CS03316.

On May 27, 2009, Champion wrote to CSAG with the reasons why Champion had refused and was continuing to refuse to consent to the MAK assignments. Champion also placed CSAG on notice that MAK had begun aggressively opposing Champion's leverage reduction strategy, and that the MAK assignments would give MAK voting power it could use to block the amendment of the Credit Agreement Champion would need to implement its strategy. Ex.2031.

**\*28** Nevertheless, CSAG continued to assign interests in Champion bank debt to MAK. Ibsen Dep. 32:12–33:17; Ex.2024 at CS03220. According to CSAG's records, by early June 2009, MAK held at least $20.4 million of the senior secured debt, not counting the amount CSAG had placed "on hold," making it the largest single holder of Champion bank debt. Ex.2069.

**3. CSAG Reversed its Position on Consent**

On June 19, 2009, CSAG reversed its position on the consent issue. It wrote to Champion that consent was not required because Champion had not expressly refused consent during the ten days following May 12, 2009. Ex.2022; Tr. 2/14, 55:11–56:6; Ibsen Dep. 50:14–52:4. CSAG's new position was unjustified because Champion had clearly refused its

consent on May 12, 2009. In addition, the notice of Champion's right to consent came far too late for CSAG to invoke the ten day limitation. By May 12, 2009, the assignments at issue already had been recorded by CSAG as MAK holdings. CSAG had already violated the contract and had no right to insist that Champion respond to the belated notice, let alone within ten days. On June 23, 2009, Champion promptly informed CSAG that it was in breach of the Credit Agreement. Ex.2022 at CHAMPION0000904–05; Ex.2039 at CS10822–23; Tr. 2/14, 56:10–57:9, 57:19–58:8.

In late June and throughout most of July 2009, CSAG and Champion continued to discuss their ongoing dispute over the consent issue. By July 20, 2009, CSAG unilaterally terminated discussions on the consent issue, informing Champion that it did "not believe Borrower consent is required and does not plan on seeking it" and would shortly finalize the assignments. Exs.2096 at CS24999–25000; *see also* Ex.2097. On July 22, 2009, MAK sent CSAG a letter which threatened legal action against CSAG if it did not finalize the "on hold" assignments. Ex. 2102. Within a day of CSAG's receipt of that letter, Defendant agreed to close the outstanding assignments to MAK and confirmed MAK's status as a Lender with respect to all the MAK assignments. Ex. 2105. On learning that the disputed assignments had been finalized, Knight emailed Champion's CEO and its counsel that "it is important that we confirm with CSAG that despite Champion's not consenting to an assignment to MAK, CSAG has nonetheless effected the assignment, and they are now a lender rather than a participant." Ex. 2117; Tr. 2/14, 82:6–17.

### 4. Champion Was Not In Default and Performed Its Duties Under the Credit Agreement When the MAK Assignments Occurred During the First Two Quarters of 2009.

CSAG has offered no evidence whatsoever that Champion was not in compliance with its obligations under the Credit Agreement during the first two quarters of 2009. No one has raised any issue as to whether Champion was in default under the Credit Agreement until the second quarter of 2009 ended. Furthermore, there is evidence that Champion was making its required payments to the Lenders under the Credit Agreement. *See, e.g.,* Ex.2045; Ibsen Dep. 65:12–67:15.

### 5. Champion Did not Unreasonably Refuse To Consent

 **\*29**  Champion had valid business reason to withhold consent. MAK was aggressively seeking to oppose the business strategy through which Champion was seeking to improve its financial condition. In addition, by May 12, 2009, the assignments had caused MAK to become one of the largest holders of Champion bank debt and placed MAK in a position to block Champion's strategy for reducing its leverage. Exs.2015, 3025; Tr. 2/14, 44:1–9.

### 6. As This Court Previously Ruled, a Default By Champion Would Not Retroactively Validate Defective Assignments

During CSAG's July 2009 negotiations with Champion, Defendant took the position that Champion was in default under the Credit Agreement as of the end of the second quarter 2009, and that the effect of that alleged default was to validate the defective assignments because consent was no longer required. The Court previously ruled that an event of default under the Credit Agreement could not retroactively revive MAK assignments which were invalid at their inception under the Credit Agreement. *In re Champion Enters .,* No. 09–14019, 2011 Bankr.LEXIS 3607, at *21–22 (Bankr.D.Del. Sept. 27, 2011). That ruling stands.

### 7. Champion Is Not Estopped From Taking the Position That CSAG Wrongfully Finalized the Disputed Assignments

CSAG argues that Champion is estopped from challenging CSAG's entitlement to finalize the assignments in July 2009 because Champion allegedly agreed with CSAG that Defendant was entitled to effectuate all the MAK assignments at that time. To the contrary, there is no basis for an estoppel. "Under New York law, equitable estoppel requires a showing of: (1) an act constituting a concealment of facts or a false misrepresentation; (2) an intention or expectation that such acts will be relied upon; (3) actual or constructive knowledge of the true facts by the wrongdoers; (4) reliance upon the misrepresentations which causes the innocent party to change its position to its substantial detriment." *Gen. Elec. Capital Corp. v. Eva Armadora, S.A.,* 37 F.3d 41, 45 (2d Cir.1994).

Champion made no false representation to CSAG on which the Defendant relied. CSAG also made good on its intent to finalize the disputed assignments without Champion's consent (Exs.2096, 2097). CSAG clearly did not rely on Champion's consent.

Champion maintained that it had claims against CSAG arising from the MAK assignments. FOF No. 47. Champion also continued to insist that because it had not defaulted, MAK's

status as a participant could not be immediately converted into that of a Lender. FOF Nos. 32, 35, 60.

Champion, and therefore the Committee, is not estopped from claiming CSAG breached the Credit Agreement. Champion's statements and actions evince its strenuous opposition to the assignments from MAK.

### C. *Champion did not Waive its Right to Consent*

Champion did not waive its right to consent to the MAK assignments based on a prior course of dealing. To prove a waiver based on conduct, there must be evidence "that the party charged with waiver relinquished a right with both knowledge of the existence of the right and an intention to relinquish it." *Christian Dior–N.Y., Inc. v. Koret, Inc.,* 792 F.2d 34, 40 (2d Cir.1986) (*quoting Voest–Alpine Int'l Corp. v. Chase Manhattan Bank, N.A.,* 707 F.2d 680, 685 (2d Cir.1983).* There is no evidence that before May 2009, Champion's management ever focused on the borrower consent provision at the time it learned of new holders and formed an intent to waive it. Indeed, there is no evidence that consent would have been required for any of the assignments of interest in Champion's senior secured debt that occurred before January 30, 2009. SOF Nos. 19–20. 117 of those assignments identified a Credit Suisse affiliate as Assignee. SOF No. 21. Because the Credit Agreement defines "Eligible Assignees" to include affiliates of existing Lenders, all those latter assignments were apparently to eligible assignees for which consent would not have been required. In sum, there simply is no evidence that Champion and CSAG ever agreed orally or in writing to modify the Credit Agreement and therefore there was no waiver of consent on this basis. *See Grandonico v. Consortium Commc'ns Int'l, Inc.,* 566 F.Supp. 1288, 1291 (S.D.N.Y.1983)* (when a written contract provides that it cannot be altered except in writing, it cannot be altered except in writing subject to a narrow exception).

### D. *The Breach of the Credit Agreement Did Not Damage Champion*

### 1. The Implied Covenant of Good Faith and Fair Dealing.

*30 Plaintiff alleges that CSAG breached the implied covenant of good faith and fair dealing by "coercing Champion to accept MAK as a member of the lending group, and later forcing Champion to release Champion's claims against CSAG relating to the improper MAK

assignments." (2d Am.Compl.¶ 252.) Plaintiff did not prove its allegations.

#### *Accepting MAK As A Lender*

CSAG did not need to coerce Champion to accept MAK's entry into the lending group because even if MAK had not become a Lender in February 2009, MAK was a Participant pursuant to the terms of the Credit Agreement.

Although Champion could block MAK's status as a Lender until it went into default at the end of its second fiscal quarter, Plaintiff did not prove that CSAG coerced or otherwise acted improperly in formally recognizing MAK as a Lender on July 27, 2009. As the uncontroverted evidence establishes, Champion upon the advice of its counsel itself understood that MAK could become a Lender. (*See, e .g.,* Trial Ex. 3040 (advice of outside counsel that the Credit Agreement "clearly supports CSAG's position that once Champion [was] in default, it could implement an assignment to MAK without Champion's approval"); Feb. 14 Tr., 162:25–163:8 (Knight and her counsel believed that Champion's approval of assignments to new Lenders was no longer needed after Champion was in default); Scholten Tr. 48:25–49:22 (Champion's General Counsel agreed with outside counsel's opinion); Trial Ex. 3041 (same); Griffiths Tr., 28:7–28:20 (Champion's CEO agreed that the issue was moot); Feb. 14 Tr., 79:23–80:18, 164:16–165:22 (testimony of Knight that Champion agreed with counsel's advice).)

Champion even expressly communicated its understanding to CSAG's counsel. (*See, e.g.,* Trial Ex. 3063 at CHAMPION 0032881 (Champion's outside counsel told CSAG that the Credit Agreement, "upon a default, allowed a conversion of participations to direct lender"); Feb. 14, Tr., 166:9–167:15 (Knight knew that outside counsel communicated this opinion to CSAG); Feb. 14 Tr. 167:12–167:17 (Knight testified that the parties had a "collective understanding" that this issue was "done" by July 21, 2009).) Clearly, even without the assignment MAK as a Participant became a Lender following Champion's default.

CSAG did not coerce Champion into accepting this position. Champion accepted the independent advice of its outside counsel and General Counsel that Champion had no contractual or other right to block MAK from becoming a Lender and subsequently accepted MAK as a Lender upon

receiving confirmation of MAK's status as a Lender from CSAG.


### The Release In The Sixth Amendment

Plaintiff also alleges that CSAG "forced" Champion to include a release against CSAG in the Sixth Amendment and this action was a violation of the implied covenant. Plaintiff's allegations fail both as a matter of law and because Plaintiff has not proved its claim. Plaintiff complains that CSAG breached the implied covenant due to its decision whether, and on what terms, to enter into an amendment to the Credit Agreement that would waive Champion's default. The Credit Agreement contained no explicit or implicit provision requiring CSAG or the Lenders to enter into any amendment or wavier sought by Champion. Thus, there is no basis for Plaintiff's contention that the expectation of a future amendment or waiver was a benefit of the bargain obtained by Champion under the terms of the Credit Agreement.

**\*31** New York law is clear that a party is not obligated to facilitate or enter into an amendment or waiver of an existing contract pursuant to the implied covenant of good faith and fair dealing. *See Citibank, N.A. v. United Subcontractors, Inc.,* 581 F.Supp.2d 640, 646 (S.D.N.Y.2008) (administrative agent did not breach the covenant of good faith and fair dealing in terminating loan agreement because "[a] party to a contract is allowed to act in its own self-interest consistent with its rights under the contract"); *Broughel v. Battery Conservancy,* No. 07–CV–7755, 2009 WL 928280, \*7 (S.D.N.Y. Mar. 30, 2009) ("the implied covenant of good faith and fair dealing ... does not obligate the promisor to make future promises ... or to renegotiate the contract"); *Resolution Trust Corp. v. Lesal Assocs.,* No. 91 Civ.2025, 1992 WL 98843, at \*5 (S.D.N.Y. May 6, 1992) (covenant of good faith and fair dealing "does not require ... contrary to ... economic interest such as modifying the terms, or even negotiating the possible modification of the terms of, a risky loan"); *John St. Leasehold LLC v. FDIC,* No. 95 Civ. 1074, 1996 WL 737196, at \*9 (S.D.N.Y. Dec. 24, 1996) (refusal to grant waiver of certain provisions in parties' contract not a breach of the covenant of good faith and fair dealing).

CSAG and the Lenders had the right to decide whether to negotiate or enter into any amendment or waiver requested by Champion. Nevertheless, Plaintiff has claimed that CSAG breached the implied covenant by compelling Champion to accept the release provision in the Sixth Amendment.

Plaintiff's claim fails because Champion was not entitled to an amendment and waiver under the Credit Agreement.

The evidence shows that Champion agreed to the release after conducting arm's length negotiations, in which all parties were represented by able, competent, and experienced internal and external counsel. The inclusion of a release was important to CSAG and the Lenders (and completely standard when lenders provide amendments to distressed borrowers —as recognized by Champion's bankruptcy counsel and, eventually, Champion's officers). (*See, e.g.,* Rose Tr., 48:16–50:3; Scholten Tr., 57:6–57:21, 62:14–62:24; Trial Exs. 1031, 3094.) CSAG and the Lenders agreed to include certain provisions of importance to Champion in the Sixth Amendment. (Scholten Tr., 69:20–70:6.) This was a good faith negotiation by the parties to the Credit Agreement to amend that agreement after the default by Champion. Plaintiff has not proved a violation of the implied covenant of good faith and fair dealing.

### 2. Champion Released Plaintiff's Claim Against CSAG.

The Sixth Amendment contains a release. (Trial Ex. 1002 at § 7.8 .) There can be no dispute that this release, by its clear terms, releases any claim, including Plaintiff's claim, against CSAG relating to the Credit Agreement for conduct that occurred prior to August 12, 2009. (*Id.; see also* Scholten Tr., 61:1–61:14, 62:14–62:24, 70:7–70:16, 70:21–71:13; Feb. 14 Tr., 178:7–178:17.) Champion agreed to include the release in the Sixth Amendment after conducting extensive arm's length negotiations. All parties were represented by able, competent, and experienced counsel. (Scholten Tr., 69:17–70:6.) Champion's management, its in-house and outside attorneys, and its board of directors were all aware that the release would apply to any claim relating to assignments to MAK and, specifically, to the claims brought by Plaintiff. (Feb. 14 Tr., 178:7–178:17; Scholten Tr., 61:1–61:14, 62:14–62:24, 70:7–70:16, 70:21–71:13.) Champion's board of directors overruled the opinions of counsel, and entered into the amendment and release all claims against CSAG and the Lenders for past conduct, acts, or omissions. (Trial Ex. 2176; Feb. 14 Tr., 177:4–178:14, 118:11–119:12; Scholten Tr., 60:4–60:9, 62:14–62:21 ("[The board of directors] had a strong view, I believe, of obtaining the amendment and, therefore, directing management to negotiate and finalize the amendment").)

**\*32** To succeed on a duress theory, Champion is required to show it was compelled to agree to the terms of the release by means of a wrongful threat which precluded the exercise

of his free will." *Fruchthandler v. Green,* 649 N.Y.S.2d 694, 695–96 (App.Div.1996). Economic disadvantage is inadequate to support a claim of economic duress. *VKK Corp. v. NFL,* 244 F.3d 114, 123 (2d Cir.2001); *See also Nasik Breeding & Research Farm Ltd. v. Merck & Co.,* 165 F.Supp.2d 514, 527 (S.D.N.Y.2001) (finding no economic duress where plaintiff's "own difficult financial circumstances necessitated signing the agreements at issue").

Plaintiff cannot make a showing of economic duress under New York law. See *In re MarketXT Holdings Corp.,* 361 B.R. 369, 401 (Bankr .S.D.N.Y.2007) ("A sophisticated party must support a claim for economic duress by more than the claim that the defendant knew and used the plaintiff's poor financial condition to obtain an advantage in negotiations."). Here, Plaintiff alleges that CSAG and the Lenders were unyielding and refused to agree to waive the default provisions of the Credit Agreement unless Champion agreed to a release. (*See* Trial Ex. 1015.) CSAG and the Lenders had no obligation to waive Champion's default and their willingness to do so could rightfully be conditioned on Champion agreeing to terms desired by the Lenders. The undisputed evidence, which Champion's bankruptcy counsel confirmed, is that releases are contained in "virtually all" forbearance agreements or amendments in connection with distressed loans. (Rose Tr., 48:16–50:3; *see also* Trial Ex. 3094; Scholten Tr., 57:6–57:21.)

A borrower's free will is precluded when (1) it would have suffered 'irreparable harm' had the wrongful threat been carried out, and (2) it was bereft of alternatives to signing the contract." *Interpharm, Inc. v. Wells Fargo Bank, N.A.,* No. 08–11365, 2010 WL 1257300, at *10 (S.D.N.Y. Mar. 31, 2010), *aff'd,* No. 10–1801–CV, 655 F.3d 136 (2d Cir.2011). Champion cannot prove that it would have been irreparably harmed if it had not signed the Sixth Amendment or that Champion had no alternative to signing the Sixth Amendment. Champion's senior management advocated disclosing the default without obtaining a waiver from the Lenders, but Champion's board of directors refused to support such an alternative. Thus, Champion accepted the release rather than pursue other options. Champion also had the option of filing for bankruptcy without obtaining a waiver from the Lenders. Such an available alternative precludes a finding of economic duress. *MarketXT,* 361 B.R. at 401 (finding no economic duress where debtor "could have chosen to file for bankruptcy at an earlier point"; *Interpharm,* WL 1257300 at *11 ("Plaintiff's argument to the contrary

—that bankruptcy does not count as an alternative—lacks citation to legal authority and is unpersuasive.").

Champion did not promptly repudiate the release and is thereby deemed to have ratified it. *VKK Corp.,* 244 F.3d at 122–23; *see also Fruchthandler,* 649 N.Y.S.2d at 695–96; *Liberty Marble, Inc. v. Elite Stone Setting Corp.,* 670 N.Y.S.2d 836, 838 (App.Div.1998) (defendant ratified the release by accepting payment pursuant to the contract). Here, Champion accepted the benefits of the Sixth Amendment and the subsequent agreements containing releases and never objected until long after it executed the Sixth Amendment. Not even duress, which the Court finds was not present would nullify the acquiescence given Champions acceptance of the benefits and non-repudiation of the waiver.

### 3. Failure to Prove CSAG's Breach Caused Any Damage to Champion.

**\*33** The Committee claims that CSAG's breach was a proximate cause of Champion's bankruptcy which, in turn, resulted in Champion being compelled to sell its assets and its business in a fire sale at values that reflected the unusually depressed market values of Champion's assets. Courts can award damages only if they are a foreseeable consequence of the breach. Damages not directly traceable to the breach or that result from other intervening causes are not allowed. *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank,* 392 F.3d 520, 526 (2d Cir.2004); *See also Dupont Flooring Sys., Inc. v. Discovery Zone, Inc.,* No. 98 Civ. 5101, 2004 WL 1574629, at *5–7, *9 (S.D.N.Y. July 14, 2004) (no liability for destruction of business because of pre-existing and ongoing business and financial problems).

Plaintiff did not establish that Champion's purported damages resulted from allowing MAK to become a Lender. The Committee argues that the Lenders refused to provide Champion with an eighteen-month amendment and waiver that would have enabled Champion to avoid bankruptcy and the resultant sale of its assets.

The Court received testimony from only one Lender—Wallitt of General Electric Capital Corp. ("GECC")—who provided unambiguous and undisputed testimony that GECC was unwilling to provide a medium or long-term waiver and amendment to Champion because of his analysis of Champion's worsening financial performance and his effort to maximize the value of GECC's position in the Champion loans. (Feb. 14 Tr., 211:14–211:20, 213:10–213:25.) Additionally, the undisputed evidentiary

record clearly demonstrates that the Lenders' rejection of the proposed eighteen-month amendment was based on a variety of concerns, including concerns about the Company's deteriorating financial condition and liquidity, historical inability to meet its forecasts, and the worsening housing market. (*Id.* at 212:13–214:18, 218:24–219:20; *see also id.* at 193:13–193:24.) There is no evidence that the Lenders' views on the eighteen-month amendment would have been any different in the absence of MAK. (*Id.* at 219:21–220:10.) Instead, the only evidence on the subject establishes that GECC, a major Lender, was opposed to granting a long-term amendment to Champion independent of MAK's presence. (*Id.* at 213:10–213:21.) Other significant Lenders were likewise opposed. (*Id.* at 171:18–171:22 (National City was opposed), 172:2–172:21 (Citizens Bank was opposed), 222:5–222:15 (Raven Asset Management was opposed), 242:1–242:22 (Fraser Sullivan was opposed).)

The evidentiary record does not support the Committee's claim that MAK's involvement as a Lender led to Champion's bankruptcy.

1. MAK's status was irrelevant until the Lenders were called upon to vote on a proposed amendment to the Credit Agreement. No vote occurred until after Champion defaulted under the Credit Agreement and affirmatively recognized MAK's status as a Lender. (Feb. 14 Tr., 180:11–180:16.) As either a Lender or a Participant, MAK was free to negotiate with Champion and the Lenders as it saw fit.

**\*34** 2. MAK could have proposed the term sheet that was presented to Champion as a Lender or otherwise. Phyllis Knight testified that MAK was "a fifty percent holder of converts, at least a former shareholder, if not a current shareholder, and their right to have a voice, whether or not they're a lender, isn't something I can control as the CFO of the company ... whether or not they're a lender they're a big stakeholder that has a right to make a proposal ." (*Id.* at 115:22–117:2.)

3. If Champion had secured an 18–month forbearance from the Lending Group in July 2009, it nevertheless would have failed to meet the proposed amended covenants by the end of 2009. (*Id.* at 176:4–176:10, 176:20–177:3; Trial Ex. 1060 at 6.) Champion would have been in the same position by the end of 2009—in default, unable to convince the Lenders to grant an extended waiver, and having no right to deny consent to MAK or any other entity seeking to become a Lender. The breach of

contract by CSAG did not create the financial problems of Champion.

4. Plaintiff's expert provided no opinion regarding any causal connection between CSAG's alleged breach and the purported damage caused to Champion and its unsecured creditors. (Feb. 15 Tr., 35:3–37:22.) Mr. Frank ignored evidence that Champion's cash flow problems were completely unrelated to any issues involving MAK. (*Id.* at 39:7–40:13.) He made no attempt to determine whether Champion was going to run out of money at any point in time after July 2009. (*Id.* at 42:1–42:10.)

There is no evidence whatsoever that Champion would have obtained a longer-term amendment and waiver if MAK had not been a Lender. On the other hand there is substantial evidence that Champion would not have avoided bankruptcy regardless of any action that MAK took or did not take. Plaintiff has not met its burden of proving that CSAG damaged Champion.

### 4. Failure to Prove that Champion Suffered Any Non–Speculative Damages.

A plaintiff cannot prevail on a cause of action for breach of contract where the claimed damages are speculative or uncertain in nature. *See Farash & Robbins, Inc. v. Fleet Bank, 326 F. App'x 77, 82 (3d Cir.2009)*; *see also Chemipal Ltd. v. Slim–Fast Nutritional Foods Int'l, Inc., 350 F.Supp.2d 582, 596–97 (D.Del.2004).* Plaintiff failed to put forth any credible evidence that it suffered damages.

Market price is 'a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses.' " *Iridium Operating LLC v. Motorola, Inc., 373 B.R. 283, 347 (Bankr.S.D.N.Y.2007)* (*quoting VFB LLC v. Campbell Soup Co., 482 F.3d 624, 633 (3d Cir.2007)*). At trial, the Court heard evidence of three different methods by which to determine the fair market value of Champion: (1) the objective value generated through the sale of the Company pursuant to an open, fair, and extensive bidding process and auction process; (2) by calculating the objective total enterprise value ("TEV") of Champion using the publicly disclosed values of Champion's securities; and (3) estimating a subjective fair market value using mathematical analyses. The first two of these methods rely on market data as determined by a market test in the case of the sale under Code Section 363 and the market price of Champion's securities. These two methods each establish a fair market value of

Champion substantially lower than the value of the Champion Loans, thus ensuring that there was never going to be recovery by any creditors other than the holders of the secured Champion Loans.

**\*35** Plaintiff therefore relied on the "subjective estimate" of its expert witness, Jason Frank, who did not give sufficient consideration to market data concerning Champion in conducting his analysis. The Court finds Plaintiff's subjective estimate unreliable and therefore it does not provide competent evidence of any damages suffered by Plaintiff.

### a. *The Court–Supervised Section 363 Sale.*

The value generated through a Court approved auction process pursuant to Section 363 reflects the market value of Champion's assets. *See In re Trans World Airlines, Inc., No. 01–00056, 2001 WL 1820326, at \*12 (Bankr.D.Del. Apr. 2, 2001).* The Third Circuit has held that sales pursuant to Section 363 are an efficient and reliable mechanism for valuing assets. *Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.), 432 F.3d 448, 461 (3d Cir.2006).* A market test is the best evidence of a company's value at a given point in time.

Here, Champion sold its assets under Court supervision, providing a true market test of the fair market value of Champion. (*See* Trial Ex. 3209; Case No. 09–14019(KG), Docket No. 517, ¶¶ E, F, I, L, 3.) The sale process was thorough, conducted at arm's length, and took place over many months pre- and post-petition. (*Id.*) Morgan Joseph, Champion's financial advisors, targeted 170 potential investors and received a total of twelve indications of interest. (Jacquin Tr. 157:4–157:14.) At no time did any potential buyer express an interest in paying more than approximately $130 million for Champion. (*Id.* at 113:3–114:4; Trial Ex. 1056.) Champion, despite the strenuous efforts by management and Morgan Joseph, did not receive any viable offers to purchase the company prior to the § 363 sale. (*See* Feb. 14 Tr., 180:17–181:22.) Ultimately, the Court approved a "stalking horse" bid by three Lenders, and Champion received no qualified competing bids by the February 24, 2010 deadline. (*See* Case. No. 09–14019(KG), Docket No. 385; *see also* Trial Ex. 3209, at 5–6.) Morgan Joseph agreed that the sale "achieve[d the] objective of getting the highest and best value for Champion." (Jacquin Tr., 158:19–159:4.) There is no evidence that anyone was willing to offer anything close to the value of the Lenders' secured claims of approximately $227 million (plus interest).

Plaintiff's expert opined that the Section 363 sale did not provide a fair market value. (Feb. 15 Tr., 82:7–83:4.) Mr. Frank admitted that he "didn't analyze the sale" or the "bankruptcy proceedings." (*Id.* at 83:5–83:9, 84:3–84:10.) In other words, according to Mr. Frank, the Champion sales process could not be evidence of Champion's fair market value even though he knew virtually nothing about the sales process. Defendant's expert, on the other hand, appropriately identified the market test as the best evidence of Champion's fair market value. (*See id.* at 103:13–105:14; *see also* Trial Ex. 1060 at 11.)

**\*36** There is no evidence on the record that any actual potential purchaser of Champion—and approximately 170 were solicited—was willing to pay anywhere close to the value of the Champion Loans at any time during the pre-and post-petition sales process. Plaintiff did not establish that the actual market-based value of Champion is greater than the value of the senior secured creditors' claims. Plaintiff therefore has not established that it has suffered any damages as a result of the alleged breach.

### b. *The Actual Value Of Champion's Securities.*

In addition to the Section 363 sale, there was additional evidence of Champion's fair market value available based on the public disclosures of the value of Champion's securities. The value that the markets placed on Champion's debt and equity securities is further evidence of the Company's value. (Trial Ex. 1060, at 9.)

The market value of Champion's securities had declined rapidly since the beginning of 2008. On December 29, 2007, Champion had a total enterprise valuation ("TEV") of $908.8 million. (Trial Ex. 1060, at 1, 4; Feb. 15 Tr., 99:13–100:11, 102:10–103:9.) This value declined by almost half by the beginning of 2009. (*Id.* (Champion's TEV was $480.4 million at January 3, 2009).) By July 4, 2009, the TEV of Champion's securities was only 20% of its value at the beginning of that year—$98 million. (*Id.*)

Plaintiff, however, does not claim that the impact of CSAG's alleged breach began until after the Lenders declined to grant Champion an eighteen-month waiver and amendment to the Credit Agreement. (*See* Pl.'s Pre–Trial Br. at 12–16.) Champion did not even circulate a proposed eighteen-month amendment to the Lenders until on or about July 16, 2009. (*See* Trial Exs. 3048, 3049, 3055.) Yet, the total value of Champion on July 4, 2009 was only $98 million—

approximately $89 million below the value of the Champion Loans. (Statement of Undisputed Facts No. 400.) The market value of Champion was already lower than the value of the Champion Loans before the breach. Therefore, unsecured creditors would not have received any recovery after the Lenders and other senior secured creditors were paid.

#### c. *Plaintiff's Calculations Of The Fair Market Value.*

Plaintiff's expert conducted a fair market valuation of Champion using his subjective judgment. Although such an analysis would be appropriate in the absence of market data, "subjective estimates" are inferior methods for determining value. *VFB LLC,* 482 F.3d at 624, 633; *Iridium,* 373 B.R. 283 (Bankr.S.D.N.Y.2007). Mr. Frank also based his entire analysis on projections made by management that were known to be inaccurate and unreliable even at the time they were made.

Where a supposed valuation expert uses "untested, and unverified marketing projections [as] the foundation of a damages calculation," the expert's conclusions will be disregarded as unreliable, and plaintiff's claimed damages will be deemed too speculative for recovery. *Chemipal Ltd.,* 350 F.Supp.2d at 592, 597. The projections Mr. Frank relied upon were issued by Champion to persuade the Lenders to provide a long-term amendment and wavier to the Credit Agreement and to solicit bids for the Company's sale. (Feb. 15 Tr., 15:9–16:3, 29:18–29:24, 66:22–68:2.) In fact, Mr. Frank admitted that the 2009 projections were estimates and were not a reliable indicator of Champion's future performance. (*Id.* at 74:16–76:2, 78:24–81:2.)

 **\*37** While a prefabricated housing industry specialist predicted in its report for 2009 that industry sales were expected to increase 3.9% over the next five years (*see* Trial Ex. 3210 at 11), Champion's management forecasted, in the projections used by Mr. Frank, that its sales would grow by an average annual rate of 22.4% over that same period. (Feb. 15 Tr., 58:9–62:16.) Mr. Frank used these projections to determine Champion's fair market value. Mr. Frank conducted no analysis to determine how Champion management calculated the projections or whether they were reasonable.

In contrast Knight knew, at the time the projections were created, that Champion's U.S. business had "no visibility" and that the projections, while made in good faith, were not likely predictive of future events. (Feb. 14 Tr., 197:2–197:12; *see also* Feb. 14 Tr., 90:16–91:1.) Champion had repeatedly

proven itself unable to accurately forecast its results even in the very *short-term*. Wallitt testified that his review of Champion's financial information quickly revealed that "the company had lost the ability to forecast. The company was at ground zero of, you know, the housing crisis which was enveloping the entire U.S. economy." (*Id.* at 214:1–214:10.) Champion's most recent forecasts had been especially bad:

> So not only were year-over-year sales down by over fifty percent[,] in [the first quarter of 2009] that we were analyzing, they missed their budget by what looks to be roughly thirty-three million dollars in round numbers, that's twenty percent, which again major red flag. You can't project or forecast your top line within twenty percent in the current quarter that you're in? How on earth are you going to forecast out six quarters? ... [I]t led me to ... draw the pretty fast conclusion that management could not project the business.

(*Id.* at 215:19–216:7.) Nevertheless, Mr. Frank used Champion's *long-term* projections as the most important factor in determining his estimate of fair market value.

Defendant's expert, Loughlin, performed a valuation with non-market data (although continuing to believe that market data provides the best evidence of Champion's value) to point out the flaws in Mr. Frank's analysis. Loughlin used the more reliable industry projections to calculate fair market value rather than the "inflated, unreliable, and unattainable Company financial forecasts" used by Mr. Frank. (Trial Ex. 1060 at 12–13.) Loughlin recognized, consistent with the testimony of Knight and Wallitt, that "[r]eliable and reasonably predictable cash flows were not available at Champion because the Company's operating results were deteriorating rapidly and there was little visibility as to future performance." (*Id.*) Using these more reasonable projections, Loughlin calculated a TEV for Champion of $91.4 million at December 31, 2009 and $112.2 million at June 30, 2010. (*Id.* at 15.) These estimates are more credible than Mr. Frank's estimates because they are more consistent with the available market information. Loughlin's fair market value analysis results in an estimate of Champion's value lower than the amount of the senior secured creditors' claims, again foreclosing the possibility that Plaintiff can establish any non-speculative damages.

### CONCLUSION

**\*38**  The Court has found that CSAG breached the Credit Agreement but that the Committee did not prove the breach caused Champion's bankruptcy or resulted in damages. Accordingly, the Court will dismiss the claims against CSAG and enter judgment in favor of CSAG.

Footnotes

1    This Opinion constitutes the findings of fact and conclusions of law required by Federal Rule of Bankruptcy Procedure 7052.

2    Pursuant to the confirmed Second Amended Joint Plan of Liquidation, a Creditor Trust was created and the Court granted the Creditor Trustee standing to prosecute this adversary proceeding.

3    The Court previously dismissed the claims against all other defendants by Order, dated September 1, 2010 (D.I.259).

**End of Document**                                         © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 66

Case 09-10138-MFW    Doc 13460-9    Filed 05/02/14    Page 114 of 177

Matter of Cajun Elec. Power Co-op., Inc., 119 F.3d 349 (1997)

31 Bankr.Ct.Dec. 333, Bankr. L. Rep. P 77,486, 11 Tex.Bankr.Ct.Rep. 327

119 F.3d 349
United States Court of Appeals,
Fifth Circuit.

In the Matter of CAJUN ELECTRIC
POWER COOPERATIVE, INC., Debtor.
The OFFICIAL COMMITTEE OF
UNSECURED CREDITORS, Appellant,

v.

CAJUN ELECTRIC POWER COOPERATIVE,
INC., By and Through Its Chapter 11
Trustee, Ralph R. MABEY; Entergy Gulf
States, Inc.; Entergy Corporation; United
States Department of Agriculture, on
Behalf of Rural Utilities Service, Appellees.

No. 96–30985.    |    Aug. 5, 1997.

Unsecured trade creditors committee objected to proposed settlement of claims between Chapter 11 debtor-electrical power cooperative and debtor's two largest creditors. The United States District Court for the Middle District of Louisiana, Frank J. Polozola, J., approved settlement. Committee appealed. The Court of Appeals, Benavides, Circuit Judge, held that: (1) district court's approval of settlement was final order for purposes of appeal; (2) settlement did not effect prohibited sub rosa plan of reorganization; and (3) approval of settlement agreement was not abuse of discretion.

Affirmed.

West Headnotes (17)

[1]    **Bankruptcy**
       👈 Representation of debtor, estate, or creditors

       Trustee in bankruptcy has standing to bring equitable subordination claim on behalf of estate's creditors.

       6 Cases that cite this headnote

[2]    **Bankruptcy**
       👈 Jurisdiction

Court of Appeals' jurisdiction was governed by statute concerning appeals from final decision of district court where district court heard case itself as court of bankruptcy, rather than sitting as bankruptcy appeals court. 28 U.S.C.A. §§ 158(d), 1291.

1 Cases that cite this headnote

[3]    **Bankruptcy**
       👈 Finality; interlocutory orders

District court's approval of settlement ending protracted litigation between Chapter 11 debtor-electrical power cooperative and its two largest creditors was "final" order within context of bankruptcy appeals, and therefore Court of Appeals had jurisdiction over appeal from approval order under statute governing appeals from final decisions of district court. 28 U.S.C.A. § 1291.

10 Cases that cite this headnote

[4]    **Federal Courts**
       👈 In general; necessity

Appellate jurisdiction under statute governing appeals from final decisions of district courts ordinarily depends on existence of decision by district court that ends litigation on the merits and leaves nothing for court to do but execute judgment. 28 U.S.C.A. § 1291.

Cases that cite this headnote

[5]    **Bankruptcy**
       👈 Finality; interlocutory orders

In Fifth Circuit, in bankruptcy context, liberalized final judgment rule of statute governing appeals from bankruptcy courts applies even when appellate jurisdiction is based on statute governing appeals from final decisions of district courts. 28 U.S.C.A. §§ 158(d), 1291.

2 Cases that cite this headnote

[6]    **Bankruptcy**
       👈 Finality

       **Bankruptcy**

Case 09-10138-MFW    Doc 13460-9    Filed 05/02/14    Page 115 of 177

Matter of Cajun Elec. Power Co-op., Inc., 119 F.3d 349 (1997)

31 Bankr.Ct.Dec. 333, Bankr. L. Rep. P 77,486, 11 Tex.Bankr.Ct.Rep. 327

🔑 Finality; interlocutory orders

Under liberalized final judgment rule applicable to bankruptcy appeals, jurisdiction exists if there is order finally disposing of some, but not necessarily all, of claims. 28 U.S.C.A. §§ 158(d), 1291.

2 Cases that cite this headnote

**[7]    Bankruptcy**

🔑 Review

Court of Appeals would review de novo district court's legal conclusion that settlement between Chapter 11 debtor-electrical power cooperative and its two largest creditors did not effect sub rosa plan of reorganization; related factual findings would be reviewed for clear error.

6 Cases that cite this headnote

**[8]    Bankruptcy**

🔑 Compromises, Releases, and Stipulations

Settlement between Chapter 11 debtor-electrical power cooperative and its two largest creditors did not effect prohibited sub rosa plan of reorganization; settlement did not dispose all claims against debtor, restrict creditors' rights to vote as they deemed fit on proposed plan, or dispose of virtually all of debtor's assets, but rather disposed of debtor's interest in nuclear plant, which would facilitate reorganization without denigrating objecting unsecured trade creditors' rights, and debtor retained as much as $1.1 billion in other assets. Bankr.Code, 11 U.S.C.A. § 363(b); Fed.Rules Bankr.Proc.Rule 9019(a), 11 U.S.C.A.

15 Cases that cite this headnote

**[9]    Bankruptcy**

🔑 Review

Court of Appeals would review district court's decision to approve settlement between Chapter 11 debtor-electrical power cooperative and its two largest creditors for abuse of discretion and subsidiary factual findings for clear error.

Cases that cite this headnote

**[10]    Bankruptcy**

🔑 Judicial authority or approval

Approval of compromise settlement of debtor's claim should only be given if settlement is fair and equitable and in best interest of the estate. Fed.Rules Bankr.Proc.Rule 9019(a), 11 U.S.C.A.

4 Cases that cite this headnote

**[11]    Bankruptcy**

🔑 Judicial authority or approval

Words "fair and equitable," as used in context of approval of compromise settlement of debtor's claim, are terms of art, and mean that senior interests are entitled to full priority over junior ones. Fed.Rules Bankr.Proc.Rule 9019(a), 11 U.S.C.A.

8 Cases that cite this headnote

**[12]    Bankruptcy**

🔑 Judicial authority or approval

In deciding whether settlement of litigation is fair and equitable, judge in bankruptcy must make well-informed decision, comparing terms of compromise with likely rewards of litigation; in particular, judge must evaluate and set forth in comprehensible fashion probability of success in litigation, with due consideration for uncertainty in fact and law, complexity and likely duration of litigation and any attendant expense, inconvenience and delay, and all other factors bearing on wisdom of compromise. Fed.Rules Bankr.Proc.Rule 9019(a), 11 U.S.C.A.

22 Cases that cite this headnote

**[13]    Bankruptcy**

🔑 Judicial authority or approval

With respect to requirement that bankruptcy court consider probability of success in litigation as factor in determining whether settlement is fair and equitable, it is unnecessary for court

Case 09-10138-MFW    Doc 13460-9    Filed 05/02/14    Page 116 of 177

Matter of Cajun Elec. Power Co-op., Inc., 119 F.3d 349 (1997)
31 Bankr.Ct.Dec. 333, Bankr. L. Rep. P 77,486, 11 Tex.Bankr.Ct.Rep. 327

to conduct mini-trial to determine probable outcome of any claims waived in settlement; court need only apprise itself of relevant facts and law so that it can make informed and intelligent decision. Fed.Rules Bankr.Proc.Rule 9019(a), 11 U.S.C.A.

22 Cases that cite this headnote

**[14]    Bankruptcy**
    👉 Judicial authority or approval

In considering "all other factors bearing on wisdom of settlement," as part of determining whether compromise settlement of debtor's claim is fair and equitable, court should consider best interests of creditors, with proper deference to their reasonable views, and extent to which settlement is truly the product of arms-length bargaining, and not of fraud or collusion. Fed.Rules Bankr.Proc.Rule 9019(a), 11 U.S.C.A.

24 Cases that cite this headnote

**[15]    Bankruptcy**
    👉 Judicial authority or approval

Approval of settlement between Chapter 11 debtor-electrical power cooperative and its two largest creditors was not abuse of discretion; likelihood that debtor would succeed on waived claims, including equitable subordination claims against settling creditors, was minimal, cost and complexity of settled litigation was staggering, settlement was result of arms-length bargaining, and, although numerical majority of creditors opposed settlement, overall interests of creditors were well served by settlement. Bankr.Code, 11 U.S.C.A. § 510(c); Fed.Rules Bankr.Proc.Rule 9019(a), 11 U.S.C.A.

7 Cases that cite this headnote

**[16]    Bankruptcy**
    👉 Inequitable conduct

Equitable subordination is remedial in nature and is only rarely granted. Bankr.Code, 11 U.S.C.A. § 510(c).

6 Cases that cite this headnote

**[17]    Bankruptcy**
    👉 Inequitable conduct

Equitable subordination is permitted when claimant engaged in inequitable conduct, conduct resulted in harm to creditors or conferred unfair advantage upon claimant, and equitable subordination is not inconsistent with Bankruptcy Code. Bankr.Code, 11 U.S.C.A. § 510(c).

7 Cases that cite this headnote

**Attorneys and Law Firms**

*351 Joseph E. Friend, Breazeale, Sachse & Wilson, New Orleans, LA, Gerald M. Amero, Catherine Ruth Connors, Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, ME, for Appellant.

David S. Rubin, Kantrow, Spaht, Weaver & Blitzer, Baton Rouge, LA, Lon A. Jenkins, Kenneth L. Cannon, LeBoeuf, Lamb, Greene & MacRae, Salt Lake City, UT, for Cajun Electric Power Cooperative, Inc.

Tom F. Phillips, Courtney S. DeBlieux, Taylor, Porter, Brooks & Phillips, Baton Rouge, LA, David J. Messina, Taylor, Porter, Brooks & Phillips, New Orleans, LA, for Entergy Gulf States, Inc. and Entergy Corp.

Thomas Mark Bondy, William Kanter, U.S. Department of Justice, Civil Division, Washington, DC, for U.S. Department of Agriculture.

Appeal from the United States District Court for the Middle District of Louisiana.

Before SMITH, BARKSDALE and BENAVIDES, Circuit Judges.

**Opinion**

*352 BENAVIDES, Circuit Judge:

Cajun Electric Power Cooperative, Inc. ("Cajun") is a non-profit rural electrical power cooperative that made an imprudent investment in a nuclear power plant and

31 Bankr.Ct.Dec. 333, Bankr. L. Rep. P 77,486, 11 Tex.Bankr.Ct.Rep. 327

is now a Chapter 11 debtor. In this bankruptcy appeal, a committee representing more than 500 unsecured trade creditors asserting claims of approximately $7 million objects to the settlement of litigation between Cajun and its two largest creditors. The district court, having withdrawn the reference to the bankruptcy court in order to superintend the case directly, approved the settlement.

Cajun's largest creditor is the federal government's Rural Utilities Service ("RUS") (formerly the Rural Electrification Administration), which provided Cajun with loans and loan guarantees for its investment in the River Bend nuclear plant. RUS asserts that it has secured claims against Cajun of $4.2 billion. Cajun's second-largest creditor is the nuclear plant's builder and principal owner, Gulf States Utilities Co. ("Gulf States"), which through its corporate successor, Entergy Gulf States, Inc., asserts unsecured claims of $400 million. The settlement was agreed to by Cajun's Chapter 11 trustee, Ralph R. Mabey.

The settlement approved by the district court would end the litigation between Cajun, RUS, and Gulf States relating to the River Bend plant. It also would resolve several other claims. In the view of the district court, the settlement would clear the way for approval of a plan of reorganization for the debtor, Cajun.

In the instant appeal, the trade creditors disavow any intention of preventing a settlement of the underlying litigation. They claim, however, that the settlement is flawed and should be "modified." They ask this court to order that the settlement be made contingent upon approval of a reorganization plan, or, alternatively, to equitably subordinate the claims of Gulf States and RUS.

In support of these requests, appellants advance two distinct legal theories. First, they contend that the settlement approved by the district court is an impermissible *sub rosa* reorganization plan. Alternatively, they contend that the settlement is not fair and equitable.

We affirm the district court order approving the settlement. Consequently, we need not address whether the unusual relief sought by the Committee is appropriately addressed to this court. [1]

**FACTUAL AND PROCEDURAL BACKGROUND**

Cajun and Gulf States were bitter rivals who in 1980 united in a common endeavor: construction of the River Bend nuclear reactor. Cajun invested $588 million in River Bend in exchange for a 30 percent ownership stake. RUS lent Cajun a substantial amount of capital for its investment in River Bend and guaranteed the remainder of Cajun's River Bend loans.

When River Bend turned out to be a financial drain, Cajun attempted to remain solvent by raising its rates. This course was disallowed by the Louisiana Public Service Commission on the ground that River Bend was an imprudent investment. On December 21, 1994, Cajun filed for protection from its creditors under Chapter 11.

It is unnecessary to recount the entire history of Cajun's Chapter 11 proceedings. We need only provide a brief summary of the settlement agreement approved by the district court.

If the settlement is affirmed, Cajun first and foremost would be freed of any future involvement in River Bend. Cajun would be **\*353** obligated, however, to pay $107 million toward its share of the reactor's decommissioning trust fund. Cajun would be absolved of any further liability for the plant's decommissioning, but would be barred from recovering any excess if the decommissioning fund proves to be overfunded.

Cajun, unshackled from its River Bend investment, would drop its suit against Gulf States seeking (1) rescission of the River Bend agreement on grounds of fraud and error; or, in the alternative, (2) damages for breach of contract, breach of fiduciary duty, and mismanagement. A four-month trial was held in district court on the fraud suit; it ended with the district court ruling in Gulf States' favor, although a final written opinion had not been issued. The breach of contract suit has not yet gone to trial; the trustee has estimated that Cajun might recover $200 million in damages.

[1]   The parties would relinquish several additional claims against one another, including:

• Claims and counter-claims relating to Gulf States' transmission of Cajun power (the "Transmission Services" suit). Based on a ruling favoring Gulf States by the Federal Energy Regulatory Commission ("FERC"), the settling parties estimate that Cajun could be required to pay $55 million in counter-claim damages if this suit runs its course.

Case 09-10138-MFW    Doc 13460-9    Filed 05/02/14    Page 118 of 177

Matter of Cajun Elec. Power Co-op., Inc., 119 F.3d 349 (1997)

31 Bankr.Ct.Dec. 333, Bankr. L. Rep. P 77,486, 11 Tex.Bankr.Ct.Rep. 327

• A dispute over Cajun's unilateral decision to cease payments to Gulf States on certain River Bend expenses (the "Service Water" suit). Gulf States has obtained a preliminary injunction allowing it to deduct the money withheld by Cajun, $58 million, from Gulf States' payments to Cajun for electricity generated by Cajun's coal-burning plant. The $58 million has been deposited in district court; under the settlement, Gulf States would keep it.

• Cajun's claim against Gulf States and RUS for equitable subordination. [2]

• Claims between Cajun and RUS arising from River Bend, including Cajun's claims for lender liability and waiver of deficiency judgment. Cajun retains the right to claim that RUS did not perfect its security interest.

• Cajun transfers two transmission lines worth $20 million to Gulf States, which agrees to transmit Cajun power through its lines.

Also under the settlement, RUS succeeds to Cajun's interest in River Bend. RUS can keep this "asset," sell it, or force Gulf States to take it. In the unlikely event that the plant is sold to a third party, Cajun will deduct the sale price from its debt to RUS. The eventual owner of Cajun's interest in River Bend would receive any proceeds from litigation over design defects, estimated by the trustee to be about $10 million.

The Committee representing the trade creditors did not ask the district court to reject the Agreement. Instead, the Committee requested that the court defer approval until confirmation of a bankruptcy plan, or, in the alternative, approve the settlement conditionally, pending confirmation of a plan. The district court denied these requests and approved the settlement on August 27, 1996. The Committee appeals.

## DISCUSSION

### I. JURISDICTION

[2] [3] Because the district court did not sit as a bankruptcy appeals court but heard the case itself as a court of bankruptcy, 28 U.S.C. 158(d) does not confer appellate jurisdiction on this court. Instead, our jurisdiction is governed by 28 U.S.C. § 1291. *Cajun Elec. Power Coop., Inc. v. Central Louisiana Elec. Co. (In re Cajun Elec. Power Coop., Inc.),* 69 F.3d 746 (5th Cir.1995), *modified on other grounds on reh'g,* 74 F.3d 599 (5th Cir.) (per curiam)(authorizing appointment of trustee

in the instant case), *cert. denied,* 519 U.S. 808, 117 S.Ct. 51, 136 L.Ed.2d 15 (1996).

**\*354** [4] [5] [6] Section 1291 vests the federal courts of appeals with "jurisdiction of appeals from all final decisions of the district courts...." Appellate jurisdiction under this statute ordinarily "depends on the existence of a decision by the District Court that 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.' " *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 467, 98 S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978) (quoting *Catlin v. United States,* 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945)). However, it is settled in this circuit that in the bankruptcy context, the liberalized final judgment rule of 28 U.S.C. § 158(d) applies, even when appellate jurisdiction is based on section 1291. *Cajun,* 69 F.3d at 748. Under this rule, jurisdiction exists if there is an order finally disposing of some, but not necessarily all, of the claims.

The district court's approval of the settlement order brings to an end the protracted litigation over the River Bend nuclear project and various other claims among Cajun, Gulf States, and RUS. It is "final" as the term is understood in bankruptcy. Accordingly, we have jurisdiction under 28 U.S.C. § 1291.

### II. *SUB ROSA* REORGANIZATION

[7] We review *de novo* the district court's legal conclusion that the settlement does not effect a *sub rosa* plan of reorganization. *See Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1307 (5th Cir.1985). Related factual findings are reviewed for clear error. *See id.* at 1308.

[8] A bankruptcy trustee is authorized by statute to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Under the Bankruptcy Rules, a trustee is permitted to settle lawsuits pursuant to section 363(b). FED. BANKR.R. 9019(a). However, section 363(b) does not authorize the trustee to enter a settlement if the result amounts to a *sub rosa* plan of reorganization. As we have stated:

> The debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of a plan sub rosa in connection with a sale of assets.

Case 09-10138-MFW    Doc 13460-9    Filed 05/02/14    Page 119 of 177

Matter of Cajun Elec. Power Co-op., Inc., 119 F.3d 349 (1997)

31 Bankr.Ct.Dec. 333, Bankr. L. Rep. P 77,486, 11 Tex.Bankr.Ct.Rep. 327

*Pension Benefit Guar. Corp. v. Braniff Airways, Inc.* (*In re Braniff Airways, Inc.*), 700 F.2d 935, 940 (5th Cir.1983). On the other hand, "compromises are a normal part of the process of reorganization, oftentimes desirable and wise methods of bringing to a close proceedings otherwise lengthy, complicated and costly." *Rivercity v. Herpel (In re Jackson Brewing Co.),* 624 F.2d 599, 602 (5th Cir.1980) (internal quotation marks and citations omitted).

The Committee asserts that the instant settlement effectively gutted the assets of the estate without affording the unsecured trade creditors the procedural protections of the reorganization process. Specifically, the Committee contends that the settlement, by removing more than $100 million from the estate and by eliminating the estate's equitable subordination claims against RUS and Gulf States, effectively dictates the terms of any future reorganization plan—an outcome proscribed by our cases. Appellees counter that far from being a *sub rosa* reorganization plan, the settlement removes a major obstacle to reorganization by ridding Cajun of its involvement in River Bend. They point out that the nuclear plant and related litigation had clouded title to Cajun's other assets, precluding any sale of those assets prior to a settlement.

Appellees make a strong argument that the Committee failed to preserve this issue for appeal by stating precisely the Chapter 11 protections that they would lose under the settlement. However, even assuming that the Committee preserved the issue, we reject its claim on the merits. [3]

The legal standard for deciding whether a transaction under section 363(b) amounts to a *sub rosa* reorganization emerges from our case law. In the *Braniff* case, this court **\*355** reversed the district court's approval of a transaction that would have transferred the bankrupt airline's cash, aircraft and equipment, and terminal leases to another airline (the purchaser) in exchange for scrip for travel on the purchaser.

We found the transaction deficient on three grounds. First, the agreement "had the practical effect of dictating some of the terms of any future reorganization plan." *Braniff,* 700 F.2d at 940. That is because, had a reorganization plan failed to restrict the use of the travel scrip as specified in the agreement, the scrip would have been forfeited. *Id.* Second, the agreement required Braniff's secured creditors to vote "in favor of any future reorganization plan approved by a majority of the unsecured creditors committee." *Id.* The secured creditors'

voting rights were thus infringed. Finally, the transaction "provided for the release of claims by *all parties* against Braniff, its secured creditors, and its officers and directors." *Id.* (emphasis added). Had the sale of Braniff's assets been approved, we concluded, "little would remain" in the estate and there would be "little prospect or occasion for further reorganization." *Id.*

The instant settlement is not a *sub rosa* reorganization of the type disapproved in *Braniff*. It does not dispose of all claims against Cajun, nor does it restrict creditors' right to vote as they deem fit on a proposed reorganization plan. Finally, the settlement does not dispose of virtually all of Cajun's assets, leaving "little prospect or occasion for further reorganization." *Cf. Braniff,* 700 F.2d at 940. Instead it disposes of one particular "asset," River Bend, which is not so much the crown jewel of Cajun's estate but its white elephant. *Cf. Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303 (5th Cir.1985) (recognizing that the disposal of a crown jewel asset might, in some circumstances, amount to a *sub rosa* plan). The removal of River Bend from the estate will facilitate Cajun's reorganization, and will do so without denigrating the rights of the unsecured trade creditors.

Undeniably, the settlement removes $107 million in cash and transmission lines worth $20 million from the debtor's estate; it also precludes Cajun from pursuing litigation—an uncertain prospect at best—against Gulf States and RUS. [4] However, Cajun retains as much as $1.1 billion in non-River Bend assets. In sum, the settlement does not "alter creditors' rights, dispose of assets, and release claims to the extent proposed in the wide-ranging transaction disapproved in" *Braniff. Richmond Leasing,* 762 F.2d at 1303. The cases are entirely distinguishable, and the settlement at issue does not effect a *sub rosa* plan.

## III. FAIR AND EQUITABLE SETTLEMENT

The Committee argues in the alternative that the settlement violates the "fair and equitable" standard and that the district court erred by approving it without conditioning the settlement on approval of a reorganization plan.

 [9]    We review the district court's decision to approve the settlement for an abuse of discretion. *Connecticut Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.),* 68 F.3d 914, 917 (5th Cir.1995) (internal citations omitted). Subsidiary factual findings are reviewed for clear error. *Id.*

Case 09-10138-MFW    Doc 13460-9    Filed 05/02/14    Page 120 of 177

Matter of Cajun Elec. Power Co-op., Inc., 119 F.3d 349 (1997)

31 Bankr.Ct.Dec. 333, Bankr. L. Rep. P 77,486, 11 Tex.Bankr.Ct.Rep. 327

**[10]**    **[11]**    As noted above, the courts are empowered to approve a compromise settlement of a debtor's claim under Bankruptcy Rule 9019(a). *See id.* Approval should only be given if the settlement is "fair and equitable and in the best interest of the estate." *Id.* (citing *In re Jackson Brewing Co.,* 624 F.2d at 602 (additional citations omitted)). The "fair and equitable standard" is not as vague as it might appear to be. "The words 'fair and equitable' are terms of art—they mean that senior interests are entitled to full priority over junior ones." *United States v. AWECO, Inc. (In re AWECO, Inc.),* 725 F.2d 293, 298 (5th Cir.) (internal quotation marks **\*356** and citations omitted), *cert. denied,* 469 U.S. 880, 105 S.Ct. 244, 83 L.Ed.2d 182 (1984).

**[12]**    In deciding whether a settlement of litigation is fair and equitable, a judge in bankruptcy must make a well-informed decision, "compar [ing] the terms of the compromise with the likely rewards of litigation." *Jackson Brewing Co.,* 624 F.2d at 602 (internal quotation marks and citation omitted). In particular:

[The judge] must evaluate and set forth in a comprehensible fashion:

(1) The probability of success in the litigation, with due consideration for the uncertainty in fact and law,

(2) The complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and

(3) All other factors bearing on the wisdom of the compromise.

*Id.* (internal citation omitted).

**[13]**    With respect to the first factor, it is unnecessary to conduct a mini-trial to determine the probable outcome of any claims waived in the settlement. "The judge need only apprise himself of the relevant facts and law so that he can make an informed and intelligent decision...." *La Salle Nat'l Bank v. Holland (In re American Reserve Corp.),* 841 F.2d 159, 163 (7th Cir.1987). [5]

**[14]**    Under the rubric of the third, catch-all provision, we have specified two additional factors that bear on the decision to approve a proposed settlement. First, the court should consider the best interests of the creditors, "with proper deference to their reasonable views." *Foster Mortgage Corp.,* 68 F.3d at 917. Second, the court should consider "the extent

to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Id.* at 918 (internal citations omitted).

**[15]**    Applying this standard to the facts of the instant case, we conclude that the district court did not abuse its discretion by approving the settlement. We consider each factor in turn.

*Probability of Success in Litigation.* The settlement requires Cajun to abandon several claims against Gulf States and RUS. None of these actions look particularly promising from our vantage point, and more important, none impressed the district court.

Under the agreement, Cajun would drop its suit against Gulf States for rescission of the River Bend joint ownership agreement. The probability of Cajun's succeeding in this action is close to nil, inasmuch as Cajun has already lost after a four-month trial in district court. Moreover, the district court, which is excruciatingly familiar with the details of this case, found that Cajun had little chance of succeeding in the companion action seeking damages for breach of contract and breach of fiduciary duty.

The settlement also would require Cajun to drop the Transmission Services suit. This action has boomeranged against Cajun, resulting in a judgment of $55 million against it on Gulf States' counter-claim.

Cajun would be forced to drop the Service Water suit as well. In that action, Gulf States has obtained an injunction effectively denying Cajun the right to withhold payment for various River Bend expenses. Cajun does not seem to be giving up anything of value by waiving its right to pursue these actions.

Perhaps most important to the Committee, Cajun would be required to surrender any claim of equitable subordination against Gulf States and RUS. These claims too are unlikely to succeed, for the reasons that follow.

**[16]**    The Bankruptcy Code provides that "after notice and a hearing, the court may—(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim...." 11 U.S.C. § 510(c). Equitable subordination is remedial in nature and is only rarely granted. *United States Abatement Corp. v. Mobil Exploration & Producing U.S., Inc.*

Case 09-10138-MFW    Doc 13460-9    Filed 05/02/14    Page 121 of 177

Matter of Cajun Elec. Power Co-op., Inc., 119 F.3d 349 (1997)

31 Bankr.Ct.Dec. 333, Bankr. L. Rep. P 77,486, 11 Tex.Bankr.Ct.Rep. 327

*(In re United States Abatement Corp.),* 39 F.3d 556, 561 (5th Cir.1994).

**\*357**  **[17]**  The Bankruptcy Code does not specify the circumstances in which equitable subordination is appropriate. Instead, drawing on common law principles, this circuit has crafted a widely followed standard authorizing equitable subordination if three preconditions are satisfied. Under this test, equitable subordination is permitted when (1) the claimant engaged in inequitable conduct; (2) the conduct resulted in harm to the creditors or conferred an unfair advantage upon the claimant; and (3) equitable subordination is not inconsistent with the Bankruptcy Code. *United States Abatement* Corp., 39 F.3d at 561 (citing *Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.),* 926 F.2d 1458, 1464 (5th Cir.1991)); *see also Benjamin v. Diamond (In re Mobile Steel Co.),* 563 F.2d 692, 699–700 (5th Cir.1977) (additional citations omitted). As a practical matter, we generally have found equitable subordination in only three typical cases: "(1) when a fiduciary of the debtor misuses his position to the disadvantage of other creditors; (2) when a third party controls the debtor to the disadvantage of other creditors; and (3) when a third party actually defrauds other creditors." *United States Abatement* Corp., 39 F.3d at 561 (internal citations omitted).

The settlement would force Cajun to relinquish claims of equitable subordination against Gulf States and RUS. The only conceivable bases for these claims are (1) that Gulf States breached a fiduciary duty to Cajun, and (2) that RUS controlled Cajun to the trade creditors' disadvantage. However, Cajun has failed to present a persuasive argument as to why Gulf States owed it a fiduciary duty, let alone as to how Gulf States breached that duty. Moreover, the theory that Cajun was controlled by RUS is far-fetched.

The typical case of equitable subordination based on creditor control of the debtor involves a corporate insider. *See, e.g., Fabricators,* 926 F.2d at 1465–66. On occasion, bankruptcy courts have found that a creditor exerted such dominance over the debtor as to warrant subordination of the creditor's claims. However, the degree of control in such cases far exceeds the influence of RUS over Cajun, and is typically related to some egregious misconduct by the creditor. *See, e.g., In re American Lumber Co.,* 5 B.R. 470, 478–79 (D.Minn.1980) (creditor deprived borrower of its sole source of cash, forced it to adopt austerity measures, decided which creditors would be paid, and required debtor to provide secured interest in all remaining assets); *Slefco v. First Nat'l Bank of Stuttgart*

*(In re Slefco),* 107 B.R. 628 (Bankr.E.D.Ark.1989) (bank made false representations to debtor about amount of loan and ability to borrow in the future, leading debtor to pledge all its assets to the bank); *Bank of New Richmond v. Production Credit Ass'n of River Falls (In re Osborne),* 42 B.R. 988 (W.D.Wis.1984) (affirming subordination based on affirmative misrepresentation to another creditor). In this case, by contrast, Cajun does not even bother to allege that RUS engaged in inequitable conduct. Nor does Cajun explain how RUS, an arm of the government with no authority to actually take over and run the company, can rationally be viewed as its alter ego.

In sum, Cajun's prospects in the courtroom, on the equitable subordination claims as in its other lawsuits, are iffy at best. More likely, they are dismal. Our review of Cajun's likelihood of success in litigation does not support the Committee's assertion that the settlement should be modified.

*Complexity and Expense of Litigation.* We need not belabor this factor. According to the trustee, the litigation has cost Cajun $37 million to date, and continuing the litigation would cost "millions of dollars and years of delay." The district court has repeatedly commented upon the complexity of the legal issues raised. The fraud trial in district court took four months; the breach of contract trial would consume an estimated seven to fourteen months. Moreover, the district court found that continuing the litigation would waste the estate's resources and chill efforts to acquire Cajun's non-nuclear assets. These findings were not clearly erroneous.

Given the complexity and cost of the litigation, settlement is advisable.

*The Best Interests and Wishes of the Creditors.* The trustee testified, and the district court found, that Cajun's ownership interest  **\*358** in River Bend was a major impediment to reorganization. The district court also determined that the settlement would remove this obstacle without altering the creditors' rights under the Code. The court thus concluded that the settlement was in the creditors' interests. None of these findings were clear error.

The issue is complicated somewhat by the requirement that the court, in considering whether a settlement is fair and equitable, consider the reasonable views of a majority of the creditors. *In re Foster Mortgage Corp.,* 68 F.3d at 917. In this case, the vast numerical majority of creditors is represented by the Committee, which opposes the settlement as approved

Case 09-10138-MFW    Doc 13460-9    Filed 05/02/14    Page 122 of 177

Matter of Cajun Elec. Power Co-op., Inc., 119 F.3d 349 (1997)

31 Bankr.Ct.Dec. 333, Bankr. L. Rep. P 77,486, 11 Tex.Bankr.Ct.Rep. 327

by the district court. [6] The appellees point out, however, that the trade creditors' aggregate claim against Cajun is only a drop in the bucket—by some estimates less than one percent of Cajun's total debt.

Even if we were to count heads and declare that a majority opposes the settlement, it is established that the "desires of the creditors are not binding." *In re Foster,* 68 F.3d at 917. The test is not the desires of the majority as such, but the best interests of the creditors, taking into account their reasonable views. In this case there is room to argue about who speaks for the "majority." But given the salutary effects of a settlement on the prospects for reorganization, and given also the relatively small amount of the trade creditors' claims, the district court did not clearly err by finding the settlement in the creditors' interests. In any event, given that all of the other factors in the equation overwhelmingly favor the settlement, the wishes of the trade creditors do not compel us to reject the settlement.

*Arms-Length Negotiations.* The Committee does not contest the district court's determination that the settlement was the result of arms-length bargaining, and not the result of fraud or collusion.

Based on the foregoing factors, we hold that the district court did not abuse its discretion by finding the settlement was fair and equitable. [7] Cajun's prospects in the litigation are dubious; the cost and complexity of the litigation are staggering. The settlement was the result of arms-length bargaining. And although a numerical majority of creditors opposes the settlement, the overall interests of the creditors, giving due regard to the views of the two largest creditors as well the many smaller ones, will be well served by the settlement.

## CONCLUSION

The order of the district court approving the settlement is AFFIRMED.

**Parallel Citations**

31 Bankr.Ct.Dec. 333, Bankr. L. Rep. P 77,486, 11 Tex.Bankr.Ct.Rep. 327

Footnotes

1     As discussed below, this court has the authority to set aside the order approving the settlement if we find that it was an abuse of the district court's discretion. That is not the relief sought by the Committee, however. The Committee asks this court to order that up to $7 million in unsecured trade creditors' claims be paid in full as part of any reorganization plan incorporating the settlement.
      Appellees contend that this relief is unauthorized by the Bankruptcy Code, and if granted, would amount to a *sub rosa* reorganization plan. They further contend that such a ruling would amount to an order equitably subordinating the claims of Gulf States and RUS, without the benefit of a trial in district court.

2     A trustee in bankruptcy has standing to bring an equitable subordination claim on behalf of the bankrupt estate's creditors. *See Fruehauf Corp. v. T.E. Mercer Trucking Co. (In re T.E. Mercer Trucking Co.),* 16 B.R. 176, 187 (Bankr.N.D.Tex.1981); *First Bank Billings v. Feterl Mfg. Co. (In re Parker Montana Co.)* 47 B.R. 419, 421 (D.Mont.1985).

3     In its reply brief, the Committee cites portions of the district court record in which it listed various procedural protections afforded by Chapter 11, such as the right to a disclosure statement providing adequate information about any proposed plan. Missing from this recitation is any indication of how the Committee might lose these protections if the settlement is approved.

4     As noted above, Cajun retains the right to pursue certain claims against RUS, including the claim that its security interest was not perfected.

5     In this case, the district court had already tried a four-month trial on the rescission claim and was more than familiar with the applicable facts and law.

6     The Committee contends that it would not oppose the settlement, if only it were conditioned on approval of a plan that protected their interests.

7     The district court cited public safety as one more factor favoring the settlement. We do not doubt that the public interest will be served by a settlement that resolves a dispute over River Bend's decommissioning trust fund, thus assuring the availability of funds for the safe decommissioning of the nuclear plant. However, we do not rely on this factor and need not decide whether public safety is an appropriate consideration in determining whether a settlement is fair and equitable.

**Matter of Cajun Elec. Power Co-op., Inc., 119 F.3d 349 (1997)**

31 Bankr.Ct.Dec. 333, Bankr. L. Rep. P 77,486, 11 Tex.Bankr.Ct.Rep. 327

---

**End of Document**                                           © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 67

246 F.3d 152
United States Court of Appeals,
Second Circuit.

ON DAVIS, Plaintiff–Appellant,

v.

The GAP, INC., Defendant–Appellee.

Docket No. 99–9081.    |    Argued June 27,
2000.    |    Decided April 3, 2001.    |    As Amended
April 10, 2001.    |    As Amended May 15, 2001.

Designer of copyrighted nonfunctional jewelry worn in
the manner of eyeglasses brought copyright infringement
suit against international retailer, based on retailer's use in
advertisement of photograph in which one of models wore
designer's eyewear. The United States District Court for
the Southern District of New York, Robert W. Sweet, J.,
granted summary judgment to retailer, 1999 WL 199005,
and denied reargument, 186 F.R.D. 322. Designer appealed.
The Court of Appeals, Leval, Circuit Judge, held that: (1)
designer could not recover statutory damages or attorney
fees; (2) district court could not grant summary judgment
without first considering request for declaratory relief; (3)
designer failed to show causal connection between infringing
use and retailer's profits, as required to recover award
of compensatory damages under Copyright Act based on
retailer's profits; but (4) in certain cases a copyright holder's
loss of a reasonable royalty or license fee may serve as
"actual damages" supporting recovery; (5) evidence was not
too speculative to support such recovery; and (6) infringement
of copyright was not de minimis or a fair use.

Affirmed in part, vacated in part, and remanded.

West Headnotes (24)

[1]    **Copyrights and Intellectual Property**
        👉 Statutory Damages;  Minimum Award

        **Copyrights and Intellectual Property**
        👉 Attorney fees

        Designer of nonfunctional jewelry worn over
        eyes in the manner of eyeglasses could not
        recover statutory damages or attorney fees in
        copyright infringement action brought against
        international retailer, which was based on

retailer's use of holder's copyrighted jewelry
design in advertisement, where allegedly
infringing use occurred more than three months
after first publication of eyewear design, but
before registration of copyright. 17 U.S.C.A. §
504(a).

6 Cases that cite this headnote

[2]    **Copyrights and Intellectual Property**
        👉 Summary judgment

        District court could not grant summary
        judgment dismissing copyright infringement
        claims without first determining whether
        plaintiff was entitled to requested declaratory
        judgment that copyright had been infringed,
        where grant of summary judgment was based
        on a variety of theories that had no bearing on
        demand for declaratory relief.

        1 Cases that cite this headnote

[3]    **Copyrights and Intellectual Property**
        👉 Nature and elements of injury

        Existence of damages suffered is not an essential
        element of a claim for copyright infringement.

        4 Cases that cite this headnote

[4]    **Declaratory Judgment**
        👉 Copyrights

        Owner of a copyright is entitled to prevail in a
        claim for declaratory judgment of infringement
        without showing entitlement to monetary relief.

        3 Cases that cite this headnote

[5]    **Copyrights and Intellectual Property**
        👉 Recovery in general;  actual damages and
        profits

        Provision of Copyright Act governing awards
        of damages for copyright infringement provides
        for the recovery of both the infringer's profits,
        and the copyright owner's actual damage, but
        specifies that double recovery is not permitted
        where categories overlap. 17 U.S.C.A. § 504.

6 Cases that cite this headnote

**[6]**    **Copyrights and Intellectual Property**

👉 Recovery in general;  actual damages and profits

Categories of damages in copyright infringement suits of infringer's profits, and copyright holder's actual damages, have different justifications and are based on different financial data: award of infringer's profits examines the facts only from the infringer's point of view, and if infringer has earned a profit, such an award makes him disgorge it to insure that he not benefit from his wrongdoing, while an award of copyright holder's actual damages looks at the facts from the point of view of the holder, and undertakes to compensate him for any harm he suffered by reason of the infringer's illegal act. 17 U.S.C.A. § 504.

12 Cases that cite this headnote

**[7]**    **Copyrights and Intellectual Property**

👉 Recovery in general;  actual damages and profits

Designer who held copyright for nonfunctional jewelry worn over eyes in the manner of eyeglasses failed to show causal connection between infringement of copyright by international retailer, based on its use of advertisement in which model was wearing designer's eyewear, and retailer's profits, as required to recover award of compensatory damages under Copyright Act based on retailer's profits in infringement suit, even though designer submitted proof of net sales of retailer's corporate parent; parent's overall revenues had no reasonable relationship to act of infringement, as advertisement infringed only with respect to one chain of stores operated by parent, and did not promote other labels in corporate family. 17 U.S.C.A. § 504.

29 Cases that cite this headnote

**[8]**    **Copyrights and Intellectual Property**

👉 Recovery in general;  actual damages and profits

"Gross revenue," within meaning of provision of Copyright Act under which copyright holder is required to present proof only of copyright infringer's gross revenue to recover damages based on infringer's profits, means gross revenue reasonably related to the infringement, and not revenue from lines of business unrelated to act of infringement. 17 U.S.C.A. § 504.

37 Cases that cite this headnote

**[9]**    **Copyrights and Intellectual Property**

👉 Recovery in general;  actual damages and profits

Evidence submitted by designer who held copyright for nonfunctional jewelry worn over eyes in the manner of eyeglasses was not too speculative to support recovery of designer's actual damages in copyright infringement suit against international retailer, based on its use for advertising purposes of photograph in which model wore designer's eyewear without permission; designer submitted evidence of numerous instances in which rock music stores wore his eyewear in photographs exhibited in music publications, and on one occasion designer was paid $50 for publication by magazine of photograph of deceased rock star wearing his eyewear. 17 U.S.C.A. § 504.

8 Cases that cite this headnote

**[10]**    **Copyrights and Intellectual Property**

👉 Recovery in general;  actual damages and profits

In appropriate cases, a copyright holder's loss of a reasonable royalty or license fee to which a willing buyer and a willing seller would have agreed for use taken by copyright infringer may serve as its "actual damages" supporting recovery under Copyright Act in infringement suit. 17 U.S.C.A. § 504(b).

27 Cases that cite this headnote

**[11]**    **Copyrights and Intellectual Property**

⌁ Recovery in general; actual damages and profits

Term "actual damages," as used in provision of Copyright Act under which actual damages sustained by copyright holder due to infringement will support award of damages in infringement suit, should be broadly construed to favor victims of infringement. 17 U.S.C.A. § 504(a, b).

11 Cases that cite this headnote

**[12]    Copyrights and Intellectual Property**
⌁ Nature of statutory copyright

A principal objective of the copyright law is to enable creators to earn a living either by selling or by licensing others to sell copies of the copyrighted work. U.S.C.A. Const. Art. 1, § 8, cl. 8.

Cases that cite this headnote

**[13]    Copyrights and Intellectual Property**
⌁ Elements, measure, and amount

Award in copyright infringement action of actual damages sustained by copyright holder based on loss of reasonable royalty or licensing fee may not be based on undue speculation, and in order to make out his claim that he has suffered actual damage because of the infringer's failure to pay the fee, copyright holder must show that the thing taken had a fair market value. 17 U.S.C.A. § 504.

45 Cases that cite this headnote

**[14]    Copyrights and Intellectual Property**
⌁ Recovery in general; actual damages and profits

In assessing damages for copyright infringement, courts must necessarily engage in some degree of speculation, and some difficulty in quantifying the damages attributable to infringement should not bar recovery. 17 U.S.C.A. § 504.

2 Cases that cite this headnote

**[15]    Copyrights and Intellectual Property**

⌁ Recovery in general; actual damages and profits

**Copyrights and Intellectual Property**
⌁ Statutory Damages; Minimum Award

As a general rule, punitive damages are not awarded in an infringement action under Copyright Act; instead, purpose of punitive damages, which is to punish and prevent malicious conduct, is generally achieved through provisions of statute which allow increases to an award of statutory damages in cases of willful infringement. 17 U.S.C.A. § 504.

14 Cases that cite this headnote

**[16]    Copyrights and Intellectual Property**
⌁ Nature and elements of injury

"De minimis doctrine" essentially provides that where unauthorized copying is sufficiently trivial, the law will not impose legal consequences for copyright infringement.

7 Cases that cite this headnote

**[17]    Copyrights and Intellectual Property**
⌁ Nature and elements of injury

De minimis doctrine is an important aspect of the law of copyright, as trivial copying is a significant part of modern life, and most honest citizens in the modern world frequently engage, without hesitation, in trivial copying that, but for de minimis doctrine, would technically constitute a violation of law.

5 Cases that cite this headnote

**[18]    Copyrights and Intellectual Property**
⌁ Pictorial, graphic, and sculptural works

Infringement of copyright by international retailer, arising from its unauthorized use in advertisement of photograph in which one of models wore copyrighted design of nonfunctional jewelry worn over eyes in manner of eyeglasses, was not a de minimis act of copying to which the law would attach no consequences, for purposes of copyright infringement suit; infringing item was highly noticeable in advertisement, in part because of

strikingly bizarre design and concept of eyewear, and impression created by advertisement was that models had been outfitted from top to bottom with retailer's merchandise.

4 Cases that cite this headnote

**[19]    Copyrights and Intellectual Property**
👉 Fair use and other permitted uses in general

Fair use doctrine, which was originally a judicial creation, has since been explicitly recognized in statute. 17 U.S.C.A. § 107.

Cases that cite this headnote

**[20]    Copyrights and Intellectual Property**
👉 Pictorial, graphic, and sculptural works

Infringement of copyright by international retailer, which arose from its unauthorized use in advertisement of photograph in which one of models wore copyrighted design of nonfunctional jewelry worn over eyes in manner of eyeglasses, was not protected by fair use doctrine; use was not transformative, but rather, superseded original design, and by taking design for free for its advertisement, retailer avoided paying "customary price" designer was entitled to charge, thus causing market harm. 17 U.S.C.A. § 107.

15 Cases that cite this headnote

**[21]    Copyrights and Intellectual Property**
👉 Fair use and other permitted uses in general

Heart of inquiry into whether alleged copyright infringement is protected by fair use doctrine is the purpose and character of the use. 17 U.S.C.A. § 107(1).

1 Cases that cite this headnote

**[22]    Copyrights and Intellectual Property**
👉 Fair use and other permitted uses in general

Factor for consideration in determining whether alleged copyright infringement is protected by fair use doctrine of the nature of the copyrighted work is rarely determinative. 17 U.S.C.A. § 107(2).

3 Cases that cite this headnote

**[23]    Copyrights and Intellectual Property**
👉 Fair use and other permitted uses in general

Factor considered in determining whether alleged copyright infringement is protected by fair use doctrine of the amount and substantiality of the portion used in relation to the copyrighted work as a whole recognizes that fragmentary copying is more likely to have a transformative purpose than wholesale copying. 17 U.S.C.A. § 107(3).

6 Cases that cite this headnote

**[24]    Copyrights and Intellectual Property**
👉 Fair use and other permitted uses in general

When considering effect of infringing use upon potential market for or value of copyrighted work, for purposes of determining whether alleged copyright infringement is protected by fair use doctrine, court must examine the source of the harm: if harm resulted from a transformative secondary use that lowered the public's estimation of original, such as a devastating review of a book that quotes liberally from the original to show how silly and poorly written it is, this transformative use will be found to be a fair use notwithstanding the harm, but if secondary use, by copying the first, offers itself as a market substitute and in that fashion harms the market value of the original, factor argues strongly against a finding of fair use. 17 U.S.C.A. § 107(4).

17 Cases that cite this headnote

**Attorneys and Law Firms**

**\*155**  Kenneth Spole, Syosset, NY (On Davis, pro se, on the brief) for Appellant.

Lorin L. Reisner, Debevoise & Plimpton, New York, NY (Suzanne J. Irving on the brief) for Appellees.

Before: LEVAL, PARKER and KATZMANN, Circuit Judges.

**Opinion**

LEVAL, Circuit Judge:

Plaintiff On Davis ("Davis") appeals from an order of the United States District Court for the Southern District of New York (Sweet, *J.*) granting summary judgment to the defendant, The Gap, Inc. ("the Gap"), dismissing plaintiff's claim of copyright infringement. *See On Davis v. The Gap, Inc.,* No. 97 CIV. 8606(RWS), 1999 WL 199005 (S.D.N.Y. Apr.9, 1999) ("*Davis I*"); *Davis v. The Gap, Inc.,* 186 F.R.D. 322 (S.D.N.Y.1999) ( "*Davis II* ").

**\*156**  Davis is the creator and designer of nonfunctional jewelry worn over the eyes in the manner of eyeglasses. The Gap, Inc. is a major international retailer of clothing and accessories marketed largely to a youthful customer base with annual revenues of several billions of dollars. It operates several chains of retail stores, some under the name "Gap." It is undisputed that the Gap, without Davis's permission, used a photograph of an individual wearing Davis's copyrighted eyewear in an advertisement for the stores operating under the "Gap" trademark that was widely displayed throughout the United States. Davis brought this action seeking a declaratory judgment of infringement and damages, including $2,500,000 in unpaid licensing fees, a percentage of the Gap's profits, punitive damages of $10,000,000, and attorney's fees. The district court granted summary judgment for the Gap on the grounds that (1) Davis's claims for actual damages and profits under 17 U.S.C. § 504(b) (1994) were too speculative to support recovery, or were otherwise barred by a prior ruling of this court, (2) he was not eligible for statutory damages or attorney's fees because he had not timely registered his copyright, and (3) the Copyright Act does not permit recovery of punitive damages. *See Davis I,* 1999 WL 199005, at *3–8. We affirm in part and, in part, vacate and remand.

**BACKGROUND**

Davis has created at least fifteen different designs of eye jewelry, which he markets under the name "Onoculii Designs." Davis describes Onoculii eyewear as "sculptured metallic ornamental wearable art." *Am. Compl.* ¶ 7. Each piece is made of gold, silver, or brass, and is constructed in a manner similar to eyeglasses (a frame hinged to templates

that hook over the ears), but with very different effect. The frames support decorative, perforated metallic discs or plates in the place that would be occupied by the lenses of a pair of eyeglasses. The discs effectively conceal the wearer's eyes, although the perforations permit the wearer to see through them. Some of Davis's designs are of flowery or abstract filagree shapes, some are crescents with protruding spokes or wings. The particular piece that gives rise to this action consists of a horizontal bar at the level of the eyebrows from which are suspended a pair of slightly convex, circular discs of polished metal covering the eyes, perforated with dozens of tiny pinprick holes. Davis registered his copyright for the design at issue, effective May 16, 1997.

Davis sought to gain recognition for his Onoculii line by promoting and marketing his designs "in carefully chosen media settings." *Am. Compl.* ¶ 13. As part of his marketing plan, Davis encouraged "known stylish and popular entertainers" to wear his creations in public settings. *Pl's Counter 56.1(c) Statement,* ¶ 8. Entertainers who have worn Onoculii designs while appearing on stage, on MTV, in magazine photographs or other media include Vernon Reid, Thomas Mapfumo, Don Cherry, Sun Ra, Ryo Kawasaki, Cat Coore, Mr. Pepper Seed, Chuck Johnson, and Jack and Jill. Various fashion designers have also featured Davis's eyewear as accessories in runway shows or photographs, and his work has been noted in such publications as *Vogue, Women's Wear Daily, Fashion Market, In Fashion, The New York Times, The New York Post,* and *The Village Voice.*

While Davis initially sold his designs on the street, since about 1995 he has marketed his merchandise through boutiques and optical stores. The eyewear sold at a wholesale price of approximately $30–45 a pair. Evidence in the record indicates **\*157** that it sold at retail for $65–100 a pair in 1995. *See Am. Compl.,* Ex. B. Davis asserts he has earned approximately $10,000 from sales. He testified that on one occasion he received a $50 fee from *Vibe* magazine for the use of a photograph depicting the musician Sun Ra wearing an Onoculii piece.

In May 1996, prior to Davis's registration of his copyright, the defendant created a series of advertisements showing photographs of people of various lifestyles wearing Gap clothing. The campaign was designed to promote the concept that Gap merchandise is worn by people of all kinds. The ad in question, which bears the caption "fast" emblazoned in red (the "fast" ad), depicts a group of seven young people probably in their twenties, of Asian appearance, standing

in a loose V formation staring at the camera with a sultry, pouty, provocative look. The group projects the image of funky intimates of a lively after-hours rock music club. They are dressed primarily in black, exhibiting bare arms and partly bare chests, goatees (accompanied in one case by bleached, streaked hair), large-brimmed, Western-style hats, and distinctive eye shades, worn either over their eyes, on their hats, or cocked over the top of their heads. The central figure, at the apex of the V formation, is wearing Davis's highly distinctive Onoculii eyewear; he peers over the metal disks directly into the camera lens.

The "fast" photograph was taken by the Gap in May 1996 during a photo shoot in the Tribeca area of Manhattan. The defendant provided the subjects with Gap apparel to wear for the shoot, and a trailer in which to change. The Gap claims that it did not furnish eyewear to any of the subjects, and that the subjects were told to wear their own eyewear, wristwatches, earrings, nose-rings or other incidental items, thereby "permitting each person to project accurately his or her own personal image and appearance." *Def.'s 56.1(c) Statement,* ¶ 18.

The Gap's "fast" advertisement was published in a variety of magazines, including *W, Vanity Fair, Spin, Details,* and *Entertainment Weekly.* Davis claims that the total circulation of these magazines was over 2,500,000. For five weeks during August and September of 1996, the advertisement was displayed on the sides of buses in New York, Boston, Chicago, San Francisco, Atlanta, Washington, D.C., and Seattle. The advertisement may also have been displayed on bus shelters. According to Davis, when used on buses the photograph was cropped so that only the heads and shoulders of the subjects were shown.

Davis submitted evidence showing that during the fourth quarter of 1996, the period that Davis asserts is relevant to the "fast" advertisement, the net annual sales of the parent company, Gap, Inc., increased by about 10 percent, compared to the fourth quarter of 1995, to $1.668 billion dollars. There was no evidence of what portion of the parent company's revenues were attributable to the stores operated under the Gap label, much less what portion was related to the ad in question.

Shortly after seeing the "fast" advertisement in October and November 1996, Davis contacted the Gap by telephone and in writing. The Gap's advertising campaign, which apparently ran during August and September of 1996, had

been completed by the time Davis wrote. Davis stated that he had not authorized the use of his design and inquired whether the Gap might be interested in selling a line of his eyewear.

Davis filed this action on November 19, 1997. The Gap then filed a motion for summary judgment, arguing, *inter alia,* that Davis had no entitlement to damages **\*158** and that his claims were barred by the *de minimis* and fair use doctrines.

 **[1]**    On April 9, 1999, the district court granted summary judgment for the Gap. *See Davis I,* 1999 WL 199005, at *10. The district court first noted that Davis was not eligible for "statutory damages" under 17 U.S.C. § 504(c) due to the fact that he had not registered his copyright within three months of his first "publication" of his work or prior to the allegedly infringing use by the Gap. [1] As regards damages under 17 U.S.C. § 504(b), the court rejected Davis's claim as unduly speculative and, insofar as it sought damages for Davis's failure to receive a license fee from the Gap, precluded by a prior decision of this court. *See Davis I,* 1999 WL 199005, at *3–*7. Since the court also found Davis ineligible for punitive damages, it concluded that he was not entitled to any form of damages, and thus dismissed his claims. *See id.* at *8, *10. Davis filed a motion for reconsideration on April 27, 1999, which was denied on June 16, 1999. *See Davis II,* 186 F.R.D. 322.

On appeal, Davis argues principally that (1) the district court erred by granting summary judgment without ruling on the merits of his claim for declaratory relief; and (2) he was entitled to both compensatory and punitive damages. The Gap defends the district court's judgment and argues in addition that the suit was subject to dismissal under the *de minimis* and fair use doctrines.

We affirm in part and reverse in part.

## DISCUSSION

Summary judgment is proper when the record, viewed in the light most favorable to the party against whom judgment is sought, reveals "no genuine issue as to any material fact" and the moving party is entitled to summary judgment as a matter of law. *See Fed.R.Civ.P.* 56(c).

### A. *Declaratory Relief*

**[2]    [3]    [4]**    Davis contends that it was improper for the district court to grant summary judgment on his copyright claims without first determining whether the defendant infringed his copyright. The complaint expressly sought "a declaratory judgment in favor of Mr. Davis against GAP, declaring" that the Gap had infringed Davis's copyright by its reproduction of his eyewear in its advertisement. *Am. Compl.,* ¶ A. The district court granted the defendant's motion for summary judgment on the basis of a variety of theories that had no bearing on the demand for declaratory relief. No doubt because of the confusing and prolix nature of the complaint, this aspect of the relief sought was overlooked. The existence of damages suffered is not an essential element of a claim for copyright infringement. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991) (to establish a *prima facie* case of copyright infringement, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original"); 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.01, at 13–6 **\*159** (1999) ( "Notably absent from this formulation of the *prima facie* case is damage or any harm to [the] plaintiff resulting from the infringement."). The owner of a copyright is thus entitled to prevail in a claim for declaratory judgment of infringement without showing entitlement to monetary relief. Insofar as the judgment dismissed the claim for declaratory relief without discussion, we are obliged to vacate the judgment and remand for consideration of that claim.

**B.** *Compensatory Damages*

**[5]    [6]**    17 U.S.C. § 504 imposes two categories of compensatory damages. Taking care to specify that double recovery is not permitted where the two categories overlap, the statute provides for the recovery of both the infringer's profits and the copyright owner's "actual damages."[2]  It is important that these two categories of compensation have different justifications and are based on different financial data. The award of the infringer's profits examines the facts only from the infringer's point of view. If the infringer has earned a profit, this award makes him disgorge the profit to insure that he not benefit from his wrongdoing. The award of the owner's actual damages looks at the facts from the point of view of they copyright owner; it undertakes to compensate the owner for any harm he suffered by reason of the infringer's illegal act. *See generally Fitzgerald Publ'g Co. v. Baylor Publ'g Co.,* 807 F.2d 1110, 1118 (2d Cir.1986); *Walker v. Forbes, Inc.,* 28 F.3d 409, 412 (4th Cir.1994).

The district court granted summary judgment dismissing Davis's claims for damages. As for Davis's claim of entitlement to a part of the "infringer's profits," the district court believed Davis failed to show any causal connection between the infringement and the defendant's profits. With respect to Davis's claim of entitlement to "actual damages" based on the license fee he should have been paid for the Gap's unauthorized use of his copyrighted material, the district court believed that his evidence was too speculative and that our decision in *Business Trends Analysts, Inc. v. Freedonia Group, Inc.,* 887 F.2d 399 (2d Cir.1989), precluded any such award.

We agree with the district court as to the defendant's profits, but not as to Davis's claim for damages based on the Gap's failure to pay him a reasonable license fee.

**1.** *Infringer's profits*

**[7]**    Davis submitted evidence that, during and shortly after the Gap's advertising campaign featuring the "fast" ad, the corporate parent of the Gap stores realized net sales of $1.668 billion, an increase of $146 million over the revenues earned in the same period of the preceding year. The district court considered this evidence inadequate to sustain a judgment in the **\*160** plaintiff's favor because the overall revenues of the Gap, Inc. had no reasonable relationship to the act of alleged infringement. *See Davis I,* 1999 WL 199005, at *6. Because the ad infringed only with respect to Gap label stores and eyewear, we agree with the district court that it was incumbent on Davis to submit evidence at least limited to the gross revenues of the Gap label stores, and perhaps also limited to eyewear or accessories. Had he done so, the burden would then have shifted to the defendant under the terms of § 504(b) to prove its deductible expenses and elements of profits from those revenues attributable to factors other than the copyrighted work.

**[8]**    It is true that a highly literal interpretation of the statute would favor Davis. It says that "the copyright owner is required to present proof only of the infringer's gross revenue," 17 U.S.C. § 504(b), leaving it to the infringer to prove what portions of its revenue are not attributable to the infringement. Nonetheless we think the term "gross revenue" under the statute means gross revenue reasonably related to the infringement, not unrelated revenues.

Thus, if a publisher published an anthology of poetry which contained a poem covered by the plaintiff's copyright, we do

not think the plaintiff's statutory burden would be discharged by submitting the publisher's gross revenue resulting from its publication of hundreds of titles, including trade books, textbooks, cookbooks, etc. In our view, the owner's burden would require evidence of the revenues realized from the sale of the anthology containing the infringing poem. The publisher would then bear the burden of proving its costs attributable to the anthology and the extent to which its profits from the sale of the anthology were attributable to factors other than the infringing poem, including particularly the other poems contained in the volume. The point would be clearer still if the defendant publisher were part of a conglomerate corporation that also received income from agriculture, canning, shipping, and real estate development. While the burden-shifting statute undoubtedly intended to ease plaintiff's burden in proving the defendant's profits, we do not believe it would shift the burden so far as to permit a plaintiff in such a case to satisfy his burden by showing gross revenues from agriculture, canning, shipping and real estate where the infringement consisted of the unauthorized publication of a poem. The facts of this case are less extreme; nonetheless, the point remains the same: the statutory term "infringer's gross revenue" should not be construed so broadly as to include revenue from lines of business that were unrelated to the act of infringement.

The district court relied on the Seventh Circuit's ruling in *Taylor v. Meirick,* 712 F.2d 1112 (7th Cir.1983). In that case the defendant was a map-maker, who copied and sold three of the plaintiff's copyrighted maps. During the relevant time period the defendant sold 150 maps, as well as other merchandise. Plaintiff submitted evidence of gross revenues and profits deriving from the defendant's overall sales. The court rejected plaintiff's claim, reasoning:

> all [the burden shifting language of § 504(b)] means is that [the plaintiff] could have made out a prima facie case for an award of infringer's profits by showing [the defendant's] gross revenues from the sale of the infringing maps. It was not enough to show [the defendant's] gross revenues from the sale of everything he sold....

*Id.* at 1122.

Applying this reasoning to our case, we think the district court was correct in ruling **\*161** that Davis failed to discharge his burden by submitting The Gap, Inc.'s gross revenue of $1.668

billion—revenue derived in part from sales under other labels within the Gap, Inc.'s corporate family that were in no way promoted by the advertisement, not to mention sales under the "Gap" label of jeans, khakis, shirts, underwear, cosmetics, children's clothing, and infantwear.

## 2. *The copyright owner's actual damages: Davis's failure to receive a reasonable licensing fee*

Among the elements Davis sought to prove as damages was the failure to receive a reasonable license fee from the Gap for its use of his copyrighted eyewear. The complaint asserted an entitlement to a $2.5 million licensing fee. The district court rejected the claim on two grounds. First, the court found that Davis's claim was too speculative—that is, insufficiently supported by evidence. *See Davis I,* 1999 WL 199005, at \*5. Second, the court believed that our decision in *Business Trends,* 887 F.2d 399, bars a copyright owner's claim for actual damages consisting of the infringer's failure to pay the fair market value of a license fee for the use the infringer made. *See Davis I,* 1999 WL 199005, at \*6–\*7.

### a. *Was Davis's evidence too speculative?*

[9]    While there was no evidence to support Davis's wildly inflated claim of entitlement to $2.5 million, in our view his evidence did support a much more modest claim of a fair market value for a license to use his design in the ad. In addition to his evidence of numerous instances in which rock music stars wore Onocilii eyewear in photographs exhibited in music publications, Davis testified that on one occasion he was paid a royalty of $50 for the publication by *Vibe* magazine of a photo of the deceased musician Sun Ra wearing Davis's eyewear.

On the basis of this evidence, a jury could reasonably find that Davis established a fair market value of at least $50 as a fee for the use of an image of his copyrighted design. This evidence was sufficiently concrete to support a finding of fair market value of $50 for the type of use made by *Vibe.* And if Davis could show at trial that the Gap used the image in a wider circulation than *Vibe,* that might justify a finding that the market value for the Gap's use of the eyewear was higher than $50. Therefore, to the extent the district court dismissed the case because Davis's evidence of the market value of a license fee was too speculative, we believe this was error.

### b. *Our decision in Business Trends*

**[10]** The district court believed our decision in *Business Trends* interprets § 504(b) to foreclose "actual damages" to compensate a plaintiff for the defendant's failure to pay for the reasonable value of what the defendant took. We believe this was a misreading of the holding in *Business Trends.* The district court decision under review in that case had not made an award of "actual damages" under this theory. The award we reviewed and rejected in that case was fashioned under the other prong of § 504(b)—the infringer's profits. *See Business Trends,* 887 F.2d at 402. While there is some language in our *Business Trends* decision expressing disfavor for Davis's theory of actual damages, it was not at issue in that case. Furthermore, our decision did not purport to lay down an absolute rule; the decision made clear that our ruling depended on the particular factual circumstances —circumstances that are not present here. Finally, as we discuss below, both before and after *Business Trends,* we have either **\*162** awarded such damages or implied that they were appropriate. *See Rogers v. Koons,* 960 F.2d 301, 310–13 (2d Cir.1992); *Abeshouse v. Ultragraphics, Inc.,* 754 F.2d 467, 470–72 (2d Cir.1985); *Szekely v. Eagle Lion Films, Inc.,* 242 F.2d 266, 268–69 (2d Cir.1957). Moreover, other courts have adopted the same analysis, and the Supreme Court has suggested, albeit obliquely, that such a measure of damages is appropriate. *See Harper & Row Publishers, Inc. v. Nation Enters.,* 471 U.S. 539, 562, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985).

In *Business Trends,* the plaintiff and defendant were competitors in the publication of economic analyses and forecasts—not a relationship where the defendant was a potential licensee of the plaintiff. Each produced a study of the robotics industry. The plaintiff BTA marketed copies of its study for $1,500. The defendant TFG produced a similar study which it initially offered at the same price as BTA's study. In response to slow sales, defendant TFG cut its price by 90% to $150 during a three-month special-offer period. It sold 37 copies at the reduced price. Plaintiff BTA registered its study with the Copyright Office but only after the defendant had begun selling its version. *See Business Trends,* 887 F.2d at 401.

BTA sued TFG alleging that TFG's report included portions that were copied from BTA's. The district court found copying and substantial similarity. It awarded damages of $54,028.35. The damages were found solely for the infringer's profits under the second prong of § 504(b). No damages were awarded under the first prong for the "actual damages" suffered by the owner. In fact, the district court expressly found that plaintiff "failed to establish actual damages as a consequence of defendants' infringement of BTA's robotics study." *Business Trends Analysts, Inc. v. Freedonia Group, Inc.,* 700 F.Supp. 1213, 1233 (S.D.N.Y.1988).

The infringer's profits awarded were derived from two components: a smaller component consisting of TFG's cash profit (revenues minus expenses) on its sale of the robotics study, and a larger amount consisting of non-cash profit attributed in part to the value of acquired goodwill (a "value of use") deriving in part from TFG's giving the report to customers at a 90% markdown. *See Business Trends,* 700 F.Supp. at 1237–41. In justifying the proposition that the profits of the infringement could properly include non-cash benefits to the infringer resulting from the infringement, the district court referred to the Seventh Circuit's conclusion in *Deltak, Inc. v. Advanced Sys., Inc.,* 767 F.2d 357 (7th Cir.1985), that " 'saved acquisition cost is a measure of damages or profit' when calculating value of use under the statute, where cash was not generated." *Business Trends,* 700 F.Supp. at 1238 (quoting *Deltak,* 767 F.2d at 362 n. 3).

We affirmed the award insofar as it was based on TFG's cash profit from the sale of the infringing report. However, insofar as the district court had attributed profits to the defendant based on non-cash elements consisting either of goodwill achieved by giving the infringing study to customers at a heavily discounted price, or the "value of use" the defendant achieved by acquiring for free material for which it might otherwise have paid the plaintiff, we found such attribution of profit to the defendant inappropriate. *See Business Trends,* 887 F.2d at 404–407.

We noted that the district court had based its analysis of the non-cash elements of the defendant's profits in part on *Deltak's* reasoning. *See Business Trends,* 887 F.2d at 404–405. We declined to adopt *Deltak* 's approach, relying primarily on two reasons. *See id.* at 405. First, we **\*163** believed the instructions of § 504(b) relating to the proof of the "infringer's profits" indicated "that Congress means 'profits' in the lay sense of gross revenue less out-of-pocket costs, not the fictive purchase price that TFG hypothetically chose not to pay to BTA." *Id.* at 405–06. Second, given the defendant's larcenous intent and the competitive relationship between the plaintiff and the defendant, we believed it was unreasonable to find that the defendant profited within the meaning of the statute by copying for free rather than paying the price it might have negotiated with the plaintiff. *See id.* at 405 ("TFG no more priced the BTA study and then decided

to copy than a purse-snatcher decides to forego friendly negotiations.").

The sole issue before us was whether either the expenses saved by the infringer resulting from its decision to infringe rather than purchase or the goodwill the defendant generated by offering the infringing material to its customers at a greatly reduced price can be considered "infringer's profits" recoverable under § 504(b). The decision did not involve the question we now consider—whether the amount the owner failed to collect as a reasonable royalty or license fee could be considered as constituting the owner's actual damages under § 504(a) and (b). [3]

It is true that the *Business Trends* decision, in a digression, observed "that [actual damages] is hardly a reasonable description of the entirely hypothetical sales to TFG lost by BTA." *Id.* at 405. The opinion also quoted a lengthy passage from the Nimmer treatise which asserts "it is open to question" whether *Deltak's* "value of use" standard fits within the statutory limits for either actual damages or infringer's profits. *See Business Trends,* 887 F.2d at 406.

For two reasons, we believe *Business Trends* does not foreclose the use of the owner's loss of a reasonable royalty as its "actual damages" under § 504(a) and (b). First, as noted, that issue was not before the court. Whatever comments we made about "actual damages" were dicta. Second, we went to pains in *Business Trends* to make clear that we were *not* laying down an absolute rule, but rather making a ruling that was heavily influenced by the particular facts of that case. We rejected the defendant's argument that a "value of use" standard is always impermissible, saying "we see no legal barrier to such an award under Section 504(b) so long as the amount of the award is based on a factual basis rather than on 'undue speculation.' " *Id.* at 404. Again at the conclusion of the opinion we "emphasize[d] that we are not rejecting as a matter of law" a recognition of the "value of use" theory. *Id.* at 407. We held "only that the proof in the instant case is inadequate to support such an award." *Id.* [4]

To the extent that the *Business Trends* decision was based on its observation that the defendant before it was no more inclined to negotiate a purchase price than a "purse snatcher," the facts of our case are **\*164** significantly different. The Gap was not seeking, like the *Business Trends* defendant, to surreptitiously steal material owned by a competitor. There is no reason to suppose that the Gap's use of Davis's copyrighted eyewear without first receiving his permission

was attributable to anything other than oversight or mistake. To the contrary, the facts of this case support the view that the Gap and Davis could have happily discussed the payment of a fee, and that Davis's consent, if sought, could have been had for very little money, since significant advantages might flow to him from having his eyewear displayed in the Gap's ad. Alternatively, if Davis's demands had been excessive, the Gap would in all likelihood have simply eliminated Davis's eyewear from the photograph. Where the *Business Trends* decision was motivated by its perception of the unrealistic nature of a suggestion that the infringer might have bargained with the owner, *see* 887 F.2d at 405, such a scenario was in no way unlikely in the present case.

c. *Actual damages under* § 504(a) *and* (b)

Because *Business Trends* did not rule on, much less foreclose, the use of a reasonable license fee theory as the measure of damages suffered by Davis when the Gap used his material without payment, we proceed to consider whether that measure of damages is permissible under the statute.

The question is as follows: Assume that the copyright owner proves that the defendant has infringed his work. He proves also that a license to make such use of the work has a fair market value, but does not show that the infringement caused him lost sales, lost opportunities to license, or diminution in the value of the copyright. The only proven loss lies in the owner's failure to receive payment by the infringer of the fair market value of the use illegally appropriated. Should the owner's claim for "actual damages" under § 504(b) be dismissed? Or should the court award damages corresponding to the fair market value of the use appropriated by the infringer?

Neither answer is entirely satisfactory. If the court dismisses the claim by reason of the owner's failure to prove that the act of infringement cause economic harm, the infringer will get his illegal taking for free, and the owner will be left uncompensated for the illegal taking of something of value. On the other hand, an award of damages might be seen as a windfall for an owner who received no less than he would have if the infringer had refrained from the illegal taking. In our view, the more reasonable approach is to allow such an award in appropriate circumstances.

[11]  Section 504(a) and (b) employ the broad term "actual damages." Courts and commentators agree it should be broadly construed to favor victims of infringement. *See* William F. Patry, *Copyright Law and Practice* 1167 (1994)

("Within reason, any ambiguities should be resolved in favor of the copyright owner."); 4 *Nimmer* § 14.02[A], at 14–12 ("[U]ncertainty will not preclude a recovery of actual damages if the uncertainty is as to amount, but not as to the fact that actual damages are attributable to the infringement."); *Fitzgerald Publ'g Co.,* 807 F.2d at 1118 ("[A]ctual damages are not ... narrowly focused."); *Sygma Photo News, Inc. v. High Society Magazine,* 778 F.2d 89, 95 (2d Cir.1985) (stating that when courts are confronted with imprecision in calculating damages, they "should err on the side of guaranteeing the plaintiff a full recovery"). *Cf. In* *Design v. K–Mart Apparel Corp.,* 13 F.3d 559, 564 (2d Cir.1994) (noting that any doubts in calculating profits which result **\*165** from the infringer's failure to present adequate proof of its costs are to be resolved in favor of the copyright holder), *abrogated on other grounds by Fogerty v. Fantasy, Inc.,* 510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994).

 **[12]**    A principal objective of the copyright law is to enable creators to earn a living either by selling or by licensing others to sell copies of the copyrighted work. *See* U.S. Const. Art. I, § 8, cl. 8 ("Congress shall have the power ... [t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."); Statute of Anne, 1709, 8 Anne, ch. 19 (Eng.), *reprinted in* III Patry, *supra,* at 1461 (first establishing copyright protection for authors because "Printers, Booksellers, and other Persons, have of late frequently taken the liberty of printing, reprinting, and publishing ... books, and other writings, without the consent of the authors or proprietors of such books and writings, to their very great detriment, and too often to the ruin of them and their families").

If a copier of protected work, instead of obtaining permission and paying the fee, proceeds without permission and without compensating the owner, it seems entirely reasonable to conclude that the owner has suffered damages to the extent of the infringer's taking without paying what the owner was legally entitled to exact a fee for. We can see no reason why, as an abstract matter, the statutory term "actual damages" should not cover the owner's failure to obtain the market value of the fee the owner was entitled to charge for such use.

The problem is roughly analogous to illegal takings or uses in other contexts outside the realm of copyright. For example:

(a) D, who lives on property adjacent to P, without authorization regularly swims and canoes in P's lake and uses a road crossing P's land because it provides more direct access to town. The right to use P's property for such purposes has a fair market value. P proves neither harm to his property nor loss of opportunity to license others to use the property for such recreation. Nonetheless P has lost the revenue he would have recovered if D had paid the fair market value of what he took.

(b) P, the owner of a baseball stadium charges $50 for admission to games. D, through a corrupt arrangement with a stadium usher, sneaks in free on days when the stadium has excess seating capacity. P shows no economic injury inflicted by D's free entrance, other than the hypothetical loss of the revenue for the tickets D did not purchase.

(c) P Telephone Company charges set rates for calls on its lines. D devises an electronic "black box" that emits signals mimicking the telephone company's codes, enabling D to place calls without charge. D places free calls at late-night, off-peak hours when the telephone lines are underutilized, and P is unable to prove any loss inflicted by the unauthorized use, other than its failure to collect its regular rates.

(d) P is a public transportation system. D, a subway rider, jumps the turnstile and avoids paying the normal $1.50 fee.

(e) P, a manufacturing company in reorganization, owns (or leases) warehousing space in a warehouse facility. Because of P's financial and **\*166** legal difficulties, the space has been unused for some time. D company, which leases adjacent warehouse space, noting that P's space is not being used, secretly uses P's space to warehouse its own inventories.

In each of these cases, the defendant has surreptitiously taken a valuable right, for which plaintiff could have charged a reasonable fee. Plaintiff's revenue is thus smaller than it would have been if defendant had paid for what he took. On the other hand, plaintiff's revenue is no less than it would have been if the defendant had refrained from the taking. In our view, as between leaving the victim of the illegal taking with nothing, and charging the illegal taker with the reasonable cost of what he took, the latter, at least in some circumstances, is the preferable solution.

It is important to note that under the terms of § 504(b), unless such a foregone payment can be considered "actual damages," in some circumstances victims of infringement

will go uncompensated. If the infringer's venture turned out to be unprofitable, the owner can receive no recovery based on the statutory award of the "infringer's profits." And in some instances, there will be no harm to the market value of the copyrighted work. The owner may be incapable of showing a loss of either sales or licenses to third parties. To rule that the owner's loss of the fair market value of the license fees he might have exacted of the defendant do not constitute "actual damages," would mean that in such circumstances an infringer may steal with impunity. We see no reason why this should be so. Of course, if the terms of the statute compelled that result, our perception of inequity would make no difference; the statute would control. But in our view, the statutory term "actual damages" is broad enough to cover this form of deprivation suffered by infringed owners.

[13]    We recognize that awarding the copyright owner the lost license fee can risk abuse. Once the defendant has infringed, the owner may claim unreasonable amounts as the license fee—to wit Davis's demand for an award of $2.5 million. The law therefore exacts that the amount of damages may not be based on "undue speculation." *Abeshouse,* 754 F.2d at 470. The question is not what the owner would have charged, but rather what is the fair market value. In order to make out his claim that he has suffered actual damage because of the infringer's failure to pay the fee, the owner must show that the thing taken had a fair market value. But if the plaintiff owner has done so, and the defendant is thus protected against an unrealistically exaggerated claim, we can see little reason not to consider the market value of the uncollected license fee as an element of "actual damages" under § 504(b).[5]

[14]    We recognize also that finding the fair market value of a reasonable license fee may involve some uncertainty. But that is not sufficient reason to refuse to consider this as an eligible measure of actual damages. Many of the accepted methods of calculating copyright damages require the court to make uncertain **167** estimates in the realm of contrary to fact. *See* 4 *Nimmer* § 14.02[A], at 14–9. A classic element of the plaintiff's copyright damages is the profits the plaintiff would have earned from third parties, were it not for the infringement. *See* 4 *Nimmer* § 14.02[A], at 14–9 to 10. This measure requires the court to explore the counterfactual hypothesis of the contracts and licenses the plaintiff would have made absent the infringement and the costs associated with them. *See Fitzgerald Publ'g,* 807 F.2d at 1118 (actual damages measured by "the profits which the plaintiff might have earned were it not for the infringement"); *Stevens Linen Assocs. v. Mastercraft Corp.,* 656 F.2d

11, 15 (2d Cir.1981) (same). A second accepted method, focusing on the "infringer's profits," similarly requires the court to explore circumstances that are counterfactual. The owner's entitlement to the infringer's profits is limited to the profits "attributable to the infringement." 17 U.S.C. § 504(b). The court, therefore, must compare the defendant's actual profits to what they would have been without the infringement, awarding the plaintiff the difference. Neither of these approaches is necessarily any less speculative than the approach that requires the court to find the market value of the license fee for what the infringer took. Indeed, it may be far less so. Many copyright owners are represented by agents who have established rates that are regularly paid by licensees. In such cases, establishing the fair market value of the license fee of which the owner was deprived is no more speculative than determining the damages in the case of a stolen cargo of lumber or potatoes. Given our long-held view that in assessing copyright damages "courts must necessarily engage in some degree of speculation," *id.* at 14, some difficulty in quantifying the damages attributable to infringement should not bar recovery. *See* 4 *Nimmer* § 14.02 [A], at 14–12 ("[U]ncertainty will not preclude a recovery of actual damages if the uncertainty is as to amount, but not as to the fact that actual damages are attributable to the infringement."); II Paul Goldstein, *Copyright* § 12.1.1, at 12:6 (2d ed. 2000) ("Once the copyright owner shows a connection between infringement and damage, uncertainty about the amount of damages will not bar an award."); *Szekely,* 242 F.2d at 269 (where "legal injury is certain ... [w]e should not allow difficulty in ascertaining precisely the value of the right destroyed, which difficulty arises largely from the destruction, to enable the infringer to escape without compensating the owner of the right").

### d. *Governing Authority*

The decisions of this and other courts support the view that the owner's actual damages may include in appropriate cases the reasonable license fee on which a willing buyer and a willing seller would have agreed for the use taken by the infringer.

Although the Supreme Court has never directly addressed this question, it has suggested in the somewhat different context of a fair use analysis that a critical question is "whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Nation Enters.,* 471 U.S. at 562, 105 S.Ct. 2218.

In *Szekely,* a 1909 Act case, we awarded such damages. A screenwriter sued a film distributor for damages based

on its distribution of a film employing the plaintiff's **\*168** screenplay. The plaintiff had contracted with a movie producer to sell the screenplay for $35,000. However, the producer encountered financial difficulties, and failed to complete the purchase, leaving the ownership of the screenplay with the plaintiff. The production company nonetheless made the film using the plaintiff's screenplay. The screenwriter sued the distributor for infringement, and the distributor was held liable. The plaintiff's award of damages was based on the amount of the license fee the plaintiff would have been entitled to charge, calculated by reference to the contract the plaintiff had made with the production company. *See Szekely,* 242 F.2d at 268–69.

In *Abeshouse,* under the current Act, we again awarded such damages. The plaintiff had licensed the defendant to be the plaintiff's exclusive distributor for a poster design showing a Rubik's Cube solution. The defendant secretly caused infringing posters to be printed by an independent source and sold them. We upheld an award of damages under § 504(b) in two parts: one part consisting of the infringer's profits from its sale of the infringing posters; the second part representing the payments the plaintiff would have received if the defendant had obtained the infringing posters from the plaintiff. *See Abeshouse,* 754 F.2d at 470–71.

In *Koons,* the defendant, a famous pop art sculptor, appropriated the plaintiff's copyrighted photograph of a couple with a litter of puppies, and caused his workshop to fabricate a work of sculpture copying the plaintiff's image. In rejecting the defendant's claim of fair use, we observed that while a finding of infringement would not necessarily prevent the defendant from publishing his expression, "it does recognize that any such exploitation must at least entail 'paying the customary price.' " *Koons,* 960 F.2d at 310 (quoting *Nation Enters.,* 471 U.S. at 562, 105 S.Ct. 2218). In remanding to the district court to assess the plaintiff's actual damages we observed that "a reasonable license fee for the use of [the plaintiff's work] best approximates the market injury sustained by [the plaintiff] as a result of [the defendant's] misappropriation." *Id.* at 313. *See also Ringgold v. Black Entertainment Television,* 126 F.3d 70, 81 (2d Cir.1997) (fact that infringement had little likelihood of adversely affecting sales of licensed poster of copyrighted artwork "deserves little weight [in fair use analysis] against a plaintiff alleging appropriation without payment of a customary licensing fee").

*Szekely, Abeshouse,* and *Koons* are supported by the decisions of other Circuits, as well as district courts. In *Nucor Corp. v. Tennessee Forging Steel Serv., Inc.,* 513 F.2d 151, 152 (8th Cir.1975), a 1909 Act case, the defendant infringed on the plaintiff's architectural plans. After a trial on damages, the jury returned with a verdict of no damages. *See id.* On appeal, the Eighth Circuit held that the district court had erred by failing to instruct the jury that the defendants were liable for the "fair value," or market value, of the infringed plans. *See id.* at 153 & n. 3.

In *Sid & Marty Krofft Television Prods. Inc. v. McDonald's Corp.,* 562 F.2d 1157, 1174 (9th Cir.1977), where the defendant had produced commercials infringing on the plaintiff's television show, the Ninth Circuit approved a jury instruction that allowed the jury to award an amount approximating "what a willing buyer would have been reasonably required to pay to a willing seller for plaintiffs' work."

In *Kleier Adver., Inc. v. Premier Pontiac, Inc.,* 921 F.2d 1036, 1039 (10th Cir.1990), the defendant automobile dealership infringed for twenty-two months upon an advertising agency's syndicated advertising **\*169** program. The Tenth Circuit upheld the jury's award of damages, concluding that the jury had intended an award of actual damages that represented the plaintiff's lost license fees over the twenty-two month period. *See id.* at 1040.

In *Encyclopedia Brown,* a cable television company and various cable operators infringed on the plaintiff's television program. The district court rejected the defendants' argument that the plaintiff's claim for a reasonable license fee was not cognizable as a matter of law. The court reasoned that if the lost sale of a product to a third party customer constitutes "actual damages," then the lost sale of a license to a defendant who, absent the infringement would have paid for a license, may constitute "actual damages" as well. *See Encyclopedia Brown,* 25 F.Supp.2d at 399–402. The court found authorization for such an award in *Koons. See Encyclopedia Brown,* 25 F.Supp.2d at 401 (quoting *Koons,* 960 F.2d at 313).

In *Aitken, Hazen, Hoffman, Miller, P.C. v. Empire Constr. Co.,* 542 F.Supp. 252 (D.Neb.1982) the defendant construction company, after first engaging the plaintiff architectural firm to design an apartment complex, subsequently copied and used the plaintiff's plans in construction of an apartment complex on a neighboring

parcel of land. The court determined that the fair market value of the modified architectural plans was the relevant measure for actual damages, and calculated that amount by determining "the amount [defendant] would reasonably have paid to the plaintiff and the plaintiff would reasonably have expected to receive for the revision and use of the [first set of] plans." *Id.* at 263. In *Kleier Adver. Co. v. James Miller Chevrolet, Inc.,* 722 F.Supp. 1544, 1546 (N.D.Ill.1989), where the facts were similar to the Tenth Circuit's *Kleier* case cited above, the court awarded lost license fees, which it characterized as "actual damages," as well as the infringer's profits. *See also Curtis v. General Dynamics Corp.,* No. C89–566S, 1990 WL 302725, at *11 (W.D.Wash. Sept.26, 1990) (awarding plaintiff photographer the fee he would have been paid had defendant hired him instead of infringing his copyright); *Bishop v. Wick,* No. 88 C 6369, 1988 WL 166652, at *5 (N.D.Ill.Dec.29, 1988) ("Plaintiffs shall recover the fair market value of the [infringed computer program] in an amount equal to the ordinary licensing fees charged to licensees of plaintiffs, multiplied by each time that defendants illegally copied or utilized the [program]." (emphasis omitted)); *Sherry Mfg. Co. v. Towel King,* 220 U.S.P.Q. 855, 859 (S.D.Fla.1983) (awarding actual damages based on reasonable royalty which should have been paid for license to use infringed design), *rev'd on other grounds,* 753 F.2d 1565 (11th Cir.1985).

### e. *Commentators*

Commentators on copyright law are divided on the question whether actual damages may be calculated based on lost license or royalty fees. Professor Goldstein's treatise regards an award to the copyright owner representing the fair market value of the royalty payment that the defendant avoided by infringing as clearly included within the concept of the copyright owner's "actual damages." *See* II Goldstein § 12.1, at 12:4. Indeed this discussion is prominently featured in opening discussion of "Damages and Profits." At the outset of his discussion of damages, Professor Goldstein offers the illustrative hypothetical in which Publisher B publishes an unauthorized French translation of Publisher A's novel. The treatise postulates:

> If, instead of infringing, ... B had negotiated with ... A for a license ..., the parties would probably have agreed upon a license fee giving ... A royalties **\*170** roughly equal to the royalties that some other translator would have been willing to pay for

the license and, at the same time, offering the prospect of profit to ... B. *The negotiated license fee that Publishers A and B would have agreed upon represents the damage that Publisher A will suffer when Publisher B publishes its translation without obtaining a license.*

*Id.* (emphasis added) (footnote omitted).

In exploring the subject in greater detail, Goldstein remarks:

> If the infringer occupies the same market as the copyright owner, courts usually employ [the owner's] lost sales as the measure of damages on the assumption that every sale made by the defendant is one that the plaintiff otherwise could have made. If the infringer occupies a market that the copyright owner has not yet entered, *courts usually employ a market value or reasonable royalty measure of damages* on the assumption that the value of the copyrighted work in defendant's market corresponds to the sum that the copyright owner and the infringer would have agreed upon for licensing the work's use in that market.

II Goldstein § 12.1.1.1, at 12:7 (emphasis added) (footnote omitted).

> In cases where, before the infringement, the copyright owner had licensed the infringer or a third party ..., courts will generally employ the [hypothetical] negotiated license fee as the measure of the copyright owner's damages from the infringement.

II Goldstein § 12:1.1.1, at 12:11. Goldstein thus justifies such an award by the fact that the infringer has illegally taken something of value and may properly be required to pay for its fair market value.

The Nimmer treatise takes the opposite view, expressing the opinion that a "reasonable royalty" measure of actual damages should not be regarded as authorized by § 504(b).

*See* 4 Nimmer § 14.02[A], at 14–13 to 17. The argument proceeds as follows. First it postulates that such damages were not available under the 1909 Act. *See id.* at 14–16. Under the terms of that Act, discretionary statutory damages were easily available to all plaintiffs. Because of the availability of statutory damages, courts shied away from awards of "actual damages" that were impossible or difficult to quantify.

> [G]iven the availability of statutory damages, the courts under the 1909 Act rejected the "reasonable royalty" standard, a patent measure of damages that looks to the royalties customarily paid for the type of use to which the defendant has put the infringing material....

*Id.*

Nimmer recognizes that under the 1976 Act, Congress altered the availability of statutory damages, making them much less widely available. *See id.* Nonetheless, Nimmer asserts that use of the term "actual damages" in the 1976 Act does not encompass the loss of the royalties payable by the infringer. *See id.*

To justify this conclusion, Nimmer discusses *Deltak,* in which the Seventh Circuit found the owner entitled to an award of the value of use the infringer had for free. The court believed this value could constitute the owner's actual damages. Nimmer contends that the court's "logic relies on the most transparent of fictions—if not for the infringement, there would have been no saved acquisition costs to [the defendant] and *a fortiori* no losses to the plaintiff]." *Id.* at 14–16 to 17. The reason that it would be a "transparent fiction" to postulate the price at which the defendant might have purchased a license from the plaintiff was that the defendant **\*171** in *Deltak,* being the plaintiff's competitor seeking to steal business from the plaintiff, would not have paid the plaintiff's price to buy each of the copies the defendant subsequently sold. *See id.* at 14–16 to 17. Had the infringer not taken by infringement, it would not have taken at all, and the owner would have earned no additional revenue.

Recognizing that the unavailability of reasonable royalties as a measure of actual damages, combined with the absence of statutory damages for owners who failed to register their copyrights would, in certain circumstances, deprive copyright owners of all compensation, Nimmer suggests that perhaps Congress intended to leave such copyright owners remediless

to create an incentive to owners to register their copyrights so as to qualify for statutory damages. *See id.* at 14–17.

We are not persuaded by Nimmer's reasoning. First, but perhaps least important, the Nimmer treatise's assertion that "the courts under the 1909 Act rejected the 'reasonable royalty standard,' " *id.* at 14–16, seems overstated. Nimmer cites only one case which so held. [6] *See Widenski v. Shapiro, Bernstein & Co.,* 147 F.2d 909 (1st Cir.1945). However, other courts, including ours, took the contrary position under the 1909 Act. *See, e.g. Szekely,* 242 F.2d at 268–69 (assessing damages based on the hypothetical license fee the infringer avoided paying); *Nucor,* 513 F.2d at 153 & n. 3 (defendants liable for market value of infringed architectural plans).

Second, even if under the 1909 Act *Widenski's* ruling had been universally accepted, it would not necessarily follow that courts should similarly decline to award such damages under the 1976 Act. Nimmer does not argue that the *Widenski* ruling was required by the definitional terms of the 1909 Act. To the contrary, the treatise explains that the reason underlying reluctance to award such damages under the 1909 Act was that courts could more easily accomplish the same result, avoiding problems of speculative proof, by making a discretionary award of statutory damages which were then freely available. But when the 1976 Act made statutory damages less widely available, explicitly denying them to copyright owners who had not registered their copyright at the time of the infringement, *see* 17 U.S.C. § 412, the reason supporting the *Widenski* court's ruling disappeared.

Third, Nimmer's argument with respect to *Deltak,* that an effort to estimate the royalty the defendant might have paid had it negotiated with the owner rests on "the most transparent of fictions," 4 Nimmer, § 14.02[A], at 14–16 to 17, may be pertinent to the peculiar facts of that case, but for two reasons does not justify a general rule denying damages based on the market value of the use appropriated by the infringer.

As the Goldstein treatise explains, whether the infringer might in fact have negotiated with the owner or purchased at the owner's price is irrelevant to the purpose **\*172** of the test. *See* II Goldstein § 12.1.1.1, at 12:13. The pertinence of the test is not premised on the fictive belief that the copyright owner is worse off than if the infringer, instead of infringing, had done nothing. It proceeds on a different basis. The hypothesis of a negotiation between a willing buyer and a willing seller simply seeks to determine the fair market value of a valuable right that the infringer has illegally taken from the owner.

The usefulness of the test does not depend on whether the copyright infringer was in fact himself willing to negotiate for a license. The honest purchaser is hypothesized solely as a tool for determining the fair market value of what was illegally taken.

Furthermore, even if the larcenous intentions of the *Deltak* infringer furnished a valid reason to decline to award damages *in that case* for the fair market value of what the infringer took for free, that circumstance, as noted above, would not apply to all copyright infringement cases. Honest users can infringe by reason of oversight or good faith mistake. The infringer may have mistakenly believed in good faith that the work was in the public domain, that his licensor was duly licensed, or that his use was protected by fair use. On the record before us, there is no reason to believe the Gap had any intention to infringe a copyright.

* * * * * *

We conclude that Section 504(b) permits a copyright owner to recover actual damages, in appropriate circumstances, for the fair market value of a license covering the defendant's infringing use. Davis adduced sufficiently concrete evidence of a modest fair market value of the use made by the Gap. The Gap's use of the infringed matter was substantial. If Davis were not compensated for the market value of the use taken, he would receive no compensation whatsoever.

## C. *Punitive Damages*

 [15]    The district court correctly held that Davis is not entitled to punitive damages under the Copyright Act. *See Davis I,* 1999 WL 199005, at *8. As a general rule, punitive damages are not awarded in a statutory copyright infringement action. *See* 4 *Nimmer* § 14.02[B], at 14–23 to 24; *Oboler v. Goldin,* 714 F.2d 211, 213 (2d Cir.1983). The purpose of punitive damages—to punish and prevent malicious conduct—is generally achieved under the Copyright Act through the provisions of 17 U.S.C. § 504(c)(2), which allow increases to an award of statutory damages in cases of willful infringement. *See* 4 *Nimmer* § 14.02[B], at 14–23 to 24; *Kamakazi Music Corp. v. Robbins Music Corp.,* 534 F.Supp. 69, 78 (S.D.N.Y.1982). In any event, the question need not detain us long because Davis has failed to show willfulness on the Gap's part.

## D. *De Minimis Use*

 [16]    The Gap contends that even if we find fault with the district court's reasons, its dismissal should be affirmed under the doctrine *de minimis non curat lex* because any copying of protected matter was trivial. The *de minimis* doctrine essentially provides that where unauthorized copying is sufficiently trivial, "the law will not impose legal consequences." *Ringgold,* 126 F.3d at 74. *See also Knickerbocker Toy Co. v. Azrak–Hamway Int'l, Inc.,* 668 F.2d 699, 703 (2d Cir.1982) (denying relief under *de minimis* doctrine where defendant had made a copy of plaintiff's work, but copy was never used); *American Geophysical Union v. Texaco, Inc.,* 60 F.3d 913, 916 (2d Cir.1994) (suggesting that if photocopying **\*173** for individual use in research is *de minimis,* it would not constitute an infringement); Pierre N. Leval, *Nimmer Lecture: Fair Use Rescued,* 44 U.C.L.A. L.Rev. 1449, 1457–58 (1997).

 [17]    The *de minimis* doctrine is rarely discussed in copyright opinions because suits are rarely brought over trivial instances of copying. Nonetheless, it is an important aspect of the law of copyright. Trivial copying is a significant part of modern life. Most honest citizens in the modern world frequently engage, without hesitation, in trivial copying that, but for the *de minimis* doctrine, would technically constitute a violation of law. We do not hesitate to make a photocopy of a letter from a friend to show to another friend, or of a favorite cartoon to post on the refrigerator. Parents in Central Park photograph their children perched on José de Creeft's Alice in Wonderland sculpture. We record television programs aired while we are out, so as to watch them at a more convenient hour.[7] Waiters at a restaurant sing "Happy Birthday" at a patron's table. When we do such things, it is not that we are breaking the law but unlikely to be sued given the high cost of litigation. Because of the *de minimis* doctrine, in trivial instances of copying, we are in fact not breaking the law. If a copyright owner were to sue the makers of trivial copies, judgment would be for the defendants. The case would be dismissed because trivial copying is not an infringement.

 [18]    The Gap seeks to avail itself of the *de minimis* rule. It argues that even in advertising, it is a trivial matter for persons to be shown wearing their eyeglasses or wristwatches. The Gap's argument may well be valid in other circumstances, but does not fit these facts.

Here, the combination of circumstances convinces us that the *de minimis* doctrine is not applicable. In the "fast" advertisement, the infringing item is highly noticeable. This is in part because Davis's design and concept are strikingly

bizarre; it is startling to see the wearer peering at us over his Onoculii. Because eyes are naturally a focal point of attention, and because the wearer is at the center of the group—the apex of the V formation—the viewer's gaze is powerfully drawn to Davis's creation. The impression created, furthermore, is that the models posing in the ad have been outfitted from top to bottom, including eyewear, with Gap merchandise. All this leads us to conclude that the Gap's use of Davis's jewelry cannot be considered a *de minimis* act of copying to which the law attaches no consequence.

### E. *Fair Use*

 [19]    Finally, the Gap contends its advertisement was protected by the fair use doctrine, and that the dismissal could be affirmed on that basis. Fair use is a judicially created doctrine dating back nearly to the birth of copyright in the eighteenth century, *see Burnett v. Chatwood,* 2 Mer. 441, 35 Eng. Rep. 1008–09 (Ch. 1720); *Gyles v. Wilcox,* 26 Eng. Rep. 489 (Ch. 1740), but first explicitly recognized in statute in the Copyright Act of 1976. *See* 17 U.S.C. § 107 (1994). [8]

 *174  [20]    We review the Gap's claim of fair use in light of the Supreme Court's clarification in *Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994), of the relationship among the four factors specified in the statute as appropriate for consideration.

 [21]    The heart of the fair use inquiry is into the first specified statutory factor identified as "the purpose and character of the use." 17 U.S.C. § 107(1). This formulation, as the Supreme Court observed in *Campbell,* 510 U.S. at 578, 114 S.Ct. 1164, draws on Justice Story's famous reference in *Folsom v. Marsh,* 9 F. Cas. 342, 348 (C.C.D.Mass.1841) (No. 4901), to "the nature and objects of the selections made." As the *Campbell* Court explained,

> The central purpose of this investigation is to see, in Justice Story's words, whether the new work merely "supersede[s] the objects" of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message ..., in other words, whether and to what extent the new work is "transformative." Although such transformative use is not absolutely necessary for a finding of fair use, the

goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works. *Such [transformative] works thus lie at the heart of the fair use doctrine's guarantee of breathing space ....*

*Campbell,* 510 U.S. at 579, 114 S.Ct. 1164 (emphasis added) (alteration in original) (citations omitted).

Pausing for the moment at that inquiry, we find nothing transformative about the Gap's presentation of Davis's copyrighted work. The ad shows Davis's Onoculii being worn as eye jewelry in the manner it was made to be worn—looking much like an ad Davis himself might have sponsored for his copyrighted design.

The first factor, as spelled out in the statute, goes on to mention "whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). By reason of dicta in the Supreme Court's opinion in *Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 451, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984), to the effect that commercial uses of a copyrighted work are "presumptively ... unfair," courts have sometimes given "dispositive weight" to whether the secondary use was commercial. *Campbell,* 510 U.S. at 584, 114 S.Ct. 1164 (criticizing *Acuff–Rose Music, Inc. v. Campbell,* 972 F.2d 1429 (6th Cir.1992)). The Supreme Court in *Campbell* rejected the notion that the commercial nature of the use could by itself be a dispositive consideration. The *Campbell* opinion observes that "nearly all of the illustrative uses listed in the preamble paragraph of § 107, including news reporting, comment, criticism, teaching, scholarship, and research ... are generally conducted for profit," and that Congress "could not have *175 intended" a rule that commercial uses are presumptively excluded. *Id.* at 584 (internal quotation marks and citation omitted). The commercial objective of the secondary work is merely a factor. "[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Id.* at 579, 114 S.Ct. 1164.

In this case, as in *Sony,* the secondary use is not transformative. The question whether the new use is commercial thus acquires an importance it does not have when the new work is transformative. In *Sony,* however, the copied work was saved by its private, noncommercial character. *See Sony,* 464 U.S. at 449, 104 S.Ct. 774. Here the work, being an advertisement, is at the outer limit of

commercialism. *See Campbell,* 510 U.S. at 585, 114 S.Ct. 1164 ("The use, for example, of a copyrighted work to advertise a product ... will be entitled to less indulgence under the first factor ... than the sale of [the new work] for its own sake.").

**[22]** The second statutory factor, the nature of the copyrighted work, *see* 17 U.S.C. § 107(2), is rarely found to be determinative. *Campbell* explained that "[t]his factor calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that [with the former] fair use is more difficult to establish." *Campbell,* 510 U.S. at 586, 114 S.Ct. 1164. In this case, as in *Campbell,* the plaintiff's copyrighted work is in the nature of an artistic creation that falls close to "the core of the copyright's protective purposes." *Id.*

**[23]** The third factor, which looks at the "amount and substantiality of the portion used in relation to the copyrighted work as a whole," 17 U.S.C. § 107(3), recognizes that fragmentary copying is more likely to have a transformative purpose than wholesale copying. In this case, the Gap's ad presents a head-on full view of Davis's piece, centered and prominently featured. The Gap cannot benefit from the third factor.

The fourth factor looks at "the effect of the use upon the potential market for or value of the copyrighted work." *Id.* § 107(4). Although the Supreme Court had observed in dictum in *Nation Enters.,* 471 U.S. at 566, 105 S.Ct. 2218, that this is perhaps the "most important" of the factors, *Campbell* made clear that this dictum, if misunderstood, was capable of causing confusion. As the *Campbell* opinion explained, if the secondary work harms the market for the original through criticism or parody, rather than by offering a market substitute for the original that supersedes it, "it does not produce a harm cognizable under the Copyright Act." *Campbell,* 510 U.S. at 592, 114 S.Ct. 1164. "[T]he role of the courts is to distinguish between biting criticism that merely suppresses demand and copyright infringement, which usurps [the market for the original]." *Id.* (internal quotation marks omitted) (alterations in original unmarked).

**[24]** Thus, when secondary uses harms the market for, or value of, the original, courts must examine the source of the harm. If the harm resulted from a transformative secondary use that lowered the public's estimation of the original (such as a devastating review of a book that quotes liberally from the original to show how silly and poorly

written it is), this transformative use will be found to be a fair use, notwithstanding the harm. If, on the other hand, the secondary use, by copying the first, offers itself as a market substitute and in that fashion harms the market value **\*176** of the original, this factor argues strongly against a finding of fair use.

*Campbell* explains that the market effect must be evaluated in light of whether the secondary use is transformative.

> [W]hen a commercial use amounts to mere duplication of the entirety of an original, it clearly 'supersede[s] the objects,' *Folsom v. Marsh* [9 F. Cas. at 348], of the original and serves as a market replacement for it, making it likely that cognizable [actionable] market harm to the original will occur. But when, on the contrary, the second use is transformative, market substitution is at least less certain, and market harm may not be so readily inferred.

*Campbell,* 510 U.S. at 591, 114 S.Ct. 1164 (citation omitted). Notwithstanding harmful effect, the use may be a fair use.

In this case, as noted, the Gap's use is not transformative. It supersedes. By taking for free Davis's design for its ad, the Gap avoided paying "the customary price" Davis was entitled to charge for the use of his design. *See Nation Enters.,* 471 U.S. at 562, 105 S.Ct. 2218. Davis suffered market harm through his loss of the royalty revenue to which he was reasonably entitled in the circumstances, as well as through the diminution of his opportunity to license to others who might regard Davis's design as preempted by the Gap's ad.

In our view, all the fair use factors favor Davis. We cannot accept the Gap's claim that its use of Davis's design is protected by the fair use doctrine.

## CONCLUSION

Finding no merit to the parties' other contentions, we affirm the grant of summary judgment in favor of the defendant denying Davis's claims for infringer's profits under 17 U.S.C. § 504(b), and for punitive damages; as regards Davis's claims for declaratory relief and "actual damages" under § 504(b),

the judgment of the district court is vacated and the case remanded for further proceedings.

**Parallel Citations**

2001 Copr.L.Dec. P 28,245

Footnotes

1   17 U.S.C. § 412 specifies that a copyright holder is not entitled to elect statutory damages or receive attorney's fees under §§ 504 and 505 if "any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work." Because the allegedly infringing use of Davis's eyewear occurred in the late summer of 1996, far more than three months after the first publication of the eyewear in 1991 but before registration of the copyright on May 16, 1997, Davis is ineligible for statutory damages or attorney's fees.

2   Section 504(a) makes the infringer liable for

(1) the copyright owner's actual damages and any additional profits of the infringer, as provided by subsection (b); or

(2) statutory damages, as provided by subsection (c).

17 U.S.C. § 504(a). Section 504(b) goes on to provide:

The copyright owner is entitled to recover the actual damages suffered ... as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

17 U.S.C. § 504(b).

3   See Encyclopedia Brown Prods. Ltd. v. Home Box Office, Inc., 25 F.Supp.2d 395, 400–02 (S.D.N.Y.1998) (reading Business Trends to preclude license fee under "profits" prong of § 504(b), but not to preclude license fee under "actual damages" prong); Childress v. Taylor, 798 F.Supp. 981, 991 (S.D.N.Y.1992) (questioning "whether Business Trends precludes as a matter of law [plaintiff's] claim for lost royalties").

4   See Sunset Lamp Corp. v. Alsy Corp., 749 F.Supp. 520, 524 (S.D.N.Y.1990) (reading Business Trends as "merely limit[ing] the extent of actual recovery to amounts proved to have resulted from a defendant's infringement, as demonstrated by credible evidence").

5   Furthermore, the fair market value to be determined is not of the highest use for which plaintiff might license but the use the infringer made. Thus, assuming the defendant made infringing use of a Mickey Mouse image for a single performance of a school play before schoolchildren, teachers and parents with tickets at $3, the fair market value would not be the same as the fee customarily charged by the owner to license the use of this image in a commercial production.

6   The other cases Nimmer lists, see Nimmer at § 14.02[A], at 14–16 n. 44, are, as he implicitly acknowledges, not directly on point. See Woolworth Co., 344 U.S. at 232–33, 73 S.Ct. 222 (holding that district court did not abuse its discretion in awarding higher statutory damages where defendant had proved a lower figure for profits but evidence of plaintiff's actual damages had been excluded); Childress, 798 F.Supp. at 990–91 (noting disagreement between Nimmer, who finds "reasonable royalties" impermissible, and Goldstein, who believes they are not inconsistent with the 1976 Act); Lundberg v. Welles, 93 F.Supp. 359, 362 (S.D.N.Y.1950) (questioning Widenski as applied to evidentiary question whether inquiry into infringer's profits is permissible where there is no established royalty and no direct evidence of plaintiff's loss).

7   The Supreme Court in Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 447–56, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984) found such recording would also be protected by the fair use doctrine.

8   17 U.S.C. § 107 provides:

Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

2001 Copr.L.Dec. P 28,245

---

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

---

# TAB 68

847 F.Supp.2d 1178
United States District Court,
N.D. California.

ORACLE AMERICA, INC., Plaintiff,
v.
GOOGLE INC., Defendant.

No. C 10–03561 WHA.    |    Jan. 9, 2012.

**Synopsis**

**Background:** Computer technology developer brought action alleging that search engine operator's operating system for mobile devices infringed its patents and copyrights relating to software programming language. After plaintiff's expert's first damages report was rejected, 798 F.Supp.2d 1111, defendant filed motion in limine to exclude portions of plaintiff's revised expert damages report.

**Holdings:** The District Court, William Alsup, J., held that:

[1] expert's proposed testimony was not excessively speculative;

[2] expert did not improperly use $100 million as his starting point for hypothetical negotiation;

[3] expert's decision to adjust his starting point upward to account for lost convoyed sales was not excessively speculative;

[4] expert improperly failed to apportion operator's $100 million offer properly between 26 claims in suit versus all other items in offer;

[5] expert had to conduct claim-by-claim analysis of damages instead of patent-by-patent analysis; and

[6] expert could not use evidence of noncomparable licenses and settlements involving other companies in calculating damages.

Motion granted in part and denied in part.

West Headnotes (12)

**[1]    Evidence**
    Damages

Expert's proposed testimony concerning damages suffered by computer technology developer due to infringement of its patents and copyrights in software programming language by competitor's operating system for mobile devices was not excessively speculative, even though developer never licensed incompatible version of its programming language to competitors, where expert started with real-world negotiations between parties for compatible version, and then adjusted that amount up to compensate for incompatibility.

Cases that cite this headnote

**[2]    Copyrights and Intellectual Property**
    Elements, measure, and amount

In the context of copyright infringement, hypothetical lost license fee can be based on copyright's fair market value at time of infringement.

1 Cases that cite this headnote

**[3]    Patents**
    Damages

For reasonable royalty for patent infringement, hypothetical negotiation requires court to envision terms of licensing agreement reached as result of supposed meeting between patentee and infringer at time infringement began.

1 Cases that cite this headnote

**[4]    Evidence**
    Damages

In calculating damages suffered by computer technology developer due to infringement of its patents and copyrights in software programming language by competitor's operating system for mobile devices, developer's expert did not improperly use $100 million as his starting

point for hypothetical negotiation instead of $28 million, which was amount in draft agreement proposed by developer for broad technology partnership between parties, even if jury might eventually reject expert's premise, where expert opined that important terms of $28 million draft agreement were still being negotiated, and $100 million offer was actually on table during real-world negotiations between parties.

Cases that cite this headnote

**[5]    Patents**

    Profits

Patent owner may be able to recover directly for loss of collateral sales on lost-profits theory, but lost convoyed sales also remain relevant to reasonable royalty even where patent owner's proof is insufficient to show lost profit.

Cases that cite this headnote

**[6]    Evidence**

    Damages

Expert's decision, in calculating damages suffered by computer technology developer due to infringement of its patents and copyrights in software programming language by competitor's operating system for mobile devices, to adjust his starting point upward to account for lost convoyed sales that were expected from real-world negotiations was not excessively speculative, where, from parties' discussions and developer's business model, it was clear that developer expected convoyed sales after licensing compatible version of programming language to competitor, jury could reasonably find that competitor's infringement led to product that was incompatible with programming language and precluded developer from receiving convoyed sales, and convoyed-sales projections used by expert had been contemporaneously calculated by developer.

Cases that cite this headnote

**[7]    Evidence**

    Damages

In calculating damages suffered by computer technology developer due to infringement of its patents in software programming language by competitor's operating system for mobile devices, developer's expert improperly failed to apportion competitor's $100 million offer properly between 26 claims in suit versus all other items in offer, even though expert had estimated importance of features to consumers, where expert based his estimates in marketplace as it existed two to five years after parties' negotiations took place, accused operating system represented some technology owned by strangers to litigation and features developed by competitor itself, and many features included in developer's offer were not used in accused operating system.

Cases that cite this headnote

**[8]    Evidence**

Damages

In calculating damages suffered by computer technology developer due to infringement of its patents in software programming language by competitor's operating system for mobile devices, developer's expert was required to conduct claim-by-claim analysis of damages instead of patent-by-patent analysis.

Cases that cite this headnote

**[9]    Evidence**

Damages

In calculating damages suffered by computer technology developer due to infringement of its copyrights in software programming language by competitor's operating system for mobile devices, developer's expert was required to separate copyright damages for two categories of copyrighted material asserted in action.

Cases that cite this headnote

**[10]    Evidence**

Damages

Damages experts cannot use noncomparable licenses, with little relationship to claimed

invention or parties-in-suit, as basis for
calculating reasonable royalties.

Cases that cite this headnote

[11]    **Evidence**
    **Damages**

Expert could not use evidence of noncomparable
licenses and settlements involving other
companies in calculating damages suffered
by computer technology developer due to
infringement of its patents and copyrights in
software programming language by competitor's
operating system for mobile devices, where
expert did not specify whether referenced
licenses related to software or hardware, or how
extensive licenses were.

Cases that cite this headnote

[12]    **Evidence**
    **Damages**

Expert could not use evidence of computer
technology developer's settlements involving
another company in calculating damages
suffered by computer technology developer due
to infringement of its patents and copyrights in
software programming language by competitor's
operating system for mobile devices, where
developer's litigations with other company
involved antitrust and false advertising claims
that were not present in current litigation.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*1180** Alanna Rutherford, Boies, Schiller, Flexner L.L.P.,
New York, NY, Beko Osiris Ra Reblitz–Richardson,
Meredith Richardson Dearborn, Steven Christopher
Holtzman, William Fred Norton, Jr., Boies Schiller &
Flexner L.L.P., Oakland, CA, Benjamin Andrew Petersen,
Kenneth Alexander Kuwayti, Marc David Peters, Michael
A. Jacobs, Roman A. Swoopes, Ruchika Agrawal, Rudolph
Kim, Yuka Teraguchi, Morrison and Foerster L.L.P., Palo
Alto, CA, Daniel Pierre Muino, Morrison & Foerster
L.L.P., San Francisco, CA, David Boies, Boies Schiller

and Flexner, Armonk, NY, Deborah Kay Miller, Dorian
Estelle Daley, Matthew M. Sarboraria, Oracle Corporation,
Redwood Shores, CA, Mark Edward Ungerman, Morrison
Foerster, Washington, DC, for Plaintiff.

Donald Frederick Zimmer, Jr., Cheryl A. Sabnis, Geoffrey
M. Ezgar, King & Spalding L.L.P., Robert Addy Van
Nest, Christa M. Anderson, Daniel Edward Purcell, Eugene
Morris Paige, Matthias Andreas Kamber, Michael S. Kwun,
Reid Patrick Mullen, Keker & Van Nest L.L.P., Dana K.
Powers, Joseph Richard Wetzel, Greenberg Traurig L.L.P.,
San Francisco, CA, Brian Christopher Banner, Truman
Haymaker Fenton, King and Spalding L.L.P., Austin, TX,
Bruce W. Baber, Christopher C. Carnaval, Mark H. Francis,
Robert F. Perry, Scott T. Weingaertner, King & Spalding
L.L.P., New York, **\*1181** NY, Heather Janine Meeker,
Luis Villa, IV, Greenberg Traurig L.L.P., East Palo Alto,
CA, Ian Ballon, Valerie Wing Ho, Wendy Michelle Mantell,
Greenberg Traurig L.L.P., Santa Monica, CA, Renny F.
Hwang, Google Inc., Mountain View, CA, Steven T. Snyder,
King and Spalding L.L.P., Charlotte, NC, for Defendant.

Opinion

### ORDER GRANTING IN PART AND DENYING IN PART GOOGLE'S MOTION IN LIMINE NUMBER THREE TO EXCLUDE PORTIONS OF DR. COCKBURN'S REVISED DAMAGES REPORT

WILLIAM ALSUP, District Judge.

### INTRODUCTION

In this patent and copyright infringement action involving
Java and Android, defendant challenges plaintiff's revised
expert damages report. For the following reasons, the motion
is **GRANTED IN PART** and **DENIED IN PART.**

### STATEMENT

The background was set forth in previous orders (*see* Dkt.
Nos. 137, 230, 433). A July 22 order rejected Dr. Cockburn's
first damages report for failing to apportion the value of the
asserted claims and instead using the total value of Java and
Android in calculating damages, among other reasons (Dkt.
No. 230).

In his substitute damages report, Dr. Cockburn calculated damages in total, through the end of 2012, to be approximately two and a half billion dollars. This was broken down as follows. He estimated damages from 2007 through 2011, to be $201.8 million for patent infringement, $823.9 million in unjust enrichment for copyright infringement (not deducting for expenses or apportionment), and $136.2 million in lost profits or $102.6 million in lost licensing fees for copyright infringement (Cockburn Report ¶¶ 47, 467, 496, and 474; Exhs. 3, 22, 23).

Dr. Cockburn calculated patent damages using a hypothetical negotiation method: as had been suggested in a prior order, he began with a $100 million starting value that was based on a real-world negotiation between the parties in 2006. He then adjusted downward for patent apportionment, then adjusted upward for lost revenue that was expected from the licensing agreement (Rpt ¶ 19). The same methodology was used to calculate a hypothetical lost license fee for copyright infringement (Rpt Exhs. 23–24). Unjust enrichment was calculated by adding together Android's ad revenue, the hardware revenue from selling Nexus phones, and applications sales in the Android Market store (Rpt ¶ 466). Lost profits were calculated by adding together lost revenue from licensing Java, ancillary revenue from back-end services, and revenue from a smartphone operating system (Rpt ¶ 475). Using similar methodology, Dr. Cockburn also estimated future damages through the end of 2012 to be $1.2 billion in unjust enrichment for copyright infringement, $102.6 million in lost license fees for copyright infringement, and $205.2 million for patent damages (Cockburn Rpt Exhs. 22, 25, 18). Again, the grand total came to approximately two and a half billion dollars.

Following motion practice directed at the new substitute report, a tentative order issued on December 6, 2011 (Dkt. No. 642). Parties submitted critiques of the tentative order (Dkt. Nos. 651, 652), and arguments were heard at the final pretrial conference on December 21, 2011. Post-hearing briefs and responses were submitted on January 5 and 9. This order is the final order and it strikes major portions of the substitute report.

## *1182  ANALYSIS

An expert witness may provide opinion testimony "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods,

and (3) the witness has applied the principles and methods reliably to the facts of the case." FRE 702. District courts thus "are charged with a 'gatekeeping role,' the objective of which is to ensure that expert testimony admitted into evidence is both reliable and relevant." *Sundance, Inc. v. DeMonte Fabricating Ltd.,* 550 F.3d 1356, 1360 (Fed.Cir.2008).

Google raises several objections to Dr. Cockburn's report. Each of Google's arguments will be addressed below.

### 1. COPYRIGHT LOST LICENSE FEE.

[1] Dr. Cockburn calculated actual damages for copyright infringement using the lost license fee approach. He did so by determining what Google would have paid to license the use of the copyrights at issue in a hypothetical negotiation with Sun at the time of infringement. Google now argues that the hypothetical negotiation approach cannot be used to calculate the lost licensee fee. Google contends that any hypothetical negotiation would be excessively speculative under *Daubert* because Sun never licensed an incompatible version of Java to competitors, and would not have done so with Google at the time of infringement. Therefore any calculation of actual damages based on a hypothetical negotiation must be excessively speculative (Br. 4, Supp. Br. 11–14). This order disagrees.

[2]  [3]  In the context of copyright infringement, the hypothetical lost license fee can be based on the fair market value of the copyright at the time of infringement. *Polar Bear Productions, Inc. v. Timex Corp.,* 384 F.3d 700, 709 (9th Cir.2004). "To determine the work's 'market value' at the time of the infringement, we have endorsed a hypothetical approach: what a willing buyer would have been reasonably required to pay to a willing seller for the owner's work." *Mackie v. Rieser,* 296 F.3d 909, 917 (9th Cir.2002) (citations omitted). This standard is similar, if not the same, as the standard for calculating a reasonably royalty in the context of patent damages. For a reasonable royalty for patent infringement, the hypothetical negotiation also requires the court to envision the terms of a licensing agreement reached as the result of a supposed meeting between the patentee and the infringer at the time infringement began. *Rite–Hite Corp. v. Kelley Co., Inc.,* 56 F.3d 1538, 1554 (Fed.Cir.1995).

Google argues that because Sun never licensed its Java copyrights in agreements that also allowed the licensee to develop an incompatible version of Java, any calculation of the hypothetical lost license fee would be incurably speculative under *Daubert.* This argument fights the

hypothetical. In order to calculate the lost licensing fee, the hypothetical licensing agreement must be *reached* as the result of a hypothetical meeting between the parties. *See Rite–Hite Corp.,* 56 F.3d at 1554 (patent reasonable royalty). Although our court of appeals has not explicitly held so, the Second Circuit has held that whether the parties might in fact have negotiated is irrelevant to the purpose of the lost licensing fee calculation for copyright damages. *On Davis v. The Gap, Inc.,* 246 F.3d 152, 171–72 (2nd Cir.2001). The hypothetical negotiation is only a means for calculating the fair market value. It is the fair market value that must not be speculative under *Daubert.*

Dr. Cockburn had a non-speculative factual basis to value a license for an incompatible version of Java. Dr. Cockburn did so by starting with the real-world negotiations between Sun and Google for a compatible **\*1183** Java, and then adjusting that amount up to compensate for the incompatibility. The amount of the upward adjustment was based on Sun's own revenue projections at the time for the value of compatibility. Dr. Cockburn's calculation was sufficiently based on real-world facts. This calculation was not speculative under *Daubert.* Google's objections are overruled.

## 2. STARTING POINT OF $100 MILLION.

[4] For both copyright lost license fee and patent reasonable royalty calculations, Google argues that Dr. Cockburn erred by using $100 million as his starting point for the hypothetical negotiation instead of $28 million, which was the amount in a draft agreement proposed by Sun dated April 19, 2006, for a "broad technology partnership" between the parties (Br. 2). This order disagrees.

Dr. Cockburn's decision not to use the $28 million draft agreement as the starting point was within the bounds of reason, although a jury may eventually reject the premise and therefore everything that depends from it. Contrary to Google's assertion that Dr. Cockburn ignored the agreement, he actually addressed it over two pages in his report (Rpt ¶¶ 211–16). Dr. Cockburn opined that important terms of the $28 million draft agreement were still being negotiated (Rpt ¶ 212). As a factual basis for his opinion that terms were not finalized, Dr. Cockburn cited the "Go To Market Plan" section of the agreement, which had the following text: *"Need to discuss.* We propose agreement to the price in return for Sun's hosting & ISV leadership" (Rpt ¶ 211) (emphasis added). Dr. Cockburn also cited emails from Sun executives suggesting that management had not decided on the final terms of the agreement (Rpt ¶¶ 213–16). Google has

not rebutted those citations. Having reviewed the available record, this order finds that Dr. Cockburn reasonably relied on sufficient facts when rejecting the $28 million draft agreement as a starting point. This does not, of course, mean reasonable experts could not have honest differences of professional opinion on this point and it will be up to the jury to reach its own judgment after hearing both opinions.

This order also finds that Dr. Cockburn did not err in using $100 million as the starting point. Dr. Cockburn extensively reviewed the entire licensing history between the parties (Rpt ¶¶ 191–221). The $100 million offer was actually on the table during real-world negotiations between Google and Sun in February and April 2006 (Rpt ¶¶ 196, 207). Dr. Cockburn decided on a $100 million fee for "a worldwide [Java] license" (Rpt ¶ 228). Although not entirely clear from Dr. Cockburn's report, this license would likely have included "all Sun owned CD JavaME technologies, unencumbered rights" and "engineering and back-end support and services," and "joint promotion of the Java brand" (Rpt ¶¶ 230–31). Dr. Cockburn also opined that this $100 million amount would have been structured as $60 million in fixed payments and the remainder as ad-revenue sharing (Rpt. Exh. 14). This deal was very similar to the opening draft agreement by the parties in February 2006, and could reasonably be the basis for a hypothetical negotiation. Google's arguments must be directed to the jury.

## 3. UPWARD ADJUSTMENT OF THE STARTING POINT.

For both copyright lost license fee and patent reasonable royalty calculations, Dr. Cockburn adjusted his starting point upward to account for lost conveyed sales that was expected from real-world negotiations (Rpt. Exh. 3). Google argues that this upward adjustment was speculative because Dr. Cockburn relied on "a single **\*1184** internal Sun presentation that roughly sketch[ed] a projection of the money Sun might earn from a partnership with Google," (Br. 5). Google argues that this presentation reflected "Sun's optimistic hope, without any grounding in experience or past practice, that it might be able to earn money by partnering with Google" (Br. 5); and that Dr. Cockburn improperly ignored the fact that this would have been a new line of business, he did not vet the reliability of the projections with anyone at Oracle, and he did not see any other documents to support the lost-profits projection (Br. 10).

[5] A patent owner may be able to recover directly for loss of collateral sales on a lost-profits theory. But lost conveyed

Oracle America, Inc. v. Google Inc., 847 F.Supp.2d 1178 (2012)

sales also remain relevant to a reasonable royalty even where the patent owner's proof is insufficient to show lost profit. *Georgia–Pacific Corp. v. United States Plywood Corp.,* 318 F.Supp. 1116, 1121, 1128–1130 (S.D.N.Y.1970); *see also Rite–Hite Corp. v. Kelley Co., Inc.,* 56 F.3d 1538, 1554–55 (Fed.Cir.1995) (same).

Dr. Cockburn based his upward adjustment on three factors: *first,* "harm to Sun, in the form of foregone licensing revenues and convoyed sales that Sun expected to generate pursuant to" licensing its technology to Google; *second,* "the effect of fragmentation on non-mobile Java revenues portended by [alleged] infringement;" and *third,* a "litigation premium" reflecting the fact that the hypothetical negotiation must assume that the patents are valid and infringed (Rpt ¶¶ 35–40). Although noting that the harm from fragmentation would have been great, Dr. Cockburn opined that only lost convoyed sales had a reasonably certain value (*ibid.;* Cockburn Dep. at 176:12–16).

[6] This upward adjustment was not improper under *Daubert.* From the parties' discussions during the 2006 negotiations and Sun's business model, it was clear that Sun expected convoyed sales after licensing a compatible version of Java to Google. Sun's expectations were catalogued qualitatively in a variety of documents (*see, e.g.,* Rpt ¶¶ 297–99) and quantitatively in financial projections (Rpt ¶¶ 298–302; Purcell Exhs. 18–19). The jury could reasonably find that Google's infringement led to an Android that was *incompatible* with Java and precluded Sun from receiving convoyed sales "through licensing royalty bearing commercial implementations, using TCK licenses to maintain the integrity of the Java platform, and providing backend services and potentially other revenue opportunities" (Rpt ¶ 288). If so, then the hypothetical negotiation should take that lost revenue into account and upwardly adjust the licensing fee Sun would have required to license an incompatible version of Java. Dr. Cockburn had a sufficient factual basis for this calculation to allow it to be in play before the jury.

While the amount of adjustment involves an element of uncertainty, Dr. Cockburn's quantitative analysis was based on sufficiently reliable financial projections. The Federal Circuit has upheld a hypothetical royalty based on a contemporaneously created business plan projecting revenue. *Interactive Pictures Corp. v. Infinite Pictures, Inc.,* 274 F.3d 1371, 1385 (Fed.Cir.2001). The convoyed-sales projections were contemporaneously calculated by Kathleen Knopoff, a senior director of business operations at Sun. Google does

not explain why Ms. Knopoff would have projected an overly optimistic amount. Google's objections to the upward adjustment are overruled.

**4. APPORTIONMENT OF THE STARTING VALUE AND UPWARD ADJUSTMENT.**

The July order stated a strong view that the patent hypothetical negotiation should use the $100 million offer in 2006 as the **\*1185** starting point and then make appropriate adjustments. The order, however, expressly stated that it did not rule out other formats of analysis.

[7] Dr. Cockburn elected to use the $100 million offer as a starting point for both copyright lost license fee and patent reasonable royalty calculations. But, this order holds, he failed to apportion that $100 million offer properly between the 26 claims in suit versus all other items in the 2006 offer. He did make a stab at an apportionment but his apportionment methodology was flawed.

His method was to review future 2008–2011 data to estimate the impact of certain features in the 2008–2011 marketplace. One such feature, for example, was faster processing time. The features tested were those allegedly enabled by the claims in suit. His method ran many eBay transactions collected between January 2010 and June 2011 through a statistical analysis and estimated the importance of the feature to consumers. This in turn led to an estimate of the extent to which the feature contributed to 2008–2011 demand for Android. Overall, he estimated that the claimed functionalities accounted for 30 percent of the overall Android revenues, that is, revenues for Android would have been 30 percent less had the claimed functionalities been deleted from Android. This is for the patent claims only. Another 15 percent was attributed to the alleged copyright violations.

Dr. Cockburn then assumed that this outcome would have been foreseeable in 2006 at the time of the hypothetical negotiation and thus 30 percent of the value of the actual 2006 offer should be attributed to the patent claims in suit and another 15 percent to the copyright claims in suit, leaving 55 percent to be spread over the many thousands of other know-how items included in the 2006 offer.

The main flaw in this method is that the universe of know-how included in Android during 2008–2011 was different from the universe of know-how included in the 2006 offer. Put differently, Android today undoubtedly represents some

Java know-how, some technology owned by strangers to this litigation (presumably licensed), and a fair dose of Google's own engineering. The 2006 offer, in contrast, represented thousands of Java-related features, many of which never made it into Android but nonetheless would have had value. Dr. Cockburn failed to account for this disconnect. For all that is shown, the thousands of other items in the 2006 offer might have deserved far more than 55 percent of the total pie. Dr. Cockburn made no attempt to evaluate the remainder of the items offered for license in 2006.

It is no answer to say, as Dr. Cockburn did in his footnote 327, that his approach is "conservative." The meaning of the turbid footnote is bewildering. It does not escape the apples-and-oranges problem. While the after-the-fact studies arguably show that the claims in suit eventually contributed strongly to the success of Android, and while those studies possibly show that a reasonable negotiator in Google's position in 2006 would have been willing to assign a disproportionate share of the $100 million to the claims in suit, the fact remains that the rest of the 2006 bundle does not bear any relationship to the rest of the modern Android, for all the record shows. Reasonable parties in 2006 might well have viewed the rest of Java as worth far more than the claims conveniently selected for litigation after the fact. This order assumes without deciding that the after-the-fact studies are valid enough to go to the jury.

If the $100 million offer in 2006 is used as the starting point, as the July order suggested (but did not require), then a fair **\*1186** apportionment of the $100 million as between the technology in suit and the remainder of the technology then offered must be made. One way this might be done would be to divide the thousands of items into coherent groups and to evaluate the relative importance of the groups and to apportion the $100 million across the groups in proportion to their relative importance. The group or groups including the 26 claims in suit would further need to be apportioned as between these claims versus the rest of the group members. Other methods might be viable as well. Dr. Cockburn's method, however, does not withstand scrutiny. His damages opinions on apportionment and calculations based on apportionment (including patent damages and copyright lost license fee) are **STRICKEN.**

It is important to state that this order does not strike Dr. Cockburn's opinion on the unjust enrichment from copyright infringement. Under copyright law, the burden is on Google to allocate Android profit based on the copyrights in suit

versus other non-infringing contributions. *See* 17 U.S.C. 504(b). Possibly, that allocation will substantially whittle down the claimed unjust enrichment. This order does not disturb that portion of Dr. Cockburn's opinion. Similarly, this order does not disturb Dr. Cockburn's lost profit analysis for copyright. These calculations were not based on Dr. Cockburn's apportionment and have not been challenged under *Daubert.*

## 5. CLAIM–BY–CLAIM INSTEAD OF PATENT–BY–PATENT ANALYSIS.

 **[8]**  Google argues that Dr. Cockburn should have conducted a claim-by-claim analysis of damages instead of a patent-by-patent analysis (Br. 9). As such, Google requests that Dr. Cockburn be precluded from apportioning an asserted patent's value among its claims at trial (*ibid.*). This order agrees.

The July 22 order stated that a claim-by-claim analysis of damages was needed: "determining the date of first infringement requires a claim-by-claim analysis" (Dkt. No. 230 at 7). There are a number of reasons. *First,* a single patent can include many distinct variations of an invention, each represented by its own claim. Some may be apparatus claims. Some may be method claims. A single patent may include many apparatus claims, again each represented by its own claim. The same is true for methods. An infringer of one claim is compelled by law to pay for a license, via the hypothetical negotiation, for the specific invention represented by that claim but it is not required to pay for a license for the other specific inventions not infringed. Therefore, the hypothetical negotiation must be focused only on negotiating a compulsory license for each claim infringed, not for the entire patent.

*Second,* some of the asserted claims might be less valuable, or easier to design around, than other claims contained within that same patent.

*Third,* the jury may find liability on some claims but not others in the same patent, or some claims may be rejected by the USPTO on re-examination.

*Fourth,* if liability is found on a claim, it may be possible to extend the royalty rate found by the jury on that claim into the future as a condition of not granting an injunction.

Oracle does not deny that Dr. Cockburn treated each patent as an indivisible whole (*see* Rpt Exhs. 2, 4–13). It is a mystery why Oracle and Dr. Cockburn deliberately choose to disregard this aspect of the July order.

## 6. NO DIVISION OF SEPARATE COPYRIGHT CLAIMS.

**[9]**   In a parallel manner, Google argues that Dr. Cockburn erred by not separating **\*1187** copyright damages for the two categories of copyrighted material asserted in this action: the lines of Android source code and the structure, arrangement, and selection of the Application Programming Interfaces (API) packages. This order agrees.

Dr. Cockburn's discussion of copyright damages focused almost entirely on the value of the APIs (*see* Rpt Part XI). But if the structure, arrangement, and selection of the APIs is not copyrightable or if Google engaged in fair use with respect to APIs, then Oracle's copyright claim would be limited to only a dozen code files. Dr. Cockburn has not adequately valued that code in his report and cannot do so at trial. This order holds that the jury will be instructed that if Google is found not liable for infringing the selection, arrangement, and structure of the API packages, then Dr. Cockburn's copyright damages analysis is inapplicable.

## 7. INADEQUATE CALCULATION OF FUTURE DAMAGES.

In the context of patent infringement, Google argues that Dr. Cockburn erred by calculating future damages only for one year after past damages and not taking into account the varying expiration dates of the asserted patent claims (Br. 7–8). Oracle does not deny that Dr. Cockburn only calculated damages through the end of 2012 and did not calculate damages for unexpired patents after that date. Nor did Dr. Cockburn calculate damages or a royalty rate past the end of 2012 for copyright infringement.

If liability is established at trial, the jury will be asked to make a finding of the reasonable royalty rate for each infringed patent claim and copyright. If an injunction is not granted, then the royalty rate found by the jury will be used to award supplemental damages on a year-to-year basis, this for ongoing damages after the last damages period calculated. If an injunction is granted, there will be no need for future damages. Either way, Dr. Cockburn will not be allowed to testify about damages after the end of 2012.

## 8. REFERRING TO LICENSES INVOLVING UNRELATED TECHNOLOGY AND PARTIES.

Google argues that Dr. Cockburn should be precluded from referring to noncomparable licenses and settlements involving other companies (Supp. Br. 16). Specifically, Google seeks to preclude Dr. Cockburn from testifying regarding past licenses involving Nokia, Qualcomm, and Apple, and settlements between Sun and Microsoft (Br. 9–10).

**[10]**   Damages experts cannot use noncomparable licenses, with little relationship to the claimed invention or parties-in-suit, as a basis for calculating reasonable royalties. *See ResQNet.com, Inc. v. Lansa, Inc.,* 594 F.3d 860, 870 (Fed.Cir.2010).

**[11]**   In his report, Dr. Cockburn cursorily discussed licenses involving Nokia, Qualcomm, and Apple (Rpt ¶¶ 104–105). Other than listing the licensing amounts, Dr. Cockburn did little to describe these licenses. The only description given about the technology was that the licenses involved "intellectual property associated with mobile devices and services" (Rpt ¶ 104). Importantly, Dr. Cockburn did not specify whether the referenced licenses related to software or hardware, or how extensive the licenses were. Because there was so little information given about these licenses, this order cannot see how a jury could adequately evaluate the probative value of those agreements. References in Dr. Cockburn's report to these licenses are **STRICKEN.**

Dr. Cockburn also referenced the settlement entered into between Sun and Microsoft in 2004, under which Microsoft agreed **\*1188** to pay Sun over one billion dollars to settle ongoing litigation and to enter into license agreements (Rpt ¶¶ 70–71). Dr. Cockburn opined that the settlement exemplified the importance of compatibility to Java because Microsoft was threatening to fragment the Java platform (*ibid.*).

The problem with Dr. Cockburn's analysis is that he confused *two separate* litigations between Sun and Microsoft in the late–1990s and early–2000s. Dr. Cockburn used Sun's complaint from the earlier litigation to describe the importance of the settlement amount from the later litigation (Rpt ¶ 71). More specifically, Sun sued Microsoft in 1997 for $35 million, alleging that Microsoft had breached its contract by trying to extend Java so it would work differently on Windows computers. *Sun Microsystems, Inc. v. Microsoft Corp.,* No. 97–20884 RMW (N.D.Cal.). One of Sun's main arguments in the case was that Microsoft wrongfully advertised that its products were Java-compatible because, in Sun's eyes, they were not. The two parties settled in 2001

for $20 million. *Sun, Microsoft settle Java suit,* CNET News, January 23, 2001, accessed at <http://news.cnet.com/2100–1001–251401.html>.

In 2002, Sun sued Microsoft for one billion dollars claiming that Microsoft had engaged in anticompetitive actions against Java. *Sun Microsystems, Inc. v. Microsoft Corp,* No. 02–01150 RMW (N.D.Cal.). In 2004, Sun and Microsoft settled that lawsuit (Rpt ¶ 71). The settlement involved payments of $700 million by Microsoft to resolve pending antitrust issues and $900 million to release all possible patent claims. This second settlement was about more than fragmentation, patent and copyright infringement. That litigation featured antitrust issues. It is too dissimilar to be helpful for calculating damages.

 [12]    The Microsoft–Sun litigation can be used for one very limited purpose, and that is to show that Sun did have a policy to disfavor fragmentation. However, the settlement of that litigation was much broader than the patent claims and copyrights-in-suit, and for that matter, Java. The settlement sums paid by Microsoft would serve no purpose other than laying large numbers in front of our jury. Therefore, the expert will be permitted, pursuant to the rules of evidence and the rest of this order, to use the Microsoft–Sun litigation only to show that Sun took fragmentation seriously. The settlement amounts, or any allusions to settlement amounts, cannot be referenced in front of the jury.

## CONCLUSION

For the reasons stated above, Google's motion in limine is **GRANTED IN PART** and **DENIED IN PART.** Any portion of the report based on the apportionment of the patent claims and copyrights-in-suit is **STRICKEN.** Specifically, references to the $400 million in patent damages through the end of 2012 are stricken. References to the value of each patent are stricken. References to copyright lost licensee fee are stricken. However, calculations of copyright unjust enrichment and copyright lost profits are not stricken.

References to nonparty licenses and settlements are **PARTIALLY STRICKEN.** Specifically, references regarding past licenses involving Nokia, Qualcomm, and Apple are stricken. The litigation between Sun and Microsoft can only be used for the limited purpose of showing that Sun had a policy disfavoring fragmentation.

Dr. Cockburn will not be able to testify about damages after the end of 2012. There was nothing in his report that calculated damages past 2012. His calculations of the future values of individual patents and copyrights based on apportionment are stricken. His testimony will not be helpful for calculating ongoing royalties if an injunction is not granted.

 *1189  By **JANUARY 17, 2012, AT NOON,** both parties may submit 20–page memoranda on whether Dr. Cockburn should be allowed a third try. By **JANUARY 20 AT NOON,** both sides may submit five-page replies.

**IT IS SO ORDERED.**

---

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 69

52 F.3d 1026
United States Court of Appeals,
Federal Circuit.

ORTHO PHARMACEUTICAL
CORP., Plaintiff–Appellant,
and

Cilag Gesellschaft M.B.H., Cilag N.V., Cilag
Ltd., Cilag S.A.R.L., Cilag G.M.B.H., Cilag
S.P.A., Cilag–Medicamenta, LDA., Johnson
& Johnson S.A. (Cilag Division), Cilag AB,
Cilag AG and Cilag AG International, Plaintiffs,

v.

GENETICS INSTITUTE, INC. and
Amgen Inc., Defendants–Appellees.

No. 93–1166.    |    April 5, 1995.

Following determination of infringement in lead case, licensee of patent covering products of recombinant DNA technology used to produce erythropoietin (EPO), an important therapeutic agent in treatment of various blood disorders, brought action for damages against infringer. The United States District Court for the District of Massachusetts, William G. Young, J., 808 F.Supp. 894, entered summary judgment for infringer based on licensee's lack of standing, and licensee appealed. The Court of Appeals, Nies, Circuit Judge, held that: (1) licensee had implied licensee to use patented technology; (2) license was nonexclusive such that licensee had no standing to pursue infringement action; and (3) license agreement did not give licensee right to sue.

Affirmed.

West Headnotes (17)

**[1]    Patents**
 Parties

Under Patent Act, parties to infringement suit will have patentee on one side and accused infringer on other side; without patentee as plaintiff, statutory remedies are unavailable except in extraordinary circumstances. 35 U.S.C.A. §§ 100(d), 281.

7 Cases that cite this headnote

**[2]    Patents**
 Persons entitled to sue

Where patentee makes assignment of all significant rights under patent, such assignee may be deemed effective "patentee" under Patent Act and has standing to bring suit in its own name for infringement; any other party seeking enforcement of patent can sue, if at all, only with patentee or in name of patentee. 35 U.S.C.A. § 281.

20 Cases that cite this headnote

**[3]    Patents**
 Nature of license
**Patents**
 Persons entitled to sue

Patent licensee does not necessarily have right to become party to infringement action; license may amount to no more than covenant by patentee not to sue licensee for making, using, or selling patented invention, reserving right to grant others that same right, and holder of such nonexclusive license suffers no legal injury from infringement and, thus, has no standing to bring suit or even join in suit with patentee.

76 Cases that cite this headnote

**[4]    Patents**
 Persons entitled to sue

Economic injury alone does not provide patent licensee with standing to sue under patent statute, rather, to have coplaintiff standing in infringement suit, licensee must hold some of proprietary sticks from bundle of patent rights, albeit lesser share of rights in patent than for assignment and standing to sue alone. 35 U.S.C.A. § 281.

22 Cases that cite this headnote

**[5]    Patents**
 Nature of ownership of patents

**Patents**

👉 Exclusive Nature of Right

**Patents**

👉 Nature of license

Proprietary rights granted by any patent are rights to exclude others from making, using or selling invention in United States, and patent license may have effect of transferring some of those proprietary rights from patentee to licensee; such license does more than provide covenant not to sue, but makes licensee beneficial owner of some identifiable part of patentee's bundle of rights to exclude others. 35 U.S.C.A. § 154.

23 Cases that cite this headnote

**[6]     Patents**

👉 Rights, Remedies, and Liabilities of Licensees

Licensee with proprietary rights in patent is generally called "exclusive" licensee, but it is licensee's beneficial ownership of right to prevent others from making, using or selling patented technology that provides foundation for coplaintiff standing, not simply that word "exclusive" may or may not appear in license. 35 U.S.C.A. § 154.

12 Cases that cite this headnote

**[7]     Patents**

👉 Persons entitled to sue

Consequence of recognizing coplaintiff standing for patent licensee is that licensee has right to bring suit on patent, albeit in name of licensor, whether or not license so provides and regardless of patentee's cooperation, and patentee suffers legal consequences of litigation brought in its name.

21 Cases that cite this headnote

**[8]     Patents**

👉 Persons entitled to sue

To resolve issue of patent licensee's standing to sue alleged infringer, court must examine licensing agreement to determine whether parties

intended to effect transfer of proprietary rights to licensee as incident to protection of its interests. 35 U.S.C.A. § 154.

29 Cases that cite this headnote

**[9]     Federal Courts**

👉 Pleading

**Federal Courts**

👉 Summary judgment

**Federal Courts**

👉 Dismissal for failure to state a claim

**Federal Courts**

👉 Summary judgment

On review of grant of motions for summary judgment and dismissal for failure to state claim upon which relief could be granted, Court of Appeals accords each of these determinations plenary review as matter of law, accepting as true all material allegations of complaint, which is construed in plaintiff's favor. Fed.Rules Civ.Proc.Rules 12(b)(6), 56(c), 28 U.S.C.A.

Cases that cite this headnote

**[10]     Patents**

👉 Construction and Operation of Licenses

Under California law, section of patent license agreement giving licensee right to manufacture erythropoietin (EPO), which was produced using patented product, gave licensee implied license to use patented technology, even though section did not specifically reference patent.

Cases that cite this headnote

**[11]     Patents**

👉 Construction and Operation of Licenses

**Patents**

👉 Persons entitled to sue

Licensee of patent for products of recombinant DNA technology used to produce erythropoietin (EPO), an important therapeutic agent in treatment of various blood disorders, was nonexclusive licensee and thus had no standing to bring or join infringement action; claimed exclusive right to sell EPO abroad did not

support standing, as right to sell patented product outside United States was not conferred by patent. 35 U.S.C.A. §§ 154, 281.

27 Cases that cite this headnote

[12]   **Patents**
    👉 Construction and Operation of Licenses

**Patents**
    👉 Persons entitled to sue

Right-to-sue clause in patent license agreement which governed conduct of patentee and licensee did not allow licensee to bring action against alleged infringer, as licensee had nonexclusive license and thus had no standing to bring suit, and licensee did not appeal denial of its motion to intervene in patentee's infringement action.

11 Cases that cite this headnote

[13]   **Patents**
    👉 Contracts relating to patents and patent rights

Express covenants may regulate duties between patent licensor and licensee to implement rights of parties, but contract cannot change statutory requirement that infringement action be brought by patentee; right-to-sue clause cannot negate requirement that, for coplaintiff standing, licensee must have beneficial ownership of some of patentee's proprietary rights. 35 U.S.C.A. §§ 154, 281.

15 Cases that cite this headnote

[14]   **Patents**
    👉 Nature of ownership of patents

Patentee may not give right to sue alleged infringer to party who has no proprietary interest in patent.

4 Cases that cite this headnote

[15]   **Patents**
    👉 Parties

Requirement that licensee sue in name of patentee is not merely formality; patentee is

brought into suit for substantive reasons, namely, to protect its own interests in connection with charged acts of infringement and to enable alleged infringer to respond in one action to all claims of infringement.

2 Cases that cite this headnote

[16]   **Patents**
    👉 Joinder of causes of action

**Patents**
    👉 Persons entitled to sue

Patent licensee cannot stand by until patentee's infringement suit is concluded and then seek to vindicate its rights in second suit.

Cases that cite this headnote

[17]   **Patents**
    👉 Original utility

4,703,008. Cited.

Cases that cite this headnote

**Attorneys and Law Firms**

*1028 Eugene M. Gelernter, Patterson, Belknap, Webb & Tyler, New York City, argued for plaintiff-appellant. With him on the brief was David F. Dobbins.

William F. Lee, Hale & Dorr, Boston, MA, argued for defendants-appellees, Genetics Institute, Inc. With him on the brief were William G. McElwain and David B. Bassett. Jon O. Nelson, Allegretti & Witcoff, Ltd., Boston, MA, argued for defendants-appellees, Amgen, Inc. With him on the brief was D. Dennis Allegretti. Of counsel was Steven M. Odre and Stuart L. Watt, Amgen, Inc., of Thousand Oaks, CA.

Before ARCHER, Chief Judge, NIES [*] and MICHEL, Circuit Judges.

**Opinion**

NIES, Circuit Judge.

This appeal raises a question of a patent licensee's standing to sue an infringer in the name of the patentee/licensor. Ortho Pharmaceutical Corporation is a licensee of Amgen, Inc.,



owner of United States Patent No. 4,703,008 (the '008 patent). Ortho and its sublicensees filed suit against Genetics Institute for infringement of the '008 patent in the District Court for the District of Massachusetts. The district court dismissed Ortho's suit concluding that Ortho was a nonexclusive licensee and, therefore, lacked standing. *Ortho Pharmaceutical Corp. v. Genetics Institute, Inc.,* Civil Action 91–12174–Y (D.Mass. Dec. 4, 1992) (judgment) (reported *sub nom. Amgen, Inc. v. Chugai Pharmaceutical Co.,* 808 F.Supp. 894, 27 USPQ2d 1578 (D.Mass.1992)). We affirm.

## I.

The '008 patent claims a product used for the production of erythropoietin (EPO), a hormone that stimulates the synthesis of red blood cells in bone marrow. The '008 patent claims a purified and isolated DNA sequence encoding human EPO and host cells transformed or transfected with a DNA sequence in a manner allowing host cells to express EPO. The claims do not claim the EPO product itself. [1]

In 1984, three years prior to the issuance of the patent, Amgen and Kirin Brewery Co., Ltd., established a joint venture, Kirin–Amgen, Inc. At that time, Amgen, as owner of the then-pending application for the '008 patent, assigned certain rights to Kirin–Amgen. In 1985, Ortho entered into Product License **1029** Agreements (PLAs) [2] with Kirin–Amgen and Amgen separately under which Ortho was allowed limited rights to manufacture in the United States and sell EPO in the United States and in certain foreign countries in which the licensors were seeking to obtain patents on various products and processes, including EPO itself.

On October 27, 1987, the date the '008 patent issued, Kirin–Amgen assigned the patent to Amgen. On the same date, Amgen brought suit for infringement against Genetics and Chugai. The trial of Amgen's suit was bifurcated into liability and damages phases. Shortly before trial on liability, Ortho attempted to intervene under Fed.R.Civ.P. 24, either as a matter of right or permissively, based on its rights under the license from Amgen. This motion was denied on the grounds of untimeliness and because Ortho's interests were adequately represented by Amgen respecting liability, a decision Ortho did not appeal. Following a bench trial on liability, claims 2, 4, and 6 of the '008 patent were held not to be invalid or unenforceable and found to be infringed by both Chugai and Genetics Institute. *Amgen, Inc. v. Chugai Pharmaceutical Co.,* 13 USPQ2d 1737, 1989 WL 169006 (D.Mass.1989).

This court affirmed that judgment on interlocutory appeal. *Amgen, Inc. v. Chugai Pharmaceutical Co.,* 927 F.2d at 1200, 18 USPQ2d at 1016.

Ortho and its European sublicensees then filed a suit against Genetics Institute in the same court. Before an answer was filed, they amended the complaint to name Amgen as a defendant and subsequently moved to realign Amgen as an involuntary plaintiff. Genetics and Amgen filed motions to dismiss or for summary judgment on the ground of the plaintiff's lack of standing or for failure to state a claim. Ortho and the co-plaintiffs cross-moved to intervene in the Amgen litigation for the purpose of securing part of the damages. Ortho's suit was consolidated with the Amgen suit.

In reply to the defendants' motions, Ortho again asserted its rights as a licensee of Amgen. In particular, Ortho relied on Paragraph 2.01 of the PLA license, which provides:

> (a) AMGEN hereby grants to ORTHO but not AFFILIATES, except as hereinafter provided, an exclusive license to make in one location, have made and use LICENSED KNOW–HOW, LICENSED PATENTS and LICENSED PRODUCTS in the LICENSED TERRITORY in the LICENSED FIELD and to sell LICENSED PRODUCTS in the LICENSED TERRITORY.

> (b) AMGEN, having received the consent of Kirin Brewery Co., Ltd., hereby grants to ORTHO but not AFFILIATES, an exclusive license, except as against AMGEN's rights under this AGREEMENT in the LICENSED TERRITORY, to make EPO in one location in the United States for use and sale outside the LICENSED TERRITORY but not including China and Japan. AMGEN shall provide to ORTHO all information and any assistance and know-how required to ORTHO to achieve the purposes of this paragraph....

The agreement defined the LICENSED TERRITORY as the United States and the LICENSED FIELD as "all indications for human use except dialysis and diagnostics." In return, Amgen received royalties on Ortho's resulting sales of EPO in the United States. [3] Thus, one of the effects of paragraph 2.01(a), as interpreted by the court, was to grant Ortho the implied right to use the invention claimed in the '008 patent in one location to make EPO, for use or sale in the United States, for all human use except dialysis or diagnostics. Paragraph 2.01(b) repeated the implied grant to Ortho to use the '008 invention to make EPO in one location in the United States

and, with Kirin–Amgen's consent, the right to make certain foreign sales of EPO.

The PLA executed by Ortho and Amgen also contains section 8.02 entitled "Infringement **\*1030** by Third Parties." Amgen argues that this section precludes Ortho's suit because Amgen exercised its right to sue alone, as provided therein. However, Ortho disputes that the provisions control to bar a second suit by Ortho in Amgen's name, even though Amgen has sued.

In ruling on the motion, the court first rejected Ortho's argument that it could premise standing based upon paragraph 2.01(a) of the license agreement. The court reasoned that because Amgen did not promise not to sublicense its own right to use its '008 invention to manufacture EPO in the United States, Ortho held a nonexclusive license under this provision. 808 F.Supp. at 902, 27 USPQ2d at 1584. The court also found no merit in Ortho's argument that paragraph 2.01(b) granted it an exclusive field-of-use license for sales of EPO abroad. The court emphasized that the '008 patent did not cover sales of EPO itself. Thus, Ortho's right to sell EPO abroad could not be a right arising from or a license under the U.S. patent grant. As in paragraph 2.01(a), Ortho's license to use the '008 patented technology was held to be nonexclusive. 808 F.Supp. at 904, 27 USPQ2d at 1585. The district court did not rule on the effect of the right to sue provisions in the contract. Upon entry of the judgment of dismissal, the trial judge vacated the order of consolidation with the Amgen litigation. This appeal followed. The sole issue on appeal is whether Ortho's license gave it standing to sue.

## II.

**[1]** The Patent Act of 1952 provides "a patentee shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281 (1988). The term patentee includes "not only the patentee to whom the patent was issued but also the *successors in title* to the patentee." 35 U.S.C. § 100(d) (emphasis added). Thus, the statute requires that the parties to an infringement suit will have the patentee on one side and the accused infringer on the other. Without the patentee as plaintiff, the remedies provided in the patent statute are unavailable except in extraordinary circumstances "as where the patentee is the infringer, and cannot sue himself." *Waterman v. Mackenzie,* 138 U.S. 252, 255, 11 S.Ct. 334, 335, 34 L.Ed. 923 (1891) (suit dismissed because not brought by record owner); *Crown Die & Tool Co. v. Nye Tool & Mach. Works,* 261 U.S. 24, 40–41, 43 S.Ct. 254, 258, 67 L.Ed. 516

(1923) (plaintiff must have legal title to patent at the time of infringement); [4] *see also Arachnid, Inc. v. Merit Indus., Inc.,* 939 F.2d 1574, 1579, 19 USPQ2d 1513, 1517 (Fed.Cir.1991) (relying on *Crown Die* ).

**[2]** Courts look to the substance of an agreement to determine whether it has the effect of an assignment and, thus, satisfies the statutory requirement that the "patentee" must sue. Where a patentee makes an assignment of all significant rights under the patent, such assignee may be deemed the effective "patentee" under the statute and has standing to bring a suit in its own name for infringement. *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.,* 944 F.2d 870, 875, 20 USPQ2d 1045, 1049 (Fed.Cir.1991) (transfer of substantially all rights held to be assignment); *Bell Intercontinental Corp. v. United States,* 381 F.2d 1004, 1011, 180 Ct.Cl. 1071, 152 USPQ 182, 184 (1967); *see Waterman,* 138 U.S. at 260, 11 S.Ct. at 337 (mortgagee held to be patent owner). Any other party seeking enforcement of the patent can sue, if at all, only with the patentee or in the name of the patentee. "Any rights of the licensee must be enforced through or in the name of the owner of the patent," and "never in the name of the licensee alone, unless that is necessary to prevent an absolute failure of justice." **\*1031** *Waterman,* 138 U.S. at 255, 11 S.Ct. at 335; *see Independent Wireless Telegraph Co. v. Radio Corp. of America,* 269 U.S. 459, 468, 46 S.Ct. 166, 169, 70 L.Ed. 357 (1926) (patentee necessary to give jurisdiction in law or equity and to enable infringer to defeat all claims in one action or bar all other actions by satisfying one decree); *Abbott Labs. v. Diamedix Corp.,* 47 F.3d 1128 (Fed.Cir.1995) (patentee has a right to intervene in licensee's suit).

**[3]** Saying that a licensee must sue with or in the name of the patentee does not mean that every licensee under a patent has a rightful place in an infringement suit. A licensee must have "standing" under the patent statute. A license may amount to no more than a covenant by the patentee not to sue the licensee for making, using or selling the patented invention, the patentee reserving the right to grant others the same right. A holder of such a nonexclusive license suffers no legal injury from infringement and, thus, has no standing to bring suit or even join in a suit with the patentee. As explained in *Western Elec. Co. v. Pacent Reproducer Corp.,* 42 F.2d 116, 118 (2d Cir.), *cert. denied,* 282 U.S. 873, 51 S.Ct. 78, 75 L.Ed. 771 (1930):

> In its simplest form, a license means only leave to do a thing which the

63 USLW 2672, 34 U.S.P.Q.2d 1444

licensor would otherwise have a right to prevent. Such a license grants to the licensee merely a privilege that protects him from a claim of infringement by the owner of the patent monopoly.... He has no property interest in the monopoly of the patent, nor any contract with the patent owner that others shall not practice the invention. Hence the patent owner may freely license others, or may tolerate infringers, and in either case no right of the patent licensee is violated. Practice of the invention by others may indeed cause him pecuniary loss, but it does him no legal injury.

The district court here relied on Judge Hand's analysis of standing in *A.L. Smith Iron Co. v. Dickson,* 141 F.2d 3, 6 (2d Cir.1944), with which we agree:

The key question for determining standing of a licensee is whether the licensee as a matter of law has an exclusive property interest in the patent itself, not whether the licensee in fact has been harmed by a third-party infringer. As Judge Learned Hand explained in *A.L. Smith Iron Co. v. Dickson,* 141 F.2d 3, 6 (2d Cir.1944), there are strong policy reasons why patent law does not confer standing on a nonexclusive licensee to sue a third party for infringement even though the licensee has suffered due to the infringement:

It is indeed true that a mere licensee may have an interest at stake in such a suit; his license may be worth much more to him than the royalties which he has agreed to pay, and its value will ordinarily depend on his ability to suppress the competition of his rivals. The reason why he is not permitted to sue is not because he has nothing to protect. But against that interest is the interest of the infringer to be immune from a second suit by the owner of the patent; and also the interest of the patent owner to be free to choose his forum.... Indeed, the owner may have granted a number of licenses, and it would be exceedingly oppressive to subject him to the will of all his licensees. These two interests in combination have been held to overweigh any interest of the licensee[.]

808 F.Supp. at 904 n. 11, 27 USPQ2d at 1585 n. 11.

[4]   Thus economic injury alone does not provide standing to sue under the patent statute. To have co-plaintiff standing in an infringement suit, a licensee must hold some of the proprietary sticks from the bundle of patent rights, albeit a lesser share of rights in the patent than for an assignment and standing to sue alone. *See Weinar v. Rollform, Inc.,* 744 F.2d 797, 803, 223 USPQ 369, 374–75 (Fed.Cir.1984) (exclusive licensee properly joined in suit; "two parties sharing the property rights represented by the patent may have respective rights protected").

[5]   [6]   The proprietary rights granted by any patent are the rights to exclude others from making, using or selling the invention in  **1032  the United States. [5] A patent license may have the effect between the parties to the license of transferring some of those proprietary rights from the patentee to its licensee. Such license then does more than provide a covenant not to sue, *i.e.,* a "bare" license. In addition, the license makes the licensee a beneficial owner of some identifiable part of the patentee's bundle of rights to exclude others. Thus, a licensee with proprietary rights in the patent is generally called an "exclusive" licensee. But it is the licensee's beneficial ownership of a right to prevent others from making, using or selling the patented technology that provides the foundation for co-plaintiff standing, not simply that the word "exclusive" may or may not appear in the license. As stated in *Philadelphia Brief Case Co. v. Speciality Leather Prods Co.,* 145 F.Supp. 425, 428, 111 USPQ 180, 182 (D.N.J.1956), *aff'd,* 242 F.2d 511, 113 USPQ 100 (3rd Cir.1957):

[T]his so-called exclusive licensee, while only a licensee, comes so close to having truly proprietary interests in the patent, that the courts have held that he is equitably entitled to sue on the patent, provided he joins the true proprietor of the patent in such suit[.]

[7]   The consequence of recognizing co-plaintiff standing is that the licensee has a right to bring suit on the patent, albeit in the name of the licensor, whether or not the license so provides and regardless of the patentee's cooperation. Further, the patentee/licensor suffers the legal consequences of litigation brought in its name. As stated in *Independent Wireless Co.,* 269 U.S. at 469, 46 S.Ct. at 169–70:

It seems clear then on principle and authority that the owner of a patent who grants to another the exclusive right to make, use or vend the invention, which does not constitute

a statutory assignment, holds the title to the patent in trust for such a licensee, to the extent that he must allow the use of his name as plaintiff in any action brought at the instance of the licensee in law or in equity to obtain damages for the injury to this exclusive right by an infringer or to enjoin infringement of it. Such exclusive licenses frequently contain express covenants by the patent-owner and licensor to sue infringers that expressly cast upon the former the affirmative duty of initiating and bearing the expense of the litigation. But without such express covenants, *the implied obligation of the licensor to allow the use of his name is indispensable to the enjoyment by the licensee of the monopoly which by personal contract the licensor has given.* Inconvenience and possibly embarrassing adjudication in respect of the validity of the licensor's patent rights, as the result of suits begun in aid of the licensee, are only the equitable and inevitable sequence of the licensor's contract, whether express or implied. [Emphasis added.]

[8]   In the case at hand, the patentee has refused to let its licensee join in its suit against an infringer. However, co-plaintiff standing is determined by whether or not the licensee acquired proprietary rights in the patent under the contract with the patentee. The patentee's later second thoughts are irrelevant, either to confer standing or, as here, to deny standing. To resolve the issue of standing, we must examine the licensing agreement to determine whether the parties intended to effect a transfer of proprietary rights to the licensee as an incident to protection of its interests. *Vaupel, 944 F.2d at 874* (intent of parties controlling).

### III.

[9]   Ortho does not assert it has standing to sue alone. Moreover, on appeal, Ortho has abandoned paragraph 2.01(a) of the license as a basis for co-plaintiff standing and now relies only upon paragraph 2.01(b) of the license.[6] The

burden of demonstrating standing falls to Ortho, as "[i]t is well established ... that before a federal court can **\*1033** consider the merits of a legal claim, the person seeking to invoke the jurisdiction of the court must establish the requisite standing to sue." *Whitmore v. Arkansas,* 495 U.S. 149, 154, 110 S.Ct. 1717, 1722, 109 L.Ed.2d 135 (1990); *accord Lujan v. Defenders of Wildlife,* 504 U.S. 555, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992); *Animal Legal Defense Fund v. Quigg,* 932 F.2d 920, 925, 18 USPQ2d 1677, 1681 (Fed.Cir.1991). We reach this issue in the context of review of the grant of motions for summary judgment and dismissal for failure to state a claim upon which relief could be granted. We accord each of these determinations plenary review as a matter of law, *e.g., Dehne v. United States,* 970 F.2d 890, 892 (Fed.Cir.1992) (dismissal); *Intellicall, Inc. v. Phonometrics,* 952 F.2d 1384, 1387, 21 USPQ2d 1383, 1386 (Fed.Cir.1992) (summary judgment), accepting as true all material allegations of Ortho's complaint, which is construed in its favor. *Animal Legal Defense Fund,* 932 F.2d at 925, 18 USPQ2d at 1682 (quoting *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975)); *see also* 13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure:* Jurisdiction 2d § 3531.15, p. 91 (1984).

### A.

[10]   Before reaching the issue of standing, Ortho must first demonstrate that the license in fact concerns the '008 patent. In contrast to paragraph 2.01(a), which specifically references "licensed patents," paragraph 2.01(b) expressly grants the right to manufacture EPO and does not address any patents by which it is made. Although the district court concluded that by paragraph 2.01 Ortho received the right to use the inventions claimed in the '008 patent to make EPO (*Amgen, 808 F.Supp. at 902, 27 USPQ2d at 1583),* it offered no further analysis on how it reached this result. We can only conclude that the court found that a license under the '008 patent could be implied under the law of California, which it found the appropriate jurisdiction under paragraph 10.8 of the licensing agreement. 808 F.Supp. at 902 n. 9, 27 USPQ2d at 1583 n. 9. *See generally* 6 Ernest Bainbridge Lipscomb III, *Walker on Patents* §§ 20:14–20.20 (3d ed. 1987) (describing law of implied patent licenses).

Applying the contract law of California, *see Intel Corp. v. International Trade Comm'n,* 946 F.2d 821, 826–28, 20 USPQ2d 1161, 1166–68 (Fed.Cir.1991) (stating principles of

63 USLW 2672, 34 U.S.P.Q.2d 1444

California contract law and applying them to interpretation of license agreement for purposes of implied license defense), we agree that paragraph 2.01(b) may reasonably be implied to license Ortho to use the '008 technology. A contrary reading would hardly comport with the requirement under paragraph 2.01(b) that Amgen assist Ortho with its EPO manufacturing efforts.

### B.

 [11]    Despite this implied license, the trial court found Ortho had no proprietary interest in the '008 patent based on its rights under either paragraph (a) or (b). It was a nonexclusive licensee. With respect to patent rights, Ortho had an implied license to use the '008 invention in one location in the United States. It is undisputed that that right was nonexclusive inasmuch as Amgen had the right to license others to do the same. Ortho concedes this point but argues that its additional right to sell EPO abroad as provided in paragraph (b) is an exclusive field of use of the '008 technology which provides standing. We disagree. Ortho commingles its consent from Kirin–Amgen to sell EPO abroad (as expressly stated in paragraph (b) to be necessary) with the rights it received from Amgen under the U.S. patent to use the '008 technology. U.S. patent '008 provides no rights respecting the product EPO *per se.* Moreover, a U.S. patent grants rights to exclude others from making, using and selling the patented invention only *in the United States.* 35 U.S.C. § 154; *Vaupel,* 944 F.2d at 875. With respect to Ortho's right to sell unpatented EPO abroad, the court correctly held that Ortho's right was not a proprietary right arising from the '008 patent. [7]   **\*1034**   Indeed, Amgen itself had no right to sell EPO abroad by reason of its obtaining the '008 patent and, thus, could not license that right to Ortho as an incident of patent ownership. With respect to rights under the '008 patent, Ortho had only a nonexclusive right to use the '008 invention at one location in the United States. Thus, considering only this right, Ortho is a bare, that is, nonexclusive, licensee and has no standing to bring or join a suit for infringement against Genetics.

### C.

 [12]    The conclusion that Ortho held only nonexclusive rights under paragraph 2.01(b) would end our inquiry except for the provision in the license agreements which gave Ortho the right to bring appropriate suits if Amgen did not. As provided in paragraph 8.02:

> AMGEN shall have the right, but not the obligation, to bring, defend, and maintain any appropriate suit or action.... In the event AMGEN fails to take action with respect to such matters within a reasonable period, not more than six (6) months, following receipt of such notice and evidence, ORTHO shall have the right, but not the obligation, to bring, defend, and maintain any appropriate suit or action. Absent an agreement between the parties to jointly bring any action or suit hereunder and share the expenses thereof, any amount recovered in any such action or suit shall be retained by the party bearing its expenses thereof.

Other parts of the right to sue clause require that Amgen and Ortho consult and sue together if either "finds it necessary" to "join" the other and that each will "cooperate" with the other.

Ortho argues that the contract should be construed to give each party the right to bring its own action where cooperation is not forthcoming. Amgen argues that the contract provisions, under which Amgen exercised its right to sue alone and keep all damages, would control regardless of whether or not Ortho had an exclusive license. We conclude that the right to sue clause has no effect in this case.

 [13]    [14]   First, a licensee with sufficient proprietary interest in a patent has standing regardless of whether the licensing agreement so provides. Express covenants may, of course, regulate the duties between the licensor and licensee to implement the rights of the parties. *Independent Wireless Co.,* 269 U.S. at 469, 46 S.Ct. at 169; *Abbott Labs.,* 47 F.3d at 1134. However, a contract cannot change the statutory requirement for suit to be brought by the "patentee." By the same token, a right to sue clause cannot negate the requirement that, for co-plaintiff standing, a licensee must have beneficial ownership of some of the patentee's proprietary rights. A patentee may not give a right to sue to a party who has no proprietary interest in the patent. *Crown Die & Tool Co. v. Nye Tool & Machine Works,* 261 U.S. 24, 44, 43 S.Ct. 254, 259, 67 L.Ed. 516 (1923); *see also Life Time Doors, Inc. v. Walled Lake Door Co.,* 505 F.2d 1165, 1167–68, 184 USPQ 1, 2 (6th Cir.1974) (bare licensee has no right to be in suit or to appeal; such authorization by patentee has no effect); *Overman Cushion Tire Co. v.*

*Goodyear Tire & Rubber Co.,* 59 F.2d 998, 14 USPQ 104 (2d Cir.), *cert. denied,* 287 U.S. 651, 53 S.Ct. 97, 77 L.Ed. 562 (1932) (nonexclusive licensee has no right to sue or be joined in suit); *Philadelphia Brief Case Co.,* 145 F.Supp. at 429–30, 111 USPQ at 183 (contract clause cannot give right to sue where licensee would otherwise have no such right). Here, being only a nonexclusive licensee, Ortho has no inherent or implied right to sue which the clause regulates as between the parties. Thus, we conclude the right to sue clause has no effect on Ortho's standing, one way or the other.

[15]  Secondly, under the cited precedent, the requirement that a licensee sue in the name of the patentee is not merely a formality. The patentee is brought into the suit for substantive reasons, namely, to protect its own interests in connection with the charged acts of infringement and "to enable the alleged **\*1035** infringer to respond in one action to all claims of infringement for his act." *Independent Wireless Co.,* 269 U.S. at 468, 46 S.Ct. at 169.

[16]  A licensee cannot stand by until a patentee's suit is concluded and then seek to vindicate its rights in a second suit. As stated in *Birdsell v. Shaliol,* 112 U.S. 485, 486–87, 5 S.Ct. 244, 245, 28 L.Ed. 768 (1884):

> [W]hen a suit ... has been brought and prosecuted, in the name of the patentee alone, with the licensee's consent and concurrence, to final judgment from which, if for too small a sum, an appeal might have been taken in the name of the patentee, we should hesitate to say merely because the licensee was not

a formal plaintiff in that suit, that a new suit could be brought to recover damages against the same defendant for the same infringement.

While Ortho sought to become part of Amgen's suit at trial, on appeal Ortho seeks approval of an independent second suit in the name of Amgen against the same infringer for the same acts of infringement, namely, Genetics use of the patented '008 technology in the United States, which was the subject of Amgen's suit. Ortho does not claim it was a necessary or indispensable party to Amgen's suit, did not appeal the denials of intervention therein, and did not appeal the order deconsolidating this suit from Amgen's. Moreover, the parties advised the court at the hearing that the Amgen/Genetics litigation has been settled. Thus, Ortho has effectively consented and concurred to suit in the name of the patentee alone.

## IV.

## CONCLUSION

For the foregoing reasons, the judgment is

*AFFIRMED.*

## Parallel Citations

63 USLW 2672, 34 U.S.P.Q.2d 1444

Footnotes

\*    Circuit Judge Nies vacated the position of Chief Judge on March 17, 1994.

1    For a full analysis of the invention, see *Amgen, Inc. v. Chugai Pharmaceutical Co.,* 927 F.2d 1200, 18 USPQ2d 1016 (Fed.Cir.), *cert. denied,* 502 U.S. 856, 112 S.Ct. 169, 116 L.Ed.2d 132 (1991).

2    In 1988, the PLAs replaced the Technological License Agreements, entered at the same time as the PLAs, upon approval in France of recombinant EPO for human use.

3    Ortho paid royalties to Kirin–Amgen on Ortho's European sales. As a licensee of European patents, Ortho has filed suit in Europe against Genetics' European customer.

4    35 U.S.C. § 261 provides in pertinent part:
     Applications for patent, patents, or any interest therein, shall be assignable in law by an instrument in writing. The applicant, patentee, or his assigns or legal representatives may in like manner grant and convey an exclusive right under his application for patent, or patents, to the whole or any specified part of the United States.
     ....
     An assignment, grant or conveyance shall be void as against any subsequent purchaser or mortgagee for a valuable consideration, without notice, unless it is recorded in the Patent and Trademark Office within three months from its date or prior to the date of such subsequent purchase or mortgage.

5    35 U.S.C. § 154 states:

> Every patent shall contain ... a grant to the patentee ... of the right to exclude others from making, using, or selling the invention throughout the United States.

6    The Cilag plaintiffs, who are sub-licensees of Ortho only in Europe, do not appeal.

7    Ortho finds fault with the trial court's phraseology that this right "exceeds the scope of the patent" and argues that the court found the agreement unenforceable for this reason. Contrary to Ortho's argument, the court held only that the provision respecting foreign sales of EPO was a contract right, not that the agreement was unenforceable against Amgen.

---

**End of Document**                                © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 70

[2001] 1 W.L.R. 143                                                                    Page 1

[2001] UKHL 2 [2001] 1 W.L.R. 143 [2001] 1 All E.R. 673 [2001] B.C.C. 864 [2001] 1 B.C.L.C. 145 [2001]
B.P.I.R. 119 (2001) 98(12) L.S.G. 43 (2001) 145 S.J.L.B. 32 Times, January 23, 2001 Official Transcript [2001]
UKHL 2 [2001] 1 W.L.R. 143 [2001] 1 All E.R. 673 [2001] B.C.C. 864 [2001] 1 B.C.L.C. 145 [2001] B.P.I.R. 119
(2001) 98(12) L.S.G. 43 (2001) 145 S.J.L.B. 32 Times, January 23, 2001 Official Transcript
**(Cite as: [2001] 1 W.L.R. 143)**

**C**

**\*143 Phillips and another v Brewin Dolphin Bell Lawrie Ltd and another [2001] UKHL/2**

House of Lords

Lord Steyn, Lord Hutton, Lord Hobhouse, Lord Millett,  and Lord Scott

2000 Oct 30, 31; 2001 Jan 18

Insolvency—Transaction at undervalue—Linked contracts—Purchaser wanting to buy company's business without paying for goodwill—Company transferring goodwill to subsidiary and selling subsidiary to purchaser for £1—Purchaser's parent company leasing computer equipment used in business from company—Company liquidator subsequently contending subsidiary sold at undervalue—Whether lease part of consideration for sale—Whether transaction at undervalue— Insolvency Act 1986 (c 45), s. 238

In October 1989 the plaintiff company negotiated to sell its stockbroking business to the first defendant, B Ltd for a price of £1.25m. The relevant part of the business, including the goodwill, was transferred to a wholly-owned subsidiary of the company, and for tax and regulatory reasons the sale was effected by two agreements made in November 1989 by which the company sold the subsidiary's share capital to B Ltd for £1, and sublet the computer equipment used in the business, which it held on lease, to B Ltd's parent company, P Ltd, for four years at an annual rent of £312,500 payable in arrears. B Ltd made a loan to the company of £312,500 intended to be set off against the first rental payment when due, and undertook to discharge certain redundancy obligations of the company. The sublease agreement was made in breach of a covenant in the agreements with the owners of the computer equipment prohibiting the assignment or subletting of the equipment. Before the sublease was entered into with P Ltd, B Ltd had decided not to use the computer equipment to run its business but to update its own existing computer system. Two months later, and before the first payment under the sublease became due, the owners of the computer equipment terminated the company's leases for non-payment of rent. P Ltd claimed that it was discharged from further performance of the sublease agreement. The company was wound up in April 1990. On an application by the liquidator under section 238 of the Insolvency Act 19861 for a declaration that the share sale agreement was a transaction at an undervalue, the judge held that payments made under the sublease agreement were not to be treated as consideration for the transfer of the shares and that the share sale agreement had been a transaction at an undervalue, and ordered B Ltd to pay the liquidator the amount of the undervalue, namely the difference between the value of the shares, assessed at £1,050,000, and the value of the redundancy obligations, assessed at £325,000. The Court of Appeal dismissed an appeal by B Ltd and P Ltd and held that the share sale agreement alone was the relevant transaction for the purposes of section 238 and that that transaction had been at an undervalue.

On appeal by B Ltd and P Ltd—

*Held* , (1) that the issue was to identify under section 238(4)(b) of the Act not the "transaction" but the "consideration" for the transaction entered into by the company, which was a question of fact notwithstanding that it might involve issues of law such as the construction of a document; that it was irrelevant by whom the consideration was provided, and it could include the value of a collateral agreement entered into by the company with a third party; and that it was clear that the **\*144** consideration for the company's shares included the benefit of the entry by P Ltd into the sublease agreement whereby the purchase price of £1.25m would be paid by four annual payments of £312,500 each

[2001] UKHL 2 [2001] 1 W.L.R. 143 [2001] 1 All E.R. 673 [2001] B.C.C. 864 [2001] 1 B.C.L.C. 145 [2001] B.P.I.R. 119 (2001) 98(12) L.S.G. 43 (2001) 145 S.J.L.B. 32 Times, January 23, 2001 Official Transcript [2001] UKHL 2 [2001] 1 W.L.R. 143 [2001] 1 All E.R. 673 [2001] B.C.C. 864 [2001] 1 B.C.L.C. 145 [2001] B.P.I.R. 119 (2001) 98(12) L.S.G. 43 (2001) 145 S.J.L.B. 32 Times, January 23, 2001 Official Transcript

**(Cite as: [2001] 1 W.L.R. 143)**

(see post, pp 145A–E , 150G–151A, D–F ).

(2) Dismissing the appeal, that in assessing the value in money or money's worth of the sublease agreement, the court was entitled to give precedence to reality over speculation, by having regard to events which had occurred after the agreement was entered into; that since B Ltd had decided before the date of the sublease agreement not to use the computer equipment in its business and since the agreement itself was made in breach of the company's covenant, the sublease agreement was precarious and speculative from the outset; that in those circumstances it was for the party who relied on the agreement as consideration to establish its value, and the defendants were unable to do so; that, taking into account subsequent events, the value of the sublease agreement was nil and added nothing to the consideration for the share sale; and that, accordingly, since there was no reason to differ from the judge's conclusion, that the value of the company's shares was £1,050,000, the sale of the shares was at an undervalue and, in exercise of the discretion conferred by section 238(3) of the Act, the liquidator would be ordered to give credit for the loan of £312,500 made to the company by P Ltd against the sum due from B Ltd (see post, pp 151H–152E , 153A–F, G–154B, D–G ).

Decision of the Court of Appeal [1999] 1 WLR 2052 ; [1999] 2 All ER 844 affirmed .

**The following case is referred to in the speech of Lord Scott of Foscote:**

• M C Bacon Ltd, In re [1990] BCLC 324

**The following additional cases were cited in argument:**

• Agricultural Mortgage Corpn plc v Woodward [1995] 1 BCLC 1, CA
• Attorney General v Equiticorp Industries Group Ltd [1996] 1 NZLR 528
• Chohan v Saggar [1994] BCC 134, CA
• Duckwari plc, In re [1999] Ch 253; [1998] 3 WLR

913, CA
• Jeffrey Bigelow Design Group Inc, In re (1992) 956 F 2d 479
• Paramount Airways Ltd, In re [1993] Ch 223; [1992] 3 WLR 690; [1992] 3 All ER 1, CA
• Philips v Ward [1956] 1 WLR 471; [1956] 1 All ER 874, CA
• Phipps v Boardman [1967] 2 AC 46; [1966] 3 WLR 1009; [1966] 3 All ER 721, HL(E)
• Royal Bank of Canada v North American Life Assurance Co [1996] 1 SCR 325
• Rubin v Manufacturers Hanover Trust Co (1981) 661 F 2d 979
• Tosich Construction Pty Ltd v Tosich (1997) 23 ACSR 466

**APPEAL** from the Court of Appeal

This was an appeal by leave of the House of Lords (Lord Hoffmann, Lord Hutton and Lord Hobhouse of Woodborough) granted on 26 October 1999, by the defendants, Brewin Dolphin Bell Lawrie Ltd (formerly Brewin Dolphin & Co Ltd) and Private Capital Group Ltd from a decision of the Court of Appeal (Lord Woolf MR, Morritt and Laws LJJ) on 17 March 1999 affirming a decision dated 28 January 1998 of Evans-Lombe J who, on an action brought by the first plaintiff, Ian Peter Phillips, as liquidator of the second plaintiff, A J Bekhor & Co, ordered that the sale to the first defendant of shares in Bekhor Securities Ltd, a wholly-owned subsidiary of the second plaintiff, was a sale at an undervalue for the purposes of section 238 of the Insolvency Act 1968 .

The facts are stated in the opinion of Lord Scott of Foscote.**145**

**Representation**

• Gregory Mitchell QC , Ewan McQuaterChristopher Hare and for the defendants.
• Michael Briggs QCRichard Slade and for the plaintiffs.

LORD STEYN

[2001] UKHL 2 [2001] 1 W.L.R. 143 [2001] 1 All E.R. 673 [2001] B.C.C. 864 [2001] 1 B.C.L.C. 145 [2001] B.P.I.R. 119 (2001) 98(12) L.S.G. 43 (2001) 145 S.J.L.B. 32 Times, January 23, 2001 Official Transcript [2001] UKHL 2 [2001] 1 W.L.R. 143 [2001] 1 All E.R. 673 [2001] B.C.C. 864 [2001] 1 B.C.L.C. 145 [2001] B.P.I.R. 119 (2001) 98(12) L.S.G. 43 (2001) 145 S.J.L.B. 32 Times, January 23, 2001 Official Transcript

**(Cite as: [2001] 1 W.L.R. 143)**

Their Lordships took time for consideration.

18 January. My Lords,

1 For the reasons given by Lord Scott of Foscote in his opinion I would also make the order which he proposes.

LORD HUTTON

My Lords,

2 I have had the advantage of reading in draft the speech prepared by my noble and learned friend, Lord Scott of Foscote, and for the reasons which he gives I would dismiss the appeal and make the order which he proposes.

LORD HOBHOUSE OF WOODBOROUGH

My Lords,

3 I have had the advantage of reading in draft the speech to be delivered by my noble and learned friend, Lord Scott of Foscote. I agree with the order which he is to propose and with the reasons which he will give.

LORD MILLETT

My Lords,

4 I have had the advantage of reading in draft the speech prepared by my noble and learned friend, Lord Scott of Foscote. I agree with it, and with the order he proposes.

LORD SCOTT OF FOSCOTE

My Lords,

5 Section 238 of the Insolvency Act 1986 provides a remedy where a company goes into liquidation within two years after entering into a transaction at an undervalue. Where the section applies the liquidator may apply to the court for an order ( subsection (2) ) and the court:

"shall, on such an application, make such order as it thinks fit for restoring the position to what it would have been if the company had not entered into that transaction" ( subsection (3) ).Subsection (4)(b) elucidates the meaning of a transaction at an undervalue:

"a company enters into a transaction with a person at an undervalue if… the company enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company." The company in the present case is A J Bekhor & Co ("AJB"). On 10 November 1989 AJB entered into agreements with Brewin Dolphin & Co Ltd ("Brewin Dolphin") and into agreements with Private Capital Group Ltd ("PCG"). PCG was the parent company of Brewin Dolphin. These agreements were linked. I will describe later the nature of the link and how **\*146** it arose. The purpose of the agreements was the sale of AJB's stockbroking business to Brewin Dolphin. On 17 October 1989, in order to facilitate and set the stage for the sale, AJB sold its stockbroking business and business assets to Bekhor Securities Ltd ("BSL"), a wholly-owned subsidiary, for a consideration of £1. The transfer of the business to Brewin Dolphin was to be brought about by a transfer of the BSL shares. Accordingly, under one of the 10 November 1989 agreements with Brewin Dolphin, AJB transferred to Brewin Dolphin its shares in BSL. Brewin Dolphin thus acquired AJB's business. AJB received in return (i) from Brewin Dolphin, the assumption by Brewin Dolphin of AJB's obligations to its employees, including, in particular, the obligation to make redundancy payments; and (ii) from PCG, under one of the 10 November 1989 agreements between AJB and PCG, a covenant by PCG to pay AJB £312,500 per annum for four years, the first payment to be made on 10 November 1990. This agreement was expressed to be a computer equipment leasing agreement and the payments were expressed to be rent payable for the right to use the computer equipment. The total "rent" to be paid over the four years was £1.25m. It was by no means a coincid-

[2001] 1 W.L.R. 143                                                                                                    Page 4
[2001] UKHL 2 [2001] 1 W.L.R. 143 [2001] 1 All E.R. 673 [2001] B.C.C. 864 [2001] 1 B.C.L.C. 145 [2001]
B.P.I.R. 119 (2001) 98(12) L.S.G. 43 (2001) 145 S.J.L.B. 32 Times, January 23, 2001 Official Transcript [2001]
UKHL 2 [2001] 1 W.L.R. 143 [2001] 1 All E.R. 673 [2001] B.C.C. 864 [2001] 1 B.C.L.C. 145 [2001] B.P.I.R. 119
(2001) 98(12) L.S.G. 43 (2001) 145 S.J.L.B. 32 Times, January 23, 2001 Official Transcript

**(Cite as: [2001] 1 W.L.R. 143)**

ence that £1.25m was the sum that it had been agreed would be paid for the stockbroking business. The computer equipment in question was not owned by AJB but had been leased from two lessors, Wirral Equipment Ltd and Asterrose Ltd. Each of the leases required the consent of the lessor to any subletting by AJB. Consent to the subletting of the equipment by AJB to PCG had neither been sought nor given. On account of default by AJB in paying the rent due under these head leases, the head leases were terminated in early 1990 and the computer equipment was recovered by the head lessors. This took place before the date, 10 November 1990, on which the first payment of £312,500 was due to be paid to AJB under the 10 November 1989 sublease to PCG. So PCG treated the sublease as having been brought to an end by the termination of the head leases, and consequently made none of the £312,500 payments.

6 In the negotiations between AJB and Brewin Dolphin that had led to the 10 November 1989 agreements, the value of AJB's stockbroking business, and the sum to be paid for it, had first been agreed at £2.5m but later negotiated down to the £1.25m. There were two reasons why, under the form the transaction finally took, the £1.25m was to be paid to AJB not by Brewin Dolphin, the purchaser of the business, but by PCG as rent for the computer equipment spread over four years. One reason was that PCG hoped to be able to deduct the "rent" from its taxable profits. The other reason was that the payment of £1.25m for the goodwill of the stockbroking business would have prompted requirements by the regulatory authority for additional capital funding for that business.

7 AJB was, at the time of these agreements, in deep financial trouble. A winding up order was made against AJB on 25 April 1990. The petitioners were Wirral and Asterrose. On 4 May 1990 an administrative receiver was appointed by AJB's debenture holder. There is no dispute but that AJB is, and was when the winding up order was made, hopelessly insolvent.

8 On 24 June 1994 Mr Phillips, the liquidator and administrative receiver of AJB, and AJB in liquidation commenced proceedings against Brewin Dolphin and PCG. It was contended that the transaction under which AJB had transferred its shares in BSL to Brewin Dolphin, thereby, in effect, transferring its stockbroking business to Brewin Dolphin, was a sale **\*147** at an undervalue. An order against Brewin Dolphin under section 238 was sought. As against PCG, payment of the four annual sums of £312,500 was claimed. The payment of these was said to be the means by which "part of the value of the share capital of BSL was due to be paid to [AJB]".

**The judgment of Evans-Lombe J**

9 The trial took place before Evans-Lombe J [1998] 1 BCLC 700 . An important issue at the trial was the extent to which the 10 November 1989 agreement under which the BSL shares were transferred to Brewin Dolphin and the 10 November 1989 agreement under which PCG was to make the four annual £312,500 payments should be treated as together providing the consideration for the transfer to Brewin Dolphin of the BSL shares. The judge held that the two agreements were linked "in the sense that it was never contemplated that one would not be entered into without the other". (There is an obviously unintentional double negative in this sentence.) This finding of fact by the judge was not challenged in the Court of Appeal or before your Lordships. Brewin Dolphin and PCG were, said the judge, contending on the one hand that the 10 November 1989 sublease of the computer equipment was to be treated as a separate transaction, capable of being treated as at an end on the recovery of the equipment by the head lessors, but contending on the other hand that PCG's covenant in the sublease should be treated as part of the consideration for Brewin Dolphin's purchase of the BSL shares. The judge said, at pp 723–724:

"It seems to me that it is not open to the defendants to put forward these two contentions simultaneously. If the payments made under the lease agree-

© 2014 Thomson Reuters.

[2001] 1 W.L.R. 143                                                                                                                    Page 5

[2001] UKHL 2 [2001] 1 W.L.R. 143 [2001] 1 All E.R. 673 [2001] B.C.C. 864 [2001] 1 B.C.L.C. 145 [2001] B.P.I.R. 119 (2001) 98(12) L.S.G. 43 (2001) 145 S.J.L.B. 32 Times, January 23, 2001 Official Transcript [2001] UKHL 2 [2001] 1 W.L.R. 143 [2001] 1 All E.R. 673 [2001] B.C.C. 864 [2001] 1 B.C.L.C. 145 [2001] B.P.I.R. 119 (2001) 98(12) L.S.G. 43 (2001) 145 S.J.L.B. 32 Times, January 23, 2001 Official Transcript

**(Cite as: [2001] 1 W.L.R. 143)**

ment were, in truth, part of the consideration for the purchase of the BSL shares under the share purchase agreement, then the lease agreement is not to be treated as a contract for the hire of goods within section 7 of the 1982 Act. Failure to ensure that PCG would be in position to enjoy possession of the leased equipment was not a breach going to the root of the share acquisition agreement nor did it constitute a repudiation of that agreement nor has the consideration for that agreement wholly failed, nor does the doctrine of eviction by title paramount have the effect of terminating that agreement."

10 PCG and Brewin Dolphin were, he said, trying to "blow hot and cold". He held that it was not open to Brewin Dolphin and PCG to represent the four £312,500 payments as being part of the consideration for the shares, and, thus, of the stockbroking business. PCG's intention had been to set-off the four £312,500 payments against profit for the purposes of corporation tax. This could not be done if the payments were in truth part of the purchase price of the BSL shares. The judge concluded, therefore, that the covenant to make the payments under the computer equipment sublease had to be left out of account in considering whether, in selling the BSL shares to Brewin Dolphin, AJB had entered into a transaction at an undervalue. Leaving out of account the covenant to make the four annual payments of £312,500 the judge then set about the task of considering, on the one hand, what the value was of the shares, ie in effect what the value was of AJB's stockbroking business, and, on the other hand, what the value was of the consideration that AJB had received.*148

11 As to the value of the consideration received by AJB, the judge took account of the obligation cast on Brewin Dolphin under the share sale agreement to meet redundancy costs. These costs, he noted, were the reason why, in the negotiations, an initial valuation of the business of £2.5m was reduced by £500,000 in early September 1989. The redundancy obligations were in the event discharged by Brewin Dolphin at a net cost, after the gross cost had been

taken into account for corporation tax purposes, of £325,000. The judge's calculation of this figure has not been challenged nor has his conclusion that the £325,000 should be treated as consideration given by Brewin Dolphin for the BSL shares. The £325,000 was, he held, the only consideration given for the shares that could be taken into account. I have already explained why he declined to allow the value of PCG's covenant to pay the four £312,500 payments to be taken into account, notwithstanding that the total, £1.25m, was the sum it had been agreed AJB should receive for the business.

12 On 9 November 1989 PCG had lent AJB £312,500 as a loan for a year intended to be repaid by set-off against the £312,500 payment that would become due on 10 November 1990. Consistently with his view about the "rent" to be paid by PCG under the sublease, the judge declined to allow that £312,500 to be treated as consideration for the transfer of the shares.

13 As to the value of the shares, the judge noted that Brewin Dolphin/PCG had treated £1.25m payable over a period of four years as the value of the stockbroking business. He discounted the £1.25 m to £875,000 in order to arrive at the value as at 10 November 1989. He took into account certain other business assets and put a total value of £1,050,000 on the value of the BSL shares as at 10 November 1989.

14 It had been argued for Brewin Dolphin that for section 238 purposes the value of the stockbroking business, and thus of the shares, was no more than nominal. Various pieces of evidence were referred to and various arguments were advanced in support of this contention but, at the end of the day, the judge declined "to depart from the prima facie value which results from what Brewin Dolphin were prepared to spend in acquiring the BSL shares". He deducted the £325,000 from the £1.05m and ordered Brewin Dolphin to pay £725,000 with interest. He dismissed the claim against PCG.

© 2014 Thomson Reuters.

[2001] UKHL 2 [2001] 1 W.L.R. 143 [2001] 1 All E.R. 673 [2001] B.C.C. 864 [2001] 1 B.C.L.C. 145 [2001] B.P.I.R. 119 (2001) 98(12) L.S.G. 43 (2001) 145 S.J.L.B. 32 Times, January 23, 2001 Official Transcript [2001] UKHL 2 [2001] 1 W.L.R. 143 [2001] 1 All E.R. 673 [2001] B.C.C. 864 [2001] 1 B.C.L.C. 145 [2001] B.P.I.R. 119 (2001) 98(12) L.S.G. 43 (2001) 145 S.J.L.B. 32 Times, January 23, 2001 Official Transcript

**(Cite as: [2001] 1 W.L.R. 143)**

**The Court of Appeal**

15 Both Brewin Dolphin and PCG appealed. It is not clear to me why PCG did so. AJB cross-appealed, reviving the claim that PCG should be held liable to AJB in respect of the sums covenanted to be paid under the sublease notwithstanding that all the subleased equipment had been recovered by the head lessors. The Court of Appeal dismissed both the appeal and the cross-appeal. Their grounds, however, were rather different from those of the judge.

16 The judge had held that the 10 November 1989 share sale agreement and the 10 November 1989 computer equipment sublease were linked in that one would not have been entered into without the other and the four £312,500 payments under the sublease were the means by which the agreed consideration of £1.25m for the shares was to be paid to AJB. But he held that Brewin Dolphin and PCG were barred from relying on the £312,500 payments as part of the consideration for the shares. Morritt LJ, with whose **\*149** judgment Laws LJ and Lord Woolf MR agreed, took a stricter approach to the identification for section 238 purposes of the "transaction". Morritt LJ said that unless the sublease agreement could be said to be a sham, or unless there had been an artificial division of the real transaction entered into by the parties, the form of the agreement into which the parties had entered would be determinative in identifying the transaction on which section 238 would bite. He identified the two issues before the court as being (1) the value of the shares in BSL to be taken into account for section 238 purposes and (2) the value of the consideration for those shares provided to AJB. And he said [1999] 1 WLR 2052 , 2060:

"The first two issues to which I referred earlier, particularly the second, depend on ascertaining, for the purposes of section 238 of the Insolvency Act 1986 , what was the transaction alleged to have been entered into by the company at an undervalue. The allegation of the liquidator is that the share sale agreement was the transaction so that only the con-

sideration passing to and from the company thereunder is to be taken into account. This was disputed by Brewin Dolphin on the basis that the court must have regard to the whole transaction not just that part of it the liquidator seeks to challenge. This is a point of some importance on the true construction and application of section 238. It is true that the word 'transaction' is very widely defined. It is also true, as submitted by counsel for Brewin Dolphin, that, given the purposes of sections 238, 339 and 423 to which it applies, the court should not strain to narrow the definition by judicial decision. However, the word 'transaction' is to be construed and applied as part of section 238 as a whole… First, the transaction must be identified by reference to the person (or persons, for the singular must include the plural) with whom the company entered into it. Only the elements of the transaction between the company and that person may be taken into account. Thus, without more, a contract between the company, A, and B cannot be part of a transaction entered into by the company, A, with C. I introduce the caveat 'without more' to guard against cases where the transaction is artificially divided. The second limit appears to me to flow from the comparison the statute requires the court to make. In each case it is necessary to ascertain the consideration to be received by the company. In the case of section 238(4)(a) the transaction is either a gift or 'on terms that provide for the company to receive no consideration'. In other cases, as provided for in subsection (4)(b), the task is to ascertain the value of the consideration provided by the other person 'for' the consideration provided by the company. Whether or not the word 'consideration' in those contexts is confined to its legal meaning it clearly connotes the quid pro quo for that which it is alleged the company disposed of at an undervalue." Then, addressing himself to the facts of this case, Morritt LJ concluded that "the transaction" was the share sale agreement alone. He explained his conclusion in the following passage, at p 2061:

"First, the parties acting at arm's length and for readily understandable commercial reasons chose

© 2014 Thomson Reuters.

[2001] 1 W.L.R. 143                                                                                                                    Page 7

[2001] UKHL 2 [2001] 1 W.L.R. 143 [2001] 1 All E.R. 673 [2001] B.C.C. 864 [2001] 1 B.C.L.C. 145 [2001]
B.P.I.R. 119 (2001) 98(12) L.S.G. 43 (2001) 145 S.J.L.B. 32 Times, January 23, 2001 Official Transcript [2001]
UKHL 2 [2001] 1 W.L.R. 143 [2001] 1 All E.R. 673 [2001] B.C.C. 864 [2001] 1 B.C.L.C. 145 [2001] B.P.I.R. 119
(2001) 98(12) L.S.G. 43 (2001) 145 S.J.L.B. 32 Times, January 23, 2001 Official Transcript

**(Cite as: [2001] 1 W.L.R. 143)**

so to structure the deal between them so that on the face of the documents the share sale agreement and the lease **\*150** agreement effected two separate, though linked, transactions. There is no indication that this different treatment was a sham or otherwise colourable. If parties in such circumstances choose so to structure their commercial dealings in my view the court should give full weight to their intentions. Second, for the reasons I have already given, the share sale agreement and the lease agreement cannot be the same transaction for the purposes of the section because, though the company was party to both of them, only Brewin Dolphin was party to the first and only PCG party to the second. Third, the parties to the lease agreement… unambiguously attributed the four annual payments of £312,500 to rent due thereunder for possession and use of the computer equipment to which it related. The promise to make those payments cannot be recharacterised as consideration from PCG or Brewin Dolphin 'for' the shares being sold by the company"

17 For those reasons, different from those of the judge, Morritt LJ declined to allow the value of PCG's covenant to pay the £312,500 to be treated as part of the consideration for the shares.

18 On the values to be attributed to the shares on the one hand and to the consideration given for the shares on the other, Morritt LJ agreed with the judge. So the appeal and cross-appeal were dismissed.

19 This appeal by Brewin Dolphin and PCG is brought with the leave of your Lordship's House. There is no cross-appeal by AJB. So PCG stands excused from any liability to AJB under the 10 November 1989 sublease. The four payments of £312,500 each are not going to be made.

**The first issue**

20 The first issue for your Lordships to decide is whether Evans-Lombe J and the Court of Appeal were right in declining to allow PCG's covenant in the sublease to be taken into account in assessing the value of the consideration for which AJB entered into the share sale agreement. Evans-Lombe J would, I think, have allowed it but for the view he took about Brewin Dolphin and PCG "blowing hot and cold". The Court of Appeal based its decision on the form of the agreements into which the parties had entered. In my respectful opinion, neither approach was right. One must, obviously, start with the share sale agreement. That was the agreement under which AJB agreed to divest itself of its allegedly valuable asset, namely, the shares in BSL. It is worth repeating the language of section 238(4)(b): "the company [AJB] enters into a transaction [the share sale agreement] with that person [Brewin Dolphin] for a consideration the value of which…" etc. The subsection does not stipulate by what person or persons the consideration is to be provided. It simply directs attention to the consideration for which the company has entered into the transaction. The identification of this "consideration" is in my opinion, a question of fact. It may also involve an issue of law, for example, as to the construction of some document. But if a company agrees to sell an asset to A on terms that B agrees to enter into some collateral agreement with the company, the consideration for the asset will, in my opinion, be the combination of the consideration, if any, expressed in the agreement with A and the value of the agreement with B. In short, the issue in the present case is not, in my **\*151** opinion, to identify the section 238(4) "transaction"; the issue is to identify the section 238(4) "consideration".

21 On the facts of this case it is, in my opinion, plain that the consideration for the BSL shares was, apart from obligations assumed by Brewin Dolphin under the share sale agreement itself, the entry by PCG nto the sublease agreement under which it covenanted to pay £312,500 per annum for four years. The facts are fully and clearly set out in Evans-Lombe J's judgment and are concisely and accurately summarised by Morritt LJ [1999] 1 WLR 2052 , 2056–2058. Both set out the relevant

© 2014 Thomson Reuters.

[2001] UKHL 2 [2001] 1 W.L.R. 143 [2001] 1 All E.R. 673 [2001] B.C.C. 864 [2001] 1 B.C.L.C. 145 [2001] B.P.I.R. 119 (2001) 98(12) L.S.G. 43 (2001) 145 S.J.L.B. 32 Times, January 23, 2001 Official Transcript [2001] UKHL 2 [2001] 1 W.L.R. 143 [2001] 1 All E.R. 673 [2001] B.C.C. 864 [2001] 1 B.C.L.C. 145 [2001] B.P.I.R. 119 (2001) 98(12) L.S.G. 43 (2001) 145 S.J.L.B. 32 Times, January 23, 2001 Official Transcript

**(Cite as: [2001] 1 W.L.R. 143)**

part of a memorandum prepared in September 1989 by Brewin Dolphin's finance director. The memorandum described what had been agreed:

"The basic concept is that Brewin Dolphin purchases the trade of [AJB] for a consideration of £1.25m payable over four years… The detailed scheme is as follows: (1) [AJB] forms [BSL] as a subsidiary. [AJB] sells its business excluding its computer and other fixed assets to [BSL]… [AJB] sells [BSL] to Brewin Dolphin… The purchase consideration would be £1… (2) [AJB] enters into a finance lease for the computer and other assets with PCG. PCG enters into an operating lease with Brewin Dolphin for the computer, the lease payments to be yearly in arrears for four years at a rate of £312,500. This means that the purchase price will be tax allowable and there will be no goodwill." So the purchase price of £1.25m was to be paid under the sublease in four annual payments of £312,500 each. No other conclusion is, in my opinion, possible but that on those facts the consideration for the BSL shares included the benefit of the covenant given by PCG under the sublease. In In re M C Bacon Ltd [1990] BCLC 324 , 340 my noble and learned friend, Lord Millett, then a Chancery judge, analysed the requirements of section 238(4)(b). He said:

"To come within that paragraph the transaction must be (i) entered into by the company; (ii) for a consideration; (iii) the value of which measured in money or money's worth; (iv) is significantly less than the value; (v) also measured in money or money's worth; (vi) of the consideration provided by the company." In my respectful opinion, that is a useful breakdown of the statutory requirements. In the present case the agreement for the sale of the shares was entered into for a consideration which included the benefit of the sublease agreement. So I now move on to the issues of value.

**What was the value, in money or money's worth, of PCG's covenant under the sublease?**

22 This was not an issue which either Evans-Lombe

J or the Court of Appeal had to consider. The approaches of each, different though they were, were alike in treating this issue as irrelevant. Naturally enough Mr Mitchell, counsel for Brewin Dolphin and PCG, contends that the value of the covenant was its face value. He points out that there is not, and never has been, any question as to PCG's ability to pay. I agree that there is no doubt as to PCG's ability to pay but the value of the covenant needs, in my opinion, to be investigated a little more deeply. The covenant was, according to the sublease, given in exchange for the right to use the computer equipment. But *152 it appears that, by the end of September 1989, Brewin Dolphin had decided not to use the equipment in order to run the business it was negotiating to acquire but, instead, to update its own existing computer system. This decision did not, of course, affect the willingness of PCG to pay the £312,500 per annum for four years. The amount of those payments was attributable to the purchase, via the BSL shares, of AJB's business and was not attributable in the least to any value placed on the right to use the computer equipment. Nonetheless, the payments, according to the terms of the sublease, were for the right to use the computer equipment. The computer equipment, as Brewin Dolphin and PCG knew, was held by AJB under head leases from Wirral and Asterrose. Under each of these head leases, the lessee, AJB, was barred from assigning or subletting any of the equipment. The bar was expressed as an absolute one. It was not subject to the lessor's consent first being obtained or anything of that character. In each head lease the events on the occurrence of which the lessor would become entitled to terminate the lease include (i) failure by the lessee to pay the due rent, (ii) the appointment of an administrative receiver of the lessee's assets, and (iii) breach by the lessee of any of the terms of the lease. The right to terminate was expressed to be exercisable "at any time [after the event in question] notwithstanding any subsequent acceptance by the lessor of any rental…"

23 The 10 November 1989 sublease, under which

[2001] UKHL 2 [2001] 1 W.L.R. 143 [2001] 1 All E.R. 673 [2001] B.C.C. 864 [2001] 1 B.C.L.C. 145 [2001] B.P.I.R. 119 (2001) 98(12) L.S.G. 43 (2001) 145 S.J.L.B. 32 Times, January 23, 2001 Official Transcript [2001] UKHL 2 [2001] 1 W.L.R. 143 [2001] 1 All E.R. 673 [2001] B.C.C. 864 [2001] 1 B.C.L.C. 145 [2001] B.P.I.R. 119 (2001) 98(12) L.S.G. 43 (2001) 145 S.J.L.B. 32 Times, January 23, 2001 Official Transcript

**(Cite as: [2001] 1 W.L.R. 143)**

the four £312,500 payments were to be made, constituted, ipso facto, a breach by AJB of a term of the head leases. So the head leases became terminable at any time by the head lessors and the equipment comprised in the sublease could at any time have been repossessed by the head lessors. The repossession of the computer equipment, which is what happened, would, and did, bring to an end the sublease and the payment obligations of PCG. So, what was the value, in money or money's worth, of a covenant by PCG that was so precarious?

24 Mr Mitchell suggested that the covenant was worth something, because the benefit of the sublease, and of PCG's obligation to pay the £312,500 sums, could have been assigned by AJB to the head lessors. There is, however, no evidence that the head lessors would have had any interest at all in such an assignment. If a covenant with the precarious character of PCG's covenant in the sublease is to have value attributed to it for section 238 purposes, the value must, in my opinion, be placed on a more firm footing than that of speculative suggestion. The actual events that took place in 1990, before any payment under the sublease had become due, are in my opinion, relevant. First, within a week of the date of the sublease agents for the head lessors wrote to AJB complaining about the sublease and threatening proceedings. In January 1990 AJB defaulted in payment of the rents due under the head leases and shortly thereafter the head lessors demanded the return of the equipment. On 5 February PCG confirmed that neither it nor Brewin Dolphin would obstruct the repossession of the equipment by the head lessors and on 23 February 1990 solicitors for PCG wrote to solicitors for AJB notifying them that "our client intends to accept your client's repudiatory breach of the agreement between them. Alternatively there has been a total failure of consideration by your clients in relation to the lease of equipment dated 10 November 1989"

25 PCG's covenant, which had been precarious at the outset, had become worthless by 23 February 1990 at the latest. To complete the point, **\*153** AJB

went into compulsory winding up in April 1990 and an administrative receiver was appointed in May. These events would inevitably have led the head lessors to terminate the head leases and recover their equipment, if they had not done so previously, thereby bringing the sublease to an end.

26 Mr Mitchell submitted that these ex post facto events ought not to be taken into account in valuing PCG's sublease covenant as at 10 November 1989. I do not agree. In valuing the covenant as at that date, the critical uncertainty is whether the sublease would survive for the four years necessary to enable all the four £312,500 payments to fall due, or would survive long enough to enable some of them to fall due, or would come to an end before any had fallen due. Where the events, or some of them, on which the uncertainties depend have actually happened, it seems to me unsatisfactory and unnecessary for the court to wear blinkers and pretend that it does not know what has happened. Problems of a comparable sort may arise for judicial determination in many different areas of the law. The answers may not be uniform but may depend upon the particular context in which the problem arises. For the purposes of section 238(4) however, and the valuation of the consideration for which a company has entered into a transaction, reality should, in my opinion, be given precedence over speculation. I would hold, taking account of the events that took place in the early months of 1990, that the value of PCG's covenant in the sublease of 10 November 1989 was nil. After all, if, following the signing of the sublease, AJB had taken the sublease to a bank or finance house and had tried to raise money on the security of the covenant, I do not believe that the bank or finance house, with knowledge about the circumstances surrounding the sublease, would have attributed any value at all to the sublease covenant.

27 Where the value of the consideration for which a company enters into a section 238 transaction is as speculative as is the case here, it is, in my judgment, for the party who relies on that consideration

© 2014 Thomson Reuters.

[2001] 1 W.L.R. 143    Page 10

[2001] UKHL 2 [2001] 1 W.L.R. 143 [2001] 1 All E.R. 673 [2001] B.C.C. 864 [2001] 1 B.C.L.C. 145 [2001] B.P.I.R. 119 (2001) 98(12) L.S.G. 43 (2001) 145 S.J.L.B. 32 Times, January 23, 2001 Official Transcript [2001] UKHL 2 [2001] 1 W.L.R. 143 [2001] 1 All E.R. 673 [2001] B.C.C. 864 [2001] 1 B.C.L.C. 145 [2001] B.P.I.R. 119 (2001) 98(12) L.S.G. 43 (2001) 145 S.J.L.B. 32 Times, January 23, 2001 Official Transcript

(Cite as: [2001] 1 W.L.R. 143)

to establish its value. PCG and Brewin Dolphin are, in the present case, unable to do so.

28 For these reasons I, as did Evans-Lombe J and the Court of Appeal for different reasons, would treat the value of the consideration for which AJB entered into the share sale agreement as being confined to the value of the consideration under that agreement. The sublease covenant, in my opinion, adds nothing.

**The value of the consideration given by the company**

29 On this issue, Mr Mitchell submitted that AJB's business as at 10 November 1989 was worthless and that the BSL shares were therefore valueless. This submission was based on the fact that AJB appears to have been hopelessly insolvent and by November 1989 was trading at a substantial loss of £13,000 odd per day. The judge's findings on the value of the BSL shares are conveniently summarised at paragraph 4.3 of AJB's case:

"(1)Bekhor's business assets were an attractive package to buyers such as Brewin Dolphin. (2) It could not be inferred that Brewin Dolphin was the only potential purchaser. (3) Brewin Dolphin was a reasonably well informed potential purchaser from the class of typical purchasers. (4) The contemporary view of what a reasonably well-informed potential purchaser was prepared to pay was some evidence in assessing the market *154 value of the BSL shares. (5) Brewin Dolphin had been prepared to pay about £1,050,000 for the BSL shares"

30 I respectfully agree with this approach. The value of an asset that is being offered for sale is, prima facie, not less than the amount that a reasonably well informed purchaser is prepared, in arm's length negotiations, to pay for it.

31 On this issue the judge reached his figure of £1,050,000 after hearing and assessing the evidence, including expert evidence. It has not been demonstrated that in doing so he misdirected him-

self. The Court of Appeal reviewed the judge's conclusion. Morritt LJ at p 2063, described his conclusion as "eminently sensible and evidently right" and upheld it. Your Lordships have, in my opinion, been provided with no reason to come to any different conclusion.

**The £312,500 loan**

32 In my opinion, in agreement with the judge and the Court of Appeal, AJB succeeded in establishing that, for the purposes of section 238, it had entered into a transaction, namely the share sale agreement, at an undervalue and that the amount of the undervalue was £725,000, ie £1,050,000 less £325,000. The order made by the judge and upheld by the Court of Appeal required Brewin Dolphin to pay that sum, with interest, to AJB. Neither before the judge nor before the Court of Appeal was any account taken of the £312,500 loan that had been made by PCG to AJB on 9 November 1989 and that had been intended to be repaid by set-off against the same amount due on 10 November 1990. In my opinion, however, that sum ought to be taken into account. It constituted an advance payment, as a loan, of a part of the consideration that had been given for the BSL shares. The receipt of that sum was an advantage that AJB would not have received but for its entry into the share sale agreement and the sublease agreement.

33 PCG has proved for that sum in the liquidation of AJB, but what, if any, dividend will be received is not known. I imagine it will be negligible.

34 Under section 238(3) , the court has a broad discretion to make "such order as it thinks fit for restoring the position to what it would have been if the company had not entered into that transaction". In my opinion, an order under the subsection that did not take account of AJB's receipt of the £312,500 would be unfair to Brewin Dolphin and PCG. I would, therefore, vary the order against Brewin Dolphin by allowing credit to be taken for the £312,500 and interest thereon. The interest should run from the same date and at the same rate

© 2014 Thomson Reuters.

[2001] 1 W.L.R. 143

[2001] UKHL 2 [2001] 1 W.L.R. 143 [2001] 1 All E.R. 673 [2001] B.C.C. 864 [2001] 1 B.C.L.C. 145 [2001] B.P.I.R. 119 (2001) 98(12) L.S.G. 43 (2001) 145 S.J.L.B. 32 Times, January 23, 2001 Official Transcript [2001] UKHL 2 [2001] 1 W.L.R. 143 [2001] 1 All E.R. 673 [2001] B.C.C. 864 [2001] 1 B.C.L.C. 145 [2001] B.P.I.R. 119 (2001) 98(12) L.S.G. 43 (2001) 145 S.J.L.B. 32 Times, January 23, 2001 Official Transcript

**(Cite as: [2001] 1 W.L.R. 143)**

as the interest on the sum payable by Brewin Dolphin. PCG will, of course, have to withdraw its proof for the £312,500 in the liquidation. With that variation to the order made by Evans-Lombe J, however, I would uphold the order and dismiss the appeal. Appeal dismissed. Order of Evans-Lombe J varied. Question of costs adjourned.

---

1. Insolvency Act 1986, s. 238(4)(b) : see post, p 145G.

END OF DOCUMENT

© 2014 Thomson Reuters.