# TAB 71

63 A.F.T.R.2d 89-344, 88-2 USTC P 9601

863 F.2d 263
United States Court of Appeals,
Third Circuit.

PLEASANT SUMMIT LAND
CORPORATION, Appellant in 88-1373,
v.
COMMISSIONER OF INTERNAL REVENUE.
George PRUSSIN and Sharon
Prussin, Appellants in 88-1377,
v.
COMMISSIONER OF INTERNAL REVENUE.

Nos. 88-1373, 88-1377.   |   Argued Oct. 7,
1988.   |   Decided Nov. 25, 1988.   |   Opinion
on Denial of Rehearing in No. 88-1377 Jan. 30. 1989.

Land corporation and investors in limited partnership that
indirectly purchased property from land corporation appealed
from adverse decision entered by the United States Tax
Court, Mary Ann Cohen, J., following consolidated trial
on their petitions to redetermine deficiencies determined by
Commissioner of Internal Revenue. The Court of Appeals,
Greenberg, Circuit Judge, held that: (1) tax court's factual
finding that property was not held primarily for sale to
customers in ordinary course of trade or business-meaning
that income from its sale would not be included in
determining whether land corporation was "personal holding
company"-was not clearly erroneous, and fact that property
was subject to preexisting contract of sale at time it was
purchased did not mandate contrary legal conclusion; (2) tax
court's finding that nonrecourse debt exceeded fair market
value was not clearly erroneous; and (3) noncourse debt did
not support interest and depreciation deductions to extent it
exceeded sum of cash investment by partnership in property
and fair market value of property at time of its purchase.

Affirmed in part, reversed in part, and remanded.

West Headnotes (8)

[1]     **Internal Revenue**
        👉 Judicial Authority and Duty
        Court of Appeals has plenary review of Tax
        Court's construction of Internal Revenue Code.

6 Cases that cite this headnote

[2]     **Internal Revenue**
        👉 Trade or Business of Taxpayer
        **Internal Revenue**
        👉 Nature and Source of Income
        Tax Court's factual finding that land corporation
        did not hold property primarily for sale to
        customers in the ordinary course of its trade or
        business was not clearly erroneous; thus, income
        from sale of property would not be included in
        determining whether corporation was "personal
        holding company" under Internal Revenue Code.
        26 U.S.C.A. § 1221(1).

6 Cases that cite this headnote

[3]     **Internal Revenue**
        👉 Trade or Business of Taxpayer
        Court must consider and weigh several factors
        in determining whether purchase of asset for
        sale subject to preexisting contract of sale results
        in acquisition of property to be held primarily
        for sale to customers in ordinary course of
        trade or business, including purpose for which
        taxpayer acquired and held property, extent of
        improvements made to facilitate sale, activity
        of taxpayer in promoting sales, frequency and
        continuity of sales, extent and substantiality of
        sales, length of time between purchase and sales,
        and relative income to taxpayer from sale of
        property, compared with his other income.

2 Cases that cite this headnote

[4]     **Internal Revenue**
        👉 Income and Losses of Partnership or
        Venture
        Partnership's purchase of property, not
        individual limited partners' investment in
        partnership, was appropriate focal point of
        analysis of tax consequences of investment.

3 Cases that cite this headnote

[5]     **Internal Revenue**

 Weight and Sufficiency

Tax court judge's finding that nonrecourse indebtedness exceeded fair market value of property was not clearly erroneous.

6 Cases that cite this headnote

[6]    **Internal Revenue**
          Particular Transactions
       **Internal Revenue**
          Cost or Value of Property

Nonrecourse debt did not support depreciation and interest deductions, to extent it exceeded sum of cash investment by partnership in property and fair market value of property at time of its purchase.

12 Cases that cite this headnote

[7]    **Internal Revenue**
          Particular Transactions
       **Internal Revenue**
          Cost or Value of Property

Taxpayer who has acquired property subject to nonrecourse indebtedness that is far larger than property's fair market value at time of acquisition is entitled to deductions for interest and depreciation attributable to nonrecourse indebtedness, to extent of collateral's fair market value.

7 Cases that cite this headnote

[8]    **Internal Revenue**
          Deductions

Commissioner of Internal Revenue was not required to periodically recalculate the sum of nonrecourse debt constituting genuine indebtedness in determining taxpayer's deductions.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*264** Paul Windels, Jr. (argued), John Y. Taggart, Clayton A. Prugh, Windels, Marx, Davies & Ives, New York City, for appellants.

William S. Rose, Jr., Asst. Atty. Gen., Gary R. Allen, Jonathan S. Cohen (argued), Michael J. Roach, U.S. Dept. of Justice, Tax Div., Washington, D.C., for appellee.

Before    HIGGINBOTHAM,    MANSMANN    and GREENBERG, Circuit Judges.

**Opinion**

### OPINION OF THE COURT

GREENBERG, Circuit Judge.

Appellants, Pleasant Summit Land Corporation (PSLC) and George and Sharon **\*265** Prussin, appeal from adverse decisions entered by the Tax Court following a consolidated trial on their petitions to redetermine deficiencies determined by the Commissioner of Internal Revenue. PSLC challenges the Tax Court's conclusion that it was a "personal holding company" subject to the tax on personal holding companies in its tax year in issue. Resolution of its appeal depends on whether its sale of the Summit House apartments in West Orange, New Jersey, was of a capital asset and thus resulted in a capital gain or whether the Summit House was a property it held primarily for sale to customers in the ordinary course of its trade or business so that its sale resulted in ordinary gross income.

George Prussin is an investor in a limited partnership, Pleasant & Summit Associates (PSA), which indirectly purchased Summit House from PSLC. The Prussins challenge the Tax Court's conclusions that: (1) nonrecourse financing of the Summit House purchase exceeded its fair market value; (2) the nonrecourse financing would not support depreciation and interest deductions which they claimed by reason of George Prussin's limited partnership interest in PSA; and (3) these deductions would be disallowed in full rather than only to the extent that they were the product of financing in excess of the fair market value of Summit House. Furthermore, they argue that the complete disallowance of the deductions unconstitutionally violated their right to due process of law.

63 A.F.T.R.2d 89-344, 88-2 USTC P 9601

This court has jurisdiction under section 7482(a) of the Internal Revenue Code of 1954.[1] The Tax Court had jurisdiction under I.R.C. §§ 6213(a), 6214(a), and 7442. Inasmuch as PSLC was a New Jersey corporation with its principal place of business in New Jersey when it filed its petition and filed its appeal to this court and the Prussins were a married couple residing in New Jersey at all times relevant to their petition and appeal, the venue for these appeals properly lies in this court.[2]

We will affirm the Tax Court's decision with respect to PSLC. We will reverse the Tax Court's decision to the extent it completely disallowed the Prussins' deductions and will remand for a determination of the fair market value of Summit House and for calculation of the appropriate deductions allowable to the Prussins. Since we hold that the Prussins' deductions may be disallowed only in part, their constitutional claim is moot and we do not address it.

## I. BACKGROUND

### A. *The Underlying Business Transaction*

On May 3, 1978, in an arm's length transaction, PSLC entered into an agreement to purchase the Summit House, a property on Summit Street, West Orange, New Jersey, containing two apartment buildings and a small separate resident manager's apartment for $4,200,000. The purchase was closed on or about June 1, 1978 and the consideration was paid by $250,000 in cash, by delivery of a $1,350,000 note secured by a purchase money mortgage, and by PSLC *266 taking title subject to a previously existing $2,600,000 nonrecourse mortgage.

Contemporaneously with the purchase, PSLC created a wholly owned subsidiary, Mount Orange Realty Corp. (MORC), to which it then sold the Summit House buildings while retaining the land beneath them. The sale price to MORC was $5,200,000, consisting of $500,000 in cash which MORC borrowed or owed and a $4,700,000 nonrecourse mortgage which wrapped around and was subject to the prior two mortgages.[3] The note which this mortgage secured permitted accumulation of interest and principal through December 31, 1988, except that annual interest payments were required up to the available cash flow. This conveyance of the property placed the depreciable buildings in one entity while leaving the nondepreciable land in another.

PSLC then sold its MORC stock to the newly created PSA, which was organized to acquire the Summit House, for $2,559,200, paid in the form of a nonrecourse note secured by the MORC shares, for which a mortgage of Summit House to PSLC was immediately substituted. This note had provisions for accumulation of interest and principal through December 31, 1988, similar to those in the $4,700,000 note. PSA then dissolved MORC, took direct ownership of the Summit House buildings and took over MORC's obligations including the $500,000 due on the purchase of the Summit House and the $4,700,000 nonrecourse wraparound mortgage. Thus, the cost to PSA for acquisition of Summit House was the $2,559,200 indebtedness for the purchase of the MORC shares, assumption of MORC's $500,000 obligation, and assumption of MORC's $4,700,000 nonrecourse wraparound mortgage for a total of $7,759,200. The record, however, does not clearly establish that PSA paid the $500,000. Of course, this assumption of obligations did not transform the nonrecourse debts to recourse obligations. The consequence of these transactions was to leave PSA with large debts with interest charges and a substantial depreciable asset, a situation setting up the possibility for it to claim large tax deductions. Additionally, PSLC leased the land under the buildings to PSA for $10,000 a year under an agreement allowing rent to be accumulated and deferred at a fixed rate of interest. This provision caused PSA to generate additional tax deductions for the interest which accrued on the unpaid rent.

PSA sold thirty limited partnership units to a group of investors including George Prussin for a total of $1,980,000 paid with down payments and subsequent installments. The offering memorandum to the investors indicated that the $500,000 due on the sale from PSLC would be paid from the investors' down payments, leading the Commissioner in his brief to indicate that it appears that MORC's $500,000 obligation for its down payment was satisfied from the investors' funds. Inexplicably, the agreement for sale of the MORC shares between PSLC and PSA included a warranty by PSLC that MORC had no liabilities. Some months after PSA acquired Summit House, a new nonrecourse mortgage was substituted for the prior $2,600,000 mortgage but this did not enhance PSA's risk in the transaction. Most of the foregoing transactions were nearly contemporaneous and thus they formed part of one large structured undertaking.

PSA reported losses on its income tax returns for 1978 and 1979, and later years, largely attributable to interest deductions and depreciation. These losses were passed through to the limited partners who used them to off-set

income on their individual tax returns. On December 19, 1985 an unrelated third party purchased the Summit House land from PSLC and the buildings and lease from PSA for a total of $7,000,000.

**B.** *The Assessment of Deficiencies Against PSLC*

On its corporate income tax return for its taxable year ending May 31, 1979, PSLC **\*267** indicated that: (1) it had realized a gain of $3,742,704 on the sale of certain improvements to land in West Orange, New Jersey (Summit House); (2) it elected to use the cost recovery method for reporting this profit; and (3) under this method none of the gain was includable in its gross income for the taxable year covered by the return.

On October 7, 1982, the Commissioner issued a deficiency notice to PSLC. This notice stated that: (1) PSLC was required to recognize gain on the sale of its real property in the year of the sale;[4] (2) PSLC was not entitled to use the cost recovery method of accounting; (3) under the installment method of accounting, which PSLC had elected as an alternative to the cost recovery method, PSLC was required to report a gain in the amount of $464,069 for the taxable year ending May 31, 1979; (4) the $464,069 sum was a capital gain to PSLC in the taxable year ending May 31, 1979; (5) PSLC was a "personal holding company" because more than sixty percent of its adjusted ordinary gross income was from interest because the $464,069 was a capital gain and not ordinary income, and (6) inasmuch as PSLC was a personal holding company it owed an additional $106,832 under the personal holding company tax imposed by I.R.C. § 541.

**C.** *The Assessment of Deficiencies Against the Prussins*

The Prussins reported a loss of $417,012 from George Prussin's distributive share of the 1978 losses of PSA on their joint federal income tax return for 1978, and a loss of $345,170 from George Prussin's distributive share of PSA's 1979 losses on their 1979 income tax return. On April 22, 1985, the Commissioner issued a deficiency notice to the Prussins entirely disallowing his share of the partnership losses on the ground that the Prussins had not established the amount and character of any of the partnership items on which their individual loss claims were based.

**D.** *This Litigation*

PSLC and the Prussins brought these actions challenging the Commissioner's deficiency notices. Prior to the consolidated trial, PSLC conceded all issues other than its status as a personal holding company. A trial then ensued before Judge Cohen of the United States Tax Court whose opinion is reported as *Pleasant Summit Land Corporation v. Commissioner,* T.C.M. (CCH) 1987-469 at 566-76 (Sept. 17, 1987) [hereinafter *PSLC* ]. Judge Cohen held that PSLC qualified as a personal holding company subject to the personal holding company tax and, accordingly, she upheld the Commissioner's assessment of a $236,840 deficiency for PSLC's taxable year ending May 31, 1979. On this appeal PSLC challenges the Tax Court's finding that PSLC was a personal holding company, though it does not contend that, if it was a personal holding company, the assessment was erroneously calculated.

Judge Cohen determined that the Prussins had deficiencies for their taxable years ending December 31, 1978, and December 31, 1979, respectively, of $264,571.00 and $141,496, attributable to her sustaining the disallowance of deductions that PSA passed through to its limited partners including **\*268** the Prussins.[5] The disallowance of PSA's deductions was based on Judge Cohen's factual finding that the nonrecourse debt underlying its purchase of Summit House was greater than its fair market value, which did not exceed $4,200,000. The judge held that as a matter of law nonrecourse indebtedness in excess of fair market value would not support deductions for either depreciation or interest payments as there was no investment in the property and no genuine indebtedness for its purchase. She explained that no depreciable basis in Summit House had been established and consequently no portion of the nonrecourse indebtedness would support tax deductions. On appeal the Prussins challenge Judge Cohen's findings of fact, her application of legal standards, and the constitutionality of the legal standards applied.

## II. THE STANDARDS OF REVIEW

 [1]   This court has plenary review of the Tax Court's construction of the Internal Revenue Code. *See Minizza v. Stone Container Corp.,* 842 F.2d 1456, 1459 (3d Cir.1988); *Creque v. Luis,* 803 F.2d 92, 93 (3d Cir.1986). This standard of review applies with regard to three issues on appeal. First, it is a question of law whether a single factor test or a multiple factor analysis is employed to determine if a property is held primarily for sale to customers in the

63 A.F.T.R.2d 89-344, 88-2 USTC P 9601

ordinary course of a taxpayer's trade or business. Second, it is a question of law whether nonrecourse indebtedness in excess of fair market value may support depreciation and interest deductions. Third, it is a question of law whether deductions based on such indebtedness should be completely disallowed when a taxpayer fails to meet his burden of proof of the fair market value of the property.

The Tax Court's conclusion that the nonrecourse indebtedness on the underlying transaction exceeded the fair market value of Summit House was a finding of fact subject to review for clear error only. *See Anderson v. Bessemer City,* 470 U.S. 564, 573-76, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518 (1985); *Commissioner v. Duberstein,* 363 U.S. 278, 289, 80 S.Ct. 1190, 1198-99, 4 L.Ed.2d 1218 (1960); *B.B. Rider Corp. v. Commissioner,* 725 F.2d 945, 948 (3d Cir.1984).

PSLC argues that while factual findings are generally subject to review under the clearly erroneous standard, the Tax Court finding that the underlying transaction was not of property held primarily for sale to customers within the ordinary course of its trade or business, constituted an "ultimate fact" subject to plenary review. The Commissioner, however, urges that we accept this finding unless it was clearly erroneous. We have indicated that we no longer recognize the ultimate fact exception to the standard that factual findings are reviewed only for clear error. *American Home Products Corp. v. Barr Laboratories, Inc.,* 834 F.2d 368, 370 n. 2 (3d Cir.1987). Further, the Supreme Court has rejected the ultimate fact exception and has stated that the clearly erroneous standard applies to findings of ultimate fact. *See Pullman-Standard v. Swint,* 456 U.S. 273, 285-90, 102 S.Ct. 1781, 1788-91, 72 L.Ed.2d 66 (1982). Thus, our earlier decisions permitting plenary review of ultimate fact determinations, *see, e.g., Jersey Land & Development Corp. v. United States,* 539 F.2d 311, 315 (3d Cir.1976); *Pennroad Corp. v. Commissioner,* 261 F.2d 325, 328 (3d Cir.1958), *cert. denied,* 359 U.S. 958, 79 S.Ct. 797, 3 L.Ed.2d 766 (1959), cannot be taken to represent the present position of this court. Therefore, to the extent that the Tax Court's conclusion regarding the character of the underlying transaction was predicated on a factual finding, it must be accepted unless clearly erroneous. We add, however, that even under a plenary standard of review we would reach the same conclusion as the Tax Court on this issue. Finally, we point out that PSLC contends that, as a matter of law, the undisputed facts require a reversal of the finding in the Tax Court that the sale of Summit House was not of a property held primarily for sale to customers in the ordinary course of PSLC's trade or business. Thus, as we

make a plenary determination of legal issues, the dispute over the standard of review is of limited significance in this case.

### III. PSLC'S APPEAL

Determination of whether PSLC was properly held to be a personal holding company **\*269** turns solely on whether Summit House was "property held by [PSLC] primarily for sale to customers in the ordinary course of [its] trade or business" within I.R.C. § 1221(1). The Tax Court's opinion provided a clear explanation of the purpose of the personal holding company tax which we need not repeat. We do note that the personal holding company tax is imposed on all corporations satisfying a mechanical test of objective factors which the Tax Court explained in detail.

#### A. *The Mechanical Test of the Personal Holding Company Tax*

Section 541 of the Internal Revenue Code imposes an additional tax on undistributed personal holding company income, as defined in section 545, for "every personal holding company (as defined in section 542)." Section 542(a) provides that any corporation is a personal holding company if it meets mechanical tests relating to the number of stockholders and to the character of income earned during the tax year. Inasmuch as all PSLC stock was owned by one person, PSLC agrees that the stockholder test was met and thus we do not describe that test in detail.

The character of income requirement is contained in section 542(a)(1), which provides that "[a]t least 60 percent of [the corporation's] adjusted ordinary gross income (as defined in section 543(b)(2)) for the taxable year [must be] personal holding company income (as defined in section 543(a))." This may be expressed as follows: a corporation is a personal holding company if the fraction consisting of personal holding company income as the numerator and adjusted ordinary gross income as the denominator is greater than or equal to sixty percent (60%). Our task in establishing this fraction is simplified by the circumstance that during its applicable tax year PSLC had only two kinds of income, income from interest payments on debts arising from the Summit House transactions and income from the sale of the Summit House property.

Inasmuch as the parties agree that only the interest payments constituted personal holding company income, the numerator

of the fraction is not in dispute. They disagree, however, over calculation of the denominator of the fraction. If the gain from the sale of Summit House is included in the denominator then PSLC is not a personal holding company. But if the gain is excluded then only the interest income is included in both the numerator and the denominator, giving the fraction a value of one or 100% and, since 100% is greater than 60%, PSLC is a personal holding company.

### B. *Calculation of the Denominator*

The denominator of the fraction consists of "adjusted ordinary gross income (as defined in section 543(b)(2))." I.R.C. § 542(a)(1). Section 543(b)(2) defines adjusted ordinary gross income as "ordinary gross income" subject to certain reductions not applicable to this case.

"Ordinary gross income" is defined by section 543(b)(1) (A) as gross income less "all gains from the sale or other disposition of capital assets." [6] A "capital asset" is defined by section 1221 to include all property of a taxpayer subject to certain specific exceptions. PSLC argues that the exception for "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business" applies to the Summit House. I.R.C. § 1221(1).

### C. *Whether the Sale was Within the Ordinary Course of Trade or Business.*

While the Commissioner recognizes that a pre-trial stipulation provided that PSLC held Summit House exclusively for sale, he contends that the sale was not of an asset primarily held for sale within the ordinary course of PSLC's trade or business. A determination that PSLC's sale of Summit House was not within the ordinary course of its trade or business would result in the exception of section 1221(1) not applying and, inasmuch as PSLC has not argued that any other exception applies, the general rule of section 1221 would govern. Thus, Summit House would be deemed to be a capital asset and the gain on its sale would be excluded from both PSLC's ordinary gross income and adjusted ordinary gross income. Consequently, PSLC's interest income would constitute the only element of both the numerator and denominator giving the fraction a value of one or 100% and PSLC would qualify as a personal holding company.

Thus, it is perfectly obvious that the determination of whether PSLC is a personal holding company turns solely on whether its sale of Summit House was of **\*270** property held primarily for sale within the ordinary course of its trade or business. PSLC argues that the trial judge's conclusion that its sale of Summit House was not within the ordinary course of its trade or business was clearly erroneous and that, in any event, the Tax Court was required to reach the opposite conclusion as a matter of law.

### 1. PSLC's Factual Challenge

[2] We have held that determination of whether property is held for sale within the ordinary course of a taxpayer's trade or business is a question of fact. See *Jersey Land & Development Corp.,* 539 F.2d at 315; *Juleo, Inc. v. Commissioner,* 483 F.2d 47, 50 (3d Cir.) (Gibbons, J., dissenting), *cert. denied,* 414 U.S. 1103, 94 S.Ct. 737, 38 L.Ed.2d 559 (1973); *Heebner v. Commissioner,* 280 F.2d 228, 231-32 (3d Cir.), *cert. denied,* 364 U.S. 921, 81 S.Ct. 285, 5 L.Ed.2d 260 (1960). [7] PSLC argues that the Tax Court's finding was clearly erroneous because it was inconsistent with the pretrial stipulation that PSLC held Summit House exclusively for sale.

This stipulation reads as follows:

> On or about June 1, 1978, PSLC purchased a certain piece of real estate located in West Orange, New Jersey, and certain fixtures, equipment, and other personal property located on or used in connection therewith.... *Said purchase was made by PSLC with a view towards immediately reselling the buildings and personalty* to its wholly-owned subsidiary, Mount Orange Realty Corp [MORC]. (Emphasis added.)

PSLC relies on the emphasized portion. This language, however, is not inconsistent with the Tax Court's conclusion that PSLC did not establish that the Summit House transaction occurred within the ordinary course of PSLC's trade or business for it does not even mention the point.

Furthermore, PSLC did not present any evidence as to whether it held Summit House primarily for sale to customers within the ordinary course of its trade or business. Since PSLC bore the burden of proof on this issue, *see* Tax Ct.R.P. 142(a); *Helvering v. Taylor,* 293 U.S. 507, 513-15, 55 S.Ct. 287, 290-91, 79 L.Ed. 623 (1935); *Anastasato v.*

63 A.F.T.R.2d 89-344, 88-2 USTC P 9601

*Commissioner,* 794 F.2d 884, 886-87 (3d Cir.1986), the Tax Court upheld the Commissioner's determination. Judge Cohen pointed out that "[h]ad petitioner chosen to address the issue at trial, it might have submitted evidence demonstrating that the property was held or sold in the ordinary course of PSLC's trade or business. See section 1221(1). Absent such evidence, we cannot find that the property was not a capital asset. Rules 142(a) and 149(b). Respondent's [Commissioner's] determination is sustained." *PSLC* at 573 (citations omitted).

In summary, the stipulation does not state that the Summit House transaction was within PSLC's ordinary course of trade or business and PSLC offered no evidence that it was. Thus, we hold that the Tax Court's factual finding that the sale was not within the ordinary course of PSLC's trade or business was not clearly erroneous.

## 2. PSLC's Legal Challenge

 **[3]**    PSLC nevertheless advances the slightly different argument that, as a matter of law, the stipulated facts required that the Tax Court conclude that sale of Summit House occurred within the ordinary course of its business. In substance, its argument is that as a matter of law it must be concluded that the purchase of an asset for sale subject to a pre-existing contract of sale *always* results in the acquisition of a property to be held primarily for sale to customers in the ordinary course of trade or business. PSLC argues that the Tax Court erred in failing to follow this single factor approach. If, however, as the Commissioner argues, a court must consider and weigh several factors to make this determination, then PSLC cannot prevail on this theory.

This court addressed the problems involved in determining when a sale occurs during a taxpayer's ordinary course of business in *Jersey Land & Development Corp.,* where we stated:

> Whether or not a taxpayer has held real property for sale to customers in the ordinary course of its business is an issue that has often been litigated in the federal courts. Despite this volume of **\*271** litigation, however, *there is no fixed formula or rule of thumb to which a court may readily resort for guidance in resolving this issue.* Rather, each case must, by necessity, turn upon its own facts since *this*

> *question is, in the final analysis, one of fact to be determined from the totality of the circumstances surrounding each particular case.* [539 F.2d at 315 (emphasis added.) ]

This fact-specific approach in *Jersey Land & Development* was consistent with our precedents. *See* Heebner v. Commissioner, 280 F.2d at 232; Kaltreider v. Commissioner, 255 F.2d 833, 838 (3d Cir.1958). The Tax Court has followed this approach and it is now stated that the determination "[w]hether income from the sale of property is excluded from capital gains treatment is a question of fact, the burden of which is on [the taxpayer]." *S & H, Inc. v. Commissioner,* 78 T.C. 234, 242 (1982) *see* Baumgart v. Commissioner, 47 T.C.M. (CCH) 592, 598, 52 T.C.M. (P-H) 3095, 3101 (1983) [available on WESTLAW, 1983 WL 14727].

The characterization of the income from the sale of Summit House is a question of fact depending partially on PSLC's intent with respect to its business activities. *See Baumgart,* 47 T.C.M. (CCH) at 596, 52 T.C.M. (P-H) at 3099. Several cases have identified a number of factors to be considered in this analysis. [8]  The factors most frequently identified are: (1) the purpose for which the taxpayer acquired and held the property; (2) the extent of improvements made to facilitate its sale; (3) the activity of the taxpayer in promoting the sales; (4) the frequency and continuity of sales; (5) the extent and substantiality of sales; (6) the length of time between purchase and sale; and (7) the relative income to the taxpayer from the sale of the property, compared with his other income. *See Baumgart,* 47 T.C.M. (CCH) at 598, 52 T.C.M. (P-H) at 3101; *S & H,* 78 T.C. at 243 n. 12. This court has enumerated and relied on these factors. *See Kaltreider,* 255 F.2d at 838.

PSLC has not cited any controlling authority to suggest that we have departed from this multi-factor analysis. PSLC does, however, cite *S & H. Morley v. Commissioner,* 87 T.C. 1206 (1986), *Baumgart,* and DeMars v. United States, 71-1 U.S. Tax Cas. (CCH) ¶ 9288, at 86,114, 27 A.F.T.R.2d (P-H) ¶ 71-490, at 71-925 (S.D.Ind.1968) [available on WESTLAW, 1968 WL 170], for the proposition that when a taxpayer purchases real estate for sale to a specific party under a pre-existing contract, it holds the property primarily for sale to customers in the ordinary course of business regardless of other factors or facts.

*S & H* and *Morley* do not stand for the stated proposition. Like our case, those cases involved a taxpayer's single venture and determination of whether the property involved was held primarily for sale to customers within the ordinary course of the taxpayer's trade or business. *S & H* and *Morley* merely rejected adoption of an absolute prohibition precluding the court from determining that a unique undertaking was within the scope of the taxpayer's trade or business with respect to that single transaction. As *Morley* explained, *S & H* "rejected the so-called 'one-bite' rule to the extent that such rule established that 'a taxpayer who engaged only in one venture or one sale *cannot under any circumstances* be held to be in a trade or business as to that venture or sale.'" *Morley,* 87 T.C. at 1211 (citing *S & H,* 78 T.C. at 244 (emphasis added)). By rejecting a *per se* rule, the Tax Court in *Morley* and *S & H* reaffirmed that this is an issue of fact in which no one fact or factor is dispositive. *See Morley,* 87 T.C. at 1213.

*DeMars* and *Baumgart,* however, do go further and state a *per se* rule, "that property acquired for the purpose of sale to a specific party pursuant to a pre-existing arrangement constitutes property held for sale in the ordinary course of a trade or business." *DeMars,* 71-1 U.S.Tax Cas. (CCH) ¶ 9288 at 86,117, 27 A.F.T.R.2d (P-H) ¶ 71-490, at 71-929. We, however, decline to follow these cases as we have previously stated that "[n]o single factor or test is dispositive." *Kaltreider,* 255 F.2d at 838. We reaffirm our conclusion that whether a property is held primarily for sale to customers within the ordinary course of a taxpayer's trade or business is a fact specific question for which no single factor is dispositive. Here the finding of fact by the Tax Court on the issue was not clearly erroneous and thus must be upheld. In any event, on an independent review of the record we would reach the same result **\*272** because of the lack of evidence that the transaction involved a property held primarily for sale to customers in the ordinary course of PSLC's trade or business. Thus, we will affirm the judgment of the Tax Court on PSLC's appeal.

## IV. THE PRUSSINS' APPEAL

The Prussins, as limited partners in PSA, claimed a deduction for their distributive share of PSA's depreciation and interest deductions which the Commissioner, upheld by the Tax Court, completely disallowed. Three issues are raised with respect to the Tax Court's decision on this point. First, we consider whether PSA's purchase of Summit House, and not the individual limited partners' investment in PSA, is the

appropriate transaction for examination. Second, we must decide whether the Tax Court's finding of fact that PSA's nonrecourse indebtedness substantially exceeded the fair market value of Summit House was clearly erroneous. Third, we must consider which of the following approaches should be followed: (1) the excess nonrecourse indebtedness may support the claimed deductions; (2) the presence of excess nonrecourse indebtedness requires a complete disallowance of the claimed deductions; or (3) only deductions attributable to the nonrecourse indebtedness to the extent that it was excessive should be disallowed.

### A. *The Relevant Inquiry Takes Place at the Partnership Level*

[4] The Prussins urge that we consider the transaction from the perspective of the individual limited partners who did make substantial cash contributions for their investments. But a partnership is required to file its own federal income tax return. Accordingly, for the purpose of computing income and deductions, "the partnership is regarded as an independently recognizable entity apart from the aggregate of its partners." *United States v. Basye,* 410 U.S. 441, 448, 93 S.Ct. 1080, 1085, 35 L.Ed.2d 412 (1973); *accord Brannen v. Commissioner,* 722 F.2d 695, 703 (11th Cir.1984). After the partnership's income and deductions are calculated and reported it is a conduit through which income and deductions are distributed to individual partners. *See Brannen,* 722 F.2d at 703; *Goodwin v. Commissioner,* 75 T.C. 424 (1980), *aff'd without published opinion,* 691 F.2d 490 (3d Cir.1982). Thus, inasmuch as the Prussins claim losses from the Summit House transaction because of George Prussin's limited partnership interest in PSA, we must make our analysis of the investment from the point of view of the partnership. *See Simon v. Commissioner,* 830 F.2d 499, 506-07 (3d Cir.1987). This conclusion renders immaterial the Prussins' argument which, predicated on the investment of the limited partners, is that this transaction should be regarded as an at risk rather than a nonrecourse transaction.

### B. *Whether PSA's Nonrecourse Indebtedness Exceeded the Fair Market Value of Summit House*

[5] If we assume, even though the record is unclear on this point, that PSA paid the $500,000 which MORC was to have paid to PSLC, PSA's purchase price for Summit House was $7,759,200, of which no more than $500,000 was paid other than by creation of nonrecourse indebtedness. Otherwise it was $7,259,200. It is this investment which must be compared to the fair market value of Summit House.

63 A.F.T.R.2d 89-344, 88-2 USTC P 9601

The Prussins challenge Judge Cohen's finding of the maximum fair market value. At trial they had the burden of proof on the issue. Tax Ct.R.P. 142(a); *see Helvering v. Taylor,* 293 U.S. at 513-15, 55 S.Ct. at 290-91; *Anastasato v. Commissioner,* 794 F.2d at 886-87. But they introduced no significant evidence of valuation and they produced no expert testimony on this point. [9]

While normally the parties to a real estate transaction have adverse economic interests and thus can be expected to establish fair market value themselves, Judge Cohen explained that here "[s]ales subsequent to PSLC's acquisition of the property ... were not at arm's length, and provide no evidence of the property's fair market value." *PSLC* at 575. This determination rested on her perception of the motivation for the conveyances: "in a transaction entered into primarily to generate tax benefits, the interests of the buying and selling parties are not necessarily adverse." *PSLC* at 575.

**\*273** The Prussins challenge this line of reasoning by asserting that not paying money out is almost *always* better than getting a deduction. Thus, PSA would not pay an excessive amount for the property. While their reasoning is generally true, the Tax Court cited PSA's own projected tax benefits to demonstrate that this transaction did indeed provide deductions sufficient to compensate for the additional money paid out. *See PSLC* at 570. In addition, there was no evidence that PSA had attempted to negotiate the sales price. We conclude that Judge Cohen was justified in considering indications other than what PSA paid to determine the fair market value of Summit House.

The Tax Court did consider the following indicia of fair market value: (1) PSLC had paid $4,200,000 for the improvements *and the land* in an arms length transaction immediately before selling the improvements to PSA for over $7,700,000, *see PSLC* at 573-76; (2) the assessed value of the improvements for property tax purposes suggested a fair market value of $1,522,500; [10] (3) the improvements were insured for $2,745,000; [11] and, (4) the improvements and land were sold in 1985 for $7,000,000.

The Prussins argue that the Tax Court erroneously ignored oral testimony regarding the anticipated increase in value of Summit House provided it could be marketed as originally envisioned as cooperatives or condominiums, a purpose frustrated by a change of local law. We, however, see no reason to accept this assertion in view of Judge Cohen's

analysis of the evidence in the record. Further, the facts of this case demonstrate the peril in relying on anticipated changes in a property to support an enhanced value. In short, Judge Cohen did not have to reject solid evidence showing a maximum fair market value because of a speculative projected new use.

The Prussins erroneously assert that Judge Cohen held that PSLC's purchase price was conclusive of fair market value in PSA's subsequent purchase. She, however, did not hold that Summit House could be worth no more to PSA than PSLC had paid for the property. What she did hold was that the Prussins had failed to meet their burden of proof on value and that only the sale to PSLC on the record provided evidence of the value of Summit House. Furthermore, she did not find that fair market value was $4,200,000; she concluded that fair market value could not have been more than that sum. *See PSLC* at 575.

Given her consideration of many different bases for finding fair market value and the Prussins' failure to present expert testimony on value, we conclude that Judge Cohen's findings as to the maximum fair market value were not clearly erroneous. Accordingly, we will not disturb her finding that the nonrecourse financing exceeded the fair market value of Summit House.

### C. *The Appropriate Legal Standard*

The Internal Revenue Code does not expressly provide in any section germane to this case for any adjustment of deductions when nonrecourse debt exceeds fair market value. [12] Thus, it is necessary to analyze the overall statutory framework and legal precedents to understand the significance of the Tax Court's finding that PSA's nonrecourse debt exceeded the fair market value of Summit House.

### 1. The Statutory Framework

The Internal Revenue Code allows a deduction for "a reasonable allowance for the exhaustion, wear and tear" of property used in the taxpayer's trade or business and of property held for the production of income. I.R.C. § 167(a). This depreciation deduction is calculated using the adjusted basis of the property used to calculate gain under section 1011. *See* I.R.C. § 167(g). The basis of the property for purposes of calculating gain under section 1011 is ultimately defined in section 1012. Section 1012 provides that generally the "basis of property shall be the cost of such property."

**\*274** The cost of property includes the amount of indebtedness incurred or assumed by the purchaser as part of the purchase transaction. *See Crane v. Commissioner, 331 U.S. 1, 9-10, 67 S.Ct. 1047, 1052-53, 91 L.Ed. 1301 (1947).* However, several courts of appeals have held that nonrecourse debt in excess of fair market value is not included in the cost of property for purposes of calculating the depreciation deduction. *See, e.g., Odend'hal v. Commissioner, 748 F.2d 908, 912-14 (4th Cir.1984), cert. denied, 471 U.S. 1143, 105 S.Ct. 3552, 86 L.Ed.2d 706 (1985); Estate of Franklin v. Commissioner, 544 F.2d 1045, 1049 (9th Cir.1976).*

Section 163(a) of the Internal Revenue Code allows a deduction for all interest paid or accrued within the taxable year on indebtedness. This provision allows a deduction for interest paid on nonrecourse debt. It has been held, however, that when "both the purchase price and the lesser principal amount of the nonrecourse note which makes up a portion of such purchase price unreasonably exceed the value of the property acquired, then no 'genuine indebtedness' exists and no 'investment in the property' occurs." *Flowers v. Commissioner, 80 T.C. 914, 942 (1983); see also Odend'hal, 748 F.2d at 912-14; Estate of Franklin, 544 F.2d at 1049.*

Although separate statutory provisions govern interest and depreciation deductions, the case law typically merges issues relating to their allowance. Thus, when nonrecourse debt is excluded from the basis for purposes of calculation of depreciation, it is not treated as genuine indebtedness for determination of interest deductions.

**2. Whether the Nonrecourse Indebtedness is Included In PSA's Basis and Whether it is "Genuine Indebtedness"**

 **[6]**    Although this court has not previously addressed this issue, [13] decisions of other courts of appeals have disallowed deductions for interest and depreciation in circumstances similar to those here. Some of these cases specifically involve investments in real estate and improvements. [14]

Of the cases decided by other courts of appeals, that most similar to this case is *Odend'hal v. Commissioner, 748 F.2d 908. Odend'hal* stands for the proposition that if the fair market value of property is less than its nonrecourse financing, the principal of the nonrecourse financing in excess of fair market value is not included in the basis for the purpose of claiming depreciation. Moreover, *Odend'hal* holds

this excess nonrecourse debt does not sustain a deduction for interest payments.

The facts of *Odend'hal* were as follows. Ten taxpayers purchased a warehouse and food processing facility. As in this case, the taxpayers acquired only the improvements and a long term lease on the land. [15] The purchase took place in December of 1972 for a total consideration of $4,000,000 of which $80,000 was paid in cash and $3,920,000 was financed by nonrecourse debt. Interest on the nonrecourse debt was to be serviced currently but the principal was due in a balloon payment at the end of a fifteen year period.

The promoter of this investment represented that based on a depreciable lifespan of fourteen-and-a-half years, the income earned from leasing the property would not equal the total of the cost of leasing the **\*275** land, mortgage interest, and depreciation. However, he explained that the interest and depreciation deductions would generate additional tax benefits so that an investor in the 50% tax bracket would convert the investment income loss into an after-tax gain.

Although the taxpayers purchased the property for $4,000,000, the Tax Court concluded that its fair market value was only $2,000,000. Because of the wide discrepancy between the face value of the nonrecourse debt and the fair market value, the Tax Court held that the nonrecourse note did not represent genuine indebtedness. Thus, it did not allow the taxpayers to include the nonrecourse debt in their basis for purposes of depreciation. In addition, the taxpayers were allowed to deduct interest and other expenses only to the extent of their income from the property.

The taxpayers appealed to the United States Court of Appeals for the Fourth Circuit, arguing that the Tax Court's determination of fair market value was clearly erroneous and that, as a matter of law, the Tax Court was bound to recognize the entire nonrecourse indebtedness when computing depreciation and interest deductions. The Court of Appeals rejected both contentions.

In finding that the Tax Court's valuation of the property was not clearly erroneous, the Court of Appeals relied, in part, on the fact that the same property had been conveyed for $2,670,000 in an arm's length sale five years before it was sold to the group of ten taxpayers. *See id.* at 911-12. Once the fair market value was established the court turned to the issue of the excessive nonrecourse debt. It stated:

If, as a matter of fact, the fair market value of the property is less than that financed by a nonrecourse loan, the authorities hold that the principal of the nonrecourse loan which exceeds fair market value does not represent a real investment in the property by a taxpayer and he may not include that nonrecourse amount in his basis for depreciation. In addition, the interest paid on the loan is not allowable as an interest deduction. Basis for depreciation usually includes the amount of any indebtedness incurred or assumed by the purchaser in connection with the purchase of the property, because the taxpayer has an obligation to pay the debt. When the debt is a nonrecourse loan, the principal amount of the loan is included in the taxpayer's basis so long as the fair market value of the property is at least equal to the amount of the nonrecourse debt at the time it was incurred, because the taxpayer, even though he has no personal liability at stake, has an economic incentive to pay off the debt rather than to lose the collateral. But if the stated price financed by nonrecourse debt exceeds the fair market value of the property, to the extent of the excess, the taxpayer has no equity in the property to protect and no economic incentive to pay off the debt. [*Id.* at 912.] (Citations omitted.)

Under this analysis taxpayers are able to claim depreciation and interest deductions to the extent that nonrecourse debt does not exceed fair market value.

*Odend'hal* ultimately relied on *Estate of Franklin,* 544 F.2d 1045, which imposed similar limits on deductions supported by nonrecourse debt. In *Estate of Franklin* the owner of a motel agreed to sell it for $1,224,000 with the entire purchase price to be paid by a note secured by a nonrecourse mortgage with monthly principal and interest installments of $9,045.36. A balloon payment of $975,000 was due ten years from

the sale. The property was leased back to the seller for a monthly rental equal to the $9,045.36 monthly debt service. The seller was responsible for operating the motel and paying all expenses. The buyers' only cash payment was $75,000 of prepaid interest.

The buyers claimed that they could take interest and depreciation deductions for the ten years and then either make the balloon payment and complete the purchase or back out of the purchase. The Tax Court characterized this transaction as a ten year option to purchase and accordingly disallowed the deductions for interest and depreciation.

The Court of Appeals for the Ninth Circuit considered the case from a different perspective. It held that if the transaction met two criteria it would not be considered a sale for tax purposes and thus no interest or depreciation deductions would be allowed. The first test was whether the value on which the transaction was based exceeded the fair market value of the property. The second factor was whether the transaction was financed with nonrecourse debt which exceeded the fair market value of the underlying property. The Court of Appeals concluded that the transaction in **\*276** *Estate of Franklin* met these two criteria and thus it affirmed the Tax Court.

The Prussins attempt to distinguish *Odend'hal* and *Estate of Franklin* on two rationales. First, they argue cash represented only three percent of the purchase price in *Odend'hal* and just over six percent of the purchase price in *Estate of Franklin,* as opposed to their own more substantial investment in PSA. Second, they contend the large balloon payments in *Odend'hal* and *Estate of Franklin* demonstrate that the transactions were mere options to purchase and that here there are no such balloon payments.

Each of these attempts to distinguish *Odend'hal* and *Estate of Franklin* must fail. With regard to the first objection, the appropriate comparison with *Odend'hal* and *Estate of Franklin* is the proportion of cash to nonrecourse debt paid by PSA rather than the amount of the individual limited partners' cash investments. Based on a purchase price of $7,759,200 and a $500,000 cash payment, assuming it was made, this calculation would indicate that 6.44% of the purchase price was paid in cash. This analysis reveals the similarity of this case to the precedents rather than providing a basis to distinguish them. Of course, the Prussins' argument is even weaker if the $500,000 was not paid.

The Prussins' second rationale partially misstates the terms of PSA's obligations. As we have indicated, principal payments on the mortgages were substantially postponed. [16] But even if they were not, it is the existence of deferred nonrecourse indebtedness in excess of the value of the property that creates the economic disincentive to pay the debt. While there may be less incentive to make a balloon payment at the end of a term as compared with earlier structured payments, the proper analysis must be predicated on a comparison of the nonrecourse debt to the fair market value of the property at its acquisition.

The Prussins attempt to distinguish other cases applying *Estate of Franklin* to real estate investments. Both *Beck v. Commissioner,* 678 F.2d 818 (9th Cir.1982), and *Narver v. Commissioner,* 75 T.C. 53 (1980), *aff'd per curiam, 670 F.2d 855 (9th Cir.1982),* are supposedly inapplicable in light of the small percentage of the purchase price paid in a form other than nonrecourse debt and the great overvaluing of the property. But the Prussins' attempt to distinguish these cases must fail for the same reason that *Odend'hal* and *Estate of Franklin* cannot be distinguished: that is, the Prussins are not comparing the same parts of the different transactions as they are looking to the limited partners' investment rather than that of PSA. The Summit House purchase price was substantially paid by PSA with nonrecourse obligations. [17]

While we regard *Odend'hal* and *Estate of Franklin* as the appropriate precedents, we do not consider them as authority to eliminate all deductions for interest and depreciation. While we realize that a taxpayer holding property subject to a nonrecourse debt in excess of the market value of the property may have no incentive to pay off any portion of the debt, including the amount not exceeding the fair market value of the property, it is equally logical to recognize that the creditor holding the debt has no incentive to take back the property if the taxpayer offers to pay the debt up to the value of the property. For example, if a creditor held a nonrecourse debt for $1,500,000 on a property with a fair market value of $1,000,000, he would have a disincentive to foreclose if his defaulting debtor offered to settle the debt for not less than $1,000,000. Thus, it is appropriate to disregard only the portion of nonrecourse debt in excess of the fair market value of the property when it was acquired for purposes of calculations of the depreciation and interest deductions and to regard the nonrecourse debt as genuine indebtedness to the extent it is not disregarded. **\*277** Moreover, there is precedent for disallowing deductions based on nonrecourse

debt only insofar as attributable to the excess of debt over the fair market value. *See Odend'hal,* 748 F.2d at 912-14.

Unquestionably, the record compels the conclusion that Summit House, though not exceeding $4,200,000 in fair market value, had a substantial value. Thus, under our analysis the Tax Court's determination that the deductions should be disallowed in full cannot be sustained. Accordingly, we will remand the case to the Tax Court for a determination of fair market value of Summit House at the time of PSA's acquisition. [18]

We also conclude that the actual cash investment of PSA in the purchase of Summit House, if there was any, should be disregarded in the calculation of the fair market value as it obviously was at risk. While Judge Cohen inferred that the $500,000 was not paid by PSA, we are not satisfied that this was necessarily correct, particularly in view of the Commissioner's brief in which it is recited that it appears that the $500,000 was paid from the investor's funds. According to the Prussins, the absence of evidence establishing that the $500,000 was paid is attributable to the fact that there was no issue at trial raised regarding this point. On the remand it may be definitively ascertained whether the payment was made. The significance of the cash investment is that there is an economic reason to pay off a nonrecourse debt when there is some equity in the property, even though the total debt when added to the equity exceeds the value of the property, as the alternative to paying the debt is the loss of the equity. Thus, if there is a $500,000 equity in a property worth $4,000,000, the owner of the property should logically be willing to pay off up to $4,000,000 in nonrecourse debt to save the property because his loss in that case will not exceed $500,000 but his loss in giving up the property will be $500,000.

The Prussins' constitutional challenge is based on a contention that they were denied due process of law by the total disallowance of the deductions. Thus, they do not assert that the result we reach would deny them due process of law. Accordingly, their constitutional argument is moot and will not be considered.

## V. CONCLUSION

In summary, we hold that PSLC failed to establish that it held Summit House primarily for sale to customers in the ordinary course of its trade or business. Hence, the decision of the Tax Court with respect to PSLC will be affirmed. We hold that

the Tax Court's finding that PSA's nonrecourse debt exceeded the fair market value of Summit House was not clearly erroneous and will not be disturbed. We also hold that PSA's nonrecourse debt did not support interest and depreciation deductions to the extent it exceeded the sum of the cash investment of PSA in Summit House and the fair market value of Summit House at the time of its purchase. We will partially reverse the decision as to the Prussins and will remand the matter to the Tax Court for a determination of the fair market value of Summit House, the actual cash investment, if any, made by PSA for the purchase of Summit House, and for further proceedings consistent with this opinion which will partially allow the interest and depreciation deductions claimed by them.

## OPINION

GREENBERG, Circuit Judge

The Commissioner filed a petition urging this panel of the court to reconsider our opinion filed on November 25, 1988. Although we will deny the petition we will address several of the Commissioner's arguments.

[7]   As framed by the Commissioner the issue meriting rehearing is:

> Whether a taxpayer who has acquired property subject to nonrecourse indebtedness that is far larger than the fair **\*278** market value of the property at the time of acquisition is entitled to deductions for interest and depreciation attributable to the nonrecouse indebtedness to the extent of the fair market value of the collateral.

Our opinion answered this question in the affirmative.

The Commissioner petitions for reconsideration on two bases. First, he objects to our reading of several precedents upon which we rely as persuasive authority. Second, the Commissioner argues that our opinion will create valuation problems which will produce intolerable administrative burdens.

The Commissioner's first argument refers to our reliance on *Odend'hal v. Commissioner*, 748 F.2d 908 (4th Cir. 1984), cert. denied, 471 U.S. 1143, 105 S.Ct. 3552, 86 L.Ed.2d 706(1985) and *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976). He argues that the courts in these cases disallowed any depreciation or interest deductions rather than disallowing only deductions attributable to the excess nonrecouse debt. Accordingly, he contends that we should disregard the language in each of the opinions suggesting the contrary result.

We observe, however, that in both *Odend'hal* and *Estate of Franklin*, as the Commissioner seems to acknowledge, the issue of whether the taxpayers were entitled to a partial deduction was apparently not raised either before the Tax Court, *see Odend'hal v. Commissioner*, 80 T.C. 588, 590, 602-05, 617-18(1983); *Estate of Franklin v. Commissioner*, 64 T.C. 752, 760-62, 770-71 (1975), or on appeal, *see Odend'hal*, 748 F.2d at 909, 912, 913; *Estate of Franklin*, 544 F.2d at 1046, 1048-49. In this case the issue was squarely presented to the court, and thus we were required to rule on it. We found the opinions and reasoning in *Odend'hal* and *Estate of Franklin* persuasive while we found their holdings, which did not directly address this issue, not in opposition. Indeed, the Commissioner acknowledges in his petition for rehearing that "[t]o be sure, there is language in the opinions in both *Odend'hal* and *Estate of Franklin*, which, taken out of context, could be read as consistent with the panel opinion here."

[8]   The Commissioner's second argument is based on a misreading of our opinion. The Commissioner correctly notes that we call "for the taxpayers to use the fair market value of the property on the date of purchase in determining how much of the nonrecourse debt to allow in calculating their basis in the property." However, the Commissioner suggests that we would allow annual recalculations of the portion constituting genuine indebtedness " because [the taxpayers] have an incentive to repay a greater amount of the nonrecouse debt each year." Accordingly, the Commissioner observes that these recalculations would impose administrative burdens and produce "computational anarchy". We cannot perceive how the Commissioner arrived at this understanding as we said that "it is appropriate to disregard only the portion of nonrecouse debt in excess of the fair market value of the property when it was acquired for purposes of the depreciation and interest deductions and to regard the nonrecouse debt as genuine indebtedness to the extent it is not disregarded." Panel opinion, *supra*, at 277-78 (emphasis added.) We never suggested that there would be annual

reevaluations. Thus, the administrative burdens which the Commissioner contemplates do not exist. However, to clear up any possible misunderstanding, we now expressly state that our opinion of November 25, 1988, is not to be read to require periodic recalculations of the sum of nonrecourse debt constituting genuine indebtedness.

The Commissioner argues in support of his second basis for rehearing that "a borrower whose note exceeds a reasonable estimate of the fair market value of the property has no immediate incentive to pay off any part of the note, because his payments will not give him any equity in the property unless and until the value of his interest exceeds the face amount of the note." In this regard the Commissioner points out that "the investor's entitlement to the claimed tax benefits" is fixed at the time the property is acquired. But if the lender is rational the borrower does have an incentive to pay off a portion of the debt for the lender has a disincentive to foreclose if the purchaser offers to pay the debt up to the value of the property. While the Commissioner dismissed the compromise possibility as "entirely speculative" and "wholly unpredictable at the time the borrower acquires the property subject to the non-recourse note" his argument proves too much because the concept of disallowance of the deductions in excess non-recourse financing **279** situations is based on the theoretical economic disincentive to the borrower to pay the debt rather than upon what ultimately happens. It is no more speculative to assume that the lender will act rationally in compromising than it is to assume that the borrower will not foolishly pay the entire nonrecourse debt. We said as much in our original opinion and we see no reason to change our conclusion in this regard.

The Commissioner's Petition for Rehearing will be denied.

### Parallel Citations

63 A.F.T.R.2d 89-344, 88-2 USTC P 9601

Footnotes

1   The years with respect to which tax liability is contested predate the enactment of the Tax Reform Act of 1986, Pub.L. No. 99-514, 100 Stat. 2085. Thus, while that Act redesignated the Internal Revenue Code of 1954 as the Internal Revenue Code of 1986, *see id.* § 2, we refer throughout this opinion to the 1954 Code which governs the substantive issues.

2   A related case, *Estate of Isaacson v. Commissioner*, 2d Cir., Docket No. 88-4062, arising from the same transaction but involving different taxpayers, was appealed to the United States Court of Appeals for the Second Circuit. In this related case, the estate of Melvin W. Isaacson and Miriam A. Isaacson appealed from a decision disallowing deductions for depreciation and interest based on Melvin Isaacson's ownership of two limited partnership units in PSA. Venue for the Isaacson appeal lay to the Court of Appeals for the Second Circuit rather than to this court because the Isaacsons resided in Connecticut at the time their tax court petitions were filed. I.R.C. § 7482(b). PSLC and the Prussins in their brief recite that the Commissioner "would not consent to a consolidation of these appeals." On October 24, 1988 the court affirmed the Isaacson appeal in a per curiam opinion for the following reason: "We agree with the reasoning and conclusions of the Tax Court, and, for the reasons set forth in Judge Cohen's thorough opinion, the judgment of the Tax Court is affirmed." 860 F.2d 55. Notwithstanding the opinion of the Court of Appeals for the Second Circuit, we have independently arrived at our result which is partially different. We note that in its brief recitation of the facts, the Court of Appeals for the Second Circuit indicated that $500,000 was paid in cash by PSLC for the original purchase. We are confident that the correct figure was $250,000, as set forth by Judge Cohen.

3   The $500,000 was not paid by MORC. A pretrial stipulation indicated that it was to be paid but does not indicate that this happened. In their brief, appellants suggest it was borrowed and was thus owed. It should be noted that the consideration in the PSLC and MORC purchases was divided between personal property and real estate but the allocation is not significant for our purposes.

4   In the Tax Court opinion the judge refers to the gain on the sale of Summit House by PSLC as being on a sale *to* MORC but the parties refer to it as being on the sale to PSA and therefore, in effect, being *of* MORC. Thus, PSLC in its brief, in an assertion that the Commissioner does not challenge, indicates that "the Commissioner determined that PSLC realized a capital gain of $3,742,704 from its sale of Summit House to PSA of which $464,069 was recognizable in PSLC's taxable year ending May 31, 1979, because of the application of the installment method. Although PSLC's sale was of the stock of MORC, the Commissioner computed the gain as if PSLC had sold Summit House to PSA" for $7,759,200. Elsewhere, however, PSLC refers to the $464,069 as "income realized on the sale of real property to its subsidiary by PSLC...." We will not linger on this point as all of the transactions we have described were clearly part of a related program. Furthermore, the parties do not treat the question of which transfer was taxed as significant. We do note that the size of the gain suggests that the transfer to PSA was taxed. We also point out that it was not simply the Commissioner who determined that there was a gain of $3,742,704, as suggested in the quotation, for PSLC reported that gain on its tax return.

63 A.F.T.R.2d 89-344, 88-2 USTC P 9601

5   In its brief, the Commissioner indicates that the deficiencies were $229,842.80 and $138,112.50. These figures come from the decision of the Tax Court rather than the opinion. On the record before us, we cannot account for this discrepancy but are not required to do so as the deficiencies will in any event be recalculated.

6   There are other exclusions as well but they are not applicable.

7   The determination of the taxpayer's primary purpose in holding the property is made as of the time of sale. *Jersey Land & Development,* 539 F.2d at 315. Here, the circumstances were such that PSLC's purpose in holding the Summit House could not have changed in the time between when it acquired the property and sold the shares of MORC.

8   This court has observed, however, that while these factors may be helpful in analyzing residential real estate transactions, they are of limited utility when commercial real estate is involved. *See Jersey Land & Development,* 539 F.2d at 316.

9   Judge Cohen observed that Tax Court Rule of Procedure 143(f) and a pretrial standing order required the taxpayers to present an expert report but that the taxpayers decided to forego expert testimony on the value of Summit House. *See PSLC* at 574 & n. 6.

10  The Tax Court relied on the assessed value and the municipality's stated relationship between the assessed value and fair market value. The assessed value had been presented by PSA to its investors in its initial offering memorandum. *See PSLC* at 575. Judge Cohen considered and rejected the Prussins' contention that PSLC's purchase price was for less than the fair market value. This finding was not clearly erroneous.

11  The replacement value of the buildings, not the land, was insured for this value under a policy containing a 90 percent coinsurance clause. *See PSLC* at 574.

12  The at risk provisions of the Internal Revenue Code of 1954 do not govern this case. *See I.R.C. § 465* as amended by the Revenue Act of 1978, Pub.L. No. 95-600, § 201, 92 Stat. 2763, 2814-15 (1978).

13  In *CRC Corp. v. Commissioner,* 693 F.2d 281 (3d Cir.1982), *cert. denied,* 462 U.S. 1106, 103 S.Ct. 2453, 77 L.Ed.2d 1333 (1983), we held that we would not require the Commissioner to permit contingent or speculative obligations to be included in the basis while the uncertainty surrounding them was unresolved. *CRC,* like *Brountas v. Commissioner,* 692 F.2d 152 (1st Cir.1982), *cert. denied,* 462 U.S. 1106, 103 S.Ct. 2453, 77 L.Ed.2d 1333 (1983), and *Gibson Products Co. v. United States,* 637 F.2d 1041 (5th Cir.1981), on which it relied, should thus be regarded as timing cases and, while wholly consistent with our result, are not sufficient authority on which to base our decision.

14  The Prussins argue that cases involving wasting assets are inapplicable to real estate investments. The Prussins rely on *Siegel v. Commissioner,* 78 T.C. 659, 690 (1982), to demonstrate that the Tax Court recognizes the distinction between wasting assets and realty when determining whether excess debt should be added to basis. *Siegel* involved a limited partnership investment in a motion picture and thus to the extent it addresses the treatment of real estate, the portion of *Siegel* relied on by the Prussins is dictum. The actual holding of *Siegel* is not inconsistent with our result but even if it was we would not be bound by it.

15  The lease at the lessees' option was for 99 years. Here it was for 90 years.

16  We have so concluded on the basis of our study of notes and mortgages in the record. We point out, however, that the Commissioner makes no mention of this point in his brief.

17  The Prussins challenge the entire *Estate of Franklin* line of cases by pointing out that inasmuch as this is a limited partnership case, the Commissioner's reliance on the nonrecourse aspect of the transaction is "completely misplaced" as the limited partners were not liable anyway. We do not agree, because the legal insulation of the limited partners in no way would impact on the incentive of the general partner to pay a recourse obligation. Thus, their argument on this point incorrectly looks at the transaction from the wrong perspective. As we have indicated, the relevant inquiry takes place at the partnership level. Their argument may actually cut the other way as in a limited partnership recourse note situation it could be contended that the *Estate of Franklin* rationale should be followed if the debt is excessive as compared to the value of the property and the general partner is not financially responsible.

18  While Judge Cohen indicated that "the fair market value of the property could not have been more than $4,200,000," *PSLC* at 575, she may have concluded that it was $4,200,000, though her opinion does not include a definitive finding on the point. We, however, doubt that she did intend to determine the fair market value as distinguished from the maximum fair market value, as the $4,200,000 figure came from the price to PSLC which included the land and improvements and PSA by purchasing MORC acquired only the improvements. If, however, we misunderstand her findings on this point, the fair market value need not be reconsidered. We also point out that while we are remanding the case for calculation of the fair market value, the Prussins will be limited to a maximum value of $4,200,000, as we are upholding the finding that the fair market value did not exceed that figure.

---

**End of Document**                                   © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 72



1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

▷

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

Pocklington Foods Inc. v. Alberta (Provincial Treasurer)

Pocklington Foods Inc., Plaintiff v. Her Majesty the Queen in Right of the Province of Alberta as Represented by the Provincial Treasurer of Alberta, Defendant

Alberta Court of Queen's Bench

Ritter J.

Judgment: May 1, 1998
Docket: Edmonton 9003-14825

© Thomson Reuters Canada Limited or its Licensors. All rights reserved.

Counsel: *W. E. Code, Q.C.* and *C. J. Popowich, Esq.*, for the Plaintiff.

*N. J. Pollock, Q.C., M. E. Lesniak, Esq.* and *A. R. Gray, Esq.*, for the Defendant.

Subject: Contracts; Corporate and Commercial

Contracts --- Performance or breach — Breach — General

Plaintiff corporation entered into loan agreement with Alberta government — Government provided both loans and loan guarantees to subsidiary corporation of plaintiff on condition that if subsidiary defaulted, government would be entitled to take shares of subsidiary and apply amount equivalent to their value to total indebtedness — Agreement provided that value of shares was to be determined by government "in the exercise of its reasonable discretion" — Subsidiary defaulted and government seized its shares — Plaintiff sued for breach of contract when government informed it that subsidiary's shares were valued at nil — Action allowed — Evidence established that government breached contract by not exercising its discretion reasonably — Government decided for political reasons to simply not conduct valuation of shares and arbitrarily decided that shares were worth nothing — Court established value of shares of subsidiary at $95,000,000, which was to be set-off against debt owed to government totalling $114,000,000.

Corporations --- Shares — Share capital — Value

Plaintiff corporation entered into loan agreement with Alberta government — Government provided both loans and loan guarantees to subsidiary corporation of plaintiff on condition that if subsidiary defaulted, government would be entitled to take shares of subsidiary and apply amount equivalent to their value to total indebtedness — Agreement provided that "value" of shares was to be determined by government "in the exercise of its reasonable discretion" — Subsidiary defaulted and government seized its shares — Plaintiff sued for breach of contract when government informed it that subsidi-

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

ary's shares were to be valued at nil — Action allowed — Evidence established that government breached contract by not exercising its discretion reasonably — Court proceeded to value shares of subsidiary — "Value" of shares interpreted to have required that shares be valued pursuant to fair market value standard — Facts of case required that actual value of shares be determined pursuant to combination of market price, valuation of net assets, and capitalization of maintainable earnings approaches — Plaintiff not entitled to special compensation because of special value placed on shares by government — Value of shares of subsidiary determined to be $95,000,000, which was to be set-off against debt owed to government totalling $114,000,000.

**Cases considered by _Ritter J._:**

_Associated Provincial Picture Houses Ltd. v. Wednesbury Corp._, [1948] 1 K.B. 223, [1947] 2 All E.R. 680 (Eng. C.A.) — considered

_Bexley v. Dunning_, [1976] 4 W.W.R. 446 (B.C. S.C.) — considered

_Brant Investments Ltd. v. KeepRite Inc._ (1987), 37 B.L.R. 65, 60 O.R. (2d) 737, 42 D.L.R. (4th) 15 (Ont. H.C.) — referred to

_Canada (National Capital Commission) v. Hobbs_, [1970] S.C.R. 337, 10 D.L.R. (3d) 11 (S.C.C.) — considered

_Canadian Gas & Energy Fund Ltd. v. Sceptre Resources Ltd._, 29 B.L.R. 178, [1985] 5 W.W.R. 43, 38 Alta. L.R. (2d) 223, 61 A.R. 67 (Alta. Q.B.) — considered

_Dau v. Murphy Oil Co._, [1970] S.C.R. 861, 73 W.W.R. 269, 12 D.L.R. (3d) 19 (S.C.C.) — referred to

_Diggon-Hibben Ltd. v. R._, [1949] S.C.R. 712, 64 C.R.T.C. 295, [1949] 4 D.L.R. 785 (S.C.C.) — considered

_Domglas Inc. v. Jarislowsky, Fraser & Co._, 13 B.L.R. 135, [1980] C.S. 925 (Que. S.C.) — considered

_Domglas Inc. v. Jarislowsky, Fraser & Co._, [1982] C.A. 377, 22 B.L.R. 121, 138 D.L.R. (3d) 521 (Que. C.A.) — referred to

_Ellis v. Abell_ (1884), 10 O.A.R. 226 (Ont. C.A.) — considered

_Fraser Inc. v. Aitken_ (1988), 41 B.L.R. 87 (Ont. H.C.) — referred to

_Gold Coast Selection Trust Ltd. v. Humphrey (Inspector of Taxes)_, 30 T.C. 209, [1948] A.C. 459, [1948] 2 All E.R. 379 (U.K. H.L.) — considered

_Grant v. Grant_ (1870), L.R. 5 C.P. 727 (Eng. Exch.) — considered

_Hemani v. British Pacific Properties Ltd._ (1992), 24 R.P.R. (2d) 248, 70 B.C.L.R. (2d) 91 (B.C. S.C.) — considered

_Indian Molybdenum Ltd. v. R._, [1951] 3 D.L.R. 497 (S.C.C.) — considered

_Kelvin Energy Ltd. v. Bahan_ (1987), 52 Alta. L.R. (2d) 71, 79 A.R. 259 (Alta. Q.B.) — considered

_King v. Major Oil Investments Ltd._, [1943] 2 W.W.R. 541 (Alta. S.C.) — considered

_King v. Major Oil Investments Ltd._, [1944] 3 W.W.R. 233 (Alta. C.A.) — referred to

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

*Lake Erie & Northern Railway v. Brantford Golf & Country Club* (1916), 32 D.L.R. 219 (S.C.C.) — considered

*Lord Advocate v. Earl Home* (1891), 28 S.L.R. 293, 18 R. 397 (Scotland Ct. Sess.) — considered

*Montreal (City) v. Sun Life Assurance Co.*, [1950] S.C.R. 220, [1950] 2 D.L.R. 785 (S.C.C.) — considered

*Montreal Island Power Co. v. Laval-des-Rapides (Ville)*, [1935] S.C.R. 304, [1936] 1 D.L.R. 621 (S.C.C.) — considered

*New Quebec Raglan Mines Ltd. v. Blok-Andersen* (1993), 9 B.L.R. (2d) 93 (Ont. Gen. Div. [Commercial List]) — referred to

*Northwestern Mechanical Installations Ltd. v. Yukon Construction Co.*, 20 Alta. L.R. (2d) 156, 37 A.R. 132, [1982] 5 W.W.R. 40, 136 D.L.R. (3d) 685 (Alta. C.A.) — considered

*R. v. Bourque* (1962), 34 D.L.R. (2d) 120 (N.B. C.A.) — referred to

*R. v. Harwood* (1900), 6 Ex. C.R. 420 (Can. Ex. Ct.) — referred to

*R. v. Jones*, 23 M.P.R. 426, *(sub nom. Saint John Sulphite Ltd., Ex parte)* [1949] 4 D.L.R. 259 (N.B. C.A.) — referred to

*R. v. Roach*, [1919] 3 W.W.R. 56 (Alta. S.C.) — considered

*R. v. Rothesay Assessors* (1964), 50 M.P.R. 317, 46 D.L.R. (2d) 156 (N.B. C.A.) — referred to

*R. v. Trudel* (1914), 49 S.C.R. 501, 19 D.L.R. 270 (S.C.C.) — considered

*Secretary of State for Education & Science v. Tameside Metropolitan Borough Council*, [1977] A.C. 1014, [1976] 3 All E.R. 665 (U.K. H.L.) — considered

*Shapiro v. Winnipeg City Assessor* (1987), 49 Man. R. (2d) 305, *(sub nom. Shapiro v. City Assessor for City of Winnipeg)* 43 D.L.R. (4th) 506 (Man. C.A.) — referred to

*Steen v. R.*, 86 D.T.C. 6498, [1986] 2 C.T.C. 394, 6 F.T.R. 179, [1987] 1 F.C. 139 (Fed. T.D.) — considered

*T. Eaton Co. v. Alberta (Assessment Appeal Board)* (1995), 33 Alta. L.R. (3d) 349, [1996] 1 W.W.R. 399, 174 A.R. 99, 102 W.A.C. 99, 128 D.L.R. (4th) 469 (Alta. C.A.) — considered

*Westfair Foods Ltd. v. Watt*, 73 Alta. L.R. (2d) 326, 48 B.L.R. 43, [1990] 4 W.W.R. 685, 106 A.R. 40 (Alta. Q.B.) — referred to

*Winnipeg (City) v. T. Eaton Realty Co.*, [1944] 2 W.W.R. 541, 52 Man. R. 106, [1944] 2 D.L.R. 638 (Man. K.B.) — referred to

*Withycombe Estate, Re*, [1945] S.C.R. 267 (S.C.C.) — considered

*Zwicker v. Stanbury*, [1953] 2 S.C.R. 438, [1954] 1 D.L.R. 257 (S.C.C.) — referred to

**Statutes considered:**

Page 4

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

*Business Corporations Act*, S.A. 1981, c. B-15

    Generally — referred to

*Business Corporations Act*, R.S.O. 1990, c. B.16

    Generally — referred to

*Canada Business Corporations Act*, R.S.C. 1985, c. C-44

    Generally — referred to

*Income Tax Act*, S.C. 1970-71-72, c. 63

    s. 7(1)(a) — referred to

**Words and phrases considered**

**fair market value**

The experts agreed that the most common value standard is fair market value, which is a notional concept involving a willing buyer and a willing seller. The concept assumes equally informed, arms-length parties and involves an objective standard. Matters like compulsion on one of the parties to act are assumed away, such that the intended result is something that allows for fairness to each of the parties involved in the evaluation. The notion of fair market value assumes that the market is open and unrestricted and that there are no potential purchasers who are excluded from participation in the market. In assuming that the parties are acting at arms-length, the negotiation is contemplated to be between parties with opposing interests, each having an economic stake in the outcome.

**value-to-owner**

Another standard of value is the value-to-owner, or value-in-use, which is defined as the price the owner would pay rather than be denied the uninterrupted ownership and use of the property. It is also defined as the adverse value of the entire loss, direct and indirect, that the owner might expect to suffer if he is deprived of the property. It is never less than fair market value and can be used to describe either owner-perceived economic advantage, non-economic advantage, or a combination of both. In an economic context, value-to-owner may be equal to or greater than fair market value.

**value-in-use**

Another standard of value is the value-to-owner, or value-in-use, which is defined as the price the owner would pay rather than be denied the uninterrupted ownership and use of the property. It is also defined as the adverse value of the entire loss, direct and indirect, that the owner might expect to suffer if he is deprived of the property. It is never less than fair market value and can be used to describe either owner-perceived economic advantage, non-economic advantage, or a combination of both. In an economic context, value-to-owner may be equal to or greater than fair market value.

**asset base**

The asset base, or cost base approach is a way of measuring the future benefits of ownership by quantifying the amount of money that would be required to replace the future service capability of the subject property. This approach contemplates that the cost to purchase or develop new property is commensurate with the economic value of the service that the

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

property can provide during its life. It assumes that economic benefits exist and are of sufficient amount and duration to justify the expenditures. Under this approach, current costs of obtaining an unused replica of the subject property, including intangible property, or cost of obtaining a property of equivalent utility, is determined. Depreciation is deducted from the cost to reflect elements of physical, economic, and functional obsolescence.

**cost base**

The asset base, or cost base approach is a way of measuring the future benefits of ownership by quantifying the amount of money that would be required to replace the future service capability of the subject property. This approach contemplates that the cost to purchase or develop new property is commensurate with the economic value of the service that the property can provide during its life. It assumes that economic benefits exist and are of sufficient amount and duration to justify the expenditures. Under this approach, current costs of obtaining an unused replica of the subject property, including intangible property, or cost of obtaining a property of equivalent utility, is determined. Depreciation is deducted from the cost to reflect elements of physical, economic, and functional obsolescence.

**income approach**

The income approach involves an estimation of the cash flow of the business and its profitability. The profitability is then converted to value by the application of a capitalization or discount rate. In determining the appropriate rate, factors such as interest rates, rate of return expected by investors on relevant investments, and the risk characteristics of the anticipated benefits are taken into consideration. In some industries and in some circumstances the value of a business is determined simply by multiplying or capitalizing the gross revenue.

**market approach**

The market approach involves comparable properties. What the evaluator does is look at the sale prices for similar assets which have sold on the open market. The evaluator then makes adjustments for the differences between the asset being evaluated and those similar assets which have been sold. The market approach is frequently used with respect to real estate appraisals, particularly where there are a great many similar properties which have sold, or which are on the market.

**value**

The question of value has arisen in contractual situations. In *Bexley et al. v. Dunning*, [1976] 4 W.W.R. 446 (B.C.S.C.), the Court ... determined that in the absence of surrounding circumstances indicating a different sense, what value meant was "what can be obtained in money on the open market".

In a contractual sense, the classic statement of value is found in *Lord Advocate v. Earl of Home* (1891), 28 Sc. L.R. 293 18 R (Ct. of Sess.) 397 at 403 where Lord MacLaren said "... value ... means exchangeable value - the price which the subject will bring when it is exposed to the test of competition."

ACTION by plaintiff corporation against government for breach of contract.

*Ritter J.:*

**Introduction**

1      This matter arises out of a series of transactions involving the Government of the Province of Alberta and a meat processing company, Gainers Inc., which was 100 percent owned by the Plaintiff Pocklington Foods Inc. In turn, Pock-

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

Page 6

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10
W.W.R. 244

lington Foods Inc. was wholly owned by Mr. Pocklington.

2      To some extent, this matter involves the overlay of politics on what would normally be purely commercial arrange-ments. That is because one of the parties is the Government of Alberta, in a direct sense, as the Defendant is a Depart-ment of that Government and not some arms-length entity owned by government.

3      Where there is such an overlay a Court should always proceed with caution as it is not normally the function of the Courts to comment on or question political decisions of government. At the same time, if what might be regarded as purely political invades what should be purely commercial, and if that invasion has some real effect on the commercial arrangements or consequences flowing from those commercial arrangements, then the Court must consider whether the introduction of political consideration was appropriate.

4      In this trial, several former Ministers of the Government of Alberta testified. In some instances their credibility was placed in issue. The duty of the Court is to test that credibility as it would with any witness before the Court. It is also the duty of the Court to state its findings with respect to credibility, provided that determination has some material purpose in deciding the issues before the Court. The Court should not cast aspersions on the credibility of a witness where credibility plays no part in a determination of the issues before it. This applies to all witnesses whether or not they hold or held high public office.

5      At the same time, the Court cannot shy away from determinations of credibility because of concern that someone who is in the public domain and holds or held a high public profile has further to fall than does someone who is not so stationed.

6      The next item that I wish to comment on in relation to the nature of the Government as a party to this action is that I heard a great deal about "taxpayers" from several defence witnesses. I take it that the overuse of this word occurred be-cause it is expected that the Court will consciously or subconsciously extend a benefit to a party if the Court is convinced that that party is really composed of all of the citizens of a province. That is not the case. The Government comes before this Court like any other party. Courts are required to uphold the law and sometimes that requires the Court to do what is unpopular or what will affect the will or the purse of citizenry.

7      In addition, to extend a benefit to "taxpayers" on a case-by-case basis would be counterproductive to citizens and the Government. If the fact that one party is Government and composed of citizens resulted in special considerations for that party, no one would ever do business with the Government, or if they did, would require a premium to do so.

8      The final general consideration that I wanted to comment upon arising from the Government of Alberta being a party is in relation to comments that one often hears and sees to the effect that omissions of past governments should not be visited on present citizenry. In my view, such comments are illogical. If citizens do not feel responsible for omissions of past governments, then logically they should refuse to accept any continuing benefits which are attributable to such governments. I doubt that anyone would refuse to use highways, hospitals or schools built by the government of the day when these events arose in order to be consistent with their position that what is past is past. I raise this consideration only to point out that it played no role in this decision.

9      Some of the issues to be determined by this Court are outlined in the Court Order of the Case Management Judge, Costigan, J., granted on Thursday, the 1st day of May, 1997. Some of those issues have become moot due to agreements among the parties, or concessions made by one or another of them. I will respond specifically to the issues that remain in dispute near the end of these Reasons.

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

10      While the issues stated in the Order and otherwise raised in the pleadings give rise to a degree of complexity, they may be broken down into the following questions:

1. Having regard to the assets, liabilities and purpose of Gainers Inc., excluding the benefits and detriments arising from a series of related Court actions, is there any surplus value to shares?

2. Is the Defendant required to account to the Plaintiff for any surplus value in the shares of Gainers Inc. and Gainers Properties Inc. taken by the Defendant on the 6th of October, 1989?

3. Has the Crown reasonably valued the shares of Gainers Inc. and Gainers Properties Inc.?

4. If the shares have a nil or positive value, how does that affect the related actions?

5. If the value of the shares is a negative figure (excluding consideration of the related actions), what steps should the Defendant take in pursuit of its claims under the series of related actions?

11      During the course of these Reasons it is my intention to follow a somewhat linear process, but where I feel there is a valid reason I will make reference to matters which might more appropriately relate to subjects other than the subject I am dealing with at the time. This is because the resolution of the questions before me involves an interplay of factors.

12      In addition, while I intend to lay out the general facts as I have found them, specific facts will be alluded to throughout my Reasons. I do this to "bring home" the facts that I find particularly compelling in relation to a particular area of my analysis.

13      It is my intention to follow the following general headings in terms of my analysis and conclusion:

1. General factual narrative.

2. The valuation of Gainers by the Defendant.

3. Valuation theory.

4. Intangible assets.

5. Land appraisal.

6. Valuation of improvements.

7. Tax loss carry forward.

8. Expert business evaluation.

9. Legal analysis.

10. Conclusions.

14      I intend to further break down each of these general headings so that the reader will have a better understanding of the point being addressed or the source or purpose of the point being addressed.

**Factual Matters**

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

*Agreed Statements of Facts*

15     The parties are in agreement on many facts. They have filed a series of Agreed Statements of Facts and have included, as attachments to those agreements, documents relevant to this matter. From the Agreed Statements of Facts, the following factual analysis arises.

16     Gainers Inc., or a predecessor of Gainers Inc. has been in the meat packing business in Edmonton, Alberta since before 1900. In or about 1977, an agreement was made by Mr. Peter Pocklington to acquire Gainers Inc. This acquisition was completed in 1978, through a series of companies owned by Mr. Pocklington.

17     Expansion of Gainers ensued and pursuant to an agreement entered into in 1980 and completed in January 1981, Gainers Inc. acquired the Canadian Food Business assets of Swift Canadian Co., including the slaughtering and meat plant at 66th Street and Yellowhead Trail in Edmonton, Alberta. The main slaughtering and meat packing operations of Gainers Inc. were moved to this plant, and between 1981 and 1982 a 50,000 square foot distribution centre was constructed on this main plant site. The old Gainers Inc. Edmonton Plant was then closed.

18     In connection with the acquisition from Swifts, Gainers Inc. and other companies entered into a Permitted User Agreement with Swift Canadian Company Limited, dated January 13, 1981. That Permitted User Agreement and Amendments and Modifications made after it provided Gainers with the right to use Swift trademarks for the specified period of time contained in the Agreement.

19     Gainers Inc. has continued to operate from the former Swift Plant in Edmonton, Alberta. In 1983 Gainers Inc. disposed of its Eastern Canadian operations, and certain other assets which had been acquired from Swift.

20     In 1985, as part of a re-organization, Gainers Inc. became a wholly owned subsidiary of 332658 Alberta Ltd., which was later re-named Pocklington Foods Inc. The terms of Pocklington Foods Inc.'s acquisition of Gainers Inc. are set out in an agreement which was dated September 23, 1985. Pursuant to that agreement it was agreed that the fair market value of Gainers Inc.'s common shares was $50,000,000.00 with certain provisions for adjustments set out in that agreement.

21     The book value of Gainers Inc.'s fixed assets was "stepped up" for the Audited September 28th, 1985 Gainers Inc.'s financial statements as part of the 1985 reorganization. The book value was written up to appraised value, based on appraisals done in 1984. (The fiscal year end of Gainers Inc. is the last Saturday of each September and accordingly the dates of the Audited Financial statements vary from year-to-year.)

22     In 1985 Gainers Inc. purchased the assets of Magic Pantry Foods. Magic Pantry produced retort pouch microwavable trays containing complete meals for retail market, for military rations and for private label products for diet centres.

23     In 1986 the business assets of Sodor Foods Inc., a regional meat processor in Quebec City, were acquired and this operation was conducted by Sodor Foods Inc. as a Gainers Inc. subsidiary. This Plant was closed by Gainers Inc. during March, 1989, with the consent of the Defendant. All of the equipment at the Sodor Plant was then moved to other Gainers Inc. Plants.

24     In 1986 Gainers Inc. endured a long strike by its unionized employees, and an associated boycott of its products which spread across Canada. The effect of the strike and the boycott extended into the 1987 fiscal year results and beyond.

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

25      During 1986 and 1987 Gainers Inc. constructed a 45,000 square foot bacon processing facility in North Battleford, Saskatchewan.

26      In September of 1987, in connection with closing the Master Agreement (which will be described in some detail later in these Reasons), most of Gainers Inc.'s fixed assets were conveyed to Gainers Properties Inc. Gainers Inc. and Gainers Property Inc. agreed that Gainers Inc.'s fixed assets were to be conveyed to Gainers Property Inc. at fair market value, based on appraisals which were prepared in 1987.

27      In September of 1987, Gainers Inc. acquired Z & W Foods Limited in Toronto from Loblaws. The Purchase Agreement relating to this transaction was assumed by Kretchmar Inc., a wholly owned subsidiary of Gainers Inc., and the operation was thereafter operated as Kretchmar Inc. This company specialized in high-quality processed meat and had such customers as McDonalds. As part of the acquisition, Kretchmar Inc. entered into a five year supply agreement with Loblaws in Eastern Canada, and Gainers Inc. entered into a five year supply agreement with Kelly Douglas in Western Canada to supply certain of their food and processed meat requirements.

28      By 1989 Gainers Inc. had nine distribution and sales offices or facilities across Canada and two sales facilities in the United States. Its branded products were sold under the Gainers Inc. and Swift names and names owned by Gainers Inc., as well as under private brand labels. In 1989, Gainers Inc. was one of the largest meat processors in Canada, and the only national meat processor located in Alberta. It was the largest hog slaughterer in Western Canada. It employed over 1,500 people nationally, with 1,200 of its employees working in Alberta. The company's operations had a significant impact on the manufacturing and agricultural sectors of the Alberta economy.

29      As of October 6th and 10th, 1989 Gainers Inc., Kretchmar Inc. and Sodor Foods Inc. were the owners or registered owners of various trademarks and trademark applications. In particular, Gainers Inc. had the following Swift brands listed in stores across Canada, namely: Swift Premium, Lazy Maple, Sugar Plum and Ever Sweet. It also had the following Gainers Inc. brands listed in retail stores, namely: Superior and Captain's Cabin. Kretchmar Inc. or Gainers Inc. had the following Kretchmar brands listed, namely: Kretchmar Deli Line and Karl Kraemar. Gainers Inc. distributed Magic Pantry brands through the Magic Pantry Division. Gainers Inc. also bought and sold poultry products, fish and some dairy products, but not under a specific brand that Gainers Inc. represented.

30      Pocklington Foods Inc. continued to be the sole shareholders of Gainers Inc. until October 6th, 1989 when Gainers Inc.'s shares were taken out of escrow by the Defendant and its nominee pursuant to an agreement which will be described below.

31      Because of legislation which was in effect in the Province of Alberta during the relevant time, Gainers Inc. was required by law to buy its Alberta hogs from a Hog Board. That Board was known by various names, but in this judgment will be referred to as the A.P.P.D.C., being the Alberta Pork Producers Development Corporation.

32      On or about May 29th, 1986, Gainers Inc. and the A.P.P.D.C. entered into a contract for the pricing and supply of hogs. A similar contract was made by the A.P.P.D.C. and Fletchers, who were Gainers Inc.'s primary competitor for the purchase of hogs in Alberta. These contracts expired during July of 1989. No new contract replaced them in 1989 or 1990, but, for a time, hogs appear to have been supplied to Gainers Inc. in a manner consistent with the expired contract.

33      On or about the 25th of September, 1987 the Plaintiff and the Province of Alberta Treasury Branches ("A.T.B."), together with several other parties, entered into an agreement in writing, entitled "Master Agreement". Pursuant to the Master Agreement:

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10
W.W.R. 244

(a) The A.T.B. agreed to issue a guarantee in favour of a Chartered Bank to secure the repayment by Gainers Properties Inc. to that Chartered Bank of the sum of $55,000,000.00, together with accrued interest thereon, which sum had been agreed by the Chartered Bank to be lent to Gainers Property Inc.;

(b) It was provided that in the event that A.T.B. assigned its interest in the Master Agreement to the Defendant, Her Majesty In Right of the Province of Alberta as represented by the Provincial Treasurer of Alberta, it was anticipated that the Defendant, subject to the terms and conditions set out in the Master Agreement, would lend to Gainers Property Inc. up to $12,000,000.00 to be advanced in six semi-annual instalments commencing April 1st, 1987 of $2,000,000.00 each. In these Reasons that loan will from time-to-time be referred to as the "Term Loan";

(c) It was agreed that the proceeds of each instalment of the Term Loan would be loaned by Gainers Property Inc. to Gainers Inc. As security or collateral security as defined in the Master Agreement, Gainers Inc., Gainers Property Inc. and Pocklington Foods Inc. and others delivered to A.T.B. debentures, mortgages and other items of security, including, *inter alia*:

(i) An agreement in writing executed by Pocklington Foods Inc., A.T.B., Gainers Inc. and others and entitled "Negative Pledge";

(ii) An agreement in writing executed by Pocklington Foods Inc., Treasury Branch and an Escrow Agent and entitled "Escrow Agreement"; and

(d) The Master Agreement also contained a number of positive covenants which the Pocklington Group agreed to observe.

34      Pursuant to the Escrow Agreement and the Negative Pledge, Pocklington Foods Inc. delivered to the Escrow Agent certain documents, including a share certificate representing 101 class "A" common voting shares of Gainers Inc., issued in the name of Pocklington Foods Inc., which shares represented 100 percent of the issued shares of Gainers Inc. and with the share transfer form thereon duly endorsed in blank and the executed undated resignation of each Director and Officer of Gainers Inc. It was also agreed that if the Escrow Agent received a letter from the A.T.B. directing the Escrow Agent to deliver the escrow documents to the A.T.B., that Escrow Agent would without inquiry and unconditionally, release the escrow documents to the A.T.B.

35      Pursuant to the Negative Pledge, Pocklington Foods Inc. agreed to and did ensure delivery to the Escrow Agent of executed undated resignations of all Gainers Inc.'s Directors and Officers. It also agreed with the A.T.B. that the A.T.B., upon the occurrence of any event of default as defined under the Master Agreement, would have the right to deliver to the Escrow Agent a letter of direction requiring delivery to the A.T.B. of the escrow documents. Article 6.04 of the Negative Pledge Agreement provided that upon receipt of the Gainers Inc. shares by the A.T.B. from the Escrow Agent, the A.T.B. was entitled to:

(a) Sell the Gainers Inc.'s shares by public or private sale, acting in good faith, to a *bona fide* third party purchaser, in such manner, and on such terms as may seem to it advisable, without notice or advertisement, and for the purposes thereof each and every requirement relating thereto and prescribed by law or otherwise is hereby waived, the Treasury Branches may make delivery to the purchaser of good and sufficient deeds, assurances and conveyances of the Gainers Inc. shares and give receipts for the purchase price and any such shares shall be a perpetual bar, both at law and in equity, against Pocklington Foods Inc. and all those claiming by, from, or under it. The proceeds realized from the sale of all or any part of the Gainers Inc. shares shall be applied by the Treasury Branches to the total actual indebtedness, or in the manner contemplated in Article 10.01(b) of the Master Agreement, or in reduction of the total

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

aggregate indebtedness or to any combination of the foregoing; it being understood and agreed that no such payment shall release any of the G.I. Group, or Pocklington, or any one or more of them from their respective covenants and agreements pursuant to the Master Agreement and all other Agreements contemplated unless and until zero total outstanding obligations due and owing pursuant to the Master Agreement have been duly and fully paid, performed and satisfied, as the case may be; or

(b) Accept the G.I. shares as payment of a portion of the total actual indebtedness in which event the Treasury Branches shall apply on account of the total actual indebtedness that amount equivalent to the value of the Gainers Inc. shares at the time as determined by the Treasury Branches in the exercise of its reasonable discretion; it being understood and agreed that no such application of the value of the G.I. shares to the total indebtedness, or in the manner contemplated by Article 10.01(b) of the Master Agreement, or in reduction of the total aggregate indebtedness, or any combination of the foregoing shall release any members of the G.I. Group, or Pocklington, or any one or more of them from their respective covenants and agreements pursuant to the Master Agreement and all other agreements contemplated thereby unless and until all total outstanding obligations due and owing pursuant to the Master Agreement have been duly and fully paid, performed and satisfied as the case may be.

36      Under Article 1.01 of the Master Agreement "Total Actual Indebtedness" means the total Term Loan outstanding at the relevant time, together with the repayable "Loan Guarantee Amount", which is defined as any monies required to have been paid to Lloyds Bank by the A.T.B. pursuant to the Loan Guarantee to a maximum of $55,000,000.00 plus interest, which would then be outstanding together with interest.

37      The agreements between the A.T.B. and the Plaintiff and other companies associated with the Plaintiff also contained several other important provisions. In particular, there were positive covenants to the effect that the red meat business would be continuously carried on by Gainers Inc. at the Gainers Inc. Plants and that Gainers Inc. would maintain certain productive capacities in each of the Gainers Plants, unless the Crown otherwise consented. Further, Gainers Inc. was to, upon securing Government grants equivalent to 25 percent of the construction costs, cause a hog plant to be constructed in Southern Alberta, which plant was to be operating by June, 1989.

38      The corporations associated with the Plaintiff also agreed that they would not change the general nature of the businesses of any of various companies involved in the meat production business and would not sell or otherwise dispose of their assets, except in the ordinary course of the business.

39      The Master Agreement also contained a provision which was under a heading referred to as "Condition Precedent To Loan Guarantee and Term Loan". That condition was to the effect that all steps required to effect a corporate restructuring of any of the members of the Gainers Group, or all members thereof, as the case may be, as disclosed in the Gainers Inc. Pro Forma Balance Sheet, would be completed. That Pro Forma Balance Sheet directed the write-off of various intercorporate transactions involving Gainers Inc. and related corporations.

40      The various documents also contain clauses to the effect that the documents themselves constitute the entire agreement between the parties and supersede any previous representations or agreements.

41      It was acknowledged by the Defendant that A.T.B. was acting under the direction of the Defendant in this transaction. It was always anticipated that A.T.B. would be used as an interim party and that A.T.B. would be replaced under the Master Agreement by the Defendant at a later date.

42      The Deputy Provincial Treasurer also acknowledged that A.T.B. had not conducted its usual credit review, or followed its normal credit approval procedures, and that normal due diligence in the transaction had been performed by the

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

Defendant to the extent the Defendant thought necessary.

43    The Defendant acknowledged that it approved the Master Agreement for, among others, "economic development" reasons. One of the reasons it approved this financing package was to retain the benefits to the provincial economy that could be expected from the continuation of Gainers Inc.'s operations, which included jobs and marketing of Alberta meat products.

44    In addition to the financing obtained from the A.T.B., Gainers Inc. also continued the use of an operating line of credit with Lloyds Bank in the approximate sum of $25,000,000.00. Lloyds took primary security from Gainers Inc. against its inventory and receivables while A.T.B. took primary security from Gainers Properties Inc. against the fixed assets.

45    Prior to the execution of the Master Agreement, the Plaintiff provided to the Defendant a number of appraisals of Gainers Inc.'s fixed assets to be conveyed to Gainers Property Inc. in conjunction with the Master Agreement. These stated the value of Gainers Property Inc.'s assets to be as follows:

| | | |
|---|---|---|
| 1. | Edmonton Plants, machinery and equipment | $15,610,000.00 |
| 2. | North Battleford Plant, land, building and equipment | $7,400,000.00 |
| 3. | Magic Pantry Division - Hamilton machinery and equipment | $3,070,000.00 |
| 4. | Magic Pantry Division - Hamilton land and buildings | $2,430,000.00 |

46    On September 29th, 1987 prior to the implementation of the Master Agreement, the Plaintiff also provided to the Defendant a letter of appraisal for the Edmonton Main Plant, land and buildings, advising of a value of $30,790,000.00. On October 5th, 1987 the Defendant acknowledged that the appraisals were satisfactory for the Defendant's purposes.

47    Prior to the completion of the Master Agreement, the fixed assets of the Edmonton Plant, the North Battleford Bacon Plant, Magic Pantry, the Sales Unit and Sodor were sold to Gainers Property Inc. for $57,924,000.00. The transaction was recorded in Gainers Property Inc.'s books at this price, and the book value of those assets as set out in Gainers Property Inc.'s Audited September 1988 financial statements was based on this acquisition price. The difference between the 1987 sale price of the fixed assets to Gainers Property Inc. and the previous book value in Gainers Inc.'s financial statements was recorded as a deferred gain on sale on Gainers Inc.'s audited September 1988 financial statements and in the 1987 Gainers Inc. Pro Forma Balance Sheet.

48    Pursuant to an agreement entitled "Assignment", dated March 30th, 1988 the Master Agreement and related documents and securities were assigned by the A.T.B. to the Defendant. All parties acknowledged and agreed that the obligation of the A.T.B. was at an end and that the Defendant, in all aspects, replaced the A.T.B.

49    Subsequently, the Defendant advanced three instalments of $2,000,000.00 each of the Term Loan to Gainers Property Inc. on or about June 7th, 1988, October 3rd, 1988 and April 10th, 1989. Gainers Property Inc., acquired with the proceeds 6,000,000 Class "C" preferred shares of Gainers Inc., which were issued to Gainers Property Inc. by Gainers Inc. These were endorsed in blank by Gainers Property Inc. and delivered to the Escrow Agent pursuant to Amending Agreements, Escrow Agreements and Negative Pledges dated April 3rd, 1988, June 7th, 1988, October 3rd, 1988 and April 3rd, 1989, which agreements were substantially similar to the Escrow and Negative Pledge Agreements.

50    By letter dated April 3rd, 1989, Gainers Inc. requested an extension of the Southern Alberta Hog Plant completion date to June 30th, 1990.

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10
W.W.R. 244

51      By some time in May of 1989, Gainers Inc. and Gainers Property Inc. were in default with the Crown and with their banker under their borrowing agreements, and in July and August, 1989, steps were taken to increase the banker's security. On June 1st, 1989 Lloyds Bank presented Gainers Inc. with a demand for payment of the loans held by it. Pursuant to an agreement set out in a letter dated August 8th, 1989 from Alberta to, *inter alia*, Gainers Property Inc., Gainers Inc. and Pocklington Finance Inc. and the Plaintiff, and confirmed and acknowledged and agreed to by those parties (this agreement is sometimes herein referred to as the "Letter Agreement"):

(a) One hundred percent of the common and preferred shares of Gainers Property Inc. were agreed to be transferred by Peter Pocklington to Gainers Inc. It was agreed that Gainers Inc. would enter into agreement with respect to the Gainers Property Inc. shares in favour of the Defendant, substantially similar to that of the Negative Pledge and Escrow Agreement;

(b) Peter Pocklington transferred the Gainers Property Inc. shares to Gainers Inc. and Gainers Inc. delivered the Gainers Property Inc. shares to the Escrow Agent, and further, entered into the Gainers Property Inc. shares Escrow Agreements and Gainers Property Inc. shares Negative Pledges with Gainers Property Inc. and the Crown, upon terms and conditions substantially the same as those set out in the original Escrow Agreement and the original Negative Pledge and further delivered to the Escrow Agent duly executed, undated resignations of all Gainers Property Inc. Directors and Officers; and

(c) It was agreed that upon receipt by the Defendant of the Gainers Property Inc. shares from the Escrow Agent, consequent upon delivery to the Escrow Agent of a letter of direction, the Crown was entitled to proceed pursuant to Article 6.04 of the Gainers Property Inc. shares Negative Pledge as previously quoted in these Reasons.

52      In September, 1989 Gainers Inc.'s position under its financial agreement with Lloyds Bank deteriorated further and the bank gave notice of an intention to enforce its security. On October 5th, 1989 the Crown gave notice to Gainers Property Inc., Gainers Inc., the Group's subsidiaries and Mr. Pocklington, in accordance with the provisions of the Master Agreement and the Letter Agreement, of the happening of the following events of default:

(a) A default by Gainers Property Inc. in the payment of interest due on October 1st, 1989 on the Term Loan;

(b) Failure to pay rent to Gainers Property Inc. by Gainers Inc. and Sodor for the months of September and October, 1989;

(c) Failure to commence construction of a hog plant in Southern Alberta by September 30th, 1989;

(d) Defaults on or after August 8th, 1989 between Gainers Inc., Gainers Property Inc. and Pocklington, or any one or more of them and the Bank.

53      At the same time the Defendant also gave notice:

(a) That it terminated the Letter Agreement;

(b) That it was exercising its rights under Article 15.04 of the Master Agreement; and

(c) That it would take such steps as it deemed fit to immediately enforce the terms of the security, the Master Agreement, the Letter Agreement and all other agreements contemplated under the Master Agreement. The Defendant also declined to make the October 1st, 1989 advance on the Term Loan.

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

54      On October 5th, 1989, the Defendant also caused to be delivered to the Escrow Agent letters of direction requiring the Escrow Agent to deliver to the Defendant the escrow documents, including the Gainers Inc. shares, the Gainers Inc. preferred shares and the Gainers Property Inc. shares. These documents, including the shares, were delivered to the Defendant by the Escrow Agent in the early morning of October 6th, 1989.

55      On October 10th, 1989 the Defendant gave notice in writing to the Plaintiff, under Article 6.04 of the Negative Pledge, that the Defendant would apply on account of the total actual indebtedness an amount representing the value of the shares taken as determined by the Defendant in its exercise of its reasonable discretion.

56      On October 6th, 1989 the Defendant caused the Gainers Inc. shares and the Gainers Inc. preferred shares to be registered in the name of the Defendant's nominee. The Defendant's nominee was the registered owner of those shares in trust for the Defendant and for the management and employees of Gainers Inc.

57      The Defendant acknowledges that it caused the Gainers Inc. shares to be delivered out of escrow and to the Defendant's nominee for the following reasons, among others:

(a) In order to obtain or preserve economic development for economic benefits, including the preservation of jobs at Gainers Inc.'s Edmonton Plants and the preservation of Gainers Inc.'s meat business, including slaughter and processing business, primarily the hog/pork operations;

(b) In order to gain control of those assets that would enable continuation of the contribution to the economy of Alberta that Gainers Inc. had achieved;

(c) To continue the operation of the company's business and provide a market for Alberta meat products, primarily pork;

(d) To protect agricultural producers and suppliers in Alberta:

(e) To give the company an opportunity to re-establish itself;

(f) To support an industry important to Alberta's diversification strategy;

(g) To ultimately privatize the company, with a view to continuing operations in Alberta, maximizing realization of Gainers Inc.'s assets, and minimizing Crown financial support;

(h) To minimize the impact on livestock markets and producers;

(i) To protect the interests of small creditors.

58      After the Defendant acquired the assets of Gainers Inc. and Gainers Property Inc., Mr. Pocklington by a letter dated October 17th, 1989 required "The Crown in exercising its reasonable discretion take into account the underlying value of assets in Gainers Inc., including tax losses and intangibles as valued by the Hathaway Corporation in its report of September 22, 1989", which had been delivered to the Crown. The Defendant did not advise the Plaintiff that it had determined a value for the Gainers Property Inc. shares by August 3rd, 1990, at which date the Plaintiff commenced this action.

59      Several other actions, primarily between the Crown and Mr. Pocklington and one or more of his companies and also involving others, were commenced by the Crown, its nominee, Gainers Inc., or Gainers Property Inc. on October

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

6th, 1989 and thereafter. One has been the subject of a previous trial, which trial was heard by Clarke, J. of this Court, judgment being pronounced on December 6th, 1995. That judgment allowed a claim advanced by Gainers Inc. in the sum of $712,200.00, plus interest. All other claims were dismissed. Costs were awarded to the Defendants in that action and set off against the judgment in favour of Gainers Inc. and the interest thereon. This judgment has been appealed to the Alberta Court of Appeal, but as of the date of this decision, has not yet been heard by the Alberta Court of Appeal. The remaining actions are in various states of readiness and the first of them is scheduled to be heard in the fall of 1998.

### Factual Findings Based on the Evidence

60     In addition to matters arising from the Agreed Statements of Facts, I am able to determine a number of other facts which are based on the evidence that I heard during the course of this trial. Some of those facts are really not controverted, as both Plaintiff and Defence witnesses testified to them. Many facts are supported by the numerous documents that were filed as exhibits in these proceedings and I will, from time to time, refer to some of those exhibits. Finally, other facts were hotly contested by the parties and where there are factual matters which were contested, I will make my findings and give the reasons as to why I came to the conclusion that I did.

61     On December 5th, 1985 Dick Johnston, the Minister of Economic Development, wrote to Mr. Pocklington at the Plaintiff corporation. In his letter he indicated that:

> During one of our conversations on the question of hog marketing in Alberta you mentioned the possibility of your company locating a plant in Southern Saskatchewan. I indicated that I owned some farmland adjoining the town of Indian Head, Saskatchewan, which would be ideal for such a facility.

He then went on to suggest that Indian Head would be an appropriate location for the proposed Southern Saskatchewan Hog Facility.

62     Mr. Johnston, indicated that he sent this letter after he and Mr. Pocklington had briefly discussed this matter at a social occasion. He says that it was a follow-up to their conversation and the first sentence quoted seems to support that version.

63     Mr. Pocklington indicated that the letter "came out of the blue" and he was surprised by it. He further indicated that at the time he received the letter he felt it was totally inappropriate coming from a Minister of the Crown, as the Edmonton Oilers, another entity owned by Mr. Pocklington, owed a large debt to the A.T.B. At that time the A.T.B. was very much a hands on operated near bank owned by the Province of Alberta. Mr. Pocklington testified that he did not know what to do, and as a result did nothing.

64     Mr. Pocklington further testified that it was his "feeling" that his failure to respond to Mr. Johnston's inquiry soured whatever relationship existed between them and was one of the precipitators that led to the downfall of Gainers Inc. It was suggested by the Plaintiff that if this were the case, it would logically follow that the downfall of Gainers Inc. was precipitated by a personal vendetta, as opposed to purely commercial reasons. It was further submitted that if I came to this conclusion, then the conclusion would support a claim for general damages, as well as punitive and exemplary damages.

65     Mr. Johnston indicated that the letter was merely a form of passing reference with no significant importance attached to it. He further indicated that he was not really aware that Mr. Pocklington was indebted through the Edmonton Oilers to the A.T.B., and I gather that it is Mr. Johnston's position that he was not taking advantage of the fact that he was a Minister of the Crown.

Page 16
1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10
W.W.R. 244

66    I do not believe Mr. Johnston when he suggests that he was not aware that the Edmonton Oilers were indebted to the A.T.B. As Provincial Treasurer he was directly responsible for those Branches. The notoriety of Mr. Pocklington's dealings within the Province of Alberta was such that practically every grade school student in Alberta could have told you to whom the Edmonton Oilers owed money, and yet Mr. Johnston would have this Court believe that he, as the person in charge of that entity, was not aware that money was owed to the A.T.B.

67    I am, however, satisfied that this letter sent almost four years prior to the steps taken by the Defendant to acquire the shares of the Gainers Group of Companies played no role in that acquisition. The letter is significant only in that it raises questions of morality involving Mr. Johnston; further it heightens perceptions respecting his credibility. I will comment on that credibility later in these Reasons.

68    During the course of the trial, questions were asked and answers given with respect to the negotiations that led to the Master Agreement and the documents contemplated by the Master Agreement. At the time those questions were asked, objections were raised on the basis that those questions were a breach of the parole evidence rule. The position taken was that as the language in the contract was clear and unambiguous, it alone could be looked at in order to ascertain the intention of the parties. (*Indian Molybdenum Ltd. v. R.*, [1951] 3 D.L.R. 497 (S.C.C.), *King v. Major Oil Investments Ltd.*, [1943] 2 W.W.R. 541 (Alta. S.C.); aff'd. [1944] 3 W.W.R. 233 (Alta. C.A.), *Northwestern Mechanical Installations Ltd. v. Yukon Construction Co.* (1982), 20 Alta. L.R. (2d) 156 (Alta. C.A.), *Ellis v. Abell* (1884), 10 O.A.R. 226 (Ont. C.A.), *Grant v. Grant* (1870), L.R. 5 C.P. 727 (Eng. Exch.))

69    At the time these questions were posed and answered, I indicated that I would consider their admissibility and relevance at the end of the trial. Many of them related to a meeting between Mr. Pocklington and the then Premier of the Province of Alberta, Donald Getty. At that meeting, the question of financial assistance from the Province of Alberta to Gainers Inc. was first raised. That financial assistance was ultimately provided. The documentation reflecting that financial assistance consists of the Master Agreement, and the documents contemplated by the Master Agreement.

70    The Master Agreement itself and the documents contemplated by the Master Agreement were drafted by Counsel for the Defendant and were reviewed by counsel for the Plaintiff. In his testimony, Mr. Pocklington acknowledged that he signed the documents only after receiving advice from his counsel, his accountants, and others who had reviewed the documents on his behalf, and after he had satisfied himself that the documents reflected the transaction as he understood it.

71    In those circumstances, one would not normally give consideration to any extrinsic evidence, and in particular the evidence offered by Mr. Pocklington, about discussions involving or leading to the Master Agreement.

72    Similarly, one would expect the same to be the case with respect to subsequent discussions that Mr. Pocklington had relative to further agreements between himself, the Plaintiff, the Gainers corporations and the Defendant where those discussions were ultimately reduced to a written contract.

73    It is, however, my determination that the Master Agreement itself contemplates that if these discussions occurred, then they are relevant to at least one of the questions that I must determine. I come to this conclusion because of the wording of 6.04(b) of the Negative Pledge Agreements. That provision required the Defendant to utilize its reasonable discretion in determining the value of the Gainers Inc. shares. I am satisfied that in the circumstances of this case, the Defendant's conduct is relevant to the determination of whether or not that discretion was exercised in a reasonable manner. I am satisfied that that conduct included conduct by the representatives of the Defendant leading to the creation of the agreements, the conduct of the representatives of the Defendant leading to the acquisition of the Gainers Group shares, and finally the conduct of the various representatives of the Defendant after the acquisition of the Gainers Group

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

shares by the Defendants.

74     I turn to the discussions. It was the evidence of Mr. Pocklington that during the month of December, 1986 Gainers Inc. was involved in a strike lock out and had been involved in that strike lock out for several months. He indicated that he was contacted by the then Premier of the Province of Alberta, Donald Getty, and asked to attend at a meeting with Mr. Getty. Mr. Getty, in his evidence, confirmed that this occurred.

75     Mr. Pocklington says that at that meeting a "gentleman's agreement" was arrived at, and that that gentleman's agreement included two key components:

1. A package of financing, which ultimately constituted the Master Agreement; and

2. An agreement that something would be done about the monopoly of the A.P.P.D.C.

76     It is clear from Mr. Pocklington's evidence that he did not consider these "agreements" to be legally binding on the Defendant, but that he considered the Defendant to have a moral obligation to fulfil them.

77     In his testimony Mr. Getty indicated that no agreements were reached, but that he did indicate that there might be financing available to assist Gainers Inc. pursuant to various Government programmes and that Mr. Pocklington should approach the appropriate Ministers who administered those programmes if he desired that financing. Mr. Getty could not remember any substantial discussion about the A.P.P.D.C. monopoly, and says that he definitely did not make any commitment in that regard. From Mr. Getty's perspective, it was possible that matters were raised about the A.P.P.D.C. by Mr. Pocklington as Mr. Pocklington raised many problems relating to Gainers, including things like pricing for pork products and pricing relating to the raw material for pork products, namely hogs.

78     No minutes were kept of this meeting, nor was any other documentation created shortly after its occurrence which would reflect the contents of the discussion at this meeting. There is, however, some subsequent documentation which gives some light to the nature of the discussions between Mr. Pocklington and Mr. Getty. One of the exhibits tendered was a memo, initially sent by Dick Johnston to Donald Getty, and then returned with a notation placed thereon by Mr. Getty. The memo from Mr. Johnston to Mr. Getty was delivered to Mr. Getty during the course of a Cabinet Meeting and raises the question of assistance to Gainers. It is clear from the tenor of that memo that Mr. Getty had reported to other Cabinet Ministers subsequent to his meeting with Mr. Pocklington. The memo from Mr. Johnston states:

You suggested the potential for us considering 'something' for Gainers during your Gainers' strike discussion. My question:

Did you make any comments which could guide my discussions this afternoon?

Mr. Getty then responded with the following words:

Dick, some type of thing like for pulp mill at Whitecourt or like Sask. or like the magnesium deal. - Some funding through guarantees or creative debentures or preferred.

79     Mr. Johnston and Mr. Getty indicated that the reference to the pulp mill at Whitecourt related to the Miller Western Pulp Mill at Whitecourt. The reference to Sask. related to the Husky Oil Upgrader at Lloydminster, Saskatchewan, and the magnesium deal related to a proposed magnesium plant in High River, Alberta. Each of these projects had received some government funding including at least a portion in the form of an interest free loan.

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10
W.W.R. 244

80      The next document that flows from these discussions was not created until after Gainers Inc.'s financial picture had taken a turn for the worse. Mr. Getty testified that during the spring and summer of 1989 he kept hearing rumours to the effect that Mr. Pocklington was saying that he had reneged on some form of undertaking relating to hog pricing. Consequently, he sent Mr. Pocklington a letter on July 12th, which states in part:

> At no time could I, nor would I, make any specific commitments that involved our Government. I was aware that your Company wanted certain changes in its hog purchasing arrangements and financing, etc., but my position was that this was not appropriate for me to discuss and would have to be the result of future discussions with the Ministers responsible, such as Economic Development and Trade, Treasury, or Agriculture. I also stressed to you I would not be involved in those details but that any further assistance must be at going commercial terms or under existing Government programmes to help strengthen and diversify our province during a difficult economic downturn.

81      Mr. Getty testified that subsequent to the delivery of this correspondence he never heard back from Mr. Pocklington and that at subsequent meetings at which both he and Mr. Pocklington attended, Mr. Pocklington did not raise the Province's alleged reneging of its commitment to "the free market purchase and sale of hogs".

82      Mr. Pocklington also testified that he had discussions about the A.P.P.D.C. with other Government Ministers, and that while those Government Ministers acknowledged that the A.P.P.D.C. monopoly was a problem for slaughterhouses in Alberta, they were unprepared to do anything about that monopoly. He indicated that their position was invariably to the effect that the hog producers were supporters of the party in power and that, generally speaking, the employees in the Gainers Plant supported an opposition party. Consequently, they were unwilling to honour any commitment that the Government had made to allow for the free marketing of hogs.

83      Two of these Ministers testified at this trial. They were Dick Johnston, the Minister of Economic Development, and Ernie Isley, who at one time was the Minister of Agriculture. Mr. Johnston and Mr. Isley acknowledged having discussions with Mr. Pocklington relative to hog marketing. They, however, denied making any commitment and stated that the hog processing plant owners and management were constantly contacting them relative to what they perceived to be a pricing problem. They, however, felt that this problem had been resolved by the contract entered into between the A.P.P.D.C. and the two major producers referred to earlier in these Reasons. Consequently, they were not prepared to do anything about it.

84      I conclude that both the questions of the loan and hog pricing came up during the course of the meeting between Mr. Pocklington and Mr. Getty. I am satisfied that there was no commitment to the point of being contractual. Words like "gentleman's agreement" have no real meaning in law. They are, however, generally well-known concepts from a moral perspective. In this respect, I am also satisfied that what Mr. Pocklington perceived to be a gentleman's commitment was probably something less than that. There was discussion, the matter was on the table and there was an undertaking by Mr. Getty to see what he could do about the problems that Gainers was facing, but nothing more.

85      I am satisfied that Mr. Getty perceived, and with the passage of time, enhanced that perception, the matter to be a very loose discussion only. Mr. Pocklington perceived the results of the meeting to be considerably more precise than what Mr. Getty perceived them to be. I am satisfied that this is a genuine difference of opinion and that the reality is probably somewhere between what Mr. Pocklington felt occurred and what Mr. Getty felt occurred.

86      I am also satisfied that Mr. Pocklington raised the question of hog marketing with several Government Ministers and was told things like "our support must remain with the farmers, as they are supporters of the Government". That, in my view, did not create a moral circumstance of the type that was required to be taken into consideration in the Government's reasonable exercise of its discretion in the valuation of the Gainers Group shares.

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

87      I turn to other questions which relate to matters involving the Defendant's conduct, and, which in my view, are at least potentially relevant to the question of whether or not the Defendant acted reasonably in the exercise of its discretion in valuing the shares of the Gainers Group of companies.

88      In September of 1987, which is the time frame within which the Master Agreement and related documents were completed, the Defendant conducted its due diligence to the extent that it felt was necessary. That due diligence included the receipt of appraisals, which appraisals were provided by the Gainers Group. At that time the Defendant communicated with the Gainers Group and the Plaintiff to the effect that the appraisals it had received were satisfactory for the Defendant's purposes.

89      The representative of the Defendant who was in charge of administering the loans to the Gainers Group was George Kinsman. It was Mr. Kinsman's view and his advice to the Defendant that the Gainers Group was essentially bankrupt in the fall of 1987. It was Mr. Kinsman's view, and again this was communicated to the Defendant, that within six months of the granting of the loan the Defendant would be taking over all of the assets of Gainers, due to defaults that he anticipated would occur. Mr. Kinsman's evidence was to the effect that it turned out that he was wrong, but that there was a reason for that. In 1988 the Gainers Group showed a profit. It was generally acknowledged by a number of witnesses that that profit resulted from a lock out affecting Gainers' major competitor, Fletchers in Red Deer. The result of that lock out was that Gainers was left to supply virtually all of the Alberta market for pork and other meat products. In consequence, Gainers had an operating profit of approximately $8,000,000.00 in its year ending in September 1988.

90      The events which occurred after the Fletchers labour dispute was resolved support Mr. Kinsman's prognosis. Gainers commenced losing, and continued to lose, approximately $1,000,000.00 each month. By May 1989, Gainers was in default with its primary lender, Lloyds Bank and with the Defendant respecting the loans and guarantees provided by the Defendant.

91      I conclude that Mr. Kinsman was correct in his assessment and that due diligence conducted in a businesslike manner would have revealed to the Defendant that the events which ultimately transpired were likely to transpire. I also conclude that the loan to Gainers Inc. was precipitated by a desire to deal with two political matters, namely:

   1. The Gainers' strike, which was causing considerable social and economic upheaval in Edmonton and elsewhere in the Province of Alberta; and

   2. The desire of the then current Government to see to the continued diversification of the economy of the Province of Alberta, including, as Government Ministers testified, enhancing the value added nature of various agricultural products produced in the Province.

92      I also conclude that the commitment of the Government to provide a loan to Gainers Inc. was significantly stronger than the Government Ministers were willing to admit, as the political will overrode the advice they received from their employee charged with administering the loan.

93      I raise these matters now, as they reflect upon the testimony that I frequently heard from Government Ministers and representatives to the effect that they hoped and expected Gainers, the Plaintiff and others who were committed to meet their obligations under the Master Agreement and related documents. The substance behind those expectations seems a little hollow in the face of the advice that those same Ministers and representatives of the Defendant had received from the experienced economist and banker who was charged with administering the loan. Mr. Kinsman's expectation was that what actually occurred would occur, and he passed that expectation on to the Ministers of the Government.

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10
W.W.R. 244

94      From the spring of 1989 until the shares were taken by the Defendant, Ministers of the Defendant, Deputy Ministers of the Defendant and employees of the Defendant engaged in numerous meetings, discussions and other activities in an attempt to deal with and determine the best way to resolve Gainers' financial issues. Several committees were struck, including a Cabinet Steering Committee, whose specific duties were to deal with the financial deterioration at Gainers. The subject of Gainers' financial position was discussed at the Priorities and Planning Committee of Cabinet, was discussed among the various Deputy Ministers, was discussed by the staff of the departments involved in the administration of the Master Agreement or affected by Gainers' operations, and was the subject of numerous memos, minutes and documents flowing among various departments, employees and officers of the Defendant.

95      Several of the writings emanating from the Defendant have left the Plaintiff with the view that the Defendant was acting in a manner that was outside the commercial nature of the contractual relationships between the parties, and introduced political and other considerations into those relationships. On May 30th, 1989 the Priorities and Planning Committee of Cabinet met. Those in attendance included Premier Donald Getty, Dick Johnston and Ernie Isley. Subsequently, a memorandum relating to that meeting was prepared by the Deputy Secretary to Cabinet. The memorandum states that the Finance and Coordination Cabinet Committee agreed to:

(a) Send notice of default to Gainers; and

(b) Appoint an Inspector to determine the present status of the company and to assist in the formulation of alternative strategies.

The memorandum then states that the Provincial Treasurer should act as spokesperson on the issue, and that efforts should be made to investigate alternatives such as an employee buy-out to allow the company to continue to operate. The memorandum finally states:

Any take out action recommended must ensure that no benefits fall to existing shareholders should this recommendation be pursued.

96      The only existing shareholder was the Plaintiff. It is the Plaintiff's position that this reference is indicative of a vendetta and the political considerations taken by the Defendant in its dealings with the Plaintiff. The Plaintiff is of the view that the Defendant was aware that in some circles the owner of the Plaintiff was not a popular person, having been involved in the Gainers strike lock out and having sold Edmonton Oilers' hockey star, Wayne Gretsky, to the Los Angeles Kings. It was, accordingly, politically astute of the Defendant Government to ensure that they dealt with the Plaintiff in a fashion that was different than had the owner of Gainers been someone other than the Plaintiff.

97      Mr. Pocklington points out that subsequent to this memorandum, he entered into negotiations with the Defendant and Lloyds Bank with a view to finding a solution to Gainers' financial problems. He understood these to be give-and-take type of negotiations, but the memorandum makes it clear that no "give" was contemplated by the Defendant.

98      Mr. Getty and Mr. Johnston both suggest that the meaning of the last sentence in the memo has been misconstrued by the Plaintiff. They say that what was discussed at the meeting, and what the last sentence intends to convey, is that the direction determined was not to prevent the Plaintiff from receiving a surplus should one exist, but to ensure that the Plaintiff was forced to comply with the Master Agreement.

99      At the trial, during argument and throughout this litigation, it has been the Defendant's position that it is not responsible to pay any surplus, should one exist, to the Plaintiff. I find the position taken by the Ministers in their evidence and the position taken by the Defendant in its submissions difficult to reconcile. I doubt that they remember what the in-

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

tention of the Committee of Cabinet was when it met on the 30th of May, 1989 and prefer to take the plain meaning of the memorandum as representing that intention. That plain meaning is that the Defendant was going to ensure that no benefits fell to the existing shareholder should take out action be pursued.

100     I consider that plain meaning to be a factor to be considered in the determination of whether or not the Defendant has exercised its reasonable discretion in the valuation of the shares.

101     The second writing emanating from the Defendant which leaves the Plaintiff with the view that the Defendant was acting outside the commercial nature of the contractual relationships between the parties is found in a memorandum dated the 4th of July 1989 and prepared by Barry Mehr, who was the Associate Deputy Minister of Agriculture in charge of marketing. This memorandum was sent to Ernie Isley, who was then the Minister of Agriculture.

102     The memorandum makes reference to the fact that the alternatives put forward by Mr. Pocklington indicate that he is still in a negotiation mood. It then suggests that the Government of Alberta can improve its position by, for example, inclusion of Mr. Pocklington's share position in one of his holdings, Canbra Foods Inc. It then further states that:

> Any dealings with Pocklington will be seen as letting Pocklington off the hook and will raise much political and public concern.

103     It is suggested by the Plaintiff that these statements raise two flags. The first is that at the time all parties were in negotiations and there was an expectation that those negotiations would be conducted in good faith. The tenor of the first portion of the memo, however, suggests that the Defendant should at least consider improving its position by inclusion of Mr. Pocklington's position re Canbra shares.

104     In his testimony, Mr. Mehr indicated that he might have thought that Canbra shares were already part of the security provided to the Defendant. I am satisfied that that was not the case. Mr. Mehr was one of the recipients of previous correspondences indicating that the Defendant had no claim to Mr. Pocklington's shares in Canbra Foods. Further, the tenor of the memo indicates that inclusion of Canbra shares will improve the Defendant's position. It is impossible to ascertain how one can improve that position by taking security on shares that are already part of the security. Mr. Mehr had to be suggesting that the Defendant attempt to negotiate Mr. Pocklington into adding his shares in Canbra as security to the Defendant.

105     The second portion of this memo raises a concern that the negotiations were not being conducted on a commercial basis, but rather with political objectives in mind. No one has testified on behalf of the Defendant that Mr. Pocklington, or the Plaintiff, were made aware that in addition to the usual commercial objectives, these negotiations also included political features.

106     The next document to which the Plaintiff makes reference in relation to this aspect of its claim is a memorandum dated the 7th of August, 1989. This memorandum was made by Mr. Pocklington and comprises notes made during the course of a telephone conversation with Dick Johnston. The notes state:

> If I didn't back up the Government to stop Lloyds from foreclosure, Johnston threatened retaliation on Palm and any and all assets of Peter P.

The memo further states:

> Also claims that Cabinet wants blood.

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

This memo is dated one day before Mr. Pocklington signed the Letter Agreement. Mr. Pocklington suggests that the threats made by Mr. Johnston precipitated his signing the agreement the next day. At the time of this memorandum, Mr. Pocklington was the owner of Palm Dairies. This is what is meant by "Palm" in the memorandum.

107    Mr. Johnston testified that many conversations occurred between himself and Mr. Pocklington at about the time of the August 8th Letter Agreement. He indicated that he recalls telling Mr. Pocklington that Cabinet was insisting that the Government enforce its security. He further recalls telling Mr. Pocklington in no uncertain terms that if necessary the Defendant would be realizing on its assets and would realize to the fullest extent possible as allowed by the Master Agreement and the documents contemplated by it.

108    Mr. Johnston denies saying that Cabinet wanted blood and said that if he did say something like that, it would have only been to convey the urgency of the situation to Mr. Pocklington.

109    There is, to some extent, a conflict between the testimony of Mr. Pocklington and that of Mr. Johnston. They were the only parties to this conversation, and consequently we have a clear contest of credibility. It is my finding that the events as related by Mr. Pocklington are to be preferred, as he made a memorandum of the conversation and Mr. Johnston has no distinct recollection of it. Secondly, having regard to the findings which I will relate later as to Mr. Johnson's credibility, I prefer the evidence of Mr. Pocklington to that of Mr. Johnston.

110    The final writing which the Plaintiff has referenced in relation to what it considers to be inappropriate considerations by the Defendant in its administration of the loan and guarantees, is found in a memorandum from Brian Williams, the Executive Director of Business Finance Development for the Department of Economic Development and Trade, to George de Rappard, Chief Deputy Minister of the same Department, dated September 27th, 1989. Near the conclusion of this two page memorandum is found the following sentence:

    I believe the public must be convinced Alberta has taken every action possible to strip Peter Pocklington of as many of his assets as possible.

111    The Plaintiff suggests that this quotation indicates the type of thinking that was prevalent within the minds of those charged with the administration of the Gainers loans and guarantees. That is, that there was a concern for political gains to be made at the expense of the Plaintiff and ultimately Mr. Pocklington. Mr. Williams stated that what was meant was that the public must be convinced that every action possible was taken to realize on the security provided for under the Master Agreement. That, of course, is not what the document states and I am satisfied that what was meant by the statement contained in this memorandum is its plain English meaning.

112    Another concern that the Plaintiff raised regarding the Defendant's administration of the Gainers loan and guarantees results from an approach made by three senior management members of Gainers Inc. to the Defendant in the spring of 1989. This approach was done through an Edmonton lawyer, hired by these three senior managers. The purpose of the approach was to advance concerns to the Defendant about the use of Gainers Inc. by the Plaintiff and its *alter ego*, Mr. Pocklington. Subsequent to this approach, meetings between personnel from the Defendant, the Defendant's solicitors and these three senior managers ensued. However, I am, satisfied that by the time these meetings occurred Mr. Pocklington was aware that senior management was dealing with the Defendant and had consented to those dealings in the hopes that an agreement between the Defendant and senior management and employees of Gainers Inc. would result in some form of buy-out of his interest in Gainers.

113    It is clear that at the time of the initial approach, Mr. Pocklington as Chairman and Principal of Gainers was not aware of the approach. One of the two senior managers who testified indicated that the approach was made on behalf of

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

"stakeholders" whom he defined as being the management and employees of Gainers, the suppliers of Gainers, the Northern Alberta hog farmers who provided the raw materials for Gainers, the customers of Gainers and the Defendant. Gainers' sole shareholder was apparently not regarded as a "stakeholder".

114      There is no evidence to indicate that the Defendant invited this approach by senior management, or obtained confidential information that was utilized by the Defendant in its dealings with the Plaintiff. It is true that shortly after the approach the Defendant provided the Plaintiff with the first notice indicating default under the terms of the Master Agreement and related documents, but that default was precipitated by acts of default which were clearly independent of any approach by Gainers' management. In consequence, I do not see how the approach by Gainers' senior management to the Defendant assists the Plaintiff in any material respect.

115      The Plaintiff also complains that the Defendant refused to cooperate when the Plaintiff attempted to effect the sale of its Magic Pantry Division. Again, I do not feel there is any merit in this position. The assets of Magic Pantry were part of the security enjoyed by the Defendant. The Master Agreement provides a specific formula for the use of proceeds emanating from a sale of Magic Pantry. What the Plaintiff was proposing was a sale of Magic Pantry assets, with all the proceeds being injected into Gainers to allow it to continue to operate and hopefully weather the storm created by a downturn in the meat industry. The Defendant took the position that if part of the security was sold the proceeds realized from that security should be applied on account of Gainers' indebtedness to the Defendant to the extent provided for in the Master Agreement. I am satisfied that the Defendant was entitled to take this position and that its doing so was totally within the commercial context in which the parties were operating.

116      The Plaintiff suggests that the fact that the Defendant immediately upon the acquisition of the Gainers shares, commenced various actions against Mr. Pocklington, the Plaintiff and corporations associated with Mr. Pocklington or the Plaintiff is indicative of the Defendant following up on its threat "to strip Peter Pocklington of all of his assets". I do not intend to comment to any great extent upon the ability of the Defendant to succeed with respect to these actions, but note that the subject matter of one of the actions has already attracted comment by one of the Case Management Judges in this litigation. That is in relation to the action brought by the Defendant to recover dividends paid by Gainers to the Plaintiff. McDonald, J. of this Court, in commenting on an application of the Defendants in that action (Mr. Pocklington et al.) to have the action struck stated:

> In my view, Mr. Kowalchuk's [counsel for Mr. Pocklington et al.] arguments are likely to be very persuasive at trial, that G.I. cannot complain of acts asserted to be by the Pocklington Group, and that the Pocklington Group made full disclosure to Counsel for Alberta and the A.T.B. of their intention to declare the dividends which were, in fact, declared not long after the 1987 transactions, and likewise to redeem shares, and that the Counsel referred to accepted those declared intentions without complaint.

117      One of the related actions has already proceeded to trial and the Defendant has only recovered the amount offered to it. That action is the subject of an appeal, but that appeal has been lodged for approximately one and a half years without any significant advancement through the process.

118      Another action was lodged on the 6th of October, 1989. The Statement of Claim was presented to me during the course of the trial and I have had an opportunity to review it. There does not appear to be anything in the Statement of Claim which would indicate any urgency like a limitation date, calling for the action to be commenced immediately upon the Defendants obtaining the shares of Gainers. In his testimony, Mr. Johnston acceded to a suggestion that the real purpose for commencing this action was to permit the Government of the day to respond to embarrassing questions in the Legislature by pleading that it could not respond to the questions as the matter was before the Court.

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

119     Having reviewed the Statement of Claim and having heard the testimony before me, I can categorically state that at least some of the claims contained in that Statement of Claim have little chance of success, unless witnesses who testified in this trial contradict themselves at that trial. For example, the Statement of Claim makes reference to Sodor, which was a Division of Gainers operating in Quebec, not continuously carrying on business. However, various defence witnesses indicated that the Plaintiff contacted the Defendant in the spring of 1989 with a request to the effect that Sodor be allowed to discontinue its operations. The Defendant agreed to this request and made much of this agreement in support of its position that it had no vendetta against the Plaintiff or Mr. Pocklington.

120     How the exact opposite allegation can be maintained in a Statement of Claim is difficult to ascertain. I conclude that the real purpose to the filing of the Statement of Claim on the 6th of October, 1989 was the "collateral benefit" referred to in evidence by Mr. Johnston, consisting of the ability of the Government to respond to embarrassing questions in the Legislature to the effect that the Government could not provide any real response as the matter was before the Court.

121     The filing of a Statement of Claim for such a purpose is either an abuse of process, or comes close to being that. It is inappropriate for the Government or any other party to use the Courts for purposes other than the legitimate pursuit of Court remedies. I am satisfied that, as Mr. Johnston testified, this collateral benefit was very much in the mind of the Defendant when instructions to file the Statement of Claim on October 6th, 1989 were given.

122     Finally, the Plaintiff suggests that the manner in which the A.T.B. became a party to the Master Agreement is indicative of the political considerations which were taken by the Defendant in its dealings with the Plaintiff. It was acknowledged by several Defendant witnesses that the reason the A.T.B. was indicated to be a party (and then quickly assigned away as a party) to the Master Agreement, instead of a Department of Government was that procedures were in place whereby the accounts of the Departments of Government were reviewable in the Legislature, while the private dealings of the A.T.B. were not. Mr. Johnston, in his evidence, testified that this was the case, but it was his recollection that Mr. Pocklington insisted upon this. Mr. Pocklington testified that it was the Defendant who insisted on the A.T.B. being the party to the agreement.

123     Later in his testimony, Mr. Johnston indicated that the reason the Government preferred to proceed through the A.T.B. was to avoid questions in the Legislature, which would result in full public knowledge of the terms and conditions of the Gainers loan. Mr. Johnston explained that the Gainers loan was made close to the time when the Principal Group of Companies, centred in Edmonton, was placed into receivership. Many members of the public had lost money as a result of the downfall of the Principal Group, and the Provincial Government, as the regulator of that Group, was the recipient of many complaints relating to that regulation. A political decision was made to the effect that lending money to a corporation such as Gainers, in the face of extensive losses by small investors in the Principal Group would have political repercussions. Consequently, the Government decided to proceed through the A.T.B., as the accounts of the A.T.B. were not subject to review in the Legislature.

124     There is a contradiction in the testimony of Mr. Johnston, as he initially indicates that Mr. Pocklington insisted upon the A.T.B. being utilized. If that remains his position, I prefer the testimony of Mr. Pocklington. I note that in one of his correspondences to Donald Getty, Mr. Pocklington complained that the Defendant's insistence on the utilization of the A.T.B. greatly delayed the process of advancement of loan proceeds, thereby affecting Gainers' financial status. That letter was sent well before any actions were commenced and some time before the realization on the shares of Gainers by the Defendant was imminent.

125     The Defendant has produced no response to that correspondence indicating it to be erroneous, and I take that

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

lack of response to be approbation of the position taken by Mr. Pocklington.

126    After Gainers Inc.'s initial default in May of 1989, the Defendant commissioned an accounting firm, Woods Gordon, to review the financial position of Gainers Inc. so as to assist the Defendant in the determination of steps it should take relative to the default by Gainers Inc. The Woods Gordon Report was completed and was presented to several Ministers of the Government, several Deputy Ministers and other persons associated with the Gainers Inc. account during the first and second weeks of June 1989. The conclusions emanating from this Report were that Gainers would likely lose money for the balance of 1989, that it could not survive without more funds and that it could not carry its then debt load.

127    Further, pork markets and hog prices were such that the then losses were likely to continue well into 1990. In addition, the plant and equipment needed to be replaced if Gainers was to continue within the industry in the future, would cost $40,000,000.00-$50,000,000.00 or more.

128    The Report also concluded that Kretchmar and Magic Pantry were viable operations which could be sold as going concerns for a maximum return to the holders. Finally, the Report concluded that the management at Gainers, Kretchmar and Magic Pantry were good, experienced and conscientious.

129    The Report then outlined various options and indicated the estimated result should the Defendant pursue any of those options. The first option suggested that the Defendant realize on the assets immediately. It was estimated that in the event the Defendant pursued this option, there would be a shortfall of approximately $40,000,000.00.

130    The second option was to do nothing and let Lloyds Bank take steps to liquidate the Gainers corporations. It was estimated that permitting this option to occur would result in an estimated shortfall to the Defendant of a sum between $45,000,000.00-$50,000,000.00.

131    ´ The third option presented to the Defendant was to operate Gainers until replacement production facilities were in place. The Report estimated a shortfall and investment requirement in the pursuit of this option of between $106,000,000.00-$166,000,000.00.

132    The fourth option was for the Defendant to operate Gainers until third parties could take over the "kill and cut" portions of Gainers' activities. The shortfall and investment estimated to be required from the Defendant in pursuit of this option was placed at between $78,000,000.00-$100,000,000.00.

133    The third and fourth options included investment, and presumably that investment would have enhanced the value of the assets of Gainers. It is, however, the case that each of these options also included a shortfall while the Gainers' operations were conducted by the Defendant. In each case the shortfall exceeded the estimated shortfall for the first two options.

134    The Plaintiff and Mr. Pocklington were aware that Woods Gordon was conducting an investigation of Gainers' affairs, and Mr. Pocklington and other officers of the Plaintiff, together with management of Gainers Inc. cooperated with Woods Gordon personnel in their investigation.

135    At about the same time that the Defendant engaged Woods Gordon to conduct an investigation of the financial affairs of Gainers, Lloyds Bank engaged Ernst and Young to conduct a similar investigation. A Report was ultimately produced and that Report was made available to both the Plaintiff and the Defendant. The conclusions in that Report were similar to those contained in the Woods Gordon Report.

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10
W.W.R. 244

136      One of the events of default which occurred at the end of May, 1989 was the fact that Gainers Inc. was also in default with respect to its obligations to Lloyds Bank. In consequence, on June 1, 1989, Lloyds Bank demanded repayment of various credit facilities provided by Lloyds Bank to Gainers Inc. At about the same time, the Defendant provided the Plaintiff and Gainers Inc. with notice of Gainers Inc.'s default under the Master Agreement.

137      The demands and notices of default provided to Gainers Inc. precipitated a flurry of negotiations between the Plaintiff's employees and officers, Lloyds Bank and the Defendant. Various accommodations resulted in the Lloyds Bank's demands being deferred or withdrawn for a period of time. For example, on July 12, 1989 a Letter Agreement was entered into between Lloyds Bank and Gainers Inc. whereby Lloyds obtained additional security by way of security from Kretchmar, charging the accounts receivable in Kretchmar in favour of Lloyds Bank in support of a $3,000,000.00 guarantee provided by Kretchmar of the Gainers' indebtedness to Lloyds Bank. Gainers Inc. also provided Lloyds Bank with an unconditional irrevocable $2,000,000.00 letter of credit, which was considered as a topping up of Gainers' inventory and accounts receivable for the purposes of calculating the margin position of Gainers in determination of the amount of the operating line of credit established for Gainers by Lloyds Bank, which was available to be drawn by Gainers at any given time.

138      However, throughout the summer of 1989 the financial position of Gainers Inc. did not improve but continued to deteriorate. Gainers Inc. was still losing approximately $1,000,000.00 each month. This resulted in continued pressure by both the Defendant and Lloyds Bank for an injection of capital by the shareholder in Gainers Inc. and for additional security to secure the positions of Lloyds Bank and the Defendant. This pressure and continued negotiations resulted in the Letter Agreement referred to in the Agreed Statements of Facts portion of these Reasons. That Letter Agreement accomplished a release by the Defendant of security valued at $5,000,000.00 in favour of Lloyds Bank and the Plaintiff pledged $5,000,000.00 in other assets to the Defendant. The Letter Agreement provided for a 90 day cooling off period and it was hoped by all parties that during that period some sort of accommodation or solution might be found.

139      Such a solution was not to be the case. Gainers continued to lose money and the operating line of credit with Lloyds Bank was frequently out of margin. Lloyds Bank considered the Letter Agreement to be breached and provided the Plaintiff with further demands near the end of September, 1989. At that time, the intention of Lloyds Bank to place the Gainers into receivership was obvious and the fact of receivership was imminent.

140      In late September and early October, 1989 the Defendant agreed to provide further guarantees of $3,000,000.00, then a total of $5,000,000.00, respecting Lloyds Bank's operating line of credit, on the condition that Lloyds Bank did not take steps to place Gainers into receivership. In addition, the Defendant obtained the right to acquire all of Lloyds Bank's loan accounts with Gainers. Lloyds Bank agreed to a five percent reduction in the total indebtedness should the Defendant exercise such option, as Lloyds Bank anticipated costs in realization which would be avoided by a pay out from the Defendant.

141      I now turn to events which occurred after the Defendant decided to acquire the shares of Gainers Inc. and Gainers Property Inc. pursuant to the provisions of 6.04(b) of the various Negative Pledge Agreements.

142      Immediately upon acquiring the shares on October 6, 1989 the Premier of the Province, Donald Getty, and the Provincial Treasurer, Dick Johnston, held a news briefing. At that briefing a press release was provided to those in attendance. It advised the move by the Defendant to acquire the shares in Gainers. The release speaks of meat packing being a major component of the Defendant's efforts in upgrading agricultural products. It further speaks of Gainers as being the only Alberta based company with a processed meat brand name and a national marketing distribution system. It makes reference to protecting 1,200 jobs in the City of Edmonton and indicates that the action was taken to ensure that

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

agricultural producers and suppliers in Alberta would be protected. It further states that Gainers was considered to be an integral part of the Defendant's strategy to rebuild the economic strength of the Province of Alberta.

143     Mr. Johnston is quoted as stating:

> We have a responsibility to pursue Mr. Pocklington's outstanding financial obligations to the Government and the Company through every legal means available. We will file an action in the court today in response to his defaults in those obligations. Any money realized by those in other possible legal actions will offset financial commitments made by the Government.

144     A Board of Directors was immediately appointed, with a senior accountant from a national accounting firm being appointed to the Presidency of Gainers.

145     On October 10th, 1989 the Defendant provided the Plaintiff with a notice to the effect that it was proceeding under 6.04(b) of the Negative Pledge Agreements, and not under 6.04(a) or any of the other potential remedies available to the Defendant. On October 17th, 1989 Mr. Pocklington wrote to A.J. McPherson, Deputy Provincial Treasurer, and asked him that in the exercise of its "reasonable discretion" Alberta take into account the underlying value of the assets of Gainers Inc., including assets valued by the Hathaway Corporation in their report of September 22, 1989. The Hathaway Report was a report relating to the value of intangibles.

146     The letter also requested that the Government consider the excess value of vehicle leases, residual value in pension funds, the value of Magic Pantry Division, the value of Gainers' tax losses, and the excess value of Kretchmar Inc. over and above the book value of shares, plus inter-company accounts.

147     At about the same time as the acquisition of the shares in Gainers Inc. and Gainers Property Inc. the Defendant entered into trust agreements with the management and employees of Gainers Inc. These trust agreements provided that 10 percent of the shares of Gainers was to be held in trust for the management and employees. The effect of this was another "collateral benefit", which enabled the Defendant to keep its financial dealings with Gainers out of the purview of Legislative review by Members of the Legislature. Pursuant to the regulations in force, corporations not wholly owned by the Government were considered to be outside of the purview of Legislative review.

148     On October 10th, 1989 there appeared two media reports which summarized interviews with Dick Johnston respecting the Government's acquiring of the Gainers shares and during which Mr. Johnston made statements respecting the value of those shares. In one of those reports, Mr. Johnston is quoted as stating:

> There are more assets in the Company than our total exposure.

This report also indicated that Mr. Johnston stated that Gainers had assets of about $120,000,000.00 and Government liabilities of slightly more than $100,000,000.00, including a $65,000,000.00 loan guarantee. In the second report, Mr. Johnston is quoted as indicating that Gainers owed about $100,000,000.00 and stated that the $55,000,000.00 value reported by media on the day of takeover included only the hard physical assets. He is further quoted as stating that the Gainers' accounts receivable, current inventory, and off balance sheets assets were worth approximately another $65,000,000.00. Mr. Johnston testified that these quotations were made at a media scrum which occurred as he was moving between various locations in the Alberta Legislature. He acknowledged that what he said was consistent with the plain meaning of those statements and stated that he "mis-spoke" when he estimated a positive value to Gainers' assets over and above the debt of approximately $20,000,000.00.

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

149     It is noteworthy that only a very few days before these statements were made to the media, Mr. Johnston had been provided with a report from his Deputy Minister indicating that the lowest possible negative value to Gainers was $42,000,000.00. Accordingly, his "mis-speaking" was to the extent of a difference of at least $62,000,000.00.

150     I am satisfied that Mr. Johnston did not mis-speak. I am satisfied that he knew full well that the Defendant valued Gainers' shares at substantially less than the total exposure to which those shares were subject. When he spoke to the media, he was under no legal compulsion to tell the truth. However, when he testified in Court, he was under such legal compulsion. It would have been a simple matter for him to say that he misled the media and the public when he indicated that the assets of Gainers were more than sufficient to cover Gainers' liabilities, as that was not his belief at the time. It is suggested that Mr. Johnston took an opportunity to correct his "mis-speaking" approximately six months later, when he is quoted in another media report as having indicated that "there was a negative value and that the Government would be pursuing Mr. Pocklington for that negative value". However, that statement was not in the same context, and was by then self-serving, as the Defendant was pursuing Mr. Pocklington.

151     The best that can be said for Mr. Johnston is that when he testified that he mis-spoke to the media, he had convinced himself that he "mis-spoke" as opposed to his deliberately attempting to mislead this Court. Regardless, his credibility suffers, as either he is capable of adjusting his views to suit his purposes, or he has chosen to deliberately lie in Court.

152     Several times previously I indicated that I would, at a subsequent point, make reference to Mr. Johnston's credibility. This is that subsequent point. I conclude that Mr. Johnston's credibility is lacking, and that where his evidence is contradicted by the evidence of Mr. Pocklington, I prefer the evidence of Mr. Pocklington.

153     I also come to this conclusion because of the nature of Mr. Johnston's testimony. I found Mr. Johnston to be incapable of directly responding to questions. It frequently appeared that Mr. Johnston was restating the question to suit his purposes and then responding to the restated question, or responding to a question that was not asked at all. Questions which were perfectly straightforward, and which could have been answered directly, were answered obliquely, or not at all.

**The Valuation of Gainers by the Defendant**

154     Subsequent to the acquisition of Gainers Inc., the Defendant continued the operation of Gainers Inc., using existing management, and under the direction of a Board of Directors appointed by the Defendant. In early August of 1990, the Plaintiff filed its Statement of Claim in this action. On the 14th of August, 1990 Allister McPherson, the Deputy Provincial Treasurer, sent to the Plaintiff and Peter H. Pocklington a letter stating:

In the exercise of Alberta's reasonable discretion, the G.I. shares and the G.P.I. shares have no value which will be applied on account of the total actual indebtedness.

155     Mr. McPherson stated that he understood that the Crown was to determine whether there was a value to the shares at the time they were taken. He stated that the approach he took was to determine what the shares were worth in a fair market sense — what they would have been worth to a third party at the time.

156     He also said that he looked at the liabilities and the assets of Gainers to determine whether there was any value that belonged to the previous owner. He considered that the determination of the value of the shares was similar to the determination of the value of mortgaged property on a foreclosure of the mortgage.

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

157      Mr. McPherson admitted that he did not provide any real value to the intangibles, aside from the values that were found in the financial statements for Gainers. He also did not consider or value the tax loss carry forward. Finally, when he made his determination that the shares had no value which could be applied on account of the total actual indebtedness, he did not create any memorandum listing assets and liabilities, or outlining any of the matters that he took into consideration in that determination.

158      He had reviewed financial statements and reports emanating from Gainers both prior to the Government acquiring the shares and after the Government did acquire the shares. He was aware of the Woods Gordon Report and the Coopers & Lybrand Report. He was aware of the activities of Gainers both before and after the Defendant's acquisition of it.

159      He never determined a specific value of assets. He used the financial statement as the template. In determining the value of the shares, he did not take into account the value to the Government, including economic benefits, because the shares were part of the security package and in that context it did not seem reasonable to him that the shares would have a different value to the Government than they would to some other party.

160      Mr. McPherson indicated that he discussed the specifics of his determination of the value of the shares with Mr. Kinsman. Mr. Kinsman testified that he met with Mr. McPherson on a number of occasions and outlined to Mr. McPherson various factors which he believed Mr. McPherson took into consideration. Mr. Kinsman advised Mr. McPherson that Gainers, in his opinion, had no value as a going concern and was essentially insolvent.

161      Mr. McPherson testified that he was not aware of any discussions or memorandum within the Defendant which gave rise to what I have described as political considerations. For example, while he had communication with Mr. Mehr and Mr. Williams, he says that it was never indicated to him by those people that Mr. Pocklington, or the Plaintiff, should be treated any differently than would have been the case had the Plaintiff been a party other than one controlled by Mr. Pocklington.

162      I am satisfied that it would have been impossible for Mr. McPherson to be unaware of, and totally immune to, political influences. His own Minister, Dick Johnston, testified that both he and the entire Cabinet were extremely upset with the state of Gainers' loans and guarantee. Mr. Johnston acknowledged that in discussions with Mr. Pocklington expletives were frequently utilized. Memos emanated from people who are allegedly civil servants without political affiliation, and yet those memos made it clear that those people were concerned about the political wellbeing of the Government. Those same people had daily contact with Mr. McPherson and that daily contact was often directed towards the status of Gainers' accounts. It is impossible to believe that people would only have discussions relating to the nature of the ownership of Gainers in the absence of Mr. McPherson.

163      The Plaintiff's reading of the letter of August 14th, 1990 suggests that the Defendant simply determined it would not apply any amount on account of the indebtedness, but did not determine what the value of the shares was. The Plaintiff further takes the position that no value was ever determined. It comes to this conclusion on the following basis:

(a) No documents exist relating to any valuation of shares;

(b) The value of the shares was never a topic considered by the Defendant's Committees in respect of Gainers. Mr. McPherson was initially not able to state when the valuation was done and said so at his Discoveries. At trial, he indicated that the valuation was arrived at by the end of June, 1990, but for some reason, which he cannot explain, he did not send the letter relating to valuation until August 14th, some 11 days after the Plaintiff had filed its suit in this matter;

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

(c) Mr. McPherson never set out a calculation that would show a value. The information said to have been relied on was done in his mind, without any writing;

(d) Mr. McPherson stated that he considered the valuation would be assets minus liabilities, but did not take into consideration intangibles that do not appear on the financial statements, nor tax losses carried forward.

164     Finally the Plaintiff raises the questions of introduction of political considerations, personal vendetta and the like into the valuation process. This is really a bad faith argument and suggests that by the time it came to the valuation of the Plaintiff's shares, the process had to be contaminated by irrelevant, largely political considerations.

165     In my analysis of the question of whether or not the Defendant conducted a reasonable valuation, it is first necessary to review the agreement under which the Defendant was operating. It is common ground that the Defendant elected to proceed under Article 6.04(b) of the various Negative Pledge Agreements. The operative portions of that section state:

Accept the G.I. shares as payment of a portion of the total actual indebtedness, in which event the Treasury Branches shall apply on account of the total actual indebtedness that amount equivalent to the value of the G.I. shares at that time as determined by Treasury Branches in the exercise of its reasonable discretion.

166     It is further common ground that in interpreting that provision, the Defendant is to be substituted for the A.T.B. Further, by the time of the valuation, the reference to G.I. shares included both Gainers Inc. shares, and the Gainers Property Inc. shares.

167     The total actual indebtedness was defined as meaning, at the relevant time, the total Term Loan outstanding ($6,000,000.00 plus interest) at that time, together with the repayable loan guarantee amount then outstanding, together with all interest accrued thereon as of the date of calculation of the same and due and owing in each case by Gainers Property Inc. It is acknowledged by the Defendant that by October 10th, 1990 the Defendant had secured the position of Lloyds Bank and had, in fact, paid out the guaranteed loan. This meant that the additional sum of $55,000,000.00, plus interest, had been paid to Lloyds Bank and constituted part of the total actual indebtedness. As the value of the shares is to be applied against the total actual indebtedness, the total actual indebtedness must be withdrawn from the equation when a share valuation is conducted. Otherwise, the total actual indebtedness enters the equation twice. Accordingly, to consider the amount of the total actual indebtedness as being a liability for the purpose of calculating the value of the shares and then to apply the shares' value to the total actual indebtedness, is an unreasonable exercise of discretion. That is the case no matter what standard of review of an exercise of reasonable discretion might be used.

168     It is further clear from the evidence of Mr. McPherson that this is exactly what he did. It was suggested by Defence Counsel in argument that the valuation can be adjudged as being reasonable on a corrected basis, namely for the Court to look at what Mr. McPherson did as being reasonable in terms of arriving at a nil value having regard to all the assets and liabilities. But for the Court to do this would be for the Court to approve a procedure that is not contemplated by the agreement. The drafting of the agreement was in the hands of the Defendant, the Defendant is a sophisticated party, has a battery of lawyers available to it within its own entity, and has the ability to hire (and has hired) outside Counsel. For the Court at this point in the process to correct or redo what the Defendant did in its exercise of discretion in these circumstances is not appropriate.

169     In the event I am incorrect in any part of this analysis, I wish to state my analysis and findings with respect to whether the exercise of discretion would have been reasonable had Defendant gone through the process contemplated by the agreement, but continued to utilize the factors that it alleges to have utilized. It is clear that the Defendant had a dis-

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

cretion, but I am satisfied that that discretion is not a totally unfettered discretion. As stated by Lord Green M.R. in *Associated Provincial Picture Houses Ltd. v. Wednesbury Corp.* (1947), [1948] 1 K.B. 223 (Eng. C.A.), at 229:

> A person entrusted with a discretion must, so to speak, direct himself properly in law. He must call his own attention to the matters which he is bound to consider. He must exclude from his consideration matters which are irrelevant to what he has to consider.

170      I am satisfied, and the case law supports this position, that there are many possible results emanating from an exercise of reasonable discretion in the valuation of Gainers Inc.'s and Gainers Property Inc.'s shares. A Court should not interfere where the Court has a different opinion from that of the person exercising the discretion. As stated by Lord Denning in *Secretary of State for Education & Science v. Tameside Metropolitan Borough Council* (1976), [1977] A.C. 1014 (U.K. H.L.), at pp. 1025 to 1026:

> No one can properly be labelled as being unreasonable unless he is not only wrong, but unreasonably wrong, so wrong that no reasonable person could sensibly take that view.

171      Some cases speak of manifest unreasonableness, which I take to mean as being obvious unreasonableness (see *Hemani v. British Pacific Properties Ltd.* (1992), 24 R.P.R. (2d) 248 (B.C. S.C.)). But, in my view, the word "manifest" is almost a redundancy as most unreasonableness will be obvious.

172      I am satisfied that a reasonable exercise of discretion in valuing shares encompasses a process component. To show what I mean by requiring a reasonable process component, I give the following example. If Mr. McPherson had placed a series of numbers on a dart board and thrown a dart at that board, striking one of those numbers, and if he had determined the value to be that particular number, then even if the value determined was within the realm of reason, I would not consider that method to be a reasonable exercise of the Defendant's discretion in valuing the Gainers shares.

173      I have already detailed the matters which were available to Mr. McPherson to consider. Mr. McPherson, in his evidence, testified that he considered some of those matters and Mr. Kinsman, in his evidence, indicated that he and Mr. McPherson discussed and reviewed the balance of the items. Unfortunately, there is no written document outlining the factors taken into consideration by Mr. McPherson in his exercise of the Defendant's discretion. Mr. McPherson says that he did the valuation "in his mind" and used the financial statement for Gainers as a template in determining the value of the Gainers Inc. and Gainers Property Inc. shares.

174      By any standard, the Gainers assets were extensive. They comprised the general assets that I referred to earlier in this decision and each of those general assets included many other components. When I look at the process of evaluation and consider the fact that the standard for appeal of finding of facts in civil litigation is not dissimilar from the standard in the exercise of a discretion, such as the one to be exercised by the Defendant, I wonder what the Defendant would consider would be an appropriate argument at appeal if in the course of this decision I simply stated that I had considered all relevant factors, and without any breakdown of those factors, gave a value to the shares.

175      I suspect that the Defendant, if it were unhappy with that value, would argue that the process I utilized was flawed and unreasonable. An argument by the Plaintiff that I had a great deal of material before me may not meet with success.

176      That is not to say that in every exercise of reasonable discretion in the valuation of shares there needs to be a written calculation of that value, but surely when the value of the assets behind the shares is in the Defendant's own estimation in excess of $70,000,000.00 and those assets are practically enumerable, then some form of calculation or writ-

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

ten process is necessary.

177    I turn to consideration of another matter which leads me to the conclusion that the Defendant has not properly exercised its discretion. It is the Defendant's position before this Court that the shares have a negative value of $42,000,000.00. The letter of August 14, 1990 does not say that. It simply states that no amount will be applied to the shares. It is obvious that Mr. McPherson did not determine the value to be a negative $42,000,000.00 or any other particular amount. In my view, the Plaintiff was entitled to know what the Defendant's true evaluation was, and entitled to have the Defendant utilize a process that would arrive at an appropriate value.

178    I find it noteworthy that during the month of July, 1990 the Defendant cancelled appraisals, which it had previously commissioned, respecting Gainers assets. No explanation was given for that cancellation.

179    The Defendant has taken the next step in this matter and has asked this Court to calculate the value in the event that this Court determines a reasonable valuation process or result was not achieved by the Defendant. In doing so, the Defendant has presented to this Court a series of appraisals. In fact, these appraisals constitute the largest part of the Defendant's case relative to valuation. The Defendant has also proffered an expert in share values who has tied the values as established by the appraisals together, so as to enable this Court to come to a proper determination of share value.

180    I take it that the Defendant feels that it is necessary for this Court to have these appraisals in order to arrive at a reasonable valuation. The Defendant has also supplied this Court with practically every piece of information that was available to Mr. McPherson and yet the Defendant still felt the appraisals to be necessary for this Court's determination. If the Defendant was of the view that the matters before Mr. McPherson were sufficient to establish a reasonable valuation, then why has it taken the next step in its presentation of its case to this Court. I conclude that the reason is not based on an abundance of caution, but based on the Defendant's assessment that the appraisals and the evidence from the expert valuator are necessary.

181    Further, the Defendant has asked this Court to establish the negative value and acknowledges that Mr. McPherson did not do so. If the steps taken by Mr. McPherson were a reasonable exercise of the Defendant's discretion, then that should end the matter. What the Defendant is asking this Court to conclude is that Mr. McPherson partially exercised the Defendant's reasonable discretion and that the Court should accept that, but should complete the balance of that exercise. In my view, in order to be reasonable, an exercise of discretion such as contemplated by paragraph 6.04(b) of the Negative Pledge Agreements must be sufficiently complete to enable both parties to know exactly where they stand. By the Defendant's own acknowledgement, this exercise of discretion by Mr. McPherson does not meet that standard.

182    I turn to the matters allegedly considered by Mr. McPherson and those matters which he did not consider. Much of the Defendant's case was an attempt to outline to the Court the materials and information that were available to Mr. McPherson when he exercised the discretion as to the value of the shares on behalf of the Defendant. In his evidence, Mr. McPherson outlined that he had considered some of those materials and that he consulted with Mr. Kinsman. Mr. Kinsman, in his evidence, indicated that the consultation was extensive and that all of the evidence proffered by the Crown, excepting the evidence from appraisers, was discussed between himself and Mr. McPherson.

183    Mr. McPherson has indicated he allegedly considered all of the evidence which was proffered in Court relating to Gainers' financial affairs. I assume that he at least gave some consideration to those matters, as several of them were ongoing; for example, things like monthly reports emanating from Gainers, several of which involved presentations where Mr. McPherson was in attendance. Mr. McPherson did not, however, give any consideration to the possible value relating to the tax loss carry forward. The Plaintiff's expert has valued that tax loss carry forward at approximately $4,000,000.00. The Defendant's expert has approached the tax loss carry forward on a different basis, but has also valued

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

it at several million dollars.

184      With respect to the intangibles not found on the balance sheet, again Mr. McPherson acknowledged that he did not give consideration to those matters. The Plaintiff's expert valued those intangibles at $25.6 million. The Defendant's expert valued those intangibles at a substantially lesser amount, but one of the Defendant's experts acknowledged a cost of $7.5 million being the re-creation cost of management in place, and further acknowledged that there was some value to the Swift brand name.

185      Several of the appraisers who testified indicated that there is always going to be a difference of opinion in the value of property, and that a range of approximately 10 percent in that difference is common. From that I conclude that if the assets not considered by Mr. McPherson constituted a value totalling less than 10 percent of the total value that he arrived at, then that would be within the field of practice and would be reasonable. There are two difficulties here:

1. Mr. McPherson did not arrive at any value. He simply stated that there was nothing to apply, and I am satisfied from his evidence that he himself never considered whether or not there was a negative value, or what that negative value might have been;

2. If one looks at the value which the Defendant submits is the appropriate value, the assets missed by Mr. McPherson could easily constitute more than 10 percent of that total value. To exclude assets that constitute more than 10 percent must place whatever figure his mind was able to discern outside of that reasonable scope for difference.

186      Mr. McPherson denied drawing his attention to political considerations, or considerations relating to who the owner of the Plaintiff was. In fact, he stated that he was not aware that such discussions were going on around him, or that any of the documents that I have referred to in evidence existed. I have already said that I find this impossible to believe and will not repeat that discussion here, other than to say I am satisfied that political considerations had to and did filter down to Mr. McPherson and influence his process of evaluation.

187      In conclusion, I determine that the Defendant did not exercise its reasonable discretion in valuing the shares and applying that value against the total actual indebtedness. Further, I am satisfied that once this matter was before the Court, the utilization of a Statement of Defence that denies any value without any more substance, or reference to a process of valuation, does not elevate what was unreasonable to reasonable. The Defendant having failed to exercise its reasonable discretion, or having exercised it unreasonably, it now falls to the Court to make a determination of value.

**Valuation Theory**

188      Between the summer of 1990 and the date of trial, the Defendant sold many of the assets of Gainers, including essentially all of its equipment to various purchasers. The Defendant's operations in North Battleford, Saskatchewan, Kretchmar and Magic Pantry have all been sold. The sole remaining asset of any significance is the plant located on Yellowhead Trail in the City of Edmonton. That plant was ultimately leased to Maple Leaf Foods and operated by Maple Leaf Foods until December of 1997 when Maple Leaf Foods shut down its Edmonton operations as a result of a strike. I am satisfied that it was the strike and other economic factors that caused the shutdown of the Maple Leaf Plant in Edmonton, and not the condition of the plant.

189      As part of the process for preparation for trial in this matter, each of the parties commissioned various appraisals. Meetings of various experts, representing each of the parties ensued, and the value of at least some of the assets and the liabilities of Gainers have now been agreed upon. The agreed values are as follows:

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

| | |
|---|---|
| Value of Magic Pantry Foods | $ 10,980,000.00 |
| Value of Kretchmar | $ 9,500,000.00 |
| Gainers' Fixed Assets North Battleford (All) | $ 7,200,000.00 |
| Edmonton Equipment | $ 13,500,000.00 |
| Sodor | $ 1,000,000.00 |
| Pension Assets | $ 410,000.00 |
| Bonds | $ 30,000.00 |

In addition, the parties have agreed to the "book value" of several assets belonging to Gainers. These are as follows:

### AGREED BOOK VALUES

| | |
|---|---|
| Accounts receivable | $ 13,300,000.00 |
| Inventory | $ 16,200,000.00 |
| Prepaid items | $ 190,000.00 |
| Bank indebtedness | $114,000,000.00 |

190    It was further agreed that for the purpose of this litigation the opening balance of the tax loss carry forward available to Gainers Inc. as at the valuation date was $20,000,000.00.

191    In consequence, some of the assets that go into the share values are agreed upon in terms of their value. The Bank indebtedness is agreed upon and the opening balance of the tax loss carried forward is also agreed upon. What the value of that tax loss carry forward is, is not agreed upon. Not all the agreements as to value of assets transcribe into agreement as to value of shares.

192    Each of the parties presented evidence and a theory as to how the shares should be valued. The evidence consisted of appraisals and evidence relating to the quality of the Gainers Plant and operations. Experts in the valuation of shares presented evidence on behalf of the Plaintiff and the Defendant. Those experts attempted to take the appraisal results, apply the theory of valuation that they felt was appropriate, and provide the Court with an opinion of the value of the shares of Gainers Inc. and Gainers Property Inc.

193    Having regard to the agreed values, the following outlines what remains in dispute:

1. The appropriate standards and approaches to be applied in valuing Gainers' assets;

2. The actual value of the opening balance of the tax loss carry forward is;

3. The value of Gainers' lands and plant located on Yellowhead Trail in Edmonton;

4. The value of intangibles, and in particular, intangible assets that do not appear on Gainers' balance sheets;

5. The translation from asset value to share value.

194    In my review and consideration of these questions, I will first outline the theory of each of the Plaintiff and the Defendant as to the appropriate standard and approach and the evidence given by their experts in that regard. I will then make reference to the individual appraisals conducted by various asset appraisers, and then provide further detail relating

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

to the evidence of the expert share evaluators. Next, I will review the law as it relates to valuations and appraisals, and interpretation of contracts. Finally, I will relate that analysis to the appraisal and valuation evidence previously reviewed.

195    I have already indicated that each of the Plaintiff and the Defendant presented experts who testified as to the appropriate method to value the shares of Gainers Inc. and Gainers Property Inc. The experts generally agreed on the description of various theories of value, but were unable to agree on what were the proper standards of value and approach as to valuation.

196    It is common ground that the first step is the determination of an appropriate value standard. The determination of value standard asks the question value to whom?

197    The experts agreed that the most common value standard is fair market value, which is a notional concept involving a willing buyer and a willing seller. The concept assumes equally informed, arms-length parties and involves an objective standard. Matters like compulsion on one of the parties to act are assumed away, such that the intended result is something that allows for fairness to each of the parties involved in the evaluation. The notion of fair market value assumes that the market is open and unrestricted and that there are no potential purchasers who are excluded from participation in the market. In assuming that the parties are acting at arms-length, the negotiation is contemplated to be between parties with opposing interests, each having an economic stake in the outcome.

198    It was the opinion of the Defendant's expert that the fair market value standard was the appropriate standard to be applied and the Defendant's expert used it in his evaluation of the shares.

199    Another standard of value is the value-to-owner, or value-in-use, which is defined as the price the owner would pay rather than be denied the uninterrupted ownership and use of the property. It is also defined as the adverse value of the entire loss, direct and indirect, that the owner might expect to suffer if he is deprived of the property. It is never less than fair market value and can be used to describe either owner-perceived economic advantage, non-economic advantage, or a combination of both. In an economic context, value-to-owner may be equal to or greater than fair market value.

200    The Plaintiff's expert took the view that value-to-owner, or value-in-use was the appropriate standard, and referred to that value as the value to the Defendant. It was his opinion that this was the appropriate standard of value, in view of the fact that the Defendant had a choice to proceed under 6.04(a) (sell the shares) or 6.04(b) (assume the assets of Gainers). The fact that the Defendant chose to proceed under 6.04(b) indicated that the Defendant had a particular attachment to, or use for the Gainers' assets. The Plaintiff's expert was of the opinion that the Defendant was proceeding in order to obtain and preserve economic development benefits and political benefits. The Plaintiff's expert was not able to quantify what those benefits were, but was of the opinion that the benefits had to exceed the fair market value of the assets, otherwise the Defendant would have proceeded to liquidation, or disposal of the assets in the marketplace.

201    After the determination of a standard of value, the evaluator must proceed to determine the appropriate approach. The approach is also referred to as the appropriate valuation method or technique. Each of the experts agreed that there are three basic approaches for valuing a business, business ownership interest, or security:

(a) The asset base (cost) approach;

(b) The income approach; and

(c) The market approach.

202    The asset base, or cost base approach is a way of measuring the future benefits of ownership by quantifying the

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10
W.W.R. 244

amount of money that would be required to replace the future service capability of the subject property. This approach contemplates that the cost to purchase or develop new property is commensurate with the economic value of the service that the property can provide during its life. It assumes that economic benefits exist and are of sufficient amount and duration to justify the expenditures. Under this approach, current costs of obtaining an unused replica of the subject property, including intangible property, or cost of obtaining a property of equivalent utility, is determined. Depreciation is deducted from the cost to reflect elements of physical, economic, and functional obsolescence.

203     The income approach involves an estimation of the cash flow of the business and its profitability. The profitability is then converted to value by the application of a capitalization or discount rate. In determining the appropriate rate, factors such as interest rates, rate of return expected by investors on relevant investments, and the risk characteristics of the anticipated benefits are taken into consideration. In some industries and in some circumstances the value of a business is determined simply by multiplying or capitalizing the gross revenue.

204     The market approach involves comparable properties. What the evaluator does is look at the sale prices for similar assets which have sold on the open market. The evaluator then makes adjustments for the differences between the asset being evaluated and those similar assets which have been sold. The market approach is frequently used with respect to real estate appraisals, particularly where there are a great many similar properties which have sold, or which are on the market.

205     It was the Plaintiff's expert's opinion that an asset based, or cost approach was the appropriate approach to be utilized. The Defendant's expert utilized an income approach, and also looked at the market approach and an asset based approach as a check on his value as determined under the income approach.

206     Having stated in a general sense the concepts involved in evaluation which were presented to this Court, I will now look at the evidence contained in the appraisals.

**Intangible Assets**

207     The Plaintiff called two experts with respect to the appraisal of intangibles. The first expert on behalf of the Plaintiff was Russell Parr. He presented evidence relating to theories of evaluation of intangibles. Mr. Parr, however, had no intimate knowledge of the meat business and, accordingly, the Plaintiff also retained Allan H. Beswick to review and establish the value of intangibles. Mr. Beswick had a 40 year career in the meat industry at the management and consultant level, and generally his qualifications to provide his opinion were accepted by the Defendant.

208     The valuing of intangibles deals with assets that often do not show on a company's balance sheet, but are nevertheless valuable. These assets come about as a result of years of trial and error to find procedures and methods that are most effective for a particular business entity. They are crucial to the ongoing success of any business enterprise.

209     In his appraisal, Mr. Beswick considered the following:

1. The in place management of Gainers;

2. Gainers' trade marks;

3. Shelf space allocation obtained by Gainers in various retail outlets;

4. Suppliers' lists;

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

5. Packaging;

6. The development of standards;

7. The development of processes and procedures;

8. Accounting procedures;

9. The establishment of creditworthiness;

10. Codes for inter-company use;

11. Customer lists and records; and

12. Management information system development (computer and data systems).

210    The Defendant's expert, Mr. Steel, agreed that these type of assets can have value, dependent on the particular circumstances of the business enterprise being valued. It was, however, his opinion that the value of these assets in Gainers' circumstances was very little and certainly substantially less than the value attributed to these assets by Mr. Beswick.

211    Mr. Parr testified that as the Defendant wanted Gainers' assets to continue its political and economic agenda, the question to be asked was what those assets would have cost the Defendant to create if Gainers did not already exist. Mr. Beswick, in preparing his Report and giving his evidence, assumed that the new corporation being created would be formed for the purpose of earning profits. The Defendant suggests that as Mr. Parr ruled out the income approach on the basis that this business was not being required or set up for the purpose of profit, but rather for the extension of economic and political benefit, the basis for Mr. Beswick's opinion is not solidly established. In my view, this is not the case. The cost of setting up a company like Gainers would be the same, or very similar, whether the purpose was profit, or to maximize economic and political benefits within a community. A business that hopes to sell $400,000,000.00 worth of product annually requires systems in place and the other intangibles referred to in the Beswick Report.

212    Mr. Beswick also assumed that the new company would attempt to enter the market with all existing companies in the market continuing their operations, including Gainers. The Defence suggests that this assumption is inconsistent with the valuation theories of Mr. Parr and Mr. Wise, the Plaintiff's share evaluator, because if Gainers continued to operate, the Crown would have no need or desire to create another competitor. What the Defence misses with respect to this assumption is that when one is doing an appraisal, one frequently is operating in a notional world and at the end, that appraisal is brought back into the real world. It may well be, however, that this assumption would lead to a skewing of costs, as the necessity of meeting another competitor may well entail greater cost in terms of things like advertising expense. To that extent, the Defence's point is well made.

213    In order to determine the value of the intangibles, Mr. Beswick attempted to determine what it would cost to set up the systems that constitute those intangibles. His conclusions were as follows:

| 1. | A two year marketing expenditure | $11.4 million |
| 2. | Sales Expenditures (for staff) | $ 6.7 million |
| 3. | Marketing | $ 600,000.00 |
| 4. | Research development | $ 400,000.00 |
| 5. | Quality assurance | $ 400,000.00 |

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

| 6. | Fresh meats | $ 800,000.00 |
| 7. | Human resources | $ 300,000.00 |
| 8. | Operations | $2,300,000.00 |
| 9. | Administration | $1,400,000.00 |
| 10. | Contingency | $1,200,000.00 |
| | *TOTAL* | *$25.5 million* |

214    In his Report, Mr. Beswick stated that he did not reduce the $25.5 million by any amount to account for the fact that most of it would be deductible and would result in income tax savings. It was his view that in the first two years of operation, a new corporation would not turn a profit and hence there would be nothing to deduct against. This ignores the fact that tax losses can be carried forward. However, the failure to consider any deduction for tax loss carry forward is not inconsistent with the general theory of the Plaintiff. That theory is that this operation was not being created for the purpose of profit, but for the purpose of fulfilment of economic and political objectives. In such circumstances, there likely would never be income against which the tax loss could be set off.

215    The Defence experts with respect to valuation of intangibles were David Haigh and Andrew Caldwell, who carry on business together as expert evaluators of intangibles. Mr. Haigh's and Mr. Caldwell's joint evidence was presented by way of a report. It was met by a rebuttal report from Mr. Parr and Mr. Haigh and Mr. Caldwell presented a sur-rerebuttal report.

216    It was the opinion of Mr. Haigh and Mr. Caldwell that the cost approach was not relevant to the valuation of Gainers' intangible asset portfolio as at the 6th of October, 1989. It was their view that what the intangibles might have cost to create is virtually impossible to accurately calculate, and irrelevant to the contemporary value. It was their conclusion that the income approach was the appropriate approach to use when assessing the value of Gainers' intangible assets. In their view, commercial investors are generally willing to pay for assets which produce a return. This depends on post-tax earnings.

217    They acknowledged that the Gainers portfolio of intangible assets ensured greater trade distribution, volume of sales and prices than might have been the case without them. They helped ensure that Gainers' losses were no greater than they were, and that a return was made on the tangible assets. However, over and above this, the value was not necessarily high.

218    As the valuation of a business on an income basis is prospective, one should base it upon what one expects the business to earn. Accordingly, Mr. Haigh and Mr. Caldwell utilized the income projections from a financing plan, which had been submitted by Gainers' management to the Defendant and which included what Mr. Haigh and Mr. Caldwell considered to be optimistic projections relating to future Gainers' earnings. On the basis of those projections, they calculated a not more than value of $3.78 million for the intangible assets of Gainers. When asked to assume the following factors, namely:

1. Swifts' and Gainers' brands were relatively weak and the business of Gainers was predominantly in the area of bulk commodity meats;

2. Gainers' intangibles would not be of primary importance to a potential purchaser in October, 1989; and

3. Gainers never paid for shelf space prior to October of 1989;

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10
W.W.R. 244

they concluded that their original intangible asset valuation at $3.78 million may have been overstated. On the basis of
these factors, the intangible value of assets may have had some value to Gainers' business as a going concern, which
might have been in the order of $2,000,000.00 to $3,000,000.00.

219    The assumptions made by Mr. Haigh and Mr. Caldwell were supported by the evidence of several witnesses who
testified about the methods used in the meat industry for the establishment of market share and the effects these methods
had on the value of Gainers' intangible assets. Mr. William Baker testified that he was employed by Intercontinental
Packers in Saskatoon, Saskatchewan for some 32 years. After the takeover of Gainers by the Defendant, Intercontinental
Packers offered to purchase Gainers, but did not attach any significant value to the trademarks or goodwill of Gainers in
making that offer. The trademarks were not considered valuable because of the labour strike which had occurred prior to
the Government takeover and the subsequent boycott of Gainers' products in the marketplace. In his view, Gainers brands
were looked at in the marketplace as a commodity-type brand of product, which was significantly price sensitive.

220    Mr. Thomas Hodgins testified that he was the Meat Merchandising Manager for Canada Safeway from 1978
through 1992, and that from 1990 through 1992 he was in charge of all of Safeway's Alberta stores, constituting approx-
imately 80 retail locations. In his view, price was the most important factor in creating product demand when it came to
branded meat products. Gainers and Swifts brands did very well in Safeway Stores before the strike and before a change
in the Presidency of Gainers. After the change in Presidency, the formula seemed to have changed, resulting in more
moisture in bacon and hams and a lack of quality in the luncheon meats. This and the strike caused sales to drop.

221    Brian Parteno was a Vice President of Gainers, both prior to and after the takeover of Gainers by the Defendant.
He testified that Gainers did not pay for shelf space in 1989, and that the Gainers brand names were in the process of be-
ing replaced by Swift brand names because of the boycott following the strike. Gainers got its product onto the shelves
by promoting through retailers (co-op advertising), and pricing advertised products in such a way that they would move
quickly through the supermarket.

222    The Defendant also called Roy Steel as an expert in the area of Accounting and Management Consulting, partic-
ularly in respect to the management, sales, marketing and market entry strategies, operation, costs and prices, and corpor-
ate restructuring in the Canadian food processing industry. Mr. Steel testified that, in his opinion, trademarks were not
necessary to a meat packing operation similar to Gainers, even if the owner wished to make a profit. That is because an
operation similar to Gainers can be profitable without selling any processed or branded product. He further testified that,
in his opinion, if the owner of a meat packing operation similar to Gainers does not care about making a profit, but is
concerned about economic development value, there would even be less motivation to spend money to create brands. He
testified that he would never advise the Defendant, or anyone else, to pay $25 million for the intangible assets of Gainers.
He did, however, acknowledge that $7.5 million, being the cost of putting management into place, was a realistic cost.
He also acknowledged that there was some value to the Swift brand name, but concluded that it would be no more than
what Gainers had paid for it.

223    He also stated that individual assets can have an apparent value, but if the company does not generate any
profits, they are then valueless. When a company is liquidated, very little can be recovered from its intangible assets.

**Land Appraisal**

224    Each of the Plaintiff and the Defendant presented evidence through an expert land appraiser. The Plaintiff's ex-
pert land appraiser was Edward Shaske, while the Defendant utilized Larry Dybvig. The lands in relation to which value
is disputed are those lands where Gainers' main plant is located, immediately North of Yellowhead Trail and east of 66th
Street in the City of Edmonton. More specifically, the municipal address is 12425 - 66th Street, Edmonton, Alberta. The

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

Yellowhead Trail, which is on the south boundary of the subject property, is a major east/west arterial road, linking Highway number 16 East with Highway number 16X West. 66th Street is a major roadway running from the south, between 118th Avenue to the Fort Trail, a short distance to the north.

225    Development within the area surrounding Gainers' property includes residential areas south of 122nd Avenue, and north of the Fort Trail. The Fort Trail, which runs diagonally from southwest to northeast has commercial and industrial development along its frontage. The subject property is located within a small pocket of industrial utilized land that has the Yellowhead Trail as the southern boundary and railway tracks as the northern boundary. This industrial development runs along the Yellowhead Trail and extends from the railway tracks to the east, to approximately 50th Street.

226    Access to the subject lands is easily obtained from Yellowhead Trail, as well as 66th Street, which branches off from the Fort Trail. 66th Street leads to the South to 118th Avenue, which is a major roadway that leads into residential areas. Easy access to the Capilano Freeway is also obtainable. This freeway runs south and ultimately connects with the Whitemud Freeway, which bisects the city from east to west. It may be concluded that the subject lands have good access to major roadways, as well as access to major residential areas which supply the labour forces required.

227    The lands themselves are made up of four individual lots. Lot 1, which is located with a frontage on 62nd Street to the east, is almost rectangular in shape, with the exception of a small cut on the northeast corner. It contains a total of 15.37 acres. Lot 2 is located on the northwest corner of 62nd Street and Yellowhead Trail. This is a rectangular lot with an area of 4.3 acres. Lot 3 is irregular in shape and is located with extensive frontage along Yellowhead Trail and 66th Street. It also has rear frontage on 62nd Street. It comprises 27.13 acres. Lot 4, which contains 0.43 acres is a very long and narrow strip situated to the extreme Northeast of Lot 1, with frontage along 126th Avenue. Its apparent purpose is historical, as at one time livestock was delivered by way of train, and Lot 4 provided a corridor to herd the livestock from the point of unloading of the train to the Gainers property. Generally, there is good access to all of the lands, with the access to Lot 2 being exceptional.

228    At the time of the acquisition of Gainers' shares, Lot 2 was utilized for the purposes of parking. All of the improvements relating to the Gainers plant were located on Lot 3. Lot 1 was essentially vacant, as was Lot 4. In their proposed operating plan, Gainers' management had submitted a plan whereby a new plant would be located on Lot 1. This would, presumably, allow the old plant to continue operating in its present location on Lot 3 until the new plant was ready. The old plant would then be substantially demolished.

229    It was common ground between the two appraisers and the share evaluators, that Lot 4 was considered to be excess to the needs of Gainers. Mr. Shaske also considered Lot 2 to be excess, although it was utilized for Gainers' parking. The Defendants took the view that Lot 2 was required for parking, as Gainers' employees had to park somewhere. I am satisfied that Lot 2 may have been excess within a reasonable period of time, as the reconstruction of a new Gainers plant on Lot 1 would have freed up the entirety of Lot 3, which would have allowed for parking for Gainers' personnel.

230    It was the Plaintiff's expert's opinion that the highest and best use of the lands would be the continuation of the existing utilization as a meat packing plant, as an interim use, until economic conditions ripened to warrant redevelopment of the site to a use that would conform with the surrounding land uses, which were in transition from heavier industrial to light industrial and commercial utilization. The Plaintiff's expert described this property as a special use property, that is that the lands and the plant were devoted to a particular single use, and the plant in particular was not adaptable to uses other than that.

231    The Plaintiff's expert used a direct comparison method in valuing the land. That is, he examined sales that he considered to be comparables, made adjustments to the sale price per acre relating to those sales to reflect differences

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

between the comparables and the lands being appraised, and then applied the price per acre to the appraised lands. He appraised the lands as if they were vacant, and not on the basis that they were being used for the special use meat packing plant. With respect to Lots 1 and 4, he felt that those properties could be appraised together, as they were back properties, and Lot 4 is joined to Lot 1. He found six indicators, and went through the exercise of adjusting those indicators for factors such as location, size, time of sale and corner location. He concluded a value of $63,000.00 per acre. This placed the value of Lot 1, after costs to prepay improvements had been deducted, at $949,000.00. Lot 4 was valued at $14,000.00.

232    With respect to Lot 2, he also found six indicators. He considered Lot 2 to be the most valuable property, and after going through the same adjustments mentioned that relate to Lots 1 and 4, he concluded a value of $164,630.00 per acre. This parcel was valued, after costs to prepay were deducted, at $655,000.00.

233    Finally, with respect to Lot 3, the same sales utilized in arriving at a value for Lot 2 were considered. The size adjustment, and a corner influence adjustment were made relating to those two lots.

234    In order to determine a size adjustment factor, he located two separate sets of sales involving larger lots (between 4.04 and 7.24 acres) and smaller lots (between 1.08 acres and 2.11 acres) and determined that a price differential relating to size of 38 percent was appropriate. He also used a second subset to test size differential, involving only one large lot of 7.91 acres, and a group of six lots varying between 1.02 and 1.87 acres. He determined that a decrease in price per acre for the large lot involving that amount of land in the range of 28.39 percent resulted. He acknowledged that as the sampling was small, it would be difficult to determine the accuracies of percentages, but they did indicate a fairly large differential for small parcels versus large parcels. It was his opinion that considering that Lot 3 could be subdivided, if it was not being utilized for a packing plant, a maximum adjustment of 25 percent for size differential was appropriate. The resulting adjusted value per acre for Lot 3 was $115,500.00. When prepayment costs were deducted, his appraisal resulted in the sum of $3,100,000.00 as the value for Lot 3.

235    The Defendant's expert was Larry Dybvig, who is an employee of American Appraisals Canada Inc. and resides in Vancouver, British Columbia. Mr. Dybvig utilized a concept of value being the market value - continued use. He defined it as the estimated monetary amount at which the subject property might be expected to exchange between a willing buyer and a willing seller, neither being under duress, each having reasonable knowledge of all relevant facts and with equity to both. He assumed the retention of the facilities at their present location for the continuation of their current use as part of the going concern, being the meat packing plant. An estimate of market value arrived at on the premise of continued use does not represent the amount that might be realized from piecemeal disposition of the assets in the marketplace, or from alternative use of the assets. It was his opinion that the premise of continued use is generally appropriate when:

1. The assets are fulfilling an economic demand for the service they provide;

2. The assets have a significant remaining useful life expectancy;

3. There are responsible ownership and competent management;

4. Diversion of the assets to an alternate use would not be economically feasible or legally permitted;

5. Continuation of the existing use by present or similar users is practical; and

6. Due consideration is given to the assets' functional utility.

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

236    Mr. Dybvig based part of his analysis on what appears to be a subdivision method. That method involves look-ing at a subdivision and the cost per acre in that subdivision and relating it to a similar subdivision emanating from the subject property. He concluded that one subdivision within the general area was similar. One actual sale in the general area consisting of approximately 5 1/2 acres was also similar. He then looked at the cost per acre of several other proper-ties, some of which were located in different areas of the City and concluded that those properties were superior. The properties that he felt were similar had a price range of approximately $75,000.00 per acre. Mr. Dybvig applied that $75,000.00 per acre to the large block of property, consisting of Lots 1 through 3, and came to a value of $3,487,500.00. He substantially reduced the cost per acre for Lot 4, because of its 35 foot depth and extreme width. He concluded that there was little demand for this type of land in the area, and therefore applied a $25,000.00 per acre factor, for a total value of $10,500.00. He rounded the total of $3,498,000.00 to $3,500,000.00.

237    It is noteworthy that most of the sales that Mr. Dybvig considered to be superior occurred after the date of ap-praisal and involved lands in locations other than within the vicinity of the subject lands.

238    His comparable number 5 was in the vicinity of the subject lands. The sale price per acre was $110,077.00. It was reduced to the $75,000.00 range as it consisted of 2.58 acres, and of course, the subject lands are substantially larger than that. This is a reduction in excess of 30 percent for size differential.

239    I find it noteworthy that the Defendant was critical of the size differential analysis conducted by the Plaintiff's appraiser. However, the Defendant's appraiser made similar size differential deductions without any analysis at all. That is, he relied only on his experience, without attempting to show the Court how that experience might operate in conduct-ing a size differential reduction.

240    I recognize that the experience and the knowledge of the appraiser is a factor to be considered, and that ap-praisers have to utilize their experience and knowledge. However, a Court will always find it of assistance if there is some attempt to show how that experience and knowledge was applied, even if there exists some imperfections within that attempt.

241    I also had some difficulty with the Defence expert's adjustment for superior property. The values attained from those considered to be superior were reduced based on statements like "recognizing the premium associated with smaller industrial sites and industrial properties having substantial exposure to vehicular traffic, the value per acre indicated by this transaction was concluded to be superior to that of the subject property". As an example, one of those properties was found between Fort Road and 54th Street, west of 136th Avenue. The exposure on these streets would not be any greater than the exposure found on the subject property, which borders the Yellowhead Trail, one of the major routes through the City of Edmonton. The second property, being comparable number 3, has proximity to the same Yellowhead Trail (but not actually on it) and that was considered to be something that would result in a premium. I cannot see how proximity to a street would provide a premium over and above actually being on that street. If it is considered that some of the subject lands are not actually on Yellowhead Trail, surely they enjoy the same sort of proximity as does comparable number 3.

242    The Defendant's experts also made reference to a number of sales that occurred after 1989 and were not in the initial Defendant's report. The Defendant considered the sale of the Canada Packers' property to be particularly instruct-ive. This property, which is located on Fort Road, totalled 26.42 acres and sold at a price of $39,364.00 per acre. However, on cross-examination, the Defendant's expert acknowledged that the sale price included a requirement of de-molishing the Old Canada Packers' facility. That, apparently, cost something in the vicinity of $1,000,000.00 and would have had the effect of doubling the price per acre. I conclude that further analysis of each of the Plaintiff's and Defend-ant's experts' analysis is required and I will state my views respecting their evidence later in this decision.

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10
W.W.R. 244

## Valuation of Improvements

243    The Plaintiff's expert with respect to the valuation of the improvements, on the subject lands was again Edward
Shaske. The Defendant called as its expert Joseph Martins, who was also with American Appraisals Canada Inc. in Van-
couver. The Defendant also called several witnesses who testified as to the condition of the improvements. Generally, it
is acknowledged that many of the improvements were old and that the plant itself was inefficient. It is, however, also ac-
knowledged that the improvements do have some value, and some of the improvements are relatively modern, up-to-date
and fully functional. For example, a distribution centre was built in the early 1980s, and even the Defendant's appraisers
acknowledged that it fulfilled the function it was built for and was in good operating condition. Other buildings were
constructed in the 1960s, and still other buildings were constructed more than 80 years prior to early October of 1989.

244    The inefficiency of a multi-storey plant was described by several witnesses during the course of their testimony.
Essentially, the way the Gainers' kill plant operated was to have livestock herded up a ramp to the top floor of a six-
storey structure. The actual killing was done on this floor, and then the carcasses were dropped down to lower floors,
where cutting, wrapping and processing were accomplished. Sometimes the process would require the raw materials to
move up a floor or two, and this would be accomplished through the use of elevators. The inefficiency existed because
the elevators acted as a bottleneck to the process. A further inefficiency existed in that livestock was stressed by the six-
storey climb required to get to the top floor of the kill building. Stressed livestock does not produce the quality of carcass
that unstressed livestock produces. Consequently, there was not only an inefficiency in terms of operations, but an ineffi-
ciency that led to a reduction in quality.

245    I am satisfied that on the evidence much of the Gainers plant was old and relatively inefficient. It, however, was
still functional and still capable of doing the job it was designed for. I am also satisfied that the maintenance of the Gain-
ers plant kept it reasonably functional. There was significant evidence as to the amounts spent on maintenance, and I am
satisfied that a reasonable amount was spent on maintenance by the Plaintiff prior to the take over of Gainers by the De-
fendant. No doubt more could have been spent, but that probably is the case with practically any plant of this nature. The
plant always met the standards required of it by the Federal Meat Inspectors, the only exception being for a brief period
of time with respect to one area after the Defendant acquired the plant.

246    The Plaintiff's expert testified that he had discussions with management personnel for Gainers prior to preparing
his report. That discussion led him to understand that management was projecting a new kill plant within five to ten
years. In fact, the plant has not been rebuilt. This means it was utilized as a meat packing plant, in substantially the same
form as existed in 1989, for more than 8 years after the acquisition of the shares by the Government.

247    When asked as to why the expert chose five years, as opposed to any other time frame, it was his indication that
an appraisal is done prospectively, not with hindsight. He, for whatever reason, chose to do it on the prospective basis of
five years, even though management had indicated that the plant would be replaced within five to ten years.

248    With respect to the improvements themselves, there are approximately 35 to 45 buildings on the property, and
because some of them are joined with others, there are approximately 20 to 25 distinct structures. The type of building
varies from wood frame, to brick, to concrete structures. The buildings range in terms of their purpose, their functional-
ity, their age and the method of construction.

249    In appraising the improvements, the Plaintiff's expert, Mr. Shaske, felt it was appropriate to use a depreciated
cost approach. This was because the improvements are a unique special purpose property and are not often bought and
sold in the marketplace. He crafted his appraisal on the basis of replacement cost, which is the cost of construction of a
building having a utility equivalent to the building being appraised, but built with modern materials, standards, designs

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

and layout. He looked at each building individually and considered each building in terms of its condition. He then developed a replacement cost model, based on a cost service manual. He indicated that replacement cost of improvements is generally calculated through the use of either a cost service manual, or local contractor estimates. The cost service manual provides unit cost information for benchmark structures at a given date, and supply indices to account for variations from the benchmark structures in terms of construction details, geographic location and the passage of time.

250    Local contractor experience is generally preferred where similar buildings have been recently completed or are under construction. Here some of the buildings were from another era, and were constructed at various times, with renovations, additions and modifications. They did not lend themselves to contractor comparisons, and accordingly a cost service manual was used.

251    He chose a manual entitled the *Marshall Swift Evaluation Manual*, which was developed in the United States and contains adjustments to account for localized conditions, including in Edmonton. He indicated that the *Boueckh Manual*, which was a manual used by the Defendant's expert was not appropriate to the appraisal of this property, because that Manual applies an across-the-board value for a hog slaughtering operation. Here, because of the many different types of buildings, with different ages and types of construction, it was impossible to take an across-the-board figure and apply it uniformly.

252    It was Mr. Shaske's opinion that none of the buildings had a remaining economic life of less than 15 years from the date of appraisal. With respect to some of the newer buildings, he used the actual age and applied depreciation to that. With other buildings, he looked at the projected life of the building, and then considered what was left in it and applied the number of years left to the number of years the building is expected to last, to determine a depreciation factor.

253    In calculating depreciation, he used the depreciation tables found in the *Marshall Swift Manual*. These tables are not a straight line depreciation, where the building depreciates down to zero over a certain period, with the same amount being deducted each year, nor are they a declining balance form of depreciation, where a percentage is taken off the initial value, and then the same percentage is taken off of each year from the balance remaining.

254    What the tables do represent is a tracking of literally tens of thousands of sales of different types of property across North American. From that tracking, the people who prepared the *Marshall Swift Manual*, calculated what actually happens when a building is bought and sold in terms of the deduction in value for the fact that the useful life of the building was diminishing. The result is that as buildings get older they decline, but not on any exact curve, or on a straight line. One might describe the form of depreciation utilized by the *Marshall Swift Manual* as a "real world" depreciation. That is, depreciation which represents what actually happens in the marketplace.

255    Mr. Shaske then used his experience in categorizing various buildings in terms of their form of construction and quality, and applied the useful life as contained in the *Marshall Swift Manual*. It was his conclusion that in 1989 the depreciated cost of the structures was $21,342,110.00. Subsequent agreement between Counsel resulted in a decrease of this depreciated replacement cost to $20,227,000.00. Mr. Shaske then added this amount to the $4,718,000.00 that he had appraised as being the value of the land, and the result was $26,060,110.00. He rounded that figure to $26,000,000.00. I assume that with the reduction agreed by Counsel, Mr. Shaske would have rounded the total amount for the land and the buildings to $25,000,000.00.

256    In arriving at his conclusions, Mr. Shaske, entered into a notional reconstruction of the exact same building, and applied depreciation to it, which he indicated would result in removal of functional and economic obsolescence. It is difficult to appreciate how this would occur, because that exercise results in the exact same enterprise as already exists with all of its functional and economic obsolescence. Mr. Shaske acknowledged that he estimated replacement of an exactly

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

same size building, and was not aware of whether or not that exact size would be required. He further acknowledged that management would have a better understanding of that than he would.

257      With respect to replacement with a similar six-storey building, it was Mr. Shaske's evidence that if a modern single-storey building was built, that that building would cost more per square foot, as ground floor space is more expensive than second, third, fourth, fifth and sixth floor space.

258      Mr. Shaske further acknowledged that life expectancy of the building was based on his experience. He did not obtain a measure of life expectancy from any of the management, staff or any other consultants in the meat industry. He agreed that the rendering plant and feed mill were included in his appraisal, even though they appeared to be inactive. With respect to the entire property, Mr. Shaske indicated that his total depreciation rate came to 39 percent.

259      The Defence expert was Mr. Joseph Martins. He testified that:

1. A return on investment from the assets was assumed, and if the earnings were inadequate a reduction in value would be required;

2. He had inspected the premises on three occasions in 1987, 1990 and 1996;

3. In addition to his own observations, he also collected data and information from drawings, reports, plant staff and consultants;

4. He described the conditions of the building as poor to fair, requiring repair, showing its age, with portions not in use;

5. Based on reports from Mr. Horton, an Engineer retained by plant management, discussions with plant management and review of the drawings for an intended replacement plant, it was his opinion that as of October, 1989, the plant had a five year remaining economic life;

6. He was of the view that the replacement cost new of the improvements was $41,200,000.00;

7. He based his estimates on the models contained in the *Boueckh Manual*, which he considered to be superior to the *Marshall Swift Manual* because it included more types of building construction and special use buildings;

8. He then made deductions for all forms of depreciation;

9. Physical and functional incurable depreciation was then determined;

10. He measured depreciation against existing improvements, not intended replacement improvements; and

11. He used a straight line method of depreciation.

260      His concluded value of all the improvements was $10,685,000.00.

261      If one adjusts his figures to account for the fact that Mr. Martins chose the lowest possible number of years given to him by management as being the useful life of the oldest of the improvements, and substitutes an eight year useful life for the oldest of the improvements, leaving the balance of the improvements at the amounts concluded by Mr. Martins, the result would have shown a value of $12,230,050.00 for the improvements. At 10 years, the result would be

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

$13,387,000.00. At 15 years, the result would be $16,090,000.00.

262    I will provide my comments as to the correct view for the value of the improvements near the conclusion of this judgment.

**Tax Loss Carry Forward**

263    As I noted in the Agreed Statements of Facts portion of this judgment, the parties agreed that, for the purpose of this decision, the total tax loss carry forward was $20,000,000.00. They did not agree as to what purpose it may be put.

264    The evidence disclosed that the disposal of Magic Pantry Foods, as contemplated in the Agreed Statements of Facts, would have depleted the opening balance by $4,902,000.00. However, at the same time, Gainers was losing money at approximately $1,000,000.00 per month, and consequently I am satisfied that a sale of Magic Pantry would have been easily offset by the continued losses of Gainers.

265    The Defendant also makes much of the fact that the Defendant was a Crown corporation and would not be taxable. The Defendant takes the position that Mr. Wise's selection of the standard "value-to-Defendant-in-use" results in an inconsistency as he has valued the tax loss.

266    I look at the matter differently than the Defendant. If Mr. Wise's standard of value is the correct one, then the tax loss carry forward could be regarded as a surplus asset. That is, if it is anticipated that the Defendant is taking over Gainers for the purposes of the economic and political advantages referred to in Mr. Wise's evidence, and expects to continue losing money, the tax loss carry forward has no value to the Defendant, whether the Defendant is a Crown corporation or not. It would, however, have value to a profitable competitor.

267    The Defendant suggests that Mr. Wise's proposal that the assets of Gainers be moved out of the corporation into a new corporation, leaving only the tax loss carry forward within Gainers itself, with a subsequent sale of Gainers to a profitable meat processing company for the purpose of amalgamation, is not possible under current tax legislation. The Defendant filed with its argument a number of provisions from the *Income Tax Act* and put forward submissions indicating that the Gainers to be sold to the profitable meat marketing company would not be an active business carrying on meat marketing, and therefore could not be amalgamated with a profitable corporation, resulting in tax write-offs to that corporation.

268    The Defendant did not offer any expert evidence with respect to the tax loss carry forward issue. The only expert evidence offered by the Plaintiff was the evidence of Mr. Wise, who in addition to being an expert business evaluator, is a Chartered Accountant. The Defendant was unable to address questions such as whether there would be an advantage to the Crown in purchasing a very small meat processing plant, placing that in Gainers, and then selling that off, together with the tax loss carry forward, to a profitable meat processing company.

269    I am satisfied that a literal reading of the tax legislation presented by the Defendant would have enabled the Defendant to pursue such an avenue. The Defendant chose not to do so, but that is not the Plaintiff's problem.

270    In consequence, I am satisfied that if Mr. Wise's theory or approach to valuation is appropriate, then the tax loss carry forward is a surplus asset, and his valuation of it at $4.1 million is a reasonable valuation. For reasons which will become apparent, the same analysis does not hold true with respect to the theory of the Defendant's expert in share values.

**Expert Business Evaluation**

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

Page 47

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

271    The Plaintiff presented as its expert in valuing a business Richard Wise. Mr. Wise's qualifications were accepted by the Defendant. In fact, he has testified many times in Canada and elsewhere as to the valuation of businesses. This includes the valuation of shares representing business assets.

272    The results of his testimony, as with any expert who has testified on a number of occasions in Court, varies. That is, he has not always been successful in convincing the Court that the position he presented to the Court was the correct one. Each of the Plaintiff and the Defendant presented copies of cases where Mr. Wise's testimony has been commented on. In reviewing those cases, I feel that I can draw little from them. The fact is that, like many experts who testify in Court on a number of occasions, Mr. Wise's evidence has been accepted from time-to-time, and the evidence of the expert giving a contrary position has been accepted from time-to-time. This does not mean, *per se*, that Mr. Wise might be termed "a hired gun", who is willing to compromise his opinions to fit the scenario desired by the particular litigant on whose behalf he is called. Legitimate differences of opinion can and do arise between experts, and sometimes a Court will be convinced to accept one expert's opinion, and sometimes the other's. This does not mean that the acceptance or rejection by another Court should be overly persuasive to subsequent Courts unless there is a pattern of contradictions, or a consistent lack of Court acceptance of a particular expert's testimony.

273    The Defence expert with respect to valuation of shares was Michael Dobner. Mr. Dobner has provided reports and evidence before Expropriation Boards and the like in the past. This, however, was the first time he testified in Court. Consequently there is no "track record" emanating from a series of testimonies in Court which would have allowed the Plaintiff to attack Mr. Dobner's evidence in a similar fashion. The Plaintiff, however, pointed out that Mr. Dobner was considerably less experienced than Mr. Wise in terms of presentation of evidence and experience in the field.

274    I am satisfied that the Plaintiff is correct as Mr. Dobner is obviously less experienced than Mr. Wise, as very few people in Canada or North America have Mr. Wise's experience. At the same time, Mr. Dobner's evidence impressed me as being straightforward, based on facts that might be drawn from the evidence as a whole, and generally logical.

275    The Defence and Plaintiff's expert differ in the selection of the appropriate value term, and in relation to the approach to valuation. These differences are fundamental to their opinions and I am satisfied that they are legitimate differences of opinion, as opposed to being based on inexperience, or arising from the type of witness who might be termed "a hired gun".

276    The Plaintiff's expert, Mr. Wise, testified that the first step in valuation of shares involves the selection of the appropriate value term. In his view, this selection is dictated by the fact that Article 6.04 of the Negative Pledge Agreements employs the term "value" with respect to Gainers' shares. The term is not defined in the Negative Pledge Agreements, the Master Agreement, or any related agreements.

277    It was Mr. Wise's evidence that there are many standards of value employed in different situations. These include terms like fair value, book value, adjusted book value, real value, fair cash value, going concern value, replacement value, liquidation value, value-in-use, value-to-owner, investment value, sentimental value, prestige value and many others. In fact, Mr. Wise testified that there are in excess of 100 standards of value.

278    It was his testimony that the standard of value addresses the question of value to whom. He was also of the view that the term "value" depended on the identity of the person making the assessment (in this case the Defendant), and on its interpretation of the benefits and risks related to the property being valued.

279    He observed the process utilized by the Defendant in October of 1989 and determined that the Defendant had three alternatives. First, it could have liquidated the assets of Gainers. Secondly, it could have sold the Gainers shares.

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

Thirdly, it could have operated Gainers as a going concern, with a view to ultimately privatizing the operation. In his view, under the first alternative liquidation value would be the appropriate valuation standard. Under the second alternative, fair market value, or market value would be the appropriate standard. Finally, under the third alternative, which was the choice made by the Defendant, his view was value-to-owner, or value-in-use would be the relevant value standard.

280    He defined value-to-owner as the price the owner would pay, rather than be denied the uninterrupted ownership and use of the property. He stated that it was also defined as the adverse value of the entire loss, direct and indirect, that the owner might expect to suffer if he were deprived of the property. It was his view that having regard to the reasons listed at paragraph #57 of this decision, the Defendant intended to continue the operations of Gainers in order to preserve economic development advantages generated by the business, so the value standard should be selected in light of the value of the Gainers shares to the Defendant.

281    It was his opinion that to maintain, or retain, the economic benefits in Alberta, the Defendant had two alternatives:

(a) To reconstruct and recreate the operations in Alberta of similar function and utility to Gainers; or

(b) Take possession of Gainers, thereby ensuring continuing operations.

It was his opinion that if the Defendant had proceeded under alternative (a), a certain cost would have resulted. Therefore, the value of Gainers' shares to the Defendant represented at least the cost it would have otherwise had to incur to recreate Gainers as it existed at the valuation date.

282    Mr. Wise was also of the view that all of the parties were sophisticated, represented by legal counsel and must have been aware of the concept of fair market value. The fact that they chose not to utilize the words "fair market value" in paragraph 6.04 of the Negative Pledge Agreements was instructive to Mr. Wise. In his view, this was an indication that the parties intended that a term other than fair market value be used by the Defendant in the exercise of its reasonable discretion in valuing the Gainers shares.

283    When Mr. Wise presented this evidence, the Defendant raised the objection that this testimony usurped the function of the Court. However, it was and remains my view, that in order to appreciate the evidence of an expert witness, one must appreciate the basis for that evidence.

284    The next step in Mr. Wise's evaluation of the Gainers shares was to consider the appropriate approach. As I discussed earlier, there are three basic approaches for valuing a business and they are the asset based (cost) approach, the income approach and the market approach. I have already discussed these approaches and I will not say more about them, other than that it was Mr. Wise's opinion that an asset based approach was the appropriate one. Again, he considered the fact that what the Defendant was receiving was a business which allowed the Defendant to pursue its economic and political objectives. If the Defendant had not received Gainers in this form, and as the Defendant wished to retain these economic benefits, the Defendant's only alternative would have been to reconstruct the operation of Gainers. To do so would have required the Defendant to essentially recreate Gainers in its entirety, and the cost of recreation in Mr. Wise's view is the value of Gainers to the Defendant.

285    The Defendant argued that there was no expert evidence proffered by the Plaintiff to show what the economic value of Gainers was to the Defendant relating to those items referred to at paragraph #57 of this decision. It was Mr. Wise's view that such evidence was unnecessary because if the cost of recreating Gainers was greater than the perceived economic benefits, the Defendant would have proceeded under 6.04(a) of the Negative Pledge Agreements.

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

286      In arriving at his adjusted shareholders' equity, Mr. Wise looked at the balance sheet of Gainers as it existed at the end of September, 1989 and made adjustments to that balance sheet, based on the agreed values referred to earlier in this decision, and the replacement cost value as established by the Plaintiff's expert. From those figures, he restated the balance sheet as follows:

| | |
|---|---|
| Current assets | $ 35,190,000.00 |
| Due from affiliates | $ 804,000.00 |
| Fixed assets | $ 48,254.00 |
| Other assets | $ 26,040,000.00 |
| Business of Magic Pantry Foods | $ 10,700,000.00 |
| Investment in Kretchmar | $ 9,500,000.00 |
| Value of tax loss | $ 4,100,000.00 |
| Total assets | $ 134,588,000.00 |
| Liabilities | ($114,000,000.00) |
| *ADJUSTED SHAREHOLDERS' EQUITY* | *$ 20,588,000.00* |

287      He then suggested a range of plus or minus five percent to account for the inaccuracy inherent in the process of appraising assets and came to an adjusted shareholders' equity range of between $21,600,000.00 and $19,600,000.00. Having regard to the Agreement by Counsel relating to Mr. Shaske's evidence, reducing his appraisal figures by $1,000,000.00, I assume that that range also reduces by $1,000,000.00, so that the range would now be between $20,600,000.00 and $18,600,000.00.

288      Mr. Wise did not feel it was appropriate to make any adjustment to the values of the shares based on tax shielding, which is essentially a comparison of capital cost allowances when assets are sold versus when shares are sold. This was because Gainers, as it existed, was already losing money and, from a tax perspective, having greater losses would not be of any benefit to Gainers. Further, the basic assumption made by Mr. Wise was that the economic and political benefits which fell to the Defendant were at least equivalent to the cost of recreation. The cost of recreation would involve the total figures he arrived at and, again, the availability of larger capital cost allowances in that cost of recreation would not be a benefit to the Defendant.

289      The Defence expert, Michael Dobner, was of the opinion that fair market value was the appropriate value standard. He defined fair market value as being the highest price available in an open and unrestricted market between informed and prudent parties acting at arms-length and under no compulsion to act, expressed in terms of cash.

290      Mr. Dobner used "constant dollars" throughout his report and evidence. He defined "constant dollars" as money based on October, 1989 value, such that the effects of inflation were taken into account.

291      It was also Mr. Dobner's evidence that he approached the valuation of Gainers' shares on a "not more than value" approach. He did this by giving the Plaintiff the most favourable treatment whenever there were variables to be considered. That is, where a range of values might have been appropriate, he chose the value that was the most beneficial to the Plaintiff. Having proceeded on this basis, it was his opinion that the normal five to ten percent range of difference one would expect in valuing shares would not exist with respect to the value conclusions he arrived at.

292      Mr. Dobner did not consider intercorporate debts involving Gainers and other companies owned or under the

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

control of Mr. Pocklington. Nor did he take into consideration the related actions, because the Consent Order granted by Costigan, J., referred to earlier in these Reasons specifically directed the exclusion of the related actions when valuing the shares for the purposes of this trial.

293     It was Mr. Dobner's conclusion that fair market value always includes consideration of a liquidation value. That is, because if the liquidation value is greater than the fair market value of the business as a going concern, then the liquidation value is the fair market value. It was his conclusion that with respect to Gainers, the liquidation value was less than the fair market value of Gainers as a going concern. This is because of the cost of liquidation and the fact that, on liquidation, many assets of Gainers would experience a diminished value.

294     It was Mr. Dobner's opinion that the income approach to valuation was the appropriate one. That is because investors in a business are interested in the cash productivity of the business. It was Mr. Dobner's view that it is a function of the benefits of the business which brings value to the owner.

295     The approach he utilized was to take projections relating to income, put forward to the Defendant in 1989 as part of the management's proposal relating to a take over of Gainers by management and employees, and applying an appropriate discount factor to those projections to give a present value to them. I am satisfied that this approach with respect to projected income was reasonable. It should be remembered that management had initially approached the Defendant "behind the Plaintiff's back" in the Spring of 1989. While it might be argued that during that time management was acting contrary to its duty to the owner, it cannot be demonstrated that its projections would have continued that contrary activity. This is because when management made its projections, it was acting with a view to acquiring Gainers and in order to do so, it had to show that Gainers would, within a reasonable time, become profitable. The greater the profitability it was able to show, the more likely it would be able to convince the Defendant to enter into some sort of arrangement with management and the employees.

296     Further, when I review the projections, I note that they contain some fairly glowing assumptions regarding a Gainers' turnaround. The expert evidence offered by the Defendant relating to the meat industry indicated that such a glowing turnaround was not anticipated and did not occur.

297     In his analysis, Mr. Dobner considered that many meat packing companies operate with borrowed money. He considered the industry standard to be one where the corporate ratio consisted of 65 percent equity and 35 percent debt. Based on that standard, he concluded that if one were to acquire Gainers, using 35 percent borrowed money, and if one could anticipate the returns contemplated by management in its projections, the price to be paid for Gainers, reflective of fair market value, was $73,348,000.00.

298     Included in that amount were what he described as being excess assets. These are assets that Gainers really did not require in order to continue its operations. They included an advance by Gainers to a company called High Grade Feeders Inc. At the time of the valuation, this company was considered to be insolvent. Mr. Dobner, in keeping with his best to the Plaintiff value approach, gave that account a 50 percent value to reflect its uncertainty. He took a similar approach respecting a further $80,000.00 advanced to other companies under the control of Mr. Pocklington. It was his opinion that a best to the Plaintiff fair market valuation of those assets was $40,000.00.

299     In accordance with the Agreed Statements of Facts, he concluded the value of the bonds to be $30,000.00 and the value of Sodor Foods to be $1,000,000.00. He also concluded the value of pension assets to be $410,000.00 and considered that there was excess land at the Edmonton Plant, which he valued at $1.5 million. Based on these figures, he estimated the fair market value of the excess assets to be not more than $3,000,000.00.

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

Page 51

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10
W.W.R. 244

300    Mr. Dobner then considered what he described as contingent assets, which consisted of two lawsuits brought by Gainers. One was against Rolston Purina and one was against Canadian Pacific Railway. Again, on a best to Plaintiff value basis, he concluded that these lawsuits were to be valued at $600,000.00.

301    Finally, he conducted a similar analysis respecting lawsuits against Gainers and concluded that the best position from the Plaintiff's point of view would be to value those as a liability of $1,300,000.00. The result of his analysis is as follows:

| | |
|---|---|
| Operating business enterprise | $71,000,000.00 |
| Excess assets | $3,000,000.00 |
| Contingent assets | $600,000.00 |
| Contingent liabilities | $1,300,000.00 |
| *TOTAL* | *$73.3 million* |

302    As I noted earlier, Mr. Dobner considered both the valuation of assets in use and the market value approach as checks for the reasonableness of the value that he found using the income approach. I will deal with his views regarding the market approach first.

303    Mr. Dobner looked at several comparable corporations that were traded publicly and concluded that those comparable corporations gave some indication as to the value of Gainers' shares. He added a premium to the share price that these shares were being traded at of 20 percent to reflect the fact that the price on a stock exchange reflects a minority position. A majority position is always considered to be more valuable than a minority position, and the Gainers shares represented a majority position. After conducting his analysis of the similar corporations, his conclusion was a value indication of $87.5 million for Gainers. He testified that this supported a valuation based on an income approach of approximately $71,000,000.00 for Gainers as the comparable companies were, on the date of the valuation, in a substantially better market and technological position than Gainers was. It was his view that the Gainers Plant was far from modern, and that the brand names of Gainers were not well-known. In addition, Gainers was operating in a very competitive market and was facing new competitors which would likely have an adverse future effect on Gainers' earnings.

304    Mr. Dobner then considered the appraised value of the assets in use. He arrived at a total figure relating to these assets by taking amounts contained in various appraisal reports and stating that he was giving the best possible figure relating to those appraisal reports to the Plaintiff. The total was approximately 40 percent greater than the amount that he had determined on the basis of the income approach. Mr. Dobner testified that in his experience, this was not unusual and in fact supported his conclusion of a market value or fair market value of $71,000,000.00 for Gainers because the assets appraisals do not take into account economic obsolescence. The Gainers Plant was old, and had many built-in inefficiencies in plant design and methods of operation.

305    At the conclusion of the trial of this matter, I asked Mr. Dobner to prepare a calculation which took into consideration reduction in interest rates relating to monies borrowed for the purposes of the acquisition of Gainers. I asked him to do the calculations for a reduction of interest rates by 1/3 after five years, and by 1/2 after five years. The results were that the values for Gainers' shares, on an income basis, would be increased to $87,848,000.00 for a 1/3 reduction in interest after five years, and $97,848,000.00 for a 1/2 reduction in interest rate after five years.

306    I am satisfied that it is the Defendant's position that reductions in interest rates which followed 1989 should not be taken into consideration, since a purchaser would not have been contemplating such reductions. However, I am also satisfied that the sophisticated purchaser that would be required in order to purchase assets worth many millions of dol-

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

lars would have available to it appropriate economic advice which would have at least indicated that future interest rate reductions were a likelihood. Mr. Dobner's report supports this position. On page 17 of his report, Mr. Dobner makes reference to a likelihood of interest rate reduction predicted by economists. He, however, limits that prediction to two years following the acquisition of the shares. I am satisfied that economists could have predicted some continuing interest rate reduction having regard to factors that were in place, or about to be brought into place in the marketplace.

307     I now turn to difficulties that I perceive which emanate from Mr. Dobner's testimony and report. The first arises from the agreed values. These are contained in the Agreed Statements of Facts, and in particular those Facts dated the 30th of September, 1997 and in Exhibit 41, which outlines some agreed values for the purposes of Article 6.04(b) of the Negative Pledge Agreements. These Agreed Facts include certain values that are to be applied directly to 6.04(b) and which relate to assets that Mr. Dobner included in Gainers. For example, the assets in the North Battleford Saskatchewan Plant have an agreed value of $7,200,000.00. Secondly, the equipment in the Edmonton Plant is agreed to be valued at $13,500,000.00 for the purposes of 6.04(b) of the Negative Pledge Agreements.

308     Mr. Dobner's analysis ignores these agreements. He pulled these assets out of the agreement, and included them in his analysis of Gainers' value as a going concern.

309     I am satisfied that in his asset based check of the income based approach Mr. Dobner pulled these values out of the agreement and considered them on the basis of the 40 percent reduction that he spoke about. This is incorrect as the values contained in the agreement were to be applied directly to the value requirement of Article 6.04(b) of the Negative Pledge Agreements.

310     I recognize that this poses a difficulty when one prefers to do an evaluation of an entire enterprise on a cash flow, or income basis. But the parties have agreed to these values, and as they are values for the purpose of 6.04(b) of the Negative Pledge Agreements, it is not for Mr. Dobner, or me, to alter that agreement.

311     The second difficulty I have with respect to Mr. Dobner's approach is that it is difficult to appreciate how or why a 40 percent reduction should be applied to accounts receivable, inventory, prepaid expenses and the like. When Mr. Dobner approached these items on a liquidation basis, he reduced them to account for things like spoilage, dissatisfied customers, and cost of disposal with respect to the inventory and presumably similar considerations, plus bad debt considerations with respect to the accounts receivable. However, his reductions on a liquidation basis do not come anywhere close to 40 percent, and a discount of 40 percent for these items on an asset comparison basis seems excessive.

312     Accounts receivable should not suffer the concerns relating to economic obsolescence that Mr. Dobner referred to in his evidence. Perhaps some of the inventory would, as it would be in the process of production, but other inventory would have been completely processed and would already have been subject to the economic obsolescence concerns raised by Mr. Dobner.

313     I am also concerned that the reduction on a market basis from $87,000,000.00 to $71,000,000.00 was arrived at because those were the amounts that Mr. Dobner had concluded. In other words, there is no real basis for that reduction. In fact, in expressing the reduction, Mr. Dobner has ignored the excess assets which would still have existed on the fair market basis analysis. In other words, the reduction is really from approximately $90,000,000.00 down to $71,000,000.00.

314     Another concern that I have regarding Mr. Dobner's analysis arises from the appraisals that he has chosen to use. Mr. Dobner states that he is proceeding on a best to the Plaintiff basis. However, it is clear that some appraisals that he has relied upon in doing his check on an asset in use basis against the income analysis are far from best to the Plaintiff

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

evaluations. For example, the Plaintiff's appraiser who appraised the improvements was told by management that the improvements were expected to continue in use for five to ten years. That appraiser chose a five year term when evaluating the oldest of the improvements. In actuality, the improvements continued to be used until December of 1997 when the plant was closed, not because the improvements were incapable of being further utilized, but because of a strike.

315    It was the Plaintiff's expert's opinion that even the oldest of the improvements had a continued useful life of approximately 15 years. This appraiser is probably the most experienced appraiser in the Province of Alberta, and while one should not generally consider hindsight in conducting appraisals, hindsight can assist in determining which of the views of appraisers is correct when those views are disparate. I am satisfied that Mr. Shaske's view with respect to the durability of the improvements is to be preferred over that of the Plaintiff's expert.

316    I am also satisfied that Mr. Shaske's values with respect to lands are to be preferred to those of the Plaintiff's expert. As I have stated, Mr. Shaske is probably the most experienced appraiser in Alberta. In fact, the Defendant itself has utilized Mr. Shaske's services many times. While his approach to valuation may not fit within the Defendant's general theory of value, I am satisfied that the figures obtained are nevertheless reasonable.

317    The reasons I prefer Mr. Shaske's valuation of land includes the following:

1. An appreciation of the true effects of the system of tax assessment in effect in the City of Edmonton at the relevant time;

2. A recognition that the location of Gainers' Yellowhead Trail Plant is what might be considered to be a prime industrial location, having access to transportation for finished products and raw materials (in terms of roadways and railways) and in terms of a labour force (being close to significant residential areas), as opposed to lands on the outskirts of Edmonton which are not as accessible to Yellowhead Trail, or other major flow-ways;

3. A recognition that no premium attaches to land that is adjacent to Yellowhead Trail in comparison with land that abuts the Yellowhead Trail;

4. The utilization of comparables which were closer in time to the relevant date; and

5. The explanation, although far from perfect, of the manner in which adjustment for size differential was made. The Defendant's expert simply made such an adjustment without any explanation.

318    I turn to one further matter which I should consider in analysis of Mr. Dobner's evidence that being his treatment of the tax loss carry forward. Mr. Dobner has utilized much of the tax loss carry forward to offset income tax which would emanate from the profits projected by Gainers' management. Therefore, if his approach is correct, the tax loss carry forward is not an excess asset.

319    I now turn to consideration of the law relating to the valuation of shares.

**Legal Analysis**

320    There are several issues that I should deal with prior to considering the main issues relating to valuation. These issues were raised by the Defendant and if the Defendant is successful with respect to any of them, the question of valuation is rendered academic and the Defendant succeeds. It is, however, my determination that the Defendant is not to be successful with respect to these preliminary issues, for the reasons which follow.

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

Page 54

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

321    The first issue is the question of whether or not a surplus is payable to the Plaintiff at all. It is the Defendant's position that there is nothing compelling the Defendant to pay a surplus to the Plaintiff, even if one exists. If that is the case, the Plaintiff's claim must be dismissed.

322    The answer to this question is found in paragraph 6.04(b) of the Negative Pledge Agreements. That paragraph indicates that the A.T.B. is to use its reasonable discretion in determining the value of the shares and to apply that on "account of the total actual indebtedness".

323    It was the Defendant's choice to structure this transaction through the A.T.B.. I am satisfied that an account at the A.T.B. operates in essentially the same manner as an account at a bank. That is, unless there is something in the account agreement to the contrary, the account can have a positive or a negative balance. If it has a positive balance, then money is owed to the account holder by the bank, or in this case the A.T.B.. If it has a negative balance, then the account holder owes money to the bank, or in this case the A.T.B.

324    Therefore, if the value of the shares creates a surplus, that surplus must be paid over to the Plaintiff.

325    The second question raised came about by virtue of the fact that in the fall of 1990, in a related action, Mr. Pocklington filed an Affidavit wherein he indicated that Gainers owed more money than its asset value. I am satisfied that Mr. Pocklington was talking about a fair market value scenario and not about the value of Gainers calculated in the manner that his experts considered to be the correct standard and approach. Further, I am satisfied that Mr. Pocklington's statement is of little more value than Mr. Johnston's statement, which earlier valued the Gainers shares at something in excess of $20,000,000.00.

326    The third matter arose during the course of argument. The Defendant took the position that the values established by Defence evidence were reasonable and constituted part of the Defendant's reasonable valuation. I have already determined that the valuation conducted in the summer of 1990 was not reasonable and I will not repeat my reasons for that. I take it that the Defendant is of the view that it is to be given a second chance at utilizing its reasonable discretion in the valuing of the Gainers shares. I further take it that the evidence composed of the appraisals and the share valuation done by Mr. Dobner constitutes the Defendant's view of what the results of that second chance are.

327    I am satisfied that when the Defendant did not exercise its reasonable discretion in 1990, that failure constituted a breach of contract. The Defendant is not now in a position to correct, or make amends for that breach on its own. The reason I come to that conclusion is because the exercise of a reasonable discretion includes a reasonable time element. To exemplify this; if a party in the position of the Defendant conducted its evaluation tens of years after the acquisition of shares, then that evaluation is, *prima facie*, unreasonable. Here the Defendant would have required some time to conduct its investigations and exercise its reasonable discretion. But that time has long since passed.

328    When a breach of contract occurs and Courts are accessed, the Court makes a determination which results in placing the parties in positions they should have been absent the breach. The parties themselves do not make that determination.

329    It is the Plaintiff's position that the Court should interpret the valuing requirement in Article 6.04(b) of the Negative Pledge Agreements as meaning value-in-use to the owner, being the Defendant. It is the Defendant's position that fair market value, calculated on the present valuing of a stream of income is the appropriate standard. As I have noted, it would appear that at least some of the agreed upon values for the purposes of paragraph 6.04(b), and which total $42,667,000.00 were arrived at on an asset-by-asset basis. It is not clear as to whether or not fair market value was the value standard, or some other value standard was used. This is because the Agreed Statements of Facts, dated September

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

30th, 1997, suggests that where agreement has been arrived at, the market value continued use, the fair market value in use, the depreciated replacement cost, and the value for the purposes of valuing the shares pursuant to Article 6.04(b) are all equivalent to the agreed amount. I assume that the reason is to satisfy each side that their position remains in tact.

330     Several appraisers acknowledged that in appraising assets, a range of 10 percent is expected, and if appraisers come up with different figures within that range, each figure is reasonable. Mr. Dobner was not as generous as he stated that he was giving a best to the Plaintiff value throughout, and consequently no adjustment was appropriate. However, he was not as generous as he stated he was being, as I have already determined that when he considered his best to Plaintiff scenario, he did not look at the underpinnings of any of the appraisals that he took into consideration. Mr. Wise says that he looked at each of the Plaintiff's appraisals and considered them to have been appropriately performed. He was not able to detect things like an overlap between the appraisals of the improvements and the appraisals of the equipment, but did give a value range within 10 percent.

331     When confronted with the questions of what are the correct value standard and approach, Counsel were unable to refer me to cases where a share acquisition as has occurred here has been before the Courts. The mixture of political, social and economic considerations that are found in the matter before me, and which are attached to a commercial contract, appear to be unique. I will, therefore, consider other occasions where the question of value has been considered by Canadian Courts.

332     The question of value has arisen in contractual situations. In *Bexley v. Dunning*, [1976] 4 W.W.R. 446 (B.C. S.C.), the Court considered a written option to purchase shares "at such price as the [company's] auditors shall determine to be the value of the shares". The Court considered that it was necessary to determine the meaning to be given to the word "value". It determined that in the absence of surrounding circumstances indicating a different sense, what value meant was "what can be obtained in money on the open market".

333     In a contractual sense, the classic statement of value is found in *Lord Advocate v. Earl Home* (1891), 28 S.L.R. 293, 18 R. 397 (Scotland Ct. Sess.), at 403 where Lord MacLaren said "... value ... means exchangeable value - the price which the subject will bring when it is exposed to the test of competition."

334     In property tax assessment cases, Courts are often called on to interpret words like real value, actual value and similar expressions. In *Montreal Island Power Co. v. Laval-des-Rapides (Ville)*, [1935] S.C.R. 304 (S.C.C.), Duff, C.J.C. dissented with respect to the principles applied by the majority, but not with respect to the result of their judgment. At p. 305, he quoted with approval the passage from the judgment of Lord MacLaren in *Lord Advocate v. Earl Home, supra*, and stated:

    For the purpose of defining the valuation of property for taxation purposes, the Courts have, in this country, and generally speaking, on this continent, accepted this view of the term "value".

335     This decision has been quoted with approval in judgments in the following cases: *Winnipeg (City) v. T. Eaton Realty Co.*, [1944] 2 D.L.R. 638 (Man. K.B.); *R. v. Jones, (*sub nom. *Saint John Sulphite Ltd., Exporté)* [1949] 4 D.L.R. 259 (N.B. C.A.); *R. v. Rothesay Assessors* (1964), 46 D.L.R. (2d) 156 (N.B. C.A.); *R. v. Bourque* (1962), 34 D.L.R. (2d) 120 (N.B. C.A.); *Shapiro v. Winnipeg City Assessor* (1987), 43 D.L.R. (4th) 506 (Man. C.A.).

336     In succession duty situations (*R. v. Roach*, [1919] 3 W.W.R. 56 (Alta. S.C.)), the Court determined that value was equivalent to the current price at which the property could be sold.

337     With respect to income tax legislation, in *Steen v. R.* (1986), 86 D.T.C. 6498 (Fed. T.D.) the Court held that the

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

value of shares for the purposes of s. 7(1)(a) of the *Income Tax Act* is fair market value.

338      The dissenting shareholders' provisions in the Canada, Alberta and Ontario Business Corporations Acts, all provide that dissenting shareholders are entitled to be paid by the corporation the fair value of their shares. Courts which have applied the dissenting shareholders' provision have consistently held that fair value should be fixed by first determining fair market value and then making any adjustments required by the circumstances of the case. In *Canadian Gas & Energy Fund Ltd. v. Sceptre Resources Ltd.* (1985), 29 B.L.R. 178 (Alta. Q.B.) Forsythe, J. stated at pp. 192-193 that:

> ... I am satisfied that the fair market value of the shares forms the main criteria [sic] to be utilized in establishing the fair value of the shares on the critical date.

339      In *Kelvin Energy Ltd. v. Bahan* (1987), 52 Alta. L.R. (2d) 71 (Alta. Q.B.), Forsythe, J. again considered the term "fair value" as used in the dissenting shareholders' provisions of the *Alberta Business Corporations Act*, and stated at p. 76:

> The term "fair value" has been subject to judicial interpretation and comment concerning the method of arriving at what is the fair value of a particular share. It is clear from the authorities that there are four generally accepted methods of valuation which can be used in arriving at the fair market value of Kelvin shares from which the fair value of the dissenting shares may be determined for the purposes of s. 184 of A.B.C.A. These are as follows:
>
> 1. Market price;
>
> 2. Net assets approach;
>
> 3. Earnings or investment value approach;
>
> 4. A combination of the foregoing.

340      Similar conclusions were arrived at by Courts in a myriad of decisions involving the question of fair value under various *Business Corporations Acts*, including *Brant Investments Ltd. v. KeepRite Inc.* (1987), 60 O.R. (2d) 737 (Ont. H.C.); in *New Quebec Raglan Mines Ltd. v. Blok-Andersen* (1993), 9 B.L.R. (2d) 93 (Ont. Gen. Div. [Commercial List]); *Fraser Inc. v. Aitken* (1988), 41 B.L.R. 87 (Ont. H.C.).

341      With respect to expropriations, it is clear that a party from whom land was taken under the compulsory powers of expropriation is entitled to the compensation for the value of the land to him. This principle is based on rationale set out by Rand, J. in *Diggon-Hibben Ltd. v. R.*, [1949] S.C.R. 712 (S.C.C.), at 715, where he stated:

> A compensation statute should not be approached with the attitude that Parliament intended an individual to be victimized and lost because of the accident that his land rather than his neighbour's should be required for public purposes; ...

342      In *Lake Erie & Northern Railway v. Brantford Golf & Country Club* (1916), 32 D.L.R. 219 (S.C.C.), an expropriation involving lands for a public golf course, Duff, J. spoke of the value in land to the parties losing the land, and then said at p. 229:

> It is needless to emphasize perhaps that the phrase does not imply that compensation is to be given for "value" resting on motives and considerations that cannot be measured by any economic standard.

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

343    In *Canada (National Capital Commission) v. Hobbs*, [1970] S.C.R. 337 (S.C.C.), Abbott, J. referred to the manner in which value is to be determined, and at pp. 339-340 stated:

> Generally speaking, an owner is entitled to the value of the property to him, calculated on the basis of its highest and best use. This value may be the market value, but it may be more in those cases where, for some reason, the land has a special value to the owner beyond what it would have in similar use by somebody else.

> Where it is claimed that a property has a special value to the owner over and above its market value, the owner must adduce the facts necessary to prove this value, which must be such that it can be measured in terms of money. It is not sufficient for a claimant to say that he would pay a certain amount of money rather than be deprived of his property. There must be proof that the land has special advantages that gave it a special economic value for the expropriated party ...

344    Expropriation legislation has been considered by the Alberta Court of Appeal. In *T. Eaton Co. v. Alberta (Assessment Appeal Board)* (1995), 128 D.L.R. (4th) 469 (Alta. C.A.), the Alberta Assessment Appeal Board confirmed a municipal tax assessment of land. The Court of Appeal held that the municipality and Board erred in law by having regard to the special value of the land to the owner rather than its value on the market, finding that generally special value of land to a particular person is irrelevant in the determination of the market value.

345    It is a general principle that in expropriation and similar circumstances, the value to the taker of the property is not a legitimate measure of compensation to the party from whom the property has been taken. This proposition was succinctly stated by Duff, J. in *R. v. Trudel* (1914), 49 S.C.R. 501 (S.C.C.), at pp. 510-511, where he states:

> The principle of compensation is, of course, well settled. It is stated very clearly in the following passage from the judgment of Moulton, L.J. in **Re Lucas and Chesterfield Gas and Water Board** at p. 29:

>> The principles on which compensation is assessed when land is taken under compulsory powers are well-settled. The owner receives for the land he gives up their equivalent, i.e. that which they were worth to him in money. His property, therefore, not diminished in amount, but to that extent it is compulsorily changed in form. But the equivalent is estimated on the **value to him**, and not on the value to the purchaser.' (Emphasis added)

346    Similar statements of law may be found in *R. v. Harwood* (1900), 6 Ex. C.R. 420 (Can. Ex. Ct.); *Dau v. Murphy Oil Co.*, [1970] S.C.R. 861 (S.C.C.) and in *Westfair Foods Ltd. v. Watt* (1990), 106 A.R. 40 (Alta. Q.B.). In the latter case, which dealt with determination of fair value under the *Business Corporations Act*, the Court determined that value to taker was not a legitimate measure of compensation.

347    In circumstances where there is a limited, or no market, the Courts have looked at the return one might expect to realize on money invested in the undertaking. In *Montreal (City) v. Sun Life Assurance Co.*, [1950] S.C.R. 220 (S.C.C.), the Supreme Court stated that the rule for determining compensation in expropriation cases was not to be followed in municipal assessment cases where the land and buildings are to be assessed at their value. The Court stated that the test to be used was an objective one, and that Courts should seek the exchange value, or the value in a competitive market. If such a competitive market does not exist, then the expropriating authority or Court should ask what a prudent investor would pay for the subject property, keeping in mind the return that might be expected upon the money invested. In *Withycombe Estate, Re*, [1945] S.C.R. 267 (S.C.C.), the Supreme Court of Canada allowed an appeal from the Court of Appeal of Alberta that had overturned a decision of a Commissioner appointed to determine the value of a theatre property for the purpose of succession duty. There was no evidence of the value of the property in the open market. The Commissioner had determined the value on the basis of capitalization of revenue. In his judgment, Estey, J. stated at p. 287:

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

The authorities are clear that under such statutory provision as we are here concerned with, value means market value as that term is properly understood. The value with which we are concerned here is the value of Untermeyer's death, that is to say, the then value of every advantage which his property possessed for these advantages, as they stood, would naturally have an effect on the market price. The sum of all these advantages controls the market price, which, if it be not spasmodic or ephemeral, is the best test of fair market value of property of this description.

348     Assistance for Courts in evaluating shares can be had by consideration of the nature of shares. They are fractions of potential interest in the assets in the active life of the company, whatever it may be, into which the capital is divided ( *Zwicker v. Stanbury*, [1953] 2 S.C.R. 438 (S.C.C.)).

349     Courts have provided general comment with respect to the methods of valuation of shares and those comments are instructive. In *Brant Investments Ltd. v. KeepRite Inc.*, *supra*, [at para. 340] the Court held that four methods of valuation appear to have been generally accepted by experts and judges alike. These are:

(a) The quoted market price on the stock exchange: the market value approach;

(b) The valuation of the net assets of the company at fair market value: the assets approach;

(c) The capitalization of maintainable earnings: the earnings or investment value approach; and

(d) Some combination of the preceding three approaches.

It further held that the value of shares determined by the "market value approach" must be distinguished from the "market value". The former is determined by quoted prices on the stock market; the latter is "an opinion arrived at by evidence, assumptions, calculations and judgment, in the absence of an actual transaction".

350     In *Domglas Inc. v. Jarislowsky, Fraser & Co.* (1980), 13 B.L.R. 135 (Que. S.C.); aff'd (1982), 138 D.L.R. (3d) 521 (Que. C.A.), Greenberg, J. concluded that:

The Canadian jurisprudence ... although it places primary emphasis on the earnings method, reserves as well a role for net asset values. The basic concept currently accepted by valuation theories is that a business is worth only what it can earn, except where it is worth less on an earnings basis than the amount that would be realized if it were liquidated.

351     He further concluded that the earnings approach involved a two-stage process, namely; first, to arrive at the most probable and reasonable prospective net earnings; and second, to capitalize those projected earnings at an appropriate rate.

352     Courts have also concluded that valuation is not a science, and cannot be done with mathematical precision ( *Gold Coast Selection Trust Ltd. v. Humphrey (Inspector of Taxes)*, [1948] 2 All E.R. 379 (U.K. H.L.)).

353     In *Brant Investments Ltd. v. KeepRite Inc.*, *supra*, Anderson, J. stated at p. 775:

While due application of the methodical approach is adopted by experts is useful, it is dependent upon factors which are entirely a matter of judgment and the end result is an opinion, not a precise solution arrived at by precise methods utilizing only known and constant factors.

354     I conclude that from the foregoing precedents the following general principles may be drawn:

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

1. Canadian Courts have generally considered the word "value" when it is contained in legislation, regulations, contracts and other legal documents to be synonymous with market value or fair market value;

2. Generally speaking the capitalization of maintainable earnings, the earnings or investment value approach is the method of valuation preferred by Canadian Courts. At the same time, the market price, as determined by stock exchange analysis and the valuation of net assets of a company at fair market value, being the assets approach, also plays some role. In some cases, a combination of these three approaches may be desirable;

3. Generally speaking value, where assets are being removed by one party from another party, is approached from what the value was to the party losing the assets. In particular, where governmental authorities remove assets and those assets provide a special value to that authority, that special value does not constitute part of the value to be paid to the party losing the asset as compensation for his loss;

4. The "circumstances of the case" may direct the Court to utilize a particular value standard, or particular value approach;

5. Determination of "value" is an art and not a science. Value cannot be determined with mathematical precision. It is not simply a matter of plugging particular numbers into a particular formula. Appraisers use their subjective knowledge in determining value of assets. Similarly share evaluators apply their subjective knowledge to the treatment of value;

6. Finally, Courts in determining value must consider the application of subjective knowledge and test that against logical analysis in order to determine the "value" in the particular matter before the Court.

**Conclusions**

355    I turn to consideration of the matter before me. Here, pursuant to a commercial contract, the Defendant loaned to Gainers monies and pursuant to a guarantee, guaranteed other monies being loaned to Gainers by a bank. In return, Gainers provided the Defendant with certain security documentation, including the Master Agreement, the Escrow Agreement and the Negative Pledge Agreements. By virtue of the various Escrow Agreements, the Plaintiff placed in escrow its shares in Gainers Inc. and Gainers Property Inc. The Defendant had the right to acquire those shares from the Escrow Agent upon events of default occurring.

356    Events of default did occur and the Defendant provided the Escrow Agent with appropriate direction pursuant to the Escrow Agreement and the Negative Pledge Agreements.

357    By virtue of the Negative Pledge Agreements the Defendant had two choices:

1. It could sell the shares and apply the amount obtained by virtue of the sale to the debt owing, which was defined as the direct debt and any debt paid to the bank pursuant to the guarantee;

2. It could keep the shares and apply on account of the same debt an amount equivalent to the value of the shares as determined by the Defendant in the exercise of its reasonable discretion.

Pursuant to the Notice dated October 10th, 1989, the Defendant elected to proceed under the second option available to it.

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

Page 60

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

358    It is acknowledged by the Defendant that the reasons it elected to proceed under the second option was that it hoped to preserve certain economic and political advantages that Gainers provided to the Defendant. It was feared that Gainers would be placed in receivership by the bank and that receivership would result in liquidation of Gainers. Upon liquidation of Gainers, there was no guarantee that the economic and political benefits relating to Gainers would continue for the Defendant.

359    The Defendant also took into consideration the fact that by electing to proceed under the second option, it would, on the basis of advice it had received from professionals, lose less money than it would have had had it proceeded under any other reasonable alternative.

360    The Plaintiff has not been able to refer me to any case where a Court has decided value on the basis of its preferred standard. I must determine whether within these general circumstances, there is anything which directs me to apply the value standard and value approach urged by the Defendant. I come to the conclusion that there is not.

361    I am satisfied that the first option available to the Defendant would have achieved the same political and economic benefits. Gainers could have been sold by the Defendant at some price to investors. Such a sale could have included a condition of continued operation. A sale under 6.04(a), by the Plaintiff's own admission, would reflect fair market value, or market value, and that value would have been the amount to be applied against the debt as defined in the Master Agreement. I can see nothing that changes what the Defendant received under 6.04(b) from what it would have received had it proceeded under 6.04(a).

362    I am also satisfied there are public policy grounds which direct Courts away from the form of valuation urged by the Plaintiff. The Plaintiff's position is little different than that of a land owner whose land is required for a major highway, airport, or similar enterprise and who takes the position that he is entitled to receive an amount equivalent to the political, social and economic benefits enjoyed by the governing body in question. Such an approach has been rejected by Canadian Courts in expropriation and other forced acquisitions.

363    A requirement that when Government is a lender it must pay the borrower upon the borrower's default a premium, would hamstring Government and narrow the political choices available to Government. For example, certain political parties and forms of Government are of the position that Government's involvement in the economy should be extremely proactive. That is their political choice. If such a Government is elected, then the ability of such a Government to pursue its mandate would be hampered by the fact that it has to pay a premium in pursuit of that mandate. Political choices should not be affected by Courts imposing special rules when Government is a party to a commercial agreement.

364    I am satisfied that the appropriate value standard which arises out of the circumstances of this case is that which is normally applicable to commercial contracts. I can see no reason why I should apply a standard different to this lender than I would had the lender been a bank. I am satisfied that the correct value standard is fair market value, or market value, relative to the shares taken.

365    I turn to the question of approach to value. Here I have greater difficulty in determining the appropriate approach. There are several reasons for this difficulty, they include:

1. The agreed Statement of Facts and agreement relating to value for the purposes of 6.04(b) respecting certain specific assets. Unfortunately, the Plaintiff's evaluator pulled the value of these assets out of the agreed values in the agreement, and put them back into his calculation of fair market value on the basis of an income approach;

2. The Defendant had the ability to affect the share value as it was in charge of regulating a method of setting

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

the price for the raw materials used by Gainers, namely hogs. The hog contract between Gainers and the A.P.P.D.C. had expired by the time valuation was required. The Defendant had the ability to affect the price or value at which Gainers' shares could be sold by simply creating a new formula, which either increased or decreased the price of hogs. It could also deregulate the pricing of hogs and has come close to doing that under the current regime. Any of these activities gave the Defendant an ability to affect the price or value of the Gainers shares which would not normally be available to another commercial lender;

3. The fact that I found much of the appraisal evidence and the direct marketing analysis of the Defendant's share valuator to be wanting.

366     I, accordingly, conclude that a combination of the market price, the valuation of net assets of the company and capitalization of maintainable earnings is the appropriate approach to the valuation of Gainers' shares. In fact, I conclude that all three of these approaches point towards a particular value range.

367     I will first deal with consideration of a capitalization of maintainable earnings approach. As I have stated, I am satisfied that the projections provided by management and utilized by the Defendant's expert were reasonable projections. No evidence was presented as to what actually occurred as the evidence indicated that some Gainers assets were eventually sold, or leased to third parties other than management and the employees of Gainers.

368     In dealing with this approach, I will keep in mind the ability of the Defendant to affect Gainers profitability through Hog Marketing and the fact that some assets have already been valued for the purposes of Article 6.04(b) of the Negative Pledge Agreements.

369     I also noted previously that in my view a downturn in interest rates was something that should have been predictable and this is supported by the Defendant's own expert. I am satisfied that that prediction would have been in the range of a drop of 1/3 from the interest rates that existed in October of 1989. That by itself provides a value to Gainers of approximately $87,000,000.00. When I add an amount which reflects a reasonable factor relating to the pull out of the Gainers assets and the ability of the Defendant to affect the value of Gainers' shares through its hog marketing policies, I conclude that a value based on an income approach or capitalization of maintainable earnings approach can reasonably be put in the range of $90,000,000.00 to $95,000,000.00. Finally, if I consider that in a very quick turnaround a purchaser of Gainers could expect some additional value for the inventory and accounts receivable, I am pushed towards the $95,000,000.00 figure.

370     With respect to the market price on stock exchange approach, similar problems exist. The share value of Gainers was still capable of being affected by the Defendant's hog marketing pricing policies. Certain assets were already valued and those values totalled in excess of $42,000,000.00. What was left included the accounts receivable, inventories, and prepaid expenses. It also included Gainers' physical plant and lands and the intangible assets. I am again satisfied that the market approach, utilized by the Defendant's expert, did not take these factors into consideration in determining the market value at approximately $87,000,000.00 reflected his determined value of just over $73,000,000.00.

371     Again, I am satisfied that the range of value, had the appropriate considerations been taken, would have been in the $90,000,000.00 to $95,000,000.00 range.

372     With respect to the asset approach, I have earlier made comment regarding the differentiation between a write off of inventories and prepaid expenses of 40 percent, and a substantially lesser amount when liquidation was considered. The sale of these inventories would be exactly the same on an ongoing basis as it would have been on a liquidation basis.

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10
W.W.R. 244

In addition, I have determined that certain other appraisals utilized by the Defendant's expert, Mr. Dobner, were not the appraisals of choice, and the result would have been an increased asset base. Even if the appraised assets, with their built in inefficiencies were to be reduced by a reasonable percentage to reflect obsolescence, the result is in the range of $90,000,000.00 to $95,000,000.00.

373     I am, according to each of these approaches, pushed towards the $95,000,000.00 figure and, in fact, determine it to be the correct value of Gainers, excluding the related actions.

374     I turn to the question of the debt. Exhibit 41 indicates the debt relating to Gainers (excluding Kretchmar and Magic Pantry) is $114,000,000.00. The Defendant and its expert is prepared to accept that amount of debt at face value.

375     The Defendant's expert, however, added an additional $2,000,000.00, which he says emanates from Kretchmar and Magic Pantry. However, the agreed statement of facts indicate that the *net value* of Magic Pantry and Kretchmar are the amounts contained in the Agreed Statements of Facts. The Defendant's share evaluation expert was the only witness to make reference to a differential in debt as it related to Magic Pantry and Kretchmar, and again, I do not believe that the Defendant's expert can override agreements made between the parties and which are filed as Agreed Statements of Facts. Consequently, I set the debt at $114,000,000.00. This means that there is a shortfall in the value of Gainers' shares in the sum of $19,000,000.00. In other words, there is $19,000,000.00 more owing by Gainers than there are assets to support that debt.

376     There are, however, additional assets in Gainers. These consist of the related actions. Part of the value of any corporation includes contingent assets and here some of the contingent assets have been taken into consideration but not others. The contingent assets that have not been taken into consideration are those referred to in the Consent Order of Costigan, J. earlier referred to. They consist of various lawsuits commenced by Gainers and the Defendant which would have the effect, if successful, of obtaining money from the Plaintiff, Mr. Pocklington, or other corporations owned by Mr. Pocklington. Any such monies would have the effect of reducing the negative equity in Gainers. Once the negative equity became a positive amount, the Plaintiff would be entitled to judgment reflecting that positive amount. Consequently it does not make sense for the Defendant and Gainers Inc. to pursue the Plaintiff, Mr. Pocklington, or other corporations owned by Mr. Pocklington, for an amount which would exceed $19,000,000.00 on a net basis.

377     During the course of argument, the Defendant conceded this and acknowledged that this answered several of the questions contained in the Consent Order of Costigan, J.

378     One of the related actions has already proceeded to trial and judgment has been rendered in favour of the Defendant in a sum just in excess of $700,000.00. However, the Defendant, while successful in terms of a judgment amount in its favour, was not successful in terms of costs. Costs were awarded to the Plaintiff, or some other corporation controlled by Mr. Pocklington, as the amount of the judgment had been made available to the Defendant in advance of the trial.

379     During the course of argument respecting the related actions, it was the Defendant's position that the balancing of the accounts would include all of the Defendant's costs on a solicitor/client basis. I gather the Defendant was taking the position that those costs were payable whether or not the Defendant was successful in the pursuit of each related action.

380     In my view, that would be inappropriate, and could well lead to abuse of process. To give the Defendant immunity with respect to its costs and to do so on a solicitor/client basis would invite the Defendant to pursue all the suits it has commenced, regardless of any of their chances of success.

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

Page 63

1998 CarswellAlta 335, 218 A.R. 59, 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, [1998] A.J. No. 364, [1998] 10 W.W.R. 244

381    I have previously stated that I am satisfied that the initial suit brought by the Defendant immediately upon the Defendant obtaining the shares of Gainers was done for purposes other than the prosecution of legitimate claims. It is, therefore, in my view, not beyond belief that the Defendant would engage in a less than creditable course of conduct.

382    I have also previously referred to a passage from McDonald, J., who at one time was in charge of case management of this and the related actions, which addresses the Defendant's chance of success with respect to at least one of those actions. Also there is some apparent difficulty with respect to the validity of claims for monies which were written out of Gainers' Balance Sheet as a part of the Master Agreement.

383    I, therefore, conclude that the question of whether the Defendant is entitled to solicitor and client costs with respect to actions in relation to which it might succeed shall be left to the trial judge respecting those actions. I feel compelled to comment, however, that as regards the question of the Defendant receiving any costs in relation to actions where it loses, this must be answered by the word "no". Further, in any situation where a trial judge determines that the real purpose of the Defendant in pursuit of an action was an abuse of process, or the pursuit of a doomed and hopeless cause, that trial judge is asked to consider whether or not the Plaintiff, Mr. Pocklington, or a company owned by him, should receive solicitor and client costs. There is one further matter to be dealt with. That is the question of the Plaintiff's claims for general, punitive and exemplary damages arising out of some of the Defendant's actions. I have determined that some Defendant actions were less than credit worthy, but in my view they do not invite general, punitive or exemplary damages. They may affect costs.

384    At the conclusion of argument, the parties indicated that with respect to this matter they would prefer to await the outcome and then deal with costs. If Counsel are not able to arrive at any determination with respect to costs, they may of course seek audience with me and the question will be argued before myself in open Court. I also ask Counsel, if they feel that I have missed any issue or matter, that they address that issue or matter at the same time. However, I indicate that this is not an invitation to re-litigate or re-argue matters that I have dealt with.

*Action allowed.*

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. Govt. Works

# TAB 73

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 2000 ABCA 8, 2000...

2000 ABCA 8, 2000 CarswellAlta 7, [2000] 3 W.W.R. 267, [2000] A.W.L.D. 184...

2000 ABCA 8
Alberta Court of Appeal

Pocklington Foods Inc. v. Alberta (Provincial Treasurer)

2000 CarswellAlta 7, 2000 ABCA 8, [2000] 3 W.W.R. 267, [2000] A.W.L.D. 184, 184
D.L.R. (4th) 152, 213 W.A.C. 188, 250 A.R. 188, 2 B.L.R. (3d) 103, 75 Alta. L.R. (3d) 263

# Pocklington Foods Inc., Appellant (Plaintiff) and Her Majesty the Queen in the Right of the Province of Alberta as Represented by the Provincial Treasurer of Alberta, Respondent (Defendant)

McClung, Picard, Hunt JJ.A.

Heard: November 29, 1999
Judgment: January 11, 2000
Docket: Edmonton Appeal 9803-0366-AC

Proceedings: affirming (1998), 61 Alta.L.R. (3d) 125 (Alta. Q.B.)

Counsel: *John M. Hope, Q.C.*, for Appellant.
*N.J. Pollock, Q.C.* and *A.R. Gray*, for Respondent.

Subject: Contracts; Corporate and Commercial

**Related Abridgment Classifications**

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**

Corporations --- Shares — Share capital — Value

Plaintiff corporation entered into loan agreement with Alberta government — Government provided both loans and loan guarantees to subsidiary corporation of plaintiff on condition that if subsidiary defaulted, government would be entitled to take shares of subsidiary and apply amount equivalent to their value to total indebtedness — Agreement provided that value of shares was to be determined by government "in the exercise of its reasonable discretion" — Subsidiary defaulted and government seized its shares — Plaintiff sued for breach of contract when government informed it that subsidiary's shares were to be valued at nil — Action was allowed and value of shares was determined by court pursuant to fair market value standard — Actual value of shares was determined pursuant to combination of market price, valuation of net assets, and capitalization of maintainable earnings approaches — Plaintiff appealed from court's valuation of shares — Appeal dismissed — It was not for court to interfere with findings of trial judge who chose to reject expert evidence before him, especially where that evidence was in competition with other expert opinions — Judge did not err in assessing value of shares.

**Table of Authorities**

Cases considered:

*Cyprus Anvil Mining Corp. v. Dickson* (1986), 8 B.C.L.R. (2d) 145, 33 D.L.R. (4th) 641 (B.C. C.A.) — applied

*Domglas Inc. v. Jarislowsky, Fraser & Co.*, [1982] C.A. 377, 22 B.L.R. 121, 138 D.L.R. (3d) 521 (Que. C.A.) — considered

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 13460-10    Filed 05/02/14    Page 83 of 610

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 2000 ABCA 8, 2000...

2000 ABCA 8, 2000 CarswellAlta 7, [2000] 3 W.W.R. 267, [2000] A.W.L.D. 184...

*Tat v. Ellis* (1999), 228 A.R. 263, 188 W.A.C. 263 (Alta. C.A.) — referred to

*Toneguzzo-Norvell (Guardian ad litem of) v. Burnaby Hospital*, [1994] 2 W.W.R. 609, 87 B.C.L.R. (2d) 1, 18 C.C.L.T. (2d) 209, [1994] 1 S.C.R. 114, 110 D.L.R. (4th) 289, *(sub nom. Toneguzzo-Norvell v. Savein)* 162 N.R. 161, *(sub nom. Toneguzzo-Norvell v. Savein)* 38 B.C.A.C. 193, *(sub nom. Toneguzzo-Norvell v. Savein)* 62 W.A.C. 193, *(sub nom. Toneguzzo-Norvell v. Savein)* [1994] R.R.A. 1 (S.C.C.) — considered

*Towne Cinema Theatres Ltd. v. R.*, [1985] 1 S.C.R. 494, [1985] 4 W.W.R. 1, 18 D.L.R. (4th) 1, *(sub nom. R. v. Towne Cinema Theatres Ltd.)* 59 N.R. 101, 37 Alta. L.R. (2d) 289, 61 A.R. 35, 18 C.C.C. (3d) 193, 45 C.R. (3d) 1 (S.C.C.) — considered

APPEAL by plaintiff from judgment reported at 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, 218 A.R. 59, [1998] 10 W.W.R. 244 (Alta. Q.B.) with respect to court's valuation of shares relating to breach of contract action.

*Per curiam*:

1    The panel is unanimous that the appeal by Pocklington Foods Inc. ("Pocklington") must be dismissed. The parties were informed of that decision on November 29, 1999, the date the appeal was heard. This memorandum of judgment provides our reasons.

2    Pocklington appealed the trial judge's valuation of the shares of Gainers Properties Inc. ("Gainers"). The Crown in the Right of the Province of Alberta, the Respondent, had entered into an agreement with Pocklington in September of 1987 to grant a loan to Gainers and to guarantee the repayment of a loan given to Gainers by a chartered bank. In return, Pocklington provided the Crown with security in the form of shares in Gainers Inc. Pocklington subsequently defaulted in its payments under the loan agreement and the Crown acquired the shares of the company. The Crown exercised its option under the agreement to continue the operation of the company and apply the value of shares against the outstanding debt. The Crown took the position that the shares had no value to be applied to the total actual indebtedness owed by Pocklington to the Crown.

3    The trial judge found that the Crown did not reasonably exercise its discretion in valuing the shares. Thus, he undertook the task of valuation himself and, based on the evidence of the experts before him, he chose a combination method of valuation. It involved an assessment of the shares on each of an income based approach, an asset based or cost approach, and a market based approach. The trial judge ultimately valued the shares of Gainers at $95,000,000.

4    On appeal, Pocklington took issue with the trial judge's method of valuation. First, it argued that the trial judge erred in failing to determine that the only approach appropriate to valuation on the unique facts of this case was the asset based or cost approach. Second, it submitted that the trial judge erred in failing to consider that the shares had worth to the Crown beyond their intrinsic value — that is, the political and economic benefits the Crown received from the continued operation of Gainers. No issue was taken with the trial judge's decision that the value standard to be used was fair market value.

5    D. H. Peterson in *Shareholder Remedies in Canada*, looseleaf (Toronto and Vancouver: Butterworths, 1989) at 4.1 writes that, while there are a variety of valuation techniques that may be employed by a court in valuing shares, "in any particular case, the factual circumstances are paramount" and they alone will determine which approach is to be adopted. Lambert J.A. in *Cyprus Anvil Mining Corp. v. Dickson* (1986), 8 B.C.L.R. (2d) 145 (B.C. C.A.) at 158-9 made the following comments:

> ... the problem of finding fair value of stock is a special problem in every particular instance. It defies being reduced to a set of rules for selecting a method of valuation, or to a formula or equation which will produce an answer with the illusion of mathematical certainty. Each case must be examined on its own facts, and each presents its own difficulties. Factors which may be critically important in one case may be meaningless in another. Calculations which may be accurate guides for one stock may be entirely flawed when applied to another stock.

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 13460-10    Filed 05/02/14    Page 84 of 610

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 2000 ABCA 8, 2000...

2000 ABCA 8, 2000 CarswellAlta 7, [2000] 3 W.W.R. 267, [2000] A.W.L.D. 184...

The one true rule is to consider all the evidence that might be helpful, and to consider the particular factors in the particular case, and to exercise the best judgment that can be brought to bear on all the evidence and all the factors. I emphasize: it is a question of judgment.

6    Because share valuation involves primarily the judgment and discretion of a trial judge based on the facts of the case, a lower court's valuation approach should not be interfered with on appeal unless that technique displays a "manifest error": see *Domglas Inc. v. Jarislowsky, Fraser & Co.* (1982), 138 D.L.R. (3d) 521 (Que. C.A.) at 523; see also *Toneguzzo-Norvell (Guardian ad litem of) v. Burnaby Hospital,* [1994] 1 S.C.R. 114 (S.C.C.) at 121.

7    At trial, the learned trial judge heard expert evidence from both parties on the compelling approaches available in the valuation of the shares. Each party advocated that a particular method be employed by the trial judge. However, after considering the evidence and determining that there were difficulties in the approaches advanced by each party, the trial judge selected a combination approach as the most appropriate method of valuation in the circumstances.

8    It is not for this Court to interfere with the findings of a trial judge who choses to reject expert evidence before him, especially where that evidence is in competition with other expert opinions. As was stated by the Supreme Court of Canada in *Towne Cinema Theatres Ltd. v. R.,* [1985] 1 S.C.R. 494 (S.C.C.) at 517:

the law is clear that a trier of fact does not have to accept testimony, whether expert or otherwise. He can reject it, in whole or in part. He cannot, however reject it without good reason.

See also *Toneguzzo-Norvell (Guardian ad litem of) v. Burnaby Hospital, supra; Tat v. Ellis* (1999), 228 A.R. 263 (Alta. C.A.) at 267, (1999), 188 W.A.C. 263 (Alta. C.A.).

9    The trial judge declined the conclusions of the expert witnesses before him for valid and stated reasons. There is no legal authority for the principle put forth by Pocklington that, because the Crown enjoyed economic (or at least political) benefits from the continued operation of Gainers, the only appropriate method of share valuation was the asset base or cost approach. Nor is there legal authority for the principle that, in determining the share value, the trial judge had to value any political and economic benefits acquired by the Crown. Few businesses are acquired without collateral hopes for their good fortune.

10    We are not persuaded that the learned trial judge's scrutiny of the competing avenues to assess the value of Gainers' shares was an error at all, let alone an error that was palpable and overriding. Therefore, we dismiss the appeal.

*Appeal dismissed.*

**End of Document**    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 74

2002 CarswellOnt 1261, 33 C.B.R. (4th) 284, 113 A.C.W.S. (3d) 760

**c**

2002 CarswellOnt 1261, 33 C.B.R. (4th) 284, 113 A.C.W.S. (3d) 760

PSINet Ltd., Re

In the Matter of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as Amended

In the Matter of a Plan of Compromise or Arrangement of PSINet Limited, PSINet Realty Canada Limited, PSINetworks Canada Limited and Toronto Hosting Centre Limited, Applicants

Ontario Superior Court of Justice [Commercial List]

Farley J.

Heard: March 14, 2002
Judgment: March 14, 2002
Docket: 01-CL-4155

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Counsel: *Lyndon A.J. Barnes*, *Monica Creery*, for Applicants

*Geoffrey B. Morawetz*, for the Monitor, PricewaterhouseCoopers Inc.

*Peter H. Griffin*, for PSINet Inc.

*Edmond F.B. Lamek*, for 360Networks Services Ltd.

Subject: Corporate and Commercial; Insolvency

Corporations --- Arrangements and compromises — Under Companies' Creditors Arrangement Act — Arrangements — Approval by court — "Fair and reasonable"

Corporations proposed consolidated plan of arrangement or compromise — Consolidated plan was approved by creditors at meeting — Unsecured creditors strongly supported consolidated plan — Since meeting of creditors negotiations with respect to some aspects of plan had been ongoing — Corporations brought motion to sanction consolidated plan of arrangement or compromise — As result of negotiations, sanction was unopposed — Motion granted — Consolidated plan avoided complex and potentially litigious issues arising from allocation of proceeds from sale of corporations' assets — Consolidated plan was in strict compliance with statutory requirements and adhered to previous orders of court — Determination was made that all done or purported to be done was authorized by Companies' Creditors Arrangement Act — Creditors had sufficient time to make reasoned decision — As to fairness and reasonableness of plan, perfection was not required — In circumstances, given in-

2002 CarswellOnt 1261, 33 C.B.R. (4th) 284, 113 A.C.W.S. (3d) 760

tertwined nature of business, consolidated plan was appropriate — Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36.

**Cases considered by _Farley J._:**

_Associated Freezers of Canada Inc., Re_, 36 C.B.R. (3d) 227, 1995 CarswellOnt 944 (Ont. Bktcy.) — considered

_Canadian Airlines Corp., Re_, 2000 ABCA 238, 2000 CarswellAlta 919, [2000] 10 W.W.R. 314, 20 C.B.R. (4th) 46, 84 Alta. L.R. (3d) 52, 9 B.L.R. (3d) 86, 266 A.R. 131, 228 W.A.C. 131 (Alta. C.A. [In Chambers]) — referred to

_Canadian Airlines Corp., Re_, 2000 ABQB 442, 2000 CarswellAlta 662, [2000] 10 W.W.R. 269, 20 C.B.R. (4th) 1, 84 Alta. L.R. (3d) 9, 9 B.L.R. (3d) 41, 265 A.R. 201 (Alta. Q.B.) — considered

_Central Guaranty Trustco Ltd., Re_, 21 C.B.R. (3d) 139, 1993 CarswellOnt 228 (Ont. Gen. Div. [Commercial List]) — referred to

_J.P. Capital Corp., Re_, 31 C.B.R. (3d) 102, 1995 CarswellOnt 53 (Ont. Bktcy.) — referred to

_Lehndorff General Partner Ltd., Re_, 17 C.B.R. (3d) 24, 9 B.L.R. (2d) 275, 1993 CarswellOnt 183 (Ont. Gen. Div. [Commercial List]) — referred to

_Northland Properties Ltd., Re_, 73 C.B.R. (N.S.) 175, 1988 CarswellBC 558 (B.C. S.C.) — considered

_Northland Properties Ltd., Re_, _(sub nom. Northland Properties Ltd. v. Excelsior Life Insurance Co. of Canada)_ 34 B.C.L.R. (2d) 122, _(sub nom. Northland Properties Ltd. v. Excelsior Life Insurance Co. of Canada)_ 73 C.B.R. (N.S.) 195, _(sub nom. Northland Properties Ltd. v. Excelsior Life Insurance Co. of Canada)_ [1989] 3 W.W.R. 363, 1989 CarswellBC 334 (B.C. C.A.) — referred to

_Northland Properties Ltd., Re_, 69 C.B.R. (N.S.) 266, 29 B.C.L.R. (2d) 257, 73 C.B.R. (N.S.) 146, 1988 CarswellBC 531 (B.C. S.C.) — referred to

_Sammi Atlas Inc., Re_, 1998 CarswellOnt 1145, 3 C.B.R. (4th) 171 (Ont. Gen. Div. [Commercial List]) — considered

**Statutes considered:**

_Bankruptcy and Insolvency Act_, R.S.C. 1985, c. B-3

Generally — referred to

_Companies' Creditors Arrangement Act_, R.S.C. 1985, c. C-36

Generally — referred to

MOTION by corporations to sanction consolidated plan of arrangement or compromise.

**_Farley J._:**

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2002 CarswellOnt 1261, 33 C.B.R. (4th) 284, 113 A.C.W.S. (3d) 760

1      This motion was for the sanctioning of the consolidated plan of arrangement or compromise of the four Canadian applicants under the *Companies' Creditors Arrangement Act* ("CCAA"). The consolidated plan was approved by the creditors of the applicants at meetings held February 28, 2002. Since that time and as permitted by the consolidated plan there have been ongoing negotiations concerning various aspects of the plan. It is a tribute to the expertise and experience of the parties involved and their counsel that they have been able to negotiate resolutions of the various points in issue with the result that this sanction motion is unopposed. I also think it commendable that the Monitor so amply demonstrated the objectivity and neutrality which is the hallmark of a court-appointed officer.

2      I am advised that while the applicants initially considered an unconsolidated plan which had the support of PSINet Inc. ("Inc."), their parent and major creditor, it was considered that the consolidated route was the way to go. The consolidated plan avoids the complex and likely litigious issues surrounding the allocation of the proceeds from the sale of substantially all of the assets of the applicants to Telus Corporation. The consolidated plan also reflected the intertwined nature of the applicants and their business operations, which businesses in essence operated as a single business and with only one of the applicants having employees. I have previously alluded to the incomplete and deficient record keeping of the applicants. While shooting oneself in the foot should not be endorsed, this is another factor favouring consolidation and the elimination of expensive allocation (amongst the four Canadian applicants) litigation.

3      I note that the consolidated plan also provides that Inc. valued its charge against the assets of PSINet Limited ("Ltd.") one of the applicants to $55 million. The Monitor, PricewaterhouseCoopers Inc. found this to be a reasonable amount and within the range of values which might reasonably be anticipated. Again however I would repeat my observation about incomplete and deficient record keeping.

4      At the February 28th meeting of creditors, a single class of creditors, namely the unsecured creditors, voted on the consolidated plan as it then existed. Secured creditors were not affected by the plan, but were of course characterized as unsecured creditors to the extent that their claim exceeded the expected deficiency in the deemed realization of their security. 92.7% of the creditors voting, representing 98.8% in value of the claims, voted in favour of the plan. Had the votes of Inc. and other creditors affiliated with the applicants been ignored, then 92.5% of the class, representing 87.2% in value voted in favour of the plan.

5      Since the vote, 360Network Services Ltd. (and other affiliates) ("360Networks") have reached agreement with the applicants and Inc. to resolve a motion brought by 360Networks in respect of its concerns regarding the consolidation of the estates of the applicants in the plan of arrangement.

6      Similarly Inc. has made certain concessions as to the plan with an eye to making good on the condition imposed on it to make a material (albeit modest) adjustment so as to compensate the other creditors for the "frustration cost" associated with Inc.'s late blooming discovery of its security vis-à-vis Ltd. and its motion to reperfect this security.

7      The three part test for sanctioning a plan is laid out in *Northland Properties Ltd., Re* (1988), 73 C.B.R. (N.S.) 175 (B.C. S.C.), affirmed (1989), 73 C.B.R. (N.S.) 195 (B.C. C.A.); *Sammi Atlas Inc., Re*, 3 C.B.R. (4th) 171 (Ont. Gen. Div. [Commercial List]):

        (a) There must be strict compliance with all statutory requirements and adherence to the previous orders of the court;

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2002 CarswellOnt 1261, 33 C.B.R. (4th) 284, 113 A.C.W.S. (3d) 760

(b) All material filed and procedures carried out are to be examined to determine if anything has been done or purported to be done which is not authorized by the CCAA or other orders of the court; and

(c) The plan must be fair and reasonable.

8    It appears to me that parts (a) and (b) have been accomplished, now that Inc. has made the further concessions. The creditors have had sufficient time and information to make a reasoned decision. They have voted in favour of the consolidated plan by a significant margin over the statutory requirement, even where one eliminates the related vote of Inc. and its affiliates. In reviewing the fairness and reasonableness of a plan, the court does not require perfection. As discussed in *Sammi* at p. 173:

A Plan under the CCAA is a compromise; it cannot be expected to be perfect. It should be approved if it is fair, reasonable and equitable. Equitable treatment is not necessarily equal treatment... One must look to the creditors as a whole (i.e. generally) and to the objecting creditors (specifically), and see if rights are compromised in an attempt to balance interests (and have the pain of the compromise equitably shared) as opposed to a confiscation of rights...

9    There is a heavy onus on parties seeking to upset a plan that the required majority have supported: See *Sammi* at p. 174 citing *Central Guaranty Trustco Ltd., Re*, 21 C.B.R. (3d) 139 (Ont. Gen. Div. [Commercial List])

10    The fairness and reasonableness of a plan are shaped by the unique circumstances of each case, within the context of the CCAA. In *Canadian Airlines Corp., Re*, [2000] 10 W.W.R. 269 (Alta. Q.B.), leave to appeal refused [2000] 10 W.W.R. 314 (Alta. C.A. [In Chambers]) Paperny J. at p. 294 considered factors such as the composition of the unsecured vote, what creditors would receive on liquidation or bankruptcy as opposed to the plan, alternatives available (to the plan and bankruptcy) and the public interest. I have already discussed the first element; the third and fourth do not appear germane here. As to the second, it is clear that the creditors generally are receiving more than in a bankruptcy and to the extent that Inc. is impacted, it has consented to such impact.

11    In the circumstances of this case, the filing of a consolidated plan is appropriate given the intertwining elements discussed above. See *Northland Properties Ltd., Re*, 69 C.B.R. (N.S.) 266 (B.C. S.C.), affirmed (B.C.C.A.), *supra*, at p. 202; *Lehndorff General Partner Ltd., Re*, 17 C.B.R. (3d) 24 (Ont. Gen. Div. [Commercial List]) at p. 31. While consolidation by its very nature will benefit some creditors and prejudice others, it is appropriate to look at the overall general effect. Here as well the concessions of Inc. have ameliorated that prejudice. Further I am of the view if consolidation is appropriate (and not proceeded with by any applicant for tactical reasons of minimizing valid objections), then it could be inappropriate to segregate the creditors into classes by corporation which would not naturally flow with the result that one or more is given a veto, absent very unusual circumstances (and not present here). I would also note that *Associated Freezers of Canada Inc., Re*, 36 C.B.R. (3d) 227 (Ont. Bktcy.) and *J.P. Capital Corp., Re*, 31 C.B.R. (3d) 102 (Ont. Bktcy.) which referred to prejudice to one creditor were not CCAA cases, but rather *Bankruptcy and Insolvency Act* cases; secondly *Associated Freezers* merely kept the door open for the objecting party to reconsider its position given the short notice and provided that if on reflection it wished to come back to make its submissions, it was entitled to do so for a period of time.

12    In the end result (and with no creditors objecting), I approve and sanction the consolidated plan as amended. Order to issue accordingly as per my fiat.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2002 CarswellOnt 1261, 33 C.B.R. (4th) 284, 113 A.C.W.S. (3d) 760

*Motion granted.*

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

TAB 75

**CITATION:** R. v. Dunn, 2013 ONSC 137
**COURT FILE NO.:** 10-00145
**DATE:** 20130114

2013 ONSC 137 (CanLII)

### ONTARIO

### SUPERIOR COURT OF JUSTICE

| | | |
|---|---|---|
| BETWEEN: | ) | |
| | ) | |
| HER MAJESTY THE QUEEN | ) | *Robert Hubbard, Amanda Rubaszek & David Friesen*, for the Crown |
| – and – | ) | |
| FRANK A. DUNN, DOUGLAS C. BEATTY AND MICHAEL J. GOLLOGLY | ) | *David M. Porter, John Dent, Sarit Batner, Harry Underwood & Andrew Matheson,* for the Defendant, Frank A. Dunn, |
| Defendants | ) | *Gregory Lafontaine &, Lori Anne Thomas,* for the Defendant, Douglas C. Beatty |
| | ) | *Sharon Lavine & Robin McKechney*, for the Defendant, Michael J. Gollogly |
| | ) | **HEARD:** January 12, 16, 17, 18, 19, 20, 30, 31, February 1, 2, 3, 6, 7, 8, 9, 13, 14, 15, 16, 17, 21, 22, 27, 28, 29, March 5, 6, 26, 27, 28, April 2, 3, 4, 5, 10, 11, 17, 18, 30, May 1, 2, 3, 10, 14, 22, 23, 24, 28, 29, June 4, 5, 12, 13, 14, 19, 20, 21, 22, 25 & 26, September 27, 28, October 2, 3, 2012 |

**Contents**

Nortel's Circumstances during the time-frame of this indictment ................................................... 6

The law of fraud as it applies to the allegations against the accused in this case ........................... 9

Materiality ........................................................................................................................................ 11

     SAB 99 and Mr. Dunn, Mr. Beatty and Mr. Gollogly ......................................................... 13

The presumption of innocence, reasonable doubt, R. v. W.(D.), [1991] 1 S.C.R. 742 ............... 13

Business Records ............................................................................................................................. 14

Should the evidence of some of the Nortel and Deloitte's employees be viewed with caution? . 14

A few basic accounting principles ............................................................ 18

    More generally ................................................................................ 20

    Considerations concerning the set-up and use of accrued expenses/liabilities .............. 21

Nortel specific circumstances ............................................................... 21

    Deloitte's historical relationship with Nortel .......................................... 21

    Target setting and Nortel's culture ...................................................... 22

    The employment of Mr. Dunn, Mr. Beatty and Mr. Gollogly at Nortel .............. 23

    Mr. Frank Dunn .......................................................................... 23

    Mr. Douglas Beatty ...................................................................... 24

    Mr. Michael Gollogly .................................................................... 24

    Mr. Dunn, Mr. Beatty and Mr. Gollogly ............................................. 25

    Nortel was a complex corporate organization ....................................... 25

The Financial Results of Nortel Networks Corporation ................................. 26

    Nortel's Consolidation Close Process .................................................. 27

    Excess accrued liabilities & Nortel's policy of Conservatism ...................... 29

    The accused knew there were excess liabilities on the balance sheet ............. 32

    Unsupported and excessive accrued liabilities on the balance sheet ............. 33

    Nortel's Pro Forma earnings calculations ............................................ 33

    Pro Forma earnings and Bonus Thresholds ......................................... 34

Nortel's Re-statement of previously-published financial statements .................. 35

    The First restatement .................................................................... 36

    A short chronology ...................................................................... 36

    Who was Responsible .................................................................... 37

    Nortel Restatements are complex ..................................................... 37

    How the Restatements came about .................................................... 37

The Comprehensive Balance Sheet Review ........................................................ 39

Was the Comprehensive Balance Sheet Review Comprehensive? ...................................... 41

The results of the second restatement .................................................................. 43

Inferences concerning Nortel's restated financial results for Q1 03 and Q2 03 .................. 47

Q4 02-the 4th quarter of 2002 ............................................................................. 48

The participation of Mr. Dunn and Mr. Beatty ................................................... 51

The specific late entry accrued expenses/liabilities solicited by Mr. Harrison ................. 52

The solicitation of late entries from Karen Sledge ............................................. 52

Late entry Fringe and Vacation accrued liability balances ................................... 52

Fringe Benefit Accrued Liability Balances ........................................................ 52

Vacation Expenses ........................................................................................ 53

Soliciting accrued expenses in Asia ................................................................. 54

The solicitation of additional accruals from Ken Crosson ..................................... 56

Excess and obsolete inventory ........................................................................ 56

Use of Mr. Crosson's $30 million as an offset .................................................. 58

The JDS Uniphase Corporation transactions ..................................................... 58

Perot Systems .............................................................................................. 61

The solicitation of additional accruals from Jim Kinney for the period Q4 02 ................. 62

Mr. Gollogly's knowledge generally ................................................................ 64

360 Networks .............................................................................................. 65

The manipulation of Nortel's pro forma earnings before taxes to get a bonus .................. 66

Did the late entry accrual expenses/liabilities misrepresent Nortel's US GAAP financial results for Q4 02? ....................................................................................... 66

Susan Shaw's 2002 Summary of Accrued Liabilities ............................................. 67

Corporate ........................................................................................................ 70

Non-Op ........................................................................................................... 71

Q4 2002 Conclusion ....................................................................................... 72

Q1 03 & Q2 03 ............................................................................................... 74

The release of $361 million in Q1 03 and $372 million in Q2 03 ........................ 74

The Crown's Chart – "operations" Ex. 42E .................................................... 75

The PWC release – $19 million-originally released Q1 03 ................................ 76

The Genuity release – $23 million originally released Q1 03 ............................ 77

The Optical Warranty release – $8 million released in Q2 03 ............................ 78

Conclusion .................................................................................................... 79

The release of $80 million in Non-op accrued liability balances and the entitlement to a bonus ........................................................................................................... 79

The effect of the $80 million on earnings .......................................................... 85

Conclusion concerning the Bonus Payments & earnings .................................... 85

The materiality of the release of $80 million of Non-op accrued liability balances ............. 86

Conclusion .................................................................................................... 89

Susan Shaw's list of $189 million Non-op accrued liabilities .............................. 89

Should the $189 million have been dealt with in Q4 02? .................................... 93

The knowledge of Mr. Dunn, Mr. Beatty and Mr. Gollogly ................................ 94

The accrued liability balance for the Degree of Difficulty bonus – $25 million ................. 95

The accrued liability balance for the General Provision $10 million .................... 96

The $142 million in accrued liabilities which Nortel wished to release in Q2 03 ............... 98

Conclusion .................................................................................................... 99

The use of Outlooks and Roadmaps in 2003 .................................................... 100

The Arris Proposal ......................................................................................... 105

Deloitte's interest in forecasting .................................................................... 105

The 2003 Outlooks and Roadmaps tracked proposed releases .......................... 107

The February 19, 2003 teleconference .............................................................. 107

The June 6, 2003 Outlook and the surrounding events ........................................................ 111

The release of the $4 million Siemens accrued liability balance ........................................ 113

The Restricted Stock Unit Bonus Plan.................................................................................. 115

Conclusion ............................................................................................................................. 116

The draft letters Mr. Gollogly prepared for the Board of Directors and the Audit Committee in July 2003 ......................................................................................................................... 117

Mr. Gollogly's draft letter to the Chairman of the Board of Directors, the Chairman of the Audit Committee and the Chairman of the Joint Leadership Resources Committee ......... 120

Conclusion ............................................................................................................................. 121

Mr. Gollogly's draft letter to Mr. Beatty .............................................................................. 121

The "now infamous intercompany out of balance provision" ............................................. 122

Mr. Gollogly's reference to the unsupported accrued liability balances ............................ 123

Mr. Gollogly's reference to the forecasted Q3 03 loss ....................................................... 125

Mr. Gollogly's concern about Nortel's internal controls .................................................... 125

Conclusion ............................................................................................................................. 125

The language in the 2003 press releases and the notes to the first restatement ................. 126

The Crown's criticism of the Q3 03 financial results ............................................................... 129

Preservation of the integrity of the Q3 03 General Ledger ................................................. 131

Conclusion ............................................................................................................................. 132

Conclusion ................................................................................................................................... 132

The excess and unsupported accrued liabilities ................................................................... 132

Q4 2002 (Q4 02) ................................................................................................................... 133

The $80 million in Non-op Accrued liability balances released to the Q1 03 profit and loss statement ............................................................................................................................... 134

The Return to Profitability Bonus ......................................................................................... 134

The Restricted Stock Unit Bonus .......................................................................................... 134

The $80 million generally ................................................................................... 135

The attempt to release the $142 Million ........................................................... 136

Nortel's published financial results for Q3 03 ................................................... 136

The Comprehensive Balance Sheet Review ....................................................... 136

The Q1 & Q2 03 accrued liability balance releases ........................................... 138

Verdict ................................................................................................................ 139

**MARROCCO J.:**

[1]      The defendants are charged with two counts of fraud.

[2]      The first count alleges that, between January 1, 2000 and April 28, 2004, the three accused did, by deceit falsehood or other fraudulent means, defraud the public by deliberately misrepresenting the financial results of Nortel Networks Corporation.

[3]      The second alleges that, between January 1, 2000 and April 28, 2004, the three accused did, by deceit falsehood or other fraudulent means, defraud Nortel Networks Corporation by deliberately misrepresenting the financial results of Nortel Networks Corporation.

[4]      In both counts, it is alleged that the extent of the fraud exceeded $5,000.

[5]      For the sake of completeness, I make two observations: first, the events captured by this indictment concern matters which occurred between 2000 and 2004. Nortel did not commence *Companies Creditors Arrangement Act* proceedings until January 14, 2009. The evidence in this proceeding did not describe events linked to the commencement of those proceedings. Second, Nortel Networks Corporation's shares traded publicly on the New York and Toronto Stock Exchanges. It ceased trading publicly on January 14, 2009.

**NORTEL'S CIRCUMSTANCES DURING THE TIME-FRAME OF THIS INDICTMENT**

[6]      All allegations of criminal conduct are made within a factual fabric or context. A true appreciation of the nature of the alleged criminal conduct is impossible without a description of that fabric or context.

[7]      Part of the factual context for this matter is set out in Exhibit 251D. Exhibit 251D was received in evidence as a business record of Deloitte & Touche.

[8]      Nortel Networks Corporation ("Nortel") was in the business of providing data, wireless and optical networking products and services to telecommunications carriers and enterprise customers around the world. Between 1998 and 2001, Nortel Networks Corporation and its

predecessor, Nortel Networks Limited, undertook a total of twenty-two acquisitions for an aggregate purchase price of $29 billion. These acquisitions were undertaken during a period of both strong economic growth in 1999 and 2000 and rapid infrastructure build-out by the telecommunications industry.

[9]     By 2001, the telecommunications industry began to experience a slowdown attributed to excess capacity created as a result of the build-out, the consolidation of service providers within the industry and lower capital spending by industry participants. As a result, there was a dramatic and significant reduction in the demand for Nortel's products and services.

[10]    In response to the industry and economic downturn in 2001, Nortel attempted to streamline its operations. Nortel reduced its overall workforce from approximately 94,002 to approximately 52,000 and incurred severance and termination charges in excess of $3.3 billion. Nortel discontinued aspects of its operations and divested itself of investments. Nortel recorded a write down of $12.4 billion for goodwill and other intangible assets in the quarter ending June 30, 2001.

[11]    In 2002, Nortel reduced its workforce to 37,000 as at December 31, 2002. Nortel experienced a write down of its goodwill in its Optical business of approximately $595 million and, on December 13, 2002, Nortel pledged substantially all of its assets in favor of certain lenders.

[12]    Nortel experienced net income losses of $197 million in 1999, $2.9 billion in 2000, $27.4 billion in 2001 and $3.6 billion in 2002.

[13]    The equity of Nortel's shareholders shrank from $28.7 billion in 2000 to $1.9 billion in 2002.

[14]    The circumstances had become so dire at Nortel that, when a quarterly result was announced, the auditors had to take a view of the next twelve months from the date of the quarterly report and opine on the likelihood of Nortel continuing as a going concern.

[15]    Nortel Networks was publicly-traded on the New York Stock Exchange. The New York Stock Exchange ran on Nortel equipment. Nortel's decline was so severe that the closing share price for the company's common shares in September 2002 fell below the minimum for continual listing on the New York Stock Exchange. The Chairman of Nortel's Board was advised that Nortel might be de-listed although, in fact, this did not occur.

[16]    The compelling but rather sterile economic reality described above was put into more human terms by Mr. Bruce Richmond, who testified as a Crown witness. During the time-frame of the indictment, Mr. Richmond was the Vice-Chair and Deputy Chief Executive of Deloitte & Touche LLP (Canada). He is a chartered accountant; he is a Fellow of the Institute of Chartered Accountants since 1997, a designation conferred on approximately 2% of the Institute's members.

[17]    During the time-frame set out in the indictment, Mr. Richmond was responsible for overall management of Deloitte's clients across the entire Deloitte organization, which comprised sixty-seven offices with $1.4 billion in revenues.

2013 ONSC 137 (CanLII)

[18]    Mr. Richmond was professionally associated with Nortel through Deloitte & Touche from the late 1970's.

[19]    Through the time-frame described in the indictment, Mr. Richmond served as the Deloitte & Touche Senior Advisory Partner to Nortel. Specifically, Mr. Richmond had been the Senior Advisory Partner at Nortel since 1992. In addition to Nortel, Mr. Richmond also served as the Advisory Partner to approximately a dozen of Canada's major corporations.

[20]    I accept Mr. Richmond's entire evidence in this matter without qualification.

[21]    As Advisory Partner, Mr. Richmond had two primary responsibilities; first, to interface with the directors, particularly members of the Audit Committee, as well as the CEO and the CFO; second, to be a sounding board for the Deloitte partners conducting Nortel audits and reviews.

[22]    Mr. Richmond attended virtually all Audit Committee meetings.

[23]    Mr. Richmond described Nortel as a major client in the same category as Canadian banks and other major Canadian corporations. Mr. Richmond indicated that approximately twenty companies in Canada would be described as major clients.

[24]    Mr. Richmond described Nortel's situation during the time period set out in the indictment as follows: "Nortel was descending down a very slippery path at a very fast rate… The notion of where the bottom was going to be was not understood at that point in time by anybody… One day a client existed the next day it was out of business… The team was clearly on red alert in terms of what they were facing… ….endeavoring to the best of our collective ability, and I'm talking Nortel folk and I'm talking Deloitte folk, to put your arms around a situation that frankly, having had 20 years in the profession and having been the lead client guy and the senior client service guy for the largest firms in the country, this was a situation that we had never seen before".

[25]    Later on in his evidence, Mr. Richmond said: "in the years 2001, 2002, the company was fighting for its very survival…"

[26]    Mr. Richmond indicated that the free-fall that Nortel was experiencing resulted in a situation where Nortel could be comfortable with the value of an asset on one day and next day be convinced that the asset was severely diminished in value.

[27]    As a result of that situation, Nortel's Audit Committee and Board of Directors were in Mr. Richmond's words: "focused like a laser beam in terms of ensuring from their perspective in the discharge of their responsibilities that the Corporation was doing whatever was required to ensure that they had identified and appropriately quantified provisioning in connection with any exposure of the Corporation".

[28]    Nortel's Audit Committee and Board of Directors had succeeded in communicating this concern about providing for every risk to senior management and the field.

[29]    Nortel's first re-statement re-stated more than $900 million in excess accrued liabilities into previously-published Nortel financial statements. I am satisfied that one of the underlying reasons for the presence of these  excess accrued liability balances was the determination of Nortel's Audit Committee, auditors, senior management and field staff to provide for every risk and, thereby, avoid unpleasant surprises.

## THE LAW OF FRAUD AS IT APPLIES TO THE ALLEGATIONS AGAINST THE ACCUSED IN THIS CASE

[30]    It is the Crown's position that the accused told lies and that the lies put investors at risk of economic deprivation. It is also the Crown's position that the accused told lies which put Nortel itself at risk of economic deprivation. The lies, according to the indictment, are found in the deliberate misrepresentation of Nortel Networks Corporation`s financial results.

[31]    The offence of fraud is set out in the *Criminal Code*, RSC 1985, C. C-46 s. 380 in the following terms:

> 380. (1)  Every one who, by deceit, falsehood or other fraudulent means, whether or not it is a false pretense within the meaning of this Act, defrauds the public or any person, whether ascertained or not, of any property, money or valuable security or any service,
>
> > (a) is guilty of an indictable offence and liable to a term of imprisonment not exceeding 10 years, where the subject matter of the offence is a testamentary instrument or the value of the subject matter of the offence exceeds $5000.

[32]    At the outset of the trial, the Crown provided the court with a factum setting out the general principles of the law of fraud, as well as helpful references to s. 397(1)(a) of the *Criminal Code*. That factum was quite helpful and I have attempted to apply those principles in this case.

[33]    In *R. v. Zlatic* (1993), 79 C.C.C. (3d) 466 (S.C.C.) at para. 26, the court stated that the *actus reus* of fraud will be established by proof of: (i) the prohibited act, be it an act of deceit, a falsehood or some other fraudulent means; and (ii) deprivation caused by the prohibited act, which may consist in actual loss or the placing of the victim's pecuniary interests at risk.

[34]    The court, in *R. v. Zlatic*, at para. 26, held that the *mens rea* for fraud was established by proof of: (i) subjective knowledge of the prohibited act; and, (ii) subjective knowledge that the prohibited act could have as a consequence the deprivation of another (which deprivation may consist in knowledge that the victim's pecuniary interests are put at risk).

[35]    Finally, the court stated that, where proof of these two elements was established, the accused was guilty if he or she actually intended the prohibited consequence or was reckless concerning the consequences (see: *R. v. Zlatic (supra)*, at para. 27).

[36]    In *R. v. Eizenga* 2011 ONCA 113 [2011] O.J. No. 524, at para. 81, the Court of Appeal emphasized that a subjective intent to mislead was not an essential element of fraud.

[37]    In *R. v. Theroux* (1993), 79 C.C.C. (3d) 449, at paras. 16-17 (S.C.C.), McLachlin J. [as she then was] defined the *actus reus* for the offence of fraud as requiring two elements: a dishonest act and deprivation.

[38]    McLachlin J. indicated that deprivation was established if it was proven that the dishonest act caused detriment, prejudice or risk of prejudice to the economic interests of the victim.

[39]    In *R. v. Theroux*, McLachlin J. [as she then was] defined the *mens rea* requirement for the offence of fraud.

[40]    McLachlin J. stated that the *mens rea* of fraud was established by proof of subjective awareness that one was undertaking the prohibited act, *i.e.* the deceit, falsehood or other dishonest act, and that the prohibited act could cause deprivation in the sense of depriving the proposed victim of property or putting the proposed victim's property at risk.

[41]    McLachlin J. also stated that the fact that an accused person may have hoped that the deprivation would not take place or may have felt that there was nothing wrong with what he or she was doing was not a defence (see: *R v Theroux*, at para. 22).

[42]    Later on, McLachlin J. stated, at para. 29: "the accused must have subjective awareness at the very least that his or her conduct will put the property or economic expectations of others at risk".

[43]    This case deals with false financial results. Where the omission or misstatement complained of is not material to those financial results, it stands to reason that it will be difficult to prove that there was any risk of prejudice to the economic interests of the public.

[44]    The public are not defined in the indictment in count one. Obviously, the public can be divided into different groups or segments. I am satisfied that a fair interpretation of the public in this case is the investing public.

[45]    In count two, the victim is defined; namely, Nortel Networks Corporation.

[46]    As indicated earlier, the Crown advances the proposition that, in this fraud case, the accused told lies. McLachlin J. specifically commented in *R. v. Theroux*, at para.29: "But in cases like the present one, where the accused tells a lie knowing that others will act on it and thereby puts their property at risk, the inference of subjective knowledge that the property of another would be at risk is clear".

[47]    In *R. v. Drabinsky*, 2011 ONCA 582 [2011] O.J. No. 4022, one of the charges in the indictment was that the accused in that case had provided false financial information to persons who invested in an IPO. In that case, at para. 80, the Ontario Court of Appeal stated: "the Crown had to prove the appellants knew that the financial statements contained misrepresentations and that they were material to the decision to invest in the IPO".

[48]    The matter before me is different; there is no IPO. In this case, the defendants are, in count one, facing a charge of defrauding the public by deliberately misrepresenting the financial results of Nortel Networks Corporation. Accordingly, if one applies the same conclusion that the Court of Appeal expressed in *R. v. Drabinsky, supra*, the conclusion in this case must be that the Crown has to prove that the accused knew that Nortel's financial statements contained misrepresentations that were material to the decision of a member of the investing public to buy, hold or sell Nortel publicly-traded securities.

[49]    With respect to count two, the essence of the matter seems to be that the misrepresentation of Nortel's financial results created the economic risk that Nortel Networks Corporation would pay money to the defendants that ought not to be paid to them.

## MATERIALITY

[50]    In *R. v. Drabinsky*, at para. 83, the Court of Appeal commented on the notion of materiality. The court said that materiality in the context of that case was a fair inference from the nature of the misrepresentations, the documents in which they appeared and the context in which those documents were used.

[51]    At paras. 81 & 82, the Court of Appeal, in *R. v. Drabinsky*, upheld the trial judge's decision that the misrepresentations in the financial statement relied on in support of the IPO were material to the decision to purchase shares through the IPO.

[52]    The materiality of a misstatement or omission is, therefore, important. In its opening, as part of a Glossary of Terms, the Crown provided a definition of materiality. In the context of financial statements, an omission or misstatement is material according to this glossary if "the judgment of a reasonable person relying on the statements would have been changed or influenced by the inclusion or correction of the item".

[53]    The Crown offered expert evidence on various aspects of the accounting issues of concern in this proceeding. This evidence was received on consent in the form of a written report from Asset Risk Advisory Inc. The Asset Risk Advisory Inc. Report was prepared by Mr. Robert Chambers, who is a lawyer, a chartered accountant, a certified fraud Examiner and a Fellow of the Institute of Chartered Accountants of Ontario.

[54]    At paragraph 31 of his report, which was appended to his affidavit, Mr. Chambers made the following observation about materiality: "According to FASB, materiality is the quality of being important. The omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item."

[55]    Mr. Chambers referred the reader of his report to SEC Staff Accounting Bulletin 99 ("SAB 99") for guidance in determining materiality. SAB 99 was published in 1999 – the same year that Nortel's world began to unravel.

[56]    In SAB 99, SEC made it clear that exclusive reliance on dollar thresholds cannot be used as a substitute for a full analysis of all relevant considerations when determining materiality.

2013 ONSC 137 (CanLII)

2013 ONSC 137 (CanLII)

[57]    SAB 99 states that, among the considerations that may render material a quantitatively small misstatement of a financial statement item, are:

- Whether the misstatement arises from an item capable of precise measurement or whether it arises from an estimate and, if so, the degree of imprecision inherent in the estimate;

- Whether the misstatement masks a change in earnings or other trends;

- Whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise;

- Whether the misstatement changes a loss into income or vice versa;

- Whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability;

- Whether the misstatement affects the registrant's compliance with regulatory requirements;

- Whether the misstatement affects the registrant's compliance with loan covenants or other contractual requirements;

- Whether the misstatement has the effect of increasing management's compensation – for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation; and,

- Whether the misstatement involves concealment of an unlawful transaction.

[58]    Apart from Mr. Chambers' general statements, no expert evidence concerning materiality was offered in this case. Representatives of Deloitte performed a materiality analysis, which was admitted as a business record and to which reference will be made.

[59]    Count number one alleges a fraud upon the public. Nortel was publicly-traded. I am satisfied that the public in this case includes the investing public. Persons who own publicly-traded Nortel securities are included in the term "public". Persons who are thinking of purchasing publicly-traded Nortel securities are included in the term "public". I accept and intend to apply the notion of materiality that is described in Mr. Chambers' report. A misrepresented financial result is material if, in light of the surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable member of the investing public would have been changed or influenced by the correction of the item. The omission of a financial result is material if, in light of the surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable member of the investing public would have been changed or influenced by the disclosure of the item.

2013 ONSC 137 (CanLII)

### *SAB 99 and Mr. Dunn, Mr. Beatty and Mr. Gollogly*

[60]    Mr. Gollogly was aware of SAB 99. Mr. Gollogly sent a memo to selected Nortel employees dealing with SAB 99 on March 3, 2003. His memo attached SAB 99 itself. Mr. Gollogly made a presentation to Nortel's Audit Committee on April 23, 2003, in which he explained the concept of materiality. Mr. Beatty and Mr. Dunn were normally in attendance at Audit Committee meetings.

[61]    I am satisfied that Mr. Dunn and Mr. Beatty were present when Mr. Gollogly made this presentation to the Audit Committee.

[62]    Mr. Beatty was aware of SAB 99. On April 19, 2003, Mr. Beatty sent an e-mail to Mr. Gollogly which stated: "would you please email me the charts (if possible) for SAB 99 that speak to the need to disclose, particularly if management comp'n is achieved etc. – probably useful to have the SAB 99 text as well for Monday a.m."

[63]    Mr. Dunn was Nortel's CEO during the time with which we are concerned. Prior to that, he was Nortel's CFO and, prior to that, he was Nortel's Corporate Controller.

[64]    Mr. Dunn, Mr. Beatty and Mr. Gollogly were senior officers of a corporation publicly-traded on the New York Stock Exchange with annual revenues of approximately $10 billion per year during the time frame of the indictment.

[65]    I am satisfied that Mr. Dunn, Mr. Beatty and Mr. Gollogly were aware of the specifics of SAB 99, the importance of determining whether items of financial information were materially important and, finally, the importance of making the appropriate disclosure to the public.

## THE PRESUMPTION OF INNOCENCE, REASONABLE DOUBT, R. V. W.(D.), [1991] 1 S.C.R. 742

[66]    I have instructed myself on the presumption of innocence, the burden of proof and reasonable doubt. In a criminal case, the accused is presumed to be innocent unless and until the Crown has proved his/her guilt beyond a reasonable doubt. It is not the responsibility of any accused under our law to establish or to demonstrate or to prove his innocence. If the Crown should fail to prove guilt in respect of a particular crime beyond a reasonable doubt, then the accused is not guilty of that crime. To put the matter somewhat differently, in order to find an accused guilty of a particular offence, the Crown must prove each and every one of the essential elements of that offence beyond a reasonable doubt. If I should entertain a reasonable doubt about the proof of one or more of those essential elements, then I must find the accused not guilty of that offence.

[67]    A reasonable doubt is not a far-fetched or frivolous doubt. It is not some fanciful doubt. It is not a doubt based upon sympathy or prejudice. Rather, it is an honest and fair doubt based on reason and common sense. It is doubt that logically arises from the evidence or lack of evidence. It is not enough that I believe that Mr. Dunn, Mr. Beatty or Mr. Gollogly is probably or likely guilty of count one or count two of this indictment. In those circumstances, I must find any or all of them not guilty because Crown counsel has failed to satisfy me of guilt beyond a reasonable doubt. Proof of probable guilt or likely guilt is not proof of guilt beyond a reasonable

doubt. I should also remember, however, that it is virtually impossible to prove anything with absolute certainty. Crown counsel is not required to do so. Absolute certainty is a standard of proof that is impossibly high.

[68]    If, based on all the evidence, I am sure that Mr. Dunn, Mr. Beatty or Mr. Gollogly committed the offence described in either count one or count two in the indictment, I should find Mr. Dunn, Mr. Beatty or Mr. Gollogly guilty of such offence since I would have been satisfied of guilt beyond a reasonable doubt. If, at the end of the case based on all the evidence, I am not sure that Mr. Dunn, Mr. Beatty or Mr. Gollogly committed either count one or count two in this indictment, I should find Mr. Dunn, Mr. Beatty or Mr. Gollogly not guilty of such offence. If, after a full consideration of all the evidence admissible against any one of defendants, there remains in my mind a reasonable doubt concerning the guilt of such defendant, then the Crown has failed to meet the standard of proof which the law requires, the presumption of innocence prevails and it is my duty to acquit. On the other hand, if, after a full and careful consideration of all the evidence, I am left with no reasonable doubt concerning the guilt of Mr. Dunn or Mr. Beatty or Mr. Gollogly on either or both counts in the indictment, the presumption of innocence has been displaced and it is my duty to convict.

[69]    Reasonable doubt applies to issues of credibility. I am not required to firmly believe or disbelieve any witness or set of witnesses. I must ask myself whether, on the basis of the evidence which I do accept, I am convinced beyond a reasonable doubt by that evidence of the guilt of one or more of the accused )see: R. v. W.(D.), [1991] 1 S.C.R. 742, at para. 28).

**BUSINESS RECORDS**

[70]    During the course of this trial, the Crown and the defence tendered hundreds of documents. These documents were received as business records. As such, they are capable of proving the facts contained within them. However, I am not bound to accept the business records as proof of facts contained within them.

**SHOULD THE EVIDENCE OF SOME OF THE NORTEL AND DELOITTE'S EMPLOYEES BE VIEWED WITH CAUTION?**

[71]    The Crown indicated that several of the witnesses listed in the Appendix to its submissions were accomplices. The Crown indicated that these witnesses sought to minimize their involvement or distance themselves from wrongdoing and that this took the form of acquiescing quickly with defence suggestions on cross-examination.

[72]    Leading questions were asked on cross-examination and it is correct that, on many occasions, witnesses accepted the suggestions contained in those questions.

[73]    At the same time, the Crown submits that there was strong confirmatory evidence of aspects of the testimony of these witnesses in the documents which were tendered.    The witnesses in respect of whom the Crown urges caution played a role, according to the Crown, in the planning, analysis and use of accrued liability balances to meet earnings targets. Without the co-operation of these witnesses, the Crown submits the three accused would not have been able

2013 ONSC 137 (CanLII)

to shift Nortel from a profit to a loss in Q4 02 (the fourth quarter of 2002) and engineer profits in Q1 03, Q2 03 and Q3 03 (the first quarter of 2003 etc.).

[74]    This is perhaps an appropriate place to observe that there is nothing about the background of any of these witnesses which makes them inherently "unsavory". The evidence has disclosed that regulatory proceedings against the defendants are in abeyance pending the outcome of this matter. The evidence has not disclosed that any of the witnesses listed in the Crown's Appendix are facing criminal charges themselves. There is no suggestion in the evidence that any of these witnesses are the subject of outstanding regulatory proceedings.

[75]    The Crown submits that there was a long-standing culture of Conservatism at Nortel and many of the witnesses who are chartered accountants or certified management accountants had to know that accrued liability balances therefore existed and were being used to meet earnings targets. The Crown submits that compliant employees assisted the accused in misrepresenting the financial results of Nortel Networks Corporation.

[76]    I am satisfied that, during the time-frame of the indictment, there was at Nortel a culture of Conservatism, in the accounting sense of that term. I am satisfied that this culture existed for in excess of twenty years. It has to be remembered, however, that, until 1999, the SEC and the Ontario Securities Commission had not prohibited the practice of releasing accrued liability balances to bridge the gap between a company's actual performance and a previously announced financial target. Coincidentally, it was in the same year, 1999, that Nortel began experiencing significant losses.

[77]    Finally, one has to remember that Nortel's culture concerning the recording of accrued liability balances was slow to change because for fiscal 2000, 2001 2002 Nortel reported losses in the billions and, as a result, the Board of Directors, Nortel's auditors and its senior management were preoccupied with survival.

[78]    The accused called no defence. All of the witnesses who testified were called by the Crown.

[79]    The ten witnesses listed in the Crown's Appendix gave evidence which was capable of both inculpating and exculpating the accused. As well, this is not a case in which it is relatively straightforward to delineate evidence which implicates any one or all of the accused in either of the offences set out in the indictment.

[80]    With respect to those portions of the evidence which, in my view, are exculpatory, the question is whether such evidence alone or in combination with other evidence leaves me with a reasonable doubt (see: *R. v. Rowe*, 2011 ONCA 753, 2011 OJ No. 5382 (Ont. CA), at para. 42).

[81]    With respect to those portions of the evidence which implicate the accused, I have to decide whether the credit of these witnesses is such that I should caution myself about accepting, in the absence of confirmatory evidence, testimony from them which implicates any one or more of the three accused.

16

[82]    As indicated earlier, the Crown suggested that these witnesses were accomplices and that their evidence implicating the accused should be viewed with caution in the absence of confirmatory evidence.

[83]    I propose now to consider a few highlights of the testimony of the witnesses named by the Crown.

[84]    Mr. Brian Harrison was, during the time-frame of the indictment, the Vice-President of Performance Management and, later, when the position of Vice-President Performance Management was eliminated, Nortel's Director of Financial Planning and Analysis. Mr. Harrison was directly involved in the process of soliciting accruals during Q4 02. It is the Crown's view that he actively assisted in changing a Q4 02 pro forma gain before taxes into a loss before taxes. Mr. Harrison was a CMA or certified management accountant during the time-frame of the indictment. He no longer has that designation for reasons which were not disclosed. He was interviewed many times by different police forces and regulatory authorities. At one point, he was told that he was a target of the investigation into the matters described in this indictment. Prior to actually testifying, he was told by the police and the Crown that he was no longer considered a target of the investigation into these matters.

[85]    In my view, I should exercise some caution before accepting unconfirmed evidence from Mr. Harrison which I think implicates any of the accused in this matter

[86]    Linda Mezon, Nortel's Assistant Corporate Controller for a portion of the time-frame described in this indictment, indicated she was not aware of the fact that there was a point in time in Q4 02 when Mr. Harrison's Outlook (forecast) suggested positive pro forma earnings before taxes of $73 million. Ms. Mezon also played a central role in the JDS offset in the fourth quarter of 2002 (Q4 02). While I will discuss this in more detail later, it is sufficient to say that the JDS offset resulted in expenses being reduced to reflect a reduction in revenue at a late point in Nortel's close of the books for Q4 02.

[87]    Even if I were to disbelieve Ms. Mezon concerning what she knew about Nortel's preliminary pro forma earnings before taxes during the early part of the Q4 02 close, this would not make her a witness, whose testimony implicating any or all of the accused, should be viewed with caution in the absence of confirmatory evidence. It simply means that she knew something which she claimed not to know. While this could affect her credibility, it does not make her a *Vetrovec* witness (see: *R. v. Winmill* (1999), 131 C.C.C. (3d) 380 (Ont. C.A.), at para. 113). Similarly, her participation in the JDS offset does not make her a witness whose evidence implicating the accused ought to be viewed with caution unless confirmed by other evidence. It simply means that, with the knowledge and consent of her superiors and Nortel's auditors, she accepted an entry to offset the loss of revenue caused by the accounting for the JDS transaction. This conduct does not make her a witness whose evidence implicating the accused I should be cautious about accepting in the absence of confirmatory evidence.

[88]    Helen Verity was the Director of Consolidations for Nortel from 2001 – 2003. She received Outlooks or forecasts during the Q4 02 close process. Her handwriting is on some of them. Ms. Verity testified that she was not aware of the skepticism which greeted Mr. Harrison's assertion that Nortel's pro forma earnings before taxes were positive in Q4 02. While this may be

2013 ONSC 137 (CanLII)

a credibility issue as far as Ms. Verity's concerned, it does not make her a *Vetrovec* witness (see: *R. v. Winmill, supra*, at para. 113).

[89]    Mr. Crosson was a long-standing Nortel employee who, during the material time, was the Vice-President of Global Operations. Mr. Ken Crosson, despite the fact that he was satisfied with the original financial results he submitted to Nortel headquarters in Brampton during the Q4 02 close, came up with additional accrued liability balances upon request. These additional balances resulted in increases in expenses and a corresponding decrease in earnings. This clearly assisted Mr. Harrison, who was canvassing for accrued liability expenses/liabilities which, by definition, would decrease earnings.

[90]    Mr. Crosson, in my view, was responding to requests from his superiors, but I am not satisfied that he responded in an inappropriate way. He indicated in his estimation there was some flexibility concerning excess and obsolete accrued liability balances relating to inventory. While his responses arguably were not entirely consistent with United States Generally Accepted Accounting Principles ("US GAAP") and while that may be a concern for securities regulators, the accrual balances which he agreed to increase could be changed without distorting Nortel's underlying financial reality.

[91]    I am not satisfied that Mr. Crosson's conduct changes his character as a witness such that I ought to be cautious, in the absence of confirmatory evidence, about accepting inculpatory evidence from him.

[92]    Mr. Glenn Morita was the Director of Finance for the Europe Middle East Asia Region during the time-frame of the indictment.  Mr. Morita was also satisfied with his original financial results submitted to Nortel headquarters in Brampton during the Q4 02 close but, nevertheless, located additional accrued liability balances upon request from Mr. Harrison. The fact that Mr. Morita provided additional accrued liability balances which he thought were genuine does not change Mr. Morita's character as a witness such that, in the absence of confirmatory evidence, caution should be exercised before accepting evidence from him implicating any or all of the accused.

[93]    Mr. Jim Kinney was, during the time-frame in the indictment, Vice-President Finance of Wireless, which was a business unit within Nortel. Mr. Kinney and his group worked very hard to meet their Q4 02 target. Despite this, Mr. Kinney submitted additional accrued liability balances that moved him off target in Q4 02. He testified that he was not concerned because he had been requested by his superiors to find additional accruals and that is what he did.

[94]    I do not find that Mr. Kinney's behavior in this regard changes his character as a witness and that I should, therefore, be cautious in the absence of confirmatory evidence about accepting evidence from him implicating any or all of the accused.

[95]    Ms. Karen Sledge was the U.S. Controller during the Q4 02 close. She became Assistant Corporate Controller in 2003 where she remained until 2005. When she was Assistant Corporate Controller Ms. Sledge reported to Mr. Gollogly until he was suspended in March 2004. Ms. Sledge changed the Fringe accrued liability balance as a result of repeated calls from Mr. Gollogly and others. Ms. Sledge was not comfortable with making this change and mentioned it

to the representatives of the Wilmer Cutler Pickering law firm. Wilmer Cutler Pickering, about one year later, were conducting, at the request of Nortel's Audit Committee, an independent review of the circumstances leading to Nortel's re-statement of previously-published financial results. Her conduct does not change her character as a witness such that I should, in the absence of confirmatory evidence, exercise caution before accepting inculpatory evidence from her.

## A FEW BASIC ACCOUNTING PRINCIPLES

[96]    Mr. Robert Chambers, the Crown's expert, provided some basic accounting principles in his report.

[97]    A general principle underlying US GAAP is that expenses are to be matched with revenues as long as it is reasonable to do so. When work or a product makes its contribution to revenue, expenses associated with that work or product are recognized even if those expenses cannot be known with precision. This matching principle is applied through accrual accounting. In such a situation, the accrued expenses are estimated.

[98]    An accrued expense is an expense that has been incurred but not yet paid. An accrued liability is an obligation disclosed on the balance sheet that is not yet payable.

[99]    Recording an accrued expense reduces income on the profit and loss statement and, simultaneously, results in the recording of an accrued liability on the balance sheet.

[100]    Once the accrued liability is recorded on the balance sheet of a publicly-traded corporation like Nortel, the corporation is required to assess that accrued liability balance at the end of each financial quarter to determine whether something has occurred within that quarter which requires a change (*i.e.*, an increase or decrease) in the estimate of the liability.

[101]    If an event has occurred within that quarter which requires a change in the estimate of the accrued liability balance, then the accrued liability balance should be either increased or decreased in that quarter. This is sometimes referred to as a "change in estimate".

[102]    If an accrued liability balance is increased as a result of the change in estimate, earnings are negatively affected.

[103]    If an accrued liability balance is decreased as a result of a change in estimate, earnings are positively affected.

[104]    In Nortel speak, the event which required a change in the estimate of the accrued liability balance was called a triggering event or a trigger. Put simply, trigger was a word used to denote an event or some other situation that drove a change in an accrued liability balance.

[105]    When the accrued expense becomes certain and is paid, the earnings of the corporation can be favorably affected. The following example, borrowed and slightly-amended from the Crown's expert evidence, illustrates this.

[106]    Assume that, as a result of a contract into which it has entered, a publicly-traded corporation is involved in litigation at the close of its fiscal year ending December 31, 2002 and

assume that an unfavorable outcome is probable. Management does not know the exact amount it will have to pay, but its reasonable estimate is that the judgment against it will be for not less than $3 million and not more than $9 million. If no amount within that range appears to be a better estimate than any other, Financial Accounting Standards No. 5 ("FAS 5") requires that an expense of $3 million be recorded at December 31, 2002, *i.e.*, the expense estimate at the lowest end of the estimated range of appropriate exposures.

[107]   Recording this expense on the profit and loss statement will have a $3 million negative impact on earnings for the period ending December 31, 2002. Recording this accrued expense also results in an accrued liability of $3 million being recorded on the balance sheet.

[108]   In the example above, if the company thought that $4 million was the best estimate of its liability, then it would record $4 million as an expense/liability despite the fact that it was not at the lowest end of the range of appropriate liabilities. It is only when no amount within the acceptable range is a better estimate than any other that the lowest amount in the range must be chosen.

[109]   Assume, for simplicity's sake, that the company settles the litigation for $2 million in the third quarter of 2003 and pays the plaintiff in that quarter. At the end of the third quarter of 2003, the company should eliminate the accrued liability of $3 million. $2 million of the liability was used to pay the plaintiff so the remaining balance is $1 million. This remaining $1 million excess is removed from the balance sheet and $1 million is recorded on the profit and loss statement as a positive impact on earnings. This is sometimes referred to as a "releasing" the accrued liability balance to the profit and loss statement or "releasing the accrual" or a "releasing the $1 million". Sometimes it is referred to as "reversing the accrual".

[110]   In some of the documentation received in evidence, accrued liabilities were referred to as "provisions". Setting up accrued expense/liability was sometimes referred to as "provisioning".

[111]   There is a timing issue in the example. US GAAP, specifically SEC Bulletin 14, requires the elimination of the accrued liability and the recording of the $1 million positive impact on earnings in the quarter when the event precipitating the conversion of the liability occurred. In this example, it is the third quarter of 2003 because the precipitating event is the settlement of the litigation.

[112]   In the example, if the accrued liability balance was not adjusted in the third quarter of 2003, then an "error" has occurred. In the third quarter 2003, accrued liability balances would be $3 million greater than they should be and earnings would be $1 million lower than they should be.

[113]   An accrued liability can be falsely stated on the balance sheet if any one of three things happens:

- first, if, contrary to US GAAP, the liability is fictitious;

- second, if, contrary to US GAAP, an artificially-high number is used to estimate the liability when it is first set up;

- third, if an event occurs within a quarter which calls for a change (*i.e.*, an increase or decrease) in the estimate of the accrued liability and, contrary to US GAAP, a change in estimate does not occur. From that point on, accrued liabilities will be either overstated or understated on the balance sheet.

[114]   When there are excess accrued liability balances on the balance sheet, an opportunity is created to tailor earnings by arbitrarily "releasing the accrual" to positively impact earnings in the quarter where you want to increase earnings. The motive for tailoring earnings is often to meet a previously-publicized financial target. Such behavior is contrary to US GAAP. The financial results in the tailored quarter are misrepresented. Whether the misrepresentation is material is a separate consideration.

[115]   Returning to the example, if the corporation did not release the $1 million in Q3 02 but, instead, left it on the balance sheet for a rainy day, the corporation would be said to have a "cookie jar" of $1 million on its balance sheet.

[116]   A corporation can also tailor earnings by lowering them if, contrary to US GAAP, it creates an accrued expense/liability which is completely false or artificially high. The false or artificially-high expense negatively affects earnings and results in earnings being misrepresented on the corporation's profit and loss statement. Recording the false or artificially-high expense automatically results in the recording of a false or artificially-high accrued liability. When this happens, the corporation's financial results are misrepresented. Whether the misrepresentation is material is a separate consideration.

[117]   Finally, a corporation has to account for impairment of its assets even if there is uncertainty concerning the recognition of revenue or the incurring of an expense and uncertainty concerning how much money is involved.

[118]   The Financial Accounting Standards Board issued the Statement of Financial Accounting Standards No. 5 ("FAS 5") in March 1975 to assist in accounting for uncertainties related to the occurrence of future events, commonly known as accounting for contingencies.

[119]   Nortel was required to record an expense related to a material contingency if information available prior to the issuance of its financial statements indicated that it was probable that an asset had been impaired or a liability had been incurred at the date of the financial statements and the amount of the impairment or loss could be reasonably estimated. The evidence established that, during Nortel's decline, assets thought secure became impaired overnight. The evidence established that great uncertainty existed in 2001 and 2002 concerning the extent to which Nortel's assets had become impaired.

### *More generally*

[120]   First, when estimating and recording accrued expenses/liabilities, considerable discretion is accorded to management and, correspondingly, considerable judgment is required.

[121]   Second, Mr. Richmond testified that, while the basic concepts of accrual accounting were straightforward, their application could be quite complex. He testified that, between 2000 and

2005, the operating mechanics of accrual accounting did not change, the regulatory environment changed. To this, I would add sometimes reasonable differ; sometimes interpretations and applications of basic principles change.

## *Considerations concerning the set-up and use of accrued expenses/liabilities*

[122]  Mr. Richmond explained that there are two considerations. The first is ensuring that your provisioning for expenses is appropriate at any point in time; that is, that you had identified every risk for which you should provide. The second consideration requires, if necessary, reducing accrued liability balances should they turn out, at any point in time, to be overstated.

[123]  It was Mr. Richmond's view that there had been a practice in corporate Canada and corporate America in the late 1990s to prepare financial statements in a professional, thorough and comprehensive way, but also in a way that made sure there was flexibility in the accrued liability levels of the corporation so that, at the end of a quarter if a CEO found himself slightly short of the market's expectations of profitability, he or she might release accrued liabilities from the balance sheet and, thereby, positively impact earnings in order to meet the corporation's publicly-stated targets.

[124]  Mr. Richmond commented that this practice was ended by the SEC and the Ontario Securities Commission in 1999. The result of the change, according to Mr. Richmond, was that it was still permitted to provision in a prudent way, but not appropriate after the results of the corporation had been determined to go in and use "magic" to change numbers arbitrarily to comply with previously-publicized targets.

[125]  Mr. Richmond described this change in 1999 as "a huge deal". Mr. Richmond gave examples of corporations such as Microsoft, which had experienced difficulty with regulators because they failed to appreciate this change in the environment.

## NORTEL SPECIFIC CIRCUMSTANCES

### *Deloitte's historical relationship with Nortel*

[126]  The scope of Deloitte's involvement with Nortel is an important part of the context of this matter. It is difficult to get a full appreciation of the total number of Deloitte & Touche partners and associates who worked on the Nortel file. Mr. Richmond indicated that younger partners, managers and senior accountants worked on the Nortel file full-time. In terms of billings, Nortel was a major client of Deloitte.

[127]  Evidence in this proceeding indicated that external auditing fees for 2003 were approved by the Nortel Audit Committee in the amount of $19 million.

[128]  Some Deloitte's auditors including the lead audit partner had their offices in Brampton at Nortel headquarters.

[129]  Deloitte had been Nortel's auditors for approximately one hundred years.

2013 ONSC 137 (CanLII)

[130]  I am satisfied that Nortel was a significant Deloitte & Touche client. I am satisfied that Deloitte & Touche were embedded in one form or another in all aspects of Nortel's operations. The evidence is replete with communications between Nortel staff and Deloitte staff. Many of the witnesses testified that, when Deloitte asked for information, it was provided. This assertion is amply borne out by the documentary record.

### Target setting and Nortel's culture

[131]  Mr. Peter Dans testified in this matter. Mr. Dans worked at Nortel from 1990 to 2007. Mr. Dans served in a strategic planning role from 2001 to 2003. Specifically, Mr. Dans was assigned to the Global Planning and Reporting Group.

[132]  Mr. Dans has a degree in engineering. He has an MBA; he is also a CMA – that is, a certified management accountant.

[133]  Mr. Dans described the setting of targets. He testified that Nortel, whose fiscal year was the calendar year, started working on its budget in August. In August 2003, Mr. Dans prepared budgets and potential targets for each of the business units for fiscal 2004. The initial targets came from the Global Planning and Reporting Group. They produced a target for revenue and profitability which was essentially in the form of a profit and loss statement. Mr. Dans then reviewed these initial targets with the accused Douglas Beatty and it was Mr. Dans' understanding that Mr. Beatty reviewed the target with the accused Frank Dunn.

[134]  The targets were sent to the Presidents and financial Vice-Presidents of the various business units so that they could provide their view on achieving their proposed target.

[135]  Mr. Dunn and the Presidents of the business units would hold a final meeting and set the budget targets for the year.

[136]  Mr. Dans further testified that there were times during the year when targets were updated. Mr. Dans indicated that Mr. Dunn and Mr. Beatty set what were called "stretch targets". This was a target that would be harder to achieve. It might be as much as 5% better than the budget. While Mr. Dans only had direct knowledge of this process for the fiscal year 2003, it was his impression that the target setting process employed in 2003 had not changed from earlier years.

[137]  Hitting the target was an important part of Nortel's culture. Mr. Kinney offered the observation that one negotiated targets which allowed one to succeed rather than fail.

[138]  Mr. Gollogly described the attitude at Nortel in an e-mail, dated July 31, 2003: "... General approach is to sandbag good news and close hard to the forecast".

[139]  E-mails were received as business records in this trial.

[140]  Mr. Glenn Morita is a chartered accountant. He was the Director of Finance for the Europe Middle East Asia Region. Mr. Morita similarly expressed himself in an e-mail to a colleague, dated January 8, 2004. Mr. Morita testified and confirmed the implication in his e-mail.

2013 ONSC 137 (CanLII)

[141]   The inference I draw is that the Nortel business units made a very determined effort to meet their targets.

### The employment of Mr. Dunn, Mr. Beatty and Mr. Gollogly at Nortel

[142]   Mr. Richmond and other witnesses were able to provide some history and context to the employment at Nortel of all three accused. This evidence could not be elicited from the accused because they did not testify.

### Mr. Frank Dunn

[143]   Specifically, Mr. Richmond testified that Mr. Dunn, a certified management accountant by training, joined Nortel out of university. Mr. Richmond, although aware of Mr. Dunn, only began to deal with him when Mr. Dunn became Corporate Controller (1992-1993). When Mr. Dunn was Nortel's Controller, Mr. Richmond met with him both individually and at Audit Committee meetings.

[144]   Mr. Richmond indicated that, after Mr. Dunn became Nortel's CFO, their dealings became more frequent. Mr. Richmond was present at Audit Committee meetings when Mr. Dunn, as CFO, made presentations and commented on issues.

[145]   Mr. Richmond pointed out that, when Mr. Dunn was the CFO of Nortel, he was the CFO of a corporation with the largest capitalization value of any corporation in Canada.

[146]   Mr. Dunn became the CEO of Nortel in the fall of 2001. Mr. Richmond continued to deal with Mr. Dunn after that time.

[147]   Mr. Richmond testified that Mr. Dunn was technically competent as far as accounting skills were concerned. Mr. Brian Harrison indicated that Mr. Dunn was knowledgeable concerning accounting principles. Mr. Harrison also testified that Mr. Dunn was very interested in details; he described him as detail-oriented. In a similar vein, Ms. Helen Verity, a chartered accountant herself, testified that she worked with Mr. Dunn and Mr. Beatty at different times during her career at Nortel. Ms. Verity described Mr. Dunn as "a very smart man" with a good grasp of accounting principles. Mr. Ken Crosson testified that he had known Mr. Dunn for twenty-five years at Nortel and offered the opinion that Mr. Dunn was "very familiar with numbers, very efficient with numbers. Understood – – he – – he understood numbers". Mr. Crosson also indicated that, on the occasions when he and Mr. Dunn discussed accounting issues, Mr. Dunn was able to "understand it completely".

[148]   I accept the assessments of Mr. Dunn offered by Mr. Richmond, Mr. Harrison, Ms. Verity and Mr. Crosson. They had years to observe Mr. Dunn and their evidence in this regard did not appear to be contentious.

[149]   Mr. Lynton R. Wilson also testified.  Mr. Wilson was the Chairman, President and CEO of BCE Inc. and, as a result, joined the Board of Nortel in 1991. Mr. Wilson was a member of the Board of Directors throughout the period described in the indictment. He was the Chair of the Board of Directors of Nortel for most of the period set out in the indictment. Mr. Wilson was, therefore, personally familiar with the period described in the indictment.

2013 ONSC 137 (CanLII)

[150]   Mr. Wilson is an Officer of the Order of Canada and a Companion of the Order of the Business Hall Of Fame. During his career, Mr. Wilson served as CEO and as a director of a number of major Canadian corporations.

[151]   I accept Mr. Wilson's evidence without qualification.

[152]   Mr. Wilson became the Chair of Nortel's Board in 2001. He testified that Mr. Dunn was asked to take on the role of CEO at Nortel in the fall of 2001 at a difficult time. At that time with reference to Nortel, Mr. Wilson stated, "the ship was listing pretty badly…"

[153]   It was Mr. Wilson's opinion that it was a credit to Mr. Dunn's leadership that he was able "to keep the ship afloat" after he became CEO in 2001.

### Mr. Douglas Beatty

[154]   The evidence established that Mr. Beatty was a C.A., who became the CFO of Nortel on July 17, 2002. Thus, Mr. Beatty's first quarter as CFO was Q3 2002. Prior to being CFO, Mr. Beatty was the Corporate Controller. Mr. Beatty succeeded Mr. Dunn as Corporate Controller.

[155]   Mr. Richmond testified that he felt it was part of his responsibility to assess Mr. Beatty's ability to be CFO. Mr. Richmond indicated that it never occurred to him to suggest to the Chair of the Board or the Chair of the Audit Committee that Mr. Beatty did not possess the technical and other expertise to carry out his responsibilities. To the contrary, Mr. Richmond testified that he recommended Mr. Beatty to the Board for the position of CFO.

[156]   Mr. Brian Harrison testified and I accept his evidence that Mr. Beatty was knowledgeable concerning accounting principles. Ms. Helen Verity also confirmed that Mr. Beatty was "a good accountant". Mr. Ken Crosson testified that he was in contact with Mr. Beatty on at least a weekly basis. He testified that Mr. Beatty was a very knowledgeable and efficient accountant.

[157]   I accept the evidence of Mr. Richmond, Mr. Harrison, Ms. Verity and Mr. Crosson concerning Mr. Beatty's background and accounting acumen.

### Mr. Michael Gollogly

[158]   The evidence established that Mr. Gollogly is a C.A., who became Nortel's Corporate Controller on July 25, 2002, eight days after Mr. Beatty became CFO. July 25 was in the third quarter of 2002. The fourth quarter of 2002 (October 1-December 31) figured quite prominently in the evidence in this case.

[159]   At an earlier point in his career, Mr. Gollogly had been Nortel's Assistant Controller (the late 1990s). He moved from Assistant Controller to senior executive positions with Nortel in France, Asia and England and then returned to the Brampton head office in July 2002 as Controller.

[160]   Quite significantly, immediately upon assuming his position, Mr. Gollogly made a better understanding of Nortel's Balance Sheet a priority for him and his staff.

2013 ONSC 137 (CanLII)

2013 ONSC 137 (CanLII)

[161]  Exhibit 42 TT demonstrates that, in January 2003, Mr. Gollogly began Balance Sheet Reviews for all units and statutory entities within Nortel.

[162]  Mr. Richmond was of the view that Mr. Gollogly was technically competent as far as his accounting skills were concerned. Mr. Harrison and Ms. Verity both indicated that Mr. Gollogly was knowledgeable concerning accounting principles.

[163]  In addition, Mr. Gollogly prepared draft letters and made presentations to the Audit Committee of Nortel staff which demonstrated that he was quite knowledgeable concerning accounting principles of interest in this proceeding.

[164]  I accept Mr. Richmond's, and Ms. Verity's assessment of Mr. Gollogly's accounting ability.

### Mr. Dunn, Mr. Beatty and Mr. Gollogly

[165]  The three defendants were, from Q3 02 (the 3rd quarter of 2002), the three senior managers of the Corporation.

[166]  I am satisfied that all three of the defendants were knowledgeable and experienced accountants who had the principal responsibility for Nortel's financial statements and records.

[167]  I am satisfied that they were, by reason of their training, their access to forecasts and their long association with Nortel, interested in and well-acquainted with all aspects of Nortel's financial affairs.

[168]  I am satisfied that all three accused were aware of financial information which materially affected Nortel's financial results.

### Nortel was a complex corporate organization

[169]  Nortel, itself, is part of the fabric in context of this case. Because we are dealing with the consolidated financial statements, there is a tendency to think of Nortel as a single entity. This is not precise.

[170]  Mr. Richmond testified that Nortel operated in at least sixty countries in the world. He stated that the organizational chart included dozens of separate entities operating in geographies all over the world. He pointed out that, every time you had a subsidiary Nortel Corporation, generally speaking, you had to conduct an audit.

[171]  Mr. Richmond described Nortel as a large, complex organization with a large and complex audit-processing team. He estimated that there were hundreds of people involved in Nortel auditing.

[172]  This fact is important because it means that the financial information which the Regions were forwarding to corporate headquarters each quarter was financial information which had been produced by entities which, themselves, had been audited.

[173]   Mr. Donald Hathway was Deloitte's Lead Audit Partner on the Nortel audit commencing in the spring of 2003. He was the DeLoitte person in charge of the conduct of the actual audit. Mr. Hathway stated that Nortel had a matrix organization. He said that responsibility for particular General Ledger accounts was divided between geographic entities and line of business entities. He said that responsibility for particular accounts was not always clear because of the complicated nature of the organization. Mr. Hathway testified that there were financial decisions made at the business level which were not controlled by Regional Controllers and for which Regional Controllers would have no responsibility.

[174]   Mr. James Kinney testified. Mr. Kinney is a Certified Management Accountant. He started at Nortel in 1980 and continued there until 2004. From August 2002, he was the Vice-President Finance for the Wireless Business Group. Mr. Kinney indicated that, from a business perspective, Nortel was divided by both Business Lines and Regions. Mr. Kinney also indicated that the Business Lines, in turn, were divided by technologies and products. The products were also divided by Regions. Each Line of Business had a President; each Region had a President. Each Line of Business had Vice-President Finance and each Region had Vice-President Finance.

[175]   Mr. Kinney testified that the Regions were also responsible for the contractual liabilities that went with the customer. Contractual liabilities were 40% of Nortel's total liabilities. Contracts would be understood by the responsible person in the Regional organization and would have been set-up through the Regional organization. Knowledge about the documentation of the contract and knowledge concerning the customer resided with individuals within the Regional organization.

[176]   Finally, it was Mr. Kinney's view that ownership of the balance sheet resided in many sections of Nortel but, primarily, in the Regions. This aspect of Mr. Kinney's evidence was not contentious and I accept it.

[177]   I am satisfied that Nortel's business organization worldwide was composed of dozens of separate corporations operating in geographies everywhere and that it was internally a complex entity.

**THE FINANCIAL RESULTS OF NORTEL NETWORKS CORPORATION**

[178]   Because the essence of these charges is that the defendants deliberately misrepresented the financial results of Nortel Networks Corporation, it is necessary to make some comments about Nortel's financial results and Nortel's decisions to re-state some of those results.

[179]   Nortel's fiscal year ended on December 31. Nortel reported its financial results in accordance with US GAAP and Canadian Generally Accepted Accounting Principles ("Canadian GAAP"). The primary financial statements were prepared in accordance with US GAAP.

[180]   Mr. Robert Chambers, the Crown's expert on accounting matters, stated that US GAAP is the common set of United States accounting principles, standards and procedures that companies use to compile their financial statements. It is a combination of standards set by the Financial Accounting Standards Board Statements of Financial Accounting Standards, the Accounting Principles Board Opinions and Accounting Research Bulletins, the American Institute of

Certified Public Accountants Statement of Position, the Financial Accounting Standards Board Emerging Issue Task Force, SEC Staff Accounting Bulletins, as well as other rules of the SEC.

[181] Mr. Chambers indicated that there were thousands of standards set by these various standards-setting agencies.

[182] The evidence in the trial concerned compliance with US GAAP; compliance with Canadian GAAP was not an issue.

### *Nortel's Consolidation Close Process*

[183] Nortel had an accelerated closing process, which meant that financial results had to be reported publicly within less than four weeks. It is the General Ledger which is being closed. Nortel reported quarterly so the closing process occurred quarterly. Nortel reported annual results so the General Ledger was closed annually.

[184] Ms. Helen Verity, the Director of Consolidations, indicated that the Consolidation Close meant that Nortel consolidated its results.

[185] Ms. Verity indicated that there were stages of consolidation. Each business unit closed its General Ledger. Ms. Verity referred to the Regional General Ledger as a sub-ledger. Sometimes, the sub-ledger was referred to as Advance 2. Each business unit may have had more than one entity for which it was responsible so each business unit had to consolidate those entries before it could close its sub-ledger. Mr. Morita testified that the sub-ledgers (Advance 2) had to close within three to five days of the end of the fiscal quarter.

[186] Backup for sub-ledger entries remained in the Regions. The Regions had their own management sign-off and they had their own auditors. The same was true for entries coming from Corporate Services.

[187] After Day 4, late entries that were not material would not be considered. Despite this rule, if one of Ms. Verity's counterparts from the Regions called and wanted to book a late entry, there would be a discussion about the entry. If the entry was a re-classification between the business units, she would refuse to book the entry. If an entry was significant, Ms. Verity would tell Ms. Mezon, who approved late entries, to expect it.

[188] Mr. Dans testified that an Outlook was prepared every time a consolidation took place and Mr. Dans pointed out that consolidations took place every day and sometimes more than once a day during the first days of a close as results came into corporate headquarters in Brampton Ontario. The Outlook prepared by Mr. Dans during the closing of the books was a snapshot of Nortel's financial results at that moment. The word "Outlook" denoted more than one document. One type of Outlook was a forecast. Forecasts were prepared throughout the quarter.

[189] After the sub-ledgers were closed, draft financial statements were produced according to the number of adjustments and entries which occurred. Mr. Dans indicated that the draft financial statements were available to the Controller and the CFO upon request.

2013 ONSC 137 (CanLII)

[190]   The corporate headquarters General Ledger was referred to as Advance 1. When the last entry was made into that General Ledger, numbers were final.

[191]   Ms. Verity testified that management wanted to have a line of sight to the results earlier than waiting for the consolidated results and so, on Day 4 of the close, a draft of the results would be run. It is important to remember that the close process contemplates repeated drafts being produced after the sub-ledgers had been closed. Draft results can change due to entries from corporate headquarters. Mr. McMillan, Nortel's Director of Consolidations, indicated that, by Day Four or Day Five of the close process, corporate in Brampton would get their first complete view of the regional financial information. At this point, according to Mr. McMillan, they did not have a complete view from a corporate perspective.

[192]   The evidence established that there were up to twenty draft financial statements produced over the close. Each draft statement was numbered.

[193]   Results can change due to entries to the General Ledger from corporate headquarters or late entries from the Regions. Corporate headquarters was not subject to the same deadlines as the Regions.

[194]   There were two headquarters units which submitted entries to the General Ledger. These units were called Corporate and Non-op. Corporate was a consolidation of the various corporate functions such as real estate, human resources etc.; Non-op was a catchall – a collection of everything that was left over.

[195]   Releases of accrued liability balances to the profit and loss statement from Corporate and Non-op could be entered in the General Ledger after the Regions had closed their sub-ledgers.

[196]   The Assistant Corporate Controller, Linda Mezon, advised whether an entry from the Regions was appropriate for the General Ledger. Ms. Mezon would advise Helen Verity that an entry was appropriate and Ms. Verity would sign the entry so that it could be recorded in the General Ledger.

[197]   Ms. Verity testified that she was responsible for managing the time-lines associated with the close process. Ms. Verity testified that there was a well-established close schedule. It was distributed by e-mail prior to the close and one of her responsibilities was to hold people accountable to that schedule. It was her responsibility to work with Nortel people to resolve timing issues.

[198]   Ms. Verity was responsible for resolving posting issues that arose during the close process; she reviewed profit and loss statements and balance sheets; she prepared binders and provided information to the Investor Relations Group within Nortel.

[199]   Ms. Verity indicated that an entry was significant if it was significant to the profit and loss statement or the balance sheet. An entry was significant if it was not a "net to zero" or a re-classification entry. This distinction was made because dealing with such items would slow down the close process.  At the same time, management cared about trying to get things right and so the compromise was that after Day 4 of the close, entries that changed the consolidated results

2013 ONSC 137 (CanLII)

for external reporting purposes or changed the profit and loss statement would be processed. Ms. Mezon said even small items which met those criteria could be processed.

[200]  Ms. Verity indicated that Fringe was the last entry of the close because, if you made another entry to the General Ledger, it might affect the Fringe. Typically, when all entries had been finalized, the business units released any Fringe accrued liabilities to the profit and loss statement.

[201]  The binders for which Ms. Verity was responsible contained a consolidation package which was an XL-based profit and loss statement and balance sheet.

[202]  The consolidation package was available to everyone at head office in her group; it was available to the auditors and it was available to Linda Mezon, the Assistant Corporate Controller.

[203]  There was a Frank Dunn binder which was prepared for the purpose of giving Mr. Dunn a summary of the close. Douglas Beatty and Michael Gollogly and the Assistant Controller and several others received copies of this binder.

[204]  Mr. McMillan indicated that the executive package binder included financial statements prepared by Corporate Consolidations and detailed schedules.

[205]  The external auditors, according to Ms. Verity, had access to all of the close process material, including the Frank Dunn binder. Mr. Dans indicated that Deloitte & Touche had special access to and a special binder for late entries. The Late Journal Entry Binder contained a copy of the late entries and a copy of the backup for those entries. Deloitte and Touche received regular profit and loss statement updates during the close process.

[206]  Ms. Verity indicated that there were regularly-scheduled update meetings during the close; there was also a Controller's meeting and a CFO meeting. At the Controller's meeting, there would be a discussion of entries outside the close process which remained outstanding. At the CFO meeting, the results were discussed with the CFO.

### Excess accrued liabilities & Nortel's policy of Conservatism

[207]  Nortel had a long-standing corporate policy concerning estimates of liabilities. Nortel Corporate Policy 300.33 provided that any anticipated decline in the value of Nortel assets and any anticipated liabilities must be provided for in accordance with the accounting concept of Conservatism.

[208]  On February 27, 2003, following a review of Nortel's accounting policies including Corporate Policy 300.33, Deloitte & Touche reported to the Audit Committee that they considered Policy 300.33 to be an appropriate accounting policy.

[209]  Mr. Chambers discussed Conservatism.

[210]  The accounting concept of Conservatism is a characteristic of financial accounting. It is referenced in paragraph 17 of Accounting Principles Board Statement No. 4, as follows: "Conservatism. Frequently assets and liabilities are measured in the context of significant

2013 ONSC 137 (CanLII)

uncertainties historically; managers, investors, and accountants have generally preferred that possible errors in measurement be in the direction of understatement rather than overstatement of net income and net assets. This has led to the convention of Conservatism…"

[211]  It is also referenced in paragraph 35 of Accounting Principles Board Statement No. 4, as follows: "Conservatism. The uncertainties that surround the preparation of financial statements are reflected in a general tendency toward early recognition of unfavorable events and minimization of the amount of net assets and net income".

[212]  As indicated earlier, the Financial Accounting Standards Board issued Financial Accounting Standard 5 ( FAS 5), which provides that where there is a range of accrued liabilities and no estimate within the range is better than any other, the lowest estimate in the range must be used. Significantly, paragraph 84 of provides that FAS 5 is not inconsistent with the accounting concept of Conservatism.

[213]  Mr. Richmond testified that Nortel had, for twenty years prior to the events described in the indictment, a Conservative accounting culture within the context of the rules.

[214]  Mr. Richmond stated that because of the precipitous descent that Nortel went through, those in the field took it upon themselves to identify as many risks as they could and to put an estimate of those risks at the conservative end of the range.

[215]  Mr. Richmond elaborated that, when an organization is experiencing the "free fall" that Nortel was experiencing, a customer that one day might appear sound may very well be in financial peril the next day. As a result, Mr. Richmond stated that it was his experience at Nortel that, in preparing Nortel's financial statements, there was an overarching desire by the directors and the executive management team to ensure that they did the best job possible to prepare the financial statements to adequately account for risks.

[216]  Mr. Richmond testified that Nortel was operating in an atmosphere of doubt about the value of its assets and the operative principle was "if in doubt provide for it".

[217]  It struck Mr. Richmond as reasonable and unsurprising that Nortel employees and Deloitte professional staff defaulted to a position that was at the conservative end of the range when recording an accrued expense and liability estimating a particular risk.   Mr. Richmond testified that this was something he personally embraced and that it was appropriate in Nortel's set of circumstances "to provide at the reasonably hard end of that conservative range". He also testified that the identification of the range involved considerable judgment.

[218]  More generally, Mr. Richmond said that the essential concern was whether Nortel would stabilize before it hit the ground.

[219]  Mr. Richmond indicated that the critical issue, during the time period described in the indictment, was "making sure that you have the cash to operate the enterprise". Mr. Richmond indicated that cash was a critical issue in terms of everything Nortel did. I infer from this that Nortel's cash position was material to its financial results.

2013 ONSC 137 (CanLII)

[220]  There was no suggestion in the evidence that Nortel's financial results misrepresented its cash reserves, its cash flow generally or its cash flow in its various business units.

[221]  Mr. Richmond stated that the data, upon which risk management decisions were made, changed very rapidly and, therefore, management's estimates quantifying risk went up and down.

[222]  Mr. Richmond indicated that the Audit Committee's preference was for Nortel to be at the conservative end of the acceptable range of risk. He described making sure that adequate provisions had been taken against the risk that assets had lost their value as an overarching paramount focus of Deloitte and Nortel in 2001 and 2002. According to Mr. Richmond, management and Deloitte's were both told by the Audit Committee concerning the corporation's exposure to risks to "make sure there are no surprises".

[223]  Mr. Wilson, the Chair of the Board of Nortel, gave similar evidence. He referred specifically to a briefing the Board received in January 2003 concerning an accrued expense/liability of $50 million taken in respect of a claim by a company known as 360 Networks. Mr. Wilson did not recall the details of the briefing concerning the taking of the provision, but he recalled that Mr. Cleghorn, the Chair of the Audit Committee during the time period of the indictment, asked at the Board meeting if $50 million was sufficient because the claim against Nortel was for $100 million.

[224]  Similar evidence was provided by Mr. Cleghorn. Prior to serving as Chair of the Nortel Audit Committee, Mr. Cleghorn was the Chairman and CEO and a Director of the Royal Bank of Canada. He was also Chairman of the Board of the Canadian Pacific Railway until 2012. He, like Mr. Richmond, is a Fellow of the Institute of Chartered Accountants of Ontario.

[225]  I accept Mr. Cleghorn's evidence without qualification.

[226]  Mr. Cleghorn described participating at the Audit Committee meeting in 2001 where Nortel management advised that it was necessary to write off $19 billion. Mr. Cleghorn testified that his first thought when he heard this was "did they get it all?" Mr. Cleghorn testified that, during the period described in the indictment, the auditors were regularly asked if they were satisfied with management's estimates of liabilities.

[227]  Mr. Gollogly expressed a somewhat similar view in an e-mail, dated October 13, 2003. In this e-mail, Mr. Gollogly proposed a draft for the Note to the Financial Statements explaining why it was necessary for Nortel to re-state earlier financial statements.  While Mr. Gollogly's proposed draft was not used, I note that he attributed the overstatement of accruals and the failure to draw down accruals in the correct fiscal period to "the high level of Conservatism used to identify Nortel Networks financial exposure during our period of realignment and our significant workforce reductions…"

[228]  A more extreme view was articulated by Mr. Michael McMillan in his evidence. Mr. McMillan joined Nortel in 1997. Mr. McMillan had an M.B.A. from the University of Manitoba. During the timeframe of the indictment Mr. McMillan was Nortel's Director of Consolidations. It was Mr. McMillan's evidence that accrued liabilities were booked on a worst-case scenario

basis rather than a best estimate basis. Mr. Peter Dans, to whom reference will be made later, testified that he was aware of accruals being booked on a conservative basis "which may have been the worst-case scenario sometimes".

[229]  During the time period described in the indictment, Nortel lost billions. I do not find it unusual that sensible people confronted with that reality would think that the worst-case scenario was the best estimate of the risks to Nortel's assets. I also do not find it unusual that sensible people confronted with Nortel's reality would be slow to decrease accrued liabilities already on the balance sheet.

[230]  I am satisfied that throughout the time period described in the indictment accrued liabilities at Nortel were estimated at the high-end of the range of estimates and sometimes on a worst-case scenario basis. According to the evidence a risk can be provided for on a worst-case scenario basis provided that it is the judgment of the person estimating the risk that the worst-case scenario is the best estimate of that risk.

[231]  One of the risks created by Nortel's situation was that excess accrued liability balances would find their way onto Nortel's balance sheet. This reality created a possibility of using accrued liability balances to meet financial targets. Exhibit 5, tab 242 provides an example of how ingrained this problem was by 2004. This document is an e-mail string. Mr. Glenn Morita, one of the authors of some of the e-mails in the string, in an e-mail, dated January 8, 2004, wrote: "sounds like you Aussies are like squirrels (not sure if you have them Down Under) secretly storing your nuts for a rainy day". Mr. Morita testified that he was frustrated when he sent the e-mail because his Australian counterpart was covering an expense with the release of an accrued liability balance. Mr. Morita said he was frustrated because Nortel had just gone through a Comprehensive Balance Sheet Review and his Region, which included Australia, thought that it had cleaned up the problem, but it turned out that they had not.    There are other references in emails to digging up "opportunities" and having "flexibility".

[232]  Nortel's Conservatism concerning the recording of accrued liabilities and expenses was likely in effect for twenty years. It was ingrained in Nortel's culture.

[233]  This policy of Conservatism was memorialized in Nortel Corporate Policy number 300.33. This policy had been reviewed by Deloitte in 2003 and found to be an appropriate corporate accounting policy. This policy, which had become a Nortel cultural norm, resulted in the excess accrued liability balances found on Nortel's consolidated balance sheet during the Comprehensive Balance Sheet Review in 2003.

### The accused knew there were excess liabilities on the balance sheet

[234]  I am satisfied beyond a reasonable doubt that all three accused, by virtue of their long experience with Nortel and their positions of responsibility, well-understood how the men and women in the field were implementing Nortel's policy of Conservatism.

[235]  I am satisfied, based on the evidence adduced at this trial, that none of the accused initiated this policy.

2013 ONSC 137 (CanLII)

[236]  I am satisfied beyond a reasonable doubt that they knew that the policy of Conservatism had created excess accrued liabilities and, therefore, they knew that these excess liabilities could be released to assist in meeting financial targets.

[237]  I also find that the enormous losses suffered by Nortel in these years created a situation in which senior management, Nortel's Board of directors and Nortel's auditors were quite reasonably concentrating on doing all things necessary to make sure that Nortel had sufficient cash reserves to survive and continue in business. I am satisfied that non cash impacting excess accrued liabilities on the balance sheet were not a priority.

[238]  I am satisfied, on the evidence, that Mr. Gollogly, virtually from the time he took over as Corporate Controller, turned his attention to Nortel's balance sheet. I am also satisfied, on the evidence, that neither Mr. Dunn nor Mr. Beatty, his immediate superiors, did anything to impede his efforts.

### *Unsupported and excessive accrued liabilities on the balance sheet*

[239]  The evidence persuades me that accruals were present on Nortel's consolidated balance sheet which could not be supported by documentation. However, I decline to draw the inference that these accruals never existed. It seems more logical to me that the downsizing of Nortel, which involved the closing of offices, the selling of real estate and, undoubtedly, the storage of documents, created a situation in which supporting documentation for some of Nortel's accrued liability balances could not be located. Further, the loss of employees (two out of every three worldwide) created a situation in which the institutional memory concerning the unsupported accruals no longer existed within the company. I am satisfied that these were the reasons why unsupported accrued liabilities were present on Nortel's consolidated balance sheet.

[240]  Also, the evidence does establish and, I so find, that excessive accrued liabilities existed because accrued liabilities were not released when they should have been and because accrued liabilities were not adjusted when they should have been.

[241]  Mr. Dunn and Mr. Beatty took part in the analyst calls which generated a 2002 Accrued Liability Report by Ms. Susan Shaw. Ms. Shaw, a chartered accountant in Nortel's Corporate Consolidations Group, reported to Mr. Gollogly. Ms. Shaw advised both Mr. Gollogly and Mr. Harrison that there were unsupported liabilities on Nortel's balance sheet.

[242]  I am satisfied that all three accused knew that there were unsupported and excessive accrued liabilities on Nortel's balance sheet.

### *Nortel's Pro Forma earnings calculations*

[243]  The evidence disclosed that securities regulators encouraged Nortel and other publicly-listed companies to refrain from reporting non-GAAP measures commencing Q1 2003 (Q1 03). Prior to Q1 2003, Nortel had reported "pro forma" financial results.

[244]  As a result of this regulatory change in attitude, as of fiscal 2003, pro forma earnings calculations at Nortel became an internal measure only. This meant that, commencing in Q1 03, Nortel no longer published pro forma financial results.

2013 ONSC 137 (CanLII)

[245]   Pro forma financial results were calculated using a formula generated internally at Nortel. This formula changed from year-to-year. The 2002 pro forma formula was not the same as the formula used in 2003.

[246]   Despite this change, certain Nortel bonus plans, which are important for our purposes, continued to be triggered by Nortel's 2002 formula for calculating pro forma earnings.

[247]   The pro forma calculation of earnings differed from the calculation of earnings according to US GAAP. The pro forma formula for calculating earnings excluded items, including significant cost items, which were included in US GAAP earnings calculations. The items excluded were non-operational in nature. For example, pro forma earnings calculations excluded gains from buying back bonds. According to Mr. Harrison, the items included in pro forma earnings calculations were, themselves, calculated in accordance with US GAAP. Mr. Harrison's evidence in this regard was not questioned and I accept this aspect of his evidence.

[248]   For the sake of completeness, the method of calculating pro forma earnings that was used in 2002 excluded charges which were included in the 2003 method of calculating pro forma earnings. In other words, the 2002 formula resulted in higher pro forma earnings.

[249]   The difference between pro forma earnings calculations and US GAAP earnings calculations was also referenced in a glossary of terms filed in this proceeding which contained a definition of "pro forma". The definition provided, in part, that pro forma financial statements consisted of information which Nortel management believed was meaningful to investors.

[250]   Nortel published Q4 02 pro forma financial results in its January 24, 2003 press release announcing financial results for Q4 02. Nortel did not publish pro forma financial statements for Q4 02.

[251]   In 2003, Nortel did not publish pro forma earnings calculations at all.

### *Pro Forma earnings and Bonus Thresholds*

[252]   Mr. Cleghorn testified that, in the summer of 2002, Nortel employees were being approached by the competition. By this time, many employees at Nortel had been laid off or fired, sales were declining and the auditors considered Nortel to be a high-risk audit. Employees with stock options found that the options were worthless. In an effort to prevent valuable employees from leaving the company, Mr. Cleghorn testified that the Board adopted a Return to Profitability Bonus Plan.

[253]   The Return to Profitability Bonus Plan was announced in November 2002. It provided eligible employees with a special bonus if Nortel achieved profitability for any quarter in the period from Q4 2002 through to and including Q4 2003.

[254]   Profitability for the purpose of this bonus plan was based on pro forma earnings from continuing operations; it also included an accrual for the cost of the bonus in such period. In other words, there had to be sufficient pro forma earnings before taxes from operations to pay for the bonus. Senior executives would be paid in three tranches.

2013 ONSC 137 (CanLII)

[255]  Pro forma earnings (loss) before taxes was an internal Nortel calculation and metric. This meant that Nortel could change the calculation and this happened in 2003. The Board of Directors, however, in a minute from the 2:50 p.m. Board meeting of April 24, 2003, decided that, for greater certainty concerning the bonus calculations, Nortel's 2002 formula for calculating pro forma earnings before taxes would continue to be used for the purpose of calculating whether the Return to Profitability Bonus and the Restricted Stock Unit Bonus were earned. This is significant because it meant that, although Nortel changed the way in which it calculated pro forma earnings in 2003, this change did not affect the pro forma calculation of earnings for the purpose of determining whether Restricted Stock Unit and Return to Profitability Bonus targets had been met.

[256]  Entitlement to bonuses is an issue in this trial. The bonus payment issue was not made simpler by the fact that Mr. Dans, who did the bonus calculations, erroneously used Nortel's 2003 pro forma income formula in some of his calculations. Mr. Dans agreed that profitability was more easily achieved under the 2002 formula than the 2003 formula.

## NORTEL'S RE-STATEMENT OF PREVIOUSLY-PUBLISHED FINANCIAL STATEMENTS

[257]  The evidence established that Nortel, on two occasions, restated financial statements which it had previously published.

[258]  Neither restatement affected Nortel's cash position. Nortel's cash position was critical to its survival.

[259]  Mr. Chambers, the Crown's expert, explained in his report when a restatement of previously-published financial information is necessary. Mr. Chambers indicated that, if a misstatement has occurred in a publicly-traded corporation's published financial results, a restatement of the prior year's financial statements is required if the misstatement is material in the prior year or if a correction in the current year, *i.e.*, when the misstatement is discovered, materially overstates or understates earnings in the current year.

[260]  Mr. Chambers also offered expert evidence on the reasons why financial statements are restated. Mr. Chambers stated in his report that Restatements occur because the earlier financial statements contain errors:

- due to the misapplication of US GAAP;

- mathematical mistakes;

- incorrect facts;

- fraud due to the manipulation of accounting records, misrepresentation, or the intentional misapplication of US GAAP;

- changes in accounting principles; and,

- stock splits.

[261]  Mr. Chambers stated that the majority of Restatements are attributable to internal company errors.

[262]  Mr. Hathway, the lead auditor for Deloitte on the Nortel file in 2003, explained when it is necessary to restate prior published financial results so that accrued liability balances can be re-profiled to the appropriate financial periods when they should have been released to the profit and loss statement.

[263]  Mr. Hathway testified that, where there is an error in the financial statements due to an overstatement of accrued liabilities, there are two choices:

- if the overstatement of an accrued liability balance is not material to either the balance sheet or the profit and loss statement in the current quarter or the quarter in which it should have been released, then it can be, with the appropriate disclosure, released to the profit and loss statement in the quarter in which the error is discovered; and,

- if the overstatement is material to the results in the quarter in which the error is discovered or to the results in the quarter in which it should have been released to the profit and loss statement, then there must be a Restatement of the earlier financial statements to push the excess accrued liability balance back to the period when it should have been released.

[264]  Mr. Richmond testified that Restatements in both Canada and the United States are infrequent. He said that for an organization to restate a previously-published financial result is not something that is well-embraced by the organization. Mr. Richmond's evidence is consistent with evidence heard in the trial to the effect that Mr. Beatty told Mr. Cleghorn that a restatement was never a good idea.

### The First restatement

### A short chronology

[265]  Nortel's first decision to restate financial statements for 2000, 2001, 2002, Q1 2003 and Q2 2003 was announced on October 23, 2003.

[266]  This restatement essentially restated excessive accrued balances on Nortel's balance sheet back to the quarters when they should have been released to the profit and loss statement.

[267]  The restated financial statements resulting from the first Restatement were released to the public on December 23, 2003 approximately two months after the announcement of the first Restatement.

2013 ONSC 137 (CanLII)

### Who was Responsible

[268]  Ms. Sledge, indicated that she personally dealt with both Douglas Beatty and Michael Gollogly in connection with the first Restatement and that, from her perspective, both Douglas Beatty and Michael Gollogly were in charge of the first Restatement. Ms. Sledge's evidence in this regard is consistent with the positions held by Douglas Beatty and Michael Gollogly during the first Restatement; namely CFO and Controller. I accept this portion of Ms. Sledge's evidence; although I am satisfied Ms. Sledge, a certified public accountant and Nortel's Assistant Corporate Controller from 2003-2005, also had a major role in the first restatement.

### Nortel Restatements are complex

[269]  Mr. Michael McMillan testified that, due to the significant number of corporate entities involved worldwide, the restatement process was complex. I accept Mr. McMillan's evidence that the restatement process for Nortel was a complex one.

### How the Restatements came about

[270]  Mr. Richmond described the situation at Nortel when consideration was being given for the first time to restating financial statements from earlier periods. The immediate cause of this discussion was the release to the profit and loss statement in Q2 03 (the second quarter of 2003) of approximately $142 million in accrued liabilities which could no longer be supported. The release of this $142 million would have had a positive effect on earnings. These balances had been released during preparation of one of the preliminary drafts of Nortel's Q2 03 financial statements during the Q2 03 close process described earlier.

[271]  Mr. Gollogly made Mr. Hathaway, Deloitte's lead Nortel audit partner, specifically aware of the $142 million and asked Mr. Hathway for Deloitte's view. Mr. Hathway objected to the release of these balances, with the result that the release of these balances was reversed in the next preliminary draft of the financial statements and the $142 million in accrued liability balances was returned to Nortel's balance sheet where they always been.

[272]  No profit and loss statement containing the $142 million was ever published.

[273]  It was Mr. Richmond's evidence that Mr. Dunn maintained that the $142 million was the total number of unsupported liabilities on Nortel's consolidated balance sheet. It was Mr. Dunn's view that the $142 million should remain released to the profit and loss statement of Q2 03 and that there should be appropriate disclosure of this fact in the press release publishing Nortel's Q2 03 financial results. Mr. Dunn maintained that his view should be respected because not only was he the CEO, but he had been, prior to that, Nortel's CFO and Corporate Controller.

[274]  This is perhaps an appropriate time to observe the obvious. Mr. Dunn was spectacularly wrong; the first restatement identified in excess of $900 million of accrued liabilities that could no longer remain on Nortel's consolidated balance sheet.

[275]  Mr. Richmond indicated that Mr. Dunn also resisted the idea of a comprehensive balance sheet review due to the workload demands it would place on a group of busy people. This

observation attributed to Mr. Dunn seems reasonable to me because, by this time in 2003, Nortel's employees had been reduced by two-thirds.

[276]  Mr. Richmond indicated that, if Mr. Dunn had been correct, the restatement might have been a simple as booking the $142 million back into 2002 because, in 2002, Nortel suffered total losses of $3.7 billion. Thus, the effect of restating the $142 million into 2002 would only have been to reduce that loss to $3.5 billion approximately, which would have been an immaterial change to Nortel's financial statements for 2002.

[277]  Mr. Richmond indicated that it was Deloitte's position that Nortel had to comprehensively review its balance sheet so that the true extent of the accrued liability problem would be known and that, only when that had occurred, could consideration be given to the correct accounting treatment of the $142 million in unsupported accrued liability balances that everyone already knew was on Nortel's consolidated balance sheet.

[278]  Mr. Richmond indicated that it was Deloitte's view that it was appropriate to "park" the $142 million on the balance sheet until the comprehensive review of the balance sheet was completed. It was Mr. Richmond's view and Deloitte's view that leaving the $142 million on Nortel's balance sheet did not misrepresent Nortel's financial results. Mr. Richmond explained that Nortel had more than $5 billion in liabilities on its balance sheet in Q2 03 and that, in Deloitte's view, the $142 million was not material to that total. Mr. Chambers, the Crown's expert, offered no opinion to the contrary.

[279]  I accept Mr. Richmond's evidence in this regard and I agree with his conclusion.

[280]  Mr. Richmond further explained that Nortel's profit and loss statement for Q2 03 revealed that it was, at long last, at break-even and that, therefore, the release of the $142 million to the profit and loss statement in Q2 03 would have been material to that statement and, therefore, could not be permitted.

[281]  I agree with this conclusion as well.

[282]  Finally, Mr. Richmond pointed out that Deloitte's was not satisfied that the $142 million represented the entire extent of the problem.

[283]  Mr. Richmond indicated that this discussion between Deloitte and Mr. Dunn went on for a period of time.

[284]  Nortel's second-quarter concluded on June 30, 2003. Mr. Richmond indicated that, sometime in the first two weeks of July 2003, he had a meeting with Mr. Dunn which resolved the matter as follows:

- The $142 million in accrued liabilities, released to the profit and loss statement in Q2 03 and returned to Nortel's balance sheet after Deloitte's objected, would remain on Nortel's balance sheet;

- Nortel would comprehensively review its balance sheet;

- The fact that a comprehensive balance sheet review was taking place would be disclosed in Nortel's public financial filings for Q2 03. Mr. Richmond did not suggest that this aspect of the discussion was contentious.

### *The Comprehensive Balance Sheet Review*

[285]  Ms. Karen Sledge testified that she participated in the Comprehensive Balance Sheet Review which began at the end of July 2003. During this process, she was part of the team reviewing all of the different accounts from the different regions and business units. She said, as the balance sheet review proceeded, it became clear that that there was more and more on the balance sheet that needed to be corrected. She said that the numbers were increasing every time they looked at the accounts.

[286]  It was Ms. Sledge's evidence that, at some point during the Balance Sheet Review process, those involved realized that there would need to be a restatement of prior years' financial results. Her evidence in this regard is also consistent with Mr. Richmond's evidence that, as the Comprehensive Balance Sheet Review progressed, the quantum of excess accrued liabilities increased. Mr. Richmond indicated that, as a practical matter, the error with respect to accrued liabilities was so large that a Restatement was inevitable.

[287]  I accept this aspect of Ms. Sledge's evidence.

[288]  Mr. McMillan testified that there was a timing sensitivity associated with the first Restatement. Specifically, he said that all of the people involved in the restatement wanted to make sure that it was completed within the normal reporting lines so that the appropriate filings with the SEC and the Ontario Securities Commission would not be delayed. Mr. McMillan said that the need to report in a timely manner made the first Restatement a demanding exercise.

[289]  It was Mr. McMillan's view that "at the end of it I felt that we had done a good job of it and we had managed it within the timeframe". Mr. McMillan also indicated that he was quite surprised that it was necessary to restate Nortel's earlier financial results a second time. I accept Mr. McMillan's evidence concerning timeliness.

[290]  Mr. Richmond also testified that there was pressure to complete the Comprehensive Balance Sheet Review in a timely manner. Mr. Richmond indicated that there was an agreement among the Board, senior management and Deloitte to complete the review "as rapidly as was humanly possible".

[291]  It was Mr. McMillan's view that the Comprehensive Balance Sheet Review and first Restatement was driven by Karen Sledge and Michael Gollogly. He said that these were the two people to whom he regularly reported. McMillan's evidence is not contentious and I accept it. Ms. Sledge work was obviously satisfactory; she remained in Nortel's employ until 2010.

[292]  Mr. Peter Dans testified that there was a "focus on getting the Restatement correct and there was, you know, high level of review that was going to be associated with that to try and ensure that the Restatement was done correctly".

[293]   Mr. Richmond said that it was his observation, as the balance sheet review progressed, that "there were some really tired folk, both at Nortel and our firm in terms of trying to make that happen".

[294]   Mr. Richmond indicated that the Comprehensive Balance Sheet Review exercise was so intense that, at one point, he spoke to the Chairman of the Audit Committee and suggested that Nortel should provide an opportunity for those Nortel and Deloitte employees and partners involved in the Comprehensive Balance Sheet Review to enjoy a long weekend.

[295]   The time pressure was so intense that Mr. Gollogly wrote in his diary "get it done versus get it right" which was a play on the theme for the restatement which was "do it once and do it right".

[296]   Mr. Hathway recounted being present when Mr. Gollogly suggested to Mr. Dunn that the restatement might not be finished in time for Nortel's next public filing; Mr. Hathway indicated that Mr. Dunn was adamant that a delay was unacceptable.

[297]   Mr. Richmond indicated that, in his view, the Deloitte Nortel engagement team, led by Don Hathway and John Cawthorne, was as close to workaholics as he had ever seen; he said their behaviour was matched by the individuals working for Mr. Gollogly.

[298]   Ms. Karen Sledge testified that she remembered one evening where she, Mr. Hathway and Mr. Gollogly were up the entire night resolving balance sheet review issues affecting Nortel's operations in Asia.

[299]   Mr. Hathway was interviewed by the R.C.M.P. in connection with this matter on November 14, 2005. By this time, he was well-aware of the results of the Wilmer Cutler Pickering independent inquiry on behalf of the Audit Committee concerning the causes of the need to restate Nortel's previously-published financial statements. By this time, Mr. Dunn, Mr. Beatty and Mr. Gollogly had been accused of wrongdoing in that report and, as a result, fired for cause.

[300]   During the course of that interview, Mr. Hathway was asked by Sgt. Bone if he felt a conscientious effort had been made during the first balance sheet review. Mr. Hathway said he thought the Nortel side had done a conscientious job. When asked why he thought that, he said "the extent of the work they did, the amount of documentation they tried to go back and find, they did, seemed to me they made a real effort to get behind these items and find out what the real story was, when we asked questions about it, if we were not satisfied with what they gave us initially we would tell them to follow up and it seemed to me they were making a real concerted effort to get you know to respond to our questions and to get the answers…"

[301]   Mr. Hathway confirmed that his answers in the R.C.M.P. interview reflected his thinking, not only at the time of the Comprehensive Balance Sheet Review, but also at the time of his RCMP interview in November 2005.

[302]   During the course of the R.C.M.P. interview, Mr. Hathway recounted a conversation with Mr. Gollogly at the time when it became clear that there would be a restatement. Apparently, Mr. Gollogly asked Mr. Hathway if he, that is Mr. Gollogly, should resign. Mr. Gollogly thought he

2013 ONSC 137 (CanLII)

should resign because he was the Corporate Controller and should accept responsibility for the fact that the Audit Committee found it necessary to restate previously-published financial results. Mr. Hathway told Mr. Gollogly that he did not think he should resign. When asked during the R.C.M.P. interview why he gave Mr. Gollogly that advice, Mr. Hathway said, "my view was Mike was trying to get the numbers right…" Mr. Hathway was asked during his interview if his opinion had changed and he said, "I am not sure my opinion's changed".

### *Was the Comprehensive Balance Sheet Review Comprehensive?*

[303]   The Crown suggested all three accused misinformed the public by saying that the first restatement represented a comprehensive review engaged in for the purpose of correcting past accounting errors.

[304]   The Crown maintains that the first restatement was not comprehensive.   The Crown suggested that the scope of the first restatement was too narrow.

[305]   The Crown suggested that, because Nortel and Deloitte staff worked so hard, the first restatement was under-resourced.

[306]   The Crown submits that the first restatement understated the extent of the errors on the balance sheet and argues this is demonstrated by the fact that there was a second restatement.

[307]   Mr. Wilson, whose evidence I accept, testified that the impact of the restatement of $900 million in accrued liability balances identified during the Comprehensive Balance Sheet Review was favorable to shareholders. The $900 million represented expenses on the balance sheet that did not have to be recognized. Shareholders' equity was increased by $900 million.

[308]   Mr. Wilson described the first restatement as a restatement of over-providing; amounts were brought back which added to the shareholders investment in the company.

[309]   The Crown has never suggested that the $900 million in accrued liability balances ought not to have been restated.

[310]   I accept the evidence of Mr. Richmond, Ms. Sledge, Mr. McMillan and others attesting to the effort that went into the first restatement. No witness testified or suggested that Mr. Beatty or Mr. Gollogly interfered with the first restatement. Mr. Hathway remained convinced, after the release of the Wilmer Cutler Pickering Review and after the investigation into this matter had begun, that "Mike was trying to get the numbers right".

[311]   I propose to separately consider why there was a second restatement and the inferences to be drawn from that restatement.

[312]   I am satisfied the Comprehensive Balance Sheet Review was, in a word, comprehensive.

[313]   I am not satisfied that the scope of the first Comprehensive Balance Sheet Review (a review of all accrued liability balances in excess of $100,000 and a review of all accrued liability balances released to the profit and loss statement equal to or in excess of $2 million) was too narrow in scope.

[314]  It became apparent in the late summer that a restatement would likely be necessary. The scope of the Comprehensive Balance Sheet Review was approved by Nortel's auditors and Nortel's Audit Committee. Nortel's Audit Committee and auditors knew that the decision to restate earlier published financial statements would attract regulatory interest. It was to satisfy regulators that Nortel's Audit Committee hired Wilmer Cutler Pickering to conduct an independent review of the circumstances leading to the decision to restate. I am satisfied that, without the benefit of hindsight, Nortel's auditors and Nortel's Audit Committee thought that these parameters were reasonable.

[315]  I am not satisfied that the first restatement was under-resourced. Deloitte was free to add staff as they saw fit. Mr. Richmond did not hesitate to recommend that Nortel staff and Deloitte staff be compelled to take a long weekend. I have no doubt he would have recommended that Nortel find additional staff for the Comprehensive Balance Sheet Review if it had come to his attention that the project, which he had insisted upon, was being compromised because it was under-resourced on the Nortel side. The Comprehensive Balance Sheet Review did, in fact, reveal that approximately $900 million in accrued liability balances needed to be restated.

[316]  I am not satisfied that the original balance sheet review was too narrow in scope

[317]  I am satisfied that there was intense pressure to complete the Comprehensive Balance Sheet Review as quickly as possible. I do not attribute this imperative to the accused alone. I accept the evidence of Mr. Richmond that there was an agreement among the Board, senior management and Deloitte that the Comprehensive Balance Sheet Review should be completed "as rapidly as was humanly possible". I am satisfied that this imperative existed because Nortel wanted to put the balance sheet review and a restatement, if there was indeed going to be one, behind them as quickly as possible and because the accused and Nortel's Audit Committee wanted to make their appropriate filings with the SEC and the Ontario Securities Commission within normal reporting lines.

[318]  I am not satisfied, on the evidence, including the evidence specifically referred to, that the first restatement was not comprehensive because timelines were short.

[319]  I am not persuaded that any or all of the three accused insisted upon an unreasonably short timeline in an effort to make certain that the first restatement failed to uncover the true extent of the accrued liability problem on Nortel's balance sheet.

[320]  I attach no importance to the fact that Mr. Beatty told Mr. Cleghorn, the chair of the Audit Committee, that he, that is Mr. Beatty, viewed a restatement as a last resort or that a restatement was a last resort. Mr. Beatty's statement proves that his attitude toward a restatement was consistent with what Mr. Richmond described as the attitude of corporations generally.

[321]  The restatement of these accrued liability balances had no cash impact on Nortel's cash reserves. Maintaining sufficient cash reserves to keep Nortel functioning was the most pressing responsibility of Nortel senior management, Audit Committee and Board of Directors. In fact, neither the first restatement nor the second restatement had an effect on Nortel's critically important cash reserves.

[322]  Mr. Richmond testified that Nortel lost $3.5 billion in 2000, $27 billion in 2001 and $3.7 billion in 2002. It was his view that the $900 million in excess accrued liability balances was not material to Nortel's financial statements in those years. Mr. Chambers did not offer a contrary opinion.

[323]  Mr. Chambers did not offer any opinion concerning the comprehensive balance sheet review or the first restatement.

[324]  I am not satisfied beyond a reasonable doubt that Nortel's original financial statements for 2000, 2001, 2002, Q1 03 and Q2 03 were materially misstated. I am not satisfied that Nortel's original financial statements for those fiscal years materially misrepresented Nortel's financial results. I am not satisfied beyond a reasonable doubt that Nortel's financial statements published after the first restatement materially misrepresented Nortel's financial results.

[325]  I am satisfied that Nortel's original financial statements for the years 2000, 2001, 2002, Q1 03 and Q2 03 properly reflected Nortel's financial reality.

### The results of the second restatement

[326]  The Crown relied upon the fact of and results from the second restatement as proof that the first restatement was not comprehensive.

[327]  Mr. Richmond indicated that, when it became clear in October 1993 that there were $900 million in excess accrued liability balances to be restated, he suggested that the directors retain independent attorneys to review the circumstances which led to both the recording of excess accrued liability balances on Nortel's consolidated balance sheet and the decision to restate previously-published financial statements for fiscal 2000, 2001, 2002, Q1 2003 and Q2 2003.

[328]  The independent attorneys chosen were from the U.S. firm of Wilmer Cutler Pickering.

[329]  The Summary of Findings and Recommended Measures resulting from the WCP Review ("WCP Summary") was received in evidence for contextual purposes and not as proof of the facts or conclusions contained within it.

[330]  The WCP Summary is contextual in the sense that it affected conduct which was the subject of evidence in these proceedings. For example, it precipitated the decision by the Board of Directors to restate for a second time. It also precipitated the decision by the Board of Directors to terminate all three defendants for cause. Finally, Mr. Hathway repeatedly asserted during his testimony that Deloitte's attitude toward Nortel would have been different had Deloitte known about the matters disclosed in the WCP Summary.

[331]  The WCP Summary recorded the conclusion that the defendants and other persons employed in the former finance management of Nortel carried out accounting practices relating to the recording and release of provisions that were not in compliance with US GAAP in at least Q3 2002 and Q4 2002 and Q1 2003 and Q2 2003.

[332]  The WCP Summary concluded that the dollar value of the individual provisions recorded and released was relatively small and that the aggregate value of the provisions made the

2013 ONSC 137 (CanLII)

difference between a profit and a reported loss on a pro forma basis in Q4 2002 and the difference between a loss and a reported profit on a pro forma basis in Q1 2003 and Q2 2003.

[333]  Nortel did not publish pro forma results in Q1 03 or Q2 03.

[334]  The WCP Summary concluded that these practices were undertaken to meet internally imposed pro forma earnings targets.

[335]  The WCP Summary concluded that the conduct in question caused Nortel to pay bonuses to all employees and senior management under bonus plans tied to pro forma profitability.

[336]  The WCP Summary recorded that the work of Nortel's external auditor, Deloitte & Touche LLP, was not examined, although several current and former audit partners were interviewed.

[337]  With respect to the Q3 2003 and Q4 2003, the WCP Summary concluded that no evidence emerged to suggest an attempt to release provisions strategically in those quarters. However, given the significant volume of accrued liability balance releases in those quarters, it recommended a review of releases down to a low threshold.

[338]  In addition, the WCP Summary recorded a series of recommendations intended to prevent a recurrence of the conduct uncovered by the WCP Review.

[339]  I do not wish to imply that I disagree with the Wilmer Cutler Pickering conclusions. I have no opinion about their conclusions. Forming an opinion about their conclusions would confuse my task with theirs, fail to take into account differences in the evidence we considered and fail to take into account my standard of proof and whatever standard they used. Wilmer Cutler Pickering was answering a question: what were the facts and circumstances leading to the need to restate Nortel's previously-published financial statements for the relevant periods (*i.e.*, 2000, 2001, 2002, Q1 03 & Q2 03)? I am trying to determine beyond a reasonable doubt whether Nortel's financial results were deliberately misrepresented during the time-frame of the indictment.

[340]  Mr. Richmond stated that, on or about March 5, 2004, he found out that Wilmer Cutler Pickering intended to recommend that Nortel restate its prior financial results yet again. Mr. Richmond briefed the Chairman of the Board and the Chairman of the Audit Committee. Mr. Richmond's briefing led to a March 10, 2004 Board meeting attended by representatives of the Wilmer Cutler Pickering firm and, following the Board meeting, a press release, dated March 10, 2004.

[341]  The March 10, 2004 press release announced that Nortel Networks would delay filing its 2003 annual reports. The press release indicated that Nortel was re-examining the establishment, timing of, support for and release to income of certain accrued liabilities in prior periods. The press release indicated that Nortel suspected that it would have to revise both its previously announced consolidated results for the fiscal year ending December 31, 2003 and its consolidated results for one or more earlier quarterly periods.

[342]  Mr. Richmond testified that, when Nortel publicly-stated that it was going from the first Restatement to a Second Restatement, the level of interest in its affairs was intense. He stated that everyone from the Ontario Securities Commission to the SEC was looking over the collective shoulder of Nortel and Deloitte. He said that there was a mandate to get the Second Restatement right in an environment where there was significant litigation going on in the marketplace. He described it as a "high-stakes game".

[343]  Mr. Hathway indicated that the parameters for the second restatement were chosen as a result of the findings of the Wilmer Cutler Pickering independent review. He testified that the Wilmer Cutler Pickering Review revealed information which suggested that aspects of the prior accounting were not correct and raised the potential of earnings management. It was Mr. Hathway's view that these findings eroded confidence in senior management and resulted in a second restatement.

[344]  Mr. Hathway accepted the Wilmer Cutler Pickering conclusions and, based on those conclusions, testified that the first restatement was not comprehensive. As indicated earlier, I do not accept Mr. Hathway's conclusion.

[345]  I am satisfied that, once the Audit Committee received the Wilmer Cutler Pickering Review, it was necessary in response to that information to restate for a second time.

[346]  The evidence established that this second review of Nortel's previously-published financial results considered issues related to revenue recognition, as well as the release of accrued liability balances. Thus, it not only dealt directly with Nortel's consolidated balance sheets, but also directly with the revenue side of its consolidated profit and loss statements.

[347]  The thresholds for the first and second restatement were not the same. The first restatement reviewed all accrued liability balances in excess of $100,000; the second restatement reviewed all accrued liability balances in excess of $10,000. The first restatement reviewed all releases of accrued liability balances to income in excess of $2 million; the second restatement reviewed all releases of accrued liability balances to income in excess of $100,000.

[348]  The Second Restatement of Nortel's previously-published financial results was released January 11, 2005.

[349]  A press release, dated January 11, 2005, announced the restatement of Nortel's consolidated financial results for the fiscal years ended December 31, 2001 and 2002. It also released a revision of Nortel's previously-announced results for the 2003 fiscal year.

[350]  The various press releases were admitted into evidence as business records. The press releases were also attached to Nortel's filings with the SEC. SEC filings were received as business records.

[351]  The January 11, 2005 press release announced that the restated financial results reflected substantial revenue adjustments. The adjustments in revenue, according to the press release, had to be made because there had been accounting errors in Nortel's previously-released consolidated financial results related to revenue recognition. The press release announced that

2013 ONSC 137 (CanLII)

Wilmer Cutler Pickering would be conducting a further independent review of the circumstances that led to the erroneous recognition of revenue.

[352] The causes of the substantial revenue recognition adjustments reflected in the Second Restatement were not developed in the evidence offered in this case.

[353] This aspect of the January 11, 2005 press release is consistent with the evidence of Ms. Karen Sledge, whose evidence in this regard I accept, that the first Restatement focused primarily on the accrued liabilities on the balance sheet, while the Second Restatement had a much broader scope.

[354] The Crown's expert, Mr. Chambers, indicated that, as a general rule, expenses are to be matched with revenues as long as it is reasonable to do so. Accordingly, the logical inference is that, if revenues are re-profiled or restated from one financial quarter to another, the expenses associated with earning those revenues will be similarly re-profiled or restated.

[355] The first restatement was published December 23, 2003; the second restatement was announced March 10, 2004. The reason for the proximity of these two announcements was disclosed in the evidence.

[356] Mr. Richmond recommended to the Board that it not file the restated financial statements until Wilmer Cutler Pickering had completed their independent review. Mr. Richmond testified that there was no legal or regulatory requirement to file the restated financial statements on or about December 23, 2003. It was Mr. Richmond's view that, now that the first restatement was completed, the restated financial statements could be put to one side until Wilmer Cutler Pickering provided their advice, which was expected by mid-February 2004.

[357] The Board, for its own reasons, decided to publish the restated financial statements without waiting. Mr. Richmond conferred with the Wilmer Cutler Pickering firm, who advised that, at that point in December 2003, they knew of no reason why the restated financial statements could not be published. Accordingly, the statements were published.

[358] A short time later, Wilmer Cutler Pickering advised, among other things, that the accused had engaged in earnings management and that there should be a review of Nortel's previously-published financial results.

[359] Neither the first or second restatement affected Nortel's critically-important cash reserves. The Wilmer Cutler Pickering review did not suggest that Nortel's cash reserves had been misrepresented in Nortel's original financial statements or in the first restatement of those financial statements.

[360] The first restatement of previously published financial results differed from the 2nd restatement because the thresholds for the 2nd restatement were lower and because the 2nd restatement considered errors in revenue recognition as well as accrued liabilities.

### *Inferences concerning Nortel's restated financial results for Q1 03 and Q2 03*

[361]  During Q1 03, Nortel's financial results were affected by the release of $361 million in accrued liability balances to income. These releases affected Nortel's balance sheet and profit and loss statement for Q1 03. The first restatement restated $111 million of these balances. The second restatement restated a further $106 million of these balances.

[362]  During Q2 03, Nortel's financial results were affected by the release of $372 million in accrued liability balances to income. These releases affected Nortel's balance sheet and profit and loss statement for Q2 03. The first restatement restated $105 million of these balances. The second restatement restated a further $105 million of these balances.

[363]  The Crown submits that this indicates that the original Q1 03 and Q2 03 releases were not in the "normal course" and that, therefore, Nortel's financial results were misrepresented in the original financial statements and the first restatement of those financial statements. The Crown argued that the effect of the two restatements was to demonstrate that approximately 2/3 of the accrued liability balances released during Q1 03 and Q2 03 were wrongly released in those periods. The Crown submits that this supports its argument that the Comprehensive Balance Sheet Review was misrepresented as comprehensive and that the resulting financial statements misrepresented Nortel's financial results.

[364]  In my view, this is an incomplete interpretation of the restatement process. The restatement process had the effect of restating releases of accrued liability balances in two directions:

- releases of accrued liability balances to income came out of the profit and loss statements for Q1 03 and Q2 03 into which they had erroneously been released. These releases were restated to the profit and loss statements for the quarters into which they should have been released;

- releases of accrued liability balances came into the profit and loss statements for Q1 03 and Q2 03, if those quarters were the quarters into which those balances should have been released.

[365]  The Crown's interpretation only takes into account the accrued liability balances removed from income and, as a result, is incomplete.

[366]  One of the late entry accruals provided by Mr. Morita, the PRC securitization release, was restated from Q4 02 to Q1 03. Although a small amount, $1.8 million, it is an example of a release that was restated into Q1 03. The fact that this release into Q1 03 was randomly reflected in the evidence illustrates that it is reasonable to conclude that other releases were restated into Q1 03. The evidence does not permit an analysis of the net effect on a quarter-by-quarter basis of the restating of accrued liability balances.

[367]  Mr. Chambers did not offer the opinion that this "one way analysis" was valid.

[368]  The reason for releasing specific balances undermines the suggestion that the 3 accused are responsible for the Q1 03 and Q2 03 balances that were restated.

[369]   The evidence demonstrated that at least one release was restated out of Q1 03 because Deloitte disagreed with itself. An example of this seemingly odd conclusion is the Genuity release ($23 million) which is discussed elsewhere in these reasons.

[370]   The PWC accrued liability release ($19 million), also discussed elsewhere, was restated out of Q1 03 on the basis of the legal opinion which was produced in April 2004 after the accused had been dismissed from their positions.

[371]   The fact that the results of the first restatement were tested undermines that portion of the argument which suggests that the first restatement misrepresented Nortel's financial results.

[372]   Mr. Dans testified that he was involved with Deloitte when they performed a trending analysis to validate the results of the first restatement. He stated that each of the leadership categories presented to Deloitte & Touche the results of the restatement and explained the trends that resulted from the restatement to validate those trends from a business perspective. He described it as a "validation exercise."

[373]   No evidence suggested that this trending analysis indicated that the results of the first restatement could not be validated from a business perspective. No evidence suggested Mr Dans was mistaken about the validation exercise. The trending analysis was not produced. I accept this aspect of Mr. Dans' evidence.

[374]   The restatement of individual accrued liability balances occurred for a variety of reasons. It is not safe to generalize. The specifics of each restated balance have to be looked at in order to see what inferences they support. The first restatement was validated. No expert offered an opinion concerning the Comprehensive Balance Sheet Review and the first restatement.

[375]   As indicated earlier, I am satisfied that the first restatement of previously published financial results differed from the 2nd restatement because the thresholds for the 2nd restatement were lower and because the 2nd restatement considered errors in revenue recognition as well as accrued liabilities.

[376]   I am not satisfied, by the evidence, that the first restatement of accrued liability balances released in Q1 03 and Q2 03 demonstrates that the 3 accused misrepresented Nortel's original financial results. I am not satisfied, by the evidence, that the 2nd restatement of accrued liability balances demonstrates that the 3 accused misrepresented Nortel's financial results as first restated.

## Q4 02-THE 4TH QUARTER OF 2002

[377]   Q4 02 was the subject of considerable evidence. The Crown argued that the accused attempted to manage earnings in Q4 02 and, in so doing, deliberately turned a pro forma profit into a pro forma loss.

[378]   The Crown submitted that the solicitation of late accrued expenses/liabilities wrongly converted a pro forma gain before taxes into a pro forma loss before taxes in Q4 02.

[379]   Mr. Harrison described how his solicitation of late entry accrued expenses and liabilities for fiscal Q4 02 came about.

[380]   As indicated earlier, after the business unit sub-ledgers had been closed and the business unit financial results submitted to corporate headquarters, Mr. Harrison frequently prepared an Outlook document to give management a hint of the consolidated financial results. This Outlook document was a snapshot of the results from the general ledger.

[381]   At a daily status update meeting, Mr. Harrison shared his latest Outlook snapshot. Mr. Harrison also commented on what entries were still to be made.

[382]   Typically, the Assistant Corporate Controller, Linda Mezon, the Controller, Michael Gollogly, Mr. Harrison and someone from his staff would be in attendance.

[383]   Mr. Harrison identified one of these snapshots, dated January 6, 2003, which indicated that Nortel's pro forma gain before taxes was $73 million. Mr. Harrison testified that, when he announced this result at the January 6 status meeting, there was surprise. He testified that showing a profit in Q4 02 seemed out of context. He described the feeling at the meeting was that the result did not make sense.

[384]   Skepticism concerning Mr. Harrison's calculation of a pro forma gain before taxes of $73 million was justified. Nortel's pro forma income calculations excluded gains on the buyback of bonds. Mr. Harrison erroneously included $59 million in gains from one such bond transaction in his January 6 Outlook calculations. Mr. Harrison had overstated Nortel's pro forma net gain before taxes by this amount.

[385]   Mr. Harrison corrected his error two days later. By this time, Mr. Harrison had solicited the late entry accrued expenses/liabilities of which the Crown now complains.

[386]   Mr. Harrison testified that, as a result of the skepticism concerning his calculation, he agreed to make calls to senior finance individuals in each of the business units and the Regions to see if they had accrued expenses/liabilities which they had failed to record.

[387]   Mr. Harrison had no clear recollection of any particular person asking him to make these calls; he said the idea that he would do that came from the meeting. Mr. Harrison testified he had never before made a call of this nature.

[388]   Mr. Harrison testified that he made these phone calls and told each of the individuals to whom he spoke that Nortel's results were very favorable and asked each of the individuals if they had any accrued expenses they needed to cover.

[389]   Mr. Harrison's calls resulted in the various business units booking approximately $176 million worth of accrued expenses/liabilities.

[390]   Mr. Harrison created a list of the individual accrued expenses which he had solicited and testified that $137 million of this total came from Non-op which Mr. Harrison stated was under the "purview of the Controller". Mr. Harrison, elsewhere on the same list, indicated that $126

million in additional accrued expenses came from Non-op. The reason for this discrepancy is not clear.

[391]   Two days later, January 8, 2003, Mr. Harrison's Outlook, or snapshot at the daily status meeting, suggested that Nortel was going to have a pro forma loss before taxes of $73 million, rather than a pro forma gain of $73 million.

[392]   Mr. Harrison indicated that, if he had not made the calls, the $176 million in accrued expenses would not have been booked and that Nortel's pro forma and US GAAP results would have not reflected the $176 million in negative impacts represented by the late entry accrued expenses/liabilities.

[393]   Mr. Harrison confirmed that if, the Q4 2002 results had reflected a pro forma gain before taxes, most of Nortel's employees would have been entitled to all or part of a Return to Profitability Bonus.

[394]   The payment of this bonus in Q4 2002 was awkward from Nortel's point of view because, in Q4 2002, Nortel experienced a loss calculated according to US GAAP of $248 million. This result had to be publicly reported. Bonus payments were payable if net pro forma income was positive after allowing for the cost of the bonus. The bonus was payable regardless of the fact that that there was a US GAAP loss.

[395]   The awkwardness, to which I refer results from the fact that Nortel would have publicly reported a US GAAP loss and, at the same time, publicly reported that it was paying its employees a bonus. The evidence disclosed that it was well-known that other publicly-traded corporations had been criticized for precisely this behavior.

[396]   The three accused representing Nortel senior management were motivated to avoid such a situation.

[397]   Additional accrued expenses/liabilities which were all that Mr. Harrison was soliciting would have a negative impact on pro forma earnings. Sufficient additional accrued expenses /liabilities could, therefore, turn a pro forma gain before taxes into a pro forma loss before taxes. If Nortel reported a pro forma loss before taxes in its press release announcing Q4 02 financial results, then no bonus would be payable.

[398]   Reporting a pro forma loss before taxes in Q4 02 was expected.  Mr. Dunn had publicly predicted pro forma gains before taxes in Q2 03 or the second quarter of 2003.

[399]   Mr. Beatty had expressed himself to Mr. Harrison on a related issue. In a conversation in Q3 02 or the third quarter of 2002, according to Mr. Harrison, Mr. Beatty stated that "The Street" would not reward Nortel for only one quarter of positive earnings. Mr. Harrison said that he understood the objective was constant positive results.

[400]   It is not contrary to the criminal law to attempt to manage the affairs of a corporation to achieve a financial target. The question is whether, in attempting to achieve the targeted result, those responsible for preparation of the corporation's financial results cause the financial statements to misrepresent the corporation's financial results.

[401]   Accordingly, the question becomes did the late entry accrued expenses/liabilities cause a misrepresentation of Nortel's financial results?

[402]   Before considering the additional accrued liability balances which resulted from Mr. Harrison's solicitation, I propose to discuss the participation of Mr. Dunn, Mr. Beatty and Mr. Gollogly in the solicitation of additional accrued expenses.

### The participation of Mr. Dunn and Mr. Beatty

[403]   Nortel was a multibillion-dollar year business, international in scope and publicly- traded. It was also financially at risk. When Nortel announced a quarterly result, the auditors had to take a view of the next twelve months from the date of the quarterly report and opine on whether Nortel would be able to continue in business as a going concern.

[404]   It is not logical and I decline to draw the inference that matters affecting Nortel's pro forma and US GAAP earnings escaped the attention of Nortel's CFO and CEO. Both Mr. Dunn and Mr. Beatty were accomplished accountants. Mr. Dunn, in particular, was described as very intelligent with a mind for detail. The evidence disclosed that on a trip to China, as one would expect, he made arrangements to be kept informed of the final 2002 financial results. Mr Dunn told Mr. Wilson that Nortel was profitable on operations in Q4 02 but the quarter was going to be negative due to accruals including 360 Networks.

[405]   Exhibit 1, tab 30 was received as a business record. It is, therefore, capable of proving the facts contained in it. One of the facts contained in the business record is that Mr. Beatty discussed with Mr. Dunn the $30 million increase in Optical's excess and obsolete inventory accrued liability balance. The increase in this balance came about as a result of Mr. Harrison's solicitation of additional accrued expenses. Thus, the evidence is that Mr. Dunn was informed by Mr. Beatty of Optical's response to Mr. Harrison's communication.

[406]   Nortel's Board of Directors decided to pay a Return to Profitability Bonus based on Nortel's 2002 formula for calculating pro forma gains (losses) before taxes. The bonus was created, in part, at Mr. Dunn suggestion because Nortel's competitors were attempting to hire away Nortel employees. It stands to reason that conclusions concerning whether the bonus was payable or not would be brought to Mr. Dunn's attention.

[407]   Mr. Beatty, as Nortel's CFO, would obviously be preoccupied with Nortel's financial results.

[408]   Mr. Gollogly was Nortel's Controller. Mr. Gollogly was at the meeting on January 6, 2003 when Mr. Harrison announced that his calculations indicated that Nortel was pro forma positive by $73 million at that point in time. It was at the same meeting that it was decided that Mr. Harrison would call around and solicit late entries.

[409]   I am satisfied that all three accused knew that Mr. Harrison was soliciting additional late entry accrued expenses/liabilities for fiscal Q4 02.

2013 ONSC 137 (CanLII)

*The specific late entry accrued expenses/liabilities solicited by Mr. Harrison*

*The solicitation of late entries from Karen Sledge*

### Late entry Fringe and Vacation accrued liability balances

[410]   Karen Sledge offered some testimony concerning the solicitation of additional accrued expenses in connection with Fringe and Vacation benefits during the close of the books for Q4 02.

[411]   Ms. Sledge is a CPA, which is the American designation which corresponds to our C.A. In Q4 2002, Ms. Sledge was responsible for accrued liability balances for vacations, holidays and termination benefits. Ms. Sledge indicated that she took on this responsibility in 2002, which was also the first year that she had U.S. Controller responsibilities.

### Fringe Benefit Accrued Liability Balances

[412]   In September or October 2002, Ms. Sledge and her team made a forecast that they did not have enough expenses accrued to cover medical costs in the U.S. throughout the fourth quarter of 2002.

[413]   Ms. Sledge indicated that an additional $13 million should be added to the Fringe accrued liability balance. This was done in October 2002. This increase in the accrued liability balance negatively affected Nortel's Q4 02 results by $13 million.

[414]   This conclusion was based on a review of medical costs associated with recently-terminated employees which demonstrated that recently-terminated employees took greater advantage of medical benefits than active employees. Apparently, terminated employees in 2002 spent approximately 141% of active employees' expenditures. Terminations in 2002 were 6% higher than originally estimated. Medical costs rose between 18 and 20% in 2002, resulting in significantly higher prescription drug costs.

[415]   On December 20, 2002, only two months after the original forecast, Ms. Sledge's staff indicated that they had overestimated this accrued liability balance by $7.3 million. This meant that, on December 20, 2002, Ms. Sledge and her team thought that a release to the profit and loss statement in the amount of $7.3 million would reduce the Fringe accrued liability balance to the appropriate level.  This meant that the $7.3 million would positively affect Nortel's Q4 02 results by $7.3 million.

[416]   On January 3, 2003, two weeks later, Ms. Sledge advanced a new position, namely that the Fringe accrued liability balance should be reduced by $37 million. This meant that the Fringe accrued liability balance had been overestimated by $37 million. This meant that Q4 02 results would be positively affected by $37 million. A journal entry recording this $37 million reduction was made on January 4, 2003.

[417]   Ms. Sledge received two or three telephone calls from Mr. Gollogly on January 5 or 6, 2003, as well as a call from Mary Cross, her immediate supervisor, expressing concern about the $37 million release.

[418]   According to Ms. Sledge, Mr. Gollogly asked her to take a look at her decision to release this $37 million and Ms. Sledge initially responded that she thought the decision to release the accrued liability was correct. Ms. Sledge indicated that Mr. Gollogly became more emphatic about the need for her to reconsider the release with each call.

[419]   Ms. Sledge said that she then increased the Fringe accrued liability balance by $11 million. A journal entry recording this $11 million increase was made on January 13, 2003. This, in effect, reduced the $37 million positive impact on earnings by $11 million. Ms. Sledge testified that, without these calls, she would not have increased the Fringe accrued liability balance.

[420]   Ms. Sledge based her decision to increase the Fringe accrued liability balance by $11 million on invoices that had been incurred but not yet received from medical institutions. A trending analysis was done on these invoices and this analysis indicated the invoices would ultimately come in higher than expected.

[421]   Ms. Sledge said that she asked her own team to consider whether the $11 million increase was justified. Their verification of the increase was communicated to Ms. Sledge on January 13, 2003. Accordingly, the Fringe accrued liability balance was adjusted upwards by $11 million at that time.

[422]   Ms. Sledge indicated that she then asked her staff to determine why their initial forecast had suggested a $13 million increase in the Fringe accrued liability balance was necessary and then their subsequent forecast recommended a $37 million reduction in the accrued liability balance. Ms. Sledge's staff discovered a $19 million double counting error was, in part, responsible. In addition, Ms. Sledge's staff discovered that four months of employee severance notifications and their corresponding medical expenses had been overlooked in their original calculations.

[423]   It is clear from Exhibit 58A, tab 8 that Deloitte & Touche audited Ms. Sledge's decision to increase the Fringe accrual by $11 million. It appears that Deloitte did this on January 17, 2003. Deloitte concluded that the Fringe accrued liability balance should be increased, but only by $8.7 million and a downward adjustment of $2.3 million, representing the difference between $11 million and $8.7 million, was made in Q1 03.

[424]   Nortel published its Q4 02 results on January 23, 2003.

[425]   Ms. Sledge testified that the accrual increase was restated during the Second Restatement. Deloitte restated the $11 million increase because the increase was "not based on sufficient and/or appropriate evidence to support the accrual".

### *Vacation Expenses*

[426]   Ms. Sledge testified that she was also responsible for accrued liability balances for vacation expenses. She said that, after she had submitted her figures, she was asked by her supervisor, Mary Cross, and by Mr. Gollogly if she had any other accrued expenses/liabilities to record in Q4 02.

2013 ONSC 137 (CanLII)

[427]   Ms. Sledge knew that there had been a $9 million release of vacation accrued liability balances to the profit and loss statement. Ms. Sledge reversed the release of this $9 million to the profit and loss statement. She did so by increasing the percentage factor that Nortel used in establishing vacation liability. Specifically, she increased the percentage factor from 75% to 85%.

[428]   Ms. Sledge's increase in the percentage factor used in establishing vacation liability and the supporting documentation were specifically brought to the attention of Deloitte & Touche.

[429]   In an e-mail to Deloitte explaining the decision, Ms. Sledge that prior to 1998, the U.S. had used 100% as a vacation factor and Canada 75%. In September 1998, after a survey of North American employers to determine the average vacation days on hand, a decision was made to use 75% as a factor across North America. Due to unusual circumstances at Nortel in 2002, which Ms. Sledge partially identified as layoffs, management churn and employees not taking time off out of fear that they would be laid off, the consensus was reached that Nortel North American employees had not taken vacation and, therefore, a factor of 85% factor was more appropriate than 75%.

[430]   Ms. Sledge indicated in her e-mail that a North American survey and analysis was scheduled for June-July 2003 and that further adjustments could be made upon receipt of the survey results and analysis.

[431]   The North American survey was conducted in May 2003, which suggested a range of percentages varying from 77% to 89%.

[432]   The $9 million increase in the vacation accrued liability balance was restated in the second restatement. The reason given for restating this $9 million increase was that the results of the survey were not available at the end of Q4 02.

[433]   The restatement set the appropriate percentage at 85% for Q2 03 and Q3 03, which was the period when the study was available. The restatement set the appropriate percentage factor at 77% for Q4 03.

### *Soliciting accrued expenses in Asia*

[434]   Glenn Morita joined Nortel in 1997 and became a chartered accountant in 1998. Commencing in 2000, he was stationed in what Nortel termed the Asia Region. His title was Director of Finance.

[435]   Asia Region was very large; it included China, India, Pakistan, Australia, New Zealand, Taiwan and Japan.

[436]   When Mr. Morita first arrived in Asia Region, he reported to Mr. Gollogly. Mr. Morita knew Mr. Gollogly prior to being stationed in Asia because both of them were stationed in Brampton for a time.

2013 ONSC 137 (CanLII)

[437]  While in Asia Region, Mr. Morita was responsible for end of year, budgeting, forecasting and financial reporting. Mr. Morita said that he was also responsible for passing information along to the Corporate Consolidation Group in Brampton headed by Mr. Harrison.

[438]  Mr. Morita indicated that, during the quarterly close of the general ledger, it was his responsibility to make sure that partial almost complete deals were properly documented so that Asia Region could book the revenues and the appropriate expenses associated with those revenues. Mr. Morita also indicated that, sometimes, it was possible to proceed more quickly with part of a project and, thereby, trigger a release of an accrued liability balance to income.

[439]  During the course of his cross-examination, Mr. Morita indicated that accrued expenses booked in Asia were not readily visible in North America, with the result that Corporate in Brampton depended upon Asia Region to tell them about potential accrued liability releases to the profit and loss statement.

[440]  Mr. Morita indicated that he had received a request to look for potential accrued expenses/liabilities that had been missed at the original close of the Asia Region sub-ledger. Mr. Morita said the request came from Mr. Gollogly and his team. He recalled the request specifically as being one to survey the Region and all the Regional Financial Primes for risk areas that they might want to cover off.

[441]  Mr. Morita said that he spent the day making calls around the Region asking if there were accrued expenses/liabilities which people wanted to book to the general ledger.

[442]  Mr. Morita pointed out that, at the time he was making these calls in January, the books in Asia Region had already been closed and Asia Region had already submitted its final Q4 02 figures to corporate headquarters in Brampton.

[443]  Mr. Morita booked three additional items totaling $4.8 million. He said that these were not large items; they were not material at the corporate consolidations level. Mr. Morita indicated that because he was sending these three items so late in the process, he thought the entries would be refused because they were not material to the results. Mr. Morita testified that he sent the information along to demonstrate that he had cooperated with the request from Mr. Gollogly and his team. He indicated that he had no backup for these accruals when he sent them along. Back up was obtained later.

[444]  The $4.8 million in accrued expenses was, in fact, booked to the General Ledger on January 8, 2003. Mr. Morita agreed on cross-examination with the suggestion that he viewed this process as an opportunity to make things more accurate; to go back and to double-check for opportunities to cover off risk.

[445]  It appears that one of these items (the PRC securitization release) was restated from the Q4 02 profit and loss statement to the Q1 2003 profit and loss statement. The reason for this restatement appears to be that it was part of a Securitization Review.

[446]  Mr. Morita indicated that the $4.8 million in additional accrued expenses, which he submitted, were given to him by his contacts in the various countries. He indicated that the three accrued expenses which he submitted were genuine and verifiable. Mr. Morita indicated that he

went through each expense with the individual submitting the expense. It was his view that, if he had not booked these accrued expenses in Q4 02, they would have been booked in a subsequent quarter. Mr. Morita was firm that he would not have engaged in this process if he thought he was doing something wrong or incorrect.

[447]  Mr. Morita indicated that, from his perspective, whether it was proper to set-up an accrued expense or release an accrued liability balance to the profit and loss statement depended upon whether the set-up or release could be justified.

[448]  Mr. Morita indicated that, from his perspective, while it was not proper to release accrued expenses to the profit and loss statement to meet targets, the appropriate release of accrued liabilities to the profit and loss statement could, in fact, assist in meeting targets.

### The solicitation of additional accruals from Ken Crosson

### Excess and obsolete inventory

[449]  Mr. Crosson joined Nortel in 1975 after obtaining an MBA from York University. From 2000 to 2003, he was the Vice-President of Global Operation; he was located in Raleigh, North Carolina. Mr. Crosson had between twelve and seventeen people reporting to him. Mr. Crosson reported to the accused Douglas Beatty. He was terminated by Nortel in 2003 for matters apparently unrelated to this case.

[450]  Global Operations was a single supply chain that supplied product to various lines of business. Mr. Crosson was responsible for the financial management of the supply chain in the manufacturing of Nortel's products. Mr. Crosson was responsible for efficiently managing inventory; this was one of his two prime responsibilities.

[451]  Mr. Crosson indicated that gross inventory was valued at $2 billion and that there was an accrued liability balance for inventory for $1 billion approximately. In Mr. Crosson's words, half the inventory "was provided for". The risk with respect inventory was that it was excess or obsolete; i.e., not sold within the appropriate period of time or unusable.

[452]  Mr. Crosson pointed out that excess inventory on the books of Nortel's contract manufacturers was, in many cases, Nortel's responsibility and had to be provided for. According to Mr. Crosson, determining who was responsible for what was a contentious matter among Nortel and its contract manufacturers. Finally, Mr. Crosson indicated that the Optical business unit had an inventory problem. Specifically, Optical's exposure on account of excess and obsolete inventory was more than $500 million or approximately ½ of the total accrued liability balance on account of excess and obsolete inventory.

[453]  The precise amount of the inventory accrued liability balance was determined by an algorithm or formula. Obsolete inventory was not usable and so the accrued liability for it was 100% of its value on Nortel's books. Excess inventory was inventory calculated on a percentage basis based on whether the inventory was six-months-old, nine-months-old or one-year-old. The algorithm made these calculations.

2013 ONSC 137 (CanLII)

[454]  Mr. Crosson testified that determining the level of excess inventory involved judgment and forecasting. Forecasting is important because, if orders do not come in and revenues are not as anticipated, then there will be a calculation suggesting that excess inventory is greater than originally anticipated and the accrued liability balance for excess inventory will have to be increased. Optical was particularly vulnerable in this regard.

[455]  The accrued liability balance for excess and obsolete inventory was also affected by various attempts to dispose of the inventory. For example, Nortel approached manufacturers of similar items and offered its excess or obsolete inventory to them at a significant discount. Mr. Crosson testified that Deloitte & Touche took an active interest in auditing these excess or obsolete inventory mitigation programs.

[456]  Mr. Crosson indicated that the Optical business unit had not reached "the bottom" and so there was always the risk that the accrued liability balance on account of Optical's inventory was not sufficient. Specifically, the possibility was that, when the algorithm was applied to Optical's inventory, it would indicate that the accrued liability balance for Optical's inventory must increase.

[457]  Mr. Crosson indicated that running the algorithm for all of Nortel's inventory required time; specifically, it required you to input the age of the inventory and then run the algorithm. It was not something that could be done instantaneously. Accordingly, a decision was reached in late 2002 to postpone re-evaluating the inventory and focus on disposing of it.

[458]  Mr. Crosson indicated that he submitted his financial information for Q4 02 on time that is by January 5, 2003. Mr. Crosson indicated that he was satisfied that his financial information was accurate. Mr. Crosson indicated that, prior to submitting his financial information, he gave consideration to increasing the accrued liability balance on account of excess and obsolete inventory by $50 million. His evidence in this regard is confirmed by an Outlook outlining a potential $50 million increase in the accrued liability balance for excess and obsolete inventory, dated December 19, 2002.

[459]  Mr. Crosson ultimately decided not to make this adjustment to the excess and obsolete inventory balance in Q4 02.

[460]  Mr. Crosson testified that he received a telephone call from Brian Harrison on January 6 or 7, 2003 asking him if he could justify increasing his inventory accrued liability balance. Specifically, the request was, if required, could Mr. Crosson justify increasing his inventory accrued liability balance for Optical by $30-$35 million. Mr. Crosson indicated that he had never before received such a communication. Mr. Crosson indicated to Mr. Harrison that, based on Optical's history and the fact that he did not see a bottom for Optical, such an increase could be justified.

[461]  Mr. Crosson would not have increased the accrued liability balance for Optical's inventory had he not received Mr. Harrison's call.

[462]  Increasing Optical's accrued liability balance had the effect of reducing its income because it meant increasing Optical's expenses on its profit and loss statement, thereby

negatively affecting Optical's net income. A similar effect would be felt on Nortel's consolidated profit and loss statement.

[463]   Subsequent to agreeing to this increase, Mr. Crosson testified that he was then asked to agree to a reduction of this increase from $35 million to $30 million. Mr. Crosson indicated that he was unconcerned about the reduction.

[464]   Mr. Crosson indicated that, after the reduction, the backup documentation was changed to support a $30 million increase in the excess and obsolete inventory accrued liability balance rather than a $35 million increase.

[465]   Interestingly, one of the business records introduced was an e-mail from Mr. Beatty to Mr. Gollogly and others indicating that Mr. Dunn did not agree with the $30 million increase in the accrued liability balance for Optical's inventory.

### Use of Mr. Crosson's $30 million as an offset

[466]   The tale of Mr. Crosson's $30 million increase in the excess and obsolete inventory accrued liability balance contained an unexpected twist.

### The JDS Uniphase Corporation transactions

[467]   Nortel purchased a plant from JDS Uniphase which was located in Switzerland and, as well, purchased related assets in New York State.

[468]   The purchase price ($2.8 billion) had two components – cash and Nortel shares. A portion of the Nortel shares (500,000 shares) amounted to future consideration for the purchase of these assets. Specifically, if Nortel purchased 16.9% of its component needs from JDS in the years 2001, 2002 and 2003, then Nortel would not have to issue 500,000 shares of its stock to JDS. In other words, this portion of the purchase price was deferred and could potentially amount to a purchase price discount.

[469]   At the time of the transaction in 2001, advice was received from Deloitte & Touche concerning how this deferral of the purchase price should be treated in the years 2001, 2002 and 2003. Specifically, Deloitte's advice was that Nortel positively impact net income by approximately $40 million per quarter. Nortel followed this advice. Each quarter, commencing immediately after the purchase, $40 million in positive impacts to income was automatically posted to the General Ledger. Consistent with this decision $40 million in positive impacts had been posted in Q4 02.

[470]   On November 8, 2002, Nortel sold these assets to an arm's length company.

[471]   Deloitte gave Nortel the opinion that the $40 million in positive impacts to Q4 02 net income had to be reduced by $25 million. Nortel accepted Deloitte's opinion.

[472]   Due to the fact that the resolution of this matter was not straightforward, the decision to reduce the $40 million positive impact for Q4 02 by $25 million was not made until January 21, 2003. This was two days before Nortel intended to publish its Q4 02 results.

[473]   Rather than revise Nortel's financial statements for Q4 02, a decision was made to find a fully offsetting entry. Specifically, the accrued liability balance for Optical's excess and obsolete inventory was reduced by $25 million.

[474]   From the Crown's perspective, the changes in the accrued liability balance for Optical's excess and obsolete inventory are suspicious in the extreme. First, Mr. Crosson increases the accrued liability balance for excess and obsolete inventory by $35 million in response to Mr. Harrison's request. The $35 million increase is reduced to $30 million. Then it is reduced to $5 million so that Nortel's financial statements will not have to be changed two days before they were to be published.

[475]   Ms. Linda Mezon testified in these proceedings. Ms. Mezon joined Nortel in Brampton in May 2001 as Assistant Corporate Controller. At this point in time, Mr. Beatty was the Controller. She left Nortel in 2003.

[476]   Ms. Mezon is both a CPA (the American equivalent of the Canadian CA) and a C.A. Ms. Mezon is also an MBA. She was a member for eight years of the Accounting Standards Board, which is responsible for setting accounting standards in Canada for public companies, private entities, not-for-profit organizations and government entities.

[477]   Ms. Mezon testified that she had a good solid working knowledge of both Canadian and United States GAAP.

[478]   Ms. Mezon indicated that, after the decision was made to reduce Nortel's revenue by $25 million on January 21, she, Mr. Gollogly and Helen Verity had a conversation about finding an offset. The reason they were looking for an offset was because it was January 21, 2003 and the press release describing Nortel's financial results was due to be released on January 23, 2003. Finding an offset would mean that the financial statements which already been prepared would not have to be changed.

[479]   Ms. Mezon indicated that it was not her job to find the actual offset and so she went home. The next morning she found out that the offset was a $25 million reduction of Mr. Crosson's $30 million increase in the excess and obsolete inventory accrued liability balance. Ms. Mezon testified that, as soon as she found out about this, she contacted Mr. Crosson and confirmed that he was content with the reduction.

[480]   Ms. Mezon explained her own thinking which was quite helpful. She thought that the total accrued liability balance for excessive and obsolete inventory exceeded $1 billion and so she asked herself whether the $25 million reduction would materially misstate the balance sheet and she concluded that it would not. Ms. Mezon indicated that she knew that excessive and obsolete inventory had been discussed many times with Deloitte & Touche. She described excessive and obsolete inventory as "a very difficult area because in this business, you know the demand had ramped up very quickly, and the demand had fallen off very quickly, particularly, for instance, in Optical, which was—it was very difficult the forecast".

[481]  She said that she concluded that the $25 million reduction was not material. She said that, although she talked to Mr. Gollogly about the offset, she felt the decision was really her responsibility because she was the "GAAP expert".

[482]  Ms. Mezon testified that she made Deloitte & Touche specifically aware of the offset.

[483]  Deloitte specifically reviewed the offset and concluded that the $25 million release was a release associated with inventory classed as a deferred asset which had already been provided for. Accordingly, there was no impact on the inventory line in Nortel's consolidated balance sheet from the $25 million reduction. This conclusion is recorded in Exhibit 156; a Deloitte's working paper, at Tickmark I. Deloitte's working papers were admitted into evidence as business records. The author of this particular working paper was not called as a witness. No witness, including the Crown's expert Mr. Robert Chambers, suggested this conclusion was wrong.

[484]  As far as the offsetting entry is concerned, Ms. Mezon understood the transaction concerning which she was testifying and took responsibility for her decisions.  The decision to reduce the excess and obsolete inventory balance to offset the unexpected revenue decline was reasonably taken. Mr. Crosson was consulted; it is true, only after the decision was taken. However, Mr. Crosson was consulted before Nortel's financial statements for Q4 02 were finalized. The auditors were made aware of the downward adjustment and signed off on the financial statements for an "accounting reason" that was not challenged.

[485]  There is one other aspect of this matter and that is the difficulty with drawing general conclusions about an item which has been restated.

[486]  The Q4 02 accounting for this transaction was reviewed when Nortel sold these assets to an arm's length purchaser. At a meeting of Nortel's Audit Committee on January 9, 2003, Deloitte & Touche confirmed that they were of the opinion that the accounting advice which they gave in 2001 remained appropriate.

[487]  During the second restatement, Deloitte changed its opinion concerning the treatment of the entire transaction.

[488]  Deloitte's new approach calculated that the deferral of the purchase price was worth approximately $500 million. Accordingly, Deloitte decided that the appropriate accounting treatment was to reduce the purchase price by $500 million. This reduction in the purchase price meant that $319 million in positive revenue impacts, which had resulted from the $40 million revenue entry in each quarter after the sale, had to be eliminated. As a result, revenue in 2001 and 2002 was collectively reduced by $319 million as a result of Deloitte changing its mind. I infer from Mr. Chambers report that any expenses associated with earning this $319 million would also have to be restated.

[489]  Deloitte gave two opinions endorsing the accounting treatment of this transaction. The first opinion was given in 2001 and the second confirming opinion was given to the Audit Committee in 2003. In October 2004, during the second restatement, Deloitte changed its opinion, resulting in a reduction in Nortel revenues.

[490]  The Crown argues that the accused, in restating previously-published financial statements, have admitted that accrued expenses/liabilities should not have been recorded in the quarters in which they were recorded, that they were not properly released in the quarters when they should have been released and that, therefore, Nortel's financial statements are not US GAAP compliant. The Crown argues that the fact that there was a restatement proves that Nortel's financial results were misrepresented from 2000 to May 2003 and the only question is whether the accused knew this when those results were published.

[491]  It would be wrong to conclude in a criminal case such as this that the $319 million reduction in revenue means that Nortel's original financial statements misstated its revenue in 2001 in 2002 by $319 million. Describing the original JDS entries as false or wrong inaccurately characterizes what occurred and could easily lead to the false conclusion that something inappropriate happened when the original accounting was done. A consideration of the details of this transaction illustrates why it is impossible to draw the inference which the Crown urges from the fact that accounting entries are restated. The accounting for this transaction was changed because Deloitte changed its mind. A consideration of the specifics of this restatement of the JDS Uniphase transaction makes it clear that it is dangerous to generalize about items that are restated.

[492]  When the facts of this specific restatement are known, it is clear that the accused could not have known that the original treatment of the $500 million purchase price discount was an error or wrong or false. Such words are not appropriate when describing the fact that Deloitte changed its mind.

### Perot Systems

[493]  Mr. Crosson found a second accrued expense/liability – Perot Systems.

[494]  In March 1996, Perot Systems and Nortel Networks Corporation combined to jointly pursue certain identified business opportunities. In 1997, there were significant performance defaults by Nortel. Nortel Networks Corporation and Perot Systems settled their dispute over these defaults in August 1998 upon the following terms:

- Nortel paid $2 million to Perot Systems;

- Nortel agreed to provide Perot Systems with $5 million in product credits;

- Nortel agreed to award Perot Systems a total of $75 million in business over five years ending August 1, 2003.

[495]  From 1998 to the end of December 2002, Nortel had provided Perot Systems with approximately $48 million worth of business. By the close of Q4 2002, Nortel had identified the fact that it still had to provide $27 million worth of work by August 2003 to meet its settlement obligations. Nortel received legal advice in November 2002 to the effect that Perot Systems had a legal right to invoice them for the $27 million difference.

2013 ONSC 137 (CanLII)

2013 ONSC 137 (CanLII)

[496]  Nortel was looking for an opportunity to establish a more permanent relationship with Perot Systems. Nortel wanted to continue to do business with Perot Systems and Perot Systems wanted to continue to do business with Nortel. Nortel did not want to receive an invoice for $27 million. Both sides wanted to avoid litigation.

[497]  When Mr. Crosson submitted his Q4 2002 results, he did not provide for or set up an accrued expense/liability to reflect the risk of unsuccessful litigation with Perot systems. Mr. Crosson did not believe there was sufficient risk. Mr. Crosson knew that Nortel was struggling and was not going to create an expense if he did not believe the $27 million risk warranted it. Mr. Crosson agreed that he knew, on January 2, 2003, about a potential exposure under the Perot Systems Settlement Agreement.

[498]  After Mr. Harrison's telephone call, there was an accrued liability balance entry made in the general ledger for Q4 2002 increasing accrued expenses and accrued liabilities by $27 million on account of Perot Systems.

[499]  Mr. Crosson indicated that he would not have suggested the $27 million increase unless he thought it could be justified. Mr. Crosson indicated that any late entry increase in accrued liability balances would have to be supported to the satisfaction of Deloitte & Touche.

[500]  Mr. Crosson said initially when he submitted his financial information, he did not submit the Excess and Obsolete Inventory accrued liability balance increase and the Perot Systems Perot systems accrued liability balance increase because the accrued expenses/liabilities which he submitted were within a range with which he could live. He felt he could also support a higher number and, therefore, felt that increases of these two accrued liability balances were supportable. Mr. Crosson also testified that the material that he submitted in support of these increases was genuine.

### The solicitation of additional accruals from Jim Kinney for the period Q4 02

[501]  Mr. Kinney was trained as a certified management accountant. He started at Nortel in 1980 and worked there continuously until 2004. Commencing in August 2002, he was the Vice-President Finance for Wireless, one of Nortel's business units. He succeeded Michael Gollogly in that position. As the VP Finance for Wireless, Mr. Kinney reported to the accused, Douglas Beatty. There were various Financial Primes within Wireless and those persons reported to Mr. Kinney.

[502]  As Vice-President Finance for Wireless, Mr. Kinney was responsible for the consolidation of its global financial performance, financial planning and analysis, liaison with the other line organizations, sales proposals and budgeting.

[503]  Mr. Kinney indicated that, in October 2002, he had a phone conversation with the defendant, Michael Gollogly. Mr. Gollogly advised Mr. Kinney that there were issues with the Wireless balance sheet and acknowledged some responsibility for their existence. Mr. Gollogly instructed Mr. Kinney to clean up the balance sheet. Mr. Gollogly was not specific about the items which were problematic. Mr. Kinney said that Mr. Gollogly, as Controller, was instructing

him to get a thorough understanding of what was on the balance sheet, why it was there and, most importantly, whether it should stay on the balance sheet.

[504]  Mr. Kinney said that the balance sheet cleanup at Nortel began in earnest in December 2002 with a conference call among himself, people on his staff, Karen Sledge, in her role as U.S. controller, and Mary Cross, in her role as Controller for North America. It was agreed that Wireless would review its balance sheet quarter by quarter, region by region and entity by entity. The purpose of the review, according to Mr. Kenny, was to determine whether accrued liability balances should remain on the balance sheet.

[505]  Mr. Kinney said he had no contact with Douglas Beatty or Frank Dunn about the balance sheet cleanup that he was undertaking.

[506]  Mr. Kinney explained the difficulty he faced trying to clean up the Wireless balance sheet. Whether liabilities remained on the balance sheet came down to a judgment call based on the representation of the individual who was responsible for the specific accrued liability balances on the Wireless balance sheet. The tricky part, according to Mr. Kinney, arose because many of the liabilities had to do with liquidated damages or potential customer claims. These items were, therefore, self-determined. Within the sales organization, the decision was dependent upon internal representation that there was a liability and that the liability needed to remain on the balance sheet.

[507]  Mr. Kinney said that he viewed the passage of time as the failsafe mechanism. The longer something was on the balance sheet without a claim the more confident he became that it could be taken off the balance sheet. Mr. Kinney said that, in his judgment, an accrued liability balance could be released to the profit and loss statement if there was a high degree of certainty, if not virtual certainty, that the liability no longer existed. Mr. Kinney said he followed the practice of allowing a cooling-off period when he thought an accrued liability balance could be released to the profit and loss statement. Specifically, he waited one extra quarter to make sure that an unexpected exposure did not present itself.

[508]  Mr. Kinney also followed the practice of seeking customer representation that the liability was gone and used receipt of that representation as the event which triggered removal of the liability balance.

[509]  Mr. Kinney testified that, until July 31, 2003, he thought that balance sheet reconciliation was sufficient justification to remove an accrued liability from the balance sheet. According to Mr. Kinney, when he heard a presentation by Mr. Gollogly which indicated that this was not a sufficient justification, it was "a game changer". The evidence disclosed that Mr. Kinney was not alone in this misconception.

[510]  This is perhaps an appropriate place to remark on the fact that Mr. Beatty is a chartered accountant like Mr. Gollogly. I am satisfied that he understood when accrued liabilities could be released to the profit and loss statement. Mr. Kinney recounted that Mr. Beatty explained to him that a change in estimate was a proper way of releasing an accrued liability to the profit and loss statement. Mr. Kinney testified that Mr. Beatty provided him with a reference to the section of

the accountants' handbook dealing with the proprietary of accrued liability balance sheet releases.

[511]  Mr. Kinney testified that, for Q4 2002, the Wireless "stretch target" contribution to pro forma earnings before taxes was $70 million. He agreed that, on January 7, 2003, his submitted numbers had reached that target. Mr. Kinney testified that he received a telephone call from either Brian Harrison or Michael Gollogly. Mr. Kinney was not the only one on this telephone call. He believed there were other Vice Presidents of Finance on the call. They were told that Nortel had a favorable variance to its anticipated earnings and that, as a result, they were being asked to go back and make certain that adequate provision had been made.

[512]  Mr. Kinney indicated that he would not have attempted to find and book increases to Nortel's accrued liability balances without the phone call from Mr. Harrison or Mr. Gollogly.

[513]  Mr. Kinney solicited Wireless for possible increases in the accrued liability balances and received two responses upon which he acted. The first related to an inventory issue involving a customer in China and the second dealt with an increased risk as a result of Nortel's relationship with France Telecom.

[514]  The result of Mr. Kinney's efforts was that he submitted accrued liability balance increases of $12 million. This $12 million increase in the accrued liability balances for Wireless was not restated.

[515]  Coincidentally, Wireless revenue was reduced by a further $8 million because, during the closing of the General Ledger, $8.9 million was removed from Mr. Kinney's revenue calculations by Nortel corporate headquarters.

[516]  As a result of searching for and booking the $12 million in accrued liability balance increases and the $8.9 million revenue reversal, Wireless missed its stretch target by $19 million.

[517]  Mr. Kinney indicated that he was concerned about the reaction of the President of Wireless because Wireless had missed its target. He also indicated that he was not concerned about the reaction of senior management because senior management set the target and, therefore, could dispense with the target.

### Mr. Gollogly's knowledge generally

[518]  Because Mr. Kinney took over from Mr. Gollogly and because Mr. Gollogly instructed Mr. Kinney to clean up the Wireless balance sheet, this is an appropriate place to comment on Mr. Gollogly's knowledge concerning Nortel's financial results.

[519]  Mr. Kinney said that, when he took over as VP Finance for Wireless, he recognized that the balance sheet for Wireless was not well understood within Wireless. After he took over as VP Finance for Wireless, Mr. Kinney recognized that there were significant excess accrued liability balances on the Wireless balance sheet. He also thought that there were accrued expenses/ liabilities which were not well understood. Mr. Kinney testified that he thought that there were $180 million in excess accrued expenses/liabilities on the Wireless financial statements at the end of Q2 02.

[520]  Mr. Kinney also observed that Wireless used the balance sheet as a means by which to meet its earnings targets. This practice was not peculiar to Wireless. Mr. Gollogly said as much in an e-mail (Exhibit 3, tab 140), dated July 31, 2003. Specifically, he said in the e-mail: "I think we need to reinforce the importance of forecasting. It seems like a throwaway comment, but if we 'cleanup' the balance sheet, the LC's ability to deliver earnings based partly on discretionary elements pretty much goes away. So they will need an incremental level of precision in their forecasting. I do not think the company is ready for this since the general approach is to sandbag good news and close 'hard' to the forecast. But if we cannot move the numbers one way or the other, we may get much more surprised than currently".

[521]  I am satisfied beyond a reasonable doubt that Mr. Gollogly knew that there were excess accrued liabilities on Nortel's balance sheet.

[522]  I am also satisfied that Mr. Gollogly was determined to do something about this after he became Corporate Controller. I say this because one of his first acts was to begin balance sheet reviews. His instruction to Mr. Kinney is telling, not only in terms of his knowledge, but also his intent to remove these excess accrued liabilities. I am not persuaded that he understood the extent of the problem.

[523]  Although slightly out of context, it is perhaps appropriate to point out here that Mr. Richmond testified that the $900 million in excess accrued liabilities identified in the Comprehensive Balance Sheet Review were not material, in his opinion, to Nortel's financial results in fiscal 2001 and 2002 due primarily to the $33 billion in losses that Nortel experienced in those years. Mr. Chambers did not offer a contrary opinion.

### 360 Networks

[524]  The largest late entry accrued expense/liability in Q4 02 was $50 million. This accrual was in relation to 360 Networks litigation. This entry was reviewed during the second restatement. Deloitte's conclusion was "accrual was appropriate based primarily on in-house legal representation". Accordingly, this entry was never restated.

[525]  Reference has been made elsewhere to Nortel's preoccupation with providing for every possible risk. With respect to this accrued expense/liability, Mr. Cleghorn, the Chair of the Audit Committee, recalled this matter. Specifically, he recalled that, at a January 2003 Audit Committee meeting, he sought specific assurances $50 million was a sufficient accrued liability balance for this risk because the 360 Networks claim was for $100 million.

[526]  Mr. Cleghorn's evidence was entirely consistent with other evidence to the effect that it was part of Nortel's culture to provide for every possible risk in order to ensure that there were no surprises.

[527]  There is no issue about the appropriateness of this late accrued expense/liability entry which comprised $50 million of the $176 million in late entries.

[528]  I accept the evidence of Ms. Sledge, Mr. Morita, Mr. Crosson, Ms. Mezon and Mr. Kinney concerning the solicitation of late entry accrued expenses/liabilities.

[529]   Nortel's press release of January 23, 2003 also announced a pro forma net loss for Q4 02 of $62 million. This was the only report of a pro forma financial result. Q4 02 was the last time Nortel ever announced pro forma results. Pro forma financial results for Q4 02 were never restated. Deloitte published no opinion concerning pro forma results because it was not retained to do so.

[530]   I am satisfied that the negative impacts of the $59 million revenue error which Mr. Harrison made in his January 6 calculation and $50 million late entry accrued liability for 360 Networks, the appropriateness of which has never been challenged, were more than sufficient to create a pro forma loss in Q4 02. I am satisfied that it was Mr. Harrison's snapshot on January 6, 2003 of a pro forma gain before taxes of $73 million which misrepresented Nortel's pro forma Q4 02 financial result.

[531]   I am not satisfied that the reported pro forma loss of $62 million misrepresented Nortel's Q4 02 financial results.

### The manipulation of Nortel's pro forma earnings before taxes to get a bonus

[532]   The Crown alleges that the accused manipulated Nortel's pro forma earnings before taxes calculation in order to get a bonus. I reject this submission elsewhere in these reasons.

### Did the late entry accrual expenses/liabilities misrepresent Nortel's US GAAP financial results for Q4 02?

[533]   Nortel's press release, on January 23, 2003, announced its financial results for Q4 02. Nortel reported a net loss calculated according to US GAAP of $248 million.

[534]   Nortel's Q4 02 financial statements were restated twice.

[535]   Exhibit 85B also records that, after the second restatement, Nortel reported a net loss calculated according to US GAAP of $294 million for Q4 02.

[536]   I am not satisfied the difference is a misrepresentation. No witness offered such an opinion.

[537]   In addition, in Q4 02, Nortel originally reported total revenue of approximately $2.5 billion. After the second restatement, Nortel reported total revenue of approximately $2.6 billion.

[538]   In Q4 02, Nortel originally reported a gross margin of 39%. The second restatement reported a gross margin of 42%. Mr. Harrison indicated that it was his experience with Nortel that it typically reported gross margins in the range of 40%. No witness suggested that the difference in reported gross margins was important.

[539]   Nortel's press release of January 23, 2003 announced that it was "net cash positive" in Q4 02. The evidence did not suggest that this assertion was a misrepresentation. This was a critically- important piece of information for investors because the evidence indicates that maintaining sufficient cash reserves was a fundamental concern for Nortel's Board of Directors, Audit Committee, senior management and Auditors and fundamental for Nortel's survival.

[540] Nortel's original financial statements for Q4 02 indicated that Nortel had outstanding approximately 4.3 billion shares. The evidence did not suggest that this assertion was a misrepresentation.

[541] I am satisfied that the late entry accrued expenses/liabilities did not result in a misrepresentation of Nortel's US GAAP financial results for Q4 02.

[542] I am not satisfied that Nortel's original published US GAAP financial results misrepresented Nortel's actual financial results.

### Susan Shaw's 2002 Summary of Accrued Liabilities

[543] Susan Shaw prepared a compilation dealing with accrued liabilities and presented it to Mr. Gollogly in Q4 02. Her compilation indicated that $303 million in accrued liabilities were no longer required and available for release.

[544] It is the Crown's position that, despite knowing that there were millions of dollars in excess accruals on the balance sheet, none of the accused advised Nortel's Audit Committee or Deloitte about this situation.

[545] It is also the Crown's position that the accused did not initiate a comprehensive review of Nortel's balance sheet or initiate a restatement of its previously-published financial information.

[546] Ms. Shaw brought her findings to the attention of her superiors, Helen Verity and Linda Mezon. Susan Shaw reported her findings to Mr. Gollogly. Ms. Mezon testified that she brought Ms. Shaw's report to the attention of Mr. Beatty.

[547] Ms. Shaw's compilation informed Mr. Gollogly and Mr. Beatty that $303 million in accrued liability balances were no longer required and available for release. It also told Mr. Gollogly, who as Corporate Controller was responsible for Non-op, that $66 million of the no longer required accrued liability balances were Non-op accrued liability balances.

[548] On November 6, 2002, Ms. Shaw sent an e-mail to Mr. Gollogly's assistant attaching an XL spreadsheet entitled "Acc Liab Q3 for FD". I am satisfied that FD refers to the accused Frank Dunn.

[549] Mr. Dunn was financially trained and described as an intelligent detail-oriented person. Given Nortel's precarious position, I am satisfied that financial information of any importance was brought to his attention. I am satisfied that Ms. Shaw's compilation would have been considered important because it had been generated in response to questions from outside financial analysts.

[550] I am satisfied, therefore, that Mr. Gollogly, Mr. Beatty and Mr. Dunn were aware that Ms. Shaw believed that there were $303 million in accrued liability balances which were no longer required and were available for release.

[551] Some context is helpful in assessing the Crown's position.

2013 ONSC 137 (CanLII)

[552]   Susan Shaw is a chartered accountant. She joined Nortel in 1988 and, in 2002; she was transferred to the Corporate Consolidations Group where she reported to Helen Verity, who was the Director of that group.

[553]   During a call with securities analysts in July 2002, one of the analysts asked Douglas Beatty about Nortel's accrued current liabilities. The analyst pointed out that Nortel's accrued current liabilities exceeded $5 billion and had been increasing over the last few quarters.

[554]   The first problem raised by the question was that if the $5 billion was all cash impacting, then Nortel would not have enough cash to pay all those liabilities. As indicated many times these reasons cash was a critical issue in terms of anything and everything Nortel did.

[555]   The second problem with the question was that Nortel's business had been declining in the previous quarters and yet the liabilities did not seem to be trending downward.

[556]   As a result of this question, the Assistant Corporate Controller, Linda Mezon, asked Helen Verity to look into the matter. Specifically, Linda Mezon wanted to know which provisions would require payment and, therefore, have an impact on cash. In addition, Ms. Mezon wanted to know when the accrued liability balances would be cleared to the profit and loss statement.

[557]   Helen Verity asked the various finance vice presidents throughout Nortel, in an e-mail dated August 2, 2002, to follow up on the question. Ms. Verity assigned the task of compiling the information provided to Ms. Shaw.

[558]   Ms. Shaw described the process she followed in preparing her compilation as iterative. The various business units were provided with their liability balances at Q2 2002 (June 30, 2002) and asked whether those liabilities were going to be cash impacting. In addition, they were asked whether all of the accrued liability balances were correct or whether some were greater than necessary. The business units were also asked whether those that were required were going to be utilized within 2002.

[559]   There was a template which was provided to the units and Ms. Shaw was in communication with the various business units about the information provided when they returned the completed template; she was also in communication with Helen Verity and Linda Mezon to make sure that she was collecting the information that they wanted.

[560]   Ms. Shaw emphasized that, while the business units were being asked for information, they were not being asked to justify their numbers.

[561]   Ms. Shaw also indicated that the information which the units were providing was not designed to provide the basis for a determination of what accrued liabilities should be released to income.

[562]   Finally, Ms. Shaw indicated that 50% of her work concerned contractual liabilities because they composed 40% of the total liabilities on Nortel's consolidated balance sheet. Given that Nortel's total liabilities exceeded $5 billion, contractual liabilities exceeded $2 billion.

2013 ONSC 137 (CanLII)

[563]   I am satisfied that the primary purpose, from Ms. Shaw's point of view, was to determine the cash impact of Nortel's accrued liabilities as at Q2 2002.

[564]   One of the pieces of information which Ms. Shaw uncovered was that, in the opinion of the various business units, there was a total of $303 million in accrued liabilities which were no longer required and available for release.

[565]   Ms. Shaw's Summary of Accrued Liabilities was not kept a secret. E-mail evidence was introduced which indicated that senior accountants of Deloitte & Touche were aware of her work.

[566]   The $303 million in excess accrued liabilities was broken down into categories.

[567]   Two thirds of this total is contractual liabilities. A contractual liability was an accrued liability that arose out of a promise to perform that Nortel had made in agreeing to supply a product or service. Put simply, when the total revenue which Nortel was to receive from the contract to supply a product or perform a service was recognized, the cost of providing that product or service for the life of the contract also had to be estimated and recognized.

[568]   Of the remaining one-third of these accrued liabilities, which were no longer required and available for release (approximately $100 million), $66 million was attributed to Non-op, which was a non-operating unit under the control of Nortel's Corporate Controller, Michael Gollogly. Mr. Gollogly had only recently (July 25, 2002) assumed this position when Ms. Shaw presented him with her final compilation in October 2002.

[569]   To put the $66 million in excess accrued liabilities in context, it should be remembered that Ms. Shaw's report also identified the fact that Non-op had, at the end of Q2 2002, total accrued liabilities of $315 million. In other words, at the end of Q2 2002, $249 million in accrued liabilities were, according to Ms. Shaw, required by Non-op and $66 million were not required.

[570]   In addition, it should be remembered that Ms. Shaw was consolidating results being provided to her. She was not determining which specific accrued liability balances were required and which specific accrued liability balances were no longer required.

[571]   On September 16, 2002, Ms. Shaw met with Linda Mezon to explain the results of her consolidation so that Linda Mezon could meet with Michael Gollogly and provide him with a progress report.

[572]   On October 2, 2002, Mr. Gollogly was formally briefed by Ms. Shaw and others on the final results of her consolidation. Ms. Shaw indicated that, during the meeting, Mr. Gollogly was concerned to know the persons who had provided the information contained in her compilation. It was her impression that Mr. Gollogly was attempting to acquire a level of confidence about the financial information in her report.

[573]   It is important to remember that the numbers in Ms. Shaw's report were those available for the period ending Q2 2002, *i.e.*, June 30, 2002. The numbers in this report were never updated.

[574]  Mr. Richmond provided some assistance on the implication of Ms. Shaw's report. Mr. Richmond was not shown the report and, given his position and responsibilities as Senior Advisory Partner in the Nortel/ Deloitte's relationship, there is no reason why he should have been shown the report. Suffice to say, Deloitte was aware of Ms. Shaw's report and documentary evidence suggested that a person within Deloitte was to liaise with Ms. Shaw while she was preparing her compilation. This person was never identified in the evidence.

[575]  Mr. Richmond said his reading of Ms. Shaw's report suggested to him that she had performed "some sort of analysis and concluded that there were $303 million of provisions that were so-called no longer required". Mr. Richmond stated that there would be a need to review whether that was an accurate statement. He said it would have to be reviewed carefully with many different people to find out whether $303 million was the correct number. After that had been done, consideration would be given to the appropriate way of returning the $303 million to Nortel's profit and loss account.

[576]  I am satisfied that, while Ms. Shaw's report would require follow-up, it would not support, as the Crown suggested, a restatement of Nortel's previously-published financial statements. Mr. Richmond testified that restatements are a serious matter. Obviously, an unverified internal compilation could not provide the basis for the restatement of previously-published financial results.

[577]  Mr. Michael McMillan was asked, in 2004, to follow-up on Ms. Shaw's report. The purpose of this project was, in part, to find out what happened to the reserves that had been identified by Ms. Shaw's October 2002 report as no longer required and available for release

[578]  Prior to preparing his report, Mr. McMillan met with Ms. Shaw, reviewed her original mandate and located the templates upon which she relied. Mr. McMillan requested the business units to locate all documentation which they had used to satisfy Linda Mezon's original e-mail requesting information.

[579]  Mr. McMillan developed a template for the business units to use in determining what happened to the forecasted balances. Mr. McMillan consolidated the submissions from the various business units and reviewed his report with Deloitte & Touche.

[580]  Mr. McMillan reported on March 26, 2004. Mr. McMillan provided a copy of his report and an explanation to the law firm of Wilmer Cutler Pickering which, along with Huron Consulting LLP, was reviewing on behalf of the Audit Committee the reasons why Nortel had to restate some of its prior published financial statements.

[581]  By March 26, 2004, the accused had been virtually suspended. There was no suggestion that they played any role in the preparation of Mr. McMillan's report.

[582]  As far as Corporate and Non-op were concerned, Mr. McMillan came to the following conclusions:

Corporate

2013 ONSC 137 (CanLII)

- the forecasted releases were mainly specific and traceable; only $1 million was unidentified;

- $7 million in forecasted real estate releases were, subsequent to Ms. Shaw's Compilation, found to be supportable accrued liability balances and not released; $1 million of this balance was used.

- $1 million release dealing with a supplier bankruptcy was determined to be valid and released in Q4 2002;

- $4 million out of $15 million accrued on account of asset shrinkage was released in Q4 02 and the remainder was reclassified;

- $5 million which had been accrued on account of late terminations was released in Q1 2003;

- $5 million accrued as a specific Controller's provision was not released in 2002 or 2003; this accrual was re-profiled during the Second Restatement;

- $1 million accrued on account of annual report printing was released in Q3 2002 and this was found to be a valid release;

- $28 million accrued on account of dispute resolution was released in Q3 02 and this was determined to be a valid release;

Non-Op

- $20 million on account of Intercompany Out Of Balance was released in Q3 2002 and reversed to Q4 2001 in the First Restatement;

- $20 million could not be linked to a specific balance and was, therefore, categorized as unidentified.

[583] Mr. McMillan indicated that a portion of the forecasted releases in the original study were not linked to specific provisions and, for that reason, it was necessary to go back to the business units to determine whether the forecast was in relation to a specific provision or a basket of provisions.

[584] Mr. McMillan determined that $222 million of the $303 million was released in Q3 2002 and Q4 2002. Specifically, he determined that $146 million in releases occurred in Q3 2002; $76 million in releases occurred in Q4 2002. No witness testified that the release of this $222 million was material to Nortel's 2002 financial results.

[585] As originally calculated Nortel lost $1.8 billion in Q3 02 and $250 million in Q4 02. Nortel lost approximately $3.6 billion in fiscal 2002. These releases to income were not material to Q3 02, Q4 02 or fiscal 2002 financial results.

[586]  In addition to carrying out the specific task of preparing this accrued liability analysis, Ms. Shaw had ongoing responsibilities for reporting on the status of accrued liabilities in Corporate and Non-op. As a result, she was able to confirm that $20 million of the $66 million was released in Q3 2002 to Nortel's profit and loss statement. This $20 million would have favorably impacted earnings. I attach no significance in terms of the accuracy of Nortel's financial statements to the release of these excess provisions in Q3 2002 because Nortel lost $1.8 billion in Q3 2002.

[587]  Mr. McMillan determined that $10 million in releases occurred in Q1 2003 and $14 million in releases occurred in Q2 2003. No further evidence was led concerning these releases and I am unable to determine whether they were released in the normal course of business or otherwise.

[588]  Mr. McMillan concluded that $57 million in releases were either not released or so vaguely described in Ms. Shaw's report that they could not be identified.

[589]  Ms. Shaw testified that she thought Mr. McMillan's conclusions concerning her report were accurate.

[590]  The release of this $303 million in accrued liabilities would not be cash impacting but would favorably impact earnings by $303 million. The entire $303 million would not be material to Nortel's 2002 balance sheet or profit and loss statement. In 2002, Nortel had approximately $5.2 billion in liabilities on its consolidated balance sheet. Nortel's consolidated profit and loss statement for 2002 reported losses of $3.6 billion.

### Q4 2002 Conclusion

[591]  I am satisfied that Mr. Gollogly did not accept Mr. Harrison's assertion on January 6, 2003 that Nortel's pro forma gain before taxes on that date was $73 million.

[592]  I am satisfied that Mr. Gollogly was quite right to be skeptical about this result because Mr. Harrison had made a $59 million error on the revenue side in his January 6 calculation.

[593]  I am satisfied that Mr. Harrison and Mr. Gollogly, with the knowledge and consent of Mr. Dunn and Mr. Beatty, were attempting to manage Nortel's financial results in this quarter for the following reasons:

- First, the Wireless business unit, for which Mr. Kinney was the Vice-President Finance, had achieved its stretch target of $70 million. It is not logical that Mr. Kinney would be asked to go over his results to see if he had made any errors or if there were risks for which he wanted to provide unless the intention was to negatively manage the pro forma gain which Mr. Harrison had reported;

- Second, all of the persons solicited by Mr. Harrison or Mr. Gollogly were only asked to provide additional accrued expenses/liabilities. They were not asked if there were any positive impacts to income which they had erroneously failed to report.

2013 ONSC 137 (CanLII)

[594]  However, it is clear that Mr. Harrison erroneously included $59 million in his revenue calculation.  It is also clear that the 360 Networks' late entry accrued liability expense/liability of $50 million is unchallenged.   These two required adjustments (totaling $109 million) turn Mr. Harrison's forecasted earnings before taxes into a loss.

[595]  In the same vein, if I consider Mr. Harrison's erroneously calculated pro forma gain of $73 million as a starting point and then account for the negative impacts of the $59 million revenue error and the $176 million in late entries of accrued expenses/liabilities, the pro forma loss before taxes should have been greater than the $62 million which Nortel reported in its January 23, 2003 press release. Accordingly, there must have been positive impacts to Nortel's pro forma gain (loss) which are not clear from the evidence. In short, there must have been other changes to Nortel's pro forma calculations which are not apparent from the evidence.

[596]  I am not satisfied Nortel's pro forma financial results for Q4 02 were correctly reflected in Mr. Harrison's January 6 Outlook calculation.

[597]  I am not satisfied that Nortel had pro forma earnings before taxes in Q4 02.

[598]  The evidence does not establish that Nortel's published Q4 02 pro forma $62 million loss misrepresented Nortel's Q4 02 financial results.

[599]  When I consider all the evidence, including the evidence to which I have made specific reference, I am not satisfied beyond a reasonable doubt that the accruals solicited by Mr. Harrison and recorded in Q4 02 resulted in a misrepresentation of Nortel's US GAAP financial results for Q4 02 or fiscal 2002.

[600]  I am not satisfied that Nortel's financial results for Q4 02 were misrepresented due to the solicitation of late entry accrued liability expenses/balances.

[601]  I am satisfied that $222 million of the $303 million identified by Ms. Shaw in 2002 as provisions no longer required and available for release were, in fact, released in Q3 02 and Q4 02. I am also satisfied that a portion of the $57 million identified as unreleased was so noted because it could not be identified and, therefore it cannot be determined whether those unsupported provisions were released or not in 2002 or 2003.

[602]  I am not persuaded that the release of these accrued liability balances in Q3 02 and Q4 02 materially misrepresented Nortel's financial results in those periods or for the fiscal year 2002.

[603]  The circumstances surrounding the $10 million released in Q1 2003 and the $14 million, released in Q2 2003 were not disclosed in the evidence. I am not satisfied that those releases misrepresented Nortel's financial results in Q1 03 or Q2 03.

[604]  I am not satisfied beyond a reasonable doubt that the manner in which Nortel dealt with the $303 million in accrued liability balances identified by Susan Shaw as no longer required and available for release in her October 2002 compilation misrepresented Nortel's financial results in Q4 02, fiscal 2002, Q1 03 or Q2 03.

2013 ONSC 137 (CanLII)

**Q1 03 & Q2 03**

### *The release of $361 million in Q1 03 and $372 million in Q2 03*

[605]   Quantitatively, Nortel released $361 million in accrued liability balances to its profit and loss statement in Q1 03. The Crown contends that, in its original filings, the accused, on behalf of Nortel, falsely represented that these accruals were in the normal course.

[606]   Included in the $361 million and accrued liability balance releases were $80 million in accrued liability balance releases relating to Non-op. The Crown contends this $80 million was improperly released and, further, that the motive for the improper $80 million release was the desire on the part of the accused to qualify for a bonus and to meet previously-published financial targets.

[607]   Mr. Cleghorn, the Chair of the Audit Committee, testified that he thought that, apart from the $80 million, the balance of the $361 million in releases was in the normal course.

[608]   The first restatement reviewed the release of these accrued liability balances and determined that $111 million of these balances should be restated. The Crown contends that this underestimated the extent of the problem because, during the second restatement, an additional $106 million was identified and re-profiled or restated.

[609]   The Crown contends that the combined effect was that $218 million was restated and that this demonstrates, along with other evidence, that the $361 million was not in the normal course and that the first restatement was not comprehensive.

[610]   Quantitatively, Nortel released $372 million in accrued liability balances to its profit and loss statement in Q2 03. The Crown contends that, in its original filings, the accused, on behalf of Nortel, falsely represented that these accruals were in the normal course.

[611]   The first restatement reviewed the release of these accrued liability balances and determined that $105 million of these balances should be restated. The Crown contends that this underestimated the extent of the problem because, during the second restatement, an additional $105 million was identified and restated.

[612]   The Crown contends that the combined effect was that $210 million was restated and that this demonstrates, along with other evidence, that the $372 million was not in the normal course and that the second restatement was not comprehensive.

[613]   The Crown's expert did not express an opinion consistent with the Crown's contention.

[614]   The Crown attempted to demonstrate the financial effect of the $361 million in Q1 03 and the $372 million in Q2 03 by means of a chart which it constructed and which was received as Exhibit 42E. Mr. Harrison confirmed the entries in the Exhibit reproduced the entries in his Outlooks. Mr. Chambers expressed no opinion concerning this chart.

2013 ONSC 137 (CanLII)

### The Crown's Chart – "operations" Ex. 42E

[615] It is necessary to make an observation about Exhibit 42E in order to avoid its misapplication in this trial.

[616] The Crown introduced this chart which it had prepared; the chart was based on Mr. Harrison's Outlooks and Roadmaps (forecasts). Mr. Harrison confirmed that the entries in the Exhibit reproduced entries in his Outlooks.

[617] There is a column in the chart marked "Operations". I attach no weight to this column. To the extent that the Operations column was intended to describe positive or negative net income from the actual operations of the business units, I find it to be unreliable.

[618] Mr. Harrison indicated Operations for him was something that he tracked. It was a metric he created; it was a metric to show the earnings, excluding the positive impact of the release of accrued liabilities to the profit and loss statement.

[619] The evidence established that, in order to calculate net income from a business unit's operations or its normalized results for a particular quarter, one had to eliminate both the positive impacts of releasing accrued liability balances to the profit and loss statement in that quarter and the negative impacts of setting up accrued expenses/ liabilities in that quarter.

[620] An example of this calculation for the Wireless business unit is found in Exhibit 42G. The analysis starts with the actual results for the period Q4 02; that is $46 million. According to Exhibit 42G, Wireless set up $196 million worth of accrued expenses/liabilities in Q4 02 which had a negative impact on its net income of $196 million. According to the Exhibit, Wireless released $181 million in accrued liabilities in Q4 02 to its profit and loss statement which had a positive effect on its net income of $181 million. To determine Wireless' "normalized results", both of these impacts must be eliminated. The net effect of this calculation is that net income is increased by $15 million.

[621] Accordingly, as described in Exhibit 42G, the normalized result for Wireless in Q4 02 is $60 million approximately.

[622] A comparison with Mr. Harrison's calculation reveals why this aspect of the Crown's chart is unreliable. Mr. Harrison's calculation only involved eliminating the positive impact of the release of $181 million. Mr. Harrison confusingly called this metric which he had created "Operations". Applying Mr. Harrison's methodology leads to a net loss in his "Operations" metric of $135 million.

[623] Confusing Mr. Harrison's metric with the normalized results for the Wireless business unit leads to the erroneous conclusion that Wireless lost $135 million on account of its Operations when, in fact, Wireless enjoyed a $60 million gain on operations.

[624] To the extent that the Operations column in the Crown's chart was intended to describe positive or negative net income from actual operations, it is unreliable. I attach no weight to Mr. Harrison's Operations metric. Mr. Harrison's Operations metric does not accurately establish operational losses at any time during the time-frame of the indictment.

[625]   The evidence established that, in Q1 03, Nortel's set-up $1.1 billion in accrued liability balances and released $361 million in accrued liability balances to the Q1 03 profit and loss statement.

[626]   The evidence established that, in Q2 03, Nortel set up $1.2 billion in accrued liability balances and released $372 million in accrued liability balances to the Q2 03 profit and loss statement.

[627]   This activity with respect to accrued liability balances was fully-disclosed to Nortel's Audit Committee by Mr. Gollogly.

[628]   I propose now to comment on certain specific releases which were disclosed in the evidence.

### The PWC release – $19 million-originally released Q1 03

[629]   This release was specifically referred to in the Wilmer Cutler Pickering Review. It was part of a list of fourteen items listed in the review that the authors said required further study. Each of these items was, according to Mr. Kerr, analyzed from cradle-to-grave. According to Mr. Kerr, this meant an analysis of the accrued liability balance from the moment it was established. Any activity in the accrued liability balance was specifically considered.

[630]   This accrued liability balance was released to the profit and loss statement in Q1 03. Accordingly, it is part of the $361 million in accrued liability balances in Q1 03 which the Crown maintained were not in the normal course. The PWC release was not restated in the first restatement. It was specifically identified in the Wilmer Cutler Pickering review. It was then analyzed from cradle-to-grave during the second restatement.

[631]   Some context is helpful in considering this accrued liability balance.

[632]   In April 2000, Nortel outsourced certain services to PWC. In 2002, Nortel decided to bring these services in-house. An accrued liability balance in the amount of $19 million was set up to account for certain disputed invoices between Nortel and PWC.

[633]   The repatriation of the services was substantially completed in December 2002. The Final Close of the Disengagement Agreement between Nortel and PWC occurred on January 17, 2003.

[634]   Nortel originally released the $19 million PWC accrued liability balance to its profit and loss statement in Q1 03, the quarter in which the Disengagement Agreement closed.

[635]   On April 13, 2004, Nortel received legal advice from its senior counsel. This advice was to the effect that closings of the disengagement agreement for all locations, other than those in France, were completed before December 31, 2002. It was counsel's opinion that no claims against Nortel could originate from the French locations, despite the fact that the closing of the disengagement agreement with respect to locations in France did not take place until January 17, 2003.

2013 ONSC 137 (CanLII)

[636]   Upon receiving this legal opinion in April 2004, Deloitte decided that the $19 million accrued liability balance should be restated from Q1 03 to Q4 02. Deloitte was also of the view that the legal opinion of April 13, 2004 did not represent new information and, as a result, the failure to originally release the $19 million accrued liability in Q4 02 was classified as an error.

[637]   The $19 million was restated to Nortel's Q4 02 profit and loss statement.

[638]   As can be seen from the details of this release, the original set-up of the release properly recorded an accrued liability.

[639]   I am not satisfied that the release in Q1 03, as opposed to Q4 02, can fairly be classified as false. I am not persuaded that the failure to restate this accrued liability balance release in the first restatement demonstrates that the first restatement was not comprehensive or a continuation of the fraud alleged in this indictment. I am satisfied that the release in Q1 03 is exactly what Deloitte said it was: namely, an error. Furthermore, it was an error that is understandable once the facts are known.

[640]   Finally, it has not been demonstrated that the accused were, in any sense, responsible for this error or the failure to consider the error in the first restatement.

### *The Genuity release – $23 million originally released Q1 03*

[641]   This is another accrued liability that was originally released in Q1 03. It was part of the $361 million in total releases for that quarter. It was not restated during the first restatement.

[642]   It was also identified by Wilmer Cutler Pickering as a release which should be reviewed and, as such, was subject to "cradle-to-grave" reconsideration.

[643]   Some context is helpful in considering this accrued liability balance.

[644]   Nortel had several claims against Genuity, totaling approximately $156 million. Genuity alleged that Nortel was liable for substantial claims arising out of their business relationship. Specifically, Genuity alleged that Nortel had supplied defective equipment, had resiled from a guarantee and, finally, that Nortel was liable to Genuity for contributions to a joint development and marketing fund.

[645]   Genuity filed a petition for re-organization under the US Bankruptcy Code in November 2002. At the same time, Genuity proposed to sell all of its assets free and clear of pre-existing claims to an arm's length third-party purchaser.

[646]   The arm's length purchaser received permission to purchase Genuity's assets in Q1 03 and the $19 million accrued liability balance was released to Nortel's profit and loss statement.

[647]   Nortel's counsel advised that part of Genuity's claim was well-founded in its opinion. Nortel and Genuity reached a settlement at the end of Q2 03. Nortel's counsel was of the view that the settlement would not be approved by the Bankruptcy Court because they believed it would be opposed by others interested in Genuity's bankruptcy. However, there was no opposition to the settlement and the Bankruptcy Court approved the settlement in Q3 03.

[648]  During the second restatement, the release was reviewed. The opinion of the Deloitte reviewers was that the Q1 03 release was appropriate. However, the U.S. National Office of Deloitte & Touche overruled the Deloitte reviewers and required that this conclusion be changed. Deloitte's U.S. national office required that the $23 million release in Q1 03 be classified as an error on the basis that the release should have occurred in Q2 03 instead of Q1 03.

[649]  This release also undermines the position taken by the Crown with respect to the Q1 03 and Q2 03 releases. The Genuity release reveals that the $23 million released in Q1 03 was restated into Q2 03. The Crown's submission is undermined because it only takes into account releases that were restated out of Q2 03; it ignores the releases that were restated into Q2 03. This same observation applies to Q1 03. The Crown's submission does not take into account those releases restated into Q1 03.

[650]  Finally, the specifics of this accrued liability balance indicate that it was restated because Deloitte, in essence, disagreed with itself.

[651]  There is no evidence that would permit me to conclude that any or all of the accused were responsible for this error or for the failure to restate it in the first restatement.

### The Optical Warranty release – $8 million released in Q2 03

[652]  In Q1 2001, the Optical Warranty accrued liability balance became underfunded by $21 million. Adjustments were made to the balance in 2001 and 2002. These adjustments reflected changes in the standard costs for the Optical Network Repair Group. The problem was that customers were using the warranty at a higher rate than had been used to calculate the accrued liability balance. In other words, the accrued liability balance on account of the Optical Warranty was not adequate.

[653]  However, during the first half of 2002, it was discovered that the Optical Network Repair Group's standard costs, which were used to record warranty usage, were overstated by about 64% in 2001. This problem was corrected in Q2 02. This meant that the accrued liability balance for Optical Warranty was overfunded; however, the accrued liability balance remained overfunded because of the Optical Networks management team did not have confidence in its data.

[654]  By Q2 03, there was twelve months' usage data available. Accordingly, the accrued liability balance for the Optical Warranty was reduced by $8 million in Q2 03.

[655]  The $8 million reduction in the Optical Warranty accrued liability balance was reviewed and confirmed during the first restatement. It was the opinion of Deloitte during the first restatement that the $8 million change was due to a change in estimate.

[656]  The $8 million with which we are concerned was considered again during the second restatement because it was specifically mentioned in the Wilmer Cutler Pickering review.

[657]  In April 2004 during the second restatement, the decision that the $8 million was released to income as a result of a change in estimate and, therefore, in accordance with US GAAP. The release was confirmed again.

[658]  However, for reasons that are not clear, the matter was reviewed yet again in October 2004. This time it was decided that the Optical Warranty model that was used in arriving at the decision to release $8 million to the profit and loss statement was, itself, inherently flawed. The model was inherently flawed because it had not been revised to reflect the significant changes that had taken place in the Optical business unit's environment in 2001 and 2002. Accordingly, a New Warranty Model was developed. This new model was applied retroactively to 1999.

[659]  Accordingly, the $8 million Q2 03 release was determined to be an error. In addition, the new Warranty Model was applied to all changes in the Optical Warranty accrued liability balance from 1999 to 2003. The changes which had taken place in the Optical Warranty accrued liability balance from 1999 to 2003, based on the old model, were determined to be errors as well.

[660]  A consideration of the specific details surrounding the restatement of this accrued liability balance leads to the conclusion that the decision to restate was taken based on a New Warranty Model which did not exist in Q2 03. The new model did not exist when the accused were employed at Nortel.

[661]  The evidence does not demonstrate that the accused had any role in the decision to release this accrued liability balance in Q2 03 or any knowledge that the old warranty model was flawed.

### Conclusion

[662]  The specific releases to which I have referred demonstrate that the decision to restate on account of an error can be the same thing as saying that there was a decision to restate on account of a difference of opinion.. Clearly new information can affect the decision to restate. Arguably hindsight can be a factor in the decision to restate.

[663]  I agree with the Crown that the fact that accrued liability balances were restated is capable of supporting an inference that financial results were misrepresented, but I am not persuaded by the evidence which I have heard that I should draw such an inference in this case.

[664]  As a result, I cannot give effect to the Crown's submissions concerning the inferences I should draw from the fact that original Q1 03 and Q2 03 accrued liability balance releases were restated.

[665]  I am not satisfied beyond a reasonable doubt that the three accused misrepresented Nortel's Q1 03 and Q2 03 financial results by releasing to income $361 million and $372 million respectively in accrued liability balances. Further I am not satisfied that the original release to income of $361 million and $372 million misrepresented Nortel's financial results.

### The release of $80 million in Non-op accrued liability balances and the entitlement to a bonus

[666]  There was no triggering event in Q1 03 that would have justified the release of this $80 million in accrued liability balances to Nortel's profit and loss statements for Q1 03. This fact was well-known to everyone.

[667]   The Crown alleges that the release of this $80 million in Non-Op accrued liabilities to the profit and loss statement in Q1 03 had the effect of changing pro forma losses in Q1 into a profit which resulted in substantial Return to Profitability and Restricted Stock Unit bonuses being paid to all three defendants in May 2003.

[668]   Put differently, it is the Crown's position that, without the release of this $80 million, the profit targets required for the payment of these bonuses would not have been met and none of the accused would have been entitled to a bonus.

[669]   It is the Crown's position that Mr. Hathway was misled when he was informed by either Mr. Gollogly or Mr. Beatty that the Return to Profitability Bonus would have been paid even without the release of the $80 million.

[670]   The Crown also alleges that the three accused failed to disclose the fact that there was a direct connection between the $80 million release of accrued liabilities and the payment of these bonuses. Specifically, the release of the $80 million offset the liability ($73 million) associated with paying the Return to Profitability Bonus.

[671]   The Crown takes the position that the disclosure in the April 24, 2003 release made it appear as though these two events were unrelated. Specifically, the press release in the Crown's view failed to draw a direct connection between the $80 million release and the payment of the bonuses (*i.e.*, it did not say that the $73 million RTP Bonus was payable because of the release of the $80 million) nor did the press release mention that the $80 million was related to other excess accrued liabilities; namely $109 million in unsupported accrued liabilities which remained on Nortel's consolidated balance sheet.

[672]   It is also the Crown's position that Nortel's SEC filings for Q1 03 obfuscated the nature of the $80 million release.

[673]   The Crown also alleges that the release of this $80 million improperly reduced US GAAP losses.

[674]   It is the Crown's position that the improper release of this $80 million resulted in the publication of financial statements which misrepresented Nortel's financial results.

[675]   It is the Crown's position that even if, based on the Second Restatement financial statements, the bonus milestones would have been met at some point in 2003, the timing of those payments would have been different in the sense that the payments would have been made in different quarters of 2003. The Crown maintains Nortel was at risk when the bonuses were paid based on false results and it does not matter that the bonuses would have been payable later in 2003 based on the restated results for that year.

[676]   I have no difficulty in accepting the fact that all three accused knew what targets had to be hit before they were entitled to the Return to Profitability Bonus and the Restricted Stock Unit Bonus. I attach no significance to that fact; it is simply rational economic behavior. The inference is easily drawn from the access that all three accused had access to Outlooks (forecasts), as well as their positions in the company. The evidence was, for example, that Mr. Dunn played a role in deciding the milestones for the Return to Profitability Bonus.

2013 ONSC 137 (CanLII)

[677]  Releasing the $80 million in accrued liabilities to the profit and loss statement was specifically considered by Deloitte & Touche in an internal memo, which appears to have been produced to the Crown on December 23, 2011.

[678]  Counsel for Deloitte indicated in the letter producing the memo that it had been previously produced to "other regulators". Counsel for Deloitte indicated in the letter producing the memo that it was a "desk file", which apparently means it was never finalized and incorporated into Deloitte's audit working papers. I infer this information was provided to explain the late production.

[679]  Apparently, after the draft memo was turned over to the unidentified regulators, Deloitte was asked a series of questions by one or more of these regulators which they answered. The questions and answers were also turned over to the Crown on December 23, 2011 and produced in this trial as business records of Deloitte & Touche.

[680]  The trial in this matter commenced in January 2012. The authors of the memo, Diana De Acetis, Peter Chant and Chris Allen, were not called as witnesses.

[681]  It is trite that business records are capable of proving the facts contained within them. I am not required to find that these business records or any other business records prove the facts contained in them. However, I found this business record to be particularly helpful, despite the fact that it was a "desk file."

[682]  The draft memo to the Nortel Networks Corporation file of Deloitte & Touche LLP was primarily written by Diana De Acetis. However, during the course of the drafting of the memo, Ms. De Acetis received significant content and input from two other Deloitte accountants, namely, Peter Chant and Chris Allen. Tony Ciciretto assisted by providing information to Ms. De Acetis, but was not otherwise directly involved in the memo's preparation. In addition, according to the memo's introduction, Don Hathway, John Cawthorne and others reviewed the memo. It appears from Exhibit 11 tab 42 that Mr. Hathway also provided information to Ms. De Acetis, Mr. Chant and Mr. Allen prior to the preparation of the memo.

[683]  When Ms. De Acetis prepared this memo, she was a senior manager in Deloitte's Complex Accounting and Transaction Expertise Group. As a member of that group, Ms. De Acetis had provided technical assistance and advice to members of the Nortel engagement team in respect of a number of issues which had arisen during the course of the quarterly reviews in Q1 and Q2 2003.

[684]  Ms. De Acetis reported to Peter Chant. Mr. Chant was a partner and practice group leader of the Complex Accounting and Transaction Expertise Group. Mr. Chant was not a member of the engagement team that performed Deloitte's audits or quarterly reviews at Nortel in Q1 and Q2 2003. However, like Ms. De Acetis, he provided technical assistance and advice to members of that engagement team from time to time in respect of a number of issues that arose in connection with the Q1 and Q2 2003 quarterly reviews.

2013 ONSC 137 (CanLII)

[685]   Chris Allen was a partner at Deloitte, who worked on the Nortel engagement during the Q1 and Q2 2003 reviews. Mr. Allen was a senior member of the Deloitte engagement team for Nortel.

[686]   Tony Ciciretto was, during the Q1 and Q2 2003 reviews, responsible for supervising Deloitte's review work in respect of Nortel's Corporate Analysis and Consolidations Group in Brampton. Mr. Ciciretto's name appears on very many e-mails which were received in evidence as business records. I infer from the documentation that Mr. Ciciretto was a senior member of the Nortel engagement team. Mr. Ciciretto was not called as a witness.

[687]   According to the information provided to the Crown by Deloitte, the memo was created because, in April 2003 during the course of performing its review work, Deloitte's engagement team noted that Nortel had released $80 million in accrued liabilities. Deloitte's engagement team identified a number of documentation and support issues with respect to these accrued liabilities. In late June or early July 2003, Deloitte's engagement team became aware that Nortel intended to release in its financial results for Q2 03 a number of additional accrued liability balances which were no longer required on Nortel's balance sheet. Once again, the engagement team identified documentation and support issues. Based on Deloitte's advice, Nortel did not release these accrued liabilities to the profit and loss statement.

[688]   As a result of these documentation and support issues, Diana De Acetis was asked to conduct a review of Nortel's release of the $80 million in accrued liability balances to the profit and loss statement in Q1 2003 to determine whether these releases were appropriate under US GAAP. I should add here that, in terms of topic and timing, this is an extremely pertinent inquiry.

[689]   According to the information provided to the Crown, Ms. De Acetis obtained background information from Mr. Ciciretto and other members of the Deloitte engagement team for Nortel. Ms. De Acetis prepared an initial draft of the memo in July 2003 and then received comments from Chris Allen and others. Further drafts were generated during July and August. In September, Ms. De Acetis received further comments from Peter Chant. By late September or early October 2003, work on the preparation of the draft memo itself was halted.

[690]   The draft memo bears the date of July 15, 2003. At this point according to the evidence, it was clear to Deloitte that Nortel had unsupported accrued liabilities on its balance sheet and that a Comprehensive Balance Sheet Review was required.

[691]   The draft memo identified six corporate level provisions totaling $80 million, which Nortel determined in Q1 2003 were no longer required or which could not otherwise be justified on its balance sheet at their current balances. In addition to itemizing these accrued liability balances, the memo set out when the accrued liabilities were recorded, the reason for initially recording them and the reasons and support for their reversal in Q1 2003.

[692]   The memo concluded that $6 million worth of releases resulted from a change in estimate triggered in Q1 2003. Therefore, the release of this $6 million was entirely in accordance with US GAAP.

[693]  The memo concluded that the remaining five accrued liability balances totaling $74 million could not be supported. Of this amount, two of the balances, EDSN ($9 million) and Capital Tax ($10 million), had been recognized as errors in the year in which they were created, that is 2002, and so their release in Q1 2003 was considered to be the correction of an error.

[694]  The memo concluded that the remaining three accrued liability balances released to the profit and loss statement in Q1 2003; namely, Intercompany Out Of Balance ($35 million), QST ($5 million) and Short Close ($15 million) were errors, although the memo specifies that a portion of the Short Close release in Q1 2003 was in accordance with US GAAP.

[695]  The memo then spends three pages analyzing whether the releases were material to the Q1 2003 financial statements. The analysis references Staff Accounting Bulletin 99 of the SEC, which has been referred to repeatedly during this trial, as the foundation for a materiality analysis. No materiality expert testified during the trial. The Crown's expert did not comment on the materiality analysis in this memo.

[696]  The memo concluded that "the reversal of the provisions was not considered on a qualitative and quantitative basis to be material to Nortel's financial statements for Q1 2003…"

[697]  One of the tests for materiality which is set out in Staff Accounting Bulletin 99 is whether the misstatement "changes a loss into income or vice versa". Accordingly, the memo re-calculates Nortel's net income for Q1 2003, excluding the effects of the release of the $80 million in accrued liability balances to the profit and loss statement. The memo concludes, after making the appropriate accounting adjustments that Nortel would have had net income of $2.2 million without the benefit of the release of the $80 million to income. The memo concludes that this net income of $2.2 million would have been earned after allowing for payment of the Return to Profitability Bonus and the Success Plan Bonus. The Success Plan Bonus was the performance-based bonus for a large portion of employees. Accordingly, the release of the $80 million did not turn a loss into a profit.

[698]  More specifically, the memo concludes, in an Appendix, that the Return to Profitability Bonus target is achieved whether the $80 million in accrued liability balances is released to the profit and loss statement or not.

[699]  The memo also concludes that the Success Plan Bonus earnings, revenue and cash flow targets are met whether the $80 million in accrued liability balances is released to the profit and loss statement or not.

[700]  Thus, the memo concludes that the thresholds for these two bonuses would have been met whether or not the $80 million in accrued liability balances is released to the profit and loss statement.

[701]  The memo, which was received as Exhibit 251D, is quite thorough. It analyzes six specific accrued liabilities totaling $80 million and it calculates the financial state of affairs relevant for our purposes that would have existed had the $80 million remained on the balance sheet of Nortel instead of being incorporated into its profit and loss statement.

2013 ONSC 137 (CanLII)

2013 ONSC 137 (CanLII)

[702]   Mr. Harrison testified that he did not calculate the Return to Profitability Bonus plan target in the same fashion as Deloitte & Touche. His evidence in this regard was not particularly helpful.

[703]   A review of the minutes of the Human Resources Committee of the Board of Directors of Nortel Networks Corporation, known in Nortel speak as the Joint Leadership Resources Committee ("JLRC"), demonstrates that the bonus target for the Return to Profitability Bonus is to be calculated using Nortel's method in 2002 of calculating pro forma gains before taxes.

[704]   The only issue is whether Deloitte's calculation is consistent with that definition. The lack of similarity between Mr. Harrison's method of calculating the target for the Return to Profitability Bonus and Deloitte's method is of no assistance.

[705]   Deloitte's calculation is contained in one of the Appendices to the memo. The only way to describe this Appendix is by the document number, DT 601338. The Appendix has two purposes: its first stated purpose is to evaluate the effects of the release to income of $80 million of accrued liability balances in Q1 03 on Nortel's ability to achieve the Return to Profitability Bonus and Success Plan Bonus thresholds. In this memo, the release of accrued liability balances to the profit and loss statement is described as the "reversal of provisions". The second stated purpose is to evaluate the effects of the reversal of these provisions reported on net income for Q1 03.

[706]   As a result, this Appendix addresses two important issues in this trial.

[707]   The first calculation concludes that the Return to Profitability Bonus target is met with and without the release of the $80 million. The calculation is plainly set out. It starts with Nortel's loss from continuing operations as reported and then adjusts for the pro forma items that are called for by the 2002 definition of pro forma income; namely, the amortization of acquired technology, stock compensation expense, special charges, and gains on the buyback of bonds. It then adjusts for the cost of the bonuses and arrives at positive pro forma gains before taxes of $161 million. It then adjusts or subtracts the $80 million with which we are concerned and it concludes that the Return to Profitability Bonus target is met.

[708]   Mr. Dans testified about this calculation, although I found his evidence to be vague. He agreed with the adjustment for the amortization of acquired technology, stock compensation, special charges and gains on the buyback of bonds. To the extent that he said that Deloitte, in this Appendix, did not adjust for the cost of the Return to Profitability Bonus, he was in error. If I misunderstood Mr. Dans' evidence, it does not matter because the Deloitte calculation did adjust for the cost of the bonus.

[709]   Deloitte included in its calculation two positive adjustments totaling $28 million. Mr. Dans did not agree with these adjustments. It does not matter. Assuming Mr. Dans is correct, pro forma gains before taxes are $133 million. If I had to decide this matter, I would prefer the Deloitte analysis in the Appendix to Mr. Dans' conclusory statement.

[710]  The Appendix then considers the Success Bonus Plan which had three targets: an earnings target, a revenue target and a cash flow targets. Deloitte, in this memo, concluded that all three targets were met with or without regard to the $80 million with which we are concerned.

[711]  I observe here that the Restricted Stock Unit Bonus Plan, with which we were also concerned in this trial, is not referred to in this memo. It was never suggested that a threshold for this bonus plan was achieved in Q1 03.

### The effect of the $80 million on earnings

[712]  The appendix then considers the effect of the $80 million with which we are concerned on reported earnings. It concludes that Nortel achieved positive earnings with or without the $80 million. This calculation appears on document DT 601339. Mr. Dans did not comment on this calculation.

[713]  Apart from the calculation's conclusion, the analysis contains a note dealing with foreign tax credits. The note reveals that the authors of this memo participated in a conference call with a person identified as John Van Oglrop. The purpose of the call was to obtain clarification about certain foreign tax credits. It appears that a foreign tax credit, which had been recorded as a recoverable asset, had been written off in Q1 2003 and it should have been written off in 2002. This meant that the accrued liability balance for foreign tax credits was overstated by $20 million in Q1 2003 and understated in 2002. The note is interesting because it demonstrates the thoroughness with which the authors of this desk memo approached their task.

### Conclusion concerning the Bonus Payments & earnings

[714]  I am satisfied that the Return to Profitability Bonus was payable in Q1 2003 with or without the release of $80 million in Non-op accrued liability balances.  I am satisfied that the Success Plan Bonus was payable with or without the release of $80 million in Non-Op accrued liability balances. The Restricted Stock Unit Bonus Plan was not an issue in Q1 03.

[715]  I am satisfied that Nortel achieved net US GAAP income in Q1 03 with or without the $80 million.

[716]  I am satisfied that Mr. Hathway was not misled when he was told by either Mr. Beatty or Mr. Gollogly that the Return to Profitability Bonus would have been paid with or without the release of the $80 million in Non-op accrued liability balances.

[717]  I am not satisfied that the accused used Non-op "cookie jar" accrued liability balances to manage earnings and permit the payment of a bonus in Q1 03.

[718]  I am not satisfied that the inclusion of the $80 million with which we are concerned in Nortel's profit and loss statement for Q1 03 misrepresented Nortel's financial results.

2013 ONSC 137 (CanLII)

***The materiality of the release of $80 million of Non-op accrued liability balances***

[719]  Ms. De Acetis, Mr. Chant and Mr. Allen considered whether the $80 million in Non-op accrued liability balances, which were released to Nortel's profit and loss statement in Q1 03, were material to the Q1 03 financial statements.

[720]  Notwithstanding the fact that this is entitled a draft memo, the materiality analysis is instructive.

[721]  The memo concluded that, from a quantitative perspective, the $80 million was material because the materiality threshold used for Deloitte's Q1 03 audit review was $14 million. These authors noted that the $14 million threshold was calculated in accordance with the stated policy of the Deloitte & Touche firm.

[722]  The authors then considered whether the $80 million was material from a qualitative perspective.

[723]  Staff Accounting Bulletin 99 of the SEC mandates both a quantitative and qualitative analysis prior to a materiality determination.

[724]  No materiality expert was called during the trial.

[725]  The draft memo then applies all of the considerations which are set out in Staff Accounting Bulletin 99.

[726]  The draft memo concludes that all six accrued liability balance releases all relate to estimates which are inherently imprecise. The memo concludes that the degree of imprecision is high due to the changes at Nortel and in the industry. According to the authors, there is an inability to accurately predict liabilities of the type that make up the $80 million.

[727]  The memo concluded that the $80 million in changes do not mask a change in earnings or other trends. Six ($6) million in releases were in accordance with US GAAP. Of the remaining $74 million $44, million was reported in "other income". Of the remaining $30 million, $25 million was due to the reversal of a tax provision. The short close liability release ($5 million) was reported as a part of selling, general and administrative expenses during a time when sales, general and administrative expenses were going through dramatic reductions. The remaining $5 million was composed of a portion of the Out Of Balance account which related to Research and Development. Apparently, the classification of items within selling, general and administrative expenses and research and development expenses did not affect trends for those financial statement line items.

[728]  The memo then concluded that the $80 million did not hide a failure to meet analysts' expectations. In order to make this determination, the authors reviewed a variety of analysts' reports and concluded that they focused primarily on revenues, gross margins, operating expenses and operating income and earnings before interest taxes depreciation and amortization (commonly known as "EBITDA").

2013 ONSC 137 (CanLII)

[729]   The memo then examined whether the $80 million changed a loss into income. It was the opinion of the authors that, without the $80 million, Nortel would have made a net income of $2.2 million after payment of the Return to Profitability Bonus and the Success Bonus.

[730]   Pursuant to the provisions of Staff Accounting Bulletin 99, the authors then addressed the question of whether the $80 million concerned a segment or other portion of Nortel's business that had been identified as playing a significant role in Nortel's profitability. The authors answered this question in the negative because Nortel reported contribution from four segments. Research and Development ("R & D") and "Other Income" were excluded from this calculation. Selling, General and Administrative expense was included when calculating contribution to profit, but the contribution of this item was small.

[731]   The authors concluded that the release of the $80 million did not affect Nortel's compliance with regulatory requirements.

[732]   The authors also concluded that the $80 million did not affect Nortel's compliance with loan covenants and other contractual requirements. These requirements required Nortel to have a tangible net worth of $1.8 billion or more. In Q1 03, Nortel reported a tangible net worth of $2.33 billion.

[733]   Finally, the authors concluded that the release of the $80 million did not conceal an unlawful transaction.

[734]   As part of their analysis, the authors commented on the fact that Nortel specifically disclosed the release of the $80 million of favorable impacts in the 10-Q Report for Q1 03.

[735]   The authors pointed out that the effect on Nortel's earnings of the release of the $80 million was brought to the attention of Nortel's Audit Committee on April 23, 2003 prior to Nortel's publication of its financial results.

[736]   After making all these observations, the authors set out their conclusion. They noted that, quantitatively, the $80 million appeared to be material. The authors concluded that the $80 million did not have any of the qualitative characteristics that would indicate a particular concern to users of the financial statement. These items were, at the most, 5% of any particular line item in which they were included and fully disclosed in the notes to the financial statements.

[737]   When the authors considered all of these factors, their collective conclusion was that, if the $80 million had been removed from the financial statements, it would not have altered the total mix of information available to an investor.

[738]   It was the authors' opinion that the $80 million was not material in the broadest sense of the term.

[739]   Mr. Hathway, from late February 2003 Deloitte's lead audit partner on the Nortel 2003 audit, attempted to distance himself from these conclusions by saying that it was based on the knowledge that Deloitte had at the time the memo was prepared.

[740]   On cross-examination, he seemed to say that it was still possible that US GAAP was not complied with, but the non-compliance was immaterial.

[741]   Later on in his cross-examination, Mr. Hathway indicated that he did not agree with the conclusion that the Return to Profitability Bonus target would have been met with and without the $80 million. He suggested that the authors, although he seemed to be referring to Ms. De Acetis, may not have understood the metric for calculating the bonus, although he conceded that Ms. De Acetis would have done her best to understand it before doing her calculation. It would have been a simple matter for Mr. Hathway to explain the error in Ms. De Acetis's calculation. He never did this on cross-examination or on re-examination.

[742]   I do not know how Mr. Hathaway could presume to disagree with Ms. De Acetis' calculations when he admitted in his direct examination that he did not have a detailed understanding of the Nortel pro forma calculations. He stated that he recommended that Nortel discontinue disclosing pro forma earnings in its Q1 03 financial statements, which Nortel did do.

[743]   Mr. Hathway admitted that he reviewed the memo. Mr. Hathway said he had a vague recollection of providing his comments to the author of the memo, but he could not remember what his comments were.

[744]   Mr. Hathway said that he would have made changes or edits to the memo, but did not do so because it was determined that there would be a restatement of earlier published financial statements and that the payment of the bonus would be looked at as part of the restatement.

[745]   Finally, Mr. Hathway said that the author of the memo, by which he seemed to mean Diana De Acetis, was not part of the engagement team and was not familiar with everything that was going on at Nortel. This particular assertion is misleading.

[746]   Ms. De Acetis was consulted on other matters and obviously was familiar with the Nortel file [see: Exhibit 228, tab 215].

[747]   In addition, the memo, which Mr. Hathway seemed to view as only the work of Ms. De Acetis, was co-authored by her superior, Mr. Chant, as well as Mr. Allen.

[748]   Mr. Allen joined the Nortel engagement in 2001. In Q1 03 and Q2 03, he was a senior member of the Deloitte engagement team for Nortel. Finally, Mr. Allen attended the meeting on April 15, 2003, where each one of the accrued liability balance releases which made up the $80 million, which is the subject of the memo, was specifically discussed prior to Deloitte agreeing to their Q1 03 release.

[749]   Mr. Chant was a partner in the firm and was the practice group leader of the Complex Accounting and Transaction Expertise Practice Group to which Ms. De Acetis was assigned.

[750]   Mr. Ciciretto, who provided information to Diana De Acetis, was a senior member of Deloitte's Nortel engagement team.

[751]   I simply do not accept this portion of Mr. Hathway's evidence. He admits he was asked for his comments about this memo. I am satisfied he would have provided those comments in a

2013 ONSC 137 (CanLII)

timely way. I do not understand why he would not have insisted on his comments being incorporated into the memo.

[752]  The notion that Mr. Hathway had some comments concerning and disagreements with the memo, which he may have communicated to the author, but which were ignored and never recorded in writing, seems unlikely. I do not believe Deloitte would conduct itself in this fashion. It seems far more logical to me that the memo would have been changed to reflect Mr. Hathway's comments or that his comments and edits would have been described in the memo in some form that made clear the portions with which he disagreed.

[753]  I do not accept this portion of Mr. Hathway's evidence based on the thoroughness of the memo.

[754]  The Crown's expert, Mr. Chambers, did not comment on this memo.

### Conclusion

[755]  I accept the analysis and conclusions in the draft memo prepared by Ms. De Acetis, Mr. Chant and Mr. Allen. I reject Mr. Hathway's evidence to the effect that the calculations in this draft memo are somehow not correct. This memo represents a coherent materiality analysis and I find it persuasive.

[756]  I am satisfied that the release of the $80 million from Nortel's balance sheet to its profit and loss statement was not material to Nortel's Q1 03 financial results.

[757]  I am not satisfied that including the $80 million with which we have been concerned in Nortel's Q1 03 profit and loss statement or removing the $80 million from Nortel's Q1 03 consolidated balance sheet misrepresented Nortel's financial results for Q1 03 to the public or to Nortel's Audit Committee and its Board of Directors.

[758]  I am satisfied that the thresholds for the Return to Profitability Bonus and the Success Bonus Plan were met with or without the release of the $80 million.

### Susan Shaw's list of $189 million Non-op accrued liabilities

[759]  Reference was made earlier to Ms. Shaw's 2002 report. This is a second occurrence involving Ms. Shaw. It involves Non-op accrued liability balances with which she was concerned in Q1 03. This occurrence not only involves the $80 million to which I have referred, but an additional $109 million in accrued liability balances.

[760]  One of Susan Shaw's responsibilities was to analyze and be responsible for Non-op accrued liability balances. Throughout Q4 2002, Ms. Shaw had been expressing to her superior, Helen Verity, uneasiness about some of Non-op accrued liability balances for which she lacked support.

[761]  In February 2003, Ms. Shaw started reporting to Brian Harrison because Helen Verity left Nortel. In an effort to educate Mr. Harrison about Non-op and to bring to his attention the

2013 ONSC 137 (CanLII)

2013 ONSC 137 (CanLII)

problem with some of the accrued liability balances, Ms. Shaw classified the Non-op accrued liabilities on a chart which was entered into evidence as Exhibit 11, tab 11.

[762]  On this chart, she referred to the accrued liability balances which concerned her as "releasable provisions". Specifically, Ms. Shaw's concerns were that the "releasable provisions" on the chart were not current, didn't seem to be changing and lacked sufficient backup. Ms. Shaw believed that the problem with backup flowed both from the fact that there had been substantial staff reductions (two out of every three employees had been dismissed) and because facilities had been closed resulting in documents being packed up and put into storage making it virtually impossible to search for supporting documentation. Ms. Shaw pointed out that she was not suggesting that backup for these accrued liabilities did not exist; she was simply saying that she did not have that backup.

[763]  Ms. Shaw also cautioned that prematurely releasing an accrued liability which was truly required would create an exposure at a point in the future when the accrued liability crystallized. The evidence established that failing to provide for a risk was very countercultural at Nortel.

[764]  Ms. Shaw thought she met with Mr. Harrison in the latter part of February 2003 and, at that meeting, presented her list of Non-op accrued liabilities and explained the Non-op balance sheet. During the course of her explanation, she identified $189 million worth of "releasable provisions" or accrued liability balances which, in her view, had to be removed from the balance sheet.

[765]  Ms. Shaw's list of releasable provisions presented a problem: there was no justification for retaining these accrued liability balances on the balance sheet; there was no justification for releasing them in Q1 03; Mr. Dunn, Mr. Beatty and Mr. Gollogly had to provide certifications with their financial filings to the effect that, based on their knowledge, Nortel's financial statements fairly presented Nortel's financial condition; the auditors had to provide an opinion that the financial statements "present fairly, in all material respects, the financial position of Nortel Networks…".

[766]  Mr. Harrison was unable to assist Ms. Shaw with the problem. Mr. Harrison was not a chartered accountant. He was a Registered Industrial Accountant; later called a Certified Management Accountant. Quite illogically, he suggested that they release half of it in Q1 03 and half of it in Q2 203. Mr. Harrison described his solution as "an elegant way of, you know, getting out of the problem". Mr. Harrison's solution was hardly elegant. Ms. Shaw was a chartered accountant; she was not comfortable with his suggestion. Mr. Harrison agreed to raise the issue with Mr. Gollogly.

[767]  When Susan Shaw returned from a winter holiday, she was advised that Mr. Harrison was proposing to release $75 million of the Non-Op accrued liabilities on her list of releasable provisions. Mr. Harrison indicated, in his e-mail of March 24, 2003, that he was waiting confirmation from Mr. Beatty and Mr. Gollogly. Later, Ms. Shaw was advised that an additional $9 million from her list of releasable provisions was added to the liabilities that were to be released (total $84 million). Ms. Shaw was unable to say who made this decision.

[768]   Ms. Shaw testified that she was then asked to prepare an explanation of these releases, both for Nortel's purposes and so that Nortel could explain the accrued liability balance releases to Deloitte & Touche.

[769]   Ms. Shaw's written explanation was entered into as an exhibit. Specifically, it appears at tab 20 of Exhibit 11. By the time Ms. Shaw began to prepare her explanation, the list of accrued liability balances to be released had been reduced to $80 million from $84 million. Ms. Shaw did not know how the reduction came about. This $80 million in accrued liability balances is the same $80 million to which I have previously referred.

[770]   Ms. Shaw's prepared explanatory notes described the $80 million in accrued liability balances. Ms. Shaw testified that she prepared an additional chart which showed the $109 million remaining accrued liability balances. This chart was introduced as Exhibit 67G.

[771]   The Crown submitted that the decision to only release $80 million in accrued liabilities in Q1 03 is illogical. The Crown submits there is no difference between the $80 million which was released in Q1 03 and the remaining $109 million which was not released.

[772]   The Crown submitted that Ms. Shaw was aware of these liabilities in Q4 02. The Crown submitted many of them appeared on her $303 million liability list which she compiled in August 2002. The Crown pointed out that the $189 million in accrued liability balances were restated as part of the Comprehensive Balance Sheet Review and the first restatement process. Therefore, the Crown submits that the inclusion of these accrued liability balances in Q4 02, Q1 03 and Q2 03 represented the inclusion of false financial information on Nortel's consolidated balance sheet and as a result Nortel's financial results were misrepresented.

[773]   Ms. Shaw e-mailed her typewritten explanatory notes and other information to Joyce Lam and Guillermo Olguin, both of whom are chartered accountants with Deloitte & Touche, on April 14, 2003. Mr. Olguin forwarded her e-mail and attachments to John Cawthorne, Tony Ciciretto, Chris Allen and others on April 14, 2003.

[774]   Ms. Shaw indicated that she sent her material to Deloitte & Touche in advance of a joint meeting between Nortel and Deloitte to highlight for them the fact that $80 million in accrued liabilities for which there was little backup had been released to the profit and loss statement in one of the preliminary closings of General Ledger for Q1 03.

[775]   Mr. Shaw testified that, by the time this document was discussed with Deloitte & Touche on April 15, 2003, the $80 million had been released to the profit and loss statement. April 15, 2003 was approximately halfway through the close cycle for the preparation of the Q1 2003 financial statements.

[776]   At the April 15 meeting, on the Nortel side, Ms. Shaw, Brian Harrison, Linda Mezon, Michael McMillan and Michael Gollogly attended; on the Deloitte & Touche side, John Cawthorne, Don Hathway, Tony Ciceretto, Joyce Lam and Chris Allen attended. Mr. Hathway and Mr. Cawthorne were the two most senior Deloitte & Touche auditors on the Nortel file, with the exception of Mr. Richmond. Mr. Allen was one of the co-authors of the desk file memo to which I referred earlier.

2013 ONSC 137 (CanLII)

[777]  Ms. Shaw said that her role at the meeting was to walk the Deloitte & Touche partners through her explanation of each of the provisions that had been released, as well as the provisions that remained. She said that her own purpose was to make it very clear that her report was the sum total of her knowledge of the accrued liability balances in her chart.

[778]  Ms. Shaw testified that she went through each item mentioned. She recalled a lengthy discussion about the Intercompany Out of Balance accrued liability balance because it was an ongoing issue between Nortel and Deloitte. Other evidence established that Mr. Dunn wanted to maintain the provision and Deloitte's wanted the Non-op Intercompany Out Of Balance account reconciled and then eliminated. Ms. Shaw indicated that the Intercompany Out Of Balance portion of the discussion was quite heated.

[779]  Ms. Shaw testified that, after the Intercompany Out Of Balance item had been discussed, the meeting proceeded to discuss the other items in her report. She said that Deloitte wanted to know what event had triggered the releases and that she informed them that there really were no triggering events. Ms. Shaw also recalled, at one point, someone on the Deloitte side wanted to know whether Nortel staff understood that there had to be a triggering event before an accrued liability balance could be changed or released to the profit and loss statement. She informed Deloitte that the accrued liability balances had been on Nortel's books for a number of quarters if not years. Ms. Shaw said it was quite evident at the meeting that these balances did not have adequate backup and that their release to the profit and loss statement had not been triggered. She said that Deloitte wanted to know why they were releasing these accrued liabilities in Q1 2003.

[780]  Ms. Shaw indicated that after the $80 million was discussed the remaining accrued liabilities, which totaled $109 million, were discussed.

[781]  The existence of provisions for which there was little support would not come us a surprise to either Mr. Cawthorne or Mr. Hathway despite their lack of experience with the Nortel engagement. In February 2003 Mr. Cawthorne asked for and received a list of "soft provisions" prepared in connection with the 2002 audit. The accrued liability balances on this list totaled $413 million. Mr. Hathway saw this list because his handwriting is on it. Soft provisions were accrued liability balances with questionable support.

[782]  Ms. Shaw elaborated that the other Deloitte partners were experienced with the Nortel account and the liability balances to which she was referring. Ms. Shaw testified that these balances had been on the books for many quarters and, for those experienced with the Nortel account, were not new. She said, for example, everyone from Deloitte, with the exception of John Cawthorne and Don Hathway, who were both new to the file, knew what the Matra Restructuring accrued liability balance was.

[783]  Evidence was introduced which established that balance sheet reviews were conducted in 2002 in relation to the balance sheet for Non-op. Ms. Shaw testified that these balance sheet reviews could go on for hours and that partners from Deloitte & Touche attended. Ten e-mails were introduced, which indicated that, in 2002, accountants with Deloitte & Touche were reviewing and asking questions about changes in accrued liabilities in Non-op in Q3 2002. I accept this aspect of Ms. Shaw's evidence.

2013 ONSC 137 (CanLII)

2013 ONSC 137 (CanLII)

[784] John Cawthorne, Tony Ciciretto, Joyce Lam and Chris Allen did not testify. Only Don Hathway testified and gave evidence about the April 15, 2003 meeting. Mr. Hathway was not part of the Nortel engagement prior to early 2003.

[785] Ms. Shaw testified that, in her mind, there was no difference between the $189 million, which she initially identified, and the $80 million which was actually released in Q1 2003. Ms. Shaw said that, after she made her presentation and after the partners at Deloitte & Touche had finished asking her questions, she and others left the meeting. Ms. Shaw estimated that the portion of the meeting which she attended lasted for about forty-five minutes. She said four people remained behind in the meeting room: John Cawthorne, Don Hathway, Linda Mezon and Michael Gollogly.

[786] I accept Ms. Shaw's evidence concerning the $109 million Non-Op accrued liability balances which remained on Nortel's balance sheet. Her conduct as she described it is entirely consistent. Ms. Shaw had responsibility for Non-op's liabilities; she had concerns about some of them. She brought her concerns to the attention of her superiors. As a chartered accountant, she understood the importance of making sure that Nortel's auditors understood that there was no support for the $80 million in accrued liability balances that were being released to the profit and loss statement and no support for the $109 million in accrued liability balances which remained on Nortel's balance sheet. She was quite candid in describing her own discomfort with these liability balances.

[787] The $80 million remained released to income in Nortel's published financial results for Q1 2003. The $109 million remained on Nortel's published balance sheet where it always been included in Nortel's $5 billion in liabilities...

[788] Ms. Shaw made further inquiries about the $109 million in Q2 03. She testified that she consulted with a broader group concerning the remaining $109 million of Non-op accrued liability balances. She described it as "taking more time and really going deeper into the provisions…" Ms. Shaw indicated that no new information concerning the remaining provisions was discovered. It was her evidence that "quite a bit of time was spent trying to find out about some of these items". Ms. Shaw testified that, because so many people had left the company, it was impossible to track down the information. I accept this aspect of Ms. Shaw's evidence.

### Should the $189 million have been dealt with in Q4 02?

[789] The Crown suggested that the accrued liability balances, which appeared in Ms. Shaw's $189 million list, also appeared in her Accrued Liability Analysis report which she presented to Mr. Gollogly in October 2002. The Crown suggested, in argument, that this meant that Mr. Gollogly should have decided in October 2002 that these accrued liability balances were not supportable and dealt with them at that time. I reject this argument.

[790] Ms. Shaw's Accrued Liability Analysis Report in October 2002 (Exhibit 1, tab 5) listed all of the Non-op accrued liabilities. This list totaled $315 million. Ms. Shaw identified each accrued liability balance and the total. Ms. Shaw did not state in her Report that all of these accrued liability balances could not be supported and should be released. Ms. Shaw indicated in

her Report that $66 million of Non-op accrued liability balances could not be supported and should be released. Ms. Shaw did not identify these individual balances.

[791] In February 2003, Ms. Shaw, in her capacity as a person responsible for the Non-op accrued liability balances, met with Mr. Harrison to whom she was directly reporting. She met with him about the state of accrued liability balances in Non-op. In that meeting, Ms. Shaw advised Mr. Harrison that there were $189 million in Non-op accrued liability balances which, in her view, at that time were not supportable. In her notes which she prepared for that meeting, she referred to these accrued liability balances as "Releasable Provisions." In her notes, Ms. Shaw specifically identified each one of these provisions. Mr. Gollogly was not present at that meeting.

[792] There is no basis for suggesting that Ms. Shaw had disclosed to Mr. Gollogly in the fall of 2002 the specific Non-op accrued liability balances which were incorporated into the memo which she were prepared for the April 15, 2003 meeting with Deloitte.

[793] The Crown also suggested that Mr. Gollogly did not deal with the $189 million in accrued liability balances in Q4 02 because he wished to maintain them as a "cookie jar" to assist in managing earnings. I reject this argument for the same reason.

### The knowledge of Mr. Dunn, Mr. Beatty and Mr. Gollogly

[794] I have already indicated elsewhere that I am satisfied that Mr. Dunn, Mr. Beatty and Mr. Gollogly were very aware of financial developments within Nortel.

[795] I am also satisfied that accrued liability balances owned by the two non-operational units of Nortel; namely, Corporate and Non-op, were under the control of the Controller. The Crown relied on this fact to suggest that all three accused were more familiar with accrued liability balances in Corporate and Non-op.

[796] The decisions to be taken with respect to this $189 million were important. Nortel's financial situation was still precarious although improving. It is clear that Mr. Gollogly was at the meeting with representatives of Deloitte in April 2003 when the decision to release the $80 million in accrued liability balances was confirmed.

[797] The evidence discloses, and Mr. Gollogly well-understood, his obligations as Nortel's controller. I am satisfied that he brought to Mr. Beatty's attention this $189 million balance sheet problem. Mr. Dunn was described in the evidence as a strong, intelligent detail-oriented leader.

[798] I am satisfied beyond a reasonable doubt that Mr. Gollogly, Mr. Beatty and Mr. Dunn were aware of Ms. Shaw's and Nortel's $189 million in releasable provisions.

[799] The Crown relied on the presence of two accrued liability balances in Non-op as a further indication of the familiarity of all three accused with Corporate and Non-op accrued liability balances. The two accrued liability balances to which the Crown referred were known as the Degree of Difficulty ("DOD") bonus and the General Provision.

2013 ONSC 137 (CanLII)

[800]  I am satisfied that all 3 accused were familiar with Non-op accrued liability balances. However, reference was made to these 2 accrued liability balances and it is helpful to look at them in detail and see what they demonstrate.

### The accrued liability balance for the Degree of Difficulty bonus – $25 million

[801]  The Degree of Difficulty accrued liability balance was created when Mr. John Roth was Nortel CEO. It was created to provide for the risk created by the fact that Mr. Roth had the authority, at his discretion, to pay a bonus to a senior executive. As a result, the Degree of Difficulty bonus was payable at the discretion of the CEO. Ms. Mezon indicated that details surrounding the payment of a Degree of Difficulty Bonus were considered confidential to the CEO. The other Bonus Plans disclosed in the evidence were payable upon the recommendation of the JLRC committee of the Board of Directors.

[802]  Mr. Roth left Nortel in 2000. Accordingly, this accrued liability balance was set up prior to that time. The original accrued liability balance was $19 million and later increased to $25 million.

[803]  Due to the fact that Nortel was in extremely difficult financial circumstances from 2000 forward, it is not surprising that Mr. Dunn never attempted to use this balance to pay a bonus.

[804]  The Crown suggested that the accused attempted to release this provision as a substitution for the Intercompany Out Of Balance provision. It is the Crown's position that Deloitte & Touche would not agree to the release of any portion of the Intercompany Out Of Balance accrued liability balance in Q2 03 because the entire Intercompany Out Of Balance account was under review. It is the Crown's position that the accused then attempted to release both the Degree of Difficulty accrued liability balance and the General Provision as a substitute.

[805]  It is also the Crown's position that this provision had been identified in February 2003 by Susan Shaw's as a provision that should not be on the balance sheet and that it ought not to have been, therefore, retained on the balance sheet in Q1 03.

[806]  The inclusion of the Degree of Difficulty bonus in Ms. Shaw's notes simply demonstrates that she knew nothing about the details surrounding this accrued liability balance. Ms. Shaw had no documentation herself because details surrounding the payment of a degree of difficulty bonus were considered confidential. She knew that it had been on the books for a long time and that it had not changed. As a result, Ms. Shaw included reference to this bonus in the notes she prepared for her discussion with Deloitte in April 2003. In her April 14, 2003 Report, Ms. Shaw recorded a brief description of the bonus plan and then the words "left in place per Frank Dunn".

[807]  This is perhaps an appropriate place to note that documentation existed supporting this bonus plan. It was approved by Nortel's Board of directors when it was created. The person, who had the authority to pay the bonus, Mr. Dunn, was still employed at Nortel. Ms. Shaw's note "left in place per Frank Dunn" obviously means that Ms. Shaw had received information from someone that Mr. Dunn wished to retain the discretion to pay a bonus to a senior executive.

2013 ONSC 137 (CanLII)

[808]   Nortel did not attempt to release this accrued liability balance in Q1 03. In Q2 03, the attempt to release this accrued liability balance was unsuccessful because Mr. Hathway would not approve it and the other balances which totaled $142 million. Even if the release of this accrued liability balance would have been material to Nortel's profit and loss statement in Q2 03, it never happened. All that happened was that this $25 million accrued liability balance remained on Nortel's balance sheet where it always been.

[809]   Mr. Hathway testified that, at the April 15, 2003 meeting, he questioned reference to this accrued liability balance because Ms. Shaw, in her memo, did not indicate whether a bonus was going to be paid.

[810]   Even if the Crown's submission is correct and it is true that Mr. Gollogly, Mr. Beatty and Mr. Dunn attempted to release this accrued liability balance to substitute, in part, for the fact that they could not release the Intercompany Out Of Balance accrued liability balance that is not the end of the matter. The release never took place. It is not a crime for a corporation to try to achieve a financial target. A line is crossed when, in pursuit of that goal, financial statements are released to the public which misrepresent the corporation's financial results. No such misrepresentation was brought about by an unsuccessful attempt, if that is what happened, to release the accrued liability balance associated with the Degree of Difficulty bonus.

[811]   Mr. Richmond testified that it was Deloitte's opinion that leaving the $142 million on the Nortel balance sheet pending The Comprehensive Balance Sheet Review did not misrepresent Nortel's financial results. Mr. Chambers, the Crown's expert, did not offer a contrary opinion.

[812]   I attach no significance to the existence of the Degree of Difficulty accrued liability balance. I attach no significance to the fact that Mr. Dunn wanted it left in place in Q1 03 and subsequently changed his mind in Q2 03. I attach no significance to the fact that the 3 accused unsuccessfully attempted to release this balance in Q2 03.

### The accrued liability balance for the General Provision $10 million

[813]   In an undated note, Ms. Shaw records that the General Provision was set up to cover various items confidential to the Controller.

[814]   The evidence indicated that the timing of the set-up of this General Provision was unclear. Documentary evidence indicated that this accrued liability balance was set-up either in Q3 00 or Q4 01. Mr. Beatty was the Controller of Nortel at the time. Helen Verity testified that this provision was, in fact, held by the Controller. Ms. Mezon said she had very little knowledge about this accrued liability balance except that it was confidential.

[815]   This provision was not released in Q1 03. Ms. Shaw referred to it in her notes for the April 15, 2003 meeting with Deloitte & Touche. In her report, the only note Ms. Shaw recorded concerning this accrued liability balance was "left in place per Doug Beatty". Ms. Shaw had no information about this accrued liability balance except that it was confidential and held by the Controller. Ms. Shaw indicated that this limited information had come from Brian Harrison or Linda Mezon.

2013 ONSC 137 (CanLII)

[816]  Ms. Shaw indicated that the name of the accrued liability balance in the General Ledger cannot be relied upon to define it. Ms. Shaw indicated that the only way to know the risk for which an accrued liability balance was providing was to read the specific backup for it.

[817]  Ms. Shaw pointed out in her evidence that this accrued liability balance was well-known to Deloitte & Touche. It had been on the Nortel books for many quarters.

[818]  Mr. Hathway indicated that he questioned the provision at that April 2003 meeting when he saw it on Susan Shaw's list. He testified that US GAAP did not permit a general provision and that, unless there was more to this provision than Susan Shaw had provided, it was not permitted. Mr. Hathway agreed that, even though he was new to the Nortel file, he was aware that some of the provisions on Susan Shaw's list, including this one, had been on Nortel's balance sheet for a long period of time. As indicated earlier Mr. Hathway had seen a soft provisions list totaling $413 million which had been provided to Mr. Cawthorne in February 2003.

[819]  Mr. Richmond testified that an accrued liability balance intended to provide for liability generally, that is, a provision that was not tied to a specific liability, existed inside corporate Canada and in the United States prior to 1999. In 1999, he testified there was a clear attempt to eliminate this type of accrued liability balance. Accordingly the purpose of the provision needed to be understood.

[820]  Obviously Mr. Beatty could have been asked about the provision at any time. If the provision was for a specific purpose then the only question would be whether Mr. Beatty thought it was possible that he might use it. If the provision was general in nature it had to be eliminated because it was contrary to US GAAP.

[821]  An attempt was made to release this accrued liability balance to the profit and loss statement in Q2 03. Ms. Shaw could not remember how it was that she learned that this balance was to be released. Specifically, it was part of the $59 million in Non-op accrued liability balances which were included in the $142 million of accrued liability balances which were, for a short time during a preliminary close of Nortel's Q2 03 general ledger, released to Nortel's profit and loss statement.

[822]  In a note explaining why, in Q2 03, this accrued liability balance should be released to the profit and loss statement, Ms. Shaw explained that specific drawdowns and the timing of those drawdowns were unknown and, therefore, the accrued liability balance should be eliminated.

[823]  This accrued liability balance was not released to Nortel's Q2 03 published profit and loss statement. Karen Sledge testified that, during the first restatement, this accrued liability balance was completely eliminated.

[824]  The Crown suggested that the accused attempted to release this provision as a substitution for the Intercompany Out Of Balance provision. It is the Crown's position that Deloitte & Touche would not agree to release any portion of the Intercompany Out Of Balance accrued liability balance to Nortel's profit and loss statement because the entire Intercompany

Out Of Balance account was under review. It is the Crown's position that the accused then attempted to release both this balance Degree of Difficulty balance as a substitute. This never happened.

[825]   Even if the Crown's submission is correct and it is true that Mr. Gollogly, Mr. Beatty and Mr. Dunn attempted to release this accrued liability balance to substitute, in part, for the fact that they could not release the Intercompany Out Of Balance accrued liability balance that is not the end of the matter. The release never took place. It is not a crime for a corporation to try to achieve a financial target. A line is crossed when, in pursuit of that goal, financial statements are released to the public which misrepresent the corporation's financial results. No such misrepresentation was brought about by an unsuccessful attempt, if that is what happened, to release the accrued liability balance associated with the General Provision.

[826]   It is also the Crown's position that this provision had been identified in February 2003 by Susan Shaw's as a provision that should not be on the balance sheet and that it ought not to have been, therefore, retained on the balance sheet in Q1 03. Ms. Shaw identified this provision as one that Mr. Beatty wanted left in place. The only question is whether this accrued liability balance existed to provide for a specific risk.

[827]   As indicated this accrued liability balance was never released. It was included in the $142 million. It never affected Nortel's profit and loss results. It remained on the balance sheet where it had always been. Mr. Richmond testified that it was Deloitte's opinion that leaving the $142 million on the Nortel balance sheet pending The Comprehensive Balance Sheet Review did not misrepresent Nortel's financial results. Mr. Chambers, the Crown's expert, did not offer a contrary opinion.

[828]   I attach no significance to the existence of the General Provision accrued liability balance. I attach no significance to the fact that Mr. Beatty wanted it left in place in Q1 03 and subsequently changed his mind in Q2 03. I attach no significance to the fact that the 3 accused unsuccessfully attempted to release this provision in Q2 03.

### *The $142 million in accrued liabilities which Nortel wished to release in Q2 03*

[829]   Mr. Hathway testified that Mr. Gollogly advised him that, in the initial close or one of the initial closes of the General Ledger for Q2 03, Nortel had identified $142 million of reserves that did not have support and had released those reserves to the profit and loss statement, thereby positively impacting earnings by $142 million. Mr. Gollogly asked Mr. Hathway if this would be acceptable to Deloitte & Touche. Mr. Hathway objected.

[830]   Mr. Hathway indicated that his objection was that, because these amounts must have had no support at the end of Q1 03, when these amounts were combined with the $80 million released to income in Q1 03, they would have amounted to a material error in Nortel's profit and loss statement.

2013 ONSC 137 (CanLII)

[831]  As a result of Mr. Hathway's objection, Mr. Gollogly returned the $142 million to Nortel's balance sheet where it had always been. This happened at the next preliminary close of the General Ledger. Mr. Hathway had no recollection of discussing the $142 million release with Mr. Beatty or Mr. Dunn.

[832]  As a result of this occurrence, Deloitte insisted that Nortel undertake a comprehensive review of its balance sheet. Mr. Gollogly had already instituted a balance sheet review. However, this comprehensive balance sheet review was agreed on between Mr. Dunn and Mr. Richmond, endorsed by Nortel's Audit Committee and disclosed in Nortel's public filings.

[833]  The results of the comprehensive balance sheet review led to a decision to restate for the first time Nortel's previously-published financial results.

[834]  Included in these $142 million balances were $59 million in Non-op accrued liability balances from the $109 million in Non-op balances which Ms. Shaw discussed with Deloitte on April 15, 2003.

[835]  The return of the $142 million in releases resulted in the return to Nortel's balance sheet of $55 million out of the $59 million in Non-op accrued liability balances. The one release which did not return to the balance sheet was a $4 million release that had to do with Siemens, which is discussed elsewhere in these reasons.

[836]  No published Nortel financial results reflected this $142 million as a component of Nortel's earnings.

[837]  There is no doubt that Mr. Dunn and Mr. Beatty were aware of the momentary release of the $142 million. Mr. Dunn told both Mr. Richmond and the Audit Committee that the $142 million represented all of the remaining unsupported accrued liability balances on Nortel's balance sheet. It was Mr. Dunn's view that those liability balances should remain released to Nortel's Q2 03 profit and loss statement with the appropriate disclosure in Nortel's financial statements and press release. Mr. Beatty attended the Audit Committee meeting where these releases were discussed.

### Conclusion

[838]  I am also satisfied that the attempt to release $142 million in accrued liability balances in Q2 03 did not misrepresent Nortel's financial results because Mr. Hathway objected to the release and Mr. Gollogly returned the $142 million to Nortel's balance sheet where those balances had always been.

[839]  Mr. Richmond testified that it was Deloitte's opinion that leaving the $142 million on the Nortel balance sheet pending The Comprehensive Balance Sheet Review did not misrepresent Nortel's financial results. Mr. Chambers, the Crown's expert, did not offer a contrary opinion. I adopt this conclusion is my own.

[840]  The $109 million in balances which remained on Nortel's balance sheet as Non-op accrued liability balances were defined by Ms. Shaw as releasable provisions. Their presence on the balance sheet raises an issue concerning the appropriateness of the certification signed by the

2013 ONSC 137 (CanLII)

2013 ONSC 137 (CanLII)

accused as part of the Nortel financial filings and the appropriateness of the Deloitte audit opinions while those releasable provisions were on the balance sheet.

[841]  Mr. Richmond testified that the $142 million, which contained $59 million from Ms. Shaw's list, was appropriately parked on the balance sheet pending the Comprehensive Balance Sheet Review.

[842]  The Crown's expert, Mr. Chambers, in his report offered no opinion concerning the appropriateness of the certifications of Mr. Dunn, Mr Beatty or Mr. Gollogly. He also offered no comments concerning the Deloitte opinion which accompanied the Q1 03 published financial statements.

[843]  I am not satisfied that it is safe for me to draw a conclusion about this particular aspect of the matter in the absence of such evidence.

[844]  I am not satisfied beyond a reasonable doubt that the retention on Nortel's balance sheet of $109 million of accrued liability balances which Ms. Shaw identified as releasable misrepresented Nortel's financial results.

[845]  I am satisfied, based on my acceptance of Ms. Shaw's evidence, that Ms. Shaw at the April 15, 2003 meeting fully-disclosed to Deloitte the circumstances surrounding the release of $80 million in accrued liability balances, as well as the circumstances surrounding the decision to keep the remaining $109 million in accrued liabilities on the balance sheet.

[846]  The $80 million which was released in Q1 03 had been conclusively determined to be unsupportable. Deloitte, the Audit Committee, Ms. Shaw and all the accused knew that there were no triggering events in Q1 03 which required the release of this $80 million. It was obviously the view of everyone involved that the disclosed release of this $80 million would not materially affect Nortel's balance sheet profit and loss statement and thereby misrepresent Nortel's financial results. As indicated elsewhere in these reasons, I agree with this conclusion. I mention it here to note that the way in which the release of the $80 million was handled was unobjectionable.

[847]  Disclosure of the fact that Nortel's financial results for Q1 03 were positively affected by the release of this $80 million was included in Nortel's published financial statements and the press release announcing the Q1 03 financial results.

[848]  When I consider all of the evidence, including the evidence to which I have specifically referred, I am not satisfied that the release of this $80 million misrepresented Nortel's financial results.

### The use of Outlooks and Roadmaps in 2003

[849]  Nortel management used documents known as Outlooks and Roadmaps in connection with forecasting. Several Outlooks, approximately five, were prepared for every quarter.

[850]  Mr. Brian Harrison prepared many of the Outlooks and Roadmaps which were entered into evidence. Mr. Harrison was assigned to the Global Planning and Reporting Group.

[851]   Mr. Harrison said the Outlook's purpose was to provide insight into the estimates that the various business units provided to management. Mr. Harrison indicated that, in the volatile environment in which Nortel found itself, with cash challenges, downsizing and a soft market, forecasting was important.

[852]   Mr. Harrison indicated that the Outlook process called for him to collect forecasts and other information from each of the business units through their financial representatives and consolidate those forecasts into an overall view. The Outlooks which he produced included information about accrued liability balances that the business units had released in the quarter; the Outlooks included information about possible releases of accrued liability balances to income. Mr. Harrison's evidence in this regard is confirmed by notations identifying possible releases which appear on some of the Outlooks.

[853]   Mr. Harrison received the financial information used in his Outlooks from contacts within the Finance Groups of the various units within Nortel.

[854]   Mr. Harrison prepared Outlooks whenever he received news of any importance from the various business units.

[855]   The business units engaged in active operations were known as: Enterprise, Wireline, Wireless, and Optical. There were two other units, Corporate and Non-Op, referred to on these Outlooks and Roadmaps. As indicated earlier, Corporate was a consolidation of the various corporate functions such as real estate, human resources etc.; Non-op was a catchall – a collection of everything that was left over.

[856]   Mr. Harrison did not perform calculations to arrive at the numbers employed in the Outlooks which he created; he did perform the mathematical calculations within the Outlook itself.

[857]   Mr. Harrison included a Gross Margin in his Outlooks calculation because Gross Margin, in his experience, was a useful metric for profitability. In Mr. Harrison's experience, Nortel's gross margin during the time-frame of this indictment was in the 40% range.

[858]   Mr. Harrison testified that he prepared a document known as a Roadmap. His evidence was that Roadmaps were started in February 2003; they were prepared in Q1 03 and Q2 03 and not after that time. Mr. Harrison described them as a modeling exercise.

[859]   According to Mr. Harrison, a Roadmap was more ambitious than an Outlook; it described where Nortel wanted to go rather than where it was heading. Mr. Harrison said that the difference between an Outlook and a Roadmap was that a Roadmap reflected what the business units would like to achieve or had been asked to achieve. Roadmaps included items positively affecting earnings such as higher sales, reduction of expenses and accelerated deal closings to record revenue sooner and releases or possible releases of accrued liability balances to income.

[860]   Mr. Harrison indicated that he received information on a variety of fronts from the business units concerning what had actually occurred in relation to their attempts to achieve their targets.

2013 ONSC 137 (CanLII)

[861]   Mr. Harrison testified that it was his responsibility to work with the business units to determine how the business units were going to achieve the target.

[862]   Mr. Harrison described the Roadmap as a hypothetical scenario. He indicated that it was not clear to him when he was creating these hypotheses that they were doable; rather, they were based on the best information he had from the various business units.

[863]   Mr. Harrison indicated that the targets in the Roadmaps came from Mr. Beatty, although in one instance, a target for a Roadmap came from Mr. Dunn. Mr. Harrison stated that the targeted figure was pro forma income earnings before taxes. Mr. Harrison indicated that he passively accepted the target and prepared his Outlooks with the target as a given.

[864]   Mr. Harrison indicated that the practice of setting targets was a long-standing one at Nortel; this practice did not originate with Mr. Beatty or the other defendants. Mr. Harrison also testified that the practice of preparing Outlooks pre-dated Mr. Beatty's appointment as CFO.

[865]   Mr. Harrison testified that, despite the fact that he reported to the Controller, the main customer for his Outlooks and Roadmaps was the CFO, Douglas Beatty, although e-mail evidence demonstrated that, on occasion, the Outlooks and Roadmaps were shown to Mr. Dunn and the business unit presidents, who were collectively referred to as the "FAD Cabinet".

[866]   I am satisfied that the targets set by Mr. Beatty and contained in the Roadmaps were approved by Mr. Dunn. Given the precarious financial position of Nortel, it is inconceivable that financial targets would be set for the various business units without the approval of the CEO. Mr. Gollogly was also aware of these targets because he was on the Outlook distribution list.

[867]   Mr. Harrison left Nortel in June 2003 and, thereafter, the Outlook process, including Roadmap preparation, was taken over by Mr. Peter Dans.   Mr. Dans had assisted with the preparation of Outlooks prior to taking over from Mr. Harrison.

[868]   According to Mr. Dans, the Outlook was part of a standard process whereby the Global Planning and Reporting Group collected forecasts from the various leadership categories and consolidated them into a forecast for the subsequent quarters.

[869]   Mr. Dans described the Outlook process as a short-term forecast that tended to focus on two or three quarters out from the time the Outlook was prepared.

[870]   Mr. Dans said that he first became aware of Roadmaps in February or March 2003. Mr. Dans indicated that, from that point onward, the Outlook package also included a Roadmap and was, therefore, received by all persons who were on the Outlook distribution list.

[871]   It was Mr. Dans' evidence that a Roadmap was an analysis or scenario that was put together by the Global Planning and Reporting Group. It was quite often based on an Outlook. According to Mr. Dans, the Global Planning and Reporting Group came up with targets for revenue and profitability. Mr. Dans then reviewed his analysis with his superior, Peter Browne, and then with Douglas Beatty. Mr. Dans understood that Mr. Beatty reviewed these targets with Mr. Dunn.

[872]  Mr. Dans' evidence in this regard is slightly different than Mr. Harrison's. In my view, Mr. Harrison sought to distance himself from the target-setting process which I found odd, given that he was the Director of Global Planning and Reporting. I prefer the evidence of Mr. Dans in this regard concerning the origination of targets.

[873]  Mr. Dans testified that the Corporate Planning and Reporting Group where he was also assigned would ask the various business units to indicate the extent to which balance sheet releases were included in their forecasts and then record these releases separately within the Outlook package. Mr. Dans indicated that the Global Planning and Reporting Group did not segregate provision releases according to whether they had been triggered in the current quarter; they just looked at provision releases in general. It is clear that balance sheet releases to income were recorded on the Outlooks and Roadmaps and I accept Mr. Dans' evidence in this regard.

[874]  Some of the Outlooks referred to accrual liability releases as "balance sheet"; this was later changed to "other" at the suggestion of Mr. Beatty. Mr. Beatty apparently offered no reason for the terminology change.

[875]  Mr. Harrison testified that the Outlook distribution list was limited. Mr. Dans testified that Mr. Beatty would further distribute the Outlook package if he thought it advisable. The Outlook package was forwarded to Mr. Peter Browne when Mr. Harrison reported to him and to Michael Gollogly when Mr. Harrison reported to him.

[876]  I attach no significance to the fact that the distribution of Outlooks and Roadmaps was relatively narrow because there are disclosures issues which arise when confidential financial information is widely disseminated within the corporation but not otherwise publicly made known.

[877]  The Crown pointed out that the presentations made to the Board of Directors consistently understated what senior management believed Nortel's actual results would be. Mr. Harrison, who prepared the Outlooks, offered his own observation which was that commitments to the Board of Directors were more conservative generally. Mr. Harrison explained that his Outlooks had a short shelf life. They were frequently replaced by other Outlooks. Board communications were more rigid and less frequent and, in his experience, more conservative. Mr. Harrison said the Outlooks were a short-term management tool to generate discussion. The Board update was more like placing a marker to explain how Nortel was doing versus its budget.

[878]  The Crown suggested that the Board was not given accurate information about Nortel's performance. The Crown suggested that Mr. Beatty deliberately understated Nortel's financial results and withheld Mr. Harrison's Outlooks.

[879]  The Crown's suggestion applies to all three accused because the evidence was that Mr. Dunn, Mr. Beatty and Mr. Gollogly attended Audit Committee and Board of directors meetings when Board updates were presented.

[880]  I am satisfied that any financial presentation to the Audit Committee or the Board of Directors was, in effect, a representation to the Board by all three accused.

[881]  I previously referred to Exhibit 42E and the portion of it I found unreliable.  I now propose to refer to other information contained in that exhibit.  Exhibit 42E was used by the Crown to put some specificity to the argument that the Audit Committee received understated estimates concerning Nortel's financial performance.

[882]  On January 23, 2003, Mr. Beatty provided the Board with a financial forecast update for Q1 03 which predicted a pro forma loss of $112 million. Mr. Beatty also advised the Board that Nortel could expect a US GAAP loss of $240 million.

[883]  On February 27, 2003, Mr. Beatty provided the Board with a financial forecast update for Q1 03 which predicted a pro forma loss of $50 million. Mr. Beatty also advised the Board that they could expect a US GAAP loss of $128 million.

[884]  By March 28, 2003 Mr. Beatty provided the Board with a financial forecast update for Q1 03 which predicted a pro forma loss of $20 million. Mr. Beatty also advised the Board that they could expect the US GAAP loss of $48 million.

[885]  On April 24, 2003, Mr. Beatty advised the Board that Nortel achieved a pro forma profit of $40 million. Mr. Beatty also advised the Board that Nortel achieved US GAAP profit of $54 million.

[886]  It would be obvious to the Board that Nortel's results for Q1 03 were improving throughout the quarter. Secondly, among other things, the Board would know that these results were based on revenues of $2.4 billion which helps to put the fluctuations into perspective.

[887]  In Q2 03 (which began April 1, 2003), Mr. Beatty advised the Board on April 22, 2003 in a financial update that Nortel would report pro forma earnings before taxes for Q2 03 of $25 million.  Mr. Beatty also advised the board to expect a US GAAP loss of $54 million.

[888]  On May 2, 2003, Mr. Beatty advised the Board to expect a pro forma profit of $25 million.  Mr. Beatty also advised the Board to expect the US GAAP loss of $54 million.

[889]  On May 29, 2003, Mr. Beatty advised the Board in a financial update that Nortel was anticipating a pro forma profit for Q2 03 of $25 million. Mr. Beatty also advised the Board to expect the US GAAP loss of $54 million.

[890]  On July 28, 2003, the Board was advised that Nortel's pro forma profit for Q2 03 was $34 million. Mr. Beatty also advised the Board that Nortel experienced a US GAAP loss of $14 million.

[891]  Nortel's revenues for Q2 03 were $2.3 billion.

[892]  In Q3 03 (which began July 1, 2003), the Board was advised in a financial update, dated July 28, 2003, to expect a pro forma loss before taxes of between $30 million and $60 million. Mr. Beatty also advised the Board to expect the US GAAP loss of between $40 million in $70 million.

2013 ONSC 137 (CanLII)

[893]   On September 25, 2003 in two financial updates, the Board was advised that Nortel's pro forma gain before taxes for Q3 03 was predicted to be $65 million or, alternatively, between $50 and $75 million. Mr. Beatty also advised the Board that the US GAAP income was predicted to be $51 million or, alternatively, between $45 million and $65 million.

[894]   On October 23, 2003, the Board of Directors was advised that Nortel was expecting a pro forma profit before taxes of $172 million. Mr. Beatty also advised the Board to expect a US GAAP profit of $179 million.

[895]   On November 21, 2003, the Board was advised that for Q3 03 the pro forma gain before taxes was $179 million. Mr. Beatty also advised the Board that Nortel US GAAP profit was $185 million.

[896]   Nortel's revenues for Q3 03 were $2.2 billion.

[897]   The evidence indicated that forecasting can be difficult. Nortel's difficulty with forecasting in Q1 03 is demonstrated by the circumstances surrounding the Arris proposal.

### The Arris Proposal

[898]   On the day after Mr. Beatty provided his January 23, 2003 Board update (which predicted a US GAAP loss of $240 million), he received an e-mail telling him about a proposal from the Board of Arris. Nortel owned 27% of Arris and the majority owners of Arris wanted to buy Nortel out. The buyout, if it took place, would increase Nortel's US GAAP income by approximately $137 million.

[899]   In Q1 03 Nortel, eventually accepted a proposal from Arris, although the transaction did not close until March 2003, shortly before the end of Q1 03.

[900]   Obviously, Mr. Beatty could not go to the Audit Committee the day after he made his financial update presentation and advise them that there was a possibility of a dramatic improvement in US GAAP net income in Q1 03. It was not clear until March that there would actually be a deal. There was evidence that the chair of the Audit Committee was in regular contact with Mr. Dunn and was very often given a "heads up" about what was happening.

[901]   The Arris Proposal illustrates not only the vagaries of forecasting, but also the sense of urgency on the part of Mr. Beatty and others within Nortel to close the transaction in Q1 03 and significantly improve US GAAP earnings in that quarter.

### Deloitte's interest in forecasting

[902]   Mr. Harrison testified, and his evidence was confirmed by e-mail correspondence and Deloitte and Touche business records, that the forecasting process which he used was reviewed by Nortel's auditors in Q4 2002.

[903]   Mr. Harrison also indicated that Deloitte & Touche were interested in forecasting to assist in planning. At this time, Deloitte was required to express an opinion on the likelihood of Nortel

remaining in business in the twelve months following their audit or quarterly review This confirms Mr. Harrison's evidence in this regard.

[904] Accordingly, I accept Mr. Harrison's evidence concerning Deloitte's interest in forecasting.

[905] Mr. Dans indicated that Deloitte and Touche were provided with a copy of the final Outlook for Q1 2003 and Q2 2003. It was also his recollection that Deloitte & Touche were provided with both a preliminary and final Outlook for Q2 03. Mr. Dans confirmed that the process worked out with Deloitte & Touche was that they were given the last Outlook of the quarter so that they could compare the actual results with the final Outlook. In addition, there was a telephone conference with each of the heads of the business units, Mr. Dans and representatives of Deloitte & Touche during which the actual results were presented and variances, if any, between those results and the final Outlook explained. Exhibit 53 confirms that the Outlook, dated September 17, 2002, was provided to Deloitte & Touche as part of their audit of the forecasting process. In addition, some further confirmation of Mr. Dans' evidence is provided in Exhibit 65 – an internal Deloitte & Touche e-mail – forwarding "the most recent outlook/forecast". There was some evidence that the Outlooks provided to Deloitte & Touche were in a different format than the internal Nortel Outlook package; the content, however, was similar.

[906] Exhibit 2, tab 94 is an e-mail. This e-mail records that "D & T will be looking for the Outlook and the list of accrued liability balances to be released to the profit and loss statement". This e-mail establishes that at least some of the Outlooks produced by Mr. Harrison and Mr. Dans were provided to Deloitte & Touche and that these Outlooks included the accrued liability balances that were to be released to the profit and loss statement.

[907] I accept Mr. Dans' evidence that Outlook packages were provided to Deloitte & Touche during Q1 and Q2 2003 and that Deloitte & Touche was aware of the Outlook forecasting process which he employed. Mr. Dans could not recall Deloitte & Touche receiving Roadmaps and I find that none were provided to them.

[908] During the close period when the consolidated financial results were being prepared, Mr. Harrison also prepared for Mr. Gollogly and the Assistant Controller, Linda Mezon, a similar looking document, also called an Outlook, based on actual numbers to provide management with a perspective on the evolving financial results for the quarter. This update was prepared daily and each time there was an update of the General Ledger. By this method, management could compare the actual results recorded in the General Ledger with the targeted results that Mr. Harrison had been preparing in the form of Outlooks and Roadmaps throughout the quarter.

[909] I accept the evidence of Mr. Harrison and Mr. Dans concerning the preparation and distribution of Outlook packages including Roadmaps. Their evidence in this regard was entirely consistent with the documentary evidence.

[910] I am satisfied that the Board was given accurate, albeit understated, updates about Nortel's progress through each of the three quarters to which I referred. I am satisfied that the Board was given predictions about Nortel's performance which were deliberately understated in

the sense that Mr. Dunn, Mr. Beatty and Mr. Gollogly were confident that the targets which they had predicted could be achieved. The Audit Committee and the Board of Directors were composed of experienced sophisticated directors whom I would expect to be able to assess management's targets.

[911]  I do not find it unreasonable that the three accused would avoid promising the Audit Committee more than it might be able to deliver. Hitting the target was an important part of Nortel's culture. Mr. Kinney offered the observation that one negotiated targets to succeed not to fail and I accept his evidence in this regard as an accurate description of the Nortel approach to target setting.

[912]  I am satisfied that the financial updates provided to the Board of Directors accurately presented Nortel's financial results. Even if I had not come to this conclusion, I would not have been persuaded by the evidence that it was proven beyond a reasonable doubt that the financial updates misrepresented Nortel's financial results.

### The 2003 Outlooks and Roadmaps tracked proposed releases

### The February 19, 2003 teleconference

[913]  I have already commented on the fact that the Outlooks and Roadmaps tracked releases of accrued liability balances to income. The Crown also introduced other evidence which, in its submission, supported the idea that the accused were managing earnings by arbitrarily releasing accrued liability balances to income contrary to US GAAP and thereby misrepresenting Nortel's financial results to the investing public and Nortel's Audit Committee and Board of Directors

[914]  Mr. Harrison testified that he participated in a conference call on February 19, 2003 with Mr. Beatty, Mr. Gollogly and the four Vice-Presidents of Finance for the four business units: Wireline, Wireless, Enterprise and Optical. Mr. Dunn did not participate in the call.

[915]  At this time, Mr. Harrison had prepared a Roadmap which was part of a series of documents entitled, "2003 Financial Commitment". This document was prepared for Mr. Beatty, who intended to present it at Mr. Dunn's cabinet meeting. Mr. Dunn's cabinet, or the FAD Cabinet, consisted of all the persons reporting directly to Mr. Dunn; that is, the Presidents of the business units.

[916]  Mr. Harrison's Roadmap contained a target of a $20 million pro forma loss before taxes. This represented an improved target from a previous Q1 03 Roadmap. Similarly, there was a new improved Q2 03 target.

[917]  In Q1 03, the Roadmap required Corporate to achieve a $2 million improvement over budget; the Roadmap required Non-op to achieve a $13 million improvement over budget.

[918]  Mr. Harrison said Corporate and Non-op were not revenue-producing business units. It was Mr. Harrison's view that Corporate could achieve the increase required ($2 million) by spending less. It was Mr. Harrison's view that there were a variety of income and expense lines, including releasing accrued liability balances to the profit and loss statement in Non-op that could be used to achieve the $13 million improvement required of it by the Roadmap.

[919]   The Roadmap indicates that there is still a $12 million shortfall which is represented by a $12 million "plug" to hit the target. This plug is recorded under Non-op. Mr. Harrison indicated that he recorded the shortfall under Non-op because it was the least contentious way to record it. Apparently, if Mr. Harrison had tried to record the $12 million shortfall under any of the active business units, the heads of those units would have objected.

[920]   Mr. Harrison testified that he made notes of the conversation on the Roadmap which was entered as a Nortel business record (Exhibit 1, tab 45). He identified his handwriting on portions of the Roadmap.

[921]   Part of the documentation shows whether meeting the Roadmap target will result in the payment of Return to Profitability Bonus, the RSU bonus and the Success Bonus.

[922]   Mr. Harrison made notes of the call as the call was progressing. According to Mr. Harrison's notes, the Vice-President of Finance for Wireless said he could meet his $70 million Roadmap and that he would be releasing $50 million of accrued liabilities to his profit and loss statement in order to do that. The Vice-President for Enterprise said that he could achieve his target and that Enterprise would be releasing $8 million of accrued liability balances to the profit and loss statement. The Vice-President Finance for Wireline indicated that it would be able to achieve its Roadmap target and would be releasing $20 million. The Finance Vice-President for Optical indicated that it could achieve its target and it would be releasing $21 million in accrued liability balances. There appears to have been no discussion concerning the shortfall.

[923]   According to Mr. Harrison's notes, the various Finance Vice-Presidents indicated that they could achieve the Roadmap target and that they would be releasing, in total, $99 million of accrued liability balances to the profit and loss statement.

[924]   This presentation also contains a Roadmap for Q2 03. This Roadmap sets a target of positive $54 million in earnings before taxes. This Roadmap contains a "plug" or shortfall of $22 million.

[925]   According to Mr. Harrison's notes, the Vice-President Finance for Wireless indicated that it could reach this target and that it would be releasing zero accrued liability balances. The Vice-President Finance for Enterprise indicated that it could achieve its Roadmap target for Q2 03 and that it would be releasing $7 million in accrued liabilities from its balance sheet to its profit and loss statement. The Vice-President Finance for Wireline indicated that it could achieve its Q2 Roadmap target and that it would be releasing $15 million. Mr. Harrison noted that the Vice-President of Finance for Optical indicated that it could achieve the Roadmap target and that it would be releasing $20 million in accrued liability balances. There appears to have been no discussion concerning the shortfall.

[926]   Mr. Harrison said that these Vice-Presidents were indicating what they realistically thought they could achieve.

[927]   Mr. Harrison's evidence in-chief was to the effect that the information concerning the release of accrued liability balances was in addition to the acceptance of the target by the various Finance Vice-Presidents. The gist of his evidence was, for example, that the Vice-President

Finance for Enterprise indicated in the conference call that Enterprise could not meet the $85 million target suggested for it in the Roadmap in Q1 03, but could meet a target of $80 million and that included in its revenues would be $8 million in accrued liability balances that had been released to the profit and loss statement.

[928]  Mr. Crosson, who attended the teleconference, had no specific recollection of the teleconference.

[929]  Mr. Kinney described the Roadmap as a "what if scenario". Mr. Kinney's version of this teleconference prior to the trial apparently had been that he had been given the target for Wireless on February 3, 2003 and asked to use the release of accrued liability balances from Wireless' balance sheet to meet the target.

[930]  At the trial, however, Mr. Kinney's evidence was different. Mr. Kinney confirmed that his original recollection of this matter was that he could not remember a telephone call on February 19, 2003. However, over the years, he had been shown documents to help refresh his memory and that, as a result of looking at those documents; he had come to believe what I set out in the previous paragraph.

[931]  Mr. Kinney agreed that counsel for Mr. Dunn had shown him documents at an interview immediately prior to his testimony. Mr. Kinney agreed that, based on those documents, he was now satisfied that the $75 million target for Wireless came from Wireless itself as far back as December 13, 2002. Documentary evidence tendered on cross-examination made it clear that the President of Wireless suggested the $70 million target to Mr. Dunn on January 15, 2003. Apparently, there had been some negotiation between the President of Wireless and Mr. Dunn in January 2003, which resulted in the target for Wireless being pushed back to $70 million from $75 million.

[932]  It was very clear on cross-examination that Mr. Kinney's recollection of this matter has been confused over the years. Mr. Kinney concluded by saying, "I am the first to admit that I have probably mixed them all up…"

[933]  Mr. Kinney testified that he and his staff paid attention to potential releases of accrued liability balances to the profit and loss statement. Mr. Kinney stated that he and his staff would try to resolve outstanding issues and obtain releases from his customers so that accrued liability balances could be released to the profit and loss statement in a particular quarter. He mentioned Qualcomm as an example of an issue that he thought he would be able to resolve in Q1 03. He also indicated that there were some matters not resolved in Q4 02 which he thought could be resolved in Q1 03.

[934]  Finally, Mr. Kinney was referred to an Outlook, dated February 6, 2003, in which Wireless projected $48 million in releases of accrued liability balances. Mr. Kinney agreed that it appeared that he already knew at the time of the February 3 phone call that Wireless was projecting $48 million in releases of accrued liabilities.

[935]  Projections about balance sheet releases were not always positive. Specifically, Mr. Kinney pointed out that when he was asked about possible releases of accrued liability balances

2013 ONSC 137 (CanLII)

for Q2 03, he indicated there would be zero releases from Wireless in that quarter. In December 2002, Mr. Crosson told Mr. Harrison that he was considering increasing the accrued liability balance for excess and obsolete inventory by $50 million. Mr. Harrison recorded this on his December 19, 2002 Outlook. Mr. Crosson changed his mind.

[936]  I am satisfied that Mr. Kinney's recollection of the telephone calls of February 3 and February 19, 2003 is unreliable.

[937]  I am also satisfied that the documentation confirms Mr. Harrison's evidence of these two teleconferences. The Q1 Roadmap at Exhibit 1, tab 45 was a target which represented an improvement upon Nortel's Q1 03 budget target. This target, I am satisfied, was communicated to Mr. Harrison by Mr. Beatty and then discussed with the Vice-Presidents of Finance of the various business units.

[938]  I am satisfied that these discussions, as recorded in Mr. Harrison's notations on Exhibit 1, tab 45, represented two pieces of information: whether the business unit could meet the revised target and to what extent the unit would be relying upon releases of accrued liability balances.

[939]  Nortel was in an extremely difficult financial situation; forecasting was both difficult and important.

[940]  I am satisfied that Mr. Harrison was interested in this information because he thought it was part of his job to understand whether or not Nortel's various business units were generating positive net income on their operations.

[941]  The reference to balance sheet releases in the Roadmaps is disconcerting. On the one hand, tracking releases suggests earnings management; on the other hand, it is undeniable that Mr. Kinney indicated that Wireless would have zero balance releases in Q2 03. Mr. Harrison noted his comments on Exhibit 1, tab 45, document number 505-5637. Mr. Kinney's comment of zero balances, as noted by Mr. Harrison at the time, is consistent with the Vice-Presidents of Finance for the business units keeping Mr. Harrison aware of the contribution anticipated from balance sheet releases in each quarter.

There was also a part of Nortel's culture which understood that the balance sheet could be used to achieve the target. In a July 31, 2003 e-mail, Mr. Gollogly makes the following observation: "it seems like a throwaway comment, but if we clean up the balance sheet, the LC's ability to deliver earnings based partly on discretionary elements pretty much goes away". There are other references in emails to digging up "opportunities" and having "flexibility".

[942]  The claim by Mr. Harrison and Mr. Dans that they tracked proposed accrued liability balance sheet releases throughout the quarter in their Outlooks and Roadmaps for forecasting purposes and so that they could encourage events triggering these releases within the quarter is supported by notes that appear in the Outlook packages. For example, see the Q2 2003 Roadmap at Exhibit 2, tab 78. The Roadmaps also include notes concerning the setup of accrued liabilities and expenses (see: for example, Exhibit 1, tab 35). The Outlooks also include written notes concerning potential impacts which have yet to be included in the forecast (see also: Exhibit 1, tab 35).

2013 ONSC 137 (CanLII)

[943]  I am not satisfied that that these two telephone calls represent an example of Mr. Gollogly, Mr. Beatty and the Vice-Presidents of Finance of Nortel's business units discussing how they would each resort to their balance sheet without regard to US GAAP to meet the February Roadmap financial earnings before taxes target of $20 million referred to in Exhibit 1, tab 45.

[944]  I am satisfied that Mr. Harrison, for his own forecasting purposes, wanted to know the extent to which releases of accrued liability balances were assisting the business units in meeting their financial target.

[945]  I am not satisfied that these two telephone calls represent Mr. Gollogly, Mr. Beatty and the Vice-Presidents of Finance of Nortel's business deciding to use approximately $100 million in excess accrued liabilities to meet financial targets.

### The June 6, 2003 Outlook and the surrounding events

[946]  The Crown also suggested that the true nature of the Outlook and Roadmap process was demonstrated by events which occurred around the June 6, 2003 Outlook.

[947]  Mr. Beatty made notes of his attendance at the June 18 Frank Dunn Cabinet meeting. Mr. Dunn's cabinet consisted of the Presidents of Nortel's business units. Mr. Beatty's notes read in part "FAD Staff Meeting… Q2 results-embarrassed/ashamed-no RTP-grow the top line/cut costs".

[948]  The Crown asked me to infer that Mr. Beatty recorded Mr. Dunn's comments. The e-mail traffic prior to the meeting makes it clear that Mr. Beatty was presenting his June 6, 2003 Outlook. As part of the backup for his presentation, Mr. Beatty had what was termed a "Q2 2003 Bottom-up Roll up". The Bottom-up Rollup reflected the actual experience of the business units in Q2 03 as of June 6, 2003. Q2 03 ended on June 30, 2003.

[949]  The Bottom-up Rollup stated that, if the books were closed on June 6, 2003, Nortel would experience a pro forma loss before taxes of $45 million and a loss calculated according to US GAAP of $95 million.

[950]  The Crown suggested that, on June 20, 2003, two days after the Frank Dunn cabinet meeting, Nortel's Bottom-Up Rollup suggested that, if the books were closed that day, Nortel would experience a pro forma gain before taxes of $50 million and US GAAP net income of zero.

[951]  This improvement, according to the Crown, resulted from a $129 million increase in liability balances released to the profit and loss statement. Specifically, on June 6, accrued liability balance releases totaled $179 million and, on June 18, totaled $308 million.

[952]  Finally, the Crown points out that the June 20 Outlook also tracked whether the required RSU Bonus Plan milestone would be met.

[953]  If one accepts the Crown's argument, then one has to assume that the Presidents of the business units left Mr. Dunn's cabinet meeting on June 6 and returned to their business units and

began releasing accrued liability balances to the profit and loss statements to improve their financial performance so that Mr. Dunn would no longer feel "embarrassed and ashamed" and so that they would avoid any consequences attendant upon Mr. Dunn feeling like that. While this sounds plausible enough, it actually is not when you consider what was actually going on within Nortel at this time.

[954]  Mr. Dans testified, and his evidence in this regard was not challenged, that Nortel had been going through a process of balance sheet reviews initiated by Mr. Gollogly in June 2003. These reviews are to be distinguished from the Comprehensive Balance Sheet Review which was formally launched on July 31, 2003. These reviews were being used to identify excess accrued liability balances, as well as any accrued liability balances that were to be released in Q2 03 in the normal course. All of these balances were fed centrally into corporate headquarters in Brampton so that headquarters could understand them. Initially, the accrued liability balances were released into the profit and loss statement and then reviewed by a corporate control team working with Deloitte & Touche. Obviously, some releases would be normal course releases and others would represent a cleaning-up of the balance sheet.

[955]  Not surprisingly, it was in Q2 03 that Mr. Gollogly informed Mr. Hathway that $142 million in releases for which there was no support had been released to Nortel's profit and loss statement in an early preliminary closing of the general ledger.

[956]  I do not find it logical that the Presidents of the business units would indiscriminately release accrued liability balances to attempt to satisfy Mr. Dunn in the face of this type of scrutiny. To the extent that these excess accrued liability balances represented a "cookie jar", they were, in effect, at least partially emptying the "cookie jar" in a pointless exercise. Decisions to release liability balances which were not US GAAP compliant would likely be discovered when the release was reviewed by headquarters and the auditors.

[957]  Assuming that the Presidents were upset by Mr. Dunn's comments and move to do something about it, it is unlikely that this could have taken place between June 18 and June 20. Mr. Dans testified that his Outlooks were based on information which the business units had received and consolidated from the regions in which they were operating. When Mr. Harrison was soliciting the set-up of late entry accrued expenses/liabilities in Q4 02, his contacts within the Regions first had to call their own contacts to identify specific accrued expenses/liabilities. It seems reasonable that, in seeking to locate specific accrued liabilities for release, a similar process would be followed. It is difficult to see this being done within two days. Further, there was no necessity to complete the process within two days because Q2 03 did not end until June 30, 2003 and the business units were not required to close in their sub-ledgers for a few days after that.

[958]  I cannot accept the Crown submission. The events surrounding the June 6 and June 20 Outlooks seem to me to be disconnected from the submission of accrued liability balances to Nortel head office.

### *The release of the $4 million Siemens accrued liability balance*

[959]   The Crown suggested that the way in which the Siemens accrued liability balance was manipulated illustrated the management of earnings to achieve a bonus target. The Siemens $4 million dollar release occurred originally in Q2 03. This is an appropriate place to examine that release in detail.

[960]   In connection with the January 28, 2000 acquisition of a company called Qtera, that company and two of its employees were named as defendants in a lawsuit filed by Siemens ICN in Palm Beach County Florida. The lawsuit (Siemens v. Qtera, Diner & Cao) alleged, among other things, misappropriation of trade secrets.

[961]   An accrued liability balance was set up to allow for the fact that Nortel might be unsuccessful in defending the lawsuit. The original accrued liability balance was in the amount of $36 million; it was part of a larger entry involving various Qtera balances.

[962]   The original accrued liability balance was set up in Q3 01. In Q4 01, a portion of this balance, namely $32 million, was internally re-classified from Corporate to the United States where the litigation was taking place. This left the $4 million balance in Corporate on account of the Siemens litigation.

[963]   Mr. Beatty was Nortel's Controller at this time and responsible for Corporate accrued liability balances.

[964]   Nortel entered into a settlement agreement with Siemens on September 17, 2001. Nortel's first payment to Siemens on account of the settlement in the amount of $20 million occurred on October 25, 2001. A final payment of $12 million due in October 2002 remained.

[965]   Mr. Beatty was required, as the CFO, to authorize the final $12 million payment. Upon being requested to authorize this payment, Mr. Beatty asked Mr. Gollogly, the Controller in October 2002, to look into the matter and advise him about it. Mr. Beatty was later told that the proposed final payment amount was correct and the final payment was made in October 2002. Accordingly, as of October 2002, approximately $32 million of the original $36 million accrued liability balance had been used. The accrued liability balance in the amount of $4 million remained with Corporate.

[966]   When Ms. Shaw met with Mr. Harrison in February 2003 to discuss Non-op accrued liability balances, she did not identify the Siemens $4 million accrued liability balance as one that should be released.

[967]   In the notes she prepared for her meeting on April 15, 2003 with representatives of Deloitte, the Siemens $4 million was not part of the $80 million that had been released in Q1 03. However, the $4 million Siemens accrued liability balance was referred to in Ms. Shaw's notes as a Non-op liability balance. Specifically, Ms. Shaw recorded: "this provision was established in Q3 01 for potential exposures relating to a legal suit with Siemens. This settlement was made in Q4 02 after extremely rancorous dealings with Siemens. It was determined by management that this provision would be left in place for a couple of quarters after the settlement to ensure no further claims were made or adjustments to the settlement".

[968]  The Siemens $4 million accrued liability balance was released to the profit and loss statement in Q2 2003; ultimately, the $4 million excess accrual balance was restated during the First Restatement to Q4 2001 when the litigation was settled.

[969]  Deloitte's view in the first restatement was that this matter should not have remained an accrued liability balance after the settlement was entered into in Q4 01.

[970]  The Crown suggested that accrued liability balances were restated because they were false. This entry, along with others, illustrates the difficulty with the Crown's assertion. Simply put, the Crown's submission ignores the possibility that there can be a difference of opinion.

[971]  Indeed, there would have been a difference of opinion in connection with this entry. Mr. Hathway stated that proper accounting mandated that there be no remaining accrued liability balance for this matter subsequent to the final payment, rather than the entering into of the settlement agreement. Mr. Hathway's opinion, as expressed in his evidence and Deloitte's opinion during the First Restatement are obviously different.

[972]  The truth of the matter probably is that there is more than one financial quarter to which this $4 million accrued liability balance could properly be restated. Put differently, one chartered accountant might conclude that the triggering event for the release of the accrued liability balance was the entering into of the written settlement of the litigation in Q4 01; another chartered accountant acting in good faith might conclude that the triggering event for the release of the accrued liability balance was Nortel's final settlement payment.

[973]  Interestingly, the Crown asserted, in its closing submissions that the correct course of action was to clear the $4 million from Nortel's balance sheet after the final settlement payment.

[974]  Management's decision to release the accrued liability balance one or two quarters after the final settlement payment was excessively cautious, but entirely consistent with Nortel's culture.

[975]  I decline to draw any inculpatory inference from the retention of the accrued liability balance, given Nortel's history of ensuring that every liability was properly provided for.

[976]  The Siemens accrual liability balance had been on the Nortel balance sheet since 2001 and, thus, had been reviewed in one form or another for every quarter since then. No secret was made of the fact that the litigation had settled and that Nortel had made a $20 million payment on account of that settlement in October 2001.

[977]  As discussed elsewhere, in Q2 03, Mr. Gollogly advised Mr. Hathway about the release during a preliminary close of the books of $142 million in accrued liability balances. Mr. Hathway did not approve of this release, with the result that the $142 million was returned to Nortel's balance sheet in subsequent draft Q2 03 financial statements. However, the $4 million Siemens balance remained released. Given the controversial nature of the $142 million accrued liability balance release in Q2 03, I am satisfied that Deloitte adverted to the Siemens release at that time.

2013 ONSC 137 (CanLII)

[978]  The Crown's position is that the Siemens accrual was not released when it should have been and remained for the accused to utilize in Q2 03 in order to achieve a Restricted Stock Unit Bonus Plan milestone.

[979]  This assertion requires some consideration of the Restricted Stock Unit Bonus Plan.

### The Restricted Stock Unit Bonus Plan

[980]  As the name implies, this bonus was payable in shares unless the executive receiving the bonus elected to receive payment in cash. No such election was made in Q2 2003.

[981]  Payment of this bonus was not made on an "all or nothing" basis. In other words, a percentage of the total allocation for a particular quarter could be paid. For example, the JLRC Committee of the Board of Directors (the Board's HR Committee) could determine and recommend to the Board of Directors that 90% of the bonus was earned, in which case that percentage of the bonus would be paid out.

[982]  The performance period for payment of this bonus was January 1, 2003 to December 31, 2005. The proposed performance milestones were four distinct "Return on Sales before Tax" percentage targets. The percentage was calculated on Sales, as the description of the milestones suggests. In other words, the milestone considered what percentage Nortel's return on sales before tax was of total sales. In addition, the milestones were calculated "on a **rolling four** quarter basis". [Emphasis added]

[983]  The first milestone required a Return on Sales before Tax percentage of sales of equal to or better than <u>negative</u> 6.5% calculated "on a rolling four quarter basis."

[984]  The "rolling four quarter basis" for the calculation means that, if you want to make the Restricted Stock Unit Bonus Plan milestone calculation in Q2 03, you have to look back four quarters starting with Q2 03; namely, Q2 03, Q1 03, Q4 02 and Q3 02.

[985]  The final payment on account of the Siemens settlement was made in Q4 02. If the $4 million had been released to the profit and loss statement in Q4 02, as Mr. Hathway thought it should, it would have been included in the RSU Bonus Plan milestone calculation in the same way as it was when it was originally released in Q2 03 because the calculation of the percentage is "on a rolling **four** quarter basis" and Q4 02 and Q2 03 are in the same four quarter set.

[986]  Accordingly, the release of the $4 million to the profit and loss statement in Q4 02 or Q2 03 would have the same effect on the ability of the accused to benefit from the Restricted Stock Unit Bonus Plan.

[987]  The Crown's position seems to be that, because the Siemens accrual was not released when it should have been, it remained in a "cookie jar" to be utilized in Q2 03 in order to achieve the RSU milestone.

[988]  In the first restatement, the $4 million was restated to Q4 01 when Nortel and Siemens entered into their settlement agreement. It is true that, at that point in time, Mr. Dunn was the CEO and Mr. Beatty was the Controller. I am not satisfied that the evidence demonstrates that

Mr. Dunn or Mr. Beatty played any role in the decision to retain the $4 million Siemens accrual balance in Corporate in Q4 2001.

[989]  It is also true that, in Q4 01, Nortel reported <u>negative</u> net income of $1.8 billion. I am not persuaded that, in that quarter facing that level of negative net income, Mr. Beatty and Mr. Dunn decided to manipulate liabilities and set them aside in a "cookie jar" for a rainy day. It seems more reasonable to me that their thoughts at the time would be that the rainy day was upon them.

[990]  Ms. Shaw's note, based on her inquiries, was prepared in Q1 03 and it provides that management decided to leave the $4 million excess accrued liability balance in place for a "couple of quarters" to ensure no further claims were made and that there were no further adjustments to the settlement. Her note suggests that management made a decision in Q4 02 to retain the $4 million as an accrued liability for a "couple of quarters" which would be to Q2 03, which was the quarter when the $4 million was released to the profit and loss statement. This decision meant there were no surprises in connection with the Siemens settlement without making it harder to achieve the Restricted Stock Unit Bonus Plan milestone of -6.5% calculated on a rolling 4 quarter basis.

[991]  Leaving the accrued liability on the balance sheet for a time after it was releasable is consistent with Mr. Kinney's approach to releasing accrued liabilities. Mr. Kinney said he followed the practice of allowing a cooling-off period, when he reached a point in time when he thought he could reduce an accrued liability balance. Specifically, he would wait one extra quarter to make sure that some unexpected exposure did not present itself. This is similar in approach to what happened with the Siemen's $4 million. I do not condone Mr. Kinney's practice because it was contrary to US GAAP; I simply mention it.

### Conclusion

[992]  I am not satisfied beyond a reasonable doubt that the three accused used the $4 million Siemens accrued liability balance to falsely represent to Nortel's Audit Committee, JLRC committee and board of directors that Nortel had achieved the financial results of meeting the Restricted Stock Unit Bonus Plan milestone of -6.5%.

[993]  I am not satisfied that the restatement of this accrued liability balance to Q4 01 proves anything. Mr. Hathway thought that the accrued liability balance should have been released in Q4 02 when the final settlement payment was made. This seems to be a reasonable conclusion. It apparently was not correct according to Deloitte's opinion in the first restatement. The difference of opinion demonstrates that one should be careful before drawing an inculpatory inference based, in part, on the fact that an accrued liability balance was restated. The circumstances surrounding the restatement of an item are significant.

[994]  Finally, I am not satisfied beyond a reasonable doubt that any or all of the three accused knew that the $4 million Siemens' accrued liability balance should have been released in Q4 01.

**The draft letters Mr. Gollogly prepared for the Board of Directors and the Audit Committee in July 2003**

[995]  Some of the evidence concerned two unsent letters authored by Mr. Gollogly, in which he questioned whether Nortel had truly returned to profitability. The Crown pointed out that the three accused never expressed similar sentiments in Nortel's financial statements or press releases. The relevant time period is July 2003.

[996]  Mr. Hathway testified that, shortly before Monday, July 7, 2003, Mr. Gollogly advised him that, in the initial close or one of the initial closes of the books for Q2 03, Nortel had identified $142 million of accrued liabilities that did not have support and had released those accrued liabilities to the profit and loss statement.

[997]  After Mr. Hathway objected, Mr. Gollogly reversed the $142 million out of the profit and loss statement and put it back on the balance sheet.  This reversal happened on Thursday, July 10, 2003.

[998]  Mr. McMillan testified that the draft financial results, produced after the $142 million was returned to the balance sheet, recorded that Nortel had a US GAAP loss of $14 million for Q1 03.

[999]  Mr. McMillan testified that, on Friday, July 11, 2003, he was advised by his superior, Mr. Peter Browne, to make three journal entries. Mr. McMillan said that Mr. Browne provided him with support for the entries and they were made on Friday, July 11, 2003.

[1000] These entries transferred $20 million in accrued liability balances to the profit and loss statement. They, therefore, had a positive impact of $20 million on the profit and loss statement. As indicated earlier, prior to this entry, Nortel had a US GAAP loss of $14 million; thus, this $20 million positive impact on net income had the effect of changing the $14 million tiny US GAAP loss into to a tiny gain.

[1001] Nortel's pro forma income for Q2 03 was positive despite the return of $142 million to the balance sheet.

[1002] Thus, the effect of these three journal entries was that Nortel had both positive pro forma income and positive US GAAP income.

[1003] Mr. McMillan testified that Mr. Gollogly was away when this happened.

[1004] The evidence established that Mr. Dunn had expressed publicly to Mr. Harrison that he did not believe it was in Nortel's interest to have a pro forma gain before taxes and a US GAAP loss at the same time. This was always a possibility because pro forma net income was calculated differently than US GAAP net income.

[1005] Mr. Hathway testified that, on Sunday, July 13, 2003, Mr. Gollogly called him at his home in the United States. Mr. Gollogly told Mr. Hathway that while he, Mr. Gollogly, was out of the office on July 11, 2003; Mr. Beatty had instructed Mr. Gollogly's staff to post three journal entries which transformed the Q2 2003 results from a tiny loss to a tiny profit. Mr.

2013 ONSC 137 (CanLII)

Hathway indicated that he and Mr. Gollogly agreed to discuss the matter further on Monday, July 14, 2003 when he, that is Mr. Hathway, would be back in Canada.

[1006] Mr. Hathway indicated that Mr. Gollogly's concern centered on the fact that turning a loss into a profit was one of the qualitative factors to be considered in deciding whether an entry to the General Ledger was material.

[1007] Mr. Hathway testified that he saw Mr. Gollogly on Monday, July 14, 2003 at Mr. Gollogly's office in Brampton. He said Mr. Gollogly was very upset about the entries. Mr. Gollogly told Mr. Hathway that he was going to see Mr. Beatty and demand that the three entries be removed from the profit and loss statement and put back on the balance sheet. Mr. Gollogly advised Mr. Hathway that he intended to resign if Mr. Beatty refused. Mr. Hathway described this as a "gutsy move by Mr. Gollogly".

[1008] The three entries were reversed.

[1009] Mr. Hathway indicated that, later, he had a conversation with Mr. Beatty about what had happened. Mr. Hathway indicated that Mr. Beatty's view was that he, that is Mr. Beatty, was Nortel's CFO and, therefore, entitled to make General Ledger entries.

[1010] This is perhaps an appropriate place to make the obvious point that these three entries never had any effect on the profit and loss statement published by Nortel for the period Q2 03. The three entries were put back on the balance sheet before the financial results were published. These entries did not cause the Audit Committee or the Board of Directors to do anything.

[1011] Similarly, the $142 million in balances released to the profit and loss statement and then returned to Nortel's balance sheet never had an effect on the profit and loss statement published by Nortel for the period Q2 03. The $142 million was brought to the attention of Nortel's Audit Committee because it prompted the Comprehensive Balance Sheet Review.

[1012] With respect to the three entries totaling $20 million, the Crown submits that this is another example of senior management at Nortel, in this case Mr. Beatty, doing whatever it takes to meet a target. It is also the Crown's position that I should draw the inference that Mr. Dunn was aware of these matters and approved of Mr. Beatty's actions.

[1013] I have already indicated that I have no difficulty in drawing the inference that Mr. Dunn was aware of important matters affecting Nortel's profit and loss statement. This is especially true with respect to these three matters because they had the effect of turning a tiny US GAAP loss into a tiny profit and Mr. Dunn had publicly-stated that Nortel would be profitable for Q2 03.

[1014] In addition, Nortel, despite the fact that the $142 million was not released to the profit and loss statement, still had a pro forma profit and, therefore, was in a position that Mr. Dunn did not think advisable; namely, a pro forma profit and a US GAAP loss. Specifically, Mr. Dunn did not want Nortel to be reporting a US GAAP loss while, at the same time, reporting internally positive pro forma income because reporting positive pro forma income would require the payment of bonuses. Mr. Dunn was concerned that Nortel would be criticized for paying its employees bonuses when it was publicly reporting a loss.

2013 ONSC 137 (CanLII)

[1015] In Q1 03, Nortel reported US GAAP results only. Accordingly, Nortel was publicly reporting a loss and publicly reporting that it was paying bonuses to its employees.

[1016] Mr. Gollogly reported to the Board on July 24, 2003, which was after the $142 million had been removed from the profit loss statement and returned to the balance sheet, that there was positive pro forma income for the quarter of $40 million and a positive pro forma income for the year to date of $48 million. It is not clear from Mr. Gollogly's presentation whether this was a pro forma income calculation according to the 2002 formula or the 2003 formula. The Board of Directors had decided that it was the 2002 formula which was to be used for bonus purposes. However, the evidence suggested that the 2002 formula yielded a higher net income figure than the 2003 formula.

[1017] Mr. Beatty's instruction to release the $20 million in accrued liabilities to the profit and loss statement had the effect of solving this problem because it converted the tiny US GAAP loss into a profit and thereby created a situation in which Nortel would have been publicly reporting US GAAP net income and publicly reporting that it was paying a bonus.

[1018] I accept the Crown's submission that Mr. Beatty's conduct demonstrates he was, with Mr. Dunn's knowledge and consent, willing to go to considerable lengths to achieve a targeted result.

[1019] I am satisfied that this episode proves that Mr. Beatty, with Mr. Dunn's consent, was prepared to go to considerable lengths to avoid a situation which Mr. Dunn considered awkward.

[1020] I am satisfied that the only reason Mr. Beatty intervened as he did was to manage Nortel's US GAAP income for the purpose of turning a tiny loss into a tiny profit. The effort was unsuccessful.

[1021] To help Mr. Beatty understand how unhappy he was with the three Journal entries, authorized in his absence, Mr. Gollogly prepared two draft letters which were never sent.

[1022] The Crown submits that this entire incident demonstrates that entries made to the General Ledger were intentional. The Crown also submits that these letters demonstrate that Mr. Gollogly was well aware of the significance of turning a tiny loss into a tiny profit or *vice versa*.

[1023] I am satisfied that Mr. Gollogly well-understood the significance from a materiality perspective of turning a tiny profit into a tiny loss or *vice versa*. I am satisfied that the draft letters demonstrate that Mr. Beatty was capable of directing entries to the General Ledger that were quite intentional and quite significant.

[1024] I want to consider the Crown's submission that Mr. Gollogly's concern about Nortel's quality of earnings and return to profitability were not disclosed by Mr. Gollogly or Mr. Beatty. I have no difficulty in assuming that Mr. Gollogly brought the draft letters to Mr. Beatty's attention and used those letters to help persuade Mr. Beatty to reverse the entries to which Mr. Gollogly objected.

[1025] I propose to consider each draft letter separately.

*Mr. Gollogly's draft letter to the Chairman of the Board of Directors, the Chairman of the Audit Committee and the Chairman of the Joint Leadership Resources Committee*

[1026] This undated draft letter was never sent. However, Mr. Gollogly's draft letter to Mr. Beatty, which was also introduced in evidence, is dated July 14, 2003. I am satisfied that this draft letter was drafted at the same time as the draft letter to Mr. Beatty. The content of the two letters is similar. In addition, the evidence establishes that Mr. Gollogly was in the mood to resign if the three entries were not reversed and the effect of this draft letter, had it been sent, would almost certainly have been his termination.

[1027] In this draft letter, Mr. Gollogly indicates that, due to the fact that the SEC was making inquiries of Nortel in April and May 2003, it was necessary to be particularly vigilant in the application of accounting issues within the company.

[1028] Mr. Gollogly then called attention to unsupported accrued liability balances on Nortel's consolidated balance sheet which he placed in the area of $192 million. I should note at this point that Mr. Gollogly's $192 million is the same as the $142 million referred to in these reasons. The $142 million was specifically discussed by the Audit Committee. The $50 million was actually the Intercompany Out Of Balance account which was under review by the auditors and not a secret. Nortel's auditors publicly-reported a problem with Nortel's internal controls which referred to the $142 million that, for a short time, had been released to income. Mr. Richmond indicated that, when these matters were discussed, some people spoke of $142 million and others spoke of $192 million. Mr. Richmond testified that everyone was speaking about the same set of numbers.

[1029] Mr. Gollogly then disclosed that management had a forecast suggesting a $75 million pro forma loss in Q3 03. He indicates that this forecast begs the question whether further restructuring is required. He suggests that a change in the company-stated policy that a small loss position is unconcerning may be in order.

[1030] Finally, Mr. Gollogly says that the Q3 03 forecast calls into question the quality of the Q2 03 results.

[1031] The forecast to which Mr. Gollogly refers was, in a word, incorrect. Nortel reported positive net income of $185 million in Q3 2003. Nortel's published results for Q3 2003 were not restated in the first restatement. Financial results for Q3 03 were restated in the second restatement. Net earnings remained positive in the amount of $131 million despite the revenue recognition issues that were prevalent during that restatement.

[1032] In addition, the Crown, in its opening, suggested that the Q3 03 results had been affected by improper earnings management techniques employed by the accused. Evidence was received concerning the extent to which Nortel and Deloitte's staff preserved the integrity of the general ledger for Q3 03. As indicated in my discussion of the financial results for Q3 03, I accept that evidence. I am satisfied that the integrity of the Q3 03 general ledger was maintained.

[1033] Mr. Gollogly then makes reference to a positive impact of $51 million to the Q2 2003 profit and loss statement. He also makes the point that Nortel's gross margins contain approximately $50 million worth of positive adjustments due to changes in estimates.

[1034] Mr. Gollogly made a presentation to the Board on April 24, 2003, in which he specifically noted and highlighted at page 38 of his presentation, the $51 million to which he referred in his draft letter. Thus, the Board of Directors was made aware of this concern.

[1035] The $50 million in gross margin adjustments was not discussed by Mr. Gollogly. No opinion evidence was offered concerning gross margin calculations. Mr. Harrison indicated that typically Nortel's gross margins were approximately 40%. His evidence in that regard was on contentious.

[1036] In his draft letter, Mr. Gollogly makes reference to the July 11, 2003 journal entries. These entries were reversed on July 14, 2003.

[1037] Mr. Gollogly indicates that he questions the wisdom of making bonus payments because the Q2 03 results are affected by the two items referred to above which total $101 million. Mr. Gollogly notes, in his letter, that there are many other factors to consider when determining whether to pay bonuses. This latter observation is correct. The evidence disclosed that Nortel's competitors were approaching key Nortel employees and urging them to leave the company. This was a primary reason for the creation of the Return to Profitability Bonus.

[1038] Mr. Gollogly indicates in the draft letter that he feels so strongly about the payment of the bonuses that he will not accept his return to profitability bonus. Mr. Gollogly obviously thought better of the matter and, in fact, accepted his bonus.

### Conclusion

[1039] When I consider the content of this draft letter and the other evidence, I am not prepared to accept the Crown submission in regard to the disclosure of the contents of this letter.

[1040] I am satisfied that Mr. Gollogly's concern about the prospects for Q3 03 was misplaced. I am satisfied that the other matters concerning earnings were disclosed to the Audit Committee and, through the Audit Committee, to the Board of Directors with the exception of the gross margin adjustments. There was public disclosure of the Comprehensive Balance Sheet Review and the fact that the auditors had identified a reportable condition as a result of the attempt to release the $142 million. Finally, Mr. Gollogly's concern over the appropriateness of paying a bonus was a matter beyond his authority. The decision to pay a bonus was a decision for the JLRC committee of the board and the Board of Directors as a whole.

### Mr. Gollogly's draft letter to Mr. Beatty

[1041] This is the second draft letter to which the Crown referred.

[1042] Mr. Gollogly begins his letter by referring to certain elements of the Q2 results with which he is uncomfortable.

[1043] He first refers to what he called the three final July 11, 2003 journal entries. These are the three entries totaling $20 million. He speaks to the need for supporting documentation and indicates to Mr. Beatty that he, that is Mr. Beatty, will have to sign each of the three journal entries. He also indicates that a memo or note is required explaining why the three final entries are not material.

[1044] The three final Journal entries to which Mr. Gollogly objects were reversed on July 14, 2003 prior to the publication of Nortel's financial statements.

[1045] Mr. Gollogly then indicates that he is insisting upon a full and fair discussion of two key elements of the Q2 2003 results with the Audit Committee.

[1046] The first is the inclusion of the $101 million composed of the $51 million of customer financing services and $50 million relating primarily to contract changes in estimates and contract finalization in Nortel's Q2 03 profit and loss statement.

[1047] Nortel's press release, dated July 24, 2003, discloses the fact that selling, general and administrative expenses included the US$51 million benefit to which Mr. Gollogly referred. In addition, Mr. Gollogly made a presentation to the Audit Committee concerning this $51 million.

[1048] The second is that the balance sheet as at June 30 contains $142 million of accrued liabilities that Nortel is investigating and approximately $50 million of accrued liabilities relating to what he refers to as the "now infamous intercompany out of balance provision…" Mr. Gollogly wants the Board informed that these provisions will likely need to be reversed into the profit and loss statement when Nortel's analysis is complete.

[1049] The second point suggests Mr. Gollogly thinks that the Board needs to know that $192M will be "reversed into the P&L at some point in the future". If this is what he means, he was simply mistaken concerning what would become of the $142 million. The Audit Committee and the Board of Directors were well aware of the $142 million.

[1050] Mr. Richmond indicated that, when these matters were discussed, some people spoke of $142 million and others spoke of a $192 million. Mr. Richmond testified that everyone was speaking about the same set of numbers.

[1051] Mr. Richmond also testified that the $50 million Out Of Balance accrued liability balance, which Mr. Gollogly in his draft letter referred to as the "now infamous intercompany out of balance provision…", had been the subject of discussion between Mr. Dunn and the audit partners for months.

[1052] Due to the fact that Mr. Gollogly referred to the Intercompany Out Of Balance account as "infamous", I think it is appropriate to consider that account in some detail.

### The "now infamous intercompany out of balance provision"

[1053] Mr. Richmond indicated that Nortel had maintained an Intercompany Out Of Balance account for many years. Mr. Richmond explained that, when you have a company as large as Nortel, there are transactions that flow from one company to another within Nortel's corporate

world. Therefore, you will have balances due to and due from the various entities in Nortel's corporate world. When you come to do a consolidation, these balances should net out to zero but frequently do not. As a result, an accrued liability balance is maintained to account for the discrepancy. In Nortel's case, this had been true for some years.

[1054] Mr. Richmond indicated that Nortel's Intercompany Out Of Balance accrued liability balance fluctuated. In the years 2001 and 2002, the quantum of the account was driven up with the result that the balances due to and due from the various entities in Nortel's corporate world were out of balance by as much as $100 million.

[1055] Mr. Richmond explained that Deloitte wanted to work through a reconciliation process and reconcile the balances due to and due from the various Nortel entities to attempt to bring the Intercompany Out Of Balance accrued liability balance to zero.

[1056] Mr. Richmond indicated the Intercompany Out Of Balance account had been the subject of discussion between Mr. Dunn and the audit partners for months.

[1057] The Intercompany Out Of Balance account was well-known to Deloitte. It was the subject of two detailed Deloitte memos, dated April 10, 2003 and April 16, 2003 (Exhibit 227, tab 79). The memos were received as business records of Deloitte & Touche. Neither of the Deloitte's accountants who authored these memos was called as a witness.

[1058] These memos explain, in part, that the Intercompany Out Of Balance account is reviewed monthly and that, at that time, discrepancies are identified. Importantly the memos disclose that discrepancies identified as "material" are cleared.

[1059] The Intercompany Out Of Balance account balance fluctuated as a result of judgment exercised at the senior management level of Nortel concerning what was sufficient. Therefore, the opportunity to achieve an earnings target by varying the Intercompany Out Of Balance account balance presented itself. However, the account was well- known and scrutinized by Deloitte & Touche and material discrepancies were cleared monthly.

[1060] Specifically, the April 16, 2003 memo demonstrates that the reduction in the Intercompany Out Of Balance accrued liability balance by $35 million, which formed part of the contentious $80 million Q1 03 release to income, was reviewed prior to the finalization of the Q1 03 financial statements. The reduction was found to be unobjectionable.

[1061] There was nothing infamous about the Intercompany Out Of Balance account. Mr. Gollogly's reference may have been facetious; in which case, it is understandable. If the reference was serious, it was erroneous.

### *Mr. Gollogly's reference to the unsupported accrued liability balances*

[1062] Mr. Richmond indicated that he met with Mr. Dunn between July 11 and July 15, 2003. They agreed that the $142 million would be "warehoused" on Nortel's balance sheet pending the outcome of the Comprehensive Balance Sheet Review. While Mr. Richmond and Mr. Dunn resolved the matter between July 11 and July 15, in fact, Mr. Gollogly had already reversed the

2013 ONSC 137 (CanLII)

entry on July 10, 2003. I interpreted Mr. Richmond's evidence to be that Mr. Dunn agreed to leave the $142 million on Nortel's balance sheet.

[1063] Mr. Richmond indicated that there was a longer discussion concerning Deloitte's insistence that there be a comprehensive balance sheet review. Mr. Dunn said that he had been the Controller, the CFO and the CEO and that he was intimately aware of Nortel's financial affairs and that it was his view that the $142 million was the end of the matter. Accordingly, it was Mr. Dunn's view that the $142 million should be released to the profit and loss statement and disclosed in Nortel's Q2 03 press release. Mr. Richmond testified that he expressed Deloitte's view that a comprehensive balance sheet review was required to corroborate Mr. Dunn's position. Mr. Richmond also expressed the view that simply releasing $142 million of accrued liability balances into a profit and loss statement that otherwise showed a loss of $14 million would not satisfy regulators.

[1064] Mr. Richmond indicated that, during the meeting, Mr. Dunn agreed that a comprehensive balance sheet review was necessary.

[1065] The minutes of the Audit Committee meeting in July 18, 2003 indicate that Mr. Gollogly made a presentation concerning Nortel's Q2 03 results. His presentation was described as preliminary and subject to change. Part of his presentation outlined "Key Issues." The first item under this heading was entitled "Reserves". Mr. Gollogly's notes indicate that he made reference to the fact that: significant reserves and provisions were recorded on the balance sheet; significant additions, usages and releases of those reserves and provisions had occurred in Q2 03; management had a project underway to gather support and determine the proper resolution of certain reserve balances.

[1066] Mr. Cleghorn confirmed that, at the July 23 Audit Committee meeting, Mr. Dunn indicated that, while he was not pleased at the prospect of a comprehensive balance sheet review, it would result in stronger financial statements.

[1067] Minutes of the Audit Committee for July 24, 2003 indicate that Mr. John Cawthorne made a presentation dealing specifically with an analysis of Nortel's balance sheet. In his presentation, he pointed out that certain balance sheet accruals and provisions were established by management in prior periods dating back to 1999 and earlier. He indicated that these accruals and provisions were recorded by the company during periods when the balance sheet and income statement were much larger. Mr. Cawthorne indicated that these accruals and provisions were receiving greater scrutiny due to the shrinking size of Nortel's overall balance sheet and their materiality to the income statement. His presentation points out that there is a lack of documentation about certain accruals and that, as a result of that and the passage of time and the turnover of personnel, it is unclear what adjustments should have been made be made to these provisions in prior years. As a result, management has a project underway to gather support and determine the proper resolution of these questionable balances.

[1068] Prior to making this presentation Mr. Cawthorne and Mr. Hathway had received a soft provisions list in February 2003 which listed $413 million in soft provisions or accrued liability balances was questionable support.

[1069] Finally, Nortel's press release of July 24, 2003 announced a Comprehensive Balance Sheet Review.

[1070] I am satisfied that what Mr. Gollogly mistakenly thought was a problem involving only $142 million of accrued liability balances and $50 million of Intercompany Out Of Balance accrued liability balances was brought to the attention of the Audit Committee as Mr. Gollogly suggested in his draft letter.

[1071] I am satisfied that, as of July 24, 2003, some ten days after the date on Mr. Gollogly's draft letter, the Audit Committee was well-aware of the fact that there were potential problems with accrued liabilities.

### Mr. Gollogly's reference to the forecasted Q3 03 loss

[1072] Mr. Gollogly also records in this draft letter that he wants a discussion at the Audit Committee of the fact that the current Q3 03 forecast projects a loss in circumstances where the projected revenue for Q3 03 is the same as the actual revenue in Q2 03.

[1073] As indicated in my discussion of Q3 03, this forecast was simply wrong. Nortel reported net income of $185 million calculated according to the US GAAP despite the fact that revenue for Q3 03 was flat to Q2 03.

[1074] Nortel's published results for Q3 03 were restated in the second restatement; net income was positive in the amount of $131 million after restatement.

[1075] Nortel also reported positive net income in Q4 03 of $528 million (Exhibit 85B).

[1076] Mr. Gollogly's concern in this regard seems to have been misplaced.

### Mr. Gollogly's concern about Nortel's internal controls

[1077] Finally, due to the fact that there were late adjustments and an ongoing review of unsubstantiated or poorly-supported accrued liabilities, Mr. Gollogly wanted a full debate with Mr. Nick DeRoma, Nortel's General Counsel, on the adequacy of Nortel's internal controls.

[1078] I am not certain whether a debate involving Mr. DeRoma, Mr. Gollogly and others within Nortel took place.

[1079] Mr. Cawthorne, in his presentation to the Audit Committee of July 24, 2003, brought to the committee's attention that Deloitte had identified a reportable condition which, in my view, was sufficient to bring to the Audit Committee's attention the fact that Nortel was experiencing an internal control problem.

### Conclusion

[1080] Generally, I am satisfied that the matters of concern to Mr. Gollogly, which he expressed in his draft letter to Mr. Beatty, were disclosed to the Audit Committee.  Mr. Gollogly's concern

about earnings in Q3 03 was misplaced. The other issues were disclosed to Nortel's Audit Committee and Board of Directors.

### The language in the 2003 press releases and the notes to the first restatement

[1081] The Crown objected to a statement in the press release, dated April 24, 2003, which stated that Nortel's reported results included approximately $80 million of favorable impacts associated with reductions in accrued liability balances. The press release went on to say that these favorable impacts were more than offset by costs related to the Return to Profitability Bonus Plan and stock-based compensation.

[1082] There is no basis for this objection. The return to profitability bonus was estimated to cost $73 million. This amount is very close to the $80 million in favorable impacts. The two entries basically offset each other.

[1083] What is not true is that the $80 million in favorable impacts permitted Nortel to pay the return to profitability bonus that it would otherwise not have been able to pay. As explained elsewhere, I am not satisfied that such a conclusion is proven by the evidence.

[1084] In my view, the press release simply says that Nortel's earnings were not inflated by this $80 million because Nortel's expenses included an employee bonus of virtually the same amount of money. The statement in the press release is not false and no objection can properly be maintained to it.

[1085] The Crown also objected to the same press release because it failed to properly describe the $80 million as excess accruals.

[1086] The Crown also objected to the press release because it said that the press release alluded to the $80 million in a manner that was almost unintelligible.

[1087] The press release stated "in the first quarter of 2003, our SG&A and R&D and other income-net included approximately $80 million of favorable impacts associated with reductions in accruals which principally related to the accumulation of charges associated with the integration activities of previously acquired companies and operations originally structured as joint ventures as well as miscellaneous tax matters…"

[1088] The procedure for drafting press releases was not explicitly spelled out in the evidence. The evidence did disclose, however, that there was an Investor Relations Committee and a Press Release Working Group that was a subcommittee of that committee that decided on the wording of press releases. Various persons were canvassed for their views. In addition, the committee had the assistance of internal and external securities lawyers. In addition, Mr. Cleghorn indicated that the Audit Committee would not approve press releases without a sign-off from Nortel's auditors. Mr. Richmond confirmed that he assisted in drafting the April 24, 2003 press release.

[1089] On the evidence before me, I am not prepared to conclude that any or all of the accused are entirely responsible for the wording of Nortel's press releases announcing financial results and other material matters. I am satisfied that the press release was the product of many people

2013 ONSC 137 (CanLII)

including outside counsel. I also do not accept the Crown's characterization of the wording of the press release as far as the $80 million was concerned.

[1090] The Crown also asserted that Conservatism was contrary to US GAAP and disclosure of the existence of this practice within Nortel was required in the press release.

[1091] As indicated elsewhere, I am not satisfied that the evidence established that Conservatism was contrary to US GAAP.

[1092] The Crown also suggested that the introductory note to the restated financial statements was false and relied upon a draft note prepared by Mr. Gollogly. Mr. Gollogly's draft was his suggestion concerning the wording of the note that would accompany the restated financial statements and the Item 4 disclosure required by the September 30 10-Q report.

[1093] In his draft of the note, Mr. Gollogly, in part, states the following:

- Nortel initiated a comprehensive review in the 2nd quarter of fiscal 2003;

- the objective of the review was to assess whether previously-recorded accrued liability balances could potentially have a material impact on future financial results;

- preliminary observations indicated a lack of support and documentary evidence for certain accrued liabilities established in fiscal 2002 and 2001;

- the review is now completed and preliminary results indicate that certain accrued liabilities recorded in 2002 and 2001 were either overstated or not drawn down in the correct fiscal period;

- the systemic causes of these errors are the high level of conservatism used to identify Nortel's financial exposure during the period of business realignment, significant workforce reductions resulting in departures from stated finance policies and lost business knowledge around specific internal control processes; and,

- Nortel has determined the need to voluntarily restate its financial statements for the errors contained in previously reported financial statements because the aggregate impact would be material to future financial results.

[1094] Mr. Gollogly indicates an email to Mr. Beatty attaching the draft that this was the first note that he had drafted.

[1095] The first restatement of the financial statements for Q2 03 included a note which disclosed that:

- Nortel had initiated a comprehensive review of its assets and liabilities;

- in excess of $900 million in accrued liability balances needed to be restated;

- these balances were either initially recorded incorrectly in prior periods or not properly released to the profit and loss statement in the appropriate period;

- in certain cases these accrued liability balances had not been adjusted for changes in estimates in the appropriate periods;

- certain other errors which were not material were also corrected;

- Nortel made certain revenue adjustments, corrected errors related to its deferred income tax assets and foreign-currency accounts and reclassified adjustments to its consolidated balance sheet;

- certain accruals and provisions should not have been recorded because the appropriate conditions in documentation supporting the establishment of these accruals and provisions did not exist at the time of recognition. These accrued liability balances were re-profiled to the periods in which they were created and then eliminated;

- Nortel identified situations where accrued liability balances had been released to the profit and loss statement in inappropriate periods. These accrued liability balances have been recognized in the appropriate periods;

- the restatement includes the release of accrued liability balances established to bring the intercompany payables and receivables into balance. (I note that this is a reference to the Intercompany Out Of Balance account which occupied a certain amount of attention during the course of this trial); and,

- excessive accrued liability balances for discretionary bonuses have been adjusted.

[1096] The Crown relies on the fact that Mr. Gollogly states in his draft that the systemic causes for overstating accrued liability balances or failing to draw them down in the correct fiscal period was a high level of Conservatism used to identify financial exposure during the period of Nortel's realignment from 2000-2002.

[1097] The note in the financial statements does not use the word Conservatism, but it discloses that accrued liability balances were recorded incorrectly in prior periods, not properly released, not adjusted for changes in estimates in the appropriate period.

[1098] The Crown indicated, in its opening, that Conservatism was contrary to US GAAP. The evidence did not support such a conclusion.

[1099] The Crown complained that the press release announcing the first restatement did not say that the restatement was required due to a systemic tendency to overstate accrued liabilities.

[1100] It is true that the note to the restated financial statements does not say that there was a systemic or cultural tendency in Nortel to set-up accrued liability balances on a worst-case

2013 ONSC 137 (CanLII)

scenario basis. The restatement, however, discloses that over $900 million in accrued liability balances were excessive because they were not recorded properly, not properly released or not adjusted in a timely manner. The restatement discloses that this happened in 2000, 2001, 2002 and the first two quarters of 2003. A reasonable reader would conclude that the problems identified in the restatement note were systemic at least in the years that were stated.

[1101] I attach no significance to the absence of a reference, in the note accompanying the restated financial statements, to Nortel's financial errors resulting from systemic causes.

[1102] The Crown suggested that the assertion in Mr. Gollogly's draft that certain known errors which were not material were not corrected until the restatement was false. The Crown submitted the errors were material. Mr. Gollogly's draft does not define those errors. It is impossible to know to what he was referring.

[1103] The note that accompanied the restated financial statements makes a similar statement. That note also fails to define the errors to which it refers.

[1104] It is impossible to conclude that either of these references to the correction of unspecified immaterial errors were references to material errors.

[1105] Finally, Mr. Gollogly clearly prepared a draft of the note that was to accompany the restated financial statements. He submitted it first to Blair Morrison, Gordon Davies, Karen Sledge and Gary Beck. The next day Mr. Gollogly forwarded the same note to Mr. Beatty for his consideration. In his e-mail to Mr. Beatty, Mr. Gollogly makes reference to a new draft note which potentially will have been reviewed by someone named Nick. Nortel's General Counsel was Nick DeRoma. While it makes sense that Nortel's General Counsel would review the wording of the note accompanying the restated financial statements, I cannot say for certain to whom Mr. Gollogly was referring.

[1106] I am not satisfied that there is any real difference between Mr. Gollogly's draft and the note that actually accompanied the restated financial statements.

[1107] Even if the note accompanying the restated financial statements was incomplete and I am not satisfied that it was, I am not satisfied that Mr. Gollogly, Mr. Beatty or Mr. Dunn could in their sole discretion determine the final wording of Nortel press releases.

## THE CROWN'S CRITICISM OF THE Q3 03 FINANCIAL RESULTS

[1108] The Crown maintained that Mr. Gollogly's concerns about Q3 03 were never properly disclosed either to the Audit Committee or to the public. Mr. Gollogly's concern about Q3 03 earnings was misplaced as indicated earlier. The forecast to which Mr. Gollogly referred was likely a September 19, 2003 Outlook.

[1109] The Crown attacked Nortel's original publication of Q3 03 results. The Crown maintained that Nortel's financial statements, as originally published for Q3 03, misrepresented Nortel's financial results for that fiscal period. Specifically, the Crown maintained that the Q3 03 results were "polluted" because $391 million in accrued liability balances were released to the profit and loss statement in Q3 03.

2013 ONSC 137 (CanLII)

[1110] The September 19, 2003 Outlook referred to by Mr. Gollogly in his draft letters indicates that this sum is made up of $264 million, the release of which was triggered in Q3, and $127 million the release of which was triggered in earlier quarters of 2003.

[1111] The Crown also highlighted a reference in Mr. Gollogly's diary which the Crown suggested demonstrated his opinion that the accounting oversight in Q3 03 was a "joke". Specifically, Mr. Gollogly indicated, in a diary entry, dated October 7, 2003, "intense scrutiny on Q3-it is a joke". This reference occurs on a page which is entitled "LC\Region Finance Call". The diary entry seems to be recording comments that were made during this telephone call. It is not clear from the entry that the comment represents Mr. Gollogly's view or one of the callers that it is a joke to suggest that there is intense scrutiny on Q3.

[1112] The Crown also relied on a note made by Mr. Beatty. This note states "Q3 was 'Amnesty' time from now on people will be fired for not following proper accounting practices". The Crown asked me to interpret this reference as a statement by Mr. Beatty that Q3 was everyone's last opportunity to manage earnings by releasing accrued liability balances to the profit and loss statement.

[1113] Mr. Beatty's note is dated September 30, 2003 and the document purports, on its face, to be notes of the Finance Conference Call. The note appears under a bullet point entitled "what is needed going forward". The first item that is needed, according to the note, is an understanding of how much the world has changed from a regulatory point of view. The second thing that is needed, according to the note, is that Q3 was amnesty time and that from now on people will be fired for not following proper accounting practices. The third item that is required, according to the note, is that if you are in doubt about what to do, you are to ask Karen's team who have the final say. The note is dated September 30, 2003, which is the last day of Q3.

[1114] With respect to Mr. Beatty's note, it seems to me to be more reasonable to construe the statement, assuming for a moment it was made by Mr. Beatty, as a promise not to fire employees who disclose, in Q3 03, items which should be removed from the balance sheet. This would certainly be consistent with the worldwide effort to comprehensively review the balance sheet.

[1115] The Crown also relied upon the fact that the September 19, 2003 Outlook prepared by Mr. Dans forecasted net income of $178 million and the press release of October 23, 2003 announced net income of $179 million. The Crown suggested that it was extraordinary that Mr. Dans' forecast could be so accurate.

[1116] In this regard, it is also a fact that Mr. Dans produced an Outlook, dated September 2, 2003, (seventeen days earlier) in which he projected net income for Q3 03 at $19 million.

[1117] It is more reasonable to me to conclude that Mr. Dans produced Outlooks which forecasted varying levels of net income; one of which, in Q3 03, happened to be quite accurate.

[1118] Wilmer Cutler Pickering, on behalf of Nortel's Audit Committee, in effect, investigated the behavior of the three accused and their report resulted in all three accused being fired. Wilmer Cutler Pickering concluded with respect to Q3 03 and Q4 03: "In light of concerns raised by the inappropriate accounting judgments outlined above, the Audit Committee expanded its

investigation to determine whether excess provisions were released to meet internal EBT targets in each of these two quarters. No evidence emerged to suggest an intent to release provisions strategically in those quarters to meet EBT targets". Wilmer Cutler Pickering indicated that a further review down to a low threshold would be conducted and that any changes would be reflected in the second restatement.

### *Preservation of the integrity of the Q3 03 General Ledger*

[1119] Returning to the Crown's suggestion that the Q3 03 general ledger was polluted, some care needs to be taken with references to non-trigger items finding their way into the Q3 03 general ledger due to the way in which Nortel and Deloitte used the Q3 03 General Ledger during the Comprehensive Balance Sheet Review.

[1120] The Comprehensive Balance Sheet Review took place during Q3 03. Ms. Sledge described the steps taken to preserve the integrity of the Q3 03 general ledger:

- Balance sheet items identified as not belonging on the balance sheet any longer were given a specific code in the General Ledger;

- The code identified them as items that potentially would need to be restated. These separately coded balance sheet items were separately tracked in a parallel system because they were recorded in a database as items marked for potential restatement;

- Ms. Sledge testified that these entries were tracked very carefully. These balance sheet items, by definition, were items that needed to come off the balance sheet, but did not belong in the Q3 profit and loss statement;

- These separately coded items were then audited by Deloitte & Touche; and,

- When it was decided that prior published financial statements were, in fact, going to be restated, the coded items removed from the General Ledger and restated to the appropriate prior financial period.

[1121] Ms. Sledge testified that she felt rushed into the October 23, 2003 press release but, nevertheless, she felt that Nortel's balance sheet and profit and loss statement and financial records were accurate. In this regard, it should be remembered that the October 23, 2003 press release specified that the financial results were <u>preliminary</u> results.

[1122] During the Crown's opening submissions, reference was made to the fact that Ms. Sledge prepared a project update for Mr. Gollogly, dated October 10, 2003, and that the presentation stated that the preliminary Q3 03 results were "polluted". In this presentation, the word polluted is placed in quotation marks. Ms. Sledge testified that the slide was prepared by one of her staff and meant to convey that all of the unsupported balances were initially released to the Q3 03 profit and loss statement because they could not remain on the balance sheet. The items were separately coded and then restated when it was determined that a restatement was necessary.

[1123] I attach no significance to the fact that one of the pages of Ms. Sledge's report to Mr. Gollogly contains the word polluted in quotes. The unsupported balances were separately coded so that they could be identified and, in that sense, the Q3 03 results were, for a time, "polluted."

[1124] I am satisfied that the process employed by Ms. Sledge and her team and audited by Deloitte preserved the integrity of the Q3 03 results.

[1125] Mr. Chambers did not offer the opinion in his report that the Q3 03 financial results were polluted or otherwise contaminated.

### Conclusion

[1126] When I consider this evidence, I am not satisfied that the Q3 03 results were false due to the improper release of accrued liability balances to the profit and loss statement.

[1127] In Q3 03, the total accrued liability balances released to the profit and loss statement, in fact, totaled $391 million. This is a significant volume of releases. Some of these releases were in the normal course and some were not. Steps were taken to identify which was which. The integrity of Nortel's General Ledger was maintained. There was no misrepresentation of Nortel's Q3 03 financial results.

[1128] I am not satisfied beyond a reasonable doubt that Nortel's original Q3 03 financial statements misrepresented Nortel's financial results.

## CONCLUSION

### The excess and unsupported accrued liabilities

[1129] I am satisfied beyond a reasonable doubt that all three accused, by virtue of their long experience with Nortel and their positions of responsibility, well-understood how the men and women in the field were implementing Nortel's policy of Conservatism.

[1130] I am satisfied beyond a reasonable doubt that they knew that the policy of Conservatism and its implementation had created excess accrued liabilities which could be released to assist in meeting financial targets. Liabilities were very often estimated by men and women in the field on a worst-case scenario basis. As well, in order to avoid exposing Nortel to risks that were not provided for, there was a reluctance to reduce accrued liability balances in the appropriate quarter in response to a triggering event. The result was the presence of excess accrued liabilities on Nortel's balance sheet.

[1131] The evidence does establish, and I so find, that excessive accrued liabilities existed because genuine accrued liabilities were not released when they should have been and because genuine accrued liabilities were not adjusted when they should have been. I am not satisfied that any or all of the accused understood the extent of the excess accrued liabilities on Nortel's balance sheet.

[1132] I am satisfied that, in addition to excess accrued liabilities, there were accrued liabilities on Nortel's balance sheet which could not be supported.

[1133] The evidence persuades me that accruals were present on Nortel's consolidated balance sheet which could not be supported by documentation. I am satisfied that the downsizing of Nortel, which involved the closing of offices, the selling of real estate and, undoubtedly, the storage of documents, created a situation in which supporting documentation for some of existing accrued liability balances could not be located. Further, the loss of employees (two out of every three worldwide) created a situation in which the institutional memory concerning the unsupported accruals no longer existed within the company.

[1134] I am satisfied beyond a reasonable doubt that all 3 accused knew that there were unsupported accrued liabilities on Nortel's balance sheet. I am not satisfied that any or all of the accused understood the extent of the unsupported accrued liabilities on Nortel's balance sheet.

[1135] I am satisfied that neither the unsupported nor the excess accrued liabilities were fictitious. This finding does not mean that the release of accrued liabilities could not be used to manage earnings or achieve a pre-published financial target. It simply means that both the unsupported and the excessive liability balances originated from real risks.

[1136] I am satisfied, on the evidence, that Mr. Gollogly, virtually from the time he took over as Corporate Controller, turned his attention to Nortel's balance sheet.

[1137] I am satisfied that the enormous losses suffered by Nortel in fiscal 2000 and 2001 created a situation in which senior management, Nortel's Board of Directors and Nortel's auditors were concentrating their efforts and energy on doing what was necessary to make sure that Nortel had sufficient cash reserves to survive.

### Q4 2002(Q4 02)

[1138] Mr. Harrison initially reported in his January 6 snapshot pro forma earnings before taxes of $73 million. It is clear that he erroneously included $59 million in his revenue calculation and that the 360 networks accrued liability balance of $50 million is unchallenged. These two uncontested adjustments are capable of turning Mr. Harrison's forecasted earnings before taxes into a loss.

[1139] I am not satisfied that Nortel's Q4 2002 financial results were pro forma net profitable.

[1140] When I consider all of the evidence, including the evidence to which I have made specific reference, I am not satisfied beyond a reasonable doubt that the late entry accrued expenses/liabilities solicited by Mr. Harrison and recorded in Q4 02 misrepresented Nortel's financial results.

[1141] When I consider all of the evidence, including the evidence to which I have specifically referred, I am not satisfied beyond a reasonable doubt that Nortel's January 23 press release reporting a pro forma net loss of $62 million misrepresented Nortel's pro forma financial results.

[1142] When I consider all the evidence, including the evidence to which I have made specific reference, I am not satisfied beyond a reasonable doubt that the accruals solicited by Mr. Harrison and recorded in Q4 02 resulted in a misrepresentation of Nortel's US GAAP financial results.

[1143] I am not satisfied beyond a reasonable doubt that the late entry accruals solicited by Mr. Harrison caused a misrepresentation of Nortel's financial results to Nortel's Audit Committee, Nortel's JL RC Committee or Nortel's Board of Directors.

[1144] I am satisfied that $222 million of the $303 million identified by Ms. Susan Shaw as provisions no longer required and available for release were, in fact, released in Q3 02 and Q4 02. I am also satisfied that $57 million worth of accrued liability balances, described by Mr. McMillan as unreleased, included releases which could not be identified.

[1145] I am satisfied that the release of this $222 million in Q3 02 and Q4 02 did not result in a misrepresentation of Nortel's financial results for those quarters or for fiscal 2002. These releases positively impacted earnings in those quarters but Nortel still lost in excess of $2 billion in those two quarters.

[1146] I am not satisfied beyond a reasonable doubt that the manner in which the three accused dealt with the $303 million in accrued liability balances identified by Susan Shaw in her October 2002 compilation resulted in a misrepresentation of Nortel's financial results to the investing public or Nortel's Board of Directors.

### The $80 million in Non-op Accrued liability balances released to the Q1 03 profit and loss statement

### The Return to Profitability Bonus

[1147] I am satisfied that the Return to Profitability Bonus was payable in Q1 2003 with or without the release of $80 million in Non-op accrued liability balances.

[1148] I am satisfied that Mr. Hathway was not misled when he was told by either Mr. Beatty or Mr. Gollogly that the Return to Profitability Bonus was payable with or without the release of the $80 million with which we have been concerned.

### The Restricted Stock Unit Bonus

[1149] I am not satisfied that the $4 million Siemens accrued liability balance released in Q2 03 misrepresented Nortel's financial results by causing them to indicate that a Restricted Stock Unit Bonus Plan milestone had been reached.

[1150] I am not satisfied that releasing the $4 million Siemens balance in Q2 03 created a risk to the pecuniary interests of Nortel Networks Corporation contrary to count 2 in the indictment by falsely indicating that the first milestone of the Restricted Stock Unit Bonus Plan had been met.

[1151] I am satisfied that the release of the $4 million Siemens accrued liability balance in Q4 02 or Q2 03 would have had exactly the same effect as far as the first milestone of the Restricted Stock Unit Bonus Plan was concerned.

2013 ONSC 137 (CanLII)

[1152] I am not satisfied that any or all of the accused knew that the $4 million Siemens accrued liability balance should have been released in Q4 01.

### The $80 million generally

[1153] I am satisfied that Nortel achieved net income in Q1 03 with or without the $80 million.

[1154] I am satisfied that including the $80 million with which we have been concerned in Nortel's Q1 03 profit and loss statement or removing the $80 million from Nortel's Q1 03 consolidated balance sheet did not misrepresent Nortel's financial results for Q1 03.

[1155] I am satisfied, based on my acceptance of Ms. Shaw's evidence, that Ms. Shaw, Mr. Gollogly and the other Nortel employees at the April 15, 2003 meeting fully disclosed to their auditors the circumstances surrounding the release of $80 million in accrued liability balances, as well as the circumstances surrounding the remaining $109 million in accrued liabilities on the balance sheet.

[1156] The $80 million which was released in Q1 03 had been conclusively determined to be unsupportable. Deloitte, the Audit Committee, Ms. Shaw and all the accused knew that there were no triggering events in Q1 03 which required the release of this $80 million. It was obviously the view of everyone involved that the release of this $80 million would not materially affect Nortel's balance sheet or profit and loss statement. As indicated elsewhere in these reasons, I agree with this conclusion.

[1157] Disclosure of the fact that Nortel's financial results for Q1 03 were positively affected by the release of this $80 million was, in fact, included in Nortel's published financial statements and the press release announcing the Q1 03 financial results.

[1158] I accept the conclusions in the draft memo prepared by Ms. De Acetis, Mr. Chant and Mr. Allen. I find the memo persuasive. I reject Mr. Hathway's evidence to the effect that the calculations or conclusions in this draft memo are not correct.

[1159] I accept the coherent materiality analysis in the draft memo prepared by Ms. De Acetis, Mr. Chant and Mr. Allen.

[1160] I am satisfied that the release of $80 million in Non-op accrued liability balances to Nortel's profit and loss statement was not material to Nortel's Q1 03 profit and loss statement.

[1161] I am satisfied that the release of the $80 million from Nortel's balance sheet to its profit and loss statement was not material to Nortel's Q1 03 balance sheet.

[1162] I am satisfied that the release of this $80 million did not create a risk to the pecuniary interests of Nortel Networks Corporation.

[1163] I am not satisfied that the way in which the three accused dealt with the $80 million in unsupported accrued liability balances in Q1 03 misrepresented Nortel's financial results to the investing public or Nortel's Audit Committee or Nortel's board of directors.

2013 ONSC 137 (CanLII)

2013 ONSC 137 (CanLII)

### The attempt to release the $142 Million

[1164] I am also satisfied that the attempt to release $142 million in unsupported or excess accrued liability balances in Q2 03 did not misrepresent Nortel's financial results. Mr. Hathway objected to the release and Mr. Gollogly returned the $142 million to Nortel's balance sheet where those balances had always been.

[1165] I am satisfied that the presence of this $142 million in accrued liability balances on Nortel's balance sheet in Q2 03 did not misrepresent Nortel's liabilities or otherwise misrepresent Nortel's financial results in Q2 03.  Mr. Richmond was clearly of this opinion; the Crown expert Mr. Chambers did not offer a contrary opinion.

[1166] Because the presence on Nortel's balance sheet of $142 million in unsupported/excess accrued liability balances was disclosed to Nortel's Audit Committee in a way which resulted in a Comprehensive Balance Sheet Review, I am satisfied that the presence of this $142 million in unsupported balances on Nortel's balance sheet did not create a risk to the pecuniary interests of Nortel Networks Corporation.

### Nortel's published financial results for Q3 03

[1167] When I consider this evidence, I am not satisfied that the original published Q3 03 financial statements misrepresented Nortel's financial results for Q3 03 due to the improper release of accrued liability balances to the profit and loss statement or for any other reason.

[1168] In Q3 03, the total accrued liability balances released to the profit and loss statement, in fact, totaled $391 million. This is a significant volume of releases. Some of these releases were in the normal course and some were not. Steps were taken to identify which was which to ensure that the published financial statements were not affected inappropriately. Neither Mr. Chambers nor any other witness offered the opinion that the steps were inadequate.

[1169] I am satisfied that the steps taken to preserve the integrity of the Q3 03 financial statements were successful with the result that Nortel's financial results for that quarter were not misrepresented.

### The Comprehensive Balance Sheet Review

[1170] The first restatement produced $900 million in favorable impacts to shareholders. The $900 million in excess accrued liabilities represented expenses/liabilities on the balance sheet that did not have to be recognized. It was never suggested that these accrued liability balances ought not to have been restated. As a result of restating these balances, shareholder equity was increased.

[1171] I am satisfied that the Comprehensive Balance Sheet Review was comprehensive. It identified more than $900 million in excessive accrued liabilities.

[1172] I am satisfied that there was intense pressure to complete the Comprehensive Balance Sheet Review as quickly as possible. I do not attribute this imperative to the accused alone. I accept the evidence of Mr. Richmond that there was an agreement among the Board, senior

management and Deloitte that the comprehensive balance sheet review should be completed "as rapidly as was humanly possible". I am satisfied that this imperative existed because the accused and Nortel's Audit Committee wanted to make their appropriate filings with the SEC and the Ontario Securities Commission within normal reporting lines. I am not satisfied, on the evidence, including the evidence specifically referred to, that the Comprehensive Balance Sheet Review was not comprehensive because timelines were short.

[1173] The evidence falls far short of proving that the accused, either individually or collectively, attempted to frustrate the Comprehensive Balance Sheet Review or the first restatement of Nortel's previously-published financial results. Deloittes, specifically Mr. Richmond, insisted on the Comprehensive Balance Sheet Review and I am satisfied that Deloitte would not have accepted such obstruction and would have brought the matter to the attention of the Audit Committee.

[1174] I am not satisfied that the first restatement was under-resourced. Deloitte was free to add staff as they saw fit. Mr. Richmond did not hesitate to recommend that Nortel staff and Deloitte staff be compelled to take a long weekend. I have no doubt he would have recommended that Nortel find additional staff for the Comprehensive Balance Sheet Review if it had come to his attention that the project, which Deloitte had insisted upon, was being compromised because it was under-resourced on the Nortel side.

[1175] I am satisfied that the scope of the Comprehensive Balance Sheet Review was reasonable. The scope of the Comprehensive Balance Sheet Review was accepted by Nortel's auditors and its Audit Committee. Throughout the Comprehensive Balance Sheet Review, there was no suggestion that the scope of the review was too narrow.

[1176] I accept the evidence of Mr. Richmond, Ms. Sledge, Mr. McMillan and others attesting to the effort that went into the Comprehensive Balance Sheet Review.

[1177] I accept the evidence of Mr. Dans that there was a trending analysis done at the conclusion of the first restatement which validated the results of that restatement.

[1178] An accrued liability balance when Deloitte decided there had been an error. In order to understand what to make of the error, one has to understand the specifics of the release. An example is the JDS Uniphase transaction. Deloitte gave Nortel an opinion in 2001 concerning the accounting for this transaction which Nortel accepted. Deloitte confirmed its original advice on January 9, 2003. During the second restatement, Deloitte changed its opinion entirely. Nortel accepted Deloitte's new opinion and, as a result, restated $319 million worth of revenue. Deloitte behaved in a similar manner when considering the Optical Warranty accrued liability balance.

[1179] It would be imprecise and dangerous to conclude, without knowing the specifics of the transactions, that Nortel's prior published financial results were false because transactions such as these were restated. The more accurate statement is that Deloitte changed its mind about the accounting treatment for these transactions and, as a result, previously-published financial statements had to be changed. Once the specifics of the transaction are known, it is clear that the three accused could not have known about these so-called errors.

[1180] It would be wrong to infer that the three accused knew that an accrued liability balance that was restated was false in the absence of evidence concerning the specifics of the balance.

[1181] When I consider all of the evidence, it is my conclusion that the second restatement produced different results than the first restatement because the thresholds of the second restatement were different, because the second restatement concentrated on revenue recognition, as well as excessive accrued liability balances, and because Deloitte changed its mind about the accounting for specific transactions. Sometimes, as the specifics of the Genuity accrued liability balance demonstrate, Deloitte disagreed with itself. With respect to that release, the U.S. National Office of Deloitte & Touche disagreed with the Deloitte reviewers at Nortel and overruled them.

[1182] I am not satisfied by the evidence in this case, including the fact that the second restatement resulted in financial statements which were different than Nortel's previously-published and restated financial statements, proves that the previously-published and restated financial statements misrepresented Nortel's financial results. For example, in the period Q4 02, which occupied a considerable amount of the court's time, Nortel's original published financial statements reported a US GAAP loss of $248 million and revenue of $2.5 billion. After two restatements, Nortel reported a US GAAP loss of $294 million and revenue of $2.6 billion.

### The Q1 & Q2 03 accrued liability balance releases

[1183] I am not satisfied beyond a reasonable doubt that the three accused deliberately misrepresented Nortel's original Q1 03 and Q2 03 published financial results by releasing $361 million and $372 million, respectively, to Nortel's Q1 03 and Q2 03 profit and loss statements.

[1184] The restated releases referred to in the evidence lead me to the conclusion that the decision to restate on account of an error can be the same thing as saying that there was a decision to restate on account of a difference of opinion. The difference of opinion can occur with the benefit of hindsight. The difference of opinion can be influenced by new information. As indicated earlier, when deciding to restate an accrued liability balance, sometimes Deloitte disagreed with itself. The specifics of each restated item are a story, the details of which cannot be inferred from the ending.

[1185] In the abstract, it is true that the fact that accrued liability balances in Nortel's balance sheet were restated is capable of supporting an inference that, in their original form, the financial statements misrepresented Nortel's financial results. Based on the evidence that I have heard, it is my conclusion that I should not draw such an inference in this case.

[1186] When I consider the evidence generally, including the evidence to which I have referred, I come to the conclusion that I am not satisfied by the evidence that, apart from the $80 million in Non-op releases, the Q1 03 and Q2 03 accrued liability releases were outside the normal course of business.

[1187] As a result, I cannot give effect to the Crown submissions concerning the inferences I ought to draw from the fact that the original Q1 03 and Q2 03 accrued liability balances were restated.

2013 ONSC 137 (CanLII)

**VERDICT**

[1188] For the reasons that I have set out and having regard to all the evidence, I am not satisfied beyond a reasonable doubt that Frank A. Dunn, Douglas C. Beatty and Michael J. Gollogly deliberately misrepresented the financial results of Nortel Networks Corporation and, therefore, I find each of them not guilty of counts one and two in this indictment.

_____

MARROCCO J.

**Released: 20130114**

**CITATION:** R. v. Dunn, 2013 ONSC 137
**COURT FILE NO.:** 10-00145
**DATE:** 20130114

2013 ONSC 137 (CanLII)

## ONTARIO

## SUPERIOR COURT OF JUSTICE

**B E T W E E N:**

HER MAJESTY THE QUEEN

– and –

FRANK A. DUNN, DOUGLAS C. BEATTY AND
MICHAEL J. GOLLOGLY

Defendants

---

**JUDGMENT**

---

MARROCCO J.

**Released: 20130114**

# TAB 76

591 F.2d 248
United States Court of Appeals,
Third Circuit.

R. M. SMITH, INC., Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE.

No. 78-1442.   |   Argued Nov. 14,
1978.   |   Decided Jan. 26, 1979.

Commissioner of Internal Revenue found that taxpayer's amortization deductions were excessive and issued notice of deficiency, and taxpayer sought review. The Tax Court, William M. Drennan, 69 T.C. 317, found that claimed depreciation and amortization deductions were excessive, and taxpayer appealed. The Court of Appeals, Rosenn, Circuit Judge, held that: (1) Tax Court's valuation of depreciable intangible assets was not clearly erroneous; (2) residual value method was appropriate for determining value of goodwill; (3) Tax Court did not err in including difference between face value of note and its asserted market value in goodwill, and (4) while Tax Court erroneously included in total price which taxpayer paid for stock federal income tax liability of acquired corporation for period between acquisition of stock and liquidation of corporation, Tax Court's judgment would not be disturbed since amount of interim earnings erroneously deducted from total price paid exceeded interim income tax liability and more than offset error in including interim tax liability in total price paid.

Affirmed.

West Headnotes (10)

**[1]** **Internal Revenue**

 Value

Where taxpayer established that Commissioner's valuation of patent was in error, taxpayer was not required to prove correct figure, but, rather, Commissioner had burden of establishing proper valuation and actual tax owed after proper depreciation deductions were taken.

2 Cases that cite this headnote

**[2]** **Internal Revenue**

 Scope and Extent of Review

Even though taxpayer established that Commissioner's calculation of value of patents was in error and even though Tax Court refused to accept Commissioner's evidence in this regard, where sufficient evidence was introduced to allow Tax Court to reach reasonable conclusion, Tax Court was not limited to simply choosing one of the two values proffered, but it was appropriate for it to evaluate all of the evidence and to make independent determination that did not necessarily accept valuation of either party.

1 Cases that cite this headnote

**[3]** **Internal Revenue**

 Value

Tax Court's finding of fact with respect to valuation of patents for purposes of Internal Revenue Code provisions relating to basis of assets received by corporation in a distribution in complete liquidation of another corporation was to be reviewed under clearly erroneous standard. 26 U.S.C.A. (I.R.C.1954) § 334(b)(2).

2 Cases that cite this headnote

**[4]** **Internal Revenue**

 Evidence

Tax Court's finding of fact with respect to valuation of patents, for purposes of Internal Revenue Code provisions relating to basis of assets received by taxpayer corporation in a distribution in complete liquidation of another corporation, was not clearly erroneous. 26 U.S.C.A. (I.R.C.1954) § 334(b)(2).

1 Cases that cite this headnote

**[5]** **Internal Revenue**

 Allocation of Basis

Under Internal Revenue Code provisions relating to basis of assets received by corporation in a distribution in complete liquidation of another corporation, before allocation of taxable basis

to assets received is made, determination of fair market value of all of the assets must be made. 26 U.S.C.A. (I.R.C.1954) § 334(b)(2).

Cases that cite this headnote

**[6]**    **Internal Revenue**
         🔑 Allocation of Basis

"Residual value method," which assumes that sum of fair market values of all corporate assets acquired equals price paid for acquisition of these assets, was appropriate for determining value of goodwill for purposes of allocating taxable basis to assets received by taxpayer in a distribution in complete liquidation of another corporation, where there was no proof of substantial variations in asset values during two-month period between acquisition of stock and liquidation of corporation and where taxpayer failed to present evidence showing that price paid was not equal to fair market value. 26 U.S.C.A. (I.R.C.1954) § 334(b)(2).

13 Cases that cite this headnote

**[7]**    **Internal Revenue**
         🔑 Basis of Property Received by Corporate Transferee

Under Internal Revenue Code provisions relating to basis of assets received by corporation in a distribution in complete liquidation of another corporation, residual value method, which assumes that sum of fair market values of all corporate assets acquired equals price paid for acquisition of these assets, is an appropriate means for deriving value of intangible assets as long as total price paid and values of all other assets are known; however, resulting figure is not to be deemed conclusive proof of unknown value, and evidence suggesting that fair deal was not reached should be permitted. 26 U.S.C.A. (I.R.C.1954) § 334(b)(2).

13 Cases that cite this headnote

**[8]**    **Internal Revenue**
         🔑 Allocation of Basis

For purposes of Internal Revenue Code provisions relating to basis of assets received by a corporation in a distribution in complete liquidation of another corporation, Tax Court did not err in including in goodwill difference of over $700,000 between face value of 4% promissory note and its asserted market value, which difference resulted from decision by taxpayer and seller corporation to incorporate unstated interest into principal part of installment note, and Tax Court did not err in failing to allocate $700,000 to basis spread among all of the assets received in liquidation. 26 U.S.C.A. (I.R.C.1954) § 334(b)(2).

Cases that cite this headnote

**[9]**    **Internal Revenue**
         🔑 Valuation of Property

When parties themselves have deliberately fixed values to be placed on elements of a transaction, they are bound to accept Commissioner's construction of these values unless they can prove mistake, undue influence, fraud, or duress.

1 Cases that cite this headnote

**[10]**    **Internal Revenue**
         🔑 Determination and Disposition of Cause

Although Tax Court erroneously included in total price paid for stock federal income tax liability of acquired corporation for period between acquisition of stock and liquidation of corporation, where Tax Court also erroneously deducted from total price paid interim earnings of acquired corporation, where amount of interim earnings exceeded interim income tax liability and more than offset error in including in total price federal income tax liability, and where Internal Revenue Service did not appeal error in favor of taxpayer, Tax Court's judgment would not be disturbed. 26 U.S.C.A. (I.R.C.1954) § 334(b)(2).

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*249** Kenneth P. Simon, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for appellant.

M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Jonathan S. Cohen, Richard D. Buik, Attys., Tax Div., Dept. of Justice, Washington, D. C., for appellee.

Before ROSENN, GARTH and HIGGINBOTHAM, Circuit Judges.

**Opinion**

## OPINION OF THE COURT

ROSENN, Circuit Judge.

The issues raised on this appeal reflect some of the subtle tax hazards lurking in corporate liquidations. The issues turn on the application of section 334(b)(2) of the Internal Revenue Code of 1954, 26 U.S.C. s 334(b)(2) (1976), dealing with the basis of property received in liquidation of a subsidiary. Section 334(b)(2) provides that "(i)f property is received by a corporation in a distribution in complete liquidation of another corporation," and if certain requirements are met, "then the basis of the property in the hands of the distributee shall be the adjusted basis of the stock with respect to which the distribution was made." Basis in the assets is to be allocated in proportion to the fair market values of the assets. 26 C.F.R. 1.334-1(c)(4) (viii) (1978). In this case, both parties agree that the prerequisites **\*250** to the applicability of section 334(b)(2) have been met. The dispute hinges on the proper allocation of basis to the property transferred.

## I. THE PREDICATE FOR ASSET BASIS

In early 1970, R. A. Gilmour and Robert M. Smith entered into an agreement for the sale of all assets of the Gilmour Company, a manufacturer of lawn and garden equipment, to R. M. Smith, Inc. ("Smith"). At the request of Gilmour, the transaction was changed to a sale of all Gilmour Company stock for a total price of $3,780,550. The agreement did not include identification of the individual values of the assets being transferred. Payment for the stock was as follows: cash in the amount of $780,550; a promissory note for $300,000 at 71/2 percent; and an installment note for $2,700,000 at 4 percent. Smith also assumed existing liabilities of Gilmour Company which, by the time of liquidation, totalled $272,180.93. Although the transfer was effective as of

February 1, 1970, the transaction was not consummated until March 24, 1970. Within a week, Gilmour Co. was liquidated with Smith retaining the assets. After the liquidation, Smith continued to use the trade names, trademarks, and customer lists of Gilmour Company.

Pursuant to section 334(b)(2) and the underlying Treasury regulations, Smith allocated the refined adjusted basis [1] in the stock to the assets received upon liquidation. Included in this allocation was $1,833,392.53 assigned to depreciable intangible assets, namely six patents and an unpatented invention. No allocation was made to nondepreciable intangible assets (E. g., goodwill) which Smith regarded as having no fair market value. In subsequent tax returns, Smith claimed deductions for the amortization of the patents and invention based on the amount assigned.

In reviewing Smith's tax return the Internal Revenue Service ("IRS") concluded that only one patent had any basis and that amounted to $10,000. Thus, the Commissioner viewed the amortization deductions as excessive and issued a notice of deficiency. Smith petitioned the tax court for review of this determination.

The primary issue at trial was the fair market value of the patents and the invention. [2] Each side presented an expert witness who employed the identical method of computing the values but used different variables resulting in substantially differing figures of values. [3] The tax court determined that although the identical method employed by the experts was appropriate, each had either overestimated or underestimated certain variables. The tax court fixed the correct valuation at $860,000, a sum between the figures proposed by the witnesses.

The tax court proceeded to find that Smith had failed to assign basis to nondepreciable intangible assets goodwill, trademark, trade name, and customer lists. The court determined that the value of these intangible assets must be equal to the total purchase price of the stock less the sum of the known values of all other assets. This is based on the assumption that the best evidence of the fair market value of all of the assets is the total price paid for the stock. The court thus determined that the goodwill was worth $1,225,697.41. No attempt was made to fix specific values to the individual components of this total as all are nondepreciable.

The net effect of the court's holdings is that approximately $1.23 million in basis previously assigned to depreciable intangible assets are now assigned to nondepreciable assets,

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

resulting in a reduction in allowable **\*251** depreciation and amortization deductions.

On appeal, Smith challenges the tax court determinations of the values of the patents and of the nondepreciable intangibles. We affirm.

## II. PATENTS AND INVENTION

In support of its assessment of the fair market value of the patents and invention, Smith presented two witnesses qualified to address this issue. Smith's president adopted a method of calculating this figure which the court found "wholly unacceptable" and refused to give weight to the testimony. However, the other witness, a financial appraiser, utilized an approach which the court found appropriate. His analysis yielded an aggregate fair market value for the six patents of $1,867,000.

The Commissioner presented one expert witness, a patent lawyer. The witness employed the same method as Smith's expert, but his gross value for the patents was only $424,647. [4]

The court found that correct valuation of the patents lay in between the two figures presented by the experts. Specifically, it found the royalty rates and projections of future sales used by Smith's expert to be overly optimistic and those variables applied by the IRS expert to be unduly pessimistic. The judge concluded:

> After giving careful consideration to testimony received, the valuation reports submitted, and the parties' arguments on brief, we have done the best we could to make a reasonable determination of the fair market value of the patents . . . . , and, using the same approach used by (both experts), have computed an aggregate amount of $745,000 . . . .

The court also found the unpatented invention to have a value of $115,000. Smith's expert set the figure at $130,000, as opposed to $10,000 by the IRS expert. (The value of this asset is not an issue on appeal.) Thus, the total value of the depreciable intangible assets was determined by the tax court to be $860,000.

[1]  Smith's contention on appeal attacks the appropriateness of the tax court assigning this value to the patents. Smith states that it had the burden of proving that the Commissioner's

determination of the gross values, which initially amounted to $10,000, was arbitrary. Having established that the calculation was in error, Smith was not required to prove the correct figure. The Commissioner had the burden of establishing the proper valuation and thus the actual tax owed. This much is an accurate statement of the law. Helvering v. Taylor, 293 U.S. 507, 55 S.Ct. 106, 79 L.Ed. 623 (1935); Federal National Bank v. Commissioner of Internal Revenue, 180 F.2d 494, 497 (10th Cir. 1950).

[2]   [3]   [4]   Where Smith's argument fails is in suggesting that the refusal of the tax court to accept the Commissioner's evidence requires this court to reverse the trial judge with instructions to expunge the deficiencies. The teaching of Helvering v. Taylor, supra, and Federal National Bank v. Commissioner of Internal Revenue, supra, is that the appropriate remedy in the absence of evidence of proper valuation is a remand to allow for additional evidence to be presented. In this case, however, sufficient evidence was introduced to allow the tax court to reach a reasonable conclusion. The court is not limited to simply choosing one of the two values proffered. It is appropriate for it to evaluate all of the evidence and to make an independent determination that does not necessarily accept the valuation of either party. This is not the first time the tax court has used this approach. See Philadelphia Steel & Iron Corp. v. Commissioner, 23 T.C.M. 558, 564-65 (1964), Aff'd per curiam, 344 F.2d 964 (3d Cir. 1965). The court's finding of fact with respect to valuation is to be reviewed under the clearly erroneous standard, **\*252** Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960), and in this case must be sustained.

## III. NONDEPRECIABLE INTANGIBLE ASSETS

### A. Is the Residual Value Method Appropriate for Determining the Value ofGoodwill in this Case?

[5]   According to Treasury Regulation 1.334-1(c)(4)(viii) (1978), the allocation of taxable basis to the assets received in a section 334(b)(2) transaction shall be made in proportion to the fair market value of the assets. Thus, before basis is allocated, a determination of fair market value of All of the assets must be made. Having found that Smith received assets not listed on its balance sheet (goodwill, trademark, trade name, and customer lists), the tax court proceeded to assess their worth.

[6]    Rather than attempting an independent appraisal of these intangible assets, the court held that their value could be ascertained by the residual valuation method. Simply put, this method assumes that the sum of the fair market values of all assets acquired equals the price paid for the acquisition of these assets. The formula is the price paid minus known

values of assets equals unknown values of the remaining assets. Because the only assets without known values are the nondepreciable intangible assets, this formula can be applied readily to this case and yield the following results:

| | |
|---|---|
| total consideration paid | |
| (price plus liabilities assumed) | $4,052,730.93 |
| less known fair market values of assets | |
| (as of date of liquidation) | -2,827,033.52 |
| fair market value of intangible assets | $1,225,697.41 |

The tax court also found that the evidence justifies allocating this sum to nondepreciable intangibles. Upon liquidation, Smith received an ongoing business that had been profitable for a number of years. It inherited a sound marketing program established in North and South America. It continued to use Gilmour Co.'s trade names which the tax court found were "well and favorably known to the users of lawn and garden equipment and promoted sales of these products."

Smith challenges the appropriateness of the utilization of the residual value method to the facts of this case. Smith presents basically two arguments in support of its contention.

First, Smith points out that two months elapsed between acquisition of the stock and liquidation of the corporation. During this time the value of the assets had to change as a result, for example, of normal appreciation and depreciation. If the value of the tangible assets decreased, then, by applying the residual value method (using total price paid on February 1 and the fair market value of assets on March 31), the assigned value to goodwill would be greater (and vice versa), even though the value of goodwill should remain constant. Although the argument is logically sound, the determination of fair market value, as a practical matter, is not an act of precision but only a matter of approximation. Minor fluctuations in asset values during the two months would be insignificant. Although proof of substantial variations would require adjustments in the resulting goodwill figure, this is not a sufficient reason for altogether abandoning the residual value method. In any event, no such proof was presented in this case.

Appellant's second argument is that the tax court permitted "the Commissioner to introduce as new matter residuary value goodwill after the record was closed" and, as a result, Smith was denied an opportunity to present testimony concerning goodwill. If true, this claim is significant.

As pointed out earlier, the theoretical underpinning of the residual value method is that the total price paid for the stock equals the sum of the fair market values of all of the underlying assets. Although this is a sound principle in economic theory, in reality it has its shortcomings. Specifically, it fails to take into account the common situation when one party to the transaction achieves a bargain. If the purchaser of the stock obtains a "good deal," then the residual value method would undervalue the **\*253** goodwill. If, on the other hand, the price paid is too high, then the computation will result in a correspondingly inflated goodwill figure. This problem does not require rejection of the residual value method price paid Is strongly probative, albeit not conclusive, of fair market value. However, it does suggest that the court consider evidence which would require alterations in the figure or abandonment of the formula altogether.

The cases applying the residual value method recognize this limitation. In Jack Daniel Distillery v. United States, 379 F.2d 569, 180 Ct.Cl. 308 (1967), the parties to the sale of stock had agreed to a value for goodwill after actively bargaining in good faith and settling on the value of the other assets. The court rejected an alternative computation for goodwill advocated by the IRS and used the residual method to confirm the figure agreed to by the parties. "The residuary method, though lacking in precision for use in all cases, may in

a proper case be accepted as the reasonable way to value goodwill." Id. at 579.

In Moss American, Inc. v. Commissioner, 33 T.C.M. 1121 (1974), the question was whether the price of the stock was equal to the fair market value of the underlying assets. The IRS argued that the aggregated fair market values exceeded the price by $12.5 million. However, the court concluded that the Commissioner's evidence was insufficient to treat the purchase of stock as a bargain purchase. "If such a purchase had, in fact, occurred, we would, of course, be faced with a different question and respondent's position would have merit." Id. at 1127-28.

In Plantation Patterns, Inc. v. Commissioner, 29 T.C.M. 817 (1970), Aff'd 462 F.2d 712 (5th Cir. 1972), and Philadelphia Steel & Iron Corp. v. Commissioner, supra, as in the cases above, the court allowed evidence demonstrating the inappropriateness of the residual method to be presented. Only after deciding that the evidence was unpersuasive did the court determine the value of goodwill by this formula. See also 10 Mertens, Law of Federal Income Taxation s 59.37 (residual method of valuing goodwill "should be followed with caution and in most cases the value of the goodwill should be supported by other collateral evidence").

[7]    The rule to be drawn from these cases is that the residual value method is an appropriate means for deriving the value of intangible assets as long as the total price paid and the values of all other assets are known. The resultant figure, however, is not to be deemed conclusive proof of the unknown value. Evidence suggesting that a fair deal was not reached should be permitted. When appropriate, adjustments should be made in the value assigned to the intangible assets, or a different basis for deriving the figure should be substituted. Collateral evidence supporting a goodwill valuation by the residual method also should be received.

It is evident that in this case the tax court found support for its conclusion that the residual method was appropriate. It considered carefully the evidence which proved that intangible assets of substantial value had been received by Smith upon liquidation. If, however, the court precluded Smith from presenting contrary evidence to show that the price paid was not equal to fair market value, then it committed error. Despite its protestations, our review of the record leads us to the conclusion that Smith did have the opportunity to present such evidence. At trial, Smith argued that any intangible assets received upon liquidation were of nominal value only. The tax court stated in its opinion:

And, although, petitioner steadfastly maintains that we should sustain its asserted valuation of the patents and invention, petitioner Belatedly argued that if we should decide that the fair market values of the patents and invention were of lesser amounts than petitioner has claimed, nevertheless, the value of the trademark and goodwill should not be determined under the residual method. Rather, petitioner urges, as best we can understand it, that a specific determination of the fair market value of the trademark and goodwill must be made . . . . (Emphasis supplied.)

*254  Thus, it appears that Smith anticipated the possibility that the court might find value for goodwill and it should have presented evidence on this point at

### trial. B. Did the Tax Court Calculate the Residual Value Goodwill Correctly?

Smith argues that the tax court erred in the starting point for the residual method the price paid for the stock. The form of payment for the stock was as follows:
1. $780,550 cash;

2. $300,000 promissory note at 71/2 percent for 3 years;

3. $2,700,000 installment note at 4 percent with no principal payments during first three years;

4. $272,180.92 liabilities assumed.

Smith contends that in determining the price paid, the $2,700,000 note should not have been assigned face value, but that it should have been discounted at its market value, $1,990,943. If this argument is accepted, then the resultant value of the intangible assets would be lower. This would mean that there would be a greater allocation of basis to the depreciable assets, and, thus, greater depreciation deductions. Smith, however, fails to discern the adjustment that then must be made to the $2,700,000 note when calculating the basis in the stock. If the adjustment is made in both places, then the net effect would be nil.

It appears that the difference of over $700,000 between the face value of the note and its asserted market value results from a decision by Smith and Gilmour to incorporate this economic or unstated interest into the principal part of the installment note. If the face value of the note did reflect its market value and the note carried a market rate of interest, then the $700,000 would have been included in interest payments on the note and would have been deductible by Smith. Of course, an equal amount would have to be treated as ordinary income by R. A. Gilmour. By including the sum in the principal portion of the note, the $700,000 becomes a capital gain to Gilmour. The question involving Smith's tax return is whether this amount should be allocated to basis spread among all of the assets received in liquidation allowing Smith to depreciate much of it, or whether it should be assigned to goodwill, a nondepreciable asset. We believe including it in goodwill is the appropriate result in this case.

[8]    [9]    Our independent research has failed to uncover a case which addresses the issue: under the residual method, in calculating the total purchase price for capital stock partially paid by a promissory note, should adjustments be made to the face value of the note when it is apparent from the low interest rate on the obligation that the face value does not equal the market value? The argument in favor of adjustment has intuitive appeal in that greater precision is being used to derive the fair market value of the unknown. However, the effect desired by the taxpayer (increase in bases of depreciable assets) only comes about because less precision is demanded in calculating the basis in the stock. The Internal Revenue Code, 26 U.S.C. s 483 (1976), and the underlying regulations, 26 C.F.R. ss 483.1-483.2 (1978), require that the treatment of notes for tax purposes be adjusted for unstated interest when the rate assigned is less than four percent. Because the interest rate of the note in question is four percent, no adjustment is required; nor do we believe one is necessary. We hold that both calculations should be made at face value. See Commissioner of Internal Revenue v. Danielson, 378 F.2d 771 (3d Cir. 1967). [5] Thus, the tax court did not err.

*255    [10]    The final contention made by Smith is that the tax court erroneously included in the total price paid for the stock the federal income tax liability ($59,766) of the acquired Gilmour Co. for the period between acquisition of the stock and liquidation of the corporation. By application of the residual value method, the increase in the price paid results in an increase in the value assigned to goodwill (see formula, Supra at 252). As noted earlier, an increase in the amount treated as goodwill results in a lower allocation of basis to depreciable assets. Because the tax court was attempting to derive the value of goodwill as of the date of acquisition, the inclusion of the subsequent tax liability in total price paid is inappropriate. The interim income tax liability in no way would increase the value of goodwill at the time of acquisition.

Reversal is unnecessary, however, because the tax court also erred in deducting from the total price paid the interim earnings of the Gilmour Co. ($109,700). The interim earnings flowed into the company after acquisition and became part of the value of the assets known (the subtrahend in the residual value formula). Increasing the subtrahend resulted in a reduction of the value assigned to goodwill. The events transpiring during the interim period could not have altered the value of goodwill as of the date of acquisition and again should not have been included in applying the residual value formula. The amount of interim earnings exceeded the interim income tax liability and more than offset the error claimed by the taxpayer. The IRS has not appealed this error in favor of the taxpayer, and thus, the tax court's judgment need not be disturbed.

## IV. CONCLUSION

We perceive no reversible error by the tax court and its decision will be affirmed. Costs to be taxed against the appellant.

**Parallel Citations**

43 A.F.T.R.2d 79-526, 79-1 USTC P 9179

Footnotes

1    "Refined adjusted basis" is a term adopted by the tax court referring to basis that has gone through two adjustments.

2    Prior to trial the parties agreed to the fair market value of all the tangible assets received by Smith upon liquidation.

3    The president of Smith, Robert M. Smith, also testified on this issue; however, his testimony was discredited by the trial judge.

4    The Commissioner abandoned his original position that the total value of these assets was $10,000.

**R. M. Smith, Inc. v. C. I. R., 591 F.2d 248 (1979)**

43 A.F.T.R.2d 79-526, 79-1 USTC P 9179

5    It seems incongruous for the court to approve as large a sum as $1,225,697.41 for the goodwill of a manufacturing concern whose gross revenue only approximates $2,000,000 per annum. This allocation, however, was the direct result of the amount fixed in the installment note by the parties to the sale and purchase. Smith's president was a practicing accountant fully familiar with the affairs of the Gilmour Company, having been its accountant. He should have recognized the possibility that this result might flow from the agreement. When the parties themselves have deliberately fixed the values to be placed on the elements of a transaction, they are bound to accept the Commissioner's construction of these values, unless they can prove mistake, undue influence, fraud, or duress. Commissioner of Internal Revenue v. Danielson, 378 F.2d 771, 775 (3d Cir. 1967).

---

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 77

2005 CarswellNS 27, 2005 NSCA 12, 18 C.C.L.I. (4th) 204, 230 N.S.R. (2d) 132, 729 A.P.R. 132, 249 D.L.R. (4th) 628, 136 A.C.W.S. (3d) 744



2005 CarswellNS 27, 2005 NSCA 12, 18 C.C.L.I. (4th) 204, 230 N.S.R. (2d) 132, 729 A.P.R. 132, 249 D.L.R. (4th) 628, 136 A.C.W.S. (3d) 744

Ryan v. Sun Life Assurance Co. of Canada

Leslie Susan Ryan (Appellant / Respondent by Cross-Appeal) v. Sun Life Assurance Company of Canada (Respondent / Appellant by Cross-Appeal)

Nova Scotia Court of Appeal

Cromwell, Freeman, Oland JJ.A.

Heard: November 17, 2004
Judgment: January 27, 2005
Docket: C.A. 220129

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Proceedings: affirming *Ryan v. Sun Life Assurance Co. of Canada* (2003), 2003 NSSC 247, 2003 CarswellNS 455, 7 C.C.L.I. (4th) 111, 219 N.S.R. (2d) 329, 692 A.P.R. 329 (N.S. S.C.)

Counsel: W. Augustus Richardson for Appellant

Douglas Lutz for Respondent

Subject: Insurance; Contracts

Insurance --- Contract of indemnity — Subrogation — Right of insurer

Insured was enrolled in employer's compulsory group disability insurance plan — Insured was involved in motor vehicle accident and suffered significant injuries resulting in chronic pain syndrome — Insured brought civil action for damages against other motorist which resulted in all-inclusive settlement of $350,000 — It was understood that part of this settlement reflected claim for wage loss but there was no allocation of settlement figure into various heads of damage — Group disability insurer, relying on subrogation clause in policy, sought to offset money received by applicant from lawsuit against disability benefits payable to insured — Insured brought application for order determining applicability, meaning and scope of subrogation clause — Subrogation clause was in effect and was binding on insured — Subrogation clause was not ambiguous and did not limit insurer's recovery to only that part of settlement attributed to past loss of income — If insured was unable to establish what part of settlement related to income compensation or if insurer, acting in good faith, did not accept that figure, insurer was entitled under terms of subrogation clause to recover reasonable amount for loss of earnings from general damage award — Insured appealed, submitting that chambers judge erred in finding that subrogation clause applied to her claim — Insurer cross-appealed, submitting that clause permitted subrogation against

2005 CarswellNS 27, 2005 NSCA 12, 18 C.C.L.I. (4th) 204, 230 N.S.R. (2d) 132, 729 A.P.R. 132, 249 D.L.R. (4th) 628, 136 A.C.W.S. (3d) 744

75 per cent of total settlement proceeds less costs and with respect to benefits actually paid or payable under policy — Appeal dismissed — Cross-appeal dismissed — Standard of review is correctness — Insured submitted that subrogation clause did not apply to her claim because it was negotiated and agreed to after date of her accident — Policy provides that it may be modified by mutual agreement of policy holder, who is Her Majesty the Queen in Right of Canada represented by President of Treasury Board, and insurer — Chambers judge was correct to limit insurer's right to reimbursement to part of settlement proceeds which insured could show was fairly attributable to damages for income loss, past or future — Insurer cannot seek reimbursement for benefits accruing to insured after she received her settlement proceeds — Insurer's right to reimbursement or set-off did not extend to benefits that accrue in future, but only to benefits paid or found to have been payable.

**Cases considered by *Cromwell J.A.*:**

*Andrews v. Grand & Toy Alberta Ltd.* (1978), [1978] 2 S.C.R. 229, 3 C.C.L.T. 225, 83 D.L.R. (3d) 452, 19 N.R. 50, [1978] 1 W.W.R. 577, 8 A.R. 182, 1978 CarswellAlta 214, 1978 CarswellAlta 295 (S.C.C.) — followed

*British Transport Commission v. Gourley* (1955), [1956] A.C. 185 (U.K. H.L.) — followed

*Chilton v. Co-operators General Insurance Co.* (1997), 41 C.C.L.I. (2d) 35, 32 O.R. (3d) 161, 97 O.A.C. 369, 143 D.L.R. (4th) 647, [1997] I.L.R. I-3423, 1997 CarswellOnt 360 (Ont. C.A.) — followed

*Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.* (1979), *(sub nom. Exportations Consolidated-Bathurst Ltée c. Mutual Boiler & Machinery Insurance Co.)* [1980] 1 S.C.R. 888, 112 D.L.R. (3d) 49, 32 N.R. 488, [1980] I.L.R. 1-1176, 1979 CarswellQue 157, 1979 CarswellQue 157F (S.C.C.) — followed

*Eli Lilly & Co. v. Novopharm Ltd.* (1998), 227 N.R. 201, 1998 CarswellNat 1061, 1998 CarswellNat 1062, 161 D.L.R. (4th) 1, [1998] 2 S.C.R. 129, 152 F.T.R. 160 (note), 80 C.P.R. (3d) 321 (S.C.C.) — followed

*Housen v. Nikolaisen* (2002), 2002 SCC 33, 2002 CarswellSask 178, 2002 CarswellSask 179, 286 N.R. 1, 10 C.C.L.T. (3d) 157, 211 D.L.R. (4th) 577, [2002] 7 W.W.R. 1, 219 Sask. R. 1, 272 W.A.C. 1, 30 M.P.L.R. (3d) 1, [2002] 2 S.C.R. 235 (S.C.C.) — followed

*MacIsaac v. Deveaux* (2004), 11 C.C.L.I. (4th) 1, 224 N.S.R. (2d) 315, 2004 NSCA 87, 2004 CarswellNS 257 (N.S. C.A.) — followed

*Maritime Life Assurance Co. v. Mullenix* (1986), 76 N.S.R. (2d) 118, 189 A.P.R. 118, 23 C.C.L.I. 248, [1987] I.L.R. 1-2190, 1986 CarswellNS 102 (N.S. T.D.) — distinguished

*Melanson v. Co-operators General Insurance Co.* (1996), [1997] I.L.R. I-3383, 183 N.B.R. (2d) 1, 465 A.P.R. 1, 1996 CarswellNB 364 (N.B. Q.B.) — distinguished

*Melanson v. Co-operators General Insurance Co.* (1997), 1997 CarswellNB 357, *(sub nom. Co-operators General Insurance Co. v. Melanson)* [1998] I.L.R. I-3505, 46 C.C.L.I. (2d) 211, 192 N.B.R. (2d) 273, 489 A.P.R. 273 (N.B. C.A.) — referred to

*Melanson v. Co-operators General Insurance Co.* (1998), 196 N.B.R. (2d) 80 (note), 501 A.P.R. 80 (note), 227 N.R. 195 (note) (S.C.C.) — referred to

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 27, 2005 NSCA 12, 18 C.C.L.I. (4th) 204, 230 N.S.R. (2d) 132, 729 A.P.R. 132, 249 D.L.R. (4th) 628, 136 A.C.W.S. (3d) 744

*Nova Scotia Public Service Long Term Disability Plan (Trustees of) v. MacDonald* (1996), 38 C.C.L.I. (2d) 178, 153 N.S.R. (2d) 321, 450 A.P.R. 321, 1996 CarswellNS 358 (N.S. S.C.) — distinguished

*Reid Crowther & Partners Ltd. v. Simcoe & Erie General Insurance Co.* (1993), [1993] 2 W.W.R. 433, *(sub nom. Simcoe & Erie General Insurance Co. v. Reid Crowther & Partners Ltd.)* [1993] I.L.R. 1-2914, 13 C.C.L.I. (2d) 161, 83 Man. R. (2d) 81, 36 W.A.C. 81, 6 C.L.R. (2d) 161, [1993] 1 S.C.R. 252, 147 N.R. 44, 99 D.L.R. (4th) 741, 1993 CarswellMan 96, 1993 CarswellMan 343 (S.C.C.) — followed

*Sansalone v. Wawanesa Mutual Insurance Co.* (2000), 2000 CarswellBC 885, 2000 CarswellBC 886, *(sub nom. Non-Marine Underwriters, Lloyd's of London v. Scalera)* 2000 SCC 24, 75 B.C.L.R. (3d) 1, 18 C.C.L.I. (3d) 1, *(sub nom. Non-Marine Underwriters, Lloyd's of London v. Scalera)* 185 D.L.R. (4th) 1, 50 C.C.L.T. (2d) 1, [2000] 5 W.W.R. 465, *(sub nom. Non-Marine Underwriters, Lloyd's of London v. Scalera)* [2000] I.L.R. I-3810, *(sub nom. Scalera v. Lloyd's of London)* 253 N.R. 1, *(sub nom. Scalera v. Lloyd's of London)* 135 B.C.A.C. 161, *(sub nom. Scalera v. Lloyd's of London)* 221 W.A.C. 161, *(sub nom. Non-Marine Underwriters, Lloyd's of London v. Scalera)* [2000] 1 S.C.R. 551 (S.C.C.) — considered

APPEAL by insured and CROSS-APPEAL by insurer of judgment reported at *Ryan v. Sun Life Assurance Co. of Canada* (2003), 2003 NSSC 247, 2003 CarswellNS 455, 7 C.C.L.I. (4th) 111, 219 N.S.R. (2d) 329, 692 A.P.R. 329 (N.S. S.C.), with respect to interpretation of subrogation provisions in group disability insurance policy.

*Cromwell J.A.:*

**I. Introduction:**

1     This appeal requires us to interpret the subrogation provisions in a group disability insurance policy.

2     The appellant, Ms. Ryan, was disabled as a result of a motor vehicle accident. She received income replacement benefits based on her loss of earnings under a group disability insurance policy and, as well, a lump sum settlement of her damages claim against the other driver.

3     A dispute arose between Ms. Ryan and the respondent, Sun Life, the disability insurer. It concerned the insurer's right under a subrogation clause to be reimbursed out of Ms. Ryan's settlement proceeds for income replacement benefits that it had paid or might pay in the future. There are three main points in contention: whether the subrogation provisions apply to Ms. Ryan at all; if they do, what part of the settlement is available to the insurer for reimbursement; and does the right to reimbursement extend to benefits to be paid by the insurer in the future.

4     The dispute was taken before a Chambers judge in the Supreme Court. He decided that the insurer could seek reimbursement only from settlement proceeds fairly attributable to damages for income loss, whether past or future. He did not decide whether the insurer could seek reimbursement of benefits which might be payable to Ms. Ryan in the future.

5     Ms. Ryan appeals and the insurer cross-appeals.

6     In my view, both appeals should be dismissed. The judge was correct to limit the insurer's right to reimbursement to the part of the settlement proceeds which Ms. Ryan could show was fairly attributable to damages for income loss, past or future. I also conclude that the insurer cannot seek reimbursement for benefits accruing to Ms. Ryan after she received her settlement proceeds.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 27, 2005 NSCA 12, 18 C.C.L.I. (4th) 204, 230 N.S.R. (2d) 132, 729 A.P.R. 132, 249 D.L.R. (4th) 628, 136 A.C.W.S. (3d) 744

### II. Overview of Facts and Judicial History:

7      Ms. Ryan joined the federal public service in September of 1980. She was enrolled in the compulsory group insurance plan which provided income replacement benefits of 70% of her salary in the event she became disabled. The group policy was amended from time to time and the amendments included the addition of a sub-rogation clause.

8      In March of 1994, Ms. Ryan was injured in a motor vehicle accident and could not work. Effective in October, 1995, she received income replacement benefits under the group policy based on 70% of her salary. She also sued the other driver, claiming general and special damages. In late 2001, she settled that litigation for an all-inclusive amount of $350,000 which was not apportioned among her various heads of damage.

9      The group disability insurance contract was amended in May of 1994 (after Ms. Ryan's accident) to add a type of subrogation clause. It gave the insurer certain rights to be reimbursed out of the amount employees recovered from third parties and, as well, to set off against benefits, otherwise payable, amounts which the employee had received as a result of litigation or settlement with third parties. The contract provided that this amendment was to be effective from March 1, 1993.

10      Ms. Ryan and the insurer could not agree about the impact of this new clause on the insurer's rights to reimbursement out of the settlement proceeds. Ms. Ryan's position was (and is) that the clause does not apply to her at all because it was not agreed upon until after the accident which gave rise to the settlement: remember that while the clause was back-dated, it was agreed upon in May of 1994 while the accident had occurred in March. If the clause does apply, Ms. Ryan says there are two limits on the right to reimbursement: it applies only to the part of her settlement that is reasonably attributable to past income loss and only with respect to benefits actually paid up to the time of the settlement. The insurer's position was (and is) that the subrogation clause applies and that it permits the insurer to recover against 75% of the entire settlement proceeds (less legal fees) for past benefits paid and with respect to benefits which might become payable in the future.

11      Ms. Ryan brought an application before Davison, J. in Supreme Court Chambers for an interpretation of the subrogation clause. The clause provides:

Where benefits under this policy have been paid or may be payable to an Employee and the Employee has a right of action against a Third Party for recovery of loss of income which otherwise would have been earned by the Employee during the whole or any part of the period that benefits are paid, or may be payable, to the Employee under this policy,

1. any amount recovered by the Employee from the Third Party (including general damages, damages for loss of income, interest and legal costs, whether recovered through settlement or trial), less the Employee's legal costs expended for such recovery, shall be deemed to be the Employee's Net Recovery from the Third Party;

2. the Employee shall pay to Sun Life an amount equal to 75% of his/her Net Recovery from the Third Party (to a maximum of the amounts paid to the Employee under this policy), such percentage of his/her Net Recovery to be held in trust by the Employee for Sun Life until payment is made to Sun Life;

3. in the event that any benefits not paid to the Employee under this policy are subsequently determined to have been payable, Sun Life shall be entitled to set off against its liability for such benefits the

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 27, 2005 NSCA 12, 18 C.C.L.I. (4th) 204, 230 N.S.R. (2d) 132, 729 A.P.R. 132, 249 D.L.R. (4th) 628, 136 A.C.W.S. (3d) 744

amount the Employee would have been obliged to pay pursuant to subparagraph 2. hereof if such benefits had been paid to the Employee before the Employee obtained his/her recovery from the Third Party; ...

12      The Chambers judge held that (decision reported at (2003), 219 N.S.R. (2d) 329 (N.S. S.C.)):

1. The subrogation clause was not ambiguous (Reasons, paras. [36] and [52]);

2. It applies to that part of a settlement or judgment which can reasonably be attributed to a past or future income loss caused by the accident (Reasons, paras. [52] and [58]);

3. The burden of establishing which part of a settlement or judgment can reasonably be attributed to a past or future loss of income lies on the insured. (Reasons, para. [53]);

4. If the insured cannot discharge that burden, the insurer is entitled to set off the amount of its benefits against "a reasonable amount for loss of earnings" (Reasons, para. [58]) or "against the whole or part of the amount of settlement or judgment." (Order, para. (3)).

13      Ms. Ryan appeals, submitting that the judge erred in finding that the clause applies to her claim. Alternatively, she says that he erred in finding that the insurer could claim against the portion of her settlement relating to future income loss. The insurer cross-appeals, submitting that the clause permits subrogation against 75% of the total settlement proceeds (less costs) and with respect to benefits actually paid or payable under the policy.

## III. Issues:

14      The issues to be decided are these:

1. What is the applicable standard of review?

2. Does the right of subrogation apply to Ms. Ryan's claim?

3. If so, how should the subrogation clause be interpreted:

(a) Does the right of subrogation apply to the whole of the settlement proceeds?

(b) Does the right of subrogation relate to benefits paid to the date of settlement or also to future benefits to which Ms. Ryan becomes entitled?

## IV. Analysis:

### 1. Standard of Review:

15      The appeal relates to the judge's interpretation of a contract of insurance which is a question of law. The standard of review on that question is correctness: *Housen v. Nikolaisen*, [2002] 2 S.C.R. 235 (S.C.C.) at paras. 8 - 9.

### 2. Does the subrogation clause apply to Ms. Ryan?

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 27, 2005 NSCA 12, 18 C.C.L.I. (4th) 204, 230 N.S.R. (2d) 132, 729 A.P.R. 132, 249 D.L.R. (4th) 628, 136 A.C.W.S. (3d) 744

16    Ms. Ryan submits that the subrogation clause does not apply to her claim because it was negotiated and agreed to after the date of her accident. The insurer responds that the parties to the contract can, by agreement, stipulate its effective date and they did so, making the clause effective from March 1, 1993. The Chambers judge accepted the insurer's argument on this point and Ms. Ryan says he erred in doing so.

17    In my respectful view, the Chambers judge was right. The policy provides that it may be modified by the mutual agreement of the policy holder (who is Her Majesty the Queen in Right of Canada represented by the President of the Treasury Board) and the insurer. The changes and their effective date were so mutually agreed. Moreover, as the chambers judge stated, relying on J.A. Appleman and J. Appleman, *Insurance Law and Practice* (revised vol I, 1981) at section 44, page 119, the terms of the policy govern the effective date of coverage. Ms. Ryan has not advanced any authority to the contrary.

### 3. How should the subrogation clause be interpreted?

18    It is common ground that, if the subrogation clause applies, it at least permits reimbursement to the insurer of benefits it has paid to Ms. Ryan out of the portion of the settlement relating to past income loss. Ms. Ryan says that is the extent of the right, if it exists. The insurer claims that the right is much broader: it is entitled to reimbursement of all benefits paid or payable out of 75% of the net settlement.

19    The Chambers judge's interpretation resulted in a middle ground. As noted, he held that the insurer could claim against the settlement proceeds that relate to either past or future income loss. Although he adverted to the issue of whether the insurer's right was with respect to benefits actually paid or extended to benefits that would become payable, he did not resolve it.

20    Before turning to an analysis of the language of the policy, it will be helpful to set out the principles of interpretation relating to contracts of insurance. As McLachlin, J. (as she then was) said on behalf of the Court in *Reid Crowther & Partners Ltd. v. Simcoe & Erie General Insurance Co.*, [1993] 1 S.C.R. 252 (S.C.C.), at pp. 268-269, these principles include, but are not limited to: (1) the *contra proferentum* rule; (2) the principle that coverage provisions should be construed broadly and exclusion clauses narrowly; and (3) the desirability, at least where the policy is ambiguous, of giving effect to the reasonable expectations of the parties.

21    The first of these principles, the *contra proferentum* rule, was described by Iacobucci, J. in *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 (S.C.C.) at para. 53 as operating "to protect one party to a contract from deviously ambiguous or confusing drafting on the part of the other party, by interpreting any ambiguity against the drafting party." Its operation depends, therefore, on a finding of ambiguity in the language to be interpreted. Ambiguity in this context means that a term in the contract is reasonably capable of more than one meaning: see for example *Chilton v. Co-operators General Insurance Co.* (1997), 143 D.L.R. (4th) 647 (Ont. C.A.), at 654. The third principle, that the interpretation should give effect to the parties' reasonable expectations, is also engaged when the contract language is ambiguous: *Sansalone v. Wawanesa Mutual Insurance Co.*, [2000] 1 S.C.R. 551 (S.C.C.) at para. 71. (Like McLachlin, J. in *Reid Crowther* at p. 27 and Laskin, J.A. in *Chilton* at 657, I do not think it necessary to decide whether the principle may also apply where the language is not ambiguous.)

22    These principles, however, assume that the first step in any task of interpretation is to give effect to the parties' contractual intent determined by reference to the words they used in drafting the document, possibly read in light of the surrounding circumstances which were prevalent at the time: *Eli Lilly*, *supra* at para 54. It is in this context that the often quoted words of Estey, J. in *Consolidated Bathurst Export Ltd. v. Mutual Boiler &*

2005 CarswellNS 27, 2005 NSCA 12, 18 C.C.L.I. (4th) 204, 230 N.S.R. (2d) 132, 729 A.P.R. 132, 249 D.L.R. (4th) 628, 136 A.C.W.S. (3d) 744

*Machinery Insurance Co.* (1979), [1980] 1 S.C.R. 888 (S.C.C.), at 901 should be understood:

> Even apart from the doctrine of *contra proferentem* as it may be applied in the construction of contracts, the normal rules of construction lead a court to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract. Consequently, literal meaning should not be applied where to do so would bring about an unrealistic result or a result which would not be contemplated in the commercial atmosphere in which the insurance was contracted. Where words may bear two constructions, the more reasonable one, that which produces a fair result, must certainly be taken as the interpretation which would promote the intention of the parties. Similarly, an interpretation which defeats the intentions of the parties and their objective in entering into the commercial transaction in the first place should be discarded in favour of an interpretation ... which promotes a sensible commercial result.

23    As Iacobucci, J. pointed out at para. 56 of *Eli Lilly*, where there is no ambiguity in the wording of the document, the *Consolidated-Bathurst* principle favouring the interpretation which produces a "fair result" or a "sensible commercial result" is not determinative. While it would be absurd to adopt an interpretation which is inconsistent with the commercial interests of the parties, it should be presumed that the parties intended the legal consequences of their words. Evidence of their subjective intent should be resorted to only in cases of ambiguity: paras. 54 - 55.

24    I mention this because the parties and the Chambers judge referred to evidence concerning the exchange of drafts and correspondence between the parties relating to this new subrogation clause. While there can be little doubt from a review of this material that the insurer's objective in advancing the language which was subsequently adopted was to give it the right to share in all types of damages, the issue is not what the insurer intended. Rather, as Iacobucci, J. emphasized in *Eli Lilly*, the question is what was the contractual intent of the parties. This is to be determined from the words they used in light of the surrounding circumstances. Evidence of the subjective intent of one of the parties has no independent place in this endeavour; it is unnecessary to consider any extrinsic evidence at all when the document is clear and unambiguous: *Eli Lilly* at paras. 54 - 55.

25    While I have reviewed all of the evidence in relation to the various drafts and exchanges leading up to the adoption of the subrogation clause, I have not found it necessary to rely on it. In my view, the words agreed upon, read in context, are not ambiguous and evidence of the subjective intention of the insurer is not necessary for, or helpful to, the task of interpretation.

26    It is also fundamental to the task of interpretation that the words must be understood in the context in which they are used. Saunders, J.A. in *MacIsaac v. Deveaux* (2004), 224 N.S.R. (2d) 315, [2004] N.S.J. No. 250 (N.S. C.A.), at paras. 60 - 62 stated that "... particular words and phrases should not be lifted from the context and considered in isolation ..." but must be considered in the "...context, scheme and objectives ..." of the entire contract. He referred to *Liability Insurance Law in Canada*, 3rd ed. (Toronto: Butterworths, 2001) where the author Gordon Hilliker states at pages 27-28:

> The requirement that words are to be construed in accordance with their plain, ordinary and popular sense does not mean that one ignores the context in which the words are found. Rather, it is a cardinal rule that a contract of insurance should be considered in its entirety and be constructed liberally so as to give effect to the purpose in which it was written.

27    This is an especially important principle to bear in mind in this case. The clause uses two terms, "loss of

2005 CarswellNS 27, 2005 NSCA 12, 18 C.C.L.I. (4th) 204, 230 N.S.R. (2d) 132, 729 A.P.R. 132, 249 D.L.R. (4th) 628, 136 A.C.W.S. (3d) 744

income" and "general damages" which give rise to much of the interpretative difficulty. Both have a strict legal meaning, but are also used more loosely to describe different things in their "ordinary and popular sense." Their intended meaning may only be understood in light of the legal context from which the terms are adopted and the particular context in which they are used. Before turning to a detailed review of the text of the clause, it will be helpful to set out briefly the legal context of these two critical and, in this case, problematic terms.

28      We are concerned here with reimbursement out of a judgment or settlement of the employee's personal injury action. The disabled employee will often have a claim for both pecuniary and non-pecuniary losses. The pecuniary losses include those actually experienced to the date of trial or settlement, such as lost earnings, expenses for care and out of pocket expenses. The pecuniary losses also include losses which will likely be suffered after the date of settlement or trial into the future, such as earnings that will not be obtained because of the disability and the cost of care required in the future. The non-pecuniary losses relate primarily to pain and suffering and the loss of amenities and expectation of life, both up to the date of trial or settlement and into the future.

29      In strict legal language in the context of personal injury cases, pecuniary losses suffered to the date of trial or settlement are referred to as "special damages": see S. M. Waddams, *The Law of Damages*, looseleaf (Toronto, Canada Law Book Ltd., 1991) at para. 3.340. Losses likely to be suffered after that date are referred to as "general damages."

30      Technically, therefore, the term "general damages" refers to compensation for two types of losses: future pecuniary loss — such as the cost of future care and the loss of earning capacity — as well as all non-pecuniary loss: see K. Cooper-Stevenson and Iwan Saunders, *Personal Injury Damages in Canada* ( Toronto: Carswell, 1996) at 93. That this is the correct legal meaning of the term general damages in the personal injury context is confirmed by leading cases both here and in England: *Andrews v. Grand & Toy Alberta Ltd.*, [1978] 2 S.C.R. 229 (S.C.C.) *per* Dickson, J. (as he then was) at 235-236; *British Transport Commission v. Gourley (1955)*, [1956] A.C. 185 (U.K. H.L.) *per* Lord Goddard at 206.

31      However, lawyers and others knowledgeable about personal injury claims do not always use the term general damages in its strict, legal meaning. The sense of the term depends on the context in which it is used. For example, in everyday conversation among lawyers about personal injury cases, the term "general damages" (or "generals") is often used to refer only to damages for non-pecuniary loss, that is for pain and suffering and the loss of amenities and expectation of life. However, that is not a precise use of the term or the only use of it in common parlance among lawyers. The other common use of the term occurs where it is necessary to differentiate claims for loss of earnings up to the date of trial and claims for earnings to be lost in the future.

32      In personal injury damage assessment, income loss to the point of trial or settlement is conceptually distinct from the anticipated loss of income to occur in the future. The former, as noted, is an item of special damages while the latter is an item of general damages. But the anticipated loss of income in the future is viewed as the loss of a capital asset — the present loss of the capacity to earn income in the future: see e.g., *Andrews* at page 251; Waddams at para. 3.710. However, in common parlance among lawyers, the term loss of income may be used somewhat loosely to refer to both past and future losses. In a discussion of a loss of income claim, it would be quite usual for lawyers to differentiate between the special damages — that is the past loss of income to the date of judgment or settlement and the general damages — that is the loss of earning capacity into the future.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 27, 2005 NSCA 12, 18 C.C.L.I. (4th) 204, 230 N.S.R. (2d) 132, 729 A.P.R. 132, 249 D.L.R. (4th) 628, 136 A.C.W.S. (3d) 744

33      So, while the term general damages has a strict legal meaning which includes damages for future pecuniary losses as well as all non-pecuniary losses, lawyers often use the term somewhat loosely to refer only to one or the other of these types of damages depending on the context. Similarly, the term loss of earnings strictly means the special damages claimed for income lost up to the date of trial or settlement. But in common parlance among lawyers, the term may be used, depending on the context, to refer to both past and future claims. Therefore, in interpreting the terms "general damages" and "loss of income", one must pay close attention to the context in which the terms are used.

34      I turn then to the text of the clause. There are two main issues of interpretation in this case: what goes into the "reimbursement pot" and what may be included in the reimbursement claim. The first concerns how much of the settlement is potentially available to the insurer for reimbursement. The second concerns what benefits may be the subject of the insurer's claim for reimbursement out of the settlement proceeds. I will address each in turn.

*(a) Does the right of subrogation apply to the whole of the settlement proceeds?*

35      I would first note that the subrogation clause here is limited to reimbursement. Unlike many other subrogation clauses, this one does not give the insurer a right to bring an action in the name of the insured. It is, as counsel for the insurer submitted in Chambers, in the nature of a reimbursement clause rather than a traditional subrogation clause.

36      The clause opens with a statement of two conditions. In order for the insurer to seek reimbursement, these two conditions must be present. They are:

> 1. Benefits under the policy "have been paid or may be payable to an Employee". There is no doubt this condition is satisfied.

> 2. The employee "has a right of action against a Third Party <u>for recovery of loss of income which otherwise would have been earned by the Employee during the whole or any part of the period that benefits are paid, or may be payable,</u> to the Employee under this policy."

(Emphasis added)

37      Critical aspects of context are found in the second condition, one relating to the nature of the employee's right of action and the second helping to explain the meaning of the term "loss of income".

38      The condition does not refer to an employee's right to claim damages in general. Instead, it refers specifically to the employee's right of action "for recovery of loss of income ." This is important because, in subsequent paragraphs, the clause defines the fund available to the insurer for reimbursement of benefits in terms of the employee's "recovery" in relation to his or her right of action. But the right of action described in this condition is expressly stated to be a right of action for recovery of loss of income. This suggests that the fund available to the insured for reimbursement does not include all the damages recovered by the employee from the third party, but rather only the damages received on account of loss of income. That is the "right of action" which gives rise to the "recovery" and the fund is later defined in terms of that recovery.

39      A second important contextual consideration helps explain the meaning of the term "loss of income" as it is used in this condition. As noted earlier, this term technically refers to income lost to the point of trial or settle-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 27, 2005 NSCA 12, 18 C.C.L.I. (4th) 204, 230 N.S.R. (2d) 132, 729 A.P.R. 132, 249 D.L.R. (4th)
628, 136 A.C.W.S. (3d) 744

ment, but is also sometimes used more loosely to refer to all kinds of loss of income, past and future. The context here makes it clear that this looser meaning is the one intended in this condition. The full phrase in which the term appears is: "recovery of loss of income <u>which otherwise would have been earned by the Employee during the whole or any part of the period that benefits are paid. ...</u>" (Emphasis added) Benefits will be paid into the future so long as the disability lasts. It follows that the "income which otherwise would have been earned" during that period obviously includes income that would have been earned in the future but for the continuing disability. This, in my view, makes it clear that the words "loss of income" in the second condition refer not only to wages actually lost up to the time of settlement, but also to recovery on account of any loss of income during any period for which benefits are paid, a period which could well extend into the future. In other words, read in the context of the entire phrase, the term "loss of income" must be understood here as referring to recovery on account of both past and future income loss.

40    After setting out these two conditions, the clause goes on to do three more things: to set out a definition of the employee's "net recovery", to establish the insurer's rights of reimbursement from that net recovery; and, to address the situation in which benefits that were not paid initially are subsequently found to have been payable. The first two of these elements are most relevant to the task at hand.

41    The language defining net recovery is this:

any amount recovered by the employee from the Third Party (including general damages, damages for loss for income, interest and legal costs, whether recovered through settlement or trial), less the Employee's legal costs expended for such recovery, shall be deemed to be the Employee's Net Recovery from the Third Party;

42    The question is this: what damages recovered from the third party are included in the definition of the employee's net recovery. The insurer's position is that it includes all damages recovered, including damages for pain and suffering and loss of enjoyment of life and potentially even special damages unrelated to income loss. The insurer points to the expansive language of the definition. The words used are "any amount recovered." This is followed by a non-exhaustive list of inclusions — general damages, damages for loss of income, interest and legal costs — which tends to reinforce the breadth of the intention. The use of the term "general damages" is relied on as evidencing a clear intention not to limit the fund to damages on account of income loss.

43    Ms. Ryan says that the definition includes only the recovery in relation to past income loss to the time of settlement or judgment. She says that the clause is ambiguous and that the interpretation advanced by the insurer leads to absurd results: it permits the insurer to be reimbursed out of settlement proceeds that have nothing to do with the payments made by the insurer. As Mr. Richardson put it on behalf of Ms. Ryan, she has to pay the insurer out of her own pocket. This, he submits, cannot have been the parties' intention and that we should apply the principle that where there are two possible constructions, the one which promotes their true intention should be adopted.

44    The Chamber's judge did not accept the interpretation advanced by either party. As noted, he found that the recovery included only the amounts which could be reasonably attributed to loss of past and future income.

45    It is true that broad words — "any amount recovered by the Employee from the Third Party" — are used to define the fund from which the insurer may seek reimbursement. However, these words must be read in the context of the clause as a whole and particularly the earlier stated conditions which give rise to the right to reimbursement. As discussed earlier, those conditions refer to the employee having a right of action against a Third Party "... for recovery of loss of income ...". Thus, the words "any amount recovered" following on from that

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 27, 2005 NSCA 12, 18 C.C.L.I. (4th) 204, 230 N.S.R. (2d) 132, 729 A.P.R. 132, 249 D.L.R. (4th) 628, 136 A.C.W.S. (3d) 744

statement of entitlement to reimbursement must be understood as relating back to a recovery with respect to that "right of action ... for recovery of loss of income... ." In other words, the recovery on the employee's right of action relates to the right of action which gives rise to that recovery. The right of action, and therefore the recovery, are defined as relating to "loss of income."

46       The reference to general damages in the list of inclusions in the net recovery could be taken, as the insurer suggests, as a reference to damages for pain and suffering and loss of enjoyment of life. However, read in the context of the clause as a whole, I do not find that interpretation to be the most plausible.

47       The term general damages is used in this clause which is triggered where an employee has "... a right of action ... for recovery for loss of income ...". As noted, the clause then defines the fund — the "amount recovered" — out of which the insurer may seek reimbursement. This definition of the "amount recovered" refers back to the first condition for reimbursement — that the employee have a right of action for recovery of loss of income. The amount recovered must be understood in the context of the right of action — that is, a right of action for loss of income — which gives rise to the recovery. That context strongly suggests that the term general damages, which is used to clarify the amount of the recovery, should be understood as referring to the right of action for loss of income which gives rise to the recovery. This, in turn, strongly suggests that the term "general damages" is used to refer to general damages relating to loss of income, that is to future pecuniary loss. That is one of the types of compensation included in the strict meaning of the broad term "general damages" and an appropriate term to use in order to differentiate between damages for past income loss and loss of future earning capacity.

48       The rest of the clause confirms this interpretation. The next item after "general damages" in the list of inclusions within the term "amount recovered" is "damages for loss of income." This appears to be a reference to compensation for past loss of income, as compensation for the loss of future income would better be described as relating to loss of earning capacity. The other inclusions are interest and costs. Thus, consistent with the condition that the employee have a right of action for recovery of loss of income, the inclusions make it clear that both past income loss ("damages for loss of income") and loss of future earning capacity ("general damages") are included.

49       The term "loss of income" in this clause is not modified or explained as it is in the condition discussed earlier. It is sensible that in this clause defining the employee's net recovery, the term loss of income would be used more strictly to refer to past loss of income and in order to contrast those losses with the general damages for loss of earning capacity.

50       In summary, the clause, while not a model of precision, makes it clear that the net recovery consists of damages fairly attributable to income loss. However, and contrary to Ms. Ryan's position, the clause also makes it clear that damages for both past lost earnings and loss of earning capacity into the future are included. This interpretation in my view makes sense of all of the words used by the parties in the context in which they are used. It makes the definition of net recovery consistent with the condition triggering the right to reimbursement — the right of action for recovery of loss of income. It also avoids the harsh result of permitting the insurer to be reimbursed for payment of income replacement benefits out of damages which the employee recovered from a third party to compensate him or her for pain and suffering or to provide for the cost of future care.

51       Consistent with the conclusions of the Chambers judge, I would hold that the employee's net recovery under this clause consists of the portion of the settlement or award which the employee can show is fairly attrib-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 27, 2005 NSCA 12, 18 C.C.L.I. (4th) 204, 230 N.S.R. (2d) 132, 729 A.P.R. 132, 249 D.L.R. (4th) 628, 136 A.C.W.S. (3d) 744

utable to past income loss and loss of future earning capacity, interest and costs.

*(b) Does the right of subrogation relate to benefits paid to the date of settlement or also to future benefits to which Ms. Ryan becomes entitled?*

52    This issue is concerned primarily with paragraphs 2 and 3 in the clause. They read:

> 2. the Employee shall pay to Sun Life an amount equal to 75% of his/her Net Recovery from the Third Party (to a maximum of the amounts paid to the Employee under this policy), such percentage of his/her Net Recovery to be held in trust by the Employee for Sun Life until payment is made to Sun Life;

> 3. in the event that any benefits not paid to the Employee under this policy are subsequently determined to have been payable, Sun Life shall be entitled to set off against its liability for such benefits the amount the Employee would have been obliged to pay pursuant to subparagraph 2 hereof if such benefits had been paid to the Employee before the Employee obtained his/her recovery from the Third Party; ...

53    Paragraph 2 imposes an obligation on the employee to pay an amount from his or her recovery to the insurer. Paragraph 3 concerns the insurer's right to reduce its liability to pay benefits on account of the recovery received by the employee. The questions are what amounts does paragraph 2 require the employee to pay and what amounts does paragraph 3 entitle the insurer to set off against benefit payments?

54    The insurer contends that these paragraphs create an ongoing obligation on the employee to pay benefits received after the recovery and an ongoing right on the part of the insurer to set off proceeds of the recovery against future benefit payments. As expressed in its factum, the insurer says that paragraphs 2 and 3 entitle the insurer to be reimbursed (or to set off against benefits payable) with respect to benefits to which the employee will become entitled under the terms of the policy after the settlement of her claim against the third party tort feasor.

55    In my view, this is not an interpretation which the clause can reasonably bear.

56    Paragraph 2 does not support the insurer's position. It contemplates one payment by the employee to the insurer out of the recovery of the amount paid to the employee under the policy. The use of the past tense — paid — to describe the amount of benefits to be repaid suggests that there is no obligation to reimburse the insurer for payments to be made in the future, that is, after the date of reimbursement.

57    Nor does the right of set off in paragraph 3 support the insurer's position. The insurer's right of set off arises on the condition set out at the beginning of the paragraph: that "... any benefits not paid ... are subsequently determined to have been payable." The relevant time to judge whether the benefit was or was not paid is the time the employee receives the recovery. The paragraph requires that the amount of the set off is to be determined as if the benefits that were not paid, but are subsequently determined to have been payable, "... had been paid ... before the Employee obtained his/her recovery ... ." Therefore, paragraph 3 deals with the situation in which two things have occurred: first, benefits to which the employee was entitled had not been paid by the time of recovery; and second, after the employee has obtained his or her recovery, those benefits which ought to have been, but were not paid before the employee received the recovery are determined after the recovery to have been payable.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2005 CarswellNS 27, 2005 NSCA 12, 18 C.C.L.I. (4th) 204, 230 N.S.R. (2d) 132, 729 A.P.R. 132, 249 D.L.R. (4th) 628, 136 A.C.W.S. (3d) 744

58    Thus, the paragraph cannot reasonably be interpreted as addressing benefits which relate to a time after the recovery or reimbursement. The use of the language of benefits "not paid ... but subsequently determined to have been payable" is inconsistent with any such intention. That language can only refer to benefits which accrued in the past but were not paid and which were subsequently determined to <u>have been payable</u> before the settlement or reimbursement.

59    This interpretation is consistent with the paragraph's definition of the amount to which the right of set off applies. The paragraph provides that the amount which the insurer is entitled to set off is "... the amount the employee would have been obliged to pay [under paragraph 2] if such benefits [i.e., the benefits which had not been paid at the time of the employee's recovery but are thereafter determined to have been payable] <u>had been paid to the employee before the employee obtained his/her recovery</u> ... ." Thus, the focus of the clause is what benefits had been or ought to have been paid as of the date the employee received his or her recovery from the third party. The former amount — benefits actually paid to the date of recovery — is the subject of paragraph 2. The latter amount — benefits not paid by that date, but subsequently determined to have been payable as of that date — is the subject of paragraph 3. Neither paragraph deals with benefits accruing in the future.

60    The insurer relies on three cases, but none assists in my view. *Maritime Life Assurance Co. v. Mullenix* (1986), 76 N.S.R. (2d) 118 (N.S. T.D.); N.S.J. No. 479 concerned the equitable right to subrogation, not the interpretation of contractual language. As the insurer in the present case has emphasized, the insurer's rights here are entirely contractual and must be determined from the language used in the relevant provisions of the policy. *Mullenix* does not assist in that task. *Nova Scotia Public Service Long Term Disability Plan (Trustees of) v. MacDonald* (1996), 153 N.S.R. (2d) 321 (N.S. S.C.); N.S.J. 418 turned on the particular contractual language in that plan which has virtually nothing in common with the language in the insurer's group disability policy in issue here. Similarly, *Melanson v. Co-operators General Insurance Co.*, [1996] N.B.J. No. 381 (N.B. Q.B.); aff'd (N.B. C.A.); application for leave dismissed (1998) (S.C.C.) turned on the language of an endorsement which is not at all like the contractual language in issue here.

61    I would hold that the right to reimbursement or set off does not extend to benefits that accrue in the future, but only to benefits paid or found to have been payable as of the relevant time.

**V. Disposition:**

62    I would dismiss the appeal and the cross-appeal. As success is divided, I would make no order as to costs.

*Appeal dismissed; cross-appeal dismissed.*

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

# TAB 78

1992 CarswellOnt 633, 29 R.P.R. (2d) 60, 11 O.R. (3d) 744, 59 O.A.C. 191, 99 D.L.R. (4th) 153



1992 CarswellOnt 633, 29 R.P.R. (2d) 60, 11 O.R. (3d) 744, 59 O.A.C. 191, 99 D.L.R. (4th) 153

Scanlon v. Castlepoint Development Corp.

JOE F. SCANLON v. CASTLEPOINT DEVELOPMENT CORPORATION and BRAMALEA LIMITED

Ontario Court of Appeal

Morden A.C.J.O., Goodman and Robins JJ.A.

Heard: April 2-3, 1992
Judgment: December 17, 1992
Docket: Doc. CA C9007

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Counsel: *Dennis R. O'Connor*, for appellant Bramalea Limited.

*Angela M. Costigan*, for respondent.

*Derek A.J. D'Oliveira* and *Dennis M. O'Leary*, for intervenor Stanley Kopman.

*Joseph C. Goldenberg*, for Stella and Vito DiMauro, Rocco Mattucci, Anna Budahazy and Gordon Glavan, Carmen Alfano, Rose Weinberg, Mary Louise Neill, Max Pivetta and Jeff Bridge.

Subject: Property; Contracts

Sale of Land --- Agreement of purchase and sale — Interpretation of contract

Sale of Land --- Condominiums — Agreement of purchase and sale — Time of performance

Agreements of purchase and sale — Interpretation — Closing — Extension — Vendor's extension of closing date not constituting anticipatory breach of agreement — Extension being permitted under agreement — Agreement being valid and subsisting.

Condominiums — Sale — Completion — Vendor's unilateral extension of closing date being expressly permitted under agreement — Agreement being valid and subsisting.

Condominiums — Disclosure statement — Sufficiency — Respondent purchaser failing to objectively satisfy materiality tests respecting alleged deficiencies in disclosure statement.

The respondent purchaser entered into an agreement to purchase a condominium unit in a proposed 47-storey

1992 CarswellOnt 633, 29 R.P.R. (2d) 60, 11 O.R. (3d) 744, 59 O.A.C. 191, 99 D.L.R. (4th) 153

luxury condominium project. The project was subsequently sold to the appellant developer. The closing date specified in the agreement of purchase and sale was November 4, 1991, or as extended. Another clause provided that if the unit were substantially completed to permit occupancy on the closing date but the condominium description and declaration were not yet registered, the purchaser was obliged to occupy the unit on an interim occupancy basis. The closing date would then be extended to 20 days after written notice was given of condominium registration. The vendor was also permitted to extend the closing date where completion of the unit or the common elements was delayed.

The developer commenced construction in 1989 but due to various construction delays, individual unit closings could not take place as anticipated. The developer then unilaterally changed the purchaser's closing date from November 4, 1991, to September 14, 1992.

The purchaser successfully applied for a declaration that his agreement of purchase and sale was void on the basis that the developer's unilateral extension of the closing date constituted an anticipatory breach of the agreement of purchase and sale, and for a repayment of his deposits. The purchaser also argued that the developer failed to comply with s. 52(1) of the *Condominium Act* (Ont.) in not delivering to him an adequate disclosure statement and all material amendments. The developer appealed.

**Held:**

The appeal was allowed.

**Per Robins J.A. (Morden A.C.J.O. concurring)**

The agreement specifically provided for a lapse between the occupancy of the unit and the final closing date which served to accommodate the delay created by the statutory condominium registration process. The parties could not have reasonably expected that the developer was unconditionally guaranteeing that either full or substantial completion would occur in any eventuality on November 4, 1991. The agreement specifically provided that the closing date could be extended when completion of a purchaser's unit was delayed for various reasons, and took into account the practical reality of construction strikes and delays. The extension provision could not reasonably be interpreted to apply only to post-occupancy delays. To construe the provision in such a manner would be to render the clause substantially, if not totally, ineffective. The developer had not in any way acted in bad faith, nor could it be blamed for the delay in completion of the building.

**Per Goodman J.A. (dissenting in part)**

Where it is the intention of a vendor that it have the right to extend the date of substantial completion for a condominium unit, the vendor must set forth such a right clearly in the agreement of purchase and sale. Where a contract is ambiguous, the normal rules of interpretation may be supplemented by the application of the contra proferentem rule. In the context of the agreement as a whole, there existed an ambiguity with respect to the conditions under which the agreement could be extended. Accordingly, where contractual language may bear two constructions, that which produces the more reasonable and fair result is to be applied. An interpretation based on the contra proferentem rule would mean that the vendor was obliged to substantially complete the purchaser's unit by November 4, 1991, and that it could not unilaterally extend the closing date.

With respect to the alleged deficiencies in the disclosure statement, the onus was on the purchaser to prove objectively that had the information that was not disclosed or was inaccurately or insufficiently disclosed been

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1992 CarswellOnt 633, 29 R.P.R. (2d) 60, 11 O.R. (3d) 744, 59 O.A.C. 191, 99 D.L.R. (4th) 153

properly divulged in the disclosure statement at the time it was initially delivered to him, he would, as a reasonable purchaser, have regarded the information as sufficiently important to his decision to purchase the unit that he would not have proceeded with the transaction but would have rescinded the agreement prior to the expiration of the 10-day cooling-off period. The deficiencies noted by the purchaser were not sufficient to satisfy the onus required to be fulfilled to render the agreement void.

**Cases considered:**

*By Goodman J.A. (dissenting in part)*

*Abdool v. Somerset Place Developments of Georgetown Ltd.* (1991), 19 R.P.R. (2d) 229, 82 D.L.R. (4th) 50, 4 O.R. (3d) 280 (Gen. Div.), reversed (1992), 27 R.P.R. (2d) 157, 10 O.R. (3d) 120, 96 D.L.R. (4th) 449, 58 O.A.C. 176 (C.A.) — *considered*

*Abdool v. Somerset Place Developments of Georgetown Ltd.* (1992), 27 R.P.R. (2d) 157, 10 O.R. (3d) 120, 96 D.L.R. (4th) 449, 58 O.A.C. 176 (C.A.) — *referred to*

*Barchak Estate v. Anderson*, [1945] 1 W.W.R. 657, [1945] 2 D.L.R. 698 (Alta. C.A.) — *considered*

*Budinsky v. Breakers East Inc.* (1992), 23 R.P.R. (2d) 54, 6 O.R. (3d) 255, 87 D.L.R. (4th) 572 (Gen. Div.), reversed in part (sub nom. *Abdool v. Somerset Place Developments of Georgetown Ltd.*) (1992), 27 R.P.R. (2d) 157, 10 O.R. (3d) 120, 96 D.L.R. (4th) 449, 58 O.A.C. 176 (C.A.) — *considered*

*Budinsky v. Breakers East Inc.* (sub nom. *Abdool v. Somerset Place Developments of Georgetown Ltd.*) (1992), 27 R.P.R. (2d) 157, 10 O.R. (3d) 120, 96 D.L.R. (4th) 449, 58 O.A.C. 176 (C.A.) — *referred to*

*Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.* (1979), [1980] 1 S.C.R. 888, 32 N.R. 488, 112 D.L.R. (3d) 49, [1980] I.L.R. 1-1176 — *considered*

*Di Cecco v. 733725 Ontario Inc.* (December 21, 1990), Doc. 15280/90, Fedak J. (Ont. Gen. Div.), affirmed (May 21, 1991), Doc. CA 20/91 (Ont. C.A.) — *considered*

*Hillis Oil & Sales Ltd. v. Wynn's Canada Ltd.*, [1986] 1 S.C.R. 57, 65 N.R. 23, 71 N.S.R. (2d) 353, 171 A.P.R. 353, 25 D.L.R. (4th) 649 — *considered*

*Morris v. Cam-Nest Developments Ltd.* (1988), 49 R.P.R. 229, 64 O.R. (2d) 475, 50 D.L.R. (4th) 707 (H.C.) — *considered*

*By Robins J.A. (Morden A.C.J.O. concurring)*

*Albrecht v. Opemoco Inc.* (1991), 21 R.P.R. (2d) 68, 5 O.R. (3d) 385, 85 D.L.R. (4th) 289, 51 O.A.C. 261 (C.A.) — *considered*

*Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.* (1979), [1980] 1 S.C.R. 888, 32 N.R. 488, 112 D.L.R. (3d) 49, [1980] I.L.R. 1-1176 — *considered*

*Hillis Oil & Sales Ltd. v. Wynn's Canada Ltd.*, [1986] 1 S.C.R. 57, 65 N.R. 23, 71 N.S.R. (2d) 353, 171 A.P.R. 353, 25 D.L.R. (4th) 649 — *referred to*

*McClelland & Stewart Ltd. v. Mutual Life Assurance Co. of Canada*, [1981] 2 S.C.R. 6, 125 D.L.R. (3d)

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

257, [1981] I.L.R. 1-1393, 37 N.R. 190 — *referred to*

*Métropolitaine, Cie d'assurance-vie c. Frenette*, [1992] 1 S.C.R. 647, 4 C.C.L.I. (2d) 1, 134 N.R. 169, [1992] I.L.R. 1-2823, 89 D.L.R. (4th) 653, 46 Q.A.C. 161, [1992] R.R.A. 466 — *referred to*

*National Trust Co. v. Mead*, [1990] 2 S.C.R. 410, 12 R.P.R. (2d) 165, [1990] 5 W.W.R. 459, 71 D.L.R. (4th) 488, 112 N.R. 1, 87 Sask. R. 161 — *referred to*

*Reliance Petroleum Ltd. v. Stevenson*, [1956] S.C.R. 936, 5 D.L.R. (2d) 673 — *referred to*

**Statutes considered:**

Condominium Act, R.S.O. 1980, c. 84 [R.S.O. 1990, c. C.26] —

s. 51(6) [R.S.O. 1990, c. C.26, s. 51(6)]

s. 52 [R.S.O. 1990, c. C.26, s. 52]

s. 52(1) [R.S.O. 1990, c. C.26, s. 52(1)]

s. 52(6)(*c*) [R.S.O. 1990, c. C.26, s. 52(6)(*c*)]

s. 52(6)(*d*) [R.S.O. 1990, c. C.26, s. 52(6)(*d*)]

Condominium Act, R.S.O. 1990, c. C.26 —

s. 52

Vendors and Purchasers Act, R.S.O. 1990, c. V.2.

**Rules considered:**

Ontario, Rules of Civil Procedure.

Appeal from decision reported at (1991), 22 R.P.R. 211, 85 D.L.R. (4th) 443 (Ont. Gen. Div.), additional reasons at (1991), 22 R.P.R. (2d) 211 at 215, 86 D.L.R. (4th) 573 (Ont. Gen. Div.), declaring respondent's condominium agreement of purchase and sale null and void.

***Goodman J.A.*** **(dissenting in part):**

1    This is an appeal by Bramalea Limited ("Bramalea") from the decision of Austin J., reported in (1992), 85 D.L.R. (4th) 443, in which he held that the applicant, Joe F. Scanlon (the respondent herein), was entitled to a declaration that the agreement of purchase and sale of a condominium unit entered into between Castlepoint Development Corporation ("Castlepoint") and Scanlon on September 16, 1988 is null and void. He further held that Scanlon was entitled to a return of his deposit with interest.

**Terms of Agreement of Purchase and Sale of Condominium Unit**

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1992 CarswellOnt 633, 29 R.P.R. (2d) 60, 11 O.R. (3d) 744, 59 O.A.C. 191, 99 D.L.R. (4th) 153

2      By para. 2(a) of the agreement, the purchase price of the unit was stated to be $424,000. A deposit of $10,000 was payable as a deposit and an additional sum of $74,800 was payable in successive instalments of $32,400, $21,200 and $21,000 on dates specified in the agreement, the last of which was payable 365 days after the presentation of the offer by the purchaser and representing in total 20 per cent of the purchase price. All of these payments were duly made by Scanlon. He was to give back to the vendor a first mortgage for $318,000 (75 per cent of the purchase price) and, as provided by para. 2(a)(vi), to pay the balance of the price "on closing (or Occupancy Date, if applicable) which, when taken together with the deposits heretofore paid will be 25 % of the Purchase Price, subject to the adjustments hereinafter set forth."

3      The other relevant paragraphs contained in the agreement of purchase and sale read as follows:

1. The following definitions shall apply to this Agreement:

(a) "Act" means the Condominium Act, R.S.O. 1980, Chapter 84, and any amendments thereto.

(b) "Closing Date" or "Closing" means the 4th day of November, 1991 or as extended by Paragraph 13(d).

12. The transaction of purchase and sale is to be completed on the Closing Date.

13. If the Unit is substantially completed sufficient to permit occupancy on Closing, but the declaration and description have not been registered, then the Purchaser shall occupy the Unit on that date (the "Occupancy Date") on the following terms and conditions:

(a) the payment to the Vendor, of the balance of the Purchase Price set forth in this Agreement, but without adjustments;

(b) the payment of the Occupancy Fee, monthly, in advance, on the first day of each month, following Occupancy Date, with appropriate adjustments from Occupancy Date to the first of the month following, said monthly fee not to be credited as payment on account of the Purchase Price. The Purchaser agrees to provide to the Vendor on the Occupancy Date a series of 12 post-dated cheques for the monthly occupancy fees for the 12 months immediately following the Occupancy Date. The Purchaser acknowledges that the components of the occupancy fee are set out in s. 52(6) of the Act are subject to recalculation by the Vendor and may be increased at any time prior to Closing to the maximum permitted by s. 51(6) of the Act with any readjustments to be made 30 days after demand by the Vendor, with the final readjustment on Closing;

. . . . .

(d) the Closing Date shall be extended to a date 20 days after notice in writing is given by the Vendor's Solicitors to the Purchaser or his Solicitor that the declaration and description have been registered. If the Purchaser fails to close the transaction as aforesaid, through no fault of the Vendor, the Purchaser shall be in default hereunder, and shall be required to deliver vacant possession of the Unit. The Vendor shall in that event be entitled to retain all monies paid hereunder for damages and expenses and unpaid occupation charges. The Purchaser shall be responsible for the damages and expenses and the cost of redecorating as may be determined by the Vendor at its sole discretion as a result of the possession herein.

. . . . .

The Purchaser acknowledges and it is understood and agreed that the Purchaser shall not be entitled to ac-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1992 CarswellOnt 633, 29 R.P.R. (2d) 60, 11 O.R. (3d) 744, 59 O.A.C. 191, 99 D.L.R. (4th) 153

cess to the Unit prior to the Occupancy Date.

22. If the completion of the Unit or the common elements is delayed by reasons of strikes, lock-outs, fire, lightning, tempest, riot, war and unusual delay by common carriers or unavoidable casualties or by any other cause of any kind whatsoever whether or not beyond the control of the Vendor, the Vendor shall be permitted extensions of time from time to time for completion and the Closing Date shall be extended accordingly. If the Vendor is unable to complete the Unit and close this transaction within such extended time or times for closing, all monies paid hereunder by the Purchaser other than any occupancy fees, shall be returned to him and this Agreement shall be null and void. If the unit is substantially completed by the Vendor on or before Closing or any extension thereof as aforesaid, this transaction shall be completed on such date notwithstanding that the Vendor has not fully completed the Unit or the common elements and the Vendor shall complete such outstanding work within a reasonable time after Closing, having regard to weather conditions and the availability of labour and materials. In any event the Purchaser acknowledgesthat failure to complete the common elements on or beforeClosing shall not be deemed to be a failure to complete the Unit.

25. This offer when accepted shall constitute a binding contract of purchase and sale and time shall in all respects be of the essence hereof. It is agreed that there is no representation, warranty, collateral agreement or condition affecting this agreement or the real property or supported hereby other than as expressed herein in writing whether contained in any sales brochures or alleged to have been made by any sales representative or agents.

4        Scanlon discontinued the original application against Castlepoint on August 29, 1991 as Castlepoint had prior thereto assignedits interest in the agreement as vendor to Bramalea. Accordingly, Castlepoint is not a party to this appeal.

5        In the proceedings before Austin J., Scanlon relied on two grounds for the relief requested:

(1) That Bramalea had unilaterally purported to change the closing date set forth in the agreement of purchase and sale, thereby committing an anticipatory breach of contract which entitled him to terminate it.

(2) Castlepoint did not make the disclosure required by s. 52 of the *Condominium Act*, R.S.O. 1980, c.84, and as a result the agreement was not binding on him.

6        The relevant provisions of the agreement and the facts of the case will be set out in due course. It is sufficient to say at this time that Austin J. concluded in his reasons, in part, as follows [at p. 446]:

The closing was to be on November 4, 1991, and Bramalea's letter of May 31, 1991, changing the date, constituted an anticipatory breach of the agreement. The date of closing was a fundamental term. Scanlon was therefore entitled to treat the agreement as at an end. He is entitled to a declaration that the agreement is null and void.

In these circumstances it is not necessary to deal with the question of the adequacy of the disclosure made by Castlepoint.

7        In reaching this conclusion Austin J. found that para. 22 of the agreement conflicts with or is contradictory to paras. 12 and 1(b) thereof and that para. 13(d) did not apply in the circumstances. He also purported to ap-

1992 CarswellOnt 633, 29 R.P.R. (2d) 60, 11 O.R. (3d) 744, 59 O.A.C. 191, 99 D.L.R. (4th) 153

ply the contra proferentem principle to the interpretation of the agreement.

8      On this appeal Bramalea took the positions:

1.(a) That it was the intention of the parties under the agreement, read as a whole, to allow for reasonable extensions of time to complete units delayed by the practical realities of high-rise condominium development.

(b) That the exclusion of para. 22 under the contra proferentem rule would leave a gap in the agreement of purchase and sale inconsistent with the intentions and expectations of the vendor and purchaser.

2.(a) That a purchaser can avoid an agreement for the sale and purchase of a condominium unit where the inadequacy of a disclosure statement is so fundamental that a reasonable purchaser of the condominium would have exercised the right of rescission had the adequacy not existed, but no such fundamental inadequacy existed in this case.

(b) That if such a fundamental inadequacy existed it had been waived by the purchaser during the period when the contract was still executory.

9      The second position taken by Bramalea is not really a ground of appeal. Austin J. did not deal with it. Scanlon, as respondent, took the position that if Austin J. was in error with respect to the first ground, he was still entitled to the declaration by reason of the alleged inadequacy of the disclosure statement. It should be noted that this appeal was heard together with appeals in *Abdool v. Somerset Place Developments of Georgetown Ltd.* (1991), 4 O.R. (3d) 280 (Gen. Div.), and *Budinsky v. Breakers East Inc.* (1992), 6 O.R. (3d) 255 (Gen. Div.), in which extensive submissions were made with respect to the matter of adequacy of disclosure statements under the provisions of the *Condominium Act*. Reasons were released in those appeals on October 13, 1992 [reported at (1992), 10 O.R. (3d) 120 (C.A.)], and the principles set forth therein are applicable to this appeal. There is no need to repeat here the reasoning for the conclusions reached in those cases.

**Facts Relating to Bramalea Position on Extension of Time**

10      On September 6, 1988, Scanlon presented an offer to purchase the condominium unit in question to Castlepoint Development Corporation. Castlepoint accepted the offer on September 16, 1988. The agreement of purchase and sale created upon the acceptance was on a form prepared by Castlepoint, which company determined the stipulations contained therein. The condominium project comprised 504 dwelling units on 74 floors. The unit purchased by Scanlon is on the 37th floor of the building.

11      On December 22, 1988, Bramalea purchased the project from Castlepoint and received an assignment of Scanlon's purchase agreement. It commenced construction of the project in the month of February 1989. The date fixed for closing by the agreement (November 4, 1991), was approximately 37-1/2 months after acceptance of the offer.

12      On October 17, 1989, Scanlon executed two amendments to the purchase agreement with Bramalea. One amendment acknowledged receipt by him of revised floor plans of the unit and his consent to the changes. The other amendment confirmed the terms of the agreement and Bramalea agreed thereby to permit occupancy of the unit by a third party subject to the conditions set forth therein. The amendments were accepted by Bramalea on April 9, 1990.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1992 CarswellOnt 633, 29 R.P.R. (2d) 60, 11 O.R. (3d) 744, 59 O.A.C. 191, 99 D.L.R. (4th) 153

13      Scanlon duly made all of the payments by way of deposit and on account of the purchase price in accordance with the terms of the agreement.

14       On or about May 31, 1991, Bramalea notified Scanlon in writing on its letterhead that "your revised occupancy date will now be September 14, 1992." The notice did not indicate any reason for the postponement of the occupancy date. The notice reads as follows:

*RE: PALACE PLACE, SUITE 3709*

Dear Palace Place Purchaser:

We are pleased with the construction progress of Palace Place. Over the past two years, construction has continued at a steady pace with the concrete structure now reaching the 34th floor, the exterior wall windows now at the 18th floor, and the drywall complete to the 4th floor. In June, the installation of the ceramics and the kitchen cabinets are scheduled to commence, and by November 1991 we anticipate completion of the roof.

We have rescheduled your closing date to coincide with the new construction program. The first closings will now commence in January of 1992 and as a result, your revised occupancy date will now be September 14, 1992.

Prior to your occupancy date, a letter will be forwarded to you regarding the details of your move-in. (Inspection appointments, booking elevator times, etc.)

Please forward a copy of this letter to your Solicitor to advise him/her of your revised occupancy date. If you have not as yet informed Bramalea Limited of your Solicitor's name, address, and telephone number, please advise us in writing as soon as possible. For your convenience, our fax number is 487-2779.

In the meantime, should you have any further inquiries or if I can be of any assistance to you, please call me at 480-8442 or fax us a letter to 487-2779.

Sincerely,

BRAMALEA LIMITED

        (signed)

        Ellie Moore,

        Customer Relations Manager,

        Residential Group.

The revised occupancy date was more than four years after the date of presentation of the offer and if Bramalea's submission is valid, Scanlon was subject to further unilateral delays in that regard and also with respect to final closing of the transaction.

15      On August 7, 1991, Scanlon commenced his application under the *Vendors and Purchasers Act*, R.S.O.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1992 CarswellOnt 633, 29 R.P.R. (2d) 60, 11 O.R. (3d) 744, 59 O.A.C. 191, 99 D.L.R. (4th) 153

1990, c. V.2; the *Condominium Act*, R.S.O. 1990, c. C.26, as amended, and Regulations made pursuant thereto and under the *Rules of Civil Procedure* for a declaration that the agreement is null and void. The grounds for the application were stated to be that Bramalea had terminated the agreement of purchase and sale by its anticipatory breach of the agreement and that the declarant had failed to make proper disclosure as required by s. 52 of the *Condominium Act*. In an affidavit filed in the proceedings the Vice-President of Finance of Bramalea stated that Bramalea realized it could not complete the project by the date stipulated and that the notice was sent as soon as it realized the situation. It is commonground that the unit was not substantially completed sufficient to permit occupancy on November 4, 1991.

16      Paragraph 25 of the agreement stipulates that time shall in all respect be of the essence thereof. Paragraph1(b) defines "closing date" or "closing." It states that those words mean "the 4th day of November, 1991 or as extended by para. 13(d)." The words are clear and unequivocal in their meaning. If either of the parties to the agreement desire to extend the date it must be done in accordance with the provisions of para. 13(d).

17      It is perhaps unnecessary to say that if the unit had been completed and the declaration and description registered on or before November 4, 1991, both parties would have been obligated to complete the transaction on that date (see para. 12). The definition of closing date makes that conclusion quite clear. If a party to the contract takes the position that the "closing date" or "closing" is a date other than November 4, 1991, it is necessary to show that the provisions of para. 13 support such a claim.

18      As is the case with the wording of para. 1(b), the wording of para. 13 is clear and unambiguous. By applying the definition of "closing," the opening words of that para. would read, "If the unit is substantially completed sufficient to permit occupancy on the 4th day of November, 1991, but the declaration and description have not been registered, then the purchaser shall occupy the unit on that date (the 'Occupancy Date') on the following terms and conditions:."

19      On their face, the provisions of para. 13 can become operative only if the unit is substantially completed sufficient to permit occupancy on November 4, 1991. If that condition had been fulfilled, the declaration and the description not having been registered, November 4, 1991 would be converted from "closing date" to "occupancy date." Scanlon would have been obliged to pay the balance of 25 per cent of the purchase price in accordance with the provisions of para. 2(a)(vi) or face the penalties and damages set out in para. 2(b). In such event, the provisions of paras. 1(b) and 13(d) read together would provide for the extension of the closing date of November 4, 1991 to a later date determined in accordance with the provisions of para. 13(d). Paragraph 2(b) is solely for the benefit of the vendor and is of a Draconian nature insofar as the purchaser is concerned. It provides as follows:

> 2.(b) Failure by the Purchaser to pay any of the sums required by Paragraph2 hereof or of any post-dated cheque to be honoured, shall be a default entitling the Vendor in its sole discretion to terminate this Agreement and retain all sums theretofore paid by the Purchaser as a pre-estimate of liquidated damages and not as a penalty, but without prejudice to the Vendor's right to bring such further or other action as may be available to it as a result of such breach.

20      There is nothing in the wording of para. 13 which extends the time for substantial completion of the unit sufficient to permit occupancy beyond November 4, 1991 and it is clear that Scanlon did not consent to any such extension. It is also clear that Bramalea could not substantially complete the unit by that date and in effect advised Scanlon of that fact by its notice. In those circumstances Scanlon would be entitled to a declaration that he

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1992 CarswellOnt 633, 29 R.P.R. (2d) 60, 11 O.R. (3d) 744, 59 O.A.C. 191, 99 D.L.R. (4th) 153

was no longer bound by the agreement unless some other provision in the agreement entitled Bramalea to extend the occupancy date and closing date.

21      Bramalea relies on the provisions of para. 22 of the agreement of purchase and sale. It took the position that the contract must be read as a whole and that the provisions of para. 22 represent a modification of the provisions of 1(b) and 13 and do not conflict with them.

22      Specifically, Bramalea submitted that para. 13 converts "Closing Date" (pursuant to para. 1(b)) into "Occupancy Date" upon the unit being substantially completed and sufficient to permit occupancy on that date. At the date of such substantial completion (now "Occupancy Date"), Closing Date is redefined under para. 13(d) to be a date after registration of the condominium declaration and description. It then submitted that by para. 22 of the agreement the parties agreed that if substantial completion of the unit sufficient for occupancy purposes is delayed by the factors named therein (and occupancy is not possible on the closing date), closing date is extended to the date of actual completion, on which date para. 13 becomes operative and the extended closing date becomes the "Occupancy Date" pursuant to para. 13(d).

23      I am unable to agree with the second part of this submission. The provisions of para. 22 do not in any part thereof mention "substantial completion of the unit sufficient for occupancy purposes" being delayed by the factors named therein. Paragraph 22 speaks first of delay in "completion of the Unit or the common elements" by reasons of the factors named, permitting extension of time for completion and extension of the closing date. The unmodified use of the word "completion" in referring to a condominium unit connotes the performance of all the work necessary to fully construct the unit.

24      The agreement stipulates in para. 13(a) that Scanlon is obligated to occupy the unit and pay the balance due on closing without adjustments only upon substantial completion sufficient to permit occupancy. He cannot be compelled to close the transaction until the unit is fully completed and the declaration and description have been registered. If the purchaser has entered into occupation of the unit under para. 13 the vendor is obligated to complete the unit and register the declaration before the purchaser can be compelled to close the transaction. Scanlon takes the position that the first sentence of para. 22 refers to an extension of time for such final completion and an extended closing date if such completion is delayed by any of the factors mentioned and that it only becomes operative when a purchaser has entered into occupation after substantial completion in accordance with the provisions of para. 13.

25      He submitted that this interpretation is strengthened by the wording of para. 22 which provides that if the vendor is unable to complete the unit and close the transaction within the extended time or times for closing, all money paid by the purchaser *other than any occupancy fee* shall be returned to him. Since an occupancy fee is payable only after the purchaser has occupied the unit, pursuant to the provisions of para. 13(b), it is reasonable to interpret the words "completion of the unit" as referring to work required to bring the unit from a state of substantial completion sufficient to permit occupancy, to one of full completion.

26      I agree with these two submissions made by Scanlon.

27      It is to be noted that para. 22 of the agreement is an exculpatory paragraph insofar as the vendor is concerned. If the correct interpretation of the clause is that it becomes operative only if the unit is substantially completed sufficient to permit occupancy on November 4, 1991 but the closing has not taken place, the vendor cannot be held responsible for any delays in fully completing the unit or common elements if the delays have resulted from the stated causes, or any causes even if they were within the control of the vendor. In the absence

1992 CarswellOnt 633, 29 R.P.R. (2d) 60, 11 O.R. (3d) 744, 59 O.A.C. 191, 99 D.L.R. (4th) 153

of such clause the purchaser would be able to terminate the contract and claim for damages.

28     The last two sentences of para. 22 are also exculpatory. Scanlon submits that those sentences mean that, the agreement being then ongoing, which would require a previous occupation date and an extended closing date twenty days after notice to the vendor of the registration of the declaration and description, the vendor is entitled to compel the purchaser to complete the transaction even though there has been only substantial completion of the unit rather than full completion.

29     In effect, the position taken by Scanlon is that "substantial completion" as used here can only refer to a situation where the purchaserhas entered into occupation under para. 13. If the words "substantial completion" were interpreted to mean a state less than substantial completion sufficient to permit occupancy on closing, the provision would be a direct contradiction of para. 13, on which a purchaser is entitled to rely in determining the closing date. He cannot be compelled to close the transaction before the unit is substantially completed sufficient to permit occupancy. The words can only apply to a situation where the unit has reached a state of substantial completion sufficient to permit occupancy, the declaration and description have been registered but the unit is not yet fully completed.

30     In my opinion, the two sentences of para. 22 last considered relate to a situation where the purchaser has entered into occupation under para. 13, and the declaration and description have been registered enabling a vendor to establish an extended closing date and requiring the purchaser to complete the transaction although the unit is not fully completed. Substantial completion in this case would be a state at least equal to substantial completion sufficient to permit occupancy but less than full completion.

31     I am of the view that there is nothing in the agreement and other material filed to support the submission of Bramalea that the parties agreed that if substantial completion of the unit sufficient for occupancy purposes is delayed by the factors named therein, closing date is extended to the actual date of completion. If the interpretation sought by Bramalea is the correct one, it may be that, as found by Austin J., it would contradict the provisions of paras. 1(b) and 13. At the very least, from the standpoint of Scanlon, there is an ambiguity in para. 22 in this regard and in applying the contra proferentem principle (of which more will be said later). I would adopt the interpretation of the paragraphs more favourable to Scanlon.

32     Bramalea in its factum and oral argument made substantial submissions to the effect that Scanlon understood that the "closing date" in para. 1(b) of the agreement was the proposed date on which he would go into occupancy and that final closing would be after registration of the condominium declaration and description notwithstanding para. 12 of the agreement. It further asserted that lower floors of high-rise condominiums are completed several months prior to completion of upper units for occupancy purposes and that condominium unit purchasers in the Metropolitan Toronto Area generally understand the necessity, particularly in high-rise condominium developments, of a delay between substantial completion of the unit ready for occupancy and the date on which title to the unit can be transferred.

33     Although it is open to serious doubt whether the understanding of condominium purchasers generally can or should be imputed to a particular purchaser, it is not important for the purposes of this appeal. Scanlon acknowledges that under para. 13, in proper circumstances, the original closing date becomes occupancy date and a new closing date is to be determined in accordance with the terms thereof. His position is simply that under the agreement he expected and was entitledto have his unit substantially completed sufficient to permit occupationon or before November 4, 1991.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1992 CarswellOnt 633, 29 R.P.R. (2d) 60, 11 O.R. (3d) 744, 59 O.A.C. 191, 99 D.L.R. (4th) 153

34    Having regard to the fact that the original date set for closing (and for occupation) was more than three years after presentation of his offer, such expectation cannot be said to be unrealistic nor unreasonable. A purchaser might reasonably conclude that the vendor had made due allowance for delays which might be encountered in the completion of the project sufficient for occupancy. The right of the vendor to extend the closing date for a period in excess of that provided by para. 1(b) and 13, if it exists at all, must be found in the agreement.

35    I have already dealt with Bramalea's first submission with respect to para. 22. It further submitted, based on an affidavit of a solicitor filed, that paragraphs similar to para. 22 are commonly used in high-rise condominium construction to permit the vendor reasonable flexibility to complete the building because of delays which may occurduring the construction process. The solicitor's affidavit stated, in part, at para. 9: "Paragraph 22 of ScheduleA to the agreement is a commonly used and overriding provision which contemplates delays. ..."

36    Even if this were so, the fact that it is commonly used does not derogate in any way from the rights of Scanlon to have it interpreted in the light of the other provisions of the agreement. Although the solicitor was not cross-examined on his affidavit, I am not prepared to accept that para. 22 in its exact form is commonly used. Bramalea did not state that it had used this paragraph or a similar paragraph in its own agreements dealing with other projects. Such an allegation would not have strengthened its case in any event but it is interesting to note that counsel for Bramalea stated that the words in para. 22 indicate an intention to allow only for reasonable extensions of time. It should be noted that Bramalea was not the author of the agreement but as assignee thereof it takes the detriment along with any benefit that might enure to it as assignee.

37    As just noted, counsel for Bramalea on this appeal submitted that para. 22 of the agreement should be interpreted to provide only for reasonable extensions of the date for closing resulting from causes other than deliberate bad faith. He was, however, in effect, suggesting that in interpreting this paragraph, the court should add to it words not included in it. The fact that a vendor (through its assignee) consentsto a less strict interpretation of a paragraph in an agreement not warranted by its actual wording and in fact contradicting such wording,does not assist it in obtaining an interpretation more favourable to it in other respects after it has been executed and acted upon.

38    If the position which Bramalea takes prevails to the effect that paras.22 and 13(d) involve two completely different situations which are complementary and not contradictory, it would mean, to use the words of the intervenor Kopman, that Bramalea could extend the time for closing at any time that it wished, as often as it wished and for any reason that it wished, even though it is unable to complete by reason of causes for which it is solely to blame. It would be difficult to characterize this interpretation as a fair and reasonable one from the purchaser's standpoint.

39    I am satisfied that para. 22 in the broad form used in the agreement under consideration is not in common use. The material filed does not disclose the use of such a broad paragraph in any particular agreement. On the contrary, although some of the agreements, which formed the subject matter of the appeals heard together with this appeal and the subject matter of cases cited to us, contained provisions relating to subject matter similar to that contained in para. 22, none of such paragraphs were unrestricted as to cause of delay and length of extension of closing date in the manner set forth in para. 22.

40    Furthermore, Bramalea takes the position that, in determining the interpretation of para. 22, the court must look at the agreement as a whole and that the courts have applied provisions in agreements of purchase and

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1992 CarswellOnt 633, 29 R.P.R. (2d) 60, 11 O.R. (3d) 744, 59 O.A.C. 191, 99 D.L.R. (4th) 153

sale of a condominium unit extending the completion date for reasons such as strikes, fire and other acts of God, and engineering difficulties, as enforceable against purchasers of those units.

41        In support of this submission Bramalea cited *Morris v. Cam-Nest Developments Ltd.* (1988), 64 O.R. (2d) 475 (H.C.), where the court held that the vendor was entitled to invoke the provisions of para. 15 of the agreement, as was done, to extend the date for closing set out in para. 4. The provisions of those paragraphs are set forth on p. 482, as follows:

    4. This agreement shall be completed on July 26, 1982, or any extended date as herein provided.

                                    . . . . .

    15. If the completion of the Unit or the common elements is delayed by reason of strikes, lock-outs, fire, lightning, tempest, riot, war and unusual delay by common carriers or unavoidable casualties, or by any other cause of any kind whatsoever beyond the control of the Vendor, ... the Vendor shall be permitted a reasonable extension or extensions of time for completion ... and the date of closing shall be extended accordingly.

42        I do not doubt the correctness of that decision and that it supports the proposition for which it was cited. It has, however, only limited application to the case at bar. In that case, as in all the other cases cited to the court, the agreements under consideration do not contain a definition of "closing date" or "closing" as set forth in para. 1(b) of the subject agreement incorporating therein by reference the provisions of para. 13(d). It must also be noted that para. 15 clearly falls within the extension provision of para. 4 and that the grounds for extension are clearly limited to causes beyond the control of the vendor, and only reasonable extension or extensions are permitted. Obviously, provisions for extended closing dates or extended dates for occupation are enforceable provided that the terms of the agreement for purchase and sale clearly indicate the intention of the parties to give to the vendor the right to ask for the extension in the circumstances therein set forth.

43        In the *Abdool* appeal, heard at the same time as this appeal (although the point under discussion was not in issue in that appeal), the agreement for purchase and sale set out in para. 2(a) the specific date for occupation as "the 1st day of September, 1989 or such extended date pursuant to the terms hereof that the unit is substantially completedby the vendor for occupancy by the purchaser."

44        The agreement did not contain a definition paragraph such as para. 1(b) of the subject agreement, and the provision quoted made it clear that the occupation date was subject to being extended.

45        Paragraph 18 of the *Abdool* agreement permitted the vendor to extend the closing date for any reason other than wilful neglect of the vendor for such reasonable periods of time not exceeding 24 months in aggregate.

46        Paragraph 21 of the agreement provided, inter alia, that if the completion of the unit or common elements is delayed by any reason whatsoever, then the vendor shall be permitted a reasonable extension or extensions of time for giving occupancy or completing the Unit from time to time in accordance with the terms of para. 18.

47        In the *Budinsky* appeal, also heard at the same time as this appeal (although the point under discussion was also not in issue in that appeal), a specific date for closing was set out in the agreement. It also provided for

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1992 CarswellOnt 633, 29 R.P.R. (2d) 60, 11 O.R. (3d) 744, 59 O.A.C. 191, 99 D.L.R. (4th) 153

occupancy by the purchaser if the unit was substantially completed to permit occupancy on the date set for closing or prior thereto. By para. 8(a) it provided:

> 8.(a) If the completion of the Unit should be delayed for any reason whatsoever, other than wilful neglect of the Vendor, so that the Purchaser cannot be given possession thereof on the earlier of Occupancy Date or Closing Date, then the Vendor, at its sole option, shall be entitled to extend the Occupancy Date for one or more periods of time which the Vendor, in its sole discretion considers reasonable, such periods, not to exceed (18) months.

48     Reference was made by the parties to the case of *Di Cecco v. 733725 Ontario Inc.*, an unreported decision of Fedak J. released on December 21, 1990 and affirmed by this court on May 21, 1991. The agreement under consideration in that case did not contain a definition of "closing date." Paragraph 4 thereof set out a specific closing date. Paragraph 17, which has some similarity to para. 22 of the subject agreement, provided for the right of the vendor to have reasonable extensions of time for completion for causes beyond the control of the vendor and to extend the closing date accordingly. It gave the vendor in addition to, or in lieu of the foregoing extensions, if any, the right to extend closing for a period not exceeding 15 months by giving notice as therein stated.

49     The agreements in these four cases, chosen at random by me, are illustrative of the fact, confirmed by an examination of the agreements under consideration in the various condominium cases cited to the court on the appeals, that para. 22 is not one in common use in condominium sale agreements. They indicate that where it was the intention of the vendor that it shall have right to extend the date for substantial completion of the unit sufficient to permit occupancy or the closing date, it was set forth clearly in the agreement. In addition, a definition of closing date as in para. 1(b) of the subject agreement was not contained in any of those agreements nor considered in any reported cases. Accordingly, the interpretation of the agreement must be approached by applying the principles of contract interpretation to the specific wording of the subject agreement.

**Application of Law to the Agreement**

50     In *Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.*, [1980] 1 S.C.R. 888, Estey J. said, at p. 901, in delivering the majority judgment of the court:

> Even apart from the doctrine of *contra proferentem* as it may be applied in the construction of contracts, the normal rules of construction lead a court to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract. Consequently, literal meaning should not be applied where to do so would bring about an unrealistic result or a result which would not be contemplated in the commercial atmosphere in which the insurance was contracted. Where words may bear two constructions, the more reasonable one, that which produces a fair result, must certainly be taken as the interpretation which would promote the intention of the parties. Similarly, an interpretation which defeats the intentions of the parties and their objective in entering into the commercial transaction in the first place should be discarded in favour of an interpretation of the policy which promotes a sensible commercial result.

51     Where a contract is ambiguous, the normal rules of construction may be supplemented by the application of the contra proferentem rule of construction. In *Hillis Oil & Sales Ltd. v. Wynn's Canada Ltd.*, [1986] 1 S.C.R. 57, Le Dain J. said, at pp. 68-69, in delivering the judgment of the court:

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1992 CarswellOnt 633, 29 R.P.R. (2d) 60, 11 O.R. (3d) 744, 59 O.A.C. 191, 99 D.L.R. (4th) 153

Given this ambiguity as to whether the distributor's agreements could be terminated pursuant to clause23 with immediate effect or whether such termination could take effect only upon reasonable notice, I also agree with Richard J. that it should be resolved against Wynn's and in favour of Hillis by application of the *contra proferentem*rule of construction. It is true that this rule has been most often invoked with reference to the construction of insurance contracts, particularly clauses in such contracts purporting to limit or exclude the insurer's liability. Statements of the rule and its application in such cases may be found in the decisions of this court in *Consolidated-Bathurst, supra*, and *McClelland and Stewart, supra*. The rule is, however, one of general application whenever, as in the case at bar, there is ambiguity in the meaning of a contract which one of the parties as the author of the document offers to the other, with no opportunity to modify its wording. The rule is stated in its general terms in *Anson's Law of Contract* (25th ed. 1979), at p. 151, as follows:

> The words of written documents are construed more forcibly against the party using them. The rule is based on the principle that a man is responsible for ambiguities in his own expression, and has no right to induce another to contract with him on the supposition that his words mean one thing, while he hopes the Court will adopt a construction by which they would mean another thing, more to his advantage.

The rule is also stated in general terms by Estey J. in *McClelland and Stewart, supra*, at p. 15 as follows:

> That principle of interpretation applies to contracts and other documents on the simple theory that any ambiguity in a term of a contract must be resolved against the author if the choice is between him and the other party to the contract who did not participate in its drafting.

52     As stated previously, the closing date by definition was November 4, 1991. This carries with it the obligation of the vendor to complete the unit by that date. By definition, the only provision for extending such date is under para. 13 which is applicable only if the unit had been substantially completed sufficient to permit occupancy. In effect, para. 13 establishes such substantial completion as a prerequisite to an extension of the closing date from November 4, 1991.

53     Scanlon submitted that para. 13 does not address completion (i.e., "total completion" or "substantial completion" as opposed to "substantial completion sufficient to permit occupancy") of the unit; nor does it address the completion of the common elements, including amenities. Paragraph 1(b) makes no reference to para. 22. Paragraph 22 does not refer to occupancy nor to substantial completion of the units sufficient to permit occupancy. It does not by its words purport to supersede para. 13 in any way.

54     Bramalea takes the position that para. 22 becomes operative when the vendor has failed for any reason (other than deliberate bad faith) to substantially complete the unit sufficient to permit occupancy on November 4, 1991. Scanlon takes the position that para. 22 becomes operative only where there has been such completion but full completion or substantial completion (not modified by the words "sufficient to permit occupancy") has been delayed by the factors set forth therein.

55     In considering the contract as a whole, even without the application of the contra proferentem rule, I would be inclined to agree with the submission made by Scanlon. In *Barchak Estate v. Anderson*, [1945] 1 W.W.R. 657 (Alta. C.A.), Ford J.A. said, at p. 669, in delivering the majority judgment of the court:

> The best construction of all written instruments is to make all parts agree. The instrument must be construed as a whole and the words of each clause must be so interpreted as to bring it into harmony with the other provisions of the document.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1992 CarswellOnt 633, 29 R.P.R. (2d) 60, 11 O.R. (3d) 744, 59 O.A.C. 191, 99 D.L.R. (4th) 153

56    Although it may not be possible to do so in all cases, I agree that where there are two possible interpreta-tions of a paragraph it should be interpreted to bring it into harmony with the other provisions of the document and all the more so where the application of the contra proferentem rule supports such a result.

57    I am satisfied that taken in the context of the agreement as a whole, there is an ambiguity with respect to the conditions under which the provisions of para. 22 apply. If one applies the general rule of construction stated by Estey J. in *Consolidated-Bathurst*, supra, viz., that where words may bear two constructions, the more reas-onable result, that which produces a fair result, must be taken as the one which would promote the intention of the parties, the position of Scanlon must prevail.

58    On his interpretation of the agreement he would be entitled to no more and no less than substantial com-pletion of the unit sufficient to permit occupancy on November 4, 1991. That is a period more than three years after acceptance of the offer, and would not be an unreasonable expectation on his part. Similarly, it would not be an unreasonable burden to place on the developer (Bramalea), which is in a position to contract for a closing date that would allow a sufficient cushion for delays which may be encountered on a realistic basis.

59    On Bramalea's interpretation of the agreement, Scanlon, who would reasonably expect to occupy the premises on November 4, 1991, would be put in the position of having his right to occupy the unit and close the transaction delayed for an indefinite period of time for any reason whatsoever. It is difficult to imagine a more unfair result. As previously stated, counsel for Bramalea on the appeal appeared to recognize the unfairness of such an interpretation and stated that the causes for delay must not be occasioned by bad faith and that the exten-sion or extensions of the date must be for a reasonable time. The fact remains, however, that the court is being asked to amend ex post facto a term in an agreement drafted by the vendor.

60    The agreement under consideration was prepared by the original vendor. Its terms are drawn in a manner substantially to protect its interest. The purchaser is required to make his payments on account and to take pos-session and close the transaction on the dates and times specified. He is given no discretion to delay for any reason without suffering a loss of payments on account and incurring liability for damages. The agreement is re-plete with provisions exculpatory in nature and giving discretion for extensions of time all of which are favour-able to the vendor, and with provisions which require strict compliance with time limits by the purchaser and the payment of damages and forfeiture of money by reason of lack of compliance on the part of the purchaser. It is heavily weighted in favour of the vendor. It is a classic case for the application of the contra proferentem prin-ciple which I find to be applicable because of the ambiguity.

61    It was pointed out during the hearing of this appeal that as a matter of fact the delay was caused by struc-tural problems with respect to providing a solid foundation, and by the extremely sophisticated technology in-volved in building the structure requiring equipment "from overseas." Scanlon was not told of the reason for the delay in the notice extending the closing date nor thereafter until an officer of Bramalea was cross-examined in these proceedings on September 4, 1991.

62    In my opinion, the fact that the delay was caused by a factor which may have been beyond Bramalea's control and that the extension was to be for a period of nine months is really not relevant to the rights of the parties. The extended occupancy date would not have given occupation to Scanlon until four years after he had executed the offer and if para. 22 became operative by superseding or modifying paras. 1(b) and 13, he might be faced with additional delays. The rights of the parties under the contract must be determined by the terms of the agreement at the time of its execution. The fact that the delay in issue did not occur as a result of bad faith on the

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1992 CarswellOnt 633, 29 R.P.R. (2d) 60, 11 O.R. (3d) 744, 59 O.A.C. 191, 99 D.L.R. (4th) 153

part of Bramalea does not assist in the interpretation of the contract.

63     By the application of the general rule of construction of contracts and the contra proferentem rule, I interpret para. 22 in accordance with Scanlon's submission. By interpreting the agreement in the manner set forth in these reasons, there is no contradiction between para. 22 and para. 1(b), meaning is given to all parts of para. 22 and its provisions are then fair and reasonable for the purchaser. In effect, that means that it does not contradict the provisions of paras. 1(b) and 13 but rather, covers a different situation, and to that extent my reasons differ with those of Austin J. The result, however, is the same. I conclude that Bramalea was obligated to substantially complete the unit purchased by Scanlon sufficient to permit occupancy by November 4, 1991, that time was of the essence, that Bramalea acknowledged by its notice that it could not comply with this term of the agreement and that that constituted an anticipatory breach entitling him to the declaration granted by Austin J.

64     There is no doubt that a vendor of a condominium unit which is to be erected or is in the process of being erected can, by contract, provide that a proposed occupancy date and closing date be postponed or extended for whatever reasons are therein set out, subject to any statutory provisions which may be applicable. As indicated, this agreement failed to make such a provision.

**Adequacy of Disclosure Statement**

65     Scanlon took the position in the proceedings in the original application and on this appeal that even if he was unsuccessful in persuading the court with respect to the interpretation of the agreement of purchase and sale, he was entitled to the declaration sought on the ground that Bramalea (and its predecessor Castlepoint) had failed to comply with the provisions of the *Condominium Act*, R.S.O. 1980, c. 84, by failing to deliver to him a current disclosure statement and all material amendments thereto. Section 52(1) provides that an agreement of purchase and sale is not binding on the purchaser until the declarant has delivered the statement to the purchaser.

66     In view of the conclusion which I have reached with respect to the interpretation of the agreement, it is not necessary that I deal with this matter in order to determine the outcome of this appeal. It seems to me, however, that in view of the substantial submissions which were made by the various participants in the appeal with respect to this matter, I should address that matter.

67     The questions of the nature of the disclosure statement, the extent of the disclosure requirement, the brevity or fullness of the statement, and generally that which is necessary in order that a statement be deemed to have complied with the Act, were dealt with extensively by this court in the *Abdool* and *Budinsky* appeals (released October 13, 1992). We have also dealt in those appeals with the effect of the failure of a purchaser to rescind an agreement within 10 days after receipt by him of the disclosure statement on his right to declare an agreement non-binding on the ground that the statement did not constitute a disclosure statement within the meaning of the Act.

68     There is no point in repeating in this case the reasons which support the principles espoused in those appeals. These principles, however, must be applied to the individual facts of each case in order to determine whether the statement is one that constitutes a disclosure statement having regard to the requirements of the Act.

69     In *Abdool* and *Budinsky*, the court established the principle to be applied where a purchaser, who has not rescinded an agreement during the 10-day cooling-off period provided by the Act, seeks to resile from the agreement later on the basis of deficiencies in the disclosure statement. That principle is that the onus is on the purchaser to prove objectively that had the information that was not disclosed or was inaccurately or insufficiently

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1992 CarswellOnt 633, 29 R.P.R. (2d) 60, 11 O.R. (3d) 744, 59 O.A.C. 191, 99 D.L.R. (4th) 153

disclosed, been properly disclosed in the disclosure statement at the time it was delivered to the purchaser, a reasonable purchaser would have regarded the information as sufficiently important to the decision to purchase that he or she would not likely have gone ahead with the transaction but would have rescinded the agreement before the expiration of the 10-day cooling-off period.

70    In *Abdool* and *Budinsky*, this court held that the purchasers failed to discharge the onus on the basis of the deficiencies therein alleged. In the case at bar, two novel deficiencies are alleged with which I will now deal.

71    First, the complaint is made that Castlepoint failed to comply with s. 52(6)(*c*) of the Act. That subsection reads as follows:

> (6) The disclosure statement referred to in subsection (1) shall contain and fully and accurately disclose,
>
> . . . . .
>
> (*c*) the portion of units or proposed units which the declarant or the proposed declarant intends to market in blocks of units to investors.

The disclosure statement contained a heading and paragraph as follows:

> **Marketing of Blocks of Units**
>
> The declarant reserves the right to market all of the units in the condominium in one or more blocks to investors.

72    A purchaser who was genuinely concerned about buying a unit in a condominium in which one or more blocks might be sold to investors would be immediately put on notice of that possibility by this paragraph. If it were a matter of importance to the purchaser, one would reasonably expect that he or she would rescind the agreement within the 10-day period. Although the paragraph may not be in strict compliance with the provisions of s. 52(6)(*c*), I am satisfied that the deficiency is not one that if brought to his knowledge would have caused him to rescind within the 10-day period. He knew immediately that some or all of the remaining units might be sold in blocks of units to investors.

73    Second, the complaint is made that Bramalea failed to comply with s. 52(6)(*d*) of the Act. That subsection reads as follows:

> (6) The disclosure statement referred to in subsection (1) shall contain and fully and accurately disclose,
>
> . . . . .
>
> (*d*) a brief narrative description of the significant features of the existing or proposed declaration, by-laws and rules governing the use of common elements and units, and of any contracts or leases that may be subject to termination or expiration under section 39.

The disclosure statement set out a list of recreational and other amenities provided for the use of owners and occupants of the dwelling units.

74    Under the heading "Rules governing the use of the units and common elements," the disclosure statement contained the following:

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1992 CarswellOnt 633, 29 R.P.R. (2d) 60, 11 O.R. (3d) 744, 59 O.A.C. 191, 99 D.L.R. (4th) 153

The rules governing the use of the common elements and units are made for the purpose of promoting the safety, security and/or welfare of the owners and/or for the purpose of preventing unreasonable interference with the use and enjoyment of the common elements and of other units. The Board of Directors makes the rules and can change them, but the owners by majority vote of those present at an owners' meeting may in turn change the rules made by the Board of Directors.

Scanlon was provided with a copy of the proposed rules governing the use of the common elements. By para. 4.00, under the heading "Recreation Area," they provided:

Rules pertaining specifically to the use and operation of the recreation facilities will be promulgated by the board and communicated to the owners or posted in the recreational areas and anyone entering the recreation facilities must comply with such rules, as if they were included herein.

75     Finally, Scanlon was provided with a copy of the proposed declaration.By Article IV thereof it provided under the heading "Use of common elements" that "subject to the provisions of the Act, the declaration,the by-laws and the rules, each owner has the full use, occupancy and enjoyment of the whole or any part of the common elements,except as therein otherwise provided." It further provided that the Board shall be entitled to determine from time to time on terms and conditions satisfactory to it, the basis upon which the guest suites, meeting rooms, conference rooms, executive business centre, racquetball and squash courts, may be utilized by the owners and/or occupants of the dwelling units including any changes to be made for the use thereof.

76     Although the disclosure statement does not appear to wholly comply with the provisions of s. 52(6)(*d*) in the sense that it does not give a narrative description of the significant features of the rules governing the use of common elements, it does point out what is, perhaps, the most significant feature of those rules, viz., that the owners by majority present at a meeting can make and change the rules. The existing rules or lack of rules have less significance when it is made clear that the owners will in due course determine what the rules will provide. It would have been better if the disclosure had indicated that no rules had been made or proposed in connection with the recreational facilities but I am of the view that if a reasonable purchaser were given a more detailed narrative of the rules or lack thereof, he would not have rescinded the agreement having regard to the fact that it was disclosed to him that the Board and finally the owners have the final say as to what those rules will be.

77     Taking into consideration these two novel deficiencies and the other deficiencies alleged by Scanlon, I would find that he has not satisfied the onus required to be fulfilled by the principle laid down in the *Abdool* and *Budinsky* appeals.

78     For the reasons I have given respecting Bramalea's delay, I would dismiss the appeal with costs.

*Robins J.A.* (*Morden A.C.J.O.* concurring):

79     I respectfully disagree with Mr. Justice Goodman's interpretation of the agreement of purchase and sale in issue in this appeal. For the reasons which follow, I am of the opinion that the appellant was not guilty of an anticipatory breach of the agreement and that this appeal should accordingly succeed.

**The Facts**

80     The facts, reduced to their essentials, may be stated briefly. On September 16, 1988, the respondent Scanlon entered into an agreement with a company known as Castlepoint Development Corporation to purchase

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1992 CarswellOnt 633, 29 R.P.R. (2d) 60, 11 O.R. (3d) 744, 59 O.A.C. 191, 99 D.L.R. (4th) 153

a luxury condominium unit on the 37th floor of a proposed residential condominium project to be located on Palace Pier Court on the waterfront of Lake Ontario in Metropolitan Toronto. Construction of the project, which is known as "Palace Place," had not yet been commenced. When completed, Palace Place was to be a 47-storey building containing 504 residential units, parking and storage facilities, and recreational and other amenities.

81    On December 22, 1988, Castlepoint sold the project to the appellant Bramalea Limited. Bramalea received an assignment of the respondent's agreement of purchase and sale and all other agreements of purchase and sale entered into by Castlefield. For all purposes relevant to this appeal, Bramalea now stands in the place and stead of Castlefield and may therefore be treated as though it were the vendor originally named in the agreement.

82    Under the terms of the agreement, the "Closing Date" or "Closing" is defined in paragraph 1(b) as meaning "the 4th day of November, 1991 or as extended by Paragraph 13(d)." Paragraph 12 provides that the transaction is to be completed on the "Closing Date." If, however, the unit is "substantially completed sufficient to permit occupancy on Closing but the description and declaration have not been registered" (as is required by the *Condominium Act*, R.S.O. 1990, c. C.26 (the "Act")), para. 13(d) provides that the purchaser is to occupy the unit on the terms and conditions set out in para. 13. "[T]he Closing Date" would then be extended "to a date 20 days after notice in writing is given by the Vendor's Solicitor to the Purchaser or his Solicitor that the declaration and description have been registered." Paragraph 22 permits the vendor to extend the closing date where completion of the unit or the common elements is delayed. The disclosure statement which accompanied the agreement, and which, of course, is mandated by the Act, projected the date for completion of the amenities and recreational areas as "approximately December 31, 1993."

83    Bramalea commenced construction in February 1989. It appears that the work progressed as planned save for a problem encountered in laying the foundations for the building. Unexpected soil conditions evidently required Bramalea to import sophisticated equipment from overseas to erect the structure. As a result, the construction overall was delayed by approximately ten months. By May 1991, the work had progressed to the point where the concrete structure had reached the 34th floor, the building had been enclosed up to the 18th floor, and the drywall had been completed to the 4th floor. By this stage, it was apparent that the building or, more specifically, the respondent's proposed unit, would not be completed by the November 4, 1991 closing date.

84    On May 31, 1991, Bramalea advised the respondent of the stage to which construction had progressed. Bramalea notified him that the first closings would commence in January of 1992 and that the new "closing date" for his 37th floor unit was being rescheduled so that his "revised occupancy date" would be September 14, 1992. The respondent responded to this notice on August 4, 1991, by the commencement of this application seeking: (1) a declaration that the agreement of purchase and sale was void on the ground that Bramalea's unilateral extension of the closing date constituted an anticipatory breach of the agreement entitling the respondent to terminate the agreement; and (2) a declaration that the agreement was not binding on the ground that the disclosure statement failed to satisfy the requirements of s. 52 of the *Condominium Act*, R.S.O. 1980, c. 84. I agree with my learned colleague's disposition of the disclosure statement issue and need make no further reference to it.

85    The application came on for hearing before Austin J., coincidentally, on November 4, 1991 [reported at (1992), 85 D.L.R. (4th) 443 (Ont. Gen. Div.)]. Accepting the respondent's contentions, the learned judge declared the agreement null and void on the basis that the closing date as defined by clause 1(b) is a fundamental term of the contract, and that Bramalea's unilateral extension of that date accordingly constituted an anticipatory breach of the contract. In his view, para. 22, upon which Bramalea relied, is in conflict with or contradictory to

1992 CarswellOnt 633, 29 R.P.R. (2d) 60, 11 O.R. (3d) 744, 59 O.A.C. 191, 99 D.L.R. (4th) 153

para. 1(b) and para. 12. "If it had been the intention of the parties that clause 22 override the others, then," the judge concluded, "clause 1(b) would have read, 'or as extended by Paragraphs 13(d) and 22'." In essence, he held that the November 4th closing date could be extended only pursuant to clause 13(d) and for no other reason. Bramalea now appeals from that order.

86      Leave to intervene in the appeal was granted to seven condominiumunit purchasers represented collectively by Mr. Goldenberg, and to Stanley Kopman, a purchaser of 24 condominium units. The intervenors support the positions advanced by the respondent.

**The Agreement of Purchase and Sale**

87      I shall, for ease of reference, reproduce the provisions of the agreement most relevant to the anticipatory breach of contract issue. They are as follows:

1. The following definitions shall apply to this Agreement:

. . . . .

(b) "Closing Date" or "Closing" means the 4th of November, 1991 or as extended by Paragraph 13(d).

. . . . .

12. The transaction of purchase and sale is to be completed on the Closing Date.

13. If the Unit is substantially completed sufficient to permit occupancy on Closing, but the declaration and description have not been registered, then the Purchaser shall occupy the Unit on that date (the "Occupancy Date") on the following terms and conditions:

. . . . .

(d) the Closing Date shall be extended to a date 20 days after notice in writing is given by the Vendor's Solicitors to the Purchaser or his Solicitor that the declaration and description have been registered. If the Purchaser fails to close the transaction as aforesaid, through no fault of the Vendor, the Purchaser shall be in default hereunder, and shall be required to deliver vacant possession of the Unit. The Vendor shall in that event be entitled to retain all monies paid hereunder for damages and expenses and unpaid occupation charges. The Purchaser shall be responsible for the damages and expenses and the cost of redecorating as may be determined by the Vendor at its sole discretion as a result of the possession herein.

. . . . .

22. If the completion of the Unit or the common elements is delayed by reasons of strikes, lock-outs, fire, lightning, tempest, riot, war and unusual delay by common carriers or unavoidable casualties or by any other cause of any kind whatsoever whether or not beyond the control of the Vendor, the Vendor shall be permitted extensions of time from time to time for completion and the Closing Date shall be extended accordingly. If the Vendor is unable to complete the Unit and close this transaction within such extended time or times for closing, all monies paid hereunder by the Purchaser other than any occupancy fees, shall be returned to him and this Agreement shall be null and void. If the unit is substantially completed by the Vendor on or before Closing or any extension thereof as aforesaid, this transaction shall be completed on such date

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1992 CarswellOnt 633, 29 R.P.R. (2d) 60, 11 O.R. (3d) 744, 59 O.A.C. 191, 99 D.L.R. (4th) 153

notwithstanding that the Vendor has not fully completed the Unit or the common elements and the Vendor shall complete such outstanding work within a reasonable time after Closing, having regard to weather conditions and the availability of labour and materials. In any event the Purchaser acknowledges that failure to complete the common elements on or before Closing shall not be deemed to be a failure to complete the Unit.

25. This offer when accepted shall constitute a binding contract of purchase and sale and time shall in all respects be of the essence hereof.

**The Applicable Rules of Construction**

88      Before considering the contractual provisions which are in dispute, I remind myself of certain well established rules of construction applicable to the issue at hand. The agreement with which we are concerned is a negotiated commercial document which should be construed in accordance with sound commercial principles and good business sense. To the extent that it is possible to do so, it should be construed as a whole and effect should be given to all of its provisions. The provisions should be read, not as standing alone, but in light of the agreement as a whole and the other provisions thereof: *Hillis Oil & Sales Ltd. v. Wynn's Canada Ltd.*, [1986] 1 S.C.R. 57, at p. 66. The court should strive to give meaning to the agreement and "reject an interpretation that would render one of its terms ineffective": *National Trust Co. v. Mead*, [1990] 2 S.C.R. 410, at p. 425.

89      The court is "to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract": *Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.*, [1980] 1 S.C.R. 888, at p. 901; see also *McClelland & Stewart Ltd. v. Mutual Life Assurance Co. of Canada*, [1981] 2 S.C.R. 6, at p. 19. In searching for the intention of the parties, the court should give particular consideration "to the *terms* used by the parties, the *context* in which they are used and ... the *purpose* sought by the parties in using these terms": *Métropolitaine, Cie d'assurance-vie c. Frenette*, [1992] 1 S.C.R. 647, at p. 667.

90      In the event that the court is unable to resolve a contradiction or ambiguity in the terms of a contract, the language of the contract will be construed against its author in accordance with the contra proferentem rule: *Consolidated Bathurst Export Limited v. Mutual Boiler and Machinery Insurance Company*, supra, at p. 901. "The rule is ... one of general application whenever ... there is ambiguity in the meaning of a contract which one of the parties as the author of the document offers to the other, with no opportunity to modify its wording": *Hillis Oil & Sales v. Wynn's Canada*, supra, at pp. 68-69. However, resort is to be had to the contra proferentem rule "only when all other rules of construction fail to enable the Court of construction to ascertain the meaning of a document": *Reliance Petroleum Ltd. v. Stevenson*, [1956] S.C.R. 936, at p. 953; *Consolidated Bathurst*, supra, at p. 901.

91      With those general principles in mind, I turn to the issue which is the basis of this appeal.

**Does the Agreement of Purchase and Sale Permit Bramalea to Extend the Time for Completion or Substantial Completion of the Respondent's Unit to September 14, 1992, and to Extend the Closing Date Accordingly?**

92      In answering this question it is essential to bear in mind that the subject matter of this agreement is the purchase and sale of a proposed residential condominium unit, and that a transaction of this nature is subject to the *Condominium Act*. Before title can be transferred from the vendor to the purchaser and the transaction can be

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1992 CarswellOnt 633, 29 R.P.R. (2d) 60, 11 O.R. (3d) 744, 59 O.A.C. 191, 99 D.L.R. (4th) 153

"closed," as that term is normally understood in real estate transactions, the vendor is obliged under the Act to register a declaration and description of the property. The condominium registration process inevitably creates a delay between the time some or all of the units in a given project are ready for occupancy and the time the developer is able to deliver a registrable transfer of title and "close" the transaction. In *Albrecht v. Opemoco Inc.* (1991), 5 O.R. (3d) 385, at p. 392, I had occasion to describe the manner in which agreements of purchase and sale of proposed condominium units have generally been structured in this province in contemplation of the delays produced by the complexity of the registration process:

> Under the *Condominium Act*, before title to a proposed unit can be transferred to a purchaser, a developer is obliged to register a declaration and description of the property. Registration, however, cannot be effected until the project has been substantially completed and all requisite governmental approvals have been obtained. The complexity of the registration process is such as to create an inevitable delay between the time that some or all of the units in a given project are completed and otherwise ready for occupancy and the time the developer is able to deliver a registrable transfer of title. The length of the delay depends on a variety of factors, and may be substantial. In order to generate income during this period, condominium developers usually seek to have purchasers take occupancy as soon as their units can be occupied. *Agreements of purchase and sale are therefore generally structured, as are the agreements in these appeals, so as to provide for closing in two stages. The purchaser is first required or permitted to take possession on an interim basis when the unit is substantially complete and ready for occupancy (the possession closing), and the transaction is finally closed after registration has taken place and the vendor is able to transfer title (the title or final closing).* (Emphasis added.)

93       The present agreement makes provision for the potential delay between the time the unit is ready for occupancy and the time the transaction can be completed in accordance with the Act. It is important for the purposes of this appeal to appreciate the way in which the agreement has been structured to achieve this purpose. The agreement unequivocally provides in para. 12 that the transaction is to be completed on the "Closing Date." This, by definition, is November 4, 1991. It is common ground that para. 12 carries with it the obligation of the vendor to complete the unit by that date. If, however, the transaction cannot be completed in accordance with para. 12, it is to be closed in the manner provided for in para. 13(d) and the "Closing Date" is to be extended as therein provided.

94       Paragraph 13(d) is manifestly designed to accommodate the delay created by the condominium registration process by effectively providing for the two-stage closing described in *Albrecht*. It does this in a somewhat indirect or circuitous manner. If the unit is at least substantially completed sufficient to permit occupancy on the closing date, that is, on November 4, 1991, but the project has not yet been registered, the purchaser is nonetheless to take occupancy on that date. In that event, the November 4th "Closing Date" becomes the "Occupancy Date," and the "Closing Date" is extended to an unspecified date 20 days after the vendor gives notice that registration has taken place. In the interim, the purchaser is to pay an "occupancy fee" calculated in accordance with s. 51(6) of the Act. The Act contemplates that purchasers of proposed residential condominium units may take possession of or occupy a unit before a deed or transfer can be delivered and contains a number of provisions governing the relationship of the parties during the interim occupancy period.

95       Paragraph 13(d) is concerned with the position of the parties if the unit is substantially completed. It is not concerned with the question of construction delays. This clause deals with the situation in which the unit is ready for occupancy but, because of non-registration, the transaction cannot be concluded. Put another way, if there cannot be a final closing on the "Closing Date" referred to in para. 12, an occupancy closing is to take

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1992 CarswellOnt 633, 29 R.P.R. (2d) 60, 11 O.R. (3d) 744, 59 O.A.C. 191, 99 D.L.R. (4th) 153

place if the prerequisites to para. 13(d) are satisfied.

96     Given the terms of this agreement and the accompanying disclosure information, the parties could not realistically have expected the proposed condominium unit transaction to be finally closed on the November 4th closing date. The proposed completion date of the recreational and other amenities, as I noted earlier, was to be "approximately December 31, 1993." Since that was a date more than two years later than the date for completion or substantial completion of the unit, they could hardly have expected that the requisite governmental approvals would be obtained and the project registered so long before these amenities were to be completed. Be that as it may, this agreement plainly provides for completion of the transaction on November 4, 1991, or alternatively provides for the purchaser taking occupancy on that date if the premises are then substantially completed sufficient to permit occupancy. In the latter event, the transaction is to be completed on some future date following registration of the declaration and description.

97     The question then is what happens if the unit cannot be completed or substantially completed by November 4, 1991. Is there no room under the terms of this agreement for extending the defined "Closing Date" to accommodate a delay in the construction of the unit? Does the fact that the term "Closing Date" is defined in para. 1(b) as meaning "the 4th of November, 1991 or as extended by Paragraph 13(d)" restrict extensions to the extension specified in para. 13(d) and preclude any extension of the "Closing Date" as stipulated elsewhere in the agreement? In other words, is Bramalea absolutely and unconditionally bound to deliver a unit ready for occupancy on November 4th and guilty of an anticipatory breach of contract if it informs the purchaser in advance of that date that it will be unable to do so?

98     This brings me to para. 22 of the agreement which, Bramalea says, answers these questions in its favour. However, before considering this provision, I should perhaps say that I have no difficulty in accepting the suggestion that clauses of this type, whether framed in these exact terms or not, are commonly found in contracts for the sale of units in condominium projects under construction as, indeed, they are in construction contracts generally. The practical reality is that the construction of large, luxury high-rise buildings which are to be erected over a lengthy period of time, such as the building in this case, can be subject to many delays for innumerable reasons. Consequently, it is hardly surprising that agreements of purchase and sale are routinely structured so as to permit occupancy closing dates to be extended in the event of construction delays. In his reasons, Goodman J.A. refers to the agreements in the cases to which the court was directed and those in the cases heard contemporaneously with this appeal. Those agreements all contain broad provisions, albeit with limitations differing from the instant agreement, which enable the vendor to extend occupancy closings because of delays *for any reason whatsoever* other than the wilful neglect of the vendor or *for any cause of any kind whatsoever* beyond the control of the vendor. While para. 22 must, of course, be construed in the context of the instant agreement, it should be recognized that force majeure clauses of this kind are not uncommon to high-rise condominium construction and their general purport is by no means unique to this agreement.

99     The first sentence of para. 22 deals expressly with the situation in issue. It is the operative provision in the factual circumstances of this case. The focus must accordingly be on this part of para. 22, which provides:

> *If the completion of the Unit or the common elements is delayed* by reasons of strikes, lock-outs, fire, lightning, tempest, riot, war and unusual delay by common carriers or unavoidable casualties or by any other cause of any kind whatsoever whether or not beyond the control of the Vendor, *the Vendor shall be permitted extensions of time* from time to time *for completion and the Closing Date shall be extended accordingly.* (Emphasis added.)

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1992 CarswellOnt 633, 29 R.P.R. (2d) 60, 11 O.R. (3d) 744, 59 O.A.C. 191, 99 D.L.R. (4th) 153

100    On a plain reading of this provision, the "Closing Date" may be extended when *completion* of the unit is delayed by reason of the circumstances referred to in the provision. The term "Closing Date" is defined by para. 1(b) to mean "the 4th of November, 1991 or as extended by Paragraph 13(d)." In May 1991, when Bramalea invoked para. 22 and rescheduled the respondent's closing date to September 14, 1992, "the Closing Date" was manifestly the November 4, 1991 closing date. The transaction was to be completed on that date pursuant to para. 12. At that stage, there had been no extension of the closing date by para. 13(d), nor could there have been. Accordingly, to implement para. 22 and give effect to the extension mandated by it while, at the same time, allowing for the extension contemplated by para. 13(d), it is obviously necessary to read the definition of "Closing Date" (and "Closing") in para. 1(b) as meaning "the 14th of September, 1992 or as extended by Paragraph 13(d)."

101    The transaction is then to proceed in precisely the same manner as it would have proceeded had there been no construction delay. Under para. 12, Bramalea is obliged to complete the unit and close the transaction on September 14, 1992, the new "Closing Date," just as it was obliged, before para. 22 was invoked, to complete the unit and close the transaction on November 4, 1991. Paragraph 12, as I noted earlier, carries with it the obligation of the vendor to complete the unit by the final closing date, now September 14, 1992. Paragraph 22, consistent with para. 12, extends the "Closing Date" to the date necessary to accommodate the delay in the "completion of the Unit." Since it was known that the project could not be registered by September 14, 1992, it was apparent that the transaction could not be completed by then in accordance with para. 12. It followed, however, that if Bramalea completed or substantially completed the unit for occupancy by September 14, 1992, there would be an occupancy closing in accordance with para. 13(d) and the date for finally concluding the transaction as provided for in para. 12 would be postponed to an unspecified date 20 days after notice in writing was given that the declaration and description had been registered.

102    In my opinion, para. 22 authorized Bramalea to extend the date of closing of this transaction to September 14, 1992, as it did. Bramalea's notice to this effect did not constitute an anticipatory breach of the agreement or provide a basis for declaring the agreement null and void. Paragraph 22, as I have noted, makes the extension necessitated by the construction delay specifically referable to the defined "Closing Date." Although an express reference to para. 22 in the para. 1(b) definition of this term may have been helpful, the omission of this reference does not preclude the court from giving effect to the part of para. 22 applicable to this case any more than the omission of a reference to para. 13(d) in para. 1(b) would have precluded the court from giving effect to that provision. The balance of para. 22 must, of course, also be seen in the framework of the closing process envisioned by this agreement, and applied to the relevant factual circumstances.

103    The principles of contractual interpretation require that the agreement be construed as a whole and that, so far as possible, meaning and purpose be given to all its provisions. On the interpretation of the learned motions court judge, however, para. 22 is given no meaning or purpose but is instead effectively ruled out of the agreement. As a result, the vendor's obligation to deliver a unit ready for occupancy on November 4, 1991, is treated as being an absolute and unconditional obligation. Thus, Bramalea's inability, for whatever reason, to have the unit ready for occupancy on that date necessarily constitutes a breach of the agreement; and its advance notification to this effect constitutes an anticipatory breach of the agreement.

104    I am unable to accept that as a proper construction of this agreement. Given the extensions of the "Closing Date" expressly contemplated and permitted by para. 22, I think it patent that it cannot have been the intention of the vendor, nor the expectation of the purchaser, that Bramalea was unconditionally guaranteeing either full or substantial completion of the unit on the November closing date. Paragraph 22 takes into account a prac-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1992 CarswellOnt 633, 29 R.P.R. (2d) 60, 11 O.R. (3d) 744, 59 O.A.C. 191, 99 D.L.R. (4th) 153

tical reality of the construction industry — the likelihood, if not the inevitability, of construction delays which may render it impossible to deliver occupancy of this unit on the 37th floor of this 47-storey building on that specific date. The presence of this provision in itself makes manifest an intention to provide a means of extending the closing date in the event of unforeseeable delay. If that were not the intention, para. 22 would be unnecessary and would not have been included in the agreement. In short, on the wording of this contract, the parties have in essence agreed that if supervening events delay construction so that the transaction cannot be concluded by the November 4, 1991, Bramalea is to be permitted to extend that date for the additional time needed to complete construction of the unit.

105     With respect to the contention that paras. 22 and 13(d) are inconsistent with one another, para. 13(d) provides for the two-stage closing described earlier, and sets the terms pursuant to which the purchaser is to occupy the unit during the interim between the occupancy and final closing. This clause is not concerned with delays in the completion of the unit; rather, it addresses the question of what is to happen if the vendor is unable to complete the transaction on the date stipulated in para. 12. In contrast to para. 13(d), para. 22 addresses the question of delay in completion of the unit by the date stipulated in para. 12, and entitles the vendor to extend the time for completion, and accordingly the date for closing of the transaction. The purpose and effect of these clauses is plainly different and each may be afforded a reasonable and distinct meaning. In my opinion, they are neither contradictory nor do they create any ambiguity such as to invoke the doctrine of contra proferentum.

106     I respectfully reject the notion that para. 22 is restricted to the situation in which a unit has been substantially completed and the purchaser has entered into occupation pursuant to para. 13. Such an interpretation overlooks the manner in which this transaction is structured and fails to give proper effect to the intention of the parties as manifested by their agreement. It is to be remembered that once the purchaser has taken occupancy, the "Closing Date" is converted by para. 13(d) from a fixed date to an indeterminate date. At that stage, the vendor is not obliged to complete the transaction on any specific date. Until the project is registered and notice to this effect is given, there is simply no date to which the extension mandated by para. 22 can be referable. If para. 22 is to become operative only after an occupancy closing has taken place, it can be applicable only to extensions needed because of delays related to the final closing date once that date has been determined.

107     To construe para. 22 in so narrow and restrictive fashion, in my opinion, is to render the clause substantially, if not totally, ineffective. To demonstrate this by way of an example, let us suppose that a strike had occurred in, say, the plumbing or electrical industry, which upset Bramalea's timing for the scheduled completion of the respondent's unit on November 4, 1991, by one month, and thus made it impossible to have an occupancy closing on that date. On this interpretation, para. 22 is inapplicable and Bramalea would not be entitled to extend the November 4th closing date for the extra month needed to enable it to close pursuant to either paras. 12 or 13(d); the transaction would be at an end. If, however, to change the facts, an occupancy closing pursuant to para. 13(d) did take place on November 4, 1991, then, on this interpretation, Bramalea would subsequently be entitled to invoke para. 22. Accordingly, "[i]f the completion of the Unit ... is delayed by reason of strikes ... [Bramalea] shall be permitted extensions of time ... for completion and the Closing Date shall be extended accordingly." What is the "Closing Date" which is to be "extended accordingly"? Until the project is registered and the vendor gives the 20-day notice called for in para. 13(d), there is no set closing date. Before a closing date is set, there is no reason for the vendor to invoke para. 22 and, moreover, there is no mechanism for putting the provision into operation. Once the closing date has been set, there is, I suppose, the far-fetched possibility that something may arise during the 20-day period following the vendor's notice to require the vendor to extend the closing date set by it less than 20 days earlier. Beyond that possibility, the clause would serve no practical purpose.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1992 CarswellOnt 633, 29 R.P.R. (2d) 60, 11 O.R. (3d) 744, 59 O.A.C. 191, 99 D.L.R. (4th) 153

108        In my opinion, para. 22 cannot be meant to produce a result which, to all intents and purposes, is tantamount to striking the clause from the agreement. For the reasons I have already stated, in executing a contract containing this clause, a purchaser could not reasonably have expected that Bramalea was guaranteeing to deliver occupancy on November 4, 1991, without regard to any of the contingencies that might arise to delay construction.

109        It is argued that para. 22 is an exemption clause, and as such, is to be construed contra proferentem strictly against the party benefiting from the exemption. In my view, whether this provision can properly be described as an exemption clause or not is, in so far as this case is concerned, beside the point. Even assuming it is an exemption clause, and applying the special rules of construction relevant to clauses falling into that category (see A.D. Guest, ed., *Chitty on Contracts*, 24th ed. (London: Sweet & Maxwell, 1977), Vol.1, at p. 362), para. 22 does not admit to a construction which limits its application to post-occupancy closing delays. However, while it is unnecessary to decide the matter, it appears to me that para. 22, or more particularly its first sentence which is the focus of this appeal, cannot be characterized as exclusionary in nature. This provision does not limit or exclude the vendor's liability in any respect. Rather, it provides the vendor with a substantive right or entitlement, namely, the right to extend the time for completion, and accordingly, the closing date, in the event of a delay in construction. See S.M. Waddams, *The Law of Contracts*, 2d ed. (Aurora, Ont.: Canada Law Book, 1984), at pp. 346-347.

110        Finally, the argument is made that para. 22 is distinguishable from the force majeure clauses referred to earlier because it permits the vendor extensions for delays resulting from any cause whether the cause was beyond the control of the vendor or not, and because it sets no maximum limit on the number or total length of the extensions that may be permitted. Bramalea acknowledges that the causes for delay cannot be the result of bad faith and that any extension or extensions cannot be for other than a reasonable period of time, and agrees that para. 22 must be read accordingly. However, the respondent's application was not put forward on these grounds. It is not suggested that Bramalea was guilty of bad faith or wilful neglect or was otherwise to blame for the delay in question; nor is it suggested that the ten-month extension was unreasonable and that Bramalea therefore ought not to be entitled to rely on para. 22. This application was based entirely on the proposition that Bramalea was guilty of an anticipatory breach of the agreement because, under the terms of the agreement as the respondent would have it construed, Bramalea was not entitled, for any reason whatsoever, to any extension whatsoever of the November 4th closing date. How para. 22 may be treated in a case in which the length of the extension or the cause of the delay is placed in issue is not a question that arises here, nor is it one that can or should be determined in the context of this case.

### Disposition

111        I would allow the appeal, with costs, set aside paragraphs 1, 2, 3 and 5 in the order of Austin J., and make an order dismissing the application, with costs, in so far as it seeks a declaration that the agreement of purchase and sale is null and void, a declaration that the applicant has an interest in the lands described in Schedule "A," an order granting leave to issue a certificate of pending litigation, and repayment of the deposit money.

*Appeal allowed.*

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

# TAB 79

348 B.R. 234
United States Bankruptcy Court,
D. Delaware.

In re WINSTAR COMMUNICATIONS,
INC. et al., Debtors.
Christine C. Shubert, Chapter 7 Trustee, Plaintiff,
v.
Lucent Technologies Inc., Defendant.

Bankruptcy No. 01–1430 (JBR).    |    Adversary
No. 01–1063 (JBR).    |    Dec. 21, 2005.

**Synopsis**

**Background:** Chapter 11 debtor-telecommunications carrier and its debtor-subsidiary brought adversary proceeding against debtor's lender-equipment supplier. Following case conversion, Chapter 7 trustee filed amended complaint asserting claims for, inter alia, breach of subcontract, preference, and equitable subordination. Lender-supplier filed counterclaim alleging, inter alia, fraud and negligent misrepresentation.

**Holdings:** After conducting trial, the Bankruptcy Court, Joel B. Rosenthal, J., held that:

[1] remaining claims and counterclaims fell within bankruptcy court's core jurisdiction;

[2] lender-supplier breached subcontract under New York law by refusing to pay invoice for work performed by subsidiary;

[3] transfer by debtor of loan proceeds to lender-supplier was preferential transfer;

[4] equitable subordination of claim of lender-supplier was warranted;

[5] lender-supplier did not reasonably rely upon debtor's alleged fraudulent misrepresentations; and

[6] lender-supplier failed to establish negligent misrepresentation claim under New York law.

Judgment for trustee.

West Headnotes (51)

**[1]** **Bankruptcy**
 Orders

Pursuant to bankruptcy court's pretrial order, adversary defendant waived counterclaims that were not raised in joint pretrial memorandum.

Cases that cite this headnote

**[2]** **Bankruptcy**
Counterclaims

**Bankruptcy**
Claims or proceedings against estate or debtor; relief from stay

District court's findings that claims and counterclaims asserted in Chapter 7 trustee's adversary proceeding against debtor's lender-equipment supplier fell within claims allowance process necessitated determination that claims fell within bankruptcy court's core jurisdiction. 28 U.S.C.A. § 157(b)(2)(B).

Cases that cite this headnote

**[3]** **Bankruptcy**
Claims or proceedings against estate or debtor; relief from stay

Whether debtor's lender-equipment supplier breached subcontract by refusing to pay on spreadsheet reflecting work performed by debtor's wholly-owned subsidiary had direct bearing upon whether lender-supplier could recover under its proof of claim for equipment and money loaned, and, if so, in what amount, and therefore Chapter 7 trustee's claim for breach of subcontract fell within bankruptcy court's core jurisdiction, even though proof of claim was filed after original complaint in adversary proceeding raising breach of subcontract claim. 28 U.S.C.A. § 157(b)(2)(B).

2 Cases that cite this headnote

**[4]** **Bankruptcy**

👉 **Particular proceedings or issues**

Equitable subordination, as an action affecting the liquidation of the assets of the bankruptcy estate or the adjustment of the debtor-creditor or the equity security holder relationship, is a "core" proceeding. 28 U.S.C.A. § 157(b)(2).

Cases that cite this headnote

**[5]** **Bankruptcy**
👉 Counterclaims

**Bankruptcy**
👉 Claims or proceedings against estate or debtor; relief from stay

Counterclaims for fraud and negligence asserted by debtor-telecommunications carrier's lender-equipment supplier in Chapter 7 trustee's adversary proceeding fell within ambit of lender-supplier's proof of claim and thus were both part of claims allowance process and within bankruptcy court's core jurisdiction, given that counterclaims arose from lender-supplier's due diligence performed under its credit agreement with debtor and conduct in which debtor allegedly engaged in connection with that agreement, which in turn was related to network buildout contract between debtor and lender-supplier underlying proof of claim, since it provided means by which debtor was to obtain financing to pay for goods and services under network buildout contract, including those services subcontracted to debtor's subsidiary under its subcontract with lender-supplier. 28 U.S.C.A. § 157(b)(2).

2 Cases that cite this headnote

**[6]** **Bankruptcy**
👉 Consent to or Waiver of Objections to Jurisdiction or Venue

Even if breach of subcontract claim and fraud and negligence counterclaims in Chapter 7 trustee's adversary proceeding against debtor-telecommunications carrier's lender-equipment supplier were non-core matters, lender-supplier waived its objection to bankruptcy court's entry of final orders through its conduct, given that lender-supplier both narrowed what counts and

counterclaims it believed fell outside court's core jurisdiction and repeatedly sought judgment in its favor without noting that court could only recommend findings and conclusions to district court, that lender-supplier failed to raise in joint pretrial memorandum core or non-core nature of claims and counterclaims as legal issue to be determined, and that lender-supplier asserted setoff claims against bankruptcy estate, which it acknowledged was a core matter. 28 U.S.C.A. § 157; Fed.Rules Bankr.Proc.Rule 7012(b), 11 U.S.C.A.

3 Cases that cite this headnote

**[7]** **Contracts**
👉 Written Contracts

Through their behavior, telecommunications carrier, its wholly-owned subsidiary, and lender-equipment supplier modified subcontract to provide for payment of purchase orders, invoices, and the like by lender-supplier after subsidiary performed work under subcontract, and therefore lender-supplier breached subcontract under New York law by refusing to pay invoice for work performed by subsidiary due to lack of task order required by subcontract; based upon lender-supplier's past practices, neither carrier nor subsidiary was unreasonable in relying upon lender-supplier's practice of funding and paying for services upon presentation of invoice and spreadsheet, or in expecting practice to continue.

Cases that cite this headnote

**[8]** **Contracts**
👉 Parol modification

Although "no oral modification" contract clauses are generally enforceable under New York law, there are two exceptions: (1) when an oral modification is supported by full performance, or by partial performance unequivocally referable to the oral modification, and (2) when a party has relied upon an oral modification through conduct which is incompatible with the express terms of the contract; in latter circumstances, equitable estoppel will prevent the other party

from attempting subsequent strict reliance on the written terms.

Cases that cite this headnote

**[9]    Contracts**

👉 **Parol modification**

Under New York law, oral directions to perform extra work, or the general course of conduct between the parties, may modify or eliminate contract provisions requiring written authorization or notice of claims.

Cases that cite this headnote

**[10]   Contracts**

👉 **Evidence**

Under New York law, when a contract has not been fully performed, the party seeking relief from the written terms of the contract must introduce evidence of conduct on the part of other parties or reliance on his own part which is unequivocally referable to an alleged oral modification and incompatible with the contract's written terms.

Cases that cite this headnote

**[11]   Frauds, Statute Of**

👉 **Part Performance in General**

Given that, under New York law, doctrine of part performance is based upon the equitable principle that it would be a fraud to allow one party, insisting on the statute of frauds, to escape performance after permitting the other party, acting in reliance, to substantially perform, the acts of part performance must have been those of the party insisting on the contract, not those of the party insisting on the statute of frauds.

Cases that cite this headnote

**[12]   Bankruptcy**

👉 **Proceedings**

By agreeing to stipulated fact which indicated that the transfer element of Chapter 7 trustee's claim alleging preferential transfer had been satisfied, creditor waived argument that no

transfer of debtor's interest had occurred, notwithstanding its subsequent assertion that trustee had not sustained burden of proving that transfer element of claim was met. 11 U.S.C.A. § 547(b).

Cases that cite this headnote

**[13]   Bankruptcy**

👉 **When Transfer Occurs**

Transfer of debtor-telecommunications carrier's interest in property occurred, for purposes of Chapter 7 trustee's preferential transfer claim, when debtor paid over portion of loan proceeds obtained from different lender to its lender-equipment supplier, given that, but for payment of loan proceeds to lender-supplier, debtor would have had use of such funds; that failure to pay lender-supplier upon completion of financing transaction might have given rise to claim by lender-supplier for breach of contract did not nullify fact that transfer of debtor's interest was made. 11 U.S.C.A. § 547(b).

Cases that cite this headnote

**[14]   Bankruptcy**

👉 **Ownership of interest transferred**

In determining whether a transfer was "an interest of the debtor in property," for purposes of preferential transfer claim, courts apply the "diminution of estate doctrine," under which a transfer of an interest of the debtor occurs when a transfer diminishes directly or indirectly the fund to which creditors of the same class can legally resort for the payment of their debts to such an extent that it is impossible for other creditors of the same class to obtain as great a percentage as the favored one. 11 U.S.C.A. § 547(b)(1).

Cases that cite this headnote

**[15]   Bankruptcy**

👉 **Ownership of interest transferred**

Earmarking doctrine did not apply to preclude determination that transfer of debtor-telecommunications carrier's interest in property occurred, for preferential transfer purposes,

when debtor paid over portion of loan proceeds obtained from different creditor to its lender-equipment supplier, given that debtor did not assign its interest in loan proceeds to lender-supplier, but rather had simple contractual obligation to pay over proceeds, and given that debtor did not have agreement with creditor to use loan proceeds to pay lender-supplier. 11 U.S.C.A. § 547(b)(1).

Cases that cite this headnote

**[16]     Bankruptcy**

👉 Pleading

Earmarking was affirmative defense that was waived by creditor when creditor failed to plead it as such in Chapter 7 trustee's preference avoidance action. 11 U.S.C.A. § 547(b).

3 Cases that cite this headnote

**[17]     Bankruptcy**

👉 Construction and Operation

Bankruptcy Code's test of insolvency, the so-called "balance sheet" insolvency, compares the fair value of all of debtor's assets with the face or stated value of debtor's liabilities on the relevant date, and is different from equity tests that focus on debtor's current ability to pay debts as they become due. 11 U.S.C.A. §§ 101(32), 547(b).

3 Cases that cite this headnote

**[18]     Bankruptcy**

👉 Insolvency

Although generally accepted accounting principles (GAAP) are relevant in solvency analysis conducted for purposes of preference avoidance claim, it is not determinative. 11 U.S.C.A. § 547(b).

Cases that cite this headnote

**[19]     Bankruptcy**

👉 Actions and Proceedings in General

Whether a company is insolvent under the Bankruptcy Code is considered a mixed question of law and fact. 11 U.S.C.A. § 101(32).

Cases that cite this headnote

**[20]     Bankruptcy**

👉 Construction and Operation

A fair valuation of assets, for purposes of determining whether debtor was insolvent under Bankruptcy Code, contemplates a conversion of assets into cash during a reasonable period of time, and while the determination of what is a reasonable period of time depends upon the facts of each case, a reasonable time should be an estimate of the time that a typical creditor would find optimal: not so short a period that the value of the goods is substantially impaired via a forced sale, but not so long a time that a typical creditor would receive less satisfaction of its claim, as a result of the time value of money and typical business needs, by waiting for the possibility of a higher price. 11 U.S.C.A. § 101(32).

Cases that cite this headnote

**[21]     Bankruptcy**

👉 Insolvency

Whether, in evaluating debtor's solvency in the context of preference avoidance action, determination of "fair value" requires valuing debtor's assets at the time of challenged transfer as a going concern or on some other basis, such as a liquidation sale, depends upon whether a liquidation in bankruptcy was clearly imminent on the date of challenged transfer; moreover, "going concern" value may not be an appropriate test in an unstable market. 11 U.S.C.A. §§ 101(32), 547(b).

Cases that cite this headnote

**[22]     Bankruptcy**

👉 Insolvency

Transferee's market approach to valuation of debtor-telecommunications carrier, for purposes of determining whether debtor was solvent on date of allegedly preferential transfer, artificially overvalued debtor, given that market investors did not know that transferee, as debtor's lender-equipment supplier, was holding back on

issuing refinancing notice, that transferee, but not average investor, knew that debtor's true financial picture was much bleaker than debtor's publicized financials would indicate, and that market was too unstable to be adequate indicator of value. 11 U.S.C.A. §§ 101(32), 547(b).

Cases that cite this headnote

[23]    **Bankruptcy**
        👉 Insolvency

Under asset approach to valuation of debtor-telecommunications carrier, debtor was insolvent by approximately $1,600,000,000 on date of allegedly preferential transfer to debtor's lender-equipment supplier, notwithstanding lender-supplier's contention that actual sales price obtained for debtor's assets, as going concern, could not be considered in determining debtor's prepetition insolvency. 11 U.S.C.A. §§ 101(32), 547(b).

Cases that cite this headnote

[24]    **Bankruptcy**
        👉 Insolvency

Under rule of retrojection, when debtor was insolvent on the first known date and insolvent on the last relevant date, and trustee demonstrates the absence of any substantial or radical changes in debtor's assets or liabilities between the retrojection dates, debtor is deemed to have been insolvent at all intermediate times for purposes of trustee's preference avoidance claim. 11 U.S.C.A. §§ 101(32), 547(b).

5 Cases that cite this headnote

[25]    **Bankruptcy**
        👉 Insolvency

Use of capitalized debt-free method of estimating company's value under income approach mandated finding that debtor-telecommunications carrier was insolvent on date of alleged preferential transfer to debtor's lender-equipment supplier, given that debtor never had any debt-free cash flow, and that, by year of challenged transfer, debtor's losses had

grown to $870,000,000. 11 U.S.C.A. §§ 101(32), 547(b).

1 Cases that cite this headnote

[26]    **Bankruptcy**
        👉 Insolvency

Discounted cash flow methodology for valuing company under income approach could not be used to determine whether debtor-telecommunications carrier was insolvent on date of allegedly preferential transfer to its lender-equipment supplier, given unreliability of debtor's future projections, which included growth rates significantly in excess of what was projected to be reasonable growth in the telecommunications industry, and given debtor's historical understatement of its expenses.

Cases that cite this headnote

[27]    **Bankruptcy**
        👉 Construction and Operation

Absent unusual circumstances, Bankruptcy Code's insolvency test anticipates that liabilities will be valued at their face value. 11 U.S.C.A. § 101(32).

Cases that cite this headnote

[28]    **Bankruptcy**
        👉 Construction and Operation

Whether a party is or was "in control" of a debtor, and thus an insider as defined by Bankruptcy Code, requires a case-by-case determination. 11 U.S.C.A. § 101(31).

Cases that cite this headnote

[29]    **Bankruptcy**
        👉 Construction and Operation

True test of "insider" status under Bankruptcy Code is whether one's dealings with the debtor cannot accurately be characterized as arm's-length; emphasis is on the nature of the relationship between debtor and the other person, especially on whether their relationship gave the

other person the power or influence to have a debt owed to it repaid. 11 U.S.C.A. § 101(31).

1 Cases that cite this headnote

---

[30]    **Bankruptcy**
   👉 Construction and Operation

In determining whether a creditor, and particularly a bank, has the requisite level of control to be debtor's insider under the Bankruptcy Code, courts examine whether the creditor had more ability to assert control than other creditors and whether the creditor made management decisions for debtor, directed work performance, and directed payment of debtor's expenses; there must be day-to-day control, rather than some monitoring or exertion of influence regarding financial transactions in which the creditor has a direct stake. 11 U.S.C.A. § 101(31).

3 Cases that cite this headnote

---

[31]    **Bankruptcy**
   👉 Insider transferees; reasonable cause to believe debtor insolvent

**Bankruptcy**
   👉 Trial

Although whether allegedly preferential transfer was done under pressure from creditor is one fact to be considered in determining issue of creditor's control, creditor's use of its insider's status to force the making of the preferential payment is not required. 11 U.S.C.A. §§ 101(31), 547(b).

2 Cases that cite this headnote

---

[32]    **Bankruptcy**
   👉 Insider transferees; reasonable cause to believe debtor insolvent

Lender-equipment supplier for debtor-telecommunications carrier was debtor's "insider" at time of challenged transfer, as required for transfer, which occurred outside 90-day prepetition preference period but less than one year prepetition, to qualify as preferential transfer under Bankruptcy Code,

given evidence and adverse inferences drawn from invocation of Fifth Amendment privilege against self-incrimination by lender-supplier's former employees, that lender-supplier forced debtor's purchase of its goods before equipment was needed and even when goods were not needed, and that lender-supplier forced debtor's involvement in lender-supplier's scheme to inflate revenues. U.S.C.A. Const.Amend. 5; 11 U.S.C.A. §§ 101(31), 547(b).

Cases that cite this headnote

---

[33]    **Witnesses**
   👉 Effect of refusal to answer

Fifth Amendment privilege against self-incrimination does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them. U.S.C.A. Const.Amend. 5.

Cases that cite this headnote

---

[34]    **Witnesses**
   👉 Effect of refusal to answer

Invocation by former employees of debtor's lender-equipment supplier of Fifth Amendment privilege against self-incrimination warranted drawing of adverse inferences with respect to Chapter 7 trustee's preference avoidance claim against lender-supplier, given that both witnesses were employees of lender-supplier when relevant actions occurred, both were parties to action by Securities and Exchange Commission (SEC) arising from related events, and questions that both refused to answer related directly to their actions as lender-supplier's employees during relevant time period, and given that independent evidence showed witnesses' involvement in transactions about which they were questioned. U.S.C.A. Const.Amend. 5; 11 U.S.C.A. § 547(b).

1 Cases that cite this headnote

---

[35]    **Witnesses**
   👉 Effect of refusal to answer

That former employees of debtor-telecommunications carrier's lender-equipment supplier were not parties to Chapter 7 trustee's adversary proceeding against lender-supplier, and were no longer employed by lender-supplier at time of action, did not make admission of their testimony, in which former employees invoked Fifth Amendment privilege against self-incrimination, impermissible. U.S.C.A. Const.Amend. 5.

Cases that cite this headnote

**[36]** **Witnesses**
 Effect of refusal to answer

Before an adverse inference may be drawn from a party's refusal to testify in a civil case, there must be independent corroborative evidence to support the negative inference beyond the invocation of Fifth Amendment privilege against self-incrimination. U.S.C.A. Const.Amend. 5.

1 Cases that cite this headnote

**[37]** **Bankruptcy**
 Elements and Exceptions

Transfer of interest of debtor-telecommunications carrier that occurred when debtor, while insolvent, paid over portion of loan proceeds obtained from different lender to its lender-equipment supplier, which was debtor's insider, was preferential transfer. 11 U.S.C.A. § 547(b).

Cases that cite this headnote

**[38]** **Bankruptcy**
 Particular cases

To the extent that lender-equipment supplier provided new value to debtor-telecommunications carrier, after receiving preferential transfer of loan proceeds from debtor, it did so only on secured basis, and therefore lender-supplier could not rely on new value affirmative defense to preference avoidance claim. 11 U.S.C.A. § 547(g).

Cases that cite this headnote

**[39]** **Bankruptcy**
 New Value

To support a new value affirmative defense to preference avoidance claim, creditor must establish that, after receiving a preferential payment, creditor advanced "new value" to debtor not secured by an otherwise unavoidable security interest. 11 U.S.C.A. § 547(c)(4)(A).

Cases that cite this headnote

**[40]** **Bankruptcy**
 Inequitable conduct

Courts considering equitable subordination follow the *Mobile Steel* test, under which (1) the claimant must have engaged in some type of inequitable conduct, (2) the misconduct must have resulted in injury to the creditors of the debtor or conferred an unfair advantage on the claimant, and (3) equitable subordination of the claim must not be inconsistent with the Bankruptcy Code. 11 U.S.C.A. § 510(c).

Cases that cite this headnote

**[41]** **Bankruptcy**
 Determination of priority

When creditor is debtor's insider, the proof required to prove equitable subordination is not demanding, in that trustee need only show material evidence of unfair conduct. 11 U.S.C.A. § 510(c).

1 Cases that cite this headnote

**[42]** **Bankruptcy**
 Inequitable conduct

For non-insider claimants, egregious conduct must be established to justify equitable subordination of claim under Bankruptcy Code. 11 U.S.C.A. § 510(c).

1 Cases that cite this headnote

**[43]** **Bankruptcy**
 Insiders, stockholders, fiduciaries, and dominant persons

In the context of equitable subordination claim under Bankruptcy Code, there are three categories of misconduct which may constitute inequitable conduct for insiders: (1) fraud, illegality, and breach of fiduciary duties, (2) undercapitalization, and (3) claimant's use of debtor as a mere instrumentality or alter ego. 11 U.S.C.A. § 510(c).

Cases that cite this headnote

[44]    **Bankruptcy**
        👉 Inequitable conduct

Lender-equipment supplier for debtor-telecommunications carrier engaged in egregious conduct supporting equitable subordination under Bankruptcy Code, regardless of whether lender-supplier was treated as debtor's insider, given that lender-supplier used debtor as mere instrumentality to inflate its own revenues, repeatedly threatened debtor with nonpayment after debtor's subsidiary performed significant services under subcontract so as to extract more from debtor, as lender-supplier's captive buyer, and deliberately delayed issuing refinancing notice to debtor to ensure that third-party refinancing occurred and new equity was infused into debtor. 11 U.S.C.A. § 510(c).

Cases that cite this headnote

[45]    **Bankruptcy**
        👉 Inequitable conduct

Egregious misconduct in which lender-equipment supplier engaged with respect to debtor-telecommunications carrier resulted in substantial damages to debtor and debtor's creditors, supporting Chapter 7 trustee's claim for equitable subordination under Bankruptcy Code, including lender-supplier's receipt of preferential transfer of loan proceeds resulting from debtor's third-party refinancing, interest paid by debtor to lender-supplier on unnecessary equipment and services bought by debtor to generate revenue for lender-supplier, and harm resulting from lender-supplier's intentional delay in sending debtor refinancing notice until debtor

received proceeds of third-party refinancing. 11 U.S.C.A. § 510(c).

Cases that cite this headnote

[46]    **Bankruptcy**
        👉 Inequitable conduct

Equitable subordination of claim asserted against debtor-telecommunications carrier by its secured lender-supplier was not inconsistent with Bankruptcy Code, given lender-supplier's egregious conduct in using debtor to inflate its own revenues and damages suffered by debtor and its creditors due to such misconduct by lender-supplier, and therefore claim of lender-supplier would be subordinated to claims of all creditors, including all unsecured claims and deficiency claim of third-party lender, the proceeds of whose loan were subject of preferential transfer to lender-supplier, and those entities who infused equity into debtor at the time preferential transfer was made. 11 U.S.C.A. § 510(c).

Cases that cite this headnote

[47]    **Contracts**
        👉 Agreements relating to actions and other proceedings in general

Under Delaware law, express choice of law provisions in contracts are generally given effect.

Cases that cite this headnote

[48]    **Fraud**
        👉 Elements of Actual Fraud
        **Fraud**
        👉 Fraudulent Concealment
        **Fraud**
        👉 Weight and Sufficiency

To prevail on fraud claim under New York law, claimant must establish, by clear and convincing evidence, each of the following elements: (1) a material misrepresentation or omission of fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, (4) reasonable reliance on the representation, and (5) resulting damages.

**[49]** **Fraud**

👉 **Reliance on Representations and Inducement to Act**

To the extent that telecommunications carrier was not in compliance with covenant under credit agreement imposing limits on its cash capital expenditures when it made representations of compliance in connection with four borrowings, lender did not reasonably rely upon carrier's representations, as required to establish fraud under New York law, given that lender was well aware of carrier's financial status and that some of lender's employees had attempted to help carrier to lower its cash capital expenditures to comply with covenant.

Cases that cite this headnote

**[50]** **Fraud**

👉 **Statements recklessly made; negligent misrepresentation**

**Fraud**

👉 **Weight and Sufficiency**

To establish a claim of negligent misrepresentation under New York law, claimant must prove by a preponderance of the evidence (1) carelessness in imparting words, (2) upon which others were expected to rely, (3) and upon which others acted or failed to act, (4) to their damage, and (5) that declarant expressed the words directly to one to whom it is bound by some relation or owes a special duty of care; claimant must also demonstrate that its reliance on the alleged misrepresentations was reasonable.

Cases that cite this headnote

**[51]** **Fraud**

👉 **Reliance on Representations and Inducement to Act**

Lender-equipment supplier that was deeply immersed in telecommunications carrier's financial transactions could not ignore its own knowledge of carrier's precarious financial

condition and feign surprise to learn that carrier breached covenant of credit agreement imposing limits on carrier's cash capital expenditures in connection with four borrowings in which carrier made representations of compliance, and thus failed to establish negligent misrepresentation claim under New York law.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*241** Stephen M. Rathkopf, Herrick, Feinstein, LLP, New York City, David R. King, Herrick, Feinstein, LLP, Princeton, NJ, for Christine C. Shubert.

Paul C. Sanders, Daniel Slifkin, Michael A. Paskin, Cravath, Swaine & Moore, LLP, New York City, Daniel J. DeFranceschi, Rebecca L. Booth, Jason J. Madron, Richards, Layton & Finger, PA, Wilmington, DE, for Lucent Technologies, Inc.

**Opinion**

**MEMORANDUM OF DECISION INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW WITH RESPECT TO COUNTS VII, X, AND XI OF THE SECOND AMENDED COMPLAINT AND COUNTS 5 AND 6 OF THE SECOND AMENDED ANSWER AND COUNTERCLAIMS**

JOEL B. ROSENTHAL, Bankruptcy Judge.

**[1]** This matter came before the Court for trial on Counts VII (breach of subcontract),[1] X (preference), and XI (equitable subordination) of the Second Amended **\*242** Complaint[2] and one count of fraud (Count 5) and one count of negligent misrepresentation (Count 6) of the Second Amended Answer and Counterclaims.[3] As set forth in greater detail below, the Court finds that these matters are core proceedings in which the Court may enter final orders, or with respect to Lucent's counterclaims, even if they are related to non-core proceedings, Lucent has consented to the entry of final orders.

In reaching its determinations, the Court considered the entire 21 days of testimony given by 39 witnesses, considered the demeanor and credibility of the 13 witnesses who testified

in person [4] and, to the extent possible the demeanor and credibility of the 16 witnesses whose videotaped testimony was introduced, [5] considered the credibility of the witnesses whose testimony was read into the record, reviewed the over 1400 exhibits (including many duplicates) totaling many thousands of pages admitted in evidence, heard arguments of counsel, and reviewed the various pre– and post-trial pleadings submitted in support of each party's position. The following **\*243** decision constitutes the Court's findings of fact and conclusions of law in accordance with Fed. R. Bankr.P. 7052, and as set forth below, to the extent that the district court concludes that this Court may only enter proposed finding and rulings pursuant to Fed. R. Bank. P. 9033 with respect to some or all of the counts or counterclaims, the following constitutes the Court's proposed findings and rulings with respect to such counts or counterclaims.

**EXPLANATION OF CITATIONS**

The parties have stipulated to certain facts as most recently set forth in the Revised Joint Stipulation of Uncontested Facts (the "Revised Joint Stipulation"), attached as Exhibit A to the Renumbered Joint Stipulation of Uncontested Facts [Docket # 331].

Citations to trial exhibits introduced by the Plaintiff are cited as "PX # "; Defendant's trial exhibits are cited as "DX # ." In many instances the parties introduced the same document or portions of the same document. The Court generally has cited to duplicate documents by only one exhibit number. Citations to specific pages within a multiple-page exhibit are cited by exhibit number and Bates number or by page number if the exhibit does not contain Bates numbers.

Citations to testimony in the trial transcripts (which include only testimony from witnesses who were physically present in court and deposition testimony read into the record) identify the witness, followed by the designation "Depo" in instances where the deposition testimony was read into the record, and "Tr." along with reference to the transcript volume, the page and, where needed, line numbers. The trial transcripts appear on the docket at numbers 322–326, 338, and 351–356.

Citations to transcripts of videotaped deposition testimony (which was played during trial but not transcribed as part of the trial transcript) contain the designation "Video" and identify the witness; if necessary, whether the testimony is designated as "Direct," "Cross" or "Redirect," [6] the page and

line numbers of the transcribed deposition testimony. The transcripts of the videotaped depositions or portions thereof that were introduced at trial were admitted as exhibits and are listed in the Stipulated Joint Trial Exhibits [Docket # 335].

**JURISDICTION**

1. In order to understand the Court's conclusions with respect to its jurisdiction to enter final orders, [7] it is necessary to explore Lucent's objection to this Court's entry of a final order. On April 18, 2001 **\*244** (the "Petition Date") Wireless Communications, Inc. ("Winstar") and Winstar Wireless, Inc. ("Wireless" and collectively with Winstar, the "Debtors") filed voluntary petitions for reorganization pursuant to Chapter 11 of the United States Bankruptcy Code. (Revised Joint Stipulation, ¶ 3). In January 2002 the cases were converted to Chapter 7 and shortly thereafter Christine C. Shubert (the "Trustee") was appointed as the Chapter 7 trustee. (*Id.,* ¶¶ 3 and 4).

2. This adversary proceeding was commenced by the Debtors on the Petition Date. In July 2002 the Trustee stepped in as the Plaintiff and soon thereafter filed her Second Amended Complaint and Jury Demand ("Second Amended Complaint") [Docket # 69], the operative complaint in this case. As the caption of the Second Amended Complaint suggests, the Trustee requested a jury trial on all actions that could be tried to a jury. In the Second Amended Answer and Counterclaim of Defendant Lucent Technologies Inc. ("Lucent") to the Second Amended Complaint ("Second Amended Answer"), dated March 24, 2004 [Docket # 156], Lucent also demanded a jury trial "on all issues properly triable thereby." Subsequently the Trustee withdrew her request for a jury trial. [8] The Trustee alleged that these proceedings are core; Lucent disagreed except with respect to the preference action. (Second Amended Complaint at ¶ 3; Second Amended Answer at ¶ 3).

3. In June 2004 Lucent sought discretionary withdrawal of the reference pursuant to 28 U.S.C. § 157(d) in the district court and a waiver of Local Bankruptcy Court Rule 5011–1 as it did not file a contemporaneous motion asking the Bankruptcy Court to determine whether these matters were core or non-core [Docket # 208]. [9] In July 2004 Lucent filed a memorandum in support of its withdrawal motion [Docket # 237] and urged withdrawal of the reference on the grounds that Lucent was entitled to a jury trial on the Trustee's preference and breach of contract claims and on its own fraud and negligent misrepresentation counterclaims.

The Bankruptcy Court then stayed its proceedings pending the district court's determination of the withdrawal motion.

4. In November 2004 the district court entered its Memorandum Opinion and Order [District Court Docket 11 and 12] denying the withdrawal motion. Specifically the district court concluded that Lucent had waived its right to a jury trial by the filing of its proofs of claim and that Lucent did not meet the standards for a permissive withdrawal of the reference for "cause" under *In re Pruitt,* 910 F.2d 1160, 1168 (3d Cir.1990).

5. From before the filing of the withdrawal motion, through the conclusion of the Trustee's case-in-chief in this Court when Lucent then unsuccessfully sought judgment on partial findings pursuant to Fed. R. Bank. P. 7052, until after submission of all the evidence, and indeed, submission of each party's proposed findings of fact and conclusions of law in this adversary **\*245** proceeding. [10] Lucent did not raise the issue that the Bankruptcy Court lacked jurisdiction to enter final judgment. In fact the record is clear: Lucent sought a final order in its favor on several occasions from this Court. [11]

6. On the evening of June 9, 2005, Lucent filed a letter, dated June 8, 2005 [Docket # 343], "remind[ing] the Court that Lucent has not consented to the Court's jurisdiction to issue final orders or judgments with respect to non-core proceedings in this matter." In the letter Lucent identified the Trustee's breach of the subcontract claim and Lucent's fraud and negligent misrepresentation counterclaims as non-core. Although the June 8, 2005 letter cites to Lucent's Second Amended Answer and Counterclaims to Second Amended Complaint in support of its position that it has not consented to the entry of final orders by this Court, its failure to mention the withdrawal motion or the district court's ruling is striking and perhaps intentionally deceptive. [12]

7. At closing argument Lucent maintained that the district court's decision did not address the core/non-core issue but only whether Lucent was entitled to a jury trial. Although the district court plainly concluded that the matters on which Lucent claimed a jury trial were triable only in equity, the district court concluded that Lucent's filing of its proofs of claim triggered the claims allowance process. [13] The **\*246** "allowance or disallowance of claims against the estate" is one of the specifically enumerated types of actions which fall

within the express definition of a core proceeding. 28 U.S.C. § 157(b)(2)(B).

8. Following the district court's decision, Lucent filed a motion seeking certification of the district court's order pursuant to 28 U.S.C. § 1292. That motion was pending in the district court when this case was being tried before the Court. Subsequently the district court denied the motion. [14] The district court stated that this Court "has not determined whether this matter is a core or non-core proceeding." (Memorandum Order [District Court Docket # 21] at p. 3).

**[2]**    9. The Court, however, interprets the district court's earlier findings that the claims and counterclaims fall within the claims allowance process to necessitate a finding that these actions are core pursuant to 28 U.S.C. § 157(b)(2)(B). While fully cognizant of this Court's role in following the findings and conclusions of the district court with respect to jurisdiction in this case, lest Lucent continue to espouse the position that whether these proceedings fall within the core jurisdiction of the Bankruptcy Court remains an open issue, this Court seeks to be clear: even if the district court did not intend its use of the phrase "claims allowance process" to be read as synonymous with the language of section 157(b)(2)(B), the Court's independent examination of its own jurisdiction would lead to the same conclusion, namely the counts decided herein are core pursuant to 28 U.S.C. § 157(b)(2)(B). Although the counterclaims for fraud and misrepresentation could be classified as non-core related to actions, Lucent has given its implicit consent to the entry of final orders on those counterclaims. The rationale for these findings is set forth below.

**[3]**    10. As set forth in greater detail below, in 1998 Lucent and Winstar entered into a Credit Agreement (the "First Credit Agreement") (DX 96) whereby Lucent was the primary secured lender to Winstar, and a Supply Agreement (PX 123) whereby Lucent was to provide Winstar with a turnkey buildout of its global communications network. Because Lucent was unable or unwilling to perform the buildout, it subcontracted services to Wireless under the Network Agreement for Buildout Services (the "Subcontract") (DX 177). The expectation was that Lucent would, in time, assume all of its obligations under the Supply Agreement. Accordingly, the Supply Agreement contemplated that Lucent would "develop a transition plan with Winstar's input, review and potential approval" scheduling Lucent's assumption of the various aspects of the

buildout. (PX 123 at Schedule A ¶ 3.3(a); *see also* PX 123 at ¶ 6.1 and ¶ 6.5). Although all obligations under the First Credit Agreement **\*247** were fully paid in 2000, the First Credit Agreement was replaced by a Second Credit Agreement (DX 29). The anticipated Transition Plan never came to fruition [15] and thus the parties continued to operate under the Supply Agreement and Subcontract.

11. In October 2001 Lucent filed a proof of claim (the "Proof of Claim") (PX 340) which, on its face, states Lucent held a secured claim (and to the extent not secured, an unsecured claim) in "[a]n amount not less than $138,957,218.90" for "goods sold," "money loaned," and "other." In the "Summary of Supporting Documentation" attached as Tab A.2 to the Proof of Claim, Lucent described the documents which support its claim as the "Supply Agreement ..., any amendments thereto and *any and all related documents, agreements and statements of work.*" (Emphasis added). The Subcontract is certainly an agreement related to the Supply Agreement; it is the means by which Lucent was to fulfill its obligation to perform the network buildout. In addition, although the parties do not define a "statement of work," its plain meaning suggests it is nothing more than a description or list of work performed. The March 2001 "spreadsheet," [16] against which Lucent refused to pay, is a breakdown of the services performed. (PX 245). Thus this spreadsheet appears to qualify as a statement of work. Whether Lucent may have breached the Subcontract by refusing to pay the March 2001 spreadsheet has a direct bearing upon whether Lucent may recover under its Proof of Claim and if so, in what amount. Therefore the breach of the Subcontract claim falls within the core jurisdiction of the Court. 28 U.S.C. § 157(b)(2)(B). *Southeastern Sprinkler Co., Inc. v. Meyertech Corp. (In re Meyertech Corp.),* 831 F.2d 410, 418 (3d Cir.1987)(creditor's filing a proof of claim on a pre-petition breach of contract action created an action in bankruptcy court that "[b]y its very nature [ ] fits directly under the more specific definition of a core proceeding under § 157(b)(2)(B) ...."). *See also S.G. Phillips Constructors, Inc. v. City of Burlington, Vermont (In re S.G. Phillips Constructors, Inc.),* 45 F.3d 702 (2d Cir.1995)(filing a proof of claim converts a pre-petition state law claim into a core proceeding); *In re NDEP Corp.,* 203 B.R. 905, 910 (D.Del.1996).

12. The Court is cognizant of the fact the Proof of Claim was filed after the original complaint in this matter. That fact is insufficient to render the above case distinguishable and the breach of contract claim non-core. Although older cases often cite what has been described as a "firmly established rule that

subject matter jurisdiction is tested as of the time of the filing of the complaint," *Rosa v. Resolution Trust Corporation,* 938 F.2d 383, 392 n. 12 (3d Cir.), *cert. denied* 502 U.S. 981, 112 S.Ct. 582, 116 L.Ed.2d 608 (1991), the Third Circuit has recognized that the rule is not to be applied blindly.

The principle that jurisdiction is determined at the outset of the action is simply insufficient to support the continuing **\*248** applicability of [12 U.S.C.] § 1441a(*l* )(1) to this case. One basic difficulty with this argument is that the letter and spirit of the rule apply most clearly to diversity cases. The Supreme Court set out the rule in the diversity context. *St. Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 286, 290–92, 58 S.Ct. 586, 590, 591–92, 82 L.Ed. 845 (1938). In addition, the Court crafted the rule for the removal of actions from state court, which involves a more lenient standard not relevant here. *Id.* Most importantly, the policies behind removal and the risks of manipulative behavior played a significant role in the Court's decision. St. Paul focused primarily on the monetary threshold for federal jurisdiction, observing that the time of filing rule prevented plaintiffs from subsequently amending their complaint to plead a lesser amount and avoid removal. *Id.* at 294, 58 S.Ct. at 592–93. Similar concerns applied to changes of parties that would potentially destroy diversity of citizenship. *Id.* at 294–95, 58 S.Ct. at 592–93. From the outset, the underlying concern of the time of filing rule was the risk that parties would deploy procedural tactics to manipulate federal jurisdiction.

The rule that jurisdiction is assessed at the time of the filing of the complaint has been applied only rarely to federal question cases. Moreover, in these rare cases, the rule has often been applied axiomatically, without extensive discussion or analysis. *See Rosa v. Resolution Trust Corp.,* 938 F.2d 383, 392 n. 12 (3d Cir.), *cert. denied,* 502 U.S. 981, 112 S.Ct. 582, 116 L.Ed.2d 608 (1991); see also *F. Alderete General Contractors, Inc. v. United States,* 715 F.2d 1476, 1480 (Fed.Cir.1983) (observing in government contracts action that "the decision below is at variance with the long-standing rule in the Federal courts that jurisdiction is determined at the time the suit is filed and, after vesting, cannot be ousted by subsequent events, including action by the parties"). Even in the federal question context, however, the focus of the time of filing rule has been on preventing manipulation of jurisdiction when a claim is removed. As we observed in *Westmoreland Hospital Ass'n v. Blue Cross of Western Pa.,* "a subsequent amendment to the complaint after removal designed to eliminate the federal claim will not defeat federal jurisdiction." 605 F.2d

119, 123 (3d Cir.1979) (emphasis added), *cert. denied,* 444 U.S. 1077, 100 S.Ct. 1025, 62 L.Ed.2d 759 (1980). Along with the obvious goal of judicial efficiency, we perceive the risk of strategic behavior as the primary rationale behind the time of filing rule.

Manipulation of jurisdiction is simply not at issue in this case. There is no suggestion of manipulation, nor would the facts support it. The jurisdiction-destroying transfer of assets between the RTC and New Rock was an arms length transaction independent of the jurisdictional issue. Without the possibility of manipulative behavior, the primary policy behind the time of filing rule is not implicated.

Our rejection of an absolute time of filing requirement breaks no new ground. Courts that have considered the rule more fully have not hesitated to abandon it where appropriate. In *Boelens v. Redman Homes, Inc.,* 759 F.2d 504 (5th Cir.1985), the Fifth Circuit discussed the policies behind the time of filing rule and held that in a federal question case, where the plaintiff's amended complaint omitted federal counts included in the original complaint on which jurisdiction could be based, the court would look to the amended complaint and decline jurisdiction. **\*249** *Id.* at 508. The Fifth Circuit interpreted this rule as consistent with the general principle that the amended complaint "supersedes the original and renders it of no legal effect, unless the amended complaint specifically refers to or adopts the earlier pleading." *Id.* at 508.

We were equally quick to reject the time of filing rule in *Lovell Mfg. v. Export–Import Bank,* 843 F.2d 725 (3d Cir.1988):

> *Lovell* ... cites several older Third Circuit cases for the proposition that our determination of jurisdiction should be based solely on the basis of the pleadings, and not on subsequent events.... We are uncertain that these cases stand for the broad proposition for which *Lovell* cites them. However, regardless of what they once might have stood for, and regardless of the merit of these principles elsewhere, plainly they do not reflect recent Third Circuit jurisprudence. As *Lovell* itself concedes, later cases clearly hold that once all federal claims have been dropped from a case, the case simply does not belong in federal court.

*Id.* at 734 (citations omitted). We concluded by observing "that to the extent a black-letter rule ever existed, precluding a court from relying on post-removal events ..., the Supreme Court clearly did not feel bound by it in

*Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)." *Id.* at 735. Although the time of filing rule certainly retains a large measure of persuasive efficacy, we read *Lovell* as a clear rejection of any iron-clad time of filing requirement. *Cf. Carr v. American Red Cross,* 17 F.3d 671, 683–84 (3d Cir.1994) (federal jurisdiction arising from the involvement of the American Red Cross in a case will cease on the dismissal of the Red Cross from the case).

*New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.,* 101 F.3d 1492, 1503–04 (3d Cir.1996).

13. In this case the operative complaint, the Second Amended Complaint, was filed after the filing of Lucent's Proof of Claim. Moreover, this case does not involve the issue of destroying jurisdiction by subsequent events nor is there any suggestion that the Trustee attempted to manipulate jurisdiction.

**[4]** 14. In its Second Amended Answer, Lucent admitted that the preference action is a core matter but disputed that all other counts were core. (Second Amended Answer at ¶ 3). This denial would include the count for equitable subordination. "Equitable subordination is unquestionably a 'core' proceeding pursuant to section 157(b)(2)." *In re M. Paolella & Sons, Inc.,* 161 B.R. 107, 116 (E.D.Pa.1993), *aff'd* 37 F.3d 1487 (3d Cir.1994). It is an action "affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship...." *See also In re Insilco Technologies, Inc.,* 330 B.R. 512, 520 (Bankr.D.Del.2005).

**[5]** 15. Similarly Lucent's fraud and negligence counterclaims arise from Winstar's alleged conduct in connection with the Second Credit Agreement. This is also an agreement related to the Supply Agreement. [17] It provided the means by which Winstar was to obtain financing to pay for **\*250** goods and services under the Supply Agreement, including those services subcontracted to Wireless under the Subcontract, and thus Winstar's conduct in connection with its draws under the Second Credit Agreement is within the ambit of the Proof of Claim. Moreover, the Second Credit Agreement gave Lucent the right to conduct the due diligence about which it now complains. The counterclaims are now part of the claims allowance process and within the core jurisdiction of this Court. 28 U.S.C. § 157(b)(2)(B).

**[6]**   16. Finally, even if these matters were non-core, Lucent has waived its objection to this Court's entry of final orders by its conduct. *Abramowitz v. Palmer,* 999 F.2d 1274, 1280 (8th Cir.1993); *In re G.S.F. Corp.,* 938 F.2d 1467, 1476 (1st Cir.1991); *In re Daniels–Head & Associates,* 819 F.2d 914, 918–19 (9th Cir.1987). [18] Not only has Lucent narrowed what counts and counterclaims it believes fall outside the core jurisdiction of the Bankruptcy Court, [19] Lucent repeatedly sought judgment in its favor without noting that the Court could only recommend findings and conclusions to the district court. [20] *Baldwin–United Corp. v. Thompson (In re Baldwin–United Corp.),* 48 B.R. 49, 54 (Bankr.S.D.Ohio 1985)* (consent may be implied from failure to object or from any act indicating a willingness to have the bankruptcy court determine a claim). Similarly in the Joint Pretrial Memorandum [Docket # 292] Lucent did not raise the core or non-core nature of the claims and counterclaims as one of the legal issues to be determined. Finally Lucent has asserted a setoff claim against the estate which it acknowledges is a core matter. *In re Iridium Operating LLC,* 285 B.R. 822, 832 (S.D.N.Y.2002). The parties agree Lucent's setoff claim be set off against any monetary award on the breach of the Subcontract claim. The Court believes this is further evidence of Lucent's waiver.

17. For all of the foregoing reasons, the Court concludes these are all core **\*251** matters under 28 U.S.C. § 157 and, to the extent not core matters, Lucent has consented to entry of final orders by this Court. Under the Standing Order of Reference, the Court will enter final judgment.

**OVERVIEW OF FACTS AND THE PARTIES' CLAIMS**

18. At its essence this case is simply a tale of two companies –one large, one small which entered into what each expected to be a mutually beneficial relationship to build a wireless communications network and deliver services to customers via that network. What became apparent as the evidence unfolded was that what began as a "strategic partnership" to benefit both parties quickly degenerated into a relationship in which the much larger company bullied and threatened the smaller into taking actions that were designed to benefit the larger at the expense of the smaller. Along the way some executives of each company demonstrated their incompetence and arrogance, and in some instances, now find themselves targets of criminal investigations. The Court notes that there was poor communications not only between the two companies but among each companies' employees. In fact,

when Lucent replaced some of its upper level management in the fall of 2000 in response to an internal and SEC investigations, the new executives issued directives regarding the Winstar–Lucent relationship without having even read the operative agreements. Officers and executives often saw the relationship unfolding from different perspectives such that, if the Court were so inclined to view each witness' testimony in isolation, it could find support for virtually any fact. Yet taking all the *credible* evidence as a whole, it is clear that Lucent used Winstar to inflate Lucent's own revenues, especially in the third and fourth quarters of 2000 when Lucent was "feeling a lot of pressure on revenue." (Hayes, Depo, Tr. 13–38). Although Winstar benefitted from some of its dealings with Lucent and its own actions were, at times, no less questionable than Lucent's, the facts point to one conclusion: Lucent extracted what it needed to prop up its own revenue from Winstar in the form of purchases by Winstar of unneeded equipment and manipulated the timing of a refinancing notice that would have put the world on notice that Winstar was in dire financial straits until Lucent could take some more. Lucent used its position as Winstar's lender to ensure Winstar's cooperation by repeated threats to stop both the funding of Winstar's draw requests and the payment of Wireless's invoices for services already performed.

**Summary of the Trustee's Claims**

19. Although the parties tried this case for 21 trial days, surprisingly most of the critical facts surrounding the relationship of the Debtors and the Defendant are not disputed. The parties could have and should have saved their own and this Court's resources by agreeing to many more underlying facts which really are not disputed.

20. Prior to their bankruptcies, Winstar, a Delaware corporation, was a local and long distance telecommunications carrier and engaged in the buildout of a global broadband telecommunications network to service its customers. (DX 701 at 8). Its stock was publicly traded. (DX 701; PX 460). Wireless, Winstar's wholly-owned subsidiary, was also a Delaware corporation engaged in the design and construction of Winstar's network. (Revised Joint Stipulation ¶¶ 1 and 2).

21. Starting at the customer's end, Winstar would build facilities within the customer's building, known as a "B site," to connect the customer to Winstar's voice and data network via a radio and antenna located on the roof of the customer's building. **\*252** Radios and antennae were also located on the roof of a Winstar's traffic collection point known as a "hub."

Signals were sent between the B site and hub via the radios and antennae. (DX 699 at page 9, line 15 through page 10, line 38). [21]

22. The hubs, in turn, collected the signal traffic and distributed it to a high capacity facility known as a "central office." Typically signals were transmitted between hubs and central offices via fiber cables, either owned by Winstar or leased from an incumbent telephone company. (*Id.*).

23. The central offices had data and voice switching equipment which would connect transmissions from the central office either into other local or long-distance telephone companies or into Winstar's own national fiber network which provided long-haul capacity for Winstar's voice and data services. (*Id.*).

24. Winstar's long-haul network typically was made of fiber supplied by non-Lucent vendors and ran along routes that connected one city to another. (Kipke, Tr. 18–190). Optical equipment that amplified and transmitted the signals were generally located at each end of and at certain intervals along the fiber. (Kipke, Tr. 17–72–73).

25. Lucent, is also a Delaware corporation, whose stock is publicly-traded on the New York stock exchange (DX 739 at ¶ 12). It designs and delivers telecommunications systems, services, and products, including software. (Revised Joint Stipulation ¶ 5). It was, at the relevant times, much larger in size and resources than the Debtors. (Ackerman, Video–Direct, p. 17, line 18–p. 18, line 5).

26. In the late nineties, telecommunications companies were "hot" companies, and on the grow. Winstar, like many others, desired to increase the size and reach of its network and joined forces with Lucent to help accomplish the expansion. Prior to that time, Winstar and Lucent had an arms'-length vendor-creditor relationship whereby Lucent sold goods to Winstar. (Ackerman, Video–Direct at p. 4, line 12). That relationship changed in October 1998 when the two entered into what they both describe as a "strategic partnership." (Ackerman, Video–Direct at pp. 3–4). The "strategic partnership" [22] was created through a series of agreements, three of which figure prominently in this litigation.

27. In October 1998, after three weeks of "lockdown" negotiations, Lucent and Winstar entered into two related agreements: the First Credit Agreement and the Supply Agreement. (*Id.*). Under the First Credit Agreement, dated

October 21, 1998, Lucent became the primary secured lender to Winstar and provided a $2 billion line of credit (although only $500 million could be borrowed at any one time) to be used for the purchase of certain products and services in exchange for a lien in virtually all of Winstar's assets. Wireless was not a borrower, guarantor, or otherwise a signatory to the First Credit Agreement. (Revised Joint Stipulation ¶¶ 13 **\*253** and 14). When the parties entered into the First and subsequently Second Credit Agreements, Lucent expected that the loans were be repaid either by borrowing from other lenders or by raising equity. (Hayes, Depo, Tr. 13–36).

28. Under the Supply Agreement Lucent agreed to provide and finance (under the First Credit Agreement which was later supplanted by the Second Credit Agreement) the purchase of products and services. (Revised Joint Stipulation ¶ 6). Lucent was to provide equipment of a quality described as "Best of Breed" and, in instances where it could not provide Best of Breed equipment, it was obligated to finance Winstar's purchase of such equipment from other vendors. [23] (Ackerman, Video–Direct at pp. 81–82; PX 123 at ¶ 11.3 and Schedule H thereto).

29. To assure that the content of the Winstar network was primarily equipment manufactured and/or sold by Lucent, to develop and enhance its reputation for providing these type of buildout services in a "hot" telecommunications world, and ultimately to enhance its revenue production, Lucent wanted to build Winstar's entire global network, including all supporting infrastructures, on a completely turnkey basis. Consequently the Supply Agreement provided that Lucent would build and deliver a turnkey operation to Winstar. As with its obligations to finance Best of Breed equipment even if supplied by third parties, if Lucent itself was unable to perform the services needed to comply with buildout obligations, it was obligated to finance the payment of those services provided by others who would develop the turnkey system. (PX 123, section 11.3(c)).

30. When the parties entered the Supply Agreement, they both recognized that Lucent did not have all the core competencies necessary to perform the buildout. Therefore the Supply Agreement provided that Lucent would prepare a transition agreement that included a schedule of its assumption of various aspects of the buildout as broadly outlined in the Supply Agreement. (PX 123 at Schedule A, § 3.3). No transition agreement was executed and it quickly became apparent that Lucent either could not or would not take

over the building of the turnkey network as promptly as anticipated. (Kantor, Video–Cross at pp. 46–48). [24] In March 1999 Lucent and Wireless entered into the Subcontract, effective January 4, 1999, whereby Wireless agreed to act as Lucent's subcontractor and build the network at least until such time as Lucent was willing and able to assume that role. (Revised Joint Stipulation ¶ 7). Wireless would perform the services, many or most of which were the types of service it had already been performing directly for Winstar, as Lucent's subcontractor and then bill Lucent. [25] **\*254** Lucent, in turn, would bill Winstar which would pay Lucent by drawing down under the First Credit Agreement or, after May 2000, the Second Credit Agreement. In essence Lucent loaned Winstar the money to pay Lucent for building the network; Lucent then paid the money over to Wireless. The paperwork, especially the purchase orders, were exchanged after the work was completed. It is Lucent's refusal to pay for services for the month of March 2001 that gives rise to the Count Seven, the breach of the Subcontract claim.

31. As Winstar grew and required additional financing to feed its insatiable appetite for cash to grow its business, it sought bank financing and in May 2000 arranged for a consortium of bank lenders, with Bank of New York as the administrative and collateral agent, to provide a $1.15 billion revolving credit and term loan (the "Bank Facility") for part of its working capital needs. WCI Capital Corp ("WCI Capital"), one of Winstar's subsidiaries, was the borrower; Winstar and certain other of its subsidiaries were guarantors.

32. The First Credit Agreement, pursuant to which Winstar had borrowed approximately $1.2 billion, was paid off with a portion of the proceeds of the Bank Facility and other funds raised by Winstar. Lucent released its lien in Winstar's assets. (Revised Stipulation ¶ 8).

33. Winstar also had raised money in the public debt and equity markets over the years. (DX 701 at 26 and 48).

34. As Winstar was growing and building out a global telecommunications network, it was purchasing millions of dollars of equipment from Lucent. Lucent desired to keep its good customer relationship with Winstar and thus in May 2000, simultaneously with the execution of the Bank Facility and repayment of the $1.2 billion owed under the First Credit Agreement, the parties entered into the Second Credit Agreement whereby Winstar received from Lucent a $2 billion line of credit with the ability to borrow up to $1 billion at any one time. WVF–I LLC ("WVF–I"), a newly

formed subsidiary of Winstar was the actual borrower; [26] Winstar and WCI Capital, the borrower under the Bank Facility, were the guarantors. (DX 38). Among other things, the Second Credit Agreement permitted WVF–I to purchase both Lucent and non-Lucent equipment and in exchange WVF–I granted Lucent a security interest ahead of the Bank Facility only in the equipment Lucent financed Lucent also took a security interest in WVF–I's "general intangibles" and "proceeds." The Second Credit Agreement also contained certain financial covenants, including a covenant that Winstar not permit its total Cash Capital Expenditures ("CAPEX") to exceed $1.3 billion in "any year prior to and including 2001"; [27] and entitled Lucent to serve a **\*255** "refinance notice" on Winstar if the outstanding loans exceeded $500,000,000. It also provided that any increases in the Bank senior loan arrangement would be used to repay Lucent. It is a partial repayment made to Lucent pursuant to the Second Credit Agreement, using funds from the so-called Siemans Transaction, that gives rise to Count 10, the preference claim.

35. Winstar repeatedly and knowingly helped Lucent by making massive, last minute, allegedly unneeded purchases that were arranged by Lucent as the ends of quarters approached. These end of quarter deals enabled Lucent to report more revenue and appear more profitable in its quarterly public reports than it really was. [28] In fact the dollar amount of Winstar's purchases of Lucent equipment in end of quarter sales was on average eight times as high as the dollar amount of Winstar purchases of Lucent equipment in months in which a quarter did not end. Lucent used these end of quarter deals to close its own revenue gaps.

36. In addition to the end of quarter deals, Winstar helped Lucent record revenue through alleged accounting schemes such as improper bill and hold deals, [29] whereby Winstar would pay for goods that it did not need, often were not identified with any kind of particularity, and frequently never even left the Lucent warehouse. The Trustee alleges that the Software Pool Agreement, dated September 29, 2000 (PX 323), whereby Winstar was to pay Lucent $135 million, in four equal payments of $33.75 million to be made in January, March, June, and August 2001, for software it did not need, did not use, and had a fair market value of substantially less than the contract price was another in a series of sham transactions that were designed to do little more than inflate Lucent's revenue. [30]

**\*256** 37. The actions of Lucent in allegedly forcing Winstar to enter into transactions such as the end of quarter purchases, bill and hold deals and the Software Pool Agreement, as well as Lucent's alleged delay in negotiating a transition agreement during the later part of 2000 in order to gain leverage over Winstar and its alleged delay in issuing the refinancing notice in order to improve its position viz a vie other creditors, give rise to Count 11, the claim of equitable subordination. [31]

### Summary of Lucent's Counterclaims

38. One of the covenants of the Second Credit Agreement required Winstar's CAPEX to not exceed $1.3 billion in any year prior to and including 2001. It is Winstar's alleged CAPEX in excess of the $1.3 billion limitation, its behavior to bring its CAPEX into compliance, its failure to undertake inquiry regarding its CAPEX, and its certification in each borrowing request that all covenants have been or would be met by the time of the borrowing that give rise to both Lucent's counterclaim for fraud, Counterclaim 5, and its counterclaim for negligent misrepresentation, Counterclaim 6.

### COUNT VII: BREACH OF THE SUBCONTRACT

39. The Trustee contends in Count Seven of the Second Amended Complaint that Lucent breached the Subcontract between Wireless and Lucent, thereby causing Wireless $62,050,742.00 in damages. Lucent responds that it was not required to perform under Subcontract because there was no "task order" for the work performed.

### The Subcontract and Task Orders, Purchase Orders, Invoices and Spreadsheets

40. The Subcontract expressly provides:

1.1. *Services.* Contractor agrees to perform for Lucent the tasks, responsibilities and services described on the attached task specific schedule(s) (individually a "Task Order") (the "Services"). The parties may enter into future Task Orders, to which the parties agree, from time to time, with each Task Order to be consecutively numbered and attached hereto. Services shall be provided in accordance with the provisions of this Agreement and the applicable Task Order and shall be on either a firm, fixed price or time and materials basis as specified in the applicable Task Order executed by both parties.

1.2. *Task Order.* Unless otherwise agreed by the parties in writing, each Task Order will include the

following information: (i) a description of the Services to be performed; (ii) the targeted commencement and completion dates of the Services; (iii) a list of deliverables to be provided by Contractor (the "Deliverables") and targeted delivery dates; (iv) methods of compensation to be provided to the Contractor (e.g., time and materials, firm fixed price or otherwise) and **\*257** other appropriate pricing terms such as hourly rates; and (v) other information the parties agree to include.

41. Even though the Subcontract called for Winstar to submit task orders to Lucent prior to Wireless's provision of services, the parties ignored this requirement and between January 1999 and October 2000, Lucent paid Wireless approximately $325 million for services performed under the Subcontract, most, if not all, without a prior written task order. In fact the parties agree that after the first quarter of 1999 they never exchanged a single task order (Revised Joint Stipulation ¶ 20). [32] Nathan Kantor, Winstar's President and Chief Operating Officer when the relevant agreements, including the Subcontract were negotiated and approved, testified that it was his understanding that Lucent and Winstar agreed that the invoices would function as the equivalent of the task orders. (Kantor, Video at 356–57). "The contract was administered by using the invoices and a Lucent purchase order to reflect these task orders and the work that was performed by Winstar to Lucent and agreed to by Lucent and those invoices were paid for several years." (Kantor, Video at 361–62).

42. Yet if the letter dated January 4, 1999 is a task order, the parties quickly dispensed with the task order process, opting instead to exchange less formal documentation, including purchase orders, invoices and spreadsheets summarizing Wireless' charges. Generally Winstar sent a purchase order to Lucent which, in turn, sent a purchase order to Wireless. Wireless performed the services and then sent Lucent an invoice, with or without an accompanying spreadsheet showing the breakdown of services or goods. Lucent then invoiced Winstar in the same amount as Lucent was billed by Wireless. Then, as described above, Winstar would draw down under the applicable Credit Agreement, use the draw to pay Lucent which would then pay its obligation to Wireless. In fact, Richard Uhl, Winstar's former Chief Financial Officer provided credible testimony about how payments were sought and obtained, as well as the underlying reason for dispensing with formal task orders.

Well, Lucent, the original agreement required that Lucent issue purchase orders. Early on it was discovered that

Lucent was unable or not capable of defining what should go into the purchase order. So the practice evolved, in **\*258** fact, was present when I became CFO in the fall of '99 that inasmuch as Lucent could not produce the details of the purchase order, Winstar Wireless would as its subcontractor to Lucent issue an invoice which Lucent would then cover with a purchase order and that was the sequence. That was the sequence present and existing when I assumed responsibility for Chief financial Officer's position in the fall of 1999.

(Uhl, Video-direct at 11).[33]

43. Shortly after entering the Supply Agreement, Lucent began to balk at the arrangement and as early as June 1999, Lucent threatened to pull the plug. Shortly after entering the Subcontract, Lucent determined very quickly that the pass-through payment arrangement "yielded no material benefit for Lucent, and in fact cost [Lucent] considerable resources to process, track and manage." (DX 163; *see also* Wilson, Tr. 16–30). Lucent could not recognize revenue on the pass-through transaction because it did not have sufficient control over the services being performed by Winstar's employees to allow revenue recognition under the accounting rules. (PX 388 at LW 00303141; DX 523; *see also* DX 155 at 2WC 0016320.) Lucent was also concerned that financing any additional services would hamper its ability to sell Winstar's loans because the banks it consulted with concerning such financing were "very negative on the inclusion of these Incremental services." (DX 149 at WC 0118574; *see* Wilson, Tr. 16–28–29; DX 155; *see also* DX 137.). And Lucent was attempting to sell the Winstar loan as it was among the largest loan Lucent had financed. (Hayes, Depo, Tr. 13–33). Consequently in early June 1999, even though Lucent was still unwilling or unable to build the turnkey operation as required under the Subcontract, it informed Winstar that it would not pass through any additional services because it was "concerned about having to severely discount the paper to sell it." (DX 154.)

44. Quickly discussion escalated to the chief executive level and ultimately Lucent agreed to continue the arrangement and it did so up until March 2001 when Lucent refused to pay for the previously rendered services ostensibly because there was no task order.

45. Lucent ultimately agreed to finance Wireless-performed services and facilitate the favorable accounting treatment that Winstar desired by passing through the 2Q1999 services.

(Wilson, Tr. 16–54.) Lucent only did so as an accommodation to Winstar, which claimed that ending the pass-through would have negative financial repercussions and which promised to negotiate a true turnkey approach to services that would allow Lucent to recognize revenue on such services in the future. "[T]here was a large pressure from Winstar to go ahead and [pass through services because Winstar] felt like it would have implications on their earnings report since they were capitalizing these services last quarter, and had it not happened this quarter it would reflect badly on their announcement." (*Id.*) Therefore, Lucent agreed to pass through Wireless-performed services in 2Q1999 "with the agreement from Winstar that [Winstar and Lucent] would pursue a business arrangement structure around a turnkey approach to the projects and network implementation that would then, again, well define the tasks for each company to perform, orders up front from Winstar to Lucent, Lucent then going through those task lists and ordering back from Winstar what we could not perform." (*Id.; see also* DX 164.)

**\*259** 46. On September 8, 2000 Winstar issued a purchase order, WVF 1–00000002958 (*See also* DX 390 and 391 referencing Lucent's position with respect to the September 8th invoice) that in line item number 1, sought payment of $65,509,331.00. But by this time Lucent was not inclined to increase the Winstar loan. In fact, Lucent was seeking to rid itself of some or all of this debt. At about this time Lucent was seeking to sell the Winstar loan. In mid-September 2000 Deborah Hopkins (Lucent's CFO), Rich McGinn (Lucent's President and CEO), Fred Rubin (Lucent's Treasurer and Senior Vice President), Richard Uhl (Winstar's CFO), and William Rouhana (Winstar's CEO) met with senior officers of the Bank of New York at a luncheon meeting at the Water Club. One of the goals of the meeting was to get the Bank of New York to buy the Winstar debt. The deal was not consummated as the financial market collapsed on the same day as the meeting. (Uhl, Video 282–83).

47. On September 21, 2000 Deborah Harris and William Plunkett of Lucent had a conversation with David Ackerman and Richard Uhl of Winstar and informed them that Lucent would not pay the $65,509,331. The next day Deborah Harris followed up the conversation with an email and a letter (PX–15) which reads in part:

At the signing of the supply agreement certain services in support of the Winstar network deployment were described as potentially being performed by Lucent Technologies. The actual assumption of these services was contingent upon the development and successful execution of a

transition plan for services that Lucent and Winstar agreed were Lucent competencies and could be successfully executed by Lucent.

* * * * * *

There is a category of services which, to date, Winstar continues to provide for itself...

We have been pursuing ways to take on these services in a manner agreeable to all parties, but have not been able to reach consensus. Consequently, we believe it is not appropriate for Lucent to accept Purchase Orders for these services. Specifically, we must reluctantly reject line item # 1 of the Purchase Order for $65,509,331.00, WVF 1–00000002958 issued by Winstar on September 8, 2000. Lucent stands ready to negotiate an arrangement under which Lucent becomes responsible for some or all of these services, whether via outsourcing or some other method. We suggest that Lucent and Winstar each designate an empowered team to move ahead with these negotiations with the goal of completing by October 1, 2000. If you agree with this suggestion, we are ready to start immediately beginning with a kickoff meeting next week.

48. At the time of the Harris letter, Lucent, however, had still not developed the core competencies needed for it to assume the buildout by itself. The suggestion that Lucent was ready and willing to perform the buildout and would do so but for the failure of the parties to agree to a transition plan was nothing more than an attempt to create a pretext for denying further draws under the Second Credit Agreement so that Lucent could renegotiate the terms of the "strategic partnership" for its benefit.

49. In fact, Lucent's demands for a financial concession had already begun by the time of the Harris' letter as had its pressure on Winstar to help Lucent make its end of quarter numbers as reflected in a September 18, 2000 email sent on Harris' behalf.

Nina and Bill:

**260** I have tried to do a very brief summary of all the "good, bad and ugly" on this account. Bottom line is that to do an EOQ [end of quarter] deal, we need Nate to provide direction to Ackerman and Uhl that this will take place. They are vehement that they are out of money and do not want to spend money on product that they can not immediately utilize. The deals of the past are haunting

us...there is $87M in their warehouses. But much of this is also due to problems with Williams.

We have a restructured proposals that categorizes what they need now through to long term. Definitely the majority of the money we are asking for is not for immediate use. It also includes pricing for the B's and Hubs which is 2 tiered, and time sensitive. Depending on how fast we can implement and identify cost reductions thru [sic] the breakthru [sic] items, could cause our BGP to hover around 30% or below.

What 1 need are 2 things:

**1. A call to Nate Kantor getting agreement to move forward on an EOQ deal**. Our meeting with Dave Ackerman is first thing Tuesday morning, so this would need to happen today. We believe they already will be spending around $46M with us, so we are asking for another $50–60M. (I am trying to get the total number in the $110–115M range).

2. Agreement that we can discuss at 5:15 today, on the aggressiveness of the proposal.... (PX 86)(emphasis in the original).

50. The same email transmission further supports a finding that Lucent was not only pressuring Winstar to do deals that were designed to benefit Lucent at Winstar's expense but conspiring to ensure that the lucrative to Lucent end of quarter deals got done.

Following are the "headlines" for the Winstar account:

* * * * * *

• Winstar Services: We pass through around $67M/Q of WinstarServices. We have been told to stop this practice. We will be communicating our position to Winstar the week of 9/18, including options of what portions of these services we can do. **We may want to delay this move for a quarter based on this EOQ deal**.

* * * * * *

• Previous EOQ Deals: ...

– Winstar does have major inventory as a consequence of these deals.

– Credits provided in all the previous EOQ deals are now hitting in 4Q2000 results.... (PX 86) (emphasis added).

51. Aversano placed the call to Kantor and, despite Winstar's financial condition, the deal was done. (Aversano, Video Tr. at 8). As Kantor subsequently wrote to Aversano, "Great to talk to you and we will help whenever possible." (PX 157). Kantor then instructed Ackerman to make the Lucent deal, which ultimately turned into a deal for $212 million in end of quarter purchases, happen. (PX 56).

52. Yet as David Ackerman wrote to Kantor in a September 18, 2000 e-mail, in view of Winstar's CAPEX issues, complying with Kantor's instructions to provide substantial revenue to Lucent would not be possible unless Ackerman got "creative:"

I just spoke with [Lucent employee Bill] Plunkett. He informed me that you and Nina [Aversano] had met (dinner?) and you agreed to help them get to the number they need this quarter ... something around $110M, of which we've already spent about $45M. There is not much I can give them that we really  **261**  need, but there are some creative things I can do that can get us close to their number without being totally stupid.

* * * * * *

Thus; we are working to cut another $70 [Million] in addition to the $117 [Million] [to meet capex covenants]. This means stopping ANY and ALL incremental spends for ANYTHING capex immediately, and letting capitalized contractors go ...

* * * * * *

How much capital CAN I REALLY SPEND THIS YEAR, and how much do I do to give Lucent what they need for 3Q?

If the answer is; both give Lucent the business, AND reduce the cap spend to $1B even I will need to institute some very severe measures immediately.

(PX–127) (Emphasis in original).

53. After receiving a copy of the September 22, 2000 email and letter, Nate Kantor, Winstar's President and COO, sent the following email to Nina Aversano, President of Lucent's North America group (PX–16):

I am very surprised and disappointed with this-we've only discussed it a million times. This doesn't sit well with me

and will have a major impact on our ability to help you this quarter.

You've got to get this fixed.

54. On September 25, 2000 James Cocito, Lucent's chief operating officer of its North America Region, sent Frank Manzi an email suggesting that Lucent consider the possibility of " 'a one more time' strategy." (PX 88). As Cochito noted in his email, "[Kantor] has indicated there will be no deal for the QTR unless this gets fixed. Impact about 60M or more. Also, I will know as of this morning whether they are going to play with the AR as well."

55. On September 27, 2000 Nina Aversano, President of Lucent's North America Region sent Richard Uhl, Winstar's CFO, [34] a letter (PX 17) [35] that purported to modify the terms under which the two companies did business and containing the conditions under which Lucent would pay the September 8, 2000 Purchase Order.

This is to inform you that Lucent will accept your purchase order WVF 1–0000002958[sic] conditioned upon Winstar's agreeing to the following terms and conditions. If you agree, kindly sign in the space provided below and return to me. Immediately. Nate, this is a great opportunity for us to move our relationship forward to what we envisioned-a seamless partnership where the many resources of Lucent can be utilized to help achieve Winstar's business plan. I hope you agree with me that we should seize the moment.

It would appear that there has been a great deal of confusion between us regarding which services and to what extent services would be provided by Lucent to Winstar under our Supply Agreement dated October 21, 1998. Pursuant TO Schedule A of that contract the parties intended a transition plan for Lucent to take over services that at that time Winstar was providing to itself. This was a broad plan possibly leading to a full outsourcing of all Winstar required services to Lucent Since the signing of that contract there have been a number of attempts to formalize this broad services relationship. The last such attempt was undertaken this past June when the parties entered into two addenda– the Hub and B–Site Addendum  **262**  [PX–18] and the Optical Network Addendum [PX–19]. These addenda did not include the full range of services contemplated in the Supply Contract.

I'm sure you would agree that the fault for the failure to execute on our original concept lies with both Winstar and lucent. Happily it appears we both favor the same result-a broad services relationship. We need to finalize that result as soon as possible so that our contractual relationship matches our mutual intent. We propose that commencing Monday morning October 2nd, or as soon thereafter as is reasonably possible, out two teams meet at your offices to finalize a broad services agreement. This would be a lock-up session to finalize a full service agreement no later than two weeks thereafter. Consistent with the principles already established in our two addenda referenced above, Lucent would have complete control of the work covered by the scope of work the parties mutually define in this new agreement. Lucent may either perform the work itself by acquiring expertise and personnel from Winstar, or subcontract some or all of it to third parties (including Winstar). Consistent with this model, commencing October 1, 2000, Winstar would perform this work only upon prior receipt of a mutually acceptable written purchase order from Lucent (and not at its sole initiative). Should this process not be followed, Lucent would not be able to accept purchase orders or invoices for any Winstar performed services that are outside the scope of work defined in this agreement.

Further, until this new service agreement is in place, Lucent will not be able to accept purchase orders or invoices for services performed by Winstar after September 30, 2000 that are either outside the scope of the two addenda referenced above or that fall within the scope of the new, as yet unexecuted, service agreement. Prior to Winstar performing any work that might rightfully fall within either of the two existing addenda referenced above, Lucent would need to issue mutually acceptable written purchase orders. Should this process not be followed, Lucent would not be able to accept purchase orders or invoices for any Winstar performed services presumably on Lucent's behalf.

I look forward to your prompt reply, and the further growth of our relationship consistent with our shared vision....

56. Uhl signed the letter thereby acknowledging his assent and returned the same to Lucent. Uhl did not understand this letter to terminate the original agreement in the event the parties were unable to enter into a new agreement. (Uhl Video-direct at pp. 16, 18, and 19). Kantor understood that

Lucent's financial people were demanding a letter because they needed to book revenue. (Kantor Video-direct at 180–81).

57. In addition to Uhl's signing the letter, Lucent extracted another and even more substantial financial concession from Winstar when, on September 29, 2000 the parties executed the Software Pool Agreement (PX 323). Under the Software Pool Agreement Winstar purchased $135 million of unneeded software. The transaction was simply a sham, however. It's purpose was to inflate Lucent's end of quarter revenues. To that end, the Software Pool Agreement was successful: it alone accounted for 26% of Lucent's profits that quarter. (DX 739 at ¶ 60).

58. The end of quarter deals for the third quarter of 2000 committed Winstar to make approximately $212 million in purchases and forced Winstar out of compliance **\*263** with the CAPEX covenant and over the $500 million refinancing threshold. (Ackerman Video at 605–08 and 666–69; PX 43; PX 57; PX 78; PX 107; PX 148).[36]

59. Lucent's Initial software proposal was for a much smaller amount—$25 million—but in less than nine days, with Kantor's promise to Lucent that Winstar would help "wherever possible," the pool expanded approximately five-fold to the $135 million figure. (PX–57; PX–323, Zlotnick Video-direct at 157). This increase occurred without the numerous internal studies or any of the other planning documentation that Mr. Pocalyko testified were typical. (DX–702; Pocalyko Tr. 3–41–42). As Lucent's Deborah Harris advised on September 22, 2000, "I know the overall Software request will be a surprise and that is an area where a conversation will be of (PX–52). benefit."

60. As part of this software pool transaction, the parties also agreed that Lucent's list pricing for the software, rather than Winstar's contractually-reduced pricing, would be used to further boost Lucent's revenue. (PX–53; PX–349). As Winstar executive William Zlotnick testified, the software deal was ultimately priced "at whatever Lucent needed for its revenue." (Zlotnick Video direct at 160–61; PX–79; see also PX–57). Of the $135 million of software, less than $20 million was of value to Winstar. (Zlotnick Video-direct at 169–71). In fact, in post-deal documentation Lucent took the position that Winstar was only entitled to select $20 million of software—and would have to pay extra if it wanted more—despite Winstar's obligation to pay $135 million in cash in 2001. (PX–54). Lucent later recanted this position.

61. To enable Winstar to make the required cash payment for the software, the companies agreed to enter into contracts for credits postdated after September 29, 2000 and payable in the fourth quarter of 2000 (*i.e.,* before Winstar was obligated to actually make the software payments to Lucent), (PX–54; PX–57; PX–186 at internal tab 2; PX–324; PX–462 at 37; Rubin 2003 152:15—154:11).

62. On behalf of Winstar, Ackerman signed the post-dated credit agreements, enabling Lucent to book almost the entire amount of the software deal as revenue in Lucent's final fiscal quarter of 2000 (September 30, 2000). (PX–167; DX–739). Thus, Lucent funded Winstar's purchase of the unnecessary software in advance, to obtain Lucent's September 2000 revenue and profit infusion.

63. Shortly thereafter Rouhana, Winstar's Chairman and CEO, informed Schacht, one of Lucent's directors and who, as of October 23, 2000, resumed his previous position as CEO of Lucent, about the financial improprieties between the companies. Lucent retained its outside counsel to investigate its accounting procedures. The investigation resulted in Lucent's reversal of the revenue recognition from the Software Pool Agreement and a shake-up of the company's accounting staff. (Schacht, Tr. 21 at 33–35).

64. The Securities and Exchange Commission ("SEC") also conducted an investigation that ultimately lead to the SEC's filing a civil complaint against Lucent, certain key Lucent employees, including Deborah Harris, who as Vice President of Sales assumed responsibilities for the Winstar account in August 2000, and **\*264** Plunkett, a member of Lucent's management team overseeing the Winstar account, and former Winstar employee, David Ackerman, a "Group Executive" responsible for the build out of Winstar's network. A criminal investigation is still ongoing. When deposed as part of the SEC, both Harris and Plunkett refused to answer citing their right against self-incrimination under the Fifth Amendment to the United States Constitution.

65. Lucent in fact terminated Mr. Plunkett for his involvement in postdating documents related to the software deal. (Schacht Tr. 21–35). It did nothing, however, to terminate or otherwise punish fellow Winstar Sales Team members Deborah Harris, Vanessa Petrini or David Rigotti, all of whom remained active on the Winstar account into 2001, and who were clearly culpable in the scheme to fraudulently post-date the deal documents. (See PX–73; PX–66). Thus, while Mr. Plunkett

became the scapegoat, the transaction remained in place, and the other Lucent participants remained active on the core Winstar sales team. (Schacht, TR. 21–29:3–21, 21–33:13–17, 21–35:7–14).

66. Soon after sending her September 27, 2000 letter Aversano was relieved of her duties at Lucent and formally left Lucent in December 2000. (Aversano Depo, Tr. 8–22–24.). When she left, the parties had not executed a transition agreement nor had they resolved the ongoing problem of payment of the pass-through requests.

67. During this same time period Lucent was experiencing its own financial crisis and was attempting to reduce its exposure on loans it was financing. (PX184). By at least mid October 2000 it drafted, but did not send, a refinancing notice as Winstar's outstanding borrowing exceeded the $500 million trigger. (Hayes, Depo, Tr. 13–40); PX 185 ("Per the email below, we are planning to issue a Refinancing Notice to Winstar next week."). Lucent was well aware of the impact sending such a notice could have. By email dated November 2, 2000, Paul Hayes, Lucent's Director of Syndication and whose job was created in late 1999 or early 2000 specifically to manage the process of removing loans from Lucent's books, circulated a memorandum from Beth Perricone addressing the implications of sending a refinancing notice to Winstar. (Hayes, Depo, Tr. 13–31; PX 187). That memorandum provides in part:

> Paul and I have studied the implications for Winstar and Lucent of issuing a refinance notice....

\* \* \* \* \* \*

### IV. Implications of Issuing a Refinance Notice:

#### Option 1–Issue a written 105 day refinance notice for all or a portion of the Lucent Loan

Pros:

- Puts pressure on Winstar to seek alternative sources of capital (i.e. existing Bank Syndicate, Bondholders, Equity Sponsors, and Vendors);

- Forces parties to the table to deal with funding shortfall issues;

- Provides ability for Lucent to re-negotiate certain provisions, e.g. content requirements, limit non-

Lucent content financing, eliminate Winstar pre-approval for Lucent loan sales, improve collateral position (i.e. pari passu with Bank Syndicate);

• Repayment by Winstar results in fresh $1B of Lucent financing available for Winstar;

• Lucent can always rescind or modify the refinancing notice

Cons:

**\*265**  • Winstar is likely to immediately file 8–K to disclose material adverse event, disclosing the amount of the financing;

• Disclosure may result in details of Lucent's financing becoming public;

• Market rumors may further disrupt capital markets and deter new investors;

•  Existing Winstar securities could suffer price deterioration, further impacting market appetite and further depressing price of Lucent Loans;

• Potential Rating Agency implication for Lucent and Winstar;

• Potential increased cash flow requirement for Winstar, which would result at end of Refinance Period (90–105 days). If winstar does not refinance, rate on Lucent Loan increases by 2% (i.e. a potential $13.8 M in additional interest cost annually on current & 690 M of Lucent Loans). If Lucent chooses to convert its notes at the end of the Refinance Period, the Conversion Notes (a defined legal term) could carry a cash payment coupon as high as approx. 21% based on Winstar's current bond prices (i.e. a potential $62 M of additional interest cost annually on current $690 M of Lucent Loans)

**Option 2–Meet with Winstar immediately and advise verbally of pending notice**

Pros:

• Provides opportunity to negotiate right to sell up to $300 M of Lucent Loans today if Lucent desires;

• Advise of refinance amount of 100% of Lucent Loans then negotiate a lesser amount if Lucent desires;

• Flush out any strategic options currently under consideration by winstar;

• Extract other amendments (i.e. collateral, voting, assignments, etc.) and any additional economic concessions (i.e. rate, fees, warrants)

• Limit public disclosure and market impacts

Cons:

• Time is of the essence

• 105 days required for refinance

• Rumors still may permeate the marketplace

**V. Conclusions:**

• Lucent's ultimate negotiating position may be driven by our own perception of Winstar as a "going concern";

• If we believe they are a survivor than our primary concern might be limiting a loss of Lucent profits, i.e., discounting Lucent paper;

• To make the most informed Lucent decision we need better clarity from marketplace on capacity for Winstar debt/equity to make a more informed decision; A confidential discussion may begin immediately on this;

• Alternatively, do we perceive Winstar as completely locked out of the capital markets and absent a strategic investor? Should we be concerned about capital preservation and the impact to Lucent's balance sheet and credit rating?

• Ultimately our decision should be driven by where we think this is going. In our judgment, if the capital market disruption is temporary, i.e., 3–6 months longer; than [sic] Winstar is likely to survive.

68. By November 7, 2000 Lucent had apparently decided to delay issuing the refinancing notice when Beth Perricone again wrote in an email:

As you will see below there was a meeting of the minds at Winstar yesterday. Late last nite [sic] Bill Quinn and I spoke briefly to Peter for the outcomes  **\*266**  of that meeting. Peter described 3 capital events about to occur:

• Bank group to provide for new term loan of $200M to be supported via guaranty of Siemans. The proceeds of this loan are to paydown [sic] Lucent Apparently Winstar will enter into long term supply agreement w/Winstar [sic] in exchange for their guaranty. Not sure how they will pay for Siemans gear if that facility is used to repay us? ?

• Winstar to enter into new $275M capital lease w/Cisco

• Winstar to inject new $25M of equity (term sheet to follow to Lucent)

This would bring our current exposure of $690M down to $490M or below the trigger amount. I am not clear from Peter whether we will issue refinance notice now, sounds like we are waiting.

Peter want complete due diligence done at Winstar so Quinn, Keller and I are coming up w/ a list today.... (PX 188).

69. On November 10, 2000 Perricone sent yet another email in which she again recommended that due diligence of Winstar be undertaken to evaluate the impact of a refinancing notice prior to send such a notice. (PX 189). Lucent was clearly worried that the issuance of the refinancing notice would have dire consequences for Winstar. (Hayes, Depo, Tr 13–45). Nevertheless Hayes assuredly wrote in a November 16, 2000 email to Hunt–Majean, "Sending the refinancing will not send Winstar into a financial 'tailspin,' and I will stake my bonus from this past year on it." [37] (PX 191).

70. In November 2000 Lucent commenced its due diligence of winstar's financial condition. As a result of the due diligence, Perricone recommended that Lucent lower Winstar's "Asset Quality Rating" or "ARQ" from 6 to 7. [38] (Perricone, Depo, Tr. 3–115).

71. Lucent replaced some of its key management in the fall of 2000 but it continued along a tumultuous path with employees in the sales and finance department continuing to have different goals and objectives. Although Lucent's upper management wanted to extricate the company from the business of lending to its customers, or at least from Winstar, the pressure to have Winstar continue purchasing and building out the network continued. Indeed when Winstar did not behave as Lucent wanted, Lucent simply shut down any discussion of a transition agreement. Lucent continued to

control Winstar throughout the course of their relationship, including in December 2000. Although there may have been periods when Lucent's control was less apparent or even relaxed, and indeed there were times when Winstar was able to extract concessions from Lucent, the fact remains that these parties were not dealing at arms length. For example, the bill and hold transactions were done at the request of Lucent (PX 462 at Exhibit N); [39] purchase **\*267** orders are vague-often describing as "miscellaneous" a purchase of several million dollars (*See, e.g.,* PX 462 at Exhibit H and I); the inflation of the Software Pool Agreement from $31 million to $135 million over the course of a 9 day period (PX 462 at Exhibit P). [40] There were also excessive end of quarter deals, unneeded equipment paid for by Winstar but sitting in Lucent's facilities, duplicate charges, and difficulty, to say the least, in getting credits correctly to Winstar's accounts. [41] Winstar was and remained Lucent's captive purchaser of unneeded and sometimes unidentified goods to permit Lucent to inflate its own revenue.

72. By letter dated December 28, 2000 and addressed to Michael Montemarano, Lucent's Vice President of Finance of Worldwide Sales and Marketing, (DX 556), Winstar sent Lucent a request to borrow $62,324,930.00. [42] Accompanying the letter was a one page "analysis" captioned:

**Winstar Telecommunications, Inc.**

**Lucent Billing for Capital Labor**

**Q1 2001 Estimate**

The chart lists the departments which provided the services under three general headings: "Winstar Systems Group," "Winstar For Buildings," and "Winstar Network Services." Each general heading is followed by a specific list of what appear to be the various departments which rendered services, along with the total of "internal," "external," and "Lucent billable" labor costs incurred by each department for the months of October, November, and **\*268** December (for which month the figures are estimates) of 2000.

73. On the evening of December 27, 2000 Montemarano sent an email (included as part of PX 199) to several Lucent employees, including Ben Verwaayen, Lucent's Vice

Chairmen; and Hopkins, Lucent's CFO, which reads in part as follows:

> Based on a call today from winstar [sic] chairmen, president and CFO we took the following position as articulated by Ben. We could "allow" winstar [sic] to use the credit facility to fund their services for this quarter. We would not engage in any billing/po's between the companies, but they could and do intend to draw down the facility for about 65M [sic]. This is money out the door for us.
>
> We agreed that the 35m [sic] credit granted in 4qtr can be used as a reduction to their outstanding credit facility. It would not be dispersed as cash to them, but we [sic] go against the credit facility as "repayment."
>
> They also Indicated they had presented a draw down last week of 32M [sic], Ben asked them to reconsider this given the extremely low lucent [sic] content.
>
> I will work this tomorrow with their CFO and plan to ensure they adequately document cash draws. In addition, Ben asked the CT [customer team][43] to set up a meeting with winstar to get the relationship to a new level where both companies benefit.

74. The next morning Lucent's CFO sent the following reply via email (also part of PX 199):

> WE HAVE ALREADY SAID no TO
> THE SERVICES FUNDING.

75. A few hours later, Verwaayen emailed (also part of PX 199) the following:

> Well, after a read out from the lawyers and after reviewing the options with everybody on our pre call yesterday, Winstar can draw down upon the credit facility, including services.
>
> We did push back on credits (no cash, but off setting a/r's) and the 30 million request that came in Friday.
>
> We really had not the option of denying their rights here.
>
> In reality, we can make their lives miserable for a couple of days, but they have an open line and that is what we have to change.
>
> So what we did, after all agreed in our pre call is to create a basis for a fundamental resetting of this relationship.

> We will create from both sides a wishlist how to recreate our legal platform working together and renegotiate on those issues.
>
> I think we all understand how much better we are and how to get out of this situation going forward.
>
> We want to make this a profitable account with clear rules of engagement.

76. But as suggested in the December 29, 2000 email Ben Verwaayen sent, Lucent had used its influence over Winstar to set the stage for the new negotiations.

> Now we have positioned ourselves for a major overhaul of our relationship with Winstar, I think we should involve our partners in treasury and Legal in preparing a model for our negotiations on Jan 9 or 10.... (PX 261).

77. On the evening of January 5, 2001, Elizabeth Perricone (who was not copied on the above series of emails) sent an email (PX 119) which reads in part:

*Financing of Services on 12/29/00:*

> Given our agreement to finance services on 12/29/00, legal feels it would be prudent **\*269** to send Winstar a letter confirming this was a borrowing under the Credit Agreement as an accomodation [sic], and we reserve the right not to make loans for any such purpose in the future.

78. On March 27, 2001 Winstar faxed to Lucent a notice of Winstar's request to borrow $62,050,743.00 effective March 30, 2001. (DX 668). The draw request is on Winstar letterhead and is captioned "Notice of Request for Borrowing." The Notice states that the request is given "[p]ursuant to Section 2.03 of the Credit Agreement" and contains a certification "that all conditions for borrowing set forth in Section 4.03 the [sic] Credit Agreement have been satisfied or will be satisfied as of the date hereof and as of the date the borrowing is made." The Notice also indicates that the entire amount requested is to be paid to the "Borrower" for non-Lucent equipment.

79. On April 2, 2001 Winstar sent Lucent a second fax that contained the back-up detail to the Notice of Request for Borrowing (included as part of DX 668). The cover sheet contains the following note: "Please add this to the

draw request as an attachment. Although this is not usually provided, this is the detail behind the services number." The detail attached is a one page chart that is captioned:


**Winstar Telecommunications, Inc.**

**Lucent Billing for Capital Labor**

**Q1 2001 Estimate**

The chart is virtually identical to the one attached to the fourth quarter 2000 request except that this request is for the months of January, February, and March (for which the figures are estimates) of 2001. The total of all of these costs is approximately $62,050,742. [44]

80. Lucent refused to pay citing the lack of a task order. The lack of a task order was simply a ruse, however. Lucent had not required task orders in the past and, although Aversano's September 27, 2000 letter purported to set new parameters for payment, Aversano's letter extorted Winstar's assent to the reset terms by threatening nonpayment. Even Lucent's own executives testified that the documentation submitted by Winstar created a "commercially binding relationship" for the relevant time periods: "[a]t September 30th [2000], we clearly were in a relationship that was commercially binding because there were purchase orders and invoices between the companies where we subcontracted with them." (Montemarano, Video-direct at 10–11; see also Montemarano, Video-direct 68:8—69:24; Simpson, Video-direct at 18–54). [45]

81. Although, beginning as early as the communications surrounding the invoice for the second quarter of 1999, Lucent warned Winstar that it would pay for Wireless' services "one last time" without a task order, there were too many "one last times" for that warning to be effective. (See Aversano's letter of September 27, 2000; December 27, 2000 call between Lucent and Winstar) (Wilson, Tr. 16–110–11). Moreover, privately Lucent employees agreed that Lucent was obligated to pay for these services. As is discussed in greater detail below, Lucent was using the threat of non-payment to get Winstar to **\*270** renegotiate their various agreements to get a better deal. On repeated occasions, Lucent advised Winstar that it was paying for Wireless' services under the Subcontract "one more time" or "one last time" but always paying each invoice until March 2001 when Lucent

was again trying to turn up the heat to get a better deal from Winstar. (Wilson, Tr. 16–110–11).

[7]  82. The requirement that there be "task orders" as contemplated by the Subcontract was modified by the course of conduct between the parties.

[8]  83. Lucent argues that this course of conduct between the parties is irrelevant because the Subcontract contains a "no oral modification" clause. Although such clauses are generally enforceable under New York law, there are two exceptions: (1) where an oral modification is supported by full performance, or by partial performance unequivocally referable to the oral modification, *Rose v. Spa Realty Associates,* 42 N.Y.2d 338, 343, 397 N.Y.S.2d 922, 926, 366 N.E.2d 1279 (N.Y.1977), and (2) where a party has relied upon an oral modification through conduct which is incompatible with the express terms of the contract, equitable estoppel will prevent the other party from attempting subsequent strict reliance on the written terms. *Id.,* 42 N.Y.2d at 344, 397 N.Y.S.2d at 927.

[9]  [10]  [11]  84. "Under New York law, oral directions to perform extra work, or the general course of conduct between the parties, may modify or eliminate contract provisions requiring written authorization or notice of claims." *Barsotti's, Inc. v. Consolidated Edison Co. of New York, Inc.,* 254 A.D.2d 211, 212, 680 N.Y.S.2d 88, 89 (1998) (internal quotations and citations omitted). When the contract has not been fully performed, "the party seeking relief from the written terms of the contract must introduce evidence of conduct on the part of other parties or reliance on his own part which is 'unequivocally referable' to the oral modification and incompatible with the contract's written terms." *Rose,* 42 N.Y.2d at 341, 344, 366 N.E.2d at 1281, 1283, 397 N.Y.S.2d at 924, 927. "Because the doctrine of part performance is based upon the equitable principle that it would be a fraud to allow one party, insisting on the Statute [of Frauds], to escape performance after permitting the other party, acting in reliance, to substantially perform, the acts of part performance must have been those of the party insisting on the contract, not those of the party insisting on the Statute of Frauds." *Messner Vetere Berger McNamee Schmetterer Euro RSCG Inc. v. Aegis Group PLC,* 93 N.Y.2d 229, 237, 711 N.E.2d 953, 958, 689 N.Y.S.2d 674, 679 (1999).

85. In this case the parties' behavior resulted in a modification to the Subcontract. There can be no question that Wireless' performance was undertaken pursuant to the Subcontract.

Based upon Lucent's past practices, neither Wireless nor Winstar was unreasonable in relying upon Lucent's practice of funding and paying for services upon presentation of an invoice and spreadsheet and neither was unreasonable in expecting this practice to continue. Moreover, it is not credible that almost two years after the pattern had been established that Lucent would insist upon compliance with the letter of the Subcontract, particularly when Lucent has used this tactic in the past to try to pressure Winstar and when Lucent itself was dragging its heels on negotiating the long-awaited transition agreement. In fact, after Lucent forced Uhl, under threat of non-payment of the Winstar's September 8, 2000 invoice in the amount of $65,509,331, to sign Aversano's September 27, 2000 letter (PX 88) purportedly resetting the terms and conditions of the Subcontract, **\*271** Lucent ignored the reset terms the very next quarter. Therefore based on the parties' behavior, the Subcontract was modified to provide for payment of purchase orders, invoices, etc. after the Wireless performed the work and thus Lucent's refusal to pay the March 2001 invoice was in breach of the Subcontract.

86. The Trustee is awarded damages in the amount of $62,050,742.00, the amount of the March 2001 invoice which Lucent was obligated to, but did not, pay. Pursuant to the law of this case, no consequential or punitive damages are awarded in connection with the breach. (*See* Docket # 85 and # 103). Moreover the parties have agreed that, if the event that the Trustee should be awarded damages pursuant to this Count, Lucent would be entitled to an offset of $6.3 million. Therefore the damage award is reduced to $55,750,742.00.

**COUNT X: PREFERENCE**

87. Section 547(b) of the Bankruptcy Code, 11 U.S.C. § 547(b), provides in relevant part as follows:

Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

* * * * * *

(B) between ninety days and one year before the date of filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

88. The burden of proving each of these elements by a preponderance of the evidence is on the chapter 7 Trustee. 11 U.S.C. § 547(g). *Official Committee of Unsecured Creditors v. Conceria Sabrina,* 195 B.R. 602, 612 (Bankr.M.D.Pa.1996).

89. In November 2000, with Lucent and Winstar still in negotiations on a transition agreement, Winstar informed Lucent that Siemans agreed to join the Bank Facility and lend Winstar an additional $200 million.

90. Prior to the closing of the Siemans loan, Winstar sought Lucent's permission to keep all, or failing that, $100 million of the loan and pay the other $100 to Lucent even though the Second Credit Agreement called for 100% of the proceeds of any increase in the Bank Facility to be paid to Lucent. Lucent refused and responded with a letter dated November 7, 2000 "consent letter" that was merely a list of demands. Those demands included the following:

A. First, Lucent demanded that Winstar draw all of the funds down as soon as they were available and pay them to Lucent, rather than allowing Winstar to determine whether and when it would tap the facility.

B. Second, Lucent demanded that Winstar agree to prepare a written paydown schedule for the remainder of the sums it owed Lucent under the Second Credit Agreement—even though Winstar was not obligated even to begin repaying the sums until 2005—and insisted that **\*272** Winstar help Lucent sell off the other outstanding Winstar borrowings.

C. Third, Lucent required that Winstar cooperate in Lucent's performing a due diligence review of Winstar.

91. When Winstar did not immediately agree to Lucent's demands, Lucent put the transition agreement negotiations on hold. Lucent's communications to Winstar were clear and carried the single message: agree to Lucent's demands or there would be no transition agreement.

92. When Winstar still did not acquiesce, Lucent played its ultimate trump card: give Lucent all of the Siemans proceeds or there would be no further draws under the Second Credit Agreement. Lucent, of course, could not withhold funding without breaching the Second Credit Facility. Lucent's threat was one more ploy to control Winstar.

93. Faced with the economic pressure, Winstar agreed to turn over the Siemans proceeds and on December 7, 2000 closed on a $200 million increase to its syndicated loan with Bank of New York.

94. On the same day Winstar paid, by wire transfer, Lucent $188,180,000 to reduce Winstar's outstanding loan with Lucent. This transfer represented the net loan proceeds of $194 million minus $5,820,000 refund of an up-front fee Winstar had paid Lucent at the time of the borrowing under the Second credit Agreement.

95. Lucent disputes that a transfer of Winstar's interest in property was made, that Winstar was insolvent at the time of the Transfer, and that Lucent was an insider of Winstar at the time of the Transfer.

### Transfer of the Debtor's Interest

[12] 96. Lucent waived the argument that there was not a transfer of Winstar's interest when it agreed to the following stipulated fact set forth in paragraph 6 of the Additions to Stipulated Facts, filed in open court on March 21, 2005:

> Section 547(b)(1) of the United States Bankruptcy Code has been satisfied with respect to the Trustee's claim that the transfer to Lucent of a portion of the Siemens loan proceeds constituted a voidable preference.

[13] [14] 97. Subsequently, after the Trustee had rested, Lucent argued its motion for partial findings under Fed.R.Civ.P. 52(c), incorporated by reference into Fed. R. Bankr.P. 7052, and asserted for the first time that the Trustee had not sustained her burden of proving that section 547(b)(1) had been satisfied. (Tr. 17–7.) Having stipulated that this

element has been satisfied, Lucent is not free to take back the stipulation after the Plaintiff concluded her case. But lest Lucent argue that the stipulated fact which, to the Court, is clear on its face is somehow ambiguous or means something other than what it says, the Court finds that even without the stipulation, there is more than ample evidence that a transfer of Winstar's interest in property occurred when it paid over a portion of the Siemens proceeds to Lucent. As Judge Fitzgerald recently stated in *In re AmeriServe Food Distribution, Inc.*

Section 547(b) requires, inter alia, that the property transferred by the debtor be an "interest of the debtor in property." The Supreme Court has interpreted this to be "property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings." *Begier v. IRS,* 496 U.S. 53, 58, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990). In determining whether a transfer was "an interest of the debtor in property," courts apply the "diminution of estate doctrine," under **\*273** which a transfer of an interest of the debtor occurs when a transfer "diminish[es] directly or indirectly the fund to which creditors of the same class can legally resort for the payment of their debts, to such an extent that it is impossible for other creditors of the same class to obtain as great a percentage as the favored one." *In re Superior Stamp & Coin Co. Inc.,* 223 F.3d 1004, 1007 (9th Cir.2000), quoting 4 Collier on Bankruptcy, ¶ 547.03, at 547–26 (15th ed.1993).

*AFD Fund v. Transmed Foods, Inc. (In re AmeriServe Food Distribution, Inc.),* 315 B.R. 24, 29 (Bankr.D.Del.2004).

98. But for the payment over to Lucent that Debtor would have had the use of those funds. That failure to pay Lucent upon completion of the refinancing with Siemens might have given rise to a claim by Lucent for breach of contract does not nullify the fact that a transfer of the Debtor's interest was made.

[15] 99. Lucent further attempts to couch this argument as one of "substitution," that is, Siemens was substituted for Lucent on that portion of the loan it made. This argument is factually incorrect. By Lucent's own admission, its collateral pool was different from that given the Siemens. The Siemens transaction was not simply the substitution of one lender for another. Viewed another way what Lucent is really arguing is, as the Trustee correctly notes, the so-called "earmarking doctrine." Under this theory Lucent argues that Winstar had no ability to divert a vast majority of the Siemens

proceeds away from Lucent. Thus, Lucent asserts Winstar had no interest in the proceeds and was somehow simply a conduit through which the money flowed. But the facts here are distinguishable from those cases in which debtors validly assign proceeds before they are acquired. Here there was no assignment, just a simple promise to pay. That contractual obligation, without more, is insufficient to convert this into an assignment. *Compare In re Computer Engr'ng Assocs., Inc.,* 337 F.3d 38 (1st Cir.2003) (valid assignment of contract proceeds meant that debtor had no interest in proceeds as they accrued); *In re RISCmanagement, Inc.,* 304 B.R. 566 (Bankr.D.Mass.2004) (valid assignment of contract proceeds would deprive debtor of any interest in that property, but mere agreement to pay creditor out of contract proceeds would not). Moreover there is nothing in the record evidencing an agreement between Siemans and the Debtors that the proceeds of the Siemans transaction be used to pay Lucent. *See Reigle v. S.S. Mahajan (In re Kumar Bavishi & Associates),* 906 F.2d 942, 944 (3d Cir.1990) (affirming preference where "record does not reflect the existence of an agreement between [new creditor] and the debtor that the funds be used to pay a specified antecedent debt"); *In re Bohlen Enters., Ltd.,* 859 F.2d 561, 566 (8th Cir.1988); *Howdeshell of Fort Myers v. Dunham–Bush, Inc. (In re Howdeshell of Fort Myers),* 55 B.R. 470, 474–75 (Bankr.M.D.Fla.1985) (rejecting earmarking where debtor decided who to pay, and third party did not "condition" loan on payment to defendant).

**[16]**    100. Finally, earmarking is an affirmative defense. Lucent did not raise it in its Answer or in the Joint Pretrial Memorandum. Thus, even if Lucent had not previously waived the issue in the Additional Stipulated Facts, and even if it had proved facts that bring the Siemens proceeds under the doctrine of earmarking, it waived the defense when it failed to plead it as an affirmative defense.

### Insolvency

**[17]**    101. Under the Bankruptcy Code

> **\*274**  "insolvent" means—(A) with reference to an entity other than a partnership and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—
>
> (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and

> (ii) property that may be exempted from property of the estate under section 522 of this title ....

11 U.S.C. § 101(32).

**[18]    [19]**    102. This test of insolvency, the so-called "balance sheet" insolvency, compares the "fair value" of all of the debtor's assets with the face or "stated" value of its liabilities on the relevant date. It is different from equity tests that focus on a debtor's current ability to pay debts as they become due. Moreover, although labeled as the "balance sheet" test, as Judge Wairath noted "this may be a misnomer because the Balance sheet Test is based upon a fair valuation and not based on Generally Accepted Accounting Principles ('GAAP'), which are used to prepare a typical balance sheet." *Lids Corp. v. Marathon Investment Partners, L.P. (In re Lids Corp.),* 281 B.R. 535, 540 (Bankr.D.Del.2002). "[A]lthough GAAP is relevant in [a] section 547 solvency analysis, it is not determinative." *Id.* at 542. "Whether a company is insolvent under the Bankruptcy Code is considered a mixed question of law and fact." *In re Trans World Airlines, Inc.,* 134 F.3d 188, 193 (3d Cir.1998).

### Fair Valuation

103. There are three standard approaches to determine the fair value of assets: the market approach, the income approach and the asset approach. (Scherf, Tr. 12–12–13 and 23–24). Although experts generally consider each of these approaches (Scherf, Tr 12–13), not all of the approaches are appropriate or helpful in determining the proper measure of valuation. Indeed valuation, although employing broad principles of economics, is as much an art as it is a science. Each approach may yield a different result and which approach offers the best or better framework is a determination made in light of the facts of a case. Nevertheless there are some basic tenets that guide courts in evaluation valuation evidence.

104. Fair valuation is generally interpreted as fair market value, that is the amount a hypothetical willing buyer would pay to a willing seller, rather than a distressed or liquidation value. *Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.),* 134 F.3d 188, 194 (3d Cir.1998), *cert. denied,* 523 U.S. 1138, 118 S.Ct. 1843, 140 L.Ed.2d 1093 (1998).

**[20]    [21]**    105. "[A] fair valuation of assets contemplates a conversion of assets into cash during a reasonable period of time." *Id.* Although the determination of what is a reasonable

period of time depends upon the facts of each case, a "reasonable time should be an estimate of the time that a typical creditor would find optimal: not so short a period that the value of the goods is substantially impaired via a forced sale, but not so long a time that a typical creditor would receive less satisfaction of its claim, as a result of the time value of money and typical business needs, by waiting for the possibility of a higher price." *Id.* at 195. Thus the Court must decide whether "fair value" under the facts of this case means that the Debtor's assets at the time of the transfer must be valued as a going concern or on some other basis, such as a liquidation sale. The answer depends on whether a liquidation in bankruptcy was "clearly imminent on the date of the challenged trans **\*275** fer...." *Id.* at 193. *Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply, Inc.),* 100 B.R. 127, 131 (Bankr.D.Mass.1989)*("The proper standard of valuation to be applied in determining solvency in a bankruptcy proceeding is the value of the business as a going concern, not the liquidation value of its assets less its liabilities.... Liquidation value is appropriate, however, if at the time in question the business is so close to shutting its doors that a going concern standard is unrealistic...."). Moreover "going concern" value may not be an appropriate test in an unstable market. *In re Art Shirt, Ltd.,* 93 B.R. 333 (E.D.Pa.1988).

106. As Lucent's insolvency expert noted in his report:

> During the 1999–2000 period telecom stocks exhibited a great deal of volatility. According to Merrill Lynch, during the period from January 1, 1999 to early March 2000 an average stock within the emerging broadband group appreciated 63% year to date, then these stocks declined an average of 87% by the end of 2000.

(DX 701 at 11).

107. The traditional method of determining " 'going concern' value is by capitalizing net profit." *Vadnais Lumber Supply,* 100 B.R. at 131.

108. The Trustee and Lucent each rely upon the testimony of their respective insolvency experts and not unexpectedly those experts reached vastly different conclusions. The Trustee's expert, Scherf, concluded that Winstar was insolvent on December 7, 2000, the date of the transfer;

Collins, Lucent's expert, concluded the Debtor was solvent on that date.

109. Stephen J. Scherf, the Trustee's expert, is a Certified Public Accountant and a Certified Valuation Analyst. He is a principal in Parente Rudulph, LLC and is well qualified to render an expert opinion in the area of insolvency. Lucent does not dispute his qualifications as an expert in this matter. Scherf's report was admitted into evidence as PX 460.

110. Lucent relied upon the expert opinion of Kevin Collins, a managing director of Houlihan Lokey Howard & Zukin and in charge of the valuation practice of the firm's New York City office. He is also well qualified to render an expert opinion in the area of insolvency and the Trustee does not dispute his qualifications as an expert in this matter. His report was admitted into evidence as DX 701.[46]

111. In this case the Trustee's expert considered all three approaches (Scherf, Tr. 12–24–25), while Lucent's expert did not consider the asset approach (Collins, Tr. 18–16).

### *The Market Approach*

**[22]** 112. The market approach measures the subject company's assets and those of similarly situate companies.

113. Collins testified that "there was a large and active trading market for Winstar...." (Collins, Tr. 18–16). He opined that the market approach or an income approach would be the appropriate tests for valuation. Because the market approach considered the value only on the basis that the purchaser could only acquire a minority ownership interest via stock purchases, he then adjusted the value upward **\*276** to include the increase in value that could be attributed to buying a controlling, or indeed entire, interest in the Debtors. Based upon his analysis, he opined that Winstar was solvent on the Transfer date.

114. Scherf rejected the stock market valuation of Winstar and he was correct to do so. The stock market value artificially overvalued the Debtor. For one thing market investors did not know that Lucent was holding back on issuing its refinancing notice. Lucent, but not the average investor, knew that Winstar's true financial picture was much bleaker than the Debtors' publicized financials would indicate. Moreover, as even Collins acknowledged, the market was unstable. [cite] It was simply too unstable to be an adequate indicator of valuation.

115. Moreover, as part of his market approach, Collins, blending a market approach with principles upon which the income approach is based, examined sales of companies or controlling interest in companies that were not comparable to Winstar in performing a guideline company approach and comparable transaction methodology.

### The Asset Approach

[23]   116. Scherf and Collins both utilized an asset approach to value Winstar. This approach looks at categories of assets and determines the fair market value of those assets or categories of assets based on what it would cost to replace or reconstruct the assets, that is, their replacement cost. (Scherf, Tr. 12–24 and PX 460 at 6). This approach generally begins with a company's balance sheet but substitutes the fair market value of assets and liabilities in place of the book value.

[24]   117. The date of the transfer, in this case December 7, 2000, is the relevant date for solvency. The Debtors, however, did not have financial statements as of that date, and, even if they had, financial statements prepared according to GAAP, although relevant, are not controlling. The Debtor did, however, have internally prepared financial statements for December 1, 2000 and December 31, 2000. Thus one approach to determining solvency as of December 7, 2000 is to begin with the financial statements of December 31, 2002 and apply a technique commonly referred to as retrojection. "[T]he United States Court of Appeals for the First Circuit has expressly approved the technique of retrojection, whereby a trustee may meet his burden of proof on the issue of insolvency by showing that the debtor was insolvent at a reasonable time subsequent to the alleged transfer, accompanied by proof that the debtor's financial situation did not change materially during the intervening period." *In re Industrial Commercial Elec., Inc. v. Babineau ( In re Industrial Commercial Elec., Inc.),* 2004 WL 1354530, *7 (Bankr.D.Mass.)* (citations omitted). There is no reason to believe that this technique, employed by both parties' experts, would not be expressly approved by the Third Circuit as well. "That rule [retrojection] provides that when a debtor was insolvent on the first known date and insolvent on the last relevant date, and the trustee demonstrates 'the absence of any substantial or radical changes in the assets or liabilities of the bankrupt between the retrojection dates,' *id.,* the debtor is deemed to have been insolvent at all intermediate times. *Foley v. Briden (In re Arrowhead Gardens, Inc.),* 32 B.R. 296, 300 (Bankr.D.Mass.1983)." *Murphy v. Nunes (In re Terrific Seafoods, Inc.),* 197 B.R. 724, 731 (Bankr.D.Mass.1996).

118. There were no contemporaneously prepared audited financials for the year ended December 31, 2000. Winstar's unaudited financials for that time showed Winstar had a positive net worth *on a book value basis.* (PX 460 at 10). Book value **\*277** is not the same as fair value. [47] If Winstar's net worth is evaluated on an income basis, it had a negative value.

119. Scherf identified four subsequent events he believed had to be accounted for in order to apply the asset approach: (1) the recognition and recording of a $1.8 billion impairment charge for the three months ended December 31, 2000 by Grant Thorton, LLP, the Debtors' independent auditors; (2) the sale of substantially all of the Debtors' assets and nor of their liabilities to IDT for $42.5 million on December 19, 2001; [48] (3) the valuation prepared for IDT in connection with the allocation of the purchase price; and (4) the administrative insolvency of the Debtors' estates, a factor which he ultimately determined did not provide evidence of solvency or insolvency on the Transfer Date. (Scherf, Tr. 12–25).

120. The impairment charge was based on projections that were prepared for a presentation on December 11, 2000. The impairment charge was clearly knowable on December 7, 2000. (Scherf, Tr. 12–33).

121. In February 2001 Monoco sent an email documenting Winstar's cash flow problems.-Monaco's email in Feb 2001 re: "Depending on the time of checks clearing, we will have difficulty getting to the end of March when we anticipate a brief reprieve by receiving $60mm from Lucent for services, etc." (PX 284). By March 30, 2001 Uhl recognized Winstar's need to file bankruptcy. (Uhl Video-direct at 242–43).

122. Valuations were prepared for IDT in connection with the December 19, 2001 sale by Deloitte & Touche, which valued just the tangible assets at $328 million, and Empire Valuation, after reviewing the work of Deloitte & Touche, determined that the tangible and intangible assets were worth $630 million.

123. Based upon his analysis, Scherf opined that Winstar was insolvent by approximately $1.6 billion on the Transfer Date. The Court agrees.

124. Lucent criticizes any reliance upon the actual sale price ultimately paid for Winstar's assets during its bankruptcy. It argues this number represents a distress sale and a price

significantly less than Winstar's value on December 7, 2000. The sale price, although not the only or even the primary fact upon which Scherf's valuation is based, is relevant. Contrary to Lucent's characterization of the sale of Winstar's assets, the sale was not an auction but rather as a going concern. *See, e.g.,* Order Authorizing Sale [of substantially all assets to IDT], dated December 19, 2001 at M (entry of sale order necessary to provide uninterrupted service to Debtors' customers) [Docket # 1627]; Master/Final Execution Copy of Asset Purchase Agreement [Docket # 1629].

**\*278**  *The Income Approach*

[25]   125. The income approach estimates the value of a company based on its earnings capacity. (PX 460 at 7). There are two commonly used methods to conduct income approach valuation. The first, capitalized debt free method also called capitalization of earnings, is based on a company's debt free net cash flow for one year or some other discreet period. Winstar never had any debt free cash flow. In fact Winstar, which began its operations in 1996, lost $83 million in that year. The losses steadily increased and by 2000 the loss had grown to $870 million. Thus application of this method mandates a finding of insolvency.

[26]   126. Under the second method, the discounted cash flow method, future earnings are projected and then discounted to present value, adjusted to reflect the risk that such earnings will not materialize. (PX 460 at 8). Winstar in fact had prepared projections for a ten (10) year period, until 2009. Because of Winstar's historical performance and the instability of the telecommunications industry, Scherf concluded the Winstar was insolvent using this method. His conclusion is correct. Those projections were speculative at best. They included growth rates significantly in excess of what was projected to be reasonable growth in the telecommunications industry. Moreover, while Winstar generally had been able to meet its revenue projections-although the ten year projections through 2009 relied heavily upon equity infusion which may or may not materialize in an unstable market, historically it understated its expenses. Finally the balance sheet for December 31, 2000 in actuality differed significantly for what Winstar had projected.

127. Collins ignored the deficiencies inherent in Winstar's projections; instead he accepted them at face value and thus his reliance on them produced a flawed result. Further he used a discounted rate of 16% to reflect the risk to investors at a time when Winstar's debt yield was in the range of 25–30%.

128. But Lucent argues that Scherf ignored contemporaneous cash flow data and future projections (which would be used to perform a valuation based on the discounted cash flow method) when performing a valuation based on the income approach and instead relied upon the capitalized debt free net cash flow method. Lucent is incorrect. The capitalized debt free net cash flow method is supported by valuation treatises and has been adopted by courts. Moreover, Scherf did not ignore the discounted cash flow method but rather rejected its use in this case given the unreliability of Winstar's future projections. The discounted cash flow methodology is simply an unacceptable method to be used in this case.

*Amount of Liabilities*

[27]   129. Absent some unusual circumstances not applicable here, the insolvency test anticipates that liabilities will be valued at their face value. *In re Trans World Airlines, Inc.,* 134 F.3d 188, 197 (3d Cir.1998).

130. Scherf values those liabilities at $4.8 billion as of December 7, 2000 (Tr. 12–14–15, PX 460); Collins did not value them as of that date. (Tr. 18–118). In fact Collins testified that he was unable to value the liabilities as of December 7, 2000. (Tr. 18–119). He valued the liabilities as of December 31, 2000 at $4.321 billion. (Tr. 18–118).

131. Based upon the valuation of the assets and liabilities, Winstar was insolvent on December 7, 2000, the date of the Transfer.

**\*279**  *Insider Status*

132. Because the Transfer occurred during the period greater than 90 days before the Petition date but less than one year prior to the bankruptcies, the Trustee may only recover on her preference claim if she proves that Lucent was an insider at the time of the Transfer.

133. With respect to a corporation, an insider includes a "person in control of the debtor." 11 U.S.C. § 101(31).

134. Some courts have defined control as the creditor dominating the debtor. *In re A. Tarricone, Inc.,* 286 B.R. 256, 265 (Bankr.S.D.N.Y.2002). Others "have used terminology such as having a 'stranglehold' over the debtor, having 'complete domination' of the debtor, rendering the debtor a 'mere instrumentality or alter ego' of the lender or 'powerless to act independently.' " *Badger Freightways, Inc. v. Continental Ill. Nat'l Bank & Trust Co. Of Chicago*

*In re Badger Freightways, Inc.),* 106 B.R. 971, 981–82 (Bankr.N.D.Ill.1989)(internal citations omitted).

**[28]** **[29]** 135. Both Lucent and the Trustee correctly note that whether a party is or was "in control" of a debtor requires a case by case determination. "The legislative history of § 101(31) indicates that the term applies to 'one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor.' " *Official Committee of Unsecured Creditors v. Austin Financial Services, Inc. (In re KDI Holdings, Inc.),* 277 B.R. 493, 511 (Bankr.S.D.N.Y.1999)* (quoting S.Rep. No. 989, 95th Cong., 1st Sess. 25 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5810, 6269) (legislative history 11 U.S.C. § 101(31)) (other citations omitted). "The true test of 'insider' status is whether one's dealings with the debtor cannot accurately be characterized as arm's-length. *In re Craig Systems Corporation,* 244 B.R. 529, 539 (Bankr.D.Mass.2000). The emphasis is on the nature of the relationship between debtor and the other person, especially on whether their relationship gave the other person the power or influence to have a debt owed to it repaid." *In re Demko,* 264 B.R. at 408.

**[30]** 136. In determining whether a creditor, and particularly a bank, has the requisite level of control to be an insider, the courts examine whether the creditor had more ability to assert control than other creditors, whether the creditor made management decisions for the debtor, directed work performance, and directed payment of the debtor's expenses. *ABC Elec. Serv. Inc. v. Rondout Elec., Inc., (In re ABC Elec. Serv. Inc.),* 190 B.R. 672 (Bankr.M.D.Fla.1995). *There must be day-to-day control, rather than some monitoring or exertion of influence regarding financial transactions in which the creditor has a direct stake.* *In re Armstrong,* 231 B.R. 746, 749–50 (Bankr.E.D.Ark.1999).

**[31]** 137. That does not mean, however, as Lucent asserts that Lucent must have used its control to obtain the transfer although whether the transfer in question was done under pressure from Lucent is one fact to be considered in making the determination of control. *Walsh v. Dutil (In re Demko),* 264 B.R. 404, 408 (Bankr.W.D.Pa.2001). Neither the Bankruptcy Code nor the case law, however, require the use of the insider's status as an insider to force the preferential payment to be made. The elements of a preference are set forth in Section 547(b) which requires, among other things, that the transfer have been made "between ninety days and one year

before the date of filing of the petition, if such creditor at the time of such **\*280** transfer was an insider...." 11 U.S.C. § 547(b)(4)(B). There is nothing in the language that requires the causal connection between the control and the preferential transfer that Lucent claims is needed.

**[32]** 138. In this case the facts indicate that Lucent controlled many of Winstar's decisions relating to the buildout of the network. Lucent forced the "purchase" of its goods well before the equipment was needed and in many instances under the Software Pool Agreement, never needed at all. Lucent treated Winstar as a captive buyer for Lucent's goods. These purchases, especially those under the Software Pool Agreement were just a means for Lucent to inflate its own revenue.

139. Lucent argues, however, that Winstar is complicit in its scheme to inflate revenues. For example when Lucent required Winstar employees to sign false bill and hold letters needed for Lucent to book revenue, they did so even though Winstar knew that Lucent used the process to deceive its auditors. That Winstar was a participant in Lucent's scheme does not prove that Winstar was not under Lucent control. In fact, Lucent's ability to involve Winstar's employees in Lucent duplicity is further evidence of Lucent's control.

**[33]** **[34]** **[35]** 140. Two former Lucent employees, Deborah Harris and William Plunkett refused to answer deposition questions beyond providing their names and addresses and instead asserted their right against self incrimination.[49] "The Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). This Court may and chooses to draw negative adverse inferences from their testimony. Both were employees of Lucent when the relevant actions occurred.[50] Although neither is a party to this lawsuit, a fact which Lucent emphasizes to show that neither "cared whether Lucent succeeds in this litigation," their non-party status does not render admitting their testimony impermissible given the facts of this case. Nor does the fact that neither was employed by Lucent when their testimony was taken. *Rad.* Both Harris and Plunkett were parties to the SEC's action (PX 739); both were employed by Lucent during the relevant **\*281** time frame and the questions they refused to answer related directly to their actions as Lucent employees during this period.

[36]    141. Before an adverse inference may be drawn from a party's refusal to testify in a civil case, there must be independent corroborative evidence to support the negative inference beyond the invocation of the privilege. *See* Baxter, 425 U.S. at 318, 96 S.Ct. at 1558. ("the Fifth Amendment does not forbid adverse inferences against parties ... when they refuse to testify in response to probative evidence offered against them"); "[L]iability should not be imposed based solely upon the adverse inference." *United States v. Private Sanitation Industry Ass'n,* 899 F.Supp. 974, 982 (E.D.N.Y.1994), aff'd 47 F.3d 1158 (2d Cir.), *cert. denied sub. nom., Ferrante v. United States,* 516 U.S. 806, 116 S.Ct. 50, 133 L.Ed.2d 15 (1995).

142. During his deposition Mr. Plunkett was asked a series of questions relating to end of quarter deals, sham bill and hold transactions, the Software Poll Agreement. He asserted his Fifth Amendment privilege in response to each question but had he responded truthfully, his testimony would have added to the substantial evidence against Lucent and indeed would have been devastating to his former employer. Examples of the questions asked of this witness are set forth below.

Q: Isn't it a fact that in 1999 and 2000 you participated in transactions between Lucent and Winstar at the end of each quarter form December 31st, 1999 through September 30th, wherein Winstar purchased substantial quantities of equipment, software, and/or services from Lucent Technologies?

A: "On advice of counsel I respectfully decline to answer on the ground that my answer may incriminate or tend to incriminate me." (Hereinafter referred to as "Fifth Amendment Response").

Q: Isn't it a fact that in December 1999 Winstar purchased over $96 million worth of goods and services from Lucent?

A: Fifth Amendment Response

Q: Isn't it a fact that this transaction was referred to as an end of quarter deal?

A: Fifth Amendment Response

Q: Isn't it a fact that certain of the equipment purchased by Winstar in the December 1999 end of quarter deal was not delivered to Winstar but was held by Lucent even through the purchase price was paid by Winstar?

A: Fifth Amendment Response

And isn't it a fact that in connection with the end of quarter deal and in order to be certain that Lucent could book the revenue Lucent prepared letters which it gave to winstar which it asked Winstar to sign?

A: Fifth Amendment Response

Q: Isn't it a fact that Winstar did, in fact, sign the letters provided by Lucent with respect tot he December 1999 end of quarter deal?

A: Fifth Amendment Response

Q: And isn't it, in fact, correct that these letters were not true and correct in all respects?

A: Fifth Amendment Response

Q: Isn't it a fact that these letters falsely stated dates by which Lucent would install the purchased equipment?

A: Fifth Amendment Response

Q: And isn't it a fact the Winstar did not need the equipment purchased through these letters immediately but was buying the equipment earlier to provide Lucent with additional revenue?

A: Fifth Amendment Response

**\*282** Q: And isn't it a fact that the letters also stated falsely that Winstar lacked the warehouse space to store equipment?

A: Fifth Amendment Response

Q: Isn't it a fact that some of the equipment purchased by Winstar in the December 1999 end of quarter deal included Optronics equipment?

A: Fifth Amendment Response

Q: And isn't it a fact that when your employment with Lucent terminated in November of 2000 this equipment remained in Lucent's warehouses?

A: Fifth Amendment Response

(Plunkett, Deposition transcript at p. 11, line 25 to p. 14, line 23).

143. He was then asked virtually identical questions with respect to March 2000, June 2000 purchases, and September

2000 end of quarter purchases and again asserted his Fifth Amendment privilege. (*Id.* at p. 15. Line 9 to p. 20, line 25, p. 22, line 8 to p. 24, line 4). Similarly when questioned about the Software Pool Agreement, Plunkett refused to answer. Had he answered truthfully his testimony would support the finding that the agreement was a sham transaction; it was nothing more than a device to inflate Lucent's revenues. (*Id.* at p. 24, line 5 to p. 26, line 18). [51]

144. Independent evidence shows that Plunkett was involved in the June 2000 end of quarter deal. *See, e.g.,* PX 360 (Ackerman's June 23, 2000 email to Kantor) ("He [Plunkett] wants us to agree to another $53M in purchases for 2Q (that includes $17M of accelerated pay as you grow for 5ESS's)"). Independent evidence also proves he was involved in the September 2000 end of quarter deal and the Software Pool Agreement. *See e.g.,* PX 125 (Plunkett's September 29, 2000 letter to Ackerman): "Winstar Agrees [sic] to purchase from Lucent the following ... $18,852,500 5ESS PAYG" and PX 127 (Ackerman's September 18, 2000 email to Kantor): "I just spoke with Bill [Plunkett]. He informed me that you and Nina had met (dinner?) And you agreed to help them get to the number they need this quarter...something around $110M, of which we have already spent about $45M. There is not much I can give them that we really need, but there are some creative things I can do that can get us close to their number without being totally stupid."

145. Harris was asked virtually the same questions and also invoked her Fifth Amendment privilege. She, like Plunkett, was involved in the transactions about which she was questioned and the Court finds that had she answered truthfully, her testimony would also have been adverse to Lucent. Had Plunkett and Harris answered truthfully about the nature of the relationship between the two companies, they would have acknowledged Lucent's control over Winstar and lack of arms' length relationship between them. *Rad Services v. Aetna Cas. & Surety Co.,* 808 F.2d 271, 280–81 (3d Cir.1986), *quoting Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). *See also Baxter,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810; *LiButti v. U.S.,* 107 F.3d 110 (2d Cir.1997); *Federal Deposit Ins. Corp. v. Fidelity & Deposit Co. of Maryland,* 45 F.3d 969 (5th Cir.1995); *Davis v. The Mut. Life Ins. Co. of New York,* 6 F.3d 367 (6th Cir.1993), *cert. denied,* 510 U.S. 1193, 114 S.Ct. 1298, 127 L.Ed.2d 650 (1994); **\*283** *Brink's Inc. v. The City of New York,* 717 F.2d 700 (2d Cir.1983).

146. Lucent was an insider of Winstar's on December 7, 2000, the date of the Transfer.

[37] 147. Consequently all of the elements of a preference have been satisfied. The payment of the Siemans proceeds was a preference.

[38] 148. Lucent argues, however, that even if the Transfer was preferential the Trustee may not recover because Lucent gave subsequent new value to Winstar when it continued to loan under the Second Credit Agreement. Although the amount that it claims it gave in new value is an ever-changing figure in this case, the inability of Lucent to fix the amount is irrelevant as it is not entitled to the benefit of the new value defense.

149. Lucent bears the burden of establishing new value. 11 U.S.C. § 547(g) (the creditor ... against whom recovery or avoidance is sought has the burden of proving the non-avoidability of a transfer under subsection (c) of this section); *Phoenix Restaurant Group, Inc. v. Ajilon Professional Staffing LLC (In re Phoenix Restaurant Group, Inc.),* 317 B.R. 491, 494 (Bankr.M.D.Tenn.2004).

150. Lucent's new value defense fails for two reasons. First, to the extent Lucent provided any equipment or software to Winstar after December 7, 2000, it did so on a secured basis, as is evidenced by the Security Agreements dated May 9, 2000, and December 22, 2000, (DX–32; DX–33) and as admitted by Lucent in its October 11, 2001, secured proof of claim (PX–340) and the escrow fund stipulations. (PX–506; PX–507; PX–508). Second, even if the additional value were provided on an unsecured basis, Lucent has failed to show that it was provided *after* the receipt by Lucent of the preferential transfer.

[39] 151. It is well settled that to support a new value affirmative defense, section 547(c)(4)(A) requires a creditor to establish that, after receiving a preferential payment, the creditor advanced "new value" to the debtor "not secured by an otherwise unavoidable security interest." *New York City Shoes, Inc. v. Bentley Int'l, Inc. (In re New York City Shoes, Inc.),* 880 F.2d 679, 680 (3d Cir.1989). Lucent provided only secured value: all Lucent equipment and software sold to Winstar was sold subject to two separate security agreements dated May 9, 2000, and December 22, 2000. (DX–32, DX–33); Lucent's proof of claim (PX–340) alleges a secured claim although it provides no evidence of the value of its collateral; the Trustee and Lucent have entered into three stipulations

(PX–506, PX–507, and PX–508) which recognize the validity of Lucent's security interests and provide for distribution to Lucent of the proceeds of the sale of Winstar assets that were subject to Lucent's lien (subject to judgment on the Trustee's equitable subordination claim).

152. For the foregoing reasons the Trustee is awarded judgment in the amount of $188,180,000.

## COUNT XI: EQUITABLE SUBORDINATION

[40]  153. The Bankruptcy Code invests the Court with authority to subordinate all or part of a claim "under the principles of equitable subordination...." 11 U.S.C. § 510(c). Courts considering equitable subordination follow the *Mobile Steel* test: (1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the debtor or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with **\*284** the Bankruptcy Code. *In re Mobile Steel Co.,* 563 F.2d 692, 700 (5th Cir.1977). *See also Merrimac Paper Co. v. Harrison (In re Merrimac Paper Co.),* 420 F.3d 53, 58 (1st Cir.2005); *Citicorp Venture Capital, Ltd. v. Committee of Creditors Holding Unsecured Claims,* 160 F.3d 982, 986 (3d Cir.1998).

[41]  154. When the creditor is an insider, the proof required to prove equitable subordination is not demanding. In such cases, a bankruptcy trustee need only show "material evidence" of unfair conduct. *In re N & D Properties, Inc.,* 799 F.2d 726, 731 (11th Cir.1986); *see also In re Epic Capital Corp., et. al.,* 290 B.R. 514, 524 (Bankr.D.Del.2003), *aff'd,* 307 B.R. 767 (D.Del.2004).

[42]  155. "For non-insider claimants, egregious conduct must be established to justify equitable subordination...." *In re Mid–American Waste Systems, Inc.,* 284 B.R. 53, 70 (Bankr.D.Del.2002) (internal citations omitted). "[The degree of non-insider misconduct] has been variously described as 'very substantial' misconduct involving 'moral turpitude or some breach of duty or some misrepresentation whereby other creditors were deceived to their damage' or as gross misconduct amounting to fraud, overreaching or spoliation." *In re M. Paolella & Sons, Inc.,* 161 B.R. 107, 119 (E.D.Pa.1993), citing *In re Osborne,* 42 B.R. 988, 996 (W.D.Wis.1984).

156. Nevertheless the test is the same; only the standard of proof required differs. *Mid–American Waste Systems,* 284 B.R. at 70 (internal citations omitted).

### Inequitable Conduct

[43]  [44]  157. There are three generally recognized categories of misconduct which may constitute inequitable conduct for insiders: "(1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere Instrumentality or alter ego." *Id.*

158. The same facts underlying the finding that Lucent was an insider of Winstar warrant a finding that Lucent engaged in inequitable conduct by using Winstar as a mere instrumentality to inflate Lucent's own revenues.

159. Yet whether Lucent is an insider or not does not affect the outcome of the Court's conclusion that the first prong of the *Mobile Steel* test is satisfied: the facts in this case warrant equitably subordinating Lucent's claim because it was egregious. Lucent repeatedly threatened Winstar with nonpayment after Wireless performed significant services under the subcontract, all in an effort to extract more and more from Winstar, Lucent's captive purchaser. Ultimately, when Lucent's new management regime determined that a refinancing notice, the equivalent of a financial death knell for Winstar, had to be sent, Lucent deliberately held up the refinancing notice to ensure that the Siemans refinancing occurred and new equity was infused into the dying Winstar.

### Harm to Winstar's creditors

[45]  160. Lucent's conduct resulted in substantial damages to Winstar and ultimately Winstar's creditors, including, apart from the preferential payment itself, the interest paid by Winstar to Lucent on unnecessary Lucent equipment and services purchased by Winstar to generate revenue for Lucent, storage costs, and insurance costs. Winstar sustained additional damages in that the approximate $244 million (on a cost adjusted basis) of Lucent equipment in inventory in warehouses on March 31, 2001 was sold in December 2001 for approximately a penny on the dollar compared to its December 7, 2000, balance sheet stated value.

**\*285**  161. In addition Winstar received $270 million in equity financing on December 7, 2000 through the issuance of Series H Preferred Stock. The funding came primarily from Welch Carson Anderson & Stowe and Credit Suisse First Boston Private Equity. (DX 701 at 26 and 48).

162. The Debtors and their creditors were harmed by Lucent's deliberate delay in sending the refinancing notice. Lucent

intentionally waited until it had received the proceeds of the Siemans refinancing before allowing the public to learn what it already knew; Winstar was in significant financial distress and indeed, as set forth above, was insolvent. Lucent reaped a substantial benefit but at the expense of the Debtors' other creditors.

### Consistent with the Bankruptcy Code

**[46]**    163. Subordinating Lucent's claims is not inconsistent with the Bankruptcy Code.

164. Consequently Lucent's claim will be subordinated under section 510(c) of the Bankruptcy Code to the claims of *all* creditors, including all unsecured claims which includes the deficiency claim of Siemans, if any, and to the interests of those entities who infused the $270 million of equity in Winstar on December 7, 2000. The lien of Lucent is preserved for the benefit of the estate and is transferred to the Trustee in her representative capacity.

### LUCENT'S COUNTERCLAIMS

165. Lucent seeks damages from Winstar's estate on the basis of fraud and negligent misrepresentation arising from Winstar's representation implicit in at least four borrowing representations from and after January 18, 2001 that it was in compliance with the CAPEX covenant.

**[47]**    166. "Under Delaware law, express choice of law provisions in contracts are generally given effect." *Harper v. Delaware Valley Broadcasters, Inc.,* 743 F.Supp. 1076 (D.Del.1990).

**[48]**    **[49]**    167. Lucent must establish each of the following elements: (1) a material misrepresentation or omission of fact; (2) made with knowledge of its falsity; (3) with an intent to defraud; (4) reasonable reliance on the representation; and (5) resulting damages. *Schlaifer Nance & Co. v. Estate of Warhol,* 119 F.3d 91, 98 (2d Cir.1997); *see also Dallas Aero., Inc. v. CIS Air Corp.,* 352 F.3d 775, 784–85 (2d Cir.2003). Each must be proved by clear and convincing evidence. *Dallas Aero., Inc. v. CIS Air Corp.,* 352 F.3d 775, 784–85 (2d Cir.2003).

168. Lucent has not proved that Winstar breached the CAPEX covenant and if it did so, it did so knowingly. Winstar's

employees testified that they believed that the company was in compliance with the CAPEX covenant in the first quarter of 2001. To the extent that Winstar was not in compliance with the CAPEX covenant, this "breach" is harmless. Lucent was well aware of Winstar's financial status and some of its employees were even involved in attempting to help Winstar lower its CAPEX in order to comply with the covenant.

169. Lucent has not demonstrated, and given the level of its knowledge and involvement cannot demonstrate, that it reasonably relied upon Winstar's representations. Lucent itself knew of Winstar's deteriorating financial condition in November and December 2000. Lucent was prepared to issue the refinancing notice as soon as it got the Siemans proceeds. For it now to argue it was duped by the Debtor is disingenuous.

**[50]**    **[51]**    170. To establish a claim of negligent misrepresentation, the claimant must prove by a preponderance of the evidence: (1) carelessness in imparting **\*286** words; (2) upon which others were expected to rely; (3) and upon which others acted or failed to act; (4) to their damage; and (5) the declarant must express the words directly to one to whom it is bound by some relation or owes a special duty of care (which must involve a "closer degree of trust" than that of an ordinary buyer and seller). *Dallas Aero., Inc.,* 352 F.3d at 788; *see also Hydro Investors, Inc. v. Trafalgar Power Inc.,* 227 F.3d 8, 20 (2d Cir.2000). It must also demonstrate that its reliance on Winstar's purportedly false statements was "reasonable." *Morrissey v. GMC,* 21 Fed.Appx. 70, 73 (2d Cir.2001).

171. As set above, Lucent has not met its burden. It cannot ignore its own knowledge and feign surprise to learn the CAPEX covenant was breached when it was deeply immersed in the financial transactions of Winstar. Therefore judgment will enter for Winstar with respect to Lucent's counterclaims.

### CONCLUSION

For the foregoing reasons, the Court finds that judgment should enter for the Plaintiff on all counts and counterclaims as set forth above.

A separate order of judgment for the Plaintiff will enter.

Footnotes

1    The parties agree that the alleged breach is a breach of the Agreement for Network Build-out Services (the "Subcontract") and not a breach of any funding obligation under the credit facilities. *See* Joint Pretrial Memorandum [Adversary Proceeding Docket (hereinafter "Docket") # 292] at Exhibit 12.

2    On May 29 and August 7, 2003, the Bankruptcy Court, on Lucent's motion, entered orders dismissing Count IX (breach of covenant of good faith and fair dealing), precluding the Trustee from recovering consequential or punitive damages on any of her claims, and prohibiting the Trustee from obtaining any affirmative monetary recovery on her equitable subordination claim [Docket 85, 103]. The Trustee, with Lucent's assent, voluntarily dismissed Counts I through VI and Count VIII [Docket # 207].

3    Count 2 of the Second Amended Answer and Counterclaims is a count for setoff pursuant to 11 U.S.C. § 553. The parties have stipulated that in the event the Trustee is awarded judgment against the Defendant under the Subcontract, the Defendant is entitled to a total setoff of $6.3 million. (Stipulation By and Between The Trustee and Lucent. Technologies Inc. Concerning Lucent's Counterclaim for Setoff at ¶ 1 [Docket # 337] ). Counterclaim 3 is a claim for fraud and counterclaim 4 is one for negligent misrepresentation. Both are based on Winstar's alleged representations to Lucent during Lucent's "due diligence" investigation in November and December 2000. Neither of these counterclaims were raised by Lucent in the Joint Pretrial Memorandum as required by paragraph 7(H) and (I) of the Court's Pretrial Order of January 26, 2005 [Docket # 275] ("The parties are ordered to file ... a Joint Pretrial Memorandum approved by all counsel and unrepresented parties, which shall set forth the following: ... (H) The issues of fact which remain to be litigated (evidence at trial shall be limited to these issues); (I) The issues of law to be determined....") and thus are deemed waived. Had they not been waived, the credible evidence supports a finding that Lucent did not carry its burden of proof as it had sufficient knowledge of the financial condition of Winstar during the relevant period that it could not have reasonably relied upon any allegedly misleading information. Lucent's surviving counterclaims for fraud and negligent misrepresentation relate to the breach of the so-called CAPEX covenant.

4    The witnesses who testified at trial were Paul Pocalyko, Stephen Scherf, Martina Hunt–Majean, Mark Wilson, Reginald Kipke, Kevin Collins, Christopher Stark, Michael Keefe, Elizabeth Perricone (some of Perricone's testimony also came in via portions of deposition testimony read at trial), Gregory Garrett, Henry Schacht (some of Schacht's testimony also came in via videotaped deposition testimony played at trial), Vernon Terrill, and John Solomon.

5    The witnesses whose testimony was admitted via videotaped depositions were Nathan Kantor, Lisa Hicks, William Zlotnick, Jill Diroma, Frederic Rubin, David Ackerman, Richard McGinn (some of McGinn's testimony also came in via portions of deposition testimony read at trial), William Rouhana, Michael Montemarano, Deborah Hopkins, Gary Simpson, William Fullerton, Richard Uhl, Kevin Monaco (some of Monaco's testimony also came in via portions of deposition testimony read at trial), Gary Goldman, and Kevin Howell. As noted above some of Schacht's testimony was introduced on videotape; the Court also had the opportunity to observe this witness when he testified in person later during the trial.

6    In many instances non-consecutive portions of videotaped testimony were introduced, In designating the corresponding transcripts, the parties, for some but not all of these witnesses, renumbered the pages sequentially and kept the reference to the original volume and page. In some instances while the renumbered pages introduced as a witness' direct testimony begin with page 1, so do the first pages of the witness' cross examination and redirect testimony. The Court will refer to the renumbered page designation as "direct," "cross" or "redirect" when necessary and omit reference to the original volume and page numbers unless such additional citation is necessary to avoid confusion.

7    Whether the Court treats its order as final under Fed. R. Bankr.P. 7052 or proposes findings and rulings to the district court under Fed. R. Bank. P. 9033 will affect the way in which the parties respond to the orders issued contemporaneously herewith. Moreover "a proceeding's core or non-core nature is crucial in bankruptcy cases because it defines both the extent of the Bankruptcy Court's jurisdiction, and the standard by which the District Court reviews its factual findings." *Halper v. Halper,* 164 F.3d 830, 836 (3d Cir.1999). *Compare* Fed. R. Bankr.P. 9033(d) *with* Fed.R.Bankr.P. 8013.

8    The district court concluded that the Trustee had the right to withdraw her jury demand without Lucent's consent. Memorandum Opinion, dated November 16, 2004, at 7 entered in *Shubert v. Lucent Technologies, Inc.,* United States District Court for the District of Delaware Civil Action 04–928 [District Court Docket # 8].

9    Contemporaneously with the filing of the withdrawal motion, Lucent filed a Motion for Summary Judgment [Docket # 210] seeking judgment from the Bankruptcy court on all three remaining counts. The motion is silent with respect to any objection to the entry of final orders.

10    The last day on which evidence was submitted was May 11, 2005. Both parties rested at that time. Lucent electronically filed its proposed findings of fact and conclusions of law on June 6, 2005 at 11:32 p.m. Closing arguments, which of course are not evidence, occurred on June 13, 2005.

11    Lucent sought summary judgment on Trustee's preference and breach of contract claims as well as its own claims for fraud and negligent misrepresentation in June 2004. There is nothing in the pleadings to suggest Lucent was asking the Court to provide proposed findings and conclusions to the district court. In the Pretrial Memorandum, the parties were unable to agree as to the legal

issues to be decided so each party set forth its position. Nowhere in Lucent's detailed 12 page statement of the legal issues, or indeed anywhere else in the Pretrial Memorandum, does Lucent allege the Court lacked jurisdiction to enter final orders. At the conclusion of the Trustee's case in chief, Lucent orally and in writing sought judgment pursuant to Fed. R. Bank. P. 7052 and again did not raise an objection to this Court's entering a final order. Similarly Lucent's proposed findings and conclusions do not suggest that there is an ongoing dispute as to whether these proceedings fall outside the core jurisdiction of the Court.

12    The Court views the statement in the same June 8, 2005 letter that "[t]his court has never decided whether these claims are core or non-core" as another example of counsel's attempt to mislead this Court. The statement, although technically correct, was occasioned by Lucent's own behavior. As the district court noted, one of the grounds for denying the withdrawal motion was Lucent's failure to follow Local Bankruptcy Rule 5011–1 which required that Lucent file a motion seeking a determination by the Bankruptcy Court as to whether these counts and counterclaims were core or not. Moreover, as discussed herein, whether this Court views the claim and counterclaims as core or non-core is largely irrelevant because, contrary to Lucent's argument, the district court has definitively spoken on this issue when it found that the claims and counterclaims were part of the claims allowance process and when it refused to find, as Lucent had urged, that the claims and counterclaims were independent of the proofs of claim.

13    "[T]he Court finds that the Trustee's subsequent preference action is now part of the claims allowance process, and is triable only in equity." Memorandum Opinion at 6–7. "The Court is not persuaded by Lucent's argument that the determination of its proofs of claim does not depend on the outcome of the Trustee's Subcontract Claim. The Court finds that the Trustee's Subcontract Claim may affect the ordering of creditors or the equitable distribution of the res of the estate and, thus, are now part of the claims allowance process, triable only in equity." Id. at 7–8. "The Court finds that Lucent's Fraud and Negligent Misrepresentation counterclaims involve a decision regarding distribution of the bankruptcy estate and, thus, are now part of the claims allowance process, triable only in equity." Id. at 8.

14    Throughout the course of this case and indeed, after closing arguments, the parties sent a flurry of letters to the Court. Many of them were little more than recitations of the squabbling between the parties regarding alleged misstatements of facts. Ultimately the Court issued an order cautioning the parties that it would not tolerate such behavior [Docket # 350]. Given the district court's Memorandum Order, however, the Court would have expected the parties to file some type of notice advising this court of the district court's decision. Neither parties, however, informed the Court of the district court's decision and order. The Court only discovered the Memorandum Order when it checked the district court docket as it was about to issue these findings and rulings.

15    The Supply Agreement defines the Transition Plan as "the plan specified in Schedule A regarding Lucent's time periods to begin providing certain of the Services as specified in the plan." (PX 123 ¶ 1.1(qq)). Schedule A, titled "Statement of Work," describes Lucent's anticipated role in designing, building, and managing the network. Exhibit A–4 is titled "Initial Transition Plan." The Initial Transition Plan is not the "Transition Plan" which the parties agree never came to be.

16    The Court uses the term "spreadsheet" because this is a term used by the parties to describe this document. What the document is or should be deemed to be is the matter of some discussion, infra.

17    Section 11.3(a) of the Supply Agreement expressly provides:

Lucent shall provide WinStar financing in accordance with the Credit Agreement and otherwise in accordance with the terms of this Agreement.

18    Although Fed. R. Bankr.P. 7012(b) provides that in non-core matters, "final orders and judgments shall not be entered on the bankruptcy judge's order except by express consent of the parties," the substantial weight of authority holds that consent may be implied. 10 Collier on Bankruptcy ¶ 7012.11 at 7012–25 n. 3 (Bender 2003). Moreover courts have found expressions of consent based upon a party's actions such as filing a complaint. Id. In its counterclaims contained in the Second Amended Answer, Lucent pled only that counterclaims one and two were core. The pleading is silent with respect to any mention of whether the remaining counterclaims are core or not. But in pleading, Lucent requested that judgment be entered in its favor on all counterclaims which should properly be viewed as Lucent's express consent to this Court's jurisdiction to enter final orders.

19    In its closing argument Lucent argued that the Court could not enter a final order only with respect to the breach of the Subcontract claim (Tr. 22–50) and thus the Court finds Lucent waived its objection to the entry of final orders with respect to its counterclaims.

20    During closing argument Lucent's attorney conceded, in response to questioning by the Court, that he had not raised the issue of core versus non-core jurisdiction with the Court directly but had informed the Court during the summary judgment arguments that Lucent had sought certification of the district court's order. At the summary judgment argument, counsel's sole discussion of any challenge to this Court's jurisdiction was as follows:

Mr. Saunders: Your Honor, I should point out, unless Your Honor already knows this, that we have asked Judge Famum to certify, under Section 1292(b), the jury trial issue.

Transcript of December 14, 2004 Hearing [Docket # 274] at 20–21. Moreover the argument that this statement put the Court on notice that the core/non-core dichotomy was at issue in the district court is wholly inconsistent with Lucent's argument that the district court focused only on the jury trial issue and did not address the core/non-core issue.

21    DX 699 is a transcript of the testimony of David Ackerman, Winstar's former group executive/executive vice president for corporate strategy and business planning, given under oath on October 11, 2001 as part of the investigation by the Securities and Exchange Commission ("SEC") styled *In the Matter of Lucent Technologies, Inc.*, file no. HO–9128 (the "SEC Action"). The transcript of the Ackerman videotaped deposition to which DX 699 is an exhibit was admitted as Joint Trial Exhibit 6.

22    The "strategic partnership" was not actually a partnership, a fact Lucent spent considerable time emphasizing. The parties used the term simply to connote their intent to work closely and collaboratively. *See* October 22, 1998 Joint Press Release (PX 331).

23    The Supply Agreement provides that 65% of the equipment and services purchased during the first year of the contract would be purchased from Lucent. The percentage increased to 70% thereafter. (PX 123 at ¶ 11.3(b)(1)). The Supply Agreement also permits Lucent to surcharge Winstar if Lucent funds the purchase of goods and services from other vendors beyond the applicable percentages. There was no evidence to suggest that Lucent ever surcharged Winstar despite the fact that the parties agree Lucent funded substantially more non-Lucent purchases than percentages set forth in the Supply Agreement.

24    The transcript of Kantor's videotaped deposition testimony is Joint Trial Exhibit 1.

25    Lucent attempted to portray this arrangement as a scheme perpetrated and controlled by Winstar to enhance its own financials through questionable accounting practices. The Court disagrees. While there is evidence to suggest that this arrangement gave Winstar the means to capitalize many of its network buildout expenses, most of these expenses could be capitalized even without flowing them through Lucent. (Harris, Depo, Tr. 11 at 47).

26    The Second Credit Agreement contemplated the future formation of other Winstar subsidiaries to act as borrowers under the Agreement. Subsequently WVF–LU2 LLC ("WVF–LU2") was formed and was also a borrower under the Second Credit Agreement. It also acquired equipment with funds borrowed under the Second Credit Agreement and gave Lucent a security interest in that equipment. WVF–LU2 is the entity that requested the March 30, 2001 borrowing in the amount of $62,050,743.00. (DX 668). The parties, however, refer to the request as Winstar's request and throughout the conduct of this case did not draw distinctions as to which Winstar entity actually made the funding request.

27    The Second Credit Agreement contained other financial covenants including the obligation that Winstar give Lucent Winstar's financial information signed by an officer who was to certify that the financial statements were kept according to generally accepted accounting principles and that Winstar was in compliance with the Credit Agreements. Moreover each draw request under the Credit Agreements was considered an independent certification that Winstar was in compliance with the covenants. At trial Lucent sought to introduce evidence regarding breaches of these covenants but because Lucent did not raise these issues in the Joint Pretrial Memorandum, the Court refused the introduction of such evidence. Lucent did make an offer of proof that it did not consider it its responsibility to verify the certified draw requests. Even if the evidence of these breaches was properly before the Court and even assuming that Winstar, in fact, breached these additional covenants, the outcome would be no different. As discussed *infra*, Lucent cannot divert its own independent knowledge of Winstar's true financial condition, including its complicity in trying to help Winstar meet the CAPEX requirement, by hiding behind Winstar's alleged breaches.

    In addition the Second Credit Agreement also contained express covenants dealing with foreign collateral, EBITDA, and transaction fees. Again because Lucent did not raise these issues in the Pretrial Memorandum, the Court refused to consider evidence of these alleged breaches. But again, given Lucent's knowledge of the state of Winstar's affairs, it cannot feign that it was somehow deceived.

28    As discussed in greater detail below, the distortion of Lucent's financial picture lead to an SEC investigation that resulted in the commencement of a lawsuit for alleged violations of various securities laws against Lucent, several of its former employees, and three former employees of Winstar.

29    Bill and hold sales are transactions in which a party sells goods to another party but, at the purchaser's request, stores the goods in the seller's facility for shipment at a later date.

30    Winstar could not use funding from the Second Credit Agreement to pay for its purchases under the Software Pool Agreement. (PX 323 at ¶ 6 "Winstar agrees that it will maintain sufficient cash on hand to meet the above-described payment obligations at the respective Invoice Dates independent of any financing arrangements in place between Lucent and Winstar.")

31    In Count XI of her Second Amended Complaint, the Trustee alleges that the Siemans loan is the transaction which give rise to her request for equitable subordination and seeks return of the Siemans loan proceeds and subordination of Lucent's claim. At trial the evidence of Lucent's alleged impermissible conduct was much broader and therefore, to the extent necessary, the Second Amended Complaint is deemed amended to conform to the evidence as such amendment in no way prejudiced Lucent's rights. *See* Fed.R.Civ.P. 15(b), made applicable by Fed. R. Bankr.P. 7015(b); *see generally* 6A Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d §§ 1491, 1493 (1990 & Supp.2003). In fact the parties themselves agreed at the end of the trial that their pleadings should be deemed amended to conform to the evidence (which would not include any of the offers of proof) as long as neither party added any new claims, counterclaims, or defenses. *See* Tr. 21–135–140.

32  The task order for that first quarter, dated January 4, 1999, was not actually executed until March 1999 when the parties also executed the Subcontract (Wilson, Tr. 16, 105–06) and this document, which the Defendant describes as the only task order executed, is actually a letter, dated January 4, 1999, from Lucent's Vice President of Emerging Services to a Winstar employee that reads as follows:

> Pursuant to our recently executed *Agreement for Network Build-out Services,* please accept this letter as my authorization for the subcontracting of Network Services from Winstar Wireless, Inc.
>
> The following is a list of services, which Lucent will subcontract to Winstar for an amount not to exceed $25 M for the period January 1, 1999 through March 31, 1999[:]
>
> • Switch Site Planning & Construction
>
> • Hub Site Planning & Construction
>
> • Broadband Riser Engineering
>
> • Inside Wire engineering
>
> • Network Integration (CO & Hubs)
>
> • Network Integration (B Sites)
>
> • Site Surveys
>
> • Site Acquisition
>
> Thank you in advance for your support.
>
> (First page, bearing Bates Stamp WC0019778, of DX 117). Even this "task order" is devoid of the details that Lucent argues must be present for it to comply with the Section 1.2 of the Subcontract and be considered a "task order."

33  The transcript of Uhl's videotaped deposition testimony is Joint Trial Exhibit 13.

34  The letter is addressed to Uhl but contains the salutation "Dear Nate."

35  The same document is also a Defendant's exhibit (DX 424).

36  Lucent was well aware of the CAPEX problem. Lucent proposed the Software Pool Agreement, which called for all payments to be deferred until 2001, as a way to commit funds to Lucent without further increasing Winstar's capital expenditures. (Zlotnick Video-direct at 156; the transcript of Zlotnick's testimony is Joint Trial Exhibit 3).

37  Hayes testified that the comment about staking his bonus on his opinion that the refinancing notice would not send Winstar into a tailspin was intended as a joke as Lucent did not offer bonuses. (Hayes, Depo, Tr. 13–89).

38  The ARQ rated Lucent's borrowers on a scale of 1 to 10. The higher the rating, the higher the inherent risk of non-payment. (Perricone, Depo., Tr. 13–115).

39  PX 462 is the Report of Paul Pocalyko who was retained as an expert by Winstar to render an opinion as to whether the transactions were arm's-length and if Lucent exerted undue influence and control. Lucent sought to exclude Pocalyko's testimony under *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Assuming for the sake of argument that *Daubert* is applicable in a bench trial, the Court denied the motion. (Tr. of March 16, 2005 hearing at 34–41) [Docket 322]. Although the Court continues to believe its initial ruling is correct, it has used Pocalyko's report only as a convenient vehicle to refer to relevant documents. The Court has not relied upon Pocalyko's opinions in reaching its decision.

40  The Software Pool Agreement prices the equipment at "list" price rather than the reduced price that the Supply Agreement provides.

41  Although the parties disputed these allegations, after weighing the credible evidence, including the documents appended to and compiled as part of the Pocalyko Report, the Court finds that the Plaintiff has proved that Lucent essentially dumped excessive amount of unneeded equipment on Winstar in order to inflate Lucent's own revenues. For example, excluding the $135 million paid to Lucent under the Software Pool Agreement (which itself is another indication of the sham transactions Lucent devised to inflate its own revenues), Winstar made an aggregate of approximately $706,000,000 in purchases from Lucent in calendar years 1999 and 2000. During this period the amount of Lucent equipment paid for by Winstar but sitting in Winstar's or Lucent's warehouses continued to increase so that by March 31, 2001 there was, on an adjusted cost basis, approximately $327 million in those warehouses. Of that $327 million in equipment, the overwhelming majority, indeed about $256 million was paid Lucent equipment while $71 million was non-Lucent merchandise. And needless to say, the valuation of the Lucent equipment at $256 million on an adjusted cost basis is less than that actual amount paid to Lucent by Winstar for that equipment.

> Moreover closer examination of the facts relating to the warehoused equipment purchased from Lucent reveals that of the approximately $256,000,000 (on a cost adjusted basis) of Lucent equipment in Winstar inventory in warehouses as of March 31, 2001, approximately $74 million of the $256 million of Lucent equipment could be specifically traced as to the original date that Winstar purchased such equipment from Lucent. Of that $74 million of Lucent equipment, approximately $36 million (on a cost adjusted basis) of that equipment was purchased by Winstar in a December 31, 1999, end of quarter bill and hold sale and remained in a Lucent warehouse undeployed for 15 months as of March 31, 2001. In fact once Winstar paid for Lucent equipment, it was not unusual for some of that merchandise to sit in a warehouse for more than a year.

42  The letter requests that the funds be wired to WCI Capital Corp.

43    Hayes, Depo, Tr. 13–63.

44    This figure was calculated by the Court; the numbers listed on the line called "Grand Total" are unreadable on the exhibit. Some of the numbers throughout the exhibit are difficult to read but the total appears to be within $1 of the amount requested in the Notice of Request for Borrowing.

45    The transcript of Montemarano's deposition testimony is Joint Trial Exhibit 9; the transcript of Simpson's testimony is Joint Trial Exhibit 11.

46    Both experts have substantial experience testifying as experts. Both have had courts accept their opinions as correct; both have had their opinions criticized. Because the Court must determine solvency in light of the unique facts of *this* case, criticism by another court of the methodology chosen by either expert in a different factual context has limited value.

47    In fact one indication of how poorly Winstar's book value reflected that actual market value of its assets is the optronics inventory. Because Winstar had purchased unneeded equipment from Lucent, including optronics equipment, when Winstar's financial condition was deteriorating in the fall of 2000, it made plans to institute some measures to improve its financial condition. *See* PX 68. One of those measures included selling off excess equipment, including the optronics equipment. (Kantor Video-direct at 479). But the only offer Winstar received for its excess optronics equipment came from Lucent, and it was at a reduced price. *See* PX 22 (Uhl's 12/14/00 email to Frank Jules, Fred Rubin and Nate Kantor: "Guys[,] Carole Spurrier and Debbie Harris called at 4:30 to inform as follows:...5. They have found no buyer for the Optronics. Their internal remarketing group offered to buy it at $.30 on the $1.00. (I said no thanks).").

48    The purchase price was paid as follows: $30 million in cash and $12.5 million in IDT Class B stock. (Scherf 12–34; PX 460 at 10).

49    Prior to trial the Trustee sought a ruling that the Court could draw an adverse interest from Harris' and Plunkett's silence while Lucent disputed that their testimony was relevant and otherwise corroborated. It also argued that the questions posed to these two individuals were too specific thus rendering the examinations unfair. The Court granted the Trustee's motion but noted that it would revisit the issue after hearing the evidence upon Lucent's request. *See* Transcript of March 16, 2005 hearing [docket # 322] at 59–62. Having revisited the issue, the Court concludes that its initial ruling was correct for the reasons set forth herein.

50    There is no dispute that Harris and Plunkett were employed by Lucent during the time when the events at issue in the specific questions which the Court finds that they would have answered adversely had they answered the questions honestly. Ms. Harris answered questions during her 2001 deposition and at the time testified she was employed by Lucent as the Vice President of Sales for the Winstar account beginning in August 2000. (Harris, Depo, Tr. 11–34). She also testified that William Plunkett the Vice President of Emerging Markets and was a member of Lucent's management team responsible for the Winstar account. (*Id.*). Mr. Plunkett was placed on administrative leave by Lucent in late November 2000 and was terminated shortly thereafter. (Wilson, Tr. 16–11). His termination was a direct result of his involvement in postdating documents relating to the Software Pool Agreement. (Schacht, Tr. 21 at 35). Both Harris and Plunkett reported to Nina Aversano.

51    Although there is conflicting testimony about the actual value of the goods Winstar was committed to purchases under the Software Pool Agreement, evidence of the value is that it totaled somewhere between $20 and $40 million, significantly less than the $135 million Winstar was to pay.

---

**End of Document**      © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 80

830 F.2d 476
United States Court of Appeals,
Third Circuit.

SLATKY, John, Appellant,

v.

AMOCO OIL COMPANY, Appellee, Service
Station Dealers of America, Inc., Amicus Curiae.

No. 86-5102.  |  Argued Aug. 20,
1986.  |  Reargued In Banc May 4,
1987.  |  Decided Sept. 30, 1987.

Petroleum franchisee brought action against distributor challenging alleged failure to make franchise premises available to him at a reasonable price prior to termination of franchise. The United States District Court for the Middle District of Pennsylvania, William W. Caldwell, J., 626 F.Supp. 1223, entered judgment in favor of distributor, and franchisee appealed. The Court of Appeals, Becker, Circuit Judge, held that: (1) distributor's offer to sell the premises must be objectively reasonable in that it approaches fair market value; (2) evidence sustained finding that distributor sincerely believed that its offer was reasonable; but (3) remand was required to determine whether offer was reasonable.

Reversed and remanded.

Mansmann, Circuit Judge, filed a dissenting opinion.

West Headnotes (8)

**[1]    Antitrust and Trade Regulation**
👉 Duration, Termination, and Renewal

So long as petroleum distributor's nonrenewal of franchise is based on marketing decision, courts are precluded from examining the merits of the decision but courts may scrutinize the merits of a termination or nonrenewal decision which result from a franchisee's misconduct. Petroleum Marketing Practices Act, § 102(b)(3)(D), 15 U.S.C.A. § 2802(b)(3)(D).

6 Cases that cite this headnote

**[2]    Antitrust and Trade Regulation**
👉 Transfer, Sale, and Assignment

Courts are not required to defer to petroleum distributor's determination of the reasonableness at the price at which it offers the premises to the franchisee prior to terminating the franchise. Petroleum Marketing Practices Act, § 102(b)(3)(D), 15 U.S.C.A. § 2802(b)(3)(D).

3 Cases that cite this headnote

**[3]    Antitrust and Trade Regulation**
👉 Duration, Termination, and Renewal
**Antitrust and Trade Regulation**
👉 Transfer, Sale, and Assignment

What the court decides on a challenge to the decision of a petroleum distributor not to renew the franchise is not whether the distributor determined not to renew according to some elusive notion of good faith but, rather, whether it sincerely made a decision to sell the property or to alter it or to accomplish some other business purpose permitted under the statute. Petroleum Marketing Practices Act, § 102(b)(3)(D), 15 U.S.C.A. § 2802(b)(3)(D).

1 Cases that cite this headnote

**[4]    Antitrust and Trade Regulation**
👉 Transfer, Sale, and Assignment

Subjective good faith standard is not the proper standard to apply in determining whether petroleum distributor has made bona fide offer to sell the premises to the franchisee prior to termination of franchise. Petroleum Marketing Practices Act, § 102(b)(3)(D), 15 U.S.C.A. § 2802(b)(3)(D).

14 Cases that cite this headnote

**[5]    Antitrust and Trade Regulation**
👉 Transfer, Sale, and Assignment

Petroleum distributor must make an offer to sell premises to franchisee prior to terminating franchise as if it actually wanted to sell the property and thus must set the offer at a fair market value. Petroleum Marketing Practices

Act, § 102(b)(3)(D), 15 U.S.C.A. § 2802(b)(3)(D).

6 Cases that cite this headnote

**[6]    Antitrust and Trade Regulation**
👉 Transfer, Sale, and Assignment

In determining whether petroleum distributor has made bona fide offer to sell premises to franchisee prior to terminating franchise, court must first determine if the distributor believed that its offer price represented fair market value and then must determine whether the estimate was objectively reasonable, i.e., whether the offer approached fair market value. Petroleum Marketing Practices Act, § 102(b)(3)(D), 15 U.S.C.A. § 2802(b)(3)(D).

30 Cases that cite this headnote

**[7]    Antitrust and Trade Regulation**
👉 Weight and Sufficiency

Finding that petroleum distributor believed that its offer to sell premises to franchisee prior to termination of franchise was at fair market value was sustained by the evidence. Petroleum Marketing Practices Act, § 102(b)(3)(D), 15 U.S.C.A. § 2802(b)(3)(D).

1 Cases that cite this headnote

**[8]    Antitrust and Trade Regulation**
👉 Transfer, Sale, and Assignment

To determine whether petroleum distributor's estimate of fair market value of property, and thus the price at which it offered the property to the franchisee prior to termination of franchise, was reasonable, court must focus on the specific facts used by the appraisers in their valuation and the inferences made from them. Petroleum Marketing Practices Act, § 102(b)(3)(D), 15 U.S.C.A. § 2802(b)(3)(D).

13 Cases that cite this headnote

**Attorneys and Law Firms**

*477  Joel Weisberg (argued), Harrisburg, Pa., for appellant.

Dimitri G. Daskal, Washington, D.C., for amicus curiae.

John A. Guernsey (argued), DeStefano & Guernsey, Philadelphia, Pa., Marguerite E. McDermed, Amoco Corp., Chicago, Ill., for appellee.

**\*478  Argued Aug. 20, 1986.**

Before BECKER, MANSMANN, Circuit Judges, and TEITELBAUM, District Judge. [*]

**Reargued In Banc May 4, 1987.**

Before GIBBONS, SEITZ, WEIS, HIGGINBOTHAM, SLOVITER, BECKER, STAPLETON and MANSMANN, Circuit Judges.

**Opinion**

**OPINION OF THE COURT**

BECKER, Circuit Judge.

Under Title I of the Petroleum Marketing Practices Act, ("PMPA"), 15 U.S.C. §§ 2801-06, an oil company that terminates or fails to renew a franchise for a permissible business purpose unrelated to the franchisee's misconduct must make a "bona fide offer" to sell to the franchisee the leased property used by the franchisee in his business. §§ 2802(b)(2)(E)(iii)(I); 2802(b)(3)(D)(iii)(I). This appeal from the judgment of the district court, 626 F.Supp. 1223, following a bench trial, in favor of appellee Amoco Oil Company and against one of its franchisees, appellant John Slatky, requires us to decide what this "bona fide offer" provision requires the oil company (hereinafter "distributor") to do and in what manner courts should scrutinize the distributor's offer in determining its *bona fides*.

The district court found that Amoco sincerely believed its offer price, derived from its internal business practices, was at fair market value and that the offer had a reasonable basis in fact because its procedures were reasonable, notwithstanding that the price was substantially higher than the estimate of independent appraisers retained by Slatky and by Amoco

itself. We conclude that the district court erred in failing to insist that the offer be objectively reasonable, i.e., that it approach fair market value. We therefore reverse and remand for further proceedings.

## I. *The Statutory Scheme*

Title I of the PMPA generally regulates the relationship between distributors of motor fuel, principally oil refiners, and their franchisees, principally retail gas station operators, many of whom lease their stations from the distributors. Evidence at Congressional hearings indicated that distributors had been using the threat of termination or nonrenewal to compel franchisees to comply with the distributor's marketing policies. *See* S.Rep. No. 731, 95th Cong., 2d Sess. 17-19, *reprinted in* [1978] *U.S. CodeCong. & Ad.News* 873, 875-77 (hereinafter "Senate Report"). In addition, Congress found that franchisors had used their superior bargaining power and the threat of termination to gain an unfair advantage in contract disputes. *Id.*

In passing the PMPA, Congress determined that franchisees had a "reasonable expectation[ ]" that "the [franchise] relationship will be a continuing one." Senate Report at 18, U.S.Code Cong. & Ad.News 1978, at 876. The PMPA's goal is to protect a franchisee's "reasonable expectation" of continuing the franchise relationship while at the same time insuring that distributors have "adequate flexibility ... to respond to changing market conditions and consumer preferences." Senate Report at 19, U.S.Code Cong. & Ad.News 1978, at 877. To accomplish these purposes, the PMPA works principally by limiting the grounds on which distributors may terminate or fail to renew a franchise. 15 U.S.C. § 2802. The PMPA also provides various notification requirements, some of which guarantee a franchisee an opportunity to correct any improper conduct with which he has been charged. *See* §§ 2802, 2804.

Most of the grounds for termination or nonrenewal involve some form of franchisee misconduct. For example, a distributor may terminate for a franchisee's failure to pay sums due under the franchise agreement, *see* § 2802(b)(2)(C) (incorporating § 2802(c)(8)), or for a franchisee's "fraud or criminal misconduct ... relevant to the operation" of the property, § 2802(b)(2)(C) (incorporating § 2802(c)(1)). A distributor may fail to renew because of **\*479** numerous "bona fide customer complaints" about the franchisee's operations of the property, *see* § 2802(b)(3)(B), or because of

a franchisee's failure to operate a property "in a clean, safe, and healthful manner," *see* § 2802(b)(3)(C).

To assure distributors' market flexibility, however, the Act also permits termination or nonrenewal because of certain distributor business decisions. So long as a franchisee has received or been offered at least a three year franchise agreement, a distributor may terminate or fail to renew a franchise agreement if it decides "in good faith and in the normal course of business" to withdraw from the relevant geographic market area. *See* § 2802(b)(2)(E). [1]

In addition, for three-year franchisees, a distributor may fail to renew the agreement of a franchisee who leases a property from the distributor if the distributor determines "in good faith and in the normal course of business:

(I) to convert the leased marketing premises to a use other than the sale or distribution of motor fuel,

(II) to materially alter, add to, or replace such premises,

(III) to sell such premises, or

(IV) that renewal of the franchise relationship is likely to be uneconomical to the franchisor [distributor] despite any reasonable changes or reasonable additions to the provisions of the franchise which may be acceptable to the franchisee."

§ 2802(b)(3)(D)(i).

Whenever a distributor terminates or fails to renew a franchise relationship for one of these business purposes, however, he must meet several other requirements. First, the distributor may not terminate or fail to renew in order to convert the property to direct management by its own employees or agents. *See* § 2802(b)(2)(E)(ii), 2802(b)(3)(D)(ii). Second, the distributor must either make a "bona fide offer" to sell the property or, if applicable, provide the franchisee a right of first refusal on an offer made by another. *See* §§ 2802(b)(2)(E)(iii)(I); 2802(b)(3)(D)(i). [2] The meaning of the "bona fide offer" requirement under the nonrenewal subsection, § 2802(b)(3)(D)(i), is the principal issue in this case.

## II. *Facts and Procedural History*

For several years, Slatky was an Amoco franchisee, leasing a gasoline station in York, Pennsylvania. In May, 1985,

following a year in which Slatky's sales volume started to decline, Amoco determined not to renew Slatky's franchise on the ground that renewal would be uneconomical despite any reasonable changes or additions to the franchise relationship to which Slatky might agree. Amoco gave proper notice, and because it based its nonrenewal on § 2802(b)(3)(D)(i)(IV), it proceeded, in a letter dated June 28, 1985, to offer to sell Slatky the station for $306,300.00 without the underground tanks and pumps. The testimony reveals that Amoco arrived at this price through a two-step process.

First, Amoco's employee Melvin O'Dell evaluated the land alone in early May, 1985. O'Dell based his appraisal on three allegedly comparable properties, which had been sold several years before. He testified, however, that he made no effort to verify his information about these "comparables" or to find other reports on other properties. O'Dell further testified that his best comparable was a property that he later found had been understated in land area by 40% and that was not suitable as a basis of comparison because of its location. **\*480** [3] Based on this analysis, O'Dell appraised the value of the land at $155,000.

Following the land appraisal, another Amoco employee, Charles Bogdanowicz, performed an initial appraisal of the property improvements. Bogdanowicz had no formal appraisal experience but had built stations for Amoco in several parts of Pennsylvania. He estimated the replacement cost of the improvements, including tanks and lines, to be $121,300.

Based on these two estimates, Amoco's real estate manager, Eugene O'Brien, recommended a price of $276,300 to the district manager, Lemuel Warfield. Although he did not disagree with any of the conclusions used to come up with the appraisal, Warfield sent a note back to O'Brien stating, "costs as they are today and the improvements that we have on the property, I would believe the appraisal would be more reasonable at $350,000, less tanks and lines." Warfield asked O'Brien to review the figure, and O'Brien passed this request to O'Dell. [4]

O'Dell then reviewed his appraisal and came up with a land value of $185,000, $30,000 higher than the first estimate. In a letter to Warfield, O'Brien stated that this new figure was "about as far as we think it should go." Warfield then offered to sell the station to Slatky for $306,300 ($185,000 for the land plus $121,300 for the improvements), explicitly stating that this figure did not cover the tanks and pumps.

After Slatky filed his complaint in this case, Warfield sent Slatky a letter explaining that the exclusion of the tanks and pumps was mistaken and offering the property for $256,300 plus $50,000 for the tanks and pumps.

Slatky's suit seeks damages and an injunction ordering Amoco to sell the property to him at fair market value. He did not challenge the grounds for nonrenewal but claimed that Amoco's offer of $306,300 was not a bona fide offer because it was not at fair market value. Two certified appraisers hired by Slatky valued the property respectively at $158,200 (including pumps and tanks) and $145,000 (not including pumps and tanks). An independent appraisal eventually commissioned by Amoco for this litigation appraised the property at $221,000 also not including pumps and tanks.

After a bench trial, the district court held that Amoco had fulfilled its obligation to make a bona fide offer. The court accepted as a general standard the requirement that the offer be "sincere and have a reasonable basis in fact." [5] The court found the sincerity standard met because Amoco had followed its "general" procedure for determining the selling price of property and because it believed its offer price to be at fair market value. The court also found that Amoco's offer had a reasonable basis in fact because, although its appraiser had not followed formal appraisal techniques, "the procedures used by them were reasonable" and hence the "offer was not arbitrarily made." The district court made no finding whether the offer actually approached fair market value, as Slatky claimed the statute required, or whether the offer was a reasonable estimate of fair market value. This appeal followed.

### III. *Amoco's Subjective Good Faith Standard*

#### A.

Amoco's principal contention is that we should interpret the term "bona fide" to require that a distributor make its offer only in subjective good faith. Amoco grounds this argument on an analogy between the distributor's determination of an **\*481** offer price and its original determination not to renew a franchise because of a business reason permitted under § 2802(b)(3)(D). The statute requires only that the latter decision be made "in good faith and in the normal course of business." *Id.* The Senate Report states:

> These tests provide adequate protection of franchisees from arbitrary or discriminatory termination or non-renewal, yet avoid judicial scrutiny of the business judgment itself. Thus, it is not necessary for the court to determine whether a particular marketing strategy, such as a market withdrawal, or the conversion of leased marketing premises to a use other than the sale of distribution of motor fuel, is a wise business decision.

Senate Report at 37, U.S.Code Cong. & Ad.News 1978, at 896. Contending that the decision about an offer price is essentially the same kind of business judgment as a decision not to renew the franchise, Amoco claims that the same good faith standard designed to prevent second-guessing of a distributor's business judgment should apply.

[1]   We reject Amoco's suggestion for several reasons. First and fundamentally, we disagree with Amoco's basic analogy between a nonrenewal decision on the one hand and the determination of a bona fide offer price on the other. We have noted that Congress wished distributors to have the flexibility to respond to changing market conditions: when making a nonrenewal decision under § 2802(b)(3)(D), distributors make such a marketing decision. So long as nonrenewal was truly based on such a marketing decision, Congress precluded courts from examining its merits. Congress did not, however, preclude courts from scrutinizing the merits of termination or nonrenewal decisions that result from a franchisee's misconduct. Whether a franchisee has truly created health or safety violations or violated a term of the franchise agreement is a question the courts may examine freely. Congress thereby distinguished between decisions involving general business matters and decisions turning on a right created by the PMPA.

[2]   Like a termination or nonrenewal decision for franchisee misconduct, the determination of an offer price is not a business decision. It is not a decision that the distributor decides on its own to make. Rather, the distributor sets a bona fide price only because the statute requires it to do so. Indeed, when a distributor fails to renew a franchise because of a decision to convert a property to a different use, or to alter the premises, see § 2802(b)(3)(D)(i)(I), (II), selling the property will interfere with its business plans. The determination of an offer price therefore represents something we may call a

"compliance judgment," a judgment about how best to protect the company's interests while complying with the statute. Congress did not instruct the courts to defer to such decisions.

The legislative history reveals this distinction. Under H.R. 1300 (94th Cong), the predecessor to Title I of the PMPA, a franchisee could not obtain injunctive relief if the franchisor failed to renew on the basis of "a determination made by the franchisor in good faith and in the normal course of business" even if such nonrenewal was prohibited under the bill. H.R. 1300 § 105(e)(1)(A). But such nonrenewal decisions were remediable with money damages, which would have compensated the franchisee for the loss of its reasonable expectation of renewal. Id. § 105(e)(2).

Under H.R. 1300, the distributor could mitigate damages by making a bona fide offer. Responding to the pleas of the major oil companies, see, e.g., Hearings on H.R. 130, Senate Subcomm. on Energy Conservation and Regulation of the Energy and Natural Resources Committee, Publ. No. 95-61, 250 (95th Cong., 1st Sess.) (statement of Duval Pickey, Vice President of Marketing for Exxon), the next Congress made a bona fide offer a surrogate for damages, H.R. 130 (95th Cong.), and that provision became law. Under either bill, however, Congress treated the bona fide offer requirement not as a statutory recognition of a business judgment but as a form of compensation to the franchisee for the harm resulting from the *482 distributor's valid business judgment. We would misread that legislative history and permit distributors to "eat their cake and have it too" if we were to defer not only to the business merits of the distributor's business judgment but also to the distributor's sense of the fairness of its offer of compensation.

[3]   Second, even assuming the correctness of the analogy between nonrenewal decisions and offer price decisions, Amoco confuses procedural restrictions with substantive ones. The substantive restriction on the nonrenewal decision comes from the limitation on the distributor's grounds for renewal. The "good faith and normal course of business" requirement is essentially a procedural direction to the courts about how to judge whether the distributor has abided by the substantive restrictions and failed to renew only because of one of the statutorily permissible reasons. Thus, what the court decides in a challenge to a nonrenewal decision is not whether the distributor determined not to renew according to some elusive notion of good faith but whether it sincerely made a decision to sell the property or to alter it or to accomplish some other business purpose permitted under the

statute. *See* Senate Report at 37, U.S.Code Cong. & Ad.News 1978, at 896 ("good faith test is meant to preclude sham determinations").

Amoco's suggestion that the statute only requires a distributor to determine an *offer* price in "good faith" takes this procedural standard of judicial scrutiny and turns it into a substantive restriction on the distributor's behavior. But a mere requirement to make an offer "in good faith" is essentially without content. Failing to suggest what a distributor must sincerely decide, it suggests only some kind of floating goodwill. Because it is so ephemeral, a franchisee would virtually never be able to show its absence. Even if we were to accept Amoco's analogy between the offer price decision and a decision not to renew a franchise, we would therefore adopt the "good faith" standard only as a standard of judicial scrutiny. In order to decide whether the distributor had made the offer price in good faith, we would still have to decide what kind of offer price the statute requires.

## B.

 [4]    Apart from its analogy between the bona fide offer provision and the decision not to renew a franchise, Amoco claims that a subjective good faith standard is consistent with the general purposes of the statute. According to Amoco, the statute seeks only to prevent "arbitrary and discriminatory" terminations and nonrenewals while otherwise leaving the distributor unfettered discretion to pursue its own economic self-interest. By requiring only that a distributor make an offer in good faith, Amoco claims, courts can prevent discriminatory conduct while otherwise allowing distributors to act in accordance with their self-interest.

This reading of the statute's requirements, however, trivializes Congress's goals. Distributors have no reason to mistreat franchisees out of simple spite, and Congress did not attribute any such motivation to them. The Senate Report makes clear that the "arbitrary and discriminatory" terminations and nonrenewals Congress wished to stop were those aimed at forcing the franchisee to accept marketing practices not set out in the franchise agreement. *Senate Report* at 12-19, 36-37, U.S.Code Cong. & Ad.News 1978, at 873-877, 894-896. Obviously, Congress found that distributors had been using their power over franchisees to further their own self-interest. In remedying this "disparity in bargaining power" by limiting the grounds for termination and nonrenewal, Congress protected the franchisee's interests by curbing those

of the distributor. *Senate Report* at 18, U.S.Code Cong. & Ad.News 1978, at 876.

Other provisions also quite explicitly restrict a distributor's self-interest in favor of franchisees. In particular, Congress proscribed a distributor from terminating or failing to renew a franchise for the purpose of transferring a property to direct management by its own employees. *See* § 2802(b)(2) (E)(ii), § 2802(b)(3)(D)(ii).  **\*483**  These provisions in part address Congress' fear that major distributors were engaging in predatory pricing to drive independents out of business. *See* Cong.Rec. S12761-62 (daily ed. May 5, 1978) (statement of Sen. Durkin). But these provisions also reflect Congress' concern that the major distributors' desire to operate their own stations resulted in their pressing franchisees to sell out or face stiff increases in rent. *See* 123 Cong.Rec. H10,385 (daily ed. April 5, 1977) (statement of Rep. Conte). By protecting in this way the franchisee's interest in continuing to earn a livelihood from the franchise property, Congress limited the ability of the distributor to shift to more profitable direct management.

As these specific provisions illustrate, the very act of passing the PMPA indicated Congress's rejection of the view advanced by the major gasoline retailers that remedial legislation was unnecessary because the interests of distributors and franchisees were in harmony. *See, e.g., Senate Hearings, supra,* at 319-22 (statement of Kenneth E. Curtis, Vice-President of Marketing for Amoco). While a subjective good faith standard would probably enable distributors to pursue their own, unfettered self-interest, the statute does not generally guarantee distributors that right. We therefore reject this goal as a guiding principle for interpreting the bona fide offer provision.

## IV. *The Role of Fair Market Value*

## A.

Having rejected Amoco's proffered definition of a bona fide offer, we must now derive the correct one. The starting point of all statutory analysis is the words of the statute themselves. Our review of the many statutes in which Congress has used the term "bona fide" reveals that while Congress uses the phrase in contexts in which good faith intent helps reveal and may even help determine genuineness, the term is also used to convey an objective notion of actuality. [6] For example, immigration statutes provide special privileges variously for a

"bona fide student," 8 U.S.C. § 1101(a)(15)(F)(i), for a father with a "bona fide parent-child relationship" with a child, 8 U.S.C. § 1101(b)(1)(D), for a "bona fide member of the crew" of a vessel, 8 U.S.C. § 1287, or for employees of a "bona fide United States incorporated nonprofit organization," 8 U.S.C. § 1430(c). While the purposes of those who claim to fit into these categories may be relevant to a determination of their *bona fides,* the status of each would seem to turn at least substantially on objectively verifiable characteristics.

Bona fide occupational qualifications for employment, which serve as exceptions to our employment discrimination laws, *see* 29 U.S.C. § 621, 42 U.S.C. § 2000e-2(e), work similarly. For a qualification to be bona fide, an employer must show not only that it is necessary but the facts must support its "reasonable necessity" and the inability to accomplish the same purpose through a less discriminatory means. *See Dothard v. Rawlinson,* 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977) (interpreting Title VII); *Western Air Lines v. Criswell,* 472 U.S. 400, 105 S.Ct. 2743, 2751-53, 86 L.Ed.2d 321 (1985) (interpreting Age Discrimination in Employment Act).

A review of the fourteen code sections that use the phrase "bona fide offer" does not provide a definite meaning. Some refer to a "bona fide offer of employment," providing for special relocation benefits to those who have accepted such an offer under certain circumstances, *see* 29 U.S.C. § 1653; 19 U.S.C. § 2298(b), or denying benefits to those who have rejected them, *see* 42 U.S.C. § 607(b). In these contexts, Congress does not appear to use the phrase in connection with any notion of price level.

In many other contexts, however, Congress uses the phrase "bona fide offer" in tandem with some specified notion of market value. *See, e.g.,* 16 U.S.C. § 544f(*o*) (conservation area rules limiting use of property do not apply to unpurchased land for which owner has made "bona fide offer" **\*484** to sell to government; offer "shall not be considered bona fide" if owner refuses consideration equal to the fair market value); 45 U.S.C. § 748(e) (in complicated statutory scheme governing abandonment of rail-line by bankrupt railroad company, company must sell if it receives "bona fide offer" for 75% of appraised value of line); 10 U.S.C. § 9512(e)(2)(D) (Secretary of Defense may reimburse private owner of aircraft modified to be able to serve as cargo plane if needed by government if resale of plane pursuant to "bona fide, arm's length transaction made to the highest bidder" is for a price less than fair market value of non-modified plane).

We acknowledge that the coupling of "bona fide offer" with some particular statement of value could suggest that "bona fide" conveys a solely independent meaning. We believe, however, that we read these statutes more fairly by deducing that Congress generally intends the *bona fides* of an offer to be determined in accordance with some level of fair market value.

Section 3604 of Title 42 U.S.C., which does not explicitly define bona fide in some relation to "fair market value," supports this view. That section makes it illegal "to refuse to sell or rent after the making of a bona fide offer ... a dwelling to any person because of race, color, religion, sex, or national origin." Because a property owner who refused to rent or sell a property because of a below-market price would not engage in discrimination, an offer that did not meet the market price would assumedly not be a bona fide offer.

Notwithstanding the helpful guidance of these sections, they primarily establish that the phrase "bona fide" gains meaning from its statutory context. We must therefore derive the meaning of bona fide offers to sell under the PMPA from that statute's legislative purpose.

As we have discussed, the overriding purpose of Title I of the PMPA is to protect the franchisee's reasonable expectation of continuing the franchise relationship. Because of the distributor's need to adjust to changing market conditions, however, Congress permitted distributors to end the franchise relationship for legitimate business reasons. Yet in doing so, distributors still deprived franchisees of their reasonable expectations. The bona fide offer provision therefore serves as a second, and distinct, layer of protection, assuring the franchisee an opportunity to continue to earn a livelihood from the property while permitting the distributor to end the franchise relationship.

Permitting the distributor to set an offer price as high as it wished would not provide this second layer of protection because the distributor's business plans may lead it to wish to retain the property. Distributors would set offer prices that compensated them fully for the loss of their business plans. Alternatively, distributors would set an even higher price if they thought the franchisee would pay it. The special desire of a franchisee to maintain the property with which he has worked is exactly what produces the distributor's general bargaining advantage. Either price, a price reflecting the distributor's desire to pursue its business plans or a price reflecting the franchisor's special commitment to the

property, might fail to compensate the franchisee for the loss of his reasonable expectation of renewal.

[5]    To protect the interests of franchisees, we believe that the statute effectively requires the distributor to set an offer price ignoring both its own alternative business plans and the special needs of a franchisee to hold on to the property. Rather, the statute requires the distributor to make an offer as if it "actually" wanted to sell the property (not necessarily to the franchisee but to someone). With such a desire, however, the distributor would set an offer price at fair market value. That, by definition, is the highest price a willing buyer would pay, and an offer at fair market value protects the franchisee's reasonable expectation of being able to make a living with the franchise property.

### B.

Having stated this requirement, we must now decide in what manner courts should scrutinize the distributor's offer to determine **\*485** whether it complies with the requirement. In *Robertson v. Mobil Oil Corp.,* 778 F.2d 1005, 1008 (3d Cir.1985), we defined "bona fide" in the context of the PMPA provision permitting nonrenewal of a franchise because of "bona fide customer complaints" to mean "sincere and having a reasonable basis in fact." We similarly here are guided by Congress's decision not actually to use the term "fair market value" but instead the term bona fide, which suggests some degree of deference. That choice indicates, we believe, a recognition that "the word 'value' almost always involves a conjecture, a guess, a prediction, a prophecy." *Amerada Hess Corp. v. Commissioner,* 517 F.2d 75, 83 (3d Cir.1975) (quoting other cases). "[T]here is no universally infallible index of fair market value." *Id.* There may be a range of prices with reasonable claims to being fair market value. Were we to mandate that courts determine whether the distributor's offer actually was at fair market value, distributors could rarely rest comfortably that their offer would eventually be determined by the court to be fair market value.

On the other hand, a standard of scrutiny that simply focused on whether the distributor believed its offer to represent fair market value would leave the franchisee open to injury through sloppiness or mere error. Such a focus might also prove difficult to apply, for intentions are always difficult to discern, especially when we deal not with the intentions of individuals but of organizations.

[6]    We therefore believe that courts should scrutinize the distributor's offer in a manner similar to that we adopted in *Robertson.* Courts should determine first if the distributor believed its offer price represented fair market value. Even if the distributor did have that sincere belief, however, courts should also determine whether the estimate was objectively reasonable. i.e., whether the offer approached fair market value. [7]

### V. *The Need for Remand*

[7]    In this case, our disagreement with the district court is narrow. The district court found that Amoco sincerely believed its offer to be at fair market value. Slatky has pointed to considerable evidence that might support a contrary finding, in particular to apparently sloppy appraisal methods and to pressures placed on the appraisal department by the district manager, Lemuel Warfield, that resulted in a higher price. However, the district court's finding on the sincerity of Amoco's belief is not clearly erroneous.

[8]    The district court also found that the "procedures" used by the Amoco employees were reasonable, and upon this finding, it apparently risked its judgment that the offer had a reasonable basis in fact. [8] The mere following of reasonable procedures, however, does not necessarily result in a reasonable estimate. To determine whether the estimate was reasonable, the district court must focus on the specific facts used by the appraisers in their valuation and the inferences made from them.

Slatky presented evidence that the land appraisal was based on out-of-date and inappropriate comparables and that the improvements appraisal did not represent local costs. Slatky also presented the testimony of independent appraisers that disagreed **\*486** markedly with the evaluations of Amoco. Indeed, Amoco's own appraiser, apparently hired for trial preparation, valued the property $31,000 less than the amount offered by Amoco. The district court should have evaluated these specific challenges. In the face of an apparent congruence of independent appraisals that Amoco's estimate was considerably too high, the court had an obligation to state clearly why it found the Amoco estimate objectively reasonable. [9]

Because the district court failed to find objective reasonableness (in addition to a belief that the property was

offered to the franchisee at fair market value), the judgment of the district court will be reversed and the case remanded for further proceedings consistent with this opinion. The district court will have to make further fact findings. We leave it to the discretion of the district court whether to reopen the record.

MANSMANN, Circuit Judge, dissenting.

I respectfully dissent. I disagree with the majority's position regarding what evidentiary burden a franchisor must meet to establish that an offer is bona fide, and what evidence a franchisee may introduce in order to raise a triable issue of fact on the bona fides of an offer to sell the franchise premises. The statute puts the good faith of the franchisor at issue, not the market value of the franchise property. Reliance on the opinion of a certified, independent appraiser would be competent evidence of the franchisor's good faith in arriving at its offering price. However, nothing in the statute supports the majority's intimation that, in every case, an independent appraisal is required as part of the franchisor's initial evidentiary burden and that the district court is required to make an independent determination of fair market value.

I believe that once the franchisor has established that it has arrived at its offering price in accordance with its usual appraisal practices, it is entitled to an inference that the offer was made in good faith, *i.e.,* that the franchisor's usual appraisal practices produced a price which the franchisor reasonably believed represented the value of the property. The burden would then shift to the franchisee to raise a triable issue of fact with regard to the franchisor's good faith.

## I.

Congress enacted Title I of the PMPA to remedy the disparity of bargaining power which enabled a petroleum franchisor to obtain the right to terminate a franchise relationship for minor contract violations or changes in circumstances. Evidence at Congressional hearings demonstrated that franchisors used the prospect of nonrenewal to compel franchisees to comply with the franchisor's marketing policies, and frustrated the reasonable renewal expectations of franchisees through arbitrary and discriminatory cancellations. *See generally* S.Rep. No. 731, 95th Cong., 2d Sess. 17-19, *reprinted in* 1978 U.S.Code Cong. & Ad.News 873, 875-77 (the "Senate Report"). In order to strengthen the bargaining position of franchisees, Congress drafted Title I to prohibit a franchisor from terminating or failing to renew a franchise agreement

except on grounds specified in the statute. The statute also requires written notice of the franchisor's intent to terminate or fail to renew. 15 U.S.C. § 2804(a).

The legislative history of the PMPA recognizes an essential legislative purpose to provide statutory grounds for termination and nonrenewal which would not be "so broad as to deny franchisees meaningful protections from arbitrary or discriminatory terminations and nonrenewals or to prevent fulfillment of the reasonable renewal expectations of the franchisees." Senate Report at 18, 1978 U.S.Code Cong. & Ad.News at 877. Yet, a competing legislative concern was expressed for "the legitimate needs of a franchisor to be able to terminate a franchise or not renew a franchise relationship based upon certain actions of the franchisee." *Id.* at 19, 1978 U.S.Code Cong. & Ad.News at 877. Congress also **\*487** recognized the particular importance of providing "adequate flexibility so that franchisors may initiate changes in their marketing activities to respond to changing market conditions and consumer preferences." *Id.*

The statutory grounds for termination or nonrenewal reflect Congress' attempt to strike a balance among these competing concerns. Permissible grounds for either termination or nonrenewal include specific courses of conduct of the franchisee, events such as fraud or bankruptcy, and agreement of the parties, or the franchisor's determination to withdraw from the geographic area. *See* 15 U.S.C. §§ 2802(b)(2)(A)-(E). Customer complaints, failure of the franchisee to operate the franchise in a safe and sanitary manner, and failure by the parties to agree to reasonable changes in the franchise agreement are also grounds for nonrenewal. *See* 15 U.S.C. §§ 2802(b)(3)(A)-(C). A franchisor may also fail to renew a franchise if he decides "in good faith" and "in the normal course of business" to convert the premises to another use, to materially alter the premises, to sell the premises, or that the franchise is uneconomical. 15 U.S.C. § 2802(b)(3)(D).

To establish a prima facie case under the enforcement provisions of the PMPA, the franchisee need only establish a termination or nonrenewal of a franchise agreement. 15 U.S.C. § 2805(c). The franchisor then has the burden of going forward with evidence to establish as an affirmative defense that the termination or nonrenewal was permitted under the statute. *Id.* When the decision not to renew is based upon one of the business judgments permitted under § 2802(b)(2)(E) or (b)(3)(D), the franchisor must also establish in defense that the determination was not for the purpose of converting the premises to operation by employees or agents

of the franchisor for the franchisor's own account, 15 U.S.C. § 2802(b)(2)(E)(ii) and (b)(3)(D)(ii), and that it has complied with the notice requirements of the statute, 15 U.S.C. § 2804.

The statutory section in dispute here provides that once a franchisor has made an economic determination not to renew a franchise agreement in accordance with the statute and has notified the franchisee of its decision not to renew, the franchisor must make to the franchisee a "bona fide offer" to sell or otherwise transfer the franchisor's interest in the marketing premises or grant a right of first refusal of an offer made by another. 15 U.S.C. §§ 2802(b)(2)(E)(iii), (b)(3)(D)(iii).

The parties agreed that the PMPA places upon the franchisor the burden of proving its compliance with the statutory requirements including the fact that its offer was "bona fide." The parties stipulated that Amoco's ground for nonrenewal of Slatky's franchise was a business decision permitted by the statute and that the franchisor had complied with the notice requirements of the statute. Section 2802(b)(3)(D)(iii) is the applicable provision requiring a bona fide offer, and the parties parted company over the definition of "bona fide" to be applied here.

After a bench trial, the district court rendered judgment for Amoco. [1] In seeking to ascertain the correct legal standard to apply, the district court relied on our decision in *Robertson v. Mobil Oil Corp.,* 778 F.2d 1005 (3d Cir.1985), in finding that Amoco's offer to Slatky was bona fide. In *Robertson* we defined bona fide in the context of a different section of the PMPA, namely § 2802(b)(3)(B) which allows termination or nonrenewal of a franchise based on "bona fide" customer complaints. We there defined a bona fide complaint as "sincere and having a reasonable basis in fact." *Id.* at 1008.

The district court concluded that Amoco's offer was reached in a reasonable manner, in the normal course of business, by Amoco's employees who appraise any property **\*488** Amoco intends to buy, sell, or lease and who followed procedures normally used for evaluating any of Amoco's property for sale. The court found that "although [Amoco's real estate manager] was requested to reappraise the land which resulted in a higher valuation, there is no evidence that he was directed to increase his appraisal." The court relied upon these findings in concluding that the offer had a reasonable basis in fact. The district court made no finding of fact regarding whether the offer approached the fair market value of the marketing premises as determined by

an independent appraisal, but the court found the offer to be sincere in that the property was offered at what Amoco believed was the fair market value. The court rejected the argument of the plaintiff that in order for the franchisor to meet its statutory obligation of proving a bona fide offer under the PMPA, the franchisor must demonstrate that its offer equals or approaches a fair market value as determined by an independent appraiser.

On appeal, the plaintiff argues that the district court erred first in finding that Amoco's valuation procedures were reasonable, and second, in applying a legal standard which did not require an independent consideration of the fair market value of the marketing premises.

Our review in cases of statutory construction is plenary. *Chrysler Credit Corp. v. First National Bank Trust Company of Washington,* 746 F.2d 200, 202 (3d Cir.1984); *Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 101-02 (3d Cir.1981). Findings of fact should stand unless clearly erroneous. *See Leeper v. United States,* 756 F.2d 300, 308 (3d Cir.1985).

## II.

Neither the statute itself nor the legislative history of the PMPA provides us with an explicit definition of "bona fide." In *Robertson* we arrived at a definition of bona fide suited to the particular statutory context of the PMPA-namely, that Congress intended "bona fide" customer complaints to be "sincere and hav[e] a reasonable basis in fact." *Robertson,* 778 F.2d at 1008. Our present task is to determine precisely what our *Robertson* definition requires in the context of offers to sell leased marketing premises pursuant to § 2802(b)(3)(D)(iii) of the PMPA.

The avowed purpose of Title I of the PMPA "is the establishment of minimum Federal standards governing the termination and nonrenewal of franchise relationships for the sale of motor fuel by the franchisor or supplier of such fuel." Senate Report at 15, 1978 U.S.Code Cong. & Ad.News at 873. Congress implemented its objective primarily by delineating clearly the grounds on which the franchisors may terminate or refuse renewal of an existing franchise. *See* 15 U.S.C. § 2802. As discussed above, the remedial scheme of the statute attempts to balance the franchisee's relative lack of bargaining power and reasonable renewal expectations

against the legitimate property rights and economic interests of the franchisor. *See* Senate Report at 18-19.

I agree with the majority that protection of the franchisee requires that the franchisor behave as though it truly wished to sell the franchise premises. Thus, consistent with *Robertson*, for an offer to be bona fide the appraisal upon which it is based must have a reasonable basis in fact. I disagree with the majority's view regarding what role the concept of "market value" should play in the court's determination of whether the franchisor has conformed to the bona fide offer.

The majority implies that a franchisor may not meet its burden of proof to establish the bona fide offer element of its defense without affirmatively establishing, in addition, that its offering price was "objectively reasonable," measured by the degree to which the offer "approach[es] fair market value" as determined by an independent appraiser and by the district court. The majority effectively requires the franchisor to introduce evidence that it relied upon the opinion of an independent appraiser in arriving at its offering price. The majority would then further require that the district court make an independent determination **489** of the acceptable range of fair market values for the franchise premises. I disagree. I find no basis in the PMPA for imposing the majority's objective evidentiary standard.

The statutory construction process must look in the first instance to the plain meaning of a statute's terms. *See National Freight v. Larson,* 760 F.2d 499, 503 (3d Cir.), *cert. denied,* 474 U.S. 902, 106 S.Ct. 228, 88 L.Ed.2d 227 (1985). "The common legal definition of bona fide, consistent with the non-legal definition, is '[i]n or with good faith; honestly, openly, and sincerely ... real, actual, genuine, and not feigned.' " *Robertson,* 778 F.2d at 1008, *quoting* Black's Law Dictionary (5th ed. 1979). In a legal context, the term bona fide looks almost exclusively to subjective good faith. For example, a bona fide purchaser, a bona fide holder for value, a bona fide mortgagee or a bona fide possessor of property may be party to illegal transactions yet exempt from liability because the action was taken in subjective good faith irrespective of another's prior or superior claim of right to the property. Additionally, nothing in § 2802(b)(3)(D)(iii) requires a franchisor to offer to sell, transfer, or assign its interest in the leased marketing premises for a price which in fact approximates fair market value. We must presume, accordingly, that Congress, in prescribing a bona fide offer did not necessarily intend to equate the franchisor's good faith

with an enforcing court's independent determination of fair market value.

No express statutory language governs what evidence may inform the bona fides of an offer. I believe the concept of a bona fide offer as utilized in § 2802(b)(3)(D)(iii) contemplates subjective good faith, *i.e.,* is undertaken without a motive or purpose to discriminate against the franchisee, which may be objectively evidenced through the use of the franchisor's normal procedure for appraising property for sale. The position of § 2802(b)(3)(D)(iii) in the statutory remedial scheme suggests that the franchisor's decision as to an offering price should be subject to a standard of intent similar to that which governs economic determinations which may support a decision not to renew a franchise. Under the PMPA, the requirement to offer the property for sale is triggered by the franchisor's reliance upon grounds for nonrenewal set forth in § 2802(b)(3)(D), which involve economic decisions regarding marketing strategy or recommitment of resources. There is nothing in the statute to indicate that compliance with § 2802(b)(3)(D)(iii) demands anything more than what is required for compliance with the sections which trigger its applicability. The standard governing those economic decisions is that they be made "in good faith and in the normal course of business." §§ 2802(b)(3)(D)(I)-(IV).

We may reasonably assume that through its ordinary valuation procedures a franchisor will determine a selling price which it considers to be market value and that the valuation will, as a result, have a reasonable basis in fact.

The fact that ordinary business procedures are not expressly required by the language of the section under consideration does not mean that a decision in the ordinary course of business may not evidence a bona fide offer. The absence of the express requirement of normal procedures merely suggests that other courses of conduct, *e.g.,* the use of outside appraisers even if not the franchisor's usual practice, could evidence good faith as well. I find nothing in the PMPA which requires the franchisor to offer its interest in the marketing premises to a current franchisee at a price which is any less than the franchisor would expect to receive from a third party purchaser. Section 2802(b)(3)(D)(iii)(II) contemplates that the franchisor might actively solicit bids or offer the marketing premises at a given price to the public at large. The section requires only that the franchisor must "offer [ ] the franchisee a right of first refusal ... of an offer, made

by another, to purchase such franchisor's interest in such premises."

The purposes of the statute would be served by defining a bona fide offer to sell as an offer to sell the fully operative marketing premises, which offer is the same as that which the franchisor would make to **\*490** any prospective buyer and based upon a valuation of the marketing premises arrived at through the normal procedures used by the franchisor in informing its decision at what price to offer any of its property for sale. Initially, therefore, the franchisor need carry the evidentiary burden to show that the franchisor arrived at its asking price through the normal appraisal procedures employed in the buying and selling of any of its property. Such a showing would presumptively satisfy our *Robertson* requirement of a sincere offer reasonably based in fact.

If the franchisor met its initial evidentiary burden, the franchisee could then introduce evidence of any arbitrary or discriminatory variation from the franchisor's normal business practices. If as Slatky complains, the franchisor did not really desire to sell the premises and inflated the selling price to prevent a sale, the franchisee could challenge the bona fides of the offer, for example, by introducing evidence to controvert the facts supporting the appraisal, the inferences drawn from them, on any unexplained inflation of the appraisers' figures in arriving at an offering price.

### III.

I part company with the majority's suggestion that the mere fact that independent appraisers arrived at a different opinion of the value of the property raises an issue of fact as to the bona fides of the franchisor's offer.

Market value is merely a matter of opinion until the subject property actually changes hands. *Amerada Hess Corp. v. Commissioner,* 517 F.2d 75, 83 (3d Cir.), *cert. denied,* 423 U.S. 1037, 96 S.Ct. 574, 46 L.Ed.2d 412 (1975).[2] As the majority recognizes, there may be a range of prices with reasonable claims to being fair market value. Consequently, a test of Amoco's bona fides cannot require more than that it relied on a well-founded opinion as to the market value of the franchise property, *i.e.,* whether Amoco reasonably believed its offer to be at fair market value, the standard applied by the district court. This conclusion fully comports with the Congressional aims expressed in the overall scheme and legislative history of the PMPA.

Slatky cites *Tobias v. Shell Oil Co.,* 782 F.2d 1172 (4th Cir.1986), and *Brownstein v. Arco Petroleum Products Co.,* 604 F.Supp. 312 (E.D.Pa.1985), as squarely holding that a "bona fide offer" must approach fair market value. The plaintiff, however, misplaces his reliance on these authorities. In *Brownstein,* the plaintiff attacked the *bona fides* of Arco's offer to sell him the franchise premises at a price sixteen percent above the value Arco's appraiser had assigned to the property. Since Arco could not demonstrate why it inflated its appraiser's figures, the district court held that the offer was not in conformity with the offeror's general practice for selling property, and was therefore not bona fide. *Id.* at 316. This result conforms to our analysis.

We note that the district court stated that:

> Even had Arco demonstrated that the procedures by which it arrived at the offering price were consistent with those utilized in non-PMPA-restricted cases, I am not convinced that it would have satisfied the strictures of the Act.... [A] proper reading of the Act compels the conclusion that for an offer to be bona fide-that is *actual*-it must meet or very nearly approach what the offeror believes to be the fair market value of the property [footnote omitted].

**\*491** *Id.,* emphasis in original. A close reading of *Brownstein* shows it to be consistent with Amoco's, not Slatky's, position. Even the court's dicta tested "what the offeror *believes* to be the fair market value of the property [footnote omitted]." *Id.,* emphasis added. The trial judge here specifically found that Amoco believed its offer to reflect fair market value. Even under the *Brownstein* analysis, therefore, Amoco has satisfied the bona fide offer requirement of the PMPA.

The opinion of the Court of Appeals for the Fourth Circuit in *Tobias* offers little help to us here. In *Tobias* the fair market value of the premises was undisputed and, in fact, the franchisor's sale price approached fair market value. *See Tobias,* 782 F.2d at 1174. The court was not faced with the problem we have here.

In sum, neither the express language nor the legislative history of § 2802(b)(3)(D) requires a franchisor's "bona fide

offer" to approach fair market value as determined by the court or by an independent appraiser. I conclude that the PMPA's requirement of a "bona fide offer" contemplates, at a minimum, that the franchisor should follow its general practice for selling property. The franchisor, of course, may demonstrate its good faith by means of an independent appraisal of fair market value if it so wishes, but nothing in the Act or its history requires such a course.

### IV.

Applying the legal standard enunciated above to the facts as found by the district court, I would hold that Amoco's offer to sell the premises was "bona fide." The district court properly found the franchisor's offer to be bona fide because the offeror arrived at its opinion of the value of the property in accordance with its normal procedures and offered to sell the property to the plaintiff at a price based upon that appraisal. In my view the trial court had discretion to credit the testimony of Amoco's employees with respect to Amoco's good faith in arriving at what they perceived to be a fair offering price.

Amoco's employees were qualified to form and express an opinion as to the value of the franchise property. A substantial and sufficient basis for the expression of that opinion appears in the record. The record establishes that the employees are acquainted with the property and are informed about the state of the market. The weight and credibility of their evidence was for the factfinder.

Eugene O'Brien, Manager of Projects for the North East United States, testified that out of 40 years of employment with Amoco approximately 38 were spent in real estate related positions involving extensive on-the-job experience as well as seminars and training courses. In 1985 his project team was responsible for $6.5 million in sales of properties. He testified about the company's procedures for determining an offering price and the employment of those procedures in this case. He affirmed that the procedures used in this case were the same as those employed by Amoco throughout the history of his employment with them. He further testified that Amoco's general procedure for determining the offering price of property is to conduct an initial appraisal of the land and real estate improvements by its own employees. That appraisal is then reviewed by a real estate manager and project team director. If the review raises questions, the property is reappraised or the appraisal is otherwise corrected. A selling price is then determined by Amoco's capital asset manager.

Melvin O'Dell, the capital investment representative for that area who prepared the appraisal of the land value, testified that he had been a capital investment representative for 25 of his 33 years with Amoco and had spent the first 8 years with Amoco in other real estate related positions. His duties and responsibilities for the past 25 years have been to buy, sell, lease and appraise Amoco properties in Pennsylvania and the four adjoining states. He testified to extensive on-the-job training, numerous appraisal seminars and a real estate license. He performs roughly 75 appraisals in the course of a year. Factors he relies on include determination of comparable sales in the market area and evaluation of **\*492** them in relation to the site being appraised as to size, geographic location, accessibility, overall appeal, zoning, and traffic volume. He makes on-site inspections of the comparable properties and the subject property.

Charles Bogdanowicz, who appraised the improvements, had been, at the time of his testimony, employed by Amoco for 13 years, the last 5 of which were spent as a project engineer. In this capacity he designs facilities to be constructed on various Amoco properties, a job which requires him to estimate the cost of improvements, secure bids, purchase equipment for service station facilities, supervise construction and, approximately twice a month, appraise service station improvements and equipment.

Lemuel Warfield, the Washington, D.C., district manager, testified that based on the number of gallons sold at the subject property Amoco could not purchase a replacement property, *i.e.,* with the potential to pump as many gallons, for the building and land value assigned by Amoco's appraisers. He testified that Amoco would have to pay close to half a million dollars to replace the property. Nevertheless, and despite his protest which resulted only in a closer appraisal of the land value and an increase of $30,000, his opinion that the station was more profitable for Amoco than reflected in the offer was not taken into consideration in arriving at the offering price. Thus, the only evidence of record regarding the matter of "value to Amoco" was that income from alternative uses was not considered by Amoco in setting its offering price.

I would hold that the franchisor's evidence of a price arrived at through its usual appraisal procedures and by experts who are qualified to testify as to the value of the property raised an inference that the franchisor believed it was offering the premises to the franchisee at a fair price. This inference satisfied the burden of proof as to the franchisor's good faith

defense unless the plaintiff was able to raise an issue of fact as to the franchisor's good faith. I do not believe the franchisee met this burden simply by introducing evidence of lower appraisals. Something more persuasive would be required than evidence that other appraisers were of a different opinion.

Under the majority's analysis, an independent appraisal of market value would be the only way to determine good faith. Reliance upon the opinion of a qualified independent appraiser would be persuasive evidence of a franchisor's good faith but it certainly would not be conclusive. The opinions of independent appraisers and the reasonableness of the franchisor's reliance upon them would be subject to testing and scrutiny by cross-examination and, as with the employee appraisers, the district court would have to decide what weight to give their opinions.

The majority also insists that the district court must focus on the specific facts used by the Amoco appraisers in their evaluation and the inferences made from them. I agree, but only to the extent that the franchisee is able to produce evidence to raise an issue of fact. The only fact placed in issue by the plaintiff here was that O'Dell's original appraisal of land value had been based on a considerable underestimation of the square footage of the principal comparable property, the Turkey Hill Market site. O'Dell, however, corrected the figures in his second appraisal and testified that he had determined that the underestimation would not change his estimate of the value of the subject property because even with the additional square footage the Turkey Hill site was considerably smaller than the franchise premises and was not adapted to as many uses.

The majority holds that where the franchisor introduces evidence of independent appraisals which are considerably lower than the franchisor's offer, the district court must state clearly why it finds the franchisor's offer to be objectively reasonable. Since, as the majority admits, the franchisor's good faith, and not the precise market value of the property, is the ultimate statutory issue, I do not believe the franchisee raises a triable issue of fact simply by introducing evidence of lower **\*493** appraisals. Something more persuasive would be required than evidence that other appraisers arrived at a different figure.

The plaintiff might, for example, place the franchisor's good faith in issue by offering persuasive evidence that the franchisor did not follow its usual procedures or employ its usual criteria or that the franchisor's witnesses were not competent to testify concerning the value of the property, *i.e.*, that the figures developed by the franchisor's appraisers or adjustments to their figures were based on speculation, guess, or conjecture. If employees did not know or consider some of the factors ordinarily used by certified appraisers, they may be asked to relate the details of their training and experience which justified them in disregarding the factors ignored.

The majority seizes upon the argument that O'Dell used out-of-date and inappropriate comparables in making his land value appraisal. However, the plaintiff introduced no evidence that better comparables were available. Plaintiff's expert testified that his best comparable was a site known as the Turkey Hill Mini-Mart which O'Dell also used as his principal comparable. The plaintiff's experts both testified on cross-examination that there were no recent sales of property for use as a service station in the area.

The majority also finds suspect the fact that Mr. O'Brien, after receiving O'Dell's first land estimate of $155,000, requested that O'Dell reevaluate the property. O'Dell then secured current traffic volume figures for the subject property and each comparable, determining the current zoning status of each and studying the residential areas encompassing the marketing areas of all three comparables and the subject property; he thereupon increased his land appraisal to $185,000.

The plaintiff also faulted O'Dell for failing to rely on comparables he had selected personally. However, O'Dell testified that he was familiar with the work of the prior appraiser, found him to be thorough and exacting and was comfortable in relying upon his selection of comparable properties. The plaintiff's arguments go only to the weight and credibility of O'Dell's testimony, a subject properly within the discretion of the trial court.

The majority also suggests that the improvements' appraisal did not represent local costs. Bogdanowicz, however, testified from his experience with new construction in Pennsylvania, Delaware, New Jersey, Maryland, and particularly in Harrisburg, that he would conclude that the construction costs in the Harrisburg area are comparable to the Philadelphia area where he had done most of his construction during the last three years.

The arguments made by the plaintiff and adopted by the majority are in essence challenges to the methods used by the

Slatky v. Amoco Oil Co., 830 F.2d 476 (1987)

56 USLW 2215

Amoco appraisers. Whatever suspicions the majority might have as to Amoco's good faith, there is no *evidence* that the appraisal is speculative. The facts supporting Amoco's appraisal were virtually unchallenged, and there is no evidence that the conclusions drawn from that data were incorrect. Nor is there any basis in fact to assume that an independent appraiser could value franchise property more accurately than could its present owner. The fact that the appraisers were employed by the defendant may also affect the weight of their testimony. Nevertheless, questions as to weight and credibility are for the factfinder, and we may not remand simply on the basis of our own speculation.

Even in cases where the facts will admit of more than one opinion, it is the province of the factfinder to choose among them. In this case, however, such a choice is not necessary. The defendant's burden is to prove good faith. If the data will support the franchisor's opinion as to the value of the property, the franchisor may not have proved market value, but it has proved good faith. This is true even if the facts will also reasonably support another opinion as to market value.

The district court specifically found that the procedures outlined by O'Brien are those followed by Amoco in the valuation of any property Amoco intends to buy, sell or lease. In addition, the court found that in this case Amoco did follow its customary **\*494** business procedures in arriving at an offering price to Slatky. The record clearly indicates that Amoco's appraisers were capable of forming an intelligent opinion derived from an adequate knowledge of the nature and kind of property in controversy and of its value. The district court noted that Amoco's appraisers showed precisely how they arrived at their respective appraisals. The district court found that the franchisor sincerely believed its offer to be at fair market value. The majority agrees that this finding is not clearly erroneous. No further findings were necessary to support the conclusion that the offer was bona fide.

The facts found by the district court support the decision that Amoco has fulfilled its statutory obligation to make a bona fide offer to sell the marketing premises to Slatky. Therefore, I would affirm the judgment of the district court.

## Parallel Citations

56 USLW 2215

## Footnotes

\*    Honorable Hubert I. Teitelbaum, United States District Judge for the Western District of Pennsylvania, sitting by designation.

1    The Senate Report explained that the disparity in bargaining power increased "as shorter franchise periods and more frequent renewal intervals are utilized." Senate Report at 18, U.S.Code Cong. & Admin.News 1978, at 877. By permitting terminations or nonrenewals for business reasons only of franchisees who had obtained or were offered three year franchises, Congress provided an incentive to distributors to provide franchises of at least that length.

2    In the case of a termination, a franchisor has a third option: he may sell the property to another franchisor and have that franchisor offer the franchisee a franchise agreement comparable to those the other franchisor has with other franchisees. *See* § 2802(b)(2)(E)(iii)(II).

3    Testimony of Slatky's appraisers indicated that the claimed sales price for the next most comparable property could not be verified.

4    Warfield had earlier told Slatky that he considered the property worth $500,000.

5    The district court took this standard from *Robertson v. Mobil Oil Corp.,* 778 F.2d 1005 (3d Cir.1985), in which we dealt with the provision in the PMPA permitting nonrenewal of a franchise because of "bona fide customer complaints." 15 U.S.C. § 2802(b)(3) (B). We interpreted the term bona fide there to mean "sincere and having a reasonable basis in fact." 778 F.2d at 1008.

6    According to a computer search of the United States Code, 369 sections of the Code contain the phrase "bona fide."

7    While we have held that sincere belief and objective reasonableness (as defined) are essential elements in the determination of the *bona fides* of an offer, we do not thereby exclude the possibility that there may be other relevant factors. For example, an offer approaching fair market value might be hedged with unreasonable conditions of sale.

8    Exactly what the district court meant by the reference to the appraiser's "procedures" in this context is unclear. The full sentence reads: "Although Mr. O'Dell and Mr. Bogdanowicz did not apply formal appraisal techniques, the procedures used by them were reasonable." 626 F.Supp. at 1226. In context, the reference appears to refer to broader techniques of appraisal. It certainly does not refer to the actual choice of comparables, the measurements of them, or the formula for relating one comparable to another.

The district court's standard of "reasonableness" is also unclear. The court suggested that the procedures were reasonable so long as the offer "was not arbitrarily made." *Id.* We do not believe that an offer is reasonable whenever it is not arbitrary. A reasonable offer must be one that approaches fair market value.

9    We do not suggest that any one valuation method is appropriate.

**Slatky v. Amoco Oil Co., 830 F.2d 476 (1987)**

56 USLW 2215

1    Amoco had counterclaimed for damages caused by the plaintiff's possession of the service station beyond the lease expiration date. Relying on the parties' pretrial stipulation to maintain the status quo pending the outcome of the trial, the district court entered judgment in favor of the plaintiff on the counterclaim.

2    In *Amerada Hess Corp. v. Commissioner,* we cited the classic formulation of fair market value: " 'the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts.' " *Id., citing United States v. Cartwright,* 411 U.S. 546, 551, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973), *quoting* Treas. Reg. § 20.2031-1(b). We also noted that " 'the word "value" almost always involves a conjecture, a guess, a prediction, a prophecy.' " *Amerada Hess Corp.,* 517 F.2d at 83, *citing Andrews v. Commissioner,* 135 F.2d 314, 317 (2d Cir.), *cert. denied,* 320 U.S. 748, 64 S.Ct. 51, 88 L.Ed. 444 (1943), *quoting Commissioner v. Marshall,* 125 F.2d 943, 946 (2d Cir.1942). Furthermore, "there is no universally infallible index of fair market value." *Amerada Hess Corp.,* 517 F.2d at 83. The supposedly objective standard of fair market value is, therefore, subject to a host of variables.

---

**End of Document**                         © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 81

2002 WL 31947572
Only the Westlaw citation is currently available.
United States Court of Federal Claims.

STANDARD FEDERAL BANK, Plaintiff,
v.
THE UNITED STATES, Defendant.

No. 95-CV-478. | Dec. 30, 2002.

**Attorneys and Law Firms**

Edward L. Lublin, Washington, D.C., with whom was
Lawrence S. Sher, for plaintiff.

Thomas P. Reilly, Trial Attorney, Commercial Litigation
Branch, Civil Division, Department of Justice, Washington,
D.C., with whom were Stuart E. Schiffer, Assistant Attorney
General, David M. Cohen, Director, Jeanne E. Davidson,
Deputy Director, for defendant.

**Opinion**

### *Opinion and Order*

SYPOLT, J.

**\*1** Before the court are the parties' cross-motions for
partial summary judgment [1] with respect to whether the
Federal Home Loan Bank Board (FHLBB or Bank Board)
and the Federal Savings and Loan Insurance Corporation
(FSLIC) guaranteed plaintiff the right to use for regulatory
purposes the purchase method of accounting for goodwill
created through its acquisitions of various savings and loan
associations ("regulatory goodwill"), notwithstanding the
subsequent enactment of the Financial Institutions Reform,
Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L.
No. 101-73, 103 Stat. 183 (codified in relevant part of 12
U.S.C. § 1464).

### *Background*

This is one of approximately 120 cases brought in this
court by savings and loan, or "thrift," institutions to obtain
damages allegedly occasioned by the enactment of FIRREA,
for breaches of contracts the government allegedly entered
into in approving mergers with and acquisitions of some of
the hundreds of thrifts threatened with insolvency during the
savings and loan crisis of the late 1970's and early 1980's. A
chief cause of the crisis was the increasing rate of inflation
and rising interest rates, because of which the interest paid to
attract depositors outpaced the returns thrifts were collecting
on their existing long-term fixed-rate mortgage loans the thrifts
were created to disburse. *See* Federal Home Loan Bank Act,
Pub.L. No. 72-304, 47 Stat. 725 (1932) (codified as amended
at 12 U.S.C. §§ 1421-1449 (1988)).

As regulator of these institutions' deposits, the FSLIC
faced the undesirable prospect of initiating receivership and
liquidating the banks. Compensating the unpaid depositors
would be potentially enormously costly to the government.
*See United States v. Winstar Corp.,* 518 U.S. 839, 843-861
(1996) (discussing in depth the circumstances of the savings
and loan crisis) (*Winstar* ). [2] *See also Winstar Corp., v.
United States,* 64 F.3d 1531 (Fed.Cir.1995) (*Winstar II* );
*California Federal Bank, FSB v. United States,* 245 F.3d 1342
(Fed.Cir.2001) (*Cal.Fed.II* ).

To stave off such consequences, the FHLBB and FSLIC
adopted a plan of encouraging healthier (not always 'healthy,'
as some cases have held, *see Winstar II,* at 1535, a relative
concept, in fact) thrifts to acquire or merge with the failing
ones, and often offered various inducements for doing so,
such as: cash contributions (often treated as a capital credit
not reducing assets in regulatory compliance calculations);
loans on more-favorable-than-market terms; various types
of agreements from enforcing regulatory requirements not
met due to the merger; indemnification agreements; and,
the principal inducement discussed in *Winstar,* permission
to treat the negative net worth of the surviving thrift
as amortizable goodwill countable toward meeting the
thrift's minimum regulatory capital requirements (regulatory
goodwill).

Under generally accepted accounting principles (GAAP),
an entity resulting from a merger or acquisition may elect
between the "pooling method" of accounting treatment (in
which the two former entities' assets and liabilities are fully
merged) and the "purchase method" of accounting treatment.
Under the latter method, the excess of the purchase price
(including assumed liabilities) over the fair market value of
the acquired asset is treated as an intangible asset, called
"goodwill," which is amortized against (deducted from)
income over a term of years. In the context of the savings
and loan transactions, this goodwill is generally referred to
as "supervisory goodwill," if it was created during a merger
approved by the federal banking authorities and "regulatory

goodwill" if it also could be counted toward meeting the minimum regulatory capital requirements established by the banking regulations. *See* 12 C.F.R § 563.13 (1983). By the device of goodwill, liabilities in effect became assets for accounting purposes, whether for regulatory purposes (to meet regulatory minimum capital requirements) or for public accounting purposes (to satisfy public financial disclosure requirements).

 **\*2** In the 1970's, the accounting profession established rules governing the accounting method to be applied to a purchase transaction of a savings and loan acquisition under GAAP. *See* Financial Accounting Standards Board (FASB) Interpretation No. 9, "Applying APB Opinion Nos. 16 and 17 When a Savings and Loan Association or Similar Institution is Acquired in a Business Combination Accounted for by the Purchase Method" (1976). The GAAP rules provided that goodwill could be amortized over a period of not more than 40 years, utilizing either a straight-line method (whereby goodwill is divided into equal amounts spread evenly over the entire amortization period) or an interest-rate approach, which amplifies amounts in the early years. [3]

On September 1, 1981, the FHLBB issued Memorandum # R 31b, which formally approved, and set guidelines for, the purchase method of accounting for goodwill arising from the acquisition of a savings and loan institution. Consistent with the earlier FASB Interpretation No. 9, it permitted amortization of intangible assets when the amount paid for such assets cannot be determined, for a useful life of up to forty years.

Between 1980 and 1983, plaintiff Standard Federal Bank (Standard), located in Troy, Michigan, consummated four transactions in which it acquired a total of seven federally-insured thrifts that were experiencing varying degrees of financial difficulties: 1) First Federal Savings and Loan Association of Niles, Michigan (Niles), in 1980; 2) Landmark Savings and Loan Association (Landmark), in 1981; 3) Peoples Federal Savings and Loan Association (Peoples), in 1982; and 4) four Indiana thrifts (Indiana Thrifts), in 1983.

In 1989, Congress enacted FIRREA, which, among other things, phased out, over a five-year period, a thrift's ability to count supervisory goodwill toward the new regulatory minimum capital ("core capital") requirements. *See* 12 U.S.C. § 1464(t).

Standard alleges that FIRREA and its implementing regulations took effect, at the time it held $120.5 million of unamortized supervisory goodwill generated by the merger transactions at issue here. Although Standard's strong financial position allowed it to meet the new regulatory capital requirements without having to rely on any regulatory goodwill, Standard claims that the enactment of FIRREA limited its "ability to make acquisitions using goodwill" and denied it "valuable benefits and business opportunities."

### Procedural History

On July 26, 1995, Standard filed a complaint for monetary relief in connection with the four transactions in this case seeking: 1) restitution for breach of contract; 2) restitution for frustration of contractual purpose; 3) restitution as a result of mutual mistake; 4) damages for breach of contract; 5) compensation for taking of property rights; 6) compensation for taking of contract rights; 7) damages for deprivation of property without due process; and 8) damages for retroactive application of FIRREA in violation of the due process clause.

 **\*3** Pursuant to the Omnibus Case Management Order, Standard filed four short-form motions for summary judgment on liability for breach of contract. *See supra,* note 1. On March 3, 1997, defendant filed a cross-motion for summary judgment on liability.

Briefing on defendant's motion to dismiss plaintiff's non-contractual claims for restitution, takings of property and contract rights, and due process violations has been stayed. (However, the court notes that the takings and due process claims are unlikely to prevail because this court has no jurisdiction over due process claims and the Federal Circuit has recently held that "the enactment and enforcement of FIRREA did not effect a taking [under the Fifth Amendment]." *Castle v. United States,* 301 F.3d 1328, 1342 (Fed.Cir.2002).

Following the reassignment of the case to this judge in February, 2002, the parties filed memoranda on the effect of the Federal Circuit's decision *Cal. Fed. II.* Defendant then filed a supplemental motion, which plaintiff opposes, seeking dismissal based on the FHLBB Principal Supervisory Agent's (PSA) and Supervisory Agent's (SA) lack of authority to enter into the Landmark and Niles contracts. [4] Because the court grants defendant's motion for summary judgment on other grounds, it need not reach this issue.

### Standard of Review

Under Rule 56(c) of the Rules of the United States Court of Federal Claims (RCFC), a motion for summary judgment will be granted if, after drawing all reasonable inferences in favor of the non-movant, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *O'Connor v. United States,* 308 F.3d 1233, at 1240 (Fed.Cir.2002) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Castle v. United States,* 301 F.3d at 1336.

The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986); *see Bayer AG v. Carlsbad Tech., Inc. (Bayer Corp.)* 298 F.3d 1377, 1379-80 (Fed.Cir.2002).

In deciding cross-motions for summary judgment, grant of the motion in favor of one party nonetheless must satisfy the requirement that all justifiable inferences be drawn in favor of the losing party. *Murphy Exploration & Prod. Co. v. Oryx Energy Co.,* 101 F.3d 670, 673 (Fed.Cir.1996).

In ruling on a motion for summary judgment, the court "must be guided by the substantive evidentiary standards that apply to the case." *Liberty Lobby,* 477 U.S. at 255. Thus, before a party may prevail on a breach of government contract claim, it must demonstrate the existence of the basic elements of a contract, *i.e .:* mutual intent to contract, including offer and acceptance based on a meeting of the minds; consideration; and an individual with actual authority to bind the government. *Cf. Cal. Fed. II,* 245 F.3d at 1346 (citing *Massie v. United States,* 166 F.3d 1184, 1188 (Fed.Cir.1999)).

### Elements of Winstar Contracts

**\*4**  Plaintiff's central argument is that the transactions in this case are substantively indistinguishable from those in *Winstar* and *Cal. Fed. II.*

Defendant argues that the facts and circumstances of the Niles, Landmark, and Peoples transactions are eminently distinguishable from those in *Winstar* and *Cal. Fed. II* because there is no evidence that Standard bargained with the bank regulators in any of these cases to be permitted, as a condition of merger, to use goodwill in meeting its regulatory net worth requirements.

It bears noting at the outset that, neither in *Winstar* nor in any similar case, has a court held that, as a matter of law, and irrespective of the contractual promises actually exchanged, that every supervisory takeover of a failing thrift during the savings and loan crisis of the 1980's resulted in a contractual obligation by the government, that was breached by the enactment of FIRREA, to allow the surviving bank to count goodwill toward meeting its minimum regulatory capital requirements in the face of subsequent contrary statutory requirements.

To do so would be tantamount to deciding that a contract must be implied as a matter of law in all of these cases once the minimum documentation required for regulatory approval is present, and would contravene the intent, clearly expressed by the Supreme Court in *Winstar* as well as by the Federal Circuit in *Cal.Fed.II,* that these cases be adjudicated based on their individual facts and according to accepted principles of contract law. This approach also would be inconsistent with the strict prohibition against this court's exercise of jurisdiction over contracts implied-in-law. *See Barrett Ref. Corp. v. U.S.,* 242 F.3d 1055, 1059 (Fed.Cir.2001); *Heyer Prods., Co. v. U.S.,* 177 F.Supp. 252, 252 (Ct.Cl.1959).

Consistent with these principles, the Supreme Court in *Winstar,* recognizing that it was not a trier of fact, avoided deciding the facts relevant to whether a contract was formed, relying instead, as behooves an appellate court, on the factual determinations of the courts below. *See Winstar,* 518 U.S. at 860-61. The frequent references to, the factual record by the Supreme Court in *Winstar,* 518 U.S. at 860-868, 909, and by the Federal Circuit in *Cal. Fed. II,* 245 F.3d at 1344-1348, underscore the need for a fact-intensive and transaction-specific analysis in each of these cases. As the Supreme Court expressly directed, a court in *Winstar*-related litigation should apply "ordinary principles of contract construction and breach that would be applicable to any contract action between private parties." *Winstar,* 518 U.S. at 871.

The elements indicating actual contractual agreement to permit the use of regulatory goodwill in each of the three *Winstar* cases-*Glendale, Winstar,* and *Statesman*-included: 1) a merger proposal from the acquiring thrift containing a

specific request for the purchase method of accounting; 2) extensive negotiations; 3) an FHLBB resolution expressly approving the use of the purchase method of accounting for regulatory goodwill and specifying both the goodwill amount and the exact amortization period permitted; 4) a clearly-insolvent acquisition target; and 5) no discernible business reason for entering into the transaction absent an agreement to permit the use of goodwill for regulatory purposes. While agreements providing for financial assistance from the government were involved in all three *Winstar* cases, it is clear that, even with the assistance agreements, the transactions would not have been economically viable from the plaintiffs' perspective without the favorable regulatory goodwill treatment as well.

 **\*5**  Another circumstance that strongly supported the reading of the documents as contractual promises in *Winstar* was the fact that each of the surviving thrifts would have been in violation of regulatory net worth requirements from the moment the transaction was consummated had it been unable to count supervisory goodwill toward meeting the regulatory capital requirements. *Winstar,* 518 U.S. at 862-67.

Also, the transactions in *Cal. Fed. II,* as in *Winstar,* were based on merger proposals expressly requesting permission to amortize goodwill over a specific term of years (over an estimated useful life of 35-years in the Brentwood transaction and 40-years in the Family transaction), and the requests were expressly granted by the FHLBB through forbearance letters stipulating that the resulting associations could amortize goodwill for the amortization period and goodwill amount requested. These transactions also involved extensive negotiations over the specific amounts of goodwill and the terms of the amortization periods.

Such extensive negotiations clarify that purchase accounting for regulatory purposes for the full term of the specified amortization period was "a central consideration" and "an essential term" of the acquisitions. *See Cal. Fed. II,* 245 F.3d at 1348; *see also Winstar,* 518 U.S. at 849 and 855 (stating: "[r]ecognition of [supervisory] goodwill under the purchase method was essential to supervisory merger transactions ..." and stating "[t]he advantageous treatment of amortization schedules ... in supervisory mergers amounted to more clear-cut departures from GAAP and, hence, subjects worthy of agreement....")

The circumstances in several recent *Winstar*-related cases, in which members of this court have identified thrift merger

transactions that did not give rise to contracts by the government to permit goodwill treatment, are distinguishable from those in *Winstar* and *Cal.Fed.II. See Fifth Third Bank of W. Ohio v. United States,* 52 Fed. Cl. 202 (2002); *Anchor Savings Bank, FSB. v. United States,* 52 Fed. Cl. 406 (2002); *First Commerce Corp. v. United States,* 53 Fed. Cl. 38 (2002).

In *Fifth Third Bank,* the court denied plaintiff's summary judgment motion when the plaintiff's only request for accounting forbearances was contained in its merger application materials, which created doubt as to whether the government's ultimate approval of the merger was an expression of its intent to enter into a contract or merely an exercise of its regulatory authority and the surrounding economic circumstances and negotiating history did not clearly support an intent to contract.

In *Anchor,* the court granted defendant's motion for summary judgment on one of two transactions when plaintiff did not request an accounting forbearance (with regard to goodwill or otherwise), defendant did not grant such a forbearance, and there was no assistance agreement. Plaintiff relied solely upon its merger application and the subsequent approval of the merger by the FHLBB.

 **\*6**  Finally, in *First Commerce,* the court granted defendant's motion for summary judgment when plaintiff bank never specifically requested assurances from the government that it would receive purchase money accounting treatment of regulatory goodwill, there was no assistance agreement and integration clause, and the circumstances indicated that plaintiff bank would have acquired the failing thrift absent any regulatory forbearances since plaintiff would have remained in capital compliance after the acquisition without them.

Accordingly, the court must determine whether, on the specific, unique undisputed facts and circumstances of the particular transactions at issue in this case, the FHLBB agreed to allow Standard to use goodwill for regulatory purposes.

### *The Indiana Transactions*

Because defendant no longer contests the entry of summary judgment on liability for breach of contract in connection with the acquisition of the Indiana Thrifts, the court grants plaintiff's motion for summary judgment on liability for breach of contract with respect to the Indiana Thrifts.

### The Niles Transaction

### Facts

In the fall of 1980, Niles, an institution with assets of approximately $133 million, suffered financial losses in excess of $10.5 million, apparently occasioned by unauthorized investment transactions by its president and managing officer. Because the losses would have exceeded its net worth of $4.8 million by approximately $5.7 million, the FHLBB appointed a conservator for Niles on September 2, 1980 and FSLIC publicly solicited proposals for its acquisition by another thrift.

Six institutions were represented at a bidder's conference on September 16, 1980. Standard offered by far the largest amount of "loss sharing," $4 million; the lowest offer was $500,000. By letter to the FHLBB of September 21, 1980, Standard proposed to acquire Niles as a "logical expansion ... consistent with [Standard's] long-range policy of developing a broader geographical base...."

In its merger proposal the same day, Standard requested the use of the purchase method of accounting for regulatory as well as public accounting purposes; a five-year supervisory forbearance for any failure by Standard to meet the reserve and net worth requirements of FHLBB Rule 12 C.F.R. § 563.13(c) arising from the acquisition of Niles; and an agreement that it would not be subject to "adverse consequences, sanctions, or other restrictions for failure arising from the acquisition of Niles to meet the requirements of applicable regulations limiting advances or lending."

An internal memorandum of October 9, 1980, recommended approval of the merger, but recommended that the Secretary of the FHLBB be directed (emphasis added) "to interpose no objection to the use of purchase accounting *for certain reports.*" The following day, the FHLBB adopted Resolution No. 80-641, which approved the merger, and authorized the FSLIC to make a loan and contribution to the merged entity, but did not mention purchase accounting, goodwill amortization periods, or the use of goodwill for regulatory reporting requirements.

**\*7**  On October 14, 1980, FSLIC, Standard, and Niles entered into a five-year "assistance agreement." Under its terms, Standard would absorb up to $4 million of Niles'

liabilities ($3.5 million in existing negative net worth —— the remainder would be paid by FSLIC —— and 10% in additional portfolio losses up to $5 million), while FSLIC would contribute up to $50 million in cash and provide a five-year, $20 million loan, at a more-favorable-than-market rate. [5]

The assistance agreement specified no particular accounting treatment, but only that GAAP accounting rules would apply. It required no accountant's letter, regarding the purchase method of accounting for regulatory purposes, or even regarding GAAP treatment. The only opinion of counsel required was one regarding the corporate *bona fides* of the merger.

The assistance agreement did not mention purchase accounting, amortization of goodwill (or, necessarily, a particular amortization period), or otherwise betray any intention to use goodwill to meet regulatory minimum net worth requirements. The merger agreement, entered into by Standard and Niles on the same date as the assistance agreement, also did not mention purchase accounting or supervisory goodwill.

The assistance agreement's integration clause provided that it "supersede[d] all prior agreements and understandings of the parties ... excepting only the plan of merger and any resolutions or letters issued contemporaneously herewith by the [FHLBB] or the [FSLIC], ... [but,] in the event of any conflict ... the provisions of this [a]greement shall govern...." It also provided that "[n]o modification or termination of this [a]greement shall be binding unless executed in writing by the parties thereto or their successors."

On October 15, 1980, the FHLBB issued a letter confirming that the merger was being instituted for supervisory reasons and the five-year forbearance (which expired before the enactment of FIRREA). The letter also stated that "for purposes of [FHLBB] regulatory and reporting requirements, the accounting for the merger shall be on the basis of a *pooling* of interests [not purchase]" and that, while the FHLBB had "no objection to the use of purchase accounting to reflect the merger," its use was to be restricted to *"public financial statements issued to the public* by Standard subsequent to the merger ..." (emphasis added).

Standard concedes that it recognized the inconsistent reporting requirements at the time (that it would be permitted to use purchase accounting for public, but not regulatory,

purposes), but now alleges that it agreed to proceed with the merger "after receiving assurances from FHLBB and FSLIC officials that the accounting treatment issue would be revisited after the Niles' [sic] merger was closed...." However, the court must disregard this allegation as there is no proffer of evidence as to when, by whom, or under what circumstances such assurances were made. *See* RCFC 56(e), which provides: "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials ... but[,] ... by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."

**\*8** Over a year after the merger, on October 21, 1981, Standard wrote to an FHLBB Principal Supervisory Agent (PSA) *see supra* note 4, and requested permission to change the regulatory accounting treatment for the Niles merger from the pooling to the purchase method, based on FHLBB Memorandum # R 31b, issued September 1, 1981, by which the FHLauthorized the use of purchase accounting in savings and loan mergers. Standard requested this treatment for regulatory as well as for public reporting purposes, and sought to amortize $11,387,100 of the supervisory goodwill created by the merger over a 40-year period, on a straight-line basis. On December 29, 1981, an SA (retroactively) approved the purchase method of accounting for the Niles merger.

### Discussion

Numerous factors support the conclusion that the government entered into no agreement permitting Standard to use the purchase method of accounting for the Niles transaction for regulatory purposes: 1) the merger clearly was approved initially on the pooling, not purchase, basis; 2) there is no evidence of negotiations to permit the use of purchase method accounting for regulatory purposes; 3) the assistance agreement does not mention purchase accounting and there is no evidence of a bilateral written modification to the assistance agreement to that effect, as required by the integration clause; 4) the accountant's letter did not specify a goodwill amount or amortization period; 5) Niles was only barely insolvent at the time of the merger and the merger would not have rendered the surviving entity insolvent absent purchase accounting of regulatory goodwill; and 6) plaintiff had valid business reasons for entering into the transaction other than use of purchase method accounting treatment for

supervisory goodwill by the surviving entity for regulatory accounting.

While Standard proposed to acquire Niles on the condition that the merger be accounted for using purchase accounting for regulatory and public accounting purposes, this term was not included in the FHLBB resolution (No. 80-641) approving the Niles merger or in the October 14, 1980 three-way agreement between Niles, Standard and FSLIC, which did provide, however, for various other forms of governmental assistance from the government.

Unlike the resolutions and forbearance letters incorporated into the assistance agreements in *Winstar,* which permitted purchase accounting for regulatory purposes, the forbearance letter issued to Standard expressly prohibited such treatment for regulatory purposes (although permitting it for public financial statements). Thus, Standard secured through the Niles assistance agreement only a contractual right to use the pooling, and not the purchase, method of accounting for regulatory purposes.

In fact, Standard's October 21, 1981 letter to the FHLBB requesting authority to use purchase accounting for regulatory purposes as well as in public financial statements, acknowledges that, until then, it was *not* authorized to do so.

**\*9** Moreover, in proposing to acquire Niles, Standard's stated reasons for the merger are not supervisory goodwill, but "logical expansion.. consistent with [its] long-range policy of developing a broader geographical base" and a fear that not acquiring Niles would preclude Standard "from new Michigan markets by [its] larger savings and loan competitor." (Similarly, Standard's merger agreement obligations are expressly conditioned on "[FHLBB approval permitting the [merged entity] to maintain [Niles'] home office and all of [its] existing branch offices as branch offices of [the merged thrift].").

Given FSLIC's up to $50 million cash assistance, the $20 million loan on favorable terms, and a five-year forbearance from enforcing regulatory capital requirements, entering into the Niles merger absent permission to use goodwill for regulatory purposes was not, unlike the transactions in *Winstar,* "madness" on Standard's part. As "one of the largest thrift institutions in America with assets in excess of $3 billion," which had successfully taken over other problem thrifts in the past, the merger of Niles into Standard, as the Office of Examinations and Supervision stated "pose[d] no

supervisory concern." Therefore, the success of the Niles merger obviously was not dependent upon the use of goodwill for regulatory accounting purposes and Standard's "very existence" would not then have been "in jeopardy from the moment [the merger agreement] w[as] signed," *see, Winstar,* 518 U.S. at 910, if it had not received purchase accounting treatment of goodwill for regulatory purposes.

Standard argues, nevertheless, that the October 21, 1981 letter and the SA's December 29, 1981 response, constitute an "understanding agreed to in writing by the parties" within the meaning of the integration clause of the assistance agreement. [6]

The plain language of the integration clause rebuffs Standard's position. Even assuming, *arguendo,* that the September 21, 1981 request and the response to it constituted an "understanding agreed to in writing by the parties," such an understanding does not, under the terms of the integration clause, supersede letters issued contemporaneously with the agreement by the FHLBB. The clause states (emphases added): "[A]ny ... understanding agreed to in writing by the parties, ... supersedes all prior agreements and understandings of the parties in connection herewith, *excepting ... resolutions or letters issued contemporaneously herewith by the [FHLBB]."* Because the October 15, 1980 forbearance letter, which prohibited the use of purchase accounting for regulatory purposes, was issued concurrently with the assistance agreement, it may not be superseded by any later inconsistent written understandings of the parties such as the October 21, 1981 letter.

Alternatively, Standard argues that the September 21, 1981 request and the SA's response constitute a written modification to the assistance agreement. Apart from the fact that neither the request nor the SA's response refer to the assistance agreement or otherwise purport to modify any previous agreement, it is well-established that a modification must be supported by consideration. *See Aviation Contractor Employees, Inc. v. United States,* 945 F.2d 1568, 1574 (Fed.Cir.1994) ("In [g]overnment contracts, [lack of consideration] most often occurs when the [g]overnment modifies a contract to benefit the contractor but receives no additional or different promise or performance in return. Under Restatement, Second, Contracts § 73 (1981), such modifications are without consideration since they involve performance of a pre-existing duty which is neither doubtful nor the subject of honest dispute.") (quoting J.

Cibinic, Jr. and R. Nash, Jr., *Formation of Government Contracts* 189 (2d ed.1989) (emphasis omitted)).

**\*10** On its face, the December 29, 1981 SA approval of purchase accounting retroactive to the Niles merger consummated 14 months earlier was not in exchange for an additional or different promise to the government, nor the subject of any dispute, honest or otherwise. Although the SA issued the letter in response to Standard's request, the record contains and plaintiff points to no evidence of any negotiations or other indicia of a bargained-for exchange. Unlike in the *Winstar* or *Cal. Fed. II* transactions, at the time purchase accounting was approved, the merger here already had been agreed upon expressly and unambiguously without the inducement of counting goodwill toward regulatory capital. Thus, there was no consideration for the SA's approval of purchase accounting for regulatory purposes.

Of course, one may modify an executory contract without providing new consideration, but only in such limited situations, when circumstances arise that were not anticipated when the contract was made. *See McCallum Highlands v. Washington Capital Dus,* 66 F .3d 89, 94-95 (5th Cir.1995). Using purchase accounting to account for the merger for regulatory purposes clearly was anticipated, however, as is clear from Standard's own letter to the FHLBB proposing to acquire Niles, which expressly requested, but ultimately did not receive, permission to use such treatment.

While Standard contends that it agreed to proceed with the merger only because it was assured by FHLBB and FSLIC officials that the accounting treatment "would be revisited" after the merger, it provides no specifics regarding the time, parties, or circumstances of such alleged assurances. *See* RCFC 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials ... but ... must set forth specific facts showing that there is a genuine issue for trial.")

Moreover, even if such extra-contractual promises were made, the court may not, in light of the integration clause in the assistance agreement, consider extrinsic evidence of them unless they are relevant to an ambiguity in the contract language, *City of Tacoma v. United States,* 31 F.3d 1130, 1134 (Fed.Cir.1994) (extrinsic evidence of prior contracts could not be considered absent identification of an ambiguity). No such ambiguity has been brought to the court's attention.

Clearly, the facts and circumstances of the Niles transaction do not support the conclusion that Standard entered into a contract with the FHLBB or FSLIC to permit the use of purchase accounting of goodwill for regulatory purposes.

### The Landmark Transaction

#### Facts

In the fall of 1981, Landmark-another Michigan thrift-was experiencing a rapid decline in its net worth and almost insolvent.[7] Before any attempt by the FHLBB to find a buyer, to initiate regulatory action, or otherwise to become involved, Standard independently entered into a merger agreement with Landmark .[8]

**\*11** The September 14, 1981 merger agreement between Landmark and Standard, to which neither the FHLBB nor the FSLIC was a party, stated that the thrifts wished to "increase the combined associations' deposit base, achieve operating economies and improve their savings, mortgage and other services."

While the merger agreement conditioned performance on receiving regulatory approval, it did not specify: purchase accounting; use of goodwill towards meeting minimum regulatory net worth requirements; or the amounts and expected amortization periods of any such goodwill.

The October 9, 1981, application for merger stated that it would be accounted for "as a purchase in accordance with [GAAP]," and provided an accountant's opinion reciting the general conditions for purchase accounting for goodwill under GAAP.

By letter to Standard of October 23, 1981, an FHLBB SA, Mr. Ronald R. Morphew, stated that "the application [met] the conditions ... for delegated authority approval set forth in Federal Regulation 546.2(h)" and approved the merger, subject to certain conditions, including the submission of a statement of financial condition and a certification from legal counsel. The SA made no reference, however, to purchase accounting, goodwill, amortization periods, or regulatory net worth requirements.

On December 2, 1981, the SA informed Standard that, because "all conditions of the approvals have been satisfactorily fulfilled," the FHLBB was closing its files on the merger. The SA's January 14, 1982, letter to Standard indicated that the FHLBB had been advised that the merger with Landmark was effective as of October 26, 1981. Neither letter referred to purchase accounting, goodwill, amortization periods, or regulatory net worth requirements.

There is no allegation or documentary evidence of negotiations over the use of purchase method accounting of goodwill for regulatory purposes or to support Standard's allegation that as a result of the merger it was entitled to record $13.2 million of goodwill and to amortize it over 40 years.

In the summer of 1982, Standard requested the FHLBB to issue a certification that at the time of the merger Landmark's financial difficulties threatened the thrift's insolvency and, accordingly, would have justified appointing a conservator or receiver under 12 U .S.C. § 1464(d)(6)(A), which authorizes such an appointment on grounds, *inter alia,* of "insolvency in that the assets of the association are less than its obligations to its creditors and others, including its members...." 12 U.S.C. § 1464(d)(6)(A)(i). Standard claimed that the certification was necessary to classify the merger as a tax-free reorganization under Section 368 of the Internal Revenue Code of 1954. The FHLBB issued the certification.

#### Discussion

The Landmark transaction is distinguishable from those at issue in *Winstar* and *Cal. Fed. II* because: 1) the plan of merger did not request purchase method accounting; 2) there were no negotiations regarding regulatory goodwill; 3) the letter approving the merger does not mention purchase accounting or goodwill or contain an integration clause incorporating other documents; 4) the merger agreement did not call for purchase method accounting; 5) no FHLBB resolution was issued; 6) no assistance agreement was involved; 7) no forbearance agreement was issued; 8) neither Landmark nor the surviving entity (Standard) faced insolvency absent permission to use purchase method accounting for goodwill; and 9) plaintiff had other valid business reasons for entering into this transaction, such as the potential for an increased deposit base and operating economies.

**\*12**  In sum, the record of the Landmark merger contains no document issued by the government, internally or to Standard, that refers to purchase or any other form of accounting treatment. For example, the internal memorandum from an SA to the PSA recommending approval of the merger goes into some detail regarding the transaction (including such specifics as the $37,400 per annum post-merger level of compensation for Landmark's President), but makes no mention of purchase accounting or the $13.2 million of supervisory goodwill that Standard alleges to have been promised it would be allowed to amortize over 40 years and to count toward regulatory capital. Similarly, the SA's letter approving the merger never refers to supervisory or other goodwill or to purchase accounting.

The accountant's letter submitted with the application for merger and the application itself are the only two documents the court has uncovered that actually mention purchase accounting. However, the application merely states that "the merger will be accounted for as a purchase in accordance with [GAAP]," and that the accounting treatment will conform with FHLBB rules and regulations. It then paraphrases an enclosed accountant's opinion letter. Yet, neither document specifies the amount of goodwill contemplated or requests any particular amortization period, as required by FHLBB Office of Examinations and Supervision, Memorandum # R 31b (September 1, 1981) (period of amortization for goodwill should not exceed forty years; there should be "a description of any resulting intangible assets.... Identifying the fair value of ... [intangible assets]....) [9]

The accountant's opinion technically describes the general operation of purchase accounting, but is couched in conspicuously conditional or theoretical terms: "*if* [purchase] accounting treatment is followed, the recording of the proposed transaction will conform with [GAAP];" "[s]ince it is *probable* that the fair market value of Landmark's assets *would be* less that its liabilities, a goodwill account for such a difference *would be* recorded." (Emphases added). [10]

Even if the SA's letter, which states that the merger application is approved, but does not mention purchase accounting, were intended as approval of the merger and of the request to use purchase accounting in accordance with Memorandum # R 31b and the APB Opinions, it cannot form the basis of a contract with the government because it contained a requirement to submit further documentation describing and substantiating the goodwill amounts and amortization periods, which, as far as can be told, since

Standard has presented no evidence that it ever submitted such documentation, was not satisfied.

Thus, there are ample grounds to distinguish the facts and circumstances of the Landmark transaction from those at issue in *Winstar* and *Cal. Fed. II*. Were the right to count $13.2 million in goodwill towards regulatory capital the "principal inducement" for the merger, as Standard now claims, it is remarkable that the merger application described the availability of goodwill as merely "probable" and was completely silent on the question of whether Standard would be able to count goodwill towards regulatory capital or, if so, the amount of goodwill, or the length of the amortization period, permitted. As the Supreme Court suggested in *Winstar,* when "it was not obvious that regulators would accept purchase accounting in determining compliance with regulatory criteria, ... it [would have been] clearly prudent to get agreement on the matter." *Winstar,* 518 U.S. at 855.

**\*13**  In short, if the right to count $13.2 million in goodwill towards regulatory capital were critical to the merger and not clearly permitted by the regulations in effect at the time of the merger, it seemingly would have been, not only prudent, but essential, for Standard to obtain clear agreement from the FHLBB permitting the use of a specified amount of regulatory goodwill for a set period of time (not merely its own accountant's letter opining that it was 'probable' that some unspecified amount might be allowed under accounting rules).

Where the parties leave the principal term of a contract incomplete, there is a strong presumption that there was no intent to be contractually bound and, therefore, that no contract was formed. *See* Restatement (Second) of Contracts § 33 (1981); Uniform Commercial Code § 2-305(4). To be valid and enforceable, a contract must have sufficient definiteness to "provide a basis for determining the existence of a breach and for giving an appropriate remedy." *Ace-Federal Reporters, Inc. v. Barram,* 226 F.3d 1329, 1332 (Fed.Cir.2000) (quoting Restatement (Second) of Contracts § 33 (1981).

A contract that does not fix the amount of consideration, to be binding, must provide an objective method for determining the amount. *Barry v. Liddle, O'Connor, Finkelstein & Robinson,* 98 F.3d 36, 40 (2d Cir.1996). (Memorandum # R 31b, however, expressly states that "identifying the fair value of ... intangible factors, whether separately identified or included in goodwill, is a *subjective* task...." While

it strives to make any "assumptions used in determining [goodwill] amounts realistic, the factors it looks to are equally subjective: the resulting association's "management philosophies, practices, and abilities.")

As the Federal Circuit has stated, the *Winstar*-type contracts arise "once specific terms as to the amount of supervisory goodwill and its amortization periods under that regulatory policy were incorporated in a negotiated arm's length contract." *Cal. Fed. II,* 245 F.3d at 1347 (quoting *Winstar II,* 64 F.3d at 1542). Standard has presented no documentary or other evidence of any intent by the government to enter into a contract in the Landmark transaction permitting Standard to count any specified amounts of goodwill toward meeting its regulatory capital requirements.

### The Peoples Transaction

### Facts

On December 2, 1981, Standard entered into an agreement and plan of merger with Peoples, a thrift located in Detroit, Michigan. During the first eleven months of 1981, the net worth of Peoples had declined from approximately $6.23 million to $3.17 million. Standard also was experiencing operating losses-in the first eleven months of the year it generated a net loss of over $45 million, and, as of February 3, 1982, it was projected to be insolvent within 16 months. The agreement and plan of merger stated that the parties desired to merge in order to increase the combined deposit base, achieve operating economies, and improve services. The agreement provided that the merger was conditioned upon "the approval by the [FHLBB] of the method of accounting to be used by Standard Federal with respect to the merger," but did not refer to the use of a goodwill purchase accounting method.

 **\*14**  On December 18, 1981, Standard sent the FHLBB a letter and an application for merger. Both requested that "the FHLBB approve the purchase method of accounting for this merger." The application described in detail the business purposes for the merger: 1) to reduce Peoples' operating losses by using Standard's unexhausted "loss-carry backs;" [11] 2) to save costs through eliminating duplicative expenses; 3) to use purchase accounting treatment for the merger; 4) to close under-performing branches; and 5) to better compete with large thrifts, banks, and other financial services companies in the state.

The application stated that the merger would be accounted for using the purchase method, in accordance with GAAP, and enclosed an independent accountant's opinion letter, issued December 15, 1981, stating that "if [purchase accounting] is followed, the recording of the proposed transaction will conform with [GAAP]," that it was "probable" that a goodwill account would be recorded, and that under Memorandum # R 31b, accounting for any goodwill for regulatory purposes "should be" in accordance with GAAP." An exhibit attached to the application showed that Standard proposed to amortize $27,631,400 in goodwill over 40 years.

On January 7, 1982, the FHLBB Office of Examination and Supervision sent an internal memorandum to an FHLBB Regional Director stating that, while purchase accounting appeared appropriate based on the merger application, the *pro forma* statements shown by the Standard-Peoples merger documents "do not reflect application of the purchase method of accounting." The memorandum suggested that any approval of the merger be conditioned upon Standard submitting analyses from its independent accountant describing any goodwill or discount arising from the merger and substantiating the amounts as well as amortization periods and methods attributed to them.

On February 5, 1982, FHLBB adopted resolution No. 82-91, approving the Standard-Peoples merger provided that, within 120 days of the resolution, Standard:

> ... furnish analyses, accompanied by a concurring opinion from its independent accountant, satisfactory to the Supervisory Agent of the [FHLBB] and to the Office of Examinations and Supervision, which (a) specifically describe, as of the effective date of the merger, any intangible assets, including goodwill, or discount of assets arising from the merger to be recorded on Standard's books, and (b) substantiate the reasonableness of amounts attributable to intangible assets, including goodwill, and the discount of assets and the related amortization periods and methods.

On February 9, 1982, the FHLBB issued a certification that in the absence of such a merger, there would be grounds for the appointment of a conservator or receiver for Peoples in the near future, based on insolvency, as set forth in 12 U.S.C. § 1464(d)(6)(A)(i).

On February 16, 1982, SA David L. Hostetler sent Standard a copy of FHLBB Resolution No. 82-91 and a letter repeating the conditions described above. The SA also required Standard, within 30 days of the merger, to submit a consolidated statement of the financial condition of the merged entity immediately after the merger.

**\*15** The merger took place on March 1, 1982. The record does not show whether the statements were provided within the required 120 days. However, Standard apparently was using the purchase method of accounting for public financial reporting (but not regulatory reporting) purposes in April 1982.

Almost seven months later, on September 29, 1982, Standard wrote PSA Gordon Husk to request "approval to account for the [Standard-Peoples] business combination by the purchase method of accounting *for regulatory accounting purposes,"* based on Memorandum # R 31b. (Emphasis added.) The letter attached several schedules describing the nature and results of goodwill calculations and included a copy of a letter from its independent accountant giving an opinion that the use of the purchase method to account for the merger, the goodwill amounts, and the amortization periods would be in accordance with GAAP. The financial statements attached to the letter disclosed amortization of $42,593,547 worth of goodwill over 40 years.

On October 8, 1982, in a two-sentence letter, the PSA wrote: "This letter will acknowledge your submission of materials to comply with condition number one of Federal Home Loan Bank Board Resolution No. 82-91, dated February 5, 1982. We are closing our files on the application." None of these documents mentions regulatory core capital or net worth requirements.

### Discussion

The Peoples transaction is distinguishable from those at issue in *Winstar* and *Cal. Fed. II* because: 1) there is no evidence of negotiations between plaintiff and FHLBB

regarding purchase accounting for the goodwill generated by the merger for purposes of meeting minimum regulatory capital requirements; 2) the FHLBB documents themselves do not evidence any agreement to permit plaintiff to use purchase accounting or goodwill for regulatory purposes; 3) plaintiff's application was never incorporated into a merger or assistance or other agreement between Standard and FSLIC or the FHLBB and the accompanying accountant's letter merely stated that it was 'probable' goodwill would be used for regulatory purposes; 4) no FHLBB resolution approved purchase accounting for regulatory purposes of any specified amounts of goodwill or any specific amortization period; 5) plaintiff conceded, by later requesting regulatory purchase accounting, that it had permission to use purchase accounting for public financial accounting purposes only; and 6) plaintiff had many valid business reasons for entering into this transaction apart from any inducement to be allowed to employ purchase accounting.

The documents submitted to the FHLBB by Standard in the Peoples transaction contain several references to purchase accounting and goodwill. The accountants' letter submitted to FHLBB with the application stated that purchase accounting would be used, in accordance with GAAP, and an attachment to the application indicated a specific amount of, and amortization period for, the goodwill generated by the merger. [12]

**\*16** However, the February 5, 1982 FHLBB resolution, forwarded by letter of February 16, 1982, approving the Standard-Peoples merger does not agree to the use of purchase accounting, or to any particular treatment of goodwill, but merely requires Standard to submit various accounting analyses of goodwill within 120 days of the resolution. The February 16, 1982, letter from the SA adds nothing to those requirements.

Several features of this transaction undermine plaintiff's contention that a contract for the use of supervisory goodwill for regulatory purposes was formed. First, the very fact that a request was made, eight months after the merger, to use such accounting is rather persuasive evidence that Standard did not already have that right, and did not even think it had the right, either then or at the time of the merger.

Nor is there any indication that Standard intended the September 29, 1982 letter to serve as the 120-day submission required by the FHLBB resolution approving the merger. First, it was not submitted on time. Second, it never mentions

that it was being submitted to satisfy the conditions stated in the FHLBB resolution. Third, it appears on its face to be an independent letter seeking permission, for the first time, to use purchase accounting for regulatory minimum capital purposes rather than public financial reporting. (In the last paragraph, Standard acknowledges that the February 16, 1982 letter from the SA "permitt[ed] the application of purchase accounting principles in all *public financial statements* [only] providing [Standard's] independent accountants issue a conforming opinion.")

Finally, this letter greatly resembles the one sent by Standard after the Niles merger, in which, as here, Standard first received permission to use purchase accounting only in public financial statements, and significantly later-a year after consummating the Nile merger-sought and was granted permission to use that treatment for regulatory purposes as well. The relevant section of Standard's letter in the Niles transaction also acknowledged a letter from the FHLBB (dated October 30, 1980) "permitting the application of purchase accounting principles *in all public financial statements* providing [Standard's] independent accountants issue a conforming opinion."

An April 2, 1982 FHLBB Report of Examination of Standard's deteriorating financial condition, submitted recently by Standard, states that the Peoples "acquisition was accounted for by the purchase method" and includes Standard's consolidated Financial Statements and Pro-Forma Income Statements and other schedules showing that Standard was amortizing $42,571,672 million in goodwill over 40 years. App. E to Pl.'s Resp. filed May 20, 2002, at PL-0027778, 798, 799. This only confirms the statement in the September 29, 1982 letter that Standard interpreted the FHLBB approval of the merger to allow purchase accounting in its public financial statements only.

**\*17** As discussed in connection with the Niles merger, either a modification or a new contract requires consideration. Because the September 29, 1982 letter was sent approximately eight months after the merger was consummated, whatever benefit the government received from the merger already had accrued and granting a new accounting treatment to Standard was not a bargained-for exchange.

Furthermore, there is no evidence of any negotiations or inducement. In fact, an internal FHLBB memo of February 3, 1982 states that "[Standard] is projected to be insolvent

in sixteen months." This supports defendant's argument that plaintiff had sufficient independent business reasons-such as loss-carry backs" and economies of scale, as well as preserving its own viability-for merging with other thrifts.

In light of the above, even the multiple references to purchase accounting in the documents surrounding the Peoples transaction do not rise to the level of clear, bargained-for contractual promises present in *Winstar* or *Cal. Fed. II*. In *Cal. Fed. II*, for example, plaintiffs specifically requested in their merger applications that FHLBB allow purchase accounting for regulatory purposes and the forbearance letter issued by the FHLBB in *Cal. Fed. II* included a detailed description of purchase accounting of regulatory goodwill and the periods for goodwill amortization and accretion of discount. This specificity sharply contrasts with the documents in the record of the Peoples transaction, especially the October 8, 1982 letter, which merely acknowledges the submission of documents and announces the closing of the merger application file.

Accordingly, Standard's short-form motion for summary judgment on liability with respect to the Peoples transaction is denied and defendant's cross-motion is granted.

### CONCLUSION

Plaintiff's motion for partial summary judgment on liability for breach of contract arising from Standard's acquisition of the four Indiana thrifts is GRANTED. Plaintiff's motions for partial summary judgment on liability for breach of contract arising from Standard's acquisition of Niles, Landmark, and Peoples are DENIED and defendant's respective cross-motions are GRANTED. On or before January 31, 2003, plaintiff shall respond to defendant's October 10, 2000 motion to dismiss counts I, II, III, V, VI, VII, and VIII. Defendant shall reply to plaintiff's response on or before February 17, 2003. Following the resolution of the motion to dismiss, the court will schedule further proceedings to determine any remaining issues of liability and damages.

The clerk of the court shall enter judgment for plaintiff on its "Short Form Motion for Partial Summary Judgment on Liability: The Acquisition by Plaintiff Standard Federal Bank of American Savings and Loan Ass'n of Fort Wayne, First Federal Savings and Loan Ass'n of Fort Wayne, Fort Wayne Federal Savings and Loan Ass'n of Fort Wayne, and South Bend Federal Savings and Loan Ass'n of South Bend" and

enter judgment for defendant on its cross-motions for partial summary judgment on the Niles, Landmark and Peoples transactions.

Footnotes

1    So-called "short-form" motions for summary judgment were required to be filed by Paragraph 5 of the Omnibus Case Management Order issued on September 18, 1996, by then-Chief Judge Loren A. Smith and by that court's order in *California Federal Bank v. United States,* 39 Fed. Cl. 753,779 (1997) (*Cal.Fed.I* ); *aff'd in part, vacated in part and rem'd, California Federal Bank, FSB v. United States,* 245 F.3d 1342 (Fed.Cir.2001) (*Cal.Fed.II* ) that the government, apparently in each case similar to *United States v. Winstar,* 518 U.S. 839 (1996), show cause why summary judgment should not be entered against it, on liability only:

   "In all Winstar-related cases where there are pending summary judgment motions or cross-motions filed by the plaintiffs, the United States shall show cause, within 60 days, why those motions should not be granted, and liability found on all Winstar contract issues based upon the instant decision. In all cases where the government has a pending summary judgment motion or cross-motion the government shall show cause within 60 days, why those motions should be denied, for the same reasons. Following the submission of any summary judgment motion on liability in any Winstar-related case the United States shall have 90 days to show cause why that motion should not be granted on the same basis.

   The government in responding to this order shall not raise issues that have been resolved by opinions in the original Winstar cases as clarified by this decision. Irrespective of ultimate attorneys fee issues in these cases, failure to follow this order will require the government to reimburse the plaintiffs for attorneys fees spent litigating issues that have already been resolved by this court, the Federal Circuit or the Supreme Court." *See also* paragraph III of Procedural Order No. 1: Master Litigation Plan (August 11, 1997).

2    The Court in *Winstar* noted, however, the opinions of some analysts that the costs of the acquisitions may have approximated 70% of the liquidation expense. *See Winstar,* 518 U.S. at 847 n. 3 (citing remarks by H. Brent Beasley, Director of FSLIC, before the California Savings and Loan League Management Conference (Sept. 9, 1982).

3    *See* Salam, Ahmad W. and Tucker, James T., *Congress, Regulators, RAP, and the savings and loan debacle,* CPA Journal online (Jan.1994), at *www.nysscpa.org/cpajournal/old/14979917.htm* . In 1983, the GAAP rules applicable to thrift mergers reduced the amortization period to the length of time the acquired asset produced income and required amortization by the interest method. Statement of Financial Accounting Standards No. 72; *Winstar,* 518 U.S. at 855.

4    The supervisory authority of the FHLBB, located in Washington, DC, was dispersed among 12 regional "Federal Home Loan Banks." The president of each was termed the "supervisory agent" (SA) for thrifts in the region and the Principal Supervisory Agent was an officer or employee designated to that position by the FHLBB. *See* 39 FR 45260 (December 31, 1974) (codified at 12 C.F.R. §§ 501.10 and 501.11)

5    The October 9, 1980 FHLBB memorandum estimated that the comparative cost to the FSLIC of the assistance was approximately $11 million.

6    The integration clause provided:

   This agreement, together with any interpretation thereof or understanding agreed to in writing by the parties, constitutes the entire agreement between the parties hereto and supersedes all prior agreements and understandings of the parties in connection herewith, excepting only the plan of merger and any resolutions or letters issued contemporaneously herewith by the [FHLBB] or the [FSLIC], *provided,* however that in the event of any conflict, variance, or inconsistency between this [a]greement and the plan of merger, the provisions of this [a]greement shall govern and be binding.... No modification or termination of this [a]greement shall be binding unless executed in writing by the parties thereto or their successors.

7    Landmark's net worth had declined from $898,000 (or 1.8% of approximately $50 million in assets) on June 30, 1981, to $274,194 (or .55% of assets) on October 26, 1981.

8    Standard claims approximately $3.4 billion in assets and a $109 million net worth at the time.

9    Memorandum # R 31b provides, in part (emphasis added):

   Identifying the fair value of ... intangible factors, whether separately identified or included in goodwill, is a subjective task. It can be based on marketing and other demographic studies, analysis of the resulting association's liabilities to cross sell services, or analysis of past and expected behavior and lives of the acquired association's savings and loan accounts.... Any assumptions used in determining these amounts must be *realistic* in light of the resulting association's management philosophies, practices, and abilities.

   ...

   An application from an association requesting approval for a business combination to be accounted for by the purchase method of accounting, from which intangible assets will result, *should include a description of any resulting intangible assets and the*

*plan for their amortization.* This description should discuss the nature and results of management's analysis of the underlying intangible assets *and the resulting amortization periods and methods.*

APB Opinion No. 17 provides (emphasis added) that, in discussing the estimated life of intangible assets, "analysis of all factors should result *in a reasonable estimate of the useful life of most intangible assets.* A reasonable estimate of the useful life may often be based on upper and lower limits, even though a fixed existence is not determinable. The period of amortization should not, however, exceed forty years."

**10**   The letter states in pertinent part (emphasis added):

Applying the purchase method to the merger ... *would require* that the assets and liabilities of Landmark be recorded on Standard's books on the merger date at their respective values.... Goodwill account *would be amortized* to expense in accordance with the provisions of APB Opinion No. 17. The discount resulting from the determination of the fair value of Landmarks assets *would be amortized* into income over the estimated lives of the respective assets.

**11**   According to the application, "loss-carry backs" allow a business to offset current losses against prior year's profits so that it may recover a portion of federal income taxes paid during prior profitable years.

**12**   A January 7, 1982 internal FHLBB memorandum indicates that the government clearly recognized the fact that Standard requested to use purchase accounting in its merger application and that such accounting treatment seemed appropriate. However, like the February 5, 1982 resolution, the internal memo expressed the opinion that approval of purchase accounting for the merger should be conditional on Standard's submission of a statement by an independent accountant, describing the goodwill created by the merger by amount as well as amortization period and methods.

---

**End of Document**     © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 82

**CITATION:** Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc., 2013 ONSC 1300
**COURT FILE NO.:** CV-08-7809-00CL
**DATE:** 20130301

2013 ONSC 1300 (CanLII)

## ONTARIO
## SUPERIOR COURT OF JUSTICE
## COMMERCIAL LIST

| | | |
|---|---|---|
| **B E T W E E N :** | ) | |
| | ) | |
| STETSON OIL & GAS LTD. | ) | *William J. Burden, Arthur Hamilton and* |
| | ) | *Lara Jackson,*, for the Plaintiff |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| | ) | |
| - and - | ) | |
| | ) | |
| | ) | |
| STIFEL NICOLAUS CANADA INC. | ) | *Joseph Groia, Kellie Seaman* and *David* |
| | ) | *Sischy* for the Defendant |
| | ) | |
| Defendant | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | **HEARD:** January 9, 10, 11, 16, 18, 21, 22, |
| | | 23, 24, 28 and February 5, 2013 |

<u>**Newbould J.**</u>

[1]    The plaintiff Stetson Oil & Gas Ltd. ("Stetson") sues for breach of a "bought deal" underwriting agreement contained in a signed letter agreement (the "engagement letter") under which Thomas Weisel Partners Canada Inc. ("Weisel")[1] agreed to purchase for resale 45,454,600 subscription receipts in the capital of Stetson at a price of 55 cents per subscription receipt for aggregate gross proceeds of approximately $25,000,030. Weisel did not close the agreement.

---

[1] At the conclusion of the trial, the name of the defendant was changed from Thomas Weisel Partners Canada Inc. to Stifel Nicolaus Canada Inc. For ease of reference, the defendant will be referred to as Weisel.

Page: 2

Stetson then made an agreement with Canaccord Capital Corporation for financing which resulted in gross proceeds to Stetson of $12,000,000 for the issuance of 60,000,000 units (each consisting of a share and warrant) at 20 cents per unit. Stetson claims damages for breach of contract against Weisel, being the difference between the proceeds it should have received under the engagement letter and the proceeds raised in the Canaccord financing, plus interim financing costs.

[2]    For the reasons that follow, the action is allowed and Stetson is entitled to judgment against Weisel for $16,042,669 and interest.

**Pertinent History**

[3]    Stetson is a junior oil and gas exploration company which trades on the TSX Venture Exchange.[2]  Weisel at material times operated as an investment bank and securities dealer specializing in the growth sectors of the economy.

[4]    In June, 2008 Stetson made a proposal to the Fort Berthold Tribe of North Dakota to lease tribal lands to explore in the Bakken Formation in North Dakota. In 2008 the Bakken was one of the hottest oil and gas plays in the United States, due in part to new horizontal fracturing technology that allows for exploration and development in property that under conventional techniques could not be profitably explored. The Bakken in North Dakota and Saskatchewan has the potential to become a world class producer of oil and gas.  Today it produces over 700,000 barrels of oil a day, mostly in North Dakota.

[5]    Stetson needed to raise funds in order to pursue the Bakken opportunity.  Stetson's market capitalization at the time was $15 to $20 million

[6]    Stetson wanted to raise funds through a bought deal financing because it wanted a guarantee with no financing risk.  In a bought deal, the underwriter agrees to purchase the issuer's securities at a fixed price and takes the risk of selling them in the market at a profit. A bought deal in this respect is fundamentally different from an agency or best efforts underwriting in which an underwriter makes best efforts to sell the securities of the issuer but provides no

---

[2] Statements of fact in these reasons are findings of fact unless stated otherwise.

2013 ONSC 1300 (CanLII)

guarantee of the amount or value of the securities that will be sold. The issuer takes the market risk.

[7]     Stetson began canvassing the underwriting market in June, 2008 in anticipation of acquiring the lease rights in the Bakken. Mr. Stan Bharti, the founder and Chairman of Forbes & Manhattan, a very successful resource merchant bank, had been a director of Stetson since 2006. Forbes & Manhattan and Mr. Bharti had existing investment banking relationships with, among others, Canaccord and Macquarie Capital Markets Inc., but had no relationship with Weisel.

[8]     Weisel was very interested in doing business with Mr. Bharti as he was viewed as a very successful businessman who had been involved in many successful start-up ventures. When Weisel learned of his involvement in Stetson and Stetson's interest in the Bakken play in North Dakota, Weisel reached out to Mr. Bharti and Stetson. They viewed Mr. Bharti as the key decision maker for Stetson.

[9]     Mr. Alex Wylie of Calgary acted as the lead banker for Weisel in dealing with Stetson. Mr. Alec Rowlands of Weisel had known Mr. Bharti since 1993 and he and Mr. Wylie agreed to pursue Mr. Bharti and Stetson. Meetings were arranged for the president of Stetson, Mr. Bill Ward, to meet with Mr. Wylie and after that there were a number of meetings between Stetson and Weisel.

[10]     Weisel had detailed research coverage on the Bakken play.  It had extensively analyzed Kodiak Oil & Gas Corp. ("Kodiak"), a successful oil exploration company with lands near the lands that Stetson was pursuing. After his meeting with Mr. Ward, Mr. Wylie sent him several research reports Weisel had done on Kodiak and on another company involved in the Bakken named Tristar Oil & Gas.

[11]     Weisel promoted its expertise and knowledge of the Bakken formation as something that would be of assistance to Stetson. Messrs. Wylie and Rowlands told Mr. Bharti that they and their analysts knew the Bakken well, and that Weisel wanted to get involved in the deal and to build a relationship with Mr. Bharti and Forbes & Manhattan.

[12]     Weisel understood from discussions with Mr. Bharti and Mr. Said, another director of Stetson, that Stetson was looking to raise $25 million through a bought deal and that it could be

2013 ONSC 1300 (CanLII)

Page: 4

expected that obtaining an underwriting agreement would be a competitive situation. There is no question but that Weisel was very anxious to get the business. An internal Weisel e-mail of July 4, 2008 from Mr. Wylie was indicative of this:

> Stetson is a Stan Bhardhi [sic] company with assets in the Bakken…
>
> …
>
> They are ging [sic] to want a bought deal…Stan's last deal out here was a few weeks back for Vast…Niko took a big chunk…apparently they had $75MM in orders on a $25MM deal… Stan is going to be the decision maker on this .. they will have a syndicate but you need to put up a deal to get in the game on this one …

[13]    Vast Exploration was a company in the Forbes & Manhattan group and the reference to it was to a recent financing for Vast that had received $75 million in orders for a limited $25 million financing.

[14]    On July 7, shortly after Mr. Ward met with the sales force of Weisel in Toronto, Mr. Wylie said in another internal Stetson e-mail that Stan Bharti was clearly the decision maker and that Mr. Rowlands "has the best relationship with Stan and he needs to start working him over". Mr. Wylie's evidence that all he was indicating was that he wanted Weisel to be prepared in case Stetson won the lands was not convincing. More indicative of Weisel's frame of mind was an e-mail from Mr. Rowlands to Mr. Bharti of July 9 which said "…this is a deal we want to lead, we believe that our coverage of the Bakken and the US players in the area will benefit Stetson, let's talk today, when are u available?" On the same day Mr. Wylie e-mailed Mr. Said of Stetson and said "The firm is very enthusiastic about getting behind the Stetson story and will be putting up a deal to Stetson once you are ready for bids."

[15]    The lease sought by Stetson required approval by the Tribal Council which was expected in early July. On July 11, 2008 Stetson announced that it had received Tribal Council approval to the lease of 8,570 acres of what were referred to as tribal lands that were adjacent to another 4,500 acres of freehold lands that it was leasing, subject to approval of the Bureau of Indian Affairs.

2013 ONSC 1300 (CanLII)

[16]    On that day, the Commitment Committee of Weisel met and decided to offer 50 cents a share on a bought deal that would see Stetson receive $25 million less fees to Weisel.  Mr. Wylie called Mr. Bharti and Mr. Said and said that Weisel was prepared to deliver a bought deal letter at 50 cents a share. Mr. Bharti said that 50 cents was not enough and proposed 55 cents. The Commitment Committee of Weisel met a second time and agreed to the price of 55 cents a share.

[17]    At 8:53 p.m. on July 11, 2008, Weisel e-mailed a signed engagement letter from Mr. Wylie to Mr. Bharti and others.   In the e-mail, Mr. Wylie outlined the terms of the "bought deal letter",  including the following:

> Syndicate:   65% TWP [Weisel], 35% Canaccord – the deal is not subject to syndication

[18]    This arose as a result of discussions between Messrs. Bharti and Mr. Said of Stetson and Messrs. Rowlands and Wylie of Weisel who knew that Forbes & Manhattan had a close relationship with Canaccord and that Canaccord was very interested in the financing. Canaccord had been the lead banker for oil and gas deals that Forbes & Manhattan had done. Weisel thought that it would be easier to obtain Mr. Bharti's agreement to use Weisel for the financing if Weisel offered some of the deal to Canaccord. In early discussions Weisel had said to Mr. Bharti that if Stetson wanted syndication they could do that. Syndication means that the underwriter brings in other underwriters to reduce its liability or risk. Weisel told Mr. Bharti that if he felt syndication was important because of his relationships with other bankers, they would be open to it.

[19]    The engagement letter stated that the deal was not subject to syndication, and all Weisel witnesses confirmed that the deal did not require that Canaccord participate in it and that Weisel was quite prepared to proceed with the deal alone. It is quite clear that the participation of Canaccord was not required, or even asked for, by Weisel. Weisel told Mr. Bharti that their first preference was to go without any syndication. Mr. Bharti told Weisel that if Canaccord agreed, he would like to see Canaccord in the syndicate because of their long-term relationship and over the week-end after the engagement letter was sent by Weisel, he told them that he would like to see Canaccord with 40% rather than 35% but that it would be entirely up to Weisel how they would structure the syndicate.

2013 ONSC 1300 (CanLII)

Page: 6

[20]    Over the week-end there were communications between Mr. Gleeson, Stetson's in-house counsel, and Mr. Wylie of Weisel regarding terms of the engagement letter. Some terms were changed. On Sunday, July 13, 2008 at 11:11 pm Mr. Gleeson e-mailed to Mr. Wylie a copy of the engagement letter signed by him on behalf of Stetson. The terms had been changed somewhat from the previous version signed and sent by Weisel on July 11, 2008.

[21]    The engagement letter provided that Weisel, as the Lead Underwriter, would on a bought deal basis purchase by way of private placement for resale 45,454,600 subscription receipts in the capital of Stetson at a price of 55 cents per subscription receipt for aggregate gross proceeds of approximately $25,000,030. Weisel was granted an option to purchase an additional 9,091,000 subscription receipts for 55 cents each. Each subscription receipt was to be automatically exchanged for one common share of Stetson upon approval of the Bureau of Indian Affairs to the lease of the 8,570 acres already approved by the Tribal Council.

[22]    One of the terms of the engagement letter was that it was subject to reconfirmation by 5 a.m. Calgary time on July 14, 2008. It is apparently quite common if a bought deal is done at night that there must be reconfirmation in the morning. That is done to give a party time to react to something that may happen overnight before the morning. In this case Mr. Wylie of Weisel reconfirmed the deal at 5 a.m. Calgary time in a call to Mr. Said of Stetson.

[23]    Shortly before 7 a.m. Toronto time Mr. Pocrnic of Weisel telephoned Canaccord to invite Canaccord to participate in a syndicate. He recalls little of the discussion. A few minutes later he got a call back from Canaccord saying they were going to pass on the transaction. Mr. Wylie called Mr. Said who suggested he call Genuity as Genuity had indicated late on Sunday evening that if Canaccord did not participate, which Genuity though highly remote, Genuity would certainly play a syndicate role. Mr. Pocrnic then spoke to the head of institutional sales at Genuity who indicated they would not participate. Mr. Wylie informed Mr. Said of this and said that Weisel was going ahead with the marketing of the deal.

[24]    At 7:31 a.m. Toronto time, Weisel released a press release announcing on behalf of Stetson that Stetson had entered into an agreement with Weisel as lead underwriter on behalf of a syndicate of underwriters to purchase on a bought deal private placement basis 45,454,600

2013 ONSC 1300 (CanLII)

Page: 7

subscription receipts in the capital of Stetson at a price of 55 cents per subscription receipt for aggregate gross proceeds of approximately $25,000,030. In the parlance of the underwriting market, the deal at that point went "live".

[25]    On July 13, Weisel advised its sales and trading personnel that it would be going live on a bought deal for Stetson the next morning at 7:30 a.m. Weisel intended and expected to sell the entire bought deal by 9:15 am, within two hours of announcing the deal, and fifteen minutes before the TSX opened at 9:30am.  This was consistent with both the timelines for a bought deal in Weisel's Deal Book, the guide used by Weisel to conduct its business. Mr. Wylie testified that once Canaccord backed out, Weisel was not sure that the entire position would sell by the opening of the market that day. I have some trouble with that evidence. Mr. Wylie had said that putting a provision in the engagement letter that the deal was not subject to syndication had been intended to show a sign of strength on the part of Weisel and that Weisel did not need Canaccord in the deal but could do it alone.

[26]    Weisel was not able to sell any of its position in Stetson on the 13th. Mr. Rowlands, the managing director of institutional equity sales for Weisel, said that at the same time the Stetson press release was issued to announce the bought deal with Weisel, Shell Canada announced it was going to buy Duvernet Oil, an oil and gas play in Alberta, for $6.5 billion dollars. Most of the people Weisel wanted to talk to were shareholders of either Shell or Duvernet and it was very difficult to get them on the telephone as they were pre-occupied with the larger deal. There was no suggestion that the fact that Canaccord was not part of the syndicate was any impediment to the deal. Mr. Rowlands kept Mr. Bharti informed on a daily basis that week and for the first half of the week told Mr. Bharti that they were confident that the deal would be sold.

[27]    However, by July 17, 2008 Weisel had managed to place only $2 million of its position. Mr. Bharti's evidence, which I accept, was that in his experience involving 30 or 40 bought deals, they can sell out in one hour, sometimes in two or three days and usually are always sold out in the first four or five days. He said it was that it was in no one's interest for a bought deal to be a hung deal, meaning for the underwriters to be holding the stock. The market would understand that the stock could not be sold and it would hurt the price of the stock.

2013 ONSC 1300 (CanLII)

Page: 8

[28]    Mr. Bharti offered later that month to have Aberdeen, a Forbes & Manhattan fund, buy $2 million of Weisel's position if the rest was sold, and said that Stetson was open to discussions if Weisel wanted to change some terms to help them resell the deal. He testified that he made it clear to Weisel that Stetson needed the money by the end of July or early August to meet their obligations, that Stetson had to be pragmatic, and that if Weisel came back with a proposal that would help them sell the deal, for example with a different price or incentives, Stetson would be open to looking at. Weisel never came back with any new fixed proposal before closing.

[29]    The engagement letter provided that the deal was to close on July 31, 2008. On that date Stetson was to receive the agreed amount from Weisel. However, on July 28, 2008 Weisel's lawyers wrote to Stetson's lawyers and said that Weisel did not intend to close the deal on July 31, 2008. No reason was provided.

[30]    By letter of July 31, 2008 e-mailed on August 1, 2008, Stetson's lawyers wrote to Weisel's lawyers and said that Stetson "agrees to allow the extension of the closing past July 31, 2008 to a later date that reasonably coincides with the Corporation's capital expenditure requirements". There had been no request for an extension from Weisel and it cannot be said that the extension was made by agreement with Weisel. Mr. Bharti's evidence, which I accept, was that Stetson had no choice but to state that there was an extension as Weisel had gone silent and had not said why they would not close or provided new terms. He said that Stetson had commitments and that its business was in jeopardy. Because they had had some discussion on terms, he felt an extension would give time to perhaps come to new terms that would allow them to fulfill their commitments. He said he had to be practical and pragmatic and was trying to look for a solution. Mr. Said's evidence, which I also accept, was to the same effect.

[31]    A press release announcing the extension was made on August 8th. Mr. Bharti's evidence, which I accept, was that they had not heard back from Weisel regarding the extension letter and they had statutory disclose requirements to announce the extension contained in the July 31, 2008 letter e-mailed the following day. Mr. Said testified that Stetson was stuck because of the failure of Weisel to close the transaction and that announcing anything other than that the deal was extended would be terrible for Stetson. He said that there was no agreement with Weisel

2013 ONSC 1300 (CanLII)

about the extension. I accept that evidence. I do not accept the evidence of Mr. Wylie that he had discussions with Mr. Bharti and Mr. Said regarding the extension or that Weisel agreed or participated in extended the closing. There was no discussion in the conversation between Stetson and Weisel people on August 1, 2008 about any extension of the closing. Weisel had no interest or intention of closing the deal reached in the engagement letter. It sought a new deal for much less and for terms more favourable to it.

[32]    Around the time of the extension, Mr. Bharti received a call from Mr. Lionel Conacher, the president and chief operating office of Weisel, who was based in San Francisco at the time. They met in Toronto on August 13, 2008. They differ as to what exactly was said. I viewed Mr. Bharti as having the better recollection, but it is perhaps unimportant. No new agreement was reached. On August 14, 2008 Weisel offered to make a debt investment of $8 million in return for a release of its obligations under the engagement letter. On August 18, 2008 the solicitors for Stetson replied that Stetson would not release Weisel from the terms of the engagement letter and that if Weisel did not fulfill its obligations, it would take action.

[33]    As early as August 1, 2008 Stetson began to consider alternatives to the Weisel deal. On that day they received a proposal from First Energy that was not acceptable. They went to Canaccord and Macquarie for advice. Canaccord suggested considering a strategic partner and Mr. Said met with Crescent Point at Canaccord's suggestion. However Mr. Said testified that Stetson had no leverage and Crescent Point knew they had a financing problem. No agreement was made. They also met with Tristar and although it looked promising at the outset, Tristar knew that Stetson had no leverage and in Mr. Said's words, were trying to squeeze Stetson. Tristar knew that if Stetson did not get financing, they could go themselves to the Tribal Council and get the lands themselves.

[34]    Eventually Stetson signed an agreement with Canaccord effective August 28, 2008 pursuant to which Canaccord agreed to provide a $12 million financing on a "best efforts" basis in exchange for 60,000,000 units, each unit consisting of a share and warrant of Stetson, at 20 cents per unit. In addition, Stetson agreed to issue approximately 85 million preferred shares to every existing shareholder of Stetson who would be entitled to "the proceeds of any final

Page: 10

judgment or settlement monies paid to and received by the Corporation in connection with its claim against Thomas Weisel…". The preferred shares were the idea of Canaccord as a sweetener to assist the sale of the Stetson shares.

[35]    Mr. Said testified that Canaccord was doing Stetson, and particular Mr. Bharti, a favour. He testified that Stetson was tainted because of the failed bought deal and that Canaccord were uncertain what they could do. Stetson trusted Canaccord would do its best. I accept this evidence.

[36]    The Canaccord financing closed on September 17, 2008 for net proceeds to Stetson of $11,215,928.92 after fees paid to Canaccord.

[37]    Before the closing, Stetson had to obtain two bridge loans from Longford Energy Inc., a public company that is a member of the Forbes & Manhattan group, to make lease payments that had become due.  These bridge loans and the associated fees ($100,000) and accrued interest ($33,559) were repaid from the proceeds received on closing of the Canaccord financing.

[38]    There were not sufficient funds from the Canaccord financing for Stetson to undertake its development in the Bakken. Another $23 or $24 million was needed. Mr. Ward, the president of Stetson, thought a strategic partner was needed and he canvassed potential parties. Eventually a proposal was made in early October 2008 by Red Willow Great Plains, LLC. Red Willow was a business enterprise of the Southern Ute Indian Tribe with sizeable oil and gas production.

[39]    Under the Red Willow deal, Stetson assigned 50% of its oil and gas mineral rights in the allotment lands and 60% of its rights in the tribal lands to Red Willow. In exchange, Red Willow agreed to pay for Stetson's first $3,500,000 of drilling costs and also to pay for its share of all land, drilling and exploration costs, to provide its considerable technical expertise and to act as the operator of the programme.

[40]    Eventually only one well was drilled before Red Willow decided not to proceed further, and the project was terminated and the leases lost. During the trial, a ruling was made refusing a motion by Weisel to amend its pleading to rely on the Red Willow transaction and subsequent activity under it, and thus geological evidence regarding the leased lands and their economic potential was not led.

2013 ONSC 1300 (CanLII)

Page: 11

## Was there a binding agreement?

[41]     Weisel takes the position that the engagement letter was not a binding agreement, but only an agreement to agree, and that before there could be a binding agreement, there had to be an underwriting agreement signed by the parties prior to closing.

[42]     The principles to be considered in assessing whether the parties entered into a binding agreement or merely agreed to agree were recently discussed by Pepall J. (as she then was) in *UBS Securities Canada Inc. v. Sands Brothers Canada Ltd.* (2008), 45 B.L.R. (4th) 105 at paras. 40 to 43; aff'd (2009), 95 O.R. (3d) 93 (C.A.). I take from her discussion the following principles:

    (a)    The test as to whether there was *consensus ad idem* is an objective one. The parties will be found to have reached a meeting of the minds where it is clear to the objective reasonable bystander, in light of all the material facts, that the parties intended to contract and the essential terms of that contract can be determined within a reasonable degree of certainty.

    (b)    The investigation to determine whether a reasonable observer would think that two parties intended to contract extends to all the circumstances of the agreement. This has been held to include words and conduct, future actions and representations by both parties and reliance. This determination frequently involves an assessment of the credibility of witnesses

    (c)    An agreement is not incomplete simply because it calls for some further agreement between the parties or because it provides for the execution of a further formal document. It is a question of construction whether the execution of the further contract is a condition or term of the bargain, or whether it is a mere expression of the desire of the parties as to the manner in which the transaction already agreed to will in fact go through.

[43]     In *Canada Square Corp. v. VS Services Ltd.* (1981), 34 O.R. (2d) 250 (C.A.), which involved an issue as to whether a letter sufficed to make a binding agreement or required a formal contract, Morden J.A. cited Professor Waddams for the proposition that subsequent conduct of the parties, while not conclusive and to be looked at with caution, may be helpful in showing what meaning the parties attached to the document after its execution, and this in turn may suggest that they took the same view at the earlier date. He also cited Corbin on Contracts for the proposition that the fact that the parties have acted by rendering some substantial

2013 ONSC 1300 (CanLII)

Page: 12

performance or by taking other material action in reliance upon their existing expressions of agreement is itself a circumstance bearing upon the question of completeness of their agreement.

[44]    Morden J.A. also said, quoting Cardozo J., that it is important to consider, as a part of the context of the document, "the genesis and aim of the transaction".

[45]    There are a number of provisions in the engagement letter that suggest it constitutes a binding agreement. There is also a provision requiring an underwriting agreement to be made prior to closing. Included are the following provisions:

> Thomas Weisel Partners Canada Inc. ("Thomas Weisel" or the "Lead Underwriter"), hereby offers, on a "bought deal" basis by way of private placement, to purchase for resale…
>
> **1.    Terms of Engagement**
>
> …The Offer shall be open for acceptance by the Company until 10 a.m. (Calgary time) on July 13, 2008 unless otherwise extended…and is subject to reconfirmation prior to 5 a.m. (Calgary time) on July 14, 2008. Upon the reconfirmation of this engagement letter, the Company authorizes Thomas Weisel to disseminate the press release attached in Schedule C…The Company agrees upon reconfirmation of this engagement letter to have the trading of its securities halted, if necessary,…
>
> **3.    Underwriting Agreement**
>
> The definitive terms of this agreement will be governed by a formal underwriting agreement to be entered into prior to closing of the purchase by Thomas Weisel (the "Underwriting Agreement") in respect of the Offering. The Underwriting Agreement will be negotiated in good faith between the Company and Thomas Weisel, on behalf of the Underwriters, and will contain representations, warranties, covenants, conditions (including, without limitation, the delivery of certificates of responsible officers of the Company on behalf of the Company, and legal opinions from counsel to the Company regarding relevant corporate and securities matters with respect to the Offering, and the principal subsidiaries and properties of the Company, together with other relevant corporate and securities matters, acceptable to Thomas Weisel and its counsel), indemnity and termination provisions (including without limitation, standard "due diligence-out", "disaster-out",

2013 ONSC 1300 (CanLII)

Page: 13

2013 ONSC 1300 (CanLII)

"material adverse change-out", and "regulatory-out" rights) customary in agreements of this type and will be consistent in all material respects with this letter agreement, unless otherwise agreed between the parties.

### 5. Indemnification

The Company agrees to indemnity the Underwriters in accordance with Schedule B attached hereto, which Schedule forms part of this agreement and the consideration of which is the entering into this agreement. Such indemnity shall be executed and delivered to Thomas Weisel on the execution of this agreement. The Underwriting Agreement shall contain more comprehensive indemnity provisions consistent with Schedule B. This agreement and the indemnity provisions contained in Schedule B shall enure to the benefit of the respective successors and assigns of the parties hereto and of the indemnified parties, and the obligations and liabilities assumed in the agreement and in the indemnity contained in Schedule B shall be binding upon their respective successors and assigns. …

### 8. Other matters

(e)   Any dispute arising out of this agreement (including any Schedule) will exclusively be submitted to an arbitrator for binding and conclusive resolution.…[3]

### 9. Acceptance

Please confirm that the foregoing is in accordance with the Company's understanding by signing and returning the attached duplicate copy of this letter, which shall thereupon constitute a binding agreement between the Company and Thomas Weisel. (Underlining added)

[46]   The language of this engagement letter certainly indicates an intention that it be a binding agreement. It states so expressly in paragraph 9 and the expression "this agreement" is referred to many times. The provision in paragraph 3 calling for the negotiation of an underwriting agreement does not state that until there is such an underwriting agreement there is no binding agreement between the parties.

---

[3] The parties agreed to litigate rather than arbitrate this dispute.

[47]    The inclusion of an arbitration clause is a clear indication that a binding agreement was made. Otherwise there would be no purpose in an arbitration provision. The same is the case with respect to the indemnity provided in the engagement letter.

[48]    What is the "genesis and aim" of the transaction? It was a bought deal underwriting transaction that was intended to be acted upon within hours of the signing of the engagement letter. The time for acceptance by Stetson of the offer contained in the engagement letter was very short. The price of 55 cents per share (or subscription receipt) had been settled by Weisel after taking into account the trading price of Stetson's shares late on the afternoon of Friday, July 11, 2008 with the intention that if the engagement letter was signed by Stetson the deal would go "live" before the opening of the markets on Monday morning, and if normal events occurred, would be sold out shortly thereafter.

[49]    The engagement letter was to be reconfirmed by Weisel by 5 a.m. Calgary time, Monday morning, which it was. There would be no need for a reconfirmation if there were no binding agreement. Weisel intended to thereupon contact Canaccord to offer them part of the Stetson position that it had agreed to underwrite, which it did, and to issue the press release announcing the agreement by the parties to a bought deal, which it did. All of this before the market opened in Toronto at 9:30 a.m. Weisel then met with a number of its institutional clients to try to sell them a position. Weisel could not have taken these steps if it thought that it had no binding agreement with Stetson. It would make no commercial sense to view things differently.

[50]    The form of the engagement letter was a standard form used by Weisel, and any substantive changes had to be approved by its Commitment Committee. The form of the letter was contained in Weisel's Deal Book, the guide used by Weisel to conduct its business. That Deal Book also contained the following statement about the engagement letter:

> "The engagement letter specifies the terms of the deal and serves as the primary agreement defining the obligations of the dealer to the issuer and vice versa."

[51]    Mr. Wylie, the lead banker for Weisel on this transaction, agreed on cross-examination that the statement was a correct statement at the time the engagement letter was signed. That is, Weisel itself acted on the basis that the engagement letter was the primary agreement that

Page: 15

defined the obligations of Stetson and Weisel. While the test as to whether there was a binding agreement is not a subjective test, this evidence is consistent with what a reasonable observer would consider to have occurred, i.e. that a binding agreement had been made by the parties. The same can be said for the lack of evidence of any Weisel witness that the engagement letter was not a binding agreement. No Weisel witness testified that Weisel acted as it did on the basis that the engagement letter was not a binding agreement or that the engagement letter was viewed by them as not being a binding agreement.

[52]    There are other indications that Weisel understood that it was making a binding agreement. Mr. Wylie testified that at the first meeting of the Weisel Commitment Committee dealing with Stetson on July 11, 2008, the thrust of the conversation was that Weisel had to be confident in putting up the firm's capital that the deal "would sell" in the market place, i.e. not that they would be committing capital only after they had gone to the market and learned that the deal had sold, but before.

[53]    After Weisel had gone to the market and had had difficulty in selling its position, Mr. Conacher, the president and chief operating officer of Weisel, e-mailed Mr. Pocrnic, the managing director and head of syndication and equity capital markets in Toronto, and others at Weisel on July 19, 2008. He stated:

> Nick - I'd like to have a review first thing on Monday of exactly which accounts we've approached on Stetson, which ones are outstanding, which accounts are likely buyers of the deal and for you to review the action plan for the coming week.  I think we should include Seth and/Mo in the discussion so that we make sure we are thinking about ALL possible alternatives to get off this liability.  This is by far the most important thing we need to do between now and month end and I want to make sure that we are utilizing all of the Firm's resources to manage this situation.  Going forward I want a full daily report that includes all of the above.  I want a full Court press on this. Nobody goes on vacation until this deal is sold. If people are on vacation, call them back. (Underlining added)

[54]    This was a clear indication that Weisel was acting on an understanding that it had a liability to Stetson and that it wanted to sell out the position before it was required to close the deal with Stetson on July 31, 2008. No reasonable observer could view it otherwise.

2013 ONSC 1300 (CanLII)

2013 ONSC 1300 (CanLII)

[55]     Stetson clearly acted on the basis that it had a binding agreement with Weisel and it relied on the agreement being binding. Stetson consented to the press release announcing the bought deal to be released in its name on July 14, 2008 and Stetson personnel attended the meetings set up by Weisel with prospective purchasers in accordance with the terms of the engagement letter. No reasonable observer would expect Stetson to have done these things if there was no binding agreement.

[56]     This is not a case such as two U.S. cases relied upon by Weisel[4] in which the parties clearly provided that the imposition of legal obligations must be preceded by execution of an underwriting agreement.

[57]     Weisel contends that its offer was subject to due diligence and the execution of an underwriting agreement, and that was an indication that a formal agreement was necessary, absent which the engagement letter was merely an agreement to agree. However, this is not what the language of the engagement letter says.

[58]     So far as due diligence is concerned, the engagement letter stated that "completion of the offering was subject to due diligence to be completed prior to the closing", which was to be on July 31, 2008, a little over two weeks after the engagement letter was open for acceptance and long after it was expected that the Stetson position would have been sold by Weisel. Due diligence was not a condition for the offer in the engagement letter and its acceptance to be binding, but a potential reason for Weisel not to close the transaction if there were material matters undisclosed at the time of the acceptance of the engagement letter affecting Stetson's affairs.

[59]     So far as the requirement for an underwriting agreement is concerned, it was also something to be negotiated prior to closing. The engagement letter did not state that it was a condition of the engagement letter being binding.    It is ironic that such reliance is made by Weisel of the need for an underwriting agreement. Weisel made no attempt at all to negotiate

---

[4] *Health & Community Living, Inc. v. Goldis Financial Group, Inc.*, 1998 WL 117928 at *4 (E.D.N.Y March 13, 1998) and *Café La France, Inc. v. Schneider Securities, Inc.*, 281 F.Supp.2d 361 (2003).

one, and a request by Stetson's solicitors on July 24, 2008 to Weisel's solicitors for a draft of the underwriting agreement went unanswered.

[60]    While the engagement letter contemplated that an underwriting agreement would be made prior to closing, the underwriting agreement, in the language of Parker J. in *Hatzfeldt-Wildenburg v. Alexander* quoted by Judson J. in *Calvan Consolidated Oil & Gas Co. v. Manning*, [1959] S.C.R. 253 at page 5, was not a condition of the bargain but rather it was an expression of the desire of the parties as to the manner in which the transaction already agreed to was to go through.

[61]    Stetson called as an expert witness Mr. Stephen Halperin, a lawyer practising at the Toronto law firm of Goodmans LLP, where he is a partner, member of the firm's executive committee and co-chair of the corporate securities group. Mr. Halperin was called to give evidence as to how a "Reasonable Market Actor" would view the engagement letter in the circumstances of this case. His Reasonable Market Actor was a proxy for how he believed a reasonably sophisticated participant in an underwriting process would have construed the situation. His qualifications as an expert witness were not challenged by Mr. Groia, but surprisingly in light of that concession, the weight to be placed on his evidence is now challenged on the basis that he has little experience in what he testified to.

[62]    Mr. Halperin was an impressive witness. It is the case that he is a highly regarded lawyer in his field, which no doubt was the reason why he was not challenged as an expert, but it is also the case that he has had business experience in the area and dealings in his career with the issues involved in this case. He has been involved in a variety of significant transactions in the areas of corporate finance and mergers and acquisitions and as acted for both issuers and underwriters.  In his capacity as a director, he has participated in probably 6 private placements and has been involved in bought deals.  He is currently a member of the OSC's Senior Securities Lawyers Advisory Group and is a past member of the OSC's Securities Advisory Committee. It was evident throughout his testimony that he is very knowledgeable and I accept his views without qualification.

2013 ONSC 1300 (CanLII)

Page: 18

[63]    Mr. Halperin was clear to say that he was not offering a legal opinion as to whether the engagement letter constituted a binding contract, but an opinion of whether a Reasonable Market Actor would consider the engagement letter to be a binding agreement. I expressed some concern that he was trespassing on the purview of the judge who is to decide this issue, but was reminded that as the case law has developed, particularly in *R. Mohan*, [1994] 2 S.C.R. 9, the rule which excluded expert evidence on the ultimate issue before a court is no longer of general application, although the concerns underlying it remain.

[64]    In determining whether expert evidence is a necessity in assisting the trier of fact, what is required is that the opinion be necessary in the sense that it provides information which is likely to be outside the experience and knowledge of a judge or jury. See *R v. Mohan* at para. 26.

[65]    It is Mr. Halperin's opinion that a Reasonable Market Actor would view the engagement letter as being a binding obligation of Stetson and Weisel. I appreciate that Mr. Halperin does not purport to opine on the legal meaning of the engagement letter but rather how a Reasonable Market Actor would view it. In that sense, he is looking at it from the perspective of a reasonable man, or put differently, from the perspective of what objectively can be taken from the engagement letter and the surrounding circumstances. That however is not really something that is outside the experience and knowledge of a judge. It is commonplace for judges to consider whether parties have arrived at a meeting of the minds to form a binding contract. The tests for doing so are contained in the jurisprudence, some of which I have referred to.

[66]    Mr. Levy, who filed an expert report on behalf of Weisel and who testified at the trial, referred in his report to the engagement letter as a letter of intent. He stated in his report that the letter of intent "is an agreement" used within the Canadian securities industry to set the intended terms, conditions and indemnifications of a financing. On cross-examination, Mr. Levy said he agreed with the statement in the Weisel Deal Book that the engagement letter serves as the primary agreement defining the obligations of the dealer and issuer. Thus in that regard his evidence on this point was not inconsistent with Mr. Halperin's opinion.

[67]    In the circumstances I decline to rely on Mr. Halperin's opinion that a Reasonable Market Actor would view the engagement letter as being a binding obligation of Stetson and Weisel. I

2013 ONSC 1300 (CanLII)

Page: 19

also decline to rely on Mr. Levy's statement that the engagement letter was an agreement. These are not matters for which evidence is necessary in order for a judge understand and deal with the issue.

**Applicability of the "out clauses"**

[68]    The engagement letter provided in paragraph 5 that the definitive terms of "this" agreement would be governed by a formal underwriting agreement to be entered into prior to closing of the purchase, to be negotiated in good faith between the parties, and that the underwriting agreement would contain certain terms, including standard "due diligence out", "disaster out", "material adverse change-out", and "regulatory out" rights customary in agreements of this type, to be consistent in all material respects with "this" letter agreement.

[69]    In the first offer from Weisel sent to Stetson, the word "broad" preceded the out clauses. This word was changed in the final signed engagement letter at the request of Mr. Gleeson of Stetson to "standard", so that the clauses were to be standard out clauses customary in agreements of this type.

[70]    Weisel contends that the inclusion of the out provisions in the underwriting agreement was a fundamental term of its participation in the financing and that it would not have committed to any obligation with respect to the financing unless an agreement explicitly included standard out clauses. Two things can be said to that argument. First, Weisel did commit to the obligation by reason of the language and provisions in the engagement letter that I have already discussed. Second, the engagement letter in paragraph 5 provided that what was to be contained in the underwriting agreement regarding out clauses were to be standard provisions customary in agreements of this type. Presumably Weisel must have been satisfied with this description.

[71]    Weisel relies on two of the clauses in its closing argument, being the "material adverse change-out" and "disaster out" clauses. In my view, it is not open for Weisel to rely on these clauses.

[72]    First, Weisel never attempted to negotiate an underwriting agreement before it failed to close the transaction on July 31, 2008 as required by the engagement letter. The Weisel Deal Book checklist for bought deals in which Weisel was the lead underwriter required Weisel to

2013 ONSC 1300 (CanLII)

Page: 20

draft an underwriting agreement with legal counsel. Counsel for Stetson's request for Weisel's draft underwriting agreement went unanswered. Therefore there was no agreement containing these out clauses that Weisel could rely on in refusing to close.

[73]    Second, at no time did Weisel purport to rely on these clauses. They were first raised during this litigation. The form of clauses relied on by Weisel as being the standard clauses were by their language to be available to Weisel to refuse to close the transaction (i) if Weisel came to the opinion that the conditions in them were not met and (ii) written notice to that effect was given prior to the time of closing. When Weisel announced through its lawyers on July 28, 2008 that it did not intend to close on July 31, 2008, no suggestion was made by its lawyers that Weisel had formed the opinion that it had a right to refuse to close because of any out clause nor was anything said by anyone at Weisel to anyone at Stetson that it was relying on any out clause in deciding not to close on July 31, 2008.

[74]    Mr. Levy, Weisel's expert witness, in discussing the out clauses, stated that if Weisel determined as a result of its ongoing review of the Bakken project that the potential profitability had been materially reduced as a result of an oil price decline (which Weisel relied on at the trial), Weisel could consider termination by use of the due diligence out clause and/or the material change out clause. While I disagree with Mr. Levy's opinion that these clauses could have been relied on by Weisel, it is noteworthy that he said that before considering termination of the agreement, Weisel had to first make a determination after reviewing the Stetson Bakken project that its profitability had been materially reduced. Weisel had made no review of Stetson's Bakken project after signing the engagement letter nor had it made any determination that its profitability had been reduced before it announced that it was not going to close on July 31, 2008 as required by the engagement letter. Thus even according to Weisel's own expert, there was no basis to be purporting to rely on the out clauses.

[75]    Mr. Levy's opinion reflects the two clauses relied on by Weisel. The clauses require that in order to terminate its obligations, the underwriter must form an opinion prior to the time of closing that the conditions in the clause have occurred and must give written notice of its exercise of the rights contained in the clauses. None of that occurred in this case.

2013 ONSC 1300 (CanLII)

Page: 21

[76]    The standard material adverse change out clause relied on by Weisel provides:

> If, after the date hereof and prior to the Time of Closing, there shall occur any material change or change in a material fact which, in the reasonable opinion of the Underwriters (or any of them), would be expected to have a significant adverse effect on the market price or value of the Securities, any Underwriter shall be entitled, at its option, to terminate its obligation under this agreement by written notice to that effect, given to the Company at or prior to the Time of Closing.

[77]    The standard disaster out clause relied on by Weisel provides:

> The obligations of the Underwriter (or any of them) to purchase the Securities under this agreement may be terminated by the Underwriter at its option by written notice to that effect to the Company at any time prior to the Closing if there should develop, occur or come into effect or existence any event, action state, condition or major financial occurrence of national or international consequence or any law or regulation which in the opinion of the Underwriter seriously adversely affects, or involves, or will seriously affect, or involve, the financial markets or the business, operations or affairs of the Company and its subsidiaries taken as a whole.

[78]    Weisel argues that oil price changes were sufficient to enable it to rely on these clauses. It points to no evidence, and there is none, that prior to July 31, 2008 it formed an opinion required by the material change out clause that oil price changes would be expected to have a significant adverse effect on the market price or value of the Stetson securities. Nor is there any evidence that prior to July 31, 2008 Weisel formed an opinion required by the disaster out clause that because of oil price changes there had developed, occurred or come into effect or existence any event, action state, condition or major financial occurrence of national or international consequence or any law or regulation which seriously adversely affected, or involved, or would seriously affect, or involve, the financial markets or the business, operations or affairs of Stetson.

[79]    Nor did Weisel give written notice that it was terminating its obligations under the engagement letter because of the out clauses. On August 1, 2008 there was a conference call participated in by Messrs. Bharti and Said and others on behalf of Stetson and by Messrs. Conacher, Wylie, Rowlands and others on behalf of Weisel. During that call there was nothing

2013 ONSC 1300 (CanLII)

Page: 22

said by anyone on behalf of Weisel about the price of oil, or the state of the markets or the Stetson share price, and nothing was said about using any out clause to terminate their obligations under the engagement letter.

[80]    This argument of Weisel that the out clauses entitle it to deny liability to Stetson because of oil price declines is nothing more than a *post facto* attempt to rely on something said to fall within the material adverse change and disaster out clauses. It is supported by no plausible evidence. No Weisel witness testified that Weisel refused to close because of any drop in oil prices.

[81]    When one looks at the oil prices changes, they can hardly be said to rise to the level that would support any reasonable opinion that the out clauses now relied on by Weisel permitted the termination of the engagement letter.

[82]    Weisel argues that as at July 14, 2008, the price of oil reached a near-peak price of $145.16 per barrel. As at September 5, 2008, the price of oil had dropped to $106.47 per barrel, representing a 27% drop in less than two months and said to be the first substantive material decline in oil prices since December 2006.

[83]    However, Stetson was an exploration play and the daily price of oil was of less importance than for an oil producer. Stetson would likely have not been in production for four years. The evidence of Mr. Bharti, which I accept, was that with an exploration play such as Stetson's project, short term price movements were not important when compared to the long term view on oil pricing and that the long term view of oil was bullish with oil prices staying at or above $80 to $85 per barrel.  Mr. Said's evidence, which I also accept, was to the same effect. What was of importance to Stetson, and fully recognized by Weisel, was that oil prices would not likely drop below the forecasted oil prices used in their future value models.

[84]    In its various reports at relevant times, Weisel used conservative oil prices much below market prices in forecasting future values of oil plays. Also, Mr. Wylie, the lead banker for Weisel on this transaction, acknowledged that oil by nature has a high beta, i.e. high volatility and that he would look at pricing over a one or two month period to give him a trend line. It was

2013 ONSC 1300 (CanLII)

2013 ONSC 1300 (CanLII)

only two weeks after the deal went live on July 14, 2008 that Weisel through its lawyers said on July 28, 2008 that it would not close on July 31, 2008.

[85]   On March 12, 2008, Weisel prepared a research report in respect of Kodiak Oil & Gas Corp.   Under the heading Unproven Resource Potential, Weisel stated that it estimated Kodiak's unproven Bakken resource potential based on a number of assumptions. The assumption for oil was an average NYMEX oil price of $75 per barrel and an average realized oil price of $65 per barrel.   Kodiak was also an exploration play in the Bakken and no drilling had yet occurred. On the day of its report the spot price for WTI oil closed at $109.86.

[86]   On April 25, 2008, Weisel prepared a research report with respect to another Bakken player, TriStar Oil & Gas Ltd, an oil producer, and used as commodity prices in its valuation a WTI price of $110 per barrel for 2008 and $100 per barrel for 2009. On that day, April 25, 2008, the WTI spot price for oil closed at $132.99.

[87]   On May 21, 2008, Weisel produced another research report on Kodiak.   In its net asset value sensitivity analysis, it used three price point cases – the low case at $75 per barrel, the mid-range case at $85 per barrel, and the high case at $95 per barrel. On May 21, 2008 the WTI spot price for oil closed at $132.99.

[88]   In an investor presentation dated July 3, 3008 which was provided to Weisel shortly afterwards, Stetson used initial production price assumptions in its two forecasted cases of WTI $90 and $115 per barrel. On that date, the spot price for WTI oil closed at $145.31. After this report was made to the Weisel sales team on July 8, 2008, Mr. Wylie told Stetson that Weisel was very enthusiastic about Stetson and would be putting up a deal to Stetson once it was ready for bids. By July 10, 2008 Weisel had prepared a presentation to be used by its sales team that used the same price assumptions of $90 and $115 that Stetson had used. On July 28, 2008, the date that Weisel's lawyers advised Stetson that it would not close, the spot price for TWI oil closed at $124.72.

[89]   Throughout July, Weisel's equity sales team used its sales presentation in trying to market the Stetson position. As well, Weisel continued to promote Stetson as being similar to Kodiak. On July 21, 2008 Weisel sent to potential equity investors the two Kodiak reports of

Page: 24

March 12 and 21 which contained the price assumptions already referred to. On that date Weisel was valuing the Stetson shares, which it had agreed to purchase for 55 cents, at $1.50. It would hardly be right for Weisel to now take the position that the oil prices had dropped to the point that the material adverse market and disaster out clauses were applicable when at the same time it was marketing its Stetson position with oil price forecast assumptions that were lower than the then current price of oil.

[90]    What also belies Weisel's argument on oil pricing is how it reacted to oil pricing at relevant times. On July 3, 2008, oil closed at its highest price to date, at $145.31 per barrel. However, in the next two trading days, oil retreated by more than $9 per barrel to close on July 8 at a price of $136.06 per barrel. July 8 was the day Stetson made its presentation to Weisel's sales desk.    There is no evidence that anyone within Weisel, whether connected with the sales desk or otherwise, registered any concern about the drop in the price of oil and it was after this presentation that Mr. Wylie stated, in an e-mail to Mr. Said of Stetson that Weisel was very enthusiastic about getting behind the Stetson story and would be putting up a deal to Stetson once Stetson was ready for bids.

[91]    In light of all of this, it is not surprising that no one from Weisel testified that Weisel refused to close because of any drop in oil prices. To have asserted that would not have been plausible or reasonable.

[92]    Mr. Rowlands did testify that the markets began to turn around negatively at about the time that oil prices hit their high. Both he and Mr. Conacher testified that the markets were buoyant leading up to the engagement letter but that by the end of July (Mr. Conacher) or third week of July (Mr. Rowlands), they had turned negative. This evidence was given to support a case that it was oil pricing that caused a turn in the markets. I have considerable doubt about the admissibility of this evidence, which is opinion evidence.

[93]    Mr. Rowlands also asserted that by July 28 the decline in oil pricing from July 14th was a reflection of a growing concern for the debt crisis. I do not think he had any qualifications to make such a statement. He was a trader of stocks, not an economist or someone trained in the analysis of markets and the cause and effect of factors on those markets.

2013 ONSC 1300 (CanLII)

2013 ONSC 1300 (CanLII)

[94]     In any event, I think the evidence of Mr. Rowlands and Mr. Conacher on these issues is unreliable. Their assertions were made baldly, with no objective evidence given by them to support them. While they testified in chief that the markets were buoyant at the time of the engagement letter, in fact the major indices such as the TSX, the Dow and the S & P 500 were down considerably since their highs earlier in the year. Mr. Conacher could not recall the date of the major economic event that year, the collapse of Lehman Brothers that occurred on September 15, 2008 and he acknowledged that it had an immense impact on the financial markets. The world financial markets, of course, suffered from the debt crisis much earlier than July, 2008, as witness the collapse of the asset backed commercial paper market in 2007. I do not accept the implication of their evidence that the failure of Weisel to sell its position in Stetson was caused by the price of oil starting to drop shortly after the engagement letter was agreed on the evening of July 13, 2008.

[95]     In my view, and I so find, even if the out clauses relied on by Weisel were applicable, there were no facts present that would have entitled Weisel to rely on them or that entitle Weisel to rely on them in this trial.


(i)  **Material adverse change out clause**

[96]     On the premise, however, that the out clauses were a part of the agreement between the parties, I will consider material adverse change out and disaster out clauses as they are the two clauses relied on by Weisel.

[97]     In this connection the expert opinions of Mr. Halperin and Mr. Levy must be considered. What would be considered to be standard material adverse change or disaster out clauses is something that is not within the knowledge of a judge and is the proper purview of expert evidence. For the reasons that follow, I prefer the evidence of Mr. Halperin rather than Mr. Levy.

[98]     The engagement letter provided that the underwriting agreement was to contain "a standard material adverse change-out… customary in agreements of this type". I assume, although it is not clear, that "agreements of this type" refers to a bought deal by way of a private

2013 ONSC 1300 (CanLII)

placement. A material adverse change out provision is referred to in the jargon of the industry as a "MAC out" provision.

[99]    The handbook of the Investment Industry Association of Canada (IIAC), which sets out the standard features of an underwriting agreement and the particular wording that "parties in the business have come to expect", contains a "material change out" clause that would be applicable to both a bought deal and an agency best efforts deal. It says that "material change out" clause means a provision substantially in the following form:

> If, after the date hereof and prior to the Time of Closing, there shall occur any <u>material change or change in a material fact</u> which, in the reasonable opinion of the Underwriters (or any of them), <u>would be expected to have a significant adverse effect on the market price or value of the Securities</u>, any Underwriter shall be entitled, at its option, to terminate its obligation under this agreement by written notice to that effect, given to the Company at or prior to the Time of Closing. (Underlining added).

[100]    There are two other MAC out clauses in the record that apply to agency agreements and not bought deals. I view them as not determinative, although the one in the Weisel Deal Book is some indication of what Weisel would want in a negotiated material adverse change out clause.[5]

[101]    The IIAC material change out clause does not define what is meant by material change or change in a material fact. These are not loose terms but have particular meaning in the securities industry.

[102]    Mr. Halperin's opinion is that MAC out clauses in the securities underwriting context (again subject to the specific language of the relevant provision) would typically be expected to be interpreted by reference to the legal definition of "material change" in the

---

[5]  Weisel has a material adverse change out clause in its Deal Book precedent for an agency agreement. The clause applies only to a change in the business of the issuer. In the Canaccord agency agreement made by Stetson with Canaccord, it contains a material adverse change clause that applies to a material adverse change or change to a material fact that could have a material adverse effect on the business of Stetson or the market price of the offered units. The evidence indicates that in an agency agreement less attention is paid to the language of a material change out provision as the underwriter is not obliged to buy the position of the issuer but only make best efforts to sell the position on behalf of the issuer. Mr. Halperin's opinion, which I accept, is that the Canaccord agreement should not be looked at in considering the issues in this case.

*Securities Act* (Ontario) and comparable provisions under other Canadian provincial securities legislation, which define a "material change", in pertinent part, as: "a change in the business, operations or capital of the issuer that would reasonably be expected to have a significant effect on the market price or value of any of the securities of the issuer ... ".  He went on to say:

> In my experience, "MAC out" provisions in underwriting agreements tend to be based upon the statutory definition of material change (adding the adjective "adverse").  Thus, in the underwriting context, Reasonable Market Actors would expect that a "MAC out" would be available to the underwriter in the event of a change in the business, operations or capital of the issuer of the securities that would rise to the level of a defined material change, with the change "trigger" being the price or value of the issuer's securities, without regard to whether the change is permanent or transformational.

[103]      Mr. Halperin went on to say that there is some debate and uncertainty as to whether a MAC out in this context only gives rise to an underwriter termination right if the MAC out is specific to the issuer as opposed to being of general application.  Mr. Halperin said that the issue is sometimes addressed through specific drafting of the provision in the underwriting agreement.  In this case Weisel never attempted to negotiate an underwriting agreement.

[104]      Mr. Halperin's opinion is that in the absence of drafting specificity, the Reasonable Market Actor would derive some guidance on the issue from two sources, being National Policy 51-201 of the Canadian Securities Administration dealing with disclosure standards for reporting issuers and a decision of the Supreme Court of Canada in *Kerr v. Danier Leather Inc*. [2007] 3 S.C.R. 331 which he said became well known in the business community.

[105]      National Policy 51-201 states that it is only external developments that have a direct effect on a business not generally experienced by other business in the same industry that require disclose of changes, as follows:

> Companies are not generally required to interpret the impact of external political, economic and social developments on their affairs.  However, if an external development will have or has had a direct effect on the business and affairs of a company that is both material and uncharacteristic of the effect generally experienced by other companies engaged in the same business or industry, the company is urged to explain, where practical, the particular impact on them.  For

2013 ONSC 1300 (CanLII)

example, a change in government policy that affects most companies in a particular industry does not require an announcement, but if it affects only one or a few companies in a material way, such companies should make an announcement.

[106]     In *Danier*, the trial judge held that a significant change in weather patterns was not a change in the business of *Danier* and thus not a material change within the definition of material change in the Securities Act. The Supreme Court agreed with that finding and pointed out that the distinction between a material fact and a material change was deliberate. Binnie J. stated:

> The distinction between "material change" and "material fact" is deliberate and policy-based, as explained by a former chairman of the O.S.C.:
>
> > The term "material fact" is necessary when an issuer is publishing a disclosure document, such as a prospectus or a take-over bid circular, where all material information concerning the issuer at a point in time is published in one document which is convenient to the investor.  The term "material change" is limited to a change in the business, operations or capital of the issuer.  This is an attempt to relieve reporting issuers of the obligation to continually interpret external political, economic and social developments as they affect the affairs of the issuer, unless the external change will result in a change in the business, operations or capital of the issuer, in which case, timely disclosure of the change must be made.

[107]     Thus the purport of Mr. Halperin's opinion is that absent a specific contractual provision to the contrary, a Reasonable Market Actor would consider that a standard material adverse change out clause would require a change to the business of Stetson and not a change in oil pricing generally in order for Weisel to attempt to rely on the clause.

[108]     Weisel takes the position that a MAC out clause as contained in the IIAC form of clause is applicable and that any material change in oil prices is not required to have an effect on the business of the issuer, in this case Stetson. This position is somewhat ironic as the form of MAC out clause in Weisel's Deal Book for an agency agreement restricts its applicability to a material change in the business of the issuer, and one would think that in any negotiations that clause would be the starting position for Weisel and accepted by Stetson. The language of the engagement letter was changed between the first draft and the signed letter to change the out

2013 ONSC 1300 (CanLII)

clauses to be included in the underwriting agreement from "broad" to "standard" out clauses.[6] No evidence was given as to what that difference would be so far as a material adverse change out clause is concerned, but it suggests that perhaps the clause would have been restricted to changes to the business of Stetson rather than to the industry in general.

[109]     Weisel says that there is a distinction between materiality in a legislative context and in contractual context, and that the objectives behind legislative provisions to protect the public are different from contractual objectives. It relies on the following passage from *Inmet Mining Corp. v. Homestake Canada Inc.*, 2002 BCSC 61, 2002:

> There is an important distinction to be made between the tests for materiality that the courts have applied in cases of legislated disclosure, such as that found in the Securities Act, Real Estate Act, etc., and the test for materiality in a contract. In the former cases the tests have to be more objective because the legislation is aimed at protection of the general public.  It would be impossible to know what would affect the mind of every purchaser. <u>By contrast, the parties to a contract have the opportunity to tailor make their own terms and a purchaser is able to build in its own protections. In a contract the court is bound to use a more subjective standard in determining what was material and adverse to a particular purchaser's decision to buy.</u> (Underlining added)

[110]     I take the point of the underlined passage relied on by Weisel. However, unlike the situation posited in *Inmet*, there was no material adverse change out clause tailored by Weisel. Another case relied on by Weisel, *Mull v. Dynacare Inc.*, (1998), 44 B.L.R. (2d) 211 makes clear that whether the defendant purchaser could refuse to close because of changes to the business being acquired was to be determined on the wording of the agreement. See Sanderson J. at paras. 113 to 125.

[111]     In this case, where there was no material adverse change out clause negotiated by the parties, other than a reference in the engagement letter to the parties negotiating in good faith an underwriting agreement that was to contain a standard material change out clause, I accept the

---

[6] Schedule A to the engagement letter is an "indicative term sheet", which contains in summary form the terms of the offer. It refers to "broad" rather than "standard" out clauses. No evidence was given why there was this difference between the engagement letter and Schedule A. One can perhaps infer that it was overlooked when the change was made to paragraph 3 of the engagement letter. However, the indicative term sheet was a document intended to be given by Weisel to any underwriter who joined the syndicate, and presumably would have been the

Page: 30

opinion of Mr. Halperin that a Reasonable Market Actor would be guided by the provisions that he referred to in thinking that a material adverse change out clause would restrict changes to those that materially affected Stetson rather than just affecting businesses in the industry generally.

[112]    There is another reason why Mr. Halperin considered this to be so, and it has to do with the difference between a market out clause and a material adverse change out clause.

[113]    A market out clause allows an underwriter to refuse to close if the securities to be acquired by the underwriter cannot be marketed profitably. A typical clause is contained in the IIAC Handbook as follows:

> If, after the date hereof and prior to the Time of Closing, the state of financial markets in Canada or elsewhere where it is planned to market the Securities is such that, in the reasonable opinion of the Underwriters (or any of them), the Securities cannot be marketed profitably, any Underwriter shall be entitled, at its option, to terminate its obligations under this agreement by notice to that effect given to the Company at or prior to the Time of Closing.

[114]    All witnesses agreed that a bought deal cannot contain a market out clause. This is because a principal element of a bought deal is that the market risk is transferred to the underwriter on the execution of the agreement. Whether the underwriter will be able to sell the securities for more than it paid to the issuer is entirely the risk of the underwriter. For that reason a market out clause is never contained in a bought deal agreement, and is inconsistent with a bought deal.

[115]    Mr. Halperin's opinion, which I accept, is that Reasonable Market Actors would understand that, on balance, in the context of a "bought deal" arrangement where there is axiomatically no "market out" in favour of the underwriter, the MAC out clause should not be construed so as to effectively provide the underwriters with a "market out" by another name. Stetson contends that that is what Weisel is effectively doing in this case by arguing that because it could not sell its Stetson position profitably, it should be relieved of its obligation to purchase

subject of negotiations between Weisel and the particular underwriter. It was not argued that the out clauses so far as Stetson and Weisel are concerned should have been "broad" out clauses.

2013 ONSC 1300 (CanLII)

2013 ONSC 1300 (CanLII)

the Stetson shares (or subscription receipts). I agree with Stetson on this point. What Weisel says would fall within a MAC out clause would also fall within a market out clause.

[116]    This notion that a MAC out clause should not be construed so as to effectively provide an underwriter with a market out clause is particularly important in this case in which no specific MAC out clause was negotiated. I would not construe the language of a "standard material adverse change out clause" contained in the engagement letter as to be negotiated by the parties as permitting a market out clause by another name. No reasonable market actor would think otherwise.

[117]    Finally, even if the form of MAC out clause contended by Weisel should govern, I do not think that it would be of assistance to Weisel. That is because any change would have to be material, and in my view the evidence on this point is against Weisel.

[118]    First, Weisel knew that the price of oil was very volatile, that it had a high beta. It could not possibly think that when it reached an all-time high that it would stay there. The oil prices during the second half of July, 2008 continued to be above the assumed pricing used by Weisel in its analysis of the share price of Stetson as well as other companies such as Kodiak, and no witness testified that at the time it was thought that the oil pricing would drop below those levels.

[119]    Second, Weisel did not believe that the oil pricing had materially affected the value of Stetson. On July 21, 2008 Mr. Pocrnic, the managing director and head of syndication and equity capital markets in Toronto, said in an internal engagement letter-mail that based on the Stetson land package and a comparison to the Kodiak Bakken lands "we come to a valuation of approximately $1.50 per share (with $.31 in cash)." When this is compared to the 55 cents per share that Weisel agreed to pay Stetson, it hardly can be said that if there were an adverse change by reason of the oil price movements, it was material to the risk that Weisel had taken on, or that it would be reasonable to conclude that the change would expect to have a significant adverse effect on the market price or value of the Stetson shares.

[120]    It is significant, in my view, that there is no evidence that the reasons given to Weisel by prospective purchasers of the Stetson position for not wanting to purchase Stetson

2013 ONSC 1300 (CanLII)

shares was any concern for oil pricing. Mr. Pocrnic prepared an account tracking document that listed the feedback Weisel sales personnel had received from various accounts concerning the Stetson offering. A significant majority of the feedback from those accounts that had passed on the Stetson offering reported "too small", and Mr. Pocrnic confirmed that this feedback referred to Stetson's market capitalization size or size of the deal.   None of the feedback listed in the account tracking maintained by Mr. Pocrnic, and distributed by e-mail on July 23, disclosed any account that expressed concern about the current price of oil.

[121]        Mr. Levy in his report referred to the WTI spot price of oil on July 11, 2008 of $144.96 and on August 15, 2008 of $113.46, a drop of 21.73%. He then referred to five corporations in the energy sector and compared their share prices on July 11, 2008 and August 15, 2008, which had a drop in trading of between 7.56 % and 58.62%. He then stated that it was his opinion that:

> (i)   If Weisel determined as a result of its ongoing review of the Bakken project, that the potential profitability had been materially reduced as a result of the oil price decline, they could consider termination by use of the due diligence out clause and/or the material change out clause.

> (ii)  If Weisel's analysis determined as a result of this initial oil price decline that the exploration relating to the Bakken leases was no longer viable, then the material change out clause and/or the disaster out clause could be considered.

[122]        I have considerable concerns with Mr. Levy's opinions. It was unclear whether Mr. Levy had any or much relevant experience in bought deals, or what that experience was. He acknowledged that he is not an expert in the oil and gas industry. He is now a consultant but when in business was involved in areas of management, compliance and supervision.

[123]        Of considerable concern are the five corporations he chose for his comparison to oil price declines. It is clear that he knew very little of these corporations and he admitted he did no analysis to determine if the companies were comparable to Stetson. On cross-examination he said he did not say they were true comparables. He acknowledged that many factors affect share prices and that he did not look at the individual companies to consider what other factors might

2013 ONSC 1300 (CanLII)

have affected their share prices. His use of the date of August 15, 2008 was not explained other than a reference in his report to negotiations going on between Stetson and Weisel at the time. It was July 31, 2008 that was the date for closing and it was three days earlier on July 28, 2008 that Weisel announced through its lawyers that it was not going to close.

[124]     Mr. Levy acknowledged that the failure of a bought deal would be viewed as a negative for the Stetson share price. The expectation was that the Stetson position would be closed on the day it went live on July 14, 2008. As time passed and the position had not sold, Mr. Bharti's evidence, which I accept was that the failure was viewed as a negative for Stetson. The Stetson shares closed at 60 cents on Friday, July 11, 2008 when Weisel made its offer at 55 cents, and on July 14, 2008, the date that the deal went live. By July 28, 2008 when Weisel announced it was not going to close on July 31, 2008, the closing price of the Stetson shares had drifted down to 44 cents at the close on light volume. It is possible that the slide was because of the bought deal going awry. It may have been because of falling oil prices, although if that were the case it would mean the market was not valuing the exploration play on a longer term basis, or any other factor that causes share prices to go up or down. Two days later the shares closed on July 30, 2008 at fifty cents.

[125]     Mr. Levy in my view had no basis to state, as he did, that the price decline in oil from July 11 to August 15, 2008 "had immediate and significant impact on the trading prices of energy related securities, especially junior issuer's securities, many of which suffered material declines in prices." He was not qualified to express such an opinion and his analysis (or lack of analysis) did not support it. Nor did he have a basis to state that Weisel could rely on a market adverse change out clause or a disaster out clause. He did say, which I have previously discussed, that in order for Weisel to rely on such clauses, it would have had to consider the issues referred to in those clauses, which Weisel did not do.

[126]     Mr. Halperin's opinion was that Reasonable Market Actors would not have an expectation that a bought deal underwriter would be entitled to terminate its commitment by invoking standard disaster out or MAC out provisions solely on the basis of a decline in the price of oil which neither results in or leads to a serious deterioration in financial markets generally,

Page: 34

nor affects the issuer in question in a manner disproportionate to its effect upon other entities in the issuer's industry sector. I accept that opinion. I am not prepared to find on the evidence that any decline in oil prices at the relevant times led to a serious deterioration in financial markets generally, nor affected Stetson in a manner disproportionate to its effect upon other entities in Stetson's sector. Weisel has not established those things.

[127]       In all the circumstances, I find that Weisel may not rely on a material adverse change out clause to contend that it was entitled to terminate its obligations under the engagement letter.

### (ii)   Disaster out clause

[128]       Weisel relies on a form of disaster out clause contained in the IIAC Handbook:

> The obligations of the Underwriter to purchase the Securities under this agreement may be terminated by the Underwriter at its option by written notice to that effect to the Company at any time prior to the Closing if there should develop, occur or come into effect or existence any event, action state, condition or major financial occurrence of national or international consequence or any law or regulation which in the opinion of the Underwriter seriously adversely affects, or involves, or will seriously affect, or involve, the financial markets or the business, operations or affairs of the Company and its subsidiaries taken as a whole.

[129]       Weisel asserts that the 27% drop in oil price from July 14, 2008 to September 5, 2008 and the 62% drop in the value of Stetson's common shares in the same time period entitled Weisel to terminate any obligations it had under the engagement letter pursuant to the disaster-out clause.

[130]       Even assuming that Weisel formed the necessary opinion and acted pursuant to a disaster out clause, which I have held it did not, I cannot accept the argument that it had grounds to act under such a clause.

[131]       The relevant date is not September 5, 2008, but July 28 or the latest July 31, 2008. The drop in oil from July 14 to July 31, 2008 was from $145.16 to $124.17, or approximately

2013 ONSC 1300 (CanLII)

14.5% and the price of the shares of Stetson during that period declined from 60 cents to 50 cents, or 16.67%.

[132]     On what basis can one conclude that the drop in the price of oil of 14.5% was a major financial occurrence of national or international consequence that seriously adversely affected or involved the financial markets or the business, operations or affairs of Stetson? There was no evidence to support such an assertion. With oil having a high beta, or volatility, one would expect prices to go up or down and even Mr. Wylie said he would want to look at a longer period of over one or two months to see a trend line. I have already disregarded the assertion of Mr. Levy that the price decline in oil from July 11 to August 15, 2008 had immediate and significant impact on the trading prices of energy related securities, especially junior issuer's securities.

[133]     Mr. Halperin's opinion is that a disaster out clause in the underwriting context is generally understood by Reasonable Market Actors to be somewhat analogous to a *force majeure* provision in other contractual contexts.  The clause contemplates termination of an underwriting obligation, and Reasonable Market Actors would expect that it could only be invoked, in the event of a catastrophic "macro" event, circumstance or change in law of national or international general application which is not specific to a particular issuer or (except in the most extraordinary circumstances) industry.  That opinion is consistent with the IIAC form of disaster out clause and I accept it.

[134]     Mr. Halperin further opined that most significantly, in the context of a "bought deal" arrangement which is typified by the absence of a "market out" provision, Reasonable Market Actors would have an expectation that a disaster out clause would not be used by, or interpreted as being available to, underwriters to terminate commitments, in the absence of a "disaster" properly so called, on the basis solely of facts and circumstances that affect the state of the financial markets such that the underwriters have determined that the underwritten securities, in the language of standard "market out" provisions, cannot be marketed profitably.  I accept that opinion as well.

2013 ONSC 1300 (CanLII)

[135]        Without discussing any of the specifics of the disaster out clause contained in the IIAC Handbook, Mr. Levy asserted:

> If however, Weisel's analysis determined as a result of this initial oil price decline that the exploration relating to the Bakken leases was no longer viable, then in our opinion, as to CSI practice that termination under the due diligence out clause, the material change out clause and/or the disaster out clause could be considered.

[136]        Weisel made no analysis or determination that the exploration relating to Stetson's Bakken leases was no longer viable. But even had it done so, Mr. Levy has not explained how the oil price decline reached the level required by the disaster out clause. I do not accept his opinion that the disaster out clause could be considered.

[137]        In all the circumstances, I find that Weisel may not rely on a disaster out clause to contend that it was entitled to terminate its obligations under the engagement letter.

**Indemnity agreement**

[138]        Section 5 of the engagement letter provided, in part:

> **5.  <u>Indemnification</u>**
>
> The Company agrees to indemnity the Underwriters in accordance with Schedule B attached hereto, which Schedule forms part of this agreement and the consideration of which is the entering into this agreement. …The Underwriting Agreement shall contain more comprehensive indemnity provisions consistent with Schedule B. …

[139]        What those more comprehensive indemnity provisions would have been in the underwriting agreement is unknown as there was no underwriting agreement.

[140]        Schedule B contained an indemnity provision, portions of which are as follows:

> In connection with the engagement (the "Engagement") of Thomas Weisel Partners Canada Inc. ("Thomas Weisel") pursuant to an engagement letter (the "Engagement Letter") between Thomas Weisel and Stetson Oil & gas Ltd. (the "Company") dated July 11, 2008, the Company agrees to indemnify and hold harmless Thomas Weisel and other members of the syndicate formed in connection with the Engagement, and any of their respective affiliates (herein

referred to collectively as the "Underwriters") and the Underwriters' respective directors, officers, employees, partners, each other person, if any, controlling any of the Underwriters or any of their respective subsidiaries and each shareholder of the Underwriters (collectively, the "Indemnified Parties" and individually, an Indemnified party"), from and against any and all losses (other than lost profits), claims (including shareholder actions, derivative or otherwise), actions, suits, proceedings, damages, liabilities or expenses of whatever nature or kind, joint or several, including the aggregate amount paid in reasonable settlement of any actions, suits, proceedings, investigation or claims and the reasonable fees, expenses and taxes of their counsel that may be incurred for advising with respect to and/or defending any action, suit, proceedings, investigation or claim that may be made or threatened against any Indemnified Party or in enforcing this indemnity (collectively the "Claims") to which any Indemnified Party may become subject or otherwise involved in any capacity insofar as the Claims relate to, are caused by, result from, arise out of or are based upon, directly or indirectly, the Engagement whether performed before or after the Company's execution of the Engagement Letter and to reimburse each Indemnified Party forthwith, upon demand, for any legal or other expenses reasonably incurred by such Indemnified Party in connection with any Claim. <u>The Company agrees that in no event will any Indemnified Party be liable or obligated in any manner for any damages (including, without limitation, actual, consequential, exemplary or punitive damages or lost profits) in excess of fees actually received by Thomas Weisel pursuant to Section 4 of this Engagement Letter (captioned "Fees"), and the Company agrees not to seek or claim any such damages or profits in any circumstance.</u> (Underlining added)

[141]        Weisel contends that the underlined words prevent Stetson from suing Weisel for more than the fees actually received by Weisel, which in this case were nothing as Weisel did not close the transaction. Thus, if it is the case that Weisel breached the engagement letter by failing to close, Weisel reads the indemnity provision to prevent Stetson from suing Weisel for breach of contract.

[142]        The issue therefore is to interpret this contractual provision. The principles of contract interpretation are well known and were recently summarized by Winkler C.J.O. in *Salah v. Timothy's Coffees of the World Inc.* (2010), 74 B.L.R. (4th) 161 at para. 16 as follows:

2013 ONSC 1300 (CanLII)

16.     The basic principles of commercial contractual interpretation may be summarized as follows. When interpreting a contract, the court aims to determine the intentions of the parties in accordance with the language used in the written document and presumes that the parties have intended what they have said. The court construes the contract as a whole, in a manner that gives meaning to all of its terms, and avoids an interpretation that would render one or more of its terms ineffective. In interpreting the contract, the court must have regard to the objective evidence of the "factual matrix" or context underlying the negotiation of the contract, but not the subjective evidence of the intention of the parties. The court should interpret the contract so as to accord with sound commercial principles and good business sense, and avoid commercial absurdity. If the court finds that the contract is ambiguous, it may then resort to extrinsic evidence to clear up the ambiguity. Where a transaction involves the execution of several documents that form parts of a larger composite whole -- like a complex commercial transaction -- and each agreement is entered into on the faith of the others being executed, then assistance in the interpretation of one agreement may be drawn from the related agreements.

[143]     I do not read Schedule B as being the only relevant provision. Paragraph 5 of the engagement letter is also part of the agreement, and it provides that Stetson agrees to indemnify the underwriters in accordance with Schedule B. One cannot read paragraph 5 in any way other than that what was intended by the parties was an indemnity.

[144]     The language of Schedule B is hardly a model of draftsmanship. The portions relied on by Weisel are not all of its contents. Its form is contained in Weisel's Deal Book and was apparently drafted by its outside counsel (not Mr. Groia's firm). The language is prolix, difficult to follow and unclear.

[145]     The language of Schedule B provides that the indemnified parties include Weisel, any other underwriter who becomes a member of the syndicate and the directors, employees, partners, etc. of Weisel or other syndicate underwriters. It contains many clauses typical of indemnities, including requirements to notify Stetson of a claim made against an indemnified party and the right of Stetson to approve any settlement of a claim. Down to the underlined portion of the quoted part of Schedule B relied on by Weisel, it is relatively clear that the indemnity refers to losses etc. caused to an indemnified party by some third party other than the indemnified party. That is the nature of an indemnity.

[146]     For ease of reference, the last sentence of the quoted part of Schedule B states:

Page: 39

> The Company agrees that in no event will any Indemnified Party be liable or obligated in any manner for any damages (including, without limitation, actual, consequential, exemplary or punitive damages or lost profits) in excess of fees actually received by Thomas Weisel pursuant to Section 4 of this Engagement Letter (captioned "Fees"), and the Company agrees not to seek or claim any such damages or profits in any circumstance.

[147]    By agreeing that an indemnified party will not be liable or obligated for any damages in excess of fees received by Weisel, the Company, being Stetson, could not literally restrict what a third party could successfully claim against an indemnified party, and that could not have been the purpose of that provision. Stetson argues, and I tend to agree, that in the context of an indemnity given to an indemnified party, the provision means (i) that Stetson must pay to the indemnified party any liability of the indemnified party to a third party in excess of the fees actually received by Weisel and (ii) Stetson may not sue or claim against any such third party any amount in excess of those fees. Thus if Weisel were the indemnified party in any situation, the issuer, in this case Stetson, would have to indemnify Weisel against any liability it had to a third party in excess of the fees received by Weisel and Stetson could not sue the third party for anything in excess of those fees.

[148]    The reference in the provision limiting liability to the amount of fees actually received by Weisel pursuant to the engagement letter suggests that the provision is intended to apply only if the engagement letter has been closed. Weisel could not have actually received any fees if the engagement letter did not close. Mr. Groia in argument said that if Weisel were found to be in breach of agreement, it would not object to a judgment against it in the amount of the fees that it would have received had the agreement closed. However, that would be providing a result not in accordance with the language of the agreement. The concession, however, was a reflection I believe of the difficulty in arguing that Schedule B means that a breach of agreement by Weisel results in no damages payable to Stetson.

[149]    There is another provision in Schedule B that lends support to the interpretation of the provision as not applying to a claim by Stetson against Weisel for failure to close the engagement letter. Schedule B contains the following:

2013 ONSC 1300 (CanLII)

> The foregoing indemnity shall not apply to the extent that a court of competent jurisdiction in a final judgment that has become non-appealable shall determine that such losses, expenses, claims, actions, damages or liabilities to which the Indemnified Party may be subject were caused by the negligence or wilful misconduct of the Indemnified Party.

[150]     This provision clearly would mean that if Weisel is the indemnified party, it may not be indemnified for something caused by its negligence or wilful misconduct. Wilful means intentional as opposed to accidental. Misconduct is defined in the Concise Oxford English Dictionary as "unacceptable or improper behaviour". The American Heritage Dictionary includes in its definition of misconduct "Behaviour not conforming to prevailing standards or laws; impropriety". Businessdictionary.com defines wilful misconduct as "Conscious or intentional disregard of the rights or the safety of others; misconduct in which an individual is doing what he or she intends to do".

[151]     It is hard to think that wilful misconduct could not include intentional breach of contract. Breach of contract is certainly unacceptable and improper in the eyes of the law and it disregards the rights of the other party to the contract. The sense of the provision that the indemnity does not cover damages caused by Weisel's negligence or wilful conduct is clear. If Weisel was involved in such conduct as found by a court, it is not entitled to be indemnified. In this case, Weisel has been involved in intentional breach of contract by not closing the engagement letter on July 31, 2008 and thus the provision relied on by Weisel, even if it did otherwise prevent Stetson from suing Weisel, could not apply.

[152]     Mr. Groia argued that the provision dealing with wilful misconduct does not apply to the provision Weisel relies on regarding damages in excess of the fees actually received by Weisel. This is because, he says, the provision dealing with wilful misconduct begins by stating that the foregoing "indemnity" shall not apply if there is wilful misconduct, whereas the provision regarding damages in excess of fees is not an indemnity. The reason why this latter provision is not an indemnity, he says, is because it refers to "damages", which is to be distinguished from a Claim that is the subject of the indemnification in the lengthy paragraph that precedes the sentence Weisel relies on.

[153]        This interpretation appears to me to be a completely strained and artificial interpretation, one that might be made by wordsmiths but which lacks any commercial or common sense. Technically it ignores the definition of "Claim" in the indemnity that includes the word "damages". The sentence relied on by Weisel begins with the words "The Company agrees that in no event will any Indemnified Party be liable or obligated in any manner for any "damages"…in excess of fees actually received…". This is a reference obviously to a claim for damages and it is part of the indemnity provisions contained in the paragraph.   The provision regarding wilful misconduct begins with the words "The foregoing indemnity shall not apply…". There is no basis to say that "the foregoing indemnity" was anything but the indemnity provision contained earlier in Schedule B, including the sentence dealing with no liability or obligation in excess of fees received by Weisel.

[154]        There is another reason why the clause should not prevent Stetson from suing Weisel in this case. One of the principles of contract interpretation as summarized by Winkler C.J.O. in *Salah v. Timothy's Coffees of the World Inc., supra,* is that a court should interpret a contract so as to accord with sound commercial principles and good business sense, and avoid commercial absurdity. It would be a commercial absurdity to conclude that the parties intended that Weisel would have a free pass to break the contract by not closing it without any liability. That would make no commercial sense, and any such result would have to be expressly and explicitly stated in the agreement. In my view, the language of the paragraph 5 of the engagement letter and Schedule B is not so explicit.

[155]        Finally, Stetson points out that the arbitration provision dealing with disputes between Stetson and Weisel provides that the arbitrator will have no power to award consequential (including lost profits), punitive or exemplary damages. Stetson contends that the arbitration provision is the only provision dealing directly with claims between the parties, that it is an indication that the parties directed their minds to what damages the arbitrator could not award, and that there is no limitation of damages against Weisel to its fees received.[7] Weisel

---

[7] This argument was made by correspondence following the conclusion of oral argument. Weisel contends that it was improper for Stetson to make the argument in this manner without giving counsel for Weisel advance notice. It may have been preferable for Mr. Burden to have given advance notice to Mr. Groia, but I fail to see what difference

2013 ONSC 1300 (CanLII)

contends that the arbitration clause is not the only provision in the agreement dealing with claims between the parties and there is nothing in the arbitration provision that affects, limits or supersedes the indemnity agreement in Schedule B.

[156]      I think there is force to this argument of Stetson. The parties directed their mind in the arbitration clause to the kinds of damages that could not be awarded. There was no limitation of the damages that could be awarded against Weisel to only the fees received by Weisel. I recognize that it is a general arbitration clause, and if the provision in Schedule B clearly and explicitly provided that Weisel could not be sued by Stetson for its breach of contract when it had not received any fees, that might survive in spite of the language of the arbitration provision. However in my view it does not so explicitly provide.

[157]      Weisel led evidence from some if its witnesses as to what protection was sought by the indemnity agreement. In my view, this evidence does not affect the issue. While there may have been some ambiguity in the language of Schedule B, any such ambiguity could be resolved without the need to consider extrinsic evidence. In any event, evidence of Weisel's intentions regarding an indemnity would be inadmissible. See Geoff R. Hall, *Canadian Contractual Interpretation,* 2d ed. (LexisNexus) at 2.4.3.

[158]      In the result, any damages suffered by Stetson are not to be reduced to nil by reason of Weisel not actually receiving any fees.

**Damages**

[159]      Stetson claims damages based on the difference between the 55 cents per share that Weisel agreed to pay and the 20 cents per share that Canaccord paid, after taking into account the extra shares that Stetson had to sell to Canaccord, plus expenses incurred in obtaining the interim loans pending the Canaccord underwriting.

---

that would have made. It would have been counter-productive to have an oral hearing on this point, and Mr. Groia does not suggest he wanted an oral hearing. He made his reply argument by letter. Mr. Groia also contended that by his letter, Mr. Burden was attempting to file new evidence about the arbitration provision. I do not understand that. It is not a matter of evidence but an argument about the proper interpretation of the agreement, which in this case is a legal rather than an evidentiary matter.

Page: 43

[160]        Losses recoverable for breach of contract are limited to those that will put the injured party in the same position as he or she would have been in had the wrongdoer performed the contract. See *Baud Corp., N.V. v. Brook*, [1979] 1 S.C.R. 633 at para. 18. What are the damages that a seller of an asset may be entitled to on a breach by the purchaser to complete the purchase? The authorities make clear that the seller is entitled to the difference between the contract price and the market price subject to the obligation of the seller to take reasonable steps to mitigate the loss by selling on the market. See S.M. Waddams, *The Law of Damages*, Looseleaf, (Canada Law Book, November 2012) at para. 13.110. See also *Jamal v. Moola Dawood, Sons & Co.*, [1916] 175 (P.C.)

[161]        Normally the seller has an obligation to mitigate damages by selling on the date of the breach for the best price possible. But that is not always the case if the shares could not be sold on that date. In *Leitch Transport Ltd. v. Neonex International Ltd.,* [1979] O.J. No. 1093 (C.A.) the defendant Neonex failed to purchase a large block of shares of Maple Leaf Mills Limited, a public company trading on the Toronto Stock Exchange. It was not realistic to sell the shares on the stock exchange on the date of the breach, but rather the block had to be sold to an investment dealer who would make a secondary offer. It was held that the law permits a realistic approach to valuation and does not insist upon an arbitrary sale on the date of the breach. The Court stated:

> Under a contract for the sale of shares in a company upon a breach by the purchaser, the measure of damages is the difference between the contract price and the market price at the date of the breach; the seller has, however, an obligation to mitigate damages by selling the shares for the best price obtainable on that date: *Jamal v. Moolla Dawood & Sons & Co.* [1916] A.C. 175. Since Maple Leaf was a public company whose shares traded on the TSE, the market price would ordinarily be the price at which the shares were trading on the Exchange on the date of the breach. Here, however, because of the limited market for the shares and the large quantity that was being sold under the contract, it was not possible to sell the shares on the Exchange. In these circumstances, the law permits a realistic approach to the valuation of shares and does not insist upon an arbitrary sale on the date of the breach: *Hooper v. Herts,* [1906] 1 Ch. 549. We agree with the trial judge that the only realistic way to have disposed of the directly held shares was to sell them to a broker or investment dealer who would have made a secondary offering of them, and that the amount which could have been obtained by such a sale constituted the market price in this case.

2013 ONSC 1300 (CanLII)

Page: 44

[162]         See also *Treaty Group Inc. v. Drake International Inc.* (2007), 86 O.R. (3d) (C.A.) and *Johnson v. Agnew*, [1980] A.C. 367. In the latter case, in a passage adopted in *Semelhago v. Paramadevan*, [1996] 2 S.C.R. 415, Lord Wilberforce  stated:

> (2)   The general principle for the assessment of damages is compensatory, i.e., that the innocent party is to be placed, so far as money can do so, in the same position as if the contract had been performed. Where the contract is one of sale, this principle normally leads to assessment of damages as at the date of the breach -- a principle recognised and embodied in section 51 of the Sale of Goods Act 1893. But this is not an absolute rule: if to follow it would give rise to injustice, the court has power to fix such other date as may be appropriate in the circumstances.

[163]         Weisel contends that the shares of Stetson traded at fifty cents on or about July 31, 2008, five cents less than what Weisel had agreed to pay, and therefore if damages for breach of contract are to be awarded, the damages should be limited to five cents per share on the 45,454,600 shares that Weisel agreed to purchase, for damages of $2,272,730.

[164]         Apart from the fact that the shares of Stetson traded on July 31, 2008 at a closing price of 45 cents, which on the argument of Weisel would double the damages to approximately $4.5 million, this argument is completely unrealistic. Stetson was a company with a very small market cap. The volume of shares of Stetson that traded that day was 56,000. No one suggests that Stetson could have issued 45,454,600 shares and sold them that day on the TSX. To suggest that such a large block of stock had a market value that day equal to what a minute fraction of those shares traded for defies common sense and no evidence was led to support this value for such a large block of stock.

[165]         Stetson had to consider how to proceed to raise the money it was supposed to have received from Weisel, including obtaining advice from Canaccord and Macquarie, and negotiating with other companies such as Crescent Point and Tristar.  Stetson had been damaged by the failure of the bought deal to close and did not have a lot of leverage. After canvassing the market it was able to conclude an underwriting on a best efforts basis with Canaccord, which was uncertain as to what could be done but was doing Stetson and Mr. Bharti a favour.

2013 ONSC 1300 (CanLII)

Page: 45

[166]        The steps taken by Stetson to mitigate their damages by entering into the agreement with Canaccord were reasonable. Taking into account the principles discussed in *Leitch Transport Ltd. v. Neonex International Ltd.* and *Johnson v. Agnew,* the appropriate measure of damages in my view is the amount per share that Stetson would have received from Weisel had the engagement letter closed on July 31, 2008 less the amount per share received by Stetson from the Canaccord transaction.

[167]        Mr. Groia contended at the end of the trial that the Bakken project for Stetson had no prospect of success as after only one well was drilled, Red Willow decided not to proceed further. He contends therefore that had Weisel provided funding under the engagement letter, Stetson would have ended up with nothing, and thus will gain a windfall if successful in this action. This issue has already been the subject of a ruling I made after the first week of trial refusing leave to the defendant to amend its pleading. Evidence regarding the feasibility of the project was not led as a result, and during argument Mr. Groia conceded that as no expert evidence was called, I was in no position to be making a finding that the property had no prospect of success.

[168]        In any event, the authorities make clear, as discussed, that the damages for failure to purchase shares is the difference between the purchase price and the value of the shares at the time of the breach, subject to an obligation to mitigate and to a discretion as to the appropriate date. What the plaintiff would have done with its money had it been received under the contract, or what it did with the replacement money, is not relevant.

[169]        In principle as well, I do not think the argument of Weisel is correct. Suppose instead of issuing equity shares, Stetson had agreed to borrow the necessary funds from a lender at say 5% interest but after the lender reneged, Stetson was only able to borrow the money at 10% interest. Suppose Stetson then took all of the borrowed money and drilled nothing but empty wells and ended up with nothing. Stetson still would have suffered damages to the tune of the extra 5% in interest payments it had to pay for the loan. In this case, Stetson had to issue shares at 20 cents instead of 55 cents. It received less for its shares than it would have had Weisel not breached its contract. It has suffered those damages.

Page: 46

[170]        At the opening of trial Weisel contended that it was not Stetson that would  suffer any damages but rather the holders of the preferred shares issued at the time of the Canaccord financing on the advice of Canaccord as a sweetener to entice the market to accept the Stetson shares sold by Canaccord. These holders will be entitled to the proceeds of any final judgment or settlement money paid to Stetson for this action. This argument was not pursued at the conclusion of the case. In any event, there is nothing to it. What Stetson does with its money is its business. Whether it pays the money from the judgment to its bankers, its common shareholders or its preferred shareholders is irrelevant.

[171]        Stetson acknowledges that there are two possible ways that its damages can be calculated. The first is based on the difference between the 55 cents that Weisel was to pay to purchase the Stetson shares and the 20 cents that Canaccord agreed to pay, which is 35 cents, multiplied by the 45,454,600 shares provided for in the bought deal.  This results in an award of $15,909,110.  Stetson contends that damages should be calculated on a per share, rather than an aggregate basis so that Weisel does not obtain the benefit of the fact that Stetson was required to sell 14,545,400 more shares for lower proceeds under the Canaccord transaction.  Stetson had to sell these additional shares and is entitled to consideration for that fact.

[172]        The second method is to calculate damages on an aggregate basis, which would simply involve taking the difference between the $25,000,030 contract price that Weisel was to pay Stetson under the engagement letter and the $12 million Stetson received from the Canaccord transaction,  which results in an award of $13,000,030.

[173]        I agree with Stetson that the first method is the appropriate method as it reflects the fact that it had to sell far more shares to Canaccord than it would have to Weisel. It is not in a company's interest to issue more shares than necessary to obtain equity financing. Weisel did not argue otherwise and, as discussed, contended that the damages, if to be awarded, should be on the same basis as the first method chosen by Stetson, albeit by using five cents a share rather than 35 cents.

[174]        Stetson is also entitled to the expenses it had to incur in borrowing money on an interim basis that it needed to comply with its lease obligations, which borrowing would not have

2013 ONSC 1300 (CanLII)

Page: 47

been required had Weisel not breached the engagement letter. The interim loans were repaid from the money received from Canaccord. These expenses were incurred by Stetson to mitigate its loss and totaled $133,559.

[175]        Stetson is therefore entitled to judgment for $15,909,110 and $133,559, totalling $16,042,669.

[176]        Stetson is entitled to interest. No argument was made as to what basis interest should be awarded. If interest cannot be agreed, Stetson may make written submissions within 10 days and Weisel will have a further 10 days to make submissions.

[177]        Stetson is entitled to its costs. If these cannot be agreed, Stetson may make written submissions within 10 days, including a cost outline in accordance with the rules, and Weisel will have a further 10 days to make submissions.

_____

Newbould J.

**Released:**    March 1, 2013

2013 ONSC 1300 (CanLII)

**CITATION:** Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc., 2013 ONSC 1300
**COURT FILE NO.:** CV-08-7809-00CL
**DATE:** 20130301

# ONTARIO

## SUPERIOR COURT OF JUSTICE

## COMMERCIAL LIST

**B E T W E E N:**

STETSON OIL & GAS LTD.

Plaintiff

**- and -**

STIFEL NICOLAUS CANADA INC.

Defendant

---

REASONS FOR JUDGMENT

---

Newbould_J.

Released:      March 1, 2013

2013 ONSC 1300 (CanLII)

# TAB 83

110 F.2d 468
Circuit Court of Appeals, Second Circuit.

SYRACUSE ENGINEERING CO., Inc., et al.

v.

HAIGHT.

No. 230.    |    March 4, 1940.

Appeal from the District Court of the United States for the Northern District of New York.

Bankruptcy proceedings by Syracuse Engineering Company, Inc., and others, as petitioning creditors, against Julian S. Brown, wherein First Trust & Deposit Company and Claire D. Lawton, executrix, intervened as additional petitioning creditors, and George M. Haight, receiver of Sale Springs National Bank of Syracuse, a creditor, opposed the petition. From an order adjudging defendant Brown a bankrupt, Haight, receiver, appeals.

Affirmed.

West Headnotes (11)

[1]    **Bankruptcy**

 Intervention Curing Deficiency

Whether two or three original petitioners in involuntary bankruptcy proceedings had valid claims was academic where two additional creditors with valid claims had been allowed to intervene and join in the petition. Bankr.Act § 59, sub. b, 11 U.S.C.A. § 95, sub. b.

3 Cases that cite this headnote

[2]    **Bankruptcy**

 Intervention Curing Deficiency

Creditors who intervene before adjudication may be counted in determining whether the necessary three petitioning creditors exist. Bankr.Act § 59, sub. f, 11 U.S.C.A. § 95, sub. f.

2 Cases that cite this headnote

[3]    **Bankruptcy**

 Intervention

**Bankruptcy**

 Discretion

Intervention to join in an involuntary petition in bankruptcy is a matter of right, but even if granting of leave is discretionary, district court's ruling will not be reversed except for clear cause shown. Bankr.Act, § 59, sub. f, 11 U.S.C.A. § 95, sub. f.

Cases that cite this headnote

[4]    **Bankruptcy**

 Intervention

Permitting two creditors with valid claims to intervene to join in involuntary petition in bankruptcy was not an abuse of discretion. Bankr.Act § 59, sub. f, 11 U.S.C.A. § 95, sub. f.

2 Cases that cite this headnote

[5]    **Bankruptcy**

 Evidence and Fact Questions

Where alleged involuntary bankrupt consented to examination, burden of proving insolvency rested on petitioning creditors.

2 Cases that cite this headnote

[6]    **Bankruptcy**

 Findings of Fact

In involuntary bankruptcy proceedings, findings of bankruptcy court as to assets and liabilities of alleged bankrupt would not be reversed where they were not clearly erroneous and the evidence was sharply conflicting. Rules of Civil Procedure for District Courts, rule 52(a), 28 U.S.C.A. following section 723c.

2 Cases that cite this headnote

[7]    **Bankruptcy**

 Insolvency;  Current Payment of Debts

As respects insolvency, where alleged involuntary bankrupt 49 years of age was

beneficiary of spendthrift trust created for benefit of himself and brother with right to one-half of income until he reached 60, when he was to be paid one-half of principal, alleged bankrupt's interest in both income and principal must be considered in determining value of his property.

Cases that cite this headnote

[8]    **Bankruptcy**
       👉 Evidence and Fact Questions

In involuntary bankruptcy proceedings, finding that interest of alleged bankrupt, 49 years of age, in one-half of principal of $1,000,000 trust fund payable upon his reaching 60 years of age was worth no more than $50,000, in view of beneficiary's refusal to consent to insurance, was sustained by the evidence.

Cases that cite this headnote

[9]    **Bankruptcy**
       👉 Insolvency; Current Payment of Debts

As respects insolvency, where beneficiary of trust fund was to receive principal upon reaching 60 years of age, value of his interest in principal could not rest on assumption that insurance was obtainable where beneficiary expressly refused to assent to taking out of insurance.

Cases that cite this headnote

[10]   **Bankruptcy**
       👉 Insolvency; Current Payment of Debts

Under the "balance sheet tests" "insolvency" results when the aggregate of a debtor's property is not sufficient at a fair valuation to pay his debts, which means a fair market price that can be made available for payment of debts within a reasonable period of time, and "fair market value" implies not only a willing buyer, but a willing seller. Bankr.Act § 1(15) now (19), 11 U.S.C.A. § 1(15) now (19).

33 Cases that cite this headnote

[11]   **Bankruptcy**
       👉 Insolvency; Current Payment of Debts

In determining whether alleged involuntary bankrupt 49 years of age was insolvent, his interest in income of spendthrift trust paying about $22,000 a year was without substantial present value in view of concession that beneficiary's minimum living expenses amounted to $7,000 yearly and beneficiary's refusal to assent to insurance. Personal Property Law N.Y. § 15(1); Real Property Law N.Y. §§ 98, 103; Civil Practice Act N.Y. § 684; Bankr.Act § 1(15) now (19), 11 U.S.C.A. § 1(15) now (19).

Cases that cite this headnote

**Attorneys and Law Firms**

*469  Stewart F. Hancock, of Syracuse, N.Y. (Morris Berman and Lionel O. Grossman, both of Syracuse, N.Y., on the brief), for petitioning creditors-appellees.

George R. Fearon, of Syracuse, N.Y. (Keith F. Driscoll and Costello, Cooney & Fearon, all of Syracuse, N.Y., on the brief), for objecting creditor-appellant.

Gerald H. Henley, of Syracuse, N.Y. (Hiscock, Cowie, Bruce & Lee and A. J. & A. P. Oot, all of Syracuse, N.Y., on the brief), for intervening creditors-appellees.

Before SWAN, CLARK, and PATTERSON, Circuit Judges.

**Opinion**

CLARK, Circuit Judge.

The appellant herein, a creditor having a judgment lien against Julian S. Brown, appeals from Brown's adjudication as an involuntary bankrupt on the grounds (1) that there were not three petitioning creditors with provable claims and (2) that the alleged bankrupt was not insolvent.

The creditors of Julian S. Brown have been fighting over his considerable estate for nine years. Brown himself is not disposed to help them; with an annual income in excess of $20,000 under a trust, their efforts to tie up his other assets have not proven too embarrassing to him. An attempt of one creditor group to set up a receivership for Brown proved abortive. He was then placed in involuntary bankruptcy, but the petition was dismissed and we affirmed. In re Brown,

2 Cir., 87 F.2d 306. A second involuntary petition resulted in an adjudication. We vacated that ruling for errors below, and remanded the proceedings for a new hearing. Syracuse Engineering Co., Inc. v. Haight, 2 Cir., 97 F.2d 573. It is from the adjudication made after the new hearing that this appeal is taken.

The questions now before use resolve themselves in the main into problems of valuing assets and liabilities, i.e., decisions of fact made on sharply disputed testimony produced at an extensive trial. There is no reason to believe that we can reach any sounder results than did the district judge who was familiar with this estate from long association with it, as well as with the local conditions in and around Syracuse, where the physical assets are located. That an objecting creditor can so long prevent administration of an estate while he endeavors to preserve his priority perhaps indicates the wisdom of the change made in the bankruptcy statute by the Chandler Act in omitting creditors from those who may plead in answer to an involuntary petition. Section 18, sub. b, 11 U.S.C.A. § 41, sub. b. These long drawn out proceedings have engendered hard feeling among counsel, leading to unsupported charges of bad faith in the briefs wholly out of place in appellate argument.

[1] [2] [3] [4] First, however, we must note appellant's claim that two of the three original petitioners did not have provable claims as required by Sec. 59, sub. b, 11 U.S.C.A § 95, sub. b. The District Court supported one of these claims on disputed testimony; while the other, asserted to be barred by the statute of limitations, was not so barred when the petition was filed. But their status becomes academic here, since between the last appeal to this court and the new hearing below, two additional creditors with unquestionably valid claims have been allowed to intervene and join in the petition. Creditors who intervene before adjudication may be counted in determining whether the necessary three petitioning creditors exist. Canute S.S. Co. v. Pittsburgh & West Virginia Coal Co., 263 U.S. 244, 44 S.Ct. 67, 68 L.Ed. 287. Appellant's only reply is that under Sec. 59, sub. f, intervention to join in an involuntary petition is a matter of right, Canute S.S. Co. v. Pittsburgh & West Virginia Coal Co., supra; Guterman v. C. D. Parker & Co., 1 Cir., 87 F.2d 546, certiorari denied, 300 U.S. 677, 57 S.Ct. 670, 81 L.Ed. 882, though compare In re Brown, supra, F.2d at page 308. Even if the granting of leave to intervene is discretionary, we have said that we will not upset the ruling of the District Court except for clear cause shown. In re Tidewater Coal Exchange, 2 Cir., 280 F. 638, certiorari denied, Delaware S.S. Co., v. New England Coal & Coke Co., 259 U.S. 584, 42 S.Ct. 587,

66 L.Ed. 1075. No satisfactory reason has been presented why intervention should not have been allowed here.

[5] We turn next to the issue of Brown's solvency. The alleged act of bankruptcy is that Brown, while insolvent, permitted **\*470** the present objecting creditor, Haight, to obtain a lien against his property by judicial proceedings-the lien which Haight is here trying to preserve- and failed to discharge it within thirty days thereafter. Bankruptcy Act, Sec. 3, sub. a(3), 11 U.S.C.A. §21, sub. a(3). Since Brown consented to examination, the burden of proving insolvency, as we ruled before, rests on the petitioning creditors. Syracuse Engineering Co., v. Haight, 2 Cir., 97 F.2d 573, 575. Whether the burden would fall on the objecting creditor if Brown had refused to undergo examination, we declined to decide on the last appeal, and we decline again. In any event, we think petitioners have this time sustained their burden.

The parties are apart to the extent of almost $900,000 in their claims as to the values in this estate. Petitioners assert assets of a trifle over $116,000 and liabilities of $388,000. The objecting creditor appraises assets at about $800,000 and liabilities at $183,452. The trial court took a middle course, with a finding of $204,000 in assets, and $319,000 in liabilities. To overrule the district judge, we must therefore find aggregate error (and in one direction only) of $115,000 in his valuations.

Liabilities. The largest single liability is the judgment of $131,641.97 in favor of the objecting creditor. We need consider only three other items; the validity of all the rest cannot be seriously questioned. These three are claims asserted against Brown for deficiencies under mortgages on which he was personally obligated. The mortgage debt owed to the Thalheimer estate was $123,000. Under N.Y. Civil Practice Act, Sec. 1083-a, a deficiency judgment could be taken only for this sum less the fair market value of the property. A witness for petitioning creditors appraised fair market value at $65,000; appellant claims a value up to $180,000. The District Court arrived at a figure of $73,000, and placed Brown's deficiency liability at $50,000.

Two other deficiency claims are asserted by the First Trust & Deposit Co., which holds the Pack and Schumacher mortgages. The court found the claim against Brown on the Pack mortgage to be at least $5,000. Evidence for the petitioning creditors showed that the correct sum might even be $9,000. The Schumacher mortgage was a second mortgage, and the previous foreclosure of the senior mortgage

had left no surplus. Brown was surety on the second mortgage, but his principal had no assets. Consequently the District Court found Brown liable for the full mortgage debt of $67,500.

[6]    We shall not reverse any of these findings. The evidence was sharply conflicting; nothing in the record persuades us that the court's estimates were erroneous. Certainly they were not 'clearly erroneous,' as they must be to justify reversal. Federal Rule of Civil Procedure 52(a), 28 U.S.C.A.following section 723c; cf. In re Connecticut Co., 2 Cir., 107 F.2d 734; In re United Finance Corp., 7 Cir., 104 F.2d 593, 598.

Assets. Except for the trust fund to be discussed below, most of the assets of Julian S. Brown were parcels of real estate in the City of Syracuse. What we have said above applies equally to the District Court's appraisals of these properties. We accept its figure of $154,000 for all assets exclusive of the trust fund.

[7]    The principal dispute now, as on the former appeal, concerns the trust fund created by Julian S. Brown's mother for the benefit of Julian and his brother and valued at more than $1,000,000. By the terms of the will creating the trust, each brother receives one-half the income until he reaches the age of 60, at which time he receives one-half the principal; but if one brother dies before becoming 60, the entire principal goes to the other upon attaining that age. No provision is made for the contingency that both die before 60; but it is agreed that the principal will then pass in equal parts to the estates of the two brothers as sole distributees. At the time of the adjudication Julian S. Brown was 49 and his brother 51. The expectancy that a man of 49 will live for 10 years is about 84 per cent by the American Mortality Tables. Both Julian's interest in the principal and his interest in the income must be considered in determining the value of his property. Syracuse Engineering Co. v. Haight, 2 Cir., 97 F.2d 573, 576.

[8]    The principal. Both sides offered expert testimony to show a market for the purchase of vested and contingent remainders and as to the fair price that Julian S. Brown's remainder would bring. Appellant's witness Martindell gave such price as $200,000 if no insurance could be secured on Brown's life by the purchaser. Under the same conditions, Rosenberg, the witness for petitioning creditors, would hazard no more than $20,000. A bank officer **\*471** also testified that banks would loan nothing on such an interest. Rosenberg's testimony was far more credible than Martindell's. He had been a decade in the business,

while Martindell was an adviser who had engaged only in occasional adventures. Without insurance, the purchase of the remainder would not be an investment, but a gamble. According to Rosenberg, a $500,000 vested remainder subject to no contingency whatsoever but the lapse of time could be purchased for less than the sum at which Martindell appraised Brown's contingent interest. The District Court allowed a 'speculative or gambling value' to Brown's interest of not over $50,000.

Much is made of the possibility of avoiding the speculative nature of the investment by insurance. It clearly appeared, however, that Brown would not consent to insurance. He did not believe in insurance- perhaps naturally under the circumstances. He had none himself. Without Brown's signature on the application, a purchaser of the interest could not procure insurance on his life in New York. Insurance Law (Consol. Laws, c. 28) Sec. 55. Furthermore, it would be necessary that Brown take a physical examination and be accepted as a proper risk by an insurance company. Lloyd's of London was said to be a possibility, but it was not licensed to act in New York and no evidence was offered of its willingness to accept such risks. A scheme of self-insurance by the purchaser such as proposed by Martindell is not insurance at all. It would not shift a penny of the risk.

Nevertheless, appellant argues that in valuing the interest Brown's assistance in obtaining insurance must be assumed. Even on this assumption valuation is not clear, and it still may be doubtful that the value of the asset is then increased so far above $50,000 as to offset the additional margin of $115,000 allowable in the District Court's figures before the adjudication becomes erroneous. A heavy charge must be incurred for insurance before adequate protection is secured. According to the testimony, insurance on Brown's life would cost $30 per thousand. To determine his actual investment a purchaser would have to add loss of interest, necessary attorney's fees, and the cost of insurance to his original payment; unless he protected himself on these items, he would be out of pocket on the unsuccessful termination of his venture. [1]  And if he won, the income tax gatherer would be at hand to reduce his gains sadly. In view of these uncertainties, we might well hesitate to overthrow the District Court's conclusion in any event

[9]    [10]    We do not believe, however, that this asset should be valued on the assumption that insurance is obtainable. Here involved are some fundamental conceptions of the role of valuation in determining insolvency. Under 'the balance

sheet test' of the Bankruptcy Act Sec. 1, (15), now (19), 11 U.S.C.A. § 1(15), now (19) (In re United Finance Corp., supra, 104 F.2d at page 598), insolvency results when the 'aggregate' of a debtor's property is not sufficient 'at a fair valuation' to pay his debts. Fair valuation of an estate such as this might conceivably be based on forced sale prices, or on fair market prices, or on so-called intrinsic values, irrespective of sale. A proper regard for the interests of the bankrupt, as well as for the interests of his creditors, compels the conclusion that fair market price is the most equitable standard. Bonbright and Pickett, Valuation to Determine Solvency under the Bankruptcy Act, 29 Col.L.Rev. 582, 597, 598; 1 Collier on Bankruptcy (14th Ed. 1940) 74-81, collecting cases. It involves a value that can be made available for payment of debts within a reasonable period of time. In re United Finance Corp., supra; Babbitt v. Read, 2 Cir., 236 F. 42, 47, certiorari denied 243 U.S. 648, 37 S.Ct. 475, 61 L.Ed. 946; Stern v. Paper, D.C.N.D., 183 F. 228, 230, 231, affirmed 8 Cir., 198 F. 642. And fair market value implies not only a 'willing buyer,' but a 'willing seller.' Grandison v. National Bank of Commerce, 2 Cir., 231 F. 800, 804, certiorari denied 242 U.S. 644, 37 S.Ct. 213, 61 L.Ed. 542; Irving Trust Co. v. Manufacturers' Trust Co., D.C.S.D.N.Y., 6 F.Supp. 185; Collier, supra at 77.

The 'willing seller' could be either Brown or his trustee in bankruptcy. Whatever might be the fair market value of this interest with Brown agreeing to take out insurance, Brown's refusal presents a different situation. We do not believe that **\*472** the concept of fair market value requires us to conceive of a willing seller as one able and willing to take out insurance when we know that no such person exists. Hence we cannot say that the District Court's valuation of this interest is clearly erroneous.

[11]   The income. The income from the trust fund has averaged roughly $22,000 a year. Appellant concedes that Brown needs a minimum of $7,000 for living expenses, but it is claimed that the $15,000 surplus must be included as one of Brown's assets. An absolute right to receive $15,000 a year for a period of years has a substantial present value; if it be computed at 4 per cent for eleven years it would be at least $131,000. But Brown's right to income could not be sold for a figure approaching this sum. As before, the risk that Brown might die must be offset by insurance to attract a purchaser, and Brown will have none of insurance. Even if we disregard the risk of death and Brown's refusal to insure, this right to income has little or no market value. A voluntary assignment by Brown would not be enforceable against the

trustee of his mother's estate. N.Y. Personal Property Law (Consol. Laws, c. 41) Sec. 15(1); cf. Real Property Law (Consol. Laws, c. 50) Sec. 103; Judis v. Martin, 218 App.Div. 4u2, 218 N.Y.S. 423, appeal dismissed 244 N.Y. 605, 155 N.E. 916; Matter of Ungrich, 201 N.Y. 415, 94 N.E. 999. Brown as a willing seller could hardly find a willing buyer, for no sensible buyer would pay for a right good against Brown alone. And if we consider the trustee in bankruptcy as the willing seller, additional difficulties arise. A judgment creditor, by appropriate equitable proceedings, may secure 10 per cent of Brown's income under N.Y. Civil Practice Act, Sec. 684, plus whatever surplus exists above Brown's suitable living expenses under Real Property Law, Sec. 98; and the bankruptcy trustee should have like rights. See In re Morris, 2 Cir., 204 F. 770; Jenks v. Title Guarantee & Trust Co., 170 App.Div. 830, 156 N.Y.S. 478. But just what the bankruptcy trustee can actually sell and transfer, if anything, is not clear; it has been held that he cannot make an assignment giving the right of garnishee execution. Matter of Towne, 278 N.Y. 597, 16 N.E.2d 117, affirming 253 App.Div. 795, 1 N.Y.S.2d 1016. And we could hardly require a bankruptcy administration of eleven years while the trustee collected the income himself.

Appellant would have us overcome all these difficulties by the simple expedient of resort to the rule that property exempt from attachment and execution must nevertheless be computed as a part of the defendent's assets under Bankruptcy Act, Sec. 1(15), now (19), 11 U.S.C.A. § 1(15), now (19); Lasswell v. Stein-Block Co., 5 Cir., 93 F.2d 322; Bonbright and Pickett, supra at page 590; Collier, supra at 71, 72. Appellant admits that Brown needs $7,000 a year for suitable living expenses; this sum is the maximum we can consider exempt, in view of N.Y. Real Property Law, Sec. 98. Should we concede that exempt property be included in our valuation, we must appraise the value of Brown's right to receive $7,000 annually for eleven years. But we have already concluded that Brown's right to receive $22,000 for eleven years has no present market value, and the same must be said of his right to receive the exempt portion of that sum. As we have ruled above, valuation for purposes of straight bankruptcy contemplates sale for payment of debts within a reasonable period of time. Neither the accessible nor the exempt portion of Brown's right to receive income has any sale value of substance.

Being thus unwilling to substitute our uncertain guess for the findings of the District Court on these items of doubtful and disputed value, particularly in the light of the substantial

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

margin of insolvency thus disclosed, we hold that the adjudication of bankruptcy must be affirmed.

Footnotes

1    Appellees assert that on an original purchase price of $200,000, and with insurance to return only that amount, a purchaser would have additional expenses of $137,000 by the end of ten years- $66,000 for loss of interest at 3 per cent; $5,000 for administration expenses and attorney's fees; and $66,000 for insurance premiums.

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 84

**Tercon Contractors Ltd.**    *Appellant*

*v.*

**Her Majesty The Queen in Right of the Province of British Columbia, by her Ministry of Transportation and Highways**    *Respondent*

and

**Attorney General of Ontario**    *Intervener*

INDEXED AS: TERCON CONTRACTORS LTD. *v.* BRITISH COLUMBIA (TRANSPORTATION AND HIGHWAYS)

**2010 SCC 4**

File No.: 32460.

2009: March 23; 2010: February 12.

Present: McLachlin C.J. and Binnie, LeBel, Deschamps, Fish, Abella, Charron, Rothstein and Cromwell JJ.

ON APPEAL FROM THE COURT OF APPEAL FOR BRITISH COLUMBIA

*Contracts — Breach of terms — Tender — Ineligible bidder — Exclusion of liability clause — Doctrine of fundamental breach — Province issuing tender call for construction of highway — Request for proposals restricting qualified bidders to six proponents — Province accepting bid from ineligible bidder — Exclusion clause protecting Province from liability arising from participation in tendering process — Whether Province breached terms of tendering contract in entertaining bid from ineligible bidder — If so, whether Province's conduct fell within terms of exclusion clause — If so, whether court should nevertheless refuse to enforce the exclusion clause because of unconscionability or some other contravention of public policy.*

The Province of British Columbia issued a request for expressions of interest ("RFEI") for the design and construction of a highway. Six teams responded with submissions including Tercon and Brentwood. A few months later, the Province informed the six proponents

**Tercon Contractors Ltd.**    *Appelante*

*c.*

**Sa Majesté la Reine du chef de la Colombie-Britannique, représentée par le ministère des Transports et de la Voirie**    *Intimée*

et

**Procureur général de l'Ontario**    *Intervenant*

RÉPERTORIÉ : TERCON CONTRACTORS LTD. *c.* COLOMBIE-BRITANNIQUE (TRANSPORTS ET VOIRIE)

**2010 CSC 4**

Nᵒ du greffe : 32460.

2009 : 23 mars; 2010 : 12 février.

Présents : La juge en chef McLachlin et les juges Binnie, LeBel, Deschamps, Fish, Abella, Charron, Rothstein et Cromwell.

EN APPEL DE LA COUR D'APPEL DE LA COLOMBIE-BRITANNIQUE

*Contrats — Inexécution — Appel d'offres — Soumissionnaire inadmissible — Clause de non-responsabilité — Principe d'inexécution fondamentale — Appel d'offres lancé par la province pour la construction d'une route — Demande de propositions tenant seulement six entreprises pour admissibles — Acceptation par la province de la proposition d'un soumissionnaire inadmissible — Clause de non-recours protégeant la province contre toute responsabilité découlant de la participation à l'appel d'offres — La province s'est-elle rendue coupable d'inexécution du contrat issu de l'appel d'offres en considérant la proposition d'un soumissionnaire inadmissible? — Dans l'affirmative, son comportement tombait-il sous le coup de la clause de non-recours? — Dans l'affirmative, un tribunal devrait-il néanmoins refuser de faire respecter la clause en raison de son iniquité ou pour quelque autre atteinte à l'ordre public?*

La province de la Colombie-Britannique a lancé une demande d'expression d'intérêt (« DEI ») pour la conception et la construction d'une route. Elle a reçu six soumissions, dont celles de Tercon et de Brentwood. Quelques mois plus tard, la province a fait savoir aux

TERCON CONTRACTORS LTD. *v.* B.C.

that it now intended to design the highway itself and issued a request for proposals ("RFP") for its construction. The RFP set out a specifically defined project and contemplated that proposals would be evaluated according to specific criteria. Under its terms, only the six original proponents were eligible to submit a proposal; those received from any other party would not be considered. The RFP also included an exclusion of liability clause which provided: "Except as expressly and specifically permitted in these Instructions to Proponents, no Proponent shall have any claim for compensation of any kind whatsoever, as a result of participating in this RFP, and by submitting a Proposal each Proponent shall be deemed to have agreed that it has no claim." As it lacked expertise in drilling and blasting, Brentwood entered into a pre-bidding agreement with another construction company ("EAC"), which was not a qualified bidder, to undertake the work as a joint venture. This arrangement allowed Brentwood to prepare a more competitive proposal. Ultimately, Brentwood submitted a bid in its own name with EAC listed as a "major member" of the team. Brentwood and Tercon were the two short-listed proponents and the Province selected Brentwood for the project. Tercon successfully brought an action in damages against the Province. The trial judge found that the Brentwood bid was, in fact, submitted by a joint venture of Brentwood and EAC and that the Province, which was aware of the situation, breached the express provisions of the tendering contract with Tercon by considering a bid from an ineligible bidder and by awarding it the work. She also held that, as a matter of construction, the exclusion clause did not bar recovery for the breaches she had found. The clause was ambiguous and she resolved this ambiguity in Tercon's favour. She held that the Province's breach was fundamental and that it was not fair or reasonable to enforce the exclusion clause in light of the Province's breach. The Court of Appeal set aside the decision, holding that the exclusion clause was clear and unambiguous and barred compensation for all defaults.

*Held* (McLachlin C.J. and Binnie, Abella and Rothstein JJ. dissenting): The appeal should be allowed. The Court agreed on the appropriate framework of analysis but divided on the applicability of the exclusion clause to the facts.

*The* Court: With respect to the appropriate framework of analysis the doctrine of fundamental breach

six entreprises intéressées qu'elle entendait désormais concevoir elle-même la route et demander des propositions pour sa construction. La demande de propositions (« DP ») décrivait un projet précis et indiquait que les propositions seraient considérées au regard de certains critères. Elle stipulait que seules les six entreprises intéressées initialement étaient admises à soumissionner et que les propositions présentées par d'autres personnes ne seraient pas examinées. La DP renfermait également une clause de non-recours, dont le texte était le suivant : « Sauf ce que prévoient expressément les présentes instructions, un proposant ne peut exercer aucun recours en indemnisation pour sa participation à la DP, ce qu'il est réputé accepter lorsqu'il présente une soumission. » Comme elle n'avait pas d'expertise dans le forage et le dynamitage, Brentwood a conclu avec une autre entreprise de construction (« EAC ») — qui n'était pas admise à soumissionner — une entente préalable à la soumission prévoyant qu'elles réaliseraient les travaux en coentreprise. De la sorte, elle pouvait présenter une proposition plus concurrentielle. Elle a finalement soumissionné en son nom, présentant EAC comme un « membre important » de son équipe. La liste des adjudicataires possibles a été ramenée à deux entreprises — Brentwood et Tercon —, puis le ministère a finalement opté pour la première. Tercon a intenté une action en dommages-intérêts contre la province et elle a eu gain de cause. La juge de première instance a conclu que la soumission de Brentwood était en fait celle de la coentreprise formée avec EAC, et que la province, qui le savait, avait contrevenu aux stipulations expresses du contrat intervenu avec Tercon en acceptant la soumission d'une autre entreprise qui n'était pas admissible, puis en confiant les travaux à cette même entreprise. Elle a aussi statué que le libellé de la clause de non-recours ne faisait pas obstacle à l'indemnisation pour les inexécutions relevées. La clause était équivoque et elle l'a interprétée en faveur de Tercon. Elle a estimé que l'inexécution reprochée à la province était fondamentale et qu'il n'était ni juste ni raisonnable de faire respecter la clause de non-recours étant donné la nature de l'inexécution. La Cour d'appel a annulé sa décision, statuant que la clause de non-recours était claire et non équivoque et qu'elle faisait obstacle à l'indemnisation pour toute inexécution.

*Arrêt* (la juge en chef McLachlin et les juges Binnie, Abella et Rothstein sont dissidents) : Le pourvoi est accueilli. Les juges de la Cour conviennent du cadre de l'analyse qui s'impose, mais ils sont partagés sur l'applicabilité de la clause de non-recours aux faits de l'espèce.

*La* Cour : Pour ce qui concerne le cadre d'analyse approprié, il convient de donner le « coup de grâce » au

should be "laid to rest". The following analysis should be applied when a plaintiff seeks to escape the effect of an exclusion clause or other contractual terms to which it had previously agreed. The first issue is whether, as a matter of interpretation, the exclusion clause even applies to the circumstances established in evidence. This will depend on the court's interpretation of the intention of the parties as expressed in the contract. If the exclusion clause applies, the second issue is whether the exclusion clause was unconscionable and thus invalid at the time the contract was made. If the exclusion clause is held to be valid at the time of contract formation and applicable to the facts of the case, a third enquiry may be raised as to whether the court should nevertheless refuse to enforce the exclusion clause because of an overriding public policy. The burden of persuasion lies on the party seeking to avoid enforcement of the clause to demonstrate an abuse of the freedom of contract that outweighs the very strong public interest in their enforcement. Conduct approaching serious criminality or egregious fraud are but examples of well-accepted considerations of public policy that are substantially incontestable and may override the public policy of freedom to contract and disable the defendant from relying upon the exclusion clause. Despite agreement on the appropriate framework of analysis, the court divided on the applicability of the exclusion clause to the facts of this case as set out below.

*Per* LeBel, Deschamps, Fish, Charron and Cromwell JJ.: The Province breached the express provisions of the tendering contract with Tercon by accepting a bid from a party who should not even have been permitted to participate in the tender process and by ultimately awarding the work to that ineligible bidder. This egregious conduct by the Province also breached the implied duty of fairness to bidders. The exclusion clause, which barred claims for compensation "as a result of participating" in the tendering process, did not, when properly interpreted, exclude Tercon's claim for damages. By considering a bid from an ineligible bidder, the Province not only acted in a way that breached the express and implied terms of the contract, it did so in a manner that was an affront to the integrity and business efficacy of the tendering process.

Submitting a compliant bid in response to a tender call may give rise to "Contract A" between the bidder and the owner. Whether a Contract A arises and what its terms are depends on the express and implied terms and conditions of the tender call and the legal consequences of the parties' actual dealings in each case.

principe de l'inexécution fondamentale. L'analyse qui suit vaut lorsque le demandeur tente de se soustraire à l'application d'une clause d'exonération ou d'une autre stipulation contractuelle dont il a précédemment convenu. Il faut d'abord déterminer, par voie d'interprétation, si la clause de non-recours s'applique aux faits mis en preuve, ce qui dépend de l'intention des parties qui se dégage du contrat. Lorsque la clause s'applique, il faut en deuxième lieu se demander si elle était inique et de ce fait invalide au moment de la formation du contrat. Lorsqu'elle est jugée valide au moment de la formation du contrat et applicable aux faits de l'espèce, le tribunal peut se demander dans un troisième temps s'il devrait tout de même refuser de la faire respecter en raison d'une considération d'ordre public prépondérante. Il incombe à la partie qui tente de se soustraire à l'application de la clause de prouver un abus de la liberté contractuelle qui l'emporte sur le très grand intérêt public lié au respect des contrats. Le comportement qui se rapproche de l'acte criminel grave ou de la fraude monumentale n'est qu'un exemple de considération d'ordre public bien établie et « foncièrement incontestable » pouvant primer la liberté contractuelle, elle aussi d'ordre public, et empêcher le défendeur de se retrancher derrière la clause de non-recours. Même si les juges de la Cour conviennent du cadre de l'analyse qui s'impose, ils sont partagés sur l'applicabilité de la clause de non-recours aux faits de l'espèce, comme il appert ci-après.

*Les* juges LeBel, Deschamps, Fish, Charron et Cromwell : La province a contrevenu aux stipulations expresses du contrat issu de l'appel d'offres et intervenu avec Tercon en acceptant la proposition d'une entreprise qui n'était pas admise à prendre part au processus d'appel d'offres, puis en confiant les travaux à cette même entreprise inadmissible. Par ce comportement inacceptable, la province a également manqué à son obligation tacite d'équité envers les soumissionnaires. Correctement interprétée, la clause de non-recours, qui écartait toute demande d'indemnisation « pour [l]a participation » à l'appel d'offres, ne faisait pas obstacle au recours en dommages-intérêts de Tercon. En considérant l'offre d'un soumissionnaire inadmissible, la province a non seulement manqué à ses obligations contractuelles expresses et tacites, mais elle l'a fait d'une manière qui portait outrageusement atteinte à l'intégrité et à l'efficacité commerciale du processus d'appel d'offres.

Le dépôt d'une soumission conforme en réponse à un appel d'offres peut faire naître un « contrat A » entre le soumissionnaire et le propriétaire. L'existence d'un tel contrat et sa teneur dépendent des conditions expresses et tacites de l'appel d'offres ainsi que des conséquences juridiques des échanges intervenus entre les parties.

Here, there is no basis to interfere with the trial judge's findings that there was an intent to create contractual obligations upon submission of a compliant bid and that only the six original proponents that qualified through the RFEI process were eligible to submit a response to the RFP. The tender documents and the required ministerial approval of the process stated expressly that the Province was contractually bound to accept bids only from eligible bidders. Contract A therefore could not arise by the submission of a bid from any other party. The trial judge found that the joint venture of Brentwood and EAC was not eligible to bid as they had not simply changed the composition of their team but, in effect, had created a new bidder. The Province fully understood this and would not consider a bid from or award the work to that joint venture. The trial judge did not err in finding that in fact, if not in form, Brentwood's bid was on behalf of a joint venture between itself and EAC. The joint venture provided Brentwood with a competitive advantage in the bidding process and was a material consideration in favour of the Brentwood bid during the Province's evaluation process. Moreover, the Province took active steps to obfuscate the reality of the true nature of the Brentwood bid. The bid by the joint venture constituted "material non-compliance" with the tendering contract and breached both the express eligibility provisions of the tender documents, and the implied duty to act fairly towards all bidders.

When the exclusion clause is interpreted in harmony with the rest of the RFP and in light of the commercial context of the tendering process, it did not exclude a damages claim resulting from the Province unfairly permitting an ineligible bidder to participate in the tendering process. The closed list of bidders was the foundation of this RFP and the parties should, at the very least, be confident that their initial bids will not be skewed by some underlying advantage in the drafting of the call for tenders conferred only upon one potential bidder. The requirement that only compliant bids be considered and the implied obligation to treat bidders fairly are factors that contribute to the integrity and business efficacy of the tendering process. The parties did not intend, through the words found in this exclusion clause, to waive compensation for conduct, like that of the Province in this case, that strikes at the heart of the tendering process. Clear language would be necessary to exclude liability for breach of the implied obligation, particularly in the case of public procurement where

En l'espèce, il n'y a pas lieu de modifier la conclusion de la juge de première instance selon laquelle la présentation d'une soumission conforme était censée faire naître des obligations contractuelles et seules les six entreprises intéressées initialement, devenues admissibles à l'issue de la DEI, pouvaient donner suite à la DP. L'obligation de la province de considérer seulement les propositions de soumissionnaires admissibles figurait expressément dans le dossier d'appel d'offres et dans l'approbation ministérielle requise du processus. Un contrat A ne pouvait donc pas naître de la présentation d'une soumission par une autre personne. La juge de première instance a conclu que la coentreprise formée de Brentwood et d'EAC n'était pas un soumissionnaire admissible, car la composition de l'équipe n'était pas simplement modifiée, mais un nouveau soumissionnaire voyait en fait le jour. La province le savait bien et elle estimait qu'elle ne pouvait ni considérer la proposition de cette coentreprise ni adjuger le contrat à celle-ci. La juge de première instance n'a pas eu tort de conclure qu'en dépit des apparences, la soumission de Brentwood était en fait présentée par la coentreprise formée avec EAC. L'existence de la coentreprise a fait bénéficier Brentwood d'un avantage concurrentiel dans le processus d'appel d'offres, et la province l'a considérée comme un élément favorable à Brentwood lors de son processus d'évaluation. De plus, la province a pris des mesures pour masquer la véritable nature de la soumission de Brentwood. La présentation d'une proposition par une coentreprise constituait une « inexécution importante » du contrat issu de l'appel d'offres ainsi qu'une inobservation des conditions expresses d'admissibilité et de l'obligation tacite d'agir équitablement vis-à-vis de tous les soumissionnaires.

Interprétée en harmonie avec les autres conditions de la DP et eu égard au contexte commercial de l'appel d'offres, la clause de non-recours n'écartait pas le recours en dommages-intérêts intenté au motif que la province avait inéquitablement permis à une entreprise inadmissible de prendre part au processus. La limitation du nombre de soumissionnaires admissibles constituait l'assise de la DP, et un soumissionnaire devait à tout le moins être assuré que l'évaluation de sa soumission initiale ne serait pas biaisée par quelque avantage sous-entendu dans le dossier d'appel d'offres et dont ne bénéficiait qu'un seul soumissionnaire éventuel. L'exigence que seules soient examinées des soumissions conformes et l'obligation tacite de traiter tous les soumissionnaires équitablement sont généralement considérées comme des éléments contribuant à l'intégrité et à l'efficacité commerciale du processus d'appel d'offres. Les parties n'ont pas voulu, en employant le libellé de la clause de non-recours, écarter toute indemnisation pour un comportement comme celui reproché à la province

transparency is essential. Furthermore, the restriction on eligibility of bidders was a key element of the alternative process approved by the Minister. When the statutory provisions which governed the tendering process in this case are considered, it seems unlikely that the parties intended through this exclusion clause to effectively gut a key aspect of the approved process. The text of the exclusion clause in the RFP addresses claims that result from "participating in this RFP". Central to "participating in this RFP" was participating in a contest among those eligible to participate. A process involving other bidders — the process followed by the Province — is not the process called for by "this RFP" and being part of that other process is not in any meaningful sense "participating in this RFP".

*Per* McLachlin C.J. and Binnie, Abella and Rothstein JJ. (dissenting): The Ministry's conduct, while in breach of its contractual obligations, fell within the terms of the exclusion compensation clause. The clause is clear and unambiguous and no legal ground or rule of law permits a court to override the freedom of the parties to contract with respect to this particular term, or to relieve Tercon against its operation in this case. A court has no discretion to refuse to enforce a valid and applicable contractual term unless the plaintiff can point to some paramount consideration of public policy sufficient to override the public interest in freedom of contract and defeat what would otherwise be the contractual rights of the parties. The public interest in the transparency and integrity of the government tendering process, while important, did not render unenforceable the terms of the contract Tercon agreed to.

Brentwood was a legitimate competitor in the RFP process and all bidders knew that the road contract would not be performed by the proponent alone and required a large "team" of different trades and personnel to perform. The issue was whether EAC would be on the job as a major sub-contractor or identified with Brentwood as a joint venture "proponent" with EAC. Tercon has legitimate reason to complain about the Ministry's conduct, but its misconduct did not rise to the level where public policy would justify the court in depriving the Ministry of the protection of the exclusion of compensation clause freely agreed to by Tercon in the contract.

en l'espèce, un comportement qui porte directement atteinte à l'intégrité de l'appel d'offres. Seul un libellé clair peut écarter la responsabilité consécutive au non-respect de l'obligation tacite, spécialement dans le cas de la passation de marchés publics, où la transparence est de rigueur. Qui plus est, l'admissibilité restreinte constituait un élément essentiel de l'autre processus approuvé par le ministre. Au regard du cadre législatif régissant l'appel d'offres en l'espèce, il est peu probable que les parties aient vraiment voulu, en stipulant la clause de non-recours, supprimer un aspect essentiel de ce processus. Le texte de la clause de non-recours de la DP vise les demandes d'indemnisation d'un préjudice découlant de la « participation à la DP ». La participation à un concours ouvert aux seules personnes admises à y prendre part était donc au cœur de la « participation à la DP ». Un processus ouvert à d'autres entreprises — ce qui était le cas du processus suivi par la province — ne saurait s'entendre de « la DP », et le fait d'y prendre part ne saurait véritablement être considéré comme une « participation à la DP ».

*La* juge en chef McLachlin et les juges Binnie, Abella et Rothstein (dissidents) : Même s'il n'a pas respecté ses obligations contractuelles, le ministère bénéficie de la clause de non-recours en indemnisation. La clause est claire et non équivoque, et aucune règle de droit ou autre fondement juridique ne permet aux tribunaux de passer outre à la liberté des parties de convenir de cette condition ni de soustraire Tercon à son application en l'espèce. Le tribunal n'a pas le pouvoir discrétionnaire de refuser de faire respecter une clause contractuelle valide et applicable, sauf lorsque le demandeur fait valoir une considération d'ordre public prépondérante qui l'emporte sur l'intérêt public lié à la liberté de contracter et qui fait obstacle à ce qui, autrement, constitueraient les droits contractuels des parties. L'intérêt public lié à la transparence et à l'intégrité du processus gouvernemental d'appel d'offres, même s'il est important, n'a pas rendu inapplicables les clauses du contrat auxquelles Tercon avait consenti.

Brentwood était un concurrent légitime dans le processus de DP. Tous les soumissionnaires savaient que le contrat de construction routière ne serait pas exécuté seulement par le proposant retenu, mais bien par une grande « équipe » pluridisciplinaire. La question était celle de savoir si EAC serait sous-traitant principal ou « proposant » dans le cadre de la coentreprise avec Brentwood. Tercon a raison de dénoncer le comportement du ministère, mais celui-ci n'était pas répréhensible au point que l'ordre public justifie le tribunal de refuser au ministère la protection de la clause de non-recours en indemnisation à laquelle Tercon avait librement consenti.

Contract A is based not on some abstract externally imposed rule of law but on the presumed (and occasionally implied) intent of the parties. At issue is the intention of the actual parties not what the court may project in hindsight would have been the intention of reasonable parties. Only in rare circumstances will a court relieve a party from the bargain it has made.

The exclusion clause did not run afoul of the statutory requirements. While the *Ministry of Transportation and Highways Act* favours "the integrity of the tendering process", it nowhere prohibits the parties from negotiating a "no claims" clause as part of their commercial agreement and cannot plausibly be interpreted to have that effect. Tercon — a sophisticated and experienced contractor — chose to bid on the project, including the risk posed by an exclusion of compensation clause, on the terms proposed by the Ministry. That was its prerogative and nothing in the "policy of the Act" barred the parties' agreement on that point.

The trial judge found that Contract A was breached when the RFP process was not conducted by the Ministry with the degree of fairness and transparency that the terms of Contract A entitled Tercon to expect. The Ministry was at fault in its performance of the RFP, but the process did not thereby cease to be the RFP process in which Tercon had elected to participate.

The interpretation of the majority on this point is disagreed with. "[P]articipating in this RFP" began with "submitting a Proposal" for consideration. The RFP process consisted of more than the final selection of the winning bid and Tercon participated in it. Tercon's bid was considered. To deny that such participation occurred on the ground that in the end the Ministry chose a Brentwood joint venture (an ineligible bidder) instead of Brentwood itself (an eligible bidder) would be to give the clause a strained and artificial interpretation in order, indirectly and obliquely, to avoid the impact of what may seem to the majority *ex post facto* to have been an unfair and unreasonable clause.

Moreover, the exclusion clause was not unconscionable. While the Ministry and Tercon do not exercise the same level of power and authority, Tercon is a major contractor and is well able to look after itself in a commercial context so there is no relevant imbalance of bargaining power. Further, the clause is not as draconian as Tercon portrays it. Other remedies for breach of Contract A were available. The parties expected, even if they did not like it, that the "no claims" clause would

L'assise du contrat A demeure l'intention présumée (et parfois inférée) des parties, et non quelque règle de droit abstraite imposée par un tiers. C'est l'intention des parties elles-mêmes qui importe, et non ce qui, à l'issue d'une analyse rétrospective du tribunal, aurait été l'intention de parties raisonnables. Ce n'est qu'en de rares circonstances que le tribunal relève une partie de ses engagements.

La clause de non-recours ne dérogeait pas aux exigences légales. La *Ministry of Transportation and Highways Act* favorise « l'intégrité du processus d'appel d'offres », mais aucune de ses dispositions n'empêche les parties de faire figurer dans leur accord commercial une clause « écartant toute indemnisation » ni ne peut vraisemblablement être interprétée comme ayant cet effet. Tercon — une entreprise avertie et expérimentée — a décidé de participer au processus aux conditions proposées par le ministère malgré le risque posé par la clause de non-recours en indemnisation. C'était sa décision, et la « raison d'être de la Loi » ne faisait aucunement obstacle à la convention des parties sur ce point.

La juge du procès a conclu à l'inexécution du contrat A du fait que, dans sa DP, le ministère n'a pas agi avec l'équité et la transparence auxquelles Tercon était en droit de s'attendre vu le libellé du contrat A. Le ministère a été fautif dans sa mise en œuvre de la DP, mais le processus n'a pas cessé pour autant d'être la DP à laquelle Tercon avait décidé de prendre part.

Les juges dissidents ne souscrivent pas à l'interprétation des juges majoritaires à cet égard. La « participation à la DP » a commencé par la « présent[ation d']une soumission ». Le processus de DP ne se résumait pas au choix final de l'adjudicataire, et Tercon y a participé. La soumission de Tercon a été considérée. Nier cette participation au motif que le ministère a finalement choisi la coentreprise inadmissible dont faisait partie Brentwood, et non Brentwood elle-même (qui était admissible), équivaut à une interprétation forcée et artificielle visant à éviter, par des moyens indirects et détournés, les conséquences de ce qui peut sembler aux juges majoritaires, *ex post facto*, avoir été une clause injuste et déraisonnable.

En outre, la clause de non-recours n'était pas inique. Tercon n'a ni le pouvoir ni l'autorité du ministère, mais c'est une entreprise importante parfaitement en mesure de défendre ses intérêts commerciaux. Il n'y avait donc pas d'inégalité déterminante du pouvoir de négociation. Aussi, la clause de non-recours n'est pas aussi draconienne que le laisse entendre Tercon. L'inexécution du contrat A donnait ouverture à d'autres recours. Les parties s'attendaient, même si cette éventualité ne les

operate even where the eligibility criteria in respect of the bid (including the bidder) were not complied with.

Finally, the Ministry's misconduct did not rise to the level where public policy would justify the court in depriving the Ministry of the protection of the exclusion of compensation clause freely agreed to by Tercon in the contract.

enchantait guère, à ce que la clause « écartant toute indemnisation » s'applique advenant même le non-respect des critères d'admissibilité de la soumission (et de son auteur).

Enfin, l'inconduite n'était pas répréhensible au point que l'ordre public justifie le tribunal de refuser au ministère la protection de la clause de non-recours en indemnisation à laquelle Tercon a librement consenti.

## Cases Cited

By Cromwell J.

**Applied:** *M.J.B. Enterprises Ltd. v. Defence Construction (1951) Ltd.*, [1999] 1 S.C.R. 619; *Martel Building Ltd. v. Canada*, 2000 SCC 60, [2000] 2 S.C.R. 860; **considered:** *Hunter Engineering Co. v. Syncrude Canada Ltd.*, [1989] 1 S.C.R. 426; *Cahill (G.J.) & Co. (1979) Ltd. v. Newfoundland and Labrador (Minister of Municipal and Provincial Affairs)*, 2005 NLTD 129, 250 Nfld. & P.E.I.R. 145; *Guarantee Co. of North America v. Gordon Capital Corp.*, [1999] 3 S.C.R. 423; *Fraser Jewellers (1982) Ltd. v. Dominion Electric Protection Co.* (1997), 34 O.R. (3d) 1; **referred to:** *Canadian Pacific Hotels Ltd. v. Bank of Montreal*, [1987] 1 S.C.R. 711; *Double N Earthmovers Ltd. v. Edmonton (City)*, 2007 SCC 3, [2007] 1 S.C.R. 116; *Hillis Oil and Sales Ltd. v. Wynn's Canada, Ltd.*, [1986] 1 S.C.R. 57.

## Jurisprudence

Citée par le juge Cromwell

**Arrêts appliqués :** *M.J.B. Enterprises Ltd. c. Construction de Défense (1951) Ltée*, [1999] 1 R.C.S. 619; *Martel Building Ltd. c. Canada*, 2000 CSC 60, [2000] 2 R.C.S. 860; **arrêts examinés :** *Hunter Engineering Co. c. Syncrude Canada Ltée*, [1989] 1 R.C.S. 426; *Cahill (G.J.) & Co. (1979) Ltd. c. Newfoundland and Labrador (Minister of Municipal and Provincial Affairs)*, 2005 NLTD 129, 250 Nfld. & P.E.I.R. 145; *Guarantee Co. of North America c. Gordon Capital Corp.*, [1999] 3 R.C.S. 423; *Fraser Jewellers (1982) Ltd. c. Dominion Electric Protection Co.* (1997), 34 O.R. (3d) 1; **arrêts mentionnés :** *Société hôtelière Canadien Pacifique Ltée c. Banque de Montréal*, [1987] 1 R.C.S. 711; *Double N Earthmovers Ltd. c. Edmonton (Ville)*, 2007 CSC 3, [2007] 1 R.C.S. 116; *Hillis Oil and Sales Ltd. c. Wynn's Canada, Ltd.*, [1986] 1 R.C.S. 57.

By Binnie J. (dissenting)

*Hunter Engineering Co. v. Syncrude Canada Ltd.*, [1989] 1 S.C.R. 426; *The Queen in right of Ontario v. Ron Engineering & Construction (Eastern) Ltd.*, [1981] 1 S.C.R. 111; *M.J.B. Enterprises Ltd. v. Defence Construction (1951) Ltd.*, [1999] 1 S.C.R. 619; *Naylor Group Inc. v. Ellis-Don Construction Ltd.*, 2001 SCC 58, [2001] 2 S.C.R. 943; *Martel Building Ltd. v. Canada*, 2000 SCC 60, [2000] 2 S.C.R. 860; *Double N Earthmovers Ltd. v. Edmonton (City)*, 2007 SCC 3, [2007] 1 S.C.R. 116; *Tercon Contractors Ltd. v. British Columbia* (1993), 9 C.L.R. (2d) 197, aff'd [1994] B.C.J. No. 2658 (QL); *Karsales (Harrow) Ltd. v. Wallis*, [1956] 1 W.L.R. 936; *Guarantee Co. of North America v. Gordon Capital Corp.*, [1999] 3 S.C.R. 423; *ABB Inc. v. Domtar Inc.*, 2007 SCC 50, [2007] 3 S.C.R. 461; *Re Millar Estate*, [1938] S.C.R. 1; *Plas-Tex Canada Ltd. v. Dow Chemical of Canada Ltd.*, 2004 ABCA 309, 245 D.L.R. (4th) 650.

Citée par le juge Binnie (dissident)

*Hunter Engineering Co. c. Syncrude Canada Ltée*, [1989] 1 R.C.S. 426; *La Reine du chef de l'Ontario c. Ron Engineering & Construction (Eastern) Ltd.*, [1981] 1 R.C.S. 111; *M.J.B. Enterprises Ltd. c. Construction de Défense (1951) Ltée*, [1999] 1 R.C.S. 619; *Naylor Group Inc. c. Ellis-Don Construction Ltd.*, 2001 CSC 58, [2001] 2 R.C.S. 943; *Martel Building Ltd. c. Canada*, 2000 CSC 60, [2000] 2 R.C.S. 860; *Double N Earthmovers Ltd. c. Edmonton (Ville)*, 2007 CSC 3, [2007] 1 R.C.S. 116; *Tercon Contractors Ltd. c. British Columbia* (1993), 9 C.L.R. (2d) 197, conf. par [1994] B.C.J. No. 2658 (QL); *Karsales (Harrow) Ltd. c. Wallis*, [1956] 1 W.L.R. 936; *Guarantee Co. of North America c. Gordon Capital Corp.*, [1999] 3 R.C.S. 423; *ABB Inc. c. Domtar Inc.*, 2007 CSC 50, [2007] 3 R.C.S. 461; *Re Millar Estate*, [1938] R.C.S. 1; *Plas-Tex Canada Ltd. c. Dow Chemical of Canada Ltd.*, 2004 ABCA 309, 245 D.L.R. (4th) 650.

## Statutes and Regulations Cited

*Ministry of Transportation and Highways Act*, R.S.B.C. 1996, c. 311, ss. 4, 23.

## Lois et règlements cités

*Ministry of Transportation and Highways Act*, R.S.B.C. 1996, ch. 311, art. 4, 23.

**Authors Cited**

Hall, Geoff R. *Canadian Contractual Interpretation Law.* Markham, Ont.: LexisNexis, 2007.

Kain, Brandon, and Douglas T. Yoshida. "The Doctrine of Public Policy in Canadian Contract Law", in Todd L. Archibald and Randall Scott Echlin, eds., *Annual Review of Civil Litigation, 2007.* Toronto: Thomson Carswell, 2007, 1.

McCamus, John D. *The Law of Contracts.* Toronto: Irwin Law, 2005.

Waddams, S. M. *The Law of Contracts*, 5th ed. Aurora, Ont.: Canada Law Book, 2005.

APPEAL from a judgment of the British Columbia Court of Appeal (Donald, Mackenzie and Lowry JJ.A.), 2007 BCCA 592, 73 B.C.L.R. (4th) 201, 40 B.L.R. (4th) 26, 289 D.L.R. (4th) 647, [2008] 2 W.W.R. 410, 249 B.C.A.C. 103, 414 W.A.C. 103, 66 C.L.R. (3d) 1, [2007] B.C.J. No. 2558 (QL), 2007 CarswellBC 2880, setting aside a decision of Dillon J., 2006 BCSC 499, 53 B.C.L.R. (4th) 138, [2006] 6 W.W.R. 275, 18 B.L.R. (4th) 88, 51 C.L.R. (3d) 227, [2006] B.C.J. No. 657 (QL), 2006 CarswellBC 730. Appeal allowed, McLachlin C.J. and Binnie, Abella and Rothstein JJ. dissenting.

*Chris R. Armstrong*, *Brian G. McLean*, *William S. McLean* and *Marie-France Major*, for the appellant.

*J. Edward Gouge*, *Q.C.*, *Jonathan Eades* and *Kate Hamm*, for the respondent.

*Malliha Wilson* and *Lucy McSweeney*, for the intervener.

The judgment of LeBel, Deschamps, Fish, Charron and Cromwell JJ. was delivered by

CROMWELL J. —

I.    Introduction

[1]    The Province accepted a bid from a bidder who was not eligible to participate in the tender and then took steps to ensure that this fact was not disclosed. The main question on appeal, as I see it, is whether the Province succeeded in excluding

**Doctrine citée**

Hall, Geoff R. *Canadian Contractual Interpretation Law.* Markham, Ont. : LexisNexis, 2007.

Kain, Brandon, and Douglas T. Yoshida. « The Doctrine of Public Policy in Canadian Contract Law », in Todd L. Archibald and Randall Scott Echlin, eds., *Annual Review of Civil Litigation, 2007.* Toronto : Thomson Carswell, 2007, 1.

McCamus, John D. *The Law of Contracts.* Toronto : Irwin Law, 2005.

Waddams, S. M. *The Law of Contracts*, 5th ed. Aurora, Ont. : Canada Law Book, 2005.

POURVOI contre un arrêt de la Cour d'appel de la Colombie-Britannique (les juges Donald, Mackenzie et Lowry), 2007 BCCA 592, 73 B.C.L.R. (4th) 201, 40 B.L.R. (4th) 26, 289 D.L.R. (4th) 647, [2008] 2 W.W.R. 410, 249 B.C.A.C. 103, 414 W.A.C. 103, 66 C.L.R. (3d) 1, [2007] B.C.J. No. 2558 (QL), 2007 CarswellBC 2880, qui a infirmé une décision de la juge Dillon, 2006 BCSC 499, 53 B.C.L.R. (4th) 138, [2006] 6 W.W.R. 275, 18 B.L.R. (4th) 88, 51 C.L.R. (3d) 227, [2006] B.C.J. No. 657 (QL), 2006 CarswellBC 730. Pourvoi accueilli, la juge en chef McLachlin et les juges Binnie, Abella et Rothstein sont dissidents.

*Chris R. Armstrong*, *Brian G. McLean*, *William S. McLean* et *Marie-France Major*, pour l'appelante.

*J. Edward Gouge*, *c.r.*, *Jonathan Eades* et *Kate Hamm*, pour l'intimée.

*Malliha Wilson* et *Lucy McSweeney*, pour l'intervenant.

Version française du jugement des juges LeBel, Deschamps, Fish, Charron et Cromwell rendu par

LE JUGE CROMWELL —

I.    Introduction

[1]    La province a accepté la soumission d'une entreprise non admise à participer à l'appel d'offres, puis elle a pris des mesures pour dissimuler ce fait. De mon point de vue, la principale question que soulève le pourvoi est celle de savoir si, grâce à

its liability for damages flowing from this conduct through an exclusion clause it inserted into the contract. I share the view of the trial judge that it did not.

[2]   The appeal arises out of a tendering contract between the appellant, Tercon Contractors Ltd., who was the bidder, and the respondent, Her Majesty the Queen in Right of the Province of British Columbia, who issued the tender call. The case turns on the interpretation of provisions in the contract relating to eligibility to bid and exclusion of compensation resulting from participation in the tendering process.

[3]   The trial judge found that the respondent (which I will refer to as the Province) breached the express provisions of the tendering contract with Tercon by accepting a bid from another party who was not eligible to bid and by ultimately awarding the work to that ineligible bidder. In short, a bid was accepted and the work awarded to a party who should not even have been permitted to participate in the tender process. The judge also found that this and related conduct by the Province breached the implied duty of fairness to bidders, holding that the Province had acted "egregiously" (2006 BCSC 499, 53 B.C.L.R. (4th) 138, at para. 150). The judge then turned to the Province's defence based on an exclusion clause that barred claims for compensation "as a result of participating" in the tendering process. She held that this clause, properly interpreted, did not exclude Tercon's claim for damages. In effect, she held that it was not within the contemplation of the parties that this clause would bar a remedy in damages arising from the Province's unfair dealings with a party who was not entitled to participate in the tender in the first place.

[4]   The Province appealed and the Court of Appeal reversed (2007 BCCA 592, 73 B.C.L.R. (4th) 201). Dealing only with the exclusion clause issue, it held that the clause was clear and unambiguous and barred compensation for all defaults.

la clause de non-recours en indemnisation (« clause de non-recours ») qu'elle a insérée dans le contrat, la province parvient à échapper à la responsabilité civile découlant de ces actes. À l'instar de la juge de première instance, je conclus par la négative.

[2]   Le pourvoi fait suite au contrat issu de l'appel d'offres et intervenu entre l'appelante Tercon Contractors Ltd., le soumissionnaire, et l'intimée Sa Majesté la Reine du chef de la Colombie-Britannique (la « province »), l'auteur de l'appel d'offres. Le dénouement de l'affaire tient à l'interprétation des clauses du contrat relatives à l'admissibilité à soumissionner et à l'exclusion de toute indemnité pour la participation à la demande de propositions.

[3]   La juge de première instance conclut que la province a contrevenu aux stipulations expresses du contrat intervenu avec Tercon en acceptant la proposition d'un autre soumissionnaire qui n'était pas admissible, puis en confiant les travaux à ce même soumissionnaire. Pour faire court, une proposition a été acceptée et le marché a été accordé à une entreprise qui n'aurait même pas dû être admise à participer au processus. La juge de première instance conclut également que par ces actes et d'autres mesures connexes, la province a manqué à son obligation tacite d'équité envers les soumissionnaires et qu'elle a agi [TRADUCTION] « de manière inacceptable » (2006 BCSC 499, 53 B.C.L.R. (4th) 138, par. 150). Elle se penche ensuite sur la clause de non-recours qui, selon la province, ferait obstacle à toute demande d'indemnisation [TRADUCTION] « pour [l]a participation » à l'appel d'offres. Elle estime que, correctement interprétée, la clause ne faisait pas obstacle au recours en dommages-intérêts de Tercon. Elle statue en effet que les parties n'ont pas envisagé que la clause empêche un tel recours intenté pour l'iniquité dont a fait preuve la province en se mettant en rapport avec une entreprise qui n'était même pas admise à soumissionner.

[4]   La province s'est adressée à la Cour d'appel, qui lui a donné raison, se prononçant uniquement sur la clause de non-recours et statuant qu'elle était claire et non équivoque et qu'elle faisait obstacle à l'indemnisation pour toute inexécution (2007 BCCA 592, 73 B.C.L.R. (4th) 201).

[5]   On Tercon's appeal to this Court, the questions for us are whether the successful bidder was eligible to participate in the request for proposals ("RFP") and, if not, whether Tercon's claim for damages is barred by the exclusion clause.

[6]   In my respectful view, the trial judge reached the right result on both issues. The Province's attempts to persuade us that it did not breach the tendering contract are, in my view, wholly unsuccessful. The foundation of the tendering contract was that only six, pre-selected bidders would be permitted to participate in the bidding. As the trial judge held, the Province not only acted in a way that breached the express and implied terms of the contract by considering a bid from an ineligible bidder, it did so in a manner that was an affront to the integrity and business efficacy of the tendering process. One must not lose sight of the fact that the trial judge found that the Province acted egregiously by "ensuring that [the true bidder] was not disclosed" (para. 150) and that its breach "attacke[d] the underlying premise of the [tendering] process" (para. 146), a process which was set out in detail in the contract and, in addition, had been given ministerial approval as required by statute.

[7]   As for its reliance on the exclusion clause, the Province submits that the parties were free to agree to limitations of liability and did so. Consideration of this submission requires an interpretation of the words of the clause to which the parties agreed in the context of the contract as a whole. My view is that, properly interpreted, the exclusion clause does not protect the Province from Tercon's damage claim which arises from the Province's dealings with a party not even eligible to bid, let alone from its breach of the implied duty of fairness to bidders. In other words, the Province's liability did not arise from Tercon's participation in the process that the Province established, but from the Province's unfair dealings with a party who was not entitled to participate in that process.

[8]   I would allow the appeal and restore the judgment of the trial judge.

[5]   Dans le pourvoi formé par Tercon, la Cour est appelée à déterminer si l'adjudicataire était admis à participer à la demande de propositions (« DP ») et, dans la négative, si la clause de non-recours fait obstacle au recours en dommages-intérêts de Tercon.

[6]   En toute déférence, j'estime que la juge de première instance tranche correctement les deux questions. La province n'est pas du tout parvenue, selon moi, à convaincre la Cour qu'elle n'avait pas manqué à ses obligations contractuelles. Suivant le contrat issu de l'appel d'offres, seules six entreprises présélectionnées pouvaient prendre part à l'appel d'offres. La juge statue qu'en considérant l'offre d'un soumissionnaire inadmissible, la province a manqué à ses obligations contractuelles expresses et tacites, et ce, d'une manière qui portait outrageusement atteinte à l'intégrité et à l'efficacité commerciale du processus d'appel d'offres. Sans oublier qu'à son avis, la province a agi de manière inacceptable en [TRADUCTION] « veillant à ce que [l'identité du véritable soumissionnaire] ne soit pas révélée » (par. 150). La juge ajoute que cette inexécution [TRADUCTION] « a sapé l'assise du processus [d'appel d'offres] » (par. 146), lequel était décrit en détail dans le contrat et, qui plus est, avait obtenu l'approbation ministérielle exigée par la loi.

[7]   Pour ce qui concerne l'application de la clause de non-recours, la province soutient que les parties étaient libres de limiter leur responsabilité comme elles l'ont fait. Statuer sur cette prétention exige que l'on interprète le libellé de la clause dont les parties ont convenu, au vu du contrat dans son entier. J'estime que, correctement interprétée, la clause de non-recours ne protège pas la province contre l'action en dommages-intérêts intentée par Tercon pour la mise en rapport de la province avec une entreprise qui n'était même pas admise à soumissionner, sans compter le manquement à son obligation tacite d'équité envers les soumissionnaires. Autrement dit, la responsabilité de la province ne résulte pas de la participation de Tercon au processus, mais bien de l'iniquité dont la province s'est rendue coupable en se mettant en rapport avec une entreprise non admise à prendre part à ce processus.

[8]   Je suis d'avis d'accueillir le pourvoi et de rétablir le jugement de première instance.

## II. Brief Overview of the Facts

[9]    I will have to set out more factual detail as part of my analysis. For now, a very brief summary will suffice. In 2000, the Ministry of Transportation and Highways (also referred to as the "Province") issued a request for expressions of interest ("RFEI") for designing and building a highway in northwestern British Columbia. Six teams made submissions, including Tercon and Brentwood Enterprises Ltd. Later that year, the Province informed the six proponents that it now intended to design the highway itself and would issue a RFP for its construction.

[10]    The RFP was formally issued on January 15, 2001. Under its terms, only the six original proponents were eligible to submit a proposal. The RFP also included a clause excluding all claims for damages "as a result of participating in this RFP" (s. 2.10).

[11]    Unable to submit a competitive bid on its own, Brentwood teamed up with Emil Anderson Construction Co. ("EAC"), which was not a qualified bidder, and together they submitted a bid in Brentwood's name.  Brentwood and Tercon were the two short-listed proponents and the Ministry ultimately selected Brentwood as the preferred proponent.

[12]    Tercon brought an action seeking damages, alleging that the Ministry had considered and accepted an ineligible bid and that, but for that breach, it would have been awarded the contract. The trial judge agreed and awarded roughly $3.5 million in damages and prejudgment interest. As noted, the Court of Appeal reversed and Tercon appeals by leave of the Court.

## III. Issues

[13]    The issues for decision are whether the trial judge erred in finding that:

1.  the Province breached the tendering contract by entertaining a bid from an ineligible bidder.

## II. Bref aperçu des faits

[9]    Je reviendrai plus en détail sur les faits, mais pour l'heure, en voici un bref résumé. En 2000, le ministère des Transports et de la Voirie (également appelé la « province ») a lancé une demande d'expression d'intérêt (« DEI ») pour la conception et la construction d'une route dans le nord-ouest de la Colombie-Britannique. Elle a reçu six soumissions, dont celles de Tercon et de Brentwood Enterprises Ltd. Plus tard la même année, la province a fait savoir aux six entreprises intéressées qu'elle entendait désormais concevoir elle-même la route et demander des propositions pour sa construction.

[10]    Lancée officiellement le 15 janvier 2001, la DP précisait que seules les six entreprises intéressées initialement étaient admises à soumissionner. Elle comportait aussi une clause écartant tout recours en indemnisation [TRADUCTION] « pour [l]a participation à la DP » (clause 2.10).

[11]    Incapable de présenter seule une soumission concurrentielle, Brentwood s'est jointe à Emil Anderson Construction Co. (« EAC »), qui n'était pas un soumissionnaire admissible, et une proposition commune a été présentée au nom de Brentwood. La liste des adjudicataires possibles a été ramenée à deux entreprises — Brentwood et Tercon —, puis le ministère a finalement opté pour la première.

[12]    Tercon a intenté une action en dommages-intérêts, alléguant que le ministère avait examiné puis accepté une soumission inadmissible et que, n'eût été ce manquement, elle aurait obtenu le contrat. Elle a eu gain de cause en première instance et obtenu une indemnité d'environ 3,5 millions de dollars plus l'intérêt avant jugement, mais elle a été déboutée en Cour d'appel. Tercon se pourvoit devant notre Cour sur autorisation.

## III. Les questions en litige

[13]    Notre Cour doit déterminer si la juge de première instance a eu tort ou non de tirer les conclusions suivantes :

1.  la province a manqué à une obligation contractuelle en considérant la proposition d'un soumissionnaire inadmissible;

2. the exclusion clause does not bar the appellant's claim for damages for the breaches of the tendering contract found by the trial judge.

IV. Analysis

A. *Was the Brentwood Bid Ineligible?*

[14]  The first issue is whether the Brentwood bid was from an eligible bidder. The judge found that the bid was in substance, although not in form, from a joint venture of Brentwood and EAC and that it was, therefore, an ineligible bid. The Province attacks this finding on three grounds:

(i) a joint venture is not a legal person and therefore the Province could not and did not contract with a joint venture;

(ii) it did not award the contract to EAC and EAC had no contractual responsibility to the Province for failure to perform the contract;

(iii) there was no term of the RFP that restricted the right of proponents to enter into joint venture agreements with others; this arrangement merely left Brentwood, the original proponent, in place and allowed it to enhance its ability to perform the work.

[15]  While these were the Province's main points, its position became more wide-ranging during oral argument, at times suggesting that it had no contractual obligation to deal only with eligible bidders. It is therefore necessary to take a step back and look at that threshold point before turning to the Province's more focussed submissions.

1. The Province's Contractual Obligations in the Bidding Process

[16]  The judge found, and it was uncontested at trial, that only the six original proponents that

2. la clause de non-recours ne faisait pas obstacle au recours en dommages-intérêts de l'appelante pour les inexécutions contractuelles relevées par le tribunal.

IV. Analyse

A. *La proposition de Brentwood était-elle admissible?*

[14]  La première question est celle de savoir si la proposition de Brentwood était présentée par un soumissionnaire admissible. La juge de première instance conclut que, malgré sa forme, la proposition provenait essentiellement d'une coentreprise formée de Brentwood et d'EAC et qu'elle était donc inadmissible. La province invoque trois motifs à l'encontre de cette conclusion :

(i) une coentreprise étant dépourvue de la personnalité morale, elle ne pouvait contracter avec une telle entité et elle ne l'a pas fait;

(ii) elle n'a pas adjugé le marché à EAC, et EAC n'avait envers elle aucune responsabilité en cas d'inexécution contractuelle;

(iii) aucune disposition de la DP n'interdisait aux proposants de s'associer à des tiers en coentreprise : Brentwood, proposant initial, demeurait simplement en lice et accroissait sa capacité d'exécuter les travaux.

[15]  Ce sont les principaux arguments invoqués par la province, mais celle-ci a défendu une thèse beaucoup plus large en plaidoirie orale, faisant valoir à certains moments qu'elle n'était pas contractuellement tenue de se mettre en rapport seulement avec des soumissionnaires admissibles. Il faut donc revenir sur cette question préliminaire avant d'analyser les points plus précis de son argumentation.

1. Les obligations contractuelles de la province dans le processus d'appel d'offres

[16]  La juge de première instance conclut — ce qui n'a pas été contesté au procès — que seules les

qualified through the RFEI process were eligible to submit a response to the RFP. This finding is not challenged on appeal, although there was a passing suggestion during oral argument that there was no contractual obligation of this sort at all. The trial judge also held, noting that this point was uncontested, that a joint venture between Brentwood and EAC was ineligible to bid. This is also not contested on appeal. These two findings are critical to the case and provide important background for an issue that is in dispute, namely whether the Brentwood bid was ineligible. It is, therefore, worth reviewing the relevant background in detail. I first briefly set out the legal framework and then turn to the trial judge's findings.

### 2.   Legal Principles

[17]   Submitting a compliant bid in response to a tender call *may* give rise to a contract — called Contract A — between the bidder and the owner, the express terms of which are found in the tender documents. The contract may also have implied terms according to the principles set out in *Canadian Pacific Hotels Ltd. v. Bank of Montreal*, [1987] 1 S.C.R. 711; see also *M.J.B. Enterprises Ltd. v. Defence Construction (1951) Ltd.*, [1999] 1 S.C.R. 619, and *Martel Building Ltd. v. Canada*, 2000 SCC 60, [2000] 2 S.C.R. 860. The key word, however, is "may". The Contract A/Contract B framework is one that arises, if at all, from the dealings between the parties. It is not an artificial construct imposed by the courts, but a description of the legal consequences of the parties' actual dealings. The Court emphasized in *M.J.B.* that whether Contract A arises and if it does, what its terms are, depend on the express and implied terms and conditions of the tender call in each case. As Iacobucci J. put it, at para. 19:

What is important . . . is that the submission of a tender in response to an invitation to tender may give

six entreprises intéressées initialement, devenues admissibles à l'issue de la DEI, pouvaient donner suite à la DP. Cette conclusion n'est pas contestée en appel même si, en plaidoirie orale, la province a laissé entendre qu'elle n'avait pas d'obligation contractuelle concomitante. La juge estime également — et relève l'absence de contestation sur ce point — que la coentreprise formée de Brentwood et d'EAC n'était pas un soumissionnaire admissible. Cette conclusion n'est pas non plus contestée en appel. Ces deux conclusions sont cruciales en l'espèce et elles offrent une toile de fond importante pour trancher une question en litige, à savoir l'admissibilité de la proposition de Brentwood. Il convient donc d'examiner ce contexte en détail. Je ferai brièvement état du cadre juridique applicable avant de me pencher sur les conclusions de la juge de première instance.

### 2.   Les principes juridiques

[17]   Le dépôt d'une soumission conforme en réponse à un appel d'offres *peut* faire naître entre le soumissionnaire et le propriétaire un contrat — le contrat A — dont les conditions sont celles figurant dans le dossier d'appel d'offres. Le contrat peut également comporter des clauses tacites, suivant les principes formulés dans l'arrêt *Société hôtelière Canadien Pacifique Ltée c. Banque de Montréal*, [1987] 1 R.C.S. 711; voir aussi les arrêts *M.J.B. Enterprises Ltd. c. Construction de Défense (1951) Ltée*, [1999] 1 R.C.S. 619, et *Martel Building Ltd. c. Canada*, 2000 CSC 60, [2000] 2 R.C.S. 860. L'élément clé réside toutefois dans l'emploi du mot « peut ». L'existence d'un contrat A et d'un contrat B dépend entièrement des échanges entre les parties. Il ne s'agit pas d'une conception artificielle imposée par les tribunaux, mais d'une description des conséquences juridiques des échanges intervenus entre les parties. Dans l'arrêt *M.J.B.*, la Cour souligne que ce sont les conditions expresses et tacites de l'appel d'offres qui déterminent chaque fois s'il y a ou non un contrat A et, le cas échéant, quelles en sont les conditions. Comme le dit le juge Iacobucci au par. 19 :

L'important [. . .] c'est que la présentation d'une soumission en réponse à un appel d'offres peut donner

Case 09-10138-MFW    Doc 13460-10    Filed 05/02/14    Page 428 of 610

82        TERCON CONTRACTORS LTD. *v.* B.C.    *Cromwell J.*        [2010] 1 S.C.R.

rise to contractual obligations, quite apart from the obligations associated with the construction contract to be entered into upon the acceptance of a tender, <u>depending upon whether the parties intend to initiate contractual relations by the submission of a bid</u>. If such a contract arises, its terms are governed by the terms and conditions of the tender call. [Emphasis added.]

### 3.  The Trial Judge's Findings Concerning the Existence of Contract A

[18]    The question of whether Tercon's submission of a compliant bid gave rise to contractual relations between it and the Province was contested by the Province at trial. The trial judge gave extensive reasons for finding against the Province on this issue. We are told that the Province did not pursue this point in the Court of Appeal but instead premised its submissions on the existence of Contract A. The Province took the same approach in its written submissions in this Court. However, during oral argument, there was some passing reference in response to questions that there was no Contract A. In light of the position taken by the Province on its appeal to the Court of Appeal and in its written submissions in this Court, it is now too late to revisit whether there were contractual duties between Tercon and the Province.  Even if it were open to the Province to make this argument now, I can see no error in legal principle or any palpable and overriding error of fact in the trial judge's careful reasons on this point.

[19]    The trial judge did not mechanically impose the Contract A/Contract B framework, but considered whether Contract A arose in light of her detailed analysis of the dealings between the parties. That was the right approach. She reviewed in detail the provisions of the RFP which supported her conclusion that there was an intent to create contractual relations upon submission of a compliant bid. She noted, for example, that bids were to be irrevocable for 60 days and that security of $50,000 had to be paid by all proponents and was to be increased to $200,000 by the successful proponent.  Any revisions to proposals prior to the closing date had to be in writing, properly executed and received before the closing time. The RFP also set

naissance à des obligations contractuelles tout à fait distinctes des obligations découlant du contrat d'entreprise qui doit être conclu dès l'acceptation de la soumission, <u>selon que les parties auront voulu établir des rapports contractuels par la présentation d'une soumission</u>. Advenant la formation d'un tel contrat, ses modalités sont régies par les conditions de l'appel d'offres. [Je souligne.]

### 3.  Les conclusions de la juge de première instance concernant l'existence du contrat A

[18]    La province a nié au procès que la présentation d'une soumission conforme par Tercon a fait naître un lien contractuel entre elles. La juge du procès motive abondamment sa décision de donner tort à la province sur ce point. Il appert que la province n'aurait pas persisté dans cette voie devant la Cour d'appel, mais aurait plutôt invoqué l'existence d'un contrat A. La province défend la même thèse dans l'argumentation écrite présentée à notre Cour, mais en réponse à des questions posées lors de sa plaidoirie, elle a laissé entendre qu'il n'existait pas de contrat A. Vu la position de la province en Cour d'appel et l'argumentation écrite qu'elle nous a présentée, il est désormais trop tard pour revenir sur la question de l'existence d'obligations contractuelles entre Tercon et la province. Et même s'il était loisible à la province de faire valoir cet argument aujourd'hui, je ne relève pas d'erreur de droit ni d'erreur de fait manifeste et dominante dans les motifs soigneusement rédigés par la juge de première instance sur ce point.

[19]    La juge de première instance n'a pas mécaniquement appliqué le modèle du contrat A et du contrat B. Elle s'est plutôt demandé si l'examen détaillé des échanges entre les parties révélait qu'un contrat A en avait résulté. C'est ce qu'il convenait de faire. Elle conclut à l'issue d'un examen minutieux des dispositions de la DP qu'il y avait intention que la présentation d'une soumission conforme crée un lien contractuel. Par exemple, elle relève que les soumissions devaient être irrévocables pendant 60 jours et que chaque soumissionnaire devait verser 50 000 $ à titre de garantie, montant qui passait à 200 000 $ si sa proposition était retenue. Toute modification de la proposition avant la date de clôture devait être faite par écrit, porter les

out detailed evaluation criteria and specified that they were to be the only criteria to be used to evaluate proposals. A specific form of alliance agreement was attached. There were detailed provisions about pricing that were fixed and non-negotiable. A proponent was required to accept this form of contract substantially, and security was lost if an agreement was not executed. The Ministry reserved a right to cancel the RFP under s. 2.9 but in such event was obliged to reimburse proponents for costs incurred in preparing their bids up to $15,000 each. Proponents had to submit a signed proposal form, which established that they offered to execute an agreement substantially in the form included in the RFP package. Further, they acknowledged that the security could be forfeited if they were selected as the preferred proponent and failed to enter into good faith discussions with the Ministry to reach an agreement and sign the alliance agreement.

[20]   In summary, as the trial judge found, the RFP set out a specifically defined project, invited proposals from a closed and specific list of eligible proponents, and contemplated that proposals would be evaluated according to specific criteria. Negotiation of the alliance construction contract was required, but the negotiation was constrained and did not go to the fundamental details of either the procurement process or the ultimate contract.

[21]   There is, therefore, no basis to interfere with the judge's finding that there was an intent to create contractual obligations upon submission of a compliant bid. I add, however, that the tender call in this case did not give rise to the classic Contract A/Contract B framework in which the bidder submits an irrevocable bid and undertakes to enter into Contract B on those terms if it is accepted. The alliance model process which was used here was more complicated than that and involved good faith negotiations for a Contract B in the form set out in the tender documents. But in my view, this should not distract us from the main question here. We do not have to spell out all of the terms of Contract A, let alone of Contract B, so as to define all of the duties and obligations of both

signatures requises et être reçue avant cette date. La DP donnait en outre le détail des critères d'évaluation, précisant qu'il s'agissait des seuls applicables. L'ébauche d'un accord de partenariat y était jointe. Des dispositions précises et non négociables sur les coûts y étaient prévues. Le soumissionnaire devait adhérer en substance à cette forme de contrat, sinon il perdait le montant de la garantie. À la clause 2.9, le ministère se réservait le droit d'annuler la DP, mais il devait alors rembourser les proposants des frais engagés pour la préparation des propositions, jusqu'à concurrence de 15 000 $ chacun. Le formulaire de proposition que devait signer le soumissionnaire portait qu'il s'engageait à signer un accord revêtant essentiellement la forme de celui compris dans les documents de la DP. Le proposant reconnaissait en outre que si son offre était retenue, l'omission de négocier de bonne foi avec le ministère en vue de la conclusion d'une entente et de signer l'accord de partenariat pouvait entraîner la perte du dépôt de garantie.

[20]   En résumé, comme le conclut la juge, la DP décrivait un projet précis, invitait un certain nombre de proposants admissibles à soumissionner et indiquait que les propositions seraient considérées au regard de critères établis. Il devait y avoir négociation de l'accord de construction en partenariat, mais à l'intérieur de certaines limites et elle ne devait pas porter sur les éléments fondamentaux du processus d'appel d'offres ou du contrat final.

[21]   Il n'y a donc pas lieu de modifier la conclusion de la juge selon laquelle il y avait intention de faire en sorte que la présentation d'une soumission conforme fasse naître des obligations contractuelles. J'ajoute cependant que l'appel d'offres considéré en l'espèce ne correspondait pas au modèle classique du contrat A et du contrat B où le soumissionnaire présente une offre irrévocable et s'engage à conclure le contrat B aux mêmes conditions s'il est choisi. Le modèle du partenariat adopté en l'espèce était plus complexe et supposait des négociations de bonne foi en vue de la conclusion du contrat B revêtant la forme indiquée dans les documents de l'appel d'offres. Toutefois, cette particularité ne doit pas nous faire perdre de vue la principale question en litige. Point n'est besoin d'exposer

the bidders and the Province. The question here is much narrower: did contractual obligations arise as a result of Tercon's compliant bid and, if so, was it a term of that contract that the Province would only entertain bids from eligible bidders? The trial judge found offer, acceptance and consideration in the invitation to tender and Tercon's bid. There is no basis, in my respectful view, to challenge that finding even if it were open to the Province to try to do so at this late stage of the litigation.

#### 4.    The Trial Judge's Finding Concerning Eligibility

[22]   It was not contested at trial that only the six original proponents that qualified through the RFEI process were eligible to bid. This point is not in issue on appeal; the question is what this eligibility requirement means. It will be helpful, therefore, to set out the background about this limited eligibility to bid in this tendering process.

[23]   To begin, it is worth repeating that there is no doubt that the Province was contractually bound to accept bids only from eligible bidders. This duty may be implied even absent express stipulation. For example, in *M.J.B.*, the Court found that an implied obligation to accept only compliant bids was necessary to give business efficacy to the tendering process, noting, at para. 41, that a bidder must expend effort and incur expense in preparing its bid and must submit bid security and that it is "obvious" that it makes "little sense" for the bidder to comply with these requirements if the owner "is allowed, in effect, to circumscribe this process and accept a non-compliant bid". But again, whether such a duty should be implied in any given case will depend on the dealings between the parties. Here, however, there is no need to rely on implied terms. The obligation to consider only bids from eligible bidders

toutes les conditions du contrat A, encore moins celles du contrat B, pour circonscrire les obligations respectives du soumissionnaire et de la province. La question qu'il nous faut trancher est beaucoup plus étroite : la présentation d'une soumission conforme par Tercon a-t-elle fait naître des obligations contractuelles et, dans l'affirmative, l'obligation que la province n'examine que les propositions de soumissionnaires admissibles en faisait-elle partie? La juge de première instance estime qu'il y a eu offre, acceptation et contrepartie dans l'appel d'offres et dans la présentation d'une soumission par Tercon. Même si la province pouvait contester cette conclusion à ce stade avancé de l'instance, elle n'aurait à mon avis aucun motif valable de le faire.

#### 4.    La conclusion de la juge de première instance sur l'admissibilité

[22]   Nulle partie n'a contesté en première instance que seules les six entreprises intéressées initialement, qui s'étaient rendues admissibles en répondant à la DEI, étaient admises à soumissionner. Ce point échappe donc au présent pourvoi. La question est de savoir ce qu'il en est de cette condition d'admissibilité. Le contexte de cette limitation de l'admissibilité au processus d'appel d'offres est donc susceptible de nous éclairer.

[23]   D'abord, il convient de répéter qu'il ne fait aucun doute que la province était contractuellement tenue de n'accepter que les propositions de soumissionnaires admissibles. Même en l'absence d'une stipulation expresse, cette obligation peut être inférée. Dans l'arrêt *M.J.B.*, par exemple, notre Cour a statué que l'obligation tacite de n'accepter que les soumissions conformes était nécessaire à l'efficacité commerciale du processus d'appel d'offres, signalant au par. 41 qu'un soumissionnaire doit consacrer efforts et sommes d'argent à la préparation de sa soumission et verser une garantie, de sorte qu'il est « évident » qu'il serait « déraisonnable » qu'il doive satisfaire à ces exigences si le propriétaire « peut, dans les faits, contourner ce processus et accepter une soumission non conforme ». Mais encore une fois, ce sont les échanges entre les parties qui déterminent s'il y a lieu d'inférer l'existence d'une telle

was stated expressly in the tender documents and in the required ministerial approval of the process which they described.

[24]    As noted, in early 2000, the Province issued a RFEI based on a design-build model; the contractor would both design and build the highway. The RFEI contemplated that a short list of three qualified contractors, or teams composed of contractors and consultants, would be nominated as proponents. Each was to provide a description of the legal structure of the team and to describe the role of each team member along with the extent of involvement of each team member as a percentage of the total scope of the project and an organization chart showing each team member's role. Any change in team management or key positions required notice in writing to the Province which reserved the right to disqualify the proponent if the change materially and negatively affected the ability of the team to carry out the project.

[25]    Expressions of interest ("EOI") were received from six teams including Tercon and Brentwood. The evaluation panel and independent review panel recommended a short list of three proponents with Tercon topping the evaluation. Brentwood was evaluated fifth and was not on the short list. Brentwood was known to lack expertise in drilling and blasting and so its EOI had included an outline of the key team members with that experience. EAC did not participate and had no role in the Brentwood submission. The results of this evaluation were not communicated and the process did not proceed because the Province decided to design the project itself and issue an RFP for an alliance model contract to construct the highway.

[26]    It was clear from the outset that only those who had submitted proposals during the RFEI process would be eligible to submit proposals under the RFP. This was specified in the approval of the process by the Minister of Transportation and

obligation. Cependant, en l'espèce, toute inférence est inutile, car l'obligation de considérer seulement les propositions de soumissionnaires admissibles figurait expressément dans le dossier d'appel d'offres et dans l'approbation ministérielle requise du processus qui y était décrit.

[24]    Rappelons qu'au début de l'année 2000, la province a lancé une DEI pour un projet où l'entrepreneur était appelé à concevoir une route puis à la construire. Suivant la DEI, le nombre de proposants devait être ramené à trois, qu'il s'agisse d'entrepreneurs ou d'équipes d'entrepreneurs et de consultants, tous qualifiés. Chaque proposant devait préciser la structure juridique de l'équipe, le rôle de chacun de ses membres ainsi que le pourcentage de sa contribution à l'ensemble du projet, et remettre un organigramme indiquant la tâche de chacun. Toute modification touchant la direction de l'équipe ou les postes clés devait être notifiée par écrit à la province, qui se réservait le droit d'écarter le proposant si la modification compromettait substantiellement l'aptitude à mener le projet à bien.

[25]    Six équipes, dont Tercon et Brentwood, ont manifesté leur intérêt. Le comité d'évaluation et le comité de révision indépendant ont recommandé de retenir trois proposants, dont Tercon en tête de liste. Classée cinquième, Brentwood ne figurait pas sur cette liste. Comme elle n'avait pas d'expertise dans les domaines du forage et du dynamitage, Brentwood avait énuméré les membres clés de son équipe dotés de cette expertise. EAC n'a pas participé au processus ni joué de rôle dans la soumission de Brentwood. Les résultats de cette évaluation n'ont pas été communiqués, et la province a mis fin au processus après avoir décidé de se charger elle-même de la conception du projet et de demander des propositions en vue de la mise sur pied d'un partenariat pour la construction de la route.

[26]    Il était clair dès le départ que seules les entreprises qui avaient manifesté leur intérêt pourraient présenter une proposition. C'est ce que prévoyait l'approbation du processus donnée par le ministre des Transports et de la Voirie (« ministre ») avant le

Highways ("Minister") before the RFP was issued. It is worth pausing here to briefly look at the Minister's role.

[27] Pursuant to s. 23 of the *Ministry of Transportation and Highways Act*, R.S.B.C. 1996, c. 311, the legislation in force at the relevant time, the Minister was required to invite public tenders for road construction unless he or she determined that another process would result in competitively established costs for the work. The section provided:

23 (1)  The minister must invite tenders by public advertisement, or if that is impracticable, by public notice, for the construction and repair of all government buildings, highways and public works, except for the following:

. . .

(c)  if the minister determines that an alternative contracting process will result in competitively established costs for the performance of the work.

(2)  The minister must cause all tenders received to be opened in public, at a time and place stated in the advertisement or notice.

(3)  The prices must be made known at the time the tenders are opened.

(4)  In all cases where the minister believes it is not expedient to let the work to the lowest bidder, the minister must report to and obtain the approval of the Lieutenant Governor in Council before passing by the lowest tender, except if delay would be injurious to the public interest.

. . .

[28]  These provisions make clear that the work in this case had to be awarded by public tender, absent the Minister's approval of an alternative process, and had to be awarded to the lowest bidder, absent approval of the Lieutenant Governor in Council. As noted, ministerial approval was given for an alternative process under s. 23(1)(c). The Minister issued

lancement de la DP. Il convient de se pencher brièvement sur le rôle du ministre.

[27]  Suivant l'article 23 de la loi applicable à l'époque — la *Ministry of Transportation and Highways Act*, R.S.B.C. 1996, ch. 311 —, le ministre devait lancer un appel d'offres pour la construction d'une route, sauf s'il était d'avis qu'un autre moyen permettrait la réalisation des travaux à un coût concurrentiel. L'article prévoyait notamment ce qui suit :

[TRADUCTION]

23 (1)  Le ministre procède à un appel d'offres par annonce publique ou, lorsque c'est impossible, par avis public, pour la construction et la réparation d'un immeuble gouvernemental, d'une route ou d'un ouvrage public, sauf dans les cas suivants :

. . .

c)  il estime qu'un autre processus d'adjudication de marché permettra la réalisation des travaux à un coût concurrentiel.

(2)  Le ministre veille à ce que toutes les soumissions reçues soient ouvertes en public à la date, à l'heure et à l'endroit indiqués dans l'annonce ou dans l'avis.

(3)  Les prix doivent être communiqués lors de l'ouverture des soumissions.

(4)  Lorsqu'il estime qu'il n'est pas opportun d'adjuger le marché au soumissionnaire le moins disant, le ministre en informe le lieutenant-gouverneur en conseil et obtient l'autorisation de ne pas retenir ce soumissionnaire, sauf s'il en résulte un retard préjudiciable à l'intérêt public.

. . .

[28]  Il ressort de ces dispositions qu'à défaut de l'approbation d'un autre processus par le ministre, le marché devait en l'espèce être attribué par voie d'appel d'offres et que, sauf autorisation du lieutenant-gouverneur de choisir un autre adjudicataire, le marché devait être adjugé au soumissionnaire le moins disant. Un autre processus

a notice that, pursuant to that section, he approved the process set out in an attached document and had determined it to be an alternative contracting process that would result in competitively established costs for the performance of the work. The attached document outlined in seven numbered paragraphs the process that had been approved.

[29]  The document described the background of the public RFEI (which I have set out earlier), noting that *only those firms identified through the EOI process would be eligible to submit proposals for the work* and that they would receive invitations to do so. The Minister's approval in fact referred to the firms who had been short-listed from the RFEI process as being eligible. If this were taken to refer only to the three proponents identified by the evaluation process of the RFEI, Tercon would be included but Brentwood would not. However, no one has suggested that anything turns on this and it seems clear that ultimately all six of the RFEI proponents — including both Tercon and Brentwood — were intended to be eligible. The ministerial approval then briefly set out the process. Proposals "by short-listed firms" were to be evaluated "using the considerations set out in the RFP".

[30]  It is clear, therefore, that participation in the RFP process approved by the Minister was limited to those who had participated in the RFEI process.

[31]  The Province's factum implies that the Minister approved inclusion of the exclusion clause in the RFP. However, there is no evidence of this in the record before the Court. The Minister's approval is before us. It is dated as having been prepared on August 23, 2000 and signed on October 19, 2000, and approves a process outlined in a two-page document attached to it. It says nothing about exclusion of the Province's liability. The RFP, containing the exclusion clause in issue here, is dated January 15, 2001 and was sent out to eligible bidders under cover of a letter of the

d'adjudication a fait l'objet d'une approbation ministérielle conformément à l'al. 23(1)*c*). Le ministre a donné avis de son approbation, en vertu de cette disposition, du processus décrit dans un document joint en annexe et de sa conclusion qu'il s'agissait d'un processus d'adjudication de marché permettant la réalisation des travaux à un coût concurrentiel. Le document joint en annexe décrivait en sept paragraphes numérotés le processus approuvé.

[29]  Ce document faisait état du contexte (mentionné précédemment) de la DEI publique, précisant que *seules les entreprises retenues à l'issue du processus d'expression d'intérêt pourraient présenter une proposition* et seraient invitées à le faire. L'approbation ministérielle visait en fait les entreprises jugées admissibles par suite de la DEI. S'il s'agissait seulement des trois proposants sélectionnés dans le cadre de cette première évaluation, Tercon en faisait partie, mais non Brentwood. Or, nul ne laisse entendre que ce point est décisif à quelque égard, et il semble clair que, finalement, les six entreprises ayant donné suite à la DEI, dont Tercon et Brentwood, étaient tenues pour admissibles. L'approbation ministérielle décrit ensuite brièvement le processus. Les propositions des entreprises présélectionnées devaient être évaluées [TRADUCTION] « en fonction des critères énoncés dans la DP ».

[30]  Il ne fait donc aucun doute que la participation au processus de DP approuvé par le ministre était réservée aux entreprises qui avaient répondu à la DEI.

[31]  Dans son mémoire, la province laisse entendre que le ministre a approuvé la clause de non-recours figurant dans la DP. Or, selon le dossier de la Cour, aucun élément n'étaye sa prétention. Nous disposons du texte de l'approbation ministérielle. Suivant la date qui y est apposée, elle aurait été rédigée le 23 août 2000 et signée le 19 octobre de la même année. Elle vise le processus énoncé dans le document de deux pages qui y est joint. Aucune mention n'y est faite de la non-responsabilité de la province. La DP, qui renferme la clause de non-recours litigieuse, porte la date du 15 janvier 2001

same date, some three months after the Minister's approval.

[32]    The RFP is a lengthy document, containing detailed instructions to proponents, required forms, a time schedule of the work, detailed provisions concerning contract pricing, a draft of the ultimate construction contract and many other things. Most relevant for our purposes are the terms of the instructions to proponents and in particular the eligibility requirements for bidders.

[33]    The RFP reiterates in unequivocal terms that eligibility to bid was restricted as set out in the ministerial approval. It also underlines the significance of the identity of the proponent.  In s. 1.1, the RFP specifies that only the six teams involved in the RFEI would be eligible. The term "proponent", which refers to a bidder, is defined in s. 8 as "a team that has become eligible to respond to the RFP as described in Section 1.1 of the Instructions to Proponents". Section 2.8(a) of the RFP stipulates that *only* the six proponents qualified through the RFEI process were eligible and that *proposals received from any other party would not be considered*. In short, there were potentially only six participants and "Contract A" could not arise by the submission of a bid from any other party.

[34]    The RFP also addressed material changes to the proponent, including changes in the proponent's team members and its financial ability to undertake and complete the work. Section 2.8(b) of the RFP provided in part as follows:

If in the opinion of the Ministry a material change has occurred to the Proponent since its qualification under the RFEI, including if the composition of the Proponent's team members has changed . . . or if, for financial or other reasons, the Proponent's ability to undertake and complete the Work has changed, then the

et elle a été envoyée aux soumissionnaires admissibles avec lettre d'accompagnement datée du même jour quelque trois mois après l'approbation ministérielle.

[32]    La DP est un document volumineux renfermant des instructions détaillées à l'intention des proposants, des formulaires à remplir, un calendrier des travaux, des dispositions précises sur la fixation du prix du contrat, une ébauche de l'accord final de construction en partenariat et bien d'autres éléments. Toutefois, ce qui importe le plus pour les besoins du présent pourvoi c'est le libellé des instructions aux proposants et, plus particulièrement, les conditions d'admissibilité des soumissionnaires.

[33]    La DP rappelle de manière non équivoque que l'admissibilité à soumissionner est limitée comme le prévoit l'approbation ministérielle. Elle souligne aussi que l'identité du proposant importe. Le paragraphe 1.1 dispose que seules les six équipes ayant répondu à la DEI sont admissibles. L'article 8 prévoit que [TRADUCTION] « proposant » — l'équivalent de « soumissionnaire » — [TRADUCTION] « s'entend d'une équipe admise à répondre à la DP suivant le libellé du par. 1.1 des instructions aux proposants ». L'alinéa 2.8a) de la DP précise que *seuls* les six proposants devenus admissibles en répondant à la DEI peuvent soumissionner et qu'*aucune proposition d'une autre personne ne sera examinée*. En somme, il ne pouvait y avoir que six participants, et le « contrat A » ne pouvait naître de la présentation d'une proposition présentée par une autre personne.

[34]    La DP aborde aussi la question de la modification substantielle visant un proposant, notamment en ce qui concerne la composition de son équipe et son aptitude financière à entreprendre les travaux et à les mener à bien. L'alinéa 2.8b) prévoit notamment ce qui suit :

[TRADUCTION] Lorsque de l'avis du ministère, depuis que le proposant est devenu admissible en répondant à la DEI, une modification substantielle le concernant s'est produite, notamment en ce qui a trait à la composition de son équipe [. . .] ou à son aptitude financière ou autre à entreprendre les travaux ou à les mener à bien, il peut

Ministry may request the Proponent to submit further supporting information as the Ministry may request in support of the Proponent's qualification to perform the Work. If in the sole discretion of the Ministry as a result of the changes the Proponent is not sufficiently qualified to perform the Work then the Ministry reserves the right to disqualify that Proponent, and reject its Proposal.

[35]  The proponent was to provide an organization chart outlining the proponent's team members, structure and roles. If the team members were different from the RFEI process submission, an explanation was to be provided for the changes: s. 4.2(b)i. A list of subcontractors and suppliers was also to be provided and the Ministry had to be notified of any changes: s. 4.2(e).

[36]  The RFP provided proponents with a mechanism to determine whether they remained qualified to submit a proposal. If a proponent was concerned about its eligibility as a result of a material change, it could make a preliminary submission to the Ministry describing the nature of the changes and the Ministry would give a written decision as to whether the proponent was still qualified: s. 2.8(b).

[37]  Brentwood tried to take advantage of this process. The trial judge thoroughly outlined this, at paras. 17-23 of her reasons. In brief, Brentwood lacked expertise in drilling and blasting and by the time the RFP was issued, it faced limited local bonding capacity due to commitments to other projects, a shorter construction period, the potential unavailability of subcontractors and limited equipment to perform the work. It in fact considered not bidding at all. Instead, however, it entered into a pre-bidding agreement with EAC that the work would be undertaken by a joint venture of Brentwood and EAC and that upon being awarded the work, they would enter into a joint venture agreement and would share 50/50 the costs, expenses, losses and gains. The trial judge noted that it was common in the industry for contractors to agree to a joint venture on the basis of a pre-bid agreement with the specifics of the joint venture to be worked out once the contract was awarded and that Brentwood and EAC

exiger du proposant d'autres renseignements établissant qu'il est en mesure d'exécuter les travaux. Lorsque, à son seul gré, il estime que la modification fait en sorte que le proposant n'est pas suffisamment apte à exécuter les travaux, le ministère se réserve le droit de l'écarter et de rejeter sa proposition.

[35]  Le proposant devait fournir un organigramme indiquant la composition et la structure de son équipe et le rôle de ses membres. Lorsque les membres de son équipe n'étaient pas les mêmes que ceux mentionnés dans sa réponse à la DEI, il devait s'en expliquer : sous-al. 4.2b)i). Une liste de sous-traitants et de fournisseurs devait également être remise, et tout changement qui y était apporté devait être notifié au ministère : al. 4.2e).

[36]  La DP prévoyait un mécanisme permettant au proposant de s'assurer qu'il était toujours admissible. Le proposant désireux de savoir si un changement substantiel compromettait son admissibilité à soumissionner pouvait en communiquer la nature au ministère en vue d'obtenir une décision préalable confirmant ou non qu'il était toujours admissible : al. 2.8b).

[37]  Brentwood a tenté de se prévaloir de ce mécanisme, et la juge de première instance relate sa démarche en détail aux par. 17 à 23 de ses motifs. Pour résumer, Brentwood n'avait pas d'expertise en matière de forage et de dynamitage et lorsque la DP a été lancée, le cautionnement qu'elle pouvait offrir était limité par d'autres engagements, la période de construction était écourtée, des sous-traitants pouvaient ne plus être disponibles et le matériel dont elle disposait pour exécuter les travaux était restreint. Elle a d'ailleurs envisagé de ne pas présenter de proposition du tout. Elle a cependant conclu avec EAC une entente préalable à la soumission prévoyant qu'elles réaliseraient les travaux en coentreprise et que, dès l'adjudication du marché, elles concluraient un accord de coentreprise et se répartiraient à parts égales les coûts, les dépenses, les pertes et les bénéfices. La juge signale qu'il est courant dans ce secteur d'activité qu'avant le dépôt d'une soumission, des entrepreneurs conviennent

acted consistently throughout in accordance with this industry standard.

[38]   Brentwood sent the Province's project manager, Mr. Tasaka, a preliminary submission as provided for in s. 2.8(b) of the RFP, advising of a material change in its team's structure in that it wished to form a joint venture with EAC. This was done, the trial judge found, because Brentwood thought it would be disqualified if it submitted a proposal as a joint venture without the Ministry's prior approval under this section of the RFP. The Province never responded in writing as it ought to have according to s. 2.8(b).

[39]   It seems to have been assumed by everyone that a joint venture of Brentwood and EAC was not eligible because this change would not simply be a change in the composition of the bidder's team, but in effect a new bidder. Without reviewing in detail all of the evidence referred to by the trial judge, it is fair to say that although Brentwood ultimately submitted a proposal in its own name, the proposal in substance was from the Brentwood/EAC joint venture and was evaluated as such. As the trial judge concluded:

> The substance of the proposal was as a joint venture and this must have been apparent to all. The [project evaluation panel] approved Brentwood/EAC as joint venturers as the preferred proponent. The [panel] was satisfied that Tercon had the capacity and commitment to do the job but preferred the joint venture submission of Brentwood/EAC. [para. 53]

[40]   There was some suggestion by the Province during oral argument that the trial judge had wrongly imposed on it a duty to investigate Brentwood's bid, a duty rejected by the majority of the Court in *Double N Earthmovers Ltd. v. Edmonton (City)*, 2007 SCC 3, [2007] 1 S.C.R. 116. In my view, the trial judge did not such thing. As her detailed findings make clear, the Province: (1) fully understood that the Brentwood bid was in fact on behalf of a joint venture of Brentwood and EAC; (2) thought

de la création d'une coentreprise dont les modalités seront arrêtées dès l'adjudication du contrat. Elle ajoute que Brentwood et EAC ont toujours agi dans le respect de cette pratique établie.

[38]   Conformément à l'al. 2.8b) de la DP, Brentwood a fait parvenir au gestionnaire du projet, M. Tasaka, une proposition préliminaire qui signalait la modification substantielle de la structure de son équipe résultant de son intention de former une coentreprise avec EAC. Selon la juge de première instance, Brentwood l'a fait parce qu'elle pensait que sa proposition serait rejetée si elle était présentée au nom d'une coentreprise sans que le ministère n'ait donné son approbation au préalable en application de cette disposition de la DP. La province n'a jamais répondu par écrit comme elle était censée le faire suivant l'al. 2.8b).

[39]   Tous les intéressés semblent avoir tenu la coentreprise Brentwood/EAC pour inadmissible du fait que la composition de l'équipe n'était pas simplement modifiée, mais qu'un nouveau soumissionnaire voyait en fait le jour. Sans analyser en détail tous les éléments de preuve mentionnés par la juge de première instance, on peut à juste titre affirmer que même si la proposition de Brentwood a été présentée en son seul nom, elle provenait essentiellement de la coentreprise Brentwood/EAC et elle a été considérée en conséquence. Selon la juge,

> [TRADUCTION] [l]a proposition était essentiellement celle d'une coentreprise, ce qui a dû être évident pour tout le monde. Le [comité d'évaluation du projet] a arrêté son choix sur la coentreprise Brentwood/EAC. Il estimait que Tercon avait les moyens et la détermination nécessaires pour réaliser les travaux, mais il a préféré la proposition de Brentwood/EAC. [par. 53]

[40]   Dans sa plaidoirie orale, la province a laissé entendre que la juge lui avait imputé à tort l'obligation de vérifier la soumission de Brentwood, ce qui allait à l'encontre de l'avis des juges majoritaires de notre Cour dans l'arrêt *Double N Earthmovers Ltd. c. Edmonton (Ville)*, 2007 CSC 3, [2007] 1 R.C.S. 116. Je ne crois pas que cela ait été le cas. Il ressort des conclusions détaillées de la juge que la province (1) savait pertinemment que la soumission de Brentwood était en fait celle d'une coentreprise

that a bid from that joint venture was not eligible; and (3) took active steps to obscure the reality of the situation. No investigation was required for the Province to know these things and the judge imposed no duty to engage in one.

### 5.   The Province's Submissions

[41]   I will address the Province's first two points together:

(i)   a joint venture is not a legal person and therefore the Province could not and did not contract with a joint venture; and

(ii)   it did not award the contract to EAC and EAC had no contractual responsibility to the Province for failure to perform the contract.

[42]   I cannot accept these submissions. The issue is not, as these arguments assume, whether the Province contracted with a joint venture or whether EAC had contractual obligations to the Province. The issue is whether the Province considered an ineligible bid; the point of substance is whether the bid was from an eligible bidder.

[43]   At trial there was no contest that a bid from a joint venture involving an ineligible bidder would be ineligible. The Province's position was that there was no need to look beyond the face of the bid to determine who was bidding: the proposal was in the name of Brentwood and therefore the bid was from a compliant bidder. Respectfully, I see no error in the trial judge's rejection of this position. There was a mountain of evidence to support the judge's conclusions that first, Brentwood's bid, in fact if not in form, was on behalf of a joint venture between itself and EAC; second, the Province knew this and took the position that it could not consider a bid from or award the work to that joint venture; third, the existence of the joint venture was a material consideration in favour of the Brentwood bid during the evaluation process; and finally, that steps were taken by revising and drafting documentation to obfuscate the reality of the situation.

formée avec EAC, (2) qu'elle estimait que la proposition de cette coentreprise était inadmissible et (3) qu'elle s'est activement employée à gommer ce fait. Nulle vérification ne s'imposait à cet égard, et la juge n'a pas imputé d'obligation de vérification à la province.

### 5.   La thèse de la province

[41]   Je me penche maintenant sur les deux premiers arguments de la province :

(i)   une coentreprise étant dépourvue de la personnalité morale, la province ne pouvait contracter avec elle et elle ne l'a pas fait;

(ii)   elle n'a pas adjugé le marché à EAC, et EAC n'avait envers elle aucune responsabilité en cas d'inexécution du contrat.

[42]   Je ne peux faire droit à ces prétentions. Il ne s'agit pas de savoir si la province a contracté avec une coentreprise ou si EAC avait des obligations contractuelles envers elle, mais bien si la province a considéré une proposition inadmissible. Il faut déterminer si la proposition provenait d'un soumissionnaire admissible.

[43]   Au procès, nul n'a contesté l'inadmissibilité d'une coentreprise comptant en son sein un soumissionnaire inadmissible. La province affirme qu'elle n'avait pas à se demander si la proposition provenait d'une autre entreprise que celle nommée : la proposition était présentée au nom de Brentwood, un soumissionnaire admissible. Je suis pourtant d'avis que la juge de première instance n'a pas eu tort d'écarter cet argument. Une preuve plus qu'abondante étayait ses conclusions selon lesquelles (1) la soumission de Brentwood, en dépit des apparences, était en fait présentée par la coentreprise avec EAC, (2) la province le savait et estimait qu'elle ne pouvait ni considérer la proposition de cette coentreprise ni adjuger le contrat à celle-ci, (3) l'existence de la coentreprise jouait en faveur de Brentwood dans le cadre du processus d'évaluation des propositions et, enfin, (4) la province s'est employée à masquer cette réalité en révisant et en rédigeant la documentation.

[44] Brentwood was one of the original RFEI proponents and was of course eligible to bid, subject to material changes in the composition of its team. EAC had not submitted a proposal during the RFEI process. It had been involved in advising the Ministry in relation to the project in 1998 and, in the fall of 2000, the Ministry had asked EAC to prepare an internal bid for comparison purposes (although EAC did not do so) as EAC was not entitled to bid on the Project.

[45] As noted earlier, after the RFP was issued, Brentwood and EAC entered into a pre-bidding agreement that provided that the work would be undertaken in the name of Brentwood/Anderson, a joint venture, that the work would be sponsored and managed by the joint venture and that upon being awarded the contract, the parties would enter into a joint venture agreement. Brentwood advised the Ministry in writing that it was forming a joint venture with EAC "to submit a more competitive price"; this fax was in effect a preliminary submission contemplated by s. 2.8(b) of the RFP and was written, as the trial judge found, because Brentwood assumed that it could be disqualified if it submitted a proposal as a joint venture unless prior arrangements had been made. The Province never responded in writing to this preliminary submission, as required by s. 2.8(b). There were, however, discussions with the Province's project manager, Mr. Tasaka who, the trial judge found, understood that a joint venture from Brentwood and EAC would not be eligible. As the judge put it, the Province's position appears to have been that the Brentwood/EAC proposal could proceed as long as the submission was in the name of Brentwood.

[46] In the result, EAC was listed in the ultimate submission as a "major member" of the team. The legal relationship with EAC was not specified and EAC was listed as a subcontractor even though, as the trial judge found, their relationship bore no resemblance to a standard subcontractor agreement. The trial judge found as facts — and these findings are not challenged — that Brentwood and EAC always intended between themselves to form a joint venture and to formalize that arrangement once the contract was secured, and further, that the

[44] Comme Brentwood faisait partie des entreprises ayant initialement répondu à la DEI, elle était bien sûr admise à soumissionner, sauf modification substantielle de la composition de son équipe. EAC n'avait pas donné suite à la DEI. En 1998, elle avait conseillé le ministère relativement au projet et, à l'automne 2000, ce dernier lui avait demandé de préparer une soumission interne aux fins de comparaison (ce qu'elle n'a cependant pas fait) puisqu'elle n'était pas admise à soumissionner.

[45] Rappelons qu'après le lancement de la DP, Brentwood et EAC ont conclu un accord préalable à la proposition prévoyant que les travaux seraient entrepris au nom de la coentreprise, que celle-ci les financerait et les gèrerait et qu'un accord de coentreprise interviendrait si le contrat leur était adjugé. Brentwood a informé le ministère par écrit qu'elle formait une coentreprise avec EAC [TRADUCTION] « afin de présenter une soumission plus concurrentielle ». Le document télécopié constituait en fait la proposition préliminaire visée à l'al. 2.8b) de la DP et, suivant la juge de première instance, Brentwood l'avait envoyé parce qu'elle pensait que faute de démarches préalables, la soumission présentée au nom de la coentreprise pouvait être rejetée. La province n'y a jamais donné suite comme l'exigeait l'al. 2.8b). Cependant, des discussions ont eu lieu avec le gestionnaire du projet, M. Tasaka, qui, selon la juge de première instance, était conscient de l'inadmissibilité d'une coentreprise formée de Brentwood et d'EAC. Comme le dit la juge, la province paraît avoir estimé que la soumission de Brentwood/EAC pouvait être considérée si elle était présentée au nom de Brentwood.

[46] Dans la proposition finale, EAC a donc été qualifiée de [TRADUCTION] « membre important » de l'équipe. Le lien juridique entre Brentwood et EAC n'était pas précisé, et EAC figurait dans la liste des sous-traitants, même si, comme l'indique la juge de première instance, la relation entre les deux parties ne s'apparentait en rien à celle créée par un contrat de sous-traitance. La juge conclut — et nul ne conteste — que Brentwood et EAC ont toujours eu l'intention commune de former une coentreprise et de rendre celle-ci officielle une fois le contrat

role of EAC was purposefully obfuscated in the bid to avoid an apparent conflict with s. 2.8(a) of the RFP.

[47]    During the selection process, it became clear that the bid was in reality on behalf of a joint venture. The project evaluation panel ("PEP") requested better information than provided in the bid about the structure of the business arrangements between Brentwood and EAC. Brentwood responded by disclosing the pre-bid agreement between them to form a 50/50 joint venture if successful. The PEP understood from this that Brentwood and EAC had a similar interest in the risk and reward under the contract and that this helped satisfy them that the "risk/reward" aspect of the alliance contract could be negotiated with them flexibly. The PEP clearly did not consider EAC to be a subcontractor although shown as such in the bid. In its step 6 report, the PEP consistently referred to the proponent as being a joint venture of Brentwood and EAC or as "Brentwood/EAC" and the trial judge found that it was on the basis that they were indeed a joint venture that PEP approved Brentwood/EAC as the preferred proponent. This step 6 report was ultimately revised to refer only to the Brentwood team as the official proponent. The trial judge found as a fact that this revision was made because "it was apparent that a joint venture was not eligible to submit a proposal" (para. 56).

[48]    The findings of the trial judge and the record make it clear that it was no mere question of form rather than a matter of substance whether the bidder was Brentwood with other team members or, as it in fact was, the Brentwood/EAC joint venture. As she noted, at para. 121 of her reasons, the whole purpose of the joint venture was to allow submission of a more competitive price than it would have been able to do as a proponent with a team as allowed under s. 2.8(b) of the RFP. The joint venture permitted a 50/50 sharing of risk and reward and co-management of the project while at the same time avoiding the restrictions on subcontracting in the tendering documents. As the judge put it, the bid by the joint venture constituted "material non-compliance" with the tendering contract: ". . .

obtenu et que le rôle d'EAC a été occulté à dessein dans la proposition afin d'éviter toute inobservation apparente de l'al. 2.8a) de la DP.

[47]    Il est apparu clairement au cours du processus de sélection que la soumission était en fait présentée au nom d'une coentreprise. Le comité d'évaluation du projet (« CEP ») a demandé plus de précisions sur les liens d'affaires entre Brentwood et EAC. Brentwood a alors révélé l'existence de l'accord préalable prévoyant la formation d'une coentreprise à parts égales si sa soumission était retenue. Le CEP en a déduit que Brentwood et EAC avaient une même participation aux risques et aux bénéfices découlant du marché, ce qui a contribué à le convaincre qu'elles pourraient faire preuve de souplesse dans la négociation du volet « risques/bénéfices » de l'accord de partenariat. Manifestement, le CEP n'a pas considéré EAC comme un sous-traitant même si elle était présentée de la sorte dans la soumission. Dans son rapport de l'étape 6, le CEP renvoie systématiquement à la coentreprise formée de Brentwood et d'EAC ou à « Brentwood/EAC » pour parler du proposant. La juge de première instance conclut que c'est bien parce qu'elles formaient une coentreprise que le CEP a arrêté son choix sur elles. Le rapport a par la suite été modifié de façon que seule l'équipe Brentwood y figure comme proposant officiel. La juge de première instance y voit [TRADUCTION] « l'évidence qu'une coentreprise n'était pas admissible à soumissionner » (par. 56).

[48]    Il ressort des conclusions de la juge de première instance et du dossier que la question de savoir si le soumissionnaire était Brentwood avec l'appui des autres membres de l'équipe ou — comme c'était effectivement le cas —, la coentreprise, ne tenait pas seulement à la forme, mais également au fond. La juge indique au par. 121 de ses motifs que la raison d'être de la coentreprise était essentiellement d'arriver à un prix plus concurrentiel que celui qu'aurait pu offrir un proposant appuyé d'une équipe comme le permettait l'al. 2.8b) de la DP. La coentreprise rendait possible le partage à parts égales des risques et des bénéfices ainsi que de la gestion du projet tout en soustrayant le soumissionnaire aux limitations de la sous-traitance prévues dans le dossier d'appel d'offres. Comme

Case 09-10138-MFW    Doc 13460-10    Filed 05/02/14    Page 440 of 610

94    TERCON CONTRACTORS LTD. *v.* B.C.    *Cromwell J.*    [2010] 1 S.C.R.

the joint venture with EAC allowed Brentwood to put forward a more competitive price than contemplated under the RFEI proposal. This went to the essence of the tendering process" (para. 126).

[49]    The Province suggests that the trial judge's reasons allow form to triumph over substance. In my view, it is the Province's position that better deserves that description. It had a bid which it knew to be on behalf of a joint venture, encouraged the bid to proceed and took steps to obfuscate the reality that it was on behalf of a joint venture. Permitting the bid to proceed in this way gave the joint venture a competitive advantage in the bidding process, and the record could not be clearer that the joint venture nature of the bid was one of its attractions during the selection process. The Province nonetheless submits that so long as only the name of Brentwood appears on the bid and ultimate Contract B, all is well. If ever a submission advocated placing form above substance, this is it.

[50]    It is true that the Province had legal advice and did not proceed in defiance of it. However, the facts as found by the trial judge about this legal advice hardly advance the Province's position. The judge found that the Province's lawyer was not aware of the background relevant to the question of whether the Brentwood bid was eligible, never reviewed the proponent eligibility requirements in the RFP and was not asked to and did not direct his mind to the question of eligibility. As the trial judge put it, the lawyer "appears to have operated on the assumption that Brentwood had been irreversibly selected" (para. 70).

[51]    The Brentwood/EAC joint venture having been selected as the preferred proponent, negotiations for the alliance contract ensued. The trial judge found that by this time, all agreed that a joint venture

l'explique la juge, la présentation d'une proposition par une coentreprise constituait une [TRADUCTION] « inexécution importante » du contrat issu de l'appel d'offres : [TRADUCTION] « . . . en formant une coentreprise avec EAC, Brentwood pouvait proposer un prix plus concurrentiel que celui offert en réponse à la DEI, ce qui touchait à l'essence même du processus d'appel d'offres » (par. 126).

[49]    La province reproche à la juge de première instance de faire primer la forme sur le fond. À mon avis, c'est plutôt à sa thèse qu'on peut imputer pareille dérive. Elle avait en main une soumission qu'elle savait provenir d'une coentreprise, elle a encouragé sa présentation et elle a pris des mesures pour masquer le fait qu'elle était formulée par une coentreprise. Elle a ainsi conféré un avantage concurrentiel à celle-ci dans le processus d'appel d'offres, et il appert on ne peut plus clairement du dossier que l'existence de la coentreprise a été considérée comme un atout lors du processus de sélection. La province soutient néanmoins qu'il n'y a là rien d'irrégulier dans la mesure où le nom de Brentwood figurait sur la soumission, puis dans le contrat B. S'il est un argument qui fait primer la forme sur le fond, c'est bien celui-là.

[50]    Certes, la province avait obtenu un avis juridique et elle n'a pas agi à l'encontre de celui-ci. Or, les faits établis selon la juge de première instance relativement à cet avis juridique n'appuient pas vraiment la prétention de la province. La juge relève que le conseiller juridique de la province ne disposait pas des éléments de contexte nécessaires pour déterminer si la soumission de Brentwood était admissible, il n'a jamais examiné les conditions d'admissibilité à soumissionner énoncées dans la DP et on ne lui a pas demandé de se pencher sur la question de l'admissibilité, ce qu'il n'a pas fait de son propre chef non plus. Comme le dit la juge, le conseiller juridique [TRADUCTION] « paraît avoir supposé au départ que Brentwood avait été irrévocablement retenue » (par. 70).

[51]    La proposition de la coentreprise Brentwood/ EAC ayant été retenue, les négociations en vue de la conclusion de l'accord de partenariat ont commencé. De l'avis de la juge de première instance,

was not an eligible proponent and the Ministry was taking the position that the contract could not be in the name of the joint venture. Brentwood and EAC executed a revised pre-contract agreement that provided, notwithstanding the letter of intent from the Ministry addressed to Brentwood indicating that the legal relationship between them would be contractor/subcontractor, the contract would be performed and the profits shared equally between them. The work was to be managed by a committee with equal representation, the bond required by the owner was to be provided by both parties and EAC indemnified Brentwood against half of any loss or cost incurred as a result of performance of the work. According to schedule B4 of the RFP, all subcontracts were to be attached to the RFP but no contract between Brentwood and EAC was ever provided or attached to the proposal.

[52] The Province has identified no palpable and overriding error in these many findings of fact by the trial judge. I conclude, therefore, that we must approach the case on the basis of the judge's finding that the bid was in fact, if not in form, submitted by a joint venture of Brentwood and EAC, that the Ministry was well aware of this, that the existence of the joint venture was a material consideration in favour of the bid during the evaluation process and that by bidding as a joint venture, Brentwood was given a competitive advantage in the bidding process.

[53] I reject the Ministry's submissions that all that matters is the form and not the substance of the arrangement. In my view, the trial judge's finding that this bid was in fact on behalf of a joint venture is unassailable.

[54] I turn to the Province's third point:

(iii) there was no term of the RFP that restricted the right of proponents to enter into joint venture agreements with others; this arrangement merely left Brentwood, the original

tous convenaient alors que la coentreprise n'était pas un soumissionnaire admissible, et le ministère estimait que le contrat ne pouvait être conclu avec elle. Brentwood et EAC ont signé un accord préalable modifié stipulant que, malgré la lettre d'intention du ministère adressée à Brentwood et selon laquelle la relation juridique entre les deux entreprises serait celle existant entre un entrepreneur et un sous-traitant, le contrat serait exécuté par les deux entreprises, et les bénéfices partagés entre elles à parts égales. L'accord prévoyait aussi que la gestion des travaux relèverait d'un comité constitué d'un nombre égal de représentants des deux entreprises, que le cautionnement exigé par le propriétaire serait fourni par les deux entreprises et qu'EAC dédommagerait Brentwood de la moitié des pertes ou des coûts découlant de l'exécution des travaux. Suivant l'annexe B4 de la DP, tous les sous-contrats devaient être joints à la proposition, mais nul contrat intervenu entre Brentwood et EAC ne l'avait été.

[52] La province ne relève aucune erreur manifeste et dominante dans ces nombreuses conclusions de fait tirées en première instance. J'estime donc qu'il nous faut trancher en tenant pour acquis, conformément à ces conclusions, que malgré les apparences, le soumissionnaire était en fait la coentreprise formée de Brentwood et d'EAC, le ministère le savait, l'existence de la coentreprise a été considérée comme un atout lors du processus d'évaluation et la présentation d'une proposition par une coentreprise a fait bénéficier Brentwood d'un avantage concurrentiel dans le processus d'appel d'offres.

[53] La prétention du ministère voulant que tout ce qui importe c'est la forme de l'accord, et non sa teneur, ne saurait tenir. Je conviens avec la juge de première instance que la proposition était en fait présentée par une coentreprise. Sa conclusion est inattaquable.

[54] Je passe maintenant au troisième argument de la province :

(iii) aucune disposition de la DP n'empêchait un proposant de conclure un accord de coentreprise; cette mesure permettait seulement à Brentwood, l'un des proposants initiaux, de

proponent in place and allowed it to enhance its ability to perform the work.

[55]   This submission addresses the question of whether the joint venture was an eligible bidder. The Province submits that it is, arguing that s. 2.8(b) of the RFP shows that the RFP contemplated that each proponent would be supported by a team, that the composition of the team might change and that the Province under that section retained the right to approve or reject changes in the team of any proponent. I cannot accept these submissions.

[56]   Section 2.8 must be read as a whole and in light of the ministerial approval which I have described earlier. Section 2.8(a), consistent with that approval, stipulates that only the six proponents qualified through the RFEI process were eligible to submit responses and that proposals from any other party "shall not be considered". The word "proponent" is defined in s. 8 as a team that has become eligible to respond to the RFP. The material change provisions in s. 2.8(b) should not be read as negating the express provisions of the RFP and the ministerial approval of the process. When read as a whole, the provisions about material change do not permit the addition of a new entity as occurred here. The process actually followed was not the one specified in the bidding contract and was not authorized by the statute because it was not the one approved by the Minister.

[57]   Moreover, even if one were to conclude (and I would not) that this change from the Brentwood team that participated in the RFEI to the Brentwood/EAC joint venture by whom the bid was submitted could fall within the material change provisions of s. 2.8(b), the Province never gave a written decision to permit this change as required by that provision. As the trial judge noted, in fact the Province's position was that such a bid would not be eligible and its agents took steps to obfuscate the true proponent in the relevant documentation.

[58]   The trial judge also found that there was an implied obligation of good faith in the contract and

demeurer en lice et d'accroître sa capacité d'exécuter les travaux.

[55]   L'argument soulève la question de savoir si la coentreprise était un soumissionnaire admissible. La province prétend que c'était le cas, car selon elle, il appert de l'al. 2.8b) de la DP que chacun des soumissionnaires bénéficierait de l'appui d'une équipe, que la composition de cette équipe pouvait changer et que la province se réservait le droit d'approuver ou non la modification d'une équipe. Je ne puis adhérer à ce raisonnement.

[56]   Il faut considérer l'art. 2.8 dans son ensemble et au vu de l'approbation ministérielle dont il est question précédemment. Conformément à cette approbation, l'al. 2.8a) prévoit que seuls les six proposants tenus pour admissibles à l'issue de la DEI peuvent présenter une proposition et que les propositions présentées par d'autres personnes [TRADUCTION] « ne seront pas examinées ». Suivant l'article 8, [TRADUCTION] « proposant » s'entend d'une équipe admise à répondre à la DP. L'alinéa 2.8b) — relatif aux changements substantiels — ne saurait être interprété de façon à contrecarrer les dispositions expresses de la DP et l'approbation ministérielle du processus. Considérées globalement, les dispositions relatives aux changements substantiels ne permettent pas l'adjonction d'une nouvelle entité comme celle qui a eu lieu en l'espèce. La procédure suivie dans les faits n'a pas été celle prévue dans le dossier d'appel d'offres et, n'ayant pas été approuvée par le ministre, elle n'était pas légalement autorisée.

[57]   Qui plus est, à supposer même (et je ne suis pas disposé à le faire) que le passage de l'équipe Brentwood ayant répondu à la DEI à la coentreprise Brentwood/EAC qui a présenté la soumission constituait un changement substantiel pour les besoins de l'al. 2.8b), il reste que la province ne l'a jamais avalisé par écrit comme l'exigeait cette disposition. La juge du procès fait observer que la province jugeait la soumission inadmissible et que ses préposés ont occulté la véritable identité du proposant dans les documents en cause.

[58]   La juge de première instance conclut également qu'il y avait une obligation contractuelle

that the Province breached this obligation by failing to treat all bidders equally by changing the terms of eligibility to Brentwood's competitive advantage. This conclusion strongly reinforces the trial judge's decision about eligibility. Rather than repeating her detailed findings, I will simply quote her summary at para. 138:

The whole of [the Province's] conduct leaves me with no doubt that the [Province] breached the duty of fairness to [Tercon] by changing the terms of eligibility to Brentwood's competitive advantage. At best, [the Province] ignored significant information to its [i.e. Tercon's] detriment. At worst, the [Province] covered up its knowledge that the successful proponent was an ineligible joint venture. In the circumstances here, it is not open to the [Province] to say that a joint venture was only proposed. Nor can the [Province] say that it was unaware of the joint venture when it acted deliberately to structure contract B to include EAC as fully responsible within a separate contract with Brentwood, so minimizing the [Province's] risk that the contract would be unenforceable against EAC if arrangements did not work out. . . . The [Province] was . . . prepared to take the risk that unsuccessful bidders would sue: this risk did materialize.

[59]    To conclude on this point, I find no fault with the trial judge's conclusion that the bid was in fact submitted on behalf of a joint venture of Brentwood and EAC which was an ineligible bidder under the terms of the RFP. This breached not only the express eligibility provisions of the tender documents, but also the implied duty to act fairly towards all bidders.

B.  *The Exclusion Clause*

1.  Introduction

[60]    As noted, the RFP includes an exclusion clause which reads as follows:

**2.10** . . .

Except as expressly and specifically permitted in these Instructions to Proponents, <u>no Proponent shall</u>

tacite d'agir de bonne foi et que la province a manqué à cette obligation en ne traitant pas tous les soumissionnaires sur un pied d'égalité du fait de la modification des conditions d'admissibilité et de l'octroi d'un avantage concurrentiel à Brentwood. Cette conclusion de la juge affermit considérablement celle qu'elle tire au sujet de l'admissibilité. Je m'abstiens de reprendre ses conclusions détaillées, mais j'en cite le résumé (par. 138) :

[TRADUCTION] Au vu de l'ensemble de la conduite [de la province], il ne fait pour moi aucun doute que celle-ci a manqué à son obligation d'équité à l'endroit de [Tercon] lorsqu'elle a modifié les conditions d'admissibilité à l'avantage de Brentwood du point de vue concurrentiel. Au mieux, elle a fait abstraction de renseignements importants au détriment de Tercon. Au pire, elle a dissimulé le fait que le soumissionnaire retenu était une coentreprise inadmissible. Dans ces circonstances, la province ne saurait faire valoir que la formation d'une coentreprise était seulement envisagée. Elle ne peut non plus prétendre avoir ignoré l'existence de la coentreprise alors qu'elle a délibérément conçu le contrat B de façon qu'EAC en accepte les modalités dans un contrat distinct conclu avec Brentwood, réduisant ainsi le risque [pour la province] que le contrat ne puisse être opposable à EAC si les accords projetés tournaient court. [. . .] [La province] était [. . .] prête à courir le risque que les soumissionnaires non retenus la poursuivent : ce risque s'est matérialisé.

[59]    Pour clore sur ce point, sa conclusion selon laquelle la soumission était en fait celle d'une coentreprise formée de Brentwood et d'EAC qui n'était pas admise à soumissionner suivant la DP n'est à mon avis entachée d'aucune erreur. L'inobservation qui en découle touche non seulement les conditions d'admissibilité énoncées dans le dossier d'appel d'offres, mais aussi l'obligation tacite d'agir équitablement vis-à-vis de tous les soumissionnaires.

B.  *La clause de non-recours*

1.  Introduction

[60]    Rappelons que la DP renferme une clause de non-recours, dont voici le texte :

[TRADUCTION]

**2.10** . . .

Sauf ce que prévoient expressément les présentes instructions, <u>un proposant ne peut exercer aucun</u>

Case 09-10138-MFW    Doc 13460-10    Filed 05/02/14    Page 444 of 610

98          TERCON CONTRACTORS LTD. *v.* B.C.    *Cromwell J.*          [2010] 1 S.C.R.

have any claim for compensation of any kind whatsoever, as a result of participating in this RFP, and by submitting a Proposal each Proponent shall be deemed to have agreed that it has no claim. [Emphasis added.]

[61]  The trial judge held that as a matter of construction, the clause did not bar recovery for the breaches she had found. The clause, in her view, was ambiguous and, applying the *contra proferentem* principle, she resolved the ambiguity in Tercon's favour. She also found that the Province's breach was fundamental and that it was not fair or reasonable to enforce the exclusion clause in light of the nature of the Province's breach. The Province contends that the judge erred both with respect to the construction of the clause and her application of the doctrine of fundamental breach.

[62]  On the issue of fundamental breach in relation to exclusion clauses, my view is that the time has come to lay this doctrine to rest, as Dickson C.J. was inclined to do more than 20 years ago: *Hunter Engineering Co. v. Syncrude Canada Ltd.*, [1989] 1 S.C.R. 426, at p. 462. I agree with the analytical approach that should be followed when tackling an issue relating to the applicability of an exclusion clause set out by my colleague Binnie J. However, I respectfully do not agree with him on the question of the proper interpretation of the clause in issue here. In my view, the clause does not exclude Tercon's claim for damages, and even if I am wrong about that, the clause is at best ambiguous and should be construed *contra proferentem* as the trial judge held. As a result of my conclusion on the interpretation issue, I do not have to go on to apply the rest of the analytical framework set out by Binnie J.

[63]  In my view, the exclusion clause does not cover the Province's breaches in this case. The RFP process put in place by the Province was premised on a closed list of bidders; a contest with an ineligible bidder was not part of the RFP process and was in fact expressly precluded by its terms. A "Contract A" could not arise as a result of submission of a bid from any other party. However, as

recours en indemnisation pour sa participation à la DP, ce qu'il est réputé accepter lorsqu'il présente une soumission. [Je souligne.]

[61]  La juge de première instance statue que le libellé de la clause ne fait pas obstacle à l'indemnisation pour les inexécutions relevées. À son avis, la clause est équivoque et, conformément à la règle *contra proferentem*, elle l'interprète en faveur de Tercon. Elle opine en outre que l'inexécution reprochée à la province est fondamentale et qu'il n'est ni juste ni raisonnable de faire respecter la clause de non-recours étant donné la nature de l'inexécution. La province fait valoir que la juge a interprété erronément la clause et qu'elle a eu tort de recourir au principe de l'inexécution fondamentale.

[62]  En ce qui concerne son application aux clauses d'exonération, je crois que le temps est venu de donner le coup de grâce au principe de l'inexécution fondamentale comme le juge en chef Dickson y était enclin il y a plus de 20 ans : *Hunter Engineering Co. c. Syncrude Canada Ltée*, [1989] 1 R.C.S. 426, p. 462. Je souscris à la démarche analytique qui s'impose, selon mon collègue le juge Binnie, pour s'attaquer à une question touchant à l'applicabilité d'une clause d'exonération. Malheureusement, je ne puis faire mienne son interprétation de la clause litigieuse en l'espèce. À mon sens, la clause ne fait pas obstacle au recours en dommages-intérêts de Tercon et, même si j'ai tort sur ce point, la clause est au mieux équivoque et doit être interprétée *contra proferentem* comme le préconise la juge de première instance. Vu ma conclusion concernant l'interprétation, je n'ai pas à appliquer les autres volets de la démarche analytique du juge Binnie.

[63]  J'estime que la clause de non-recours ne s'applique pas aux inexécutions imputées à la province. Le processus de DP mis en place par celle-ci supposait la participation d'un nombre limité d'entreprises. La mise en concurrence avec un soumissionnaire inadmissible n'en faisait pas partie et elle était même expressément exclue. La présentation d'une proposition par une autre entreprise ne

a result of how the Province proceeded, the very premise of its own RFP process was missing, and the work was awarded to a party who could not be a participant in the RFP process. That is what Tercon is complaining about. Tercon's claim is not barred by the exclusion clause because the clause only applies to claims arising "as a result of participating in [the] RFP", not to claims resulting from the participation of other, ineligible parties. Moreover, the words of this exclusion clause, in my view, are not effective to limit liability for breach of the Province's implied duty of fairness to bidders. I will explain my conclusion by turning first to a brief account of the key legal principles and then to the facts of the case.

### 2.   Legal Principles

[64]   The key principle of contractual interpretation here is that the words of one provision must not be read in isolation but should be considered in harmony with the rest of the contract and in light of its purposes and commercial context. The approach adopted by the Court in *M.J.B.* is instructive. The Court had to interpret a privilege clause, which is somewhat analogous to the exclusion clause in issue here. The privilege clause provided that the lowest or any tender would not necessarily be accepted, and the issue was whether this barred a claim based on breach of an implied term that the owner would accept only compliant bids. In interpreting the privilege clause, the Court looked at its text in light of the contract as a whole, its purposes and commercial context. As Iacobucci J. said, at para. 44, "the privilege clause is only one term of Contract A and must be read in harmony with the rest of the tender documents. To do otherwise would undermine the rest of the agreement between the parties."

[65]   In a similar way, it is necessary in the present case to consider the exclusion clause in the RFP in light of its purposes and commercial context as well as of its overall terms. The question is whether the exclusion of compensation for claims resulting

pouvait faire naître un « contrat A ». La province a donc ignoré le fondement même de sa propre DP et elle a attribué le marché à une entreprise non admise à y prendre part. C'est ce dont Tercon lui fait grief. La clause de non-recours ne fait pas obstacle au recours de Tercon, car elle ne s'applique qu'à l'indemnisation demandée [TRADUCTION] « pour [l]a participation à la DP », et non au recours qui fait suite à la participation d'une autre entreprise, elle inadmissible. De plus, le texte de la clause ne limite pas selon moi la responsabilité de la province pour le manquement à son obligation tacite de faire preuve d'équité à l'égard des soumissionnaires. Je m'explique en exposant brièvement les principes juridiques essentiels, puis en les appliquant aux faits de l'espèce.

### 2.   Les principes juridiques

[64]   Le principe fondamental d'interprétation applicable en l'espèce veut qu'une clause contractuelle ne doive pas être considérée isolément mais en harmonie avec les autres et à la lumière de son objet et du contexte commercial dans lequel elle s'inscrit. La démarche suivie dans l'arrêt *M.J.B.* est éclairante. La Cour devait y interpréter une clause de réserve qui s'apparentait quelque peu à la clause de non-recours qui nous intéresse. La clause de réserve stipulait que le marché ne serait pas nécessairement attribué au soumissionnaire le moins disant ni même attribué du tout. La question était celle de savoir si elle faisait obstacle à une action en justice pour non-respect de la clause tacite voulant que le propriétaire n'accepte que les soumissions conformes. Pour l'interpréter, la Cour examine son libellé au vu du contrat dans son ensemble, de son objet et de son contexte commercial. Le juge Iacobucci conclut au par. 44 : « . . . la clause de réserve n'est qu'une condition du contrat A et elle doit être interprétée de façon à s'harmoniser avec le reste du dossier d'appel d'offres. Agir autrement, ce serait saper le reste de l'entente entre les parties. »

[65]   De même, il faut en l'espèce examiner la clause de non-recours de la DP à la lumière de son objet et du contexte commercial dans lequel elle s'inscrit, ainsi que de l'ensemble de ses conditions. Il faut se demander si l'exclusion de toute

from "participating in this RFP", properly interpreted, excludes liability for the Province having unfairly considered a bid from a bidder who was not supposed to have been participating in the RFP process at all.

indemnisation pour [TRADUCTION] « [l]a participation à la DP », correctement interprétée, soustrait la province à sa responsabilité lorsqu'elle se rend coupable d'iniquité en prenant en considération la proposition d'une entreprise qui n'était pas du tout censée participer à la DP.

### 3.    Application to This Case

[66]    Having regard to both the text of the clause in its broader context and to the purposes and commercial context of the RFP, my view is that this claim does not fall within the terms of the exclusion clause.

[67]    To begin, it is helpful to recall that in interpreting tendering contracts, the Court has been careful to consider the special commercial context of tendering. Effective tendering ultimately depends on the integrity and business efficacy of the tendering process: see, e.g., *Martel*, at para. 88; *M.J.B.*, at para. 41; *Double N Earthmovers*, at para. 106. As Iacobucci and Major JJ. put it in *Martel*, at para. 116, "it is imperative that all bidders be treated on an equal footing . . . . Parties should at the very least be confident that their initial bids will not be skewed by some underlying advantage in the drafting of the call for tenders conferred upon only one potential bidder."

[68]    This factor is particularly weighty in the context of public procurement. In that context, in addition to the interests of the parties, there is the need for transparency for the public at large. This consideration is underlined by the statutory provisions which governed the tendering process in this case. Their purpose was to assure transparency and fairness in public tenders. As was said by Orsborn J. (as he then was) in *Cahill (G.J.) & Co. (1979) Ltd. v. Newfoundland and Labrador (Minister of Municipal and Provincial Affairs)*, 2005 NLTD 129, 250 Nfld. & P.E.I.R. 145, at para. 35:

The owner — in this case the government — is in control of the tendering process and may define the

### 3.    Application à la présente espèce

[66]    Compte tenu du libellé de la clause dans son contexte plus général ainsi que de l'objet et du contexte commercial de la DP, j'estime que le recours échappe à la clause de non-recours.

[67]    D'abord, il convient de rappeler que pour interpréter le contrat issu de l'appel d'offres, la Cour tient dûment compte du contexte commercial particulier de la demande de propositions. Au final, le caractère fructueux du processus dépend de son intégrité et de son efficacité commerciale : voir, p. ex., les arrêts *Martel*, par. 88; *M.J.B.*, par. 41, et *Double N Earthmovers*, par. 106. Comme l'affirment les juges Iacobucci et Major dans l'arrêt *Martel*, au par. 116 : « Il est [. . .] impératif que tous les soumissionnaires soient traités sur un pied d'égalité [. . .] Un soumissionnaire devrait à tout le moins être assuré que l'évaluation de sa soumission initiale ne sera pas biaisée par quelque avantage sous-entendu dans le dossier d'appel d'offres et dont ne bénéficie qu'un seul soumissionnaire éventuel. »

[68]    Ce facteur importe particulièrement dans le contexte de la passation de marchés publics. C'est pourquoi il faut non seulement protéger les intérêts des parties, mais également assurer la transparence du processus vis-à-vis des citoyens en général. Ce souci ressort des dispositions législatives qui régissaient le processus dans la présente affaire et dont l'objectif était d'assurer la transparence et l'équité des appels d'offres. Comme le dit le juge Orsborn (maintenant Juge en chef) dans l'arrêt *Cahill (G.J.) & Co. (1979) Ltd. c. Newfoundland and Labrador (Minister of Municipal and Provincial Affairs)*, 2005 NLTD 129, 250 Nfld. & P.E.I.R. 145, par. 35 :

[TRADUCTION] Le propriétaire — en l'occurrence l'État — est maître du processus d'appel d'offres. Il peut

parameters for a compliant bid and a compliant bidder. The corollary to this, of course, is that once the owner — here the government — sets the rules, it must itself play by those rules in assessing the bids and awarding the main contract.

[69] One aspect that is generally seen as contributing to the integrity and business efficacy of the tendering process is the requirement that only compliant bids be considered. As noted earlier, such a requirement has often been implied because, as the Court said in *M.J.B.*, it makes little sense to think that a bidder would comply with the bidding process if the owner could circumscribe it by accepting a non-compliant bid. Respectfully, it seems to me to make even less sense to think that eligible bidders would participate in the RFP if the Province could avoid liability for ignoring an express term concerning eligibility to bid on which the entire RFP was premised and which was mandated by the statutorily approved process.

[70] The closed list of bidders was the foundation of this RFP and there were important competitive advantages to a bidder who could side-step that limitation. Thus, it seems to me that both the integrity and the business efficacy of the tendering process support an interpretation that would allow the exclusion clause to operate compatibly with the eligibility limitations that were at the very root of the RFP.

[71] The same may be said with respect to the implied duty of fairness. As Iacobucci and Major JJ. wrote for the Court in *Martel*, at para. 88, "[i]mplying an obligation to treat all bidders fairly and equally is consistent with the goal of protecting and promoting the integrity of the bidding process." It seems to me that clear language is necessary to exclude liability for breach of such a basic requirement of the tendering process, particularly in the case of public procurement.

déterminer les paramètres de la conformité d'une soumission et de l'admissibilité d'un soumissionnaire. Il s'en suit évidemment que lorsque le propriétaire — en l'occurrence l'État — établit les règles, il doit les respecter au moment d'évaluer les offres et d'attribuer le contrat principal.

[69] L'exigence que seules soient examinées des soumissions conformes est généralement considérée comme un élément favorisant l'intégrité et l'efficacité commerciale du processus d'appel d'offres. J'ai déjà mentionné que cette exigence est souvent inférée parce que, pour reprendre les propos de la Cour dans l'arrêt *M.J.B.*, il est déraisonnable qu'un soumissionnaire doive se conformer au processus d'appel d'offres si le propriétaire peut le contourner en acceptant une soumission non conforme. J'ajoute qu'il est encore moins concevable qu'un soumissionnaire admissible prenne part à une DP si la province peut échapper à toute responsabilité malgré l'inobservation d'une condition expresse relative à l'admissibilité à soumissionner, une condition qui formait l'assise de la DP en entier et qui bénéficiait de l'approbation ministérielle requise par la loi.

[70] La limitation du nombre de soumissionnaires admissibles constituait l'assise de la DP, et l'entreprise admise à soumissionner malgré cette restriction se voyait conférer un avantage concurrentiel considérable. À mon sens, l'intégrité et l'efficacité commerciale du processus d'appel d'offres commandent donc une interprétation qui permet une application de la clause de non-recours compatible avec la limitation du nombre de soumissionnaires admissibles, laquelle formait l'assise même de la DP.

[71] Il en va de même de l'obligation tacite d'équité. Comme le disent les juges Iacobucci et Major au nom de la Cour dans l'arrêt *Martel*, « [l]'existence présumée d'une obligation de traiter tous les soumissionnaires équitablement et sur un pied d'égalité est compatible avec l'objectif de protéger et de promouvoir l'intégrité du mécanisme d'appel d'offres » (par. 88). J'estime que seul un libellé clair peut écarter la responsabilité consécutive au non-respect d'une exigence aussi fondamentale applicable au processus d'appel d'offres, spécialement lorsqu'il s'agit de passer un marché public.

[72]   The proper interpretation of the exclusion clause should also take account of the statutory context which I have reviewed earlier. The restriction on eligibility of bidders was a key element of the alternative process approved by the Minister. It seems unlikely, therefore, that the parties intended through this exclusion clause to effectively gut a key aspect of the approved process. Of course, it is true that the exclusion clause does not bar all remedies, but only claims for compensation. However, the fact remains that as a practical matter, there are unlikely to be other, effective remedies for considering and accepting an ineligible bid and that barring compensation for a breach of that nature in practical terms renders the ministerial approval process virtually meaningless. Whatever administrative law remedies may be available, they are not likely to be effective remedies for awarding a contract to an ineligible bidder. The Province did not submit that injunctive relief would have been an option, and I can, in any event, foresee many practical problems that need not detain us here in seeking such relief in these circumstances.

[73]   The Province stresses Tercon's commercial sophistication, in effect arguing that it agreed to the exclusion clause and must accept the consequences. This line of argument, however, has two weaknesses. It assumes the answer to the real question before us which is: what does the exclusion clause mean? The consequences of agreeing to the exclusion clause depend on its construction. In addition, the Province's submission overlooks its own commercial sophistication and the fact that sophisticated parties can draft very clear exclusion and limitation clauses when they are minded to do so.  Such clauses contrast starkly with the curious clause which the Province inserted into this RFP. The limitation of liability clause in *Hunter*, for example, provided that "[n]otwithstanding any other provision in this contract or any applicable statutory provisions neither the Seller nor the Buyer shall be liable to the other for special or consequential damages or damages for loss of use arising directly or indirectly from any breach of this contract, fundamental or otherwise" (p. 450). The Court found this to be clear and unambiguous. The limitation clause in issue in *Guarantee Co. of North*

[72]   La juste interprétation de la clause de non-recours doit aussi s'appuyer sur le cadre législatif examiné précédemment. L'admissibilité restreinte constituait un élément essentiel de l'autre processus approuvé par le ministre. Il est donc peu probable que les parties aient vraiment voulu, en stipulant la clause de non-recours, supprimer un aspect essentiel de ce processus. La clause ne fait évidemment obstacle qu'aux demandes d'indemnisation. Cependant, il demeure peu probable que l'examen et l'acceptation d'une soumission inadmissible confèrent un autre recours efficace, sans compter que l'exclusion de l'indemnisation du préjudice causé par un tel manquement supprime en fait toute la raison d'être du processus d'approbation ministérielle. Quel que soit le recours possible en droit administratif, il est peu probable qu'il permette d'obtenir réparation pour l'octroi d'un marché à un soumissionnaire inadmissible. La province ne plaide pas qu'une injonction aurait pu être obtenue et, de toute manière, je peux concevoir de nombreuses difficultés d'ordre pratique qui justifient de ne pas s'attarder davantage à cette avenue possible.

[73]   La province insiste sur l'expérience commerciale de Tercon. Elle soutient en fait que l'entreprise a convenu de la clause de non-recours et qu'elle doit en accepter les conséquences. L'argument comporte toutefois deux failles. Il préjuge du règlement par la Cour de la véritable question en litige : quelle est la portée de la clause de non-recours? Les conséquences résultant de l'adhésion à cette clause dépendent de son interprétation. En outre, la province passe sous silence sa propre expérience commerciale et le fait que des parties rompues aux usages commerciaux peuvent rédiger des clauses très claires de non-recours ou de responsabilité limitée lorsqu'elles entendent le faire. Ce n'est manifestement pas le cas de la curieuse clause que la province a insérée dans sa DP. À titre d'exemple, la clause de responsabilité limitée visée dans l'arrêt *Hunter* disposait que « [n]onobstant toute autre disposition du présent contrat ou toute disposition législative applicable, ni le vendeur ni l'acheteur n'est tenu de verser à l'autre des dommages-intérêts spéciaux ni des dommages-intérêts pour un préjudice indirect ou encore pour la perte d'usage résultant directement ou indirectement d'une inexécution, fondamentale

*America v. Gordon Capital Corp.*, [1999] 3 S.C.R. 423, provided that legal proceedings for the recovery of "any loss hereunder shall not be brought . . . after the expiration of 24 months from the discovery of such loss" (para. 5). Once again, the Court found this language clear. The Ontario Court of Appeal similarly found the language of a limitation of liability clause to be clear in *Fraser Jewellers (1982) Ltd. v. Dominion Electric Protection Co.* (1997), 34 O.R. (3d) 1. The clause provided in part that if the defendant "should be found liable for loss, damage or injury due to a failure of service or equipment in any respect, its liability shall be limited to a sum equal to 100% of the annual service charge or $10,000.00, whichever is less, as the agreed upon damages and not as a penalty, as the exclusive remedy" (p. 4). These, and many other cases which might be referred to, demonstrate that sophisticated parties are capable of drafting clear and comprehensive limitation and exclusion provisions.

[74]  I turn to the text of the clause which the Province inserted in its RFP. It addresses claims that result from "participating in this RFP". As noted, the limitation on who could participate in this RFP was one of its premises. These words must, therefore, be read in light of the limit on who was eligible to participate in this RFP. As noted earlier, both the ministerial approval and the text of the RFP itself were unequivocal: only the six proponents qualified through the earlier RFEI process were eligible and *proposals received from any other party would not be considered*. Thus, central to "participating in this RFP" was participating in a contest among those eligible to participate. A process involving other bidders, as the trial judge found the process followed by the Province to be, is not the process called for by "this RFP" and being part of that other process is not in any meaningful sense "participating in this RFP".

ou autre, du présent contrat » (p. 450). La Cour a jugé ce texte clair et non équivoque. Dans l'affaire *Guarantee Co. of North America c. Gordon Capital Corp.*, [1999] 3 R.C.S. 423, la clause en litige prévoyait que des procédures judiciaires en vue de l'indemnisation de « tout sinistre visé aux présentes ne doivent pas être engagées [. . .] après l'expiration d'un délai de 24 mois suivant la découverte du sinistre » (par. 5). Là encore, la Cour conclut à la clarté du libellé. Dans l'arrêt *Fraser Jewellers (1982) Ltd. c. Dominion Electric Protection Co.* (1997), 34 O.R. (3d) 1, la Cour d'appel de l'Ontario conclut également au caractère non équivoque de la clause de responsabilité limitée, qui disposait notamment que si la défenderesse [TRADUCTION] « était tenue responsable d'un préjudice consécutif à une défaillance du service ou du matériel, quelle qu'elle soit, elle n'était tenue de verser que la totalité des frais de service annuels ou 10 000 $, selon le moindre des deux montants, à titre d'indemnité convenue, et non de pénalité, à l'exclusion de toute autre réparation » (p. 4). Ces exemples et bien d'autres que l'on pourrait citer montrent que des parties expérimentées sont en mesure de rédiger des clauses de responsabilité limitée ou de non-recours à la fois claires et exhaustives.

[74]  Passons maintenant au texte de la clause insérée au contrat par la province. Il vise les demandes d'indemnisation d'un préjudice découlant de la [TRADUCTION] « participation à la DP ». Rappelons que l'une des assises de la DP était la limitation du nombre d'entreprises admises à y prendre part. Il faut donc interpréter ce texte au regard de cette limitation. Tant l'approbation ministérielle que le texte de la DP elle-même sont clairs : seuls les six proposants s'étant rendus admissibles en répondant à la DEI pouvaient soumissionner, et *aucune proposition d'une autre personne ne serait examinée*. La participation à un concours ouvert aux seules personnes admises à y prendre part était donc au cœur de la « participation à la DP ». Un processus ouvert à d'autres entreprises — ce qui était le cas du processus suivi dans les faits selon la juge de première instance — ne saurait s'entendre de « la DP », et le fait d'y prendre part ne saurait véritablement être considéré comme une « participation à la DP ».

[75] The Province would have us interpret the phrase excluding compensation "as a result of participating in this RFP" to mean that compensation is excluded that results from "submitting a Proposal". However, that interpretation is not consistent with the wording of the clause as a whole. The clause concludes with the phrase that "by submitting a Proposal each Proponent shall be deemed to have agreed that it has no claim". If the phrases "participating in this RFP" and "submitting a Proposal" were intended to mean the same thing, it is hard to understand why different words were used in the same short clause to express the same idea. The fact that the Minister had approved a closed list of participants strengthens the usual inference that the use of different words was deliberate so as not to exclude compensation for a departure from that basic eligibility requirement.

[76] This interpretation of the exclusion clause does not rob it of meaning, but makes it compatible with other provisions of the RFP. There is a parallel between this case and the Court's decision in *M.J.B.* There, the Court found that there was compatibility between the privilege clause and the implied term to accept only compliant bids. Similarly, in this case, there is compatibility between the eligibility requirements of the RFP and the exclusion clause. Not any and every claim based on any and every deviation from the RFP provisions would escape the preclusive effect of the exclusion clause. It is only when the defect in the Province's adherence to the RFP process is such that it is completely outside that process that the exclusion clause cannot have been intended to operate. What is important here, in my view, is that the RFP in its conception, in its express provisions and in the statutorily required approval it was given, was premised on limiting eligibility to the six proponents in the RFEI process. Competition among others was not at all contemplated and was not part of the RFP process; in fact, the RFP expressly excluded that possibility. In short, limiting eligibility of bidders to those who had responded to the RFEI was the foundation of the whole RFP. As the judge found, acceptance of

[75] La province nous exhorte à conclure que l'énoncé écartant toute indemnisation « pour [l]a participation à la DP » signifie qu'il ne saurait y avoir d'indemnisation d'un préjudice résultant de la [TRADUCTION] « présent[ation d']une soumission », ce qui pourtant serait incompatible avec le texte de la clause dans son ensemble. Il y est d'ailleurs stipulé à la toute fin que le proposant [TRADUCTION] « est réputé accepter [qu'il ne peut exercer aucun recours en indemnisation] lorsqu'il présente une soumission ». Si la « participation à la DP » et la « présent[ation d']une soumission » devaient s'entendre de la même chose, on s'expliquerait difficilement que des termes différents soient employés dans la même clause brève pour exprimer la même idée. L'aval donné par le ministre à la limitation du nombre de participants étaye l'interprétation habituelle voulant que l'emploi des termes différents visait délibérément à ne pas écarter l'indemnisation en cas d'inobservation de cette exigence fondamentale liée à l'admissibilité.

[76] Pareille interprétation de la clause de non-recours ne la prive pas de sens, mais assure sa compatibilité avec les autres clauses de la DP. Un parallèle peut être établi entre la présente espèce et l'affaire *M.J.B.*, où la Cour conclut à la compatibilité de la clause de réserve avec la condition tacite que seule une soumission conforme puisse être acceptée. Il y a également compatibilité en l'espèce entre les conditions d'admissibilité de la DP et la clause de non-recours. Toute action intentée pour quelque manquement aux dispositions de la DP n'échappe pas à l'application de la clause de non-recours. Ce n'est que lorsque le non-respect du processus de DP par la province est tel que la démarche suivie est totalement étrangère à ce processus qu'on ne peut conclure que les parties ont voulu l'application de la clause de non-recours. Ce qui importe en l'occurrence selon moi c'est que la DP, au vu de sa conception, de ses dispositions expresses et de son approbation légale, avait pour assise l'admissibilité des seuls six proposants ayant répondu à la DEI. La mise en concurrence avec des tiers n'était pas envisagée et elle ne faisait pas partie du processus; en fait, la DP l'excluait expressément. En bref, l'admissibilité des seuls proposants qui avaient répondu à la DEI était l'assise même la DP.

a bid from an ineligible bidder "attacks the under-lying premise of the process" established by the RFP: para. 146. Liability for such an attack is not excluded by a clause limiting compensation result-ing from participation in this RFP.

[77]    This interpretation is also supported by another provision of the RFP. Under s. 2.9, as men-tioned earlier, the Province reserved to itself the right to unilaterally cancel the RFP and the right to propose a new RFP allowing additional bid-ders. If the exclusion clause were broad enough to exclude compensation for allowing ineligible bid-ders to participate, there seems to be little purpose in this reservation of the ability to cancel the RFP and issue a new one to a wider circle of bidders. It is also significant that the Province did not reserve to itself the right to accept a bid from an ineligible bidder or to unilaterally change the rules of eligi-bility. The RFP expressly did exactly the opposite. None of this, in my opinion, supports the view that the exclusion clause should be read as applying to the Province's conduct in this case.

[78]    To hold otherwise seems to me to be incon-sistent with the text of the clause read in the context of the RFP as a whole and in light of its purposes and commercial context. In short, I cannot accept the contention that, by agreeing to exclude com-pensation for participating in this RFP process, the parties could have intended to exclude a damages claim resulting from the Province unfairly permit-ting a bidder to participate who was not eligible to do so. I cannot conclude that the provision was intended to gut the RFP's eligibility requirements as to who may participate in it, or to render mean-ingless the Minister's statutorily required approval of the alternative process where this was a key ele-ment. The provision, as well, was not intended to allow the Province to escape a damages claim for applying different eligibility criteria, to the compet-itive disadvantage of other bidders and for taking

Comme le dit la juge de première instance, l'accep-tation de la proposition d'un soumissionnaire inad-missible [TRADUCTION] « sape l'assise du proces-sus » établi par la DP : par. 146. La clause écartant toute indemnisation pour la participation à la DP ne saurait soustraire une partie à la responsabilité découlant d'une telle atteinte.

[77]    Une autre disposition de la DP valide cette interprétation. Comme je le signale précédemment, à la clause 2.9, la province se réserve le droit d'an-nuler unilatéralement la DP et celui de proposer la tenue d'un nouvel appel d'offres ouvert à d'autres soumissionnaires. Si la clause de non-recours avait une portée suffisamment large pour écarter la res-ponsabilité résultant de l'acceptation de propo-sitions présentées par des soumissionnaires non admissibles, point n'aurait été besoin de prévoir cette faculté de mettre fin à la DP et d'en lancer une nouvelle en élargissant le cercle des soumis-sionnaires éventuels. Il est aussi révélateur que la province ne se soit pas réservé le droit d'accepter la proposition d'un soumissionnaire inadmissible ou de modifier de son seul chef les règles d'admissi-bilité. La DP prévoit expressément l'exact contraire. À mon sens, rien de tout cela n'appuie la thèse que la clause de non-recours devrait être interprétée de façon à la rendre applicable au comportement de la province en l'espèce.

[78]    Selon moi, conclure le contraire va à l'en-contre du texte de la clause interprété eu égard au contexte de la DP dans son ensemble et à la lumière de l'objet et du contexte commercial de celle-ci. En somme, je ne peux faire droit à la prétention selon laquelle, en écartant toute indemnité pour la parti-cipation à la DP, les parties ont pu vouloir faire ob-stacle à tout recours en dommages-intérêts intenté pour l'iniquité dont aurait pu faire preuve la pro-vince en permettant à une entreprise de participer à un processus auquel elle n'était pas admise à pren-dre part. Je ne peux conclure que la clause visait à supprimer les conditions d'admissibilité de la DP, à priver de sa raison d'être l'approbation ministé-rielle du nouveau processus exigée par la loi, dont les conditions d'admissibilité en question formaient un élément clé, non plus qu'à permettre à la pro-vince d'échapper à toute responsabilité après avoir

steps designed to disguise the true state of affairs. I cannot conclude that the parties, through the words found in this exclusion clause, intended to waive compensation for conduct like that of the Province in this case that strikes at the heart of the integrity and business efficacy of the tendering process which it undertook.

[79] If I am wrong about my interpretation of the clause, I would hold, as did the trial judge, that its language is at least ambiguous. If, as the Province contends, the phrase "participating in this RFP" could reasonably mean "submitting a Proposal", that phrase could also reasonably mean "competing against the other eligible participants". Any ambiguity in the context of this contract requires that the clause be interpreted against the Province and in favour of Tercon under the principle *contra proferentem*: see, e.g., *Hillis Oil and Sales Ltd. v. Wynn's Canada, Ltd.*, [1986] 1 S.C.R. 57, at pp. 68-69. Following this approach, the clause would not apply to bar Tercon's damages claim.

V. Disposition

[80] I conclude that the judge did not err in finding that the Province breached the tendering contract or in finding that Tercon's remedy in damages for that breach was not precluded by the exclusion clause in the contract. I would therefore allow the appeal, set aside the order of the Court of Appeal and restore the judgment of the trial judge. The parties advise that the question of costs has been resolved between them and that therefore no order in relation to costs is required.

The reasons of McLachlin C.J. and Binnie, Abella and Rothstein JJ. were delivered by

[81] BINNIE J. (dissenting) — The important legal issue raised by this appeal is whether, and in what

---

appliqué des critères d'admissibilité différents défavorisant des soumissionnaires sur le plan concurrentiel et pris des mesures pour dissimuler cette réalité. Je ne puis non plus arriver à la conclusion que les parties ont voulu, en employant le libellé de la clause de non-recours, exclure toute indemnité pour le préjudice infligé par un comportement comme celui reproché à la province en l'espèce, un comportement qui porte directement atteinte à l'intégrité de l'appel d'offres lancé et à son efficacité commerciale.

[79] Si toutefois j'avais tort d'interpréter la clause comme je le fais, je statuerais, à l'instar de la juge de première instance, que son texte est pour le moins équivoque. Si, comme le prétend la province, l'énoncé [TRADUCTION] « participation à la DP » pouvait raisonnablement s'entendre de la « présent[ation d']une proposition », il pourrait aussi bien équivaloir au fait de « se mesurer aux autres participants admissibles ». Toute ambiguïté dans le cadre du contrat commande que la clause soit interprétée au détriment de la province et en faveur de Tercon suivant la règle *contra proferentem* : voir, p. ex., *Hillis Oil and Sales Ltd. c. Wynn's Canada, Ltd.*, [1986] 1 R.C.S. 57, p. 68-69. Dès lors, la clause ne ferait pas obstacle au recours en dommages-intérêts de Tercon.

V. Dispositif

[80] Je conclus que la juge de première instance n'a pas commis d'erreur en statuant que la province n'avait pas respecté le contrat issu de l'appel d'offres et que la clause de non-recours figurant dans ce contrat ne faisait pas obstacle à l'action en dommages-intérêts intentée par Tercon pour cette inexécution. Je suis donc d'avis d'accueillir le pourvoi, d'annuler l'ordonnance de la Cour d'appel et de rétablir le jugement de première instance. Les parties ayant réglé entre elles la question des dépens, il n'est donc pas nécessaire de rendre d'ordonnance à ce sujet.

Version française des motifs de la juge en chef McLachlin et des juges Binnie, Abella et Rothstein rendus par

[81] LE JUGE BINNIE (dissident) — Le présent pourvoi soulève une question de droit importante,

circumstances, a court will deny a defendant contract breaker the benefit of an exclusion of liability clause to which the innocent party, not being under any sort of disability, has agreed. Traditionally, this has involved consideration of what is known as the doctrine of fundamental breach, a doctrine which Dickson C.J. in *Hunter Engineering Co. v. Syncrude Canada Ltd.*, [1989] 1 S.C.R. 426, suggested should be laid to rest 21 years ago (p. 462).

[82]  On this occasion we should again attempt to shut the coffin on the jargon associated with "fundamental breach". Categorizing a contract breach as "fundamental" or "immense" or "colossal" is not particularly helpful. Rather, the principle is that a court has no discretion to refuse to enforce a valid and applicable contractual exclusion clause unless the plaintiff (here the appellant Tercon) can point to some paramount consideration of public policy sufficient to override the public interest in freedom of contract and defeat what would otherwise be the contractual rights of the parties. Tercon points to the public interest in the transparency and integrity of the government tendering process (in this case, for a highway construction contract) but in my view such a concern, while important, did not render unenforceable the terms of the contract Tercon agreed to. There is nothing inherently unreasonable about exclusion clauses. Tercon is a large and sophisticated corporation. Unlike my colleague Justice Cromwell, I would hold that the respondent Ministry's conduct, while in breach of its contractual obligations, fell within the terms of the exclusion clause. In turn, there is no reason why the clause should not be enforced. I would dismiss the appeal.

I.  Overview

[83]  This appeal concerns a contract to build a $35 million road in the remote Nass Valley of British Columbia (the "Kincolith project"). The respondent Ministry accepted a bid from Brentwood

celle de savoir si le tribunal peut refuser à la partie coupable d'inexécution — et dans l'affirmative, à quelles conditions — le bénéfice d'une clause d'exonération de la responsabilité à laquelle a consenti l'autre partie alors qu'elle n'était frappée d'aucune inaptitude. Les tribunaux appelés à se prononcer en la matière s'en sont traditionnellement remis au principe de l'inexécution fondamentale, un principe auquel le juge en chef Dickson proposait d'asséner le coup de grâce il y a 21 ans dans l'arrêt *Hunter Engineering Co. c. Syncrude Canada Ltée*, [1989] 1 R.C.S. 426, p. 462.

[82]  Nous devrions saisir l'occasion qui nous est à nouveau donnée d'éliminer le jargon associé à l'« inexécution fondamentale ». Qualifier l'inexécution contractuelle de « fondamentale », « monumentale » ou « phénoménale » n'est pas spécialement utile. En fait, le tribunal n'a pas le pouvoir discrétionnaire de refuser de faire respecter une clause de non-recours valide et applicable, sauf lorsque le demandeur (en l'espèce, l'appelante Tercon) fait valoir une considération d'ordre public prépondérante qui l'emporte sur l'intérêt public lié à la liberté de contracter et qui fait obstacle à ce qui, autrement, constitueraient les droits contractuels des parties. Tercon invoque l'intérêt public lié à la transparence et à l'intégrité du processus gouvernemental d'appel d'offres (visant en l'occurrence la construction d'une route), mais à mon sens, même s'il s'agit d'une condition importante, son inobservation n'a pas rendu inapplicable les clauses du contrat auxquelles Tercon avait consenti. La clause de non-recours n'a rien d'intrinsèquement déraisonnable. Tercon est une grande entreprise dotée d'une vaste expérience. Contrairement à mon collègue le juge Cromwell, j'estime que même s'il n'a pas respecté ses obligations contractuelles, le ministère intimé bénéficie de la clause de non-recours. Il n'y a donc pas de raison de ne pas faire respecter celle-ci. Je suis d'avis de rejeter le pourvoi.

I.  Survol

[83]  Le contrat avait pour objet la construction d'une route au coût de 35 millions de dollars dans la vallée isolée de la Nass, en Colombie-Britannique (le « projet Kincolith »). Le ministère intimé a

Enterprises Ltd. that did not comply with the terms of tender. Tercon, as the disappointed finalist in the bidding battle, seeks compensation equivalent to the profit it expected to earn had it been awarded the contract.

[84] Tercon alleged, and the trial judge found, that although the winning bid was submitted in the name of Brentwood (an eligible bidder), Brentwood in fact intended, with the Ministry's knowledge and encouragement, to do the work in a co-venture with an ineligible bidder, Emil Anderson Construction Co. ("EAC"). The respondent Ministry raised a number of defences including the fact that the formal contract was signed in the name of Brentwood alone. This defence was rejected in the courts below. The Ministry's substantial defence in this Court is that even if it failed to abide by the bidding rules, it is nonetheless protected by an exclusion of compensation clause set out clearly in the request for proposals ("RFP"). The clause provided that "no Proponent shall have any claim for compensation of any kind whatsoever, as a result of participating in this RFP" and that "by submitting a Proposal each Proponent shall be deemed to have agreed that it has no claim" (s. 2.10 of the RFP).

[85] The appeal thus brings into conflict the public policy that favours a fair, open and transparent bid process, and the freedom of contract of sophisticated and experienced parties in a commercial environment to craft their own contractual relations. I agree with Tercon that the public interest favours an orderly and fair scheme for tendering in the construction industry, but there is also a public interest in leaving knowledgeable parties free to order their own commercial affairs. In my view, on the facts of this case, the Court should not rewrite — nor should the Court refuse to give effect to — the terms agreed to by the parties.

[86] I accept, as did the courts below, that the respondent Ministry breached the terms of its own RFP when it contracted with Brentwood, knowing the work would be carried out by a co-venture with Brentwood and EAC. The addition of EAC, a

accepté de Brentwood Enterprises Ltd. une soumission qui n'était pas conforme aux conditions de son appel d'offres. Écartée à l'étape ultime du processus, Tercon a réclamé une indemnité équivalant au profit escompté advenant l'obtention du contrat.

[84] Tercon a allégué que même si la soumission retenue avait été présentée au nom de Brentwood, ce soumissionnaire admissible entendait en fait exécuter les travaux en coentreprise avec un soumissionnaire inadmissible, Emil Anderson Construction Co. (« EAC »), au su et avec l'appui du ministère. La juge de première instance lui a donné raison. Le ministère intimé a invoqué divers moyens de défense, dont le fait que Brentwood seule était signataire du contrat intervenu. Ce moyen a été rejeté par les juridictions inférieures. Devant notre Cour, le ministère fait valoir comme moyen de fond qu'en dépit de l'inobservation des règles de l'appel d'offres, il peut se prévaloir de la clause de non-recours en indemnisation que prévoit clairement la demande de propositions (« DP »). Une clause stipule en effet qu'[TRADUCTION] « un proposant ne peut exercer aucun recours en indemnisation pour sa participation à la DP, ce qu'il est réputé accepter lorsqu'il présente une soumission » (clause 2.10 de la DP).

[85] S'opposent donc en l'espèce des considérations d'ordre public privilégiant un appel d'offres équitable, ouvert et transparent et la liberté de personnes compétentes et expérimentées de définir leurs liens contractuels dans un contexte commercial. Je conviens avec Tercon que, dans le secteur de la construction, il est dans l'intérêt public que les appels d'offres se déroulent de manière ordonnée et équitable. Mais il est également dans l'intérêt public que des personnes rompues aux usages d'un domaine conservent la faculté d'organiser leurs propres affaires. Vu les faits de la présente espèce, la Cour ne devrait pas reformuler les conditions arrêtées par les parties ni refuser de leur donner effet.

[86] Je conviens avec les juridictions inférieures que le ministère intimé n'a pas respecté les conditions de sa propre DP en accordant le marché à Brentwood alors qu'il savait que les travaux seraient exécutés en coentreprise avec EAC. L'adjonction

bigger contractor with greater financial resources than Brentwood, created a stronger competitor for Tercon than Brentwood alone. However, I also agree with the B.C. Court of Appeal that the exclusion of compensation clause is clear and unambiguous and that no legal ground or rule of law permits us to override the freedom of the parties to contract (or to decline to contract) with respect to this particular term, or to relieve Tercon against its operation in this case.

## II.    The Tendering Process

[87]    For almost three decades, the law governing a structured bidding process has been dominated by the concept of Contract A/Contract B initially formulated in *The Queen in right of Ontario v. Ron Engineering & Construction (Eastern) Ltd.*, [1981] 1 S.C.R. 111. The analysis advanced by Estey J. in that case was that the bidding process, as defined by the terms of the tender call, may create contractual relations ("Contract A") prior in time and quite independently of the contract that is the actual subject matter of the bid ("Contract B"). Breach of Contract A may, depending on its terms, give rise to contractual remedies for non-performance even if Contract B is never entered into or, as in the present case, it is awarded to a competitor. The result of this legal construct is to provide unsuccessful bidders with a *contractual* remedy against an owner who departs from its own bidding rules. Contract A, however, arises (if at all) as a matter of interpretation. It is not imposed as a rule of law.

[88]    In *Ron Engineering*, the result of Estey J.'s analysis was that as a matter of contractual interpretation, the Ontario government was allowed to retain a $150,000 bid bond put up by Ron Engineering even though the government was told, a little over an hour after the bids were opened, that Ron Engineering had made a $750,058 error in the calculation of its bid and wished to withdraw it. Estey J. held:

The contractor was not asked to sign a contract which diverged in any way from its tender but simply to sign a

de cet autre entrepreneur à la taille et aux moyens financiers plus grands que ceux de Brentwood a opposé à Tercon un concurrent plus puissant que Brentwood seule. Toutefois, je conviens aussi avec la Cour d'appel de la Colombie-Britannique que la clause de non-recours en indemnisation est claire et non équivoque et qu'aucune règle de droit ou autre fondement juridique ne nous permet de passer outre à la liberté des parties de convenir (ou non) de cette condition ni de soustraire Tercon à son application en l'espèce.

## II.    Le processus d'appel d'offres

[87]    Depuis près de trois décennies, le modèle du contrat A et du contrat B appliqué pour la première fois dans l'arrêt *La Reine du chef de l'Ontario c. Ron Engineering & Construction (Eastern) Ltd.*, [1981] 1 R.C.S. 111, prédomine dans le droit applicable en matière d'appel d'offres. Suivant l'analyse du juge Estey dans cet arrêt, le processus défini par les conditions de l'appel d'offres peut faire naître des relations contractuelles (« contrat A ») antérieures au marché projeté (« contrat B ») et tout à fait indépendantes de celui-ci. Le non-respect du contrat A, dépendant de sa teneur, peut donner ouverture à un recours contractuel pour inexécution même si le contrat B ne voit pas le jour et même si, comme en l'espèce, il est octroyé à un concurrent. Cette construction juridique permet au soumissionnaire non retenu d'exercer un recours *contractuel* contre le propriétaire qui ne respecte pas les règles de l'appel d'offres qu'il a lui-même établies. Cependant, l'existence du contrat A relève de l'interprétation, elle n'est pas dictée par une règle de droit.

[88]    Dans l'arrêt *Ron Engineering*, le juge Estey conclut que suivant son interprétation du contrat, le gouvernement de l'Ontario pouvait conserver le cautionnement de soumission de 150 000 $ même s'il avait appris un peu plus d'une heure après l'ouverture des soumissions que Ron Engineering avait commis une erreur de 750 058 $ dans le calcul du montant offert et qu'elle souhaitait retirer sa soumission. Le juge Estey dit :

On n'a pas demandé à l'entrepreneur de signer un contrat qui différait en quoi que ce soit de sa soumission, mais

contract in accordance with the instructions to tenders and in conformity with its own tender. [p. 127]

In other words, harsh as it may have seemed to Ron Engineering, the parties were held to their bargain. The Court was not prepared to substitute "fair and reasonable" terms for what the parties had actually agreed to.

[89] In *M.J.B. Enterprises Ltd. v. Defence Construction (1951) Ltd.*, [1999] 1 S.C.R. 619, Contract A included a "privilege" clause which stated that the owner was not obliged to accept the lowest or *any* tender. The Court implied a term, based on the presumed intention of the parties, that notwithstanding the privilege clause, only compliant bids were open to acceptance. While the owner was not obliged to accept the lowest compliant bid, the privilege clause did not, as a matter of contractual interpretation, give the owner "the privilege" of accepting a non-compliant bid. *M.J.B.* stops short of the issue in the present appeal because in that case, there was a breach of Contract A but no clause purporting to exclude liability on the part of the owner to pay compensation in the event of a Contract A violation.

[90] In *Naylor Group Inc. v. Ellis-Don Construction Ltd.*, 2001 SCC 58, [2001] 2 S.C.R. 943, the Court enforced the rules of the bid depository system against a contractor whose bid was based on what turned out to be a mistaken view of its collective bargaining status with the International Brotherhood of Electrical Workers. The Court again affirmed that "[t]he existence and content of Contract A will depend on the facts of the particular case" (para. 36). Ellis-Don sought relief from its bid on the basis of a labour board decision rendered subsequent to its bid that upheld, to its surprise, the bargaining rights of the union. This Court held that no relief was contemplated in the circumstances under Contract A and none was afforded, even though this was a costly result when viewed from the perspective of Ellis-Don.

simplement de signer un contrat conforme aux instructions adressées aux soumissionnaires et à sa propre soumission. [p. 127]

Autrement dit, les parties ne pouvaient revenir sur le marché conclu, aussi draconien que cela ait pu paraître à Ron Engineering. La Cour n'était pas disposée à substituer « justes et raisonnables » à celles dont les parties avaient convenu.

[89] Dans l'arrêt *M.J.B. Enterprises Ltd. c. Construction de Défense (1951) Ltée*, [1999] 1 R.C.S. 619, le contrat A renfermait une clause « de réserve » portant que le propriétaire n'était tenu d'accepter ni la soumission la plus basse ni *aucune* soumission. Invoquant l'intention présumée des parties, la Cour infère du contrat, malgré la clause de réserve, l'obligation tacite du propriétaire de n'accepter qu'une soumission conforme. Le propriétaire n'était pas tenu d'accepter la soumission conforme la plus basse, mais suivant son interprétation, la clause de réserve ne « réservait » pas au propriétaire le droit d'accepter une soumission non conforme. L'arrêt *M.J.B.* ne tranche pas la question soulevée dans le présent pourvoi, car même s'il y avait eu inexécution du contrat A, aucune clause n'avait pour objet d'écarter l'obligation du propriétaire de verser une indemnité en cas de non-respect du contrat A.

[90] Dans l'arrêt *Naylor Group Inc. c. Ellis-Don Construction Ltd.*, 2001 CSC 58, [2001] 2 R.C.S. 943, la Cour donne effet aux règles régissant le système de soumissions au détriment d'un entrepreneur dont la soumission se fondait sur ce qui s'est révélé être une mauvaise interprétation de l'obligation de négocier collectivement avec la Fraternité internationale des ouvriers en électricité. La Cour y confirme que « [l]'existence et le contenu du contrat A dépendent des faits de chaque affaire » (par. 36). Ellis-Don tentait d'échapper à ses obligations contractuelles en invoquant une décision de la Commission des relations de travail — rendue après le dépôt de sa soumission — qui reconnaissait contre toutes attentes les droits de négociation collective du syndicat. La Cour statue que le contrat A ne prévoyait aucune mesure réparatrice en pareil cas et elle n'en accorde aucune, même si le résultat se révèle coûteux pour Ellis-Don.

[91]   In *Martel Building Ltd. v. Canada*, 2000 SCC 60, [2000] 2 S.C.R. 860, citing *M.J.B.*, the Court implied a term in Contract A obligating the owner to be fair and consistent in the assessment of tender bids. On the facts, the disappointed bidder's claim of unfair treatment was rejected.

[92]   Finally, in *Double N Earthmovers Ltd. v. Edmonton (City)*, 2007 SCC 3, [2007] 1 S.C.R. 116, the unsuccessful bidder claimed that Edmonton had accepted, in breach of Contract A, a competitor's non-compliant bid to provide heavy equipment of a certain age to move refuse at a waste disposal site. The Court refused to imply a term "requiring an owner to investigate to see if bidders will really do what they promised in their tender" (para. 50). Accepting the existence of a duty of "fairness and equality", the majority nevertheless held that "[t]he best way to make sure that all bids receive the same treatment is for an owner to weigh bids on the basis of what is actually in the bid, not to weigh them on the basis of subsequently discovered information" (para. 52). In other words, the majority's interpretation of the express terms of Contract A was enforced despite Double N Earthmovers' complaint of double dealing by the owner.

[93]   On the whole, therefore, while *Ron Engineering* and its progeny have encouraged the establishment of a fair and transparent bidding process, Contract A continues to be based not on some abstract externally imposed rule of law but on the presumed (and occasionally implied) intent of the parties. Only in rare circumstances will the Court relieve a party from the bargain it has made.

[94]   As to implied terms, *M.J.B.* emphasized (at para. 29) that the focus is "the intentions of the <u>actual</u> parties". A court, when dealing with a claim to an implied term, "must be careful not to slide

[91]   Dans l'arrêt *Martel Building Ltd. c. Canada*, 2000 CSC 60, [2000] 2 R.C.S. 860, s'appuyant sur l'arrêt *M.J.B.*, la Cour conclut que le contrat A obligeait tacitement le propriétaire à évaluer les soumissions de façon équitable et uniforme. Mais au vu des faits, elle rejette la prétention du soumissionnaire éconduit selon laquelle il n'avait pas été traité avec équité.

[92]   Enfin, dans l'affaire *Double N Earthmovers Ltd. c. Edmonton (Ville)*, 2007 CSC 3, [2007] 1 R.C.S. 116, à l'issue d'un appel d'offres pour la fourniture de machinerie lourde devant servir au déplacement des déchets dans une décharge, un soumissionnaire non retenu prétendait que la ville d'Edmonton avait contrevenu au contrat A en acceptant une soumission non conforme pour ce qui était de l'année de fabrication des machines. La Cour refuse de conclure à l'obligation tacite du propriétaire « de vérifier si les soumissionnaires respecteront vraiment les engagements qu'ils ont pris dans leur soumission » (par. 50). Les juges majoritaires reconnaissent que le propriétaire est tenu de traiter tous les soumissionnaires « équitablement et sur un pied d'égalité », mais ils estiment néanmoins que « [l]e meilleur moyen pour le propriétaire de s'assurer que toutes les soumissions sont traitées de façon équitable est de les évaluer d'après leur contenu réel et non en fonction des renseignements révélés ultérieurement » (par. 52). Ainsi, il est donné effet à leur interprétation des conditions expresses du contrat A malgré l'allégation de duplicité formulée par Double N Earthmovers contre le propriétaire.

[93]   Dans l'ensemble, bien que l'arrêt *Ron Engineering* et ceux rendus dans sa foulée préconisent un processus d'appel d'offres équitable et transparent, l'assise du contrat A demeure l'intention présumée (et parfois inférée) des parties, et non quelque règle de droit abstraite imposée par un tiers. Ce n'est qu'en de rares circonstances que le tribunal relèvera une partie de ses engagements.

[94]   Dans l'arrêt *M.J.B.*, la Cour souligne que, pour les conditions implicites, l'accent est mis sur « l'intention des parties <u>elles-mêmes</u> » (par. 29). Le tribunal appelé à statuer sur l'existence alléguée

into determining the intentions of <u>reasonable</u> parties" (emphasis in original). Thus, "if there is evidence of a contrary intention, on the part of either party, an implied term may not be found on this basis".

[95]    Tercon is a large and experienced contractor. As noted by Donald J.A. in the B.C. Court of Appeal, it had earlier "successfully recovered damages from the [Ministry] on a bidding default in a previous case" (2007 BCCA 592, 73 B.C.L.R. (4th) 201, at para. 15). See *Tercon Contractors Ltd. v. British Columbia* (1993), 9 C.L.R. (2d) 197 (B.C.S.C.), aff'd [1994] B.C.J. No. 2658 (QL) (C.A.). Thus Tercon would have been more sensitive than most contractors to the risks posed by an exclusion of compensation clause. It nevertheless chose to bid on the project on the terms proposed by the Ministry.

### III.    <u>Tercon's Claim for Relief From the Exclusionary Clause It Agreed to</u>

[96]    In these circumstances, the first question is whether there is either a statutory legal obstacle to, or a principled legal argument against, the freedom of these parties to contract out of the obligation that would otherwise exist for the Ministry to pay compensation for a breach of Contract A. If not, the second question is whether there is any other barrier to the court's enforcement of the exclusionary clause in the circumstances that occurred. On the first branch, Tercon relies on the *Ministry of Transportation and Highways Act*, R.S.B.C. 1996, c. 311 ("*Transportation Act*" or the "Act"). On the second branch, Tercon relies on the doctrine of fundamental breach.

### A.    *The Statutory Argument*

[97]    Section 4 of the *Transportation Act* provides that before awarding a highway contract, "the minister must invite tenders in any manner that will make the invitation for tenders reasonably available

d'une condition implicite « doit se garder de chercher à déterminer l'intention de parties <u>raisonnables</u> » (souligné dans l'original). Ainsi, « en présence d'une preuve d'intention contraire de la part de l'une ou l'autre des parties, l'on ne peut conclure à l'existence d'une condition implicite sur ce fondement ».

[95]    Tercon est une grande entreprise expérimentée et, comme le fait observer le juge Donald de la Cour d'appel, elle [TRADUCTION] « a déjà obtenu des dommages-intérêts du [ministère] dans une autre affaire d'irrégularité du processus d'appel d'offres » (2007 BCCA 592, 73 B.C.L.R. (4th) 201, par. 15). Voir *Tercon Contractors Ltd. c. British Columbia* (1993), 9 C.L.R. (2d) 197 (C.S.C.-B.), conf. par [1994] B.C.J. No. 2658 (QL) (C.A.). Tercon aurait donc été plus consciente que la plupart des autres entreprises du risque que posait la clause de non-recours en indemnisation. Elle a néanmoins décidé de participer au processus aux conditions proposées par le ministère.

### III.    <u>Demande de Tercon visant à la soustraire à l'application de la clause de non-recours à laquelle elle a consenti</u>

[96]    Dans ces circonstances, il faut premièrement se demander si un élément législatif ou un argument juridique valable s'oppose à la liberté des parties d'exclure dans leur contrat l'obligation qu'aurait le ministère de verser une indemnité en cas d'inexécution du contrat A. S'il n'y en a pas, il convient deuxièmement de déterminer si, au vu des faits de l'espèce, il existe un autre obstacle à l'application de la clause de non-recours. Pour le premier volet, Tercon invoque la *Ministry of Transportation and Highways Act*, R.S.B.C. 1996, ch. 311 (« *Loi sur les transports* » ou « Loi »), pour le second, le principe de l'inexécution fondamentale.

### A.    *L'argument de nature législative*

[97]    L'article 4 de la *Loi sur les transports* dispose qu'avant d'accorder un contrat de voirie, [TRADUCTION] « le ministre lance l'appel d'offres de manière à informer raisonnablement le public de

to the public", but then provides for several exceptions: "The minister need not invite tenders for a project . . . if . . . (c) the minister believes that an alternative contracting process will result in a competitively established cost for the project". Here the required ministerial authorization was obtained for an "alternative process". The reason is as follows. As noted by Cromwell J., the Ministry's original idea was to use a "design-build" model where a single contractor would design and build the highway for a fixed price. The Ministry issued a request for expressions of interest ("RFEI") which attracted six responses. One was from Tercon. Another was from Brentwood. EAC declined to bid because it did not think the "design-build" concept was appropriate for the job.

[98]    On further reflection, the Ministry decided not to pursue the design-build approach. It decided to design the highway itself. The contract would be limited to construction, as EAC had earlier advocated. EAC was not allowed to bid despite the Ministry coming around to its point of view on the proper way to tender the project. The Ministry limited bidding on the new contest to the six respondents to the original RFEI, all of whom had been found capable of performing the contract. But to do so, it needed, and did obtain, the Minister's s. 4 approval.

[99]    A question arose during the hearing of the appeal as to whether the Minister actually approved an "alternative process" that not only restricted eligibility to the six participants in the RFEI process (an advantage to Tercon and the other five participants), but also contained the "no claims" clause excluding compensation for non-observance of its terms (no doubt considered a disadvantage). In its factum, the Ministry states:

In this case, the Minister approved an alternate process under [s. 4(2) of the B.C. *Transportation Act*]. That process was set out in the Instructions to Proponents, which included the No Claim Clause. Having been approved by the Minister, the package (including the No Claim

sa tenue », sauf dans certains cas, notamment lorsque [TRADUCTION] « c) le ministre estime qu'un autre processus d'adjudication de marché permettra la réalisation des travaux à un coût concurrentiel ». En l'espèce, le ministre a approuvé un « autre processus ». La raison en est — comme le signale le juge Cromwell — que le ministère prévoyait initialement qu'un seul entrepreneur se chargerait de la conception et de la construction de la route moyennant un prix fixe. Il a lancé une demande d'expression d'intérêt (« DEI ») et reçu six réponses, dont celles de Tercon et de Brentwood. Estimant que les travaux ne se prêtaient pas au modèle « conception-construction », EAC n'a pas manifesté son intérêt.

[98]    Après réflexion, le ministère a renoncé à ce modèle. Il a décidé de concevoir lui-même la route et de ne passer un marché que pour sa construction, comme l'avait préconisé EAC. Cette dernière ne pouvait cependant pas soumissionner même si le ministère s'était rangé à son avis sur les modalités qu'il convenait d'établir pour l'appel d'offres. Le ministère a réservé la participation au nouveau processus aux six entrepreneurs ayant initialement répondu à la DEI, qu'il avait tous jugés aptes à exécuter les travaux. Il devait toutefois obtenir du ministre l'approbation visée à l'art. 4, et il l'a obtenue.

[99]    Lors de l'audition du pourvoi, la question s'est posée de savoir si le ministre avait effectivement approuvé un « autre processus » qui non seulement tenait pour admissibles les six participants à la DEI (conférant ainsi un avantage à Tercon et aux cinq autres entreprises), mais renfermait également une clause « écartant tout recours » en indemnisation d'un préjudice découlant du non-respect de ses conditions (assurément perçue comme un élément défavorable). Dans son mémoire, le ministère soutient ce qui suit :

[TRADUCTION] Dans la présente affaire, le ministre a approuvé un autre processus [en application du par. 4(2) de la *Transportation Act* de la Colombie-Britannique]. Ce processus était énoncé dans les instructions aux proposants, qui comprenaient la clause « écartant tout

Clause) complied with section 4 of the *Transportation Act*. [para. 70]

[100]   Tercon argued at the hearing of this appeal that as a matter of *law*, Contract A could not have included the exclusion clause because

[t]he policy of the [*Transportation Act*] is to ensure that the Ministry is accountable; to preserve confidence in the integrity of the tendering process. To ensure that is so and that the Minister is accountable, the Ministry must be held liable for its breach of Contract A in considering and accepting a proposal from the joint venture . . . .

.   .   .

**MADAM JUSTICE ABELLA:** Can I just ask you one question. Is it your position, sir, that you can never have -- that a government can never have a no claims clause?

**MR. McLEAN:** Yes. Under this statute because of the policy of the statute. [Transcript, at p. 27]

[101]   While it is true that the Act favours "the integrity of the tendering process", it nowhere prohibits the parties from negotiating a "no claims" clause as part of their commercial agreement, and cannot plausibly be interpreted to have that effect.

[102]   In the ordinary world of commerce, as Dickson C.J. commented in *Hunter*, "clauses limiting or excluding liability are negotiated as part of the general contract. As they do with all other contractual terms, the parties bargain for the consequences of deficient performance" (p. 461). Moreover, as Mr. Hall points out, "[t]here are many valid reasons for contracting parties to use exemption clauses, most notably to allocate risks" (G. R. Hall, *Canadian Contractual Interpretation Law* (2007), at p. 243). Tercon, for example, is a sophisticated and experienced contractor and if it decided that it was in its commercial interest to proceed with the bid despite the exclusion of compensation clause, that was its prerogative and nothing in the "policy of the Act" barred the parties' agreement on that point.

recours ». Avalisé par le ministre, l'ensemble des conditions (dont la clause « écartant tout recours ») était conforme à l'article 4 de la *Transportation Act*. [par. 70]

[100]   Tercon a soutenu à l'audience que le contrat A ne pouvait *légalement* comprendre la clause de non-recours, car

[TRADUCTION] [l]a raison d'être de la [*Transportation Act*] est de rendre le ministre responsable de ses actes, de protéger la foi dans l'intégrité du processus d'appel d'offres. C'est pourquoi le ministre doit engager sa responsabilité en cas d'inexécution du contrat A lorsqu'il considère puis accepte la proposition d'une coentreprise . . .

.   .   .

**MADAME LA JUGE ABELLA :** Puis-je seulement vous poser une question? Allez-vous jusqu'à prétendre, Maître, qu'il ne peut jamais y avoir de clause « écartant tout recours », qu'un gouvernement ne peut jamais stipuler une telle clause?

**MAÎTRE McLEAN :** Oui. Sous le régime de cette loi, à cause de sa raison d'être. [Transcription, p. 27]

[101]   Certes la Loi favorise « l'intégrité du processus d'appel d'offres », mais aucune de ses dispositions n'empêche les parties de faire figurer dans leur accord commercial une clause écartant toute indemnisation ni ne peut vraisemblablement être interprétée comme ayant cet effet.

[102]   Dans l'arrêt *Hunter*, le juge en chef Dickson fait observer que dans le contexte ordinaire du commerce, « les clauses de limitation ou d'exclusion de responsabilité sont négociées dans le cadre de l'ensemble du contrat. Comme elles le font pour les autres conditions du contrat, les parties négocient les conséquences de l'exécution insuffisante » (p. 461). De plus, Hall fait remarquer que [TRADUCTION] « [b]on nombre de raisons valables justifient les parties contractantes de recourir à une clause exonératrice, le plus souvent pour répartir le risque » (G. R. Hall, *Canadian Contractual Interpretation Law* (2007), p. 243). Tercon est une entreprise avertie et expérimentée, et si elle a jugé commercialement opportun de présenter une soumission malgré la clause de non-recours en indemnisation, c'était sa décision. La « raison d'être de la Loi » ne faisait aucunement obstacle à la convention des parties sur ce point.

[103]   To the extent Tercon is now saying that as a matter of *fact* the Minister, in approving the RFP, did not specifically approve the exclusion clause, and that the contract was thus somehow *ultra vires* the Ministry, this is not an issue that was either pleaded or dealt with in the courts below. The details of the ministerial approval process were not developed in the evidence. It is not at all evident that s. 4 *required* the Minister to approve the actual terms of the RFP. It is an administrative law point that Tercon, if so advised, ought to have pursued at pre-trial discovery and in the trial evidence. We have not been directed to any exploration of the matter in the testimony and it is too late in the proceeding for Tercon to explore it now. Accordingly, I proceed on the basis that the exclusion clause did not run afoul of the statutory requirements.

### B.   *The Doctrine of the Fundamental Breach*

[104]   The trial judge considered the applicability of the doctrine of fundamental breach. Tercon argued that the Ministry, by reason of its fundamental breach, had forfeited the protection of the exclusion of compensation clause.

[105]   The leading case is *Hunter* which also dealt with an exclusion of liability clause. The appellants Hunter Engineering and Allis-Chalmers Canada Ltd. supplied gearboxes used to drive conveyor belts at Syncrude's tar sands operations in Northern Alberta. The gearboxes proved to be defective. At issue was a broad exclusion of warranty clause that limited time for suit and the level of recovery available against Allis-Chalmers (i.e. no recovery beyond the unit price of the defective products). Dickson C.J. observed: "In the face of the contractual provisions, Allis-Chalmers can only be found liable under the doctrine of fundamental breach" (p. 451).

[106]   This doctrine was largely the creation of Lord Denning in the 1950s (see, e.g., *Karsales*

[103]   Tercon prétend aujourd'hui devant nous que, dans les *faits*, lorsqu'il a approuvé la DP, le ministre n'a pas approuvé la clause de non-recours comme telle, si bien que le contrat était en quelque sorte *ultra vires* du pouvoir du ministère. Or, cette thèse n'a été ni formulée devant les tribunaux inférieurs ni examinée par eux. Le détail du processus d'approbation ministérielle n'a pas été mis en preuve. Il n'est pas du tout évident que l'art. 4 *exigeait* du ministre qu'il approuve les conditions précises de la DP. Il s'agit d'un point de droit administratif que Tercon aurait dû soulever, si elle le souhaitait, à l'interrogatoire préalable ou lors de la présentation de la preuve au procès. La preuve ne nous a pas incités à explorer la question, et il est désormais trop tard pour que Tercon s'engage dans cette voie. Je poursuis donc l'analyse en tenant pour acquis que la clause de non-recours ne dérogeait pas aux exigences légales.

### B.   *La notion d'inexécution fondamentale*

[104]   La juge de première instance s'est penchée sur l'applicabilité de cette notion. Tercon soutenait qu'en raison de l'inexécution fondamentale dont il s'était rendu coupable, le ministère n'avait plus droit à la protection découlant de la clause de non-recours en indemnisation.

[105]   *Hunter* est l'arrêt de principe en la matière. Une clause d'exonération de la responsabilité y était également en cause. Les appelantes Hunter Engineering et Allis-Chalmers Canada Ltd. fournissaient des boîtes d'engrenage pour les convoyeurs à courroie utilisés par Syncrude pour l'exploitation de sables bitumineux dans le nord de l'Alberta. Le matériel s'est révélé défectueux. L'objet du litige était une clause générale d'exclusion de la garantie limitant le délai de poursuite et plafonnant au prix unitaire du produit défectueux le montant de l'indemnité qu'Allis-Chalmers pouvait être tenue de verser. Le juge en chef Dickson conclut que « [c]ompte tenu des dispositions du contrat, Allis-Chalmers ne peut être tenue responsable qu'aux termes du principe de l'inexécution fondamentale » (p. 451).

[106]   Ce principe de droit datant des années 1950 était en grande partie attribuable à lord Denning

*(Harrow) Ltd. v. Wallis*, [1956] 1 W.L.R. 936 (C.A.)). It was said to be a rule of law that operated independently of the intention of the parties in circumstances where the defendant had so egregiously breached the contract as to deny the plaintiff substantially the whole of its benefit. In such a case, according to the doctrine, the innocent party was excused from further performance but the defendant could still be held liable for the consequences of its "fundamental" breach even if the parties had excluded liability by clear and express language. See generally S. M. Waddams, *The Law of Contracts* (5th ed. 2005), at para. 478; J. D. McCamus, *The Law of Contracts* (2005), at pp. 765 *et seq.*

[107]    The five-judge *Hunter* Court was unanimous in the result and gave effect to the exclusion clause at issue. Dickson C.J. and Wilson J. both emphasized that there is nothing inherently unreasonable about exclusion clauses and that they should be applied unless there is a compelling reason not to give effect to the words selected by the parties. At that point, there was some divergence of opinion.

[108]    Dickson C.J. (La Forest J. concurring) observed that the doctrine of fundamental breach had "spawned a host of difficulties" (p. 460), the most obvious being the difficulty in determining whether a particular breach is fundamental. The doctrine obliged the parties to engage in "games of characterization" (p. 460) which distracted from the real question of what agreement the parties themselves intended. Accordingly, in his view, the doctrine should be "laid to rest". The situations in which the doctrine is invoked could be addressed more directly and effectively through the doctrine of "unconscionability", as assessed at the time the contract was made:

It is preferable to interpret the terms of the contract, in an attempt to determine exactly what the parties agreed. If on its true construction the contract excludes liability for the kind of breach that occurred, the party in breach will generally be saved from liability. Only where the contract is unconscionable, as might arise from situations of unequal bargaining power between the parties,

(voir, p. ex., *Karsales (Harrow) Ltd. c. Wallis*, [1956] 1 W.L.R. 936 (C.A.)). Il devait s'appliquer indépendamment de l'intention des parties lorsque le défendeur avait à ce point manqué à ses obligations contractuelles qu'il avait privé le demandeur de la quasi-totalité du bénéfice censé découler du contrat. Ainsi, le cocontractant innocent était dès lors relevé de ses obligations, et le défendeur pouvait en outre être tenu responsable des conséquences de son inexécution « fondamentale » même si les parties avaient clairement et expressément écarté toute responsabilité. Voir de façon générale S. M. Waddams, *The Law of Contracts* (5e éd. 2005), par. 478; J. D. McCamus, *The Law of Contracts* (2005), p. 765 et suiv.

[107]    Dans l'arrêt *Hunter*, les cinq juges de la Cour s'entendent sur l'issue du pourvoi et donnent effet à la clause d'exclusion. Le juge en chef Dickson et la juge Wilson font tous deux ressortir qu'une telle clause n'est pas intrinsèquement déraisonnable et qu'il faut la faire respecter sauf motif impérieux de ne pas donner effet au libellé employé par les parties. Certaines divergences d'opinions apparaissent ensuite.

[108]    Le juge en chef Dickson (avec l'accord du juge La Forest) fait remarquer que le principe de l'inexécution fondamentale a « engendré un grand nombre de difficultés » (p. 460), la plus évidente tenant à la détermination du caractère fondamental de l'inexécution. Les parties devaient en effet se livrer à des « jeux de caractérisation » (p. 460) qui détournaient leur attention de la question véritable, celle de savoir ce dont elles avaient elles-mêmes voulu convenir. Il est donc d'avis de « donner le coup de grâce » au principe, les situations où il est invoqué pouvant être réglées plus directement et plus efficacement sous l'angle de l'« iniquité » considérée au moment de la formation du contrat :

Il est préférable d'interpréter les conditions du contrat dans le but de déterminer exactement ce que les parties ont convenu. Si d'après son interprétation juste, le contrat écarte la responsabilité pour le genre d'inexécution qui s'est produit, la partie fautive sera généralement soustraite à la responsabilité. Ce n'est que lorsque le contrat est inique, comme cela pourrait se produire

should the courts interfere with agreements the parties have freely concluded. [p. 462]

Dickson C.J. explained that "[t]he courts do not blindly enforce harsh or unconscionable bargains" (p. 462), but "there is much to be gained by addressing directly the protection of the weak from overreaching by the strong, rather than relying on the artificial legal doctrine of 'fundamental breach'" (p. 462). To enforce an exclusion clause in such circumstances could tarnish the institutional integrity of the court. In that respect, it would be contrary to public policy. However, a *valid* exclusion clause would be enforced according to its terms.

[109]    Wilson J. (L'Heureux-Dubé J. concurring) disagreed. In her view, the courts retain some residual discretion to refuse to enforce exclusion clauses in cases of fundamental breach where the doctrine of *pre-*breach unconscionability (favoured by Dickson C.J.) did not apply. Importantly, she rejected the imposition of a general standard of reasonableness in the judicial scrutiny of exclusion clauses, affirming that "the courts . . . are quite unsuited to assess the fairness or reasonableness of contractual provisions as the parties negotiated them" (p. 508). Wilson J. considered it more desirable to develop through the common law a *post-*breach analysis seeking a "balance between the obvious desirability of allowing the parties to make their own bargains . . . and the obvious undesirability of having the courts used to enforce bargains in favour of parties who are totally repudiating such bargains themselves" (p. 510).

[110]    Wilson J. contemplated a two-stage test, in which the threshold step is the identification of a fundamental breach where "the foundation of the contract has been undermined, where the very thing bargained for has not been provided" (p. 500). Having found a fundamental breach to exist, the exclusion clause would *not* automatically be set

dans le cas où il y a inégalité de pouvoir de négociation entre les parties, que les tribunaux devraient modifier les conventions que les parties ont formées librement. [p. 462]

Le juge en chef Dickson explique que « [l]es tribunaux n'appliquent pas aveuglément les conventions draconiennes ou iniques » (p. 462), mais qu'« il y a beaucoup à gagner à aborder directement la question de la protection des plus faibles contre l'exploitation des plus forts, plutôt que de s'en remettre au principe juridique artificiel de l'"inexécution fondamentale" » (p. 462). Faire respecter une clause de non-recours en pareil cas pourrait porter atteinte à l'intégrité de l'appareil judiciaire. Sous ce rapport, ce serait contraire à l'ordre public. Toutefois, une clause de non-recours *valide* sera appliquée conformément à son libellé.

[109]    La juge Wilson (avec l'appui de la juge L'Heureux-Dubé) exprime son désaccord, opinant que les tribunaux doivent continuer d'exercer un certain pouvoir discrétionnaire et refuser d'appliquer une clause d'exclusion en cas d'inexécution fondamentale lorsque le principe de l'iniquité *préalable* à l'inexécution (privilégié par le juge en chef Dickson) ne s'applique pas. Elle s'oppose surtout à ce que l'examen judiciaire d'une clause d'exonération se fasse au regard d'une norme générale de raisonnabilité : « . . . les tribunaux [. . .] sont fort mal placés pour déterminer le caractère juste ou raisonnable de dispositions contractuelles négociées par les parties » (p. 508). Elle préconise plutôt une démarche *a posteriori* fondée sur la common law visant à établir « un équilibre entre ce qui est manifestement souhaitable, c'est-à-dire permettre aux parties de conclure leurs propres contrats [. . .] et ce qui est manifestement peu souhaitable, c'est-à-dire recourir aux tribunaux pour faire respecter des contrats en faveur de parties qui elles-mêmes refusent catégoriquement de les exécuter » (p. 510).

[110]    La juge Wilson propose un double critère dont le premier volet consiste à déterminer l'existence d'une inexécution fondamentale, à savoir une situation « où le fondement même du contrat a été miné, c'est-à-dire lorsque l'objet même du contrat n'a pas été réalisé » (p. 500). Le tribunal qui conclut à l'existence d'une inexécution fondamentale

aside, but the court should go on to assess whether, having regard to the circumstances of the breach, the party in fundamental breach should escape liability:

Exclusion clauses do not automatically lose their validity in the event of a fundamental breach by virtue of some hard and fast rule of law. They should be given their natural and true construction so that the meaning and effect of the exclusion clause the parties agreed to at the time the contract was entered into is fully understood and appreciated. But, in my view, the court must still decide, having ascertained the parties' intention at the time the contract was made, whether or not to give effect to it in the context of subsequent events such as a fundamental breach committed by the party seeking its enforcement through the courts. . . . [T]he question essentially is: in the circumstances that have happened should the court lend its aid to A to hold B to this clause? [Emphasis added; pp. 510-11.]

[111]   Wilson J. reiterated that "as a general rule" courts should give effect to exclusion clauses *even in the case of fundamental breach* (p. 515). Nevertheless, a residual discretion to withhold enforcement exists:

Lord Wilberforce [in *Photo Production Ltd. v. Securicor Transport Ltd.*, [1980] A.C. 827 (H.L.)] may be right that parties of equal bargaining power should be left to live with their bargains regardless of subsequent events. I believe, however, that there is some virtue in a residual power residing in the court to withhold its assistance on policy grounds in appropriate circumstances. [Emphasis added; p. 517.]

Wilson J. made it clear that such circumstances of disentitlement would be rare. She acknowledged that an exclusion clause might well be accepted with open eyes by a party "very anxious to get" the contract (p. 509). However, Wilson J. did not elaborate further on what such circumstances might be because she found in *Hunter* itself that no reason existed to refuse the defendant Allis-Chalmers the benefit of the exclusion clause.

[112]   The fifth judge, McIntyre J., in a crisp two-paragraph judgment, agreed with the conclusion of

*n*'écarte *pas* automatiquement la clause d'exclusion, mais il poursuit son examen pour déterminer si l'auteur de l'inexécution fondamentale devrait, compte tenu des circonstances de celle-ci, échapper à sa responsabilité :

Il n'y a aucune règle de droit absolue qui dit que les clauses d'exclusion sont automatiquement frappées d'invalidité en cas d'inexécution fondamentale. Il faut leur donner une interprétation naturelle et juste afin de pouvoir saisir et apprécier parfaitement le sens et l'effet de la clause d'exclusion sur laquelle les parties se sont accordées au moment de la passation du contrat. J'estime toutefois qu'après avoir déterminé l'intention qu'avaient les parties au moment où elles ont conclu le contrat, la cour doit encore décider si elle appliquera ce contrat dans le contexte d'événements subséquents tels qu'une inexécution fondamentale de la part de la partie qui s'adresse aux tribunaux pour le faire respecter. [. . .] [L]a question qui se pose est essentiellement celle de savoir si, suite aux faits survenus, la cour devrait prêter son concours à A pour obliger B à respecter cette clause. [Je souligne; p. 510-511.]

[111]   La juge Wilson rappelle qu'« en règle générale », les tribunaux doivent faire respecter la clause d'exclusion *même en cas d'inexécution fondamentale* (p. 515), sous réserve de leur pouvoir résiduel d'écarter son application :

Il se peut que [dans *Photo Production Ltd. c. Securicor Transport Ltd.*, [1980] A.C. 827 (H.L.)] lord Wilberforce ait raison d'affirmer qu'on devrait laisser des parties ayant négocié à armes égales vivre avec leurs contrats, quels que soient les événements subséquents. Je crois cependant qu'il y a un certain intérêt à ce que les tribunaux soient revêtus d'un pouvoir résiduel de refuser pour des motifs de principe de prêter leur concours à une partie, lorsque cela est indiqué. [Je souligne; p. 517.]

La juge Wilson précise qu'il sera rarement indiqué d'écarter une clause d'exclusion. Elle ajoute qu'une telle clause peut très bien avoir été acceptée en pleine connaissance de cause par une partie qui « tenait beaucoup à [. . .] avoir » le contrat (p. 509). Elle ne précise toutefois pas les circonstances dans lesquelles il conviendrait de l'écarter, car dans *Hunter*, elle ne voit pas de raisons d'empêcher la défenderesse Allis-Chalmers de bénéficier de son application.

[112]   Dans un jugement incisif de deux paragraphes, le juge McIntyre, le cinquième à se prononcer,

Wilson J. in respect of the exclusion clause issue but found it "unnecessary to deal further with the concept of fundamental breach in this case" (p. 481).

[113]  The law was left in this seemingly bifurcated state until *Guarantee Co. of North America v. Gordon Capital Corp.*, [1999] 3 S.C.R. 423. In that case, the Court breathed some life into the dying doctrine of fundamental breach while nevertheless affirming (once again) that whether or not a "fundamental breach prevents the breaching party from continuing to rely on an exclusion clause is a matter of construction rather than a rule of law" (para. 52). In other words, the question was whether the parties *intended* at the time of contract formation that the exclusion or limitation clause would apply "in circumstances of contractual breach, whether fundamental or otherwise" (para. 63). The Court thus emphasized that what was important was not the label ("fundamental or otherwise") but the intent of the contracting parties when they made their bargain. "The <u>only limitation</u> placed upon enforcing the contract as written in the event of a fundamental breach", the Court in *Guarantee Co.* continued,

would be to refuse to enforce an exclusion of liability in circumstances where to do so would be unconscionable, according to Dickson C.J., <u>or</u> [note the disjunctive "or"] unfair, unreasonable or otherwise contrary to public policy, according to Wilson J. [Emphasis added; para. 52.]

(See also para. 64.)

What has given rise to some concern is not the reference to "public policy", whose role in the enforcement of contracts has never been doubted, but to the more general ideas of "unfair" and "unreasonable", which seemingly confer on courts a very broad after-the-fact discretion.

[114]  The Court's subsequent observations in *ABB Inc. v. Domtar Inc.*, 2007 SCC 50, [2007] 3 S.C.R. 461, should be seen in that light. *Domtar* was a products liability case arising under the civil

souscrit à la conclusion de la juge Wilson en ce qui concerne la clause d'exclusion, mais il trouve « inutile de s'arrêter davantage à la notion d'inexécution fondamentale en l'espèce » (p. 481).

[113]  Cette orientation apparemment bicéphale du droit a valu jusqu'à ce que, dans l'arrêt *Guarantee Co. of North America c. Gordon Capital Corp.*, [1999] 3 R.C.S. 423, la Cour ravive la notion moribonde d'inexécution fondamentale tout en (ré)affirmant que « la question de savoir si l'inexécution fondamentale empêche la partie qui en est l'auteur de continuer d'invoquer une clause d'exclusion est une question d'interprétation plutôt que de règle de droit » (par. 52). En d'autres termes, la question est celle de savoir si les parties ont *voulu*, lors de la formation du contrat, que la clause d'exclusion (prévoyant le délai de prescription) s'applique « à la suite d'une inexécution de contrat, qu'elle soit fondamentale ou autre » (par. 63). La Cour souligne donc que ce n'est pas la qualification qui compte (« fondamentale ou autre »), mais bien l'intention des parties au moment de contracter. Elle ajoute :

En cas d'inexécution fondamentale, la <u>seule restriction</u> à l'exécution du contrat tel que rédigé consisterait à refuser d'appliquer une exonération de responsabilité dans le cas où il serait inique de le faire, selon le juge en chef Dickson, <u>ou</u> [notez l'emploi du *ou* disjonctif] injuste, déraisonnable ou par ailleurs contraire à l'ordre public, selon l[a] juge Wilson. [Je souligne; par. 52.]

(Voir aussi le par. 64.)

La difficulté n'a pas résulté du renvoi à l'« ordre public », une notion dont la pertinence en matière d'exécution des contrats n'a jamais été mise en doute, mais bien des considérations plus générales évoquées par les mots « injuste » et « déraisonnable », qui paraissent ouvrir la voie à l'exercice a posteriori d'un très grand pouvoir judiciaire discrétionnaire.

[114]  Les observations subséquentes de la Cour dans l'arrêt *ABB Inc. c. Domtar Inc.*, 2007 CSC 50, [2007] 3 R.C.S. 461, doivent être considérées dans ce contexte. L'arrêt porte sur la responsabilité du

law of Quebec, but the Court observed with respect to the common law:

> Once the existence of a fundamental breach has been established, the court must still analyse the limitation of liability clause in light of the general rules of contract interpretation. If the words can reasonably be interpreted in only one way, it will not be open to the court, <u>even on grounds of equity or reasonableness</u>, to declare the clause to be unenforceable since this would amount to rewriting the contract negotiated by the parties. [Emphasis added; para. 84.]

While the *Domtar* Court continued to refer to "fundamental breach", it notably repudiated any judicial discretion to depart from the terms of a valid contract upon vague notions of "equity or reasonableness". It did not, however, express any doubt about the residual category mentioned in *Guarantee Co.*, namely a refusal to enforce an exclusion clause on the grounds of public policy.

[115]    I agree with Professor Waddams when he writes:

> [I]t is surely inevitable that a court must reserve the ultimate power to decide when the values favouring enforceability are outweighed by values that society holds to be more important. [para. 557]

[116]    While memorably described as an unruly horse, public policy is nevertheless fundamental to contract law, both to contractual formation and enforcement and (occasionally) to the court's relief *against* enforcement. As Duff C.J. observed:

> It is the duty of the courts to give effect to contracts and testamentary dispositions according to the settled rules and principles of law, since we are under a reign of law; but there are cases in which rules of law cannot have their normal operation because the law itself recognizes some paramount consideration of public policy which over-rides the interest and what otherwise would be the rights and powers of the individual.

(*Re Millar Estate*, [1938] S.C.R. 1, at p. 4)

See generally B. Kain and D. T. Yoshida, "The Doctrine of Public Policy in Canadian Contract

fabricant en droit civil québécois, mais la Cour y signale ce qui suit au sujet de la common law :

> Une fois l'inexécution fondamentale constatée, le tribunal doit encore analyser la clause limitative selon les règles générales d'interprétation des contrats. Dans la mesure où les termes sont raisonnablement susceptibles d'une seule interprétation, le tribunal ne pourra déclarer la clause limitative de responsabilité inapplicable, <u>même pour des motifs d'équité ou de raisonnabilité</u>, puisque cela reviendrait à réécrire le contrat négocié entre les parties. [Je souligne; par. 84.]

Même si elle renvoie encore à la notion d'« inexécution fondamentale », la Cour exclut nettement tout pouvoir discrétionnaire de passer outre aux conditions d'un contrat valide pour de vagues considérations « d'équité ou de raisonnabilité ». Elle ne remet cependant pas en cause le pouvoir résiduel — mentionné dans l'arrêt *Guarantee Co.* — de refuser de donner effet à une clause de non-recours pour des motifs liés à l'ordre public.

[115]    Je conviens avec le professeur Waddams de ce qui suit :

> [TRADUCTION] [I]l est certes incontournable que les tribunaux se réservent le pouvoir suprême de déterminer si des valeurs privilégiées par la société l'emportent sur celles favorables à l'applicabilité. [par. 557]

[116]    L'ordre public, qu'on a pourtant mémorablement comparé à un « cheval rétif », joue un rôle fondamental en droit contractuel pour ce qui est de la formation et de l'exécution du contrat, mais aussi (parfois) lorsqu'un tribunal est appelé à déclarer un contrat *non* applicable. Comme l'a signalé le juge en chef Duff :

> [TRADUCTION] Dans un système soumis à la règle de droit, il incombe aux tribunaux de donner effet aux stipulations contractuelles et testamentaires suivant les règles et les principes de droit établis. Or, il arrive parfois que l'on ne puisse appliquer ceux-ci normalement parce que le droit lui-même reconnaît une considération d'ordre public prépondérante qui prime les intérêts de l'intéressé et ce qui, autrement, constituerait ses droits.

(*Re Millar Estate*, [1938] R.C.S. 1, p. 4)

Se reporter généralement à B. Kain et D. T. Yoshida, « The Doctrine of Public Policy in Canadian

Law", in T. L. Archibald and R. S. Echlin, eds., *Annual Review of Civil Litigation, 2007* (2007), 1.

[117]   As Duff C.J. recognized, freedom of contract will often, but not always, trump other societal values. The residual power of a court to decline enforcement exists but, in the interest of certainty and stability of contractual relations, it will rarely be exercised. Duff C.J. adopted the view that public policy "should be invoked only in clear cases, in which the harm to the public is substantially incontestable, and does not depend upon the idiosyncratic inferences of a few judicial minds" (p. 7). While he was referring to public policy considerations pertaining to the nature of the *entire contract*, I accept that there may be well-accepted public policy considerations that relate directly to the nature of the *breach*, and thus trigger the court's narrow jurisdiction to give relief against an exclusion clause.

[118]   There are cases where the exercise of what Professor Waddams calls the "ultimate power" to refuse to enforce a contract may be justified, even in the commercial context. Freedom of contract, like any freedom, may be abused. Take the case of the milk supplier who adulterates its baby formula with a toxic compound to increase its profitability at the cost of sick or dead babies. In China, such people were shot. In Canada, should the courts give effect to a contractual clause excluding civil liability in such a situation? I do not think so. Then there are the people, also fortunately resident elsewhere, who recklessly sold toxic cooking oil to unsuspecting consumers, creating a public health crisis of enormous magnitude. Should the courts enforce an exclusion clause to eliminate contractual liability for the resulting losses in such circumstances? The answer is no, but the contract breaker's conduct need not rise to the level of criminality or fraud to justify a finding of abuse.

Contract Law », dans T. L. Archibald et R. S. Echlin, dir., *Annual Review of Civil Litigation, 2007* (2007), 1.

[117]   Le juge en chef Duff reconnaît donc que la liberté contractuelle prime souvent les autres valeurs sociétales, mais pas toujours. Le pouvoir résiduel du tribunal d'écarter l'application existe bien, mais la certitude et la stabilité des rapports contractuels commandent de l'exercer rarement. Le juge en chef Duff adopte le point de vue selon lequel l'ordre public [TRADUCTION] « ne doit être invoqué que lorsqu'il est manifeste que le préjudice infligé au public est foncièrement incontestable et ne tient pas seulement aux conclusions bien personnelles de quelques magistrats » (p. 7). Même s'il renvoie à des considérations d'ordre public liées à la nature du *contrat en entier*, je reconnais qu'il peut y avoir des considérations d'ordre public bien établies se rapportant directement à la nature de l'*inexécution* et conférant alors au tribunal le pouvoir limité d'écarter la clause de non-recours.

[118]   Il arrive que l'exercice de ce que le professeur Waddams appelle le [TRADUCTION] « pouvoir suprême » de refuser de faire respecter un contrat puisse se justifier, même en contexte commercial. On peut abuser de la liberté contractuelle comme de toute autre liberté. Considérons le cas de fournisseurs de lait qui, pour accroître leur profit, altèrent une formule pour nourrissons en y ajoutant une substance toxique, causant ainsi maladies et décès. En Chine, de tels fournisseurs sont fusillés. Au Canada, les tribunaux devraient-ils en pareil cas faire respecter une clause contractuelle écartant la responsabilité civile? Je ne crois pas. Considérons également le cas de ces gens sans scrupules — résidant heureusement dans un autre pays — qui ont vendu de l'huile de cuisson toxique à des consommateurs qui ne se doutaient de rien, créant ainsi une crise sanitaire publique d'une ampleur considérable. Dans de telles circonstances, nos tribunaux devraient-ils faire respecter une clause de non-recours de façon à écarter la responsabilité contractuelle pour le préjudice ainsi causé? Je ne le crois pas non plus. Cependant, point n'est besoin que l'inexécution contractuelle équivaille à un acte criminel ou à une fraude pour qu'il y ait véritablement abus.

[119]   A less extreme example in the commercial context is *Plas-Tex Canada Ltd. v. Dow Chemical of Canada Ltd.*, 2004 ABCA 309, 245 D.L.R. (4th) 650. The Alberta Court of Appeal refused to enforce an exclusion clause where the defendant Dow knowingly supplied defective plastic resin to a customer who used it to fabricate natural gas pipelines. Instead of disclosing its prior knowledge of the defect to the buyer, Dow chose to try to protect itself by relying upon limitation of liability clauses in its sales contracts. After some years, the pipelines began to degrade, with considerable damage to property and risk to human health from leaks and explosions. The court concluded that "a party to a contract will not be permitted to engage in unconscionable conduct secure in the knowledge that no liability can be imposed upon it because of an exclusionary clause" (para. 53). (See also McCamus, at p. 774, and Hall, at p. 243.) What was demonstrated in *Plas-Tex* was that the defendant Dow was so contemptuous of its contractual obligation and reckless as to the consequences of the breach as to forfeit the assistance of the court. The public policy that favours freedom of contract was outweighed by the public policy that seeks to curb its abuse.

[120]   Conduct approaching serious criminality or egregious fraud are but examples of well-accepted and "substantially incontestable" considerations of public policy that may override the countervailing public policy that favours freedom of contract. Where this type of misconduct is reflected in the breach of contract, all of the circumstances should be examined very carefully by the court. Such misconduct may disable the defendant from hiding behind the exclusion clause. But a plaintiff who seeks to avoid the effect of an exclusion clause must identify the overriding public policy that it says outweighs the public interest in the enforcement of the contract. In the present case, for the reasons discussed below, I do not believe Tercon has identified a relevant public policy that fulfills this requirement.

[119]   L'affaire *Plas-Tex Canada Ltd. c. Dow Chemical of Canada Ltd.*, 2004 ABCA 309, 245 D.L.R. (4th) 650, constitue un cas d'inexécution contractuelle moins extrême. La Cour d'appel de l'Alberta a refusé d'appliquer une clause de responsabilité limitée au bénéfice de la défenderesse, Dow, qui avait sciemment fourni de la résine plastique défectueuse à un client qui s'en était servi pour la fabrication de conduites de gazoducs. Au lieu de signaler à l'acheteur la défectuosité dont elle connaissait l'existence, Dow avait tenté de se protéger en limitant sa responsabilité dans les contrats de vente. Après quelques années, les gazoducs ont commencé à se fissurer, causant d'importants dommages matériels et compromettant la santé de la population ainsi exposée à un risque grave de fuites et d'explosions. La Cour d'appel a conclu qu'un [TRADUCTION] « contractant ne saurait agir de façon inique avec la certitude qu'il pourra échapper à toute responsabilité grâce à une clause d'exonération » (par. 53). (Voir également McCamus, p. 774, et Hall, p. 243.) Ainsi, dans cette affaire, la défenderesse Dow a manifesté un tel mépris pour ses obligations contractuelles et fait preuve d'une telle insouciance pour les conséquences du non-respect de celles-ci qu'il était exclu que les tribunaux lui prêtent leur concours. Les considérations d'ordre public visant à réprimer l'abus de la liberté contractuelle l'emportaient sur celles qui privilégient celle-ci.

[120]   Le comportement qui se rapproche de l'acte criminel grave ou de la fraude monumentale n'est qu'un exemple de considération d'ordre public bien établie et « foncièrement incontestable » pouvant primer la liberté de contracter, elle aussi d'ordre public. Lorsque l'inexécution du contrat se traduit par des actes répréhensibles de cette nature, le tribunal doit examiner très attentivement les circonstances. De tels actes peuvent empêcher le défendeur de se retrancher derrière la clause de non-recours. Mais le demandeur désireux de se soustraire à l'application d'une telle clause doit faire valoir la considération d'ordre public prépondérante qui, à son avis, l'emporte sur l'intérêt public lié à l'application des contrats. Pour les motifs qui suivent, je ne crois pas que Tercon invoque une considération d'ordre public applicable qui satisfait à cette exigence.

[121]  The present state of the law, in summary, requires a series of enquiries to be addressed when a plaintiff seeks to escape the effect of an exclusion clause or other contractual terms to which it had previously agreed.

[122]  The first issue, of course, is whether as a matter of interpretation the exclusion clause even *applies* to the circumstances established in evidence. This will depend on the Court's assessment of the intention of the parties as expressed in the contract. If the exclusion clause does not apply, there is obviously no need to proceed further with this analysis. If the exclusion clause applies, the second issue is whether the exclusion clause was unconscionable at the time the contract was made, "as might arise from situations of unequal bargaining power between the parties" (*Hunter*, at p. 462). This second issue has to do with contract formation, not breach.

[123]  If the exclusion clause is held to be valid and applicable, the Court may undertake a third enquiry, namely whether the Court should nevertheless refuse to enforce the valid exclusion clause because of the existence of an overriding public policy, proof of which lies on the party seeking to avoid enforcement of the clause, that outweighs the very strong public interest in the enforcement of contracts.

## IV. Application to the Facts of This Case

[124]  I proceed to deal with the issues in the sequence mentioned above.

### A. *Did the Ministry Breach Contract A?*

[125]  The trial judge found that the parties intended to create contractual relations at the bidding stage (i.e. Contract A): 2006 BCSC 499, 53 B.C.L.R. (4th) 138, at para. 88. I agree with that conclusion. If there were no intent to form Contract A, there would be no need to exclude liability for compensation in the event of its breach.

[126]  The Ministry argued that Contract A was not breached. It was entitled to enter into Contract B

[121]  En résumé, dans l'état actuel du droit, le tribunal doit répondre à plusieurs questions lorsqu'une partie lui demande de la soustraire à l'application d'une clause de non-recours ou d'une autre stipulation contractuelle à laquelle elle a précédemment consenti.

[122]  Évidemment, il lui faut d'abord déterminer, par voie d'interprétation, si même la clause de non-recours *s'applique* aux faits mis en preuve, ce qui dépend de l'intention des parties qu'il dégage du contrat. De toute évidence, lorsque la clause ne s'applique pas, point n'est besoin de poursuivre l'examen. Lorsqu'elle s'applique, il doit en deuxième lieu se demander si la clause était inique au moment de la formation du contrat, « comme cela pourrait se produire dans le cas où il y a inégalité de pouvoir de négociation entre les parties » (*Hunter*, p. 462). Cette deuxième considération touche à la formation du contrat, non à l'inexécution.

[123]  Lorsque la clause de non-recours est jugée valide et applicable, le tribunal peut se demander dans un troisième temps s'il convient tout de même de refuser de la faire respecter en raison d'une considération d'ordre public prépondérante, dont la preuve incombe à la partie qui veut se soustraire à l'application de la clause, qui l'emporte sur le très grand intérêt public lié à l'application des contrats.

## IV. Application aux faits de l'espèce

[124]  J'examine maintenant les questions en litige dans l'ordre susmentionné.

### A. *Le ministère a-t-il respecté le contrat A?*

[125]  La juge de première instance conclut que les parties ont voulu faire naître un lien contractuel dès le dépôt de la soumission (le contrat A) : 2006 BCSC 499, 53 B.C.L.R. (4th) 138, par. 88. Je suis d'accord. Si les parties n'avaient pas eu l'intention de conclure le contrat A, il n'aurait pas été nécessaire d'écarter toute obligation d'indemnisation en cas d'inexécution.

[126]  Le ministère soutient qu'il n'y a pas eu inexécution du contrat A. Il lui était loisible de

with Brentwood and it did so. There was no privity between the Ministry and EAC. The Ministry would have had no direct claim against EAC in the event of deficient performance. I accept as correct that Brentwood, having obtained Contract B, was in a position of considerable flexibility as to how and with whom it carried out the work. Nevertheless, it was open to the trial judge to conclude, as she did, that the RFP process was not conducted by the Ministry with the degree of fairness and transparency that the terms of Contract A entitled Tercon to expect. At the end of an unfair process, she found, Contract B was not awarded to Brentwood (the eligible bidder) but to what amounted to a joint venture consisting of Brentwood and EAC. I therefore proceed with the rest of the analysis on the basis that Contract A was breached.

B.  *What Is the Proper Interpretation of the Exclusion of Compensation Clause and Did the Ministry's Conduct Fall Within Its Terms?*

[127]  It is at this stage that I part company with my colleague Cromwell J. The exclusion clause is contained in the RFP and provides as follows:

**2.10** . . .

> Except as expressly and specifically permitted in these Instructions to Proponents, no Proponent shall have any claim for compensation of any kind whatsoever, as a result of participating in this RFP, and by submitting a Proposal each Proponent shall be deemed to have agreed that it has no claim.

In my view, "participating in this RFP" began with "submitting a Proposal" for consideration. The RFP process consisted of more than the final selection of the winning bid and Tercon participated in it. Tercon's bid *was* considered. To deny that such participation occurred on the ground that in the end the Ministry chose a Brentwood joint venture (ineligible) instead of Brentwood itself (eligible) would, I believe, take the Court up the dead end identified by Wilson J. in *Hunter*:

> . . . exclusion clauses, like all contractual provisions, should be given their natural and true construction.

conclure le contrat B avec Brentwood, et il l'a fait. Il n'avait pas de lien contractuel avec EAC. Il n'aurait eu aucun recours direct contre EAC en cas d'exécution insuffisante. J'estime qu'après avoir obtenu le contrat B, Brentwood jouissait effectivement d'une grande latitude pour arrêter les modalités d'exécution des travaux et choisir ses partenaires. La juge du procès pouvait néanmoins conclure comme elle le fait que, dans sa DP, le ministère n'a pas agi avec l'équité et la transparence auxquelles Tercon était en droit de s'attendre au vu du libellé du contrat A. Elle conclut qu'au terme d'un processus inéquitable, le contrat B n'a pas été adjugé à Brentwood (le soumissionnaire admissible), mais bien à une coentreprise formée de Brentwood et d'EAC. Je conclus donc qu'il y a eu inexécution du contrat A et je poursuis l'analyse en conséquence.

B.  *Quelle est la juste interprétation de la clause de non-recours en indemnisation, et les actes du ministère tombent-ils sous le coup de celle-ci?*

[127]  C'est à cette étape que je me dissocie de mon collègue le juge Cromwell. La clause de non-recours figurant dans la DP est libellée comme suit :

[TRADUCTION]

**2.10** . . .

> Sauf ce que prévoient expressément les présentes instructions, un proposant ne peut exercer aucun recours en indemnisation pour sa participation à la DP, ce qu'il est réputé accepter lorsqu'il présente une soumission.

À mon avis, la « participation à la DP » a débuté par la « [présentation d']une soumission ». Le processus ne se résumait pas au choix final de l'adjudicataire, et Tercon y a participé. La soumission de Tercon *a été* considérée. Selon moi, nier la participation de Tercon au motif que le ministère a finalement choisi la coentreprise inadmissible dont faisait partie Brentwood, et non Brentwood elle-même (qui était admissible), mène la Cour dans l'impasse relevée par la juge Wilson dans l'arrêt *Hunter* :

> . . . les clauses d'exclusion, comme toutes les stipulations d'un contrat, doivent recevoir une interprétation

Great uncertainty and needless complications in the drafting of contracts will obviously result if courts give exclusion clauses strained and artificial interpretations in order, indirectly and obliquely, to avoid the impact of what seems to them *ex post facto* to have been an unfair and unreasonable clause. [p. 509]

Professor McCamus expresses a similar thought:

. . . the law concerning exculpatory clauses is likely to be more rather than less predictable if the underlying concern is openly recognized, as it is in *Hunter*, rather than suppressed and achieved indirectly through the subterfuge of strained interpretation of such terms. [p. 778]

[128]   I accept the trial judge's view that the Ministry was at fault in its performance of the RFP, but the conclusion that the process thereby ceased to be the RFP process appears to me, with due respect to colleagues of a different view, to be a "strained and artificial interpretatio[n] in order, indirectly and obliquely, to avoid the impact of what seems to them *ex post facto* to have been an unfair and unreasonable clause".

[129]   As a matter of interpretation, I agree with Donald J.A. speaking for the unanimous court below:

The [trial] judge said the word "participating" was ambiguous. With deference, I do not find it so. The sense it conveys is the contractor's involvement in the RFP/contract A <u>stage</u> of the process. I fail to see how "participating" could bear any other meaning. [Emphasis added; para. 16.]

Accordingly, I conclude that on the face of it, the exclusion clause applies to the facts described in the evidence before us.

C. *Was the Claim Excluding Compensation Unconscionable at the Time Contract A Was Made?*

[130]   At this point, the focus turns to contract formation. Tercon advances two arguments: firstly, that it suffered from an inequality of bargaining power and secondly, (as mentioned) that the

juste et naturelle. Il est évident que, si les tribunaux donnent aux clauses d'exclusion des interprétations forcées et artificielles afin d'éviter, par des moyens indirects et détournés, les conséquences de ce qui leur semble *ex post facto* avoir été une clause injuste et déraisonnable, il en résultera une grande incertitude et des complications inutiles dans la rédaction de contrats. [p. 509]

Le professeur McCamus va dans le même sens :

[TRADUCTION] . . . le droit régissant les clauses d'exonération sera assurément plus prévisible, et non moins, si la considération sous-jacente est ouvertement reconnue, comme elle l'est dans *Hunter*, au lieu d'être occultée et prise en compte indirectement par le moyen détourné de l'interprétation forcée du libellé en cause. [p. 778]

[128]   Je conviens avec la juge de première instance que le ministère a été fautif dans la mise en œuvre de la DP. Cependant, en toute déférence pour les tenants de l'avis contraire, sa conclusion selon laquelle le processus a cessé dès lors d'être la DP me paraît être le fruit d'« interprétations forcées et artificielles afin d'éviter, par des moyens indirects et détournés, les conséquences de ce qui leur semble *ex post facto* avoir été une clause injuste et déraisonnable ».

[129]   Sur le plan de l'interprétation, je suis d'accord avec le juge Donald qui exprime l'avis unanime de la Cour d'appel :

[TRADUCTION] La juge de première instance dit que le mot « participation » est ambigu. Avec déférence, je ne suis pas d'accord. Il renvoie à la part que prend l'entrepreneur à l'<u>étape</u> du contrat A du processus de DP. Je ne vois pas quel autre sens pourrait avoir ce mot. [Je souligne; par. 16.]

Par conséquent, je conclus qu'à première vue, la clause de non-recours s'applique aux faits établis selon le dossier de la Cour.

C. *La clause de non-recours était-elle inique au moment de la formation du contrat A?*

[130]   Pour ce volet, l'accent est mis sur la formation du contrat. Tercon avance deux arguments : premièrement, son pouvoir de négociation était moins grand que celui du ministère et, deuxièmement (je

Case 09-10138-MFW   Doc 13460-10   Filed 05/02/14   Page 472 of 610

126        TERCON CONTRACTORS LTD. *v.* B.C.   *Binnie J.*        [2010] 1 S.C.R.

exclusion clause violates public policy as reflected in the *Transportation Act*.

### (1) Unequal Bargaining Power

[131]   In *Hunter*, Dickson C.J. stated, at p. 462: "Only where the contract is unconscionable, as might arise from situations of unequal bargaining power between the parties, should the courts interfere with agreements the parties have freely concluded." Applying that test to the case before him, he concluded:

I have no doubt that unconscionability is not an issue in this case. Both Allis-Chalmers and Syncrude are large and commercially sophisticated companies. Both parties knew or should have known what they were doing and what they had bargained for when they entered into the contract. [p. 464]

While Tercon is not on the same level of power and authority as the Ministry, Tercon is a major contractor and is well able to look after itself in a commercial context. It need not bid if it doesn't like what is proposed. There was no relevant imbalance in bargaining power.

### (2) Policy of the *Transportation Act*

[132]   As mentioned earlier, Tercon cites and relies upon the policy of the Act which undoubtedly favours the transparency and integrity of the bidding process. I have already discussed my reasons for rejecting Tercon's argument that this "policy" operates as a bar to the ability of the parties to agree on such commonplace commercial terms as in the circumstances they think appropriate. In addition, the exclusion clause is not as draconian as Tercon portrays it. Other remedies for breach of Contract A (specific performance or injunctive relief, for example) were available.

[133]   In this case, injunction relief *was* in fact a live possibility. Although Tercon was not briefed on the negotiations with other bidders, the trial judge found that Glenn Walsh, the owner of Tercon, "had seen representatives of EAC with Brentwood following [the Brentwood/EAC interviews with the

le rappelle), la clause de non-recours va à l'encontre de la raison d'être de la *Loi sur les transports*.

### (1) Inégalité du pouvoir de négociation

[131]   Dans l'arrêt *Hunter*, le juge en chef Dickson affirme à la p. 462 : « Ce n'est que lorsque le contrat est inique, comme cela pourrait se produire dans le cas où il y a inégalité de pouvoir de négociation entre les parties, que les tribunaux devraient modifier les conventions que les parties ont formées librement. » Appliquant ce critère à l'espèce dont la Cour était saisie, il conclut :

Je n'ai aucun doute que l'iniquité n'est pas en cause en l'espèce. Allis-Chalmers et Syncrude sont d'importantes sociétés commerciales ayant une grande expérience des affaires. Les deux parties savaient ou auraient dû savoir ce qu'elles faisaient et ce qu'elles avaient négocié au moment de conclure le contrat. [p. 464]

Tercon n'a ni le pouvoir ni l'autorité du ministère, mais c'est une entreprise importante parfaitement en mesure de défendre ses intérêts commerciaux. Elle n'a pas à donner suite à un appel d'offres dont les conditions ne lui conviennent pas. Il n'y avait pas d'inégalité déterminante du pouvoir de négociation.

### (2) Raison d'être de la *Loi sur les transports*

[132]   J'ai déjà signalé que Tercon s'en remet à la raison d'être de la Loi, qui favorise indubitablement la transparence et l'intégrité du processus d'appel d'offres. J'ai également fait état des motifs pour lesquels je rejette la thèse de Tercon selon laquelle cette « raison d'être » fait obstacle à la faculté des parties de convenir des conditions commerciales courantes qu'elles jugent indiquées dans les circonstances. En outre, la clause de non-recours n'est pas aussi draconienne que le laisse entendre Tercon. L'inexécution du contrat A donnait ouverture à d'autres recours (dont l'exécution en nature et l'injonction).

[133]   En l'espèce, l'injonction *était* effectivement une avenue possible. Bien que Tercon n'ait pas été informée des négociations avec les autres soumissionnaires, la juge de première instance relève que son propriétaire, Glenn Walsh, [TRADUCTION] « avait rencontré des représentants d'EAC et de

Ministry and Bill Swain of Brentwood]", and when asked whether Tercon was going to sue, Walsh had said "no" without further comment. Had Tercon pushed for more information and sought an injunction (as a matter of private law, not public law), at that stage the exclusion clause would have had no application, but Tercon did not do so. This is not to say that estoppel or waiver applies. Nor is it to say that injunctive relief would be readily available in many bidding situations (although if an injunction had been sought here, the unavailability of the alternative remedy of monetary damages might have assisted Tercon). It is merely to say that the exclusion clause is partial, not exhaustive.

[134]    The Kincolith road project presented a serious construction challenge on a tight time frame and within a tight budget. Contract A did not involve a bid for a fixed price contract but for the right to negotiate the bid details once the winning proponent was selected. In such a fluid situation, *all* participants could expect difficulties in the contracting process. Members of the construction bar are nothing if not litigious. In the circumstances, the bidders might reasonably have accepted (however reluctantly) the Ministry's need for a bidding process that excluded compensation, and adjusted their bids accordingly. The taxpayers of British Columbia were not prepared to pay the contractor's profit twice over — once to Brentwood/EAC for actually building the road, and now to Tercon, even though in Tercon's case the "profit" would be gained without Tercon running the risks associated with the performance of Contract B. The Court should not be quick to declare such a clause, negotiated between savvy participants in the construction business, to be "contrary to the Act".

D.    *Assuming the Validity of the Exclusion Clause at the Time the Contract Was Made, Is There Any Overriding Public Policy That Would Justify the Court's Refusal to Enforce It?*

[135]    If the exclusion clause is not invalid from the outset, I do not believe the Ministry's performance

can be characterized as so aberrant as to forfeit the protection of the contractual exclusion clause on the basis of some overriding public policy. While there is a public interest in a fair and transparent tendering process, it cannot be ratcheted up to defeat the enforcement of Contract A in this case. There *was* an RFP process and Tercon participated in it.

[136]   Assertions of ineligible bidders and ineligible bids are the bread and butter of construction litigation. If a claim to defeat the exclusion clause succeeds here on the basis that the owner selected a joint venture consisting of an eligible bidder with an ineligible bidder, so also by a parity of reasoning should an exclusion clause be set aside if the owner accepted a bid ineligible on other grounds. There would be little room left for the exclusion clause to operate. A more sensible and realistic view is that the parties here expected, even if they did not like it, that the exclusion of compensation clause would operate even where the eligibility criteria in respect of the bid (including the bidder) were not complied with.

[137]   While the Ministry's conduct was in breach of Contract A, that conduct was not so extreme as to engage some overriding and paramount public interest in curbing contractual abuse as in the *Plas-Tex* case. Brentwood was not an outsider to the RFP process. It was a legitimate competitor. All bidders knew that the road contract (i.e. Contract B) would not be performed by the proponent alone. The work required a large "team" of different trades and personnel to perform. The issue was whether EAC would be on the job as a major sub-contractor (to which Tercon could not have objected) or identified with Brentwood as a joint venture "proponent" with EAC. All bidders were made aware of a certain flexibility with respect to the composition of any proponent's "team". Section 2.8(b) of the RFP provided that if "a material change has occurred to the Proponent since its qualification under the RFEI, including if the composition of the Proponent's team members has changed, . . . the Ministry may

contrat par le ministère s'éloigne à ce point de la norme qu'une considération d'ordre public prépondérante justifie le tribunal d'écarter la protection découlant de la clause contractuelle de non-recours. Il est certes dans l'intérêt public que le processus d'appel d'offres soit équitable et transparent, mais cette considération ne suffit pas à justifier le refus de faire respecter le contrat A en l'espèce. Un processus de DP *s'est* déroulé et Tercon y a participé.

[136]   En droit de la construction, les litiges naissent souvent à la suite d'allégations d'inadmissibilité de soumissionnaires et de soumissions. Si, dans la présente affaire, on faisait droit à la demande parce que le propriétaire a choisi une coentreprise formée de deux soumissionnaires dont un était admissible et l'autre non, par souci de cohérence, faudrait-il également écarter la clause de non-recours lorsque le propriétaire accepte une soumission inadmissible sous quelque autre rapport, laissant ainsi peu de place à l'application d'une telle clause? D'un point de vue plus réaliste et rationnel, les parties s'attendaient en l'espèce, même si cette éventualité ne les enchantait guère, à ce que la clause excluant toute indemnisation s'applique advenant même le non-respect des critères d'admissibilité de la soumission (et de son auteur).

[137]   Les actes du ministère ont certes contrevenu au contrat A, mais j'estime qu'ils n'étaient pas répréhensibles au point de faire en sorte qu'une considération d'ordre public prépondérante justifie la répression d'un abus contractuel comme dans l'affaire *Plas-Tex*. Brentwood n'était pas étrangère au processus de DP. Il s'agissait d'un concurrent légitime. Tous les soumissionnaires savaient que le proposant retenu n'exécuterait pas seul le contrat de construction routière (le contrat B). Il fallait pouvoir compter sur une « équipe » pluridisciplinaire pour mener le projet à bien. La question était celle de savoir si EAC serait sous-traitant principal (ce à quoi Tercon n'aurait pu s'opposer) ou « proposant » dans le cadre de la coentreprise avec Brentwood. Une certaine latitude était accordée à tous les soumissionnaires pour la constitution de leur « équipe ». L'alinéa 2.8b) de la DP prévoyait en effet que lorsque [TRADUCTION] « depuis que le proposant est devenu admissible en répondant à la

request [further information and] . . . reserves the right to disqualify that Proponent, and reject its Proposal". Equally, "[i]f a qualified Proponent is concerned that it has undergone a material change, the Proponent can, at its election, make a preliminary submission to the Ministry, in advance of the Closing Date, and before submitting a Proposal. . . . The Ministry will, within three working days of receipt of the preliminary submission give a written decision as to whether the Proponent is still qualified to submit a Proposal."

[138]   The RFP issued on January 15, 2001. The Ministry was informed by Brentwood of a "proposed material change to our team's structure" in respect of a joint venture with EAC by fax dated January 24, 2001. From the Ministry's perspective, the change was desirable. EAC was a bigger company, had greater expertise in rock drilling and blasting (a major part of the contract) and a stronger balance sheet. EAC was identified in Brentwood's amended proposal as a sub-contractor. In the end, the Ministry did not approve the January 14, 2001 request, presumably because it doubted that a change in the "composition of the Proponent's team's members" could , according to the terms of the RFP, include a change in the Proponent itself.

[139]   The Ministry did obtain legal advice and did not proceed in defiance of it. On March 29, 2001, the Ministry noted in an internal e-mail that a Ministry lawyer (identified in the e-mail) had come to the conclusion that the joint venture was not an eligible proponent but advised that Contract B could lawfully be structured in a way so as to satisfy both Brentwood/EAC's concerns and avoid litigation from disappointed proponents.

[140]   I do not wish to understate the difference between EAC as a sub-contractor and EAC as a joint-venturer. Nor do I discount the trial judge's condemnation of the Ministry's lack of fairness

DEI, une modification substantielle le concernant s'est produite, notamment en ce a trait à la composition de son équipe [. . .], [le ministère] peut exiger du proposant d'autres renseignements [. . .] et [il] se réserve le droit de l'écarter et de rejeter sa soumission ». Puis, « le proposant admissible qui estime qu'une modification substantielle le concernant a pu se produire peut à son gré présenter au ministère une soumission préliminaire avant la date de clôture et avant de formuler une proposition. [. . .] Dans les trois jours ouvrables qui suivent la réception de la soumission préliminaire, le ministère lui fait savoir par écrit s'il est toujours admissible. »

[138]   La DP a été lancée le 15 janvier 2001. Dans une télécopie datée du 24 janvier 2001, Brentwood a informé le ministère de la [TRADUCTION] « modification substantielle qu'elle se proposait d'apporter à la composition de son équipe » en vue de la formation d'une coentreprise avec EAC. Le ministère voyait le changement d'un bon œil. EAC était une société de plus grande taille, dotée d'une plus grande expertise dans le forage de roches et le dynamitage (ce qui comptait pour une grande partie des travaux) et elle affichait une meilleure santé financière. Elle figurait à titre de sous-traitant dans la proposition modifiée de Brentwood. Finalement, le ministère n'a pas approuvé la modification signalée le 14 janvier 2001, vraisemblablement parce qu'il craignait que la modification de la « composition de [l']équipe [du proposant] » ne puisse, suivant la DP, englober la modification du proposant lui-même.

[139]   Le ministère a obtenu un avis juridique, et il n'a pas agi à l'encontre de celui-ci. Le 29 mars 2001, le ministère signalait dans un courriel interne qu'un avocat du ministère (nommé dans le courriel) avait conclu que la coentreprise n'était pas un proposant admissible, mais que le contrat B pouvait en toute légalité être rédigé de façon à tenir compte des préoccupations de Brentwood et d'EAC et à éviter toute contestation des proposants non retenus.

[140]   Je ne veux pas minimiser la différence entre le fait, pour EAC, d'être un sous-traitant ou un coentrepreneur. Je ne mésestime pas non plus les conclusions de la juge de première instance

and transparency in making a Contract B which on its face was at odds with what the trial judge found to be the true state of affairs. Tercon has legitimate reason to complain about the Ministry's conduct. I say only that based on the jurisprudence, the Ministry's misconduct did not rise to the level where public policy would justify the court in depriving the Ministry of the protection of the exclusion of compensation clause freely agreed to by Tercon in the contract.

[141] The construction industry in British Columbia is run by knowledgeable and sophisticated people who bid upon and enter government contracts with eyes wide open. No statute in British Columbia and no principle of the common law override their ability in this case to agree on a tendering process including a limitation or exclusion of remedies for breach of its rules. A contractor who does not think it is in its business interest to bid on the terms offered is free to decline to participate. As Donald J.A. pointed out, if enough contractors refuse to participate, the Ministry would be forced to change its approach. So long as contractors are willing to bid on such terms, I do not think it is the court's job to rescue them from the consequences of their decision to do so. Tercon's loss of anticipated profit is a paper loss. In my view, its claim is barred by the terms of the contract it agreed to.

selon lesquelles le ministère a fait preuve d'un manque d'équité et de transparence en établissant un contrat B qui ne correspondait manifestement pas à la réalité. Tercon a raison de dénoncer le comportement du ministère. Seulement, au vu de la jurisprudence, l'inconduite n'était pas répréhensible au point que l'ordre public justifie le tribunal de refuser au ministère la protection de la clause de non-recours en indemnisation à laquelle Tercon a librement consenti.

[141] Dans le secteur de la construction de la Colombie-Britannique, des gens compétents dotés d'une grande expérience répondent à des appels d'offres et concluent des contrats avec l'État en toute connaissance de cause. Aucune loi de cette province et aucun principe de common law ne l'emporte en l'espèce sur leur faculté de convenir d'un processus d'appel d'offres, y compris d'une responsabilité limitée ou d'une absence de recours advenant le non-respect des conditions applicables. L'entrepreneur qui estime qu'il n'est pas dans son intérêt commercial de répondre à un appel d'offres aux conditions proposées est libre de s'en abstenir. Comme le fait observer le juge Donald, si un nombre suffisant d'entrepreneurs refusent de soumissionner, le ministère sera bien obligé de modifier sa façon de faire. Tant que des entrepreneurs seront disposés à soumissionner à de telles conditions, je ne crois pas qu'il revienne aux tribunaux de les soustraire aux conséquences de leurs actes. La perte du profit escompté par Tercon est théorique. Selon moi, les conditions du contrat auxquelles elle a consenti font obstacle à sa demande.

V.  Disposition

[142]  I would dismiss the appeal without costs.

*Appeal allowed,* McLachlin C.J. *and* Binnie, Abella *and* Rothstein JJ. *dissenting.*

*Solicitors for the appellant: McLean & Armstrong, West Vancouver.*

*Solicitor for the respondent: Attorney General of British Columbia, Victoria.*

V.  Dispositif

[142]  Je suis d'avis de rejeter le pourvoi sans dépens.

*Pourvoi accueilli, la juge en chef* McLachlin *et les juges* Binnie, Abella *et* Rothstein *sont dissidents.*

*Procureurs de l'appelante :  McLean & Armstrong, West Vancouver.*

*Procureur de l'intimée :  Procureur général de la Colombie-Britannique, Victoria.*

*Solicitor for the intervener: Attorney General of Ontario, Toronto.*

*Procureur de l'intervenant : Procureur général de l'Ontario, Toronto.*

# TAB 85

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1



1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)

The Toronto-Dominion Bank, Plaintiff and Peat Marwick Thorne Inc. in its capacity as Trustee of the Estate of Leigh Instruments Limited, a bankrupt; The Plessey Company plc; GEC Siemens plc; and The General Electric Company plc, Defendants

Ontario Court of Justice, General Division [Commercial List]

Winkler J.

Heard: January 13, 1997-May 1, 1998
Judgment: June 24, 1998[FN*][FN**]
Docket: 51353/90, B195/94

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Proceedings: additional reasons at *Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)* (October 26, 1998), 51353/90, B195/94, 98-BK001066 (Ont. Gen. Div. [Commercial List])

Counsel: *John A. Campion*, *Peter Downard* and *Paul F. Monahan*, for Plaintiff.

*Earl A. Cherniak, Q.C.*, *Robert J. Morris*, *Susan B. Wortzman* and *Lisa C. Munro*, for Defendant The Plessey Company plc.

*Peter F.C. Howard*, *Johanna Superina* and *Adrian C. Lang*, for Defendant The General Electric Company plc.


Subject: Contracts; Corporate and Commercial; Torts


Banking and banks --- Loans and discounts — General

Bank opened line of credit for subsidiary of parent company — Line of credit was unsecured — Parent Co. did not formally guarantee loan but gave bank comfort letter — Subsidiary borrowed $40.5 million from bank before it went into bankruptcy — Parent Co. was taken over by corporation — Bank brought action against parent Co. and corporation to recover amount advanced to subsidiary — Action dismissed — No binding contract existed between bank and parent Co. — Comfort letter contained policy statement that subsidiary would be managed to always meet financial obligations — Comfort letter contained explicit statement that it was not legally binding commitment — Policy was self evident statement that subsidiary was under own management — Comfort letter was not contractual promise by parent Co. to cause subsidiary to meet its financial obligations — Comfort letter did not bind parent Co. to pay debts of its subsidiary — No collateral contract or collateral warranty existed.

Contracts --- Construction and interpretation — Resolving ambiguities — Contra proferentem rule

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

Bank opened line of credit for subsidiary of parent company — Subsidiary borrowed $40.5 million from bank before it went into bankruptcy — Line of credit was unsecured — Parent Co. did not formally guarantee loan but gave bank comfort letter — Parent Co. was taken over by corporation — Bank brought action against parent Co. and corporation to recover amount advanced to subsidiary — Action dismissed — Comfort letter contained explicit statement that it was not legally binding commitment — Comfort letter did not bind parent Co. to pay debts of subsidiary — Comfort letter was unambiguous — Bank agreed to language contained in comfort letter — Doctrine of contra proferentem did not apply.

Contracts --- Rectification or reformation — General

Bank opened line of credit for subsidiary of parent company — Subsidiary borrowed $40.5 million before went into bankruptcy — Line of credit was unsecured — Parent Co. did not formally guarantee loan but gave bank comfort letter — Parent Co. was taken over by corporation — Bank brought action against parent Co. and corporation to recover amount advanced to subsidiary — Action dismissed — Comfort letter contained explicit statement that it was not legally binding commitment — Bank read and accepted comfort letter upon receipt — Bank failed to make comment or complaint from time of delivery up to bankruptcy of subsidiary — Parent Co. reasonably concluded bank accepted revised comfort letter — Rectification of letter, to remove statement, was denied.

Fraud and misrepresentation --- Negligent misrepresentation (Hedley Byrne principle) — Detrimental reliance

Bank opened line of credit for subsidiary of parent company — Subsidiary borrowed $40.5 million from bank before it went into bankruptcy — Line of credit was unsecured — Parent Co. did not formally guarantee loan but gave bank letter of comfort — Parent Co. was taken over by corporation — Bank brought action against parent Co. and corporation to recover amount advanced to subsidiary, based in part on negligent misrepresentation — Action dismissed — Comfort letter contained policy statement that subsidiary be managed to always be in position to meet financial obligations — Policy statement disclosed parent Co. was not required to do anything to ensure subsidiary could pay bank — Policy remained in place through material time, until bankruptcy of subsidiary — No negligent misrepresentations were made — Conduct which did amount to misrepresentation was not relied upon by bank.

Fraud and misrepresentation --- Fraudulent misrepresentation — Specific elements — Recklessness of truth or falsity

Bank opened line of credit for subsidiary of parent company — Subsidiary borrowed $40.5 million from bank before it went into bankruptcy — Line of credit was unsecured — Parent Co. did not formally guarantee loan but gave bank comfort letter — Parent Co. was taken over by corporation — Bank brought action against parent Co. and corporation to recover amount advanced to subsidiary, based in part on fraudulent misrepresentation — Action dismissed — Comfort letter contained policy statement that subsidiary would be managed to always be in position to meet its financial obligations — Comfort letter contained explicit statement that it did not constitute legally binding commitment — Parent Co.'s representative did not fraudulently misrepresent to bank that financial statements were not available — Representative did not act deliberately or recklessly when statement made — Dishonest intent, sufficient to attract liability to parent Co. or corporation, was not established.

### Cases considered by *Winkler J.*:

*Abel v. McDonald*, [1964] 2 O.R. 256, 45 D.L.R. (2d) 198 (Ont. C.A.) — considered

*Alampi v. Swartz*, [1964] 1 O.R. 488, 43 D.L.R. (2d) 11 (Ont. C.A.) — applied

*Alex Duff Realty Ltd. v. Eaglecrest Holdings Ltd.*, [1983] 5 W.W.R. 61, 26 Alta. L.R. (2d) 133, 30 R.P.R. 207, 146 D.L.R. (3d) 731, 44 A.R. 67 (Alta. C.A.) — applied

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

*Anns v. Merton London Borough Council* (1977), [1978] A.C. 728, [1977] 2 W.L.R. 1024, *(sub nom. Anns v. London Borough of Merton)* [1977] 2 All E.R. 492 (U.K. H.L.) — applied

*Arthur Andersen Inc. v. Toronto Dominion Bank* (1994), 13 C.L.R. (2d) 185, *(sub nom. Andersen (Arthur) Inc. v. Toronto Dominion Bank)* 71 O.A.C. 1, 17 O.R. (3d) 363, 14 B.L.R. (2d) 1 (Ont. C.A.) — applied

*Asiatic Petroleum Co. v. Lennard's Carrying Co.* (1914), [1915] A.C. 705, [1914-15] All E.R. Rep. 280, 13 Asp. Mar. Law Cas. 81, 31 T.L.R. 294 (U.K. H.L.) — considered

*Atlantic Computers plc, Re,* [1995] B.C.C. 696 (Eng. Ch. Div.) — applied

*Banque Brussels Lambert S.A. v. Australian National Industries Ltd.* (1989), 21 N.S.W.L.R. 502 (New South Wales Sup. Ct.) — distinguished

*BG Checo International Ltd. v. British Columbia Hydro & Power Authority,* 41 C.L.R. 1, 4 C.C.L.T. (2d) 161, 44 B.C.L.R. (2d) 145, [1990] 3 W.W.R. 690 (B.C. C.A.) — considered

*BG Checo International Ltd. v. British Columbia Hydro & Power Authority,* [1993] 2 W.W.R. 321, [1993] 1 S.C.R. 12, 147 N.R. 81, 75 B.C.L.R. (2d) 145, 99 D.L.R. (4th) 577, 20 B.C.A.C. 241, 35 W.A.C. 241, 14 C.C.L.T. (2d) 233, 5 C.L.R. (2d) 173 (S.C.C.) — referred to

*Brownlie v. Campbell* (1880), 5 App. Cas. 925 (U.K. H.L.) — considered

*Canadian Pacific Hotels Ltd. v. Bank of Montreal,* 77 N.R. 161, [1987] 1 S.C.R. 711, 21 O.A.C. 321, 41 C.C.L.T. 1, 40 D.L.R. (4th) 385 (S.C.C.) — referred to

*Caparo Industries plc v. Dickman,* [1990] 1 All E.R. 568, [1990] 2 W.L.R. 358, [1990] 2 A.C. 605 (U.K. H.L.) — applied

*Charles P. Rowen & Associates Inc. v. Ciba-Geigy Canada Ltd.*, 14 B.L.R. (2d) 125, [1994] I.L.R. 1-3068, *(sub nom. Charles P. Rowen & Associates Inc. v. Ciba-Geigy Canada Inc.)* 19 O.R. (3d) 205, *(sub nom. Rowen (Charles P.) & Associates Inc. v. CIBA-Geigy Canada Inc.)* 72 O.A.C. 321 (Ont. C.A.) — referred to

*Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.* (1979), *(sub nom. Exportations Consolidated-Bathurst Ltée c. Mutual Boiler & Machinery Insurance Co.)* [1980] 1 S.C.R. 888, 112 D.L.R. (3d) 49, 32 N.R. 488, [1980] I.L.R. 1-1176 (S.C.C.) — applied

*Craighampton Investments Ltd. v. Ayerswood Developments Ltd.* (1984), 4 O.A.C. 124 (Ont. C.A.) — applied

*Esso Petroleum Co. v. Mardon,* [1976] Q.B. 801, [1976] 2 All E.R. 5, 2 Lloyd's Rep. 305 (Eng. C.A.) — referred to

*H.L. Bolton Engineering Co. v. T.J. Graham & Sons Ltd.* (1956), [1957] 1 Q.B. 159, [1956] 3 All E.R. 624 (Eng. C.A.) — considered

*Hawrish v. Bank of Montreal,* [1969] S.C.R. 515, 2 D.L.R. (3d) 600, 66 W.W.R. 673 (S.C.C.) — referred to

*Hercules Management Ltd. v. Ernst & Young,* [1997] 2 S.C.R. 165, 211 N.R. 352, 115 Man. R. (2d) 241, 139 W.A.C. 241, *(sub nom. Hercules Managements Ltd. v. Ernst & Young)* 146 D.L.R. (4th) 577, 35 C.C.L.T. (2d) 115, 31 B.L.R. (2d) 147, [1997] 8 W.W.R. 80 (S.C.C.) — applied

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

*Hill v. Nova Scotia (Attorney General)*, 142 D.L.R. (4th) 230, 206 N.R. 299, [1997] 1 S.C.R. 69, 157 N.S.R. (2d) 81, 462 A.P.R. 81, 60 L.C.R. 161 (S.C.C.) — applied

*Hillis Oil & Sales Ltd. v. Wynn's Canada Ltd.*, [1986] 1 S.C.R. 57, 25 D.L.R. (4th) 649, 65 N.R. 23, 71 N.S.R. (2d) 353, 171 A.P.R. 353 (S.C.C.) — referred to

*Kleinwort Benson Ltd. v. Malaysia Mining Corp. Bhd.*, 43 B.L.R. 40, [1989] 1 All E.R. 785 (Eng. C.A.) — considered

*Kleinwort Benson Ltd. v. Malaysia Mining Corp. Bhd.*, [1989] 1 All E.R. 785 at 798 (Eng. C.A.) — referred to

*Kripps v. Touche Ross & Co.*, 89 B.C.A.C. 288, 145 W.A.C. 288, 35 C.C.L.T. (2d) 60, [1997] 6 W.W.R. 421, 33 B.C.L.R. (3d) 254 (B.C. C.A.) — considered

*Kripps v. Touche Ross & Co.* (1997), 102 B.C.A.C. 238 (note), 166 W.A.C. 238 (note), 225 N.R. 236 (note) (S.C.C.) — referred to

*Leitch Gold Mines Ltd. v. Texas Gulf Sulphur Co.* (1968), [1969] 1 O.R. 469, 3 D.L.R. (3d) 161 (Ont. H.C.) — applied

*Peek v. Derry*, 38 W.R. 33, 1 Meg. 292, 14 App. Cas. 337, [1889] All E.R. Rep. 1, 58 L.J. Ch. 864, 61 L.T. 265, 54 J.P. 148, 5 T.L.R. 625 (Eng. H.L.) — applied

*Prenn v. Simmonds*, [1971] 3 All E.R. 237, [1971] 1 W.L.R. 1381 (U.K. H.L.) — applied

*Queen v. Cognos Inc.*, 45 C.C.E.L. 153, 93 C.L.L.C. 14,019, 99 D.L.R. (4th) 626, 60 O.A.C. 1, 14 C.C.L.T. (2d) 113, [1993] 1 S.C.R. 87, 147 N.R. 169 (S.C.C.) — applied

*R. v. McNamara (No. 1)*, *(sub nom. Canadian Dredge & Dock Co. v. R.)* 45 C.R. (3d) 289, *(sub nom. Canadian Dredge & Dock Co. v. R.)* 9 O.A.C. 321, *(sub nom. Canadian Dredge & Dock Co. v. R.)* 19 C.C.C. (3d) 1, *(sub nom. Canadian Dredge & Dock Co. v. R.)* 19 D.L.R. (4th) 314, *(sub nom. Canadian Dredge & Dock Co. v. R.)* 59 N.R. 241, *(sub nom. R. v. Canadian Dredge & Dock Co.)* [1985] 1 S.C.R. 662 (S.C.C.) — applied

*R. v. Mohan*, 29 C.R. (4th) 243, 71 O.A.C. 241, 166 N.R. 245, 89 C.C.C. (3d) 402, 114 D.L.R. (4th) 419, [1994] 2 S.C.R. 9, 18 O.R. (3d) 160 (note) (S.C.C.) — referred to

*Rainbow Industrial Caterers Ltd. v. Canadian National Railway* (1988), 46 C.C.L.T. 112, *(sub nom. Rainbow Industrial Caterers Ltd. v. C.N.R. Co.)* 54 D.L.R. (4th) 43, 30 B.C.L.R. (2d) 273, [1989] 1 W.W.R. 673 (B.C. C.A.) — considered

*Rainbow Industrial Caterers Ltd. v. Canadian National Railway*, 8 C.C.L.T. (2d) 225, 59 B.C.L.R. (2d) 129, [1991] 6 W.W.R. 385, 84 D.L.R. (4th) 291, 126 N.R. 354, 3 B.C.A.C. 1, 7 W.A.C. 1, [1991] 3 S.C.R. 3, [1991] R.R.A. 850 (S.C.C.) — referred to

*Reardon Smith Line v. Hansen-Tangen*, [1976] 1 W.L.R. 989, [1976] 3 All E.R. 570 (U.K. H.L.) — applied

*Smith v. Scrimgeour Vickers*, [1996] 4 All E.R. 769 (Eng. H.L.) — referred to

*Spinks v. R.*, 19 C.C.E.L. (2d) 1, 12 C.C.P.B. 81, *(sub nom. Spinks v. Canada)* 134 D.L.R. (4th) 223, *(sub nom.*

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

*Spinks v. Canada)* 195 N.R. 184, *(sub nom. Spinks v. Canada)* [1996] 2 F.C. 563 (Fed. C.A.) — considered

*Standard Investments Ltd. v. Canadian Imperial Bank of Commerce* (1985), 52 O.R. (2d) 473, 22 D.L.R. (4th) 410, 11 O.A.C. 318, 30 B.L.R. 193 (Ont. C.A.) — considered

*Standard Investments Ltd. v. Canadian Imperial Bank of Commerce* (1986), 53 O.R. (2d) 663 (note), 65 N.R. 78 (note), 15 O.A.C. 237 (note) (S.C.C.) — referred to

*Tesco Supermarkets v. Nattrass* (1971), [1972] A.C. 153, 2 W.L.R. 1166, [1971] 2 All E.R. 127 (U.K. H.L.) — considered

*TransCanada Pipelines Ltd. v. Northern & Central Gas Corp.* (1983), 41 O.R. (2d) 447, 146 D.L.R. (3d) 293 (Ont. C.A.) — applied

*White v. Central Trust Co.* (1984), 7 D.L.R. (4th) 236, 54 N.B.R. (2d) 293, 17 E.T.R. 78, 140 A.P.R. 293 (N.B. C.A.) — applied

**Statutes considered:**

*Canada Evidence Act*, R.S.C. 1985, c. C-5

    s. 9 — referred to

*Courts of Justice Act*, R.S.O. 1990, c. C.43

    Generally — referred to

*Evidence Act*, R.S.O. 1990, c. E.23

    s. 5 — referred to

ACTION by bank against parent company and corporation for monies advanced to subsidiary.

***Winkler J.*:**

1    This is an action on a comfort letter brought by *The Toronto-Dominion Bank against The Plessey Company plc.*, the U.K. parent of a Canadian company Leigh Instruments Ltd., and one of Plessey's shareholders General Electric Company plc.. The claim is for damages for breach of contract and in the alternative damages for the tort of negligent misrepresentation. The bank alleges fraud.

**Part I**

*Introduction*

2    The short unhappy life of Leigh Instruments Ltd. provides the centre-piece for this action. Leigh was a high-tech company on the leading edge of the Canadian defence industry. The events described here occurred during the brief period of two years from April 1988 to April 1990.

3    In April 1988, Leigh was acquired as the result of a successful takeover bid by The Plessey Company plc., a large U.K. company with a focus on electronics and defence products. A year and a half later, in September 1989, GEC

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

Siemens plc, a joint venture consisting of General Electric Company plc. and Siemens A.G., completed a hostile takeover of Plessey. GEC has been described as the largest industrial enterprise in the U.K., Siemens is a vast German multinational company. Both companies are heavily into the electronics and defence businesses.

4    The Toronto-Dominion Bank is one of Canada's five main chartered banks with operations world wide. TD is the plaintiff in this action and was banker to Leigh. Over the two-year period in question Leigh's borrowing increased from nil at the time of the take-over by Plessey in April 1988, to $40.5 million in April 1990 when Leigh went into bankruptcy.

5    Although the Bank's line of credit to Leigh was unsecured and the parent company had not formally guaranteed the loan, the Bank did have a letter of comfort issued in its favour by Plessey in respect of the Leigh loan.

6    In this proceeding, TD seeks to recover from Plessey and GEC the amount advanced by it to Leigh. It bases its claim on the letter of comfort and alleges breach of contract and negligent misrepresentation. The bank also alleges fraud. My overview of the facts, key findings and points of argument follow.

*Overview*

7    Leigh's banking relationship with TD dated back to 1982. At that time Leigh was a public company with operations at Kanata, Ontario. In 1983 the bank had been concerned about Leigh's financial condition and the reliability of its security for the borrowing, to the extent that it considered forcing Leigh into bankruptcy or ridding itself of Leigh as a customer. With the assistance of a bank work-out specialist and the bank's co-operation, Leigh survived this crisis.

8    The relationship continued and on March 1, 1988, Leigh and TD entered into a facility agreement pursuant to which Leigh had a $5.4 million loan facility, secured by a floating charge debenture and an assignment of book debts. Leigh, however, did not draw down on the facility and had approximately $10 million in its treasury. At the same time, Leigh had entered into a number of long-term, fixed-price contracts with the Canadian government to design and build defence products. Two of the largest programs were the Ship Interior Communications System Program (SHINCOM) and Tactical Air Navigational System Program (TACAN). All of this must have seemed attractive because at least two takeover bids for Leigh were mounted in the early spring of 1988.

9    The bid by the Plessey Company plc. through its acquisition vehicle Plessey Canada (1988) Inc. was successful and Leigh was acquired for $104 million in April 1988.

10    In order partially to assist with the financing of the acquisition, TD made available to Plessey Canada a $10 million uncommitted loan facility. This was a short-term acquisition loan, unsecured and payable on demand. It was understood that this facility would be re-paid from the $10 million in the Leigh treasury once Plessey had complete ownership of Leigh, expected to occur about three months later.

11    The loan was based on the creditworthiness of the parent company, since there were no financial statements for the acquisition vehicle, Plessey Canada. Operating in the mistaken belief, at least initially, that Plessey did not provide guarantees for loans to its subsidiaries but more pointedly because a guarantee from the parent company was not on offer, TD proposed that Plessey supply it with a letter of comfort, which Plessey agreed to provide. TD noted that a "strong letter of comfort" would be obtained by TD in London and forwarded to the bank in Toronto. The first comfort letter dated April 20, 1988 was sent to TD on April 27, two to three weeks after the funds were drawn down.

12    The internal structure of the bank was such that Corporate Banking Division was responsible for direct customer

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

contact, monitoring accounts, preparation of credit applications and documentation. Credit Division, on the other hand, was charged with reviewing credit risks to the bank and approving loans subject to whatever terms it felt appropriate.

13    TD's willingness to accommodate Plessey, as demonstrated above, was it seems motivated to no small extent by its desire to retain the Leigh business in Canada, since it had no prior relationship with Plessey, TD also hoped to use this as a bridgehead for development of business with Plessey itself in Canada and abroad. Therefore, although the line with Plessey Canada was clearly a short-term bridge loan, TD put it through as an operating line. The facility contained no financial reporting provision.

14    Letters of comfort are at the heart of this proceeding. A letter of comfort is an improvisation of the banking industry which grew out of the increased competitiveness between banks, making it more difficult for banks to obtain parent company guarantees for loans to subsidiaries. A comfort letter may be described as a letter provided by a parent company to a bank concerning the borrowings of a subsidiary intended to give to the bank a degree of comfort about the transaction but also intended to fall short of a guarantee to repay the debts of the subsidiary. Comfort letters generally are not legally binding in terms of imposing an obligation to repay the debt of the subsidiary, and are perceived in the business world as moral agreements.

15    Typically a comfort letter may contain statements or obligations such as an acknowledgment of awareness of the debt facility, an obligation to maintain ownership of the subsidiary or to provide notice of any change in such ownership. It may contain a statement of general corporate policy.

16    Those commercial considerations which might impact on a bank's decision to accept a comfort letter as opposed to insisting on a formal and legally enforceable guarantee could include the overall relationship of the bank with the corporate group involved, its general reputation, the volume of business and profit margins that the bank enjoyed from them as well as the degree of risk inherent in the instant transaction. In short, the terms which comprise a letter of comfort will likely be negotiated individually, address some or all of the above issues and be somewhat idiosyncratic reflecting the respective bargaining power of the parties.

17    Moving from the general to the particular, the Plessey letter of comfort referenced the loan to Plessey Canada. It stated that Plessey would not change its ownership position in the subsidiary without providing prior notice to TD. Finally, it contained a policy paragraph which stated:

    It is our policy that our wholly-owned subsidiaries, including Plessey Canada (1988) Inc., be managed in such a way as to be always in a position to meet their financial obligations, including repayment of all amounts owing under the above facility.

Two points were clear. The Plessey letter of comfort was not formal security and it was not a formal guarantee. Nonetheless, Plessey included it in its guarantee register for convenience.

18    On June 30, 1988, Plessey Canada was amalgamated with Leigh; the new entity was known as of July 1, 1988 as Leigh Instruments Limited. When it came time, however, to pay down the Plessey Canada loan from the funds in the Leigh treasury, as had been the plan, it was determined that the cash had been depleted. As a consequence, the loan was rolled over, with Plessey acknowledging on August 1, 1988, that the comfort letter applied to what was now a loan to Leigh. This became known as the second comfort letter.

19    The financial structure of Leigh was settled by Plessey and Leigh, largely in accordance with the initial plan, with approximately $25 million in equity and $69 million in inter-company debt owed to Plessey, plus the $10 million loan

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

from TD. As a result of acquisition accounting adjustments made to bring Leigh's accounting policies into line with those of Plessey, the book value of the assets of Leigh was devalued from $51 million to $13 million. All of this was known to TD.

20      Deloitte, Haskins and Sells, Plessey's auditors, had prepared a due diligence report for Plessey prior to the acquisition of Leigh, in March, 1988. The report stated that Plessey's policies regarding valuation of inventory and revenue recognition were more conservative than those of Leigh. It noted also that there were missed milestones and projected margins regarding certain of Leigh's major contracts. It drew attention to liquidated damages consequences in certain of the contracts for delays. These prognostications boded ill for the future, for in the summer and fall of 1988 the bank loan began an upward climb due to these very problems, culminating ultimately in the bankruptcy of Leigh on April 12, 1990.

21      Although the bank was aware of all of this, it is clear to me that the pre-occupation of the bank throughout this period was with its relationship with Plessey and business development. At the same time, the bank's credit division was concerned about the need for financial information from Leigh. The corporate banking division was less than diligent in obtaining such information for them.

22      In September 1988, it became apparent to Leigh and Plessey that Leigh would require an increase in its borrowing limit to $30 million to the end of December, due to slippage in production in the two major contracts, SHINCOM and TACAN. Notwithstanding that an existing facility letter between Leigh and the bank provided security for the demand loan in the form of a floating charge debenture and an assignment of book debts, and notwithstanding the existence of Plessey comfort letter number two, the bank extended the line of $15.4 million on a temporary basis only to October 31, 1988, due to the absence of audited financial statements, and in order to obtain fresh documentation and a new letter of comfort.

23      On October 6, 1988, Jonathan Exton manager of corporate finance at the bank's office in London, together with a Toronto-based vice-president of the bank, made a courtesy call on Ian Musgrave, group treasurer of Plessey. Leigh was discussed only briefly, the conversation centering on the bank's £5 million participation in a Plessey £200 million Multi-Option Facility.

24      By the beginning of November, what had begun as a short-term bridge loan of $10 million to assist Plessey with the Leigh acquisition had been transformed in a little more than seven months into an operating line of about $17 million to Leigh. The bank continued to be driven by a desire to retain the Leigh business, obtain the Plessey business in Canada from the Bank of Montreal, and to position itself to obtain $2 billion of business which it projected Plessey would generate in Canada over the next ten years. This hope had been expanded by TD's participation in the Multi-Option Facility. However, Leigh had not repaid the $10 million acquisition loan as planned, the acquisition accounting would significantly affect Leigh's balance sheet and income statement negatively, and Leigh's financial situation was deteriorating, as evidenced by the increasing bank loan. Although the bank's motivation had not changed, the underlying purpose and circumstances relating to the loan had shifted dramatically, without, it seems, the bank's Corporate Banking Division adjusting its approach to reflect this reality. Credit Division, mindful of the problem flew storm warnings throughout the bank saying that the facility should be regularized, and the bank should avoid being dragged along.

25      In the fall of 1988, Plessey requested that the bank release the Leigh security. A further temporary increase or "bulge" to $20 million in the bank line was required in November, and it was expected that Leigh might need a further extension to $30 million. In this period Leigh went into an overdraft position several times. On December 16 Credit Division approved an increase to $25 million to regularize the exposure of more than $24 million, pending fresh documentation.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

26    The bank appeared to concede internally that the comfort letter did not amount to a formal guarantee, noting "we are confident Plessey will support Leigh as required". The concern was expressed that the parent might not honour the comfort letter in the event of a hostile takeover. In the context of commenting on the lack of reliable financials for Leigh, the comfort letter was characterized by a Senior Vice-President Credit Division in a November note as "support, albeit informal" from Plessey. More conclusively, in the Corporate Credit Reviews of Leigh prepared by Corporate Banking Division and sent to Credit Division for processing, the bank consistently rated the risk of Leigh as opposed to that of Plessey thus making it clear that they did not hold the belief that the comfort letter was in the nature of a guarantee or that it constituted a legally binding obligation to pay.

27    In November, 1988, GEC Siemens launched a hostile takeover bid for Plessey, an earlier bid by GEC having failed in 1985. The bid was referred to the U.K. Mergers and Monopolies Commission in January, 1989. Jonathan Exton of the bank's London office met with a Plessey representative the day after the bid was announced and offered the bank's support in resisting the hostile takeover bid. Also around this time, the bank's account manager for Leigh, Greg Young expressed a concern in an internal memorandum that the comfort letter for Leigh might not be honoured in the event of a successful hostile takeover.

28    Leigh's borrowing came up for annual review by the bank in January 1989. Credit Division reviewed the request for an increase in the bank line to $35 million, and approved the requested release of security contingent upon a postponement of the inter-company debt of $69 million. This would subordinate the inter-company debt to the bank loan which would now be unsecured. Also required was a "strong" comfort letter in the same form as the second letter. The audited financial statements for Leigh as at June 30, 1988 and an unaudited balance sheet at September 30, 1988 were provided to the bank at this time.

29    As background, at the time of the January review, both Corporate Banking and the Credit Division were aware that: Leigh faced cash and working capital deterioration: Leigh had problems with major contracts; and that in light of the known details of the financial structure, debt and tax considerations of Leigh, Leigh could not support the debt on its own. The bank noted that the relationship with Plessey was growing, but remained cognizant of the outstanding hostile takeover bid.

30    Ultimately, over the next three months, the Corporate Banking Division took it upon itself to waive the Credit Division's condition that the inter-company debt be postponed and agreed to release its security over the assets of Leigh. Meanwhile however, because of its effect on the Leigh balance sheet and tax considerations, reasons entirely unrelated to the banking issues, Plessey decided to convert the Leigh intercompany debt to equity, capitalizing the debt as preferred shares, and thereby rendering the postponement of debt problem moot, effective April 1, 1989. The bank did not agree to remove its security over the assets of Leigh based on anything that Plessey said or did but rather for its own purposes.

31    On March 29, 1989, TD revised the $35 million facility, deleting reference to the inter-company debt. Security was to be released upon receipt of a revised comfort letter. On April 4 and 10, the form of the third comfort letter was approved by Plessey and TD respectively. On April 20, 1989 an executed comfort letter dated March 31, 1989 was delivered to the bank. The third comfort letter by its terms replaced the prior two. The $34 million facility letter was executed by Leigh on June 27, 1989, and an executed copy was received by the bank on July 21, accompanied by Leigh's year-end and quarterly financial. With this process completed Leigh had fulfilled the conditions set out in the April 7 letter from the bank for release of the security over its assets.

32    In the months that followed, attention within Plessey began to focus on defending against the hostile GEC Siemens bid. At Leigh the cash problems continued with a request of TD for a $4 million bulge from $34 to $38 million.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

33      The negotiation and delivery of the new facility between Leigh and TD and third comfort  letter between TD and Plessey took place over a period of some six months in early 1989. While this was happening two events of note occurred. The first was the launching of the GEC Siemens takeover bid of which mention has been made. The second was a decision of the English Court of Appeal, released February 2, 1989, which has a direct bearing in several ways on the instant case. *Kleinwort Benson Ltd. v. Malaysia Mining Corp. Bhd.*, [1989] 1 All E.R. 785 (Eng. C.A.) (Leave to appeal to the House of Lords refused [[1989] 1 All. E.R. 785 at 798 (Eng. C.A.)]) involved the enforceability of a letter of comfort, and overturned the trial decision which had held that the comfort letter was enforceable. This was a landmark decision in the world of banking and commerce, not because of the result, which seems not to have been unexpected, but rather due to the dearth of court authority on the subject. All parties to this proceeding were aware generally of both the trial and appeal decisions in *Kleinwort Benson*. The timing of the decision as it pertains to the case at bar is striking especially in light of the bank's decision some six weeks later in March of 1989 to rest its exposure with Leigh solely on the comfort letter from Plessey.

34      In the summer of 1989, Leigh requested and received approval for a further temporary $4 million bulge from the bank, necessary due to delays in the SHINCOM and TACAN contracts. Plessey did not provide another comfort letter to secure the additional borrowing, although it undertook to do so if the funds were required beyond the end of August. Although TD made no request for delivery of the further comfort letter, Plessey nevertheless on September 7, forwarded a fourth comfort letter dated August 31, 1989, revised to cover the full amount of the Leigh borrowings. The letter was sent, in part, as a consequence of the impending hostile takeover. This letter was the same as the prior one except for the amount and by its terms  replaced the earlier letters. Approval of the comfort letter was one of the last acts performed by Plessey group treasurer Ian Musgrave, before leaving the company on August 31, 1989.

35       During this period, Leigh also underwent personnel changes at the executive level. On August 8, 1989 Frank Driscoll took over as president of Leigh from Barry Flower who had departed Leigh for Plessey in June. At the very outset of his tenure, Driscoll began a review of progress on all major outstanding Leigh contracts. This revealed that the estimates to completion for both the SHINCOM and TACAN contracts were woefully inaccurate.

36       Slightly more than one week later, on August 17, 1989, GEC Siemens submitted its final offer for Plessey. The bid was successful on September 8, 1989, and GEC Siemens took over Plessey in late September.

37      Somewhat obliquely, the TD account manager Greg Young reported to Credit Division at TD on August 30, 1989 that the bank has enjoyed a long relationship with Leigh and a good relationship with Plessey. He commented mistakenly that the GEC Siemens takeover was unlikely to succeed before October 31st. He reported as well that he had met the new president of Leigh. He concluded with reference to goodwill generation and potential new business. He characterized the comfort letter as "quite strong" and his superiors concurred that the letter was "strong".

38      Shortly after the takeover, Young referred in a corporate credit review of Leigh to the  hostile takeover, stated he was comfortable with the quality of GEC Siemens' credit, and expressed the hope of developing a relationship with GEC. On the other hand he identified a "significant weakness" in terms of the uncertain fate of Leigh as a result of the takeover. Canadian Marconi, a GEC subsidiary and client of the Royal Bank of Canada, might be merged with Leigh. Young noted TD had been unable to establish a relationship with GEC in London, despite several attempts. As of October 2, 1989, the Leigh loan was about $36 million.

39      September was a long month at GEC Siemens. Plessey was not a single business enterprise. It consisted, between 1988 and 1989 of between 80 and 100 companies located in 43 different countries around the world. The strategy of the joint venture was a matter of public record. In the bid document made public in August 1989, the proposal was to dis-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

band Plessey and divide the spoils between GEC and Siemens 50-50; certain of its businesses were intended to be trans-
ferred 100 per cent to GEC: others 100 per cent to Siemens, with the remainder to remain within Plessey, where they
would be operated jointly until such time as they were sold or otherwise disposed of.

40      The bid package revealed that Leigh was intended to be owned 100 per cent by GEC. Also noteworthy was the
fact that Leigh was but a tiny piece of the Plessey pie. To put this in perspective, Leigh had comprised two per cent of
the group sales of Plessey and three and a half per cent of its group assets. Plessey was a £1.5 billion to £1.8 billion com-
pany. The significance of Leigh paled even further in the context of GEC Siemens. GEC alone was a £6.5 billion com-
pany, and held over 100 companies world-wide prior to the Plessey acquisition. Both Plessey and GEC were holding
companies with small, central staffs. Plessey was headquartered at Ilford, England. GEC maintained its head office at
Stanhope Gate, in London. Plessey had arranged that the MOF would fund its acquisitions. GEC, on the other hand, was
cash rich and referred to as a cash mountain with over £1 billion in cash reserves on its balance sheet. Thus, in either
case, Leigh and its borrowings did not make a significant impact within the framework of Plessey or GEC Siemens.

41      It was understood in a firm sense between GEC Siemens and the UK regulatory agencies that the Plessey com-
panies would be divided or "hived-up" between the two parent companies by March 8, 1990. Additionally, there were
constraints as to which company could acquire certain parts of Plessey. Indeed, it was a requirement of the bid approval
by the Mergers and Monopolies Commission that Siemens, as a German company, was not permitted to own certain of
the defence industry businesses. As a consequence, GEC and Siemens had to decide the ultimate destinations, and trans-
fer ownership of all the Plessey companies by this deadline. As part of this process. GEC and Siemens had to agree on
valuations for all the Plessey companies, since the division was to be approximately 50-50. The purchase price of Plessey
was £2.2 billion. Since the takeover was a hostile one, the new parents had very little information about the financial
situation of the Plessey businesses. In essence, they walked into Plessey "blind". In addition, shortly after the takeover
most of those Plessey executives who had not already resigned were terminated by the new owners. The departure of
these executives signaled the departure of valuable information about the operation of the Plessey empire, and created
hurdles for the new owners both in terms of valuing the companies and also their ongoing administration.

42      To fill this vacuum, each shareholder appointed a point person to act in concert as managing directors of Plessey.
GEC's representative was Simon Weinstock, a GEC executive and manager and son of the GEC managing director Lord
Weinstock. Siemens appointed Dr. Philip Gerdine, an experienced mergers and acquisitions accountant from its U.S. op-
eration. Those companies slated to be transferred 100 per cent to either GEC or Siemens were to be supervised directly
by the intended parent until the transfer was completed, while the companies to be held jointly within Plessey were su-
pervised through it.

43      Leigh was earmarked in the bid document to go to GEC, GEC in turn was considering a possible merger of Leigh
with one of its Canadian subsidiaries, Canadian Marconi where there would be obvious synergies. Jonathan Exton
learned of this possibility for Leigh on a goodwill call to David Newlands, finance director at GEC on October 3, 1989,
although it was clear a final decision on the merger was not expected until mid-1990. The bank was made aware of GEC
Siemens plan for Plessey when it received a refinancing package from the joint venture, containing a copy of the bid doc-
ument. As a consequence of the takeover, it was necessary to refinance Plessey, and on October 30, 1989, the joint ven-
ture company and Plessey invited some 40 banks on the open market to provide quotes for the refinancing. One of these
was TD.

44      Due to the possible merger of Leigh with CMC, it was natural that GEC Marconi, also a GEC subsidiary would
provide technical and finance people to assume responsibility for evaluating Leigh. To this end, David Newlands, GEC
finance director, and David Rickard, finance director for GEC Marconi, visited Leigh on October, 20, 1989, to appraise

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

Leigh.  Newlands had in hand a briefing document from Colin Justice at Plessey who was assigned to Leigh, in which Justice alerted Newlands to the fact that the technical baseline at Leigh was sufficiently insecure that the financial results of the company could not be relied upon. Newlands was quick to identify problems at Leigh. He was critical of management, in particular David Dean, the vice-president of finance. Newlands concluded that Plessey's budgets for Leigh were hopelessly optimistic. Included in the material presented to Newlands and Rickard were the draft six-month financial results for the period ended September 30, 1989, which showed a cumulative loss of $2.858 million to the end of September and the bank line outstanding at approximately $36 million. Leigh was trading at a loss, absorbing cash, and there was no indication it would improve.

45     Plessey described Leigh internally in the August 1989 as a "major loss maker". Between the October 20 meeting at Kanata with Newlands and Rickard, and the end of November, Frank Driscoll provided numerous reports and financial information to GEC and GEC Marconi, as well as to Lord Weinstock personally. These included a President's report for October and revised half-yearly reports to September 30, 1989 with forecasts to the end of the financial year in March 1990. The seriousness of the problems at Leigh was apparent to Driscoll and the recipients of his reports, and were underscored by the variances from previous budgets and forecasts. Leigh was pursuing explanations for the variances from budget and was seeking cost-cutting solutions. As of mid-November 1989 there was a variance from budgeted profit of negative $19 million.

46     Back at the bank, on October 3, 1989 account manager Greg Young sent to Leigh the  facility letter for $38 million, which was to become the last facility agreement entered into by the bank and Leigh. Young stated that the facility was contingent upon the year-end financials at July 31, 1990. This package referenced the fourth comfort letter. This was accepted by Leigh on October 26, 1989. The following day Dean returned the facility to Young, referred to problems with SHIN-COM and enclosed cash flow forecasts. There seems to have been no suggestion from anyone at TD that they seek to obtain a new comfort letter from GEC or Siemens.

47     Jonathan Exton, in England, was pursuing larger fish, and met with David Newlands on October 3 at Stanhope Gate to discuss possible new business with GEC, in his words. "to further our marketing relationship with GEC". They discussed the plan to dismantle Plessey and also Leigh's tax position and low profits.

48     As noted earlier, GEC, Siemens and Plessey on October 30, 1989 wrote to some 40 banks including TD with a view to replacing the Plessey MOF, which was to be canceled on November 23. This package contained the final offer for Plessey, financial data on all three companies, and the proposed restructuring of Plessey. GEC and Siemens were offering 50-50 several guarantees to secure the proposed facilities. On November 17 Jonathan Exton forwarded a £50 million facility for Plessey to Ross Anderson, group treasurer for GEC, Plessey never drew down on the facility.

49     On October 31, 1989, Greg Young, the account manager for Leigh, left the bank's employ. He was replaced by Rob Wilson. Wilson was given the sparest of briefing by Young on  his hand over, but was left on his own to review the files. Young and Wilson met once with Dean at Leigh. Wilson's supervisor at TD, Wendy Leaney also gave him little help in familiarizing himself with his accounts, which included the troubled Leigh. Wilson did not see or review the comfort letter.

50     Upon Ian Musgrave's departure from the position of finance director at Plessey on August 31, 1989, his duties had been assumed by his former assistant, Denise Beard. On November 3, 1989, Denise Beard also left Plessey. Beard had been deeply involved in Leigh's affaris, particularly the first comfort letter and the details surrounding the lifting of security on the Leigh assets at the time of the negotiation of the facility agreement and the third comfort letter in early 1989. The exit of Musgrave, Young and Beard from the scene all at about the same time did not enhance the ability of

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

TD and Plessey to adapt to the GEC Siemens takeover. To make matters worse, all Plessey's senior management left following the takeover, including managing director Stephen Walls, signatory to the first four comfort letters. As replacement TD account manager Rob Wilson observed in a memorandum to file in late November 1989, Leigh's numbers were getting worse and the comfort letter was from the old Plessey management.

51    The unaudited quarterly financial statements of Leigh were due to be provided to the bank of Leigh, according to the terms of the facility agreement, by the end of October for the quarter ending September 30, 1989. These were not sent. On November 8, 1989, in a meeting with Young and Wilson, David Dean advised them the financial statements were unavailable due to the implementation of the purchase accounting adjustments necessitated by the GEC Siemens takeover. The bankers did not ask for any alternative financial information. Colin Justice of Plessey assisting at Leigh gave this identical explanation to the bank on December 21, 1989. Dean left Leigh on December 18, 1989, as part of a cost-cutting general layoff. Dean was replaced by his assistant, Patrick Smith. Frank Driscoll, president of Leigh, was personally unaware of this reporting obligation to the bank. The bank was not provided with financial statements until March 21, 1990.

52    The figures reported by Leigh in October and November indicate the state of disarray of Leigh. At the October 20 meeting with Newlands and Rickard, Leigh reported a cumulative loss to September 30 of $2.85 million and the bank line at $36.081 million. Six days later in the President's Report for September, Driscoll reported a revised loss, to date, of $15.634 million and a bank loan of $37.17 million. Financial results for that period were due to the bank four days later. On November 17 in the President's Report for October, he reported a loss for the seven months to October 27 of $16.677 million and the loan at $38.534 million. At the end of November, at the six-month review at Stanmore, he reported a cumulative loss to September 30 of $18.850 million and a bank line of $38.745 as at November 24.

53    Leigh was in breach of the facility agreement by not providing to TD the unaudited quarterly financial statements, given that there were in fact some statements in existence, albeit not in the form that Leigh wished to provide. However, up until his departure in December, Dean spoke by telephone with Wilson, and conveyed to him some details of Leigh's cash flow position and the contract overruns. Although the messages were at best mixed, they were such that they ought to have given rise to questions which inexplicably were never put by the bank to Leigh.

54    The half-year review for Leigh was to take place at Stanmore in the U.K., the home of GEC Marconi, on November 28 and 29, 1989. In attendance were representatives of Leigh, GEC Marconi and GEC. Although Driscoll's approach was seen as positive, two serious problems were presented. To begin with, Leigh predicted a $19.6 million loss for the year. As a cost-cutting measure they proposed a staff reduction of 250 persons. Also, Leigh was preparing a plan for sale of its components division. Problems with the SHINCOM and TACAN contracts were reported in detail. Leigh was asked to re-attend later to deal with the operational problems.

55    To make matters worse however, Leigh was anticipating a problem meeting its payroll, and submitted a proposal for approval of an increase in its bank line from $38 million to $45 million. An increase to the borrowing limit of Leigh required prior approval of Plessey and GEC, in order for Leigh to make a request to the bank. David Newlands and Simon Weinstock considered the request and Newlands "reluctantly" approved the increase in the Leigh bank line, on the basis that any drawdown over $41 million had to be approved specifically by Anderson or someone else with similar authority. Leigh was given the go-ahead to request the increase from the bank.

56    Wilson at TD meanwhile, produced a detailed corporate credit review of Leigh on December 6, 1989, in which he referred to the proposed layoffs, an $8.4 million contract payment due to Leigh in early January, 1990, the support by Plessey in converting the inter-company debt to equity, and the possible sale to or merger with Canadian Marconi. As

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

negatives, he referred to the dynamic of the defence industry, delays and slow payments, and uncertainty about Leigh ultimate ownership. His recommendation of approval for the request for an increase to $45 million was accepted by Credit Division on the condition that the fifth comfort letter be delivered by Plessey in the same form and substance as the fourth letter of August 31, 1989, especially the third paragraph, the policy paragraph noted above. These conditions were never communicated to Leigh. Plessey or GEC by anyone at TD. Wilson included reference in the CCR to TD's intention to bid on providing a fairness opinion in the event that the CMC purchase of Leigh proceeded, and reference to the London office's continued attempts to build a relationship with GEC.

57      At GEC, Ross Anderson was advised that David Newlands had approved the increase to Leigh's bank line. Anderson was charged with preparing the fifth comfort letter. Working on his prior experience, he revised the existing comfort letter, adding among other things an additional phrase which stated that the letter "... does not constitute a legally binding commitment". The policy paragraph was unchanged. This letter, as had its predecessors, by its terms replaced the prior letters. Anderson ran the draft of the revised letter past David Newlands, who approved the wording, in a brief meeting in the corridor outside his office. Anderson then forwarded the letter to Plessey company secretary Bernard Huntbatch for his review and processing. Copies were sent to a number of GEC and Siemens executives, including the Siemens treasury person Andy Hafner and Dr. Gerdine. There were no representations to TD by anyone on behalf of Plessey that the letter would be in the same form as the prior letters. Nor were the conditions stipulated by Noonan regarding the comfort letter communicated by Wilson or anyone else to Plessey or to  Anderson. The signed letter became the fifth comfort letter in the piece, dated December 15, 1989, received by the bank's London office on December 27, TD filed the letter without commenting on the changes to either Leigh, Plessey, GEC or Siemens. No one at TD acknowledges having read the comfort letter until sometime in April 1990. I find, however, that Wendy Leaney received, read and accepted the letter on behalf of the bank in January 1990.

58      The Leigh President's Report for November, dated December 14, 1989, recorded a loss of $18.6 million, $21.4 million below budget. The report was not sent to the bank.

59      On January 8 and 9, 1990 representatives of Leigh re-attended in London for budget meetings and to review Leigh's status. Leigh management were dispatched at the conclusion of this meeting to review five options available to the company. At the same time, GEC and Siemens were engaged in valuing the Plessey companies. On January 8, Exton and Wilson called Anderson at GEC from Canada to advise of Leigh's loan balance and to introduce Wilson. On January 11. Newlands wrote to Dr. Mackenrodt Vice President at Siemens, describing Leigh's situation as "very serious". Appended to the letter was a proposal showing Leigh in the Plessey rump of jointly-held companies rather than going to GEC.

60      In late January, representatives of Leigh and GEC Marconi were debating the intended future of Leigh, which had been expressed as a series of options at the meetings in early January. These options included shut down or wind down of Leigh, sale to a third party or fold in to Canadian Marconi, the original plan. One of the options considered was to renegotiate the  TACAN and SHINCOM contracts with the Canadian Government. Newlands and Gerdine based on their experience still thought this was a possibility. An $8.4 million payment was received from Paramax in mid-January, with a corresponding effect on the bank loan. One executive noted 'so far so good'. On February 1 and 2, 1990 representatives of Leigh and GEC Marconi met again to discuss Leigh's analysis of the five options.

61      Bill Alexander of GEC Marconi met Canadian government officials in Ottawa on January 22 and 23, 1990, in an attempt to negotiate some relief from the provisions of the government contracts. The government was advised of the "desperate situation" at Leigh, heavy losses on SHINCOM and acute cash problems. He reported back that there was some sympathy and that he was less pessimistic than previously. Simon Weinstock, appearing to be losing patience, contacted Shearson. Lehmann, an American investment banking firm, seeking an evaluation of Leigh. Copying Gerdine,

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

Weinstock described the viability of the company as being in question. Others at GEC and Siemens disagreed. The prospect of Leigh going to CMC was still being debated.

62      On February 8, 1990, GEC and Siemens met to finalize the valuations and disposition of the Plessey companies. It was agreed that Leigh would be placed in the Plessey rump, to be held 50-50 until sold. Leading up to this, Dr. Gerdine had become involved with Leigh at the end of January 1990, at the insistence of Dr. Mackenrodt of Siemens. Shortly thereafter at the instance of Simon Weinstock, he met with Shearson Lehmann, the investment banking firm, to canvas the possibility of selling the three Plessey companies in North America, including Leigh,  together as a package. By late January it is clear that GEC had decided not to take 100 per cent ownership of Leigh. Dr. Gerdine knew this around this same time, at least by February 8, 1990.

63      Newlands, since his visit to Leigh on October 20, 1989 had seen Leigh's long-term, fixed price contracts with the Canadian government as a problem. Dr. Gerdine was of the same view after becoming involved with Leigh in late January. Both were highly experienced in the defence industry and felt relief through contract re-negotiations was possible. It was commonplace in the industry for the customer to agree to re-negotiation, so why not here? This had been broached at the meetings held with the Canadian government on January 22 and 23, 1990. Further such meetings, attended by Dr. Gerdine, took place on March 27.

64      A more serious problem however, was the technical problem with the contracts, in particular SHINCOM, and the issue of whether they could be performed by Leigh at all. As a consequence, the GEC Marconi technical review of Leigh was pivotal in the decision as to what was to be done with Leigh. The technical team assigned this task was dubbed the Red Team and their report was expected in early April, 1990. On February 28, Dr. Gerdine visited Leigh on behalf of Siemens, and was shocked by the projected year-end loss of $68.3 million. If this was accurate, he felt bankruptcy for Leigh was not out of the question. On March 6, Shearson Lehmann concluded Leigh was unsaleable to a third party, a view with which Simon Weinstock and Dr. Gerdine reluctantly agreed.

65      Frank Driscoll inadvertently brought the matter to a head. On February 26 he had become  aware for the first time of the reporting obligation of Leigh contained in the facility letter with the Bank. For some unexplained reason, he felt he needed the direction of GEC and Siemens before complying with this obligation. Despite repeated requests for such a direction, none was forthcoming, although Dr. Gerdine is adamant that he advised Driscoll orally to do so on at least two occasions, at the February 28 meeting and again on March 15. Finally, on March 21, 1990, not having heard from GEC, Driscoll instructed Pat Smith to send the financials to the bank.

66      In fact, the six-month results forwarded were outdated numbers which had been presented to Newlands when he visited Leigh on October 20, 1989. However, the financial statements provided to TD also included the nine-month results to the end of December, 1989, which showed a loss of $21.3 million. Even this information was not sufficient to prod TD into action. It was not until Dr. Gerdine telephoned Wendy Leaney and Rob Wilson at the bank on March 26th or 27th, to inquire whether they knew what was going on at Leigh financially that they reacted to the data. As a consequence, the bank line was frozen on March 27, 1990 following Gerdine's indication that GEC and Siemens might not commit to the Plessey comfort letter.

67      GEC Siemens did not give up on Leigh without further effort. On April 9, 1990, Dr. Gerdine and others met again with Government officials in Ottawa, in the hope of negotiating contract relief, but to no avail. By this time, on April 3, the GEC Marconi technical RED Team had completed its review of SHINCOM, confirming that Leigh had serious technical problems and casting doubt on its ability to complete the contracts, absent new personnel and funding. When GEC and Siemens refused to guarantee the Leigh loan, the bank called the loan on April  11, 1990. The next day, on April 12,

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

Leigh made an assignment in bankruptcy. Thus ended ignominiously the short, unhappy life of Leigh instruments and set the stage for this lawsuit.

68     This concludes the basic chronology. The following observations emerge.

69     The transitional effect of the movement of personnel on and off of the scene was highly disruptive to all parties. Frank Driscoll arrived as president of Leigh on August 8, 1989. One month later to the day the hostile takeover occurred. Ian Musgrave left Plessey at the end of August after approving the fourth comfort letter. Almost all of the senior management at Plessey departed at this time. GEC and Siemens people were required to assist. The account manager at TD, Greg Young left at the end of October. The treasury person at Plessey, Denise Beard, left on November 3. All of these people filled critical roles at a material time in the life of Leigh. However, the most significant change from the standpoint of the fifth, operative comfort letter, was the change in the management group at Plessey, as noted by Rob Wilson in late November 1989.

70     The bank at the same time as it was advancing funds to Leigh was pre-occupied with the parent companies' business potential and appeared heedless of its exposure at Leigh. The bank paid scant attention to detail at Leigh and reaped the consequences.

71     From the time of the third comfort letter in April, 1989 and the decision of the bank to remove its security over Leigh's assets, the bank rested its risk solely on the comfort letter.  Although at first glance it might appear from the bank's lack of diligence in monitoring the financial situation at Leigh, that Wilson and Leaney were not acting as prudent bankers, rather, the approach by TD toward Leigh makes it plain and obvious that TD was not relying upon the financial condition of Leigh or any representations in that regard, since it knew Leigh was not capable of repaying the loan without assistance. The bank assumed this assistance would come from Leigh's parents, and to that end, relied upon the moral obligation they believed the comfort letter to contain. The final proof of this lies in the fact that TD did not cap the loan until it was advised by Dr. Gerdine in March, 1990 that Plessey might not honour the comfort letter.

72     There were many victims of the disaster which befell Leigh. One such victim was certainly the TD bank. But also victims of almost equal proportion were Plessey and ultimately GEC Siemens which lost their total investment. On a personal level, Frank Driscoll and the other employees of Leigh were casualties. The Government of Canada likewise suffered losses at the hands of Leigh.

73     The question in this proceeding is, simply put, whether Plessey and GEC are responsible to TD for the losses of the bank.

### The Trial

74     This trial commenced January 13, 1997 and concluded on May 1, 1998. There are more than 15,000 pages of trial transcript, and thousands of pages of exhibits some lengthy and many  detailed. The parties submitted extensive written argument consisting of more than 1200 pages, followed by oral submissions.

75     During the openings by counsel it was stated that the amended amended statement of claim contained more than one hundred and fifty alleged causes of action. During the trial the issues were not narrowed, even though the court urged the plaintiff to do so. This did not occur until the time of filing of written submissions. Any alleged causes of action not pursued in argument are abandoned.

### Disposition

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

*The Claim in Contract*

76      I have concluded that Wendy Leaney received, read and accepted on behalf of the bank the fifth comfort letter dated December 15, 1989 in January 1990. This letter by its terms supersedes all prior comfort letters. There was no representation that the fifth comfort letter would be in the same form as the prior ones. There are no collateral agreements or warranties. Hence, the operative comfort letter is the fifth comfort letter which was delivered to the bank by Plessey in December 1989.

77      The bank asserts that this comfort letter contains in paragraph three, the policy paragraph, a contractual commitment by Plessey to directly or indirectly pay the bank the amount of the  Leigh loan. The added words in the fifth comfort letter that "The letter ... does not constitute a legally binding commitment." are a complete answer to this contention and dispose of the claim in contract. Moreover, even disregarding those words, a literal reading of the paragraph which I find to be clear and unambiguous is to like effect. The paragraph does not contain a contractual promise enforceable in law. Rather it is a statement of present policy of Plessey. The added words do not alter that meaning. Indeed, the extrinsic evidence, if admitted, does not assist the bank. Instead it confirms two things: first, the paragraph does not contain a latent ambiguity, and second, the literal reading of the paragraph discloses its true meaning. The claim in contract fails.

*The Claim in Tort*

78      The bank asserts a number of causes of action in negligent and fraudulent misrepresentation, based on the statement of policy in the third paragraph of all of the comfort letters, and in the alternative, based solely on the policy statement in the fifth letter. For the reasons that follow, I find that the statement of policy in the comfort letters was not misleading and the claim in this respect is dismissed. The bank also claims damages for misrepresentation based on certain alleged statements made by Justice, Anderson and Musgrave to the bank. For the reasons below, I find that none of these claims have been made out, either because the statements did not take place, were not misleading, or were not relied upon by the bank.

79      The bank has alleged fraud against Plessey and GEC based on their conduct in failing to  direct Leigh to provide the financial statements, and also based upon alleged statements by Colin Justice and Ross Anderson to the bank. There is no basis in the evidence for a finding of fraud. Accordingly, and in light of my appreciation of the totality of the evidence, I decline to make a finding of fraud against Plessey, GEC or either of Justice and Anderson. The claim in fraud is dismissed.

80      A review of the evidence, my findings and reasons follow.

## Part II

### *The Evidence*

*The Bank and Leigh prior to April 1988.*

81      The relationship between TD and Leigh dates back to the early 1980s, when Leigh acquired a company called Marsland Engineering Limited. At that time, Marsland had been a client of TDs for several years, however Leigh terminated the relationship with TD following the takeover. In consequence, TD solicited the business of Leigh and eventually succeeded in bringing Leigh in as a client. From the outset however, the bank had concerns about Leigh's financial performance. By July of 1983, the Leigh account had been classified by the bank as unsatisfactory and removed from the discretion of the branch manager. In an internal bank memo, F.G. McDowell, then vice-chairman of the bank, described

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

the Leigh account as a  "persistent worry" and recommended that the bank divest itself of the relationship with Leigh.

82      In 1983 the bank appointed management consultants Woods Gordon to review the Leigh contracts and management. Following on recommendations of Woods Gordon, Leigh sold certain subsidiaries, raised capital and changed management. The company began to turn a profit and the bank decided to continue the banking relationship.

83      In March of 1984 the Leigh risk was again classed as unsatisfactory, and the bank expressed concern that the working capital of Leigh was being used to pay off secured debt, to the detriment of the bank's position.

*Spring 1988- The Takeover by Plessey, First Comfort Letter and Amalgamation*

84      Leigh Instruments was a supplier of high-technology products and systems for the defence and aerospace markets. The company's main products included secure voice communications systems, ground-based navigation systems and flight data recording systems.

85      The bulk of Leigh's business was composed of contracts to supply two sophisticated products, SHINCOM and TACAN, SHINCOM was a ship interior communications system program and TACAN was a tactical air navigation program. The bulk of Leigh's contracts were with the Canadian Department of National Defence either directly or as subcontractor to other  companies with government contracts, and were long-term contracts for fixed prices. SHINCOM was being installed by the Canadian Navy as part of its program to refit older destroyers.

86      In January 1988, Leigh acquired all the shares of a Nova Scotia based company known as Micronav Ltd. for $2.8 million. Micronav had developed a microwave landing system, which was a leading-edge airport landing system. TD was the banker for Micronav both before and after the takeover, and noted in a credit review of Leigh on February 29th, 1988 that "MLS is widely recognized as the next generation of airport landing systems with a world market estimated to be several billion dollars during the next decade. For example, Transport Canada has recommended MLS for up to 40 airports in Canada."

87      At this time, Leigh was a publicly traded company. In late February of 1988, a Halifax based Aerospace company, IMP Group Ltd., made a public offer of $80 million for all the shares of Leigh. Leigh's board of directors rejected the bid and retained Dominion Securities and First Boston to advise it on defensive strategies.

88      In order to assist in the defence of the takeover bid, TD offered Leigh a $10 million operating line with a number of conditions attached. In approving the credit application on February 29, 1988 however, senior vice president James Laitner noted: "this is not the type of company that should have a lot of debt." The bank rated the risk of this borrowing at 3A and included as a condition that Leigh provide to the bank quarterly unaudited financial statements and audited year end statements. Leigh did not accept this offer, but chose instead to accept the  straight renewal of its existing operating facility of $5.4 million, which to date had not been drawn upon. That facility included a requirement that Leigh provide to the bank its quarterly/annual financial statements within $^{30}/_{90}$ days from the end of the respective financial period.

89      In early March, 1988, while the hostile IMP takeover bid was still outstanding, Plessey announced a friendly takeover bid for Leigh, offering $96.4 million for the outstanding shares of Leigh. When TD learned of the bid. Howard Baker of TD's London office immediately telephoned the Plessey treasury department, and then wrote to Ian Musgrave, group treasurer of Plessey, offering to provide financial assistance in connection with the takeover. On March 24, Plessey increased its offer for Leigh to $104 million, leading IMP to drop out of the running and withdraw its offer on April 5th. The Plessey bid succeeded that same day.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

90      In connection with the bid, Plessey retained Deloitte, Haskins & Sells to prepare a due diligence report on Leigh, which was delivered on March 6th. This report was reviewed in detail by Ian Musgrave, who was in charge of structuring Leigh's acquisition, and others at Plessey. The report noted that Leigh's major source of revenue was from government contracts associated with the TACAN, SHINCOM, and LSI programs, and that Leigh's revenue recognition policies for the contract were, from an accounting perspective, less conservative than Plessey's. Other accounting policies were also less conservative than Plessey's and the report cautioned that application of the accounting principles used by Plessey would result in a significant writedown of the value of Leigh's inventories. Deloitte's also noted that Leigh had failed to meet certain  contract milestones for the TACAN program, had not yet filed its corporate tax return for 1987, and had made no payments towards its tax liabilities for the 1987 or 1988 fiscal years. The report failed to note the security held by TD over Leigh's assets.

91      As treasurer, Ian Musgrave was responsible for the structure of the Leigh acquisition. In evidence, he explained the structure was designed to provide the most favorable tax results for Plessey. In order to minimize the amount of profit on which Leigh would have to pay tax, Plessey imposed a capital structure on Leigh of 25 percent equity and 75 percent interest-bearing intercompany debt. The intercompany debt was payable to Plessey, with the notion that the interest payments on the debt would reduce or eliminate Leigh's taxable profits. In the final analysis, the structure consisted of $69 million intercompany debt, $25 million in equity, plus the TD loan for the total purchase price of $104 million. There was a $3 million acquisition cost for a total outlay of $107 million.

92      In order to facilitate the transition, Plessey incorporated a holding company called Plessey Canada (1988) Inc., with the 75-25 debt to equity capital structure. This company was to be used to purchase the shares of Leigh and then the two companies were to be amalgamated, with the merged company assuming the intercompany debt held by the acquisition vehicle. At the time of the acquisition, the Leigh balance sheet showed approximately $10 million in cash. Accordingly, Plessey decided to borrow $10 million of the acquisition financing from the TD bank, through Plessey Canada, with the intention that this $10 million would be re-paid to the bank from Leigh's cash balances following the amalgamation.

93      TD had approached Plessey immediately after the announcement of the takeover bid, and offered to assist with acquisition financing. Initially, TD offered Plessey a $50 million facility, with the provision that $10 million be made available to Plessey Canada (1988) Inc. directly.

94      The procedures and responsibilities within the bank in terms of processing and approving credit applications for customers was addressed by numerous bank witnesses in the course of the trial. The Corporate Banking Division ("Corporate Banking") had responsibility for direct customer contact. It was charged with the responsibility for preparing documentation of a credit request which was then submitted to the Credit Division. Corporate Banking had no lending authority. The Credit Division's role was that of decision maker - it had no liaison with customers or documentation role after a credit was approved. Those duties were left to Corporate Banking, and included responsibility for ensuring that any condition placed on an approval of a credit by the Credit Division was implemented. There was no procedure in place within the bank by which the Credit Division could ensure that its conditions had been complied with, and the Credit Division simply relied on Corporate Banking to do so. For example, the account manager in Corporate Banking was responsible for obtaining the requisite security or other documentation for a loan, in keeping with the bank's requirements. Similarly, if a loan went into an overdraft position, it was the responsibility of the account manager to obtain approval of an increased loan limit from the Credit Division. Once that approval was obtained, the account manager was charged with obtaining a new facility agreement from the customer reflecting the increased amount, and obtaining any other associated documentation.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

95      For the purpose of standardizing credit applications, the bank had in place a Credit Procedures Manual. This manual was described by bank witnesses as a "guideline" on how to complete a Corporate Credit Review (CCR). Although its purpose was described variously by bank witnesses as to standardize the format of submissions for ease of processing or as being "mechanical", there were aspects of it which were admitted to be requirements, as opposed to discretionary guidelines. Portions of the manual were for use by Corporate Banking and were available to every manager responsible for the Leigh account, and certainly Wendy Leaney.

96      The manual expressly provided that a corporate guarantee be accompanied by a solicitor's opinion and a resolution of the board of directors authorizing the guarantee. No such stipulation applied to comfort letters, which the manual described as "documentation" rather than "security", unlike a guarantee. It stated that comfort letters were "not legally enforceable in the collection of our loan." In contrast, guarantees were to be in the bank's standard form. Guarantees not conforming with the standard form were to be vetted and approved by the bank's legal counsel.

97      Within the Credit Division, each person had an authorized credit approval limit, which conferred upon them the discretion to approve any loan which fell within that limit, as long as they were satisfied with the risk. If a credit application exceeded the authorized limit, the person to whom it had been sent would review it and add whatever comments were appropriate. The application would be forwarded up the chain to someone with a higher limit, and this might happen several times before the credit was approved by the ultimate decision maker. Each person who signed off on a credit would review it and the comments of the persons below them in the  chain of approval. Persons reviewing a credit also had the authority to recommend changes in the terms and conditions of the credit, or to recommend rejection.

98      Once the credit was approved, the application was returned to the Corporate Banking Division, along with the comments or conditions added by the Credit Division. It fell then to the Corporate Banking people to ensure that the conditions were complied with and documentation obtained, and Wendy Leaney testified the department had its own internal procedures in this regard. If these terms and conditions were not complied with, it was the responsibility of the account manager to report this to the Credit Division.

99      Patrick Noonan senior vice president. Credit Division, testified that he assumed everyone below him on a credit approval application had read all of the material he received, because any recommendation was based upon it. Since a recommendation could be approved with conditions attached, he assumed it would be read by everyone on its way back down the chain. There was no process by which Credit Division could ensure those below adhered to conditions it imposed so that the responsibility for this rested on the account manager in Corporate Banking. Hence, it was not for Credit Division to pass on a comfort letter. It was for the account manager to see to it that a comfort letter was satisfactory to the bank. Noonan testified that he had never spoken to anyone at Plessey, GEC, GEC Marconi or CMC at any time material to this proceeding.

100      In accordance with standard bank procedure for the approval of credit applications, a Corporate Credit Review of Plessey was prepared by the account manager, in this case Howard  Baker, manager of corporate finance in the Bank's London office. The account was given a risk rating of 2, a rate which the bank reserved for corporate borrowers with strong balance sheets, strong earnings, good access to public markets and a top corporate credit. Although the CCR indicated the bank had had a relationship with Plessey since 1982, it listed facilities then available to Plessey, none of which had been drawn upon. In the section entitled purpose of review/use of credit, Baker noted "We view Plessey risk as entirely acceptable for this transaction. A successful bid will enhance our relationship with Plessey in London (which currently consists only of occasional FX business), and of course in Canada where we hope to maintain our relationship with Leigh, and further build on Plessey's growth in Canada. ...Plessey intends to use Leigh as its platform to sell communications, avionics and defence equipment in Canada, estimating that it would be able to bid for £500 million of Canadian

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

contracts over the next five years." Under pricing Baker noted "we would therefore seek your guidance on lowering the pricing ... on the basis of our relationship with Leigh in Canada and the important one-off opportunity we have been presented with." The security for the $50 million short-term, uncommitted line was listed as nil, with the explanatory note "Borrowings by Plessey Canada (1988) Inc. will not be guaranteed by the parent. Plessey & Co. plc do not provide guarantees for any subsidiaries borrowing." The CCR was sent to the bank's Credit Division in Toronto for approval.

101    Ian Musgrave testified that Baker's observation was incorrect, and while Plessey had a group policy of ordinarily avoiding guarantees, that Plessey did guarantee the borrowings of its subsidiaries in certain circumstances. I accept his evidence. Although Musgrave was not  involved in negotiation of the terms of this facility, he was treasurer of the Company at the time. The negotiations were conducted largely by Denise Beard, who reported directly to Musgrave. No evidence was led as to the source of Baker's mistaken conclusion that Plessey did not give guarantees. This observation was critical however, in that it led Patrick Noonan, then a senior vice president in TDs Credit Division, to recommend as a condition of the credit approval, that a letter of comfort be obtained from the parent, Plessey Company plc. Musgrave did confirm in evidence that bank was correct in noting that a Plessey guarantee was not on offer for the Plessey Canada borrowing.

102    In recommending that the credit be approved, Noonan noted:

> Credit risk of U.K. parent acceptable. Appl'n requests Cdn $10MM to Plessey Canada (1988) Inc. which is obviously a new vehicle for this investment. It is not listed as a subsidiary of the U.K. parent in last annual report. No gtee will be provided.

> As there are no financials we should have an appropriate comfort letter from parent. Would agree on this basis in light of interim finance requested.

103     In this period, Noonan testified he was reviewing well over 1000 CCRs a year. Noonan explained he was not surprised to see that a guarantee was not on offer because "it was common for major companies not to guarantee borrowings of subsidiaries and I was aware that the common practice was to provide comfort letters in some cases". He testified that he specified an "appropriate comfort letter" because the bank had no financials for Plessey Canada and therefore no basis upon which to assess the company's debt service capacity, its ability to repay, nor at that  time, information on how the loan was to be re-paid. Hence, he explained that he wanted "a clear undertaking from the Plessey Company Plc that they would see the bank whole on any portion that may be taken by the Canadian company." Regarding his reference to an ongoing Canadian bank role, Noonan testified that since they were the sole bankers for Leigh and had no active relationship with Plessey, he hoped the bank would preserve the relationship with Leigh. He described this aspect of the credit as a marketing aspect between the corporate account manager at the bank and Plessey. He explained that each member of the bank's Credit Division had a discretionary lending limit. If the credit application was for an amount within that limit, then the person reviewing it had authority to approve the risk. If not, the application would be passed to a more senior member of the department who had a higher lending limit. Noonan testified that he reviewed the Plessey application from the perspective of acceptance of credit risk. As the $50 million limit was in excess of his discretionary lending authority, he recommended that the credit be approved, and forwarded the CCR to the senior executive.

104    In the case of the $50 million Plessey facility, the CCR was passed above to William T. Brock, Executive Vice President, Credit, who recommended that the application be approved and noted "this is a short term bridge loan and we are bankers to Leigh which will now be expanded by Plessey. We would not want to lose this to a Canadian competitor." The credit application was ultimately approved by the chairman of the bank himself, Richard Thomson, and the requirement that an appropriate comfort letter be obtained was left unchanged.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

105    The credit was approved the same day as the application was made. In notifying the  London office of the approval, Noonan advised:

Insofar as CDN $10,000,000 being available under the name of Plessey Canada (1988) Inc., which is obviously a new vehicle for this investment, as there are no financials, we should have an appropriate comfort letter from the parent. We note your remarks that no guarantee would be available. However in light of short-term requested, we are agreeable on the above basis.... We would not want to lose this financing to Canadian competitor, particularly with our long-standing account relationship in Canada where we are the sole bankers to Leigh.

106    Noonan explained in evidence that while it was his idea to obtain a comfort letter, he did not provide any of the language or participate in the drafting of the letter. Nor could he recall indicating what, in his view constituted an appropriate comfort letter. He explained that according to bank procedure it was the responsibility of the account manager, in consultation with legal counsel, to obtain the appropriate documentation, including in this case, the comfort letter. While on occasion he would provide some verbal guidance to Corporate Banking officers if approached by them. Noonan said he could not recall having spoken to Baker or his assistant J.A. Read concerning the Plessey letter.

107    The bank learned subsequently that Plessey did not intend to use the $50 million loan facility, but did wish to draw upon the $10 million amount which had been carved out for use by Plessey Canada.

108    Howard Baker, of TDs London office, and Greg Young, a manager of Corporate Banking  in Toronto, were responsible for obtaining an "appropriate letter of comfort" from Plessey. Young had been in charge of the Leigh account in Toronto since early 1987, and was responsible for determining that the comfort letter was acceptable. Since Baker was the bank officer then in charge of the relationship with Plessey, he was charged with obtaining the letter from Plessey and forwarding it to Young for approval. Young testified it was reasonable to assume that Baker had received Noonan's comments when he contacted Plessey.

109    Baker had available to him a draft comfort letter, which he used as a template for drafting the Plessey letter. The template letter stated:

We understand that Toronto-Dominion Bank has agreed to place at the disposal of [blank] a subsidiary of [blank] banking facilities of C$3,750.000 (three million seven hundred and fifty thousand Canadian dollars).

This letter will confirm that [blank] is aware of and approves of the above-mentioned facilities. We also wish to assure you that during the period of such financial assistance we expect to provide adequate financial support in order that the affairs of [blank] will be conducted on a sound basis. Furthermore, we undertake to retain control of this subsidiary company as long as any indebtedness to you may be outstanding.

It is our policy that our subsidiary companies including [blank] be managed and operated in such a way as to be always in a position to meet their financial obligations when they become due and in this particular instance we will ensure that sufficient liquid resources are available to discharge any liabilities at maturity.

110    Baker did not use the template letter verbatim, and instead sent Plessey an amended version. No evidence was led as to the reason for these changes. On April 7, 1988, Baker faxed  to Ms. Beard a draft of a proposed comfort letter which stated:

We understand that the Toronto-Dominion Bank ("the bank") has in place at the disposal of Plessey Canada (1988) Inc., a wholly-owned subsidiary of The Plessey Company PLC, borrowing facilities of up to C$10,000,000 (ten mil-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

lion Canadian dollars).

This letter confirms that The Plessey Company Plc is aware of and approves of this facility, and undertakes to advise the Bank if any reduction in ownership of Plessey Canada (1988) Inc. is contemplated. We also wish to assure you that during the period of such financial assistance we expect to provide adequate financial support in order that the affairs of Plessey Canada (1988) Inc. will be conducted on a sound basis.

That same day, Denise Beard responded by sending Baker the following draft comfort letter, which was in a form Plessey had used on other occasions:

This is to confirm that The Plessey Company plc has full knowledge of the facility of c$10,000,000 (ten million Canadian dollars) which has been granted by Toronto-Dominion Bank to Plessey Canada (1988) Inc.

Plessey Canada (1988) Inc is currently a wholly-owned subsidiary of Plessey Overseas Limited which is a wholly-owned subsidiary of The Plessey Company plc. No change in the ownership of Plessey Canada (1988) Inc or Plessey Overseas Limited is contemplated and we undertake not to reduce our share-holding during the term of the above mentioned facility without prior notification to yourselves

It is our policy that our wholly-owned subsidiaries, including Plessey Canada (1988) Inc. be managed in such a way as to be always in a position to meet their financial obligations, including repayment of all amounts due under the above facility.

111    In evidence, Musgrave said it was common for Plessey to negotiate the language of the comfort letters it gave, and that quite often the bank concerned would produce a form and Plessey would then respond with its own form of letter. He said there was some degree of negotiation in most cases and that Plessey's comfort letters were reviewed by its in-house counsel, Tony Noon, "as a matter of course." In respect of comfort letter number one, no party called Baker or Beard to give evidence about the extent of the negotiations.

112    Upon receipt of the Plessey draft, Baker in London forwarded the letter to Young in Toronto with a note saying that Plessey wanted the line in place by the next day. Young had previously been involved in several other files involving comfort letters, however this was his first experience in actually taking one. Upon receipt of the draft, Young showed it to Alex Norton, in-house counsel at the bank. Young testified that following the brief meeting with Norton, he believed the Plessey letter was "a strong comfort letter" and "legally binding." Neither Plessey's counsel, Tony Noon, nor TD's counsel, Alex Norton, testified at trial.

113    Young did not show the draft letter to Noonan in the Credit Division, nor did Noonan see the first comfort letter until after it had been executed. On April 7, Baker faxed a letter to Beard confirming that TD had made available a short-term $10 million facility for use by Plessey Canada, noting "documentation to formalize this facility will follow due course."

114    On April 11, 1988, Young sent a facility letter to J. Palazzi of Plessey U.S. containing the terms of the $10 million loan facility. This term sheet described the borrower as Plessey Canada,  noted that repayment was on demand, that the loan was unsecured, and did not contain any financial reporting requirements. It listed that documentation would include "a Comfort Letter from the Plessey Company PLC in the form attached." The attached comfort letter was in the same form as that which Plessey had forwarded to the bank and which Young had shown to Norton. On April 12, prior to receipt of an executed comfort letter by the bank, Plessey Canada drew down the amount of $10 million from the bank, which it used as part of the acquisition financing for Leigh. Plessey group treasurer Ian Musgrave explained in evidence

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

that from time to time the drawdown of cash would precede completion of the formal documentation with a bank. He said that normally by that time all the terms and conditions would be pretty well agreed, and there would be no contentious items left unresolved. The documentation would amount to the completion of paperwork in the terms agreed. Plessey Canada accepted the terms as offered and signed the facility letter on April 15, 1988.

115      In connection with this facility, the bank prepared a second, separate Corporate Credit Review of Plessey Canada, on April 19, after the loan facility had been offered by the bank and accepted by Plessey Canada. The CCR was prepared by Randi Winston, of the Corporate Banking Division in Toronto. It rated the risk of the borrowing as 2 low risk, which was the same as the risk rating given to Plessey Plc in the April 5 CCR, and listed security as nil. Documentation was "to be obtained" and included "comfort letter from The Plessey Company PLC."

116      The April 19 CCR enclosed the draft Plessey comfort letter and a copy of the April 5  CCR of Plessey Plc. In the remarks section Winston noted:

> The purchase of Leigh should enable Plessey Company to bid for about $2 billion in Canadian contracts over the next 10 years. The Department of National Defence proposes to spend several billion dollars to acquire a fleet of nuclear powered submarines which should provide Plessey with an opportunity to market its sonar equipment, currently used on the British submarines.

> While Bank of Montreal is Plessey Canada's banker, the company has expressed in interest in adding another financial institution and splitting their banking business. For the time being. Plessey has indicated that Leigh's facilities with the TD bank will remain intact.

Under "Use of Credit and Repayment" the CCR noted that the loan was to assist in the purchase of Leigh and that repayment of the advances under the facility was to be derived from Leigh's cash balances. The loan was to mature in 90 days, on July 11. Winston also observed:

> Plessey Canada has advised us that this is a short-term need and have not requested a formal operating line of credit. However, having available an authorized facility would place TD in good standing in the event that Plessey decides to split its banking business. At this time we note that EMEA division was unsuccessful in winning Plessey Company PLC's $50 million deal.

The security section stated that "While there is no security per se, a strong comfort letter from the Plessey Company Plc will be obtained by EMEA division and forwarded to us shortly." Winston explained the risk assessment as follows: "Given the short term nature of this facility and the comfort letter to be obtained the risk is acceptable to the bank. Given the strong financial position of the Plessey Company PLC we are recommending account rating of 2." Young also signed the CCR which was ultimately approved by Noonan, who stipulated that the bank should obtain financials of the borrowing entity as soon as possible.

117      In reviewing the credit application Noonan testified that he noted the purchase of Leigh should enable Plessey to bid for Canadian contracts over the next 10 years and that while Bank of Montreal were the bankers for Plessey Canada, there might be opportunity for TD to be involved in their ongoing banking requirements. He testified that while this was a noteworthy point, it had no bearing on his risk assessment. Noonan testified that he noted the facility was for a short-term and that a formal operating line was not requested by the customer. He said other points of note were that the $10 million was to be repaid from Leigh's cash balances once Plessey had obtained the 100 percent ownership, and that while there was no security per se, a strong comfort letter would be forwarded by Plessey.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

118     Noonan said he read the attached draft comfort letter, and in particular, paragraph 3. He said that, at the time, he took the view that the language of the comfort letter provided a commitment from Plessey to see that Plessey Canada was in funds or solvent to meet its financial obligations, including the amounts due under the TD facility. Noonan testified he formed this view based on the wording of the third paragraph and based also on the standing, strength and reputation of Plessey, which he described as "of paramount importance." In that regard, he said when a draft comfort letter was given by a company with a reputation that, enjoyed access to the public markets of the world, then he believed it was a company which valued its reputation, and  that the bank in turn could believe in its word. As well, he said he took Plessey at its word, as expressed in the letter, because the comfort letter had been signed by two authorized signatories, and because he believed the people who gave the comfort letter also controlled finances and were in a position to provide the flow of funds to the appropriate subsidiaries. He said "in my view it's a quasi-solvency guarantee that they, in turn, will always meet their financial obligations." He elaborated that while he did not view the comfort letter as a guarantee per se, he viewed it as a quasi-guarantee from the point of view of ensuring that the subsidiary was in a solvent position.

119     Meanwhile, within Plessey, Denise Beard was arranging for formal approval of the comfort letter. While group treasurer Musgrave was not involved in negotiating the comfort letter, he testified that Beard would "almost certainly" have shown him the final draft before it was signed. Musgrave explained that Plessey controlled the borrowings of its subsidiaries and that approval of the Plessey main board was required for both a borrowing limit and a guarantee limit for each of its subsidiaries. Once approved by the board, the borrowing limit would entitle the subsidiary to borrow in amounts up to that limit, without exceeding it. The guarantee limit was Musgrave's authority to negotiate with the banks the degree of support Plessey could offer in connection with those borrowings. He said the degree of support to be offered by Plessey was within his discretion, and that he could choose to offer no support, a comfort letter, or a guarantee if one was necessary. Once a guarantee limit had been approved, it was not necessary to have the support approved by the main board, although in light of the group policy, Musgrave testified that if a guarantee was offered, he would consult with Stephen Walls, managing director of Plessey, first. He said the main board would not have seen the wording of the comfort letter  itself.

120     On April 20, Denise Beard sent a memo to Stephen Walls requesting authorization of the comfort letter by him and one other board member, and the letter was in fact signed by Walls and Mayes. Musgrave explained that it was somewhat unusual to issue a comfort letter without prior main board approval of a guarantee limit, but that this happened from time to time if a transaction was taking place at high speed and there wasn't a board meeting scheduled in time. Hence, on April 29, after the letter had already been issued, Musgrave placed the issue of retrospective approval of a guarantee limit for Plessey Canada on the agenda of the next main board meeting. On May 6, 1988, the Plessey main board retrospectively approved both a borrowing limit and guarantee limit for Plessey Canada of $10 million.

121     Musgrave testified that the Plessey treasury department maintained a "guarantee register" in which it recorded all guarantees and comfort letters, including the comfort letter provided to TD. Although designated as a guarantee register, Musgrave explained in evidence that the title of the register did not mean every document recorded there was a guarantee. He said that in addition to guarantees, comfort letters were recorded there for the sake of convenience, but were separately identified. Musgrave testified that the register included documents which did not require Plessey to pay the debt of a subsidiary. I accept Musgrave's explanation, and hence his evidence on this point.

122     Although the TD comfort letter was recorded in the guarantee register, Musgrave stated in  evidence that his personal intention at the time was that the comfort letter would not bind Plessey to repay the indebtedness of Plessey Canada. Further, he testified that while he could not recall discussing the question specifically with Stephen Walls, Walls was a highly experienced finance director and Musgrave stated he would be very surprised if Walls did not understand the difference between a comfort letter and a guarantee.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

123      Notwithstanding this however, Musgrave testified that in his view, the comfort letter still had value for the bank. In respect of the first paragraph of the letter, Musgrave said the statement that Plessey was aware of the facility should prevent the bank from feeling vulnerable that it was advancing money to a subsidiary without knowledge of the parent. Regarding paragraph 2, Musgrave said it was his belief at the time that this statement would have significant value to the bank. He said notification of any intention of Plessey's to reduce its shareholding would give the bank the opportunity to withdraw its facility, which was a demand loan. He said the third paragraph would also have value for the bank in that Plessey was stating its policy that its subsidiaries are expected to manage their affairs so as to be always in position to meet their financial obligations. Musgrave testified that he expected the bank to take the statements into account in deciding whether to make the facility available to Plessey Canada, that he expected the bank to rely upon the statements as being factually correct, and that they were intended to give the bank a degree of comfort about the proposed facility. He said he and Plessey would have known that the bank would not advance the funds without the comfort letter.

124      On April 27, 1988, Plessey forwarded to the bank a comfort letter dated April 20, 1988 executed by authorized signatories Stephen Walls and Derek Mayes, which was identical to the draft previously submitted to the bank by Beard. This the first comfort letter, stated:

> This is to confirm that The Plessey Company plc has full knowledge of the facility of C$10,000,000 (Ten million Canadian dollars) which has been granted by Toronto Dominion Bank to Plessey Canada (1988) Inc.

> Plessey Canada (1988) Inc is currently a wholly owned subsidiary of Plessey Overseas Limited which is a wholly owned subsidiary of The Plessey Company plc. No change in the ownership of Plessey Canada (1988) Inc or Plessey Overseas Limited is contemplated and we undertake not to reduce our share-holding during the term of the above mentioned facility without prior notification to yourselves.

> It is our policy that our wholly-owned subsidiaries, including Plessey Canada (1988) Inc. be managed in such a way as to be always in a position to meet their financial obligations, including repayment of all amounts due under the above facility.

125      By this time the acquisition of Leigh had been completed, and Plessey Canada held the shares of Leigh. As an acquisition vehicle, Plessey Canada simply held the shares of Leigh. It did not carry on business and was run by Plessey's lawyers in Canada acting on direction from Plessey in London. Once the transaction had been completed, Musgrave said all the cash holdings in Plessey Canada were paid out, and conceded that Plessey Canada would not have had the cash to pay the TD loan, if payment had been demanded. He said there were options available to Plessey Canada however, and at least one other bank was interested in assisting. At the time of the takeover, Leigh had available to it a $5.4 million facility from TD, although it had not drawn down upon it, and the amount outstanding was nil.

126      Although Plessey paid $104 million for the shares of Leigh, when the transaction was completed Plessey determined that the book value of Leigh's assets was about $50 million. Of that $104 million, $10 million was drawn down on the TD bank line. The remaining $94 million was structured as $69 million intercompany debt held by Plessey and $25 million equity. In consequence, Leigh's total debt load was within the order of $79 million.

*The Second Comfort Letter*

127      Following the acquisition. Plessey commenced a process of purchase accounting adjustments, whereby the Leigh balance sheet was adjusted to reflect the introduction of Plessey accounting principles. Although this process was not completed until several months later, it spoke as of the date of the takeover. Due to the fact that Plessey's accounting principles were more conservative than Leigh's, their introduction led to a $38.5 million reduction in the book value of

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

Leigh's assets, leaving Leigh with a book value, on paper, of $13.1 million.

128    On June 30, 1988, Leigh and Plessey Canada were amalgamated under the name Leigh Instruments Limited. Thus, Leigh became responsible for the $10 million acquisition loan from TD held by Plessey Canada. Around this time, Musgrave spoke to Greg Young, the account manager for Leigh at TD's Corporate Banking Division in Toronto, and assured him the bank needn't worry about the amalgamation and that "as far as we were concerned, the letter of comfort still stood."

129    Following the amalgamation, Plessey determined that, in fact, Leigh did not have the anticipated $10 million in cash on its books. At the same time, Leigh advised Plessey it required an additional $2 million working capital. As a result, Leigh was unable to repay the $10 million facility to TD on its maturity date of July 11. On July 4, Musgrave sent a memo to Stephen Walls, apprising him of the situation and proposing that the $10 million facility be rolled over. As well, he requested permission from Walls to advance the additional $2 million to Leigh. Walls approved both requests.

130    Musgrave then requested an explanation for the Leigh shortfall from Andrew Akerman the financial analyst at PESL, the group to which Leigh belonged. Akerman reported that most of the shortfall was due to adverse phasing variances on the TACAN contract. In evidence, Musgrave explained this sort of shortfall was fairly common within Plessey. He said most of Plessey's business consisted of long-term advanced technology contracts, and that it would not be unusual at any point in time for several of these contracts to experience difficulties on a technical level. He said such technical difficulties resulted in cash flow variances, since often the customer would only make progress payments on the contract once specific technical milestones had been met. If there was a delay in meeting these milestones, it would affect the company's cash flow. Musgrave testified that while Leigh did not have sufficient cash to repay the loan at this point, it did have other options available to it. He said if TD had called the loan, Leigh could have sold some of its assets or perhaps approached the Bank of Montreal, which he said was keen to get involved.

131    In a July 11 memo to Noonan at TD Credit Division, Young reported the conversation with Musgrave about the comfort letter and that he had confirmed with the bank's legal department that the comfort letter would continue to apply. He also noted that contrary to prior expectation. Leigh did not have the $10 million to repay the outstanding loan, and that Leigh's cash balances had declined due to a temporary delay on a major contract. Young requested that the existing loan be rolled over for a further 90 days and continued in the name of Leigh, concluding "We are satisfied that the risk is still acceptable based on the comfort letter".

132    Plessey delivered written confirmation to the bank in a letter dated August 1, 1988, that the comfort letter applied to Leigh. This letter was vetted by Plessey in-house counsel before being sent, and was signed by Walls and Huntbatch. This second comfort letter stated: "We confirm that the comfort letter dated April 20, 1988 remains valid and now applies to Leigh Instruments Limited."

*The Multi-Option Facility*

133    In August 1988, Jonathan Exton of the Bank's London office received an invitation from Plessey to submit a bid to participate in a £250 million multi-option facility, which Exton explained was a "facility which permitted the borrower to draw down in different currencies of its choice". Due to the size of the facility, this invitation had been extended to a number of banks. Exton testified that when he received the invitation, he prepared a Corporate Credit Review of Plessey, which he sent to the Credit Division in Toronto. The CCR, dated August 24, described its purpose as a request for approval to underwrite £5 million of the £200/250 million five-year multi-option facility, arranged for Plessey by Barclays de Zoete Wedd Limited. The CCR gave Plessey a risk rating of 2 (unchanged). Under documentation, Exton noted that the MOF agreement included standard events of default, including a material adverse change clause and a negative

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

pledge.

134    In the section pertaining to use of credit. Exton noted that TD had been invited to participate due to its "close relationship in Canada as the principal banker of its subsidiary Leigh Instruments of Canada ... since the acquisition TD has also taken the banking business of Plessey Canada, who were formerly with the bank of Montreal." Exton went on to state that the pricing on the MOF would not provide much profit for the bank. Nevertheless, he was seeking approval to participate for "relationship reasons and the opportunity to gain future business," and added that the bank had recently offered Plessey a £20 million uncommitted short-term facility which had been fully drawn down. In his financial summary of Plessey, Exton observed that the company's turnover had fallen by 9 percent as senior management had devoted resources to fighting off a recent hostile takeover bid by GEC. Also, Plessey's net worth had been reduced by £335 million from £623 million as a result of a write-off of goodwill associated with a series of recent acquisitions, one of which was Leigh. Despite this, Exton described the company as "financially strong". The CCR was also signed by Hugh Rising, vice president of corporate finance for the EMEA division, who added: "We are proposing to participate in this facility at the minimum level for existing relationship reasons, feeling as well opportunities will be presented going forth. This will assure our prominent position as bankers to the Canadian operations and afford us with opportunities in the US and specifically the UK relative to FX and Capital Market products." The application was approved by McDowell, who noted that the bank should obtain a capital adequacy clause. In evidence, McDowell said concern about losing the Plessey business to a competitor would not have affected his decision, but agreed that building up the relationship with Plessey was an important consideration for the bank. The MOF was signed on September 20, 1988.

*September 1988 to April 1989 - The Third Comfort Letter*

135    Plessey completed the purchase accounting adjustments for Leigh by early September 1988. The opening balance sheet showed Leigh's assets were valued at $51.66 million on March 31, 1988. This figure was arrived at using Leigh's accounting principles. Once the asset value had been calculated using Plessey's more conservative accounting principles, Leigh's assets were reduced to $13.16 million as at April 5, 1988. Musgrave explained in evidence that Plessey took a more conservative view than Leigh on the valuation of contracts in progress. He explained that Leigh and Plessey were both involved in large long-term contracts, and with such contracts it was necessary to book profit on the contract as it progressed. He said if the contract ran over a period of several years, profit would accrue over the life of the contract and there was a certain amount of discretion as to how and when the profit was booked or recognized on the balance sheet. Plessey was more conservative than Leigh in recognizing profit, so when Leigh's balance sheet  was adjusted according to Plessey principles, it resulted in the write-down to $13.16 million.

136    In late September 1988, only five months after the Leigh acquisition, Leigh advised that it would have a total borrowing requirement for the quarter ended December 1988, of $30 million. Leigh's cash requirements included $3.55 million for the payment to Plessey of interest on the $69 million intercompany debt which had been imposed following the acquisition.

137    Although the interest payment on the intercompany debt was payable on September 15, Leigh did not make this payment. Plessey was not pleased at this turn of events. In a memo to file in late October. Musgrave recorded that he had been informed by David Dean, the vice president, finance at Leigh, that the loan interest payments to Plessey might have to be further deferred due to contract slippages. Musgrave noted "we cannot allow trading cash flow slippages to be accommodated by the deferral of loan obligations."

138    In late September, Andrew Akerman, financial analyst at PESL, advised Musgrave that Leigh required increased working capital due to delays in start-up of the TACAN program, and due to technical problems plaguing the SHINCOM

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

program. However, Leigh was forecasting that its bank borrowings would decrease from $30 million at the end of December, to $19.89 million by the end of March 1989.

139    Based on the information from Akerman, Musgrave drafted a submission to Plessey's main board, requesting an increase in Leigh's borrowing and guarantee limit to $30 million.  Board approval was granted on September 30, 1988.

140    On September 26, Greg Young at TD prepared a Corporate Credit Review of Leigh for the purpose of renewing the outstanding facilities, and placing the $10 million acquisition facility in Leigh's name, since it had previously been in the name of Plessey Canada. The total of Leigh's outstanding borrowings at the date of the review was $13.782 million.

141    In the CCR, the Leigh account was given the risk rating of 3A for all the facilities which. Noonan explained, de-noted a normal banking risk, with the A indicating an improving trend. It is significant that this was the same risk rating which had been applied by the bank to the Leigh operating line prior to the acquisition. The $10 million acquisition facil-ity had been given a lower risk rating of 2 when it was held by Plessey Canada, 2 being the same rating as the parent, Plessey Plc. In evidence, Noonan testified that the $10 million acquisition facility, as secured by the comfort letter, was still rated at 2, but that the practice and policy of the bank was that if a portion of the credit facilities of the borrower had a more adverse rating than any other, then the total account rating for the borrower would receive the higher risk.

142    Notwithstanding Noonan's evidence, it is clear that the risk rating applied by the bank to all the facilities was that of Leigh and not Plessey. Plessey Canada was merely a shell company incorporated for the sole purpose of the Leigh acquisition. Since it was not an operating company, there was no basis for a risk rating other than the risk of the parent. Once the acquisition loan had been placed in Leigh's name following the amalgamation, the risk was rated  as that of Leigh rather than Plessey. This conclusion is further reinforced by the risk rating given by the bank subsequently in the January 10, 1989 CCR. As is set out in more detail below, in that CCR the bank merged all the Leigh facilities into one operating line, released all its formal security and rested its exposure solely on the comfort letter. The risk rating of the account remained that of Leigh however. This risk rating is inconsistent with the bank's subsequently professed view that the comfort letter contained an obligation to pay or was in the nature of a guarantee.

143    Security was listed in the September 26 CCR as a registered general assignment of book debts and documenta-tion for the $5.4 million operating line was listed as a loan agreement containing normal representations, warranties and covenants. For the second line of credit, documentation was described as a letter agreement and the comfort letter from Plessey. Repayment was "As funds permit on demand (subject to contract maturities)."

144     In the remarks section. Young noted that Leigh's financing requirements had increased substantially due to the acquisition and subsequent amalgamation, and that Leigh had advised they would request an increased operating facility of $25 million. Young reported that the introduction of Plessey accounting principles had altered Leigh's balance sheet significantly, but recommended the risk as acceptable, despite the deterioration in Leigh's financial position. He made his recommendation, in part, on the basis that the lines were payable on demand and fully secured by receivables, and be-cause "facility #2 is backed by a strong comfort letter from Plessey and we are confident that Plessey will support Leigh as required". The review concluded that the  low pricing on the $10 million facility had been recommended by Credit Di-vision to ensure that the bank kept the Leigh relationship.

145    Although this CCR was intended to serve as Leigh's annual review, Noonan refused to approve it on that basis. He renewed Leigh's facilities only until October 31 and noted that based on a review of Leigh's balance sheet, outside se-curity such as a comfort letter would be required for the expected loan increase.

146     Noonan testified that he limited the renewal period of the facilities to Oct. 31 because the bank had only the

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

draft accounts, and he wanted to see a full set of audited financials for the company. Noonan said he specified a new comfort letter because the amount of the anticipated increase would exceed the value of the receivables over which the bank held a charge.

147      A subsequent Credit for Executive Circulation dated September 30, 1988, reviewed the Leigh facilities and concluded "our lines are fully secured by the assets of the company and supported by comfort letter from Plessey. We are confident that Plessey will support Leigh as required." This document was initialed by Brock, McDowell, and Noonan.

148      That same day, Young sent Noonan a memo requesting a temporary increase or bulge in Leigh's operating line of $1 million, until the company could provide the amalgamated financials. Young reported that the Leigh borrowings were at $15.8 million (an increase of $2 million over the past four days), some $400,000 in excess of the authorized limit. In recommending approval  of the bulge. Wendy Leaney, general manager, Corporate Banking Division and Young's immediate superior, described Plessey as a "valued connection." The request was approved, and initialed by both Noonan and McDowell.

149      On October 6, 1988, Brock, who was visiting the U.K., attended a meeting with Musgrave at Plessey, accompanied by Jonathan Exton, manager, corporate finance in the bank's London office. Musgrave explained that this sort of visit happened quite frequently. He said someone senior would visit from overseas and would be taken around to meet major customers or potential customers of the bank. In fact, requests for appointments like this were so common. Musgrave had instructed his secretary to limit them to two per week.

150      In his reporting memo following the meeting. Exton commented that the bank's last visit to Plessey had been more than two and half years earlier. Plessey had not been prepared to accept visits, despite repeated attempts, and so he was pleased to be able to make this call. Exton did not record any discussion about Leigh, but did note that Plessey intended to drawdown on the MOF sometime in the next month.

151      By the first of November, Leigh again requested a temporary increase in its loan facility, this time of $4 million. In a memorandum to Noonan on that date, Young stated the bank was still awaiting a copy of the amalgamated financial statements, which they expected to receive by mid-November. The total outstandings to Leigh at this point were $16.851 million. No explanation was provided in the memo regarding the need for an increase, however Young did  point out that the London office felt the Leigh relationship had assisted in the efforts with Plessey, and that Brock had recently called on the company. As well, he reported that Plessey's board had approved Leigh's request for an increased operating line of $30 million. Included in the description of security was the comfort letter.

152      In recommending the increase, Young's supervisor Wendy Leaney, noted that while the Leigh relationship was taking a long time to "regularize", this was the bank's only relationship with Plessey, although this latter observation was in error. Leaney explained in evidence that she did not object to the inclusion of the comfort letter under security, because she considered it part of the security package.

153      This particular credit did not go to Noonan, who was away from the office. Instead, it was reviewed by Sid Owen, senior vice president, Credit Division. Owen approved the requested increase until months end, but commented that the lack of presentation of reasonable figures was difficult to understand, and that they must be tabled if the bank was to consider restructuring the loan. He concluded cautiously "the combination of Plessey's support, albeit informal, and receivables should provide adequate protection but all must work to regularize this company's facilities by Nov 30/88. We must resist being dragged along."

154      When asked in evidence about the reference to informal support, Noonan said that, although he had not seen the

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

note at that time, the comfort letter in his view amounted to a quasi-guarantee. He explained that while a comfort letter might not be supported by a formal resolution and all the protective clauses that accompany a guarantee, he believed it could convey a quasi-guarantee to perform certain functions.

155      Meanwhile, on November 16, GEC announced a second hostile takeover bid for Plessey, this time in partnership with Siemens, a German company. The two companies formed GEC Siemens plc as a vehicle for the joint venture. As Musgrave explained, this was the second such hostile bid from GEC, and it was most certainly not welcomed by Plessey, which wished to remain independent. Also, Musgrave said there had been a long-standing adversarial relationship between the chairman of Plessey and the chairman of GEC. Exton at the bank's London office wasted no time in offering the bank's support to Plessey. He met with Denise Beard of Plessey's Treasury Department on Nov, 17. In evidence, Exton explained the purpose of the call was to develop further business opportunities with Plessey. In his report of the meeting, Exton described the purpose of the call as, among other things, to advise of the bank's willingness to support Plessey in any defence strategy against the hostile bid, and to follow up on amendments to credit facilities for Leigh. Exton reported that Plessey would put a freeze on meeting other bankers while the bid was on, and that they were Plessey's last visitors for the time being. He noted that the bank's pledge of support was greatly appreciated by Plessey, and that Plessey's main need was credit facilities.

156      Also in this meeting, Beard requested that the bank release its formal security over the assets of Leigh. Exton testified that he understood the request for release of security was related to the terms of the MOF, which restricted negative pledges on the assets of Plessey. He said it was his understanding that Plessey was concerned about its level of encumbrances, which was approaching the percentage allowable under the MOF, and consequently it wished to reduce them.

157      This contrasts with the evidence of Musgrave, who indicated it was merely Plessey's preference not to have security over the assets of its subsidiaries, as it restricted Plessey's ability to deal with these assets, and because if security was granted to one bank, others might wish to follow suit. He explained that the Deloitte's due diligence report on Leigh had omitted any reference to the security TD held over Leigh's assets. Plessey only discovered the security when preparing for the MOF, since as an appendix to the MOF. Plessey had to list all the secured assets in the group at the time of signing. He said the MOF was signed with the Leigh security in place and listed in the appendix. As well, he testified that Plessey was well within the allowable limit in secured assets contained in the MOF. As such, the terms of the MOF did not require that the security be released. However, when Musgrave became aware of the security, he asked Beard to try and have it removed. He said it was simply a matter of good housekeeping that the security be released.

158      To the extent that Musgrave's evidence conflicts with that of Exton regarding the reason for the requested release of security, I prefer the evidence of Musgrave. He was intimately acquainted with Plessey's policy on secured assets as group treasurer. Moreover, although Ms. Beard did not testify, she would have been aware that TD was a signatory to the MOF, and thus would have a copy of the MOF agreement. Accordingly, I conclude that Plessey requested the security be released simply because it preferred not to grant security over assets of the group, and not because it was required to do so by the MOF.

159      Leigh continued to experience cash flow problems and on November 18, Dean at Leigh advised A.G. Finnis, group taxation manager at Plessey, that the $3.5 million in interest owing on the intercompany debt, which had been due September 15, would not be paid before January. Leigh also advised that it would require a further increase in its borrowing limit. Musgrave responded to Finnis in a memo dated November 28 that a request would be submitted to the Plessey main board for an increase in the borrowing limit, in part to enable Leigh to pay the interest on the intercompany debt. In evidence however, Musgrave explained that payment of the interest had always been factored into Leigh's financing re-

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

quirements, and that the need for an increased borrowing limit stemmed from cash flow problems related to Leigh's contracts.

160    By November 28, Leigh was in an "out of order" position on its TD facility. This prompted Leaney to write to the senior vice president advising that Leigh's credit had been renewed to November 30, with an operating line increased to $10 million in addition to the $10 million acquisition loan. On November 29, Young advised Leigh's local account manager in Ottawa that a credit exposure for Leigh of $21 million had been verbally approved by the bank and was not to be exceeded.

161    In his record of the conversation, the account manager noted "the bank is concerned that the letter of comfort provided by Leigh Instruments' parent company (Plessey) will not be  honoured in the event of a successful hostile takeover from G.E. and Simmons [sic] group."

162    The credit authorization was followed by a memo from Leaney and Young to the Ottawa account manager on November 30, authorizing a temporary renewal of the Leigh facilities, with the operating line at $11 million for total of $21 million. The memo observed that the bank was still awaiting updated financial information, expected on December 5, before proceeding with Leigh's request for lines totaling $30 million. Leaney added a handwritten note that "in the interim, no security is to be released."

163    Leigh's cash flow difficulties did not abate however, and by December 12th Leigh was again in an out of order position, with a credit exposure of over $22 million. The branch manager in Ottawa called Leaney concerning this, and Leaney authorized the branch to manage the account over the $21 million which had been authorized. At the same time, she stipulated the Leigh position be reported to Corporate Banking Division on a daily basis. In evidence, Leaney said this was a judgment call she made, knowing Plessey had approved a $30 million limit, and that she knew it was only a matter of time before the bank received an increased comfort letter. Leaney conceded that it was beyond her authority to grant approval to manage the account above the authorized limit, and that she should have obtained approval from Credit Division. She said it was a judgment call she made, given that she had been delegated responsibility to manage the relationship, and she took it upon herself to give the approval. Leaney said she wasn't concerned about the account in view of the security package the bank had, but was annoyed at the way the account was being managed.

164    By December 16, the Leigh outstandings had risen to $24 million, and accordingly, Young and Leaney met with Noonan on that date and sought from him an exceptional approval of an increase in the Leigh limit to $25 million, to regularize the company's position on the books. Leaney advised Noonan that Plessey had approved a borrowing limit of $30 million, and that a credit review of Leigh was underway. Noonan approved the increase, on the basis that the credit review would be received in the week of December 19. Leaney and Young failed to provide the credit review within the stipulated time.

165    At Plessey, Musgrave was taking steps to have the Leigh borrowing limit increased even further, to $34 million, following a request from Dean on December 12. In his record of the conversation with Dean, Musgrave noted that the bank was "getting a little uneasy about the security for the local borrowings, in light of the GEC bid for Plessey," despite the $10 million letter of comfort and floating charge on inventory and receivables. Musgrave told Dean he would prefer to secure the bank's position by an increased letter of comfort, "matched at the same time by an elimination of the bank's security on the inventory and receivables."

166    Musgrave prepared a main board submission in the name of Walls, requesting that the Leigh borrowing and guarantee limits be increased from $30 million to $34 million. The need for the increase was attributed to delivery slippages and higher costs on the TACAN and SHINCOM programs. The submission noted that technical problems plaguing

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

SHINCOM had been resolved and borrowing levels were expected to fall to $29 million by March 1989. The increase was approved by Plessey's executive committee on December 21.

167    Meanwhile, at Leigh, steps were being taken to find a new president of the company. To that end, Barry Flower and John Shepherd, president and chairman of the board of Leigh, respectively, met with Frank Driscoll, an engineer with an army background and long experience working for the military and later in the defence industry. Driscoll ultimately was to become president of Leigh in August, 1989. In that initial meeting however, both Flower and Shepherd expressed concern to Driscoll about the performance of David Dean. Driscoll testified that they expressed reservations to him about Dean's ability to perform in his role as vice president of finance, in view of the growth they had planned for Leigh.

168    On January 10, 1989. Leaney and Young finally submitted the credit review Noonan had expected in the week of December 19. By this time, Leigh had again exceeded its authorized credit of $25 million and had outstanding $25.552 million. The purpose of the review was to cancel the separate operating line and $10 million acquisition facility, and replace them with a single operating line of $35 million. The credit was ultimately approved by McDowell upon Noonan's recommendation, however both imposed changes and conditions in the proposal as submitted by Young. Young and Leaney had proposed that the account risk rating remain at 3 A. however Noonan changed the rating to 3 B, denoting a stable rather than improving trend. I note at this stage that the prior $10 million acquisition facility was given a risk rating of 2 by the bank, based on the comfort letter. However this new facility, which was also to be supported by a comfort letter, was given a much lower risk rating though still normal. This reinforces my conclusion above that the risk rating applied by the bank was clearly that of Leigh rather than that of Plessey. As such, the risk rating was inconsistent with any belief on the part of the bank that  the comfort letter contained an obligation to pay Leigh's debts or amounted to a guarantee.

169    Security was listed in the credit review as the general assignment of book debts and floating charge debenture. Leaney had handwritten next to the description of security that it was to be released, however Noonan struck out her note and substituted "No! See below," in reference to his lengthy typewritten additional recommendations, set out below.

170    Under documentation, Young had listed the letter and loan agreements and comfort letter from Plessey Company. Beside the reference to the loan agreements for the canceled facilities, Leaney had handwritten "to be released." to which Noonan added "only when new security package is in place." To the reference to the comfort letter, Noonan added the handwritten notations: "for $35 million and in the same form, wording and sign off as existing letter, including final paragraph." and "with negative pledge by Leigh Instruments Limited." Noonan explained in evidence his reason for adding this condition was to ensure, if the bank gave up its security on these assets, that Leigh would not be in a position to place security on them in favor of another party.

171    In the conditions section, Young included a requirement that Plessey maintain a majority interest in the voting stock of Leigh. In evidence, Young explained that he included this condition in view of the GEC/Siemens takeover bid and the uncertainty surrounding the ownership of Leigh. Even though the comfort letter contained an ownership clause, he explained that he wished to be able to trigger the loan agreement in the event that Leigh was no longer a  subsidiary of Plessey. Young also included a condition that the intercompany debt be postponed in priority to the TD debt, to which Noonan added the word "formally." Attached as enclosures to the review were Leigh's audited financial statements for the period ending June 30, 1988, draft financials as at September 30 and a copy of the existing comfort letter.

172    Under use of credit and repayment, Young noted that while Leigh's balance sheet indicated some of Leigh's debt should be "termed out" they were prepared to increase Leigh's operating line based on the comfort letter from Plessey,

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

noting as well that the facility was payable on demand. In the security section. Young commented that Plessey had requested that the security be released, since it was Plessey's policy that all its debt and that of its subsidiaries be unsecured. He recommended acceding to this request in return for the comfort letter. In fact, Young's observation on this point was in error, as Musgrave testified. I accept Musgrave's evidence that Plessey did, on occasion, provide guarantees and other security where circumstances warranted. In support of this finding. I note that in April 1989, Musgrave issued a memo permitting a creditor of Micronav to maintain security over Micronav's assets in the amount of $700,000. Musgrave explained in evidence that there were good commercial reasons in that instance to leave the Micronav security in place.

173    In the section on risk assessment. Young observed that the six month delay in the TACAN project had adversely affected Leigh's cash flow and earnings to tune of about $5 million per month. He stated that the acquisition by Plessey and related financing has had a "major negative impact on Leigh's financial position" and that of the $81 million in debt carried  by Leigh, $71 million of it was intercompany debt. "Clearly Leigh cannot support this level of debt on its own and consequently this credit depends on the support of Plessey," Young stated, noting that Plessey was prepared to provide a "strong" comfort letter similar to the one attached, and that the risk rating for Plessey itself was 2-low risk. He added that the bank's relationship with Plessey was growing and the Leigh account must be considered in that context, noting again that Plessey was the target of hostile takeover bid.

174    Leaney recommended the credit be approved, although she observed that "there is no question that the Plessey support is required here and on that basis, credit is recommended."

175    Noonan appended lengthy comments to the credit review and was clearly cautious about the risk. In respect of the request to release the security, he noted that the existing security predated the negative pledge in the MOF and should not be released until acceptable security package was in place. Noonan also observed that the existing comfort letter was "indeed strong," but stipulated that Corporate Banking Division request subordination of the intercompany debt to the TD facility. He recommended the credit on the basis, among other things, that the comfort letter be in the "same form, wording and sign-off as the existing letter, particularly paragraph 3". In cross-examination, Noonan said that although the facility was for an increased amount, and although it was now an operating line, rather than a short-term acquisition loan, he did not see any need to change the wording of the comfort letter, which was substantially the same as comfort letter number one.

176    Noonan also noted in the credit review that if a negative pledge was obtained from Leigh he would be flexible on the debt subordination. He retracted this suggestion in handwriting however, in light of the comments of McDowell, who ultimately approved the credit. Noonan testified that he added his own written retraction because he wanted to be absolutely sure the account manager realized that McDowell had overruled and wanted a full subordination of the intercompany debt.

177    McDowell noted "it is preferable to have full subordination of the inter-company loan because Leigh will be in no position to repay for some time and in the absence of a call on assets, subordination adheres to spirit of the comfort letter." McDowell testified that it was not his practice to review the documentation accompanying a credit review, and that responsibility rested with the senior vice president who recommended the credit, in this case Noonan. McDowell said he had tremendous respect for Noonan and trusted him implicitly. In the board sheet remarks relating to the CCR, it was noted in reference to the comfort letter: "We are confident that Plessey will support Leigh as required."

178    In evidence, Noonan testified he felt the comfort letter was strong, in part because it was signed by people with authority to commit the company, and because in his view the third paragraph, coming from a company with the stature

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

to fulfill its obligations, was a clear commitment to the bank that they would see that Leigh was in funds to repay the amounts due under the loan facility. He said the reputation of Plessey was significant to him, and that with its standing the bank could believe in what Plessey said.

179    Accordingly, the bank agreed to release its security and rest its risk on the comfort letter, without stipulating any changes to the wording of the comfort letter, notwithstanding that the form and substance of the letter had been initially approved in the context of a short-term acquisition facility. I must infer from all of this evidence that the bank made this decision based on a desire to foster its relationship with Plessey, as noted in the CCR.

180    On February 2 1989, less than a month after the credit was approved, and before a new facility agreement was in place, the English Court of Appeal released its decision in *Kleinwort Benson Ltd. v. Malaysia Mining Corp. Bhd.*, [1989] 1 All E.R. 785 (Eng. C.A.) (leave to appeal to the House of Lords refused), overturning the trial decision and refusing to enforce payment on a letter of comfort. Noonan testified that he was aware of both the trial and appeal decisions, but that the appeal decision did not change his approach to comfort letters, as he had always practiced a policy of handling comfort letters with caution.

181    At this point, TD did not have an updated facility agreement to cover the outstanding Leigh borrowings. Indeed, the bank had not obtained a facility agreement with Leigh since its amalgamation with Plessey Canada following the acquisition, and the most recent facility agreement had been executed by Plessey Canada the previous April regarding the acquisition loan. The other facility agreement outstanding was for the $5.4 million Leigh operating line, which was dated March 1, 1988, and also predated the acquisition. On February 9, Dean forwarded to Beard at Plessey a proposed facility letter received from TD, which contained a clause requiring the subordination of the intercompany debt and attached a draft resolution to that  end. Plessey did not wish to enter into this agreement. Musgrave explained in evidence that Plessey did not wish to subordinate the debt for reasons similar to their reluctance to grant security, and that if subordination had been agreed to, it would restrict Plessey's ability to deal as it liked with the capital structure of the group.

182    On the January 10 CCR, Young made a handwritten note on the last page, which he dated March 6 1989, and which read: "Plessey has refused to provide postponement of the intercompany loan as they view comfort letter as tantamount to a guarantee, which it is. In consultation with WAL, we have agreed to waive that condition." In the body of the CCR, beside the reference to the request for postponement. Young wrote "Plessey has refused, since comfort letter is very strong. We waived postponement."

183    In evidence, Mr. Young testified that he wrote this note following a telephone conversation with Ian Musgrave, and that someone from the bank's London office was also on the line, although he could not recall who. Young said Musgrave told him the bank did not need the postponement, that Plessey viewed the comfort letter as tantamount to a guarantee, and that Musgrave's words were exactly as he had recorded them. He said the words "which it is" reflected his own view, arrived at after consultation with the bank's in-house counsel, Norton. This was the extent of Mr. Young's recollection.

184    Ms. Leaney testified that Young told her about this conversation immediately after it took place. She said that she and Young had discussed the question of the postponement, and that she  had approved the decision to waive that requirement. I note that this was despite McDowell's condition that subordination be obtained.

185    This conversation, alleged to have taken place between Young and Musgrave, was a contentious issue in this trial, particularly the statement attributed to Musgrave that the comfort letter was "tantamount to a guarantee". Mr. Musgrave testified that he had no recollection of any conversation with the bank, apart from the call in spring of 1988, when he advised that the first comfort letter would continue to apply following the amalgamation. He said specifically he could

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

not recall ever discussing the meaning and intent of the comfort letter with the bank, and that he did not hold the views expressed in the note. Musgrave conceded on cross-examination that it was possible he spoke to Young and told him there would be no postponement of the intercompany loan, although he could not recall doing so.

186    Musgrave said that comfort letters and guarantees were quite different, and that he would be "amazed" if anyone at Plessey had said that a comfort letter was "tantamount to a guarantee". He elaborated that he and Beard had developed a standard response to the question of what a comfort letter meant, which was to tell anyone who asked that, as a matter of fact, in the entire time he had been at Plessey, the main board had never walked away from a comfort letter. He said the statement was intended to give the banks a degree of comfort, but at the same time they would make it quite clear as part of the response that the board saw comfort letters and guarantees as something quite different. Musgrave said he "certainly" didn't believe that the Leigh comfort letter was tantamount to a guarantee. In cross-examination, he had to concede that since he had no recollection of such a conversation, it was possible the conversation took place, however he thought it was highly unlikely.

187    I have considered the evidence of both Mr. Young and Mr. Musgrave on this point, and I prefer the evidence of Mr. Musgrave. Mr. Musgrave was group treasurer of Plessey, and used to dealing with banks and bank security on a daily basis. He was intimately acquainted with Plessey's policy and views regarding comfort letters. He had no recollection of saying a comfort letter was tantamount to a guarantee and thought it was highly unlikely that he had done so. Such a statement was contrary to his set response. Further, he testified that it was his practice, when he had dealings on a file in which someone else was involved, to dictate a note concerning the conversation. Musgrave said he had no recollection of making such a note, nor was he aware of the existence of one.

188    There is no reference in Young's note to Musgrave, nor indeed to a telephone call. Jonathan Exton, formerly of the bank's London office, gave evidence in this trial. He was the contact person for Plessey, and Young testified it was "a reasonable assumption" that Exton was the other person on the call. Yet Exton testified he could not recall any telephone conversation with Musgrave up to March 6, 1989, nor could he recall any conversation jointly with Musgrave and Young. No one else was ever identified as being the person from the bank's London office on the line.

189    Mr. Young himself, had very little recollection of this conversation, apart from the note.  He conceded in cross-examination that the note was not contemporaneous with the phone call, but was made on March 6, 1989, following a conversation with Ms. Leaney. He could not recall how much time had elapsed between the phone call and when he wrote the note. The plaintiff did not produce any contemporaneous note of the phone call. Further, the note was made to record the decision which Young and Leaney had taken it upon themselves to make, to waive the requirement that Plessey postpone the intercompany debt, despite the strong comments from McDowell.

190    Finally, Young never again referred to the phone call, or to Plessey's alleged description of the comfort letter as tantamount to a guarantee, in any subsequent bank documentation. Nor did he refer to it in any other communication, written or oral, with Plessey. This description, as attributed to Plessey, would have been significant, and would certainly have been recorded in internal bank documents or raised by the bank upon renewal of the comfort letter. However, there is no evidence that the bank ever made any further reference to the alleged statement, although it would have been in the bank's interest to have done so, had the statement actually been made. Since it is improbable that such a key statement, if made, would not have been referred to again in some fashion, the allegation lacks any ring of credibility. I conclude that the conversation between Young and Musgrave and the unnamed third person, did not take place, and that Musgrave did not state to Young that the comfort letter was tantamount to a guarantee. I find that TD did not give up its security, nor did it make any further advances to Leigh after this date, on the basis that such a statement had been made or was purported to have been made by Musgrave.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

191      In the meantime, unbeknownst to the bank, Plessey was considering an alteration to Leigh's capital structure. In a February 16 memo to Musgrave, Alan Jones the managing director of PESL, expressed concern about the capital structure of Leigh and the high level of interest-bearing debt which had been imposed upon Leigh for tax reasons. He informed Musgrave the government, as Leigh's main customer had expressed concerns about Leigh's long-term viability in the context of the debt load. At this point in time, Leigh had still not paid any of the interest owing on the intercompany debt from September 15, 1988, despite the increases in its bank line. Musgrave testified that in this period, Plessey began to realize that the financial structure of Leigh was not appropriate. He said that at some point in February or March, Plessey decided to waive any further payments of the interest owing on the debt, and on April 1, converted the intercompany debt into preference shares. He explained the debt had been put in place initially, to offset taxation of Leigh's profits, however Leigh was not generating enough profit to cover the expense. Conversion of the debt to equity removed the burden of the interest expense from Leigh.

192      This conversion essentially supplied the bank with the subordination they had requested, since the conversion of debt to equity removed the threat to priority of the bank's loan posed by the intercompany debt. Musgrave testified, however, that the decision was taken purely for tax reasons, and not in response to the bank's request for subordination.

193      At the same time, TD was continuing its efforts to generate business with Plessey on other fronts. On March 16, Exton met again with Musgrave and Beard, and presented them with  a revised facility letter for a short-term loan to Plessey of £20 million. At this meeting, Exton also tried to interest Plessey in participating in a Canadian commercial paper program in connection with Leigh. Exton noted Plessey was interested in such a program, but wished to wait until the GEC/Siemens bid situation was over. Exton discussed the bid with Beard and Musgrave and noted that "the tables may be turning in favor of Plessey." They also discussed the Leigh account briefly. Leigh and TD had not yet agreed upon terms for the new facility agreement and Plessey requested a revised copy of the facility be sent to them.

194      On March 29, Young forwarded a fresh proposed facility to Exton, who in turn sent it to Beard the following day. By this point the Leigh borrowings were about $29 million and the bank still did not have a facility in place. Moreover. Young conceded on cross-examination that Leigh was well in excess of its authorized credit. Although the January 10 CCR had been approved, the conditions in it had not yet been fulfilled and Young agreed the approval was not operative. The prior authorization was only for $25 million, some $4 million less than the amount outstanding.

195      The revised facility letter did not contain a subordination clause. It provided an operating line of $35 million, payable on demand, and noted that the existing security was to be released upon receipt of a new comfort letter. The facility contained a negative pledge against Leigh's assets and requirement that Plessey maintain a majority interest in the voting stock of Leigh. The facility agreement also contained a reporting clause, requiring Leigh to provide the bank with audited financial statements within 90 days of Leigh's fiscal year end unaudited financial  statements within 30 days of the end of each quarter.

196      On April 4, Beard responded by sending Exton a proposed draft of the comfort letter, asking him to confirm that its content was acceptable, and that the security held by TD would be released as of March 31, 1989 (Plessey's year end and the date proposed for the comfort letter). Exton wrote Beard on April 10, enclosing a copy of a letter from Young confirming that the draft comfort letter was acceptable to the bank and that the bank would treat the Leigh facility as unsecured as of March 31, provided that Leigh accepted the proposed credit facility and that the letter of comfort was dated the 31st March.

197      On April 20, Beard sent Exton an executed copy of the letter of comfort, signed by Walls and Huntbatch and dated March 31. This, the third letter, stated:

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

To this is to confirm that The Plessey Company plc has full knowledge of the facility of C$34,000.000 (Thirty four million Canadian dollars) which has been granted by Toronto Dominion Bank to Leigh Instruments Limited.

Leigh Instruments Limited is currently a wholly owned subsidiary of Plessey Overseas Limited which is a wholly owned subsidiary of The Plessey Company plc. No change in the ownership of Leigh Instruments Limited or Plessey Overseas Limited is contemplated and we undertake not to reduce our share-holding during the term of the above mentioned facility without prior notification to yourselves.

It is our policy that our wholly-owned subsidiaries, including Leigh Instruments Limited, be managed in such a way as to be always in a position to meet their financial obligations, including repayment of all amounts due under the above facility.

This letter replaces our letters of 20th April 1988 and 1st August 1988.

198        Exton testified that when he received the letter, he simply checked to ensure the letter was for the right amount, and then forwarded it to Young in Toronto. He said he took no steps to determine whether the letter was acceptable to the bank, because this was the responsibility of the account manager. This proposed facility letter was never executed by Leigh.

199        Four days later, on April 24, Leigh received its audited financial statements for the year ending March 31, 1989, which showed a profit for the year, before taxes and one extraordinary item, of $4.659 million. The net income for the period was the same figure.

200        Meanwhile, the GEC/Siemens bid for Plessey was proceeding apace. Plessey had obtained an injunction to prevent GEC and Siemens for making the offer to its shareholders in December, however the injunction was overturned and GEC/Siemens issued the offer in late December. The GEC/Siemens bid document indicated that the existing Plessey businesses were intended to be divided between GEC and Siemens and that GEC intended to take a majority interest in Plessey's North American defence electronics industries. The offer was referred to the British Monopolies and Mergers Commission in January, and in April the commission ruled the bid could proceed. The Commission stipulated, however, that certain of the Plessey businesses could not go to Siemens, a German company, for security reasons. Similarly, UK monopoly restrictions prevented certain of the businesses from going to GEC.

201         In response, Plessey continue to resist the bid. In a May 2 memo to all Plessey's businesses, managing director Stephen Walls stated:

As part of our defence we will almost certainly be publishing a profit forecast to demonstrate the financial benefits starting to flow from strategies we have adopted.

The provisional budget does not yet represent a sufficiently strong performance to fully achieve our objectives. The timing of our forecast requirements is as yet unclear but it is vital that we use forecast to be submitted with April results as the first opportunity to add profit improvement plans onto the budget to create a better platform for our bid defence. Would you please ensure, therefore that profit forecasts and improvements are closely scrutinized to enable us to maximise performance.

Musgrave said that while he did not recall seeing this memo at the time, he would expect it to be sent to stand alone subsidiaries like Leigh.

*The Fourth Comfort Letter and the Bulge*

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

202    By the 13th of June, Leigh was again experiencing financial difficulties. Dean contacted Musgrave and requested authorization for a further $4 million bulge in the bank line. That same day, Musgrave sent a memo to Walls asking for approval of "an emergency increase in the borrowing limit". Musgrave explained in evidence that although he could not recall the precise reason for the urgency, the request had to be turned around very quickly. He said Dean would have needed the money fairly rapidly, and could not wait until the next scheduled board meeting for approval of the increase. Walls approved the request, and Beard informed Dean on June 15 that the borrowing and guarantee limits had been increased by $4 million to $38 million. The increase was approved to the end of August only, at which time it would revert back to $34 million.

203    Having received Plessey approval, Dean then wrote to Young at TD and requested the $4 million bulge, leading Young to prepare a CCR of Leigh dated June 15. Young described the submission as urgent and requested a decision as soon as possible. The purpose of the CCR was to lower the amount of the operating line from $35 million to $34 million, which was the amount supported by the third comfort letter, and to obtain approval for a temporary $4 million line until August 31st. The risk rating remained unchanged at 3B (normal risk). In the remarks section, Young noted that Leigh had missed milestones on both the TACAN and SHINCOM contracts, with a consequent impact on cash flow leading to the bulge request. Young pointed out that the bulge had been approved by Plessey, but that Plessey was reluctant to amend the comfort letter for such a short period. However, "Plessey has agreed to provide a new comfort letter if outstandings are not back in order by August 31/89." Young then observed that the general assignment of book debts and floating charge debenture over Leigh's assets had not yet been released, despite the fact the bank had received the new third comfort letter from Plessey, and that the security would not be released until the outstandings were back in order. He noted that TD London confirmed Plessey's account rating of 2 - low risk - and concluded "believe the risk is acceptable." Leaney recommended approval of the credit, which was then forwarded to James Laitner, senior vice president, Credit Division. Although he recommended approval as well, he stipulated that the security was not to be released until the bulge was repaid or a new comfort letter received for the increased amount. The credit was ultimately approved by William Brock, the executive vice president, Credit Division, without comment.

204    On June 26, Young sent Noonan a memo updating him on Leigh's credit situation and the condition that security not be released. He reported that in-house counsel had advised TD would be in a conflict of interest if it retained the security, given that TD had signed the MOF containing a negative pledge, and given the agreement in writing to release the security. Noting that Plessey had agreed to provide a new comfort letter if the bulge was required beyond the end of August, he stated "We have a good relationship with Plessey and believe the risk is acceptable. Although the hostile takeover bid by Siemens and GEC is a concern, it will likely take beyond Aug. 31/89 to complete or resolve. We request that the condition for the approval of the bulge, that our security not be released, be waived."

205    Leaney agreed, although she observed "clearly a higher comfort letter is the best solution but for relationship reasons would go along." Noonan added his own comments: "The new comfort letter is certainly strong & I am told by CBD actually boarded by Plessey Co PLC." He added that the bulge was clearly to the end of August only, but pointed out that the MOF did permit encumbrance of 10 percent of Plessey's group assets and that the bank security predated the MOF in any event. He concluded that he would agree to release the security "if it is the Co *request* to do so." The decision to release the security was alternately taken by Brock: "We have agreed to release the security and would proceed to do so, resting the exposure on the comfort letter." An executive review sheet regarding the release of security was initialed by Noonan, Brock, McDowell, bank president Robin Korthalls and Thomson, the chairman and CEO of the bank. It noted the risk rating of Leigh at 3B (unchanged) and specified the audited year-end financials be obtained prior to Leigh's annual review date of September 30, 1989. I note that Young's letter sent to Beard on April 10 stated the security would be released when the comfort letter was delivered and the credit facility accepted by Leigh. This latter condition had not yet been met.

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

206      On June 27, Young sent a new facility letter to Leigh. At this point, the most recent executed facilities remained that accepted by Plessey Canada in April, 1988 and the Leigh facility executed March 1, 1988. The facility offered an operating line of $34 million, was payable on demand, and listed security as nil, with a note that the existing security was to be released. The facility contained the same terms and conditions regarding Plessey majority interest in Leigh's voting stock and Leigh's financial reporting requirements as had been contained in the last proposed letter. In a separate letter, Young offered the $4 million temporary bulge, on the understanding that Plessey would provide a further comfort letter if the funds were required past the end of August. Both facility letters were accepted by Leigh the same day.

207      In London, Exton wrote to Beard on June 29, enclosing a draft letter of undertaking for Plessey to sign regarding the possible extension of the comfort letter at the end of August. Musgrave executed the letter without any change to the draft:

> We are writing to confirm our agreement with Mr. Michael Walzak on the telephone last week with respect to the temporary increase in the operating facilities for Leigh. We are aware that Leigh requires its operating line to be increased from C$34 million to C$38 million for a period of two months. Since at this time this is only a temporary requirement we will not revise the Letter of Comfort (dated 31st March 1989) to reflect the increased amount. However, should Leigh require the higher level of operating facilities beyond the end of August 1989, then The Plessey Company plc undertakes to amend the Letter of Comfort accordingly.

Exton forwarded the letter to Young on June 30th. The $34 million guarantee limit and $38 million borrowing limit for Leigh received retrospective approval of the Plessey main board on July 28.

208      On July 8, Leigh received its unaudited first-quarter financial statements for the quarter ending June 30. These financials showed net earnings for the quarter of $131,000 before deductions for taxes and an internal Plessey Group payment. After deductions, the financials showed a loss of $181,000 the financial statements included a quarterly forecast to the end of the fiscal year, projecting net earnings as at March 31, 1990 of $8.379 million. The information contained in these financial statements was sent to the bank pursuant to Leigh's reporting obligations, by letter of July 21, 1989, together with the executed facilities for the $34 million operating line and the $4 million bulge.

209      By the end of July however, Leigh was showing an increased loss. In the Plessey corporate finance report for the month of August, Leigh was listed under the heading "major loss makers". Leigh had budgeted a profit of £1.246 million for the period to the end of July, but in fact reported a loss of £326,000. Hence Leigh reported a negative variance from its budget of £1.572 million. The Plessey corporate finance reports were produced monthly by the Plessey treasury department. In evidence, Binnie Sammon, group chief accountant at Plessey, testified that the corporate finance reports were distributed to a restricted list of recipients, including Walls, Musgrave and Huntbatch. Musgrave testified that while Leigh was showing a loss in that period, there were other subsidiaries with worse numbers, and there was nothing in the report which would have caused him to get "too excited".

210      On August 17, GEC and Siemens released their proposals for the Plessey businesses in the event that the takeover was successful. David Newlands, the GEC finance director, explained in evidence that there were two components of the Plessey businesses which particularly interested GEC and Siemens; the telecommunications aspect of the business and the defence electronics aspect. He said the original plan had been for GEC and Siemens to operate the Plessey businesses in partnership, however the Monopolies and Mergers Commission in Britain refused to permit Siemens to participate in certain defence businesses and refuse to allow GEC takeover other of the Plessey businesses for monopoly reasons. The conditions imposed by the commission led to the GEC/Siemens final offer document on August 17. In that document, GEC and Siemens set out their plans for restructuring Plessey and indicated that Leigh was inten-

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

ded to be wholly-owned by GEC if the bid was successful.

211     In TD's annual Corporate Credit Review of Plessey, dated August 25, the bank noted that  a £20 million facility and the MOF were still in place, but had not been drawn upon. The CCR of Plessey also contained an update on the status of the takeover bid, however Brock noted "financial covenants protect if there were a takeover and restructuring."

212     Frank Driscoll had assumed his new role as president of Leigh on Aug. 8, and on August 23 had a short meeting with Young and Leaney, although he described it as a social, get acquainted meeting rather then a business meeting.

213     On August 29, Pat Smith of the Leigh finance department contacted Beard at Plessey and requested that the $4 million bulge be extended past the end of August to the end of November. The Leigh outstandings at that date were $34.8 million. The next day, Young relayed to Noonan a request for extension of the bulge to the end of October.

214     Young recommended approval of the request provided Leigh supply their written acknowledgment, and added that he did not believe it was necessary to obtain a new undertaking from Plessey. He based this recommendation on the fact that Leigh's balance sheet had improved dramatically with the conversion of intercompany debt, and noted that he and Leaney had met with Driscoll and believed this gesture would demonstrate the bank's support, thus generating good-will and new business. Although he referred to the hostile takeover bid, he erroneously stated that it was unlikely to be completed before October 31st. Young noted in conclusion that the potential market for Leigh's MLS program was $300 million in Canada and $4 billion worldwide. The request was reviewed by Owen, who recommended the bulge be extended as  long as Plessey was notified of the extension and Leigh formally requested it. Brock approved the extension without comment.

215     Meanwhile, several weeks earlier Musgrave had informed Walls he was leaving Plessey at the end of August. Notwithstanding that the bank had not requested a further comfort letter relating to the bulge extension, Plessey nevertheless prepared one on its own initiative, in substantially the same form as the earlier letters. One of Musgrave's last acts before leaving the company was to review a draft of this letter. The comfort letter was executed by Walls and Huntbatch on behalf of Plessey and sent to Exton, who faxed it on to Young on September 7, with the explanation that "Plessey appreciated that the Bank was not requesting a revised Letter of Comfort, but as they had promised one, if the facility was required beyond August, and in view of GEC/Siemens bid, it was considered appropriate to do so." Exton testified he simply checked the amount and that the document was a comfort letter before forwarding it to Young. The fourth comfort letter stated:

> This is to confirm that The Plessey Company plc has full knowledge of the facility of C$38,000,000 (Thirty eight million Canadian dollars) which has been granted by Toronto Dominion Bank to Leigh Instruments Limited.
>
> Leigh Instruments Limited is currently a wholly owned subsidiary of Plessey Overseas Limited which is a wholly owned subsidiary of The Plessey Company plc. No change in the ownership of Leigh Instruments Limited or Plessey Overseas Limited is contemplated and we undertake not to reduce our share-holding during the term of the above mentioned facility without prior notification to yourselves.
>
> It is our policy that our wholly-owned subsidiaries, including Leigh Instruments Limited, be managed in such a way as to be always in a position to meet their financial obligations, including repayment of all amounts due under the above facility.
>
> This letter replaces our letters of 31st March 1989 and 30th June 1989.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

*The GEC Siemens Takeover*

216      On September 8, 1989 the GEC/Siemens offer to purchase the shares of Plessey was accepted by more than 50 percent of Plessey's shareholders, and the hostile takeover of Plessey succeeded. GEC and Siemens ultimately paid £2.2 billion for Plessey shares. On September 22nd the new owners held a Plessey board meeting, at which they elected a new Board of Directors composed of representatives of GEC and Siemens, including GEC finance director David Newlands. Shortly following the takeover a great many of the Plessey senior management left the company, either having resigned or having been terminated by the new owners. Stephen Walls left on October 6th and Denise Beard left on November 3rd.

217      On September 28, each of GEC and Siemens put forward a candidate for managing director of Plessey. The two nominees were to work together to manage Plessey from that date forward. Simon Weinstock was appointed by GEC and Phillip Gerdine by Siemens. Gerdine testified that from the outset he and Weinstock proceeded with several goals in mind. He said they intended to separate the Plessey businesses into units to be acquired by GEC and by Siemens. Those businesses remaining in the Plessey "rump" following this "hive-up" of the Plessey companies were to be liquidated. Gerdine explained that GEC and Siemens had purchased Plessey for about $4.5 billion U.S. and held the interest roughly 50-50. He stated that the hive-up exercise was a two-step process. The first step was that GEC and Siemens had to decide what companies would go where and then, how much the companies were valued at. He said allocation of the companies fell into two categories; those mandated by the U.K. government and those which were discretionary. Because it was a hostile takeover, the discretionary companies had been allocated preliminarily on the basis of very little information. Gerdine said GEC and Siemens put in place teams of people to determine the fair value of Plessey's assets, and each of the subsidiaries was subject to a review based on revenue earnings and net book value. Those values then had to be reconciled within the $4.5 billion purchase price.

218      Gerdine testified GEC and Siemens each took responsibility at the outset for the companies intended ultimately to be held solely by them. He said he took responsibility for the Siemens companies, Simon Weinstock for the GEC companies, and companies remaining in the rump were administered jointly. At the time of the takeover, Plessey had in place a set of rules and procedures governing financial reporting of the subsidiaries to the parent, and the new owners left those in place for the purpose of public filing of Plessey's financial reports. Each of GEC and Siemens applied additional internal financial reporting requirements in accordance with their respective practice.

219      News of the takeover was greeted by Exton as a further opportunity to develop business.  He forwarded the original of the fourth comfort letter to Young in mid-September with the note: "As you know the GEC/Siemens bid for Plessey has been successful, and we now hope to develop our relationship with GEC. Hugh Rising and I will be visiting David Newlands, Finance Director, on 3rd October, 1989 and if you have any items for discussion, please advise me."

220      Almost immediately, the bank began to consider the effect of the takeover on Leigh. Ernest Mercier, executive vice president of the Corporate Banking Division contacted the bank's Montreal office which in turn contacted Canadian Marconi, which was owned 51 percent by GEC. A Montreal based vice-president of Corporate Banking wrote to Mercier on September 13, noting that CMC had accepted in principal the notion of a merger with Leigh, in view of the similarity in their product lines.

221      On September 19, Mercier had an executive luncheon with Leigh president Frank Driscoll, the purpose of which was to solicit any business opportunities arising out of the takeover. In a briefing memo prepared in advance of the luncheon, Young advised Mercier of Leigh's contract related cash flow problems and of the Plessey comfort letters. Young pointed out the possibilities for merger with CMC, and repeated the market estimates for the MLS system. He re-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

minded Mercier that TD was Leigh's only banker, and that CMC did all its banking with the Royal Bank. He concluded that the London office had been unable to establish a meaningful relationship with GEC and "In addition to identifying opportunities arising out of the Plessey acquisition (e.g. fairness opinion on Leigh), we have a substantial interest to protect." Driscoll testified that when he met with Mercier, the discussion focused on the prospects for Micronav, and on the future of Leigh's banking relationship with TD in light of the possible CMC merger. The comfort letter was not discussed.

222     Driscoll testified that Leigh was aware it was intended to be wholly-owned by GEC fairly shortly after the takeover, if not earlier. He said that Dean attended a briefing on GEC accounting policies in England in late September or the first week of October.

223     The day after Driscoll's lunch with Mercier, on September 20, 1989, Young prepared a new CCR of Leigh in order to renew the existing facilities on the same terms, and to downgrade Leigh's risk rating from 3B to 4. In the remarks section, Young noted the recent acquisition of Plessey by GE Siemens and that Leigh was slated to go to GEC. "Although we were aware of the hostile takeover bid by GEC/Siemens, we are comfortable with the quality of their credit and hope to use our positions with Leigh/Plessey to develop a relationship with GEC." Young describe the uncertainty about Leigh's ownership and possible merger with CMC as a weakness however, leading to the revised risk rating of 4.

224     This CCR also mentioned the contract delays and missed milestones on SHINCOM and TACAN, observing that "A restructuring of the company's debt is clearly required". Young speculated that in view of GEC's cash resources and Leigh's tax position, it was likely that Leigh would receive an equity injection to pay out the bank. Young elaborated in evidence that Leigh had a number of research and development tax credits and carryforwards and that they were not taxable as a result. In that situation, he said it made sense for a parent with taxable cash to put in into the nontaxable subsidiary. He testified he vaguely recalled discussing this issue with Dean. The CCR concluded that TD Montreal would solicit opportunities arising out of the Plessey acquisition, including the possibility of providing a fairness opinion to CMC. Young explained in evidence that given 49 percent of CMC was publicly held, a fairness opinion on any acquisition or merger with Leigh would be required.

225     Leaney reviewed the CCR and recommended renewal of the facility but suggested, while the risk was increasing, that a rating of 3C was more appropriate, and Young agreed. Noonan in turn recommended the rating remain at 3 B in light of the "strong and renewed comfort letter" and the intercompany debt conversion. He testified that he reviewed the attached comfort letter at this time. McDowell agreed and authorized the credit.

226     An October 2 Credit for Executive Circulation distributed to senior bank executives regarding the Leigh credit misstated the terms of a comfort letter, describing it as at commitment "to maintain ownership and to manage Leigh Instruments in such a way as to be always in a position to meet their financial obligations."

227     Just two weeks after the new Plessey board was in place, on October 3, Exton and Rising met with Newlands and reported GEC's intention to integrate Plessey's operating subsidiaries into its own businesses. Exton pointed out the bank's relationship with Leigh and observed that Newlands was familiar with Leigh's tax position and low profits, however Newlands advised refinancing of Leigh was premature. Exton noted GEC had not yet decided whether to sell Leigh to CMC but that Newlands noted the bank's interest in providing a fairness opinion. As follow-up, Exton advised that the bank should maintain close contact with Leigh and CMC in Canada, and attempt to develop a relationship with GEC Treasury Department in the U.K.. Newlands testified they did not discuss the Leigh comfort letter.

*Fall 1989 and the Fifth Comfort Letter*

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

228     Back at Leigh, by mid-October Driscoll had received some financial results for the month of September, which revealed a further deterioration. In September, shortly after arriving at Leigh, Driscoll had initiated an ETC review of all Leigh's SHINCOM and TACAN contracts in progress to estimate the cost of completing the contracts. The review involved the calculation of the ETC or estimate of the cost of completing the contract. That figure, combined with the actual cost incurred to date, would generate an estimated cost at completion of the contract of EAC. The EAC would then be compared to the contract price to measure the financial success of the contract. Driscoll testified that to the extent that a business had a fixed price contract, periodic calculation of EAC's was an important indicator of performance.

229     Driscoll explained that he attended reviews of Leigh's programs in August and became aware that the actual cost spent on SHINCOM had already exceeded the most recent EAC for that project, and there were several months left before completion of the contracts. He said this information, combined with the fact that there had not been a rigorous ETC review since early in the year, led him to implement the review. He said quarterly ETC reviews were ordinarily standard on larger contracts. When he arrived at Leigh, he said the company had about 20 major contracts and that the SHINCOM and TACAN programs comprised the larger part of the business.

230     David Newlands, finance director of GEC, visited Leigh in person on October 20, 1989, accompanied by David Rickard, finance director at GEC Marconi to learn more about the new acquisition. In preparation for the meeting, Newlands received a briefing memorandum on Leigh prepared by Colin Justice, divisional finance director at PESL, who was at Leigh participating the fair value exercise for the GEC Siemens hive up of Plessey. In addition, on October 2nd, very shortly after the takeover, Newlands had reviewed the opening balance sheet for Leigh incorporating the purchase accounting adjustments implemented by Plessey as of April 5.

231      Justice's briefing memo to Newlands noted the difficulties with SHINCOM and expressed the concern that Leigh's performance might not be technically adequate. He pointed out SHINCOM had failed to meet some technical tests in the contract, giving rise to a need for additional program management and engineering expense. Justice observed that this was an area where they should be highly conservative in the fair value exercise. Newlands explained in evidence that accounting provision should be made for the contract risks in the context of the fair value exercise.

232      The Justice memo pointed out that there had been major program deterioration for both TACAN and SHINCOM and that the EAC's had worsened substantially. Regarding SHINCOM, Justice wrote that the product was not "technically secure and underwritten". Newlands testified that this statement put him on notice that all the financial information about the project was open to "extreme doubt." He said if the program was not technically secure, it could not produce a reliable EAC. The memo showed a forecast loss for the year ending March 1990, of $2.316 million.

233      The Newlands and Rickard visit took place in Leigh's Kanata, Ontario offices on Oct. 20. Leigh prepared a presentation for Newlands and Rickard on the company's programs and financial condition, including the ongoing ETC review and fair value exercise. The transition to GEC accounting principles was also discussed and Newlands instructed the company to take care to distinguish between operational issues, such as the ETC results, and adjustments to the balance sheet resulting from the fair value exercise.

234      Included in the material presented to Newlands and Rickard at the meeting were second-quarter financial statements, in Leigh accounting format, to the end of September. These results showed an actual loss to the end of September of $2.85 million and a forecast loss of $1.5 million to the end of the fiscal year. Newlands was also given a preliminary draft of the purchase accounting adjustments following the GEC takeover, and a copy of Leigh's cash requirements forecast. The forecast showed the bank line outstanding at $36.081 million as at October 16, with a forecast overdraft of $35.774 million at the year-end on March 31st 1990.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

235      Newlands drafted a memo to file following his visit to Leigh in which he recorded his view that the business was in poor shape and, using GEC accounting principles, trading at a loss and absorbing cash. He noted that "The businesses have prepared September management accounts in GEC format but do not reflect current contract cost to complete reviews and changes to GEC accounting policies. As a result of the half year reviews, adoption of GEC accounting principles and purchase accounting, there will be significant changes to the results to 30 September, and the Balance Sheet will have to be restated in the October management accounts." Newlands added that these changes would leave Leigh showing a "significant loss."

236      He observed that, in his view, the Plessey budgets for the business were "hopelessly optimistic and should be disregarded," and that support from Marconi would be required to turn the business around. Newlands noted that Driscoll was "showing the right attitude," but that Dean was under pressure and in Newlands view not up to the job.

237      Six days later on Oct. 26, Leigh produced a revised half year forecast, which showed an actual loss of $15.634 million to Sept. 30 and forecast a loss for the year of $12.813 million. Driscoll testified that these figures reflected an incorporation of some of the ETC results, including a loss on the SHINCOM program of $6.88 million. The report noted that the results would likely require further re-statement to reflect purchase accounting adjustments, and that a number of unquantifiable risks regarding SHINCOM and TACAN had not been provided for. This report was forwarded to Rickard, Justice, Flower and Shepherd.

238      Pursuant to the financial reporting obligations contained in Leigh's facility agreement, Leigh was obliged to provide TD with unaudited quarterly financial statements within 30 days of the end of the quarter. Thus, the quarterly statements for the period ending September 30 were due on October 30, four days after Driscoll's six-month results were prepared. Driscoll conceded in cross-examination that the six-month results did constitute an unaudited interim quarterly report.

239      Also on October 26, Young wrote to Dean, to confirm that the bank had agreed to discharge its security and would do so forthwith. The next day Dean wrote to Young and requested a further extension of the $4 million bulge to July 31, 1990, due to persisting problems with the SHINCOM program. Dean attached a copy of the cash flow forecast which had been presented to Newlands on Oct. 20 and which showed an estimate of the bank line at $35.57 million as at the end of December, and $35.774 million as at March 31, 1990. He enclosed an executed facility agreement renewing the operating line on the same terms and conditions, and a facility executed September 18 regarding extension of the bulge. The bulge facility offered an extension only until October 31st however, and the offer to extend had expired on September 15. The package sent to Young did not include the October 26 half year results, with their actual and forecast losses.

240      In a letter dated October 30, and sent to Exton along with about 40 other banks, GEC, Siemens and Plessey invited TD to provide Plessey with an uncommitted bank facility. The invitation was signed by Anderson, Huntbatch and Gerdine. Anderson testified that following the takeover, GEC and Siemens decide to cancel Plessey's MOF and instead borrow from one of a number of available bank facilities, depending on terms offered on any particular day. The package included a copy of the GEC Siemens final offer for Plessey with details of the proposed restructuring of Plessey. The letter noted "Siemens and GEC are prepared to guarantee, on a $50/50$ several basis, such new borrowings. Therefore the terms of these new borrowing facilities should be based on the creditworthiness of Siemens and GEC." The letter added that in view of the security offered and the reduction in treasury staff at Plessey, preference would be given to those banks who accept the shortest, simplest, standard documentation. A committee of the GEC board passed a resolution prior to the issuance of this letter, authorizing Anderson to sign, on behalf of the company, this letter which included a commitment to provide a several guarantee.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

241      Several of the key players in the piece changed at the end of October. On November 3, Denise Beard, who had been assistant treasurer, left Plessey. On the same day, Greg Young, who had been in charge of the Leigh account since 1987, left TD and was replaced by Rob Wilson. His evidence was that there was a two or three week period when he overlapped with Young. During that period, he said he shadowed Young day-to-day to "assimilate" the relationships he would be taking over. Wilson said he familiarized himself with Leigh account by discussing it with Young and reviewing the file. He said he did not discuss the Leigh file with his supervisor Leaney, nor did he review the comfort letters. Also during this period, GEC treasurer Ross Anderson began to receive weekly cash reports from Plessey.

242      On November 8, Young and Wilson met with David Dean at Leigh. In the meeting, Dean  advised the bankers that Leigh's numbers were getting worse, and told them there were legal disputes with some of the contractors involved in the SHINCOM program. Wilson said Dean told them he could live with a $38 million operating line, but if there was no change, Leigh might require further funds from TD or GEC. In his notes of the meeting. Wilson jotted "new forecast forthcoming". In evidence, he said at this point in the meeting he asked Dean for financial statements. He said Dean told him there would be a new forecast forthcoming but that the financial statements were not available because the acquisition accounting issues had not been resolved. Wilson also noted "fold in or fund $10 million or more". He said Dean told him Leigh had a couple of options available to it. One was an acquisition by CMC, or in the alternative they would need further funding of $10 million. Wilson testified Dean told them if other money was required from TD another comfort letter could be provided: "Q.. From Whom? A. He said GEC, once they took it over, but I understood at this time that it would be a Plessey comfort letter consistent with the previous ones." Young testified he had no recollection of this meeting.

243      On November 15, Exton and three other managers of Corporate Banking produced a CCR of Plessey in relation to the invitation of Oct. 30 to provide Plessey with an uncommitted facility. The risk rating was 1 and was described as that of the parents, and the proposal was to increase the £20 million facility already available to Plessey to £50 million. Under security, they noted that GEC and Siemens were offering unconditional and irrevocable 50-50 several guarantees. Documentation referred to a facility agreement containing a material adverse change clause. In the remarks section they noted that despite the fine pricing, TD had enjoyed a strong relationship with Plessey but had not had a relationship with GEC, and they hoped to forge such a relationship through Plessey. They noted other opportunities with CMC and Leigh merited this business for relationship reasons. Senior vice president, credit division, Sid Owen recommended the credit on the basis that the guarantees be supported by a directors' resolution and solicitors' letters of opinion. Brock also recommend the credit, which was ultimately approved by McDowell who reduced the risk rating to 2 on the basis that 1 was reserved for governments.

244      In mid-November, the corporate finance report for October showed a cumulative Leigh loss of $15.6 million to the end of October, and a forecast loss to year end of £8.45 million. On Nov. 17, Driscoll forwarded a copy of the October President's Report to Lord Weinstock, managing director of GEC, directly. The financial results to October 27, which were attached, showed a cumulative loss to October 27 of $16.677 million, and the Leigh loan outstanding at $38.5 million, some $500,000 in excess of the authorized credit.

245      In the week of November 20, Leigh completed the ETC review process and Justice returned to Leigh to assist in preparation for the half-year review meetings to be held at GEC's Marconi's offices in Stanmore, U.K. the following week. Wilson testified he had a conversation with Dean on November 23rd, in which Dean indicated his concern that Leigh might go into overdraft the next day. He said Dean also advised that Paramax, the major contractor in connection with SHINCOM, wished to withhold a $5 million payment due to Leigh until early in the new year. As a consequence, Dean asked for a further $5 million from the bank. Wilson said he wasn't concerned as Dean advised they would be invoicing Paramax about $10 million in December. Wilson's note of the call stated: "full comfort from Plessey, even

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

GEC." He said  Dean told him any additional borrowings would have full comfort from Plessey, and even GEC. Wilson said he did not ask about the overdue financial statements. It is clear to me, and I so find, that the term "full comfort" refers to the full amount of the authorized line of credit.

246      In late November, Dean called Wilson. Justice was on the call and since Wilson and Justice had not met previously, Dean introduced him to Wilson as the PESL divisional finance director. There was discussion concerning additional short term borrowing up to $41 million. Justice raised the possibility of a floating letter of comfort, but Wilson rejected this concept. Wilson testified that either Dean or Justice confirmed that the Paramax payments would be coming in January. Wilson was advised that Leigh planned to reduce its work force in the near future, possibly in March, but perhaps earlier, with consequent severance obligations. Wilson did not commit to the increased borrowings. He took the layoff as "somewhat positive". There was no discussion of Leigh's financial statements.

247      Wilson stated in cross-examination that Justice had "indicated" to him during this conversation that "We'd get the same comfort letter." He conceded when pressed that Justice did not "expressly say that." "He did not say those words" but he said "we'd get full comfort" and "I clearly understood that we were getting the same comfort letter." Wilson said it was clear to him what Justice meant, and he took it the letter would be in the same form. He conceded further that Justice did not say the comfort letter would be in the same form. His note was silent on this point.

248      I am not satisfied that there was any discussion during this telephone conversation in late November concerning the form of the comfort letter or that it would be in the same form as the previous letters, and I find that Justice made no such statements, or representations to this effect to Wilson.

249      On November 28 and 29 Driscoll, Dean and Justice attended a series of meetings at GEC Marconi offices in Stanmore. The purpose of these meetings was the GEC half-year review. The first day, Driscoll testified they met with representatives of GEC Marconi and the second meeting was attended as well by Simon Weinstock and David Newlands. He said they presented a package of financial material on the first day and essentially responded to questions. The material had been prepared in Canada with the assistance of Justice and then finally revised the day before the meetings in England.

250      The financial information presented at the meeting disclosed a forecast loss to year end of $19.608 million. Driscoll said this increase in the projected loss from the October estimates was due in large part to the ETC review. The revised six-month figures to the end of September, also included in the package, showed an actual loss of $18.85 million.

251      Driscoll testified that the meeting on November 28 was largely a fact-finding meeting and that the GEC Marconi representatives commented from time to time but gave no broad reaction to the size of the losses, nor did they comment on any options for Leigh for the future. On the second day, the meeting was attended by Simon Weinstock and David Newlands. Driscoll said  this meeting was much shorter and that Newlands zeroed in on SHINCOM and TACAN which Driscoll said were the largest components of the losses. He said again there was no comment on any future options for Leigh, but that Leigh's position in the GEC group could be characterized at this time as uncertain.

252      Driscoll testified that at the conclusion of the second day, he with the assistance of Justice, presented a written request for an increase in the bank line. He said some combination of Justice, Newlands, and Rickard said they would take care of the request, and that Justice and Rickard were charged with doing further work on the issue.

253      In cross-examination, Driscoll was asked whether Newlands was left in charge of the issue and he answered that he was not sure Newlands was. This is consistent with the evidence of Newlands, who testified that he probably led the discussion, and that Leigh and Marconi management were then charged with producing more support for the request. He

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

said the request would have come back to him because he had led the discussion, but that treasury actually reported to Simon Weinstock. Newlands also testified that he had no recollection of any mention in the meeting that Leigh ought to be allowed to go bankrupt. Following the meetings Leigh was instructed to provide a weekly cash report to GEC, which Newlands explained was an attempt put pressure on the business to utilize its cash resources as sparingly as possible.

254    Driscoll testified that following these meetings he was of the opinion that Leigh was terminal, absent a significant change in its capital structure or relief from contractual  requirements. There was no evidence that he expressed this view to anyone at Plessey or GEC at the time. In cross-examination, Newlands disagreed with Drisoll's assessment that the company was terminal on the basis that the technical baseline was not secure and hence, Driscoll didn't necessarily have all the information he needed to reach such a conclusion. However, I do note that a concerted effort to negotiate contract relief with the Canadian government was commenced by Leigh in early January, with the assistance of GEC and Plessey. These efforts continued right up until Leigh's bankruptcy.

255    Rickard wrote to Newlands on December 1 that Leigh had now demonstrated a need for essential payments, particularly payroll. He noted Justice would visit Leigh the following week to review the cash requirement in depth, and report back to him. In the meantime, he wrote that it would be sensible to extend the limit to $41 million and monitor it weekly. He closed by noting that this would require an uplift in the comfort letter.

256    On November 30, Derek Thorn, Plessey finance director, group services, faxed GEC treasurer Ross Anderson, with information on Leigh's line of credit and cash forecast, and a copy of the fourth comfort letter. Anderson and Hafner had been made available to assist the Plessey treasury department on an as-needed basis in view of the depletion of their personnel following the takeover. Regarding the proposed increase in the bank line, Thorn noted that Leigh had asked for an increase to $45 million but Justice had recommended it only be increased to $41 million. Thorn suggested that if Simon Weinstock and David Newlands approved the increase to $45 million, the company be instructed not to exceed $41 million without a specific approval from  the U.K.. In conclusion, Thorn asked Anderson to notify him when the increase had been approved, and "can we then discuss the mechanics, particularly the form of comfort letter that may be required."

257    Anderson said when he received the memo he probably looked at the attached cash forecast but it did not indicate anything of significance to him. He said he could not recall discussing the increase with Newlands or Simon Weinstock but that he must have done to get their approval. Newlands reluctantly approved the requested increase, and Justice, who was at Leigh, was informed of the approval on Dec. 6.

258    Upon receiving the package from Thorn, Anderson said he reviewed the copy of the fourth comfort letter which was included and made some changes to it. He explained in evidence that he did this in order to make the letter as accurate and as clear as he could. Anderson did two different markups on the comfort letter. He testified he would have done the first one at the same time or immediately after receiving the comfort letter and a second, more detailed markup a few days later. Anderson added to the third paragraph of the letter the words: "and does not constitute a legally binding commitment."

259    Anderson testified that he did not make any inquiries into the terms of the Leigh facility, the history of the loan, or how the comfort letter had been arrived at. He did not view the comfort letter as a legally binding commitment, but testified that he added the words "does not constitute a legally binding commitment" to eliminate any doubt or uncertainty. He said he did not consider it to be a change of any substance, but he felt that with the added words, it was 100 percent certain that the letter was not binding, and without them it was slightly less certain. David Newlands testified that Anderson stopped him in the hall and showed him the comfort letter with the handwritten changes. He said Anderson

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

asked him to read and "bless" it, which he did.

260     Exton testified that Anderson called him on December 6 or 7 and advised that permission had been granted to increase the loan facility to $45 million but that the borrowings were not to go above $41 million without Anderson's explicit approval. Exton said this struck him as being an unusual request as Anderson was taking direct control of the advances to be made to a subsidiary of a joint venture involving GEC, and that he had never received such a request in his banking career.

261     Exton testified that he and Anderson also discussed the possibility of TD providing a fairness opinion on the possible Leigh CMC merger. As well, he said Anderson told him he would forward to Exton a revised comfort letter for $45 million, and that this would be done with the full knowledge and approval of GEC and Siemens. Exton passed this information on to Wilson.

262     Anderson testified in relation to this conversation that he might well have told Exton he would forward a new comfort letter. Although he could not recall the conversation, he did not believe he would have told Exton the comfort letter would be revised with respect to the amount  of the facility alone, because he had already started to amend the comfort letter by this time. He said he did not discuss the changes in the comfort letter with Exton, nor did he tell him about the added words "does not constitute a legally binding commitment." Anderson testified that if he had felt he was making changes of substance, he likely would have told Exton. He said he had expected the bank to read the letter, which was only a one page document, and said if the bank had not agreed to any of the language of the comfort letter, he had expected they would indicate this upon receipt of it. I accept Anderson's evidence. He was a credible and forthright witness.

263     Wilson at TD prepared a CCR of Leigh dated December 6, to formally cancel the $4 million bulge and authorize an increased operating line of $45 million. The risk rating remained at 3B and security was listed as nil. Documentation was described as a $45 million comfort letter and letter agreement. The terms and conditions remained the same as the prior facility.

264     In the remarks section, Wilson noted that the funding was necessary due to the delays in receiving cash payments from Paramax, the main contractor on the SHINCOM contracts. He observed that:

> Any additional borrowings will be fully supported by a Plessey letter of comfort. Jonathan Exton of TD-London has been in contact with Ross Anderson, Group Treasurer of GEC regarding this. Anderson is providing a letter of comfort from Plessey with the full knowledge and approval of GEC and Siemens to cover Leigh borrowings up to $45.0 million. Internally, Plessey will cap Leigh's borrowings on a weekly basis at levels below the $45.0 MM to keep pressure on Leigh to manage its cash flow; consequently, while we will have authorized availability of $45.0 MM, Anderson will personally approve any excess borrowing requirements above $41.0 MM and he does not plan to disclose to Leigh the full extent of Plessey's letter of comfort support.

265     In the next paragraph, Wilson referred to Leigh's revised cash flow forecasts projecting peak borrowings of $43.3 million in December, and expected to fall below $36 million upon receipt of the Paramax payments in January.

266     Wilson noted as well that TD intended to bid on a fairness opinion for CMC regarding its potential acquisition of Leigh, and that the bank had recently offered Plessey a £50 million uncommitted facility. Under strengths. Wilson observed that the revised comfort letter covered borrowings of Leigh, and that Plessey was ultimately owned by GEC and had access to significant parent company resources. He listed Leigh's weaknesses as delayed contract payments which had impacted cash flow and dependence on defence industry expenditures which had suffered cutbacks. Finally, he

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

noted: "There is still continued uncertainty over Leigh's ultimate ownership; however, we believe that this does not represent a significant credit risk in view of strong existing parent company support." Leaney concurred and recommended approval with the note "the support letter justifies."

267    Noonan reviewed the application on December 8th and recommended the credit on condition that the comfort letter was in the same form and substance as the Aug. 31/89 letter attached to the review, "particularly to include para.3", and that no borrowings be extended beyond $41 million without the prior approval of GEC's group treasurer. These conditions were never communicated to Leigh. McDowell approved the credit on the assumption the bank was satisfied with the financial condition of Paramax and its ability to pay the amounts owing to Leigh.

268    Noonan testified it was incumbent on the Corporate Banking Division personnel to obtain a new facility agreement as condition of the credit, and that he received no request from Corporate Banking Division that this requirement be waived. He said he also expected Corporate Banking to read both the Aug. 31 comfort letter and the one received in connection with the credit. McDowell testified that he agreed with Noonan's expectation of the Corporate Banking department. McDowell said he expected they would read and compare the comfort letters, and if the new document was in a different form than that stipulated, Corporate Banking would have to seek authorization from the Credit Division before accepting it. Noonan testified he received no such request.

269    Wilson sent a letter to Leigh's Ottawa branch advising of the approval on December 8 and cautioned that the $45 million limit was not to be disclosed to Leigh, "as it is an internal matter how GEC/Plessey manages a subsidiary's borrowings. Therefore, Leigh should be informed that availability only totals $41.0 MM."

270    On December 13, a Credit for Executive Circulation relating to the Leigh line was circulated among the bank's senior executive. The document referred to the GEC takeover and contained the same erroneous description of the comfort letter as had been included in the earlier  Credit for Executive Circulation. The document was initialed by Noonan, McDowell, president Robin Korthalls, and the chairman and CEO of the bank, Richard Thomson.

271    Driscoll had completed the Presidents Report for the month of November by December 14. This report, which was forwarded to GEC, disclosed an actual loss as at November 24 of $20.301 million with an outstanding bank line of $38.745 million. Driscoll attributed these figures to the results of the ETC review and SHINCOM and TACAN contract delays.

272    On approximately the 14th of December, in the course of revising the comfort letter, Anderson called Dean at Leigh to ascertain whether there was a holding company in the corporate structure between Leigh and Plessey. Anderson testified he did not discuss Leigh's financial condition with Dean.

273    Anderson sent the revised comfort letter to Bernard Huntbatch at Plessey on December 15, with a copy to Andy Hafner, treasurer at Siemens' offices in London, Rickard, Justice, Simon Weinstock and Newlands. Anderson testified he sent the letter to everyone who had an interest in it, to give them an opportunity to comment. Mr. Huntbatch, who is now deceased, was Plessey's Company Secretary, a solicitor, and one of the few remaining members of the Plessey old guard. He had signed the second, third and fourth comfort letters as well. Anderson said in evidence that Huntbatch did not call him to comment on the letter or query it. Anderson said he would expect Huntbatch to review the letter and if he had any comments, to make them or to change the letter if necessary.

274    The other signatory to the letter was Brendan Sammon, group chief accountant at Plessey. Sammon testified that he knew the final paragraph constituted a change from the fourth letter and discussed this with Huntbatch. He said they concluded Plessey had never considered comfort letters to be binding, that this was simply GEC's "belt and braces", and

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

hence they signed the letter. The letter was not forwarded to TD's London office until December 27. The fifth comfort letter stated:

> This is to confirm that The Plessey plc has full knowledge of the facility of C$45,000,000 (Forty Five Million Canadian dollars) which has been granted by the Toronto-Dominion Bank to Leigh.

> Leigh is currently a wholly owned subsidiary of 160956 Canada Inc. Which is a wholly owned subsidiary of Plessey Overseas Limited which in turn is a wholly owned subsidiary of The Plessey Company plc. We undertake not to reduce our share-holding in Leigh or its holding company without prior notification to yourselves.

> It is Plessey's policy that Leigh be managed in such a way as to be always in a position to meet its financial obligations, including repayments of all amounts owed under the above facility to yourselves on their due dates.

> The letter replaces our letters of 31st August 1989, 31st March 1989 and 30th June 1989 and does not constitute a legally binding commitment.

275      On December 18, Leigh laid off 80 people, including David Dean, the vice-president of finance and the bank's main contact person. Pat Smith took over his role. Driscoll testified the layoff was due in part to a decline in manufacturing, which meant Leigh had excess staff for its needs. He said it was also due in part to Leigh's losses.

276      Colin Justice had been traveling back and forth between Britain and Canada throughout the fall and was back at Leigh during this period. On December 21 Justice called Wilson at the bank to advise him of the staff layoff and that Dean was no longer with the company. Justice attributed the layoff to difficult market conditions and told Wilson a second wave of layoffs might be forthcoming. In a memo to file following phone call, which he copied to Leaney and others, Wilson reported details of the call, including the staff layoff and the termination of Dean. Wilson noted that Justice would continue to be actively involved in the affairs of Leigh, having spent four of the past seven weeks in Canada, that he expected to be in Canada regularly, and would be returning for budget meetings in January. Wilson noted he took the opportunity to discuss with Justice the possibility of a Leigh merger with CMC in some detail, indicating TD would be "very interested" in providing a fairness opinion. Justice told him the question of the CMC acquisition of Leigh would be reviewed early in the new year. Wilson recorded in detail the aspects of the conversation dealing with the layoff and the fairness opinion.

277      In evidence, Wilson testified that although he had not recorded this in his memo, he had asked Justice in this conversation for Leigh's financial statements. He said Justice told him the financial statements were not ready due to the acquisition accounting issues related to the GEC/Siemens takeover. Wilson said he did not ask him about the accounting issues because this was consistent with what he had been told by Dean. This conversation is admitted by the defendant Plessey, who did not call Justice as a witness.

278      Also on December 21, Driscoll forwarded a draft budget for Leigh to Bill Alexander, managing director at GEC Marconi, in which Driscoll commented that "cash flow is awful" and that dramatic improvement would likely come only from a politically directed renegotiation of the TACAN and SHINCOM contracts, or a radical restructuring of their operations. The draft budget projected a worsening overdraft of $39 million in March of 1990 and $62 million by March of 1991. It estimated the bank line would be at $41.576 million by December 31st of the current year.

279      Justice had requested authorization from Newlands on December 19 to increase Leigh's line to $42.5 million, and on December 22, Anderson called Exton to tell him the increase had been approved. Exton did not receive the fifth comfort letter however, until December 27, at which point he sent it on to Wilson. Exton testified that when he received

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

the letter he checked to see the amount was correct and that was the extent of his review of the comfort letter. He did not notice the added line that the comfort letter did not constitute a legally binding commitment. Exton said that his role regarding the letter was merely to pass it on to the account manager and no more. I accept his evidence on this point.

280     Wilson's evidence was that when he received the comfort letter, he advised his supervisor Leaney of its arrival and sent her a copy for her information, but did not discuss it with her any further.

281     Wilson testified that following the December 6 conversation with Anderson, Exton  advised him that Anderson had said the new comfort letter would be the same form and substance as the prior letters, revised only as to amount. Wilson said that as a consequence, when he received the fifth comfort letter, he simply checked to see the amount was accurate and instructed his secretary to file it. He said he felt he had fulfilled his responsibilities by doing this. Although he had never read the prior comfort letters, he did not compare the wording of the 4th and fifth comfort letters, nor did he notice the changed wording. Wilson said he felt Anderson made a verbal commitment that the letter would be changed only in amount, and so that was the only part of the letter he checked. He said he felt Noonan's condition that the comfort letter be in the same form and substance was satisfied based on his confirmation of the amount. He conceded in cross-examination he had not advised anyone at Leigh or Plessey about Noonan's condition.

282     I am unable to accept his explanation for this. Wilson did not record this alleged representation by Anderson in any note, credit review, or other document. Wilson was not party to the conversation between Anderson and Exton. None of the exhibits corroborates Wilson's evidence. Jonathan Exton was a witness at this trial and gave evidence about the conversation with Anderson. He did not testify that Anderson had said the letter would be in the same form and substance. Anderson also testified at trial and said he did not believe he would have said such a thing, as he had already changed the language of the letter by the time he spoke to Exton.

283     I accept the evidence of Anderson and Exton and I find as a fact that Anderson did not represent or state to Exton that the letter would be the same form and substance as the previous comfort letter. Hence, any failure on Wilson's part to read the fifth comfort letter was not due to  the representation Wilson attributed to Anderson. I accept Wilson's statement that he had not read the prior letters before receiving comfort letter number five. Hence, either Wilson read the letter and did not realize the letter had been changed, or he did not read the letter at all. Even if he had read the letter, not having read the fourth comfort letter, he had no basis for comparison, and likely would not have noticed the alteration. In my view, however, responsibility for this oversight lies squarely on the shoulders of Wendy Leaney.

284     Leaney was general manager, corporate Banking and Wilson's direct supervisor. She knew he had only been in his position for two months. She testified in another context that responsibility for managing the relationship had been delegated to her. She was aware of Leigh's climbing bank line, contracts difficulties, and of the recent hostile takeover, with the consequent changes in management personnel at Plessey. Wilson told her the letter had arrived and sent her a copy to review. She, at least, was familiar with the language of the prior letters, and knew of Noonan's condition that the fifth letter be of the same form and substance. She received the letter and placed her initials on the covering memo from Wilson to which the comfort letter was attached.

285     Leaney's evidence is that she did not read the comfort letter on or about December 28 when it was transmitted by Exton in London to Wilson in Toronto. She stated the covering memo from Wilson with the executed comfort letter attached was passed up to her "...in January 1990 when I returned from Christmas vacation, and it was just -- it was passed to me by Rob [Wilson]." She stated that she did not read it. "I expected that he would have read it and I -- I  didn't read it myself."

286     She said she first heard about the words "does not constitute a legally binding obligation" the day she went on

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

vacation on March 29, 1900, from Ernest Mercier, who had been in touch with the bank's office in London. She testified she was concerned about the words. She had not seen the letter, had not been "apprised" by Plessey "that there was going to be any change, that we assumed the letter was the same as we'd had before."

287      Leaney's evidence on discovery was that she had been told by Wilson in December that the bank had received the comfort letter, but in January she did not "look at it." Leaney testified at trial that she subsequently realized she did see the memo, but did not read the comfort letter. She conceded on cross examination that her evidence on discovery had been mistaken. The covering memo has "Wendy FYI" handwritten on it in red ink, and the initials "W.L." in her hand-writing in blue ink. She acknowledged on cross-examination she had only discovered the memo several months prior to trial, and then realized that she must have looked at the covering memo.

288      In cross-examination when asked to explain her initials on the covering memorandum she stated: "I didn't read the comfort letter for certain, and the covering memo I don't recall specifically reading. Obviously I saw it because my initials are there. But it was one of many pieces of paper that came across my desk, especially after coming back from vacation." "It was a piece of paper ... that was it. It was just information only."

289      Other exhibits in this trial contain Leaney's handwritten initials, which she testified meant she had read the doc-ument in question. Of all the 20 documents initialed by Leaney and made exhibits at this trial, neither she nor her counsel could point to one other she had initialed but not reviewed. The bank's outstanding exposure for some $40 million rested solely on the comfort letter and she conceded that she knew the letter was an important document. Nevertheless, Ms. Leaney maintained that when she received the fifth comfort letter, she merely glanced at it, and did not review it in depth because it had been sent to her for information purposes.

290      In the CCR of March 28, internal memos, and conversations with Anderson and Gerdine subsequently, no bank official ever raised the issue of the added sentence in comfort letter number five. Leaney had no explanation for this, nor could she explain the reference by Wilson to "the integrity of both GEC and Siemens, consistently demonstrated to us" in an April 5 letter to Newlands and Gerdine.

291      I find that Ms. Leaney read and accepted the fifth comfort letter dated December 15, 1989, when she received the letter and covering memo and initialed it in January, 1990. She could point to no other document she had initialed without reading it. Her explanation of relying on Wilson to read it is not credible. He was new on the job and had no in-volvement with the previous comfort letters. This was a large loan and the line was increasing steadily. The bank was resting its position entirely on the comfort letter and knew Leigh could not pay the debt itself.

292      The issue of the form and content of the comfort letter was never raised prior to the bankruptcy of Leigh on April 12, 1990. It was not referred to in any internal bank document, including the March 28 CCR. Nor was it raised in the subsequent conversations with GEC and Siemens concerning Leigh. The reference in Wilson's April 5 letter to the in-tegrity of GEC and Siemens is not consistent with the behaviour of a party upon whom a fraud has just been perpetrated. All of these facts are consistent however, with Leaney having read and accepted the comfort letter when she received it in January.

293      Leaney was disciplined by Ernest Mercier in June, 1990, and did not receive the bonus part of her compensation package that year, on the basis that she had accepted the fifth comfort letter. Mercier wrote to Leaney on June 25:

**Re: Credit Portfolio Management**

Referring to your memorandum of May 22nd, 1990, and our discussions with regard to the captioned situation.

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

Upon review of your memorandum as well as the events surrounding the four accounts mentioned in said correspondence, we acknowledge that your actions on these accounts have generally demonstrated a positive commitment towards exercising appropriate credit judgment. *The one situation which falls short of this standard is in the case of Leigh Instruments, and the acceptance of the Comfort Letter in December 1989 that was deficient in form from previous Comfort Letters we had received as a Bank*. This was a serious oversight. This matter and its severity is accentuated by the significant exposure which the Bank has in regard to this credit facility.

Given the serious nature of this situation it has been decided that no Incentive Compensation Award will be granted to you this year.

A review of future Long Term Incentive Plan Awards will be considered at the appropriate time.

This letter will be placed in your Human Resource file and we ask that you acknowledge receipt by signing below. [Emphasis added]

294    This reprimand letter supports my conclusion that Ms. Leaney read and accepted the fifth comfort letter when it was received by TD, and that the bank shared this view.

*Winter-Spring 1990 - The Bankruptcy of Leigh*

295    GEC and Siemens were continuing the hive-up process and the valuation of the Plessey businesses. By January 8, a further valuation proposal exchanged between Siemens and GEC showed Leigh in the category of businesses to be held 50-50 or to be sold, and not in the list of businesses to go to GEC. In that document, GEC did not place a value on Leigh, but inserted a question mark rather than a number. Siemens, who had had little direct involvement with Leigh to that point, had assigned it a value of £70 million.

296    GEC Marconi budget meetings were held annually within the first three or four months of the calendar year. Driscoll and Smith attended meetings at GEC Marconi's Stanmore offices in England on January 8 and 9, including a meeting January 9 chaired by Dr. Ian McBean, managing director of GEC Marconi, to discuss the preliminary Leigh budget for 1991.  Following this review, at the end of the meeting, future options for Leigh were discussed very briefly. McBean instructed Driscoll and Smith to return to Canada and develop a series of options for Leigh, to be reviewed later in the month. Most of the options were identified in a brief discussion at the meeting, and included a restructuring of Leigh, integration with CMC, sale of Leigh to a third party, controlled shutdown and windup of the business, and immediate closing. Driscoll testified these were intended to cover the range of available options.

297    By January 11, Newlands' evidence was that he was of the view that the Leigh situation was serious. He said his initial impression from his visit in the fall was that the North American businesses were in poor shape and the monthly management accounts had not shown the position to be improving. He explained that GEC Marconi were analyzing the position and that McBean would have to determine whether the management of Leigh and personnel were capable of completing their contracts in a sensible time, or at all. He said no conclusion regarding the future of Leigh had been reached by this time in January, however he conceded that GEC was uncertain by this time whether they wanted to take Leigh, and in a further valuation proposal had listed it under 50-50 or to be sold.

298    Meanwhile, Leigh's financial position was still grim. The Plessey finance reports for December, available mid-January, showed a cumulative loss for Leigh to the end of December of £10.721 million or roughly $20 million. By the 16th of January however, Leigh had received the expected Paramax payments and applied them to its overdraft, thus reducing the bank line to $31.646 million

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

299    Driscoll and Shepherd had written several letters to the Canadian government in early January, outlining Leigh's financial situation, in the hope that relief could be negotiated on the TACAN and SHINCOM contracts. To that end, Driscoll, Shepherd, and Alexander attended a series of meetings with various Canadian government officials from Invest-ment Canada, The Department of Industry, Trade and Technology and the Department of National Defence on January 22 and 23. At these meetings, Driscoll advised that there was a serious threat to the viability of Leigh and that one of the options under consideration was the closure of Leigh. Driscoll also presented financial information on Leigh's situation giving a clear indication of the gravity of the situation. At the conclusion of the meeting with the Department of National Defence, Driscoll and Alexander were advised that the government would deal with the Leigh issues on an urgent basis.

300    On January 25th, Driscoll forwarded to GEC his presidents report for December, which showed a cumulative loss to the end-of that month of $21.387 million.

301    Driscoll, Smith and Justice re-attended at Stanmore February 1 and 2 to review the list of options for Leigh, which they had prepared pursuant to McBean's direction in early January. Also present at the meeting were Rickard, Mc-Bean and Alexander. The options tabled for discussion included a restructuring of Leigh with a recapitalization to elimin-ate the bank debt; an integration with Canadian Marconi; sale of the company to a third party; a controlled shutdown and windup of the business; and immediate closure. Payment of the bank debt was listed as one of the steps to be taken pur-suant to the last option and Driscoll testified it was discussed briefly. No decision was arrived at concerning what, if any option would be chosen for Leigh, and GEC Marconi took the matter under advisement.

302    Rickard wrote to Justice on February 6 as a follow-up to the options meeting held at Stanmore earlier in the week, and advised that the financial data presented at that meeting represented an "unacceptable deterioration over what appeared to have been a firmly established position on January 9th." He asked Driscoll to respond to McBean's require-ment for a concise explanation for each item of deterioration.

303    On February 1, Gerdine was contacted by Simon Weinstock, who expressed concern that Leigh was losing a lot of money. Shortly after that he received a copy of Alexander's memorandum concerning the Ottawa meetings with gov-ernment in which Alexander observed that Leigh was "running out of money" and "could be insolvent." On February 2nd, Rickard sent Simon Weinstock a copy of the preliminary purchase accounting adjustments for Leigh, which showed a writedown in Leigh's assets of $33 million.

304    Driscoll's evidence was that during this period he felt the likely outcome would be consolidation with CMC. However, on or about February 2, 1990, G. Stuurop, treasurer of CMC and Anderson met. Stuurop told Anderson that upon seeing the comfort letter, CMC seriously considered advising Plessey to walk away. Anderson had no recollection of this but testified he thought it meant that CMC no longer wanted to buy Leigh.

305    On February 8, GEC and Siemens formally decided to place Leigh in the Plessey rump, pending sale, closure or other solution. As a result, Philip Gerdine, the Siemens representative who was co-managing director of Plessey, became more involved with Leigh. Gerdine testified that prior to this time he did not pay much attention to Leigh.

306    Gerdine also testified that by early February, Siemens and GEC were considering selling three of Plessey's North American companies, including Leigh, to a third party. To that end, Simon Weinstock wrote to investment bankers Shearson Lehman in New York, to arrange assistance in the sale of the companies. Gerdine had had previous dealings with the Shearson bankers and thus was asked to attend two meetings with them in early February, to discuss due dili-gence on the companies and preparation of a sales package.

307    Meanwhile, on other fronts the negotiations with the Canadian government were continuing. The government

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

had not responded directly to the earlier approaches by Leigh, and on February 13, Driscoll and others again met with officials in the Department of National Defence in the hope of negotiating some contract relief. Driscoll presented the government with a detailed package of financial material, including analysis of the five options being considered for Leigh's future, and a revised a six-month balance sheet showing a loss as at September 30 1989, of $63.628 million. The projected loss to March 31st, 1990 was $67.7 million. Driscoll testified that these figures included adjustments reflecting both the ETC reviews, which were operational losses, and GEC fair value adjustments. On Feb. 14 Driscoll reported to Alexander on the outcome of the meeting and noted that "some assurance will be required from GEC before the government will proceed in any significant contractual areas."

308     Gerdine met with Justice the next day, on Feb. 15, to be briefed on the Leigh situation. Justice informed him of the projected $68 million loss, leading Gerdine to write to Simon Weinstock "we are appalled at the projected losses and bankruptcy is not out of the question if much of this is true." He questioned in the letter whether the sale of Leigh would even be possible. Weinstock had written on Feb. 5 to Shearson Lehman, copying Gerdine, stating that there were "major problems in the business" and noting that the future viability of the company was in question.

309     Wilson at TD telephoned Smith at Leigh on February 21, to get an update on the company's progress, find out more information about Leigh's contracts, and ask about the financial statements. In a memorandum of the conversation made the same day, Wilson noted that Smith told him there was some difficulty with the SHINCOM qualification testing, and that this might have an impact on the profitability of Leigh's fixed-price contracts if costs escalate, but that Leigh was negotiating with the Department of National Defence in this regard.

310     Wilson recorded that Smith had told him the budget for the fiscal year ending March 31, 1991 had not yet been finalized, but that Smith was predicting the sales for the year would be relatively flat, with a modest profit pre-debt service. Wilson testified that this meant a modest profit prior to interest payment on the outstanding debt. Wilson testified that he asked Smith for updated financial statements and Smith told him that the current year's results were difficult to forecast in view of the GEC Siemens takeover, but that he believed GEC would adopt conservative accounting, requiring Leigh to take up-front provisions for projects such as SHINCOM on Leigh's opening balance sheet. Wilson noted that "this is still under active discussion and results are therefore difficult to predict." Wilson testified this did not concern him as there had also been a delay in producing financial statements following the Plessey takeover of Leigh.

311     Smith told Wilson that a merger with CMC was not imminent, given that GEC and Siemens had not yet decided how to divide Leigh's assets, and that Colin Justice was no longer actively involved with Leigh, as he was concentrating on the hive-up and valuation of Plessey's assets. Wilson noted that Siemens was scheduled to visit Leigh the following week. Wilson concluded the memo, referring to the current fiscal year: "In summary, Smith will therefore be closely managing his cash position, but acknowledged that it will be a "tight" year for Leigh.... Smith expects to operate within his budget but is concerned with the high level of debt and related servicing burden. I confirmed that we are comfortable with the support provided by Plessey for Leigh's borrowings." Wilson testified that he took the reference to "tight" to mean modest profit to break even, although he conceded that Smith had not said. Wilson noted as follow-up to keep Anderson informed, through Exton, which he testified referred to the Leigh borrowing levels. As follow up Wilson also listed a reminder to schedule a visit to Leigh in mid-March, although he testified that this visit never took place, but he could not recall why. Wilson testified that following this conversation he still had the same view that Leigh was performing satisfactorily, and that Smith did not tell him anything which would lead him to think otherwise. At the bottom of the memo, Wilson noted that a copy was to go to Exton.

312     In London, Exton met with Anderson in person on February 22 for the first time. He testified that he advised Anderson of the amount outstanding on the Leigh loan and discussed the bank generally. No evidence was led at trial that

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

Anderson and Exton discussed the conversation between Smith and Wilson which had taken place the previous day. Nor did Anderson tell Exton of Leigh's financial condition, although he knew of the deterioration. Anderson testified that he asked Exton for a £50 million facility for GEC at this meeting.

313    Driscoll learned for the first time on February 23 that Leigh had a financial reporting requirement in its facility with the bank, and that Leigh was in violation of this term of the facility. He also discovered that the most recent financial information the bank had was the quarterly financial statements to the end of June 1989 and the 1989 year-end financials, which showed Leigh trading at a modest profit.

314    This discovery prompted Driscoll to write to Alexander on February 26, informing him that Leigh had not fulfilled its reporting requirements for the September and December quarters and noting that, although the bank had not requested the financial statements, he expected a request in light of the continually rising bank line. He asked Alexander for direction as to what information should be provided to the bank in terms of Leigh's current financial position and projected cash flow. He sent a copy of the letter to Justice and Rickard, and Rickard noted in handwriting on the side of his copy of the memo "must tell if they ask". All parties agreed on this  transcription of Rickard's note, although he was not called to give evidence about it. Driscoll testified that he expected some guidance from Alexander, but that he never received any response to the letter.

315    Also on February 26, Exton wrote Anderson at GEC, thanking him for the recent meeting and undertaking to keep him advised of Leigh outstanding levels of borrowing.

316    Two days later, Gerdine visited Leigh with Shearson Lehman as part of the due diligence process for the potential sale of Leigh through the investment bankers. This was his first visit to the company. Driscoll and Smith presented him with a detailed financial package similar to the material presented to the Department of National Defence earlier in the month. Gerdine became aware for the first time in this meeting of the depth and seriousness of the problems facing Leigh, including the TACAN and SHINCOM delays and technical problems. Gerdine testified that they advised him Leigh was in violation of its reporting requirements to the bank and Gerdine stated in evidence that he suggested forcibly to them that they send the financial information to the bank. In contrast, Driscoll's evidence was that while he did discuss reporting requirements with Gerdine, Gerdine gave him no direction he could recall. If he had received direction, he testified that he thought he would have acted upon it. Driscoll's version of events is supported by the memo he wrote to both Gerdine and Alexander on March 1, reiterating his request for guidance on the question of the information to be provided to the bank. Driscoll testified he could not recall receiving any guidance in response to the memo. Although I do not prefer his version of events to that of Gerdine, it is clear that if Driscoll thought any guidance was required, he  thought it was required from both GEC and Siemens. Given Siemens' relatively recent involvement with Leigh, it seems unlikely that Driscoll would have acted on Gerdine's direction alone.

317    Also in this meeting, Gerdine became aware of the comfort letter in connection with the $37 million TD loan. Although he had seen the draft comfort letter in December, he testified he had not connected it with the Leigh loan.

318    Gerdine concluded following the meeting that, based on Leigh's losses, the company was technically insolvent and its future uncertain, although its ultimate viability was still unclear. Also uncertain was whether Leigh could pay its debts on a standalone basis without some form of financial assistance. Gerdine had not, by this point, given up on Leigh as a going concern, and felt that Driscoll and Shepherd were taking positive steps regarding Leigh's future.

319    On March 5, following his visit, Gerdine reported to Simon Weinstock that he had found Leigh to be out of financial control, and confirmed that Shearson had informed him that morning Leigh was "unsellable at this time". He noted however that shutting Leigh down "might hurt us all" in light of Leigh's close ties to the Canadian government.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

320    The process of valuing and allocating the Plessey businesses was continuing, and by Feb. 22, GEC and Siemens had finalized division of the companies between GEC and Siemens, and determined which companies would remain in the Plessey "rump" ultimately to be liquidated or sold. The destination of each company was a matter of negotiation between the parties, with a view to the value allocated to each company and the overall acquisition cost of Plessey. Leigh was relegated to the Plessey "rump". As the companies in the "rump" were assigned one, lump sum value, the parties never agreed on a specific valuation for Leigh. The hive-up transaction closed on March 8.

321    Driscoll flew to New York to meet with Gerdine, who was there on other business, on March 12. Driscoll testified he once again raised the issue of the financial reporting to the bank with Gerdine but received no direction he could recall. Gerdine testified, to the contrary, that he instructed Driscoll again to send the statements, although his note of the meeting does not record such an instruction. It is apparent that Driscoll received no direction from GEC, but I am not prepared to find that Gerdine did not so direct.

322    On March 15 Driscoll wrote to Gerdine, Alexander, and Rickard, regarding guidance about the reporting requirements and noting "I propose to provide a copy of our September and December results and discuss our present cash flow position with the bank unless you advise otherwise." Driscoll testified he again received no response and on March 21st, acting on his own initiative, he instructed Smith to forward the financial statements to the bank. In view of Driscoll's repeated requests in writing, his evidence that if he had received instruction to provide the statements to the bank he likely would have done so, and in view of the fact that he did ultimately provide the statements to the bank on his own initiative, I accept his evidence that he received no response to his requests for guidance from GEC. That said, the obligation to provide the financial statements to the bank was that of Leigh and not the parent companies. Driscoll was the president of Leigh and thus ultimately responsible for delivering the statements to the bank. I must infer that his repeated requests for direction from GEC and Siemens were an attempt to transfer responsibility to them for his oversight in not knowing of the obligation to provide the statements to the bank, and for Leigh's failure to comply with the reporting requirements in the facility. GEC's failure to respond is understandable in this light. This inference is supported by the fact that Driscoll ultimately did provide the statements to the bank without any direction to do so from GEC.

323    On March 21, at Driscoll's direction, Smith sent a package of financial data to Wilson at the bank. The documents sent by Smith included financial information for the quarters ending September 30 and the end of December, 1989, and cash flow forecasts. Unfortunately, the financial statements that Smith sent to the bank were inaccurate. The six-month results to the end of September only reflected the Leigh financial position as it was known in October, and did not reflect the magnitude of the losses as they were known on March 21st. Indeed, the six-month results were the same figures as had been presented to David Newlands on October 20, 1989, when he visited Leigh, and showed an actual loss, as at September 30, 1989 of $2.858 million. The third-quarter results were more up-to-date, and included the president's report for the month of December. The consolidated management report for the quarter, included in the package, disclosed an actual loss to December 29, 1989 of $21.387 million. The cash flow forecast projected an overdraft of $40.976 million at the end of March 1990. All the financial statements were, according to Driscoll, prepared in Plessey format, and not using GEC accounting principles.

324    Driscoll conceded on cross-examination that the information provided to the bank did not reflect all the information Leigh knew at the time, and did not include the revised loss figure of $63.628 which had been disclosed by that time to GEC, Siemens, Plessey, and the Government of Canada. Driscoll testified that he did not review the financial statements before they were sent to the bank, but simply instructed Smith to send them. The president's report prepared only two days previously showed an operational loss to the end of February of $24.402 million, although this data was not sent to the bank.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

325     Wilson's evidence was that he received the financial information on or about March 22, and reviewed the financial statements and enclosures, particularly the profit and loss statements. He testified that he had not been aware of the technical and manufacturing problems associated with SHINCOM and TACAN, although I note that he had referred to contract delays in prior CCRs.

326     Gerdine attended a board meeting at Leigh on March 26, 1990, at which a number of proposals regarding the future of Leigh were discussed, including a five-year plan for the company. The issue of the reporting requirement to the bank was also placed on the agenda. Following the meeting, Gerdine testified that he telephoned the bank, and spoke to Wilson and Leaney. Gerdine asked Leaney if she was aware of the serious financial situation at Leigh, and that she sounded surprised that anything was wrong. He said it seemed evident to him that she  had not seen the financial package which had been sent to the bank. He said she then brought up the subject of the letter of comfort and asked if GEC and Siemens would countersign it. Gerdine testified that he did not know what the legal effect of that would be, but that it seemed to be a "quick fix" to a lot of the problems. He testified that Leaney pointed out Leigh was near its authorized credit limit, and indicated that the bank would be willing to increase the line to $50 million if GEC and Siemens signed the comfort letter. Gerdine testified that he told Leaney he would look into the question of whether the comfort letter would be signed by the parents. Gerdine said he suggested that the bank arrange for the assistance of a work-out specialist for Leigh, and that Leaney was receptive to the idea, suggesting the same specialist who had worked with Leigh in the early 1980s. He said the conversation concluded that he would speak to the treasury department at Siemens and the bank would look into arranging a work-out specialist.

327     Gerdine testified that the next day, he again spoke with Leaney and Wilson and that the tone of the conversation "suddenly changed about 180 degrees." Leaney advised Gerdine she was freezing the loan, and Gerdine said the potential to involve a work-out specialist seemed to evaporate at that point. Gerdine ultimately told Leaney that a letter of comfort was "just that" and that parent company signatures on the letter of comfort were not "going to be forthcoming" in his estimation.

328     Leaney testified that she felt Gerdine was "back-pedalling" from association with Leigh. She testified regarding this conversation:

> Well, I brought the comfort letter up because I felt that at this point, given the serious situation at Leigh and the fact that Dr. Gerdine seemed to be back-pedalling from the association with Leigh, I -- I can't put specific words in his mouth, but he -- the impression I got was they were not -- Siemens was not fully in support of the comfort letter that we had, uhm, from Plessey and, uhm, we -- we said, you know, the only reason we were lending was because we had the comfort letter, *and he said, Well, a comfort letter was just that*, and, uhm, — but he did agree that he would review -

329     Later that day, Gerdine attended a meeting with the Canadian government, which he described as more positive than he would have expected. He said he proposed a "save Leigh" program which would require participation from all the various parties, and that he thought at this time there was still a chance that Leigh could be saved. He said the government indicated it would want parent company guarantees. On the 29th of March, Gerdine composed a list of possible options for Leigh, which he forwarded to Driscoll.

330      Following the conversations with Gerdine, Wilson at the bank prepared a memo to Noonan, in which he summarized the discussion with Gerdine. Apart from a number of minor discrepancies and the fact that the memo appears to collapse the two conversations into one, Gerdine confirmed in evidence that the memo accurately reflected the conversations. Wilson noted in the memo, which was incorporated into a CCR of Leigh dated March 28, that Gerdine had indic-

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

ated Siemens felt there were two potential alternatives in dealing with Leigh; to do nothing and go away, or to inject capital and turn the company around. The CCR recommended that the risk rating for Leigh be reclassified at 5, and that Leigh be placed on the "watch list". The CCR was reviewed by Yovhan Burega, vice president of corporate banking, who noted "GEC and Siemens will have to provide us with a *very strong* letter of comfort. They do not have an option to do nothing. If that was the case we should immediately call the loan; also, we will not provide any concessions and GEC/Siemens must honour all of Plessey's commitments." Pierre Boulanger, senior vice president in the Credit Division, noted that "The situation is of concern and a firm stance is needed. We agree that we should make it very clear to Siemens that we do not view the "do nothing" option as a viable alternative for the company and we agree with Mr. Burega's position that unless we can shore-up our position we should immediately call the loan in order to force their hand." He concluded that the bank should not advance further funds to help the company pay interest when it was operating at a loss. The CCR was initialed by Brock and Thomson. Wilson confirmed in evidence that the bank decided in this period it would not offer Leigh any concessions, nor would it intercede with the Canadian government to seek concessions on behalf of Leigh.

331    Wilson sent Exton a copy of the memo regarding the conversation with Gerdine, and indicated he would be interested to hear the views expressed by GEC. In consequence, Exton called Anderson on March 29th, and advised him of the bank's concern following the conversation with Gerdine. He said Anderson told him Gerdine did not have authority to speak for the joint venture, and that "the original intention for GEC is not abandoned, but has not happened," which Exton interpreted as Anderson telling him GEC still intended to take over Leigh. After speaking to Anderson, Exton called Wilson, who told him the line had been capped at $41 million. Exton then called Anderson back the same day to advise him of this development. He said Anderson was "upset and disappointed" that the bank had decided not to stand by their arrangement. Exton testified that he told Anderson the bank definitely wanted the Plessey comfort letter to be acknowledged by GEC and Siemens, and that Anderson told him this was unlikely. Exton told Anderson someone from the bank in Toronto would call him.

332    Wendy Leaney did call Anderson shortly thereafter, and gave the following evidence regarding the call:

I talked to him about the situation at Leigh and the fact that we capped the line of credit, and we had a conversation. He said that GEC had never reneged on any of its obligations and a number of other things, such as commenting about social life, that he and his wife would not be invited anywhere if they did renege on any of their obligations, and we just left it at that.

333    Anderson testified that while he did have a conversation with Leaney, he would not have made the remarks attributed to him, particularly since his wife had died of brain cancer five years earlier. His evidence in this regard was as follows:

Q. ...Mr. Anderson, it is alleged by the bank that during a phone call with Ms. Leaney on or about March 29 you said to her that you and your wife could not show up at social functions if such a letter of comfort was not honoured. Do you have any recollection of making that statement to her?

A. No recollection of saying that.

Q. Do you have any belief as to whether it is possible you said that?

A. Well, I think now that it's inconceivable I could have said that.

Q. Why do you say that, sir?

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

A. Well, this is what date, March, 1990. My wife had died five years before then and it was not a very nice death and I haven't gone to a social function with ladies since then so I just feel that I couldn't have said such a thing.

334    Although Ms. Leaney was told of the death of Mrs. Anderson, in cross-examination she insisted that Mr. Anderson had made the statements in question:

Q. Ms Leaney, have you become aware since the date of that conversation that Mr. Anderson was, at the time, widowed and his wife had died of brain cancer?

A. No.

Q. I suggest to you that -- is it possible your memory in that regard is mistaken?

A. Absolutely not. He talked about his -- he and his wife had been -- they were guests all the time at functions, and business -- corporate functions, if they did not honour their obligations, they wouldn't be invited. It was a bizarre statement. That's why I'm so strongly -

Q. You agree especially bizarre for a man who was a widower whose wife had died of brain cancer?

A. Maybe he was talking in the past. I don't know. He might well have been.

335    In my view, Ms. Leaney's evidence on this point is incapable of belief. I observed the demeanor of Mr. Anderson when questioned on this point. He was visibly upset by the line of questioning. Although Mr. Anderson had no recollection of the substance of the conversation, I  prefer his evidence. Moreover, he testified in a different context that he did not view comfort letters as binding obligations. Accordingly I find as a fact that he did not make the statements attributed to him by Ms. Leaney, and in particular those concerning the comfort letter.

336    Ms. Leaney testified that following the conversation with Anderson, she met with Ernest Mercier, to update him on the situation. She said Mercier told her of the added line in the comfort letter, which she said was the first indication she had that the letter had been amended. In light of my finding above that she had read and accepted the letter when it was received, I do not accept her evidence on this point. She testified she told Mercier they had not been advised of the change by Plessey and she had assumed the letter would be the same as the prior letters. Leaney left on vacation following the conversation with Mercier and did not return until April 16, by which time Leigh had made an assignment in bankruptcy.

337    Meanwhile, on April 3, the Red Team delivered its report on Leigh, at a meeting attended by Simon Weinstock and Gerdine, among others. The Red Team was composed of technical people from GEC Marconi who had been hand-picked by MacBean and put in place in mid-February to review the technical assumptions underlying the Leigh contracts and the cost estimates of completing the SHINCOM contracts. Driscoll testified that this was a technical review rather than financial, and that it validated his belief about the state of the contracts. The report concluded that there were numerous engineering problems in relation to the contracts that would require significant investment, and that without changes in both investment and personnel, Leigh would not be able to deliver the product. David Newlands testified that he concluded from  the review that Leigh had terminal problems unless Leigh could negotiate some relief from its customer, the Canadian government.

338    Also on April 3, Exton testified that he called Anderson concerning a shareholders meeting. Exton reported the call to Wilson by facsimile, stating that "given Leigh's financial performance and position, a joint guarantee would obviously be preferable, but I doubt whether this would be forthcoming." Exton explained himself in his testimony, stating

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

"...I was aware that Toronto was very concerned about the letter of comfort that they had and whether or not it would be good security..."

339    Wilson drafted a new comfort letter in consultation with Norton, the bank's in-house counsel, and sent it to Newlands and Gerdine on April 5, 1990. In his covering letter, he requested that the letter be executed by both GEC and Siemens, noting: "Our comfort and support for Leigh has been based on the integrity of both GEC and Siemens, consistently demonstrated to us." Wilson made no mention of the added wording in the fifth comfort letter, nor that Musgrave had allegedly told Young the comfort letter was tantamount to a guarantee, explaining in evidence that they were trying to be conciliatory and co-operative. The proposed letter stated:

This is to confirm that we have full knowledge of the facility of C$45 million (Forty Five million Canadian dollars) which has been granted by the Toronto-Dominion Bank to Leigh Instruments Limited ("Leigh").

Leigh is currently a wholly owned subsidiary of 160956 Canada Inc which is a wholly owned subsidiary of Plessey Overseas Limited which is in turn a wholly owned subsidiary of The Plessey Company plc which is owned jointly by GEC plc and Siemens AG. We undertake not to reduce out respective share-holdings in Leigh or its holding companies without your prior consent.

We undertake to ensure that Leigh be managed in such a way, so long as your credit facility remains outstanding, as to be in a position to meet its financial obligations, including repayment of all amounts owed under the above facility to yourselves on their due dates.

340    On cross-examination, Wilson conceded there was no reference in the letter to the added language of the fifth comfort letter, namely that it did not constitute a legally binding obligation. Given that he testified that he felt "shock and dismay" when he read the fifth letter, his explanation of the reference to the integrity of GEC and Siemens is not believable. He was hard pressed to explain this apparent inconsistency, saying only that the reference to the parents' integrity was "somewhat of an overstatement on my part".

341    In late March or early April, TD decided that it would not offer concessions as part of an overall solution for Leigh. Wilson testified that the bank had indicated it would not provide any concessions and would not approach the government with the shareholders to seek concessions.

342    On April 6, Wilson and Anderson spoke. Wilson testified that Anderson told him "the news was not good" and that it was possible that neither GEC or Siemens would take Leigh. During the conversation, Wilson did not complain about the added words in the fifth comfort  letter. His explanation for not doing so was that it should have been clear to Anderson by the deletion of the words from the proposed letter. Wilson makes no reference to this issue in his note of the call. I find his explanation unconvincing and that no complaint was registered concerning the added words.

343    On April 9, Gerdine and Alexander came to Canada to meet with members of the Canadian government. Gerdine testified that the government officials refused any assistance, following which he concluded the only alternative was bankruptcy for Leigh. He said the group returned to the offices of their legal counsel and that Gerdine then called the bank. He spoke to Yovhan Burega, who he said was insistent that the parent companies sign "some kind of an instrument" regarding the Leigh borrowings and Gerdine told him that they might not be able to do it. He said he told Burega "we will all have to do what we have to do" which ended the call. He said that since it was manifest that the shareholders were not going to put any cash into Leigh, following the call bankruptcy was the only alternative. During these final calls no mention was made of the wording of the fifth comfort letter by anyone at the bank. On April 10 Hugh Rising of the bank's London office called David Newlands. Newlands testified that Rising was seeking comfort that GEC would stand

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

behind the Leigh loan. Newlands did not give him the comfort he was seeking.

344     On April 11, 1990, Exton, in a memorandum recording discussions between himself, Rising, Walzak, Burega and Wilson, concerning events between April 5 and April 11, outlined "key strategic areas identified by Rob Wilson." These included, "GEC & Siemens worldwide  reputation - negative publicity, if the companies do not stand behind the Comfort Letter," government pressure, and poor relations with the Canadian government. Also a possible injunction which could "cause costly delays and be a major nuisance factor." In a separate memorandum of the same date, Wilson adverted to the these factors and added "Need to give GEC/Siemens lessons on doing business in Canada ... moreover, they are reneging on a commitment to a major Canadian bank, with public sympathy clearing [sic] falling on the side of TD rather than 2 European multinationals."

345     On April 11 and 12, abortive discussions were held between the government and Leigh in a last attempt to save Leigh. When these failed, Leigh applied for bankruptcy protection on April 12, 1990.

346     Newlands took part in GEC's decision not to pay TD. He could not recall who was in attendance at the meeting, but he believes it took place in Lord Weinstock's office. He testified they had a brief discussion and concluded that there was no reason why GEC should pay. Newlands participated in the a similar discussion regarding whether Plessey should pay TD and the same conclusion was reached.

347     The process followed by both the Plessey board and GEC accords with Musgrave's view of what a company is-suing a letter of comfort ought to do when demand is made. Musgrave testified that, while he never saw a legal obliga-tion for Plessey to pay under a comfort letter of this kind, he personally felt that the board of directors of the issuer had a moral obligation at least  to consider a bank's request for payment. If the directors reviewed the matter but decided not to pay the borrower's outstanding loan, then they had, in his view, discharged that obligation.

*The Parties' Understanding of Comfort Letters.*

348      At the outset, I note that where the views of the witnesses constitute legal conclusions on issues before this court, I place no weight on their evidence.

349     The bank and Plessey were both large and sophisticated business organizations. Their states of mind was placed squarely in issue in this trial. Their knowledge of the use of comfort letters in the marketplace in which they both oper-ated was the subject of considerable evidence.

350     Dealing first with the bank, Noonan testified that he used comfort letters with caution. It was he who first pro-posed that a comfort letter be obtained from Plessey, given that a guarantee was not on offer. The bank characterized the Plessey comfort letter as "strong" throughout, and knew that comfort letters varied in strength, according to their word-ing.

351     F.G. McDowell, vice chairman of the Credit Division and the most senior credit person involved with the Leigh facility (other than the chairman of the bank), testified that the bank was aware of the distinction between a comfort letter binding a parent to pay a subsidiary's debt and one that did not, even though he did not review the specific comfort letters accepted by the bank.

352     TD's Legal department was mindful of concerns about the enforceability of comfort letters. In a memo and dated September 8, 1982, as senior member TD's legal department, T. G. O'Connor identified a series of weaknesses and legal technicalities which accompanied comfort letters and concluded that "comfort letters are only of use where political as-

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

surances are better than legal assurances (which is seldom the case) or where a shadow of a guarantee is better than nothing at all. They are inappropriate for lenders who require a serious legal claim."

353      Neither Noonan nor McDowell had seen this memorandum but McDowell was aware that the TD legal department had "reservations" about comfort letters. Young did not know of the memorandum either but was aware of the "uncertainty of enforceability" of comfort letters.

354      On September 16, 1988 a "head office circular" emanated from the bank's general counsel and secretary, R. G. Bumstead, dealing with the use of comfort letters. Bumstead stated that comfort letters "invariably" fall short of a guarantee, are not a suitable substitute for a standard form of guarantee, and should not "normally" be used unless the bank is "otherwise well protected or secured." Where a comfort letter is all that is on offer and the bank is prepared to lend on that basis, he advised as to procedures to be followed. McDowell testified that this permanent circular reflected the legal department's opinion of comfort letters, he would have seen it and it would have been circulated to staff, including to the corporate bank banking department, and retained by them. He added that it was merely an opinion however, and not binding. Evaluating credits was a matter of personal judgment, he stated, but the circular should have been read and considered.

355      McDowell stated that he did not agree with everything in the legal department memos, although he did not see them at the time. Noonan's evidence was substantially in line with that of McDowell. Leaney testified that she was not aware of the circular or the views expressed in it, either through the circular or other sources. Exton, Young and Wilson all testified that they also had not seen the circular. Leaney Young and Wilson differed somewhat as to what effect knowledge of the memo would have had on their actions, but all agreed they would have had to at least consider it.

356      In a memorandum dated March 16, 1989 the bank's legal department reported on the decision of the English Court of Appeal in *Kleinwort Benson*, stating that "the enforceability of comfort letters is limited." The memorandum concluded:

> If a fully protected legal obligation is sought, a standard guarantee, resolution and solicitor's letter of opinion should be obtained. The Bank cannot rely on comfort letters to do more than state a fact, which may or may not change in the future. If there is misrepresentation in the letter, the Bank may have an action against the signatory for misrepresentation but not in contract. A comfort letter is cold comfort for the Bank.

357      This document was addressed to the Credit Division, Corporate Banking Division, and senior vice presidents of the Line Division, and bore the handwritten notation "Sent -Mar 28" with the names of McDowell and Mercier, and "all Division SVPs".

358      McDowell and Noonan both testified they could not recall having received this memo.  Noonan would have felt obliged to follow it he said, but not necessarily where existing customers or comfort letters were involved. McDowell would have expected persons required to deal with comfort letters to receive it, however, Leaney apparently did not. Exton, Young and Wilson had not seen the memo either. Exton and Young knew of *Kleinwort Benson* independently of the memo, but Wilson did not know of the case.

359      Noonan testified that he was aware of the trial decision in *Kleinwort Benson* and had, indeed drawn to the attention of Bumstead a financial Times of London clipping dealing with *Kleinwort Benson* in January, 1988. Noonan and Young were both involved in the first four Plessey comfort letters. Both testified that they were aware of the trial decision in *Kleinwort Benson*, and also of the subsequent Court of Appeal decision, reversing it. Young had consulted with a lawyer in the bank's legal department, Alex Norton, when he learned of the appellate decision. Leaney testified she

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

never learned of the *Kleinwort Benson* decision at any time. Young however, said he thought it "likely" he would have discussed the case with her. Young recalled that at least one source of his knowledge of *Kleinwort Benson* was from a law firm circular, and any information circulated to him would have gone to Leaney as well.

360    TD had used comfort letters in other facilities and examples were introduced in evidence. McDowell stated that he expected the legal department to keep on top of developments in commercial law, including comfort letters, and advise the lending and credit officers of developments to the extent they felt appropriate. Non-lawyers were not expected to keep abreast of developments in the law on their own.

361    McDowell and Noonan agreed the bank would be or ought to be aware of major developments affecting the usefulness and enforceability of comfort letters, to the extent this received attention in the marketplace. There was evidence of a plethora of law firm circulars, articles, and other documents dealing with comfort letters, over and above those generated within the bank.

362    Noonan and Young had a general working familiarity with comfort letters based on their experience, but no formal education regarding them.

363    Noonan testified that his characterization of the comfort letter as strong was based on the language in the letter, the fact that two authorized persons signed it, and the company's reputation and ability pay. He testified he believed Plessey would do what it had said in the letter, although, as he stated, he never spoke to anyone at any of the corporate defendants. He stated that of paramount importance was the reputation of the giver of the letter, whether it had access to world markets, valued its reputation, and whether the bank could believe their word. He felt Plessey met all the above criteria; it was a "major world corporation" with the resources to flow money to the subsidiary to see the commitment fulfilled. Noonan said he thought the language of the comfort letter was appropriate and Plessey's reputation was such that the bank could take it at its word. He said he thought the same was true after the GEC Siemens takeover.

364    McDowell testified that he knew Plessey as a very respectable U.K. corporation. Sir Alastair Frame was a director of both Plessey and the bank. The bank was soliciting an  opportunity to do business with Plessey. McDowell noted, on a September, 1988 Group Credit for Board Presentation for the Plessey group including Leigh, that Plessey was "a leading U.K. high tech company and the parent of Leigh Instruments Ltd. in Canada. Well capitalized, profitable, and considered responsible. Loans to Leigh are supported by comfort letter."

365    McDowell's personal view was that a well-written comfort letter was one which was from a responsible corporation and signed by its authorized officers, which acknowledged the borrowing, confirmed ownership of the borrower, and stated the intention to keep the borrower in sound financial condition. In his view, such a letter would be a very good comfort letter, and he would view it as an undertaking. In his words: "my word is my bond, and if I make a commitment, I expect to fulfill it." McDowell did not see any of the Plessey comfort letters, and thus these views were of comfort letters generally and not a construction of any particular letter.

366    I turn next to Plessey, and its knowledge of and experience with comfort letters.

367    Musgrave was head of Plessey's Treasury Department. He was responsible for all comfort letters issued by Plessey. Since becoming group treasurer in 1982, he had acquired knowledge of comfort letters from varied sources ranging from professional organizations such as the Association of Corporate Treasurers, discussions with Plessey in-house counsel, a review of all of the Plessey comfort letters on file, and by following the literature on the subject. He learned of the *Kleinwort Benson* decisions through this professional literature, but testified that the decisions and subsequent comment upon them did not lead him to alter his views on comfort letters.

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

368      Musgrave testified that he knew the essential nature of a guarantee, which he described as a direct obligation to pay someone else's debt. Conversely, a comfort letter in most cases was intended to provide, in his view, "a degree of comfort" to the bank about a transaction, while falling short of the guarantee to repay the debt of a subsidiary. There was, he said, a "clear distinction between a comfort letter and a guarantee". He was aware of the range of language used in comfort letters, from mere awareness of a facility to "just short of a guarantee". He said comfort letters could include legal or moral obligations.

369      Musgrave stated comfort letters were a means of avoiding giving a guarantee, and that Plessey did not like to give guarantees, except where necessary, such as for a large contract or at government insistence. His and Plessey's view was that a comfort letter did not impose an obligation to repay a subsidiary's debt. Lenders, he testified, accepted such letters based on commercial considerations such as the overall relationship with the lending group, the amount of business from the group, and an overall assessment of the risk in the transaction. He expected that a bank would look at the particular comfort letter and the overall relationship with the group in arriving at its decision.

370      Musgrave testified that during the period of his involvement from 1982 to 1989, it was a buyers market, and since Plessey was credit worthy, many banks wished to do business with it. He testified that comfort letters would be negotiated between the bank and Plessey in any given  transaction. Since Plessey was reluctant to give guarantees, comfort letters were sought from time to time, as a lesser form of support for the facility sought by the subsidiary. Plessey produced several comfort letters it had used over the years, and Musgrave testified about two examples where Plessey had paid on a non-binding comfort letter. He said on one of those occasions, Plessey paid for relationship reasons, because public knowledge they had walked away could make future dealings with banks difficult. He stated that he would be "embarrassed" if Plessey signed a comfort letter and decided not to pay the debt associated with it, without first giving a request for payment reasonable consideration, because Plessey would have failed to live up to the spirit of the letter. He said he viewed comfort letters as imparting a moral obligation to consider whether or not to pay the debt of the subsidiary, and that as long as Plessey gave the comfort letter that consideration, that was all that was required. He said once Plessey had given that consideration, a decision not to pay would not embarrass him.

371      The evidence of Musgrave, Noonan and McDowell was not inconsistent in substance. Each of them essentially viewed comfort letters as gentlemen's agreements, and placed emphasis on considerations of reputation in the business community and ability to pay, when assessing a comfort letter.

### The Witnesses

372      In light of my evidentiary findings, it is perhaps useful to share my impressions of the  witnesses called by the three parties to the action.

373      This is a fact driven case, however there was no significant controversy about much of the evidence, with the exception of the evidence of the three witnesses to whom I now turn. It is necessary to make adverse credibility findings in respect of these three witnesses only.

### The Bank Witnesses

374      I must comment generally on the evidence of the three bank witnesses from the Corporate Banking Division; Mr. Young, Mr. Wilson, and their supervisor, Ms. Leaney. Ms. Leaney graduated from the University of Toronto with a B.A. (Hons.) and immediately thereafter joined the TD Bank. After a brief training period she became a senior accounting officer at a branch and then moved up the ranks into middle management. She held a series of positions and gained experience in lending, credit and marketing. She had been involved with Leigh in 1983, in the period when it had experi-

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

enced financial difficulties, resolved with the help of a work-out specialist. After a period in Corporate Finance, she returned to the Corporate Banking Division in 1988 as a general manager. The account manager responsible for the Leigh account, Young, and then Wilson, reported to her. She herself reported to Ernest Mercier, executive vice president of Corporate Banking. In 1990 she moved to the Corporate and Investment Banking Group as a vice president, and then into TD Securities Inc., from which she retired in 1996. I found Ms. Leaney to be alternatively aggressive, argumentative and defensive when giving evidence. Her evidence at trial contained a plethora of inconsistencies and contradictions with the evidence she gave on discovery.

375      Greg Young also has an MBA and worked as a chartered accountant at Clarkson Gordon until 1980. From 1981 until 1987 when he joined TD he held a series of positions at the Bank of Montreal, Citibank Canada and Royal Trust. He remained in TDs Corporate Banking Department until November, 1989, when he was replaced by Rob Wilson. He is presently self-employed as a management consultant.

376      Rob Wilson obtained a B.A. from University of Toronto in 1978 and an M.B.A. in 1980. He joined the Continental Illinois Bank following graduation and stayed there until the fall of 1983, when he entered a forestry program at the University of Toronto. Upon obtaining his diploma in resource management from the Department of Forestry, he attempted unsuccessfully to obtain employment in the forestry industry, and then joined the Bank of Nova Scotia in 1984. In 1985 he rejoined the Corporate Banking department of the Continental Illinois Bank, where he remained until 1987 when he again moved, this time to a merchant bank called Canadian Corporate Funding Limited. He left that position and joined TD in October, 1989. He is presently a vice president of TD Securities, where he has been since 1994.

377      These three members of the Corporate Banking Department were involved in management of the Leigh account during the period of time material to this proceeding. During that interval their handling of the account for the bank left much to be desired. In December, 1988 Leaney and Young extended credit to Leigh with Noonan's authorization, on condition that a revised credit review was received the following week. The credit review was not prepared until almost one month later.

378      On the occasion of the taking of the third comfort letter, Young and Leaney acted contrary to the specific direction of the Credit Division in waiving the requirement that the intercompany debt be postponed of their own volition, and releasing the security notwithstanding that the debt had not been postponed. Upon the assumption of Young's responsibilities by Wilson, the degree of supervision provided by Leaney to ensure continuity was unsatisfactory. From time to time the account was out of order, facility letters were not updated and fresh documentation not obtained as directed by Credit Division, and good banking practice not always followed. Ms. Leaney authorized an extension of the authorized credit for Leigh when Leigh was in an overdraft position without consulting the Credit Division, and even though, as she conceded, she did not have the authority to do so. Mr. Wilson did not read the fourth comfort letter when he took over responsibility for the Leigh account, nor did he do so upon receipt of the fifth comfort letter. Thus, while he failed to read the fifth comfort letter, he would not, in any event, have been able to draw an informed comparison if he had done so. Ms. Leaney claims not to have read the comfort letter, which was the only support for a loan of over $40 million, even though her initials appear on the covering memorandum, and she was responsible for the account. When the Leigh situation came to a head, with Leigh on the brink of bankruptcy and the parent companies "back-pedalling" from the association with Leigh, Leaney left for a two-week vacation without, she maintains, having bothered to read the fifth comfort letter.

379      Throughout, the monitoring of the Leigh account was less than diligent, although it is apparent all three knew a good deal more about Leigh than they admitted to. There was a pre-occupation with maintaining existing business and generating new business which pervaded their  approach and clouded their judgment. These three bank witnesses were

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

the persons directly responsible for supervision and control of the Leigh account. All of this resulted, to varying degrees, in a retrospective reconstruction of events by each of these three witnesses in testimony, perhaps inadvertently, in an attempt to explain or minimize their errors and oversights and to cover their mistakes.

380    For all of these reasons, I must conclude that, where the evidence of these three witnesses conflicts with that of any other witness, I cannot rely on the evidence of the Corporate Banking witnesses, and I prefer the evidence of the others. These observations have no bearing, however, upon my perception of the evidence of the witnesses from the bank's Credit Division or that of Mr. Exton.

381    The other bank witnesses were Patrick Noonan and Ted McDowell. McDowell joined the bank out of high school in 1947 and rose through the ranks by dint of hard work. He was the senior credit officer for the bank, a post he had held from 1972 until his retirement in 1990. He was appointed vice-chair of the bank in 1981, and reported directly to the chairman and chief executive officer of the bank. He remained on the board of directors of the bank until 1995. Patrick Noonan began his banking career in 1948 with the Canadian Imperial Bank of Commerce, and joined TD in 1968. He held numerous senior positions in the bank, and was posted in the U.K. and Singapore, as well as Canada. He was appointed senior vice president, credit, in 1982, a position he held until his retirement in 1991. In 1986 he became one of only four senior vice presidents responsible for all credit, globally. Both these witnesses were  seasoned professional bankers, who conducted themselves with integrity, and I found them to be knowledgeable and credible.

382    Jonathan Exton is a graduate of the City of London Business school, and received his MBA from the University of British Columbia in Canada. He held positions with Canadian Pacific and the Bank of Montreal, before joining TDs London office in 1988 as manager of corporate finance. He subsequently was promoted to the position of director of corporate finance, a position he held until he left TD in 1994. He is presently the head of the European multi-nationals group for the Industrial Bank of Japan. I found him to be an honest, credible and forthright witness.

*The Plessey Witnesses*

383    Ian Musgrave is a chartered accountant, and joined Plessey in 1978. He became group finance director seven months later and group treasurer in 1982, a post he held until August, 1989, when he resigned shortly before the hostile takeover succeeded. He was an informed and experienced businessman, who gave his evidence in a responsive, forthright and credible manner. The word which comes to mind in connection with his evidence and his demeanor is honourable.

384    Brendon Sammon was Plessey group chief accountant from 1972 until he left in September, 1990. His, experience, duties and responsibilities at Plessey were in the accounting area and not general management. He executed the fifth comfort letter, not because it fell  naturally within his purview, but more because the senior management of Plessey was depleted following the GEC Siemens takeover. He was a forthright witness, but I gave little, if any, weight to his evidence where it went beyond his area of experience and responsibility, for instance in the area of the general enforceability of comfort letters.

385    Dr. Philip Gerdine is a vice president of Siemens in New York, seconded to Siemens in Munich, in the mergers and acquisitions department. Dr. Gerdine has both an MBA and a Ph.D. and is a certified public accountant. Prior to joining Siemens, he served for about five years as manager in charge of acquisitions services for Price Waterhouse. Following the GEC Siemens acquisition of Plessey in September, 1990, he became the co-managing director of Plessey, along with Simon Weinstock. I found him to be a candid, forthright and credible witness, with a high degree of business acumen and sophistication.

*The GEC Witnesses*

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

386    David Newlands was finance director and a director of GEC plc until his retirement last year. He and Gerdine were both highly involved in the integration of the Plessey businesses into GEC and Siemens. This was a gargantuan task, especially given the lack of prior knowledge of Plessey due to the information constraints associated with a hostile takeover. Leigh was a minute portion of the Plessey whole, and more so in context of the size of the two parents, GEC and Siemens. The GEC group comprised some 145,000 employees, and the group sales in the 1989-90 fiscal year were £6.5 billion, with a profit of £797 million. GEC had cash reserves at the time of about £1 billion and no borrowings. Newlands testified that a "miniscule" amount of his time, less than one per cent of it, was taken up with Leigh matters. I found his evidence to be straightforward, informed, and credible.

387    Ross Anderson joined GEC in London as deputy treasurer in 1975, and was promoted to treasurer in 1979. He has an M.A. from Oxford in jurisprudence and is a chartered accountant. His principal duty as treasurer was the regular, almost daily, investment of GECs sizable resources. I found him to be a responsive, ingenuous witness who was believable in his testimony.

388    Simon Weinstock, who is now deceased, was a manager and executive director of GEC in the period of time material to this action, and reported directly to Lord Weinstock, the managing director of GEC and his father. He was the GEC appointee to act as co-managing director of Plessey following the hostile takeover and was intimately involved in the GEC Siemens hive-up of Plessey. Simon Weinstock was originally named as a defendant to this action and was examined for discovery prior to his death. At trial, the plaintiff vigorously cross-examined David Newlands on a number of areas touching upon the conduct of Simon Weinstock as a directing mind of Plessey. As a consequence, GEC moved to introduce the discovery transcript of Simon Weinstock, which I allowed. I have placed little weight on this discovery evidence however, in view of the fact that I did not have an opportunity to observe his viva voce evidence, and because the cross-examination of Simon Weinstock on discovery was likely less extensive than would have been the case at trial.

### The Leigh Witness

389    Frank Driscoll became president and CEO of Leigh on August 8, 1989. His background was in the technical area with little, if any, experience in finance. At or about the time of the Stanmore meetings on Nov. 28 and 29, 1989, Driscoll became aware that the past president of Leigh, Barry Flower, who was then working with Plessey, was attempting to place blame for Leigh's contractual and other difficulties on Driscoll. Driscoll was of the view that these difficulties had their genesis prior to his arrival at Leigh, during Flower's watch. It is apparent that he felt taken advantage of and vulnerable, and felt in retrospect he had been deceived about the condition of Leigh when he was hired. Prior to the collapse of Leigh he asked for and was given an indemnity agreement by GEC and Siemens. Driscoll was originally named as a defendant in this action. When he was called by the bank to testify, the bank stated that though it had discontinued the action against him, it reserved the right to reinstate or recommence those claims at the end of trial. Prior to testifying, Driscoll invoked the protection of s. 9 of the *Canada Evidence Act* and s. 5 of the *Ontario Evidence Act*. His evidence must be considered in the light of all of these circumstances, and I have apportioned weight to it accordingly.

### The Expert Banking Witness

390    The defendants proffered as expert banking evidence the report and testimony of Robert Wickham. He is a retired banker who spent 25 years with the Royal Bank of Scotland, based in London, until his retirement in 1993. This court ruled he was qualified as an expert in the area of banking, and particularly corporate lending in England, subject to later argument on admissibility.

391    Wickham's expert evidence related to banking practices generally and the use of comfort letters during the peri-

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

od of time material to this action. His evidence also describes the commercial context in which the Plessey letters were delivered to the bank. TD, through its bank witnesses, continually characterised the Plessey letters as strong. TD has pleaded and argued in the alternative that the comfort letters are ambiguous. Wickham's evidence was intended to counter these characterizations. In my opinion, Wickham's evidence meets the test of relevance necessary to assist the trier of fact, and is not subject to an exclusionary rule. It is given by a properly qualified expert. See: *R. v. Mohan, [1994] 2 S.C.R. 9* (S.C.C.) at 20 per Sopinka J.. It is accordingly admissible. Wickham's evidence was useful in respect of the commercial context in which the comfort letters were exchanged and buttressed other evidence in that regard, but was not essential to any findings. Where his evidence overlapped with issues which were to be decided by this Court, it was given no weight.

**Part III**

*Issues and Law*

*Overview*

392    The plaintiff submits that several causes of action arise from Leigh and Plessey's failure to pay the TD loan and Leigh' assignment in bankruptcy, and has advanced claims against the defendants in both contract and tort. In the statement of claim, the plaintiff asserted approximately 150 causes of action against the defendants, however in argument many of these claims were abandoned. As set out below, the plaintiff's claims against Plessey in contract and tort remain outstanding, as do the claims against GEC in tort. All claims of the plaintiff other than those dealt with below have been abandoned.

*The Claims in Contract*

393    The bank claims as against Plessey for breach of contract, and submits that the comfort letters, properly construed in their factual matrix, constitute contractual promises by Plessey to cause Leigh to be managed so as to be always in a position to meet its financial obligations, including all amounts owed to the bank pursuant to the bank's loan to Leigh. The plaintiff asserts that Plessey is in breach of this contractual promise to cause Leigh to be so managed, and is therefore liable to the bank in contract. The bank also seeks an order that the fifth comfort letter be rectified to conform with the agreement between the parties, or that it be set aside.

*The Claims in Tort*

394    The plaintiff submits that Plessey is liable to the bank in misrepresentation on the basis that the third paragraph of the Plessey comfort letters misrepresented the Plessey policy regarding management of its wholly-owned subsidiaries. Specifically, the plaintiff claims that the letters misrepresented the policy because the letters did not disclose the following: that the policy was regarding the management of the subsidiaries by their own management rather than by Plessey; that the policy in the third paragraph did not require Plessey to do anything so that the subsidiaries would always be in a position to pay their debts; that the letters were only a statement of Plessey's policy as at the date of the letter; and that the letter was so "commercially hollow" Leigh could go bankrupt and the bank would receive nothing under its loan facility. In the alternative, the plaintiff claims the third paragraph of each letter was a material misrepresentation because Plessey had adopted no policy regarding the management of its subsidiaries.

395    The bank claims in the alternative that if the policy did exist, it had ceased to exist or was subject to material qualifications by or after December 27, 1989. The plaintiff submits that GEC and Plessey knew the policy statement in the fourth comfort letter had been made and "knew,  recklessly disregarded or should have known" of these material

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

qualifications, and should not have made the statement of policy in the third comfort letter, or should have disclosed the material qualifications. The plaintiff submits the defendants' actions in this regard amount to fraud or negligent misrepresentation.

*Conduct outside the Comfort Letters*

396      In the further alternative, the plaintiff claims the defendants are liable in contract and tort for conduct separate and apart from the comfort letters. In particular, the bank submits that the alleged statement of Ian Musgrave, Plessey group treasurer, that the comfort letters were "tantamount to a guarantee" amounted to a misrepresentation upon which the bank relied to its detriment. Further, the plaintiff claims that certain statements of Colin Justice, made to the bank in November and December 1989, regarding the Leigh financial statements, were negligently or fraudulently made. In addition, the bank claims that certain statements allegedly made by Ross Anderson to Exton constituted negligent misrepresentations.

397      Finally, the bank claims that from no later than February 26, 1990, Plessey and GEC were aware that Leigh was knowingly withholding its unaudited financial statements from the bank, in breach of its express contractual requirements to deliver them. The plaintiff submits that Leigh's conduct in knowingly withholding the statements while continuing to take further funds constituted a deceit upon the bank, and that Plessey and GEC were parties to this deceit through their silence.

**The Claims in Contract**

398      The plaintiff submits that the comfort letters, properly construed in their factual matrix, constitute contractual promises by Plessey to cause Plessey Canada and Leigh to be managed so as to be always in a position to meet their financial obligations, including all amounts due pursuant to the banks loan to Leigh. The bank claims that Plessey is in breach of that contractual promise to cause Leigh to be so managed and is liable to the bank for the amount of the bank's advances to Leigh.

399      In addition, the bank submits it is entitled to rectification of the fifth comfort letter to eliminate the words "and does not constitute a legally binding commitment" on the basis that it does not reflect the agreement of the parties. In the alternative, the bank seeks an order that the defendants cannot rely upon those words, or that the fifth comfort letter be set aside in its entirety.

400      In response, Plessey submits that the operative document is the fifth comfort letter, and asserts that the letter creates no legally binding obligation upon Plessey to directly or indirectly make good the indebtedness of Leigh to TD, regardless of the concluding words which, it submits, simply reinforce the plain meaning of the document.

401      Regarding the bank's assertions as to the contractual promises contained in the comfort letters, Plessey argues that such an interpretation would require the court to insert words into the third paragraph which are not there, and which would, if added, convert a statement of policy or representation into a promise amounting to a guarantee.

402      Plessey resists the request for rectification on the basis that the fifth comfort letter accurately records the understanding between Plessey and TD that the comfort letter did not create a binding legal obligation to pay Leigh's debt to the bank.

*Principles of Contractual Interpretation*

403      The aim of the court, in construing a written agreement, is to determine the intentions of the parties to the agree-

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

ment, and in this regard, the cardinal presumption is that the parties have intended what they have said. Their words must be construed as they stand. See: *Chitty on Contracts* Volume 1, General Principles, 27th ed. (1994) at 580.

404     Where the agreement has been reduced to writing, the parol evidence rule operates to prohibit the introduction of extrinsic evidence to vary the written contract. This rule of interpretation is enunciated in G.H.L. Fridman, *The Law of Contract in Canada*, 3rd ed. (Toronto: Carswell, 1994) at pp. 455-456:

> The fundamental rule is that if the language of the written contract is clear and unambiguous, then no extrinsic parol evidence may be admitted to alter, vary, or interpret in any way the words used in the writing.

See also: *Hawrish v. Bank of Montreal*, [1969] S.C.R. 515 (S.C.C.) per Judson J..

405     This is consistent with the principle that where a document purports on its face to be the final and conclusive expression of the parties' agreement, the document will be taken to be a reliable record of the parties' latest agreement, and evidence of the negotiations leading up to it will not be admissible. See: S.M. Waddams, *The Law of Contracts* (3rd ed.) (Toronto: Canada Law Book, 1993) at 210. This principle was articulated by Lord Wilberforce in *Prenn v. Simmons*, [1971] 1 W.L.R. 1381 (U.K. H.L.) at 1384-1385:

> The reason for not admitting evidence of these exchanges is not a technical one or even mainly one of convenience, (though the attempt to admit it did greatly prolong the case and add to its expense). It is simply that such evidence is unhelpful. By the nature of things, where negotiations are difficult, the parties' positions, with each passing letter, are changing and until the final agreement, though converging, still divergent. It is only the final document which records a consensus. If the previous documents use different expressions, how does construction of those expressions, itself a doubtful process, help on the construction of the contractual words? If the same expressions are used, nothing is gained by looking back; indeed, something may be lost since the relevant surrounding circumstances may be different. And at this stage there is no consensus of the parties to appeal to.

406     These principles were adopted by the Court of Appeal for Ontario in *Craighampton Investments Ltd. v. Ayerswood Developments Ltd.* (1984), 4 O.A.C. 124 (Ont. C.A.) at 126:

> This case obviously demonstrates the practical sense of the parol evidence rule. When equals negotiate at length and arrive at a written agreement which can be interpreted by itself or by reference to matters which must be taken to have been known to both of them and which show the sense or meaning that the words must be taken to have had when the agreement was made, it verges on idle activity for a court to rehash the negotiations, activities and conduct of the parties and hear their now professed expression of what their intentions were at an earlier time.

*Factual Matrix*

407     The court need not be confined to a strict, literal interpretation of the language of the document however, and may admit evidence of the "factual matrix" or circumstances surrounding the conclusion of the agreement as an aid in interpretation. Lord Wilberforce stated in *Prenn v. Simmons, supra* at 1383-4:

> In order for the agreement of July 6, 1960, to be understood, it must be placed in its context. The time has long passed when agreements, even those under seal, were isolated from the matrix of facts in which they were set and interpreted purely on internal linguistic considerations. ...We must ... inquire beyond the language and see what the circumstances were with reference to which the words were used, and the object, appearing from those circumstances, which the person using them had in view. Moreover, at any rate since 1859 ... it has been clear enough that evidence

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

of mutually known facts may be admitted to identify the meaning of a descriptive term.

He rejected the notion, however, that evidence of the parties' subjective intentions ought to be admissible, at 1385:

> And if it can be shown that one interpretation completely frustrates that object, to the extent of rendering the contract futile, that may be a strong argument for an alternative interpretation, if that can reasonably be found. But beyond that it may be difficult to go: it may be a matter of degree, or of judgment, how far one interpretation, or another, gives effect to a common intention: the parties, indeed, may be pursuing that intention with differing emphasis, and hoping to achieve it to an extent which may differ, and in different ways. The words used may, and often do, represent a formula which means different things to each side, yet may be accepted because that is the only way to get "agreement" and in the hope that disputes will not arise. The only course then can be to try to ascertain the "natural" meaning. *Far more, and indeed totally, dangerous is it to admit evidence of one party's objective -- even if this is known to the other party. However strongly pursued this may be, the other party may only be willing to give it partial recognition, and in a world of give and take, men often have to be satisfied with less than they want.* So, again, it would be a matter of speculation how far the common intention was that the particular objective should be realised...

> In my opinion, then, evidence of negotiations, or of the parties' intentions, and a fortiori of Dr. Simmonds' intentions, ought not to be received, and evidence should be restricted to evidence of the factual background known to the parties at or before the date of the contract, including evidence of the "genesis" and objectively the "aim" of the transaction. [Emphasis added]

Lord Wilberforce returned to this theme and elaborated upon the notion that evidence of the factual matrix may be admitted to construe a term in *Reardon Smith Line v. Hansen-Tangen,* [1976] 3 All E.R. 570 (U.K. H.L.) at 574-575:

> When it comes to ascertaining whether particular words apply to a factual situation or, if one prefers, whether a factual situation comes within particular words, it is undoubtedly proper, and necessary, to take evidence as to the factual situation.

> . . . . .

> It is less easy to define what evidence may be used in order to enable a term to be construed. ...[I]t does not follow that ...one must be confined within the four corners of the document. No contracts are made in a vacuum: there is always a setting in which they have to be placed. The nature of what is legitimate to have regard to is usually described as 'the surrounding circumstances' but this phrase is imprecise: it can be illustrated but hardly defined. In a commercial contract it is certainly right that the court should know the commercial purpose of the contract and this in turn presupposes knowledge of the genesis of the transaction, the background, the context, the market in which the parties are operating.

> . . . . .

> It is often said that, in order to be admissible in aid of construction, these extrinsic facts must be within the knowledge of both parties to the contract, but this requirement should not be stated in too narrow a sense. When one speaks of the intention of the parties to the contract, one is speaking objectively - the parties cannot themselves give direct evidence of what their intention was - and what must be ascertained is what is to be taken as the intention which reasonable people would have had if placed in the situation of the parties. Similarly, when one is speaking of aim, or object, or commercial purpose, one is speaking objectively of what reasonable persons would have in mind in the situation of the parties. It is in this sense and not in the sense of constructive notice or of estopping fact that

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

judges are found using words like 'knew or must be taken to have known'....

. . . . .

I think that all of their Lordships are saying, in different words, the same thing - what the court must do must be to place itself in thought in the same factual matrix as that in which the parties were. All of these opinions seem to me implicitly to recognize that, in the search for the relevant background, there may be facts, which form part of the circumstances in which the parties contract, in which one or both may take no particular interest, their minds being addressed to or concentrated on other facts, so that if asked they would assert that they did not have these facts in the forefront of their mind, but that will not prevent those facts from forming part of an objective setting in which the contract is to be construed.

408     The Supreme Court of Canada has adopted the notion that a court may look at evidence of the surrounding circumstances when construing a document. In *Hill v. Nova Scotia (Attorney General)*, [1997] 1 S.C.R. 69 (S.C.C.), the court cited with approval the *dicta* of LaForest J. (as he then was), in *White v. Central Trust Co.* (1984), 54 N.B.R. (2d) 293 (N.B. C.A.) at 310-311:

What the statement quoted means is that in determining what was contemplated by the parties, the words used in a document need not be looked at in a vacuum. The specific context in which a document was executed may well assist in understanding the words used. It is perfectly proper, and indeed may be necessary, to look at the surrounding circumstances in order to ascertain what the parties were really contracting about.

409     From these authorities can be gleaned certain principles which should guide the court in interpreting an agreement. The document should be looked at as a whole, with each contractual term considered in the context of the entire document. See: G.H.L. Fridman, *The Law of Contract in Canada*, 3rd ed. (Toronto: Carswell, 1994) at 469. The court should make every effort to construe the document on its face, without regard to extrinsic evidence.

410     Where an agreement is clear and unambiguous on its face, the parol evidence rule  operates to prohibit admission of evidence to alter or vary the written terms of the contract. However, the court may admit evidence of the surrounding circumstances, including evidence of the commercial purpose of the contract, the genesis of the transaction, the background, the context and the market in which the parties were operating. In this regard, evidence to be admitted must be objective in the sense of what reasonable persons in the position of the parties would have had in mind, rather than subjective evidence of the parties' actual intentions.

*Ambiguity*

411     A contract which appears clear and unambiguous on its face may, nevertheless, contain a latent ambiguity. Such an ambiguity may only become apparent when the court seeks to apply the language of the agreement to the facts. Extrinsic evidence of the factual matrix of the agreement may also disclose such an ambiguity, by revealing a meaning attributable to the language of the document apparent only in light of evidence of the commercial context. Where the court determines that a document contains a latent ambiguity, further extrinsic evidence is admissible to clear up the ambiguity. See: *Leitch Gold Mines Ltd. v. Texas Gulf Sulphur Co.* (1968), [1969] 1 O.R. 469 (Ont. H.C.). The role of the court in interpreting an ambiguous commercial contract was stated by Estey J. in *Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.* (1979), [1980] 1 S.C.R. 888 (S.C.C.) at 901:

[T]he normal rules of construction lead a court to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract. Consequently,

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

literal meaning should not be applied where to do so would bring about an unrealistic result or a result which would not be contemplated in the commercial atmosphere in which the insurance was contracted. Where words may bear two constructions, the more reasonable one, that which produces a fair result, must certainly be taken as the interpretation which would promote the intention of the parties. Similarly, an interpretation which defeats the intentions of the parties and their objective in entering into the commercial transaction in the first place should be discarded in favour of an interpretation of the policy which promotes a sensible commercial result.

412      The nature of the evidence to be admitted as an aid to interpretation was considered by the Court of Appeal for Ontario in the seminal case of *Alampi v. Swartz,* [1964] 1 O.R. 488 (Ont. C.A.). In that case, McGillivray J. A. for the court held that extrinsic evidence was not admissible to vary the terms of a written contract, but could be admitted to explain the document and to prove the facts upon which interpretation of the document depends, including the validity of the document, the identity of the parties and to explain technical terms or commercial usage. Mr. Justice McGillivray held that such evidence may not contradict a term of the contract, but is adduced to relate the terms of the contract to the proper subject matter or to assign to the terms a definite meaning. Once such evidence is admitted, it may disclose that a term of the contract is ambiguous and capable of more than one meaning. In that case, he noted at p. 493, "Such an ambiguity, a "latent ambiguity", because not apparent on the face of the writing, demands evidence of intention to establish whether there was an agreement at all, or if the parties intended a particular one of alternate meanings to prevail." Evidence of intention may only be admitted however, once the latent ambiguity has been established.

413      This issue was later considered by Cory J.A. (as he then was), in *TransCanada Pipelines Ltd. v. Northern & Central Gas Corp.* (1983), 41 O.R. (2d) 447 (Ont. C.A.), who noted that every effort should be made to construe the contract based on the wording. Where, however, a doubt arises as to the true sense and meaning of the words or there is difficulty in their application to the circumstances, resort may be had to extrinsic evidence. Mr. Justice Cory held that once the court is of the opinion the contract is difficult to interpret, extrinsic evidence may be admitted to determine whether, in fact, the agreement contains a latent defect, and noted that if, at a later stage, another court was able to interpret the document without regard to that evidence, no harm would result from its admission. At p. 452 Cory J.A. adopted and paraphrased the reasoning of Gale C.J.O. in *Leitch Gold Mines Ltd. v. Texas Gulf Sulphur Co., supra*:

(1) The extrinsic evidence admitted may establish that there is no latent ambiguity in the written document relevant to the issue in dispute. In such a case obviously the written document governs.

(2) The extrinsic evidence may demonstrate that there is latent ambiguity in the terms of the written document which are in dispute. Nonetheless, upon a consideration of all the surrounding circumstances, it requires the choice to be made in favour of the meaning of the agreement which would appear from a reading of the whole document without any extrinsic evidence to show ambiguity.

(3) The extrinsic evidence establishes that there is a latent ambiguity. However, a consideration of the surrounding circumstances requires the choice of a meaning consistent with the words of the document but different from their patent meaning. The party contending that there is a latent ambiguity must not only establish that there is such an ambiguity but also resolve that ambiguity by evidence from which the court can find what agreement was made and what the choice of alternative meanings should be. The party contending for the latent ambiguity must show that the extrinsic evidence dictates the selection of a meaning which is generally consistent with the wording of the written document but different from its patent meaning.

(4) The extrinsic evidence indicates that there is a latent ambiguity of such an extent that the true agreement between the parties is different from the agreement expressed in the written document. That is, the extrinsic evidence estab-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

lished that there is a case of mistake.

(5) The extrinsic evidence establishes that there is a latent ambiguity and goes further and demonstrates that the minds of the parties never really met upon the subject matter concerning which there is an agreement. In other words, there is in fact no agreement upon the terms which would decided the issue between the parties. The court then cannot, on the balance of probabilities, make the necessary finding of *consensus ad idem*.

Similarly in *Arthur Andersen Inc. v. Toronto Dominion Bank* (1994), 17 O.R. (3d) 363 (Ont. C.A.), Grange and McKinlay JJ.A. stated at 372:

First, the words of the contract must be analyzed "in its factual matrix", and a conclusion arrived at that there are two possible interpretations of the contract. Then, and only then, may the trial judge look at other facts, including facts leading up to the making of the agreement, circumstances existing at the time the agreement was made, and evidence of subsequent conduct of the parties to the agreement.

414    Accordingly, where there is some doubt as to the meaning of language used in the contract, or the court has difficulty in applying it to the facts, the court should, in light of the factual matrix, search for an interpretation which would appear to advance the true intent of the parties. The more reasonable construction of the words, which produces a fair result consistent with the commercial atmosphere, is the interpretation which the court should adopt.

415    The court may have regard to extrinsic evidence in order to resolve the ambiguity, and no harm will come from its admission, however extrinsic evidence of facts leading up to the making of the agreement, circumstances existing at the time of the agreement and subsequent conduct of the parties may only be considered once an ambiguity has been found. Extrinsic evidence demonstrating the intention of the parties is only admissible however, once an ambiguity has been found, and in my view, should be objective, rather than subjective evidence of the parties' intentions.

*Application to the Circumstances of This Case*

*Interpretation of the Comfort Letter on its Face*

416    The starting point of any analysis must be identification of the document to be construed. In the present case, the operative document is clearly the fifth comfort letter, dated December 15, 1989 and delivered to the bank on December 27, 1989. This was the last comfort letter delivered to TD prior to the bankruptcy of Leigh in April, 1990. Moreover, the letter states on its face "This letter replaces our letters of 31st August 1989, 31st March 1989 and 30th June 1989...." Applying the principles enunciated by Professor Waddams, *supra*, the fifth comfort letter purports on its face to be the most recent iteration of the parties' agreement. Subject to the plaintiff's submission that the letter should be rectified or set aside, the fifth letter is the document to be construed by the court in the context of the claim in contract.

417    Applying the principles of contractual interpretation set out above, the first step in any analysis must be an attempt on the part of the court to construe the document according to the language on its face, without reference to extrinsic evidence of any sort. The fifth comfort letter states, in its entirety:

This is to confirm that The Plessey plc has full knowledge of the facility of C$45,000,000 (Forty Five Million Canadian dollars) which has been granted by the Toronto-Dominion Bank to Leigh.

Leigh is currently a wholly owned subsidiary of 160956 Canada Inc. Which is a wholly owned subsidiary of Plessey Overseas Limited which in turn is a wholly owned subsidiary of The Plessey Company plc. We undertake not to reduce our share-holding in Leigh or its holding company without prior notification to yourselves.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

It is Plessey's policy that Leigh be managed in such a way as to be always in a position to meet its financial obligations, including repayments of all amounts owed under the above facility to yourselves on their due dates.

The letter replaces our letters of 31st August 1989, 31st March 1989 and 30th June 1989 and does not constitute a legally binding commitment.

418      The last line of the letter is, in my view, dispositive of the plaintiff's contract argument. Having regard to the principle that contracting parties are presumed to intend what they say, the fifth comfort letter states on its face that it replaces all prior comfort letters, and must therefore  be taken to be a reliable record of the parties' latest agreement. Moreover, the letter states that it does not constitute a legally binding agreement and must be taken as conclusive of Plessey's intention that it not be so bound. This is a full and complete answer to the plaintiff's claim in contract.

*The Statement of Policy in the Third Paragraph*

419      The plaintiff submits that the statement of policy in the third paragraph of the comfort letter amounts to a contractual promise by Plessey that it had and would have a policy, as long as the bank's loans were outstanding, to cause Leigh to be managed in such a way that it could pay the bank when called upon to do so. Hence, the plaintiff asserts that the added words in the last line of the document operate to eliminate the contractual promise contained in the third paragraph.

420      In response, Plessey asserts that, notwithstanding the added words in the last line, the statement in the third paragraph is merely a representation as to its policy speaking as at the date of the letter, and not a binding contractual promise. As such, the added words in the last line do not change the effect or alter the meaning of the third paragraph. Plessey argues that the interpretation urged by the plaintiff amounts to a contractual promise that Plessey would see to it that the bank be paid, either directly or indirectly, and that in order to arrive at such an interpretation, the court would have to read into the comfort letter words that are not there.

421      The difference between a contractual promise and a representation was articulated by Professor Fridman in *The Law Of Contract in Canada, supra*, at 3-4 as follows:

Promises are fundamental to the idea of contract. A promise is an *undertaking* as to the future conduct of the party promising, the promisor, with respect to the party to whom the promise is given, the promisee. ...It is the idea of promise which distinguishes contract from representation. A representation is not an undertaking, although, sometimes, it may resemble a promise in its form, for example, where a seller of goods states that the goods in question are "top quality". Representations are statements as to an existing or past fact, not promises as to future events or states of affairs. Although representations can have legal consequences, if made falsely or negligently, or, on occasion, without either fraud or negligence on the part of the representor, such consequences are non-contractual in their nature. They stem from the misleading nature of a statement, not from any promissory character.

[Emphasis added]

422      The leading case on the interpretation of comfort letters in the decision of the English court of appeal in *Kleinwort Benson Ltd. v. Malaysia Mining Corp. Bhd.,* [1989] 1 All E.R. 785 (Eng. C.A.) (leave to appeal to the House of Lords refused). In that case, Ralph Gibson L.J. held that a comfort letter given in support of a subsidiaries borrowing did not have contractual effect.

423      The plaintiffs seek to rely upon the decision of Rogers C.J. in *Banque Brussels Lambert S.A. v. Australian Na-*

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

*tional Industries Ltd.* (1989), 21 N.S.W.L.R. 502 (New South Wales Sup. Ct.), in which the Supreme Court of New South Wales held that a comfort letter was a legally enforceable obligation. In my view that case can have no application to the facts before me. In this regard I adopt the reasoning of Chadwick J. in *Atlantic Computers plc, Re,* [1995] B.C.C. 696 (Eng. Ch. Div.) at 699:

> I was referred also, understandably, to the decision of Rogers CJ in the Supreme Court of New South Wales in the case of *Banque Brussels Lambert SA v. Australian National Industries Ltd.* (1989) 21 NSWLR 502. It is clear from remarks on p. 523 that the Chief Justice found the approach of the Court of Appeal in *Kleinwort Benson* somewhat unreal. He took the view that the construction reached by the Court of Appeal rendered the document in that case nothing but a scrap of paper.

> It would not be open to me to follow the Chief Justice's decision, even if I were to accept his criticism of the Court of Appeal's approach; but I draw attention to the fact that, as he acknowledged, the test prescribed by the law of Australia to determine whether a statement is promissory or only representational is different from that in England (see p. 524A). In my view, the law of England is clear. A document in the terms of these two letters of comfort does not impose a contractual promise as to future conduct.

424      In *Kleinwort Benson*, as in the present case, the paragraph in issue was the third paragraph containing a statement of policy of the parent company that: "*It is our policy to ensure* that the business of MMC Metals Limited is at all times in a position to meet its liabilities to you under the above arrangements." I note in passing that the language used in that comfort letter, including the word "ensure" is arguably stronger than that used in the comfort letter before me.

425      The question before the court in *Kleinwort Benson* was whether the paragraph was a contractual promise as to the parent company's future conduct, or, whether it was simply a statement of present fact regarding the company's intentions. Although the wording and factual matrix of that comfort letter differ from those in the case at bar, nevertheless I find the reasoning to be instructive. In holding that the paragraph was a representation, the court stated at 792:

> In my judgment the defendants made a statement as to what their policy was, and did not in para 3 of the comfort letter expressly promise that such policy would be continued in future. It is impossible to make up for the lack of express promise by implying such a promise, and indeed, no such implied promise is pleaded. My conclusion rests on what, in my judgment, is the proper effect and meaning which, on the evidence, is to be given to para 3 of the comfort letters.

426      In my view, the statement in the third paragraph of the comfort letter is, on its face, a representation and not a contractual promise or warranty. The paragraph does not use promissory language or language of undertaking. It simply contains a statement or representation as to Plessey policy at the time the letter was executed, and does not contain a contractual promise that it will cause Leigh to be so managed nor a promise that the bank will be paid. Moreover, the paragraph must be construed in the context of the document as a whole. A comparison of the wording in the second and third paragraphs is instructive in this regard. The second paragraph states: "We undertake not to reduce our share-holding in Leigh..." The use of words of promise or undertaking stands in sharp contrast to the wording of paragraph three: "It is our policy...."

427      In order to arrive at the construction urged by the plaintiff, it would be necessary to add or imply the words "It is Plessey's policy to *cause Leigh to be managed* in such a way..." or "Plessey *undertakes to ensure* that Leigh be managed..." or other, similar language. The word policy itself, given its common usage, means a guideline or principle, and does not amount to a promise to do anything or a requirement that the terms of the policy be adhered to. A consideration of the policy statement, placed in the context of the letter as a whole, supports this construction of the word, for the reas-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

ons set out below. Further, the words "it is our policy" are, in my view, a representation of present policy and not a contractual undertaking to have the policy in the future. The paragraph does not say "it is *and will be* our policy", and in order to construe the statement of policy as a statement of future intention, it would again be necessary to imply into it words which are not there. The word "always" in the third paragraph has the effect of making the representation as to policy a continuing representation, although subject to change. Absent the word "always", the policy statement could be taken as speaking only as at the date of the letter. The word "always" does not have the effect of elevating the policy statement to the level of a contractual promise to have the policy in the future.

428    If the construction urged by the plaintiff is adopted, namely that Plessey promises to have the policy as long as the loan is outstanding and that Plessey will cause Leigh to be managed in accordance with the policy, the effect is to emasculate the preceding two paragraphs of the comfort letter. In this regard, the reasoning in *Kleinwort Benson* at 795-796 is apposite:

> Next, the first draft of the comfort letter was produced by the plaintiffs. Paragraph 1 contained confirmation that the defendants knew of and approved of the granting of the facilities in question by the plaintiffs to Metals, and para 2 contained the express confirmation that the defendants would not reduce their current financial interest in Metals until (in effect) facilities had been paid or the defendants consented. Both are relevant to the present and future moral responsibility of the defendants. *If the words of para 3 are to be treated as intended to express a contractual promise by the defendants as to their future policy, which Hirst J. held the words to contain, then the recitation of the plaintiffs' approval and the promise not to reduce their current financial interest in Metals would be of no significance. If the defendants have promised that at all times in the future it will be the defendants' policy to ensure that Metals is in a position to meet its liabilities to the plaintiffs under the facility, it would not matter whether they had approved or disapproved, or whether they had disposed of their shares in Metals.* Contracts may, of course, contain statements or promises which are caused to be of no separate commercial importance by the width of a later promise in the same document. Where, however, the court is examining a statement which is by its express words no more than a representation of fact, in order to consider whether it is shown to have been intended to be of the nature of a contractual promise or warranty, it seems to me to be a fact suggesting at least the absence of such intention if, as in this case, to read the statement as a contractual promise is to reduce to no significance two paragraphs included in the plaintiff's draft, both of which have significance if the statement is read as a representation of fact only. [Emphasis added]

429    Similarly, in the case at bar, the first paragraph of the comfort letter contains a statement of Plessey's awareness of the facility extended by TD to Leigh, and the second paragraph contains an undertaking on the part of Plessey not to reduce its shareholding without prior notification to the bank. If the third paragraph is read as a contractual obligation that Plessey will continue to have the policy while the facility is outstanding, and that it will cause Leigh to be managed so that it can meet its obligations under the facility, the preceding two paragraphs would become irrelevant. To paraphrase Ralph Gibson L.J., there would be no reason to waste ink or paper on the first two paragraphs.

430    Finally, in interpreting the document as a whole, the third paragraph must also be construed in light of the last line, stating that the comfort letter (and thus the third paragraph) does not constitute a legally binding commitment. Hence, the fifth comfort letter is clear and unambiguous on its face, does not contain any contractual promise, and the bank's claim in contract must fail.

*The Factual Matrix*

431    A consideration of the comfort letter in its factual matrix does not alter this conclusion. Plessey and TD have

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

both made submissions as to the appropriate evidence of the surrounding circumstances which the court ought to consider. I have reviewed the evidence carefully, and having regard to the principles outlined above, in my view the following evidence is admissible to place the comfort letter in its factual matrix. Plessey was a large, multinational corporation with subsidiaries in 43 countries. TD is a Canadian Bank with branches throughout the world. Both are large, sophisticated parties, and both were intimately familiar with commercial lending transactions and the various forms of security used in such transactions, including loan guarantees. Prior to the delivery of the Leigh comfort letters, both parties had been involved in other transactions involving comfort letters. Both parties knew that there was no single "standard form" of comfort letter in use in the financial marketplace, and both knew that the legal effect of a comfort letter depended on the wording of the letter. Plessey and the Bank were both aware that in the commercial context in which they were operating, a confirmation by a parent company that it was aware of the borrowings of its subsidiary was considered to have some significance, as was an undertaking to notify the bank of any reduction by the parent in its shareholding in the subsidiary. It would also have been known to both parties that banks competed for the business of companies of the size and prominence of Plessey and actively solicited them to develop business opportunities. TD had solicited Plessey for business unsuccessfully in the past. The aim of the transaction was to arrange bank financing for Leigh on terms that were acceptable to both parties.

432      Regarding the specific transaction in issue and its genesis, as is outlined above the bank approached Plessey when the Leigh takeover bid was announced, and offered to assist in financing the purchase of Leigh. Plessey ultimately availed itself of a $10 million short-term acquisition loan, to be used by the acquisition vehicle, Plessey Canada (1988) Inc.. Plessey also provided a letter of comfort to the bank, in a form which was agreed upon following negotiation, and which the bank accepted. The first comfort letter was in substantially the same form as the fifth letter, absent the last sentence.

433      The factual matrix surrounding the comfort letter does not alter my conclusion that the comfort letter is clear and unambiguous. The parties were sophisticated and accustomed to operating in international financial markets. The comfort letter contained statements of commercial significance to the bank. The first paragraph contained a representation that Plessey was aware of the facility which had been granted to Leigh by the bank. The second paragraph contained an undertaking, using express contractual language, that Plessey would not reduce its shareholding in Leigh without prior notification to the bank. Such notification would provide the bank with an opportunity to call the loan or take whatever steps it deemed necessary.

434      The third paragraph contained a representation as to the policy of Plessey. The paragraph does not contain express promissory language, in direct contrast with the contractual undertaking given in the second paragraph. This contrast is significant given that both parties were sophisticated and used to negotiating the terms of security. Both parties also knew what a guarantee was and the appropriate language of guarantee. The comfort letter was arrived at in a commercial marketplace in which banks, including TD, solicited large companies like Plessey for business, and competed with other banks for that business. In that context, to construe the third paragraph as a promise to do anything, including a promise to pay the bank, in the absence of express language to that effect, defies both legal and commercial sense.

435      The plaintiff asserts that to construe the third paragraph as a representation makes no commercial sense, in that the bank would be no better off than it would have been with a letter from Leigh itself, saying that it intended to manage its own affairs in such a way as to be always in a position to meet its financial obligations. I do not agree with this submission. While Plessey is not obliged to pay the bank, nor to have the policy stated, the letter nevertheless has commercial value. Delivery of the letter provides the bank with a recourse it would not otherwise have had, namely, to approach the parent company and ask it to pay. The possibility that the parent will consider paying must give the bank more comfort than such a letter from Leigh standing alone, without potential recourse to a parent. Moreover, to interpret the third

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

paragraph as a representation rather than a contractual promise is not to render it commercially hollow or devoid of meaning. An interpretation of the paragraph as not obliging Plessey to do anything to have or enforce such a policy does not mean that, in fact, Plessey did not take such steps. A comfort letter containing a representation as to policy must, in my view, have more commercial value than a letter which did not contain such a statement.

436    The third paragraph does not amount to a contractual promise by Plessey to have the policy described, either at the date of the letter or in the future. Nor is it a promise by Plessey to cause Leigh to be managed in accordance with the policy, or that Plessey would cause the bank to be paid. In order to reach such conclusions, it would be necessary to read into the paragraph words which are not there, and there is no basis in the evidence for the implication of such terms. See: *Canadian Pacific Hotels Ltd. v. Bank of Montreal*, [1987] 1 S.C.R. 711 (S.C.C.); *Charles P. Rowen & Associates Inc. v. Ciba-Geigy Canada Ltd.* (1994), 19 O.R. (3d) 205 (Ont. C.A.). My conclusion is reinforced when the paragraph is viewed in the context of the entire letter, including the final sentence disavowing any binding legal obligation.

*Ambiguity*

437    Both the bank and Plessey assert that the comfort letter is not ambiguous, although each urges the court to adopt a different construction of the third paragraph, based upon the same wording. The bank asserts that the third paragraph amounts to an ongoing contractual promise to have the policy set out in the paragraph for as long as the loan was outstanding, and a contractual promise that Plessey would cause Leigh to be managed so that it could pay the bank. Plessey, on the other hand, submits that the paragraph contains no contractual obligation, and is simply a statement of present intention. In their submission, the paragraph is merely a representation that on the date of the comfort letter Plessey had the policy described, and that a policy, as opposed to a obligation of some kind, merely speaks to Plessey's expectation as to the management of Leigh, and not to any requirement that it be so managed.

438    As was noted by Cory J.A. (as he then was) in *TransCanada Pipelines Ltd. v. Northern & Central Gas Corp.*, *supra*, a document which appears clear on its face, may nevertheless disclose an ambiguity if a doubt arises as to the true meaning of the words, or if the court has difficulty in applying the language to the facts. I agree with the submissions of both parties that the letter is not ambiguous on its face and, for the reasons outlined above, a consideration of the letter in its factual matrix does not disclose any ambiguity, nor any reason to depart from a construction of the document based upon its express wording. I find the document contains no latent ambiguity. However, even had I found there was such an ambiguity, the extrinsic evidence which would then be admissible does not assist the plaintiff. Although it is not necessary that I review it, the extrinsic evidence supports the conclusion that there is no latent ambiguity and defeats the construction urged by the plaintiff. The salient details of this extrinsic evidence are outlined below.

*Circumstances Leading up to the First Comfort Letter*

439     The starting point must be that the bank knew from the outset that a guarantee was not on offer by Plessey. When Plessey announced its friendly takeover bid for Leigh, the bank approached Plessey and offered to assist with funding for the acquisition. Although the bank had made loan facilities available to Plessey prior to this, none had been drawn upon, and Baker referred to the possibilities for developing business opportunities with Plessey in his CCR recommending that the loan be approved. Baker also noted in the CCR that a guarantee was not on offer for the borrowing, which would be unsecured. Indeed, it was this notation which led Noonan in the Credit Division to stipulate that an appropriate comfort letter be obtained from Plessey, instead.

440    The form of comfort letter which was ultimately delivered to the bank was the subject of negotiation between the bank and Plessey. Drafts were exchanged. Howard Baker sent an initial draft to Plessey, based on a template comfort letter. The template Baker was working from included a line which contained language which, in my view, amounted to a

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

contractual promise: "and in this particular instance, we will ensure that sufficient liquid resources are available to discharge any liabilities at maturity." Baker deleted this line from the proposed draft which he sent to Plessey. Baker's draft concluded "We also wish to assure you that during the period of such financial assistance we expect to provide adequate financial support in order that the affairs of Plessey Canada (1988) Inc. will be conducted on a sound basis." Plessey responded with its own draft, which was accepted by the bank without amendment.

441      I can only conclude from the foregoing that the bank was aware Plessey was not prepared to provide a guarantee for the borrowings of Plessey Canada, that the bank agreed to accept a comfort letter rather than a guarantee in order to develop the business relationship with Plessey, and that the bank was consulted as to the terms of the comfort letter to be provided. In this regard, it is significant that in October 1989, the bank was invited to (and did) tender a bid to provide Plessey with an uncommitted facility, security for which was offered as the unconditional and irrevocable 50-50 several guarantees of GEC and Siemens. In my opinion, none of this evidence supports a finding that the comfort letter contains a latent ambiguity, nor that the third paragraph of the letter contains any contractual promise.

*Evidence Regarding the Subsequent Comfort Letters.*

442      The corporate credit reviews of the Leigh account are replete with references to the bank's relationship with Plessey and later GEC, and to the bank's desire to generate further business with these companies. Throughout, the comfort letter is listed as documentation rather than security, in accordance with the bank's Credit Procedures Manual. At the same time, from the time of delivery of the third comfort letter, the risk rating in these credit reviews is clearly that of Leigh, and not that of the parent companies. The risk rating deteriorates as the Leigh bank line grows, a fact which is inconsistent with an understanding on the part of the bank that they had a guarantee or enforceable contractual commitment from Plessey that they would be paid. Indeed, the bank explicitly recognized that the support from Plessey was informal. In his comment on the Nov. 1, 1988 request that the Leigh line be extended by $4 million, Sid Owen noted: "the combination of Plessey's support, albeit informal, and receivables should provide adequate protection but all must work to regularize this company's facilities by November 30, 1988. We must resist being dragged along." This observation is, in my view, completely  inconsistent with the notion that the bank thought it had a contractual promise from Plessey that it be paid.

443      In the fall of 1988, Plessey discovered that the bank held security over the assets of Leigh in the form of a general assignment of book debts and a floating charge debenture. Plessey requested that the bank release this security and the bank agreed. The Credit Division required as a term of this agreement that Plessey subordinate its intercompany debt in priority to the debt of the bank. Plessey refused to do this, and the Corporate Banking Division agreed to waive that condition, and also agreed to release its security over Leigh's assets. At no time did the bank suggest that the wording of the comfort letter be altered or amended in any way, notwithstanding that the line of credit was now an operating loan rather than a short-term acquisition loan, and that the amount of the loan had increased substantially. This is so even though Plessey forwarded a draft of the third comfort letter to the bank and requested confirmation that its terms were acceptable, thus providing TD with an opportunity to suggest changes in the wording. It is noteworthy that the loan was repayable on demand, and thus could have been called by the bank at any time.

444      Prior to delivery of the fourth comfort letter, the bank agreed to extend credit to Leigh in excess of the amount referred to in the comfort letter. Plessey executed a letter to this effect which had been provided in draft form by the bank, without amending its terms, which stated: "However, should Leigh require the higher level of operating facilities beyond the end of August 1989, then The Plessey Company plc undertakes to amend the letter of comfort accordingly."  This document contains words which amount to a contractual promise to provide a further comfort letter if one was needed, in language which was supplied by the bank. Plessey complied with the terms of this undertaking, and for-

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

warded the fourth comfort letter to the bank, despite the fact the bank had not requested it. This is significant, both because the bank clearly was familiar with promissory language and requested it when it felt such language was appropriate, and also because having given an enforceable undertaking, Plessey honoured it.

445     In the fall of 1989, Plessey was the subject of a successful hostile takeover. The bank was aware of this, and noted the GEC Siemens plan to divide up the assets of Plessey in the September 20, 1989 CCR. Almost all of the senior personnel at Plessey left shortly after the takeover, and were replaced by representatives of GEC and Siemens. The bank viewed this as an opportunity to develop a business relationship with GEC, and made no effort to renegotiate the terms of the comfort letter or call the loan.

446     Finally, as I have found above, the bank read and accepted the fifth comfort letter, including the last line which stated that the comfort letter did not constitute a legally binding obligation.

447     All of this extrinsic evidence displays a clear focus on the part of the bank on generation of further business with Plessey and GEC, and, in a competitive marketplace, indicates to me that the bank was prepared to assume risks and make concessions in order to further that goal. Moreover, all of this evidence, including Plessey's refusal to provide a guarantee at the outset; the descriptions of the support from Plessey as informal; the fact that the relevant risk rating was that of Leigh rather than Plessey; the parties' use of contractual language prior to delivery of the fourth comfort letter; and the offer of joint and several guarantees in the October 1989 Plessey uncommitted facility; all of this is inconsistent with an understanding on the part of the bank that they had obtained a contractual promise in the comfort letter that they would be paid directly or indirectly by Plessey. It is also inconsistent with a belief by the bank that it had obtained a promise that Leigh would remain solvent.

*Evidence of Subsequent Conduct.*

448     The bank read and accepted the fifth comfort letter. At no time up until the bankruptcy of Leigh on April 12, 1990, did anyone from the bank comment or complain to any of the defendants regarding the additional wording in the last line, let alone ask that the language be deleted. In conversations with Gerdine and Anderson, the bank requested that GEC and Siemens formally acknowledge the existing Plessey comfort letter. On April 5, 1990, the bank sent both GEC and Siemens a letter enclosing a draft comfort letter which it requested that they execute. The covering letter stated: "Our comfort and support for Leigh has been based on the integrity of both GEC and Siemens, consistently demonstrated to us." The bank's reference to its reliance on the integrity of the parent companies is, in my view, inconsistent with an understanding on their  part that they were in possession of a binding contract in the comfort letter. Further, the accompanying comfort letter contained no reference to Plessey's policy, but did contain express promissory language which might well have amounted to a contractual obligation, had the letter been executed: "We undertake to ensure that Leigh be managed in such a way, so long as your credit facility remains outstanding, as to be in a position to meet its financial obligations, including repayment of all amounts owed under the above facility to yourselves on their due dates."

449     The subsequent conduct of the bank is consistent with an understanding on its part that it did not have a binding contract with Plessey. It is also consistent with an understanding that the third paragraph did not contain a promise that the bank would be paid, nor a promise that Plessey would cause Leigh to be managed in accordance with the policy. In light of all of my findings above, there is no basis in the evidence for a finding of any collateral contract or collateral warranty. See: *Hawrish v. Bank of Montreal, supra*, and *Esso Petroleum Co. v. Mardon*, [1976] 2 All E.R. 5 (Eng. C.A.). For all of the foregoing reasons, I conclude that the comfort letter is clear and unambiguous, and the construction of the comfort letter urged by the plaintiff is not supported either by the wording of the document or the evidence.

*Contra Proferentem*

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

450    TD seeks to rely upon the doctrine of contra proferentem and argues that any ambiguity in the comfort letters should be resolved in favour of the bank. In my view, even had I found an ambiguity in the comfort letter, the doctrine of *contra proferentum* would have no application on these facts.

451    Only where the court finds an ambiguity and the other rules of construction fail to resolve that ambiguity may the court invoke the *contra proferentem* doctrine and interpret the document strictly against its drafter. *Contra proferentem* is a principle of last resort. See *Hillis Oil & Sales Ltd. v. Wynn's Canada Ltd.*, [1986] 1 S.C.R. 57 (S.C.C.) at 68-69; *Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co. (1979)*, [1980] 1 S.C.R. 888 (S.C.C.) at 900-901; and *Alex Duff Realty Ltd. v. Eaglecrest Holdings Ltd.*, [1983] 5 W.W.R. 61 (Alta. C.A.). In *Hillis Oil & Sales Ltd. v. Wynn's Canada Ltd., supra*, at p. 69, Le Dain J. speaking for the court, quoted from Anson's *Law of Contract*, 25th ed., (1979) at p. 151, as follows:

> The words of written documents are construed more forcibly against the party using them. The rule is based on the principle that a man is responsible for ambiguities in his own expression and has no right to induce another to contract with him on the supposition that his words mean one thing while he hopes the court will adopt a construction by which they would mean another thing, more to his advantage.

452    Le Dain J., in *Hillis Oil*, also made it clear that, as a general principle relevant to the construction of all contracts, *contra proferentem* may only be applied where there has been no opportunity for the other side to review and modify the disputed or ambiguous terms. He said (at p. 68):

> [T]he rule is, however, one of general application whenever, as in the case at bar, there is ambiguity in the meaning of a contract which one of the parties as the author of the document offers to the other, with no opportunity to modify its wording.

453    Even if I had found the comfort letter to be ambiguous, which I have not, TD cannot rely upon the doctrine of *contra proferentum* on the facts of this case. The bank was consulted on the wording of the first and third comfort letters, and given an opportunity to modify the language used. The bank agreed to the language contained in the third paragraph, and accepted the comfort letters as drafted. The bank read and accepted the fifth comfort letter. If it was dissatisfied with the language used, it could have requested a revision, refused to advance further funds until the revision was obtained, or indeed, it could have called the loan, which was repayable on demand. It did none of these things. Accordingly, in my view, the comfort letter is not ambiguous and in any event, the plaintiff had a full opportunity to modify its wording. The doctrine of *contra proferentum* has no application.

*Rectification*

454    The plaintiff requests an order of this court that the fifth comfort letter be rectified to  conform with the agreement between the parties by striking out the last line, or in the alternative, seeks an order that the fifth comfort letter be set aside in its entirety. It is not necessary to deal with these arguments in depth, in light of my finding above, that the bank, and specifically Wendy Leaney, read and accepted the fifth comfort letter upon its receipt. In light of the bank's failure to make any comment or complaint regarding the last line of the letter at the time of its delivery or at any time up to the bankruptcy of Leigh on April 12, 1990, it was reasonable for Plessey to conclude that the bank had accepted the revised comfort letter, including the final sentence. It is not now open to the bank to claim rectification.

455    In any event, in view of my conclusions above regarding the interpretation of the third paragraph of the comfort letter, the orders sought by the plaintiff would be of no effect. All parties concede that the fourth comfort letter is substantially the same as the fifth, but for the last line, and I agree. While an order granting rectification might have some ef-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

fect on the promissory wording contained in the second paragraph, that paragraph is not in issue, and in my view the third paragraph does not contain any contractual promise. Hence, rectification would be of no assistance to the plaintiff.

### Negligent and Fraudulent Misrepresentation

456      In the alternative to its claim in contract, the plaintiff has advanced a number of causes of action in negligent and fraudulent misrepresentation. The bank claims that the statement in  paragraph three of all five of the comfort letters amounted to a material misrepresentation because, it submits, the paragraph failed to disclose the following: that the policy was not a policy as to how Plessey managed Plessey Canada and Leigh, but rather a policy as to how Plessey Canada and Leigh were managed by their own management; that the policy did not require Plessey to do anything so that its subsidiaries would always be in a position to pay their debts; that the letters were only statements of Plessey policy as at the date of the letters, and as such, could not be taken as statements of Plessey policy as at the date of receipt of the letters, when the policy "might or might not" be the same; and that the policy was so commercially hollow that the policy could be in place. Leigh could go bankrupt, and the bank would receive nothing under its loan facility.

457      In the alternative, TD claims that the third paragraph of each of the letters of comfort was a material misrepresentation because Plessey had, in fact, adopted no policy regarding any of its subsidiaries, including Leigh. In support of this allegation, the bank asserts that nowhere in any of Plessey's internal documentation is it demonstrated that the Board of Plessey actually adopted the policy described in the letters.

458      In the further alternative, TD claims that even if Plessey had a policy which was accurately described in the letters of comfort, that policy ceased to exist or became subject to material qualifications prior to receipt by the bank of the fifth comfort letter on December 27, 1989. In the alternative, the bank pleads that the policy ceased to exist or became subject to material qualifications between receipt by the bank and the bankruptcy of Leigh on April 12,  1990. The bank submits that Plessey and GEC knew, recklessly disregarded or should have known of these material qualifications to the statement of policy in the August 31, 1989 letter, and had an obligation to disclose them to the bank. The bank alleges that GEC and Plessey's conduct in this regard amounts to fraudulent misrepresentation or negligent misrepresentation.

459      In addition to claims arising out of the comfort letters, the plaintiff alleges certain representations made by representatives of GEC and Plessey amount to fraudulent or negligent misrepresentation.

### The Law

### Negligent Misrepresentation

460      The law of negligent misrepresentation in Canada was set out by the Supreme Court of Canada in the seminal case of *Queen v. Cognos Inc.*, [1993] 1 S.C.R. 87 (S.C.C.). In that case, Iacobucci J., speaking for the court, stated the five elements of a claim in negligent misrepresentation at 110:

The required elements for a successful *Hedley Byrne* claim have been stated in many authorities, sometimes in varying forms. The decisions of this court cited above suggest five general requirements:

(1) There must be a duty of care based on a "special relationship" between the representor and the representee;

(2) The representation in question must be untrue, inaccurate or misleading;

(3) The representor must have acted negligently in making said misrepresentation;

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

> (4) The representee must have relied, in a reasonable manner, on said negligent misrepresentation; and

> (5) The reliance must have been detrimental to the representee in the sense that damages resulted.

461    Each of these elements must be made out in order for the plaintiff to be successful in its claim of negligent misrepresentation.

*1. There must be a Duty of Care based on a "Special Relationship"*

462    In *Queen*, *supra*, Iacobucci J. considered the nature of the special relationship that must exist between the parties before a duty of care will arise, and applied the approach adopted by the House of Lords in *Caparo Industries plc v. Dickman*, [1990] 1 All E.R. 568 (U.K. H.L.), in which their Lordships held that three criteria determine the imposition of a duty of care, and hence, the existence of a "special relationship": forseeability of damage, proximity of relationship and the reasonableness of imposing a duty. In so doing, he noted at p. 117-118 that the duty of care is no longer restricted to situations of reliance on professional advice:

> In my opinion, confining this duty of care to "professionals" who are in the business of providing information and advice, such as doctors, lawyers, bankers, architects and engineers, reflects an overly simplistic view of the analysis required in cases such as the present one. The question of whether a duty of care with respect to representations exists depends on a number of considerations including, but not limited to, the representor's profession. While this factor may provide a good indication as to whether a "special relationship" exists between the parties, it should not be treated in all cases as a threshold requirement. There may be situations where the surrounding circumstances provide sufficient *indicia* of a duty of care, notwithstanding the representor's profession.

463    The Supreme Court revisited and refined the criteria for establishment of a "special relationship" in the recent case *Hercules Management Ltd. v. Ernst & Young*, [1997] 2 S.C.R. 165 (S.C.C.). In that case, LaForest J. held for the court that there ought not, in principle, to be any difference between the criteria used to establish a duty of care in negligent misrepresentation and the criteria applied in any other negligence case, and adapted the two-part test first described in *Anns v. Merton London Borough Council* (1977), [1978] A.C. 728 (U.K. H.L.). The *Anns* test mandates that where there is a sufficient relationship of proximity between the parties such that carelessness on the part of one may be likely to cause damage to the other, it will give rise to a *prima facie* duty of care. Once the court has found that such a duty of care exists, it is then necessary to consider whether there are any considerations which ought to limit the scope of the duty or the class of persons to whom it is owed.

464    In adapting the notion of proximity to cases of negligent misrepresentation, LaForest J. stated at 188:

> In cases of negligent misrepresentation, the relationship between the plaintiff and defendant arises through reliance by the plaintiff on the defendant's words. Thus, if "proximity" is meant to distinguish the cases where the defendant has a responsibility to take reasonable care of the plaintiff from those where he or she has no such responsibility, then in negligent misrepresentation cases, it must pertain to some aspect of the relationship of reliance. *To my mind, proximity can be seen to inhere between a defendant-representor and a plaintiff-representee when two criteria relating to reliance may be said to exist on the facts: (a) the defendant ought reasonably to foresee that the plaintiff will rely on his or her representations: and (b) reliance by the plaintiff would, in the particular circumstances of the case, be reasonable*. To use the term employed by my colleague, Iacobucci J., in *Cognos*, ... the plaintiff and the defendant can be said to be in a "special relationship" whenever these two factors inhere. [Emphasis added]

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

465    Regarding the second limb of the *Anns* test, Mr. Justice LaForest held at p. 197 that the court, in a claim of negligent misrepresentation, may look to such factors as "knowledge of the plaintiff (or an identifiable class of plaintiffs) on the part of the defendant" and "use of the statements at issue for the precise purpose or transaction for which they were prepared", in order to determine whether there are any policy considerations which should limit the scope of the duty, such as the potential for indeterminate liability on the part of the defendants.

*2. The Representation in Question must be Untrue, Inaccurate or Misleading*

466    In order to satisfy the second requirement of a claim in misrepresentation, the plaintiff  must establish that the statement relied upon was untrue, inaccurate or misleading. In this regard, Iacobucci J. held in *Cognos, supra*, at p. 653 that failure to divulge highly pertinent information may, in some circumstances, amount to a negligent misrepresentation.

467    In addition, the court held at p. 658-659 that in some circumstances, an implied representation, as opposed to an actual representation, may give rise to actionable negligence:

> In my view, there is no compelling reason in principle, authority or policy for the proposition that, as a general rule, an implied representation cannot under any circumstances give rise to actionable negligence.... On the other hand, there is considerable authority for the more flexible view that, *in appropriate circumstances*, implied representations can and often do, give rise to actionable negligence.

> In my opinion, a flexible approach to this issue is preferable. It is arbitrary and premature to declare as a general rule that nothing less than express or direct representations can succeed under the *Hedley Byrne* doctrine. ...It is unnecessary for me to set out in detail the circumstances in which so-called implied representations can be enough to sustain an action in tort for negligent misrepresentation. I prefer to leave this task to trial judges dealing with specific factual situations. [Emphasis in original]

468    This reasoning was followed by Mr. Justice Linden in *Spinks v. R.* (1996), 134 D.L.R. (4th) 223 (Fed. C.A.) who noted that silence as to a fact may give rise to an implied representation. He stated at 236;

> A person may be "misled" by a failure to divulge as much as by advice that is inaccurate or untrue. In the same way that absent information can be "erroneous", as discussed above, missing information can be misleading. ...Consequently, the duty may be breached not only by positive misstatements but also my omissions, for they may be just as misleading.

469    In *Cognos*, it was argued that only representations of existing facts, and not those relating to future occurrences, can give rise to actionable negligence. Mr. Justice Iacobucci noted that there were a number of authorities cited in support of this proposition, and proceeded on the assumption that these authorities were correct, without deciding the point, on the basis that the representations at the heart of the case before him concerned representations of existing fact.

470    The question of when a representation will amount to a material misrepresentation was considered by the British Columbia Court of Appeal in *Kripps v. Touche Ross & Co.* (1997), 35 C.C.L.T. (2d) 60 (B.C. C.A.) (Leave to appeal to the Supreme Court of Canada refused Nov. 7, 1997 [Reported (1997), 102 B.C.A.C. 238 (note) (S.C.C.)]). Following a review of the case law, Finch J.A. stated at 85:

> From these submissions it would appear that there are two or three different tests for materiality. The first test is whether a representation *might possibly* affect a decision [made by a representee]; the second is whether a representation *is capable* of affecting a decision; and the third is whether a representation *would probably* affect a decision. I

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

think that the first two tests are the same, and that the real distinction is between a representation that *might possibly* affect a decision and one that *would probably* affect a decision. [Emphasis in original]

471     The court did not decided which of these two tests was applicable, as on the facts before it. Finch J.A. was of the view that even the higher standard was met. In either case, the test is an objective one of the effect that the statement would have had on a reasonable person in the circumstances of the representee.

*3. The Representor must have acted Negligently in Making the Misrepresentation*

472      The standard of care to be exercised by the representor is the same standard as is applied in other negligence cases, that of the reasonable person. This standard of care is an objective one, namely, what a reasonable person would do in the circumstances. The duty requires not only that the representor be honest and truthful, but that the representor exercise such reasonable care as the circumstances of the case dictate, to ensure that representations made are accurate and not misleading. See: *Queen v. Cognos, supra*. At p. 651-652 Iacobucci J. cited with approval the following passage from L.N. Klar, *Tort Law* (Toronto: Thomson Professional Publishing Canada, 1991) at 160:

An advisor does not guarantee the accuracy of the statements made, but is only required to exercise reasonable care with respect to it. As with the issue of standard of care in negligence in general, this is a question of fact which must be determined in the circumstances of the case. Taking into account the nature of the occasion, the purpose for which the statement was made, the foreseeable use of the statement, the probable damage which will result from an inaccurate statement, the status of the advisor and the level of competence generally observed by others similarly placed, the trier of fact will determine whether the advisor was negligent.

Iacobucci J. elaborated upon the requirements of the duty, noting that it was not a duty of full disclosure, but rather a duty to take reasonable care. He added at p. 654 that the representor's belief in the truth of his representations is not relevant to a determination of whether the duty has been breached:

Although the representor's subjective belief in the accuracy of the representations and his moral blameworthiness, or lack thereof, is highly relevant when considering whether or not a misrepresentation was fraudulently made, it serves little, if any, purpose in an inquiry into negligence. As noted above, the applicable standard of care is that of the objective reasonable person. The representor's belief in the truth of his or her representations is irrelevant to that standard of care. The position adopted by the Court of Appeal seems to absolve those who make negligent misrepresentations from liability if they believe that their representations are true. Such a position would virtually eliminate liability for negligent misrepresentation as liability would result only where there is actual knowledge that the representation made is not true; the basis of *fraudulent* misrepresentation. [Emphasis in original]

*4. The Representee must have Relied, in a Reasonable Manner, on the Negligent Misrepresentation*

473     The fourth element of the tort is that the plaintiff must reasonably have relied upon the  representation made by the defendant. As Mr. Justice Linden observed in *Spinks v. R.*, *supra*, at p. 239, this is simply the universal requirement of proof of causation, necessary in all negligence cases in order to found liability.

474      In *Kripps*, *supra*, the British Columbia Court of Appeal considered the nature of reasonable reliance in a negligent misrepresentation case, and concluded that in some circumstances, reliance may be inferred by the court. However, the circumstances in that case were unusual, in that the trial judge had heard no oral evidence but proceeded on the basis of affidavits and transcripts of cross-examinations. As well, the trial judge had made no findings on the reliance issue, having previously found there was no misrepresentation. In addition, the plaintiff's claims of presumed or deemed reli-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

ance had been struck at the pleadings stage of the action, leaving only the claims of actual reliance. Hence, the court of appeal held it was in as good a position to draw these inferences as the trial judge had been. Finch J.A. stated at 89-90:

> Whether a representation was made negligently or fraudulently, reliance upon that representation is an issue of fact as to the representee's state of mind. There are cases where the representee may be able to give direct evidence as to what, in fact, induced him to act as he did. Where such evidence is available, its weight is a question for the trier of fact. In many cases however, as the authorities point out, it would be unreasonable to expect such evidence to be given, and if it were it might well be suspect as self-serving. This is such a case.

> The distinction between cases of negligent and fraudulent misrepresentation is that proof of a dishonest or fraudulent frame of mind on the defendant's part is required in actions of deceit. That, too, is an issue of fact and one which may also, of necessity, fall to be resolved by way of inference. There is, however, nothing in that which touches on the issue of the plaintiff's reliance. I can see no reason why the burden of proving reliance by the plaintiff, and the drawing of inferences with respect to the plaintiff's state of mind, should be any different in cases of negligent misrepresentation than it is in cases of fraud.

475    The court concluded that it was sufficient, in a negligent misrepresentation action, for the plaintiff to prove that the misrepresentation was at least one factor which induced the plaintiff to act to his or her detriment. Where the misrepresentation was one which was calculated to induce the plaintiff to act, or one which would naturally induce the plaintiff to act, the court held that reliance may be inferred. The inference of reliance may be rebutted by the representor.

476    Proof of the element of reliance on a misrepresentation involves a two step test. The first is a factual test, namely, whether the plaintiff relied upon the representation in fact. The second limb of the test requires a determination by the court, on an objective basis, as to whether the reliance was reasonable. This second requirement was described in Allen M. Linden, *Canadian Tort Law*, 6th ed (Butterworths: Toronto, 1997) at 445-446:

> Reliance not only must be proven in fact but also must be demonstrated to be *reasonable*. The second part of the fourth requirement, therefore, means that only those injuries resulting from reliance reasonably placed on a defendant will be compensable. It follows that, to the extent injuries were sustained as a result of unreasonable reliance, recovery may be barred. In most cases, however, a plaintiff will be barred from recovery only to the extent the reliance was unreasonable. The notion of unreasonableness here simply suggests a limit on the degree of reliance a given factual scenario may bear. It does not suggest that, if a plaintiff steps beyond that limit, all recovery must be lost.

> Nevertheless, where the facts suggest that any reliance whatsoever is unreasonable, recovery is rightly barred.

*Fraudulent Misrepresentation*

477    Fraud is the most serious civil tort which can be alleged, and must be both strictly pleaded and strictly proved. The main distinction between the elements of fraudulent misrepresentation and negligent misrepresentation has been touched upon above, namely the dishonest state of mind of the representor. The state of mind was described in the seminal case *Peek v. Derry* (1889), 14 App. Cas. 337 (Eng. H.L.) which held fraud is proved where it is shown that a false representation has been made knowingly, or without belief in its truth, or recklessly, without caring whether it is true or false. The intention to deceive or reckless disregard for the truth is critical.

478    Where fraudulent misrepresentation is alleged against a corporation, the intention to deceive must still be strictly proved. Further, in order to attach liability to a corporation for fraud, the fraudulent intent must have been held by an individual person who is either a directing mind of the corporation, or who is acting in the course of their employment

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

through the principle of respondeat superior or vicarious liability. In *BG Checo International Ltd. v. British Columbia Hydro & Power Authority* (1990), 4 C.C.L.T. (2d) 161 (B.C. C.A.) at 223 (Aff'd, [1993] 1 S.C.R. 12 (S.C.C.)), Hinkson J.A., writing for the majority, traced the jurisprudence on corporate responsibility in the context of a claim in fraudulent misrepresentation at 222-223:

> Subsequently, in *H.L. Bolton (Engineering) Co. v. T.J. Graham & Sons Ltd.*, [1957] 1 Q.B. 159, [1956] 3 All E.R. 624 (Eng. C.A.), Denning L.J. said at p. 172:
>
> . . . . .
>
> > A company may in many ways be likened to a human body. It has a brain and nerve centre which controls what it does. It also has hands which hold the tools and act in accordance with directions from the centre. Some of the people in the company are mere servants and agents who are nothing more than hands to do the work and cannot be said to represent the mind or will. Others are directors and managers who represent the directing mind and will of the company, and control what it does. The state of mind of these managers is the state of mind of the company and is treated by the law as such. So you will find that in cases where the law requires personal fault as a condition of liability in tort, the fault of the manager will be the personal fault of the company. That is made clear by Lord Haldane's speech in *Leonard's Carrying Co. Ltd. v. Asiatic Petroleum Co. Ltd.*
>
> . . . . .

In the field of criminal law, corporate responsibility has its roots in civil law. In *R. v. McNamara (No. 1)*, [1985] 1 S.C.R. 662 (S.C.C.) ...Estey J., speaking for the Supreme Court of Canada, discussed the directing mind or identification theory and the respondeat superior approaches to corporate liability in a criminal context.

In tracing the development of the law, Estey J. referred to the decision of the Lord Chancellor, Viscount Haldane in *Asiatic Petroleum Co. v. Lennard's Carrying Co.* [(1914), [1915] A.C. 705 (U.K. H.L.)] supra. He also made reference to the decision in *Tesco Supermarkets v. Nattrass* [(1971), [1972] A.C. 153 (U.K. H.L.)], supra. After analyzing the previous decisions in this field of the law, Estey J. said at p. 311 [of C.R., p. 691 of S.C.R.]:

> In summary, therefore, the courts in this country can be said to this date to have declined generally to apply the principle of respondeat superior in the determination of corporate criminal responsibility. Criminal responsibility in our courts thus far has been achieved in the mens rea offences by the attribution to the corporation of the acts of its employees and agents on the more limited basis of the doctrine of the directing mind or identification. Corporate responsibility in both strict and absolute liability offences has been found to arise on the direct imposition of a primary duty in the corporation in the stature in question, as construed by the court. By what appears to be the same purely pragmatic reasoning, the courts of the United Kingdom find criminal liability in a corporation only by the attribution to it of the conduct of its employees and agents where those natural persons represent the core, mind and spirit of the corporation. The United States federal courts are inclined, as we have seen, to find criminal liability in the corporation by vicarious liability where any employee-agent commits in the course of his employment, the criminal act.
>
> . . . . .

It is apparent that the law in Canada dealing with the responsibility of a corporation for the tort of deceit is still evolving. In view of the English decisions and the decision of the Supreme Court of Canada in the *R. v. McNamara*

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

*(No. 1)*, supra, it would appear that the concept of vicarious responsibility based upon respondeat superior is too narrow a basis to determine the liability of a corporation. The structure and operations of corporations are becoming more complex. However, the fundamental proposition that the plaintiff must establish an intention to deceive on the part of the defendant still applies.

See also: *Standard Investments Ltd. v. Canadian Imperial Bank of Commerce* (1985), 52 O.R. (2d) 473 (Ont. C.A.) (Leave to appeal to Supreme Court of Canada refused Feb. 3, 1986) [Reported (1986), 53 O.R. (2d) 663 (note) (S.C.C.)].

479    In the case of fraudulent misrepresentation, there are circumstances where silence may attract liability. If a material fact which was true at the time a contract was executed becomes false while the contract remains executory, or if a statement believed to be true at the time it was  made is discovered to be false, then the representor has a duty to disclose the change in circumstances. The failure to do so may amount to a fraudulent misrepresentation. See: P. Perell, "False Statements", [1996] 18 *Advocates' Quarterly* 232 at 242.

480    In *Rainbow Industrial Caterers Ltd. v. Canadian National Railway* (1988), 54 D.L.R. (4th) 43 (B.C. C.A.) (Aff'd on other grounds [1991] 3 S.C.R. 3 (S.C.C.)), the British Columbia Court of Appeal overturned the trial judge's finding of fraud through non-disclosure on the basis that the defendant did not remain silent as to the changed fact but was simply slow to respond to the change, and could only be criticized for its "communications arrangements". In so doing, the court adopted the approach to fraud through silence established by the House of Lords in *Brownlie v. Campbell* (1880), 5 App. Cas. 925 (U.K. H.L.) at 950. Esson J.A. stated at 67-68:

> There is much emphasis in the plaintiff's submissions and in the reasons of the trial judge on the circumstance that this is not a case of fraud "of the usual-kind" involving positive representations of fact but is, rather, one concerned only with non-disclosure by a party which has become aware of an altered set of circumstances. It is, I think, potentially misleading to regard these as different categories of fraud rather than as a different factual basis for a finding of fraud. Where the fraud is alleged to arise from failure to disclose, the plaintiff remains subject to all of the stringent requirements which the law imposes upon those who allege fraud. The authority relied upon by the trial judge was the speech of Lord Blackburn in *Brownlie v. Campbell*. ...The trial judge quoted this excerpt:

>> ...when a statement or representation has been made in the *bona fide* belief that it is true, and the party who has made it afterwards comes to find out that it is untrue, and discovers what he should have said, he can no longer honestly keep up that silence on the subject after that has come to his knowledge, thereby allowing the other party to go on, and still more, inducing him to go on, upon a statement which was honestly made at the time at which it was made, but which he has not now retracted when he has become aware that it can be no long honestly perservered in.

> The relationship between the two bases for fraud appears clearly enough if one reads that passage in the context of the passage which immediately precedes it:

>> I quite agree in this, that whenever a man in order to induce a contract says that which is in his knowledge untrue with the intention to mislead the other side, and induce them to enter into the contract, that is downright fraud; in plain English, and Scotch also, it is a downright lie told to induce the other party to act upon it, and it should of course be treated as such. I further agree in this: that when a statement or representation...

481    Fraud through "active non-disclosure" was considered by the Court of Appeal for Ontario in *Abel v. McDonald*, [1964] 2 O.R. 256 (Ont. C.A.) in which the court held at 259: "By active nondisclosure is meant that the defendants, with

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

knowledge that the damage to the premises had occurred actively prevented as far as they could that knowledge from coming to the notice of the appellants."

*Application to the Facts of this Case*

*Misrepresentation in the First Four Comfort Letters*

482      The plaintiff asserts a cause of action in negligent misrepresentation against Plessey based on the wording of the third paragraph of the first four comfort letters. In particular, the bank claims that the paragraph did not disclose that the policy referred to the management of Plessey Canada and Leigh by their own management, rather than by Plessey; that the policy did not require Plessey to do anything so that its subsidiaries would be in a position to pay their debts: that the letters were only statements of policy as at the date of the letters, and could not be taken to be statements of Plessey's policy as at the date of receipt of the letters by the bank, when the policy "might or might not" be that stated in the letter; and that the policy was so commercially hollow that the policy could be in place, Leigh could go bankrupt, and the bank receive nothing. In the alternative, the bank pleads that the third paragraph was a material misrepresentation because Plessey had, in fact, adopted no policy regarding Leigh, and asserts that there was no direct evidence led at trial that the board of Plessey had adopted the policy. I propose to deal with the latter submission first.

*Existence of a "Special Relationship"*

483      Plessey concedes that there exists a special relationship between it and the bank regarding  the text of the comfort letters, and I agree. Applying the principles set out in *Hercules Management, supra*, it is reasonably forseeable that the bank would rely on the statements in the comfort letter and reliance upon those statements, in the circumstances, would be reasonable. There are no policy considerations, such as indeterminate liability of the defendant, to preclude a finding that Plessey owed TD a duty of care.

*The Representation Must be Untrue, Inaccurate or Misleading*

*The Plaintiff's Interpretation of the Comfort Letter.*

484      The plaintiff submits that the third paragraph of the letters is materially misleading because Plessey had, in fact, adopted no policy with respect to any of its subsidiaries, including Leigh. TD's misrepresentation argument is premised on the same interpretation of the comfort letter as was advanced above in the contract argument, namely that the bank understood the policy paragraph to mean that Plessey would manage its subsidiaries, including Leigh so that the subsidiaries would always be in a position to meet their financial obligations, and that Plessey had not adopted this policy. Hence, they assert that the policy paragraph was misleading. I have rejected this construction of the comfort letter above, in the contract portion of these reasons, and I adopt and reiterate that reasoning here. The interpretation urged by the plaintiff requires that words be implied into the third paragraph which are not there. In my view there is no basis in the evidence to find such an implied representation.

485      The bank's interpretation of the comfort letter is based upon the testimony of Patrick Noonan that this was his subjective understanding of the policy paragraph. The proper test however, is not what the plaintiff subjectively thought of the representation, but what a reasonable person, in all of the circumstances of the plaintiff, would have thought. See: *Cognos, supra*, at 131-132. In my view, the bank's interpretation of the comfort letter is not reasonable in the circumstances, nor is it supported by the totality of the evidence of Noonan and McDowell.

486      Noonan testified that he read the letter with a high regard for Plessey's standing, strength and reputation, and

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

financial capacity to give effect to the stated policy. This is consistent with McDowell's evidence as to what constituted a strong comfort letter. McDowell testified that a well-written comfort letter was one from a responsible corporation and signed by its authorized officers, which acknowledged the borrowing, confirmed ownership of the borrower, and stated the intention to keep the borrower in sound financial condition. In his view, such a letter would be a very good comfort letter, and he would view it as an undertaking. In his words: "my word is my bond, and if'l make a commitment, I expect to fulfill it." These criteria are consistent with a perception of comfort letters as moral, rather than legal obligations.

487      Noonan testified that he was not involved in the negotiation or drafting of the first comfort letter, he never discussed the wording of the letter with anyone at Leigh, Plessey or GEC, nor did he direct the terms to be used in it. It was not his practice to discuss the wording of comfort letters with bank counsel, nor did he do so regarding the Leigh letter. He did not discuss the letter with Baker, who negotiated the letter from the bank's London office. In fact, it was never the responsibility of Noonan or anyone else in the Credit Division to negotiate the terms of documents like comfort letters. That responsibility rested with the account manager in the Corporate Banking Division.

488      Further, Howard Baker, who did negotiate the wording of the first letter, worked from a template comfort letter, which contained in the policy paragraph the additional words: "and in this particular instance we will ensure that sufficient liquid resources are available to discharge any liabilities at maturity." Those words were deleted by Baker from the draft comfort letter he sent to Plessey and were never included in the Leigh letters.

489      Finally, a Plessey guarantee was not on offer for the Leigh loan, and the bank knew this prior to negotiating the first comfort letter. I am of the view that the interpretation urged by the bank, based on the evidence of Patrick Noonan's subjective view of the letter, is not one which would be held by a reasonable person in all the circumstances. The evidence does not support a finding that Plessey impliedly represented that it would cause Leigh to be managed in accordance with the policy. Such an interpretation amounts to a promise that directly or indirectly, the bank would be paid, and both parties knew a guarantee was not on offer.

*Untrue, Inaccurate or Misleading*

490      The plaintiff submits that the statement of policy in the third paragraph of the comfort  letters was materially misleading because Plessey had adopted no policy at all with respect to Leigh. In this regard, the plaintiff asserts that nowhere in the internal Plessey documentation produced was there any evidence that the Plessey board had adopted a formal policy regarding management of its subsidiaries. The bank argues that if Plessey had such a company-wide policy, it would have to have been in writing and published throughout the company so that everyone required to know about the policy would be aware of it and understand it. I do not accept this submission, and the evidence is to the contrary.

491      I find as a fact that Plessey did have the policy stated in the third paragraph of the comfort letter. Indeed, such a policy is virtually axiomatic from a business management perspective. While the Plessey board may not have published a company-wide policy statement to the effect of paragraph three, Musgrave prepared a submission for the Plessey main board regarding each of the comfort letters, and the board did formally approve the issuance of each. The Plessey board did authorize the signatories to sign the comfort letters on behalf of the company, and this, in my view, is sufficient formal confirmation that Plessey had the policy.

492      It was the evidence of Ian Musgrave, which I accept, that Plessey did have the policy set out in the third paragraph, regarding both Plessey Canada and later Leigh, for the duration of his tenure at Plessey. Musgrave gave the following evidence regarding board's adoption of the policy:

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

Q. So just to be absolutely certain, the general instructions in writing dealt with the company policy that the wholly-owned subsidiaries of Plessey Company plc would be managed in such a way as to always be in a - or to be - such as to always be in a position to pay or to meet their financial obligations.

A. That's my understanding. Yes.

Q. Now, we - where is that written general instruction?

A. The section I'd always read as covering this is actually in general instruction number 215, which is at tab "C" in 227. ...It reads:

> This instruction supersedes all current General Instructions in matters relating to levels of delegated authority where in conflict. However, it must be noted that it does not remove any statutory, legal or contractual obligations of the directors or employees of The Plessey Company or any of its subsidiaries.

Certainly in the context of U.K. company law, it was a statutory, legal obligation of the directors of U.K. subsidiaries to manage the affairs of the company concerned so that they could meet all their obligations as they fell due. If they didn't, I think they were trading illegally, going under U.K. company law, and they should legally stop trading. So that's the section I had always looked at on that point. There is another section in the finance manual itself. Let me just find this, if I might. Yes. If you look at Exhibit 227, 1C. ...This section is headed "Policies Financial Accounting Balance Sheet". ...And then on the third page there's a paragraph at the top headed "Creditors":

> It is company policy to pay suppliers in accordance with the agreed credit terms. It is not permitted to take excessive credit, which may damage the Group's reputation or result in difficulty in obtaining supplies or services. Creditors and liabilities are recorded by reference to goods delivered and services received...

Now, I fully expect that was written with trade creditors in mind, but I think the principle equally applies to any supply of services, which would include supply of credit.

So those are the bits I looked at to, if you like, to back up the claim that the company had a policy in that area. It's not something that I'm looking at post the event. These are sections which I looked at at the time to justify that type of statement.

Musgrave was pressed on the point and said:

A. The policy is not defined precisely in the general instruction, nor anywhere else, as far as I can see, in precisely the same words that were used in Paragraph 3 of the comfort letter. However, my view at the time was that the second paragraph of the introduction section to GIP. 215 set out a policy which had the same meaning, did not use the same words, or it didn't get there in quite the same way, but the meaning is the same. I don't think there was any particular need in the comfort letter to use precisely the same words as might have appeared in an internal company document.

493        In addition, Musgrave testified as to the application of the policy to the Plessey group:

A. Yes, I do. This was a policy that Plessey applied to the whole group, to all its subsidiaries and to joint venture companies where it was able to apply it. Essentially, the policy was that the management of the company concerned should manage the business of that company in such a way as to be always in a position, etc., etc.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

Q. What role did the Plessey plc management have in that policy?

A. Well, they laid down the policy in the first place and I think if it came to their attention that the policy was not being applied by the management of any particular subsidiary, they would clearly, at least in the first instance, remind the management of the policy. That would hopefully be enough to ensure policy was applied by the management.

Q. During your time, and did that policy pre-date this day, December 22nd, 1988?

A. I'm certain it did.

Q. And in your time at Plessey till you left Plessey at the end of August, 1989, did that policy ever change?

A. No.

Musgrave elaborated on the meaning of the policy under cross-examination:

THE WITNESS: Excuse me, your Honour. There's actually something I'd like to say just before we start. There was an answer I gave to Mr. Campion on Thursday afternoon which, at the time, I wasn't comfortable with. I've reflected quite a lot on the weekend and I think - I gave him the wrong answer. It concerns the area of participation in a company's management. I think Mr. Campion suggested that a parent company, by setting down through policies, procedures, levels of delegated authority, but the parent company was actually participating in the management of the subsidiary concerned. I agreed with that. I was uncomfortable with it at the time. I have reflected on it. I don't now agree with the suggestion. *It seems to me that the legal responsibility for managing the affairs of a subsidiary lies with the board of the subsidiaries concerned. That is certainly the case in English law, and I expect it is in Canadian law, as well. And nobody can take that away from them.*

Now, having said that, the management has to manage the affairs of the company, manage the business within a whole series of constraints. They might be constraints laid down by the government in the form of law, environmental laws, labour laws, customer protection laws. The management has to have regard to all of those. The management may have to regard - have regard to policies laid down by a regulator, if it's operating a regulated industry. The management might have to have regard to policies and procedures laid down by some professional body, if that's relevant. In the case of a company which is a subsidiary within a group, almost certainly it will have to have regard to the policies and procedures laid down by the parent company of the group. But I don't see any difference with any of that - I don't think any of those situations involve the person who is setting out the policies, procedures, laws, regulations, whatever, participating in the management of the group. I think the management of the subsidiary have to manage the affairs of the company concerned within those policies and procedures.

So, on reflection, I disagree with Mr. Campion's suggestion. I think you can actually take it a stage further. *As I said earlier, certainly in the U.K. it is the board of a company who are responsible for the management of that company. And they can't give away that responsibility. If they allowed someone else who wasn't a member of that board or didn't report to that board to participate in the management of the company, I think they would be in a very shaky legal position, and I'm certain that Plessey did not structure its delegated authorities to put the members of all its subsidiaries' boards in that sort of position.* So I'm afraid I have got to change my mind on that one. [Emphasis added]

494      In addition to the evidence of Musgrave, I note that shortly following its takeover of Leigh. Plessey implemented a series of financial controls, in order to monitor Leigh's performance. These included a requirement that Leigh

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

provide Plessey with key financial data on a monthly basis, including external sales, operating profit, profit before tax and cash flow. Binnie Sammon testified that Plessey would have begun receiving this information from Leigh by July, 1988. In addition, Plessey controlled the borrowing and guarantee limits of Leigh, which were set by the Plessey main board. Leigh could not exceed these limits without main board approval. Leigh, along with the other Plessey subsidiaries, was required to produce an annual budget, for approval by Plessey. This requirement was continued by GEC following the takeover of Plessey. When it became apparent, in the spring of 1989, that Leigh could not support the interest payments associated with the intercompany debt, Plessey converted the debt to preference shares, thus increasing the equity capital on Leigh's books and eliminating the interest payments. Finally, throughout the period of the first four comfort letters, Leigh did meet its financial obligations, and no evidence has been led to the contrary. All of this evidence supports the finding that Plessey did have the policy as stated on the face of the comfort letters, and acted in accordance with it, even though it had no legal obligation to do so. Accordingly, I find that the comfort letter was not misleading in this respect, and the bank's claim in this regard must fail.

495     In the alternative, the bank claims that the comfort letter was materially misleading because the policy paragraph did not disclose that: 1. the policy was not a policy as to how Plessey managed Plessey Canada and Leigh, but rather a policy as to how Plessey Canada and Leigh were managed by their own management; 2. that the policy did not require Plessey to do anything so that its subsidiaries would always be in a position to pay their debts; 3. that the letters were only statements of Plessey policy as at the date of the letters, and as such, could not be taken as statements of Plessey policy as at the date of receipt of the letters, when the policy "might or might not" be the same; and 4. that the policy was so commercially hollow that the policy could be in place, Leigh could go bankrupt, and the bank would receive nothing under its loan facility. These submissions are premised upon an acceptance by the bank of the evidence of Ian Musgrave as to the interpretation of the comfort letters and an assertion that this evidence is inconsistent with the bank's interpretation of the comfort letters. I have rejected the bank's interpretation for the reasons set out above.

496     Ian Musgrave left Plessey in 1989 prior to the hostile takeover by GEC Siemens, and prior to Leigh's demise. He was approached by National Power plc in 1989 and accepted an offer from them. For the past three years he has been employed as group cash manager for a Norwegian company called Kvaerner, which has between 400 and 500 subsidiaries worldwide. In that position, Musgrave is responsible for setting up the group banking systems globally and controlling the day to day liquidity of the entire group. Borrowings for the group are in the range of £1.5 billion, and Musgrave testified that he deals with banks on a daily basis. I accept Musgrave's evidence, which in my view is in accord with a reasonable, objective interpretation of the comfort letter. In addition, I note that Musgrave's evidence was consistent with that of Robert Wickham, the expert banking witness.

497     The first of the bank's assertions is that the policy statement was misleading because it did not disclose that Leigh was to be managed by its own officers and directors. I cannot accede to this submission. In my view, it is self evident, and would be to any reasonable person in the circumstances of the bank, that Leigh was to be managed by its own management. In this regard, I note the evidence of Musgrave, above, that it would be an improper delegation of authority of the board of directors of Leigh to permit the company to be managed by a party other than an office holder of the company. I agree. A bank is a commercially sophisticated plaintiff, and a reasonable party in the position of the bank would have been aware of this provision of company law.

498     The second assertion of the bank is that the paragraph was misleading in that it did not disclose that the policy did not require Plessey to do anything so that its subsidiaries would always be in a position to pay the bank. On the contrary, I am of the view that this is exactly what the policy paragraph says, clearly and on its face. I have set out the reasons for this conclusion in the section on contract, and need not repeat them again here. Similarly, the comfort letter does carry a degree of value in the commercial context, and for the reasons outlined above, is not commercially hollow.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

499        Regarding the third assertion, while I found above that the wording of the third paragraph does not contain a contractual promise by Plessey to have the policy into the future, I am of the view that the comfort letter does contain a continuing representation as to Plessey policy. The letter is not misleading in this respect, as this is consistent with the bank's reading of the letter and also with Musgrave's evidence:

Q. I take it that it was your understanding that this was a statement of continuing policy.

A. I think, as the word stands, it's a statement of our policy at that point in time. It is our policy. We don't say our policy will continue to be. But I think, if the policy changed, if it had changed at any point in time, I would, I think almost certainly, have gone back to the bank, this bank and any other bank who had a similar comfort letter, and say; Look, our policy has changed

Q. I see. So you'd feel obliged to go to the bank, policy changed?

A. Yes. I don't think we were obliged in the legal sense, because it's simply a statement of policy at the time saying it doesn't commit us to notify the bank of a change of policy. But as a matter of good practice, I think I would have gone back and informed the banks, not just Toronto-Dominion but any bank, if policy in this area had changed.

Q. But you weren't legally obliged here?

A. I don't think we were.

Hence, for all of the above reasons, I find that the first four comfort letters are neither untrue, inaccurate, nor misleading, and the bank's claim in negligent misrepresentation must fail.

*Fraud and Negligent Misrepresentation in the Fifth Comfort Letter*

500        In the alternative, the bank claims that even if Plessey had a policy which was accurately described in the first four comfort letters, that policy ceased to exist or became subject to "material qualifications" prior to the bank's receipt of the fifth letter. In the further alternative, the bank asserts that the policy changed at some time following receipt of the letter on December 27, 1989 and the bankruptcy of Leigh on April 12, 1990. The bank claims that Plessey and GEC knew, recklessly disregarded, or should have known of the "material qualifications" to the policy, and had an obligation to disclose them to TD. Their failure to do so, the bank asserts, amounts to fraudulent or negligent misrepresentation.

501        The bank submits, as the basis for this claim, that GEC, knowing of Leigh's financial results following the Stanmore meetings in late November, had not adopted any settled policy with respect to Leigh. I cannot accede to these submissions. While GEC, in the months following the Stanmore meetings, may have had reservations as to whether it wanted to become 100 per cent owner of Leigh, these reservations and the uncertainty as to Leigh's ultimate ownership, were unrelated to the management policy for Leigh as stated in the fifth comfort letter, and the letter is not misleading in this respect.

502        The bank also asserts, as the basis for this claim, that Plessey, GEC and Siemens did not have a common understanding of what their policy was for Leigh and that GEC and Siemens  never discussed or came to a specific agreement as to what Plessey's policy for Leigh was to be. I disagree. Anderson testified that following his revisions to the comfort letter, he sent a copy of it to everyone at GEC, Siemens and Plessey who had an interest in the letter, in order that they might comment upon it. Both Andy Hafner and Philip Gerdine received a copy of the letter, and neither commented upon it to Anderson, who interpreted this as approval from Siemens. Moreover, I find that the evidence of Gerdine and Newlands is consistent as to the application and substance of the policy.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

503      The policy stated in the third paragraph was a policy as to Leigh's management, and I find as a fact, based on a consideration of all the evidence, that policy remained in place throughout the material period of time, right up until immediately before the bankruptcy of Leigh.

504      Both David Newlands and Philip Gerdine gave evidence in this trial, and both testified that Plessey continued to have the policy stated in the third paragraph of the comfort letter following the takeover. Gerdine, who was the co-managing director of Plessey following the takeover, stated in evidence:

Q. I'm suggesting to you that in April, 1990, as you look back on the period September '89 to April '90, you must have concluded that Plessey never had the policy referred to in the third paragraph of the letter we have just referred to during that period, namely September '89 to April '90. Do you agree with me?

A. I don't agree for this reason: That I think that with respect to worldwide operations, Plessey had this policy, which is a very simple policy, which says that we are going to supply the direction on the resources so that - and delegate to the 178 affiliates of Plessey so that they would be in a position to be managed in this way to meet financial obligations, because there are just so many alternatives available. The opposite one is simply unacceptable, that they would be unable to meet any financial obligations. So that would not be acceptable. There's another one which is Plessey's policy to run each of these subsidiaries, and it certainly didn't do that, it delegated. And I thought about this at some length about what this policy meant. It had to be in place during the entire period, and then come shortly before all the facts were in, that there was something terribly wrong here, that policy would change with respect to Leigh on that day. And that was a unique event. But frankly, even today, Plessey's policy is as stated here, in my opinion.

Gerdine also testified as to the substance of the policy:

Q. Do I take it that what you're saying is, is that Plessey had a policy that - Plessey would see that Leigh would be managed in such a way as to always be in a position to meet its financial obligations?

A. Well, yes, again, it's just slightly different from that. It's that Plessey would provide the resources in management, in financial instruction, in various things that would permit Leigh to run its business in a position to meet its financial obligations. And there is an important distinction there of what Plessey was doing, because there is a policy at Plessey on delegation which is important, that these people operate their own businesses, and Plessey sets the guidelines.

Q. As I understand your answer, as part of that, Plessey would supply resources, management, and financial instructions and various things to Leigh as part of that policy.

A. Yes.

Q. And when you use the term "resources", that would include the financial support from Plessey.

A. It would include basic investment, because the way Plessey or any parent would manage a subsidiary, at least in my view, is, it provides the management and the basic financial resource to carry on its business. And it - then the business itself does the business itself.

Q. And when you say that, it would, in this resources, provide financial support if needed.

A. I'm not sure you can say that. It might or it might not, depending on the circumstances.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

Q. And I take it, then, having regard to those answers, that I'm correct in saying that you read this policy as saying - read this paragraph as saying that as long as the policy was in place, Leigh would be able to pay The Toronto-Dominion Bank.

A. I'm not sure if that follows. I mean, the policy was in place for the fundamental input, but I'm not sure that the last part of that sentence would apply necessarily. We would hope it would apply, but what Plessey did was provide this fundamental policy guidance and support by making the investment and putting the management, and that was Plessey's policy. What they do with it is their business. That's how I understood it.

505        David Newlands was the finance director of GEC and the person who "blessed" Anderson's revisions of the comfort letter prior to its signature and delivery. His evidence was, in substance, the same as that of Gerdine:

A. Thirdly, that it was Plessey's policy that Leigh be managed so that it could pay its bills as they fell due.

Q. Yes.

A. And fourthly, the letter replaced earlier letters and did not constitute a legally binding commitment.

Q. And again, I want you to focus on what you thought at the time. Do you recall anything further as to why you thought it was fine?

A. I thought all those statements were explicit and statements that Plessey could properly make. This was from a common sense point of view.

Q. I take it that except by agreement during the period takeover date to the corridor conversation date, this policy, as stated in the latter August 31, 1989 found at tab 21, was not in place.

A. I wouldn't take that at all. I can't envisage how, when a company has a policy, that its subsidiaries be managed in such a way that they meet their bills as and when they fall due can ever be a policy that wouldn't exist. It would be a very odd company that didn't have such a policy. Any company - I mean, it's almost a statement of the obvious, that you would seek to have your subsidiaries run in such - in that sort of way, which is why I didn't have any problem with the policy in the 31st of August letter, and I don't believe that Ross's changes actually changed the meaning of that statement, either. So it seemed to me - I don't mean to put it the wrong way, but a motherhood statement, it seems a sensible policy for any company to have.

. . . . .

Q. Now, obviously in the letter, in the third paragraph, there is the Plessey policy statement.

A. Yes.

Q. Or statement about the Plessey policy. I take it that the policy, as far as you understood, was in place certainly when the letter was sent and was true when the letter was sent.

A. Yes.

506        In addition to the evidence of Newlands and Gerdine, I find that Plessey and GEC acted  in accordance with the policy throughout the material time. Colin Justice, divisional finance director of PESL was dispatched to Leigh to assist with the transition to GEC accounting principles and to assist the Plessey management with the ETC reviews, which

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

were ongoing. Justice visited Leigh periodically through the fall of 1989 and assisted in the preparation of financial data presented at the Nov. 28 and 29 meetings at Stanmore, and at the meetings with Dr. MacBean in early January, 1990. At these January meetings, MacBean, who by then was aware of the increasingly bleak financial picture at Leigh, tasked Driscoll with preparation of a feasibility analysis of the various options available to Leigh. While these options did include closure of the business, other options contemplated the continued viability of Leigh, including restructuring, integration with Canadian Marconi, and sale to a third party. Justice assisted in the analysis. It is clear that Plessey and GEC were still trying to find solutions which would enable Leigh to continue as a viable entity. In this period, Driscoll, along with various representatives of Plessey and GEC Marconi met repeatedly with the Canadian government. The government was Leigh's main customer, and the purpose of the meetings was to negotiate some contractual relief for Leigh.

507     In the same period, the Red Team review was initiated to investigate the technical situation at Leigh and to ascertain the source of Leigh's contractual difficulties. Throughout this period, Leigh continued to meet its obligations as they became due.

508     Once Plessey co-managing director Philip Gerdine became involved with Leigh, he too made vigorous efforts on Leigh's behalf, attending a number of meetings with the Canadian  government, and meeting with Leigh management. Even after the bank had frozen the loan, Gerdine prepared a "save Leigh" proposal. In early April, the Red Team had reported that Leigh had numerous serious engineering problems in relation to the SHINCOM contracts, and that Leigh was incapable of performing its contracts from a technological perspective. Nevertheless, Gerdine and others continued their efforts on Leigh's behalf and made further attempts to negotiate relief from the Canadian government. It was not until the government finally indicated on April 9 that no relief would be forthcoming, that the decision was taken to place Leigh into bankruptcy. Throughout this period, Leigh continued to meet its obligations as they became due.

509     Accordingly, if Plessey did change its stated policy regarding the management of Leigh, I find that such change did not take place until the decision was taken that Leigh was terminal and bankruptcy was the only option. Only then did the policy of Plessey, as stated in the third paragraph of the comfort letter, become misleading. Up until that point, Plessey had actively supervised the management of Leigh and endeavored to solve its problems. By the time the decision was made to abandon Leigh, the bank had already frozen the loan, no further funds had been advanced, and no damages incurred by the bank. Hence, there is no basis for a finding of negligent or fraudulent misrepresentation in the fifth comfort letter.

510     Even if I had found that the statement of policy in the fifth comfort letter was materially misleading, I am of the view that any reliance placed upon the statement of policy by the bank was not reasonable, having regard to all the evidence.

511      Plessey became the target of a hostile takeover bid by GEC and Siemens in November, 1988. The bank was aware of this from the time the hostile bid was announced, and was also aware that GEC and Siemens intended to dismantle Plessey and divide up its assets between them. One of Musgrave's last acts at Plessey was to review the fourth comfort letter, which Plessey sent to the bank even though the bank had not asked for it. When Exton forwarded the letter to Young, he noted that Plessey felt it was "appropriate" to send the letter, due in part to the hostile takeover bid.

512     Following the success of the hostile takeover bid in September 1989, the Plessey management was decimated. Virtually all of the prior Plessey executive and managers either resigned or were terminated by the new owners. These were the people with whom the bank had been dealing regarding Leigh. The new owners, and particularly GEC, were large companies with whom TD had no existing relationship, despite repeated attempts to develop one over the years.

513     Plessey was a borrower of funds from banks, while GEC was referred to as a "cash mountain" with over £1 bil-

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

lion in cash reserves, over and above its other assets. One of Anderson's main responsibilities was the daily investment of this surplus on the most favourable terms possible. Rather than being dependant on banks and their goodwill for funding, GEC dealt with banks as a depositor of huge sums of money. Banks eagerly vied for GEC's business, including TD.

514      Throughout the piece, both before and after the hostile takeover, Leigh kept the bank informed of its contract difficulties, including delays and missed milestones, all of which had a negative impact on Leigh's cash flow. The bank knew that the Leigh loan was continually climbing. On several occasions Leigh exceeded its authorized credit and went into an overdraft position. Leigh provided cash flow forecasts to the bank, including a forecast in late November projecting a peak of borrowings in December of $43.3 million. In December, the bank was informed that Leigh had laid off 80 people, and that a second tranche of layoffs was anticipated early in the new year.

515      Finally, Leaney read and accepted the fifth comfort letter, which included the added language in the last paragraph that the letter did not constitute a legally binding commitment. This was the first comfort letter received from Plessey since the hostile takeover, and the change from the wording of the four prior letters should have signaled a warning to the bank.

516      In all of these circumstances, I find that any reliance placed upon the policy paragraph by the bank was not reasonable, and hence the claim in misrepresentation must be dismissed.

*Conduct Outside the Letters*

517      In addition to the causes of action arising out of delivery of the comfort letters, the bank asserts a number of causes of action in negligent or fraudulent misrepresentation arising out of  the conduct of several individuals.

*Tantamount to a Guarantee*

518      In particular, the bank asserts that Plessey is liable in negligent misrepresentation for the alleged statement by Ian Musgrave to Greg Young at TD that the Plessey comfort letter was "tantamount to a guarantee". Following a careful consideration of all the evidence, and for reasons which are set out above in my recounting of the evidence. I have found as a fact, on a balance of probabilities, that Musgrave did not make this statement to Wilson. Consequently, the bank's claim in this regard must fail.

*The Justice Statements*

519      In addition, the bank claims that statements made by Colin Justice in two telephone conversations with Wilson of the bank constituted fraudulent or negligent misrepresentations. Regarding both conversations, the evidence is uncontroverted. TD urges the court to draw an adverse inference from the fact that Plessey chose not to call Justice as a witness, though the nature of the inference to be drawn is not particularized. I decline to draw an adverse inference, on the basis that the statements attributed to Justice were admitted by the defendant, and his evidence was not necessary. I observe that the plaintiff did not call Smith or Dean from Leigh's  finance department to testify.

520      The bank alleges that in the first conversation, which took place in late November, Justice and Dean were both on the call. Either Justice or Dean discussed the financial condition of Leigh and advised Wilson that Leigh would be receiving payments totaling $11.4 million in January. The bank alleges that Justice was aware at the time of the call that Leigh was reporting a loss to the end of September, 1989 of $18.85 million, and knew of the ETC results regarding Leigh's contracts. The bank asserts that "Justice was conveying to the bank that the Bank could increase the line to Leigh because Leigh was merely suffering cash flow problems" and that Justice's statements amount to negligent misrepresent-

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

ations.

521    I am unable to accede to this submission. This conversation must be placed in context. The late November conversation was the first of only two occasions on which Justice ever spoke to the bank. On November 8, Wilson met with Dean at Leigh's offices, and Dean informed him that "Leigh's numbers are getting worse" that there were legal disputes with some of the SHINCOM contractors, and that Leigh might require a further $10 million from the bank. On November 23, Wilson had a conversation with Dean alone, in which Dean requested a further $5 million from the bank, as Paramax was withholding payments owed to Leigh. In that conversation, Dean informed Wilson that Leigh would invoice Paramax for about $10 million in December, which they expected to receive in January.

522    Regarding the conversation in which Justice participated, this was the first time Justice had had any contact with anyone at TD. Wilson was unable to recall who had said Leigh would receive Paramax payments in January, Justice or Dean. On this basis alone, I am not prepared to find that Justice made a negligent misrepresentation to TD. Moreover, regardless of who made the statement, it was true. Leigh did expect to receive the payments, did in fact receive them in early January, and applied them to pay down the TD operating line. Finally, I am not persuaded that even if Justice had said the payments were due in January, that Wilson would have relied upon the statement from Justice. Wilson had never spoken to Justice before. He knew that Dean was the vice president of finance at Leigh and had spoken to him on several occasions. Dean was the person who had previously broached the subject of the extended line of credit and the expected payments in January. If Wilson did rely on these representations, it is more probable that he relied on the statements made by Dean, and I so find.

523    The second conversation between Justice and Wilson took place on December 21. In that conversation, Wilson asked Justice for financial statements for Leigh, and Justice responded that the statements were "not available", "due to the takeover with acquisition accounting issues". The fact that Justice made these statements is admitted by Plessey. The bank asserts that to Justice's knowledge, some financial statements for Leigh were available and that this statement by Justice was intentionally false, or made so recklessly as to amount to fraud. In the alternative, the bank asserts that the statement amounted to a negligent misrepresentation.

524    In my view, the explanation given by Justice to Wilson, that the financial statements were not ready due to the acquisition accounting issues, was misleading. Although the explanation was accurate as far as it went, in that the adjusted financial statements were not available (and indeed were never finalized prior to Leigh's bankruptcy), the statement was misleading in what it failed to disclose. By the time Justice made this statement to Wilson, he had assisted in the preparation of the financial information presented at the Stanmore meetings on November 28 and 29. He had attended those meetings with Dean and Driscoll, and knew that Leigh had some financial data available, even though the reports were not finalized using GEC format. He also knew that by this time, Leigh was reporting a loss to the end of September 1989 of more than $16 million, and that it was the quarterly financial statements for this same period, to the end of September, which had been due to the bank almost two months earlier. In these circumstances, it was misleading of Justice to simply tell Wilson that the statements were not available due to the purchase accounting issues, and to omit any reference to the financial results Leigh did have.

525    However, while the statement made by Justice was misleading, I am not prepared, on the evidence before me, to find that the bank relied upon it. Again, the December conversation must be placed in context. At the November 8 meeting at Leigh, Dean was asked for the financial statements for the third quarter and he responded that they were not available "due to the acquisition accounting issues had not been resolved." As noted above, Dean told Wilson at this meeting that Leigh's numbers were getting worse, that there were difficulties with the SHINCOM program, and that Leigh might require an increase in its bank line. Dean also said that a new cash flow forecast would be forthcoming, and subsequently

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

sent the bank a revised forecast projecting peak borrowings of $43.3 million in December.

526     In the late November phone call, Justice was introduced to Wilson as the Plessey Divisional Finance Director. His explanation of his role was that he was "assisting GEC with respect to Leigh," without further elaboration. In this phone call, Wilson was advised of the intended layoff at Leigh, which he considered somewhat positive. He did not ask about the overdue financial statements. By December 6, Wilson had received the revised cash flow forecast from Leigh, and also knew that Ross Anderson at GEC was personally monitoring the Leigh borrowings weekly, and that Plessey had authorized availability of $45 million but had only advised Leigh of a $41 million limit in order to "keep pressure on Leigh to manage its cash flow".

527     The conversation on December 21 was initiated by Justice to tell Wilson of the layoff at Leigh and to advise him that Dean had been terminated and replaced by Pat Smith. This was the second and final conversation Justice had with the bank. Wilson noted in his memo of the call that he took the opportunity to discuss with Justice "in some detail" the possibility of TD providing a fairness opinion in connection with the potential merger with Canadian Marconi, and that he told Justice TD "would be very interested" in providing the opinion. In his detailed record of the call, Wilson devoted half of his memo to discussion of the layoff at Leigh, and the other half to the fairness opinion issue. Wilson made no reference whatever in his memo to the request for financial statements or Justice's reply that they were not ready due to the acquisition accounting issues. Nor did he ask Justice any questions about the accounting issues in the phone call, or if there were any financial statements available in some other format.

528     Justice told Wilson that he would return to Canada in January to assist with Leigh's budget meetings. Implicit in the notion of budget meetings is that there is a budget to be discussed, yet Wilson never followed up on this. He neither asked for the results of the budget meetings in January, nor did he ask for a copy of the budget or any underlying documentation. Indeed, he did not contact Leigh to ask about the financial statements again until February 21, two months later.

529     Finally, when the bank did receive the financial statements in March, 1990, they did not react to them. It was not until Gerdine called the bank himself, several days after the statements had been delivered, that anyone from the bank made any comment upon them. Even then it was Gerdine's evidence that Leaney sounded surprised that anything was wrong, and he testified that it was evident to him she had not seen the financial package. In all of these circumstances, and particularly in light of the scant contact between Justice and the bank; the fact that Wilson failed to record any reference to the statement by Justice in his detailed memo of the call; the fact that the responsibility for providing the statements lay with Leigh and not Justice; the fact that the bank did not know the extent of Justice's involvement with Leigh's finances; the fact that Dean had made the same statement to the bank himself two months earlier; and in light of the bank's failure to react to the statements until contacted by Gerdine, I am unable to find that the bank relied or acted upon the statement made by Justice. Hence, one of the essential elements of negligent and fraudulent misrepresentation has not been made out. Further, the Justice statement was not a representation of a continuing nature and, as is set out below, the plaintiff has suffered no damages. The claims in negligent and fraudulent misrepresentation are dismissed.

530     I note in passing that the question of any liability which may attach to Leigh for misrepresentation or fraud is not before this court, and thus I make no comment upon it.

531     Even if I had found that the remarks made by Justice amounted to a negligent misrepresentation, I would not have found the statement to be fraudulent. I am mindful of the requirement that fraud must be strictly pleaded and strictly proved. In order to prove fraud, the dishonest mind must be established. The statements made by Justice were, strictly speaking, true. Leigh never produced a finalized set of financial statements adjusted for purchase accounting issues prior

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

to the bankruptcy. In addition, Newlands testified that Justice had provided him with a memo in October, 1989 indicating the technical baseline at Leigh was insecure, thus casting doubt on the accuracy of all the numbers Leigh produced. For these reasons, and given the paucity of evidence, I am not prepared, on a balance of probabilities, to draw the inference that Justice acted deliberately or recklessly in making the statement to Wilson.

532      Moreover, applying the principles set out in *Canadian Dredge & Dock Co.*, and *supra, B.G. Checo, supra*, I am not persuaded, on the basis of the evidence before me, that Justice was a directing mind of either GEC or Plessey, such that the corporations should be liable in fraud. Justice was not directly employed by GEC. He was the divisional finance director for PESL, however, no evidence was led as to the nature or scope of his responsibilities in that position. I am unable to conclude that he represented a directing mind of either GEC or Plessey, nor that he was acting within the scope of his authority as an employee when he discussed the financial statements of Leigh with the bank. For this reason as well, the claim in fraud must fail.

*The Anderson Statement*

533      On February 22, 1990, at a meeting in London, Anderson told Exton that the possibilities for Leigh "include Marconi acquisition or Siemens acquisition but the main problem is valuation of Leigh's worth to GEC or Siemens." The bank asserts that prior to this conversation, on February 2, Anderson had been told by the treasurer of CMC, Gerry Stuurop, that "Leigh will owe banks $50 to $60 million soon and is worth about negative C$30 million versus cost $110 million" and that Stuurop had told him, as he recorded in a note: "CMC very seriously considered advising Plessey to walk away when they saw "my" letter of support to Toronto Dominion." The bank had asserted a cause of action against GEC in fraud based upon these statements, however, the fraud allegation was abandoned by the plaintiff in argument. In any event, I find that there is absolutely no evidence to support such an allegation.

534      The bank submits that Anderson did not convey this information to Exton and that as a consequence, GEC is liable in negligent misrepresentation. I am not persuaded by this submission. Mr. Anderson had virtually no recollection of either the meeting with Stuurop or the meeting with Exton, and his evidence regarding both was purely reconstructed. He said under cross-examination that he did not recall receiving the information from Stuurop on Feb. 2, but that it was possible. He gave this evidence based on an entry in his diary, and because his notes of the information from Stuurop were written on the face of a memo dated December 21. The next document on top of this in his file was a letter from Wilson dated Feb. 21. Anderson  testified his practice was to make notes on the top memo in his file until the document was superceded by a new addition to the file, although he also testified that the documents were sometimes out of order, as they were simply placed loosely in a plastic file and were not held together in order by any kind of document clip.

535      Further, the meeting must be placed in context. Mr. Exton was not responsible for the Leigh account. Anderson was the treasurer of a huge multinational corporation, with whom the bank, and particularly Mr. Exton, had been attempting to develop a direct business relationship for some time. Leigh was a minuscule part of the GEC group. Leigh was purchased by Plessey for $107 million cdn.. Plessey was itself purchased by GEC and Siemens for $4.5 billion U.S., and GEC alone was worth £6.5 billion. The purpose of the meeting was not to discuss Leigh and I find that Leigh was discussed in the meeting only in passing. Exton used the Leigh relationship only as a door-opener with GEC, in order to develop business opportunities with the company. Indeed, Anderson asked Exton for a separate £50 million loan facility in the meeting.

536      In these circumstances, I cannot find that Anderson owed Exton a duty of care. In my view, it was not reasonably forseeable that Exton or the bank would rely on the statement about the valuation of Leigh, or any omission from that statement, to its detriment. This claim in negligent misrepresentation is dismissed.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

*The February 26 Memo*

537    The bank asserts that GEC and Plessey are liable in fraud for their failure to direct Driscoll to deliver the financial statements due to the bank, following his February 26 memo asking for direction in this regard. The bank argues that Leigh's behaviour in knowingly failing to produce the financial statements amounts to fraud and deceit, and that Plessey and GEC were parties to this deception, as "Plessey and GEC must be taken to have known that Leigh was not going to deliver the financial statements to the bank without their direction." I cannot accede to this submission.

538    In the first instance, I note that TD raised this allegation of fraud for the very first time in its written argument submitted at the conclusion of trial. It was not pleaded in the statement of claim, although the claim has been amended twice, most recently in April, 1996 when several new claims were added. The parties spent over six years in pre-trial preparation. The statement of claim does refer to Driscoll's February 26 memo, and hence, the bank could have pleaded the fraud allegation, since it was aware of the document upon which it is based.

539    The defendants were denied the opportunity to respond to this very serious allegation through cross-examining witnesses or calling witnesses of their own in order to refute it. The prejudice to the defendants in this regard is considerable.

540    Moreover, the bank has not identified any specific person at GEC or Siemens who is alleged to have had the dishonest mind which is an integral part of any fraud claim. In order to attach liability to a corporation for fraud, as noted above, the fraudulent intent must be  established on the part of a natural person. I reiterate that fraud must be strictly pleaded and strictly proved.

541    Notwithstanding that the defendants have not had an opportunity to properly meet this allegation, in my view the plaintiff has failed to establish a case for fraud. The contractual obligation to provide the financial statements was that of Leigh and not of either GEC or Plessey. The memo was sent by Driscoll to Rickard and Alexander, both of GEC Marconi, and to Justice. None of these people gave evidence at this trial, nor was detailed evidence led about the nature or scope of their duties and responsibilities. No evidence was led as to their reaction, if any, to the memo. The only evidence of any response to Driscoll's memo is a copy of the memo, produced by GEC, with the handwritten notation "must tell if they ask". This notation is admitted by GEC to be in the handwriting of David Rickard. Rickard and Alexander were not employed by GEC, but by GEC Marconi, a GEC subsidiary which is not a party to this action. The plaintiff has failed to establish a dishonest intent on the part of any person sufficient to attach liability to either GEC or Plessey. I am not prepared to draw an inference of dishonest intent in these circumstances, and this claim in fraud must fail. In this respect, the observation of Essen J.A. in *Rainbow Industrial, supra* at p. 69 is apt:

> It seems, most regrettably, to have become fashionable to allege fraud in commercial cases without much regard for the fundamental rule that fraud must be strictly pleaded and strictly proven. To some extent, this may be an off-shoot of the mistaken notion, to which I referred earlier, that those stringent requirements do not apply to fraud by non-disclosure.

**Part IV**

*Damages*

542    I have not found either GEC or Plessey liable in either contract or tort under any of the causes of action asserted. However, if I had done so, I would have assessed the damages in the following amounts.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

543    The applicable principles concerning the measure of damages in contract and for the tort of negligent misrepresentation are set out by the majority of the Supreme Court of Canada in *BG Checo International Ltd.*, *supra* at 37:

> The measure of damages in contract and for the tort of negligent misrepresentation are:
>
> Contract The plaintiff is to be put in the position it would have been in had the contract been performed as agreed.
>
> Tort The plaintiff is to be put in the position it would have been in had the misrepresentation not been made.

See also *MacGregor on Damages*, 15th ed. (London: Sweet & Maxwell, 1997) at pp. 9-11.

544    I assess the damages in respect of each of the plaintiffs claims as follows:

*The Claim in Contract*

545     I have held that the comfort letter does not contain a contractual obligation on Plessey to pay the bank nor to have the policy referenced in the third paragraph. I have also found that there was no breach of the policy paragraph. If there was a contract which was breached, the plaintiff should be placed in the same position as it would have been had the contract been performed. I assess the damages flowing from a breach of that contract as follows. The amount of the Leigh loan outstanding at the time of the bankruptcy was $40,489,427.09. Leigh had in its account a positive cash balance of $1 million, which the bank seized and applied to the outstanding loan. Accordingly, the damages must be reduced by this amount. As well, the bank recovered $398,710.87 in an action against Leigh's auditors Deloitte. Haskins & Sells regarding the Leigh loan. The damages should be reduced by this amount as well. Accordingly, I assess damages for breach of contract at $39,090,716.22.

546     I am not prepared to reduce the damages by the amount of any taxation provision taken by the bank on account of the loss. The evidence does not establish with certainty what the bank's tax treatment of the Leigh loan was, nor the amount of any tax saving which may have accrued to the bank. In the event that damages were awarded the bank, any recapture of this provision could be adjusted for in future tax returns.

*The Claim in Misrepresentation based on the Comfort Letters*

547     I have held that the comfort letters did not contain a misrepresentation from their inception in April 1988 forward. If I had held Plessey liable in misrepresentation from the date of the first comfort letter, I would assess the damages in the same amount as in the contract claim above, that is $39,090,716.22.

548     I have held that the fifth comfort letter dated December 15, 1989 and delivered on December 27, 1989 did not amount to a negligent or fraudulent misrepresentation and could not be reasonably relied upon by the bank. Had I held otherwise, I would assess the damages so as to put the plaintiff in the same position it would have been in if the misrepresentation had not been made. Given that this representation was a continuing representation, in my view the plaintiff would be entitled to recovery of all amounts advanced in reliance on the representation. In this case, Leigh received payments which reduced its loan balance in January, however further amounts were advanced by the bank thereafter. In fact, the full amount of funds advanced following the reduction in the Leigh loan and prior to the bankruptcy was $8,843,140.04, although the loan balance was actually slightly higher at the date of delivery of the comfort letter than it was at the date of the bankruptcy. Accordingly, I would assess damages at $8,843,140.04, less the plaintiff's recovery of $1 million from the Leigh bank account and $398,710.87 from the Deloitte's settlement for a total of $7,444,429.17.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

*Conduct Outside the Letters*

549      I have found that the bank did not give up its security at the time of delivery of the third comfort letter in April 1989 nor did it make advances thereafter based on the alleged statements by Musgrave that the letter was tantamount to a guarantee. I have found such statement was not made by him. The bank did not give up its security or make further advances based on anything Plessey said or did at that time. Had I found liability on the basis of the alleged statement by Musgrave, I would assess damages flowing from such a claim as follows. The value of TD's security over Leigh's assets was $14,300.000.00. Assuming that the bank would have called the Leigh loan as at the date of the representation by Musgrave, from March 6, 1989 to the date of bankruptcy, the bank advanced to Leigh the sum of $12,279,290.03, for a total of $26,579,290.03. I would subtract the sums recovered from the Deloitte's settlement and the Leigh bank account above, for a total damages award of $25,180,579.16.

550      Had I found liability on the basis of the statements made by Colin Justice to the bank in late November, 1989 and on December 21, 1989, I would have assessed damages as at November 30 at $919,698.09, being the difference between the loan balance on that date of $38,171,018.13 and at the date of bankruptcy, less the recovery above. Applying the same calculation to December 21, I would assess the damages at that date as ($330,052.04). Hence, the plaintiff would have suffered no damages.

551      Regarding the Anderson meeting with Exton, applying the same calculation to the loan balance outstanding on February 22 of $36,482,251.92, I would assess damages at $2,608,464.30.

552      TD claims damages in respect of Plessey's and GEC failure to direct Leigh to provide to the bank the financial information which Leigh was required to provide pursuant to the terms of the facility letter reporting provisions. I would assess any damages flowing therefrom if liability had been found, at $2,544,543.81, based on a loan balance of $36,546,172.41 on February 26, 1990, and applying the calculation above.

553      The bank has pleaded fraud against GEC and Plessey. I have found that there is a total absence of any evidence of fraud and I have rejected this assertion by TD. Nevertheless, the measure of damages would be the same as for negligent misrepresentation. See *Smith v. Scrimgeour Vickers,* [1996] 4 All E.R. 769 (Eng. H.L.) at 792 and S.M. Waddams. *The Law of Damages*, 2ⁿᵈ ed. (Toronto: Canada Law Book, 1993) at 5-19.M

*Interest*

554      During the period up to the freezing of the line by the bank interest was either included in the amount of the loan or paid. Accordingly, I would assess pre-judgment interest from March 30, 1990. I would assess both pre-judgment and post judgment interest in accordance with the Courts of Justice Act.

**Part V**

*Conclusion*

555      Letters of comfort are just that, comfort. They are not guarantees or formal security nor are they enforceable as such. They are gentlemen's agreements and moral obligations. This is common knowledge in the business community. The bank recognized this fact of life in its credit manual and in its references to comfort letters in its CCRs and other internal documents

556      Mr. McDowell, one of the most senior officers of the bank, stated that he expected the bank's legal department to follow and provide updates on issues such as comfort letters to those persons at the bank making and approving loans.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

Noonan, Leaney, Young and Wilson acknowledged that this would be important to them although they either could not recall or denied receiving information from the legal department. If those opinions were not circulated, or if circulated not paid due attention, this is sparse consolation. The opinions of the bank's highly qualified legal department accurately reflected the quality, in law, of comfort letters.

557      One might rightfully ask why it is that parties exchange language such as that in the policy paragraph of the Plessey comfort letter. More so, when the language conspicuously lacks  words of promise or contract, and where there has been no attempt to provide otherwise. In such circumstances one may only conclude that it was not intended that such words be enforceable as a contract. These were both, after all, large commercially sophisticated parties.

558      The defendants criticize the bank for its characterization of the comfort letters as "strong". It seems to me that this censure is unfair. To begin with, the bank did not state the letters to be strong in law. This would have been wrong, both in the face of the bank's legal advice and in general principle. A comfort letter may nevertheless be strong, even though not legally strong because its essence is that of a gentleman's agreement or moral obligation. Hence the test of the true strength of such a document is whether it will be honoured and paid on when presented for payment. Musgrave testified that Plessey had paid pursuant to two comfort letters which were not legally enforceable. Whether Plessey, prior to the GEC-Siemens hostile takeover, would have paid on their letter to TD is a matter for speculation.

559      As Musgrave, and the expert banker Wickham testified, companies may pay on nonbinding comfort letters based on commercial considerations, such as corporate reputation and concern that a refusal to honour a comfort letter may undercut the company's relationship with the affected bank or become public knowledge and make future dealings with other banks difficult. Plessey paid on one comfort letter for these exact reasons, although this was not known to TD. Based on such considerations of which McDowell and Noonan were certainly mindful, TD was perhaps justified in regarding the Plessey comfort letter as "strong" given the reputation of Plessey in the marketplace, up to the time of the hostile takeover in September 1989.

560      The takeover is a clear break point in this chronology. Although not a factor in anything that followed, TD had backed Plessey in its losing gamut to fend off the GEC-Siemens bid. It had no prior relationship with the new Plessey shareholders. It also knew that the takeover proposal was to dismantle Plessey and distribute the Plessey companies between GEC and Siemens. The Plessey management with whom TD had been dealing, as is to be expected in such circumstances, was decimated after the takeover. TD, lacking any relationship with the GEC and Siemens personnel, attempted to use the Plessey situation as a beachhead to develop a relationship and generate new business with GEC. In this environment, however, for the bank to rest its risk on a comfort letter which in turn depends for its integrity on relationship, was not only decidedly unwise, it was foolhardy. It is not as though TD was without options. Its facility with Leigh was payable on demand. As such it could have called the loan prior to the takeover. Or, it could have re-negotiated the arrangement with Plessey immediately afterwards by broaching the subject directly.

561      The leverage available to the lender in enforcing a comfort letter is that stated above - a possible impairment, in the event of refusal to honour the letter, of the creditworthiness of the giver of the letter in the marketplace. In short, the reputation of the giver is on the line should it fail to honour a moral commitment, notwithstanding it is unenforceable at law. Plessey, pre takeover, was a user of credit. GEC, on the other hand, was variously described as a cash mountain, debt free, and one of the richest companies in the U.K. The GEC treasurer Ross Anderson had as one of his main duties the almost daily investment of the company's cash surplus measured in billions of pounds. Such a company was not dependent on the banking  industry for its goodwill. It was a lender not a borrower. Thus leverage of reputation among and access to the banking industry was not a factor in the case of GEC. TD overlooked this critical distinction.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

562      Nevertheless, when TD asked Plessey to pay on the comfort letter and was met with a refusal, it sought to fall back on the traditional strategy in such a situation, marketplace pressure and the threat of its consequences, only to learn to its chagrin that Plessey with its new shareholders was immune to such tactics. This trial appears to be the last move by TD in its execution of this strategy.

563      At the beginning of these reasons I said that this case had at the center Leigh Instruments and TD, a bank and its customer. It also involves TD and, like itself, Plessey, another large multinational company, not in a banker-customer relationship and an effort by one to recover on a moral commitment, unsuccessfully.

564      It is not the role of the courts to re-write bargains, to substitute a better bargain than the one that the parties made for themselves or to enforce moral obligations and gentlemen's agreements. McDowell stated that, in his world, his word was his bond and if he made a commitment he expected to fulfill it. Unfortunately, the converse of that proposition is that if one accepts another person's word instead of taking their bond, one does so at their own peril. This does not however, condone the actions of a large multinational company with over a billion pounds sterling in cash reserves in walking away from a gentleman's business agreement to  support its subsidiary.

565      I may be spoken to regarding costs.

*Action dismissed.*

## Appendix A

### Dramatis Personae

#### *The Toronto-Dominion Bank*

| | |
|---|---|
| Baker, Howard M. | Manager, Corporate Finance, London, England |
| Boulanger, Pierre de G. | Senior Vice-President, Credit Division (from September 1988) |
| Brock, William T. | Executive Vice-President, Credit |
| Bumstead, R. Glenn | Senior Vice-President & General Counsel and Secretary |
| Burega, Yovhan M. | Vice-President, Corporate Banking Division |
| Exton, Jonathan | Manager, Corporate Finance, London, England (from May 1988 to end of 1989) |
| | Director, Corporate Finance, London, England (from end of 1989) |
| Klingenstierna, Goran G. | Manager, Corporate Banking Division |
| Kriss, Merle | Assistant General Manager, Corporate Banking Division |
| Laitner, James | Senior Vice-President, Credit Division |
| Leaney, Wendy A. | General Manager, Corporate Banking Division |
| Mercier, Ernest C. | Executive Vice-President, Corporate Banking Division |
| McDowell, F.G. (Ted) | Vice-Chairman, Credit Division |
| Noonan, Patrick C. | Senior Vice-President, Credit Division |
| Norton, Alec I. | Assistant General Counsel |

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

| | |
|---|---|
| Owen, Sidney C. | Senior Vice-President, Credit Division |
| Read, J.A. | Assistant General Manager, London, England |
| Rising, Hugh | Vice-President, Corporate Finance, London, England |
| Thomson, Richard | Chairman and CEO |
| Walzak, Mike | Assistant General Manager, Credit, London, England |
| Wilson, Robert | Manager, Corporate Banking (as of October 31, 1989) |
| Winston, Randi | Assistant Manager, Corporate Banking Division |
| Young, Gregory G. | Manager, Corporate Banking Division |

### *Leigh Instruments Limited*

| | |
|---|---|
| Dean, David | Vice-President, Finance (laid off on December 20, 1989) |
| Driscoll, Frank | President and CEO (from August 8, 1989) |
| Flower, Barry | President and CEO (to June, 1989) |
| Plumley, Kent | Secretary |
| Shepherd, John | Chairman/Director |
| Smith, Pat | Finance Director (replaced Dean) |

### *The Plessey Defendants*

*The Plessey Company plc:*

| | |
|---|---|
| Beard, Denise | Treasury Department: |
| | Group Banking Manager (to August 31, 1989); |
| | Assistant Treasurer (Sept. 1, 1989); |
| | (left Plessey November 3, 1989) |
| Finnis. A. G. | Group Taxation Manager |
| Dr. Gerdine, Philip V. | (a director, as of February, 1990); Co-managing Director of Plessey (Siemens representative) after GEC/Siemens takeover of Plessey |
| Huntbatch, Kenneth Bernard | Company Secretary and Director of Administration (to Jan. 3, 1989); |
| | Director of Administration (from Jan. 3, 1989) (Company Secretary until his resignation on June 29, 1990) (died in latter part of 1990) (a director) |
| Musgrave. Ian C. | Group Treasurer (previously Group Finance Director) resigned as Group Treasurer on August 31, 1989 |
| Noon, Anthony J. | Director of Legal and Contract Services |
| Sammon, Brendon P. (Binny) | Group Chief Accountant (to September 1990) |
| Thorn, Derek G. | Finance Director, Group Services (deceased- December, 1989) |
| Walls, Stephen R. | Managing Director (a director) (promoted from Finance Director in 1988) (resigned October 6, 1989) |

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

*Plessey Incorporated, White Plains, New York*

| | |
|---|---|
| Palazzi. J.L. | Finance Director |

*Plessey Electronic Systems Limited ("PESL")*

| | |
|---|---|
| Akerman, Andrew C. | Financial Analyst (to February, 1989) |
| Flower, Barry | Managing Director - International Defense (from July 1, 1989) |
| Justice, Colin J. | Finance Director (from Aug. 1, 1988) |

### The Gec Defendants

*The General Electric Company plc*

| | |
|---|---|
| Anderson, Ross K. | Treasurer |
| Bates, Malcolm | Deputy Managing Director/Director |
| MacBean, Ian | Director |
| Newlands, David | Finance Director/Director (from September 1989) |
| Robinson, Tony | Assistance Finance Director |
| Weinstock, Lord | Managing Director/Director |
| Weinstock, Simon | Commercial Director/Director |

*GEC Marconi*

| | |
|---|---|
| Alexander, Bill | Managing Director, GEC Avionics |
| MacBean, Ian | Managing Director, GEC Marconi |
| Rickard, David | Finance Director, GEC Marconi |

*Canadian Marconi*

| | |
|---|---|
| Simons, John | President |
| Stuurop, G. | Treasurer |

### Siemens Aktiengesellschaft

| | |
|---|---|
| Baumann, Dr. Karl | Executive Vice-President, Finance |
| Gerdine, Dr. Philip | Executive Director |
| Hafner, Andreas | Treasurer |
| Mackenrodt, Dr. Jochen | Vice-President, Central Finance, Foreign Affiliates |

**Appendix B**

**Corporate Structure**

Tabular or graphic material set at this point is not displayable.**Graphic 1**

**Appendix C**

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

**Leigh Loan Balances**

May 17, 1990

LEIGH BORROWINGS:

| MONTH | | B/A's | OVERDRAFT | TOTAL |
|---|---|---|---|---|
| January 1989 | | | | |
| | 1 | 10,600,000 | 12,517,600.37 | 23,117,600.37 |
| | 2 | 10,600,000 | 12,517,600.37 | 23,117,600.37 |
| | 3 | 10,600,000 | 12,176,688.72 | 22,776,688.72 |
| | 4 | 10,600,000 | 12,214,143.35 | 22,814,143.35 |
| | 5 | 10,600,000 | 12,333,052.16 | 22,933,052.16 |
| | 6 | 10,600,000 | 13,129,833.44 | 23,729,833.44 |
| | 7 | 10,600,000 | 13,129,833.44 | 23,729,833.44 |
| | 8 | 10,600,000 | 13,129,833.44 | 23,729,833.44 |
| | 9 | 10,600,000 | 13,146,357.80 | 23,746,357.80 |
| | 10 | 10,600,000 | 13,255,838.06 | 23,855,838.06 |
| R/O-11 | | 20,000,000 | 4,200,956.94 | 24,200,956.94 |
| | 12 | 20,000,000 | 4,274,752.88 | 24,274,752.88 |
| | 13 | 20,000,000 | 4,277,027.45 | 24,277,027.45 |
| | 14 | 20,000,000 | 4,277,027.45 | 24,277,027.45 |
| | 15 | 20,000,000 | 4,277,027.45 | 24,277,027.45 |
| | 16 | 20,000,000 | 4,513,489.16 | 24,513,489.16 |
| | 17 | 20,000,000 | 4,805,016.65 | 24,805,016.65 |
| | 18 | 20,000,000 | 4,955,113.19 | 24,955,113.19 |
| | 19 | 20,000,000 | 4,920,040.60 | 24,920,040.60 |
| | 20 | 20,000,000 | 5,175,640.37 | 25,175,640.37 |
| | 21 | 20,000,000 | 5,175,640.37 | 25,175,640.37 |
| | 22 | 20,000,000 | 5,175,640.37 | 25,175,640.37 |
| | 23 | 20,000,000 | 5,892,985.50 | 25,892,985.50 |
| | 24 | 20,000,000 | 5,989,040.15 | 25,989,040.15 |
| | 25 | 20,000,000 | 6,282,432.32 | 26,282,432.32 |
| | 26 | 20,000,000 | 6,878,134.17 | 26,878,134.17 |
| | 27 | 20,000,000 | 6,736,230.90 | 26,736,230.90 |
| | 28 | 20,000,000 | 6,736,230.90 | 26,736,230.90 |
| | 29 | 20,000,000 | 6,736,230.90 | 26,736,230.90 |
| | 30 | 20,000,000 | 6,898,160.20 | 26,898,160.20 |

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

|  |  |  |  |  |
|---|---|---|---|---|
|  | 31 | 20,000,000 | 7,021,523.63 | 27,021,523.63 |
| February 1989 |  |  |  |  |
|  | 1 | 20,000,000 | 7,126,693.17 | 27,126,693.17 |
|  | 2 | 20,000,000 | 7,413,772.56 | 27,413,772.56 |
|  | 3 | 20,000,000 | 8,203,459.85 | 28,203,459.85 |
|  | 4 | 20,000,000 | 8,203,459.85 | 28,203,459.85 |
|  | 5 | 20,000,000 | 8,203,459.85 | 28,203,459.85 |
|  | 6 | 20,000,000 | 8,290,740.86 | 28,290,740.86 |
|  | 7 | 20,000,000 | 8,328,058.19 | 28,328,058.19 |
|  | 8 | 20,000,000 | 8,289,384.74 | 28,289,384.74 |
|  | 9 | 20,000,000 | 8,426,878.83 | 28,426,878.83 |
|  | 10 | 20,000,000 | 8,457,334.03 | 28,457,334.03 |
|  | 11 | 20,000,000 | 8,457,334.03 | 28,457,334.03 |
|  | 12 | 20,000,000 | 8,457,334.03 | 28,457,334.03 |
|  | 13 | 20,000,000 | 9,421,372.38 | 29,421,372.38 |
|  | 14 | 20,000,000 | 9,666,167.87 | 29,666,167.87 |
| R/O-15 |  | 25,200,000 | 3,529,973.98 | 28,729,973.98 |
|  | 16 | 25,200,000 | 3,627,371.46 | 28,827,371.46 |
|  | 17 | 25,200,000 | 3,659,017.88 | 28,859,017.88 |
|  | 18 | 25,200,000 | 3,659,017.88 | 28,859,017.08 |
|  | 19 | 25,200,000 | 3,659,017.88 | 28,859,017.88 |
|  | 20 | 25,200,000 | 3,797,809.52 | 28,997,809.52 |
|  | 21 | 25,200,000 | 3,971,011.66 | 29,171,011.66 |
|  | 22 | 25,200,000 | 3,978,941.88 | 29,178,941.88 |
|  | 23 | 25,200,000 | 4,450,248.60 | 29,650,248.60 |
|  | 24 | 25,200,000 | 4,450,248.60 | 29,650,248.60 |
|  | 25 | 25,200,000 | 4,450,248.60 | 29,650,248.60 |
|  | 26 | 25,200,000 | 4,450,248.60 | 29,650,248.60 |
|  | 27 | 25,200,000 | 4,479,813.36 | 29,679,813.36 |
|  | 28 | 25,200,000 | 2,645,394.72 | 27,845,394.72 |
| March 1989 |  |  |  |  |
|  | 1 | 25,200,000 | 2,778,153.15 | 27,978,153.15 |
|  | 2 | 25,200,000 | 2,347,556.87 | 27,547,556.87 |
|  | 3 | 25,200,000 | 3,034,892.22 | 28,234,892.22 |
|  | 4 | 25,200,000 | 3,034,892.22 | 28,234,892.22 |
|  | 5 | 25,200,000 | 3,034,892.22 | 28,234,892.22 |
|  | 6 | 25,200,000 | 3,010,137.06 | 28,210,137.06 |

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

| | | | |
|---|---|---|---|
| 7 | 25,200,000 | 2,942,566.24 | 28,142,566.24 |
| 8 | 25,200,000 | 875,753.18 | 26,075,753.18 |
| 9 | 25,200,000 | 613,084.43 | 25,813,084.43 |
| 10 | 25,200,000 | 960,205.40 | 26,160,205.40 |
| 11 | 25,200,000 | 960,205.40 | 26,160,205.40 |
| 12 | 25,200,000 | 960,205.40 | 26,160,205.40 |
| 13 | 25,200,000 | 967,037.38 | 26,167,037.38 |
| 14 | 25,200,000 | 1,019,345.36 | 26,219,345.36 |
| 15 | 25,200,000 | 1,385,809.09 | 26,585,809.09 |
| 16 | 25,200,000 | 1,393,298.34 | 26,593,298.34 |
| 17 | 25,200,000 | 1,258,199.42 | 26,458,199.42 |
| 18 | 25,200,000 | 1,258,199.42 | 26,458,199.42 |
| 19 | 25,200,000 | 1,258,199.42 | 26,458,199.42 |
| 20 | 25,200,000 | 2,185,732.95 | 27,385,732.95 |
| R/O-21 | 25,300,000 | 2,459,049.45 | 27,759,049.45 |
| 22 | 25,300,000 | 1,654,251.16 | 26,954,251.16 |
| 23 | 25,300,000 | 2,067,089.24 | 27,367,089.24 |
| 24 | 25,300,000 | 2,067,089.24 | 27,367,089.24 |
| 25 | 25,300,000 | 2,067,089.24 | 27,367,089.24 |
| 26 | 25,300,000 | 2,067,089.24 | 27,367,089.24 |
| 27 | 25,300,000 | 2,147,265.65 | 27,447,265.85 |
| 28 | 25,300,000 | 2,106,861.67 | 27,406,861.67 |
| 29 | 25,300,000 | 2,113,873.01 | 27,413,873.01 |
| 30 | 25,300,000 | 1,881,398.58 | 27,181,398.58 |
| 31 | 25,300,000 | 2,438,391.74 | 27,738,391.74 |
| April 1989 | | | |
| 1 | 25,300,000 | 2,438,391.74 | 27,738,391.74 |
| 2 | 25,300,000 | 2,438,391.74 | 27,738,391.74 |
| 3 | 25,300,000 | 2,442,323.39 | 27,742,323.39 |
| 4 | 25,300,000 | 2,536,700.93 | 27,836,700.93 |
| 5 | 25,300,000 | 2,296,313.54 | 27,596,313.54 |
| 6 | 25,300,000 | 2,384,335.89 | 27,684,335.89 |
| 7 | 25,300,000 | 2,587,594.42 | 27,887,594.42 |
| 8 | 25,300,000 | 2,587,594.42 | 27,887,594.42 |
| 9 | 25,300,000 | 2,587,594.42 | 27,887,594.42 |
| 10 | 25,300,000 | 3,512,317.61 | 28,812,317.61 |
| 11 | 25,300,000 | 3,732,516.46 | 29,032,516.46 |

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

| | | | |
|---|---|---|---|
| 12 | 25,300,000 | 3,761,812.59 | 29,061,812.59 |
| 13 | 25,300,000 | 3,773,262.71 | 29,073,262.71 |
| 14 | 25,300,000 | 4,534,060.18 | 29,834,060.18 |
| 15 | 25,300,000 | 4,534,060.18 | 29,834,060.18 |
| 16 | 25,300,000 | 4,534,060.18 | 29,834,060.18 |
| 17 | 25,300,000 | 4,685,046.55 | 29,985,046.55 |
| 18 | 25,300,000 | 4,729,857.98 | 30,029,857.98 |
| 19 | 25,300,000 | 4,828,939.81 | 30,128,939.81 |
| 20 | 25,300,000 | 2,782,380.50 | 28,082,380.50 |
| 21 | 25,300,000 | 2,899,300.79 | 28,199,300.79 |
| 22 | 25,300,000 | 2,899,300.79 | 28,199,300.79 |
| 23 | 25,300,000 | 2,899,300.79 | 28,199,300.79 |
| 24 | 25,300,000 | 2,914,336.09 | 28,214,336.09 |
| R/O-25 | 30,000,000 | 615,774.45 | 30,615,774.45 |
| 26 | 30,000,000 | 595,369.26 | 30,595,369.26 |
| 27 | 30,000,000 | 1,611,577.04 | 31,611,577.04 |
| 28 | 30,000,000 | 930,467.56 | 30,930,467.56 |
| 29 | 30,000,000 | 930,467.56 | 30,930,467.56 |
| 30 | 30,000,000 | 930,467.56 | 30,930,467.56 |
| May 1989 | | | |
| 1 | 30,000,000 | 572,124.83 | 30,572,124.83 |
| 2 | 30,000,000 | 312,673.05 | 30,312,673.05 |
| 3 | 30,000,000 | 332,028.81 | 30,332,028.81 |
| 4 | 30,000,000 | 316,847.53 | 30,316,847.53 |
| 5 | 30,000,000 | 161,261.05 | 30,161,261.05 |
| 6 | 30,000,000 | 161,261.05 | 30,161,261.05 |
| 7 | 30,000,000 | 161,261.05 | 30,161,261.05 |
| 8 | 30,000,000 | 446,373.25 | 30,446,373.25 |
| 9 | 30,000,000 | 330,426.43 | 30,330,426.43 |
| 10 | 30,000,000 | 3,369.55 | 30,003,369.55 |
| 11 | 30,000,000 | 165,814.06 | 30,165,814.06 |
| 12 | 30,000,000 | 1,089,795.02 | 31,089,795.02 |
| 13 | 30,000,000 | 1,089,795.02 | 31,089,795.02 |
| 14 | 30,000,000 | 1,089,795.02 | 31,089,795.02 |
| 15 | 30,000,000 | 1,314,848.53 | 31,314,848.53 |
| 16 | 30,000,000 | 1,464,716.98 | 31,464,716.98 |
| 17 | 30,000,000 | 1,631,817.02 | 31,631,817.02 |

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

| | | | |
|---|---|---|---|
| 18 | 30,000,000 | 1,221,046.01 | 31,221,046.01 |
| 19 | 30,000,000 | 1,277,309.62 | 31,277,309.62 |
| 20 | 30,000,000 | 1,277,309.62 | 31,277,309.62 |
| 21 | 30,000,000 | 1,277,309.62 | 31,277,309.62 |
| 22 | 30,000,000 | 1,277,309.62 | 31,277,309.62 |
| 23 | 30,000,000 | 1,862,398.81 | 31,862,398.81 |
| 24 | 30,000,000 | 1,984,855.44 | 31,984,855.44 |
| 25 | 30,000,000 | 2,450,199.76 | 32,450,199.76 |
| 26 | 30,000,000 | 3,140,392.90 | 33,140,392.90 |
| 27 | 30,000,000 | 3,140,392.90 | 33,140,392.90 |
| 28 | 30,000,000 | 3,140,392.90 | 33,140,392.90 |
| 29 | 30,000,000 | 3,169,024.65 | 33,169,024.65 |
| 30 | 30,000,000 | 3,272,847.14 | 33,272,847.14 |
| 31 | 30,000,000 | 3,421,007.24 | 33,421,007.24 |
| June 1989 | | | |
| 1 | 30,000,000 | 3,807,906.22 | 33,807,906.22 |
| 2 | 30,000,000 | 3,494,903.39 | 33,494,903.39 |
| 3 | 30,000,000 | 3,494,903.39 | 33,494,903.39 |
| 4 | 30,000,000 | 3,494,903.39 | 33,494,903.39 |
| 5 | 30,000,000 | 4,183,246.54 | 34,183,246.54 |
| 6 | 30,000,000 | 4,221,107.60 | 34,221,107.60 |
| 7 | 30,000,000 | 4,286,095.12 | 34,286,095.12 |
| 8 | 30,000,000 | 4,276,486.77 | 34,276,486.77 |
| 9 | 30,000,000 | 3,927,642.68 | 33,927,642.68 |
| 10 | 30,000,000 | 3,927,642.66 | 33,927,642.68 |
| 11 | 30,000,000 | 3,927,642.68 | 33,927,642.68 |
| 12 | 30,000,000 | 3,869,384.91 | 33,869,384.91 |
| 13 | 30,000,000 | 3,870,629.94 | 33,870,629.94 |
| 14 | 30,000,000 | 3,906,792.83 | 33,906,792.83 |
| 15 | 30,000,000 | 3,901,483.73 | 33,901,483.73 |
| 16 | 30,000,000 | 3,949,557.44 | 33,949,557.44 |
| 17 | 30,000,000 | 3,949,557.44 | 33,949,557.44 |
| 18 | 30,000,000 | 3,949,557.44 | 33,949,557.44 |
| 19 | 30,000,000 | 1,326,243.09 | 31,326,243.09 |
| 20 | 30,000,000 | 1,792,483.59 | 31,792,483.59 |
| 21 | 30,000,000 | 1,940,661.74 | 31,940,661.74 |
| 22 | 30,000,000 | 114,015.07 | 30,114,015.07 |

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

| | | | |
|---|---|---|---|
| 23 | 30,000,000 | 1,362,525.52 | 31,362,525.52 |
| 24 | 30,000,000 | 1,362,525.52 | 31,362,525.52 |
| 25 | 30,000,000 | 1,362,525.52 | 31,362,525.52 |
| 26 | 30,000,000 | 1,699,284.94 | 31,699,264.94 |
| 27 | 30,000,000 | 1,740,425.93 | 31,740,425.93 |
| 28 | 30,000,000 | 1,619,155.96 | 31,619,155.96 |
| 29 | 30,000,000 | 1,645,231.57 | 31,645,231.57 |
| R/O-30 | 30,000,000 | 1,659,173.91 | 31,659,173.91 |
| July 1989 | | | |
| 1 | 30,700,000 | 1,659,173.91 | 32,359,173.91 |
| 2 | 30,700,000 | 1,659,173.91 | 32,359,173.91 |
| 3 | 30,700,000 | 1,659,173.91 | 32,359,173.91 |
| 4 | 30,700,000 | 904,935.09 | 31,604,935.09 |
| 5 | 30,700,000 | 1,132,744.32 | 31,832,744.32 |
| 6 | 30,700,000 | 1,933,687.99 | 32,633,687.99 |
| 7 | 30,700,000 | 2,765,740.22 | 33,465,740.22 |
| 8 | 30,700,000 | 2,765,740.22 | 33,465,740.22 |
| 9 | 30,700,000 | 2,765,740.22 | 33,465,740.22 |
| 10 | 30,700,000 | 3,362,740.73 | 34,062,740.73 |
| 11 | 30,700,000 | 3,219,776.51 | 33,919,776.51 |
| 12 | 30,700,000 | 3,210,332.88 | 33,910,332.88 |
| 13 | 30,700,000 | 3,481,122.61 | 34,181,122.61 |
| 14 | 30,700,000 | 3,550,969.80 | 34,250,969.80 |
| 15 | 30,700,000 | 3,550,969.80 | 34,250,969.80 |
| 16 | 30,700,000 | 3,550,869.80 | 34,250,969.80 |
| 17 | 30,700,000 | 2,887,189.99 | 33,587,189.99 |
| 18 | 30,700,000 | 2,920,771.73 | 33,620,771.73 |
| 19 | 30,700,000 | 3,013,625.52 | 33,713,625.52 |
| 20 | 30,700,000 | 3,712,734.07 | 34,412,734.07 |
| 21 | 30,700,000 | 3,712,734.07 | 34,412,734.07 |
| 22 | 30,700,000 | 3,712,734.07 | 34,412,734.07 |
| 23 | 30,700,000 | 3,712,734.07 | 34,412,734.07 |
| 24 | 30,700,000 | 4,588,772.15 | 35,286,772.15 |
| 25 | 30,700,000 | 5,023,958.06 | 35,723,958.06 |
| 26 | 30,700,000 | 4,762,514.74 | 35,462,514.74 |
| 27 | 30,700,000 | 4,828,507.48 | 35,528,507.48 |
| 28 | 30,700,000 | 4,659,731.62 | 35,359,731.62 |

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

| | | | |
|---|---|---|---|
| 29 | 30,700,000 | 4,659,731.62 | 35,359,731.62 |
| 30 | 30,700,000 | 4,659,731.62 | 35,359,731.62 |
| 31 | 30,700,000 | 4,280,482.57 | 34,980,482.57 |

**August 1989**

| | | | |
|---|---|---|---|
| 1 | 30,700,000 | 6,059,098.65 | 36,759,098.65 |
| R/O- 2 | 30,700,000 | 6,004,154.56 | 36,704,154.56 |
| 3 | 30,700,000 | 2,375,802.44 | 33,075,802.44 |
| 4 | 30,700,000 | 3,047,364.30 | 33,747,364.30 |
| 5 | 30,700,000 | 3,047,364.30 | 33,747,364.30 |
| 6 | 30,700,000 | 3,047,364.30 | 33,747,364.30 |
| 7 | 30,700,000 | 3,104,314.68 | 33,804,314.68 |
| 8 | 30,700,000 | 3,164,696.67 | 33,864,896.67 |
| 9 | 30,700,000 | 3,000,534.07 | 33,700,534.07 |
| 10 | 30,700,000 | 3,365,019.83 | 34,065,019.83 |
| 11 | 30,700,000 | 3,313,923.56 | 34,013,923.56 |
| 12 | 30,700,000 | 3,313,923.56 | 34,013,923.56 |
| 13 | 30,700,000 | 3,313,923.56 | 34,013,923.56 |
| 14 | 30,700,000 | 3,474,923.56 | 34,174,923.56 |
| 15 | 30,700,000 | 3,561,681.48 | 34,261,681.48 |
| 16 | 30,700,000 | 3,751,602.27 | 34,451,602.27 |
| 17 | 30,700,000 | 3,780,700.45 | 34,480,700.45 |
| 18 | 30,700,000 | 4,253,846.23 | 34,953,846.23 |
| 19 | 30,700,000 | 4,253,846.23 | 34,953,846.23 |
| 20 | 30,700,000 | 4,253,846.23 | 34,953,846.23 |
| 21 | 30,700,000 | 4,392,378.08 | 35,092,378.08 |
| 22 | 30,700,000 | 4,904,112.81 | 35,604,112.81 |
| 23 | 30,700,000 | 5,006,737.32 | 35,706,737.32 |
| 24 | 30,700,000 | 5,308,323.67 | 36,008,323.67 |
| 25 | 30,700,000 | 5,746,268.34 | 36,446,268.34 |
| 26 | 30,700,000 | 5,746,268.34 | 36,446,268.34 |
| 27 | 30,700,000 | 5,746,268.34 | 36,446,268.34 |
| 28 | 30,700,000 | 4,364,417.93 | 35,064,417.93 |
| 29 | 30,700,000 | 4,228,592.01 | 34,928,592.01 |
| 30 | 30,700,000 | 4,306,706.93 | 35,006,706.93 |
| 31 | 30,700,000 | 3,184,768.20 | 33,884,768.20 |

**September 1989**

| | | | |
|---|---|---|---|
| 1 | 30,700,000 | 3,184,768.20 | 33,884,768.20 |

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

| | | | |
|---|---|---|---|
| 2 | 30,700,000 | 4,050,491.60 | 34,750,491.60 |
| 3 | 30,700,000 | 4,050,491.60 | 34,750,491.60 |
| 4 | 30,700,000 | 4,050,491.60 | 34,750,491.60 |
| R/O- 5 | 30,700,000 | 4,210,666.17 | 34,910,666.17 |
| 6 | 30,700,000 | 4,312,993.41 | 35,012,993.41 |
| R/O- 7 | 30,700,000 | 4,312,993.41 | 35,012,993.41 |
| 8 | 30,700,000 | 4,750,775.23 | 35,450,775.23 |
| 9 | 30,700,000 | 4,750,775.23 | 35,450,775.23 |
| 10 | 30,700,000 | 4,750,775.23 | 35,450,775.23 |
| 11 | 30,700,000 | 3,735,418.60 | 34,435,418.60 |
| R/O-12 | 30,700,000 | 3,841,093.34 | 34,541,093.34 |
| 13 | 30,700,000 | 4,418,509.99 | 35,118,509.99 |
| R/O-14 | 30,700,000 | 4,478,971.44 | 35,178,971.44 |
| 15 | 30,700,000 | 5,459,126.43 | 36,159,126.43 |
| 16 | 30,700,000 | 5,459,126.43 | 36,159,126.43 |
| 17 | 30,700,000 | 5,459,126.43 | 36,159,126.43 |
| 18 | 30,700,000 | 5,515,347.94 | 36,215,347.94 |
| R/O-19 | 30,700,000 | 4,152,908.82 | 34,852,908.82 |
| 20 | 30,700,000 | 4,307,175.52 | 35,007,175.52 |
| R/O-21 | 31,000,000 | 4,023,254.92 | 35,023,254.92 |
| 22 | 31,000,000 | 4,542,997.42 | 35,542,997.42 |
| 23 | 31,000,000 | 4,542,997.42 | 35,542,997.42 |
| 24 | 31,000,000 | 4,542,997.42 | 35,542,997.42 |
| 25 | 31,000,000 | 5,139,590.56 | 36,139,590.56 |
| 26 | 31,000,000 | 5,170,884.55 | 36,170,884.55 |
| 27 | 31,000,000 | 5,265,858.00 | 36,265,858.00 |
| 28 | 31,000,000 | 5,109,688.79 | 36,109,688.79 |
| R/O-29 | 31,000,000 | 4,927,237.95 | 35,927,237.95 |
| 30 | 31,000,000 | 4,927,237.95 | 35,927,237.95 |
| October 1989 | | | |
| 1 | 31,000,000 | 4,927,237.95 | 35,927,237.95 |
| 2 | 31,000,000 | 5,005,795.86 | 36,005,795.86 |
| 3 | 31,000,000 | 5,064,463.04 | 36,064,463.04 |
| 4 | 31,000,000 | 5,108,529.51 | 36,108,529.51 |
| 5 | 31,000,000 | 3,147,895.01 | 34,147,895.01 |
| R/O- 6 | 30,000,000 | 4,446,893.01 | 34,446,893.01 |
| 7 | 30,000,000 | 4,446,893.01 | 34,446,893.01 |

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

| | | | |
|---|---|---|---|
| 8 | 30,000,000 | 4,446,893.01 | 34,446,893.01 |
| 9 | 30,000,000 | 4,446,893.01 | 34,446,893.01 |
| 10 | 30,000,000 | 5,071,166.84 | 35,071,186.84 |
| 11 | 30,000,000 | 5,032,946.25 | 35,032,946.25 |
| 12 | 30,000,000 | 5,025,761.02 | 35,025,761.02 |
| 13 | 30,000,000 | 5,911,510.55 | 35,911,510.55 |
| 14 | 30,000,000 | 5,911,510.55 | 35,911,510.55 |
| 15 | 30,000,000 | 5,911,510.55 | 35,911,510.55 |
| 16 | 30,000,000 | 6,148,109.84 | 36,148,109.84 |
| 17 | 30,000,000 | 6,272,575.37 | 36,272,575.37 |
| 18 | 30,000,000 | 6,475,771.31 | 36,475,771.31 |
| 19 | 30,000,000 | 6,520,320.96 | 36,520,320.96 |
| R/O-20 | 30,000,000 | 7,249,339.24 | 37,249,339.24 |
| 21 | 30,000,000 | 7,249,339.24 | 37,249,339.24 |
| 22 | 30,000,000 | 7,249,339.24 | 37,249,339.24 |
| 23 | 30,000,000 | 6,937,449.81 | 36,937,449.81 |
| 24 | 30,000,000 | 6,756,758.68 | 36,756,758.68 |
| 25 | 30,000,000 | 7,246,658.57 | 37,246,658.57 |
| 26 | 30,000,000 | 7,177,329.10 | 37,177,329.10 |
| R/O-27 | 30,000,000 | 9,243,466.88 | 39,243,466.88 |
| 28 | 30,000,000 | 9,243,466.88 | 39,243,466.88 |
| 29 | 30,000,000 | 9,243,466.88 | 39,243,466.88 |
| 30 | 30,000,000 | 9,192,083.03 | 39,192,083.03 |
| 31 | 30,000,000 | 9,111,727.71 | 39,111,727.71 |
| November 1989 | | | |
| 1 | 30,000,000 | 9,177,322.75 | 39,177,322.75 |
| 2 | 30,000,000 | 9,093,386.46 | 39,093,386.46 |
| 3 | 30,000,000 | 6,604,835.68 | 36,604,835.88 |
| 4 | 30,000,000 | 6,604,835.88 | 36,604,835.88 |
| 5 | 30,000,000 | 6,604,835.88 | 36,604,835.88 |
| 6 | 30,000,000 | 6,770,013.70 | 36,770,013.70 |
| 7 | 30,000,000 | 6,794,751.71 | 36,794,751.71 |
| 8 | 30,000,000 | 6,910,148.70 | 36,910,148.70 |
| 9 | 30,000,000 | 6,983,774.72 | 36,983,774.72 |
| 10 | 30,000,000 | 7,281,922.99 | 37,281,922.99 |
| 11 | 30,000,000 | 7,281,922.99 | 37,281,922.99 |
| 12 | 30,000,000 | 7,281,922.99 | 37,281,922.99 |

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

| | | | |
|---|---|---|---|
| 13 | 30,000,000 | 7,281,922.99 | 37,281,922.99 |
| 14 | 30,000,000 | 7,357,647.97 | 37,357,647.97 |
| 15 | 30,000,000 | 7,532,161.84 | 37,532,161.84 |
| 16 | 30,000,000 | 7,554,032.80 | 37,554,032.80 |
| 17 | 30,000,000 | 7,569,149.60 | 37,569,149.60 |
| 18 | 30,000,000 | 7,569,149.60 | 37,569,149.60 |
| 19 | 30,000,000 | 7,569,149.60 | 37,569,149.60 |
| 20 | 30,000,000 | 7,808,426.72 | 37,808,426.72 |
| 21 | 30,000,000 | 7,757,066.84 | 37,757,066.84 |
| 22 | 30,000,000 | 7,915,046.19 | 37,915,046.19 |
| 23 | 30,000,000 | 7,940,170.04 | 37,940,170.04 |
| 24 | 30,000,000 | 8,651,457.84 | 38,651,457.84 |
| 25 | 30,000,000 | 8,651,457.84 | 38,651,457.84 |
| 26 | 30,000,000 | 8,651,457.84 | 38,651,457.84 |
| 27 | 30,000,000 | 8,087,463.15 | 38,087,463.15 |
| 28 | 30,000,000 | 8,071,525.94 | 38,071,525.94 |
| 29 | 30,000,000 | 8,192,922.73 | 38,192,922.73 |
| 30 | 30,000,000 | 8,171,018.13 | 38,171,018.13 |
| December 1989 | | | |
| 1 | 30,000,000 | 8,172,202.80 | 38,172,202.80 |
| 2 | 30,000,000 | 8,172,202.80 | 38,172,202.80 |
| 3 | 30,000,000 | 8,172,202.80 | 38,172,202.80 |
| 4 | 30,000,000 | 8,317,144.93 | 38,317,144.93 |
| 5 | 30,000,000 | 8,398,592.62 | 38,398,592.62 |
| 6 | 30,000,000 | 8,482,020.38 | 38,482,020.38 |
| 7 | 30,000,000 | 8,501,066.61 | 38,501,066.61 |
| 8 | 30,000,000 | 9,293,161.61 | 39,293,161.61 |
| 9 | 30,000,000 | 9,293,161.61 | 39,293,161.61 |
| 10 | 30,000,000 | 9,293,161.61 | 39,293,161.61 |
| 11 | 30,000,000 | 9,419,747.97 | 39,419,747.97 |
| 12 | 30,000,000 | 9,353,653.80 | 39,353,653.80 |
| 13 | 30,000,000 | 9,401,980.70 | 39,401,980.70 |
| 14 | 30,000,000 | 9,482,030.69 | 39,482,030.69 |
| 15 | 30,000,000 | 9,672,803.33 | 39,672,803.33 |
| 16 | 30,000,000 | 9,672,803.33 | 39,672,603.33 |
| 17 | 30,000,000 | 9,672,803.33 | 39,672,803.33 |
| 18 | 30,000,000 | 9,399,857.48 | 39,399,857.48 |

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

| | | | |
|---|---|---|---|
| 19 | 30,000,000 | 9,527,175.77 | 39,527,175.77 |
| 20 | 30,000,000 | 9,552,579.42 | 39,552,579.42 |
| 21 | 30,000,000 | 9,420,768.26 | 39,420,768.26 |
| 22 | 30,000,000 | 10,508,266.94 | 40,508,266.94 |
| 23 | 30,000,000 | 10,508,266.94 | 40,508,266.94 |
| 24 | 30,000,000 | 10,508,266.94 | 40,508,266.94 |
| 25 | 30,000,000 | 10,508,266.94 | 40,508,266.94 |
| 26 | 30,000,000 | 10,508,266.94 | 40,508,266.94 |
| 27 | 30,000,000 | 10,635,970.30 | 40,635,970.30 |
| 28 | 30,000,000 | 10,697,291.73 | 40,697,291.73 |
| 29 | 30,000,000 | 10,766,437.10 | 40,766,437.10 |
| 30 | 30,000,000 | 10,766,437.10 | 40,766,437.10 |
| 31 | 30,000,000 | 10,766,437.10 | 40,766,437.10 |

January 1990

| | | | |
|---|---|---|---|
| 1 | 30,000,000 | 10,766,437.10 | 40,766,437.10 |
| 2 | 30,000,000 | 10,754,186.13 | 40,754,186.13 |
| 3 | 30,000,000 | 11,481,214.94 | 41,481,214.94 |
| 4 | 30,000,000 | 9,818,104.83 | 39,818,104.83 |
| 5 | 30,000,000 | 8,446,340.99 | 38,446,340.99 |
| 6 | 30,000,000 | 8,446,340.99 | 38,446,340.99 |
| 7 | 30,000,000 | 8,446,340.99 | 38,446,340.99 |
| 8 | 30,000,000 | 8,519,719.51 | 38,519,719.51 |
| 9 | 30,000,000 | 8,793,567.82 | 38,793,567.82 |
| 10 | 30,000,000 | 9,391,486.94 | 39,391,486.94 |
| 11 | 30,000,000 | 4,519,480.36 | 34,519,480.36 |
| 12 | 30,000,000 | 4,636,852.71 | 34,519,852.71 |
| 13 | 30,000,000 | 4,636,852.71 | 34,519,852.71 |
| 14 | 30,000,000 | 4,636,852.71 | 34,519,852.71 |
| 15 | 30,000,000 | 4,859,292.27 | 34,859,292.27 |
| 16 | 30,000,000 | 1,646,287.05 | 31,646,287.05 |
| 17 | 30,000,000 | 1,760,211.90 | 31,760,211.90 |
| 18 | 30,000,000 | 1,787,825.23 | 31,787,825.23 |
| 19 | 30,000,000 | 2,698,729.75 | 32,698,729.75 |
| 20 | 30,000,000 | 2,698,729.75 | 32,698,729.75 |
| 21 | 30,000,000 | 2,698,729.75 | 32,698,729.75 |
| 22 | 30,000,000 | 2,934,734.46 | 32,934,734.46 |
| 23 | 30,000,000 | 3,207,365.71 | 33,207,365.71 |

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

| | | | |
|---|---|---|---|
| 24 | 30,000,000 | 3,906,014.36 | 33,906,014.36 |
| 25 | 30,000,000 | 3,976,907.17 | 33,976,907.17 |
| 26 | 30,000,000 | 3,165,852.02 | 33,165,852.02 |
| 27 | 30,000,000 | 3,165,852.02 | 33,165,852.02 |
| 28 | 30,000,000 | 3,165,852.02 | 33,165,852.02 |
| R/O-29 | 30,000,000 | 3,377,469.60 | 33,377,469.60 |
| 30 | 30,000,000 | 3,487,811.03 | 33,487,811.03 |
| 31 | 30,000,000 | 3,604,761.96 | 33,604,761.96 |
| February 1990 | | | |
| 1 | 30,000,000 | 3,783,285.08 | 33,783,285.08 |
| 2 | 30,000,000 | 4,579,377.41 | 34,579,377.41 |
| 3 | 30,000,000 | 4,579,377.41 | 34,579,377.41 |
| 4 | 30,000,000 | 4,579,377.41 | 34,579,377.41 |
| 5 | 30,000,000 | 4,494,132.41 | 34,494,132.41 |
| 6 | 30,000,000 | 4,132,872.96 | 34,132,872.96 |
| 7 | 30,000,000 | 4,507,118.28 | 34,507,118.28 |
| 8 | 30,000,000 | 4,608,245.77 | 34,608,245.77 |
| 9 | 30,000,000 | 4,806,967.72 | 34,806,967.72 |
| 10 | 30,000,000 | 4,806,967.72 | 34,806,967.72 |
| 11 | 30,000,000 | 4,806,967.72 | 34,806,967.72 |
| 12 | 30,000,000 | 4,781,593.95 | 34,781,593.95 |
| 13 | 30,000,000 | 4,774,292.88 | 34,774,292.88 |
| 14 | 30,000,000 | 4,775,563.95 | 34,775,563.95 |
| 15 | 30,000,000 | 4,907,788.81 | 34,907,788.81 |
| 16 | 30,000,000 | 5,600,621.06 | 35,600,621.06 |
| 17 | 30,000,000 | 5,600,621.06 | 35,600,621.06 |
| 18 | 30,000,000 | 5,600,621.06 | 35,600,621.06 |
| 19 | 30,000,000 | 5,821,451.91 | 35,821,451.91 |
| 20 | 30,000,000 | 5,982,391.96 | 35,982,391.96 |
| 21 | 30,000,000 | 6,430,392.55 | 36,430,392.55 |
| 22 | 30,000,000 | 6,482,251.92 | 36,482,251.92 |
| 23 | 30,000,000 | 6,490,160.60 | 36,490,160.60 |
| 24 | 30,000,000 | 6,490,160.60 | 36,490,160.60 |
| 25 | 30,000,000 | 6,490,160.60 | 36,490,160.60 |
| 26 | 30,000,000 | 6,546,172.41 | 36,546,172.41 |
| 27 | 30,000,000 | 7,070,969.01 | 37,070,969.01 |
| 28 | 30,000,000 | 7,179,650.03 | 37,179,650.03 |

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

March 1990

|  |  |  |  |  |
|---|---|---|---|---|
|  | 1 | 30,000,000 | 7,161,620.64 | 37,161,620.64 |
|  | 2 | 30,000,000 | 7,297,703.11 | 37,297,703.11 |
|  | 3 | 30,000,000 | 7,297,703.11 | 37,297,703.11 |
|  | 4 | 30,000,000 | 7,297,703.11 | 37,297,703.11 |
| R/O- 5 |  | 30,000,000 | 7,822,176.33 | 37,822,176.33 |
|  | 6 | 30,000,000 | 7,941,922.94 | 37,941,922.94 |
|  | 7 | 30,000,000 | 8,286,889.99 | 38,286,889.99 |
|  | 8 | 30,000,000 | 8,480,590.42 | 38,480,590.42 |
|  | 9 | 30,000,000 | 8,567,789.11 | 38,567,789.11 |
|  | 10 | 30,000,000 | 8,567,789.11 | 38,567,789.11 |
|  | 11 | 30,000,000 | 8,567,789.11 | 38,567,789.11 |
|  | 12 | 30,000,000 | 8,709,952.06 | 38,709,952.06 |
|  | 13 | 30,000,000 | 8,537,558.70 | 38,537,558.70 |
|  | 14 | 30,000,000 | 8,712,265.42 | 38,712,265.42 |
|  | 15 | 30,000,000 | 8,542,273.30 | 38,542,273.30 |
|  | 16 | 30,000,000 | 9,374,689.38 | 38,374,689.38 |
|  | 17 | 30,000,000 | 9,374,689.38 | 38,374,689.38 |
|  | 18 | 30,000,000 | 9,374,689.38 | 38,374,689.38 |
|  | 19 | 30,000,000 | 9,443,816.07 | 39,443,816.07 |
|  | 20 | 30,000,000 | 9,565,672.22 | 39,565,672.22 |
|  | 21 | 30,000,000 | 9,926,127.87 | 39,926,127.87 |
|  | 22 | 30,000,000 | 10,210,851.53 | 40,210,851.53 |
|  | 23 | 30,000,000 | 10,204,423.29 | 40,204,423.29 |
|  | 24 | 30,000,000 | 10,204,423.29 | 40,204,423.29 |
|  | 25 | 30,000,000 | 10,204,423.29 | 40,204,423.29 |
|  | 26 | 30,000,000 | 10,216,162.75 | 40,216,162.75 |
|  | 27 | 30,000,000 | 10,425,698.00 | 40,425,698.00 |
|  | 28 | 30,000,000 | 10,409,060.50 | 40,409,060.50 |
|  | 29 | 30,000,000 | 10,482,581.14 | 40,482,581.14 |
|  | 30 | 30,000,000 | 10,489,427.09 | 40,489,427.09 |

FN* Additional reasons at (October 26, 1998), Doc. 51353/90, B195/94, 98-BK001066 (Ont. Gen. Div.).

FN** A corrigendum delivered by the court on September 3, 1998 has been incorporated herein.

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

# TAB 86

1999 CarswellOnt 2812, 124 O.A.C. 87, 45 O.R. (3d) 417, 178 D.L.R. (4th) 634, 50 B.L.R. (2d) 64, [1999] O.J. No. 3290

**H** 📙

1999 CarswellOnt 2812, 124 O.A.C. 87, 45 O.R. (3d) 417, 178 D.L.R. (4th) 634, 50 B.L.R. (2d) 64, [1999] O.J. No. 3290

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)

The Toronto-Dominion Bank, Plaintiff/Appellant and Peat Marwick Thorne Inc. in its capacity as Trustee of the Estate of Leigh Instruments Limited, a bankrupt; The Plessey Company plc; Gec Siemens plc; The General Electric Company plc, Defendants/Respondents

Ontario Court of Appeal

Doherty, Austin, Sharpe JJ.A.

Heard: August 30 and 31, 1999
Judgment: September 13, 1999
Docket: CA C30288

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Proceedings: affirming (1998), 40 B.L.R. (2d) 1 (Ont. Gen. Div. [Commercial List]); additional reasons at (October 26, 1998), Doc. 51353/90, B195/94, 98-BK001066 (Ont. Gen. Div. [Commercial List]); and affirming (October 26, 1998), Doc. 51353/90, B195/94, 98-BK001066 (Ont. Gen. Div. [Commercial List])

Counsel: *Bryan Finlay, Q.C.* , *John A. Campion* , *Peter A. Downard* and *Paul F. Monahan* , for the appellant.

*Earl A. Cherniak, Q.C.* , *Robert J. Morris* , *Susan B. Wortzman* and *Lisa C. Munro* , for the respondents, Plessey.

*Peter F.C. Howard* and *Adrian C. Lang* , for the respondents, GEC.

Subject: Contracts; Insolvency; Torts; Corporate and Commercial; Civil Practice and Procedure

Banking and banks --- Loans and discounts — General

Bank opened line of credit for subsidiary company of parent company — Parent company did not guarantee loan, but gave bank five comfort letters — Subsidiary borrowed $40,500,000 from bank before going bankrupt — Parent company was taken over by corporation — Trial judge dismissed bank's action against parent company, corporation and subsidiary to recover loan — Trial judge found bank failed to establish negligent misrepresentation by parent company — Trial judge found parent company represented that subsidiaries managed own affairs — Bank appealed — Appeal dismissed — Bank knew that comfort letters were not security and that commercial value of letter depended on relationship between bank and parent — Comfort letters avoided suggestion of legal responsibility of parent company for loans — Trial judge's interpretation of comfort letters did

1999 CarswellOnt 2812, 124 O.A.C. 87, 45 O.R. (3d) 417, 178 D.L.R. (4th) 634, 50 B.L.R. (2d) 64, [1999] O.J. No. 3290

not render it valueless and did not yield commercial absurdity.

Fraud and misrepresentation --- Fraudulent misrepresentation — Specific elements — Recklessness of truth or falsity

Bank opened line of credit for subsidiary company of parent company — Parent company did not guarantee loan, but gave bank comfort letters — Subsidiary borrowed $40,500,000 from bank before going bankrupt — Parent company was taken over by corporation — Trial judge dismissed bank's action against parent company, corporation and subsidiary to recover loan — Trial judge found that bank failed to establish misrepresentation by parent company — Trial judge found that parent company represented policy to bank that subsidiaries managed own affairs — Bank appealed — Appeal dismissed — Parent company had policy in operation throughout relevant time — Bank knew comfort letters were not security and parent company did not provide guarantee of loan — Language of letters did not contain material misrepresentation — Bank could not reasonably rely on any representation in letters.

Fraud and misrepresentation --- Negligent misrepresentation (Hedley Byrne principle) — Detrimental reliance

Bank opened line of credit for subsidiary company of parent company — Parent company did not guarantee loan, but gave bank comfort letters — Subsidiary borrowed $40,500,000 from bank before going bankrupt — Parent company was taken over by corporation — Trial judge dismissed bank's action against parent company, corporation and subsidiary to recover loan — Trial judge found that bank failed to establish negligent misrepresentation by parent company — Trial judge found that parent company had policy that subsidiaries managed own affairs — Bank appealed — Appeal dismissed — Bank knew comfort letters were not security and parent company did not provide guarantee of loan to subsidiary — Parent company was not required to put bank on notice that subsidiary was unable to manage own affairs — Existence of policy was not inconsistent with existence of circumstances which interfered with subsidiary's ability to manage affairs in accordance with policy — Parent company made extensive efforts to salvage subsidiary business — Policy remained in place throughout relevant period — Bank could not reasonably rely on any representation in letters.

Practice --- Costs — Particular orders as to costs — Costs on solicitor and client basis — Grounds for awarding — Unfounded allegations

Bank opened line of credit for subsidiary company of parent company — Parent company did not guarantee loan, but gave bank comfort letters — Subsidiary borrowed $40,500,000 from bank before going bankrupt — Parent company was taken over by corporation — Trial judge dismissed bank's action against parent company, corporation and subsidiary to recover loan — Trial judge found letter of comfort was not security and parent company did not provide guarantee of loan to subsidiary — Trial judge found allegations of fraud and deceit were wholly unfounded — Trial judge awarded solicitor and client costs to defendant — Bank sought leave to appeal costs — Leave granted and appeal dismissed — Appropriate order of costs was within discretion of trial judge — Trial judge referred to appropriate statutory authorities.

**Cases considered:**

*Eli Lilly & Co. v. Novopharm Ltd.*, 227 N.R. 201, 161 D.L.R. (4th) 1, [1998] 2 S.C.R. 129, 152 F.T.R. 160 (note) (S.C.C.) — referred to

*Kleinwort Benson Ltd. v. Malaysia Mining Corp. Bhd.*, 43 B.L.R. 40, [1989] 1 All E.R. 785 (Eng. C.A.) — referred to

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1999 CarswellOnt 2812, 124 O.A.C. 87, 45 O.R. (3d) 417, 178 D.L.R. (4th) 634, 50 B.L.R. (2d) 64, [1999] O.J. No. 3290

APPEAL by bank from judgment reported at (1998), 40 B.L.R. (2d) 1 (Ont. Gen. Div. [Commercial List]), dismissing claim against parent company for recovery of loan made to subsidiary company.

*Per curiam*:

1      This is an appeal from the judgment of Winkler J. dismissing all of the appellant's claims. Those claims were based on five letters of comfort provided to the appellant (the Bank) by the Plessey Company plc (Plessey) in connection with a series of loans made at the time of and following Plessey's take-over of Leigh Instruments Limited (Leigh). The respondent, General Electric Company plc (GEC) was in effective control of Plessey when the fifth letter of comfort was provided (December 19, 1989) and the claims against it arise out of that letter.

2      The court dismissed the appeal at the conclusion of oral argument with reasons to follow. These are the reasons.

3      Justice Winkler's reasons are reported at (1999), 40 B.L.R. (2d) 1 (Ont. Gen. Div. [Commercial List]). His detailed and careful review of the evidence and analysis of the issues have proved most helpful on the hearing of this appeal. The factual background necessary to an understanding of these reasons can be found in the reasons of Winkler J.

4      The trial took over a year. The wide ranging attack launched by the Bank at trial has been replaced on appeal by a focussed challenge to the trial judge's finding that the appellant had failed to establish negligent misrepresentation by Plessey in respect of any of the five letters of comfort or by GEC in respect of the fifth letter of comfort.

## The Main Appeal

5      Mr. Finlay, with his usual consummate skill, advanced five grounds of appeal on behalf of the Bank. Four require him to convince us that the trial judge erred in his interpretation of the meaning of paragraph 3 of the letters of comfort provided by Plessey. Paragraph 3 reads:

> It is our policy that our wholly owned subsidiaries, including Leigh Instruments Limited, be managed in such a way as to be always in a position to meet their financial obligations including repayment of all amounts due under the above facility.

6      "The above facility" refers to the line of credit made available by the Bank to Leigh. That amount varied and reached $45 million when the fifth comfort letter was provided by Plessey in December 1989.

7      Throughout his submissions, Mr. Finlay stressed the differences between the contract claim advanced by the Bank and the tort claim in so far as they related to paragraph 3 of the comfort letters. He did not take issue with the trial judge's analysis of the contract claim, but submitted that the trial judge erroneously applied the same analysis when interpreting paragraph 3 for the purposes of the negligent misrepresentation claim.

8      No doubt there are important differences between the two claims, however, the task of determining the meaning to be given to the words in paragraph 3 was common to both. Before considering the legal effect of those words, the trial judge had to determine what they meant. The same words in the same document cannot have one meaning in the context of a contract claim and a different meaning in the context of a tort claim. Once the meaning of the words is fixed, the legal effect of those words must be considered. It is at this stage of the interpretative process that distinctions between contract and tort claims can become important.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1999 CarswellOnt 2812, 124 O.A.C. 87, 45 O.R. (3d) 417, 178 D.L.R. (4th) 634, 50 B.L.R. (2d) 64, [1999] O.J. No. 3290

9    The process of determining the meaning to be given to words in a document is governed by the same principles regardless of whether the process is engaged in the context of a contract claim or a tort claim. Those principles are identified by the trial judge at pp. 105-111 and recently reviewed by the Supreme Court of Canada in *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 (S.C.C.) at 166-167. Essentially, the process is captured in the following question:

> Bearing in mind the relevant background, the purpose of the document, and considering the entirety of the document, what would the parties to the document reasonably have understood the contested words to mean?

10    The Bank contends, and the respondents agree, that paragraph 3 contained a representation by Plessey to the Bank as to its policy with respect to the business affairs of Leigh. It is also common ground that the representation was a continuing one. The dispute centers on what the policy was represented to be. The Bank reads paragraph 3 as a representation by Plessey that it would manage Leigh's affairs in such a way that Leigh would always be in a position to meet its obligations to the Bank. The Bank contends that it was entitled to rely on this representation as to Plessey's policy unless and until given notice of a change in that policy.

11    The respondents, emphasizing the words "be managed" in paragraph 3, submit that the paragraph was not a representation that Plessey would manage the affairs of Leigh, but rather a representation that it was Plessey's policy that its subsidiaries, including Leigh, should manage their own affairs in such a way as to be able to meet their financial obligations. The respondents rely not only on the language of paragraph 3, but on basic corporate law principles which they submit fixed the responsibility of management with the properly appointed officers of Leigh even though ultimate control of the company rested with the sole shareholder, Plessey.

12    Winkler J. accepted the respondents' interpretation of paragraph 3. In reaching that conclusion, he emphasized the language of paragraph 3 considered in the context of the entire letter (pp. 111-16). He further held that his conclusion as to the meaning of the words in paragraph 3 was fortified by a consideration of the relevant background facts (pp. 116-18).

13    Winkler J. construed paragraph 3 in the course of his consideration of the contract claim and applied that construction to both the contract claim and the tort claim. For the reasons set out above, we think this was a proper approach.

14    There is some uncertainty as to the standard of review to be applied when addressing the appellant's submission that the trial judge misconstrued paragraph 3 of the comfort letters. We will assume that no deference is due to the trial judge's conclusion and that a correctness standard of review should be applied.

15    After giving careful consideration to Mr. Finlay's submissions, we come to the same conclusion as the trial judge. We agree with the trial judge's observation, at p. 141, that the appellant's interpretation is inconsistent with the words "be managed" and would require that additional words be inserted in paragraph 3. The parties chose not to insert any such language. The phrase "be managed" does not suggest that Plessey itself would manage the affairs of Leigh.

16    Whatever doubt might exist if only the words of paragraph 3 are considered is dispelled by a consideration of the relevant factual background. The Bank and Plessey were sophisticated commercial entities. Both were familiar with letters of comfort. The Bank knew full well that the letter of comfort was not security in the traditional sense and that its commercial value depended very much on the relationship which existed between

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1999 CarswellOnt 2812, 124 O.A.C. 87, 45 O.R. (3d) 417, 178 D.L.R. (4th) 634, 50 B.L.R. (2d) 64, [1999] O.J. No. 3290

the lender and the provider of the letter of comfort. The Bank was very anxious to establish an ongoing relationship with Plessey, a very large multinational corporation. It was well known that Plessey would not provide any guarantee on loans made to Leigh by the Bank. The letter was crafted to avoid any suggestion that Plessey had any legal responsibility for the loans. The interpretation of paragraph 3 now advanced by the Bank would effectively put Plessey in the position of a guarantor subject to Plessey's ability, on notice to the Bank, to change its "policy." The interpretation urged by the Bank would give it almost exactly the security which it knew full well was not available to it when it chose to proceed with the loan in the hopes of doing more business with Plessey and its many subsidiaries.

17     It was argued before Winkler J. and here that the respondents' interpretation of paragraph 3 meant that it amounted to no more than a "motherhood" statement having no real commercial purpose or value to the Bank. The trial judge, at pp. 116-18, considered and rejected this argument. He observed that other paragraphs in the letters contained valuable representations and undertakings by Plessey and that the third paragraph gave the Bank a basis, *albeit* not a legal one, upon which to request that Plessey stand behind the commercial activities of Leigh and honour Leigh's debts. That request, while not based on any legal obligation, had substance and value in the commercial world revealed by the extensive evidence heard by the trial judge.

18     The trial judge, drawing on the language used by the English Court of Appeal in *Kleinwort Benson Ltd. v. Malaysia Mining Corp. Bhd.*, [1989] 1 All E.R. 785 (Eng. C.A.) , referred to paragraph 3 of the letter as imposing a "moral obligation" on Plessey or as constituting a "gentleman's agreement" between the Bank and Plessey. We prefer the description of the commercial value of comfort letters in general and this one in particular provided in the factum of the respondent GEC. Counsel wrote:

> ... In this marketplace, both parties have experience in situations where a parent, for reasons it deems appropriate, refuses to give a legally binding assurance and a bank, for reasons it similarly considers appropriate agrees to accept something less, perhaps believing that when, and if, "push comes to shove", the parent would pay for any or all of the "non-legal" commercial considerations of reputation, fear of adverse publicity, higher future borrowing costs and a myriad other reasons and possibilities depending on the circumstances.

19     The interpretation given to paragraph 3 by the trial judge did not render the letters of comfort valueless and it cannot be said that his interpretation yields a commercial absurdity. The Bank's primary submission must be rejected. The trial judge correctly construed paragraph 3 of the letters of comfort.

20     The second ground of appeal assumes that the Bank's interpretation of paragraph 3 of the comfort letters is correct and goes on to contend that as Plessey had no such policy, paragraph 3 contained a misrepresentation. Obviously, the accuracy of the representation in paragraph 3 must be considered in the light of the meaning given to that paragraph by Winkler J. and affirmed by this court. The trial judge considered whether Plessey had a policy as he had found it described in paragraph 3. After an extensive review of the evidence (pp. 136-42), he concluded that Plessey had such a policy and that it remained in operation throughout the relevant time. This finding is clearly one of fact to which deference is due. There was ample evidence to support the finding.

21     The Bank's third submission relates only to the fifth letter of comfort. The trial judge found that the fifth letter, like the first four, did not contain a material misrepresentation. He further held, at p. 146, that in the circumstances existing when the fifth letter was provided, the Bank could not reasonably have relied on any representation in the letter. In coming to that conclusion, the trial judge placed considerable emphasis on the conclud-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1999 CarswellOnt 2812, 124 O.A.C. 87, 45 O.R. (3d) 417, 178 D.L.R. (4th) 634, 50 B.L.R. (2d) 64, [1999] O.J. No. 3290

ing language of the fifth letter. In that letter Plessey indicated that the letter "does not constitute a legally bind-ing commitment." That language did not appear in the earlier letters.

22      As we are satisfied that the fifth letter contained no misrepresentation, it is not necessary to address the reliance argument. We will do so for the sake of completeness. The trial judge was entitled on all of the evid-ence to come to the conclusion that he did. His finding was reached not only on the basis of the closing language in the letter, but on all of the circumstances existing as of December 1989 when the fifth letter was provided. By that date, Plessey had been the subject of a hostile takeover and was controlled by commercial entities, one of which was the respondent, GEC, which had no ongoing working relationship with the Bank and no apparent need to look to the Bank for financing in the future. The commercial considerations which may have prompted Plessey to respond favourably to the Bank's request that Plessey honour these debts were not operative after Plessey itself was acquired by GEC and another corporate entity.

23      The fourth submission made by the Bank is directed at GEC. The Bank seeks to hold GEC jointly liable with Plessey, the author of the letter, for negligent misrepresentation. This ground of appeal must fail as we are satisfied that the fifth letter did not contain any misrepresentation, and in any event any representation in that letter could not reasonably be relied on by the Bank.

24      The Bank's fifth submission is somewhat different. For the purpose of this submission, the Bank accepts the interpretation of paragraph 3 given by the trial judge and adopted by this court. Counsel submits that even on that interpretation, the representation became untrue or at least misleading by January or February 1990 when Plessey realized that Leigh's continued fiscal viability was uncertain. Counsel submits that the continuing nature of the representation in paragraph 3 of the letters required Plessey to put the Bank on notice when it became clear to Plessey that Leigh might not be able to manage itself so as to meet its obligations to the Bank. If this submission is accepted, the Bank is entitled to recover the advances made to Leigh after Plessey knew that Leigh's prospects were not good.

25      We cannot accept this submission. There is nothing inconsistent with the continued existence of a policy that Leigh should manage its affairs so as to be able to meet its financial obligations and the existence of circum-stances which imperiled Leigh's ability to conduct its affairs in accordance with that policy. The policy may re-main extant even if circumstances make compliance difficult or doubtful.

26      The trial judge conducted an extensive review of the evidence surrounding Leigh's slide into insolvency in late 1989 and early 1990. He reviewed the extensive efforts made by Plessey and its owners to salvage Leigh's business. He concluded, at p. 142, that the policy referred to in paragraph 3 of the letters remained in place throughout the material period of time right up until immediately before the bankruptcy of Leigh. We see no basis for interfering with that finding.

27      There is a second reason why this submission must fail. It is premised on the representations made in the fifth letter of comfort. As indicated above, we agree with the trial judge's conclusion that the Bank could not reasonably rely on any representation in that letter. Consequently, even if we accepted the Bank's argument that the representations in paragraph 3 became misleading some time in January or February 1990, the Bank could still not establish the requisite reliance on the representations.

28      We affirm the order of Winkler J. dismissing the Bank's action.

**The Costs Appeal**

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1999 CarswellOnt 2812, 124 O.A.C. 87, 45 O.R. (3d) 417, 178 D.L.R. (4th) 634, 50 B.L.R. (2d) 64, [1999] O.J. No. 3290

29    The Bank also seeks leave to appeal the costs order made by Winkler J. He ordered that the respondents should have their costs on a solicitor-and-client scale. The Bank submits that the trial judge should have awarded costs on a party-and-party basis.

30    The determination of an appropriate costs order is within the discretion of the trial judge. This court will only interfere with the exercise of that discretion if it is satisfied that the order is unreasonable or premised on some error in principle.

31    The trial judge referred to the appropriate statutory authorities and instructed himself that an order of costs on a solicitor-and-client level should be made only in "exceptional" and "rare" cases.

32    In holding that this was a case for costs, the trial judge said:

In my view, this is one of the "rare" and "exceptional" cases where an award of solicitor and client costs is warranted. The plaintiff advanced numerous allegations of fraud and deceit on the part of the defendants. These allegations included: allegations that Colin Justice intentionally make false and misleading statements to the bank regarding Leigh' financial statements; that Justice intentionally misrepresented Leigh's financial condition to the bank; that Plessey, GEC and GEC Siemens plc intentionally misrepresented the affairs of Leigh to the Bank in order to induce the bank to lend money to Leigh; and that the fifth and last comfort letter was delivered to the bank fraudulently, and that this fraud was perpetrated, in part, by Ross Anderson. These allegations were pursued unrelentingly through to the conclusion of trial. Indeed, the plaintiff raised a novel allegation of fraud concerning Mr. Anderson in its written argument, despite the fact that it had not been pleaded and the defendants had no opportunity to lead evidence to refute it. All of these allegations of fraud and deceit were held to be wholly unsupported by the evidence.

33    The above-quoted observations of the trial judge are fully supported in the record and, in our view, provide ample reason for the costs order made by the trial judge.

34    Mr. Finlay submitted that the trial judge erroneously accepted the respondents' submission that their offer to settle the action by the payment of $15 million made in 1996 was evidence that they did not simply "walk away" from their "moral obligation" under the comfort letters. We agree that the offer of payment made some 6 years after the litigation commenced says little about the respondents' sense of their "moral obligations." We do not think, however, that this mischaracterization of the motivation for the settlement offer warrants interference with the costs order made by the trial judge. That order was fully justified in the light of the unfounded allegations made by the Bank and the conduct of the trial by the Bank.

35    We would grant leave to appeal the costs order, but dismiss that appeal.

36    The respondents are entitled to their costs on the appeal on a party-and-party basis.

*Appeal dismissed.*

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works