TAB 87

TransCore, LP v. Electronic Transaction Consultants Corp., 563 F.3d 1271 (2009)

90 U.S.P.Q.2d 1372

563 F.3d 1271
United States Court of Appeals,
Federal Circuit.

TRANSCORE, LP and TC License,
Ltd., Plaintiffs–Appellants,

v.

ELECTRONIC TRANSACTION CONSULTANTS
CORPORATION, Defendant–Appellee.

No. 2008–1430.    |    April 8,
2009.    |    Rehearing and Rehearing
En Banc Denied June 5, 2009.

Synopsis

**Background:** Holder of patents relating to automated toll collection systems brought infringement action against toll collection service provider. The United States District Court for the Northern District of Texas, James Edgar Kinkeade, J., 2008 WL 2152027, entered summary judgment in provider's favor, and holder appealed.

**Holdings:** The Court of Appeals, Gajarsa, Circuit Judge, held that:

[1] doctrine of patent exhaustion barred holder's patent infringement claims against provider;

[2] parol evidence of parties' intent not to provide downstream rights to customers was irrelevant; and

[3] holder's rights to patent that had not yet issued, and was thus not identified in settlement agreement, were exhausted.

Affirmed.

West Headnotes (8)

[1]     **Patents**
          Rights and powers of patentees as to making, use, or sale of invention
Toll collection service provider's sales of toll collection systems were authorized by settlement agreement between patent holder and provider's

supplier, and thus doctrine of patent exhaustion barred holder's patent infringement claims against provider, where holder had agreed not to bring any suit for future infringement, but did not place any restriction on sales.

7 Cases that cite this headnote

[2]     **Patents**
          Rights and powers of patentees as to making, use, or sale of invention
Doctrine of patent exhaustion provides that initial authorized sale of patented item terminates all patent rights to that item.

8 Cases that cite this headnote

[3]     **Patents**
          Construction and Operation of Licenses
Patentee, by license or otherwise, cannot convey affirmative right to practice patented invention by way of making, using, selling, etc.; patentee can only convey freedom from suit. 35 U.S.C.A. § 154(a)(1).

16 Cases that cite this headnote

[4]     **Courts**
          Particular questions or subject matter
Evidentiary rulings, which are procedural in nature, are reviewed by Court of Appeals for Federal Circuit according to regional circuit's law.

2 Cases that cite this headnote

[5]     **Federal Courts**
          Taking case or question from jury; judgment as a matter of law
      **Federal Courts**
          Admission of Evidence
      **Federal Courts**
          Exclusion of Evidence
Under Fifth Circuit law, unless trial court has abused its discretion and substantial right of defendant has been affected, Court of Appeals

will not reverse on basis of evidentiary ruling in question.

1 Cases that cite this headnote

**[6]    Patents**
&#9758; Rights and powers of patentees as to making, use, or sale of invention

Only issue relevant to patent exhaustion is whether sales of patented items were authorized, not whether patent holder and seller intended, expressly or impliedly, for covenant to extend to seller's customers, and thus parol evidence of parties' intent not to provide downstream rights to customers was irrelevant in patent infringement action against customers.

9 Cases that cite this headnote

**[7]    Patents**
&#9758; Rights and powers of patentees as to making, use, or sale of invention

Patent holder's rights to patent that had not yet issued, and was thus not identified in its settlement agreement with competitor, were exhausted by competitor's authorized sales under implied license to practice that patent by virtue of legal estoppel, where later-issued patent was broader than, and necessary to practice, patent that was included in settlement agreement.

10 Cases that cite this headnote

**[8]    Patents**
&#9758; Original utility

4,303,904, 5,086,389, 5,144,553, 5,253,162, 5,289,183, 5,347,274, 5,351,187, 5,406,275, 5,751,973, 5,805,082, 6,653,946. Cited.

Cases that cite this headnote

**Attorneys and Law Firms**

*1272 William J. Robinson, Foley & Lardner LLP, of Los Angeles, CA, argued for plaintiffs-appellants. With him on the brief was Grant E. Kinsel.

John R. Emerson, Haynes and Boone, LLP, of Dallas, TX, argued for defendant-appellee. With him on the brief were Phillip B. Philbin, Jacob G. Hodges, and William D. White.

Before GAJARSA, DYK, and MOORE, Circuit Judges.

**Opinion**

GAJARSA, Circuit Judge.

TransCore, LP and TC License, Ltd. (collectively "TransCore") appeal from a final judgment of the U.S. District Court for the Northern District of Texas that was entered upon the district court's grant *1273 of summary judgment. *See Transcore, LP v. Electronic Transaction Consultants Corp.,* No. 3:05–CV–2316–K, 2008 WL 2152027 (N.D.Tex. May 22, 2008). Specifically, the District Court found that TransCore's patent infringement claims against Electronic Transaction Consultants Corp. ("ETC") were barred by patent exhaustion, implied license and legal estoppel, in view of a settlement agreement between TransCore and the supplier of the products ETC installed, Mark IV. Because we agree with the district court and find that Mark IV's sales were authorized and exhausted TransCore's patent rights, thus barring TransCore's claims against ETC, we affirm.

**BACKGROUND**

TransCore is engaged in the manufacture, sale and installation of automated toll collection systems—the tags and readers that communicate as a vehicle passes through an automated toll plaza (e.g., E–ZPass). TransCore is the assignee of several patents to related technologies.

In 2000, TransCore sued a competitor, Mark IV Industries, for infringement of several TransCore patents. That action was resolved by a settlement agreement, in which Mark IV agreed to pay $4.5M in exchange for an unconditional covenant not to sue and a release of all existing claims. The covenant and release, which are central to the dispute here, read:

> 3. In exchange for the payment set forth in paragraph 1, TCI hereby agrees and covenants not to bring any demand, claim, lawsuit, or action against Mark IV for future infringement of any of United States Patent Nos. 5,805,082; 5,289,183; 5,406,275; 5,144,553; 5,086,389; 5,751,973; 5,347,274; 5,351,187; 5,253,162; and 4,303,904, or any foreign counterparts of the aforesaid

United States Patents, for the entire remainder of the terms of the respective United States Patents and their foreign counterparts. This Covenant Not To Sue shall not apply to any other patents issued as of the effective date of this Agreement or to be issued in the future.

* * *

8. TCI, TII and GRAVELLE, for themselves and their respective predecessors, successors, heirs and assigns, fully and forever release, discharge and dismiss all claims, demands, actions, causes of action, liens and rights, in law or in equity (known, unknown, contingent, accrued, inchoate or otherwise), existing as of June 26, 2001, that they have against MARK IV, and its officers, directors, employees, representatives and attorneys of MARK IV, but excluding any claims for breach of this Agreement. No express or implied license or future release whatsoever is granted to MARK IV or to any third party by this Release.

Several years later, ETC, a firm engaged in consulting and systems integration related to toll-collection systems, won a bid with the Illinois State Toll Highway Authority (ISTHA) to install and test a new open-road tolling system. As part of the contract, ETC agreed to set up and test toll-collection systems purchased by the ISTHA from Mark IV.

TransCore sued ETC for infringement of three patents that had previously been in suit against Mark IV (U.S. Patent Nos. 5,805,082; 5,289,183; and 5,406,275 (the #082, #183, and #275 patents)) as well as U.S. Patent No. 6,653,946 (the #946 patent), a related patent that was pending *1274 before the Patent and Trademark Office but had not yet issued at the time of the TransCore—Mark IV settlement. During a hearing, the district court questioned the legal impact of the TransCore—Mark IV settlement agreement on the TransCore—ETC lawsuit and ordered the parties to brief the issue. ETC responded by filing a motion for summary judgment with the district court, asserting that its activities were permitted by the TransCore—Mark IV settlement agreement under the related doctrines of patent exhaustion, implied license and legal estoppel.

On May 22, 2008, the district court granted ETC's motion, dismissed TransCore's claims with prejudice and directed the entry of final judgment. TransCore timely appealed to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## DISCUSSION

Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). We review a district court's grant of summary judgment without deference, reapplying the same standard as the district court. *Micro Chem., Inc. v. Lextron, Inc.,* 318 F.3d 1119, 1121 (Fed.Cir.2003). "In deciding whether summary judgment is appropriate, we view the evidence in a light most favorable to the party opposing the motion with doubts resolved in favor of the opponent...." *Ethicon Endo–Surgery, Inc. v. U.S. Surgical Corp.,* 149 F.3d 1309, 1315 (Fed.Cir.1998).

### I.

[1]    The district court found that Mark IV's sales of the toll collection systems installed by ETC were authorized by the TransCore—Mark IV settlement agreement, such that TransCore's patent rights were exhausted as to those systems. We agree. [1]

### A.

[2]    Recently, in *Quanta Computer, Inc. v. LG Electronics, Inc.,* 553 U.S. 617, 128 S.Ct. 2109, 170 L.Ed.2d 996 (2008), the Supreme Court reiterated unequivocally that "[t]he longstanding doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates all patent rights to that item," *id.* at 2115, and that "[e]xhaustion is triggered only by a sale authorized by the patent holder," *id.* at 2121. The question for this court is whether an unconditional covenant not to sue authorizes sales by the covenantee for purposes of patent exhaustion. We hold that it does.

TransCore asserts that sales under a covenant not to sue are not "authorized," relying heavily on *Jacobs v. Nintendo of America, Inc.,* 370 F.3d 1097 (Fed.Cir.2004). In *Jacobs,* a panel of this court addressed the respective roles of a license term and a covenant not to sue in a settlement agreement. Explicitly considering downstream customer liability, the panel explained:

If all that [the patent holder] intended to do through the settlement agreement *1275 was to free [the infringing manufacturer] of its liability for infringement, paragraph 5 of the agreement (the covenant not to sue) would have been fully sufficient to serve that purpose. Paragraph 3 [the license provision], however, goes much further by granting [the infringing manufacturer] an affirmative right to engage in the manufacture and sale of accelerometers to be used in tilt-sensitive control boxes. That grant comes without restriction of any kind.

Id. at 1101. The court in Jacobs was differentiating between settlement terms for the express purpose of determining the contracting parties' intent in the context of an implied license analysis. As the Supreme Court explained in Quanta, however, the parties' intent with respect to downstream customers is of no moment in a patent exhaustion analysis. See Quanta, 128 S.Ct. at 2122 ("But the question whether third parties received implied licenses is irrelevant because [the downstream customer] asserts its right to practice the patents based not on implied license but on exhaustion. And exhaustion turns only on [licensee's] own license to sell products practicing the [licensor's] Patents."). The analysis in Jacobs, therefore, does not apply here.

[3]    Rather, our analysis begins with the premise that one cannot convey what one does not own. This principle is particularly important in patent licensing, as the grant of a patent does not provide the patentee with an affirmative right to practice the patent but merely the right to exclude. See 35 U.S.C. § 154(a)(1) ("Every patent shall contain ... a grant to the patentee, his heirs or assigns, of the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States ...."); see also Leatherman Tool Group Inc. v. Cooper Indus., Inc., 131 F.3d 1011, 1015 (Fed.Cir.1997) ("In fact, the federal patent laws do not create any affirmative right to make, use, or sell anything.... [T]he Supreme Court made clear that the patent laws provide a limited right to exclude others from making, using, or selling a claimed invention for a limited period of time, but afford no affirmative right to make, use, and sell a patented invention." (citing Bloomer v. McQuewan,

55 U.S. (14 How.) 539, 548, 14 L.Ed. 532 (1852) ("The franchise which the patent grants, consists altogether in the right to exclude every one from making, using, or vending the thing patented, without the permission of the patentee. This is all that he obtains by the patent."))). It follows, therefore, that a patentee, by license or otherwise, cannot convey an affirmative right to practice a patented invention by way of making, using, selling, etc.; the patentee can only convey a freedom from suit.

For this reason, the Supreme Court in De Forest Radio Telephone & Telegraph Co. v. United States, reiterated: "As a license passes no interest in the monopoly, it has been described as a mere waiver of the right to sue by the patentee." 273 U.S. 236, 242, 47 S.Ct. 366, 71 L.Ed. 625 (1927) (treating a covenant not to enjoin infringing acts as a license). To like effect, this court and its predecessors have on numerous occasions explained that a non-exclusive patent license is equivalent to a covenant not to sue:

> As a threshold matter, a patent license agreement is in essence nothing more than a promise by the licensor not to sue the licensee. Even if couched in terms of "[l]icensee is given the right to make, use, or sell X," the agreement cannot *1276 convey that absolute right because not even the patentee of X is given that right. His right is merely one to exclude others from making, using or selling X. Indeed, the patentee of X and his licensee, when making, using, or selling X, can be subject to suit under other patents. In any event, patent license agreements can be written to convey different scopes of promises not to sue, e.g., a promise not to sue under a specific patent or, more broadly, a promise not to sue under any patent the licensor now has or may acquire in the future.

Spindelfabrik Suessen–Schurr, Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft, 829 F.2d 1075, 1081 (Fed.Cir.1987) (citations omitted); see also U.S. Philips Corp. v. Int'l Trade Comm'n, 424 F.3d 1179, 1189 (Fed.Cir.2005) ("A nonexclusive patent license is simply a promise not to sue for infringement."); Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1369 (Fed.Cir.2004) ( "This license is, in essence, a licensor's covenant not to sue the licensee."); Hilgraeve Corp. v. Symantec Corp., 265 F.3d 1336, 1346 (Fed.Cir.2001) ("This court has stated that 'licenses are considered as nothing more than a promise by the licensor not to sue the licensee.' " (quoting Jim Arnold Corp. v. Hydrotech Sys., Inc., 109 F.3d 1567, 1577 (Fed.Cir.1997))); Intell. Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc., 248 F.3d 1333, 1345 (Fed.Cir.2001)

(defining "a nonexclusive license or 'bare' license" as "a covenant by the patent owner not to sue the licensee for making, using, or selling the patented invention and under which the patent owner reserves the right to grant similar licenses to other entities"); *Ortho Pharm. Corp. v. Genetics Inst., Inc.,* 52 F.3d 1026, 1031 (Fed.Cir.1995) ("A license may amount to no more than a covenant by the patentee not to sue the licensee for making, using or selling the patented invention, the patentee reserving the right to grant others the same right."); *W. Elec. Co. v. Pacent Reproducer Corp.,* 42 F.2d 116, 118 (2d Cir.1930) ("In its simplest form, a license means only leave to do a thing which the licensor would otherwise have a right to prevent. Such a license grants to the licensee merely a privilege that protects him from a claim of infringement by the owner of the patent monopoly."). The real question, then, is not whether an agreement is framed in terms of a "covenant not to sue" or a "license." That difference is only one of form, not substance—both are properly viewed as "authorizations." Rather, the pertinent question here is not whether but what the TransCore—Mark IV settlement agreement authorizes. More specifically, does the TransCore—Mark IV settlement agreement authorize *sales*? We conclude that it does.

The language of the TransCore—Mark IV settlement agreement is unambiguous: "[TransCore] agrees and covenants not to bring any demand, claim, lawsuit, or action against Mark IV for future infringement...." This term, without apparent restriction or limitation, thus authorizes all acts that would otherwise be infringements: making, using, offering for sale, selling, or importing. TransCore did not, as it could have, limit this authorization to, for example, "making" or "using." And indeed, at oral argument, TransCore conceded that the TransCore—Mark IV settlement agreement does not include a restriction on sales. *See* Audio Recording of Oral Arg. at 40:54–42:25, *TransCore, LP v. Elec. Transaction Consultants Corp.,* No. 2008–1430 (Fed.Cir. Feb. 5, 2009), *available at* http://oralarguments.cafc.uscourts.gov/mp 3/2008–1430.mp3; *cf.* *1277 Quanta,* 128 S.Ct. at 2121 (applying patent exhaustion where "[n]othing in the License Agreement restricts [licensee's] right to sell its microprocessors and chipsets to purchasers who intend to combine them with non-Intel parts. It broadly permits Intel to 'make, use, [or] sell' products free of [licensor's] patent claims." (internal quotation marks omitted)). As a result, the district court correctly found that Mark IV's sales to ISTHA were authorized and that TransCore's patent rights are exhausted. The inclusion of the language "No express or implied license

or future release whatsoever is granted to MARK IV or to any third party by this Release" refers only to the effect of the Release provision and thus does not require a different result.

**B.**

As a subordinate issue to the proper interpretation of the covenant not to sue, TransCore argues that the district court abused its discretion by excluding parol evidence of TransCore's and Mark IV's intent at the time they entered into the settlement agreement. We disagree.

**[4]** **[5]** Evidentiary rulings, which are procedural in nature, are reviewed by this court according to the law of the regional circuit. *See Sulzer Textil A.G. v. Picanol N.V.,* 358 F.3d 1356, 1363 (Fed.Cir.2004). Applying Fifth Circuit law, "unless the trial court has abused its discretion and a substantial right of the defendant has been affected, we will not reverse on the basis of [an] evidentiary ruling in question." *United States v. Saldana,* 427 F.3d 298, 306 (5th Cir.2005).

**[6]** The district court's decision to exclude TransCore's parol evidence has not affected any substantial right of TransCore. On this point *Quanta* is clear. The only issue relevant to patent exhaustion is whether Mark IV's sales were authorized, not whether TransCore and Mark IV intended, expressly or impliedly, for the covenant to extend to Mark IV's customers. *See Quanta,* 128 S.Ct. at 2122. TransCore's proffered evidence of the parties' intent not to provide downstream rights to Mark IV's customers is, therefore, irrelevant and could not impact the outcome reached by the district court and affirmed here.

Moreover, California law, which governs the TransCore—Mark IV settlement agreement, prohibits the admission of parol evidence: (i) to insert an additional term into a written contract, if the contract is a complete and exclusive statement of the terms of the agreement, Cal.Civ.Proc.Code § 1856(b), (d); and/or (ii) to influence the meaning of contract terms where no ambiguity exists, *id.* § 1856(g); *see also Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.,* 69 Cal.2d 33, 69 Cal.Rptr. 561, 442 P.2d 641, 644–45 (Cal.1968).[2] The district court correctly concluded that the settlement agreement is a final, complete and exclusive agreement, and that the settlement agreement is unambiguous. We, therefore, find no error in the district court's decision not to admit TransCore's parol evidence.

TransCore, LP v. Electronic Transaction Consultants Corp., 563 F.3d 1271 (2009)

90 U.S.P.Q.2d 1372

*1278  **C.**

TransCore further argues that several material facts remain in dispute: (1) which Mark IV entity actually sold the products to ISTHA for installation by ETC; (2) whether the sale from Mark IV to ISTHA occurred within the United States; and (3) assuming Mark IV U.S. (referred to by the parties, at times, as "IVHS") is found to have actually sold the products to ISTHA, whether Mark IV U.S. was included within the terms of the TransCore—Mark IV settlement agreement, which extended coverage to "sister" companies of Mark IV Canada. Based on the record before the district court, as viewed in the light most favorable to TransCore (the non-movant), we disagree.

Although the parties do not agree about which Mark IV entity actually sold the toll collection products—the irrevocable offer was made by Mark IV US, but the purchase order was placed with (and the order was ultimately filled by) Mark IV Canada—there is no dispute that a Mark IV entity was responsible for the sale.

Moreover, there is no dispute that the toll collection products were sold and shipped to ISTHA. Even if we accept TransCore's assertions that the products were shipped from Canada, this does not alter the essential fact that the transaction as a whole ultimately occurred "to" the United States. *See Lightcubes, LLC v. N. Light Prods., Inc.,* 523 F.3d 1353, 1369–71 (Fed.Cir.2008) (finding that a sale "to" the United States is sufficient to support infringement liability).

Finally, as to the third "disputed" fact—whether Mark IV U.S. is covered by the terms of the TransCore—Mark IV settlement agreement—the parties do not dispute that both Mark IV U.S. and Mark IV Canada are wholly-owned subsidiaries of Mark IV Industries. Because the term "sister company" is commonly used and generally understood to refer to a subsidiary company that shares common ownership (i.e., a common "parent") with another subsidiary company, *see generally, e.g., Poly–America, L.P. v. GSE Lining Tech., Inc.,* 383 F.3d 1303 (Fed.Cir.2004) (referring to two corporations that share a common parent as "sister corporations"); *Humana Inc. v. Comm'r,* 881 F.2d 247 (6th Cir.1989) (referring to *all* subsidiaries of Humana, Inc. as "brother-sister" corporations), we find it to be beyond dispute that Mark IV U.S. is a "sister" company of Mark IV Canada and thus has the same express authority under

the TransCore—Mark IV settlement agreement as any other "sister" company.

**II.**

[7]  The district court further found that TransCore's rights to the # 946 patent—which had not yet issued and was thus not identified in the TransCore—Mark IV settlement agreement —were exhausted by Mark IV's authorized sales under an implied license to practice that patent by virtue of legal estoppel. Again, we agree with the district court.

As explained by our predecessor court in *AMP Inc. v. United States,* 182 Ct.Cl. 86, 389 F.2d 448 (1968):

> [W]hen a person sells a patent which employs an invention which infringes a prior patent, the person selling is estopped from bringing an action against his grantee for that infringement, even though the earlier patent is acquired after the sale of the later patent. The same principle applies to the grant of a patent right by license as well as assignment.

*1279  *Id.* at 451 (citation omitted). Although TransCore argues that this form of legal estoppel only applies to "prior" or "earlier" patents, we see no reason for so fine a distinction —the timing of patent issuance is no more relevant to this inquiry than the timing of acquisition. Indeed, the court in *AMP* explained the policy rationale underlying the legal estoppel doctrine in the following manner:

> The essence of legal estoppel that can be found in the estoppel of the implied license doctrine involves the fact that the licensor (or assignor) has licensed (or assigned) a definable property right for valuable consideration, and then has attempted to derogate or detract from that right. The grantor is estopped from taking back in any extent that for which he has already received consideration.

*Id.* at 452. The basic principle is, therefore, quite simple: "Legal estoppel refers to a narrow[ ] category of conduct encompassing scenarios where a patentee has licensed or

TransCore, LP v. Electronic Transaction Consultants Corp., 563 F.3d 1271 (2009)

90 U.S.P.Q.2d 1372

assigned a right, received consideration, and then sought to derogate from the right granted." *Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571, 1581 (Fed.Cir.1997).

On summary judgment, ETC asserted, and TransCore did not dispute, [3] that TransCore's later-issued #946 patent was broader than, and necessary to practice, at least the #082 patent that was included in the TransCore—Mark IV settlement agreement. Indeed, during discovery TransCore adopted its # 082 patent infringement contentions as its contentions related to the # 946 patent. [4] Absent argument to the contrary, the district court properly concluded that in order for Mark IV to obtain the benefit of its bargain with TransCore, it must be permitted to practice the #946 patent to the same extent it may practice the #183, #275 and #082 patents. TransCore is, therefore, legally estopped from asserting the #946 patent against Mark IV in derogation of the authorizations granted to Mark IV under the #183, #275 and #082 patents. And Mark IV is, in turn, an implied licensee of the # 946 patent. The language of the TransCore—Mark IV settlement agreement, which states that "[t]his Covenant Not To Sue shall not apply to any other patents ... to be issued in the future," is not to the contrary. This language may protect TransCore against broad claims that future patents generally are impliedly licensed, but it does not permit TransCore to

derogate from the rights it has expressly granted and thus does not preclude a finding of estoppel.

Mark IV's rights under its implied license to the #946 patent are necessarily coextensive with the rights it received in **\*1280** the TransCore—Mark IV license agreement. Mark IV's sales to ISTHA were thus authorized and, accordingly, exhausted TransCore's patent rights in the products sold.

## CONCLUSION

The district court's decision, granting summary judgment and thus dismissing TransCore's claims, is affirmed.

*AFFIRMED*

## COSTS

No costs.

**Parallel Citations**

90 U.S.P.Q.2d 1372

## Footnotes

1    Because we agree with the district court that TransCore's claims are barred by the doctrine of patent exhaustion, we need not address the district court's decision on the related doctrine of implied license by no non-infringing use.

2    We note that, under California law, the district court may *receive* and *consider* extrinsic evidence to determine whether one or more terms of a contract is reasonably susceptible to multiple meanings, *see Dore v. Arnold Worldwide, Inc.*, 39 Cal.4th 384, 46 Cal.Rptr.3d 668, 139 P.3d 56, 60 (2006), but once the district court determines that no ambiguity exists, as it did here, extrinsic evidence is properly not *admitted, see Pac. Gas*, 69 Cal.Rptr. 561, 442 P.2d at 644–45.

3    On appeal, TransCore claims that it is possible to practice the #183, #275 and #082 patents without infringing the #946 patent. TransCore did not, however, raise this argument to the district court. We, therefore, deem it waived. *See Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1426 (Fed.Cir.1997) ("If a litigant seeks to show error in a trial court's overlooking an argument, it must first present that argument to the trial court. In short, this court does not 'review' that which was not presented to the district court.").

4    At oral argument, TransCore argued that "a contention of infringement ... is not enough for an implied license." Oral Arg. at 39:31–39:35. This argument misses the mark. TransCore's contentions did not create the implied license; they merely serve as evidence that TransCore sought to enforce the #946 patent in derogation of the rights it granted under the TransCore—Mark IV settlement agreement. That attempted derogation is prevented by legal estoppel, which gives rise to the implied license.

**End of Document**                                © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 88

U.S. v. 50 Acres of Land, 469 U.S. 24 (1984)

105 S.Ct. 451, 21 ERC 2105, 83 L.Ed.2d 376, 15 Envtl. L. Rep. 20,117

105 S.Ct. 451
Supreme Court of the United States

UNITED STATES, Petitioner,
v.
50 ACRES OF LAND, etc., et al.

No. 83-1170. | Argued Oct. 2,
1984. | Decided Dec. 4, 1984.

In an eminent domain action, condemnee city appealed from judgment of the United States District Court for the Northern District of Texas, Robert M. Hill, J., 529 F.Supp. 220, basing recovery on market value rather than the substitute facility approach. The Court of Appeals for the Fifth Circuit, 706 F.2d 1356, reversed and remanded. Certiorari was granted. The Supreme Court, Justice Stevens, held that: (1) reference to "private property" in the Fifth Amendment encompasses property of state and local governments, and (2) public condemnee is not entitled to compensation measured by the cost of acquiring a substitute facility when market value of the condemned facility is ascertainable, notwithstanding that condemnee has a duty to replace the condemned facility.

Judgment of Court of Appeals reversed.

Justice O'Connor with whom Justice Powell joined, filed concurring opinion.

West Headnotes (6)

[1]     **Eminent Domain**
   &#9758; Taking Entire Tract or Piece of Property

Public condemnee is not entitled to compensation measured by cost of acquiring a substitute facility if it has a duty to replace the condemned facility in the case where market value of the condemned property is ascertainable and, hence, where federal Government condemned land that had been used by city as sanitary landfill the city was not entitled to recover all costs incurred in acquiring a substitute, more expensive and extensive site and developing it as a landfill but was entitled only to market value of the taken facility, as market for landfill property existed in the area

and there was expert testimony as to value. U.S.C.A. Const.Amend. 5.

37 Cases that cite this headnote

[2]     **Eminent Domain**
   &#9758; Taking Entire Tract or Piece of Property

For the most part, cases where measure of compensation is something other than fair market value involve properties that are seldom sold on the open market. U.S.C.A. Const.Amend. 5.

21 Cases that cite this headnote

[3]     **Eminent Domain**
   &#9758; Property and Rights Subject of Compensation

Reference to "private property" in the takings clause of the Fifth Amendment encompasses property of state and local governments and the same principles of just compensation presumptively apply with private and public condemnees. U.S.C.A. Const.Amend. 5.

13 Cases that cite this headnote

[4]     **Eminent Domain**
   &#9758; Taking Entire Tract or Piece of Property

The "substitute facilities doctrine" as identified in dictum in the *Brown* taking case does not mean that a distinction must be drawn between public and private condemnees and does not imply that the federal government has a duty to provide a public condemnee with something more than fair market value of the condemned property. U.S.C.A. Const.Amend. 5.

37 Cases that cite this headnote

[5]     **Eminent Domain**
   &#9758; Necessity of Just or Full Compensation or Indemnity

Just compensation must be measured by objective standard that disregards subjective values which are only of a significance to an individual owner. U.S.C.A. Const.Amend. 5.

U.S. v. 50 Acres of Land, 469 U.S. 24 (1984)

105 S.Ct. 451, 21 ERC 2105, 83 L.Ed.2d 376, 15 Envtl. L. Rep. 20,117

3 Cases that cite this headnote

**[6]**    **Eminent Domain**

    Value of Property

Admissibility of testimony on reproduction cost, as offered on issue of fair market value, must be evaluated under generally applicable rules of evidence. Fed.Rules Evid.Rules 401-403, 701-705, 28 U.S.C.A.; U.S.C.A. Const.Amend. 5.

2 Cases that cite this headnote

**\*\*451  \*24 Syllabus\***

In connection with a flood control project, the United States filed proceedings **\*\*452** in Federal District Court to condemn approximately 50 acres of land owned by respondent city of Duncanville, Tex., that had been used as a sanitary landfill. The court awarded compensation in the amount of the condemned property's fair market value as determined by the jury, rather than the larger amount fixed by the jury as the reasonable cost to the city of acquiring and developing a substitute facility, which was larger and better than the condemned facility. The court found no basis for departing from the normal market value standard for determining the amount of compensation, but the Court of Appeals reversed and remanded.

*Held:* The Fifth Amendment does not require that the United States pay a public condemnee compensation measured by the cost of acquiring a substitute facility that the condemnee has a duty to acquire, when the market value of the condemned property is ascertainable and when there is no showing of manifest injustice. Pp. 455-458.

(a) "Just compensation" under the Fifth Amendment normally is to be measured by the market value of the property at the time of the taking, and this case is not one in which an exception is required because fair market value is not ascertainable. The testimony at trial established a fairly robust market for sanitary landfill properties. Nor is an award of compensation measured by market value here fundamentally inconsistent with the basic principles of indemnity embodied in the Just Compensation Clause. P. 455.

(b) The text of the Fifth Amendment does not mandate a more favorable rule of compensation for public condemnees than for private parties. The reference to "private property" in the Takings Clause of the Fifth Amendment encompasses the property of state and local governments when it is condemned by the United States, and under this construction the same principles of just compensation presumptively apply to both private and public condemnees. Pp. 455-456.

(c) When the dictum in *Brown v. United States,* 263 U.S. 78, 44 S.Ct. 92, 68 L.Ed. 171-which is the source of the "substitute-facilities doctrine"-is read in the context of the decision in that case, it lends no support to the suggestion that a distinction should be drawn between public and private condemnees. **\*25** Nor does it shed any light on the proper measure of compensation in this case. *Brown* merely indicates that it would have been constitutionally permissible for the Federal Government to provide the city with a substitute landfill site instead of compensating it in cash. Pp. 456-457.

(d) The city's legal obligation to maintain public services that are interrupted by a federal condemnation does not justify a distinction between public and private condemnees for the purpose of measuring "just compensation." The risk that a private condemnee might receive a "windfall" if its compensation were measured by the cost of a substitute facility that was never acquired or was later sold or converted to another use is not avoided by the city's obligation to replace the facility. If the replacement facility is more costly than the condemned facility, it presumably is more valuable, and any increase in the quality of the facility may be as readily characterized as a "windfall" as the award of cash proceeds for a substitute facility that is never built. Moreover, the substitute-facilities doctrine, if applied in this case, would diverge from the principle that just compensation must be measured by an objective standard that disregards subjective values which are only of significance to an individual owner. Pp. 457-458.

706 F.2d 1356 (CA5 1983), reversed.

**Attorneys and Law Firms**

*Joshua I. Schwartz* argued the cause for the United States. With him on the briefs were *Solicitor General Lee, Assistant Attorney General Habicht, Deputy Solicitor General Claiborne, Deputy Assistant Attorney General*

**U.S. v. 50 Acres of Land, 469 U.S. 24 (1984)**

105 S.Ct. 451, 21 ERC 2105, 83 L.Ed.2d 376, 15 Envtl. L. Rep. 20,117

*Liotta, Raymond N. Zagone, Dirk D. Snel,* and *Thomas H. Pacheco.*

*H. Louis Nichols* argued the cause for respondents.\*

\* Briefs of *amici curiae* urging affirmance were filed for the Council of State Governments et al. by *Lawrence R. Velvel* and *Elaine Kaplan;* and for Open Lands Project et al. by *Young Kim, Ruth E. Van Demark, George W. Overton, T.S.L. Perlman,* and *Adam Yarmolinsky.*

**Opinion**

Justice STEVENS delivered the opinion of the Court.

[1]   The Fifth Amendment requires that the United States pay "just compensation"  \*\*453 -normally measured by fair market value [1] -WHenever it takes private property for public \*26 use. [2] This case involves the condemnation of property owned by a municipality. The question is whether a public condemnee is entitled to compensation measured by the cost of acquiring a substitute facility if it has a duty to replace the condemned facility. We hold that this measure of compensation is not required when the market value of the condemned property is ascertainable.

**I**

In 1978, as part of a flood control project, the United States condemned approximately 50 acres of land owned by the city of Duncanville, Texas. [3] The site had been used since 1969 as a sanitary landfill. In order to replace the condemned landfill, the city acquired a 113.7-acre site and developed it into a larger and better facility. [4] In the condemnation proceedings, the city claimed that it was entitled to recover all of the costs incurred in acquiring the substitute site and developing it as a landfill, an amount in excess of $1,276,000. The United States, however, contended that just compensation should be determined by the fair market value of the \*27 condemned facility and deposited $199,950 in the registry of the court as its estimation of the amount due.

Before trial the Government filed a motion *in limine* to exclude any evidence of the cost of the substitute facility, arguing that it was not relevant to the calculation of fair market value. Record, Doc. No. 62. The District Court denied the motion, noting that this Court had left open the question of the proper measure of compensation for the condemnation

of public property. See *United States v. 564.54 Acres of Land,* 441 U.S. 506, 509, n. 3, 99 S.Ct. 1854, 1856, n. 3, 60 L.Ed.2d 435 (1979) (*Lutheran Synod*). The court concluded that "a complete factual record should be developed from which an independent determination of the appropriate measure of compensation can be made." Record, Doc. No. 111.

At trial, both parties submitted evidence on the fair market value of the condemned property [5] and on the cost of the substitute landfill facility. [6]  Responding to special interrogatories, \*\*454 the jury found that the fair market value of the \*28 condemned property was $225,000, and that the reasonable cost of a substitute facility was $723,624.01. Record, Doc. Nos. 199, 200. The District Court entered judgment for the lower amount plus interest on the difference between that amount and the sum already paid. [7] 529 F.Supp. 220 (ND Tex.1981). The District Court explained that the city had not met its "burden of establishing what would be a reasonable cost of a substitute facility." [8] In addition, the court was of the view that "substitute facilities compensation should not be awarded in every case where a public condemnee can establish a duty to replace the condemned property, at least where a fair market value can be established." *Id.,* at 222. The court found no basis for departing from the market value standard in this case, and reasoned that the application of the substitute-facilities measure of compensation would necessarily provide the city with a "windfall." [9]

The Court of Appeals reversed and remanded for further proceedings. 706 F.2d 1356 (CA5 1983). It reasoned that the city's loss attributable to the condemnation was "the amount of money reasonably spent ... to create a functionally equivalent facility." *Id.,* at 1360. If the city was required, either as a matter of law or as a matter of practical \*29 necessity, to replace the old landfill facility, the Court of Appeals believed that it would receive no windfall. The court, however, held that the amount of compensation should be adjusted to account for any qualitative differences in the substitute site. Finding that the trial judge's instructions had not adequately informed the jury of its duty to discount the costs of the substitute facility in order to account for its increased capacity and superior quality, see n. 4, *supra,* the Court of Appeals remanded for a new trial. [10] We granted the Government's petition for certiorari, [11] 465 U.S. 1098, 104 S.Ct. 1590, 80 L.Ed.2d 122 (1984), and we now reverse with instructions to direct the District Court to enter judgment based on the jury's finding of fair market value.

U.S. v. 50 Acres of Land, 469 U.S. 24 (1984)

105 S.Ct. 451, 21 ERC 2105, 83 L.Ed.2d 376, 15 Envtl. L. Rep. 20,117

## II

The Court has repeatedly held that just compensation normally is to be measured by "the market value of the property at the time of the taking contemporaneously paid in money." **455 *Olson v. United States,* 292 U.S. 246, 255, 54 S.Ct. 704, 708, 78 L.Ed. 1236 (1934). "Considerations that may not reasonably be held to affect market value are excluded." *Id.,* at 256, 54 S.Ct., at 709. Deviation from this measure of just compensation has been required only "when market value has been too difficult to find, or when its application would result in manifest injustice to owner or public." *United States v. Commodities Trading Corp.,* 339 U.S. 121, 123, 70 S.Ct. 547, 549, 94 L.Ed. 707 (1950); *Kirby Forest Industries, Inc. v. United States,* 467 U.S. 1, 10, n. 14, 104 S.Ct. 2187, 2194, n. 14, 81 L.Ed.2d 1 (1984).

[2]    *30 This case is not one in which an exception to the normal measure of just compensation is required because fair market value is not ascertainable. Such cases, for the most part, involve properties that are seldom, if ever, sold in the open market. [12] Under those circumstances, "we cannot predict whether the prices previously paid, assuming there have been prior sales, would be repeated in a sale of the condemned property." *Lutheran Synod,* 441 U.S., at 513, 99 S.Ct., at 1858. In this case, however, the testimony at trial established a fairly robust market for sanitary landfill properties, see n. 5, *supra,* and the jury's determination of the fair market value of the condemned landfill facility is adequately supported by expert testimony concerning the sale prices of comparable property. Cf. 441 U.S., at 513-514, 99 S.Ct., at 1858-1859.

The city contends that in this case an award of compensation measured by market value is fundamentally inconsistent with the basic principles of indemnity embodied in the Just Compensation Clause. If the city were a private party rather than a public entity, however, the possibility that the cost of a substitute facility exceeds the market value of the condemned parcel would not justify a departure from the market value measure. *Lutheran Synod,* 441 U.S., at 514-517, 99 S.Ct., at 1858-1860. The question-which we expressly reserved in the *Lutheran Synod* case [13] -is whether a substitute-facilities measure of compensation is mandated by the Constitution [14] *31 when the condemnee is a local governmental entity that has a duty to replace the condemned facility.

## III

[3]    The text of the Fifth Amendment certainly does not mandate a more favorable rule of compensation for public condemnees than for private parties. To the contrary, the language of the Amendment only refers to compensation for "private property," and one might argue that the Framers intended to provide greater protection for the interests of private parties than for public condemnees. That argument would be supported by the observation that many public condemnees have the power of eminent domain, and thus, unlike private parties, need not rely on the availability of property on the market in acquiring substitute facilities.

When the United States condemns a local public facility, the loss to the public entity, to the persons served by it, and to the local taxpayers may be no less acute than the loss in a taking of private property. Therefore, it is most reasonable to construe the reference to "private property" in the Takings Clause of the Fifth Amendment as **456 encompassing the property of state and local governments when it is condemned by the United States. [15] Under this construction, the same principles of just compensation presumptively apply to both private and public condemnees.

## IV

[4]    The Court of Appeals correctly identified a dictum in *Brown v. United States,* 263 U.S. 78, 44 S.Ct. 92, 68 L.Ed. 171 (1923), as the source *32 of what has become known as the "substitute-facilities doctrine." [16] When that passage is read in the context of the Court's decision in that case, it lends no support to the suggestion that a distinction should be drawn between public and private condemnees. Nor does it shed any light on the proper measure of compensation in this case.

The facts of the *Brown* case were, in the Court's word, "peculiar." [17] The construction of a reservoir on the Snake River flooded approximately three-quarters of the town of American Falls, Idaho, an area of some 640 acres. To compensate both the public and private owners of the flooded acreage, the Government undertook to relocate most of the town to the other side of the river. The owners of a large tract to be included within the limits of the reconstructed town challenged the Government's power to condemn their

Case 09-10138-MFW    Doc 13460-11    Filed 05/02/14    Page 14 of 75

U.S. v. 50 Acres of Land, 469 U.S. 24 (1984)

105 S.Ct. 451, 21 ERC 2105, 83 L.Ed.2d 376, 15 Envtl. L. Rep. 20,117

property, contending that the transfer of their property to other private persons was not a "public use" as required by the Fifth Amendment. Cf. *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 239-244, 104 S.Ct. 2321, 2328-2331, 81 L.Ed.2d 186 (1984).

In rejecting that contention, the Court held that the Government's method of compensating the owners of the flooded property was legitimate. Writing for the Court, Chief Justice Taft observed:

> "The usual and ordinary method of condemnation of the lots in the old town, and of the streets and alleys as town property, would be ill adapted to the exigency.... A town is a business center. It is a unit. If three-quarters **\*33** of it is to be destroyed by appropriating it to an exclusive use like a reservoir, all property owners, both those ousted and those in the remaining quarter, as well as the State, whose subordinate agency of government is the municipality, are injured. A method of compensation by substitution would seem to be the best means of making the parties whole. *The power of condemnation is necessary to such a substitution.*" 263 U.S., at 82-83, 44 S.Ct., at 93-94 (emphasis added).

Taken in context, the apparent endorsement of compensation by substitution is made in support of the Government's power to condemn the property in *Brown* and does not state the proper measure of compensation in another case. *Lutheran Synod,* 441 U.S., at 509, n. 3, 99 S.Ct., at 1856, n. 3.

*Brown* merely indicates that it would have been constitutionally permissible for the Federal Government to provide the city with a substitute landfill site instead of compensating it in cash. Nothing in **\*\*457** *Brown* implies that the Federal Government has a duty to provide the city with anything more than the fair market value of the condemned property.

### V

In this case, as in most, the market measure of compensation achieves a fair "balance between the public's need and the claimant's loss." *United States v. Toronto, Hamilton & Buffalo Navigation Co.,* 338 U.S. 396, 402, 70 S.Ct. 217, 221, 94 L.Ed. 195 (1949). This view is consistent with our holding in *Lutheran Synod* that fair market value constitutes "just compensation" for those private citizens who must replace their condemned property with more expensive substitutes and with our prior holdings that the Fifth Amendment does not require any award for consequential damages arising from a condemnation.[18]

**\*34** The city argues that its responsibility for municipal garbage disposal justifies a departure from the market value measure in this case. This responsibility compelled the city to arrange for a suitable replacement facility or substitute garbage disposal services.[19] This obligation to replace a condemned facility, however, is no more compelling than the obligations assumed by private citizens. Even though most private condemnees are not legally obligated to replace property taken by the Government, economic circumstances often force them to do so. When a home is condemned, for example, its owner must find another place to live. The city's legal obligation to maintain public services that are interrupted by a federal condemnation does not justify a distinction between public and private condemnees for the purpose of measuring "just compensation."[20]

Of course, the decision in *Lutheran Synod* was based, in part, on a fear that a private condemnee might receive a "windfall" if its compensation were measured by the cost of a substitute facility and "substitute facilities were never acquired, or if acquired, were later sold or converted to another use." 441 U.S., at 516, 99 S.Ct., at 1859. The Court of Appeals suggested that the city's obligation to replace the facility avoids this risk, 706 F.2d, at 1360, but we do not agree. If the replacement facility is more costly than the condemned facility, it presumably is more valuable,[21] and any increase in the quality **\*35** of the facility may be as readily characterized as a "windfall" as the award of cash proceeds for a substitute facility that is never built.

The Court of Appeals, however, believed that the risk of any windfall could be reduced by discounting the cost of the substitute facility to account for its superior quality. *Id.,* at 1362-1363. This approach would add uncertainty and complexity to the valuation proceeding without any necessary improvement in the process. In order to implement the Court of Appeals' approach, the factfinder would have to make at least two determinations: (i) the reasonable (rather than the

U.S. v. 50 Acres of Land, 469 U.S. 24 (1984)

105 S.Ct. 451, 21 ERC 2105, 83 L.Ed.2d 376, 15 Envtl. L. Rep. 20,117

actual) replacement cost, which would require an inquiry into the fair market value of the second facility; and (ii) the extent to which the new facility is superior to the old, which would require an analysis of the qualitative differences between the new and the old. It would also be necessary to determine the **458 fair market value of the old property in order to provide a basis for comparison. There is a practical risk that the entire added value will not be calculated correctly; moreover, if it is correctly estimated, the entire process may amount to nothing more than a roundabout method of arriving at the market value of the condemned facility.[22]

[5]    Finally, the substitute-facilities doctrine, as applied in this case, diverges from the principle that just compensation must be measured by an objective standard that disregards subjective values which are only of significance to an individual owner. As the Court wrote in *Kimball Laundry Co. v. United States,* 338 U.S. 1, 5, 69 S.Ct. 1434, 1437, 93 L.Ed. 1765 (1949):

> "The value of property springs from subjective needs and attitudes; its value to the owner may therefore differ widely from its value to the taker. Most things, however, *36 have a general demand which gives them a value transferable from one owner to another. As opposed to such personal and variant standards as value to the particular owner whose property has been taken, this transferable value has an external validity which makes it a fair measure of public obligation to compensate the loss incurred by an owner as a result of the taking of his property for public use. In view, however, of the liability of all property to condemnation for the common good, loss to the owner of nontransferable values deriving from his unique need for property or idiosyncratic attachment to it, like loss due to an exercise of the police power, is properly treated as part of the burden of common citizenship."

[6]    The subjective elements in the formula for determining the cost of reasonable substitute facilities would enhance the risk of error and prejudice.[23] Since the condemnation contest is between the local community and a National Government that may be thought to have unlimited resources, the open-ended character of the substitute-facilities standard increases the likelihood that the city would actually derive the windfall that concerned both the District Court and the Court of Appeals.[24] "Particularly is this true where these issues are to be left for jury determination, for juries should not be given sophistical and abstruse formulas as the basis for their findings nor be left to apply even sensible formulas to factors that are too elusive." *Id.,* at 20, 69 S.Ct., at 1445.

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

*37    Justice O'CONNOR, with whom Justice POWELL joins, concurring.

I concur in the Court's opinion and judgment that, on the facts of this case, the city of Duncanville is justly compensated by the payment of the market value for the sanitary landfill that was condemned by the Government. I write separately to note that I do not read the Court's opinion to preclude a municipality or other local governmental entity from establishing that payment of market value in a particular case is manifestly unjust and therefore inconsistent with the Just Compensation Clause. See *ante,* at 455. When a local governmental entity can prove that the **459 market value of its property deviates significantly from the make-whole remedy intended by the Just Compensation Clause and that a substitute facility must be acquired to continue to provide an essential service, limiting compensation to the fair market value in my view would be manifestly unjust. Because the city of Duncanville did not establish that the market value in this case deviated significantly from the indemnity principle, I agree that the decision of the Court of Appeals should be reversed.

**Parallel Citations**

105 S.Ct. 451, 21 ERC 2105, 83 L.Ed.2d 376, 15 Envtl. L. Rep. 20,117

Footnotes

**U.S. v. 50 Acres of Land, 469 U.S. 24 (1984)**

105 S.Ct. 451, 21 ERC 2105, 83 L.Ed.2d 376, 15 Envtl. L. Rep. 20,117

\*     The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1     *United States v. Miller,* 317 U.S. 369, 374, 63 S.Ct. 276, 280, 87 L.Ed. 336 (1943) ("what a willing buyer would pay in cash to a willing seller").

2     "[N]or shall private property be taken for public use, without just compensation." U.S.Const., Amdt. 5.

3     The United States initiated the condemnation proceedings by filing a declaration of taking under 40 U.S.C. § 258a. Under that procedure the Government deposits the estimated value of the land in the registry of the court. "Title and right to possession thereupon vest immediately in the United States. In subsequent judicial proceedings, the exact value of the land (on the date the declaration of taking was filed) is determined, and the owner is awarded the difference (if any) between the adjudicated value of the land and the amount already received by the owner, plus interest on that difference." *Kirby Forest Industries, Inc. v. United States,* 467 U.S. 1, 5, 104 S.Ct. 2187, 2191, 81 L.Ed.2d 1 (1984).

4     The new landfill site is larger in acreage than the old facility and because of superior soil and water table conditions it can be excavated to a greater depth. As a result, the capacity of the new facility is 2,100,000 cubic yards while the remaining capacity of the old facility was 650,000 cubic yards. The new facility is expected to remain in service for 41.6 years, or 28.8 years longer than the condemned facility would have remained in service. Tr. 395-397, 399, 402.

5     Experts for both the United States and the city agreed that a market for landfill properties existed in the area. A Government witness, for example, testified that there are "private owners of solid waste companies in the market for land for their own solid waste disposal sites. You've got the major corporations in the marketplace securing sites for landfill operations and then you've got all of your City Governments, they're seeking locations to deposit solid waste. And all of these people at one time or another are in the marketplace looking for a site for solid waste disposal." *Id.,* at 297.

    Based on their evaluation of the recent sale prices of comparable parcels, the experts for the city estimated the value of the condemned facility as between $367,500 and $370,000; experts for the United States estimated its value as between $160,410 and $190,000. *Id.,* at 173, 182, 276, 353.

6     The city's Director of Public Works admitted on cross-examination that the city had condemnation powers, but did not use them in acquiring the land for the new facility. Nor did the city bargain over the seller's asking price or have the land appraised prior to the acquisition: "This was the price that he had asked for, what we ended up paying for it." *Id.,* at 93-94. The Government's expert witnesses testified that the city paid considerably more than fair market value for the new land. *Id.,* at 282, 321, 357.

7     The District Court awarded interest at the statutory rate of six percent, 40 U.S.C. § 258a, because the city had not offered any evidence indicating that a higher rate of interest prevailed. 529 F.Supp. 220, 223-224 (ND Tex.1981).

8     *Id.,* at 221.

9     Relying on Justice WHITE's concurring opinion in *United States v. 564.54 Acres of Land,* 441 U.S. 506, 518, 99 S.Ct. 1854, 1860, 60 L.Ed. 435 (1979) (*Lutheran Synod*), the District Court wrote:

    "When the doctrine of cost of substitute facilities is applied, a windfall *necessarily* accrues to the condemnee who is awarded an amount sufficient to replace ancient or depleted facilities with brand new facilities. [441 U.S., at 517, 99 S.Ct., at 1860] (Justice WHITE concurring). *See also [United States v.] 564.54 Acres,* 576 F.2d 983, 996-1000 (3d Cir.1978) (Judge Stern concurring). By definition, a market value represents approximately what it would cost to purchase the same or similar property in the marketplace." 529 F.Supp., at 222 (emphasis in original).

10     "In light of [the remand for a new trial]," the Court of Appeals instructed the District Court to allow the city a second opportunity to present evidence on whether the rate of interest on the condemnation award should exceed the statutory rate of six percent. 706 F.2d, at 1364. In view of our disposition of the case, the Court of Appeals' rationale for a new hearing on that issue is no longer valid.

11     We denied the petition for certiorari filed by the city challenging the order of a new trial and seeking the entry of judgment on the jury's finding of the cost of the substitute facility. *City of Duncanville v. United States,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984).

12     "This might be the case, for example, with respect to public facilities such as roads or sewers." *Lutheran Synod,* 441 U.S., at 513, 99 S.Ct., at 1858.

13     "This Court has not passed on the propriety of substitute-facilities compensation for public condemnees.... In light of our disposition of this case, we express no opinion on the appropriate measure of compensation for publicly owned property." *Id.,* at 509, n. 3, 99 S.Ct., at 1856, n. 3.

14     Congress, of course, has the power to authorize compensation greater than the constitutional minimum. See *United States v. General Motors Corp.,* 323 U.S. 373, 382, 65 S.Ct. 357, 361, 89 L.Ed. 311 (1945); see, *e.g.,* Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 84 Stat. 1894, 42 U.S.C. § 4601 *et seq.* (requiring the payment of relocation assistance to specified persons and businesses displaced as a result of federal and federally assisted programs).

15     See *United States v. Carmack,* 329 U.S. 230, 242, 67 S.Ct. 252, 257, 91 L.Ed. 209 (1946):

**U.S. v. 50 Acres of Land, 469 U.S. 24 (1984)**

105 S.Ct. 451, 21 ERC 2105, 83 L.Ed.2d 376, 15 Envtl. L. Rep. 20,117

> "[W]hen the Federal Government ... takes for a federal public use the independently held and controlled property of a state or of a local subdivision, the Federal Government recognizes its obligation to pay just compensation for it and it is conceded in this case that the Federal Government must pay just compensation for the land condemned."

See also *Block v. North Dakota ex rel. Board of University and School Lands,* 461 U.S. 273, 291, 103 S.Ct. 1811, 1822, 75 L.Ed.2d 840 (1983).

16   See, *e.g., United States v. Certain Property in Borough of Manhattan,* 403 F.2d 800, 803 (CA2 1968); *United States v. Board of Education of Mineral County,* 253 F.2d 760, 763 (CA4 1958).

17   "An important town stood in the way of a necessary improvement by the United States. Three-quarters of its streets, alleys and parks and of its buildings, public and private, would have to be abandoned.... American Falls is a large settlement for that sparsely settled country and it was many miles from a town of any size in any direction. It was a natural and proper part of the construction of the dam and reservoir to make provision for a substitute town as near as possible to the old one." 263 U.S., at 81, 44 S.Ct., at 93.

18   See *United States v. General Motors Corp.,* 323 U.S., at 382, 65 S.Ct., at 361; see generally J. Gelin & D. Miller, Federal Law of Eminent Domain § 2.4(B) (1982).

19   The Court of Appeals left open the question whether the city was, in fact, under an obligation to replace its landfill facility, 706 F.2d, at 1360, n. 6, but for purposes of our decision we assume that it was obligated to do so.

20   In holding that the substitute-facilities measure of compensation was appropriate in this case, the Court of Appeals did not rely solely on the city's legal obligations to arrange for garbage disposal within the municipality, but also on "any practical, economic or logistical advantages of the city's operation and control of its own sanitary landfill." *Ibid.*

21   "Obviously, replacing the old with a new facility will cost more than the value of the old, but the new facility itself will be more valuable and last longer." *Lutheran Synod,* 441 U.S., at 518, 99 S.Ct., at 1860 (WHITE, J., concurring).

22   Indeed, one might infer from the record that this would be the result here. See nn. 4 and 6, *supra.* The District Court, in fact, found that an award of fair market value would place the city "in as good a position pecuniarily as if its property had not been taken." 529 F.Supp., at 223.

23   Cf. R. Posner, Economic Analysis of Law 402 (2d ed. 1977) ("The vogue of cost-benefit analysis has created inflated notions of the effectiveness of analytical techniques in resolving questions of cost and demand").

24   Of course, we express no view on the admissibility of testimony on reproduction cost when it is offered on the issue of fair market value. Cf. *United States v. Commodities Trading Corp.,* 339 U.S. 121, 126, 70 S.Ct., 547, 551, 94 L.Ed. 707 (1950). The admissibility of such evidence must be evaluated under the generally applicable rules of evidence. *E.g.,* Fed.Rules Evid. 401-403, 701-705.

---

**End of Document**                                  © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 89

93 S.Ct. 1713, 36 L.Ed.2d 528, 31 A.F.T.R.2d 73-1461, 73-1 USTC P 12,926...

93 S.Ct. 1713
Supreme Court of the United States

UNITED STATES, Petitioner,

v.

Douglas B. CARTWRIGHT, as Executor
of the Estate of Ethel B. Bennett.

No. 71-1665.  |  Argued Jan.
16, 1973.  |  Decided May 7, 1973.

Federal estate tax refund action. The United States District Court, for the Western District of New York, 323 F.Supp. 769, held applicable Treasury regulation invalid and appeal was taken. The Court of Appeals, 457 F.2d 567, affirmed, and the Government's petition for certiorari was granted. The Supreme Court, Mr. Justice White, held that where, under statutory scheme created by Investment Company Act, initial purchases by the public of shares of open-end mutual fund with a sales load are made from the fund at the 'asked' price which includes the load but shareholders sell their shares back to the fund at statutorily defined redemption or 'bid' price set by the Act at approximately the fractional value per share of fund's net assets at time of redemption, Treasury regulation that such shares are to be valued for federal estate tax purposes at their public offering price or 'asked' price at date of death was inconsistent with provisions of Investment Company Act, imposed an unreasonable and unrealistic measure of value and was invalid.

Judgment of Court of Appeals affirmed.

Mr. Justice Stewart, with whom The Chief Justice and Mr. Justice Rehnquist joined, filed dissenting opinion.

West Headnotes (2)

[1]     **Internal Revenue**
         Making, Requisites and Validity
         Regulations promulgated under authority of Secretary of the Treasury, if found to implement congressional mandate in some reasonable manner, must be upheld. 26 U.S.C.A. (I.R.C.1954) § 7805(a).

100 Cases that cite this headnote

[2]     **Internal Revenue**
         Rules and Regulations
         Where, under statutory scheme created by Investment Company Act, initial purchases by the public of shares of open-end mutual fund with a sales load are made from the fund at the "asked" price which includes the load but shareholders sell their shares back to the fund at statutorily defined redemption or "bid" price set by the Act at approximately the fractional value per share of fund's net assets at time of redemption, Treasury regulation that such shares are to be valued for federal estate tax purposes at their public offering price or "asked" price at date of death was inconsistent with provisions of Investment Company Act, imposed an unreasonable and unrealistic measure of value and was invalid. 26 U.S.C.A. (I.R.C.1954) §§ 2031, 7805(a); Investment Company Act of 1940, §§ 1 et seq., 2(a)(32, 35), 15, 22(e) as amended 15 U.S.C.A. §§ 80a-1 et seq., 80a-2(a)(32, 35), 80a-15, 80a-22(e).

417 Cases that cite this headnote

**1714  *546  Syllabus [*]

Shares in mutual funds can be 'sold' by the shareholder only back to the fund and only at a set redemption price. Treas.Reg. s 20.2031-8(b), requiring that such shares be valued for federal estate tax purposes at the current public offering ('asked') price, which is determined by adding a load or sales charge to the net asset value, is clearly inconsistent with the Investment Company Act of 1940, and is therefore invalid. Pp. 1716-1720.

2 Cir., 457 F.2d 567, affirmed.

**Attorneys and Law Firms**

Sol. Gen. Erwin N. Griswold for petitioner.

Ralph J. Gregg, Buffalo, N.Y., for respondent.

U.S. v. Cartwright, 411 U.S. 546 (1973)

93 S.Ct. 1713, 36 L.Ed.2d 528, 31 A.F.T.R.2d 73-1461, 73-1 USTC P 12,926...

**Opinion**

Mr. Justice WHITE delivered the opinion of the Court.

The Internal Revenue Code of 1954 requires that, for estate tax purposes, the 'value' of all property held by a decedent at the time of death be included in the gross estate. 26 U.S.C. s 2031. By regulation, the Secretary of the Treasury has determined that shares in open-end investment companies, or mutual funds, are to be valued at their public offering price or 'asked' price at the date *547 of death. Treas.Reg. on Estate Tax s 20.2031-8(b) (1963). The question this case presents is whether that determination is reasonable in the context of the market for mutual fund shares.

At the time of her death in 1964, Ethel B. Bennett owned approximately 8,700 shares of three mutual funds that are regulated by the Investment Company Act of 1940, 54 Stat. 789, as amended, 15 U.S.C. s 80a-1 et seq.[1] The 1940 Act **1715 seeks generally to regulate publicly held companies that are engaged in investing in securities. Open-end investment companies, or mutual funds, 'dominate' this industry. 1966 SEC Report 43. Unquestionably, the unique characteristic of mutual funds is that they are permitted, under the Act, to market their shares continuously to the public, but are required to be prepared to redeem outstanding shares at any time. s 80a-22(e). The redemption 'bid' price that a shareholder may receive is set by the Act at approximately the fractional value per share of the fund's net assets at the time of redemption. s 80a-2(a)(32). In contrast, the 'asked' price, or the price at which the fund initially offers its shares to the public, includes not only the net asset value per share at the time of sale, but also a fixed sales charge or 'sales load' assessed by the fund's principal underwriter who acts as an agent in marketing the fund's shares. *548 s 80a-2(a)(35).[2] Sales loads vary within fixed limits from mutual fund to mutual fund, but all are paid to the funds' underwriters; the charges do not become part of the assets of the fund.[3] The sales loads of the funds held by the decedent ranged from seven and eight percent to one percent of the fractional net asset value of the funds' shares.

*549 Private trading in mutual fund shares is virtually nonexistent.[4] Thus, at any given time, under the statutory scheme created by the Investment Company Act, shares of any open-end mutual fund with a sales load are being sold at two distinct prices. Initial purchases by the public are made from the fund, at the 'asked' price, which includes the load.

But shareholders 'sell' their shares **1716 back to the fund at the statutorily defined redemption or bid price.

Respondent is the executor of the decedent's estate. On the federal estate tax return, he reported the value of the mutual fund shares held by the decedent at their redemption price, which amounted to about $124,400. The Commissioner assessed a deficiency based upon his valuation of the shares at their public offering or asked price, pursuant to Treas.Reg. s 20.2031-8(b).[5] Valued *550 on that basis, the shares were worth approximately $133,300. Respondent paid the deficiency of about $3,100, including interest, filed a timely claim for a refund, and, when that claim was denied, commenced a refund action in Federal District Court on the ground that the valuation based on s 20.2031-8(b) was unreasonable. The District Court agreed with respondent and held the Regulation invalid. 323 F.Supp. 769. The Court of Appeals affirmed. 2 Cir., 457 F.2d 567. We granted the Government's petition for certiorari, 409 U.S. 840, 93 S.Ct. 61, 34 L.Ed.2d 79, because of the conflict among the circuits.[6]

[1]    We recognize that this Court is not in the business of administering the tax laws of the Nation. Congress has delegated that task to the Secretary of the Treasury, 26 U.S.C. s 7805(a), and regulations promulgated under his authority, if found to 'implement the congressional mandate in some reasonable manner,' must be upheld. United States v. Correll, 389 U.S. 299, 307, 88 S.Ct. 445, 449, 19 L.Ed.2d 537 (1967). See Bingler v. Johnson, 394 U.S. 741, 749-751, 89 S.Ct. 1439, 1444, 22 L.Ed.2d 695 (1969); Commissioner v. South Texas Lumber Co., 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831 (1948). But that principle is to set the framework for judicial analysis; it does not displace it. We find that the contested regulation is unrealistic and unreasonable, and therefore affirm the judgment of the Court of Appeals.

In implementing 26 U.S.C. s 2031, the general principle of the Treasury Regulations is that the value of *551 property is to be determined by its fair market value at the time of the decedent's death. 'The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.' Treas.Reg. s 20.2031-1(b). The willing buyer-willing seller test of fair market value is nearly as old as the federal income, estate, and gifts taxes themselves, **1717 and is not challenged here.[7] Under this test, is is clear that if the decedent had owned ordinary corporate

Case 09-10138-MFW    Doc 13460-11    Filed 05/02/14    Page 21 of 75

U.S. v. Cartwright, 411 U.S. 546 (1973)

93 S.Ct. 1713, 36 L.Ed.2d 528, 31 A.F.T.R.2d 73-1461, 73-1 USTC P 12,926...

stock listed on an exchange, its 'value' for estate tax purposes would be the price the estate could have obtained if it had sold the stock on the valuation date, that price being, under Treas. Reg. s 20.2031-2(b), the mean between the highest and lowest quoted selling prices on that day. Respondent urges that similar treatment be given mutual fund shares and that, accordingly, their value be measured by the redemption price at the date of death, the only price that the estate could hope to obtain if the shares had been sold.

Respondent's argument has the clear ring of common sense to it, but the United States maintains that the redemption price does not reflect the price that a willing buyer would pay, inasmuch as the mutual fund is under a statutory obligation to redeem outstanding shares whenever they are offered. According to the Government, the only market for mutual fund shares that has both willing buyers and willing sellers is the public offering market. Therefore, the price in that market, the asked *552 price, is an appropriate basis for valuation. The central difficulty with this argument is that it unrealistically bifurcates the statutory scheme for the trading in mutual fund shares. To be sure, the fund is under an obligation to redeem its shares at the stated price. 15 U.S.C. s 80a-22(e). But, at the time of the original purchases, both the fund and the purchasers are aware of that duty and both willingly enter into the sale transactions nonetheless. As Judge Winner correctly observed in Hicks v. United States, 335 F.Supp. 474, 481 (Colo.1971):

> 'Viewing the contract in this light meets every test of the 'willing buyer-willing seller' definition usually applied in the determination of market value. The 'willing buyer' is the fully informed person who agrees to buy the shares, agreeing at that time to sell them to the fund-the only available repurchaser-at the redemption price. The 'willing seller' is the fund which sells the shares at market value plus a load charge, and which agrees to buy the shares back at market less the load charge. That is the market, and it is the only market. It is a market made up of informed buyers and an informed seller, all dealing at arm's length.'

In the context of the Investment Company Act, the redemption price may thus be properly viewed only as the final step in a voluntary transaction between a willing buyer and a willing seller. As a matter of statutory law, holders of mutual fund shares cannot obtain the 'asked' price from the fund. That price is never paid by the fund; it is used by the fund when selling its shares to the public-and even then the fund receives merely the net asset value per share from the sale, with the sales load being paid directly to the underwriter. In short, the only price that a shareholder may realize and that the fund-the only buyer-will pay is the redemption *553 price. In the teeth of this fact, Regulation s 20.2031-8(b) purports to assign a value to mutual fund shares that the estate could not hope to obtain and that the fund could not offer.

In support of the Regulation, the Government stresses that many types of property are taxed at values above those which could be realized during an actual sale. For example, ordinary corporate stock is valued at its fair market price without taking into account the brokerage commission that a seller must generally pay in order to sell the stock. Respondent does not contend that that approach is inappropriate or that, for example, **1718 the value of ordinary stock in an estate should be the market price at the time less anticipated brokerage fees. But s 20.2031-8(b) operates in an entirely different fashion. The regulation includes as an element of value the commission cost incurred in the hypothetical purchase of the mutual fund shares already held in the decedent's estate. If that principle were carried over to the ordinary stock situation, then a share traded at $100 on the date of death would be valued, not at $100 as it now is, but at, say, $102, representing the 'value' plus the fee that a person buying the stock on that day would have to pay. It hardly need be said that such a valuation method is at least inconsistent with long-established Treasury practice and would appear at odds with the basic notions of valuation embodied in the Internal Revenue Code.[8] See Estate of Wells v. Commissioner, 50 T.C. 871, 880 (1968) (Tannenwald, J., dissenting).

Even if it were assumed that the public offering price were somehow relevant to the value of mutual fund shares *554 privately held, there would still be the difficulty that shares so held are, in important respects, similar to ordinary corporate stock held subject to a restrictive agreement (such as a first-refusal right at a specified price). With respect to the value of such stock, the Treasury Regulations have provided that the price that may be obtained in the marketplace does not control. Rather, so long as the restriction is a bona fide one, the value of the shares in the hands of the restricted stockholder is determined in accordance with the terms of the

93 S.Ct. 1713, 36 L.Ed.2d 528, 31 A.F.T.R.2d 73-1461, 73-1 USTC P 12,926...

restriction. Treas.Reg. s 20.2031-2(h). Outstanding mutual funds share are likewise held subject to a restriction, as the Court of Appeals noted. 457 F.2d at 571. Those shares may not be 'sold' at the public offering price. By statute, they may be 'sold' back to the mutual fund only at the redemption price. We see no valid justification for disregarding this reality connected with the ownership of mutual fund shares.

The Government nevertheless argues that Treas.Reg. s 20.2031-8(b) reasonably values the 'bundle of rights' that is transferred with the ownership of the mutual fund shares. [9] For this argument, heavy reliance is placed on this Court's decisions in Guggenheim v. Rasquin, 312 U.S. 254, 61 S.Ct. 507, 85 L.Ed. 813 (1941); Powers v. Commissioner, 312 U.S. 259, 61 S.Ct. 509, 85 L.Ed. 817 (1941); United States v. Ryerson, 312 U.S. 260, 61 S.Ct. 479, 85 L.Ed. 819 (1941), which held that the cash-surrender value of a single-premium life insurance policy did not necessarily represent its only taxable value for federal gift tax purposes. *555 [10] In Guggenheim, the lead case, the taxpayer purchased single-premium life insurance policies with an aggregate face value of one million dollars for approximately $852,000 and, shortly thereafter, gave the policies to her children. On the gift tax return, the policies were listed at their cash-surrender **1719 value of about $717,000-admittedly the only amount the donor or the donees could receive, if the policies were surrendered. But the Commissioner valued the gift at the cost of the policies, and this Court upheld that valuation: 'the owner of a fully paid life insurance policy has more than the mere right to surrender it; he has the right to retain it for its investment virtues and to receive the face amount of the policy upon the insured's death. That these latter rights are deemed by purchasers of insurance to have substantial value is clear from the difference between the cost of a single-premium policy and its immediate or early cash-surrender value . . . .' 312 U.S., at 257, 61 S.Ct. at 509. Because the 'entire bundle of rights in a single-premium policy' is so difficult to give a realistic value to, the Court deferred to the Commissioner's determination and permitted valuation to be based on cost: 'Cost is cogent evidence of value.' Id., at 258, 61 S.Ct. at 509. But as the District Court observed, 323 F.Supp., at 773, shares in mutual funds are quite unlike insurance policies, particularly in light of the policyowner's right to receive the full face value of the policy upon the insured's death. Moreover, mutual fund shares present no analogous difficulties in *556 valuation. On any given day, their commercial value may be determined by turning to the financial pages of a newspaper. Obviously, with respect to mutual funds, there are 'investment virtues' and the

prospects of capital gains or dividends. But that is true of any corporate security. Nonetheless, shareholders in mutual funds are singled out by the Regulation and their holdings valued at an unrealistic replacement cost-which includes 'brokers' commissions'-while other shareholdings are valued without regard to such commissions.

The unrealistic nature of this difference in treatment may be demonstrated by comparing the treatment of shares in load funds, such as the decedent's with shares in no-load funds. Obviously, even if it could be argued that there are relevant differences between mutual fund shares generally and corporate stock, there are no differences in terms of 'investment virtues' or related interests between no-load and load fund shares. Indeed, as the terms imply, the only real distinction between the two is that one imposes an initial sales charge and the other does not. [11] Nonetheless, under the Regulation, a share in a noload fund is valued at its net asset value while a share in a load fund is valued at net asset value plus sales charge. To further illustrate, consider a decedent who had purchased one share in each of two no-load mutual funds, at $100 per share. The decedent died before either appreciated, but after one of the funds had changed to a load fund. Although both shares are still worth $100, and could be redeemed for only that amount, the Regulation would require that one be valued at $100 and the other at $100 plus the new load charge. A regulation that results in such differing treatment of identical property should be supported by something more than a transparent analogy to life insurance.

*557 [2]   We recognize that normally 'Treasury regulations must be sustained unless unreasonable and plainly inconsistent with the revenue statutes.' Commissioner v. South Texas Lumber Co., 333 U.S., at 501, 68 S.Ct., at 698. But even if the Regulation contested here is not, on its face, technically inconsistent with s 2031 of the Internal Revenue Code, it is manifestly inconsistent with the most elementary provisions of the Investment Company Act of 1940 and operates without regard for the market in mutual fund shares that the Act created and regulates. Cf. L. E. Shunk Latex Products, Inc. v. Commissioner, 18 T.C. 940 (1952). Congress surely could not have intended s 2031 to be interpreted in such a manner. The Regulation also imposes **1720 an unreasonable and unrealistic measure of value. We agree with Judge Tannenwald, who stated at the very outset of the dispute over Regulation s 20.2031-8(b), that 'it does not follow that, because (the Commissioner) has a choice of alternatives, his choice should be sustained where

U.S. v. Cartwright, 411 U.S. 546 (1973)

93 S.Ct. 1713, 36 L.Ed.2d 528, 31 A.F.T.R.2d 73-1461, 73-1 USTC P 12,926...

the alternative chosen is unrealistic. In such a situation the regulations embodying that choice should be held to be unreasonable.' Estate of Wells v. Commissioner, 50 T.C., at 878 (dissenting opinion).

The judgment of the Court of Appeals is affirmed.

It is so ordered.

Judgment affirmed.

Mr. Justice STEWART, with whom THE CHIEF JUSTICE and Mr. Justice REHNQUIST join, dissenting.

This case presents a narrow issue of law regarding the valuation of certain assets-shares in an open-end investment company or 'mutual fund'-for purposes of the federal estate tax. The case turns upon a single question of law: whether or not s 20.2031-8(b) of the Treasury Regulations, which provides a specific method for valuing such shares, represents a reasonable implementation of the legislation enacted by Congress.

**\*558** On December 4, 1964, Mrs. Ethel Bennett died testate leaving, among other property several thousand shares in three separate mutual funds. Each of the funds in question is managed by a firm known as Investors Diversified Services, Inc., and all are subject to regulation by the Securities and Exchange Commission under the Investment Company Act of 1940. In his tax return for the estate, the respondent, Mrs. Bennett's executor, valued these shares at their so-called 'net asset value,' that is, the amount at which the estate is entitled, as a matter of law, to have the shares redeemed by the issuer. The net asset value of a mutual fund share is calculated daily by the issuing company, and is equivalent to the fractional value per share of the fund's total net assets on that day. In addition to serving as a gauge for the redemption value of fund shares already issued, net asset value is also employed by the issuing companies in determining the price at which they will offer new shares in the fund to the public on any given day. In general, such shares are sold to the public at their net asset value plus a sales charge or 'load.' The load is a varying percentage of the value of the shares sold, and fluctuates in accordance with the size of the purchase. In the case of Mrs. Bennett's shares, the maximum allowable sales load at the time of her death ranged between 7% and 8%, and the minimum was 1%.

Upon receipt of respondent's return, the Commissioner, acting in accordance with Treas.Reg. s 20.2031-8(b),[*] assessed a deficiency, contending that the value of **\*559** Mrs. Bennett's shares for federal estate tax purposes was their public offering price on the date of her death, that is, the price which a member of the public would have had to pay to acquire similar shares from the issuer. This price would, of course, encompass not only the net asset value of the shares, but also the applicable sales load. Such a method of valuation for mutual fund shares is expressly prescribed by the Treasury Regulation noted above. Thus, the sole question before us is whether that Regulation constitutes a reasonable exercise by the Commissioner of his statutory power to prescribe 'all needful rules' for the proper enforcement of the tax laws, see 26 U.S.C. s 7805, or whether the Regulation is **\*\*1721** so inherently unreasonable and inconsistent with the statute as to be invalid. United States v. Correll, 389 U.S. 299, 88 S.Ct. 445, 19 L.Ed.2d 537; Bingler v. Johnson, 394 U.S. 741, 89 S.Ct. 1439, 22 L.Ed.2d 695. Upon the facts presented by this case, I cannot say that the Commissioner's Regulation is invalid, and I therefore dissent from the decision of the Court.

At the outset, it may be well to note the basic general rule with respect to valuation that prevails under our estate tax laws. This rule is embodied in Treas.Reg. s 20.2031-1(b), and provides that the value of property includable in a decedent's estate shall be the fair market value of such property at the date of the decedent's death. 'The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.' 26 CFR s 20-2031-1(b).

The difficulty in applying this rule to mutual fund shares- a difficulty which, no doubt, led the Commissioner to promulgate Regulation s 20.2031-8(b)-is that such shares once issued are not subject to disposition in a market of 'willing buyers' and 'willing sellers.' Indeed, as both the District Court and the Court of Appeals **\*560** noted, the only practical means of disposing of mutual fund shares once acquired is redemption, and redemption cannot be deemed a sale of the sort described in the general rule (26 CFR s 20.2031-1(b)), since the party purchasing (the issuing company) is under an absolute obligation to redeem the shares when tendered, and the party selling has no practical alternative, if he wishes to liquidate his holdings, other than to offer them to the issuing company for redemption.

This being the case, the Commissioner was faced with the problem of establishing a method of valuing the shares most nearly equal to their inherent worth. In doing so, he chose not to treat their redemption value as dispositive of this question. In promulgating his Regulation, he might rationally have considered that 'on demand' redemption at net asset value is but one of many rights incident to the ownership of mutual fund shares.

For example, in the case of Mrs. Bennett's shares, her estate had not only the right to redeem them 'on demand,' but also to retain them; and if it had done so it would have possessed not only the normal dividend and capital gains rights associated with most investments, but also the right to have such dividends and capital gains as accrued applied toward the purchase of additional shares at a price below that which a member of the general public would have had to pay for such shares. In addition, under the investment contracts involved here, Mrs. Bennett's estate would have had the right to exchange her shares in any one of the three mutual funds involved for those of either or both of the other funds managed by Investors Diversified Services, Inc.-without paying the usual sales charge or load.

The Commissioner has determined that the proper method of valuing all the rights, both redemptive and otherwise, incident to the ownership of mutual fund shares is to determine what a member of the general public, *561 acting under no constraints, would have had to pay for these rights if purchased on the open market. And, as noted earlier, although no such market exists for mutual fund shares once issued to an investor, a perfectly normal market of willing buyers and sellers does exist with respect to such shares prior to their issuance. Thus, the Commissioner took the price at which the shares would have sold on this market as fairly reflective of their inherent worth. I cannot say that this method of valuation adopted by the Commissioner, and embodied in Regulation s 20.2031-8(b), is so unreasonable and inconsistent with the statute as to render it invalid.

**1722 The respondent's claim that the regulation is invalid is grounded upon two principal arguments. First, he says, the estate is being taxed on an amount in excess of what it can, as a practical matter, realize from the disposition of the mutual fund shares. But this is equally true of many other assets subject to taxation under our estate tax laws. For example, real property passing into an estate is taxed upon its full fair market value, despite the fact that as a practical matter the estate must usually pay some percentage of that sum in brokerage fees if it wishes to dispose of the property and receive cash in its stead. This attack upon the Regulation thus amounts to no less than an attack upon the whole system of valuation embodied in the Treasury Regulations on Estate Tax, based as it is upon fair value in an open market. I am not ready to hold that this long-established and long-accepted system is basically invalid.

The respondent's second argument is that the Regulation places a higher valuation on mutual fund shares than is placed upon registered common stock shares and other similarly traded securities. This argument assumes that the redemption or net asset value of a mutual fund share is identical to the fair market value of a traded security, and, by a parity of reasoning, that the sales *562 charge or load associated with mutual fund purchases is equivalent to the commission that a stockbroker charges a purchaser of securities. Under this view, the Commissioner would be entitled to tax mutual fund shares passing into an estate only on their net asset value, since in the allegedly comparable situation of common stock shares no consideration may be given to brokers' commissions in arriving at an appropriate valuation for estate tax purposes. See 26 CFR s 20.2031-2(b).

Although this argument has a certain superficial appeal, the analogy on which it relies is hardly an exact one. For an estate in disposing of marketable securities must pay a brokerage commission on their sale, and will thus realize less than the amount at which the securities have been valued, while an estate turning in mutual fund shares for redemption pays no commission or other surcharge whatever. Moreover, unlike traditional securities, there is no open trading market for mutual fund shares once issued and in the hands of an investor. If such a market of willing buyers and sellers did exist, the Commissioner would doubtless be bound to treat mutual fund shares exactly like other securities. But where no market for an asset exists, there simply is no market price to provide a readily identifiable standard for valuation. Under these circumstances, it is the Commissioner's duty under the statute to establish criteria for determining the true worth of the totality of rights and benefits incident to ownership of the asset. This the Commission has done in Regulation s 20.2031-8(b) by providing that the value of a mutual fund share for federal estate tax purposes shall be the price a member of the general public would have to pay to acquire such share. Such an approach to the valuation of assets not regularly traded in a market of willing buyers and sellers has already been sustained by this Court in a case closely akin

93 S.Ct. 1713, 36 L.Ed.2d 528, 31 A.F.T.R.2d 73-1461, 73-1 USTC P 12,926...

to the case before us. See Guggenheim v. Rasquin, 312 U.S. 254, 61 S.Ct. 507, 85 L.Ed. 813.

*563 Given the peculiar characteristics of mutual fund shares, it is arguable that the Commissioner might reasonably have adopted a method of valuation different from that which he has chosen. But that is a question that is not for us to decide. '(We) do not sit as a committee of revision to perfect the administration of the tax laws. Congress has delegated to the Commissioner, not to the courts, the task of prescribing 'all needful rules and regulations for the enforcement' of the Internal Revenue Code. 26 U.S.C. s 7805(a). In this area of limitless factual variations, 'it is the province of Congress and

the Commissioner, not the courts, to make the appropriate adjustments.'' **1723 United States v. Correll, 389 U.S., at 306-307, 88 S.Ct., at 449. See Bingler v. Johnson, 394 U.S., at 750, 89 S.Ct., at 1445.

I would reverse the judgment of the Court of Appeals and sustain the validity of the Regulation.

**Parallel Citations**

93 S.Ct. 1713, 36 L.Ed.2d 528, 31 A.F.T.R.2d 73-1461, 73-1 USTC P 12,926, 1973-1 C.B. 400

Footnotes

*   The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1   The decedent owned 2,568.422 shares of Investors Mutual, Inc., in her own name, and 2,067.531 shares as trustee for her daughter. The decedent also owned 2,269.376 shares of Investors Stock Fund, Inc., and 1,869.159 shares of Investors Selective Fund, Inc.
    For thorough discussions of the operations of open-end investment companies, see SEC Report on Public Policy Implications of Investment Company Growth, H.R.Rep.No.2337, 89th Cong., 2d Sess. (1966) (hereinafter 1966 SEC Report); SEC Report of Special Study of Securities Markets, c. XI, Open-End Investment Companies (Mutual Funds), H.R.Doc.No. 95, pt. 4, 88th Cong., 1st Sess. (1963) (hereinafter 1963 Special Study).

2   A number of mutual funds are so-called 'no-load funds'; in such cases the bid and asked prices are the same. See 1966 SEC Report 58-59. The underwriter for all three funds involved in this case is Investors Diversified Services, Inc. (IDS), which is not itself an open-end investment company. IDS also serves as the investment manager of the funds, for which it receives separate management fees. See 15 U.S.C. s 80a-15.

3   The 1963 Special Study 96-97 explained the trading in mutual fund shares as follows:
    'Mutual fund shares are not traded on exchanges or generally in the over-the-counter market, as are other securities, but are sold by the fund through a principal underwriter, and redeemed by the fund, at prices which are related to 'net asset value.' The net asset value per share is normally computed twice daily by taking the market value at the time of all portfolio securities, adding the value of other assets and subtracting liabilities, and dividing the result by the number of shares outstanding. Shares of most funds are sold for a price equal to their asset value plus a sales charge or commission, commonly referred to as the 'sales load,' and usually ranging from 7.5 to 8.5 percent of the amount paid, or 8.1 to 9.3 percent of the amount invested. A few funds, however, known as 'no-load' funds, offer their shares for sale at net asset value without a sales charge. Shares of most funds are redeemed or repurchased by the funds at their net asset value, although a few funds charge a small redemption fee. The result of this pricing system, it is apparent, is that the entire cost of selling fund shares is generally borne exclusively by the purchaser of new shares and not by the fund itself. In this respect the offering of mutual fund shares differs from, say, the offering of new shares by a closed-end investment company or an additional offering 'at the market' of shares of an exchange-listed security, where at least a portion of the selling cost is borne by the company selling the shares.' (Footnote omitted.)

4   See Estate of Wells v. Commissioner, 50 T.C. 871, 873 (1968), aff'd sub nom. Ruehlmann v. Commissioner, 418 F.2d 1302 (CA6 1969), cert. denied, 398 U.S. 950, 90 S.Ct. 1869, 26 L.Ed.2d 290 (1970); 1966 SEC Report 42; and 1963 Special Study 96.

5   The regulation reads, in part, as follows:
    '(b) Valuation of shares in an opened investment company. (1) The fair market value of a share in an open-end investment company (commonly known as a 'mutual fund') is the public offering price of a share, adjusted for any reduction in price available to the public in acquiring the number of shares being valued. In the absence of an affirmative showing of the public offering price in effect at the time of death, the last public offering price quoted by the company for the date of death shall be presumed to be the applicable public offering price. . . .
    '(2) The provisions of this paragraph shall apply with respect to estates of decedents dying after October 10, 1963.'

This regulation was promulgated in 1963, T.D. 6680, 28 Fed.Reg. 10872, after some years of confusion within the Treasury Department and between that Department and the Department of Justice. See the District Court's opinion, 323 F.Supp. 769, 777. A corresponding regulation was adopted for gift tax purposes. Treas.Reg. s 25.2512-6(b).

6    In Estate of Wells v. Commissioner, supra, the Tax Court sustained the regulation, with six judges dissenting. That decision was affirmed by the Sixth Circuit in Ruehlmann v. Commissioner, 418 F.2d 1302 (1966), cert. denied, 398 U.S. 950, 90 S.Ct. 1869, 26 L.Ed.2d 290 (1970). The companion gift tax regulation was upheld in Howell v. United States, 414 F.2d 45 (CA7 1969). Regulation s 20.2031-8(b) was held invalid in Davis v. United States, 460 F.2d 769 (CA9 1972), aff'g 306 F.Supp. 949 (CDCal.1969). See also Hicks v. United States, 335 F.Supp. 474 (Colo.1971), appeal pending in the Tenth Circuit, No. 72-1360.

7    See Treas.Reg. 63 Relating to Estate Tax Under the Revenue Act of 1921, Art. 13 (1922 ed.) ('The criterion of such value is the price which a willing buyer will pay to a willing seller for the property in question under the circumstances existing at the date of the decedent's death . . .'); Treas.Reg. 105 Relating to the Estate Tax Under the Internal Revenue Code (of 1939), s 81.10 (1942).

8    Whatever the situations may be where it is realistic and appropriate under Treas.Reg. s 20.2031-1(b) to use a standardized retail price to measure value for estate tax purposes, it is sufficient to note here that for the reasons given, the valuation of mutual fund shares does not present one of those situations.

9    The Government argues that, as a practical matter, an estate would rarely be hurt by valuation of mutual fund shares at the asked price, because Treas.Reg. s 20.2053-3(d)(2) permits an estate to deduct the difference between the asked and bid prices if the shares are sold to pay certain enumerated expenses. By its terms, however, that regulation applies only if 'the sale is necessary' to pay those expenses. (Emphasis added.) In any event, the regulation is inapplicable altogether if the shares are transferred in kind to an heir or legatee.

10    It is coincidence that the contested regulation was placed in Treas.Reg. s 20.2031-8, which deals with '(v)aluation of certain life insurance and annuity contracts . . . .' But we agree with Judge Winner:

'The Commissioner cannot cross-breed life insurance and investment trust shares by the simple expedient of discussing them in separate paragraphs of a single regulation.' Hicks v. United States, 335 F.Supp., at 482.

11    See 1966 SEC Report 51-59.

*    The text of the regulation, insofar as relevant here, reads as follows: 'The fair market value of a share in an open-end investment company (commonly known as a 'mutual fund') is the public offering price of a share, adjusted for any reduction in price available to the public in acquiring the number of shares being valued. . . .' There is a companion Gift Tax Regulation of identical import. See 26 CFR s 25.2512-6(b).

---

**End of Document**        © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 90

U.S. v. Cartwright, 411 U.S. 546 (1973)

93 S.Ct. 1713, 36 L.Ed.2d 528, 31 A.F.T.R.2d 73-1461, 73-1 USTC P 12,926...

93 S.Ct. 1713
Supreme Court of the United States

UNITED STATES, Petitioner,

v.

Douglas B. CARTWRIGHT, as Executor
of the Estate of Ethel B. Bennett.

No. 71-1665.  |  Argued Jan.
16, 1973.  |  Decided May 7, 1973.

Federal estate tax refund action. The United States District Court, for the Western District of New York, 323 F.Supp. 769, held applicable Treasury regulation invalid and appeal was taken. The Court of Appeals, 457 F.2d 567, affirmed, and the Government's petition for certiorari was granted. The Supreme Court, Mr. Justice White, held that where, under statutory scheme created by Investment Company Act, initial purchases by the public of shares of open-end mutual fund with a sales load are made from the fund at the 'asked' price which includes the load but shareholders sell their shares back to the fund at statutorily defined redemption or 'bid' price set by the Act at approximately the fractional value per share of fund's net assets at time of redemption, Treasury regulation that such shares are to be valued for federal estate tax purposes at their public offering price or 'asked' price at date of death was inconsistent with provisions of Investment Company Act, imposed an unreasonable and unrealistic measure of value and was invalid.

Judgment of Court of Appeals affirmed.

Mr. Justice Stewart, with whom The Chief Justice and Mr. Justice Rehnquist joined, filed dissenting opinion.

West Headnotes (2)

[1]      **Internal Revenue**
&#8258; Making, Requisites and Validity
Regulations promulgated under authority of Secretary of the Treasury, if found to implement congressional mandate in some reasonable manner, must be upheld. 26 U.S.C.A. (I.R.C.1954) § 7805(a).

100 Cases that cite this headnote

[2]      **Internal Revenue**
&#8258; Rules and Regulations
Where, under statutory scheme created by Investment Company Act, initial purchases by the public of shares of open-end mutual fund with a sales load are made from the fund at the "asked" price which includes the load but shareholders sell their shares back to the fund at statutorily defined redemption or "bid" price set by the Act at approximately the fractional value per share of fund's net assets at time of redemption, Treasury regulation that such shares are to be valued for federal estate tax purposes at their public offering price or "asked" price at date of death was inconsistent with provisions of Investment Company Act, imposed an unreasonable and unrealistic measure of value and was invalid. 26 U.S.C.A. (I.R.C.1954) §§ 2031, 7805(a); Investment Company Act of 1940, §§ 1 et seq., 2(a)(32, 35), 15, 22(e) as amended 15 U.S.C.A. §§ 80a-1 et seq., 80a-2(a)(32, 35), 80a-15, 80a-22(e).

417 Cases that cite this headnote

**1714  *546 Syllabus[*]

Shares in mutual funds can be 'sold' by the shareholder only back to the fund and only at a set redemption price. Treas.Reg. s 20.2031-8(b), requiring that such shares be valued for federal estate tax purposes at the current public offering ('asked') price, which is determined by adding a load or sales charge to the net asset value, is clearly inconsistent with the Investment Company Act of 1940, and is therefore invalid. Pp. 1716-1720.

2 Cir., 457 F.2d 567, affirmed.

**Attorneys and Law Firms**

Sol. Gen. Erwin N. Griswold for petitioner.

Ralph J. Gregg, Buffalo, N.Y., for respondent.

U.S. v. Cartwright, 411 U.S. 546 (1973)

93 S.Ct. 1713, 36 L.Ed.2d 528, 31 A.F.T.R.2d 73-1461, 73-1 USTC P 12,926...

**Opinion**

Mr. Justice WHITE delivered the opinion of the Court.

The Internal Revenue Code of 1954 requires that, for estate tax purposes, the 'value' of all property held by a decedent at the time of death be included in the gross estate. 26 U.S.C. s 2031. By regulation, the Secretary of the Treasury has determined that shares in open-end investment companies, or mutual funds, are to be valued at their public offering price or 'asked' price at the date **\*547** of death. Treas.Reg. on Estate Tax s 20.2031-8(b) (1963). The question this case presents is whether that determination is reasonable in the context of the market for mutual fund shares.

At the time of her death in 1964, Ethel B. Bennett owned approximately 8,700 shares of three mutual funds that are regulated by the Investment Company Act of 1940, 54 Stat. 789, as amended, 15 U.S.C. s 80a-1 et seq.[1] The 1940 Act **\*\*1715** seeks generally to regulate publicly held companies that are engaged in investing in securities. Open-end investment companies, or mutual funds, 'dominate' this industry. 1966 SEC Report 43. Unquestionably, the unique characteristic of mutual funds is that they are permitted, under the Act, to market their shares continuously to the public, but are required to be prepared to redeem outstanding shares at any time. s 80a-22(e). The redemption 'bid' price that a shareholder may receive is set by the Act at approximately the fractional value per share of the fund's net assets at the time of redemption. s 80a-2(a)(32). In contrast, the 'asked' price, or the price at which the fund initially offers its shares to the public, includes not only the net asset value per share at the time of sale, but also a fixed sales charge or 'sales load' assessed by the fund's principal underwriter who acts as an agent in marketing the fund's shares. **\*548** s 80a-2(a) (35).[2] Sales loads vary within fixed limits from mutual fund to mutual fund, but all are paid to the funds' underwriters; the charges do not become part of the assets of the fund.[3] The sales loads of the funds held by the decedent ranged from seven and eight percent to one percent of the fractional net asset value of the funds' shares.

**\*549** Private trading in mutual fund shares is virtually nonexistent.[4] Thus, at any given time, under the statutory scheme created by the Investment Company Act, shares of any open-end mutual fund with a sales load are being sold at two distinct prices. Initial purchases by the public are made from the fund, at the 'asked' price, which includes the load.

But shareholders 'sell' their shares **\*\*1716** back to the fund at the statutorily defined redemption or bid price.

Respondent is the executor of the decedent's estate. On the federal estate tax return, he reported the value of the mutual fund shares held by the decedent at their redemption price, which amounted to about $124,400. The Commissioner assessed a deficiency based upon his valuation of the shares at their public offering or asked price, pursuant to Treas.Reg. s 20.2031-8(b).[5] Valued **\*550** on that basis, the shares were worth approximately $133,300. Respondent paid the deficiency of about $3,100, including interest, filed a timely claim for a refund, and, when that claim was denied, commenced a refund action in Federal District Court on the ground that the valuation based on s 20.2031-8(b) was unreasonable. The District Court agreed with respondent and held the Regulation invalid. 323 F.Supp. 769. The Court of Appeals affirmed. 2 Cir., 457 F.2d 567. We granted the Government's petition for certiorari, 409 U.S. 840, 93 S.Ct. 61, 34 L.Ed.2d 79, because of the conflict among the circuits.[6]

[1] We recognize that this Court is not in the business of administering the tax laws of the Nation. Congress has delegated that task to the Secretary of the Treasury, 26 U.S.C. s 7805(a), and regulations promulgated under his authority, if found to 'implement the congressional mandate in some reasonable manner,' must be upheld. United States v. Correll, 389 U.S. 299, 307, 88 S.Ct. 445, 449, 19 L.Ed.2d 537 (1967). See Bingler v. Johnson, 394 U.S. 741, 749-751, 89 S.Ct. 1439, 1444, 22 L.Ed.2d 695 (1969); Commissioner v. South Texas Lumber Co., 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831 (1948). But that principle is to set the framework for judicial analysis; it does not displace it. We find that the contested regulation is unrealistic and unreasonable, and therefore affirm the judgment of the Court of Appeals.

In implementing 26 U.S.C. s 2031, the general principle of the Treasury Regulations is that the value of **\*551** property is to be determined by its fair market value at the time of the decedent's death. 'The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.' Treas.Reg. s 20.2031-1(b). The willing buyer-willing seller test of fair market value is nearly as old as the federal income, estate, and gifts taxes themselves, **\*\*1717** and is not challenged here.[7] Under this test, is is clear that if the decedent had owned ordinary corporate

U.S. v. Cartwright, 411 U.S. 546 (1973)

93 S.Ct. 1713, 36 L.Ed.2d 528, 31 A.F.T.R.2d 73-1461, 73-1 USTC P 12,926...

stock listed on an exchange, its 'value' for estate tax purposes would be the price the estate could have obtained if it had sold the stock on the valuation date, that price being, under Treas. Reg. s 20.2031-2(b), the mean between the highest and lowest quoted selling prices on that day. Respondent urges that similar treatment be given mutual fund shares and that, accordingly, their value be measured by the redemption price at the date of death, the only price that the estate could hope to obtain if the shares had been sold.

Respondent's argument has the clear ring of common sense to it, but the United States maintains that the redemption price does not reflect the price that a willing buyer would pay, inasmuch as the mutual fund is under a statutory obligation to redeem outstanding shares whenever they are offered. According to the Government, the only market for mutual fund shares that has both willing buyers and willing sellers is the public offering market. Therefore, the price in that market, the asked **552 price, is an appropriate basis for valuation. The central difficulty with this argument is that it unrealistically bifurcates the statutory scheme for the trading in mutual fund shares. To be sure, the fund is under an obligation to redeem its shares at the stated price. 15 U.S.C. s 80a-22(e). But, at the time of the original purchases, both the fund and the purchasers are aware of that duty and both willingly enter into the sale transactions nonetheless. As Judge Winner correctly observed in Hicks v. United States, 335 F.Supp. 474, 481 (Colo.1971):

> 'Viewing the contract in this light meets every test of the 'willing buyer-willing seller' definition usually applied in the determination of market value. The 'willing buyer' is the fully informed person who agrees to buy the shares, agreeing at that time to sell them to the fund-the only available repurchaser-at the redemption price. The 'willing seller' is the fund which sells the shares at market value plus a load charge, and which agrees to buy the shares back at market less the load charge. That is the market, and it is the only market. It is a market made up of informed buyers and an informed seller, all dealing at arm's length.'

In the context of the Investment Company Act, the redemption price may thus be properly viewed only as the final step in a voluntary transaction between a willing buyer and a willing seller. As a matter of statutory law, holders of mutual fund shares cannot obtain the 'asked' price from the fund. That price is never paid by the fund; it is used by the fund when selling its shares to the public-and even then the fund receives merely the net asset value per share from the sale, with the sales load being paid directly to the underwriter. In short, the only price that a shareholder may realize and that the fund-the only buyer-will pay is the redemption **553 price. In the teeth of this fact, Regulation s 20.2031-8(b) purports to assign a value to mutual fund shares that the estate could not hope to obtain and that the fund could not offer.

In support of the Regulation, the Government stresses that many types of property are taxed at values above those which could be realized during an actual sale. For example, ordinary corporate stock is valued at its fair market price without taking into account the brokerage commission that a seller must generally pay in order to sell the stock. Respondent does not contend that that approach is inappropriate or that, for example, **1718 the value of ordinary stock in an estate should be the market price at the time less anticipated brokerage fees. But s 20.2031-8(b) operates in an entirely different fashion. The regulation includes as an element of value the commission cost incurred in the hypothetical purchase of the mutual fund shares already held in the decedent's estate. If that principle were carried over to the ordinary stock situation, then a share traded at $100 on the date of death would be valued, not at $100 as it now is, but at, say, $102, representing the 'value' plus the fee that a person buying the stock on that day would have to pay. It hardly need be said that such a valuation method is at least inconsistent with long-established Treasury practice and would appear at odds with the basic notions of valuation embodied in the Internal Revenue Code. [8] See Estate of Wells v. Commissioner, 50 T.C. 871, 880 (1968) (Tannenwald, J., dissenting).

Even if it were assumed that the public offering price were somehow relevant to the value of mutual fund shares **554 privately held, there would still be the difficulty that shares so held are, in important respects, similar to ordinary corporate stock held subject to a restrictive agreement (such as a first-refusal right at a specified price). With respect to the value of such stock, the Treasury Regulations have provided that the price that may be obtained in the marketplace does not control. Rather, so long as the restriction is a bona fide one, the value of the shares in the hands of the restricted stockholder is determined in accordance with the terms of the

U.S. v. Cartwright, 411 U.S. 546 (1973)

93 S.Ct. 1713, 36 L.Ed.2d 528, 31 A.F.T.R.2d 73-1461, 73-1 USTC P 12,926...

restriction. Treas.Reg. s 20.2031-2(h). Outstanding mutual funds share are likewise held subject to a restriction, as the Court of Appeals noted. 457 F.2d at 571. Those shares may not be 'sold' at the public offering price. By statute, they may be 'sold' back to the mutual fund only at the redemption price. We see no valid justification for disregarding this reality connected with the ownership of mutual fund shares.

The Government nevertheless argues that Treas.Reg. s 20.2031-8(b) reasonably values the 'bundle of rights' that is transferred with the ownership of the mutual fund shares. [9] For this argument, heavy reliance is placed on this Court's decisions in Guggenheim v. Rasquin, 312 U.S. 254, 61 S.Ct. 507, 85 L.Ed. 813 (1941); Powers v. Commissioner, 312 U.S. 259, 61 S.Ct. 509, 85 L.Ed. 817 (1941); United States v. Ryerson, 312 U.S. 260, 61 S.Ct. 479, 85 L.Ed. 819 (1941), which held that the cash-surrender value of a single-premium life insurance policy did not necessarily represent its only taxable value for federal gift tax purposes. *555 [10] In Guggenheim, the lead case, the taxpayer purchased single-premium life insurance policies with an aggregate face value of one million dollars for approximately $852,000 and, shortly thereafter, gave the policies to her children. On the gift tax return, the policies were listed at their cash-surrender **1719 value of about $717,000-admittedly the only amount the donor or the donees could receive, if the policies were surrendered. But the Commissioner valued the gift at the cost of the policies, and this Court upheld that valuation: 'the owner of a fully paid life insurance policy has more than the mere right to surrender it; he has the right to retain it for its investment virtues and to receive the face amount of the policy upon the insured's death. That these latter rights are deemed by purchasers of insurance to have substantial value is clear from the difference between the cost of a single-premium policy and its immediate or early cash-surrender value . . . .' 312 U.S., at 257, 61 S.Ct. at 509. Because the 'entire bundle of rights in a single-premium policy' is so difficult to give a realistic value to, the Court deferred to the Commissioner's determination and permitted valuation to be based on cost: 'Cost is cogent evidence of value.' Id., at 258, 61 S.Ct. at 509. But as the District Court observed, 323 F.Supp., at 773, shares in mutual funds are quite unlike insurance policies, particularly in light of the policyowner's right to receive the full face value of the policy upon the insured's death. Moreover, mutual fund shares present no analogous difficulties in *556 valuation. On any given day, their commercial value may be determined by turning to the financial pages of a newspaper. Obviously, with respect to mutual funds, there are 'investment virtues' and the

prospects of capital gains or dividends. But that is true of any corporate security. Nonetheless, shareholders in mutual funds are singled out by the Regulation and their holdings valued at an unrealistic replacement cost-which includes 'brokers' commissions'-while other shareholdings are valued without regard to such commissions.

The unrealistic nature of this difference in treatment may be demonstrated by comparing the treatment of shares in load funds, such as the decedent's with shares in no-load funds. Obviously, even if it could be argued that there are relevant differences between mutual fund shares generally and corporate stock, there are no differences in terms of 'investment virtues' or related interests between no-load and load fund shares. Indeed, as the terms imply, the only real distinction between the two is that one imposes an initial sales charge and the other does not. [11] Nonetheless, under the Regulation, a share in a noload fund is valued at its net asset value while a share in a load fund is valued at net asset value plus sales charge. To further illustrate, consider a decedent who had purchased one share in each of two no-load mutual funds, at $100 per share. The decedent died before either appreciated, but after one of the funds had changed to a load fund. Although both shares are still worth $100, and could be redeemed for only that amount, the Regulation would require that one be valued at $100 and the other at $100 plus the new load charge. A regulation that results in such differing treatment of identical property should be supported by something more than a transparent analogy to life insurance.

*557 [2]    We recognize that normally 'Treasury regulations must be sustained unless unreasonable and plainly inconsistent with the revenue statutes.' Commissioner v. South Texas Lumber Co., 333 U.S., at 501, 68 S.Ct., at 698. But even if the Regulation contested here is not, on its face, technically inconsistent with s 2031 of the Internal Revenue Code, it is manifestly inconsistent with the most elementary provisions of the Investment Company Act of 1940 and operates without regard for the market in mutual fund shares that the Act created and regulates. Cf. L. E. Shunk Latex Products, Inc. v. Commissioner, 18 T.C. 940 (1952). Congress surely could not have intended s 2031 to be interpreted in such a manner. The Regulation also imposes **1720 an unreasonable and unrealistic measure of value. We agree with Judge Tannenwald, who stated at the very outset of the dispute over Regulation s 20.2031-8(b), that 'it does not follow that, because (the Commissioner) has a choice of alternatives, his choice should be sustained where

U.S. v. Cartwright, 411 U.S. 546 (1973)

93 S.Ct. 1713, 36 L.Ed.2d 528, 31 A.F.T.R.2d 73-1461, 73-1 USTC P 12,926...

the alternative chosen is unrealistic. In such a situation the regulations embodying that choice should be held to be unreasonable.' Estate of Wells v. Commissioner, 50 T.C., at 878 (dissenting opinion).

The judgment of the Court of Appeals is affirmed.

It is so ordered.

Judgment affirmed.


Mr. Justice STEWART, with whom THE CHIEF JUSTICE and Mr. Justice REHNQUIST join, dissenting.

This case presents a narrow issue of law regarding the valuation of certain assets-shares in an open-end investment company or 'mutual fund'-for purposes of the federal estate tax. The case turns upon a single question of law: whether or not s 20.2031-8(b) of the Treasury Regulations, which provides a specific method for valuing such shares, represents a reasonable implementation of the legislation enacted by Congress.


*558 On December 4, 1964, Mrs. Ethel Bennett died testate leaving, among other property several thousand shares in three separate mutual funds. Each of the funds in question is managed by a firm known as Investors Diversified Services, Inc., and all are subject to regulation by the Securities and Exchange Commission under the Investment Company Act of 1940. In his tax return for the estate, the respondent, Mrs. Bennett's executor, valued these shares at their so-called 'net asset value,' that is, the amount at which the estate is entitled, as a matter of law, to have the shares redeemed by the issuer. The net asset value of a mutual fund share is calculated daily by the issuing company, and is equivalent to the fractional value per share of the fund's total net assets on that day. In addition to serving as a gauge for the redemption value of fund shares already issued, net asset value is also employed by the issuing companies in determining the price at which they will offer new shares in the fund to the public on any given day. In general, such shares are sold to the public at their net asset value plus a sales charge or 'load.' The load is a varying percentage of the value of the shares sold, and fluctuates in accordance with the size of the purchase. In the case of Mrs. Bennett's shares, the maximum allowable sales load at the time of her death ranged between 7% and 8%, and the minimum was 1%.

Upon receipt of respondent's return, the Commissioner, acting in accordance with Treas.Reg. s 20.2031-8(b), [*] assessed a deficiency, contending that the value of *559 Mrs. Bennett's shares for federal estate tax purposes was their public offering price on the date of her death, that is, the price which a member of the public would have had to pay to acquire similar shares from the issuer. This price would, of course, encompass not only the net asset value of the shares, but also the applicable sales load. Such a method of valuation for mutual fund shares is expressly prescribed by the Treasury Regulation noted above. Thus, the sole question before us is whether that Regulation constitutes a reasonable exercise by the Commissioner of his statutory power to prescribe 'all needful rules' for the proper enforcement of the tax laws, see 26 U.S.C. s 7805, or whether the Regulation is **1721 so inherently unreasonable and inconsistent with the statute as to be invalid. United States v. Correll, 389 U.S. 299, 88 S.Ct. 445, 19 L.Ed.2d 537; Bingler v. Johnson, 394 U.S. 741, 89 S.Ct. 1439, 22 L.Ed.2d 695. Upon the facts presented by this case, I cannot say that the Commissioner's Regulation is invalid, and I therefore dissent from the decision of the Court.

At the outset, it may be well to note the basic general rule with respect to valuation that prevails under our estate tax laws. This rule is embodied in Treas.Reg. s 20.2031-1(b), and provides that the value of property includable in a decedent's estate shall be the fair market value of such property at the date of the decedent's death. 'The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.' 26 CFR s 20-2031-1(b).

The difficulty in applying this rule to mutual fund shares-a difficulty which, no doubt, led the Commissioner to promulgate Regulation s 20.2031-8(b)-is that such shares once issued are not subject to disposition in a market of 'willing buyers' and 'willing sellers.' Indeed, as both the District Court and the Court of Appeals *560 noted, the only practical means of disposing of mutual fund shares once acquired is redemption, and redemption cannot be deemed a sale of the sort described in the general rule (26 CFR s 20.2031-1(b)), since the party purchasing (the issuing company) is under an absolute obligation to redeem the shares when tendered, and the party selling has no practical alternative, if he wishes to liquidate his holdings, other than to offer them to the issuing company for redemption.

U.S. v. Cartwright, 411 U.S. 546 (1973)

93 S.Ct. 1713, 36 L.Ed.2d 528, 31 A.F.T.R.2d 73-1461, 73-1 USTC P 12,926...

This being the case, the Commissioner was faced with the problem of establishing a method of valuing the shares most nearly equal to their inherent worth. In doing so, he chose not to treat their redemption value as dispositive of this question. In promulgating his Regulation, he might rationally have considered that 'on demand' redemption at net asset value is but one of many rights incident to the ownership of mutual fund shares.

For example, in the case of Mrs. Bennett's shares, her estate had not only the right to redeem them 'on demand,' but also to retain them; and if it had done so it would have possessed not only the normal dividend and capital gains rights associated with most investments, but also the right to have such dividends and capital gains as accrued applied toward the purchase of additional shares at a price below that which a member of the general public would have had to pay for such shares. In addition, under the investment contracts involved here, Mrs. Bennett's estate would have had the right to exchange her shares in any one of the three mutual funds involved for those of either or both of the other funds managed by Investors Diversified Services, Inc.-without paying the usual sales charge or load.

The Commissioner has determined that the proper method of valuing all the rights, both redemptive and otherwise, incident to the ownership of mutual fund shares is to determine what a member of the general public, *561 acting under no constraints, would have had to pay for these rights if purchased on the open market. And, as noted earlier, although no such market exists for mutual fund shares once issued to an investor, a perfectly normal market of willing buyers and sellers does exist with respect to such shares prior to their issuance. Thus, the Commissioner took the price at which the shares would have sold on this market as fairly reflective of their inherent worth. I cannot say that this method of valuation adopted by the Commissioner, and embodied in Regulation s 20.2031-8(b), is so unreasonable and inconsistent with the statute as to render it invalid.

**1722 The respondent's claim that the regulation is invalid is grounded upon two principal arguments. First, he says, the estate is being taxed on an amount in excess of what it can, as a practical matter, realize from the disposition of the mutual fund shares. But this is equally true of many other assets subject to taxation under our estate tax laws. For example, real property passing into an estate is taxed upon its full fair market value, despite the fact that as a practical matter the estate must usually pay some percentage of that sum in brokerage fees if it wishes to dispose of the property and receive cash in its stead. This attack upon the Regulation thus amounts to no less than an attack upon the whole system of valuation embodied in Treasury Regulations on Estate Tax, based as it is upon fair value in an open market. I am not ready to hold that this long-established and long-accepted system is basically invalid.

The respondent's second argument is that the Regulation places a higher valuation on mutual fund shares than is placed upon registered common stock shares and other similarly traded securities. This argument assumes that the redemption or net asset value of a mutual fund share is identical to the fair market value of a traded security, and, by a parity of reasoning, that the sales *562 charge or load associated with mutual fund purchases is equivalent to the commission that a stockbroker charges a purchaser of securities. Under this view, the Commissioner would be entitled to tax mutual fund shares passing into an estate only on their net asset value, since in the allegedly comparable situation of common stock shares no consideration may be given to brokers' commissions in arriving at an appropriate valuation for estate tax purposes. See 26 CFR s 20.2031-2(b).

Although this argument has a certain superficial appeal, the analogy on which it relies is hardly an exact one. For an estate in disposing of marketable securities must pay a brokerage commission on their sale, and will thus realize less than the amount at which the securities have been valued, while an estate turning in mutual fund shares for redemption pays no commission or other surcharge whatever. Moreover, unlike traditional securities, there is no open trading market for mutual fund shares once issued and in the hands of an investor. If such a market of willing buyers and sellers did exist, the Commissioner would doubtless be bound to treat mutual fund shares exactly like other securities. But where no market for an asset exists, there simply is no market price to provide a readily identifiable standard for valuation. Under these circumstances, it is the Commissioner's duty under the statute to establish criteria for determining the true worth of the totality of rights and benefits incident to ownership of the asset. This the Commission has done in Regulation s 20.2031-8(b) by providing that the value of a mutual fund share for federal estate tax purposes shall be the price a member of the general public would have to pay to acquire such share. Such an approach to the valuation of assets not regularly traded in a market of willing buyers and sellers has already been sustained by this Court in a case closely akin

**U.S. v. Cartwright, 411 U.S. 546 (1973)**

93 S.Ct. 1713, 36 L.Ed.2d 528, 31 A.F.T.R.2d 73-1461, 73-1 USTC P 12,926...

to the case before us. See Guggenheim v. Rasquin, 312 U.S. 254, 61 S.Ct. 507, 85 L.Ed. 813.

**\*563** Given the peculiar characteristics of mutual fund shares, it is arguable that the Commissioner might reasonably have adopted a method of valuation different from that which he has chosen. But that is a question that is not for us to decide. '(We) do not sit as a committee of revision to perfect the administration of the tax laws. Congress has delegated to the Commissioner, not to the courts, the task of prescribing 'all needful rules and regulations for the enforcement' of the Internal Revenue Code. 26 U.S.C. s 7805(a). In this area of limitless factual variations, 'it is the province of Congress and the Commissioner, not the courts, to make the appropriate adjustments.'' **\*\*1723** United States v. Correll, 389 U.S., at 306-307, 88 S.Ct., at 449. See Bingler v. Johnson, 394 U.S., at 750, 89 S.Ct., at 1445.

I would reverse the judgment of the Court of Appeals and sustain the validity of the Regulation.

**Parallel Citations**

93 S.Ct. 1713, 36 L.Ed.2d 528, 31 A.F.T.R.2d 73-1461, 73-1 USTC P 12,926, 1973-1 C.B. 400

Footnotes

\*   The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1   The decedent owned 2,568.422 shares of Investors Mutual, Inc., in her own name, and 2,067.531 shares as trustee for her daughter. The decedent also owned 2,269.376 shares of Investors Stock Fund, Inc., and 1,869.159 shares of Investors Selective Fund, Inc. For thorough discussions of the operations of open-end investment companies, see SEC Report on Public Policy Implications of Investment Company Growth, H.R.Rep.No.2337, 89th Cong., 2d Sess. (1966) (hereinafter 1966 SEC Report); SEC Report of Special Study of Securities Markets, c. XI, Open-End Investment Companies (Mutual Funds), H.R.Doc.No. 95, pt. 4, 88th Cong., 1st Sess. (1963) (hereinafter 1963 Special Study).

2   A number of mutual funds are so-called 'no-load funds'; in such cases the bid and asked prices are the same. See 1966 SEC Report 58-59. The underwriter for all three funds involved in this case is Investors Diversified Services, Inc. (IDS), which is not itself an open-end investment company. IDS also serves as the investment manager of the funds, for which it receives separate management fees. See 15 U.S.C. s 80a-15.

3   The 1963 Special Study 96-97 explained the trading in mutual fund shares as follows:
    'Mutual fund shares are not traded on exchanges or generally in the over-the-counter market, as are other securities, but are sold by the fund through a principal underwriter, and redeemed by the fund, at prices which are related to 'net asset value.' The net asset value per share is normally computed twice daily by taking the market value at the time of all portfolio securities, adding the value of other assets and subtracting liabilities, and dividing the result by the number of shares outstanding. Shares of most funds are sold for a price equal to their asset value plus a sales charge or commission, commonly referred to as the 'sales load,' and usually ranging from 7.5 to 8.5 percent of the amount paid, or 8.1 to 9.3 percent of the amount invested. A few funds, however, known as 'no-load' funds, offer their shares for sale at net asset value without a sales charge. Shares of most funds are redeemed or repurchased by the funds at their net asset value, although a few funds charge a small redemption fee. The result of this pricing system, it is apparent, is that the entire cost of selling fund shares is generally borne exclusively by the purchaser of new shares and not by the fund itself. In this respect the offering of mutual fund shares differs from, say, the offering of new shares by a closed-end investment company or an additional offering 'at the market' of shares of an exchange-listed security, where at least a portion of the selling cost is borne by the company selling the shares.' (Footnote omitted.)

4   See Estate of Wells v. Commissioner, 50 T.C. 871, 873 (1968), aff'd sub nom. Ruehlmann v. Commissioner, 418 F.2d 1302 (CA6 1969), cert. denied, 398 U.S. 950, 90 S.Ct. 1869, 26 L.Ed.2d 290 (1970); 1966 SEC Report 42; and 1963 Special Study 96.

5   The regulation reads, in part, as follows:
    '(b) Valuation of shares in an openend investment company. (1) The fair market value of a share in an open-end investment company (commonly known as a 'mutual fund') is the public offering price of a share, adjusted for any reduction in price available to the public in acquiring the number of shares being valued. In the absence of an affirmative showing of the public offering price in effect at the time of death, the last public offering price quoted by the company for the date of death shall be presumed to be the applicable public offering price. . . .
    '(2) The provisions of this paragraph shall apply with respect to estates of decedents dying after October 10, 1963.'

U.S. v. Cartwright, 411 U.S. 546 (1973)

93 S.Ct. 1713, 36 L.Ed.2d 528, 31 A.F.T.R.2d 73-1461, 73-1 USTC P 12,926...

This regulation was promulgated in 1963, T.D. 6680, 28 Fed.Reg. 10872, after some years of confusion within the Treasury Department and between that Department and the Department of Justice. See the District Court's opinion, 323 F.Supp. 769, 777. A corresponding regulation was adopted for gift tax purposes. Treas.Reg. s 25.2512-6(b).

6   In Estate of Wells v. Commissioner, supra, the Tax Court sustained the regulation, with six judges dissenting. That decision was affirmed by the Sixth Circuit in Ruehlmann v. Commissioner, 418 F.2d 1302 (1966), cert. denied, 398 U.S. 950, 90 S.Ct. 1869, 26 L.Ed.2d 290 (1970). The companion gift tax regulation was upheld in Howell v. United States, 414 F.2d 45 (CA7 1969). Regulation s 20.2031-8(b) was held invalid in Davis v. United States, 460 F.2d 769 (CA9 1972), aff'g 306 F.Supp. 949 (CDCal.1969). See also Hicks v. United States, 335 F.Supp. 474 (Colo.1971), appeal pending in the Tenth Circuit, No. 72-1360.

7   See Treas.Reg. 63 Relating to Estate Tax Under the Revenue Act of 1921, Art. 13 (1922 ed.) ('The criterion of such value is the price which a willing buyer will pay to a willing seller for the property in question under the circumstances existing at the date of the decedent's death . . .'); Treas.Reg. 105 Relating to the Estate Tax Under the Internal Revenue Code (of 1939), s 81.10 (1942).

8   Whatever the situations may be where it is realistic and appropriate under Treas.Reg. s 20.2031-1(b) to use a standardized retail price to measure value for estate tax purposes, it is sufficient to note here that for the reasons given, the valuation of mutual fund shares does not present one of those situations.

9   The Government argues that, as a practical matter, an estate would rarely be hurt by valuation of mutual fund shares at the asked price, because Treas.Reg. s 20.2053-3(d)(2) permits an estate to deduct the difference between the asked and bid prices if the shares are sold to pay certain enumerated expenses. By its terms, however, that regulation applies only if 'the sale is necessary' to pay those expenses. (Emphasis added.) In any event, the regulation is inapplicable altogether if the shares are transferred in kind to an heir or legatee.

10  It is coincidence that the contested regulation was placed in Treas.Reg. s 20.2031-8, which deals with '(v)aluation of certain life insurance and annuity contracts . . . .' But we agree with Judge Winner:

'The Commissioner cannot cross-breed life insurance and investment trust shares by the simple expedient of discussing them in separate paragraphs of a single regulation.' Hicks v. United States, 335 F.Supp., at 482.

11  See 1966 SEC Report 51-59.

*   The text of the regulation, insofar as relevant here, reads as follows: 'The fair market value of a share in an open-end investment company (commonly known as a 'mutual fund') is the public offering price of a share, adjusted for any reduction in price available to the public in acquiring the number of shares being valued. . . .' There is a companion Gift Tax Regulation of identical import. See 26 CFR s 25.2512-6(b).

---

**End of Document**                                                © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 91

20 U.S.P.Q.2d 1045

944 F.2d 870
United States Court of Appeals,
Federal Circuit.

VAUPEL TEXTILMASCHINEN KG and
Vaupel North America, Plaintiffs–Appellants,

v.

MECCANICA EURO ITALIA S.P.A. and American
Trim Products, Inc., Defendants/Cross–Appellants.

Nos. 90–1397, 90–1422.    |    Sept. 13, 1991.

Licensee filed action for alleged infringement of a patent for a weaving method and machine. The United States District Court for the Western District of North Carolina, Woodrow Wilson Jones, J., found infringement, but also found that laches and estoppel barred the action. Appeal and cross appeal were taken. The Court of Appeals, Lourie, Circuit Judge, held that: (1) the patent licensing agreement transferred sufficient rights to the licensee so that it could be treated as an assignee and had standing; (2) delay during reissue proceedings was not to be considered in deciding whether the action was barred by laches or estoppel; and (3) the district court did not clearly err in finding that the patent had been infringed.

Affirmed in part and reversed in part.

West Headnotes (15)

**[1]**    **Patents**
          👉 Construction and Operation of Licenses
          **Patents**
          👉 Persons entitled to sue

Patent licensing agreement transferred all substantial rights under patent, giving licensee status of assignee that had standing to bring infringement action; although inventor retained right to veto sublicensing, and agreement as limited in scope to United States, agreement transferred right to sue for all infringements, past, present, and future. 35 U.S.C.A. § 261; Fed.Rules Civ.Proc.Rules 19, 19(a), 28 U.S.C.A.

178 Cases that cite this headnote

**[2]**    **Patents**
          👉 Laches

Laches and estoppel are equitable defenses in patent infringement action and are within district court's discretion.

Cases that cite this headnote

**[3]**    **Patents**
          👉 Laches

Key factor in finding laches is length of patentee's delay in bringing suit from time he knew, or in exercise of reasonable diligence should have known, of alleged infringement.

3 Cases that cite this headnote

**[4]**    **Patents**
          👉 Effect of prior or pending litigation

Patent owner may avoid consequences of what would otherwise be unreasonable delay in filing infringement action by establishing that he or she was engaged in "other litigation" such as reissue proceedings.

11 Cases that cite this headnote

**[5]**    **Patents**
          👉 Effect of prior or pending litigation

For other litigation to excuse patent holder's delay in bringing infringement action, accused infringer must have adequate notice of existing proceedings.

17 Cases that cite this headnote

**[6]**    **Patents**
          👉 Effect of prior or pending litigation

For "other litigation" to excuse patentee's delay in bringing infringement action until conclusion of another lawsuit, alleged infringer must have had proper notice of existing suit so as to permit alleged infringer to change his activities to avoid liability or to bring declaratory judgment action if delay would be burdensome.

Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA, 944 F.2d 870 (1991)

20 U.S.P.Q.2d 1045

31 Cases that cite this headnote

[7]    **Patents**
   👈 Effect of prior or pending litigation
   Alleged infringer had sufficient notice of patentee's ongoing reissue proceeding and of patentee's intent to sue and, therefore, delay consumed by reissue proceeding could be excused in deciding whether infringement action was barred by laches; not only was alleged infringer aware of reissue proceeding, but it actively participated and it would have been superfluous to tell alleged infringer of intent to sue after conclusion of reissue proceeding.

   8 Cases that cite this headnote

[8]    **Patents**
   👈 Effect of prior or pending litigation
   Delay caused by patentee's reissue proceeding could be excused in deciding whether laches barred infringement action, despite infringer's alleged knowledge that reissue proceeding would affirm original patent allowance; patentability issues were not resolved until nearly three and one-half years later and, without valid and enforceable patent, there could be no obligation to sue in order to avoid laches.

   7 Cases that cite this headnote

[9]    **Patents**
   👈 Specific period
   Delay of three and one-half years after conclusion of reissue proceeding and commencement of patent infringement action did not result in laches where licensee did not have knowledge to whom alleged infringer had sold infringing devices.

   39 Cases that cite this headnote

[10]   **Patents**
   👈 Defenses
   Continuing conflict between licensee and alleged infringer barred determination that infringement action had been barred by estoppel; alleged

infringer could not reasonably have drawn inference of abandonment, it did not rely on any purported abandonment, and alleged infringer repeatedly asserted its right to sell allegedly infringing devices.

   11 Cases that cite this headnote

[11]   **Patents**
   👈 Comparison with claims of patent
   Liability for patent infringement requires that accused device contain every limitation of claim or its substantial equivalent.

   9 Cases that cite this headnote

[12]   **Patents**
   👈 Claims
   Preamble language in patent for weaving method and machine did not involve structural limitation of claims and, thus, absence of specified loom parts from accused device did not preclude liability for patent infringement; loom "parts" were not illustrated in any figures of patent or otherwise described in specification.

   15 Cases that cite this headnote

[13]   **Patents**
   👈 Particular patents
   District court did not clearly err in finding that accused device literally infringed claim of patent for weaving method and machine by guiding fabric through use of spreader bar, take-up roll, pressure rollers, guide rollers, and drive cloth roll, all of which kept tension on fabric and produced tensile stresses.

   11 Cases that cite this headnote

[14]   **Patents**
   👈 Rejection and Amendment of Claims
   Evidence did not show that threaded temple bar limitation had been added to apparatus claim for guiding station, cutting station, and thermostabilizing station of weaving method and machine merely to avoid obviousness rejection

Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA, 944 F.2d 870 (1991)

20 U.S.P.Q.2d 1045

and, therefore, prosecution history estoppel did not bar enforcement of claim.

11 Cases that cite this headnote

[15]    **Patents**
⬥ Original utility
3,961,650. Infringed.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*871** Melvin M. Goldenberg, Christensen, O'Connor, Johnson & Kindness, Seattle, Wash., argued, for plaintiffs-appellants. With him on the brief, were Michael W. Bocianowski and Jeffrey W. Reis. Also on the brief, was Charles W. Helzer, Arnold, Md.

Gregory B. Wood, Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst, Los Angeles, Cal., and Susan Lerner, Los Angeles, Cal., argued, for defendants/cross-appellants.

Before NEWMAN, LOURIE and RADER, Circuit Judges.

**Opinion**

LOURIE, Circuit Judge.

This appeal and cross-appeal are from the June 1, 1990, judgment of the United States District Court for the Western District of North Carolina, ST–C–88–127. The court, in a suit brought by Vaupel Textilmaschinen KG (Vaupel KG) and Vaupel North America (Vaupel NA) (collectively Vaupel), found that Meccanica Euro Italia, S.P.A. and American Trim Products (collectively MEI) infringed U.S. Patent 3,961,650 ('650 patent), but that Vaupel was barred from maintaining its infringement action by laches and estoppel. Vaupel appeals the court's conclusion that its infringement action is barred. MEI cross-appeals, alleging **\*872** that Vaupel, as a mere licensee, has no standing to bring suit and that the district court clearly erred in finding infringement. We reverse that part of the judgment relating to laches and estoppel and affirm the judgment in all other respects.

**BACKGROUND**

The '650 patent, entitled "Weaving Method and Machine" and issued to Ruthard Marowsky, discloses a method for use on what is commonly called a "broad weaving loom," which produces cut strips of woven labels for garments. For many years prior to the invention of the '650 patent, labels were woven on narrow loom machines. Because of the physical constraints of narrow looms, any label manufacturer who wanted to offer a wide variety of label widths had to maintain a number of narrow looms of different sizes.

Marowsky's invention took advantage of the faster weaving ability of the modern broad loom to make a woven label. The prior art had taught that the materials used to make labels could be cut by heat and that such fibers could be severed by using electrically heated blades which would also melt and fuse together the weft threads of the fiber. Marowsky envisioned that the cutting means could be made adjustable across the width of the fabric, so that adjustment of the cutters would permit labels in a variety of widths to be woven on a single machine. He improved upon this art and found a way to not only cut the fibers into the desired width, but also to melt and fuse the ends of the weft threads and thereby form a solid edge or "selvage" so there would be no loose ends. He also knew that it was important that the finished label not be lopsided, so he envisioned the use of a guiding station extending across the weft yarns in a rectilinear position. In addition, he used heat to thermostabilize the labels after they were cut to provide a smooth finish of the product.

On January 22, 1974, Marowsky filed a patent application in the United States Patent and Trademark Office (PTO). The application issued as the '650 patent on June 8, 1976. Only Claims 1 and 2 are at issue in this appeal.

Claim 1 is directed to a process involving weaving and cutting fabric in such a way as to avoid weft arching, *i.e.,* to ensure that the warp and weft threads are at right angles to each other. The broad woven fabric is then transformed into individual strips whose edges are simultaneously cut and welded by heated blades. The strips are then thermostabilized by heating at a temperature lower than the cutting and welding temperature before being removed from the loom. Claim 1 reads as follows:

1. A method of forming a plurality of patterned strips of fabric woven from threads of synthetic material using a broad weaving machine having a sley and a breast beam, which method comprises:

Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA, 944 F.2d 870 (1991)

20 U.S.P.Q.2d 1045

weaving on the broad weaving machine a unitary broad fabric with said strips to be formed extending in parallel relation along the warp direction of said fabric;

conveying said fabric from the position where the sley of said machine beats up the fabric at a sufficiently low warp tension that a boxing condition occurs to obviate weft arching;

guiding the woven fabric leaving the position where the sley beats up the fabric to allow movement towards the breast beam of said machine, but not in the opposite direction;

cutting the guided woven fabric in the warp direction with a heated cutting blade means maintained at a first temperature of at least about 300°C to form strips whereby the edges are welded by the heat and thereby avoids ripping;

separating said strips;

and thereafter further heating the entire body of said separated strips at a second temperature lower than said cutting temperature to relieve varying tensile stress therein by thermostabilization.

Claim 2 is an apparatus claim:

2. In a broad fabric weaving machine having a sley and a breast plate for forming a plurality of strips of fabric from threads of synthetic fiber, the improvement comprising:

**\*873** a fabric guiding station extending across the width of said machine at the output from the machine where the sley beats up the fabric and ahead of the breast plate, said fabric guiding station comprising a slot and a rounded guide bar there-behind to define a re-entrant part-annular path for passage of woven fabric into said slot, round said bar and back out of said slot;

said guide bar being formed with a left-hand fabric guided thread over the right-hand half of its length in the direction towards a cutting station, and a right-hand guiding thread over its left-hand half;

a heating and cutting station downstream from said guiding station in the fabric path to said breast plate, which station includes a plurality of electrically heated cutting wires successively spaced across the width of said machine in the direction of the weft and extending into the path of the

fabric for heating and cutting said woven fabric into desired width separated strips parallel to the warp of the fabric and for heating the cut edges of said strips to weld the same;

and a second heating station comprising an elongated heating member to heat said separated strips extending across the width of said machine downstream from said hot wire cutting and cut edge heating station towards said breast beam for heating the strips at a temperature lower than said cutting temperature to effect thermostabilization of said strips.

Before trial, MEI moved to dismiss under Fed.R.Civ.P. 19(b) on the ground that Vaupel KG and Vaupel NA were mere licensees of the '650 patent and as such could not maintain an infringement action without the joinder of Marowsky. The district court concluded that by virtue of a series of agreements, the Vaupel companies were assignees of the patent and had the right to bring suit without joining Marowsky.

At trial the issues were narrowed to include only infringement and the defenses of laches and estoppel. The district court held that MEI had directly infringed, contributorily infringed, and induced infringement of the '650 patent. It further held, however, that Vaupel was barred from maintaining the action and from any relief because of laches and estoppel. These appeals followed.

## DISCUSSION

### A. License v. Assignment

[1]   MEI contends in its cross appeal that this suit must be dismissed because Vaupel KG and Vaupel NA were mere licensees under the '650 patent and could not maintain an infringement action without the joinder of Marowsky. As mentioned above, MEI first raised this issue in a pretrial motion, and the district court concluded that by virtue of a series of agreements, Vaupel KG and Vaupel NA were the assignees of the '650 patent and therefore had the right to bring this action without the joinder of Marowsky. MEI again raised this issue at trial and the district court again concluded that Vaupel had standing.

MEI's contention requires us to decide as a matter of law whether the district court was correct in concluding that Vaupel KG and Vaupel NA were assignees of the '650

Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA, 944 F.2d 870 (1991)

20 U.S.P.Q.2d 1045

patent, or, in any event, could maintain suit without joining Marowsky as an indispensable party.

The Patent Act provides that "patents shall have the attributes of personal property ... [;] any interest therein, shall be assignable in law by an instrument in writing." 35 U.S.C. § 261. The right to sue under a patent was discussed by the Supreme Court one hundred years ago:

> The patentee or his assigns may, by instrument in writing, assign, grant and convey, either, 1st, the whole patent, comprising the exclusive right to make, use, and vend the invention throughout the United States; or, 2d, an undivided part or share of that exclusive right; or, 3d, the exclusive right under the patent within and throughout a specified part of the United States. A transfer of either of these three kinds of interests is an assignment, properly speaking, and vests in the assignee a title in so much of the *874 patent itself, with a right to sue infringers; in the second case, jointly with the assignor; in the first and third cases, in the name of the assignee alone. Any assignment or transfer, short of one of these, is a mere license, giving the licensee no title in the patent and no right to sue at law in his own name for an infringement.

*Waterman v. Mackenzie,* 138 U.S. 252, 255, 11 S.Ct. 334, 335, 34 L.Ed. 923 (1891) (citations omitted).

To determine whether a provision in an agreement constitutes an assignment or a license, one must ascertain the intention of the parties and examine the substance of what was granted. "An assignment of an interest in an invention secured by letters-patent, is a contract, and like all other contracts is to be construed so as to carry out the intention of the parties to it." *Nicolson Pavement Co. v. Jenkins,* 81 U.S. (14 Wall.) 452, 456, 20 L.Ed. 777 (1871). One of our predecessor courts has also made this point:

> Whether a transfer constitutes a sale or license is determined by the *substance of the transaction* and a transfer will suffice as a sale if it appears

from the agreement and surrounding circumstances that the *parties intended* that the patentee surrender all his substantial rights to the invention.

*Bell Intercontinental Corp. v. United States,* 381 F.2d 1004, 1011, 180 Ct.Cl. 1071, 152 USPQ 182, 184 (1967) (emphasis added). We must therefore examine whether the agreements transferred all substantial rights to the '650 patent and whether the surrounding circumstances indicated an intent to do so.

In 1973, Marowsky entered into an agreement with Theobald Vaupel oHG, the predecessor to Vaupel KG, wherein Marowsky granted "the exclusive right, to solely use [the label weaving machine and process embodied in the '650 patent]." The agreement provided further that "[a] sublicensing agreement given by Vaupel needs a written consent"; that "Marowsky has the right ... to register patents in all countries of his choice in reference to the invention which forms the basis of this contract"; and that "the contract is cancelled automatically on the same day on which Vaupel files for bankruptcy or stops production of [the machine]." It also provided that:

> A possibly necessary litigation to sue for violation of the patent registrations which are the basis of this contract will have to be dealt with among the parties, case by case. In principle, both parties will work together towards prohibiting third parties of making use of the object of this contract.

In January, 1977, the agreement was modified to include Vaupel KG, and provided that "VAUPEL KG will handle the production and distribution of the contractual product as of January 1, 1975 according to all the rights and responsibilities of the contract."

On March 21, 1988, Marowsky and Vaupel KG entered into another agreement which provided in pertinent part:

> 1. MAROWSKY hereby grants to VAUPEL an exclusive license under United States Patent 3,961,650 to make, have made, use, sell, lease, rebuild and maintain in the United States and its territories weaving machines which practice the inventive method and apparatus covered by the claims of patent 3,961,650, and with the prior written consent of MAROWSKY, to grant sublicenses to others under the patent.

Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA, 944 F.2d 870 (1991)

20 U.S.P.Q.2d 1045

2. MAROWSKY hereby grants to VAUPEL the rights to sue for past, present and future infringements of patent 3,961,650 (if any) including the right to seek injunctions and/or money damages, in any effort by VAUPEL to protect the invention covered by the patent against encroachment by third parties; provided, however, that VAUPEL first notifies MAROWSKY in writing of its intention to sue for enforcement of the patent against a particular party. The final decision, whether or not a particular party is to be sued lies, however, solely with VAUPEL. All costs arising in connection with any infringement are carried by VAUPEL.

**\*875** The agreement further provided that Vaupel agrees "to pay to MAROWSKY any money damages obtained from third parties based on infringement of [the '650 patent]" up to a maximum of five percent of third party sales.

Finally on August 2, 1988, Marowsky entered into another agreement nearly identical to the March 1988 agreement except that Vaupel NA was joined with Vaupel KG as a grantee. The 1988 agreements thus purported to grant to Vaupel the exclusive right to make, use, and sell in the United States weaving machines and practice the method covered by the claims of the '650 patent. As we shall discuss, Marowsky retained certain other rights.

It is well settled that "[w]hether a transfer of a particular right or interest under a patent is an assignment or a license does not depend upon the name by which it calls itself, but upon the legal effect of its provisions." *Waterman,* 138 U.S. at 256, 11 S.Ct. at 335. Therefore, the use of the term "exclusive license" in the 1988 agreements is not dispositive; what the documents in fact recite is dispositive. However, the term "assignment" has a particular meaning in patent law, implying formal transfer of title. We conclude that the subject agreements here, although not constituting a formal assignment of the U.S. patent, were a grant of all substantial rights and, in accordance with Rule 19, permitted Vaupel to sue without joining Marowsky.

A patent provides its owner with the right to exclude others from making, using, and selling the claimed invention. 35 U.S.C. § 154 (1988); *Bloomer v. McQuewan,* 55 U.S. (14 How.) 539, 549, 14 L.Ed. 532 (1852). It is, in effect, a bundle of rights which may be divided and assigned, or retained in whole or part. In determining whether a grant of *all* substantial rights was intended, it is helpful to look at what rights have been retained by the grantor, not only what was

granted. The agreements show that Marowsky retained 1) a veto right on sublicensing by Vaupel; 2) the right to obtain patents on the invention in other countries; 3) a reversionary right to the patent in the event of bankruptcy or termination of production by Vaupel; and 4) a right to receive infringement damages. However, as the district court properly held, none of these reserved rights was so substantial as to reduce the transfer to a mere license or indicate an intent not to transfer all substantial rights.

The sublicensing veto was a minor derogation from the grant of rights. It did not substantially interfere with the full use by Vaupel of the exclusive rights under the patent, and it has been held not to bar capital gains treatment. *Bell,* 381 F.2d at 1017, 152 USPQ at 189 (citing *Rollman v. Commissioner,* 244 F.2d 634, 639–40 (4th Cir.1957)). Nor did the right to obtain patents in other countries affect Vaupel's rights arising from the '650 patent, which are limited to the United States. Further, the termination provisions in the agreements were entirely consistent with an assignment. An assignment of a patent "may be either absolute, or by way of mortgage and liable to be defeated by non-performance of a condition subsequent...." *Waterman,* 138 U.S. at 256, 11 S.Ct. at 336. Finally, the right to receive infringement damages was merely a means of compensation under the agreement; this was not inconsistent with an assignment. *See Rude v. Westcott,* 130 U.S. 152, 162–63, 9 S.Ct. 463, 467, 32 L.Ed. 888 (1889) (retention of portion of "sales, royalties, or settlements, or other sources" does not limit the assignment of patent).

The agreements also transferred the right to sue for infringement of the '650 patent, subject only to the obligation to inform Marowsky. This grant is particularly dispositive here because the ultimate question confronting us is whether Vaupel can bring suit on its own or whether Marowsky must be joined as a party. The policy underlying the requirement to join the owner when an exclusive licensee brings suit is to prevent the possibility of two suits on the same patent against a single infringer. *Crown Die & Tool Co. v. Nye Tool & Mach. Works,* 261 U.S. 24, 38, 43 S.Ct. 254, 257, 67 L.Ed. 516 (1923) (citing *Gayler v. Wilder,* 51 U.S. (10 How.) 477, 13 L.Ed. 504 (1850)). This policy is not undercut **\*876** here because the right to sue rested solely with Vaupel.

Under Rule 19, a court must undertake a two-step analysis to determine whether a person in question should be joined. Fed.R.Civ.P. 19(a). A person is necessary if "complete relief cannot be accorded among those already parties," or if the disposition of an action may leave "persons already

parties subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations." *Id.* The district court's decision, and our affirmance thereof, assure that the provisions of this rule have not been transgressed: complete relief can be afforded among those already parties and there is no substantial risk of a party incurring double obligations. [1]

Based on the above, we hold that the district court was correct in concluding that Vaupel KG and Vaupel NA had standing to sue for infringement without joinder of Marowsky. The contractual documents constituted a transfer of all substantial rights under the patent, thereby permitting Vaupel to sue; the agreements expressly granted Vaupel the sole right to sue for all infringements, past, present, and future as well.

### B. Laches and Estoppel

[2]    Laches and estoppel are both equitable defenses, matters within the trial court's discretion; they depend on the particular factual circumstances of a case. *Jamesbury Corp. v. Litton Indus. Prods.,* 839 F.2d 1544, 1551, 5 USPQ2d 1779, 1785 (Fed.Cir.), *cert. denied,* 488 U.S. 828, 109 S.Ct. 80, 102 L.Ed.2d 57 (1988); *Studiengesellschaft Kohle mbH v. Eastman Kodak Co.,* 616 F.2d 1315, 1325, 206 USPQ 577, 586 (5th Cir.), *cert. denied,* 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980). We review the trial court's exercise of discretion to determine whether (1) the decision was clearly unreasonable, arbitrary, or fanciful; (2) the decision was based on an erroneous conclusion of law; (3) the court's findings were clearly erroneous; or (4) the record contains no evidence upon which the court rationally could have based its decision. *Western Elec. Co. v. Piezo Technology,* 860 F.2d 428, 430–31, 8 USPQ2d 1853, 1855 (Fed.Cir.1988).

[3]    A finding of laches can occur when an accused infringer shows unreasonable and unexcused delay in filing suit and material prejudice or injury as a result of the delay. *See Leinoff v. Louis Milona & Sons,* 726 F.2d 734, 741, 220 USPQ 845, 850 (Fed.Cir.1984). A key factor in considering this question is the length of the patentee's delay in bringing suit from "the time the patentee knew, or in the exercise of reasonable diligence should have known, of the alleged infringing activity." *Jamesbury,* 839 F.2d at 1552, 5 USPQ2d at 1785 (footnote omitted).

In this case, the parties dispute whether Vaupel's period of delay began in 1980, when MEI first displayed and sold the accused infringing machines in the United States, or

sometime after early 1985, when reissue proceedings on the '650 patent were terminated. Since Vaupel brought the instant suit August 26, 1988, Vaupel's unexcused delay was either zero to 3 ½ years or approximately 8 years. Vaupel argues that its delay was excused by the reissue proceedings in the PTO, and thereafter because it neither knew nor should have known of MEI's alleged infringing activity until late 1987. Relying on a presumption of laches after a delay of longer than six years, the district court found that Vaupel did not show evidence sufficient "to excuse their failure to institute this action within six years of the time they knew or should have known of the infringement" by MEI. In so finding, the district court erred.

[4]    A patent owner may avoid the consequences of what would otherwise be an unreasonable delay in filing suit by establishing **\*877** that he or she was engaged in "other litigation." *Watkins v. Northwestern Ohio Tractor Pullers Ass'n,* 630 F.2d 1155, 1162, 208 USPQ 545, 551 (6th Cir.1980). Although here we are dealing with a reissue proceeding, such proceedings should be treated similarly to infringement litigation for purposes of laches. There is no demonstrable distinction for this purpose between judicial proceedings raising the issue of patent validity and a PTO proceeding involving patentability.

[5]    For other litigation to excuse a delay in bringing suit, there must be adequate notice of the proceedings to the accused infringer. *Hottel Corp. v. Seaman Corp.,* 833 F.2d 1570, 1573, 4 USPQ2d 1939, 1940–41 (Fed.Cir.1987). The notice must also inform the alleged infringer of the patentee's intention to enforce its patent upon completion of that proceeding. *Id.* (citing *Watkins,* 630 F.2d at 1162–63, 208 USPQ at 551–52).

[6]    The "other litigation" excuse normally applies when a patentee defers suit against an alleged infringer until the conclusion of another lawsuit. If the party is ultimately sued and had received proper notice, the time delay consumed by the original proceeding may be excused in evaluating whether laches occurred.

Notice is important for several reasons. It informs the accused infringer of the existence of the suit and that a subsequent suit will be filed against him. He can then change his activities to avoid liability. He can also bring a declaratory judgment action if the delay in waiting for a judicial determination would be a burden upon his proposed activities. To establish whether such notice was given, the district court must look

Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA, 944 F.2d 870 (1991)

20 U.S.P.Q.2d 1045

not only at the actions of the patentee, but also at evidence showing whether the alleged infringer was *in fact* on notice of an existing lawsuit.

[7]    In this case, on December 14, 1979, Marowsky filed a reissue application pursuant to the then-existing "no-fault" reissue practice.[2] One month later, Marowsky notified MEI that the reissue application had been filed and that MEI was invited to participate if it desired. During the reissue proceeding, MEI (through a related company, Nastroficio Eurotessile S.R.I. (NE))[3] actively and continuously opposed maintenance of the patent claims. Based on these protests, the PTO issued an order stating that the Office would review not only the patentability of Marowsky's claims, but also any possible inequitable conduct in procuring the '650 patent. The issues of patentability and enforceability were finally resolved in favor of the '650 patent, and the PTO effectively confirmed the patent as originally issued and terminated the proceedings in February 1985.

During the reissue proceeding, from October 18 to October 25, 1980, MEI exhibited its accused machine at a textile machinery show in South Carolina. Representatives from Vaupel inspected the machine and determined that it infringed the '650 patent. Two of the allegedly infringing machines were then sold to Universal Label Company. Vaupel sent Universal a letter warning that the purchased machines infringed the '650 patent. The parties settled the dispute when Universal purchased parts from Vaupel to replace MEI parts.

MEI, apparently concerned about the loss of Universal's business, demanded that Vaupel withdraw its warning letter. It asserted that the accused devices were manufactured according to one of its own patents and noted that the validity and enforceability of the '650 patent remained subject to the reissue proceedings. MEI also threatened Vaupel with litigation, as evidenced from its April 20, 1982 letter:

It is evident that we can no longer delay the initiation of court proceedings.

**\*878** We intend to have our rights protected and to obtain compensation for the enormous damages that we have suffered.

We are, therefore, compelled to inform you in all clarity that we are going to initiate court proceedings if we do not receive a conclusive and satisfactory response from you within fifteen days from today (April 20, 1982[) ].

Rather than filing suit, MEI continued with its opposition in the PTO.

MEI argues that our decision in *Hottel* requires that to excuse the delay during the period the '650 patent was in reissue proceedings, notice must not only have informed MEI of the reissue proceeding, but also have stated Vaupel's intention of enforcing its patent upon completion of the reissue proceeding. Both parties agree that Vaupel did not explicitly inform MEI that Vaupel would sue after the reissue proceedings. However, Vaupel argues that its actions clearly satisfied the notice requirement for such an excuse, that all the communications showed that Vaupel intended to enforce its rights, and that MEI knew of those intentions. We agree.

Our decision in *Hottel* does not require that notice of other litigation *and* of a patentee's intent to sue after that other litigation is terminated be expressly stated in writing. What is important is whether MEI had reason to believe it was likely to be sued. A review of the extensive communications between MEI and Vaupel leaves no doubt that MEI was concerned about being sued by Vaupel. Among these communications was a July 1982 letter from NE to the Commissioner wherein MEI stated that there were "continued threats of infringement by applicant's attorney against prospective purchasers of the apparatus manufactured and sold by the protester." A May 1982 letter from Vaupel KG to MEI stated that "[w]e will protect our patent No. 3,961,650 and look after our rights.... [and] highly recommend an elucidating discussion before plunging into court proceedings...." Also, as previously mentioned, in an April 1982 letter to Vaupel, MEI threatened a declaratory judgment action. These are but a sampling of the communications indicating that MEI believed during the years in question that it was threatened. Where there is explicit notice of a reissue proceeding in which an alleged infringer actively participated, and the evidence as a whole shows that the accused infringer was in fear of suit, there is no further requirement to notify the alleged infringer of an intent to sue after the reissue proceeding has been concluded in order to avoid a holding of laches. Such a notification would be superfluous, telling the accused infringer what he already knew.

In the instant case, MEI was deeply involved in protesting the reissue proceeding and acknowledged a continuing conflict between it and Vaupel. The present lawsuit is part of that conflict. We therefore hold that the district court erred in concluding that MEI lacked notice concerning Vaupel's

Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA, 944 F.2d 870 (1991)

20 U.S.P.Q.2d 1045

intention to sue and that Vaupel's delay in filing suit during the proceeding was not excused.

[8]    The district court also found that the period the '650 patent was in reissue could not be excused because Vaupel "knew in 1980 or 1981 that the reissue proceeding would affirm the original patent allowance." The record shows that patentability issues were resolved in September 1981. However, the record also shows that enforceability was not resolved until early 1985. Without a valid and enforceable patent, Vaupel could not reasonably be held to an obligation to sue in order to avoid a laches holding. MEI itself stated, as a protestor in the PTO proceedings, that "[a] final decision on this [enforceability] issue is vital to the resolution of the ongoing conflict between protestor and applicant." Patentees should be encouraged to avoid litigation when their patents are being reevaluated in the PTO rather than being forced into premature litigation on penalty of being held to have been guilty of laches.

[9]    We next examine the circumstances existing during the 3 ½ year period between the end of the reissue proceeding and the filing of the instant suit. Between April 25 and May 3, 1985, after the reissue proceeding was terminated, MEI again displayed *879 its accused infringing machine at a trade show in South Carolina. Vaupel representatives attended the show, inspected MEI's machine, and explained to MEI representatives how its machine infringed the '650 patent. None of the alleged infringing machines was sold as a result of the trade show; consequently, Vaupel took no further action to protect its patent rights.

In October 1987, MEI again displayed its accused infringing machine, this time at a trade show in Paris, France. After Vaupel warned MEI that shipment of its accused machine to the United States would constitute infringement, MEI responded that it was protected by its own patents and that MEI had already shipped accused infringing machines to the United States. After discovering the identity of the buyer of the alleged infringing machines, as well as observing other subsequent sales, Vaupel filed suit on August 26, 1988. Vaupel thus took prompt action to protect its rights once it learned of renewed infringing activity. Given the undisputed facts, it would have been an abuse of discretion for the district court to have held that these circumstances resulted in laches.

We therefore conclude that Vaupel was not guilty of laches. Because of this disposition, we need not address the district court's finding and the parties' arguments relating to MEI's alleged material prejudice or injury.

[10]    With respect to estoppel, the district court found that "the delay from 1981–1982 until 1988 is an extended period of non-enforcement and constitutes affirmative conduct from which [MEI] could infer the claims against them had been abandoned." In light of our determination regarding laches and the extensive communications evidencing a continuing conflict between the parties and the fear of imminent suit, the district court erred in holding that Vaupel's suit was barred by estoppel.

"Estoppel requires representations or conduct by the patentee from which the alleged infringer could reasonably infer that the patentee had abandoned his claim." *Jamesbury,* 839 F.2d at 1554, 5 USPQ2d at 1787. In this case, MEI could reasonably have drawn no such inference. MEI did not rely on any purported abandonment by Vaupel of its patent rights or any intentionally misleading silence to suggest abandonment, but relied on the existence of MEI's own patents. In MEI's communications with Vaupel and its customers, it repeatedly stated that because its own patent covered its loom, not Vaupel's '650 patent, it had the right to sell its allegedly infringing looms in the United States.[4] Vaupel's actions did not constitute affirmative conduct from which defendants could reasonably have inferred that the claims of infringement against them had been abandoned.

## C. Infringement

[11]    In order to determine a question of patent infringement, a district court must (1) determine as a matter of law the scope and meaning of the claims at issue and (2) determine as a factual matter whether the properly construed claims encompass or "read on" the accused device. *ZMI Corp. v. Cardiac Resuscitator Corp.,* 844 F.2d 1576, 1578, 6 USPQ2d 1557, 1559 (Fed.Cir.1988). Liability for infringement requires that an accused device contain every limitation of a claim or its substantial equivalent. *Lemelson v. United States,* 752 F.2d 1538, 1551, 224 USPQ 526, 533 (Fed.Cir.1985). We review an issue of claim interpretation *de novo, ZMI,* 844 F.2d at 1578, 6 USPQ2d at 1559, and the factual application of a properly interpreted claim to an accused structure under the clearly erroneous standard. *SRI Int'l v. Matsushita Elec. Corp. of America,* 775 F.2d 1107, 1118, 227 USPQ 577, 583 (Fed.Cir.1985) (in banc).

Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA, 944 F.2d 870 (1991)

20 U.S.P.Q.2d 1045

[12]    MEI argues that the preamble language "breast beam" and "breast plate" of Claims 1 and 2, respectively, requires a specific loom part which is absent from its *880 accused device, and that the district court erred in concluding that the terms were used "only to fix the direction of movement of the woven fabric on the loom" and not to constitute claim limitations. After reviewing the claims, the specification and drawings, the prosecution history, and the expert testimony, we conclude that the district court was correct. "Breast beam" and "breast plate" are not structural limitations of Claims 1 and 2; as used in Claims 1 and 2, they indicate a reference point to fix the direction of movement of the woven fabric from the loom. Such alleged loom "parts" are not illustrated in any of the figures of the '650 patent or otherwise described in the specification.

[13]    The district court interpreted Claim 1 and concluded that the claim does not require that "the steps of cutting and thermostabilizing be carried out in the specific manner contained in the preferred embodiment of the invention appearing in the patent description and drawings...." It also interpreted Claim 2 as not requiring that "the heating and cutting station and the thermostabilizing station be located before the take-up roll, breast beam or breast plate." We agree. The plain language of the claims supports the district court's construction. Even MEI recognized, when it was advantageous to do so, that the order of steps in Claim 1's method was not specifically set forth. In its July 31, 1980 protest, NE argued that Claim 1, as written, did not require that the cutting step take place before the take-off roll or breast plate:

> There is no specific language, nor any intimation whatsoever in Marowsky's

claim 1 that the cutting step takes place *before* the take-off roll or breast plate.

(Emphasis in original). In its March 18, 1982 protest, NE argued that Claims 1 and 2, as written, do not limit the steps or stations to any particular location or sequence:

> It is quite clear, even from a cursory reading of the Marowsky patent and the instant reissue application, that the location of Marowsky's invention relative to the breast beam or breast plate is not specifically set forth in the claims[.]

The Examiner rejected NE's arguments, allowed the claims, and reemphasized that the location of the cutter between the breast beam and the sley was not the "critical factor" for patentability, that the applicant was entitled to claim the "broadest concept" of his invention.

We also agree that the step of heating to relieve "varying tensile stresses" does not require that the heating be done between the guide bar and the take-up roll of the loom. The claims do not require the limitations MEI suggests.

At trial the parties stipulated that MEI's off-loom machines did not infringe the '650 patent, and that MEI's accused device was represented by the following drawings:

*881

Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA, 944 F.2d 870 (1991)

20 U.S.P.Q.2d 1045



MEI argues that the district court clearly erred in finding that Claim 1 was literally infringed, because the MEI device does not perform the step of "cutting the guided woven fabric" and because MEI's heated setting bar does not "relieve varying tensile stresses." However the court found, relying on expert testimony, that the MEI machine guides the fabric using the spreader bar, take-up roll, pressure rollers, guide rollers, and the drive cloth roll, and that these various rolls keep a tension on the fabric and produce tensile stresses. Because the guiding of the woven fabric in the MEI device extends through and beyond a cutting step, and varying tensile stresses also continue up to the cloth roll, the district court properly found Claim 1 to be infringed.

MEI has not shown the district court's findings relating to guiding to be clearly erroneous, and it offers no factual support for its argument that somehow the tensile stresses in its machine are relaxed downstream of the take-up roll. Given this complete lack of proof, we cannot say that the district court clearly erred. The district court first properly interpreted Claim 1, and then properly found that the MEI machine performed each and every step of Claim 1. Therefore, the district court was correct in finding that MEI's purchaser, ATP, directly infringed method Claim 1 and MEI contributorily infringed and induced infringement of Claim 1.

[14]    MEI next argues that the district court clearly erred in holding that apparatus Claim 2 was infringed under the doctrine of equivalents. The apparatus in Claim 2 comprises a "guiding station," a "cutting station," and a "thermostabilizing station." The district court found each of these three elements to have equivalent structure in the MEI machine. MEI argues that the district court failed to properly apply the doctrine of prosecution history estoppel when it found the spreader bar to be equivalent to the "guiding station" in Claim 2. It specifically argues that the threaded temple bar limitation was added "to avoid an obviousness rejection." We disagree.

There is no indication in the file history as to why the threads were added to the guide bar. The threaded guide bar limitation was already present in original Claim 6, which seems to have been combined with original Claim 5 to become Claim 2 of **882** the '650 patent. The doctrine of prosecution history estoppel bars "a patentee from enforcing its claims against otherwise legally equivalent structures if those structures were excluded by claim limitations added in order to avoid prior art." *Mannesmann Demag Corp. v. Engineered Metal Prods. Co.,* 793 F.2d 1279, 1284, 230 USPQ 45, 48 (Fed.Cir.1986) (citations omitted). In determining whether prosecution history estoppel applies because of a change in claim language during prosecution, the court must consider not only what was changed, but the *reason* for such change. *See Sun Studs, Inc. v. ATA*

Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA, 944 F.2d 870 (1991)

20 U.S.P.Q.2d 1045

*Equip. Leasing,* 872 F.2d 978, 987, 10 USPQ2d 1338, 1345 (Fed.Cir.1989).

Here, because the record does not indicate that the threaded guide bar limitation was added to avoid prior art, it does not support overturning the district court's finding that there is no estoppel against the combination of the smooth temple bar and the threaded spreader bar in the MEI machine being held to be the equivalent of the threaded guide bar limitation of Claim 2.

MEI also argues that the district court erred in finding equivalence of the "cutting station" and the "thermostabilizing station" in its accused device. MEI's argument must fail here too, because it hinges on its prior argument that the cutting and thermostabilizing stations are location-specific. We have already determined that the district court did not clearly err in finding that the claims did not require a specific sequence of the various stations.

The district court did not clearly err in finding that Claim 2 of the '650 patent was infringed under the doctrine of equivalents. Every limitation of Claim 2 has an equivalent in the MEI machine.

We have considered all the other arguments and conclude that they lack merit.

## COSTS

Costs to Vaupel.

## CONCLUSION

The judgment as it relates to laches and estoppel is reversed; in all other respects it is affirmed.

AFFIRMED–IN–PART, REVERSED–IN–PART.

**Parallel Citations**

20 U.S.P.Q.2d 1045

Footnotes

1    Only if a person is deemed necessary under Rule 19(a) must a court undertake the second step of the analysis. In other words, if a party is deemed necessary under Rule 19(a), but cannot be joined because it is not subject to process, then the court must consider in equity and good conscience whether the party is indispensable and dismissal appropriate. Fed.R.Civ.P. 19(b). In this case, the district court correctly held that Marowsky was not a necessary party under Rule 19(a) and thus analysis under Rule 19(b) was unnecessary.

2    This discontinued practice allowed an applicant to have his patent reexamined to allow the PTO to determine the effect of newly discovered prior art not previously before the examiner. *See* 37 C.F.R. § 1.175(a)(4) (1981).

3    The district court found that NE was related to MEI and treated NE as the equivalent of MEI throughout the trial. MEI has not disputed this; therefore, we impute knowledge to MEI of all actions taken in the PTO and communications received by NE.

4    MEI's statements are evidence of its fear of suit, even though it is well-established that the existence of one's own patent does not constitute a defense to infringement of someone else's patent. It is elementary that a patent grants only the right *to exclude others* and confers no right on its holder to make, use, or sell. *See* 35 U.S.C. § 154 (1988).

**End of Document**                                   © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 92

2007 CanLII 8934 (ON SC)

COURT FILE NO.: 07-CL-6893
DATE: 2007-03-06

# ONTARIO

## SUPERIOR COURT OF JUSTICE

| | | |
|---|---|---|
| **B E T W E E N :** | ) | |
| | ) | |
| Ventas, Inc., 2124678 Ontario Inc., and 2124680 Ontario Inc. | ) ) ) | Mark A. Gelowitz and Laura K. Fric, for the Applicants |
| | ) ) | |
| Applicants | ) ) | |
| | ) | |
| **- and -** | ) ) | |
| | ) ) | |
| Sunrise Senior Living Real Estate Investment Trust, Sunrise REIT Trust, Sunrise REIT GP, Inc., Sunrise Senior Living Inc., and Health Care Property Investors, Inc. | ) ) ) ) ) ) | Peter F.C. Howard, Eliot Kolers and Ellen Snow, for the Respondents, Sunrise Senior Living Real Estate Investment Trust, Sunrise REIT Trust, and Sunrise REIT GP Inc. |
| | ) | |
| Respondents | ) ) | Luis Sarabia and Cynthia Spry, for the Respondent, Sunrise Senior Living, Inc. |
| | ) ) | Robert W. Staley, Derek J. Bell and Lisa Millman, for the Respondent, Health Care Property Investors, Inc. |
| | ) ) ) | |
| **B E T W E E N :** | ) | |
| | ) | |
| Sunrise Senior Living Real Estate Investment Trust, Sunrise REIT Trust, and Sunrise REIT GP, Inc. | ) ) ) ) ) | Peter F.C. Howard, Eliot Kolers and Ellen Snow, for the Respondents, Sunrise Senior Living Real Estate Investment Trust, Sunrise REIT Trust, and Sunrise REIT GP Inc. |
| Applicants | ) ) | |
| | ) | |
| **- and -** | ) ) | |

- 2 -

2007 CanLII 8934 (ON SC)

| | |
|---|---|
| Ventas SSL Ontario II, Inc. (Formerly 2124678 Ontario Inc.) Ventas SSL Ontario I, Inc. (Formerly 2124680 Ontario Inc.) Ventas, Inc., Sunrise Senior Living, Inc. and Health Care Property Investors Inc. | Mark A. Gelowitz and Laura Fric, for the Respondents, Ventas SSL Ontario II, Inc. (Formerly 2124678 Ontario Inc.), Ventas SSL Ontario I., Inc. (Formerly 2124680 Ontario Inc.) and Ventas, Inc. |
| Respondents | Luis Sarabia and Cynthia Spry, for the Respondent, Sunrise Senior Living, Inc. |
| | Robert W. Staley, Derek J. Bell and Lisa Millman, for the Respondent, Health Care Property Investors, Inc. |

**B E T W E E N :**

| | |
|---|---|
| Sunrise Senior Living, Inc. | Luis Sarabia and Cynthia Spry, for the Applicant |
| Applicant | |

| | |
|---|---|
| Ventas SSL Ontario II, Inc. (Formerly 2124678 Ontario Inc.), Ventas SSL Ontario I, Inc. (Formerly 2124680 Ontario Inc.), Ventas, Inc., Health Care Property Investors, Inc. Sunrise Senior Living Real Estate Investment Trust, Sunrise REIT Trust and Sunrise REIT GP, Inc. | Mark A. Gelowitz and Laura Fric, for the Respondents, Ventas SSL Ontario II, Inc. (Formerly 2124678 Ontario Inc.), Ventas SSL Ontario I., Inc. (Formerly 2124680 Ontario Inc.) and Ventas, Inc. |
| Respondents | Robert W. Staley, Derek J. Bell and Lisa Millman, for the Respondent, Health Care Property Investors, Inc. |
| | Peter F.C. Howard, Eliot Kolers and Ellen Snow, for the Respondents, Sunrise Senior Living Real Estate Investment Trust, Sunrise REIT Trust, and Sunrise REIT GP Inc. |

- 3 -

**Pepall, J.**

**REASONS FOR DECISION**

Introduction

[1]     This case involves the interpretation of a purchase agreement entered into following an auction. The issue to be considered is whether the vendor has an obligation under that agreement to enforce a standstill agreement signed by an unsuccessful auction participant.

Facts

[2]     Sunrise Senior Living Real Estate Investment Trust ("Sunrise REIT") is a Canadian public real estate investment trust whose units are listed on the Toronto Stock Exchange. It owns and invests in income producing and newly developed senior living communities in major metropolitan markets and surrounding suburban areas in Canada and the United States. It owns 74 senior living communities all of which are managed by Sunrise Senior Living, Inc. ("SSL"). SSL is one of the largest providers of such management services in North America. It is an American public company whose shares are listed on the New York Stock Exchange.

[3]     In September, 2006, the Board of Trustees of Sunrise REIT determined that a strategic sale process of the investment trust would likely be beneficial for unitholders. The Board decided to explore the possibility of a sale of either the Sunrise REIT units or assets of Sunrise REIT through a confidential sale process. It established a special committee to examine alternative transactions and the committee in turn engaged TD Securities as its financial advisor. Mr. Warren, the chairman of the Board of Sunrise REIT, testified that he sought to move the REIT towards value maximization through the process of an auction and that he retained TD Securities to assist in creating an auction designed to encourage bidders to make their best offer. Sunrise REIT initiated a strategic review process. As part of the first round of this process, TD Securities approached a select number of prospective purchasers regarding their interest in purchasing all of the Sunrise REIT units or all of Sunrise REIT's assets.

2007 CanLII 8934 (ON SC)

- 4 -

[4]    Interested parties were each required to enter into a confidentiality agreement. Sunrise REIT entered into seven confidentiality agreements, three of which were with parties to these applications, namely SSL, Ventas Inc. ("Ventas") and Health Care Property Investors, Inc. ("HCP"). Ventas is an American public company whose shares are listed on the New York Stock Exchange. It is a leading health care real estate investment trust which owns a number of properties including independent and assisted living facilities, skilled nursing facilities, hospitals and medical office buildings. HCP is also an American public company whose shares are also listed on the New York Stock Exchange. It is a self-administered investment trust that invests directly or through joint ventures in health care facilities. Ventas and Sunrise REIT executed a confidentiality agreement dated November 7, 2006, HCP and Sunrise REIT entered into a confidentiality agreement on November 8, 2006 and on November 10, 2006, Sunrise REIT and SSL also executed a confidentiality agreement.

[5]    With one exception, the confidentiality agreements of HCP and Ventas were substantially similar. The agreements imposed restrictions on the use and disclosure of confidential non-public proprietary information provided by Sunrise REIT to the potential purchaser and contained further terms prohibiting communications between the potential purchaser and SSL without the prior written consent of Sunrise REIT. The agreements also prevented a potential purchaser from visiting any facility managed by SSL regardless of whether it was owned by Sunrise REIT. The agreements provided for access by the potential purchaser to a detailed online data room containing additional confidential information of Sunrise REIT. The confidentiality agreements provided that to facilitate discussion relating to a potential negotiated transaction, Sunrise REIT expected to make certain non-public information available. Specifically, the parties to the confidentiality agreements agreed that,

> "Moreover, without the prior written consent of Sunrise REIT, the Interested Party[1] will not, and will direct its Representatives not to, directly or indirectly (a) disclose to Sunrise Senior Living, Inc. ("Sunrise") that it has entered into this agreement or entered into discussions with Sunrise REIT relating to the Transaction, (b) approach or contact or discuss with Sunrise to discuss any terms or other facts with respect to the Transaction, the Evaluation Material or any

---

[1] Eg. HCP or Ventas.

2007 CanLII 8934 (ON SC)

- 5 -

information regarding the business, financial condition, operations, assets, properties, liabilities, or prospects of Sunrise REIT, including any information regarding any properties managed by Sunrise, or (c) visit any property or facility managed by Sunrise, whether owned by Sunrise REIT or otherwise."

The confidentiality agreements addressed waiver as follows,

"No provision of this agreement can be waived except by means of a written instrument that is validly executed on behalf of the party hereto granting the waiver and that refers specifically to the particular provision or provisions being waived. No failure or delay by a party hereto in exercising any right hereunder or any partial exercise thereof will operate as a waiver thereof or preclude any other or further exercise of any right hereunder."

Both HCP and Ventas had standstill provisions in their confidentiality agreements but their language differed. Amongst other things, HCP agreed that for a period of 18 months it would not make a proposal to acquire any securities or assets of Sunrise REIT unless it had Sunrise REIT's prior written consent. More precisely, the HCP confidentiality agreement provided that,

"In consideration of the Evaluation Material being furnished to the Interested Party [HCP], the Interested Party agrees that from the date hereof until the date that is 18 months from the date hereof (the "Standstill Period"), without the prior written consent of Sunrise REIT, the Interested Party shall not and shall cause its affiliates not to: (a) in any manner acquire, agree to acquire or make any proposal to acquire, directly or indirectly, by means of purchase, merger, business combination or in any other manner, beneficial ownership of any securities or all or any assets of Sunrise REIT or any of its subsidiaries, (b) make, or in any way participate, directly or indirectly, in any solicitation of proxies to vote, or seek to advise or influence any person with respect to the voting of, any voting securities of Sunrise REIT, (c) form, join or in any way participate in a "group" (within the meaning of Section 13(d)(3) of the *United States Securities Exchange Act* of 1934) or act jointly or in concert with any other person with respect to any voting securities of Sunrise REIT, (d) otherwise act, alone or in concert with others, to seek to control, advise, change or influence the management, board of trustees, or governing instruments of Sunrise REIT, (e) make any public disclosure of any intention in connection with the foregoing, (f) make any public disclosure, or take any action that could require Sunrise REIT to make any public disclosure, with respect to any of the matters set forth in this agreement, (g) disclose any intention, plan or arrangement inconsistent with the foregoing, or (h) advise, assist or encourage any other persons in connection with any of the foregoing. The Interested Party also agrees during such period not to request Sunrise REIT or any

2007 CanLII 8934 (ON SC)

- 6 -

of its Representatives, directly or indirectly, to amend or waive any provision of this paragraph (including this sentence)." (emphasis added)

For ease of reference, this provision is referred to in these reasons as the Standstill Agreement.

[6]    The Ventas confidentiality agreement contained a similar standstill provision but it ceased to apply if, amongst other things, Sunrise REIT entered into an agreement to sell more than 20% of its units or assets to a third party.  Items (a) through and including (h) and following were identical to the provisions of HCP's agreement but the definition of Ventas' Standstill Period differed from that of HCP as follows:

> "In consideration of the mutual agreements contained herein and the provisions of the Evaluation Material to the Interested party [Ventas], the parties hereto agree that until the earlier of (i) the expiration of 18 months from the date hereof, (ii) such date, if any, that Sunrise REIT or any of its affiliates has entered into or publicly disclosed its intent to enter into a definitive agreement with the Interested Party or any of its affiliates or any third party with respect to any sale of Sunrise REIT, a sale or other divestiture in a single or series of related transactions of more than 20% of Sunrise REIT's equity securities, assets or operations, or any other transaction that would reasonably be expected to result in a change of control of Sunrise REIT, or (iii) such date, if any, that is fifteen business days following the date any third party has formally commenced an unsolicited take-over bid, tender offer or exchange offer for any of Sunrise REIT's securities which has not been publicly rejected by Sunrise REIT's board (such period described in the preceding clauses (i) through (iii), the "Standstill Period")."

Ventas was unaware of the terms of the HCP confidentiality agreement until February 18, 2007.

[7]    Having executed confidentiality agreements, potential purchasers were then invited to make a preliminary non-binding written proposal.  Following a review of the preliminary proposals submitted in December, 2006, the Sunrise REIT special committee invited a number of interested bidders to go to round two, in effect to undertake further due diligence and to submit a final bid in January, 2007.

[8]    By early December 2006, it became clear to the special committee that SSL was not an interested purchaser and therefore, there was no longer any need to maintain the prohibition on discussions with SSL as set forth in the confidentiality agreements.  Sunrise REIT therefore

2007 CanLII 8934 (ON SC)

- 7 -

authorized TD Securities to contact HCP and Ventas and to arrange for them to have direct contact with SSL which they did.

[9]    Ventas and HCP were the only participants invited to the second stage of the auction. Both were asked to submit a final binding proposal for the acquisition of Sunrise REIT by January 8, 2007.  In the correspondence sent to HCP, it was told, "You should not assume that you will be given an opportunity to rebid, renegotiate, or improve the terms of your proposal." Ventas submitted its proposal but HCP withdrew from the process and declined to submit a final binding proposal on the basis that it was unable to successfully negotiate an agreement with SSL. The special committee endorsed the Ventas proposal and the Board subsequently met and voted to approve the Ventas transaction and to recommend it to the Sunrise REIT unitholders.

[10]    Following the Board approval, Ventas and Sunrise REIT entered into a purchase agreement (the "Purchase Agreement") on January 14, 2007.  Concurrently, Ventas also entered into an agreement with SSL.  The next day Sunrise REIT publicly announced the Ventas transaction.

[11]    Under the terms of the Purchase Agreement, through two wholly owned subsidiaries, 2124678 Ontario Inc. and 2124680 Ontario Inc., Ventas was to acquire substantially all of Sunrise REIT's assets as well as assume substantially all of its liabilities for a cash consideration of $15 per Sunrise REIT unit. According to Sunrise REIT's press release of January 15, 2007, this represented a 35.7% premium over the closing price of the units on January 12, 2007.  The Ventas transaction must be approved by Sunrise REIT unitholders at a special meeting of all unitholders.  The meeting is to take place before March 31, 2007.  If the unitholders reject the offer, the Purchase Agreement may be terminated by Sunrise REIT.

[12]    The Purchase Agreement contained an entire agreement provision which states,

> "This Agreement, the agreements and other documents herein referred to and the Confidentiality Agreement constitute the entire agreement between the parties pertaining hereto and supersede all other prior agreements, understandings, negotiations and discussions, whether oral or written, between the parties hereto. Except as expressly represented and warranted herein, neither party shall be

2007 CanLII 8934 (ON SC)

- 8 -

considered to have given any other express or implied representations or warranties, including without limitation as a result of oral or written statements."

The purchase price was stated to be equal to the amount of $1,137,712,410 plus assumed liabilities. In Section 2.5 of the Purchase Agreement, Sunrise REIT waived the standstill provisions contained in the Ventas confidentiality agreement and stated that in all other respects, the provisions of the Ventas confidentiality agreement continued to apply.

[13]   Article 4 of the Purchase Agreement addressed covenants and 4.4 was entitled "Covenants Regarding Non-Solicitation". Given their significance to this dispute, these provisions are reproduced in their entirety as follows:

> 4.4   (1)   Following the date hereof, Sunrise REIT shall not, directly or indirectly, through any trustee, officer, director, agent or Representative of Sunrise REIT or any of its Subsidiaries, and shall not permit any such Person to,
>
> (i)   solicit, initiate, encourage or otherwise facilitate (including by way of furnishing information or entering into any form of agreement, arrangement or understanding or providing any other form of assistance) the initiation of any inquiries or proposals regarding, or other action that constitutes, or may reasonably be expected to lead to, an actual or potential Acquisition Proposal,
>
> (ii)   participate in any discussions or negotiations in furtherance of such inquiries or proposals or regarding an actual or potential Acquisition Proposal or release any Person from, or fail to enforce, any confidentiality or standstill agreement or similar obligations to Sunrise REIT or any of its Subsidiaries, (emphasis added)
>
> (iii)   approve, recommend or remain neutral with respect to, or propose publicly to approve, recommend or remain neutral with respect to, any Acquisition Proposal,
>
> (iv)   accept or enter into any agreement, arrangement or understanding related to any Acquisition Proposal (other than a confidentiality agreement contemplated in Section 4.4(2)), or

2007 CanLII 8934 (ON SC)

- 9 -

2007 CanLII 8934 (ON SC)

(v)    withdraw, modify or qualify, or publicly propose to withdraw, modify or qualify, in any manner adverse to the Purchasers, the approval or recommendation of the Board (including any committee thereof) of this Agreement or the transactions contemplated hereby.

(2)    Notwithstanding anything contained in Section 4.4(1), until the Unitholder Approval, nothing shall prevent the Board from complying with Sunrise REIT's disclosure obligations under applicable Laws with regard to a bona fide written, unsolicited Acquisition Proposal or, following the receipt of any such Acquisition Proposal from a third party (that did not result from a breach of this Section 4.4), from furnishing or disclosing non-public information to such Person if and only to the extent that:

(i)    the Board believes in good faith (after consultation with its financial advisor and legal counsel) that such Acquisition Proposal if consummated could reasonably be expected to result in a Superior Proposal; and

(ii)    such third party has entered into a confidentiality agreement containing terms in the aggregate no more favourable to such third party than those in the Confidentiality Agreement as are then in effect in accordance with its terms.

(3)    Notwithstanding anything contained in Section 4.4(1), until the Unitholder Approval, nothing shall prevent the Board from withdrawing or modifying, or proposing publicly to withdraw or modify its approval and recommendation of the transactions contemplated by this Agreement, or accepting, approving or recommending or entering into any agreement, understanding or arrangement providing for a bona fide written, unsolicited Acquisition Proposal (that did not result from a breach of this Section 4.4) ("Proposed Agreement") if and only to the extent that:

(i)    it has provided the Purchasers with a copy of all of the documents relating to the Acquisition Proposal,

(ii)    the Board, believes in good faith (after consultation with its financial advisor and legal counsel) that such Acquisition Proposal constitutes a Superior Proposal and has promptly notified the Purchasers of such determination,

- 10 -

2007 CanLII 8934 (ON SC)

(iii) a period of at least five Business Days (the "Matching Period") has elapsed following the later of (x) the date the Purchasers received written notice advising the Purchasers that the Board has resolved, subject to compliance with this Section 4.4(3), to withdraw, modify its approval and recommendation of the transactions contemplated by this Agreement or accept, approve or recommend or enter into a Proposed Agreement in respect of such Superior Proposal and (y) the date the Purchasers received a copy of the documentation related to such Superior Proposal pursuant to Section 4.4(3)(i),

(iv) if the Purchasers have proposed to amend the transactions contemplated under this Agreement in accordance with Section 4.4(6), the Board has again made the determination in Section 4.4(3)(ii) taking into account such proposed amendments; and

(v) if Sunrise REIT proposes to enter into a Proposed Agreement (other than a confidentiality agreement referred to in Section 4.4(2)) after complying with this Section 4.4(3), Sunrise REIT shall have complied with Section 5.2 and 5.3. For the purposes of this Section 4.4(3) the preparation and delivery of a directors' circular pursuant to Section 99 of the *Securities Act* relating to an Acquisition Proposal shall be deemed to be a qualification, withdrawal or modification, of the Board's recommendation of the transactions contemplated hereby unless the Board expressly, and without qualification, reaffirms its recommendation of the transactions contemplated hereby in such disclosure.

(4) If the expiry of the Matching Period referred to in Section 4.4(3)(iii) falls on a date which is less than five Business Days prior to the Unitholder Meeting, Sunrise REIT shall, at the request of the Purchasers, adjourn the Unitholder Meeting to a date that is not more than 10 Business Days following such expiry date.

(5) Sunrise REIT acknowledges and agrees that each successive amendment to any Acquisition Proposal shall constitute a new Acquisition Proposal for purposes of Section 4.4.

(6) During the Matching Period, the Purchasers shall have the right, but not the obligation, to propose to amend the terms of this Agreement. The Trustees will review any proposal by the Purchasers to amend the terms of this Agreement in good faith in order to determine (after consultation with their financial advisor and legal counsel) whether the transactions contemplated by this Agreement, taking into account the Purchasers'

- 11 -

proposed amendments would, if consummated in accordance with its terms, result in the Superior Proposal ceasing to be a Superior Proposal. If the Trustees so determine, Sunrise REIT will enter into an amending agreement with the Purchasers reflecting such proposed amendment.

(7)   Sunrise REIT shall, as promptly as practicable, notify the Purchasers of any relevant details relating to any Acquisition Proposal, or inquiry that could reasonably be expected to lead to any Acquisition Proposal, or any amendments to any Acquisition Proposal (including the identity of the parties and all material terms thereof), or any request for non-public information relating to Sunrise REIT or any of its Subsidiaries in connection with an Acquisition Proposal or inquiry that could reasonably be expected to lead to any Acquisition Proposal, or for access to the properties, books or records of Sunrise REIT or any of its Subsidiaries by any Person that informs Sunrise REIT or such Subsidiary that it is considering making, or has made, an Acquisition Proposal, or inquiry that could reasonably be expected to lead to any Acquisition Proposal, in each case which any of Sunrise REIT, any of its Subsidiaries or any officer, trustee, director, employee or Representative may receive after the date hereof relating to an Acquisition Proposal. Sunrise REIT shall promptly and fully keep the Purchasers informed of the status on a current basis, including any change to any of the terms, of any such Acquisition Proposal.

(8)   Sunrise REIT shall

(i)     ensure that its officers and Trustees and its Subsidiaries and their respective officers and directors and any Representatives retained by it or its Subsidiaries in connection herewith are aware of the provisions of this Section 4.4, and Sunrise REIT shall be responsible for any breach of this Section 4.4 by its and its Subsidiaries' officers, directors, trustees or representatives;

(ii)    immediately cease and cause to be terminated any existing activities, discussions or negotiations with any parties conducted heretofore with respect to any Acquisition Proposal;

(iii)   require all Persons other than the Purchasers who have been furnished with confidential information regarding Sunrise REIT or its Subsidiaries in connection with the solicitation of or discussion regarding any Acquisition Proposal within 12 months prior to the date hereof promptly to return or destroy such information, in accordance with and subject to the terms of the confidentiality agreement entered into with such Persons;

2007 CanLII 8934 (ON SC)

- 12 -

2007 CanLII 8934 (ON SC)

    (iv)    terminate access for all Persons (other than the Purchasers and its Representatives) of the electronic dataroom accessible through Merrill Datasite's website; and

    (v)    <u>not amend, modify, waive or fail to enforce any of the standstill terms or other conditions included in any of the confidentiality agreements between Sunrise REIT and any third parties</u>. (emphasis added)

[14]    The Purchase Agreement defines Acquisition Proposal and Superior Proposal as follows:

"Acquisition Proposal" means any proposal or offer made by any Person other than the Purchasers (or any affiliate of the Purchasers or any Person acting jointly and/or in concert with the Purchasers or any affiliate of the Purchasers) with respect to the acquisition, directly or indirectly, of assets, securities or ownership interests of or in Sunrise REIT or any of its Subsidiaries representing 20% or more of the consolidated assets of Sunrise REIT and its Subsidiaries taken as a whole, in a single transaction or a series of transactions, or of equity interests representing a 20% or greater economic interest in Sunrise REIT or such Subsidiaries taken as a whole, in a single transaction or a series of transactions pursuant to any merger, amalgamation, tender offer, share exchange, business combination, liquidation, dissolution, recapitalization, take-over or non-exempt issuer bid, amendment to the Declaration of Trust, redemption of units, extraordinary distribution, sale, lease, exchange, mortgage, pledge, transfer, purchase, or issuance as consideration or similar transaction or series of transactions involving Sunrise REIT or any of such Subsidiaries or any other transaction the consummation of which would reasonably expected to impede, interfere with, prevent or materially delay the transactions contemplated hereby."

"Superior Proposal" means any unsolicited bona fide written Acquisition Proposal made by a third party that in the good faith determination of the Trustees, after consultation with its financial advisors and with outside counsel:

    (a)    is reasonably capable of being completed without undue delay having regard to financial, legal, regulatory and other matters;

    (b)    in respect of which adequate arrangements have been made to ensure that the required funds will be available to effect payment in full of the consideration; and

- 13 -

2007 CanLII 8934 (ON SC)

(c)  would, if consummated in accordance with its terms, result in a transaction more favourable to Unitholders from a financial point of view (including financing terms, any termination fee or expenses reimbursement payable under this Agreement, any conditions to the consummation thereof) than the transactions contemplated by this Agreement; provided, however, that for purposes of this definition the references in the definition of Acquisition Proposal to "20%" shall be deemed to be references to "100%".

[15]   In the event that a Superior Proposal emerges, the Purchase Agreement provides Ventas with both a "right to match" and in the event that it chooses not to match the proposal, subject to certain tax considerations, it receives a break fee of $39,800,000 if it terminates the Purchase Agreement.

[16]   On January 17, 2007, Sunrise REIT's solicitor wrote to HCP advising that Sunrise REIT had entered into an agreement with Ventas.  Sunrise REIT's solicitor requested HCP to promptly return certain documents "pursuant to the terms of the Confidentiality Agreement between you and Sunrise REIT dated November 8, 2006 (the "Agreement")" and went on to write, "You are reminded that the terms of the Agreement, including those with respect to the continued confidentiality and use of the Evaluation Material (including any oral Evaluation Material), continue in force in accordance with its terms."   HCP responded by returning confidential materials to Sunrise REIT's solicitor.

[17]   On February 14, 2007, HCP wrote to Sunrise REIT to submit a proposal on behalf of HCP to acquire Sunrise REIT.  Sunrise REIT described the proposal as being "otherwise identical" to that contained in the Purchase Agreement with Ventas but for cash consideration of $18 per unit.  This represented a 20% premium over the price offered by Ventas.  HCP stated in its letter that its proposal was a Superior Proposal as defined in Ventas' Purchase Agreement and it trusted that Sunrise REIT's chairman and other trustees, in the proper exercise of their fiduciary duties to unitholders, would respond immediately and positively to its proposal.  HCP also publicly announced its intention to make a bid to acquire Sunrise REIT.

- 14 -

[18]    Sunrise REIT concluded that it was not in a position to consider or make any determination as to whether HCP was a Superior Proposal as HCP's letter of February 14, 2007 suggested that the terms of the offer were conditional on HCP reaching an agreement with SSL. Sunrise REIT issued a press release to this effect on February 15, 2007.

[19]    On February 15, 2007, Ventas wrote to the president and CEO of Sunrise REIT advising that it had become aware that HCP had been in contact with two of Sunrise REIT's trustees, Messrs. Klassen and Newell, who are also the most senior executives of SSL.  Ventas took the position that this contact could constitute a violation of HCP's confidentiality agreement of November, 2006 which Ventas asserted prohibited contact between HCP and SSL. Ventas stated that it understood that HCP's confidentiality agreement was the same as that of Ventas.  Ventas also wrote to SSL.

[20]    On February 16, 2007, Sunrise REIT wrote to Ventas and stated that the term of the confidentiality agreements prohibiting contact as between HCP and Ventas on the one side and SSL on the other, had been waived and asked Ventas to confirm that it agreed that Sunrise REIT would not be in breach of the Purchase Agreement if discussions occurred as between HCP and SSL.  This confirmation was not forthcoming from Ventas.  On February 18 and 20, 2007, HCP wrote to Sunrise REIT with further proposals.  HCP offered to enter an agreement with SSL that was identical in material respects to that entered into by Ventas and HCP stated that this therefore eliminated the need for SSL to engage in discussions with HCP.  When Ventas discovered that HCP was still bound by the Standstill Agreement in its confidentiality agreement, Ventas wrote to Sunrise REIT requesting that it comply with the covenants in the Purchase Agreement and enforce its rights under the HCP confidentiality agreement.  On February 19, 2007, Sunrise REIT commenced court proceedings as did Ventas on February 21, 2007 and SSL on February 21, 2007.

Relief Requested

[21]    Sunrise REIT applies for a declaration that the term in the confidentiality agreements between Sunrise REIT and Ventas, Sunrise REIT and HCP, and Sunrise REIT and SSL

- 15 -

restricting SSL from having discussions or communications with either of HCP or Ventas with respect to Sunrise REIT has been waived by Sunrise REIT and that that waiver remains in effect. It also requests a declaration that Sunrise REIT is not and will not be in breach of the Ventas Purchase Agreement by reason of a discussion as between HCP and SSL as to its management of Sunrise REIT properties with a view towards ascertaining whether HCP and SSL can agree on management terms in the event that HCP succeeds in a bid for the assets of Sunrise REIT. It also requests a declaration that, in particular, section 4.4 of the Ventas Purchase Agreement does not apply to require Sunrise REIT to enforce terms of confidentiality agreements executed by Sunrise REIT which were waived prior to the execution of the Ventas Purchase Agreement.

[22]    Ventas applies for a declaration that Sunrise REIT, Sunrise REIT Trust and Sunrise REIT GP, Inc. are obligated pursuant to the Ventas Purchase Agreement to enforce the standstill terms and other conditions in the HCP confidentiality agreement. It also requests a declaration that the standstill terms set out in the HCP confidentiality agreement are in effect and remain in effect until May 8, 2008.

[23]    SSL applies for a declaration that the agreement set forth in a letter dated January 14, 2007 does not prohibit or in any way restrict SSL from engaging in discussions with HCP concerning SSL's management of Sunrise REIT properties with a view to ascertaining whether HCP and SSL can agree on management terms and changes to the various agreements currently in place between SSL and Sunrise REIT in the event that HCP succeeds in a bid for the assets of Sunrise REIT or other business combination with Sunrise REIT. SSL also requests a declaration that SSL is not and will not be in a breach of the confidentiality agreement between it and Sunrise REIT by reason of any discussions between SSL and HCP regarding SSL management of the Sunrise REIT properties and changes to the aforesaid various agreements in connection with HCP's bid to acquire Sunrise REIT.

[24]    Given the urgency of the matter, these applications proceeded in a very truncated time frame. I propose to address Ventas' application first.

<u>Positions of the Parties</u>

2007 CanLII 8934 (ON SC)

- 16 -

[25]    In brief, these are the parties' positions with respect to the Ventas application.  Ventas submits that sophisticated commercial parties should be held to their contracts to ensure commercial certainty and to avoid commercial chaos.  The auction process, which was designed to cause bidders to put their best foot forward, involved a set of "rules of engagement".  It is Ventas' position that as part of the auction process, a confidentiality agreement that included the Standstill Agreement was entered into by HCP and Sunrise REIT.  Ventas played by the rules and won the auction.  The benefits of winning the auction included a binding obligation on Sunrise REIT to enforce the HCP Standstill Agreement.  It argues that the covenants in section 4.4 of the Ventas Purchase Agreement are clear.  In the context of the auction process that led to the Purchase Agreement, the only objectively reasonable interpretation of Section 4.4(8)(v) is that any third parties bound by standstill terms with Sunrise REIT would continue to be bound by them and Sunrise REIT would enforce them.  Any interpretation or argument that this obligation falls away in the face of an Acquisition Proposal made by a third party in breach of its standstill terms would deprive section 4.4(8)(v) of any meaning and would render it nugatory.  In addition, Ventas argues that the HCP proposals do not satisfy the criteria that would permit 4.4(2) and 4.4(3) to oust the provisions of 4.4(1) in that they were not unsolicited or bona fide and they result from a breach of section 4.4.  It is Ventas' position that Sunrise REIT and HCP should be held to their bargains.  The rationale for deal protection devices such as the Standstill Agreement between Sunrise REIT and HCP is that, in a contested bidding situation, they encourage bidders to make their best bids.  In any event, as set forth in the Purchase Agreement, Ventas states that ultimately it should be for the unitholders to decide which course to take.

[26]    Sunrise REIT does not take the position that the Purchase Agreement is ambiguous.  Rather, it submits that Sunrise REIT contracted for a "fiduciary out" mechanism in the Purchase Agreement and these provisions were a fundamental aspect of the commercial context of the process that was designed to maximize value for the unitholders.  It agreed with Ventas not to solicit further bids but was permitted to consider an unsolicited Acquisition Proposal made by any Person as those terms were defined in the Purchase Agreement.  Ventas received significant benefits from being the winner "at the end of the first stage of the auction" as it had the right to match another proposal or walk away with a $39,800,000 break fee.  If Ventas had wanted to

2007 CanLII 8934 (ON SC)

2007 CanLII 8934 (ON SC)

exclude a person who had been involved in the auction, it could have used express language to do so. Counsel submits that sections 4.4(2) and 4.4(3) of the Purchase Agreement are engaged when Sunrise REIT receives an unsolicited Acquisition Proposal and these sections expressly supercede section 4.4(1). Furthermore, from a reading of 4.4(2) and 4.4(3), nothing, including section 4.4(8), should override Sunrise REIT's ability to consider unsolicited Acquisition Proposals and Superior Proposals. Sunrise REIT should be able to determine whether an Acquisition Proposal could be a Superior Proposal without being required to enforce a standstill provision. Counsel submits that Ventas' treatment of section 4.4(8) renders the obligation in 4.4(1) redundant and also ignores the word "nothing" in sections 4.4(2) and 4.4(3). Counsel argues that subsection 4.4(8) applies in circumstances other than those involving Acquisition Proposals. Furthermore, that section of the Purchase Agreement must be read in the context of the "fiduciary out" provisions in the manner advanced by Sunrise REIT. It is also more practical to proceed in the manner it describes given that the Ventas Purchase Agreement is subject to a vote of the unitholders before it can proceed. In its factum, Sunrise REIT acknowledged that the HCP Standstill Agreement continues to be outstanding and that it has not consented to the HCP proposal.

[27]   HCP makes substantially similar arguments to those of Sunrise REIT with respect to the interpretation to be given to the Purchase Agreement. HCP's counsel submits that the Purchase Agreement expressly permits HCP's Acquisition Proposal. The term Acquisition Proposal does not exclude proposals made by first round participants. Nothing could prevent Sunrise REIT from entering into a bona fide written unsolicited Acquisition Proposal as it had an obligation to its unitholders to design a process that would maximize unitholder value. The Ventas Purchase Agreement contemplates that any third party can make a subsequent unsolicited bid and if the bid is financially superior to the Ventas transaction, Sunrise REIT could accept the bid and terminate the Purchase Agreement with Ventas. This is clear from the wording of sections 4.4(2) and 4.4(3). The introductory words of those sections, "notwithstanding anything contained in section 4.4(1)" are not words of limitation but are for greater certainty. Unlike section 4.4(1), section 4.4(8) has no application to future discussions or negotiations with respect to a future unsolicited Acquisition Proposal. It does not apply to subsequent unsolicited bona fide

- 18 -

Acquisition Proposals. In this regard, section 4.4(3) "occupies the field." HCP also submits that its proposal did not result from a breach of section 4.4; it was unsolicited, and bona fide. Subsequent conduct also supports the argument that section 4.4(3) applies to HCP's proposal.

[28]   In any event, HCP states that it received Sunrise REIT's prior written consent to make binding bids on December 29, 2006. The consent was not limited to any specified duration or in any other way. The consent was never revoked and the Standstill Agreement was never reinstated. HCP also submits that the benefits of the Standstill Agreement may not be assigned without its consent.

<u>Discussion</u>

(a)   <u>The Purchase Agreement</u>

[29]   At its heart, this case involves issues of contractual interpretation. Therefore, I will start by addressing the appropriate principles of law that I should consider in interpreting the Purchase Agreement.

[30]   Firstly, as affirmed by the Court of Appeal in *Toronto Dominion Bank v. Leigh Instruments Ltd.*,[2]

> "The aim of the court, in construing a written agreement, is to determine the intentions of the parties to the agreement, and in this regard, the cardinal presumption is that the parties have intended what they have said. Their words must be construed as they stand."

Similar principles were expressed more recently in the Ontario Court of Appeal decision of *Venture Capital USA Inc. v. Yorkton Securities Inc.*[3]

> "The cardinal rule of contract interpretation "is that the court should give effect to the intention of the parties as expressed in their written agreement", and where the intention of the parties "is plainly expressed in the language of the agreement, the court should not stray beyond the four corners of the agreement": *KPMG Inc. v. Canadian Imperial Bank of Commerce* [1998] O.J. No.4746 (C.A.), at para. 5, leave to appeal refused, [1999] S.C.C.A. No. 36, [1999] 2 S.C.R. vi; *Indian*

---

[2] (1998), 40 B.L.R. (2d) 1 at para. 403, affirmed (1999) 45 O.R. (3d) 417 (C.A.).
[3] (2005) 75 O.R. (3d) at 333.

- 19 -

> *Molybdenum Ltd. v. R..*, [1951] 3 D.L.R. 497 (S.C.C.), at p. 502; *Eli Lilly & Co. v. Novopharm Ltd.,* [1998] 2 S.C.R. 129, [1998] S.C.J. No. 59, at pp. 166-68 S.C.R."

[31]    Secondly, I am to consider the Purchase Agreement as a whole.

> "It is a cardinal rule of the construction of contracts that the various parts of the contract are to be interpreted in the context of the intentions of the parties as evident from the contract as a whole.": *B.G. Checo International Ltd. v. British Columbia Hydro & Power Authority.* [4]

The court should also strive to give meaning to the agreement and "reject an interpretation that would render one of its terms ineffective": *Scanlon v. Castlepoint Development Corp.*[5]

[32]    As to surrounding circumstances, subjective intent and extrinsic evidence, Iacobucci J. stated in *Eli Lilly & Co. v. Novopharm Ltd.,*[6]

> "The contractual intent of the parties is to be determined by reference to the words they used in drafting the document, possibly read in light of the surrounding circumstances which were prevalent at the time. Evidence of one party's subjective intention has no independent place in this determination.

> Indeed, it is unnecessary to consider any extrinsic evidence at all when the document is clear and unambiguous on its face. In the words of Lord Atkinson in *Lampson v. City of Quebec* (1920), 54 D.L.R. 344 (P.C.):

>> ... the intention by which the deed is to be construed is that of the parties as revealed by the language they have chosen to use in the deed itself ... [I]f the meaning of the deed, reading its words in their ordinary sense, be plain and unambiguous it is not permissible for the parties to it, while it stands unreformed, to come into a Court of justice and say: "Our intention was wholly different from that which the language of our deed expresses...

> When there is no ambiguity in the wording of the document, the notion in *Consolidated Bathurst* that the interpretation which produces a "fair result" or "sensible commercial result" should be adopted is not determinative. Admittedly, it would be absurd to adopt an interpretation which is clearly inconsistent with the commercial interests of the parties, if the goal is to ascertain their true contractual

---

[4] [1993] 1 S.C.R. 12 at p. 23.
[5] (1992), 11 O.R. (3d) 744 at 770 (Ont.C.A.).
[6] [1998] 2 S.C.R. 166.

- 20 -

intent. However, to interpret a plainly worded document in accordance with the true contractual intent of the parties is not difficult, if it is presumed that the parties intended the legal consequences of their words."[7]

[33]    The Court of Appeal addressed the issue of surrounding circumstances or the "factual matrix" in *Kentucky Fried Chicken v. Scott's Food Services Inc.*[8] as follows:

> "While the task of interpretation must begin with the words of the document and their ordinary meaning, the general context that gave birth to the document or its "factual matrix" will also provide the court with useful assistance. In the famous passage in *Reardon Smith Line Ltd. v. Yngvar Hansen-Tangen*, [1976] 1 W.L.R. 989 at 995-96 (H.L.) Lord Wilberforce said this:
>
>> No contracts are made in a vacuum: there is always a setting in which they have to be placed. The nature of what is legitimate to have regard to is usually described as "the surrounding circumstances" but this phrase is imprecise: it can be illustrated but hardly defined. In a commercial contract it is certainly right that the court should know the commercial purpose of the contract and this in turn presupposes knowledge of the genesis of the transaction, the background, the context, the market in which the parties are operating.
>
> The scope of the surrounding circumstances to be considered will vary from case to case but generally will encompass those factors which assist the court "... to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of the entry into the contract." *Consolidated Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance Co.,* [1980] 1 S.C.R. 888 at 901.
>
> Where, as here, the document to be construed is a negotiated commercial document, the court should avoid an interpretation that would result in a commercial absurdity. [*City of Toronto v. W.H. Hotel Ltd.* (1966), 56 D.L.R. (2d) 539 at 548 (S.C.C.)]. Rather, the document should be construed in accordance with sound commercial principles and good business sense. [*Scanlon v. Castlepoint Development Corporation et al.* (1992), 11 O.R. (3d) 744 at 770 (Ont.C.A.)]. Care must be taken, however, to do this objectively rather than from the perspective of one contracting party or the other, since what might make good business sense to one party would not necessarily do so for the other."

---

[7] P. 166.
[8] [1998] O.J. No. 4368 at para.25-27.

- 21 -

[34]    With these broad principles of interpretation in mind, I turn to the construction to be given to section 4.4 of the Purchase Agreement. Properly construed, does it impose an obligation on Sunrise REIT to enforce the Standstill Agreement in the confidentiality agreement entered into by HCP and Sunrise REIT? In my view, it does for the following reasons.

[35]    Sunrise REIT expressly and unambiguously agreed that it would not amend, modify, waive or fail to enforce any of the standstill terms or other conditions included in any of the confidentiality agreements between Sunrise REIT and any third parties. The standstill enforcement obligations are found in sections 4.4(1) and 4.4(8) of the Purchase Agreement.

[36]    Sections 4.4(2) and 4.4(3) address Sunrise REIT's obligations with regard to "a bona fide written, unsolicited Acquisition Proposal (that did not result from a breach of this section 4.4)." Sections 4.4(2) and 4.4(3) are prefaced with the words "notwithstanding anything contained in section 4.4(1)." Sections 4.4(2) and (3) do not say "notwithstanding anything contained in section 4.4(1) or 4.4(8)." If it had been the parties' contractual intention to exempt the circumstances described in sections 4.4(2) and (3) from the operation of section 4.4(8), they could have so provided but they did not. Similarly, unlike sections 4.7 and 4.8 which commence with the words "notwithstanding any other term of the Agreement", sections 4.4(2) and 4.4(3) do not use this language.

[37]    It also should be observed that 4.4(2) and 4.4(3) contemplate a bona fide Acquisition Proposal. Bona fide means acting or done in good faith; sincere, genuine.[9] I agree with the submission of counsel for Ventas that a proposal made in breach of a contractual obligation not to make such a proposal cannot be considered to be bona fide. Sections 4.4(2) and 4.4(3) are not designed to address Acquisition Proposals that are not bona fide. So, for instance in this case, HCP is in breach of its Standstill Agreement and therefore HCP's proposals would not be encompassed by sections 4.4(2) and 4.4(3) because they could not be considered to be bona fide. Furthermore, sections 4.4(2) and 4.4(3) also contemplate an Acquisition Proposal from a third party that did not result from a breach of section 4.4. An Acquisition Proposal submitted in

---

[9] Oxford English Dictionary, Oxford University Press, 2007.

2007 CanLII 8934 (ON SC)

- 22 -

breach of a standstill agreement, to the extent it is considered by Sunrise REIT, would result from a breach of section 4.4. Again, in this case, sections 4.4(2) and 4.4(3) would be inapplicable on this ground as well.

[38]    It seems to me that the clear scheme of this Purchase Agreement was ensure enforcement of standstill agreements that had been signed as part of the auction process. This strikes me as being objectively reasonable and was a form of protection afforded to the purchaser, Ventas. This was part of the package negotiated between it and Sunrise REIT.

[39]    Such an interpretation derives from the words used by the parties to the Purchase Agreement and gives effect to the parties' intention. It is also consistent with the context of the transaction including the auction process which was the genesis of the Purchase Agreement. The Purchase Agreement does not preclude bona fide written unsolicited Acquisition Proposals nor does it preclude such a proposal from a party whose standstill agreement operated to permit such a proposal.[10]  It simply precludes a proposal from anyone who is in breach of its standstill agreement. While creative, I view Sunrise REIT's and HCP's interpretation arguments to be strained. They disregard the parties' intention and the true meaning of the subject sections and the Purchase Agreement as a whole.

[40]    Lastly, in reaching this determination, it is unnecessary to have regard to any of the evidence of Ms. Cafaro of Ventas of which Sunrise REIT and HCP take exception.

[41]    In conclusion, I am of the view that the Purchase Agreement requires Sunrise REIT to enforce the HCP Standstill Agreement contained in the HCP confidentiality agreement.

(b)    Prior Written Consent

[42]    The next issue to address is HCP's argument that, as required by the provisions of the Standstill Agreement, it received Sunrise REIT's prior written consent to submit its proposal. On December 29, 2006, Sunrise REIT invited Ventas and HCP to make binding bids in the second round of the auction process. HCP submits that these invitations constituted Sunrise

---

[10] As for example, Ventas.

- 23 -

REIT's prior written consent to both HCP and Ventas and that this consent was not limited to any specified duration or in any other way.[11]

[43]    In my view, this position is not borne out by the evidence. The December 29, 2006 letter from TD Securities invites HCP "to submit a detailed final binding proposal (a "Proposal") for the acquisition of the REIT" (emphasis added) and goes on to state "You should not assume that you will be given an opportunity to rebid, renegotiate, or improve the terms of your Proposal." This letter cannot possibly be construed as constituting Sunrise REIT's prior written consent as that term is used in the Standstill Agreement. Furthermore, on January 17, 2007, Sunrise REIT's solicitor reminded HCP that the terms of the confidentiality agreement continued in force. The confidentiality agreement of course contained the Standstill Agreement. In addition, the proposal most recently provided by HCP to Sunrise REIT provides that "Sunrise REIT hereby waives the standstill provisions." If consent had already been provided, this language would be unnecessary. Lastly, Sunrise REIT also takes the position that the Standstill Agreement continues to bind HCP and that it has not provided consent. In my view, the facts are inconsistent with a conclusion that Sunrise REIT provided its consent pursuant to the provisions of the Standstill Agreement so as to obviate the need for HCP to comply with the Standstill Agreement and for Sunrise REIT to be relieved of its obligation to enforce it.

(c)    Assignment

[44]    There is also no merit in HCP's argument that the benefit of the HCP Standstill Agreement was assigned to Ventas without HCP's consent. Neither the Standstill Agreement nor its benefit has been assigned. Ventas only requests that Sunrise REIT comply with its obligation to enforce the Standstill Agreement.

(d)    Remaining Applications

[45]    I am of the view that having found in favour of Ventas with respect to its application, the subject matter of the other two applications is moot. The question whether HCP can have discussions with SSL about Sunrise REIT is of no practical significance as they would be

---

[11] See para. 20 of the HCP factum.

2007 CanLII 8934 (ON SC)

- 24 -

discussions absent a proposal that could not be made or considered. Furthermore, on February 20, 2007, HCP wrote to Sunrise REIT stating that the need to engage in discussions with SSL was eliminated.

> "… our offer to enter into an agreement with [SSL] identical in material respects to that entered into by Ventas eliminates the need for [SSL] to engage in any discussion or communications with HCP and therefore can be accepted irrespective of any such concerns."

A court should not grant declaratory relief where the issue has become academic and therefore declaratory relief would serve no useful purpose: *Canada v. Solosky*[12] and *Lee v. Canada (Minister of Citizenship & Immigration).*[13]

Conclusion

[46]    In conclusion, I note that the parties to this transaction were experienced and sophisticated. They had financial advisors and legal representation from prominent law firms. Absent an established legal principle such as rectification, it is not the role of the courts to rewrite contracts entered into by sophisticated commercial parties. The relief set forth in paragraph (a) of the notice of application of Ventas is granted as is the request for a declaration that the standstill terms in the HCP confidentiality agreement are in effect. I am not granting Ventas' request for a declaration that the standstill terms remain in effect until May 8, 2008 as, as noted by Ventas in its factum, if the unitholders reject Ventas' offer, the Purchase Agreement may be terminated by Sunrise REIT thereby relieving Sunrise REIT of its obligations under the Agreement, including the standstill enforcement obligation at issue in this case. The applications of Sunrise REIT and SSL are dismissed. If the parties are unable to agree on costs, they are to make brief written submissions.

---

[12] [1980] 1 S.C.R. 821 at 832.
[13] (1997), 126 F.T.R. 229 (F.C.T.D) at 233.

- 25 -

Pepall, J.

**Released:**    March 6, 2007

2007 CanLII 8934 (ON SC)

COURT FILE NO.: 07-CL-6893
DATE: 2007-03-06

# ONTARIO

## SUPERIOR COURT OF JUSTICE

**B E T W E E N:**

Ventas, Inc., 2124678 Ontario Inc., and 2124680
Ontario Inc.

Applicants

- and -

Sunrise Senior Living Real Estate Investment
Trust, Sunrise REIT Trust, Sunrise REIT GP, Inc.,
Sunrise Senior Living Inc., and Health Care
Property Investors, Inc.

Respondents

---

## REASONS FOR DECISION

---

**PEPALL J**

**Released:**     March 6, 2007

2007 CanLII 8934 (ON SC)