# TAB 93

2007 CarswellOnt 1705, 222 O.A.C. 102, 29 B.L.R. (4th) 312, 56 R.P.R. (4th) 163, 85 O.R. (3d) 254

⚑🕮🗏

2007 CarswellOnt 1705, 222 O.A.C. 102, 29 B.L.R. (4th) 312, 56 R.P.R. (4th) 163, 85 O.R. (3d) 254

Ventas Inc. v. Sunrise Senior Living Real Estate Investment Trust

VENTAS, INC., 2124678 ONTARIO INC., and 2124680 ONTARIO INC. (Applicants / Respondents in Appeal) and SUNRISE SENIOR LIVING REAL ESTATE INVESTMENT TRUST, SUNRISE REIT TRUST, SUNRISE REIT GP, INC., SUNRISE SENIOR LIVING, INC., and HEALTH CARE PROPERTY INVESTORS, INC. (Respondents / Appellants in Appeal)

SUNRISE SENIOR LIVING REAL ESTATE INVESTMENT TRUST, SUNRISE REIT TRUST, and SUNRISE REIT GP, INC. (Applicants / Appellants in Appeal) and VENTAS SSL ONTARIO II, INC. (FORMERLY 2124678 ONTARIO INC.), VENTAS SSL ONTARIO I, INC. (FORMERLY 2124680 ONTARIO INC.), VENTAS INC., SUNRISE SENIOR LIVING, INC., and HEALTH CARE PROPERTY INVESTORS, INC. (Respondents / Respondents in Appeal / Ventas Inc. and numbered companies) (Appellant by Cross-Appeal / Health Care Property Investors, Inc.)

Ontario Court of Appeal

R.A. Blair, J. MacFarland, H.S. LaForme JJ.A.

Heard: March 20, 2007
Judgment: March 23, 2007
Docket: CA C46790, C46791

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Proceedings: affirming *Ventas Inc. v. Sunrise Senior Living Real Estate Investment Trust* (2007), 2007 CarswellOnt 1704, 29 B.L.R. (4th) 292 (Ont. S.C.J.)

Counsel: Peter F.C. Howard, Eliot Kolers for Appellants, Sunrise Senior Living Real Estate Investment Trust, Sunrise REIT Trust, Sunrise REIT GP Inc.

Jeffrey S. Leon, Derek J. Bell for Appellants, Health Care Property Investors Inc.

Mark A. Gelowitz, Laura K. Fric for Respondents, Ventas Inc., Numbered Companies

Luis G. Sarabia, Cynthia Spry for Respondent, Sunrise Senior Living Inc.

Subject: Corporate and Commercial; Contracts; Property; Public

Business associations --- Powers, rights and liabilities — Contracts by corporations — Miscellaneous issues

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 1705, 222 O.A.C. 102, 29 B.L.R. (4th) 312, 56 R.P.R. (4th) 163, 85 O.R. (3d) 254

Real estate investment trust was publicly traded entity — Board of trustees decided to sell assets and developed two-stage auction process to maximize value of units — Parties interested in purchasing were required to enter into confidentiality agreements with trust — Confidentiality agreements contained standstill terms prohibiting contact between either potential purchaser and trust's subsidiary — Corporation entered into agreement with trust to purchase assets — Third party learned of agreement and sent last-ditch proposal to trust — Trust told third party to enter discussions with representatives from its subsidiary — Corporation refused to waive stand-still terms of agreement — Corporation's application for declaration that trust was obliged to enforce standstill terms in confidentiality agreement was granted — Trust appealed — Third party cross-appealed for declaration that communications between it and subsidiary of trust were permitted — Appeal dismissed; cross-appeal dis-missed — Trust was obliged to enforce standstill terms — Judge correctly outlined and applied principles of contract interpretation — Judge was correct that important purpose of s. 4.4 of purchase agreement was to en-sure enforcement of standstill agreements entered into by previous players in auction process — Fiduciary out clause did not apply where unsolicited proposal was tendered in breach of non-solicitation provisions of pur-chase agreement — Fiduciary out clause did not allow trust to resile from terms of its standstill agreements with earlier bidders — Judge was sensitive to fiduciary out provisions that permitted other bona fide written unsoli-cited acquisition proposals — Judge found this was balanced by requirement that trust ensure enforcement of standstill agreements signed as part of auction process in order to protect successful bidder — This interpreta-tion made commercial sense — Judge did not err in her assessment and use of term "bona fide" — Issue on cross-appeal was moot since ruling precluded third party proposal from being pursued.

**Cases considered by *R.A. Blair J.A.*:**

*ACE Ltd. v. Capital Re Corp.* (1999), 747 A.2d 95 (U.S. Del. Ch.) — referred to

*BG Checo International Ltd. v. British Columbia Hydro & Power Authority* (1993), 1993 CarswellBC 1254, [1993] 2 W.W.R. 321, [1993] 1 S.C.R. 12, 147 N.R. 81, 75 B.C.L.R. (2d) 145, 99 D.L.R. (4th) 577, 20 B.C.A.C. 241, 35 W.A.C. 241, 14 C.C.L.T. (2d) 233, 5 C.L.R. (2d) 173, 1993 CarswellBC 10 (S.C.C.) — referred to

*Consolidated-Bathurst Export Ltd. c. Mutual Boiler & Machinery Insurance Co.* (1979), *(*sub nom. *Exporta-tions Consolidated-Bathurst Ltée c. Mutual Boiler & Machinery Insurance Co.)* [1980] 1 S.C.R. 888, 112 D.L.R. (3d) 49, 1979 CarswellQue 157, 1979 CarswellQue 157F, 32 N.R. 488, [1980] I.L.R. 1-1176 (S.C.C.) — referred to

*CW Shareholdings Inc. v. WIC Western International Communications Ltd.* (1998), 39 O.R. (3d) 755, 160 D.L.R. (4th) 131, 1998 CarswellOnt 1891, 38 B.L.R. (2d) 196 (Ont. Gen. Div. [Commercial List]) — re-ferred to

*Eli Lilly & Co. v. Novopharm Ltd.* (1998), 227 N.R. 201, 152 F.T.R. 160 (note), 1998 CarswellNat 1061, 1998 CarswellNat 1062, 161 D.L.R. (4th) 1, [1998] 2 S.C.R. 129, 80 C.P.R. (3d) 321 (S.C.C.) — referred to

*Kentucky Fried Chicken Canada v. Scott's Food Services Inc.* (1998), 1998 CarswellOnt 4170, 41 B.L.R. (2d) 42, 114 O.A.C. 357 (Ont. C.A.) — considered

*Paramount Communcations Inc. v. QVC Network Inc.* (1994), 637 A.2d 34, 62 U.S.L.W. 2530, Fed. Sec. L. Rep. P 98,063 (U.S. Del. Super.) — referred to

*Pente Investment Management Ltd. v. Schneider Corp.* (1998), 113 O.A.C. 253, *(*sub nom. *Maple Leaf*

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 1705, 222 O.A.C. 102, 29 B.L.R. (4th) 312, 56 R.P.R. (4th) 163, 85 O.R. (3d) 254

*Foods Inc. v. Schneider Corp.)* 42 O.R. (3d) 177, 1998 CarswellOnt 4035, 44 B.L.R. (2d) 115 (Ont. C.A.) — considered

*Scanlon v. Castlepoint Development Corp.* (1992), 29 R.P.R. (2d) 60, 59 O.A.C. 191, 11 O.R. (3d) 744, 99 D.L.R. (4th) 153, 1992 CarswellOnt 633 (Ont. C.A.) — referred to

*Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)* (1998), 1998 CarswellOnt 2565, 40 B.L.R. (2d) 1 (Ont. Gen. Div. [Commercial List]) — referred to

*Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)* (1999), 45 O.R. (3d) 417, *(*sub nom. *Toronto-Dominion Bank v. Leigh Instruments Ltd. (Bankrupt))* 124 O.A.C. 87, 178 D.L.R. (4th) 634, 50 B.L.R. (2d) 64, 1999 CarswellOnt 2812 (Ont. C.A.) — referred to

*Venture Capital USA Inc. v. Yorkton Securities Inc.* (2005), 2005 CarswellOnt 1875, 197 O.A.C. 264, 75 O.R. (3d) 325, 4 B.L.R. (4th) 324 (Ont. C.A.) — referred to

APPEAL by public real estate trust from decision reported at *Ventas Inc. v. Sunrise Senior Living Real Estate Investment Trust* (2007), 56 R.P.R. (4th) 184, 2007 CarswellOnt 1704, 29 B.L.R. (4th) 292 (Ont. S.C.J.), granting application by corporation for declaration that trust was obligated to enforce confidentiality agreement; CROSS-APPEAL by third party for declaration that communications between it and subsidiary of trust were permitted.

*R.A. Blair J.A.*:

**Overview**

1    Sunrise REIT is a Canadian public real estate investment trust whose units are traded on the Toronto Stock Exchange. It owns and invests in senior living communities in Canada and the United States. In September 2006, Sunrise's board of trustees determined that a strategic sale process of its assets would be beneficial to its unitholders, thus effectively putting Sunrise "in play" on the public markets.

2    To carry out this plan, the Trustees developed a two-stage auction process with a view to maximizing the value of Sunrise's units. Ventas, Inc. ("Ventas") and Health Care Property Investors, Inc. ("HCPI") were two of seven initially interested prospective purchasers in the auction process. They emerged from the preliminary round as the only two potential bidders asked to participate in the final round.

3    Ventas submitted a successful bid to acquire all of Sunrise's assets for a total purchase price of $1,137,712,410 (representing a price of $15 per unit), subject to unitholder approval. HCPI withdrew from the auction process and did not bid at that time. Instead, it put forward a post-auction bid — after it knew what Ventas had offered — "topping up" the Ventas offer by twenty per cent to $18 per unit. This increased offer represents an additional $227.5 million for the unitholders, who are to meet on March 30, 2007, to consider the Ventas proposal.

4    Hence the urgency of this appeal.

5    The appeal turns on the interpretation of the terms of the purchase agreement executed by Sunrise and Ventas following acceptance of the Ventas bid. The issue is whether Sunrise is obliged to enforce the terms of a prior standstill agreement entered into between it and HCPI in the course of the auction process and which pro-

2007 CarswellOnt 1705, 222 O.A.C. 102, 29 B.L.R. (4th) 312, 56 R.P.R. (4th) 163, 85 O.R. (3d) 254

hibits HCPI from making an offer for the Sunrise assets without Sunrise's consent. If the answer to that question is "Yes", Sunrise will be precluded from considering or accepting the richer HCPI offer pending the unitholders' meeting.

6      Following an urgent application, determined on March 6, 2007, Justice Pepall answered the foregoing question in the affirmative. Sunrise and HCPI appeal from that decision. Ventas supports it.

7      For the reasons that follow, I would dismiss the appeal and uphold the decision of the application judge.

**Facts**

8      As mentioned above, Sunrise owns and invests in senior living communities in Canada and the United States. The properties are managed by Sunrise Senior Living, Inc. ("SSL"), a U.S. public company whose shares are traded on the New York Stock Exchange.

9      HCPI is a self-administered real estate investment trust that also invests in healthcare facilities. Ventas is a U.S.-based health care real estate investment trust whose shares are listed on the New York Stock Exchange.

10      In September 2006, after Sunrise's board of trustees determined that a strategic sale process of the Trust's assets would be beneficial to its unitholders, it began an auction process with a view to maximizing unitholder value.

11      Parties who were interested in acquiring Sunrise (including HCPI and Ventas) were required to enter into a confidentiality agreement with it in order to prevent non-public information exchanged by the parties from being publicly disclosed (the "Confidentiality Agreements"). The Confidentiality Agreements contained restrictions preventing each prospective acquiring party from attempting a hostile (unsolicited) takeover bid (the "Standstill Agreements").

12      Although the parties' Confidentiality Agreements were largely similar, Ventas's Standstill Agreement was worded differently from HCPI's in that the Ventas standstill ceased to apply if, among other things, Sunrise entered into an agreement to sell more than twenty per cent of its assets to a third party. Notably, HCPI's Standstill Agreement did not contain a similar termination clause.

13      On November 21, 2006, Sunrise invited potential bidders to submit bids in the non-binding preliminary round of an auction. After the first round of bids, Sunrise invited HCPI and Ventas to engage in further negotiations and on December 29, 2006, it invited them to submit final binding bids in the second round of the auction by January 8, 2007. Sunrise waived the Standstill Agreements with those bidders for that purpose, and HCPI and Ventas were expressly told not to assume that the "winning" bid was assured of actually acquiring Sunrise at the price agreed upon or that they would be given an opportunity to rebid, renegotiate, or improve the terms of their proposal.

14      Ventas submitted a second bid on January 8, but HCPI withdrew from the auction and did not.

15      On January 14, 2007, Ventas and Sunrise signed an agreement contemplating the purchase by Ventas of all of Sunrise's assets for a total purchase price of $1,137,712,410 (representing a price of $15.00 per Unit), subject to Unitholder approval (the "Purchase Agreement"). This price represented a 35.8% premium over the closing price of the units on January 12, 2007. The Purchase Agreement contemplated subsequent third-party unsolicited bids and allowed Sunrise to accept such a bid if it was financially superior to Ventas's bid.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 1705, 222 O.A.C. 102, 29 B.L.R. (4th) 312, 56 R.P.R. (4th) 163, 85 O.R. (3d) 254

16    On January 17, 2007, Sunrise notified HCPI of the agreement with Ventas and asked for the return of Sunrise's confidential materials. In the letter, Sunrise's solicitor reminded HCPI of the terms of the Confidentiality Agreement it signed in November 2006.

17    On February 14, 2007, HCPI submitted a proposal to acquire all of Sunrise's assets for $18.00 per unit (the "HCPI Proposal"), conditional on HCPI's ability to reach a management agreement with SSL. Sunrise treated the HCPI Proposal as an unsolicited third-party bid, but it concluded that it was not in a position to determine whether the bid was a superior bid because of the SSL condition.

18    The Confidentiality Agreements entered into in the course of the auction process contained a provision prohibiting prospective purchasers from communicating with SSL. This was because SSL was viewed as a possible bidder. Following the preliminary round of the auction, in late November 2006, and after realizing that SSL was not an interested purchaser, Sunrise had authorized its financial advisors to arrange to allow HCPI and Ventas to contact SSL for purposes of the second round of bidding. On February 15, 2007, however — after learning of the HCPI Proposal — Ventas advised Sunrise that, if it permitted communications between SSL and HCPI, Sunrise would be in breach of the Purchase Agreement. It did not assert that HCPI would be in breach of its Standstill Agreement because it apparently assumed that HCPI's Standstill Agreement was worded similarly to the Ventas Standstill Agreement, which meant that the restraint on an unsolicited bid was no longer enforceable since Sunrise had entered into an agreement with a third party.

19    On February 18, 2007, Sunrise served application materials upon Ventas, HCPI and SSL indicating its intention to seek the court's interpretation of the Purchase Agreement, specifically on the issue of communications between HCPI and SSL. It is at this point that Ventas learned of the specific terms of HCPI's Confidentiality Agreement and realized that HCPI's Standstill Agreement did not contain the same termination clause as Ventas's Standstill Agreement. On February 21, 2007, Ventas brought the within Application seeking a declaration that Sunrise was required to enforce its Standstill Agreement with HCPI, thereby preventing it from considering the HCPI Proposal.

20    The application judge found that Sunrise had agreed with Ventas that it would enforce existing Standstill Agreements and that any bid made in breach of an existing Standstill Agreement would not be *bona fide*. She then concluded that Sunrise was required to enforce the Standstill Agreement with HCPI and that HCPI did not have prior written consent to submit its bid. She dismissed Sunrise's application on the grounds that the issue was moot in light of her earlier conclusion.

**The Provisions of the Agreement**

21    Section 4 of the Purchase Agreement deals generally with the covenants of the parties. Section 4.4 deals with Sunrise's "Covenants Regarding Non-Solicitation". Because of their importance, I reproduce the provisions of section 4.4 in their entirety (the underlining is mine):

> 4.4(1) <u>Following the date hereof, Sunrise REIT shall not</u>, directly or indirectly, through any trustee, officer, director, agent or Representative of Sunrise REIT or any of its Subsidiaries, and shall not permit any such Person to,
>
> > (i) <u>solicit</u>, initiate, encourage or otherwise facilitate (including by way of furnishing information or entering into any form of agreement, arrangement or understanding or providing any other form of assistance) the initiation of any inquiries or <u>proposals</u> regarding, or other action that constitutes, or may reas-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 1705, 222 O.A.C. 102, 29 B.L.R. (4th) 312, 56 R.P.R. (4th) 163, 85 O.R. (3d) 254

onably be <u>expected to lead to, an actual or potential Acquisition Proposal,</u>

(ii) <u>participate in any discussions or negotiations in furtherance of such inquiries or proposals or regard-</u>
<u>ing an actual potential Acquisition Proposal or release any Person from, or fail to enforce, any confid-</u>
<u>entiality or standstill agreement or similar obligations to Sunrise REIT or any of its Subsidiaries,</u>

(iii) approve, recommend or remain neutral with respect to, or propose publicly to approve, recommend
or remain neutral with respect to, any Acquisition Proposal,

(iv) accept or enter into any agreement, arrangement or understanding, related to any Acquisition Pro-
posal (other than a confidentiality agreement contemplated in Section 4.4(2)), or

(v) withdraw, modify or qualify, or publicly propose to withdraw, modify or qualify, in any manner ad-
verse to the Purchasers, the approval or recommendation of the Board (including any committee there-
of) of this Agreement or the transactions contemplated hereby.

(2) Notwithstanding anything contained in Section 4.4(1), until the Unitholder Approval, nothing shall pre-
vent the Board from complying with Sunrise REIT's disclosure obligations under applicable Laws with re-
gard to a bona fide written, unsolicited Acquisition Proposal or, following the receipt of any such Acquisi-
tion Proposal from a third party <u>(that did not result from a breach of this Section 4.4)</u>, from furnishing or
disclosing non-public information to such Person if and only to the extent that:

(i) the Board believes in good faith (after consultation with its financial advisor and legal counsel) that
such Acquisition Proposal if consummated could reasonably be expected to result in a Superior Propos-
al; and

(ii) such third party has entered into a confidentiality agreement containing terms in the aggregate no
more favourable to such third party than those in the Confidentiality Agreement as are then in effect in
accordance with its terms.

(3) Notwithstanding anything, contained in Section 4.4(1), until the Unitholder Approval, nothing shall pre-
vent the Board from withdrawing or modifying, or proposing publicly to withdraw or modify its approval
and recommendation of the transactions contemplated by this Agreement, or accepting, approving or recom-
mending or entering into any agreement, understanding or arrangement providing for a bona fide written,
unsolicited Acquisition Proposal <u>(that did not result from a breach of this Section 4.4)</u> ("Proposed Agree-
ment") if and only to the extent that:

(i) it has provided the Purchasers with a copy of all of the documents relating to the Acquisition Propos-
al,

(ii) the Board, believes in good faith (after consultation with its financial advisor and legal counsel) that
such Acquisition Proposal constitutes a Superior Proposal and has promptly notified the Purchasers of
such determination,

(iii) a period of at least five Business Days (the "Matching Period") has elapsed following the later of
(x) the date the Purchasers received written notice advising the Purchasers that the Board has resolved,
subject to compliance with this Section 4.4(3), to withdraw, modify its approval and recommendation of
the transactions contemplated by this Agreement or accept, approve or recommend or enter into a Pro-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 1705, 222 O.A.C. 102, 29 B.L.R. (4th) 312, 56 R.P.R. (4th) 163, 85 O.R. (3d) 254

posed Agreement in respect of such Superior Proposal and (y) the date the Purchasers received a copy of the documentation related to such Superior Proposal pursuant to Section 4.4(3)(i),

(iv) if the Purchasers have proposed to amend the transactions contemplated under this Agreement in accordance with Section 4.4(6), the Board has again made the determination in Section 4.4(3)(ii) taking into account such proposed amendments; and

(v) if Sunrise REIT proposes to enter into a Proposed Agreement (other than a confidentiality agreement referred to in Section 4.4(2)) after complying with this Section 4.4(3), Sunrise REIT shall have complied with Section 5.2 and 5.3. For the purposes of this Section 4.4(3) the preparation and delivery of a directors' circular pursuant to Section 99 of the *Securities Act* relating to an Acquisition Proposal shall be deemed to be a qualification, withdrawal or modification, of the Board's recommendation of the transactions contemplated hereby unless the Board expressly, and without qualification, reaffirms its recommendation of the transactions contemplated hereby in such disclosure.

(4) If the expiry of the Matching Period referred to in Section 4.4(3)(iii) falls on a date which is less than five Business Days prior to the Unitholder Meeting, Sunrise REIT shall, at the request of the Purchasers, adjourn the Unitholder Meeting to a date that is not more than 10 Business Days following such expiry date.

(5) Sunrise REIT acknowledges and agrees that each successive amendment to any Acquisition Proposal shall constitute a new Acquisition Proposal for purposes of section 4.4.

(6) During the Matching Period, the Purchasers shall have the right, but not the obligation, to propose to amend the terms of this Agreement. The Trustees will review any proposal by the Purchasers to amend the terms of this Agreement in good faith in order to determine (after consultation with their financial advisor and legal counsel) whether the transactions contemplated by this Agreement, taking into account the Purchasers' proposed amendments would, if consummated in accordance with its terms, result in the Superior Proposal ceasing to be a Superior Proposal. If the Trustees so determine, Sunrise REIT will enter into an amending agreement with the Purchasers reflecting such proposed amendment.

(7) Sunrise REIT shall, as promptly as practicable, notify the Purchasers of any relevant details relating to any Acquisition Proposal, or inquiry that could reasonably be expected to lead to any Acquisition Proposal, or any amendments to any Acquisition Proposal (including the identity of the parties and all material terms thereof), or any request for non-public information relating to Sunrise REIT or any of its Subsidiaries in connection with an Acquisition Proposal or inquiry that could reasonably be expected to lead to any Acquisition Proposal, or for access to the properties, books or records of Sunrise REIT or any of its Subsidiaries by any Person that informs Sunrise REIT or such Subsidiary that it is considering making, or has made, an Acquisition Proposal, or inquiry that could reasonably be expected to lead to any Acquisition Proposal, in each case which any of Sunrise REIT, any of its Subsidiaries or any officer, trustee, director, employee or Representative may receive after the date hereof relating to an Acquisition Proposal. Sunrise REIT shall promptly and fully keep the Purchasers informed of the status on a current basis, including any change to any of the terms, of any such Acquisition Proposal.

(8) Sunrise REIT shall

(i) ensure that its officers and Trustees and its Subsidiaries and their respective officers and directors and any Representatives retained by it or its Subsidiaries in connection herewith are aware of the provi-

2007 CarswellOnt 1705, 222 O.A.C. 102, 29 B.L.R. (4th) 312, 56 R.P.R. (4th) 163, 85 O.R. (3d) 254

sions of this Section 4.4, and Sunrise REIT shall be responsible for any breach of this Section 4.4 by its and its Subsidiaries' officers, directors, trustees or representatives;

(ii) immediately cease and cause to be terminated any existing activities, discussions or negotiations with any parties conducted heretofore with respect to any Acquisition Proposal;

(iii) require all Persons other than the Purchasers who have been furnished with confidential information regarding Sunrise REIT or its Subsidiaries in connection with the solicitation of or discussion regarding any Acquisition Proposal within 12 months prior to the date hereof promptly to return or destroy such information, in accordance with and subject to the terms of the confidentiality agreement entered into with such Persons;

(iv) terminate access for all Persons (other than the Purchasers and its Representatives) of the electronic dataroom accessible through Merrill Datasite's website; and

(v) <u>not amend, modify, waive or fail to enforce any of the standstill terms or other conditions included in any of the confidentiality agreements between Sunrise REIT and any third parties.</u>

22    The Purchase Agreement defines "Acquisition Proposal" and "Superior Proposal" as follows:

"Acquisition Proposal" means any proposal or offer made by any Person other than the Purchasers (or any affiliate of the Purchasers or any Person acting jointly and/or in concert with the Purchasers or any affiliate of the Purchasers) with respect to the acquisition, directly or indirectly, of assets, securities or ownership interests of or in Sunrise REIT or any of its Subsidiaries representing 20% or more of the consolidated assets of Sunrise REIT and its Subsidiaries taken as a whole, in a single transaction or a series of transactions, or, of equity interests representing a 20% or greater economic interest in Sunrise REIT or such Subsidiaries taken as a whole, in a single transaction or a series of transactions pursuant to any merger, amalgamation, tender offer, share exchange, business combination, liquidation, dissolution, recapitalization, take-over or non-exempt issuer bid, amendment to the Declaration of Trust, redemption of units, extraordinary distribution, sale, lease, exchange, mortgage, pledge, transfer, purchase, or issuance as consideration or similar transaction or series of transactions involving Sunrise REIT or any of such Subsidiaries or any other transaction the consummation of which would reasonably expected to impede, interfere with, prevent or materially delay the transactions contemplated hereby.

"Superior Proposal" means any unsolicited bona fide written Acquisition Proposal made by a third party that in the good faith determination of the Trustees, after consultation with its financial advisors and with outside counsel:

(a) is reasonably capable of being completed without undue delay having regard to financial, legal, regulatory and other matters;

(b) in respect of which adequate arrangements have been made to ensure that the required funds will be available to effect payment in full of the consideration; and

(c) would, if consummated in accordance with its terms, result in a transaction more favourable to Unitholders from a financial point of view (including financing terms, any termination fee or expenses reimbursement payable under this Agreement, any conditions to the consummation thereof) than the

2007 CarswellOnt 1705, 222 O.A.C. 102, 29 B.L.R. (4th) 312, 56 R.P.R. (4th) 163, 85 O.R. (3d) 254

transactions contemplated by this Agreement; provided, however, that for purposes of this definition the references in the definition of Acquisition Proposal to "20%" shall be deemed to be references to "100%".

## Analysis

23    The central issue on this appeal, as it was before the application judge, is whether the provisions of section 4.4 of the Purchase Agreement impose an obligation on Sunrise to enforce the Standstill Agreement between it and HCPI, thus precluding it from considering the Acquisition Proposal submitted by HCPI following the close of the auction and after the Ventas bid had been accepted. In my view, they do.

24    Counsel accept that the application judge correctly outlined the principles of contractual interpretation applicable in the circumstances of this case. I agree. Broadly stated — without reproducing in full the relevant passages from her reasons (paras. 29-34) in full — she held that a commercial contract is to be interpreted,

> (a) as a whole, in a manner that gives meaning to all of its terms and avoids an interpretation that would render one or more of its terms ineffective;[FN1]

> (b) by determining the intention of the parties in accordance with the language they have used in the written document and based upon the "cardinal presumption" that they have intended what they have said;[FN2]

> (c) with regard to objective evidence of the factual matrix underlying the negotiation of the contract, but without reference to the subjective intention of the parties;[FN3] and (to the extent there is any ambiguity in the contract),

> (d) in a fashion that accords with sound commercial principles and good business sense, and that avoid a commercial absurdity.[FN4]

25    The appellants assert, however, that the application judge misapplied the principles of contractual interpretation that she had properly enunciated. They say she did so essentially,

> a) by misapprehending the interplay between sections 4.4(1), 4.4(2), 4.4(3) and 4.4(8)(v) of the Purchase Agreement and, in particular by failing to appreciate, and to reconcile, the differences between the wording of sections 4.4(1) and 4.4(8), and more generally,

> b) by failing to understand the "architecture" of section 4.4 of the Purchase Agreement and to consider it against the background of the factual matrix in which the Agreement was negotiated.

26    I do not agree.

### The Application Judge's Reasoning

27    The thrust of the application judge's reasoning in this regard is found at paragraphs 35, 36, 38 and 39 of her reasons:

> 35 Sunrise REIT expressly and unambiguously agreed that it would not amend, modify, waive or fail to en-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 1705, 222 O.A.C. 102, 29 B.L.R. (4th) 312, 56 R.P.R. (4th) 163, 85 O.R. (3d) 254

force any of the standstill terms or other conditions included in any of the confidentiality agreements between Sunrise REIT and any third parties. The standstill enforcement obligations are found in sections 4.4(1) and 4.4(8) of the Purchase Agreement.

36 Sections 4.4(2) and 4.4(3) address Sunrise REIT's obligations with regard to "a bona fide written, unsolicited Acquisition Proposal (that did not result from a breach of this section 4.4)." Sections 4.4(2) and 4.4(3) are prefaced with the words "notwithstanding anything contained in section 4.4(1)." Sections 4.4(2) and (3) do not say "notwithstanding anything contained in section 4.4(1) or 4.4(8)." If it had been the parties' contractual intention to exempt the circumstances described in sections 4.4(2) and (3) from the operation of section 4.4(8), they could have so provided but they did not. Similarly, unlike sections 4.7 and 4.8 which commence with the words "notwithstanding any other term of the Agreement", sections 4.4(2) and 4.4(3) do not use this language.

38 It seems to me that the clear scheme of this Purchase Agreement was [to] ensure enforcement of standstill agreements that had been signed as part of the auction process. This strikes me as being objectively reasonable and was a form of protection afforded to the purchaser, Ventas. This was part of the package negotiated between it and Sunrise REIT.

39 Such an interpretation derives from the words used by the parties to the Purchase Agreement and gives effect to the parties' intention. It is also consistent with the context of the transaction including the auction process which was the genesis of the Purchase Agreement. The Purchase Agreement does not preclude bona fide written unsolicited Acquisition Proposals nor does it preclude such a proposal from a party whose standstill agreement operated to permit such a proposal. It simply precludes a proposal from anyone who is in breach of its standstill agreement. While creative, I view Sunrise REIT's and HCP's interpretation arguments to be strained. They disregard the parties' intention and the true meaning of the subject sections and the Purchase Agreement as a whole.

[Footnote omitted.]

### The Scheme and Interpretation of Section 4.4

28    I agree with the application judge that an important purpose of this part of the Purchase Agreement is to ensure the enforcement of standstill agreements entered into by previous players in the auction process. The negotiating context demonstrates that Ventas has been skilful in protecting its own position with respect to competition and standstills — unlike the HCPI Standstill, the Ventas/Sunrise Standstill Agreement expired at the conclusion of the auction — and it is objectively reasonable, given this background, that it would seek protection against competition from those who were unsuccessful in the auction, particularly its principle competitor.

29    From Sunrise's perspective, the safety valve lies in the unitholders' meeting. If the unitholders believe that there is a more favourable offer available — one worth the risk of rejecting the Ventas proposal — they may well vote to reject the Ventas proposal at their meeting on March 30.

30    The language used by the parties in the Purchase Agreement supports this interpretation.

31    Viewed contextually, sections 4.4(1), 4.4(2), 4.4(3) and 4.4(8) form part of a section of the Purchase Agreement that deals with the general covenant of Sunrise not to shop for other offers pending unitholder consideration of the Ventas bid. Viewed in light of the factual matrix in which the Agreement was negotiated, the

2007 CarswellOnt 1705, 222 O.A.C. 102, 29 B.L.R. (4th) 312, 56 R.P.R. (4th) 163, 85 O.R. (3d) 254

provisions provide deal protection for Ventas, as the successful bidder in the auction, subject to Sunrise REIT's fiduciary out obligations.

32     As I read section 4.4 of the Agreement, it has four major components. First, it contains the overriding obligation of Sunrise not to solicit other bids, buttressed by the commitment of Sunrise to enforce existing stand-still agreements that may be in place with bidders who have already engaged in the auction process (section 4.4(1)). Secondly, it contains the "fiduciary out" protection for the Sunrise Trustees (and unitholders), permitting the Trustees to consider *bona fide* unsolicited Acquisition Proposals from third parties (*that are not in breach of the provisions of section 4.4*) (sections 4.4(2) and 4.4(3)). Thirdly, it contains a series of provisions dealing with how the parties are to address a situation where a permitted Acquisition Proposal is received (sections 4.4(3)-4.4(7)).[FN5] Lastly, section 4.4(8)(v) returns to the general non-solicitation obligation, reinforcing it by ensuring that Sunrise will (i) ensure all of its officers, Trustees and agents are aware of the non-solicitation provisions, (ii) immediately stop negotiating with anyone previously involved in the bidding process, (iii) require those bidders to return any confidential documentation and information they may have received during the process, (iv) terminate access to the data room by anyone other than Ventas and its representatives, and finally (a reiteration of the requirement set out in section 4.4(1)):

>      (v) not amend, modify, waive or fail to enforce any of the standstill terms or other conditions included in any of the confidentiality agreements between Sunrise REIT and any third parties ...

33     Contrary to the appellants' submissions, however, it is not *any* Acquisition Proposal that the Trustees are free to consider as part of the fiduciary out scenario; it is only an Acquisition Proposal from a third party *that is not in breach of section 4.4 of the Agreement*.

34     Properly understood in this fashion, then, a reading of section 4.4 demonstrates that there is no *conflict* between the provisions of sections 4.4(1)(ii), 4.4(2), 4.4(3) and 4.4(8)(v). The repeated standstill enforcement terms *complement* one another. As the application judge pointed out, the opening phrases of sections 4.4(2) and 4.4(3) — "notwithstanding anything contained in Section 4.4(1)" — do not have the words "or Section 4.4(8)(v)" added to them. This reinforces the interpretation that section 4.4(8)(v) is there to clarify that Sunrise's obligation to enforce its Standstill Agreements with third parties is not negated by the fiduciary out clause. An unsolicited proposal by a prior bidder bound by a Standstill Agreement is a proposal that is otherwise in breach of section 4.4, because it violates section 4.4(8)(v), and therefore is not immunized by the fiduciary out provisions.

35     In that sense, contrary to the appellants' submissions, the application judge's reading of the Purchase Agreement does not reduce section 4.4(8)(v) to simply the functional equivalent of section 4.4(1)(ii). Nor is it a case of section 4.4(8)(v) continuing to require the enforcement of a Standstill Agreement even when the fiduciary out clause is otherwise applicable. The fiduciary out clause does not apply where the unsolicited proposal is tendered in breach of the non-solicitation provisions of the Purchase Agreement, i.e., in breach of a Standstill Agreement that Sunrise is obliged to enforce. The fiduciary out formula is an important feature of the non-solicitation format, but it does not allow Sunrise to resile from the terms of its Standstill Agreements with earlier bidders, in my opinion.

### *The Difference in Wording between Sections 4.4(1)(ii) and 4.4(8)(v)*

36     Mr. Howard emphasized what he argued was a difference in wording between those two provisions. He

2007 CarswellOnt 1705, 222 O.A.C. 102, 29 B.L.R. (4th) 312, 56 R.P.R. (4th) 163, 85 O.R. (3d) 254

points out that section 4.4(1)(ii) expressly refers to situations involving "an actual or potential Acquisition Proposal" whereas section 4.4(8)(v) contains no such reference, and further, that other subsections of section 4.4(8) — namely, sections 4.4(8)(ii) and (iii) — refer to Acquisition Proposals as well, although not in the context of standstill agreements (4.4(8)(ii) and 4.4(8)(iii)). Because section 4.4(8)(v) does not refer to "Acquisition Proposals", Mr. Howard submits it does not apply in the context of such a proposal and therefore does not apply in the context of the HCPI Acquisition Proposal.

37     There are several problems with this argument. First, it misapprehends the fact that *any* proposal to acquire more than twenty percent of the assets of Sunrise — whether made before or after the close of the auction — constitutes an "Acquisition Proposal" as defined in the Agreement. Consequently, section 4.4(8)(v) can only apply in the context of an Acquisition Proposal of some sort, regardless of its wording.

38     Secondly, the argument appears to be founded on the unarticulated premise that an Acquisition Proposal, as referenced in sections 4.4(1)(ii), 4.4(2) and 4.4(3), is the equivalent of a Superior Proposal. The appellants' theory of the Agreement is that the Trustees are entitled to consider any Acquisition Proposal received after the close of the auction, and that the commitment in section 4.4(8)(v) to enforce standstill agreements only applies in the event that a subsequent Acquisition Proposal received by the Trustees does not make the grade as a Superior Proposal. The function of section 4.4(8)(v), they say, is to permit the Trustees in such circumstances to prevent a bidder in such a case — whether a prior bidder or not — from continuing to participate in the bidding process.

39     It is not the case, however, that an Acquisition Proposal and a Superior Proposal are the same thing. The latter is a narrower concept than the former. While an Acquisition Proposal is essentially an offer by anyone to acquire more than twenty percent of the assets of Sunrise, a Superior Proposal is an Acquisition Proposal[FN6] that is more favourable to the unitholders from a financial point of view than the Ventas bid. Sunrise submits, at paragraph 43 of its factum, that section 4.4(8)(v) "is part of the filtering protection for both Ventas and Sunrise REIT that allows and obliges Sunrise REIT to deal summarily with offers that do not meet the Acquisition Proposal threshold." Sunrise does not mean the "Acquisition Proposal threshold" in this statement, however; it means the "Superior Proposal threshold." To support the appellants' argument, the reference to "Acquisition Proposal" in section 4.4(1)(ii) would have to be read as "Superior Proposal". That is not what it says.

40     Moreover, and in any event, a careful reading of section 4.4(1)(ii) does not bear out the nexus between the reference to "Acquisition Proposal" and the commitment to enforce the standstill agreements. For ease of reference I repeat the wording of section 4.4(1)(ii) here:

    4.4(1) Following the date hereof, Sunrise REIT shall not ...

        (ii) participate in any discussions or negotiations in furtherance of such inquiries or proposals or regarding an actual or potential Acquisition Proposal or release any Person from, or fail to enforce, any confidentiality or standstill agreement or similar obligation to Sunrise REIT or any of its Subsidiaries.

41     Section 4.4(1)(ii) in reality contains two prohibitions, not one. The language does not work otherwise. Sunrise agrees not to participate in discussions or negotiations regarding actual or potential Acquisition Proposals. It also agrees not to release anyone from, or fail to enforce, existing Standstill Agreements. The drafters could well have divided section 4.4(1) into six general prohibitions rather than five. The commitment to enforce the Standstill Agreements is not, therefore, tied to "Acquisition Proposals" in a way that section 4.4(8)(v) is not.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 1705, 222 O.A.C. 102, 29 B.L.R. (4th) 312, 56 R.P.R. (4th) 163, 85 O.R. (3d) 254

42    Accordingly, I agree with the application judge's observation that while the appellants' interpretation arguments are creative, they are strained. As she said, "They disregard the parties' intention and the true meaning of the subject sections and the Purchase Agreement as a whole."

*An Interpretation that Reflects the "Factual Matrix", is "Commercially Sensible", and Accords with the Fiduciary Obligations of the Sunrise Trustees*

43    Nor do I accept the submission that the application judge failed to consider the factual matrix underlying the negotiation of the Purchase Agreement, or that she failed to give effect to the "commercial sense" component of contract interpretation.

44    In a blended argument, the appellants submit that the application judge's interpretation of the Purchase Agreement ignores the factual matrix in which the Agreement was negotiated, defies commercial sense and reasonableness, and eviscerates the fiduciary out mechanism that was central to the parties' agreement. Respectfully, I do not read the application judge's reasons in this fashion.

*The Factual Matrix*

45    Contracts are not made in a vacuum, and there is no dispute that the surrounding circumstances in which a contract is negotiated are relevant considerations in interpreting contracts. As this court noted in *Kentucky Fried Chicken*, *supra*, at para. 25, "[w]hile the task of interpretation must begin with the words of the document and their ordinary meaning, the general context that gave birth to the document or its 'factual matrix' will also provide the court with useful assistance."

46    Sunrise points to a number of surrounding circumstances which it says the application judge ignored in arriving at her decision. These include that:

a) the Purchase Agreement was entered into at the conclusion of the second stage of a private sale auction process where it was clear that the overall objective of Sunrise was to maximize value for it unitholders;

b) the expectations of the bidders, objectively determined, could not have been that the "winner" of the auction was assured of acquiring the Sunrise assets, because everyone was aware that there would be a fiduciary out clause and that superior proposals could displace the winning bid;

c) Ventas's own standstill terms ceased to apply in the event that Sunrise entered into a sales transaction with a third party, and Ventas could not know whether the other Standstill Agreements rested on the same footing (and did not know that HCPI's did not);

d) Ventas never told Sunrise it believed the participants in the auction would be excluded from the operation of the fiduciary out provision; and

e) Ventas had bargained for, and achieved, considerable deal protection, in the form of the "no shop" provision, the right to match any Superior Proposal, and the right to receive a $39.8 million break fee if it chose not to match such an offer.

47    Matters involving the factual matrix underlying a contract are matters of fact, or at least matters of mixed fact and law. A judge is owed considerable deference in her assessment of such matters. Here, the experienced

2007 CarswellOnt 1705, 222 O.A.C. 102, 29 B.L.R. (4th) 312, 56 R.P.R. (4th) 163, 85 O.R. (3d) 254

Commercial List judge was exercising a function common to that role — the interpretation of a commercial contract — and, while she may not have dealt with the foregoing themes expressly as the appellants would like, her reasons, read as a whole, indicate that she was alive to most, if not all, of them. She was certainly aware of the facts contained in points (a), (b), (c) and (e) above, as she dealt with them at one time or another in the reasons. The factor mentioned in (d) is not dispositive of anything.

48    At the conclusion of her consideration of the interpretation issue, as noted earlier, the application judge said (at paras. 38 and 39):

> 38 It seems to me that the clear scheme of this Purchase Agreement was [to] ensure enforcement of stand-still agreements that had been signed as part of the auction process. This strikes me as being objectively reasonable and was a form of protection afforded to the purchaser, Ventas. This was part of the package negotiated between it and Sunrise REIT.

> 39 Such an interpretation derives from the words used by the parties to the Purchase Agreement and gives effect to the parties' intention. It is also consistent with the context of the transaction including the auction process which was the genesis of the Purchase Agreement. The Purchase Agreement does not preclude bona fide written unsolicited Acquisition Proposals nor does it preclude such a proposal from a party whose standstill agreement operated to permit such a proposal. It simply precludes a proposal from anyone else who is in breach of its standstill agreement. [Emphasis added, footnote omitted.]

49    I can find no basis for concluding the applications judge was not attuned to the need to keep the factual matrix in mind when conducting her interpretative exercise.

50    Nor do I accept that she either ignored the need to interpret the contract in a way that reflected sound commercial sense, or that she failed to give it such an interpretation. It is apparent from her recitation of the principles of contract interpretation that she was aware of the relevance of the "sound commercial sense" theme. She cited the following passage from this Court's decision in *Kentucky Fried Chicken, supra,* at para. 27:

> Where, as here, the document to be construed is a negotiated commercial document, the court should avoid an interpretation that would result in a commercial absurdity: [*City of Toronto v. W.H. Hotel Ltd.* (1966), 56 D.L.R. (2d) 539 at 548 (S.C.C.)]. Rather, the document should be construed in accordance with sound commercial principles and good business sense: [*Scanlon v. Castlepoint Development Corporation et al.* (1992), 11 O.R. (3d) 744 at 770 (Ont.C.A.)]. Care must be taken, however, to do this objectively rather than from the perspective of one contracting party or the other, since what might make good business sense to one party would not necessarily do so for the other.

51    The appellants' argument that the application judge failed to interpret the Purchase Agreement in a fashion that accords with sound commercial sense is grounded in the belief that she overlooked the importance of the "maximizing value" principle and the centrality of the Trustees' fiduciary obligations in that regard, in cases of this nature. She did neither, in my view.

52    As noted above, the application judge was sensitive to the fiduciary out provisions that permitted other *bona fide* written unsolicited Acquisition Proposals. In her view, however, this was balanced, objectively and reasonably, by the requirement that Sunrise ensure enforcement of Standstill Agreements that had been signed as part of the auction process in order to protect the successful bidder. This interpretation makes commercial sense, in my view.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 1705, 222 O.A.C. 102, 29 B.L.R. (4th) 312, 56 R.P.R. (4th) 163, 85 O.R. (3d) 254

53    On behalf of HCPI, Mr. Leon placed great emphasis on the sanctity of the fiduciary out mechanism in acquisition agreements of this nature. There is no doubt that the directors of a corporation that is the target of a takeover bid — or, in this case, the Trustees — have a fiduciary obligation to take steps to maximize shareholder (or unitholder) value in the process: see *CW Shareholdings Inc. v. WIC Western International Communications Ltd.* (1998), 39 O.R. (3d) 755 (Ont. Gen. Div. [Commercial List]), at 768 and 774. That is the genesis of the "fiduciary out" clauses in situations such as the case at hand. They enable directors or trustees to comply with their fiduciary obligations by ensuring that they are not precluded from considering other *bona fide* offers that are more favourable financially to the shareholders or unitholders than the bid in hand.

54    It is not necessary — nor would it be wise, in my view — to go as far as HCPI suggests this court might go, and adopt the principle gleaned from some American authorities, that the target vendor can place no limits on the directors' right to consider superior offers and that any provision to the contrary is invalid and unenforceable: see *Paramount Communcations Inc. v. QVC Network Inc.*, 637 A.2d 34 (U.S. Del. Super. 1994), and *ACE Ltd. v. Capital Re Corp.*, 747 A.2d 95 (U.S. Del. Ch. 1999) at 105. That is not what happened in this case.

55    The Trustees did not contract away their fiduciary obligations. Rather, they complied with them by setting up an auction process, in consultation with their professional advisers, that was designed to maximize the unit price obtained for Sunrise's assets, in a fashion resembling a "shotgun" clause, by requiring bidders to come up with their best price in the second round, subject to a fiduciary out clause that allowed them to consider superior offers from anyone save only those who had bound themselves by a Standstill Agreement in the auction process not to make such a bid. In this case, that turned out to be only HCPI.

56    An auction process is well-accepted as being one — although only one — "appropriate mechanism to ensure that the board of a target company acts in a neutral manner to achieve the best value reasonably available to shareholders in the circumstances": *Pente Investment Management Ltd. v. Schneider Corp.* (1998), 42 O.R. (3d) 177 (Ont. C.A.) at 200. Here, the trustees, acting reasonably and on professional advice, formed the view that an auction process was the best way to maximize value, and conducted such an auction to the point where they attracted a successful bidder. This is not a case where the Trustees were unable to judge the adequacy of the bid ( *Schneider*, at 200). They had dealt with seven prospective purchasers in the course of the two auction rounds, and had received preliminary proposals. Ventas's $15.00-per-unit price represented a 35.8% increase over the market price of the Units on the date the auction closed. I do not think the Trustees can be said to have failed in the exercise of their fiduciary obligations to their unitholders in these circumstances simply by agreeing in the Purchase Agreement to preclude earlier bidders, who had bound themselves under Standstill Agreements not to do so, from coming in after the auction was concluded and the "successful" bidder had showed its cards and attempting to "top up" that bid.

57    It is well accepted that "where an agreement admits of two possible constructions, one of which renders the agreement lawful and the other of which renders it unlawful, courts will give preference to the former interpretation": John D. McCamus, *The Law of Contracts* (Toronto: Irwin Law, 2005) at 729. Advancing this principle, the appellants argue that we should be loathe to adopt an interpretation of the Purchase Agreement that is inconsistent with overarching fiduciary obligations. While I accept the principle put forward, however, I do not think it applies in the context of this case for the reasons outlined above. The interpretation given to the Purchase Agreement by the application judge is not inconsistent with the Trustee's fiduciary obligation to maximize unitholder value. Indeed, it is consistent with that obligation.

58    Finally, Mr. Leon emphasizes the importance of the word "nothing" in the opening language of sections

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 1705, 222 O.A.C. 102, 29 B.L.R. (4th) 312, 56 R.P.R. (4th) 163, 85 O.R. (3d) 254

4.4(2) and 4.4(3) of the Purchase Agreement. Both provisions open with the words "Notwithstanding anything contained in Section 4.4(1), until the Unitholder Approval, *nothing* shall prevent the Board from ..." [emphasis added]. Mr. Leon submits that "nothing" means what it says, and must be given the full scope of that meaning, in order to ensure that "nothing" in the Purchase Agreement or otherwise is permitted to stand in the way of the Trustees performing their duty to maximize shareholder value. This point involves parsing the Purchase Agreement in a microscopic fashion that is a little too fine, in my view. The use of the word "nothing" in sections 4.4(2) and 4.4(3) is nothing more than a different way of saying "Notwithstanding anything contained in Section 4.4(1) ... *the Board is not prevented from* ...". I would not ascribe to it the expanded role that HCPI proposes.

### The Meaning of "Bona Fide"

59      The appellants also attack the conclusion of the application judge that the HCPI Acquisition Proposal was not a "*bona fide*" offer. She accepted the Ventas submission that "a proposal made in breach of a contractual obligation not to make such a proposal cannot be considered to be *bona fide*," noting that sections 4.4(2) and 4.4(3) of the Purchase Agreement contemplate an Acquisition Proposal from a third party "that did not result from a breach of ... Section 4.4".

60      There was much debate about the meaning of "*bona fide*". The application judge viewed it as meaning acting "in good faith; sincere, genuine", relying upon *The Oxford English Dictionary*.[FN7] She found that the HCPI Acquisition Proposal was not *bona fide* because it was made in breach of the HCPI Standstill Agreement, which Sunrise was obliged by s. 4.4 to enforce. The appellants agree that *bona fide* means "genuine" or "made in good faith" but submit that a *bona fide* Acquisition Proposal, as contemplated by the Purchase Agreement, is one that is "genuine" or "authentic" in the sense that it is not a sham and is reasonably capable of becoming a Superior Proposal, and that this decision must be made in the context of the entire situation.

61      In the end, there is not much difference between the parties as to the meaning of the term "*bona fide*". As with the principles of contract interpretation, they differ on the application of the term in the circumstances of this case. Given the language of the Purchase Agreement, and the context in which it was negotiated — particularly the language "that did not result from a breach of this Section 4.4" in sections 4.4(2) and 4.4(3) — I do not think the application judge erred in her assessment and use of the term "*bona fide*" here.

### Miscellaneous

62      Two additional points were made by the appellants, but need not be dealt with at length.

63      First, HCPI argued that Sunrise had given its prior consent to HCPI to make its subsequent Acquisition Proposal following completion of the auction process and the execution of the Purchase Agreement. This consent is said to derive from the waiver Sunrise gave to both HCPI and Ventas as part of the invitation to bid in the second round. The application judge made a specific finding against this position, however, concluding that the December 29, 2006 letter "cannot possibly be construed as constituting Sunrise REIT's prior written consent as that term is used in the Standstill Agreement." There is no basis for interfering with this finding.

64      Secondly, HCPI submitted that the position of Ventas on these applications was tantamount to saying that the benefit of the HCPI Standstill Agreement had been assigned to it. The application judge correctly found that there was no merit in this argument. I agree with her that neither the Standstill Agreement nor its benefits had been assigned to anyone, and no one was taking the position that they had.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 1705, 222 O.A.C. 102, 29 B.L.R. (4th) 312, 56 R.P.R. (4th) 163, 85 O.R. (3d) 254

*The HCPI Cross-Appeal*

65      HCPI applied for a declaration that communications between it and SSL regarding Sunrise were permitted. The application judge declined to deal with this request, given her ruling which effectively precluded the HCPI Acquisition Proposal from being pursued. She concluded the application was moot.

66      I agree and for the same reason find it unnecessary to deal with the cross-appeal for the same relief.

**Conclusion**

67      For the foregoing reasons, then, I would dismiss both the appeal and the cross-appeal.

68      If the parties are unable to agree as to costs, they may make brief written submissions in that regard, not to exceed five pages in length.

69      In closing, I would like to thank all counsel for their able presentations and assistance.


*J. MacFarland J.A.:*

I agree.


*H.S. LaForme J.A.:*

I agree.

*Appeal dismissed; cross-appeal dismissed.*

FN1 *BG Checo International Ltd. v. British Columbia Hydro & Power Authority*, [1993] 1 S.C.R. 12 (S.C.C.) at 23-24; *Scanlon v. Castlepoint Development Corp.* (1992), 11 O.R. (3d) 744 (Ont. C.A.) at 770.

FN2 *Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)* (1998), 40 B.L.R. (2d) 1 (Ont. Gen. Div. [Commercial List]) at para. 403, aff'd (1999), 45 O.R. (3d) 417 (Ont. C.A.); *Venture Capital USA Inc. v. Yorkton Securities Inc.* (2005), 75 O.R. (3d) 325 (Ont. C.A.) at para. 26; *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 (S.C.C.) at 166-68 [*Eli Lilly*].

FN3 *Eli Lilly, ibid.* at 166; *Kentucky Fried Chicken Canada v. Scott's Food Services Inc.* (1998), 114 O.A.C. 357 (Ont. C.A.) at paras. 25-27 [*Kentucky Fried Chicken*].

FN4 *Consolidated-Bathurst Export Ltd. c. Mutual Boiler & Machinery Insurance Co.* (1979), [1980] 1 S.C.R. 888 (S.C.C.) at 901; *Kentucky Fried Chicken, ibid.*

FN5 The Proposal has to be a Superior Proposal; Sunrise has to notify Ventas of the Proposal and provide it with all relevant documentation; Ventas had the right to match the Proposal within five days (as defined) and, if it chooses not to, to terminate the Agreement and receive the break fee (see also, section 5.3 and Schedule "B" (definition of "Termination Payment")).

FN6 That meets the section 4.4(2) requirements of being *bona fide* and unsolicited.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2007 CarswellOnt 1705, 222 O.A.C. 102, 29 B.L.R. (4th) 312, 56 R.P.R. (4th) 163, 85 O.R. (3d) 254

FN7 2d ed., *s.v.* "bona fide".

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

# TAB 94

# American Society of Appraisers

**ASA Business Valuation
Standards**

This release of the approved *ASA Business Valuation Standards* of the American Society of Appraisers contains all standards approved through November 2009, and is to be used in conjunction with the *Uniform Standards of Professional Appraisal Practice* (USPAP) of The Appraisal Foundation and the *Principles of Appraisal Practice and Code of Ethics* of the American Society of Appraisers. Periodic updates to these Standards are posted to the Business Valuation Committee's website www.bvappraisers.org.

The *ASA Business Valuation Standards*, including Statements on Business Valuation Standards, Advisory Opinions and Procedural Guidelines have been published and/or revised as indicated in the following Table of Contents.

## TABLE OF CONTENTS

| Item | Title | Effective Date | Page |
|------|-------|----------------|------|
| **GENERAL PREAMBLE** | | September 1992<br>Revised January 1994<br>Revised February 2001<br>Revised August 2002<br>Revised January 2004<br>Revised July 2008 | 4 |

**ASA BUSINESS VALUATION STANDARDS (BVS)**
**(Standards provide minimum criteria for developing and reporting on the valuation of businesses, business ownership interests, or securities)**

| Item | Title | Effective Date | Page |
|------|-------|----------------|------|
| BVS-I | General Requirements for Developing a Business Valuation | January 1992<br>Revised June 1993<br>Revised January 1994<br>Revised January 1996<br>Revised February 2001<br>Revised July 2008 | 5 |
| BVS-II | Financial Statement Adjustments | September 1992<br>Revised January 1994<br>Revised February 2001<br>Revised July 2008 | 8 |
| BVS-III | Asset-Based Approach to Business Valuation | January 1992<br>Revised January 1994<br>Revised February 2001<br>Revised August 2002<br>Revised July 2008 | 9 |

| **Item** | **Title** | **Effective Date** | **Page** |
|---|---|---|---|
| BVS-IV | Income Approach to Business Valuation | September 1992<br>Revised January 1994<br>Revised February 2001<br>Revised July 2008 | 10 |
| BVS-V | Market Approach to Business Valuation | September 1992<br>Revised January 1994<br>Revised February 2001<br>Revised July 2008 | 12 |
| BVS-VI | Reaching a Conclusion of Value | September 1992<br>Revised January 1994<br>Revised February 2001<br>Revised August 2002<br>Revised July 2008 | 14 |
| BVS-VII | Valuation Discounts and Premiums | January 1996<br>Revised February 2001<br>Revised July 2008 | 16 |
| BVS-VIII | Comprehensive Written Business Valuation Report | June 1991<br>Revised January 1994<br>Revised February 2001<br>Revised July 2008 | 17 |
| BVS-IX | Intangible Asset Valuation | July 2008 | 20 |
| GLOSSARY | | January 1989<br>Revised September 1992<br>Revised June 1993<br>Revised January 1994<br>Revised February 2001<br>Revised June 2002<br>Revised January 2004<br>Revised July 2005<br>Revised July 2008 | 24 |

**STATEMENTS ON ASA BUSINESS VALUATION STANDARDS (SBVS)
(Statements clarify, interpret, explain, or elaborate on Standards and
have the full weight of Standards)**

| | | | |
|---|---|---|---|
| SBVS-1 | Guideline Public Company Method | January 1992<br>Revised January 1994<br>Revised February 2001<br>Revised July 2001<br>Revised January 2004<br>Revised July 2008 | 33 |
| SBVS-2 | Guideline Transactions Method | January 2004<br>Revised July 2008 | 35 |

*ASA Business Valuation Standards*
© 2009 American Society of Appraisers

| **Item** | **Title** | **Effective Date** | **Page** |
|---|---|---|---|
| | | | |

**ADVISORY OPINIONS (AO)**
**(Advisory Opinions illustrate the applicability of Standards and Statements in specific situations, offer advice for the resolution of valuation issues, and are not binding)**

| Item | Title | Effective Date | Page |
|---|---|---|---|
| AO-1 | Financial Consultation and Advisory Services | February 1997<br>Revised February 2001<br>Revised July 2008 | 37 |

**PROCEDURAL GUIDELINES (PG)**
**(Procedural Guidelines suggest certain procedures that may be used in the conduct of an assignment and are not binding)**

| Item | Title | Effective Date | Page |
|---|---|---|---|
| PG-1 | Litigation Support: Role of the Independent Financial Expert | July 2001<br>Revised July 2008 | 38 |
| PG-2 | Valuation of Partial Ownership Interests | November 2009 | 43 |

**Published by:**
**Business Valuation Committee**
**American Society of Appraisers**
**555 Herndon Parkway, Suite 125**
**Herndon, VA 20170**

*ASA Business Valuation Standards*
© 2009 American Society of Appraisers

# AMERICAN SOCIETY OF APPRAISERS
## ASA Business Valuation Standards

## General Preamble

I.    The American Society of Appraisers, through its Business Valuation Committee, has adopted these *ASA Business Valuation Standards* and Definitions ("the Standards") in order to maintain and enhance the quality of business valuations for the benefit of the business valuation profession and users of business valuations.

II.    The American Society of Appraisers, in its *Principles of Appraisal Practice and Code of Ethics*, and The Appraisal Foundation, in its *Uniform Standards of Professional Appraisal Practice* ("USPAP"), have established authoritative principles and a code of professional ethics. These Standards incorporate the *Principles of Appraisal Practice and Code of Ethics* and the relevant portions of USPAP, either explicitly or by reference, and are designed to clarify them and provide additional requirements specifically applicable to the valuation of businesses, business ownership interests, securities and intangible assets.

III.    These Standards incorporate all relevant business valuation standards adopted by the American Society of Appraisers through its Business Valuation Committee.

IV.    These Standards provide minimum criteria to be followed by business appraisers in developing and reporting the valuation of businesses, business ownership interests, securities and intangible assets.

V.    If, in the opinion of the appraiser, the circumstances of a specific business valuation assignment dictate a departure from any provision of any Standard, such departure must be disclosed and will apply only to the specific provision.

VI.    These Standards are designed to provide guidance to ASA members and to provide a structure for regulating the development and reporting of business valuations through uniform practices and procedures. Deviations from the Standards are not intended to form the basis of any civil liability and should not create any presumption or evidence that a legal duty has been breached. Moreover, compliance with these Standards does not create any special relationship between the appraiser and any other person.

*ASA Business Valuation Standards*
© 2009 American Society of Appraisers

**AMERICAN SOCIETY OF APPRAISERS**
**ASA Business Valuation Standards**

---

### BVS-I General Requirements for Developing a Business Valuation

---

## I. Preamble

A. This Standard must be followed in all valuations of businesses, business ownership interests, securities and intangible assets developed by all members of the American Society of Appraisers, be they Candidates, Accredited Members (AM), Accredited Senior Appraisers (ASA), or Fellows (FASA).

B. The purpose of this Standard is to define and describe the general requirements for developing the valuation of businesses, business ownership interests, securities and intangible assets.

C. This Standard incorporates the General Preamble to the *ASA Business Valuation Standards*.

## II. Appropriate definition of the assignment

A. Business valuation is the act or process of determining the value of a business enterprise or ownership interest therein.

B. In developing a valuation of a business, business ownership interest, security, or intangible asset, an appraiser must identify and define, as appropriate:

1. The client and other intended users
2. The purpose or intended use of the appraisal
3. The type of engagement as defined in BVS-I General Requirements for Developing a Business Valuation, Section II.C
4. The business enterprise to which the valuation relates
5. The type of entity (e.g., corporation, limited liability company, partnership or other)
6. The state or jurisdiction of incorporation, if applicable
7. The principal business location (or headquarters)
8. The business interest under consideration
9. The standard of value applicable to the valuation (e.g., fair market value, fair value, investment value, or other)
10. The premise of value (e.g., going concern, liquidation, or other)
11. The level of value (e.g., strategic control, financial control, marketable minority, or nonmarketable minority) in the context of the standard of value, the premise of value, and the relevant characteristics of the interest
12. The effective (or "as of") date of the appraisal
13. Any extraordinary assumptions used in the assignment
14. Any hypothetical conditions used in the assignment

C. The nature and type of the engagement must be defined. An acceptable type of engagement will generally be one of the three types detailed below. Other types of engagements should be explained and described.

1. Appraisal

   a. An Appraisal is the act or process of determining the value of a business, business ownership interest, security, or intangible asset.

   b. The objective of an appraisal is to express an unambiguous opinion as to the value of a business, business ownership interest, security or intangible asset which opinion is supported by all procedures that the appraiser deems to be relevant to the valuation.

   c. An appraisal has the following qualities:

      (1) Its conclusion of value is expressed as either a single dollar amount or a range

      (2) It considers all relevant information as of the appraisal date available to the appraiser at the time of performance of the valuation

      (3) The appraiser conducts appropriate procedures to collect and analyze all information expected to be relevant to the valuation

      (4) The valuation considers all conceptual approaches deemed to be relevant by the appraiser

2. Limited appraisal

   a. The objective of a limited appraisal is to express an estimate as to the value of a business, business ownership interest, security or intangible asset. The development of this estimate excludes some additional procedures that are required in an appraisal.

   b. A limited appraisal has the following qualities:

      (1) Its conclusion of value is expressed as either a single dollar amount or a range

      (2) It is based upon consideration of limited relevant information

      (3) The appraiser conducts only limited procedures to collect and analyze the information that such appraiser considers necessary to support the conclusion presented

      (4) The valuation is based upon the conceptual approach(es) deemed by the appraiser to be most appropriate

3. Calculation

   a. The objective of a calculation is to provide an approximate indication of value of a business, business ownership interest, security or intangible asset based on the performance of limited procedures agreed upon by the appraiser and the client.

   b. A calculation has the following qualities:

      (1) It's result may be expressed as either a single dollar amount or a range

      (2) It may be based upon consideration of only limited relevant information

      (3) The appraiser collects limited information and performs limited analysis

      (4) The calculation may be based upon conceptual approaches agreed upon with the client

*ASA Business Valuation Standards*
© 2009 American Society of Appraisers

### III. Information collection and analysis

The appraiser shall gather, analyze and adjust the relevant information necessary to perform a valuation appropriate to the nature or type of the engagement. Such information shall include:

A. Characteristics of the business, business ownership interest, security or intangible asset to be valued, including rights, privileges, conditions, quantity, factors affecting control and agreements restricting sale or transfer

B. The nature, history and outlook of the business

C. Historical financial information for the business

D. Assets and liabilities of the business

E. The nature and conditions of relevant industries that have an impact on the business

F. Economic factors affecting the business

G. Capital markets providing relevant information; e.g., available rates of return on alternative investments, relevant public stock market information and relevant merger and acquisition information

H. Prior transactions involving the subject business, or involving interests in, the securities of, or intangible assets in the subject business

I. Other information deemed by the appraiser to be relevant

### IV. Approaches, methods and procedures

A. The appraiser shall select and apply appropriate valuation approaches, methods and procedures.

B. The appraiser shall develop a conclusion of value pursuant to the valuation assignment as defined, considering the relevant valuation approaches, methods and procedures, the information available and appropriate premiums and discounts, if any.

### V. Documentation and retention

The appraiser shall appropriately document and retain all information relied on and the work product used in reaching a conclusion.

### VI. Reporting

The appraiser shall report the appraisal conclusions to the client in an appropriate written or oral format. Other than preliminary communications of results to a client, reporting on valuation calculations, or reporting on engagements that do not result in conclusions of value, the report must meet the requirements of Standard 10 of the Uniform Standards of Professional Appraisal Practice. In the event the assignment results in a Comprehensive Written Business Valuation Report, the report shall meet the requirements of BVS-VIII Comprehensive Written Business Valuation Report.

*ASA Business Valuation Standards*
© 2009 American Society of Appraisers

## AMERICAN SOCIETY OF APPRAISERS
### ASA Business Valuation Standards

---

### BVS-II Financial Statement Adjustments

---

## I. Preamble

    A. This Standard must be followed in all valuations of businesses, business ownership interests, securities and intangible assets developed by all members of the American Society of Appraisers, be they Candidates, Accredited Members (AM), Accredited Senior Appraisers (ASA), or Fellows (FASA).

    B. The purpose of this Standard is to define and describe the requirements for making financial statement adjustments in the valuation of businesses, business ownership interests, securities and intangible assets.

    C. This Standard applies to appraisals and may not necessarily apply to limited appraisals and calculations as defined in BVS-I General Requirements for Developing a Business Valuation, Section II.C.

    D. This Standard incorporates the General Preamble to the *ASA Business Valuation Standards*.

## II. Conceptual framework

    A. As a procedure in the valuation process, financial statements should be analyzed and, if appropriate, adjusted. Financial statements to be analyzed include those of the subject entity and any entities used as guideline companies.

    B. Financial statement adjustments are modifications to reported financial information that are relevant and significant to the appraisal process. Adjustments may be appropriate for the following reasons, among others:

        1. To present financial data of the subject and guideline companies on a consistent basis

        2. To adjust from reported values to current values

        3. To adjust revenues and expenses to levels that are reasonably representative of continuing results

        4. To adjust for non-operating assets and liabilities, and any revenues and expenses related to the non-operating items

    C. Financial statement adjustments are made for the sole purpose of assisting the appraiser in reaching a conclusion of value.

## III. Documentation of adjustments

    All adjustments made should be fully described and supported.

*ASA Business Valuation Standards*
© 2009 American Society of Appraisers

## AMERICAN SOCIETY OF APPRAISERS
### ASA Business Valuation Standards

---

### BVS-III Asset-Based Approach to Business Valuation

---

## I. Preamble

A. This Standard must be followed in all valuations of businesses, business ownership interests, securities and intangible assets developed by all members of the American Society of Appraisers, be they candidates, Accredited Members (AM), Accredited Senior Appraisers (ASA), or Fellows (FASA).

B. The purpose of this Standard is to define and describe the requirements for the use of the asset-based approach (and the circumstances in which it is appropriate) in the valuation of businesses, business ownership interests, securities and intangible assets, but not the reporting thereof.

C. This Standard applies to appraisals and may not necessarily apply to limited appraisals and calculations as defined in BVS-I General Requirements for Developing a Business Valuation, Section II.C.

D. This Standard incorporates the General Preamble to the *ASA Business Valuation Standards*.

## II. The asset-based approach

A. The asset-based approach is a general way of determining a value indication of a business, business ownership interest, security, or intangible asset using one or more methods based on the value of the assets net of liabilities.

B. In business valuation, the asset-based approach may be analogous to the cost approach of other appraisal disciplines.

C. Assets, liabilities and equity relate to a business that is an operating company, a holding company, or a combination thereof (a mixed business).

   1. An operating company is a business that conducts an economic activity by generating and selling, or trading in a product or service.

   2. A holding company is a business that derives its revenues from a return on its assets, which may include operating companies and/or other businesses.

   3. The asset-based approach should be considered in valuations conducted at the enterprise level and involving:

      a. An investment or real estate holding company

      b. A business appraised on a basis other than as a going concern

   Valuations of *particular ownership interests* in an enterprise may or may not require the use of the asset based approach.

D. The asset-based approach should not be the sole appraisal approach used in assignments relating to operating companies appraised as going concerns unless this approach is customarily used by sellers and buyers. In such cases, the appraiser must support the selection of this approach.

## AMERICAN SOCIETY OF APPRAISERS
### ASA Business Valuation Standards

### BVS-IV Income Approach to Business Valuation

## I. Preamble

A. This Standard must be followed in all valuations of businesses, business ownership interests, securities and intangible assets developed by all members of the American Society of Appraisers, be they Candidates, Accredited Members (AM), Accredited Senior Appraisers (ASA), or Fellows (FASA).

B. The purpose of this Standard is to define and describe the requirements for the use of the income approach in the valuation of businesses, business ownership interests, securities and intangible assets, but not the reporting thereof.

C. This Standard applies to appraisals and may not necessarily apply to limited appraisals and calculations as defined in BVS-I General Requirements for Developing a Business Valuation, Section II.C.

D. This Standard incorporates the General Preamble to the *ASA Business Valuation Standards*.

## II. The income approach

A. The income approach is a general way of determining a value indication of a business, business ownership interest, security, or intangible asset by using one or more methods through which anticipated benefits are converted into value.

B. Both capitalization of benefits methods and discounted future benefits methods are acceptable. In capitalization of benefits methods, a representative benefit level is divided or multiplied by an appropriate capitalization factor to convert the benefit to value. In discounted future benefits methods, benefits are estimated for each of several future periods. These benefits are converted to value by applying an appropriate discount rate and using present value procedures.

## III. Anticipated benefits

A. Anticipated benefits, as used in the income approach, are expressed in monetary terms. Anticipated benefits may be reasonably represented by such items as dividends or distributions, or various forms of earnings or cash flow.

B. Anticipated benefits should be estimated by considering such items as the nature, capital structure and historical performance of the related business entity, the expected future outlook for the business entity and relevant industries, and relevant economic factors.

## IV. Conversion of anticipated benefits

A. Anticipated benefits are converted to value by using procedures that consider the expected growth and timing of the benefits, the risk profile of the benefits stream and the time value of money.

B. The conversion of anticipated benefits to value normally requires the determination of a capitalization factor or discount rate. In that determination, the appraiser should consider such factors as the level of interest rates, the rates of return expected by investors on alternative investments and the specific risk characteristics of the anticipated benefits.

C.  In discounted future benefits methods, expected growth is considered in estimating the future stream of benefits. In capitalization of benefits methods, expected growth is incorporated in the capitalization factor.

D.  The capitalization factors or discount rates should be consistent with the types of anticipated benefits used. For example, pre-tax factors or discount rates should be used with pre-tax benefits, common equity factors or discount rates should be used with common equity benefits and net cash flow factors or discount rates should be used with net cash flow benefits.

*ASA Business Valuation Standards*
© 2009 American Society of Appraisers

## AMERICAN SOCIETY OF APPRAISERS
### ASA Business Valuation Standards

---

## BVS-V Market Approach to Business Valuation

---

## I.  Preamble

A.  This Standard must be followed in all valuations of businesses, business ownership interests, securities and intangible assets developed by all members of the American Society of Appraisers, be they Candidates, Accredited Members (AM), Accredited Senior Appraisers (ASA), or Fellows (FASA).

B.  The purpose of this Standard is to define and describe the requirements for the use of the market approach in the valuation of businesses, business ownership interests, securities and intangible assets, but not the reporting thereof.

C.  This Standard applies to appraisals and may not necessarily apply to limited appraisals and calculations as defined in BVS-I General Requirements for Developing a Business Valuation, Section II.C.

D.  This Standard incorporates the General Preamble to the *ASA Business Valuation Standards*.

## II.  The market approach

A.  The market approach is a general way of determining a value indication of a business, business ownership interest, security or intangible asset by using one or more methods that compare the subject to similar businesses, business ownership interests, securities or intangible assets that have been sold.

B.  Examples of market approach methods include the Guideline Public Company Method (see SBVS-1) and the Guideline Transactions Method (see SBVS-2).

## III.  Reasonable basis for comparison

A.  The business, business ownership interest, security or intangible asset used for comparison must serve as a reasonable basis for comparison to the subject.

B.  Factors to be considered in judging whether a reasonable basis for comparison exists include:

1.  A sufficient similarity of qualitative and quantitative investment characteristics

2.  The amount and verifiability of data known about the similar investment

3.  Whether or not the price of the similar investment was observed in an arm's-length transaction, or in a forced or distressed sale

## IV.  Selection of valuation ratios

A.  Comparisons are normally made through the use of valuation ratios. The computation and use of such ratios should provide meaningful insight about the value of the subject, considering all relevant factors. Accordingly, care should be exercised with respect to issues such as:

1.  The selection of the underlying data used to compute the valuation ratios

2.  The selection of the time periods and/or the averaging methods used for the underlying data

---

3. The computation of the valuation ratios

4. The timing of the price data used in the valuation ratios (in relationship to the effective date of the appraisal)

5. How the valuation ratios were selected and applied to the subject's underlying data

B. In general, comparisons should be made by using comparable definitions of the components of the valuation ratios. However, where appropriate, valuation ratios based on components that are reasonably representative of ongoing results may be used.

## V. Rules of thumb

Rules of thumb may provide insight into the value of a business, business ownership interest, security or intangible asset. However, value indications derived from the use of rules of thumb should not be given substantial weight unless they are supported by other valuation methods and it can be established that knowledgeable buyers and sellers place substantial reliance on them.

*ASA Business Valuation Standards*
© 2009 American Society of Appraisers

## AMERICAN SOCIETY OF APPRAISERS
### ASA Business Valuation Standards

---

### BVS-VI Reaching a Conclusion of Value

---

## I. Preamble

A. This Standard must be followed in all valuations of businesses, business ownership interests, securities and intangible assets developed by all members of the American Society of Appraisers, be they Candidates, Accredited Members (AM), Accredited Senior Appraisers (ASA), or Fellows (FASA).

B. The purpose of this Standard is to define and describe the requirements for reaching a final conclusion of value in the valuation of businesses, business ownership interests, securities and intangible assets.

C. This Standard applies to appraisals and may not necessarily apply to limited appraisals and calculations as defined in BVS-I General Requirements for Developing a Business Valuation, Section II.C.

D. This Standard incorporates the General Preamble to the *ASA Business Valuation Standards*.

## II. General

A. The conclusion of value reached by the appraiser shall be based upon the applicable standard of value, the purpose and intended use of the valuation, and all relevant information available as of the valuation date in carrying out the type of engagement for the assignment.

B. The conclusion of value reached by the appraiser will be based on value indications resulting from one or more methods performed under one or more appraisal approaches.

## III. Selection and weighting of methods

A. The selection of and reliance on appropriate methods and procedures depends on the judgment of the appraiser and not on any prescribed formula. One or more approaches may not be relevant to a particular situation, and more than one method under an approach may be relevant.

B. The appraiser must use informed judgment when determining the relative weight to be accorded to indications of value reached on the basis of various methods, or whether an indication of value from a single method should be conclusive. The appraiser's judgment may be presented either in general terms or in terms of mathematical weighting of the indicated values reflected in the conclusion. In any case, the appraiser should provide the rationale for the selection or weighting of the method or methods relied on in reaching the conclusion.

C. In assessing the relative importance of indications of value determined under each method, or whether an indication of value from a single method should dominate, the appraiser should consider factors such as:

  1. The applicable standard of value

  2. The purpose and intended use of the valuation

  3. Whether the subject is an operating company, a real estate or investment holding company, or a company with substantial non-operating or excess assets

---

*ASA Business Valuation Standards*
© 2009 American Society of Appraisers

4. The quality and reliability of data underlying the indication of value

5. Such other factors that, in the opinion of the appraiser, are appropriate for consideration

## IV. Additional factors to consider

As appropriate for the valuation assignment as defined, and if not considered in the process of determining and weighting the indications of value provided by various procedures, the appraiser should separately consider the following factors in reaching a final conclusion of value:

A. Marketability or lack thereof, considering the nature of the business, the business ownership interest, security or intangible asset

B. The effect of relevant contractual and/or other legal restrictions

C. The condition of the market(s) in which the appraised interest might trade

D. The ability of an owner of the appraised interest to control the operation, sale, or liquidation of the relevant business

E. Such other factors that, in the opinion of the appraiser, are appropriate for consideration

*ASA Business Valuation Standards*
© 2009 American Society of Appraisers

## AMERICAN SOCIETY OF APPRAISERS
### ASA Business Valuation Standards

## BVS-VII Valuation Discounts and Premiums

### I.  Preamble

    A.  This Standard must be followed in all valuations of businesses, business ownership interests, securities and intangible assets developed by all members of the American Society of Appraisers, be they Candidates, Accredited Members (AM), Accredited Senior Appraisers (ASA), or Fellows (FASA).

    B.  The purpose of this Standard is to define and describe the requirements for the use of discounts and premiums whenever they are applied in the valuation of businesses, business ownership interests, securities and intangible assets.

    C.  This Standard applies to appraisals and may not necessarily apply to limited appraisals and calculations as defined in BVS-I General Requirements for Developing a Business Valuation, Section II.C.

    D.  This Standard incorporates the General Preamble to the *ASA Business Valuation Standards*.

    E.  This Standard applies at any time in the valuation process, whether within a method, to the value indicated by a valuation method, or to the result of weighting or correlating methods.

### II. The concepts of discounts and premiums

    A.  A discount has no meaning until the conceptual basis underlying the base value to which it is applied is defined.

    B.  A premium has no meaning until the conceptual basis underlying the base value to which it is applied is defined.

    C.  A discount or premium is warranted when characteristics affecting the value of the subject interest differ sufficiently from those inherent in the base value to which the discount or premium is applied.

    D.  A discount or premium quantifies an adjustment to account for differences in characteristics affecting the value of the subject interest relative to the base value to which it is compared.

### III. The application of discounts and premiums

    A.  The purpose, applicable standard of value, or other circumstances of an appraisal may indicate the need to account for differences between the base value and the value of the subject interest. If so, appropriate discounts or premiums should be applied.

    B.  The base value to which the discount or premium is applied must be specified and defined.

    C.  Each discount or premium to be applied to the base value must be defined.

    D.  The primary reasons why each selected discount or premium applies to the appraised interest must be stated.

    E.  The evidence considered in deriving the discount or premium must be specified.

    F.  The appraiser's reasoning in arriving at a conclusion regarding the size of any discount or premium applied must be explained.

## AMERICAN SOCIETY OF APPRAISERS
### ASA Business Valuation Standards

### BVS-VIII Comprehensive Written Business Valuation Report

### I. Preamble

A. This Standard must be followed only in the preparation of comprehensive written business valuation reports developed by all members of the American Society of Appraisers, be they Candidates, Accredited Members (AM), Accredited Senior Appraisers (ASA), or Fellows (FASA).

B. A business valuation report may be less comprehensive in content provided that the report complies with the minimum content required by Standard 10.2 of USPAP.

C. The purpose of this Standard is to define and describe the requirements for the written communication of the results of a business valuation, analysis, or opinion, but not the conduct thereof, which may reflect the three types of engagements defined in BVS-I General Requirements for Developing a Business Valuation, Section II.C.

D. This Standard incorporates the General Preamble to the *ASA Business Valuation Standards*.

### II. Signature and certification

A. An appraiser assumes responsibility for the statements made in a comprehensive written report and accepts that responsibility by signing the report. To comply with this Standard, a comprehensive written report must be signed by the appraiser. For the purpose of this Standard, the appraiser is the individual or entity undertaking the appraisal assignment under a contract with the client.

B. Clearly, at least one individual is responsible for the valuation conclusion(s) expressed in a report. A report must contain a certification, as required by Standard 10 of USPAP, in which the individual(s) responsible for the valuation conclusion(s) must be identified.

### III. Assumptions and limiting conditions

The following assumptions and/or limiting conditions must be stated:

A. **Pertaining to bias.** A report must contain a statement that the appraiser has no interest in the asset appraised, or other conflict that could cause a question as to the appraiser's independence or objectivity; or, if such an interest or conflict exists, it must be disclosed.

B. **Pertaining to data used.** Where appropriate, a report must indicate that an appraiser relied on data supplied by others, without further verification by the appraiser, as well as the sources that were relied on.

C. **Pertaining to validity of the valuation.** A report must contain a statement that a valuation is valid only for the valuation date indicated and for the purpose stated.

## IV. Definition of the valuation assignment

The precise definition of the valuation assignment is a key aspect of the report. The following are components of such a definition and must be included in the report:

A. The business interest being valued must be clearly defined, such as "100 shares of the Class A common stock of the XYZ Corporation" or "a 20 percent limited partnership interest in the ABC Limited Partnership." The existence, rights, and/or restrictions of other classes of ownership in the subject business must also be adequately described if they are relevant to the conclusion of value.

B. The purpose and use of the valuation must be clearly stated, such as "a determination of fair market value for ESOP purposes" or "a determination of fair value for dissenters' rights purposes." If a valuation is being performed pursuant to a particular statute, the statute must be referenced.

C. The standard of value used in the valuation must be stated and defined.

D. The premise or basis of value, such as valuation on a going concern or liquidation basis, must be defined.

E. The level of value, such as marketable minority or nonmarketable minority, must be defined.

F. The effective date and the report date must be stated.

G. Other elements as outlined in BVS-I General Requirements for Developing a Business Valuation, Section II.B, as appropriate.

## V. Business description

A comprehensive written business valuation report must include a business description that covers relevant factual matters related to the business, such as:

A. Form of organization (e.g., corporation, partnership, or other)

B. History

C. Products and/or services

D. Markets and customers

E. Management

F. Major assets, both tangible and intangible, and major liabilities

G. Outlook for the economy, industry, and business

H. Past transactional evidence of value

I. Sensitivity to seasonal or cyclical factors

J. Competition

K. Sources of information used

L. Such other factual information as may be required to present a clear description of the business and the general context within which it operates

*ASA Business Valuation Standards*
© 2009 American Society of Appraisers

## VI. Financial analysis

A. An analysis and discussion of a firm's financial statements is an integral part of a business valuation and must be included in a comprehensive written business valuation report. Exhibits summarizing balance sheets and income statements for a period of years sufficient to the purpose of the valuation and the nature of the subject company must be included in the valuation report.

B. Any adjustments made to the reported financial data must be fully explained.

C. If projections of balance sheets or income statements are used in the valuation, key assumptions underlying those projections must be included and discussed.

D. If appropriate, the company's financial results in comparison to those of the industry in which it operates must be discussed.

## VII. Valuation methodology

A. The valuation method or methods selected, and the reasons for their selection, must be discussed. The steps followed in the application of the method(s) selected must be described. The description of the methodology and the procedures followed must contain sufficient detail to allow the intended user of the report to understand how the appraiser reached the valuation conclusion.

B. The report must include explanations of how factors such as discount rates, capitalization rates, or valuation multiples were determined and used. The rationale and/or supporting data for any premiums or discounts must be clearly presented.

## VIII. Comprehensive written business valuation report format

The comprehensive written business valuation report must clearly communicate pertinent information, valuation methods and conclusions in a logical progression, and must incorporate the other specific requirements of this Standard, including the signature and certification provisions.

## IX. Confidentiality of the report

No copies of the report may be furnished to persons other than the client without the client's specific permission or direction unless ordered by a court of competent jurisdiction.

*ASA Business Valuation Standards*
© 2009 American Society of Appraisers

## AMERICAN SOCIETY OF APPRAISERS
## Business Valuation Standards

## BVS-IX Intangible Asset Valuation

### I. Preamble

A. This Standard must be followed in all valuations of intangible assets developed by all members of the American Society of Appraisers, be they Candidates, Accredited Members (AM), Accredited Senior Appraisers (ASA) or Fellows (FASA).

B. The purpose of this Standard is to define and describe the requirements for the valuation of intangible assets.

C. This Standard applies to appraisals and may not necessarily apply to limited appraisals and calculations as defined in BVS-I General Requirements for Developing a Business Valuation, Section II.C.

D. This Standard incorporates the General Preamble to the *ASA Business Valuation Standards*.

### II. Principles

In developing an intangible asset valuation, an appraiser must:

A. Identify the intangible asset to which the valuation relates.

B. Identify and define the applicable items of BVS-I General Requirements for Developing a Business Valuation, Section II.B.

### III. Valuation methodology

In valuing an intangible asset, the appraiser should consider appropriate approaches and methods. Approaches that should be considered in valuing intangible assets are as follows:

A. Income Approach.
1. The appraiser should identify the economic benefits that are reasonably attributable to the subject intangible asset, and the risks associated with realizing those benefits.

2. The appraiser should consider the economic benefit provided by the amortization of the asset's value for income tax purposes, where applicable.

3. The appraiser should consider whether the economic life of the intangible asset is different from its legal or regulatory life.

B. Market Approach. The appraiser should consider relevant differences between the subject and guideline assets as well as respective market conditions.

C. Cost Approach. The appraiser should consider direct and indirect costs associated with reproduction or replacement, as the case may be, as well as any loss of value due to functional or economic obsolescence, or reduced life expectancy.

*ASA Business Valuation Standards*
© 2009 American Society of Appraisers

## IV. Factors

In valuing an intangible asset, the appraiser should consider:

A.  The bundle of legal rights, protections and limitations pertaining to the intangible asset to be valued.

B.  The history of the intangible asset.

C.  The intangible asset's expected remaining economic (useful) and legal life.

D.  The economic benefits, direct or indirect, that the intangible asset is expected to provide to its owner during the asset's life.

E.  Previous or existing litigation involving the intangible asset.

F.  The distinction between an undivided interest and a fractional interest in the intangible asset resulting from, e.g., shared ownership or a licensing agreement.

G.  The feasibility and character of potential commercial exploitation of the intangible asset.

H.  Additional factors relating to the specific type of intangible asset to be valued, as appropriate.

See Appendix A below for illustrations of several intellectual property intangible assets.

*ASA Business Valuation Standards*
© 2009 American Society of Appraisers

## APPENDIX A to BVS-IX: INTELLECTUAL PROPERTY EXAMPLES

The purpose of this Appendix is to illustrate asset type valuation factors in the context of intellectual property, and to provide guidance to be considered in the valuation of the indicated assets.

I.  **Patents.**  A patent is a published, public document that grants an inventor or assignee specific rights such as excluding others from making, using, or selling an invention, design or discovery within a specific jurisdiction for a term of years. For an intangible asset such as a patent, the appraiser should consider the following factors, as applicable (in addition to meeting all the other requirements of ASA Business Valuation Standard BVS IX: Intangible Asset Valuation):

    A.  Scope of protection, such as jurisdictional coverage, status of registrations and maintenance fee payments, breadth of patent claims and alternatives to the patented invention.

    B.  Risks of patent exploitation, such as infringement, invalidity, existence of technological or economic barriers to successful commercialization, or alternative innovations that could reduce the patent's economic benefit.

    C.  Public and private information that may be available regarding the subject patent and comparable or competing technologies, such as data from the United States Patent & Trademark Office [USPTO], public disclosure filed with the Securities and Exchange Commission ("SEC") and market research.

    D.  In valuing a portfolio of patents, the appraiser should consider the relevant synergies enabled by the aggregation of rights, such as:

        1.  Elimination of blocking patent rights

        2.  Obtaining design freedom, reducing the likelihood of infringement

        3.  Attainment of a broader, or more versatile or desirable mix of commercialization possibilities

II.  **Trade Secrets.**  A trade secret is information that a business keeps secret in order to gain an advantage over competitors. For an intangible asset in the nature of a trade secret, the appraiser should consider the following factors, as applicable (in addition to meeting all the other requirements of ASA Business Valuation Standard BVS IX: Intangible Asset Valuation):

    A.  The reasonableness and effectiveness of measures taken to ensure secrecy.

    B.  The possibility that the secret could be legitimately discovered and/or developed by competitors, such as through independent research, development or engineering.

    C.  If potentially patentable, the potential benefits, costs and risks of patenting versus holding the trade secret as a trade secret.

*ASA Business Valuation Standards*
© 2009 American Society of Appraisers

**III. Trademarks.** A trademark is a word, symbol or device that is used to denote a source of goods or services. For an intangible asset in the nature of a trademark, the appraiser should consider the following factors, as applicable (in addition to meeting all the other requirements of ASA Business Valuation Standard BVS IX: Intangible Asset Valuation):

    A.  The ability to extend the trademark to related products or services, i.e., without infringing on the trademarks of others.

    B.  The nature and extent of protections afforded by any registrations, including whether applicable renewals are in effect.

    C.  Possibility of abandonment due to non-use.

    D.  Possibility of the mark becoming generic.

    E.  Public and private information that may be available regarding the subject trademark and comparable or competing marks, such as USPTO data, public disclosure filed with the SEC, market analysis and research and surveys.

**IV. Copyrighted Works**. A copyright is a creative expression, such as a writing, recording, play, or work of art, which is protected by law against unpermitted copying. For an intangible asset in the nature of a copyrighted work, the appraiser should consider the following factors, as applicable (in addition to meeting all the other requirements of ASA Business Valuation Standard BVS IX: Intangible Asset Valuation):

    A.  Scope of protection, such as jurisdictional coverage, status of registrations and renewals, and whether the copyright relates to the original work or a particular derivative thereof.

    B.  Public and private information that may be available regarding the copyrighted work, and comparable or competing works.

*ASA Business Valuation Standards*
© 2009 American Society of Appraisers

# AMERICAN SOCIETY OF APPRAISERS
## ASA Business Valuation Standards

## Glossary

### Preamble

The American Society of Appraisers, through its Business Valuation Committee, has adopted these Definitions ("Definitions") to ensure the quality of valuations by defining terms whose meanings are clear and consistently applied for the benefit of appraisers, their clientele and other intended users.

A. These Definitions include the International Glossary of Business Valuation Terms as adopted by the following professional societies and organizations:

**American Institute of Certified Public Accountants**
**American Society of Appraisers**
**National Association of Certified Valuation Analysts**
**The Canadian Institute of Chartered Business Valuators**
**The Institute of Business Appraisers**

The International Glossary of Business Valuation Terms are marked with an asterisk (*)

B. In the event that the assignment requires use of definitions that materially depart from those contained herein, the appraiser should fully explain the reason for departure and the implications it may have on the valuation assignment.

C. These Definitions provide guidance to ASA members by offering uniformity and consistency in the course of applying valuation terms used in developing and reporting the valuation of businesses, business ownership interests, securities and intangible assets.

D. Departure from these Definitions is not intended to form the basis of any civil liability and should not create any presumption or evidence that a legal duty has been breached. Moreover, compliance with these Definitions does not create any special relationship between the appraiser and any other person.

## Definitions

**Adjusted Book Value.** The book value that results after asset or liability amounts are added, deleted, or changed from their respective book amounts.

**Adjusted Book Value Method.*** A method within the asset approach whereby all assets and liabilities (including off-balance sheet, intangible, and contingent) are adjusted to their fair market values (Note: In Canada on a going concern basis).

**Adjusted Net Asset Method.*** See **Adjusted Book Value Method**.

**Appraisal.** See **Valuation**.

**Appraisal Approach.*** See **Valuation Approach.**

**Appraisal Date.*** See **Valuation Date.**

**Appraisal Method.*** See **Valuation Method.**

**Appraisal Procedure.*** See **Valuation Procedure.**

**Appraised Value.** The appraiser's opinion or conclusion of value.

**Arbitrage Pricing Theory.*** A multivariate model for estimating the cost of equity capital, which incorporates several systematic risk factors.

**Asset (Asset-Based) Approach.*** A general way of determining a value indication of a business, business ownership interest, security or intangible asset using one or more methods based on the value of the assets net of liabilities.

**Beta.*** A measure of systematic risk of a stock; the tendency of a stock's price to correlate with changes in a specific index.

**Blockage Discount.*** An amount or percentage deducted from the current market price of a publicly traded stock to reflect the decrease in the per share value of a block of stock that is of a size that could not be sold in a reasonable period of time given normal trading volume.

**Book Value.*** See **Net Book Value.**

**Business.*** See **Business Enterprise.**

**Business Appraiser**. A person who, by education, training and experience, is qualified to develop an appraisal of a business, business ownership interest, security or intangible assets.

**Business Enterprise.*** A commercial, industrial, service, or investment entity (or a combination thereof) pursuing an economic activity.

**Business Risk.*** The degree of uncertainty of realizing expected future returns of the business resulting from factors other than financial leverage. See **Financial Risk**.

**Business Valuation.*** The act or process of determining the value of a business enterprise or ownership interest therein.

*ASA Business Valuation Standards*
© 2009 American Society of Appraisers

**Capital Asset Pricing Model (CAPM).*** A model in which the cost of capital for any stock or portfolio of stocks equals a risk-free rate plus a risk premium that is proportionate to the systematic risk of the stock or portfolio.

**Capitalization.*** A conversion of a single period of economic benefits into value.

**Capitalization Factor.*** Any multiple or divisor used to convert anticipated economic benefits of a single period into value.

**Capitalization of Earnings Method.*** A method within the income approach whereby economic benefits for a representative single period are converted to value through division by a capitalization rate.

**Capitalization Rate.*** Any divisor (usually expressed as a percentage) used to convert anticipated economic benefits of a single period into value.

**Capital Structure.*** The composition of the invested capital of a business enterprise, the mix of debt and equity financing.

**Cash Flow.*** Cash that is generated over a period of time by an asset, group of assets, or business enterprise. It may be used in a general sense to encompass various levels of specifically defined cash flows. When the term is used, it should be supplemented by a qualifier (e.g., "discretionary" or "operating") and a specific definition in the given valuation context.

**Common Size Statements.*** Financial statements in which each line is expressed as a percentage of the total. On the balance sheet, each line item is shown as a percentage of total assets, and on the income statement, each item is expressed as a percentage of sales.

**Control.*** The power to direct the management and policies of a business enterprise.

**Control Premium.*** An amount or a percentage by which the pro rata value of a controlling interest exceeds the pro rata value of a non-controlling interest in a business enterprise, to reflect the power of control.

**Cost Approach.*** A general way of determining a value indication of an individual asset by quantifying the amount of money required to replace the future service capability of that asset.

**Cost of Capital.*** The expected rate of return that the market requires in order to attract funds to a particular investment.

**Debt-Free.*** Use of this term is discouraged. See **Invested Capital**.

**Discount for Lack of Control.*** An amount or percentage deducted from the pro rata share of value of 100 percent of an equity interest in a business to reflect the absence of some or all of the powers of control.

**Discount for Lack of Liquidity.** An amount or percentage deducted from the value of an ownership interest to reflect the relative inability to quickly convert property to cash.

**Discount for Lack of Marketability.*** An amount or percentage deducted from the value of an ownership interest to reflect the relative absence of marketability.

**Discount for Lack of Voting Rights.*** An amount or percentage deducted from the per share value of a minority interest voting share to reflect the absence of voting rights.

**Discount Rate.*** A rate of return used to convert a future monetary sum into present value.

*ASA Business Valuation Standards*
© 2009 American Society of Appraisers

**Discounted Cash Flow Method.\*** A method within the income approach whereby the present value of future expected net cash flows is calculated using a discount rate.

**Discounted Future Earnings Method.\*** A method within the income approach whereby the present value of future expected economic benefits is calculated using a discount rate.

**Discretionary Earnings.** Earnings that may be defined, in certain applications, to reflect earnings of a business enterprise prior to the following items:

- Income taxes
- Nonoperating income and expenses
- Nonrecurring income and expenses
- Depreciation and amortization
- Interest expense or interest income
- Owner's total compensation for those services, which could be provided by a sole owner/manager.

**Economic Benefits.\*** Inflows such as revenues, net income, net cash flows, etc.

**Economic Life.\*** The period of time over which property may generate economic benefits.

**Effective Date.\*** See **Valuation Date**.

**Enterprise.\*** See **Business Enterprise**.

**Equity.\*** The owner's interest in property after deduction of all liabilities.

**Equity Net Cash Flows.\*** Those cash flows available to pay out to equity holders (in the form of dividends) after funding operations of the business enterprise, making necessary capital investments, and increasing or decreasing debt financing.

**Equity Risk Premium.\*** A rate of return added to a risk-free rate to reflect the additional risk of equity instruments over risk free instruments (a component of the cost of equity capital or equity discount rate).

**Excess Earnings.\*** That amount of anticipated economic benefits that exceeds an appropriate rate of return on the value of a selected asset base (often net tangible assets) used to generate those anticipated economic benefits.

**Excess Earnings Method.\*** A specific way of determining a value indication of a business, business ownership interest, security or intangible asset determined as the sum of a) the value of the assets derived by capitalizing excess earnings and b) the value of the selected asset base. Also frequently used to value intangible assets. See **Excess Earnings**.

**Fair Market Value.\*** The price, expressed in terms of cash equivalents, at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arm's length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts. (Note: In Canada, the term "price" should be replaced with the term "highest price")

**Fairness Opinion.\*** An opinion as to whether or not the consideration in a transaction is fair from a financial point of view.

*ASA Business Valuation Standards*
© 2009 American Society of Appraisers

**Financial Risk.\*** The degree of uncertainty of realizing expected future returns of the business resulting from financial leverage. See **Business Risk**.

**Forced Liquidation Value.\*** Liquidation value, at which the asset or assets are sold as quickly as possible, such as at an auction.

**Free Cash Flow.\*** Use of this term is discouraged. See **Net Cash Flow**.

**Going Concern.\*** An ongoing operating business enterprise.

**Going Concern Value.\*** The value of a business enterprise that is expected to continue to operate into the future. The intangible elements of Going Concern Value result from factors such as having a trained work force, an operational plant, and the necessary licenses, systems, and procedures in place.

**Going Concern Value.** Refers to the intangible elements that result from factors such as having a trained work force, an operational plant, and the necessary licenses, systems and procedures in place. Also refers to the premise of value based on the concept that a business enterprise is expected to continue operations into the future.

**Goodwill.\*** That intangible asset arising as a result of name, reputation, customer loyalty, location, products, and similar factors not separately identified.

**Goodwill.** That intangible asset arising as a result of elements such as name, reputation, customer loyalty, location, products and related factors not separately identified and quantified.

**Goodwill Value.\*** The value attributable to goodwill.

**Goodwill Value.** The value attributable to the elements of intangible assets above the identifiable tangible and intangible assets employed in a business.

**Guideline Public Company Method.\*** A method within the market approach whereby market multiples are derived from market prices of stocks of companies that are engaged in the same or similar lines of business, and that are actively traded on a free and open market.

**Guideline Transactions Method.** See **Merger and Acquisition Method**.

**Holding Company.** An entity that derives its returns from investments rather than from the sale of products or services.

**Hypothetical Condition.** That which is contrary to what exists but is supposed for the purpose of analysis.

**Income (Income-Based) Approach.\*** A general way of determining a value indication of a business, business ownership interest, security, or intangible asset using one or more methods that convert anticipated economic benefits into a present single amount.

**Intangible Assets.\*** Non-physical assets such as franchises, trademarks, patents, copyrights, goodwill, equities, mineral rights, securities and contracts (as distinguished from physical assets) that grant rights and privileges, and have value for the owner.

**Internal Rate of Return.\*** A discount rate at which the present value of the future cash flows of the investment equals the cost of the investment.

*ASA Business Valuation Standards*
© 2009 American Society of Appraisers

**Intrinsic Value.\*** The value that an investor considers, on the basis of an evaluation or available facts, to be the "true" or "real" value that will become the market value when other investors reach the same conclusion. When the term applies to options, it is the difference between the exercise price or strike price of an option and the market value of the underlying security.

**Invested Capital.\*** The sum of equity and debt in a business enterprise. Debt is typically a) all interest bearing debt or b) long-term interest-bearing debt. When the term is used, it should be supplemented by a specific definition in the given valuation context.

**Invested Capital Net Cash Flows.\*** Those cash flows available to pay out to equity holders (in the form of dividends) and debt investors (in the form of principal and interest) after funding operations of the business enterprise and making necessary capital investments.

**Investment Risk.\*** The degree of uncertainty as to the realization of expected returns.

**Investment Value.\*** The value to a particular investor based on individual investment requirements and expectations. (Note: in Canada, the term used is "Value to the Owner").

**Key Person Discount.\*** An amount or percentage deducted from the value of an ownership interest to reflect the reduction in value resulting from the actual or potential loss of a key person in a business enterprise.

**Levered Beta.\*** The beta reflecting a capital structure that includes debt.

**Limited Appraisal.** The act or process of determining the value of a business, business ownership interest, security, or intangible asset with limitations in analyses, procedures, or scope.

**Liquidation Value.\*** The net amount that would be realized if the business is terminated and the assets are sold piecemeal. Liquidation can be either "orderly" or "forced."

**Liquidity.\*** The ability to quickly convert property to cash or pay a liability.

**Liquidity.** The ability to readily convert an asset, business, business ownership interest, security or intangible asset into cash without significant loss of principal.

**Majority Control.\*** The degree of control provided by a majority position.

**Majority Interest.\*** An ownership interest greater than 50 percent of the voting interest in a business enterprise.

**Market (Market-Based) Approach.\*** A general way of determining a value indication of a business, business ownership interest, security, or intangible asset by using one or more methods that compare the subject to similar businesses, business ownership interests, securities or intangible assets that have been sold.

**Market Capitalization of Equity.\*** The share price of a publicly traded stock multiplied by the number of shares outstanding.

**Market Capitalization of Invested Capital.\*** The market capitalization of equity plus the market value of the debt component of invested capital.

**Market Multiple.\*** The market value of a company's stock or invested capital divided by a company measure (such as economic benefits, number of customers).

*ASA Business Valuation Standards*
© 2009 American Society of Appraisers

**Marketability.*** The ability to quickly convert property to cash at minimal cost.

**Marketability.** The capability and ease of transfer or salability of an asset, business, business ownership interest, security or intangible asset.

**Marketability Discount.*** See **Discount for Lack of Marketability**.

**Merger and Acquisition Method.*** A method within the market approach whereby pricing multiples are derived from transactions of significant interests in companies engaged in the same or similar lines of business.

**Mid-Year Discounting.*** A convention used in the Discounted Future Earnings Method that reflects economic benefits being generated at midyear, approximating the effect of economic benefits being generated evenly throughout the year.

**Minority Discount.*** A discount for lack of control applicable to a minority interest.

**Minority Interest.*** An ownership interest less than 50 percent of the voting interest in a business enterprise.

**Multiple.*** The inverse of the capitalization rate.

**Net Assets.** Total assets less total liabilities.

**Net Book Value.*** With respect to a business enterprise, the difference between total assets (net of accumulated depreciation, depletion, and amortization) and total liabilities as they appear on the balance sheet (synonymous with shareholders' equity). With respect to a specific asset, the capitalized cost less accumulated amortization or depreciation as it appears on the books of account of the business enterprise.

**Net Cash Flows.*** A form of cash flow. When the term is used, it should be supplemented by a qualifier (e.g., "equity" or "Invested Capital") and a specific definition in the given valuation context.

**Net Income.** Revenue less expenses and taxes.

**Net Present Value.*** The value, as of a specified date, of future cash inflows less all cash outflows (including the cost of investment) calculated using an appropriate discount rate.

**Net Tangible Asset Value.*** The value of the business enterprise's tangible assets (excluding excess assets and non-operating assets) minus the value of its liabilities. (Note: in Canada, tangible assets also include identifiable intangible assets).

**Non-Operating Assets.*** Assets not necessary to ongoing operations of the business enterprise. (Note: in Canada, the term used is "Redundant Assets").

**Normalized Earnings*.** Economic benefits adjusted for nonrecurring, non-economic, or other unusual items to eliminate anomalies and/or facilitate comparisons.

**Normalized Financial Statements.*** Financial statements adjusted for non-operating assets and liabilities and/or for nonrecurring, non-economic, or other unusual items to eliminate anomalies and/or facilitate comparisons.

**Operating Company.** A business that conducts an economic activity by generating and selling, or trading in a product or service.

*ASA Business Valuation Standards*
© 2009 American Society of Appraisers

**Orderly Liquidation Value.\*** Liquidation value at which the asset or assets are sold over a reasonable period of time to maximize proceeds received.

**Portfolio Discount.\*** An amount or percentage deducted from the value of a business enterprise to reflect the fact that it owns dissimilar operations or assets that do not fit well together.

**Premise of Value.\*** An assumption regarding the most likely set of transactional circumstances that may be applicable to the subject valuation; e.g., going concern, liquidation.

**Present Value.\*** The value, as of a specified date, of future economic benefits and/or proceeds from sale, calculated using an appropriate discount rate.

**Price/Earnings Multiple.\*** The price of a share of stock divided by its earnings per share.

**Rate of Return.\*** An amount of income (loss) and/or change in value realized or anticipated on an investment, expressed as a percentage of that investment.

**Redundant Assets.\*** See **Non-Operating Assets**.

**Replacement Cost New.\*** The current cost of a similar new property having the nearest equivalent utility to the property being valued.

**Report Date.\*** The date conclusions are transmitted to the client.

**Reproduction Cost New.\*** The current cost of an identical new property.

**Required Rate of Return.\*** The minimum rate of return acceptable by investors before they will commit money to an investment at a given level of risk.

**Residual Value.\*** The value as of the end of the discrete projection period in a discounted future earnings model.

**Return on Equity.\*** The amount, expressed as a percentage, earned on a company's common equity for a given period.

**Return on Investment.\*** See **Return on Invested Capital** and **Return on Equity**.

**Return on Invested Capital.\*** The amount, expressed as a percentage, earned on a company's total capital for a given period.

**Risk-Free Rate.\*** The rate of return available in the market on an investment free of default risk.

**Risk Premium.\*** A rate of return added to a risk-free rate to reflect risk.

**Rule of Thumb.\*** A mathematical formula developed from the relationship between price and certain variables based on experience, observation, hearsay, or a combination of these; usually industry specific.

**Special Interest Purchasers.\*** Acquirers who believe they can enjoy post-acquisition economies of scale, synergies, or strategic advantages by combining the acquired business interest with their own.

**Standard of Value.\*** The identification of the type of value being used in a specific engagement; e.g. fair market value, fair value, investment value.

*ASA Business Valuation Standards*
© 2009 American Society of Appraisers

**Sustaining Capital Reinvestment.\*** The periodic capital outlay required to maintain operations at existing levels, net of the tax shield available from such outlays.

**Systematic Risk.\*** The risk that is common to all risky securities and cannot be eliminated through diversification. The measure of systematic risk in stocks is the beta coefficient.

**Tangible Assets.\*** Physical assets (such as cash, accounts receivable, inventory, property, plant and equipment, etc.)

**Terminal Value.\*** See **Residual Value**

**Transaction Method.\*** See **Merger and Acquisition Method** and **Guideline Transactions Method.**

**Unlevered Beta.\*** The beta reflecting a capital structure without debt.

**Unsystematic Risk.\*** The risk specific to an individual security that can be avoided through diversification.

**Valuation.\*** The act or process of determining the value of a business, business ownership interest, security, or intangible asset.

**Valuation Approach.\*** A general way of determining a value indication of a business, business ownership interest, security, or intangible asset using one or more valuation methods.

**Valuation Date.\*** The specific point in time as of which the valuator's opinion of value applies (also referred to as "Effective Date" or "Appraisal Date" or "as of" date).

**Valuation Method.\*** Within approaches, a specific way to determine value.

**Valuation Procedure.\*** The act, manner, and technique of performing the steps of an appraisal method.

**Valuation Ratio.\*** A fraction in which a value or price serves as the numerator and financial, operating, or physical data serves as the denominator.

**Value to the Owner.\*** See **Investment Value.**

**Voting Control.\*** *de jure* control of a business enterprise.

**Weighted Average Cost of Capital (WACC).** The cost of capital (discount rate) determined by the weighted average, at market values, of the cost of all financing sources in the business enterprise's capital structure.

**Working Capital.** The amount by which current assets exceed current liabilities.

*ASA Business Valuation Standards*
© 2009 American Society of Appraisers

## AMERICAN SOCIETY OF APPRAISERS
### Statements on ASA Business Valuation Standards

---

## SBVS-1 Guideline Public Company Method

---

## I. Preamble

A. Statements clarify, interpret, explain, or elaborate on Standards. Statements have the full weight of Standards.

B. This Statement must be followed in all valuations of businesses, business ownership interests, securities and intangible assets developed by all members of the American Society of Appraisers, be they Candidates, Accredited Members (AM), Accredited Senior Appraisers (ASA), or Fellows (FASA).

C. The purpose of this Statement is to define and describe the requirements for the use of guideline public companies in the valuation of businesses, business ownership interests, securities and intangible assets, when applicable, under BVS–V Market Approach to Business Valuation.

D. This Statement applies to appraisals and may not necessarily apply to limited appraisals and calculations as defined in BVS-I General Requirements for Developing a Business Valuation, Section II.C.

E. This Statement incorporates the General Preamble to the *ASA Business Valuation Standards*.

## II. Conceptual framework

A. Market transactions in the securities of publicly traded companies can provide objective, empirical data for developing valuation ratios for use in business valuation.

B. The development of valuation ratios from guideline public companies should be considered in the valuation of businesses, business ownership interests, securities and intangible assets to the extent that adequate and relevant information is available.

C. Guideline public companies are companies with shares traded in the public securities markets that provide a reasonable basis for comparison to the investment characteristics of the company (or other interest) being valued. Ideal guideline companies are in the same industry as the subject company; however, if there is insufficient market evidence available in that industry, it may be necessary to select other companies having an underlying similarity to the subject company in terms of relevant investment characteristics such as markets, products, growth, cyclical variability, and other relevant factors.

## III. Search for and selection of guideline companies

A. When using the Guideline Public Company Method, a thorough, objective search for guideline public companies is required to establish the credibility of the valuation analysis.

B. The search procedure must include criteria for screening and selecting guideline public companies.

C. Empirical data can be found in market-based valuation ratios of guideline public companies that are engaged in the same business, in similar lines of business, or in businesses that share other relevant investment characteristics with the subject company.

---

*ASA Business Valuation Standards*
© 2009 American Society of Appraisers

## IV. Financial data of guideline public companies

    A.   It is necessary to obtain and analyze financial and operating data on selected guideline public companies, as available.

    B.   Adjustments to the financial data of the subject company and guideline public companies should be considered to minimize differences in accounting treatments when such differences are significant.

    C.   Unusual or nonrecurring items should be analyzed and adjusted as appropriate.

## V. Valuation ratios derived from guideline public companies

    A.   Comparisons are made through the use of valuation ratios. The computation and use of such ratios should provide meaningful insight about the value of the subject company, considering all relevant factors. Accordingly, care should be exercised with respect to issues such as:

        1.   The selection of the underlying data used to compute the valuation ratios

        2.   The selection of the time periods and/or the averaging methods used for the underlying data

        3.   The computation of the valuation ratios, which may be derived by relating prices of the guideline public companies to the appropriate underlying financial, operating, or physical data of the respective guideline companies

        4.   The timing of the price data used in the valuation ratios (in relationship to the effective date of the appraisal)

        5.   How the valuation ratios were selected and applied to the subject's underlying data

    B.   In general, comparisons should be made using comparable definitions of the components of the valuation ratios. However, where appropriate, valuation ratios based on components that are reasonably representative of ongoing results may be used.

    C.   Several valuation ratios may be selected for application to the subject company. These ratios may require adjustment for differences in qualitative and quantitative factors between the guideline public companies and the subject.

    D.   One or more indications of value may result from the use of the Guideline Public Company Method. The appraiser must consider the relative importance or weight accorded to each of the indications of value used in arriving at the opinion or conclusion of value.

## VI. Other factors and considerations

Adjustment may be necessary to the ratios or values for factors relating to the subject interest that may not have been considered earlier in the appraisal, such as:

    A.   Degree of control

    B.   Degree of marketability and liquidity

    C.   Strategic or investment value issues

    D.   Size, depth of management, diversification of markets, products and services, and relative growth and risk

*ASA Business Valuation Standards*
© 2009 American Society of Appraisers

## AMERICAN SOCIETY OF APPRAISERS
### Statements on ASA Business Valuation Standards

---

### SBVS-2 Guideline Transactions Method

---

## I. Preamble

A. Statements clarify, interpret, explain, or elaborate on Standards. Statements have the full weight of Standards.

B. This Statement must be followed in all valuations of businesses, business ownership interests, securities and intangible assets developed by all members of the American Society of Appraisers, be they Candidates, Accredited Members (AM), Accredited Senior Appraisers (ASA), or Fellows (FASA).

C. The purpose of this Statement is to define and describe the requirements for the use of guideline transactions in the valuation of businesses, business ownership interests, securities and intangible assets, when applicable, under BVS–V Market Approach to Business Valuation.

D. This Statement applies to appraisals and may not necessarily apply to limited appraisals and calculations as defined in BVS-I General Requirements for Developing a Business Valuation, Section II.C.

E. This Statement incorporates the General Preamble to the *ASA Business Valuation Standards*.

## II. Conceptual framework

A. Transactions involving the sale, merger or acquisition of businesses, business ownership interests, securities and intangible assets can provide objective, empirical data for developing valuation ratios for use in business valuation.

B. The development of valuation ratios from guideline transactions of significant interests in companies (or intangible assets, if applicable) should be considered in the valuation of businesses, business ownership interests, securities and intangible assets to the extent that sufficient and relevant information is available.

C. Guideline transactions are transactions involving companies (or interests) that provide a reasonable basis for comparison to the investment characteristics of the company (or interest) being valued. Ideal guideline transactions are in the same industry as the subject company. However, if there is insufficient transactional information available in that industry, it may be necessary to select transactions involving other companies having an underlying similarity to the subject company in terms of relevant investment characteristics such as markets, products, growth, cyclical variability and other relevant factors. Prior transactions in the company being valued may also be considered to be guideline transactions.

## III. Search for and selection of transactions in guideline companies

A. When using the Guideline Transactions Method, a thorough, objective search for transactions of interests in companies similar to the company being valued is required to establish the credibility of the valuation analysis.

B. The search procedure must include criteria for screening and selecting guideline transactions.

C. Empirical data can be developed from guideline transactions involving controlling or minority interests in publicly traded or closely held companies or intangible assets.

D. Empirical data can be developed from valuation ratios of guideline transactions involving companies (or interests) in the same business, in similar lines of business, or in businesses that share other relevant investment characteristics with the subject company (or interest) when sufficient information is available regarding the transactions.

---

*ASA Business Valuation Standards*
© 2009 American Society of Appraisers

## IV. Financial data of guideline companies

    A. It is necessary to obtain and analyze relevant financial and operating data of the companies involved in guideline transactions, as available.

    B. Adjustments to the financial data of the subject company and the companies in the guideline transactions should be considered to minimize differences in accounting treatments when such differences are significant.

    C. Unusual or nonrecurring items should be analyzed and adjusted, as appropriate.

## V. Valuation ratios derived from guideline transactions

    A. Comparisons are made through the use of valuation ratios. The computation and use of such ratios can provide meaningful insight about the value of the subject, considering all relevant factors. Accordingly, care should be exercised with respect to issues such as:

        1. The selection of the underlying data used to compute the valuation ratios

        2. The selection of the time periods and/or the averaging methods used for the underlying data

        3. The computation of the valuation ratios, which may be derived by relating prices in guideline transactions to the appropriate underlying financial, operating, or physical data of the respective companies (or interests) involved in the transactions

        4. The timing of the price data used in the valuation ratios (in relationship to the effective date of the appraisal)

        5. How the valuation ratios were selected and applied to the subject's underlying data

    B. Several valuation ratios may be selected for application to the subject company. These ratios may require adjustment for differences in qualitative and quantitative factors between the companies (or interests) involved in the guideline transactions and the subject.

    C. Guideline transactions typically involve a specific buyer and a specific seller. Information regarding both the buyer and seller in a guideline transaction may be necessary in order to draw valuation inferences from the transaction.

    D. One or more indications of value may result from the use of the Guideline Transactions Method. The appraiser must consider the relative importance or weight accorded to each of the indications of value used in arriving at the opinion or conclusion of value.

## VI. Other factors and considerations

Adjustments may be necessary to the ratios or values for factors that have not been considered earlier in the appraisal, such as:

    A. Degree of control

    B. Degree of marketability and/or liquidity

    C. Timing differences between market transactions and the valuation date

    D. Strategic or investment value issues

    E. Size, depth of management, diversification of markets, products and services, and relative growth and risk

*ASA Business Valuation Standards*
© 2009 American Society of Appraisers

## AMERICAN SOCIETY OF APPRAISERS
### ASA Advisory Opinions

### AO-1 Financial Consultation and Advisory Services

It is the opinion of the Business Valuation Committee that the *ASA Business Valuation Standards* and the *Uniform Standards of Professional Appraisal Practice* of The Appraisal Foundation, as they apply to business valuation issues, are intended to apply to appraisals that are formally developed and presented opinions of value performed as the primary or ultimate objective of an appraisal engagement. These standards are not intended to apply to financial consultation or advisory services where there is no expression of an opinion value, or the primary or ultimate objective is not to express an opinion of value, including but not limited to, fairness opinions, solvency opinions, pricing of securities for public offerings, feasibility studies, transfer pricing studies, lifing studies of intangibles, estate planning or estate tax services, economic damage analysis and quantification, litigation consulting, royalty rate studies for intangibles and similar engagements.

## AMERICAN SOCIETY OF APPRAISERS
### Procedural Guidelines

### PG-1 Litigation Support:
### Role of the Independent Financial Expert

## I. Preamble

A. Business valuation professionals are frequently engaged as independent financial experts for purposes of assisting in dispute resolution, litigation, or potential litigation. To preserve and enhance the quality of the services of such experts, the American Society of Appraisers, through its Business Valuation Committee, has adopted this Procedural Guideline.

B. This Procedural Guideline incorporates, where appropriate, all relevant Business Valuation Standards and Statements on Standards adopted by the American Society of Appraisers through its Business Valuation Committee.

C. This Procedural Guideline suggests specific procedures that may be used by experts. It is not binding.

D. This Procedural Guideline is designed to offer guidance to ASA members providing litigation-support services. Deviations from this Procedural Guideline are not designed to be or intended to be the basis of any civil liability, and should not create any presumption or evidence that a legal duty has been breached, or create any special relationship between the expert and any other person.

## II. Performance of litigation support services

A. Litigation support services include any professional assistance provided to a client in a matter involving pending or potential litigation or dispute resolution proceedings before a trier of fact.

B. In rendering litigation support services, the expert may be retained to provide an expert opinion on the financial effects of facts and assumptions. In addition to forming an expert opinion, the expert may value a business, project future financial results, analyze the performance of a business operation, interpret financial data, opine on an impaired stream of earnings, or render other similar types of professional services.

C. In providing litigation-support services, an independent financial expert may play a role as:

1. **Expert**. One who is qualified by knowledge, skill, experience, training, or education in performing business valuation services and/or related financial analyses.

2. **Expert Witness**. An expert who is engaged to explain technical, scientific, or specialized knowledge in order to assist the trier of fact in understanding evidence.

3. **Arbitrator**. An expert who serves as a trier of fact in an alternative dispute resolution context.

4. **Court-Appointed Expert**. An expert who is engaged by a court to assist the trier of fact.

5. **Consulting or Advisory Expert**. An expert who is engaged to review another expert's work product or who is engaged to advise the client, lawyer or another expert witness about technical matters relating to the subject litigation, but who will not be called to testify at trial, and may or may not be independent. Accordingly, this Procedural Guideline may not apply to such an expert.

D. The expert should obtain a clear understanding of the type of the assignment.

E. When planning the scope of work for a particular engagement, the expert should obtain an understanding of the nature of the dispute, the events giving rise to the claim, as well as the economic context and industry outlook impacting the business and/or individual central to the assignment.

F. The expert should obtain sufficient relevant data to afford a reasonable basis for the conclusions reached and/or recommendations made.

G. Sufficient information and documentation should be gathered by such means as inspection, inquiry, computation and analysis to ensure that the expert's analysis and conclusion(s) are properly supported. The expert should exercise professional judgment in determining the extent of the information and documentation necessary to support the conclusion.

H. The expert witness, arbitrator or court-appointed expert should maintain integrity, objectivity and independence.

I. The following examples represent some of the many types of cases in which an expert may provide litigation-support services in the area of business valuation and related financial analysis:

    **1. Business valuation**

        a. Determination of "fair value" of minority shares in dissenting stockholder and oppression suits

        b. Income, property, gift tax, and estate tax issues, including the determination of fair market value in non-arm's length transactions, allocation of purchase price among different categories of assets, corporate reorganizations, rollovers, stockholder benefits, deemed dispositions, gifts and bequests, capital gains, etc.

        c. Valuation of shares held by an Employee Stock Ownership Plan

        d. Separation and divorce

        e. Partner/shareholder disputes

        f. Business valuations

        g. Buy-sell agreements

    **2. Quantification of financial loss or damages**

        a. Breach of contract and tort, including:

            (1) measuring damages for lost profits and loss of goodwill

            (2) defining relevant markets and calculating market share

            (3) restating or reconstructing financial records

            (4) developing profit and cost relationships

            (5) creating pro-forma financial statements

        b. Personal injury and fatality claims, including the quantification of impaired earnings

        c. Insurance claims, including business interruption and disturbance losses

        d. Condemnation/expropriation of business or property

        e. Trespass and conversion

        f. Professional malpractice

        g. Anti-trust/unfair competition

        h. Intellectual property-infringement damages

        i. Bankruptcy and reorganization

*ASA Business Valuation Standards*
© 2009 American Society of Appraisers

## III. Conducting the assignment

A. In performing the engagement, the expert should consider the appropriate method(s) to be adopted and procedures to be applied.

B. The expert should consider key assumptions and hypothetical conditions, determining the reasonableness and appropriateness thereof. The use of unwarranted assumptions may impair the objectivity — actual or perceived — of the expert.

C. The expert should consider the necessity of relying on the work of a specialist. When there is such reliance, the expert may wish to consider the specialist's independence and competency. If the expert relies upon a specialist, the conclusions drawn should be documented. Any written opinion or report from a specialist should be retained on file.

D. Work performed in the course of an engagement should be documented and files should be maintained in an organized manner. The form and extent of work papers should suit the circumstances and needs of the engagement for which they are prepared.

E. The expert should evaluate the necessity of obtaining a client representation letter and, if possible and applicable, a representation letter from management or other representatives of the underlying business.

F. The expert should either retain on file, or have access to, all information relied upon.

G. When the expert has determined that an engagement letter is required, the engagement letter should be retained on file. When no engagement letter has been received, the expert's file should include a summary of the nature and function of the assignment.

H. When the expert has determined that a client representation letter and/or a management representation letter is necessary, this (these) letter(s) should be retained on file.

I. The method(s) selected by the expert should be documented along with the reasons for selection. In addition, the specific procedures should be documented along with the reasons for selection. The expert should document key areas considered and significant assumptions made. A copy of calculations, explanations and documentation supporting the final conclusion should be retained in the file.

J. The expert should follow the rules of the applicable jurisdiction.

## IV. Preparation of an expert report

A. An expert report is often considered to constitute any communication, written or oral (and not in draft or preliminary form) that is prepared by an expert and that contains a conclusion pertaining to a review, analysis, or quantification of business value, damages, or economic loss and that is to be used in litigation or arbitration proceedings.

B. It is recommended that the individual(s) responsible for the preparation of the expert report be identified.

C. To the extent that it is both possible and appropriate, an expert report should contain, as a minimum, the following information:

1. **Identity of client**. The expert's client(s) should be clearly identified.

2. **Description of assignment**. The expert report should contain a clear description as to the specific nature of the expert's assignment.

*ASA Business Valuation Standards*
© 2009 American Society of Appraisers

3. **Effective date(s) or effective time period(s).** Value(s) or damages should be expressed as of a specific date or time period. In damage claims, the damages may relate to past, present and/or future economic losses.

4. **Intended use.** If not already included in the description of the nature of the assignment, the intended use of the expert report should be clearly stated, and use for other purposes should be precluded.

5. **Definitions.** The expert report should contain the expert's definition of key terms not commonly defined. The expert should define or explain terms such as (but not limited to) "damages," "economic loss," "loss of profits," "lost contribution margin."

6. **Documents and information.** The expert report should identify significant documents and information relied upon and, if applicable, those reviewed but not relied upon.

7. **Limitations.** If the expert was unable to obtain, or was otherwise denied access to, documents, information, and/or interviews, or where the information provided was incomplete, this limitation should be clearly disclosed in the expert report. It may also be appropriate to disclose the reasons for this limitation. To the extent that such limitation would restrict the ability of the expert to form an opinion, it may be necessary to express a qualified opinion, a disclaimer, or a denial of an opinion, depending on the specific circumstances.

8. **Relevant chronology.** When relevant, the expert report should summarize the chronology of events giving rise to the claim(s) in the litigation. The chronology of events, as set out in the expert report, should be consistent with the effective date or time period.

9. **Relevant context and financial analysis.** When relevant, the expert report should include an appropriate description of factors such as those listed in BVS VIII Comprehensive Written Business Valuation Report, Section V, and a financial analysis such as the one described in BVS VIII, Section VI.

10. **Methodology.** The expert report should contain a description of the method(s) adopted and the reason(s) for their use.

11. **Analysis.** The expert report should provide adequate description in clear terms of how the expert determined value, quantified economic losses, damages, etc.

12. **Assumptions.** The expert report should clearly state and identify the basis of all assumptions, hypothetical conditions and limiting conditions that affected the analyses, opinions and conclusions (see USPAP 10-2(a)(x)).

13. **Conclusion.** The expert report should clearly state the conclusions of the expert.

14. **Report date.** The expert report should be dated as of the day on which it is completed or issued.

15. **Exhibits, appendices, graphs, charts, schedules and tables.** The use of visual aids in the body of, or appending, the expert report should be made in an objective, unbiased and professional manner, so that they can be properly interpreted by the trier of fact and others connected with the litigation or arbitration.

*ASA Business Valuation Standards*
© 2009 American Society of Appraisers

## V. Retention of work papers and report

A. The expert should retain fully-documented work papers for each engagement, whether in hard copy or electronic copy. The expert should also retain summaries of oral reports or testimony (or a transcript of testimony) and all other data, information and documentation necessary to support the expert's opinions and conclusions. Summaries of key meetings, discussions and correspondence should be retained on file.

B. The expert should maintain custody of the work papers, or make appropriate retention, access, and retrieval arrangements with the party having custody of those work papers. The expert should retain the work papers for a period of at least five (5) years after preparation, or at least two (2) years after final disposition of any judicial proceeding (including arbitration) in which testimony was given, whichever period expires last.

C. A copy of the final issued expert report should be retained on file for a period of at least five (5) years after preparation, or at least two (2) years after final disposition of any judicial proceeding (including arbitration) in which testimony was given, whichever period expires last.

*ASA Business Valuation Standards*
© 2009 American Society of Appraisers

## AMERICAN SOCIETY OF APPRAISERS
### Procedural Guidelines

---

### PG-2  –  Valuation of Partial Ownership Interests

---

## I.  Preamble

A. Business valuation professionals are frequently engaged as independent financial appraisers for purposes of valuing fractional or partial ownership interests. To preserve and enhance the quality of the services of such appraisers, the American Society of Appraisers, through its Business Valuation Committee, has adopted this Procedural Guideline.

B. This Procedural Guideline incorporates, where appropriate, all relevant Business Valuation Standards and Statements on Standards adopted by the American Society of Appraisers through its Business Valuation Committee.

C. The purpose of this Procedural Guideline is to define and describe the considerations and procedures that may be used in valuing partial ownership interests in businesses, securities or other fractional interests in tangible or intangible property. It is not binding.

D. Deviations from this Procedural Guideline are not designed to be or intended to be the basis of any civil liability, and should not create any presumption or evidence that a legal duty has been breached, or create any special relationship between the appraiser and any other person.

## II. General principles

A. Partial ownership interests are interests of an enterprise or an asset of less than 100 percent. Partial ownership interests may exist in various business entities and assets such as corporations, limited liability companies, partnerships, and as direct fractional ownership of certain tangible and intangible assets.

B. Partial ownership interests comprise a spectrum of positions, from nearly total control (e.g., a 95 percent stock ownership position in a corporation, or the sole general partner of a limited partnership) to almost complete lack of control (e.g., a small block of non-voting corporate stock).

C. It is not possible to categorize partial interests in simple terms.

  1. Generally, a partial ownership position in an entity or asset that is less than 50 percent may be classified as a noncontrolling or minority interest. Similarly, an interest of greater than 50 percent often confers control. An exact 50 percent interest may have both control characteristics (such as blocking power) and lack of control characteristics (such as inability to proactively cause an action to be taken).

  2. The degree of ownership does not always indicate the degree of control.

      a. Governance documents, loan covenants, securities attributes (e.g., preferences, voting versus non-voting, etc.) and other factors may confer control of an entity even if the interest at issue is less than 50 percent.

---

*ASA Business Valuation Standards*
© 2009 American Society of Appraisers

    b.  A 60 percent limited partner may have no control over a partnership if removal of the general partner requires a two-thirds majority vote of the limited partnership interests.

    c.  A 2 percent ownership position might be in a position of limited control if there are two other owners of 49 percent each who are at odds with one another. The same 2 percent owner would be in a completely different position if there was only one other owner of 98 percent, or 49 other owners each owning 2 percent.

    d.  Three interests of one-third (33 1/3 percent) each provides yet another set of potential valuation dynamics.

3.  A complete listing of all the different potential combinations and permutations of ownership structure and characteristics is beyond the scope of this Procedural Guideline.

D.  Development of value for a partial interest can be a very different process from valuing the underlying entity or asset as a whole. In addition, valuation of partial interests may or may not be a direct function of the value of the underlying entity or asset as a whole.

1.  It is the responsibility of the appraiser to determine if valuation of the underlying asset(s) or entity as a whole is required in order to develop credible appraisal results for the partial interest.

2.  If ownership of a partial interest does not provide the ability to liquidate an entity, cause its sale or gain access to any of the assets, valuation of the whole may not be relevant to the analysis. However, if investors or market participants would nonetheless consider the value of the whole irrespective of their inability to cause liquidation or sale of the entity or assets, then valuation of the whole, either on a going concern or liquidation premise, may be appropriate to consider in the analysis.

3.  If ownership of a partial interest does provide the ability to cause liquidation of the underlying entity or sale of the underlying asset, and value of the entity or asset depends primarily on the asset-based approach, it may be appropriate to obtain qualified appraisals of any real estate or personal property.

E.  Valuation of partial ownership interests is often dependent on contractual provisions. Consequently, rights and restrictions contained in documents such as articles of incorporation, bylaws, partnership agreements, tenant-in-common agreements, option agreements, buy-sell agreements or shareholder agreements may be relevant to the analysis. Similarly, value may be a direct or indirect function of applicable laws and regulations.

F.  Appraisers should be aware that the standard (type) and premise of value can have a material effect on the value of a partial ownership interest. For example, valuation of a minority shareholding under the "fair value" standard of value may be very different from its value under the "fair market value" standard of value.

## III. Factors to consider

A number of factors may be appropriate to consider in valuing partial ownership interests. The following list is not intended to be all-inclusive. Items on the list may or may not be applicable in specific valuation situations.

*ASA Business Valuation Standards*
© 2009 American Society of Appraisers

A.  The purpose and definition of the valuation engagement in accordance with BVS–I General Requirements for Developing a Business Valuation, including the applicable standard (type) and premise of value.

B.  Factors related to the underlying enterprise or asset, including:

1.  The value of the underlying enterprise or asset, if applicable.

2.  Enterprise-level or asset-level tax effects, if relevant.

C.  Factors related to the subject partial interest, including:

1.  Provisions in the organizational and governance documents that affect the rights, restrictions, marketability and liquidity of the subject interest.  Documents to consider may include partnership agreements, articles of incorporation, bylaws, operating agreements, buy-sell agreements, investment letter stock restrictions, option agreements, lock-up requirements or others that may be relevant.

2.  Applicable laws and regulations.  Business examples include statutory rights to demand dissolution of a corporation under state law, restrictions on transfer pursuant to SEC Rule 144, and many others.  An asset example is included the right to partition.

3.  The existing ownership structure and configuration.

4.  Access to, availability of, and reliability of information regarding the underlying asset or entity.

5.  The relevant pool of potential buyers, if any.

6.  Market data on transactions in similar markets, if any.  Potentially similar markets might include private placements in publicly or privately syndicated entities (including restricted stock transactions, pre-IPO transactions, and transactions in publicly traded limited partnerships) or tenants-in-common arrangements, etc.

7.  Expected holding period for an investment in the subject interest, including consideration of such factors as:

a.  The extent to which the expected holding period may be uncertain.

b.  Defined expiration or termination dates contained in the governing documents, or other external factors, that may precipitate a foreseeable liquidation or sale of the underlying entity.

c.  Analysis of the age, health and other characteristics of the other owners and/or key managers, which could provide information about the possible timing of a sale or liquidation by the controlling owner(s).

d.  The history of transactions (if any) involving partial (or possibly controlling) interests of the subject enterprise or asset, including recapitalizations or stock repurchases that have provided liquidity to shareholders.

e.  The potential market for similar enterprises or assets (e.g., is the industry consolidating?).

*ASA Business Valuation Standards*
© 2009 American Society of Appraisers

f. The emerging attractiveness of the entity for equity offering, sale, merger or acquisition.

g. Provisions in the governing documents or buy-sell agreements, or under law or regulation either prohibiting, restricting or allowing transfer of the subject interest.

h. Rights and powers attributable to the subject interest that may enable a sale of the subject entity, asset or the interest itself, against the will of the other owners.

i. Historical actions of management and/or the directorate, which may provide information about their policy and intentions regarding eventual sale of the entity or asset, or receptivity to a potential sale or repurchase of partial interests.

j. The existence, depth and functioning of markets that might be available for interests similar to the subject interest.

k. The appropriateness of considering a range of expected holding periods and exit possibilities.

8. Expected economic benefits associated with the subject interest, which come in the form of interim benefits (dividends or distributions) and a terminal cash flow when the investment is sold or liquidated.

a. Expected interim dividends or distributions to the interest, which may differ from the expected benefits (cash flows) generated by the entity or asset as a whole. Interest-level benefits may be affected by such factors as:

(1) The history of dividends or distributions, including both timing and amounts.

(2) Current or expected future distribution policy.

(3) Preferential dividend claims.

(4) Enterprise-level and/or interest-level tax characteristics.

(5) The outlook for one-time and/or irregular dividends or distributions.

(6) Circumstances with controlling owners that may increase (or decrease) the likelihood of future interim benefits.

b. The expected terminal cash flow at the end of the expected holding period(s), which may be a function of such factors as:

(1) Possible future transactions involving the enterprise or asset as a whole, or transactions in the subject interest itself.

(2) Current (valuation date) value and expected growth in value of the enterprise or asset to the end of the expected holding period(s).

(3) Growth in value may be a function of expected earnings retention (distribution policy) and the amount of and effectiveness of expected reinvestment in the entity or asset.

*ASA Business Valuation Standards*
© 2009 American Society of Appraisers

9. Required return for investing in the subject interest. The required return may consider risks other than risks related to the enterprise or asset as a whole, including for example:

    a. The expected length and uncertainty of the holding period.

    b. The likelihood of dividends or distributions (i.e., expected distribution policy).

    c. The costs of due diligence efforts required to acquire the subject partial interest.

    d. The costs of monitoring the investment over the expected holding period, including issues related to the expected receipt of timely and reliable information concerning the investment.

    e. Required returns on similar investments or investments with similar investment-specific liquidity and holding period characteristics.

    f. The risk of tax liabilities from pass-through profits without guaranteed tax distributions in entities such as limited liability companies, Subchapter S corporations or partnerships.

    g. The difficulty and cost of marketing the subject interest.

    h. The risk of involuntary dilution when no preemptive rights are provided in the articles of incorporation or bylaws of a corporation.

    i. The degree of control conveyed by the subject interest.

10. Ownership-level tax effects, if relevant.

11. Prior transactions in the subject interest, entity or asset, and their relevance to a given assignment.

D. Interaction of the factors listed above, and their cumulative impact on the degree of control, marketability and liquidity of the subject interest.

## IV. Approaches, methods and procedures

A. Appraisers should consider all three approaches to value (asset-based, income and market) when valuing partial interests. If an approach is excluded in an assignment the appraiser should explain the reason for such exclusion in the appraisal report.

B. It may be appropriate for the appraiser to obtain the assistance of legal counsel in order to gain a reasonable familiarity and understanding of the legal and regulatory environment that may influence or affect value. Similarly, it may be appropriate for the appraiser to obtain input from counsel regarding governing documents and agreements.

C. If discounts or premiums are applied at the partial ownership level the appraiser should explain how the discounts or premiums were developed, as required by BVS–VII Valuation Discounts and Premiums.

D. If the income approach is used at the partial ownership level the appraiser should develop and support any assumptions concerning the expected benefits to be received, the expected or required holding period(s) and the appropriate required rate of return on the investment given

the risks associated with the subject ownership position. To the extent applicable the provisions of BVS-IV Income Approach to Business Valuation should be followed.

E.  If the market approach is used at the partial ownership interest level, several other sections of the Standards may be applicable.

1.  Discounts for lack of marketability (or discount rates) are sometimes developed, for example, by reference to or analysis of restricted stocks of public companies, options on public securities (such as long-term equity anticipation securities), pre-IPO transactions in private companies that later went public, or other public securities. When using such methods, the appraiser should follow the guidance of SBVS-I Guideline Public Company Method as well as BVS-V Market Approach to Business Valuation and BVS-VII Valuation Discounts and Premiums.

2.  Similarly, appraisers using studies of transactions in the secondary market for private partnership interests to develop discounts for lack of marketability (or discount rates) should follow the guidance of SBVS-II Guideline Transactions Method, as well as BVS-V and BVS-VII.

3.  If transactional premium studies involving public companies (e.g., control premium studies) are utilized by the appraiser to support discounts for lack of control (minority discounts), the provisions of SBVS-I and BVS-VII should also be applied.

F.  When reconciling the final value conclusion for a partial interest, regardless of the method(s) employed, the appraiser may wish to consider one or more tests of reasonableness for the concluded value of the partial interest, such as:

1.  Calculating the implied internal rate of return for the subject interest at the concluded price over the relevant range of expected holding periods, and comparing the implied internal rate of return to expected returns of similar investments, if available.

2.  Calculating the implied dividend or distribution yield for the investment based on the expected dividend or distribution policy of the enterprise, and comparing the implied dividend or distribution yield with expected yields on similar investments, if available.

*ASA Business Valuation Standards*
© 2009 American Society of Appraisers