# TAB 95

WILEY FINANCE

Second Edition

# Investment valuation

## Tools and Techniques for Determining the Value of *Any* Asset

UNIVERSITY EDITION

Revised and Updated

# ASWATH DAMODARAN

·any in the
ey is glob-
ervices for

investment
·l advisors.
·t, financial
·e.

n.

# Investment valuation

## Tools and Techniques for Determining the Value of *Any* Asset

### Second Edition

# ASWATH DAMODARAN

www.damodaran.com



John Wiley & Sons, Inc.

This book is printed on acid-free paper. ∞

Copyright © 2002 by Aswath Damodaran. All rights reserved.

Published by John Wiley & Sons, Inc., New York.
Published simultaneously in Canada.

No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, scanning, or otherwise, except as permitted under Section 107 or 108 of the 1976 United States Copyright Act, without either the prior written permission of the Publisher, or authorization through payment of the appropriate per-copy fee to the Copyright Clearance Center, 222 Rosewood Drive, Danvers, MA 01923, (978) 750-8400, fax (978) 750-4744. Requests to the Publisher for permission should be addressed to the Permissions Department, John Wiley & Sons, Inc., 605 Third Avenue, New York, NY 10158-0012, (212) 850-6011, fax (212) 850-6008, E-Mail: PERMREQ@WILEY.COM.

This publication is designed to provide accurate and authoritative information in regard to the subject matter covered. It is sold with the understanding that the publisher is not engaged in rendering professional services. If professional advice or other expert assistance is required, the services of a competent professional person should be sought.

Designations used by companies to distinguish their products are often claimed as trademarks. In all instances where the author or publisher is aware of a claim, the product names appear in Initial Capital letters. Readers, however, should contact the appropriate companies for more complete information regarding trademarks and registration.

*Library of Congress Cataloging-in-Publication Data:*

Damodaran, Aswath.
 Investment valuation / Aswath Damodaran.—2nd ed.
  p.   cm.—(Wiley finance)
 Includes bibliographical references and index.
 ISBN 0-471-41488-3 (cloth)
 ISBN 0-471-41490-5 (paper)
 1. Corporations—Valuation—Mathematical models.  I. Title.  II. Wiley finance series.
 HG4028.V3 D353   2002
 658.15—dc21                                                           2001026890

Printed in the United States of America.

10  9  8  7  6  5  4  3  2

.UE MULTIPLES

25, a ROE of
ook value ra-

= 5.3165

on to?
any and esti-
right your re-
m the sector

orted after-tax
l year. At the
$4 billion and
$8 billion, the
y of 11% and
, expecting to
ok value ratio

) of 2.0. If the
iity, and has a
ning in perpe-

a trading firm

owth

value-to-book

ed equity and
alue for high-

**20**

# Revenue Multiples and Sector-Specific Multiples

**W**hile earnings and book value multiples are intuitively appealing and widely used, analysts in recent years have increasingly turned to alternative multiples to value companies. For young firms that have negative earnings, multiples of revenues have replaced multiples of earnings in many valuations. In addition, these firms are being valued on multiples of sector-specific measures such as the number of customers, subscribers, or even web site visitors (for new economy firms). In this chapter, the reasons for the increased use of revenue multiples are examined first, followed by an analysis of the determinants of these multiples and how best to use them in valuation. This is followed by a short discussion of the sector-specific multiples, the dangers associated with their use and the adjustments that might be needed to make them work.

## REVENUE MULTIPLES

A revenue multiple measures the value of the equity or a business relative to the revenues that it generates. As with other multiples, other things remaining equal, firms that trade at low multiples of revenues are viewed as cheap relative to firms that trade at high multiples of revenues.

Revenue multiples have proved attractive to analysts for a number of reasons. First, unlike earnings and book value ratios, which can become negative for many firms and thus not meaningful, revenue multiples are available even for the most troubled firms and for very young firms. Thus, the potential for bias created by eliminating firms in the sample is far lower. Second, unlike earnings and book value, which are heavily influenced by accounting decisions on depreciation, inventory, research and development (R&D), acquisition accounting, and extraordinary charges, revenue is relatively difficult to manipulate. Third, revenue multiples are not as volatile as earnings multiples, and hence are less likely to be affected by year-to-year swings in a firm's fortune. For instance, the price-earnings ratio of a cyclical firm changes much more than its price-sales ratios, because earnings are much more sensitive to economic changes than revenues are.

The biggest disadvantage of focusing on revenues is that it can lull you into assigning high values to firms that are generating high revenue growth while losing significant amounts of money. Ultimately, a firm has to generate earnings and cash flows for it to have value. While it is tempting to use price-sales multiples to value

TAB 96

# DRAFTING PATENT LICENSE AGREEMENTS

## Seventh Edition

Brian G. Brunsvold
D. Patrick O'Reilley
D. Brian Kacedon

# DRAFTING PATENT LICENSE AGREEMENTS

## Seventh Edition

### *With Forms on CD-ROM*

**Brian G. Brunsvold**

**D. Patrick O'Reilley**

**D. Brian Kacedon**

*Finnegan, Henderson, Farabow,*
*Garrett & Dunner, L.L.P.*
*Washington, D.C.*

**Bloomberg BNA**

Arlington, VA



LIBRARY OF

JUL 1 7 2013

CLEARY GOTTLIEB
STEEN & HAMILTON LLP

KF
3145
.M29
2012

Copyright © 1971, 1984, 1991, 1998, 2004, 2008, 2012

The Bureau of National Affairs, Inc.
Arlington, VA 22202


**Library of Congress Cataloging-in-Publication Data**

Brunsvold, Brian G., 1938-
  Drafting patent license agreements / Brian G. Brunsvold, D. Patrick O'Reilley
D. Brian Kacedon. -- 7th ed
      pages cm.
   Includes bibliographical references and index.
   ISBN 978-1-61746-121-7
   1. Patent licenses--United States. 2. Trade secrets--Law and legislation--United
States. I. O'Reilley, Dennis P., 1943- II. Kacedon, D. Brian. III. Title

    KF3145.B78 2008
    346.7304'86--dc23

                                                      2012001859

All rights reserved. Photocopying any portion of this publication is strictly prohibited unless express written authorization is first obtained from The Bureau of National Affairs, Inc., 1801 S. Bell Street, Arlington, VA 22202, bna.com/bnabooks. Authorization to photocopy items for internal or personal use, or the internal or personal use of specific clients, is granted by The Bureau of National Affairs, Inc. for libraries and other users registered with the Copyright Clearance Center (CCC) Transactional Reporting Service, provided that $1.00 per page is paid directly to CCC, 222 Rosewood Dr., Danvers, MA 01923, copyright.com, Telephone: 978-750-8400, Fax: 978-646-8600.

Published by Bloomberg BNA
1801 S. Bell Street, Arlington, VA 22202
bna.com/bnabooks

ISBN 978-1-61746-121-7
Printed in the United States of America

Pre

    T
lectu
such
It wa
now t
field
of pat
Roche
chapt
uncer
over i
expan
bankr
in a b
inters
evolut
to rev
tion (
    T
access
carefu
reader
the ra
parag
The co
the ap
    Tl
and in
on lice
legal
legal d
the le
know-l

then only under the terms of the contract with the licensee.[37] The licensee remains responsible for the actions of the contractor.

By contrast, a sublicense, which must be expressly granted and cannot be implied, permits the sublicensee to act independently of the licensee (subject to the terms of the sublicense agreement). A sublicensee is in effect another licensee. The licensee generally is not responsible for the actions of the sublicensee unless the license agreement specifically provides for such responsibility.

Since the right to "have made" is generally implied and rarely expressly excluded, some have tried to use that right to overcome the lack of a right to grant sublicenses.[38] If the net effect of a transaction is that a licensed product made by a contractor is not sold and delivered to the licensee, it may be an unauthorized or "sham" sublicense.

### 5.04   The Compulsory License

A license compelled by law is compulsory. While such licenses are not as common in the United States as in other countries, several U.S. laws provide for compulsory licenses or their equivalent.

The Clean Air Act[39] has a provision that can be used to compel licenses under patents if the patent owner is unwilling or unable to satisfy demand for a product deemed to be in the public interest. In addition, eminent domain, the government's right to take property (such as patent rights) for reasonable compensation, is a form of compulsory license.[40]

In each of these examples, the patent owner is entitled to reasonable compensation or damages for the license. The patent statute, however, provides for the equivalent of compulsory licenses in the form of intervening rights. These equitable rights may arise as the result of a reissue patent[41] or the grant of a reexamination certificate.[42] Depending on the equities, a patent owner against whom intervening rights are awarded may not be entitled to compensation.

Another form of compulsory license occurs when a court refuses to grant an injunction after finding the patent valid and infringed.

---

1985); Velos Grp. v. Centocor, Inc., No. Civ. JFM-92-2722, 1996 WL 34477671, at *10, 1996 U.S. Dist. LEXIS 19743, at *32 (D. Md. 1996) ("resale of a product by a patent licensee does not itself constitute a license or sublicense, even when resale is by an exclusive distributor").

[37] *See* Cyrix Corp. v. Intel Corp., 77 F.3d 1381, 37 USPQ2d 1884 (Fed. Cir. 1996).

[38] *See Westinghouse Elec. & Mfg. Co.,* 23 F.2d at 632–36; E.I. du Pont de Nemours & Co. v. Shell Oil Co., 498 A.2d 1108, 1114, 227 USPQ 233, 236 (Del. 1985).

[39] 42 U.S.C. §7608 (2006) (mandatory licensing).

[40] *See* Calhoun v. United States, 453 F.2d 1385, 1391, 172 USPQ 438, 443 (Ct. Cl. 1972) ("[T]he Government, when a patented device or invention is made or used by or for the United States, *ipso facto* takes by eminent domain a compulsory compensable license in the patent [and] the patentee obtains his Fifth Amendment just compensation for that taking....").

[41] 35 U.S.C. §252 (2006).

[42] 35 U.S.C. §307(b) (2006).

---

While this had
would harm th
the Supreme C
The Court man
before granting
Thus, a patent
entitled to an
compensated fo
resulting in de
"on-going royal
license,[47] even
license.

### 5.05   The Sh

The shop ri
an employer and
time, materials,
to a nonexclusi
to the inventio

A shop rig
to invent. If th
contract exists
ployer, under t

---

[43] *See* Foster v.

[44] *See* Activated
137 (N.D. Ill. 1946).

[45] 547 U.S. 388,

[46] *See* Bard Peri
1641 (Fed. Cir. 2012)
ing royalty); Paice L
2007) (affirming den
but remanding for re
v. Microsoft Corp., 4
monwealth Scientific
(E.D. Tex. 2007) (gr
institution) had show

[47] *Compare Bar
plies that anyone wh
is licensed. By contr
lar ... defendant[]; tl
manufacturer to follo
imprimatur."), *with F*
license an 'ongoing ro
the disruptive implic:
exclusion, the trial c
opportunity to set th

[48] *See* United St
Solomons v. United S
F.2d 1576, 27 USPQ2

# TAB 97

Canada Revenue Agency    Agence du revenu du Canada

Support for your R&D in Canada

# Overview of the Scientific Research and Experimental Development (SR&ED) Tax Incentive Program

RC4472(E) Rev. 08

Canada

La version française de cette publication est intitulée *Aperçu du programme d'encouragements fiscaux pour la recherche scientifique et le développement expérimental (RS&DE)*.

# Table of Contents

|  | Page |
|---|---|
| What is the SR&ED program? | 4 |
| What is the objective of the SR&ED program? | 4 |
| How can the SR&ED program benefit my company? | 4 |
| What businesses are eligible? | 5 |
| What is "SR&ED"? | 6 |
| What is not "SR&ED"? | 6 |
| What are the eligibility requirements? | 7 |
| What expenditures can I claim? | 8 |
| How do I determine my SR&ED expenditures? | 8 |
| What are the SR&ED investment tax credit rates? | 9 |
| How do I make a claim? | 10 |
| When do I file my claim? | 10 |
| What happens after I send in my claim? | 11 |
| How long will it take to process my claim? | 12 |
| What happens during the review process? | 12 |
| What do the reviewers need from me? | 13 |
| What supporting documentation do I need to keep? | 13 |
| What can I do if I have concerns? | 14 |
| What services are available? | 15 |
| Where can I obtain more information? | 17 |
| Who can I contact to get more information? | 17 |

## What is the SR&ED program?

The Scientific Research and Experimental Development (SR&ED) tax incentive program is the largest single source of federal government support designed to encourage research and development (R&D) in Canada.

Each year, the SR&ED program provides over $4 billion in investment tax credits (ITCs) to over 18,000 claimants. Of these, about 75% are small businesses.

## What is the objective of the SR&ED program?

The objective of the SR&ED program is to deliver SR&ED tax incentives in a timely, consistent and predictable manner, while encouraging businesses to prepare their claims in compliance with tax laws, policies and procedures.

The Canada Revenue Agency (CRA) is continuously seeking new ways to improve and simplify its service delivery. The program commitments are to:

- ensure that businesses are aware of the program and can access it as easily as possible; and
- administer the program with fiscal integrity by applying the legislation correctly, consistently and fairly, and ensuring that claimants receive the full amount to which they are entitled.

## How can the SR&ED program benefit my company?

The SR&ED program can provide financial incentives by helping to:

- fund the scientific and technological advances that keep your company competitive and
- better position your company for future SR&ED projects.

You may be able to deduct SR&ED expenditures to reduce your tax liability in the current year or carry these expenditures forward indefinitely to reduce your tax liability in future years.

You may be eligible to receive benefits in the form of a refundable investment tax credit (ITC), a reduction of taxes payable, or both.

Unused ITCs may be carried back three years or carried forward 20 years if they were earned in tax years ending after 1997 (carried forward ten years if they were earned in tax years ending before 1998).

**www.cra.gc.ca/sred**

## What businesses are eligible?

The SR&ED program is available to any business operating and carrying out R&D in Canada. Certain expenditures for SR&ED performed outside Canada are also permitted.

Any business that is involved in basic or applied research, or in advancing technology in order to improve or develop new materials, devices, products or processes may be eligible under the SR&ED program.

The businesses that are eligible under the SR&ED program fall into three groups:

1.  Canadian-controlled private corporations;

2.  Other corporations; and

3.  Proprietorships (individuals), partnerships and trusts.

## 1. Canadian-controlled private corporations (CCPCs)

If you are a CCPC, you may receive a refundable investment tax credit (ITC) on your qualified SR&ED expenditures. You must first apply these ITCs against taxes payable in the year of the claim. The balance may be refunded.

The rate of refundability is based on your taxable income and taxable capital in the previous year and an expenditure limit. The table in the section "What are the SR&ED Investment Tax Credit Rates" on page 9 provides further information.

## 2. Other corporations

For other corporations, the ITC is 20% of qualified current and capital SR&ED expenditures. The ITC may be applied to taxes payable and is not refundable.

## 3. Proprietorships, partnerships and trusts

For proprietorships, partnerships and trusts, the ITC rate is 20% of qualified current and capital SR&ED expenditures. After applying the ITCs against taxes payable, you may receive a cash refund on 40% of the balance of the ITCs earned in the tax year.

## What is "SR&ED"?

The definition of "scientific research and experimental development" given in subsection 248(1) of the *Income Tax Act* can be summarized as:

> *...systematic investigation or search carried out in a field of science or technology by means of experiment or analysis . . . to advance scientific knowledge or to achieve technological advancement.*

The work **must** fall into one of the following categories:

- **Experimental development** – This is the work done to **achieve technological advancement** for the purpose of creating new, or improving existing, materials, devices, products or processes.

- **Applied research** – This is work done to **advance scientific knowledge** with a specific practical application in view.

- **Basic research** – This is work done to **advance scientific knowledge** without a specific practical application in view.

SR&ED can also include other work that is directly in support of the experimental development, applied research or basic research. This support work includes **only** the following eight specific types:

- engineering
- design
- operations research
- mathematical analysis
- computer programming
- data collection
- testing
- psychological research

The support work to be claimed must correspond to the needs of the experimental development, applied research or basic research performed.

## What is not "SR&ED"?

Certain work is not eligible for benefits under the SR&ED program, including:

- market research or sales promotion;
- quality control or routine testing of materials, devices, products or processes;
- research in social sciences or the humanities;

- prospecting, exploring or drilling for, or producing minerals, petroleum or natural gas;
- commercial production of a new or improved material, device or product, or the commercial use of a new or improved process;
- style changes; and
- routine data collection.

## What are the eligibility requirements?

For any R&D work to be eligible for SR&ED:

The **work must be a systematic investigation or search** carried out **by means of experiment or analysis;**

- This would include identifying the obstacle, formulating an objective, developing a plan of action including the method of experimentation or analysis and testing the hypothesis.

The work must be **carried out in a field of science or technology** that is not excluded by the legislated definition of SR&ED;

- Excluded work is described under the heading "What is **not** SR&ED?"

**AND**

The work must be **undertaken either:**

- **For the purpose of achieving technological advancement.** The work must attempt to increase the technology base or level from where it was at the beginning of the systematic investigation or search. The technology base or level includes all the technological resources within the business and all the knowledge on the technology that is reasonably available in the public domain.

**OR**

- **For advancing scientific knowledge.** A systematic investigation or search must be carried out with the aim of generating new scientific information or understanding of scientific relations.

**Note**

A project does not have to succeed to qualify for the SR&ED tax credit. To help you determine if your R&D work meets SR&ED requirements, please try our on-line Eligibility Self-Assessment Tool at **www.cra.gc.ca/sred/assessment**.

For more information on determining the eligibility of your work, please refer to Information Circular number 86-4R3, *Scientific Research and Experimental Development*, which is available on our Web site at **www.cra.gc.ca/sred** under the heading "SR&ED Forms and publications" or by contacting your local tax services office.

## What expenditures can I claim?

You may claim many of the expenditures incurred for SR&ED during your fiscal year. These expenditures may include:

- Salaries and wages*;
- Materials;
- SR&ED contracts;
- Lease costs of equipment;
- Overhead;
- Third-party payments; and
- Capital expenditures.

> **\* Note**
> Certain expenditures for SR&ED performed outside of Canada are now permitted.

## How do I determine my SR&ED expenditures?

In determining your SR&ED expenditures, you must choose one of the following two methods:

### 1. Traditional Method

The traditional method involves claiming all of the SR&ED expenditures you incurred during the year. You must specifically identify your overhead costs.

### 2. Proxy Method

The proxy method involves calculating a substitute amount for **overhead expenditures** using a formula, rather than specifically identifying and allocating these expenditures as you would with the traditional method.

For more information, please refer to the T4088 *Guide to Form T661*, which is available on our Web site at **www.cra.gc.ca/sred** under the heading "SR&ED Forms and publications" or by contacting your local tax services office.

## What are the SR&ED investment tax credit rates?

The investment tax credit (ITC) rates and the percentage that you can have refunded or credited vary according to the way your business is structured. The following table outlines the ITCs and the refundable rates that apply to qualified SR&ED expenditures. Most businesses are Canadian-controlled private corporations (CCPCs) with taxable income of less than $400,000.

| Category | SR&ED expenditures | ITC rate | Refundable portion of ITC earned on | | Non-Refundable portion of ITC earned on | |
|---|---|---|---|---|---|---|
| | | | Current expenditures | Capital expenditures | Current expenditures | Capital expenditures |
| Canadian-controlled private corporations (CCPCs) | Up to your calculated Expenditure Limit* | 35% | 100% | 40% | N/A | 60% |
| | In excess of your calculated Expenditure Limit* | 20% | 40% | 40% | 60% | 60% |
| Other corporations | | 20% | N/A | N/A | 100% | 100% |
| Proprietorships, partners of a partnership and trusts | | 20% | 40% | 40% | 60% | 60% |

\* The expenditure limit ($3 million maximum) is based on the previous year's taxable income and previous year's taxable capital. The limit is reduced when taxable income is greater than $400,000 or taxable capital is greater than $10 million. The maximum expenditure limit is $2 million for tax years ending prior to February 26, 2008.

Unused ITCs may be carried back three years or carried forward 20 years if they were earned in tax years ending after 1997 (carried forward ten years if they were earned in tax years ending before 1998).

## How do I make a claim?

To make an SR&ED claim you must file an income tax return along with the following prescribed forms:

- Form T661, Scientific *Research and Experimental Development (SR&ED) Expenditures Claim;* **and one of the following two forms:**

- Form T2SCH31, *Investment Tax Credit – Corporations,* **or**

- Form T2038 (IND), *Investment Tax Credits (Individuals).*

These prescribed forms are available on our Web site at **www.cra.gc.ca/sred** under the heading "SR&ED Forms and publications".

For more information on making an SR&ED claim, please see the T4088, *Guide to Form T661;* it is available on our Web site at **www.cra.gc.ca/sred** under the heading "SR&ED Forms and publications" or by contacting your local tax services office.

## When do I file my claim?

To apply for SR&ED tax incentives, you must file the applicable prescribed forms by your reporting deadline.

The reporting deadline for corporations is 18 months (individuals have 17.5 months) from the end of the tax year in which you incurred the expenditures.

If you do not report an expenditure or project on the prescribed forms by the reporting deadline, you will not be able to include the amounts in your pool of deductible SR&ED expenditures to be used to reduce your income, and you will not be able to earn an investment tax credit (ITC) on these expenditures.

For more information on the reporting deadline, please refer to Application Policy SR&ED 2004-02, *Filing Requirements for Claiming SR&ED Carried Out in Canada,* which is available on our Web site at **www.cra.gc.ca/sred** under the heading "SR&ED Forms and publications" or by contacting your local tax services office.

# What happens after I send in my claim?

When you send in your claim, we will determine if it can be processed as filed without further review. If we **can** process your claim as filed, we will reduce your taxes payable or, if applicable, issue a cheque to you. If we **cannot** process your claim as filed, we may contact you to request more information or to discuss the review of your claim.

The following chart illustrates how we process SR&ED claims:



# How long will it take to process my claim?

If you qualify for a refund, your claim can usually be processed within 120 days after the CRA receives it. A claim could be processed as filed or may require further review.

The following chart illustrates our service standards and goals for processing your claim:

| Service Standards | Goal |
|---|---|
| Refundable claims | 120 days |
| Claimant-requested adjustments to refundable claims | 240 days |
| Non-refundable claims | 365 days |
| Claimant-requested adjustments to non-refundable claims | 365 days |

**Note**
The above service standards apply in those situations where a complete claim has been filed and you have responded to any CRA requests for additional information.

# What happens during the review process?

Businesses claiming the SR&ED credit are subject to technical and financial reviews by the CRA to ensure that all eligibility and compliance requirements, as set out in the *Income Tax Act*, are met.

If we cannot process your SR&ED claim as filed, we may contact or visit you to review information relating to your claim.

The CRA's technical and financial review staff works as a team to ensure that you get the SR&ED credits to which you are entitled.

The technical reviewer evaluates the work to determine whether it meets the SR&ED eligibility criteria. The financial reviewer looks at the costs associated with your projects to ensure they are eligible SR&ED expenditures. These reviews may involve a site visit to review your documentation, talk to your technical staff who were involved in the SR&ED work, and talk to your financial staff who understand the expenditures being claimed.

All information provided to the CRA technical and financial review staff is held in strictest confidence. Legislative provisions and stringent rules protect the confidentiality of all claimants' records.

## What do the reviewers need from me?

To expedite your claim and deliver your tax credits in a timely manner, it helps if you:

- identify a technical contact person in your company who was involved in the SR&ED work;

- identify a financial contact person in your company who understands the expenditures being claimed;

- contact the CRA's technical and financial reviewers if you need to clarify information requested;

- maintain the technical and financial documents needed to substantiate the claim and make them available if requested; and

- respond in a timely manner to CRA requests for more information.

For detailed information on the review process, please see the *Guide to Conducting a Scientific Research and Experimental Development Review*, which is available on our Web site at **www.cra.gc.ca/sred** under the heading "SR&ED Forms and publications" or by contacting your local tax services office.

## What supporting documentation do I need to keep?

In order to support your SR&ED claim, it is important to maintain evidence that substantiates the SR&ED work performed and expenditures incurred. If your SR&ED claim is selected for review, you will be asked during the review process to provide this evidence. Generally, the best evidence is that which was generated as the SR&ED was being carried out.

Examples of technical and financial supporting evidence that could be kept are:

- Project planning documents

- Documents on design of experiments

- Experimentation plan

- Design documents and technical drawings

- Project records, laboratory notebooks

- Design, system architecture and source code (software development)

- Records of trial runs

- Project progress reports

- Minutes of project meetings
- Test protocols, data, results, analysis and conclusions
- Final project report or professional publications
- Photographs, videos
- Prototypes, samples
- Scrap, scrap records
- Contracts, lease agreements
- Records of resources allocated to the project, time sheets, activity records, payroll records
- Purchase invoices and proof of payment
- Accounting records

**Note**
This list is not comprehensive; you should keep any documentation that you feel will support your claim.

## What can I do if I have concerns?

If you have concerns during the review process or once the claim has been processed, refer to Application Policy Number SR&ED 2000-02R, *Guidelines for Resolving Claimants' SR&ED Concerns* for information on what you can do. These guidelines are available on our Web site at **www.cra.gc.ca/sred** under the section "SR&ED Forms and publications" or by contacting your local tax services office.

In addition, the **Taxpayer Bill of Rights** builds upon the CRA's corporate values of professionalism, respect, integrity and cooperation. It describes the treatment you are entitled to when dealing with the CRA. You can expect that the CRA will serve you with high standards of accuracy, professionalism, courtesy and fairness.

The **Taxpayer Bill of Rights** also includes the **CRA Commitment to Small Business**, a five-part statement through which the CRA undertakes to support the competitiveness of the Canadian business community by ensuring that interactions with the CRA are as effective and efficient as possible. These commitments complement the Government of Canada's pledge to create a competitive and dynamic business environment in which Canadian businesses will thrive.

Please visit the CRA Web site at **www.cra.gc.ca/rights** for more information about the **Taxpayer Bill of Rights** and **CRA Commitment to Small Business**.

## What services are available?

The SR&ED program offers several free services that can help you take full advantage of the benefits offered. These services include:

- First-Time Claimant Service;
- Preclaim Project Review (PCPR) Service;
- Account Executive (AE) Service; and
- Public Information and Industry-Specific Seminars.

## First-Time Claimant Service

If you are a new or potential claimant with questions about our program, our First-Time Claimant Service can help you. This free service helps put your business in touch with SR&ED staff who will:

- work closely with you to answer your questions;
- provide you with information, tools and the help you may need to complete your first SR&ED claim; and
- possibly visit your business to explain the program benefits and requirements in more detail.

## Preclaim Project Review Service (PCPR)

The Preclaim Project Review (PCPR) Service is a free advisory service designed to help businesses in planning and investment decisions by:

- identifying which of your company's R&D projects and work may qualify for SR&ED tax incentives;
- providing a preliminary opinion on the eligibility of SR&ED projects without having to generate extensive paperwork, potentially reducing the time and cost of claim preparation;
- helping you understand what supporting documentation should be kept; and
- establishing open communication and building a stronger working relationship between you and the CRA.

The PCPR Service is available before SR&ED tax incentives are claimed and, ideally, **early in the R&D process** or even before the work is undertaken. This provides greater up-front certainty about the eligibility of R&D work for SR&ED tax incentives.

> **Note**
> The PCPR Service is neither an advanced income tax ruling nor a pre-approval of an SR&ED claim. A final determination on any SR&ED claim must be based on the actual work done and can only be made after the claim is filed.

## Account Executive (AE) Service

The Account Executive (AE) Service is an optional service that assigns your business a designated contact person – an account executive – from the SR&ED program. This free service is generally accessible after a business has already filed its first claim and has had an SR&ED review.

The account executive will provide personal, up-to-date, consistent service by:

- being available to answer your questions and deliver advice on the program;

- working with your company to facilitate your participation in the SR&ED program;

- being your point of contact for the SR&ED program;

- giving you a better understanding of the SR&ED program and of the types of R&D that qualify for SR&ED tax incentives;

- providing consistency and continuity in service through regular communications throughout the SR&ED process; and

- providing advice on preparing and submitting your claim, the type of information that is required to support your claim, as well as the review process (CRA staff members cannot participate in preparing your claim).

To find out more about our First-Time Claimant, Preclaim Project Review (PCPR) and Account Executive (AE) services, contact your local CRA tax services office listed on our Web site at **www.cra.gc.ca/sred** under the section "SR&ED contacts".

## Public Information and Industry-Specific Seminars

The SR&ED program offers, across the country, free public general information seminars as well as seminars on SR&ED issues specific to a sector or industry.

**Public general information seminars** provide a general overview of the SR&ED program, covering the following: eligibility criteria, qualifying expenditures, how to prepare and file an SR&ED claim and supporting documentation. These seminars are intended for claimants who are new to the program or are planning on filing a claim, and are suitable for an audience of both technical and financial staff.

**Seminars on SR&ED issues specific to a sector or industry** are specialized workshops for SR&ED stakeholders involved in a specific sector or industry, and include presentations, a panel discussion and a case study or examples. The focus is on issues affecting SR&ED claims in a specific sector or industry. These workshops are intended for an audience familiar with the SR&ED program. It is recommended that you first attend an SR&ED public general information seminar.

To view the current seminars in your area please visit our Web site at **www.cra.gc.ca/sred** under the section "Services we offer" or contact your local tax services office.

## Where can I obtain more information?

You can obtain more information about the SR&ED program, including seminars, forms and publications, on the CRA SR&ED Web site at **www.cra.gc.ca/sred**.

## Who can I contact to get more information?

You can contact your nearest co-ordinating tax services offices listed below. This information is also on our Web site at **www.cra.gc.ca/sred** under the section "SR&ED contacts".

| Co-ordinating tax services offices | Telephone |
|---|---|
| Nova Scotia | 1-866-433-5986 or 902-426-2386 |
| Québec | 1-866-204-0101 extension 648-7151 or 418-648-7151 |
| Montréal | 514-496-1317 |
| Laval | 1-888-784-8709 or 514-338-4198 |
| Ottawa | 613-598-4233 |
| Toronto-Centre | 416-973-1717 |
| Toronto-West (Mississauga) | 905-566-6010 |
| Hamilton | 905-572-2650 |
| Calgary | 403-691-5890 |
| Vancouver | 1-866-317-0473 |
| Toll free | 1-800-959-5525 |

TAB 98



# DEBTORS AND CREDITORS SHARING THE BURDEN:

## A Review of the
## *Bankruptcy and Insolvency Act*
## and the
## *Companies' Creditors Arrangement Act*

Report of the Standing Senate
Committee on Banking, Trade and Commerce

*Chair*
*The Honourable Richard H. Kroft*

*Deputy Chair*
*The Honourable David Tkachuk*

*November 2003*

Ce rapport est aussi disponible en français.

Des renseignements sur le Comité sont donnés sur le site:

www.senate-senat.ca/bancom.asp

Information regarding the Committee can be obtained through its web site:

www.senate-senat.ca/bancom.asp

## S.    Subordination of Equity Claims

Insolvency legislation in the United States has created the concept of "subordination of equity claims." Equity claims are those claims that are not based on the supply of goods, services or credit to a corporation, but rather are based on some wrongful or allegedly wrongful act committed by the issuer of an instrument reflecting equity in the capital of a corporation. Conceptually, this type of claim relates more to the loss of a claimant who holds shares or other equity instruments issued by a corporation, rather than the claims of traditional suppliers. In American legislation, such claims are subordinated to the claims of traditional suppliers.

*Canadian insolvency law does not subordinate shareholder or equity damage claims.*

Canadian insolvency law does not subordinate shareholder or equity damage claims.  It is thought that this treatment has led some Canadian companies to reorganize in the United States rather than in Canada.

Mr. Kent, for example, told the Committee that "[i]f [a shareholders' rights claims by people who say that they have been lied to through the public markets] is filed in Canada, there is no facility in place to deal with it. They have no choice but to file in the U.S. where there is a vehicle to deal with these claims in a sensible, fair and reasonable way. In Canada, we have no mechanism. Thus, you end up with situations where it becomes difficult to reorganize a Canadian enterprise under Canadian law because our laws do not generally deal with shareholder claims."

He also indicated, however, that shareholder claims may be addressed within specific corporate statutes. Mr. Kent mentioned, in particular, the *Canada Business Corporations Act* and some provincial/territorial statutes, and shared his view that "[i]t becomes a lottery, depending on where the corporation is organized, whether there is a vehicle for dealing with some of these claims or there may not be. It is a hodgepodge system."

The Joint Task Force on Business Insolvency Law Reform shared with the Committee a proposal that all claims arising under or relating to an instrument that is in the form of equity are to be treated as equity claims. Consequently, "all [equity] claims against a debtor in an insolvency proceeding ... including claims for payment of dividends, redemption or retraction or repurchase or shares, and damages (including securities fraud claims) are to be treated as equity claims subordinate to all other secured and unsecured claims against the debtor ... ." It also proposed that these claims could be extinguished, at the discretion of the Court, in connection with the approval of a reorganization plan.

In view of recent corporate scandals in North America, the Committee believes that the issue of equity claims must be addressed in insolvency legislation. In our view, the law must recognize the facts in insolvency proceedings: since holders of equity have necessarily accepted – through their acceptance of equity rather than debt – that their claims will have a lower priority than claims for debt, they must step aside in a bankruptcy proceeding. Consequently, their claims should be afforded lower ranking than secured and unsecured creditors, and the law – in the interests of fairness and predictability – should reflect both this lower priority for holders of equity and the notion that they will not participate in a restructuring or recover anything until all other creditors have been paid in full. From this perspective, the Committee recommends that:

*In view of recent corporate scandals in North America, the Committee believes that the issue of equity claims must be addressed in insolvency legislation.*

**The *Bankruptcy and Insolvency Act* be amended to provide that the claim of a seller or purchaser of equity securities, seeking damages or rescission in connection with the transaction, be subordinated to the claims of ordinary creditors. Moreover, these claims should not participate in the proceeds of a restructuring or bankruptcy until other creditors of the debtor have been paid in full.**

159