TAB 99

# COLUMBIA LAW REVIEW

| VOL. 113 | JANUARY 2013 | NO. 1 |

## ARTICLE

### NO EXIT?
### WITHDRAWAL RIGHTS AND THE LAW OF CORPORATE REORGANIZATIONS

*Douglas G. Baird\* & Anthony J. Casey\*\**

*Bankruptcy scholarship is largely a debate about the comparative merits of a mandatory regime on one hand and bankruptcy by free design on the other. By the standard account, the current law of corporate reorganization is mandatory. Various rules that cannot be avoided ensure that investors' actions are limited and they do not exercise their rights against specialized assets in a way that destroys the value of a business as a whole. These rules solve collective action problems and reduce the risk of bargaining failure. But there are costs to a mandatory regime. In particular, investors cannot design their rights to achieve optimal monitoring as they could in a system of bankruptcy by free design.*

*This Article suggests that the academic debate has missed a fundamental feature of the law. Bankruptcy operates on legal entities, not on firms in the economic sense. For this reason, sophisticated investors do not face a mandatory regime at all. The ability of investors to place assets in separate entities gives them the ability to create specific withdrawal rights in the event the firm encounters financial distress. There is nothing mandatory about rules like the automatic stay when assets can be partitioned off into legal entities that are beyond the reach of the*

* Harry A. Bigelow Distinguished Service Professor, University of Chicago Law School. The John M. Olin Foundation and the Lynde and Harry Bradley Foundation provided research support.

** Assistant Professor of Law, University of Chicago Law School. The Milton and Miriam Handler Foundation and the Jerome F. Kutak Faculty Fund provided research support. We thank Kelli A. Alces, Kenneth M. Ayotte, Adam B. Badawi, Scott A. Baker, M. Todd Henderson, Robert M. Lawless, Larry Ribstein, Andres Sawicki, Julia Simon-Kerr, Richard Squire, participants at the Annual Meeting of the American Law and Economics Association, participants at the Annual Meeting of the Midwestern Law and Economics Association, participants at the Conference on Creditors and Corporate Governance at the University of Chicago, participants at the Junior Business Law Conference at Colorado Law School, and participants at the faculty workshops at the University of Chicago Law School, the University of Illinois College of Law, the Marquette University Law School, and Tulane University Law School for helpful comments. Mark Sater, Matthew Olson, and David Frankenfield provided excellent research assistance.

1

*bankruptcy judge. Thus, by partitioning assets of one economic enterprise into different legal entities, investors can create a tailored bankruptcy regime. In this way, legal entities serve as building blocks that can be combined to create specific and varied but transparent investor withdrawal rights. This regime of tailored bankruptcy has been unrecognized and underappreciated and may be preferable to both mandatory and free design regimes. By allowing a limited number of investors to opt out of bankruptcy in a particular, discrete, and visible way, investors as a group may be able to both limit the risk of bargaining failure and at the same time enjoy the disciplining effect that a withdrawal right brings with it.*

INTRODUCTION ........................................................................... 2
I. WITHDRAWAL RIGHTS, ENTITY PARTITIONING, AND BANKRUPTCY
   TAILORING ........................................................................... 7
   A. The Benefits of Withdrawal Rights ...................................... 8
   B. Bankruptcy Tailoring ....................................................... 11
II. BARGAINING AFTER THE FALL ................................................. 14
   A. Bargaining Without Bankruptcy ......................................... 15
   B. Bargaining in Bankruptcy Without Entity Partitioning .......... 17
   C. Bargaining in Bankruptcy with Entity Partitioning .............. 17
   D. The Bargained-For Share ................................................. 19
III. THE COSTS OF WITHDRAWAL RIGHTS ....................................... 20
   A. Limiting the Problem of Technical Default .......................... 20
   B. Multiple Parties and the Risk of Bargaining Failure ............. 21
IV. WITHDRAWAL RIGHTS AND THE BANKRUPTCY CODE ..................... 24
   A. Withdrawal Rights and *General Growth Properties* ............... 25
   B. Withdrawal Rights and *Charter Communications* .................. 31
V. WITHDRAWAL RIGHTS AND THIRD PARTIES .................................. 35
   A. Withdrawal Rights, True Lessors, and True Bailors .............. 35
   B. Collective Withdrawal ..................................................... 42
   C. Executory Contracts and Withdrawal Rights ........................ 45
CONCLUSION .............................................................................. 48

## INTRODUCTION

When the Los Angeles Dodgers entered bankruptcy, the filing revealed that its income depended crucially on three assets: the team itself, its stadium, and the adjoining parking lot. The team cannot play without a stadium to house the spectators, and the spectators need a place to park.[1] None of the assets is worth much without the other two. No other

---

1. Stadiums in other cities (such as Wrigley Field in Chicago) are accessible by public transportation or by foot, but not Dodger Stadium. It is located in Chavez Ravine. Apart

*NO EXIT?*

stadium in Los Angeles is suitable for baseball, and Dodger Stadium is not well suited for anything other than baseball. The parking lot is necessary for those who want to watch baseball at Dodger Stadium but useless to everyone else. Different investors hold interests in each of these three assets.

By the standard account, the law of corporate reorganizations is well equipped to handle a financially distressed enterprise with such a configuration of highly specialized assets. Chapter 11 prevents investors from exercising their rights in a way that destroys the value of the business as a whole.[2] Various rules—especially the automatic stay[3]—keep the firm together while its financial affairs are sorted out. Investors thus lose the ability to withdraw from their investment and must instead work together to create a new capital structure for the firm.[4] Bankruptcy law respects the value of each investor's rights while preventing investors from taking actions that reduce the value of the business as a whole.[5] Closer examination of the Dodgers, however, tells a rather different story. Bankruptcy was doing little to keep the assets together. While the Dodgers were one economic enterprise, the critical assets—the parking lot, the stadium, and the team—were housed in separate legal entities.[6] The limited liability company that owned the team filed one bankruptcy petition, the

---

from an express bus from Union Station, the only way there is by car. The frequently asked questions page on the part of the Dodgers' website devoted to transportation focuses only on parking. See Transportation—FAQs, Dodgers.com, http://mlb.mlb.com/la/ballpark/transportation/index.jsp?content=faq (on file with the *Columbia Law Review*) (last visited Oct. 9, 2012).

2. The idea that bankruptcy exists to solve this kind of collective action problem among creditors is one of the foundational ideas of bankruptcy law. See, e.g., Thomas H. Jackson, The Logic and Limits of Bankruptcy Law 5 (1986) (noting goal of bankruptcy "is to permit the owners of assets to use those assets in a way that is most productive to them *as a group* in the face of incentives by individual owners to maximize their own positions").

3. 11 U.S.C. § 362 (2006).

4. The right to withdraw an investment upon default is a common characteristic of debt agreements. See infra note 37 and accompanying text (describing common use of covenants that trigger withdrawal rights). The suspension of these withdrawal rights is a central principle of bankruptcy law. See supra note 2.

5. See supra note 2 (noting collective action problem).

6. At the time of bankruptcy, through a variety of holding companies, they were all owned by The McCourt-Broderick Limited Partnership ("TMBLP"). Los Angeles Dodgers LLC housed the team. LA Real Estate LLC owned Dodger Stadium. Blue Landco LLC, a direct subsidiary of TMBLP, owned the parking lot. Los Angeles Dodgers and LA Real Estate (and a number of the intervening holding companies between them and TMBLP) filed for bankruptcy. Blue Landco did not, nor did TMBLP. TMBLP was owned ninety percent by Frank H. McCourt, Jr., and ten percent by The McCourt Company, Incorporated. See Emergency Motion for Interim & Final Orders (i) Authorizing Debtors To Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 362, & 364, & (ii) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(B) & 4001(C) at 3, In re L.A. Dodgers LLC, 457 B.R. 308 (Bankr. D. Del. 2011) (No. 11-12010), 2011 WL 2535793, at *3 (discussing ownership structure). The ownership of TMBLP was further complicated by divorce proceedings between Frank and Jamie McCourt. Id. at 11.

*COLUMBIA LAW REVIEW* [Vol. 113:1

limited liability company that owned the stadium another, and the limited liability company that owned the parking lot stayed out of bankruptcy entirely.[7] While overseeing the team's bankruptcy, the bankruptcy judge had no power over the investors in the stadium. When making decisions in the bankruptcy of the stadium entity, the judge was bound to maximize the value of the stadium, not the joint value of the stadium and the team together.[8] The parking lot was never in bankruptcy, and bankruptcy's automatic stay had no effect on the rights of its investors. Moreover, the team itself was utterly dependent on its franchise rights with Major League Baseball.[9] The ability of the Dodgers to retain those franchise rights was not at all clear.[10] In short, the Dodgers bankruptcy was emphatically not a world in which all the stakeholders had to work together and no one had a right to leave the scene.

Thus, while the standard account of bankruptcy focuses on protecting economic enterprises,[11] or what many would call "Coasean firms,"[12] and equates that enterprise with the debtor that files the bankruptcy petition, the corporate structure of the Dodgers showed that the two are not always one and the same. Bankruptcy operates on legal entities, not

---

7. See Debtors' Motion for an Order Directing Joint Administration of the Debtors' Chapter 11 Cases at 1, *L.A. Dodgers*, 457 B.R. 308 (No. 11-12010) (June 27, 2011), 2011 WL 2678239, at *1 (identifying various debtor entities). The parking lot alone carried a debt of $67 million. See Declaration of Jeffrey J. Ingram in Support of Debtors' Chapter 11 Petitions & First Day Motions at 6 n.3, *L.A. Dodgers*, 457 B.R. 308 (No. 11-12010) (June 27, 2011) [hereinafter Declaration of Ingram] (describing debt structure of parking lot). Several hundred million dollars' worth of debt was in a subsidiary of the entity that owned the stadium. See id. at 5 (noting financing taken on by subsidiary of LA Real Estate LLC).

8. As discussed in Part IV, judges at the margin push back against this feature of the law and allow the law to operate on corporate groups rather than on individual debtor entities when gaps in the law permit. Part of the purpose of this Article is to examine whether this move is a good or a bad idea.

9. See Major League Baseball, Major League Constitution, art. IX, § 1 (2005), available at http://bizofbaseball.com/docs/MLConstitutionJune2005Update.pdf (on file with the *Columbia Law Review*) (providing that games will be scheduled by Commissioner and no Major League Club may play games without approval of Commissioner); see also id. art. VIII, § 4 (providing grounds for involuntary termination of rights of Major League Club).

10. See infra notes 206–207 and accompanying text (discussing legal uncertainty about assumability of nonassignable contracts).

11. See Jackson, supra note 2, at 2 ("Bankruptcy law can and should help a firm stay in business when it is worth more to its owners alive than dead.").

12. Coase famously defined the firm as coming into existence when one manager owns and directs the use of resources in a project. R.H. Coase, The Nature of the Firm, 4 Economica 386, 393 (1937) (noting firm "consists of the system of relationships which comes into existence when the direction of resources is dependent on an entrepreneur"). Legal entities, on the other hand, are artificial boundaries that may be unrelated to economic activity. An economic enterprise directed by a single entrepreneur can be split into several legal entities, or conversely, several disconnected enterprises can be brought under one legal umbrella. See Edward M. Iacobucci & George G. Triantis, Economic and Legal Boundaries of Firms, 93 Va. L. Rev. 515, 518–19 (2007) (defining differences between legal and economic theories of firm boundaries).

on firms. Investors are free to place the critical assets of the same economic firm into whatever legal entities they want, and they frequently do. This feature of modern corporate structures must be part of any coherent account of the law of corporate reorganizations. This Article focuses on an important and neglected feature of a world in which highly specialized assets of a single firm can be placed in multiple legal entities: the way in which it allows investors to opt out of the standard bankruptcy regime.[13]

In contrast to a regime of free contracting,[14] existing law allows investors to acquire the right to opt out of bankruptcy only if they take particular steps that are discrete and visible. Investors must use legal entities as building blocks.[15] For this reason, the existing regime possesses a number of conspicuous virtues that a regime of free contracting does not.[16] Withdrawal rights in their current form, far from being inconsistent with a coherent law of corporate reorganizations, may be an affirmatively desirable part of it. Giving investors the ability to create exit rights, but limiting the shape they can take, may make investors as a group better off.

This Article unites a number of different strands of thought in corporate law and corporate reorganizations. Most obviously, it connects to the literature on the way corporate form allows investors to separate assets from each other.[17] The focus of much of this work, however, is on a corporate group in which the individual legal entities contain various stand-alone businesses, rather than a single business with assets placed in separate legal entities.[18] Hence, this line of work examines such questions as spin-offs, carve-outs, and tracking stocks.[19] This work has also explored

---

13. A conspicuous exception is an excellent paper by Ayotte and Gaon. See Kenneth Ayotte & Stav Gaon, Asset-Backed Securities: Costs and Benefits of "Bankruptcy Remoteness," 24 Rev. Fin. Stud. 1299, 1301–04 (2011) (focusing on ability of parties to put assets in bankruptcy-remote entities in context of securitization of accounts and other nonspecialized assets).

14. See, e.g., Alan Schwartz, A Contract Theory Approach to Business Bankruptcy, 107 Yale L.J. 1807, 1819 (1998) (encouraging bankruptcy regime that allows parties to contract for bankruptcy system of their choice to reduce costs of debt).

15. See infra note 46 and accompanying text (noting existing law provides investors "building blocks" to tailor their rights).

16. See infra Part I.A (discussing benefits of bankruptcy regime that utilizes legal entities as building blocks).

17. Hansmann and Kraakman are most responsible for developing this idea. See, e.g., Henry Hansmann & Reinier Kraakman, Organizational Law as Asset Partitioning, 44 Eur. Econ. Rev. 807, 810 (2000) (identifying and analyzing significance of asset partitioning through corporate form).

18. See, e.g., Iacobucci & Triantis, supra note 12, at 558–65 (examining separation of different economic activities into different legal entities within same corporate group).

19. See, e.g., id. at 567–69 (discussing spin-offs, carve-outs, and tracking stocks).

bankruptcy-remote vehicles in which liquid assets such as accounts are placed in separate legal entities.[20]

This Article also connects to the work that examines the way in which the law allows parties to opt out of legal rules. One needs to worry not merely about whether a rule is a default but also the way in which parties are allowed to opt out of it.[21] At the same time, this Article links with work that focuses on the way that some legal rights, particularly those associated with property, tend to come in a finite number of discrete forms that cannot be broken down.[22]

The use of discrete and visible legal entities limits the information search costs for potential lenders. To assess these withdrawal rights, a lender need only inform itself as to the legal boundaries of the debtor. This information is already indispensable to a lender under any alternative system.[23] Thus, the use of legal entities as building blocks allows investors to adopt valuable withdrawal rights that might substitute for costly monitoring while limiting the information costs associated with bankruptcy by free contract. The account this Article offers of withdrawal rights reconciles the apparent inconsistency between the standard approach to corporate reorganizations (which views a denial of withdrawal rights as essential to solving a collective action problem) with the conventional story of debt (which relies on the need for creditor opt-out rights to discipline debtors).[24]

Part I lays out the basic structure of the argument. Part II uses a simplified version of the Dodgers reorganization to identify the bargaining dynamics that these withdrawal rights create. The costs of withdrawal rights are the focus of Part III. Part IV looks at how courts have treated withdrawal rights. At the margin, they have inclined against enforcing them. The Part argues that this instinct, while completely understandable, is likely a mistake, resting as it does on the unstated assumption

---

20. See, e.g., Ayotte & Gaon, supra note 13, at 1301–04 (discussing separate legal entities in context of securitization of accounts and other nonspecialized assets).

21. See Ian Ayres, Regulating Opt-Out: An Economic Theory of Altering Rules, 121 Yale L.J. 2032, 2036 (2012) (showing attention must be paid not merely to default rules but also to "altering rules," the path one must follow to opt out of background regime).

22. See Thomas W. Merrill & Henry E. Smith, Optimal Standardization in the Law of Property: The Numerus Clausus Principle, 110 Yale L.J. 1, 24–42 (2000) (setting out their theory of numerus clausus, which provides that having limited set of known, available options or building blocks establishes optimal balance between parties' frustration costs and third-party monitoring costs).

23. See infra text accompanying notes 49–50 (explaining it is easy for investors to discover separate legal entities).

24. Barry Adler discusses this inconsistency in depth and—accepting it as unreconciled in the current system—proposes a novel solution mechanism. See Barry E. Adler, Game-Theoretic Bankruptcy Valuation, 41 J. Legal Stud. 209, 212 (2012) (suggesting debtors with junior interests would propose take-it-or-leave-it reorganization plan that would have debtor retain collateral and include sale of debtor's assets). This Article suggests that the existing regime may already provide a solution to the problem.

that, wherever possible, bankruptcy law works best if it operates on the economic firm as a whole, rather than on the separate legal entities that constitute it.

The last Part of this Article examines—through a withdrawal-rights lens—other devices stakeholders use to control a critical asset when the business enters bankruptcy. An investor in a manufacturer, for example, may own tooling critical to a plant's operation.[25] An investor in a restaurant can own the building and lease it to the restaurateur, rather than taking a mortgage on it. A sports league might control a professional team's ability to play other teams. The way in which existing law treats these withdrawal rights is suspect, as it focuses on issues (such as whether a transaction is a "true bailment") that are largely orthogonal to the challenge at hand,[26] which is ensuring that they serve to discipline the debtor before the fact without imposing excessive bargaining costs after the fact.

## I. WITHDRAWAL RIGHTS, ENTITY PARTITIONING, AND BANKRUPTCY TAILORING

There are, of course, a number of reasons to place assets in different corporate entities.[27] This Article focuses on how such partitioning can

---

25. See infra Part V.A (analyzing relationship between Chrysler and Plastech, where Chrysler owned tooling that was located and used at Plastech plant).

26. See infra Part V (discussing how law deals with various withdrawal rights, such as leases, bailments, and nonassignable contracts).

27. A firm might attempt to isolate the business as a whole from the tort liabilities of one of its divisions. See, e.g., In re Owens Corning, 419 F.3d 195, 200 (3d Cir. 2005) (acknowledging some entities within corporate group exist to limit liability concerns with respect to asbestos); Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.), 450 B.R. 432, 437–38 (Bankr. S.D.N.Y. 2011) (detailing how company separated oil and gas assets from rest of company holdings to reduce liability for acquisition of bulk of company).

Sometimes it may make sense to put highly liquid assets that require little management and are more or less subject to exogenous risks, such as accounts receivable, into a separate legal entity. Those who invest in this entity can look to these assets without having a stake in the rest of the business. See Iacobucci & Triantis, supra note 12, at 568–69 (highlighting greater transparency and ease of asset valuation as benefits of separate legal entities). Corporate groups can also arise when a large business has several different divisions. Each division might be a stand-alone business that is best served with a different capital structure. One might be highly regulated and enjoy stable returns, while the other may be a high-technology company with highly variable returns. The optimal leverage ratios for the two may be radically different. Everyone may be better off by placing each division into a separate legal entity. See id. at 552–53 (showing inefficiency arises when assets with different risk profiles are combined in one legal entity).

These alternative explanations for the use of multiple legal entities within the same economic enterprise are not exhaustive. The tax consequences of every corporate structure, of course, must be taken into account. In addition, Richard Squire suggests that debtor opportunism may sometimes be at work in the structure of corporate groups where different subsidiaries are guaranteeing the debts of others. Richard Squire, Strategic Liability in the Corporate Group, 78 U. Chi. L. Rev. 605, 622–43 (2011). Other factors may be at work as well.

give individual investors the ability to withdraw assets from a business that encounters financial distress, notwithstanding bankruptcy law.

The standard justification for forcing all investors to participate in the bankruptcy process and not allowing anyone to exit focuses on the costs that arise when everyone acts unilaterally. A valuable business can be torn apart when investors act in their individual interests but contrary to the interests of creditors as a group.[28] Withdrawal rights, however, can bring substantial benefits when their exercise is limited. This Part focuses first on these benefits and then on how the ability to place assets in discrete legal entities allows these benefits to be captured.

## A. *The Benefits of Withdrawal Rights*

Consider a firm that has multiple assets, each of which is essential to the business continuing as a going concern. Assume that an investor has the right to withdraw a critical asset, such as a sports franchise's stadium, in the event of default, notwithstanding bankruptcy law. The exercise of this right will shut down the firm.

The existence of this withdrawal right is costly only if it is actually exercised *and* the firm has value as a going concern. When a single investor possesses this right, however, there is no collective action problem. This is not a situation in which many disparate investors will find it in their individual interests to seize assets even when it is contrary to the interests of the group. If the investor who holds the withdrawal right and the managers of the firm are equally well informed about the value of the franchise, and if they can bargain with each other costlessly, the investor and the managers will strike a bargain in which the firm remains intact if and only if the firm is worth keeping intact as a going concern. If the franchise has no value as a going concern, the withdrawal right will be exercised and the firm will be shut down.

Far from destroying value, giving the investor the withdrawal right ensures that assets are quickly put to their best use. If one is confident that the risk of bargaining failure is small, the withdrawal right provides an acid test of whether the firm should be saved. A bankruptcy judge will likely reach the same conclusion, but only more slowly and at greater cost.[29] It might be in the interests of parties before the fact to give an

---

28. See supra note 2 and accompanying text (discussing bankruptcy and collective action problem).

29. Morrison conjectures that bankruptcy judges shut down firms in the same fashion as a rational decisionmaker subject to the same constraints and provides empirical support. See Edward R. Morrison, Bankruptcy Decision Making: An Empirical Study of Continuation Bias in Small Business Bankruptcies, 50 J.L. & Econ. 381, 411 (2007) (refuting conventional wisdom that bankruptcy judges delay resolution because of continuation bias); see also Elizabeth Warren & Jay Lawrence Westbrook, The Success of Chapter 11: A Challenge to the Critics, 107 Mich. L. Rev. 603, 627–30 (2009) (providing further empirical evidence of Morrison's conjecture).

investor a withdrawal right, to provide a mechanism for shutting the firm down quickly when it turns out not to be worth saving.[30] If the number of investors who possess withdrawal rights is limited, they avoid the collective action problem that arises when multiple investors have withdrawal rights, as well as the costs that come with a drawn-out bankruptcy process and the uncertainties associated with judicial valuation.[31]

Withdrawal rights also give a creditor a way to ensure that the firm's managers act in the creditor's interest when the creditor cannot monitor them effectively. A key feature of a sensibly crafted withdrawal right is that it is state-contingent. The withdrawal right lies dormant in good states of the world. The investor can withdraw from the enterprise only when the loan is in default, and the agreement is written such that default occurs if and only if things are going poorly. Knowing that the investor has a withdrawal right only in bad states of the world, the debtor will have an incentive to prevent these states from arising. Knowing the debtor possesses this incentive, the investor will not have to monitor the debtor's behavior as much.[32] The debtor's ability to give an individual investor the right to withdraw a critical asset has the same virtue that is commonly associated with the ability to give a hostage.[33]

Taking a hostage—acquiring the right to take the stadium away from the sports franchise—substitutes for costly monitoring of human capi-

---

30. As Adler explains, the right of cramdown may allow the threat of inefficient continuation and the extraction of concessions in light of that threat. Adler, supra note 24, at 209–10; see also infra note 40 (defining "cramdown"). By providing a market test, withdrawal rights prevent these outcomes.

31. See Adler, supra note 24, at 216–17 (discussing costs of unfettered withdrawal rights); id. at 213–15 (discussing costs of judicial valuation error).

32. For an analysis of how debt brings with it the benefits of state-contingent rights, see generally Jaime F. Zender, Optimal Financial Instruments, 46 J. Fin. 1645 (1991) (modeling how "state-contingent transfer of control relaxes an incentive constraint that would bind if bankruptcy were not allowed, enhancing the value of the firm as a going concern"). Patrick Bolton develops this idea in several important papers in the early 1990s. See Philippe Aghion & Patrick Bolton, An Incomplete Contracts Approach to Financial Contracting, 59 Rev. Econ. Stud. 473, 490 (1992) (contending withdrawal rights in debt agreements can be used to allow creditors to induce profitable behavior); Patrick Bolton & David S. Scharfstein, Optimal Debt Structure and the Number of Creditors, 104 J. Pol. Econ. 1, 5–8 (1996) (modeling effects of state-contingent control and showing that borrowing from many creditors lowers payoff of strategic default by managers).

33. The hostage is a commitment mechanism. By giving value that can be destroyed by another in certain states, the debtor provides a valuable and credible commitment to act in a certain way. See Robert E. Scott, A Relational Theory of Secured Financing, 86 Colum. L. Rev. 901, 927–28 (1986) [hereinafter Scott, Relational Theory] ("When monitoring costs, such as direct supervision, are high relative to actions by the debtor that reassure the creditor, both parties will agree ex ante to substitute cost-effective bonding alternatives."); see also Oliver E. Williamson, Credible Commitments: Using Hostages To Support Exchange, 73 Am. Econ. Rev. 519, 522 (1983) (offering general discussion of how parties can use hostages to advance their mutual interests).

*COLUMBIA LAW REVIEW*

tal.[34] The investors with rights to these assets no longer need to pay as much attention to the way the team is managed.[35] In the event of default, investors will use their right to withdraw the stadium as negotiation leverage. The credible threat of withdrawal will force the debtor to negotiate with them anew. The withdrawal right matters because, even though the stadium is never actually withdrawn, the ability to withdraw gives the investor leverage whenever there is a default. This leverage allows the investor to capture a share of the firm's value as a going concern. This prospect gives the managers a strong incentive to avoid default, just as someone who gives a hostage is less inclined to misbehave. The managers want to avoid sharing a large part of the value of the firm with someone else. Even if no one is looking over their shoulders, the managers will be less likely to divert assets to themselves (such as by hosting lavish events for themselves with the team's resources) and more attentive to ensuring the success of the team (such as by firing bad coaches and hiring better players).

A withdrawal right, like the ability to hold a hostage, is more valuable to some investors than others.[36] Those who are well positioned to monitor do not need a withdrawal right. They can put covenants in their contracts that give them control over the levers of corporate governance. They can use these covenants to curb misbehavior.[37] But these investors may protect their own position to the disadvantage of other investors and to the disadvantage of the investors as a group.[38] These other investors can counterbalance this power by acquiring withdrawal rights.

---

34. When the key asset is worth comparatively little elsewhere, the ability of the investor to liquidate it is not what is driving the bargaining dynamic. Instead, what matters is that the firm has value only if the "hostage" is returned. It is in the mutual interest of the investor on the one hand and the managers (and the other investors) on the other to preserve that value. The potential loss of value to the firm drives the bargaining after the fact and instills the discipline beforehand. What matters is not how puny the prince is, but rather that the kingdom is worthless without him. See Robert E. Scott, Rethinking the Regulation of Coercive Creditor Remedies, 89 Colum. L. Rev. 730, 733 (1989) (suggesting greater potential loss in value in losing "hostage" leads to greater effectiveness in advancing cooperation).

35. See Aghion & Bolton, supra note 32, at 490–91 (explaining state-contingent rights can create incentives that substitute for other control mechanisms as optimal governance structures).

36. See Scott, Relational Theory, supra note 33, at 932–33 (summarizing characteristics that create value for hostage function of secured credit).

37. See Douglas G. Baird & Robert K. Rasmussen, Private Debt and the Missing Lever of Corporate Governance, 154 U. Pa. L. Rev. 1209, 1211–13 (2006) (describing mechanisms for creditor control in and out of bankruptcy); Michael R. Roberts & Amir Sufi, Control Rights and Capital Structure: An Empirical Investigation, 64 J. Fin. 1657, 1667, 1690–91 (2009) (showing how covenants allow control rights to shift as firms encounter financial distress).

38. See Kenneth M. Ayotte & Edward R. Morrison, Creditor Control and Conflict in Chapter 11, 1 J. Legal Analysis 511, 538–39 (2009) (finding evidence of creditor control leading to inefficient sales in bankruptcy).

Binding the managers to good behavior not only makes the investor better off, but it also improves the value of the overall enterprise. The increase in the value of the business may more than offset the costs from the risk of bargaining failure.[39] Withdrawal rights make the most sense when there are hard-to-monitor assets and a greater need to discipline managers. These are the cases where one of the key investors may be more likely to opt out of traditional bankruptcy. In these cases, the risk of default should be primarily in the hands of the managers.

On the flip side, the more likely exogenous financial cycles are to cause default, the more parties will find it in their interest to subject investors to the "cramdown" power.[40] There is no point in risking bargaining failure to create withdrawal rights when external events are the likely cause of any default.[41] Finally, of course, withdrawal rights only substitute for monitoring when the withdrawal has the potential to destroy value—that is, when the partitioned asset is actually tied to the going-concern value of the enterprise as a whole.[42]

## B. *Bankruptcy Tailoring*

The benefits of withdrawal rights set out above must be balanced against the costs they bring. If multiple investors possess withdrawal rights, the risk of bargaining failure rises, and they face the collective-action problem that bankruptcy is intended to solve.[43] Similarly, the benefits of withdrawal rights are lost if they are invisible to other investors. The familiar arguments against a regime of free contracting rest on both of these costs. If everyone is able to contract for a withdrawal right and no one has the ability to tell whether anyone else has the right, each investor assumes the worst.[44] A "menu approach" to bankruptcy[45] may avoid these difficulties, but does not allow structures that are tuned to

---

39. See Adler, *supra* note 24, at 217 (discussing bargaining failure and negotiation costs); *see also infra* Part III.B (discussing risk of bargaining failure among investors with withdrawal right).

40. "Cramdown" is the power to impose a plan of reorganization over the objections of some creditors. 11 U.S.C. § 1129(b) (2006); *see also* Kenneth N. Klee, *All You Ever Wanted To Know About Cram Down Under the New Bankruptcy Code*, 53 Am. Bankr. L.J. 133, 134 (1979) (defining cramdown as what happens when reorganization plan is confirmed over dissent of some creditors, including those with secured interests).

41. *See* Bolton & Scharfstein, *supra* note 32, at 14 (suggesting when default risk is high, one creditor will result in higher liquidation value).

42. When this is not true, the cost and benefit of the withdrawal right is zero. In these cases, other motivations to explain entity partitioning should be considered.

43. *See infra* Part III (discussing costs associated with withdrawal rights); *see also supra* note 2 and accompanying text (noting collective action problem).

44. *See, e.g.,* Robert K. Rasmussen, *Debtor's Choice: A Menu Approach to Corporate Bankruptcy*, 71 Tex. L. Rev. 51, 53–54 (1992) (setting forth approach where firms publicly select one bankruptcy regime from menu of several options).

45. *See id.* (discussing "menu approach").

the needs of individual investors. It does not cleanly distinguish between investors who can monitor effectively and those who cannot.

The ability to craft withdrawal rights by putting assets of the same business in different legal entities largely overcomes these difficulties. Legal entities provide a way for some investors to enjoy withdrawal rights without creating a collective action problem or imposing hidden costs on others. This use of legal entities and structure to transform the rights of investors during bankruptcy is what this Article refers to as bankruptcy tailoring.

From this perspective, existing reorganization law provides investors with a set of building blocks. The ability to opt out comes from the ability to put together these building blocks in different ways.[46] Investors cannot opt out of bankruptcy altogether, but the collective set of investors' rights can be tailored. Investors acquire the right to withdraw only through discrete changes to the corporate structure. It is not the equivalent of a bankruptcy-by-contract regime in which investors can craft any withdrawal right they please in the bargain they strike with their debtor.[47] Nor is it a menu approach to bankruptcy. Far from being a limited number of choices, there are many different ways of putting these building blocks together, as the Dodgers bankruptcy illustrates.[48]

---

46. While the use of different legal entities in the same corporate group is the most important way of allowing individual investors to opt out, it is not the only one. Part V of this Article examines other devices.

47. See Schwartz, supra note 14, at 1819 (laying out system of free contracting to allow investors and debtors to opt in to chosen bankruptcy system).

48. Of course, other reasons for creating this structure may also be at work in cases like the Dodgers'. Partitioning specialized assets into separate legal entities is a way to establish priority among investors. An investor in a sports franchise might want to be able to look to the stadium as collateral for its loan, but creating a security interest in a stadium is not easy. The stadium, independent of the team, produces a number of different revenue streams (e.g., concessions, sky boxes, and advertising). An investor who wants to protect itself by obtaining priority with respect to all these assets can do so, but it requires a variety of security interests. It is easier to segregate the assets for priority purposes by placing the assets in a separate subsidiary. By lending to the subsidiary, the investor obtains structural priority over any investors in the parent. Creating structural priority in this fashion may make it easier to securitize part of the revenue stream. See Iacobucci & Triantis, supra note 12, at 567–68 (discussing securitization and asset partitioning).

Major League Baseball itself has rules that drive franchises toward particular capital structures. This was evident in *In re Texas Rangers Baseball Partners*, where limits on the debt load that the League permitted the team to carry drove the capital structure and much of the dynamics of the bankruptcy. 434 B.R 393, 398 (Bankr. N.D. Tex. 2010) (noting limiting effects of debtors' prepetition agreements with Major League Baseball respecting financing); see also 2012–2016 Basic Agreement Between Major League Clubs and Major League Baseball Players Association 208 (Dec. 12, 2011), available at http://mlb.mlb.com/pa/pdf/cba_english.pdf (on file with the *Columbia Law Review*) (setting forth Debt Servicing Rule).

Of course, many of the standard explanations for asset partitioning are not at work here. For example, shielding assets from tort liability was not the motivation for putting the team, the stadium, and the parking lot in separate legal entities. The tort risks that

Requiring investors to use discrete corporate entities as building blocks makes the withdrawal right readily visible to other investors. Separate legal entities are relatively easy to discover. A public filing of some kind is needed for each one. An investor cannot obtain an exit right and expect to keep it secret. The partition is visible in a way that an ordinary contract between the debtor and an investor is not. Indeed, a transfer to a separate legal entity is equivalent to a sale of the asset to a third party. That sale alters the ownership of the asset, and that property right can be verified more easily than the myriad contractual rights that might exist in the asset. And, of course, verification of ownership is a common and necessary practice under any bankruptcy regime.[49]

Entity partitioning allows a lender to focus on where the entity ends to understand its exit rights and the rights that might be asserted against it. Put another way, the lender on one asset may focus less on the rights of particular lenders in other assets. This is a major benefit of tailored bankruptcy over bankruptcy by contract.[50] Moreover, the existence of the withdrawal right reduces the need for the lender to inform itself on the management and the capital structure of the enterprise. The investor's exit right aligns incentives in a way that substitutes for that information gathering and subsequent monitoring. In contrast, bankruptcy by free design (without building blocks) requires investors to do much deeper investigations of the contractual capital structures of all assets in the enterprise.

Withdrawal rights, of course, impose costs on other lenders. They must understand how all the assets fit together and what priority and withdrawal rights others might have in those assets. Ideally, debtors (driven by capital markets) will offer investors withdrawal rights only if their benefits exceed the costs they impose on everyone else. Critical to such a regime is the way in which bargaining plays out. It must give the debtor the right set of incentives while at the same time ensuring that assets are still put to their best use. The next two Parts of this Article turn to these dynamics.

---

render a sports franchise insolvent are remote and in any event easily insured against. More to the point, as the management and control of both the parking lot and the stadium lie with the team, it is exceedingly unlikely tort liability could arise from either without the team itself also being independently liable.

49. See Douglas G. Baird, Notice Filing and the Problem of Ostensible Ownership, 12 J. Legal Stud. 53, 55–58 (1983) (exploring relative importance, costs, and nuances of creditor's attempts to verify ownership).

50. Because bankruptcy by contract allows parties to design any set of bankruptcy rules, it might also be thought of as bankruptcy by free design. See supra note 47 and accompanying text (explaining bankruptcy by free design).

## II. Bargaining After the Fall

Consider the following hypothetical. Entrepreneur wants to establish a sports franchise. To create it, Entrepreneur must spend $7 on human capital and intangible assets. Entrepreneur must also acquire Stadium, which costs $3. Once Team is formed and Stadium is acquired, the sports franchise will generate an expected revenue stream of $10. Without the ability to use Stadium, Team is worthless. Team has nowhere else to play, and Entrepreneur has no ability to build another stadium in a timely fashion and still keep Team together. Entrepreneur has $4. Hence, to start Team, Entrepreneur must find outside investors.[51] Bank and HedgeFund are each willing to put up $3. Bank is able to monitor Team's ongoing operations closely and is confident it can protect its interests without having the ability to reach hard assets.[52] By contrast, HedgeFund has no particular ability to oversee Team. It wants to have the ability to reach Stadium in the event of default.[53]

To give HedgeFund a priority right to Stadium, there are two possible structures. Entrepreneur can create TeamCorp. TeamCorp can borrow $3 from HedgeFund and grant HedgeFund a security interest in the Stadium. It can then borrow $3 from Bank and give Bank a security interest in everything else.[54] Alternatively, Entrepreneur can create TeamCorp and have TeamCorp create StadiumCo as a wholly owned subsidiary. StadiumCo can borrow $3 from HedgeFund on a secured basis. TeamCorp can also borrow the same amount from Bank and grant Bank a security interest in TeamCorp's own assets, including TeamCorp's equity stake in StadiumCo. StadiumCo can then use its funds to build Stadium and enter a related-party lease allowing TeamCorp full use and control of the asset. The lease will set the payment obligations from TeamCorp to StadiumCo in an amount sufficient to service the debt.

---

51. See Aghion & Bolton, supra note 32, at 475–79 (developing model of financial contracting based on need of entrepreneur to obtain outside funding).

52. The assumption that Bank is better positioned to monitor is not essential. When there are two investors, neither with any special monitoring ability, it may still make sense for one of them to have a priority right that is tied to a particular asset. The one without the right receives a higher rate of interest and a lower return in bad states, but both creditors benefit from having a debtor who is less likely to misbehave. See Randal C. Picker, Security Interests, Misbehavior, and Common Pools, 59 U. Chi. L. Rev. 645, 658 (1992) (analyzing positive externalities of creditor monitoring).

53. At this level of abstraction, the standard account of secured credit developed in the early 1980s explains the capital structure of Team and the allocation of assets to Bank and HedgeFund. See Saul Levmore, Monitors and Freeriders in Commercial and Corporate Settings, 92 Yale L.J. 49, 56 (1982) (developing now conventional account of secured creditor as monitor).

54. In this first structure, HedgeFund would have a deficiency claim against TeamCorp in the event that Stadium was not worth enough to pay HedgeFund in full. Nothing of moment turns on this. Bank is the only other creditor and will exhaust all the other assets in the event that TeamCorp proves insolvent.

*NO EXIT?*

The differences in these structures matter only in bad states of the world. Let us imagine therefore that things go poorly, and Team's fortunes decline. If Team were shut down, Stadium would fetch only $2 and no other assets could fetch anything. When Team encounters financial distress, Bank is able to exercise control. It can either displace or make common cause with Entrepreneur. But Team does not engage in any workout with HedgeFund, and Team defaults on its obligations to HedgeFund.

This Article focuses only on how the withdrawal right will affect the investors when Team is worth more than Stadium and there is no doubt that the firm as a whole is worth saving. Here the withdrawal right, if exercised, would destroy value.[55] But if the investors create the right only when the risk of bargaining failure is low, the right will rarely be exercised. It changes only the way the bargain is struck among the different parties.[56]

A. *Bargaining Without Bankruptcy*

Let us assume that the enterprise altogether is worth $6 and Stadium alone is still worth $2. The synergy of keeping these assets together is worth $4. It is the difference between the value of keeping the assets together with the human capital ($6) and the liquidation value of the hard assets ($2). In the absence of bankruptcy, the default gives HedgeFund the ability to sell Stadium to someone else for $2. With this power in hand, it can enter into negotiations with Entrepreneur. Because the highest-valued use of Stadium is with Team, one would expect HedgeFund and Entrepreneur to negotiate and reach a deal of some kind.

---

55. Of course, when exercising the withdrawal right increases value by putting assets to better use, it is easy to justify.

56. The way that the right to withdraw assets affects bargaining has been well explored. See, e.g., Christopher Avery & Peter B. Zemsky, Money Burning and Multiple Equilibria in Bargaining, 7 Games & Econ. Behav. 154, 155 (1991) (modeling potential equilibria that arise when "at least one player has the ability to take some action that reduces the value of the asset after her own offer is rejected"); Douglas G. Baird & Randal C. Picker, A Simple Noncooperative Bargaining Model of Corporate Reorganizations, 20 J. Legal Stud. 311, 328–40 (1991) [hereinafter Baird & Picker, Bargaining Model] (modeling general bargaining dynamics of rights in bankruptcy between debtor's manager and senior creditors); Alberto Dalmazzo, Outside Options in a Bargaining Model with Decay in the Size of the Cake, 40 Econ. Letters 417, 418–21 (1992) (modeling effect of cake shrinking faster than outside options on bargaining); Avner Shaked & John Sutton, Involuntary Unemployment as a Perfect Equilibrium in a Bargaining Model, 52 Econometrica 1351, 1352 (1984) (modeling how "allow[ing] agents to freely revise their plans at each instant" will affect what type of agreement parties enter); John Sutton, Non-Cooperative Bargaining Theory: An Introduction, 53 Rev. Econ. Stud. 709, 709–10 (1986) [hereinafter Sutton, Non-Cooperative Bargaining] (comparing effect of choosing noncooperative bargaining model against traditional bargaining model on bargaining outcome).

The simplest way to model the bargaining problem is to assume that HedgeFund is able to start the negotiations. It proposes a share of Team that it will accept. Entrepreneur (acting on its own behalf and Bank's) can accept the offer or make a counteroffer. On hearing a counteroffer, HedgeFund can again either sell Stadium to a third party or make a counteroffer itself. Suppose also that it costs them nothing to make offers, but delay is equally costly to each. The value of Team and value of Stadium to any third party are reduced the longer the negotiations take. Under these conditions, as the periods between rounds become arbitrarily short, the unique subgame perfect equilibrium is one in which HedgeFund will propose to keep an amount arbitrarily close to half the value of Team (or $3) at the outset and Entrepreneur will accept.[57] The equilibrium of $3 assumes uniform discount factors across parties and assets. With different assumptions, the numbers change, but the outcome is consistent: HedgeFund is able to capture part of the value of the firm over and above the value of Stadium.[58]

---

57. This is a standard Rubinstein bargaining model. See generally Ariel Rubinstein, Perfect Equilibrium in a Bargaining Model, 50 Econometrica 97 (1982). For an application of such a model in bankruptcy renegotiations, see Baird & Picker, Bargaining Model, supra note 56, at 312. This Article's model assumes that the bilateral negotiations are between the investor with the withdrawal right and those currently in control of the debtor, which in the typical case will include a creditor with control rights like Bank.

Baird and Picker's model focuses on HedgeFund's ability to exit. See id. at 329 (modeling bargaining problem as "two-person noncooperative game of altering offers with exit options"). What matters for the purposes of this Article, however, is not primarily HedgeFund's ability to exit, but rather Entrepreneur's inability to cramdown HedgeFund outside of bankruptcy. This Article refers to HedgeFund's ability to exit and its ability to resist cramdown collectively as its "withdrawal right."

58. For example, it seems reasonable to assume that the value of Team decays faster than the value of Stadium. If Team cannot get its financial house in order, it may quickly lose all its value. Stadium, however, will remain available for concerts regardless of what happens to Team. All that is lost is a few concert dates. Unlike Team, it is not a melting ice cube. In the limiting case in which the liquidation value of Stadium does not decay at all, HedgeFund always gets the value of Stadium and bargains with Entrepreneur (who works in concert with Bank) over the value of the franchise over and above the value of Stadium as a concert venue. This difference is the relevant pie, and the natural dynamics of bargaining will lead them to split it. With that assumption, the bargained-for share here would be $4 ($2 for Stadium plus $2 as half of the remainder). The intuition is that the nondecaying exit option is not up for grabs. It is like money in your pocket. This equilibrium is shown in Dalmazzo, supra note 56, at 419.

If it is assumed alternatively that the value of the exit option decays at the same rate as the value of Team, the ability to liquidate puts a floor on the bargaining game. Team and HedgeFund are dividing the value of TeamCorp between them. HedgeFund will never take less than the liquidation value of its collateral, but its threat to demand more is not credible. This is Baird & Picker's assumption. Baird & Picker, Bargaining Model, supra note 56, at 333. Baird and Picker did not consider the possibility that the value of the exit option decays at a different rate. But regardless of the outcome of any particular bargain, putting Stadium into a separate legal entity allows HedgeFund to capture a part of the going-concern value that would otherwise be divided between Entrepreneur and Bank.

### B. *Bargaining in Bankruptcy Without Entity Partitioning*

When the initial deal is structured as a secured loan from HedgeFund to TeamCorp and TeamCorp files for bankruptcy, the outcome is completely different. Once the bankruptcy petition is filed, the automatic stay prevents HedgeFund from selling Stadium. In bankruptcy, Entrepreneur can propose a plan of reorganization that gives HedgeFund a share of Team that is worth the value of its collateral. The standard law-and-economics assumption is that the value should be the amount that HedgeFund would have received if it had exercised its non-bankruptcy foreclosure right,[59] but regardless of the yardstick one uses, the amount HedgeFund receives is tied to the value of Stadium, not Team as a whole. HedgeFund can argue that it is entitled to a share of the going-concern surplus, the synergy created by combining the other assets with Stadium, but this argument is hard to make. Even if it could be measured with precision, there is no metric by which to divide the going-concern surplus among multiple claimants.

What matters is that the Bankruptcy Code authorizes "cramdown."[60] Even if HedgeFund opposes the plan of reorganization, Entrepreneur can force HedgeFund to accept a share of the reorganized firm and cancel its security interest as long as one impaired creditor (in this case Bank) accepts the plan.[61] Even if HedgeFund is fully secured, the structure of the payment terms can be completely transformed. The value of this share need only equal the value of the asset in which it holds a security interest.[62]

### C. *Bargaining in Bankruptcy with Entity Partitioning*

If the separateness of legal entities is meticulously respected in bankruptcy, a different result arises if the transaction is structured as a loan from HedgeFund to StadiumCo, and Entrepreneur places TeamCorp in bankruptcy. Because Stadium is housed in StadiumCo, TeamCorp can use Stadium only if it can cure past defaults and honor all the terms of the lease between StadiumCo and TeamCorp going forward, as shown below. The lease requires TeamCorp to pay StadiumCo $3, an

---

59. See Douglas G. Baird & Thomas H. Jackson, Bargaining After the Fall and the Contours of the Absolute Priority Rule, 55 U. Chi. L. Rev. 738, 782 (1988) (defending liquidation value as creditor's entitlement).

60. See supra note 40 (defining "cramdown").

61. 11 U.S.C. § 1129(a)(10) (2006).

62. More precisely, HedgeFund is entitled to retain its lien on Stadium and a stream of cash payments equal in value to its lien or their "indubitable equivalent." Id. § 1129(b)(2)(A). The circumstances under which Entrepreneur can avoid providing a lien are contested. See Anthony Sexton, Indubitably Uncertain: *Philadelphia Newspapers* and the Role of Valuation Uncertainty in Attempted Cramdown of All-Equity Plans, 28 Emory Bankr. Dev. J. 55, 73–79 (2011) (exploring courts' uncertainty in application of "indubitable equivalent" standard and arguments for different approaches).

*COLUMBIA LAW REVIEW*                    [Vol. 113:1

amount sufficient to repay the loan from HedgeFund in full. The lease obligations are geared to the amount HedgeFund is owed, not to the value of Team or Stadium. Corporate formalities are strictly observed, but StadiumCo has no independent identity. The firm is still integrated in the Coasean sense—all assets are controlled and managed together.[63] Indeed, StadiumCo may have no operations and no employees. Its only activity consists of signing the lease.

Entrepreneur can try to file a bankruptcy petition on behalf of StadiumCo, but parties can structure things in a way that makes this hard.[64] And even if Entrepreneur could place StadiumCo in bankruptcy and impose a reorganization plan over its objection, that plan is supposed to maximize the value of StadiumCo, which requires it to insist that TeamCorp cure the defaults and assume the lease or bargain for the best deal that StadiumCo can get from TeamCorp.[65]

Even if the value of Team and Stadium were less than $3, HedgeFund can still insist on being paid everything it is owed. HedgeFund's withdrawal right gives it a veto over any reorganization of the team. While bankruptcy forces creditors of the same debtor to stay their hands and work together cooperatively, it does not oblige third parties to deal with a debtor, even if everyone knows that a deal between them would be mutually beneficial. If one focuses on legal entities rather than the business, StadiumCo is merely a third party that is free to do

---

63. See supra note 12 and accompanying text (explaining Coasean firm).

64. The corporate charter of StadiumCo might provide, for example, that independent directors must sign any bankruptcy petition. HedgeFund can take steps to ensure that these directors never file bankruptcy petitions. See, e.g., infra notes 97–100 and accompanying text (discussing independent managers' role in In re General Growth Properties, Inc., 409 B.R. 43 (Bankr. S.D.N.Y. 2009)). The parties can also create a structure such that the loan is made to a holding company that in turn owns StadiumCo and that HedgeFund is the only creditor of the holding company. A debtor with only one creditor may not be able to file a bankruptcy petition at all and, even if it does, may not be able to confirm a plan that impairs the rights of that creditor without its consent. See 11 U.S.C. § 1129(a)(10) (providing that plan can only be approved "[i]f a class is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider"). A court that is inclined to view the corporate group as the entity on which bankruptcy acts, however, might see matters differently. See infra Part IV.B (discussing judge's decision in In re Charter Communications, 419 B.R. 221 (Bankr. S.D.N.Y. 2009), to treat sole creditor of affiliate entity as member of class of creditors of entire enterprise in joint plan).

65. Again, this assumes that one adopts an approach that respects corporate form. Judge Gropper in *General Growth* explicitly rejects the idea that the bankruptcy of StadiumCo must focus on maximizing StadiumCo's value when it is solvent. See 409 B.R. at 63 (noting decision of "whether to file a Chapter 11 petition can be based in good faith on consideration of the interests of the group as well as the interests of the individual debtor").

business with TeamCorp as it wishes. Bankruptcy law leaves its exit option unaffected.[66]

### D. *The Bargained-For Share*

That the amount HedgeFund receives in bargain in the last scenario ($3) is equal to the amount lent (and the amount due under the lease from StadiumCo to TeamCorp) is an artifact of the numbers used. Imagine instead that the original loan from HedgeFund was $4 and TeamCorp owes $4 under the lease. Holding all the distressed numbers constant (enterprise value at $6 and asset liquidation value at $2), HedgeFund will still receive $3. TeamCorp will not assume the lease, but rather will bargain with HedgeFund and reach a deal where it still pays $3. This amount is HedgeFund's bargained-for share of the enterprise value and thus independent of the amount of the initial loan.

If the enterprise were worth $7 and the initial loan $3 (and the lease obligation still $3 as well), the amount of the loan would put a ceiling on the ultimate payout. TeamCorp has the right to assume the obligations under its lease with StadiumCo and pay it according to the lease terms. The amount of bargaining power HedgeFund enjoys turns on these terms. The longer the lease and the fewer events of default, the less power HedgeFund will enjoy.

HedgeFund's bargaining power comes not merely from being able to insist on being paid $3, but on being paid according to the terms of the lease. A secured creditor in bankruptcy can be paid in any coin as long as it is equal to the value of its secured claim.[67] By contrast, a lessor can insist on being paid in the coin for which it bargained. In the example, it was assumed that TeamCorp can pay what it owes HedgeFund in cash. That is not likely to be the case. TeamCorp is almost certainly liquidity-constrained at the moment of bankruptcy. If TeamCorp cannot meet the obligations in the contract or if nonbankruptcy law prevents it from assuming the contract, it will need to bargain with HedgeFund. In

---

66. In the actual *Dodgers* case, things appear to have played out this way with respect to the parking lot. The parking lot never entered bankruptcy. See supra note 6. After reorganization, the lease of the parking lot (with its $14 million annual payment) was not only respected in full but its term was extended from twenty-five to ninety-nine years. Some early reports suggest that the owners of the parking lot may have negotiated for new flexibility in future development rights. As a result the stakeholders in the parking lot suffered no loss from the reorganization. Indeed some of them may have benefited. It is noteworthy that, while McCourt's ownership of the team and the stadium do not continue after the bankruptcy, he still owns a fifty-percent interest in the parking lot. Bill Shaikin, Parking Costs: $14 Million a Year, L.A. Times, May 5, 2012, at C1. It is likely that his control over withdrawal rights of the parking lot played a role in the bargaining that went on with respect to the rest of the enterprise.

67. See 11 U.S.C. § 1129(b)(2)(A) (requiring those holding secured claim to receive note for value of collateral and lien or proceeds from sale of collateral, or their "indubitable equivalent").

driving that bargain, HedgeFund is not limited by the amount it was owed under the lease. The amount it receives in the end turns on the debtor's liquidity and the asset value relative to enterprise value. If the franchise is worth $10, the full loan payment is $3, and the asset is worth $2, then HedgeFund gets $3 if TeamCorp can meet the terms of the original contract[68] and $5 if it cannot.[69]

### III. THE COSTS OF WITHDRAWAL RIGHTS

Withdrawal rights will inure to everyone's benefit only if the costs that come with them can be contained. For its part, an investor that has a withdrawal right will have every incentive to exploit the right once triggered. It will try to capture a part of the value of the firm as a going concern. The investor will possess this incentive even when the default is merely a technical one that has nothing to do with any of the difficulties that the firm actually faces. Problems seem even more likely to arise when multiple investors are in the picture and a bargain must be struck among all of them. Ensuring that parties can bargain effectively in such environments is harder. This Part explores these two potential costs and suggests that they are smaller than they might at first appear.

### A. *Limiting the Problem of Technical Default*

Because HedgeFund can exercise its withdrawal right only if things go badly, it has only a limited ability to use the leverage that the withdrawal right gives it. Entrepreneur can protect itself by ensuring that the business has the resources needed to pay HedgeFund in full. Similarly, while HedgeFund may have an incentive to call a technical default just to get a chance to negotiate for the going concern, its ability to do so is quite limited. HedgeFund's legal relationship is with StadiumCo. Its abil-

---

68. To be precise, StadiumCo receives the payments under the lease. The terms of the deal between HedgeFund and StadiumCo will determine how much of this revenue HedgeFund receives.

69. In all of these examples, Stadium's liquidation value is less than the bargained-for share that HedgeFund could capture. Consider now the case in which the liquidation value exceeds the bargained-for share. HedgeFund lends $8 to StadiumCo, and StadiumCo leases Stadium to TeamCorp for $8. TeamCorp encounters financial distress. The business as a going concern is worth $10. Without Team, Stadium's next best use is as a concert venue that will bring expected revenues of only $6. The business has a going-concern surplus of $4, the difference between the value of the operating business and the liquidation value of its only asset. What will be the outcome of bargaining between HedgeFund and Team?

If it is assumed, as above, that the assets have uniform discount factors, then the liquidation value is a floor on the bargaining and HedgeFund demands and gets $6. If it is assumed the enterprise value decays while Stadium's liquidation value does not, then HedgeFund takes the $6 and bargains for half the remainder and takes a total of $8. See supra note 58 (discussing effects that varied rates of value decay have on bargaining dynamic).

ity to declare a default on StadiumCo does not necessarily give it any right to interfere with TeamCorp's ability to continue to use Stadium. All TeamCorp needs to do is comply with the terms of the lease.

Entrepreneur enjoys two levels of protection. First, Entrepreneur takes steps to ensure that StadiumCo does not default on its obligation to HedgeFund in the first instance. Among other things, Entrepreneur can protect itself against this by avoiding or curing technical defaults (or limiting the terms of default in the original agreement) or maintaining solid credit to allow StadiumCo to pay off or refinance the loan.

Moreover, the parties can structure the deal to ensure that even when HedgeFund forecloses on Stadium because of a default of StadiumCo, it lacks the ability to disturb the lease with TeamCorp.[70] Only TeamCorp's failure to pay the rent on Stadium would terminate the lease. HedgeFund's acceleration of the debt against StadiumCo will give it no more than a right to take over StadiumCo. It will get assets that it financed in the first place, and those assets will be subject to a lease with TeamCorp.

In this way, legal separation actually provides added protection for the debtor as well as the creditor. When Stadium is an asset within TeamCorp with no related-party contracts or leases, a technical default on a security interest would require a bankruptcy to avoid giving HedgeFund the ability to withdraw. The existence of the separate legal entity, StadiumCo, can make HedgeFund's accession to Stadium a non-event as far as TeamCorp is concerned.[71]

## B. *Multiple Parties and the Risk of Bargaining Failure*

The stylized facts involving TeamCorp and HedgeFund illustrate bilateral bargaining. Any reorganization of a large firm will involve multiple players. Modeling this bargaining is harder.[72] Moreover, when many of the players control assets that contribute to the value of the firm as a

---

70. In other contexts, it is common for parties to use a Non-Disturbance Agreement. It can be part of a larger Subordination and Non-Disturbance Agreement (SNDA) that sets out the relationship between the lender and the lessee. The nondisturbance part of the agreement is a promise that the lease will remain valid even after a creditor forecloses on the property. The point here is not the precise mechanism parties choose, but rather that the trigger empowering HedgeFund to take control over the parking lot can be finely tuned and dramatically limit the ability of HedgeFund to hold up Entrepreneur.

71. All that said, the higher the risk of technical default (and the more costly it is to contract against it), the more one would expect parties to adopt traditional security interests. Cramdown protects against this form of misbehavior by creditors where there is a traditional security interest.

72. It is possible that a unique equilibrium does not exist. Without limiting assumptions, a Rubinstein model for multilateral bargaining does not produce one. See Vijay Krishna & Roberto Serrano, Multilateral Bargaining, 63 Rev. Econ. Stud. 61, 61–62 (1996) (reconciling Rubinstein bargaining model with multilateral bargaining); Sutton, Non-Cooperative Bargaining, supra note 56, at 720–21 (finding certain ranges of discount factors do not lead to unique equilibrium).

going concern, there is the potential for an empty core problem.[73] Many coalitions of investors are possible, and none of them may be stable.[74] But even if one cannot model this process with precision, one can observe that the ability to tailor the extent of the bankruptcy cloak allows parties to exercise control over this problem.

Firms that enter bankruptcy today are rarely in freefall. To return to the example, Bank and Entrepreneur will typically begin their negotiations long before the petition is filed. If a negotiation with HedgeFund would be too costly or introduce too great a risk of bargaining failure, Bank can provide the financing needed to keep the lease of Stadium in place or allow someone else to provide it.[75] There is no risk of bargaining failure because HedgeFund will be a spectator to the bankruptcy and nothing more. Altering the dynamics of an impending bankruptcy is costly, but the ability to alter these dynamics means that the risk of bargaining failure in bankruptcy is one that can be controlled.[76]

If courts respect entity partitioning, the debtor can eliminate the costs associated with bargaining with someone who holds withdrawal rights by paying that investor off. If Bank and Entrepreneur foresee a major risk of bargaining failure, they can jointly agree to assume the contract with Stadium (and thus pay off HedgeFund). This is true even if Bank is a creditor of a partitioned entity itself. It may be that the major players agree to simplify the bargaining by financing the debtor's assumption of contracts with multiple small entities. This works especially well where the small players' loans are less than their bargained-for share.[77] By providing liquidity for the payments, Bank can increase the

---

73. See Douglas G. Baird & Robert K. Rasmussen, Antibankruptcy, 119 Yale L.J. 648, 688–92 (2010) (defining empty core problem as situation in which no focal point exists around which to form agreement).

74. See id. at 690 n.190 ("An 'empty core' exists when three or more parties cannot reach a stable agreement with each other because some other agreement always exists that at least one party prefers.").

75. In the Dodgers bankruptcy, for example, debtor-in-possession financing was needed in part to make payments to parking lot and its creditors. See Declaration of Ingram, supra note 7, at 8–12.

76. This strategy would resemble bargaining models where multiple parties can conduct sequential binding bilateral negotiations. See Suchan Chae & Jeong-Ae Yang, An N-Person Pure Bargaining Game, 62 J. Econ. Theory 86, 87–88 (1994) (envisioning one player promising certain share of overall pie to others in succession in exchange for giving up their negotiating rights); Krishna & Serrano, supra note 72, at 62–64 (describing "exit" game where one player's acceptance of proposal removes itself from negotiations, leaving other players to haggle); Sutton, Non-Cooperative Bargaining, supra note 56, at 721–23 (modeling negotiations between players who respond to proposals in turn, with earlier responders being bound unless later responders veto entire deal). The dynamics of that bargain is such that negotiations will reduce the risk of bargaining failure without allowing the debtor to selectively allocate shares of the pie.

77. The ability to assume the contract is the key. In the terms of a bargaining model, it creates the ability, not usually present, to create a binding side deal. See Chen-Ying Huang, Multilateral Bargaining: Conditional and Unconditional Offers, 20 Econ. Theory

size of the pie that it is bargaining for and the other creditors get their full payment.[78]

In this system, the opportunity for debtor misbehavior is limited. The entity that is "bought off" gets the amount it is owed under the contract and has no ability to reject that deal. To the extent that the entity is losing some bargained-for share of the going concern, it is only because the exit option worked and ensured that it was paid in full. To be sure, the debtor might favor one creditor over another when no creditor's bargained-for share was greater than its contract share. The potential for this misbehavior is limited, however. First, and most importantly, the debtor will likely need to have financing by the major creditors of the estate, and they have an incentive to curb this misbehavior. Second, bargaining models suggest no benefit to the debtor from such favoritism. The debtor just reduces its own share of the going concern.[79] There is a risk that management (as debtor's agent) will try to obtain a side payment from the favored creditor,[80] but any decision to assume a contract will go before the judge and can be challenged.[81]

---

401, 401–04 (2002) (modeling scenario where one player makes private unconditional offer to buy out another's proposal rights that would not require other players' consent); Sandeep Baliga & Roberto Serrano, Multilateral Negotiations with Private Side-Deals: A Multiplicity Example, 3 Econ. Bull., no. 1, 2001, at 1, 1 (approaching problem of multi-party negotiations in context of joint and several liability). It will not make sense to buy out parties whose bargained-for share is less than the amount they are owed unless the premium for avoiding bargaining failure makes up the difference.

78. A similar strategy appears to have been employed by Major League Baseball in the Dodgers bankruptcy. One of the largest fights in that bankruptcy was over whether Major League Baseball was to provide debtor-in-possession financing or whether the team could obtain it from a new lender. See In re L.A. Dodgers LLC, 457 B.R. 308, 311 (Bankr. D. Del. 2011) (noting Major League Baseball objected to terms proposed by new lenders). Major League Baseball was willing to make a loan on better terms than any lender in the market, perhaps because the cost of providing a below-market loan was more than offset by the more powerful bargaining position it would enjoy without another large player on the scene who also possessed withdrawal rights. Only Major League Baseball could make this below-market offer because it was going to be part of the bargaining in every event: Its participation as lender simplified the bargaining dynamic in a way that no other lender's participation could.

79. See Huang, supra note 77, at 401–04 (modeling buyout of one party in three-party bargain).

80. Such side deals are more common when a lender seeks to confirm a plan and asks for the support of the existing managers and at the same time offers continued payments, whether the manager continues working for the firm or not. See, e.g., In re Bush Indus., Inc., 315 B.R. 292, 304–05 (Bankr. W.D.N.Y. 2004) (noting lender's promise to continue paying CEO where CEO has already moved out of state and has right to quit after one year and continue receiving same payment for another three).

81. See, e.g., id. at 304–07 (finding plan proposed in bad faith because, among other things, of promise to continue paying CEO and releasing him from various debts owed to firm). Also misbehavior by debtor's management is most likely to occur when things are particularly bad. That is likely to correlate with a lack of liquidity. But, as noted, a lack of liquidity will be a limiting constraint on the ability to favor creditors here.

*COLUMBIA LAW REVIEW* [Vol. 113:1

The danger that the debtor will favor some creditors over others looms largest when courts partially disregard the characteristics of legal entities. For example, a court might allow the debtor to bring some legal entities into a bankruptcy proceeding while leaving others out and not fully collapsing the corporate structure. Such an alteration of the bargaining dynamics is more problematic. The choice between who is in and out is solely in the debtor's hands and is not constrained by law or liquidity. Priority among investors arises not out of the original bargain, but because of jockeying for position on the eve of bankruptcy. This Article returns to the issues such preferences raise in the next Part.

## IV. WITHDRAWAL RIGHTS AND THE BANKRUPTCY CODE

Judges are reluctant to disregard legal form entirely. They rarely permit substantive consolidation over the strong objection of any of the major players.[82] Nevertheless, judges are tempted to overlook the niceties of corporate form and tend to treat investors in separate entities as if they were secured creditors of a single debtor. As shown in this Part, they administer the cases jointly and make decisions that in fact look to the value of the corporate group, rather than that of the individual entities. Indeed, there is a tendency among the most able bankruptcy judges, where ambiguities in the law permit, to treat those who invest in a common enterprise subject to common control and management as if they were investors of a common debtor.[83] Apart from respecting the priority rights created by putting assets in separate corporations, the firm is treated as if it were a single corporate entity. Investors in each entity are treated as investors in the whole. This approach may give us the worst of both worlds. By failing to acknowledge squarely the ability to opt out that existing law allows, the law may lose the advantages of an opt-out regime without securing the advantages of a regime in which all investors are required to participate.

---

82. See In re Owens Corning, 419 F.3d 195, 215 (3d Cir. 2005) ("[S]ubstantive consolidation should be used defensively to remedy identifiable harms, not offensively to achieve advantage over one group . . . ."). It should be noted, however, that substantive consolidation is commonplace when the major players all find it in their interest. See William H. Widen, Corporate Form and Substantive Consolidation, 75 Geo. Wash. L. Rev. 237, 252 (2007) [hereinafter Widen, Corporate Form] (observing, as empirical matter, negotiated Chapter 11 reorganization plans frequently employ substantive consolidation); William H. Widen, Report to the American Bankruptcy Institute: Prevalence of Substantive Consolidation in Large Public Company Bankruptcies from 2000 to 2005, 16 Am. Bankr. Inst. L. Rev. 1, 8–9 (2008) (finding in course of larger study that majority of large public bankruptcy cases used substantive consolidation).

83. The manifestation of this trend is most explicit in Judge Gropper's opinion in *General Growth*, which is discussed at length in Part IV.A below. See In re Gen. Growth Props., Inc., 409 B.R. 43, 61 (Bankr. S.D.N.Y. 2009) (declining to examine issue of good faith as if each debtor were independent, instead evaluating based on "interests of the Group as a whole").

A. *Withdrawal Rights and* General Growth Properties

Withdrawal rights were the central focus of the *General Growth* bankruptcy.[84] General Growth Properties was a complicated corporate group consisting of a parent, which was a publicly traded real estate investment trust, and hundreds of subsidiaries and affiliates, some wholly owned and others not.[85] But even though made up of many legal entities, General Growth operated as a single enterprise. It owned or managed 200 shopping centers in forty-four states in addition to several commercial office buildings and five master-planned communities.[86] General Growth employed several thousand people to manage these assets exclusive of those employed at the various property sites.[87] It enjoyed the economies of scale associated with the centralized leasing and management of these properties.[88] National retailers were attracted with system-wide deals, and once brought into the fold, they were limited in their ability to misbehave at any one site because of potential repercussions elsewhere. Maintenance and construction planning were controlled centrally. In addition, all the cash was centrally managed.[89]

In the wake of the financial crisis of 2008, the company as a whole found itself in financial distress. Quite a number of the subsidiaries, however, remained in sound financial health. These included Harborplace, the premier shopping mall in Baltimore, close to its Inner Harbor.[90] Harborplace contained a variety of stores, from a Gap and an Urban Outfitters to Ann Taylor and Brooks Brothers, and from a Sunglass Hut and Bath & Body Works to Swarovski.[91] Harborplace, like a number of other highly successful shopping malls, enjoyed positive cash flows and was able to service all of its debt.[92] When General Growth entered bankruptcy, investors in Harborplace and other solvent subsidiaries sought to prevent their subsidiaries from entering bankruptcy and, once

84. For an account of General Growth's corporate structure and capital structure, see id. at 47–53.

85. Id. at 47.

86. Id.

87. Id. at 47–48.

88. Id. at 48.

89. Id.

90. Harborplace & The Gallery, General Growth Properties, http://www.ggp.com properties/mall-properties/harborplace-the-gallery (on file with the *Columbia Law Review*) (last visited Oct. 9, 2012).

91. See Harborplace & The Gallery—Tenant Information, General Growth Properties, http://www.ggp.com/properties/tenant-list/harborplace-the-gallery (on file with the *Columbia Law Review*) (last visited Oct. 9, 2012).

92. See *Gen. Growth Props.*, 409 B.R. at 55 ("Debtors did not dispute that the . . . shopping center business had a stable and generally positive cash flow and that it had continued to perform well, despite the current financial crisis.").

there, sought to prevent any of their assets from being used to finance the reorganization of the entity as a whole.[93]

The threshold question in the case was whether the bankruptcy filing of a healthy and solvent subsidiary was in good faith when its purpose was to protect the health of the larger corporate group of which it is a part.[94] This question turns on whether one can take into account the health of the corporate group as a whole, or whether one's focus should be limited to the debtor itself. The second question turned on the extent to which Harborplace's assets could be used to fund the reorganization of the rest of General Growth.[95] The investors in Harborplace insisted that it was under no greater obligation to help out the rest of General Growth than it was to help any stranger in financial distress.[96]

Harborplace's operating agreement provided that independent managers had to approve any bankruptcy filing.[97] The independent managers were picked in a way to make it extremely unlikely that they would ever agree to such a filing.[98] Moreover, the operating agreements or charters of the various subsidiaries provided explicitly that the duty of the

---

93. See id. at 54–55 (chronicling procedural posture).

94. See id. at 55 (noting several motions filed by lenders of subsidiaries arguing cases "should be dismissed because they were filed in bad faith in that there was no imminent threat to the financial viability of the Subject Debtors").

95. See id. ("Many of these parties argued that it would be a violation of the separateness of the individual companies for the Debtors to upstream cash from the individual properties for use at the parent-level entity.").

96. See The Prudential Insurance Co. of America's & Prudential Retirement Insurance & Annuity Co.'s: (I) Objection to the Debtors' Motion Requesting (A) Entry of (i) Interim & Final Orders (a) Authorizing the Debtors' Use of Cash Collateral & Granting Adequate Protection Therefore Pursuant to Sections 361 & 363 of the Bankruptcy Code & Bankruptcy Rule 4001, & (b) Modifying the Automatic Stay, & (ii) a Final Order Authorizing Borrowing With Priority Over Administrative Expenses & Secured by Liens on Property of the Estates Pursuant to Section 364(c) of the Bankruptcy Code, & (B) Scheduling a Final Hearing on Each Requested Final Order & (II) Request for (A) Determination that Certain Debtors are Single Asset Real Estate Debtors, (B) Adequate Protection, (C) Segregation & Accounting for Its Cash Collateral, (D) Entry of an Order Recognizing the Establishment of All Prerequisites for a Section 507(b) Claim, & (E) Granting Relief from the Automatic Stay or Dismissing Cases of Certain Debtors for Cause at 24, *Gen. Growth Props.*, 409 B.R. 43 (No. 09-11977) ("This would allow the Debtors to take money from the Prudential Borrowers to pay the debts and obligations of another Debtor.").

97. See *Gen. Growth Props.*, 409 B.R. at 63 ("Article XIII (p) requires the 'unanimous written consent of the Managers of the Company, including both of the Independent Managers' before the SPE can take any action to file or consent to the filing, as debtor, of any bankruptcy proceeding.").

98. This mechanism failed to keep Harborplace out of bankruptcy because the managers of General Growth were able to take advantage of a provision in the operating agreement that allowed them to replace the independent managers. The managers did not even know they had been removed until after the bankruptcy petition was filed. Id. at 67–68.

managers or directors[99] was to maximize the value of the subsidiaries, not General Growth.[100]

Allowing Harborplace to file for bankruptcy was tantamount to limiting the withdrawal right for which the investors in Harborplace had bargained. There was no suggestion that the investors wanted to take Harborplace away from General Growth. It seems Harborplace was worth more under General Growth's management than under anyone else's. To be sure, Harborplace is not as much a firm-specific asset as the parking lot is for the Dodgers. Nevertheless, the basic dynamic is the same.[101] The thousands who work at General Growth and the systems it has put in place have no value without properties to manage. These systems have been tuned, to at least some extent, to accommodate the particular challenges of running Harborplace, with its many businesses and hundreds of residents. The synergy that exists between Harborplace and General Growth gives the investors in Harborplace the ability to extract part of the overall value of General Growth as a going concern. This is a power that they would not have if General Growth owned Harborplace outright and the investors merely had a security interest in it.

The managers of General Growth make decisions that affect the overall welfare of both General Growth as a whole and Harborplace in particular. By contrast, Harborplace's investors care about the actions of the managers that affect Harborplace. But those actions are difficult to monitor and hard to control through contract. General Growth might mismanage Harborplace or make changes that reduce its liquidation value solely for the purpose of strengthening General Growth's expected payout from cramdown. And it may do so in ways that the investors in Harborplace cannot detect.

General Growth adds value to the properties it controls and manages because of the expertise it possesses. Monitoring the exercise of that expertise is hard. The monitor is unlikely to have the same expertise, and the decisions of management may not be observable. This problem exists whenever specialized human capital is a primary asset of an enterprise. But with their withdrawal rights, the investors in Harborplace have less need to observe what the managers of General Growth are doing. Even in bad states of the world, the managers will have an incentive to ensure that the Harborplace investors are paid everything to which their contract entitles them, even when there is not enough to pay others.

---

99. Because many of the subsidiaries were limited liability companies, they were governed by operating agreements rather than by corporate charters or bylaws and run by "managers" who served a similar role to corporate directors.

100. See *Gen. Growth Props.*, 409 B.R. at 63–64 (explaining subsidiary operating agreements provided independent managers "shall consider only" interests of subsidiary and its creditors in making decisions, including decision to file bankruptcy).

101. See supra Part II (explaining bargaining dynamics).

*COLUMBIA LAW REVIEW* [Vol. 113:1

On the other side of the equation, there are risks of bargaining failure and opportunistic behavior by Harborplace. But these are likely to be small. The going-concern surplus associated with keeping Harborplace in General Growth derives from the economies of scale in managing a large number of properties at the same time. Harborplace has a relatively high alternate use. Moreover, the slice of General Growth's value as a going concern that withdrawing Harborplace can destroy is small relative to the entire enterprise.[102] Withdrawing Harborplace and putting it under other management will not shut down General Growth, but the incentive for General Growth to avoid overall distress will persist as its value to the going concern is still greater than its liquidation value and General Growth's managers have an incentive to ensure that they do not have to bargain part of it away to the Harborplace investors.[103]

The bankruptcy judge in *General Growth*, however, was inclined to see Harborplace and the other solvent entities as part of an integrated whole and thus to slight the withdrawal right.[104] In his view, the corporate structure had the effect of giving the investors in Harborplace priority with respect to those assets, but it did not allow them to withdraw from the reorganization.[105] In his approach, the judge followed conventional practice and expectations. Commentators were surprised that the devices designed to keep Harborplace out of bankruptcy did not work,[106] but there was nothing unusual in the way Harborplace was treated once it was in bankruptcy.

When a corporate group files for bankruptcy, there is typically only a single lawyer representing the many corporate debtors and a single cred-

---

102. Of course, if there is no synergy connecting General Growth and Harborplace, the withdrawal rights have no cost. The lack of synergy appeared to be present with another property that General Growth managed, Faneuil Hall. After bringing Faneuil Hall into the bankruptcy, General Growth offered it for sale in 2011. According to the Boston Redevelopment Authority, the buyer had a "closer fit" because of its experience with "historic marketplaces." See Jenn Abelson, N.Y. Firm in Deal for Faneuil Hall Shops, Bos. Globe (May 10, 2011), http://www.boston.com/business/articles/2011/05/10/ny_firm_in_deal_for_faneuil_hall_shops (on file with the *Columbia Law Review*) (discussing General Growth's sale of Faneuil Hall lease).

103. As Bolton and Scharfstein note, there is often a trade-off between risk of bargaining failure and improved ex ante incentives to avoid financial distress. See Bolton & Scharfstein, supra note 32, at 2 (tying manager's incentive to strategically default to expected liquidation value of firm).

104. 409 B.R. at 63 ("[A] judgment on an issue as sensitive and fact-specific as whether to file a Chapter 11 petition can be based in good faith on consideration of the interests of the group as well as the interests of the individual debtor.").

105. See id. at 69 (explaining creditors' rights do not include avoiding bankruptcy but rather avoiding substantive consolidation that would eliminate their priority in bankruptcy).

106. See W. Rodney Clement Jr. & H. Scott Miller, *General Growth*: Special Purpose Entities (Barely) Survive First Bankruptcy Test, Prob. & Prop., Mar.–Apr. 2011, at 31, 32 (observing decision has "led some to conclude that SPEs were not quite the bankruptcy shield that lenders had envisioned them to be").

itors committee representing the creditors of the many different corporations.[107] A single plan of reorganization is proposed that provides for substantive consolidation of the many legal entities. More precisely, the plan calls for "deemed" substantive consolidation in which the entities are treated for purposes of reorganization as if they were collapsed. The plan of reorganization, however, provides for payouts to the various creditor groups that respect the priority that they would have enjoyed had there not been substantive consolidation. Put differently, the common practice reinforces the basic idea that the corporate structure is merely a means of providing for priority among creditors.[108] As long as the priority is respected, it does not matter whether there is substantive consolidation. Under this view, nothing turns on whether business is done as a single corporation or as a corporate group. It operates the same way, and the priority rights of its investors are identical. But if withdrawal rights in fact provide a means to curb ex ante misbehavior of managers, this approach may be mistaken.

The most telling lesson in *General Growth* may lie not in the treatment of the solvent entities that were brought into bankruptcy, but in those that were not.[109] In the current regime, where courts allow separate legal entities to be brought along in a bankruptcy at the whim of the debtor, the debtor's ability to modify the bargaining landscape is more problematic. A court's disregard for the separate legal entities gives the debtor an option to choose which entities have withdrawal rights and which do not, and that choice is essentially unreviewable. There are, of course, many legitimate reasons to keep some entities out of bankruptcy. Some subsidiaries may not be wholly owned, but may rather be a joint venture.[110] The financing of some ventures may be put at risk by a bank-

---

107. *General Growth* was an exception to this. In part because of the differing issues facing the parent corporation and its subsidiaries, including the challenge that the bankruptcy filings of General Growth's subsidiaries were in bad faith, separate law firms were retained to focus on the different levels of the economic enterprise. See Debtors' & Jointly Represented Debtors' Response to the United States Trustee's: (A) Objection to the Debtors' Application to Employ Kirkland & Ellis LLP as Co-Counsel for the Debtors & (B) Response to the Debtors' Application to Employ Weil, Gotshal & Manges LLP as Counsel for the Debtors at 5–7, *Gen. Growth Props.*, 409 B.R. 43 (No. 09-11977) (setting forth specific roles to be served by law firms and noting Weil's focus on enterprise level matters and Kirkland's focus on subsidiary issues such as "the resolution of various motions to dismiss certain . . . [subsidiaries'] chapter 11 cases").

108. See Widen, Corporate Form, supra note 82, at 244, 248 & n.32 (discussing "deemed consolidation" and "structural priority").

109. 409 B.R. at 47 n.6 (noting 388 of 750 subsidiaries filed for bankruptcy). Two notable subsidiaries that did not file bankruptcy, Water Tower Place and Towson Commons, are discussed below. See infra notes 117–119 and accompanying text.

110. *General Growth* relied crucially on the argument that the directors of a wholly owned entity have to pay attention to the group as a whole. 409 B.R. at 64–65. This does not apply when minority shareholders are also in the picture.

*COLUMBIA LAW REVIEW* [Vol. 113:1

ruptcy filing.[111] In others, the maturity of the debt may be far enough off that a bankruptcy filing brings no benefits.[112] But the differential treatment of withdrawal rights under existing law allows the debtor to direct the disfavored entities to file for bankruptcy but keep the favored entities out of bankruptcy. Indeed this may be what happened in the General Growth bankruptcy.

At the time of filing, General Growth had hundreds of subsidiaries.[113] Some had more complicated capital structures than others. Some were wholly owned, and some were partially owned.[114] And some were subject to complicated litigation. General Growth—presumably in an attempt to simplify the bankruptcy and the bargaining—had the less complicated entities file bankruptcy petitions.[115] The court fight revolved around the propriety of those filings, and the judge found them to be proper.[116] No great thought was attached to the significance of the various entities that did *not* file for bankruptcy. And the judge did not see any need to pull them into the bankruptcy.[117]

This approach creates a world in which the investor's withdrawal rights are respected if the managers choose to keep the entity that houses their collateral out of bankruptcy, but not otherwise. For example, compare the fate of the creditors of Harborplace to that of creditors of Towson Commons. Towson Commons was a smaller mall eight miles

---

111. In contrast to an ordinary executory contract, a lender's obligation to extend credit in the future cannot be assumed in bankruptcy. 11 U.S.C. § 365(c)(2) (2006).

112. When a loan is on favorable terms and is secured, the best course for the debtor may be to keep that loan in place. The Bankruptcy Code allows the debtor to do this. Id. § 1124(2). But if the relevant entity has no other debt and if the covenants do not otherwise limit the debtor, apart from its costs, bankruptcy may do no more than maintain the status quo.

113. *Gen. Growth Props.*, 409 B.R. at 47.

114. Id.

115. It appears that the Dodgers followed this strategy when it put the stadium entity into bankruptcy, but not the subsidiary holding the right to general admission ticket revenues. See supra notes 6–7 and accompanying text (discussing which entities of Dodgers were in bankruptcy). A bankruptcy that had to deal with hundreds of millions in securitized debt and the attendant difficulties of negotiating it would be much more complicated. The parties controlling the bankruptcy likely decided that this did not make sense.

116. *Gen. Growth Props.*, 409 B.R. at 72.

117. One notable example was Water Tower Place. It was kept out of the bankruptcy. Several years before the bankruptcy filing, the minority owner of that entity had sued for mismanagement by the majority owner (a subsidiary of General Growth). Motion for Order Pursuant to Sections 362 & 105(a) of the Bankruptcy Code & Bankruptcy Rule 7065 Enforcing or Extending the Automatic Stay or, Alternatively, Granting a Preliminary Injunction Enjoining the Urban Litigation Pending a Determination of the Relief Requested in this Adversary Proceeding & Memorandum of Law in Support Thereof at 9–10, *Gen. Growth Props.*, 409 B.R. 43 (No. 09-11977). General Growth never disclaimed Water Tower Place as part of the enterprise. Rather it filed a motion to stay the Water Tower litigation precisely because it was part of the enterprise and the litigation would complicate the reorganization. Id. But no one in control of General Growth's bankruptcy process ever attempted to bring Water Tower into it.

from Harborplace and was not brought into the bankruptcy.[118] Because Towson Commons did not file, its creditors could (and did) exercise their withdrawal rights by foreclosing and forcing a sale of the property for $28.5 million. In the end, it was those very lenders who purchased the property.[119] Thus, while the creditors of Harborplace sat on the sidelines with no bargaining power, the creditors of Towson Commons exited the relationship with collateral in hand. We confront the odd situation in which the entity that is economically flourishing and successful (Harborplace) enters bankruptcy, while the one that is distressed does not (Towson Commons).

Very few limitations are placed on the debtor's ability to choose between partitioned entities and their creditors. When legal entities are not fully respected, the debtor's choice is largely unconstrained.[120] In addition to giving the debtor the ability to prefer some investors over others, the differential treatment gives perverse incentives to those creditors. They have an incentive to create complications—such as initiating pre-bankruptcy litigation—to make it less likely that the debtor will want to bring them into a reorganization. The distribution of the debtor's assets again turns not on the bargain struck before the fact that was readily visible to other creditors but rather on decisions made on the eve of bankruptcy.[121]

## B. *Withdrawal Rights and* Charter Communications

Bankruptcy judges are not asked to endorse a general principle, but rather interpret particular provisions of the Bankruptcy Code. But judges' understanding of general principles drive the outcome. This understanding led the judge in *General Growth* to find that the filing was in good faith and that the directors could and were indeed obliged to look

---

118. See Sam Eckstein, Harbor Mall Owner Files Bankruptcy Due to Debt, Johns Hopkins News-Letter (Apr. 29, 2009), http://www.jhunewsletter.com/2009/04/29/harbor-mall-owner-files-bankruptcy-due-to-debt-12558 (on file with the *Columbia Law Review*) ("GGP also owns Towson Commons, which has not filed for bankruptcy."). It appears that Towson Commons may have been left out of the bankruptcy because it had little to add to the going-concern value of General Growth, and therefore General Growth was not concerned with its withdrawal. See Loni Ingraham, Decision on Towson Commons Auction Greeted with Optimism, Towson Times (Mar. 2, 2011), http://archives.explorebaltimorecounty.com/news/111790/decision-towson-commons-auction-greeted-with-optimism (on file with the *Columbia Law Review*) (noting retail space at Towson Commons had been "vacant for some time").

119. See Ingraham, supra note 118 (detailing foreclosure and auction processes for Towson Commons).

120. Cf. supra notes 79–81 and accompanying text (contrasting constraints on debtor misbehavior of favoring one creditor over another when separate legal entities are treated as one enterprise with constraints from when they are treated separately).

121. Cf. supra note 49 and accompanying text (noting under bankruptcy tailoring approach, withdrawal rights are readily visible to investors before the fact).

to the interests of other members of the corporate group.[122] The same force can be seen at work in two key judicial decisions in the reorganization of Charter Communications. The first involved the question of how creditors of separate legal entities would be classified for purposes of approving the plan. The second involved the question of how the default of the primary debtor would affect creditors' rights against other solvent affiliates.

Charter Communications was the fourth largest cable television provider in the country.[123] Under the leadership of Microsoft cofounder Paul Allen, it possessed an elaborate capital structure and became seriously overleveraged.[124] In late 2008 and early 2009, Charter found itself unable to meet its obligations.[125] It proposed a restructuring of its debt that many of its creditors accepted, but some did not.[126]

The first issue of interest arose because one of its most recalcitrant creditors was the only creditor of a legal entity in Charter's corporate group.[127] The reorganization plan for Charter as a whole required restructuring this creditor's debt and doing this over its objection was difficult under existing law when it was the debtor's sole creditor.

Section 1129(a)(10) of the Bankruptcy Code provides that a court cannot confirm a plan unless at least one class of impaired claims approves the plan.[128] The recalcitrant creditor argued that this was a show-stopper. As it was the only creditor of the relevant legal entity, no plan could be confirmed without its consent, and its consent, it promised, would never be forthcoming. That its debtor was part of a larger corporate group was irrelevant.[129] Nor did it matter that the legal entity was a holding company that was not an operating business and had no independent existence. Bankruptcy operated on legal entities, not on firms.[130]

The debtor insisted that the Bankruptcy Code, properly understood, required looking at the firm as a whole. The debtor argued that it was wrong to focus narrowly on a legal entity that was, by all accounts, seam-

---

122. See *Gen. Growth Props.*, 409 B.R. at 66–70.

123. JPMorgan Chase Bank v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns), 419 B.R. 221, 230 (Bankr. S.D.N.Y. 2009).

124. Id. at 232.

125. Id. at 233.

126. Id.

127. Id. at 266.

128. 11 U.S.C. § 1129(a)(10) (2006).

129. See *Charter Commc'ns*, 419 B.R. at 266 (noting creditor's argument that section 1129(a)(10) must be applied on per-debtor and not per-plan basis).

130. See Redacted Objection of Law Debenture Trust Co. of New York to the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code at 35–39, *Charter Commc'ns*, 419 B.R. 221 (No. 09-11435) ("[U]nless and until [subsidiary's] creditors . . . have been paid in full . . . no other creditors of any other entity can share in such distributions.").

lessly folded into the large cable and broadband business.[131] Because creditors of the larger corporate group overwhelmingly favored the plan, a narrow focus on a single legal entity that had one creditor was inappropriate. Chapter 11 was about preserving the value of the business as a whole, not about a holding company embedded inside of it.[132]

The bankruptcy judge accepted the debtor's argument:

> [I]t is appropriate to test compliance with section 1129(a)(10) on a per-plan basis, not . . . on a per-debtor basis. Here, the evidence supports a finding that the business of Charter is managed . . . on an integrated basis making it reasonable and administratively convenient to propose a joint plan. That joint Plan has been accepted by numerous other impaired accepting classes, thereby satisfying the requirement of section 1129(a)(10).[133]

There is a little hand-waving here. While it may be "reasonable" and "convenient" to allow all investors in a firm to decide on the plan of reorganization, there is nothing in the Bankruptcy Code that deals explicitly with "joint plans" at all, let alone anything to suggest that the confirmation standards of a "joint plan" look to the firm as a whole rather than the legal entity. Treating the plans of all the legal entities as if there were one joint plan dampens withdrawal rights.

*Charter Communications* raised a second issue about the treatment of legal entities in a corporate group that is reorganized under the Bankruptcy Code. It involved the same objecting creditor and the same legal entity. The debtor was obliged to pay the objecting creditor in full because of the absolute priority rule.[134] There was, however, a dispute over the form that the repayment had to take. In particular, the debtor wanted to reimpose the terms of the original loan. (These were far more favorable to the debtor than what loan terms would be under existing market conditions.) For its part, the creditor wanted to exercise its right to terminate the loan and be paid its principal at the existing market rate. The creditor argued that the debtor had lost its right to reinstate the original terms of the loan because of an incurable default under the terms of the loan agreement.[135] The loan agreement included a covenant that a bankruptcy petition filed by any entity related to the debtor ter-

---

131. Reorganizing Debtors' Post-Trial Brief in Support of Confirmation of the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code at 85–87, *Charter Commc'ns*, 419 B.R. 221 (No. 09-11435).

132. Id.

133. *Charter Commc'ns*, 419 B.R. at 266 (internal citations omitted).

134. The absolute priority rule is the core bankruptcy principle that requires that all assets be "distributed in strict adherence to the contractual priority that exists for liquidation outside bankruptcy." Anthony J. Casey, The Creditors' Bargain and Option Preservation Priority in Chapter 11, 78 U. Chi. L. Rev. 759, 763–65 (2011) (examining effects of absolute priority and suggesting potential alternative priority rule).

135. *Charter Commc'ns*, 419 B.R. at 243.

minated the loan, and there were many such entities in Charter's corporate group.[136] Once such a default has occurred, it cannot be cured,[137] and incurable defaults, if enforceable, limit a debtor's reinstatement right.[138]

The Bankruptcy Code says nothing explicitly about defaults linked to the bankruptcy filings of third parties. It does, however, refuse to enforce defaults linked to the debtor's own insolvency or financial question.[139] Investors as a group are better off when the Bankruptcy Code renders unenforceable clauses that automatically terminate a contract merely because a bankruptcy petition is filed. Defaults should be triggered by events connected to the economic condition of the firm, not because of its need to use a collective bankruptcy proceeding to sort out issues among its investors.[140] But none of the investors have the ability to monitor the debtor and prevent such "ipso facto" clauses from creeping into agreements. By making such clauses unenforceable, the third party's withdrawal right is effective only if the debtor cannot meet its contractual obligations. As long as the third party is paid everything it is promised on exactly the same terms, it has nothing to complain about.

But again, the twist in *Charter Communications* was that the clause was triggered by the bankruptcy of a related entity and not the legal entity that owed the debt. The crucial legal question was whether bankruptcy law enforces such clauses when they are tied, not to the debtor itself, but to the insolvency of related entities. The lender argued that the Bankruptcy Code renders unenforceable only clauses tied to the bankruptcy of its own debtor, not the bankruptcy of other entities, even when those entities were part of the same corporate group.[141]

The ability to insist on new terms is a type of exit right. It gives an investor the ability to cancel the old deal and insist on a new one. The court in *Charter Communications*, however, rejected this argument, and again focused on the corporate group rather than on the specific entity. Reasoning that "Charter is an integrated enterprise, and the financial

---

136. See id. at 236 (noting loan covenant "referencing the ability of structurally subordinated companies in the capital structure to pay debts as they come due").

137. The cross-default of payment and subsequent bankruptcy filing of a related-entity debtor will be logically incurable—the bell cannot be unrung. More specifically, unless the creditors of that related-entity debtor can be paid in full immediately (unlikely if the related-entity debtor is insolvent), the cross-default cannot be cured.

138. 11 U.S.C. § 1124(2) (2006) (setting forth requirements for reinstatement).

139. Id. § 365(e)(1) ("Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated . . . .").

140. See supra note 2 and accompanying text (noting idea that bankruptcy proceeding makes investors better off as group).

141. See *Charter Commc'ns*, 419 B.R. at 250 (summarizing lender's argument).

condition of one affiliate affects the others," the court forced the lender to remain a lender under the original terms of its loan.[142]

## V. WITHDRAWAL RIGHTS AND THIRD PARTIES

Investors possess other ways of creating withdrawal rights in addition to partitioning assets within a corporate group. Investors might be able to achieve the same outcome by slicing off a group of assets and offering ownership (but not control) to a third party. When the slice of assets are integral to the going concern of the enterprise, third-party ownership of the asset will provide the same withdrawal right and incentive alignment that HedgeFund enjoyed with respect to Team. Stakeholders can exercise withdrawal rights because bankruptcy sees them as third parties rather than investors.

Courts have typically distinguished between investors on the one hand and third parties on the other. The former must participate in the bankruptcy process, while the latter can deal with the debtor at arm's length. Courts today typically see the question turning on whether someone is a "true lessor" or a "true bailor" rather than a secured party. In such inquiries, sight of the role that withdrawal rights play is usually lost.[143] What matters should not be so much the attributes of the substantive right upon which courts typically focus. Instead, the important factors are whether the investors in the enterprise as a group understand the nature of the right and whether the party who possesses it can exercise it in a way that has the appropriate disciplining effect on the debtor before the fact. These are the attributes that the withdrawal right has when created through tailoring of the corporate form, and also the attributes that make it a useful tool for investors.

### A. *Withdrawal Rights, True Lessors, and True Bailors*

Third parties who own an asset can insist on being paid according to the contract terms, and an investor can try to opt out of bankruptcy by recasting itself as a third party. The trends in bankruptcy cases discussed throughout this Article limit the ability of parties to do this. So do spe-

---

142. Id. at 251. The same judge who presided over *Charter Communications* reached a similar conclusion in the *Lehman Brothers* bankruptcy. See Lehman Bros. Special Fin., Inc. v. BNY Corporate Tr. Servs. (In re Lehman Bros. Holdings Inc.), 422 B.R. 407, 420 (Bankr. S.D.N.Y. 2010) (finding bankruptcy of related entity triggered rule against ipso facto clause).

143. Generally an agreement is deemed a security agreement, despite being characterized by the parties as a lease, if the consideration paid by the lessee is an obligation not subject to termination by the lessee and if several other conditions are met. See, e.g., WorldCom, Inc. v. Gen. Elec. Global Asset Mgmt. Servs. (In re WorldCom, Inc.), 339 B.R. 56, 63–75 (Bankr. S.D.N.Y. 2006) (analyzing whether agreement is lease or security agreement); In re Homeplace Stores, Inc., 228 B.R. 88, 92 (Bankr. D. Del. 1998) (outlining framework for determining if "lease" is security agreement).

cific rules about how the courts treat leases.[144] For example, in the sports franchise scenario, Team may organize itself as a single entity and sell Stadium to HedgeFund, which in turn leases it back to Team. If this deal structure were respected, HedgeFund could again largely insulate itself from the bankruptcy.

But the bankruptcy court might recharacterize HedgeFund as a creditor with a security interest in the stadium rather than a lessor. Once recharacterized as a secured creditor, the lessor has no ability to insist on enforcing the lease according to its terms.[145] In this context, courts have not focused on the question of when and under what circumstances a party should be able to enjoy a withdrawal right. Instead, they have focused more narrowly on the question of how many sticks in the Hohfeldian bundle[146] the owner-lessor must retain in order to be a true lessor rather than a secured creditor.[147]

In many instances, a firm will lease assets that are not highly specialized. In these cases, the difference between finding a transaction to be a lease or a secured transaction will not make much difference.[148] The debtor will have to pay market value even if it is a secured transaction,[149] and the debtor can reject the lease if the lease obligations are above market.[150] Regardless of whether it is a lessor or a secured creditor, the third party can receive no more than what the debtor would have to pay to acquire the same asset from someone else. There are times, however, when the leased asset is highly specialized. Here the characterization can make a big difference and the withdrawal right has the dynamic that has been discussed.

One example of this can be found in the *United Airlines* bankruptcy.[151] There the parties structured the financing of the terminal at

---

144. See, e.g., United Airlines, Inc. v. HSBC Bank USA, N.A., 416 F.3d 609, 618 (7th Cir. 2005) (finding transaction is "secured loan," not "lease" for purpose of section 365 of Bankruptcy Code).

145. Id. at 612.

146. See Wesley Newcomb Hohfeld, Some Fundamental Legal Conceptions as Applied in Judicial Reasoning, 23 Yale L.J. 16, 28–30 (1913) (defining property as combination of rights, privileges, powers, and immunities).

147. See supra note 144 and accompanying text (providing example of how courts apply recharacterization test).

148. To be sure, if the transaction is a true lease, the lessor will not face the same filing obligation that a secured creditor faces, but filing a U.C.C.-1 form is cheap, and well-advised lessors will file one in any event. See Douglas G. Baird & Thomas H. Jackson, Possession and Ownership: An Examination of the Scope of Article 9, 35 Stan. L. Rev. 175, 187–88 (1983) [hereinafter Baird & Jackson, Possession and Ownership] (noting attributes of lease or secured transaction have nothing to do with problem of "ostensible ownership").

149. 11 U.S.C. § 1129(b)(2)(A) (2006) (setting forth requirements that plan must provide for secured creditors).

150. 11 U.S.C. § 365(b) (setting forth debtors' rights to reject unexpired leases).

151. United Airlines, Inc. v. HSBC Bank USA, N.A., 416 F.3d 609 (7th Cir. 2005).

San Francisco airport as a lease.[152] Because the terminal is a tailored asset that United could not readily replace, the lessor would have been able to exact a share of United's value as a going concern had it been able to bargain. Judge Easterbrook recharacterized the lease as a secured loan,[153] and the lessor was therefore unable to use this ability to negotiate for a share of the going concern. Instead, United could continue its use of the facilities while making a fraction of the agreed-upon payments.[154]

Another example can be found in the automobile industry where it is common for carmakers to own their own tooling and lease them to their suppliers.[155] Plastech Engineering was a tier-one automotive-parts supplier that made injected plastic products for Ford, GM, and Chrysler.[156] It employed thousands and had annual sales of over $1 billion.[157] Much of the equipment Plastech operated was tooling specially designed for particular car models and so was worthless for any other use. Plastech encountered financial distress and could not pay its investors in full. It filed for bankruptcy.[158] Chrysler, along with other automobile manufacturers, had the right to withdraw tooling from Plastech and turn it over to another supplier. Chrysler argued that it was free to exercise this right, notwithstanding the bankruptcy filing.[159]

The relationship between Plastech and Chrysler is one of a sort that economists have been studying intensively for many decades. Vertical integration eliminates the tensions that arise when two different firms own assets that must be used in conjunction with one another.[160] Hence, it might be expected that a car manufacturer such as Chrysler would own Plastech outright. Because Plastech's assets are specific to Chrysler's cars, Chrysler should be their residual owner, everything else equal.[161]

But everything else is not equal. A firm such as Plastech enjoys economies of scale that allow it to make injected molding for a number of

---

152. Id. at 611.

153. Id. at 618.

154. Id.

155. See infra note 178 and accompanying text (listing examples).

156. Chrysler LLC v. Plastech Engineered Prods., Inc. (In re Plastech Engineered Prods., Inc.), 382 B.R. 90, 95 (Bankr. E.D. Mich. 2008).

157. Id.

158. Id.

159. Id. at 103–04.

160. See generally Sanford J. Grossman & Oliver D. Hart, The Costs and Benefits of Ownership: A Theory of Vertical and Lateral Integration, 94 J. Pol. Econ. 691 (1986) (developing theory of ownership based on curing distortions of ex post opportunistic behavior on ex ante investment by allocating ownership to one party); see also Benjamin Klein, Robert G. Crawford & Armen A. Alchian, Vertical Integration, Appropriate Rents, and the Competitive Contracting Process, 21 J.L. & Econ. 297, 298–99 (1978) (highlighting relationship-specific investments as situation prone to opportunistic behavior).

161. See Grossman & Hart, supra note 160, at 716–17 ("Integration is . . . optimal when one firm's investment decision is particularly important relative to the other firm's.").

*COLUMBIA LAW REVIEW*          [Vol. 113:1

different manufacturers. It might become vertically integrated with Chrysler or Ford or GM, but it cannot vertically integrate with all of them. To take advantage of economies of scale, Plastech needs to enter into contracts with multiple manufacturers,[162] and these contracts need to be designed in a way that minimizes the possibility that Chrysler will seek to take advantage of Plastech or vice versa.

If Plastech commits its capital to tooling useful only for making parts for Chrysler, Chrysler might be able to take advantage of it subsequently.[163] Contracts can minimize this hold-up threat, but they cannot eliminate it.[164] To prevent such advantage-taking, Plastech might require Chrysler to finance its acquisition of the tooling. With such financing, Plastech is not making an enormous relationship-specific investment that might put it at risk of hold-up behavior by Chrysler.

Such an arrangement, however, does not completely solve the problem. Even if Chrysler cannot hold up Plastech, Plastech may still be able to hold up Chrysler. The tooling is hard for others to recreate, and Chrysler's own assembly line depends on a steady stream of parts from Plastech. A small delay from Plastech could be costly. Perhaps because of such risks, in the automobile industry it is common for each automobile manufacturer to retain ownership of the tooling its suppliers use. The parties capture the benefit of customized tooling, but with fewer risks of advantage-taking. Plastech loses the ability to threaten to shut down Chrysler to the extent that Chrysler has the ability to remove the tooling and give it to another supplier.

By the common account,[165] even this solution is imperfect. When there are different owners of assets that are most valuable when used together, one can minimize the hold-up problems, but one cannot elimi-

---

162. The limits that economies of scale and scope can place on vertical integration occur in many contexts. John Morley provides an interesting analysis of this impact in the investment fund industry. See John Morley, The Separation of Investments and Management 3 (Mar. 1, 2012) (unpublished manuscript), available at http://www.law.yale.edu/documents/pdf/cbl/Morley_The_Separation_of_Investments_and_Management.pdf (on file with the *Columbia Law Review*) (arguing that separating investment and management is necessary to reduce resulting liability and risk spillovers as well as to limit managerial conflicts of interest).

163. See Grossman & Hart, supra note 160, at 692 (noting "contractual relationship between a separately owned buyer and seller will be plagued by opportunistic and inefficient behavior" where "asset specificities" exist); Klein, Crawford & Alchian, supra note 160, at 298 (noting ways in which relationship-specific investments are prone to opportunistic behavior).

164. See Klein, Crawford & Alchian, supra note 160, at 325–36 (suggesting ways in which opportunistic behavior can be mitigated).

165. See Philippe Aghion & Richard Holden, Incomplete Contracts and the Theory of the Firm: What Have We Learned over the Past 25 Years?, 25 J. Econ. Persp. 181, 183–85 (2011) (summarizing incomplete contract and vertical integration literature).

nate them entirely.[166] When Chrysler owns the tooling, it has the ability
to withdraw the assets and use this threat to capture investments that
Plastech has made in the relationship. Plastech may in turn underinvest
in the relationship, such as by buying equipment that can be readily used
to make other products.

The dynamics explored in this Article, however, suggest that the
hold-up costs may not be as large as commonly supposed.[167] As long as
the ability to withdraw the tooling is state-contingent, Plastech can pro-
tect itself by investing resources to ensure that this state never material-
izes.[168] Moreover, these investments (such as hiring better managers and
otherwise ensuring Plastech stays out of financial distress) may them-
selves be mutually beneficial. The withdrawal right, in other words, is suf-
ficiently tailored so that the opportunity to capture going-concern value
produces healthy incentives. Far from being necessary evils, they may be
beneficial.[169]

From the perspective of traditional bankruptcy theory, Chrysler is as
much an investor in the venture as someone who provided Plastech with
the capital to buy its other equipment. Chrysler is retaining the same
rights for which HedgeFund would bargain if it were providing the fi-
nancing for the equipment and insisted that the equipment be put in a
separate legal entity.

Just as the court in *General Growth* was inclined to treat investors in
Harborplace as if they were secured creditors of General Growth as a
whole,[170] bankruptcy judges may be inclined to treat Chrysler in a way
that slights its withdrawal right. Even if ultimately unwilling to rechar-
acterize Chrysler's right as a security interest or otherwise find some other
way to deny it the ability to withdraw the equipment, the bankruptcy
judge can delay lifting the automatic stay at the very outset of the case
just to ponder the question for a time.[171]

A delay of several months effectively deprives Chrysler of its ability to
enjoy the benefits that come with its withdrawal right. As seen with
HedgeFund and StadiumCo, when the highest and best use of Chrysler's

166. See supra note 163 (noting hold-up problem associated with relationship-spe-
cific assets).

167. See supra Part II.C (discussing bargaining dynamics in bankruptcy with entity
partitioning).

168. See supra notes 32, 33 and accompanying text (explaining state-contingent with-
drawal rights).

169. Again, there is nothing revolutionary in this observation. The basic mechanism
of structuring state-contingent rights to substitute for costly monitoring is well known. See
Aghion & Bolton, supra note 32, at 486 (emphasizing that debt's role in facilitating
monitoring arises out of entrepreneur-investor control allocation that debt induces).

170. See supra Part IV.A (analyzing *General Growth*).

171. See Chrysler LLC v. Plastech Engineered Prods., Inc. (In re Plastech Engineered
Prods., Inc.), 382 B.R. 90, 109 (Bankr. E.D. Mich. 2008) (explaining that competing inter-
ests balancing analysis may change later, compelling different result).

tooling is in Plastech, then the tooling will likely remain with Plastech regardless of whether Chrysler can exercise the withdrawal right. The ability to lift the stay will ordinarily affect the bargaining dynamics, not the ultimate outcome.[172] There is, however, a risk of bargaining failure and the loss of going-concern value that comes with it.[173] This risk is not trivial, but it should be appropriately discounted and weighed against the other costs of limiting Chrysler's ability to assert its withdrawal right.

This discussion focuses on the benefits that withdrawal rights bring even when Chrysler's removal of the tooling would destroy the synergy that existed between the tooling and Plastech's assets. Their benefits are even greater when everyone would be better off if Plastech were shut down and each carmaker bore the short-term costs of removing its tooling and giving it to another supplier. The inability of Plastech to reach a deal with Chrysler may reflect not bargaining failure, but rather Plastech's lack of value as a going concern. The withdrawal right provides a market test. Limiting Chrysler's ability to lift the automatic stay would undercut one of the virtues of the right to withdraw, a right that may work to the collective advantage of all.[174]

Chrysler's desire to enjoy the right to remove its tooling parallels the rights of HedgeFund in StadiumCo. When Chrysler entrusts the production of components to an upstream supplier like Plastech, Chrysler exposes itself to a variety of risks against which it cannot contract perfectly. Chrysler has to worry that Plastech will organize its affairs in a manner that exposes the supplier to the risk of financial distress in ways that Chrysler cannot observe. Chrysler wants to ensure that Plastech will minimize these risks and that Chrysler will not be in a position where it must look for another supplier or finance Plastech's reorganization when Plastech fails. Chrysler can give Plastech the incentive to ensure its financial house is in order through a structure that shifts going-concern value from Plastech to Chrysler in the event of financial distress. The withdrawal right gives such an incentive only if the bankruptcy judge is willing to enforce the right after the fact.

---

172. See supra Part II.A (discussing bargaining dynamics without automatic stay).

173. See supra Part III.B (discussing risk of bargaining failure). Not surprisingly, when the asset has no tie to the going concern, the risk of bargaining failure is zero. In *Plastech*, this could be seen in the consensual motions allowing owners of tooling that had yet to be installed to remove it. See, e.g., Stipulation with Respect to Relief from the Automatic Stay To Permit Johnson Controls, Inc. To Obtain Possession of Certain Tooling, *Plastech Engineered Prods.*, 2008 WL 5233014 (No. 08-42417).

174. Plastech failed several months into the bankruptcy after Chrysler and other buyers had pumped additional millions into it. Unable to reclaim its tooling, Chrysler had no choice but to subsidize its operations until it failed. See Ben Fidler, Plastech Rolls out of Ch. 11, The Deal (Jan. 8, 2009, 3:00 PM), http://pipeline.thedeal.com/tdd/ViewArticle.dl?id=10005223347 (on file with the *Columbia Law Review*) (describing Plastech's liquidation plan and Chrysler's role in it).

Quite apart from whether courts will respect Chrysler's withdrawal right, the right is effective under existing law only if Chrysler qualifies as a true bailor, rather than an investor with a security interest in a highly specialized asset. This question turns on whether Chrysler possesses sufficient attributes of ownership with respect to the tooling.[175] In the case itself, the question is relatively straightforward, given that the tooling is specialized for Chrysler's needs and Chrysler can redeploy it elsewhere.[176] These two factors alone are likely sufficient to make Chrysler a true bailor as opposed to a financing buyer. But this question of how many of the relevant attributes of ownership Chrysler possesses is entirely orthogonal to the question of whether it makes sense to allow a stakeholder such as Chrysler to possess a withdrawal right. While the benefits are the same, the costs may be higher than in those cases in which specialized assets are put in separate legal entities.

When investors create withdrawal rights by putting assets into discrete corporate entities, the withdrawal right is manifest to the relevant stakeholders.[177] Entrepreneur, Bank, and HedgeFund are all aware of the withdrawal rights that exist. Under the specific facts of *Plastech*, the withdrawal right may be similarly unproblematic. Hold-up opportunities and potentially destructive withdrawal rights are common and well understood in the automobile industry.[178] In other contexts, however, investors

---

175. See supra note 146 and accompanying text (noting courts have focused on narrow question of Hohfeldian bundle of sticks).

176. *Plastech*, 382 B.R. at 97 (noting unique use of tooling for specific customer and quoting from parties' agreement).

177. See supra note 49 and accompanying text (noting entity partitioning is readily visible to all investors and easy to verify).

178. The pervasiveness of these types of structures is evidence of this. Moreover, any review of first-day motions in an automotive-parts bankruptcy demonstrates the openness of the intricate web of withdrawal rights. See, e.g., Declaration of Thomas Musgrave in Support of the Debtors' First Day Motions at 5, In re J.L. French Auto. Castings, Inc., No. 09-12445 (Bankr. D. Del. July 13, 2009) ("Debtors generally manufacture highly specialized parts designed for a particular vehicle model or platform . . . . While the Debtors typically enter into long-term supply contracts, their customers do not provide any guarantees of future volumes . . . . Major new business launches . . . often require the Debtors to make substantial investments in new machining equipment."); id. at 41 ("[W]ithout timely delivery of key components, the Debtors' customers [the OEMs] cannot complete the assembly of vehicles they sell. . . . [A]ny delay in the receipt of key parts can cause enormous operational disruption and loss of revenue."); id. at 42 (noting Debtor in turn relies on timely and uninterrupted supply from its component parts suppliers to survive); see also Motion of the Debtors for Entry of Interim & Final Orders (A) Authorizing Them To Pay Prepetition Claims of Certain Suppliers; & (B) Approving Procedures Related Thereto at 5 n.3, In re Visteon Corp., No. 09-11786 (Bankr. D. Del. May 28, 2009) ("Failure to timely deliver parts most assuredly would lead to the temporary shutdown of the production facilities of its customers who . . . typically maintain little in the way of safety stock. The consequential damages—and setoff claims—are outsized and amount rapidly. *The reputational damage from forcing a shutdown is more serious still.*" (emphasis added)); id. at 5 (noting further that Debtors cannot survive without continuous supply of component parts "at their precise design specifications at exactly the right place at exactly the right time").

will not find it so easy to distinguish the true bailor from the financing buyer.

Some have proposed imposing upon true bailors reporting obligations identical to those imposed upon secured creditors.[179] Even this, however, may be insufficient. What matters is not merely making other investors aware of the competing ownership claim, but also that that claim is accompanied by a withdrawal right. As emphasized in Part II, HedgeFund stands in a dramatically different position when it invests in StadiumCo than when it is merely a creditor of TeamCo and holds Stadium as collateral. To work effectively, withdrawal rights need to have clear contours and be visible to all involved.

## B. *Collective Withdrawal*

Plastech needed to navigate its relationship with the other automobile manufacturers at the same time it was bargaining with Chrysler. If these manufacturers also have the right to withdraw their tooling, Plastech needs to reach a bargain with all of them simultaneously. On its face, the possibility of bargaining failure is high, but the repeat nature of the relationship between Ford, Chrysler, and GM may mitigate this problem.[180]

Plastech is not the only supplier that provides parts to Chrysler, Ford, and General Motors. Indeed, the automotive supply industry is a complicated web of multilateral suppliers. GM and Ford might be content to let Chrysler play hard ball with Plastech vis-à-vis the Chrysler-specific assets. Chrysler would be reluctant to insist on a deal that would have the effect of diverting value from the other carmakers to it because of the implicit threat that they would respond in kind with other suppliers. Bankruptcies of automotive-parts suppliers arise often enough (and have throughout the history of the industry)[181] that cooperation can arise through repeat play.

In this environment, as in others, the focus of the inquiry needs to be on the ability of parties to tailor the reach of bankruptcy law. As the automobile industry has evolved, a pattern has emerged in which some of the largest parts suppliers (such as Delphi or Visteon) have their principal relationships with one manufacturer while doing business with oth-

179. See, e.g., Baird & Jackson, Possession and Ownership, supra note 148, at 189–90 (contending that, in general, both should have obligation to report in order to cure ostensible ownership problems).

180. See e.g., Edward J. Green & Robert H. Porter, Noncooperative Collusion Under Imperfect Price Information, 52 Econometrica 87 (1984) (showing how cooperation can be equilibrium when players interact repeatedly).

181. E.g., *J.L. French Auto. Castings*, No. 09-12445; *Visteon*, No. 09-11786; Kurak v. Dura Auto. Sys., Inc. (In re Dura Auto. Sys., Inc.), 379 B.R. 257 (Bankr. D. Del. 2007); In re J.L. French Automotive Castings, Inc., No. 06-10119 (Bankr. D. Del. filed Mar. 28, 2006); In re Delphi Corp., No. 05-44481 (Bankr. S.D.N.Y. filed Oct. 8, 2005).

ers as well.[182] In these arrangements, the principal customer may fill the role that Bank played vis-à-vis Entrepreneur. In other words, the withdrawal right is valuable to Chrysler both because it may be less able to monitor the supplier than other buyers and also because it needs a mechanism to ensure that the incentives of other buyers are aligned with its own.

The ability to withdraw firm-specific assets arises in other contexts, and again the value of the withdrawal right may turn on the ability of several third parties to act collectively. United's bankruptcy provides another illustration.[183] Special bankruptcy rules[184] give both lessors and secured creditors of aircraft the ability to take possession of the aircraft unless the debtor agrees to continue its obligations in full.

If an airline could readily enter the market and replace its airplanes, the dynamic this Part has been focusing on will not loom large. The lessor can threaten to withdraw the airplane, but this will not allow it to capture any of the going-concern value.[185] The airline can simply acquire another airplane to replace it. Nor can an airline threaten to pay less than the market value of the plane, given the ability of the lessors to take the plane back and lease again to a third party.

The bargaining dynamics arise because the value of an airplane in the hands of one airline is different from its value in the hands of another.[186] Each airline configures its airplanes in a different way. Airline customers pick half of the avionics on the typical plane they acquire.[187] To lease a plane that had once been part of United's fleet, another airline would have to factor in the costs of maintaining different spare parts and training its staff to accommodate the differences. United would face

---

182. See Oren Livne & Josh Simpson, Restructuring Visteon 9 (Apr. 10, 2012), available at http://www.turnaround.org/cmaextras/0.May2012-WinningPaper-NYU.pdf (on file with the *Columbia Law Review*) (showing thirty-eight percent of Visteon's business was with Ford in 2007); David Sedgwick, How Delphi Automotive Beat the Odds in Vast Corporate Turnaround, Crain's Detroit Bus. (Aug. 12, 2012, 1:50 PM), available at http://www.crainsdetroit.com/article/20120806/FREE/120809919/how-delphi-automotive-beat-the-odds-in-vast-corporate-turnaround (on file with the *Columbia Law Review*) (noting nineteen percent of Delphi's business remained with General Motors in 2011).

183. United Airlines, Inc. v. U.S. Bank N.A., 406 F.3d 918 (7th Cir. 2005).

184. 11 U.S.C. § 1110(a) (2006).

185. Cf. supra Part V.A (discussing hold-up problem in Chrysler-Plastech example).

186. See Efraim Benmelech & Nittai K. Bergman, Liquidation Values and the Credibility of Financial Contract Renegotiation: Evidence from U.S. Airlines, 123 Q.J. Econ. 1635, 1644–46 (2008) (exploring bargaining dynamics in wake of American's acquisition of TWA and showing liquidation value affects bargaining game).

187. See Daglar Cizmeci, An Examination of Boeing's Supply Chain Management Practices Within the Context of the Global Aerospace Industry 51 (June 2005) (unpublished M.Eng. thesis, Massachusetts Institute of Technology), available at http://dspace.mit.edu/bitstream/handle/1721.1/33315/62312684.pdf (on file with the *Columbia Law Review*) ("Currently, Boeing supplies approximately 50% of the avionics on its commercial aircraft. The remaining 50% is provided by customer-selected suppliers.").

similar costs in acquiring planes from others. For this reason, the aircraft lessors and the debtor in *United* found themselves in the bargaining game set out above.[188] The limited ability of the lessors to redeploy the airplanes affected the value of their exit option, but at the same time United's inability to replace the airplanes gave the lessors the ability to capture part of the value of the airline over and above the liquidation value of the planes.

At the outset of the case, the individual lessors were disorganized, and United had more planes than it needed. The threat of any individual lessor to withdraw a plane was not credible.[189] With respect to each of them, United could demand better terms on its lease without fearing that they would exercise their right to take their plane back. But eventually the investors in these airplanes organized themselves, and they threatened to withdraw their airplanes from United's fleet if United did not improve the terms it was offering.[190]

In another example of a court disinclined to allow parties to exercise withdrawal rights, the bankruptcy judge stayed the creditors' hands by issuing a temporary restraining order prohibiting the foreclosure of the planes.[191] This action can be viewed as completely consistent with core bankruptcy principles.[192] It was taken to preserve the going-concern value of the airline. A negotiation failure over a fleet of planes could shut an airline down. New aircraft take time to build, and aircraft obtained in the secondary market take time to integrate into an existing fleet. Time was not something United could spare.

On appeal, however, Judge Easterbrook found the legal argument (one based on a violation of antitrust laws) too weak a reed to support the general principle.[193] He reversed, underscoring the statutory "entitlement" of the lessors.[194] The Bankruptcy Code effectively gave both sides access to markets to frame their bargaining. It gave the creditors a withdrawal right that they would not otherwise have possessed if they were

---

188. See supra Part II.C (explaining bargaining dynamics in bankruptcy between debtor and creditor with withdrawal right).

189. See Benmelech & Bergman, supra note 186, at 1644–46 (showing reduction in airline's lease expenses of more than one-third when leases were renegotiated one-by-one).

190. United Airlines, Inc. v. U.S. Bank N.A., 406 F.3d 918, 921 (7th Cir. 2005).

191. Id. at 922.

192. See supra note 2 and accompanying text (explaining idea that "bankruptcy exists to solve . . . collective action problem among creditors").

193. See *United Airlines*, 406 F.3d at 921 ("Competition comes at the time loans are made; cooperation in an effort to collect as much as possible of the amounts due under competitively determined contracts is not the sort of activity with which the antitrust laws are concerned.").

194. Id. at 924; see also supra note 184 and accompanying text (explaining "special bankruptcy rules" for lessors and secured creditors of aircraft).

merely secured creditors of ordinary collateral.[195] Once the withdrawal right was established, it set the terms of the negotiations between the parties. The lessors did not repossess the entire fleet of airplanes, but rather used this power to extract better lease terms.[196]

Return to *General Growth*. If Harborplace's investors have the ability to act collectively with all those who invested in similar properties, their bargaining power would increase like that of the aircraft lessors in the *United* bankruptcy. The effect would be to raise the stakes considerably. Coordination makes the withdrawal right much more powerful in controlling management behavior, but it also raises the cost in the event of bargaining failure.

In a case such as *United,* whether parties should be denied the ability to exercise a withdrawal right turns critically on whether the rights result from a purposeful and well-tailored creditor's bargain, one that both allows for a collective regime, but limits its scope and the parties subject to it.[197] The reaction of the other creditors in the case suggests that the rights were not purposeful and that they were surprised. But one can be skeptical. Aircraft in a commercial fleet are relatively easy to assess, and the senior debt certificates were publicly traded. That made it foreseeable that parties would trade these rights and that they would (as they did) land in the hands of creditors who saw a benefit in acting together.

## C. *Executory Contracts and Withdrawal Rights*

The stylized hypothetical above examined relationships between the investors and Team and Stadium, where, in principle, the withdrawal rights were clear and well defined.[198] But the Dodgers' relationship with Major League Baseball is another matter altogether. It parallels in some ways the relationship between Plastech and Chrysler,[199] but Major League Baseball, unlike Chrysler, is not a true bailor, but rather a party to an executory contract.

The difficulties here can be seen by using a variation on the core hypothetical. In addition to needing Bank and HedgeFund as investors, Entrepreneur needs to find other teams to play against. Entrepreneur

---

195. It should be noted, however, that it took the lessors one more trip to the Seventh Circuit to establish their unequivocal right to remove their planes. See United Airlines, Inc. v. U.S. Bank N.A., 409 F.3d 812, 813 (7th Cir. 2005) (compelling district court to enforce its previous mandate granting immediate possession to lessors).

196. See Ronald Barliant, *United's Long Journey into the Far Reaches of § 1110,* Bankr. Strategist, Nov.–Dec. 2005, at 1, 6.

197. The intent of the parties might not be as relevant where, as here, the right was statutorily provided and hard to contract around. But the ability to foresee coordination still tells a great deal about whether the withdrawal right would have been priced into the investment agreement and whether it would have affected the debtor's behavior before the fact.

198. See supra Part II (discussing hypothetical Team-Stadium example).

199. See supra Part V.A (discussing this relationship).

will typically do this by entering into a contract with an association of other teams.[200] It enters into an agreement with League. League is an association of teams that want to play with each other. Even if it does not make a direct infusion of cash, League's own financial success—or more precisely the financial success of the other teams—depends crucially on each team being ruled effectively. League, however, has the same problems monitoring Entrepreneur as HedgeFund.

League will certainly be worried about Entrepreneur's management (of Team and Stadium) because it affects the value of League as a whole, just as a well-managed Plastech enhances Chrysler's value.[201] League will place several material default provisions[202] in its contract with Team, and it will no doubt make the contract nonassignable. When the fortune of TeamCorp declines, League may call a default. While League is not likely to withdraw its franchise rights, its ability to do so gives it the power to capture part of the going-concern value. The coin in which League is paid may be something that has the effect of enhancing the joint value of both Team and League. Rather than demand cash, League may, for example, demand a new manager who will be especially attentive to League's needs. To the extent that the old manager was tunneling assets out of the firm, League's exercise of its withdrawal rights does not necessarily leave other investors such as Bank worse off. Again, advantage-taking by League is limited, both because of reputational effects[203] and because the ability to exercise these rights is state-contingent.[204]

---

200. This is not, of course, to suggest that professional sports teams necessarily depend upon membership in a league. Some arrange matches on an entirely ad hoc basis. Indeed, two teams might agree to play only with each other. There is a professional team (the Washington Generals) that has faced only one opponent in its sixty-year history, losing thousands of games and winning only six, most recently in 1971. For additional information, see Player Opportunities, Washington Generals, http://www.washingtongenerals.com/opportunities.html (on file with the *Columbia Law Review*) (last visited Oct. 9, 2012) (emphasizing "important role" of team and "the final score does not always define winners").

201. See supra note 169 and accompanying text (explaining withdrawal right substitutes for costly monitoring by Chrysler and may be mutually beneficial).

202. These provisions could range from maximum debt ratios and minimum revenues to specific operations procedures that must be followed. The key is that League will be able to dictate precise events that will trigger default. And because the contract is nonassignable (and potentially nonassumable, see infra note 206) that default creates a withdrawal right.

203. Because of the close-knitted nature of the teams, their ability to exchange accurate information with one another, combined with repeated interaction with League, present conditions in which advantage-taking by League is minimized. See Robert C. Ellickson, Order Without Law: How Neighbors Settle Disputes 180–81 (1991) (discussing circumstances in which reputation leads to cooperative behavior).

204. See supra note 32 and accompanying text (explaining "state-contingent" feature of withdrawal right).

The type of withdrawal right that League enjoys turns on whether the franchise is assumable.[205] The question here is not whether the League has a withdrawal right but how absolute the right is. In earlier examples the distinction was between a third party who could withdraw upon default and a creditor who could be crammed down. Here the distinction is between withdrawal upon default and absolute withdrawal upon bankruptcy filing. If the franchise is assumable, it is treated like a lease. League enjoys a withdrawal right, but it is called off to the extent that Team cures past defaults. But if the franchise is nonassumable, then League is in the same position as Chrysler. League has the ability to withdraw the franchise notwithstanding the bankruptcy and notwithstanding Team's ability to cure and offer assurances of future performance.[206] As in *General Growth* and *Charter Communications*, everything turns on how the judge interprets the Bankruptcy Code's rules governing the assumption of executory contracts.[207] The judge's core intuitions about the costs and virtues of withdrawal rights will likely affect how the Bankruptcy Code is interpreted.

The conventional wisdom has long been that franchise rights, such as those involved here, should be freely assumable in bankruptcy as long as the debtor was willing and able to adhere to all the conditions of the franchise. The focus on withdrawal rights, as put forward in this Article, suggests a more complicated story. Withdrawal rights are not problematic if the existence of the withdrawal right is both clear and readily apparent to other investors. Under existing law, the Major League Baseball franchise is merely a contract between a third party and the debtor. Other stakeholders have no easy way to learn its contours or how it changes over time.

The problem with the withdrawal rights in cases like *United*, *Plastech*, and *Dodgers* may not be so much about whether they exist, but rather that existing law does too little to make them discrete and readily visible. In the case of the true-lease/lease-intended-for-security divide, the outcome turns on a multifactored test. It looks to many attributes that are invisible to other investors and that can change over time, such as the value of the

---

205. In bankruptcy a debtor has the right with some limitations to assume (continue the obligations on both sides) or reject (and treat as a claim for damages for breach) executory contracts. 11 U.S.C. § 365 (2006).

206. Because the contract is nonassignable, League may argue that it is also nonassumable. The law here is unsettled. The Ninth Circuit has found such contracts nonassumable, relying on what it found to be unequivocal language in the Bankruptcy Code. See Perlman v. Catapult Entm't, Inc., 165 F.3d 747, 753 (9th Cir. 1999) (holding debtor-in-possession may not assume patent licenses over licensor's objection (citing 11 U.S.C. § 365(c)(1) (1994))). Consistent with their impulse not to allow parties to exercise withdrawal rights, bankruptcy judges tend to find such contracts assumable. See, e.g., In re Adelphia Commc'ns Corp., 359 B.R. 65, 72 (Bankr. S.D.N.Y. 2007) ("[T]o the extent applicable law imposes restrictions on the ability to assign the franchise agreements, it does not place restrictions on the ability to assume them.").

207. 11 U.S.C. § 365 (2006).

*COLUMBIA LAW REVIEW* [Vol. 113:1

third party's reversionary interest.[208] Unlike a withdrawal right created through entity partitioning,[209] the right is both infinitely malleable and uncertain. The law has not provided parties with the necessary building blocks.

## CONCLUSION

Withdrawal rights are an integral part of the law of corporate reorganizations, and they have been neglected for far too long. There is nothing mandatory about rules like the automatic stay when assets can be partitioned off into legal entities that never enter bankruptcy. Nor are these withdrawal rights necessarily problematic. Courts may have been wrong to treat withdrawal rights as unwelcome intrusions on the collective norms of bankruptcy. At the same time, it should not be thought that they come at little risk.

The justification for withdrawal rights set out in this Article turns crucially on the ability of investors as a group to shape them and use them in a way that is mutually beneficial. This Article has suggested that creating withdrawal rights through entity partitioning seems desirable precisely because the legal rules do not allow such withdrawal rights to be fashioned under the cover of darkness. As long as courts respect corporate form, there is no ambiguity about whether they exist.

By partitioning assets of one economic enterprise into different legal entities, investors can create a tailored bankruptcy regime. In this way, legal entities serve as building blocks that can be combined to create specific and varied but transparent investor withdrawal rights. By allowing a limited number of investors to opt out of bankruptcy in a particular, discrete, and visible way, investors as a group may be able to both limit the risk of bargaining failure and at the same time enjoy the disciplining effect that a withdrawal right brings with it. Whether this preliminary assessment is correct, however, is not nearly as important as understanding the role that withdrawal rights play under existing law and their part in the much larger challenge of integrating a theory of the firm with the law of corporate reorganizations.

---

208. See supra note 146 and accompanying text (noting courts tend to focus on inquiring about attributes of ownership).

209. See supra Part I.B (discussing entity partitioning).

*NO EXIT?*

SELECTED BIBLIOGRAPHY

Adler, Barry E., Game-Theoretic Bankruptcy Valuation, 41 J. Legal Stud. 209 (2012).

Aghion, Philippe & Patrick Bolton, An Incomplete Contracts Approach to Financial Contracting, 59 Rev. Econ. Stud. 473 (1992).

Aghion, Philippe & Richard Holden, Incomplete Contracts and the Theory of the Firm: What Have We Learned over the Past 25 Years?, 25 J. Econ. Persp. 181 (2011).

Avery, Christopher & Peter B. Zemsky, Money Burning and Multiple Equilibria in Bargaining, 7 Games & Econ. Behav. 154 (1991).

Ayotte, Kenneth & Stav Gaon, Asset-Backed Securities: Costs and Benefits of "Bankruptcy Remoteness," 24 Rev. Fin. Stud. 1299 (2011).

Ayotte, Kenneth M. & Edward R. Morrison, Creditor Control and Conflict in Chapter 11, 1 J. Legal Analysis 511 (2009).

Ayres, Ian, Regulating Opt-Out: An Economic Theory of Altering Rules, 121 Yale L.J. 2032 (2012).

Baird, Douglas G., Notice Filing and the Problem of Ostensible Ownership, 12 J. Legal Stud. 53 (1983).

Baird, Douglas G. & Thomas H. Jackson, Bargaining After the Fall and the Contours of the Absolute Priority Rule, 55 U. Chi. L. Rev. 738 (1988).

Baird, Douglas G. & Thomas H. Jackson, Possession and Ownership: An Examination of the Scope of Article 9, 35 Stan. L. Rev. 175 (1983).

Baird, Douglas G. & Randal C. Picker, A Simple Noncooperative Bargaining Model of Corporate Reorganizations, 20 J. Legal Stud. 311 (1991).

Baird, Douglas G. & Robert K. Rasmussen, Antibankruptcy, 119 Yale L.J. 648 (2010).

Baird, Douglas G. & Robert K. Rasmussen, Private Debt and the Missing Lever of Corporate Governance, 154 U. Pa. L. Rev. 1209 (2006).

Baliga, Sandeep & Roberto Serrano, Multilateral Negotiations with Private Side-Deals: A Multiplicity Example, 3 Econ. Bull., no. 1, 2001.

Barliant, Ronald, United's Long Journey into the Far Reaches of § 1110, Bankr. Strategist, Nov.–Dec. 2005.

Benmelech, Efraim & Nittai K. Bergman, Liquidation Values and the Credibility of Financial Contract Renegotiation: Evidence from U.S. Airlines, 123 Q.J. Econ. 1635 (2008).

Bolton, Patrick & David S. Scharfstein, Optimal Debt Structure and the Number of Creditors, 104 J. Pol. Econ. 1 (1996).

Casey, Anthony J., The Creditors' Bargain and Option Preservation Priority in Chapter 11, 78 U. Chi. L. Rev. 759 (2011).

Chae, Suchan & Jeong-Ae Yang, An N-Person Pure Bargaining Game, 62 J. Econ. Theory 86 (1994).

Cizmeci, Daglar, An Examination of Boeing's Supply Chain Management Practices Within the Context of the Global Aerospace Industry (June 2005) (unpublished M.Eng. thesis, Massachusetts Institute of Technology), available at http://dspace.mit.edu/bitstream/handle/1721.1/33315/62312684.pdf.

Clement, W. Rodney Jr. & H. Scott Miller, General Growth: Special Purpose Entities (Barely) Survive First Bankruptcy Test, Prob. & Prop., Mar.–Apr. 2011.

Coase, R.H., The Nature of the Firm, 4 Economica 386 (1937).

Dalmazzo, Alberto, Outside Options in a Bargaining Model with Decay in the Size of the Cake, 40 Econ. Letters 417 (1992).

Ellickson, Robert C., Order Without Law: How Neighbors Settle Disputes (1991).

Green, Edward J. & Robert H. Porter, Noncooperative Collusion Under Imperfect Price Information, 52 Econometrica 87 (1984).

Grossman, Sanford J. & Oliver D. Hart, The Costs and Benefits of Ownership: A Theory of Vertical and Lateral Integration, 94 J. Pol. Econ. 691 (1986).

Hansmann, Henry & Reinier Kraakman, Organizational Law as Asset Partitioning, 44 Eur. Econ. Rev. 807 (2000).

Hohfeld, Wesley Newcomb, Some Fundamental Legal Conceptions as Applied in Judicial Reasoning, 23 Yale L.J. 16 (1913).

Huang, Chen-Ying, Multilateral Bargaining: Conditional and Unconditional Offers, 20 Econ. Theory 401 (2002).

Iacobucci, Edward M. & George G. Triantis, Economic and Legal Boundaries of Firms, 93 Va. L. Rev. 515 (2007).

Jackson, Thomas H., The Logic and Limits of Bankruptcy Law (1986).

Klee, Kenneth N., All You Ever Wanted To Know About Cram Down Under the New Bankruptcy Code, 53 Am. Bankr. L.J. 133 (1979).

Klein, Benjamin, Robert G. Crawford & Armen A. Alchian, Vertical Integration, Appropriate Rents, and the Competitive Contracting Process, 21 J.L. & Econ. 297 (1978).

Krishna, Vijay & Roberto Serrano, Multilateral Bargaining, 63 Rev. Econ. Stud. 61 (1996).

Levmore, Saul, Monitors and Freeriders in Commercial and Corporate Settings, 92 Yale L.J. 49 (1982).

Livne, Oren & Josh Simpson, Restructuring Visteon (Apr. 10, 2012), available at http://www.turnaround.org/cmaextras/0.May2012-WinningPaper-NYU.pdf.

Merrill, Thomas W. & Henry E. Smith, Optimal Standardization in the Law of Property: The Numerus Clausus Principle, 110 Yale L.J. 1 (2000).

Morley, John, The Separation of Investments and Management (Mar. 1, 2012) (unpublished manuscript), available at http://www.law.yale.edu/documents/pdf/cbl/Morley_The_Separation_of_Investments_and_Management.pdf.

Morrison, Edward R., Bankruptcy Decision Making: An Empirical Study of Continuation Bias in Small Business Bankruptcies, 50 J.L. & Econ. 381 (2007).

Picker, Randal C., Security Interests, Misbehavior, and Common Pools, 59 U. Chi. L. Rev. 645 (1992).

Rasmussen, Robert K., Debtor's Choice: A Menu Approach to Corporate Bankruptcy, 71 Tex. L. Rev. 51 (1992).

Roberts, Michael R. & Amir Sufi, Control Rights and Capital Structure: An Empirical Investigation, 64 J. Fin. 1657 (2009).

Rubinstein, Ariel, Perfect Equilibrium in a Bargaining Model, 50 Econometrica 97 (1982).

Schwartz, Alan, A Contract Theory Approach to Business Bankruptcy, 107 Yale L.J. 1807 (1998).

Scott, Robert E., A Relational Theory of Secured Financing, 86 Colum. L. Rev. 901 (1986).

Scott, Robert E., Rethinking the Regulation of Coercive Creditor Remedies, 89 Colum. L. Rev. 730 (1989).

Sexton, Anthony, Indubitably Uncertain: Philadelphia Newspapers and the Role of Valuation Uncertainty in Attempted Cramdown of All-Equity Plans, 28 Emory Bankr. Dev. J. 55 (2011).

Shaked, Avner & John Sutton, Involuntary Unemployment as a Perfect Equilibrium in a Bargaining Model, 52 Econometrica 1351 (1984).

Squire, Richard, Strategic Liability in the Corporate Group, 78 U. Chi. L. Rev. 605 (2011).

Sutton, John, Non-Cooperative Bargaining Theory: An Introduction, 53 Rev. Econ. Stud. 709 (1986).

Warren, Elizabeth & Jay Lawrence Westbrook, The Success of Chapter 11: A Challenge to the Critics, 107 Mich. L. Rev. 603 (2009).

Widen, William H., Corporate Form and Substantive Consolidation, 75 Geo. Wash. L. Rev. 237 (2007).

Widen, William H., Report to the American Bankruptcy Institute: Prevalence of Substantive Consolidation in Large Public Company Bankruptcies from 2000 to 2005, 16 Am. Bankr. Inst. L. Rev. 1 (2008).

Williamson, Oliver E., Credible Commitments: Using Hostages To Support Exchange, 73 Am. Econ. Rev. 519 (1983).

Zender, Jaime F., Optimal Financial Instruments, 46 J. Fin. 1645 (1991).