# TAB 100

**Ibbotson® SBBI®**

2010 Valuation Yearbook

Market Results for
Stocks, Bonds, Bills, and Inflation
1926–2009





**2010 Ibbotson® Stocks, Bonds, Bills, and Inflation® Valuation Yearbook**

Stocks, Bonds, Bills, and Inflation® and SBBI® are registered trademarks of Morningstar, Inc. Ibbotson®
and Ibbotson Associates® are registered trademarks of Ibbotson Associates, a wholly owned subsidiary
of Morningstar, Inc., and are used with permission.

The information presented in this publication has been obtained with the greatest of care from sources believed
to be reliable, but is not guaranteed to be complete, accurate or timely. Morningstar and its affiliated companies
expressly disclaim any liability, including incidental or consequential damages, arising from the use of this
publication or any errors or omissions that may be contained in it.

©2010 Morningstar. All rights reserved. No part of this publication may be reproduced or used in any other
form or by any other means—graphic, electronic, or mechanical, including photocopying, recording, taping, or
information storage and retrieval systems—without Morningstar's prior, written permission. To obtain permission,
please call Product Sales or write to the address below. Your request should specify the data or other inform-
ation you wish to use and the manner in which you wish to use it. In addition, you will need to include copies of
any charts, tables, and/or figures that you have created based on that information. There is a $1500 processing
fee per request. There may be additional fees depending on your proposed usage.

Published by:
Morningstar, Inc.
22 W. Washington
Chicago, Illinois 60602

Main (312) 696-6000
Product Sales (888) 298-3647
Fax (312) 696-6010
global.morningstar.com/SBBIYearbooks

ISBN 978-0-9792402-7-0
ISSN 1523-343x

Ibbotson Associates® is a leading authority on asset allocation with expertise in capital market expectations
and portfolio implementation. Approaching portfolio construction from the top-down through a research-based
investment process, its experienced consultants and portfolio managers serve mutual fund firms, banks, broker-
dealers, and insurance companies worldwide. Ibbotson Associates' methodologies and services address all
investment phases, from accumulation to retirement and the transition between the two. Visit Ibbotson.com
for contact information, published research, product fact sheets and other information.

For more information about Morningstar's software and data products for individuals, advisors, and institutions,
see "Investment Tools and Resources" at the back of this book, or call (800) 735-0700

Additional copies of the *2010 Ibbotson® SBBI® Valuation Yearbook* may be obtained for $165 per book,
plus shipping and handling. Archived editions (2009 and prior) are available in limited quantities for
$200 per book, plus shipping and handling. For purchasing or other information related to volume
discounts or companion publications, please call (888) 298-3647, or write to the address above.

# Chapter 1

# Business Valuation

Valuation, at its purest, is the act of placing a value or worth on an asset. Stock analysts determine an equity's value based on its earnings outlook, market value, and other economic variables. Public companies are typically easier to value than private ones due to availability of data. The practice of assigning value, considered a combination of science and art, can be more difficult for non-public companies. This book provides empirical data for many areas of valuation; future editions will continue to integrate expanding knowledge that serves as the basis for a scientific approach to assigning value. Although this chapter focuses on the specifics of business valuation, the data presented throughout the entire book can be applied to many other areas of valuation, such as corporate treasury, capital budgeting, and security analysis.

The three most commonly used approaches to valuing a business are the income, market, and asset-based approaches. In the income approach, a company's cash flows are projected into the future and discounted at an appropriate cost of capital rate to determine present value. The cost of capital, or discount rate, used in the denominator can have a dramatic effect on the ultimate value of a business and is the topic of discussion throughout much of this book. The market approach to valuation uses financial ratio analysis from comparable guideline companies to determine value. Finally, the asset-based approach requires a comprehensive revaluation of all of a company's assets and liabilities, both tangible and intangible. This chapter discusses all three approaches to valuation, focusing mainly on the income approach and other areas where Ibbotson has contributed in the past.

## Preparation

Determining a business entity's worth is a complicated process where preparation demands as much attention as the actual analysis. Prior to examining financial statements and assessing company risk factors, ample time and care must be taken to lay out the valuation process road map. Before discussing the three approaches to business valuation, we will first discuss some of the decision process that provides direction to the valuation process. The following guidelines and definitions are meant to serve as an outline, the details and procedures of which may vary across different organizations that certify valuation practitioners.

## Standard of Value

While the obvious driving force behind business valuation is determining the value of a business, defining "value" is not so straightforward. Value can mean many things. So for the purpose of valuing a business, certain standards of value have been formulated. One of the first choices to make when mapping out a business valuation is to determine the standard of value appropriate for the situation at hand.

## Definitions and Guidelines

*Fair market value* is defined by IRS Revenue Ruling 59-60 as "…the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts."

*Fair value* is the amount that will compensate an owner involuntarily deprived of property. Commonly there is a willing buyer but not a willing seller, and the buyer may have more knowledge than the seller. Fair value is a legal term left to judicial interpretation. Many consider fair value to be fair market value without discounts.

*Investment value* is the value to a particular investor based on individual investment requirements and expectations.[1]

*Book value* with respect to a business enterprise is the difference between total assets (net of accumulated depreciation, depletion, and amortization) and total liabilities as they appear on the balance sheet (synonymous with "shareholder's equity"). With respect to a specific asset, book value is the capitalized cost less accumulated amortization or depreciation as it appears on the books of account of the business enterprise.[1]

*Intrinsic value* is the value that an investor considers, on the basis of an evaluation or available facts, to be the "true" or "real" value that will become the market value when other investors reach the same conclusion.[1]

*Going concern value* is the value of a business enterprise that is expected to continue to operate into the future. The intangible elements of going concern value result from

factors such as having a trained work force, an operational plant, and the necessary licenses, systems, and procedures in place.[1]

*Liquidation value* is the net amount that would be realized if the business is terminated and the assets are sold piecemeal. Liquidation can be either "orderly" or "forced."[1]

Fair market value is the standard most often used in business valuation; hence, much of the analysis throughout this book is based on this assumption. Most of the data presented in this book also assumes that the company being valued is a going concern. Going concern and liquidation value are concepts that extend beyond the "standards of value" and into the "premise of value." The premise of value is a choice between valuing a company as an ongoing entity or one facing liquidation. At times a firm may be valued assuming that the company is a going concern only to find that the business is worth more if liquidated. This information should be stated in the valuation report, and is the reason why it is necessary to exhaust all reasonable possibilities when performing analysis on a company.

### Ownership Interest

To accurately apply the correct data and formulas in the approach to valuation, the practitioner must have knowledge of the ownership interest to be valued. The two terms commonly used to describe ownership interest are "control" and "minority." Someone with a controlling interest in a company has the ability to direct the firm's management and policies. An interest in a business of more than 50 percent is considered to be a controlling interest. Typically, an owner with a controlling interest can affect both the equity and debt of the company. Ownership of less than 50 percent in a company is considered a minority interest and typically does not include the ability to direct management.

### Valuation Date

IRS Revenue Ruling 59-60 changed the way business is valued and is the cornerstone of the valuation process. Among other things, Ruling 59-60 states that valuation is a forward-looking process but must be based on facts available as of the required date of appraisal. Some carry this out to the letter of the law and assume that only data available as of the relevant valuation date should be used. Others claim that events happening after the valuation date can be considered relevant if they were reasonably foreseeable as of the valuation date.

The *Ibbotson® Stocks, Bonds, Bills, and Inflation® Valuation Yearbook* provides data critical to the valuation process as far back as 1926, such as the equity risk premia and size premia presented in Appendix A of this book. Appendix A can be used to develop a cost of equity as of a previous date. Assuming that the historical data presented in Appendix A was available to the public as of the date of valuation, then many people would argue that the data from the current book can be used in valuations as of a previous date. Others would argue that only yearbooks published as of the valuation date are appropriate. Now part of Morningstar, Ibbotson has been calculating and publishing data since 1976. In addition to vastly improving our methodology for calculating size premia over the years, we have recently introduced an alternative approach to calculate the equity risk premium. It is up to the valuation practitioner to decide whether to use a current book with data from prior years or whether a book published as of the valuation date is the appropriate resource.[2]

### Fundamental Factors

A number of relevant factors should be considered carefully when appraising a business to fair market value—especially when valuing a closely held corporation whose owners have a controlling interest and whose stock quotations are sparse or lacking. According to IRS Revenue Ruling 59-8, there are eight such factors:

1. The nature of the business and the history of the enterprise from its inception.
2. The economic outlook in general and the condition and outlook of the specific industry in particular.
3. The book value of the stock and the financial condition of the business.
4. The earning capacity of the company.
5. The dividend-paying capacity of the company.
6. Whether or not the enterprise has goodwill or other intangible value.
7. Sales of the stock and the size of the block of stock to be valued.
8. The market price of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter.

Morningstar publishes information that can help in many of these areas. The *Ibbotson® Stocks, Bonds, Bills, and Inflation® Classic Yearbook* begins with a chapter on highlights of the past year and decade, describing the economic climate for the given year by outlining major economic events as well as headline mergers and acquisitions. Market performance is also presented to complete the picture on short- and intermediate-term economic performance. The *Ibbotson® Cost of Capital Yearbook* and the related online data available in the Cost of Capital Resources section at http://global.morningstar.com/US/CofCResources provide analyses that expose the strengths and weaknesses across industries. Included in this data are five-year earnings growth rate forecasts and one- and five-year financial ratios. See Graph 1-2 for a sample *Ibbotson Cost of Capital Yearbook* page.

Once all of the preparation has been completed—the standard of value selected and the ownership interest, valuation date, and fundamental factors addressed—the approach to valuation must be decided. For each approach, the appropriate calculation method must also be applied.

## Income Approach to Valuation

One of the most common business valuation methodologies is the income approach. Under the income approach, the analyst must first identify future cash flows to be generated by the asset being valued. Second is the identification of the appropriate rate to use in discounting the cash flows to present value. The discount rate, or cost of capital, should reflect the level of risk inherent in the cash flows being valued. The income approach can be expressed in the following formula:

$$PV_s = \frac{CF_1}{(1+k_s)^1} + \frac{CF_2}{(1+k_s)^2} + \ldots + \frac{CF_i}{(1+k_s)^i}$$

where:

$PV_s$ = the present value of the expected cash flows for company s;

$CF_i$ = the cash flow (or dividend) expected to be received at the end of year i; and

$k_s$ = the cost of capital for company s.

While the basic concept of the income approach to valuation is fairly straightforward, implementing it can be quite arduous. The two most commonly used methods for applying the income approach are the discounted cash flow (DCF)

and capitalization of earnings methods. The DCF method is used when future returns are expected to be substantially different from current operations. In this case, the cost of capital with which to discount is the total expected return that a buyer would demand on the purchase price of an ownership interest in the company, given the risk of that interest. The capitalization of earnings method takes the same discount rate the DCF uses, but subtracts the company's expected annual growth rate. This is most appropriate when a company's current operations are indicative of its future operations. Chapter 4 discusses estimated growth rates in detail.

## Free Cash Flow

In the field of business valuation, the appropriate cash flows used in the equation are the free cash flows generated by the entity that is being valued. Free cash flow represents a company's after-tax cash once adjustment is made for non-cash accounting entries and capital expenditures required to maintain the company as a going concern. To be clear, free cash flow is after corporate taxes and before individual taxes. Free cash flow for the entire invested capital of a firm is most often determined by the following formulas:

| Cash Flow Formula | |
|---|---|
| | EBIT × (1−t) |
| + | Depreciation and Amortization |
| + | Deferred Taxes |
| − | Capital Expenditures |
| − | Changes in Working Capital |
| = | Free Cash Flow |

| Alternate Cash Flow Formula | |
|---|---|
| | Net Income |
| + | Depreciation and Amortization |
| + | Deferred Taxes |
| − | Capital Expenditures |
| − | Changes in Working Capital |
| + | Interest Expense × (1−t) |
| = | Free Cash Flow |

Free cash flow represents the total amount of cash that can potentially flow to the shareholders and long-term interest bearing debt holders of the company; it is thus the free cash flow that drives the value for all equity and debt holders of the entity.

Several things can be noted about free cash flow. First, it is an after-tax concept. While the equation starts with earnings before interest and taxes (EBIT), this number is

tax adjusted to get to an after-tax value. The equation starts with tax-adjusted EBIT because we want to focus on cash flows independently of capital structure. We must therefore start with earnings before interest expenses and then tax adjust those earnings. Secondly, pure accounting adjustments need to be added back into the analysis. It is for this reason that depreciation expense and deferred tax expense are added back into the after-tax EBIT. Finally, cash flows necessary to keep the company going forward must be subtracted from the equation. These cash flows represent necessary capital expenditures to maintain plant, property, and equipment or other capital expenditures that arise out of the ordinary course of business. Another common subtraction is reflected in changes in working capital. The assumption in most business valuation settings is that the entity in question will remain a long-term going concern that will grow over time. As companies grow, they accumulate additional accounts receivable and other working capital elements that require additional cash to support.

Free cash flow is the relevant cash flow stream because it represents the broadest level of earnings that can be generated by the asset. With free cash flow as a starting point, the owners of a firm can decide how much of the cash flow stream should be diverted toward new ventures, capital expenditures, interest payments, and dividend payments. It is incorrect to focus on earnings as the cash flow stream to be valued because earnings contain a number of accounting adjustments and already include the impact of capital structure.

**Weighted Average Cost of Capital**

Since free cash flow represents the cash flow stream flowing from the entire entity, the appropriate discount rate to use in the income approach model is the weighted average cost of capital (WACC). The WACC is represented by the following equation:

$$WACC = W_D k_D (1-t) + W_E k_E$$

where:

$W_D$ = weight of debt in the capital structure;
$k_D$ = cost of debt capital;
$t$ = effective tax rate for the company;
$W_E$ = weight of equity in the capital structure; and
$k_E$ = cost of equity capital.

Ideally, a firm's target or optimal capital structure should be used in weighting the cost of equity and cost of debt. Unfortunately, many companies are either not able to obtain their target capital structure, or information to support the target capital structure is not available (as may be the case for a minority-interest shareholder). In the absence of a reliable target capital structure, the capital structure weights should be market value weighted. While it is typically a straightforward process to measure the market value of equity capital for a public company, it usually is not so simple for debt capital because so little debt is publicly traded. Therefore, in most cases the market value of debt in the capital structure is assumed to be the book value of debt. The weights are calculated from the market values as follows:

$$W_D = \frac{D}{D+E}, \quad W_E = \frac{E}{D+E}$$

where:

$W_D$ = weight of debt in the capital structure;
$W_E$ = weight of equity in the capital structure;
$D$ = the market value of debt outstanding; and
$E$ = the market value of equity outstanding.

Together the weights should add up to 100 percent. An excellent source for industry average capital structure weights is the *Ibbotson Cost of Capital Yearbook*.

The WACC formula above is primarily applicable to a controlling interest valuation. For a minority interest, adjustments may be made to both the numerator and the denominator of the present value formula. The free cash flow in the numerator should be adjusted to remove the effect of debt, as a minority owner does not have the power to influence capital structure and the issuance of debt. For this reason, net changes in long-term debt should be added (add new debt principal in and subtract debt principal out). If tax-effected interest expense has been added to the formula, make sure to subtract it back out. Once free cash flow has been recalculated to remove the effect of debt, the cost of capital must be calculated independent of debt as well. One way to do this is to simply discount using the cost of equity in the denominator. This is the same as using a capital structure of 100 percent equity and 0 percent debt in the WACC formula.

There may also be times when the WACC formula will apply to a minority interest valuation. In these cases, the actual capital structure of the company should be used, as opposed to an industry average or target structure, since minority shareholders will not have the power to change it.

Determining value for an S corporation or other pass-through entity can be even trickier. An S corporation is a corporation that has elected to be taxed as a pass-through entity (similar to a partnership). For an S corporation, all taxes are passed through to the shareholder level (no taxes on business income at the corporate level). However, the concept of "useable income" described above still applies: The S corporation can only reinvest and use for growth income that is available after taxes on business profits have been satisfied. The fact that it has to pay those income taxes via its shareholders makes no difference to the S corporation's value proposition. Therefore, business income taxes are still deducted from the income stream. However, an S corporation (and other pass-through entities) may have an advantage with respect to the avoidance of dividend and capital gains taxes that public market investors pay. As the Morningstar data is derived from the public market, the data includes the affects of such dividend and capital gains tax.

There has been much controversy regarding the extent to which S corporations should be adjusted for the effects of shareholder taxes, with several models designed to make adjustments to accommodate the difference. New guidance based on a broad array of academic research on the extent to which shareholder taxes effect market returns and value, suggests that this adjustment may not be as large as previously thought.[3] The valuation practitioner should evaluate each case individually to determine what adjustments, if any, should be made.

## Tax Rate Assumptions

In calculating the WACC, one important element that is often overlooked is the tax rate. While it has been known for quite some time that companies do not necessarily pay the top statutory rate, it has been common practice to use the top marginal statutory rate in cost of capital calculations.[4] One reason the use of the marginal tax rate has persisted is the difficulty in accurately measuring what the firm's expected tax rate will be.

The tax rate is an important determinant of the WACC. Its significance is demonstrated in the following simple example:

Assume a company is financed with 50 percent debt and 50 percent equity. The cost of equity ($k_E$) is 15 percent, and the cost of debt ($k_D$) is 10 percent. Calculating the WACC using a tax rate (t) of 35 percent results in a value of 10.75 percent:

$$WACC = W_D k_D (1-t) + W_E k_E = [0.5 \times 0.1 (1-0.35)] + (0.5 \times 0.15) = 10.75 \text{ percent}$$

However, if the company does not expect to pay the statutory rate and instead has a tax rate of 10 percent, the WACC increases to 12.0 percent—a change of 125 basis points:

$$WACC = W_D k_D (1-t) + W_E k_E = [0.5 \times 0.1 (1-0.1)] + (0.5 \times 0.15) = 12.0 \text{ percent}$$

Research by John Graham provides a way for practitioners to determine more accurate estimates of expected future tax rates.[5] Under Graham's methodology, expected future earnings are simulated using current tax code provisions. The Graham methodology shows that a majority of firms can expect to pay less than the top marginal rate. Under the current tax code, over 58 percent of firms can expect to pay tax rates under 10 percent, substantially less than the top marginal rate. Graph 1-1 shows the distribution of tax rates for over 7,000 companies.

Graph 1-1: Effective Tax Rate Distribution



Data from fiscal year 2008

## Other Income Approach Considerations

One important aspect of the income approach model is that the discount rate and the cash flows need to be estimated on the same basis. For instance, if pre-tax cash flows are projected in the model, they must be discounted to present value using a pre-tax cost of capital (as opposed to an after-tax cost of capital). If nominal cash flows are projected in the model, then a nominal cost of capital should be used in the discount rate. Failure to properly match the discount rate with the cash flows will produce an inaccurate value.

Another common mistake in the income approach is the use of a "most likely"—as opposed to an expected—cash flow. The calculation of an expected cash flow requires the estimation of future cash flows under different scenarios, to which probabilities are then attached. For instance, suppose there are only two possible scenarios affecting the expected cash flow, economic boom and recession. The likelihood of these economic scenarios is 75 percent and 25 percent, respectively. Also suppose that under an economic boom, the projected cash flow is $100, while in a recession the projected cash flow is $50. The expected cash flow is calculated by multiplying the projected cash flow under each economic scenario by its corresponding probability, then summing these products ($100 × 0.75) + ($50 × 0.25) = $87.50. The result is a probability-weighted projection of cash flow, rather than the "most likely" cash flow of $100.

## Market Approach to Valuation

The market approach to valuation uses data from comparable guideline companies to develop a measure of value for a particular subject company. Two types of data are used to implement the market approach. The first is data from guideline publicly traded companies. A wealth of data exists for the publicly traded equity market, including the type of financial ratios applied when determining value using the market approach. Transaction data for private and public companies can also be used in computing value using the market approach. In this case, a database of bought and sold companies is used to base transaction prices and financial fundamentals on companies similar to the subject company. Data derived from guideline public companies should be used when determining a minority interest value because the shareholders of publicly traded companies usually have a minority stake in the company. Merger and acquisition data is typically used to derive a controlling interest value because data concerns the sale of an entire company, equity and debt.

## Guideline Public Companies

Implementation of the market approach using publicly traded companies typically relies on the use of financial ratios that compare the stock price of a company to its various accounting measures of fundamental data. Many ratios contain stock price or market value of equity and work well in the market approach to determining value:

- Price to Earnings
- Price to Cash Flow
- Price to Shareholders' Equity

The above ratios can be used to determine a value of equity, but sometimes it may be desirable to determine the entire market value of invested capital (MVIC). Market value of invested capital is the combination of both equity and debt of a given company. Some common ratios used to determine market value of invested capital are:

- MVIC to Sales
- MVIC to EBIT (earnings before interest and taxes)
- MVIC to EBITDA (earnings before interest, taxes, depreciation, and amortization)

**Graph 1-2:** SIC 42 from *2009 Ibbotson® Cost of Capital Yearbook* Data Through March 2009

## Statistics For SIC Code 42

Data through March 2009

**Motor Freight Transportation and Warehousing**
This Industry Comprises 24 Companies

### Industry Description

This major group includes establishments furnishing local or long-distance trucking or transfer services, or those engaged in the storage of farm products, furniture and other household goods, or commercial goods of any nature.

### Sales ($millions)

| | |
|---|---|
| Total | 83,025 |
| Average | 3,459.3 |
| **Three Largest Companies** | |
| UNITED PARCEL SERVICE INC | 51,486.0 |
| YRC WORLDWIDE INC | 8,940.4 |
| HUNT (JB) TRANSPORT SVCS INC | 3,731.8 |
| **Three Smallest Companies** | |
| PATRIOT TRANSN HOLDING INC | 172.0 |
| TRAILER BRIDGE INC | 133.0 |
| AUTOINFO INC | 110.3 |

### Total Capital ($millions)

| | |
|---|---|
| Total | 66,708 |
| Average | 2,779.5 |
| **Three Largest Companies** | |
| UNITED PARCEL SERVICE INC | 43,818.6 |
| IRON MOUNTAIN INC | 7,720.0 |
| HUNT (JB) TRANSPORT SVCS INC | 3,673.8 |
| **Three Smallest Companies** | |
| FROZEN FOOD EXPRESS INDS | 50.4 |
| AUTOINFO INC | 22.0 |
| US 1 INDUSTRIES INC | 13.0 |

### Number of Companies & Total Capital ($millions)

| S&P Data Rating | Large Cap | Mid Cap | Low Cap | Micro Cap | Totals |
|---|---|---|---|---|---|
| AAA, AA, A | 1 | 0.0 | 0.0 | 0.0 | 1 (companies) |
| | 43.8 | 0.0 | 0.0 | 0.0 | 43.8 (capital) |
| BBB | 0 | 3.7 | 0.5 | 0.0 | 4.2 |
| | 0.0 | 3.7 | 0.5 | 0.0 | 4.2 |
| BB, B, CCC, CC, D | 0 | 1 | 6 | 3 | 4 |
| | 0.0 | 7.7 | 0.0 | 2.2 | 9.9 |
| Not Rated | 0 | 0 | 1 | 12 | 17 |
| | 0.0 | 0.0 | 0.7 | 2.0 | 8.7 |
| **Totals** | 1 | 2 | 7 | 15 | 24 |
| | 43.8 | 11.4 | 7.2 | 4.2 | 66.7 |

### Annualized Statistics

| | Avg Return | Std Deviation |
|---|---|---|
| S&P 500 | -1.75 | 15.84 |
| SIC Composite | 8.29 | 18.92 |
| Large Composite | 0.21 | 20.72 |
| Small Composite | 29.73 | 48.42 |

### Annual Equity Return Distribution (%)

| | 5 Years | 10 Years |
|---|---|---|
| 75th Percentile | 7.98 | 16.87 |
| Median | -4.81 | 9.80 |
| 25th Percentile | -14.95 | -1.27 |
| SIC Composite | -0.03 | 18.47 |
| Large Composite | -3.39 | 13.08 |
| Small Composite | 9.43 | 19.83 |

### Three Factor 12 Month Analysis (%)

| | Sales | Operating Income | Net Income | Equity Capital | Debt Capital |
|---|---|---|---|---|---|
| Latest Qtr. | 83.0 | 10.9 | 2.7 | 52.0 | 18.0 |
| Last Yr. | 90.7 | 12.3 | 0.7 | 71.2 | 18.2 |
| 2 Yrs. Ago | 77.4 | 12.2 | 5.5 | 70.2 | 9.9 |
| 3 Yrs. Ago | 70.0 | 11.3 | 5.0 | 74.6 | 9.3 |
| 4 Yrs. Ago | 59.8 | 9.5 | 4.1 | 65.5 | 6.8 |

### Growth Over Last 5 Years (%)

| | Net Sales | Operating Income | Net Income |
|---|---|---|---|
| Median | 9.11 | 8.10 | 9.82 |
| SIC Composite | 10.35 | 6.84 | -4.91 |
| Large Composite | 10.48 | 6.49 | -5.96 |
| Small Composite | 14.77 | 10.61 | NMF |

### Capital Structure Ratios (%)

| | Debt/Total Capital | | Debt/MV Equity | |
|---|---|---|---|---|
| | Latest | 5-Year Avg | Latest | 5-Year Avg |
| Median | 22.88 | 17.64 | 29.97 | 21.12 |
| SIC Composite | 24.52 | 16.31 | 32.46 | 18.94 |
| Large Composite | 24.11 | 13.03 | 31.78 | 18.18 |
| Small Composite | 45.24 | 35.31 | 82.61 | 54.59 |

### Distribution of Sales & Total Capital ($millions)

| | Distribution of Sales | | Total Capital | |
|---|---|---|---|---|
| | Latest | 5-Year Avg | Latest | 5-Year Avg |
| 90th Percentile | 3,528.9 | 3035.9 | 3137.5 | 3,834.0 |
| 75th Percentile | 1,862.6 | 1628.9 | 1284.0 | 1,490.4 |
| 25th Percentile | 659.8 | 527.7 | 343.0 | 394.8 |
| 10th Percentile | 412.8 | 349.9 | 137.3 | 218.5 |
| | 176.8 | 148.3 | 84.7 | 131.9 |

### Margins, Turnover & Returns (%)

| | Operating Margin | | Net Margin | | Asset Turnover | | Return on Inv. Cap. | | Return on Assets | | Return on Equity | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Latest | 5-Year Avg | Latest | 5-Year Avg | Latest | 5-Year Avg | Latest | 5-Year Avg | Latest | 5-Year Avg | Latest | 5-Year Avg |
| Median | 10.03 | 11.98 | 1.57 | 3.55 | 165.51 | 168.10 | 3.89 | 6.91 | 3.04 | 5.74 | 4.83 | 8.11 |
| SIC Composite | 13.03 | 15.14 | 3.22 | 4.86 | 148.03 | 136.54 | 8.28 | 8.46 | 4.71 | 6.72 | 5.34 | 5.37 |
| Large Composite | 13.10 | 15.57 | 3.47 | 5.17 | 153.48 | 141.89 | 10.72 | 10.97 | 5.33 | 7.34 | 6.97 | 5.81 |
| Small Composite | 12.00 | 14.89 | 1.52 | 3.69 | 101.82 | 94.88 | 1.31 | 3.75 | 1.55 | 3.46 | 2.60 | 3.70 |

### Equity Valuation Ratios

| | Price/Earnings | | Market/Book | | Price/Sales | | Price/Cash Flow | | Price/Operating Income | | Dividend Yield (% of Price) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Latest | 5-Year Avg | Latest | 5-Year Avg | Latest | 5-Year Avg | Latest | 5-Year Avg | Latest | 5-Year Avg | Latest | 5-Year Avg |
| Median | 20.70 | 16.37 | 1.40 | 1.47 | 0.26 | 0.51 | 47.02 | NMF | 4.45 | 4.82 | 0.00 | 0.00 |
| SIC Composite | 18.72 | 24.87 | 3.03 | 2.82 | 0.80 | 0.90 | 29.31 | 34.72 | 4.83 | 5.97 | 3.53 | 2.65 |
| Large Composite | 18.16 | 23.03 | 4.19 | 2.72 | 0.58 | 0.88 | 25.98 | 26.30 | 4.41 | 5.72 | 4.26 | 3.24 |
| Small Composite | 38.40 | 45.77 | 1.38 | 2.30 | 0.59 | 1.00 | NMF | NMF | 4.88 | 6.78 | 0.00 | 0.00 |

### Cost of Equity Capital (%) / Weighted Average Cost of Capital (%)

| | Cost of Equity Capital (%) | | | | Weighted Average Cost of Capital (%) | | | | Betas | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Analysts' Estimate | CAPM | CAPM + Size Prem | 3-Factor Fama-French | Discounted Cash Flow 1-Stage | Discounted Cash Flow 3-Stage | CAPM | CAPM + Size Prem | 3-Factor Fama-French | Discounted Cash Flow 1-Stage | Discounted Cash Flow 3-Stage | Levered Raw | Adjusted | Unlevered Raw Adjusted |
| Median | 12.48 | 5.40 | 12.23 | 12.10 | 13.05 | 12.40 | 10.27 | 12.66 | 12.54 | 14.42 | 12.76 | 0.91 | 0.90 | 0.84 |
| SIC Composite | 12.48 | 6.17 | 10.11 | 10.07 | 12.70 | 14.60 | 9.61 | 10.34 | 10.31 | 12.37 | 14.08 | 0.87 | 0.87 | 0.71 |
| Large Composite | 11.39 | 8.26 | 9.26 | 9.86 | 12.08 | 18.40 | 9.54 | 8.82 | 12.14 | 14.03 | 17.04 | 0.87 | 0.88 | 0.73 |
| Small Composite | 12.48 | 10.40 | 14.14 | 10.87 | 12.49 | 9.80 | 12.23 | 14.62 | 12.81 | 13.57 | 11.86 | 1.06 | 1.05 | 0.98 |

© 2009 Morningstar, Inc. All rights reserved. The information herein is not represented or warranted to be accurate, correct, complete or timely. Past performance is no guarantee of future results.

MORNINGSTAR®

## Gathering Data

Publicly traded companies offer many options for obtaining relevant data. Determining value using a price/earnings multiple requires obtaining the current market price of the guideline company's equity as well as the company's earnings. Stock price data is rather easy to find, but earnings data can be more difficult. Moody's and Standard & Poor's both provide this type of data in a variety of products. Morningstar's database contains comprehensive financial data on over 20,000 U.S. and global equities.

Once data has been gathered, determining the appropriate financials to use requires some analysis. For example, earnings are needed to compute a price/earnings ratio, but what exactly should be used to represent earnings? In the *Ibbotson Cost of Capital Yearbook*, income before extraordinary items is used to represent earnings because this is the item that focuses on the reoccurring income stream. Income that includes one-time charges can be misleading on a forward-looking basis.

Time periods for both the numerator and the denominator of any ratio must match as closely as possible. Mismatching time periods from which data is gathered can result in drastic distortion of results, especially when market conditions have changed significantly. While values for stock price can usually be obtained as of the valuation date, values from a company's financial statements are often from the latest fiscal year-end or latest four quarters. While some analysts use only the most recent financials, others prefer to use an average from a number of years (commonly five years). The decision on an appropriate time frame from which to gather fundamental data depends heavily on the quality and availability of the data and the stability of market conditions.

### Example Using the P/E Ratio

In this hypothetical example, assume that the subject company is a privately held publisher with $2 million in earnings. Using a page from the *Ibbotson® Cost of Capital Yearbook*, an appropriate peer group represented by SIC 42 (Motor Freight Transportation and Warehousing) is identified, as seen in Graph 1-2. The median price/earnings ratio for the group is 20.70. To solve for the implied market value of equity of the subject company, solve for the price of the subject company as follows:

$$\frac{Price_{\text{Subject Company}}}{Earnings_{\text{Subject Company}}} = \frac{Price_{\text{Peer Group}}}{Earnings_{\text{Peer Group}}}$$

Table 1-1: Mergers and Acquisitions

| Name of Publication/Database | Vendors |
|---|---|
| Acquisitions Monthly | Thomson Reuters |
| BIZCOMPS | BIZCOMPS |
| Corporate Growth Report | NVST, Inc |
| Done Deals | Thomson Reuters |
| IBA Market Database | Institute of Business Appraisers |
| Industry Valuation Update | Business Valuation Resources |
| Merger & Acquisition Sourcebook | NVST, Inc |
| Mergers & Acquisitions Report | SourceMedia |
| Mergers & Acquisitions Report, The Dealmaker's Journal | SourceMedia |
| Mergerstat Review | FactSet MergerStat |
| Mergerstat®/BVR Control Premium Study | Business Valuation Resources |
| Pratt's Stats | Business Valuation Resources |
| Public Stats | Business Valuation Resources |
| SDC Platinum | Thomson Reuters |

Since the *P/E* for the peer group is obtained from the *Ibbotson Cost of Capital Yearbook* (20.70), all we need is the earnings for the subject company and the terms can be rearranged to solve for the implied value of equity for the subject company.

$$\frac{Price}{\$2,000,000} \text{ Subject Company} \approx 20.70$$

so:

The market value of equity for the subject company is approximated at $41,400,000. The importance of choosing an appropriate group of guideline companies is evident.

### Guideline Transaction Data

In addition to publicly traded company data, transaction or sales data can be used to determine value with the market approach. Mergers and acquisitions provide much of the comparable sales data necessary to implement this approach. For publicly traded companies, their 8-K statement can be a good source of information. The statement is used to report to shareholders the occurrence of major changes, including mergers, acquisitions, and management shake-ups. Table 1-1 is a partial list of providers. The implementation of the market approach is the same whether using data on publicly traded companies or merger and acquisition transactions. Multiples used to derive value with transaction data ordinarily use the market value of invested capital (MVIC) in the numerator, since the entire capital structure of the company is typically being sold and reported in the merger and acquisition data. Instead of using market prices, the transaction or deal price is used to represent invested capital. When the entire invested capital is sold, the value derived is typically that for a majority ownership with a controlling interest.

### Asset-Based Approach to Valuation

With this approach, the value of a business is determined by valuing each component of the business separately. Taking the sum of the asset values, both tangible and intangible, and subtracting the value of liabilities derives the ultimate value of the business. The asset-based approach to valuation is primarily used when appraising a holding company, family limited partnership, or entities in bankruptcy proceedings.

The asset-based approach revaluation is organized into a balance sheet where each asset is revalued at fair market value. The presentation of results in this format is one of the benefits of the asset approach. Many potential purchasers of a business are familiar with the balance sheet format, making it easy to identify where the value of a business is coming from. While all three major valuation approaches should arrive at similar values for a company, the asset-based approach is the only one that allows identification of the areas producing the greatest value. For example, the fair market value of a business may be 50 percent greater than its historical cost value according to its balance sheet. A direct comparison of historical costs and fair market value using the asset-based approach will show where that 50 percent is located.

The greatest disadvantage of the asset-based approach is that it can be time-consuming and expensive. It may also require more involvement from the subject company's management team. Of course, the analyst will also need extensive training in accounting and may require the aid of outside experts to help value certain types of assets and liabilities that may be outside of his/her expertise. Also, the asset-based approach is the least desirable approach for minority-interest valuations because minority shareholders rarely have access to the necessary level of information and cooperation from management. Valuing intangible assets, such as goodwill, is very difficult and the resulting value may not actually explain much. Unrecorded intangible assets will not show up in the asset-based approach, but may be captured in the cash flows of the income approach. For this reason, when a substantial portion of the assets cannot be valued with accuracy, the asset-based approach is not ideal. [M]

### Endnotes

[1] Page 11, 12 International Glossary of Business Valuation Terms.

[2] Page 12 Contact Product Sales at 888-298-3647 for information on obtaining prior editions of the *Ibbotson Stocks, Bonds, Bills, and Inflation Yearbooks* (Classic and Valuation Editions).

[3] Page 15 Nancy J. Fannon. *The Impact of Taxes on Value in the Private Capital Markets,* Business Valuation Resources (BVR), available Summer 2010.

[4] Page 15 Cordes, Joseph and Steven Sheffrin."Estimating the Tax Advantage of Corporate Debt," *Journal of Finance.* Vol. 38, 1983, 95–105.

[5] Page 15 Graham, John. "Debt and the Marginal Tax Rate," *Journal of Financial Economics.* Vol. 41, 1996a, 41–73.
Graham, John. "Proxies for the Corporate Marginal Tax Rate." *Journal of Financial Economics.* Vol. 42, 1996, 187–221
Graham, John, Michael Lemon, and James Schallheim. "Debt, Leases, Taxes and the Endogeneity of Corporate Tax Status." *Journal of Finance,* Vol. 53, 1998.

# TAB 101

Castel & Walker

# CANADIAN CONFLICT OF LAWS

### Sixth Edition

### Volume 2

## Janet Walker
C.D., B.A. (Hons), M.A. (York), J.D. (Osgoode), D.Phil. (Oxon), F.C.I. Arb
*of the Ontario Bar*
Professor
Osgoode Hall Law School of York University

Founding Author
**Jean-Gabriel Castel**
O.C., O.O., Q.C., L.S.M., Chevalier de la Légion d'honneur
J.D. (Michigan), S.J.D. (Harvard), D. *hon. causa* (Aix)
*of the Ontario Bar*



**Canadian Conflict of Laws, Sixth Edition**
**Volume 2**
© LexisNexis Canada Inc. 2005
(Including update issues 2005–2014)

All rights reserved. No part of this publication may be reproduced or stored in any material form (including photocopying or storing it in any medium by electronic means and whether or not transiently or incidentally to some other use of this publication) without the written permission of the copyright holder except in accordance with the provisions of the *Copyright Act*. Applications for the copyright holder's written permission to reproduce any part of this publication should be addressed to the publisher.

Warning: The doing of an unauthorized act in relation to a copyrighted work may result in both a civil claim for damages and criminal prosecution.

The publisher, (Author(s)/General Editor(s)) and every person involved in the creation of this publication shall not be liable for any loss, injury, claim, liability or damage of any kind resulting from the use of or reliance on any information or material contained in this publication. While every effort has been made to ensure the accuracy of the contents of this publication, it is intended for information purposes only. When creating this publication, none of the publisher, the (Author(s)/General Editor(s)) or contributors were engaged in rendering legal or other professional advice. This publication should not be considered or relied upon as if it were providing such advice. If legal advice or expert assistance is required, the services of a competent professional should be sought and retained. The publisher and every person involved in the creation of this publication disclaim all liability in respect of the results of any actions taken in reliance upon information contained in this publication and for any errors or omissions in the work. They expressly disclaim liability to any user of the work.

**Library and Archives Canada Cataloguing in Publication**

Walker, Janet 1959—

    Canadian conflict of laws.—6th ed.

Previous ed. written by Jean-Gabriel Castel and Janet Walker. Frequency of updates varies. Includes bibliographical references and index. ISBN 0-433-44985-3 (loose-leaf: set) ISSN 1714-7964.

    1. Conflict of laws—Canada. I. Title.

KE470.A6W34 2005   340.9   C2005-901328-1
KF411.W35 2005

---

**Published by LexisNexis Canada, a member of the LexisNexis Group**
LexisNexis Canada Inc.
123 Commerce Valley Dr. E., Suite 700
Markham, Ontario
L3T 7W8

**Customer Service**
Telephone: (905) 479-2665 • Fax: (905) 479-2826
Toll Free phone: 1-800-668-6481 • Toll Free fax: 1-800-461-3275
Email: customerservice@lexisnexis.ca
Website: www.lexisnexis.ca

[The next page is 0-iii]

[37] *Stuart v. Baldwin* (1877), 41 U.C.Q.B. 446 (C.A.).

[38] *Montgomery v. Ruppensburg*, [1899] O.J. No. 116, 31 O.R. 433 (H.C.J.); *Jones v. Tucker* (1915), 53 S.C.R. 431.

[39] *Strange v. Radford*, [1887] O.J. No. 125, 15 O.R. 145 (H.C.J.): foreclosure operates *in personam* by extinguishing the defendant's personal and equitable right. In *Bryson v. Huntington*, [1877] O.J. No. 236, 25 Gr. 265 (Ont.), it was held that in the case of foreclosure a mortgagor may be compelled to execute a conveyance of foreign lands as will be effective to vest title in the mortgagee and will be capable of registration in the *situs*.

[40] *Burchell v. Burchell*, [1926] O.J. No. 125, 58 O.L.R. 515, referring to *Penn v. Lord Baltimore* (1715), 1 Ves. Ser. 444. In *Macedo v. Macedo*, [1996] O.J. No. 435, 19 R.F.L. (4th) 65 (Gen. Div.), the Court ordered the defendant to sell the foreign immovable.

[41] *Minera Aquiline Argentina SA v. IMA Exploration Inc.*, [2006] B.C.J. No. 1626, 32 C.P.C. (6th) 31 (S.C.), affd [2007] B.C.J. No. 1232, 43 C.P.C. (6th) 45 (C.A.), leave to appeal to S.C.C. denied [2007] S.C.C.A. No. 424; *Mountain West Resources Ltd. v. Fitzgerald*, [2002] B.C.J. No. 2402, 6 B.C.L.R. (4th) 97 (C.A.); *War Eagle Mining Co. v. Robo Management Co.*, [1995] B.C.J. No. 2142, 13 B.C.L.R. (3d) 362, [1996] 2 W.W.R. 504 (S.C.).

[42] *Minera Aquiline Argentina SA v. IMA Exploration Inc.*, [2006] B.C.J. No. 1626, 32 C.P.C. (6th) 31 (S.C.), affd [2007] B.C.J. No. 1232, 43 C.P.C. (6th) 45 (C.A.), leave to appeal to S.C.C. denied [2007] S.C.C.A. No. 424; *Precious Metal Capital Corp. v. Smith*, [2008] O.J. No. 1236 (S.C.J.). But see *Bindra v. Bindra*, [2009] O.J. No. 2919 (S.C.J.) (order seeking recommendation that foreign government vest title to foreign immovable and that foreign banks vest accounts in applicant in matrimonial dispute denied).

[43] *Mitrovic v. Mitrovic*, [2007] A.J. No. 69, 2007 ABQB 44; *P. (T.L.) v. P. (F.J.)*, [2007] A.J. No. 1114, 2007 ABQB 600; *Welsh v. Welsh*, [2011] A.J. No. 1445, 2011 ABQB 686, 9 R.F.L. (7th) 409; *Jose v. Riz*, [2009] B.C.J. No. 1593, 2009 BCSC 1075; *W. (K.) v. W. (S.)*, [2012] O.J. No. 2585, 2012 ONSC 2874, 25 R.F.L. (7th) 151; *Sidhu v. Sidhu*, [2013] B.C.J. No. 299, 2013 BCSC 275.

## §23.2  APPLICABLE LAW

As a general rule, all questions concerning rights over immovables are governed by the *lex situs*, namely the law of the place where the immovable is situated[1] because in the last resort land can only be dealt with in a manner that the *lex situs* allows.[1.1] This applies not only to immovables situated in any of the common law provinces or territories but also to immovables situated abroad, so far as Canadian courts have jurisdiction to deal with them.[2]

Although most reported cases involve an action on the personal covenant in a mortgage, which is a simple action in debt *in personam*, the courts have recognized that it carries with it certain special features because of the security on land. Consequently, the law of the jurisdiction where the land is situated is the appropriate choice of law for the debt claim.[3]

There is general agreement among text writers,[4] and some support from the English jurisprudence,[5] that the *lex situs* means not the domestic law of the *situs*, but whatever system of domestic law the courts of the *situs* would apply. In other words, there is a strong case for applying the doctrine of simple or total *renvoi*[6] to cases concerning title to foreign immovables, for the application of the domestic law of the *situs* might be ineffective if the courts of the *situs* would apply some other law.

All questions of capacity to assign[7] or to acquire an immovable are governed by the *lex situs* of the immovable.[8]

§23.2                    CANADIAN CONFLICT OF LAWS

An assignment of an immovable must comply with the formal requirements of the *lex situs* of the immovable.[9] Accordingly, a conveyance of local land must comply with the formalities prescribed by the local law,[10] but an assignment that does not do so may give rise to an equity recognized by and enforceable in a Canadian court.[11] A contract relating to an immovable will be formally valid if it satisfies the requirements as to formalities of either the law of the place of contracting or the proper law of the contract, which usually will be the *lex situs*.[12] A rule of the *lex situs* declaring a valid assignment or contract relating to an immovable inadmissible in evidence will be ignored in Canada, procedural questions being governed by the *lex fori*.[13]

The material or essential validity of an assignment of immovable property is governed by the *lex situs* of the immovable.[14] This principle applies to such matters as the nature and incidents of the estates created in the immovable,[15] restraints on alienation,[16] the rules against perpetuities and accumulations,[17] and the question whether trusts of immovables are permitted.[18]

The effect of lapse of time upon the existence or enforcement of any right in respect of an immovable is governed by the *lex situs* of the immovable.[19] Accordingly, where by the *lex situs* a person's title to an immovable is extinguished, Canadian courts will look upon it as extinguished.[20] A similar principle applies where an action for the recovery of land is statute-barred by the *lex situs*.[21] Where a Canadian court has jurisdiction to pronounce upon or enforce rights in respect of a foreign immovable,[22] it will hold a right barred by lapse of time only if it is so barred by the *lex situs*.[23]

In Quebec, paragraph one of article 3097 of the *Civil Code* provides that: "Real rights and their publication are governed by the law of the place where the property concerned is situated." As in the common law provinces and territories, this choice of law rule applies to all questions concerning rights over immovables, including hypothecs.

---

[1] *Genesee Mutual Insurance Co. v. Westman* (1852), 8 U.C.Q.B. 487 (C.A.) (a foreign legislature cannot create a lien on a legal estate situate in Canada); *Duke v. Andler*, [1932] S.C.R. 734, [1932] 4 D.L.R. 529, at 538; *Dominion Bridge Co. v. British-American Nickel Corp.*, [1924] O.J. No. 124, [1925] 2 D.L.R. 138 (S.C.); *Malo and Bertrand v. Clement*, [1943] O.J. No. 237, [1943] 4 D.L.R. 773, [1943] O.W.N. 555 (H.C.J.); *Barinds v. Green & Silverman*, [1911] B.C.J. No. 67, 16 B.C.R. 433; *Re Landry and Steinhoff*, [1941] O.R. 67, [1941] 1 D.L.R. 699 (H.C.J.); *Arnold v. Fleming*, [1923] 1 D.L.R. 1026 (Alta. S.C.); *Minot Grocery Co. v. Durick & Nye* (1913), 10 D.L.R. 126 (Sask.); *Page Estate v. Sachs*, [1990] O.J. No. 478, 72 O.R. (2d) 409, appeal dismissed [1993] O.J. No. 269, 12 O.R. (3d) 371; *Jose v. Riz*, [2009] B.C.J. No. 1593, 2009 BCSC 1075 (foreign immovable not jointly held under law of place where situated).

[1.1] *Corlett v. Hoelker*, [2012] B.C.J. No. 34, 2012 BCSC 25, 13 R.F.L. (7th) 400 (however, where the characterization of a property as the matrimonial home and the legal implications of this characterization were not raised in foreign matrimonial proceedings, the matter was *res judicata*).

[2] See *supra*, para. 23.1.

[3] *Wincal Properties Ltd. v. Cal-Alta Holdings Ltd. and Fidelis Management Ltd.*, [1983] A.J. No. 559, 24 Alta. L.R. (2d) 50 (Q.B.); *Avco Financial Services Realty Ltd. v. Harvie*, [1985] A.J. No. 864, 60 A.R. 266 (Q.B.); *Honolulu Federal Savings and Loan Association v. Robinson*, [1990] M.J. No. 598, 76 D.L.R. (4th) 103 (C.A.); *Investors Group Trust Co. v. Capital City Savings and Credit Union*, [1991] A.J. No. 318, 118 A.R. 254 (Q.B.).

[4] See e.g., Cheshire and North, *Private International Law* (12th ed., 1992) at 68, 786.

[5] *Re Ross; Ross v. Waterfield*, [1930] 1 Ch. 377; *Re Duke of Wellington; Glentanar v. Wellington*, [1947] Ch. 506, affd [1948] Ch. 118 (C.A.).

CHAPTER 24

# MOVABLES

## §24.1  PARTICULAR KINDS OF PROPERTY

### a.  Tangibles

The validity and effect of an assignment[1] of tangibles, or choses in possession,[2] are governed by the *lex situs* of the chose. Accordingly, an assignment will be recognized in common law Canada as giving a good title if, and only if, it has this effect in the *lex situs*;[3] and an assignee regarded by the *lex situs* as bound by prior rights will be similarly bound in the view of Canadian courts.[4] If the property is in one of the provinces or territories, the validity and effect of the assignment will be governed by the law of that province or territory,[5] but not all rules of domestic law are applicable to assignments taking place abroad.[6]

A change in the location of a chose in possession does not by itself affect title to the chose.[7] Thus, if the new *lex situs* does not recognize the validity or effect of an assignment that took place before the change of location, a Canadian court will nevertheless apply the old *lex situs* to these questions.[8] However, the validity and effect of an assignment made after the change of location will be governed, under the principle already stated,[9] by the new *lex situs*; and in appropriate cases good title held under the old *lex situs* will be defeated.[10]

### b.  Negotiable Instruments and Documents of Title

Negotiable instruments and documents of title to movables, such as bills of lading, are regarded as corporeal movables, the assignment of which is governed by rules different from those affecting bare choses in action.[11] The validity and effect of an assignment of a negotiable instrument or document of title are governed by the law of the legal unit in which the assignment takes place.[12] The application of the *lex situs* of the instrument or document at the time of the transfer accords with the general principle governing assignments of tangible movables.[13]

### c.  Intangibles

Whether a debt or other chose in action that is not represented by a document of title is assignable is governed by the proper law of the debt or chose.[14] This principle extends to the question whether notice need be given to the debtor,[15] and possibly to the question whether the assignee is required to join the assignor as a party to any action.[16]

It is uncertain what law governs the intrinsic validity of the assignment of a bare chose in action and the rights of the assignor and assignee. If the assignment is regarded as a contract, these matters would be governed, under the general principles of the conflict of laws relating to contracts,[17] by the proper law of the assignment,[18] save that compliance

with the formalities prescribed by the law of the place of the assignment would be an alternative to compliance with those prescribed by the proper law.[19] However, there is much authority for the view that these questions are governed by the law of the place of the assignment or by the law of the domicile of the assignor or of the parties,[20] and for the view that the formalities to be observed are those prescribed by the law of the place of the assignment.[21]

Priorities as between successive assignments of the same chose in action would seem to be governed by the proper law of the chose,[22] possibly by the *lex fori*.[23]

### d.   Intellectual Property

Canadian laws dealing with intellectual property are territorial. They are limited to the national territory.[24] Canada is also bound by several international conventions that provide, *inter alia*, for national treatment.[25]

An unregistered copyright, which is an intangible property right in the nature of a chose in action, has no *situs* apart from the domicile or residence of its owner.[26] Although registration of copyright is not required in Canada, it is available. Thus, when registered in this country, it would have a Canadian *situs* and the *Copyright Act*[27] would govern the proprietary rights of the owner of the copyright, such as its assignment,[28] as well as issues of title to or ownership of the work. The country of origin or first publication of a work could also be considered as the *situs* of the work for resolving these issues.

Statutory rights of patents and registered trademarks are strictly territorial. They are situated in the jurisdiction of the grant. Therefore, no assignment or transfer can take place except in accordance with the laws of that jurisdiction.[29]

### e.   Cultural Property

Canada is a party to the November 14, 1970 UNESCO Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property which *inter alia* provides that compensation is payable by the requesting state to an innocent purchaser or to a person who has a valid title to the property illicitly imported upon its return by the requested state.[30]

The UNIDROIT Convention on the International Return of Stolen or Illegally Exported Cultural Objects of June 23, 1995,[31] contains rules for the restitution and return of stolen or illegally exported cultural objects. Innocent purchasers are entitled to compensation.[32] The court or other competent authority of the state where the cultural object is situated has jurisdiction to hear the dispute, in addition to the court or other competent authority otherwise having jurisdiction under the rules in force in the contracting states. The parties to the dispute may also consent to give jurisdiction to any country or to resort to arbitration.[33]

### f.   Quebec

Article 3097 of the *Civil Code* provides that:

> Real rights and their publication are governed by the law of the place where the property concerned is situated.

CONTRACTS                                                                                    §31.2

[3] Party autonomy, historically, has had a less central place in many private international law systems than in Anglo-Canadian law; see Hessel E. Yntema, " 'Autonomy' in Choice of Law" (1952) 1 Am. J. Comp. L. 341.

[4] In general, see Baxter, "Choice of Law" (1964) 42 Can. Bar Rev. 46, esp. at 62-73; and Nygh, *Autonomy in International Contracts* (1999).

[5] These issues are explored in Willis Reese, "Choice of Law in Torts and Contracts and Directions for the Future" (1977) 16 Colum. J. Transnat'l L. 1. Economic arguments relating to contracting parties' ability to choose among competing state regulatory regimes are considered in Larry E. Ribstein, "From Efficiency to Politics in Contractual Choice of Law" (2003) 37 Ga. L. Rev. 363.

[6] §31.6 Mandatory Rules that Apply Notwithstanding the Proper Law.

[7] See below, §31.4.b Sale of Goods and §31.4.d Contracts of Carriage.

[8] Regulation (EC) No. 593/2008 (17 June 2008) on the law applicable to contractual obligations (Rome I). The Regulation replaced the European Community Convention on the Law Applicable to Contractual Obligations, 19 June 1980 (80/934/EEC) (Rome Convention).

[9] OAS Treaty Series No. 78, adopted at the OAS's Fifth Inter-American Specialized Conference on Private International Law. Canada, as an OAS member, may eventually become party to the convention but so far only Mexico and Venezuela have ratified it. The text is available online at: http://www.oas.org/juridico/english/treaties/b-56.html.

[10] Hague Conference on Private International Law, *Draft Hague Principles as Approved by the November 2012 Special Commission Meeting on Choice of Law in International Contracts and Recommendations for the Commentary* (2012), available online, Hague Conference on Private International Law: http://www.hcch.net/upload/wop/contracts2012principles_e.pdf. See Symeon C. Symeonides, "The Hague Principles on Choice of Law for International Contracts: Some Preliminary Comments" (April 25, 2013), *Revue critique de droit international privé*, Vol. 13, 2013, available online, SSRN: http://ssrn.com/abstract=2256661. See also Permanent Bureau of the Hague Conference on Private International Law, "Choice of Law in International Commercial Contracts: Hague Principles?" (2010) 15 Unif. L. Rev. 883.

## §31.2 EVOLVING PRINCIPLES OF THE GOVERNING LAW

In the Anglo-Canadian conflict of laws, with only a few exceptions, issues relating to the validity, interpretation, performance, and breach of a contract are governed by the "proper law" of the contract, an expression that was coined by Westlake.[1] Unlike most other choice of law rules, the primary rule is that the parties are free to contract under whichever system of law they choose. This has been the rule at least since the late 18th century. In 1760 Lord Mansfield said, "the general rule established *ex comitate et jure gentium*, is that the place where the contract is made, and not where the action is brought, is to be considered in expounding and enforcing the contract. But this rule admits of an exception where the parties (at the time of making the contract) had a view to a different Kingdom."[2]

Over the last century and a half, the choice of law principles expressed by Lord Mansfield have altered in two fundamental ways. First, the emphasis on territoriality,[3] as reflected in the reference to the place of contracting,[4] has all but disappeared. As methods of communication developed, an ever larger proportion of contracts came to be made at a distance, by mail, telegram, telex, fax or e-mail. For such contracts it makes little sense to attach presumptive importance to where the contract was made. The place of contracting is often a matter of happenstance,[5] or determined by an arbitrary rule as to whether a contract is made in the jurisdiction where the acceptance is dispatched or transmitted or the jurisdiction where it is received.[6] As a consequence, the place of

contracting, although still a factor in the absence of party choice, is now only one among many to be considered.

Second, the law has altered the form of the analysis when parties have not agreed on a proper law. The old approach was to say that the law governing a contract is ultimately a matter of what the parties intended, as suggested by Lord Mansfield's expression that the court will apply the law of a particular jurisdiction if the parties "had a view to" that country.[7] Judges acknowledged that, if the parties have not agreed on a governing law,[8] their "intention" to have a particular law apply to their contract must be imputed rather than actual. Willes J. said in 1865 that "it is necessary to consider by what general law the parties intended that the transaction should be governed, or rather to what general law it is *just to presume* that they have submitted themselves in the matter".[9] Still, because the issue was treated as one of intention, the proper law was found on construction of the contract as a whole, which allowed a court to take into account not only the provisions of the contract but also all the circumstances surrounding the making of the contract. As Singleton L.J. put it in 1953, the court's task was "to determine for the parties what is the proper law which, as just and reasonable persons, they ought or would have intended if they had thought about the question when they made the contract."[10]

Beginning in the early 1950s the courts, when dealing with a contract that lacked an agreement as to the proper law, gradually dispensed with the language of intention. They came to recognize explicitly that where the parties have not agreed as to which law will govern their contract, the role of intention is spent. The inquiry is not what the parties intended the governing law to be, because *ex hypothesi* they had no common intention on that point, but which country's law ought to apply under the circumstances. The formulation on which the English[11] and Canadian[12] courts have settled is the law with which the contract has its "closest and most real" or "closest and most substantial connection".[13] As will be seen below,[14] however, the change in formulation of the test has not fundamentally changed its substance; the proper law is still a matter that depends on assessing the contract, and its surrounding circumstances, as a whole.

The proper law of the contract is therefore a two-stage inquiry.[15] First, did the parties agree on the law to govern the contract? Second, if not, what law has the closest and most real connection to the contract? It should also be noted that determining the proper law may not resolve all issues relating to the contract. Issues that clearly or arguably are determined according to some other choice of law rule will be considered after the sections dealing with the proper law.

---

[1] John Westlake, *Private International Law* (5th ed., 1912), §212 at 306, referring to "the cases in which some other country may compete with the place where the contract was made as the truest seat of the transaction in question, and therefore as the country giving to the contract its proper law".

[2] *Robinson v. Bland* (1760), 2 Burr. 1077. Lord Collins, ed., *Dicey, Morris and Collins on the Conflict of Laws*, 15th ed. (London: Sweet & Maxwell, 2012), para. 32-041, notes that, early on, the parties' freedom to choose the governing law was not universally accepted even in England, citing ch. 12 of Westlake as an example.

[3] The territorial idea, that an obligation must "vest" by the law of the place where the acts giving rise to the obligation took place, has a long history. A notable exponent of the *lex loci contractus* principle was Huber, *De Conflictu Legum Diversarium Diversis Imperiis* (1689), rules 5, 10. See Lorenzen, *Selected Articles on the Conflict of Laws* (1947), ch. 6 at 167, 168, 174.

apply to charter parties but only to contracts of carriage. The intention to have the provisions of the statute apply to the charter party was a plausible construction because it was well known that parties often wished "to import into the contractual relation between owners and charterers the same standard of obligation, liability, right and immunity as under the rules subsists between carrier and shipper".[24] Fitting the statute to the requirements of a charter party, if that is what the parties intended, may involve ignoring statutory provisions that conflict with other terms of the contract or are otherwise inapposite.[25]

In each of the cases just mentioned, the incorporation was by way of a "clause paramount" that the terms of the relevant statute were to apply to shipments from ports in the relevant country. A marine contract of carriage may contain more than one clause paramount if different clauses are needed for different jurisdictions in which the contract may be performed, and may include a governing law clause as well.[26] The function of the clause paramount is to ensure that, irrespective of the law that governs the contract as a whole, the local law of the place of performance applies as, by that law, it is supposed to.[27] Clauses paramount are discussed further below.[28] If the clause paramount incorporates a particular statute, the terms of the statute may invalidate express provisions of the contract, including a general choice of law clause that the statute declares void.[29]

The distinction between incorporation of a foreign statute, and choice of a foreign governing law, is important in relation to the time element, that is, the time as of which the content of the foreign law is determined. This is discussed below.[30]

### v. Constraints on the Parties' Freedom to Choose the Proper Law

In the *Vita Foods* case, Lord Wright affirmed that the parties' choice of the law to govern their contract is essentially unrestricted. Where there is an express choice, he said, "[I]t is difficult to see what qualifications are possible, provided the intention expressed is *bona fide* and legal, and provided there is no reason for avoiding the choice on the ground of public policy".[31] Public policy is a general exclusionary principle in the conflict of laws and is discussed elsewhere,[32] but the first two of these qualifications need to be examined more closely here.

Aside from a sham choice, which does not actually reflect the parties' true agreement and so would be invalid on that ground, the *bona fide* criterion has been taken to invalidate a choice of law that the parties make for improper motives. One possible example of *mala fides* is where the parties select the law of a country with which the contract has no connection whatever,[33] although there are cases in which such choices of law have been treated without question as valid because they were made for good reason.[34] In *Vita Foods*, it was said that a connection with the chosen law is not, as a matter of principle, essential.[35] If the parties are from different jurisdictions the choice of a "neutral" law is readily characterized as *bona fide*.

Although there is no decision squarely on point, it has been suggested that parties cannot choose a law for the purpose of evading a mandatory rule of the law that objectively is most closely connected to their contract.[36] As one judge put it, "The parties cannot make a pretence of contracting under one law in order to validate an agreement that clearly has its closest connection with another law."[37] It is not easy to draw a clear distinction between, on the one hand, such a *mala fide* choice and, on the other, a rational

preference by the parties for one rather than another of the systems of law that are substantially connected with their contract.[38] In fact, there is no reported case in which a party succeeded in having an agreed choice of law disregarded because the chosen law was insufficiently connected with the contract. In each case in which the issue has been raised the connections with the chosen system of law were held substantial enough to qualify the choice as *bona fide*.[39]

As for an illegal choice, this would include a case in which a statute of the forum declares the choice of law invalid. In one case a choice of a Japanese forum and of Japanese law in a contract of carriage was held invalid under Canadian federal law because it would potentially have the effect of reducing the carrier's liability compared with that laid down in the Hague Rules, and the applicable federal statute made null and void any provision lessening the carrier's responsibility otherwise than as provided in the Rules.[40]

It is rare for a statute to invalidate an agreement on choice of law as such, although examples can be found.[41] Much more common are statutes that simply mandate the application of particular rules to the contract, irrespective of the system of law that applies to the contract generally.[42]

It is conceivable that the parties' choice of law might be illegal, not by the *lex fori*, but by the chosen law itself. However, it is doubtful whether a court would have regard to what is in effect a conflict of laws rule of the foreign legal system. That would amount to renvoi, the attempt to reach the same result as a court of the relevant foreign country would do by following the foreign court's conflict of laws rules. Renvoi has consistently been rejected as a technique for determining the proper law of the contract.[43]

### b.   Proper Law Impliedly Agreed

Although the parties have not expressly designated a governing law, an agreement that a particular system of law should govern the contract may be implied on the basis that any term may be implied, namely, that the parties' common intention on the point is evident as a matter of construction of the agreement as a whole.[44] Judicial decisions, especially the older ones, often do not distinguish between the law that the parties impliedly intended to apply and the law that has the closest and most real connection to the contract; both are dealt with under the rubric of an implied choice. The distinction is, however, a sound one to make because the two routes to the proper law rest on different premises.

An implied intention, strictly so called, can only be found if the terms of the contract, interpreted in the light of the surrounding circumstances, leave no room for doubt that the parties intended a particular system of law to govern their contract.[45] Where such an intention cannot be inferred from the terms of the agreement, the inquiry then broadens to ask with which system of law the contract has its closest and most real connection (as discussed in the next section). That question must be answered in light of, not only the terms of the contract, but also all the other ways in which the contract is linked to one or other system of law. The choice of law is made by the judge because the parties did not make it.

The distinction, and the difficulty of drawing it in certain situations, are illustrated by an English case[46] in which the proper law of an insurance policy was at issue. The majority

of the proper law can alter or put an end to the obligations,[77] whereas legislation elsewhere, such as the country in which the contract or part of it is performed, does not have that effect.[78]

If the issue is whether the parties' obligations under one agreement have been replaced by obligations under a new agreement between the same parties, and both agreements are governed by the same proper law, the issue is simply one of the validity and interpretation of the second agreement.[79] If the new agreement is governed by a different system of law from the first one, the question whether the obligations under the first agreement were susceptible of being superseded would logically depend on the proper law of that agreement. The question whether the new agreement achieved that result would depend on whether that agreement was valid, and apt to achieve the result, under its own proper law.[80] In the case of a discharge of a debt by novation, where one debtor is discharged and replaced by another, the logic is similar. The discharge of the original debtor is governed by the proper law of the first contract, while the obligation of the new debtor is governed by the proper law of the second contract.[81]

## j.  Assignment

The assignment of rights under a contract is characterized as the transfer of intangible movable property, and is dealt with elsewhere in this book under that heading.[82] There are, obviously, aspects of assignment that relate to the laws governing the contracts in question. The question whether the benefit of a particular contractual obligation can be assigned is referable to the proper law of the contract that is the subject of the assignment, since it is that system of law that determines the nature of the rights created.[83] On the other hand, the validity of the assignment agreement as such, and the relations between assignor and assignee, depend on the proper law of the contract of assignment.

Once obligations have been assigned, they continue to be governed by the proper law of the contract that is the subject of the assignment. Article 3120 of the Québec *Civil Code* reflects this principle: "The assignability of a claim and relations between the assignee and the assigned debtor are governed by the law governing relations between the assigned debtor and the assignee." This has the result that the assignor cannot make an assignment that renders the obligations of the assigned debtor more onerous, which is fair, since the latter has no control over the choice of the law applicable to the agreement between assignor and assignee. By the same token, questions of the assignee's giving notice to the assigned debtor, or taking other steps to make the assignment effective with regard to the debtor, should be governed by the law of the assigned contract.[84]

## k.  Rights of Third Parties

It is the proper law that gives legal force to the parties' agreement. It logically follows that it is the proper law that determines whether third parties can claim rights under the agreement.[85] The proper law of a contract of carriage was held to determine whether a stevedoring firm could invoke a limitation of liability, agreed to by the cargo owner, which was expressly applicable to third parties in the position of the stevedores.[86]

The proper law of a life insurance contract or an annuity determines who has validly been designated as the beneficiary of the contract in the event of the insured or annuitant's death.[87] Motor vehicle insurance legislation typically gives a victim of an accident who

obtains judgment against an insured driver or owner a direct claim against the insurer for any applicable insurance proceeds; this, too, is an aspect of the insurer's contractual liability that is referable to the proper law of the policy.[88] However, claims to insurance proceeds arising extraneously to the insurance contract are governed by the law applicable to the transaction that is said to entitle the claimant to the proceeds.[89]

Whether the dependants of a person who is killed are entitled to assert claims based on the fact that the wrongdoer would have been contractually liable to the deceased in respect of the death, has been held to depend on the fatal accidents legislation of the proper law of the contract between the deceased and the wrongdoer.[90]

## l.   Effect on Interests in Property

### i.   Sales of Property

Whether, and when, a contract of sale passes title to immovable or movable property depends on the applicable law of property, which will usually be that of the jurisdiction in which the property is located at the time of the purported transfer of title.[91] If the issue is where title to property situated in country A resides after a contract of sale governed by the law of B, should the validity and effect of the contract be decided according to the conflicts rules of A or those of the forum? This "incidental question" should probably be resolved by the A conflicts rules, since the aim ought to be to reach a result consistent with the view that would be taken by a court of the *situs*.[92]

### ii.   Maritime Liens

There is a body of case law on the relationship between contracts for the supply of necessaries, such as fuel, to a ship, and the property interests in the vessel that result from such contracts.[93] Under Canadian law such contracts give rise to a statutory right *in rem*[94] but not a maritime lien. Under some foreign systems of law, including that of the United States, they give rise to a maritime lien, which, under Canadian priority rules, has higher priority than the statutory right granted suppliers by Canadian maritime law. In the United Kingdom the Privy Council has held that the issue whether the creditor gets a maritime lien is a procedural question to be resolved according to the *lex fori*.[95] In Canada, however, the matter has been treated as substantive. The Federal Court of Appeal has held that the issue whether a supplier of necessaries obtains a maritime lien should be decided according to the system of law that has the closest connection with the transaction of supply.[96]

In determining that system of law, the proper law of the contract of supply will usually be the dominant factor if the transaction at issue is a sale by the supplier to the ship owners or a party with authority to bind the owners.[97] The proper law of the supply contract will not be decisive, however, if the necessaries are supplied to a party, such as a charterer, under a contract that does not bind the ship owners. In the latter case, the ship cannot be bound by the terms of the contract, so the non-contractual elements, such as the nationality of the purchaser and supplier and the location of the transaction, assume greater importance.[98] Even if the contract does bind the owners, a maritime transaction may be so strongly connected to one jurisdiction that the law of that jurisdiction, rather than the chosen proper law of the contract, should govern the question whether a maritime lien arises.[99]

**31-58**

## §31.5  SPECIFIC ISSUES

### a.  Scope of the Issues Governed by the Proper Law

The proper law of the contract governs the great majority of the substantive issues relating to the validity, interpretation, performance and discharge of the contract, as well as its effect on third parties. Legislation can create exceptions by requiring a particular jurisdiction's rule—usually that of the forum—to be applied even to contracts governed in other respects by another system of law. These will be discussed below.[1]

The common law choice of law rules include certain issues that may be governed by a system of law that is not the proper law of the contract. There are two principal reasons for these exceptions. One is that the issue goes to the existence of the agreement, as distinct from the validity of the agreement once made. Such an issue cannot be referred to the proper law because the determination of the proper law itself may depend on the terms the parties agreed to. Hence, the issue must be decided by a system of law, the selection of which does not depend on the parties' agreement. Issues of this type include the capacity of the contracting parties (see §31.5.b) and the formation of the contract (see §31.5.c).

The other reason is that applying the law in question, although it is not the proper law, serves the convenience of the parties or helps to ensure their agreement is effective. Issues in this category include formalities of entering into a contract (see §31.5.d) and the mode of performance of the contract (see §31.5.h).

Statutes of limitation, no matter whether they are worded in terms of barring the remedy or extinguishing the right, are characterized as substantive.[2] Hence, subject to any statutory modification of this rule,[3] the proper law of the contract determines the limitation period for actions on the contract.[4] Whether, and how, a limitation period can be waived are issues referable to the same law.[5]

### b.  Capacity

The question of the legal capacity of a contracting party is logically antecedent to the question of the proper law, since a party that lacks capacity to contract also lacks capacity to agree on a proper law. There is no logical objection, however, to applying the objectively determined proper law to determine whether a party lacked capacity, and the relatively few cases on the point generally adopt this solution.[6] There is some room to argue that a person's capacity should be determined by the law that governs personal status, namely the law of the domicile, but the common law concept of domicile is remote from the circumstances on which contracting parties would usually base their expectations and so has little support in the cases.[7]

In Québec, where the concept of domicile is closer to the notion of ordinary or habitual residence, the law of the domicile is the general rule for determining capacity.[8] However, a party may not invoke an incapacity under the law of his or her domicile if no such incapacity exists under the law of the other party's domicile, the contract is made there, and the other party had no reason to know of the incapacity.[9]

### c. Formation

"Formation" embraces a variety of issues relating to the validity of an agreement, including, at common law, offer, acceptance and consideration. If no choice of law clause is involved, the most obvious system of law by which to judge the existence of any of these issues is the law that is most closely connected with the contract (or putative contract). The Rome I Regulation takes this approach: "The existence and validity of a contract, or of any term of a contract, shall be determined by the law which would govern it under this Regulation if the contract or term were valid."[10]

Matters are more complicated if there is a choice of law clause in one or more of the documents that are said to be part of the contract, and there is a dispute about whether that clause was ever agreed to. Here a distinction needs to be made between questions of consent, that is, whether a party voluntarily assented to the term in question, and other questions relating to the validity of the contract, such as consideration. There is no reason why a choice of law clause that was agreed to should not be given effect in resolving the latter type of issue.[11] There are persuasive dicta that nondisclosure, where there is a duty to disclose, or misrepresentation should be treated likewise. They are not formation issues in the sense of implicating consent, because they do not render an agreement void; they only give the injured party a right to rescind.[12] However, there is room to argue that a party who obtains the other's consent by fraud or duress[13] should not be able to rely on an express choice of law that would displace the objectively most closely connected law, since the agreement to that choice of law would have been improperly obtained.[14]

On the other hand, if the issue is whether a choice of law clause was ever actually agreed to, the problem cannot logically be resolved by looking to the proper law if that proper law depends on the parties' agreement (the "bootstrap" aspect). Three choice of law approaches have been suggested to address the difficulty.[15] One is to resort in such a case to the objectively determined proper law to determine whether agreement was reached.[16] This would be a solution, for example, if it was unclear which of two documents embodied the parties' agreement and one contained a choice of A law and the other contained a choice of B law or no choice of law.

A second approach, adopted in Rome I, is to bring in the "home" law of the party that says it did not consent. As already noted, article 10, paragraph 1 states the basic position that all formation issues are to be resolved by the law that would govern the contract if it were valid. That includes a system of law selected by a choice of law clause if there is one in the putative contract.[17] However, paragraph 2 adds,

> Nevertheless, a party, in order to establish that he did not consent, may rely upon the law of the country in which he has his habitual residence if it appears from the circumstances that it would not be reasonable to determine the effect of his conduct in accordance with the law specified in paragraph 1.[18]

The OAS Convention, more vaguely, says that "to establish that one of the parties has not duly consented, the judge shall determine the applicable law, taking into account the habitual residence or place of business".[19]

A third option, which also has its advocates,[20] is to treat the question of consent as a matter for the *lex fori* because it involves the characterization of an "agreement" for the

purposes of applying a conflicts rule of the forum.[21] This is vulnerable to an argument that the conflicts rule refers to the parties' agreement, not to a particular type of agreement, and that applying the standards of offer and acceptance of the *lex fori* to decide whether there is an agreement goes beyond characterization into issues of substance.

### d. Formal Validity

Because the common law does not require that a contract must be entered into with particular formalities, issues of formal validity usually involve the question whether compliance with a foreign or a statutory formal requirement was necessary to make the contract valid. It was held early on that if the place the contract was made has no formal requirements, the contract is valid notwithstanding the failure to observe the formalities of the system of law that otherwise governs the contract.[22] However, if the place of contracting does have formal requirements, but the proper law does not, the contract has still been held valid. Thus the *Guarantees Acknowledgment Act* of Alberta,[23] which requires guarantees to be executed in the presence of a notary, has been held not to invalidate guarantees executed in Alberta where the proper law of the guarantee was the law of another province.[24] The rationale is that it seems inappropriate to allow the place of contracting, which may be fortuitous or identified through an arbitrary rule, to invalidate a contract that complies with all the requirements of its proper law.[25]

These two principles suggest that if both jurisdictions' laws have formal requirements but they differ, the contract ought to be held valid if it complies with the formal requirements of either the proper law or the law of the place of contracting. Article 3109 of the Québec *Civil Code* takes this position, in that it states that the form of a juridical act is governed by the law of the place where it is made, but the act is nevertheless valid if it is made "in the form prescribed by the law applicable to the content of the act".[26]

The Rome I Regulation provides that, if the parties are in the same country when the contract is made, the contract is valid as to form if it complies with the law that governs the contract or the law of the place where the contract is concluded.[27] If the parties are in different countries, the contract is valid if it complies with the law that governs the contract, the law of either of the countries where either of the parties or their agent is present, or the law of the country of either party's habitual residence.[28]

The OAS Convention likewise distinguishes between a contract made between parties who are in the same country and parties who are in different countries. In the same-country case, the contract is formally valid if it complies with the law that governs the contract, "the law of the State in which the contract is valid", or the law of the place where the contract is performed. In the different-country case, the middle option is replaced by "the law of one of the states in which [the contract] is concluded".[29]

If a contract is formally valid when it is executed, it remains formally valid irrespective of a party's changing residence to a jurisdiction that imposes other formal requirements.[30] A contract relating to real estate is formally valid if it complies with the law of the place of contracting or the proper law. It would seem that it should also be valid if it complied with the formalities prescribed by the law of the jurisdiction in which the land is situated, if that jurisdiction is different from both the others.[31] In any event, a contract effecting a conveyance must comply with any formal requirements of the law of the jurisdiction where the land is located in order effectively to transfer title.[32]

31-53                                    (Rel. 39-8/2013 Pub.5911)

§31.5                CANADIAN CONFLICT OF LAWS

A writing requirement that, as in the English *Statute of Frauds* and the Canadian statutes based on it, is framed in terms of a rule of evidence has been characterized as a rule of procedure and so applies to any legal proceeding in the jurisdiction.[33] Writing requirements that are framed as a rule of validity are probably best characterized as having to do with formal validity, although some cases seem to suggest that, depending on the purposes of the requirement, they may be characterized as going to essential validity.[34]

### e.  Essential Validity

Leaving aside certain questions of formation, discussed immediately above, all issues of essential validity fall to be decided by the proper law. These include issues that relate to the validity of the contract as a whole, such absence of consideration[35] or illegal purpose,[36] and those that relate to the validity of particular parts of the contract, such as an arbitration clause[37] or a limitation or exclusion of liability clause.[38] Whether a clause can validly exclude or limit extra-contractual liability, such as liability in tort, is best characterized as an issue of essential validity of the contract.[39]

Essential validity also includes issues as to when a right may validly be asserted, including waiver and estoppel,[40] as well as statutory rules such as the bar against a mortgagee's claiming on the personal covenant for the balance of the debt after foreclosure and sale of the property.[41] Bars on claims for fees by unlicensed agents or brokers are likewise applied if they are part of the proper law[42] and apply to the facts.[43] What implied obligations are created by the contract is also a matter for the proper law.[44] This includes liability to pay interest on overdue amounts.[45]

Essential validity also refers to matters of supervening invalidity, where the law changes after the contract is made to render it invalid in whole or in part, or substitute a stipulated obligation for the one originally agreed to.[46] Exchange control legislation is a fertile source of such cases.[47]

### f.  Interpretation

The case law generally treats the interpretation of a contract as intrinsic to the proper law of the contract. A clause that a contract is to be "construed" or "interpreted" according to a particular system of law is treated as an agreement on the governing law.[48]

It is theoretically possible that the parties intended the language of their agreement to be interpreted according to legal concepts drawn from a system of law other than the proper law. Nevertheless, if they make their agreement under the law of a particular jurisdiction, they bind themselves to having the legal effect of their contract determined by the law of that jurisdiction, including its rules of construction. If those rules permit reference to another system of law when interpreting provisions of the contract, it is open to a party to contend that the meaning of the contract should be determined accordingly.[49] Except in such a case, the terms of art and other special language used in the contract must be given the meaning they have under the proper law.[50] Units of measurement[51] and currency[52] have the meaning given to them in the proper law, unless it is apparent that a foreign unit or currency was meant, in which case the obligation denominated in that currency must be fulfilled according to the law of the country whose currency it is.[53]

The scope of an arbitration clause must also be determined by construing it according to the proper law.[54]

### g.  Effect of the Contract

Just as the proper law determines the validity of terms of the contract, it also determines the nature of the obligations to which the terms give rise. Both are aspects of the principle that the parties' agreement derives its legal force from the system of law that governs it. Thus, for example, the obligations of an insurer are determined by the proper law of the policy.[55] Similarly, the rights of the seller of a chattel under a conditional sales agreement depend on the proper law of the agreement,[56] although because of the proprietary aspects of the transaction the exercise of those rights may be subject to legislation, such as personal property legislation, in the jurisdiction where the property is located.

### h.  Mode of Performance

The proper law determines the substance of the obligation, but the manner in which the obligation is carried out may depend on the law of the jurisdiction where performance takes place. Applying the law of the place of performance (*lex loci solutionis*) is consistent with the presumed intent of the parties that performance must be consistent with the local usages and legal requirements, including hours of business, hours of work,[57] and obtaining any necessary licence from the local authorities.[58] Mode of performance in this context may include more than just issues of mere form. Thus, in relation to the obligation to pay a bill of exchange upon presentment, it has been held that the acceptor gets the benefit of any grace period for presentment enacted by the jurisdiction where presentment is to take place.[59]

### i.  *Transfers of Property*

Conveyances of property, to be valid, must necessarily be carried out in accordance with the legal requirements of the jurisdiction where the property is situated. The same applies to repossession of property by the seller. If the law where the property is situated requires an out-of-province seller with a security interest to register that interest, the seller can only exercise its rights, albeit that they stem from the proper law, in accordance with that requirement of the law of the place of repossession.[60]

### ii.  *Currency*

The currency in which a payment is made may be a question of mode of performance to which the *lex loci solutionis* applies, but it may also be a question of the substance of the obligation, which is to be determined according to the proper law. The distinction is often expressed in terms of the currency of payment and the currency of account. The manner in which payment is made must comply with the currency laws of the place of payment, and if those laws prescribe the local currency as the sole legal tender, that is the currency of payment. On the other hand, the amount of the obligation depends upon the currency in which the obligation is denominated, the currency of account. Which currency that is depends upon the construction of the contract according to its proper law.

These questions came to the fore in cases in which it was unclear whether an obligation stated in "dollars" was to be paid in Canadian or U.S. dollars, or an obligation originally stated in "pounds", at a time when the British Pound was the currency in many parts of the Empire, was eventually to be paid in sterling (the United Kingdom currency)

§31.5                    CANADIAN CONFLICT OF LAWS

or in the currency adopted, after they abandoned sterling, by Australia or New Zealand. In some of these cases the court did not have to distinguish between the currency of payment and the currency of account because they were held to be the same. That is, the payor's obligation was construed as being denominated (currency of account) in the currency of the place where payment was agreed to be made (currency of payment).[61] Sometimes there was even said to be a rebuttable presumption to this effect.[62] In many other cases, however, the contract was interpreted, according to the proper law, as having a currency of account other than that of the place where the creditor was entitled to be paid.[63] The currency of account need not be that of the country of the proper law.[64] The parties can—subject to any restrictions imposed by the proper law, such as exchange controls[65]—define the obligation by reference to any country's currency.[66]

If the currency of payment differs from the currency of account—in other words, if the debtor is required or entitled to pay in local currency although the obligation is denominated in foreign currency—the exchange rate would normally be calculated as of the date when payment ought to be made. This reflects the creditor's right to receive whatever amount of local currency will, as of that date, purchase the relevant amount of the currency in which the obligation is expressed.[67]

### iii.   Interest

The contractual obligation to pay interest, in respect of both the rate and the basis for computation, is a matter of the substance of the debtor's obligation and so is governed by the proper law.[68]

### iv.   Alteration of Substance of Obligation

Laws governing the mode of performance must be distinguished, for choice of law purposes, from laws that render the act of performance illegal or purport to nullify or alter the obligation to perform. If the performance of an obligation, although legal by its proper law, is an offence under the law of the place where it must be performed, the obligor cannot be liable for refusing to perform.[69] If the obligation itself is, for whatever reason, regarded as partly or wholly invalid by the proper law or by a mandatory rule of the forum, the obligation is nullified to that extent.[70] Likewise, the proper law or the law of the forum may mandatorily substitute a different obligation for the one the parties agreed on.[71]

### v.   Enforcement

A rule governing the mode of performance must also be differentiated from a rule governing the enforcement of performance, which is a matter of legal procedure. The fact that a court in the country of payment or the country of the proper law might have some discretion as to enforcement of a debt has been held not to make the debt any less a binding obligation in the eyes of a Canadian court.[72]

### i.   Discharge

Just as the proper law determines what obligations arise from a contract, it also determines whether those obligations have been discharged by performance, by the other party's seizure of security,[73] by the other party's breach,[74] by the insolvency of the other party,[75] or by supervening impossibility of performance (frustration).[76] Legislation in the country