# TAB 103

# BVR's Guide to Intellectual Property Valuation

## 2009 Edition



Authored by:

## Michael Pellegrino





**What It's Worth**

Copyright © 2009 by Business Valuation Resources, L.L.C. (BVR). All rights reserved.

Printed in the United States of America.

No part of this publication may be reproduced, stored in a retrieval system or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, scanning or otherwise, except as permitted under Sections 107 or 108 of the 1976 United States Copyright Act, without either the prior written permission of the Publisher or authorization through payment of the appropriate per copy fee to the Publisher. Requests for permission should be addressed to the Permissions Department, Business Valuation Resources, LLC, 1000 SW Broadway St., Suite 1200, Portland, OR, 97205, (503) 291-7963, fax (503) 291-7955.

Information contained in this book has been obtained by Business Valuation Resources from sources believed to be reliable. However, neither Business Valuation Resources nor its authors guarantee the accuracy or completeness of any information published herein and neither Business Valuation Resources nor its authors shall be responsible for any errors, omissions, or damages arising out of use of this information. This work is published with the understanding that Business Valuation Resources and its authors are supplying information but are not attempting to render business valuation or other professional services. If such services are required, the assistance of an appropriate professional should be sought.

Editor:  Colin Murcray
Production Editor:  Laurie Morrisey
Publisher:  Doug Twitchell
Copy Editor:  Andrea M. Nash

Chair and CEO:  David Foster
President:  Lucretia Lyons
Sales:  Linda Mendenhall
Customer Service Manager:  Stephanie Crader
ISBN: 978-935081-12-8

## Applied Valuation Approaches

approach to value IP in general carries substantial challenges to generating a credible value opinion (more on this shortly).

### The Income Approach

Valuation analysts typically use the income approach for intellectual property valuation assignments. A valuation analyst using the income approach bases his or her opinion on the intellectual property owner's business plan, marketing and operational inputs, and other external references. Using this method, the valuation analyst projects the economic income generated solely from the intellectual property over a discrete period, known as the remaining useful life (RUL).

The RUL is generally one of the most difficult attributes of the intellectual property's value to determine when using the income approach. It is also one of the most significant drivers for the intellectual property's value. All else the same, intellectual property with a long RUL is worth more than intellectual property with a shorter RUL. The RUL will vary based on the intellectual property under review. Certain intellectual property may have a longer RUL than others (e.g., a patent for a truck gas tank mount versus a patent on a software search algorithm) because of technological risk or the potential for substitutions.

To determine economic income, the valuation analyst projects the revenue (or cost savings or other economic benefit) generated from the intellectual property over the RUL, and then offsets that revenue with costs related directly to the intellectual property's exploitation, such as labor, materials, required capital investment, and any appropriate economic rents or capital charges. Valuation analysts employ several methods to measure economic income associated with a given piece of intellectual property.

The income discount rate that the valuation analyst uses has, aside from the RUL, one of the largest value impacts. There is an inverse relationship between the discount rate and value. Higher discount rates lower value, and vice versa. This is desirable, as it mirrors classic risk/reward principles when determining an appropriate discount rate. Early-stage intellectual property with little proven market power commands a higher discount rate than proven intellectual property because the risk of the early-stage intellectual property generating no economic income is higher than with proven intellectual property.

### The Assignment/Approach Match

In many of the examples presented thus far in this guide, the cost and market approaches both would have failed to account with any measure of precision or defensibility the value of the IP. For example, the cost and market approaches cannot account for the value loss of the Prozac® patent to Eli Lilly, the loss in value associated with failing to pay patent maintenance fees, the value of the Morton Salt brand, or the patent value associated with the mower sales. In the simplest sense, the IP valuation assignment encompasses a consid-

Patent-Specific Due Diligence

## Chapter 6

# Patent-Specific Due Diligence

Patent valuation is hard, in part because patents are complex things. Some believe patent documents to be the most complicated documents that exist in a legal sense.[1] Key problems with patent valuation include a lengthy and complex application process, technical and commercial uncertainties, and legal uncertainties both during the application process and with subsequent patent enforcement activity.[2] Further, as a patent represents a legal right, some may argue that the true value of a patent remains unknown until there is a legal challenge and a court decision regarding the value.[3] At that time, a full legal test of the patent's strength will result in either a court decision or a cash settlement for infringement.

It also makes a difference who exploits the patent. The value of a patent to Eli Lilly may be much higher (or lower) than the same value to Pfizer, particularly if it offers complementary features or provides for blocking value against a competitor. For example, a patent for a central nervous system (CNS) stimulant may be of low value for a start-up company, as it lacks the infrastructure and resources to exploit the patent to its full potential. Thus, the patent in this situation would command a lower value than if Eli Lilly were to own it, as Eli Lilly already has a CNS stimulant product, Strattera®, in the market and deep experience in marketing such therapies.

Recall that the patent valuation analyst measures the future incremental economic income a patent owner can generate by fully exploiting the invention described by the patent's claims compared with other solutions in the market that lack patent protection. Oftentimes a patent may have no value for a product that generates value from other sources, such as brand reverence, time to market, and others. Thus, an incremental analysis may yield little to no economic value indication. That is okay since a patent is not always valuable. What's more, a patent may not be of value to competitors, even in light of determinable economic benefits. For example, suppose that a software company developed a patented solution to streamline the manufacture of automobile engines, increasing plant yield and lowering costs to repair engines failing quality checks in the plant. Honda installs the technology

---

1 Gibbs, Andy, "Application of Multiple Known Determinants to Evaluate Legal, Commercial and Technical Value of a Patent,". Working paper, 2005, p. 2

2 Pitkethly, Robert, "The Valuation of Patents: A Review of Patent Valuation Methods With Consideration of Option Based Methods and the Potential for Further Research," Said Business School, University of Oxford, March 1997, p. 2

3 Stewart, Duncan, "Value Is Not So Patently Obvious; A Patent Is Worth What a Court Says It Is," *Financial Post Investing*, April 12, 2007.

# TAB 104

# TECHNOLOGY CONTRACTING: LAW, PRECEDENTS AND COMMENTARY

**P. Bradley Limpert**
LL.B., M.A. Sc., B. Engineering

## CARSWELL®

TORYS LLP
LIBRARY • TORONTO

# Publisher's Note

**2011 – Release 1**
**Previous release was 2010-2**



---

## Limpert
# Technology Contracting

---

This publication provides comprehensive, invaluable information relating to transactions and agreements that technology-oriented companies enter into throughout their life cycle. Each chapter includes a discussion on the law that is relevant to negotiating and drafting particular types of agreements, and practical suggestions for drafting and negotiating clauses and provisions within the agreements. The publication includes key contracts and transactions that are of interest to technology-oriented companies.

This release features the addition of sample patent license agreements to Chapter 5 (Patent Licensing).

## Commentary Highlights

The following sample patent license agreements have been added as appendices to Chapter 5 (Patent Licensing):

- Production Patent License Agreement

- Rapid Data License Agreement

- Exclusive Field-Of-Use Patent License Agreement

- Patent License Agreement

- License Agreement

---

**CARSWELL**®    **Customer Relations**
Toronto 1-416-609-3800
Elsewhere in Canada/U.S. 1-800-387-5164 Fax 1-416-298-5082
www.carswell.c
This publisher's
for the purpose

KF 905 C6 L56 2005+
Limpert, Brad, 1963-
Technology contracting : law, precedents
and materials /
Toronto

© 2005 Thomson Reuters Canada Limited

NOTICE AND DISCLAIMER: All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording or otherwise, without the prior written consent of the publisher (Carswell).

Carswell and all persons involved in the preparation and sale of this publication disclaim any warranty as to accuracy or currency of the publication. This publication is provided on the understanding and basis that none of Carswell, the author/s or other persons involved in the creation of this publication shall be responsible for the accuracy or currency of the contents, or for the results of any action taken on the basis of the information contained in this publication, or for any errors or omissions contained herein.

No one involved in this publication is attempting herein to render legal, accounting or other professional advice. If legal advice or other expert assistance is required, the services of a competent professional should be sought. The analysis contained herein should in no way be construed as being either official or unofficial policy of any governmental body.

**Library and Archives Canada Cataloguing in Publication**

Limpert, P. Bradley
    Technology contracting : law, precedents and commentary.

Updated annually.
Includes index.
ISBN 0-459-25506-1 (loose-leaf)
ISSN 1714-7379

    1. Technology and law—Canada. 2. Computer contracts—Canada. 3. License agreements—Canada. 4. Technology transfer—Law and legislation—Canada. I. Title.

KE1387.5.L55 2005          346.7102          C2005-901236-6
KF4270.L45 2005

Composition: Computer Composition of Canada Inc.



**THOMSON REUTERS**

CARSWELL, A DIVISION OF THOMSON REUTERS CANADA LIMITED

One Corporate Plaza                          Customer Relations
2075 Kennedy Road                     Toronto 1-416-609-3800
Toronto, Ontario          Elsewhere in Canada/U.S. 1-800-387-5164
M1T 3V4                                      Fax: 1-416-298-5082
                                             www.carswell.com
                              Online www.carswell.com/email



be registered.[76] The assignor of a patent has no right to sue for infringement occurring after an entire assignment, as an assignee receives the exclusive rights under s. 42 on assignment. Subsection 55(1) provides authority that an assignee is entitled to sue for patent infringement occurring prior to an assignment, as a party that infringes a patent is liable to an assignee for infringement damages "sustained . . . after the grant of the patent."

### (v) *Partial Assignment*

The *Patent Act* contemplates partial assignments of inventions, applications and patents.[77] For example, an assignment may transfer 50% of the entire interest in an invention, application or patent. The assignee of a partial patent assignment is legally a co-owner. The entire interest of a co-owner of a patent may be assigned without the consent of other patent co-owners.[78] The grant of a license of a co-owner of a patent requires co-owner consent.[79] In addition, partial assignments of subject matter or fields of use, and partial assignments of the regional application of a patent within Canada are possible.

### (vi) *Stanford v. Roche: Assignment Clauses*

In *Board of Trustees of Leland Stanford Junior University v. Roche*, the US Court of Appeal for the Federal Circuit ruled that the specific language used to assign a patent in an agreement profoundly affects the specific time that the assignment actually occurs.[79.1] This decision emphasizes the importance of careful use of language when drafting agreements for the assignment of patents.

### (A) Background

The dispute in *Stanford v. Roche* concerned the ownership of rights in several patents that claim methods for quantifying the occurrence of HIV in human blood and using the measurements to determine the efficacy of antiretroviral drugs that have been administered to a subject. The patents used a technique called polymerase chain reaction ("PCR") to measure levels of HIV in the blood.

The technology behind the patents was developed by a research fellow at Stanford University ("Stanford") named Mark Holodniy ("Holodniy"). Upon

---

76 *Ibid.* at s. 50(2).
77 *Ibid.* at ss. 49(2), 50(1).
78 *Forget, supra* note 67.
79 *Ibid.*
79.1 583 F.3d 832, 249 Ed. Law Rep. 612, 92 U.S.P.Q.2d 1442 (Fed. Cir. 2009) [*Stanford v. Roche*].

commencing employment at Stanford, Holodniy signed a Copyright and Patent Agreement ("CPA") where it was stated "I agree to assign or confirm in writing to Stanford and/or Sponsors that right, title and interest in . . . such inventions as required by Contracts or Grants".[79.2]

During the course of Holodniy's research, he sought assistance from Cetus, a company with expertise in PCR techniques. Holodniy signed a Visitor's Confidentiality Agreement ("VCA") with Cetus in which he agreed that "I will assign and do hereby assign to Cetus, my right, title, and interest in each of the ideas, inventions and improvements".[79.3]

In 1991, Roche acquired Cetus' PCR division, which included agreements with Stanford and with Holodniy. Holodniy finally filed for a patent in 1992 for the HIV measurement technology he had been researching but it was not until 1995 that Holodniy assigned the patent to Stanford.

Several years later, Roche marketed an HIV detection kit. Stanford sued Roche for infringement of Holodniy's patented technology and Roche countersued Stanford for not having standing to bring an action for infringement. The District Court for the Northern District of California held that the patents were invalid for obviousness.

### (B)  Federal Circuit

The Court of Appeal vacated the District Court's decision by reasoning that Stanford did not own the patent rights and so the lower court did not have jurisdiction to rule on the validity of the patents.[79.4]

### (C)  Agreements

The Federal Circuit analyzed the various agreements between Stanford, Holodniy and Cetus, and concluded that Cetus, and subsequently Roche, were the proper assignees of the patents.

The court held that Stanford did not acquire Holodniy's patent by execution of the CPA. The language of the CPA was that Holodniy would "agree to assign" the patents, which the court understood to mean that Holodniy merely "agreed only to assign his invention rights to Stanford at an undetermined time" when Holodniy would take further action to complete the assignment.[79.5] Thus, Stanford "gained certain equitable rights against Holodniy" but "did not immediately gain title to Holodniy's inventions as a result of the CPA, nor at the time the inventions were created".[79.6]

---

79.2 *Ibid.* at 841 [F.3d].
79.3 *Ibid.* at 842 [F.3d].
79.4 *Ibid.* at 848 [F.3d].
79.5 *Ibid.* at 841 [F.3d].
79.6 *Ibid.* at 841-42 [F.3d].

The language in the VCA, by contrast, used the phrase "do hereby assign", which the Court interpreted as having "effected a present assignment of Holodniy's future inventions to Cetus".[79.7] In contrast with the limited set of equitable rights Stanford had against Holodniy, "Cetus immediately gained equitable title to Holodniy's inventions".[79.8]

Once the patent had been filed, however, "Cetus's equitable title converted to legal title no later than the parent application's filing date".[79.9] In the court's view, Cetus had complete ownership of the patent rights. Although Holodniy later executed an assignment of his title in the patent rights to Stanford, the court held that Holodniy no longer had the right to do so and negated the assignment to Stanford.

(D)  Recordation with the USPTO and *bona fide* second purchaser

Stanford attempted to assert ownership over the patent rights by taking advantage of s. 261 of the *US Patent Act* which states:[79.10]

> An assignment, grant or conveyance shall be void as against any subsequent purchaser or mortgagee for a valuable consideration, without notice, unless it is recorded in the Patent and Trademark Office within three months from its date or prior to the date of such subsequent purchase or mortgage.

> Cetus never recorded its assignment of Holodniy's patents. Stanford attempted to portray itself as a *bona fide* subsequent purchaser of the patent rights by saying it gave valuable consideration and received no notice of Cetus' rights in the patents. The Federal Circuit did not accept this argument and found that Stanford "had at least constructive or inquiry notice of the VCA" since Holodniy's supervisor had directed him to work with Cetus.[79.11]

(E)  Implications

The exact language used in agreements to assign can have a profound impact on establishing priority of ownership of the assigned patent rights. In *Stanford v. Roche*, the phrase "agree to assign" means that the assignment will occur at a later date while the phrase "do hereby assign" is an immediate assignment of future rights. In addition, an assignee in the United States should

---

79.7  *Ibid.* at 842 [F.3d].
79.8  *Ibid.* at 842 [F.3d].
79.9  *Ibid.* at 842 [F.3d].
79.10  35 U.S.C § 261 (2006).
79.11  *Board of Trustees of Leland Stanford Junior University v. Roche, supra* note 1 at 843 [F.3d].

record the assignment with the USPTO in order to bolster its claim over the patent rights. The U.S. Supreme Court has granted leave to appeal this decision.

## (b)  Licenses

In addition to being assigned, a patent may be licensed. Unless otherwise specified, licenses are voluntary, whereby a licence is entered into by the agreement of the patentee or licensor and the licensee. Voluntary licenses are to be distinguished from the compulsory licences, which historically were available under Canadian patent law for pharmaceutical patents under former s. 39 of the *Patent Act*, or which can be granted where a patent holder is liable for abuse of patent rights under s. 65 of the *Patent Act*. Under a licence the owner of a patent, the licensor, does not transfer any property interest or title to the patent to the licensee. A licence is a contract establishing a personal right, which is a right enforceable against the person (patent owner or licensor) that is the other party to the licensing contract. A license does not create an "in rem" or legal property right in the subject matter of the licence (the patent rights licensed), but rather provides permission from the licensor to the licensee to practice a patented invention, activity that would otherwise constitute infringement.

The licensor remains the owner of a patent. Even under an exclusive licence of all patent rights for the duration of the term of a patent, a licensor typically retains a reversionary interest in the patent rights. At a minimum, this reversionary interest may provide the right to reclaim the use of the patent

(*Continued on page 5-31*)

I

should the licensee default on various obligations under the licence, including royalty payments.

Generally under Canadian law, contractual rights and obligations can be assigned by a contracting party without the permission of other contracting parties unless there is an express bar to assignment under the terms of the contract. There are of course certain exceptions to this principle, such as contracts for personal services. As such, in a patent licence both the licensor and the licensee can typically assign their rights and obligations under the contract unless there is a specific contractual provision preventing assignment. Typically under a license agreement a licensor will have an interest in restricting the capacity of licensees to assign licensee rights and obligations. In addition, under Canadian law a licensee generally has the right to sub-license its rights to third parties in whole or in part. As discussed below, this is not true for patent rights but may be true for other intellectual property rights. A licensor will typically have an interest in restricting the right of licensees right to sub-license contractual rights. Therefore, the rights of licensees to assign rights and obligations or sub-license rights must be explicitly addressed in a license agreement.

A licensor may assign its interest in licensed rights, subject to a licensee's interest. As a result, the assignee from the licensor will receive the licensor's legal interest in the patent subject to the terms of the pre-existing licence. A license may be general or limited according to numerous factors, including subject matter or field of use and region, and the provisions of the contract granting the license define the terms of use.

Licenses should be in writing and carefully drafted to reflect the interests and intentions of the parties, and a properly drafted patent license can limit potential disputes relating to the rights and obligations of the licensor and licensee. Although the rights under a license are generally limited to written terms of the license, certain rights under a license can be implied by the conduct of the licensor.

## 5.5 IMPLIED LICENSES

Under certain circumstances, patent licenses can be implied by the relationship and transactions between parties. For example, under U.S. law a patent owner's conduct when dealing with an alleged infringer has been held to create an implied license to practice the invention claimed in the patent.[80] In *Wang Laboratories*, a single in-line memory module or SIMM, a circuit board that secures an assembly of memory chips, had been developed and patented by Wang Laboratories. Wang Laboratories sought industry approval for the SIMM as a new standard and conducted approximately 60 meetings with

---

80 *Wang Laboratories, Inc. v. Mitsubishi Electronics America, Inc.*, 103 F.3d 1571, 41 U.S.P.Q.2d 1263 (Fed. Cir., 1997) [*Wang Laboratories*].

Mitsubishi over the course of six years, subsequently supplied Mitsubishi with specifications and requested that Mitsubishi manufacture the SIMM. The U.S. Federal Circuit concluded that because Wang Laboratories had consented to Mitsubishi's use of the invention, granted Mitsubishi the right to make, use and sell the patented SIMM and received consideration, Mitsubishi acquired a royalty-free patent license.

The use of implied licenses has received considerably more judicial review in the U.S. than in Canada. U.S. jurisprudence demonstrates that implied licenses may arise from the conduct of the parties absent a written agreement.[81] The existence of an implied license is dependent on the intention of the parties,[82] and the scope of an implied license is determined on the basis of the circumstances surrounding its formation.[83] A general principle under U.S. law is that the terms of an implied license are restricted to the extent of rendering the contract effective.[84] An implied license may be established on the basis of acquiescence, conduct, equitable or legal estoppel.

In *Bandag*[85] a third party purchased used machinery from the franchisee of a patent holder and assumed authorization to practice a patented method that utilized the machinery.[86] The U.S. Federal Circuit considered whether an implied license could be inferred from the purchase of products from the franchisee, where the product was used as part of a patented method or as part of a combination patent. Under the U.S. Federal Circuit ruling in *Bandag*, a license to practice a patented method or combination may be implied from the authorized sale of an article utilized in the patented method or combination provided an alleged infringer can demonstrate: (1) that there are no noninfringing uses of the article external to the patent claims; and (2) that the circumstances of the sale "plainly indicate that the grant of a license should be inferred."[87]

The Federal Circuit has broadly interpreted the definition of a noninfringing use as a use that is "reasonable" or "practical," even if the use would be inconsistent with the purchaser's intent.[88] In examining noninfringing uses in *Bandag*, the Federal Circuit noted that the machinery could have been sold to existing licensees, sold as spare parts or modified so as not to practice the patented method.[89] The Federal Circuit further found that even though the

---

81  See *B&M Corp. v. Miller*, 150 F. Supp. 942, 114 U.S.P.Q. 217 (W.D. Ky., 1957).
82  *Lukens Steel Co. v. American Locomotive Co.*, 197 F.2d 939 (2nd Cir., 1952), affirmed 197 F.2d 939 (2nd Cir., 1952).
83  *Ibid.*
84  *Waterman v. Mackenzie*, 138 U.S. 252 (1891).
85  *Bandag, Inc. v. Al Bosler's Tire Stores, Inc.*, 750 F.2d 903 (Fed. Cir., 1984) [*Bandag*].
86  *Ibid.* at 923.
87  *Ibid.* at 924-925.
88  See *Glass Equip. Dev., Inc. v. Besten, Inc.*, 174 F.3d 1337 (Fed. Cir., 1999) at 1342 [*Glass*]; see also *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 99 F.3d 1160 (Fed. Cir., 1996).
89  *Bandag, supra* note 85 at 925.

# TAB 105

# Valuing Intangible Assets

**ROBERT F. REILLY, CFA, ASA, CPA**
Managing Director
*Willamette Management Associates*

**ROBERT P. SCHWEIHS, ASA**
Managing Director
*Willamette Management Associates*

**McGraw-Hill**

New York   San Francisco   Washington, D.C.   Auckland   Bogotá
Caracas   Lisbon   London   Madrid   Mexico City   Milan
Montreal   New Delhi   San Juan   Singapore
Sydney   Tokyo   Toronto

BARUCH COLLEGE LIBRARY

HF
5681
.I55
R45
1999

Library of Congress Cataloging-in-Publication Data

Reilly, Robert F.
    Valuing intangible assets    /    Robert F. Reilly, Robert P. Schweihs.
        p.      cm.
    ISBN 0-7863-1065-0
    1. Intangible property—Valuation.    I. Schweihs, Robert P.
II. Title.
    HF5681.I55R45    1998
    657'.7—dc21                                                    98-13959
                                                                      CIP

# McGraw-Hill

*A Division of The McGraw-Hill Companies*

Copyright © 1999 by Robert F. Reilly and Robert P. Schweihs. All rights reserved. Printed in the United States of America. Except as permitted under the United States Copyright Act of 1976, no part of this publication may be reproduced or distributed in any form or by any means, or stored in a database or retrieval system, without the prior written permission of the publisher.

1 2 3 4 5 6 7 8 9 0 DOC/DOC 9 0 3 2 1 0 9 8

ISBN 0-7863-1065-0

*The sponsoring editor for this book was Roger Marsh and the production supervisor was Suzanne W. B. Rapcavage. It was set in Palatino by Inkwell Publishing Services.*

*Printed and bound by R.R. Donnelley & Sons Company.*

This publication is designed to provide accurate and authoritative information in regard to the subject matter covered. It is sold with the understanding that neither the author nor the publisher is engaged in rendering legal, accounting, or other professional service. If legal advice or other expert assistance is required, the services of a competent professional person should be sought.

> —From a Declaration of Principles jointly adopted by a Committee of
> the American Bar Association and a Committee of Publishers.

McGraw-Hill books are available at special quantity discounts to use as premiums and sales promotions, or for use in corporate training programs. For more information, please write to the Director of Special Sales, McGraw-Hill, 11 West 19th Street, New York, NY 10011. Or contact your local bookstore.

This book is printed on acid-free paper.

tive equilibrium price). These basic economic principles assert that an investor will pay no more for an investment than the cost to obtain (i.e., either by purchase or by construction) an investment of equal utility. In other words, a willing buyer for an intangible asset will pay no more for the subject intangible asset than the price of an intangible property of comparable utility. Accordingly, an efficient market adjusts the prices of all properties (including intangible assets) in equilibrium so that the price the market will pay is a function of the comparative utility of each property.

Utility is an economic concept. Functionality is an engineering concept. Some analysts mistakenly believe that the cost approach to intangible asset valuation is based upon the functionality of the subject intangible. This is not conceptually correct (except to the extent that the intangible's functionality indirectly influences its utility). The differences between utility and functionality are described in greater detail in Chapter 8.

The availability (and, therefore, the cost) of substitute properties is directly affected by shifts in the supply and demand functions with regard to the universe of substitute properties. As the supply of substitute properties increases, ceteris paribus, market influences tend to drive down the cost of the substitute. As the supply of substitute properties decreases, market influences tend to drive up the cost of the substitute. Likewise, as the demand for substitute properties increases, market influences tend to drive up the cost of the substitute, and as the demand for substitute properties decreases, market influences tend to drive down the cost of properties.

The relevant components of cost are introduced in the next section and explained in greater detail in Chapter 8. However, the basic supply-and-demand price equilibrium principles illustrate what is meant by the term cost. In the cost approach to intangible asset analysis, cost is influenced by the marketplace. That is, the relevant cost is the greatest amount that the marketplace is willing to pay for the subject intangible asset. It is not necessarily the actual historical cost of creating the subject intangible and it is not necessarily the sum of the costs for which the willing seller would like to be compensated.

In other words, value is not necessarily equal to cost, at least not to cost as measured in the historical accounting sense. Rather, value is equal to cost measured in the economic sense. The economic measure of cost is usually equal to an accounting measure of cost that has been adjusted by either (or both) incremental and decremental influences caused by market conditions.

There is one application limitation with regard to the use of the cost approach to valuing intangible assets. Unlike fungible tangible assets, often there are no reasonable substitute properties to compare to many intangible assets and intellectual properties. Accordingly, with regard to the valuation of intangible assets with unique qualities, the cost approach may have application limitations.

## Cost Approach Methods—Theoretical Concepts

Within the cost approach to intangible asset valuation, there are several related analytical methods. Each group of analytical methods uses a similar definition of the type of cost that is relevant to the valuation. The most common types or definitions of cost are the following:

# TAB 106


COLUMBIA LAW SCHOOL LIBRARY
3 5005 01349 070.

# Principles of Corporate Insolvency Law

### Fourth Edition

### Roy Goode

### SWEET & MAXWELL

# PRINCIPLES OF CORPORATE
# INSOLVENCY LAW

**by**

**Roy Goode**

**SWEET & MAXWELL**

 THOMSON REUTERS

0 257036 X

First edition 1990
Second edition 1997
Third edition 2005

Published in 2011 by Sweet & Maxwell, 100 Avenue Road, London NW3 3PF
part of Thomson Reuters (Professional) UK Limited
(Registered in England & Wales, Company No 1679046. Registered Office and
address for service: Aldgate House, 33 Aldgate High Street, London EC3N 1DL)

Typeset by LBJ Typesetting Ltd
Printed in the UK by CPI William Clowes Ltd, Beccles, NR34 7TL

For further information on our products and services, visit
www.sweetandmaxwell.co.uk
A CIP catalogue record for this book is available from the British Library

ISBN: 978-0-414-04787-7 (Paperback)
ISBN: 978-0-421-96610-9 (Hardback)

All rights reserved. Crown copyright material is reproduced with the permission of
the Controller of HMSO and the Queen's Printer for Scotland.

Only European Union legislation printed in the paper edition of the Official
Journal of the European Union is deemed authentic.
http://eur-lex.europa.eu, © European Union, 1998–2011

No part of this publication may be reproduced or transmitted, in any form or by any
means, or stored in any retrieval system of any nature, without prior written
permission, except for permitted fair dealing under the Copyright, Designs and
Patents Act 1988, or in accordance with the terms of a licence issued by the Copyright
Licensing Agency in respect of photocopying and/or reprographic reproduction.
Application for permission for other use of copyright material including permission
to reproduce extracts in other published works shall be made to the publishers.
Full acknowledgment of author, publisher and source must be given.

No natural forests were destroyed to make this product, only farmed timber was
used and replanted.

Thomson Reuters and the Thomson Reuters Logo are trademarks of Thomson
Reuters.
Sweet & Maxwell® is a registered trademark of Thomson Reuters (Professional)
UK Limited.

KJ, Hcc
KD
2149
.G65
2011

© 2011 Roy Goode

For Catherine

## Equity and debt[9]

**1-04**  For the purpose of insolvency law there is a vitally important difference between equity and debt. Shareholders are not creditors. Unlike creditors they have no claim to payment from the company except when a dividend is declared or there is a surplus of assets over liabilities on the winding up of the company. In general, creditors are entitled to be paid ahead of shareholders in the event of a company going into liquidation; only when creditors have been paid in full (which is rarely the case) do shareholders come in to participate in the surplus remaining.[10] Neither group is homogeneous. Frequently debt is multi-tiered, with one or more layers of senior debt at the top, several layers of junior debt underneath and at the bottom mezzanine debt, a form of hybrid which typically consists of either preferential shares carrying an entitlement to a fixed dividend ahead of ordinary shareholders or convertible warrants, which carry an interest coupon and a right to convert into shares. Only shareholders rank below mezzanine creditors.

Other forms of hybrid security, which combine debt and equity, are: convertible bonds or notes; payment in kind (PIK) loans, in which an amount equal to the interest is paid in stock in the borrower company or interest is rolled into the capital at maturity and which carry a detachable warrant; and income security, a mixture of debt and equity in which the debt part pays interest and the equity part dividends. The ranking of creditors among themselves may be influenced by the grant of security, which vis-à-vis the debtor[11] may leave a junior creditor in a better position than an unsecured senior creditor, or by subordination techniques, which may be contractual or structural,[12] shares may be ordinary, preferred or deferred, depending on the terms of issue; and insolvency law itself distinguishes between different categories of creditor in the priority stakes.

A more recent form of financing is second lien financing, in which agreement is reached between the first lien lender and the second lien lender as to rights of enforcement and the allocation of proceeds of realisation of collateral. Second lien financing differs from contractual subordination in that there is no formal subordination of the second lien to the first. Instead, there is an allocation of specific rights and duties designed to give the first lien lender control without a contractual subordination as such. Agreements commonly include restrictions on enforcement of the security by the second lien lender and allocation of the whole or most of the proceeds of realisation to repayment of the debt due to the first lien lender, coupled with a waiver by the second lien lender of any right it might otherwise have to challenge the first lien lender's security. Second lien lending has been widely used to overcome legal restrictions on investment in contractually subordinated debt.

## Security and quasi-security

A financially strong company will often be able to obtain credit simply on the **1-05** strength of its undertaking to pay without providing any security. But banks and other lenders frequently feel the need to buttress this undertaking with security in order to ensure that if by mischance the borrower company does become insolvent, they will be able to jump ahead of other creditors. Security may be real or personal. Real security is security in an asset or pool of assets and typically takes the form of a mortgage or charge covering specific assets or a class of existing and future assets.[13] Personal security consists of the reinforcement of the debtor company's undertaking by that of a third party, usually in the form of a guarantee of the debt, or by a stronger undertaking by the debtor himself, for example, in a negotiable instrument, claims on which are less easily resisted than those based on the underlying transaction.

### Nature of security

Real security in the true sense involves the grant of rights by the debtor **1-06** company in an asset which it owns or in which it has an interest. Consensual security takes four forms: mortgage, fixed or floating charge, pledge and contractual lien.[14] The trust, if created for the purpose of securing an obligation, is not an independent security device, but a form of equitable mortgage or charge, which may be effected either by the debtor declaring itself to be trustee of the asset or by transfer of the asset by the debtor to a trustee to hold on trust for the creditor (which could be the trustee itself)[15] as security for payment.[16] But there are other types of transaction which fulfil the

---

[9] See generally Louise Gullifer and Jennifer Payne, *Corporate Finance Law: Principles and Policy* (Oxford: Hart Publishing, 2011), Chs 2 and 3.

[10] Insolvency Act 1986 ss.107, 154.

[11] But not normally vis-à-vis the senior creditor, because the subordination agreement will usually control the junior creditor's freedom of action with regard to collection and the application of proceeds of his debt.

[12] Structural subordination results from lending to a holding company rather than the operating company. If the operating company becomes insolvent, its creditors will be paid ahead of the holding company, which is not a creditor but a shareholder, so that creditors of the holding company have to look primarily to dividends received in the winding up of the holding company. See further below, paras.8–08, as to subordination.

[13] See *Goode on Legal Problems of Credit and Security*, edited by Louise Gullifer, 4th edn (2008), Ch.1.

[14] See *Goode on Legal Problems*, paras 1–42 et seq. As to the distinction between a fixed and a floating charge see below, para.10–16.

[15] See *Re Gray v G-T-P Group Ltd, F2G Realisations Ltd* [2010] EWHC 1772 (Ch). For a discussion of this case in the context of perfection under the Financial Collateral Directive, see below, para.1–67.

[16] *Goode on Legal Problems*, 2008, para.1–53.

# TAB 107

# Valuing a Business

## The Analysis and Appraisal of Closely Held Companies

Fifth Edition

### Shannon P. Pratt, CFA, FASA, MCBA, MCBC, CM & AA

Chairman and CEO

*Shannon Pratt Valuations, Inc.*

### Alina V. Niculita, CFA, MBA

President and COO

*Shannon Pratt Valuations, Inc.*



New York  •  Chicago  •  San Francisco  •  Lisbon  •  London
Madrid  •  Mexico City  •  Milan • New Delhi • San Juan
Seoul  •  Singapore  •  Sydney  •  Toronto

Copyright © 2008 by The McGraw-Hill Companies, Inc. All rights reserved. Manufactured in the United States of America. Except as permitted under the United States Copyright Act of 1976, no part of this publication may be reproduced or distributed in any form or by any means, or stored in a database or retrieval system, without the prior written permission of the publisher.

0-07-150935-6

The material in this eBook also appears in the print version of this title: 0-07-144180-8.

All trademarks are trademarks of their respective owners. Rather than put a trademark symbol after every occurrence of a trademarked name, we use names in an editorial fashion only, and to the benefit of the trademark owner, with no intention of infringement of the trademark. Where such designations appear in this book, they have been printed with initial caps.

McGraw-Hill eBooks are available at special quantity discounts to use as premiums and sales promotions, or for use in corporate training programs. For more information, please contact George Hoare, Special Sales, at george_hoare@mcgraw-hill.com or (212) 904-4069.

TERMS OF USE

This is a copyrighted work and The McGraw-Hill Companies, Inc. ("McGraw-Hill") and its licensors reserve all rights in and to the work. Use of this work is subject to these terms. Except as permitted under the Copyright Act of 1976 and the right to store and retrieve one copy of the work, you may not decompile, disassemble, reverse engineer, reproduce, modify, create derivative works based upon, transmit, distribute, disseminate, sell, publish or sublicense the work or any part of it without McGraw-Hill's prior consent. You may use the work for your own noncommercial and personal use; any other use of the work is strictly prohibited. Your right to use the work may be terminated if you fail to comply with these terms.

THE WORK IS PROVIDED "AS IS." McGRAW-HILL AND ITS LICENSORS MAKE NO GUARANTEES OR WARRANTIES AS TO THE ACCURACY, ADEQUACY OR COMPLETENESS OF OR RESULTS TO BE OBTAINED FROM USING THE WORK, INCLUDING ANY INFORMATION THAT CAN BE ACCESSED THROUGH THE WORK VIA HYPERLINK OR OTHERWISE, AND EXPRESSLY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. McGraw-Hill and its licensors do not warrant or guarantee that the functions contained in the work will meet your requirements or that its operation will be uninterrupted or error free. Neither McGraw-Hill nor its licensors shall be liable to you or anyone else for any inaccuracy, error or omission, regardless of cause, in the work or for any damages resulting therefrom. McGraw-Hill has no responsibility for the content of any information accessed through the work. Under no circumstances shall McGraw-Hill and/or its licensors be liable for any indirect, incidental, special, punitive, consequential or similar damages that result from the use of or inability to use the work, even if any of them has been advised of the possibility of such damages. This limitation of liability shall apply to any claim or cause whatsoever whether such claim or cause arises in contract, tort or otherwise.

DOI: 10.1036/0071441808

determines the applicable standard of value—that is, the definition of value being sought—and almost always influences it. Standards of value are discussed in the next section, and an exhibit following that section illustrates the matching of certain valuation purposes with applicable standards of value.

# Standards of Value

The word *value* means different things to different people. Even to the same person, value means different things in different contexts, as we discussed in the previous section.

Without carefully defining the term *value*, the conclusions reached in the valuation report have no meaning.

Is the objective of the valuation to estimate fair market value, market value, fair value, true value, investment value, intrinsic value, fundamental value, insurance value, book value, use value, collateral value, ad valorem value, or some other value?

Clients rarely give it much thought. Many don't have enough technical background in business valuation to raise the right questions. One of the professional appraiser's most important tasks is to work carefully and thoroughly with the client and/or attorney to arrive at a definition of value that is appropriate to the specific purpose of the valuation engagement.

In this book, a *standard of value* is a definition of the type of value being sought. A *premise of value* is an assumption as to the set of actual or hypothetical transactional circumstances applicable to the subject valuation (e.g., going-concern or liquidation).

For many situations, the standard of value is legally mandated, whether by law or by binding legal documents or contracts. In other cases, it is a function of the wishes of the parties involved. The standard of value usually reflects an assumption as to who will be the buyer and who will be the seller in the hypothetical or actual sales transaction regarding the subject assets, properties, or business interests. It defines or specifies the parties to the actual or hypothetical transaction. In other words, the standard of value addresses the questions: "value to whom?" and "under what circumstances?" The standard of value, either directly by statute or (more often) as interpreted in case law, often addresses what valuation methods are appropriate and what factors should or should not be considered.

## Fair Market Value

In the United States, the most widely recognized and accepted standard of value related to business valuations is *fair market value*. With regard to business valuations, it is the standard that applies to virtually all federal and state tax matters, such as estate taxes, gift taxes, inheritance taxes, income taxes, and ad valorem taxes. It is also the legal standard of value in many other—though not all—valuation situations.

*Fair market value* is defined by the ASA as "the amount at which property would change hands between a willing seller and a willing buyer when neither is

acting under compulsion and when both have reasonable knowledge of the relevant facts."[6] This definition comports to that found in the Internal Revenue Code and Revenue Ruling 59-60.

In most interpretations of fair market value, the willing buyer and willing seller are hypothetical persons dealing at arm's length, rather than any particular buyer or seller. In other words, a price would not be considered representative of fair market value if influenced by special motivations not characteristic of a typical buyer or seller.

There is also general agreement that the definition implies that the parties have the ability as well as the willingness to buy or to sell. The *market* in this definition can be thought of as all the potential buyers and sellers of like businesses or practices.

The concept of fair market value also assumes prevalent economic and market conditions at the date of the particular valuation. You have probably heard someone say, "I couldn't get anywhere near the value of my house if I put it on the market today," or, "The value of XYZ Company stock is really much more (or less) than the price it's selling for on the New York Stock Exchange today." The standard of value that those people have in mind is some standard *other than* fair market value, since the concept of fair market value means the price at which a transaction could be expected to take place under *conditions existing at the valuation date*.

The terms *market value* and *cash value* are frequently used interchangeably with the term *fair market value*. The use of these essentially synonymous standard of value terms is often influenced by the type of asset, property, or business interest subject to valuation.

In the United States, the most widely recognized and accepted standard of value related to real estate appraisals is *market value*. The Appraisal Foundation defines *market value* as follows:

> MARKET VALUE: Market value is the major focus of most real property appraisal assignments. Both economic and legal definitions of market value have been developed and refined. A current economic definition agreed upon by agencies that regulate federal financial institutions in the United States of America is:
>
> > The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:
> >
> > 1. buyer and seller are typically motivated;
> > 2. both parties are well informed or well advised, and acting in what they consider their best interests;
> > 3. a reasonable time is allowed for exposure in the open market;
> > 4. payment is made in terms of cash in United States dollars or in terms of financial arrangements comparable thereto; and

---

[6] American Society of Appraisers, Business Valuation Standards—Definitions.

intrinsic value, the analyst suggests selling the stock. (Some analysts also factor market expectations into their fundamental analysis.)

It is important to note that the concept of intrinsic value cannot be entirely divorced from the concept of fair market value, since the actions of buyers and sellers based on their *specific* perceptions of intrinsic value eventually lead to the general consensus market value and to the constant and dynamic changes in market value over time.

Case law often refers to the term *intrinsic value*. However, almost universally such references do not define the term other than by reference to the language in the context in which it appears. Such references to *intrinsic value* can be found both in cases where there is no statutory standard of value and in cases where the statutory standard of value is specified as *fair value* or even *fair market value*. When references to *intrinsic value* appear in the relevant case law, the analyst should heed the notions ascribed to that term as discussed in this section.

## Fair Value under State Statutes

To understand what the expression *fair value* means, you have to know the context of its use. For certain bookkeeping applications, fair value is defined in the relevant accounting literature. In business valuation, the term *fair value* is usually a legally created standard of value that applies to certain specific transactions.

In most states, fair value is the statutory standard of value applicable in cases of dissenting stockholders' appraisal rights. It is also commonly used in valuations in state minority oppression cases, which have been on the rise. In these states, if a corporation merges, sells out, or takes certain other major actions, and the owner of a minority interest believes that he or she is being forced to receive less than adequate consideration for his or her stock, the owner has the right to have his or her shares appraised and to receive fair value in cash. In states that have adopted the Uniform Business Corporation Act, the definition of fair value is as follows:

> "Fair value," with respect to a dissenter's shares, means the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable.[13]

Even in states that have adopted this definition, there is no clearly recognized consensus about the interpretation of fair value in this context, but published precedents established in various state courts have not equated it directly to fair market value. When a situation arises of actual or potential stockholder dissent or dissolution action, it is necessary to carefully research the legal precedents applicable to each case. The appraiser should solicit the view of counsel as to the interpretation of fair value and, in most cases, should not assume that there is a definition that is clear and concise.

The term *fair value* is also found in the dissolution statutes of those states in which minority stockholders can trigger a corporate dissolution under certain circumstances (e.g., California Code Section 2000). Even within the same state, however, a study of case law precedents does not necessarily lead one to the same definition of fair value under a dissolution statute as under that state's dissenting stockholder statute.

---

[13] Oregon Revised Statutes, Section. 60.551(4).

Several countries undergoing privatization have adopted the term *fair value* to apply to certain transactions, often involving specific classes of buyers, such as employees. Such statutes vary widely in their definitions of fair value.

## Fair Value for Financial Reporting

Unfortunately, the standard "fair value" is an ambiguity. It means one thing (as described in the previous section) in the context of state statutes for dissenting and oppressed stockholder actions, and something altogether different (as described in this section) for financial reporting as required by generally accepted accounting principles (GAAP) and the Securities and Exchange Commission (SEC).

The financial accounting standards board (FASB) issued Statement No. 157 on September 15, 2006, and is effective for financial statements issued for fiscal years beginning after November 15, 2007. This statement gave a single definition of fair value.

> Fair value is the price in an orderly transaction between market partici-pants to sell the asset or transfer the liability in the market in which the reporting entity would transact for the asset or liability, that is, the princi-pal or most advantageous market for the asset or liability.[14]

The statement gives guidance on the measurement of fair value as a market-based measurement. A hierarchy for considering market participant assumptions outlined and distinguishes between sources independent of the reporting entity and the reporting entities' own assumptions.

The statement also expands on the difference between fair value and fair market value as follows:

> The Board agreed that the measurement objective encompassed in the def-inition of fair value used for financial reporting purposes is generally con-sistent with similar definitions of fair market value used for valuation pur-poses. For example, the definition of fair market value in Internal Revenue Service Revenue Ruling 59-60 (the legal standard of value in many valu-ation situations) refers to "the price at which property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts." However, the Board observed that the definition of fair market value relates principally to assets (property). Further, the definition has a significant body of inter-pretive case law, developed in the context of tax regulation. Because such interpretive case law, in the context of financial reporting, may not be rel-evant, the Board chose not to adopt the definition of fair market value, and its interpretive case law, for financial reporting purposes.[15]

One noticeable difference between fair value and fair market value (as point-ed out in Chapter 25 on Valuing Stock Options) is that Statement of Financial Accounting Standards (SFAS) 123R governing the application of the fair value

---

[14] SFAS No. 157—Fair Value Measurements, paragraph 5.
[15] SFAS No. 157—Fair Value Measurements, paragraph C50.

controlling interest holder would be able to make the financial decision to change the capital structure if so desired. Conversely, when valuing a noncontrolling ownership interest, focus logically is on measures that directly value the subject equity interest. Sometimes, however, measures of the MVIC are used to value noncontrolling ownership interests, subtracting the debt to reach an indication of the value of equity. This procedure is most often used when the subject and guideline companies have wide variations in capital structure, to even out the effects of the differences in leverage.

**Marketable versus Nonmarketable.** Public companies tend to focus more on net income than do private companies, while private companies tend to focus more on cash flows than do public companies. Therefore, when valuing a private company, one may choose to focus a bit more on cash flow variables than net income variables.

## Going-Concern versus Liquidation Value

Going-concern value tends to be based largely—and sometimes entirely—on income and cash flow analyses. Liquidation value often involves an analysis of individual asset values, so the emphasis is on balance sheet items. As noted earlier, however, the guideline publicly traded company valuation method is often used in connection with a going-concern premise of value.

## Type of Company

**Operating versus Holding Companies.** In the broadest general sense, valuation of operating companies tends to focus on earning power variables, while valuation of holding companies tends to focus on asset value variables. Therefore, for operating companies, focus tends to be on ratios of price to cash flows, earnings, and dividends. For holding companies, focus tends to be on ratios of price to book value or price to adjusted book value.

**Stage of Company in Life Cycle.** The more mature or stable the company, the more the focus may be on cash flow variables, whereas companies in a growth phase may focus more on net income. In fact, young companies in a very high growth phase may be expected to have negative net cash flow for years, so that net cash flow would be meaningful in a long-term discounted cash flow valuation method but meaningless for the same company in a market approach using current guideline publicly traded company data. This is not to imply diminished importance of ultimate ability to produce meaningful net cash flows, but only because multiples of negative current numbers are meaningless.

**Line of Business.** The more meaningful the assets are to the type of business, the more they should be considered in the valuation multiples computed. Usually, assets that are more liquid and not "special purpose" are more important. Furthermore, they are easier to deal with in valuation if their generally accepted accounting principles (GAAP) values are close to their market values. For example, for financial institutions, the financial assets and liabilities are extremely important, and price-to-book-value ratios are much more important than for most other types of operating companies. For distribution companies (especially wholesalers, but also retailers), inventories (and in some cases receivables) are a major part of their asset mix, usually making price to book value a relevant measure to

consider. For manufacturing companies, plant and equipment can vary tremendously from one to another, both in age and condition and also in importance to their operations, so that price-to-asset-value multiples can be difficult to implement on a comparative basis and frequently are not very meaningful. For service companies, assets typically play a very minor role, if any, in valuation multiples.

## Availability of Data

We often face the frustrating obstacle of lack (or limited availability) of data for the valuation multiples we would conceptually most prefer to use in the guideline publicly traded company method. The analyst should perform the most thorough search possible for the data he or she would *prefer* to use, and then make the best possible use of whatever is available.

**Gross Cash Flow versus Net Cash Flow.** A good example of this problem is the choice between gross cash flow and net cash flow as an economic income variable in a guideline company valuation multiple. In the discounted future economic income method, we generally prefer—and generally use—net cash flow. If one is willing to do the work, using the statement of cash flows along with the income statements and balance sheets, one can compute net cash flow for most public companies for each year. However, if data such as capital expenditures have been subject to wide variations, as they frequently are, these data generally are harder to adjust objectively for abnormal or nonrecurring items than most other data. Therefore, gross cash flow is more commonly used because it is straightforward, easier to compute, and simple to explain.

**Multiples of Market Prices to Asset Values.** When using multiples of market prices of stock or invested capital to underlying tangible asset values, it is more meaningful if the tangible asset values are adjusted to their respective fair market values. For example, publicly traded, closed-end investment companies are required to reprice their tangible assets at market value regularly, so the multiple of price to adjusted net tangible asset value is available for such companies.

Real estate investment trusts (REITs) and other real estate holding companies are not required to disclose market prices of their assets, but many choose to do so. Thus, if one is valuing a real estate holding company and has market values for the subject company tangible assets, one may limit guideline company selection to those that report market values of their holdings. Alternatively, one may use those that report market values for a price-to-adjusted-net-asset-value multiple and a broader list for income-related valuation multiples. (The availability of market prices of assets does not necessarily mean that assets are the primary value drivers.)

Data on values of timber holdings for many forest products companies are available from Wall Street analysts. Therefore, when valuing a company with timber holdings, a valuation multiple of price to net asset value adjusted for timber holdings can sometimes be developed.

For most other types of public companies, market values of asset holdings are not available. This leaves the analyst with no choice, if desiring to use a measure based on asset value in the guideline company method, but to use a simple price-to-book-value multiple. As noted earlier in the "Type of Company" section, the price-to-book-value multiple tends to have more relevance if assets are meaningful to the type of business, and if they are of such a nature that book values tend to be fairly close to market values.

TAB 108

# Valuing Small Businesses and Professional Practices

Third Edition

**Shannon P. Pratt, DBA, CFA, FASA, CBA**
Managing Director
*Willamette Management Associates*

**Robert F. Reilly, CFA, ASA, CPA**
Managing Director
*Willamette Management Associates*

**Robert P. Schweihs, ASA**
Managing Director
*Willamette Management Associates*

**McGraw-Hill**
New York • San Francisco • Washington, D.C. • Auckland
Bogotá • Caracas • Lisbon • London • Madrid • Mexico City
Milan • Montreal • New Delhi • San Juan • Singapore
Sydney • Tokyo • Toronto

Library of Congress Cataloging-in-Publication Data

Pratt, Shannon P.
    Valuing small businesses and professional practices / Shannon P.
Pratt : with Robert F. Reilly and Robert P. Schweihs.  —3rd ed.
      p.   cm.
    Includes bibliographical references (p.    ) and index.
    ISBN 1-55623-551-8
    1. Small business--Valuation.  2. Professions--Valuation.
I. Reilly, Robert F.  II. Schweihs, Robert P.  III. Title.
HG4028.V3P73  1998
658.15—dc21                  97-46846
                               CIP

# McGraw-Hill

*A Division of The McGraw-Hill Companies* 

Copyright © 1998 by The McGraw-Hill Companies, Inc. All rights reserved. Printed in the United States of America. Except as permitted under the United States Copyright Act of 1976, no part of this publication may be reproduced or distributed in any form or by any means, or stored in a data base or retrieval system, without the prior written permission of the publisher.

11 12  QWK/QWK  0 9 8

ISBN 0-7863-1186-X

*The sponsoring editor for this book was Roger Marsh, the editing supervisor was John M. Morriss, and the production supervisor was Suzanne W. B. Rapcavage. It was set in Times Roman by Douglas & Gayle Limited.*

*Printed and bound by Quebecor World / Kingsport.*

McGraw-Hill books are available at special quantity discounts to use as premiums and sales promotions, or for use in corporate training programs. For more information, please write to Director of Special Sales, McGraw-Hill, 11 West 19th Street, New York, NY 10011. Or contact your local bookstore.

 This book is printed on recycled, acid-free paper containing a minimum of 50% recycled de-inked fiber.

*To our many close friends in the business valuation profession*

*Your leadership and efforts have contributed immensely
to developing a body of knowledge
and generally accepted business valuation methodology*

*We sincerely hope that this work
adequately reflects that collective effort*

A commonly used method for the valuation of small businesses and professional practices is gross revenue pricing multiples. Gross revenue pricing multiples can be useful in the valuation process. However, as an analytical tool, this method has several limitations. When gross revenue pricing multiples are used naively in the valuation process, without the analyst completely understanding the limitations that apply to each case, the result can be an erroneous estimate of value.

## The Basic Concept of this Method

Another, and perhaps more descriptive, name for the gross revenue pricing multiple is the *price-to-sales multiple*. In other words, the basic concept is that the value of the business is some multiple of the amount of revenue that the subject business generates.

For example, let's assume that empirical transactional data on the sales of a certain type of business or practice indicate that the particular type of business almost always sells in a range of .40 to .75 times annual revenue. Let's also assume that the appraisal subject is a business or practice that generates $200,000 in annual revenues. The range of multiples of sales would indicate that the subject business should be worth somewhere between $80,000 and $150,000 (i.e., .40 × $200,000 = $80,000 and .75 × $200,000 = $150,000). Where our subject business would fall within that range of indicated values would depend on its profitability (if that information is available) and on a variety of other factors.

The gross revenue pricing multiple method is a market approach valuation method. This is because the pricing multiples are derived from the marketplace. That is, the multiples are extracted from market-derived empirical data, with respect to the actual sales of businesses that are reasonable valuation guidelines to the subject business. Accordingly, this valuation method is commonly used by business brokers and industry participants. This is because this method is—at least conceptually—based on actual, current, market-derived transactional data.

## When Gross Revenue Multiples May Be Useful

As a broad generalization, gross revenue pricing multiples may be useful with regard to the following objectives:

1. To approximate a range of possible values with a minimum of time and effort.
2. To conclude an estimate of value when other data are unavailable or inadequate.
3. As one indicator of a value—or of a range of values—used in conjunction with other, more rigorous, valuation methods.

The following sections discuss some of the situations in which the application of gross revenue pricing multiples may be useful.

## When Gross Sales Are the Only Reliable Income Data Available

For many entities, especially small sole proprietorships, a record of profitability may be impossible, or nearly impossible, to construct. This is either because there have never been complete records, they have not been saved, or because personal and business receipts and expenditures are difficult to clearly separate from each other. In these situations, no other accounts on the income statement of the business provide a reliable indication of its historic profitability, and the analyst may be forced to rely on the accuracy of the historical reported gross revenue of the business as the only indication of its financial performance.

## For Companies with Losses or Erratic Earnings

For many reasons, a business may not have demonstrable earnings to capitalize. This may be true even though the business has considerable potential. This may be (1) because of adverse economic conditions that are expected to improve, (2) because the company is in a start-up or research and development stage, or (3) because of significant nonrecurring factors. In cases such as these, most buyers would construct a pro forma income statement for one or several years into the future. However, multiples of price to revenues at which actual sales of comparative companies were consummated provide one indication of value.

Earnings of some businesses may be highly erratic. This is either (1) because of economic factors affecting the industry or (2) because of special factors affecting the particular company. Attempts to normalize the earnings may require a great deal of subjective judgment about what level of historical economic income is the best indication of prospective economic income. Gross revenue pricing multiples derived from recent sales of guideline businesses or practices may give some indication of how others assess the future of the industry or the profession.

Finally, recent earnings may have experienced a "spike," an unprecedented upward thrust that may or may not be sustainable. In this case, a rigorous analysis of the gross revenue pricing multiples of other recent sales of guideline businesses may prevent a buyer from paying too much by basing the pricing strictly upon an unsustainable earnings level.

## For Highly Homogeneous Industries and Professions

The more similar many businesses or practices within an identifiable industry are, the more valid the indication of value provided by the gross revenue pricing multiple method. If an industry or profession tends to have a fairly standard cost structure, a given level of revenue

should be expected to produce a somewhat predictable amount of economic income. In the limited number of industry or professional segments for which this homogeneity is characteristic, entities may sell within a fairly tight range of prices—in terms of multiples of revenue.

Even for relatively homogeneous industry or professional practice segments, gross revenue pricing multiples usually can be expected to vary quite a bit at any given time from one geographical region to another.

## Estimating Value of Intangible and/or Other Assets

A method used by some professional practice analysts is to appraise the practice tangible assets on a market value basis and then estimate the practice intangible value based on a multiple of practice revenue. As with other gross revenue pricing multiples, the multiple to be used may be developed on the basis of some expected level of future economic income per dollar of revenue. Or it may be developed on the basis of reported multiples of revenue actually paid for goodwill and/or for other intangible assets in comparative practice sale transactions.

Some wholesalers that help to finance franchised retailer customers (or to facilitate the sales of franchises) use a gross revenue pricing multiple method to set a value on fixtures and intangible assets. Typically, they take the view that a store should be worth the value of its inventory plus $x$ weeks' sales for its fixtures and intangibles. Where the particular store falls within the range of the high and low boundaries of the number of weeks' sales should be based, at least in part, on its historical profitability. In the limited instances where the analyst can obtain actual empirical data on comparative transactions priced this way, the gross revenue multiple method can be useful.

## Where There Is a High Industry Correlation between Price and Return on Sales

In some industries, there is a high degree of correlation between the sale price of a business and its percentage return on sales. In other industries, no such correlation exists. If there is such a correlation evident (although not necessarily to an extremely high degree of statistical significance), the industry transaction data can be helpful in developing an appropriate gross revenue pricing multiple for the subject business.

Consider the data tabulated and graphed in Exhibit 20-1 for illustrative industries A and B. In industry A, there is a smooth progression (i.e., a high degree of correlation) between return on sales and gross revenue pricing multiple. If the analyst knows or can make a good estimate of the return on sales for the subject business, it is possible to estimate what gross revenue pricing multiple is appropriate for the subject business. This can be developed either visually on the graph or statistically. For industry B, return on sales provides virtually no guidance as to selection of an appropriate gross revenue pricing multiple.

Exhibit 20–1

### CORRELATION BETWEEN PRICE AND RETURN ON SALES

| Company | Industry A | | Industry B | |
|---|---|---|---|---|
| | Return on Sales % | Price per $ of Sales | Return on Sales % | Price per $ of Sales |
| 1 | 1.190 | 0.235 | 1.169 | 0.475 |
| 2 | 2.010 | 0.355 | 2.01 | 0.245 |
| 3 | 2.830 | 0.385 | 2.79 | 0.630 |
| 4 | 3.650 | 0.510 | 3.83 | 0.325 |
| 5 | 4.780 | 0.485 | 4.57 | 0.445 |
| 6 | 5.750 | 0.615 | 5.77 | 0.419 |
| 7 | 6.800 | 0.665 | 6.77 | 0.555 |

**Industry A**

| Regression Output | | Regression Line | |
|---|---|---|---|
| | | ROS | P/R |
| Constant | 0.186357445 | 1.190 | 0.272 |
| Standard error of Y estimate | 0.040195190 | 2.010 | 0.331 |
| R squared | 0.940741036 | 2.830 | 0.390 |
| Number of observations | 7 | 3.650 | 0.449 |
| | | 4.780 | 0.531 |
| X coefficient(s) | 0.072028799 | 5.750 | 0.601 |
| Standard error of coefficient | 0.008084696 | 6.800 | 0.676 |

Price/revenues multiple = 0.1864 + 0.0720 x Return on sales

Correlation = 96.99%

**Industry B**

| Regression Output | | Regression Line | |
|---|---|---|---|
| | | ROS | P/R |
| Constant | 0.384834717 | 1.169 | 0.402 |
| Standard error of Y estimate | 0.139181500 | 2.019 | 0.415 |
| R squared | 0.052756267 | 2.790 | 0.426 |
| Number of observations | 7 | 3.830 | 0.442 |
| | | 4.579 | 0.453 |
| X coefficient(s) | 0.148397460 | 5.779 | 0.471 |
| Standard error of coefficient | 0.028121296 | 6.779 | 0.485 |

Price/revenues multiple = 0.3848 + 0.0148 x Return on sales

Correlation = 22.97%



Industry A



Industry B

# TAB 109

# COLLIER ON BANKRUPTCY

## *Sixteenth Edition*

## VOLUME 1

ALAN N. RESNICK
*Benjamin Weintraub Distinguished Professor of Bankruptcy Law, Hofstra University School of Law;*
*Of Counsel, Fried, Frank, Harris, Shriver & Jacobson LLP, New York City*

HENRY J. SOMMER
*Supervising Attorney, Consumer Bankruptcy Assistance Project, Philadelphia*

EDITORS-IN-CHIEF

**OVERVIEW; BANKRUPTCY COURTS; JURISDICTION;
VENUE; APPEALS; U.S. TRUSTEE SYSTEM;
FEES; HISTORY; GENERAL COVERAGE**

## 2014

*Filed Through:*
Release No. 129,  April 2014

 LexisNexis·

## QUESTIONS ABOUT THIS PUBLICATION?

For questions about the **Editorial Content** appearing in these volumes or reprint permission, please call:

Kent K. B. Hanson, J.D. at ............................................................... 1-800-424-0651 ext. 3207
Email: ...................................................................................... kent.hanson@lexisnexis.com
Edward Leung, J.D. at ..................................................................... 1-800-306-5230 (ext. 673-3369)
Email: ...................................................................................... edward.leung@lexisnexis.com

For assistance with replacement pages, shipments, billing or other customer service matters, please call:

Customer Services Department at ................................................. (800) 833-9844
Outside the United States and Canada, please call ......................... (518) 487-3000
Fax number ............................................................................ (518) 487-3584
Customer Service Website ........................................... http://www.lexisnexis.com/custserv/
For information on other Matthew Bender Publications, please call

Your account manager or ............................................................ (800) 223-1940
Outside the United States and Canada, please call ......................... (518) 487-3000

Sixteenth Edition LCCN 2009934799

Sixteenth Edition ISBN 978-1-4224-7512-6 (print)
ISBN 978-1-4224-8618-4 (eBook Vols 1–10)
ISBN 978-0-3271-7319-9 (eBook full set)

If you find any discrepancies between the online and print versions of *Collier on Bankruptcy*, please note that, due to our production processes, the latest content is usually available online before the print release has been shipped, received and filed by subscribers.

Cite Sixteenth Edition as follows: COLLIER ON BANKRUPTCY ¶ [000.00] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

**Example:** COLLIER ON BANKRUPTCY ¶ 303.35 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

If the print version of *Collier* is being cited, the volume number may also be included.

This publication is designed to provide authoritative information in regard to the subject matter covered. It is sold with the understanding that the publisher is not engaged in rendering legal, accounting, or other professional services. If legal advice or other expert assistance is required, the services of a competent professional should be sought.

LexisNexis and the Knowledge Burst logo are registered trademarks of Reed Elsevier Properties Inc., used under license. Matthew Bender and the Matthew Bender Flame Design are registered trademarks of Matthew Bender Properties Inc.

Copyright © 2014 Matthew Bender & Company, Inc., a member of LexisNexis. All Rights Reserved.
Fifteenth Edition originally published in 1979.

No copyright is claimed by LexisNexis or Matthew Bender & Company, Inc., in the text of statutes, regulations, and excerpts from court opinions quoted within this work. Permission to copy material may be licensed for a fee from the Copyright Clearance Center, 222 Rosewood Drive, Danvers, Mass. 01923, telephone (978) 750-8400.

Editorial Offices
121 Chanlon Rd., New Providence, NJ 07974 (908) 464-6800
201 Mission St., San Francisco, CA 94105-1831 (415) 908-3200
www.lexisnexis.com

MATTHEW◊BENDER

(Rel. 129-4/2014 Pub.219)

## ¶ 5.02  The Route of Appeal

### [1]  The Route of Appeal in General

There are three possible routes of appeal from orders of bankruptcy judges under 28 U.S.C. § 158: (1) to the district courts; (2) to a panel of three bankruptcy judges, who are members of the bankruptcy appellate panel service created by the circuit judicial councils pursuant to 28 U.S.C. § 158(b)(1), if the district court judges for the district have authorized the referral of appeals, and if the parties to the appeal consent or are deemed to consent through inaction or failure to follow the rules; and (3) directly to the court of appeals if certain rather detailed statutory criteria are satisfied.

Appeals to the district court and bankruptcy appellate panel from the bankruptcy court are the subject of Part VIII of the Bankruptcy Rules, while appeals to the court of appeals, like all other appeals from the district courts, are governed by the Federal Rules of Appellate Procedure.

### [2]  Appeals from the Bankruptcy Court to the District Court; 28 U.S.C. § 158(a)

Section 158(a) of title 28 provides:

(a)  The district courts of the United States shall have jurisdiction to hear appeals

(1) from final judgments, orders, and decrees;

(2) from interlocutory orders and decrees issued under section 1121(d) of title 11 increasing or reducing the time periods referred to in section 1121 of such title; and

(3) with leave of the court, from other interlocutory orders and decrees;

of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title. An appeal under this subsection shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving.

In addition to authorizing appeals of final judgments, orders and decrees of bankruptcy judges, section 158(a) permits the appeal, as of right, of orders increasing or reducing the exclusivity periods of 11 U.S.C. § 1121. Although these orders are interlocutory,[1] Congress noted that "undue extension [of exclusivity] can result in excessively, [sic] prolonged and costly delay, to the detriment of the creditors. [The amendment] will prevent [sic; "permit" was probably intended] those parties who feel they were harmed by an extension, or a failure to extend, to obtain possible recourse in the district court. The Committee intends that the district court carefully consider the

¶ 5.02
[1] Official Comm. of Unsecured Creds. v. Henry Mayo Newhall Mem. Hosp. (*In re* Henry Mayo Newhall Mem. Hosp.), 48 C.B.C.2d 1716, 282 B.R. 444, 448 (B.A.P. 9th Cir. 2002); First Am. Bank of New York v. Century Glove, Inc., 64 B.R. 958 (D. Del. 1986).

circumstances of each case so appealed with a view to encouraging a fair and equitable resolution of the bankruptcy."[2]

The provision regarding appealability of orders dealing with exclusivity is an example of particularly poor drafting. If the statute is read literally, neither an order simply refusing to extend exclusivity nor an order simply refusing to terminate exclusivity is appealable as of right. Given the proclivity of the Supreme Court for literal interpretation, it could very well be that the courts will not permit an appeal as of right in the circumstances hypothesized above. Given the philosophy that underlies the statutory language, such a result would be incorrect. Be that as it may, the importance of section 158(a)(2) has been diminished by subsequent amendments to the Code limiting the periods of exclusivity.[3]

Section 158(a)(1) applies only to those matters in which dispositive orders may be entered by bankruptcy judges, i.e., core proceedings,[4] non-core proceedings that, with the consent of the parties, are determined by the bankruptcy judge pursuant to section 157(c)(2)[5] and proceedings that are heard by the bankruptcy judge because of the failure of the defendant timely to object to the matter being heard by the bankruptcy judge.[6]

Section 158(a)(3) refers to interlocutory orders and decrees that may be appealed with leave of the district court or appellate court. Interlocutory orders may be entered in civil proceedings in which the bankruptcy judge is to enter a dispositive order as well as those in which the judge is making recommendations to the district judge pursuant to the procedure announced in 28 U.S.C. § 157(c)(1).[7]

Section 158(a) will not govern proceedings in which the bankruptcy judge enters proposed findings of fact and conclusions of law, because section 157(c)(1) (supplemented by Bankruptcy Rule 9033) contains its own review procedures.

The last sentence of section 158(a), which is self-explanatory, provides that "[a]n appeal under this subsection shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving."[8]

---

[2] Section-by-Section Description of H.R. 5116, 140 Cong. Rec. H10,764 (daily ed. Oct. 4, 1994), *reprinted in* App. Pt. 9(b) *infra.*

[3] *See* ch. 1121 *infra.*

[4] *See* ¶ 3.02[2] *supra.* The ability of bankruptcy judges to enter certain dispositive orders in core matters has been thrown into doubt by Stern v. Marshall, 131 S. Ct. 2594, 180 L. Ed. 2d 475, 65 C.B.C.2d 827 (2011), discussed at ¶ 3.02[3][d][ii] *supra.*

[5] *See* ¶ 3.03[4] *supra.*

[6] *See* ¶ 3.03[4] *supra.*

[7] *See* ¶ 3.03[2] *supra.*

[8] When an order for relief was entered by a bankruptcy judge in Delaware following the transfer of the case to the bankruptcy court for the District of Colorado and an appeal was taken to the appellate panel for the Tenth Circuit, the court of appeals in Healthtrio, Inc. v. Centennial River Corp. (*In re* Healthtrio, Inc.), 653 F.3d 1154, 1161–62 (10th Cir. 2011), dismissed the appeal on the grounds that it had not been taken to the judicial district in which the order for relief had been entered.

Federal Rule of Civil Procedure 53 permits the district court to appoint special masters, to which the district court may refer certain pending matters. Likewise, district court judges have the power to appoint United States magistrate judges[9] who may be designated "to conduct hearings,"[10] and act as a special master. Unlike former section 1334(c) of title 28, added by the 1978 Reform Act, nothing in the current legislation states that "a district court may not refer an appeal [from the bankruptcy courts] to a magistrate or to a special master." It is doubtful that Congress intended appeals from bankruptcy judges' decisions to be referred to special masters or to magistrates; Bankruptcy Rule 9031 provides: "Rule 53 F.R. Civ. P. does not apply in cases under the Code." Nevertheless, a conflict exists among the cases as to whether such a reference may properly be made.[11]

### [3]  Appeals from the Bankruptcy Court to the Bankruptcy Appellate Panels; 28 U.S.C. § 158(b)

#### [a]  Establishing Appellate Panels

Section 158(b) of title 28 provides:

(b) (1)  The judicial council of a circuit shall establish a bankruptcy appellate panel service composed of bankruptcy judges of the districts in the circuit who are appointed by the judicial council in accordance with paragraph (3), to hear and determine, with the consent of all the parties, appeals under subsection (a) unless the judicial council finds that—

(A)  there are insufficient judicial resources available in the circuit; or

(B)  establishment of such service would result in undue delay or increased cost to parties in cases under title 11.

Not later than 90 days after making the finding, the judicial council shall submit to the Judicial Conference of the United States a report containing the factual basis of such finding.

(2) (A)  A judicial council may reconsider, at any time, the finding described in paragraph (1).

(B)  On the request of a majority of the district judges in a circuit for which a bankruptcy appellate panel service is established under paragraph (1), made after the expiration of the 1-year period beginning on the date such service is established, the judicial council of the circuit shall determine whether a circumstance specified in subparagraph (A) or (B) of

---

[9]  28 U.S.C. § 631(a).

[10]  28 U.S.C. § 631(b)(1).

[11]  *Compare In re* Elcona Homes Corp., 810 F.2d 136, 16 C.B.C.2d 327 (7th Cir. 1987) (reference of appeal is improper), *and* Minerex Erdoel, Inc. v. Sina, Inc., 838 F.2d 781, 786, 18 C.B.C2d 510 (5th Cir.), *cert. denied*, 488 U.S. 817, 107 S. Ct. 57, 102 L. Ed. 2d 35 (1988) (same), *with* Hall v. Vance, 887 F.2d 1041, 1046 (10th Cir. 1989) (magistrate's opinion was advisory only and could be reviewed by district court), *and* United States v. Continental Airlines, Inc. (*In re* Continental Airlines, Inc.), 218 B.R. 324, 327 (D. Del. 1997) (same; the court also seized upon the failure of Congress to reenact former section 1334(c) in its original form).

such paragraph exists.

(C) On its own motion, after the expiration of the 3-year period beginning on the date a bankruptcy appellate panel service is established under paragraph (1), the judicial council of the circuit may determine whether a circumstance specified in subparagraph (A) or (B) of such paragraph exists.

(D) If the judicial council finds that either of such circumstances exists, the judicial council may provide for the completion of the appeals then pending before such service and the orderly termination of such service.

(3) Bankruptcy judges appointed under paragraph (1) shall be appointed and may be reappointed under such paragraph.

(4) If authorized by the Judicial Conference of the United States, the judicial councils of 2 or more circuits may establish a joint bankruptcy appellate panel comprised of bankruptcy judges from the districts within the circuits for which such panel is established, to hear and determine, upon the consent of all parties, appeals under subsection (a) of this section.

(5) An appeal to be heard under this subsection shall be heard by a panel of 3 members of the bankruptcy appellate panel service, except that a member of such service may not hear an appeal originating in the district for which such member is appointed or designated under section 152 of this title.

(6) Appeals may not be heard under this subsection by a panel of the bankruptcy appellate panel service unless the district judges for the district in which the appeals occur, by majority vote, have authorized such service to hear and determine appeals originating in such district.

Under section 158(b)(1) each circuit council must establish a bankruptcy appellate panel service unless the council makes either of the two findings set out in section 158(b)(1). The congressional policy in favor of establishing an appellate service is so strong that, if a judicial council makes either of these findings and consequently does not establish a bankruptcy appellate panel service, the council is to submit a report to the Judicial Conference of the United States in which the factual basis of the finding is to be set out. Presumably the Judicial Conference has the power to overrule the council's determination. The council has the power at any time to reconsider its finding.

In any event, one year after the appellate panel service is established the circuit council, upon the request of a majority of the district judges in the circuit, is to determine whether a circumstance specified in section 158(b)(1)(A) or (B) exists. If a determination is made at that time that such a circumstance exists, the council may terminate the appellate panel service pursuant to the provisions of section 158(b)(2)(D). Three years after the service is established, the judicial council of a circuit may, upon its own motion, determine whether such a circumstance exists and, if it does, terminate the appellate panel service under section 158(b)(2)(D).

(Rel. 127-9/2013 Pub.219)

Section 158(b)(5) provides that appeals are to be heard by a panel of three members of the bankruptcy appellate panel service, with the proviso that "a member of such service may not hear an appeal originating in the district for which such member is appointed or designated under section 152 of this title." Thus, if an appeal is from the Central District of California, one of the districts of the Ninth Circuit, the panel hearing the appeal cannot contain a bankruptcy judge who has been appointed or designated to sit in the Central District of California.

Two additional requirements must be satisfied before an appeal can be heard by an appellate panel. First, the district court judges in the particular district, by majority vote, must authorize the referral of appeals from that district to the panel. It is not enough that the judicial council of the circuit has created an appellate panel for the circuit. Second, even if the judicial council for the circuit has created a bankruptcy appellate panel, and even if a majority of the district court judges have authorized appeal from that district to be heard by a panel, the parties to the appeal must consent to the appeal being heard by the panel. This requirement must have been inserted in the legislation to ensure compliance with *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*,[12] which may be read to require the intervention of a tenured judge at some level of the bankruptcy process absent the consent of the parties. Whether *Marathon* really requires this is a moot matter; Congress thought it did. Indeed, as demonstrated in the earlier discussion of appeals from abstention decisions, Congress apparently believes that the right to appeal to a district court is the *sine qua non* of constitutionality.[13]

The consent to have the appeal heard by the appellant panel can be implied. For example, the rules of the Bankruptcy Appellate Panel for the Ninth Circuit provide that the appellant must make the election concurrently with the filing of the notice of appeal.[14] If the appellant does not do so, the appellant may not later elect out, even if it is truthfully stated that consent was never given to the panel's jurisdiction over the appeal.[15]

At this writing, Bankruptcy Appellate Panel Services have been established in the First, Sixth, Eighth, Ninth and Tenth Circuits. The panels established hear cases from some or all of the districts in the circuit. The First, Ninth, Tenth Circuit panels hear appeals from all districts in their circuits. The Sixth Circuit appellate panel hears appeals arising only in the Northern and Southern Districts of Ohio, the Western District of Michigan, the Western District of Tennessee, the Middle District of

---

[12] 458 U.S. 50, 102 S. Ct. 2858, 73 L. Ed. 2d 598, 6 C.B.C.2d 785 (1982), discussed at ¶ 3.01[2][b][i] *supra.*

[13] *See* ¶ 3.05[6] *supra.* This is especially true following the decision in Stern v. Marshall, 131 S. Ct. 2594, 180 L. Ed. 2d 475, 65 C.B.C.2d 827 (2011), discussed at ¶ 3.02[3][d][ii] *supra.*

[14] Bankruptcy Rule 8001(e)(1) requires the election to be made upon a separate writing; it should not be combined with the notice of appeal.

[15] Hupp v. Educational Credit Mgmt. Corp. (*In re* Hupp), 383 B.R. 476 (B.A.P. 9th Cir. 2008), *aff'd,* 2010 U.S. App. LEXIS 11543 (9th Cir. May 25, 2010) (unpublished), *cert. denied* 131 S. Ct. 1557, 179 L. Ed. 2d 325 (2011); *see also* ¶ 5.03 *infra.*

Tennessee and the Eastern District of Kentucky. The Eighth Circuit panel hears appeals arising anywhere in the circuit except the district of South Dakota. The Second, Third, Fourth, Fifth, Seventh, Eleventh and District of Columbia Circuits do not have panels.

The appellate panels, like the district courts, apply Part VIII of the Federal Rules of Bankruptcy Procedure to appeals that they hear and, when there is no governing rule, apply the Federal Rules of Appellate Procedure by analogy.

### [b]  Precedential Value of Appellate Panel Decisions

It was noted above[16] that constitutional considerations led to the statutory provision requiring the consent of the parties to an appeal to an appellate panel. The same concerns have bothered the courts addressing the precedential effect of panel decisions. Thus, the court in *Bank of Maui v. Estate Analysis, Inc.*[17] held that a panel decision can never be binding upon a district court. Other cases run the gamut from holding that, because one of the functions of a panel is to create decisional uniformity, appellate panel decisions are binding upon all of the bankruptcy courts in the circuit,[18] to holdings that they are binding only upon bankruptcy courts in the district from which the appeal was taken,[19] to holdings that they are not binding in other cases at all.[20]

---

[16] *See* text accompanying note 11 *supra.*

[17] 904 F.2d 470, 472, 23 C.B.C.2d 848, 850 (9th Cir. 1990) ("As article III courts, the district courts must always be free to decline to follow appellate panel decisions and to formulate their own rules within their jurisdiction."). *Accord* Marshall v. FIA Card Services, N.A. (*In re* Marshall), 2008 U.S. Dist. LEXIS 15336, at *15 n.9 (D. Kan. Feb. 26, 2008), *rev'd on other grounds*, 550 F.3d 1251, 60 C.B.C.2d 1659 (10th Cir.), *cert. denied* 129 S. Ct. 2871, 174 L. Ed. 2d 579 (2009); Specker Motor Sales Co. v. Eisen, 50 C.B.C.2d 1402, 300 B.R. 687 (W.D. Mich. 2003), *aff'd on other grounds*, 393 F.3d 659 (6th Cir. 2004) (arguing that appellate panel review is the equivalent of a district court review and therefore not binding upon a district court); *In re* Pepmeyer, 47 C.B.C.2d 1235, 273 B.R. 782, 784–785 (N.D. Iowa 2002).

[18] Rhiel v. OhioHealth Corp.(*In re* Hunter), 59 C.B.C.2d 252, 380 B.R. 753, 771–75 (Bankr. S.D. Ohio 2008); *In re* Windmill Farms, Inc., 70 B.R. 618, 622 (B.A.P. 9th Cir. 1987), *rev'd on other grounds*, 841 F.2d 1467 (9th Cir. 1988) (also deciding that district court decisions are not binding upon an appellate panel); *In re* Endicott, 254 B.R. 471, 477 (Bankr. D. Idaho 2000) (appellate panel decisions binding on all bankruptcy courts in the circuit at least in the absence of contrary district court authority). In State Compensation Fund v. Zamora (*In re* Silverman), 616 F.3d 1001, 1005 (9th Cir. 2010), *cert. denied*, 131 S. Ct. 1679, 179 L. Ed. 2d 616 (2011), the Court of Appeals for the Ninth Circuit disavowed any argument that it had ever held that a decision of the appellate panel, albeit "persuasive authority given its special expertise in bankruptcy issues," binds all bankruptcy courts in the circuit. The case also ruled that a bankruptcy court in one district is not bound by the decisions of a district court in another district. "Were we to hold that bankruptcy courts are bound by all district court decisions within the circuit, rather than only the decision of the district judge to whom their ruling has been appealed, bankruptcy courts would be subject to a potentially non-uniform body of law." 616 F.3d 1001, 1004. On a related topic, it has been held that bankruptcy courts in a multi-district-judge district are not bound by a decision of one of those judges. *In re* Moore, 441 B.R. 732, 738–39 (Bankr. N.D.N.Y. 2010) (collecting cases).

[19] Oregon v. Selden (*In re* Selden), 121 B.R. 59, 62 (D. Or. 1990).

[20] National Sign & Signal v. Livingston (*In re* Livingston), 379 B.R. 711, 726–27 (Bankr. W.D. Mich. 2007), *rev'd on other grounds*, 422 B.R. 645 (W.D. Mich. 2009); Crain v. PBS Lending Corp. (*In re*

This whole area of the law is muddled. What does seem clear is that appellate panel decisions will not be binding on district courts (probably on constitutional grounds—how can decisions of an Article I tribunal bind Article III judges?), and that conflicting results will continue to bedevil the issue of whether and to what extent they are binding upon bankruptcy courts in the circuit.

### [4]    Appeals to Courts of Appeals from Appellate Panels and District Courts; 28 U.S.C. § 158(d)

Section 158(d)(1) of title 28 provides: "The courts of appeals shall have jurisdiction of appeals from all final decisions, judgments, orders, and decrees entered under subsections (a) and (b) of this section."

The provisions of 28 U.S.C. § 1294 will govern the circuit to which appeals from final judgments, orders or decrees of district courts following upon appeals from bankruptcy courts, and from district court orders, judgments and decrees entered in trials that were held by the district court pursuant to section 1334 must be taken. Section 1294 states as follows:

Except as provided in sections 1292(c), 1292(d), and 1295 of this title, appeals from reviewable decisions of the district and territorial courts shall be taken to the courts of appeals as follows:

(1) From a district court of the United States to the court of appeals for the circuit embracing the district;

(2) From the United States District Court for the District of the Canal Zone, to the Court of Appeals for the Fifth Circuit;

(3) From the District Court of the Virgin Islands, to the Court of Appeals for the Third Circuit;

(4) From the District Court of Guam, to the Court of Appeals for the Ninth Circuit.

Presumably, section 1294 will govern appeals from bankruptcy appellate panels, although it does not say so.

Appeals from decisions of district court judges (either acting as a court of original jurisdiction or in reviewing the decisions of bankruptcy judges) to courts of appeals are governed by the Federal Rules of Appellate Procedure. Likewise, the Federal Rules of Appellate Procedure are applicable to appeals taken to courts of appeals from decisions of appellate panels.[21]

---

Crain), 243 B.R. 75, 81 (Bankr. C.D. Cal. 1999). A concurring opinion in Bank of Maui v. Estate Analysis, Inc., 904 F.2d 470, 23 C.B.C.2d 848 (9th Cir. 1990), suggested that the circuit court must issue a rule if panel decisions are to be binding upon lower courts. "I concur in the opinion of the court, but write separately to propose that the Judicial Council of this Circuit consider adoption of an order requiring that Bankruptcy Appellate Panel (BAP) decisions shall bind all of the bankruptcy courts of the circuit, subject to the restrictions imposed by article III [of the Constitution] so well discussed in the opinion." *Maui,* 904 F.2d 470, 472 (O'Scannlain, concurring).

[21] *See* Fed. R. App. P. 6(b), discussed at 20 Moore's Federal Practice, § 306.10[2] (Matthew Bender 3d ed.).

Some courts had held that, when the district court had withdrawn the reference and was acting as court of original jurisdiction, the appellate procedures of 28 U.S.C. § 1291, not section 158(d), applied. The reasoning was that section 158(d)(1) refers only to orders entered under subsections 158(a) and (b), neither of which appertained.[22] The issue was finally resolved in *Connecticut National Bank v. Germain*,[23] which held that sections 158(d) and 1291 can comfortably coexist in the area of bankruptcy appeals.[24] Section 1291 provides in part that "[t]he courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States."

## [5] Appeals to the Supreme Court

The method of taking an appeal to the United States Supreme Court is governed by 28 U.S.C. § 1254, which regulates the jurisdiction of the Supreme Court in cases coming from the courts of appeals. This section provides:

Cases in the courts of appeals may be reviewed by the Supreme Court by the following methods:

(1) By writ of certiorari granted upon the petition of any party to any civil or criminal case, before or after rendition of judgment or decree;

(2) By certification at any time by a court of appeals of any question of law in any civil or criminal case as to which instructions are desired, and upon such certification the Supreme Court may give binding instructions or require the entire record to be sent up for decision of the entire matter in controversy.[25]

In addition, under 28 U.S.C. § 1253 it is possible, though not likely, to have a direct appeal on bankruptcy questions from a three-judge district court to the Supreme Court. This latter section provides for such an appeal when the three-judge court issues an interlocutory or permanent injunction suspending the enforcement of a state statute. It may be applicable should the district court restrain the enforcement of a state statute on the ground that it has been superseded by the Bankruptcy Code.

In some exceptional cases, when there is no other adequate remedy, a review of the proceedings of an inferior tribunal may be brought before the Supreme Court by virtue of the authority to issue writs conferred by 28 U.S.C. § 1651.

Section 1651 provides:

(a) The Supreme Court and all courts established by Act of Congress may

---

[22] United States v. Nicolet, Inc., 857 F.2d 202, 19 C.B.C.2d 202 (3d Cir. 1988); Klenske v. Goo (*In re* Manoa Fin. Co.), 781 F.2d 1370, 14 C.B.C.2d 118 (9th Cir. 1986); Green v. Drexler (*In re* Feit and Drexler, Inc.), 760 F.2d 406, 13 C.B.C.2d 148 (2d Cir. 1985); *In re* Amatex Corp., 755 F.2d 1034, 12 C.B.C.2d 147 (3d Cir. 1985), assumed without discussion that 28 U.S.C. § 1292(a)(1) applied to an appeal from an order of the district court sitting as a trial court.

[23] 503 U.S. 249, 112 S.Ct. 1146, 117 L. Ed. 2d 391, 26 C.B.C.2d 175 (1992).

[24] *See* ¶ 5.02[4] *supra*.

[25] *See generally* 22 Moore's Federal Practice, ch. 405 (Matthew Bender 3d ed.).

Case 09-10138-MFW    Doc 13460-17    Filed 05/02/14    Page 50 of 50

issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

(b) An alternative writ or rule nisi may be issued by a justice or judge of a court which has jurisdiction.

Mandamus is an extraordinary writ that may be issued to compel the performance of a plain duty as to which there is no discretion to act or to refuse to act.[26]

---

[26] Allied Signal Recovery Trust v. Allied Signal, Inc., 298 F.3d 263, 270 (3d Cir. 2002) (mandamus granted of order otherwise not reviewable when "district court has committed a clear abuse of discretion or engaged in conduct amounting to usurpation of the judicial power") (internal quotation marks omitted); Lindsey v. Dow Chem. Co. (*In re* Dow Corning Corp.), 113 F.3d 565 (6th Cir), *cert. denied*, 522 U.S. 977, 118 S. Ct. 435, 139 L. Ed. 2d 334 (1997) (mandamus granted when district court ignored earlier circuit court decision). And because an appellate panel is a court "established by Act of Congress," it may issue a writ of mandamus. Salter v. United States Bankruptcy Court (*In re* Salter), 279 B.R. 278, 280–83 (B.A.P. 9th Cir. 2002).