**<u>EXHIBIT A</u>**

Court File No: 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
**R.S.C. 1985, c. C-36, AS AMENDED**

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION,
NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
**R.S.C. 1985, c. C-36, AS AMENDED**

**MOTION RECORD**
(Use of Documents at Trial)
**(returnable May 8, 2014)**

Date:  May 2, 2014

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

**Jay A. Carfagnini** (LSUC #: 22293T)
jcarfagnini@goodmans.ca
**Alan Mark** (LSUC #: 21772U)
amark@goodmans.ca
**Jessica Kimmel** (LSUC #: 32312W)
jkimmel@goodmans.ca
**Peter Ruby** (LSUC #: 38439P)
pruby@goodmans.ca
**Joseph Pasquariello** (LSUC #: 38390C)
jpasquariello@goodmans.ca

Tel:    416.979.2211
Fax:    416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

**GOWLING LAFLEUR HENDERSON LLP**
Barristers & Solicitors
1 First Canadian Place,
100 King Street West, Suite 1600
Toronto ON M5X 1G5

**Derrick Tay** (LSUC #: 21152A)
derrick.tay@gowlings.com
**Jennifer Stam** (LSUC #: 46735J)
Jennifer.stam@gowlings.com

Tel:    (416) 862-5697
Fax:    (416) 862-7661

Lawyers for the Canadian Debtors

# INDEX

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

<u>**INDEX**</u>

| TAB | | | PAGE NO. |
|---|---|---|---|
| 1 | | Notice of Motion returnable May 8, 2014 | 1 |
| 2 | | One Hundred and Fifth Report of the Monitor dated May 2, 2014 | 7 |
| | A | Ninety-Fifth Report of the Monitor dated June 5, 2013 | 19 |
| | B | Protective Order of this Court dated June 11, 2013 | 36 |
| | C | Excerpts relating to Confidentiality from CDMA/LTE, Enterprise, GSM, MEN, CVAS, MSS, and Residual IP sales | 58 |
| | D | Affidavit of Jennifer Stam sworn May 2, 2014 | 73 |
| | E | Affidavit of Robert Ferguson sworn May 2, 2014 | 120 |
| | F | Notices to Deloitte & Touche USA LLP, KPMG LLP, Sutherland, Asbill & Brennan LLP, Caplin & Drysdale, Global IP, and Lazard Freres & Co., all dated May 1, 2014 | 132 |
| | G | Thirty-Fifth Report of the Monitor dated January 18, 2010 | 144 |
| | H | Letter from Mark Zigler dated April 30, 2014 | 175 |

# TAB 1

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**- COMMERCIAL LIST**

**IN THE MATTER OF**
**THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36,**
**AS AMENDED**
**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**NOTICE OF MOTION**
**(Use of Documents At Trial - Returnable May 8, 2014)**

Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Technology

Corporation, Nortel Networks Global Corporation and Nortel Networks International

Corporation (collectively, the "**Canadian Debtors**") together with Ernst & Young Inc. in its

capacity as monitor of the Canadian Debtors (the "**Monitor**") will make a motion to Justice

Morawetz of the Commercial List court, on May 8, 2014, at 11:00 am or as soon after that time

as the motion can be heard, at 393 University Avenue, Toronto, Ontario.

**PROPOSED METHOD OF HEARING**: The motion is to be heard orally.

1.    **THE MOTION IS FOR AN ORDER**:

    (a)    declaring that the non-confidential use of documents at Trial is in the interests of

        public openness and except as set forth herein, documents at Trial shall be non-

        confidential and the Core Parties are directed to file the documents publicly with

        the Court subject to and on the terms and conditions of the Order;

(b)     sealing or redacting a specified list of Priority Trial Exhibits pending further order of the Court;

(c)     approving a process and timeline for the redaction of Additional Priority Trial Documents;

(d)     providing for the continuation of the Protective Order for the remaining Trial Documents relating to the "Claims Only" portion of the Trial and those documents that were produced for discovery but not designated for use at Trial;

(e)     confirming a non-waiver of privilege with respect to Joint Privileged Documents; and

(f)     Such further and other relief as to this Honourable Court may seem just.

2.     **THE GROUNDS FOR THE MOTION ARE:**

(a)     Capitalized terms used herein and not otherwise defined have the meaning given to them in the one hundred and fifth report of the Monitor dated May 2, 2014 (the **"One Hundred and Fifth Report"**);

(b)     This Court granted the protective order on June 13, 2013, which was also approved by the United States Bankruptcy Court for the District of Delaware (the **"Protective Order"**);

(c)     Pursuant to the Protective Order, producing parties produced over 3 million documents including several that were subject to confidentiality restrictions on a "confidential" or "highly confidential" basis;

(d)     Transcripts, expert reports, affidavits and briefs have all been marked "highly confidential" on a provisional basis;

(e)     Discovery is now complete and the Trial will commence on May 12, 2014;

(f)     Although the number of potential exhibits has been reduced substantially from the 3 million documents that were produced during the discovery process, thousands of documents have been designated for potential use at trial;

(g)     The use of designated documents at Trial is in the interest of public openness;

(h)     The Trial ought to be conducted openly and with access to the public as far as reasonably possible;

(i)     There are, however, certain documents that must be protected from public disclosure; primarily on the following basis:

     (i)     Business sale confidentiality concerns: The various asset purchase agreements for all the major business sales and the sale of Nortel's residual intellectual property contain confidentiality clauses, which, in most instances, impose confidentiality restrictions on the Sellers;

     (ii)     Obligations of the Monitor to hold certain information related to discussions with tax authorities in confidence;

     (iii)     Third-party contracts that contain confidentiality clauses: The documents consist primarily of patent licenses or cross-licenses, which contain sensitive proprietary intellectual property information; and

     (iv)    Personal information: Several Parties are subject to privacy and related laws in their various jurisdictions regarding the use of personal information;

(j)    The sealing or redaction of a limited number of documents and a establishment of a review process for the redaction of other Court documents is fair and reasonable in the circumstances;

(k)    Rule 30.11 of the *Rules of Civil Procedure*;

(l)    Section 137(2) of the *Courts of Justice Act;* and

(m)    Such further and other grounds as the lawyers may advise.

3.    **THE FOLLOWING DOCUMENTARY EVIDENCE** will be used at the hearing of the motion:

(a)    The One-Hundred and Fifth Report; and

(b)    Such further and other evidence as the lawyers may advise and this Honourable Court permit.

May 2, 2014

**GOODMANS LLP**
Barristers & Solicitors
333 Bay Street, Suite 3400
Toronto, Canada  M5H 2S7

Jay A. Carfagnini  (LSUC #: 22293T)
jcarfagnini@goodmans.ca
Alan Mark (LSUC #: 21772U)
amark@goodmans.ca
Jessica Kimmel (LSUC #: 32312W)
jkimmel@goodmans.ca
Peter Ruby (LSUC #: 38439P)
pruby@goodmans.ca
Joseph Pasquariello (LSUC #: 37389C)
jpasquariello@goodmans.ca

Tel:      416.979.2211
Fax:      416.979.1234

**Lawyers for the Monitor, Ernst & Young Inc.**

**Gowling Lafleur Henderson LLP**
Barristers & Solicitors
1 First Canadian Place
100 King Street West, Suite 1600
Toronto, ON  M5X 1G5

Derrick Tay  (LSUC #: 21152A)
derrick.tay@gowlings.com
Jennifer Stam  (LSUC #: 46735J)
Jennifer.stam@gowlings.com

Tel:  416.862.5697
Fax:  416.862.7661

**Lawyers for the Canadian
Debtors**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(Commercial List)**

Proceeding commenced at Toronto

**NOTICE OF MOTION**
**(Use of Documents at Trial - Returnable May 8, 2014)**

| | |
|---|---|
| **GOODMANS LLP** | **Gowling Lafleur Henderson LLP** |
| Barristers & Solicitors | Barristers & Solicitors |
| 333 Bay Street, Suite 3400 | 1 First Canadian Place |
| Toronto, Canada  M5H 2S7 | 100 King Street West, Suite 1600 |
| | Toronto, ON  M5X 1G5 |
| Jay A. Carfagnini  (LSUC #: 22293T) | |
| jcarfagnini@goodmans.ca | Derrick Tay  (LSUC #: 21152A) |
| Alan Mark (LSUC #: 21772U) | derrick.tay@gowlings.com |
| amark@goodmans.ca | Jennifer Stam  (LSUC #: 46735J) |
| Jessica Kimmel (LSUC #: 32312W) | Jennifer.stam@gowlings.com |
| jkimmel@goodmans.ca | |
| Peter Ruby (LSUC #: 38439P) | Tel:  416.862.5697 |
| pruby@goodmans.ca | Fax:  416.862.7661 |
| Joseph Pasquariello (LSUC #: 37389C) | |
| jpasquariello@goodmans.ca | **Lawyers for the Canadian Debtors** |
| | |
| Tel:     416.979.2211 | |
| Fax:    416.979.1234 | |
| | |
| **Lawyers for the Monitor, Ernst & Young Inc.** | |

# TAB 2

7

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**ONE HUNDRED AND FIFTH REPORT OF THE MONITOR**
**DATED MAY 2, 2014**

**INTRODUCTION**

1.    On January 14, 2009, Nortel Networks Corporation ("**NNC**" and collectively with all its
      subsidiaries "**Nortel**"), Nortel Networks Limited ("**NNL**"), Nortel Networks Technology
      Corporation, Nortel Networks International Corporation and Nortel Networks Global
      Corporation (collectively the "**Canadian Debtors**") filed for and obtained protection
      under the *Companies' Creditors Arrangement Act* ("**CCAA**").  Pursuant to the Order of
      this Court dated January 14, 2009, as amended and restated (the "**Initial Order**"), Ernst
      & Young Inc. was appointed as the Monitor of the Canadian Debtors (the "**Monitor**") in
      the CCAA proceedings.

2.    Nortel Networks Inc. ("**NNI**") and certain of its U.S. subsidiaries and affiliates
      concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the
      "**Code**") in the United States Bankruptcy Court for the District of Delaware (the "**U.S.**
      **Court**") on January 14, 2009 (the "**Chapter 11 Proceedings**").  As required by U.S. law,
      an official committee of unsecured creditors (the "**Committee**") was established in
      January, 2009.

3.    An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "**Bondholder Group**"). In addition, pursuant to Orders of this Court, representative counsel was appointed on behalf of the former employees of the Canadian Debtors, the continuing employees of the Canadian Debtors and the LTD Beneficiaries (and together with other Canadian creditors, "**CCC**") and each of these groups is participating in the CCAA proceedings.

4.    Nortel Networks (CALA) Inc. ("**NN CALA**" and together with NNI and certain of its subsidiaries and affiliates that filed on January 14, 2009, the "**U.S. Debtors**") filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

5.    Nortel Networks UK Limited ("**NNUK**") and certain of its affiliates located in EMEA were granted administration orders (the "**UK Administration Orders**") by the High Court of England and Wales on January 14, 2009 (collectively the "**EMEA Debtors**"). The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors, except for Nortel Networks (Ireland) Limited, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "**Joint Administrators**").

**PURPOSE**

6.    The purpose of this one hundred and fifth report of the Monitor (the "**One Hundred and Fifth Report**") is to support the motion of the Monitor and Canadian Debtors (the "**Motion**") seeking an order for certain relief relating to public the use of documents at Trial, sealing certain Priority Trial Exhibits and establishing a process for the review and partial redaction of Additional Priority Trial Documents, all as discussed in more detail below.

9

**TERMS OF REFERENCE**

7.    In preparing this One Hundred and Fifth Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with the Company.  The Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of this information and accordingly, the Monitor expresses no opinion or other form of assurance on the information contained in this One Hundred and Fifth Report.  Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

8.    The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel.  The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the Chapter 11 Proceedings are posted.

**BACKGROUND**

*The Allocation Protocol*

9.    Pursuant to an Order of this Court made on April 13, 2013 (the "**Allocation Protocol Order**"), this Court approved the Canadian Debtors' form of allocation protocol establishing the parameters for the conduct of a trial (the "**Trial**") to determine the allocation of sale proceeds (the "**Allocation**") and to litigate claims that have been asserted by the EMEA Debtors and the UK Pension Claimants (defined below) (the "**Claims**") against the Canadian Debtors (and others).  A similar Order was approved by the U.S. Court. The Allocation Protocol Order established the core parties ("**Core Parties**") who may participate in the Trial.  A similar order also approving the allocation protocol has been granted by the U.S. Court.  Among the Core Parties are the Canadian Debtors, U.S. Debtors, EMEA Debtors/Joint Administrators, Committee, CCC, Bondholder Group, administrator of the UK pension plan and pension protection fund (the "**UK Pension Claimants**"), indenture trustees under the bond trust indentures and former directors and officers of the Canadian Debtors.

3

*The Discovery Process*

10.     On May 15, 2013, this Court and the U.S. Court approved orders establishing a litigation timetable (the "**Litigation Timetable**") and discovery plan (the "**Discovery Plan**") for the purposes of the Trial. Since that time, the Core Parties have been engaged in an extensive discovery process pursuant to which, among other things:

   a) Document requests and written interrogatories were exchanged;

   b) Approximately 3 million documents were produced;

   c) Approximately 110 depositions of fact witnesses were taken that resulted in transcripts (the "**Fact Witness Deposition Transcripts**") many of which were several hundred pages long;

   d) 49  expert reports, reply expert reports and sur-reply expert reports were filed; and

   e) 33 depositions of experts were taken that resulted in transcripts (the "**Expert Witness Deposition Transcripts**" and together with the Fact Witness Deposition Transcripts, the "**Deposition Transcripts**") many of which were several hundred pages long.

11.     As part of the discovery process and to allow for access to all material produced during the document production period, the Core Parties negotiated and sought a Protective Order. The Monitor's Ninety-Fifth Report, (attached as Appendix A without appendices) was filed in support of the granting of the Protective Order. This Court granted the Protective Order on June 13, 2013 (the "**Protective Order**" attached as Appendix B). The U.S. Court also approved the Protective Order. Pursuant to the Protective Order, producing parties produced documents that were subject to confidentiality restrictions on a "confidential" or "highly confidential" basis.

12.     At the time of the granting of the Protective Order the CCC brought a motion regarding confidentiality which did not proceed at the time on the basis that the Protective Order would be revisited for purposes of the Trial. The CCC referred to the public interest served by open trials, as articulated by the Supreme Court of Canada in *Sierra Club*, and

took the position that although they were content for documents to be produced on a confidential or highly confidential basis for discovery purposes, this issue would need to be re-visited at Trial. The expectation was that by the time of the Trial, the universe of relevant documents would be reduced from the many millions that were still in the process of being reviewed and were to be produced for discovery purposes. As such, the Protective Order does not apply to the Trial or the use of documents at Trial.

13.     In addition to the confidentiality concerns during the discovery period, concerns regarding privilege also initially impeded the full exchange of documents with those Core Parties who were not the Nortel Debtors. The privileged documents encompassed different types of privilege which necessitated different treatment. With respect to "solicitor-client" privileged documents, often the privilege was held by more than one estate (the "**Joint Privileged Documents**"). The Core Parties negotiated and executed the stipulation that resulted in the Amendment to the Protective Order which allowed the Joint Privileged Documents to be used during the pre-trial discovery on a "highly confidential" basis.  On the other hand, documents that were "single estate privileged" or subject to settlement or litigation privilege in the context of this litigation were not produced.

*The Pre-Trial Schedule*

14.     The Core Parties have been following the pre-trial schedule as set out in the Litigation Timetable (revised and amended by subsequent Court Orders), the Trial Protocol (as amended) and as otherwise agreed. Specifically, in the last month, the Core Parties have exchanged:

   a)     Initial and reply affidavits;

   b)     exhibit designations, supplemental exhibit designations and objections thereto;

   c)     fact deponent transcript designations, counter-designations and supplemental fact deponent transcript designations in response to initial and reply affidavits, together with objections to all of the foregoing;

5

/2

d)    expert deponent transcript designations, counter-designations and objections to the foregoing; and

e)    Pre-trial motions and objections and replies to pre-trial motions.

15.    Specifically, with respect to proposed Trial Exhibits (defined below), the Core Parties produced initial exhibit lists on March 28 with further designations on April 11, 2014 and April 25, 2014.

**THE USE OF TRIAL DOCUMENTS AT TRIAL**

16.    The discovery period is now complete and the Trial is set to commence on May 12, 2014. Trial Documents have been designated for potential use at Trial and those documents include:

a)  Approximately 16,000 exhibits ("**Trial Exhibits**");

b)  Excerpts from over 100 Fact Witness Deposition Transcripts;

c)  49 expert reports (not including 68 expert reports on the topic of foreign law);

d)  Excerpts from over 35 Expert Deposition Transcripts;

e)  30 affidavits; and

f)  Opening briefs.

(collectively, the "**Trial Documents**").

17.    The Monitor and Canadian Debtors in consultation with the U.S. Debtors, the EMEA Debtors and the CCC have been considering how to address the confidentiality and privilege issues relating to the Trial Documents and their use at Trial. There is a general desire for an open trial which is consistent with the interest of public openness and the express desire of the Courts and the parties involved in this litigation. Additionally, the logistics of redaction and clearing of the Courtroom are such that the Monitor and Canadian Debtors wish to minimize any such requirements.

6

*13*

18.    However, as set out in the Ninety-Fifth Report, although much historical information
relating to Nortel is no longer sensitive, there are specific areas pursuant to which there
are ongoing confidentiality concerns.    Briefly, the primary areas of sensitivity are as
follows:

a)    *Business Sale Confidentiality Concerns.*    The asset purchase agreements (the
**"Sale Agreements"**) for all of the major business sales and the sale of Nortel's
residual intellectual property contained confidentiality clauses which, in most or
all instances, impose confidentiality restrictions on the Sellers (as defined in the
Sale Agreements) with respect to certain business information and types of
transaction documentation.    Attached as Appendix C are excerpts/summaries
relating to confidentiality from the asset purchase agreements relating to the
CDMA/LTE, Enterprise, GSM, MEN, CVAS, MSS and Residual IP sale. Despite
the fact that Nortel no longer operates any businesses, the businesses themselves,
now in the hands of third party buyers, continue to operate. In addition, the
Residual IP is used by the purchaser thereof.    The third party buyers (the
**"Purchasers"**), as evidenced by the terms of the Sale Agreements themselves, are
concerned with ensuring that documents related to the businesses they are
operating (or the assets they acquired), remain confidential;

b)    *Minister of National Revenue*    NNL and the Monitor are obligated to hold
confidential certain information related to the APA (as defined below), subject to
certain exceptions;

c)    *Third Party Contracts that Contain Confidentiality Clauses.*    In addition to the
confidentiality obligations set out above, many other contracts Nortel entered into
contained confidentiality clauses and information commercially sensitive to those
third parties.    These documents consist primarily of patent licenses or cross-
licenses which contain sensitive proprietary intellectual property information both
related to intellectual property transferred under the Sale Agreements and, in
some cases, the third party licensee; and

*14*

d)    *Personal Information.* The Canadian Debtors, U.S. Debtors and EMEA Debtors are all subject to privacy and related laws in their various jurisdictions when it comes to personal information (including personal information that is financial information). Furthermore, public disclosure of this information could be harmful to individuals to whom the information pertains.

19.    Although the number of exhibits has been substantially narrowed from the initial 3 million documents produced, there are still approximately 16,000 documents that have been designated as Trial Exhibits. These Trial Exhibits are referred to in many instances by the other Trial Documents submitted for use at Trial and may arise during the course of examination of witnesses at Trial. The other Trial Documents have all been provisionally designated as "highly confidential" and were exchanged and filed confidentially pursuant to the Protective Order.

*The Motion*

20.    The issues relating to confidentiality and privilege were raised by counsel to the Monitor, the U.S. Debtors, the CCC and others at the April 22, 2014 pre-trial conference (the **"April 22 Pre-Trial Conference"**). The Courts indicated that any motion to address these issues would be held by way of a joint hearing on May 8, 2014. In light of the number of Trial Documents, the Monitor, Canadian Debtors, U.S. Debtors and the EMEA Debtors prioritized a review of the approximately 6,500 Trial Exhibits that have been designated for use during the portion of the Trial to take place in May and June (the **"Priority Trial Exhibits"**) to determine which of those documents fall into one of the categories above.

21.    In anticipation of the Motion, the Monitor, Canadian Debtors, U.S. Debtors and EMEA Debtors began an early notice process to provide potentially interested parties with notice of the Motion and the issues related to the use of the documents at Trial. Specifically,

a)    On April 28, 2014, notice was given to each of the Purchasers of the anticipated use of documents at Trial and of the May 8, 2014 hearing itself. A copy of the

*15*

> affidavit of Jennifer Stam sworn May 2, 2014 evidencing such notice is attached
> as Appendix D hereto;
>
> b) On May 1, 2014, notice was given to each of the Licensees of the anticipated use
> of documents at Trial and of the May 8, 2014 hearing itself. A copy of the
> affidavit of Robert Ferguson sworn May 2, 2014 evidencing such notice is
> attached as Appendix E hereto; and
>
> c) Notice was given to each of Deloitte, KPMG, Sutherland Asbill, Global IP and
> Lazard on May 1, 2014 and Horst Frisch on May 2, 2014, all of whom had
> produced documents as part of the discovery process. Attached as Appendix F
> are the letters that were sent to those parties.

22.    As of the date of this Report, conversations with those parties that have responded to the
notice are ongoing. The Monitor and Canadian Debtors anticipate continuing to work
with these parties as well as other Core Parties to reach a limited number of Priority Trial
Exhibits which should be the subject of a sealing order prior to the Motion.

23.    In addition to the steps taken above, the Monitor has been engaged in an ongoing
dialogue with the Minister of National Revenue (the "**Minister**") with respect to the
confidentiality obligations owed in connection with the advance pricing agreement
("**APA**") entered into with the Minister. The history behind the entry into the APA is set
out in the Monitor's thirty-fifth report dated January 18, 2010 (the "**Thirty-Fifth
Report**", attached as Appendix G without appendices). On January 21, 2010, this Court
approved the APA and granted an order sealing the APA (appended to the Thirty-Fifth
Report) pending further order of the Court. The confidentiality provisions are applicable
to certain documents ("**Confidential APA Information**") that have been designated for
use at Trial.

24.    On September 11, 2013, the Monitor advised counsel to the Minister of disclosure of the
Confidential APA Information to the other Core Parties pursuant to the Protective Order
and further advised that, if necessary, a further Order or directions would be sought
concerning the treatment and permitted uses of such information at the hearing.

*16*

25.    On April 11, 2014, the Monitor sought the Minister's agreement to the unrestricted use of the Confidential APA Information at the trial. On April 15, 2014, the Minister requested the Monitor provide it with copies of the Confidential APA Information that was produced in the litigation and further identify Confidential APA Information which the Monitor or Canadian Debtors had or intended to designate for use at trial. On April 24, 2014, the Monitor provided counsel to the Minister with copies of the Confidential APA Information that had been designated for use at Trial together with certain other documents designated for Trial.

*Relief Sought*

26.    As set out above, the Monitor and the Canadian Debtors have a general desire for the Trial to be as open as possible.  However, the Monitor and Canadian Debtors (as well as the U.S. Debtors and the EMEA Debtors) are cognizant of their ongoing confidentiality obligations and believe that a balance should be struck with respect to protecting ongoing information contained in documents which the Courts determine should be protected as confidential ("**Confidential Information**").  As such, the Monitor and Canadian Debtors (along with the U.S. Debtors and EMEA Debtors) are seeking relief  relating to the Priority Trial Documents whereby they would be unsealed other than with respect to a specified set of documents containing Confidential Information to  be either redacted or sealed by the Court.

27.    Further, with respect to the balance of the documents such as transcripts, expert reports, affidavits and briefs to be used during the portion of the Trial scheduled for May and June ("**Additional Priority Trial Documents**"), the Core Parties are now faced with the challenge of reviewing tens of thousands of pages of Additional Priority Trial Documents which may refer to, discuss or reference Confidential Information when the Trial is set to commence in just over one week.  In order to address the reality of the current time frame associated with the Trial, the Monitor and Canadian Debtors (along with the U.S. Debtors and EMEA Debtors) are proposing a rolling review process (the "**Review Process**") pursuant to which specified time frames would be set for the review of the Additional Priority Trial Documents with a view to either confirmation that such documents may be

unsealed in their entirety or that redacted versions may be filed publicly. The Review Process prioritizes the deadline for the review of documents in accordance with their anticipated use at Trial. In other words, documents such as pre-trial briefs for Allocation should be completed prior to the first day of Trial and transcripts, affidavits and expert reports for trial witnesses appearing for cross-examination are prioritized after that. The remaining Additional Priority Documents primarily consist of Fact Witness Deposition Transcripts in respect of fact witnesses who are not appearing at Trial and are less likely to be referred to in open Court at Trial.

28.     With respect to the remaining Trial Documents relating to the litigation of the Claims, it is expected a similar process will be undertaken and further relief will be sought prior to the commencement of that portion of the Trial. Until such relief is sought, it is requested the Protective Order continue to apply to those "Claims only" Trial Documents. The Monitor and Canadian Debtors are further requesting the Protective Order continue to apply to all of those documents that were produced during the discovery process but were not designated for use at Trial.

29.     Although Nortel is no longer an operating business and many privilege concerns may no longer be relevant, each Nortel estate must still negotiate, resolve and/or litigate many other third party claims. The Monitor, Canadian Debtors, U.S. Debtors and EMEA Debtors wish to protect privilege in order to avoid undue prejudice to their respective estates in the resolution of those claims.

30.     In order to address the concern regarding privilege at the Trial, the Canadian Debtors, U.S. Debtors and EMEA Debtors are in discussions concerning the terms of an order which provides protections in that regard.

*Current Status of Objections*

31.     Consistent with previous positions, the CCC has advised that it is of the view the Trial should be open. On April 30, 2014, the CCC provided notice to the Core Party Service of its position that the Trial should be open and that there is no basis for any documents to be filed under seal. A copy of the letter is attached as Appendix H.

11

32.     As of the date of this Report, preliminary conversations have taken place with counsel to certain of the Purchasers who have expressed concern over protection of their Confidential Information. The Minister has expressed similar concerns. It is anticipated a further update will be provided prior to or at the Motion with respect to further positions.

## CONCLUSION

33.     As set out above, the Monitor and the Canadian Debtors have a desire for the Trial to be as open as possible but believe that a limited sealing order protecting Confidential Information is appropriate. Further, the Monitor and Canadian Debtors recognize the practical difficulty of the time required in conducting a review for Confidential Information in the Additional Priority Trial Documents. The proposed Review Process will provide for this extra time while balancing the need for the most urgent documents to be used publicly, to the extent at all possible, during the conduct of the Trial.

34.     To the extent that the Courts approve the sealing of the Confidential Information, it may be necessary for a party to request the Courtrooms be cleared. The Monitor and Canadian Debtors are hopeful there will be minimal redaction of the other Trial Documents required and the clearing of the Courtrooms during the Trial will also be kept to a minimum.

All of which is respectfully submitted this 2nd day of May, 2014.

**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Canadian Debtors**
**and not in its personal capacity**

Per:

Murray A. McDonald
President

# APPENDIX "A"

# [ATTACHED]

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**NINETY-FIFTH REPORT OF THE MONITOR**
**DATED JUNE 5, 2013**

**INTRODUCTION**

1.  On January 14, 2009, Nortel Networks Corporation ("**NNC**" and collectively with all its subsidiaries "**Nortel**"), Nortel Networks Limited ("**NNL**"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively the "**Canadian Debtors**") filed for and obtained protection under the *Companies' Creditors Arrangement Act* ("**CCAA**"). Pursuant to the Order of this Court dated January 14, 2009, as amended and restated (the "**Initial Order**"), Ernst & Young Inc. was appointed as the Monitor of the Canadian Debtors (the "**Monitor**") in the CCAA proceedings.

2.  Nortel Networks Inc. ("**NNI**") and certain of its U.S. subsidiaries and affiliates concurrently filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "**Code**") in the United States Bankruptcy Court for the District of Delaware (the "**US Court**") on January 14, 2009 (the "**Chapter 11 Proceedings**"). As required by US law, an official committee of unsecured creditors (the "**Committee**") was established in January, 2009.

1

20

3.    An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital
       Corporation has been organized and is participating in these proceedings as well as the
       Chapter 11 Proceedings (the "**Bondholder Group**"). In addition, pursuant to Orders of
       this Court, representative counsel was appointed on behalf of the former employees of the
       Canadian Debtors, the continuing employees of the Canadian Debtors and the LTD
       Beneficiaries (and together with other Canadian creditors, "**CCC**") and each of these
       groups is participating in the CCAA proceedings.

4.    Nortel Networks (CALA) Inc. ("**NN CALA**" and together with NNI and certain of its
       subsidiaries and affiliates that filed on January 14, 2009, the "**US Debtors**") filed a
       voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

5.    Nortel Networks UK Limited ("**NNUK**") and certain of its affiliates located in EMEA
       were granted administration orders (the "**UK Administration Orders**") by the High
       Court of England and Wales on January 14, 2009 (collectively the "**EMEA Debtors**").
       The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and
       Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors, except
       for Nortel Networks (Ireland) Limited, to which David Hughes (Ernst & Young LLP
       Ireland) and Alan Bloom were appointed (collectively the "**Joint Administrators**").

**PURPOSE**

6.    The purpose of this Ninety-Fifth report of the Monitor (the "**Ninety-Fifth Report**") is to
       support the joint motion of the Monitor and Canadian Debtors seeking approval of a
       protective order (attached as Appendix "A" hereto) relating to the disclosure and
       discovery of documents in the context of the trial in respect of the allocation of sale
       proceeds and the resolution of claims filed by the EMEA Debtors, certain other
       intercompany creditors and UK pension interests (the "**Trial**") scheduled to commence
       January 6, 2014.

7.    The following appendices are attached to this Ninety-Fifth Report:

       a)    Appendix A – Monitor's and Canadian Debtors' form of Protective Order;

2

b)      Appendix B – UK Pension Claimants' form of Protective Order;

c)      Appendix C – CCC's form of Protective Order; and

d)      Appendix D – Excerpts from Sale Agreements showing confidentiality clauses.

**TERMS OF REFERENCE**

8.      In preparing this Ninety-Fifth Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with the Company. The Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of this information and accordingly, the Monitor expresses no opinion or other form of assurance on the information contained in this Ninety-Fifth Report. Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

9.      The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the Chapter 11 Proceedings are posted.

**BACKGROUND**

10.      Pursuant to an Order of this Court made on April 13, 2013, this Court approved the Canadian Debtors' form of allocation protocol and established the core parties ("**Core Parties**") who may participate in the Trial. A similar order also approving the allocation protocol has been granted by the US Court. Among the Core Parties are the Canadian Debtors, US Debtors, EMEA Debtors/ Joint Administrators, Committee, CCC, Bondholder Group, administrator of the UK pension plan and pension protection fund (the "**UK Pension Claimants**"), indenture trustees under the bond trust indentures and former directors and officers of the Canadian Debtors.

11.      On May 15, 2013, this Court and the US Court approved orders establishing a litigation timetable (the "**Litigation Timetable**") and discovery plan (the "**Discovery Plan**") for the purposes of the Trial.

3

12.     The Trial has been set to commence January 6, 2014. Prior to that time, in accordance with the Litigation Timetable and Discovery Plan, significant document production is required to take place. Notably, the deadline for requests for document production was May 22, 2013. Under the Litigation Timetable, rolling production of documents is to commence on June 10, 2013 and must be substantially complete by July 22, 2013 (the **"Document Production Period"**).

13.     In order to protect material that is confidential, it is necessary to put a protective order in place.

14.     On May 22, 2013, the Canadian Allocation Group, the US Allocation Group, the EMEA Allocation Group and the Bondholder Allocation Group (all as defined in the Litigation Timetable) served their requests for production of non-privileged documents pursuant to the Litigation Timetable. Similar requests were delivered in connection with the EMEA Debtor and UK Pension Claims in both Canada and the US. The scope of the document requests is wide ranging and includes requests for documents produced during a period of over a decade in respect of wide ranging issues, some of which are listed below:

a)      valuation of business lines;

b)      valuation of intellectual property;

c)      financial statements;

d)      intercompany sales;

e)      allocation of proceeds of pre-petition asset sales;

f)      pre-petition asset sale valuation;

g)      communications with asset purchasers;

h)      value of post-petition asset sales;

i)      monetizing intellectual property;

4

j)      legal title to intellectual property;

k)      patent filings;

l)      research and development;

m)      interim funding and settlement agreement;

n)      transfer pricing agreements, calculations and payments;

o)      Project Swift;

p)      customer relationships;

q)      intercompany loans;

r)      UK pension matters;

s)      board materials including minutes, presentations and other materials;

t)      UK pension trustee materials;

u)      cabinet meetings; and

v)      tax documents.

15.    The Canadian Debtors and Monitor are in the process of reviewing the requests with a view to the commencement of production of documents substantially in accordance with the Litigation Timetable.[1]

**CONFIDENTIALITY CONCERNS**

16.    The Litigation Timetable and Discovery Plan provide for the production of documents for the purposes of the allocation litigation (including related claims). However, as set out

---

[1] Pursuant to the Litigation Timetable, rolling production of documents is set to commence on June 10, 2013. In light of the timing of the hearing, no Confidential or Highly Confidential Material will be produced until this issue has been resolved or a further interim protective order is in place.

below, the production of documents must be carried out in a way that addresses the many remaining confidentiality concerns.

*Business Sale Confidentiality Concerns*

17.     The asset purchase agreements (the **"Sale Agreements"**) for all of the major business sales and the sale of Nortel's residual intellectual property contained extensive confidentiality clauses which, in most or all instances, impose confidentiality restrictions on the Sellers (as defined in Sale Agreements).     Attached as Appendix D are excerpts/summaries relating to confidentiality from the asset purchase agreements relating to the CDMA/LTE, Enterprise, GSM, MEN, CVAS, MSS and Residual IP sale.

18.     Although the specific terms of the agreements vary, the confidentiality restrictions in each sale agreement generally prohibit the Sellers (or their affiliates) from disclosing competitively sensitive information relating to the business being sold (subject to certain exceptions). For example, certain of these provisions prohibit the Sellers (or their affiliates) from disclosing:

   a)     all confidential information relating to the business and assets being sold including trade secrets, customer lists, marketing plans and pricing information;[2]

   b)     all competitively sensitive information and data related to the business, the assets and/or the Sellers (including intellectual property and competitively sensitive "business information");[3] and

   c)     all competitively sensitive, proprietary or confidential information that pertains to the assets (including any portions of notes, dockets, reports, analyses, compilations, studies, files, claim charts, or other documents or material, whether prepared by the Sellers or others, which contain or otherwise reflect such information) and all information on the Sellers disclosure schedules.[4]

---

[2] Section 5.11 of the Sale Agreement for the sale of the MEN business.

[3] Section 5.11 of the Sale Agreement for the sale of the Enterprise business.

[4] Section 5.11 of the Sale Agreement for the sale of the residual IP and definition of "Purchaser Confidential Information".

25'

19.    The permitted exceptions in the confidentiality clauses in the Sale Agreements generally relate to the sale and approval process itself. Additionally, most or all the Sale Agreements provide that where required by applicable law, the Sellers may disclose confidential information with advance notice to the purchaser. There are two (2) instances where the terms of the purchase agreements allow the Sellers to "share" information for the purposes of allocating proceeds.[5]

20.    Despite the fact that Nortel no longer operates any business, the businesses themselves, now in the hands of third party buyers, continue to operate. The third party buyers, as evidenced by the terms of the Sale Agreements themselves, are concerned with ensuring that documents related to the businesses they are operating (or the assets they acquired), remain confidential. The Canadian Debtors (as well as the other Sellers) have contractual obligations to ensure their information is kept confidential.

*Third Party Contracts Assigned to Purchasers Contain Confidentiality Clauses*

21.    In addition to the confidentiality obligations set out above, many of the contracts Nortel had entered into pre-petition (including those assigned to third party purchasers) contained confidentiality clauses and information commercially sensitive to those third parties. Indeed, in the context of the sales processes, in many instances potential buyers were not provided with copies of these sensitive contracts. These confidentiality provisions must continue to be observed.

*Personal Information*

22.    The Canadian Debtors, US Debtors and EMEA Debtors are all subject to privacy and related laws in their various jurisdictions when it comes to personal information (including personal information that is financial information) – Furthermore, public disclosure of this information could be harmful to individuals to whom the information pertains.

---

[5] Section 5.11 of each of the Sale Agreements for the sale of the CVAS business and the MSS business.

*Third Parties not involved in the Allocation Proceedings*

23.     As set out in prior reports, the Monitor and Canadian Debtors are still in the process of resolving several outstanding third party claims including with Canada Revenue Agency and other government entities. The Monitor and Canadian Debtors understand the US Debtors also have outstanding third party claims that remain unresolved and the EMEA Debtors have not even commenced a process for addressing third party claims. The production of documents with respect to those third party claims should be informed and shaped by those claims and not by this current process.

**THE PROTECTIVE ORDER[6]**

24.     In order to address the confidentiality concerns, the Monitor and Canadian Debtors have worked with the other Core Parties to attempt to reach consensus on the terms of a form of protective order (the "**Protective Order**") and now propose that the form of Protective Order attached hereto as Appendix A be approved by this Court. The Monitor and Canadian Debtors are aware the US Debtors will be seeking approval of the same form of Protective Order from the US Court at the joint hearing scheduled in respect of this matter.

*The Proposed Terms of the Protective Order*

25.     The proposed Protective Order imposes a designation system whereby "producing parties" may designate material as "Confidential" or "Highly Confidential" if they reasonably believe such material meets specified criteria. Other parties have the right to object to such designations and ultimately, any unresolved disputes may be resolved by the Court(s).

26.     A summary of the key terms of the Protective Order is set out below:

        a)     <u>Application</u> (Section 1).   The Protective Order will govern all parties' participation in discovery undertaken in connection with the litigation or

---

[6] Capitalized terms used herein and not otherwise defined have the meaning given to them in the proposed Protective Order (Appendix A). The summary contained herein is for informational purposes only. Reference should be made to the Protective Order itself for the full proposed terms.

arbitration of allocation, EMEA claims and UK pension claims, with respect to the handling of documents, depositions, examinations for discovery, exhibits to depositions or examinations for discovery, affidavits, testimony and any other information production, given or disclosed by any Party or any non-parties (a "**Producing Party**") to any other Party or non-party receiving or viewing such materials (a "**Receiving Party**").

b) Confidential and Highly Confidential Material. The Protective Order provides that a Producing Party may designate Discovery Material as "Highly Confidential Discovery Material" or "Confidential Discovery Material" if such material meets certain criteria:

  i. Highly Confidential Discovery Material (Section 2(b)). · Discovery Material may be designated as Highly Confidential Discovery Material where the Producing Party reasonably believes that it contains or constitutes:

   A) personal information that requires the protections provided in this Protective Order, including, but not limited to, social security numbers, information about current or former employee compensation and/or benefits, health information and financial information;

   B) information required to be kept confidential pursuant to law or regulation; or

   C) information of a commercially sensitive nature subject to a non-disclosure agreement or similar agreement between any Producing Party and a third party.

  ii. Confidential Discovery Material (Section 3(b)). Discovery Material may be designated as Confidential Discovery Material where the Producing Party reasonably believes that it contains or constitutes:

   A) non-public proprietary information about a Party;

   B) non-public financial or accounting results or data;

   C) tax returns, any tax-related correspondence or agreements with any government and other tax information ("**Tax Information**");

9

D)    information subject to a non-disclosure agreement or similar agreement between any Producing Party and a third party; or

E)    confidential communications offered in mediation or compromise negotiations, including, but not limited to, Discovery Material bearing a designation that it is subject to Federal Rule of Evidence 408.

c)    Confidential and Highly Confidential Discovery Material shall not include (Section 2(a)):

i.    information that is publicly available in substantially the same form in which it was provided;

ii.    information that was, is or becomes public knowledge, not in violation of this Protective Order;

iii.    information that is voluntarily de-designated by the Producing Party;

iv.    information that a Court order has de-designated;

v.    information rightfully acquired from an independent source without restrictions as to use; or

vi.    information that is at any time independently developed by a Party without use of or reliance upon any Discovery Material.

d)    Designation (Section 4).    A Producing Party may designate material as Confidential or Highly Confidential Discovery Material by applying a legend indicating as much to each page or portion of the relevant material. At the request of a Party, a Producing Party shall designate material as Confidential or Highly Confidential Discovery Material where such requesting Party reasonably believes the material meets the criteria for designation. Thereafter, that requesting Party shall be deemed a "Producing Party" for certain purposes in the Protective Order.

e)    Treatment of Highly Confidential Information (Section 5). Highly Confidential Discovery Material will be maintained in confidence by any Receiving Party and

may only be shared with permitted third parties as set out in the Protective Order (subject to the terms and conditions of the Protective Order).

The Protective Order addresses the processes for use of or reference to Highly Confidential Discovery Material in final or draft pleadings and for showing Highly Confidential Discovery Material to parties or persons expected to be examined for discovery, deponents, Party representatives and/or trial witnesses.

f)      Treatment of Confidential Information (Section 6). Confidential Discovery Material will be maintained in confidence by any Receiving Party and may only be shared with permitted third parties as set out in the Protective Order (subject to the terms and conditions of the Protective Order). Those parties whom Receiving Parties may share Confidential Discovery Material include parties or persons to whom Highly Confidential Discovery Material may be disclosed, current employees, officers, or directors of a Receiving Party, former employees of a Receiving Party and persons expected to be deponents and/or trial witnesses in the Proceedings and counsel to such persons.

g)      Permitted Purposes (Section 7). The Protective Order generally provides that Confidential or Highly Confidential Discovery Material may only be used by permitted persons and that all Discovery Material shall only be used in connection with the Proceedings (subject to certain exceptions related to the UK Pension Claimants' Beddoe proceedings).

h)      Court Filings (Section 8). The Protective Order provides that Confidential or Highly Confidential Discovery Material shall not be filed with the Court(s) (subject to certain exceptions), but that the Parties shall meet and confer in good faith, and seek instructions from the Court(s) as necessary, prior to the start of any trial in the Proceedings regarding the use of Confidential or Highly Confidential Discovery Material at such trial or hearing. The Parties reserve all rights with respect to trial procedures.

11

i)      No Waiver (Section 10).

      i.      Where a Producing Party subsequently realizes that certain Discovery Material it previously produced should be designated as Confidential or Highly Confidential, it may notify Receiving Parties of such and provide substituted copies of the Discovery Material with the appropriate legend.

      ii.     The Protective Order does not prevent any Party from applying to the Court(s), in writing and on notice to the Parties, for relief from the Protective Order or for applying for additional Protective Orders.

j)      Objections to Designation (Section 11).  Any Party may object to the designation of Discovery Material as Confidential or Highly Confidential and, absent consensual resolution within seven (7) business days, may seek a ruling from the Court(s).  The burden shall be on the Producing Party to justify the claim that dispute material has been properly designated and is entitled to protection from disclosure.

k)      Effective Date (Section 19).  The Effective Date of the Protective Order is the date on which it has been approved by both Courts.

l)      Allocation Dataroom Access (Section 20).

      i.      Allocation Dataroom Documents will be treated as Confidential Discovery Material unless marked as "Highly Confidential Discovery Material" within 21 days following the Effective Date.

      ii.     If a Party objects to the designation of specifically identified documents in the Allocation Dataroom, the Producing Party shall reconsider such designation and within ten (10) days either re-affirm the designation or such document(s) shall no longer be considered Confidential Discovery Material.

m)      Other Provisions.  The Protective Order contains other provisions which address certain matters including, the requirement that certain persons sign a Non-

12

Disclosure Declaration prior to receiving Confidential or Highly Confidential Material, use in depositions, redaction of personal information, third party beneficiaries, survival of the Protective Order, disposal of Confidential or Highly Confidential Material and privileged documents.

## CURRENT STATUS OF THE PROTECTIVE ORDER AND KNOWN OBJECTIONS

27.    The proposed Protective Order represents the result of negotiations and compromises agreed to by the Monitor and Canadian Debtors, the US Debtors and Committee, the EMEA Debtors, the UK Pension Claimants, the CCC and other Core Parties. Certain steps have already been accomplished. In particular, on May 16, 2013, this Court granted an interim protective order (the "**Interim Protective Order**") to allow Core Parties who did not previously have access to the Allocation Dataroom to gain immediate access to those documents. A similar order was granted by the US Court on May 17, 2013.

28.    In accordance with the Litigation Timetable, the Monitor and Canadian Debtors served and filed their proposed Protective Order (attached as Appendix A) on May 17, 2013. In response, the UK Pension Claimants and CCC also served their proposed Protective Order (attached as Appendices B and C, respectively). Other than the differences set out in those proposed forms, neither the Monitor nor Canadian Debtors are aware of any remaining differences in the proposed Protective Order.

*The UK Pension Claimants*

29.    With respect to the UK Pension Claimants, there appears to be only one point of dispute with respect to the Protective Order. As set out above, the Monitor and Canadian Debtors' proposed form of Protective Order contains the following provision in the "permitted use" section of the Order:[7]

> provided that, the Protective Order shall not prohibit the UK Pension
> Claimants from complying with the Beddoe proceeding pending under

---

[7] The Monitor understands that a Beddoe application is a directions application to court seeking the court's approval to trustees bringing or defending proceedings in order to avoid potential personal liability being imposed on the trustees.

U.K. law in the English High Court by disclosing Discovery Material to the Beddoe court and counsel (including barristers and solicitors) for the representative beneficiary in those proceedings (provided that such counsel is informed of the terms of this Protective Order and the UK Pension Claimants make a good faith effort to have such counsel comply with the requirements of Section 13) for purposes of obtaining periodic directions from the Beddoe court with respect to the Proceedings, provided the Discovery Material is filed under seal and is not available as a matter of public record. (emphasis added)

30.   The UK Pension Claimants have not included the underlined wording in their proposed form of Order.

31.   The Monitor's and Canadian Debtors' concern is that once shared with the representative beneficiary, documents may be subject to 'leakage'. In order to mitigate this risk, the UK Pension Claimants are being asked by the other Core Parties to inform counsel for the representative beneficiary of the terms of the Protective Order and use a "good faith effort" to obtain a non-disclosure declaration from the representative beneficiary. This approach is reasonable and not overly burdensome upon the UK Pension Claimants. Absent an Order of this Court specifically providing for the disclosure of information to counsel for the representative beneficiary in the Beddoe proceedings, the Canadian Debtors (as well as the other Sellers under the Sale Agreements) would risk being in violation of their confidentiality obligations to third parties by disclosing confidential information to persons who may not be aware of the information's confidential nature.

*The CCC*

32.   The CCC has raised objections which are reflected in its blackline to the proposed Protective Order (the **"CCC Protective Order"**). The CCC's concerns fall into a number of categories including, scope of material that may be designated, categories of people who may view designated information, treatment of designated information at trial and de facto treatment of the Allocation Dataroom.

*33*

33.    While the Monitor and Canadian Debtors do not oppose the committee members of the CCC receiving "Confidential Discovery Material", certain other elements of CCC's concerns remain at issue. The Monitor, Canadian Debtors and CCC continue to engage in discussions to try and resolve outstanding issues with the form of Protective Order and will provide any further updates to the Court prior to the return of the motion.

**CONCLUSION**

34.    The Monitor and Canadian Debtors recognize the proposed Protective Order is unusual in the context of standard Canadian litigation. However; the Nortel process which includes companies from all around the world, three (3) major insolvency proceedings, debtors subject to the laws of numerous jurisdictions and a joint trial to be conducted by two (2) Courts simultaneously is equally unusual.

35.    The Parties are faced with the enormous task of now litigating entitlement to over $7 billion at a trial commencing in approximately six (6) months. In that time, there is an incredible amount that must be accomplished. In fact, the Document Production Period must be substantially complete within two (2) months from the date requests were made. The document production requests received by the Monitor and Canadian Debtors (as well as other Producing Parties) are wide in scope. As set out above the Monitor and Canadian Debtors are continuing to review the requests and reserve the right to file objections or other motions as contemplated by the Litigation Timetable and Discovery Plan.

36.    Given the time frame for production of documents set out in the Litigation Timetable as well as the scope of documents requested, it is necessary to adopt a practical approach to confidentiality issues.

37.    The proposed Protective Order addresses the many confidentiality concerns the Monitor and Canadian Debtors, US Debtors and EMEA Debtors all face (particularly given the Sale Agreements) and represents a practical and largely consensual basis for the treatment of Confidential and Highly Confidential Discovery Material in the Proceedings. It provides for specified limitations, which are consistent with Canadian legal principles,

34

on those documents that may reasonably be designated as Confidential or Highly Confidential and allows for Parties who disagree with that designation to object and seek direction from the Court(s).

38. Furthermore, the Monitor and Canadian Debtors believe the proposed Protective Order balances both the need for discovery (pursuant to the Court-approved Litigation Timetable and Discovery Plan) as well as the reality of the condensed time for discovery including the cost of such a process, reduced personnel and the massive volume of documents that have been requested for production. If the onus were placed on Producing Parties to seek confidentiality orders prior to producing documents in the Allocation Database or for the purposes of filing with the Court(s), the Court(s) would likely be faced with lengthy sealing motions during which the Court(s) would be asked to make decisions regarding confidentiality when it would not even yet be known whether all or even any such documents would be used at Trial.

39. The Monitor and Canadian Debtors are hopeful that once production is underway, the Parties will act reasonably in resolving matters as production occurs. However, the Protective Order does not prejudice the right of any Receiving Party to object to designations or seek direction from the Court(s) where there are disputes.

40. For the reasons set out above, the Monitor and Canadian Debtors believe the form of Protective Order attached as Appendix A is fair and reasonable and respectfully request it be approved by this Court.

All of which is respectfully submitted this 5th day of June, 2013.

**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Canadian Debtors**
**and not in its personal capacity**

Per:

Murray A. McDonald
President

16

| IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION | Court File No.:09-CL-7950 |
|---|---|

***ONTARIO***

**SUPERIOR COURT OF JUSTICE**
Proceeding Commenced at Toronto

---

**NINETY-FIFTH REPORT OF THE MONITOR DATED JUNE 5, 2013**

---

**GOWLING LAFLEUR HENDERSON LLP**
Barristers & Solicitors
1 First Canadian Place,
100 King Street West, Suite 1600
Toronto ON M5X 1G5

**Derrick Tay (LSUC #: 21152A)**
**Jennifer Stam (LSUC #: 46735J)**
Tel:   (416) 862-5697
Fax:   (416) 862-7661

**GOODMANS LLP**
Barristers & Solicitors
333 Bay Street, Suite 3400
Toronto ON  M5H 2S7

**Jay A. Carfagnini** (LSUC#: 22293T)
**Jessica Kimmel** (LSUC#: 32312W)
**Peter Ruby** (LSUC#: 38439P)
**Joseph Pasquariello** (LSUC#: 38390C)
Tel: 416.979.2211
Fax: 416.979.1234

# APPENDIX "B"

# [ATTACHED]

*36*

Court File No: 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

THE HONOURABLE MR.          )          **TUESDAY, THE 11ᵗʰ DAY OF**
JUSTICE MORAWETZ           )          **JUNE, 2013**
                           )
                           )

### IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
### R.S.C. 1985, c. C-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
### NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
### NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
### CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

### APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
### R.S.C. 1985, c. C-36, AS AMENDED

### ORDER
### (Protective Order)

**THIS MOTION**, made by Nortel Networks Corporation, Nortel Networks Limited,

Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel

Networks International Corporation (collectively, the **"Canadian Debtors"**) jointly with Ernst &

Young Inc. in its capacity as monitor (the **"Monitor"**) of the Canadian Debtors for the relief set

out in the Notice of Motion dated June 5, 2013 was heard this day at 393 University Avenue,

Toronto, Ontario.

**ON READING** the Ninety-Fifth Report of the Monitor dated June 5, 2013 (the **"Ninety-**

**Fifth Report"**) and on hearing submissions of counsel for the Canadian Debtors, the Monitor,

and those other parties present, no one appearing for any other person on the service list,

37

although served as appears from the Affidavit of Service of Jennifer Stam, sworn June 7, 2013, filed.

1.      **THIS COURT ORDERS** that the time for the service of the Notice of Motion, the Ninety-Fifth Report, and the Motion Record is hereby abridged and validated so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.      **THIS COURT ORDERS** that capitalized terms used herein and not otherwise defined shall have the meaning given to them in the protective order in the form attached hereto as Schedule "A" (the "**Protective Order**").

3.      **THIS COURT ORDERS** that the Protective Order be and is hereby approved.

**MISCELLANEOUS**

4.      **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

*38*

5.    **THIS COURT ORDERS** that each of the Applicants and the Monitor be at liberty and are hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

ENTERED AT / INSCRIT À TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

JUN 1 1 2013

## SCHEDULE A

### Attached.

*40*

# **PROTECTIVE ORDER**

1.    **Application of this Protective Order.**

(a)    This Protective Order (the "Protective Order") shall govern the participation of any person, entity or group, including, but not limited to, the Canadian Debtors,[1] EMEA Debtors, US Debtors, Committee, Bondholder Group, Monitor, Joint Administrators, CCC, Indenture Trustees, UK Pension Claimants, and Officers and Directors  (the "Parties" and each a "Party") and the Parties' counsel (and, where a Party is a committee or group, counsel to each member), in discovery undertaken in connection with the litigation or arbitration (subject to any Party's right to oppose any request for arbitration on any grounds and/or to oppose the use of any Discovery Material, as defined below, in any such arbitration) of Allocation, the EMEA Claims, and the UK Pension Claims in the US and/or Canadian Court (collectively the "Proceedings"), notwithstanding anything to the contrary previously agreed to or ordered by the United States Bankruptcy Court for the District of Delaware (the "US Court") or the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court" and, together with the US Court, the "Courts"), and subject to approval by both Courts.

(b)    This Protective Order shall govern the Proceedings with respect to the handling of documents, depositions, examinations for discovery, exhibits to depositions or examinations for discovery, affidavits, testimony and any other information produced, given or disclosed by any Party or any non-parties (in each case, a "Producing Party") to any other Party or non-party receiving or viewing such materials(in each case, "Receiving Party"), including through access to a shared dataroom (all such materials and the substance of such materials, hereinafter referred to as "Discovery Material").

2.    **Highly Confidential Discovery Material.**

(a)    Any Producing Party may designate as "Highly Confidential" any Discovery Material, in whole or part, that the Producing Party reasonably believes in good faith meets any of the criteria below, provided that "Highly Confidential" documents and information shall not include:

      (i)    information that is publicly available in substantially the same form in which it was provided;

      (ii)    information that was, is or becomes public knowledge, not in violation of this Protective Order;

      (iii)    information that is voluntarily de-designated by the Producing Party;

      (iv)    information that a Court order has de-designated;

      (v)    information rightfully acquired from an independent source without restrictions as to use; or

---

[1]    Capitalized terms not defined herein shall have the meaning given in the Allocation Protocol.

*4 1*

(vi)    information that is at any time independently developed by a Party without use of or reliance upon any Discovery Material.

(b)    Subject to these conditions and limitations, any Producing Party may designate as "Highly Confidential" any Discovery Material, in whole or part, that the Producing Party reasonably believes in good faith contains or constitutes:

(i)    personal information that requires the protections provided in this Protective Order, including, but not limited to, social security numbers, information about current or former employee compensation and/or benefits, health information and financial information;

(ii)    information required to be kept confidential pursuant to law or regulation; or

(iii)    information of a commercially sensitive nature subject to a non-disclosure agreement or similar agreement between any Producing Party and a third party;

(all information designated as such, including the document itself as well as the information therein, the "Highly Confidential Discovery Material").

## 3.    Confidential Discovery Material.

(a)    Any Producing Party may designate as "Confidential" any Discovery Material, in whole or part, that the Producing Party reasonably believes in good faith meets any of the criteria below, provided that Confidential information shall not include any documents or information as set forth in Section 2(a) hereof.

(b)    Subject to these conditions and limitations, any Producing Party may designate as "Confidential" any Discovery Material, in whole or part, that the Producing Party reasonably believes in good faith contains or constitutes:

(i)    non-public proprietary information about a Party;

(ii)    non-public financial or accounting results or data;

(iii)    tax returns, any tax-related correspondence or agreements with any government, all workpapers, books and records relating to taxes, any tax opinions, records (including accounting records) relating to taxes paid or payable by the parties, all intercompany agreements related to taxes, and all financial and tax records relating to the estate that form part of a parties' general ledger or otherwise constitute accounting records, as well as drafts with respect to any of the foregoing;

(iv)    information subject to a non-disclosure agreement or similar agreement between any Producing Party and a third party; or

2

(v)     confidential communications offered in mediation or compromise negotiations, including, but not limited to, Discovery Material bearing a designation that it is subject to Federal Rule of Evidence 408;

(all documents or information designated as such, including the document itself as well as the information therein, the "Confidential Discovery Material").

## 4.     Designation of Documents.

(a)     A Producing Party may designate Discovery Material as Confidential Discovery Material by applying the legend "Confidential" to each page or portion containing any Confidential Discovery Material.

(b)     A Producing Party may designate Discovery Material as Highly Confidential Discovery Material by applying the legend "Highly Confidential" to each page or portion containing any Highly Confidential Discovery Material.

(c)     In the case of electronically produced information, the "Confidential" or "Highly Confidential" legend, if any, shall be printed on the cover or container of the disk, tape, or other medium in which the electronic form data is stored, and the "Confidential" or "Highly Confidential" legend shall be applied, by electronic means to each electronic document or other electronically stored information containing any Confidential or Highly Confidential Discovery Material, unless such electronic materials are produced in native format. If produced in native format, such materials will be produced without alteration along with a corresponding Bates-numbered slipsheet bearing the "Confidential" or "Highly Confidential" legend.

(d)     The failure to designate a document as "Confidential" or "Highly Confidential" does not constitute a waiver of such claim, and a Producing Party may so designate a document after such document has been produced in accordance with Section 10, with the effect that such document is subject thereafter to the protections of this Protective Order.

(e)     At the request of a Party (the "Requesting Party"), a Producing Party shall designate as Confidential or Highly Confidential Discovery Material containing information of the Requesting Party that the Requesting Party reasonably believes in good faith meets any of the criteria for such designation. With respect to Discovery Material designated as Confidential or Highly Confidential Discovery Material pursuant to request, the Requesting Party shall thereafter be deemed a Producing Party for purposes of Sections 2(a)(iii), 5, 6, 8-12 and 15-17 of this Protective Order. The costs of providing new copies of such re-designated documents to each Receiving Party and/or a shared dataroom shall be borne by the Requesting Party, and the "Confidential" or "Highly Confidential" legend on such copies must clearly indicate the Party who requested the designation.

(f)     A Party may designate as Confidential or Highly Confidential Discovery Material produced by another Party pursuant to subsection (e), even if such Discovery Material has already been designated as Confidential or Highly Confidential. If more than one Party designates the same Discovery Material as Confidential or Highly Confidential, all such Parties shall be considered a Producing Party with respect to such Discovery Material and be treated as a Producing Party for purposes of Sections 2(a)(iii), 5, 6, 8-12 and 15-17 of this Protective Order.

For the avoidance of doubt, whenever consent of or notice to a Producing Party is required by this Protective Order, such consent or notice must be of or to all Parties treated as Producing Parties under this Section.

## 5.    Treatment of Highly Confidential Information.

(a)    Any information designated as Highly Confidential Discovery Material shall be maintained in confidence by each Receiving Party.

(b)    Provided that disclosure is not otherwise prohibited by this Protective Order, and subject to Section 7(d), a Receiving Party shall only disclose Highly Confidential Discovery Material to:

(i)    current employees, officers and directors of a Receiving Party who previously had rightful access to or knowledge of such Highly Confidential Discovery Material or other similar material;

(ii)    former employees of a Receiving Party who are currently retained by that Party as consultants or independent contractors who during their employment with the Receiving Party had rightful access to or knowledge of such Highly Confidential Discovery Material or other similar material provided that they comply with the requirements of Section 13 hereof;

(iii)    court-appointed Monitors, Trustees and Administrators and their respective staffs, and for the US Debtors, the employees of RLKS Executive Solutions LLC and the employees of Avidity Partners, LLC;

(iv)    outside or in-house counsel for the Parties or outside or in-house counsel for members of a committee or group (where a Party is a committee or group), and legal assistants, secretaries, staff or agents and consultants working with or for such counsel, but only to the extent that it is reasonably necessary to share Highly Confidential Discovery Material;

(v)    litigation support personnel, including outside copying, scanning and coding services and court reporters;

(vi)    persons expected to be deponents, trial witnesses or hearing witnesses in the Proceedings and counsel to such persons, provided that counsel providing the Highly Confidential Discovery Material has a good-faith basis for believing that such witnesses had prior, rightful access to or knowledge of the Highly Confidential Discovery Material, and provided that counsel ascertain as soon as practicable whether such witnesses had such access or knowledge, and provided that upon the first indication that such witnesses did not have such access or knowledge, counsel must immediately refrain from any further disclosure to such witnesses and procure the return or destruction of such Highly Confidential Discovery Material;

4

(vii)  witnesses designated pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure and/or party representatives designated for discovery examination pursuant to the Ontario Rule of Civil Procedure and/or alternative procedures agreed to by the Parties;

(viii)  any experts retained for the purpose of providing advice and assistance to outside counsel of record and/or giving evidence in the Proceedings, including their staff, provided that they comply with the requirements of Section 13 hereof;

(ix)  personnel of the Courts;

(x)  any other person upon written agreement of the Producing Party, provided that he or she complies with the requirements of Section 13 hereof;

(xi)  any other person upon order of the Court(s) and upon such conditions as may be imposed by the Court(s); and

(xii)  any other person, as required by law, regulation, government action, regulatory authority, organization of regulators, self-regulatory authority or court order, subject to Section 9 of this Protective Order.

(c)  In addition to the foregoing, draft or final pleadings that cite to or quote Highly Confidential Discovery Material (but not any attachments thereto designated as Highly Confidential) may be shared with non-attorney representatives from each Party (or, where the Party is a committee or group, non-attorney representatives of each committee or group, who represent such member or group in committee or group matters), provided that they comply with the requirements of Section 13 hereof, but only to the extent that sharing such draft or final pleadings that cite to or quote Highly Confidential Discovery Material is necessary to render advice to or receive guidance or approval from the Party in the Proceedings.

(d)  Any Receiving Party may request leave of a Producing Party to show Highly Confidential Discovery Material to parties or persons expected to be examined for discovery, deponents, Party representatives and/or trial witnesses in the Proceedings by providing notice to the Producing Party of the Highly Confidential Discovery Material the Receiving Party seeks to use and the parties shall use their best efforts within five business days to determine whether such material may be disclosed by the Receiving Party to such persons while protecting the Producing Party's need for confidentiality, including, but not limited to, considering whether portions of such material can be redacted and re-evaluating whether such material must be protected as Highly Confidential. In the event the Producing Party and the Receiving Party cannot resolve an issue concerning the use of Highly Confidential Discovery Material, the matter may be presented to the Courts for resolution on an expedited basis.

(e)  Persons receiving Highly Confidential Discovery Material pursuant to this Section shall not copy or disclose such Highly Confidential Discovery Material directly or indirectly to any other person other than in accordance with this Protective Order.

5

(f)     Treatment of Highly Confidential Discovery Material by a Receiving Party in accordance with the provisions of this Protective Order shall not constitute an admission that such Discovery Material has been correctly designated, nor waive any objection to such designation.

## 6.    Treatment of Confidential Information.

(a)     Any information designated as Confidential Discovery Material shall be maintained in confidence by each Receiving Party.

(b)     Provided that disclosure is not otherwise prohibited by this Protective Order and subject to Section 7(d), a Receiving Party shall only disclose Confidential Discovery Material to:

> (i)     parties or persons to whom Highly Confidential Discovery Material may be disclosed as set forth in Section 5;
>
> (ii)    current employees, committee members of, officers, or directors of a Receiving Party (including current employees, officers or directors of members of a committee or group that is a Party provided that they comply with the requirements of Section 13 hereof), provided that disclosure is reasonably necessary to the Proceedings;
>
> (iii)   former employees of a Receiving Party, provided that disclosure is reasonably necessary to the Proceedings and that they comply with the requirements of Section 13 hereof; or
>
> (iv)    persons expected to be deponents and/or trial witnesses in the Proceedings and counsel to such persons.

(c)     Persons receiving Confidential Discovery Material pursuant to this Section shall not copy or disclose such Confidential Discovery Material directly or indirectly to any other person other than in accordance with this Protective Order.

(d)     Treatment of Confidential Discovery Material by a Receiving Party in accordance with the provisions of this Protective Order shall not constitute an admission that such Discovery Material has been correctly designated, nor waive any objection to such designation.

## 7.    Permitted Purposes.

(a)     Confidential or Highly Confidential Discovery Material shall not be made public by any Party, shall be used only by persons permitted access to it per this Protective Order and shall be disclosed only to persons specified in this Protective Order.

(b)     All Discovery Material (except such materials publicly available in substantially the same form), whether or not designated as Confidential or Highly Confidential Discovery Material, shall be used by Receiving Parties solely in connection with the Proceedings (including appeals), and not in connection with any other litigation, judicial or regulatory proceeding or for any business, commercial, competitive, personal or other purpose except as required by law, regulation, government action, regulatory authority, organization of regulators, self-regulatory

6

authority or court order, provided, however, that this Protective Order shall not prohibit the UK Pension Claimants from complying with the Beddoe proceeding pending under U.K. law in the English High Court by disclosing Discovery Material to the Beddoe court and to counsel (including barristers and solicitors) for the representative beneficiary in those proceedings (provided that such counsel is informed of the terms of this Protective Order) for purposes of obtaining periodic directions from the Beddoe court with respect to the Proceedings, provided that the Discovery Material is filed under seal and not available as a matter of public record, and provided that such Discovery Material is disclosed to counsel for the representative beneficiary either by virtue of the disclosure to the Beddoe court or in the context of confidential discussions with such counsel.

(c)     Any summary, compilation, notes, memoranda, analysis or copy containing Confidential or Highly Confidential Discovery Material, and any electronic image or database containing Confidential or Highly Confidential Discovery Material shall be subject to the terms of the Protective Order to the same extent as the material or information from which such summary, compilation, notes, memoranda, analysis, copy, electronic image or database is derived.

(d)     This Protective Order has no effect upon, and shall not apply to, a Party's use of its own Confidential or Highly Confidential Discovery Material, including information designated as such under Section 4(e) and information that was, prior to disclosure, rightfully in the possession or knowledge of the Party, for any purpose.

(e)     This Protective Order shall not preclude any Party from showing any Confidential or Highly Confidential Discovery Material or disclosing information derived therefrom at a deposition or examination for discovery to any witness, provided that, other than the witness, only those persons who are authorized by the terms of this Agreement to receive the Confidential or Highly Confidential Discovery Material to be disclosed to the witness are present at relevant portions of the deposition and the procedures provided for in Section 12 are in place.

## 8.     Court Filings.

(a)     Confidential or Highly Confidential Discovery Material shall not be filed in the public record absent the consent of the Producing Party or an order of the Court(s) so permitting.

(b)     If a Party wishes to file or otherwise submit to the Court(s) any documents or exhibits containing or making reference to the content of Confidential or Highly Confidential Discovery Material, including, but not limited to, pleadings, memoranda, transcripts, and discovery responses, such Party may redact the Confidential or Highly Confidential Discovery Material. If the nature of the Highly Confidential Information makes redaction unreasonable or impossible, the Party may file the documents or exhibits containing or making reference to the content of Confidential or Highly Confidential Discovery Material under seal.

(c)     The entry of this Protective Order by the Courts shall be deemed an order authorizing the filing under seal of any Confidential or Highly Confidential Discovery Material and any other document citing, quoting, summarizing or otherwise reflecting information obtained from Confidential or Highly Confidential Discovery Material without any further order of either Court required.

7

(d)    This Protective Order shall not, by default, govern the use of Confidential or Highly Confidential Discovery Material at the trial. Instead, the Parties shall meet and confer in good faith, and seek instructions from the Court(s) as necessary, prior to the start of any trial in the Proceedings regarding the use of Confidential or Highly Confidential Discovery Material at such trial or hearing. The Parties reserve all rights with respect to trial procedures and the entry of this Protective Order shall be without prejudice to any position a Party may take in connection with the use of Confidential or Highly Confidential Discovery Material at the trial.

## 9.    Compelled Disclosure.

(a)    If a Receiving Party is subpoenaed in another action or proceeding, served with a document demand, or otherwise required or compelled by law, regulation, government action or other process (any of the foregoing, a "Demand") to produce Confidential or Highly Confidential Discovery Material, the Receiving Party shall, if legally permitted, (i) give prompt written notice by overnight delivery, fax or email the earlier of five (5) business days of receipt, or fourteen (14) days prior to the response date of such Demand to counsel for the Producing Party who produced or designated the Confidential or Highly Confidential Discovery Material, provided, however, that such notice shall be given as soon as practicable if the response date of the demand is within fourteen (14) business days of receipt by the Receiving Party; and (ii) refrain from producing any Confidential or Highly Confidential Discovery Material in response to such Demand until the earlier of receipt of written notice from the Producing Party that it does not object to production of the Confidential or Highly Discovery Material, or resolution of any objection asserted by the Producing Party either by agreement or by final order of the Court(s) with jurisdiction over the objection of the Producing Party.

(b)    The burden of opposing the enforcement of the Demand shall fall solely upon the Producing Party.

(c)    Should a Producing Party neither provide written notice to the Receiving Party that it does not object to production of the Confidential or Highly Discovery Material nor submit a timely objection seeking an order that the Demand not be complied with and serve such objection upon the Receiving Party prior to production pursuant to the Demand, the Receiving Party shall be permitted to produce documents responsive to the Demand on the Demand's response date.

(d)    Subject to the provisions of this Section, compliance by the Receiving Party with any order directing production pursuant to a Demand of any Confidential or Highly Confidential Discovery Material shall not constitute a violation of this Protective Order.

(e)    Nothing herein shall be construed as requiring the Receiving Party or anyone else covered by this Protective Order to challenge or appeal any order directing production of Confidential or Highly Confidential Discovery Material covered by this Protective Order, or to subject himself, herself or itself to any penalties for non-compliance with any legal process or order.

(f)    The provisions of this Section shall apply to examinations conducted by bank or other regulators to which a Party may be subject, which may include examinations of Confidential or Highly Confidential Discovery Material received by any Party and its

representatives. Any such disclosure shall be limited to such portions of the Confidential or Highly Confidential Discovery Material that the applicable Party's legal counsel advises is required under the subpoena, order or process, or request or demand by a regulatory authority, organization of regulators or self-regulatory authority received by that Party (each a "Regulator Demand"). With respect to Regulator Demands for Confidential or Highly Confidential Discovery Material, the applicable Party will promptly inform the Producing Party who produced or designated the Confidential or Highly Confidential Discovery Material in writing of any such Regulator Demand before the disclosure of such Confidential or Highly Confidential Discovery Material to such regulator, if the applicable Party is entitled to do so and if practicable. Otherwise, the applicable Party will promptly inform the Producing Party who produced or designated the Confidential or Highly Confidential Discovery Material in writing of such Regulator Demand after the disclosure of any Confidential Information to regulator, if the applicable Party is entitled to do so. Nothing herein shall obligate any Party to prohibit or restrict any regulator's prompt access, in violation of any law, regulation, order or other obligation applicable to such Party, to documents or information in the custody, possession or control of such Party its representatives.

**10.    No Waiver.**

(a)    If at any time a Producing Party determines or realizes that certain Discovery Material that it previously produced should be designated as Confidential or Highly Confidential, the Producing Party may apprise the Receiving Parties in writing, and such designated Discovery Material will thereafter be treated as Confidential or Highly Confidential Discovery Material under the terms of this Protective Order, provided, however, that the Producing Party shall, at its cost, produce to each Receiving Party and/or to the shared dataroom substitute copies, bearing the legend "Confidential" or "Highly Confidential," of any such Discovery Material at which time the Receiving Party shall promptly return to the Producing Party or (at the election of the Receiving Party) destroy the previously produced copies of such substituted Discovery Material and shall have no right to access such substituted Discovery Material electronically.

(b)    This Protective Order shall not prevent any Party from applying to the Court(s) in writing and on notice to the Parties for relief from this Protective Order or from any provision(s) thereof, or from applying to the Court(s) in writing and on notice to the Parties for further or additional protective orders.

(c)    Producing or receiving Confidential or Highly Confidential Discovery Material or otherwise complying with the terms of this Protective Order shall not:

(i)    prejudice in any way a Producing Party's rights to object to the authenticity or admissibility into evidence of any testimony or other evidence;

(ii)    prejudice in any way the rights of the Parties to object to the production of documents that they consider not subject to discovery, or operate as an admission by any Party in the context of any other litigation or proceeding that the restrictions and procedures set forth herein constitute adequate protection for any particular information deemed by any Party to be Confidential or Highly Confidential Discovery Material;

9

(iii)    prejudice in any way the rights of a Party to seek a determination by the Court(s) whether any Discovery Material should be treated as Confidential or Highly Confidential Discovery Material or subject to the terms of this Protective Order, provided that a Party seeking to challenge the designation of any Discovery Material as Confidential or Highly Confidential shall be obligated to meet and confer in good faith prior to seeking judicial resolution and follow the procedures provided in Section 11; or

(iv)    prevent the Parties to this Protective Order from agreeing to alter or waive the provisions or protections provided herein with respect to any particular Discovery Material.

## 11.  Objections to Designation.

(a)    Any Party objecting to the designation of any particular Discovery Material or testimony as Confidential or Highly Confidential Discovery Material shall so inform the Producing Party, stating the grounds of the objection, and, unless provided otherwise by the discovery plan adopted by the Courts, they shall have seven (7) business days to attempt to resolve the objection, at the end of which the Party objecting to the designation may seek a ruling from the Court(s), on no less than three (3) business days' notice to the Producing Party, that such information should not be treated as Confidential or Highly Confidential Discovery Material, provided that no Confidential or Highly Confidential Discovery Material shall be filed in the public record or disclosed other than in accordance with the terms of this Protective Order prior to such a determination by the Court(s), and provided further that the burden shall be on the Producing Party to justify the claim that disputed material has been properly designated and is entitled to protection from disclosure.

(b)    Each Party hereby agrees that it will not contest a Party's request for expedited consideration of any relief sought from the Court(s) pursuant to this Section.

## 12.  Use in Depositions / Examinations for Discovery.

(a)    If Confidential or Highly Confidential Discovery Material is utilized in a deposition, including a deposition of a party representative, examination for discovery or other recorded testimony, the Producing Party of the Confidential or Highly Confidential Discovery Material ma y designate the portion of the transcript relating to the C onfidential or Highly Confidential Discovery Material as Confidential or Highly Confidential.

(b)    Any deponent or examinee for discovery or his or her counsel may designate all or part of the transcript of a deposition or examination for discovery as Highly Confidential or Confidential. Such deponent or examinee will be the Producing Party of the deposition or examination testimony for purposes of this Protective Order, except that testimony about Confidential or Highly Confidential Discovery Material for which the deponent or examinee is not a Producing Party shall also be deemed to have been produced by the Producing Party of the Confidential or Highly Confidential Discovery Material discussed.

10

*50*

(c)     Designation of all or part of a transcript as Highly Confidential or Confidential may be made on the record during the deposition or examination or may be made by giving written notice to the court reporter and counsel for all Parties within seven (7) business days after receiving the transcript from the court reporter. All deposition or examination transcripts will be considered Confidential for the first seven (7) business days after receiving the transcript from the court reporter, unless designated otherwise by agreement of the Parties, by the Producing Party of Confidential or Highly Confidential Discovery Material discussed therein and/or by the deponent or examinee, as the case may be.

(d)     The Parties may modify this procedure for any particular deposition through agreement on the record at such deposition.

**13.     Disclosure to Certain Firms and Individuals.**

(a)     Prior to disclosure of Confidential or Highly Confidential Discovery Material pursuant to Sections 5(b)(ii), (viii) and (x) (including as incorporated by reference in Section 6(b)(i) hereof); 5(c) and 6(b)(ii) and (iii) hereof, counsel for the Receiving Party shall provide a copy of this Protective Order to the person or the representative of the firm to whom disclosure is intended and such person or representative must execute a Non-Disclosure Declaration in the form annexed as Exhibit A hereto prior to receiving any Confidential or Highly Confidential Discovery Material.

(b)     A Receiving Party shall not disclose any Confidential or Highly Confidential Discovery Material to any holder of, or the investment manager for holders of, debt securities issued and/or guaranteed by the Canadian Debtors, EMEA Debtors or US Debtors, or to any officers, employees, counsel, accountants, advisors or agents of the Receiving Party that might be involved in acquiring any assets of or trading in claims against (including debt securities issued by any of) the Canadian Debtors, EMEA Debtors or US Debtors, unless such person or the representative of the person or firm to whom disclosure is intended executes a Non-Disclosure Declaration in the form annexed as Exhibit A hereto prior to receiving any Confidential or Highly Confidential Discovery Material.

**14.     Third-Party Beneficiaries.**

Third parties that produce documents for use in the Proceedings, either voluntarily or pursuant to a subpoena or in response to discovery requests in connection with the Proceedings, are intended third-party beneficiaries of this Protective Order and shall have the right to designate materials as Confidential or Highly Confidential Discovery Material in accordance with the terms hereof and shall otherwise have the same rights and responsibilities as a Producing Party.

**15.     Redaction of Personal Information.**

(a)     Each Producing Party may redact from Discovery Material it produces, whether or not such Discovery Material are designated Confidential or Highly Confidential, such personal information (e.g., social security numbers, home addresses, bank account information) as the Producing Party deems appropriate, such as information required not to be disclosed by the data protection, privacy or similar laws of the Producing Party's jurisdiction.

11

(b)    If at any time a Producing Party determines or realizes that certain Discovery Material that it previously produced contains personal information to which a non-disclosure obligation applies, the Producing Party may apprise the Receiving Parties in writing. Promptly after receiving written notice of an inadvertent production of personal information, each Receiving Party shall return to the Producing Party or (at the election of the Receiving Party) destroy the Discovery Material as to which the claim of inadvertent production has been made and shall not use the inadvertently produced personal information for any purpose.    The Producing Party shall, at its cost, provide each Receiving Party and/or the shared dataroom with substitute copies, bearing appropriate redactions, of any such Discovery Material.

(c)    Each Receiving Party retains the right to move for the disclosure of the redacted information.

## 16.    Survival.

(a)    The provisions of this Protective Order shall, absent written permission of the Producing Party or further order of the Court(s), continue to be binding throughout and after the conclusion of the Proceedings, including without limitation any appeals therefrom.

(b)    When any Party receives a notice from a court as to the release, unsealing or disposal of Confidential or Highly Confidential Discovery Material submitted by that Party, but designated Confidential or Highly Confidential by another Producing Party, the Party receiving the notice shall promptly send the notice to all Parties by overnight delivery, fax or email, so as to enable the Parties to take any actions they deem appropriate. The provisions of this Section may be waived only with the written consent of the Producing Party.

## 17.    Disposal of Confidential and Highly Confidential Discovery Material.

(a)    Within thirty (30) days after the time for appeal of an order, judgment, or decree finally disposing of or resolving the Proceedings has expired, all persons having received Confidential or Highly Confidential Discovery Material shall, at their own cost and expense, either return such material and all copies thereof (including summaries and excerpts) to counsel for the Producing Parties or (at the election of the Receiving Party) destroy all such Confidential or Highly Confidential Discovery Material and certify that fact to the Producing Parties. Documents that have been received electronically must be electronically deleted and deleted from "trash" files; provided, however, that to the extent that Confidential or Highly Confidential Discovery Material exists in whole or in part on computer backup tapes or other not readily accessible media used for disaster recovery purposes, information from such media does not need to be restored for purposes of destroying or returning Confidential or Highly Confidential Discovery Material, but such retained information shall continue to be treated in accordance with this Protective Order.

(b)    Notwithstanding the preceding paragraph, outside counsel for the Parties shall be entitled to retain court papers, deposition and court transcripts, and attorney work product that includes or summarizes Confidential Discovery Material or Highly Confidential Discovery Material provided that such outside counsel, and employees of such outside counsel, shall not disclose such court papers, deposition or trial transcripts, or attorney work product to any person

12

52

except pursuant to court order or agreement with the Producing Party as to the Confidential Discovery Material or Highly Confidential Discovery Material at issue.

(c) Notwithstanding anything herein to the contrary, the obligations of this Section shall not preclude any Party or its experts or consultants from complying with document retention policies imposed by applicable law, regulation, government action, regulatory authority, organization of regulators, self-regulatory authority or court order, provided that the Party, expert or consultant provides notice of its retention of the documents to the Producing Party.

## 18.    Privileged Documents.

(a) Nothing in this Protective Order shall require disclosure of information that counsel contends is protected from disclosure by solicitor-client privilege, attorney-client privilege, work-product immunity, or any other applicable privilege, immunity or protection from disclosure under any applicable law (each a "Privilege" and, collectively, the "Privileges").

(b) Consistent with Rule 502(d) of the United States Federal Rules of Evidence, if information subject to a claim of Privilege is produced, such production shall not constitute or be deemed a waiver of any claim of a Privilege that the Producing Party would otherwise be entitled to assert in the Proceedings or any other proceeding, either with respect to the produced Discovery Material or any other documents, communications, or information concerning the same subject matter. The production of information subject to a claim of Privilege is without prejudice to the right of a Producing Party to seek the return or destruction of any document as to which a claim of Privilege is later asserted.

(c) If information subject to a claim of Privilege is inadvertently or mistakenly produced, such production shall in no way prejudice or otherwise constitute a waiver of, or estoppel as to, any claim of a Privilege for such information or any other information that may be protected from disclosure by Privilege. If a Party has inadvertently or mistakenly produced a document or information that is subject to a good faith claim of Privilege, upon request by the Producing Party promptly after discovery of such inadvertent or mistaken production, the document for which a claim of inadvertent production is made shall be returned within three (3) business days of such request and all copies of that document that may have been made shall be destroyed to the extent reasonably practicable, and the Receiving Party shall not use such information for any purpose.

(d) The Party returning such material may then file under seal a motion for an order compelling production of the material, but such motion shall not assert as a ground for entering such an order the fact or circumstances of the inadvertent production, and such motion shall not quote from or attach such material. While the motion for an order compelling production is pending before the Court(s), the moving Party shall not maintain a copy of, quote from or otherwise use the material.

(e) No public disclosure of the contents of the Discovery Material as to which the claim of Privilege has been made shall occur absent order of the Court(s).

13

(f)    If, at trial, at a hearing, at a deposition, at an examination for discovery or on a motion, a Producing Party marks for identification or offers into evidence information subject to a claim of Privilege by the Producing Party, or proffers or elicits testimonial or other evidence that incorporates or relies on information subject to a claim of Privilege, that act shall be deemed to effect a waiver and forfeiture by the Producing Party of Privilege. The preceding sentence shall not apply to (1) proceedings to determine whether the information is subject to a claim of Privilege, or (2) information subject to a claim of Privilege that is marked for identification, offered into evidence, or incorporated in evidence proffered or elicited by a Party other than the Producing Party, or relied on by a witness proffered by a Party other than the Producing Party. By marking for identification or offering into evidence information subject to a claim of Privilege, the Producing Party shall not waive any Privilege with respect to undisclosed Discovery Material concerning the same subject matter.

(g)    If information is subject to a claim of privilege ("Joint Privileged Information"), which appears on its face to be held by two or more Parties ("Joint Privilege"), a Party who claims the Joint Privilege shall not refuse to produce any such Joint Privileged Information to any other Party or Parties with whom the Joint Privilege is shared. A Party who holds the Joint Privilege may produce Joint Privileged Information only to those other Parties with whom it shares the Joint Privilege and shall not produce such Joint Privileged Information to Parties that do not share in the Joint Privilege or to a shared dataroom. If a Party who wishes to rely on Discovery Material containing Joint Privileged Information, such Party shall, without prejudice to its position on the claim of privilege, provide notice to the other Parties with whom it shares the Joint Privilege and such other Parties shall have seven days after receiving notice to seek a protective order from the Court(s) in writing and on notice to the Parties. Absent an order from the Court(s) granting such protective order, the Party seeking to rely on Discovery Material containing Joint Privileged Information shall designate such Discovery Material as "Highly Confidential" and produce it to the other Parties and/or to a shared dataroom. Disclosure to a shared dataroom or to persons permitted to view Highly Confidential Discovery Material under this Protective Order does not effect a waiver of privilege as to Parties other than the Producing Party subject to the foregoing sections. The production of such Discovery Material containing Joint Privileged Information does not waive any Privilege with respect to undisclosed Discovery Material concerning the same subject matter as the Joint Privileged Information.

## 19.    Effective Date and Enforceability.

(a)    This Protective Order will become effective upon the date that it has been approved by both Courts (the "Effective Date").

(b)    Nothing in this Protective Order shall preclude any Party from seeking judicial relief, upon notice to the other Parties, with regard to any provision hereof.

(c)    No amendment or modification of this Protective Order shall be binding or enforceable unless in writing and signed by the Parties, or ordered by the Courts.

## 20.    Allocation Dataroom Access

(a)    Upon the Effective Date, all documents ("Allocation Dataroom Documents") in the electronic data site established to facilitate settlement discussions (the "Allocation

14

Dataroom") shall be deemed produced in the Proceedings pursuant to this Protective Order, and subject to its terms, including but not limited to the provisions of Section 18.

(b)    From and after the Effective Date, this Protective Order shall govern and shall supersede the provisions in prior confidentiality agreements with respect to Allocation Dataroom Documents, but only as to the Parties and any other persons or entities who are entitled to receive documents under this Protective Order (subject to any requirements herein, including, but not limited to, Section 13).

(c)    The Parties shall have twenty-one (21) days following the Effective Date to designate documents in the Allocation Dataroom as Highly Confidential Discovery Material. Any Party making such designation will be required to provide new documents with the Highly Confidential legend to replace existing or to otherwise bear the cost of the designation of such documents. Until such period expires, all Parties with access to the Allocation Dataroom will treat documents therein as Highly Confidential Discovery Material.

(d)    After the expiration of the 21-day period, a Party shall have the right at any time to designate such documents in the Allocation Dataroom as Highly Confidential in accordance with paragraph 10(a). Such documents will thereafter be treated as if they had been designated as Highly Confidential in the 21-day period after the Effective Date.

(e)    Notwithstanding anything to the contrary herein, all documents in the Allocation Dataroom shall be deemed Confidential upon the Effective Date and will be electronically stamped with the Confidential legend. Where it is evident from the Bates Stamp which Party supplied the document to the Allocation Dataroom, that Party will be deemed the Producing Party for purposes of Sections 2(a)(iii), 5, 6, 8-12 and 15-17 of this Protective Order. Absent such evidence, the document will be deemed produced by the US Debtors, Canadian Debtors and EMEA Debtors and all such Parties shall each be considered a Producing Party with respect to such documents and be treated as a Producing Party for purposes of Subsection (f) *infra*, and Sections 2(a)(iii), 5, 6, 8-12 and 15-17 of this Protective Order. For the avoidance of doubt, whenever consent of or notice to a Producing Party is required by this Protective Order, such consent or notice must be of or to all Parties treated as Producing Parties under this Section.

(f)    In the event any Party objects to the designation of specifically identified documents from the Allocation Dataroom, the Producing Party shall reconsider such designation and, within ten (10) days, either re-affirm the designation or such document(s) shall no longer be considered Confidential Discovery Material.

## 21. Intentional or Negligent Disclosure of Confidential or Highly Confidential Discovery Material.

In the event of an alleged intentional or negligent disclosure of Highly Confidential Discovery Material or Confidential Discovery Material in violation of this Protective Order, the Parties shall first seek to resolve the alleged violation through prompt and reasonable discussion. In the event such efforts fail to promptly resolve the alleged violation, the Parties reserve the right to seek any available remedy from the Courts, including, *inter alia*, money damages, injunctive relief or any other relief as appropriate.

15

## 22. Enforcement Pending Entry.

The Parties agree to be bound by the terms of this Protective Order pending the entry of this Protective Order by the Courts, and any violation of its terms shall be subject to the same sanctions and penalties as if this Protective Order has been issued and entered by the Courts.

## 23. Jurisdiction.

The US Court and the Canadian Court shall retain jurisdiction and venue for the purposes of any dispute arising out of or relating to this Protective Order. For the avoidance of doubt, the Parties' obligations remain ongoing, and such jurisdiction and venue is retained even to the extent this Protective Order is utilized in connection with any arbitration proceeding.

TOR_LAW\ 8173441\3

## EXHIBIT A

I, _____, declare under penalty of perjury, the

following:

I    reside    at    _____    in    the    City    of

_____ and State/Province of _____;

I have read the annexed Protective Order dated _____, 2013;

I am fully familiar with and agree to comply with and be bound by the provisions of that

Protective Order and consent and attorn to the jurisdiction of the United States Bankruptcy Court

for the District of Delaware and the Ontario Superior Court of Justice solely for the purpose of

enforcement of the provisions of the Confidentiality Protective Order and Protective Order. I

will not divulge any Discovery Material to persons other than those specifically authorized by

the Protective Order, and will take reasonable steps, including, but not limited to, establishing

information firewalls, to prevent the inadvertent disclosure of Discovery Material to any persons

not so authorized. I understand, in particular, that any Confidential or Highly Confidential

Discovery Material, and any copies, excerpts or summaries thereof, or materials containing

Confidential or Highly Confidential Discovery Material derived therefrom, as well as any

knowledge or information derived from any of these items, may be used only for the Proceedings

and may not be used to inform the purchase or sale of securities or for any other purpose,

including, without limitation, any business or commercial purpose.

I further understand that failure to abide fully by the terms of the Protective Order may

result in legal action against me, such as for contempt of court or liability for monetary damages.

Dated: _____    Signature: _____

17

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

Court File No: 09-CL-7950

---

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
Proceeding commenced at Toronto

---

**ORDER**
**(Protective Order)**

---

**GOWLING LAFLEUR HENDERSON LLP**
Barristers & Solicitors
1 First Canadian Place,
100 King Street West, Suite 1600
Toronto ON M5X 1G5

**Derrick Tay** (LSUC #: 21152A)
**Jennifer Stam** (LSUC #: 46735J)
Tel:    (416) 862-5697
Fax:    (416) 862-7661

**GOODMANS LLP**
Barristers & Solicitors
333 Bay Street, Suite 3400
Toronto ON  M5H 2S7

**Jay A. Carfagnini** (LSUC#: 22293T)
**Jessica Kimmel** (LSUC#: 32312W)
**Peter Ruby** (LSUC#: 38439P)
**Joseph Pasquariello** (LSUC#: 38390C)
Tel: 416.979.2211
Fax: 416.979.1234

57

# APPENDIX "C"

# [ATTACHED]



(g)     enter into, adopt, amend or modify any Collective Labor Agreement affecting Transferring Employees except as required by applicable Law;

(h)     voluntarily terminate, waive any right under, or amend in any material respect any Assigned Contract, Bundled Contract, Inbound License Agreement, Outbound License Agreement or Patent Cross License, or enter into a Contract that would be a Material Contract other than a manufacturing or supply agreement with an annual cost not to exceed $1,000,000;

(i)     waive, release, assign, settle or compromise any material claim, litigation or arbitration relating to the Business to the extent that such waiver, release, assignment, settlement or compromise imposes any binding obligation, whether contingent or realized, on the Business that will bind any of the Designated Purchasers after the Closing Date and is materially adverse to the Business;

(j)     solicit bids for the sale, transfer or other disposition, directly or indirectly, including through an asset sale, stock sale, merger, amalgamation, plan of arrangement or other similar transaction of any part of the Business;

(k)     manage the Adjusted Net Working Capital other than in the Ordinary Course;

(l)     take any action to cause any employee of the Sellers who would otherwise be an Employee as of the Closing not to be an Employee (other than termination for cause or termination of Employees who failed to receive an offer of employment from Purchaser or a Designated Purchaser pursuant to this Agreement provided Sellers make a reasonable effort to provide notice to Purchaser prior to such employment termination); or take any action to cause any employee of the Sellers who does not provide all or substantially all of his or her services to the Business as of the date of this Agreement, to become an Employee (other than any employees hired and transferred in the Ordinary Course below Job Complexity Indicator 6); or

(m)     authorize, or commit or agree to take, any of the foregoing actions.

Section 5.10.   Transaction Expenses.

Except as otherwise provided in this Agreement or the Ancillary Agreements, each of the Purchaser and the Sellers shall bear its own costs and expenses (including brokerage commissions, finders' fees or similar compensation, and legal fees and expenses) incurred in connection with this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby; provided, that all filing fees in respect of Regulatory Approvals shall be shared equally between (a) the Purchaser on the one hand and (b) the Sellers on the other hand.

Section 5.11.   Confidentiality.

The Parties acknowledge that the Confidentiality Agreement remains in full force and effect in accordance with its terms, which are incorporated herein by reference, and the Parties agree to be bound thereby in the same manner and to the same extent as if the terms had

been set forth herein in full, except that the Sellers shall be at liberty to disclose the terms of this Agreement to any court or to any liquidator or in connection with any auction process approved by the Bankruptcy Court and show appropriate figures in their administration records, accounts and returns; provided, that after the Closing Date, the Purchaser's confidentiality obligations under this Section 5.11 and the Confidentiality Agreement with respect to information and data relating to the Business and/or the Assets shall terminate. Any Business Information or copies thereof retained by the Sellers pursuant to Section 5.24(c) shall be deemed to constitute "Evaluation Material" as such term is defined under the Confidentiality Agreement and, from and after the Closing Date, the Sellers shall treat such Business Information on the same terms and conditions applicable to the Purchaser's treatment of "Evaluation Material" as such term is defined under the Confidentiality Agreement.

Section 5.12.    Disclosure Schedules and Certain Information.

(a)    The Sellers shall submit to the Purchaser, every two weeks, written updates to Section 4.11(b) of the Sellers Disclosure Schedule. The Sellers shall use reasonable efforts to submit to the Purchaser, as promptly as reasonably practicable, written updates to the Sellers Disclosure Schedule in respect of ARTICLE IV disclosing any events or developments that occurred or any information learned between the date of this Agreement and the Closing Date that reflect any matters hereafter arising which, if existing, occurring or known to the Sellers at the date hereof, would have been required to be set forth or described in the Sellers Disclosure Schedule in relation to ARTICLE IV; provided, that such updates shall be disregarded for purposes of determining whether or not the condition contained in Section 8.3(a) has been fulfilled.

(b)    The Sellers shall give prompt notice to the Purchaser, and the Purchaser shall give prompt notice to the Sellers, upon obtaining knowledge of the occurrence or non-occurrence of any event that, individually or in the aggregate, would make the timely satisfaction of the conditions set forth in ARTICLE VIII impossible or unlikely.

(c)    The delivery of any update or notice pursuant to this Section 5.12 shall not cure any breach of any representation or warranty requiring disclosure of such matter or otherwise limit or affect the remedies available hereunder to any party receiving such notice. This Section 5.12 shall not constitute a covenant or agreement for purposes of ARTICLE VIII or ARTICLE IX.

Section 5.13.    Certain Payments or Instruments Received from Third Parties.

To the extent that, after the Closing Date, (a) the Purchaser and/or any Designated Purchaser receives any payment or instrument that is for the account of a Seller according to the terms of any Transaction Document or relates primarily to any business or business segment of the Sellers other than the Business, the Purchaser shall, and shall cause the Designated Purchasers to, promptly deliver such amount or instrument to the relevant Seller, and (b) any of the Sellers receives any payment that is for the account of the Purchaser, any of the Designated Purchasers according to the terms of any Transaction Document or relates primarily to the Business, the relevant Main Sellers shall, and shall cause the other Sellers to, promptly deliver such amount or instrument to the Purchaser or the relevant Designated Purchaser, as applicable.



SECTION 5.10.  <u>Transaction Expenses</u>.  Except as otherwise provided in this Agreement or the Transaction Documents, each of the Purchaser and the Sellers shall bear its own costs and expenses (including brokerage commissions, finders' fees or similar compensation, and legal fees and expenses) incurred in connection with this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby; <u>provided</u>, however, that costs and expenses of the Companies shall be deemed to be costs and expenses of the Sellers.

SECTION 5.11.  <u>Confidentiality</u>.

(a)  The Parties acknowledge that the Confidentiality Agreement remains in full force and effect in accordance with its terms, which are incorporated herein by reference, and the Parties agree to be bound thereby in the same manner and to the same extent as if the terms had been set forth herein in full, except that the Sellers shall be at liberty to disclose the terms of this Agreement to any court or to any liquidator or in connection with any auction process approved by the Bankruptcy Court and show appropriate figures in their administration records, accounts and returns.

(b)  From the Closing Date until the date that is five (5) years after the Closing Date, the Sellers shall not, and shall cause their Affiliates not to, and shall use reasonable best efforts to cause the respective representatives of the Sellers and their Affiliates not to, use or disclose to any Third Party, any Confidential Information.  For purposes of this Agreement, **"Confidential Information"** consists of all competitively sensitive information and data related to the Business, the Assets and/or the Companies (including Transferred Intellectual Property and competitively sensitive Business Information existing as of the Closing Date), Purchaser or its Affiliates that is not, in each case, already available to the public, provided that nothing herein or in the other Transaction Documents shall be construed as precluding, prohibiting, restricting or otherwise limiting the ability of the Sellers, Seller's Affiliates or their respective representatives to (i) disclose the terms of any of the Transaction Documents to any court or to any liquidator or in connection with any auction process approved by a Bankruptcy Court and show appropriate figures in their administration records, accounts and return; (ii) make permitted disclosures under Section 5.7; (iii) exercise or enforce any of its rights, or perform any obligations under this Agreement or the other Transaction Documents, including the Transition Services Agreement and the Intellectual Property License Agreement, (iv) make any disclosures that are required by applicable Law; (v) own, use or disclose Confidential Information that is not exclusive to the Business to the extent necessary to (in the reasonable judgment of the Sellers) operate the other business segments of the Sellers or their Affiliates or otherwise engage in any manner in any business activities unrelated to the Business in compliance with Section 5.33; (vi) use Confidential Information to the extent necessary to perform Rejected Customer Contracts; or (vii) make customary disclosures, subject to customary confidentiality agreements, regarding Confidential Information that is not exclusive to the Business and is primarily related to other business segments of the Sellers in connection with acquiring, merging or otherwise combining with, or being acquired by, or selling all or part of their assets to, any Person (whether in a single transaction or a series of related transactions or whether structured as an acquisition of assets, securities or otherwise).

111



(h)    voluntarily terminate, waive any right under, or amend in any material respect any Assigned Contract, Bundled Contract, Inbound License Agreement, Outbound License Agreement or Patent Cross License;

(i)    enter into any Contract that would be a Material Contract, other than any manufacturing or supply agreement with annual costs not to exceed US$1,000,000 individually or US$10,000,000 in the aggregate;

(j)    waive, release, assign, settle or compromise any material claim, litigation or arbitration relating to the Business to the extent that such waiver, release, assignment, settlement or compromise imposes any binding obligation, whether contingent or realized, on the Business that will bind the Purchaser and/or any of the Designated Purchasers after the Closing Date and is materially adverse to the Business;

(k)    solicit bids for the sale, transfer or other disposition, directly or indirectly, including through an asset sale, stock sale, merger, amalgamation, plan of arrangement or other similar transaction of any part of the Business;

(l)    manage the Adjusted Net Working Capital other than in the Ordinary Course;

(m)    take any action to cause any employee of the Sellers who would otherwise be an Employee as of the Closing not to be an Employee (other than termination for cause or termination of Employees who failed to receive an offer of employment from Purchaser or a Designated Purchaser pursuant to this Agreement provided Sellers make a reasonable effort to provide notice to Purchaser prior to such employment termination); or take any action to cause any employee of the Sellers who does not provide all or substantially all of his or her services to the Business as of the date of this Agreement, to become an Employee; or

(n)    authorize, or commit or agree to take, any of the foregoing actions. If a Seller desires to take any action in this Section 5.9 requiring Purchaser's consent, the Main Sellers may, prior to any such action being taken, request the Purchaser's consent via an electronic mail or facsimile sent to the individual(s) at the addresses listed on Exhibit 5.9. The Purchaser shall respond to such notice in writing by 11:59 p.m. (New York time) on the second Business Day after the day of delivery of such email or facsimile. The failure of the Purchaser to respond within such two (2) Business Days shall not be deemed to be consent to such action.

Section 5.10.   Transaction Expenses. Except as otherwise provided in this Agreement or the Ancillary Agreements, each of the Purchaser and the Sellers shall bear its own costs and expenses (including brokerage commissions, finders' fees or similar compensation, and legal fees and expenses) incurred in connection with this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby.

Section 5.11.   Confidentiality.

(a)    The Parties acknowledge that the Confidentiality Agreement remains in full force and effect in accordance with its terms, which are incorporated herein by reference, and the Parties agree to be bound thereby in the same manner and to the same extent as if the

terms had been set forth herein in full, except that the Sellers shall be at liberty to disclose the terms of this Agreement to any court or to any liquidator or in connection with any auction process approved by the Bankruptcy Court and show appropriate figures in their administration records, accounts and returns and (ii) the Purchaser or the Designated Purchaser shall be at liberty to disclose the terms of this Agreement and other "Evaluation Materials" (as defined under the Confidentiality Agreement) to the EMEA Purchaser or any Designated EMEA Purchaser; provided, that after the Closing Date, the Purchaser's confidentiality obligations under this Section 5.11 and the Confidentiality Agreement with respect to information and data relating to the Business and/or the Assets shall terminate. Any Business Information or copies, thereof retained by the Sellers pursuant to Section 5.24(c) shall be deemed to constitute "Evaluation Material" as such term is defined under the Confidentiality Agreement and, from and after the Closing Date, the Sellers shall treat such Business Information on the same terms and conditions applicable to the Purchaser's treatment of "Evaluation Material" as such term is defined under the Confidentiality Agreement.

(b)    To the extent a copy of any Bundled Contract is provided to Purchaser or a Designated Purchaser pursuant to Section 5.15 or otherwise, Purchaser or such Designated Purchaser shall not use or disclose any information therein that relates exclusively to a business of a Seller other than the Business (such information, "Non-Business Information"), including, without limitation, information related to product pricing, pricing strategy, production levels, production capacity or product inventories, current bids or potential bids for particular products or services, plans relating to the production, distribution, marketing, or introduction dates of specific products, including proposed territories and potential customers, matters relating to actual or potential suppliers or customers, current or project costs of procurement, development, manufacture or product research and development efforts of any specific product; provided, however, that Non-Business Information shall not include information that (i) was rightfully in Purchaser's or a Designated Purchaser's possession without a duty of confidentiality before receipt from Seller, (ii) is or has been disclosed publicly through no fault of Purchaser or a Designated Purchaser and without breach of any third parties' confidentiality obligations, (iii) is rightfully received by Purchaser or a Designated Purchaser without a duty of confidentiality, (iv) is independently developed by Purchaser or a Designated Purchaser without access to the Non-Business Information, as substantiated by written records or other documentation of Purchaser or such Designated Purchaser, or (v) is disclosed by Purchaser or a Designated Purchaser with a Seller's or its successors' or assigns' prior written approval; provided, further, that the Purchaser or the Designated Purchaser may disclose the Non-Business Information to the EMEA Purchaser or any Designated EMEA Purchaser. Furthermore, the rights of the Sellers under this Section 5.11(b) shall inure to the benefit of any buyer of a business of the Seller to which such Non-Business Information relates. Notwithstanding the foregoing, Purchaser or the relevant Designated Purchaser shall not be deemed in breach hereunder in the event that Purchaser or such Designated Purchaser is required by applicable law, regulation, legal process, or the regulations or rules of the stock exchange, or requested by a regulatory body, agency or stock exchange, to disclose any of the Non-Business Information.

Section 5.12.  Certain Payments or Instruments Received from Third Parties. To the extent that, after the Closing Date, (a) the Purchaser and/or any Designated Purchaser receives any payment or instrument that is for the account of a Seller according to the terms of any Transaction Document or relates primarily to any business or business segment of the Sellers



(o)     construct, or permit to be constructed any capital improvements or major alterations at any portion of the Real Property used for the Business (excluding the EMEA Business, except with respect to any capital improvements or major alterations at any portion of the Real Property required in connection with the purchase by purchasers of other Nortel business segments), or as otherwise contemplated in the Real Estate Terms and Conditions;

(p)     enter into any Collective Labor Agreement affecting Transferred Employees except as required by applicable Law; or

(q)     enter into any Contract not to compete in any line of business or geographic area that would reasonably be expected to bind the Purchaser or any of its Affiliates after the Closing in any material respect;

(r)     enter into any Contract granting an indemnity in respect of intellectual property infringement or misappropriation other than in the Ordinary Course that would bind the Purchaser or any of its Affiliates after the Closing in any material respect, except for those Contracts that will not be, or that the Purchaser may elect not to have, assigned to the Purchaser hereunder; or

(s)     authorize, or commit or agree to take, any of the foregoing actions.

If a Seller desires to take any action described in this Section 5.9, the Main Sellers may, prior to any such action being taken, request the Purchaser's consent via an electronic mail or facsimile sent to the individual(s) at the addresses listed on Exhibit 5.9. The Purchaser shall respond to such notice in writing by 11:59 p.m. (New York time) on the second Business Day after the day of delivery of such electronic mail or facsimile. The failure of the Purchaser to respond within such two (2) Business Days shall not be deemed to be consent to such action.

The Purchaser acknowledges and agrees that: (i) prior to the Closing Date, the Sellers shall exercise, consistent with the terms and conditions of this Agreement, control and supervision of the Business (excluding the EMEA Business) and the EMEA Sellers shall exercise, consistent with the terms and conditions of the EMEA Asset Sale Agreement, the EMEA Business and (ii) notwithstanding anything to the contrary set forth in this Agreement, no consent of the Purchaser shall be required with respect to any matter set forth in Section 5.9 or elsewhere in this Agreement to the extent the requirement of such consent would, upon advice of the Purchaser's counsel, violate any Law.

SECTION 5.10. Transaction Expenses. Except as otherwise provided in this Agreement or the Ancillary Agreements, each of the Purchaser and the Sellers shall bear its own costs and expenses (including brokerage commissions, finders' fees or similar compensation, and legal fees and expenses) incurred in connection with this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby.

SECTION 5.11. Confidentiality.

(a)     The Parties acknowledge that the Confidentiality Agreement remains in full force and effect in accordance with its terms, which are incorporated herein

by reference, and the Parties agree to be bound thereby in the same manner and to the same extent as if the terms had been set forth herein in full, except that the Sellers shall be at liberty to disclose the terms of this Agreement to any court or to any liquidator or in connection with any auction process with respect to the Business or the Assets approved by the Bankruptcy Court and show appropriate figures in their administration records, accounts and returns; provided, that after the completion of the transactions contemplated herein, the Purchaser's confidentiality obligations under this Section 5.11 and the confidentiality agreement between the Purchaser, NNC and its subsidiaries and Alan Bloom dated March 27, 2009, with respect to information and data relating to the Business and/or the Assets shall terminate. For greater certainty, the Purchaser's confidentiality obligations under the third clean team confidentiality agreement between the Purchaser and its subsidiaries and NNL and its subsidiaries, dated June 19, 2009, shall not terminate after the completion of the transactions contemplated herein.

(b)     Subject to the requirements of the Bankruptcy Laws or as may be imposed by the Bankruptcy Court or as otherwise required by applicable Law, from and after the Closing: (i) the Sellers shall, and shall cause their Affiliates to, hold in confidence all confidential information (including trade secrets, customer lists, marketing plans and pricing information) of the Sellers relating to the Business or the Assets; (ii) in the event that the Sellers or an Affiliate thereof shall be legally compelled to disclose any such information, the Sellers shall provide the Purchaser with prompt written notice of such requirement so that the Purchaser may seek a protective order or other remedy; and (iii) in the event that such protective order or other remedy is not obtained, the Sellers or their Affiliates shall furnish only such information as is legally required to be provided.

(c)     It is acknowledged by the Purchaser and the Sellers that in the course of attempting to sell the Assets, one or more of the Sellers has entered into several confidentiality agreements with Third Parties in respect of information relating to the Assets and has disclosed such information to certain of those Third Parties.

(d)     Each Seller shall assign to the Purchaser, at or prior to, and with effect from and after the Closing, all of its rights under any such confidentiality agreement made by such Seller with any Third Party but only as such confidentiality agreements relate to the Assets and the Business and only to the extent that such agreements permit such assignments without the consent of any Third Party. To the extent such agreements do not permit any assignment without the consent of any Third Party, at the Purchaser's request and the Purchaser's expense, provided that the Sellers receive an indemnity from the Purchaser in form and substance satisfactory to the Sellers, to the extent permitted by applicable Laws and the terms of such confidentiality agreements, shall appoint the Purchaser as such Sellers' representative and agent in respect of confidential information relating to the Business and Assets under such confidentiality agreements and any amounts recovered or expenses incurred in enforcing those confidentiality agreements in respect of the Sellers shall accrue to the benefit of or be for the account of the Purchaser.

(e)     Notwithstanding anything to the contrary contained in this Section 5.11, nothing contained in this Agreement shall be construed as precluding, prohibiting, restricting or otherwise limiting the ability of the Sellers, the Sellers' Affiliates or their respective representatives to: (i) make permitted disclosures under Section 5.7 or as

otherwise permitted under this Agreement; (ii) make any disclosures that are required by applicable Law; (iii) use or disclose information that is not exclusive to the Business to the extent necessary to operate the other business segments of the Sellers or their Affiliates or otherwise engage in any manner in any business activities unrelated to the Business; (iv) perform any retained Contracts, whether or not exclusively related to the Business; or (v) make customary disclosures, subject to customary confidentiality agreements, regarding information that is not exclusive to the Business and is primarily related to other business segments of the Sellers in connection with acquiring, merging or otherwise combining with, or being acquired by, or selling all or part of their assets to, any Person (whether in a single transaction or a series of related transactions or whether structured as an acquisition of assets, securities or otherwise). Notwithstanding anything to the contrary contained in this Section 5.11, nothing contained in this Agreement shall be construed as precluding, prohibiting, restricting or otherwise limiting the ability of the Purchaser, the Purchaser's Affiliates or their respective representatives to: (i) make permitted disclosures under Section 5.7 or as otherwise permitted under this Agreement or (ii) make any disclosures that are required by applicable Law.

**SECTION 5.12.  Disclosure Schedules and Certain Information.**

(a)      The Sellers shall submit to the Purchaser via electronic mail or facsimile sent to the individual(s) at the addresses listed in Exhibit 5.12, every two (2) weeks, written updates to Section 4.10(b) of the Sellers Disclosure Schedule with respect to additions, deletions or other status changes of Employees or, after finalization of the Identified Employees, only with respect to Identified Employees. The Sellers shall submit to the Purchaser at least three (3) Business Days prior to the Closing Date, written updates to the Sellers Disclosure Schedules in respect of Article IV disclosing any events or developments that occurred or any information learned between the date of this Agreement and the Closing Date that reflect any matters hereafter arising which, if existing, occurring or known to the Sellers at the date hereof, would have been required to be set forth or described in the Sellers Disclosure Schedule in relation to Article IV.

(b)      The Sellers shall give prompt notice to the Purchaser, and the Purchaser shall give prompt notice to the Sellers, upon obtaining knowledge of the occurrence or nonoccurrence of any event that, individually or in the aggregate, would make the timely satisfaction of the conditions set forth in Article IX impossible or unlikely.

(c)      The delivery of any update or notice pursuant to this Section 5.12 shall not cure any breach of any representation or warranty requiring disclosure of such matter or otherwise limit or affect the remedies available hereunder to any party receiving such notice.

**SECTION 5.13.  Certain Payments or Instruments Received from Third Parties.**
To the extent that, after the Closing Date, (a) the Purchaser or any Designated Purchaser receives any payment or instrument that is for the account of a Seller according to the terms of this Agreement or relates primarily to any business or business segment of the Sellers other than the Business, the Purchaser shall, and shall cause the Designated Purchasers to promptly deliver such amount or instrument to the relevant Seller, and (b) any of the Sellers receives any payment that is for the account of the Purchaser or any of the Designated Purchasers



Sellers thereunder) any Material Contract, Cross-License Agreements referenced in Exhibit 5.4(c) and listed in Exhibits 5.4(d) and 5.15(c), Inbound License Agreement that is an Assigned Contract or Bundled Contract material to the Business (other than as necessary to effect the unbundling of any Bundled Contract required with respect to any other business or business segment of the Sellers), unless (i) such Contract has become a Non-Assigned Contract, an Excluded 365 Customer Contract, an Excluded Non-365 Customer Contract or will not be assigned to the Purchaser or any Designated Purchaser at Closing or (ii) such amendment, waiver or change is contemplated pursuant to Section 5.23 hereof, and in each case other than in the Ordinary Course;

(i) fail to make commercially reasonable efforts to maintain Owned Inventory at levels consistent with customer orders;

(j) waive, release, assign, settle or compromise any material claim, litigation or arbitration relating to the Business to the extent that such waiver, release, assignment, settlement or compromise imposes any binding obligation, whether contingent or realized, on the Business that will bind the Purchaser or a Designated Purchaser after the Closing Date and is materially adverse to the Business;

(k) enter into any Material Contract pursuant to Section 4.4(a)(ii) or amend any Contract to thereafter be a Material Contract pursuant to Section 4.4(a)(ii) that would reasonably be expected to bind the Purchaser or any of its Affiliates in any material respect after the Closing;

(l) fail to maintain tangible property which, individually or in the aggregate, is material to the Business and which is included in the Assets, in the Ordinary Course;

(m) fail to maintain the material Consents with respect to the Business in the Ordinary Course;

(n) make or rescind any material election in relation to Taxes that would reasonably be expected to materially and adversely impact the Purchaser or a Designated Purchase after the Closing; or

(o) authorize, or commit or agree to take, any of the foregoing actions.

Section 5.10. <u>Transaction Expenses</u>. Except as otherwise provided in this Agreement or the Ancillary Agreements, each of the Purchaser and the Sellers shall bear its own costs and expenses (including brokerage commissions, finders' fees or similar compensation, and legal fees and expenses) incurred in connection with this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby.

Section 5.11. <u>Confidentiality</u>.

(a) The Parties acknowledge that the Confidentiality Agreement remains in full force and effect in accordance with its terms, which are incorporated herein by reference, and the Parties agree to be bound thereby in the same manner and to the same extent as if the terms

85

had been set forth herein in full, except that the Sellers shall be at liberty to disclose the terms of this Agreement to any court or to any liquidator or in connection with any auction process approved by the Bankruptcy Court and show appropriate figures in their administration records, accounts and returns.

(b) From the Closing Date until the date that is five (5) years after the Closing Date, the Sellers shall not, and shall cause their Affiliates not to, and shall use commercially reasonable efforts to cause the respective representatives of the Sellers and their Affiliates not to, use or disclose to any Third Party, any Confidential Information. For purposes of this Agreement, "**Confidential Information**" consists of all competitively sensitive information and data related to the Business or the Assets (including Transferred Intellectual Property and competitively sensitive Business Information existing as of the Closing Date), Purchaser or its Affiliates that is not, in each case, already available to the public (it being agreed that disclosure of Confidential Information to prospective purchasers, their representatives and other Persons affiliated with the sale process of the Business shall not be public disclosure thereof), provided that nothing herein or in the other Transaction Documents shall be construed as precluding, prohibiting, restricting or otherwise limiting the ability of the Sellers, Seller's Affiliates or their respective representatives to (i) disclose the terms of any of the Transaction Documents to any court or to any liquidator or in connection with any auction process approved by a Bankruptcy Court and show appropriate figures in their administration records, accounts and return; (ii) exercise or enforce any of their rights, or perform any obligations under this Agreement or the other Transaction Documents, including the Transition Services Agreement and the Intellectual Property License Agreement, (iii) make permitted disclosures under Section 5.7; (iv) make any disclosures that are required by applicable Law; (v) own, use or disclose Confidential Information that is not exclusive to the Business to the extent necessary to (in the reasonable judgment of the Sellers) operate the other business segments of the Sellers or their Affiliates or otherwise engage in any manner in any business activities unrelated to the Business; (vi) use Confidential Information to the extent necessary to perform any Seller Contracts not assigned to the Purchaser; (vii) share information to the extent reasonably necessary to allocate the purchase proceeds from the sale of the Assets; or (viii) make customary disclosures, subject to customary confidentiality agreements, regarding Confidential Information that is not exclusive to the Business and is primarily related to other business segments of the Sellers in connection with acquiring, merging or otherwise combining with, or being acquired by, or selling all or part of their assets to, any Person (whether in a single transaction or a series of related transactions or whether structured as an acquisition of assets, securities or otherwise).

(c) It is acknowledged by the Purchaser and the Sellers that in the course of attempting to sell the Assets, one or more of the Sellers has entered into several confidentiality agreements with Third Parties in respect of information relating to the Assets and has disclosed such information to certain of those Third Parties.

Section 5.12.  Certain Payments or Instruments Received from Third Parties. To the extent that, after the Closing Date, (a) the Purchaser and/or any Designated Purchaser receives any payment or instrument that is for the account of a Seller according to the terms of any Transaction Document or relates primarily to any business or business segment of the Sellers

86



that will not be, or that the Purchaser may elect not to have, assigned to the Purchaser hereunder; or

(s)    authorize, or commit or agree to take, any of the foregoing actions.

SECTION 5.10    <u>Transaction Expenses</u>. Except as otherwise provided in this Agreement or the other Transaction Documents to which the Sellers are parties, each of the Purchaser and the Sellers shall bear its own costs and expenses (including brokerage commissions, finders' fees or similar compensation, and legal fees and expenses) incurred in connection with this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby.

SECTION 5.11    <u>Confidentiality</u>.

(a)    The Parties acknowledge that the Confidentiality Agreement (including all amendments thereto) and the Clean Team Confidentiality Agreement (including all addenda thereto) remain in full force and effect in accordance with their respective terms, which are incorporated herein by reference, and the Parties agree to be bound thereby in the same manner and to the same extent as if the terms had been set forth herein in full, except that the Sellers shall be at liberty to disclose the terms of this Agreement: (i) to the extent required by Law or any Action in respect of the Acquired Business, (ii) to any court, any liquidator or any member of any committee of creditors, Tax Authority or Government Entity, (iii) in connection with any auction process approved by the Bankruptcy Court, (iv) to show appropriate figures in their administration records, accounts and returns, or (v) subject to entering into a confidentiality agreement with the relevant Third Party, in connection with acquiring, merging or otherwise combining, or being acquired by, or selling all or part of their assets to any Third Party (whether in a single transaction or a series of related transactions and whether structured as an acquisition of assets, securities or otherwise); <u>provided</u>, that, with respect to information and data relating exclusively to the Business, the Purchaser's and the Purchaser's Representatives' confidentiality obligations under this Section 5.11, the Confidentiality Agreement (including all amendments thereto) and the Clean Team Confidentiality Agreement (including all addenda thereto) shall terminate after the Closing Date. The Purchaser's confidentiality obligations with respect to other Confidential Information relating to the Business and/or Assets under the Confidentiality Agreement and the Clean Team Confidentiality Agreement (including as incorporated herein) shall terminate after the Closing Date except with respect to the terms and conditions of any Patent Cross-License Agreement or Omitted Patent Cross-License Agreement listed in Section 4.5(g)(iii) of the Sellers Disclosure Schedule (but not with respect to the existence of such Patent Cross-License Agreements and Omitted Patent Cross-License Agreements and the Transferred Patents to which they relate); <u>provided</u>, that the Purchaser shall treat such other Confidential Information with at least the same degree of care and confidentiality as it would treat its own confidential information of similar sensitivity were it in the Sellers' position. The Purchaser acknowledges that in the course of attempting to sell the Assets and the Business, one or more of the Sellers have entered into several confidentiality agreements with Third Parties in respect of information relating to the Assets and the Business and has disclosed such information to certain of those Third Parties.

85

(b)    For purposes of this Agreement, **"Confidential Information"** consists of all competitively sensitive information and data related to the Sellers, the Business, the Assets (including Transferred Intellectual Property and competitively sensitive Business Information existing as of the Closing Date), the Purchaser or its Affiliates that is not, in each case, already available to the public (it being agreed that disclosure of Confidential Information to prospective purchasers, their representatives and other Persons affiliated with the sale process of the Business shall not be public disclosure thereof). Nothing herein or in the other Transaction Documents shall be construed as precluding, prohibiting, restricting or otherwise limiting the ability of the Sellers, the Sellers' Affiliates or their respective representatives to (i) disclose the terms of any of the Transaction Documents to any court or to any liquidator or in connection with any auction process approved by a Bankruptcy Court and show appropriate figures in their administration records, accounts and return; (ii) exercise or enforce any of their rights, or perform any obligations under this Agreement or the other Transaction Documents, including the Transition Services Agreement and the Intellectual Property License Agreement, (iii) make permitted disclosures under Section 5.7; (iv) make any disclosures that are required by applicable Law; (v) own, use or disclose Confidential Information that is not exclusive to the Business to the extent necessary to (in the reasonable judgment of the Sellers) operate the other business segments of the Sellers or their Affiliates or otherwise engage in any manner in any business activities unrelated to the Business; (vi) use Confidential Information to the extent necessary to perform any Seller Contracts not assigned to the Purchaser; (vii) share information to the extent reasonably necessary to allocate the purchase proceeds from the sale of the Assets; or (viii) make customary disclosures, subject to customary confidentiality agreements, regarding Confidential Information that is not exclusive to the Business and is primarily related to other business segments of the Sellers in connection with acquiring, merging or otherwise combining with, or being acquired by, or selling all or part of their assets to, any Person (whether in a single transaction or a series of related transactions or whether structured as an acquisition of assets, securities or otherwise).

(c)    As promptly as reasonably practicable, and in no event more than thirty (30) days, after the Closing Date, the Sellers shall deliver to the Purchaser copies of correspondence, notices, filings, prosecution files, dockets, certifications and other documents relating to the filing, prosecution, issuance and renewal of the Business Registered IP, provided that all items to be delivered hereunder shall be delivered solely by remote telecommunication to the extent the Purchaser may so request. Without limiting the generality of the foregoing, within thirty (30) days of Closing, the Sellers shall and shall cause their Affiliates to, instruct their current attorneys and agents to deliver to the Purchaser, or attorneys designated by Purchaser, any and all records in the possession of such attorneys and agents relating to the prosecution of any applications, registrations and renewals of any Business Registered IP.

SECTION 5.12    Certain Payments or Instruments Received from Third Parties. To the extent that, after the Closing Date, (a) the Purchaser and/or any Designated Purchaser receives any payment or instrument that is for the account of a Seller according to the terms of any Transaction Document or relates primarily to any business or business segment of the Sellers other than the Acquired Business, the Purchaser shall, and shall cause the Designated Purchasers to, promptly deliver such amount or instrument to the relevant Seller, and (b) any of the Sellers receives any payment that is for the account of the Purchaser or any of the Designated Purchasers according to the terms of any Transaction Document or relates primarily to the

86



(viii)    take or omit to take any action, or request the Bankruptcy Court to approve, authorize or require the Sellers to take or to omit to take any action that would materially affect any Seller's title to or the value of any Transferred Patent, Jointly Owned Patent or Specified UK Patent or would otherwise breach the Sellers' covenants under or any other provisions of this Agreement or the Transaction Documents, or consent to any such approval or authorization;

(ix)    amend, or assign to any Third Party their rights under, any Cross-License Agreement or Outbound License Agreement to which any Transferred Patent, Jointly Owned Patent or Specified UK Patent is subject;

(x)    fail to exercise any termination right pursuant to the terms of any Cross-License Agreement or Outbound License Agreement provided that such exercise would not result in the Sellers' incurring any meaningful cost or Liability or losing any meaningful right under such Cross-License Agreement or Outbound License Agreement;

(xi)    consent to the assignment by any counterparty to any Cross-License Agreement or Outbound License Agreement of such counterparty's rights or obligations under any such agreement to any Person; or

(xii)    authorize, agree or commit to do any of the foregoing.

SECTION 5.10.    Transaction Expenses.  Except as otherwise provided in this Agreement or the other Transaction Documents, each of the Purchaser and the Sellers shall bear its own costs and expenses (including brokerage commissions, finders' fees or similar compensation, and legal fees and expenses) incurred in connection with this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby.

SECTION 5.11.    Confidentiality.

(a)    The Parties acknowledge that the Non-Disclosure Agreement and the Supplementary Non-Disclosure Agreement, as amended from time to time, remain in full force and effect in accordance with their terms, which are incorporated herein by reference, and the Parties agree to be bound thereby in the same manner and to the same extent as if the terms had been set forth herein in full, except that the Parties, the Joint Administrators and the French Liquidator shall be at liberty to disclose the terms of this Agreement to (i) if required by order of any court of competent jurisdiction or under any applicable Law, any court or to any court-appointed liquidator of any of the Sellers to show appropriate figures in their administration records, accounts and returns, (ii) the applicable Bankruptcy Court for the purposes of obtaining the Bankruptcy Consents and to the applicable Government Entities and Third Parties for purposes of obtaining the Mandatory Regulatory Consents or any other Consents contemplated hereunder; and (iii) as otherwise required by the terms and conditions of this Agreement (in respect of Third Parties pursuant to clause (ii) other than Government Entities, without any appurtenant schedules except for Sections 1.1(d) (Jointly Owned Patents), 1.1(h) (Listed Patents), 1.1(k) (Listed Inventions): A.1(d) (Cross-License Agreements); A.1(e) (Outbound License Agreements), and A.1(m) (Joint Ownership Agreements) of the Sellers Disclosure

Schedule, and only to the extent necessary to obtain the applicable Consent). Each Primary Party agrees not to request the other Primary Party to return or destroy Evaluation Material or Interested Party Material (as such terms are defined in the Non-Disclosure Agreement) pursuant to the Non-Disclosure Agreement unless this Agreement shall have terminated. The Parties further acknowledge that the Cross License Agreements and Outbound License Agreements provided or delivered pursuant to Sections 2.3.2(b) shall be deemed to have been provided to the Purchaser as "Highly Confidential Information" under the Supplementary Non-Disclosure Agreement, and the Supplementary Non-Disclosure Agreement shall apply to such documents. The Sellers agree to treat the Sellers Disclosure Schedules as Purchaser Confidential Information from and after the Closing.

        (b)    The Sellers shall not, and shall use best efforts to cause their Affiliates not to, disclose any Purchaser Confidential Information, including by means of appropriate redaction, other than (A) to any member of any committee of creditors which may include the holders of, or investment managers for holders of, equity or debt securities of the Sellers, including, without limitation, those of (i) the Official Committee of Unsecured Creditors in the Chapter 11 Cases, (ii) the Ad-Hoc Committee of Bondholders in such Chapter 11 Cases and in the filings made by the Sellers under the CCAA Cases, (iii) the unofficial Canadian creditors' committee, and (iv) any other creditors' committees or analogous bodies appointed in respect of the EMEA Sellers and their debtor affiliates, (B) to the United States Trustee for the District of Delaware in the Chapter 11 Cases, (C) to any monitor, administrator, trustee or similar appointed official in any foreign proceedings, including, without limitation, Alan Bloom, Stephen Harris, Chris Hill and Alan Hudson of Ernst & Young LLP and David Hughes of Ernst & Young Chartered Accountants, in their capacities as the Joint Administrators, Maître Cosme Rogeau as French Liquidator, the Monitor in the CCAA Cases and with respect to the Sellers and each of the foregoing persons described in clauses (A), (B) or (C), any employees, agents, advisors (including, without limitation, attorneys, accountants, investment banks and consultants) and other representatives thereof; <u>provided</u> that, in the case of each of the persons described in the foregoing clauses (A), (B) or (C), the Sellers shall have used reasonable efforts to inform such Persons of the confidential nature of such information, and that, to the extent such Persons are not already required by applicable Law or any confidentiality agreement with the Sellers to keep such information confidential, such Persons shall have agreed to be bound by confidentiality restrictions, or (D) as may otherwise be required, based on the advice of legal counsel, under applicable Law, including, without limitation, the Bankruptcy Laws; <u>provided</u>, <u>however</u>, that to the extent legally permissible and reasonably practicable, the Sellers shall provide the Purchaser with prompt notice of such event described in (D) above so that, where possible, the Purchaser may seek a protective order or other appropriate remedy and the Sellers shall cooperate with the Interested Party in taking steps to resist or narrow the scope of such request or legal process (at the expense of the Purchaser). In the event that such protective order or other remedy is not obtained and any of the Sellers or their representatives are advised by legal counsel that it is compelled by Law to disclose any information described in the foregoing sentence, the Sellers or its representative, as the case may be, (i) may without liability hereunder furnish that portion (and only that portion) of such information which, based on the advice of legal counsel to the Sellers or their representatives, as the case may be, the Sellers or their representatives are legally required to disclose and (ii) will use commercially reasonable efforts to have confidential treatment accorded any such information so furnished. For the avoidance of doubt, none of the Sellers shall act in furtherance of or consent to the unsealing of any Transaction Documents that

are filed under seal unless otherwise ordered by the applicable Bankruptcy Court or unless the Purchaser shall consent in its sole discretion.

(c)     Notwithstanding the foregoing Section 5.11(a), nothing contained in this Agreement or the Transaction Documents shall be deemed to prohibit the Parties, the Joint Administrators, or the French Liquidator from disclosing any information as may be required, based on the advice of legal counsel, under applicable Law, including Title 11 of the United States Code, the CCAA, the Insolvency Act of 1986 and any other applicable bankruptcy or insolvency Laws of any jurisdiction in which bankruptcy proceedings concerning Nortel are held from time to time, any legal process before, or any order of, the U.S. Bankruptcy Court or any other court of competent jurisdiction, the applicable rules or regulations of any securities exchange or similar self-regulatory authority or applicable securities Laws; provided, however, that to the extent legally permissible and reasonably practicable, if the relevant Party believes in its reasonable judgment that such legally required disclosure includes confidential information of any other Party hereunder, the disclosing Party shall provide the other Parties with prompt notice of such event so that, where possible, the affected Parties may seek a protective order or other appropriate remedy, and the relevant Parties shall cooperate in taking steps to resist or narrow the scope of such request or legal process (at the expense of the Party requesting such action). In the event that such protective order or other remedy is not obtained and any Party or its representatives are advised by legal counsel that it is compelled by Law, regulation or legal, regulatory or judicial process or the rules of a stock exchange or similar self-regulatory authority to disclose any information described in the foregoing sentence, such Party or its representatives, as the case may be, (i) may without liability hereunder furnish that portion (and only that portion) of such information which, based on the advice of legal counsel to such Party or its representative, as the case may be, such Party or its representative is legally required to disclose and (ii) will use commercially reasonable efforts to have confidential treatment accorded any such information so furnished.

SECTION 5.12.     <u>Certain Payments or Instruments Received from Third Parties</u>. To the extent that, after the Closing Date, (a) the Purchaser receives any payment or instrument that is for the account of a Seller according to the terms of any Transaction Document, the Purchaser shall promptly deliver such amount or instrument to the relevant Seller, and (b) any of the Sellers receives any payment or instrument that is for the account of the Purchaser according to the terms of any Transaction Document, such Seller shall promptly deliver such amount or instrument to the Purchaser. All amounts due and payable under this Section 5.12 shall be due and payable by the applicable Party in immediately available funds, by wire transfer to the account designated in writing by the relevant Party. Notwithstanding the foregoing, each Party hereby undertakes to use reasonable best efforts to direct or forward all bills, invoices or like instruments to the appropriate Party.

SECTION 5.13.     <u>License to Transferred Patents, Jointly Owned Patents, Specified UK Patents and Licensed Residual Patents; Termination of Intercompany Arrangements</u>.

(a)     Concurrently with the Closing, (i) the Purchaser shall grant the Sellers a license under the Transferred Patents, the Purchased Specified UK and other Patents acquired pursuant to this Agreement in connection with (x) the disposal of Inventory and (y) contracts that

-51-

## APPENDIX "D"

## [ATTACHED]

73

Court File No: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION
(the "Applicants")**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

---

**AFFIDAVIT OF
OF JENNIFER STAM**

---

I, **JENNIFER STAM,** of the City of Toronto, in the Province of Ontario, **MAKE**

**OATH AND SAY:**

1.    I am a partner with the law firm of Gowling Lafleur Henderson LLP, lawyers for the Applicants. As such, I have knowledge of the matters to which I hereinafter depose.

2.    On Monday, April 28, 2014, I sent by facsimile various Notice Letters providing notice of the May 8, 2014 to address matters relating to the use of documents at Trial to each of the following respective Purchasers of the Nortel businesses:

    (a)    Telefonaktiebolaget L M Ericsson (publ) (re: CDMA business) (with a copy to Paul, Weiss, Rifkind, Wharton & Garrison LLP and Blake, Cassels & Graydon LLP) in accordance with Section 10.7 of the Asset Sale Agreement dated July 24, 2009;

    (b)    Telefonaktiebolaget L M Ericsson (publ) (re: GSM business) (with a copy to Paul, Weiss, Rifkind, Wharton & Garrison LLP and Blake, Cassels & Graydon LLP) in accordance with Section 10.7 of the Asset Sale Agreement dated November 24, 2009;

(c)     Telefonaktiebolaget L M Ericsson (publ) (re: GSM Retained Contract business) (with a copy to Paul, Weiss, Rifkind, Wharton & Garrison LLP and Blake, Cassels & Graydon LLP) in accordance with Section 10.7 of the Asset Sale Agreement dated May 11, 2010;

(d)     Telefonaktiebolaget L M Ericsson (publ) (re: CDMA business) (with a copy to Paul, Weiss, Rifkind, Wharton & Garrison LLP and Blake, Cassels & Graydon LLP) in accordance with Section 10.7 of the Asset Sale Agreement dated September 24, 2010;

(e)     Avaya Inc. (re: Enterprise business) (with a copy to Ropes & Gray LLP) in accordance with Section 10.7 of the Asset Sale Agreement dated September 14, 2009;

(f)     Hitachi, Ltd. Telecommunications & Network Systems Division and Hitachi Communication Technologies America, Inc. (re: Next Generation Packet Core business) (with a copy to Morrison & Foerster LLP and McCarthy Tetrault LLP) in accordance with Section 10.7 of the Transaction Agreement dated October 25, 2009;

(g)     Ciena Corporation (re: Metro Ethernet Networks business) (with a copy to Latham & Watkins LLP and Stikeman Elliott LLP) in accordance with Section 10.7 of the Amended and Restated Asset Sale Agreement dated November 24, 2009;

(h)     Genband Inc. (re: CVAS business) (with a copy to Latham & Watkins LLP, Baker Botts LLP and Stikeman Elliott LLP) in accordance with Section 10.7 of the Asset Sale Agreement dated December 22, 2009;

(i)     Radware Ltd. (re: Layer 4-7 business) (with a copy to Kramer Levin Naftalis & Frankel LLP) in accordance with Section 11.7 of the Asset Sale Agreement dated February 19, 2009;

(j)     Rockstar Bidco, LP (re: Residual Patent Portfolio business) (with a copy to Weil, Gotshal & Manges LLP) in accordance with Section 10.7 of the Asset Sale Agreement dated June 30, 2011;

(k)     Avaya Inc. (with a copy to Ropes & Gray LLP) updating the respective Purchaser to a notice we received from one of the creditor groups;

(l)     Ciena Corporation (re: Metro Ethernet Networks business) (with a copy to Latham & Watkins LLP and Stikeman Elliott LLP) updating the respective Purchaser to a notice we received from one of the creditor groups;

(m)     Genband Inc. (re: CVAS business) (with a copy to Latham & Watkins LLP, Baker Botts LLP and Stikeman Elliott LLP) updating the respective Purchaser to a notice we received from one of the creditor groups;

(n)     Radware Ltd. (re: Layer 4-7 business) (with a copy to Kramer Levin Naftalis & Frankel LLP) updating the respective Purchaser to a notice we received from one of the creditor groups; and

(o)     Hitachi, Ltd. Telecommunications & Network Systems Division and Hitachi Communication Technologies America, Inc. (re: Next Generation Packet Core business) (with a copy to Morrison & Foerster LLP and McCarthy Tetrault LLP) updating the respective Purchaser to a notice we received from one of the creditor groups.

3.     A true copy of the various letters and the facsimile confirmations are attached hereto and marked as **Exhibit "A"**.

**SWORN** before me at the City of Toronto,    )
in the Province of Ontario, on May 2, 2014.    )
                                                )
_____                )
Commissioner for Taking Affidavits, etc.        )       _____
                                                )              **JENNIFER STAM**
                                                )

    Alvin Wong, a Commissioner,
    etc., Province of Ontario,
    while a Student-at-Law.
    Expires May 8, 2015.

76



montréal · ottawa · toronto · hamilton · waterloo region · calgary · vancouver · beijing · moscow · london

April 28, 2014

**SENT BY FACSIMILE**

**Jennifer Stam**
Direct 416-862-5697
jennifer.stam@gowlings.com

TELEFONAKTIEBOLAGET L M ERICSSON (PUBL)
Torshamnsgatan 23
Kista
Stockholm, Sweden

Attn:  Per Oscarsson
       Carl Olof Blomqvist

Fax:   +46-8-18-4085

Dear Sirs/Mesdames:

**Re:   Nortel Networks Corporation et al**

This is Exhibit ....."B"..... referred to in the
affidavit of.....~~Jennifer Stam~~.
sworn before me this ......2nd............
day of ..........May................ 20 15.

..............~~[signature]~~..............
A Commissioner, etc.

Alvin Wong, a Commissioner,
etc., Province of Ontario,
while a Student-at-Law.
Expires May 8, 2015.

We refer to the asset sale agreement(s) dated as of July 24, 2009 (including any amendments and/or restatements, the "**Sale Agreement**") pursuant to which Telefonaktiebolaget L M Ericsson (publ) purchased all or substantially all of Nortel's assets related to its CDMA business (the "**Assets**"). We also refer to the notice provided to you dated June 5, 2013 (the "**June Notice**") pursuant to which we informed you that confidential information may be disclosed pursuant to a protective order in connection with discovery for the Trial (as defined below).

On behalf of the U.S., Canadian and EMEA estates of Nortel and in accordance with Sections 5.11 and 10.7 of the Sale Agreement, further notice with respect to confidential information is hereby given as described in the paragraphs below.

As we set out in the June Notice, the U.S., Canadian and EMEA estates of Nortel and certain of their creditor groups (and other parties) have been engaged in a discovery process leading up to a trial (the "**Trial**") to determine the allocation of sale proceeds arising from, among other things, the sale of the Assets. The Trial will also address certain claims that have been asserted by the EMEA estate and the UK pension fund against the Canadian estate and certain of its former officers and directors. During the discovery process, documentary production was made to other parties to the litigation on a confidential or highly confidential basis pursuant to a protective order (the "**Protective Order**"). The discovery process has now ended.

The Trial is open to the public, and will take place simultaneously before the Ontario Superior Court of Justice and the United States Bankruptcy Court for the District of Delaware (the "**Courts**") starting on May 12, 2014.

77

# gowlings

In connection with the Trial process, there have been thousands of documents designated as trial exhibits. Included in those documents are documents that may be subject to the confidentiality provisions in the Sale Agreement. We are currently undertaking a review of the designated trial exhibits to identify those documents that may be relevant to you but we expect that they will include the following:

1. The seller disclosure schedules to the Sale Agreement;

2. Transaction documents entered into in connection with the sale of the Assets; and

3. Other commercial or competitive information including documents containing royalty rates, IP licenses and customer contracts.

We expect to be able to provide you before the end of this week with further information as to our view on which documents and information we would seek to file under seal or otherwise protect from public disclosure because they are subject to the confidentiality clauses in the Sale Agreement. To the extent necessary or agreed, a joint hearing will take place before both Courts on May 8, 2014, during which time any outstanding confidentiality issues may be raised. Your counsel should be prepared to attend at the joint hearing if you wish to be heard on the issue.

We would be pleased to speak to you in the meantime to provide you with further information or discuss any questions you may have. Please feel free to contact Jennifer Stam (Jennifer.stam@gowlings.com/ (416) 862-5697); Inna Rozenberg (irozenberg@cgsh.com/ (212) 225-2972); or Fara Tabatabai (tabataba@hugheshubbard.com/ (212) 837-6296).

Sincerely,

**GOWLING LAFLEUR HENDERSON LLP**

Jennifer Stam

JS

cc:     *Stephen J. Shimshak and Marilyn Sobel, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP (via fax)*
        *Richard Corley and Susan M. Grundy, BLAKE, CASSELS & GRAYDON LLP (via fax)*

78


montréal · ottawa · toronto · hamilton · waterloo region · calgary · vancouver · beijing · moscow · london

April 28, 2014

**SENT BY FACSIMILE**

**Jennifer Stam**
Direct 416-862-5697
jennifer.stam@gowlings.com

TELEFONAKTIEBOLAGET L M ERICSSON (PUBL)
Torshamnsgatan 23
Kista
Stockholm, Sweden

Attn:   Per Oscarsson
        Carl Olof Blomqvist

Fax:    +46-8-18-4085

Dear Sirs/Mesdames:

**Re:   Nortel Networks Corporation et al**

We refer to the asset sale agreement(s) dated as of November 24, 2009 (including any amendments and/or restatements, the "**Sale Agreement**") pursuant to which Telefonaktiebolaget L M Ericsson (publ) purchased all or substantially all of Nortel's assets related to its GSM business (the "**Assets**"). We also refer to the notice provided to you dated June 5, 2013 (the "**June Notice**") pursuant to which we informed you that confidential information may be disclosed pursuant to a protective order in connection with discovery for the Trial (as defined below).

On behalf of the U.S., Canadian and EMEA estates of Nortel and in accordance with Sections 5.11 and 10.7 of the Sale Agreement, further notice with respect to confidential information is hereby given as described in the paragraphs below.

As we set out in the June Notice, the U.S., Canadian and EMEA estates of Nortel and certain of their creditor groups (and other parties) have been engaged in a discovery process leading up to a trial (the "**Trial**") to determine the allocation of sale proceeds arising from, among other things, the sale of the Assets. The Trial will also address certain claims that have been asserted by the EMEA estate and the UK pension fund against the Canadian estate and certain of its former officers and directors. During the discovery process, documentary production was made to other parties to the litigation on a confidential or highly confidential basis pursuant to a protective order (the "**Protective Order**"). The discovery process has now ended.

The Trial is open to the public, and will take place simultaneously before the Ontario Superior Court of Justice and the United States Bankruptcy Court for the District of Delaware (the "**Courts**") starting on May 12, 2014.

# gowlings

In connection with the Trial process, there have been thousands of documents designated as trial exhibits. Included in those documents are documents that may be subject to the confidentiality provisions in the Sale Agreement. We are currently undertaking a review of the designated trial exhibits to identify those documents that may be relevant to you but we expect that they will include the following:

1. The seller disclosure schedules to the Sale Agreement;

2. Transaction documents entered into in connection with the sale of the Assets; and

3. Other commercial or competitive information including documents containing royalty rates, IP licenses and customer contracts.

We expect to be able to provide you before the end of this week with further information as to our view on which documents and information we would seek to file under seal or otherwise protect from public disclosure because they are subject to the confidentiality clauses in the Sale Agreement. To the extent necessary or agreed, a joint hearing will take place before both Courts on May 8, 2014, during which time any outstanding confidentiality issues may be raised. Your counsel should be prepared to attend at the joint hearing if you wish to be heard on the issue.

We would be pleased to speak to you in the meantime to provide you with further information or discuss any questions you may have. Please feel free to contact Jennifer Stam (Jennifer.stam@gowlings.com/ (416) 862-5697); Inna Rozenberg (irozenberg@cgsh.com/ (212) 225-2972); or Fara Tabatabai (tabataba@hugheshubbard.com/ (212) 837-6296).

Sincerely,

**GOWLING LAFLEUR HENDERSON LLP**

Jennifer Stam

JS

cc:  *Stephen J. Shimshak and Marilyn Sobel, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP (via fax)*
   *Richard Corley and Susan M. Grundy, BLAKE, CASSELS & GRAYDON LLP (via fax)*

80



montréal · ottawa · toronto · hamilton · waterloo region · calgary · vancouver · beijing · moscow · london

April 28, 2014

**SENT BY FACSIMILE**

**Jennifer Stam**
Direct 416-862-5697
jennifer.stam@gowlings.com

TELEFONAKTIEBOLAGET L M ERICSSON (PUBL)
Torshamnsgatan 23
Kista
Stockholm, Sweden

Attn:   Per Oscarsson
        Carl Olof Blomqvist

Fax:    +46-8-18-4085

Dear Sirs/Mesdames:

### Re:   Nortel Networks Corporation et al

We refer to the asset sale agreement(s) dated as of May 11, 2010 (including any amendments and/or restatements, the "**Sale Agreement**") pursuant to which Telefonaktiebolaget L M Ericsson (publ) purchased all or substantially all of Nortel's assets related to its GSM Retained Contract business (the "**Assets**"). We also refer to the notice provided to you dated June 5, 2013 (the "**June Notice**") pursuant to which we informed you that confidential information may be disclosed pursuant to a protective order in connection with discovery for the Trial (as defined below).

On behalf of the U.S., Canadian and EMEA estates of Nortel and in accordance with Sections 5.8 and 10.7 of the Sale Agreement, further notice with respect to confidential information is hereby given as described in the paragraphs below.

As we set out in the June Notice, the U.S., Canadian and EMEA estates of Nortel and certain of their creditor groups (and other parties) have been engaged in a discovery process leading up to a trial (the "**Trial**") to determine the allocation of sale proceeds arising from, among other things, the sale of the Assets. The Trial will also address certain claims that have been asserted by the EMEA estate and the UK pension fund against the Canadian estate and certain of its former officers and directors. During the discovery process, documentary production was made to other parties to the litigation on a confidential or highly confidential basis pursuant to a protective order (the "**Protective Order**"). The discovery process has now ended.

The Trial is open to the public, and will take place simultaneously before the Ontario Superior Court of Justice and the United States Bankruptcy Court for the District of Delaware (the "**Courts**") starting on May 12, 2014.

Gowling Lafleur Henderson LLP · Lawyers · Patent and Trade-mark Agents

1 First Canadian Place · 100 King Street West · Suite 1600 · Toronto · Ontario · M5X 1G5 · Canada T 416-862-7525 F 416-862-7661 gowlings.com

# gowlings

In connection with the Trial process, there have been thousands of documents designated as trial exhibits. Included in those documents are documents that may be subject to the confidentiality provisions in the Sale Agreement. We are currently undertaking a review of the designated trial exhibits to identify those documents that may be relevant to you but we expect that they will include the following:

1. The seller disclosure schedules to the Sale Agreement;

2. Transaction documents entered into in connection with the sale of the Assets; and

3. Other commercial or competitive information including documents containing royalty rates, IP licenses and customer contracts.

We expect to be able to provide you before the end of this week with further information as to our view on which documents and information we would seek to file under seal or otherwise protect from public disclosure because they are subject to the confidentiality clauses in the Sale Agreement. To the extent necessary or agreed, a joint hearing will take place before both Courts on May 8, 2014, during which time any outstanding confidentiality issues may be raised. Your counsel should be prepared to attend at the joint hearing if you wish to be heard on the issue.

We would be pleased to speak to you in the meantime to provide you with further information or discuss any questions you may have. Please feel free to contact Jennifer Stam (Jennifer.stam@gowlings.com/ (416) 862-5697); Inna Rozenberg (irozenberg@cgsh.com/ (212) 225-2972); or Fara Tabatabai (tabataba@hugheshubbard.com/ (212) 837-6296).

Sincerely,

**GOWLING LAFLEUR HENDERSON LLP**

Jennifer Stam

JS

cc:     *Stephen J. Shimshak and Marilyn Sobel, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP (via fax)*
        *Richard Corley and Susan M. Grundy, BLAKE, CASSELS & GRAYDON LLP (via fax)*

82



montréal · ottawa · toronto · hamilton · waterloo region · calgary · vancouver · beijing · moscow · london

April 28, 2014

**SENT BY FACSIMILE**

**Jennifer Stam**
Direct 416-862-5697
jennifer.stam@gowlings.com

TELEFONAKTIEBOLAGET L M ERICSSON (PUBL)
Torshamnsgatan 23
Kista
Stockholm, Sweden

Attn:   Per Oscarsson
        Carl Olof Blomqvist

Fax:    +46-8-18-4085

Dear Sirs/Mesdames:

**Re:   Nortel Networks Corporation et al**

We refer to the asset sale agreement(s) dated as of September 24, 2010 (including any amendments and/or restatements, the "**Sale Agreement**") pursuant to which Telefonaktiebolaget L M Ericsson (publ) purchased all or substantially all of Nortel's assets related to its MSS business (the "**Assets**"). We also refer to the notice provided to you dated June 5, 2013 (the "**June Notice**") pursuant to which we informed you that confidential information may be disclosed pursuant to a protective order in connection with discovery for the Trial (as defined below).

On behalf of the U.S., Canadian and EMEA estates of Nortel and in accordance with Sections 5.11 and 10.7 of the Sale Agreement, further notice with respect to confidential information is hereby given as described in the paragraphs below.

As we set out in the June Notice, the U.S., Canadian and EMEA estates of Nortel and certain of their creditor groups (and other parties) have been engaged in a discovery process leading up to a trial (the "**Trial**") to determine the allocation of sale proceeds arising from, among other things, the sale of the Assets.  The Trial will also address certain claims that have been asserted by the EMEA estate and the UK pension fund against the Canadian estate and certain of its former officers and directors. During the discovery process, documentary production was made to other parties to the litigation on a confidential or highly confidential basis pursuant to a protective order (the "**Protective Order**"). The discovery process has now ended.

The Trial is open to the public, and will take place simultaneously before the Ontario Superior Court of Justice and the United States Bankruptcy Court for the District of Delaware (the "**Courts**") starting on May 12, 2014.

# gowlings

In connection with the Trial process, there have been thousands of documents designated as trial exhibits. Included in those documents are documents that may be subject to the confidentiality provisions in the Sale Agreement. We are currently undertaking a review of the designated trial exhibits to identify those documents that may be relevant to you but we expect that they will include the following:

1. The seller disclosure schedules to the Sale Agreement;

2. Transaction documents entered into in connection with the sale of the Assets; and

3. Other commercial or competitive information including documents containing royalty rates, IP licenses and customer contracts.

We expect to be able to provide you before the end of this week with further information as to our view on which documents and information we would seek to file under seal or otherwise protect from public disclosure because they are subject to the confidentiality clauses in the Sale Agreement. To the extent necessary or agreed, a joint hearing will take place before both Courts on May 8, 2014, during which time any outstanding confidentiality issues may be raised. Your counsel should be prepared to attend at the joint hearing if you wish to be heard on the issue.

We would be pleased to speak to you in the meantime to provide you with further information or discuss any questions you may have.    Please feel free to contact Jennifer Stam (Jennifer.stam@gowlings.com/ (416) 862-5697); Inna Rozenberg (irozenberg@cgsh.com/ (212) 225-2972); or Fara Tabatabai (tabataba@hugheshubbard.com/ (212) 837-6296).

Sincerely,

**GOWLING LAFLEUR HENDERSON LLP**

Jennifer Stam

JS

cc:     *Stephen J. Shimshak and Marilyn Sobel, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP (via fax)*
        *Richard Corley and Susan M. Grundy, BLAKE, CASSELS & GRAYDON LLP (via fax)*

84

**Dhillon, Kiran**

**From:**      Tor-RightFax@gowlings.com
**Sent:**      April-28-14 5:27 PM
**To:**        Dhillon, Kiran
**Subject:**   Your fax has been successfully sent to  at 01146107199527. RE:  Return-Path:
              <Kiran.Dhillon@gowlings.com>X-Original-To: rfax@gowpop

Your fax has been successfully sent to  at 01146107199527. RE:
 Return-Path: <Kiran.Dhillon@gowlings.com>X-Original-To: rfax@gowpop
-----------------------------------------------------------
From: Kiran.Dhillon@gowlings.com
-----------------------------------------------------------
Time: 4/28/2014 5:11:25 PM
Sent to 01146107199527 with remote ID ""
Result: (0/301;0/0) Busy signal detected
Page record: NONE SENT
Elapsed time: 00:05 on channel 19
-----------------------------------------------------------
Time: 4/28/2014 5:18:51 PM
Sent to 01146107199527 with remote ID "010-719 95 27        "
Result: (0/339;0/0) Successful Send
Page record: 1 - 10
Elapsed time: 05:50 on channel 16

1

85

**Dhillon, Kiran**

| | |
|---|---|
| **From:** | RightFax E-mail Gateway [GOWLINGS\!rfax93@10.52.101.41] |
| **Sent:** | April-28-14 2:41 PM |
| **To:** | Dhillon, Kiran |
| **Subject:** | Your fax has been successfully sent to  at 12124920027. RE:  Return-Path: <Kiran.Dhillon@gowlings.com>X-Original-To: rfax@gowpop |

Your fax has been successfully sent to  at 12124920027. RE:
 Return-Path: <Kiran.Dhillon@gowlings.com>X-Original-To: rfax@gowpop
-----------------------------------------------------------
From: Kiran.Dhillon@gowlings.com
-----------------------------------------------------------
Time: 4/28/2014 2:34:21 PM
Sent to 12124920027 with remote ID "12124920027"
Result: (0/339;0/0) Successful Send
Page record: 1 - 10
Elapsed time: 04:49 on channel 17

## Dhillon, Kiran

| | |
|---|---|
| **From:** | Tor-RightFax@gowlings.com |
| **Sent:** | April-28-14 2:39 PM |
| **To:** | Dhillon, Kiran |
| **Subject:** | Your fax has been successfully sent to  at 12124920133. RE:  Return-Path: <Kiran.Dhillon@gowlings.com>X-Original-To: rfax@gowpop |

Your fax has been successfully sent to  at 12124920133. RE:
 Return-Path: <Kiran.Dhillon@gowlings.com>X-Original-To: rfax@gowpop
-----------------------------------------------------------
From: Kiran.Dhillon@gowlings.com
-----------------------------------------------------------
Time: 4/28/2014 2:34:20 PM
Sent to 12124920133 with remote ID "12124920133"
Result: (0/339;0/0) Successful Send
Page record: 1 - 10
Elapsed time: 04:38 on channel 22

## Dhillon, Kiran

| | |
|---|---|
| **From:** | Tor-RightFax@gowlings.com |
| **Sent:** | April-28-14 2:42 PM |
| **To:** | Dhillon, Kiran |
| **Subject:** | Your fax has been successfully sent to at 4168632653. RE:   Return-Path: <Kiran.Dhillon@gowlings.com>X-Original-To: rfax@gowpop |

Your fax has been successfully sent to  at 4168632653. RE:
 Return-Path: <Kiran.Dhillon@gowlings.com>X-Original-To: rfax@gowpop
-----------------------------------------------------------
From: Kiran.Dhillon@gowlings.com
-----------------------------------------------------------
Time: 4/28/2014 2:35:04 PM
Sent to 4168632653 with remote ID "Blakes Toronto"
Result: (0/339;0/0) Successful Send
Page record: 1 - 10
Elapsed time: 04:40 on channel 0

1



montréal · ottawa · toronto · hamilton · waterloo region · calgary · vancouver · beijing · moscow · london

April 28, 2014

**SENT BY FACSIMILE**

**Jennifer Stam**
Direct 416-862-5697
jennifer.stam@gowlings.com

AVAYA INC.
211 Mount Airy Road
Basking Ridge, NJ 07920-2332
United States

Attn:   Pamela F. Craven,  Chief Administrative Officer
         Frank J. Mahr, Corporate Counsel & Corporate Secretary

Fax:    908.953.3902

Dear Sirs/Mesdames:

**Re:   Nortel Networks Corporation et al**

We refer to the asset sale agreement(s) dated as of September 14, 2009 (including any amendments and/or restatements, the "**Sale Agreement**") pursuant to which Avaya Inc. purchased all or substantially all of Nortel's assets related to its Enterprise business (the "**Assets**").  We also refer to the notice provided to you dated June 5, 2013 (the "**June Notice**") pursuant to which we informed you that confidential information may be disclosed pursuant to a protective order in connection with discovery for the Trial (as defined below).

On behalf of the U.S., Canadian and EMEA estates of Nortel and in accordance with Sections 5.11 and 10.7 of the Sale Agreement, further notice with respect to confidential information is hereby given as described in the paragraphs below.

As we set out in the June Notice, the U.S., Canadian and EMEA estates of Nortel and certain of their creditor groups (and other parties) have been engaged in a discovery process leading up to a trial (the "**Trial**") to determine the allocation of sale proceeds arising from, among other things, the sale of the Assets.  The Trial will also address certain claims that have been asserted by the EMEA estate and the UK pension fund against the Canadian estate and certain of its former officers and directors. During the discovery process, documentary production was made to other parties to the litigation on a confidential or highly confidential basis pursuant to a protective order (the "**Protective Order**"). The discovery process has now ended.

The Trial is open to the public, and will take place simultaneously before the Ontario Superior Court of Justice and the United States Bankruptcy Court for the District of Delaware (the "**Courts**") starting on May 12, 2014.

89

# gowlings

In connection with the Trial process, there have been thousands of documents designated as trial exhibits. Included in those documents are documents that may be subject to the confidentiality provisions in the Sale Agreement. We are currently undertaking a review of the designated trial exhibits to identify those documents that may be relevant to you but we expect that they will include the following:

1. The seller disclosure schedules to the Sale Agreement;

2. Transaction documents entered into in connection with the sale of the Assets; and

3. Other commercial or competitive information including documents containing royalty rates, IP licenses and customer contracts.

We expect to be able to provide you before the end of this week with further information as to our view on which documents and information we would seek to file under seal or otherwise protect from public disclosure because they are subject to the confidentiality clauses in the Sale Agreement. To the extent necessary or agreed, a joint hearing will take place before both Courts on May 8, 2014, during which time any outstanding confidentiality issues may be raised. Your counsel should be prepared to attend at the joint hearing if you wish to be heard on the issue.

We would be pleased to speak to you in the meantime to provide you with further information or discuss any questions you may have. Please feel free to contact Jennifer Stam (Jennifer.stam@gowlings.com/ (416) 862-5697); Inna Rozenberg (irozenberg@cgsh.com/ (212) 225-2972); or Fara Tabatabai (tabataba@hugheshubbard.com/ (212) 837-6296).

Sincerely,

**GOWLING LAFLEUR HENDERSON LLP**

Jennifer Stam

JS

cc:    *Alfred O. Rose and Howard S. Glazer, ROPES & GRAY LLP (via fax)*

**Dhillon, Kiran**

| | |
|---|---|
| **From:** | Tor-RightFax@gowlings.com |
| **Sent:** | April-28-14 1:31 PM |
| **To:** | Dhillon, Kiran |
| **Subject:** | Your fax has been successfully sent to RightFax at 19089533902. RE:  Received: from gowexc01.gowlings.corp ([10.91.101.41]) by GOWEXC03. |

Your fax has been successfully sent to RightFax at 19089533902. RE:
 Received: from gowexc01.gowlings.corp ([10.91.101.41]) by GOWEXC03.
-----------------------------------------------------------
From: Kiran.Dhillon@gowlings.com
Copitrak ID: 195707
Matter Number: T991328
-----------------------------------------------------------
Time: 4/28/2014 1:28:37 PM
Sent to 19089533902 with remote ID "908 953 3902"
Result: (0/339;0/0) Successful Send
Page record: 1 - 4
Elapsed time: 01:50 on channel 3

**Dhillon, Kiran**

| | |
|---|---|
| **From:** | Tor-RightFax@gowlings.com |
| **Sent:** | April-28-14 1:33 PM |
| **To:** | Dhillon, Kiran |
| **Subject:** | Your fax has been successfully sent to RightFax at 16172350096. RE:  Received: from gowexc01.gowlings.corp ([10.91.101.41]) by GOWEXC03. |

Your fax has been successfully sent to RightFax at 16172350096. RE:
  Received: from gowexc01.gowlings.corp ([10.91.101.41]) by GOWEXC03.
------------------------------------------------------------
From: Kiran.Dhillon@gowlings.com
Copitrak ID: 195707
Matter Number: T991328
------------------------------------------------------------
Time: 4/28/2014 1:28:20 PM
Sent to 16172350096 with remote ID "Ropes & Gray"
Result: (0/339;0/0) Successful Send
Page record: 1 - 4
Elapsed time: 02:19 on channel 22

92

**Dhillon, Kiran**

| | |
|---|---|
| **From:** | RightFax E-mail Gateway [GOWLINGS\lrfax93@10.52.101.41] |
| **Sent:** | April-28-14 1:33 PM |
| **To:** | Dhillon, Kiran |
| **Subject:** | Your fax has been successfully sent to RightFax at 14153154873. RE:  Received: from gowexc01.gowlings.corp ([10.91.101.41]) by GOWEXC03. |

```
Your fax has been successfully sent to RightFax at 14153154873. RE:
 Received: from gowexc01.gowlings.corp ([10.91.101.41]) by GOWEXC03.
----------------------------------------------------------
From: Kiran.Dhillon@gowlings.com
Copitrak ID: 195707
Matter Number: T991328
----------------------------------------------------------
Time: 4/28/2014 1:28:29 PM
Sent to 14153154873 with remote ID "Ropes & Gray"
Result: (0/339;0/0) Successful Send
Page record: 1 - 4
Elapsed time: 02:19 on channel 11
```

93



montréal · ottawa · toronto · hamilton · waterloo region · calgary · vancouver · beijing · moscow · london

April 28, 2014

**SENT BY FACSIMILE**

**Jennifer Stam**
Direct 416-862-5697
jennifer.stam@gowlings.com

**HITACHI, LTD. TELECOMMUNICATIONS &
NETWORK SYSTEMS DIVISION**
216 Totsuka-cho, Totsuka-ku,
Yokohama-shi, Kanagawa 244-8567 Japan

**HITACHI COMMUNICATION
TECHNOLOGIES AMERICA, INC.**
2280 Campbell Creek Blvd., Suite 325
Richardson, Texas 75082

Attn:  Minoru Inayoshi
Fax:   81-45-881-3210

Attn:     Don Keeler
Fax:      469.461.5401

Dear Sirs/Mesdames:

**Re:   Nortel Networks Corporation et al**

We refer to the transaction agreement(s) dated as of October 25, 2009 (including any amendments and/or restatements, the "**Sale Agreement**") pursuant to which  Hitachi, Ltd. purchased all or substantially all of Nortel's assets related to its Next Generation Packet Core business (the "**Assets**"). We also refer to the notice provided to you dated June 5, 2013 (the "**June Notice**") pursuant to which we informed you that confidential information may be disclosed pursuant to a protective order in connection with discovery for the Trial (as defined below).

On behalf of the U.S., Canadian and EMEA estates of Nortel and in accordance with Sections 5.10 and 10.7 of the Sale Agreement, further notice with respect to confidential information is hereby given as described in the paragraphs below.

As we set out in the June Notice, the U.S., Canadian and EMEA estates of Nortel and certain of their creditor groups (and other parties) have been engaged in a discovery process leading up to a trial (the "**Trial**") to determine the allocation of sale proceeds arising from, among other things, the sale of the Assets.  The Trial will also address certain claims that have been asserted by the EMEA estate and the UK pension fund against the Canadian estate and certain of its former officers and directors. During the discovery process, documentary production was made to other parties to the litigation on a confidential or highly confidential basis pursuant to a protective order (the "**Protective Order**"). The discovery process has now ended.

The Trial is open to the public, and will take place simultaneously before the Ontario Superior Court of Justice and the United States Bankruptcy Court for the District of Delaware (the "**Courts**") starting on May 12, 2014.

In connection with the Trial process, there have been thousands of documents designated as trial exhibits.  Included in those documents are documents that may be subject to the confidentiality provisions in the Sale Agreement.  We are currently undertaking a review of the designated trial

Gowling Lafleur Henderson LLP · Lawyers · Patent and Trade-mark Agents

1 First Canadian Place · 100 King Street West · Suite 1600 · Toronto · Ontario · M5X 1G5 · Canada T 416-862-7525 F 416-862-7661 gowlings.com

94

# gowlings

exhibits to identify those documents that may be relevant to you but we expect that they will include the following:

1. The seller disclosure schedules to the Sale Agreement;

2. Transaction documents entered into in connection with the sale of the Assets; and

3. Other commercial or competitive information including documents containing royalty rates, IP licenses and customer contracts.

We expect to be able to provide you before the end of this week with further information as to our view on which documents and information we would seek to file under seal or otherwise protect from public disclosure because they are subject to the confidentiality clauses in the Sale Agreement. To the extent necessary or agreed, a joint hearing will take place before both Courts on May 8, 2014, during which time any outstanding confidentiality issues may be raised. Your counsel should be prepared to attend at the joint hearing if you wish to be heard on the issue.

We would be pleased to speak to you in the meantime to provide you with further information or discuss any questions you may have. Please feel free to contact Jennifer Stam (Jennifer.stam@gowlings.com/ (416) 862-5697); Inna Rozenberg (irozenberg@cgsh.com/ (212) 225-2972); or Fara Tabatabai (tabataba@hugheshubbard.com/ (212) 837-6296).

Sincerely,

**GOWLING LAFLEUR HENDERSON LLP**

Jennifer Stam

JS

cc:   *Michael G. O' Bryan and  William I. Schwartz, MORRISON & FOERSTER LLP (via fax)*
       *James Gage, McCARTHY TÉTRAULT LLP (via fax)*

**Dhillon, Kiran**

| | |
|---|---|
| **From:** | Tor-RightFax@gowlings.com |
| **Sent:** | April-28-14 2:48 PM |
| **To:** | Dhillon, Kiran |
| **Subject:** | Your fax has been successfully sent to  at 01181458813210. RE:  Return-Path: <Kiran.Dhillon@gowlings.com>X-Original-To: rfax@gowpop |

```
Your fax has been successfully sent to  at 01181458813210. RE:
 Return-Path: <Kiran.Dhillon@gowlings.com>X-Original-To: rfax@gowpop
---------------------------------------------------------
From: Kiran.Dhillon@gowlings.com
---------------------------------------------------------
Time: 4/28/2014 2:36:44 PM
Sent to 01181458813210 with remote ID "045 881 3210"
Result: (0/339;4/52) Transmission/Reception Error
Page record: NONE SENT
Elapsed time: 00:51 on channel 12
---------------------------------------------------------
Time: 4/28/2014 2:42:52 PM
Sent to 01181458813210 with remote ID "045 881 3210"
Result: (0/339;0/0) Successful Send
Page record: 1 - 4
Elapsed time: 02:30 on channel 14
```

## Dhillon, Kiran

| | |
|---|---|
| **From:** | Tor-RightFax@gowlings.com |
| **Sent:** | April-28-14 1:35 PM |
| **To:** | Dhillon, Kiran |
| **Subject:** | Your fax has been successfully sent to RightFax at 14694615401. RE:  Received: from gowexc01.gowlings.corp ([10.91.101.41]) by GOWEXC03. |

Your fax has been successfully sent to RightFax at 14694615401. RE:
 Received: from gowexc01.gowlings.corp ([10.91.101.41]) by GOWEXC03.
----------------------------------------------------------
From: Kiran.Dhillon@gowlings.com
Copitrak ID: 195707
Matter Number: T991328
----------------------------------------------------------
Time: 4/28/2014 1:32:35 PM
Sent to 14694615401 with remote ID ""
Result: (0/339;0/0) Successful Send
Page record: 1 - 4
Elapsed time: 01:52 on channel 4

97

## Dhillon, Kiran

| | |
|---|---|
| **From:** | Tor-RightFax@gowlings.com |
| **Sent:** | April-28-14 1:35 PM |
| **To:** | Dhillon, Kiran |
| **Subject:** | Your fax has been successfully sent to RightFax at 14152687522. RE:  Received: from gowexc01.gowlings.corp ([10.91.101.41]) by GOWEXC03. |

```
Your fax has been successfully sent to RightFax at 14152687522. RE:
 Received: from gowexc01.gowlings.corp ([10.91.101.41]) by GOWEXC03.
---------------------------------------------------------
From: Kiran.Dhillon@gowlings.com
Copitrak ID: 195707
Matter Number: T991328
---------------------------------------------------------
Time: 4/28/2014 1:32:34 PM
Sent to 14152687522 with remote ID "14152767522"
Result: (0/339;0/0) Successful Send
Page record: 1 - 4
Elapsed time: 02:03 on channel 18
```

## Dhillon, Kiran

| | |
|---|---|
| **From:** | Tor-RightFax@gowlings.com |
| **Sent:** | April-28-14 1:35 PM |
| **To:** | Dhillon, Kiran |
| **Subject:** | Your fax has been successfully sent to RightFax at 4168680673. RE:  Received: from gowexc01.gowlings.corp ([10.91.101.41]) by GOWEXC03. |

Your fax has been successfully sent to RightFax at 4168680673. RE:
Received: from gowexc01.gowlings.corp ([10.91.101.41]) by GOWEXC03.
-----------------------------------------------------------
From: Kiran.Dhillon@gowlings.com
Copitrak ID: 195707
Matter Number: T991328
-----------------------------------------------------------
Time: 4/28/2014 1:32:32 PM
Sent to 4168680673 with remote ID ""
Result: (0/339;0/0) Successful Send
Page record: 1 - 4
Elapsed time: 01:53 on channel 1

 montréal · ottawa · toronto · hamilton · waterloo region · calgary · vancouver · beijing · moscow · london

April 28, 2014

**SENT BY FACSIMILE**

**Jennifer Stam**
Direct 416-862-5697
jennifer.stam@gowlings.com

CIENA CORPORATION
1201 Winterson Road
Linthicum, Maryland 21090

Attn:   David Rothenstein
        Senior Vice President and General Counsel

Fax:   410.865.8001

Dear Sirs/Mesdames:

**Re:   Nortel Networks Corporation et al**

We refer to the amended and restated asset sale agreement(s) dated as of November 24, 2009 (including any amendments and/or restatements, the "**Sale Agreement**") pursuant to which Ciena Corporation purchased all or substantially all of Nortel's assets related to its Metro Ethernet Networks business (the "**Assets**"). We also refer to the notice provided to you dated June 5, 2013 (the "**June Notice**") pursuant to which we informed you that confidential information may be disclosed pursuant to a protective order in connection with discovery for the Trial (as defined below).

On behalf of the U.S., Canadian and EMEA estates of Nortel and in accordance with Sections 5.11 and 10.7 of the Sale Agreement, further notice with respect to confidential information is hereby given as described in the paragraphs below.

As we set out in the June Notice, the U.S., Canadian and EMEA estates of Nortel and certain of their creditor groups (and other parties) have been engaged in a discovery process leading up to a trial (the "**Trial**") to determine the allocation of sale proceeds arising from, among other things, the sale of the Assets. The Trial will also address certain claims that have been asserted by the EMEA estate and the UK pension fund against the Canadian estate and certain of its former officers and directors. During the discovery process, documentary production was made to other parties to the litigation on a confidential or highly confidential basis pursuant to a protective order (the "**Protective Order**"). The discovery process has now ended.

The Trial is open to the public, and will take place simultaneously before the Ontario Superior Court of Justice and the United States Bankruptcy Court for the District of Delaware (the "**Courts**") starting on May 12, 2014.

# gowlings

In connection with the Trial process, there have been thousands of documents designated as trial exhibits. Included in those documents are documents that may be subject to the confidentiality provisions in the Sale Agreement. We are currently undertaking a review of the designated trial exhibits to identify those documents that may be relevant to you but we expect that they will include the following:

1. The seller disclosure schedules to the Sale Agreement;

2. Transaction documents entered into in connection with the sale of the Assets; and

3. Other commercial or competitive information including documents containing royalty rates, IP licenses and customer contracts.

We expect to be able to provide you before the end of this week with further information as to our view on which documents and information we would seek to file under seal or otherwise protect from public disclosure because they are subject to the confidentiality clauses in the Sale Agreement. To the extent necessary or agreed, a joint hearing will take place before both Courts on May 8, 2014, during which time any outstanding confidentiality issues may be raised. Your counsel should be prepared to attend at the joint hearing if you wish to be heard on the issue.

We would be pleased to speak to you in the meantime to provide you with further information or discuss any questions you may have.    Please feel free to contact Jennifer Stam (Jennifer.stam@gowlings.com/ (416) 862-5697); Inna Rozenberg (irozenberg@cgsh.com/ (212) 225-2972); or Fara Tabatabai (tabataba@hugheshubbard.com/ (212) 837-6296).

Sincerely,

**GOWLING LAFLEUR HENDERSON LLP**

Jennifer Stam

JS

cc:     *David S. Dantzic and Joseph A. Simei, LATHAM & WATKINS LLP (via fax)*
        *Brian M. Pukier, STIKEMAN ELLIOTT LLP (via fax)*

## Dhillon, Kiran

| | |
|---|---|
| **From:** | Tor-RightFax@gowlings.com |
| **Sent:** | April-28-14 1:29 PM |
| **To:** | Dhillon, Kiran |
| **Subject:** | Your fax has been successfully sent to RightFax at 14108658001. RE:  Received: from gowexc01.gowlings.corp ([10.91.101.41]) by GOWEXC03. |

Your fax has been successfully sent to RightFax at 14108658001. RE:
 Received: from gowexc01.gowlings.corp ([10.91.101.41]) by GOWEXC03.
------------------------------------------------------------
From: Kiran.Dhillon@gowlings.com
Copitrak ID: 195707
Matter Number: T991328
------------------------------------------------------------
Time: 4/28/2014 1:26:51 PM
Sent to 14108658001 with remote ID "410-865-8001        "
Result: (0/339;0/0) Successful Send
Page record: 1 - 4
Elapsed time: 01:48 on channel 21

**Dhillon, Kiran**

| | |
|---|---|
| **From:** | Tor-RightFax@gowlings.com |
| **Sent:** | April-28-14 1:29 PM |
| **To:** | Dhillon, Kiran |
| **Subject:** | Your fax has been successfully sent to RightFax at 12026372201. RE:  Received: from gowexc01.gowlings.corp ([10.91.101.41]) by GOWEXC03. |

Your fax has been successfully sent to RightFax at 12026372201. RE:
 Received: from gowexc01.gowlings.corp ([10.91.101.41]) by GOWEXC03.
-----------------------------------------------------------
From: Kiran.Dhillon@gowlings.com
Copitrak ID: 195707
Matter Number: T991328
-----------------------------------------------------------
Time: 4/28/2014 1:26:47 PM
Sent to 12026372201 with remote ID "Latham&WatkinsEast"
Result: (0/339;0/0) Successful Send
Page record: 1 - 4
Elapsed time: 01:52 on channel 14

*103*

## Dhillon, Kiran

| | |
|---|---|
| **From:** | Tor-RightFax@gowlings.com |
| **Sent:** | April-28-14 1:29 PM |
| **To:** | Dhillon, Kiran |
| **Subject:** | Your fax has been successfully sent to RightFax at 4169470866. RE:   Received: from gowexc01.gowlings.corp ([10.91.101.41]) by GOWEXC03. |

```
Your fax has been successfully sent to RightFax at 4169470866. RE:
 Received: from gowexc01.gowlings.corp ([10.91.101.41]) by GOWEXC03.
-----------------------------------------------------------
From: Kiran.Dhillon@gowlings.com
Copitrak ID: 195707
Matter Number: T991328
-----------------------------------------------------------
Time: 4/28/2014 1:26:45 PM
Sent to 4169470866 with remote ID "Channel-0"
Result: (0/339;0/0) Successful Send
Page record: 1 - 4
Elapsed time: 01:49 on channel 4
```

1



montréal · ottawa · toronto · hamilton · waterloo region · calgary · vancouver · beijing · moscow · london

April 28, 2014

**SENT BY FACSIMILE**

**Jennifer Stam**
Direct 416-862-5697
jennifer.stam@gowlings.com

GENBAND INC.
3605 E. Plano Pkwy., Suite 100
Plano, Texas 75074

Attn :  General Counsel

Fax :  972.265.3581

Dear Sirs/Mesdames:

### Re:  Nortel Networks Corporation et al

We refer to the asset sale agreement(s) dated as of December 22, 2009 (including any amendments and/or restatements, the "**Sale Agreement**") pursuant to which Genband Inc. purchased all or substantially all of Nortel's assets related to its CVAS business (the "**Assets**"). We also refer to the notice provided to you dated June 5, 2013 (the "**June Notice**") pursuant to which we informed you that confidential information may be disclosed pursuant to a protective order in connection with discovery for the Trial (as defined below).

On behalf of the U.S., Canadian and EMEA estates of Nortel and in accordance with Sections 5.11 and 10.7 of the Sale Agreement, further notice with respect to confidential information is hereby given as described in the paragraphs below.

As we set out in the June Notice, the U.S., Canadian and EMEA estates of Nortel and certain of their creditor groups (and other parties) have been engaged in a discovery process leading up to a trial (the "**Trial**") to determine the allocation of sale proceeds arising from, among other things, the sale of the Assets. The Trial will also address certain claims that have been asserted by the EMEA estate and the UK pension fund against the Canadian estate and certain of its former officers and directors. During the discovery process, documentary production was made to other parties to the litigation on a confidential or highly confidential basis pursuant to a protective order (the "**Protective Order**"). The discovery process has now ended.

The Trial is open to the public, and will take place simultaneously before the Ontario Superior Court of Justice and the United States Bankruptcy Court for the District of Delaware (the "**Courts**") starting on May 12, 2014.

In connection with the Trial process, there have been thousands of documents designated as trial exhibits. Included in those documents are documents that may be subject to the confidentiality provisions in the Sale Agreement. We are currently undertaking a review of the designated trial

Gowling Lafleur Henderson LLP · Lawyers · Patent and Trade-mark Agents

1 First Canadian Place · 100 King Street West · Suite 1600 · Toronto · Ontario · M5X 1G5 · Canada T 416-862-7525 F 416-862-7661 gowlings.com

# gowlings

exhibits to identify those documents that may be relevant to you but we expect that they will include the following:

1. The seller disclosure schedules to the Sale Agreement;

2. Transaction documents entered into in connection with the sale of the Assets; and

3. Other commercial or competitive information including documents containing royalty rates, IP licenses and customer contracts.

We expect to be able to provide you before the end of this week with further information as to our view on which documents and information we would seek to file under seal or otherwise protect from public disclosure because they are subject to the confidentiality clauses in the Sale Agreement. To the extent necessary or agreed, a joint hearing will take place before both Courts on May 8, 2014, during which time any outstanding confidentiality issues may be raised. Your counsel should be prepared to attend at the joint hearing if you wish to be heard on the issue.

We would be pleased to speak to you in the meantime to provide you with further information or discuss any questions you may have. Please feel free to contact Jennifer Stam (Jennifer.stam@gowlings.com/ (416) 862-5697); Inna Rozenberg (irozenberg@cgsh.com/ (212) 225-2972); or Fara Tabatabai (tabataba@hugheshubbard.com/ (212) 837-6296).

Sincerely,

**GOWLING LAFLEUR HENDERSON LLP**

Jennifer Stam

JS

cc:     *David S. Allinson, LATHAM & WATKINS LLP (via fax)*
        *Don J. McDermett, Jr. and Curt Anderson, BAKER BOTTS LLP (via fax)*
        *Ron Ferguson, STIKEMAN ELLIOTT LLP (via fax)*

## Dhillon, Kiran

| | |
|---|---|
| **From:** | Tor-RightFax@gowlings.com |
| **Sent:** | April-28-14 2:17 PM |
| **To:** | Dhillon, Kiran |
| **Subject:** | Your fax has been successfully sent to  at 19722653599. RE:  Return-Path: <Kiran.Dhillon@gowlings.com>X-Original-To: rfax@gowpop |

Your fax has been successfully sent to  at 19722653599. RE:
 Return-Path: <Kiran.Dhillon@gowlings.com>X-Original-To: rfax@gowpop
------------------------------------------------------------
From: Kiran.Dhillon@gowlings.com
------------------------------------------------------------
Time: 4/28/2014 2:14:23 PM
Sent to 19722653599 with remote ID "9725215835"
Result: (0/339;0/0) Successful Send
Page record: 1 - 4
Elapsed time: 01:51 on channel 1

1

**Dhillon, Kiran**

| | |
|---|---|
| **From:** | RightFax E-mail Gateway [GOWLINGS\lrfax93@10.52.101.41] |
| **Sent:** | April-28-14 1:33 PM |
| **To:** | Dhillon, Kiran |
| **Subject:** | Your fax has been successfully sent to RightFax at 12127514864. RE:  Received: from gowexc01.gowlings.corp ([10.91.101.41]) by GOWEXC03. |

```
Your fax has been successfully sent to RightFax at 12127514864. RE:
 Received: from gowexc01.gowlings.corp ([10.91.101.41]) by GOWEXC03.
------------------------------------------------------------
From: Kiran.Dhillon@gowlings.com
Copitrak ID: 195707
Matter Number: T991328
------------------------------------------------------------
Time: 4/28/2014 1:29:13 PM
Sent to 12127514864 with remote ID "Latham&WatkinsEast"
Result: (0/339;0/0) Successful Send
Page record: 1 - 4
Elapsed time: 01:58 on channel 5
```

*108*

**Dhillon, Kiran**

| | |
|---|---|
| **From:** | Tor-RightFax@gowlings.com |
| **Sent:** | April-28-14 1:31 PM |
| **To:** | Dhillon, Kiran |
| **Subject:** | Your fax has been successfully sent to RightFax at 12146614454. RE:   Received: from gowexc01.gowlings.corp ([10.91.101.41]) by GOWEXC03. |

Your fax has been successfully sent to RightFax at 12146614454. RE:
 Received: from gowexc01.gowlings.corp ([10.91.101.41]) by GOWEXC03.
----------------------------------------------------------
From: Kiran.Dhillon@gowlings.com
Copitrak ID: 195707
Matter Number: T991328
----------------------------------------------------------
Time: 4/28/2014 1:29:14 PM
Sent to 12146614454 with remote ID "Baker Botts L.L.P."
Result: (0/339;0/0) Successful Send
Page record: 1 - 4
Elapsed time: 01:50 on channel 8

/09

## Dhillon, Kiran

**From:** RightFax E-mail Gateway [GOWLINGS\lrfax93@10.52.101.41]
**Sent:** April-28-14 1:33 PM
**To:** Dhillon, Kiran
**Subject:** Your fax has been successfully sent to RightFax at 4169470866. RE: Received: from gowexc01.gowlings.corp ([10.91.101.41]) by GOWEXC03.

```
Your fax has been successfully sent to RightFax at 4169470866. RE:
 Received: from gowexc01.gowlings.corp ([10.91.101.41]) by GOWEXC03.
----------------------------------------------------------
From: Kiran.Dhillon@gowlings.com
Copitrak ID: 195707
Matter Number: T991328
----------------------------------------------------------
Time: 4/28/2014 1:29:12 PM
Sent to 4169470866 with remote ID "Channel-2"
Result: (0/339;0/0) Successful Send
Page record: 1 - 4
Elapsed time: 01:49 on channel 7
```



montréal · ottawa · toronto · hamilton · waterloo region · calgary · vancouver · beijing · moscow · london

April 28, 2014

**SENT BY FACSIMILE**

**Jennifer Stam**
Direct 416-862-5697
jennifer.stam@gowlings.com

RADWARE LTD.
22 Raoul Wallenberg Street
Tel Aviv 69710  Israel

Attn:  Roy Zisapel
Fax:   978.3.7668982

Dear Sirs/Mesdames:

**Re:   Nortel Networks Corporation et al**

We refer to the asset sale agreement(s) dated as of February 19, 2009 (including any amendments and/or restatements, the "**Sale Agreement**") pursuant to which Radware Ltd. purchased all or substantially all of Nortel's assets related to its Layer 4-7 business (the "**Assets**").  We also refer to the notice provided to you dated June 5, 2013 (the "**June Notice**") pursuant to which we informed you that confidential information may be disclosed pursuant to a protective order in connection with discovery for the Trial (as defined below).

On behalf of the U.S., Canadian and EMEA estates of Nortel and in accordance with Sections 9.14 and 11.7 of the Sale Agreement, further notice with respect to confidential information is hereby given as described in the paragraphs below.

As we set out in the June Notice, the U.S., Canadian and EMEA estates of Nortel and certain of their creditor groups (and other parties) have been engaged in a discovery process leading up to a trial (the "**Trial**") to determine the allocation of sale proceeds arising from, among other things, the sale of the Assets.  The Trial will also address certain claims that have been asserted by the EMEA estate and the UK pension fund against the Canadian estate and certain of its former officers and directors. During the discovery process, documentary production was made to other parties to the litigation on a confidential or highly confidential basis pursuant to a protective order (the "**Protective Order**"). The discovery process has now ended.

The Trial is open to the public, and will take place simultaneously before the Ontario Superior Court of Justice and the United States Bankruptcy Court for the District of Delaware (the "**Courts**") starting on May 12, 2014.

In connection with the Trial process, there have been thousands of documents designated as trial exhibits.  Included in those documents are documents that may be subject to the confidentiality provisions in the Sale Agreement.  We are currently undertaking a review of the designated trial

# gowlings

exhibits to identify those documents that may be relevant to you but we expect that they will include the following:

1. The seller disclosure schedules to the Sale Agreement;

2. Transaction documents entered into in connection with the sale of the Assets; and

3. Other commercial or competitive information including documents containing royalty rates, IP licenses and customer contracts.

We expect to be able to provide you before the end of this week with further information as to our view on which documents and information we would seek to file under seal or otherwise protect from public disclosure because they are subject to the confidentiality clauses in the Sale Agreement. To the extent necessary or agreed, a joint hearing will take place before both Courts on May 8, 2014, during which time any outstanding confidentiality issues may be raised. Your counsel should be prepared to attend at the joint hearing if you wish to be heard on the issue.

We would be pleased to speak to you in the meantime to provide you with further information or discuss any questions you may have.     Please feel free to contact Jennifer Stam (Jennifer.stam@gowlings.com/ (416) 862-5697); Inna Rozenberg (irozenberg@cgsh.com/ (212) 225-2972); or Fara Tabatabai (tabataba@hugheshubbard.com/ (212) 837-6296).

Sincerely,

**GOWLING LAFLEUR HENDERSON LLP**

Jennifer Stam

JS

cc:     *Ernest S. Wechsler, KRAMER LEVIN NAFTALIS & FRANKEL LLP (via fax)*

## Dhillon, Kiran

| From: | Tor-RightFax@gowlings.com |
|-------|---------------------------|
| Sent: | April-28-14 5:53 PM |
| To: | Dhillon, Kiran |
| Subject: | Your fax has been successfully sent to  at 12015129774. RE:  Return-Path: <Kiran.Dhillon@gowlings.com>X-Original-To: rfax@gowpop |

Your fax has been successfully sent to  at 12015129774. RE:
  Return-Path: <Kiran.Dhillon@gowlings.com>X-Original-To: rfax@gowpop
------------------------------------------------------------

From: Kiran.Dhillon@gowlings.com
------------------------------------------------------------

Time: 4/28/2014 5:51:32 PM
Sent to 12015129774 with remote ID "unknown"
Result: (0/339;0/0) Successful Send
Page record: 1 - 4
Elapsed time: 01:45 on channel 7

1

**Dhillon, Kiran**

| | |
|---|---|
| **From:** | Tor-RightFax@gowlings.com |
| **Sent:** | April-28-14 1:39 PM |
| **To:** | Dhillon, Kiran |
| **Subject:** | Your fax has been successfully sent to RightFax at 12127158000. RE:  Received: from gowexc01.gowlings.corp ([10.91.101.41]) by GOWEXC03. |

```
Your fax has been successfully sent to RightFax at 12127158000. RE:
 Received: from gowexc01.gowlings.corp ([10.91.101.41]) by GOWEXC03.
-----------------------------------------------------------
From: Kiran.Dhillon@gowlings.com
Copitrak ID: 195707
Matter Number: T991328
-----------------------------------------------------------
Time: 4/28/2014 1:34:21 PM
Sent to 12127158000 with remote ID "1212 7157601"
Result: (0/339;0/0) Successful Send
Page record: 1 - 4
Elapsed time: 01:47 on channel 3
```

/ / 4



montréal · ottawa · toronto · hamilton · waterloo region · calgary · vancouver · beijing · moscow · london

April 28, 2014

**SENT BY FACSIMILE**

**Jennifer Stam**
Direct 416-862-5697
jennifer.stam@gowlings.com

ROCKSTAR BIDCO, LP
c/o Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064

Attn: Marilyn Sobel

Fax:   212.757.3900

Dear Sirs/Mesdames:

### Re:   Nortel Networks Corporation et al

We refer to the asset sale agreement(s) dated as of June 30, 2011 (including any amendments and/or restatements, the "**Sale Agreement**") pursuant to which Rockstar Bidco, LP purchased all or substantially all of Nortel's assets related to its Residual Patent Portfolio business (the "**Assets**"). We also refer to the notice provided to you dated June 5, 2013 (the "**June Notice**") pursuant to which we informed you that confidential information may be disclosed pursuant to a protective order in connection with discovery for the Trial (as defined below).

On behalf of the U.S., Canadian and EMEA estates of Nortel and in accordance with Sections 5.11 and 10.7 of the Sale Agreement, further notice with respect to confidential information is hereby given as described in the paragraphs below.

As we set out in the June Notice, the U.S., Canadian and EMEA estates of Nortel and certain of their creditor groups (and other parties) have been engaged in a discovery process leading up to a trial (the "**Trial**") to determine the allocation of sale proceeds arising from, among other things, the sale of the Assets. The Trial will also address certain claims that have been asserted by the EMEA estate and the UK pension fund against the Canadian estate and certain of its former officers and directors. During the discovery process, documentary production was made to other parties to the litigation on a confidential or highly confidential basis pursuant to a protective order (the "**Protective Order**"). The discovery process has now ended.

The Trial is open to the public, and will take place simultaneously before the Ontario Superior Court of Justice and the United States Bankruptcy Court for the District of Delaware (the "**Courts**") starting on May 12, 2014.

In connection with the Trial process, there have been thousands of documents designated as trial exhibits. Included in those documents are documents that may be subject to the confidentiality

Gowling Lafleur Henderson LLP · Lawyers · Patent and Trade-mark Agents

1 First Canadian Place · 100 King Street West · Suite 1600 · Toronto · Ontario · M5X 1G5 · Canada T 416-862-7525 F 416-862-7661 gowlings.com

# gowlings

provisions in the Sale Agreement. We are currently undertaking a review of the designated trial exhibits to identify those documents that may be relevant to you but we expect that they will include the following:

1. The seller disclosure schedules to the Sale Agreement;

2. Transaction documents entered into in connection with the sale of the Assets; and

3. Other commercial or competitive information including documents containing royalty rates, IP licenses and customer contracts.

We expect to be able to provide you before the end of this week with further information as to our view on which documents and information we would seek to file under seal or otherwise protect from public disclosure because they are subject to the confidentiality clauses in the Sale Agreement. To the extent necessary or agreed, a joint hearing will take place before both Courts on May 8, 2014, during which time any outstanding confidentiality issues may be raised. Your counsel should be prepared to attend at the joint hearing if you wish to be heard on the issue.

We would be pleased to speak to you in the meantime to provide you with further information or discuss any questions you may have.     Please feel free to contact Jennifer Stam (Jennifer.stam@gowlings.com/ (416) 862-5697); Inna Rozenberg (irozenberg@cgsh.com/ (212) 225-2972); or Fara Tabatabai (tabataba@hugheshubbard.com/ (212) 837-6296).

Sincerely,

**GOWLING LAFLEUR HENDERSON LLP**

Jennifer Stam

JS

*cc:     Kyle C. Krpata, WEIL, GOTSHAL & MANGES LLP (via fax)*
*Ronit J. Berkovich, WEIL, GOTSHAL & MANGES LLP (via fax)*

/ / 6

**Dhillon, Kiran**

| | |
|---|---|
| **From:** | RightFax E-mail Gateway [GOWLINGS\!rfax93@10.52.101.41] |
| **Sent:** | April-28-14 2:14 PM |
| **To:** | Dhillon, Kiran |
| **Subject:** | Your fax has been successfully sent to  at 12127573990. RE:  Return-Path: <Kiran.Dhillon@gowlings.com>X-Original-To: rfax@gowpop |

Your fax has been successfully sent to  at 12127573990. RE:
 Return-Path: <Kiran.Dhillon@gowlings.com>X-Original-To: rfax@gowpop
----------------------------------------------------------
From: Kiran.Dhillon@gowlings.com
----------------------------------------------------------
Time: 4/28/2014 2:09:39 PM
Sent to 12127573990 with remote ID "12126724959"
Result: (0/339;0/0) Successful Send
Page record: 1 - 4
Elapsed time: 01:51 on channel 1

*117*

## Dhillon, Kiran

| | |
|---|---|
| **From:** | Tor-RightFax@gowlings.com |
| **Sent:** | April-28-14 1:28 PM |
| **To:** | Dhillon, Kiran |
| **Subject:** | Your fax has been successfully sent to RightFax at 16508023100. RE:  Received: from gowexc01.gowlings.corp ([10.91.101.41]) by GOWEXC03. |

Your fax has been successfully sent to RightFax at 16508023100. RE:
 Received: from gowexc01.gowlings.corp ([10.91.101.41]) by GOWEXC03.
-----------------------------------------------------------
From: Kiran.Dhillon@gowlings.com
Copitrak ID: 195707
Matter Number: T991328
-----------------------------------------------------------
Time: 4/28/2014 1:26:09 PM
Sent to 16508023100 with remote ID "6508023100"
Result: (0/339;0/0) Successful Send
Page record: 1 - 4
Elapsed time: 01:54 on channel 5

1

## Dhillon, Kiran

**From:**      Tor-RightFax@gowlings.com
**Sent:**      April-28-14 2:50 PM
**To:**        Dhillon, Kiran
**Subject:**   Your fax has been successfully sent to 12123108007. RE:  Return-Path:
               <Kiran.Dhillon@gowlings.com>X-Original-To: rfax@gowpop


Your fax has been successfully sent to  at 12123108007. RE:
 Return-Path: <Kiran.Dhillon@gowlings.com>X-Original-To: rfax@gowpop
----------------------------------------------------------
From: Kiran.Dhillon@gowlings.com
----------------------------------------------------------
Time: 4/28/2014 2:45:57 PM
Sent to 12123108007 with remote ID "16463908287"
Result: (0/339;0/0) Successful Send
Page record: 1 - 4
Elapsed time: 01:58 on channel 15

1

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

Court File No: 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
Proceeding commenced at Toronto

**AFFIDAVIT OF**
**OF JENNIFER STAM**

**GOODMANS LLP**
Barristers & Solicitors
333 Bay Street, Suite 3400
Toronto ON  M5H 2S7

**Jay A. Carfagnini  (LSUC #: 22293T)**
jcarfagnini@goodmans.ca

**Alan Mark (LSUC #: 21772U)**
amark@goodmans.ca

**Jessica Kimmel (LSUC #: 32312W)**
jkimmel@goodmans.ca

**Peter Ruby (LSUC #: 38439P)**
pruby@goodmans.ca

**Joseph Pasquariello (LSUC #: 37389C)**
jpasquariello@goodmans.ca

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

**GOWLING LAFLEUR HENDERSON LLP**
Barristers & Solicitors
1 First Canadian Place
100 King Street West, Suite 1600
Toronto ON M5X 1G5

**Derrick Tay (LSUC #: 21152A)**
derrick.tay@gowlings.com

**Jennifer Stam (LSUC #: 46735J)**
Jennifer.stam@gowlings.com

Tel:   (416) 862-5697
Fax:  (416) 862-7661

Lawyers for the  Canadian Debtors

TOR_LAW\ 8419534\1

## APPENDIX "E"

## [ATTACHED]

Court File No. 09-CL-7950

***ONTARIO***
***SUPERIOR COURT OF* JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AFFIDAVIT OF SERVICE OF ROBERT FERGUSON
(NOTICE)
(sworn May 2, 2014)

I, Robert Ferguson, of the City of Pickering, Province of Ontario, **MAKE OATH
AND SAY:**

1.       I am a Manager at Ernst & Young Inc., the Court-appointed monitor (the "**Monitor**")
of Nortel Networks Corporation *et al.*, (collectively, the "**Applicants**") in their proceedings
under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, and as such, have
knowledge of the matters hereinafter deposed to.

2.       On May 1, 2014, I caused:

    (a)       the Notice re License Agreements referring to the July 16, 2013 notice annexed
              hereto and marked as Exhibit "A" to be served, by sending copies by FedEx, a
              courier, to the corresponding address of those parties as listed on Exhibit "B"
              hereto.

(b)     the Notice re Agreements annexed hereto and marked as Exhibit "C" to be served, by sending copies by FedEx, a courier, to the corresponding address of those parties as listed on Exhibit "D" hereto.

SWORN BEFORE ME at the City of
Toronto, on May 2, 2014.

_Donna Hatfull_

A Commissioner in and for the Province
of Ontario

**ROBERT FERGUSON**

DONNA MARIE HATFULL, a Commissioner, etc.,
Province of Ontario, for Ernst & Young Inc.,
Trustee in Bankruptcy.
Expires October 3, 2016.

/22

THIS IS EXHIBIT "A" REFERRED
TO IN THE AFFIDAVIT OF
ROBERT FERGUSON SWORN
BEFORE ME THIS 2nd DAY OF
MAY 2, 2014

Donna Hatfull

DONNA MARIE HATFULL, a Commissioner, etc.,
Province of Ontario, for Ernst & Young Inc.,
Trustee in Bankruptcy.
Expires October 3, 2016.

/23

## NOTICE

**RE:**          **NORTEL NETWORKS CORPORATION ET AL**

**DATE:**          **May 1, 2014**

We refer to the notice provided to you dated July 16, 2013 pursuant to which we informed you that your license agreement(s) may be disclosed pursuant to a protective order in connection with discovery for the Nortel Trial (defined below).

As you may be aware, pursuant to Orders granted by each of the Ontario Superior Court of Justice and the United States Bankruptcy Court for the District of Delaware (the "**Courts**"), coordinated trials in the Nortel proceedings (the "**Trial**") have been scheduled to start May 12, 2014. The Trial is open to the public and will be heard jointly by the Courts in order to determine issues relating to the allocation of sale proceeds as well as certain claims.

We hereby give you notice that one or more agreements (the "**Agreement(s)**") that you entered into with one or more of the Nortel entities (including without limitation Canadian, US and EMEA companies) have been designated for potential use at Trial.

In light of the confidentiality provisions contained in the Agreement(s), we plan to seek an order which may include a request for relief to allow us to (a) file the Agreement(s) provisionally under seal, (b) provisionally redact from any publicly filed submission any reference to the existence or terms of the Agreement(s), unless your identity is not revealed, and (c) and seal the courtroom during the Trial should a party seek to display the Agreement(s) during the Trial or discuss the existence or terms of the Agreement(s) in such a way as to reveal your identity. The relief we intend to seek may be opposed by other parties. In addition, the relief we intend to seek may not be granted by the Courts, and the Courts may order us to disclose to the public the Agreement(s), its existence and/or its terms. These issues are scheduled to be addressed on **May 8, 2014 at a joint hearing before the Courts**. To the extent that you or your counsel wish to be heard, your counsel should advise us in advance of your concerns and plan to attend that hearing. Copies of any court materials will be available on the Monitor's website at www.ey.com/ca/nortel and on the U.S. Debtors' website at http://dm.epiq11.com/NNI/Project.

If you have any questions, please feel free to contact any of the following individuals:

- Inna Rozenberg (irozenberg@cgsh.com/ (212) 225-2972) (lawyers for the US Debtors)

- Fara Tabatabai (tabataba@hugheshubbard.com/ (212) 837-6296) (lawyers for the EMEA Debtors)

- Jennifer Stam (Jennifer.stam@gowlings.com/ (416) 862-5697) (lawyers for the Canadian Debtors)

124

THIS IS EXHIBIT "B" REFERRED
TO IN THE AFFIDAVIT OF
ROBERT FERGUSON SWORN
BEFORE ME THIS 2nd DAY OF
MAY 2, 2014

*Donna Hatfull*

DONNA MARIE HATFULL, a Commissioner, etc.,
Province of Ontario, for Ernst & Young Inc.,
Trustee in Bankruptcy.
Expires October 3, 2016.

# EXHIBIT "B" FILED UNDER SEAL

127

THIS IS EXHIBIT "C" REFERRED
TO IN THE AFFIDAVIT OF
ROBERT FERGUSON SWORN
BEFORE ME THIS 2nd DAY OF
MAY 2, 2014

*Donna Hatfull*

DONNA MARIE HATFULL, a Commissioner, etc.,
Province of Ontario, for Ernst & Young Inc.,
Trustee in Bankruptcy.
Expires October 3, 2016.

## NOTICE

RE:        **NORTEL NETWORKS CORPORATION ET AL**

DATE:       **May 1, 2014**

Pursuant to Orders granted by each of the Ontario Superior Court of Justice and the United States Bankruptcy Court for the District of Delaware (the "**Courts**"), coordinated trials in the Nortel proceedings (the "**Trial**") have been scheduled to start May 12, 2014. The Trial is open to the public and will be heard jointly by the Courts in order to determine issues relating to the allocation of sale proceeds as well as certain claims.

We hereby give you notice that one or more agreements (the "**Agreement(s)**") that you entered into with one or more of the Nortel entities (including without limitation Canadian, US and EMEA companies) have been designated for potential use at Trial.

In light of the confidentiality provisions contained in the Agreement(s), we plan to seek an order which may include a request for relief to allow us to (a) file the Agreement(s) provisionally under seal, (b) provisionally redact from any publicly filed submission any reference to the existence or terms of the Agreement(s), unless your identity is not revealed, and (c) and seal the courtroom during the Trial should a party seek to display the Agreement(s) during the Trial or discuss the existence or terms of the Agreement(s) in such a way as to reveal your identity. The relief we intend to seek may be opposed by other parties. In addition, the relief we intend to seek may not be granted by the Courts, and the Courts may order us to disclose to the public the Agreement(s), its existence and/or its terms. These issues are scheduled to be addressed on **May 8, 2014 at a joint hearing before the Courts**. To the extent that you or your counsel wish to be heard, your counsel should advise us in advance of your concerns and plan to attend that hearing. Copies of any court materials will be available on the Monitor's website at www.ey.com/ca/nortel and on the U.S. Debtors' website at http://dm.epiq11.com/NNI/Project.

If you have any questions, please feel free to contact any of the following individuals:

- Inna Rozenberg (irozenberg@cgsh.com/ (212) 225-2972) (lawyers for the US Debtors)

- Fara Tabatabai (tabataba@hugheshubbard.com/ (212) 837-6296) (lawyers for the EMEA Debtors)

- Jennifer Stam (Jennifer.stam@gowlings.com/ (416) 862-5697) (lawyers for the Canadian Debtors)

*129*

THIS IS EXHIBIT "D" REFERRED
TO IN THE AFFIDAVIT OF
ROBERT FERGUSON SWORN
BEFORE ME THIS 2nd DAY OF
MAY 2, 2014


*Donna Hatfull*

DONNA MARIE HATFULL, a Commissioner, etc.,
Province of Ontario, for Ernst & Young Inc.,
Trustee in Bankruptcy.
Expires October 3, 2016.

# EXHIBIT "D" FILED UNDER SEAL

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

Court File No: 09-CL-7950

---

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

Proceeding commenced at Toronto

---

### AFFIDAVIT OF SERVICE OF
### ROBERT FERGUSON
### (NOTICE)

---

### GOODMANS LLP
Barristers & Solicitors
Bay Adelaide Centre, 333 Bay Street
Toronto, Canada M5H 2S7
Jay A. Carfagnini (LSUC: 222936)
Joseph Pasquariello (LSUC: 37389C)
Christopher G. Armstrong (LSUC: 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

\5958149

131

# APPENDIX "F"

# [ATTACHED]



# Hughes Hubbard

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Fax: 212-422-4726
hugheshubbard.com

May 1, 2014

**VIA EMAIL**

Linda Beyer, Esq.
Deloitte & Touche USA LLP
1633 Broadway, 9th Floor
New York, NY 10019

Re: *In re Nortel Networks Inc. et al.*, Case No. 09-10138 (KG) (Bankr. D. Del.)

   *In the Matter of Nortel Networks Corporation et al.*, Court File No. 09-CL-7950 (Ontario Superior Court of Justice)

Dear Ms. Beyer,

   As you are aware, pursuant to Orders granted by each of the Ontario Superior Court of Justice and the United States Bankruptcy Court for the District of Delaware (the "Courts"), coordinated trials in the Nortel proceedings have been scheduled to start May 12, 2014 (the "Trial"). The Trial is open to the public and will be heard jointly by the Courts in order to determine issues relating to the allocation of sale proceeds as well as certain claims.

   Deloitte & Touche USA LLP has produced documents (the "Documents") in connection with the discovery process preceding the Trial. These Documents were produced on a confidential or highly confidential basis pursuant to the protective orders governing the discovery process. The discovery process has now ended.

   We hereby give you notice that certain of the Documents have been designated for potential use at Trial. At the moment, subject to the outcome of the hearing referenced below, unless Nortel has confidentiality obligations to other third parties in respect of those Documents, they will be filed publicly with the Courts and may be discussed and referenced in publicly available submissions and during the Trial.

   The Courts have scheduled a joint hearing **on May 8, 2014** to address confidentiality matters. To the extent that Deloitte & Touche USA LLP wishes to be heard, we would request that you contact us beforehand and that Deloitte & Touche USA LLP's counsel plan to attend that hearing.

*133*

If you have any questions, please feel free to contact any of the following individuals:

- Inna Rozenberg (irozenberg@cgsh.com; (212) 225-2972) (lawyers for the US Debtors)

- Fara Tabatabai (tabataba@hugheshubbard.com; (212) 837-6296) (lawyers for the EMEA Debtors)

- Jennifer Stam (jennifer.stam@gowlings.com; (416) 862-5697) (lawyers for the Canadian Debtors)

Sincerely,


/s/ Fara Tabatabai

*134*

# Hughes
# Hubbard

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Fax: 212-422-4726
hugheshubbard.com

May 1, 2014

**VIA EMAIL**

Steven B. Carlin, Esq.
KPMG LLP
919 Third Avenue
New York, NY 10022

Re:  *In re Nortel Networks Inc. et al.*, Case No. 09-10138 (KG) (Bankr. D. Del.)

   *In the Matter of Nortel Networks Corporation et al.*, Court File No. 09-CL-
   7950 (Ontario Superior Court of Justice)

Dear Mr. Carlin,

          As you are aware, pursuant to Orders granted by each of the Ontario Superior
Court of Justice and the United States Bankruptcy Court for the District of Delaware (the
"Courts"), coordinated trials in the Nortel proceedings have been scheduled to start May 12, 2014
(the "Trial").  The Trial is open to the public and will be heard jointly by the Courts in order to
determine issues relating to the allocation of sale proceeds as well as certain claims.

          KPMG LLP has produced documents (the "Documents") in connection with the
discovery process preceding the Trial.  These Documents were produced on a confidential or
highly confidential basis pursuant to the protective orders governing the discovery process.  The
discovery process has now ended.

          We hereby give you notice that certain of the Documents have been designated for
potential use at Trial.  At the moment, subject to the outcome of the hearing referenced below,
unless Nortel has confidentiality obligations to other third parties in respect of those Documents,
they will be filed publicly with the Courts and may be discussed and referenced in publicly
available submissions and during the Trial.

          The Courts have scheduled a joint hearing **on May 8, 2014** to address
confidentiality matters.  To the extent that KPMG LLP wishes to be heard, we would request that
you contact us beforehand and that KPMG LLP's counsel plan to attend that hearing.

*135*

If you have any questions, please feel free to contact any of the following individuals:

- Inna Rozenberg (irozenberg@cgsh.com; (212) 225-2972) (lawyers for the US Debtors)

- Fara Tabatabai (tabataba@hugheshubbard.com; (212) 837-6296) (lawyers for the EMEA Debtors)

- Jennifer Stam (jennifer.stam@gowlings.com; (416) 862-5697) (lawyers for the Canadian Debtors)

Sincerely,


/s/ Fara Tabatabai



gowlings    montréal · ottawa · toronto · hamilton · waterloo region · calgary · vancouver · beijing · moscow · london

May 1, 2014

**SENT BY EMAIL**

**Jennifer Stam**
Direct 416-862-5697
jennifer.stam@gowlings.com

Sutherland, Asbill & Brennan LLP
700 Sixth Street, NW
Suite 700
Washington, DC 20001-3980

Attention: Nicholas T. Christakos

Dear Mr. Christakos

### Re:  Nortel Networks: Disclosure of Documents

As you are aware, pursuant to Orders granted by each of the Ontario Superior Court of Justice and the United States Bankruptcy Court for the District of Delaware (the "**Courts**"), coordinated trials in the Nortel proceedings (the "**Trial**") have been scheduled to start May 12, 2014. The Trial is open to the public and will be heard jointly by the Courts in order to determine issues relating to the allocation of sale proceeds as well as certain claims.

You have produced documents (the "**Documents**") in connection with the discovery process undertaken in connection with the Trial. These Documents were produced on a confidential or a highly confidential basis pursuant to the protective orders that were granted in connection with the discovery process. The discovery process has now ended.

We hereby give you notice that certain of the Documents have been designated for potential use at Trial. At the moment, subject to the outcome of the hearing referenced below, unless Nortel has confidentiality obligations to other third parties in respect of those Documents that have been designated for trial, they will not be subject to any motion for a Sealing Order and, to the extent filed and/or admitted for trial, will be done so publicly and may be discussed and referenced in publicly available submissions and during the Trial.

Scheduled for **May 8, 2014 is a joint hearing before the Courts** to address confidentiality matters. To the extent that you or your counsel wish to be heard, we would request that you contact us beforehand and your counsel should plan to attend that hearing.

If you have any questions, please feel free to contact any of the following individuals:

- Inna Rozenberg (irozenberg@cgsh.com/ (212) 225-2972) (lawyers for the US Debtors)

- Fara Tabatabai (tabataba@hugheshubbard.com/ (212) 837-6296) (lawyers for the EMEA Debtors)

*137*

# gowlings

- Jennifer Stam (Jennifer.stam@gowlings.com/ (416) 862-5697) (lawyers for the Canadian Debtors)

Sincerely,

**GOWLING LAFLEUR HENDERSON LLP**

Jennifer Stam

JS

 montréal · ottawa · toronto · hamilton · waterloo region · calgary · vancouver · beijing · moscow · london

May 1, 2014

**SENT BY EMAIL**

**Jennifer Stam**
Direct 416-862-5697
jennifer.stam@gowlings.com

Caplin & Drysdale
One Thomas Circle, N.W.
Suite 1100
Washington, D.C. 20005

Attention: Charlie Ruchelman

Dear Mr. Ruchelman,

### Re: Nortel Networks: Disclosure of Documents

As you are aware, pursuant to Orders granted by each of the Ontario Superior Court of Justice and the United States Bankruptcy Court for the District of Delaware (the "**Courts**"), coordinated trials in the Nortel proceedings (the "**Trial**") have been scheduled to start May 12, 2014. The Trial is open to the public and will be heard jointly by the Courts in order to determine issues relating to the allocation of sale proceeds as well as certain claims.

Your client Horst Frisch has produced documents (the "**Documents**") in connection with the discovery process undertaken in connection with the Trial. These Documents were produced on a confidential or a highly confidential basis pursuant to the protective orders that were granted in connection with the discovery process. The discovery process has now ended.

We hereby give you notice that certain of the Documents have been designated for potential use at Trial. At the moment, subject to the outcome of the hearing referenced below, unless Nortel has confidentiality obligations to other third parties in respect of those Documents that have been designated for trial, they will not be subject to any motion for a Sealing Order and, to the extent filed and/or admitted for trial, will be done so publicly and may be discussed and referenced in publicly available submissions and during the Trial.

Scheduled for **May 8, 2014 is a joint hearing before the Courts** to address confidentiality matters. To the extent that you or your counsel wish to be heard, we would request that you contact us beforehand and your counsel should plan to attend that hearing.

If you have any questions, please feel free to contact any of the following individuals:

- Inna Rozenberg (irozenberg@cgsh.com/ (212) 225-2972) (lawyers for the US Debtors)

- Fara Tabatabai (tabataba@hugheshubbard.com/ (212) 837-6296) (lawyers for the EMEA Debtors)

Gowling Lafleur Henderson LLP · Lawyers · Patent and Trade-mark Agents

1 First Canadian Place · 100 King Street West · Suite 1600 · Toronto · Ontario · M5X 1G5 · Canada T 416-862-7525 F 416-862-7661 gowlings.com

# gowlings

- Jennifer Stam (Jennifer.stam@gowlings.com/ (416) 862-5697) (lawyers for the Canadian Debtors)

Sincerely,

**GOWLING LAFLEUR HENDERSON LLP**

Jennifer Stam

JS

 montréal · ottawa · toronto · hamilton · waterloo region · calgary · vancouver · beijing · moscow · london

May 1, 2014

**SENT BY EMAIL**

Global IP
233 South Wacker Drive (Willis Tower)
Suite 8400
Chicago, Illinois 60606

Attention: Dave Berton

Dear Dave:

**Jennifer Stam**
Direct 416-862-5697
jennifer.stam@gowlings.com

### Re:  Nortel Networks: Disclosure of Documents

As you are aware, pursuant to Orders granted by each of the Ontario Superior Court of Justice and the United States Bankruptcy Court for the District of Delaware (the "**Courts**"), coordinated trials in the Nortel proceedings (the "**Trial**") have been scheduled to start May 12, 2014. The Trial is open to the public and will be heard jointly by the Courts in order to determine issues relating to the allocation of sale proceeds as well as certain claims.

You have produced documents (the "**Documents**") in connection with the discovery process undertaken in connection with the Trial. These Documents were produced on a confidential or a highly confidential basis pursuant to the protective orders that were granted in connection with the discovery process. The discovery process has now ended.

We hereby give you notice that certain of the Documents have been designated for potential use at Trial. At the moment, subject to the outcome of the hearing referenced below, unless Nortel has confidentiality obligations to other third parties in respect of those Documents that have been designated for trial, they will not be subject to any motion for a Sealing Order and, to the extent filed and/or admitted for trial, will be done so publicly and may be discussed and referenced in publicly available submissions and during the Trial.

Scheduled for **May 8, 2014 is a joint hearing before the Courts** to address confidentiality matters. To the extent that you or your counsel wish to be heard, we would request that you contact us beforehand and your counsel should plan to attend that hearing.

If you have any questions, please feel free to contact any of the following individuals:

- Inna Rozenberg (irozenberg@cgsh.com/ (212) 225-2972) (lawyers for the US Debtors)

- Fara Tabatabai (tabataba@hugheshubbard.com/ (212) 837-6296) (lawyers for the EMEA Debtors)

TOR_LAW\ 8422607\1

Gowling Lafleur Henderson LLP · Lawyers · Patent and Trade-mark Agents

1 First Canadian Place · 100 King Street West · Suite 1600 · Toronto · Ontario · M5X 1G5 · Canada T 416-862-7525 F 416-862-7661 gowlings.com

*141*

# gowlings

- Jennifer Stam (Jennifer.stam@gowlings.com/ (416) 862-5697) (lawyers for the Canadian Debtors)

Sincerely,

**GOWLING LAFLEUR HENDERSON LLP**

Jennifer Stam

JS

TOR_LAW\ 8422607\1

*142*


montréal · ottawa · toronto · hamilton · waterloo region · calgary · vancouver · beijing · moscow · london

May 1, 2014

**SENT BY EMAIL**

**Jennifer Stam**
Direct 416-862-5697
jennifer.stam@gowlings.com

Lazard Freres & Co.
30 Rockefeller Plaza, 61st Floor
New York, New York 10020

Attention: Matt Hart

Dear Dave:

**Re:   Nortel Networks: Disclosure of Documents**

As you are aware, pursuant to Orders granted by each of the Ontario Superior Court of Justice and the United States Bankruptcy Court for the District of Delaware (the "**Courts**"), coordinated trials in the Nortel proceedings (the "**Trial**") have been scheduled to start May 12, 2014. The Trial is open to the public and will be heard jointly by the Courts in order to determine issues relating to the allocation of sale proceeds as well as certain claims.

You have produced documents (the "**Documents**") in connection with the discovery process undertaken in connection with the Trial. These Documents were produced on a confidential or a highly confidential basis pursuant to the protective orders that were granted in connection with the discovery process. The discovery process has now ended.

We hereby give you notice that certain of the Documents have been designated for potential use at Trial. At the moment, subject to the outcome of the hearing referenced below, unless Nortel has confidentiality obligations to other third parties in respect of those Documents that have been designated for trial, they will not be subject to any motion for a Sealing Order and, to the extent filed and/or admitted for trial, will be done so publicly and may be discussed and referenced in publicly available submissions and during the Trial.

Scheduled for **May 8, 2014 is a joint hearing before the Courts** to address confidentiality matters. To the extent that you or your counsel wish to be heard, we would request that you contact us beforehand and your counsel should plan to attend that hearing.

If you have any questions, please feel free to contact any of the following individuals:

- Inna Rozenberg (irozenberg@cgsh.com/ (212) 225-2972) (lawyers for the US Debtors)

- Fara Tabatabai (tabataba@hugheshubbard.com/ (212) 837-6296) (lawyers for the EMEA Debtors)

TOR_LAW\ 8422609\1

Gowling Lafleur Henderson LLP · Lawyers · Patent and Trade-mark Agents
1 First Canadian Place · 100 King Street West · Suite 1600 · Toronto · Ontario · M5X 1G5 · Canada T 416-862-7525 F 416-862-7661 gowlings.com

# gowlings

- Jennifer Stam (Jennifer.stam@gowlings.com/ (416) 862-5697) (lawyers for the Canadian Debtors)

Sincerely,

**GOWLING LAFLEUR HENDERSON LLP**

Jennifer Stam

JS

TOR_LAW\ 8422609\1

# APPENDIX "G"

# [ATTACHED]

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION**

**THIRTY-FIFTH REPORT OF THE MONITOR**
**DATED JANUARY 18, 2010**

**INTRODUCTION**

1.   On January 14, 2009 (the "Filing Date") Nortel Networks Corporation ("NNC" and
     collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks
     Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks
     International Corporation and Nortel Networks Global Corporation (collectively the
     "Applicants") filed for and obtained protection under the *Companies' Creditors
     Arrangement Act* ("CCAA"). Pursuant to the Order of this Honourable Court dated
     January 14, 2009, as amended and restated (the "Initial Order"). Ernst & Young
     Inc. was appointed as the Monitor of the Applicants (the "Monitor") in the CCAA
     proceedings. The stay of proceedings was extended to January 30, 2010 by this
     Honourable Court in its Order dated December 18, 2009.

2.   Nortel Networks Inc. ("NNI") and certain of its U.S. subsidiaries concurrently filed
     voluntary petitions under Chapter 11 of Title 11 of the U.S. Bankruptcy Code (the
     "Code") in the United States Bankruptcy Court for the District of Delaware (the
     U.S. Court") on January 14, 2009 (the "Chapter 11 Proceedings") (collectively the

"U.S. Debtors").    As required by U.S. law, an official unsecured creditors committee (the "Committee") was established in January, 2009.

3.  An ad hoc group of holders of bonds issued by NNL and NNC has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "Bondholder Group").    In addition, pursuant to Orders of this Honourable Court dated May 27, 2009 and July 22, 2009, representative counsel was appointed on behalf of the former employees of the Applicants behalf of the continuing employees of the Applicants, respectively. Each of these groups is participating in the CCAA proceedings.

4.  Nortel Networks (CALA) Inc. ("NN CALA") filed a voluntary petition under Chapter 11 of Title 11 of the Code in the U.S. Court on July 14, 2009.

5.  Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries located in EMEA were granted administration orders (the "UK Administration Orders") by the High Court of England and Wales on January 14, 2009 (collectively the "EMEA Debtors"). The UK Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors, except for Ireland, to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "Joint Administrators"). On June 8, 2009, the Joint Administrators appointed in respect of NNUK filed a petition with the U.S. Court for recognition of the administration proceedings as they relate to NNUK (the "English Proceedings") under Chapter 15 of the Code. On June 26, 2009, the U.S. Court entered an order recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Code.

6.  On January 20, 2009, Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications Holdings (1997) Limited (together "NN Israel") were granted administration orders by the court in Israel (the "Israeli Administration Orders"). The Israeli Administration Orders appointed representatives of Ernst &

Young LLP in the UK and Israel as administrators of NN Israel and provided a stay of NN Israel's creditors which, subject to further orders of the Israeli Court, remains in effect during the administration.

7.   Subsequent to the Filing Date, Nortel Networks SA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

**PURPOSE**

8.   The purpose of this thirty-fifth report of the Monitor (the "Thirty-Fifth Report") is to report to this Honourable Court on the following matters:

   a)   consolidated cash position and liquidity as at January 2, 2010;

   b)   actual receipts and disbursements from November 29, 2009 to January 2, 2010;

   c)   cash flow forecast for the period from January 3 to April 24, 2010;

   d)   Canadian Funding and Settlement Agreement ("CFSA");

   e)   advanced pricing agreement;

   f)   NNI Loan Agreement;

   g)   current status of the Group Supplier Protocol Agreement ("GSPA");

   h)   status of foreign proceedings;

   i)   progress on restructuring;

   j)   request for an extension of the stay of proceedings until April 23, 2010; and

*147*

    k)   Advanced Pricing Agreement with Canada Revenue Agency.

**TERMS OF REFERENCE**

9.    In preparing this Thirty-Fifth Report, the Monitor has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with management of Nortel. The Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information and accordingly, the Monitor expresses no opinion or other form of assurance on the information contained in this Thirty-Fifth Report.

10.    Unless otherwise stated, all monetary amounts contained herein are expressed in U.S. dollars.

11.    Capitalized terms not defined in this Thirty-Fifth Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009 (the "Doolittle Affidavit"), the Pre-Filing Report, previous Reports of the Monitor or the CFSA.

12.    The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the voluntary proceedings under Chapter 11 of the Code are posted.

**GENERAL BACKGROUND**

13.    Since September 30, 2009, Nortel has conducted its global business through four reportable business unit segments: Wireline and Wireless Networks ("WN"), Metro Ethernet Networks ("MEN"), Carrier Voice Application Solutions ("CVAS") and LG Nortel Co. Ltd. ("LGN"). As of September 30, 2009, the Enterprise Solutions business was accounted for as a discontinued operation. The revenue and assets of each of the business units, except for LGN, are distributed among the multiple Nortel legal entities and joint ventures around the world.

**CONSOLIDATED CASH POSITION AND LIQUIDITY AS AT JANUARY 2, 2010**

14. At January 2, 2010, Nortel's consolidated cash balance was approximately $5.0 billion including $2.9 billion of total treasury cash. Nortel's consolidated cash balance is held globally in various Nortel entities and joint ventures. The following is an overview of Nortel's consolidated cash position as at January 2, 2010:

| Region | Gross Cash | Restricted | Unavaliable (JV's and Other Items) | Available Cash |
|---|---|---|---|---|
| NNL | 116 | (31) | (8) | 77 |
| Other Canada | 36 | (25) | - | 11 |
| | | | | |
| NNI | 941 | (26) | - | 915 |
| NNI - Reserve MMF (ST/LT) | 18 | - | (18) | - |
| Other US | 2 | - | - | 2 |
| **North America** | 1,113 | (82) | (26) | 1,005 |
| | | | | |
| NN UK Limited | 370 | (26) | - | 344 |
| Other EMEA Filed Entities | 394 | (12) | - | 382 |
| JV - Netas | 66 | - | (66) | - |
| EMEA non-filed entities | 25 | - | - | 25 |
| **UK/Europe** | 855 | (38) | (66) | 751 |
| | | | | |
| Greater China | 198 | (8) | - | 190 |
| Other ASIA PAC (excl JVs) | 254 | (1) | - | 253 |
| LG Nortel | 250 | - | (250) | - |
| Other JVs | 122 | - | (122) | - |
| **ASIA** | 824 | (9) | (372) | 443 |
| | | | | |
| NN CALA | 82 | - | - | 82 |
| CALA non-filed entities | 66 | - | - | 66 |
| **Cala** | 148 | - | - | 148 |
| | | | | |
| **Total Treasury Cash** | **2,940** | **(129)** | **(464)** | **2,347** |
| | | | | |
| **Divestiture Proceeds** | 2,059 | (2,059) | - | - |
| | | | | |
| **Total Cash** | **4,999** | **(2,188)** | **(464)** | **2,347** |

15. As at January 2, 2010, North America had cash available for operations and post-filing inter-company settlements of approximately $1.0 billion compared to a gross cash position of approximately $1.1 billion. Of the $1.0 billion, approximately $88 million is held by Canadian entities and approximately $917 million is held by U.S. entities.

16. None of the Applicants' Restricted Cash and Unavailable Cash is readily available to them. Restricted Cash relates primarily to: (i) $15 million of cash collateral posted by Nortel in support of non-EDC performance bonds and letter of credit facilities; (ii) $11 million held in the D&O Trust as detailed in the Pre-Filing Report; (iii) $10 million held in escrow related to the settlement of the Global Class Action; (iv) $8 million posted in support of the EDC performance bonds issued in exotic foreign currencies; (v) $6 million of cash collateral posted with EDC in support of post-filing performance bonding; (vi) $4 million held in relation to benefits paid through the Health and Welfare Trust (the "H&WT"); and (vii) $2 million held in escrow in respect of a certain real estate leases. Unavailable Cash relates to $8 million from the sale of the Strandherd Lands.

17. NNI's Restricted Cash relates primarily to: (i) a deposit of $10 million held by NNI in respect of the sale of the GSM assets; (ii) $4 million of cash collateral posted by Nortel in support of non-EDC performance bonds and letter of credit facilities; (iii) $1 million held in escrow for the benefit of utility providers in accordance with the First Day Order; and (iv) $11 million held in trust related to a payment to Flextronics as part of the Flextronics Settlement and Release Agreement. NNI's Unavailable Cash as at January 2, 2010 includes $18 million related to the Money Market Reserve Primary Fund ("MMF"). Since filing, $47 million has been recovered from the MMF.

18. The U.K. Administrators, on behalf of NNUK and the other EMEA Debtors, had available cash for operations and post–filing inter-company settlements of approximately $726 million. The EMEA non-filed entities had available cash of

approximately $25 million which is expected to be used primarily to fund their in-country operations and inter-company settlements.

19. NETAS, a joint venture in which Nortel owns a 53% interest, had approximately $66 million of cash of which approximately $35 million represents Nortel's proportionate share. Nortel believes these funds will continue to be used to fund NETAS's operations. Repatriation of these funds requires approval of the respective joint venture partners.

20. Nortel entities in the APAC region have approximately $443 million of available cash for operations and inter-company settlements. As a result of the regulatory regime in the People's Republic of China, the funds in Greater China of approximately $190 million are generally only available to fund operations within Greater China and inter-company settlements. LGN and other joint ventures of which Nortel is a participant held approximately $372 million of unavailable cash of which $190 million represents Nortel's proportional share. Repatriation of these funds requires approval of the respective joint venture partners.

21. NN CALA's available cash was $82 million. The CALA non-filed entities held approximately $66 million of available cash which is expected to be used to fund their in-country operations and inter-company settlements.

22. Divesture proceeds of $2.059 billion are being held in escrow until an agreement is reached regarding the allocation of these proceeds to various Nortel legal entities, including NNL. These divestiture proceeds relate to:

    a) amounts held by JPMorgan Chase Bank, N.A. in escrow including:

        i. $1.026 billion from the sale of CDMA business/LTE Access assets;

        ii. $18 million from the sale of the Layer 4-7 Business;

7

    iii.  $9.86 million from the sale of the Next Generation Packet Core business; and

    iv.  $874 million from the sale of Enterprise assets;

b)  an amount of $70 million held in escrow by CitiBank relating to the sale of CDMA business/LTE Access assets pursuant to the respective asset purchase agreement. These divestiture proceeds include $50 million in support of the related Transition Service Agreements (the "TSA's") and $20 million subject to finalization of the related working capital adjustment; and

c)  an amount of $60.6 million held in escrow by Wells Fargo Bank relating to the sale of the Enterprise assets pursuant to the respective asset purchase agreement. These divestiture proceeds include:

    i.  $30 million in support of the finalization of purchase price adjustments;

    ii.  $25 million subject to the delivery by Nortel of the unaudited Enterprise profit and loss statement for the period October 1 to December 18, 2009; and

    iii.  $5.6 million subject to the resolution of certain succession tax liabilities in France.

23.  The consolidated cash position balances presented above do not reflect deposits of $38 million received from Ciena Inc. with respect to the sale of the MEN assets.

## ACTUAL RECEIPTS AND DISBURSEMENTS FROM NOVEMBER 29, 2009 TO JANUARY 2, 2010

24.  The Applicants' actual consolidated net cash outflow for the period November 29, 2009 to January 2, 2010 was $75.5 million. A summary of the actual receipts and

*152*

disbursements, as compared to the forecast filed with the Thirty-Third Report (the "Thirty-Third Report Forecast"), is attached at Appendix "A".

25. Actual net cash outflow was more than forecast by $38.6 million. Significant items contributing to this negative variance were as follows:

a) a positive permanent variance of $2.8 million with respect to the collection of accounts receivable primarily resulting from higher than forecast sales;

b) payroll and accounts payable reimbursement from the buyers of the CDMA business/LTE Access assets and Enterprise Solutions business were lower than forecast by $10.8 million due to the actual spend on payroll and accounts payable payments on behalf of the buyers also being lower than forecast by $10.8 million, resulting in no net variance;

c) a negative net timing variance of approximately $5.8 million with respect to net inter-company receipts and disbursements primarily as a result of the NNI Loan Agreement interest of $3.1 million being paid earlier than originally forecast and lower than forecast inter-company receipts from NNI of $2.8 million due to a backlog in unmatched invoices. This is partially offset by increased inter-company recoveries from NNI and NNUK of $2.9 million on account of increased trade payable settlements;

d) a negative timing variance of $4.5 million with respect to payroll primarily as a result of payroll source deductions of $3.4 million originally forecast to be paid in the first week of January that were actually remitted in the last week of December;

e) a negative permanent variance of $10.0 million with respect to inventory disbursements as a backlog of unsettled post filing contract manufacturer invoices were cleared in December 2009. Of this amount, approximately $2.9

million was recovered from NNI and NNUK via inter-company settlements as noted above; and

    f)  a negative timing variance of $19.6 million with respect to non-inventory purchases primarily due to higher than forecasted volume of vendor invoices being processed at year end.

26.  Available Cash was higher than forecast by approximately $1.1 million as a result of a favourable foreign exchange translation on Canadian dollar denominated cash balances due to the appreciation of the Canadian dollar relative to the U.S. dollar during the period.

**CASH FLOW FORECAST FOR THE PERIOD JANUARY 3 TO APRIL 24, 2010**

27.  Nortel, with the assistance of the Monitor, has prepared an updated 16-week cash flow forecast for the period January 3 to April 24, 2010 (respectively, the "January 3 Forecast" and the "Forecast Period"). A copy of the January 3 Forecast is attached as Appendix "B".

28.  As at January 2, 2010, the Applicants have Available Cash balances of approximately $87.1 million, excluding Restricted Cash and Unavailable Cash of approximately $64.6 million.

29.  Based on the January 3 Forecast, it is anticipated the Applicants will have total receipts of $371.0 million (including receipts in respect of the CFSA of $191.8 million) and total disbursements of $323.2 million resulting in a net cash inflow of $47.8 million during the Forecast Period.

30.  During the Forecast Period, it is assumed NNL does not make any additional draws pursuant to the NNI Loan Agreement (as herein defined) beyond the $75 million drawn prior to February 1, 2009.

*154*

31. The significant assumptions in respect of the Forecast Period used in preparing the January 3 Forecast include the following:

    a) remittances from NNI totalling $191.8 million pursuant to the CFSA;

    b) the impact of the divestiture of the CDMA business/LTE Access assets (which closed on November 13, 2009) and Enterprise Solutions business (which closed on December 18, 2009);

    c) receipts with respect to monthly billings to buyers of the CDMA business/ LTE Access assets and Enterprise Solutions business for transition services provided by the Applicants pursuant to their respective transitional services agreements ("TSA Recoveries");

    d) no additional business units will close within the Forecast Period. As a result of the significant operational, financial and transition preparation work, including various government and regulatory approvals required to close the pending sale transactions, Nortel cannot estimate, with a high degree of certainty, the closing dates for the remaining sale transactions. The closing of the MEN, CVAS or GSM sale transactions prior to April 24, 2010, would each individually have a positive impact on the Applicants' cash flow and forecast April 24, 2010 ending cash balance. The extent of the impact on the Forecast Period is dependent on the actual closing date. The range of monthly cash savings related to the divestiture of each of the business units is estimated as follows:

        i. MEN - $10 to $15 million

        ii. CVAS - $4 to $6 million; and

        iii. GSM/GSM-R - $1 to $3 million.

If the closing dates for the sales transactions occur after March 31, 2010, the CFSA provides for an adjustment thatwould result in additional recoveries by NNL from NNI.    If the closing dates occur before March 31, 2010, an adjustment under the CFSA would result in a reduction in the funding from NNI to NNL;

e)  payroll and accounts payable disbursements relating to the CDMA business and LTE Access assets continue to be administered by Nortel subsequent to closing of the Ericsson sale transaction. During this transition period and in accordance with the relevant asset purchase agreement, Ericsson will pre-fund these expenses to Nortel resulting in no material working capital impact. The transition period for payroll concluded on December 31, 2009, whereas the administration of accounts payable disbursements is assumed to continue throughout of the Forecast Period;

f)  Avaya is responsible for payroll and accounts payable disbursements relating to the Enterprise assets sold to it. Avaya assumed this responsibility on December 18, 2009;

g)  sale proceeds from the CDMA business/LTE Access assets and Avaya transactions and from the pending sale of the other business unit transactions continue to be held or are paid into escrow and are not reflected in the January 3 Forecast;

h)  accounts receivable collections, including collection of residual accounts receivable not acquired by the purchasers as part of the divestiture of the CDMA business/ LTE Access assets, is consistent with revenue forecasts and historic customer collection experience that has been estimated by the Applicants' collection group;

12

156

i) all disbursements are made assuming pre-filing amounts owed to suppliers are stayed and post-filing amounts are paid on significantly reduced credit terms as a result of the CCAA proceedings;

j) inter-company trade accounts for post-filing transactions continue to settle on a cash basis between the Applicants, U.S. Debtors, EMEA Debtors and other Nortel entities. Inter-company pre-filing trade accounts and loans between the Applicants and all other Nortel filed and non-filed entities are stayed;

k) payroll includes payment of estimated Q4 2009 AIP;

l) pension funding continues for both current and special service payments in the ordinary course with respect to the registered defined benefit and defined contribution plans. Funding for non-registered pension or other retirement plans is stayed;

m) funding continues in the ordinary course for the H&WT; and

n) all interest payments relating to the Company's pre-filing indebtedness are stayed. Interest with respect to the post filing NNI Loan continues to accrue, the next cash payment in respect of accrued interest is in July 2010 and the term of the NNI Loan is extended to December 31, 2010.

32. Based on an analysis prepared by the Monitor, it appears NNL has sufficient cash resources to fund operations through April 23, 2010.

*157*

## CANADIAN FUNDING AND SETTLEMENT AGREEMENT[1]

*Background*

33.  The continued viability of the Applicants is necessary to the Nortel group of companies as NNL provides corporate administrative and management support to its affiliates on a global basis, is contractually obligated to provide transition services to the various purchasers of Nortel's global assets and NNL is the legal owner of substantially all of Nortel's intellectual property, which is licensed to its affiliates. In addition, a significant portion of Nortel's R&D activity, which is necessary to support the on-going business of Nortel, continues to be conducted by the Applicants.

34.  The Interim Funding and Settlement Agreement (the "IFSA"), which was approved by this Honourable Court on June 29, 2009, provided, among other things, funding to NNL from NNI for the period from the Filing Date to September 30, 2009. The funding was in satisfaction of any claims NNL may have against NNI for reimbursement of corporate overhead and R&D costs, whether pursuant to the TPA or otherwise, incurred by NNL on behalf of NNI during such period. The total amount of such funding received by NNL from NNI is $187.4 million.

35.  No similar funding has been provided by NNI to NNL in respect of the period subsequent to September 30, 2009, although the Applicants have continued to incur the cost of significant R&D activities and corporate support on behalf of NNI. Absent further funding to reimburse these costs and settle other matters, the Applicants are forecast to incur cash disbursements in excess of cash receipts of approximately $149.6 million during the Forecast Period.

---

[1] Certain terms used in this section of the Report, which have not been defined herein, shall have the same meaning as ascribed to them in the CFSA.

36.  The CFSA represents the successful conclusion of extensive negotiations between the Applicants, U.S. Debtors, Monitor, Committee and Bondholder Group in addressing certain issues, which include:

   a) forecasting liquidity requirements of the Applicants;

   b) enabling NNI, on behalf of itself and the other U.S. Debtors (which for clarity excludes NN CALA, as it is not part of the CFSA), to settle any claims of NNL for reimbursement of corporate overhead, research and development or other obligations, whether pursuant to the TPA or otherwise, incurred by NNL for the benefit of those U.S. Debtors during the period from October 1, 2009 through the later of the conclusion of the Canadian Proceedings or the consummation of the wind-down of the Applicants' estates (respectively, the "Covered Obligations" and the "Settlement Period");

   c) resolving outstanding Advanced Pricing Agreement ("APA") issues with respect to the taxation years 2001 through 2005 as described in more detail below; and

   d) establishing the net pre-filing claim amount between the Applicants and the US Debtors.

***Significant terms of the CFSA***

37.  A summary of the significant terms of the CFSA is provided in the following sub-paragraphs. Reference should be made directly to the CFSA, a redacted copy of which is attached as Appendix "C" hereto, for capitalized terms not otherwise defined and for a complete understanding of the terms of the agreement. A confidential non-redacted copy of the CFSA is attached as Appendix "D" to this Report. As the confidential non-redacted copy of the CFSA contains sensitive financial information, the Monitor supports the Applicants' request that confidential Exhibit "D" to this Thirty-Fifth report be sealed by this Honourable Court.

*159*

*NNI Funding and Settlement*

a) NNI shall pay to NNL an amount equal to $190.8 million (the "Settlement Payment") of which $156.1 million is to be paid within 3 business days following the satisfaction of all of the conditions and the effective date of the agreement. The remaining $34.7 million is to be paid in 4 instalments during 2010 as outlined in Annex C to the CFSA;

b) a portion of the Settlement Payment is subject only to the following:

   i. adjustments for actual closing dates of the various business units;

   ii. adjustments for actual D&O insurance premiums and public company reporting expenditures; and

   iii. a true-up to the allocation of corporate overhead costs between the Applicants and the U.S. Debtors based on the ultimate relative allocation of sale proceeds between the parties from the divestiture of the five primary business units (CDMA business/LTE Access assets, Enterprise, MEN, GSM and CVAS), the Passport business and the interest in LG Nortel;

c) the Settlement Payment represents:

   i. the maximum payment the U.S. Debtors may or could owe in respect of the Covered Obligations for the Settlement Period;

   ii. the maximum post-filing or administrative claim (or such other applicable priority claim) that any of the Applicants may have or could assert against the U.S. Debtors in any Proceeding with respect to the Covered Obligations; and

   iii. constitutes a full and final settlement of any and all Covered Obligations;

16

*160*

d) M&A Costs are to be treated as transaction costs and are to be recovered from the relevant sale or transaction proceeds. No recoveries have been included during the Forecast Period;

e) the Applicants agree to indemnify the U.S. Debtors, from and against any and all claims, damages, taxes, and expenses resulting from a claim, demand, lawsuit, action or proceeding relating to the Settlement Payment, Transfer Pricing Payments in respect of the Settlement Period or the Covered Obligations;

*Advance Pricing Agreement*

f) NNL shall, in a timely manner, enter into an APA with Canada Revenue Agency (the "CRA APA" and "CRA", respectively) that will apply to the taxation years beginning January 1, 2001 and ending December 31, 2005 and shall be acceptable in form and substance to NNI, the Committee and the Bondholder Group;

g) NNI shall, in a timely manner, enter into an APA with U.S. Internal Revenue Service (the "IRS APA" and "IRS", respectively), that will apply to the taxation years beginning January 1, 2001 and ending December 31, 2005 and shall be acceptable in form and substance to NNL, the Monitor, the Committee and the Bondholder Group;

h) each of NNL, the Monitor and NNI shall cooperate with each other in finalizing the terms and conditions of the CRA APA and the IRS APA;

*NNI Claim*

i) NNL and NNI agree that a $2.0627 billion pre-filing claim in the Canadian Proceedings shall be established in favour of NNI (the "NNI Claim") for the full and final settlement of the following:

17

161

i.   any claims of the U.S. Debtors against the Applicants for overpayments to the Applicants under the Transfer Pricing Agreements for the period from January 1, 2001 to December 31, 2005 whether or not resulting from any adjustment of taxable income of the U.S. Debtors as determined by the IRS;

ii.  certain claims of NNI against NNL due and owing under the Revolving Loan Agreement dated as of March 21, 2008; and

iii. any claims of the Applicants (A) for corporate overhead, research and development costs or such other alleged payment or cost reimbursement obligations pursuant to Transfer Pricing Agreements or otherwise, incurred by any Applicant for the benefit of the U.S. Debtors for the period prior to the Petition Date or (B) relating to pre-petition inter-company trading of goods and services;

j)   the priority of the NNI Claim shall be as follows:

i.   (i) $2 billion of the NNI Claim shall be a pre-petition unsecured claim against NNL ranking pari passu with other unsecured pre-petition claims against NNL; and

ii.  (ii) the remaining $62.7 million of the NNI Claim shall constitute the remainder of the secured Revolver Claim (the "Remaining Revolver Claim") and shall continue to have the benefit of the court-ordered charge in the Canadian Proceedings relating to the Revolving Loan Agreement;

k)   under no circumstances shall the NNI Claim be subject to any offsets or counterclaims;

*162*

l) the Parties agree that NNI and the other U.S. Debtors shall retain the right to assert Claims against the Applicants relating to the period prior to the Filing Date, provided, however, the U.S. Debtors shall have no right to assert any NNI TPA Claim or Revolver Claim (other than the Remaining Revolver Claim) against the Applicants (such pre-petition Claims but excluding the NNI Claim (including Remaining Revolver Claim), NNI TPA Claim or Revolver Claim, an "Additional NNI Claim"). Upon the filing of an Additional NNI Claim in the Canadian Proceedings or subsequent proceedings, the waivers of the Applicants' pre-filing claim against the U.S. Debtors under Section 12 of the CFSA shall automatically terminate and shall be of no further force and effect and the Applicants shall have the right to defend against such Additional NNI Claim, assert counter-claims against the U.S. Debtors in the Canadian Proceedings or subsequent proceedings with regards to such Additional NNI Claim, and assert any additional Claims against the U.S. Debtors in the US Proceedings or subsequent proceedings (the filing of Additional NNI Claims, however, shall have no impact on the Applicants' waivers of their setoff/counter-claim right against the NNI Claim);

m) the Parties hereby agree that (i) the Applicants shall not establish a deadline for the filing of claims by the U.S. Debtors in the Canadian Proceedings and (ii) no U.S. Debtor shall establish a deadline for the filing of claims by the Applicants in the US Proceedings, without the prior written consent of all other Parties to the CFSA and the Committee and Bondholder Group, which consent shall not be unreasonably withheld or delayed;

*General Provisions*

n) the Applicants and the U.S. Debtors agree to work with the Monitor, the Committee and the Bondholder Group to develop and timely seek approval from each of the Courts of a cross-border claims protocol and claims

19

resolution procedures for the resolution of claims filed in the Canadian Proceedings and the U.S. Proceedings;

o)  one of the conditions precedent to the CFSA becoming effective is the extension of the Amended and Restated Revolving Loan Agreement dated March 27, 2009 among NNL, NNI and Nortel Networks Technology Corporation (the "NNI Loan Agreement") through to December 31, 2010;

p)  except as provided in the CFSA, nothing in the CFSA shall constitute an amendment, modification or waiver of rights of any Party (i) under any other agreement, including, without limitation, the Transfer Pricing Agreements, applicable law or otherwise, or (ii) with respect to any potential tax contingencies, assessments, rulings or agreements arising from Transfer Pricing Payments pursuant to the Transfer Pricing Agreements or any offset arising therefrom or otherwise; provided, however, that the Parties waive any and all rights to object to or otherwise seek to amend or revisit (A) any payments made pursuant to the CFSA, (B) the APAs, (C) the allowance of the NNI Claim in the Canadian Proceedings or (D) the waiver by the Applicants and the Monitor of their rights to setoff or in any way reduce the amount of the NNI Claim (including the Remaining Revolver Claim); and

q)  neither the Applicants nor the U.S. Debtors will exercise a right of termination under the Master R&D Agreement without the prior written consent of the other Parties to the CFSA and the Committee and Bondholder Group.

**ADVANCED PRICING AGREEMENT**

38.  In addition to Canadian funding requirements, the CFSA addresses certain tax issues outstanding between NNL and NNI. The period from 2001 to 2005 has been under review by the taxing authorities in both Canada and the United States for several years.

*164*

39.  After extensive discussion and review of Nortel's transfer pricing structure, NNL and NNI have agreed that certain transfer pricing overpayments by NNI to NNL occurred during the 2001 to 2005 period and have agreed to a $2 billion inter-company adjustment to satisfy this overpayment, subject to the satisfaction of certain conditions, including approvals of this Honourable Court and the US Court.

40.  Pursuant to the terms of the CFSA, which are outlined in more detail below, each of NNL and NNI is to enter into an APA with its respective taxing authority that will apply to the taxation years beginning on January 1, 2001 and ending on December 31, 2005. The respective APAs will provide for a negative adjustment to NNL's income of $2 billion and a positive adjustment to NNI's income of $2 billion during this period.

41.  The resolution of the transfer pricing overpayment and related tax issues was a necessary condition in order to reach an agreement on the funding and cost reimbursement to the Applicants.

**NNI LOAN AGREEMENT**

42.  The NNI Loan Agreement, which provided for a post-filing revolving loan facility, under which NNI could loan up to $200 million to NNL ("NNI Loan"), was approved pursuant to the provisions of the Initial Order. As at December 31, 2009, $75 million is outstanding on the NNI Loan. As part of executing the CFSA, the term of the NNI Loan Agreement was, pursuant to an amending agreement dated December 23, 2009, extended to March 31, 2010. Subject to approval of this Honourable Court and the U.S. Court, the parties have agreed to extend the term of the NNI Loan Agreement until December 31, 2010, with an option to further extend the Term until June 30, 2011 upon prior written consent of the Lender, the Monitor, the Committee and the Bondholder Group (the "NNI Loan Amendment"). The NNI Loan Amendment is attached as Appendix "E".

*165*

**CURRENT STATUS OF GSPA**

43. Since the Filing Date, Nortel entities have continued to purchase goods and services from one another on a basis consistent with the operation of the business prior to these proceedings. Post-filing transactions between the U.S. Debtors and the Applicants are pursuant to court orders entered in the Canadian Proceedings (e.g. the Initial Order) and the Chapter 11 Proceedings and/or in accordance with the Code (together, the "Trading Orders"). Trade between the EMEA Debtors and the Applicants is pursuant to the GSPA. The GSPA has continued to be extended by the parties, substantially in the same form as the initial GSPA.

44. The purpose of the Trading Orders and GSPA is to ensure goods and services purchased after the Filing Date are paid in full without any set off, deduction, withholding, counter-claim or payment netting with respect to amounts owed as between the Nortel parties prior to the Filing Date. In addition, the Trading Orders and GSPA set out the requirement for the Applicants to secure any unpaid amount owing for post-filing purchases to the U.S. Debtors or EMEA Debtors by way of a charge on the assets of the Applicants (the "Inter-Company Charge").

45. The Applicants have previously sought and obtained approval of the first to twelfth extensions to the GPSA.

46. The Applicants are seeking this Honourable Court's approval of the thirteenth extension of the GSPA. The thirteenth extension of the GSPA expires on March 31, 2010. A copy of the GSPA is attached as Appendix "F". The Monitor supports the Applicants' request for approval of the thirteenth extension of the GSPA.

*166*

**STATUS OF FOREIGN PROCEEDINGS**

*Chapter 11*

47. The following is a summary of the court orders that have been issued and the financial information that has been filed in the U.S. Chapter 11 proceedings since the last update provided in the Monitor's Thirty-Third Report.

   a) On December 7, 2009, the U.S. Debtors filed the Debtor-in-Possession Monthly Operating Report for the period of October 2009.

   b) On December 15, 2009, the U.S. Debtors obtained orders:

      i. approving the U.S. Debtors' entry into a settlement agreement with International Business Machines Corporation; and

      ii. approving the U.S. Debtors' entry into a stipulation with NETtel Corporations, Inc.

   c) On December 16, 2009, the U.S. Debtors obtained an order approving the U.S. Debtors' entry into a stipulation with certain affiliates and the Pension Benefit Guaranty Corporation.

   d) On December 23, 2009, the U.S. Debtors filed:

      i. the Debtor-in-Possession Monthly Operating Report for the period of November 1, 2009 through November 28, 2009;

      ii. a motion to approve (a) the entry of Nortel Networks Inc. into a Settlement Stipulation with the Internal Revenue Service (the "IRS") and (b) the entry of the U.S. Debtors into an Advance Pricing Agreement with the IRS; and

     iii.  a motion to approve the entry of the U.S. Debtors into the Canadian Funding and Settlement Agreement;

e)  On January 6, 2010, the U.S. Debtors obtained orders:

     i.  approving the employment and retention of John Ray as the Principal Officer of the U.S. Debtors; and

     ii.  approving the U.S. Debtors' entry into the China Side Agreement related to the sale of CDMA business and LTE-related assets; and

f)  On January 8, 2010, the U.S. Debtors obtained an order approving the "stalking horse" asset sale agreement with GENBAND, Inc. for the sale of substantially all of the assets of the Carrier VoIP and Application Solutions (CVAS) business. The court order also established bidding procedures for an auction that allows qualified bidders to submit higher or otherwise better offers.

### Chapter 15

48.  Since the last update in the Thirty-Third Report, the Monitor has continued to file with the U.S. Court and serve on required parties notices of each of its reports to this Honourable Court.

49.  Pursuant to section 12(d) of the Cross-Border Protocol entered in these proceedings and the Chapter 11 Proceedings for the U.S. Debtors, the Monitor has, in advance of any joint-hearing, filed in the Chapter 11 Proceedings the relevant motion records submitted to this Honourable Court.

### NNSA

50.  NNSA acceded to the sixth and a seventh deed to the GSPA, pursuant to a deed of accession dated June 17, 2009 and has become a party to each subsequent extension

up to and including the twelfth extension of the GSPA. NNSA has reversed a right to terminate participation in the GSPA on five days prior notice. It is anticipated that NNSA will become a party to the thirteenth extension on similar terms.

51. As discussed in greater detail below, NNSA acceded to the APAC Agreement on December 24, 2009.

**PROGRESS ON RESTRUCTURING**

52. Nortel continues to assess a range of restructuring alternatives in consultation with their legal and financial advisors with respect to the sale of its remaining assets while at the same time exploring other options in the event it cannot maximize value through a sales transaction.

*Enterprise Solutions Sale*

53. The sale transaction was approved by this Honourable Court and the U.S. Court on September 16, 2009 and closed on December 18, 2009 generating proceeds in the amount of $874 million which are being held in escrow as discussed in paragraph 22(a)(iv).

*Carrier Voice Application Solutions Business Sale*

54. On January 6, 2010, this Honourable Court and the U.S. Court approved a "stalking horse" asset sale agreement between NNC, NNL, NNI and other parties identified therein with GENBAND Inc. for substantially all of Nortel's CVAS assets as well as approving a related sales process, auction and bidding procedures. The purchase price of $282 million is subject to balance sheet and other adjustments currently estimated to reduce the purchase price by $100 million. The terms and provisions of the agreement are more fully addressed in the Monitor's Thirty-Fourth Report.

*APAC Agreement*

55. The APAC Agreement was approved by this Honourable Court on December 2, 2009. On December 24, 2009, NNSA acceded to the APAC Agreement and on December 17, 2009, the UK Administrator waived its right to seek U.K. court approval. Except with respect to certain regulatory conditions relating to certain parties to the APAC Agreement, all conditions have now been met and the APAC Agreement has become effective.

56. Initial Payments to the Applicants by the APAC entities, as contemplated under the APAC Agreement, have now been received. The Applicants have received a total of $15.3 million of Initial Payments.

*Appeal of June 18, 2009 Order*

57. On November 26, 2009, the Court of Appeal for Ontario dismissed the appeals of the CAW-Canada and the former employees of the Applicants relating to termination and severance pay as well as payments under various retirement benefit plans. A copy of the decision of the Court of Appeal for Ontario is available on the Monitor's website. On December 23, 2009, the former employees filed an application for leave to appeal the decision to the Supreme Court of Canada. The interested parties have now agreed to a timetable for the service and filing of materials with respect to the leave to appeal application. A decision on the leave to appeal application is not anticipated until at least late February 2010.

*Employee hardship application process*

58. On July 30, 2009, an order was issued by this Honourable Court approving an employee hardship application process (the "Employee Hardship Order") described in the Monitor's Sixteenth Report and the Affidavit of John Doolittle dated July 24, 2009.

59. On December 18, 2009, this Honourable Court approved the Applicants' request to extend the Application Period until January 31, 2010 and that the eligibility requirements in respect of the Employee Hardship Process, as set out in the form attached as Appendix "G", be amended to reflect the Extension Date.

60. The Monitor is continuing to administer the hardship payment application process and report thereon to the relevant representative counsel. There remains $669,182 of the $750,000 originally provided for under the Employee Hardship Order. Applications continue to be received from former employees of the Applicants who are asserting financial hardship as a result of illness, healthcare costs or ineligibility for pension or employment insurance benefits.

61. While those individuals awarded hardship payments should also have claims against the Applicants in the CCAA proceedings, it is not anticipated that any distributions under a plan of compromise or arrangement will occur in the near term. Accordingly, the Monitor supports the Applicants' request that the Application Period be extended until and including April 23, 2010 and that Eligibility Requirements and the Procedure With Respect To Hardship Payment Applications be amended accordingly.

**REQUEST FOR AN EXTENSION TO THE STAY OF PROCEEDINGS**

62. The Stay Period presently expires on January 29, 2010. The Applicants are seeking an 84 day extension of the Stay Period until and including April 23, 2010.

**CRA APA**

63. As part of the CRA APA and related documents, NNL and the Monitor are required to maintain confidentiality of the details of the CRA APA and related documents and discussions.

64. The Monitor intends to file the confidential CRA APA under seal to provide additional supporting information solely for this Honourable Court. Nortel and the

27

Monitor will be requesting the CRA APA be sealed by this Honourable Court in its entirety.

**MONITOR'S ANALYSIS AND RECOMMENDATIONS**

65. The Monitor has assisted and continues to assist the Applicants in their efforts to review operations and assess a range of restructuring alternatives in consultation with their legal and financial advisors. The Monitor believes the Applicants are working diligently and in good faith and continue to progress towards the development of a Plan.

66. The Monitor supports the Applicants' request to have the CFSA and the CRA APA approved by this Honourable Court.

67. The Monitor supports the Applicants' request to have the confidential Appendix "D" to this Thirty-Fifth Report sealed pending further Order of this Honourable Court.

68. The Monitor has reviewed the amounts comprising the $2.0627 NNI Claim, including the Transfer Pricing overpayment and tax issues relating to the $2 billion adjustment. The Monitor supports the Applicants' request to establish the $2.0627 billion NNI Claim, subject to the following priorities upon approval of this Honourable Court:

   a) $2 billion shall be a pre-filing unsecured claim against NNL ranking pari passu with other unsecured pre-filing claims against NNL; and

   b) the Remaining Revolver Claim totalling $62.7 million shall continue to have the benefit of the court-ordered charge in the Canadian Proceedings relating to the Revolving Loan Agreement.

69. Based upon the key assumptions used in the preparation of the Applicants' January 3 Forecast, it is the Monitor's view the Applicants will have sufficient cash resources to fund their operations through April 23, 2010 permitting them to:

   a) make further progress in their efforts to complete and close the sales of the GSM/GSM-R, Metro Ethernet Network, and Carrier Voice Application Solutions businesses; and

   b) pursue the sale of their other businesses or develop alternative restructuring strategies as appropriate.

70. The Monitor supports the Applicants' request:

   a) to have the thirteenth extension to the GSPA approved by this Honourable Court;

   b) that the period for receipt of hardship applications be extended until and including April 23, 2010 and the eligibility requirements in respect of the Employee Hardship Process as set out in the form attached as Appendix "G" be amended to reflect the Extension Date; and

   c) for approval of the NNI Loan Amendment.

71. For the reasons outlined in this report, the Monitor supports the Applicants' request for an extension of the stay to April 23, 2010.

*173*

All of which is respectfully submitted this 18th day of January, 2010.

**ERNST & YOUNG INC.**
**In its capacity as Monitor of the Applicants**

Per:
Murray A. McDonald
President

30

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

Court File No: 09-CL-7950

---

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

Proceeding commenced at Toronto

---

### THIRTY-FIFTH REPORT
### OF THE MONITOR
### DATED JANUARY 18, 2010

---

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

Jay A. Carfagnini  (LSUC#: 222936)
Joseph Pasquariello (LSUC# 37389C)
Christopher G. Armstrong (LSUC# 55148B)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

# APPENDIX "H"

# [ATTACHED]



**KOSKIE**
**MINSKY**LLP
BARRISTERS & SOLICITORS

April 30, 2014

**Mark Zigler**
Direct Dial: 416-595-2090
Direct Fax: 416-204-2877
mzigler@kmlaw.ca

**VIA E-MAIL**

*SERVICE LIST*

Dear Sirs/Mesdames:

> **Re:** **Nortel Allocation Litigation re: Open Trial and Confidentiality Orders**
> **Our File No.: 09/0479**

We write to you with respect to the position of the Canadian Creditors Committee ("CCC") in respect of the attempts to seal evidence and materials for the pending Nortel Allocation Trial.

Pursuant to the Protective Order dated June 11, 2013, at Article 8(d) it was made clear that any "Confidential" or "Highly Confidential" discovery material at trial is not governed by the prior Protective Order. The parties were to meet and confer and seek instructions from the Court on this matter.

As was evident at the April 22nd pre-trial conference last week, we believe that both Courts wish to have an open trial and that the onus is on any party seeking to have any documents sealed to show cause to the Courts why it should be sealed. To date we have received no list of documents which must remain confidential and material is being filed with the Court under seal. We start from the premise that this is an open trial and there is no basis for filing any affidavits or trial briefs under seal, as well as any other exhibits.

In summary, our position is as follows:

1. This should be an open trial, so that all affidavits, trial briefs, testimony and exhibits are public and can be made available to anyone in attendance or in receipt of transcripts including all pension plan members and other former employees affected by this case;

2. It is clear that any previous Confidentiality Orders were only applicable with respect to the discovery process and do not govern material at the trial;

3. The onus is on any party seeking to have any documents at trial sealed to show cause to both Courts why this should be the case. Any such Orders should be strictly limited to special circumstances.

We understand that the Canadian Debtors and U.S. Debtors will be bringing motions returnable on May 8th to seek sealing or redaction Orders in respect of certain documents and that any



Page 2

affected third parties have been notified.   We reserve the right to object to any sealing or redaction Orders.

Yours truly,
**KOSKIE MINSKY LLP**

Mark Zigler
MZ/ll

Copy to:          Don Sproule
                  David Archibald
                  Michael Campbell
                  Susan Kennedy

1087120v4

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

Court File No. 09-CL-7950

## *ONTARIO*
## SUPERIOR COURT OF JUSTICE
### (Commercial List)

Proceeding commenced at Toronto

## ONE HUNDRED AND FIFTH REPORT OF THE MONITOR DATED MAY 2, 2014

| | |
|---|---|
| **GOODMANS LLP**<br>Barristers & Solicitors<br>333 Bay Street, Suite 3400<br>Toronto, Canada M5H 2S7<br><br>Jay A. Carfagnini (LSUC #: 22293T)<br>jcarfagnini@goodmans.ca<br>Alan Mark (LSUC #: 21772U)<br>amark@goodmans.ca<br>Jessica Kimmel (LSUC #: 32312W)<br>jkimmel@goodmans.ca<br>Peter Ruby (LSUC #: 38439P)<br>pruby@goodmans.ca<br>Joseph Pasquariello (LSUC #: 37389C)<br>jpasquariello@goodmans.ca<br><br>Tel:  416.979.2211<br>Fax:  416.979.1234<br><br>**Lawyers for the Monitor, Ernst & Young Inc.** | **Gowling Lafleur Henderson LLP**<br>Barristers & Solicitors<br>1 First Canadian Place<br>100 King Street West, Suite 1600<br>Toronto, ON M5X 1G5<br><br>Derrick Tay (LSUC #: 21152A)<br>derrick.tay@gowlings.com<br>Jennifer Stam (LSUC #: 46735J)<br>Jennifer.stam@gowlings.com<br><br>Tel:  416.862.5697<br>Fax:  416.862.7661<br><br>**Lawyers for the Canadian Debtors** |

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.***

Court File No. 09-CL-7950

---

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (Commercial List)

Proceeding commenced at Toronto

---

### MOTION RECORD
### (Use of Documents at Trial )
### (returnable May 8, 2014)

---

| | |
|---|---|
| **GOODMANS LLP** | **Gowling Lafleur Henderson LLP** |
| Barristers & Solicitors | Barristers & Solicitors |
| 333 Bay Street, Suite 3400 | 1 First Canadian Place |
| Toronto, Canada  M5H 2S7 | 100 King Street West, Suite 1600 |
| | Toronto, ON  M5X 1G5 |
| Jay A. Carfagnini (LSUC #: 22293T) | |
| jcarfagnini@goodmans.ca | Derrick Tay  (LSUC #: 21152A) |
| Alan Mark (LSUC #: 21772U) | derrick.tay@gowlings.com |
| amark@goodmans.ca | Jennifer Stam  (LSUC #: 46735J) |
| Jessica Kimmel (LSUC #: 32312W) | Jennifer.stam@gowlings.com |
| jkimmel@goodmans.ca | |
| Peter Ruby (LSUC #: 38439P) | Tel:  416.862.5697 |
| pruby@goodmans.ca | Fax:  416.862.7661 |
| Joseph Pasquariello (LSUC #: 37389C) | |
| jpasquariello@goodmans.ca | **Lawyers for the Canadian Debtors** |
| Tel:    416.979.2211 | |
| Fax:    416.979.1234 | |
| **Lawyers for the Monitor, Ernst & Young Inc.** | |

TOR_LAW\ 8184924\1