Court File No.  09-CL-7950

## ONTARIO

## SUPERIOR COURT OF JUSTICE

## (COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,* R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) | Case No. 09-10138 (KG) |
| NORTEL NETWORKS INC., *et al.,* | ) | (Jointly Administered) |
|  | ) |  |
| Debtors. | ) | Re: Docket No. 13461, 13462, 13463 |
|  | ) | Hearing:  May 8, 2014 @ 11:00 a.m. |

## BRIEF OF AUTHORITIES OF THE CANADIAN CREDITORS' COMMITTEE
(Canadian Creditors Committee's Response to Motions Seeking Sealing or Confidentiality Orders for Trial Submissions)
(Motion Returnable May 8, 2014)

May 5, 2014

**KOSKIE MINSKY LLP**
20 Queen Street West, Suite 900
Toronto, ON M5H 3r3

Mark Zigler/Ari Kaplan/Jeff Van Bakel
Tel. 416-595-2090
Fax. 416-204-2877

Lawyers for the Canadian Former Employees and Disabled Employees through their court appointed Representatives

**CAW-CANADA LEGAL DEPARTMENT**
205 Placer Court
Toronto, ON M2H 3H9

Barry Wadsworth
Tel: 416.495.3776
Fax: 416.495.3786

Lawyers for the Canadian Autoworkers Union

**SHIBLEY RIGHTON LLP**
**w/ NELLIGAN O'BRIEN PAYNE LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, ON M5H 3E5

Arthur O. Jacques/ Thomas McRae
Co-Counsel: Janice Payne / Steve Levitt
Tel: 416.214.5213/5206
Fax:416.214.5413/5400

Lawyers for active and transferred employees of
Nortel Canada

**McCARTHY TÉTRAULT LLP**
TD Bank Tower, Suite 5300
Toronto Dominion Centre
66 Wellington Street West
Toronto ON M5K 1E6

R. Paul Steep / James D. Gage / Barbara J. Boake
Tel: 416.601.7998
Fax: 416.868.0673

Lawyers for Morneau Shepell Ltd., as administrator
of the Nortel Canada registered pension plans

**PALIARE ROLAND ROSENBERG ROTHSTEIN LLP**
155 Wellington Street West, 35th Floor
Toronto, ON M5V 3H1

Ken Rosenberg / Lily Harmer / Massimo Starnino
Tel: 416.646.4300
Fax: 416.646.4301

Lawyers for the Superintendent of Financial
Services as Administrator of the Pension Benefits

Guarantee Fund

**DLA PIPER LLP (US)**

Selinda A. Melnik (DE 4032)
1201 N. Market Street, Suite 2100
Wilmington Delaware 19801
Telephone: (302) 468-5650
E-mail:  selinda.melnik@dlapiper.com

- and –

Richard Hans  (admitted *pro hac vice*)
Timothy Hoeffner (admitted *pro hac vice*)
Farah Lisa Whitley-Sebti (admitted *pro ha*)
1251 Avenue of the Americas
New York, NY 10020-1104
Telephone:  (212) 335-4500
E-mail:  richard.hans@dlapiper.com
E-mail:  timothy.hoeffner@dlapiper.com
E-mail:  farahlisa.sebti@dlapiper.com

*Counsel for the Canadian Creditors Committee*

Court File No.  09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS*
*ARRANGEMENT ACT,* R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) Case No. 09-10138 (KG) |
| NORTEL NETWORKS INC., *et al.,* | ) (Jointly Administered) |
| | ) |
| Debtors. | ) Re: Docket No. 13461, 13462, 13463 |
| | ) Hearing:  May 8, 2014 @ 11:00 a.m. |
| | ) |

**BRIEF OF AUTHORITIES OF THE CANADIAN CREDITORS' COMMITTEE**
(Canadian Creditors Committee's Response to Motions Seeking Sealing or Confidentiality
Orders for Trial Submissions)
(Motion Returnable May 8, 2014)

**INDEX**

**JURISPRUDENCE**

| TAB | DESCRIPTION |
|---|---|
| 1. | *Sierra Club*, 2002 SCC 41 |
| 2. | *Publow v. Wilson,* [1994] O.J. No. 3036 (Gen Div) |
| 3. | *Leucadia, Inc. v. Applied Extrusion Techs., Inc.*, 998 F.2d 157, 161 & n.6 (3d Cir. 1993) |
| 4. | *Ontario Council of Hospital Unions v. Ontario (Min. of Health)*, 85 O.R. (3d) 55 |

| 5.  | *MacIntyre v. Nova Scotia (Attorney General),* [1992] 1 S.C.R. 175 |
|-----|---------------------------------------------------------------------|
| 6.  | *Anderson v. St. Jude Medical Inc.,* 2010 ONSC 5191 |
| 7.  | *Fairview Donut Inc. v. TDL Group Corp.,* 2010 ONSC 789 |
| 8.  | *Hollinger Inc. v. The Ravelstone Corporation,* 2008 ONCA 207 |
| 9.  | *E.E.O.C. v. Kronos, Inc.,* 620 F.3d 287, 302 (3d Cir. 2010) |
| 10. | *In re Cendant Corp.,* 260 F.3d 183, 193-94 (3d Cir. 2001) |

1094005v1

# TAB 1

*Case Name:*

# Sierra Club of Canada v. Canada (Minister of Finance)

**Atomic Energy of Canada Limited, appellant;**
**v.**
**Sierra Club of Canada, respondent, and**
**The Minister of Finance of Canada, the Minister of**
**Foreign Affairs of Canada, the Minister of International**
**Trade of Canada and the Attorney General of Canada,**
**respondents.**

[2002] S.C.J. No. 42

[2002] A.C.S. no 42

2002 SCC 41

2002 CSC 41

[2002] 2 S.C.R. 522

[2002] 2 R.C.S. 522

211 D.L.R. (4th) 193

287 N.R. 203

J.E. 2002-803

40 Admin. L.R. (3d) 1

44 C.E.L.R. (N.S.) 161

20 C.P.C. (5th) 1

18 C.P.R. (4th) 1

93 C.R.R. (2d) 219

113 A.C.W.S. (3d) 36

2002 CarswellNat 822

2002 CarswellNat 823

File No.: 28020.


Supreme Court of Canada

2001: November 6 / 2002: April 26.

**Present: McLachlin C.J. and Gonthier, Iacobucci,**
**Bastarache, Binnie, Arbour and LeBel JJ.**


ON APPEAL FROM THE FEDERAL COURT OF APPEAL (92 paras.)

*Practice -- Federal Court of Canada -- Filing of confidential material -- Environmental*
*organization seeking judicial review of federal government's decision to provide financial*
*assistance to Crown corporation for construction and sale of nuclear reactors -- Crown*
*corporation requesting confidentiality order in respect of certain documents -- Proper analytical*
*approach to be applied to exercise of judicial discretion where litigant seeks confidentiality order --*
*Whether confidentiality order should be granted -- Federal Court Rules, 1998, SOR/98-106, r. 151.*


Sierra Club is an environmental organization seeking judicial review of the federal government's
decision to provide financial assistance to Atomic Energy of Canada Ltd. ("AECL"), a Crown
corporation, for the construction and sale to China of two CANDU reactors. The reactors are
currently under construction in China, where AECL is the main contractor and project manager.
Sierra Club maintains that the authorization of financial assistance by the government triggered s.
5(1)(b) of the Canadian Environmental Assessment Act ("CEAA"), requiring an environmental
assessment as a condition of the financial assistance, and that the failure to comply compels a
cancellation of the financial arrangements. AECL filed an affidavit in the proceedings which
summarized confidential documents containing thousands of pages of technical information
concerning the ongoing environmental assessment of the construction site by the Chinese
authorities. AECL resisted Sierra Club's application for production of the confidential documents on
the ground, inter alia, that the documents were the property of the Chinese authorities and that it did
not have the authority to disclose them. The Chinese authorities authorized disclosure of the
documents on the condition that they be protected by a confidentiality order, under which they
would only be made available to the parties and the court, but with no restriction on public access to
the judicial proceedings. AECL's application for a confidentiality order was rejected by the Federal
Court, Trial Division. The Federal Court of Appeal upheld that decision.

Held: The appeal should be allowed and the confidentiality order granted on the terms requested by

AECL.

In light of the established link between open courts and freedom of expression, the fundamental question for a court to consider in an application for a confidentiality order is whether the right to freedom of expression should be compromised in the circumstances. The court must ensure that the discretion to grant the order is exercised in accordance with Charter principles because a confidentiality order will have a negative effect on the s. 2(b) right to freedom of expression. A confidentiality order should only be granted when (1) such an order is necessary to prevent a serious risk to an important interest, including a commercial interest, in the context of litigation because reasonably alternative measures will not prevent the risk; and (2) the salutary effects of the confidentiality order, including the effects on the right of civil litigants to a fair trial, outweigh its deleterious effects, including the effects on the right to free expression, which in this context includes the public interest in open and accessible court proceedings. Three important elements are subsumed under the first branch of the test. First, the risk must be real and substantial, well grounded in evidence, posing a serious threat to the commercial interest in question. Second, the important commercial interest must be one which can be expressed in terms of a public interest in confidentiality, where there is a general principle at stake. Finally, the judge is required to consider not only whether reasonable alternatives are available to such an order but also to restrict the order as much as is reasonably possible while preserving the commercial interest in question.

Applying the test to the present circumstances, the commercial interest at stake here relates to the objective of preserving contractual obligations of confidentiality, which is sufficiently important to pass the first branch of the test as long as certain criteria relating to the information are met. The information must have been treated as confidential at all relevant times; on a balance of probabilities, proprietary, commercial and scientific interests could reasonably be harmed by disclosure of the information; and the information must have been accumulated with a reasonable expectation of it being kept confidential. These requirements have been met in this case. Disclosure of the confidential documents would impose a serious risk on an important commercial interest of AECL, and there are no reasonably alternative measures to granting the order.

Under the second branch of the test, the confidentiality order would have significant salutary effects on AECL's right to a fair trial. Disclosure of the confidential documents would cause AECL to breach its contractual obligations and suffer a risk of harm to its competitive position. If a confidentiality order is denied, AECL will be forced to withhold the documents in order to protect its commercial interests, and since that information is relevant to defences available under the CEAA, the inability to present this information hinders AECL's capacity to make full answer and defence. Although in the context of a civil proceeding, this does not engage a Charter right, the right to a fair trial is a fundamental principle of justice. Further, the confidentiality order would allow all parties and the court access to the confidential documents, and permit cross-examination based on their contents, assisting in the search for truth, a core value underlying freedom of expression. Finally, given the technical nature of the information, there may be a substantial public security interest in maintaining the confidentiality of such information.

The deleterious effects of granting a confidentiality order include a negative effect on the open court principle, and therefore on the right to freedom of expression. The more detrimental the confidentiality order would be to the core values of (1) seeking the truth and the common good, (2) promoting self-fulfilment of individuals by allowing them to develop thoughts and ideas as they see fit, and (3) ensuring that participation in the political process is open to all persons, the harder it will be to justify the confidentiality order. In the hands of the parties and their experts, the confidential documents may be of great assistance in probing the truth of the Chinese environmental assessment process, which would assist the court in reaching accurate factual conclusions. Given the highly technical nature of the documents, the important value of the search for the truth which underlies both freedom of expression and open justice would be promoted to a greater extent by submitting the confidential documents under the order sought than it would by denying the order.

Under the terms of the order sought, the only restrictions relate to the public distribution of the documents, which is a fairly minimal intrusion into the open court rule. Although the confidentiality order would restrict individual access to certain information which may be of interest to that individual, the second core value of promoting individual self-fulfilment would not be significantly affected by the confidentiality order. The third core value figures prominently in this appeal as open justice is a fundamental aspect of a democratic society. By their very nature, environmental matters carry significant public import, and openness in judicial proceedings involving environmental issues will generally attract a high degree of protection, so that the public interest is engaged here more than if this were an action between private parties involving private interests. However, the narrow scope of the order coupled with the highly technical nature of the confidential documents significantly temper the deleterious effects the confidentiality order would have on the public interest in open courts. The core freedom of expression values of seeking the truth and promoting an open political process are most closely linked to the principle of open courts, and most affected by an order restricting that openness. However, in the context of this case, the confidentiality order would only marginally impede, and in some respects would even promote, the pursuit of these values. The salutary effects of the order outweigh its deleterious effects and the order should be granted. A balancing of the various rights and obligations engaged indicates that the confidentiality order would have substantial salutary effects on AECL's right to a fair trial and freedom of expression, while the deleterious effects on the principle of open courts and freedom of expression would be minimal.

**Cases Cited**

Applied: Edmonton Journal v. Alberta (Attorney General), [1989] 2 S.C.R. 1326; Canadian Broadcasting Corp. v. New Brunswick (Attorney General), [1996] 3 S.C.R. 480; Dagenais v. Canadian Broadcasting Corp., [1994] 3 S.C.R. 835; R. v. Mentuck, [2001] 3 S.C.R. 442, 2001 SCC 76; M. (A.) v. Ryan, [1997] 1 S.C.R. 157; Irwin Toy Ltd. v. Quebec (Attorney General), [1989] 1 S.C.R. 927; R. v. Keegstra, [1990] 3 S.C.R. 697; referred to: AB Hassle v. Canada (Minister of National Health and Welfare), [2000] 3 F.C. 360, aff'g (1998), 83 C.P.R. (3d) 428; Ethyl Canada Inc. v. Canada (Attorney General) (1998), 17 C.P.C. (4th) 278; R. v. Oakes, [1986] 1 S.C.R. 103; R.

v. O.N.E., [2001] 3 S.C.R. 478, 2001 SCC 77; F.N. (Re), [2000] 1 S.C.R. 880, 2000 SCC 35; Eli Lilly and Co. v. Novopharm Ltd. (1994), 56 C.P.R. (3d) 437.

**Statutes and Regulations Cited**

Canadian Charter of Rights and Freedoms, ss. 1, 2(b).
Canadian Environmental Assessment Act, S.C. 1992, c. 37, ss. 5(1)(b), 8, 54, 54(2)(b).
Federal Court Rules, 1998, SOR/98-106, rr. 151, 312.

APPEAL from a judgment of the Federal Court of Appeal, [2000] 4 F.C. 426, 187 D.L.R. (4th) 231, 256 N.R. 1, 24 Admin. L.R. (3d) 1, [2000] F.C.J. No. 732 (QL), affirming a decision of the Trial Division, [2000] 2 F.C. 400, 178 F.T.R. 283, [1999] F.C.J. No. 1633 (QL). Appeal allowed.

J. Brett Ledger and Peter Chapin, for the appellant.
Timothy J. Howard and Franklin S. Gertler, for the respondent Sierra Club of Canada.
Graham Garton, Q.C., and J. Sanderson Graham, for the respondents the Minister of Finance of Canada, the Minister of Foreign Affairs of Canada, the Minister of International Trade of Canada and the Attorney General of Canada.

[Quicklaw note: Please see complete list of solicitors appended at the end of the judgment.]

---

The judgment of the Court was delivered by

**IACOBUCCI J.:--**

I.   Introduction

**1**   In our country, courts are the institutions generally chosen to resolve legal disputes as best they can through the application of legal principles to the facts of the case involved. One of the underlying principles of the judicial process is public openness, both in the proceedings of the dispute, and in the material that is relevant to its resolution. However, some material can be made the subject of a confidentiality order. This appeal raises the important issues of when, and under what circumstances, a confidentiality order should be granted.

**2**   For the following reasons, I would issue the confidentiality order sought and accordingly would allow the appeal.

II.   Facts

**3**    The appellant, Atomic Energy of Canada Limited ("AECL") is a Crown corporation that owns and markets CANDU nuclear technology, and is an intervener with the rights of a party in the application for judicial review by the respondent, the Sierra Club of Canada ("Sierra Club"). Sierra Club is an environmental organization seeking judicial review of the federal government's decision to provide financial assistance in the form of a $1.5 billion guaranteed loan relating to the construction and sale of two CANDU nuclear reactors to China by the appellant. The reactors are currently under construction in China, where the appellant is the main contractor and project manager.

**4**    The respondent maintains that the authorization of financial assistance by the government triggered s. 5(1)(b) of the Canadian Environmental Assessment Act, S.C. 1992, c. 37 ("CEAA"), which requires that an environmental assessment be undertaken before a federal authority grants financial assistance to a project. Failure to undertake such an assessment compels cancellation of the financial arrangements.

**5**    The appellant and the respondent Ministers argue that the CEAA does not apply to the loan transaction, and that if it does, the statutory defences available under ss. 8 and 54 apply. Section 8 describes the circumstances where Crown corporations are required to conduct environmental assessments. Section 54(2)(b) recognizes the validity of an environmental assessment carried out by a foreign authority provided that it is consistent with the provisions of the CEAA.

**6**    In the course of the application by Sierra Club to set aside the funding arrangements, the appellant filed an affidavit of Dr. Simon Pang, a senior manager of the appellant. In the affidavit, Dr. Pang referred to and summarized certain documents (the "Confidential Documents"). The Confidential Documents are also referred to in an affidavit prepared by Mr. Feng, one of AECL's experts. Prior to cross-examining Dr. Pang on his affidavit, Sierra Club made an application for the production of the Confidential Documents, arguing that it could not test Dr. Pang's evidence without access to the underlying documents. The appellant resisted production on various grounds, including the fact that the documents were the property of the Chinese authorities and that it did not have authority to disclose them. After receiving authorization by the Chinese authorities to disclose the documents on the condition that they be protected by a confidentiality order, the appellant sought to introduce the Confidential Documents under Rule 312 of the Federal Court Rules, 1998, SOR/98-106, and requested a confidentiality order in respect of the documents.

**7**    Under the terms of the order requested, the Confidential Documents would only be made available to the parties and the court; however, there would be no restriction on public access to the proceedings. In essence, what is being sought is an order preventing the dissemination of the Confidential Documents to the public.

**8**    The Confidential Documents comprise two Environmental Impact Reports on Siting and Construction Design (the "EIRs"), a Preliminary Safety Analysis Report (the "PSAR"), and the supplementary affidavit of Dr. Pang which summarizes the contents of the EIRs and the PSAR. If

admitted, the EIRs and the PSAR would be attached as exhibits to the supplementary affidavit of Dr. Pang. The EIRs were prepared by the Chinese authorities in the Chinese language, and the PSAR was prepared by the appellant with assistance from the Chinese participants in the project. The documents contain a mass of technical information and comprise thousands of pages. They describe the ongoing environmental assessment of the construction site by the Chinese authorities under Chinese law.

**9**     As noted, the appellant argues that it cannot introduce the Confidential Documents into evidence without a confidentiality order, otherwise it would be in breach of its obligations to the Chinese authorities. The respondent's position is that its right to cross-examine Dr. Pang and Mr. Feng on their affidavits would be effectively rendered nugatory in the absence of the supporting documents to which the affidavits referred. Sierra Club proposes to take the position that the affidavits should therefore be afforded very little weight by the judge hearing the application for judicial review.

**10**     The Federal Court of Canada, Trial Division refused to grant the confidentiality order and the majority of the Federal Court of Appeal dismissed the appeal. In his dissenting opinion, Robertson J.A. would have granted the confidentiality order.

III.    Relevant Statutory Provisions

**11**    Federal Court Rules, 1998, SOR/98-106

> 151. (1) On motion, the Court may order that material to be filed shall be treated as confidential.

> (2) Before making an order under subsection (1), the Court must be satisfied that the material should be treated as confidential, notwithstanding the public interest in open and accessible court proceedings.

IV.    Judgments Below

A. Federal Court, Trial Division, [2000] 2 F.C. 400

**12**    Pelletier J. first considered whether leave should be granted pursuant to Rule 312 to introduce the supplementary affidavit of Dr. Pang to which the Confidential Documents were filed as exhibits. In his view, the underlying question was that of relevance, and he concluded that the documents were relevant to the issue of the appropriate remedy. Thus, in the absence of prejudice to the respondent, the affidavit should be permitted to be served and filed. He noted that the respondent would be prejudiced by delay, but since both parties had brought interlocutory motions which had contributed to the delay, the desirability of having the entire record before the court outweighed the

prejudice arising from the delay associated with the introduction of the documents.

**13**    On the issue of confidentiality, Pelletier J. concluded that he must be satisfied that the need for confidentiality was greater than the public interest in open court proceedings, and observed that the argument for open proceedings in this case was significant given the public interest in Canada's role as a vendor of nuclear technology. As well, he noted that a confidentiality order was an exception to the rule of open access to the courts, and that such an order should be granted only where absolutely necessary.

**14**    Pelletier J. applied the same test as that used in patent litigation for the issue of a protective order, which is essentially a confidentiality order. The granting of such an order requires the appellant to show a subjective belief that the information is confidential and that its interests would be harmed by disclosure. In addition, if the order is challenged, then the person claiming the benefit of the order must demonstrate objectively that the order is required. This objective element requires the party to show that the information has been treated as confidential, and that it is reasonable to believe that its proprietary, commercial and scientific interests could be harmed by the disclosure of the information.

**15**    Concluding that both the subjective part and both elements of the objective part of the test had been satisfied, he nevertheless stated: "However, I am also of the view that in public law cases, the objective test has, or should have, a third component which is whether the public interest in disclosure exceeds the risk of harm to a party arising from disclosure" (para. 23).

**16**    A very significant factor, in his view, was the fact that mandatory production of documents was not in issue here. The fact that the application involved a voluntary tendering of documents to advance the appellant's own cause as opposed to mandatory production weighed against granting the confidentiality order.

**17**    In weighing the public interest in disclosure against the risk of harm to AECL arising from disclosure, Pelletier J. noted that the documents the appellant wished to put before the court were prepared by others for other purposes, and recognized that the appellant was bound to protect the confidentiality of the information. At this stage, he again considered the issue of materiality. If the documents were shown to be very material to a critical issue, "the requirements of justice militate in favour of a confidentiality order. If the documents are marginally relevant, then the voluntary nature of the production argues against a confidentiality order" (para. 29). He then decided that the documents were material to a question of the appropriate remedy, a significant issue in the event that the appellant failed on the main issue.

**18**    Pelletier J. also considered the context of the case and held that since the issue of Canada's role as a vendor of nuclear technology was one of significant public interest, the burden of justifying a confidentiality order was very onerous. He found that AECL could expunge the sensitive material from the documents, or put the evidence before the court in some other form, and thus maintain its full right of defence while preserving the open access to court proceedings.

**19**   Pelletier J. observed that his order was being made without having perused the Confidential Documents because they had not been put before him. Although he noted the line of cases which holds that a judge ought not to deal with the issue of a confidentiality order without reviewing the documents themselves, in his view, given their voluminous nature and technical content as well as his lack of information as to what information was already in the public domain, he found that an examination of these documents would not have been useful.

**20**   Pelletier J. ordered that the appellant could file the documents in current form, or in an edited version if it chose to do so. He also granted leave to file material dealing with the Chinese regulatory process in general and as applied to this project, provided it did so within 60 days.

B. Federal Court of Appeal, [2000] 4 F.C. 426

      (1)   Evans J.A. (Sharlow J.A. concurring)

**21**   At the Federal Court of Appeal, AECL appealed the ruling under Rule 151 of the Federal Court Rules, 1998, and Sierra Club cross-appealed the ruling under Rule 312.

**22**   With respect to Rule 312, Evans J.A. held that the documents were clearly relevant to a defence under s. 54(2)(b) which the appellant proposed to raise if s. 5(1)(b) of the CEAA was held to apply, and were also potentially relevant to the exercise of the court's discretion to refuse a remedy even if the Ministers were in breach of the CEAA. Evans J.A. agreed with Pelletier J. that the benefit to the appellant and the court of being granted leave to file the documents outweighed any prejudice to the respondent owing to delay and thus concluded that the motions judge was correct in granting leave under Rule 312.

**23**   On the issue of the confidentiality order, Evans J.A. considered Rule 151, and all the factors that the motions judge had weighed, including the commercial sensitivity of the documents, the fact that the appellant had received them in confidence from the Chinese authorities, and the appellant's argument that without the documents it could not mount a full answer and defence to the application. These factors had to be weighed against the principle of open access to court documents. Evans J.A. agreed with Pelletier J. that the weight to be attached to the public interest in open proceedings varied with context and held that, where a case raises issues of public significance, the principle of openness of judicial process carries greater weight as a factor in the balancing process. Evans J.A. noted the public interest in the subject matter of the litigation, as well as the considerable media attention it had attracted.

**24**   In support of his conclusion that the weight assigned to the principle of openness may vary with context, Evans J.A. relied upon the decisions in AB Hassle v. Canada (Minister of National Health and Welfare), [2000] 3 F.C. 360 (C.A.), where the court took into consideration the relatively small public interest at stake, and Ethyl Canada Inc. v. Canada (Attorney General) (1998), 17 C.P.C. (4th) 278 (Ont. Ct. (Gen. Div.)), at p. 283, where the court ordered disclosure after determining that the case was a significant constitutional case where it was important for the public

to understand the issues at stake. Evans J.A. observed that openness and public participation in the assessment process are fundamental to the CEAA, and concluded that the motions judge could not be said to have given the principle of openness undue weight even though confidentiality was claimed for a relatively small number of highly technical documents.

**25**    Evans J.A. held that the motions judge had placed undue emphasis on the fact that the introduction of the documents was voluntary; however, it did not follow that his decision on the confidentiality order must therefore be set aside. Evans J.A. was of the view that this error did not affect the ultimate conclusion for three reasons. First, like the motions judge, he attached great weight to the principle of openness. Secondly, he held that the inclusion in the affidavits of a summary of the reports could go a long way to compensate for the absence of the originals, should the appellant choose not to put them in without a confidentiality order. Finally, if AECL submitted the documents in an expunged fashion, the claim for confidentiality would rest upon a relatively unimportant factor, i.e., the appellant's claim that it would suffer a loss of business if it breached its undertaking with the Chinese authorities.

**26**    Evans J.A. rejected the argument that the motions judge had erred in deciding the motion without reference to the actual documents, stating that it was not necessary for him to inspect them, given that summaries were available and that the documents were highly technical and incompletely translated. Thus the appeal and cross-appeal were both dismissed.

> (2)    Robertson J.A. (dissenting)

**27**    Robertson J.A. disagreed with the majority for three reasons. First, in his view, the level of public interest in the case, the degree of media coverage, and the identities of the parties should not be taken into consideration in assessing an application for a confidentiality order. Instead, he held that it was the nature of the evidence for which the order is sought that must be examined.

**28**    In addition, he found that without a confidentiality order, the appellant had to choose between two unacceptable options: either suffering irreparable financial harm if the confidential information was introduced into evidence, or being denied the right to a fair trial because it could not mount a full defence if the evidence was not introduced.

**29**    Finally, he stated that the analytical framework employed by the majority in reaching its decision was fundamentally flawed as it was based largely on the subjective views of the motions judge. He rejected the contextual approach to the question of whether a confidentiality order should issue, emphasizing the need for an objective framework to combat the perception that justice is a relative concept, and to promote consistency and certainty in the law.

**30**    To establish this more objective framework for regulating the issuance of confidentiality orders pertaining to commercial and scientific information, he turned to the legal rationale underlying the commitment to the principle of open justice, referring to Edmonton Journal v. Alberta (Attorney General), [1989] 2 S.C.R. 1326. There, the Supreme Court of Canada held that

open proceedings foster the search for the truth, and reflect the importance of public scrutiny of the courts.

**31**    Robertson J.A. stated that although the principle of open justice is a reflection of the basic democratic value of accountability in the exercise of judicial power, in his view, the principle that justice itself must be secured is paramount. He concluded that justice as an overarching principle means that exceptions occasionally must be made to rules or principles.

**32**    He observed that, in the area of commercial law, when the information sought to be protected concerns "trade secrets", this information will not be disclosed during a trial if to do so would destroy the owner's proprietary rights and expose him or her to irreparable harm in the form of financial loss. Although the case before him did not involve a trade secret, he nevertheless held that the same treatment could be extended to commercial or scientific information which was acquired on a confidential basis and attached the following criteria as conditions precedent to the issuance of a confidentiality order (at para. 13):

> (1)    the information is of a confidential nature as opposed to facts which one would like to keep confidential; (2) the information for which confidentiality is sought is not already in the public domain; (3) on a balance of probabilities the party seeking the confidentiality order would suffer irreparable harm if the information were made public; (4) the information is relevant to the legal issues raised in the case; (5) correlatively, the information is "necessary" to the resolution of those issues; (6) the granting of a confidentiality order does not unduly prejudice the opposing party; and (7) the public interest in open court proceedings does not override the private interests of the party seeking the confidentiality order. The onus in establishing that criteria one to six are met is on the party seeking the confidentiality order. Under the seventh criterion, it is for the opposing party to show that a prima facie right to a protective order has been overtaken by the need to preserve the openness of the court proceedings. In addressing these criteria one must bear in mind two of the threads woven into the fabric of the principle of open justice: the search for truth and the preservation of the rule of law. As stated at the outset, I do not believe that the perceived degree of public importance of a case is a relevant consideration.

**33**    In applying these criteria to the circumstances of the case, Robertson J.A. concluded that the confidentiality order should be granted. In his view, the public interest in open court proceedings did not override the interests of AECL in maintaining the confidentiality of these highly technical documents.

**34**    Robertson J.A. also considered the public interest in the need to ensure that site plans for nuclear installations were not, for example, posted on a Web site. He concluded that a confidentiality order would not undermine the two primary objectives underlying the principle of

open justice: truth and the rule of law. As such, he would have allowed the appeal and dismissed the cross-appeal.

V.    Issues

**35**    A. What is the proper analytical approach to be applied to the exercise of judicial discretion where a litigant seeks a confidentiality order under Rule 151 of the Federal Court Rules, 1998?

B.    Should the confidentiality order be granted in this case?

VI.   Analysis
A.    The Analytical Approach to the Granting of a Confidentiality Order

(1)    The General Framework: Herein the Dagenais Principles

**36**    The link between openness in judicial proceedings and freedom of expression has been firmly established by this Court. In Canadian Broadcasting Corp. v. New Brunswick (Attorney General), [1996] 3 S.C.R. 480, at para. 23, La Forest J. expressed the relationship as follows:

> The principle of open courts is inextricably tied to the rights guaranteed by s. 2(b). Openness permits public access to information about the courts, which in turn permits the public to discuss and put forward opinions and criticisms of court practices and proceedings. While the freedom to express ideas and opinions about the operation of the courts is clearly within the ambit of the freedom guaranteed by s. 2(b), so too is the right of members of the public to obtain information about the courts in the first place.

Under the order sought, public access and public scrutiny of the Confidential Documents would be restricted; this would clearly infringe the public's freedom of expression guarantee.

**37**    A discussion of the general approach to be taken in the exercise of judicial discretion to grant a confidentiality order should begin with the principles set out by this Court in Dagenais v. Canadian Broadcasting Corp., [1994] 3 S.C.R. 835. Although that case dealt with the common law jurisdiction of the court to order a publication ban in the criminal law context, there are strong similarities between publication bans and confidentiality orders in the context of judicial proceedings. In both cases a restriction on freedom of expression is sought in order to preserve or promote an interest engaged by those proceedings. As such, the fundamental question for a court to consider in an application for a publication ban or a confidentiality order is whether, in the circumstances, the right to freedom of expression should be compromised.

**38**    Although in each case freedom of expression will be engaged in a different context, the Dagenais framework utilizes overarching Canadian Charter of Rights and Freedoms principles in order to balance freedom of expression with other rights and interests, and thus can be adapted and applied to various circumstances. As a result, the analytical approach to the exercise of discretion under Rule 151 should echo the underlying principles laid out in Dagenais, although it must be tailored to the specific rights and interests engaged in this case.

**39**    Dagenais dealt with an application by four accused persons under the court's common law jurisdiction requesting an order prohibiting the broadcast of a television programme dealing with the physical and sexual abuse of young boys at religious institutions. The applicants argued that because the factual circumstances of the programme were very similar to the facts at issue in their trials, the ban was necessary to preserve the accuseds' right to a fair trial.

**40**    Lamer C.J. found that the common law discretion to order a publication ban must be exercised within the boundaries set by the principles of the Charter. Since publication bans necessarily curtail the freedom of expression of third parties, he adapted the pre-Charter common law rule such that it balanced the right to freedom of expression with the right to a fair trial of the accused in a way which reflected the substance of the test from R. v. Oakes, [1986] 1 S.C.R. 103. At p. 878 of Dagenais, Lamer C.J. set out his reformulated test:

> A publication ban should only be ordered when:

> (a)    Such a ban is necessary in order to prevent a real and substantial risk to the fairness of the trial, because reasonably available alternative measures will not prevent the risk; and

> (b)    The salutary effects of the publication ban outweigh the deleterious effects to the free expression of those affected by the ban. [Emphasis in original.]

**41**    In New Brunswick, supra, this Court modified the Dagenais test in the context of the related issue of how the discretionary power under s. 486(1) of the Criminal Code, R.S.C. 1985, c. C-46, to exclude the public from a trial should be exercised. That case dealt with an appeal from the trial judge's order excluding the public from the portion of a sentencing proceeding for sexual assault and sexual interference dealing with the specific acts committed by the accused on the basis that it would avoid "undue hardship" to both the victims and the accused.

**42**    La Forest J. found that s. 486(1) was a restriction on the s. 2(b) right to freedom of expression in that it provided a "discretionary bar on public and media access to the courts": New Brunswick, at para. 33; however he found this infringement to be justified under s. 1 provided that the discretion was exercised in accordance with the Charter. Thus, the approach taken by La Forest J. at para. 69 to the exercise of discretion under s. 486(1) of the Criminal Code, closely mirrors the Dagenais common law test:

(a)   the judge must consider the available options and consider whether there are any other reasonable and effective alternatives available;

(b)   the judge must consider whether the order is limited as much as possible; and

(c)   the judge must weigh the importance of the objectives of the particular order and its probable effects against the importance of openness and the particular expression that will be limited in order to ensure that the positive and negative effects of the order are proportionate.

In applying this test to the facts of the case, La Forest J. found that the evidence of the potential undue hardship consisted mainly in the Crown's submission that the evidence was of a "delicate nature" and that this was insufficient to override the infringement on freedom of expression.

**43**   This Court has recently revisited the granting of a publication ban under the court's common law jurisdiction in R. v. Mentuck, [2001] 3 S.C.R. 442, 2001 SCC 76, and its companion case R. v. O.N.E., [2001] 3 S.C.R. 478, 2001 SCC 77. In Mentuck, the Crown moved for a publication ban to protect the identity of undercover police officers and operational methods employed by the officers in their investigation of the accused. The accused opposed the motion as an infringement of his right to a fair and public hearing under s. 11(d) of the Charter. The order was also opposed by two intervening newspapers as an infringement of their right to freedom of expression.

**44**   The Court noted that, while Dagenais dealt with the balancing of freedom of expression on the one hand, and the right to a fair trial of the accused on the other, in the case before it, both the right of the accused to a fair and public hearing, and freedom of expression weighed in favour of denying the publication ban. These rights were balanced against interests relating to the proper administration of justice, in particular, protecting the safety of police officers and preserving the efficacy of undercover police operations.

**45**   In spite of this distinction, the Court noted that underlying the approach taken in both Dagenais and New Brunswick was the goal of ensuring that the judicial discretion to order publication bans is subject to no lower a standard of compliance with the Charter than legislative enactment. This goal is furthered by incorporating the essence of s. 1 of the Charter and the Oakes test into the publication ban test. Since this same goal applied in the case before it, the Court adopted a similar approach to that taken in Dagenais, but broadened the Dagenais test (which dealt specifically with the right of an accused to a fair trial) such that it could guide the exercise of judicial discretion where a publication ban is requested in order to preserve any important aspect of the proper administration of justice. At para. 32, the Court reformulated the test as follows:

A publication ban should only be ordered when:

(a)   such an order is necessary in order to prevent a serious risk to the proper administration of justice because reasonably alternative measures will not prevent the risk; and

(b)    the salutary effects of the publication ban outweigh the deleterious effects on the rights and interests of the parties and the public, including the effects on the right to free expression, the right of the accused to a fair and public trial, and the efficacy of the administration of justice.

**46**    The Court emphasized that under the first branch of the test, three important elements were subsumed under the "necessity" branch. First, the risk in question must be a serious risk well grounded in the evidence. Second, the phrase "proper administration of justice" must be carefully interpreted so as not to allow the concealment of an excessive amount of information. Third, the test requires the judge ordering the ban to consider not only whether reasonable alternatives are available, but also to restrict the ban as far as possible without sacrificing the prevention of the risk.

**47**    At para. 31, the Court also made the important observation that the proper administration of justice will not necessarily involve Charter rights, and that the ability to invoke the Charter is not a necessary condition for a publication ban to be granted:

> The [common law publication ban] rule can accommodate orders that must occasionally be made in the interests of the administration of justice, which encompass more than fair trial rights. As the test is intended to "reflec[t] the substance of the Oakes test", we cannot require that Charter rights be the only legitimate objective of such orders any more than we require that government action or legislation in violation of the Charter be justified exclusively by the pursuit of another Charter right. [Emphasis added.]

The Court also anticipated that, in appropriate circumstances, the Dagenais framework could be expanded even further in order to address requests for publication bans where interests other than the administration of justice were involved.

**48**    Mentuck is illustrative of the flexibility of the Dagenais approach. Since its basic purpose is to ensure that the judicial discretion to deny public access to the courts is exercised in accordance with Charter principles, in my view, the Dagenais model can and should be adapted to the situation in the case at bar where the central issue is whether judicial discretion should be exercised so as to exclude confidential information from a public proceeding. As in Dagenais, New Brunswick and Mentuck, granting the confidentiality order will have a negative effect on the Charter right to freedom of expression, as well as the principle of open and accessible court proceedings, and, as in those cases, courts must ensure that the discretion to grant the order is exercised in accordance with Charter principles. However, in order to adapt the test to the context of this case, it is first necessary to determine the particular rights and interests engaged by this application.

(2)    The Rights and Interests of the Parties

**49**    The immediate purpose for AECL's confidentiality request relates to its commercial interests. The information in question is the property of the Chinese authorities. If the appellant were to

disclose the Confidential Documents, it would be in breach of its contractual obligations and suffer a risk of harm to its competitive position. This is clear from the findings of fact of the motions judge that AECL was bound by its commercial interests and its customer's property rights not to disclose the information (para. 27), and that such disclosure could harm the appellant's commercial interests (para. 23).

**50**    Aside from this direct commercial interest, if the confidentiality order is denied, then in order to protect its commercial interests, the appellant will have to withhold the documents. This raises the important matter of the litigation context in which the order is sought. As both the motions judge and the Federal Court of Appeal found that the information contained in the Confidential Documents was relevant to defences available under the CEAA, the inability to present this information hinders the appellant's capacity to make full answer and defence, or, expressed more generally, the appellant's right, as a civil litigant, to present its case. In that sense, preventing the appellant from disclosing these documents on a confidential basis infringes its right to a fair trial. Although in the context of a civil proceeding this does not engage a Charter right, the right to a fair trial generally can be viewed as a fundamental principle of justice: M. (A.) v. Ryan, [1997] 1 S.C.R. 157, at para. 84, per L'Heureux-Dubé J. (dissenting, but not on that point). Although this fair trial right is directly relevant to the appellant, there is also a general public interest in protecting the right to a fair trial. Indeed, as a general proposition, all disputes in the courts should be decided under a fair trial standard. The legitimacy of the judicial process alone demands as much. Similarly, courts have an interest in having all relevant evidence before them in order to ensure that justice is done.

**51**    Thus, the interests which would be promoted by a confidentiality order are the preservation of commercial and contractual relations, as well as the right of civil litigants to a fair trial. Related to the latter are the public and judicial interests in seeking the truth and achieving a just result in civil proceedings.

**52**    In opposition to the confidentiality order lies the fundamental principle of open and accessible court proceedings. This principle is inextricably tied to freedom of expression enshrined in s. 2(b) of the Charter: New Brunswick, supra, at para. 23. The importance of public and media access to the courts cannot be understated, as this access is the method by which the judicial process is scrutinized and criticized. Because it is essential to the administration of justice that justice is done and is seen to be done, such public scrutiny is fundamental. The open court principle has been described as "the very soul of justice", guaranteeing that justice is administered in a non-arbitrary manner: New Brunswick, at para. 22.

(3)    Adapting the Dagenais Test to the Rights and Interests of the Parties

**53**    Applying the rights and interests engaged in this case to the analytical framework of Dagenais and subsequent cases discussed above, the test for whether a confidentiality order ought to be granted in a case such as this one should be framed as follows:

A confidentiality order under Rule 151 should only be granted when:

(a)    such an order is necessary in order to prevent a serious risk to an important interest, including a commercial interest, in the context of litigation because reasonably alternative measures will not prevent the risk; and

(b)    the salutary effects of the confidentiality order, including the effects on the right of civil litigants to a fair trial, outweigh its deleterious effects, including the effects on the right to free expression, which in this context includes the public interest in open and accessible court proceedings.

**54**    As in Mentuck, I would add that three important elements are subsumed under the first branch of this test. First, the risk in question must be real and substantial, in that the risk is well grounded in the evidence, and poses a serious threat to the commercial interest in question.

**55**    In addition, the phrase "important commercial interest" is in need of some clarification. In order to qualify as an "important commercial interest", the interest in question cannot merely be specific to the party requesting the order; the interest must be one which can be expressed in terms of a public interest in confidentiality. For example, a private company could not argue simply that the existence of a particular contract should not be made public because to do so would cause the company to lose business, thus harming its commercial interests. However, if, as in this case, exposure of information would cause a breach of a confidentiality agreement, then the commercial interest affected can be characterized more broadly as the general commercial interest of preserving confidential information. Simply put, if there is no general principle at stake, there can be no "important commercial interest" for the purposes of this test. Or, in the words of Binnie J. in F.N. (Re), [2000] 1 S.C.R. 880, 2000 SCC 35, at para. 10, the open court rule only yields "where the public interest in confidentiality outweighs the public interest in openness" (emphasis added).

**56**    In addition to the above requirement, courts must be cautious in determining what constitutes an "important commercial interest". It must be remembered that a confidentiality order involves an infringement on freedom of expression. Although the balancing of the commercial interest with freedom of expression takes place under the second branch of the test, courts must be alive to the fundamental importance of the open court rule. See generally Muldoon J. in Eli Lilly and Co. v. Novopharm Ltd. (1994), 56 C.P.R. (3d) 437 (F.C.T.D.), at p. 439.

**57**    Finally, the phrase "reasonably alternative measures" requires the judge to consider not only whether reasonable alternatives to a confidentiality order are available, but also to restrict the order as much as is reasonably possible while preserving the commercial interest in question.

B. Application of the Test to this Appeal

(1)    Necessity

**58**    At this stage, it must be determined whether disclosure of the Confidential Documents would impose a serious risk on an important commercial interest of the appellant, and whether there are reasonable alternatives, either to the order itself, or to its terms.

**59**    The commercial interest at stake here relates to the objective of preserving contractual obligations of confidentiality. The appellant argues that it will suffer irreparable harm to its commercial interests if the Confidential Documents are disclosed. In my view, the preservation of confidential information constitutes a sufficiently important commercial interest to pass the first branch of the test as long as certain criteria relating to the information are met.

**60**    Pelletier J. noted that the order sought in this case was similar in nature to an application for a protective order which arises in the context of patent litigation. Such an order requires the applicant to demonstrate that the information in question has been treated at all relevant times as confidential and that on a balance of probabilities its proprietary, commercial and scientific interests could reasonably be harmed by the disclosure of the information: AB Hassle v. Canada (Minister of National Health and Welfare) (1998), 83 C.P.R. (3d) 428 (F.C.T.D.), at p. 434. To this I would add the requirement proposed by Robertson J.A. that the information in question must be of a "confidential nature" in that it has been "accumulated with a reasonable expectation of it being kept confidential" as opposed to "facts which a litigant would like to keep confidential by having the courtroom doors closed" (para. 14).

**61**    Pelletier J. found as a fact that the AB Hassle test had been satisfied in that the information had clearly been treated as confidential both by the appellant and by the Chinese authorities, and that, on a balance of probabilities, disclosure of the information could harm the appellant's commercial interests (para. 23). As well, Robertson J.A. found that the information in question was clearly of a confidential nature as it was commercial information, consistently treated and regarded as confidential, that would be of interest to AECL's competitors (para. 16). Thus, the order is sought to prevent a serious risk to an important commercial interest.

**62**    The first branch of the test also requires the consideration of alternative measures to the confidentiality order, as well as an examination of the scope of the order to ensure that it is not overly broad. Both courts below found that the information contained in the Confidential Documents was relevant to potential defences available to the appellant under the CEAA and this finding was not appealed at this Court. Further, I agree with the Court of Appeal's assertion (at para. 99) that, given the importance of the documents to the right to make full answer and defence, the appellant is, practically speaking, compelled to produce the documents. Given that the information is necessary to the appellant's case, it remains only to determine whether there are reasonably alternative means by which the necessary information can be adduced without disclosing the confidential information.

**63**    Two alternatives to the confidentiality order were put forward by the courts below. The motions judge suggested that the Confidential Documents could be expunged of their commercially sensitive contents, and edited versions of the documents could be filed. As well, the majority of the Court of Appeal, in addition to accepting the possibility of expungement, was of the opinion that the summaries of the Confidential Documents included in the affidavits could go a long way to compensate for the absence of the originals. If either of these options is a reasonable alternative to

submitting the Confidential Documents under a confidentiality order, then the order is not necessary, and the application does not pass the first branch of the test.

**64**    There are two possible options with respect to expungement, and in my view, there are problems with both of these. The first option would be for AECL to expunge the confidential information without disclosing the expunged material to the parties and the court. However, in this situation the filed material would still differ from the material used by the affiants. It must not be forgotten that this motion arose as a result of Sierra Club's position that the summaries contained in the affidavits should be accorded little or no weight without the presence of the underlying documents. Even if the relevant information and the confidential information were mutually exclusive, which would allow for the disclosure of all the information relied on in the affidavits, this relevancy determination could not be tested on cross-examination because the expunged material would not be available. Thus, even in the best case scenario, where only irrelevant information needed to be expunged, the parties would be put in essentially the same position as that which initially generated this appeal, in the sense that, at least some of the material relied on to prepare the affidavits in question would not be available to Sierra Club.

**65**    Further, I agree with Robertson J.A. that this best case scenario, where the relevant and the confidential information do not overlap, is an untested assumption (para. 28). Although the documents themselves were not put before the courts on this motion, given that they comprise thousands of pages of detailed information, this assumption is at best optimistic. The expungement alternative would be further complicated by the fact that the Chinese authorities require prior approval for any request by AECL to disclose information.

**66**    The second option is that the expunged material be made available to the court and the parties under a more narrowly drawn confidentiality order. Although this option would allow for slightly broader public access than the current confidentiality request, in my view, this minor restriction to the current confidentiality request is not a viable alternative given the difficulties associated with expungement in these circumstances. The test asks whether there are reasonably alternative measures; it does not require the adoption of the absolutely least restrictive option. With respect, in my view, expungement of the Confidential Documents would be a virtually unworkable and ineffective solution that is not reasonable in the circumstances.

**67**    A second alternative to a confidentiality order was Evans J.A.'s suggestion that the summaries of the Confidential Documents included in the affidavits "may well go a long way to compensate for the absence of the originals" (para. 103). However, he appeared to take this fact into account merely as a factor to be considered when balancing the various interests at stake. I would agree that at this threshold stage to rely on the summaries alone, in light of the intention of Sierra Club to argue that they should be accorded little or no weight, does not appear to be a "reasonably alternative measure" to having the underlying documents available to the parties.

**68**    With the above considerations in mind, I find the confidentiality order necessary in that

disclosure of the Confidential Documents would impose a serious risk on an important commercial interest of the appellant, and that there are no reasonably alternative measures to granting the order.

(2)     The Proportionality Stage

**69**     As stated above, at this stage, the salutary effects of the confidentiality order, including the effects on the appellant's right to a fair trial, must be weighed against the deleterious effects of the confidentiality order, including the effects on the right to free expression, which in turn is connected to the principle of open and accessible court proceedings. This balancing will ultimately determine whether the confidentiality order ought to be granted.

(a)     Salutary Effects of the Confidentiality Order

**70**     As discussed above, the primary interest that would be promoted by the confidentiality order is the public interest in the right of a civil litigant to present its case, or, more generally, the fair trial right. Because the fair trial right is being invoked in this case in order to protect commercial, not liberty, interests of the appellant, the right to a fair trial in this context is not a Charter right; however, a fair trial for all litigants has been recognized as a fundamental principle of justice: Ryan, supra, at para. 84. It bears repeating that there are circumstances where, in the absence of an affected Charter right, the proper administration of justice calls for a confidentiality order: Mentuck, supra, at para. 31. In this case, the salutary effects that such an order would have on the administration of justice relate to the ability of the appellant to present its case, as encompassed by the broader fair trial right.

**71**     The Confidential Documents have been found to be relevant to defences that will be available to the appellant in the event that the CEAA is found to apply to the impugned transaction and, as discussed above, the appellant cannot disclose the documents without putting its commercial interests at serious risk of harm. As such, there is a very real risk that, without the confidentiality order, the ability of the appellant to mount a successful defence will be seriously curtailed. I conclude, therefore, that the confidentiality order would have significant salutary effects on the appellant's right to a fair trial.

**72**     Aside from the salutary effects on the fair trial interest, the confidentiality order would also have a beneficial impact on other important rights and interests. First, as I discuss in more detail below, the confidentiality order would allow all parties and the court access to the Confidential Documents, and permit cross-examination based on their contents. By facilitating access to relevant documents in a judicial proceeding, the order sought would assist in the search for truth, a core value underlying freedom of expression.

**73**     Second, I agree with the observation of Robertson J.A. that, as the Confidential Documents contain detailed technical information pertaining to the construction and design of a nuclear installation, it may be in keeping with the public interest to prevent this information from entering the public domain (para. 44). Although the exact contents of the documents remain a mystery, it is

apparent that they contain technical details of a nuclear installation, and there may well be a substantial public security interest in maintaining the confidentiality of such information.

(b) Deleterious Effects of the Confidentiality Order

**74**    Granting the confidentiality order would have a negative effect on the open court principle, as the public would be denied access to the contents of the Confidential Documents. As stated above, the principle of open courts is inextricably tied to the s. 2(b) Charter right to freedom of expression, and public scrutiny of the courts is a fundamental aspect of the administration of justice: New Brunswick, supra, at paras. 22-23. Although as a general principle, the importance of open courts cannot be overstated, it is necessary to examine, in the context of this case, the particular deleterious effects on freedom of expression that the confidentiality order would have.

**75**    Underlying freedom of expression are the core values of (1) seeking the truth and the common good; (2) promoting self-fulfilment of individuals by allowing them to develop thoughts and ideas as they see fit; and (3) ensuring that participation in the political process is open to all persons: Irwin Toy Ltd. v. Quebec (Attorney General), [1989] 1 S.C.R. 927, at p. 976; R. v. Keegstra, [1990] 3 S.C.R. 697, at pp. 762-64, per Dickson C.J. Charter jurisprudence has established that the closer the speech in question lies to these core values, the harder it will be to justify a s. 2(b) infringement of that speech under s. 1 of the Charter: Keegstra, at pp. 760-61. Since the main goal in this case is to exercise judicial discretion in a way which conforms to Charter principles, a discussion of the deleterious effects of the confidentiality order on freedom of expression should include an assessment of the effects such an order would have on the three core values. The more detrimental the order would be to these values, the more difficult it will be to justify the confidentiality order. Similarly, minor effects of the order on the core values will make the confidentiality order easier to justify.

**76**    Seeking the truth is not only at the core of freedom of expression, but it has also been recognized as a fundamental purpose behind the open court rule, as the open examination of witnesses promotes an effective evidentiary process: Edmonton Journal, supra, at pp. 1357-58, per Wilson J. Clearly the confidentiality order, by denying public and media access to documents relied on in the proceedings, would impede the search for truth to some extent. Although the order would not exclude the public from the courtroom, the public and the media would be denied access to documents relevant to the evidentiary process.

**77**    However, as mentioned above, to some extent the search for truth may actually be promoted by the confidentiality order. This motion arises as a result of Sierra Club's argument that it must have access to the Confidential Documents in order to test the accuracy of Dr. Pang's evidence. If the order is denied, then the most likely scenario is that the appellant will not submit the documents with the unfortunate result that evidence which may be relevant to the proceedings will not be available to Sierra Club or the court. As a result, Sierra Club will not be able to fully test the accuracy of Dr. Pang's evidence on cross-examination. In addition, the court will not have the

benefit of this cross-examination or documentary evidence, and will be required to draw conclusions based on an incomplete evidentiary record. This would clearly impede the search for truth in this case.

**78**    As well, it is important to remember that the confidentiality order would restrict access to a relatively small number of highly technical documents. The nature of these documents is such that the general public would be unlikely to understand their contents, and thus they would contribute little to the public interest in the search for truth in this case. However, in the hands of the parties and their respective experts, the documents may be of great assistance in probing the truth of the Chinese environmental assessment process, which would in turn assist the court in reaching accurate factual conclusions. Given the nature of the documents, in my view, the important value of the search for truth which underlies both freedom of expression and open justice would be promoted to a greater extent by submitting the Confidential Documents under the order sought than it would by denying the order, and thereby preventing the parties and the court from relying on the documents in the course of the litigation.

**79**    In addition, under the terms of the order sought, the only restrictions on these documents relate to their public distribution. The Confidential Documents would be available to the court and the parties, and public access to the proceedings would not be impeded. As such, the order represents a fairly minimal intrusion into the open court rule, and thus would not have significant deleterious effects on this principle.

**80**    The second core value underlying freedom of speech, namely, the promotion of individual self-fulfilment by allowing open development of thoughts and ideas, focusses on individual expression, and thus does not closely relate to the open court principle which involves institutional expression. Although the confidentiality order would restrict individual access to certain information which may be of interest to that individual, I find that this value would not be significantly affected by the confidentiality order.

**81**    The third core value, open participation in the political process, figures prominently in this appeal, as open justice is a fundamental aspect of a democratic society. This connection was pointed out by Cory J. in Edmonton Journal, supra, at p. 1339:

> It can be seen that freedom of expression is of fundamental importance to a democratic society. It is also essential to a democracy and crucial to the rule of law that the courts are seen to function openly. The press must be free to comment upon court proceedings to ensure that the courts are, in fact, seen by all to operate openly in the penetrating light of public scrutiny.

Although there is no doubt as to the importance of open judicial proceedings to a democratic society, there was disagreement in the courts below as to whether the weight to be assigned to the open court principle should vary depending on the nature of the proceeding.

**82**    On this issue, Robertson J.A. was of the view that the nature of the case and the level of media interest were irrelevant considerations. On the other hand, Evans J.A. held that the motions judge was correct in taking into account that this judicial review application was one of significant public and media interest. In my view, although the public nature of the case may be a factor which strengthens the importance of open justice in a particular case, the level of media interest should not be taken into account as an independent consideration.

**83**    Since cases involving public institutions will generally relate more closely to the core value of public participation in the political process, the public nature of a proceeding should be taken into consideration when assessing the merits of a confidentiality order. It is important to note that this core value will always be engaged where the open court principle is engaged owing to the importance of open justice to a democratic society. However, where the political process is also engaged by the substance of the proceedings, the connection between open proceedings and public participation in the political process will increase. As such, I agree with Evans J.A. in the court below where he stated, at para. 87:

> While all litigation is important to the parties, and there is a public interest in ensuring the fair and appropriate adjudication of all litigation that comes before the courts, some cases raise issues that transcend the immediate interests of the parties and the general public interest in the due administration of justice, and have a much wider public interest significance.

**84**    This motion relates to an application for judicial review of a decision by the government to fund a nuclear energy project. Such an application is clearly of a public nature, as it relates to the distribution of public funds in relation to an issue of demonstrated public interest. Moreover, as pointed out by Evans J.A., openness and public participation are of fundamental importance under the CEAA. Indeed, by their very nature, environmental matters carry very significant public import, and openness in judicial proceedings involving environmental issues will generally attract a high degree of protection. In this regard, I agree with Evans J.A. that the public interest is engaged here more than it would be if this were an action between private parties relating to purely private interests.

**85**    However, with respect, to the extent that Evans J.A. relied on media interest as an indicium of public interest, this was an error. In my view, it is important to distinguish public interest, from media interest, and I agree with Robertson J.A. that media exposure cannot be viewed as an impartial measure of public interest. It is the public nature of the proceedings which increases the need for openness, and this public nature is not necessarily reflected by the media desire to probe the facts of the case. I reiterate the caution given by Dickson C.J. in Keegstra, supra, at p. 760, where he stated that, while the speech in question must be examined in light of its relation to the core values, "we must guard carefully against judging expression according to its popularity".

**86**    Although the public interest in open access to the judicial review application as a whole is substantial, in my view, it is also important to bear in mind the nature and scope of the information

for which the order is sought in assigning weight to the public interest. With respect, the motions judge erred in failing to consider the narrow scope of the order when he considered the public interest in disclosure, and consequently attached excessive weight to this factor. In this connection, I respectfully disagree with the following conclusion of Evans J.A., at para. 97:

> Thus, having considered the nature of this litigation, and having assessed the extent of public interest in the openness of the proceedings in the case before him, the Motions Judge cannot be said in all the circumstances to have given this factor undue weight, even though confidentiality is claimed for only three documents among the small mountain of paper filed in this case, and their content is likely to be beyond the comprehension of all but those equipped with the necessary technical expertise.

Open justice is a fundamentally important principle, particularly when the substance of the proceedings is public in nature. However, this does not detract from the duty to attach weight to this principle in accordance with the specific limitations on openness that the confidentiality order would have. As Wilson J. observed in Edmonton Journal, supra, at pp. 1353-54:

> One thing seems clear and that is that one should not balance one value at large and the conflicting value in its context. To do so could well be to pre-judge the issue by placing more weight on the value developed at large than is appropriate in the context of the case.

**87**    In my view, it is important that, although there is significant public interest in these proceedings, open access to the judicial review application would be only slightly impeded by the order sought. The narrow scope of the order coupled with the highly technical nature of the Confidential Documents significantly temper the deleterious effects the confidentiality order would have on the public interest in open courts.

**88**    In addressing the effects that the confidentiality order would have on freedom of expression, it should also be borne in mind that the appellant may not have to raise defences under the CEAA, in which case the Confidential Documents would be irrelevant to the proceedings, with the result that freedom of expression would be unaffected by the order. However, since the necessity of the Confidential Documents will not be determined for some time, in the absence of a confidentiality order, the appellant would be left with the choice of either submitting the documents in breach of its obligations, or withholding the documents in the hopes that either it will not have to present a defence under the CEAA, or that it will be able to mount a successful defence in the absence of these relevant documents. If it chooses the former option, and the defences under the CEAA are later found not to apply, then the appellant will have suffered the prejudice of having its confidential and sensitive information released into the public domain, with no corresponding benefit to the public. Although this scenario is far from certain, the possibility of such an occurrence also weighs in favour of granting the order sought.

**89**    In coming to this conclusion, I note that if the appellant is not required to invoke the relevant defences under the CEAA, it is also true that the appellant's fair trial right will not be impeded, even if the confidentiality order is not granted. However, I do not take this into account as a factor which weighs in favour of denying the order because, if the order is granted and the Confidential Documents are not required, there will be no deleterious effects on either the public interest in freedom of expression or the appellant's commercial interests or fair trial right. This neutral result is in contrast with the scenario discussed above where the order is denied and the possibility arises that the appellant's commercial interests will be prejudiced with no corresponding public benefit. As a result, the fact that the Confidential Documents may not be required is a factor which weighs in favour of granting the confidentiality order.

**90**    In summary, the core freedom of expression values of seeking the truth and promoting an open political process are most closely linked to the principle of open courts, and most affected by an order restricting that openness. However, in the context of this case, the confidentiality order would only marginally impede, and in some respects would even promote, the pursuit of these values. As such, the order would not have significant deleterious effects on freedom of expression.

VII.   Conclusion

**91**    In balancing the various rights and interests engaged, I note that the confidentiality order would have substantial salutary effects on the appellant's right to a fair trial, and freedom of expression. On the other hand, the deleterious effects of the confidentiality order on the principle of open courts and freedom of expression would be minimal. In addition, if the order is not granted and in the course of the judicial review application the appellant is not required to mount a defence under the CEAA, there is a possibility that the appellant will have suffered the harm of having disclosed confidential information in breach of its obligations with no corresponding benefit to the right of the public to freedom of expression. As a result, I find that the salutary effects of the order outweigh its deleterious effects, and the order should be granted.

**92**    Consequently, I would allow the appeal with costs throughout, set aside the judgment of the Federal Court of Appeal, and grant the confidentiality order on the terms requested by the appellant under Rule 151 of the Federal Court Rules, 1998.

Solicitors for the appellant: Osler, Hoskin & Harcourt, Toronto.
Solicitors for the respondent Sierra Club of Canada: Timothy J. Howard, Vancouver; Franklin S. Gertler, Montréal.
Solicitor for the respondents the Minister of Finance of Canada, the Minister of Foreign Affairs of Canada, the Minister of International Trade of Canada and the Attorney General of Canada: The Deputy Attorney General of Canada, Ottawa.

**TAB 2**

*Indexed as:*
## Publow v. Wilson

**Between**
**Paul F. Publow, plaintiff, and**
**Larry Wilson, Bennington Gate Management Ltd., Clifford R.**
**Topping, Alex R. Paterson, Dan B. Mills, Cottrell Investment**
**Corporation, Cottrell Capital Corporation, Pal Transport**
**Inc., Cannet Freight Cartage Limited, Cottrell Cartage Ltd.,**
**Cottrell Transport Inc., Cottrell Air Freight Ltd., Cottrell**
**Information & Distribution Services Inc., defendants**

[1994] O.J. No. 3036

9 C.C.E.L. (2d) 22

36 C.P.C. (3d) 33

59 C.P.R. (3d) 294

52 A.C.W.S. (3d) 507

1994 CanLII 7421

Court File No. 94-CQ-54423 Commercial Court File No. B239/94

Ontario Court of Justice - General Division
Toronto, Ontario

**Spence J.**

Heard: November 21 and 23, 1994.
Further submissions received: December 6, 1994.
Judgment: December 22, 1994.

(15 pp.)

*Evidence -- Confidentiality -- Application for order to protect confidentiality -- Considerations --*
*Reasonable apprehension of harm.*

The defendants sought an order to protect the confidentiality and secrecy of certain information and documentation disclosed in the proceedings. They submitted that if disclosed, the information would adversely affect the competitive position of the defendants in the market place. The plaintiff claimed against the defendants for wrongful dismissal from his senior position. The documents in question consisted of all documents produced in connection with two motions, including answers given in cross- examination on affidavits and exhibits. The concern was that some of these documents showed that the parent company was insolvent. The defendants argued that there was a reasonable apprehension of harm to persons not involved in the proceedings, namely some 600 employees. It was alleged that the plaintiff threatened to harm the company by disclosing the information to suppliers and customers of the company.

HELD: The application was dismissed. It was not established that this was a proper case for a protective order. It did not seem likely that a sealing order of a limited scope and duration would be effective to avoid the harm foreseen. Such an order could detrimentally affect the interests of other persons, i.e. trade creditors and prospective investors.

**Statutes, Regulations and Rules Cited:**

Courts of Justice Act, R.S.O. 1990, c. C43, s. 137(1), 137(2).


No counsel mentioned.

---

**1    SPENCE J.** (endorsement):-- The defendants (except for Larry Wilson and Bennington Gate Management Ltd.) seek an order to protect the confidentiality and secrecy of certain information and documentation disclosed in these proceedings. The applicant defendants submit that the information if disclosed would adversely affect the competitive position of the defendants in the market place. The other two defendants consent to the order being sought.

**2**    In these proceedings, the plaintiff claims against the defendants for wrongful dismissal from his senior position in certain of the defendant companies in the Cottrell group of companies, which are engaged in freight forwarding. The defendants assert that the plaintiff was largely responsible for the adverse developments in the financial circumstances of the parent Cottrell company and it is these financial circumstances which the defendants seek to keep confidential, as matters private to that company and its owners.

**3**    The documents sought to be kept confidential consist of all documents produced in connection with the motion in this matter now pending for December 23, 1994 and in the present motion, including answers given in cross-examination on affidavits and certain exhibits and documents

produced through a Request to Inspect.

**4**    The concerns advanced are that these documents, or certain of them, show that the parent Cottrell company is insolvent and that if this information, which would not be subject to disclosure apart from the present litigation, were to be available to interested persons, competitors would bring it to the attention of customers, suppliers and other interested persons, who would be moved to cease their dealings with the company, leading to the demise of the company. It is submitted that the company is now at a sensitive point in its business and affairs. If it can keep a breathing space during which it can pursue a search for new capital investment, its fortunes may be repaired. At the present time the company is keeping its obligations to suppliers and customers current and it is argued that the exposure which they will incur through continued dealing is not worse than if the company were caused to fail through adverse reaction to disclosure of the information in question. The plaintiff when he was the chief executive officer of the Cottrell parent company, sought to avoid disclosure of information about its financial circumstance because of the potentially damaging effect that disclosure would have.

**5**    A key consideration which is advanced is that if the material in question is disclosed and that disclosure leads to the anticipated collapse of the business of the company, the 600 employment positions in the company will be at risk.

**6**    The plaintiff contends that there must be significant trade creditors of the company who are not aware of its difficulties and stand to suffer if disclosure of its present circumstances is not made. The plaintiff challenges the claim that there is evidence of principal competitors of the company who are looking for detrimental information to damage the company's relations with its suppliers and customers. The plaintiff contends that disclosure of the bad 1993 fiscal year results of the company will not affect the current dealings of the company with its suppliers because these results are historical. In any event, the plaintiff says the evidence suggests that it is the existence and nature of the dispute between the plaintiff and the defendants which has the potential to affect confidence in the Cottrell companies not the financial difficulty of the parent company which is already widely rumoured, as well as being alleged in the plaintiff's statement of claim. The plaintiff says certain of the defendants have been advising interested parties that the Cottrell parent company has grown stronger financially since its last fiscal year. The plaintiff questions whether, even if the Cottrell parent company were to fail, the 600 jobs provided by its operations would be lost. The plaintiff alleges that it is apparent that the principal lenders to the company, Imperial Life Assurance and the defendant Bennington Gate Management Ltd. are providing it with an indulgence to assist it in its effort to find new capital, and it is this support which is the key to its continued functioning for the time being. The plaintiff disputes the breadth of the order sought by the defendants, saying that it encompasses various matters, including details of the present dispute, which do not bear on the allegedly sensitive issue of the company's financial viability. The plaintiff disputes that the financial information concerning the Cottrell parent company will affect adversely the dealings of customers and suppliers with the operating subsidiaries. Other parts of the proposed order are challenged as overreaching in various respects and potentially prejudicial to the plaintiff.

The Test to be Applied

**7**    Section 137(1) of the Courts of Justice Act R.S.O. 1990 c. C43 provides that on payment of the prescribed fee a person may see any document filed in a civil proceeding unless an Act or an order of the court provides otherwise. Section 137(2) provides that a court may order that any document filed in a civil proceeding before it be treated as confidential, sealed and not form part of the public record.

**8**    The paramount importance of openness in court proceedings is reflected in the following remarks of Dickson J., as he then was, in Attorney General of Nova Scotia et al. v. McIntyre (1982) 122 D.L.R. (3d) 385 (S.C.C.) at p. 401-402:

> Many times it has been urged that the "privacy" of litigants requires that the public be excluded from Court proceedings. It is now well established, however, that covertness is the exception and openness the rule. Public confidence in the integrity of the Court system and understanding of the administration of justice are thereby fostered. As a general rule the sensibilities of the individuals involved are not a basis for exclusion of the public from judicial proceedings.

At page 403, Dickson J. said:

> In my view, curtailment of public accessibility can only be justified where there is present the need to protect social values of superordinate importance. One of these is the protection of the innocent.

**9**    The approach endorsed in this decision was applied in MDS Health Group Ltd. v. Canada (Attorney General), (1993) 20 CPC (3d) 137 (O.C.J. (G.D.)). The case involved a dispute with Atomic Energy of Canada Limited concerning supply arrangements between it and the plaintiff. The plaintiff's concern was that if its lawsuit with AECL were to be publicly known, customers of the subsidiary of the plaintiff would lose confidence in its subsidiary's capacity to supply their needs and they would likely seek other sources of supply. The plaintiff brought a motion for an order allowing the proposed action to proceed under a pseudonym and to seal the court record.

**10**    D. Lane J. quoted from the Supreme Court decision in MacIntrye, including the passages set out above. Lane J. concluded as follows:

> In my view, that case sets the standard which an applicant in a case like this must meet. I have every sympathy with the plaintiff company which finds itself in an unenviable position, but I can find no value of superordinate importance in this motion. On the contrary, I am of the view that the arguments of the defendants are very persuasive. The public nature of the defendants, the protection of the public who may trade in the shares of the plaintiff, the nature of

the allegations made against public officers, the fact that the matter arises out of a controversial government policy, all lead inexorably to the conclusion that this is not a case where secrecy can be justified to protect private interests. This is not a case where the publicity destroys the subject matter of the action itself but rather one where the publicity is likely to upset the confidence of customers in their source of supply and perhaps lead to the entry of a new competitor in the marketplace. Similar considerations arise in many cases. To give effect to them would undermine the openness of our system.

**11**    In the present case, the defendants argue that there is a reasonable apprehension of harm to persons not involved in these proceedings. They refer to the potential loss of 600 jobs if the Cottrell business operations collapse as a result of loss of confidence on the part of suppliers and customers, which would be caused by public access to information as to the financial situation of Cottrell. I think support for this concern is to be found in the affidavit evidence, including the evidence as to the plaintiff's efforts while he was a senior office of Cottrell to keep information of this type confidential.

**12**    The defendants seek a very broad protective order, which would effectively apply to all of the materials filed on the motion which is scheduled to be heard on December 23, which is to address part of the substantive dispute between the parties. That there is such a dispute is apparently widely known among interested persons. The court should be concerned not to frame a sealing order so broadly that it would effectively preclude public access to these proceedings on an informed basis.

**13**    If the breadth of the order sought were the only concern, it might be in order to grant a narrow order for a limited period. I infer from the material and the submissions that the maximum potential harm to the continuing business prospects would be done by the disclosure of the 1993 financial statements and the statements in the materials to the effect that Cottrell is insolvent and its shares have no value. The financial statements and these other statements have an apparently definitive character that could allow them to be interpreted in a detrimental way without reference to the context of the ongoing business and affairs of the company. On the other hand it would be inappropriate to remove from the public record those materials which reflect the dispute between the parties and the adverse events which have happened to the company in the course of that dispute. To do so would potentially create a misleading impression about the matter before the court. Limiting the period for the duration of the sealing order would also avoid the potential for persons to be misled.

**14**    The defendants also seek certain ancillary orders with respect to the disclosure and use of the sealed information which might curtail the proper use of the information in these proceedings or in certain other respects and seem excessive for purposes of an order with a limited duration. The order sought by the defendants requires, not only an order to seal the court record, but also an order restricting the plaintiff from, among other things, communicating the contents of the financial statements. It was not contended that the plaintiff had come into possession of these statements

improperly. As a shareholder of the company, he would presumably be entitled to receive a copy of its financial statements. It was suggested he would be in breach of his duty to the corporation if he were to disclose information about it to its detriment. While his having been a senior officer and director of the company would constrain what he could properly do now in the way of disclosing company information, the nature and scope of that constraint would, or might, depend on the capacity in which he received information and the circumstances in which he proposed to disclose it. For example, it was mentioned that the plaintiff has certain rights to seek to sell his shares and it was suggested he might be improperly constrained in the exercise of those rights by the order sought by the defendants against him. It seems to me that this matter merited more attention than it received in the submissions. At the conclusion of the defendants' submissions, emphasis was placed, not on the order requested against communications by the plaintiff, but on the order to seal the documents filed in court; that order was said to be the key request.

**15**    Having regard to the foregoing considerations, an order could be fashioned along the above lines, so as to seal only certain information and only for a limited period.

**16**    However, without a related order against disclosure by the plaintiff, it is doubtful that the sealing order could have its desired effect. As I understand the submissions of the defendants, their concern is that the plaintiff will follow through on his alleged threat to harm the company, by disclosing the potentially damaging information to the suppliers and customers of the company, who will then seek to minimize their risk by refusing further credit to the company, with the result that the company's operations will be halted and its employees will be put out of work. Merely sealing the documents on file in court without ancillary orders against other disclosure would not prevent the disclosure of damaging information, at least with respect to the results shown in the financial statements.

**17**    The scenario which the defendants advance as the justification for the order sought poses a further difficulty for the court. The defendants fear that if the detrimental information comes to the attention of suppliers and customers they will withdraw their credit from the company and cease dealing with it. From this, it must be inferred that these trade creditors would regard the information as disclosing a risk which requires avoidance action on their part. Thus if the adverse information is ordered not to be disclosed, the suppliers are to be deprived of information they would consider beneficial and the non-disclosure of which they would therefore presumably consider harmful. The defendants say that the suppliers and customers will be no worse off if they are obliged to wait while the company seeks to resolve its problems and that they may be better off, if a favourable resolution is achieved. Perhaps that is so but those persons are not before the court and the action it is anticipated they would take if they were to receive the disputed information seems to me to speak for itself as to how they would judge the withholding of the information. In the circumstances the court is in effect being asked to disregard the potential harm to one group of people, the suppliers and customers, in order to avoid a potential harm to another group of people, the employees. If no order is made, a harm may occur, but it will not be on account of any order made by the court in the particular case but rather by reason of the operation of the generally applicable rules of the court.

No basis is presented on which the court could properly decide that in this case it ought to shift the risk of harm from one third party group to another.

**18** The disclosure of internal corporate information in the course of legal proceedings may almost always have the potential for harm to the company concerned and perhaps to others as well. This consequence of the resort to the courts is not limited to corporate parties in commercial matters; individuals may suffer from the public disclosure which ordinarily accompanies litigation. If the prospect of harm were a sufficient basis for preventing disclosure, a great many litigants might justifiably seek to have their proceedings shielded from public view, whether through a sealing order, an order for in camera proceedings or otherwise. Widespread granting of such orders could tend to diminish public confidence in the administration of justice. These considerations suggest that such orders should be available only in exceptional cases.

**19** It was submitted for the defendants that support for their request for a confidential order is to be found in those cases which have held that there is an implied undertaking that information and materials produced on discovery will not be used for purposes other than the related litigation. The argument is that if the materials sought to be sealed in this case had been produced in the course of discovery instead of being incorporated in affidavits for use on the pending motion, they would have been subject to such an implied undertaking and there is no good reason in principle to limit the implied undertaking to discovery. Against this, it is argued that the original rationale for the implied undertaking is that discovery is an involuntary process which compels disclosure of matters that could otherwise remain private and it is therefore appropriate to require that information yielded through that process not be used for any purposes other than the related litigation. This rationale it is said, has no bearing on a situation where the disclosure is made voluntarily by the parties in the course of litigation, to advance their respective positions. This distinction seems sound to me. Whether the doctrine of the implied undertaking in respect of discovery is law in Ontario was recently considered in Goodman v. Rossi (O.C.J.(G.D.) Div. Ct.)), released November 29, 1994). A majority of the Divisional Court were of the opinion that the implied undertaking is not a rule of law in Ontario. For the above reasons, invoking the implied undertaking doctrine does not assist in resolving the issue in the present case.

**20** For the reasons given, despite the desirability of avoiding unnecessary harm to the employees, it has not been established that this is a proper case for a protective order. The order sought is too broad. It does not seem likely that a sealing order of limited scope and duration would be effective to avoid the harm foreseen. Such an order could detrimentally affect the interests of other persons - the trade creditors, and possibly also prospective investors. In the circumstances, this case should not be singled out for an exception to the important rule that the business of the courts is to be conduct in the open, where it can be subjected to public scrutiny.

**21** Accordingly, the motion is dismissed. To allow the defendants an opportunity to address themselves to the consequences this decision, the sealing order which is now in effect will continue in effect until the hearing of the motion now returnable on December 23 or until 5:00 p.m. on

December 30, 1994, whichever is earlier, subject to any further order of the court. Counsel may make submissions as to costs.

SPENCE J.

qp/d/mes/DRS/DRS/DRS/qldas

# TAB 3

998 F.2d 157
United States Court of Appeals,
Third Circuit.

LEUCADIA, INC.

v.

APPLIED EXTRUSION TECHNOLOGIES, INC.,
Richard I. Burstein, Proposed Intervenor, Appellant.

No. 92–7462.    |    Argued March
29, 1993.    |    Decided June 25, 1993.

Shareholder sued corporation for securities fraud. On shareholder's motion to unseal judicial records filed in litigation between defendant corporation and another corporation, the United States District Court for the District of Delaware, James L. Latchum, J., denied access, and shareholder appealed. The Court of Appeals, Sloviter, Chief Judge, held that: (1) there was presumptive right to public access to all material filed in connection with nondiscovery pretrial motion; (2) no such right extended to discovery motions and their supporting documents; (3) burden is on party seeking to deny access to prove that secrecy is required; and (4) shareholder was entitled to access to extent that materials were subject to common-law right of access.

Vacated and remanded.

West Headnotes (9)

[1]    **Records**
       ⬿ Access to records or files in general
       **Records**
       ⬿ Court records
       There is common-law right to inspect and copy public records and documents, including judicial records and documents, which predates Constitution and which applies in both criminal and civil cases.

       14 Cases that cite this headnote

[2]    **Records**
       ⬿ Court records

Public is presumed to have right to inspect and copy judicial records.

5 Cases that cite this headnote

[3]    **Records**
       ⬿ Court records
       Common-law presumption of public right of access to judicial records applies to material filed with court under seal.

       43 Cases that cite this headnote

[4]    **Records**
       ⬿ Court records
       Presumptive right of public access applies to pretrial motions of nondiscovery nature, whether preliminary or dispositive, and material filed in connection therewith.

       51 Cases that cite this headnote

[5]    **Records**
       ⬿ Court records
       Common-law presumption of right of access to documents filed in court does not extend to material filed with discovery motions.

       76 Cases that cite this headnote

[6]    **Records**
       ⬿ Court records
       Shareholder was entitled to access to sealed documents and materials produced during pretrial discovery and filed with district court in litigation between two corporations to extent that materials were subject to common-law right of access.

       15 Cases that cite this headnote

[7]    **Records**
       ⬿ Court records
       Party seeking to overcome presumption of right of access to judicial records has burden to make particularized showing of need for continued secrecy if documents are to remain under seal.

41 Cases that cite this headnote

**[8]    Federal Courts**
&#x25a0;&#x2014; Defective proceedings

Reviewing court, upon determining that district court had improperly placed burden of persuasion on party seeking access to sealed judicial records to prove that continued secrecy was no longer required, would not grant access to records; rather, matter would be remanded to district court to determine whether any document or portion thereof merited protection from disclosure.

17 Cases that cite this headnote

**[9]    Records**
&#x25a0;&#x2014; Access to records or files in general

Press has no greater right of access to public records than does the general public.

8 Cases that cite this headnote

**Attorneys and Law Firms**

**\*158** Susan Schneider Thomas (Argued), Zlotnick & Thomas, Bala Cynwyd, PA, Jeffrey S. Goddess, Rosenthal Monhait Gross & Goddess, P.A., Wilmington, DE, for appellant.

Kevin G. Abrams (Argued), David L. Finger, Richards, Layton & Finger, Wilmington, DE (John D. Donavan, Jr., Ropes & Gray, Boston, MA, of counsel), for appellee.

Before: SLOVITER, Chief Judge, COWEN and NYGAARD, Circuit Judges

**Opinion**

**OPINION OF THE COURT**

SLOVITER, Chief Judge.

This case requires us to consider once again the contours of the common law right of public access to judicial records, a right that is well established in this circuit. *See, e.g., Republic of the Philippines v. Westinghouse Elec. Corp.,* 949 F.2d

653 (3d Cir.1991); *Littlejohn v. BIC Corp.,* 851 F.2d 673 (3d Cir.1988); *Bank of America Nat'l Trust & Savings Ass'n. v. Hotel Rittenhouse Assocs.,* 800 F.2d 339 (3d Cir.1986). In the district court, Richard I. Burstein moved to intervene permissively in a settled lawsuit for the limited purpose of modifying a court-imposed protective order to gain access to material that had been filed with the court under seal pursuant to that order. The district court refused to allow Burstein to intervene for this limited purpose. Burstein appeals.

**I.**

**FACTS AND PROCEDURAL POSTURE**

Leucadia, Inc., a leading producer of extruded strong net products, filed an action in the United States District Court for the District of Delaware in November 1990 against Applied Extrusion Technologies, Inc. (AET), its business competitor, alleging misappropriation of trade secrets relating to AET's production of the nets (the Leucadia action). The gravamen of Leucadia's complaint for injunctive relief and damages focused on AET's hiring of several former Leucadia employees who had access to confidential technical information and customer lists.

The parties filed a joint motion for a protective order covering documents and materials produced during pretrial discovery, relying on the sensitive commercial issues raised in the complaint. On December 11, 1990 the district court entered the requested order, which specified that all "confidential information" produced by the parties would be filed with the district court under seal and would be used solely in the pending dispute between Leucadia and AET.[1] The order further **\*159** provided that either party could designate any document or part thereof as confidential provided that the party in good faith believed that the information so designated constituted "financial [information], trade secrets or confidential or proprietary information or know-how of such party." App. at 11. The district court was not required to review a party's confidentiality designation unless the opposing party objected, in which case the designating party would have the burden of proving that the information was appropriately subject to the confidentiality and sealing provisions of the order.[2]

With the entry of the protective order, Leucadia and AET commenced pretrial discovery. In the course of pretrial

Leucadia, Inc. v. Applied Extrusion Technologies, Inc., 998 F.2d 157 (1993)

62 USLW 2020, 25 Fed.R.Serv.3d 1315, 21 Media L. Rep. 1737

proceedings, the parties filed under seal certain motions to which were attached discovery documents or unsealed motions together with sealed exhibits.[3] In the district court's published opinion denying AET's motion to dismiss the complaint and for a more definite statement, directing Leucadia to file an amended complaint, and temporarily postponing Leucadia's discovery to permit AET to ascertain from Leucadia the trade secrets which AET allegedly misappropriated, the court made references to some of the sealed material without disclosing their contents. *See Leucadia. Inc. v. Applied Extrusion Technologies, Inc.,* 755 F.Supp. 635 (D.Del.1991).

After the parties conducted additional discovery, AET filed a counterclaim and Leucadia moved for a preliminary injunction. Before a hearing on Leucadia's motion could be held, however, the parties reached a settlement of their dispute which they filed under seal. On August 23, 1991, the district court dismissed the case with prejudice pursuant to the terms of the settlement, but noted that it "retain[ed] jurisdiction over the parties for ***160** the limited purpose of enforcing ... the settlement agreement...." App. at 68.

In December 1991, Burstein, a stockholder of AET, filed a class action suit against the corporation and its directors in the United States District Court for the District of Delaware (the Burstein action). Burstein's complaint alleged that the defendants violated federal securities laws by making false and misleading statements regarding the corporation's business prospects, including the failure to disclose adequately the consequences of the Leucadia litigation and settlement, in a prospectus issued as part of a public offering of AET securities in 1991.

On May 21, 1992, nine months after the Leucadia litigation was dismissed with prejudice, Burstein filed a motion for permissive intervention to unseal the documents filed pursuant to the protective order in the Leucadia action. Burstein sought to "(a) obtain and examine all documents and papers filed with the Court under seal; (b) take discovery, including subpoenas for documents and materials in the possession of others who are currently bound by the protective order; and (c) use the items examined or obtained ... in the course of the collateral securities action." App. at 73.

The district court held a hearing on Burstein's motion on June 26, 1992 at which AET opposed the intervention. Leucadia initially expressed a willingness to permit Burstein to inspect the documents, provided that the district court could ensure

their confidentiality and limit their use to the collateral securities litigation. Burstein agreed to be bound by these conditions and by the terms of the protective order. Burstein conceded that an order entered several days earlier in the Burstein action staying all merits-related discovery pending a ruling on AET's motion to transfer[4] precluded him from using the formal tools of discovery to obtain information concerning the securities litigation from any party to that dispute. Thus, at the hearing, Burstein limited his intervention request to examining and copying the documents filed under seal.

The district court denied Burstein's motion. The court did not discuss the contents of the documents, noting only that it had approved "a comprehensive protective order relating to information obtained in discovery ... because of the ultra sensitive nature of both parties' trade secrets." App. at 124–25. The court also stated that the stay order in the Burstein action was the "law of the case in the securities action and this ruling should not be ignored by another judge of the same court." App. at 125–26. Finally, the court addressed Leucadia's confidentiality concerns:

> [T]his Court does not know how to deliver these assurances [regarding confidentiality]. The Court surely is in no position to examine the documents *in camera* and sort out documents in the manner Leucadia suggests. The simplest way would be to open the file to the public of all documents now under seal but neither party desires this. Thus Burstein has not shown sufficient reason to discover the documents under seal in this action and the motion to intervene [is] accordingly denied.

App. at 126.

The district court denied Burstein's motion for reargument and Burstein filed a timely notice of appeal. We have jurisdiction under 28 U.S.C. § 1291. *See Westinghouse,* 949 F.2d at 658 n. 4 ("[O]rders ... denying a motion to unseal are collateral orders within the meaning of 28 U.S.C. § 1291."); *Beckman Indus., Inc. v. International Ins. Co.,* 966 F.2d 470, 472 (9th Cir.) (order denying motion to intervene for limited purpose of modifying protective order "appealable either as

**Leucadia, Inc. v. Applied Extrusion Technologies, Inc., 998 F.2d 157 (1993)**

62 USLW 2020, 25 Fed.R.Serv.3d 1315, 21 Media L. Rep. 1737

a final order ... or as a collateral order"), **\*161** *cert. denied,* 506 U.S. 868, 113 S.Ct. 197, 121 L.Ed.2d 140 (1992).[5]

## II.

## DISCUSSION

### A.

### The Common Law Right of Access

[1]   In numerous cases since our decision in *United States v. Criden,* 648 F.2d 814 (3d Cir.1981), this court has acknowledged the existence of a pervasive common law right "to inspect and copy public records and documents, including judicial records and documents." *Id.* at 819 (quoting *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 597, 98 S.Ct. 1306, 1311, 55 L.Ed.2d 570 (1978)). The existence of this right, which antedates the Constitution and which is applicable in both criminal and civil cases, is now "beyond dispute." *Littlejohn,* 851 F.2d at 677–78 (quoting *Publicker Indus., Inc. v. Cohen,* 733 F.2d 1059, 1066–67 (3d Cir.1984)).[6]

[2]   As we recently explained, the presumption that the public has a right to inspect and copy judicial records serves numerous salutary functions:

> The public's exercise of its common law access right in civil cases promotes public confidence in the judicial system.... As with other branches of government, the bright light cast upon the judicial process by public observation diminishes the possibilities for injustice, incompetence, perjury, and fraud. Furthermore, the very openness of the process should provide the public with a more complete understanding of the judicial system and a better perception of its fairness.

*Westinghouse,* 949 F.2d at 660 (quoting *Littlejohn,* 851 F.2d at 678). In addition, "[a]ccess to civil proceedings and records promotes 'public respect for the judicial process' and helps to assure that judges perform their duties in an honest and informed manner." *Id.* (citation omitted) (quoting *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 606, 102 S.Ct. 2613, 2619, 73 L.Ed.2d 248 (1982)).

Accordingly, we have applied the presumption of public access to a wide variety of civil records and documents, including papers filed in connection with a motion for summary judgment, *Westinghouse,* 949 F.2d at 660–62; the transcript of a civil trial and exhibits admitted at trial, *Littlejohn,* 851 F.2d at 678–80; settlement documents and post-settlement motions seeking to interpret and enforce the agreement filed with the district court, *Bank of America,* 800 F.2d at 343–46; and transcripts of a hearing for a preliminary injunction, *Publicker,* 733 F.2d at 1066–67.

In *Bank of America,* where we held that the presumption of public access attached to a settlement agreement and to post-settlement motions, we acknowledged the strong interest in encouraging speedy settlement of private disputes, but nevertheless explained that "[o]nce a settlement is filed in the district court, it becomes a judicial record, and subject to the access accorded such records." 800 F.2d at 344–45. Indeed, it was the act of filing *vel non* that triggered the presumption of access, since the parties could have easily shielded their settlement from public scrutiny by filing a stipulation of dismissal pursuant to Fed.R.Civ.P. 41(a)(1). *Id.* at 344.

Numerous other courts have also recognized the principle that the filing of a document **\*162** gives rise to a presumptive right of public access. *See, e.g., FTC v. Standard Fin. Mgmt. Corp.,* 830 F.2d 404, 409 (1st Cir.1987) ( "documents which are submitted to, and accepted by, a court of competent jurisdiction in the course of adjudicatory proceedings, become documents to which the presumption of public access applies"); *Crystal Grower's Corp. v. Dobbins,* 616 F.2d 458, 460–61 (10th Cir.1980) (right of access attaches to docketing statement, joint appendix and briefs filed in court of appeals); *Pratt & Whitney Canada, Inc. v. United States,* 14 Cl.Ct. 268, 273 (1988) (right of access attaches to "pleadings, orders, notices, exhibits and transcripts filed"); *In re "Agent Orange" Prod. Liab. Litig.,* 96 F.R.D. 582, 584 (E.D.N.Y.1983) (right of access attaches to documents filed with the district court); *In re Johnson,* 232 Ill.App.3d 1068, 174 Ill.Dec. 209, 598 N.E.2d 406, 410 (Ill.App.Ct.1992) ("Once documents are filed with the court, they lose their private nature and become part of the court file and 'public components' of the judicial proceeding to which the right of access attaches." (citation omitted)).

[3]   Burstein argues that the common law presumption of access is applicable as well to the material filed under seal in this case, notwithstanding that some of it was generated as part of the discovery process. Before considering this question, it is important to recognize what is not before us. Burstein does not rely on the First Amendment as the basis for his claimed right of access to the discovery material. Nor does Burstein look to the Federal Rules of Civil Procedure as providing a basis for the relief that he seeks.[7]

In addition, because Burstein seeks only access to documents that are on file, this case does not implicate the standards to be used by the court in entering a pretrial protective order that prohibits the parties from disseminating in advance of trial information in their possession obtained through the discovery process, the issue resolved in *Seattle Times v. Rhinehart*, 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984). And, finally, because all of the discovery documents at issue were filed in connection with motions that sought court action, such as Leucadia's motion for a preliminary injunction and AET's motion to compel certain discovery, we need not decide whether there is any right to access to discovery filed with the court unconnected with any motion.[8]

*163 Turning our attention then to the issue that is before us, whether there is a presumptive right of access based on common law principles to material generated through discovery filed with the court in conjunction with pending motions,[9] we find only sparse authority. In a case limited to requested access to documents submitted in connection with discovery motions, the First Circuit held that there is no common law right to inspect such documents because "[t]here is no tradition of public access to discovery, and requiring a trial court to scrutinize carefully public claims of access would be incongruous with the goals of the discovery process." *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 13 (1st Cir.1986).

In an extended discussion of this issue, the District of Columbia Court of Appeals in *Mokhiber v. Davis*, 537 A.2d 1100 (D.C.App.1988), held that there was a presumptive common law right of public access to motions relating to the discovery process, such as the plaintiff's motion to amend the protective orders, the defendants' opposition thereto, and the defendants' opposition to motions to compel discovery. *Id.* at 1111-13. Although the court recognized that "[t]here is no common law tradition of access specifically directed to discovery hearings and to the pleadings submitted in connection with them," it rejected the argument that "the lack

of a specific tradition of access to pretrial proceedings defeats any claim for a common law right of access to discovery motions." *Id.* at 1111-12. The court reasoned that modern discovery rules "have qualitatively altered the character of pretrial discovery and the demands it makes on the courts as well as on the parties." *Id.* at 1112.

The court stated that "[i]t would make little sense to shut off access for what is, practically speaking, a new kind of judicial proceeding just because that particular procedure did not exist at common law." *Id.* It continued, "the Public should enjoy the right to view new kinds of proceedings when they are like traditional ones in this significant respect: that access will serve the same values and policies which underlie the common law's recognition of the public right to view other parts of court procedure." *Id.* The court then examined the policies supporting a presumption of openness and concluded that:

> [t]he manner in which [the discovery process] proceeds may prove decisive to the outcome of particular disputes, and the availability of mandatory discovery has greatly affected the way in which our courts do justice. Moreover, discovery procedures have become a continuing focus of controversy and reform within the judicial and the legal community. This debate has arisen precisely because discovery is so important in trial practice. If we take as our standard "that the public's right of access attaches to decisions of major importance to the administration of justice," then discovery motions and hearings fall within the ambit of this right.

*Id.* (quoting *Anderson*, 805 F.2d at 11).

It followed from the court's conclusion that there was a presumptive right of public access to discovery motions that there would also be a presumptive right of access to more substantive motions, in that case the defendants' oppositions to plaintiff's motions for a continuance and for amendment of the *ad damnum* clause of the complaint. *Id.* at 1100, 1113.

In this case, the material submitted under seal falls within both categories of motions considered in *Mokhiber*. Some of the sealed discovery material was filed in connection with Leucadia's motion for a preliminary injunction, AET's motion to dismiss and for a more definite statement, the exhibit to Leucadia's first amended complaint, and AET's motion for preclusion of evidence, which were *164 not merely motions relating to discovery. In contrast, the material submitted with respect to AET's motions to compel

**Leucadia, Inc. v. Applied Extrusion Technologies, Inc., 998 F.2d 157 (1993)**

62 USLW 2020, 25 Fed.R.Serv.3d 1315, 21 Media L. Rep. 1737

production of documents and answers to interrogatories and Leucadia's motion to shorten time for production of documents can be characterized as discovery motions.

**[4]**  We believe that our earlier decisions and those in other courts lead ineluctably to the conclusion that there is a presumptive right of public access to pretrial motions of a nondispositive nature, whether preliminary or dispositive, and the material filed in connection therewith. In *Bank of America,* where we held that a settlement agreement should not be sealed, we stated that the presumption in favor of public access applies not only to all civil trials and records but also to "motions filed in court proceedings." 800 F.2d at 343. In *Westinghouse,* we affirmed the district court's order directing the unsealing of material filed in support of or in opposition to Westinghouse's motion for summary judgment, even though the district court had denied summary judgment, concluding that papers filed in connection with such a motion "are not entitled to be shielded from public access merely because the district court denied the motion rather than granted it." 949 F.2d at 661.

We see no reason to distinguish between material submitted in connection with a motion for summary judgment and material submitted in connection with a motion for preliminary injunction, an exhibit to a complaint, and a motion to dismiss and for a more definite statement. The same is, of course, true as to any filed settlement agreement, our precise holding in *Bank of America.* The rationale applied in *Bank of America,* where we stated that "the [district] court's ... action on a motion [is a] matter[ ] which the public has a right to know about and evaluate," 800 F.2d at 344, is equally applicable here. Thus at least to this extent we agree with the *Mokhiber* court that "[b]y submitting pleadings and motions to the court for decision, one enters the public arena of courtroom proceedings and exposes oneself, as well as the opposing party, to the risk, though by no means the certainty, of public scrutiny." 537 A.2d at 1111. [10]

**[5]**  Significantly, our holding in *Westinghouse* left open the issue "whether there might be a basis to distinguish motions that are merely part of the discovery proceedings." 949 F.2d at 661. There are indeed some valid reasons why one could conclude that the common law presumptive right of access to pretrial motions is equally applicable to discovery motions and they were fully articulated by the *Mokhiber* court as set forth above. We are nonetheless reluctant for several reasons to extend the common law presumption of access to filed judicial records so far at this time.

In the first place, we cannot overlook the Supreme Court's statements in *Seattle Times,* albeit uttered in a different context, that "pretrial deposition and interrogatories are not public components of a civil trial. Such proceedings were not open to the public at common law and, in general, they are conducted in private as a matter of modern practice." 467 U.S. at 33, 104 S.Ct. at 2208 (internal citations omitted).

In the second place, a holding that discovery motions and supporting materials are subject to a presumptive right of access would make raw discovery, ordinarily inaccessible to the public, accessible merely because it had to be included in motions precipitated by inadequate discovery responses or overly aggressive discovery demands. This would be a holding based more on expediency than principle. Moreover, we do not know what the effect would be on the discovery process itself of holding such discovery presumptively accessible. *See Anderson,* 805 F.2d at 12 (permitting public access to discovery *165 might actually make the civil discovery process "more complicated and burdensome than it already is"). The public policy implications of an expansion of the common law presumption of access to discovery motions are unclear, and this alone should counsel restraint. *See* Oliver W. Holmes, The Common Law 32 (Mark D. Howe ed., 1963) ("Every important principle which is developed by litigation is in fact and at bottom the result of more or less definitely understood views of public policy; most generally, to be sure, under our practice and traditions, the unconscious result of instinctive preferences and inarticulate convictions, but none the less traceable to views of public policy in the last analysis."). [11]

Finally, we see little need to extend the federal common law to discovery motions at this time when there is in existence a source of law for the normative rules governing public access to discovery materials, that is Rules 5(d) and 26(c) of the Federal Rules of Civil Procedure. It is significant that the First Circuit, notwithstanding its 1986 opinion in *Anderson* holding that there is no common law of access to discovery motions, held two years later in *Public Citizen v. Liggett Group, Inc.,* 858 F.2d 775, 789–90 (1st Cir.1988), *cert. denied,* 488 U.S. 1030, 109 S.Ct. 838, 102 L.Ed.2d 970 (1989), that Rules 5(d) and 26(c) of the Federal Rules of Civil Procedure provide a basis pursuant to which a district court may lift its protective order precluding a party from making public unfiled discovery materials. [12]

62 USLW 2020, 25 Fed.R.Serv.3d 1315, 21 Media L. Rep. 1737

We recognize that our holding that the common law of presumptive access to documents filed in court does not extend to material filed with discovery motions may lead the parties to shield from view material which should not be sealed. We need not decide here whether we would interpret the Federal Rules of Civil Procedure to permit a member of the public to challenge an overly protective sealing order. *See In re "Agent Orange" Prod. Liab. Litig.,* 821 F.2d 139, 146 (2d Cir.) (permitting such intervention), *cert. denied,* 484 U.S. 953, 108 S.Ct. 344, 98 L.Ed.2d 370 (1987). We must rely in the first instance on the district courts to protect the legitimate public interest in filed materials from overly broad and unjustifiable protective orders agreed to by the parties for their self-interests. *See United States v. Corbitt,* 879 F.2d 224, 228 (7th Cir.1989) ("[T]he public's right to inspect judicial records may not be evaded by a wholesale sealing of court papers. Instead, the district court must be sensitive to the rights of the public in determining whether any particular document, or class of documents, is appropriately filed under seal.").

To recapitulate, we hold there is a presumptive right to public access to all material filed in connection with nondiscovery pretrial motions, whether these motions are case dispositive or not, but no such right as to discovery motions and their supporting documents.

### B.

#### Countervailing Interests

[6]   Of course, the fact that a presumption of openness attaches to the discovery documents filed with the pretrial motions in this case does not end our inquiry. Although "the right of access is firmly entrenched, so also is the correlative principle that the right ... is not absolute." *Bank of America,* 800 F.2d at 344. Rather, "the strong common law presumption of access must be balanced against the factors militating against access. The burden is on the party who seeks to overcome the presumption of access to show that the interest in secrecy outweighs the presumption." *Id.* (citations omitted).

*166   Documents containing trade secrets or other confidential business information may be protected from disclosure. As the Supreme Court stated in *Nixon v. Warner Communications,* 435 U.S. at 598, 98 S.Ct. at 1312, "courts have refused to permit their files to serve as ... sources of business information that might harm a litigant's competitive standing." We too have explained that the presence of trade secrets in court records weighs against the right of access, although we have framed the inquiry as whether the need for secrecy outweighs the presumption of access that normally attaches to such documents. *See Westinghouse,* 949 F.2d at 663 (" '[t]he potential effects of the disclosure of business information that might harm the litigant's competitive standing may in some cases meet the burden of [justifying keeping] the judicial record under seal' ") (quoting district court opinion); *see also Littlejohn,* 851 F.2d at 685.

Under Fed.R.Civ.P. 26(c)(7), the district court, for good cause shown, may grant a protective order requiring that "a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way." Fed.R.Civ.P. 26(c)(7). However, the Rules also explain that "courts have not given trade secrets automatic and complete immunity against disclosure, but have in each case weighed their claim to privacy against the need for disclosure." Fed.R.Civ.P. 26(c) advisory committee's note to 1970 amendment. As we explained in *Cipollone v. Liggett Group, Inc.,* 785 F.2d 1108, 1121 (3d Cir.1986), "Rule 26(c) places the burden of persuasion on the party seeking the protective order. To overcome the presumption, the party seeking the protective order must show good cause by demonstrating a particular need for protection. Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test."

We emphasized that "the burden of justifying the confidentiality of each and every document sought to be covered by a protective order remains on the party seeking the protective order; any other conclusion would turn Rule 26(c) on its head." *Id.* at 1122. Because of the benefits of umbrella protective orders in complex cases, the court may construct a broad "umbrella" protective order "upon a threshold showing by one party (the movant) of good cause." *Id.* After delivery of the documents, the opposing party would have the opportunity to indicate precisely which documents it believed to be not confidential, and the party seeking to maintain the seal would have the burden of proof with respect to those documents. *Id.* Although our decision in *Cipollone* concerned the challenge by a party to the confidentiality designation made by its opponent, our reasoning applies with equal force when a non-party moves to intervene in a pending or settled lawsuit for the limited purpose of modifying a protective order and inspecting documents filed under seal.

[7]    In entering the umbrella protective order in this case, the district court permitted the parties to designate any document as confidential and subject to filing under seal based solely on the parties' good faith determination that the document contained trade secrets or other confidential information. Although the record does not show that the district court ever made a finding that there was "good cause" for sealing any of the specific documents, the court was familiar with their general nature because they were submitted in connection with various motions. We have no reason to question the validity of the parties' initial confidential designations, but now that Burstein has moved to intervene to challenge the protective order, Leucadia and/ or AET must make a "particularized showing of the need for continued secrecy" if the documents are to remain under seal. *See Bank of America,* 800 F.2d at 346; *see also In re "Agent Orange" Prod. Liab. Litig.,* 821 F.2d at 148 (where parties stipulated to umbrella protective order, district court acted within its discretion by vacating order and permitting access by intervenor to filed discovery materials "subject to a showing, on an individualized basis, of good cause for continued protection").

Our review of the record in this case demonstrates that the district court improperly placed the burden of proof on Burstein to provide a "sufficient reason to discover the **\*167** documents under seal," App. at 126, rather than requiring AET and/or Leucadia to demonstrate a particularized need for continuing to enforce the protective order. Moreover, the district court permitted all of the documents filed to remain under seal without conducting a document-by-document review of their contents, even after AET admitted in its letter brief that only "*certain* of the documents filed under seal in this proceeding ... contain highly sensitive, non-public information which include trade secrets of AET and/ or Leucadia." App. at 128 (emphasis added).

The district court's approach to Burstein's requests was inconsistent with our prior statements that careful factfinding and balancing of competing interests is required before the strong presumption of openness can be overcome by the secrecy interests of private litigants. *See Littlejohn,* 851 F.2d at 685 (finding no abuse of discretion where "[t]he district court carefully considered each of the factors which favored access or continued secrecy for the documents at issue and assigned appropriate weights to the various interests").

[8]    In light of the district court's improper allocation of the burden of persuasion and its failure to separate trade secrets and other sensitive business information from the settlement agreement and material filed with the nondiscovery pretrial motions that may properly be subject to disclosure, we will vacate the order denying Burstein's motion to intervene and remand this matter to permit the district court in the first instance to conduct a review of the documents on file. We reject Burstein's argument that we should ourselves direct lifting of the protective order. We have repeatedly emphasized that the required balancing should be done in the first instance by the district court. *See Criden,* 648 F.2d at 829 (remanding "so that the district court can exercise its discretion to determine whether specific portions of the [audio and video] tapes merit excision" before being released to the news media).

In determining whether any document or portion thereof merits protection from disclosure, the district court should be guided by our prior advice that continued sealing must be based on "*current evidence* to show how public dissemination of the pertinent materials *now* would cause the competitive harm [they] claim[ ]." *Westinghouse.* 949 F.2d at 663 (emphasis added). However, as to those materials that the district court determines to be bona fide trade secrets after carefully weighing the factors for and against access, it may properly order them to remain filed under seal subject to the terms of the protective order.

### C.

### *The Effect of the Stay In the Collateral Action*

AET suggests that because Burstein has been subject to a stay of discovery in his collateral securities action against AET and its officers, [13] there is no need for the district court to make the particularized inquiry directed above. Burstein seems to argue that because he has agreed to be bound by the confidentiality order under which access was given to the discovery materials in the *Leucadia* action, he has a special claim to access. We reject both arguments.

[9]    The Supreme Court has made it plain that all persons seeking to inspect and copy judicial records stand on an equal footing, regardless of their motive for inspecting such records. Thus, the press has no greater right of access than does the general public, *see Nixon v. Warner Communications,* 435

U.S. at 609, 98 S.Ct. at 1318 (relying on First Amendment), and more importantly, an intervenor who is also a litigant in a collateral proceeding enjoys no lesser rights merely because s/ he desires to use public documents for his or her own benefit. As we have explained, "[t]he applicability and importance of the[ ] interests [favoring public access] are not lessened because they are asserted by a private party to advance its own interests in pursuing its lawsuits against [a party to the **\*168** original action]." *Bank of America,* 800 F.2d at 345; *cf. Mayock v. Nelson,* 938 F.2d 1006, 1008 (9th Cir.1991) ("rights under [the Freedom of Information Act] are neither diminished nor enhanced by litigation-generated need for agency documents") (quotation omitted).

The discovery stay imposed in the collateral securities litigation does not change this result. Just as Burstein could, consistent with the stay order, continue to research the factual underpinning for his claim in libraries or other institutions where publicly available information is stored, so he may also inspect and copy those court records which any member of the public has a right to view.

We have no occasion to consider the scope of the stay order, which is not before us. We hold merely that to the extent that the sealed materials are subject to the common law right of access, they are open to all; there is no principled basis upon which Burstein may be barred from inspecting and copying them.

### III.

For the reasons set forth above, we will vacate the district court's order denying Burstein's intervention and remand for further proceedings consistent with this opinion.

### Parallel Citations

62 USLW 2020, 25 Fed.R.Serv.3d 1315, 21 Media L. Rep. 1737

Footnotes

1    The relevant portions of the protective order read as follows:

This matter having come before the Court on stipulated motion of [the parties] for entry of a protective order pursuant to Fed.R.Civ.P. 26(c), and the Court having been advised that confidential and proprietary information may be disclosed in discovery and at trial of this cause, it is hereby ORDERED that:

If in the course of proceedings in this action a party or nonparty witness (the "producing party") discloses trade secrets or research and development or other confidential technical, scientific, commercial or financial information, within the meaning of Rule 26(c) of the Federal Rules of Civil Procedure, the following procedure shall be employed:

1. All confidential information produced or exchanged pursuant to pretrial discovery in this litigation shall be used solely for the purpose of this litigation except by further order of the Court....

2. "Confidential" information as used therein means any type or classification of information which is designated as "confidential" by a party pursuant to the procedures of this Order, whether that information be a document, information contained in a document, information revealed during a deposition, information revealed in an interrogatory answer, answers to requests for admission or otherwise. In designating information as "confidential," a party will make such designation only as to that information that it in good faith believes to constitute financial [information], trade secrets, or other confidential or proprietary information or know-how of such party.

. . . . .

9. No person may disclose, in public or private, designated material except as set forth in this Order; but nothing contained in this Order shall affect the right of any designating party to disclose to anyone information it designated as "confidential."

10. Nothing herein shall prevent disclosure of confidential information beyond the terms of this Order if each and every party consents to such disclosure, or, if the Court, after notice to all parties, orders such disclosure....

. . . . .

13. All transcripts, depositions, exhibits, answers to interrogatories and other documents and things filed with the Court pursuant to the pretrial discovery of any party to the litigation which have previously thereto been marked by a party as comprising or containing confidential information ... or any pleading or memorandum purporting to reproduce or paraphrase such information, shall be filed in sealed envelopes....

14. Promptly upon final termination of this action, including appeals and any injunctive relief, each party having documents containing confidential information or material designated as confidential by another party or nonparty witness shall assemble

and return to the producing party all such documents and materials.... Insofar as the provisions of this Order entered in this action restrict the communication and use of the documents produced thereunder, this Order shall continue to be binding after the conclusion of this litigation.

App. at 10, 11, 15, 16, 17.

2 The record reveals that the district court adjudicated only a single confidentiality dispute under the protective order. On June 6, 1991, the court granted AET's motion to unseal twelve pages of a deposition transcript that AET believed was material to a public offering of its common stock. The court concluded that the deposition did not contain trade secrets and that the need for disclosure required by the federal securities laws outweighed any harm to Leucadia.

3 These documents, which are contained in the sealed record on appeal, are: (1) an itemization of Leucadia's trade secrets and confidential business information and the measures used to protect them (later attached AET's motion to dismiss and Leucadia's amended complaint, items (3) and (6) below); (2) a memorandum in support of AET's motion to dismiss and for a more definite statement; (3) an exhibit to that motion; (4) Leucadia's memorandum in opposition; (5) AET's notice to take the deposition of Leucadia; (6) exhibit A to Leucadia's first amended complaint; (7) an appendix to and memorandum in support of Leucadia's motion to shorten time for production of documents; (8) a memorandum in support of Leucadia's motion for a preliminary injunction; (9) an appendix to AET's motion for preclusion of evidence; (10) an appendix to AET's motion to compel production of documents; (11) an appendix to AET's motion to compel an answer to interrogatories; and (12) the parties' settlement agreement.

4 On August 25, 1992, the court in the Burstein action granted AET's motion to transfer the case to the district of Massachusetts. *See Burstein v. Applied Extrusion Technologies, Inc.,* 829 F.Supp. 106 (D.Del.1992). The parties dispute whether the stay of discovery is still in effect now that the case is pending in the district of Massachusetts. AET asserts that it will seek a continuation of the stay pending a ruling on its motion to dismiss Burstein's complaint. *See* Brief for Appellee at 6 n. 3. We assume the continuation of the stay for purposes of this opinion.

5 Although AET has not contested the procedure by which Burstein sought to gain access to the sealed records, we note that a district court may properly consider a motion to intervene permissibly for the limited purpose of modifying a protective order even after the underlying dispute between the parties has long been settled. *See, e.g., United Nuclear Corp. v. Cranford Ins. Co.,* 905 F.2d 1424, 1427 (10th Cir.1990) (permitting intervention three years after underlying action had settled and noting that "courts have widely recognized that the correct procedure for a non-party to challenge a protective order is through intervention for that purpose"), *cert. denied,* 498 U.S. 1073, 111 S.Ct. 799, 112 L.Ed.2d 860 (1991); *Beckman,* 966 F.2d at 471–73 (same, for intervention motion filed two years after case was settled and dismissed).

6 In addition, we have stated that the First Amendment, independent of the common law, protects the public's right of access to the records of civil proceedings. *Westinghouse,* 949 F.2d at 659. In this case, however, we limit our inquiry to the common law.

7 *See Public Citizen v. Liggett Group, Inc.,* 858 F.2d 775, 780, 788–90 (1st Cir.1988) (holding that public has presumptive right under Fed.R.Civ.P. 5(d) and 26(c) to inspect discovery materials filed with the district court and that "[t]he effect of ... nonfiling was to deny the public the right it would otherwise have had to inspect freely the discovery materials in this case"), *cert. denied,* 488 U.S. 1030, 109 S.Ct. 838, 102 L.Ed.2d 970 (1989); *In re "Agent Orange" Prod. Liab. Litig.,* 821 F.2d 139, 146–47 (2d Cir.) (holding that under Fed.R.Civ.P. 5(d) and 26(c) the public enjoys "a presumptive right of access to discovery materials" filed with the district court pursuant to a protective order), *cert. denied,* 484 U.S. 953, 108 S.Ct. 344, 98 L.Ed.2d 370 (1987); *see also United States ex rel. Stinson, Lyons, Gerlin & Bustamonte v. Prudential Ins. Co.,* 944 F.2d 1149, 1158–60 (3d Cir.1991) (holding that federal rules create presumption of access to civil discovery materials sufficient to satisfy False Claims Act provision barring *qui tam* actions based on publicly disclosed information).

8 *See* 8 Charles Allen Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2042, at 298 (1970) ("Ordinarily a deposition is a public document freely open to inspection after it is filed with the clerk."); *Wilson v. American Motors Corp.,* 759 F.2d 1568, 1569, 1571 (11th Cir.1985) (right of access attaches to "pleadings, docket entries, orders, affidavits or depositions duly filed, and transcripts or court reporter's notes of hearings or trial proceedings"). *But see Wilk v. American Medical Ass'n.* 635 F.2d 1295, 1299 n. 7 (7th Cir.1980) (no presumption of openness under the common law to filed discovery materials until entered into evidence).

Although it is no longer, if it ever was, prevailing practice to file all discovery, and the Clerks of the district courts would undoubtedly view with askance any effort to use their limited space for that purpose, it is clear that such filing is contemplated by the Federal Rules of Civil Procedure. Thus, Fed.R.Civ.P. 5(d) provides: "All papers after the complaint required to be served upon a party ... shall be filed with the court within a reasonable time after service, but the court may on motion of a party or on its own initiative order that [discovery papers] not be filed unless on order of the court or for use in the proceeding."

The Advisory Committee Note to Rule 5 explains that in 1978 the Committee considered adopting a rule that discovery materials would not be filed unless the court ordered their filing, but retained the filing requirement because "such materials are sometimes of interest to those who may have no access to them except by a requirement of filing, such as members of a class, litigants similarly situated, or the public generally." Fed.R.Civ.P. 5(d) advisory committee's note to 1980 amendment.

**Leucadia, Inc. v. Applied Extrusion Technologies, Inc., 998 F.2d 157 (1993)**

62 USLW 2020, 25 Fed.R.Serv.3d 1315, 21 Media L. Rep. 1737

9     It has not been suggested that the "raw fruits" of discovery in the possession of private litigants that have not been filed with the court are subject to any right of access. As we explained in *Bank of America*, "discovery ... which is ordinarily conducted in private, stands on a different footing than does a motion filed by a party seeking action by the court." 800 F.2d at 343. *See Mokhiber v. Davis*, 537 A.2d 1100, 1109 (D.C.App.1988) ("no right of public access to pretrial depositions, interrogatories, and documents gained through discovery").

10    In light of our holding, we need not rely on the possibility that some of the sealed documents would be presumptively public because they were referred to by the district court in its published opinion in *Leucadia*, 755 F.Supp. at 636–37. *See, e.g., Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 529 F.Supp. 866, 901 (E.D.Pa.1981) (Becker, J.) (right of access applies to sealed documents "on which the court relies in making a ruling and which the court discusses in a published opinion"); *In re "Agent Orange" Prod. Liab. Litig.*, 98 F.R.D. 539, 545 (E.D.N.Y.1983) ("documents referred to by the court in its opinions become part of the public record and should be open to the public for inspection and copying").

11    We do not foreclose the possibility that accumulative experience may at some future time lead to expansion of the common law in this respect. *See* Richard L. Marcus, *The Discovery Confidentiality Controversy*, 1991 U.Ill.L.Rev. 457, 476.

12    Particularly surprising in light of *Anderson* is the court's statement in *Public Citizen* that, "Rule 26(c)'s good cause requirement means that, '[a]s a general proposition, pretrial discovery must take place in the public unless compelling reasons exist for denying the public access to the proceedings.' " 858 F.2d at 789 (quoting *American Tel. & Tel. Co. v. Grady*, 594 F.2d 594, 596 (7th Cir.1978), *cert. denied*, 440 U.S. 971, 99 S.Ct. 1533, 59 L.Ed.2d 787 (1979)).

13    As stated above, the Burstein action was transferred from the district of Delaware to the district of Massachusetts, where the status of the stay order remains disputed by the parties. *See supra* note 4.

---

**End of Document**                                © 2014 Thomson Reuters. No claim to original U.S. Government Works.

**TAB 4**

Ontario Council of Hospital Unions et al. v. Clement,
Minister of Health and Long-Term Care for the Province of
Ontario et al.

[Indexed as: Ontario Council of Hospital Unions v. Ontario
(Minister of Health and Long-Term Care)]

85 O.R. (3d) 55

Ontario Superior Court of Justice, Divisional
Court,
Ferrier J.
February 2, 2007

Administrative law -- Judicial review -- Jurisdiction --
Master not having jurisdiction to hear interlocutory motion in
judicial review application -- Judge in judicial review
application having power to refer interlocutory issue to master
acting as referee.

On an application for judicial review of certain decisions of
the respondent Minister of Health, an issue arose about the
confidentiality of certain documents. The case management judge
found that the documents were confidential and were to be
produced subject to restrictions on public access (the
"Confidentiality Order"). If there were any issues of
relevance concerning any document, the parties were to return
to the case management judge to resolve those issues. The
parties were unable to resolve issues of relevance of various
documents and could not resolve issues concerning the ultimate
confidentiality of documents in the hands of the respondent.
The applicants wrote to the case management judge to schedule a
motion before him to resolve relevance and confidentiality
issues. The case management judge referred the matter to the
Administrative Master, who in turn assigned another Master to
deal with the matter. The Master heard a motion for directions

2007 CanLII 2659 (ON SCDC)

regarding the content of the record to be publicly filed with
the Divisional Court for the judicial review proceedings,
pursuant to s. 10 of the Judicial Review Procedure Act, R.S.O.
1990, c. J.1 ("JRPA"). The Master ruled that the documents in
question were to be placed in the Section 10 Record. On appeal
from the Master's order, it was argued that the Master did not
have jurisdiction over the subject matter of the motion and
that, if he did have jurisdiction, he exceeded his jurisdiction
by varying the Confidentiality Order.

 Held, the appeal should be dismissed.

 A Master does not have jurisdiction to hear an interlocutory
motion in a judicial review application. Under rule 37.02(2)(f)
of the Rules of Civil Procedure, R.R.O. 1990, Reg. 194, a
master does not have jurisdiction to hear a motion under s. 4
or s. 5 of the JRPA. Section 4 of the JRPA states, "On an
application for judicial review, the court may make such
interim order as it considers proper pending the final
determination of the application." There is no longer any
substantial difference between an "interlocutory order" and an
"interim order". To the extent that any distinction remains,
it can only be reasonably said to apply in the case of
injunctions. Even if that conclusion were wrong, s. 21(3) of
the Courts of Justice Act, R.S.O. 1990, c. C.43 requires "a
motion" in the Divisional Court to be heard by a judge, and
rule 37.02(2)(a) exempts from the jurisdiction of a master a
motion "where the power to grant the relief sought is conferred
expressly on a judge by a statute or rule".

 A judge in a judicial review application, however, may refer
an interlocutory issue to a referee, in this case a Master
acting as a referee. The case management judge directed such a
reference in this case. The Master made no reversible error on
the merits. [page56 ]

Cases referred to

Sierra Club of Canada v. Canada (Minister of Finance), [2002] 2

2007 CanLII 2659 (ON SCDC)

S.C.R. 522, [2002] S.C.J. No. 42, 211 D.L.R. (4th) 193, 287
N.R. 203, 93 C.R.R. (2d) 219, 18 C.P.R. (4th) 1, 2002 SCC 41,
20 C.P.C. (5th) 1 (sub nom. Atomic Energy of Canada Ltd. v.
Sierra Club of Canada), consd

Other cases referred to

Century Engineering Co. Ltd. v. Greto, [1961] O.R. 85, [1960]
O.J. No. 581, 26 D.L.R. (2d) 300 (H.C.J.); Dempster v. Mutual
Life of Canada (2001), 55 O.R. (3d) 409, [2001] O.J. No. 3336,
14 C.P.C. (5th) 274 (Div. Ct.); Ernst v. Ernst (1977) O.R.
(2d) 585, [1977] O.J. No. 2447, 4 C.P.C. 181, 2 R.F.L. (2d)
289 (H.C.J.); Kanda Tsushin Kogyo Co. v. Coveley, [1997] O.J.
No. 56, 96 O.A.C. 324, 72 A.C.W.S. (3d) 745 (Div. Ct.);
McDonald's Restaurants of Canada Ltd. v. Humm, [1983] O.J. No.
2445, 24 M.P.L.R. 103 (Co. Ct.); Nova Scotia (Attorney
General) v. MacIntyre, [1982] 1 S.C.R. 175, [1982] S.C.J. No.
1,49 N.S.R. (2d) 609, 132 D.L.R. (3d) 385, 40 N.R. 181, 96
A.P.R. 609, 65 C.C.C. (2d) 129, 26 C.R. (3d) 193 (sub nom.
MacIntyre and R. (Re)); Prendiville v. 407 International Inc.,
[2002] O.J. No. 2548, [2002] O.T.C. 441, 24 C.P.C. (5th) 184,
114 A.C.W.S. (3d) 828 (S.C.J.) [Leave to appeal to Div. Ct.
refused [2002] O.J. No. 3913]; RJR-MacDonald Inc. v. Canada
(Attorney General), [1994] 1 S.C.R. 311, [1994] S.C.J. No. 17,
60 Q.A.C. 241, 111 D.L.R. (4th) 385, 164 N.R. 1, 20 C.R.R.
(2d) D-7, 54 C.P.R. (3d) 114; Simmons and Dalton (Re) (1886),
12 O.R. 505, [1886] O.J. No. 80 (H.C.J. Ch. D.); Solomon v.
Solomon, [1991] O.J. No. 265 (Gen. Div.)

Statutes referred to

Courts of Justice Act, R.S.O. 1990, c. C.43, ss. 7(2), 18 [as
  am.], 19 [as am.], 21 [as am.], 134(2) [as am.], 137
Fire Protection and Prevention Act, 1997, S.O. 1997, c. 4, s.
  53(9)
Insurance Act, R.S.O. 1990, c. I.8, s. 58 [as am.]
Judicature Act, R.S.O. 1970, c. 228, ss. 6, 17
Judicial Review Procedure Act, 1971, S.O. 1971, c. 48
Judicial Review Procedure Act, R.S.O. 1990, c. J.1, ss. 2, 4,
  5, 10
Labour Relations Act, 1995, S.O. 1995, c. 1, Sch. A, ss.

48(12), 98(1) [as am.]
Law Society Act, R.S.O. 1990, c. L.8, s. 49.27 [as am.]
Ontario College of Teachers Act, 1996, S.O. 1996, c. 12, s.
29(1)
Police Services Act, R.S.O. 1990, c. P.15, ss. 24(1), (2)
Public Hospitals Act, R.S.O. 1990, c. P.40, s. 4 [as am.]
Regulated Health Professions Act, 1991, S.O. 1991, c. 18, s.
37(1)
Social Work and Social Service Work Act, 1998, S.O. 1998, c.
31, s. 25(3)

Rules and regulations referred to

Rules of Civil Procedure, R.R.O. 1990, Reg. 194, rules 1.03 [as
am.], 1.04 [as am.], 1.05, 2.01, 2.03, 37.02 [as am.], 54.01,
54.02(1), 54.09 [as am.]

Authorities referred to

Homestead, G.S., et al., Homestead and Gale on the Judicature
Act of Ontario and Rules of Practice, looseleaf (Toronto,
Ont.: Carswell, 2006)
Mullan, D.J., ed., Administrative Law: Cases, Text and
Materials, 5th ed. (Toronto: Emond Montgomery Publications
Limited, 2003)
Reid, Honourable Mr. Justice R.F., "Jurisdiction of the
Divisional Court" (Toronto: Dept. of Continuing Education,
Law Society of Upper Canada, c. 1978)

APPEAL from the order of Master Polika. [page57 ]

Sean Dewart and Steven Shrybman, for applicants.

Leslie M. McIntosh, for Tony Clement, Minister of Health and
Long-Term Care for the Province of Ontario and Her Majesty the
Queen in Right of Ontario.

Robert W. Staley and Evangelia L. Krialis, for The Healthcare

Infrastructure Company of Canada Inc.

2007 CanLII 2659 (ON SCDC)

[1] FERRIER J.: -- This appeal from a decision of Master Polika raises significant questions of jurisdiction and procedure.

[2] Does a Master have jurisdiction to hear an interlocutory motion in a judicial review application?

For the reasons that follow, the answer is "no".

[3] May a judge, in a judicial review application, refer an interlocutory issue to a referee, in this case a Master acting as a referee?

For the reasons that follow, the answer to the question is "yes".

[4] Did Winkler J. direct a reference in this case?

For the reasons that follow, the answer is "yes".

Overview

[5] In September 2003, the Ontario Public Service Employees Union, the Ontario Council of Hospital Unions and the Ontario Health Care Coalition (the "applicants") filed an application for judicial review of certain decisions of the respondent Minister of Health. The applicants seek to quash a number of approvals and funding commitments pertaining to the privatization of certain hospital facilities at the William Osler Health Centre. The issues in the application concern the expenditure of substantial public funds and the delivery of health care services and raise matters of broad public concern, in addition to being of direct concern and interest to the applicants.

[6] Section 10 of the Judicial Review Procedure Act, R.S.O. 1990, c. J.1 ("JRPA") requires that the Minister file the record of the approvals at issue in the proceeding, forthwith

after notice of the application is served. More than 2[cents]
years have passed since the application was filed, however the
Minister has yet to file the record, because of assertions made
by a non-party, the Healthcare Infrastructure Company of Canada
Inc. ("THICC"), that parts of the record are confidential.

[7] Winkler J. had been case managing the file and on May 3,
2004, he made an order that certain documents, which THICC
agreed to produce, were confidential and were to be produced
[page58 ]subject to restrictions on public access (the
"Confidentiality Order"). The Confidentiality Order
specifically identified the documents that were to receive
confidential treatment. The Confidentiality Order was made on
the consent of all parties, including the applicants. The
Confidentiality Order provided that if there were issues of
relevance concerning any document, the parties were to return
to Winkler J. to resolve those issues.

[8] The parties could not resolve issues of relevance of
various documents and could not resolve issues concerning the
ultimate confidentiality of documents in the hands of the
Minister, which THICC asserted should be sealed and not form
part of the public record.

[9] The applicants wrote to Winkler J. for the purpose of
scheduling a motion before him to resolve relevance and
confidentiality issues.

[10] Winkler J. referred the matter to the Administrative
Master who in turn assigned Master Polika to deal with the
matter.

[11] The parties ultimately agreed to leave the outstanding
questions of relevance of documents to the panel hearing the
judicial review application. However, they were unable to agree
on the content of the record to be filed by the Minister,
specifically with respect to documents alleged by THICC to be
confidential.

[12] Thus, on December 2, 2005, Master Polika heard a motion
brought by the Minister for directions regarding the content of

the record to be publicly filed with the Divisional Court for
the judicial review proceedings, pursuant to s. 10 of the JRPA,
(the "Section 10 Record"). Upon hearing the motion, Master
Polika ruled that the documents in question were to be placed
in the Section 10 Record. In making his decision, Master Polika
ruled that the Confidentiality Order of Winkler J. did not
determine the issue. In making his order (the "Order"), Master
Polika held that there was no evidence to satisfy the court
that both "Sierra Club" tests had been met with respect to the
documents THICC asserted were confidential.

[13] In this appeal THICC seeks an order setting aside or
varying the Master's Order on the grounds that:

(a) the Master did not have jurisdiction over the subject
    matter of the motion; and

(b) the Master exceeded his jurisdiction by varying the
    previous order by Winkler J. concerning the production of
    the information by THICC.

Facts

[14] On September 22, 2003, the applicants brought an
application for judicial review, amended on August 18, 2004, in
the [page59 ]Divisional Court, seeking among other relief to
quash approvals granted by the Minister, pursuant to s. 4 of
the Public Hospitals Act, R.S.O. 1990, c. P.40, of any plans by
the William Osler Health Centre or the Royal Ottawa Health Care
group to permit for-profit corporations to design, build,
finance, lease/own, maintain, operate, manage and use a
hospital facility.

[15] THICC is the private sector consortium that was selected
to design, build, finance, operate, property manage and
maintain new hospital facilities for both the William Osler
Health Centre and the Royal Ottawa Health Care Group. It is a
non-party to the judicial review proceedings.

[16] The application for judicial review came before Gravely
J. on September 30, 2003. He adjourned the application "to

2007 CanLII 2659 (ON SCDC)

allow for filing of material and other preparation".

[17] The applicants sought to obtain documents from THICC, which they asserted were necessary for a determination of the application. This request resulted in an agreement between the parties on the terms under which documents, which THICC asserted were proprietary and confidential, were to be produced. THICC then brought a motion before Winkler J. for an order regarding the protection and maintenance of the confidential documents.

[18] In addition to asserting that the documents contained proprietary and confidential information, THICC asserted that they were not relevant to issues in this proceeding. On May 3, 2004, Winkler J. made the Confidentiality Order, on consent of the parties, which dealt with the production of documents to the applicants for the purpose of resolving disputes about their relevance: [See Note 1 below]

THIS COURT ORDERS THAT the Confidential Information shall be disclosed to the Designated Individuals solely for the purpose of this application and, more particularly, for the purpose of permitting the Applicants to assess, through the Designated Individuals, THICC's contention that the Confidential Information is not relevant to the issues raised on this application.

[19] Justice Winkler had been case managing the file. The Confidentiality Order also provided in para. 10 that:

Any disagreement concerning the relevance of the Confidential Information . . . shall be resolved on a motion brought before Justice Winkler for that purpose. [page60 ]

[20] As stated in para. 9, the purpose of the Confidentiality Order was to permit the applicants to assess "THICC's contention that the Confidential Information is not relevant to the issues raised on this application".

[21] After the applicants received and reviewed the documents in accordance with the detailed procedure provided for by the

2007 CanLII 2659 (ON SCDC)

Confidentiality Order, they went back before Winkler J. for a
determination of the relevance of the documents to the issues
raised on the application. Justice Winkler referred the matter
to the Administrative Master, who subsequently assigned it to
Master Polika.

[22] A number of case conferences were subsequently convened
before Master Polika to resolve the relevance issue.
Ultimately, without conceding that the documents were relevant
to the application, THICC agreed that this issue would be
resolved by the Divisional Court panel dealing with the
application on the merits.

[23] This left open the question of what would be publicly
filed by the Minister. Despite specifically being given an
opportunity by Master Polika to do so, THICC declined to bring
any motion of its own for any relief protecting the alleged
confidential nature of the documents in question. The Minister
therefore filed a motion before Master Polika seeking advice
and directions of the court about the filing of its record
pursuant to s. 10 of the JRPA.

[24] At the motion brought by the Minister before Master
Polika, THICC argued that the documents were proprietary and
confidential in nature and that public disclosure would harm
its interests. It adduced no evidence on the motion.

[25] THICC also argued the Master had no jurisdiction in view
of the wording of Winkler J.'s Confidentiality Order.

[26] It is apparent that THICC did object to the Master's
jurisdiction but not on the basis argued in this appeal.

[27] In my view, that is of no consequence. The Master either
had jurisdiction or did not. Parties cannot confer jurisdiction
by waiver or consent.

[28] Master Polika held that the documents were properly part
of the public record and ordered the Minister to file the
record, subject only to certain redactions that the applicants
do not dispute. The documents in question consist solely of

2007 CanLII 2659 (ON SCDC)

documents and information provided to the Minister by William Osler Health Centre, or documents produced independently by, or for, Ministry officials.

[29] As noted above, on this appeal, THICC argued that Master Polika had no jurisdiction but that if he did he erred in not ordering the documents to be sealed.

[30] The Master held he had jurisdiction by virtue of provisions of the Courts of Justice Act, R.S.O. 1990, c. C.43 ("CJA"), the JRPA and the Rules of Civil Procedure, R.R.O. 1990, Reg. 194. [page61 ]

[31] Master Polika also held, in the alternative, that if he were incorrect in this respect, he had jurisdiction by reason of the matter having been directed on a reference to him by Winkler J., pursuant to rule 54.02(1)(b).

[32] I turn now to an examination of the relevant statutes and rules concerning the jurisdiction of the Master, and the appointment and jurisdiction of a referee.

The Jurisdiction of the Master to hear Motions in Applications for Judicial Review

[33] A brief history of the Superior Court's jurisdiction in prerogative writs confirms that the jurisdiction is inherent in the court.

[34] The Divisional Court was created in 1970 by amendment to the Judicature Act, R.S.O. 1970, c. 228. Section 6 (now s. 18 of the CJA) established the Divisional Court as a division of the High Court of Justice of Ontario. Section 17 (now s. 19 of the CJA) set out the Divisional Court's jurisdiction. Clauses 17(1)(b) and (c) gave the Divisional Court jurisdiction over applications for judicial review made under the Judicial Review Procedure Act, 1971, S.O. 1971, v. 2, c. 48 (JRPA, 1971). The JRPA, 1971 came into effect on the same day that the Divisional Court first became operative -- April 17, 1972. [See Note 2 below]

2007 CanLII 2659 (ON SCDC)

[35] Prior to this date, judicial review through the prerogative writs was exercised by the Superior Courts. The Superior Court's power to engage in judicial review derives from its inherent jurisdiction. At the time of Confederation, the Canadian Courts of Queen's Bench had the powers of the Court of King's Bench in England. The King's Bench in England was a Court of Record, possessing inherent jurisdiction independent of any statute, and had power to issue the prerogative writs. [See Note 3 below]

[36] In Ontario, the prerogative writ of mandamus was first codified in 1872. [See Note 4 below] The first statutory expression of the writ of [page62 ]prohibition was set out in 1888 in rules 1137 and 1138. [See Note 5 below] The writ of certiorari was discontinued in 1888 by rule 1140 (and was later codified in the Judicature Act in 1908), and was replaced by an order for certiorari that had the same effect as the writ. [See Note 6 below] From Confederation to April 17, 1972 (the date the JRPA, 1971 came into force), an order for prohibition or mandamus was sought through an application by originating notice to a judge in chambers, and an order for certiorari was sought by motion to a judge. [See Note 7 below]

[37] Masters have no inherent jurisdiction and derive their powers from statutes: Ernst v. Ernst (1977), 17 O.R. (2d) 585, [1977] O.J. No. 2447 (H.C.J.), at para. 4.

[38] The Divisional Court is a branch of the Superior Court of Justice: CJA, s. 18(1).

[39] The Divisional Court has limited appellate jurisdiction: CJA, s. 19. It also has jurisdiction in applications for judicial review: JRPA, s. 2. The judicial review jurisdiction includes the power to make an order in the nature of mandamus, prohibition and certiorari; as well as an order for a declaration or injunction in relation to the exercise, refusal to exercise or proposed or purported exercise of a statutory power: JRPA, s. 2. This judicial review jurisdiction in the Divisional Court continues the jurisdiction formerly exercised by single judges of what is now the Superior Court of Justice.

2007 CanLII 2659 (ON SCDC)

[40] A proceeding in the Divisional Court (whether an appeal or application for judicial review) is required to be heard by a three-judge panel: CJA, s. 21(1). In limited instances, not relevant here, a proceeding may be heard and determined by one judge: CJA, s. 21(2).

[41] Motions in the Divisional Court are dealt with in the CJA, s. 21(3), a provision at the core of the issue before me:

   21(3) A motion in the Divisional Court shall be heard and determined by one judge, unless otherwise provided by the rules of court.

[42] Before turning to the provisions in rule 37.02, which define the jurisdiction of the Master, it is to be noted that in rule 37.02(1), a judge is given jurisdiction "to hear any motion in a proceeding".

[43] A "proceeding" means an action or application and accordingly includes an application to the Divisional Court: rule 1.03(1). [page63 ]Thus a judge has jurisdiction to hear any motion in a judicial review application. The requirement in the CJA, s. 21(3), that a motion in the Divisional Court shall be heard by one judge unless otherwise provided by the rules leaves open the possibility that the rules may confer jurisdiction on the Master.

[44] I turn now to the jurisdiction of the Master as provided in rule 37.02(2). The provisions relevant to this motion are as follows:

Jurisdiction of a Master

   37.02(2) A master has jurisdiction to hear any motion in a proceeding, and has all the jurisdiction of a judge in respect of a motion, except a motion,

        (a) where the power to grant the relief sought is
            conferred expressly on a judge by a statute or
            rule;

(b) to set aside, vary or amend an order of a judge;

. . . . .

(f) under section 4 or 5 of the Judicial Review
    Procedure Act; or

(g) in an appeal.

Thus, a Master has jurisdiction to hear any motion, subject to the exceptions listed.

[45] "Any motion" would include a motion such as that heard by Master Polika, in this application for judicial review, unless the motion falls within any of the exceptions.

[46] It is trite that, as provided in rule 37.02(2)(b), the Master has no jurisdiction to vary an order of a judge. THICC argues that that is what Master Polika purported to do. I disagree. The Master decided issues unrelated to the consent order of Winkler J.

[47] Subsections (a) and (f) of rule 37.02(2) are particularly relevant.

[48] In considering rule 37.02(2)(a) the question is whether the CJA, s. 21(3), expressly confers on a judge the power to grant relief in motions in the Divisional Court.

[49] I note that in its use of the word "shall", s. 21(3) is mandatory. It is apparent that the concluding words of the section "unless otherwise provided by the rules" leave open the possibility that the rules may provide that some motions may be required to be heard by the panel, or indeed by the Master. However, there are no such rules.

[50] I also note the difference between s. 7(2) of the CJA, which provides:

7(2) A motion in the Court of Appeal [and an appeal under clause 6(1)(c)] shall be heard and determined by one judge.

Thus, the rules cannot confer jurisdiction on a Master for motions in appeals at the Court of Appeal. [page64 ]

[51] Further, if Rule 37 were interpreted to give the Master jurisdiction in a judicial review application to the Divisional Court, such would produce the curious result that by operation of rule 37.02(2)(g) the Master would nevertheless not have jurisdiction in an appeal to the same court.

[52] As noted, rule 37.02(2)(f) exempts from the Master's jurisdiction motions under ss. 4 or 5 of the JRPA:

   4. On an application for judicial review, the court may make such interim order as it considers proper pending the final determination of the application.

   5. Despite any limitation of time for the bringing of an application for judicial review fixed by or under any Act, the court may extend the time for making the application, either before or after expiration of the time so limited, on such terms as it considers proper, where it is satisfied that there are apparent grounds for relief and that no substantial prejudice or hardship will result to any person affected by reason of the delay.

[53] The applicants argue that the Minister's motion was not an "interim order" under s. 4 of the JRPA, but rather was an "interlocutory order" on a motion brought pursuant to s. 137 of the CJA, s. 10 of the JRPA and rules 1.05 and 37 of the Rules of Civil Procedure.

[54] Further, argues the applicants, s. 4 vests a broad discretion with the court to grant interim relief, such as a stay of proceedings or other injunctive relief, when an application for judicial review is pending. Section 4 deals with interim orders "on" the application, pending "final determination", and does not purport to address any and all interlocutory orders made "in" the proceeding, such as orders made on practice motions. The applicants submit that an "interim" order is sought to preserve the underlying

2007 CanLII 2659 (ON SCDC)

positions of the parties pending a determination of any
particular dispute on the merits, whereas an "interlocutory"
order may deal with any number of procedural or other issues
that arise within on-going litigation.

[55] I note that the respondents cite no authority for the
propositions advanced.

[56] The use of the term "interim" and "interlocutory" in
Ontario statutes is inconsistent. Certain provisions support at
least part of the applicants' proposition. For example, s.
134(2) of the CJA says, "On motion, a court to which a motion
for leave to appeal is made or to which an appeal is taken may
make any interim order that is considered just to prevent
prejudice to a party pending the appeal" (emphasis added).
Likewise, s. 49.27 of the Law Society Act, R.S.O. 1990, c. L.8
empowers the Hearing Panel to make an interlocutory order
suspending the rights and privileges of a member or student
member or restricting the manner in which a member may practise
law if it is in the public interest (emphasis added). [page65 ]

[57] Yet there are also numerous examples that undermine the
applicants' proposition. Clauses 48(12)(i) and 98(1)(a) of the
Labour Relations Act, 1995, S.O. 1995, c. 1, Sch. A ("LRA"),
and s. 53(9)(i) of the Fire Protection and Prevention Act,
1997, S.O. 1997, c. 4 empower arbitrators and the Ontario
Labour Relations Board (the "OLRB") to "make interim orders
concerning procedural matters" (emphasis added).

[58] The following are examples of bodies statutorily
empowered to make interim orders that do not maintain the
status quo:

-- Clauses 98(1)(b) and (c) of the LRA empower the OLRB to
   make interim orders requiring an employer to reinstate a
   terminated employee, and to alter the terms and conditions
   of employment of an employee who has been subject to
   reprisal, penalty or discipline by the employer.

-- Subsection 58(6) of the Insurance Act, R.S.O. 1990, c. I.8
   empowers the Superintendent to make interim orders to

cancel the licence of an insurer, or control the assets of
an unincorporated insurer if it is in the public interest.

-- Subsection 29(1) of the Ontario College of Teachers Act,
   1996, S.O. 1996, c. 12 empowers the Council or the
   Executive Committee to make an interim order suspending the
   licence of a member who is facing discipline or whose
   conduct will likely cause harm to students.

-- Subsections 24(1) and (2) of the Police Services Act,
   R.S.O. 1990, c. P.15 empowers the Commission to make an
   interim order, prior to holding a hearing, suspending a
   police chief for repeatedly failing to comply with
   prescribed standards of police services, only if it is in
   the public interest.

-- Subsection 37(1) of the Regulated Health Professions Act,
   1991, S.O. 1991, c. 18 empowers the Executive Committee to
   make an interim order suspending the licence of a member
   who is facing discipline or whose conduct will likely cause
   harm to patients.

-- Subsection 25(3) of the Social Work and Social Service Work
   Act, 1998, S.O. 1998, c. 31 empowers the Council or the
   Executive Committee to make an interim order suspending the
   licence of a member who is facing discipline or whose
   conduct will likely cause harm to persons.

[59] In the case law, the difference between an "interim"
order and an "interlocutory" order has been addressed almost
exclusively within the context of injunctions. [page66 ]

[60] In Century Engineering Co. Ltd. v. Greto, [1961] O.R.
85, [1961] O.J. No. 581 (H.C.J.), at p. 90 O.R., McRuer
C.J.H.C. addressed the difference between an "interim"
injunction and an "interlocutory" injunction:

The authorities clearly indicate that the word "interim" in
the legal sense has a well-established usage. It connotes a
definite period of time with a fixed beginning and ending. It
may well be that the words "interim" and "interlocutory" are

used interchangeably but I do not think that they are strictly interchangeable. The term "interlocutory injunction" comprehends any order for an injunction made before the final disposition of the case.

[61] Therefore, an injunction that lasts until a fixed date is an "interim" injunction, and an injunction that lasts until the final disposition of a trial is an "interlocutory" injunction. This same distinction was adopted in Solomon v. Solomon, [1991] O.J. No. 265 (Gen. Div.), at p. 4 (cited to QL). However, the Divisional Court has concluded that there is no substantive legal distinction between an interim or interlocutory injunction since the same legal test set out in RJR - MacDonald Inc. v. Canada (Attorney General), [1994] 1 S.C.R. 311, [1994] S.C.J. No. 17 applies: see Kanda Tsushin Kogyo Co. v. Coveley, [1997] O.J. No. 56, 96 O.A.C. 324 (Div. Ct.), at para. 7; Dempster v. Mutual Life of Canada (2001), 55 O.R. (3d) 409, [2001] O.J. No. 3336 (Div. Ct.), at para. 19.

[62] In my view, not only is there no substantial distinction between an "interlocutory order" and an "interim order", the terms have been used interchangeably in recent decades to such a degree that there can no longer be a rational basis for a distinction in the meaning of the terms. This is evident from the statutory references noted above. To the extent that any distinction remains, it can only be reasonably said to apply in matters of injunctions.

[63] Even if I am wrong in this conclusion, the respondents' ultimate position is not saved. There remains the provision of s. 21(3) of the CJA requiring "a motion" to be heard by a judge and therefore is outside the jurisdiction of the Master by virtue of rule 37.02(2)(a).

[64] I conclude that the learned Master had no jurisdiction qua Master to determine the matters before him.

The Reference

[65] Following the order of Winkler J. of May 3, 2004, issues of relevance, and the confidentiality of documents in the hands

of the Minister, remained unresolved. Thus, counsel for the
applicants wrote a letter to Winkler J. indicating the impasse
"regarding how the issue of confidentiality might be
resolved", and asked for a date on which a motion might be
heard. [page67 ]

[66] In the correspondence, it was pointed out that the
material "is voluminous and the documents and details of the
documents are clearly part of an integrated set of transactions
which are the subject of the ministerial approvals being
challenged by the applicants".

[67] In a written response to the request for a motion date,
Winkler J. wrote in part:

I have referred the matter to Administrative Master McLeod
and have forwarded to him a copy of your correspondence.

[68] Subsequently, in a series of case conferences before
Master Polika, issues of relevance were left, on agreement, to
be dealt with by the panel on the hearing of the application.
There remained the question of what should form part of the
public record filed by the Minister.

[69] As noted above, no party took issue with the
jurisdiction of the Master qua Master, although THICC took
issue with the Master's jurisdiction in light of the
Confidentiality Order of Winkler J. of May 3, 2006, taking the
position that the issues had to be dealt with by Winkler J.

[70] No party appealed the referral to the Master, and no
party objected to the referral to the Master in the context of
a "reference". From oral submissions on this appeal, I conclude
that it did not occur to counsel at the time that Winkler J.
was directing a reference under Rule 54. Nonetheless, I
conclude that Winkler J. did have the power to direct such a
reference and that he did so.

[71] Rule 54 provides:

54.02(1) Subject to any right to have an issue tried by a

2007 CanLII 2659 (ON SCDC)

jury, a judge may at any time in a proceeding direct a
reference of the whole proceeding or a reference to determine
an issue where,

    (a) all affected parties consent;

    (b) a prolonged examination of documents or an
        investigation is required that, in the opinion of
        the judge, cannot conveniently be made at trial; or

    (c) a substantial issue in dispute requires the taking
        of accounts.

[72] Although the matter will not proceed to a "trial", it is
nevertheless a "proceeding" and falls within clause (b) of
subsection (1).

[73] I note the oft referred to provisions of the rules which
focus the court's attention on the just and expeditious
determination of proceedings:

General Principle

    1.04(1) These rules shall be liberally construed to secure
the just, most expeditious and least expensive determination
of every civil proceeding on its merits. [page68 ]

    2.01(1) A failure to comply with these rules is an
irregularity and does not render a proceeding or a step,
document or order in a proceeding a nullity, and the court,

    (a) may grant all necessary amendments or other relief,
        on such terms as are just, to secure the just
        determination of the real matters in dispute; . . .

                . . . . .

    2.03 The court may, only where and as necessary in the
interest of justice, dispense with compliance with any rule
at any time.

[74] Rule 54.01(1) requires the order directing the reference to specify the nature and subject matter of the reference. Although no formal order was issued, this requirement was met in the exchange of correspondence.

[75] No report back was required and the report of the referee (Master Polika) was, by virtue of rule 54.09(1)(b), confirmed 15 days after it was delivered. Rule 54.09(3)(b) requires that a motion opposing confirmation of the report be served within 15 days. Needless to say, no such motion was launched. I hereby extend the said 15 days and treat the appeal as a motion to oppose confirmation of the report.

[76] For the following reasons, I confirm the report of the referee, Master Polika.

The Merits

[77] There is a heavy onus on anyone seeking to deny public access to court documents or proceedings. It must be demonstrated that it is necessary to deny public access in order to protect a value of "super-ordinate importance": Nova Scotia (Attorney General) v. MacIntyre, [1982] 1 S.C.R. 175, [1982] S.C.J. No. 1, at pp. 185-87 S.C.R.

[78] In Sierra Club of Canada v. Canada (Minister of Finance), [2002] 2 S.C.R. 522, [2002] S.C.J. No. 42, the Supreme Court of Canada enunciated a two-step test for determining under what circumstances the public should be denied access to court documents filed in a civil proceeding [at p. 543 S.C.R.]:

(a) First, it must be established that such an order is · necessary to prevent a serious risk to an important interest.

(b) Second, the salutary effects of the confidentiality order, including the effects on the right of civil litigants to a fair trial, outweigh its deleterious effects, including the effects on the right to free expression, which in this context includes the public interest in open and

accessible court proceedings. [page69 ]

[79] As Iacobucci J. explained for a unanimous court in
Sierra Club, supra, a party seeking such a sealing order must
show that the order is necessary to prevent a serious risk to
an important interest including a commercial interest. In this
regard, the "risk in question must be real and substantial, in
that the risk is well grounded in the evidence, and poses a
serious threat to the commercial interest in question".

[80] The commercial interest in question must be one
"expressed in terms of the public interest in
confidentiality" and cannot simply be specific to the party
requesting the order: Prendiville v. 407 International Inc.,
[2002] O.J. No. 2548, [2002] O.T.C. 441 (S.C.J.), leave to
appeal to Div. Ct. refused [2002] O.J. No. 3913.

[81] THICC argues that the learned Master erred:

   (i) in finding that the Confidentiality Order of Winkler J.
      was irrelevant to the confidential character of the
      documents when the documents were in the hands of
      another party, the Minister, who had consented to the
      Confidentiality Order;

  (ii) in finding that there was no evidence to satisfy the
      court that both Sierra Club tests had been met with
      respect to the documents THICC asserted were
      confidential, effectively requiring THICC to re-litigate
      an issue that had already been determined by Winkler J.;

 (iii) by not recognizing that a consent order is of the same
      force and effect as other judicial orders, and is
      determinative of an issue; and

  (iv) by varying Winkler J.'s Confidentiality Order without
      applying the test for amending, setting aside or varying
      a consent order.

[82] In reference to these submissions, I note the following:

(i) The Confidentiality Order was made for the purpose of
    permitting the applicants "to assess the relevance" of
    the documents. Furthermore, the documents in question
    were those in the hands of the Minister, not THICC.

(ii) and (iii) THICC, although given ample opportunity to
     move for a confidentiality order, did not do so. Nor did
     it lead any evidence on the motion brought by the
     Minister. The Confidentiality Order did not establish
     the confidential nature of the documents at issue, and
     did not determine whether they should be part of the
     public record. [page70 ]

(iv) As indicated above, the Master did not vary the order of
     Winkler J.

[83] The learned Master delivered a comprehensive, well
reasoned decision in reference to the merits and dealt
effectively with THICC's submissions. He made no reversible
error in this respect.

[84] Accordingly, the report of Master Polika is confirmed
and the appeal is dismissed.

[85] If the parties are unable to agree on costs, they may
make brief written submissions within 20 days, with a right of
reply within a further ten days.

                                        Appeal dismissed.


                              Notes


----------------


 Note 1: The order dealt with two categories of documents,
namely un-redacted copies of the plans and leases for the
Public-Private Partnership scheme (the "P3 scheme") that had
previously been provided in redacted form by the Ministry, and
additional documents about the P3 scheme, which had not been
shared with or reviewed by the Ministry. Documents and materials
in this second category are not the cubject of this appeal.

2007 CanLII 2659 (ON SCDC)

Note 2: The Honourable Mr. Justice R.F. Reid, "Jurisdiction of the Divisional Court" (Statutory powers and judicial review: edited proceedings from the programme held on November 27, 1976) at pp. 3-4. (Toronto: Dept. of Continuing Education, Law Society of Upper Canada, c. 1978).

Note 3: David J. Mullan, ed., Administrative Law: Cases, Text and Material, 5th ed. (Toronto: Emond Montgomery Publications Ltd. 2003) at p. 1093; Simmons and Dalton (Re) (1886), O.R. 505, [1886] O.J. No. 80 (H.C.J. Ch. D.), at para. 26 (QL); McDonald's Restaurants of Can. Ltd. v. Humm, [1983] O.J. No. 2445, 24 M.P.L.R. 103 (Co Ct.) at para. 72 (QL).

Note 4: George Smith Homestead et al., Homestead and Gale on the Judicature Act of Ontario and Rules of Practice, looseleaf (Toronto, Ont.: Carswell, 2006), vol. 1, p. 164, s.s. 30-31; Vol. 4, p. 2588, s.s. 3-4 (Homestead and Gale).

Note 5: Ibid., vol. 4, p. 2615, s. 35.

Note 6: Ibid., vol. 4, p. 2650, s. 75.

Note 7: Ibid., vol. 4, p. 2592.6, s. 11 (order of mandamus); Vol. 4, p. 2618, s. 40 (order of prohibition); Vol. 4, pp. 2666.8, 2666.10, s.s. 87,89 (order of certiorari).

----------------

**TAB 5**

*Indexed as:*
## Nova Scotia (Attorney General) v. MacIntyre

**The Attorney General of Nova Scotia and Ernest Harold
Grainger, appellants;
and
Linden MacIntyre, respondent;
and
The Attorney General of Canada, the Attorney General for
Ontario, the Attorney General of Quebec, the Attorney General
for New Brunswick, the Attorney General of British Columbia,
the Attorney General for Saskatchewan and the Attorney General
for Alberta, interveners;
and
Canadian Civil Liberties Association, intervener.**

[1982] 1 S.C.R. 175

File No.: 16045.

Supreme Court of Canada

1981: February 3 / 1982: January 26.

**Present: Laskin C.J. and Martland, Ritchie, Dickson, Beetz,
Estey, McIntyre, Chouinard and Lamer JJ.**

ON APPEAL FROM THE COURT OF APPEAL FOR NOVA SCOTIA

*Criminal law -- Search warrants -- Right to inspect search warrants and informations on which
search warrants based -- Whether access restricted to "interested parties" or open to general public
-- Whether right to inspect only on execution of search warrant or whether hearings dealing with
search warrants open -- Criminal Code, R.S.C. 1970, c. C-34, ss. 443, 446.*

Respondent, an investigative journalist, was denied access to search warrants and supporting
material by appellant Grainger, the Justice of the Peace who had issued them, because such material
was not available for inspection by the general public. At trial, respondent was held entitled to a

declaration that search warrants after their execution, and the informations related to them in the control of the justice of the peace or court official, were court records available for examination by members of the general public. In dismissing an appeal, the Appeal Court declared that the public was entitled to inspect informations upon which search warrants were issued pursuant to s. 443 of the Criminal Code, and that any member of the public, including individuals about to be the subject of a search warrant, was entitled to be present in open court when the search warrants were issued.

Held (Martland, Ritchie, Beetz and Estey JJ. dissenting): The appeal should be dismissed.

Per Laskin C.J. and Dickson, McIntyre, Chouinard and Lamer JJ.: After a search warrant has been executed, and objects found during the search are brought before a justice, members of the public are entitled to inspect the warrant, and the information upon which it was issued. Curtailment of public accessibility is justified only where the need to protect other social values is of superordinate importance. In cases where a search warrant is issued but nothing is found, protection of the innocent is such an overriding social value. Furthermore, the public interest in the effective administration of justice must override public accessibility to the extent that the proceedings at which the warrant is issued can be conducted in camera. Otherwise a person whose property was to be searched could remove the goods. The need for confidentiality disappears, however, once the warrant has been executed. At this point the public as well as those who are directly interested have a right to inspect the warrant and the related information.

Per Martland, Ritchie, Beetz and Estey JJ. (dissenting): The broad declaration of the Court of Appeal, for reasons given by Dickson J., cannot be sustained. Respondent cannot assert a right to examine the search warrants and related informations on the basis that the issuance of the search warrants was a judicial act in open court with a right for the public to be present.

Proceedings before a justice under s. 443 are part and parcel of criminal investigative procedure and are not analogous to trial proceedings which are generally required to be conducted in open court. The opening to public inspection of the documents before the justice is not equivalent to the right of the public to attend and witness proceedings in court. Access to these documents should be restricted to persons who can show a direct and tangible interest in the documents. There is no general right to inspect search warrants and the informations relating thereto.

**Cases Cited**

Inland Revenue Commissioners v. Rossminster Ltd., [1980] 2 W.L.R. 1; R. v. Solloway Mills & Co., [1930] 3 D.L.R. 293; Realty Renovations Ltd. v. Attorney-General for Alberta et al. (1978), 44 C.C.C. (2d) 249; Southam Publishing Company v. Mack (1959-60), 2 Crim. L.Q. 119; Nixon v. Warner Communications, Inc. (1978), 98 S. Ct. 1306; R. v. Wright, 8 T.R. 293; Gazette Printing Co. v. Shallow (1909), 41 S.C.R. 339; Scott v. Scott, [1913] A.C. 417; McPherson v. McPherson, [1936] A.C. 177, referred to.

APPEAL from a judgment of the Nova Scotia Court of Appeal (1980), 110 D.L.R. (3d) 289, 52 C.C.C. (2d) 161, 38 N.S.R. (2d) 633, 69 A.P.R. 633, dismissing an appeal from a judgment of Richard J. Appeal dismissed, Martland, Ritchie, Beetz and Estey JJ. dissenting.

Reinhold M. Endres and Mollie Gallagher, for the appellants.
Robert Murrant and Gordon Proudfoot, for the respondent.
J.A. Scollin, Q.C., and S.R. Fainstein, for the intervener the Attorney General of Canada.
S. Casey Hill, for the intervener the Attorney General for Ontario.
Ronald Schacter, for the intervener the Attorney General of Quebec.
Eugene D. Westhaver, for the intervener the Attorney General for New Brunswick.
E. Robert A. Edwards, for the intervener the Attorney General of British Columbia.
Kenneth W. MacKay, for the intervener the Attorney General for Saskatchewan.
Y. Roslak, Q.C., and Lloyd Nelson, for the intervener the Attorney General for Alberta.
Alan D. Gold, for the intervener the Canadian Civil Liberties Association.

Solicitors for the appellants: Reinhold M. Endres and Mollie Gallagher, Halifax.
Solicitors for the respondent: Robert Murrant and Gordon Proudfoot, Dartmouth.

---

The judgment of Laskin C.J. and Dickson, McIntyre, Chouinard and Lamer JJ. was delivered by

**DICKSON J.**:-- The appellant, Ernest Harold Grainger, is Chief Clerk of the Provincial Magistrate's Court at Halifax and also a Justice of the Peace. In the latter capacity he had occasion to issue certain search warrants. The respondent, Linden MacIntyre, is a television journalist employed by the Canadian Broadcasting Corporation. At the material time Mr. MacIntyre was researching a story on political patronage and fund raising. Mr. MacIntyre asked Mr. Grainger to show him the search warrants and supporting material. Mr. Grainger refused, on the ground that such material was not available for inspection by the general public. Mr. MacIntyre commenced proceedings in the Supreme Court of Nova Scotia, Trial Division, for an order that search warrants and informations relating thereto, issued pursuant to s. 443 of the Criminal Code, R.S.C. 1970, c. C-34, or other related or similar statutes, are a matter of public record and may be inspected by a member of the public upon reasonable request.

I

Mr. Justice Richard of the Trial Division of the Supreme Court of Nova Scotia delivered reasons approving Mr. MacIntyre's application. He held that Mr. MacIntyre was entitled to a declaration to the effect that search warrants "which have been executed", and informations relating

thereto, which are in the control of the justice of the peace or a court official are court records available for examination by members of the general public.

An appeal brought by the Attorney General of Nova Scotia and by Mr. Grainger to the Appeal Division of the Supreme Court of Nova Scotia was dismissed. The Appeal Division proceeded on much broader grounds than Richard J. The order dismissing the appeal contained a declaration "that a member of the public is entitled to inspect informations upon which search warrants have been issued pursuant to section 443 of the Criminal Code of Canada". The Court also declared that Mr. MacIntyre was entitled to be present in open court when the search warrants were issued. This right, the Appeal Division said, extended to any member of the public, including individuals who would be the subjects of the search warrants.

This Court granted leave to appeal the judgment and order of the Appeal Division. The Attorney General of Canada and the Attorneys General of the Provinces of Ontario, Quebec, New Brunswick, British Columbia, Saskatchewan and Alberta intervened to support the appellant Attorney General of Nova Scotia. The Canadian Civil Liberties Association intervened in support of Mr. MacIntyre.

Although Mr. MacIntyre happens to be a journalist employed by the C.B.C. he has throughout taken the position that his standing is no higher than that of any member of the general public. He claims no special status as a journalist.

II

A search warrant may be broadly defined as an order issued by a justice under statutory powers, authorizing a named person to enter a specified place to search for and seize specified property which will afford evidence of the actual or intended commission of a crime. A warrant may issue upon a sworn information and proof of reasonable grounds for its issuance. The property seized must be carried before the justice who issued the warrant to be dealt with by him according to law.

Search warrants are part of the investigative pretrial process of the criminal law, often employed early in the investigation and before the identity of all of the suspects is known. Parliament, in furtherance of the public interest in effective investigation and prosecution of crime, and through the enactment of s. 443 of the Code, has legalized what would otherwise be an illegal entry of premises and illegal seizure of property. The issuance of a search warrant is a judicial act on the part of the justice, usually performed ex parte and in camera, by the very nature of the proceedings.

The search warrant in recent years has become an increasingly important investigatory aid, as crime and criminals become increasingly sophisticated and the incidence of corporate white collar crime multiplies. The effectiveness of any search made pursuant to the issuance of a search warrant will depend much upon timing, upon the degree of confidentiality which attends the issuance of the

warrant and upon the element of surprise which attends the search.

As is often the case in a free society there are at work two conflicting public interests. The one has to do with civil liberties and the protection of the individual from interference with the enjoyment of his property. There is a clear and important social value in avoidance of arbitrary searches and unlawful seizures. The other, competing, interest lies in the effective detection and proof of crime and the prompt apprehension and conviction of offenders. Public protection, afforded by efficient and effective law enforcement, is enhanced through the proper use of search warrants.

In this balancing of interests, Parliament has made a clear policy choice. The public interest in the detection, investigation and prosecution of crimes has been permitted to dominate the individual interest. To the extent of its reach, s. 443 has been introduced as an aid in the administration of justice and enforcement of the provisions of the Criminal Code.

III

The Criminal Code gives little guidance on the question of accessibility to the general public of search warrants and the underlying informations. And there is little authority on the point. The appellant Attorney General of Nova Scotia relied upon Taylor's Treatise on the Law of Evidence (11th ed. 1920), upon a footnote to Order 63, Rule 4 of the English Rules of Court, and upon Inland Revenue Commissioners v. Rossminster Ltd., [1980] 2 W.L.R. 1. These authorities indicate that under English practice there is no general right to inspect and copy judicial records and documents. The right is only exercisable when some direct and tangible interest or proprietary right in the documents can be demonstrated.

It does seem clear that an individual who is 'directly interested' in the warrant can inspect the information and the warrant after the warrant has been executed. The reasoning here is that an interested party has a right to apply to set aside or quash a search warrant based on a defective information (R. v. Solloway Mills & Co., [1930] 3 D.L.R. 293 (Alta. S.C.)). This right can only be exercised if the applicant is entitled to inspect the warrant and the information immediately after it has been executed. The point is discussed by Mr. Justice MacDonald of the Alberta Supreme Court in Realty Renovations Ltd. v. Attorney-General for Alberta et al. (1978), 44 C.C.C. (2d) 249 at pp. 253-54:

> Since the issue of a search warrant is a judicial act and not an administrative act, it appears to me to be fundamental that in order to exercise the right to question the validity of a search warrant, the interested party or his counsel must be able to inspect the search warrant and the information on which it is based. Although there is no appeal from the issue of a search warrant, a superior Court has the right by prerogative writ to review the act of the Justice of the Peace in issuing the warrant. In order to launch a proper application, the applicant should know the reasons or grounds for his application, which reasons or grounds are most likely to be found in the form of the information or warrant.

> I am unable to conceive anything but a denial of Justice if the contents of the information and warrant, after the warrant is executed, are hidden until the police have completed the investigation or until the Crown prosecutor decides that access to the file containing the warrant is to be allowed. Such a restriction could effectively delay, if not prevent review of the judicial act of the Justice in the issue of the warrant. If a warrant is void then it should be set aside as soon as possible and the earlier the application to set it aside can be heard, the more the right of the individual is protected.

The appellant, the Attorney General of Nova Scotia, does not contest the right of an 'interested party' to inspect search warrants and informations after execution. His contention is that Mr. MacIntyre, a member of the general public, not directly affected by issuance of the warrant, has no right of inspection. The question, therefore, is whether, in law, any distinction can be drawn, in respect of accessibility, between those persons who might be termed 'interested parties' and those members of the public who are unable to show any special interest in the proceedings.

There would seem to be only two Canadian cases which have addressed the point. In (1959-60), 2 Crim. L.Q., 119, reference is made to an unreported decision of Greschuk J. in Southam Publishing Company v. Mack in Supreme Court Chambers in Calgary, Alberta. Mandamus was granted requiring a magistrate to permit a reporter of the Calgary Herald to inspect the information and complaints which were in his possession relating to cases the magistrate had dealt with on a particular date.

In Realty Renovations Ltd. v. Attorney-General for Alberta, supra, MacDonald J. concluded his judgment with these words:

> I further declare that upon execution of the search warrant, the information in support and the warrant are matters of Court Record and are available for inspection on demand.

It is only fair to observe, however, that in that case the person seeking access was an "interested party" and therefore the broad declaration, quoted above, strictly speaking went beyond what was required for the decision.

American courts have recognized a general right to inspect and copy public records and documents, including judicial records and documents. Such common law right has been recognized, for example, in courts of the District of Columbia (Nixon v. Warner Communications, Inc. (1978), 98 S. Ct. 1306). In that case Mr. Justice Powell, delivering the opinion of the Supreme Court of the United States, observed at p. 1311:

> Both petitioner and respondents acknowledge the existence of a common-law right of access to judicial records, but they differ sharply over its scope and the circumstances warranting restrictions of it. An infrequent subject

of litigation, its contours have not been delineated with any precision.

Later, at p. 1312, Mr. Justice Powell said:

> The interest necessary to support the issuance of a writ compelling access has been found, for example, in the citizen's desire to keep a watchful eye on the workings of public agencies, see, e.g., State ex rel. Colscott v. King, 154 Ind. 621, 621-627, 57 N.E. 535, 536-538 (1900); State ex rel. Ferry v. Williams, 41 N.J.L. 332, 336-339 (1879), and in a newspaper publisher's intention to publish information concerning the operation of government, see, e.g., State ex rel. Youmans v. Owens, 28 Wis.2d 672, 677, 137 N.W.2d 470, 472 (1965), modified on other grounds, 28 Wis.2d 685a, 139 N.W.2d 241 (1966). But see Burton v. Reynolds, 110 Mich. 354, 68 N.W. 217 (1896).

By reason of the relatively few judicial decisions it is difficult, and probably unwise, to attempt any comprehensive definition of the right of access to judicial records or delineation of the factors to be taken into account in determining whether access is to be permitted. The question before us is limited to search warrants and informations. The response to that question, it seems to me, should be guided by several broad policy considerations, namely, respect for the privacy of the individual, protection of the administration of justice, implementation of the will of Parliament that a search warrant be an effective aid in the investigation of crime, and finally, a strong public policy in favour of "openness" in respect of judicial acts. The rationale of this last-mentioned consideration has been eloquently expressed by Bentham in these terms:

> 'In the darkness of secrecy, sinister interest and evil in every shape have full swing. Only in proportion as publicity has place can any of the checks applicable to judicial injustice operate. Where there is no publicity there is no justice.' 'Publicity is the very soul of justice. It is the keenest spur to exertion and the surest of all guards against improbity. It keeps the judge himself while trying under trial.'

The concern for accountability is not diminished by the fact that the search warrants might be issued by a justice in camera. On the contrary, this fact increases the policy argument in favour of accessibility. Initial secrecy surrounding the issuance of warrants may lead to abuse, and publicity is a strong deterrent to potential malversation.

In short, what should be sought is maximum accountability and accessibility but not to the extent of harming the innocent or of impairing the efficiency of the search warrant as a weapon in society's never-ending fight against crime.

IV

The appellant, the Attorney General of Nova Scotia, says in effect that the search warrants are

none of Mr. MacIntyre's business. MacIntyre is not directly interested in the sense that his premises have been the object of a search. Why then should he be entitled to see them?

There are two principal arguments advanced in support of the position of the appellant. The first might be termed the 'privacy' argument. It is submitted that the privacy rights of the individuals who have been the object of searches would be violated if persons like Mr. MacIntyre were permitted to inspect the warrants. It is argued that the warrants are issued merely on proof of 'reasonable grounds' to believe that there is evidence with respect to the commission of a criminal offence in a "building, receptacle or place". At this stage of the proceedings no criminal charge has been laid and there is no assurance that a charge ever will be laid. Moreover, search warrants are often issued to search the premises of a third party who is in no way privy to any wrongdoing, but is in possession of material necessary to the inquiry. Why, it is asked, submit these individuals to embarrassment and public suspicion through release of search warrants?

The second, independent, submission of the appellant might be termed the 'administration of justice' argument. It is suggested that the effectiveness of the search warrant procedure depends to a large extent on the element of surprise. If the occupier of the premises were informed in advance of the warrant, he would dispose of the goods. Therefore, the public must be denied access to the warrants, otherwise the legislative purposes and intention of Parliament, embodied in s. 443 of the Criminal Code, would be frustrated.

V

Let me deal first with the 'privacy' argument. This is not the first occasion on which such an argument has been tested in the courts. Many times it has been urged that the 'privacy' of litigants requires that the public be excluded from court proceedings. It is now well established, however, that covertness is the exception and openness the rule. Public confidence in the integrity of the court system and understanding of the administration of justice are thereby fostered. As a general rule the sensibilities of the individuals involved are no basis for exclusion of the public from judicial proceedings. The following comments of Laurence J. in R. v. Wright, 8 T.R. 293, are apposite and were cited with approval by Duff J. in Gazette Printing Co. v. Shallow (1909), 41 S.C.R. 339 at p. 359:

> Though the publication of such proceedings may be to the disadvantage of the particular individual concerned, yet it is of vast importance to the public that the proceedings of courts of justice should be universally known. The general advantage to the country in having these proceedings made public more than counterbalances the inconveniences to the private persons whose conduct may be the subject of such proceedings.

The leading case is the decision of the House of Lords in Scott v. Scott, [1913] A.C. 417. In the later case of McPherson v. McPherson, [1936] A.C. 177, at p. 200, Lord Blanesburgh, delivering the judgment of the Privy Council, referred to "publicity" as the "authentic hall-mark of

judicial as distinct from administrative procedure".

It is, of course, true that Scott v. Scott and McPherson v. McPherson were cases in which proceedings had reached the stage of trial whereas the issuance of a search warrant takes place at the pre-trial investigative stage. The cases mentioned, however, and many others which could be cited, establish the broad principle of "openness" in judicial proceedings, whatever their nature, and in the exercise of judicial powers. The same policy considerations upon which is predicated our reluctance to inhibit accessibility at the trial stage are still present and should be addressed at the pretrial stage. Parliament has seen fit, and properly so, considering the importance of the derogation from fundamental common law rights, to involve the judiciary in the issuance of search warrants and the disposition of the property seized, if any. I find it difficult to accept the view that a judicial act performed during a trial is open to public scrutiny but a judicial act performed at the pretrial stage remains shrouded in secrecy.

The reported cases have not generally distinguished between judicial proceedings which are part of a trial and those which are not. Ex parte applications for injunctions, interlocutory proceedings, or preliminary inquiries are not trial proceedings, and yet the 'open court' rule applies in these cases. The authorities have held that subject to a few well-recognized exceptions, as in the case of infants, mentally disordered persons or secret processes, all judicial proceedings must be held in public. The editor of Halsbury's 4th Edition states the rule in these terms:

> In general, all cases, both civil and criminal, must be heard in open court, but in certain exceptional cases, where the administration of justice would be rendered impracticable by the presence of the public, the court may sit in camera [Vol. 10, para. 705, at p. 316].

At every stage the rule should be one of public accessibility and concomitant judicial accountability; all with a view to ensuring there is no abuse in the issue of search warrants, that once issued they are executed according to law, and finally that any evidence seized is dealt with according to law. A decision by the Crown not to prosecute, notwithstanding the finding of evidence appearing to establish the commission of a crime may, in some circumstances, raise issues of public importance.

In my view, curtailment of public accessibility can only be justified where there is present the need to protect social values of superordinate importance. One of these is the protection of the innocent.

Many search warrants are issued and executed, and nothing is found. In these circumstances, does the interest served by giving access to the public outweigh that served in protecting those persons whose premises have been searched and nothing has been found? Must they endure the stigmatization to name and reputation which would follow publication of the search? Protection of the innocent from unnecessary harm is a valid and important policy consideration. In my view that consideration overrides the public access interest in those cases where a search is made and nothing

is found. The public right to know must yield to the protection of the innocent. If the warrant is executed and something is seized, other considerations come to bear.

VI

That brings me to the second argument raised by the appellant. The point taken here is that the effective administration of justice would be frustrated if individuals were permitted to be present when the warrants were issued. Therefore, the proceeding must be conducted in camera, as an exception to the open court principle. I agree. The effective administration of justice does justify the exclusion of the public from the proceedings attending the actual issuance of the warrant. The Attorneys General have established, at least to my satisfaction, that if the application for the warrant were made in open court the search for the instrumentalities of crime would, at best, be severely hampered and, at worst, rendered entirely fruitless. In a process in which surprise and secrecy may play a decisive role the occupier of the premises to be searched would be alerted, before the execution of the warrant, with the probable consequence of destruction or removal of evidence. I agree with counsel for the Attorney General of Ontario that the presence in an open courtroom of members of the public, media personnel, and, potentially, contacts of suspected accused in respect of whom the search is to be made, would render the mechanism of a search warrant utterly useless.

None of the counsel before us sought to sustain the position of the Appeal Division of the Supreme Court of Nova Scotia that the issue of the search warrant is a judicial act which should be performed in open court by a justice of the peace with the public present. The respondent Mr. MacIntyre stated in paragraph 5 of his factum:

> One must note that the Respondent never sought documentation relating to unexecuted search warrants nor did he ever request to be present during the decision making process...

It appeared clear during argument that the act of issuing the search warrant is, in practice, rarely, if ever, performed in open court. Search warrants are issued in private at all hours of the day or night, in the chambers of the justice by day or in his home by night. Section 443(1) of the Code seems to recognize the possibility of exigent situations in stating that a justice may "at any time" issue a warrant.

Although the rule is that of "open court" the rule admits of the exception referred to in Halsbury, namely, that in exceptional cases, where the administration of justice would be rendered impracticable by the presence of the public, the court may sit in camera. The issuance of a search warrant is such a case.

In my opinion, however, the force of the 'administration of justice' argument abates once the warrant has been executed, i.e. after entry and search. There is thereafter a "diminished interest in confidentiality" as the purposes of the policy of secrecy are largely, if not entirely, accomplished. The need for continued concealment virtually disappears. The appellant concedes that at this point

individuals who are directly 'interested' in the warrant have a right to inspect it. To that extent at least it enters the public domain. The appellant must, however, in some manner, justify granting access to the individuals directly concerned, while denying access to the public in general. I can find no compelling reason for distinguishing between the occupier of the premises searched and the public. The curtailment of the traditionally uninhibited accessibility of the public to the working of the courts should be undertaken with the greatest reluctance.

The 'administration of justice' argument is based on the fear that certain persons will destroy evidence and thus deprive the police of the fruits of their search. Yet the appellant agrees these very individuals (i.e. those 'directly interested') have a right to see the warrant, and the material upon which it is based, once it has been executed. The appellants do not argue for blanket confidentiality with respect to warrants. Logically, if those directly interested can see the warrant, a third party who has no interest in the case at all is not a threat to the administration of justice. By definition, he has no evidence that he can destroy. Concern for preserving evidence and for the effective administration of justice cannot justify excluding him.

Undoubtedly every court has a supervisory and protecting power over its own records. Access can be denied when the ends of justice would be subverted by disclosure or the judicial documents might be used for an improper purpose. The presumption, however, is in favour of public access and the burden of contrary proof lies upon the person who would deny the exercise of the right.

I am not unaware that the foregoing may seem a departure from English practice, as I understand it, but it is in my view more consonant with the openness of judicial proceedings which English case law would seem to espouse.

VII

I conclude that the administration of justice argument does justify an in camera proceeding at the time of issuance of the warrant but, once the warrant has been executed, exclusion thereafter of members of the public cannot normally be countenanced. The general rule of public access must prevail, save in respect of those whom I have referred to as innocent persons.

I would dismiss the appeal and vary the declaration of the Appeal Division of the Supreme Court of Nova Scotia to read as follows:

> IT IS DECLARED that after a search warrant has been executed, and objects found as a result of the search are brought before a justice pursuant to s. 446 of the Criminal Code, a member of the public is entitled to inspect the warrant and the information upon which the warrant has been issued pursuant to s. 443 of the Code.

> There will be no costs in this Court.

The reasons of Martland, Ritchie, Beetz and Estey JJ. were delivered by

MARTLAND J. (dissenting):-- This appeal is from a judgment of the Appeal Division of the Supreme Court of Nova Scotia. The facts which gave rise to the case are not in dispute.

The appellant, Ernest Harold Grainger, is Chief Clerk of the Provincial Magistrate's Court at Halifax and is also a Justice of the Peace. The respondent is a television journalist employed by the Canadian Broadcasting Corporation who, at the material time, was researching a story on political patronage and fund raising. He asked the appellant, Grainger, to show him certain search warrants and supporting material and was refused on the ground that such material was not available for inspection by the general public.

The respondent gave notice to the appellants of an intended application in the Supreme Court of Nova Scotia, Trial Division, for "an Order in the nature of mandamus and/or a declaratory judgment to the effect that the search warrants and Informations relating thereto issued pursuant to Section 443 of the Criminal Code of Canada or other related or similar statutes are a matter of public record and may be inspected by a member of the public upon reasonable request".

The application was heard by Richard J. who ordered that the respondent "is entitled to a declaration to the effect that the Search Warrants and Informations relating thereto which have been executed upon and which are in the control of a Justice of the Peace or a Court Official are court records and are available for examination by members of the general public." It will be noted that this order was limited to search warrants which had been executed.

The appellants appealed unsuccessfully to the Appeal Division. The judgment dismissing the appeal contained the following declaration:

> IT IS DECLARED that a member of the public is entitled to inspect informations upon which search warrants have been issued pursuant to section 443 of the Criminal Code of Canada.

This declaration was broader in its scope than that made by Richard J. in that it was not limited to search warrants which had been executed. The basis for the Court's decision is set forth in the following paragraph of the reasons for judgment:

> In my opinion any member of the public does have a right to inspect informations upon which search warrants are based, pursuant to s. 443 of the Criminal Code, since the issue of the search warrant is a judicial act performed in open court by a justice of the peace. The public would be entitled to be present on that occasion and to hear the contents of the information presented to the justice when he is requested to exercise his discretion in the granting of the warrant. The information has become part of the record of the court as revealed at a public hearing and must be available for inspection by members of the

public.

Subsection (1) of s. 443 of the Criminal Code provides:

443. (1) A justice who is satisfied by information upon oath in Form 1, that there is reasonable ground to believe that there is in a building, receptacle or place

(a)  anything upon or in respect of which any offence against this Act has been or is suspected to have been committed,

(b)  anything that there is reasonable ground to believe will afford evidence with respect to the commission of an offence against this Act, or

(c)  anything that there is reasonable ground to believe is intended to be used for the purpose of committing any offence against the person for which a person may be arrested without warrant,

may at any time issue a warrant under his hand authorizing a person named therein or a peace officer to search the building, receptacle or place for any such thing, and to seize and carry it before the justice who issued the warrant or some other justice for the same territorial division to be dealt with by him according to law.

Section 446 of the Criminal Code provides that anything seized under a search warrant issued pursuant to s. 443 and brought before a justice shall be detained by him or he may order that it be detained until the conclusion of any investigation or until required to be produced for the purpose of a preliminary inquiry or trial.

Subsection (5) of s. 446 provides:

446.  ...

(5) Where anything is detained under subsection (1), a judge of a superior court of criminal jurisdiction or of a court of criminal jurisdiction may, on summary application on behalf of a person who has an interest in what is detained, after three clear days notice to the Attorney General, order that the person by or on whose behalf the application is made be permitted to examine anything so detained.

The appellants, by leave of this Court, have appealed from the judgments of the Appeal Division. The two issues stated by the appellants are as follows:

> (i)   Are search warrants issued pursuant to Section 443 of the Criminal Code issued in open court and are they and the informations pertaining thereto consequently documents open for public inspection,
>
> (ii)  Whether there is otherwise a general right to inspect search warrants and the informations pertaining thereto.

With respect to the first issue, I am in agreement with my brother Dickson, for the reasons which he has given, that the broad declaration made by the Appeal Division cannot be sustained. That being so, the respondent cannot assert a right to examine the search warrants and the related informations on the basis that the issuance of the search warrants was a judicial act in open court with a right for the public to be present.

That brings us to the second issue defined by the appellants as to whether there is a general right to inspect search warrants and the informations pertaining thereto. This was the real basis of the submission of the respondent who did not seek to sustain the position taken by the Appeal Division. His position is that search warrants issued under s. 443 and the informations pertaining thereto are court documents which are open to general public inspection.

The respondent relies upon an ancient English statute enacted in 1372, 46 Edward III. An English translation of this Act, which was enacted in law French, appears in a note at the end of the judgment of the Court of King's Bench in Caddy v. Barlow (1827), 1 Man. & Ry. 275 at pp. 279-80. I will quote that part of the note which includes the statutory provision:

> It appears that originally all judicial records of the King's Courts were open to the public without restraint, and were preserved for that purpose. Lord Coke, in his preface to 3 Co. Rep. 3, speaking on this subject says, "these records, for that they contain great and hidden treasure, are faithfully and safely kept, (as they well deserve), in the king's treasury. And yet not so kept but that any subject may for his necessary use and benefit have access thereunto; which was the ancient law of England, and so is declared by an act of Parliament in 46 Edw. 3, in these words: Also the Commons pray, that, whereas records, and whatsoever is in the King's Court, ought of reason to remain there, for perpetual evidence and aid of all parties thereto, and of all those whom in any manner they reach, when they have need; and yet of late they refuse, in the Court of our said Lord, to make search or exemplification of any thing which can fall in evidence against the King, or in his disadvantage. May it please (you) to ordain by statute, that search and exemplification be made for all persons (fait as touts gentz) of whatever record touches them in any manner, as well as that which falls against the King as other persons. Le Roy le voet."

The respondent cites this legislation in support of the proposition that a member of the public has access to all judicial records. However, the provisions of the statute did not go that far. It referred to "whatever record touches them in any manner". (Emphasis added.) I take this as meaning that to obtain the benefit of the statute the person had to show that the document sought to be searched in some way affected his interests.

This view is supported by the portion of the footnote which precedes the quotation of the statute. Lord Coke states that any subject may have access to the records "for his necessary use and benefit".

The case of Caddy v. Barlow itself related to the admissibility, in an action for malicious prosecution, of a copy of an indictment against the plaintiff which had been granted to her brother, the co-accused.

The respondent refers to the judgment of the Court of Appeal for Ontario in The Attorney-General v. Scully (1902), 4 O.L.R. 394, in which reference is made to Caddy v. Barlow and to the English statute. That case dealt with an application made to the clerk of the peace for a copy of the indictment in a criminal charge of theft against the applicant who had been acquitted. He obviously had an interest in obtaining the document.

The Appeal Division in the present case which, as previously noted, based its decision to permit the examination of the search warrants and informations upon its conclusion that these documents were produced at a judicial hearing in open court, did deal with the assertion of a general right to examine court documents in the following passage in its reasons:

> In my opinion at common law courts have always exercised control over their process in open court and access to the records. Although the public have a right to any information they may gleam [sic] from attendance at a public hearing of a process in open court, and to those parts of the record that are part of the public presentation of the judicial proceeding in open court there have always been some parts of the court file that are available only to "persons interested" and this "interest" must be established to the satisfaction of the court. Parties to civil actions and the accused in criminal proceedings have always been held by the courts to be persons so interested. Other persons must establish their right to see particular documents before being entitled to do so.

The Appeal Division cited in its reasons paragraphs 1492 and 1493 of Taylor on Evidence, 11th ed. (The same paragraphs appear with the same numbers in the 12th edition):

> 1492. It is highly questionable whether the records of inferior tribunals are open to the inspection of all persons without distinction; but it is clear that everyone has a right to inspect and take copies of the parts of the proceedings in which he is individually interested. The party, therefore, who wishes to examine

any particular record of one of those courts, should first apply to that court, showing that he has some interest in the document in question, and that he requires it for a proper purpose. If his application be refused, the Chancery, or the King's Bench Division of the High Court, upon affidavit of the fact, may send either for the record itself or an exemplification; or the latter court will, by mandamus, obtain for the applicant the inspection or copy required. Thus, where a person, after having been convicted by a magistrate under the game laws, had an action brought against him for the same offence, the Court of Queen's Bench held that he was entitled to a copy of the conviction; and the magistrate having refused to give him one, they granted a writ of certiorari, for the mere purpose of procuring a copy, and of thus enabling the defendant to defeat the action. So, where a party, who had been sued in a court of conscience and had been taken in execution, brought an action of trespass and false imprisonment, the judges granted him a rule to inspect so much of the book of the proceedings as related to the suit against himself.

1493. Indeed, it may be laid down as a general rule, that the King's Bench Division will enforce by mandamus the production of every document of a public nature, in which any one of his Majesty's subjects can prove himself to be interested. Every officer, therefore, appointed by law to keep records ought to deem himself a trustee for all interested parties, and allow them to inspect such documents as concern themselves,--without putting them to the expense and trouble of making a formal application for a mandamus. But the applicant must show that he has some direct and tangible interest in the documents sought to be inspected, and that the inspection is bona fide required on some special and public ground, or the court will not interfere in his favour; and therefore, if his object be merely to gratify a rational curiosity, or to obtain information on some general subject, or to ascertain facts which may be indirectly useful to him in some ulterior proceedings, he cannot claim inspection as a right capable of being enforced.

The first edition of this work was published in 1848, and so these propositions may be taken as representing the author's views of the law of England on this subject.

In Halsbury's Laws of England, 4th ed., vol. 1, para. 97, a similar statement of the law appears:

The applicant's interest in the documents must be direct and tangible. Neither curiosity, even though rational, nor the ascertainment of facts which may be useful for furthering some ulterior object, constitutes a sufficient interest to bring an applicant within the rule on which the court acts in granting a

mandamus for the inspection of public documents.

> Although reasonable grounds must be shown for requiring inspection, it is not necessary to show as a ground for the application for a mandamus to inspect documents that a suit has been actually instituted. It will suffice to show that there is some particular matter in dispute and that the applicant is interested therein.

It is quite clear that the respondent has no direct and tangible interest in the documents which he sought to examine. He wished to examine them to further an ulterior object, i.e. for the purpose of preparing a news story. Applying the rule applicable under English law, the appellant, Grainger, was entitled to refuse his request.

It is suggested that a broader right might be recognized consonant with the openness of judicial proceedings. This suggestion requires a consideration of the nature of the proceedings provided for in s. 443. That section provides a means whereby persons engaged in the enforcement of criminal law may obtain leave, inter alia, to search buildings, receptacles or places and seize documents or other things which may afford evidence with respect to the commission of a criminal offence. A justice is empowered by the section to authorize this to be done. Before giving such authority, he must be satisfied by information on oath that there is reasonable ground for believing that there is in the building, receptacle or place anything in respect of which an offence has been committed or is suspected to have been committed; anything that there is reasonable ground to believe will afford evidence of the commission of a criminal offence; or anything that there is reasonable ground to believe is intended to be used for the commission of an offence against the person for which a person may be arrested without warrant.

The function of the justice may be considered to be a judicial function, but might more properly be described as a function performed by a judicial officer, since no notice is required to anyone, there is no opposite party before him and, in fact, in the case of a search before proceedings are instituted, no opposite party exists. There is no requirement that the justice should perform his function in court. The justice does not adjudicate, nor does he make any order. His power is to give authority to do certain things which are a part of pretrial preparation by the Crown. No provision is made in either s. 443 or s. 446 for an examination by anyone of the documents on the basis of which the justice issued a search warrant.

As the function of the justice is not adjudicative and is not performed in open court, cases dealing with the requirement of court proceedings being carried on in public, such as Scott v. Scott, [1913] A.C. 417, and McPherson v. McPherson, [1936] A.C. 177, are not, in my opinion, relevant to the issue before the Court. The documents which the respondent seeks to examine are not documents filed in court proceedings. They are the necessary requirements which enable the justice to grant permission for the Crown to pursue its investigation of possible crimes and to prepare for

criminal proceedings.

If the documents in question in this appeal are not subject to public examination prior to the execution of the search warrants, I see no logical reason why they should become subject to such examination thereafter, at least until the case in respect of which the search has been made has come to trial. It is true that a search of those documents before the search warrant has been executed might frustrate the very purpose for which the warrant was issued by forewarning the person whose premises were to be searched. The element of surprise is essential to the proper enforcement of the criminal law. There are, however, additional and important reasons why such documents should not be made public which continue even after the warrant has been executed.

The information upon oath on the basis of which a search warrant may be issued is in Form 1 contained in Part XXV of the Criminal Code. It requires a description of the offence in respect of which the search is to be made. The informant must state that he has reasonable grounds for believing that the things for which the search is to be made are in a particular place and must state the grounds for such belief. This document, which may be submitted to the justice before any charges have been laid, discloses the informant's statement that an offence has been committed or is intended to be committed.

The disclosure of such information before trial could be prejudicial to the fair trial of the person suspected of having committed such crime. Publication of such information prior to trial is even more serious.

In R. v. Fisher (1811), 2 Camp. 563, 170 E.R. 1253, a prosecution was instituted for criminal libel in consequence of the publication by the defendants of the preliminary examinations taken ex parte before a magistrate prior to the committal for trial of the plaintiff on a charge of assault with intent to rape. In his judgment, Lord Ellenborough said, at p. 570:

> If anything is more important than another in the administration of justice, it is that jurymen should come to the trial of those persons on whose guilt or innocence they are to decide, with minds pure and unprejudiced. Is it possible they should do so, after having read for weeks and months before, ex parte statements of the evidence against the accused, which the latter had no opportunity to disprove or to controvert? ... The publication of proceedings in courts of justice, where both sides are heard, and matters are finally determined, is salutary, and therefore it is permitted. The publication of these preliminary examinations has a tendency to pervert the public mind, and to disturb the course of justice; and it is therefore illegal.

Inspection of the information and the search warrant would enable the person inspecting the documents to discover the identity of the informant. In certain types of cases this might well place the informant in jeopardy. It was this kind of risk which led to the recognition in law of the right of the police to protect from disclosure the identity of police informants. That right exists even where a

police officer is testifying at a trial. The same kind of risk arises in relation to persons who give information leading to the issuance of a search warrant. For the same reasons which justify the police in refusing to disclose the identity of an informer, public disclosure of documents from which the identity of the informant may be ascertained should not be compelled.

In his reasons, my brother Dickson has referred to the fact that in recent years the search warrant has become an increasingly important investigatory aid as crime and criminals become increasingly sophisticated and has pointed out that the effectiveness of a search pursuant to a search warrant depends, inter alia, on the degree of confidentiality which attends the issuance of the warrant. To insure such confidentiality, it is essential that criminal organizations, such as those involved in the drug traffic, should be prevented, as far as possible, from obtaining the means to discover the identity of persons assisting the police.

Apart from the protection of the identity of the person furnishing the information upon which the issuance of a search warrant is founded, it is undesirable, in the public interest, that those engaged in criminal activities should have available to them information which discloses the pattern of police activities in connection with searches. In Inland Revenue Commissioners v. Rossminster Ltd., [1980] 2 W.L.R. 1, the House of Lords considered the validity of a search warrant procured pursuant to an English statute, the Taxes Management Act 1970, 1970 (U.K.), c. 9. The warrant was obtained because of suspected tax frauds. When executed, the occupants of the premises were not told the offences alleged or the "reasonable ground" on which the judge issuing the warrant had acted. In his reasons for judgment, Lord Wilberforce said, at pp. 37-38:

> But, on the plain words of the enactment, the officers are entitled if they can persuade the board and the judge, to enter and search premises regardless of whom they belong to: a warrant which confers this power is strictly and exactly within the parliamentary authority, and the occupier has no answer to it. I accept that some information as regards the person(s) who are alleged to have committed an offence and possibly as to the approximate dates of the offences must almost certainly have been laid before the board and the judge. But the occupier has no right to be told of this at this stage, nor has he the right to be informed of the "reasonable grounds" of which the judge was satisfied. Both courts agree as to this: all this information is clearly protected by the public interest immunity which covers investigations into possible criminal offences. With reference to the police, Lord Reid stated this in these words:

>> "The police are carrying on an unending war with criminals many of whom are today highly intelligent. So it is essential that there should be no disclosure of anything which might give any useful information to those who organise criminal activities. And it would generally be wrong to require disclosure in a civil case of anything which might be material in a

> pending prosecution: but after a verdict has been given or it has been decided to take no proceedings there is not the same need for secrecy."
> (Conway v. Rimmer [1968] A.C. 910, at pp. 953-954.)

The release to the public of the contents of informations and search warrants may also be harmful to a person whose premises are permitted to be searched and who may have no personal connection with the commission of the offence. The fact that his premises are the subject of a search warrant generates suspicion that he was in some way involved in the offence. Publication of the fact that such a warrant had been issued in respect of his premises would be highly prejudicial to him.

For these reasons, I am not satisfied that there is any valid reason for departing from the rule as stated in Halsbury (supra) so as to afford to the general public the right to inspect documents forming part of the search warrant procedure under s. 443.

In summary, my conclusion is that proceedings before a justice under s. 443 being part and parcel of criminal investigative procedure are not analogous to trial proceedings, which are generally required to be conducted in open court. The opening to public inspection of the documents before the justice is not equivalent to the right of the public to attend and witness proceedings in court. Access to these documents should be restricted, in accordance with the practice established in England, to persons who can show an interest in the documents which is direct and tangible. Clearly the respondent had no such interest.

I would allow the appeal and set aside the judgments of the Court of Appeal and of Richard J. In accordance with the submission of the appellants, there should be no order as to costs.

Appeal dismissed, Martland, Ritchie, Beetz and Estey JJ. dissenting.