Court File No. 09-CL-7950

## ONTARIO

## SUPERIOR COURT OF JUSTICE

## (COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) Case No. 09-10138 (KG) |
| NORTEL NETWORKS INC., *et al.*, | ) (Jointly Administered) |
|  | ) |
| Debtors. | ) Re: Docket No. 13461, 13462, 13463 |
|  | ) Hearing:  May 8, 2014 @ 11:00 a.m. |

## BRIEF OF AUTHORITIES OF THE CANADIAN CREDITORS' COMMITTEE
(Canadian Creditors Committee's Response to Motions Seeking Sealing or Confidentiality Orders for Trial Submissions)
(Motion Returnable May 8, 2014)

May 5, 2014

**KOSKIE MINSKY LLP**
20 Queen Street West, Suite 900
Toronto, ON M5H 3r3

Mark Zigler/Ari Kaplan/Jeff Van Bakel
Tel. 416-595-2090
Fax. 416-204-2877

Lawyers for the Canadian Former Employees and Disabled Employees through their court appointed Representatives

**CAW-CANADA LEGAL DEPARTMENT**
205 Placer Court
Toronto, ON M2H 3H9

Barry Wadsworth
Tel: 416.495.3776
Fax: 416.495.3786

Lawyers for the Canadian Autoworkers Union

**SHIBLEY RIGHTON LLP**
**w/ NELLIGAN O'BRIEN PAYNE LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, ON M5H 3E5

Arthur O. Jacques/ Thomas McRae
Co-Counsel: Janice Payne / Steve Levitt
Tel: 416.214.5213/5206
Fax:416.214.5413/5400

Lawyers for active and transferred employees of
Nortel Canada

**McCARTHY TÉTRAULT LLP**
TD Bank Tower, Suite 5300
Toronto Dominion Centre
66 Wellington Street West
Toronto ON M5K 1E6

R. Paul Steep / James D. Gage / Barbara J. Boake
Tel: 416.601.7998
Fax: 416.868.0673

Lawyers for Morneau Shepell Ltd., as administrator
of the Nortel Canada registered pension plans

**PALIARE ROLAND ROSENBERG
ROTHSTEIN LLP**
155 Wellington Street West, 35th Floor
Toronto, ON M5V 3H1

Ken Rosenberg / Lily Harmer / Massimo Starnino
Tel: 416.646.4300
Fax: 416.646.4301

Lawyers for the Superintendent of Financial
Services as Administrator of the Pension Benefits

Guarantee Fund

**DLA PIPER LLP (US)**

Selinda A. Melnik (DE 4032)
1201 N. Market Street, Suite 2100
Wilmington Delaware 19801
Telephone: (302) 468-5650
E-mail:  selinda.melnik@dlapiper.com

   - and –

Richard Hans  (admitted *pro hac vice*)
Timothy Hoeffner (admitted *pro hac vice*)
Farah Lisa Whitley-Sebti (admitted *pro ha*)
1251 Avenue of the Americas
New York, NY 10020-1104
Telephone:  (212) 335-4500
E-mail:  richard.hans@dlapiper.com
E-mail:  timothy.hoeffner@dlapiper.com
E-mail:  farahlisa.sebti@dlapiper.com

*Counsel for the Canadian Creditors Committee*

Court File No.  09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS*
*ARRANGEMENT ACT,* R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) Case No. 09-10138 (KG) |
| NORTEL NETWORKS INC., *et al.,* | ) (Jointly Administered) |
| | ) |
| Debtors. | ) Re: Docket No. 13461, 13462, 13463 |
| | ) Hearing:  May 8, 2014 @ 11:00 a.m. |
| | ) |

**BRIEF OF AUTHORITIES OF THE CANADIAN CREDITORS' COMMITTEE**
(Canadian Creditors Committee's Response to Motions Seeking Sealing or Confidentiality
Orders for Trial Submissions)
(Motion Returnable May 8, 2014)

**INDEX**

**JURISPRUDENCE**

| TAB | DESCRIPTION |
|---|---|
| 1. | *Sierra Club*, 2002 SCC 41 |
| 2. | *Publow v. Wilson,* [1994] O.J. No. 3036 (Gen Div) |
| 3. | *Leucadia, Inc. v. Applied Extrusion Techs., Inc.,* 998 F.2d 157, 161 & n.6 (3d Cir. 1993) |
| 4. | *Ontario Council of Hospital Unions v. Ontario (Min. of Health),* 85 O.R. (3d) 55 |

| 5. | *MacIntyre v. Nova Scotia (Attorney General)*, [1992] 1 S.C.R. 175 |
| 6. | *Anderson v. St. Jude Medical Inc.*, 2010 ONSC 5191 |
| 7. | *Fairview Donut Inc. v. TDL Group Corp.*, 2010 ONSC 789 |
| 8. | *Hollinger Inc. v. The Ravelstone Corporation*, 2008 ONCA 207 |
| 9. | *E.E.O.C. v. Kronos, Inc.*, 620 F.3d 287, 302 (3d Cir. 2010) |
| 10. | *In re Cendant Corp.*, 260 F.3d 183, 193-94 (3d Cir. 2001) |

1094005v1

# TAB 6

*Case Name:*
## Andersen v. St. Jude Medical, Inc.

**Between**
**Yvonne Andersen on her own behalf and as Executrix of**
**the Estate of Erik Andersen, Sharon Frost and Her**
**Majesty the Queen in Right of the Province of Alberta,**
**as represented by the Minister of Health and Wellness,**
**Plaintiffs, and**
**St. Jude Medical, Inc. and St. Jude Medical Canada,**
**Inc., Defendants**
**PROCEEDING UNDER the Class Proceedings Act, 1992**

[2010] O.J. No. 4287

2010 ONSC 5191

104 O.R. (3d) 192

100 C.P.C. (6th) 381

2010 CarswellOnt 7581

Toronto Court File No. 00-CV-195906CV

Ontario Superior Court of Justice

**J.L. Lax J.**

Heard: By written submissions.
Judgment: October 7, 2010.

(23 paras.)

*Civil litigation -- Civil procedure -- Discovery -- Production and inspection of documents --*
*Confidentiality orders -- Motion by the defendants for a sealing order for documents in the event*
*they became exhibits at trial allowed in part -- Most of these documents contain confidential or*
*proprietary information belonging to Spire Corporation, a non-party -- Public disclosure of the*
*documentation of the IBAD process, Spi-Argent coating methods, and other technical information*

*would create a real and substantial harm to Spire's commercial interests and these documents were sealed -- Outdated pricing information was not sealed as this document did not meet the necessity branch of the test.*

Motion by the defendants for a sealing order for documents in the event they became exhibits at trial. Most of these documents contain confidential or proprietary information belonging to Spire Corporation, a non-party. The defendants argued that these documents contained Spire's confidential information about its unique processing procedures and parameters respecting silver-based coatings on its Silzone valve.

HELD: Motion allowed in part. The evidence showed that a number of other companies were currently using or developing silver or silver-based coatings on medical devices. Interest in such technology increased the likelihood that potential competitors would be interested in this information, and made the risk to Spire more likely and less speculative. Spire's business relied on the confidentiality of its technical specifications and processes. Public disclosure of the documentation of the IBAD process, Spi-Argent coating methods, and other technical information would create a real and substantial harm to Spire's commercial interests. This information was sensitive and confidential, and disclosure enabled Spire's competitors to replicate Spire's otherwise confidential technology to unfairly compete with Spire to Spire's detriment. Disclosure of the now outdated pricing information did not create a serious risk to Spire's commercial interest. Therefore, this document did not meet the necessity branch of the test and the defendants had not established that the document should be sealed. There was a broad public interest in preserving contractual confidentiality obligations and in preserving the confidential information of non-parties. It was also in the public interest to promote commercial incentives for scientific innovation and preserve the intellectual property or proprietary rights of innovators. There was little or no risk that these proceedings would be incomprehensible to the public without reference to the information in these documents. The salutary effects of sealing the documents outweighed its deleterious effects.

**Statutes, Regulations and Rules Cited:**

Courts of Justice Act, R.S.O. 1990, c. C.43, s. 137(1), s. 137(2)

**Counsel:**

*Angus McKinnon*, for the Plaintiffs.

*Gordon McKee, Marcy McKee*, for the Defendants.

---

**Ruling on Sealing of Spire Corporation**

## Documents and Information

**1**   [1] **J.L. LAX J.**:-- The defendants, St. Jude Medical, Inc. and St. Jude Medical, Canada Inc. (collectively "SJM"), seek a sealing order for 24 documents or portions of documents in the event they become exhibits at trial. Most of these documents contain confidential or proprietary information belonging to Spire Corporation ("Spire"). The plaintiffs' position is that none of the documents meet the legal test for sealing, but they are not opposing the motion.

**2**   [2] At the time of filing these written submissions, only one of the 24 documents at issue had been made an exhibit in this trial: JB # 14105, which was marked as Exhibit 30, and is subject to an interim sealing order. The defendants are seeking to permanently seal or redact pages 48 and 49 of Exhibit 30, on the grounds that these pages contain Spire's confidential information about its unique processing procedures and parameters. Exhibit 30 is SJM's Supplementary Notice of Compliance submission to Health Canada for the Masters Series Silzone valve.

**3**   [3] In support of their request for a sealing order, the defendants provided affidavits of Richard Oliver of Spire, in which Oliver attests to the prejudicial consequences to Spire of disclosure of these documents/excerpts. Oliver also refers to SJM's License and Supply Agreement with Spire, which requires that SJM keep Spire's information confidential and that the confidentiality provisions of the Licence and Supply Agreements survive the termination of those agreements.

**4**   [4] The defendants categorize the documents for which they are seeking a sealing order into the following three categories:

1.   documents containing detailed confidential information concerning processing steps and parameters and equipment specifications for Spire's proprietary Spi-Argent and IBAD (ion beam assisted deposition) processes;
2.   documents that disclose thickness, weight and/or other measurements of the Spi-Argent coating; and
3.   documents that disclose confidential and commercially sensitive pricing information.

The documents in these categories are listed in the appendix to this order.

**5**   [6] The first category of documents or excerpts includes documents in Spire's Master File with the U.S. Food and Drug Administration ("FDA"). These documents contain a detailed explanation of Spire's IBAD process, including detailed information about the equipment associated with Spire's IBAD process; detailed instructions for use by IBAD technicians; and confidential processing parameters and measurements, which are versions of Spire's work instructions for Spi-Argent processing. Pages 48 and 49 of Exhibit 30 fall into category 1. The second category includes documents/excerpts that disclose thickness parameters and confidential measurements of Spi-Argent coating. The defendants submit that disclosure of these documents/excerpts would allow

competitors to duplicate Spire's technology as Spire uses the same equipment and procedures today.

**6**    [5] The third category is a letter from 1999 that contains confidential pricing information for Spi-Argent processing. The defendants submit that although outdated, the information discloses information about Spire's pricing policies and strategies that are still in use today and could be used by competitors to Spire's prejudice.

**The law on sealing orders**

**7**    [6] Pursuant to the *Courts of Justice Act*, R.S.O. 1990, c. C-43, on payment of a fee, a person is entitled to see any document filed in a civil proceeding in a court, unless an Act or an order of the court provides otherwise (s. 137(1)). The court may treat as confidential and seal and exclude from the public record any document filed before the court in a civil proceeding (s. 137(2)).

**8**    [7] The decision of the Supreme Court of Canada in *Sierra Club of Canada v. Canada (Minister of Finance)*, [2002] 2 S.C.R. 522 is the governing authority on the granting of a sealing or confidentiality order. In *Sierra*, the Supreme Court granted a sealing order over technical information about an environmental assessment of a site in China for the construction of two CANDU nuclear reactors. The documents were the property of the Chinese authority, which had provided the documents to Atomic Energy of Canada Ltd. ("AECL") on condition that they be protected by a confidentiality order.

**9**    [8] The Court established the following test for granting a sealing order, at para. 53:

>    A.    such an order is necessary in order to prevent a serious risk to an important interest, including a commercial interest, in the context of litigation because reasonably alternative measures will not prevent the risk; and
>    B.    the salutary effects of the confidentiality order, including the effects on the right of civil litigants to a fair trial, outweigh its deleterious effects, including the effects on the right to free expression, which in this context includes the public interest in open and accessible court proceedings.

**10**    [9] The Court stated that the three elements of the first branch are as follows (paras. 54-57):

>    i.    The risk in question must be real and substantial, in that the risk is well grounded in the evidence, and poses a serious threat to the commercial interest in question.
>    ii.    To qualify as an "important commercial interest," the interest in question cannot merely be specific to the party requesting the order; the interest must be one which can be expressed in terms of a public interest in confidentiality. Where exposure of information would cause a breach of a confidentiality agreement, the commercial interest affected can be characterized more broadly as the general commercial interest of

     preserving confidential information.

iii.    To assess whether there are "reasonably alternative measures," the judge must consider not only whether reasonable alternatives to a confidentiality order are available, but also to restrict the order as much as is reasonably possible while preserving the commercial interest in question.

**11**    [10] In *Sierra*, the Court found that branch A, the necessity branch, was satisfied. The commercial interest at stake was the objective of preserving contractual obligations of confidentiality. In establishing confidentiality, the applicant demonstrated that the information in question had been treated at all relevant times as confidential; that on a balance of probabilities the applicant's proprietary, commercial, and scientific interests could reasonably be harmed by the disclosure of the information; and that the information had been accumulated with a reasonable expectation of it being kept confidential. Further, the Court found that disclosure of the confidential documents would impose a serious risk to an important commercial interest of the appellant, and there were no reasonably alternative measures to granting the order.

**12**    [11] The Court found that the salutary effects of an order outweighed the deleterious effects and that branch B of the test was also satisfied. Absent a sealing order, the appellant's ability to mount a successful defence would be curtailed as the AECL would have been prevented from disclosing the information. The confidential documents in issue contained detailed technical information pertaining to the construction and design of a nuclear installation, and it may have been in the public interest to prevent this information from entering the public domain. The Court noted that the technical nature of the documents made it unlikely that the general public would understand their contents. At para. 78, the Court stated: "The narrow scope of the order coupled with the highly technical nature of the Confidential Documents significantly temper the deleterious effects the confidentiality order would have on the public interest in open courts."

**13**    [12] The courts have recognized the importance of contractual obligations between a party to the proceedings and a third party. For example, in *117560 Ontario Ltd. v. Great Atlantic Pacific Co. of Canada* (2003), 121 A.C.W.S. (3d) 426, [2003] O.J. No. 1016 (S.C.) (*A&P*), Master Macleod granted a permanent confidentiality order related to commercially sensitive information about supplier discounts. The master noted at para. 6 that exclusive suppliers had disclosed detailed information about pricing and profit margins and that in the public domain, "[t]his information could be used to devastating effect by other suppliers who might bid against the current supplier in dealing with A&P, by other grocery stores with whom they will be negotiating and by other suppliers who might bid with other customers." In *Camoplast Inc. v. Soucy International Inc*, [2003] F.C.J. No. 1791 (T.D.), the Federal Court recognized that contractual obligations of confidentiality raise a general commercial or important interest in circumstances where a confidentiality agreement existed between the plaintiff and a third party.

**14**    [13] As in the matter before me, *Sierra, Camoplast*, and *A&P* each address the commercial interests of third parties. In contrast, in *Fairview Donut Inc. v. TDL Group Corp*, 2010 ONSC 789,

100 O.R. (3d) 510 (S.C.), the information sought to be protected was confidential to parties to the litigation, but not third parties. In *Fairview*, the court dismissed a motion by the defendants, Tim Hortons, for a sealing order restricting public access to certain documents or portions thereof. In applying the *Sierra* test, Strathy J. was not satisfied that the defendants met the necessity branch of the test as the defendants did not satisfy the court that the interests affected went beyond the private commercial interests of Tim Hortons and its franchisees. Further, although the defendants submitted that Tim Hortons and its franchisees would suffer commercial harm if the information was disclosed to competitors, the defendants did not satisfy the court that this risk was real or substantial or well-grounded in the evidence. Rather, the defendants' evidence was speculative and lacked specifics. Strathy J. noted that although sealing orders have been routinely granted in cases involving true trade secrets (such as *Eli Lilly*, discussed below), the information that the defendants described as trade secrets was "of the most general nature and at the very lowest level of 'secrecy'" (para. 66).

**15**    [14] In *Eli Lilly and Co. v. Apotex Inc.*, 2008 FC 892, [2008] F.C.J. No. 1593, Gauthier J. ordered certain documents and portions of other documents sealed, having found that they met the *Sierra* test. The court found that for certain documents, "the public interest in maintaining the confidentiality of documents containing proprietary information filed with the regulator on a confidential basis outweighs the public interest in open and accessible Court proceedings, in a private matter such as this one" (para. 7). The court ordered sealed documents/excerpts that contained details of a particular manufacturing process and those that contained material information about the supplier's process (paras. 42 & 45). On the other hand, the court did not order sealed documents that did not "contain information not publicly available or maintained in strict confidentiality" (para. 11) and contained no details of the particular manufacturing process (para. 41).

**16**    [15] Similar to the concern over confidential processes and proprietary information expressed in *Eli Lilly*, in *Dish Network LLC v. Ramkissoon*, 2010 ONSC 761, [2010] O.J. No. 440 (S.C.), Cumming J. allowed the plaintiffs' motion to seal a document that contained technical specifications that "could be used by third parties to design other devices and software capable of infringing the Plaintiffs' trade secrets, descrambling their encrypted satellite signals, and circumventing technological measures that protect access to copyrighted and other proprietary works" (para. 8).

**Analysis**

**A i. Serious risk to important commercial interest**

**17**    [16] The defendants (through their written submissions and the affidavits of Richard Oliver) explain how the proposed documents/excerpts could be used by competitors to replicate Spire's technology. Further, the evidence shows that a number of other companies are currently using or developing silver or silver-based coatings on medical devices. Interest in such technology increases the likelihood that potential competitors will be interested in this information, and makes the risk to

Spire more likely and less speculative. SJM is under a continuing contractual obligation to preserve the confidentiality of Spire's IBAD technology. As in *Eli Lilly*, the documents/excerpts listed in categories 1 and 2 contain both submissions filed confidentially with regulators as well as details of a particular manufacturing process. Further, as in *Dish Network*, Spire's business relies on the confidentiality of its technical specifications and processes.

**18**   [17] Consistent with *Eli Lilly, Dish Network*, and *A&P*, I am satisfied that public disclosure of the documents in categories 1 and 2 - documentation of the IBAD process, Spi-Argent coating methods, and other technical information - would create a real and substantial harm to Spire's commercial interests. This information is sensitive and confidential, and disclosure enables Spire's competitors to replicate Spire's otherwise confidential technology to unfairly compete with Spire to Spire's detriment.

**19**   [18] I am not satisfied that disclosure of the now outdated pricing information in category 3, contained in a July 1999 letter from SJM to Spire, creates a serious risk to Spire's commercial interest. Therefore, this document does not meet the necessity branch of the test and the defendants have not satisfied me that the document should be sealed.

### A ii. Public interest in maintaining confidentiality

**20**   [19] As established by *Sierra* and applied in *A&P* and *Camoplast*, there is a broad public interest in preserving contractual confidentiality obligations and in preserving the confidential information of non-parties. SJM and Spire's Licence and Supply Agreement requires SJM to preserve the confidentiality of Spire's confidential information and disclosure would result in a breach of this agreement. It is also in the public interest to promote commercial incentives for scientific innovation and preserve the intellectual property or proprietary rights of innovators. It is clear that Spire intended to keep its processes and technology out of the public domain by maintaining the secrecy of its information and regulatory filings. Disclosure would undermine this. Unlike *Fairview*, where it was the defendants' interests at stake, and where the court found the information sought to be sealed very general and not particularly secretive, in this case, it is a non-party whose commercial interests are at stake, and the information sought to be sealed is highly technical and specific.

### A iii. Reasonable alternative measures

**21**   [20] I am satisfied that ordering the documents/excerpts in categories 1 and 2 sealed is the least obtrusive way to protect Spire's commercially sensitive information. Apart from the document in category 3, the defendants have been appropriately selective about the information they seek to seal.

### B. Effects of order

**22**   [21] As discussed in *Sierra* and in *Fairview*, there is a very strong public interest to ensure that

the public has access to information in court proceedings. A sealing order reduces transparency in this process and can result in the public losing trust and confidence in the administration of justice. However, here, as in *Sierra*, the documents/excerpts in the first two categories contain detailed and highly technical information that is not likely to be of interest or comprehensible to the general public. Unlike *Fairview*, there is little or no risk that these proceedings will be incomprehensible to the public without reference to the information in these documents. I find that the salutary effects of sealing the documents/excerpts in categories 1 and 2 outweigh its deleterious effects.

**Conclusion**

**23**     [22] For the reasons above, I order permanently sealed the documents/excerpts contained in categories 1 & 2 in the attached appendix in the event that any or all such documents or excerpts become exhibits at trial, including pages 48 and 49 of JB#14105, Exhibit 30. The document in category 3 does not meet the necessity branch of the *Sierra* test and should not be sealed.

J.L. LAX J.

\* \* \* \* \*

**APPENDIX**

## 1) Documents disclosing Spire Processing and Equipment Specifications and Parameters

| JB# | SJM Production # | Pages to be Sealed |
|---|---|---|
| 14105 (Exhibit 30) | 152 | 48-49 |
| 1649 | 1763 | 10-11, 39-40 |
| 2604 | 151 | 39-40 |
| 2617 | 152 | 47-48 |
| 5741 | 153 | 161-162 |
| 2646 | 171 | 36-37 |
| 2609 | 186 | 85-86 |
| 2616 | 41462 | 40-41 |
| 6027 | 49328 | All |
| 6401 | 49261 | 2-3 |
| 6025 | 2003 | 3-10 |
| 5221 | 2031 | 3-17, 18-23, 29, 30, 32. |
| 6405 | 2033 | 8-15 |
| 5857 | 49267 | 18-34 |
| 2119 | 49219 | 5 |
| 145 | 1368 | 7 |
| 5557 | 49321 | 5 |

## 2) Documents Disclosing Spi-Argent® Measurements

| JB# | SJM Production # | Pages to be Sealed |
|-----|------------------|--------------------|
| 3183 | 49320 | 6 |
| 3464 | 1355 | 4 |
| 3298 | 3253 | 9-13, 15-24, 40-45, 46-48, 49-51, 190-199 |
| 5220 | 1969 | 9-10, 67-92, 40-45 |
| 13160 | 68342 | 68, 74, 100 |
| 2648 | 13904 | 7 |

## 3) Documents Disclosing Confidential Spire Pricing Information

| JB# | SJM Production # | Pages to be Sealed |
|-----|------------------|--------------------|
| 5221 | 2301 | 34-37 |

# TAB 7

*Case Name:*

# Fairview Donut Inc. v. TDL Group Corp.

### RE: Fairview Donut Inc. and Brule Foods Ltd.,
### Plaintiffs/Respondents, and
### The TDL Group Corp. and Tim Hortons Inc., Defendants/Moving
### Parties

[2010] O.J. No. 502

2010 ONSC 789

100 O.R. (3d) 510

Court File No. CV-08-00356806-CP00

Ontario Superior Court of Justice

**G.R. Strathy J.**

Heard: December 22, 2009.
Judgment: February 8, 2010.

(72 paras.)

*Civil litigation -- Civil evidence -- Documentary evidence -- Publication bans and confidentiality
orders -- Sealed evidence -- Motion by the Tim Hortons' defendants for a sealing order dismissed --
The proposed class action asserted that the costs and expenses associated with a convection baking
method and new lunch menu items were a breach of their individual franchisee licenses -- The
defendants sought the order for certain documents in their motion record on certification and
summary judgment -- The risk of commercial harm was not real, substantial or well-grounded in
the evidence -- Even if an important commercial interest was engaged the salutary effects of a
sealing order would not have outweighed its deleterious effects -- Courts of Justice Act, ss. 135(2),
137(2).*

*Civil litigation -- Civil procedure -- Parties -- Class or representative actions -- Procedure --
Motion by the Tim Hortons' defendants for a sealing order dismissed -- The proposed class action
asserted that the costs and expenses associated with a convection baking method and new lunch
menu items were a breach of their individual franchisee licenses -- The defendants sought the order*

*for certain documents in their motion record on certification and summary judgment -- The risk of commercial harm was not real, substantial or well-grounded in the evidence -- Even if an important commercial interest was engaged the salutary effects of a sealing order would not have outweighed its deleterious effects -- Courts of Justice Act, ss. 135(2), 137(2).*

The Tim Hortons' defendants in the proposed class action moved for a confidentiality or sealing order restricting public access to certain documents, or portions of certain documents, in their motion record on certification and summary judgment. The two putative class representatives were franchisees of Tim Hortons'. The action asserted that the conversion to preparation of frozen baked goods in convection ovens result in increased costs and expenses in breach of their individual license agreements. The action further asserted that the requirement imposed on franchisees to sell lunch menu items at low margins was also a breach of their licence agreements. Tim Hortons' position was that the plaintiffs' claims were entirely without merit and that the information deleted or redacted was personal information about franchisees, financial information about franchisees, competitively sensitive commercial data and trade secrets.

HELD: Motion dismissed. The Court was not satisfied that the interests affected extended beyond the commercial interests of Tim Hortons' and its franchisees or that those interests could be expressed in terms of the broader commercial interest in the preservation of confidential information or the promotion of fair competition. The risk of commercial harm was not real, substantial or well-grounded in the evidence. The baking system was introduced in 2002 and was not unique. The information described as trade secrets was of the most general nature and in order to take advantage of that information it would be necessary to create a substantial baking infrastructure. There was no general authority to redact documents appended to affidavits, or portions thereof, on the grounds they were irrelevant. Even if an important commercial interest was engaged the salutary effects of a sealing order would not have outweighed its deleterious effects. A sealing order was not required to ensure a fair trial and such an order would have adverse effects on public confidence in the administration of justice.

**Statutes, Regulations and Rules Cited:**

Canadian Charter of Rights and Freedoms, 1982, R.S.C. 1985, App. II, No. 44, Schedule B, s. 2(b)

Courts of Justice Act, R.S.O. 1990, c. C.43, s. 135, s. 135(2), s. 137(2)

Criminal Code, R.S.C. 1986, c. C-46, s. 486

**Counsel:**

*Peter Howard and Samaneh Hosseini,* for the Defendants/Moving Parties.

*Jerome Morse and Agapé Lim,* for the Plaintiffs/Respondents.

## REASONS FOR DECISION
## REQUEST FOR SEALING ORDER

**1    G.R. STRATHY J.:**-- The defendants ("Tim Hortons") in this proposed class action move for a "confidentiality order" or sealing order, restricting public access to certain documents, or portions of certain documents, in their motion record on certification and summary judgment. Tim Hortons seeks this order on the ground that these documents are said to contain highly sensitive and competitive financial information, the disclosure of which would cause serious harm to their commercial interests. They propose a mechanism that would allow the plaintiff, members of the proposed class and other advisors to have access to the information while preserving its confidentiality. They also propose an ongoing process for dealing with confidential information in this case, under which parties will be allowed to designate information as confidential, subject to a ruling by the court. The motion engages the test for confidentiality orders in *Sierra Club of Canada v. Canada (Minister of Finance)*, [2002] 2 S.C.R. 522, [2002] S.C.J. No. 42 ("*Sierra Club*").

*The Proposed Class Action - Certification and Summary Judgment Motions*

**2**    The two putative class representatives are franchisees of the well-known Tim Hortons organization. Their action asserts two basic complaints. The first relates to a franchise-wide conversion in 2002 from a full-baking system, whereby donuts and most other baked goods were baked on-site in each store, to a method called "Always Fresh" or "par baking," where donuts and "timbits" and later sandwich buns and pastries, were baked at a central facility, frozen and shipped to the retail stores, where they were prepared in a special convection oven. The plaintiffs claim that this conversion resulted in increased costs, increased capital expenses and was a breach of their individual license agreements.

**3**    The second complaint relates to the obligation of all franchisees to provide a lunch menu - a requirement that the plaintiffs say was imposed on franchisees, and has caused them to lose money. They say that Tim Hortons breached their license agreements by requiring them to sell lunch menu items at unreasonably low margins.

**4**    The plaintiffs assert claims in breach of contract, unjust enrichment, breach of the *Arthur Wishart Act (Franchise Disclosure) 2000,* S.O. 2000, c. 3 and misrepresentation.

**5**    Tim Hortons has delivered its responding motion record on the certification motion and in support of a motion for summary judgment, to be brought at the same time as the certification motion. The materials are voluminous and include fifteen affidavits of factual witnesses and an affidavit of one expert witness and numerous exhibits, including extensive financial information.

**6** Certain material has been redacted in the motion record, or has not been included in the record, but a complete and unredacted copy has been delivered to the plaintiffs' lawyers on their undertaking to keep the material confidential pending the outcome of this motion. I have been provided with a copy of the unredacted materials. The plaintiffs have acknowledged that a confidentiality order is warranted for some of the documents and information, but not for other documents.

**7** Tim Hortons' position on the summary judgment motion is that the plaintiffs' claims are entirely without merit. It says that while the conversion to "Always Fresh" baking had the predicted result of increasing the franchisees' food costs, it has also had the expected result of reducing their labour costs, because they no longer have to hire expensive professional bakers to produce baked goods "from scratch." The result, says Tim Hortons, is that franchisees' profits have generally increased and the program has been a resounding success. Tim Hortons says that lunch items have been part of its business plan since 1986 and that every franchisee is expected to provide a lunch menu.

**8** Much of the evidence in Tim Hortons' certification and summary judgment motion record, including some of the financial information at issue on this motion, is intended to refute the plaintiffs' assertion that the conversion to par baking, and the lunch menu, resulted in increased costs and lower margins for franchisees. Tim Hortons will argue that the putative plaintiffs were inefficient operators and that their experiences are not reflective of the positive and profitable experiences of the great majority of competent franchisees. It also says that the plaintiffs' financial information and margin analysis are fundamentally flawed.

*The Information at issue*

**9** A list of the documents at issue, prepared by counsel for the defendants, is attached as a schedule to this endorsement. I will describe it in more detail shortly.

**10** In his affidavit filed in support of the summary judgment motion and in response to the certification motion, Mr. David Clanachan, the Chief Operating Officer of Tim Hortons, describes the information at issue as "sensitive commercial information that is not public and would be of considerable interest and use to the competitors of Tim Hortons and its store owners." Mr. Jeff O'Rourke, Director Financial Analysis Franchise Operations, who has also filed an affidavit in support of the summary judgment motion, describes the information as "commercially sensitive information."

**11** Mr. O'Rourke elaborates on his concerns in two affidavits filed in support of the motion for a confidentiality order. As well, a supporting affidavit has been sworn by Drew McLennan, a Tim Hortons franchisee, and a member of the Tim Hortons Advisory Board of franchisees. I will briefly summarize their evidence.

**12** Mr. O'Rourke describes the information sought to be protected as including "highly confidential and competitively sensitive financial and business data such as profit margins and sales

information of Tim Hortons franchisees from 2001 to 2009."

**13**    Mr. O'Rourke says that public disclosure of this information would give competitors useful information about Tim Hortons' costs, sales and margins that would allow them to increase their market penetration. He says information concerning the "Always Fresh" conversion would facilitate the entry of competitors into the par baking market. He claims that competitors could target geographic areas with lower than average margins and could identify regions where there is untapped demand or lower costs; suppliers and landlords could gain useful information about margins that would lead them to increase franchisees' costs.

**14**    Mr. O'Rourke says that Tim Hortons is careful to secure the confidentiality of this information through confidentiality provisions in its licence agreements with its franchisees and through express notices on some of its documents.

**15**    While Mr. O'Rourke acknowledges that as a public company Tim Hortons makes disclosure of consolidated business and financial information, confidentiality is not claimed for information in the public domain. He says, however, that it is the "level of granularity and detail" in the documents at issue that would make them valuable to competitors and their disclosure would cause damage to Tim Hortons and its franchisees.

**16**    Mr. McLennan, a franchisee and member of the Advisory Board, agrees with Mr. O'Rourke that the information at issue is provided to or by franchisees on a confidential basis. He also says:

> I also agree with [Mr. O'Rourke] that the material he describes is competitively sensitive and if it were made public could be used by our competitors and other third parties with whom we deal to the real disadvantage of the franchisees. [Mr. O'Rourke] has detailed some of the ways that this information could be used to the detriment of the franchisees and I believe that those are all valid and additionally that there are likely other negative consequences for franchisees from potential adverse publicity likely attendant upon that publication.

**17**    Mr. McLennan says that the disclosure of sales and margin information would result in "real harm" to franchisees.

**18**    The defendants say that the information redacted or deleted falls into four general categories:

(a)    <u>Personal information of Tim Hortons' franchisees</u>

**19**    The information redacted includes names, addresses and phone numbers of franchisees, which Tim Hortons claims was "collected from franchisees in the expectation that it would not be widely disseminated." The personal information is contained in Exhibits 7, 16 and 40 of Mr. Clanachan's affidavit. Exhibit 7 is a 2001 disclosure document, provided to prospective franchisees. It contains a "Confidentiality Notice" on its face. Names and addresses of franchisees have been redacted.

Exhibit 16 is a franchise agreement that has been attached as an example. The name of the franchisee and other personal information about the franchisee have been redacted. The amount of the licence fee and other financial information pertaining to charges to the franchisee, as well as hours of operation, have been redacted. Exhibit 40 is a powerpoint presentation made at Tim Hortons' Ontario Regional Meeting in 2003. It contains some information about the financial experience of identified franchisees.

    (b)   Financial information of franchisees

**20**   This information is described as financial information used to track operating margins, including sales and profit and loss information. This information is collected from franchisees by Tim Hortons on the basis that it is confidential.

**21**   Exhibit 35 is part of a presentation made to franchisees in 2002 concerning the "roll-out" of the "Always Fresh" system. It contains breakdowns of food and labour costs at various franchise locations. Exhibit 38 is entitled "Always Fresh Financial Update" and was prepared in 2003. The information redacted includes profit and loss results and operating margins prior to and after the "Always Fresh" conversion. Exhibits 39, 40 and 41 contain similar information. Exhibit 43 was prepared for the 2004 meetings with franchisees and contains information about food unit costs, sales revenue and comparisons of gross margins before and after the "Always Fresh" conversion. Exhibit 2 to Mr. O'Rourke's affidavit shows historical operating margins for Ontario for the period from 2002 to 2008. It is tendered in evidence to support Tim Hortons' position that historical margins have increased as a result of the introduction of the "Always Fresh" baking method.

**22**   Exhibit 3 to Mr. O'Rourke's affidavit is financial information provided by Mr. Jollymore, the operator of one of the putative class representatives, and appears to be introduced to support the assertion that the experiences of the plaintiffs are due to their own inefficiencies and that their financial performance is not representative of those of other franchisees. Exhibit 4 to Mr. O'Rourke's affidavit contains profit margin information for all regions in Canada in the period from 2002 to 2008. It appears to be introduced to support the assertion that the "Always Fresh" conversion has not had a negative effect.

    (c)   Competitively sensitive commercial data

**23**   This category includes earnings, projections, profitability and productivity information, historical costs of food, paper and labour, pricing information, operating margins and gross margins, profit and loss results, costs versus pricing per region, and break-downs of sales by time of day.

**24**   Many of the documents in this category are presentations made at the time of the "Always Fresh" conversion in 2002-2003. They consist of analyses of food and labour costs, sales, profits and margins to demonstrate historic results and to project anticipated results of the conversion. Exhibits 28, 33, 35, 37-40 and 43-45 of Mr. Clanachan's affidavit fall within this description. Several of the documents contain more current information of the same kind: exhibit 46 (historic

costs vs. price of donuts and timbits 2003-2009); exhibit 2 to Mr. O'Rourke's affidavit (historic operating margins for Ontario Region 2002-2008, including costs of food, paper, labour, rent, royalty, advertising fees, operating expenses and operating margins); exhibit 4 (historical operating margins 2002-2008, including costs and sales volumes; exhibit 5 (retail price change history); and exhibit 6 (costs versus price of donuts and timbits, 2003-'09) to Mr. O'Rourke's affidavit.

**25**    Exhibit 3 to Mr. O'Rourke's affidavit, referred to above, contains financial information comparing the performance of the proposed representative plaintiffs to average performance figures.

**26**    Paragraph 8 of Mr. Clanachan's affidavit contains information pertaining to the labour costs of Ontario store owners in contrast with Mr. Jollymore's - this information has been redacted. Also redacted is paragraph 20 and portions of one of the exhibits that shows information concerning the percentage of sales made at various times of the day, including during lunch times. This is introduced to respond to complaints that the introduction of the lunch menu was unreasonable and to support the argument that the plaintiffs' evidence is flawed.

  (d)    "Trade secrets"

**27**    This information is generally described as "confidential product preparation methods and procedures," relating to the preparation of Tim Hortons' products. Tim Hortons claims disclosure of this information would allow competitors to make use of its experience to gain an unfair competitive advantage.

**28**    The documents that Tim Hortons wishes to redact or seal on this basis include exhibit 29, a 2003 "Production Manual" that includes instructions and procedures for "Always Fresh." It is essentially a "how to" manual for the baking system. The parties agree that it should be excluded and sealed.

**29**    Exhibit 34 is an extract from a meeting of the Advisory Board in 2002 that contains information about the "Always Fresh" roll-out and some very basic information about the par baking system. It describes various products and contains simple baking information such as "Muffins ... bake at x [degrees] for y minutes". The plaintiff does not contest the claim for confidentiality of this document. Exhibit 35 contains similar information.

Redaction for Relevance

**30**    In addition to these documents, certain documents have been partially redacted on the basis that the redacted portions are not relevant to the issues before the court on certification or summary judgment.

*The Sierra Club Test*

**31**    The general principle, expressed in s. 135 of the *Courts of Justice Act*, R.S.O. 1990, c. C.43, is that "all court hearings shall be open to the public." Sub-section 135(2) permits the court to exclude the public from a hearing "where the possibility of serious harm or injustice to any person justifies a departure from the general principle that court hearings shall be open to the public."

**32**    The principle is also expressed in s. 486 of the *Criminal Code*, R.S.C. 1986, c. C-46, as amended, which permits exclusion of the public only where "the judge or justice is of the opinion that such an order is in the interest of public morals, the maintenance of order or the proper administration of justice or is necessary to prevent injury to international relations or national defence or national security." The "proper administration of justice" includes ensuring that witnesses under the age of eighteen are safeguarded and that participants in the justice system are protected. Specific provision is made in s. 486.4 to prevent publication of the names of victims of sexual offences.

**33**    The importance of the open court principle has been repeatedly affirmed by the Supreme Court of Canada in a line of cases interpreting s. 2(b) of the *Canadian Charter of Rights and Freedoms: Dagenais v. Canadian Broadcasting Corp.*, [1994] 3 S.C.R. 835, [1994] S.C.J. No. 104; *R. v. Mentuck*, [2001] 3 S.C.R. 442, [2001] S.C.J. No. 73; *Vancouver Sun (Re.)*, [2004] 2 S.C.R. 332, [2004] S.C.J. No. 41; and *Toronto Star Newspapers Ltd. v. Ontario*, [2005] 2 S.C.R. 188, [2005] S.C.J. No. 41. In the civil context, the principle has been most recently and definitively stated by the Supreme Court in *Sierra Club*.

**34**    The open court principle also governs applications, such as this, to seal portions of a court file. There is no doubt that the court has inherent jurisdiction, and jurisdiction under s. 137(2) of the *Courts of Justice Act*, to seal a portion of the court file:

> A court may order that any document filed in a civil proceeding before it be treated as confidential, sealed and not form part of the public record.

**35**    Even before *Sierra Club*, it was clearly established that a sealing order is an exceptional measure that violates the open court principle, a principle that should be curtailed only "where there is present the need to protect social values of superordinate importance": *Nova Scotia (Attorney General) v. McIntyre* (1982), 132 D.L.R. (3d) 385, [1982] 1 S.C.R. 175 (S.C.C.).

**36**    In *Sierra Club*, at para. 53, the Supreme Court of Canada held that a sealing order will be granted where:

> (a)    such an order is necessary in order to prevent a serious risk to an important interest, including a commercial interest, in the context of litigation because reasonable alternative measures will not prevent the risk; [the necessity stage of the test] and
>
> (b)    the salutary effects of the confidentiality order, including the effects on the right of civil litigants to a fair trial, outweigh its deleterious effects, including the

effects on the right to free expression, which in this context includes the public interest in open and accessible court proceedings [the proportionality stage of the test].

**37**   In that case, Justice Iacobucci stated, at para. 53, that three important elements are subsumed under the first branch of this test. First, the risk in question must be *real and substantial*, in that the risk is *well-grounded in evidence* and poses a serious threat to the *commercial interest* in question. As this case involves interests that are primarily commercial in nature, the words I have italicized bear emphasis - the risk must be real, substantial, and well-grounded in evidence, and disclosure must pose a serious threat to the interest in question.

**38**   Second, Justice Iacobucci made it clear that a "commercial" interest must be an interest that goes beyond harm to the private commercial interests of a person or a business. In order to qualify as an "important commercial interest," the interest must be one that can be expressed in terms of a public interest in confidentiality. Justice Iacobucci stated, at para. 55:

> In addition, the phrase "important commercial interest" is in need of some clarification. In order to qualify as an "important commercial interest", *the interest in question cannot merely be specific to the party requesting the order*; the interest must be one which can be expressed in terms of a public interest in confidentiality. For example, a private company could not argue simply that the existence of a particular contract should not be made public because to do so would cause the company to lose business, thus harming its commercial interests. However, if, as in this case, exposure of information would cause a breach of a confidentiality agreement, then the commercial interest affected can be characterized more broadly as the general commercial interest of preserving confidential information. Simply put, if there is no general principle at stake, there can be no "important commercial interest" for the purposes of this test. Or, in the words of Binnie J. in *F.N. (Re)*, [2000] 1 S.C.R. 880, 2000 SCC 35, at para. 10, the open court rule only yields "where the public interest in confidentiality outweighs the public interest in openness" [emphasis added].

**39**   Third, the phrase "reasonable alternative measures" requires the judge to consider not only whether reasonable alternatives to a confidentiality order are available, but also to restrict the order as much as is reasonably possible while preserving the commercial interest in question.

**40**   In *Sierra Club,* the Supreme Court granted a confidentiality order over technical information concerning an environmental assessment of a site, in China, for the construction of two CANDU nuclear reactors. The documents were the property of the Chinese authority and had been provided to Atomic Energy of Canada Limited ("AECL") on condition that they be protected by a confidentiality order. The Supreme Court found that the test had been met. Under the necessity branch of the test, there was a commercial interest in preserving contractual obligations of

confidentiality. The information had been treated as confidential, had been accumulated with a reasonable expectation that it would be kept confidential and proprietary commercial and scientific interests would be harmed by its disclosure. There was a serious risk of harm to an important commercial interest of AECL if there was disclosure. No alternative measures were available.

**41**    On the application of the proportionality branch of the test, the salutary effect of the order was to promote a fair trial, which would otherwise have been impaired if AECL could not disclose the documents. Limiting disclosure of the documents to the parties, under the protection of a confidentiality order, would promote, rather than harm, the search for the truth. Finally, the technical nature of the information, pertaining as it did to a nuclear facility, gave rise to a public security interest in the confidentiality order.

**42**    The deleterious effect of the order was, in general, to impair the open court principle. In these circumstances, the Supreme Court held that the salutary effects of the confidentiality order outweighed its deleterious effects.

*Application of the Sierra Club test in various contexts*

**43**    The *Sierra Club* case signals an important development of the open court principle and it has been applied in a number of cases. To illustrate the types of cases, and the interests they engage, they can be grouped as follows:

*Trade Secret and Intellectual Property Cases*

**44**    Cases of true trade secrets and patents are likely to involve important public and private interests and sealing orders have frequently been granted in such cases: see *Eli Lilly and Co. v. Apotex Inc.,* 2008 FC 892, [2008] F.C.J. No. 1593; *Laboratoires Servier v. Apotex Inc.,* 2006 FC 1405, [2006] F.C.J. No. 1764; *Camoplast Inc. v. Soucy International Inc.,* 2003 FC 1401, [2003] F.C.J. No. 1791; *Merck & Co. v. Apotex Inc.,* 2004 FC 567, [2004] F.C.J. No. 684; *AB Hassle. v. Canada (Minister of National Health and Welfare)* (2003), 5 C.P.R. (4th) 149, [2000] F.C.J. No. 283 (F.C.A.). They have been granted prior to *Sierra Club*- see, for example, *Dupont Canada Inc. v. Russel Metals Inc.,* [2000] O.J. No. 2043; *CPC International Inc. v. Seaforth Creamery Inc.,* [1996] O.J. No. 2059, 70 C.P.R. (3d) 434. In *Abbott Laboratories v. Canada (Minister of Health),* 2005 FC 1368, [2005] F.C.J. No. 1669, Prothonotary Milczynski of the Federal Court refused to make a confidentiality order in a patent case, although she noted that such orders were common in patent cases. She found that, on the evidence, the *Sierra Club* test had not been met. See also *Hyundai Auto Canada v. Cross Canada Auto Body Supply (West) Ltd.,* 2006 FC 1127, [2006] F.C.J. No. 1402. Orders were refused in *Osmose-Pentox Inc. v. Société Laurentide Inc.,* 2005 FC 1689, [2005] F.C.J. No. 2093; and in *Novopharm Ltd. v. Company "X",* 2008 FC 840, [2008] F.C.J. No. 1062.

*CCAA Cases*

**45**    Sealing orders have been granted in several Ontario cases under the *Companies' Creditors*

*Arrangement Act,* R.S.C. 1985, c. C-36 where the release of commercial information would have undermined the efficacy of the proceedings or prejudiced the position of stakeholders: *Re Nortel Networks,* [2009] O.J. No. 4487, 56 C.B.R. (5th) 224 (S.C.J.); *Re Stelco Inc.* [2006] O.J. No. 275, 17 C.B.R. (5th) 76 (S.C.J.); *Re Canwest Global Communications Corp.* [2009] O.J. No. 4286, 2009 CanLII 55114 (S.C.J.). It makes sense in such "real time" litigation that confidential information should be protected where its release would jeopardize the very purpose of the proceeding.

*Cases involving minors or persons under a disability*

**46**    Cases involving children frequently engage public interests that transcend the interests of the parties: *DB Trust (Trustees of) v. J.B. (Litigation guardian of),* [2009] O.J. No. 2693, 50 E.T.R. (3d) 50 (S.C.J.). So too may cases involving persons under a disability. In *Re. Phelan* (1999), 29 E.T.R. (2d) 82, [1999] O.J. No. 2465, a case prior to *Sierra Club,* Kitely J. granted a partial sealing order in a proceeding under the *Substitute Decisions Act, 1992,* S.O. 1992, c. 30.

*Commercial Cases*

**47**    The application of *Sierra* Club in the commercial context requires the court to distinguish between an interest that is specific to the party requesting the order and a general interest that goes beyond the interest of the party. In *Publow v. Wilson* (1992), 36 C.P.C. (3d) 33, [1994] O.J. No. 3036 (Gen. Div.) which pre-dated *Sierra Club,* Spence J. refused to grant a sealing order in spite of the argument that the disclosure of a company's insolvency to its suppliers and customers might cause them to cease dealing with the company, leading to its demise and possible unemployment for hundreds of employees. Relying on the then leading case of *Nova Scotia (Attorney General) v. McIntyre,* above, Spence J. stated, at para. 18:

> The disclosure of internal corporate information in the course of legal proceedings may almost always have the potential for harm to the company concerned and perhaps to others as well. This consequence of the resort to the courts is not limited to corporate parties in commercial matters; individuals may suffer from the public disclosure which ordinarily accompanies litigation. If the prospect of harm were a sufficient basis for preventing disclosure, a great many litigants might justifiably seek to have their proceedings shielded from public view, whether through a sealing order, an order for in camera proceedings or otherwise. Widespread granting of such orders could tend to diminish public confidence in the administration of justice. These considerations suggest that such orders should be available only in exceptional cases.

**48**    The observations of Spence J. in *Publow v. Wilson* were referred to by Nordheimer J. in *Lederer v. 372116 Ontario Ltd.* (2000), 50 O.R. (3d) 282, [2000] O.J. No. 3000 (S.C.J.), another pre-*Sierra Club* case, in which the moving party sought to seal a court file containing allegedly confidential and potentially damaging information. Nordheimer J. refused to seal the file. He observed, at paras. 26 and 27, that litigation frequently involves disclosure of sensitive,

embarrassing and sometimes prejudicial information, but the principle of open justice admits of limited exceptions:

> There are, of course, many instances where matters that parties would prefer to keep private become public because the parties become embroiled in litigation. This applies not only to corporations, both public and private, but also to individuals. Many private matters are forced into the public view as a result of the fact that litigation ensues. That is a necessary consequence of maintaining an open and public judicial system.

> As Madam Justice Swinton observed [in *Ethyl Canada Inc. v. Canada (Attorney General),* [1998] O.J. No. 315 (Gen. Div.) at para. 9], over the years courts have made exceptions to the general principle that all matters before the court must be part of the public record. Matters involving minors are one example. Matters involving trade secrets or secret processes are other examples. Customer lists and pricing information may constitute even other examples. Also, in cases where victims might be precluded, as a result of trauma and embarrassment, from pursuing a claim or giving evidence then orders restricting the openness of the proceedings may be justified. In all of these situations, though, the court must be satisfied that there is a need to protect "societal values of superordinate importance" before such restrictions on public access to the proceedings of the courts can be justified - see *MacIntyre v. Nova Scotia (Attorney-General),* [1982] 1 S.C.R. 175, supra per Dickson J. at p. 186.

**49**    Subsequent to *Sierra Club*, requests for confidentiality orders or sealing orders have been considered and rejected in *SRM Global Master Fund Limited Partnership v. Hudbay Minerals Inc.,* [2009] O.J. No. 797 (S.C.J.); *Rieger Printing Ink Co. (Re)* (2009), 94 O.R. (3d) 440, [2009] O.J. No. 755 (S.C.J.); *Ontario Council of Hospital Unions v. Ontario (Minister of Health),* (2007), 85 O.R. (3d) 55, [2007] O.J. No. 411 (Div. Ct.); and *John Deere Ltd. v. Long Tractor Inc.,* 2003 SKQB 24, [2003] S.J. No. 57 (Q.B.).

*Class action cases*

**50**    Class actions, such as this one, give rise to particular concerns in dealing with requests for confidentiality. They frequently attract public attention due to their relative novelty, the public interest in the issues involved, the size of the proposed class, and the large sums at issue. Apart from the public, members of the putative class have a substantial and direct interest in the proceedings, prior to certification, and they have a particular interest in observing and understanding the proceedings. While the defendant in this action is prepared to release the information at issue to members of the putative class who undertake to be bound by the confidentiality order, such undertakings are difficult to monitor and enforce.

**51**    A class action engages broader interests than in an ordinary civil action. With its goals of access to justice, efficient use of judicial resources and behaviour modification, a class action serves public purposes that go beyond the immediate interests of the parties, including members of the putative class. It is particularly important, therefore, that the open court principle should be observed in such proceedings and a request for a sealing order in a class action should be approached with particular caution.

**52**    A sealing order was granted by Master MacLeod in *1176560 Ontario Ltd. v. Great Atlantic & Pacific Co. of Canada*, [2003] O.J. No. 1016, 121 A.C.W.S. (3d) 426 (S.C.J.), a proposed class action in which franchisees alleged that the defendant franchisor had failed to pass on or account for discounts that had been provided by a supplier. The parties had reached an agreement that the confidential information would be sealed and made available only to the proposed class representatives and their counsel. Members of the proposed class would have access to summaries of the information, provided they signed a confidentiality agreement. The Master was satisfied that the proposed order struck an appropriate balance and was prepared to sign it. However, some of the suppliers (whose discounts were at issue) attended court, having been put on notice that their rights might be affect. They claimed an interest as their sensitive, and allegedly proprietary, information was at issue. They were concerned that the release of summaries of information to class members who were not named parties could potentially enable third parties to calculate their prices, costs and contractual arrangements with the defendant.

**53**    It is obvious from the Master's reasons, at para. 6, that he considered the information to be highly confidential and that the release would have "devastating" effects for the suppliers:

> An affidavit was filed on behalf of Parmalat [one of the suppliers]. Other suppliers appeared but only Canada Bread and Hostess Frito-Lay made submissions. Parmalat and Canada Bread appear to be in the most vulnerable position. They are exclusive suppliers of certain products and as a result of their special relationship with the defendant, they have disclosed detailed information about pricing and profit margins. This is a complex and highly competitive business in which the interests of the parties and the suppliers may be congruent for some purposes and adverse for others. I am advised that an example of this sensitivity would be an agreement to supply certain lines at close to cost while entering into an agreement with the defendant to promote other lines which have a higher profit margin. This information could be used to devastating effect by other suppliers who might bid against the current supplier in dealing with A&P, by other grocery stores with whom they will be negotiating and by other suppliers who might bid with other customers.

**54**    The Master granted the suppliers standing and provided that they were entitled to enforce the order if the defendant failed to do so. They were entitled to be informed of the release of information to members of the class. It is noteworthy that in this case the information sought to be

protected was, like the information in *Sierra Club*, confidential to persons who were not parties to the litigation.

**55**    Hoy J. in an unreported endorsement dated November 16, 2007 in *Peter v. Medronic Inc.* (05-CV-295910-PD2), granted a sealing order at the conclusion of a certification motion, at the defendant's request and without opposition from the plaintiff. She found that the documents contained commercially sensitive market information and there was evidence that one of the defendant's competitors had taken an interest in the proceeding. She found that there was a public interest in not granting an unfair advantage to competitors of the defendant, since the public financed the class of medical devices at issue. The information subject to the sealing order was "minimal" and had not even been referred to at the hearing. In that case, the order agreed upon by counsel and approved by Hoy J. permitted the court to refer to any facts in the sealed materials in its reasons. The order was amended by Hoy J. to provide that it would expire in seven years.

**56**    In *Prendiville v. 407 International Inc.* [2002] O.J. No. 2548, 24 C.P.C. (5th) 184 (S.C.J.), leave to appeal refused, [2002] O.J. No. 3913 (Div. Ct.), a decision subsequent to *Sierra* Club, Nordheimer J. declined to grant a sealing order in a proposed class action against the operators of Highway 407, a toll highway. The defendants, supported by the province, sought to seal the court file, which contained agreements between the defendants and the province. The defendants claimed that the disclosure of this information would put them at a competitive disadvantage in future highway privatizations because it would disclose their costs and pricing structures to their competitors. They argued that disclosure of this information would give third parties access to information about their business and their projections as well as historical financial information that could be used in the bid process. Nordheimer J. concluded, at paras. 14 and 15, that the commercial interest of the defendants did not meet the *Sierra Club* test:

> In any event where the 407 defendants fail in their request for a sealing order is in their inability to establish that there is an important public interest in the confidentiality that is sought. As I set out in the quotation from Mr. Justice Iacobucci above, the important commercial interest which has to be established to justify such an order cannot be specific to the party requesting the order. Mr. Justice Iacobucci mentioned expressly that "a private company could not argue simply that the existence of a particular contract should not be made public because to do so would cause the company to lose business, thus harming its commercial interests" and yet that is essentially what the argument of the 407 defendants boils down to here. For example, at para. 16 of their factum, the 407 defendants state:
>
>> "... the disclosure of the Share Purchase Agreement and the 407 Agreements will put the 407 defendants at a competitive disadvantage vis-à-vis their cost and pricing structure in future competitive bidding

processes concerning highway development and privatization."

> While no doubt arguments could be made as to the actual degree of commercial sensitivity which attaches to such information given that the prospect of future private highway acquisitions is very much speculative both in its occurrence and its timing, it would seem almost by definition to be very specific to the party whose information is involved. While it may well be that the 407 defendants will indeed be put at a commercial disadvantage if their pricing and other information is publicly revealed, that result would appear to fall squarely within the category of commercial information which Mr. Justice Iacobucci said does not constitute the type of important commercial interest justifying a confidentiality or sealing order. In fact, it would appear to more properly fall within the type of information of which Mr. Justice Spence spoke in *Publow v. Wilson* (1994), 36 C.P.C. (3d) 33 (Ont. Gen. Div.) at p. 39 [quoted above] ...

**57**    Confidentiality orders or sealing orders have also been granted in class actions to limit or prevent disclosure of:

> (a)    private medical information: *Logan v. Harper* (2004), 72 O.R. (3d) 706, [2004] O.J. No. 4132 (S.C.J.);
>
> (b)    names of victims of sexual assault: see *M.G. v. Association Selwyn House*, [2008] Q.J. No. 7721 (S.C.); *White v. Canada (Attorney General)*, [2006] B.C.J. No. 760 (S.C.);
>
> (c)    financial information concerning the defendant and the names of investors and shareholders, on the settlement of the class action where other
>
> para57proceedings were pending in another jurisdiction: *Mortillaro v. Cash Money Cheque Cashing Inc.* (2009), 73 C.P.C. (6th) 369, [2009] O.J. No. 2904 (S.C.J.); and
>
> (d)    information concerning young offenders: *Richard v. British Columbia*, [2008] B.C.J. No. 1794 (S.C.).

**58**    The use of pseudonyms has also been permitted where private medical information is being disclosed: *Jane Doe 1 v. Manitoba* (2008), 66 C.P.C. (6th) 125, [2008] M.J. No. 292 (Q.B.).

**59**    It is my understanding that confidentiality orders have been made in the case management of some class actions, to protect the names of victims of mass torts and in other cases on a consent basis, where it was in the interests of both parties to keep information confidential.

*Redaction based on Relevance*

**60**    There is no general authority to redact documents appended to affidavits, or portions thereof, on the grounds that they are irrelevant: see *Albrecht v. Northwest Protection Services Ltd.*, [2005]

O.J. No. 2149 (S.C.J.); *Guelph (City) v. Super Blue Box Recycling Corp.* (2004), 2 C.P.C. (6th) 276, [2004] O.J. No. 4468 (S.C.J.).

**61**    Requests for redaction frequently come up at the discovery stage and are often resolved on consent. Although the practice of redacting has in some cases been sanctioned by the court, the cases in which it has been permitted are usually ones in which other important interests are affected: see, for example, *Kimberly-Clark Corp v. Procter & Gamble Inc.* (1990), 31 C.P.R. (3d) 207, [1990] F.C.J. No. 451 (F.C.T.D.) (patent action); *Janhevich v. Thomas* (1977), 15 O.R. (2d) 765, [1977] O.J. No. 2227 (H.C.) (personal tax returns); *United States Surgical Corp. v. Downs Surgical Canada Ltd.,* [1982] 1 F.C. 733, [1981] F.C.J. No. 164 (patent action); *Collins v. Beach* (1988), 24 C.P.C. (2d) 228, [1988] O.J. No. 43 (H.C.) (personal tax returns); *Manufacturers Life Insurance Co. v. Dofasco Inc.* (1989), 38 C.P.C. (2d) 47, [1989] O.J. No. 1456 (H.C.) (confidential and sensitive market information); *John Labatt Ltd. v. Molson Breweries* (1993), [1994] 1 F.C. 801 [1993] F.C.J. No. 1343 (confidential and sensitive commercial information); *North American Trust Co. v. Mercer International Inc.* (1999), 71 B.C.L.R. (3d) 72, [1999] B.C.J. No. 2107 at paras. 11, 13-16 (S.C.) (commercially sensitive information).

*Application of Sierra Club Test*

**62**    As Spence J. observed in *Publow v. Wilson*, above, at para. 18, court proceedings frequently require parties and even witnesses who have no stake in the outcome, to disclose information that they would much rather keep to themselves. The information can be embarrassing and sometimes prejudicial, both personally and financially. Yet the principle of open courts has generally prevailed except in the limited circumstances now permitted by the *Sierra Club* test. In spite of this, requests for sealing orders remain commonplace. It is appropriate to observe that sealing orders impose an additional layer of complexity on an already complicated and expensive litigation process. They require that separate court files be kept, one open to the public and one not. They may require bifurcation of discovery and trial transcripts to exclude references to information in sealed documents. They may require *in camera* hearings where reference is made to documents that are subject to a sealing order. This can give rise to confusion by witnesses, counsel and the court as to what is and what is not sealed. They may restrict the ability of the court to give clear and comprehensible reasons where reference to sealed documents is necessary.

**63**    The request for a sealing order itself raises questions about whether notice must be given to the media and the public to give them an opportunity to contest the order and to speak in favour of the open court principle. On a practical level, this may give the proceeding more notoriety than would otherwise be the case - or than either party might wish.

**64**    Applying the *Sierra Club* test to the facts of this case, I am not satisfied that the interests affected extend beyond the private commercial interests of Tim Hortons and its franchisees or that these interests can be expressed in terms of the broader commercial interest in the preservation of confidential information or the promotion of fair competition. I accept that much of the information

has been treated by Tim Hortons and its franchisees as confidential - obviously in the ordinary course of their businesses they would have absolutely no reason to disclose it to third parties or to make it public. This is true in almost every business relationship, however, and in almost every such relationship it would be possible to characterize the "interest" in terms of a broader public interest in the preservation of confidential information.

**65**    That is not, however, the real interest at stake in this motion. Tim Horton puts the case on the basis that it and its franchisees will suffer commercial harm if the information is disclosed to competitors. While the promotion of fair competition is an important societal interest, I am not satisfied that the risk of harm in this case is real and substantial or well-grounded in the evidence. Tim Hortons' evidence of harm is speculative, general and lacking in specifics. The par baking system was introduced at very substantial costs in 2002, some eight years ago. The system itself is not unique. The notion that information on the successful implementation of the system, even at a "granular" level, would give competitors an unfair advantage is simply speculative. So is the notion that competitors, landlords and suppliers could take advantage of information on costs, sales, profit margins and other financial information, to the detriment of Tim Hortons and its franchisees. The information sought to be disclosed is not dissimilar to the information in *Prendiville v. 407 International Inc.*, above, and it is the kind of private commercial interest that Iacobucci J. in *Sierra Club* expressly excluded from the scope of protection.

**66**    The information described as "trade secrets" is of the most general nature and at the very lowest level of "secrecy." In order to take advantage of the information it would be necessary to create a substantial par baking infrastructure. There is no evidence that any competitor of Tim Hortons has done so or is in a position to do so. Any competitor with the resources to do so would not likely need to know that you must bake a frozen lump of ingredients for a particular length of time at a particular temperature in order to make a muffin.

**67**    As I have noted earlier, sealing orders have been routinely and appropriately granted in cases involving true trade secrets, but this case does not involve that kind of information.

**68**    In light of my conclusion that the information in this case does not meet the necessity test, I need not move to the second stage of the test in *Sierra Club*. However, if I had found that an important commercial interest was engaged in this case, I would not have found that the salutary effects of the order outweighed its deleterious effects. First, a sealing order is not required in this case to ensure a fair trial. In *Sierra Club*, AECL would have been prevented from disclosing the evidence without a sealing order. The absence of a sealing order would have impaired its right to a fair trial. There is no evidence that this is the case here. Nor is there any evidence that the request for disclosure is abusive or being used for the purpose of an unfair tactical advantage - for example, to force the defendant to settle to avoid disclosure of potentially damaging information.

**69**    Second, a sealing order in this case could have significant adverse effects on public confidence in the administration of justice. The defendants' case on the motion for summary

judgment depends to a large degree on the proposition that the putative plaintiffs are inefficient operators, whose experience is not representative of the class. To make out this case, the devil will be in the details and I expect that a careful analysis of the defendants' and the franchises' financial information will be required. There is a real risk that the proceedings will not be comprehensible to the public without reference to the information sought to be sealed. If a detailed examination of the sealed information is required at the hearing, the proceeding may have to be held *in camera*. Any analysis of this issue in reasons may require reference to the confidential information so as to be intelligible. As I said earlier, as a putative class proceeding openness is a particularly important consideration in this case.

**70**    While the consent of the parties does not absolve the court of its responsibility to ensure that court proceedings are open and transparent, I would be reluctant to compel the parties to disclose information that neither of them wishes to produce, *provided* that such material forms no part of the court record. If the parties can agree to any of the redactions proposed by Tim Hortons, and can undertake that the redacted information is not material to the motions and will not be relied upon by either party, the redacted information does not need to form part of the court record. The open court principle will not be infringed by excising irrelevant confidential material as long as the public has access to the same record as the parties and the motion judge.

**71**    Although procedural orders have been granted in some cases to protect documents pending a determination of confidentiality, no purpose would be served by such an order in this case.

**72**    For these reasons, the defendants' motion is dismissed, with costs. If counsel are unable to agree on costs, written submissions may be addressed to me in accordance with a timetable agreed upon by counsel.

G.R. STRATHY J.

\* \* \* \* \*

**SCHEDULE**
**CONFIDENTIAL INFORMATION PUT IN ISSUE BY PLAINTIFFS**

| Reference | Confidential Information | Basis for Claim of Confidentiality |
|---|---|---|
| Ex. 7 | Excerpts from TDL's Ontario 2001 Disclosure Document containing references to: initial license fees, royalty fees, total initial licensee investment, advertising levies, disclosure of administrative proceedings and civil litigation and liabilities, projected store earnings at varying sales levels, names and addresses of franchisees and Ontario store list. Certain portions redacted for relevance. | Personal Information<br><br>Competitively Sensitive Commercial Data |
| Ex. 12 | This document has not been redacted. The only reference in the Clanachan Affidavit is to the Acknowledgement of Receipt of Ontario Disclosure Document. | Not Applicable |
| Ex. 16 | Personal information on sample of agreements has been redacted. | Personal Information |
| Ex. 17 | This document has not been redacted on the basis of confidentiality. The Affidavit refers to only the relevant portion of the Tim Hortons Production Manual. | Not applicable |
| Ex. 28 | Always Fresh Financial Forecast (entire document redacted). Contains references to single store costs, sales, margins and profitability pre-Always Fresh and the projections post-Always Fresh. | Competitively Sensitive Commercial Data |
| Ex. 29 | Always Fresh Baking Production Manual (entire document redacted). | Trade Secrets |
| Ex. 33 | August 2002 Always Fresh Financial Forecast (entire document redacted). Contains references to single store costs, sales, margins and profitability pre-Always Fresh and the projections post-Always Fresh. | Competitively Sensitive Commercial Data |
| Ex. 34 | Excerpt from Advisory Board minutes referring to production methods and procedures. | Trade Secrets |

| Reference | Confidential Information | Basis for Claim of Confidentiality |
|---|---|---|
| Ex. 35 | Excerpts from November 2002 Always Fresh Presentations relating to product preparation methods, food costs, labour costs and projections, costs model, sales and costs information from specific franchisees | Trade Secrets<br><br>Franchisee Financial Information<br><br>Competitively Sensitive Commercial Data |
| Para. 130 of Clanachan Affidavit and Ex. 37 | Excerpts from 2003 Always Fresh Baking Presentation containing current and projected single store costs models and the results to date under Always Fresh. | Competitively Sensitive Commercial Data |
| Ex. 38 | Excerpt from September 2003 Always Fresh Financial Update referring to Ontario and Alberta P&L results, operating margin comparisons, operating margins by month for Always Fresh stores, Ontario and Alberta store sales. | Franchisee Financial Information<br><br>Competitively Sensitive Commercial Data |
| Para 132 of Clanachan Affidavit and Ex. 39 | Excerpts from Advisory Board minutes containing references to Ontario P&L results and pre and post Always Fresh conversion. | Franchisee Financial Information<br><br>Competitively Sensitive Commercial Data |
| Ex. 40 | Excerpts from the Ontario 2003 Regional Meeting Presentation containing profit and loss analysis, price changes, operating margins, productivity data and financial experiences of franchisees. | Personal Information<br><br>Franchisee Financial Information<br><br>Competitively Sensitive Commercial Data |
| Ex. 41 | Excerpts from the Atlantic Canada 2003 Regional Meeting Presentation containing single store operating margins, food cost impact, operating margin comparisons, and Always Fresh financial results. | Franchisee Financial Information<br><br>Competitively Sensitive Commercial Data |

| Reference | Confidential Information | Basis for Claim of Confidentiality |
|---|---|---|
| Ex. 42 | Excerpt from Advisory Board meeting minutes of February 4 and 5, 2004 referring to product improvements | [Not listed in schedule prepared by counsel] |
| Ex. 43 | Excerpts of Spring 2004 Regional Meeting Presentation slides referring to food unit costs, sales revenue and comparison of pre and post Always Fresh gross margins at the store level. | Franchisee Financial Information<br><br>Competitively Sensitive Commercial Data |
| Ex. 44 | 2002 Ontario Product Cost Summary (entire document redacted). | Competitively Sensitive Commercial Data |
| Ex. 45 | Toronto Order Guide, November 2003 (entire document redacted). | Competitively Sensitive Commercial Data |
| Ex. 46 | 2003-2009 Costs vs. Prices Report (entire document redacted). | Competitively Sensitive Commercial Data |
| Para. 8 | Reference to labour costs in specific years redacted. | Competitively Sensitive Commercial Data |
| Para. 20 | Percentage of sales by time of day has been redacted. | Competitively Sensitive Commercial Data |
| Ex. 2 | Ontario Historical Operating Margins based on P&Ls reported for 2002-2008 (entire document redacted). | Franchisee Financial Information<br>Competitively Sensitive Commercial Data |
| Ex. 3 | Jollymore reported P&L data (entire document redacted). | Franchisee Financial Information<br>Competitively Sensitive Commercial Data |
| Ex. 4 | Historical Operating Margins for all Canadian regions for 2002-2008 (entire document redacted). | Franchisee Financial Information<br>Competitively Sensitive Commercial Data |

| Reference | Confidential Information | Basis for Claim of Confidentiality |
|---|---|---|
| Ex. 5 | Price Change History for Ontario for 2002-2009 (entire document redacted). | Competitively Sensitive Commercial Data |
| Ex. 6 | Costs vs. Prices – Donuts and Timbits 2003-2009 (entire document redacted). | Competitively Sensitive Commercial Data |
| Ex. 7 | 2003- 2009 report showing volume and percentage of sale for each part of the day and for each region. | Competitively Sensitive Commercial Data |

**TAB 8**

*Case Name:*

# Hollinger Inc. v. Ravelston Corp.

**Between**
**Hollinger Inc., Domgroup Ltd., 4322525 Canada Inc., 10**
**Toronto Street Inc. and Sugra Limited, Plaintiffs**
**(Respondents), and**
**The Ravelston Corporation Limited, Ravelston**
**Management Inc., 509643 N.B. INC., 509644 N.B. INC.,**
**509645 N.B. INC., 509646 N.B. INC. 509647 N.B. Inc.,**
**Moffatt Management Inc., Black-Amiel Management Inc.,**
**Argus Corporation Limited, Conrad Black Capital**
**Corporation, Hollinger Aviation Inc., Mowitza Holdings**
**Inc., 364817 Ontario Limited, F.D. Radler Ltd.,**
**1269940 Ontario Limited, 2753421 Canada Limited,**
**Conrad M. Black, Barbara Amiel-Black, F. David Radler,**
**John A. Boultbee, 1406684 Ontario Limited and Peter Y.**
**Atkinson, Defendants (Respondents), and**
**Bell Globemedia Publishing Inc., carrying on business**
**as The Globe and Mail, Proposed Intervenor (Appellant)**

[2008] O.J. No. 1126

2008 ONCA 207

164 A.C.W.S. (3d) 771

235 O.A.C. 136

291 D.L.R. (4th) 15

89 O.R. (3d) 721

53 C.P.C. (6th) 222

169 C.R.R. (2d) 136

2008 CarswellOnt 1630

Docket: C46351

Ontario Court of Appeal
Toronto, Ontario

**J.I. Laskin, R.G. Juriansz and P.S. Rouleau JJ.A.**

Heard: September 25, 2007.
Judgment: March 28, 2008.

(130 paras.)

*Civil litigation -- Civil procedure -- Parties -- Intervenors -- Requirement of interest -- Appeal by newspaper publisher from dismissal of motion to set aside protective order allowed -- Judge erred in denying publisher intervenor status -- Newspaper had necessary interest in protecting freedom of press and public interest in open courts.*

*Civil litigation -- Civil evidence -- Constitutional issues -- Canadian Charter of Rights and Freedoms -- Documentary evidence -- Public documents -- Court documents -- Publication bans and confidentiality orders -- Appeal by newspaper publisher from dismissal of motion to set aside protective order allowed -- Judge erred in dismissing motion without reviewing documents subject to protective order based on expense -- No risk of violating right of one party to protection against self-incrimination in separate criminal proceedings -- Newspaper had necessary interest in protecting freedom of press and public interest in open courts -- Canadian Charter of Rights and Freedoms, 1982, ss. 2(b), 13. Constitutional law -- Canadian Charter of Rights and Freedoms -- Reasonable limits -- Fundamental freedoms -- Freedom of expression -- Legal rights -- Procedural rights -- Protection against self-incrimination, right to silence -- Appeal by newspaper publisher from dismissal of motion to set aside protective order allowed -- Judge erred in dismissing motion without reviewing documents subject to protective order based on expense -- No risk of violating right of one party to protection against self-incrimination in separate criminal proceedings -- Newspaper had necessary interest in protecting freedom of press and public interest in open courts -- Canadian Charter of Rights and Freedoms, 1982, ss. 2(b), 13.*

**Statutes, Regulations and Rules Cited:**

Canada Evidence Act, R.S.C. 1985, c. C-5, s. 5(2)

Canadian Charter of Rights and Freedoms, 1982, s. 2(b), s. 13

Courts of Justice Act, R.S.O. 1990, c. C.43, s. 6(2)

Criminal Code, R.S.C. 1985, c. C-46

Ontario Rules of Civil Procedure, R.R.O. 1990, O. Reg. 194, Rule 1.03, Rule 13, Rule 13.01, Rule 30.1, Rule 30.1.01(1), Rule 30.1.01(5), Rule 30.1.01(6), Rule 37.14

Supreme Court Act, R.S.C. 1985, c. S-26, s. 40, s. 40(1)

**Appeal From:**

On appeal from the order of Justice C.L. Campbell of the Superior Court of Justice dated November 9, 2006 with reasons reported at (2006), 83 O.R. (3d) 258.

**Counsel:**

Peter Jacobsen and Adrienne Lee for the appellant.

Davit D. Akman for the respondents Hollinger Inc. et al.

David Roebuck, Edward L. Greenspan, Q.C. and Jasmine Akbarali for the respondents Conrad Black and Barbara Amiel-Black.

---

[Editor's note: A corrigendum was released by the Court April 2, 2008; the correction has been made to the text and the corrigendum is appended to this document.]

Reasons for judgment were delivered by P.S. Rouleau J.A., concurred in by J.I. Laskin J.A. Separate dissenting reasons were delivered by R.G. Juriansz J.A.

**1**    R.G. JURIANSZ J.A. (dissenting in part):-- The plaintiffs in this action obtained a Mareva injunction against Conrad Black and Barbara Amiel-Black. The motion judge made a protective order sealing the motion material making it unavailable to the public. Bell Globemedia Publishing Inc. ("the Globe") moved to intervene to set aside the protective order. The motion judge dismissed the Globe's motion. The Globe appeals.

**2**    Circumstances have changed since the motion judge's decision, and the Globe could bring a new motion to set aside the protective order. Events may have largely eclipsed the dispute, but the appeal is not moot. The Globe has proceeded with the appeal rather than bringing a new motion, it explains, to ensure the motion judge's decision, which it regards as wrong, does not influence the jurisprudence in this area.

**3**    I would find that the motion judge erred in refusing to grant the Globe intervenor status and in deciding to continue the protective order. I would grant the appeal, set aside the dismissal of the Globe's motion, and replace it with an order granting the Globe intervenor status and setting aside the protective order.

**Facts**

**4**    The motion judge was case managing the action of the plaintiffs (referred to collectively as "Hollinger") against the Blacks and others. At the time, Mr. Black was facing a number of highly

publicized criminal charges in the U.S., and his trial was scheduled to begin in March, 2007.

**5**    On August 18, 2006, the motion judge made two orders on motions brought by Hollinger without notice to the Blacks. In the first order, the motion judge granted a Mareva injunction against the Blacks freezing their assets worldwide. Hollinger was required to give notice to the Blacks and then apply to have the order confirmed within ten days. The order contained a term that "the Motion Record, the Affidavits filed and this Order shall remain sealed until the return of this motion [after service of the order on the Blacks]". The parties refer to this term as the "sealing order". In the second order, the motion judge ordered "that the Motion material is hereby subject to a protective Order, subject to further Order of this court." The parties refer to this as the "protective order".

**6**    When the Blacks received notice of the Mareva order, they brought a motion to set it aside. Their motion and Hollinger's motion to continue the Mareva order were both scheduled to be heard on September 29, 2006. The motion judge made an interim order on August 29, 2006 continuing both the Mareva order and the protective order to September 29, 2006.

**7**    On August 30, 2006 the Globe learned about the August 18, 2006 orders. It filed a motion seeking:

> 1)    intervenor status for the purpose of challenging the sealing and protective orders;
> 2)    permission to have its counsel and Deputy Editor, upon giving appropriate confidentiality undertakings to the court, review the sealed material in order to provide and receive instructions and to permit counsel to make informed submissions on its motion;
> 3)    to set aside the sealing and protective orders, and in the alternative, to vary the sealing orders so that they limited public access to the motion material to the minimal extent possible.

The Globe's motion, originally returnable September 26, was also adjourned to September 29, 2006 to be heard along with the motions of Hollinger and the Blacks.

**8**    When all three motions came before the court, counsel for Hollinger and the Blacks advised that they had entered into what they called a Confidential Settlement Agreement. At their request, the court made an order on consent restraining the Blacks from dealing with their assets "except as provided by the Confidential Settlement Agreement". Evidently, the agreement itself was not filed with the court. The Blacks withdrew their motion.

**9**    When the consent order was made, the sealing order lapsed, but the protective order continued. The sealing order was part of the original Mareva order that had provided that it would remain in effect only "until the return of this motion", so the sealing order expired with the return of the motion. The protective order, however, had been issued separately and it remained in effect "subject to further order of this Court".

**10**    After making the consent order, the motion judge entertained the Globe's motion and

dismissed it.

**11**    The appeal as framed by the parties involves three decisions of the motion judge:

    1)    denying the Globe intervenor status;
    2)    refusing the Globe the opportunity to view the sealed material for the purposes of argument; and
    3)    maintaining the protective order in place, in whole or in part.

**12**    The Globe argues that the motion judge arrived at the wrong conclusion on all three questions. The respondents argue that the motion judge's orders to continue the protective order and to refuse to allow the Globe to view the protected material were interlocutory and should have been appealed to the Divisional Court. The respondents concede that the motion judge's denial of intervenor status to the Globe was a final order, but submit that it was a discretionary decision subject to a high level of deference with which this court ought not to interfere.

**The Motion Judge's Reasons**

**13**    The motion judge indicated that after he made the consent order he still had two matters before him. There was the Globe's motion and, in addition, Hollinger and the Blacks sought an order that the protective order continue and be expanded to include the material filed in the further motions: para. 8. He indicated that this request was heard along with the Globe's motion that the protective order be set aside. He characterized the issue raised by these two motions at para. 12 as "the exercise of the Court's discretion to continue the protective Order."

**14**    The motion judge then addressed the Globe's request for intervenor status. He noted that the Globe did not seek to participate in Hollinger's action against Mr. Black generally, but merely wished to challenge the protective order. He indicated that was permitted by the operation of rules 13.01 and 1.03 of the *Rules of Civil Procedure*, R.R.O. 1990, Reg. 194. Rule 13.01 contemplates intervenor status for a person who is not a party to the "proceeding", and the definition of "proceeding" in rule 1.03 has been interpreted to include a motion within a proceeding. The motion judge's conclusion following this observation, however, is not entirely clear.

**15**    The motion judge said at para. 21 that "limited intervenor status should be granted" for consideration of the matters before him. This statement could be taken to suggest he granted the Globe intervenor status, not in the action, but only for the purpose of its motion, and then went on to dismiss that motion.

**16**    Nonetheless, the parties framed the appeal on the basis that the motion judge refused the Globe's request for intervenor status. Perceiving ambiguity in the motion judge's reasons, the respondents submitted that it was "appropriate to proceed on this appeal as though the appellant were denied intervenor status by the motions judge." The view taken by the parties is supported by the motion judge's clear statement at para. 19, "Upon reflection, I am not satisfied that [the Globe]

has the necessary connection to be accorded intervenor status to challenge the sealing order". He also said at paras. 18 and 19 that "[l]eave was given to counsel for [the Globe] to make submissions on the issue of the sealing order *as if* it were granted intervenor status for that purpose" and "it is appropriate to deal with the matter on its merits and *assume* for the purpose of disposing of [the Globe's] substantive request that intervenor status is appropriate." [Emphasis added.] Moreover, his formal order referred to the Globe as the "proposed intervenor" and dismissed the entire Globe motion including the portion that requested intervenor status to challenge the protective order.

**17**    I have dealt with the appeal as framed by the parties.

**18**    It is possible to perceive another ambiguity in the judge's reasons. This is due to the statements that bookend his main analysis. At the beginning of that analysis, he remarked that the determination of the Globe's intervenor request was "dependent on a consideration of the factors *referred to below*" [emphasis added]. However, he concluded the analysis with the statement, "*For the above reasons*, I have concluded that it is not appropriate at this stage to set aside the protective Order of August 18, 2006" [emphasis added].

**19**    The motion judge's preface that the Globe's motion for intervenor status was "dependent on a consideration of the factors referred to below" could be taken to indicate that his refusal to grant the Globe intervenor status was the only substantive decision he made. On the other hand, his statement that he had decided not to set aside the protective order "for the above reasons" indicates that he turned his mind to the merits of the Globe's motion and decided that the protective order should continue.

**20**    I think the parties correctly framed the appeal on the basis that the motion judge made a substantive decision to maintain the protective order in place. He indicated at the outset that the issue before him was "the exercise of the Court's discretion to continue the protective Order". He maintained a consistent focus on that issue throughout his analysis. Very little of his analysis is relevant to the question of the Globe's intervenor status and all of it bears directly on the merits of continuing the protective order. As well, the motion judge expressly stated that he had concluded not to set aside the protective order and his formal order dismissed the Globe's motion to set it aside. Finally, it must be remembered that Hollinger and the Blacks had asked the motion judge for an order to continue the protective order in force. Hollinger and the Blacks' request reflects the fact the protective order had originally been made in combination with an *ex parte* interim Mareva order that required confirmation within ten days. The interim order the motion judge made on August 29 continued the protective order to September 29 when the Globe's motion was heard.

**21**    Again, I have proceeded with the appeal as framed by the parties on the basis that the motion judge made a substantive decision to continue the protective order. I turn to his reasons for doing so.

**22**    The motion judge offered three principle reasons for deciding to continue the protective order, each under a separate heading: that the material had been filed *ex parte* or without notice, that Hollinger and the Blacks, as part of their settlement, had agreed the material should remain sealed,

and that there was potential prejudice to Mr. Black in his criminal trial by self-incrimination or otherwise. I summarize his discussion of each of these reasons.

**23**   The motion judge stressed the fact that the protective order was made as part of the *ex parte* Mareva order. Mareva orders, he noted, are generally made without notice. Persons against whom they are made do not have the opportunity to challenge the material initially filed until the motion returns before the court to be confirmed. In this case, he observed, the Blacks did not challenge the material that Hollinger had initially filed because the dispute between Hollinger and the Blacks regarding the Mareva injunction was withdrawn from the court by their settlement. The motion judge concluded at para. 30, "it would be inappropriate, without consent of the parties to allow release of the material that has not been challenged in open Court."

**24**   The motion judge then turned to the fact that Hollinger and Mr. Black, as part of their settlement resolving the Mareva injunction, had agreed that the protective order should continue. He stated at para. 33 that the presumption that the court file should be open to the public continues to apply even though the litigants have settled the matter "unless it can be demonstrated that there is a particular privacy interest in the filed material or that it is in the interest of achieving the settlement that some or all of the file not be available to the public." As no evidence was filed, it seems the motion judge considered it implicit that Hollinger and the Blacks' agreement that the materials should remain unavailable to the public was important to their ability to reach a settlement.

**25**   While the *ex parte* nature of the proceeding and the settlement were factors considered by the judge, the main reason he decided to continue the protective order in force was to ensure the fairness of Mr. Black's trial in the United States. He accepted Mr. Black's submissions that material that is part of the public record in a Canadian court file "may be used against him in the criminal prosecution in the United States without the ability to object to its use, as would be the case in a criminal case in Canada": para. 39.

**26**   In evaluating this factor, the motion judge reiterated at para. 41 that the test for granting a sealing order is "whether the social value raised by the plaintiffs is one of superordinate importance to the rights of the public to access open court". He considered the two competing interests in this case to be "the interests of the public, represented by [the Globe], in open court records, and the interest of Mr. Black against testimonial compulsion of self-incrimination": para. 42. At para. 49 he repeated that the individual interest competing with the press' freedom of expression was the right of Mr. Black under s. 13 of the *Charter* not to self-incriminate.

**27**   The motion judge stated that the party seeking a sealing order bore the onus of rebutting the presumption of openness and adopted the two-part *Dagenais/Mentuck* test developed by the Supreme Court of Canada in *Dagenais v. Canadian Broadcasting Corp.*, [1994] 3 S.C.R. 835 and *R. v. Mentuck*, [2001] 3 S.C.R. 442 in the context of publication bans:

> (a)   Such a ban is *necessary* in order to prevent a real and substantial risk to the fairness of the trial, because reasonably available alternative measures will not

prevent the risk; and

(b)    The salutary effects of the publication ban outweigh the deleterious effects of the
free expression of those affected by the ban: *Dagenais* at 878 [emphasis in
original].

28    The motion judge noted that the Globe recognized that public access to the sealed material
might pose a "real and substantial risk" to the fairness of Mr. Black's criminal trial. However, the
Globe went on to argue, as the motion judge explained, that s. 2(b) of the *Charter* "mandates that
the Court impose on a party seeking to obtain or maintain a sealing order an onus to establish that
the material sealed or filed would be of an incriminatory nature and that the Court review with
detail and care that determination": para. 13. The Globe submitted that the determination whether
the fairness of Mr. Black's trial was in fact at risk would best be made on the basis of informed
submissions and so its counsel should be given access to the material for the purposes of argument.

29    The judge listed six reasons why he decided not to proceed as the Globe requested:

1.    The subject of the *ex parte* Order, once served, was dealt with in open
court, namely, the fact that there was a settlement reached by the parties
themselves.

2.    The fact of the settlement and the continuation of the original Order was
made in a public Order.

3.    There was no Court proceeding at which both the Blacks and [Hollinger]
were present and heard, which was not dealt with in public.

4.    The withdrawn motion of the Blacks attacked a Court Order, which they
said should not have been made without due notice to them and [without]
the opportunity to make submissions on both the material and propriety of
the Order.

5.    The continuance of the Sealing Order is time-limited and does not
represent an adjudication of any issue in the action that could be said to be
of public importance.

6.    Any affected party, and this might include [the Globe], can apply for
further direction at an appropriate point.

30    The motion judge then emphasized at para. 58 that he was exercising his discretion in favour
of a protective order to ensure that "any material that may be said to be prejudicial to Mr. Black's
defence to U.S. criminal proceedings cannot be used against him in those proceedings."

31    The motion judge explained why he declined to embark on a document-by-document review
of the material in order to determine if a portion of the material could be disclosed in order to
minimize the infringement of the Globe's freedom of the press. The motion judge stated the court
was aware of the criminal charges against Mr. Black "only in the most general way", and neither he
nor any other judge of the court "would be in a position to determine what of the material relied on

by [Hollinger] for its *ex parte* Order might be said to be relevant or prejudicial to the defence of those charges": paras. 60-61. He also observed that "settlements are to be encouraged" and noted the continued protection order arose from the settlement between Hollinger and Mr. Black. Furthermore, a document-by-document review would be time-consuming, costly to both Hollinger and the Blacks, and would serve no reasonable public purpose "*at least at this time*": para. 61 [emphasis in original]. The motion judge stated at para. 68 that if he were "to make a determination on what might or might not be used by a U.S. prosecutor, it would not protect Mr. Black's s. 13 rights under the *Charter* and might well intrude on judicial comity." The motion judge added at para. 79 that neither Hollinger nor the Blacks "want to or should in my view be put to the expensive process of review of documents that at this stage have nothing to do with the ultimate resolution of the claims in the action", especially since the order was "an interlocutory one for a limited time period". He said that "The temporarily [sic] sealing of material that may prejudice Mr. Black in the defence of charges against him by disclosure of financial records or other activities that may be said to be related to such charges does outweigh at this time the deleterious effects to freedom of expression": para. 66.

**32**    The motion judge then concluded that it was not appropriate to set aside the protective order "at this stage" and took pains to point out at para. 82 that "[s]hould circumstances warrant, before the hearing of the criminal trial of Mr. Black, the motion may be reviewed and in any event, may be reviewed following that trial."

### Issues and Positions of the Parties

**33**    The Globe submits that the motion judge erred in refusing it intervenor status, in refusing to give it access to the sealed material for the purpose of making argument, and in not setting aside the protective order or at least ensuring it had the minimal scope possible. It submits that all three are final decisions from which an appeal lies to this court.

**34**    The respondents submit that the motion judge's decision refusing to allow the Globe access to the sealed material for the purpose of making argument and his decision to continue the protective order are interlocutory and that the parts of the appeal relating to these decisions should be quashed. The respondents concede the decision refusing the Globe intervenor status was a final one, but submit it was discretionary and deserving of deference. The denial of intervenor status was appropriate, they say, because there was no public interest in an *ex parte* Mareva proceeding and, as a result, the appellant did not have any interest in the proceeding. If the decision to maintain the protective order in force was reviewable in this court, the respondents submit it was also discretionary. They say that discretion was properly exercised because the sealed material was filed on an *ex parte* motion and was untested by the adversarial process and there was no public interest in the material.

**35**    As stated earlier, I would find that the motion judge erred in refusing to grant the Globe intervenor status. I would find the decision to continue the protective order was a final one and that

the motion judge's analysis in reaching it was flawed. I consider the motion judge's decision not to allow counsel to view the sealed material in order to make informed argument a procedural decision that was interlocutory. That interlocutory decision is not appealable to this court, but courts faced with such questions may well find the Supreme Court's comments at paras. 60-61 of *Named Person v. Vancouver Sun*, 2007 SCC 43 to be helpful. I begin my analysis with the decision that the respondents concede is final and appealable.

## Denial of Intervenor Status

**36**    While the decision to recognize an intervenor is largely discretionary, in my view the motion judge erred in principle in refusing to grant the Globe intervenor status. He failed to give sufficient weight to the Globe's constitutionally guaranteed freedom of the press and to the fact the Globe sought standing to assert a position coincident with the public's interest that would not be raised otherwise.

**37**    Public access to the court system promotes confidence in the judicial system and enables oversight of the functioning of the courts. In this case, the parties to the action asked the motion judge for an order that the protective order continue. The public had an interest in whether it was continued or set aside, but that interest was not represented. Except for the Globe, there was no one, first to raise the issue whether the protective order should be set aside and then to advocate the position that it unnecessarily violated the open court principle.

**38**    In *Dagenais*, Lamer C.J.C. set out general guidelines for the Crown, the accused, the media, and the courts in criminal cases where a party has applied for a publication ban pending the completion of trial. He addressed the role of the court at 872:

> Upon a motion for a ban under the common law rule, the court should give standing to the media who seek standing (according to the rules of criminal procedure and the established common law principles) and follow the general guidelines for practice set out in ... these reasons.

**39**    This edict rests comfortably with the *Rules of Civil Procedure*. Rule 13 allows a person who is not a party to move for leave to intervene where he or she "may be adversely affected" by a judgment. The appellant brought its motion relying on the guarantee of freedom of expression including freedom of the press in s. 2(b) of the *Charter*. I have no doubt the Globe's constitutional rights were "adversely affected" by the protective order.

**40**    Given these factors and their importance, the motion judge erred by refusing the Globe intervenor status for the purpose of dealing with the question whether the protective order should be continued or set aside.

**41**    It may be suggested that the error was one of form rather than substance since the motion judge did allow the Globe to make submissions. I do not accept the suggestion. In my view, the

motion judge's perception that the Globe lacked sufficient connection to challenge the sealing order would have undermined the force of the Globe's position. The procedure he adopted and the conclusions he reached might have been different had he appreciated the Globe's status. It might have been less likely that he would have lost sight of the fact the onus was on the respondents. The Globe, as an intervenor, would have had a stronger claim to review the material for the limited purpose of making informed argument. If the rights of an intervening party were at stake, the judge might have been persuaded to undertake a review of the material. If the judge had undertaken a review, he may have concluded that some or all of it could be released.

**42**    I would conclude that the motion judge's refusal to accord intervenor status to the Globe was not merely an error of form, and must be set aside.

**43**    I pause to observe that the Globe might have proceeded differently. Instead of moving for intervenor status under Rule 13 of the *Rules of Civil Procedure*, the Globe might have moved to set aside the protective order under rule 37.14 as a "person who ... is affected by an order obtained on motion without notice". Newspapers have relied successfully on rule 37.14 to challenge sealing orders: see e.g. *P.S. v. D.C.* (1987), 22 C.P.C. (2d) 225 (Ont. High Court of Justice) and *National Bank of Canada v. Melnitzer* (1991), 5 O.R. (3d) 234 (Gen. Div.). In a decision of this court, *Ivandaeva Total Image Salon Inc. v. Hlembizky* (2002), 63 O.R. (3d) 769, Borins J.A. exhaustively reviewed the application of rule 37.14(1). He noted, as one example of cases in which successful motions under rule 37.14(1) had been brought, the "broad group of cases, usually arising from the sealing of a court file, in which the media has complained that its right to freedom of expression as guaranteed by s. 2(b) of the *Canadian Charter of Rights and Freedoms* has been compromised and in which the principle of open and accessible court proceedings has been invoked": para. 27. Later in the judgment at para. 38 he wrote that "it is apparent from the media cases that the courts have read 'an order obtained without notice' to mean without notice to the newspaper, or other media non-party, seeking to set aside a sealing order."

**44**    I now turn to a consideration of the motion judge's decision to continue the protective order.

**Decision to Continue the Protective Order**

*Interlocutory or final?*

**45**    The first question is whether the motion judge's decision to continue the protective order was interlocutory or final.

**46**    The protective order is interlocutory, the respondents say, because the reasons of the motion judge make abundantly clear that he decided to maintain it in force until the U.S. proceedings finished, after which it could be reviewed. In fact, the motion judge recorded the concession of counsel for Mr. Black that the considerations and outcome might be different once the U.S. proceedings were completed. As noted earlier, he stated that "[s]hould circumstances warrant, before the hearing of the criminal trial of Mr. Black, the motion may be reviewed and in any event,

may be reviewed following that trial."

**47**    On the other hand, the Globe argues that the protective order is a final order viewed from the Globe's perspective as a third party uninvolved in the action whose motion was entirely dismissed. The Globe says its right to have access to the material at the time of the motion has been finally determined. Moreover, the Globe points out that the order does not, in fact, expire automatically once Mr. Black's U.S. criminal proceedings are completed. Rather, the order remains in effect indefinitely. The Globe does recognize the order is "subject to further Order of this court", but submits this phrase is superfluous as the *Rules of Civil Procedure* would permit it to bring a motion to set aside or vary the order when new facts arose in any event.

### Procedural conundrum if interlocutory

**48**    Before beginning the analysis of these competing positions, it is worth noting the procedural conundrum the respondents say that the appellant faces because the motion judge's decision to maintain the protective order is interlocutory. If the decision is interlocutory, the Globe's appeal would properly lie to the Divisional Court, the respondents say. However, the Globe, having been refused intervenor status, would lack the status to file such an appeal. The Globe's only option, they say, would be first to appeal the refusal of intervenor status to this court, and after successfully having it set aside, then to pursue an appeal of the decision to maintain the protective order in the Divisional Court.

**49**    Section 6(2) of the *Courts of Justice Act*, R.S.O. 1990, c. C.43, would not provide a solution to this conundrum, the respondents say. Section 6(2) permits this court to hear an appeal that lies to the Divisional Court "if an appeal in the same proceeding lies to and is taken to the Court of Appeal". The respondents say that s. 6(2) has no application unless leave has first been obtained from the Divisional Court: *John E. Dodge Holdings Ltd. v. 805062 Ontario Ltd.* (2003), 63 O.R. (3d) 304 at para. 48 (C.A.). The respondents say that the Globe must first reverse the decision refusing it intervenor status before it would have the status to seek such leave from the Divisional Court.

**50**    If this reasoning is correct, the Globe must sequentially pursue different procedures in different courts in order to appeal the motion judge's dismissal of the motion that it brought before him. If the Globe were unsuccessful in its appeal of the decision refusing it intervenor status, it would not be able to appeal the decision to maintain the protective order in force.

**51**    The appellant's conundrum, however awkward, is not relevant to determining whether the protective order is final. The order is final only if it finally determines the rights of the parties. The classic statement of the difference between an interlocutory and final order is found in *Hendrickson v. Kallio*, [1932] O.R. 675 (C.A.). Justice Middleton explained at 678 that an interlocutory order "does not determine the real matter in dispute between the parties - the very subject matter of the litigation, but only some matter collateral. It may be final in the sense that it determines the very question raised by the application, but it is interlocutory if the merits of the case remain to be determined." On the other hand, he said a final order "determines the merits of the action and the

real rights of the parties."

*Application of the test to the Globe as a third party*

**52**    The principle becomes difficult to apply when third parties, unconcerned with the merits of an action, become involved in the proceedings for a limited purpose. The Globe, in arguing the protective order was final, emphasized it was a third party uninvolved in the action. I agree this is the key to the determination of the issue.

**53**    The Globe points out that the courts have applied the *Hendrickson* test to non-parties as if they were parties for the limited purpose of the order affecting them. It relies upon John Sopinka & Mark A. Gelowitz, *The Conduct of an Appeal* (Toronto: Butterworths, 2000) at 20 where the authors state:

> The approach the courts have taken to orders affecting non-parties has caused some commentators to suggest that in such circumstances the courts have "expanded" or "abandoned" the *Hendrickson* test. It is, perhaps, more accurate to say that the courts have applied *Hendrickson* to non-parties as if they were parties for the limited purpose of the order affecting them.

Garry D. Watson & Craig Perkins, *Holmested and Watson: Ontario Civil Procedure* (Toronto: Carswell, 1984) at R. 62, s. 7 make the same point. Whether and how a third party is affected influences the characterization of an order as interlocutory or final. Therefore, whether the motion judge's order maintaining the protective order is interlocutory or final depends on its effect on the rights of the Globe.

**54**    Certainly, the Mareva injunction against the Blacks, issued *ex parte* and then continued on consent, is interlocutory. The Globe, however, has no interest in the merits of Hollinger's action or of its motion for an interlocutory Mareva injunction. The Globe's involvement is limited to its motion to set aside the sealing order. It is in the context of that motion that its rights must be determined. It is necessary to consider what was at stake for the Globe in the motion.

**55**    The Globe in its motion did not seek a special ruling in its favour. Ordinarily, the open court principle governs, and it would be unnecessary for the Globe to bring a motion seeking the court's permission to have access to a court file. The Globe wanted the normal state of affairs to apply and brought a motion to set aside the special order that had been made in favour of Mr. Black. The issue the Globe raised was whether its routine right of access to a court file, based on its freedom of the press, had to yield to other interests. In dismissing its motion, the motion judge decided that the Globe's freedom of the press had to yield to Mr. Black's individual interests in the circumstances. As I see it, the protective order finally determined the Globe could not exercise its routine right to have access to the court file.

**56**    I attach no importance to the fact that the literal wording of the order makes it apply

indefinitely. The reasons of the motion judge make evident that he regarded the order as temporary. He fully expected the order would be set aside at someone's initiative after the U.S. proceedings ended. Even if the protective order, despite its wording, is regarded as sealing the court file temporarily, I still would consider it a final order.

**57**    Nor do I attach importance to the fact the motion judge seemed to consider the Globe could successfully assert its right of access to the file at a later time. The fact that an order has temporary application does not necessarily mean that it is interlocutory. The touchstone is whether the order determines the real matter in dispute between the parties. The right claimed and in issue in a proceeding may be the ability to do something at a particular time. For example, a separated parent may bring a freestanding application to dispense with the other parent's required consent to take a child out of the country during the summer. In my view, a dismissal of such an application determines it finally, even though the parent may bring another application the following summer, or even later in the same summer if circumstances change.

**58**    In the context of the Globe's motion, the potential right to have access later is not the same as the actual right to have access now. The decision to maintain the protective order finally determined that the Globe may not exercise its constitutional right to freedom of the press in the circumstances that were before the motion judge. A motion brought later will not revisit that question, but will decide whether the Globe may exercise its right of access in other circumstances.

**59**    For these reasons I would conclude that the motion judge's decision to continue the protective order is final for the purpose of this appeal.

*Additional commentary on media bans in criminal cases*

**60**    This is the first time this court has considered whether civil sealing orders are interlocutory or final. It is an important question and this panel does not unanimously embrace my conclusion that the continued protective order is a final one. This prompts me to discuss the issue further. I emphasize I have not relied upon the criminal law, which was not argued before us, to reach the conclusion that the continued protective order is final. However, it is worth examining the criminal law because most of the jurisprudence on media bans has developed in the criminal context, and as a result, the criminal jurisprudence concerning such bans is more mature.

**61**    In criminal cases, interlocutory publication bans are treated as final orders with respect to media third parties. I explain this more fully.

**62**    It is interesting that *Dagenais*, the leading case on the procedure to be followed in criminal cases, started as a civil application. *Dagenais* concerned an application for an injunction prohibiting the C.B.C. from broadcasting a program that could jeopardize the fair trial of four accused charged with abusing boys in their care. The accused had brought the application for an interlocutory injunction under the Ontario *Courts of Justice Act* before a judge of the Ontario Court (General Division). She prohibited the broadcast of the program and ordered that the court file be sealed,

both until the completion of the criminal trials.

**63**    The first issue before the Supreme Court was the proper avenue for a third party challenge to a publication ban sought by the Crown or accused in a criminal proceeding. Chief Justice Lamer rejected civil jurisdiction under the provincial Judicature Acts (such as the Ontario *Courts of Justice Act*), reasoning that a media challenge to publication bans in response to a request made by a party to a criminal case is a criminal, not civil, matter. Chief Justice Lamer set out general procedural guidelines for the Crown, the accused, the media, and the courts.

**64**    It is unnecessary to review these guidelines in any detail. What is important is that different procedures and different appeal routes apply to the media and to the parties. An accused or the Crown in a trial before a provincial superior court should make the application for a publication ban to the trial judge, or if the trial judge has not yet been named, to a judge of the superior court. There is no immediate right of appeal. To seek or challenge a ban on appeal, both the Crown and the accused must follow the regular avenues of appeal available to them at the end of trial through the *Criminal Code*, R.S.C. 1985, c. C-46.

**65**    By contrast, media who have unsuccessfully opposed a motion for a ban brought in a superior court should apply for leave to appeal to the Supreme Court under s. 40 of the *Supreme Court Act*, R.S.C. 1985, c. S-26 without waiting until the end of the trial. This appeal is available because "[a] publication ban order can be seen as a final or other judgment of the highest court of final resort in a province or a judge thereof in which judgment can be had in the particular case": *Dagenais* at 861.

**66**    The policy choice and implications of ordaining different avenues of appeal for the parties and for the media were discussed in detail by L'Heureux-Dubé J. in dissent. In explaining why she would not find that the media had a right of appeal under s. 40 of the *Supreme Court Act*, she set out the issue starkly, at 904:

> [T]he impugned publication ban is clearly an interlocutory order from the point of view of the accused. However, from the point of view of the appellants, this order is, for all intents and purposes, final. ... In fact, any court order made in a criminal context which affects a third party, including any order directed at witnesses, could likely be characterized as "final" from the point of view of the affected third party. Accordingly, the argument can be made that a third party appeal against such an order would not be precluded by the principle against interlocutory criminal appeals and could therefore proceed by virtue of s. 40(1) of the *Supreme Court Act*.

**67**    She did not disagree that a temporary publication ban was final from the media's point of view, but took the position that the perspective of the accused should govern.

**68**    The majority position in *Dagenais*, of course, states the law. Thus Brian A. Crane & Henry S. Brown write in *Supreme Court of Canada Practice* (Scarborough: Thomson Professional Publishing

Canada, 2007) at 77, "the Court has jurisdiction to grant leave to appeal under section 40 directly from some interlocutory orders of Superior Court judges affecting a third party in a criminal trial."

**69**     Later cases have more explicitly characterized such orders as final. Justice L'Heureux-Dubé noted at para. 25 of *L.L.A. v. A.B.*, [1995] 4 S.C.R. 536, that "the majority of this court in *Primeau* and *Jobin* [1995] 2 S.C.R. 78, expressed the view that an interlocutory order affecting third parties is a final order and, accordingly, s. 40(1) is available to appeal an order of a superior court judge".

**70**     In *R. v. Primeau*, [1995] 2 S.C.R. 60, the court explained at paras. 12-13 why such an order would be considered final:

> The procedure for third parties differs [from the procedure for parties] for two reasons. First, a third party, being outside the actual proceedings, cannot apply to the trial judge for relief. *Second, an order deciding an issue with respect to a third party is a final order. Such a characterization is important in order to comply with the general rule barring interlocutory appeals in criminal matters.* [Emphasis added.]

**71**     As can be seen, the criminal law treats appeals by third parties differently, often concluding that a matter that would be interlocutory between the parties alone is final with respect to third parties. In criminal practice, a publication ban, even one in place temporarily until the completion of the trial, is a final order determining the media's rights.

**72**     In my view, it would seem incongruous if media bans in place until the end of trial were considered final in criminal law but interlocutory in civil law. I repeat that I do not rely on the criminal law in reaching my conclusion that the continued protective order in this case is final. I recognize that the criminal law is an imperfect guide for civil law. Nevertheless, I believe the approach of the criminal law fortifies the conclusion that the continued protective order is a final one.

**73**     That said, I turn to the next issue in the appeal: whether the motion judge used a flawed legal analysis in deciding to continue the protective order.

**Merits of the Decision to Continue the Protective Order**

**74**     In my view, the analysis the motion judge used to arrive at his decision to maintain the protective order was flawed. While the decision may have been discretionary, "Discretion must be exercised within the boundaries set by the principles of the *Charter*; exceeding these boundaries results in a reversible error of law" as Lamer C.J.C. pointed out at *Dagenais* at 875.

**75**     In this case, the motion judge erred by concluding it had been established that continuing the protective order was necessary to protect Mr. Black's right to a fair trial, and by relying on the facts that the protected material had been filed on an *ex parte* motion, and that the parties' had agreed the

material should remain sealed. I would also find that the motion judge, having reached the conclusion that he did, erred by refusing to consider whether some portion of the material should have been made available to the public. I discuss these errors in turn, after first disposing of the respondents' argument that the burden was on the Globe to establish the protective order should be set aside.

### Burden of proof

**76**    The respondents argue that under the rules of procedure, a party who moves to set aside or vary a pre-existing order bears the burden of proof. The respondents acknowledge that a party who seeks to deny access to a court file has the burden of establishing the necessity of a protective order, but in their view this is an initial burden. They go on to submit that the initial burden was discharged when the original protective order was issued. Thus, they say, when the matter returned before the court, the burden was on the Globe.

**77**    In my view this argument is devoid of merit for two reasons.

**78**    First, Robert J. Sharpe in *Injunctions and Specific Performance* (Aurora, Ont.: Canada Law Book, 2000) cites a line of cases going back to *Howland v. Dominion Bank* (1892), 15 P.R. 56 (Ont. C.A.) for the proposition that a party moving against an *ex parte* order does not bear the onus of proof: section 2.25, page 2-2. In *Howland*, MacClellan J.A. stated at 63 that a judge hearing the contested motion brought by a party affected by an *ex parte* order deals with the matter "not as a mere appeal from the formal order, but as an original substantive application".

**79**    Second, and more importantly, constitutional law provides that a party attempting to justify the infringement of a *Charter* guarantee bears the onus. Rules of practice cannot displace a burden that is constitutional in nature.

**80**    The motion judge correctly accepted what he described in para. 11 as the "basic proposition that a party who seeks to limit freedom of expression bears the burden of justifying that limitation". Unfortunately, as I discuss, he subsequently he seems to have lost sight of this principle at certain steps of his reasoning.

### Right against self-incrimination

**81**    I do not find it necessary to discuss whether responding to a civil proceeding such as a motion for a Mareva injunction infringes the right against self-incrimination guaranteed by s. 13 of the *Charter* (see *R. v. Henry* (2005), 202 C.C.C. (3d) 449 (S.C.C.)), or the extent to which international comity weighs against finding that a U.S. trial would be unfair because the U.S. has no counterpart to s. 5(2) the *Canada Evidence Act*, R.S.C. 1985, c. C-5 (c.f. *Re. Ravelston Corporation Ltd.* (2007), 84 O.R. (3d) 611).

**82**    The essential point is that once the motion judge made the consent order, Mr. Black could no

longer have any interest "against testimonial compulsion of self-incrimination", if, indeed, any such compulsion existed before. Mr. Black no longer had any reason to file material in response to Hollinger's motion. This leads to me to conclude that the motion judge erred by identifying the two competing interests to be balanced as "those of the press in freedom of expression (s. 2(b) of the *Charter*) and those of Mr. Black (s. 13, the right not to self-incriminate)".

**83**    Once the consent order was made, Mr. Black's only concern could be that the material already filed by Hollinger might be prejudicial to him in the U.S. criminal proceedings. Here, the different American approach to the right not to incriminate oneself is irrelevant. Yet, as his reasons make clear, the motion judge attached great weight to Mr. Black's right not to self-incriminate. This was an error.

**84**    Despite the emphasis the motion judge placed on Mr. Black's right against self-incrimination, he also considered more generally the potential prejudicial effect of the material filed by Hollinger. At one point he said the protective order should be continued "to ensure, to the extent possible, that any material that may be said to be prejudicial to Mr. Black's defence to U.S. criminal proceedings cannot be used against him in those proceedings." The fairness of Mr. Black's trial was potentially a value worthy of protection that could conceivably outweigh the open court principle in a particular case. It was, however, necessary to apply the *Dagenais/Mentuck* test and, in my view, the motion judge failed to do so properly.

**85**    The first step was to determine whether the identified risk was real and whether the protective order was necessary. The word "necessary" was emphasized by Lamer C.J.C. in his articulation of the test. Apart from the right not to self-incriminate, the motion judge did not indicate why continuing the sealing order was "necessary" to prevent Mr. Black's U.S. trial from being unfair. He did not satisfactorily explain why that trial would be rendered unfair if the material available to the public in Canada fell into the hands of the U.S. prosecutors, and in my view, the record before him could not support such a conclusion.

**86**    The motion judge did allude to the deemed undertaking rule. He stated, "In Canada, material produced in a civil action is generally subject to the Deemed Undertaking Rule, being Rule 30.1 of the *Rules of Civil Procedure*", which limits its use "to purposes only connected with the proceeding in which the evidence was obtained." He did not indicate that rule 30.1 applies only to evidence obtained by the various forms of discovery listed in rule 30.1.01(1). There was no evidence that Hollinger had obtained any of the sealed material by any form of discovery.

**87**    More importantly, the deemed undertaking rule was not pertinent because the material had been filed with the court. Rule 30.1.01(5) expressly states that the deemed undertaking rule does not prohibit the use, for any purpose, of evidence filed with the court or of evidence given or referred to during a hearing. Moreover, even if the evidence had been obtained on discovery and even if it had not been filed with the court, rule 30.1.01(6) provides that the deemed undertaking rule does not prohibit its use "to impeach the testimony of a witness in another proceeding."

**88**    On the record in this case, the deemed undertaking rule could not provide any support for the motion judge's decision to continue the protective order.

**89**    What we are left with is the potential that the U.S. prosecutors might conceivably find the material filed by Hollinger to be of some assistance to them in their prosecution of Mr. Black. Any civil litigant involved in related criminal proceedings, even those taking place in Canada, would be concerned that information filed by another party in the civil proceeding might assist the prosecution in the criminal case. Recognizing such a bald, unformulated concern as sufficient reason to seal a civil court file would significantly erode the open court principle and frustrate the public interest in the prosecution of crime. The open availability of information fosters the goal of criminal and civil proceedings to ascertain the truth. The fact that probative evidence becomes available to the prosecution does not, in itself, render a criminal trial unfair. Additional circumstances would have to exist to support the discretionary sealing of a civil court file to prevent prejudicial information becoming available to a criminal prosecutor.

**90**    The motion judge did not indicate any additional circumstances that existed in this case that made continuing the protective order "necessary" to ensure the fairness of Mr. Black's trial. Rather, he stated that was aware of the charge against Mr. Black "in only the most general way" and so he would not be able to determine what of the material "might be said to be relevant or prejudicial to the defence of those charges". The motion judge's reasoning in this regard failed to apply the burden on the respondents to establish that continuing the sealing order was necessary to prevent Mr. Black's U.S. trial from being unfair. It was for the respondents to place before the court sufficient information to enable it to understand how prosecutor access to the sealed material would render Mr. Black's trial on the specific charges he was facing unfair. Something more than the simple assertion that prosecutor access to the material would be to Mr. Black's disadvantage in his criminal trial was required.

**91**    The lack of an adequate basis for the motion judge's conclusion is apparent from another perspective as well. Even if it is assumed that there would be some unfairness to Mr. Black in making previously unknown evidence available to U.S. prosecutors, it was not established that the prosecutors were not already in possession of this particular material. Counsel for Mr. Black advised the motion judge that Hollinger had a Cooperation Agreement with the U.S. Attorneys Office that required it to provide non-privileged information to the prosecutor. The respondents did not file any evidence as to what part of the material Hollinger had not already supplied to the prosecutor, if any.

**92**    In summary, Mr. Black had no interest against self-incrimination once the consent order was made; there was a conceivable risk that Mr. Black's interest in a fair trial would be placed at risk by the public availability of the material filed by Hollinger, but the respondents did not establish that the risk was in fact real.

*Material filed ex parte*

**93**    I would find that the motion judge erred in relying on the fact the protected material had been filed *ex parte* and its authenticity had not been challenged in open court. He provided no authority for this proposition and it is unsupported by the jurisprudence.

**94**    The public's ability to inspect court records is an integral part of the open court principle. In its recent decision *Named Person v. Vancouver Sun*, 2007 SCC 43, the Supreme Court restated the principle, saying at para 33 that "the state must not interfere with an individual's ability to 'inspect and copy public records and documents, including judicial records and documents'".

**95**    There is no exception for *ex parte* proceedings. In *Re Vancouver Sun*, [2004] 2 S.C.R. 332, the Supreme Court clearly expanded the *Dagenais/Mentuck* test beyond publication bans and specifically stated it applied to all discretionary orders limiting freedom of the press. The Supreme Court repeated this in *Toronto Star Newspapers Ltd. v. Ontario*, [2005] 2 S.C.R. 188 at para. 7 and in *Named Person* reiterated that the open court principle is "clearly a broad principle of general application to all judicial proceedings": para. 34.

**96**    The values that underlie the open court principle are just as important in *ex parte* as in contested proceedings. *Named Person* sets out a brief articulation of these values at paras. 31-32:

> The "open court principle" is a "hallmark of a democratic society", as this Court said in *Vancouver Sun (Re)*, [2004] 2 S.C.R. 332, 2004 SCC 43, at para. 23. This principle, as the Court noted in that case, "has long been recognized as a cornerstone of the common law" (para. 24), and has been recognized as part of the law since as far back as *Scott v. Scott*, [1913] A.C. 417 (H.L.), and *Ambard v. Attorney-General for Trinidad and Tobago*, [1936] A.C. 322 (P.C.), where Lord Atkin wrote, at p. 335: "Justice is not a cloistered virtue". "Publicity is the very soul of justice. It is the keenest spur to exertion, and the surest of all guards against improbity" (J. H. Burton, ed., *Benthamiana: Or, Select Extracts from the Works of Jeremy Bentham* (1843), p. 115).

> Open courts have several distinct benefits. Public access to the courts allows anyone who cares to know the opportunity to see "that justice is administered in a non-arbitrary manner, according to the rule of law": *Canadian Broadcasting Corp v. New Brunswick (Attorney General)*, [1996] 3 S.C.R. 480 ("CBC"), at para. 22. An open court is more likely to be an independent and impartial court. Justice seen to be done is in that way justice more likely to be done. The openness of our courts is a "principal component" of their legitimacy: *Vancouver Sun*, at para. 25.

**97**    The open court principle would be slender if it did not apply to documents that "have not been tested as to their authenticity or factual probity by [the] Court" or material that "has not been challenged in open Court". If the proposition were applied literally, all court files would remain

sealed until the court issued rulings. For example, the open court principle means that statements of claim, with the unanswered allegations they contain, are available as soon as they are filed.

**98**    The motion judge noted that the information in the sealed material would not be challenged because the Blacks had withdrawn their motion and so there was no need to consider the merits of the interim Mareva order. Therefore, he concluded at para. 30 that "it would be inappropriate, without consent of the parties, to allow release of material that has not been challenged in open Court."

**99**    The problem with this analysis is that it concentrated on the defendant and ignored the public's interest. There is value in the public understanding and overseeing the exercise of the court's authority to issue *ex parte* Mareva injunctions freezing individuals' worldwide assets without notice to them. Whatever the documents' ultimate authenticity or factual probity might be, they were the basis upon which the motion judge was persuaded to issue the interim Mareva injunction while exercising the "careful scrutiny and caution" he recognized was necessary. The normal operation of the open court principle in these circumstances would foster public comprehension of the exercise of this extraordinary judicial power. Further, in this case it is not apparent that the interim Mareva injunction and sealing orders were first issued in open court, and this too would be an aspect of the court's functioning important for the public to understand. Finally, Hollinger's action against Mr. Black raises issues regarding the standards of corporate governance imposed by law, a matter of great significance to the public. These are all factors relevant to the operation of the open court principle that should have been included in the analysis.

**100**    I would find the motion judge erred by relying on the fact the sealed material had been filed on an *ex parte* motion. I turn now to the significance the motion judge placed on Hollinger and the Blacks' settlement

### The settlement

**101**    It seems the motion judge believed the parties were able to reach the agreement that led to the consent order only by including a term that the protective order should continue. There was no evidence to that effect, but assuming that is so, it does not, in my view, provide a basis for continuing the protective order.

**102**    I begin by noting the limited nature of the settlement between Hollinger and the Blacks. Hollinger did not accept the private undertaking of the Blacks about how they would deal with their assets. Rather, the settlement called upon the court to exert its authority to confirm the Mareva order and restrain the Blacks from dealing with their assets except as permitted by the agreement. The court's jurisdiction to do so rested on the protected material Hollinger had filed earlier.

**103**    The motion judge stated at para. 33 that where court approval of a settlement is required, "the presumption should operate that the Court file will be open to the public unless it can be demonstrated that there is a particular privacy interest in the filed material or that it is in the interest

of achieving the settlement that some or all of the file not be available to the public." In my view, the second part of this proposition requires considerable qualification.

**104**     No doubt the encouragement of settlements is a value of the legal system. However, the interest in fostering settlements does not outweigh constitutional principles. Simply showing that sealing a court file was necessary to achieve a settlement is not enough to rebut the media's freedom of the press and the open court principle. In all cases it is necessary to satisfy the *Dagenais/Mentuck* test. All the particular circumstances, which might include those surrounding settlement, should be considered.

**105**     In this case, to the extent Hollinger and the Blacks agreed the Mareva file should remain sealed because of the potential prejudicial effect on Mr. Black's criminal trial or because the material had been filed on an *ex parte* motion, these factors had already been considered by the motion judge. If these factors could provide a basis to keep the material sealed they would do so independently of the parties' wishes for confidentiality. Here, there was no suggestion of any additional reason why the parties' wishes should outweigh the open court principle. I agree with the remark of Farley J. that "Sealing orders cannot be granted merely because the parties involved agree to have material sealed-or 'withdrawn'": *Re Stelco Inc.*, [2006] O.J. No. 277 (S.C.J.).

**106**     In my view, in this case there was no basis for attaching weight to the parties' wish for confidentiality as a factor independently of the others the motion judge identified and considered.

*Minimal impairment*

**107**     Finally, I would find that the motion judge erred by failing to consider whether there was a portion of the sealed material that could be released. It seems to me that he reversed the burden of proof at this stage of his analysis. As noted, he had earlier stated unequivocally that the burden of justifying the sealing order lay on the respondents. However, as I explain, he placed the burden on the Globe to establish that some of the material could be disclosed.

**108**     The first reason the motion judge offered for declining to embark on a document-by-document review was that he was aware of the charges Mr. Black was facing in only the most general way, and he was not in a position to determine what of the material might be said to be relevant or prejudicial to the defence of those charges. The proper perspective should have been that all the material was presumptively disclosed and that the burden was on Mr. Black to satisfy the court as to which portions of the material should not be released. If the specific nature of the charges was relevant to that determination, the onus was on the respondents to place the necessary information before the court.

**109**     In my view, the motion judge also misapplied the burden of proof when he observed that "[t]he continuance of the Sealing Order ... does not represent an adjudication of any issue in the action that could be said to be of public importance." The open court principle is intrinsically of public importance. It is unnecessary for the Globe to demonstrate that the sealing order bore on

matters of public importance. The onus was on the respondents to demonstrate that salutary effects of a ban outweighed its inherent deleterious effects.

**110**    The motion judge also observed that a document-by-document review would be time-consuming and costly to Hollinger and the Blacks. These parties were seeking a special dispensation of the court-a departure from the open court principle that routinely applied. There was no onus on the Globe to establish that granting its routine right of access could be accomplished efficiently and without occasioning cost to the parties. The record did not disclose any evidence that the cost and inconvenience to Hollinger and the Blacks of the special treatment they were seeking would be unreasonable in the circumstances.

**111**    Finally, the court observed that the documents had not been tested as to their authenticity or factual probity, and the Court was not in a position to do so at that stage. I have already explained that the fact the court had not yet finally found the documents to be authentic or have factual probity was not a reason to depart from the open court principle.

**112**    I would conclude that the motion judge provided inadequate reasons for failing to consider whether a portion of the sealed material could be released.

**Conclusion**

**113**    I would find that the motion judge erred in refusing to accord the Globe intervenor status and erred in deciding to continue the protective order on the record before him.

**114**    Neither side arranged to have the sealed material filed before this court for the purposes of the appeal. It would have been helpful had they done so. I have disregarded the possibility that some legally cognizable unfairness to Mr. Black from the release of the material might be apparent on the face of the material itself. The motion judge did not identify any such unfairness and the burden was on the respondents to demonstrate the unfairness, if it existed.

**115**    I would set aside the order dismissing the Globe's motion and replace it with an order granting the Globe intervenor status and setting aside the protective order.

**116**    If the parties cannot reach agreement on costs, they may make written submissions through the Court's senior legal officer, Mr. John Kromkamp.

R.G. JURIANSZ J.A.

P.S. ROULEAU J.A.:--

**Overview**

**117**    I have had the benefit of reading Juriansz J.A.'s reasons. I agree with his conclusion that the motion judge's decision should be set aside and that the appellant should be granted intervenor

status to challenge the protective order.

**118** Our reasons diverge on the issue of the protective order. While I am in agreement with Juriansz J.A. that the motion judge's reasoning in respect of the protective order was in some respects flawed, I would leave to the Superior Court the determination of whether the protective order should, in whole or in part, remain in place. This determination would be made with the benefit of submissions from the parties to this action, as well as the intervenor, and after they and the court have had the opportunity to review the material subject to the protective order. The intervenor's review of the material would be upon execution of an appropriate confidentiality undertaking.

**Discussion**

**119** The facts and the position taken by the parties are well summarized in the reasons of Juriansz J.A.

### a) Intervenor Status

**120** I agree with Juriansz J.A.'s analysis and disposition of the intervenor issue. Specifically, I agree that this aspect of the decision was final, that the appeal from it lies to this court and that the appellant ought to have been granted intervenor status for the reasons he has described.

### b) The Protective Order

**121** Even though the motion judge refused to give the appellant intervenor status, he nonetheless addressed the appellant's challenge of the protective order. In this portion of the reasons I understand the motion judge to be saying that in the event he was wrong and that intervenor status ought to be granted to the appellant, this is how he would have ruled on the merits of the challenge to the protective order.

**122** With respect to the motion judge's analysis of the appropriateness of continuing the protective order, I agree with Juriansz J.A.'s observation at para. 41 that the motion judge's perception that the appellant lacked sufficient connection to challenge the protective order would have undermined the appellant's position. The procedure that the motion judge adopted and the conclusions he reached might have been different had he appreciated that the effect such orders have on the rights of the media warranted granting intervenor status to the appellant. It may also explain why he considered it unnecessary to review the sealed materials and why he refused to grant the appellant conditional access to these materials for the purpose of making submissions.

**123** In dealing with the protective order issue, the motion judge correctly identified the *Dagenais/Mentuck* test as being applicable to all discretionary orders limiting freedom of the press and recognized that Mr. Black's fair trial interest may be imperilled. Indeed, the appellant has acknowledged as much. The balancing pursuant to the *Dagenais/Mentuck* test requires, however,

that a high threshold be met before a protective order will be granted. The court is required to balance the constitutionally entrenched freedom of expression against the right to privacy and the right to a fair trial. The reason for this approach was addressed in *Toronto Star Newspapers Ltd. v. Ontario*, [2005] 2 S.C.R. 188 at para. 4:

> It is well established that court proceedings are presumptively "open" in Canada. Public access will be barred only when the appropriate court, in the exercise of its discretion, concludes that disclosure would subvert the ends of justice or unduly impair its proper administration.

**124**    The protective order places the court file out of reach of the public and the media. Because the motion judge refused to give the appellant, a media enterprise, intervenor status for the limited purpose of challenging the protective order, it is apparent to me that his analysis as well as his exercise of discretion respecting the maintenance of the protective order were affected. Without the press interest being factored into the balancing, the balancing was inevitably tainted.

**125**    In the particular circumstances of this case, I view the portion of the motion judge's decision to maintain the protective order to be in the nature of *obiter dicta* and for the reasons described above, strongly linked to the decision on intervenor status. Having determined that the motion judge erred and that he ought to have given the appellant the standing of intervenor to challenge the protective order, it follows that the decision in its entirety must be set aside. There is, therefore, no need to decide whether the portion of the decision relating to the protective order, were it to stand alone, is final or interlocutory for the purpose of determining the appeal route.

### c) Remedy

**126**    I turn now to the issue of remedy. On this issue I would reach a different result from Juriansz J.A. Because the sealed materials have not been filed in this court, we are unable to examine them to assess any potential prejudice. In the circumstances of this case, the balancing required to meet the high threshold set by the *Dagenais/Mentuck* test requires an examination of the documents themselves and an assessment of the potential effect on Mr. Black's trial fairness. Without having reviewed the materials, I cannot say, with certainty, that if the balancing of interests was done with the benefit of such a review it would invariably result in all of the materials being made public.

**127**    I agree with the appellant's submission that the determination of whether the fairness of Mr. Black's trial was in fact at risk is best made on the basis of informed submissions. Once the appellant is given intervenor status and reviews the materials, the Superior Court may hear submissions on any potential prejudice to Mr. Black's trial and other possible prejudices that support maintaining the protective order. These submissions would be made with reference to specific passages in the documents so that the court would be in a position to assess the significance of any such prejudice together with other relevant factors such as the public policy interest in encouraging settlement. Against these would be weighed the public interest in "open courts", as well as *Charter* considerations, such as the core values of expression included in s. 2(b).

**128**    Although I reach a different result, I agree with Juriansz J.A.'s analysis of the burden of proof and agree that the motion judge's concerns regarding self-incrimination were misplaced given that the settlement reached had obviated the need for Mr. Black to file any materials in response to Hollinger's motion. Further, I agree that, absent reference to specific information in the documents, the concern over Mr. Black's fair trial rights was no more than unfounded speculation. Because of the approach he adopted, the motion judge did not undertake a review of the sealed materials to assess the strength of Mr. Black's allegations in this regard. Finally, I agree that the motion judge erred by failing to consider whether there was a portion of the sealed material that could be released.

## Result

**129**    In the result, I would set the order aside, grant the appellant intervenor status for the limited purpose of challenging the protective order and remit the balance of the appellant's motion to the Superior Court for a new hearing. It may well be, however, that a new hearing is unnecessary given the present reality. Mr. Black's trial and sentencing have already occurred and, as acknowledged by Mr. Black's counsel, once those are concluded, Mr. Black would not likely have any legitimate basis for perpetuating the protective order. If however, the new hearing does proceed, the appellant is to be given the opportunity to review the materials for the purpose of making submissions subject to filing an appropriate confidentiality undertaking. The Superior Court will then evaluate whether there is potential prejudice to Mr. Black's interests which would preclude some or all of the material being made public.

**130**    If the parties cannot agree on costs, I would direct that they make written submissions through the court's Legal Officer, Mr. John Kromkamp.

P.S. ROULEAU J.A.
 J.I. LASKIN J.A.:-- I agree.

\* \* \* \* \*

Corrigendum
Released: April 2, 2008

Mr. Greenspan's name is amended to read: **Edward L. Greenspan, Q.C.**

cp/e/qlkxl/qlpxm/qlbrl/qlcam/qlhcs/qltxp/qlhcs/qlrxg

# TAB 9

E.E.O.C. v. Kronos Inc., 620 F.3d 287 (2010)

110 Fair Empl.Prac.Cas. (BNA) 392, 93 Empl. Prac. Dec. P 43,981, 23 A.D. Cases 1105...

620 F.3d 287
United States Court of Appeals,
Third Circuit.

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION, Appellant

v.

KRONOS INCORPORATED.

No. 09–3219.    |    Argued Feb.
26, 2010.    |    Filed: Sept. 7, 2010.

**Synopsis**
**Background:** In employment discrimination proceeding
against supermarket chain initiated by charge of
discrimination filed by hearing and speech impaired
applicant for work as cashier, bagger and stocker, Equal
Employment Opportunity Commission (EEOC) applied
to enforce administrative subpoena as to nonparty, the
corporation that created "Customer Service Assessment"
which that employer used in its hiring process. The United
States District Court for the Western District of Pennsylvania,
Arthur J. Schwab, J., 2009 WL 1519254, granted requested
relief in part and denied it in part, narrowing scope of
subpoena and directing parties to negotiate confidentiality
order, then later denied EEOC's motion to adopt its proposed
confidentiality order, granted employer's motion for adoption
of its order, and entered employer's proposed order as its own,
with slight modifications. EEOC appealed.

**Holdings:** The Court of Appeals, Chagares, Circuit Judge,
held that:

[1] it was entirely appropriate for EEOC to investigate
employer's use of Assessment;

[2] district court's decision to narrow subpoena to include
only bagger, stocker, and/or cashier/checker positions was an
abuse of its discretion;

[3] district court misapplied relevance standard when it
limited EEOC's access to employer's information related only
to state where complainant applied, where it used the same
assessment in hiring nationwide;

[4] district court too narrowly circumscribed subpoena
when it instituted temporal limitation based on date of
complainant's application;

[5] district court's decision denying EEOC access to particular
materials unless they related only to that employer was
improper use of its discretion;

[6] EEOC's inquiry into whether assessment had adverse
racial impact was not reasonable expansion of charge
and its subpoena for materials related to race constituted
impermissible "fishing expedition"; and

[7] district court's entry of confidentiality order did not reflect
proper exercise of its discretion.

Affirmed in part and reversed in part; confidentiality order
vacated and remanded.

West Headnotes (23)

[1]    **Administrative Law and Procedure**
         ⬥ Scope
       Court of Appeals reviews district court's decision
       to enforce administrative subpoena for "abuse of
       discretion," which occurs when district court's
       decision rests upon a clearly erroneous finding
       of fact, errant conclusion of law or improper
       application of law to fact.

       1 Cases that cite this headnote

[2]    **Federal Courts**
         ⬥ Depositions and discovery
       Court of Appeals employs abuse of discretion
       standard when reviewing grant of confidentiality
       order.

       Cases that cite this headnote

[3]    **Civil Rights**
         ⬥ Charges and investigations
       Equal Employment Opportunity Commission's
       (EEOC's) statutory investigative authority is
       not plenary and EEOC is entitled to access

Case 09-10138-MFW    Doc 13487-3    Filed 05/05/14    Page 69 of 99

E.E.O.C. v. Kronos Inc., 620 F.3d 287 (2010)

110 Fair Empl.Prac.Cas. (BNA) 392, 93 Empl. Prac. Dec. P 43,981, 23 A.D. Cases 1105...

only evidence that is "relevant" to charge under investigation; courts have given broad construction to term and have traditionally allowed EEOC access to any material that might cast light on allegations against employer. National Labor Relations Act, § 11(1), 29 U.S.C.A. § 161(1); Civil Rights Act of 1964, §§ 706(b), 709(a), 710, 42 U.S.C.A. §§ 2000e–5(b), 2000e–8(a), 2000e–9; Americans with Disabilities Act of 1990, § 107(a), 42 U.S.C.A. § 12117(a).

6 Cases that cite this headnote

[4]    **Civil Rights**
⊷ Charges and investigations

Equal Employment Opportunity Commission's (EEOC's) power of investigation is anchored to charge of discrimination, and courts must be careful not to construe charge and relevance requirements so broadly as to confer unconstrained investigative authority upon EEOC. National Labor Relations Act, § 11(1), 29 U.S.C.A. § 161(1); Civil Rights Act of 1964, §§ 706(b), 709(a), 710, 42 U.S.C.A. §§ 2000e–5(b), 2000e–8(a), 2000e–9; Americans with Disabilities Act of 1990, § 107(a), 42 U.S.C.A. § 12117(a).

7 Cases that cite this headnote

[5]    **Civil Rights**
⊷ Charges and investigations

Equal Employment Opportunity Commission (EEOC) bears the burden of demonstrating relevance of evidence sought to charge under investigation. Civil Rights Act of 1964, § 709(a), 42 U.S.C.A. § 2000e–8(a).

Cases that cite this headnote

[6]    **Civil Rights**
⊷ Charges and investigations

Once Equal Employment Opportunity Commission (EEOC) begins investigation, it is not required to ignore facts that support additional claims of discrimination if it uncovers such evidence during course of reasonable

investigation of specific charge and has power to investigate broader picture of discrimination which unfolds. Civil Rights Act of 1964, § 709(a), 42 U.S.C.A. § 2000e–8(a).

6 Cases that cite this headnote

[7]    **Civil Rights**
⊷ Charges and investigations

Equal Employment Opportunity Commission (EEOC) is entitled to information that may provide a useful context for evaluating employment practices under investigation, in particular when such information constitutes comparison data. Civil Rights Act of 1964, § 709(a), 42 U.S.C.A. § 2000e–8(a).

1 Cases that cite this headnote

[8]    **Civil Rights**
⊷ Subpoenas and demands for production

In employment discrimination proceeding against supermarket chain initiated by charge of discrimination filed by hearing and speech impaired applicant for work as cashier, bagger and stocker in which Equal Employment Opportunity Commission (EEOC) applied to enforce administrative subpoena as to nonparty corporation that created "Customer Service Assessment" which employer used in its hiring process, district court's decision to narrow subpoena to include only bagger, stocker, and/or cashier/checker positions was an abuse of its discretion; employer purportedly used that assessment in hiring for every retail position, and information related to other job descriptions might shed light on whether assessment had adverse impact on persons with disabilities. National Labor Relations Act, § 11(1), 29 U.S.C.A. § 161(1); Civil Rights Act of 1964, §§ 706(b), 709(a), 710, 42 U.S.C.A. §§ 2000e–5(b), 2000e–8(a), 2000e–9; Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

Cases that cite this headnote

[9]    **Civil Rights**

🖙 Subpoenas and demands for production

In employment discrimination proceeding against supermarket chain initiated by charge of discrimination filed by hearing and speech impaired applicant for work as cashier, bagger and stocker in which Equal Employment Opportunity Commission (EEOC) applied to enforce administrative subpoena as to nonparty corporation that created "Customer Service Assessment" which employer used in its hiring process, district court misapplied relevance standard when it limited EEOC's access to supermarket chain's information related only to West Virginia, the state where complainant applied; chain used the same assessment in hiring nationwide, and nationwide data could provide important comparison data as well as useful context for evaluating whether employer's use of assessment violated the ADA. Civil Rights Act of 1964, § 709(a), 42 U.S.C.A. § 2000e–8(a); Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

Cases that cite this headnote

[10]     Civil Rights
         🖙 Subpoenas and demands for production

In employment discrimination proceeding against supermarket chain initiated by charge of discrimination filed by hearing and speech impaired applicant for work as cashier, bagger and stocker in which Equal Employment Opportunity Commission (EEOC) applied to enforce administrative subpoena as to nonparty corporation that created "Customer Service Assessment" which employer used in its hiring process, district court too narrowly circumscribed subpoena when it instituted temporal limitation based on date of complainant's application; duration of employer's use of test fell within scope of information that might cast light on practice under investigation, and evidence related to employment practice under investigation prior to and after complainant's charge provided valuable context that might assist EEOC in determining whether discrimination occurred. National Labor Relations Act, § 11(1), 29 U.S.C.A. § 161(1); Civil Rights Act of 1964, §§ 706(b), 709(a), 710,

42 U.S.C.A. §§ 2000e–5(b), 2000e–8(a), 2000e–9.

Cases that cite this headnote

[11]     Civil Rights
         🖙 Charges and investigations

Equal Employment Opportunity Commission's (EEOC's) investigatory power is broader than four corners of the charge; it encompasses not only factual allegations contained in charge, but also any information that is relevant to charge, and thus, EEOC need not cabin its investigation to literal reading of allegations in charge. National Labor Relations Act, § 11(1), 29 U.S.C.A. § 161(1); Civil Rights Act of 1964, §§ 706(b), 709(a), 710, 42 U.S.C.A. §§ 2000e–5(b), 2000e–8(a), 2000e–9.

6 Cases that cite this headnote

[12]     Civil Rights
         🖙 Subpoenas and demands for production

In employment discrimination proceeding against supermarket chain initiated by charge of discrimination filed by hearing and speech impaired applicant for work as cashier, bagger and stocker in which Equal Employment Opportunity Commission (EEOC) applied to enforce administrative subpoena as to nonparty corporation that created "Customer Service Assessment" which employer used in its hiring process, district court's decision denying EEOC access to particular materials unless they related only to supermarket chain that was subject of charge was improper use of its discretion; information pertaining to validity of test might shed light on charge of discrimination, even if it was not "performed specific(ally) for and only for" that employer, and could assist EEOC in evaluating whether employer's use of test constituted an unlawful employment action. National Labor Relations Act, § 11(1), 29 U.S.C.A. § 161(1); Civil Rights Act of 1964, §§ 706(b), 709(a), 710, 42 U.S.C.A. §§ 2000e–5(b), 2000e–8(a), 2000e–9.

1 Cases that cite this headnote

E.E.O.C. v. Kronos Inc., 620 F.3d 287 (2010)
110 Fair Empl.Prac.Cas. (BNA) 392, 93 Empl. Prac. Dec. P 43,981, 23 A.D. Cases 1105...

[13]  **Civil Rights**
  ⬤━ Charges and investigations

Equal Employment Opportunity Commission (EEOC) could investigate whether employer's use of "Customer Service Assessment" had adverse impact on people with disabilities, despite employer's contention that charge only alleged disparate treatment; charge did not contain legal theory, nor was charging party required to assert one. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; 29 C.F.R. § 1601.12(a, b).

Cases that cite this headnote

[14]  **Civil Rights**
  ⬤━ Subpoenas and demands for production

In employment discrimination proceeding against supermarket chain initiated by charge of discrimination filed by hearing and speech impaired applicant for work as cashier, bagger and stocker in which Equal Employment Opportunity Commission (EEOC) applied to enforce administrative subpoena as to nonparty corporation that created "Customer Service Assessment" which employer used in its hiring process, district court abused its discretion in limiting corporation's production of user's manual and instructions for assessment to those materials only actually provided to that employer; regardless of whether corporation actually provided that employer with those materials, they might aid EEOC in understanding assessment's potential for disparate impact on the disabled. Civil Rights Act of 1964, §§ 706(b), 709(a), 710, 42 U.S.C.A. §§ 2000e–5(b), 2000e–8(a), 2000e–9; Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

Cases that cite this headnote

[15]  **Civil Rights**
  ⬤━ Subpoenas and demands for production

In employment discrimination proceeding against supermarket chain initiated by charge of discrimination filed by hearing and speech impaired applicant for work as cashier, bagger and stocker in which Equal Employment

Opportunity Commission (EEOC) applied to enforce administrative subpoena as to nonparty corporation that created "Customer Service Assessment" which employer used in its hiring process, district court did not abuse its discretion in modifying subpoena to exclude materials concerning whether assessment had adverse racial impact; EEOC's request for "documents discussing, analyzing, or measuring potential adverse impact ... (on the basis of) race" was not relevant to, and would not shed light on, applicant's charge that chain discriminated against her based on disability, and its subpoena for materials related to race constituted impermissible "fishing expedition." Civil Rights Act of 1964, §§ 706(b), 709(a), 710, 42 U.S.C.A. §§ 2000e–5(b), 2000e–8(a), 2000e–9; Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

Cases that cite this headnote

[16]  **Records**
  ⬤━ Court records

Courts have inherent equitable power to grant orders of confidentiality upon showing of good cause.

1 Cases that cite this headnote

[17]  **Records**
  ⬤━ Court records

Party seeking confidentiality establishes good cause by showing that disclosure will work a clearly defined and serious injury to party seeking disclosure; injury must be shown with specificity, and broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not support good cause showing.

2 Cases that cite this headnote

[18]  **Records**
  ⬤━ Court records

Burden of justifying confidentiality remains at all times on party seeking order.

E.E.O.C. v. Kronos Inc., 620 F.3d 287 (2010)

110 Fair Empl.Prac.Cas. (BNA) 392, 93 Empl. Prac. Dec. P 43,981, 23 A.D. Cases 1105...

1 Cases that cite this headnote

**[19]    Records**
    &#10142; Court records

Courts deciding whether party has established good cause to grant order of confidentiality should balance public interests against private interests; factors that courts may consider as part of good cause balancing test are (1) whether disclosure will violate any privacy interests, (2) whether the information is being sought for a legitimate purpose or an improper purpose, (3) whether disclosure of the information will cause a party embarrassment, (4) whether confidentiality is being sought over information important to public health and safety, (5) whether sharing of information among litigants will promote fairness and efficiency, (6) whether party benefiting from order of confidentiality is public entity or official, and (7) whether case involves issues important to public.

6 Cases that cite this headnote

**[20]    Records**
    &#10142; Court records

Under good cause balancing test, there is strong presumption against entering order of confidentiality whose scope would prevent disclosure of information that would otherwise be accessible under relevant freedom of information law.

4 Cases that cite this headnote

**[21]    Records**
    &#10142; Court records

When district court fails to conduct a good cause balancing test before issuing order of confidentiality, that court has failed to exercise properly its discretion.

Cases that cite this headnote

**[22]    Records**
    &#10142; Court records

District court's entry of wide-reaching confidentiality order in Equal Employment Opportunity Commission (EEOC) proceeding did not reflect proper exercise of its discretion, absent indication it conducted required good cause balancing test before entering that order.

Cases that cite this headnote

**[23]    Records**
    &#10142; Court records

Courts must exercise caution when issuing confidentiality orders so as not to demand that Equal Employment Opportunity Commission (EEOC) destroy government documents, including notes and memoranda, in conflict with EEOC's duty to obey requirements of Federal Records Disposal Act (FRDA). 44 U.S.C.A. § 3301 et seq.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*291**  Corbett Anderson, Esq. (Argued), Equal Employment Opportunity Commission, Washington, DC, Lisa H. Hernandez, Esq., Equal Employment Opportunity Commission, Pittsburgh, PA, for Appellant.

**\*292**  Robert L. Ashe, Jr., Esq. (Argued), Ashe, Rafuse & Hill, Atlanta, GA, Terrance H. Murphy, Esq., Buchanan Ingersoll & Rooney, Pittsburgh, PA, for Appellee.

Rae T. Vann, Norris, Tysse, Lampley & Lakis, LLP, Washington, DC, for Amici Curiae.

Before CHAGARES, STAPLETON, and LOURIE [*], Circuit Judges.

**Opinion**

## OPINION

CHAGARES, Circuit Judge.

On March 18, 2009, the Equal Employment Opportunity Commission (the "EEOC" or the "Commission") filed a Subpoena Enforcement Application in the United States

110 Fair Empl.Prac.Cas. (BNA) 392, 93 Empl. Prac. Dec. P 43,981, 23 A.D. Cases 1105...

District Court for the Western District of Pennsylvania, seeking enforcement of a third-party administrative subpoena it issued to Kronos Incorporated ("Kronos") pertaining to the EEOC's investigation into a charge of discrimination against Kroger Food Stores ("Kroger"). On June 1, 2009, the District Court issued an order narrowing the scope of the subpoena and directing the parties to negotiate a confidentiality order. On July 22, 2009, the District Court denied the EEOC's motion to adopt its proposed confidentiality order, granted Kronos's motion for adoption of its order, and entered Kronos's proposed order as the court's own, with slight modifications. The EEOC appeals from both of these orders. For the reasons stated below, we will affirm in part and reverse in part the District Court's order of June 1, 2009 modifying the scope of the subpoena. We will vacate the District Court's July 22, 2009 confidentiality order and remand for further proceedings.

## I.

Vicky Sandy, who is hearing and speech impaired, filed a charge of discrimination with the EEOC against Kroger on or about June 30, 2007. According to her charge, Sandy applied for work as a cashier, bagger, and stocker in May 2007 at a Kroger in Clarksburg, West Virginia. She alleged that Kroger did not hire her because of her disability, in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"). Sandy alleged that "[i]n May, 2007, a management official (name unknown) told me that I would not be a good fit for any openings because of the way that I speak. After denying me employment, they continued to advertise for openings." Joint Appendix ("JA") 23.

Kroger utilizes a Customer Service Assessment, created by Kronos (the "Assessment" or "Kronos Assessment"), in its hiring process.[1] The Assessment purports to "measure[ ] the human traits that underlie strong service orientation and interpersonal skills, such as: Controlling impatience; Showing respect; Listening attentively; Working well on a team; [and] Being sensitive to others' feelings." JA 25. According to Kronos, applicants who perform well on the assessment are more likely to "[a]ct cheerful, polite, and friendly ... [l]isten carefully ... and ... [c]ommunicate well with customers." JA 26. Sandy's score on the Assessment was 40%. JA 33.

**\*293** According to Kroger's position statement in response to Sandy's charge, the store manager, Bob Bowers,

interviewed Sandy for the open positions. Kroger alleged that during the interview, "Bowers had difficulty in understanding [Sandy's] verbal responses to questions" and found her responses to be "garbled and at times inaudible and unintelligible." JA 39. Kroger also noted that Bowers discussed with Sandy her low score on the Kronos Assessment and her lack of job experience.

Kroger provided the EEOC with a copy of Sandy's employment application summary. The portion summarizing the results of the Kronos Assessment provides, *inter alia,* that Sandy "is less likely to ... listen carefully, understand and remember." JA 33. The summary contains an "Interview Guide" that lists suggested follow-up questions. Sandy's follow-up questions include, "Describe the hardest time you've had understanding what someone was talking about." Sandy's application summary also suggests observations the interviewer should make, such as "How does the applicant speak during the interview[?] Listen for: Correct language, clear enunciation, appropriate volume/tone/expression/smile/eye contact." JA 33.

After Kroger admitted in its position statement that it relied at least in part on the Assessment in its hiring decision, the EEOC sent Kroger a request for information ("RFI"), dated January 16, 2008, seeking several categories of documents related to the Assessment and its use. Included was a request for copies of "any and all validity studies" and information pertaining to applications for the position of "Cashier Bagger" going back to January 1, 2007. JA 42. The RFI asked that Kroger provide the information on or before February 12, 2008—the date of the EEOC investigator's planned site-visit.

Kroger responded to the RFI on February 14, 2008, but failed to provide all of the information requested, including validity studies. The EEOC contends that it was not sure at that point whether Kroger had access to Kronos's validity studies. JA 103 n. 5.

On March 11, 2008, the EEOC issued a third-party administrative subpoena to Kronos. The subpoena sought validity studies related to the Kronos tests Kroger purchased, instruction manuals for the assessment tests Kroger used, documents related to Kroger, "and any validation efforts made regarding any or all jobs" at Kroger, any documents related to potential adverse impact on people with disabilities, and job analyses related to "any and all positions" at Kroger. JA 48–49.

E.E.O.C. v. Kronos Inc., 620 F.3d 287 (2010)
110 Fair Empl.Prac.Cas. (BNA) 392, 93 Empl. Prac. Dec. P 43,981, 23 A.D. Cases 1105...

The EEOC later notified Kroger that it was expanding the scope of its ADA investigation:

> Based upon its authority, the [EEOC] hereby serves notice that the above referenced charge has been expanded to include the issue of disability with respect to the use of assessment test in hiring (class) during the period August 1, 2006 to the present and for all facilities in the United States and its territories.

JA 54.

According to the EEOC, around this time it discovered an article, co-written by a Kronos employee, which indicated that minority applicants performed worse than non-minority applicants on the Kronos Assessment administered by a large, geographically diverse retailer. Further, the EEOC maintains that its charge database contained complaints against Kroger alleging failure to hire based on disability and race.

Based on these circumstances, the EEOC sent Kroger a letter informing it *294 that the EEOC was expanding its investigation once again, this time to include race:

> Based upon its authority, the [EEOC] hereby serves notice that the above referenced charge has been expanded to include the basis of disability and race (black) with respect to the issues of the use of assessment tests ... in hiring (class) for the period beginning from the date that such test(s) were implemented by [Kroger] through the present and for all facilities in the United States and its territories.

JA 56. The EEOC rescinded its original subpoena to Kronos and issued a new subpoena directing that Kronos:

1. Produce any and all documents and data constituting or related to validation studies or validation evidence pertaining to Unicru [a Kronos subsidiary] and/or Kronos assessment tests purchased by The Kroger Company, including but not limited to such studies or evidence as they relate to the use of the tests as personnel selection or screening instruments.

2. Produce the user's manual and instructions for the use of the Assessment Tests used by The Kroger Company[.]

3. Produce any and all documents and data, including but not limited to correspondence, notes, and data files, relating to the Kroger Company; its use of the Assessment Tests; results, ratings, or scores of individual test-takers; and any validation efforts made thereto.

4. Produce any and all documents discussing, analyzing or measuring potential adverse impact on individuals with disabilities and/or an individuals [sic] race.

5. Produce any and all documents related to any and all job analyses created or drafted by any person or entity relating to any and all positions at The Kroger Company.

6. Furnish a catalogue which includes each and every assessment offered by Unicru/Kronos. Additionally provide descriptions of each assessment.[2]

JA 51–52.

Kronos filed a Petition to Revoke the Subpoena with the EEOC, objecting that the subpoena "requests information that is: (1) not relevant to any allegation made in [Sandy's] Charge, and (2) constitutes [sic] commercially valuable and trade secret property of Kronos, which the EEOC seeks without adequate protection." JA 59. The EEOC denied the Petition to Revoke on January 7, 2009 and ordered Kronos to comply with the subpoena. The EEOC determined that the information the subpoena requested was directly relevant to its properly expanded investigation and "well within the [EEOC]'s investigative authority." JA 108. It further concluded that Title VII of the Civil Rights Act of 1964 ("Title VII"), the ADA, and the EEOC's regulations regarding confidentiality of information obtained during an investigation provided sufficient protection against disclosure without a confidentiality agreement.

When Kronos failed to comply with the subpoena, the EEOC filed a Subpoena Enforcement Action, which the District Court granted in part and denied in part. The District Court characterized the subpoena's scope as "breathtaking— potentially including most of Kronos' business documents, covering its entire client base, with no time, geographic, or job description limitations." JA 5 (footnotes omitted). The District Court determined that materials unrelated to Sandy's discrimination charge *295 were not relevant to the

Case 09-10138-MFW    Doc 13487-3    Filed 05/05/14    Page 75 of 99

**E.E.O.C. v. Kronos Inc., 620 F.3d 287 (2010)**

110 Fair Empl.Prac.Cas. (BNA) 392, 93 Empl. Prac. Dec. P 43,981, 23 A.D. Cases 1105...

investigation. The District Court modified the subpoena to include only Kronos's work for Kroger limited to the time period of January 1, 2006 to May 31, 2007, the state of West Virginia, and the job positions of bagger, stocker, and/ or cashier/checker. Specifically, the District Court ordered Kronos to comply with the following provisions:

1. Produce any user's manual and instructions for the use of the Assessment Tests provided to the Kroger Company.

2. Produce any and all documents and data, including but not limited to correspondence, notes, and data files, relating to The Kroger Company; The Kroger Company's use of the Assessment Tests; results, ratings, or scores of individual test-takers at The Kroger Company; and any validation efforts performed specific[ally] for and only for The Kroger Company.

3. Produce any and all documents discussing, analyzing or measuring potential adverse impact on individuals with disabilities, relating specifically to and only to the Kroger Company.

4. Produce any and all documents related to any and all job analyses created or drafted by Kronos relating to the bagger, stocker, and/or cashier/checker positions at The Kroger Company.

5. Furnish any catalogue provided to The Kroger Company.

6. Items 1 through 5 are limited to the time period of January 1, 2006 through May 31, 2007, in the state of West Virginia, for the positions of bagger, stocker, and/or cashier/checker.

JA 5–6.

The District Court also ordered the parties to enter into "any appropriate confidentiality order to protect any trade secret/confidential information of Kronos and the personal information of persons taking the Assessment Tests." JA 6. The parties negotiated and agreed to certain provisions of a confidentiality order, but failed to arrive at an agreement regarding other terms Kronos requested, including: 1) a limitation confining the use of confidential material to the investigation of Sandy's allegations against Kroger and any subsequent charge she may file; 2) a restriction that during the investigation, confidential material may be disclosed only to EEOC employees with a "need to know" and any other person mutually agreed upon by Kronos and the EEOC; and 3) a requirement that the EEOC return confidential material within ten business days after concluding the Sandy investigation, and destroy any documents, including EEOC notes or memoranda, that reflect or refer to the confidential material within ten business days after a notice of right to sue.

Both parties submitted proposed confidentiality orders to the District Court. On July 22, 2009, the court denied the EEOC's motion to adopt its proposed confidentiality order and granted Kronos's motion for entry of its proposed confidentiality order. The court added an additional term to the Kronos order: "Said confidential material shall not be entered into a centralized database." JA 9.

The EEOC appeals both decisions of the District Court.

## II.

[1] [2] The District Court exercised jurisdiction under 29 U.S.C. § 161(2) and 28 U.S.C. §§ 1331 and 1345. This Court has jurisdiction pursuant to 28 U.S.C. § 1291. We review a district court's decision to enforce an administrative subpoena for abuse of discretion. *Chao v. Cmty. Trust Co.,* 474 F.3d 75, 79 (3d Cir.2007). We also employ an abuse of discretion standard when reviewing the grant of a confidentiality order. *Pansy v. Borough of Stroudsburg,* 23 F.3d 772, 783 (3d Cir.1994). "Abuse of discretion occurs when 'the district **\*296** court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact.' " *Chao,* 474 F.3d at 79 (quoting *NLRB v. Frazier,* 966 F.2d 812, 815 (3d Cir.1992)).

## III.

### A.

The ADA prohibits, *inter alia,* use of employment tests that "screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the ... test ..., as used by the [employer], is shown to be job-related for the position in question and is consistent with business necessity." 42 U.S.C. § 12112(b)(6); *see also* 42 U.S.C. § 12112(b)(7) (defining "discriminate" to include "failing to select and administer tests concerning employment in the most effective manner to ensure that, when such test is administered to a job applicant or employee who has a disability that impairs sensory, manual, or speaking skills,

Case 09-10138-MFW    Doc 13487-3    Filed 05/05/14    Page 76 of 99

E.E.O.C. v. Kronos Inc., 620 F.3d 287 (2010)
110 Fair Empl.Prac.Cas. (BNA) 392, 93 Empl. Prac. Dec. P 43,981, 23 A.D. Cases 1105...

such test results accurately reflect the skills, aptitude, or whatever other factor of such applicant or employee that such test purports to measure, rather than reflecting the impaired sensory, manual, or speaking skills of such employee or applicant...."). "Both disparate treatment and disparate impact claims are cognizable under the ADA." *Raytheon Co. v. Hernandez,* 540 U.S. 44, 53, 124 S.Ct. 513, 157 L.Ed.2d 357 (2003).

[3]    The EEOC is empowered to investigate charges of discrimination to determine whether there is reasonable cause to believe that an employer has engaged in an unlawful employment practice.[3] *See* 42 U.S.C. §§ 2000e–5(b), 12117(a) (expanding the EEOC's power to investigate and address discrimination on the basis of disability). In connection with its investigation, the EEOC may issue administrative subpoenas. *See id.* § 2000e–9; 29 U.S.C. § 161(1). However, the EEOC's statutory investigative authority is not plenary; the EEOC is entitled to access only evidence "relevant to the charge under investigation." 42 U.S.C. § 2000e–8(a).[4]

[4]    [5]    The relevance requirement is not particularly onerous. Courts have given broad construction to the term "relevant" and have traditionally allowed the EEOC access to any material that "might cast light on the allegations against the employer." *EEOC v. Shell Oil Co.,* 466 U.S. 54, 68–69, 104 S.Ct. 1621, 80 L.Ed.2d 41 (1984); *see also EEOC v. Dillon Cos., Inc.,* 310 F.3d 1271, 1274 (10th Cir.2002) ("The Supreme Court has explained that the 'relevancy' limitation on the EEOC's investigative authority is 'not especially constraining.' " (quoting *Shell Oil,* 466 U.S. at 68, 104 S.Ct. 1621)); *EEOC v. Ford Motor Credit Co.,* 26 F.3d 44, 47 (6th Cir.1994) (noting that "Congress intended [the EEOC] to have broad access to information relevant to inquiries it is mandated to conduct"); *EEOC v. Franklin & Marshall Coll.,* 775 F.2d 110, 116 (3d Cir.1985) ("The *297 concept of relevancy is construed broadly when a charge is in the investigatory stage."). Nonetheless, the EEOC's power of investigation is anchored to the charge of discrimination, and courts must be careful not to construe the charge and relevance requirements so broadly as to confer "unconstrained investigative authority" upon the EEOC. *Shell Oil,* 466 U.S. at 64–65, 104 S.Ct. 1621; *see also EEOC v. United Air Lines, Inc.,* 287 F.3d 643, 653 (7th Cir.2002). The relevance requirement "is designed to cabin the EEOC's authority and prevent fishing expeditions." *United Air Lines,* 287 F.3d at 653 (quotation marks omitted). The EEOC bears

the burden of demonstrating relevance. *See EEOC v. S. Farm Bureau Cas. Ins. Co.,* 271 F.3d 209, 211 (5th Cir.2001).

[6]    Once the EEOC begins an investigation, it is not required to ignore facts that support additional claims of discrimination if it uncovers such evidence during the course of a reasonable investigation of the charge. *See, e.g., Gen. Tel. Co. of the N.W., Inc. v. EEOC,* 446 U.S. 318, 331, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980) ("Any violations that the EEOC ascertains in the course of a reasonable investigation of the charging party's complaint are actionable."); *EEOC v. Cambridge Tile Mfg. Co.,* 590 F.2d 205, 206 (6th Cir.1979) (per curiam) (enforcing EEOC subpoena seeking information related to sex discrimination in job classification after EEOC uncovered evidence of such discrimination during investigation of allegations of sex and race discrimination in termination); *EEOC v. Gen. Elec. Co.,* 532 F.2d 359, 364–65 (4th Cir.1976) ("[T]he original charge is sufficient to support action by the EEOC ... for any discrimination stated in the charge itself or developed in the course of a reasonable investigation of that charge...."). Rather, the EEOC has the power to investigate a "broader picture of discrimination which unfolds in the course of a reasonable investigation of a specific charge." *Cambridge Tile,* 590 F.2d at 206.

**B.**

The EEOC argues on appeal that, by narrowing the subpoena's scope rather than enforcing it as written, the District Court abused its discretion. The EEOC contends that the information it sought in the subpoena is relevant because it might cast light on Sandy's allegations against Kroger, and thus meets the liberal standard of relevance the Supreme Court espoused in *Shell Oil.* In particular, the EEOC argues that the scope of Kroger's use of the Kronos Assessment —"nationwide (not just 'the state of West Virginia'), for all retail jobs (not just for 'baggers, stockers, and/or cashiers/checkers'), from whatever date Kroger began using the test to the present (not just from 'January 1, 2006 through May 31, 2007')"—is relevant as to whether Kroger discriminated against Sandy individually and/or as a member of a class of individuals with disabilities adversely impacted by the Kronos Assessment test. EEOC Br. at 19. The EEOC also asserts that Kronos Assessment instructions and manuals are relevant (regardless of whether Kronos actually provided them to Kroger), as are materials related to validation studies and potential adverse impact based on disability, even if such materials are not specific to Kroger's use of the test. We

Case 09-10138-MFW    Doc 13487-3    Filed 05/05/14    Page 77 of 99

E.E.O.C. v. Kronos Inc., 620 F.3d 287 (2010)
110 Fair Empl.Prac.Cas. (BNA) 392, 93 Empl. Prac. Dec. P 43,981, 23 A.D. Cases 1105...

agree. The District Court applied too restrictive a standard of relevance in limiting the information related to geography, time, and job position. Further, the District Court erred in limiting the EEOC's access to user's manuals and instructions, validation information, and materials pertaining to potential adverse impact on individuals with disabilities.

[7] Sandy's charge alleges failure to hire based on her disability. Kroger admitted *298 to relying at least in part on the Kronos Assessment in evaluating Sandy.[5] In order for the EEOC to determine whether Kroger's failure to hire Sandy was discriminatory, it is entirely appropriate for the EEOC to investigate Kroger's use of the Assessment. The EEOC is entitled to information that "may provide a useful context" for evaluating employment practices under investigation, in particular when such information constitutes comparison data. *EEOC v. Univ. of Pittsburgh,* 643 F.2d 983, 985–86 (3d Cir.1981) (holding EEOC request for faculty employment records of four related schools was relevant to charge of sex discrimination in the School of Nursing, especially because the School of Nursing faculty was almost entirely female); *see also EEOC v. Associated Dry Goods Corp.,* 449 U.S. 590, 604, 101 S.Ct. 817, 66 L.Ed.2d 762 (1981) ("Statistics and other information about an employer's general practices may certainly be relevant to individual charges of discrimination...."); *Franklin & Marshall Coll.,* 775 F.2d at 116–17 (holding materials related to other tenure candidates in a "similar time frame" were "relevant and not overbroad" in EEOC's investigation of charge alleging discriminatory denial of tenure because they might provide useful comparison data and help determine whether there was a "pattern of discrimination"). In this case, information pertaining to Kroger's actual use of the Kronos Assessment may provide "useful context" and important comparative data for the EEOC's investigation into Sandy's charge of discrimination.

[8] The District Court's decision to narrow the subpoena to include only bagger, stocker, and/or cashier/checker positions was an abuse of its discretion. Kroger purportedly uses the Kronos Assessment in hiring for every retail position. JA 104. Under the *Shell Oil* relevance standard, there is no reason to confine the subpoena to Kroger's use of the Assessment for bagger, stocker, and/or cashier/checker positions. Information related to other job descriptions may shed light on whether the Assessment has an adverse impact on persons with disabilities. Such data, at the very least, provides comparative information on the Assessment, which is "absolutely essential to a determination of discrimination."

*EEOC v. Roadway Express, Inc.,* 261 F.3d 634, 642 (6th Cir.2001) (quotation marks omitted) (holding that the EEOC was entitled to information related to job positions other than those at issue in the charge because such information met the *Shell Oil* standard of relevance).

[9] For the same reason, the District Court misapplied the relevance standard when it limited the EEOC's access to Kroger's information related only to the state of West Virginia. Kroger uses the Kronos Assessment in hiring nationwide. JA 104. An employer's nationwide use of a practice under investigation supports a subpoena for nationwide data on that practice. *EEOC v. United Parcel Serv. Inc.,* 587 F.3d 136, 139 (2d Cir.2009) (per curiam) (enforcing EEOC subpoena seeking information on how employer applied appearance guidelines nationwide in EEOC investigation of two complaints of religious discrimination). Here, nationwide materials could provide important comparison data, as well as a "useful context" for *299 evaluating whether Kroger's use of the Assessment violates the ADA. *See Univ. of Pittsburgh,* 643 F.2d at 985–86.

[10] The District Court also too narrowly circumscribed the subpoena when it instituted the temporal limitation of January 1, 2006 through May 31, 2007. Although the relevance requirement does impose temporal limits on the scope of the EEOC's inquiry, the duration of Kroger's use of the Kronos test falls within the scope of information that might cast light on the practice under investigation. Evidence related to the employment practice under investigation prior to and after Sandy's charge provides valuable context that may assist the EEOC in determining whether discrimination occurred. *Roadway Express,* 261 F.3d at 642 (enforcing EEOC subpoena for information both before the alleged discrimination took place and after the charge of discrimination).

[11] Kronos argues that the EEOC is not entitled to the information it seeks because Sandy's charge is completely devoid of any allegations of nationwide discrimination and discrimination in job positions other than those for which she applied. Kronos's argument fails to recognize that the EEOC's investigatory power is broader than the four corners of the charge; it encompasses not only the factual allegations contained in the charge, but also any information that is relevant to the charge. Thus, the EEOC need not cabin its investigation to a literal reading of the allegations in the charge. As we have acknowledged, "[t]he

concept of relevancy is construed broadly when a charge is in the investigatory stage." *Franklin & Marshall Coll.,* 775 F.2d at 116; *see also Univ. of Pittsburgh,* 643 F.2d at 986 ("The investigatory powers of the EEOC should be interpreted broadly."). The EEOC does not seek "information or materials related to assessment tests Kroger has never purchased and has never used." EEOC Reply Br. at 12. The requested materials are not so broad as to render the relevance requirement a "nullity." *See Shell Oil,* 466 U.S. at 69, 104 S.Ct. 1621 (noting that courts must not interpret the standard of relevance so broadly that it becomes a "nullity"). We decline Kronos's invitation to cabin the EEOC's investigation such that it is unable to access materials that meet the *Shell Oil* relevance standard—that is, materials that might cast light on Sandy's charge of discrimination.

[12]    The District Court's decision denying the EEOC access to particular materials unless they relate only to Kroger was an improper use of its discretion. The District Court limited production of "documents discussing, analyzing, or measuring potential adverse impact on individuals with disabilities" to those "relating specifically to and only to The Kroger Company." JA 6. The court also modified the subpoena to limit production of validation study information to validation efforts "performed specific[ally] for and only for Kroger." JA 5–6. Such information, regardless of whether it was "performed specifically for" or "relat[es] specifically to and only to" Kroger, certainly might shed light on the charge of discrimination. If Kronos has information relating to whether its Assessment has an adverse impact on disabled people, that information is clearly relevant to whether Kroger violated the ADA by using the Assessment. Additionally, information pertaining to the validity of the test, even if it was not "performed specific[ally] for and only for Kroger," could assist the EEOC in evaluating whether Kroger's use of the test constituted an unlawful employment action. Modifying the subpoena to exclude these materials was a misapplication of the broad relevance standard that accompanies the EEOC's subpoena authority.

*300    [13]    Kronos argues that Sandy alleged disparate treatment in her charge but failed to allege disparate impact, and thus the EEOC is not entitled to investigate whether Kroger's use of the Assessment has an adverse impact on people with disabilities. We disagree. Sandy's charge does not contain a legal theory, nor was she required to assert one. *See* 29 C.F.R. § 1601.12(a)–(b) (requiring, *inter alia,* a "clear and concise statement of the facts" related to the alleged unlawful employment practices and noting that a

charge that "describe[s] generally the action complained of" is sufficient). We have recognized that the individuals who draft charges are often "not well vested in the art of legal description" and as a result, "the scope of the original charge should be liberally construed." *Hicks v. ABT Assocs., Inc.,* 572 F.2d 960, 965 (3d Cir.1978); *see also Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 462–63 & n. 4 (5th Cir.1970) (noting that a layperson filling out a charge of discrimination might have difficulty articulating legal basis for alleged discrimination); *EEOC v. E.I. DuPont de Nemours & Co.,* 373 F.Supp. 1321, 1335 (D.Del.1974) (explaining that the "precise language of the charge ... provides less guidance for subsequent proceedings than the general character of the grievances to which the charge alludes" and that the charge is often drawn by a layperson who "perceives only dimly the nature and cause of the discrimination"), *aff'd on other grounds,* 516 F.2d 1297 (3d Cir.1975). It is entirely possible that Sandy was not fully aware of the extent to which Kroger relied on the test in evaluating her application, and thus did not perceive the potential impact the test had on Kroger's decision not to hire her. In any event, it is up to the EEOC, not Sandy, to investigate whether and under what legal theories discrimination might have occurred.

[14]    Finally, the District Court abused its discretion in limiting Kronos's production of the user's manual and instructions for the Assessment to those materials only actually provided to Kroger. We agree with the EEOC that regardless of whether Kronos actually provided Kroger with user's manuals and instructions, the materials may aid the EEOC in understanding the Assessment's potential for disparate impact on the disabled.

For the foregoing reasons, we will reverse the District Court's judgment insofar as it limited the scope of the EEOC's subpoena in terms of geography, time, and job description. We will also reverse to the extent that the District Court's order limits the EEOC's access to validation efforts conducted solely on behalf of Kroger, documents relating to potential adverse impact on disabled individuals to those relating specifically and only to Kroger, and user's manuals and instructions for the Assessment that were actually provided to Kroger.

### C.

[15]    We now turn to the EEOC's request for "documents discussing, analyzing or measuring potential adverse

E.E.O.C. v. Kronos Inc., 620 F.3d 287 (2010)
110 Fair Empl.Prac.Cas. (BNA) 392, 93 Empl. Prac. Dec. P 43,981, 23 A.D. Cases 1105...

impact ... [on the basis of] race." JA 52. The EEOC argues that it is entitled to this information as part of a properly expanded investigation of Sandy's charge and that the District Court abused its discretion in modifying its subpoena to exclude such materials. We disagree.[6]

*301 According to the EEOC, it expanded the investigation to include potential race discrimination because it discovered a scholarly article, co-written by a Kronos employee, suggesting that minority applicants performed worse than non-minorities on the Kronos Assessment. The EEOC also contends that it discovered in its database charges against Kroger alleging race discrimination in hiring. According to the EEOC, this constitutes evidence that the Assessment might be a potential "root source of discrimination" against people with disabilities and African Americans, and is thus a legitimate basis for it to expand its investigation into discrimination based on race. *See Gen. Elec. Co.*, 532 F.2d at 366 n. 9 (" 'The Commission need not confine itself to the particular symptom of discrimination identified by a charge if a reasonable investigation of that charge uncovers a root source of discrimination responsible for that and other violations of Title VII.' " (quoting *DuPont de Nemours & Co.*, 373 F.Supp. at 1335)). For support, the EEOC cites to *General Electric Co.*, 532 F.2d at 364–66, in which the Court of Appeals for the Fourth Circuit held that the original charge of race discrimination supported EEOC action (including a lawsuit) to address sex discrimination that the EEOC uncovered while investigating the race discrimination charge.

Kronos responds that the District Court did not abuse its discretion in limiting the subpoena to exclude information related to adverse impact based on race. Kronos cites to *EEOC v. Southern Farm Bureau Casualty Insurance Co.*, 271 F.3d 209 (5th Cir.2001), in support of its argument. In *Southern Farm*, an employee filed a charge with the EEOC alleging that Southern Farm had discriminated against him based on race. During the EEOC's investigation, Southern Farm provided the EEOC with a list of employees by name, position, and race. Based on this list, the EEOC suspected potential sex discrimination, and issued a subpoena requesting certain information related to possible unlawful employment practices based on sex. *Id.* at 211.

The Court of Appeals for the Fifth Circuit affirmed the district court's refusal to enforce the EEOC subpoena for information relating to potential sex discrimination. In affirming the district court's decision, the *Southern Farm* court noted that

when the EEOC discovered what it considered to be evidence of sex discrimination, it could have exercised its authority under 42 U.S.C. §§ 2000e–5(b) and 2000e–6(e) to file a commissioner's charge alleging sex discrimination. At that point, the EEOC would have been free to request information relevant to Southern Farm's employment of women. *Id.*

While the EEOC is not required to ignore facts it uncovers in the course of a reasonable investigation of the charging party's complaint, that standard does not justify the expansion of the investigation undertaken here. The charging party is a disabled white female who has complained of disability discrimination. We are unprepared to hold that a reasonable investigation of that charge can be extended to include an investigation of race discrimination.

We conclude that the inquiry into potential race discrimination is not a reasonable expansion of Sandy's charge. Instead, the EEOC's subpoena for materials related to race constitutes an impermissible "fishing expedition." *See United Air Lines*, 287 F.3d at 653. The EEOC's attempt to rely on an article in the public domain and *302 purported charges of race discrimination in its database that are not a part of this record do not convince us otherwise. We acknowledge that the EEOC's investigatory powers are expansive; however, the EEOC is still not permitted to "wander[ ] into wholly unrelated areas." *See Cambridge Tile*, 590 F.2d at 206. In this case, the EEOC's inquiry into discrimination based on race is wholly unrelated to Sandy's charge and does not fall within the ambit of a reasonable expansion.[7]

For these reasons, we will affirm the District Court's judgment to the extent that it declines to enforce the portion of the EEOC's subpoena requesting information related to potential discrimination based on race.

## IV.

[16]    [17]    [18]    Courts have "inherent equitable power" to grant orders of confidentiality upon a showing of good cause. *Pansy*, 23 F.3d at 785–86. The party seeking confidentiality establishes good cause by showing that " 'disclosure will work a clearly defined and serious injury to the party seeking closure. The injury must be shown with specificity.' " *Id.* at 786 (quoting *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1071 (3d Cir.1984)). " 'Broad allegations of harm, unsubstantiated by specific examples or articulated

**E.E.O.C. v. Kronos Inc., 620 F.3d 287 (2010)**

110 Fair Empl.Prac.Cas. (BNA) 392, 93 Empl. Prac. Dec. P 43,981, 23 A.D. Cases 1105...

reasoning,' do not support a good cause showing." *Id.* (quoting *Cipollone v. Liggett Group, Inc.,* 785 F.2d 1108, 1121 (3d Cir.1986)). The burden of justifying confidentiality remains at all times on the party seeking the order. *Pearson v. Miller,* 211 F.3d 57, 72 (3d Cir.2000).

[19]    [20]    [21]    In *Pansy,* we held that courts deciding whether a party has established good cause should balance public interests against private interests. *Pansy,* 23 F.3d at 787. We recognized several factors that courts may consider as part of this "good cause balancing test":

> 1) whether disclosure will violate any privacy interests;
>
> 2) whether the information is being sought for a legitimate purpose or an improper purpose;
>
> 3) whether disclosure of the information will cause a party embarrassment;
>
> 4) whether confidentiality is being sought over information important to public health and safety;
>
> 5) whether the sharing of information among litigants will promote fairness and efficiency;
>
> 6) whether a party benefitting from the order of confidentiality is a public entity or official; and
>
> 7) whether the case involves issues important to the public.

*Glenmede Trust Co. v. Thompson,* 56 F.3d 476, 483 (3d Cir.1995) (citing *Pansy,* 23 F.3d at 787–91). Under the good cause balancing test, there is a strong presumption against entering an order of confidentiality whose scope would prevent disclosure of information that would otherwise be accessible under a relevant freedom of information law. *Pansy,* 23 F.3d at 791. When a district court fails to conduct a good cause balancing test before issuing an order of confidentiality, that court has failed to exercise properly its discretion. *Id.* at 792.

In this case, the District Court entered a wide-reaching confidentiality order which defines "Confidential Material" as:

> any documents or information in any form produced by Kronos pursuant to **\*303** [the subpoena] or any information or documents that refer to or reflect information obtained from the documents or refer to

> or reflect information provided by Kronos pursuant to the Subpoena, including copies, notes or memoranda made by the EEOC during the Commission's investigation into the allegations made by Vicky Sandy and any subsequent or amended charge she may file.

JA 8. The order limits the use of Confidential Material solely for the purpose of Sandy's charge. It permits disclosure only to EEOC employees with a "need to know" and other individuals Kronos and the EEOC agree upon in writing. The District Court prohibited the EEOC from entering Confidential Material into a centralized database. The order prohibits the EEOC from disclosing the documents Kronos produces, and the information contained therein, to the charging party or her agents. The order also provides that:

> All Confidential Material, including copies thereof, will be returned by EEOC to Kronos within ten (10) business days after the investigation into [Sandy's charge] is concluded by EEOC. Any information or documents that reflect or refer to Confidential Material, including any notes or memoranda made by EEOC shall be destroyed by EEOC within ten (10) business days after a notice of right to sue is issued by EEOC, and such destruction shall be so certified to Kronos.

JA 9.

The EEOC appeals entry of the confidentiality order. [8] The EEOC argues that sufficient statutory and regulatory protection exists to safeguard confidential material without the confidentiality order and that the order's definition of Confidential Material is overbroad. In addition, the EEOC urges that the order is contrary to the EEOC's disclosure obligations under the Freedom of Information Act, 5 U.S.C. §§ 551–559, and its limitations on the EEOC's use of the subpoenaed material impermissibly interferes with the EEOC's law enforcement function.

[22]    The District Court did not articulate its reasoning for granting the order and its rationale for exercising its broad discretion to fashion the order by imposing the specific terms

Case 09-10138-MFW    Doc 13487-3    Filed 05/05/14    Page 81 of 99

E.E.O.C. v. Kronos Inc., 620 F.3d 287 (2010)
110 Fair Empl.Prac.Cas. (BNA) 392, 93 Empl. Prac. Dec. P 43,981, 23 A.D. Cases 1105...

it chose to include. *See Pansy,* 23 F.3d at 791 ("Courts have discretion to fashion such orders according to the needs and circumstances of each case."). Without any indication that the District Court conducted the required good cause balancing test before entering this order, we must conclude that the entry of the order does not reflect the proper exercise of discretion. *See id.* at 792; *cf. EEOC v. Nat'l Children's Ctr., Inc.,* 98 F.3d 1406, 1410 (D.C.Cir.1996) (remanding when the district court's failure to articulate its reasoning for sealing portions of the record rendered the court's decision unreviewable). Accordingly, we will vacate the order and remand to the District Court to conduct a good cause balancing test.

[23]  On remand, the District Court should be mindful of the statutory scheme governing disposal of government records. The Federal Records Disposal Act ("FRDA") prohibits destruction of government records except according to its requirements. 44 U.S.C. § 3314 ("[R]ecords *304 of the United States Government may not be alienated or destroyed except under this chapter"). The FRDA defines "records" as "documentary materials ... made or received by an agency of the United States Government under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation ... as evidence of the organization, function, policies, decisions, procedures, operations, or other activities of the Government." 44 U.S.C. § 3301. Courts must exercise caution when issuing confidentiality orders so as not to demand that the EEOC destroy government documents, including notes and memoranda, in conflict with the EEOC's duty to obey the requirements of the FRDA.

Based on the aforementioned reasons, we will vacate the District Court's confidentiality order and remand to permit the District Court to conduct a good cause balancing test.

V.

For the reasons stated above, we will reverse in part and affirm in part the District Court's judgment of June 1, 2009 narrowing the scope of the subpoena. We will vacate and remand the District Court's July 22, 2009 confidentiality order.

**Parallel Citations**

110 Fair Empl.Prac.Cas. (BNA) 392, 93 Empl. Prac. Dec. P 43,981, 23 A.D. Cases 1105, 41 NDLR P 225

Footnotes

*    Honorable Alan D. Lourie, United States Circuit Judge for the Federal Circuit, sitting by designation.

1    The Assessment consists of fifty statements, to which the applicant must answer "strongly disagree," "disagree," "agree," or "strongly agree." It includes statements such as the following: "You have confidence in yourself"; "You are always cheerful"; "You try to sense what others are thinking and feeling"; "You say whatever is on your mind"; and "It is easy for you to feel what others are feeling." JA 27.

2    The EEOC no longer seeks enforcement of Paragraph 6 of the subpoena. EEOC Br. at 16 n. 5.

3    In addition to investigating charges of discrimination filed by or on behalf of an individual, the EEOC has the authority to file and investigate a commissioner's charge alleging unlawful employment practices, pursuant to 42 U.S.C. §§ 2000e–5(b) and 2000e–6(e).

4    To obtain enforcement of an administrative subpoena, an agency must demonstrate that 1) its investigation has a legitimate purpose, 2) the inquiry is relevant to that purpose, 3) the agency does not already possess the information requested, 4) the agency has complied with relevant administrative requirements, and 5) the demand is not " 'unreasonably broad or burdensome.' " *Univ. of Med. & Dentistry of N.J. v. Corrigan,* 347 F.3d 57, 64 (3d Cir.2003) (quoting *FDIC v. Wentz,* 55 F.3d 905, 908 (3d Cir.1995)). It is the second requirement, that the inquiry be relevant to a legitimate purpose, that is at issue here.

5    According to Kroger, "Bowers also discussed with Charging Party the low score on the Customer Service Assessment she had completed as part of the application process. Bowers noted from the Customer Service Assessment that Charging Party potentially might be less inclined to deliver great customer service.... Bowers ended the interview by informing Charging Party that he was concerned about her qualifications, including her low Customer Service Assessment...." JA 38–39.

6    We understand the EEOC's argument in support of its request for information related to potential adverse impact based on race to be premised on a reasonable expansion of its investigation of the Sandy charge. However, to the extent that the EEOC asserts that the information related to race is relevant to Sandy's charge under the *Shell Oil* standard, we decline to hold that the EEOC's request for materials concerning whether the Kronos Assessment has an adverse racial impact is relevant to, or might shed light on, Sandy's charge that Kroger discriminated against her based on disability.

**E.E.O.C. v. Kronos Inc., 620 F.3d 287 (2010)**

110 Fair Empl.Prac.Cas. (BNA) 392, 93 Empl. Prac. Dec. P 43,981, 23 A.D. Cases 1105...

7    Because we conclude that the EEOC has not reasonably expanded its investigation to include race, we decline to address Kronos's argument that the EEOC lacks the authority to expand its discrimination investigation based on one anti-discrimination statute (the ADA) to include charges arising under a different statute (Title VII).

8    We note that the EEOC does not challenge the portion of the order prohibiting it from disclosing subpoenaed material to Sandy or her agents during the investigation. EEOC Br. at 41 n. 11. Further, the EEOC has represented that it "would honor the portion of the confidentiality order stating that the EEOC would disclose materials covered by the subpoena to individuals outside the Commission (including but not limited to expert witnesses) when mutually agreed upon in writing." *Id.*

---

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 10

260 F.3d 183
United States Court of Appeals,
Third Circuit.

In re CENDANT CORP., (formerly known as
CUC International, Inc. ) Cendant Capital I.
Lester A. Goldstein, on behalf of himself and all
others similarly situated; Welch & Forbes Inc., an
institutional investment manager, individually
and on behalf of all others similarly situated,
v.
Walter A. Forbes; Cosmo Corigliano;
Anne M. Pember; Merrill Lynch & Co.;
Chase Securities Inc.; Henry R. Silverman,
v.
Ernst & Young; Cendant Membership Services,
Inc.; Casper Sabatino; Steven P. Speaks; Kevin T.
Kearney; Mary Sattler; Howard Sirota, Appellant.

No. 99–5485.    |    Argued Dec.
15, 2000.    |    Filed Aug. 8, 2001.

Attorney who was an unsuccessful bidder for lead counsel position in consolidated securities litigation class actions appealed fine imposed by the United States District Court for the District of New Jersey, William H. Walls, J., for violating confidentiality order regarding bid auction process. The Court of Appeals, Fuentes, Circuit Judge, held that: (1) bids were judicial records, and thus subject to common law right to access; (2) closure of bidding auction was not warranted; (3) sealing of bids contravened purpose of the Private Securities Litigation Reform Act (PSLRA); (4) confidentiality order was improperly issued; and (5) District Court had no factual predicate to impose sanctions against attorney.

Vacated.

West Headnotes (31)

[1]    **Federal Courts**
&#9755; Substantive Matters
What constitutes the proper legal standard for granting a confidentiality order is an issue of law, over which Courts of Appeals exercise plenary review.

Cases that cite this headnote

[2]    **Federal Courts**
&#9755; Supervisory jurisdiction in general
Courts of Appeals have an inherent supervisory power, arising out of rule governing discovery, to fashion and clarify rules for district courts governing the district courts' power to enter confidentiality orders at the discovery stage or any other stage of litigation. Fed.Rules Civ.Proc.Rule 26, 28 U.S.C.A.

Cases that cite this headnote

[3]    **Records**
&#9755; Court records
There exists, in both criminal and civil cases, a common law public right of access to judicial proceedings and records.

16 Cases that cite this headnote

[4]    **Federal Civil Procedure**
&#9755; Access to proceedings; public trial
**Records**
&#9755; Court records
The public's right of access extends beyond simply the ability to attend open court proceedings; rather, it envisions a pervasive common law right to inspect and copy public records and documents, including judicial records and documents.

6 Cases that cite this headnote

[5]    **Records**
&#9755; Court records
Whether or not a document or record is subject to the right of access to court proceedings and records turns on whether that item is considered to be a "judicial record;" status of a document as a "judicial record," in turn, depends on whether a document has been filed with the court, or otherwise somehow incorporated or integrated into a district court's adjudicatory proceedings.

17 Cases that cite this headnote

**[6]**    **Records**
        🔑 Court records

For purposes of determining whether a document is subject to right of access as a "judicial record," while filing clearly establishes such status, a document may still be construed as a judicial record, absent filing, if a court interprets or enforces the terms of that document, or requires that it be submitted to the court under seal.

5 Cases that cite this headnote

**[7]**    **Records**
        🔑 Court records

Bids submitted to District Court for purpose of selecting lead counsel to represent plaintiffs in securities litigation class action were "judicial records," and thus were subject to common law right to access, even though District Court kept bids sealed and issued confidentiality order regarding bidding process, where District Court ordered attorneys to submit bids, appointed lead counsel after in camera review of bids, and issued order, itself a public document, summarizing content of bids in encoded chart.

4 Cases that cite this headnote

**[8]**    **Federal Civil Procedure**
        🔑 Access to proceedings; public trial
        **Records**
        🔑 Court records

The practical effect of the right to access doctrine is to create an independent right for the public to view proceedings and to inspect judicial records.

1 Cases that cite this headnote

**[9]**    **Federal Civil Procedure**
        🔑 Access to proceedings; public trial
        **Records**
        🔑 Court records

Protecting the right to access in class actions promotes class members' confidence in the administration of the case, diminishes the possibility that injustice, incompetence, perjury, or fraud will be perpetrated against those class members who have some stake in the case but are not at the forefront of the litigation, and provides class members with a more complete understanding of the class action process and a better perception of its fairness.

1 Cases that cite this headnote

**[10]**    **Records**
        🔑 Court records

Presumption that bids used to appoint lead counsel in class action litigation and that the in camera proceeding to review those bids would be part of an open process, accessible to the public, disallows the routine and perfunctory closing of judicial records, since throwing a veil of secrecy over selection process deprives class members of opportunity to exercise effective control in the selection of class counsel.

2 Cases that cite this headnote

**[11]**    **Federal Civil Procedure**
        🔑 Access to proceedings; public trial
        **Records**
        🔑 Court records

The presumption of public access to court proceedings and records may be rebutted.

8 Cases that cite this headnote

**[12]**    **Records**
        🔑 Court records

Every court has supervisory power over its own records and files, and access may be denied where court files might have become a vehicle for improper purposes.

2 Cases that cite this headnote

**[13]**    **Federal Civil Procedure**
        🔑 Access to proceedings; public trial
        **Records**
        🔑 Court records

In re Cendant Corp., 260 F.3d 183 (2001)

In order to override the common law right of access to court proceedings and records, the party seeking the closure of a hearing or the sealing of part of the judicial record bears the burden of showing that the material is the kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure.

51 Cases that cite this headnote

[14]    **Federal Civil Procedure**
           Access to proceedings; public trial
        **Records**
           Court records

In delineating the injury to be prevented by closure of court proceedings or sealing of judicial records, specificity is essential, and thus broad allegations of harm, bereft of specific examples or articulated reasoning, are insufficient to warrant such closure or sealing.

23 Cases that cite this headnote

[15]    **Federal Civil Procedure**
           Access to proceedings; public trial
        **Records**
           Court records

The strong common law presumption of access to court proceedings and records must be balanced against the factors militating against access, and the burden is on the party who seeks to overcome the presumption of access to show that the interest in secrecy outweighs the presumption.

11 Cases that cite this headnote

[16]    **Federal Civil Procedure**
           Access to proceedings; public trial
        **Records**
           Court records

Because of the peculiar posture of class actions whereby some members of the public are also parties to the class action, and because of the importance of selection of lead counsel to class action plaintiffs, the test for overriding the right of access to court proceedings and records, involving balancing of common law presumption of access against factors militating against access, should be applied in class actions with particular strictness.

1 Cases that cite this headnote

[17]    **Federal Civil Procedure**
           Access to proceedings; public trial
        **Records**
           Court records

The "compelling countervailing interests" standard is most appropriate test for overriding the right of access to court proceedings and records, involving balancing of common law presumption of access against factors militating against access, with the additional requirement of specific findings which may or may not require a hearing.

2 Cases that cite this headnote

[18]    **Records**
           Court records

Closure of bidding auction used by District Court in appointing lead counsel to class in securities litigation was not warranted, because disclosure of class counsel's bids and compensation arrangements benefited class; unlike usual attorney-client situation, class members did not participate in negotiations by which a part of their claim was bargained away, class members were not in a position to monitor lead counsel, and rule required attorney to communicate basis of fee to client. ABA Rules of Prof.Conduct, Rule 1.5(b).

1 Cases that cite this headnote

[19]    **Records**
           Court records

Even if a sealing order was proper at the time when it was initially imposed, the sealing order must be lifted at the earliest possible moment when the reasons for sealing no longer obtain; continued sealing must be based on current

In re Cendant Corp., 260 F.3d 183 (2001)

evidence to show how public dissemination of the pertinent materials now would cause harm.

5 Cases that cite this headnote

[20]    **Federal Civil Procedure**
 &#9758; Stockholders, investors, and depositors

Purpose of Private Securities Litigation Reform Act (PSLRA) provision requiring that subject to court approval, the most adequate plaintiff retains class counsel is to permit the plaintiff to choose counsel rather than have counsel choose the plaintiff. Securities Act of 1933, § 27(a)(3)(B)(iv), as amended, 15 U.S.C.A. § 77z–1(a)(3)(B)(iv).

4 Cases that cite this headnote

[21]    **Records**
 &#9758; Court records

Sealing of bids in auction for appointment of lead counsel in securities litigation class action contravened purpose of the Private Securities Litigation Reform Act (PSLRA), where Congress' clear intent in enacting the PSLRA was to transfer control of securities class actions from attorneys to class members through a properly selected lead plaintiff, but instead of allowing class plaintiffs to choose lead counsel, District Court selected class counsel through a sealed bidding process which had yet to be unsealed; sealing bids enabled counsel to litigate with a view toward ensuring payment for their services without sufficient regard to their clients' compensation. Securities Act of 1933, § 27(a)(3)(B)(iv), as amended, 15 U.S.C.A. § 77z–1(a)(3)(B)(iv).

7 Cases that cite this headnote

[22]    **Records**
 &#9758; Court records

Notwithstanding the limitations on sealing of judicial records created by the common law public right to access, the balancing of the factors for and against access is a decision committed to the discretion of the district court, although it is not generally accorded the narrow review

reserved for discretionary decisions based on first-hand observations.

Cases that cite this headnote

[23]    **Records**
 &#9758; Court records

A district court's discretion in balancing the factors for and against access to judicial records must be exercised properly, because the issuance of a confidentiality order overriding the common law right of public access contemplates an analytical process.

3 Cases that cite this headnote

[24]    **Records**
 &#9758; Court records

District Court abused its discretion in sealing bids in auction for appointment of lead counsel in securities litigation class action, and thus confidentiality order regarding bid auction process was improperly issued, where District Court failed to articulate "compelling countervailing interests" it found which would authorize closure through sealing of matters it sought to protect, and its order lacked factfinding or identification of compelling countervailing interests.

6 Cases that cite this headnote

[25]    **Constitutional Law**
 &#9758; Access to proceedings; closure

First Amendment right of access to civil trials exists independently of the common law right of access. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

[26]    **Constitutional Law**
 &#9758; Access to proceedings; closure

The general rationale behind First Amendment right of access to civil trials is that public access to civil trials plays an important role in the participation and the free discussion of governmental affairs. U.S.C.A. Const.Amend. 1.

1 Cases that cite this headnote

**[27]    Constitutional Law**
  👉 Access to proceedings; closure

The First Amendment right of access to court proceedings and records requires a much higher showing than the common law right to access before a judicial proceeding can be sealed. U.S.C.A. Const.Amend. 1.

5 Cases that cite this headnote

**[28]    Federal Courts**
  👉 Sanctions

Courts of Appeals review a district court's imposition of sanctions under its inherent power for abuse of discretion.

1 Cases that cite this headnote

**[29]    Federal Courts**
  👉 Abuse of discretion in general

A district court abuses its discretion if it bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.

Cases that cite this headnote

**[30]    Federal Civil Procedure**
  👉 Inherent authority

Before invoking its inherent authority to impose sanctions upon those who would abuse the judicial process, a court must consider a number of factors: (1) court must ensure that there is an adequate factual predicate for flexing its substantial muscle under its inherent powers; (2) court must ensure that the sanction is tailored to address the harm identified; and (3) court must consider the conduct at issue and explain why the conduct warrants sanction.

5 Cases that cite this headnote

**[31]    Federal Civil Procedure**
  👉 Violation of court orders

Attorney who was unsuccessful bidder for lead counsel position in consolidated securities litigation class actions did not violate terms of confidentiality order regarding bid auction process, and thus District Court had no factual predicate to impose sanctions against him, although he told reporter that he had filed objection to order appointing lead counsel, where attorney did not divulge substance of case deemed confidential; his objection was not under seal, was available to public, including media, and did not expressly divulge identity of any bidder.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*187** Adam N. Saravay (argued), McCarter & English, LLP, Newark, NJ, Attorneys for Appellant.

Judith E. Harris (argued), Lewis & Bockius, LLP, Philadelphia, PA, Amicus Curiae in support of the Order of the District Court.

Before: SCIRICA, FUENTES, and GARTH, Circuit Judges.

**Opinion**

## OPINION OF THE COURT

FUENTES, Circuit Judge.

This appeal raises important questions concerning the use of sealed bids in auctions conducted to select lead counsel in class action lawsuits. The genesis of the appeal lies in the District Court's selection of lead counsel in the Cendant "PRIDES" securities litigation based on the results of a competitive bidding process. The core of the dispute involves a confidentiality order in which the District Court decided to seal the bids until resolution of the case. The order was issued in connection with an *in camera* hearing where plaintiffs' attorneys, but not the general public, had access to the bids. After learning that one of the unsuccessful bidding attorneys, Howard Sirota, had spoken to a reporter from the New York Times about the bidding process, the District Court fined Sirota $1,000. Sirota appeals the sanction. Because we conclude that the District Court failed to articulate the necessary findings for the issuance of the confidentiality

order, and because we find that, in any case, Sirota did not violate the order, we will vacate the sanction. [1]

## *188 I.

Some explanation of the underlying securities litigation provides a helpful background for the proceeding resulting in the sanction against Sirota. Because a full procedural and factual background of the Cendant litigation is set forth in numerous published opinions, [2] we will only discuss the facts most relevant to the resolution of the issues presented in this appeal. Briefly, on April 15, 1998, Cendant Corporation announced that it had uncovered substantial accounting irregularities and would have to restate reported annual and quarterly earnings for 1997 and possibly earlier; as a result, Cendant stock plummeted 46%. Some 64 lawsuits (mostly class actions) were filed against Cendant, its officers and directors; all but one were consolidated.

On May 29, 1998, a preliminary case management/ scheduling order established a schedule for motions to address the appointment of lead counsel for the class. Among the fifteen motions filed was one submitted by Sirota, together with co-counsel John J. Barry and Charles C. Carella, to have their clients, the Joanne A. Aboff Family Trust ("Aboff") and Douglass Wilson, appointed as lead plaintiffs and to have themselves appointed lead counsel.

After considering the motions, the District Court outlined a process for selecting lead plaintiff and lead counsel. First, the District Court applied a statutory presumption that the plaintiff with the largest financial interest in the litigation should be appointed lead plaintiff. *See In re Cendant Corp. Litig.,* 182 F.R.D. 144, 146–47 (D.N.J.1998) (citing 15 U.S.C. § 77z–1(a)(3)(B)). Because of a possible conflict of interest, the District Court determined that a separate lead plaintiff would be appointed to pursue claims involving Income and Growth Prides ("PRIDES"), derivative securities based on Cendant common stock.[3] *See id.* at 149–50. Neither Aboff nor Wilson was selected as a lead plaintiff.

Second, in selecting lead counsel, the District Court adopted a competitive bidding system, reasoning that "the most effective way to establish reasonable attorney fees is through marketplace ... competition." *Id.* at 150. The District Court therefore ordered "an auction to determine the lowest qualified bidder to represent the class as counsel." *Id.* at

151. To be considered, plaintiffs' attorneys were required to submit bids under seal, stating, among other things, their professional qualifications and the fee arrangement that would be acceptable to them should they be selected as lead counsel. The record as of this date reveals that all bids remain under seal.

*189 On October 2, 1998, the District Court selected separate lead counsel for the non-PRIDES claims and for the PRIDES claims; Sirota and his co-counsel were not selected. In choosing lead counsel, the District Court stressed the need for confidentiality. Following an *in camera* hearing, attended only by applicants for the two lead counsel positions, *i.e.,* plaintiffs' attorneys, the court distributed an opinion containing a confidentiality order. The court ordered the identities of the bidders and the nature of their proposals sealed until the conclusion of the case, referring to the proposals only by number and explaining:

> It is of utmost concern to the Court that this opinion, the bidders' identities and the contents of their bids be sealed until resolution of this matter. This is done to maintain adversarial integrity, that of strategy and tactics, which is the prerogative of all parties, plaintiffs and defendants.

*In re Cendant Corp. Litig.,* 191 F.R.D. 387, 387 (D.N.J.1998) (opinion selecting lead counsel). As a result of the *in camera* hearing and the confidentiality order, plaintiffs' attorneys, but not the general public, had access to each others' bids.

Thereafter, on November 30, 1998, the District Court separated the PRIDES claims from the rest of the Cendant case. In an order entered on March 18, 1999, the District Court preliminarily approved a proposed settlement of the PRIDES case presented by lead counsel and Cendant. The proposed settlement provided that, in return for dismissal and release of all claims, Cendant would confer upon each class member who opted in, one "Right" worth $11.71 for each PRIDES held at the close of business on April 15, 1998, giving the settlement an aggregate theoretical value of $341.5 million. The March 18, 1999 order also approved the "form and content" of notice to be distributed to class members regarding the settlement. That notice stated that lead counsel would apply for attorneys' fees, to be paid in Rights, in an amount not to exceed 10% of the $341.5 million theoretical

value of the settlement. To this effect, the notice contained the following assurance:

> You also should know that the lead counsel appointment process included a court-mandated bidding process. This was intended to assure that the largest possible portion of any recovery remained with participating class members, or conversely that qualified lead counsel took the least possible sums from the benefits to be obtained by participating class members. In Lead Counsel's view, under the fee mechanism proposed by Lead Counsel and described herein, there is a substantial likelihood that a substantial part, if not all, of the fees sought will be obtained from Unclaimed Rights and Opt Out Rights. As a consequence, *in Lead Counsel's view, those Class Members who become Authorized Claimants will not have to pay any of Lead Counsel's fees, or if they do, there is a substantial likelihood that it will be less than the amount otherwise payable under the bids approved by the Court in the process of appointing lead counsel.*

*In re Cendant Corp. Prides Litig.,* No. 98–2819, slip op. at —— (D.N.J. Mar. 18, 1999) (emphasis added) (order regarding proposed class action settlement, settlement hearing and notice of proposed settlement).

Besides preliminary approval and notice, the order of March 18, 1999 also provided that any class member wishing to object to the settlement or to the lead counsel's fee application should file written objections with the District Court. On May 4, 1999, Sirota, along with co-counsel, filed objections **\*190** on behalf of Aboff to the proposed settlement and to lead counsel's application for fees. In particular, the brief submitted by Sirota argued that "the $34 million fee Lead Counsel seeks far exceeds the fee Lead Counsel agreed to accept [in the bidding auction]."

On May 14, 1999, the New York Times published an article stating, "Mr. Sirota calculates that the value of [lead counsel's

proposed fee] would be $34 million, and argues that it would thus be about 10 percent of the total settlement fund a percentage he contends greatly exceeds the confidential bid that [lead counsel] submitted to the court last year." Diana B. Henriques, *Lawyers Handling Litigation Against Cendant Propose an Innovative Way to Pay Their Fees,* N.Y. Times, May 14, 1999, at C7. Seeing this article, the District Court issued an order "to show cause why [Sirota] should not be held in contempt and sanctioned for violations of this Court's confidentiality order of October 2, 1998."[4]

On May 19, 1999, the District Court held a hearing on the order to show cause, focusing on whether Sirota's apparent statement to the New York Times concerning lead counsel's bid violated the October 2, 1998 confidentiality order. Defending himself, Sirota explained that: (1) he had no intention to violate the confidentiality order; (2) he had simply told a reporter from the New York Times that he had filed an objection with the District Court; (3) he did not make any substantive comments to the reporter; (4) the newspaper article merely referred to arguments made in his written objection of May 4, 1999; and (5) Sirota believed that the relative comparisons made in the written objection had been authorized by the District Court's March 18, 1999 order. As to the last point, Sirota noted that the March 18, 1999 order which preliminarily approved the settlement of the PRIDES case, also approved a form of notice stating lead counsel's belief that the attorneys' fees would be less than provided for by the bidding process. Thus, Sirota argued that it was reasonable for him to believe that the confidentiality order did not prohibit him from responding to lead counsel's contention that the proposed fee was less than the bid by arguing that it was actually more than the bid:

> [Because of the notice], the defendants and everyone else knew the relative magnitude of the fee sought and that according to [lead counsel] it was not more than the bid. The rationale of keeping the defendants from knowing the amount of the compensation of their adversary, I thought, was over as reflected in the Court authorized notice and reflected in [lead counsel's] understanding that one could make claims. [Lead counsel] made the claim in the notice.... The Court invited objections in the notice and we came

and said truthfully he is asking for
more than his bid.

*191 Thereafter, the District Court stated that it had "no
problem" with Sirota making this argument in court, but that
speaking to the press was different.

At the conclusion of the hearing, the District Court
determined that finding Sirota in contempt was unwarranted.
Nevertheless, relying on Local Civil Rule 101.1 and on its
inherent power to discipline attorneys, the District Court
imposed sanctions on Sirota for violating the confidentiality
order. The District Court explained:

> Why am I doing that? Because having you yourself
> admitted to twenty years before a bar if not the New
> Jersey bar, I hold you to that of a reasonable attorney who,
> when confronted with a specific order of confidentiality, a
> specific order of confidentiality before he would broach the
> subject to a third party such as the press, whether generally
> or specifically, he should have, in good conscience or in
> good professionalism at least made contact with the Court
> to insure that whatever he said did not violate the order.
> To come to court now and say that because there is a, the
> reference is made by lead counsel in the notice to claimants
> that one feels free to do what you did is not good enough
> as far as I'm concerned ...

> ....

> You have a professional obligation to, as counsel for the
> objector, to point out to the Court your objection. I don't
> understand it. Maybe I never practiced in New York, but, I
> didn't think you had a professional obligation to point out
> your objection with regard to this matter to a newspaper.

The next day, May 20, 1999, the District Court entered an
order, fining Sirota $1,000.

On June 18, 1999, Sirota filed a notice of appeal from the
order imposing sanctions. We have jurisdiction over this
appeal pursuant to the final order doctrine of 28 U.S.C. §
1291. This includes final decisions in attorney disciplinary
proceedings. *See In re Ashton,* 768 F.2d 74 (3d Cir.1985); *In
re Abrams,* 521 F.2d 1094 (3d Cir.1975).[5]

## II.

[1]   The nominal issue on appeal is whether the District
Court erred in sanctioning Sirota for violating the October
2, 1998 confidentiality order by speaking to the New York
Times. That issue, however, is predicated upon the more
basic question of whether the confidentiality order underlying
the sanction was properly issued. Because of this dependent
relationship, we feel compelled, before even considering
the District Court's sanction of Sirota, to first address the
propriety of the confidentiality order. What constitutes the
proper legal standard for granting a confidentiality order
sealing bids is an issue of law, over which we exercise plenary
review. *See Pansy v. Borough of Stroudsburg,* 23 F.3d 772,
783–84 (3d Cir.1994).

[2]   In addition to this dependent relationship, we also have
an inherent supervisory power, arising out of Fed.R.Civ.P.
26, to fashion and clarify rules for district courts governing
the district courts' power *192 to enter confidentiality orders
at the discovery stage or any other stage of litigation. *See
Pansy,* 23 F.3d at 786 & n. 16, 789 & n. 22. Accordingly,
there exists a sufficient basis for us to evaluate the District
Court's efforts to preserve the secrecy of bids. In doing so,
we conclude that, in deciding to seal the bids, the District
Court failed to recognize that the bids were judicial records,
subject to the common law presumption of public access. As
a result, the District Court failed to articulate the necessary
findings to override the presumption of access when issuing
the confidentiality order.

### A.

[3]   [4]   It is well-settled that there exists, in both
criminal and civil cases, a common law public right of
access to judicial proceedings and records. *Littlejohn v.
BIC Corporation,* 851 F.2d 673, 677–78 (3d Cir.1988).
The public's right of access extends beyond simply the
ability to attend open court proceedings. Rather, it envisions
"a pervasive common law right 'to inspect and copy
public records and documents, including judicial records and
documents.' " *Leucadia, Inc. v. Applied Extrusion Tech.,
Inc.,* 998 F.2d 157, 161 (3d Cir.1993). As we explained in
*Littlejohn,* the right of access strengthens confidence in the
courts:

> The public's exercise of its common
> law access right in civil cases promotes
> public confidence in the judicial
> system by enhancing testimonial

trustworthiness and the quality of justice dispensed by the court. As with other branches of government, the bright light cast upon the judicial process by public observation diminishes possibilities for injustice, incompetence, perjury, and fraud. Furthermore, the very openness of the process should provide the public with a more complete understanding of the judicial system and a better perception of its fairness.

851 F.2d at 678 (citations omitted). In addition, "[a]ccess to civil proceedings and records promotes 'public respect for the judicial process' and helps assure that judges perform their duties in an honest and informed manner." *Leucadia,* 998 F.2d at 161 (citations and internal quotations omitted).

[5]  [6]  The public right of access clearly applies to the *in camera* hearing conducted by the District Court, as that hearing was a judicial proceeding. We also believe that the right applies to the bids. Whether or not a document or record is subject to the right of access turns on whether that item is considered to be a "judicial record." *Pansy,* 23 F.3d at 781. The status of a document as a "judicial record," in turn, depends on whether a document has been filed with the court, or otherwise somehow incorporated or integrated into a district court's adjudicatory proceedings. *Id.* at 780–83. While filing clearly establishes such status, a document may still be construed as a judicial record, absent filing, if a court interprets or enforces the terms of that document, or requires that it be submitted to the court under seal. *See Enprotech Corp. v. Renda,* 983 F.2d 17, 20 (3d Cir.1993); *but cf. Pansy,* 23 F.3d at 780–83.[6] Especially relevant here is the case of *Leucadia,* in which we held that "there is a presumptive right of public access to pretrial motions of a nondiscovery **\*193** nature, whether preliminary or dispositive, and the material filed in connection therewith." 998 F.2d at 164.

[7]  In the present case, the District Court's auction procedure transformed the bids into judicial records. The District Court relied on the 1995 Private Securities Litigation Reform Act ("PSLRA") as authority for the selection by lead plaintiffs of lead counsel. The PSLRA provides: "The *most adequate plaintiff* shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 77z–1(a)(3)(B)(v) (emphasis added). Viewing its approval under the PSLRA as a discretionary judgment, the District Court

ordered plaintiffs' attorneys to submit bids, *In re Cendant Corp. Litig.,* 182 F.R.D. at 150–51, and the attorneys did so in direct response to the court's command. While not explicitly denominated as such, the bids were essentially submitted in the form of motions to be appointed lead counsel. *See id.* at 151 (ordering bidders to describe why they are professionally qualified to be lead counsel). Following the *in camera* hearing, the District Court ruled, and issued an Order appointing counsel. *In re Cendant Corp. Litig.,* 191 F.R.D. at 387. That Order, a public document itself, summarized the content of the bids in an encoded chart. *Id.* In these circumstances, we believe that, at the time of the District Court's confidentiality order, the bids were judicial documents subject to the common law right to access.

## B.

[8]  [9]  The practical effect of the right to access doctrine is to create an independent right for the public to view proceedings and to inspect judicial records. *See Pansy,* 23 F.3d at 781. The right of public access is particularly compelling here, because many members of the "public" are also plaintiffs in the class action. Accordingly, all the reasons we discussed in *Littlejohn* for the right of access to public records apply with even greater force here. See p. 192, supra. Protecting the access right in class actions "promotes [class members'] confidence" in the administration of the case. *Littlejohn,* 851 F.2d at 678. Additionally, the right of access diminishes the possibility that "injustice, incompetence, perjury, [or] fraud" will be perpetrated against those class members who have some stake in the case but are not at the forefront of the litigation. *Id.* Finally, openness of class actions provides class members with "a more complete understanding of the [class action process] and a better perception of its fairness." *Id.*

[10]  Indeed, the information sealed in this case and kept secret from most of the parties was of the utmost importance in the administration of the case; it was directly relevant to the selection of lead counsel. This point is crucial. In class actions, the lead attorneys have an unusual amount of control over information concerning the litigation. By contrast, class members often have little input into the conduct of the class action and accompanying settlement negotiations, because of the large scale of litigation and the disconnect between defendants' possibly enormous liability and the relatively small recovery available to the individual plaintiffs. The only stage at which class members can exercise effective control

is in the selection of class counsel. Throwing a veil of secrecy over the selection process deprives class members of that opportunity.

Thus, there should have been, in the present case, a strong presumption that the bids and the *in camera* proceeding would be part of an open process, accessible to the public. *See Littlejohn,* 851 F.2d at 678. That presumption disallows the *194 routine and perfunctory closing of judicial records. *Miller v. Indiana Hosp.,* 16 F.3d 549, 551 (3d Cir.1994). Our discussion, however, does not end here.

[11]   [12]   Although the common law right to public access is a recognized and venerated principle, courts have also recognized the accompanying principle that "the right is not absolute." *Littlejohn,* 851 F.2d at 678; *Leucadia,* 998 F.2d at 165 (same); *Publicker Indus., Inc. v. Cohen,* 733 F.2d 1059, 1070 (3d Cir.1984) (same). The presumption of public access may be rebutted. *See Republic of Philippines v. Westinghouse Elec. Corp.,* 949 F.2d 653, 662 (3d Cir.1991). "Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes." *Littlejohn,* 851 F.2d at 678 (quoting *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 598, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978)). Thus, the question becomes, under what circumstances may a district court seal judicial proceedings or documents, such as bids, by means of a confidentiality order. For this question, there are settled standards.

[13]   [14]   [15]   In order to override the common law right of access, the party seeking the closure of a hearing or the sealing of part of the judicial record "bears the burden of showing that the material is the kind of information that courts will protect" and that "disclosure will work a clearly defined and serious injury to the party seeking closure." *Miller,* 16 F.3d at 551 (citing *Publicker,* 733 F.2d at 1071). In delineating the injury to be prevented, specificity is essential. *See Publicker,* 733 F.2d at 1071. Broad allegations of harm, bereft of specific examples or articulated reasoning, are insufficient. As is often the case when there are conflicting interests, a balancing process is contemplated. "[T]he strong common law presumption of access must be balanced against the factors militating against access. The burden is on the party who seeks to overcome the presumption of access to show that the interest in secrecy outweighs the presumption." *Leucadia,* 998 F.2d at 165 (quoting *Bank of Am. Nat'l Trust and Sav. Ass'n v. Hotel Rittenhouse Assoc.,* 800 F.2d 339, 344 (3d Cir.1986)).

[16]   [17]   Additionally, because of the peculiar posture of class actions whereby some members of the public are also parties to the class action, and because of the importance of selection of lead counsel to class action plaintiffs, the test for overriding the right of access should be applied in this case with particular strictness. We are guided in the formation of a stricter standard by *Miller,* where the sealing order warranted exceptional scrutiny because the district court had sealed the entire record. In that case, we held:

> In a case such as this, involving ordinary civil litigation, the district court, before taking such an unusual step, should have articulated the *compelling countervailing interests* to be protected, made specific findings on the record concerning the effects of disclosure, and provided an opportunity for interested third parties to be heard.

*Miller,* 16 F.3d at 551 (citations omitted) (emphasis added). Thus, we hold that a "compelling countervailing interests" standard is most appropriate here, with the additional requirement of specific findings. This may or may not require a hearing.

Therefore, our emphasis here is on the District Court's denial of public access to the bids and proceedings in connection with the sealed bid auction employed to select lead counsel in this case, and we do not focus here nor decide on the propriety of bid auctions generally.

*195 *In re Oracle Sec. Litig.,* 136 F.R.D. 639 (N.D.Cal.1991), the district court case relied upon by the District Court in the present case, admittedly is one of the earliest cases in which competitive bids for lead counsel and the propriety of sealing such bids was considered.[7] *Oracle* opted for competitive selection of class counsel for a number of reasons which we decline to explore inasmuch as the issue of competitive selection is not presented on this appeal. Suffice it to say, the reasons listed in *Oracle* for use of competitive bidding provoke serious reservations and concerns here,[8] but we leave the decision as to whether competitive bidding is appropriate, justifiable, or desirable to the future case where that issue is directly raised.

[18]   Regardless of whether bidding for lead counsel would be deemed appropriate, however, we can neither subscribe to nor affirm the District Court's ruling that the bidding auction the court conducted should have been closed, i.e., sealed and kept from the very parties to whom our precedents and logic advocate disclosure. Indeed, this very principle was recognized in *Oracle*, where the court refused to seal or hold secret the bids for class counsel.

The *Oracle* court did this in part by rejecting claims that an open bidding process would allow the defendants to obtain information about lead counsel's evaluation of the case and might permit them to economically "squeeze" lead counsel by protracting proceedings. The *Oracle* court opined, as we do, that disclosure of class counsel's bids and compensation arrangements *benefits* the class because, "[u]nlike the usual attorney-client situation, ... class members do not participate in the negotiations by which a part of their claim is bargained away." 136 F.R.D. at 645. Moreover, class members are not in a position to monitor the faithfulness of their self-appointed champion. *See, e.g., In re General Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768 (3d Cir.1995) (where the original settlement called for lead counsel to receive attorneys' fees in the amount of $9.5 million, and class plaintiffs received no more than a $1,000 certificate towards a GM truck).

Thus, we generally believe that opening the bidding process (if such a process is to be authorized), while not a panacea for the agency problems in class actions, should facilitate the monitoring of lead counsel by class members and others. The disclosure of bids also comports with the spirit of the Model Rules of Professional Conduct. *See* Model Rules of Prof'l Conduct R. 1.5(b) (1983) (requiring communication to the client of the "basis or rate of the fee ... before or within a reasonable time after commencing the representation").

We find implicit recognition of these principles in the 1985 Third Circuit Task Force report on court-awarded attorneys' fees. In analogous circumstances, the Task Force expressed concern that, when lead counsel seeks fees after a settlement **\*196** has been reached, "the plaintiffs' attorney's role changes from one of a fiduciary for the clients to that of a claimant against the fund created for the clients' benefit." *Court Awarded Attorney Fees, Report of the Third Circuit Task Force,* 108 F.R.D. 237, 255 (1985) [hereinafter *Task Force Report*]. The *Task Force Report* accordingly recommended that district courts force the negotiation of class counsel's fee, asserting the "critical importance [in] assuring

that the compensation plan is negotiated in an *open and appropriately arm's length manner.*" *Id.* at 256 (emphasis added).

[19]   The strong presumption of public access forces district courts to be cognizant of when the reasons supporting sealing in a specific case (if any are found) have either passed or weakened, and to be prepared at that time to unseal bids and allow public access. Even if a sealing order was proper at the time when it was initially imposed, the sealing order must be lifted at the earliest possible moment when the reasons for sealing no longer obtain. As we observed in *Leucadia,* "continued sealing must be based on '*current evidence* to show how public dissemination of the pertinent materials *now* would cause the competitive harm [they] claim[ ].' " 998 F.2d 157, 167 (3d Cir.1993) (emphasis added). By establishing a strong presumption in favor of an open process, we intend to instill a measure of consistency into an important area where district courts have varied widely in their practice. [9]

### III.

The heightened standard which we have held must be applied to sealing class action bids is also supported by the language and legislative history of the PSLRA. [10] The PSLRA sets forth a detailed procedure for class members to apply to become lead plaintiffs. Additionally, the PSLRA provides that "[t]he most adequate plaintiff[11] shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 77z–1(a)(3)(B)(iv).

The legislative history of the PSLRA explains that the Act's purpose is:

(1) to encourage the voluntary disclosure of information by corporate issuers; **\*197** (2) *to empower investors so that they—not their lawyers—exercise primary control over private securities litigation;* and (3) to encourage plaintiffs' lawyers to pursue valid claims and defendants to fight abusive claims.

S.Rep. No. 104–98, at 4 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 683 (emphasis added).

The legislative history also points out that "[i]nvestors in the class usually have great difficulty exercising any meaningful direction over the case brought on their behalf. The lawyers can decide when to sue and when to settle,

based largely on their own financial interests, not the interests of their purported clients." S. Rep., U.S.C.C.A.N. at 685. Additionally:

> A 1994 Securities Subcommittee Staff Report found 'evidence * * * that plaintiffs' counsel in many instances litigate with a view toward ensuring payment for their services without sufficient regard to whether their clients are receiving adequate compensation in light of evidence of wrongdoing.' The comment by one plaintiff's lawyer—'I have the greatest practice of law in the world. I have no clients.'—aptly summarizes this flaw in the current system.

S. Rep., U.S.C.C.A.N. at 685.

[20]  To regulate this practice of lawyers, instead of lead plaintiffs, driving securities class actions, Congress enacted the PSLRA, through which, "[s]ubject to court approval, the most adequate plaintiff retains class counsel." H. Conf. Rep. No. 104–369, at 35 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 734. The Senate Committee explained: "This provision is intended to permit the *plaintiff* to choose counsel rather than have *counsel* choose the plaintiff." S.Rep. No. 104–98, at 11 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 690 (emphasis added).

[21]  Congress' clear intent in enacting the PSLRA was to transfer control of securities class actions from the attorneys to the class members (through a properly selected lead plaintiff). The sealing of the bids in the lead counsel auction in this case contravenes this purpose. Instead of allowing the class plaintiffs in this action to choose lead counsel, the District Court selected class counsel through a sealed bidding process which has yet to be unsealed. It also prevented many class plaintiffs and defendants from accessing the bids for lead counsel. Sealing the bids in this case enabled counsel to " 'litigate with a view toward ensuring payment for their services without sufficient regard to whether their clients are receiving adequate compensation in light of evidence of wrongdoing.' " S.Rep., U.S.C.C.A.N. at 685. [12]

### IV.

[22]  [23]  Of course, notwithstanding the limitations on sealing created by the common law public right to access, "[t]he balancing of the factors for and against access is a decision committed to the discretion of the district court, although it is not generally accorded the narrow review

reserved for discretionary decisions based on first-hand observations." *Bank of Am. Nat'l Trust and Sav. Ass'n v. Hotel Rittenhouse Assocs.,* 800 F.2d 339, 344 (3d Cir.1986). The discretion that exists, however, must be exercised properly because the issuance of a confidentiality order overriding the common law right of public access contemplates an analytical process.

[24]  [25]  [26]  [27]  In this respect, we hold that the District Court abused its discretion in sealing the bids. Apart from one general **\*198** and ambiguous reference to "adversarial integrity" and "strategy and tactics," the District Court did not provide any clear reason for why it sealed the bids. The court did not recognize the presumption of access, nor did it engage in balancing process to determine whether the bids were the type of information normally protected or whether there was a clearly defined injury to be prevented. *See Publicker,* 733 F.2d at 1073 (noting similar procedural deficiencies in the context of the First Amendment right to access); *accord Criden,* 648 F.2d at 819 (stating that district courts must "provide a firm base for an appellate judgment that discretion was soundly exercised"). Here, before sealing the entire bid record, the District Court should have articulated the "compelling countervailing interests" it found which would authorize the closure through sealing of the matters it sought to protect. *Miller,* 16 F.3d at 551. No such factfinding or identification of compelling countervailing interests can be found in the District Court's order. We therefore conclude that the District Court's confidentiality order of October 2, 1998, was improperly issued, and therefore, invalid. [13]

### V.

In addition to concluding that the October 2, 1998 confidentiality order was improperly issued, we conclude that the District Court erred in finding that Sirota violated the terms of the order. This point is important because, among other reasons, the fine was widely reported in the newspapers and legal journals, and because attorney disciplinary authorities in New York have initiated an inquiry, which is still pending, to determine whether Sirota should be sanctioned in New York based on the same facts that led the District Court to impose the fine.

[28]  [29]  Sirota's principal argument is that the District Court abused its discretion in sanctioning him $1,000 for speaking to a newspaper reporter. " 'We review a **\*199**

district court's imposition of sanctions under its inherent power for abuse of discretion.' " *Republic of Philippines v. Westinghouse Elec. Corp.,* 43 F.3d 65, 75 (3d Cir.1994) (quoting *Chambers v. NASCO, Inc.,* 501 U.S. 32, 55, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)). A district court "abuse[s] its discretion if it base[s] its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Garr v. U.S. Healthcare, Inc.,* 22 F.3d 1274, 1279 (3d Cir.1994) (citation and internal quotations omitted).

At the sanction hearing, the District Court informed Sirota that it was proceeding pursuant to L.Civ.R. 101.1, which gives the court broad authority to discipline attorneys. Clearly, the court had authority to proceed under this Rule and under its inherent disciplinary jurisdiction.

The Supreme Court has long established that "[c]ourts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." *Anderson v. Dunn,* 19 U.S. (6 Wheat.) 204, 227, 5 L.Ed. 242 (1821); *accord Ex parte Robinson,* 86 U.S. (19 Wall.) 505, 510, 22 L.Ed. 205 (1873). This Court, as well, has recognized the authority of district courts to wield sanctioning power, in the form of the court's *"inherent* authority," where necessary to preserve the integrity of the judicial process. *Philippines,* 43 F.3d at 73; *accord Eash v. Riggins Trucking, Inc.,* 757 F.2d 557, 560–65 (3d Cir.1985) (discussing thoroughly the inherent powers of courts); *In re Corn Derivatives Antitrust Litig.,* 748 F.2d 157, 160 (3d Cir.1984); *In re Abrams,* 521 F.2d 1094, 1099 (3d Cir.1975); 11A Charles A. Wright et al., *Federal Practice and Procedure* § 2960 (2d ed.1995) (analyzing the inherent power of federal courts to punish in contempt).

We have emphatically stated that federal courts retain the inherent power "to sanction errant attorneys financially both for contempt and for conduct not rising to the level of contempt." *Eash,* 757 F.2d at 566 (citing *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 765, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980)). The *Eash* court elaborated:

> [The] Supreme Court ... [has] stat[ed] that the "inherent power" to sanction an attorney was "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." If a court's inherent powers include the ability to do whatever is reasonably necessary to deter abuse of the judicial process, ... courts

must be able to impose reasonable sanctions for conduct by lawyers that falls short of contempt of court.

*Id.* at 567 (citations omitted).

[30]   Requiring courts to await the conclusion of extensive investigation and prosecution procedures following every courtroom infraction would greatly compromise the courts' ability to direct and control the proceedings. Acknowledging the weighty interest judges have in maintaining order in court affairs, we have recognized that "district courts have broad authority to preserve and protect their essential functions." *Philippines,* 43 F.3d at 73. We have also previously observed that formal rules and statutes do not exhaust a district court's power to control errant behavior:

> To the contrary, the Supreme Court recently reaffirmed that a district court has *inherent* authority to impose sanctions upon those who would abuse the judicial process.... The Supreme Court explained that "[i]t has long been understood that certain implied powers must necessarily result to our Courts of justice *200 from the nature of their institution, powers which cannot be dispensed with in a Court, because they are necessary to the exercise of all others."

*Id.* at 73 (quoting *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43–44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (internal quotations and citations omitted)). Before invoking its inherent authority, a court must consider a number of factors:

> Of course, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." "A primary aspect of [a district court's] discretion is the ability to fashion an *appropriate* sanction for conduct which abuses the judicial process." Thus, a district court must ensure that there is an adequate factual predicate for flexing its substantial muscle under its inherent powers, and must also ensure that the sanction is tailored to address the harm identified.... [T]he court must consider the conduct at issue and explain why the conduct warrants sanction.

*Id.* at 74 (quoting *Chambers,* 501 U.S. at 44, 111 S.Ct. 2123).

[31]   Here, we are constrained to conclude that no adequate factual predicate existed to justify the exercise of the District Court's inherent authority. The proceeding against Sirota commenced when the court initially charged him with violating its confidentiality order. Sirota conceded that he had spoken to the New York Times without initially approaching

the District Court, but insisted that he had divulged no information of substance:

> I spoke to the New York Times and said we filed a brief and if you want to see it, you can see it. And, I have confirmed with the author of the article that she was quoting from the brief and that I made no substantive oral statement to the New York Times. They are quoting from our brief.

The District Court did not dispute the truth of Sirota's assertion. Instead, the court seems only to have stated that Sirota's behavior breached standards of "good conscience or ... good professionalism":

> I hold you to that of a reasonable attorney who, when confronted with a specific order of confidentiality, ... before he would broach the subject to a third party such as the press, whether generally or specifically, he should have, in good conscience or in good professionalism at least made contact with the Court to insure that whatever he said did not violate the order.

Certainly, a violation of the confidentiality order would constitute "conduct which abuses the judicial process" and could justify a sanction. However, the record does not support a finding that Sirota violated any order.

Amicus counsel, in support of the District Court's order, argues that Sirota did, in fact, violate the confidentiality order because Sirota's brief may have, by implication, identified two bidders for the lead counsel position, himself and Kirby. The problem with this contention is that Sirota's brief was not under seal, was available to the general public, and did not expressly divulge the identity of any bidder. In essence, the brief is nothing more than a response to the court's order of March 18, 1999, which required that any class member wishing to contest an aspect of the settlement "file said objections, papers and briefs with the Clerk of the United States District Court for the District of New Jersey."

We further observe that, when Sirota asserted at the hearing that all the information recited by the reporter simply derived from material "[w]e filed ... in our briefs before your Honor," the court responded, "I don't have any problem with **201** that in court. I have no problem with your objecting in court, none whatsoever, none whatsoever." Thus, under the District Court's reading, Sirota was free to present in open court the same material he presented in his brief. The public, including the media, had a right of access to all such material. *See Leucadia,* 998 F.2d at 161 ("the public has the right to inspect and copy judicial records"). While it would be improper for an attorney to divulge the substance of a case that the court has deemed confidential, the public's right of access demands that the attorney must, at the very least, be able to refer a reporter to a public document.

Finding that his written submissions did not offend the confidentiality order, the Court, instead, objected solely to Sirota's contact with the media. However, because the District Court could not identify any improper extrajudicial statement, it could not sanction Sirota for contacting the media in violation of the confidentiality order. *See* L. Civ. R. 105.1 ("Notwithstanding [the Local Rules on extrajudicial statements], a lawyer involved in the litigation of a matter may state without elaboration ... the information contained in a public record."). Under these circumstances, we find no violation of the court's confidentiality order and no evidence of any misconduct.

## VI.

For the foregoing reasons, we will vacate the District Court's sanction, and we direct that the District Court enter an order unsealing all sealed bids and documents in the record if it has not already done so.

---

Footnotes

1    The Court takes this opportunity to express its appreciation to Judith E. Harris and the law firm of Morgan, Lewis & Bockius LLP, for arguing as amicus in support of the District Court's order in this case.

2    The District Court has authored several opinions. *See, e.g., In re Cendant Corp. Litig.,* 182 F.R.D. 144 (D.N.J.1998); *In re Cendant Corp. Prides Litig.,* 51 F.Supp.2d 537 (D.N.J.1999), *vacated in part,* 243 F.3d 722 (3d Cir.2001); *In re Cendant Corp. Prides Litig.,* 189 F.R.D. 321 (D.N.J.1999), *aff'd,* 233 F.3d 188 (3d Cir.2000). The Cendant cases have also spawned a number of appeals to our

Court. *See, e.g., In re Cendant Corp. PRIDES Litig.,* 243 F.3d 722 (3d Cir.2001); *In re Cendant Corp. PRIDES Litig.,* 235 F.3d 176 (3d Cir.2000); *In re Cendant Corp. PRIDES Litig.,* 234 F.3d 166 (3d Cir.2000); *In re Cendant Corp. Prides Litig.,* 233 F.3d 188 (3d Cir.2000).

3    The non-PRIDES claims included those of former shareholders of CUC International and HFS, Inc., companies which merged to form Cendant, as well as the claims of purchasers of Cendant stock. *See Cendant,* 182 F.R.D. at 146.

4    In its entirety, the order provided:

The Court brings this matter on its own initiative for Howard B. Sirota to be ordered to show cause why he should not be held in contempt and sanctioned for violations of this Court's confidentiality order of October 2, 1998 as reported in the New York Times on May 14, 1999 ("Mr. Sirota calculates that the value of that compensation [Kirby's proposed fee] would be $34 million, and argues that it would thus be about 10 percent of the total settlement fund—a percentage he contends greatly exceeds the confidential bid that the Kirby firm submitted to the court last year.").

It is on this 17th day of May, 1999:

ORDERED that Mr. Sirota appear before this Court on the 19th day of May, 1999 at 10:00 a.m. to show cause why he has not violated this Court's confidentiality order of October 2, 1998 and why he should not be held in contempt and sanctioned.

5    We note that on June 25, 1999, the District Court approved a settlement in the Cendant PRIDES case and certified the judgment embodying that settlement and awarding attorneys' fees to lead counsel as final under Federal Rule of Civil Procedure 54(b). *In re Cendant Corp. Prides Litig.,* 51 F.Supp.2d 537 (D.N.J.1999), *rev'd,* 243 F.3d 722 (3d Cir.2001). If Sirota's appeal from the sanctions order were construed as premature, it would have ripened upon entry of the final judgment in the Cendant PRIDES case. *See Lazy Oil Co. v. Witco Corp.,* 166 F.3d 581 (3d Cir.1999).

6    *Pansy* held that a settlement agreement not filed with the district court, but submitted to and reviewed by that court, was not a judicial record. However, *Pansy's* holding is inapplicable here because, among other reasons, unlike the settlement agreement in that case, the records at issue here were submitted at the District Court's request and were generated in connection with the litigation.

7    We do note, for background purposes, that lead counsel auctions have not been widely used by federal courts. *See* Developments, *The Paths of Civil Litigation,* 113 Harv. L.Rev. 1827, 1842 (2000) [*Civil Litigation*] (noting that auctions have been used in only four federal district courts, and only within the securities and antitrust context). Recently, Chief Judge Becker of this Court formed a task force to examine in detail the competitive bidding process and the method of selecting lead counsel in federal class action litigation. *See* Editorials, *Class–Counsel Auctions,* N.J.L.J., Feb. 12, 2000, at 22.

8    Indeed, one district court has affirmatively rejected bid auctions, holding that such auctions violate the PSLRA. *See In re Razorfish, Inc. Sec. Litig.,* 143 F.Supp.2d 304, 311 (S.D.N.Y.2001).

9    In cases employing competitive bidding to select lead counsel, some district courts have used what appear to be an open, unsealed bidding process. *See, e.g., In re California Micro Devices Sec. Litig.,* 168 F.R.D. 257, 259–60 (N.D.Cal.1996). Other courts have sealed the bids but later unsealed them when the lead counsel was selected. *See, e.g., In re Amino Acid Lysine,* 918 F.Supp. 1190, 1192, 1201 (N.D.Ill.1996); *In re Bank One S'holders Class Actions,* 96 F.Supp.2d 780, 782, 785 (N.D.Ill.2000); *In re Wells Fargo Sec. Litig.,* 157 F.R.D. 467, 468 (N.D.Cal.1995). Besides the District Court here, we have found only one other court that has utilized a completely sealed bidding process. *See In re Auction Houses Antitrust Litig.,* 197 F.R.D. 71, 74, 84 (S.D.N.Y.2000).

10    It should be noted that the District Court applied the provisions of the PSLRA several times in the course of the Cendant litigation, though never in the context of selection of lead counsel. *See, e.g., In re Cendant Corp. Litig.,* 139 F.Supp.2d 585 (D.N.J.2001) (PSLRA barred contribution claims); *In re Cendant Corp. Litig.,* 109 F.Supp.2d 285 (D.N.J.2000) (attorneys' fees awarded pursuant to the PSLRA); *In re Cendant Corp. Litig.,* 109 F.Supp.2d 235 (D.N.J.2000) (applied PSLRA in connection with notice of proposed settlement); *In re Cendant Corp. Litig.,* 76 F.Supp.2d 539 (D.N.J.1999) (PSLRA requires showing of scienter in securities fraud action).

11    The PSLRA states that the court "shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be the most capable of adequately representing the interests of class members (*hereinafter in this paragraph referred to as the 'most adequate plaintiff'*) ..." 15 U.S.C. § 77z–1(a)(3)(B)(i) (emphasis added).

12    We do recognize that, in this case, the District Court gave lead plaintiffs' counsel the option of matching the most acceptable bid and becoming lead counsel.

13    In addition to the common law right of access, we note that the Third Circuit has held that the "First Amendment [also] embraces a right of access to [civil] trials." *Publicker,* 733 F.2d at 1070 (citation and internal quotations omitted). This right exists independently of the common law right of access. *See Republic of Philippines v. Westinghouse Elec. Corp.,* 949 F.2d 653, 659 (3d Cir.1991). The general rationale behind this right is that "[p]ublic access to civil trials ... plays an important role in the participation and the free discussion of governmental affairs." *Publicker,* 733 F.2d at 1070; *see also Globe Newspaper Co. v. Superior Court for the County of Norfolk,* 457 U.S. 596, 604–05, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1980) ("[T]o the extent that the First Amendment embraces a right of access to criminal trials, it is to ensure that this constitutionally protected 'discussion of governmental affairs' is an informed one.").

The First Amendment right of access requires a much higher showing than the common law right to access before a judicial proceeding can be sealed. In *Publicker,* for example, we stated that "to limit the public's access to civil trials [where First Amendment right to access applies,] there must be a showing that the denial serves an important governmental interest and that there is no less restrictive way to serve that governmental interest." 733 F.2d at 1070. We also described certain procedural and substantive requirements that are required when the First Amendment applies. 733 F.2d at 1071–73.

However, the parameters of the First Amendment right of access to civil proceedings are undefined. There remain significant constitutional questions about what documents are subject to its reach. *See Littlejohn,* 851 F.2d at 680 n. 14. Because we conclude that the District Court's confidentiality order did not satisfy the requirements for abridging even the common law right of access, we will not address these issues. *See Hagans v. Lavine,* 415 U.S. 528, 547, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974) (noting "the ordinary rule that a federal court should not decide federal constitutional questions where a dispositive nonconstitutional ground is available").

---

**End of Document**                                      © 2014 Thomson Reuters. No claim to original U.S. Government Works.