**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| NORTEL NETWORKS INC., *et al.*,[1] | Case No. 09-10138-KG (Jointly Administered) |
| Debtors. | **Re: D.I. 13454 and 13456** |

— and —

Court File No. 09-CL-7950

ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C.
1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS ARRANGEMENT
ACT, R.S.C. 1985, c. C-36, AS AMENDED.

---

[1]   The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax
identification number are: Nortel Networks Inc. (6332), NNCC (9620), Alteon WebSystems, Inc.
(9769), Alteon WebSystems International, Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073),
Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management
Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS
Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358),
Northern Telecom International Inc. (6286), and Nortel Networks Cable Solutions Inc. (0567)
(collectively, the "US Debtors").

**JOINDER OF LAW DEBENTURE TRUST COMPANY
OF NEW YORK, AS INDENTURE TRUSTEE FOR THE NNCC
NOTES, IN THE (A) PRE-TRIAL BRIEF OF THE US INTERESTS
AND (B) PRE-TRIAL BRIEF OF THE AD HOC GROUP OF BONDHOLDERS**

Law Debenture Trust Company of New York ("Law Debenture"), as indenture

trustee for the NNCC Notes (defined below), by and through its attorneys, Patterson Belknap

Webb & Tyler LLP, Morris James LLP and Borden Ladner Gervais LLP hereby submits this

joinder ("Joinder") and statement in support of the (a) *Pre-Trial Brief of the US Interests*, dated

May 2, 2014  [D.I. 13454] (the "US Interests' Pre-Trial Brief") and (b) *Pre-Trial Brief of the Ad*

*Hoc Group of Bondholders*, dated May 2, 2014  [D.I. 13456] (the "Bondholders' Pre-Trial

Brief," and, with the US Interests' Pre-Trial Brief, the "Pre-Trial Briefs").   Law Debenture

hereby joins in the Pre-Trial Briefs and respectfully states as follows:

**BACKGROUND**

1.     Pursuant to an indenture, dated February 15, 1996, by and among Nortel

Networks Limited (f/k/a Northern Telecom Limited) ("NNL"), as issuer and guarantor, Nortel

Networks Capital Corporation (f/k/a Northern Telecom Capital Corporation) ("NNCC"), as

issuer, and The Bank of New York, as trustee, NNCC and NNL issued $150 million in aggregate

principal amount of 7.875% Notes Due 2026 (the "NNCC Notes").   NNCC and Nortel Networks

Inc. (f/k/a Northern Telecom Inc.) ("NNI") are parties to a Support Agreement, dated February

15, 1996.  Law Debenture is a "Core Party" as defined in the Allocation Protocol approved by

this Court in an Order, dated April 3, 2013 (D.I. 9947).[2]

---

[2] Pursuant to Section I.G.1 of the Joint Trial Protocol, "Core Parties who do not file a brief shall have
until May 6, 2014 to file a joinder to the pre-trial brief of another Core Party."  Capitalized terms used in
this Joinder but not defined have the meanings given to them in the Pre-Trial Briefs.

7078178

## JOINDER

2.      This is a complex and challenging case.  But the issue before the Courts can be simply stated:  how should the sale proceeds stemming from the transfer or surrender of assets be allocated among the three estates.[3]  Resolving this issue requires a sophisticated analysis based on principled and established approaches to valuation.

3.      The Core Parties have put forth four different allocation theories.  Two of those theories (one advanced by the CCC and the UK Pension Claimants and the other by the Canadian Debtors and Monitor) have absolutely no merit.  A third theory (advanced by the EMEA Debtors), although based on an improper cost-based valuation approach, is at least premised, in part, on a correct understanding of the rights and assets relinquished by the selling entities.  And, in contrast to those three theories, only the fourth one (advanced by the US Interests), is supported by well-established valuation principles and the evidence that will be introduced at trial.  Accordingly, Law Debenture files this Joinder in support of the fair market valuation approach advanced by the US Interests.

4.      The CCC and the UK Pension Claimants (the "Global Sub Con Proponents") argue for a "pro rata distribution" of the sale proceeds, a remedy that is rarely used *within* national borders and has *never* been employed across them without consent.  The Global Sub Con Proponents' theory does not withstand even passing scrutiny.  First, the "pro rata distribution" allocation theory is not an allocation theory at all.  It advocates a particular method of distributing funds to *creditors*.  Allocation could not even take place until years from now,

---

[3]      Each of competing groups posed essentially the same question nearly a year ago. See *Motion to Approve Allocation Position of US Debtors and Official Committee of Unsecured Creditors*, dated May 16, 2013 [D.I. 10537], at 1; *Allocation Position of the Monitor and the Canadian Nortel Debtors*, dated May 16, 2013, [D.I. 10543], at 2-3; and *Joint Administrators' Statement Regarding the Allocation Entitlement of the EMEA Debtors to Proceeds of the Sales of the Business and Residual Patent Assets*, dated May 16, 2013 [D.I. 10536], at 2.

7078178

when billions of dollars of claims against the estates are resolved and the proper allocation is reverse-engineered from the resulting claims pools in each jurisdiction. Second, global substantive consolidation finds no support in the law of any of the relevant jurisdictions or in international law. The Global Sub Con Proponents seek to extend the law based on an academic theory that no Court anywhere has adopted. Third, the evidence at trial will provide no support for the Global Sub Con Proponents' argument that Nortel's assets and liabilities are "hopelessly entangled." On the contrary, as the Bondholders' Pre-Trial Brief makes clear, the bondholders and others relied on the separateness of the various Nortel entities when transacting with them. Bondholders' Pre-Trial Brief, ¶¶ 79-84.

5.       The Global Sub Con Proponents' argument, if accepted, could wreak havoc on the bargained-for right of noteholders to enforce their claims against multiple obligors (*i.e.*, by way of guarantees and or other similar contractual rights). It is beyond dispute that sophisticated investors consider key features of a debt instrument before deciding whether to invest. One of the most basic is a guaranty or similar contractual commitment that provides investors access to another source of recovery beyond the assets of the primary obligor in the event of a default. The Global Sub Con Proponents would re-write that basic contract – and do so post hoc – in a way that is unfair to creditors, inconsistent with their reasonable expectations, and not supported by the law of any relevant jurisdiction.

6.       The allocation theory posited by the Canadian Debtors and the Monitor fares no better. In what the US Interests rightly characterize as a "dramatic overreach," US Interests' Pre-Trial Brief, 3, the Canadian Debtors and the Monitor allocate to themselves *all* of the $4.5 billion received from the sale of the Patent Portfolio merely because NNL held bare legal title to the patents. This transparently results-oriented approach to allocation is contrary to

relevant legal principles and the conduct of the parties both before and during the first four and a half years of these cases.  <u>First</u>, it is simply wrong that NNL's bare legal title to the IP entitles it to all sale proceeds.  As the US Interests' Pre-Trial Brief explains, NNL's legal title to the IP "was encumbered by NNI's exclusive, royalty-free and perpetual license to exploit those patents in the United States.  Contrary to the Monitor's argument, NNI did not agree to terminate this enormously valuable license in the Patent Portfolio Sale – without which the sale would not have occurred – for zero consideration."  US Interests' Pre-Trial Brief, 3.  <u>Second</u>, the Monitor never broached this theory with any of the other parties until May 2013 – more than four years after these cases were filed and long after the parties agreed to escrow the sale proceeds for later allocation.  As the Bondholders' Pre-Trial Brief states, "[t]he evidence before the Courts shows that the Canadian Debtors, and every other party (including the Bondholder Group), conducted themselves for years in a manner completely inconsistent with the Canadian IP Theory and, instead, the Canadian Debtors purposely led the Courts to believe that the US Debtors' estate would receive a fair share of the Patent Sale proceeds."  Bondholders' Pre-Trial Brief, ¶ 12.

       7.     Next, the EMEA Debtors advance the "contribution" approach, a theory based on historical research and development spending percentages of each estate.  Unlike the theories advanced by the Global Sub Con Proponents and the Canadian Debtors, the EMEA Debtors' theories are at least, in part, based on a proper interpretation of the assets and rights surrendered by the Nortel entities in the various sales.  But the EMEA Debtors' "contribution approach" to valuation is not the right theory for the Courts to adopt because it is inconsistent with economic reality:  the value of an asset – the price a willing buyer will pay for it – is not

dependent on the historical cost of developing that asset.[4]

        8.     Finally, the US Interests propose to allocate the sale proceeds in accordance with the fair market value of the assets and rights surrendered or transferred by each of the selling debtors.  As the US Interests' Pre-Trial Brief makes clear, the key drivers of fair market value in this context are revenue and cash flow.  US Interests' Pre-Trial Brief, 75.  "As NNI was Nortel's most valuable generator of revenue and cash flow, using straightforward and universally accepted valuation methodologies, the value of the assets sold or relinquished by NNI constitutes the substantial majority of the Sales proceeds."  *Id.* at 68.  Significantly, the US Interests' approach is supported by well-established valuation principles accepted in all relevant jurisdictions and is consistent with the terms of the MRDA.  "Fair market value [. . . ] is the foundational valuation metric widely accepted in the law and economics throughout the world."  *Id.* at 71.  And it is a far more principled, reliable, and recognized method for valuation than any of the alternatives.

---

[4] In addition, the Pre-Trial Briefs explain that the EMEA Debtors' attempted  implementation of the contribution approach contains mistakes.  One of the US Debtors' experts, Laureen Ryan, corrected those mistakes in her report.  Even if the Courts were to adopt a contribution-based approach – which, for the reasons noted in the Pre-Trial Briefs and this Joinder, they should not – the corrections set forth in the Ryan report should be taken into account.

9.    For all of these reasons and the reasons set forth in the Pre-Trial Briefs, both of which Law Debenture joins and fully supports, Law Debenture respectfully requests that the Courts approve the fair market valuation approach to allocation advanced by the US Interests.

Dated:    May 6, 2014                    **MORRIS JAMES LLP**

Stephen M. Miller (DE Bar No. 2610)
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, Delaware  19899-2306
Telephone:  (302) 888-6800
Facsimile:   (302) 571-1750
Email: smiller@morrisjames.com

- and -

Daniel A. Lowenthal
Brian P. Guiney
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY  10036-6710
Telephone:  (212) 336-2000
Facsimile:   (212) 336-2222
Email:  dalowenthal@pbwt.com
        bguiney@pbwt.com

- and -

Edmond F.B. Lamek
BORDEN LADNER GERVAIS LLP
Scotia Plaza
40 King St W, Toronto, ON  M5H 3Y4
Telephone:  (416) 367-6311
Facsimile:   (416) 361-2436
Email:  elamek@blg.com

*Attorneys for Law Debenture Trust Company of New York, as Indenture Trustee*

7078178