**<u>EXHIBIT C</u>**

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. c-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**REPLY BOOK OF AUTHORITIES OF THE MONITOR AND THE CANADIAN
DEBTORS**

**(May 5, 2014)**

**(Motion to Strike Expert Reports and Testimony of Daniel R. Bereskin QC
and Bruce W. Stratton)**

**Goodmans LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

**Jay A. Carfagnini**  LSUC#: 22293T
jcarfagnini@goodmans.ca
**Peter Ruby**  LSUC#: 38439P
pruby@goodmans.ca
**Joseph Pasquariello** LSUC#: 38390C
jpasquariello@goodmans.ca
**Hannah Arthurs**  LSUC#: 55337O
harthurs@goodmans.ca

Tel:    416.979.2211
Fax:    416.979.1234

Lawyers for the Monitor

**Gowling Lafleur Henderson LLP**
Barristers & Solicitors
1 First Canadian Place
100 King Street West, Suite 1600
Toronto, ON  M5X 1G5

**Derrick Tay**  LSUC#: 21152A
derrick.tay@gowlings.com
**Jennifer Stam**  LSUC#: 46735J
jennifer.stam@gowlings.com

Tel:    416.862.7525
Fax:    416.862.7661

Lawyers for the Canadian Debtors

**TO:  THE CORE PARTIES SERVICE LIST**

# Index

# INDEX

1.	David Vaver, *Intellectual Property Law: Copyright, Patents, Trade-Marks* (Toronto: Irwin Law, 2011), excerpt

2.	*Eco-Zone Engineering Ltd. v. Grand Falls-Windsor (Town)*, 2000 NFCA 21

3.	*Wright v. Brauer*, 2010 BCSC 1282, [2010] B.C.J. No. 1796

4.	*Hunter v. Ellenberger*, 1988 CarswellOnt 340

5.	*Jens Nielsen Custom Contracting Ltd. v. Litwin*, 2012 ONSC 2472, 2012 CarswellOnt 5792

1

# ESSENTIALS OF
# CANADIAN LAW

# INTELLECTUAL
# PROPERTY LAW
## COPYRIGHT · PATENTS · TRADE-MARKS

### SECOND EDITION

## DAVID VAVER

Professor of Intellectual Property Law,
Osgoode Hall Law School, York University
Emeritus Professor of Intellectual Property &
Information Technology Law, University of Oxford

*2011*



if the third party itself appears to have been given the licensee's rights under the licence.[92]

Licensing programs need careful handling lest the licensor inadvertently lose legal control of the asset. French chef Pierre Dubrulle let a company use the Dubrulle name for a cooking school, only to discover later that he could not prevent the company from adopting cooking techniques of which he disapproved. The company meanwhile had built up its own goodwill under the Dubrulle name. Pierre could not take that away from it, nor could he stop it from advertising Pierre as its founder if no continuing connection with him was implied.[93]

### a)   Categories

Licences can be exclusive, sole, or non-exclusive. Unfortunately, terminology is not always used consistently, and parties can create hybrid relationships or migrate one kind of licence into another (e.g., a non-exclusive licence into an exclusive one).[94]

In any event, whenever a claimant sues for infringement, it must prove that the defendant had no licence or consent to do the acts complained of.[95] So the buyer of a patented product from the patent holder or authorized licensee can deal as he likes with the product unless the seller proves that the buyer violated a restriction validly imposed and clearly brought to his notice at the time of sale.[96]

The categories of licence are now discussed, and distinguished from exclusive agencies or distributorships.

### i)   Exclusive Licence

An exclusive licence gives the licensee the power to exercise a right to the exclusion of all others including the licensor. Multiple exclusive licences may be granted if each covers a different right or field.[97] For copyrights, patents, and industrial designs, the licence should be in writing.[98] Otherwise it may not be registrable and the licensee will

---

92  *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 (licensee's agreement to supply patented product held not sublicence) [*Eli Lilly*].

93  *Dubrulle v. Dubrulle French Culinary School Ltd.* (2000), 8 C.P.R. (4th) 180 (B.C.S.C.).

94  *Dendron GmbH v. Regents of the University of California*, [2004] EWHC 1163 (Ch.).

95  *Avel Pty. Ltd. v. Multicoin Amusements Pty. Ltd.* (1990), 171 C.L.R. 88 at 94–95 & 119–20 (Austl. H.C.) [*Avel*]; D. Vaver, "Consent or No Consent: The Burden of Proof in Intellectual Property Infringement Suits (2011) 23 I.P.J. — (forthcoming).

96  *Eli Lilly*, above note 92, following *National Phonograph Co. of Australia Ltd. v. Menck*, [1911] A.C. 336 (P.C.) [*Menck*]; *Roussel Uclaf S.A. v. Hockley International Ltd.*, [1996] R.P.C. 441 (Pat. Ct.). But see section F(3), "Sale," in chapter 3.

97  *Courtaulds Ltd.'s Application*, [1956] R.P.C. 208 at 210 (Ch.) (patent).

98  *C Act*, above note 4, ss. 2(7), 13(4) & 13(7); *P Act*, above note 60, ss. 50(2) & (3); *ID Act*, above note 60, ss. 13(2)–(3).

then lose such benefits as priority over competing unregistered rights. While an oral licensee may still join in an infringement claim,[99] he may not always be entitled to compensation or a final injunction.[100]

An exclusive licence of IP is as close to an IP assignment as a lease of land is to an outright conveyance of the fee simple. The fact that it can be sometimes treated as a capital asset has sometimes led to its being called an assignment "in substance."[101] But the two types of transaction are very different. In law, I cannot call "mine own" what I hold as an exclusive licensee, any more than I can call myself the owner of land that I hold on a long-term lease. Except for copyright (where special provisions apply),[102] an exclusive IP licensee may not, technically, even have any proprietary interest in the IP.[103] He cannot usually sue infringers without joining the owner. If an owner acts inconsistently with a contractual licence, he may violate the contract but not necessarily his IP right, for no one can both own and infringe his own IP.[104] Even where an exclusive licence sits on a company's books as part of its capital, the licence cannot be valued as if the company owned it outright. Its value to shareholders and creditors may be affected by its terms, for example, if it contains the common provision that ends the licence on the licensee's insolvency. By contrast, a term in an IP assignment, purporting to reassign the asset to the assignor on the assignee's insolvency, may be ineffective and so may not affect the asset's value in the assignee's accounts.[105]

## ii)   Sole Licence

A sole licence means that the licensee is the only licensee appointed but—in contrast to an exclusive licence—the transaction does not preclude the licensor from competing with the licensee.[106]

---

99   *Apotex Ltd. v. Wellcome Foundation Ltd.* (1998), 79 C.P.R. (3d) 193 (Fed. T.D.), aff'd on this point (2000), 10 C.P.R. (4th) 65 at 93 (Fed. C.A.), not appealed [2002] 4 S.C.R. 153 (patent) [*Apotex*].

100   *Kraft*, above note 62 (SCC) (copyright); see section B(3)(c), "Licensee's Right to Sue," in this chapter.

101   *Murray (Inspector of Taxes) v. Imperial Chemical Industries Ltd.*, [1967] Ch. 1038 at 1052 & 1054 (C.A.) (taxation).

102   *Kraft*, above note 62 (SCC), Bastarache & Abella JJ. for five judges. See sections G(4)(b)(ii), "Parallel Imports," in chapter 2, & B(3)(c), "Licensee's Right to Sue," in this chapter.

103   See section B(3)(c), "Licensee's Right to Sue," in this chapter.

104   *Kraft*, above note 62 at [27] & [31] (SCC), Rothstein J.

105   *Fraser*, above note 27 at [111]–[24].

106   *Black & Decker Inc. v. GMCA Pty Ltd. (No. 2)*, [2008] FCA 504 at [128]–[34] (Austl. Fed. Ct.) (sole licence compared to exclusive and non-exclusive licence) [*Black*].

2

Date: 20000407
Docket: 95/160
Decision No.: 2000 NFCA 21

2000 NFCA 21 (CanLII)

# IN THE SUPREME COURT OF NEWFOUNDLAND
## COURT OF APPEAL

BETWEEN:

ECO-ZONE ENGINEERING LIMITED        APPELLANT

AND:

THE TOWN OF GRAND FALLS - WINDSOR
AND THE TOWN OF BISHOP'S FALLS
CARRYING ON BUSINESS UNDER THE
NAME OF EXPLOITS REGIONAL SERVICES
BOARD                                RESPONDENT


Coram: Marshall, Steele and Cameron, JJ.A.

Court Appealed From:    Supreme Court of Newfoundland, Trial Division
                        1994 G.F. No. 102


Appeal Heard: April 28 & 29, 1999
Judgment Rendered: April 7, 2000

Reasons for Judgment by Cameron, J.A.
Concurred in by Marshall & Steele, JJ.A.


Counsel for the Appellant: Ronald Noseworthy, Q.C. and Richard Gosse
Counsel for the Respondent: Alexander MacDonald

2000 NFCA 21 (CanLII)

**Cameron, J.A.:**

[1]     This is an appeal from a decision of the Trial Division in which the appellant was denied the declaratory relief requested.  The parties are the signatories to a construction contract.  This case turns on the interpretation of that contract.

**Background**

[2]     The Goods and Services Tax (GST) came into effect on January 1, 1991.  In the summer of 1992 the respondent issued a tender call for the construction of a water treatment plant[1].  The appellant, having been  the low bidder, was awarded the contract.   The project engineers were Newfoundland Design Associates Limited.  Work commenced prior to the execution of the Agreement[2] between the parties.  Indeed, the Agreement was not executed until after the dispute which gives rise to this matter arose.

[3]     Although the Instructions to Bidders was headed "unit price contract", clause 11 of the Instructions to Bidders stated payment was to be on the basis of a stipulated price, the Tender Form stated it was for a stipulated price contract and the Agreement ultimately signed by the parties is a stipulated price contract.  That is, Eco-Zone agreed to perform all the work specified by the contract for the stated amount[3]. It is common ground that the law requires that the respondent/owner[4] pay

---

[1] There is other litigation between the parties regarding the scope of the work required under the contract, but for the purposes of this case the work will be described, generally, as the construction of a water treatment plant, the exact scope of the work not being relevant to the issue in this case.

[2] The Agreement is the formal contract entered into between the parties upon acceptance by the owner of the contractor's bid.  The form of this Agreement was provided to the bidders with the tender documents.  As a result, the bidders were aware of the terms of the Agreement the successful bidder would have to enter into with the owner.

[3] There is a reference in Clause 9 of the Tender Form to a unit price for rock removal but this is a limited use of a unit price for minor aspects of the work and does not change the characterization of the contract as a stipulated price contract.

[4] The **Excise Tax Act**, R.S.C. 1985, c. E-15, s. 165 imposes tax liability on every recipient of a taxable supply.

7% GST on the amount it pays to Eco-Zone for the construction of the water treatment plant and that Eco-Zone is required, by law, to collect, and remit to the Government of Canada, the GST owed by the respondent.  The issue is whether the contract price included an amount to cover any GST payable by the respondent in respect of the contract.  The appellant concedes that the contract price included GST on cash allowances[5] and pre-selected equipment, (at least to the extent required by Clause 13 and Clause 14 of the Instructions to Bidders) but maintains that that was the limit of the GST included in the contract price.  The respondent takes the position that the tender price submitted, which was reflected in the contract price, included GST.   Eco-Zone asked the Trial Division to grant:

> (a)  a declaration that the defendant/respondent is liable to pay GST to Eco-Zone on the full contract price as amended from time to time, other than GST added to the pre-selected equipment and to be included in the cash allowances;

> (b)  an accounting of the amount due from the defendant/respondent to Eco-Zone;

> (c)  costs;  and

> (d)  any such other relief that the court deemed just and equitable.

The trial judge dismissed the claim in its entirety.  Eco-Zone appeals from that decision.

## Contract Documents

[4]    For ease of reference there is attached to this decision the following:

Schedule A                        excerpts from Instructions to Bidders

Schedule B                        selected portions of the Tender Form

---

[5]A cash allowance is a sum set aside for an item or items the cost of which cannot be completely identified or ascertained by an owner or contractor at the time of contracting. The amount is adjusted later to reflect the actual cost of the item or items.

Schedule C                          certain relevant general conditions and supplementary
                                    general conditions.

[5]    At trial, there was a great deal of evidence regarding the nature of the GST,
upon whom it is imposed and the obligations of an owner and a contractor under
the **Excise Tax Act**.  There was also evidence regarding the information relating to
the matter of GST made available to bidders on the water treatment plant contract,
amendments to contract documents prior to the closing of tenders, and
communications between the engineer and the contractor after the awarding of the
contract.  Among the issues raised by this case are whether expert evidence was
admissible and what use, if any, should the trial judge have made of parol
evidence.

[6]    The parol evidence rule has long been a part of the interpretation of
contracts.  However, there is no one definition of the rule and there is debate about
whether it is a rule of evidence or a rule of substantive contract law.  Indeed, some
have asked if the rule is required.  (See: **Do We Need a Parol Evidence Rule?**  by
S.M. Waddams (1991), 19 C.B.L.J. 385.)

[7]    For the purpose of this case I have adopted the statement of the rule in **Bank
of Australasia v. Palmer**, [1897] A.C. 540).  If the language of the written
contract is clear and unambiguous, generally no extrinsic parol[6] evidence may be
admitted[7] to contradict, vary, add to or subtract from the terms of the contract.
There are, of course, well established exceptions to the parol evidence rule[8].  For
example, extrinsic evidence is admissible to prove a subsequent variation of a
contract or that a condition precedent has not been met.  The rule has no
application when there is an allegation that a contract was obtained by fraud,

---

[6] While referred to as the parol evidence rule, its application is not limited to oral
evidence.  It applies in respect to all evidence extrinsic to a written agreement.

[7]Although stated in terms of admission of parol evidence it is often difficult to determine,
absent the evidence, whether it might be admissible as, for example, an exception to the rule.  On
some occasions the trial judge must hear the evidence and subsequently rule as whether it is to
be considered in deciding the issue at trial.  (See, for example, **Corey Developments Inc. v.
Eastbridge Developments (Waterloo) Ltd.** (1997), 34 O.R. (3d) 73 (Ont. Gen. Div.).)

[8]Some of the examples which follow could be more accurately described as illustrations
of cases where the parol evidence rule does not apply.

2000 NFCA 21 (CanLII)

misrepresentation or mistake.  There is no submission that one of the exceptions is applicable in this case, which is concerned only with the interpretation of the words used by the parties in the written contract expressing their agreement.  However, as the discussion below will address, rarely is it truly possible to interpret a document without any knowledge of the context and the parol evidence rule does not prohibit a court from admitting evidence of a contexual nature.

[8]     The statement of the parol evidence rule may seem to some to be at odds with the often stated objective of those interpreting contracts of finding the intention of the parties at the time of entry into the contract.  In **Eli Lilly & Co. v. Novopharm Ltd.**, [1998] 2 S.C.R. 129, at p. 166 Iacobucci J. made it clear, once again, that "the contractual intent of the parties is to be determined by reference to the words they used in drafting the document, possibly read in light of the surrounding circumstances which were prevalent at the time.  Evidence of one party's subjective intention has no independent place in this determination."  Indeed the parol evidence rule "within its proper limitations," has been said to be capable of being regarded as "an expression of the objective theory of contract, that is, that the court is usually concerned not with the parties' actual intentions but with their manifested intention."  (See Cheshire, Fifoot & Furmston's **Law of Contract**, (1996) (13th ed.) Butterworths)

[9]     On the other hand, where the contract, as written, is ambiguous, extrinsic evidence may be admitted to resolve the ambiguity.   "An ambiguity ... is a double or devious meaning, that is to say, one word or one expression or a series of expressions capable on its face or in its application of two or more meanings.  As the term is used in the law of contracts, it implies that the parties knew fundamentally what they were contracting for or about but did not express it clearly when they put their intentions and agreement into writing." (See:  **Leitch Gold Mines Ltd. et al. v. Texas Gulf Sulphur Co. (Incorporated) et al.**, [1969] 1 O.R. 469 at p. 524 (Ont. H.C.).)

[10]    While the excerpt from the decision of Justice Iacobucci in **Eli Lilly** only states that the contract may be read <u>possibly</u> in light of the surrounding circumstances, there is authority for the use of such evidence in the interpretation of a contract. (See: **Atlific (Nfld.) Ltd. v. Hotel Buildings Limited and Newfoundland** (1994), 120 Nfld. & P.E.I.R. 91 (NFCA)) In the often cited case of **Prenn v. Simmonds**, [1971] 3 All E.R. 237 (H.L.),  Lord Wilberforce used the

phrase "matrix of facts" to describe the circumstances which could, if not should, be considered by a trial judge in interpreting a contract, even in the absence of ambiguity.  Lord Wilberforce said at pp. 239-40:

> In order for the agreement of 6th July, 1960 to be understood, it must be placed in its context.  The time has long passed when agreements, even those under seal, were isolated from the matrix of facts in which they were set and interpreted purely on internal linguistic considerations. ...  We must ...enquire beyond the language and see what the circumstances were with reference to which  the words were used, and the object, appearing from those circumstances, which the person using them had in view.

Lord Wilberforce elaborated on this matter in **Reardon Smith Line Ltd. v. Hansen-Tangen et al.**, [1976] 3 All E.R. 570 (H.L.), where he said at pp. 574-75:

> No contracts are made in a vacuum: there is always a setting in which they have to be placed.  The nature of what is legitimate to have regard to is usually described as 'the surrounding circumstances' but this phrase is imprecise: it can be illustrated but hardly defined. In a commercial contract it is certainly right that the court should know the commercial purpose of the contract and this in turn presupposes knowledge of the genesis of the transaction, the background, the context, the market in which the parties are operating.
>
> ... when one is speaking of aim, or object, or commercial purpose, one is speaking objectively of what reasonable persons would have in mind in the situation of the parties.  It is in this sense and not in the sense of constructive notice or of estopping fact that judges are found using words like 'knew or must be taken to have known' ... .

As was pointed out in **Prenn**, the commercial or business object of the transaction, objectively ascertained, may be used in interpretation of a contract by enabling the court to reject an interpretation that frustrates the objective.   In **Hill v. Nova Scotia  (Attorney General)**, [1997] 1 S.C.R. 69 at p. 79 the Supreme Court of Canada approved of the view that in interpreting a contract, it need not be looked at in a vacuum. "It is perfectly proper, and indeed may be necessary, to look at the surrounding circumstances in order to ascertain what the parties were really contracting about."

[11]   The authorities indicate that the factual matrix would include evidence regarding the purpose, aims and objectives of the contract.  The factual matrix

2000 NFCA 21 (CanLII)

would not generally include, in my view, evidence of subsequent conduct of the parties (see **Delisle v. Bulman Group Ltd.** (1991), 54 B.C.L.R. (2d) 343 (B.C.S.C.), and **Arthur Andersen Inc. v. Toronto-Dominion Bank** (1994), 17 O.R. (3d) 363 (Ont. C.A.)) or evidence of contractual negotiations. In **Prenn**, Lord Wilberforce specifically rejected the idea that evidence of negotiations should be received as part of the factual matrix. He said that it is only the final document which records a consensus.

**Expert Evidence**

[12]   The trial judge was asked to admit two types of expert evidence: evidence respecting English grammar and rules of syntax; and evidence respecting the application of the Goods and Services Tax and the mechanisms of the collection of the GST. He admitted the second but not the first. In ruling that the expert evidence of Peter Collens, a Chartered Accountant, would be admitted, the trial judge said:

> I am satisfied that the Goods and Services Tax like other forms of taxation is highly complex and an expert's opinion is admissible to provide information which might be outside the experience and knowledge of a judge and jury.

In his decision the trial judge referred to the evidence of the expert and the decision of the Supreme Court of Canada in **Reference Re Goods and Services Tax**, [1992] 2 S.C.R. 445 to conclude that the GST is both a sales tax and an excise tax.

[13]   The appellant submits that the expert evidence should not have been admitted as it did not meet the criteria enunciated by the Supreme Court of Canada for the admission of such evidence. The criteria are: (1) relevance; (2) necessity; (3) the absence of any exclusionary rule; and (4) the qualification of the expert through whom the opinion is sought to be adduced[9]. In the factum of the appellant the admission of the evidence of the expert is challenged as being unnecessary and irrelevant. Further, the evidence given is submitted to have exceeded the area of the witness's expertise.

[14]   There are two aspects to the evidence of the expert. The first is the expert's explanation of the mechanics of the GST, how it works in practice, which is more

---

[9] See **R. v. Mohan**, [1994] 2 S.C.R. 9

in the nature of a factual description than the rendering of an opinion.  The second is the characterization of the GST as a sales tax or an excise tax.  The latter aspect becomes important if the issue in this case is ultimately  determined by reference to GC 22[10].  The appellant seems to have no difficulty with the evidence of the expert regarding the application of the tax and how it works in practice.  Indeed, Eco-Zone quotes extensively from the report of the expert in its own factum to give an "overview of the mechanics of the GST."   I would place such evidence within the factual matrix which may be considered in interpreting the contract. While the source of information is an expert, it is not opinion evidence and it is not the evidence to which the rules of admissibility of expert evidence are directed.  How the tax is paid and the input tax credit is dealt with would have been in the knowledge of the parties on entering into the contract.  It is part of the background known by the parties but perhaps not uppermost in their thoughts at the time.  It is the opinion regarding whether the GST is an excise tax or a sales tax which must be examined against the requirements for the admission of expert evidence.

[15]   What the parties did not directly address before this Court, is the long accepted view that courts do not accept opinion evidence on questions of domestic law (as opposed to foreign law).  This is part of the principle that courts do not accept expert evidence on the ultimate issue which is for the court to decide, which was referred to by the appellant.  Though one could perhaps say that there has been a relaxation of the rule regarding opinion on the ultimate issue, there is little support for the admissibility of expert opinion regarding domestic law.   In **R. v. Century 21 Ramos Realty Inc. and Ramos** (1987), 32 C.C.C. (3d) 353 (Ont. C.A.) the principal of a real estate company was charged with income tax evasion as a result of appropriation of property belonging to the company.  The taxation year in which the appropriation took place was an issue at trial and the Crown called an employee of Revenue Canada to give expert evidence as to when the accused had appropriated the property.  The Ontario Court of Appeal held such evidence to have been inadmissible as the judge was to determine what constitutes an appropriation (a question of law) and if and when an appropriation took place. The expert evidence was therefore inadmissible.  In **Doncaster et al. v. Smith** (1985), 65 B.C.L.R. 173 (B.C.S.C.) at pp. 180-181,  Southin J. suggested another approach should be taken:

---

[10]GC 22 is reproduced in Schedule C.

> Strictly speaking, expert evidence of the domestic law of this country is not
> admissible.  The classic rule is that evidence may be adduced of foreign law
> which is considered a fact but not of domestic law.  However, as the Income Tax
> Act of Canada is so complicated that the Honourable John Crosbie, now Attorney
> General for Canada, once commented, "even a witch doctor can't read it",
> perhaps the courts should relax the rule and permit expert evidence on the Act and
> its effect.  Without taking it upon myself to relax the rule, I adopt the statement as
> setting out the relevant considerations and the effect of an amalgamation [of
> companies].

The British Columbia Court of Appeal reversed the decision of the trial judge but
without comment on the question of expert evidence on domestic law. (See (1987),
40 D.L.R. (4th) 746.)

[16]   I see no basis upon which to announce the death of  the rule against the
admissibility of expert evidence as to domestic law.  The opinions of the expert as
to whether the GST was an excise tax or a sales tax should not have been admitted.

**Factual Matrix**

[17]   To return to the factual matrix in this case, as noted above, it would not
include evidence of the subjective intentions of the parties. The extrinsic evidence
upon which the appellant seeks to rely for certain submissions includes: (1) the
deletion of a supplementary general condition prior to the close of tenders;   (2) the
provisions of other similar contracts; and (3) changes made to the standard form
contract used by the Department of Municipal Affairs, subsequent to this dispute.
The question then is whether any of this evidence may be considered as part of the
factual matrix.  Except to the extent that it is necessary to determine what was
deleted and therefore no longer part of the contract, evidence respecting none of
the three listed is admissible as part of the factual matrix.  Indeed, the appellant
concedes as much in its factum when it said: "if there is an ambiguity in the
contract, it is appropriate ... to consider any deletions that were deliberately made
to a standard form, as well as prior and subsequent acts of the parties in dealing
with the standard forms of contract."  In other words the appellant limits its
argument for the admission of this evidence to the circumstances where an
ambiguity exists.

[18]   The ultimate issue to be addressed is whether the contract price contained in
the written contract includes the GST payable by the owner. The first step is to

determine whether there is ambiguity in the language used in the contract.  If there is no ambiguity parol evidence may not be used to determine the meaning of the words used in the contract, but the factual matrix may be examined to decide if there is an ambiguity and, in the absence of an ambiguity, to interpret the contract. The purpose of the parol evidence rule is to hold the parties to their written agreements where the whole of the agreement has been reduced to writing.  That does not prevent disputes because parties may disagree about what is meant by the words used in the written contract.  The task of the courts is to determine the "intention of the parties" not by what they subjectively believe the agreement says, but objectively.  The intention of the parties, objectively determined, is not decided merely on linguistic rules but on the basis of what makes sense in the context in which the agreement was made.   In the context of this case, the factual matrix includes the mechanics of the collection of the GST. Interestingly, each party submits that there is no ambiguity - that its interpretation is the one clearly stated in the contract documents.

## Application of the GST

[19]   As already noted the GST came into effect in January 1991.  The parties had approximately a year and a half experience with the tax prior to the tender call for the water treatment plant.  The appellant accepts the factual description of the expert, Peter Collens,  regarding the tax, in particular the example given of its application.  Mr. Collens, in exhibit PC -1, provided the following example to illustrate the application of the GST:

> GST is a form of value-added tax[11].  Under this system, a business collects tax from its customers on the basis of the sale price of taxable goods or services multiplied by the GST rate of 7%.  **Each business is, however, entitled to claim a refund or credit for any tax paid on the purchase of goods or services used in its commercial activities.**   This credit (referred to as an "input tax credit") is available to each person in the production and distribution chain except the final non-business consumer of the good or service.  The final consumer is therefore intended to bear the full burden of the tax.
>
> The total amount of tax collected by a business on sales in a given period, less the input tax credits for that period, will be remitted to the government.  **If, in any**

---

[11]   That statement could be said to be an expression of opinion on domestic law, but both parties agree that the GST is a value-added tax.

2000 NFCA 21 (CanLII)

**given period, the input tax credit exceeds the tax collected on sales, a business will be entitled to a refund equal to the difference.** The following oversimplified example[12] of the production and sale of furniture illustrates the basic mechanics of the GST:

|  | Sale Price to customer | Purchase price | Tax collected on sales | Input tax credit | Net tax remitted |
|---|---|---|---|---|---|
|  | $ | $ | $ | $ | $ |
| Logger to sawmill | 100 | - | 7 | - | 7 |
| Sawmill to furniture maker | 200 | 100 | 14 | 7 | 7 |
| Furniture maker to retailer | 300 | 200 | 21 | 14 | 7 |
| Retailer to customer | 400 | 300 | 28 | 21 | 7 |
|  |  |  |  | Total tax | 28 |

The total tax of $28 is equivalent to the final consumer price of $400 multiplied by the 7% tax rate. In this regard, the GST is similar to the existing provincial

retail sales taxes. However, **the mechanics of applying the GST, whereby tax is collected and remitted on the value-added at each stage of production and distribution is the essential difference between the two systems.**

(Emphasis added in original document)

So then, as Mr. Collens pointed out in his testimony and is evident from the table produced above, although the tax of 7% of the purchase price is collected at each step of the manufacturing process the amount that is actually remitted to the government by each person who collects GST, is the 7% on the value added by that person. Further, in the end, the tax is paid by the ultimate consumer. Applied to this case, Eco-Zone was responsible for paying 7% GST to those from whom it acquired goods or services which Eco-Zone in turn used to provide goods and services to the respondent. However, when the goods or services are provided to the respondent and the respondent pays Eco-Zone, as agent for the government of

---

[12]  This same example is found in **Canadian Goods & Services Tax Reporter**, ¶110.

2000 NFCA 21 (CanLII)

Canada[13], 7% on the total cost to the respondent of what was provided by Eco-Zone, Eco-Zone recovers any amount it paid for GST and remits the balance to the government.  The net result is that Eco-Zone pays no GST, the respondent pays all of the GST.  Furthermore, for those, like Eco-Zone, who are part of the production or service chain, as it were, the same is true of products purchased for the business which might not be actually used in producing the end product.  During testimony, the example that was used was a production company which purchases a new computer, not for resale but for its office.  As Mr. Collens put it, the GST is not a cost  to a business[14], though it might be an administrative headache.

[20]   There is, however, an obligation  upon the person providing the goods or services to disclose to the person purchasing the goods or services that the tax is applicable, though it is for the provider to decide if it is to be listed as a separate item to be added to the basic price or if it is to be included in the price stated by the provider[15].  So then, the fact that the price in the tender form did not state the actual amount of the tax is not contrary to the **Excise Tax Act** and is not determinative of the issue before the Court as the Act contemplates prices which include the amount of the tax.

**Specific References to the GST in the Contract Documents**

[21]   The contract documents, as initially provided to the bidders, refer specifically to the GST in 4 places:
a.  In Clause 13 of the Instructions to Bidders;

b.  In Clause 14 of the Instructions to Bidders;

c.  In SGC 1.0, which was subsequently deleted by Addendum No. 3; and

d.  In paragraph 1 of the Tender Form.

---

[13]See the **Excise Tax Act**, s. 221(1).

[14] Except for the cases where the ultimate purchaser is exempt, which has no application here.

[15]  See section 223(1) of the **Excise Tax Act**.

2000 NFCA 21 (CanLII)

All of these are reproduced in the attached schedules.  The appellant also lists  the Tender Form for Sub-Contracts as another document in which there is specific reference to the GST.  While it is true that the GST is specifically dealt with in that document, the Tender Form for Sub-Contracts  does not appear to be on any list of contract documents.  This is logical.  Sub-contracts are separate contracts between the contractor and the sub-contractor.  There is no contractual relationship between the owner and the sub-contractor.

**Parenthetical Expression**

[22]    Paragraph 1 of the Tender Form submitted by the appellant says:

> Having carefully examined the site of the proposed work and all conditions affecting such, as well as the Contract Documents including the Specifications, all Drawings listed in the Specifications, (...) all Addenda, and the Instructions to Bidders for this project,
>
> WE, THE UNDERSIGNED, hereby offer to furnish all necessary labour, materials, superintendence, plant tools and equipment, and everything else required to perform expeditiously and complete in a satisfactory manner the work for the sum of Six Million Six Hundred and Eighty-Two Thousand Dollars (including Cash Allowance and 7% G.S.T.) ($6,682,000.00) in lawful money of Canada which includes all prime costs, allowances and Government sales or excise taxes in force at this date, except as otherwise provided in the tendering documents.

The appellant argued before the trial judge, as it did before this Court, that in interpreting the words within the parentheses one should apply the rule of grammatical construction that words contained within a parenthetical expression only refer to matters within that expression. As counsel for the appellant stated it in oral argument: "because the words 'including Cash Allowance and 7% GST' were enclosed in brackets, it was a parenthetical expression [which] didn't modify the rest of the sentence."  The appellant relied on **Titan Landco Inc. v. WIS Development Corp. Ltd.** (1981), 28 B.C.L.R.  143 (B.C.S.C.) in support of this position.

[23]    In disposing of this submission the Trial Judge said at pp. 16-17 of his decision:

2000 NFCA 21 (CanLII)

The Contract in dispute is a stipulated price Contract.  Eco Zone Limited argues that the words in parenthesis are to be treated no different than those in Titan Landco Inc. v. Wis Development Corp. Ltd., 28 B.C.L.R. 148 where the B.C. Supreme Court found that words included in a parenthetical expression, separated from the rest of the sentence by commas, applied only to the reference within the parenthetical expression.  In that case the relevant clause of an Agreement stated:

> 4.  If default is made in the payment of any instalment of purchase money or interest or of any taxes, rates or assessments rated or charged against the said lands, or if the Purchaser is otherwise in default hereunder and such default shall continue for a period of thirty days after notice thereof in writing has been given by the Vendor to the Purchaser, the whole of the balance of principal and interest then remaining unpaid shall forthwith become due and payable.

Esson, J., decided at p. 143:

> The question is whether 'such default' in the third line refers to both kinds of default referred to earlier in the sentence, or whether it refers only to the words 'otherwise in default'.  The matter is essentially one of grammatical construction I adopt the rules and terminology to be found in Strunk and White, The Elements of Style, 3rd Ed.  The words, 'or if the Purchaser is otherwise in default hereunder and such default shall continue for a period of thirty days after notice thereof in writing has been given by the Vendor to the Purchaser', being separated by commas from the rest of the sentence, are one parenthetical expression which does not limit or restrict what goes before.  The words 'and such default ... the Purchaser', form a restrictive clause within that parenthetical expression and, therefore, must be taken to apply only to the second set of defaults.

I have difficulty rationalizing that the same applies to a phrase totally within enclosed brackets.  I interpret this phrase in the matter at issue as meaning the total contract price must include the Cash Allowance on the Contract and the 7% GST on the contract price.  In other words, the tendered price was all-inclusive.  If the Contractor could add GST to the total tendered price it would in effect be charging GST on GST in the Cash Allowance and on GST included in pre-selected items.  I find such an interpretation to be improper and is not permitted or allowed as anyone in business should know.

[24]    The appellant submits that the trial judge erred in three respects:

2000 NFCA 21 (CanLII)

a)      He failed to appreciate that brackets are a form of parentheses and ignored the significance of the grammatical construction of that phrase;

b)      In his interpretation he added the words "on the contract price" after the words "7% GST"; and

c)      He failed to appreciate the distinction between GST payable by the Contractor and the GST payable by the Owner.

Counsel for the appellant is correct in saying that a parenthetical phrase  may be marked by either commas or brackets.  However, like the trial judge, I do not accept the appellant's submission regarding the application of the "grammatical rule" to this case.  Further, if one merely considers the many uses of parenthetical expressions which one meets on a daily basis, parenthetical expressions may explain, limit or expand other material (usually that which immediately precedes it).

[25]   The source of the "rule" as stated in **Titan** is Strunk and White, **The Elements of Style**, (3rd ed.).  When one examines that source, there is no reference to a "rule" as enunciated by the appellant.  When Esson J. says that "the words, 'or if the Purchaser is otherwise in default hereunder and such default shall continue for a period of thirty days after notice thereof in writing has been given by the Vendor to the Purchaser', being separated by commas from the rest of the sentence, are one parenthetical expression which does not limit or restrict what goes before", he is not saying that words in parenthesis can never restrict what has gone before.  In **Titan** there was a restrictive clause *within* a parenthetical expression and it was for that reason that the words following "and such default" were taken to apply only to the default referred to within the parenthetical phrase.  The key to the decision in **Titan** is the presence of a restrictive clause within a parenthetical expression.  In contrast, in this case, while "(including Cash Allowance and 7% GST)" is a parenthetical expression, "and 7% GST" is not a restrictive clause and therefore the "rule" cited by the appellant has no application.  In fact, "including" generally signifies something in addition to the preceding words.  Contrary to the position taken by the appellant, "including" signifies that the figure which is stated includes an amount for Cash Allowances and 7% GST.  Having determined that, the fact that both Cash Allowances and GST are enclosed in the same set of brackets does not resolve the question of what is comprised in "7% GST."  We must turn to other factors.

2000 NFCA 21 (CanLII)

[26]    Further, when one examines the excerpts from **The Elements of Style** by Strunk and White, which were provided by the appellant, the point being made by the authors and relied upon by Esson J. was that restrictive clauses are not parenthetic and are not set off by commas.

[27]    As to the trial judge "adding 'on the contract price' after the words '7% GST'", this is nothing more than the trial judge stating his conclusion that the GST, which was included in the price bid, was the GST which the owner was obligated to pay under the **Excise Tax Act** in respect of the work performed under the contract.  The real question is whether the trial judge erred in this conclusion.

[28]    The appellant takes the position that the trial judge failed to distinguish between the "GST payable by the contractor and the GST payable by the owner." This is a recurring theme of Eco-Zone which contends that if the phrase  "and 7% GST"  is found to be isolated from "cash allowance"[16] in the parenthetical expression then it refers to the GST payable by the contractor and not that payable by the owner.  That is, this is just another case of the owner making it a term of the contract that the contractor  pay any taxes imposed upon it in connection with performing the work.  The appellant reasons that in Clause 13 and Clause 14 of the Instructions to Bidders, where the phrases "above amounts to include GST and PST" and "+ GST" respectively are used, these are references to the GST the appellant would have to pay the supplier of a cash allowance item or pre-selected equipment.  (The appellant notes that there is no specific instruction regarding GST applicable on the installation of the items or equipment.)  It is correct that in the context of Clauses 13 and 14 of the Instructions to Bidders, the references to the GST are references to the GST which the contractor must pay to the subcontractors.  This is the only logical conclusion as Clauses 13 and 14 are designed to convey information regarding the price of certain items or work.  To enable the bidder to use this information in the compiling of a bid it was necessary to indicate what, if any, taxes were included in the figures.  The critical factor was not whether GST was included, it was that the bidder know whether GST was included.

---

[16]The submission that 7% GST refers to the GST on cash allowance will be examined later in this decision.

2000 NFCA 21 (CanLII)

[29]    The appellant, citing the principle of statutory interpretation that same words have the same meaning[17], submits that if the GST in Clause 13 and Clause 14 of the Instructions to Bidders is the "contractor's GST" then the GST in the parenthetical expression is also the contractor's GST.  While the principle is a well established one, its application in this case is flawed for two reasons.  First, it is possible to define the GST in Clause 13 and Clause 14 and the parenthetical expression in the same way and still come to the same conclusion as the trial judge.  That is, by describing GST as being the Goods and Services Tax payable by the person in the chain who receives the goods or services.  It is the contractor who acquires the goods from the suppliers listed in Clause 14; it is the GST payable to the supplier that is referred to.  In the parenthetical expression it is the total project that is being supplied therefore it is the GST payable by the owner to the supplier (appellant) which is being referred to.  Secondly, even if the appellant's characterization were correct the principle is not immutable, one may have different meanings to the words in the same document.  (See, for example, **Watson v. Haggitt**, [1928] A.C. 127 (P.C.).)

[30]    At times the appellant describes the respondent as trying to transfer the obligation for payment of the GST to the contractor.  On other occasions it describes the issue as whether the contractor has agreed to absorb the GST which is payable by the owner.  With respect, these descriptions are misleading.  There is no doubt that the owner is the one with the obligation under the **Excise Tax Act** to pay the tax.  The appellant (contractor) has the obligation to collect the tax and remit the amount collected, less input tax credit, to the Government.  The **Excise Tax Act** requires the supplier (appellant) to disclose the tax in one of the prescribed manners.  The tax may be included in the price or it may be listed separately.  To use the example given by Mr. Collens and referred to in para. [19], the furniture retailer may list the item as $428 (GST included) or $400 plus $28 GST.  In this case the only question is whether the contract price is $6,667,300.[18] (GST included) or $6,667,300. plus GST.

[31]    The respondent counters that there is only one GST and the appellant only clouds the issue by creating an artificial distinction.  As earlier discussion

---

[17]**R. v. Zeolkowski**, [1989] 1 S.C.R. 1378 at 1387

[18]    The amount bid was amended prior to closing to reduce the bid by $14,700.

2000 NFCA 21 (CanLII)

indicates, the owner pays 7 % GST on the goods and services it receives and the contractor gets an input tax credit on any GST it may have paid out. While the contractor must pay GST to the persons who supply goods and services to it, the net result is that all GST payable in relation to the contract for the construction of the water treatment plant is paid by the owner. This is not just a case of the contractor passing its costs on to its customer. Rather, the whole of the tax collection system is directed to payment of the tax by the ultimate consumer. Why therefore, counsel for the respondent inquires, would the owner be interested in ensuring that the contractor pays any GST it must pay to its suppliers?

[32]    The fact that the contractor pays or does not pay GST to its suppliers makes no difference to the amount that the owner must pay. Whether or not the contractor has paid GST only makes a difference to the input tax credit the contractor receives, which is of no concern to the owner. This distinguishes GST from those cases where the contractor is obligated by contract to pay fees or taxes which are the responsibility of the owner and in the event they are not paid by the contractor, the taxing authority will look to the owner for payment.

[33]    Further, including what the appellant calls the "contractor's GST" in the tender price does not make business sense as this would mean the owner would pay Eco-Zone the amount it paid out to its suppliers for GST, and for the goods and services received by the owner from Eco-Zone, plus GST on both amounts. The contractor would then get an input tax credit from the federal government for the amount of GST it paid out. This would amount to double reimbursement of Eco-Zone for any GST paid to suppliers. To return to the example found in para. [19], if the appellant's explanation were accepted then the sales price for the customer of the retailer would be $421 + GST; $400 representing the price of the item to the retailer plus his profit and $21 representing the GST paid by the retailer to the furniture maker. Further the customer would then pay GST on the $21 GST as well as on the sale price of the good received. GST is not a factor in determining the price of the item. From a business stand point it only makes sense that "including 7% GST" means the GST payable by the customer, in this case the owner/respondent.

[34]    There have been a surprisingly large number of cases in which there was an issue of whether the GST was included in the contract price. Unlike this case, most of those cases arose in the context of the contract having being entered into before the GST became operative and in circumstances where there were no references in

2000 NFCA 21 (CanLII)

the contract documents to GST.  On reading those cases, it is clear that each  turns on the wording of the contract involved. The fact that the tax is imposed on the recipient of the goods and services would indicate that unless the contract directs otherwise, the contract price would not include the GST.  (See: **Prospect Builders Ltd. v. Fraser**, [1996] O.J. No. 119(Ont. Gen. Div.))  **1847-2217 Québec Inc. c. Rimouski (Ville)**, [1997] A.Q. no 3469 (C.A.) is another case in which the fact that the GST was not payable by the bidder but by the owner was considered in interpreting the wording of the contract.  In that case the majority held that the GST was not included in the contract price.  In contrast, the wording of the contract in **Marcel Charest & Fils Inc. v. Ville de Rivière-du-Loup**, [1993] G.S.T.C. 22 was considered by the Court of Appeal of Québec to be sufficiently clear to include the GST. However, a provision for an increase or decrease, arising from changes to taxes or duties after the date of signing of the contract, meant that the contract price had to be increased to reflect the addition of the GST.

**Cash Allowance and Pre-selected Items (Clauses 13 and 14[19] of the Instructions to Bidders)**

[35]   The Instructions to Bidders included two specific references to GST.  Clause 13[20] of the Instructions to Bidders deals with Cash Allowances.  It requires that the allowances be included in the bid price and that the amount for allowances include GST and PST.  Therefore, as the respondent points out, the term "including cash allowance" in the parenthetical expression already includes the GST on the Cash Allowance.  The respondent suggests that the appellant's view that GST in the parenthetical phrase in the Tender Form  means the GST on cash allowances is illogical as the result would be GST on GST.  This would, the respondent argues, result in "and 7% GST" being meaningless which would be contrary to the maxim

---

[19]   See Schedule A

[20]   Clause 13 included the following:
The above amounts to include GST & PST but do not include General Contractor's profits and overhead.  The General Contractor is to include his profit and overhead in his total tender price.

2000 NFCA 21 (CanLII)

*verba cum effectu accipienda sunt* (words are to be interpreted to give them some effect).

[36]    The respondent takes the position that Clause 13 and 14 of the Instructions to Bidders are the only places in the contract where the owner has control over the purchase and the price and the owner must therefore advise the bidder whether GST is included in the price quoted.  All the other prices are determined by the bidder and therefore, the respondent submits, the details are irrelevant to the owner who is only concerned with how much the project is going to cost it.

[37]    The appellant further argues that there is an agency relationship between the provider of the pre-selected equipment and the owner.  In fact the submission would appear to be even wider than that.  The appellant argues that both Clause 13 and Clause 14 of the Instructions to Bidders require the contractor to spend funds at the direction of the owner or its consultant and that in respect of those expenditures the appellant is acting as an agent of the owner.  An agency relationship would have, in the view of the appellant, made a difference, at the relevant time, to the application of the GST.

[38]    This position cannot be sustained.  The appellant itself points out, in para. 114 of its factum, that the "directions in clause 14 are clear - the successful bidder must enter into a contract for certain Pre-selected Equipment with Parkson Corporation for $320,290 plus GST and with Stanco Projects Limited for $194,716 plus GST." There is no contract between the owner and the subcontractor.  The relationship (or non-relationship) between the owner and the subcontractor is the same, whether the subcontractor was chosen by the contractor or directed by the owner (**Atlantic Masonry Limited v. D.J. Lowe Limited et al.** (1971), 2 N.S.R. (2d) 381 (N.S.C.A.)).  As to Clause 13, it is merely a method of allocating for bidding purposes an amount for expenditures that cannot, at that stage, be more precisely identified.

## Supplementary General Condition 1.0

[39]    Prior to the submission of tenders, one conflict within the contract documents was resolved by the deletion of SGC 1.0.  This was accomplished by an addendum to the contract documents which said: "Delete SGC 1.0 - Goods and Services Tax - in its entirety."  In an interesting twist, the appellant, while conceding that in the absence of an ambiguity SGC 1.0 cannot be examined to

2000 NFCA 21 (CanLII)

determine the meaning of what is left of the contract, argues that the wording of the Addendum conveys something more than the mere fact that SGC 1.0 is deleted.  In effect, the appellant is arguing that the wording of the addendum signals to the bidder that all references to GST are deleted.  This submission is not well founded. First, the appellant concedes that the tender price includes GST payable in respect of cash allowances and pre-selected items and it would be illogical to interpret the addendum as deleting the reference to GST in the tender price but not the GST in Clause 13 and Clause 14.  Further, if one examines the structure of the contract documents it is clear that each supplementary general condition has a heading and that "Goods and Services Tax" is merely the heading of SGC 1.0. I see no basis to make anything more of the addendum than it is a method of advising the bidders that a particular SGC is not to be part of the contract documents.

[40]   As indicated above, SGC 1.0 itself should not be examined absent ambiguity.  However, I would add that even if it were to have been considered it does not assist the appellant's argument.

[41]   SGC 1.0 had said not to include GST in individual unit prices or lump sum prices or cash allowances in the Schedule of Quantities and Prices but to include it in items (b) & (c) of the Schedule. However, Clause 13 of the Instructions to Bidders stated that the price of cash allowances included GST.  Further there was no schedule attached where GST could be included in items (b) & (c).  As a result of an inquiry by another bidder, it was decided by the owner that SGC 1.0 should be deleted.  The result was that outside the references in Clauses 13 and 14 of the Instructions to Bidders, which related only to cash allowances and pre-selected equipment, the only specific reference to the GST in the contract documents was in the parenthetical expression in the Tender Form.

[42]   The respondent argues that SGC 1.0 was for unit price contracts and therefore nothing can be made of its deletion from the contract.  The appellant points to the fact that there was a reference to stipulated price, which phrase is interchangeable with lump sum, and argues that SGC 1.0  expressly directed the bidder on how to treat GST in lump sum contracts.  Its removal, the appellant therefore argues, is an indication that GST was not intended to be included in the contract price, except as to cash allowances and pre-selected equipment.

[43]   SGC 1.0 would appear, as the respondent suggests, to have been drafted with a unit price contract in mind.  The references to the Schedule of Quantities and Prices would indicate a unit price contract.  The reference to lump sum prices does not detract from that.  There is no reason why some items of a unit price contract cannot be paid on the basis of a lump sum, just as the rock removal in the stipulated price contract under consideration here was to be paid on the basis of a unit price.   In short, the removal of SGC 1.0 does not aid in the interpretation of the parenthetical expression in the Tender Form.

**Bid Depository**

2000 NFCA 21 (CanLII)

[44]   Paragraph 9 of the Instructions to Bidders requires that the Bid Depository[21] system of the Newfoundland and Labrador Construction Association be used when the use of a bid depository was required under the Contract.   Supplementary Specifications required the use of the bid depository for certain specified items, for example, mechanical - building.   The Bid Depository Tender Form B-D-2 included the following:

a       PROVINCIAL TAX IS INCLUDED IN TENDER PRICE.
        WHEN THE TENDER DOCUMENTS REQUEST, THE TAX
        AMOUNT IS SHOWN AS FOLLOWS: $....................... .

b       FEDERAL GOODS AND SERVICES TAX IS NOT
        INCLUDED IN TENDER PRICE.

---

[21] In **Ken Toby Ltd. v. British Columbia Buildings Corp.** (1997), 34 B.C.L.R. (3d) 263 at 272 (S.C.),  Burnyeat J. described the British Columbia bid depository system. However, that description conveys the general method of operation of bid depositories.

Although the purpose of Bids Depository System has been variously described, the best description is set out in a Reference Guide published in November 1996:

The British Columbia Construction Association Bid Depository is a Provincial system for the receipt of sealed bids from Trade Contractors [Subcontractors], which enables General Contractors receiving the bids to obtain firm quotations in writing and in adequate time to compile their tenders [to Owners] completely and accurately.

Because General Contractors must rely on the bids of Subcontractors when preparing their own Tenders to Owners where the Tender Form requires the General Contractor to use Subcontractors, the Bids Depository System provides a scheme whereby sealed bids from Subcontractors can be received by General Contractors in time ... so that the General Contractors can incorporate bids from Subcontractors when compiling their Tenders to the Owner by the deadline set in the Tender documents.

2000 NFCA 21 (CanLII)

    c      It is a condition of this offer that a contract will be made on
CCA Document No. 1 latest revision.

    d      This quotation is based on strict compliance with
drawings & specifications, instructions to bidders, tender
documents, and all addenda thereto as issued to this date
and the rules and regulations of the Bid Depository.  It is
further understood that if this form is not properly
completed the tender quoted herein is automatically
invalidated.

The appellant submits that logically, if the Bid Depository tender form did not
include GST, and the Tender Form submitted by the appellant says that it is in
strict compliance with the Instructions to Bidders, Tender Documents and all
Addenda, then it follows that the Instructions to Bidders, Tender Documents and
Addenda did not require the Contract Price to include GST, except as specifically
directed.  Earlier in its factum, the appellant appears to relate the requirement under
GC 14, that the Contractor incorporate all the terms and conditions of the contract
documents into all sub-contract agreements entered into with sub-contractors and
the absence of GST from the price given in the Bid Depository tender form as
indicating that it could not have been intended that GST be included in the contract
price for the water treatment plant.

[45]   This reasoning is not persuasive.  First, the Bid Depository is conducted in
accordance with the rules of the Newfoundland and Labrador Construction
Association.  Bid Depository Official Tender Form B-D-2 is the association's
document.  It is true that the bid depository system was used at the direction of the
owner but it is a non sequitur to conclude that because the GST is excluded from
the price submitted by those using the bid depository, the contract between the
parties does not include the GST.  A contractor submitting a bid based on the
information received from the bid depository would know that the price used did
not include the GST.  That is all that is required to enable the bidder to use that
figure in deciding on its own tender price.  This submission would require
complicated  reasoning to defeat a clear statement.

**Duty to Seek Clarification**

[46]   The respondent, citing **Woodlawn Construction Ltd. v. Bedford
Waterfront Development Corp.** (1994), 117 D.L.R. (4th) 363 (N.S.C.A.), argues

2000 NFCA 21 (CanLII)

that if Eco-Zone was unsure as to whether it was required to include GST in its price, it had a duty to seek clarification. The trial judge agreed.  He said at para. 50:

> The liability for "taxes" included in the General Instructions, the Supplementary General Instructions, and the Tender Form give sufficient reference to taxes to make a contracting firm aware of its liability for same, or alternatively, to be sufficiently placed on guard to obtain clarification concerning these references.

The appellant responds in a number of ways.  First, it points to General Condition 23.4[22] which, it argues, makes the Owner responsible for ensuring that the contract documents are in compliance with section 223(1) of the **Excise Tax Act**.  If the tax is included in the price, the appellant submits, it is the contractual duty of the owner to ensure that the contract documents clearly state that and there is a common law duty to make the contract documents clear.  In support of the latter point the appellant cites **Edgeworth Construction Ltd. v. N.D. Lea & Associates Ltd.** (1993), 107 D.L.R. (4th) 169 (SCC) at p. 178.  It is acknowledged that the case concerned a claim for negligent misrepresentation but, the appellant submits, it is authority for the existence of a duty of care that an engineer or consultant has to bidders.

[47]    Secondly, the appellant says that the progress claims, documents over which the appellant had some control and which listed the amount payable and the GST related to that amount, were sufficient to meet the requirements of the **Excise Tax Act**.  Thirdly, the appellant takes the position that there was no confusion in the minds of those at Eco-Zone who were charged with dealing with this matter.  Finally, and in support of the last mentioned point,  Eco-Zone submits that by application of the maxim *expressio unius personae vel rei, est exclusio alterius* (the express mention of one person or thing is the exclusion of another) or *expressum facit cessare tacitum* (when there is express mention of certain things, then anything not mentioned is excluded) any potential confusion is resolved in its favour.

**Expressio Unius**

[48]    The import of the submission that the principle *expressio unius personae vel rei, est exclusio alterius*  should be applied in this case is that by expressly

---

[22]   See Schedule C.

2000 NFCA 21 (CanLII)

mentioning GST in relation to cash allowances and pre-selected equipment there is an "implied exclusion" of GST with respect to the remainder of the contract. (Of course, such an interpretation assumes that the reference to the GST in the tender form is restricted to the GST on the cash allowance, as the appellant argues.)

[49]   The respondent replies that the term is useful only in the context of the interpretation of legislation.  No authority has been provided for such a limitation. However, the case law is filled with warnings regarding the blind application of the maxim.  It has often been described as a valuable servant but a dangerous master. (See the discussion of Marshall J.A. in **R. v. Sall** (1990), 81 Nfld. & P.E.I.R. 10 at p. 17  and the cases cited therein.)  The expression only operates where not outweighed by other interpretative factors.

[50]   In **Driedger on the Construction of Statutes** (3rd ed.) by Ruth Sullivan the maxim is referred to as the implied exclusion argument.  The maxim is explained at p. 168 as follows:

> An implied exclusion argument lies whenever there is reason to believe that if the legislature had meant to include a particular thing within the ambit of its legislation, it would have referred to that thing expressly.  Because of this expectation, the legislature's failure to mention the thing becomes grounds for inferring that it was deliberately excluded.  Although there is no express exclusion, exclusion is implied.  The force of the implication depends on the strength and legitimacy of the expectation of express reference.  The better the reason for anticipating express reference to a thing, the more telling the silence of the legislature.

[51]   The appellant argues that the fact that the GST is specifically referred to only in the Tender Form and Clauses 13 and 14 of the Instructions to Bidders indicates that it was not intended to be included in the contract price.   With respect, that is illogical.  The inclusion of GST in the tender price indicates what is included in the price ultimately reflected in the Agreement.  If it is clear that "and 7% GST", as it appears in the Tender Form, includes the amount payable by the owner on the contract price, it would be a nonsensical interpretation of the Agreement to apply the principle to give the contractor a windfall of an amount equivalent to the GST payable by the owner.

[52]   Further the appellant maintains that while the **Excise Tax Act** makes the contractor responsible for revealing the GST to the owner, the appellant points to

provisions of the contract and submits that the obligation to pay the tax is that of the owner and to transfer that obligation to the contractor, there must be clear unequivocal language.   With respect, there is no suggestion of transfer of an obligation to pay tax in the Agreement.  The issue simply does not arise in this case.  The only issue is whether the price quoted includes GST.  It is not a question of one party taking another's obligation.

## Internal conflict in Contract documents

[53]   The Agreement signed by the parties included the following as Article A-3:

> The Contract Price is Six Million Six Hundred & Sixty Seven Thousand Three Hundred Dollars ($6,667,300.00) in Canadian funds, which price shall be subject to adjustments as may be required in accordance with the General Conditions of the Contract.

The form of this document was included in the package given to tenderers.  As can be observed the parenthetical phrase "(including Cash Allowance and 7% G.S.T.)" which appears in the Tender Form does not appear in Article A-3.  The appellant argues that if this represents a conflict, any such conflict can be resolved by reference to General Condition 2.3 of the Contract which states:

> In the event of conflicts between Contract Documents the following shall apply:
>
> a)     Documents of later date shall govern.
>
> b)     Figured dimensions shown on the Drawings shall govern even though they may differ from scaled dimensions.
>
> c)     Drawings of larger scale shall govern over those of smaller scale of the same date.
>
> d)     Specifications shall govern over Drawings.
>
> e)     The General Conditions of Contract shall govern over Specifications.
>
> f)     Supplementary General Conditions shall govern over the General Conditions of the Contract.
>
> g)     The Agreement shall govern over all documents.

Page: 28

2000 NFCA 21 (CanLII)

The appellant submits that Article A-3, which is part of a later document and part of the Agreement, prevails if there is a conflict with the Tender Form[23] and therefore the contract price does not include GST.

[54]   The appellant relies on **Charest** in support of the principle that a later document prevails over an earlier one, though the appellant asks that this Court reject the Quebec Court of Appeal finding that the GST was an excise tax.  In **Charest** the tender stated that the price included all federal, provincial and municipal taxes.  However, Article 24.2 of the contract which was signed provided that though the contractor would bear any excise taxes, any increase or decrease in such taxes after the date of the signing of the contract would be reflected in the contract price by a corresponding increase or decrease.  The GST came into effect after the contract was signed.

[55]   In the case at bar, the trial judge held at para. 22:

> **Marcel Charest** is distinguishable from the facts before me as the Contract in that case was signed prior to the GST coming into existence.  The GST was not contemplated by either the Contractor or the municipality at the time an Agreement was reached as opposed to this matter where GST was in existence when the tender advertisement was made and acted upon by the plaintiff [appellant].

[56]   The appellant argues that the trial judge erred in distinguishing **Charest** on the basis of the fact that the GST was not contemplated at the time the contract was entered into.  Rather, the appellant argues, **Charest** illustrates the application of priority of contract documents.

[57]   I agree, in part, with the appellant.  In **Charest** the tender documents had merely stated that the price included all federal, provincial and municipal taxes which the court found could include all present and future taxes.  That idea was expressed again in Article 24.1 of the formal contract.  However, Article 24.2 added a method for adjustment if those taxes were to increase after the signing of the contract.  The Quebec Court of Appeal held that the imposition of the GST

---

[23]It is agreed that the Tender Form is part of the contract documents and that all of these contract documents comprise the contract between the parties.

resulted in an increase as contemplated by Article 24.2.  (A similar provision is found in clause 22.2 of the Agreement in this case.)

[58]   I find **Charest** of no assistance in resolving the issues in this case.  Here, the argument is based on the absence of a phrase in the Agreement, not the application of a limiting provision.  In essence the appellant reasons that the later document prevails over the earlier which means that in this case there is an Agreement with no statement that the GST is included in the contract price and as a result it is not.  However, I do not see the conflict between the two documents.  In the Tender Form the bidder was required to submit a price which included GST on the services and goods being provided by him.  The appellant submitted a bid which was subsequently accepted by the owner.  The same price which was stated in the Tender Form, as amended prior to the close of tenders, appears in the Agreement.  There is no conflict.  If the Tender Form included GST, as it did,  the Agreement includes GST.

## Contra proferentem

[59]   In **Eli Lilly & Co. v. Novopharm Ltd.**, [1998] 2 S.C.R. 129, Justice Iacobucci described contra proferentem as operating " to protect one party to a contract from deviously ambiguous or confusing drafting on the part of the other party, by interpreting any ambiguity against the drafting party" (p.165).  In **Harris v. Robert Simpson Co. Ltd.** [1985] 1 W.W.R. 319 (Alta Q.B.), Foisy J. adopted at p. 328 the description as set out in  7 C.E.D. (West 3rd) **Contracts**, p. 318, para. 497:

> Where a contractual provision is sufficiently ambiguous that it is reasonably capable of more than one construction, it will be construed against the party responsible for drafting and tendering the contract and in favour of the opposite party.  But if there is reasonable certainty as to the proper meaning of a provision, even though some difficulty in construction may exist, there is no warrant for employing this rule.  The rule applies to complicated contracts, deeds and standardized business documents since care in draftsmanship may be expected in such cases, but the rule does not extend to informal contracts such as contracts formed from correspondence nor to printed forms which have been substantially amended bilaterally before execution.  The rule applies with particular force to exceptions to or reservations from the primary covenants of deeds.

2000 NFCA 21 (CanLII)

[60]   What is clear from both these references is that *contra proferentem* has no application in the absence of ambiguity.  The rule cannot be used to create an ambiguity.  The appellant's submission that *contra proferentem* operated to support its interpretation can have no application.

**Conclusion**

[61]   Consideration of the many submissions discussed above lead inescapably to the conclusions that there is no ambiguity, that the contract price includes the GST which the owner must pay to the contractor (as agent for the government of Canada) for the goods and services rendered to the owner by the contractor under the contract to construct the water treatment plant.  It is unnecessary to resort to aids for resolving conflicts within contract documents - there are none.

[62]   In the result then, the trial judge was correct when he held that the tender price included the GST owed by the respondent for the services under the contract. Although it was unnecessary for him to do so the trial judge went on to consider whether the GST was a sales tax or an excise tax and was, therefore, included in the contract price by virtue of other sections of the contract which deal with taxes, notably GC 22.  As already stated, the trial judge erred in considering expert evidence respecting whether the GST is a sales tax or an excise tax.  However, since the determination of that question was unnecessary to the conclusion reached, the error can have no impact on the outcome of this appeal.  For the reasons given the appeal is denied.  The respondent shall have its taxed costs.

_____
                    M. A. Cameron, J.A.

I Concur: _____
                    W. W. Marshall, J.A.

Page: 31

I Concur: _____
                    G. L. Steele, J.A.

2000 NFCA 21 (CanLII)

Schedule A

<u>INSTRUCTIONS TO BIDDERS</u>

9       USE OF BID DEPOSITORY

The attention of the Bidder is drawn to the fact that the Bid Depository of the Newfoundland and Labrador Construction Association will be used for the Trade as listed in Section 01000.

11    MEASUREMENT FOR PAYMENT

Payment for all items shown on drawings and outlined in the specification shall be by the Total Stipulated Price.

13    CASH ALLOWANCE

The Municipal Water, Sewer and Roads Master Construction Specification.

Section 01020 Cash Allowance is superseded by the following:

The Stipulated Tendered Prices shall include the following Cash Allowances:

| | |
|---|---|
| 1)  Testing | $ 30,000. |
| 2)  Lab Equipment Allowance | 40,000. |
| 3.  Signage | 4,000. |
| 4.  Chemical Supply | 60,000. |

The above amounts to include GST & PST but do not include General Contractors profit and overhead.  The General Contractor is to include his profit and overhead in his total tender price.

Cash allowances, unless otherwise specified, cover the net cost to the Contractor of services, products, construction machinery and equipment, freight, unloading, handling, storage, installation and other authorized expenses incurred in performing the work stipulated under the cash allowances.

Where costs under a cash allowance exceed the amount of the allowance, the Contractor shall be compensated for any excess incurred and substantiated plus an allowance for overhead and profit as set out in the Contract Documents.

2000 NFCA 21 (CanLII)

2000 NFCA 21 (CanLII)

14      PRE-SELECTED EQUIPMENT SUPPLIERS

(a)      The following suppliers were selected through pre-tender.  The general
         contractor must include the prices noted in his Tender price and enter into
         a contract with the Company listed for supply of the equipment.

                                                    <u>Tender</u>

(1)   Plate Settlers:

      Parkson Corporation                           $320,290 (+ GST)

      9050 Ryan Avenue

      Dorval, Quebec

      H9P 2M8

      Contact: Jean Grenier, P. Eng.

      Phone: (514)636-9718

(2)   Limestone Storage & Feed Equipment:

      Stanco Projects Limited                       $110,006 (+ GST)

      Richmond, B.C.

      V6V 1J8

      Contact: Dave Clarke

      Phone: (604)273-6641

(3)   Hydrated Lime Stone Storage and Feed Equipment:

      Stanco Projects Limited                       $ 84,710 (+ GST)

      Richmond, B.C.

V6V 1J8

Contact: Dave Clarke

Phone: (604)273-6441

Delivery of the equipment and payments must be co-ordinated by the General Contractor.  The Owner will not pay for equipment delivered to the site ahead of schedule unless previous written authorization is given.

2000 NFCA 21 (CanLII)

Schedule B

TENDER FORM

STIPULATED PRICE CONTRACT

Page: 35

2000 NFCA 21 (CanLII)

Tender for:          Exploits Regional Services Board

                     Water Treatment Plant - Contract No. 2


To:                  Deputy Minister

                     c/o Registry Office

                     Department of Municipal & Provincial Affairs

                     Confederation Building

                     St. John's, Newfoundland

Gentlemen,

1.     Having carefully examined the site of the proposed work and all
       conditions affecting such, as well as the Contract Documents including the
       Specifications, all Drawings listed in the Specifications, (if drawings are
       not listed in the specifications such a list appears as Appendix "B") all
       Addenda, and the Instructions to Bidders for this project,

       WE, THE UNDERSIGNED, hereby offer to furnish all necessary labour,
       materials, superintendence, plant, tools and equipment, and everything
       else required to perform expeditiously and complete in a satisfactory
       manner the work for the sum of <u>Six Million Six Hundred And Eighty-Two</u>
       <u>Thousand Dollars</u>. (including Cash Allowance <u>and 7% G.S.T.</u>)  ($
       6,682,000.00)[24] in lawful money of Canada which includes all prime costs,
       allowances and Government sales or excise taxes in force at this date,
       except as otherwise provided in the tendering documents.

2.     The Work will be substantially performed within <u>twenty (20)</u> months from
       the date of notification of award of contract.

       ...

_____

[24]   As noted in the decision, prior to the opening of the bids, the appellant reduced its bid
by $14,700.

6.      WE confirm that the sums herein tendered include all sales taxes, royalties, custom duties, foreign exchange charges, transportation, travelling costs, all overhead and profit, all coordination fees, insurance premiums, and all other charges.

        ...

9.      WE confirm that our Tender price includes the cost of rock removal for the Quantity noted in the specifications and that our unit price for rock removal is $75.00/ m3.

Schedule C

GC2            DOCUMENTS

2.1    The Contract Documents shall be signed in duplicate by the Owner and the Contractor.

2000 NFCA 21 (CanLII)

2000 NFCA 21 (CanLII)

2.2     Words which have well known technical or trade meanings are used in the Contract Documents in accordance with such recognized meanings.

2.3     In the event of conflicts between Contract Documents the following shall apply:

    a)     Documents of later date shall govern.

    b)     Figured dimensions shown on the Drawings shall govern even though they may differ from scaled dimensions.

    c)     Drawings of larger scale shall govern over those of smaller scale of the same date.

    d)     Specifications shall govern over Drawings.

    e)     The General Conditions of Contract shall govern over Specifications.

    f)     Supplementary General Conditions shall govern over the General Conditions of the Contract.

    g)     The Agreement shall govern over all documents.

GC 22     TAXES AND DUTIES

22.1     Unless otherwise stated in Supplementary General Conditions the Contractor shall pay all government sales taxes, customs duties and excise taxes with respect to the Contract.

22.2     Any increase or decrease in costs to the Contractor due to changes in such taxes and duties after the date of the Agreement and up to the agreed date of completion shall increase or decrease the Contract Price accordingly.  If the owner so desires the Contractor is to co-operate with the Engineer/Architect and Owner and permit access to books and records in order to establish the amount of such taxes involved.

22.3     The Contractor shall maintain full records of his estimates of and actual cost to him of the work together with all proper tender calls, quotations, contracts, correspondence, invoices, receipts and

2000 NFCA 21 (CanLII)

vouchers relating thereto, shall make them available to audit and inspection by the Owner, the Auditor General for Newfoundland or by persons acting on their behalf, shall allow them to make copies thereof and to take extracts therefrom, and shall furnish them with any information which they may require from time to time in connection with such records.

GC 23          LAWS, NOTICES, PERMITS AND FEES

23.1          The laws of the place of building shall govern the work.

23.2          The Contractor shall obtain all permits, licenses and certificates and pay all fees required for the performance of the Work which are in force at the date of tender submission (but this shall not include the obtaining of permanent easements or rights of servitude).

23.3          The Contractor shall give all required notices and comply with all laws, ordinances, rules, regulations, codes and order of all authorities having jurisdiction relating to the Work, to the preservation of the public health and construction safety which are or become in force during the performance of the Work.

23.4          The Contractor shall not be responsible for verifying that the Contract Documents are in compliance with the applicable laws, ordinances, rules, regulations and codes relating to the Work.  If the Contract Documents are at variance therewith, or changes which require modification to the Contract Documents are made to any of the laws, ordinances, rules, regulations and codes by the authorities having jurisdiction subsequent to the date of tender submission, any resulting change in the cost shall constitute a corresponding change in the Contract Price.  The Contractor shall notify the Engineer/Architect in writing requesting direction immediately any such variance or change is observed by him.

23.5          If the Contractor fails to notify the Engineer/Architect in writing and obtain his direction as required in GC 23.4 and performs any work knowing it to be contrary to any laws, ordinances, rules, regulations, codes and orders of any authority having jurisdiction, he shall be responsible for and shall correct any violations thereof and shall bear all costs, expense and damages attributable to his failure to comply with the provisions of such laws, ordinances, rules, regulations, codes and orders.

SUPPLEMENTARY GENERAL CONDITIONS

SGC 1.0 GOODS AND SERVICES TAX

.1      Do not include the Goods And Services Tax in individual unit prices or
        lump sum prices or cash allowances in the Schedule of Quantities And
        Prices.  Include 7% GST, if applicable, in item (b.) on the last page of the
        Schedule and in the Grand Total, item (c.), of the Schedule.  GST is
        applicable to all Municipal Projects it is not applicable to projects where
        the Province or the Department of Municipal and Provincial Affairs is the
        Signing Authority.

SGC 4.0 TAXES AND DUTIES

.1      Referring to Section G.C. 22 of the General Conditions any increase or
        decrease in taxes only refers to Products, Material and Equipment
        incorporated into the completed work.

2000 NFCA 21 (CanLII)

3

*Case Name:*

# Wright v. Brauer

**Between
Leah Melinda Wright, Plaintiff, and
Corey Brauer and Karen Brauer, Defendants**

[2010] B.C.J. No. 1796

2010 BCSC 1282

96 C.P.C. (6th) 213

14 B.C.L.R. (5th) 112

2010 CarswellBC 2391

Docket: M085647

Registry: Vancouver

British Columbia Supreme Court
Vancouver, British Columbia

**J.E.D. Savage J.
(In Chambers)**

Heard: September 8, 2010.
Oral judgment: September 10, 2010.

(22 paras.)

*Civil litigation -- Civil procedure -- Discovery -- Physical or psychological examination --
Availability -- Application by the defendants in a motor vehicle accident for the plaintiff to attend a
medical examination by an orthopedic surgeon dismissed -- Defendants failed to show that the
examination was necessary for them to respond to the two medical-legal reports submitted by the
plaintiff.*

*Tort law -- Practice and procedure -- Discovery -- Application by the defendants in a motor vehicle*

*accident for the plaintiff to attend a medical examination by an orthopedic surgeon dismissed --*
*Defendants failed to show that the examination was necessary for them to respond to the two*
*medical-legal reports submitted by the plaintiff.*

Application by the defendants in a motor vehicle accident case to have the plaintiff Wright attend a medical examination by an orthopedic surgeon on September 9, 2010. The trial in this action was set for November 18, 2010. This application was brought after Wright served the defendants with two medical-legal reports. One was prepared by her family physician and the other was prepared by a physical medicine and rehabilitation specialist that Wright saw at the request of her counsel.

HELD: Application dismissed. Wright did not have to attend the examination. The defendants did not explain why this examination was required, other than to state that it was required to properly defend the action and to respond to the two reports that Wright provided them with. The examination was not ordered because the defendants failed to show why it was required to enable them to produce a responsive report.

**Statutes, Regulations and Rules Cited:**

British Columbia Supreme Court Rules, Rule 7-6, Rule 7-6(1), Rule 11-6, Rule 11-6(3), Rule 11-6(3)(a), Rule 11-6(4), Rule 30, Rule 40A, Rule 40A(3)

**Counsel:**

Counsel for the Plaintiff: A.C.R. Parsons.

Counsel for the Defendants: S.D. Hyman.

---

**Oral Reasons for Judgment**

J.E.D. SAVAGE J. (orally):--

## I. Introduction

**1**　This is an application by the defendants in a motor vehicle accident case to have the plaintiff attend and submit to a medical examination by an orthopaedic surgeon September 9, 2010. The trial in this action is set for November 18, 2010.

**2**　The application was made on Short Notice on September 8, 2010.

**3**　On August 26 or 27, 2010, the plaintiff served on the defendants two medical/legal reports. One

was prepared by the plaintiff's family physician and the other by a physical medicine and rehabilitation specialist who the plaintiff saw at the request of her counsel (the "Reports"). The Reports say that the plaintiff is suffering from chronic or ongoing back pain as a result of the motor vehicle accident.

**4**    On September 1, 2010, the defendants requested that the plaintiff attend a medical examination by an orthopaedic surgeon on September 9, 2010 (the "Examination"). The plaintiff refused to attend the Examination on the basis that the time for delivery of expert reports had passed.

**5**    Rule 11-6(3) requires a party to serve expert reports on all other parties at least 84 days before the scheduled trial date. That deadline has passed. However, Rule 11-6(4) permits a party to serve response reports up to 42 days before trial. The deadline for response reports is nearly a month away; the defendants say that deadline is October 5, 2010.

**6**    At the conclusion of the hearing I advised the parties that the plaintiff was not required to attend the Examination (the appointment was scheduled for yesterday) and that I would deliver my Reasons today.

## II. The New Rules and Rule 40A

**7**    Rule 7-6(1) provides as follows:

> (1)    If the physical or mental condition of a person is in issue in an action, the court may order that the person submit to examination by a medical practitioner or other qualified person, and if the court makes an order under this subrule, the court may also make
>
> (a)    an order respecting any expenses connected with the examination, and
> (b)    an order that the result of the examination be put in writing and that copies be made available to interested parties of record.

**8**    Rule 7-6 was formerly Rule 30. The purpose of Rule 30 was succinctly set out by Finch J.A., as he then was, in *Stainer v. ICBC*, 2001 BCCA 133. Speaking for the Court, Mr. Justice Finch said, at paragraph 8, "the purpose of Rule 30 is to put the parties on an equal footing with respect to medical evidence".

**9**    In the context of an action seeking compensation for personal injuries, the parties are on equal footing with respect to medical evidence if they can independently obtain medical evidence and if such evidence is served in accordance with the Rules.

**10**    The procedure for exchanging independent medical evidence is laid out in Rule 11-6. Rule

11-6(3)(a) provides as follows:

> (3)    Unless the court otherwise orders, at least 84 days before the scheduled
> trial date, an expert's report, other than the report of an expert appointed by
> the court under Rule 11-5, must be served on every party of record, along
> with written notice that the report is being served under this rule,

>> (a)    by the party who intends, with leave of the court under Rule 11-3 (9)
>> or otherwise, to tender the expert's report at trial, ...

**11**    Rule 11-6(4) provides as follows:

> (4)    Unless the court otherwise orders, if a party intends to tender an expert's
> report at trial to respond to an expert witness whose report is served under
> subrule (3), the party must serve on every party of record, at least 42 days
> before the scheduled trial date,

>> (a)    the responding report, and
>> (b)    notice that the responding report is being served under this rule.

**12**    Rule 11-6(4) was enacted to fill a lacuna in the Rules. Under the former Rules, Rule 40A
permitted parties to call expert evidence in reply without notice at trial. In order for such evidence
to be admitted, however, it had to be truly responsive to the expert evidence of a witness called by
the opposing party.

**13**    In *Stainer*, *supra*, the British Columbia Court of Appeal considered Rule 40A(3) and the scope
of the Court's discretion to admit responsive evidence. At paragraphs 16-18, Finch J.A. said:

> [16] ... The admission of expert evidence is now governed by Rule 40A(3)

>> An expert may give oral opinion evidence of a written statement if the
>> opinion has been delivered to every party of record at least sixty days
>> before the expert testifies.

> [17] That rule applies equally to all parties. In the normal course, a defendant
> will wish to protect his right to adduce expert evidence at trial by giving the
> notice required by that rule. But the court retains a discretion to admit responsive
> evidence of which notice has not been given: *Pedersen v. Degelder* (1985), 62
> B.C.L.R. 253 (B.C.S.C.); *Kroll v. Eli Lilly Canada Inc.* (1995), 5 B.C.L.R. (3d) 7

(S.C.); and *Kelly v. Kelly* (1995), 20 B.C.L.R. (3d) 232 (S.C.). In the latter case Mr. Justice Williamson said:

> I would restrict, of course, as courts I think must, the practice of having opinion evidence without notice strictly to truly responsive rebuttal evidence, and I think that if that rule is carefully observed, there should be no difficulties.

[18] That is, in my respectful view, a correct statement of the proper practice.

### III. Are the Defendants Entitled to the Examination?

**14**    The defendants argue that Rule 11-6(4) and/or Rule 7-6(1) entitle them to require the plaintiff to attend the Examination.

**15**    Amongst other things, the parties argued before me regarding whether the new Rules have substantively changed the practice which existed under Rule 40A. They agreed that this is an important practice point, and a case of first impression.

**16**    Rule 40A gave the Court discretion to admit responsive evidence of which notice had not been given. Rule 11-6(4) now provides that notice must be given of responsive expert evidence (although I note that the Court retains discretion to admit expert evidence of which sufficient notice has not been given).

**17**    I would expect that, in the ordinary course, an examination would be ordered under Rule 7-6(1) where a person's medical condition was in issue in an action, provided it was requested in a timely way.

**18**    However, at this point in time in the action, the defendants are limited to what Mr. Justice Williamson referred to in *Kelly, supra,* as "truly responsive rebuttal evidence". The application must be considered in that light; the question on this application is not one of notice, but whether the Examination should be ordered to enable the defendant to file responsive evidence. The authorizing Rule, 7-6(1) uses the term "may".

**19**    In *Kroll v. Eli Lilly Canada Inc.* (1995), 5 B.C.L.R. (3d) 7, Sanders J., as she then was, noted that "true response evidence, does not permit fresh opinion evidence to masquerade as answer to the other side's reports".

**20**    In *C.N. Railway v. H.M.T.Q. in Right of Canada*, 2002 BCSC 1669, Henderson J. considered the admissibility of "reply reports" holding that only the portions of the reports that provided a critical analysis of the methodology of the opposing expert were admissible as responsive evidence.

The portions of the reports describing the authors' own opinions on the matters in issue were not admitted.

**21**    In this case, the defendants do not explain why an examination is required in these circumstances, other than a statement by a legal assistant that counsel says such is "necessary to properly defend this action and to respond to the reports of Dr. Weckworth and Dr. O'Connor". Master McCallum in *White v. Gait*, 2003 BCSC 2023 declined to order an examination where it had not been shown why such was required to produce a responsive report.

**22**    In my opinion, the bare assertion reported to a legal assistant in this case is insufficient to support an order under Rule 7-6(1) that the plaintiff attend the Examination, when the defendants are limited to providing response reports under Rule 11-6(4). In the circumstances, the application is dismissed. The plaintiff is entitled to costs of the application.

J.E.D. SAVAGE J.

cp/e/qlrds/qljxr/qlana/qljyw

4

1988 CarswellOnt 340

Ontario Supreme Court, High Court of Justice

Hunter v. Ellenberger

1988 CarswellOnt 340, [1988] O.J. No. 49, 25 C.P.C. (2d) 14

# HUNTER v. ELLENBERGER et al.

Barr J.

Heard: January 15, 1988
Judgment: January 21, 1988
Docket: No. 506/85

Counsel: *S.M. Merrifield*, for plaintiff.
*D.S. Thompson*, for defendants.

Subject: Civil Practice and Procedure

**Table of Authorities**

  **Statutes considered:**

    Evidence Act, R.S.O. 1980, c. 145 —

    s. 52(4)

  **Rules considered:**

    Ontario Rules of Civil Procedure —

    r. 49.10

    r. 53.03

    r. 53.03(1)

    r. 53.03(2)

ADJUDICATION on costs.

*Barr J.***:**

1    This is a motion relating to costs. As both counsel practise in London, it was conducted by conference telephone call. I am giving short reasons as counsel complain of the lack of authority on the points in issue.

2    The action was tried at London on November 26, 27 and 30, 1987. Judgment was reserved. When judgment was given the plaintiff was awarded costs but the reasons provided that I would hear representations from counsel, if desired, before the formal judgment was taken out.

3    On the motion, counsel agreed that the plaintiff had offered to settle before trial for an amount less than the judgment. Plaintiff's counsel asked for solicitor-and-client costs from the time of the offer. However, the offer was delivered at 4:16 p.m. on Friday, November 20, 1987. Under the Rules this was only 3 days before the trial which commenced on the following Thursday. The offer to settle, therefore, was not made within the 7 days provided by r. 49.10. Accordingly the cost consequences of r. 49.10 do not apply. While I have jurisdiction to award solicitor-and-client costs, I see no reason to depart from the usual order as to costs. The plaintiff will therefore have his costs on a party-and-party basis.

4    The second issue relates to the cost of an actuarial report and of the actuary in attending at Court. An actuarial report was obtained and served in 1986 but by the time of trial this was out of date. The plaintiff's counsel therefore obtained a further report dated November 25, 1987, which was amended on the day of argument, November 30. On that day the actuary attended to give evidence if necessary.

5    The later report was useful to me in assessing the plaintiff's damages. However, as the report was not filed in the time required by r. 53.03, defense counsel objected to it being received. I have heard that on occasion a Court has refused to permit evidence to be given where the expert's report was not served on the opposing party within time. This is clearly authorized by the wording of r. 53.03 which provides:

> 53.03(1) A party who intends to call an expert witness at trial shall, not less than ten days before the commencement of the trial, serve on every other party to the action a report, signed by the expert, setting out his or her name, address and qualifications and the substance of his or her proposed testimony.

> (2) No expert witness may testify, except with leave of the trial judge, unless subrule (1) has been complied with.

6    It may be that late delivery of a report may cause such prejudice to the opposing party that the evidence cannot be permitted lest injustice result. Such cases must be very rare indeed, particularly if the trial is without a jury and an adjournment can be granted without undue inconvenience.

7    In my view, it should be remembered that any time a Court excludes relevant evidence the Court's ability to reach a just verdict is compromised. Relevant evidence should not be excluded on technical grounds, such as lack of timely delivery of a report, unless the Court is satisfied that the prejudice to justice involved in receiving the evidence exceeds the prejudice to justice involved in excluding it. In the instant case, I received the report but gave defence counsel 10 days within which to consult with his actuary and decide whether or not he wished the trial to resume and to hear the opposing experts. Within the 10-day period defence counsel advised me that he did not wish to take advantage of this opportunity. I then proceeded to use the report of the plaintiff's actuary. Defence counsel now submits that he should not be required to pay, as part of the plaintiff's costs, the expert's fees for preparation of the second report nor for the attendance of the actuary for the purposes of giving evidence at trial.

8    There are opposing views. Counsel cannot fail to comply with the rules without suffering some penalty if the rules are to be effective.

9    For the plaintiff it might be said that the evidence was relevant and of assistance to Court. Counsel can seldom foresee with any degree of accuracy when a trial will start. Experts will often be slow in delivering reports. To the extent that the plaintiff has to pay the costs in question, the damages he receives will be eroded. The plaintiff had a legitimate claim. The defendant failed to settle and failed to accept an offer which events have shown to be reasonable.

10    I have some sympathy with both views. Although I feel that the effects of late delivery have been overcome by the opportunity afforded to defence counsel to reconvene the trial, I feel that there must be some penalty against the delinquent party.

11    I therefore order that the plaintiff shall not be entitled to include, in his costs recoverable against the defendant, the cost of the actuary for attending at trial and for his second report.

1988 CarswellOnt 340, [1988] O.J. No. 49, 25 C.P.C. (2d) 14

12    The third issue relates to the costs of a medical expert called by the plaintiff. The defendant submits that the plaintiff's medical evidence could have been given by filing the medical reports without calling oral evidence. He relies on the *Evidence Act*, R.S.O. 1980, c. 145, which provides as follows:

> 52.-(4) Where a legally qualified medical practitioner has been required to give evidence *viva voce* in an action and the court is of the opinion that the evidence could have been produced as effectively by way of a medical report, the court may order the party that required the attendance of the medical practitioner to pay as costs therefor such sum as it considers appropriate.

13    In my view, the key requirement of this subsection is that the Court be of the opinion that the evidence could have been produced as effectively by way of a medical report. While a substantial measure of agreement was reached between the two medical specialists, this only emerged in the course of their giving evidence and even then there was a measure of disagreement. In the circumstances I am quite satisfied that the evidence could not have been produced as effectively by way of a medical report. I might add that my experience has been that, generally speaking, reports outlining medical history, complaints, treatment and other routine matters can usefully be received in evidence but opinion evidence as to diagnosis, the mechanics of injury and the prognosis can seldom be given effectively by report except in cases where the opinions of the experts are not at variance. I therefore hold that the plaintiff was justified in calling his medical expert to give evidence. As he could not have given evidence unless a report under s. 53.03 had first been filed, it follows that the costs of the report as well as the costs of the doctor attending in Court are proper items to be included in the plaintiff's costs.

14    As success is divided, there will be no order as to costs of this motion.

*Order accordingly.*

---

**End of Document**            Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

 Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

5

2012 ONSC 2472
Ontario Superior Court of Justice

Jens Nielsen Custom Contracting Ltd. v. Litwin

2012 CarswellOnt 5792, 2012 ONSC 2472, [2012] O.J. No. 2105, 17 C.L.R. (4th) 1

# Jens Nielsen Custom Contracting Ltd., Plaintiffs
# v. John Litwin and Heather Litwin, Defendants

John Litwin and Heather Litwin, Plaintiffs by Counterclaim v. Jens Nielsen
Custom Contracting Ltd. and Jens Nielsen, Defendants to the Counterclaim

Fragomeni J.

Heard: April 18, 2012
Judgment: May 7, 2012 [*]
Docket: 3267/04

Proceedings: additional reasons at *Jens Nielsen Custom Contracting Ltd. v. Litwin* (2012), 2012 ONSC 3736 (Ont. S.C.J.)

Counsel: Kenneth W. Watts, for Plaintiff / Defendants to the Counterclaim
Tudor B. Carsten, Jennifer A. Whincup, for Defendants / Plaintiffs by Counterclaim

Subject: Contracts; Civil Practice and Procedure

**Table of Authorities**

  **Cases considered by *Fragomeni J.*:**

   *Ginkel v. East Asia Minerals Corp.* (2010), 2010 CarswellOnt 717, 2010 ONSC 905 (Ont. S.C.J.) — followed

   *Hunter v. Ellenberger* (1988), 1988 CarswellOnt 340, 25 C.P.C. (2d) 14 (Ont. H.C.) — considered

   *MacKenzie v. Wood Gundy Inc.* (1989), 35 C.P.C. (2d) 272, 1989 CarswellOnt 394 (Ont. H.C.) — referred to

   *Sievert & Sawrantschuk LLP v. Hommel* (2008), 2008 CarswellOnt 8450 (Ont. S.C.J.) — referred to

   *Sports Management Ltd. v. Nedomansky* (1982), 1982 CarswellOnt 435, 28 C.P.C. 223 (Ont. Master) — referred to

  **Rules considered:**

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194
     R. 2.02 — referred to

     R. 25.11 — referred to

     R. 30.08(1)(a) — referred to

     R. 31.07(2) — referred to

2012 ONSC 2472, 2012 CarswellOnt 5792, [2012] O.J. No. 2105, 17 C.L.R. (4th) 1

      R. 48.04 — considered

      R. 48.04(1) — considered

MOTION by plaintiff for order for leave to bring motion for various relief related to admission of evidence.

*Fragomeni J.*:

1    On April 19, 2012 I ruled that the Plaintiff should not be granted leave to proceed with the motion. I also ruled that in the event that my assessment and determination of the threshold issue, that is, the denial of leave to proceed with the motion, was in error, I concluded that the Plaintiff was not entitled to the relief requested.

2    I indicated that full written reasons would be provided for these rulings.

**Reasons for Decision**

3    The Plaintiff in this action, Jens Nielsen Custom Contracting Ltd., seeks an order pursuant to Rule 48.04 of the *Rules of Civil Procedure* granting the Plaintiff leave to bring this motion.

4    If leave is granted, the Plaintiff seeks the following relief:

    1) An order pursuant to Rule 25.11 of the *Rules of Civil Procedure* expunging the engineering report of TAK Engineering Limited dated January 8, 2009;

    2) An order pursuant to Rule 30.08(1)(a) of the *Rules of Civil Procedure* prohibiting the Defendants from entering into evidence the engineering report of TAK Engineering;

    3) An order pursuant to Rule 31.07(2) of the *Rules of Civil Procedure* prohibiting the Defendants from introducing and entering into evidence any information or documentation relating to the corrective work carried out in accordance with the findings set out in the TAK Engineering report of January 8, 2009.

5    In order to understand how this motion came to be heard on the morning of the start of a 10 day trial it is necessary to review in some detail the chronology of events from the start of this matter and the circumstances that surrounded each of those steps.

6    In their Factum, the defendants set out the chronology and salient events and I wish to reproduce those in these reasons:

    In early 2002, the Litwins entered into a contract with the plaintiff, Jens Nielsen Custom Contracting Ltd., to make certain additions and renovations to the Home. Jens Nielsen is the principal of Jens Nielsen Custom Contracting Ltd.

    On January 10, 2008, at the conclusion of the second day of the examination for discovery of John Litwin, the parties agreed, *inter alia*, as follows (the "Agreement"):

        that the Litwins would provide an engineer/expert report within 120 days;

        that the Nielsen Entities would have 90 days after the delivery of the Litwins' engineer/expert report to prepare and deliver their own report (and that the Litwins would provide access to the Home to the Nielsen Entities' engineer/ expert for observation); and

        that no work on items in dispute is to be done until the engineers/experts have had an opportunity to examine premises, except repairs on any emergency basis.

    The Agreement did not deal with production and delivery of supplementary engineer/expert reports.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Pursuant to the Agreement, the Litwins retained Hellyer Engineering Limited to do a report. That report (the "Hellyer Report") is produced to the Nielsen Entities on May 5, 2008, three days before the 120-day deadline set out in the Agreement.

In his letter accompanying the Hellyer Report, Mr. Warne, previous counsel for the Litwins, advised that, the Litwins had retained a consulting engineer, TAK Engineering Ltd. ("TAK") on the recommendation of Hellyer Engineering Limited, as well as a contractor to expose the existing structure and foundation and later repair all the damage done by the investigation.

It was never the Litwins' understanding that a report by TAK was a replacement for the Hellyer Report or that a report by TAK would be produced pursuant to the same terms as the Hellyer Report.

TAK began work at the Home on or about June 4, 2008. The work continued until approximately March, 2009. By letter dated November 25, 2008, Mr. Warne confirmed that the Litwins had hired TAK to do supplementary assessments and work, and advised that any supplementary report would be delivered in due course.

The TAK Draft Report

TAK delivered a draft report to the Litwins on or about January 13, 2009, which was updated on February 10, 2009 (the "Draft TAK Report").

Copies of the Draft TAK Report were shown by Mr. Litwin to Mr. Watts in April, 2009, and to Mr. Nielsen (though he refused to look at it) in March, 2010.

The Final TAK Report

The Litwins received a copy of the final report from TAK (the "TAK Report") prior to July 7, 2010, though they do not recall the specific date.

The Litwins produced the TAK Report to the Nielsen Entities on or about June 15, 2010 as part of their materials filed in respect of the first pre-trial. A copy was also included in the Litwins' Amended Affidavit of Documents dated June 29, 2010.

Issues of Expert Reports Raised at both Pre-trial Conferences

Pre-trials in this matter were held on June 22, 2010 and January 7, 2011. Each time, the Nielsen Entities objected, without success, to the delivery by the Litwins of the TAK Report.

After the June 22, 2010 pre-trial, the Nielsen Entities were given until September 10, 2010 to submit their own responding expert report. The Nielsen Entities were also given leave to conduct additional discoveries of John Litwin. This continued examination began on July 29, 2010, and John Litwin was questioned extensively on the contents of the TAK Report.

No Expert/Engineer Report Produced by the Nielsen Entities

On August 3, 2008, the 90-day period set out in the Agreement for the Nielsen Entities to produce their own expert report expired. On September 30, 2010, the deadline set by Justice Dunn at the first pre-trial for Nielsen Entities to deliver a responding expert report expired.

The Nielsen Entities have never contacted either the Litwins or their counsel to make arrangements for their own engineer or expert to attend at the Home.

Correspondence Regarding Expert Reports

There has been considerable correspondence between the parties as far back as August, 2008 as to whether the Hellyer Report qualifies as an expert report, and whether the Litwins breached the Agreement. It has consistently been the Litwins'

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2012 ONSC 2472, 2012 CarswellOnt 5792, [2012] O.J. No. 2105, 17 C.L.R. (4th) 1

position that the Hellyer Report qualifies as an expert report, that the TAK Report is a supplementary expert report, that the Litwins had complied with the Agreement, and that the Nielsen Entities had ample opportunity to obtain their own expert reports but had chosen not to do so.

Remedial Work

In early 2009, the Litwins engaged Rusand Home Renovations Inc. ("Rusand") to carry out necessary remedial work on the Home. It was Mr. Litwin's understanding, from reviewing the Draft TAK Report and TAK Report, that the remedial work was absolutely essential and needed to be done on an emergency basis as it addressed issues affecting the structural integrity of the Home as well as repairs for the investigation of TAK in exposing latent deficiencies. The invoices from Rusand (the "Rusand Invoices") were originally provided to the Nielsen Entities as part of the Litwins' pre-trial brief on June 14, 2010, and were later included in the Litwins' Amended Affidavit of Documents dated June 29, 2010. John Litwin had also previously shown some of the Rusand Invoices to Mr. Watts on April 23, 2009 and to Mr. Nielsen on March 14, 2010.

Pursuant to the Agreement, the Nielsen Entities had until August 3, 2008 to have their own expert attend at the Home and deliver a report. The remedial work did not commence until February, 2009, approximately six months after this deadline.

The Nielsen Entities Were Aware Of, and Did Not Object to the Remedial Work

When Mr. Litwin attended at Mr. Watts' offices on April 23, 3009, Mr. Watts requested proof of the remedial work to substantiate the Litwins' claim for damages. Mr. Litwin informed Mr. Watts that the work was ongoing. Mr. Watts never demanded that the Litwins stop their remedial work.

In fact, the Nielsen Entities continuously demanded evidence of repairs to the deficiencies that the Litwins claimed in their counterclaim. Furthermore, the Nielsen Entities demanded proof of remedial work before they would agree to a settlement meeting.

The Litwins' documentation regarding the remedial work on the Home was included in the Litwins' Amended Affidavit of Documents, sworn on June 29, 2010.

7    The Plaintiff, Jens Nielsen, swore an Affidavit on February 16, 2012 in support of the motion. Nielsen also sets out the events that give rise to this motion.

8    At paragraphs 9, 10, and 11 he states:

9. The specific terms of the adjournment of the examination of Mr. Litwin were as follows:

1) The Defendant will provide an engineer's [expert] report with regard to the items in issue within a hundred and twenty days of today date [January 10, 2008].

2) The Plaintiff shall have ninety days after the delivery of the engineer/expert report to have their own engineer's/expert report prepared and delivered.

The Defendant will provide access to the Plaintiff's engineer/expert to the premises for observation.

. . .

6) No work on items in dispute to be done until the engineers/experts have had an opportunity to examine premises, except repairs for on an emergency basis.

10. More particularly, the Defendants were to obtain an expert engineer's report and provide to my lawyers. I would then have to obtain my own expert engineer's report and that was to be done within 90 days of receiving the report from the Defendants. It was also a condition of the undertaking that no work would be done on the premises until I had had the opportunity to obtain my expert report and that the only work that could be done was work for emergency purposes. It

WestlawNext® CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 13499-3    Filed 05/06/14    Page 66 of 77

Jens Nielsen Custom Contracting Ltd. v. Litwin, 2012 ONSC 2472, 2012 CarswellOnt 5792...

2012 ONSC 2472, 2012 CarswellOnt 5792, [2012] O.J. No. 2105, 17 C.L.R. (4th) 1

was vitally critical to my case, to have an opportunity to obtain such a report after the Defendants had obtained their engineering report.

11. From February 20087 through March, 2009, my lawyer continuously followed up with counsel for the Defendants regarding the delivery of their expert report. Attached as Exhibits "B" through "J" of my affidavit are true copies of the exchange of correspondence between my lawyers and the lawyers for the Defendants at the time.

9    It is important to refer to some of the correspondence referred to in paragraph 11 of the Nielsen Affidavit.

**At Exhibit B**

Letter from Kenneth W. Watts to Tracy Warne, dated April 24, 2008

In the examination of the Litwins in January, 2008, the matter was adjourned in order to permit the Litwins to obtain an engineering report. The agreement was that there was to be a 120 day time period in which they are to obtain the report. We have calculated that the 120 days will expire on May 9th, 2008. We look forward to receiving that report prior to that date.

**At Exhibit C**

Letter from Tracy C. Warne to Kenneth W. Watts, dated May 5, 2008

Thank you for your letter of April 24th.

Unfortunately, the process is taking a great deal of time because of the failure of your client to produce <u>all</u> the drawings and engineers' reports. For example, in your letter of February 3rd, 2006, you stated, "There was no separate certification by a professional engineer since that was contained in the original drawings." In your January 12th, 2006 letter you wrote, "Our client will be supplying to us its copy of the engineering drawings prior to being submitted to the City of Toronto." At paragraph 13 of your amended Reply and Defence to Counterclaim, dated August 24th, 2006, you stated on behalf of your client, "Any approvals required by a certified engineer were obtained."

Where are the above-referred to documents? Please produce them. Our investigating engineer needs them. Please find enclosed a copy of the report of Hellyer Engineering Ltd.

Our consulting engineer, TAK Engineering Ltd., was hired as recommended by David Hellyer. They are arranging for a contractor to expose the existing structure and foundation and later repair all the damage done by the investigation. This will cost at least $10,000 and will not be finished by May 9th. The cost of the contractor for the investigative work, let alone the repair work, is unknown.

You can see, therefore, why we require the documents referred to above which you have clearly stated are in your client's possession. If your client doesn't have them, then why have you written that they were available and that your client relied on them.

. . .

Enclosure: Building Inspection Report, Prepared by Hellyer Engineering Ltd., Inspection date: March 28, 2008.

**At Exhibit D**

Letter from Kenneth W. Watts to Tracy Warne, dated July 10th, 2008

In response to your letter of May 5th, 2008, we have the following answers:

Jens Nielsen Custom Contracting Ltd. v. Litwin, 2012 ONSC 2472, 2012 CarswellOnt 5792...

2012 ONSC 2472, 2012 CarswellOnt 5792, [2012] O.J. No. 2105, 17 C.L.R. (4th) 1

The copy of the drawings prior to submittal to the City of Toronto, was supplied to you in answers to undertaking no. 4 of our client by correspondence to you of October 20th, 2006.

Our letter of February 3rd, 2006, was corrected in discovery of Mr. Nielsen where we advised that our client did have drawings subsequent to the City of Toronto approval. This was for the post removal in the basement. It was Exhibit No. 5 in Mr. Neilsen's examination. These documents were again supplied to you at your request on April 2nd, 2008. Further in compliance with undertaking no. 13 of Mr. Nielsen, on July 24th, 2007, we sent you the documentation from Samson Wong Professional Engineer. The reference to "any approvals required by a certified engineer was obtained" is referenced to the design proposal made by Mr. Wong. These were the only modifications done to the approved drawings. any (*sic*) other modifications to the drawings were done at the building permit stage. Your client has the City of Toronto approved drawings and the changes on those are self-evident.

Whether any other approvals were required from the engineers in subject to debate.

Trusting this answers your questions in your letter of May 5th, 2008. Your client can now proceed with obtaining its expert report.

**At Exhibit E**

Letter from Kenneth W. Watts to Tracy Warne, dated August 11, 2008

As a follow-up to my letter of July 10th, 2008, when does your client expect to have the expert report regarding deficiencies?

**At Exhibit F**

Letter from Kenneth W. Watts to Tracy Warne, dated November 11, 2008

The examination of your client was adjourned to permit your client to obtain an expert report and hopefully thereby reduced the length of time it would take to examine your client on all the items that he alleges are deficiencies and the cost of repairing. We have received no indication who he has retained to prepare the expert report, or when that report will be completed. Your client has had nine months to produce such a report. If the report is not produced by December 5th, 2008, it will be our intention to serve you with a date for the continued examination for discovery of your client.

**At Exhibit G**

Letter from Tracy C. Warne to Kenneth W. Watts, dated November 25, 2008

Thank you for your letter of November 11th.

I spoke to my client on Monday, the 24th.

As previously indicated, the Hellyer report indicated, in essence, that the job was too complex for the Hellyer organization and recommended hiring TAK Engineering. That has been done. My client advised me in the call that there are holes in his floor and holes on the outside of the home and that the engineer is conducting his investigation. Unfortunately, it was much more complex than anticipated. At this moment, I can't tell you with any certainty when the report will be received but it will be received in due course.

**At Exhibit H**

Letter from Kenneth W. Watts to Tracy Warne, dated December 22, 2008

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2012 ONSC 2472, 2012 CarswellOnt 5792, [2012] O.J. No. 2105, 17 C.L.R. (4th) 1

What is the status of your clients' expert report? We wish to set up further continued examinations for discovery of your clients. Would you kindly provide me with dates you and your clients would be available in February, 2009.

Your quick response would be greatly appreciated.

**At Exhibit I**

Letter from Kenneth W. Watts to Tracy Warne, dated January 13, 2009

Could you provide us with a date when your client expects to have his expert report. We presume by now he had at least some idea when the report will be ready. It is now 7 weeks since you indicated that a more comprehensive report would be necessary.

**At Exhibit J**

Letter from Kenneth W. Watts to John and Heather Litwin, dated March 26, 2009

As it is now clear that you have no intention to deliver an expert report in the above matter, we would like to schedule your continued examination for discovery. Would you please advise which of the following dates you would be available for this examination:

May 11 $^{th}$, 12 $^{th}$, 13 $^{th}$, 14 $^{th}$, 26 $^{th}$, 27 $^{th}$ or 28 $^{th}$, 2009

We look forward to hearing from you at your earliest convenience.

**At Exhibit K**

Letter from Kenneth W. Watts to John and Heather Litwin, dated June 25 $^{th}$, 2010

On the attendance before the pretrial Judge, certain Orders were given and you were supplied with a copy of the Judge's endorsement.

The two immediately important dates are:

The requirement of yourself to serve and file an Amended Statement of Defence by June 30 $^{th}$, 2010, and that would also include providing copies of the documents; and Your continued examination for discovery which is to be completed by July 31 $^{st}$, 2010. I am suggesting that your examination take place on Wednesday, June 21 $^{st}$, 2010, at 10:00 am, at the offices of AC Davenport, Official Examiner (this is where your previous examination took place). Unless I hear from you otherwise, we will proceed to obtain that date and serve you with a Notice of Examination for that date and place.

When you delivered to our office, your Pretrial Conference Brief, it contained the engineering report of TAK Engineering Limited, dated January 8 $^{th}$, 2009. This was delivered to our office on June 15 $^{th}$, 2010. This was the **first** time we had seen this document. It appears that you have now proceeded with certain rectification work pursuant to that engineering report. We consider this a most serious breach of the agreement reached with your lawyer on January 10 $^{th}$, 2008. I am enclosing for your information an excerpt of that examination. The agreement was:

You would supply your engineer's report within 120 days of January 10 $^{th}$, 2008. This was not done and in fact, your engineering report was not done until almost one year later; and

The Plaintiff shall have 90 days to deliver an engineer's report and have their own report prepared and delivered. We are unable to do this as we did not know of your report; The Agreement further provided that No work on items in dispute

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Jens Nielsen Custom Contracting Ltd. v. Litwin, 2012 ONSC 2472, 2012 CarswellOnt 5792...

2012 ONSC 2472, 2012 CarswellOnt 5792, [2012] O.J. No. 2105, 17 C.L.R. (4th) 1

are to be done until the Plaintiff's engineer has had an opportunity to examine the premises, except for repairs on an emergency basis.

This serious violation of not providing the report to us and thereby not permitting the Plaintiff to have its engineer review the premises has severely prejudiced our client's ability to defend against your allegations. You have taken it upon yourself to simply push through without honouring the agreement that was reached in your presence with your former lawyer. We intend to call to the Court's attention your actions which have compromised severely our client's case. If in fact you were a lawyer, this most likely would have been reported to the Law Society of Upper Canada as a very serious breach of ethics.

10      With respect to what transpired at the Pre Trial, Nielsen sets out the following at paragraphs 16 and 17 of his February 16, 2012 Affidavit:

16. On June 15th, 2010, the Defendants delivered their Pretrial Conference Memorandum. Buried deep within tab 6 of their Pretrial Conference Brief, was the engineering report of TAK Engineering dated January 8th, 2009, the very report that my lawyers had been requesting for two years. In fact, this report is not even mentioned in the body of their Pretrial Conference Memorandum. The TAK Engineering report is attached to this Motion Record at Tab 6.

17. The Defendants not only did not advise my lawyers that they had obtained an engineering report, despite numerous requests made as to the status of the report, the Defendants proceeded to destroy the evidence by employing a number of people to reconstruct a portion of their home which is the subject matter of this action, and other portions of their home. With the construction completed, I am unable to obtain an independent engineer's report as to the quality and the appropriateness of the work that was done by my company and whether all the work that was done by Defendants was necessary or exceeded the work that my company had originally been contracted to perform, and if so, to what extent.

**Issue: Whether Leave to Bring this Motion should be Granted Rule 48.04**

11      Rule 48.04(1) states:

Subject to sub-rule (3), any party who has set an action down for trial and any party who has consented to the action being placed on a trial list shall not initiate or continue any motion or form of discovery without leave of the court.

12      The defendants submit that in setting the matter down for trial, the Plaintiff certified that they had all the information they required to proceed to trial.

13      The test to obtain leave pursuant to Rule 48.04 is discussed in *Ginkel v. East Asia Minerals Corp.*, 2010 ONSC 905 (Ont. S.C.J.). At para. 17 Justice Perell sets out the following:

Having reviewed that case law about these several rules, I extract the following principles:

• Because of rule 48.04(1), if a party sets an action for trial, he or she may not without leave bring a motion for: a further or better affidavit of documents; to challenge a claim for privilege; to compel answers to any questions refused at the examination for discovery; or for further discovery: *White v. Winfair Management Ltd.*, [2005] O.J. No. 1542 (Master); *Fraser v. Georgetown Terminal Warehouse*, [2004] O.J. No. 2131 (Master); *Gawronski v. All State Insurance Co.*, [1998] O.J. No. 4640 (Master); *Machado v. Pratt & Whitney Canada Inc.* (1993), 16 O.R. (3d) 250 [1993] O.J. No. 2741 (Gen. Div.).

• The authorities are not uniform as to whether a party can move without leave to compel further discovery or the production of documents if the unanswered question is an unanswered undertaking. The predominant line of authorities, however, requires that after the action is set down for trial, leave be obtained to compel answers to undertakings: *Benedetto v. Giannoulias*, [2009] O.J. No. 3218 (S.C.J.); *Fraser v. Georgetown Terminal Warehouses Ltd.*, [2005] O.J. No. 573 (S.C.J.). There, however, is authority that indicates that leave is not required where a party

2012 ONSC 2472, 2012 CarswellOnt 5792, [2012] O.J. No. 2105, 17 C.L.R. (4th) 1

is not honouring his or her undertakings: *Region Plaza Inc. v. Hamilton-Wentworth (Regional Municipality)*, [1996] O.J. No. 4809 (Gen. Div.).

• A party who has set an action down for trial is not precluded from taking interlocutory steps or from making motions to respond to a motion or interlocutory step taken by the opposing party: *1086471 Ont. Ltd. v. 2077060 Ont. Inc.*, [2008] O.J. No. 5175 (Master); *Trotter v. Cattan* (1997), 15 O.R. (2d) 800 (Master). Thus, for example, a party who sets an action down for trial but who is confronted with his or her opponent's motion for a summary judgment may cross-examine the moving party's deponents and compel answers to refused questions; see: *1086471 Ont. Ltd. v. 2077060 Ont. Inc.*, [2008] O.J. No. 5175 (Master).

• If before setting an action down for trial, a party obtains an order compelling his or her adverse party to answer undertakings or any unanswered or refused questions from the examination for discovery, the party may set the action down for trial and he or she will not require leave to bring a motion to compel compliance with the court's existing order requiring answers: *CBL Investments Inc. v. Menkes Corp* (1994) 17 O.R. (3d) 147 (Gen. Div.); *Chiefs of Ontario v. Ontario*, [2007] O.J. No. 2569 (Master); *1086471 Ont. Ltd. v. 2077060 Ont. Inc.*, [2008] O.J. No. 5175 (Master). In these circumstances, the motion is, in effect, a motion to enforce a court order and not a motion to initiate or continue discovery within the meaning of rule 48.04(1).

• Once a party has set an action down for trial, it is a matter of discretion in the particular circumstances of the case whether the court will grant leave to initiate or continue a motion or form of discovery. However, the setting down for trial is not a mere technicality and the test for granting leave to permit further discovery or other interlocutory proceedings, is that there must be a substantial or unexpected change in circumstances such that a refusal to grant leave would be manifestly unjust or the interlocutory step must be necessary in the interests of justice. *Hill v. Ortho Pharmaceutical (Canada) Ltd.*, [1992] O.J. No. 1740 (Gen. Div.) at para. 3; *Machado v. Pratt & Whitney Canada Inc.* (1993), 16 O.R. (3d) 250 [1993] O.J. No. 2741 (Gen. Div.); *White v. Winfair Management Ltd.*, [2005] O.J. No. 1542 (Master) at paras. 15-16; *Benedetto v. Giannoulias*, [2009] O.J. No. 3218 (S.C.J.).

14    At the first Pre-Trial Justice Dunn did grant the Plaintiff leave to conduct a further examination of John Litwin after the matter had been set down for trial.

15    The Trial Record is dated June 29, 2009. The Solicitor's Certificate of Kenneth W. Watts, setting the matter down, is signed on June 29, 2009.

16    A Pre-Trial was set for June 22, 2010 with a trial date to be set at the Pre-Trial.

17    On September 13, 2010 a further Pre-Trial is set for January 7, 2011. A further Pre-Trial was held on January 7, 2011 and then adjourned to February 7, 2011. On February 7, 2011 a trial date is set for the April 2012 blitz sitting for 10 days. The motion to exclude the TAK report was made returnable March 7, 2012 at which time Murray J. ordered that the motion be heard by the trial judge. On March 26, 2012 a further Pre-Trial was held. The matter would proceed to trial and it was noted that it would take 8-9 days.

18    The Plaintiff received the Hellyer Report by letter dated May 5, 2008. The Hellyer Report clearly sets out numerous observations and lists some of the concerns observed during the inspection. These are listed at pages 3 and 4 of the Report. At page 5 of the Report, the author of the Report, Mr. David R. Hellyer states:

**Comments and Discussion**

In my opinion, the observable structural components exhibit substandard workmanship and an unusually high degree of deviation from the approved working drawings. I also found the municipal inspection paper trail to be vague and confusing. Many of the conditions observed are easily correctable; however there are several key issues which will require further investigation and will likely involve major repair expense. Based on the visible evidence, I consider the following to be significant issues:

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

• The lowered basement is leaking and was not inspected during construction. At the very least it is incomplete, but it also may need significant repair. At the time of the inspection I saw no indication of any settlement issues or distress. Further investigation and exposure will be needed to sort this out;

• The elevation difference at the box bay, although primarily cosmetic, is unacceptable workmanship which will require major repair.

• The design of the renovations features an above average number of point loads which do not appear to have been fully accounted for and do not correspond to the approved plans. Further investigation will be needed to determine what, if anything needs to be done.

**Recommendations:**

In my opinion the above average number of workmanship issues, in combination with the complicated structural design and unusual extent of deviation from the approved construction drawings justifies a complete review of the structure of the entire house. I have reviewed the proposal from TAK Engineering Ltd. and am in agreement that that is exactly what needs to be done. The total cost to investigate and remedy all of the deficiencies will depend on what is revealed during the investigation and upon removal of finishes. Based on the visible evidence, in my opinion, the anticipated costs to remedy the known deficiencies could easily exceed $50,000. The additional cost to correct unknown deficiencies is anybodies guess.

**Summary:**

The renovation work done on this home has an above number of workmanship deficiencies and deviations from the approved construction drawings. These deficiencies and deviations have resulted in an ORDER TO COMPLY from the City of Toronto. Further investigation and review of the entire structure will be needed to remedy the deficiencies and satisfy the ORDER TO COMPLY. This procedure will involve destructive procedures and major repair expenses.

19    It is difficult to understand why, in light of the Hellyer Report, the plaintiff did not make arrangements to have their expert attend at the Litwin's residence to make their own observations, take pictures and in essence crystallize the condition of the residence as it existed at that point in time.

20    The Agreement reached on January 10, 2008 at the conclusion of the second day of the examination for discovery of John Litwin, permitted the plaintiff to have access to the home to the Plaintiff's expert/engineer for observation. Instead the Plaintiff took the position that he needed the TAK Report first.

21    However, the Hellyer Report should have clearly alerted the Plaintiff that there were serious issues and deficiencies identified in the Hellyer report. At no time did the Plaintiff, immediately following the receipt of the Hellyer Report, ask for permission for their expert/engineer to be able to attend at the home. There was nothing preventing them from doing so. It was not necessary to have the TAK Report before doing so.

22    Further, once the Remedial Work commences, at no time does the plaintiff express concerns that the work is being done or seek an injunction to have the work stop until his expert/engineer can inspect and observe the home. At paragraph 19 and 20 of his February 28, 2012 Affidavit, John Litwin states:

19. On April 20 and 23, 2009, I attended at the offices of O'Connor MacLeod Hanna LLP to inspect copies of original documents that Mr. Watts held on behalf of the Nielsen Entities. I brought with us the Draft TAK Report that we received on February 10, 2009, which I showed to Mr. Watts. At that time, I explained to Mr. Watts that parts of the Home were still exposed and that remedial work was ongoing, which was confirmed by the Draft TAK Report.

20. On March 14, 2010, I met with Mr. Nielsen and showed him a copy of the Draft TAK Report received on February 10, 2009. Mr. Nielsen refused to look at the Draft TAK Report.

2012 ONSC 2472, 2012 CarswellOnt 5792, [2012] O.J. No. 2105, 17 C.L.R. (4th) 1

23      Rather than object to the work being done or seek a Court injunction to have the work stop, the Plaintiff asked for particulars of the work being done as it related to the defendant's counterclaim. The following letters are relevant on this point:

**At Tab I- Letter from Kenneth W. Watts to John and Heather Litwin, dated May 7, 2009.**

You also advised that you have ongoing work at your home. If you intend to raise this work as an issue in the litigation you will be required to amend your Counterclaim. This should be done in sufficient time to permit our client to respond to those amendments.

You have also advised that you are aware that any expert report must be served within 90 days of the date of trial. You will recall that your examination was adjourned many months ago to permit you to prepare such a report with expectation that it may shorten your discovery.

**At Tab X - Letter from Kenneth W. Watts to John and Heather Litwin dated November 2, 2009**

You have for a considerable period of time, indicated that you are having work done to repair the deficiencies in your home but, you have failed to provide to us **ANY DOCUMENTATION** that this is being done, or the cost of it. We have no copies of any tenders you have put out, contracts you have signed indicating the work that needs to be done, invoices from contractors with regards to work that has been done to correct deficiencies and the proof of payment to the contractors. Since none of that information has been supplied to us, we require it to be provided to us immediately so that we may understand your position, assess it and determine whether settlement discussions should take place.

**At Tab Y- E-mail from John and Heather Litwin to Ken W. Watts dated November 3, 2009**

We appreciate you finally responding to our requests for a settlement meeting. As per our earlier discussion in your office on April 25, 2009, I am more than willing to provide invoices and other material relating to the remedial work to facilitate a settlement meeting. I will send materials shortly. What dates is your client able to meet?

**At Tab Z - E-mail from John and Heather Litwin dated November 20, 2009 to Ken W. Watts**

We are eager to have a settlement meeting as soon as possible. We planned to send you invoices; however, your letter dated November 2, 2009 imposes several conditions before you "determine whether settlement discussions should take place". You listed the following:

    1) "copies of tenders you have put out";

    2) "contracts you have signed indicating the work that needs to be done";

    3) "invoices from contractors with regards to work that has been done to correct deficiencies"; and

    4) "proof of payment to the contractors".

It will assist us greatly in organizing our material and quite frankly understanding what you require, if Mr. Nielsen could provide us with the same documents for his work. As you attempted to set a trial date on November 2 and will do so again on December 7, 2009, we request your client's material forthwith.

**At Tab AA - Letter from Kenneth W. Watts to John and Heather Litwin dated January 6, 2010**

You also have not provided to us any documentation with regards to your alleged additional repair costs which you have indicated you have. We have requested this documentation from you before. Would you please provide this material to us immediately.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2012 ONSC 2472, 2012 CarswellOnt 5792, [2012] O.J. No. 2105, 17 C.L.R. (4th) 1

24      As John Litwin stated at paragraphs 19 and 20, in April 2009, the Plaintiff knew about the TAK Report. At paragraph 21 of his Affidavit John Litwin states:

> 21. TAK delivered to us a final report (the "TAK Report") dated January 8, 2009 on or about July 7, 2010. The TAK Report is substantially similar, though not identical, to the Draft TAK Report. Attached hereto and marked as **Exhibit "H"** to this affidavit is the TAK Report.

25      In summary I find that the following factors support the defendants' position:

1. The plaintiff received the Hellyer Report by letter dated May 5, 2008;

2. The Hellyer Report identified numerous concerns and deficiencies and upon receiving this Report, the plaintiff should have taken steps to immediately arrange to have their expert/engineer attend at the home to observe and inspect the home. The Agreement at discoveries expressly allowed for this;

3. At no time did the Plaintiff seek permission or make arrangements for their own engineer or expert to attend at the home. The Plaintiff did not need the TAK Report in order to do so;

4. Once the remedial work commenced, at no time after being made aware that work was being done, did the Plaintiff object or seek a court order to stop it. Instead the Plaintiff demanded particulars;

5. The defendants proceeded with the remedial work as a result of the TAK Report which identified deficiencies that had to be done. The Agreement reached at discoveries contemplated this, namely that repairs on an emergency basis could be done;

6. At no time following the Pre-trial in June, 2010 before Justice Dunn did the Plaintiff obtain his own expert report. Justice Dunn allowed the Plaintiff until September 2010 to do so;

7. Further, the Plaintiff conducted further examinations of Mr. Litwin with respect to the TAK Report;

8. At paragraph 2 of his Affidavit sworn March 1, 2012 Jens Nielsen states:

> In reply to paragraphs 20 and 41 of the Affidavit of John Litwin sworn February 28[th], 2012, I did meet with Mr. Litwin at the food court in Sherway Gardens Mall. At the meeting, we discussed the possibility of settlement, however no settlement was reached. Whether Mr. Litwin showed me the TAK report of January 8[th], 2009, or the invoices of Rusand Home Renovations, although I do not recall seeing them, it would not have made any difference as the work had already been completed and no professional engineer would be prepared to provide a responding engineering report without having the same opportunity to inspect the original state of the property.

However, there is nothing before the Court at this motion from an expert that what Mr. Nielsen deposes is accurate and not just speculation or conjecture on his part.

9. Despite all of the concerns raised by the Plaintiff he then still sets the matter down for trial without having proceeded with a motion to exclude the TAK Report;

10. Not only are there no unexpected circumstances, all of the circumstances are known to the Plaintiff and with that knowledge the Plaintiff took the step setting the matter down.

26      In all of these circumstances I am not satisfied that leave should be granted pursuant to Rule 48.04.

**Rule 2.02**

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

27     The Plaintiff did not seek leave to bring this motion pursuant to this Rule. The defendants submit that the Plaintiff should have done so. Rule 2.02 states:

A motion to attack a proceeding or a step, document or order in a proceeding for irregularity shall not be made, except with leave of the court,

(a) after the expiry of a reasonable time after the moving party knows or ought reasonably to have known of the irregularity; or

(b) if the moving party has taken any further step in the proceeding after obtaining knowledge of the irregularity. R.R.O. 1990, Reg. 194, r. 2.02.

28     I agree with the position of the defendants on this issue as set out in their Factum at paragraphs 30 to 38:

30. The length of delay that a court will tolerate in bringing such a motion varies with the circumstances, though delays of as little as five to six months have engaged Rule 2.02.

*MacKenzie v. Wood Gundy Inc.* (1989), 35 C.P.C. (2d) 272 (Ont. H.C.)

31. The Nielsen Entities were served with the TAK Report on June 15, 2010, approximately 20 months ago. They have known that remedial work was being carried out since April 23, 2009, approximately 34 months ago, and received the invoices setting out that work on June 29, 2010, approximately 20 months ago.

32. Nonetheless, they waited until just weeks before the start of trial to bring this motion. It is submitted that the Nielsen Entities have not brought this motion in a timely manner.

The Nielsen Entities Have Taken Further Steps or Have Waived the Irregularities

33. Though the Nielsen Entities raised objections to the TAK Report at the first pretrial, their objections were not upheld. Instead, they were offered the opportunity to further examine John Litwin on that report, and did so extensively. They were also offered the opportunity to submit a responding expert report by September 20, 2010, but chose not to do so.

34. In examining John Litwin on the TAK Report, the Nielsen Entities have taken a further step, contrary to Rule 2.02.

35. Alternately, in conducting a further examination of John Litwin, especially on the contents of the TAK Report, the Nielsen Entities have waived any claim of irregularity over the delivery of the Materials.

36. The test of waiver of irregularity is whether the complaining party has impliedly forgiven the defect by taking a further step in the proceedings. An examination for discovery implies that the documents being examined on have been accepted and any irregularity waived.

*Sports Management Ltd. v. Nedomansky* (1982), 28 C.P.C. 223 (Ont. Master) at paras 4 and 5, Respondents' Brief of Authorities, Tab 3.

**No Explanation of Delay**

37. Furthermore, the Nielsen Entities have offered no evidence or explanation for their delay in bringing this motion, or why they waited until the eve of trial to do so.

38. Absent any evidence to support or explain the delay, there is no basis upon which to determine that the delay was reasonable.

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    13

2012 ONSC 2472, 2012 CarswellOnt 5792, [2012] O.J. No. 2105, 17 C.L.R. (4th) 1

*Sievert & Sawrantschuk LLP v. Hommel* [2008 CarswellOnt 8450 (Ont. S.C.J.)], *supra*, at para 14, Respondents' Brief of Authorities, Tab 1.

**Issue: Whether the Relief Requested is Warranted**

29    As I indicated in my Ruling of April 19, 2012, in the event that my assessment and determination of the threshold issue, that is, the denial of leave to proceed with the motion, is in error, I have concluded that the relief requested by the Plaintiff is not warranted. Without repeating what I have already reviewed in dealing with the leave issue, I am satisfied that the TAK report will not prejudice or result in an unfair trial for the Plaintiff. The Plaintiff will have the ability to fully cross-examine the experts from TAK and Hellyer. The Plaintiff will have an opportunity to fully cross-examine the witnesses from Rusand who conducted the remedial work. As the defendants submit, the Plaintiff will be able to fully cross-examine all of the witnesses on all of the evidence the Plaintiff seeks to exclude.

30    In *Hunter v. Ellenberger* (1988), 25 C.P.C. (2d) 14, 1988 CarswellOnt 340 (Ont. H.C.) the Court stated the following at para 7:

> In my view, it should be remembered that any time a court excludes relevant evidence the court's ability to reach a just verdict is compromised. Relevant evidence should not be excluded on technical grounds, such as lack of timely delivery of a report, unless the court is satisfied that the prejudice to justice involved in receiving the evidence exceeds the prejudice to justice involved in excluding it. In the instant case, I received the report but gave defence counsel ten days within which to consult with his actuary and decide whether or not he wished the trial to resume and to hear the opposing experts. Within the ten-day period defence counsel advised me that he did not wish to take advantage of this opportunity. I then proceeded to use the report of the plaintiff's actuary. Defence counsel now submits that he should not be required to pay, as part of the plaintiff's costs, the expert's fees for preparation of the second report nor for the attendance of the actuary for the purposes of giving evidence at trial.

31    I am satisfied that in all of the circumstances of this case and balancing the interests of justice, the prejudice to justice in excluding the evidence exceeds the prejudice in receiving it. The TAK Report is important and critical to the defendants' case. The evidence relating to the information or documentation with respect to the remedial work is necessary for a full and proper appreciation of the issues that the trial judge has to resolve. The defendants rightfully argue that to exclude such evidence would be devastating to their case.

32    I have already reviewed the circumstances and events leading up to the bringing of this motion on the eve of trial. These circumstances apply as well to my determination of this issue.

33    I have also reviewed the factors that support the defendants' position at paragraph 25 of these reasons. Those factors are all relevant as well.

34    For all of these reasons the plaintiff's motion is dismissed.

35    The defendants shall serve and file written submissions on costs within 10 days. The Plaintiff shall serve and file its responding submissions on costs within 10 days of receiving the defendants' submissions. The defendants shall serve and file any reply within 5 days

*Motion dismissed.*

Footnotes

\*        Additional reasons at *Jens Nielsen Custom Contracting Ltd. v. Litwin* (2012), 17 C.L.R. (4th) 22, 2012 CarswellOnt 8076, 2012 ONSC 3736 (Ont. S.C.J.).

**Jens Nielsen Custom Contracting Ltd. v. Litwin, 2012 ONSC 2472, 2012 CarswellOnt 5792**

2012 ONSC 2472, 2012 CarswellOnt 5792, [2012] O.J. No. 2105, 17 C.L.R. (4th) 1

**End of Document**    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

Court File No. 09-CL-7950

---

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at Toronto

---

**REPLY BOOK OF AUTHORITIES**

---

**Goodmans LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

**Jay A. Carfagnini** LSUC#: 22293T
jcarfagnini@goodmans.ca
**Peter Ruby** LSUC#: 38439P
pruby@goodmans.ca
**Joseph Pasquariello** LSUC #: 38390C
jpasquariello@goodmans.ca
**Hannah Arthurs** LSUC#: 55337O
harthurs@goodmans.ca

Tel:     416.979.2211
Fax:     416.979.1234

Lawyers for the Monitor

**Gowling Lafleur Henderson LLP**
Barristers & Solicitors
1 First Canadian Place
100 King Street West, Suite 1600
Toronto, ON  M5X 1G5

**Derrick Tay** LSUC#: 21152A
derrick.tay@gowlings.com
**Jennifer Stam** LSUC#: 46735J
jennifer.stam@gowlings.com

Tel:     416.862.5697
Fax:     416.862.7661

Lawyers for the Canadian Debtors

6327242