**<u>EXHIBIT B</u>**

Court File No.  09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**- COMMERCIAL LIST**

**IN THE MATTER OF**
**THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36,**
**AS AMENDED**
**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

## BOOK OF AUTHORITIES
**(Motion Regarding the Use of Documents at Trial, Returnable May 8, 2014)**

May 7, 2014

**Goodmans LLP**
Barristers & Solicitors
333 Bay Street, Suite 3400
Toronto, Canada  M5H 2S7

Jay A. Carfagnini  (LSUC #: 22293T)
jcarfagnini@goodmans.ca
Alan Mark (LSUC #: 21772U)
amark@goodmans.ca
Jessica Kimmel (LSUC #: 32312W)
jkimmel@goodmans.ca
Peter Ruby (LSUC #: 38439P)
pruby@goodmans.ca
Joseph Pasquariello (LSUC #: 37389C)
jpasquariello@goodmans.ca

Tel:    416.979.2211
Fax:    416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

**Gowling Lafleur Henderson LLP**
Barristers & Solicitors
1 First Canadian Place
100 King Street West, Suite 1600
Toronto, ON  M5X 1G5

Derrick Tay  (LSUC #: 21152A)
derrick.tay@gowlings.com
Jennifer Stam  (LSUC #: 46735J)
Jennifer.stam@gowlings.com

Tel:   416.862.5697
Fax:   416.862.7661

Lawyers    for    the    Canadian
Debtors

## INDEX

## LIST OF AUTHORITIES

**Tab**

1.    *BASF Canada Inc v Max Auto Supply (1986) Inc*, [1999] OJ No 515

2.    *Sierra Club v Canada (Minister of Finance)*, [2002] 2 SCR 522

3.    *Andersen v St Jude Medical, Inc,* 2010 ONSC 5191

4.    *Orange County Choppers Inc v Trio Selection Inc.,* 2006 FC 1122

5.    *Re Canwest Global Communications Corp,* [2009] OJ No 4286

6.    *Fairview Donut Inc v TDL Group Corp,* [2010] OJ NO 502

7.    *Re Nortel Networks Corp,* [2009] OJ No 4487

8.    *Re Stelco Inc,* [2006] OJ No 275

9.    *S&K Processors Ltd v Campbell Ave Herring Producers Ltd.* (1983), 45 BCLR 218

10.   *Re Hollinger Inc,* 2011 ONCA 579

11.   *Solosky v Canada*, [1980] 1 SCR 821

# TAB 1

*Indexed as:*
## BASF Canada Inc. v. Max Auto Supply (1986) Inc.

**Between**
**BASF Canada Inc., plaintiff, and**
**Max Auto Supply (1986) Inc., Jackmax Inc., 866551 Ontario**
**Limited, 986633 Ontario Inc., Genuine Auto and Machine Ltd.**
**and ICI Paints (Canada) Inc. (c.o.b. as ICI Autocolor),**
**defendants**
**And between**
**Max Auto Supply (1986) Inc., Jackmax Inc., 866551 Ontario**
**Limited, and 986633 Ontario Inc., plaintiffs by counterclaim,**
**and**
**BASF Canada Inc. and BASF Corp., defendants by counterclaim**

[1999] O.J. No. 515

91 O.T.C. 264

30 C.P.C. (4th) 23

86 A.C.W.S. (3d) 501

Court File No. 97-CV-2227

Ontario Court of Justice (General Division)
Ottawa, Ontario

**Master Beaudoin**

February 12, 1999.

(10 pp.)

*Practice -- Discovery -- Production and inspection of documents -- Confidentiality orders.*

Motion by the plaintiff BASF for a protective order to allow the parties to designate certain
commercially sensitive documents as confidential. The defendant Max Auto was a distributor for

BASF automotive refinishing products until 1997. Shortly thereafter, BASF brought an action for breach of contract in respect of the distribution agreement. Max Auto counterclaimed on the basis of price discrimination. BASF sought to protect pricing information, alleging that unrestricted disclosure would result in a competitive disadvantage to BASF. Max Auto alleged that the price list was two years old and therefore not of any benefit to competitors. Max Auto further alleged that since paint cost was a relatively low percentage of the total cost of a body shop sale, the importance of paint pricing information had been over-emphasized by BASF. Max Auto claimed that the information was not confidential, and that it required the information to instruct counsel.

HELD: Motion allowed. The proportion of the cost to the end user was irrelevant. The cost to the suppliers was critical. Even if the information was stale-dated as suggested, a competitor could use the information to calculate the profit margins of BASF. The information sought to be protected was confidential and commercially sensitive. Max Auto showed no undue prejudice resulting from the issue of a protective order.

**Statutes, Regulations and Rules Cited:**

Competition Act, s. 50(1)(a).
Courts of Justice Act, s. 137(2).
Ontario Rules of Civil Procedure, Rule 30.11.

**Counsel:**

Randall J. Hofley, for the plaintiff/defendant by counterclaim/moving party.
Matthew J. Halpin, for the defendant/plaintiff by counterclaim/responding party.

---

MASTER BEAUDOIN

Background

**1**    The defendants by counterclaim, BASF Canada Inc. and BASF Corp. ("BASF") bring this motion for a protective order which would allow the parties to designate as confidential certain documents which are of a commercially sensitive nature. It is proposed that such documents would be restricted to review by counsel for the opposite party and third-party experts subject to further order of this court.

**2**    BASF" is a manufacturer and seller of automotive refinishing products. The defendants/plaintiffs by counterclaim, ("Max Auto") are a group of companies which acted as a distributor for "BASF" (and its corporate predecessors) products for approximately 25 years until April of 1997.

**3**    Under BASF's distribution program, distributors are classified according to function and according to volumes of sales. They have three difference categories of distributors: warehouse distributors, wholesale distributors, and jobbers. Each category of distributor has a different price list and each distributor would receive discounts, allowances and/or rebates depending on their classification. It is not disputed that "Max Auto Group" was classified as a wholesale distributor.

**4**    These proceedings were initially commenced by a statement of claim in June of 1997 wherein "BASF" claimed against "Max Auto" for breach of contract in respect of the distribution agreement between "BASF" and the "Max Auto" and wherein they also sought damages as against the defendants I.C.I. Paints for interference with contractual relations and inducing breach of contract. I.C.I Paints have not responded to this motion. "Max Auto" has counterclaimed on the basis of price discrimination under section 50(1)(a) of the Competition Act. In essence, "Max Auto" claims that other customers of "BASF" were given advantageous price treatment which was not offered to "Max Auto" in respect of sales of products of like quality and quantity.

**5**    "BASF"'s concerns with respect to confidentiality are two-fold. Firstly, they are concerned about releasing commercially sensitive information directly to the "Max Auto" in that "Max Auto" competes directly with "BASF" and, secondly, that the disclosure of this information to "Max Auto" would allow this information to come into the hands of other manufacturers and sellers of automotive refinishing products such as the defendants ICI Paints.

Is the Information Confidential?

**6**    "BASF" seeks to protect pricing information. Mr. Paul Soulière, their business manager, deposes at paragraphs 13 and 14 of his affidavit as to the confidentiality of the pricing information and addresses its commercially sensitive nature. While Mr. James Maxwell, on behalf of "Max Auto", suggests that the information is not confidential. He admits, on cross-examination, that some of it is in fact confidential. While paragraph 17 of his affidavit, Mr. Maxwell suggests that pricing information is "readily available"; he refused, on cross-examination, to provide the same information from his new suppliers. His responses, as well as those of Mr. Halpin, illustrate this point. (See Maxwell cross-examination, pp. 73-76, Q. 259, and pp. 80-81, Q. 266, pp. 124-125, Q. 455-461.)

**7**    The third-party witness examined by "Max Auto" in connection with these proceedings also expressed reluctance to share pricing and volume information. ( See examination of Steve Mara, pp. 29-32, Q. 136-145.)

**8**    Although the plaintiffs by counterclaim seemingly acknowledge the commercially sensitive nature of this information, they nevertheless maintain that price lists change every year and that the information sought by "Max Auto" is two years old, it is stale-dated. They also submit that paint cost is only six to eight percent of the total cost of the finished product of a body shop sale and, accordingly, the nature, extent, and importance of pricing information is over-emphasized by "BASF". Finally, they argue that the other parties who distribute "BASF" products also carry

competing paint lines. They allege that the very same information that "BASF" is attempting to characterize as confidential and proprietary has been provided to competitors of "Max Auto" who deal with other paint suppliers and who are fully able to compare pricing information between "BASF" and its competitors.

**9**    With respect to the pricing information, whether or not it represents six to eight percent of the cost to the end user is irrelevant. It is the cost to the suppliers that is critical and the evidence of Mr. Soulière, which was not contradicted, is that the market share is small and that profit margins are very important. It is the sharing of the information to "BASF"'s competitors that is critical, not to the end users.

**10**    Even if the information is stale-dated, as it suggested by the "Max Auto", it is still conceivable that a competitor could use this information to calculate "BASF"'s profit margins and use this information to undersell them to other distributors. Finally, with respect to some distributors carrying two product lines, namely that of "BASF" and one of its competitors, Mr. Soulière, in his affidavit, deposes that this may be the case during the process of conversion from one product line to "BASF"'s product line. The process of conversion may take some time. The example cited by the defendants, plaintiffs by counterclaim, namely that of another distributor, "CarQuest" was a case of a merger where the BASF products happened to be part of one side of the new merged entity.

**11**    In summary, the court is satisfied that the information sought to be protected is confidential.

Is the Information Commercially Sensitive and Would BASF be Prejudiced by Protected Disclosure?

**12**    Mr. Soulière, in his affidavit, describes the nature of the potential prejudice to BASF in fairly precise terms. He alleges that unrestricted disclosure of the information would: (1) Allow for disclosure in open court of information to BASF's competitors who would be monitoring the trial; (2) Provide BASF's competitors with competitive advantage unavailable to BASF, (3) Allow BASF's competitors to calculate the profit margin of BASF's distributors; (4) Allow BASF's competitors to calculate the prices at which is should offer its own products to distributors so as to be reasonably assured of undercutting BASF's prices, thereby permitting BASF's competitors to convert its distributors to their own products; (5) Seriously erode BASF's market share in the automotive refinish market; and (6) Potentially expose BASF Canada to liability under the Competition Act.

**13**    BASF's concerns about disclosure are justified to some degree. Mr. Maxwell has already filed in open court documents which were allegedly given to him in confidence subject to an express secrecy agreement, namely Exhibit K to the affidavit of Mr. Maxwell sworn January 28, 1998. Furthermore, in that same affidavit, Mr. Maxwell deposes that he intends to show the confidential information he received to third parties. (Paragraph 31).

**14**    The commercial sensitivity and issue of prejudice was not seriously challenged by the

defendants/plaintiffs by counterclaim. They have resisted this motion primarily on the basis that the information was not confidential and, secondly, on the basis that "Max Auto" needs to see these documents in order to instruct counsel. They maintain that they are a small company being sued by a corporate giant. They are involved in virtually every detail of the operation and management of the company and do not have unlimited resources to hire third-party experts to review documents or to make decisions on their behalf with respect to allegations in the law suit.

The Law

**15**    The court has the inherent jurisdiction, as well as jurisdiction under s. 137(2) of the Courts of Justice Act and Rule 30.11 to grant a protective order restricting production of documents in circumstances where unlimited production would prejudice a party. Such an order may be made by a master of the court. (See Automated Tabulation Inc. v. Canadian Market Images Ltd. et al. (1995), 24 O.R. (3d) 292 (Gen. Div.) and CPC International Inc. v. Seaforth Creamery Inc. (1996), 49 C.P.C. (3d) 382 (Gen. Div.).

**16**    As described by Cumming J.in the CPC International case, the making of a protective order is designed to strike a balance between the disclosure necessary for the conduct of an action and a party's bona fide right to protection of confidential and sensitive information. The courts have held that where the information at issue is such that the disclosure would allow a competitor to improve its competitive position, it is appropriate that a protective order be issued to guard against such effect.

(Zellers Inc. v. Venta Investments Ltd. [1998] O.J. No. 2118, (Gen. Div.)

**17**    In the present case, the court is satisfied that the information is confidential, that it is commercially sensitive, and that a competitor could obtain an unfair advantage through its release and, therefore, prima facie, the moving parties should be entitled to a protective order unless the defendants, plaintiffs by counterclaim, would be unduly prejudiced by this.

**18**    As pointed out by Mr. Soulière in his affidavit, paragraph 19:

> Max Auto Group need only be able to advise its counsel and any independent
> expert it may retain as to the automotive refinish business generally. Similarly,
> there is no need for Max Auto Group to show this information to third parties as
> part of Max Auto Group's efforts to marshall evidence of discriminatory pricing
> practices, which disclosure Max Auto Group has advised it intends to undertake.
> In short, there is distinction between the expertise to understand the manner of
> pricing in the automotive refinish business and the expertise necessary to perform
> the mechanical calculations that show whether price discrimination, as defined in
> the Competition Act, has occurred.
>  (Emphasis mine.)

**19**    The issue as to whether or not there has been a breach of s. 50(1) of the Competition Act requires a comparison between price-related benefits like quantity and like quality. (Emphasis mine.) "Max Auto"'s counsel or its expert can do the mechanical calculations.

**20**    It is not enough to suggest that "BASF" is protected in any event by the applied undertaking to be found in Rule. 30.1. Rule 30.1 would not prevent the use of the information by a competitor if that information was acquired as a result of a lawsuit and the competitor does not use the information to commence a new lawsuit but simply seeks to improve its competitive position. (See Zellers Inc. v. Venta Investments Ltd., supra.) In addition, the deemed undertaking rule explicitly does not apply to evidence filed in the court or that is referred to in hearing. Lastly, the rule only applied to parties and to counsel and not to third parties who would have access to material filed with this court or disclosed by a party.

**21**    "BASF"'s counsel have drafted a protective order attached at Tab A to their factum. The principal operating provisions of the protective order as follows:

        (a)    If either party is concerned about the confidentiality of information of a commercially sensitive nature which is to be disclosed, they may designate the information as "Confident - Counsel Only";

        (b)    Such information may only be used by counsel and independent third parties who sign an undertaking as to confidentiality;

        (c)    If counsel disagrees with the assessment of the information as confidential, or believes that disclosure of the document to their client is essential for the conduct of the action, they may bring the matter back for hearing with respect to that document and the existence of the protective orders without prejudice to determination of such a motion.

**22**    The court has reviewed the draft protective order and considers that it would be appropriate in the circumstances of this case. The court notes also that this a case-managed proceeding and that this court has already intervened in terms of issuing an interim protective order. Should further rulings be required with respect to the confidentiality of any particular document that needs to be produced, the parties have a ready access to the court for an early determination of this issue.

**23**    Accordingly, an order will issue in accordance with the draft protective order found at Tab A of the moving party's factum. The parties may contact the court to arrange an appropriate time to speak to the issue of costs.

MASTER BEAUDOIN

# TAB 2

*Indexed as:*
## Sierra Club of Canada v. Canada (Minister of Finance)

**Atomic Energy of Canada Limited, appellant;**
**v.**
**Sierra Club of Canada, respondent, and**
**The Minister of Finance of Canada, the Minister of**
**Foreign Affairs of Canada, the Minister of International**
**Trade of Canada and the Attorney General of Canada,**
**respondents.**

[2002] 2 S.C.R. 522

[2002] S.C.J. No. 42

2002 SCC 41

File No.: 28020.

Supreme Court of Canada

2001: November 6 / 2002: April 26.

**Present: McLachlin C.J. and Gonthier, Iacobucci,**
**Bastarache, Binnie, Arbour and LeBel JJ.**

ON APPEAL FROM THE FEDERAL COURT OF APPEAL (92 paras.)

*Practice -- Federal Court of Canada -- Filing of confidential material -- Environmental*
*organization seeking judicial review of federal government's decision to provide financial*
*assistance to Crown corporation for construction and sale of nuclear reactors -- Crown*
*corporation requesting confidentiality order in respect of certain documents -- Proper analytical*
*approach to be applied to exercise of judicial discretion where litigant seeks confidentiality order --*
*Whether confidentiality order should be granted -- Federal Court Rules, 1998, SOR/98-106, r. 151.*

Sierra Club is an environmental organization seeking judicial review of the federal government's
decision to provide financial assistance to Atomic Energy of Canada Ltd. ("AECL"), a Crown

corporation, for the construction and sale to China of two CANDU reactors. The reactors are currently under construction in China, where AECL is the main contractor and project manager. Sierra Club maintains that the authorization of financial assistance [page523] by the government triggered s. 5(1)(b) of the Canadian Environmental Assessment Act ("CEAA"), requiring an environmental assessment as a condition of the financial assistance, and that the failure to comply compels a cancellation of the financial arrangements. AECL filed an affidavit in the proceedings which summarized confidential documents containing thousands of pages of technical information concerning the ongoing environmental assessment of the construction site by the Chinese authorities. AECL resisted Sierra Club's application for production of the confidential documents on the ground, inter alia, that the documents were the property of the Chinese authorities and that it did not have the authority to disclose them. The Chinese authorities authorized disclosure of the documents on the condition that they be protected by a confidentiality order, under which they would only be made available to the parties and the court, but with no restriction on public access to the judicial proceedings. AECL's application for a confidentiality order was rejected by the Federal Court, Trial Division. The Federal Court of Appeal upheld that decision.

Held: The appeal should be allowed and the confidentiality order granted on the terms requested by AECL.

In light of the established link between open courts and freedom of expression, the fundamental question for a court to consider in an application for a confidentiality order is whether the right to freedom of expression should be compromised in the circumstances. The court must ensure that the discretion to grant the order is exercised in accordance with Charter principles because a confidentiality order will have a negative effect on the s. 2(b) right to freedom of expression. A confidentiality order should only be granted when (1) such an order is necessary to prevent a serious risk to an important interest, including a commercial interest, in the context of litigation because reasonably alternative measures will not prevent the risk; and (2) the salutary effects of the confidentiality order, including the effects on the right of civil litigants to a fair trial, outweigh its deleterious effects, including the effects on the right to free expression, which in this context includes the public interest in open and accessible court proceedings. Three important elements are subsumed under the first branch of the test. First, the risk must be real and substantial, well grounded in evidence, posing a serious threat to the commercial interest in question. Second, the important commercial interest must be one which can be expressed in terms of a public interest in confidentiality, where there is a general principle at stake. Finally, the judge is required to consider not only whether reasonable alternatives are available to such an order but also to restrict the order as much as is reasonably possible while preserving the commercial interest in question.

[page524]

Applying the test to the present circumstances, the commercial interest at stake here relates to the objective of preserving contractual obligations of confidentiality, which is sufficiently important to

pass the first branch of the test as long as certain criteria relating to the information are met. The information must have been treated as confidential at all relevant times; on a balance of probabilities, proprietary, commercial and scientific interests could reasonably be harmed by disclosure of the information; and the information must have been accumulated with a reasonable expectation of it being kept confidential. These requirements have been met in this case. Disclosure of the confidential documents would impose a serious risk on an important commercial interest of AECL, and there are no reasonably alternative measures to granting the order.

Under the second branch of the test, the confidentiality order would have significant salutary effects on AECL's right to a fair trial. Disclosure of the confidential documents would cause AECL to breach its contractual obligations and suffer a risk of harm to its competitive position. If a confidentiality order is denied, AECL will be forced to withhold the documents in order to protect its commercial interests, and since that information is relevant to defences available under the CEAA, the inability to present this information hinders AECL's capacity to make full answer and defence. Although in the context of a civil proceeding, this does not engage a Charter right, the right to a fair trial is a fundamental principle of justice. Further, the confidentiality order would allow all parties and the court access to the confidential documents, and permit cross-examination based on their contents, assisting in the search for truth, a core value underlying freedom of expression. Finally, given the technical nature of the information, there may be a substantial public security interest in maintaining the confidentiality of such information.

The deleterious effects of granting a confidentiality order include a negative effect on the open court principle, and therefore on the right to freedom of expression. The more detrimental the confidentiality order would be to the core values of (1) seeking the truth and the common good, (2) promoting self-fulfilment of individuals by allowing them to develop thoughts and ideas as they see fit, and (3) ensuring that participation in the political process is open to all persons, the harder it will be to justify the confidentiality order. In the hands of the parties and their experts, the confidential documents may be of great assistance in probing the truth of the Chinese environmental assessment process, which would assist the court in reaching accurate factual conclusions. Given the highly technical nature of the documents, the important value of the search for the truth which underlies [page525] both freedom of expression and open justice would be promoted to a greater extent by submitting the confidential documents under the order sought than it would by denying the order.

Under the terms of the order sought, the only restrictions relate to the public distribution of the documents, which is a fairly minimal intrusion into the open court rule. Although the confidentiality order would restrict individual access to certain information which may be of interest to that individual, the second core value of promoting individual self-fulfilment would not be significantly affected by the confidentiality order. The third core value figures prominently in this appeal as open justice is a fundamental aspect of a democratic society. By their very nature, environmental matters carry significant public import, and openness in judicial proceedings involving environmental issues will generally attract a high degree of protection, so that the public interest is engaged here more than if this were an action between private parties involving private interests. However, the narrow

scope of the order coupled with the highly technical nature of the confidential documents significantly temper the deleterious effects the confidentiality order would have on the public interest in open courts. The core freedom of expression values of seeking the truth and promoting an open political process are most closely linked to the principle of open courts, and most affected by an order restricting that openness. However, in the context of this case, the confidentiality order would only marginally impede, and in some respects would even promote, the pursuit of these values. The salutary effects of the order outweigh its deleterious effects and the order should be granted. A balancing of the various rights and obligations engaged indicates that the confidentiality order would have substantial salutary effects on AECL's right to a fair trial and freedom of expression, while the deleterious effects on the principle of open courts and freedom of expression would be minimal.

**Cases Cited**

Applied: Edmonton Journal v. Alberta (Attorney General), [1989] 2 S.C.R. 1326; Canadian Broadcasting Corp. v. New Brunswick (Attorney General), [1996] 3 S.C.R. 480; Dagenais v. Canadian Broadcasting Corp., [1994] 3 S.C.R. 835; R. v. Mentuck, [2001] 3 S.C.R. 442, 2001 SCC 76; M. (A.) v. Ryan, [1997] 1 S.C.R. 157; Irwin Toy Ltd. v. Quebec (Attorney General), [1989] 1 S.C.R. 927; R. v. Keegstra, [1990] 3 S.C.R. 697; referred to: AB Hassle v. Canada (Minister of National Health and [page526] Welfare), [2000] 3 F.C. 360, aff'g (1998), 83 C.P.R. (3d) 428; Ethyl Canada Inc. v. Canada (Attorney General) (1998), 17 C.P.C. (4th) 278; R. v. Oakes, [1986] 1 S.C.R. 103; R. v. O.N.E., [2001] 3 S.C.R. 478, 2001 SCC 77; F.N. (Re), [2000] 1 S.C.R. 880, 2000 SCC 35; Eli Lilly and Co. v. Novopharm Ltd. (1994), 56 C.P.R. (3d) 437.

**Statutes and Regulations Cited**

Canadian Charter of Rights and Freedoms, ss. 1, 2(b).
Canadian Environmental Assessment Act, S.C. 1992, c. 37, ss. 5(1)(b), 8, 54, 54(2)(b).
Federal Court Rules, 1998, SOR/98-106, rr. 151, 312.


APPEAL from a judgment of the Federal Court of Appeal, [2000] 4 F.C. 426, 187 D.L.R. (4th) 231, 256 N.R. 1, 24 Admin. L.R. (3d) 1, [2000] F.C.J. No. 732 (QL), affirming a decision of the Trial Division, [2000] 2 F.C. 400, 178 F.T.R. 283, [1999] F.C.J. No. 1633 (QL). Appeal allowed.


J. Brett Ledger and Peter Chapin, for the appellant.
Timothy J. Howard and Franklin S. Gertler, for the respondent Sierra Club of Canada.
Graham Garton, Q.C., and J. Sanderson Graham, for the respondents the Minister of Finance of Canada, the Minister of Foreign Affairs of Canada, the Minister of International Trade of Canada and the Attorney General of Canada.

[Quicklaw note: Please see complete list of solicitors appended at the end of the judgment.]

The judgment of the Court was delivered by

**IACOBUCCI J.:--**

I.    Introduction

**1**    In our country, courts are the institutions generally chosen to resolve legal disputes as best they can through the application of legal principles to the facts of the case involved. One of the underlying principles of the judicial process is public openness, both in the proceedings of the dispute, and in the material that is relevant to its resolution. However, some material can be made the subject of a confidentiality order. This appeal raises the important [page527] issues of when, and under what circumstances, a confidentiality order should be granted.

**2**    For the following reasons, I would issue the confidentiality order sought and accordingly would allow the appeal.

II.    Facts

**3**    The appellant, Atomic Energy of Canada Limited ("AECL") is a Crown corporation that owns and markets CANDU nuclear technology, and is an intervener with the rights of a party in the application for judicial review by the respondent, the Sierra Club of Canada ("Sierra Club"). Sierra Club is an environmental organization seeking judicial review of the federal government's decision to provide financial assistance in the form of a $1.5 billion guaranteed loan relating to the construction and sale of two CANDU nuclear reactors to China by the appellant. The reactors are currently under construction in China, where the appellant is the main contractor and project manager.

**4**    The respondent maintains that the authorization of financial assistance by the government triggered s. 5(1)(b) of the Canadian Environmental Assessment Act, S.C. 1992, c. 37 ("CEAA"), which requires that an environmental assessment be undertaken before a federal authority grants financial assistance to a project. Failure to undertake such an assessment compels cancellation of the financial arrangements.

**5**    The appellant and the respondent Ministers argue that the CEAA does not apply to the loan transaction, and that if it does, the statutory defences available under ss. 8 and 54 apply. Section 8 describes the circumstances where Crown corporations are required to conduct environmental assessments. Section 54(2)(b) recognizes the validity of an environmental assessment carried out by a foreign authority provided that it is consistent with the provisions of the CEAA.

**6**    In the course of the application by Sierra Club to set aside the funding arrangements, the

appellant [page528] filed an affidavit of Dr. Simon Pang, a senior manager of the appellant. In the affidavit, Dr. Pang referred to and summarized certain documents (the "Confidential Documents"). The Confidential Documents are also referred to in an affidavit prepared by Mr. Feng, one of AECL's experts. Prior to cross-examining Dr. Pang on his affidavit, Sierra Club made an application for the production of the Confidential Documents, arguing that it could not test Dr. Pang's evidence without access to the underlying documents. The appellant resisted production on various grounds, including the fact that the documents were the property of the Chinese authorities and that it did not have authority to disclose them. After receiving authorization by the Chinese authorities to disclose the documents on the condition that they be protected by a confidentiality order, the appellant sought to introduce the Confidential Documents under Rule 312 of the Federal Court Rules, 1998, SOR/98-106, and requested a confidentiality order in respect of the documents.

**7**   Under the terms of the order requested, the Confidential Documents would only be made available to the parties and the court; however, there would be no restriction on public access to the proceedings. In essence, what is being sought is an order preventing the dissemination of the Confidential Documents to the public.

**8**   The Confidential Documents comprise two Environmental Impact Reports on Siting and Construction Design (the "EIRs"), a Preliminary Safety Analysis Report (the "PSAR"), and the supplementary affidavit of Dr. Pang which summarizes the contents of the EIRs and the PSAR. If admitted, the EIRs and the PSAR would be attached as exhibits to the supplementary affidavit of Dr. Pang. The EIRs were prepared by the Chinese authorities in the Chinese language, and the PSAR was prepared by the appellant with assistance from the Chinese participants in the project. The documents contain a mass of technical information and comprise thousands of pages. They describe the ongoing environmental assessment of the construction site by the Chinese authorities under Chinese law.

[page529]

**9**   As noted, the appellant argues that it cannot introduce the Confidential Documents into evidence without a confidentiality order, otherwise it would be in breach of its obligations to the Chinese authorities. The respondent's position is that its right to cross-examine Dr. Pang and Mr. Feng on their affidavits would be effectively rendered nugatory in the absence of the supporting documents to which the affidavits referred. Sierra Club proposes to take the position that the affidavits should therefore be afforded very little weight by the judge hearing the application for judicial review.

**10**   The Federal Court of Canada, Trial Division refused to grant the confidentiality order and the majority of the Federal Court of Appeal dismissed the appeal. In his dissenting opinion, Robertson J.A. would have granted the confidentiality order.

III.    Relevant Statutory Provisions

**11**    Federal Court Rules, 1998, SOR/98-106

> 151. (1) On motion, the Court may order that material to be filed shall be treated as confidential.

> (2) Before making an order under subsection (1), the Court must be satisfied that the material should be treated as confidential, notwithstanding the public interest in open and accessible court proceedings.

IV.    Judgments Below

A.    Federal Court, Trial Division, [2000] 2 F.C. 400

**12**    Pelletier J. first considered whether leave should be granted pursuant to Rule 312 to introduce the supplementary affidavit of Dr. Pang to which the Confidential Documents were filed as exhibits. In his view, the underlying question was that of relevance, and he concluded that the documents were relevant to the issue of the appropriate remedy. Thus, in the absence of prejudice to the respondent, the affidavit should be permitted to be served and filed. He noted that the respondent would be prejudiced by delay, but since both parties had brought [page530] interlocutory motions which had contributed to the delay, the desirability of having the entire record before the court outweighed the prejudice arising from the delay associated with the introduction of the documents.

**13**    On the issue of confidentiality, Pelletier J. concluded that he must be satisfied that the need for confidentiality was greater than the public interest in open court proceedings, and observed that the argument for open proceedings in this case was significant given the public interest in Canada's role as a vendor of nuclear technology. As well, he noted that a confidentiality order was an exception to the rule of open access to the courts, and that such an order should be granted only where absolutely necessary.

**14**    Pelletier J. applied the same test as that used in patent litigation for the issue of a protective order, which is essentially a confidentiality order. The granting of such an order requires the appellant to show a subjective belief that the information is confidential and that its interests would be harmed by disclosure. In addition, if the order is challenged, then the person claiming the benefit of the order must demonstrate objectively that the order is required. This objective element requires the party to show that the information has been treated as confidential, and that it is reasonable to believe that its proprietary, commercial and scientific interests could be harmed by the disclosure of the information.

**15**    Concluding that both the subjective part and both elements of the objective part of the test had been satisfied, he nevertheless stated: "However, I am also of the view that in public law cases, the

objective test has, or should have, a third component which is whether the public interest in disclosure exceeds the risk of harm to a party arising from disclosure" (para. 23).

**16**   A very significant factor, in his view, was the fact that mandatory production of documents was not in issue here. The fact that the application involved a voluntary tendering of documents to advance the [page531] appellant's own cause as opposed to mandatory production weighed against granting the confidentiality order.

**17** ·   In weighing the public interest in disclosure against the risk of harm to AECL arising from disclosure, Pelletier J. noted that the documents the appellant wished to put before the court were prepared by others for other purposes, and recognized that the appellant was bound to protect the confidentiality of the information. At this stage, he again considered the issue of materiality. If the documents were shown to be very material to a critical issue, "the requirements of justice militate in favour of a confidentiality order. If the documents are marginally relevant, then the voluntary nature of the production argues against a confidentiality order" (para. 29). He then decided that the documents were material to a question of the appropriate remedy, a significant issue in the event that the appellant failed on the main issue.

**18**   Pelletier J. also considered the context of the case and held that since the issue of Canada's role as a vendor of nuclear technology was one of significant public interest, the burden of justifying a confidentiality order was very onerous. He found that AECL could expunge the sensitive material from the documents, or put the evidence before the court in some other form, and thus maintain its full right of defence while preserving the open access to court proceedings.

**19**   Pelletier J. observed that his order was being made without having perused the Confidential Documents because they had not been put before him. Although he noted the line of cases which holds that a judge ought not to deal with the issue of a confidentiality order without reviewing the documents themselves, in his view, given their voluminous nature and technical content as well as his lack of information as to what information was already in the public domain, he found that an examination of these documents would not have been useful.

[page532]

**20**   Pelletier J. ordered that the appellant could file the documents in current form, or in an edited version if it chose to do so. He also granted leave to file material dealing with the Chinese regulatory process in general and as applied to this project, provided it did so within 60 days.

    B.   Federal Court of Appeal, [2000] 4 F.C. 426

       (1)   Evans J.A. (Sharlow J.A. concurring)

**21**    At the Federal Court of Appeal, AECL appealed the ruling under Rule 151 of the Federal Court Rules, 1998, and Sierra Club cross-appealed the ruling under Rule 312.

**22**    With respect to Rule 312, Evans J.A. held that the documents were clearly relevant to a defence under s. 54(2)(b) which the appellant proposed to raise if s. 5(1)(b) of the CEAA was held to apply, and were also potentially relevant to the exercise of the court's discretion to refuse a remedy even if the Ministers were in breach of the CEAA. Evans J.A. agreed with Pelletier J. that the benefit to the appellant and the court of being granted leave to file the documents outweighed any prejudice to the respondent owing to delay and thus concluded that the motions judge was correct in granting leave under Rule 312.

**23**    On the issue of the confidentiality order, Evans J.A. considered Rule 151, and all the factors that the motions judge had weighed, including the commercial sensitivity of the documents, the fact that the appellant had received them in confidence from the Chinese authorities, and the appellant's argument that without the documents it could not mount a full answer and defence to the application. These factors had to be weighed against the principle of open access to court documents. Evans J.A. agreed with Pelletier J. that the weight to be attached to the public interest in open proceedings varied with context and held that, where a case raises issues of public significance, the principle of openness of judicial process carries greater weight as a factor in [page533] the balancing process. Evans J.A. noted the public interest in the subject matter of the litigation, as well as the considerable media attention it had attracted.

**24**    In support of his conclusion that the weight assigned to the principle of openness may vary with context, Evans J.A. relied upon the decisions in AB Hassle v. Canada (Minister of National Health and Welfare), [2000] 3 F.C. 360 (C.A.), where the court took into consideration the relatively small public interest at stake, and Ethyl Canada Inc. v. Canada (Attorney General) (1998), 17 C.P.C. (4th) 278 (Ont. Ct. (Gen. Div.)), at p. 283, where the court ordered disclosure after determining that the case was a significant constitutional case where it was important for the public to understand the issues at stake. Evans J.A. observed that openness and public participation in the assessment process are fundamental to the CEAA, and concluded that the motions judge could not be said to have given the principle of openness undue weight even though confidentiality was claimed for a relatively small number of highly technical documents.

**25**    Evans J.A. held that the motions judge had placed undue emphasis on the fact that the introduction of the documents was voluntary; however, it did not follow that his decision on the confidentiality order must therefore be set aside. Evans J.A. was of the view that this error did not affect the ultimate conclusion for three reasons. First, like the motions judge, he attached great weight to the principle of openness. Secondly, he held that the inclusion in the affidavits of a summary of the reports could go a long way to compensate for the absence of the originals, should the appellant choose not to put them in without a confidentiality order. Finally, if AECL submitted the documents in an expunged fashion, the claim for confidentiality would rest upon a relatively unimportant factor, i.e., the appellant's claim that it would suffer a loss of business if it breached its

undertaking with the Chinese authorities.

**26**    Evans J.A. rejected the argument that the motions judge had erred in deciding the motion without [page534] reference to the actual documents, stating that it was not necessary for him to inspect them, given that summaries were available and that the documents were highly technical and incompletely translated. Thus the appeal and cross-appeal were both dismissed.

(2)    Robertson J.A. (dissenting)

**27**    Robertson J.A. disagreed with the majority for three reasons. First, in his view, the level of public interest in the case, the degree of media coverage, and the identities of the parties should not be taken into consideration in assessing an application for a confidentiality order. Instead, he held that it was the nature of the evidence for which the order is sought that must be examined.

**28**    In addition, he found that without a confidentiality order, the appellant had to choose between two unacceptable options: either suffering irreparable financial harm if the confidential information was introduced into evidence, or being denied the right to a fair trial because it could not mount a full defence if the evidence was not introduced.

**29**    Finally, he stated that the analytical framework employed by the majority in reaching its decision was fundamentally flawed as it was based largely on the subjective views of the motions judge. He rejected the contextual approach to the question of whether a confidentiality order should issue, emphasizing the need for an objective framework to combat the perception that justice is a relative concept, and to promote consistency and certainty in the law.

**30**    To establish this more objective framework for regulating the issuance of confidentiality orders pertaining to commercial and scientific information, he turned to the legal rationale underlying the commitment to the principle of open justice, referring to Edmonton Journal v. Alberta (Attorney General), [1989] 2 S.C.R. 1326. There, the Supreme Court of Canada held that open proceedings foster the search for the truth, and reflect the importance of public scrutiny of the courts.

[page535]

**31**    Robertson J.A. stated that although the principle of open justice is a reflection of the basic democratic value of accountability in the exercise of judicial power, in his view, the principle that justice itself must be secured is paramount. He concluded that justice as an overarching principle means that exceptions occasionally must be made to rules or principles.

**32**    He observed that, in the area of commercial law, when the information sought to be protected concerns "trade secrets", this information will not be disclosed during a trial if to do so would

destroy the owner's proprietary rights and expose him or her to irreparable harm in the form of financial loss. Although the case before him did not involve a trade secret, he nevertheless held that the same treatment could be extended to commercial or scientific information which was acquired on a confidential basis and attached the following criteria as conditions precedent to the issuance of a confidentiality order (at para. 13):

> (1)    the information is of a confidential nature as opposed to facts which one would like to keep confidential; (2) the information for which confidentiality is sought is not already in the public domain; (3) on a balance of probabilities the party seeking the confidentiality order would suffer irreparable harm if the information were made public; (4) the information is relevant to the legal issues raised in the case; (5) correlatively, the information is "necessary" to the resolution of those issues; (6) the granting of a confidentiality order does not unduly prejudice the opposing party; and (7) the public interest in open court proceedings does not override the private interests of the party seeking the confidentiality order. The onus in establishing that criteria one to six are met is on the party seeking the confidentiality order. Under the seventh criterion, it is for the opposing party to show that a prima facie right to a protective order has been overtaken by the need to preserve the openness of the court proceedings. In addressing these criteria one must bear in mind two of the threads woven into the fabric of the principle of open justice: the search for truth and the preservation of the rule of law. As stated at the outset, I do not believe that the perceived degree of public importance of a case is a relevant consideration.

[page536]

33    In applying these criteria to the circumstances of the case, Robertson J.A. concluded that the confidentiality order should be granted. In his view, the public interest in open court proceedings did not override the interests of AECL in maintaining the confidentiality of these highly technical documents.

34    Robertson J.A. also considered the public interest in the need to ensure that site plans for nuclear installations were not, for example, posted on a Web site. He concluded that a confidentiality order would not undermine the two primary objectives underlying the principle of open justice: truth and the rule of law. As such, he would have allowed the appeal and dismissed the cross-appeal.

V.    Issues

35    A. What is the proper analytical approach to be applied to the exercise of judicial discretion where a litigant seeks a confidentiality order under Rule 151 of the

Federal Court Rules, 1998?

> B.    Should the confidentiality order be granted in this case?

VI.    Analysis

A.    The Analytical Approach to the Granting of a Confidentiality Order

> (1)    The General Framework: Herein the Dagenais Principles

**36**    The link between openness in judicial proceedings and freedom of expression has been firmly established by this Court. In Canadian Broadcasting Corp. v. New Brunswick (Attorney General), [1996] 3 S.C.R. 480, at para. 23, La Forest J. expressed the relationship as follows:

> The principle of open courts is inextricably tied to the rights guaranteed by s. 2(b). Openness permits public access to information about the courts, which in turn permits the public to discuss and put forward opinions and criticisms of court practices and proceedings. While the freedom to express ideas and opinions about the operation of the courts is clearly within the ambit of the [page537] freedom guaranteed by s. 2(b), so too is the right of members of the public to obtain information about the courts in the first place.

Under the order sought, public access and public scrutiny of the Confidential Documents would be restricted; this would clearly infringe the public's freedom of expression guarantee.

**37**    A discussion of the general approach to be taken in the exercise of judicial discretion to grant a confidentiality order should begin with the principles set out by this Court in Dagenais v. Canadian Broadcasting Corp., [1994] 3 S.C.R. 835. Although that case dealt with the common law jurisdiction of the court to order a publication ban in the criminal law context, there are strong similarities between publication bans and confidentiality orders in the context of judicial proceedings. In both cases a restriction on freedom of expression is sought in order to preserve or promote an interest engaged by those proceedings. As such, the fundamental question for a court to consider in an application for a publication ban or a confidentiality order is whether, in the circumstances, the right to freedom of expression should be compromised.

**38**    Although in each case freedom of expression will be engaged in a different context, the Dagenais framework utilizes overarching Canadian Charter of Rights and Freedoms principles in order to balance freedom of expression with other rights and interests, and thus can be adapted and applied to various circumstances. As a result, the analytical approach to the exercise of discretion under Rule 151 should echo the underlying principles laid out in Dagenais, although it must be tailored to the specific rights and interests engaged in this case.

**39**    Dagenais dealt with an application by four accused persons under the court's common law jurisdiction requesting an order prohibiting the broadcast of a television programme dealing with the physical and sexual abuse of young boys at [page538] religious institutions. The applicants argued that because the factual circumstances of the programme were very similar to the facts at issue in their trials, the ban was necessary to preserve the accuseds' right to a fair trial.

**40**    Lamer C.J. found that the common law discretion to order a publication ban must be exercised within the boundaries set by the principles of the Charter. Since publication bans necessarily curtail the freedom of expression of third parties, he adapted the pre-Charter common law rule such that it balanced the right to freedom of expression with the right to a fair trial of the accused in a way which reflected the substance of the test from R. v. Oakes, [1986] 1 S.C.R. 103. At p. 878 of Dagenais, Lamer C.J. set out his reformulated test:

A publication ban should only be ordered when:

(a)    Such a ban is necessary in order to prevent a real and substantial risk to the fairness of the trial, because reasonably available alternative measures will not prevent the risk; and

(b)    The salutary effects of the publication ban outweigh the deleterious effects to the free expression of those affected by the ban. [Emphasis in original.]

**41**    In New Brunswick, supra, this Court modified the Dagenais test in the context of the related issue of how the discretionary power under s. 486(1) of the Criminal Code, R.S.C. 1985, c. C-46, to exclude the public from a trial should be exercised. That case dealt with an appeal from the trial judge's order excluding the public from the portion of a sentencing proceeding for sexual assault and sexual interference dealing with the specific acts committed by the accused on the basis that it would avoid "undue hardship" to both the victims and the accused.

**42**    La Forest J. found that s. 486(1) was a restriction on the s. 2(b) right to freedom of expression in that it provided a "discretionary bar on public and media access to the courts": New Brunswick, at para. 33; [page539] however he found this infringement to be justified under s. 1 provided that the discretion was exercised in accordance with the Charter. Thus, the approach taken by La Forest J. at para. 69 to the exercise of discretion under s. 486(1) of the Criminal Code, closely mirrors the Dagenais common law test:

(a)    the judge must consider the available options and consider whether there are any other reasonable and effective alternatives available;

(b)    the judge must consider whether the order is limited as much as possible; and

(c)    the judge must weigh the importance of the objectives of the particular order and its probable effects against the importance of openness and the particular expression that will be limited in order to ensure that the positive and negative effects of the order are proportionate.

In applying this test to the facts of the case, La Forest J. found that the evidence of the potential undue hardship consisted mainly in the Crown's submission that the evidence was of a "delicate nature" and that this was insufficient to override the infringement on freedom of expression.

**43**    This Court has recently revisited the granting of a publication ban under the court's common law jurisdiction in R. v. Mentuck, [2001] 3 S.C.R. 442, 2001 SCC 76, and its companion case R. v. O.N.E., [2001] 3 S.C.R. 478, 2001 SCC 77. In Mentuck, the Crown moved for a publication ban to protect the identity of undercover police officers and operational methods employed by the officers in their investigation of the accused. The accused opposed the motion as an infringement of his right to a fair and public hearing under s. 11(d) of the Charter. The order was also opposed by two intervening newspapers as an infringement of their right to freedom of expression.

**44**    The Court noted that, while Dagenais dealt with the balancing of freedom of expression on the one hand, and the right to a fair trial of the accused on the other, in the case before it, both the right of the [page540] accused to a fair and public hearing, and freedom of expression weighed in favour of denying the publication ban. These rights were balanced against interests relating to the proper administration of justice, in particular, protecting the safety of police officers and preserving the efficacy of undercover police operations.

**45**    In spite of this distinction, the Court noted that underlying the approach taken in both Dagenais and New Brunswick was the goal of ensuring that the judicial discretion to order publication bans is subject to no lower a standard of compliance with the Charter than legislative enactment. This goal is furthered by incorporating the essence of s. 1 of the Charter and the Oakes test into the publication ban test. Since this same goal applied in the case before it, the Court adopted a similar approach to that taken in Dagenais, but broadened the Dagenais test (which dealt specifically with the right of an accused to a fair trial) such that it could guide the exercise of judicial discretion where a publication ban is requested in order to preserve any important aspect of the proper administration of justice. At para. 32, the Court reformulated the test as follows:

> A publication ban should only be ordered when:
>
> (a)    such an order is necessary in order to prevent a serious risk to the proper administration of justice because reasonably alternative measures will not prevent the risk; and
>
> (b)    the salutary effects of the publication ban outweigh the deleterious effects on the rights and interests of the parties and the public, including the effects on the right to free expression, the right of the accused to a fair and public trial, and the efficacy of the administration of justice.

**46**    The Court emphasized that under the first branch of the test, three important elements were subsumed under the "necessity" branch. First, the risk in question must be a serious risk well grounded in the evidence. Second, the phrase "proper administration of justice" must be carefully

interpreted so as not to [page541] allow the concealment of an excessive amount of information. Third, the test requires the judge ordering the ban to consider not only whether reasonable alternatives are available, but also to restrict the ban as far as possible without sacrificing the prevention of the risk.

**47**    At para. 31, the Court also made the important observation that the proper administration of justice will not necessarily involve Charter rights, and that the ability to invoke the Charter is not a necessary condition for a publication ban to be granted:

> The [common law publication ban] rule can accommodate orders that must occasionally be made in the interests of the administration of justice, which encompass more than fair trial rights. As the test is intended to "reflec[t] the substance of the Oakes test", we cannot require that Charter rights be the only legitimate objective of such orders any more than we require that government action or legislation in violation of the Charter be justified exclusively by the pursuit of another Charter right. [Emphasis added.]

The Court also anticipated that, in appropriate circumstances, the Dagenais framework could be expanded even further in order to address requests for publication bans where interests other than the administration of justice were involved.

**48**    Mentuck is illustrative of the flexibility of the Dagenais approach. Since its basic purpose is to ensure that the judicial discretion to deny public access to the courts is exercised in accordance with Charter principles, in my view, the Dagenais model can and should be adapted to the situation in the case at bar where the central issue is whether judicial discretion should be exercised so as to exclude confidential information from a public proceeding. As in Dagenais, New Brunswick and Mentuck, granting the confidentiality order will have a negative effect on the Charter right to freedom of expression, as well as the principle of open and accessible court proceedings, and, as in those cases, courts must ensure that the discretion to grant the order is exercised in accordance with Charter principles. [page542] However, in order to adapt the test to the context of this case, it is first necessary to determine the particular rights and interests engaged by this application.

> (2)    The Rights and Interests of the Parties

**49**    The immediate purpose for AECL's confidentiality request relates to its commercial interests. The information in question is the property of the Chinese authorities. If the appellant were to disclose the Confidential Documents, it would be in breach of its contractual obligations and suffer a risk of harm to its competitive position. This is clear from the findings of fact of the motions judge that AECL was bound by its commercial interests and its customer's property rights not to disclose the information (para. 27), and that such disclosure could harm the appellant's commercial interests (para. 23).

**50**    Aside from this direct commercial interest, if the confidentiality order is denied, then in order

to protect its commercial interests, the appellant will have to withhold the documents. This raises the important matter of the litigation context in which the order is sought. As both the motions judge and the Federal Court of Appeal found that the information contained in the Confidential Documents was relevant to defences available under the CEAA, the inability to present this information hinders the appellant's capacity to make full answer and defence, or, expressed more generally, the appellant's right, as a civil litigant, to present its case. In that sense, preventing the appellant from disclosing these documents on a confidential basis infringes its right to a fair trial. Although in the context of a civil proceeding this does not engage a Charter right, the right to a fair trial generally can be viewed as a fundamental principle of justice: M. (A.) v. Ryan, [1997] 1 S.C.R. 157, at para. 84, per L'Heureux-Dubé J. (dissenting, but not on that point). Although this fair trial right is directly relevant to the appellant, there is also a general public interest in protecting the right to a fair trial. Indeed, as a general proposition, all disputes in the courts should be decided under a fair trial standard. The legitimacy of the judicial process alone [page543] demands as much. Similarly, courts have an interest in having all relevant evidence before them in order to ensure that justice is done.

**51**    Thus, the interests which would be promoted by a confidentiality order are the preservation of commercial and contractual relations, as well as the right of civil litigants to a fair trial. Related to the latter are the public and judicial interests in seeking the truth and achieving a just result in civil proceedings.

**52**    In opposition to the confidentiality order lies the fundamental principle of open and accessible court proceedings. This principle is inextricably tied to freedom of expression enshrined in s. 2(b) of the Charter: New Brunswick, supra, at para. 23. The importance of public and media access to the courts cannot be understated, as this access is the method by which the judicial process is scrutinized and criticized. Because it is essential to the administration of justice that justice is done and is seen to be done, such public scrutiny is fundamental. The open court principle has been described as "the very soul of justice", guaranteeing that justice is administered in a non-arbitrary manner: New Brunswick, at para. 22.

(3)    Adapting the Dagenais Test to the Rights and Interests of the Parties

**53**    Applying the rights and interests engaged in this case to the analytical framework of Dagenais and subsequent cases discussed above, the test for whether a confidentiality order ought to be granted in a case such as this one should be framed as follows:

A confidentiality order under Rule 151 should only be granted when:

(a)    such an order is necessary in order to prevent a serious risk to an important interest, including a commercial interest, in the context of litigation because reasonably alternative measures will not prevent the risk; and

[page544]

> (b)    the salutary effects of the confidentiality order, including the effects on the
>        right of civil litigants to a fair trial, outweigh its deleterious effects,
>        including the effects on the right to free expression, which in this context
>        includes the public interest in open and accessible court proceedings.

**54**    As in Mentuck, I would add that three important elements are subsumed under the first branch
of this test. First, the risk in question must be real and substantial, in that the risk is well grounded in
the evidence, and poses a serious threat to the commercial interest in question.

**55**    In addition, the phrase "important commercial interest" is in need of some clarification. In
order to qualify as an "important commercial interest", the interest in question cannot merely be
specific to the party requesting the order; the interest must be one which can be expressed in terms
of a public interest in confidentiality. For example, a private company could not argue simply that
the existence of a particular contract should not be made public because to do so would cause the
company to lose business, thus harming its commercial interests. However, if, as in this case,
exposure of information would cause a breach of a confidentiality agreement, then the commercial
interest affected can be characterized more broadly as the general commercial interest of preserving
confidential information. Simply put, if there is no general principle at stake, there can be no
"important commercial interest" for the purposes of this test. Or, in the words of Binnie J. in F.N.
(Re), [2000] 1 S.C.R. 880, 2000 SCC 35, at para. 10, the open court rule only yields "where the
public interest in confidentiality outweighs the public interest in openness" (emphasis added).

**56**    In addition to the above requirement, courts must be cautious in determining what constitutes
an "important commercial interest". It must be remembered that a confidentiality order involves an
infringement on freedom of expression. Although the balancing of the commercial interest with
freedom of expression takes place under the second [page545] branch of the test, courts must be
alive to the fundamental importance of the open court rule. See generally Muldoon J. in Eli Lilly
and Co. v. Novopharm Ltd. (1994), 56 C.P.R. (3d) 437 (F.C.T.D.), at p. 439.

**57**    Finally, the phrase "reasonably alternative measures" requires the judge to consider not only
whether reasonable alternatives to a confidentiality order are available, but also to restrict the order
as much as is reasonably possible while preserving the commercial interest in question.

> B.    Application of the Test to this Appeal

> (1)    Necessity

**58**    At this stage, it must be determined whether disclosure of the Confidential Documents would

impose a serious risk on an important commercial interest of the appellant, and whether there are reasonable alternatives, either to the order itself, or to its terms.

**59**     The commercial interest at stake here relates to the objective of preserving contractual obligations of confidentiality. The appellant argues that it will suffer irreparable harm to its commercial interests if the Confidential Documents are disclosed. In my view, the preservation of confidential information constitutes a sufficiently important commercial interest to pass the first branch of the test as long as certain criteria relating to the information are met.

**60**     Pelletier J. noted that the order sought in this case was similar in nature to an application for a protective order which arises in the context of patent litigation. Such an order requires the applicant to demonstrate that the information in question has been treated at all relevant times as confidential and that on a balance of probabilities its proprietary, commercial and scientific interests could reasonably be harmed by the disclosure of the information: AB Hassle v. Canada (Minister of National Health and Welfare) (1998), 83 C.P.R. (3d) 428 (F.C.T.D.), at p. 434. To this I would add the requirement proposed [page546] by Robertson J.A. that the information in question must be of a "confidential nature" in that it has been "accumulated with a reasonable expectation of it being kept confidential" as opposed to "facts which a litigant would like to keep confidential by having the courtroom doors closed" (para. 14).

**61**     Pelletier J. found as a fact that the AB Hassle test had been satisfied in that the information had clearly been treated as confidential both by the appellant and by the Chinese authorities, and that, on a balance of probabilities, disclosure of the information could harm the appellant's commercial interests (para. 23). As well, Robertson J.A. found that the information in question was clearly of a confidential nature as it was commercial information, consistently treated and regarded as confidential, that would be of interest to AECL's competitors (para. 16). Thus, the order is sought to prevent a serious risk to an important commercial interest.

**62**     The first branch of the test also requires the consideration of alternative measures to the confidentiality order, as well as an examination of the scope of the order to ensure that it is not overly broad. Both courts below found that the information contained in the Confidential Documents was relevant to potential defences available to the appellant under the CEAA and this finding was not appealed at this Court. Further, I agree with the Court of Appeal's assertion (at para. 99) that, given the importance of the documents to the right to make full answer and defence, the appellant is, practically speaking, compelled to produce the documents. Given that the information is necessary to the appellant's case, it remains only to determine whether there are reasonably alternative means by which the necessary information can be adduced without disclosing the confidential information.

**63**     Two alternatives to the confidentiality order were put forward by the courts below. The motions judge suggested that the Confidential Documents could be expunged of their commercially sensitive contents, and edited versions of the documents could be [page547] filed. As well, the

majority of the Court of Appeal, in addition to accepting the possibility of expungement, was of the opinion that the summaries of the Confidential Documents included in the affidavits could go a long way to compensate for the absence of the originals. If either of these options is a reasonable alternative to submitting the Confidential Documents under a confidentiality order, then the order is not necessary, and the application does not pass the first branch of the test.

**64**     There are two possible options with respect to expungement, and in my view, there are problems with both of these. The first option would be for AECL to expunge the confidential information without disclosing the expunged material to the parties and the court. However, in this situation the filed material would still differ from the material used by the affiants. It must not be forgotten that this motion arose as a result of Sierra Club's position that the summaries contained in the affidavits should be accorded little or no weight without the presence of the underlying documents. Even if the relevant information and the confidential information were mutually exclusive, which would allow for the disclosure of all the information relied on in the affidavits, this relevancy determination could not be tested on cross-examination because the expunged material would not be available. Thus, even in the best case scenario, where only irrelevant information needed to be expunged, the parties would be put in essentially the same position as that which initially generated this appeal, in the sense that, at least some of the material relied on to prepare the affidavits in question would not be available to Sierra Club.

**65**     Further, I agree with Robertson J.A. that this best case scenario, where the relevant and the confidential information do not overlap, is an untested assumption (para. 28). Although the documents themselves were not put before the courts on this motion, given that they comprise thousands of pages of detailed information, this assumption is at best optimistic. The expungement alternative would be further complicated by the fact that the Chinese [page548] authorities require prior approval for any request by AECL to disclose information.

**66**     The second option is that the expunged material be made available to the court and the parties under a more narrowly drawn confidentiality order. Although this option would allow for slightly broader public access than the current confidentiality request, in my view, this minor restriction to the current confidentiality request is not a viable alternative given the difficulties associated with expungement in these circumstances. The test asks whether there are reasonably alternative measures; it does not require the adoption of the absolutely least restrictive option. With respect, in my view, expungement of the Confidential Documents would be a virtually unworkable and ineffective solution that is not reasonable in the circumstances.

**67**     A second alternative to a confidentiality order was Evans J.A.'s suggestion that the summaries of the Confidential Documents included in the affidavits "may well go a long way to compensate for the absence of the originals" (para. 103). However, he appeared to take this fact into account merely as a factor to be considered when balancing the various interests at stake. I would agree that at this threshold stage to rely on the summaries alone, in light of the intention of Sierra Club to argue that they should be accorded little or no weight, does not appear to be a "reasonably

alternative measure" to having the underlying documents available to the parties.

**68**    With the above considerations in mind, I find the confidentiality order necessary in that disclosure of the Confidential Documents would impose a serious risk on an important commercial interest of the appellant, and that there are no reasonably alternative measures to granting the order.

      (2)    The Proportionality Stage

**69**    As stated above, at this stage, the salutary effects of the confidentiality order, including the effects on the appellant's right to a fair trial, must be weighed against the deleterious effects of the confidentiality order, including the effects on the right to free [page549] expression, which in turn is connected to the principle of open and accessible court proceedings. This balancing will ultimately determine whether the confidentiality order ought to be granted.

      (a)    Salutary Effects of the Confidentiality Order

**70**    As discussed above, the primary interest that would be promoted by the confidentiality order is the public interest in the right of a civil litigant to present its case, or, more generally, the fair trial right. Because the fair trial right is being invoked in this case in order to protect commercial, not liberty, interests of the appellant, the right to a fair trial in this context is not a Charter right; however, a fair trial for all litigants has been recognized as a fundamental principle of justice: Ryan, supra, at para. 84. It bears repeating that there are circumstances where, in the absence of an affected Charter right, the proper administration of justice calls for a confidentiality order: Mentuck, supra, at para. 31. In this case, the salutary effects that such an order would have on the administration of justice relate to the ability of the appellant to present its case, as encompassed by the broader fair trial right.

**71**    The Confidential Documents have been found to be relevant to defences that will be available to the appellant in the event that the CEAA is found to apply to the impugned transaction and, as discussed above, the appellant cannot disclose the documents without putting its commercial interests at serious risk of harm. As such, there is a very real risk that, without the confidentiality order, the ability of the appellant to mount a successful defence will be seriously curtailed. I conclude, therefore, that the confidentiality order would have significant salutary effects on the appellant's right to a fair trial.

**72**    Aside from the salutary effects on the fair trial interest, the confidentiality order would also have a beneficial impact on other important rights and interests. First, as I discuss in more detail below, the confidentiality order would allow all parties and the court access to the Confidential Documents, and [page550] permit cross-examination based on their contents. By facilitating access to relevant documents in a judicial proceeding, the order sought would assist in the search for truth, a core value underlying freedom of expression.

**73**    Second, I agree with the observation of Robertson J.A. that, as the Confidential Documents

contain detailed technical information pertaining to the construction and design of a nuclear installation, it may be in keeping with the public interest to prevent this information from entering the public domain (para. 44). Although the exact contents of the documents remain a mystery, it is apparent that they contain technical details of a nuclear installation, and there may well be a substantial public security interest in maintaining the confidentiality of such information.

(b) Deleterious Effects of the Confidentiality Order

**74**    Granting the confidentiality order would have a negative effect on the open court principle, as the public would be denied access to the contents of the Confidential Documents. As stated above, the principle of open courts is inextricably tied to the s. 2(b) Charter right to freedom of expression, and public scrutiny of the courts is a fundamental aspect of the administration of justice: New Brunswick, supra, at paras. 22-23. Although as a general principle, the importance of open courts cannot be overstated, it is necessary to examine, in the context of this case, the particular deleterious effects on freedom of expression that the confidentiality order would have.

**75**    Underlying freedom of expression are the core values of (1) seeking the truth and the common good; (2) promoting self-fulfilment of individuals by allowing them to develop thoughts and ideas as they see fit; and (3) ensuring that participation in the political process is open to all persons: Irwin Toy Ltd. v. Quebec (Attorney General), [1989] 1 S.C.R. 927, [page551] at p. 976; R. v. Keegstra, [1990] 3 S.C.R. 697, at pp. 762-64, per Dickson C.J. Charter jurisprudence has established that the closer the speech in question lies to these core values, the harder it will be to justify a s. 2(b) infringement of that speech under s. 1 of the Charter: Keegstra, at pp. 760-61. Since the main goal in this case is to exercise judicial discretion in a way which conforms to Charter principles, a discussion of the deleterious effects of the confidentiality order on freedom of expression should include an assessment of the effects such an order would have on the three core values. The more detrimental the order would be to these values, the more difficult it will be to justify the confidentiality order. Similarly, minor effects of the order on the core values will make the confidentiality order easier to justify.

**76**    Seeking the truth is not only at the core of freedom of expression, but it has also been recognized as a fundamental purpose behind the open court rule, as the open examination of witnesses promotes an effective evidentiary process: Edmonton Journal, supra, at pp. 1357-58, per Wilson J. Clearly the confidentiality order, by denying public and media access to documents relied on in the proceedings, would impede the search for truth to some extent. Although the order would not exclude the public from the courtroom, the public and the media would be denied access to documents relevant to the evidentiary process.

**77**    However, as mentioned above, to some extent the search for truth may actually be promoted by the confidentiality order. This motion arises as a result of Sierra Club's argument that it must have access to the Confidential Documents in order to test the accuracy of Dr. Pang's evidence. If the order is denied, then the most likely scenario is that the appellant will not submit the documents

with the unfortunate result that evidence which may be relevant to the proceedings will not be available to Sierra Club or the court. As a result, Sierra Club will not be able to fully test the accuracy of Dr. Pang's evidence on cross-examination. In addition, the court will not have the benefit of this cross-examination or [page552] documentary evidence, and will be required to draw conclusions based on an incomplete evidentiary record. This would clearly impede the search for truth in this case.

**78**    As well, it is important to remember that the confidentiality order would restrict access to a relatively small number of highly technical documents. The nature of these documents is such that the general public would be unlikely to understand their contents, and thus they would contribute little to the public interest in the search for truth in this case. However, in the hands of the parties and their respective experts, the documents may be of great assistance in probing the truth of the Chinese environmental assessment process, which would in turn assist the court in reaching accurate factual conclusions. Given the nature of the documents, in my view, the important value of the search for truth which underlies both freedom of expression and open justice would be promoted to a greater extent by submitting the Confidential Documents under the order sought than it would by denying the order, and thereby preventing the parties and the court from relying on the documents in the course of the litigation.

**79**    In addition, under the terms of the order sought, the only restrictions on these documents relate to their public distribution. The Confidential Documents would be available to the court and the parties, and public access to the proceedings would not be impeded. As such, the order represents a fairly minimal intrusion into the open court rule, and thus would not have significant deleterious effects on this principle.

**80**    The second core value underlying freedom of speech, namely, the promotion of individual self-fulfilment by allowing open development of thoughts and ideas, focusses on individual expression, and thus does not closely relate to the open court principle which involves institutional expression. Although the confidentiality order would [page553] restrict individual access to certain information which may be of interest to that individual, I find that this value would not be significantly affected by the confidentiality order.

**81**    The third core value, open participation in the political process, figures prominently in this appeal, as open justice is a fundamental aspect of a democratic society. This connection was pointed out by Cory J. in Edmonton Journal, supra, at p. 1339:

> It can be seen that freedom of expression is of fundamental importance to a democratic society. It is also essential to a democracy and crucial to the rule of law that the courts are seen to function openly. The press must be free to comment upon court proceedings to ensure that the courts are, in fact, seen by all to operate openly in the penetrating light of public scrutiny.

Although there is no doubt as to the importance of open judicial proceedings to a democratic

society, there was disagreement in the courts below as to whether the weight to be assigned to the open court principle should vary depending on the nature of the proceeding.

**82**    On this issue, Robertson J.A. was of the view that the nature of the case and the level of media interest were irrelevant considerations. On the other hand, Evans J.A. held that the motions judge was correct in taking into account that this judicial review application was one of significant public and media interest. In my view, although the public nature of the case may be a factor which strengthens the importance of open justice in a particular case, the level of media interest should not be taken into account as an independent consideration.

**83**    Since cases involving public institutions will generally relate more closely to the core value of public participation in the political process, the public nature of a proceeding should be taken into consideration when assessing the merits of a confidentiality order. It is important to note that this core value will always be engaged where the open court [page554] principle is engaged owing to the importance of open justice to a democratic society. However, where the political process is also engaged by the substance of the proceedings, the connection between open proceedings and public participation in the political process will increase. As such, I agree with Evans J.A. in the court below where he stated, at para. 87:

> While all litigation is important to the parties, and there is a public interest in ensuring the fair and appropriate adjudication of all litigation that comes before the courts, some cases raise issues that transcend the immediate interests of the parties and the general public interest in the due administration of justice, and have a much wider public interest significance.

**84**    This motion relates to an application for judicial review of a decision by the government to fund a nuclear energy project. Such an application is clearly of a public nature, as it relates to the distribution of public funds in relation to an issue of demonstrated public interest. Moreover, as pointed out by Evans J.A., openness and public participation are of fundamental importance under the CEAA. Indeed, by their very nature, environmental matters carry significant public import, and openness in judicial proceedings involving environmental issues will generally attract a high degree of protection. In this regard, I agree with Evans J.A. that the public interest is engaged here more than it would be if this were an action between private parties relating to purely private interests.

**85**    However, with respect, to the extent that Evans J.A. relied on media interest as an indicium of public interest, this was an error. In my view, it is important to distinguish public interest, from media interest, and I agree with Robertson J.A. that media exposure cannot be viewed as an impartial measure of public interest. It is the public nature of the proceedings which increases the need for openness, and this public nature is not necessarily reflected by the media desire to probe the facts of the case. [page555] I reiterate the caution given by Dickson C.J. in Keegstra, supra, at p. 760, where he stated that, while the speech in question must be examined in light of its relation to the core values, "we must guard carefully against judging expression according to its popularity".

**86**    Although the public interest in open access to the judicial review application as a whole is substantial, in my view, it is also important to bear in mind the nature and scope of the information for which the order is sought in assigning weight to the public interest. With respect, the motions judge erred in failing to consider the narrow scope of the order when he considered the public interest in disclosure, and consequently attached excessive weight to this factor. In this connection, I respectfully disagree with the following conclusion of Evans J.A., at para. 97:

> Thus, having considered the nature of this litigation, and having assessed the extent of public interest in the openness of the proceedings in the case before him, the Motions Judge cannot be said in all the circumstances to have given this factor undue weight, even though confidentiality is claimed for only three documents among the small mountain of paper filed in this case, and their content is likely to be beyond the comprehension of all but those equipped with the necessary technical expertise.

Open justice is a fundamentally important principle, particularly when the substance of the proceedings is public in nature. However, this does not detract from the duty to attach weight to this principle in accordance with the specific limitations on openness that the confidentiality order would have. As Wilson J. observed in Edmonton Journal, supra, at pp. 1353-54:

> One thing seems clear and that is that one should not balance one value at large and the conflicting value in its context. To do so could well be to pre-judge the issue by placing more weight on the value developed at large than is appropriate in the context of the case.

[page556]

**87**    In my view, it is important that, although there is significant public interest in these proceedings, open access to the judicial review application would be only slightly impeded by the order sought. The narrow scope of the order coupled with the highly technical nature of the Confidential Documents significantly temper the deleterious effects the confidentiality order would have on the public interest in open courts.

**88**    In addressing the effects that the confidentiality order would have on freedom of expression, it should also be borne in mind that the appellant may not have to raise defences under the CEAA, in which case the Confidential Documents would be irrelevant to the proceedings, with the result that freedom of expression would be unaffected by the order. However, since the necessity of the Confidential Documents will not be determined for some time, in the absence of a confidentiality order, the appellant would be left with the choice of either submitting the documents in breach of its obligations, or withholding the documents in the hopes that either it will not have to present a defence under the CEAA, or that it will be able to mount a successful defence in the absence of

these relevant documents. If it chooses the former option, and the defences under the CEAA are later found not to apply, then the appellant will have suffered the prejudice of having its confidential and sensitive information released into the public domain, with no corresponding benefit to the public. Although this scenario is far from certain, the possibility of such an occurrence also weighs in favour of granting the order sought.

**89**    In coming to this conclusion, I note that if the appellant is not required to invoke the relevant defences under the CEAA, it is also true that the appellant's fair trial right will not be impeded, even if the confidentiality order is not granted. However, I do not take this into account as a factor which weighs in favour of denying the order because, if the order is granted and the Confidential Documents are not required, there will be no deleterious effects on either the public interest in freedom of expression or the appellant's commercial interests or fair trial right. This neutral result is in contrast with the [page557] scenario discussed above where the order is denied and the possibility arises that the appellant's commercial interests will be prejudiced with no corresponding public benefit. As a result, the fact that the Confidential Documents may not be required is a factor which weighs in favour of granting the confidentiality order.

**90**    In summary, the core freedom of expression values of seeking the truth and promoting an open political process are most closely linked to the principle of open courts, and most affected by an order restricting that openness. However, in the context of this case, the confidentiality order would only marginally impede, and in some respects would even promote, the pursuit of these values. As such, the order would not have significant deleterious effects on freedom of expression.

   VII.   Conclusion

**91**    In balancing the various rights and interests engaged, I note that the confidentiality order would have substantial salutary effects on the appellant's right to a fair trial, and freedom of expression. On the other hand, the deleterious effects of the confidentiality order on the principle of open courts and freedom of expression would be minimal. In addition, if the order is not granted and in the course of the judicial review application the appellant is not required to mount a defence under the CEAA, there is a possibility that the appellant will have suffered the harm of having disclosed confidential information in breach of its obligations with no corresponding benefit to the right of the public to freedom of expression. As a result, I find that the salutary effects of the order outweigh its deleterious effects, and the order should be granted.

**92**    Consequently, I would allow the appeal with costs throughout, set aside the judgment of the Federal Court of Appeal, and grant the confidentiality order on the terms requested by the appellant under Rule 151 of the Federal Court Rules, 1998.

[page558]

Solicitors for the appellant: Osler, Hoskin & Harcourt, Toronto.

Solicitors for the respondent Sierra Club of Canada: Timothy J. Howard, Vancouver; Franklin S. Gertler, Montréal.

Solicitor for the respondents the Minister of Finance of Canada, the Minister of Foreign Affairs of Canada, the Minister of International Trade of Canada and the Attorney General of Canada: The Deputy Attorney General of Canada, Ottawa.

# TAB 3

*Case Name:*
## Andersen v. St. Jude Medical, Inc.

**Between**
**Yvonne Andersen on her own behalf and as Executrix of**
**the Estate of Erik Andersen, Sharon Frost and Her**
**Majesty the Queen in Right of the Province of Alberta,**
**as represented by the Minister of Health and Wellness,**
**Plaintiffs, and**
**St. Jude Medical, Inc. and St. Jude Medical Canada,**
**Inc., Defendants**
**PROCEEDING UNDER the Class Proceedings Act, 1992**

[2010] O.J. No. 4287

2010 ONSC 5191

104 O.R. (3d) 192

100 C.P.C. (6th) 381

2010 CarswellOnt 7581

Toronto Court File No. 00-CV-195906CV

Ontario Superior Court of Justice

**J.L. Lax J.**

Heard: By written submissions.
Judgment: October 7, 2010.

(23 paras.)

*Civil litigation -- Civil procedure -- Discovery -- Production and inspection of documents --*
*Confidentiality orders -- Motion by the defendants for a sealing order for documents in the event*
*they became exhibits at trial allowed in part -- Most of these documents contain confidential or*
*proprietary information belonging to Spire Corporation, a non-party -- Public disclosure of the*
*documentation of the IBAD process, Spi-Argent coating methods, and other technical information*

*would create a real and substantial harm to Spire's commercial interests and these documents were sealed -- Outdated pricing information was not sealed as this document did not meet the necessity branch of the test.*

Motion by the defendants for a sealing order for documents in the event they became exhibits at trial. Most of these documents contain confidential or proprietary information belonging to Spire Corporation, a non-party. The defendants argued that these documents contained Spire's confidential information about its unique processing procedures and parameters respecting silver-based coatings on its Silzone valve.

HELD: Motion allowed in part. The evidence showed that a number of other companies were currently using or developing silver or silver-based coatings on medical devices. Interest in such technology increased the likelihood that potential competitors would be interested in this information, and made the risk to Spire more likely and less speculative. Spire's business relied on the confidentiality of its technical specifications and processes. Public disclosure of the documentation of the IBAD process, Spi-Argent coating methods, and other technical information would create a real and substantial harm to Spire's commercial interests. This information was sensitive and confidential, and disclosure enabled Spire's competitors to replicate Spire's otherwise confidential technology to unfairly compete with Spire to Spire's detriment. Disclosure of the now outdated pricing information did not create a serious risk to Spire's commercial interest. Therefore, this document did not meet the necessity branch of the test and the defendants had not established that the document should be sealed. There was a broad public interest in preserving contractual confidentiality obligations and in preserving the confidential information of non-parties. It was also in the public interest to promote commercial incentives for scientific innovation and preserve the intellectual property or proprietary rights of innovators. There was little or no risk that these proceedings would be incomprehensible to the public without reference to the information in these documents. The salutary effects of sealing the documents outweighed its deleterious effects.

**Statutes, Regulations and Rules Cited:**

Courts of Justice Act, R.S.O. 1990, c. C.43, s. 137(1), s. 137(2)

**Counsel:**

*Angus McKinnon*, for the Plaintiffs.

*Gordon McKee, Marcy McKee*, for the Defendants.

---

**Ruling on Sealing of Spire Corporation**

## Documents and Information

**1** [1] **J.L. LAX J.**:-- The defendants, St. Jude Medical, Inc. and St. Jude Medical, Canada Inc. (collectively "SJM"), seek a sealing order for 24 documents or portions of documents in the event they become exhibits at trial. Most of these documents contain confidential or proprietary information belonging to Spire Corporation ("Spire"). The plaintiffs' position is that none of the documents meet the legal test for sealing, but they are not opposing the motion.

**2** [2] At the time of filing these written submissions, only one of the 24 documents at issue had been made an exhibit in this trial: JB # 14105, which was marked as Exhibit 30, and is subject to an interim sealing order. The defendants are seeking to permanently seal or redact pages 48 and 49 of Exhibit 30, on the grounds that these pages contain Spire's confidential information about its unique processing procedures and parameters. Exhibit 30 is SJM's Supplementary Notice of Compliance submission to Health Canada for the Masters Series Silzone valve.

**3** [3] In support of their request for a sealing order, the defendants provided affidavits of Richard Oliver of Spire, in which Oliver attests to the prejudicial consequences to Spire of disclosure of these documents/excerpts. Oliver also refers to SJM's License and Supply Agreement with Spire, which requires that SJM keep Spire's information confidential and that the confidentiality provisions of the Licence and Supply Agreements survive the termination of those agreements.

**4** [4] The defendants categorize the documents for which they are seeking a sealing order into the following three categories:

> 1. documents containing detailed confidential information concerning processing steps and parameters and equipment specifications for Spire's proprietary Spi-Argent and IBAD (ion beam assisted deposition) processes;
> 2. documents that disclose thickness, weight and/or other measurements of the Spi-Argent coating; and
> 3. documents that disclose confidential and commercially sensitive pricing information.

The documents in these categories are listed in the appendix to this order.

**5** [6] The first category of documents or excerpts includes documents in Spire's Master File with the U.S. Food and Drug Administration ("FDA"). These documents contain a detailed explanation of Spire's IBAD process, including detailed information about the equipment associated with Spire's IBAD process; detailed instructions for use by IBAD technicians; and confidential processing parameters and measurements, which are versions of Spire's work instructions for Spi-Argent processing. Pages 48 and 49 of Exhibit 30 fall into category 1. The second category includes documents/excerpts that disclose thickness parameters and confidential measurements of Spi-Argent coating. The defendants submit that disclosure of these documents/excerpts would allow

competitors to duplicate Spire's technology as Spire uses the same equipment and procedures today.

**6**   [5] The third category is a letter from 1999 that contains confidential pricing information for Spi-Argent processing. The defendants submit that although outdated, the information discloses information about Spire's pricing policies and strategies that are still in use today and could be used by competitors to Spire's prejudice.

**The law on sealing orders**

**7**   [6] Pursuant to the *Courts of Justice Act*, R.S.O. 1990, c. C-43, on payment of a fee, a person is entitled to see any document filed in a civil proceeding in a court, unless an Act or an order of the court provides otherwise (s. 137(1)). The court may treat as confidential and seal and exclude from the public record any document filed before the court in a civil proceeding (s. 137(2)).

**8**   [7] The decision of the Supreme Court of Canada in *Sierra Club of Canada v. Canada (Minister of Finance)*, [2002] 2 S.C.R. 522 is the governing authority on the granting of a sealing or confidentiality order. In *Sierra*, the Supreme Court granted a sealing order over technical information about an environmental assessment of a site in China for the construction of two CANDU nuclear reactors. The documents were the property of the Chinese authority, which had provided the documents to Atomic Energy of Canada Ltd. ("AECL") on condition that they be protected by a confidentiality order.

**9**   [8] The Court established the following test for granting a sealing order, at para. 53:

> A.   such an order is necessary in order to prevent a serious risk to an important interest, including a commercial interest, in the context of litigation because reasonably alternative measures will not prevent the risk; and
>
> B.   the salutary effects of the confidentiality order, including the effects on the right of civil litigants to a fair trial, outweigh its deleterious effects, including the effects on the right to free expression, which in this context includes the public interest in open and accessible court proceedings.

**10**   [9] The Court stated that the three elements of the first branch are as follows (paras. 54-57):

> i.   The risk in question must be real and substantial, in that the risk is well grounded in the evidence, and poses a serious threat to the commercial interest in question.
>
> ii.   To qualify as an "important commercial interest," the interest in question cannot merely be specific to the party requesting the order; the interest must be one which can be expressed in terms of a public interest in confidentiality. Where exposure of information would cause a breach of a confidentiality agreement, the commercial interest affected can be characterized more broadly as the general commercial interest of

          preserving confidential information.

iii.    To assess whether there are "reasonably alternative measures," the judge must consider not only whether reasonable alternatives to a confidentiality order are available, but also to restrict the order as much as is reasonably possible while preserving the commercial interest in question.

**11**    [10] In *Sierra*, the Court found that branch A, the necessity branch, was satisfied. The commercial interest at stake was the objective of preserving contractual obligations of confidentiality. In establishing confidentiality, the applicant demonstrated that the information in question had been treated at all relevant times as confidential; that on a balance of probabilities the applicant's proprietary, commercial, and scientific interests could reasonably be harmed by the disclosure of the information; and that the information had been accumulated with a reasonable expectation of it being kept confidential. Further, the Court found that disclosure of the confidential documents would impose a serious risk to an important commercial interest of the appellant, and there were no reasonably alternative measures to granting the order.

**12**    [11] The Court found that the salutary effects of an order outweighed the deleterious effects and that branch B of the test was also satisfied. Absent a sealing order, the appellant's ability to mount a successful defence would be curtailed as the AECL would have been prevented from disclosing the information. The confidential documents in issue contained detailed technical information pertaining to the construction and design of a nuclear installation, and it may have been in the public interest to prevent this information from entering the public domain. The Court noted that the technical nature of the documents made it unlikely that the general public would understand their contents. At para. 78, the Court stated: "The narrow scope of the order coupled with the highly technical nature of the Confidential Documents significantly temper the deleterious effects the confidentiality order would have on the public interest in open courts."

**13**    [12] The courts have recognized the importance of contractual obligations between a party to the proceedings and a third party. For example, in *117560 Ontario Ltd. v. Great Atlantic Pacific Co. of Canada* (2003), 121 A.C.W.S. (3d) 426, [2003] O.J. No. 1016 (S.C.) (*A&P*), Master Macleod granted a permanent confidentiality order related to commercially sensitive information about supplier discounts. The master noted at para. 6 that exclusive suppliers had disclosed detailed information about pricing and profit margins and that in the public domain, "[t]his information could be used to devastating effect by other suppliers who might bid against the current supplier in dealing with A&P, by other grocery stores with whom they will be negotiating and by other suppliers who might bid with other customers." In *Camoplast Inc. v. Soucy International Inc*, [2003] F.C.J. No. 1791 (T.D.), the Federal Court recognized that contractual obligations of confidentiality raise a general commercial or important interest in circumstances where a confidentiality agreement existed between the plaintiff and a third party.

**14**    [13] As in the matter before me, *Sierra, Camoplast,* and *A&P* each address the commercial interests of third parties. In contrast, in *Fairview Donut Inc. v. TDL Group Corp*, 2010 ONSC 789,

100 O.R. (3d) 510 (S.C.), the information sought to be protected was confidential to parties to the litigation, but not third parties. In *Fairview*, the court dismissed a motion by the defendants, Tim Hortons, for a sealing order restricting public access to certain documents or portions thereof. In applying the *Sierra* test, Strathy J. was not satisfied that the defendants met the necessity branch of the test as the defendants did not satisfy the court that the interests affected went beyond the private commercial interests of Tim Hortons and its franchisees. Further, although the defendants submitted that Tim Hortons and its franchisees would suffer commercial harm if the information was disclosed to competitors, the defendants did not satisfy the court that this risk was real or substantial or well-grounded in the evidence. Rather, the defendants' evidence was speculative and lacked specifics. Strathy J. noted that although sealing orders have been routinely granted in cases involving true trade secrets (such as *Eli Lilly*, discussed below), the information that the defendants described as trade secrets was "of the most general nature and at the very lowest level of 'secrecy'" (para. 66).

**15**    [14] In *Eli Lilly and Co. v. Apotex Inc.*, 2008 FC 892, [2008] F.C.J. No. 1593, Gauthier J. ordered certain documents and portions of other documents sealed, having found that they met the *Sierra* test. The court found that for certain documents, "the public interest in maintaining the confidentiality of documents containing proprietary information filed with the regulator on a confidential basis outweighs the public interest in open and accessible Court proceedings, in a private matter such as this one" (para. 7). The court ordered sealed documents/excerpts that contained details of a particular manufacturing process and those that contained material information about the supplier's process (paras. 42 & 45). On the other hand, the court did not order sealed documents that did not "contain information not publicly available or maintained in strict confidentiality" (para. 11) and contained no details of the particular manufacturing process (para. 41).

**16**    [15] Similar to the concern over confidential processes and proprietary information expressed in *Eli Lilly*, in *Dish Network LLC v. Ramkissoon*, 2010 ONSC 761, [2010] O.J. No. 440 (S.C.), Cumming J. allowed the plaintiffs' motion to seal a document that contained technical specifications that "could be used by third parties to design other devices and software capable of infringing the Plaintiffs' trade secrets, descrambling their encrypted satellite signals, and circumventing technological measures that protect access to copyrighted and other proprietary works" (para. 8).

**Analysis**

**A i. Serious risk to important commercial interest**

**17**    [16] The defendants (through their written submissions and the affidavits of Richard Oliver) explain how the proposed documents/excerpts could be used by competitors to replicate Spire's technology. Further, the evidence shows that a number of other companies are currently using or developing silver or silver-based coatings on medical devices. Interest in such technology increases the likelihood that potential competitors will be interested in this information, and makes the risk to

Spire more likely and less speculative. SJM is under a continuing contractual obligation to preserve the confidentiality of Spire's IBAD technology. As in *Eli Lilly*, the documents/excerpts listed in categories 1 and 2 contain both submissions filed confidentially with regulators as well as details of a particular manufacturing process. Further, as in *Dish Network*, Spire's business relies on the confidentiality of its technical specifications and processes.

**18**   [17] Consistent with *Eli Lilly, Dish Network*, and *A&P*, I am satisfied that public disclosure of the documents in categories 1 and 2 - documentation of the IBAD process, Spi-Argent coating methods, and other technical information - would create a real and substantial harm to Spire's commercial interests. This information is sensitive and confidential, and disclosure enables Spire's competitors to replicate Spire's otherwise confidential technology to unfairly compete with Spire to Spire's detriment.

**19**   [18] I am not satisfied that disclosure of the now outdated pricing information in category 3, contained in a July 1999 letter from SJM to Spire, creates a serious risk to Spire's commercial interest. Therefore, this document does not meet the necessity branch of the test and the defendants have not satisfied me that the document should be sealed.

### A ii. Public interest in maintaining confidentiality

**20**   [19] As established by *Sierra* and applied in *A&P* and *Camoplast*, there is a broad public interest in preserving contractual confidentiality obligations and in preserving the confidential information of non-parties. SJM and Spire's Licence and Supply Agreement requires SJM to preserve the confidentiality of Spire's confidential information and disclosure would result in a breach of this agreement. It is also in the public interest to promote commercial incentives for scientific innovation and preserve the intellectual property or proprietary rights of innovators. It is clear that Spire intended to keep its processes and technology out of the public domain by maintaining the secrecy of its information and regulatory filings. Disclosure would undermine this. Unlike *Fairview*, where it was the defendants' interests at stake, and where the court found the information sought to be sealed very general and not particularly secretive, in this case, it is a non-party whose commercial interests are at stake, and the information sought to be sealed is highly technical and specific.

### A iii. Reasonable alternative measures

**21**   [20] I am satisfied that ordering the documents/excerpts in categories 1 and 2 sealed is the least obtrusive way to protect Spire's commercially sensitive information. Apart from the document in category 3, the defendants have been appropriately selective about the information they seek to seal.

### B. Effects of order

**22**   [21] As discussed in *Sierra* and in *Fairview*, there is a very strong public interest to ensure that

the public has access to information in court proceedings. A sealing order reduces transparency in this process and can result in the public losing trust and confidence in the administration of justice. However, here, as in *Sierra*, the documents/excerpts in the first two categories contain detailed and highly technical information that is not likely to be of interest or comprehensible to the general public. Unlike *Fairview*, there is little or no risk that these proceedings will be incomprehensible to the public without reference to the information in these documents. I find that the salutary effects of sealing the documents/excerpts in categories 1 and 2 outweigh its deleterious effects.

**Conclusion**

**23**    [22] For the reasons above, I order permanently sealed the documents/excerpts contained in categories 1 & 2 in the attached appendix in the event that any or all such documents or excerpts become exhibits at trial, including pages 48 and 49 of JB#14105, Exhibit 30. The document in category 3 does not meet the necessity branch of the *Sierra* test and should not be sealed.

J.L. LAX J.

\* \* \* \* \*

# APPENDIX

## 1) Documents disclosing Spire Processing and Equipment Specifications and Parameters

| JB# | SJM Production # | Pages to be Sealed |
|---|---|---|
| 14105 (Exhibit 30) | 152 | 48-49 |
| 1649 | 1763 | 10-11, 39-40 |
| 2604 | 151 | 39-40 |
| 2617 | 152 | 47-48 |
| 5741 | 153 | 161-162 |
| 2646 | 171 | 36-37 |
| 2609 | 186 | 85-86 |
| 2616 | 41462 | 40-41 |
| 6027 | 49328 | All |
| 6401 | 49261 | 2-3 |
| 6025 | 2003 | 3-10 |
| 5221 | 2031 | 3-17, 18-23, 29, 30, 32. |
| 6405 | 2033 | 8-15 |
| 5857 | 49267 | 18-34 |
| 2119 | 49219 | 5 |
| 145 | 1368 | 7 |
| 5557 | 49321 | 5 |

## 2) Documents Disclosing Spi-Argent® Measurements

| JB# | SJM Production # | Pages to be Sealed |
|---|---|---|
| 3183 | 49320 | 6 |
| 3464 | 1355 | 4 |
| 3298 | 3253 | 9-13, 15-24, 40-45, 46-48, 49-51, 190-199 |
| 5220 | 1969 | 9-10, 67-92, 40-45 |
| 13160 | 68342 | 68, 74, 100 |
| 2648 | 13904 | 7 |

## 3) Documents Disclosing Confidential Spire Pricing Information

| JB# | SJM Production # | Pages to be Sealed |
|---|---|---|
| 5221 | 2301 | 34-37 |

# TAB 4

*Case Name:*

# Orange County Choppers Inc. v. Trio Selection Inc.

**Between**
**Orange County Choppers Inc., Plaintiff/Defendant in**
**Counterclaim, and**
**Trio Selection Inc., Defendant/Plaintiff in Counterclaim**

[2006] F.C.J. No. 1414

[2006] A.C.F. no 1414

2006 FC 1122

2006 CF 1122

151 A.C.W.S. (3d) 395

Docket T-1132-05

Federal Court
Montréal, Quebec

**Blais J.**

Heard: August 14, 2006.
Judgment: September 19, 2006.

(12 paras.)

*Civil procedure -- Discovery -- Production and inspection of documents -- Confidentiality orders --*
*Motion by plaintiff for confidentiality order allowed -- Documents plaintiff expected to file*
*contained information that could be used by competitors against plaintiff's interests -- Information*
*to remain confidential -- Defendant would not suffer any prejudice as confidential information*
*would be provided to defendant.*

Motion by plaintiff for order protecting and maintaining confidentiality of certain documents and
information to be produced by plaintiff in present proceedings -- Documents plaintiff expected to

file contained information that could be used by competitors against plaintiff's interests --
Documents included license agreements, commission reports, invoices concerning sales in Canada
and terms and conditions of license agreements -- HELD: Motion allowed -- Financial information
of parties regarding sales in Canada and information relating to plaintiff's licensees should remain
confidential -- No obvious justification that the public interest would be harmed if they were not
aware of plaintiff's confidential and proprietary information -- Defendant would not suffer any
prejudice as confidential information would be provided to defendant.

**Statutes, Regulations and Rules Cited:**

Federal Courts Rules, Rule 151, Rule 151(1), Rule 151(2)

**Counsel:**

Hilal El Ayouby, for the Plaintiff/Defendant in Counterclaim.

Claudette Dagenais, for the Defendant/Plaintiff in Counterclaim.

---

## REASONS FOR ORDER AND ORDER

**1    BLAIS J.**:-- This is a motion for an order protecting and maintaining the confidentiality of
certain documents and information to be produced by the parties during the course of these
proceedings. Rule 151 of the *Federal Courts Rules* permits the issuance of a protective order to
protect certain material which should be treated as confidential.

> **151.** (1) On motion, the Court may order that material to be filed shall be
> treated as confidential.

> Demonstrated need for confidentiality

> (2) Before making an order under subsection (1), the Court must be satisfied
> that the material should be treated as confidential, notwithstanding the public
> interest in open and accessible court proceedings

* * *

> **151.** (1) La Cour peut, sur requête, ordonner que des documents ou éléments

matériels qui seront déposés soient considérés comme confidentiels.

Circonstances justifiant la confidentialité

(2) Avant de rendre une ordonnance en application du paragraphe (1), la Cour doit être convaincue de la nécessité de considérer les documents ou éléments matériels comme confidentiels, étant donné l'intérêt du public à la publicité des débats judiciaires

**2**    A confidentiality order should be granted when such an order is necessary to prevent a serious risk to an important interest, including a commercial interest, in the context of litigation because reasonable alternative measures will not prevent the risk, and the salutary effects of the confidentiality order, including the right of a litigant to a fair trial, outweigh its effects on the public interest in having open courts (see *Sierra Club of Canada v. Canada (Minister of Finance)*, (2002) 18 C.P.R. (4th) 1 at 19 (S.C.C.).).

**3**    As was decided by the Federal Court of Appeal in *AB Hassle v. Canada (Minister of National Health and Welfare)*, (2000) 5 C.P.R. (4th) 149 at 155 (F.C.A.), the basis for the issuance of such an order is a subjective but reasonably held belief. The plaintiff, Orange County Choppers Inc., suggests that in this case it has a reasonable belief that there is a serious risk that the disclosure of the documents to the public, including their competitors, may harm their interests. I agree.

**4**    The documents, which the plaintiff expects to file, contain information that could be used by their competitors against the plaintiff's interests. These documents include: the license agreements, the commission reports, invoices concerning sales in Canada and the terms and conditions of the license agreements.

**5**    The information that the plaintiff is required to disclose includes:

        a)    financial information of the parties regarding their sales in Canada, which is very sensitive information that could allow competitors to have access to their market strategy; and

        b)    information relating to the licensees of Orange County Choppers, also information that is highly sensitive and could allow competitors to interfere in those economic relationships.

**6**    This information has thus far been treated as confidential by the plaintiff and I have no hesitation in concluding that it should remain so. This information should be kept confidential and this is sufficient to justify the issuance of a protective order.

**7**    I do not agree with the suggestion of the defendant Trio Selection Inc. that the public interest

would be harmed by the non-disclosure of this information. The proceedings are not confidential and the confidentiality of the documents may be challenged even by a third party. There is no obvious justification that the public interest would be harmed if they are not aware of the plaintiff confidential and proprietary information.

**8**    It is also important to add that the plaintiff will provide the information to the defendant, who will not suffer any prejudice from this confidentiality order.

**9**    In proceedings regarding intellectual property, protective orders are routinely granted on the basis that the information obtained in preparation for trial may be maintained in confidence and not be divulged to the public.

**10**    The defendant has failed to demonstrate any evidence that the principle of open justice will be harmed if this information is kept confidential and a protective order is issued.

**11**    As is clearly mentioned by the plaintiff, all parties and the Court will have access to the confidential documents, and discovery based on their contents will be allowed.

**12**    I have carefully reviewed the written representations of the parties and I have also asked questions regarding the reasons and arguments raised by the defendant to oppose this motion. Consequently, I find that the defendant has failed to provide any evidence that a protective order should not be issued in this case.

## ORDER

Therefore, **THIS COURT ORDERS THAT:**

1.    The motion for a protective order is granted;
2.    Costs in favour of the plaintiff Orange County Choppers Inc.;
3.    The protective order in the form of the draft submitted by the plaintiff/defendant to counterclaim Orange County Choppers Inc. will be issued separately.

BLAIS J.

cp/e/qw/qlhbb

# TAB 5

*Case Name:*

# Canwest Global Communications Corp. (Re)

### IN THE MATTER OF the Companies' Creditors Arrangement Act, R.S.C. 1985, C-36. as amended
### AND IN THE MATTER OF a Proposed Plan of Compromise or Arrangement of Canwest Global Communications Corp. and the other applicants listed on schedule "A"

[2009] O.J. No. 4286

59 C.B.R. (5th) 72

2009 CanLII 55114

2009 CarswellOnt 6184

Court File No. CV-09-8241-OOCL

Ontario Superior Court of Justice
Commercial List

**S.E. Pepall J.**

October 13, 2009.

(60 paras.)

*Bankruptcy and insolvency law -- Companies' Creditors Arrangement Act (CCAA) matters -- Application of Act -- Affiliated debtor companies -- Application by Canwest Global for relief under the Companies' Creditors Arrangement Act and to have the stay of proceedings and other provisions extend to several partnerships allowed -- Applicant Canwest Global owned CMI which was insolvent -- CMI Entities and Ad Hoc Committee of noteholders had agreed on terms of a going concern recapitalization transaction -- Stay under Act was extended to several partnerships that were intertwined with the applicants' ongoing operations -- DIP and administration charges approved -- Applicants were also permitted to pay pre-filing liabilities to their critical suppliers.*

Application by Canwest Global for relief under the Companies' Creditors Arrangement Act and to

have the stay of proceedings and other provisions extend to several partnerships. The applicants were affiliated debtor companies with total claims against them exceeding $5 million. The partnerships were intertwined with the applicants' ongoing operations. Canwest was a leading Canadian media company. Canwest Global owned 100 per cent of CMI. CMI had direct or indirect ownership interests in all of the other CMI Entities. The CMI Entities generated the majority of their revenue from the sale of advertising. Fuelled by a deteriorating economic environment, they experienced a decline in their advertising revenues. This caused problems with cash flow and circumstances were exacerbated by their high fixed operating costs. CMI breached certain of the financial covenants in its secured credit facility. The stay of proceedings was sought so as to allow the CMI Entities to proceed to develop a plan of arrangement or compromise to implement a consensual pre-packaged recapitalization transaction. The CMI Entities and an Ad Hoc Committee of noteholders had agreed on the terms of a going concern recapitalization transaction which was intended to form the basis of the plan. The applicants anticipated that a substantial number of the businesses operated by the CMI Entities would continue as going concerns thereby preserving enterprise value for stakeholders and maintaining employment for as many as possible. Certain steps designed to implement the recapitalization transaction had already been taken prior to the commencement of these proceedings.

HELD: Application allowed. The CMI Entities were unable to satisfy their debts as they come due and were insolvent. Absent these proceedings, the applicants would lack liquidity and would be unable to continue as going concerns. It was just and convenient to grant the relief requested with respect to the partnerships. The operations and obligations of the partnerships were so intertwined with those of the applicants that irreparable harm would ensue if the requested stay were not granted. The DIP charge for up to $100 million was appropriate and required having regard to the debtors' cash-flow statement. The administration charge was also approved. Notice had been given to the secured creditors likely to be affected by the charge, the amount was appropriate, and the charge should extend to all of the proposed beneficiaries. The applicants were also permitted to pay pre-filing liabilities to their critical suppliers.

**Statutes, Regulations and Rules Cited:**

Companies' Creditors Arrangement Act, R.S.C. 1985, c. c. 36, s. 11, s. 11(2), s. 11.2, s. 11.2(1), s. 11.52

**Counsel:**

Lyndon Barnes, Edward Sellers and Jeremy Dacks, for the Applicants.

Alan Merskey, for the Special Committee of the Board of Directors.

David Byers and Maria Konyukhova,> for the Proposed Monitor, FTI Consulting Canada Inc.

Benjamin Zarnett and Robert Chadwick, for Ad Hoc Committee of Noteholders.

Edmond Lamek, for the Asper Family.

Peter H. Griffin and Peter J. Osborne, for the Management Directors and Royal Bank of Canada.

Hilary Clarke, for Bank of Nova Scotia,

Steve Weisz, for CIT Business Credit Canada Inc.

---

## REASONS FOR DECISION

S.E. PEPALL J.:--

Relief Requested

**1**    Canwest Global Communications Corp. ("Canwest Global"), its principal operating subsidiary, Canwest Media Inc. ("CMI"), and the other applicants listed on Schedule "A" of the Notice of Application apply for relief pursuant to the *Companies' Creditors Arrangement Act.*[1] The applicants also seek to have the stay of proceedings and other provisions extend to the following partnerships: Canwest Television Limited Partnership ("CTLP"), Fox Sports World Canada Partnership and The National Post Company/La Publication National Post ("The National Post Company"). The businesses operated by the applicants and the aforementioned partnerships include (i) Canwest's free-to-air television broadcast business (ie. the Global Television Network stations); (ii) certain subscription-based specialty television channels that are wholly owned and operated by CTLP; and (iii) the National Post.

**2**    The Canwest Global enterprise as a whole includes the applicants, the partnerships and Canwest Global's other subsidiaries that are not applicants. The term Canwest will be used to refer to the entire enterprise. The term CMI Entities will be used to refer to the applicants and the three aforementioned partnerships. The following entities are not applicants nor is a stay sought in respect of any of them: the entities in Canwest's newspaper publishing and digital media business in Canada (other than the National Post Company) namely the Canwest Limited Partnership, Canwest Publishing Inc./Publications Canwest Inc., Canwest Books Inc., and Canwest (Canada) Inc.; the Canadian subscription based specialty television channels acquired from Alliance Atlantis Communications Inc. in August, 2007 which are held jointly with Goldman Sachs Capital Partners and operated by CW Investments Co. and its subsidiaries; and subscription-based specialty television channels which are not wholly owned by CTLP.

**3**    No one appearing opposed the relief requested.

Backround Facts

**4**    Canwest is a leading Canadian media company with interests in twelve free-to-air television stations comprising the Global Television Network, subscription-based specialty television channels and newspaper publishing and digital media operations.

**5**    As of October 1, 2009, Canwest employed the full time equivalent of approximately 7,400 employees around the world. Of that number, the full time equivalent of approximately 1,700 are employed by the CMI Entities, the vast majority of whom work in Canada and 850 of whom work in Ontario.

**6**    Canwest Global owns 100% of CMI. CMI has direct or indirect ownership interests in all of the other CMI Entities. Ontario is the chief place of business of the CMI Entities.

**7**    Canwest Global is a public company continued under the *Canada Business Corporations Act*[2]. It has authorized capital consisting of an unlimited number of preference shares, multiple voting shares, subordinate voting shares, and non-voting shares. It is a "constrained-share company" which means that at least 66 2/3% of its voting shares must be beneficially owned by Canadians. The Asper family built the Canwest enterprise and family members hold various classes of shares. In April and May, 2009, corporate decision making was consolidated and streamlined.

**8**    The CMI Entities generate the majority of their revenue from the sale of advertising (approximately 77% on a consolidated basis). Fuelled by a deteriorating economic environment in Canada and elsewhere, in 2008 and 2009, they experienced a decline in their advertising revenues. This caused problems with cash flow and circumstances were exacerbated by their high fixed operating costs. In response to these conditions, the CMI Entities took steps to improve cash flow and to strengthen their balance sheets. They commenced workforce reductions and cost saving measures, sold certain interests and assets, and engaged in discussions with the CRTC and the Federal government on issues of concern.

**9**    Economic conditions did not improve nor did the financial circumstances of the CMI Entities. They experienced significant tightening of credit from critical suppliers and trade creditors, a further reduction of advertising commitments, demands for reduced credit terms by newsprint and printing suppliers, and restrictions on or cancellation of credit cards for certain employees.

**10**    In February, 2009, CMI breached certain of the financial covenants in its secured credit facility. It subsequently received waivers of the borrowing conditions on six occasions. On March 15, 2009, it failed to make an interest payment of US$30.4 million due on 8% senior subordinated notes. CMI entered into negotiations with an ad hoc committee of the 8% senior subordinated noteholders holding approximately 72% of the notes (the "Ad Hoc Committee"). An agreement was reached wherein CMI and its subsidiary CTLP agreed to issue US$105 million in 12% secured notes to members of the Ad Hoc Committee. At the same time, CMI entered into an agreement with CIT Business Credit Canada Inc. ("CIT") in which CIT agreed to provide a senior secured revolving asset based loan facility of up to $75 million. CMI used the funds generated for operations and to repay amounts owing on the senior credit facility with a syndicate of lenders of which the Bank of

Nova Scotia was the administrative agent. These funds were also used to settle related swap obligations.

**11**     Canwest Global reports its financial results on a consolidated basis. As at May 31, 2009, it had total consolidated assets with a net book value of $4.855 billion and total consolidated liabilities of $5.846 billion. The subsidiaries of Canwest Global that are not applicants or partnerships in this proceeding had short and long term debt totalling $2.742 billion as at May 31, 2009 and the CMI Entities had indebtedness of approximately $954 million. For the 9 months ended May 31, 2009, Canwest Global's consolidated revenues decreased by $272 million or 11% compared to the same period in 2008. In addition, operating income before amortization decreased by $253 million or 47%. It reported a consolidated net loss of $1.578 billion compared to $22 million for the same period in 2008. CMI reported that revenues for the Canadian television operations decreased by $8 million or 4% in the third quarter of 2009 and operating profit was $21 million compared to $39 million in the same period in 2008.

**12**     The board of directors of Canwest Global struck a special committee of the board ("the Special Committee") with a mandate to explore and consider strategic alternatives in order to maximize value. That committee appointed Thomas Strike, who is the President, Corporate Development and Strategy Implementation of Canwest Global, as Recapitalization Officer and retained Hap Stephen, who is the Chairman and CEO of Stonecrest Capital Inc., as a Restructuring Advisor ("CRA").

**13**     On September 15, 2009, CMI failed to pay US$30.4 million in interest payments due on the 8% senior subordinated notes.

**14**     On September 22, 2009, the board of directors of Canwest Global authorized the sale of all of the shares of Ten Network Holdings Limited (Australia) ("Ten Holdings") held by its subsidiary, Canwest Mediaworks Ireland Holdings ("CMIH"). Prior to the sale, the CMI Entities had consolidated indebtedness totalling US$939.9 million pursuant to three facilities. CMI had issued 8% unsecured notes in an aggregate principal amount of US$761,054,211. They were guaranteed by all of the CMI Entities except Canwest Global, and 30109, LLC. CMI had also issued 12% secured notes in an aggregate principal amount of US$94 million. They were guaranteed by the CMI Entities. Amongst others, Canwest's subsidiary, CMIH, was a guarantor of both of these facilities. The 12% notes were secured by first ranking charges against all of the property of CMI, CTLP and the guarantors. In addition, pursuant to a credit agreement dated May 22, 2009 and subsequently amended, CMI has a senior secured revolving asset-based loan facility in the maximum amount of $75 million with CIT Business Credit Canada Inc. ("CIT"). Prior to the sale, the debt amounted to $23.4 million not including certain letters of credit. The facility is guaranteed by CTLP, CMIH and others and secured by first ranking charges against all of the property of CMI, CTLP, CMIH and other guarantors. Significant terms of the credit agreement are described in paragraph 37 of the proposed Monitor's report. Upon a CCAA filing by CMI and commencement of proceedings under Chapter 15 of the Bankruptcy Code, the CIT facility converts into a DIP financing arrangement and

increases to a maximum of $100 million.

**15**    Consents from a majority of the 8% senior subordinated noteholders were necessary to allow the sale of the Ten Holdings shares. A Use of Cash Collateral and Consent Agreement was entered into by CMI, CMIH, certain consenting noteholders and others wherein CMIH was allowed to lend the proceeds of sale to CMI.

**16**    The sale of CMIH's interest in Ten Holdings was settled on October 1, 2009. Gross proceeds of approximately $634 million were realized. The proceeds were applied to fund general liquidity and operating costs of CMI, pay all amounts owing under the 12% secured notes and all amounts outstanding under the CIT facility except for certain letters of credit in an aggregate face amount of $10.7 million. In addition, a portion of the proceeds was used to reduce the amount outstanding with respect to the 8% senior subordinated notes leaving an outstanding indebtedness thereunder of US$393.25 million.

**17**    In consideration for the loan provided by CMIH to CMI, CMI issued a secured intercompany note in favour of CMIH in the principal amount of $187.3 million and an unsecured promissory note in the principal amount of $430.6 million. The secured note is subordinated to the CIT facility and is secured by a first ranking charge on the property of CMI and the guarantors. The payment of all amounts owing under the unsecured promissory note are subordinated and postponed in favour of amounts owing under the CIT facility. Canwest Global, CTLP and others have guaranteed the notes. It is contemplated that the debt that is the subject matter of the unsecured note will be compromised.

**18**    Without the funds advanced under the intercompany notes, the CMI Entities would be unable to meet their liabilities as they come due. The consent of the noteholders to the use of the Ten Holdings proceeds was predicated on the CMI Entities making this application for an Initial Order under the CCAA. Failure to do so and to take certain other steps constitute an event of default under the Use of Cash Collateral and Consent Agreement, the CIT facility and other agreements. The CMI Entities have insufficient funds to satisfy their obligations including those under the intercompany notes and the 8% senior subordinated notes.

**19**    The stay of proceedings under the CCAA is sought so as to allow the CMI Entities to proceed to develop a plan of arrangement or compromise to implement a consensual "pre-packaged" recapitalization transaction. The CMI Entities and the Ad Hoc Committee of noteholders have agreed on the terms of a going concern recapitalization transaction which is intended to form the basis of the plan. The terms are reflected in a support agreement and term sheet. The recapitalization transaction contemplates amongst other things, a significant reduction of debt and a debt for equity restructuring. The applicants anticipate that a substantial number of the businesses operated by the CMI Entities will continue as going concerns thereby preserving enterprise value for stakeholders and maintaining employment for as many as possible. As mentioned, certain steps designed to implement the recapitalization transaction have already been taken prior to the

commencement of these proceedings.

**20**    CMI has agreed to maintain not more than $2.5 million as cash collateral in a deposit account with the Bank of Nova Scotia to secure cash management obligations owed to BNS. BNS holds first ranking security against those funds and no court ordered charge attaches to the funds in the account.

**21**    The CMI Entities maintain eleven defined benefit pension plans and four defined contribution pension plans. There is an aggregate solvency deficiency of $13.3 million as at the last valuation date and a wind up deficiency of $32.8 million. There are twelve television collective agreements eleven of which are negotiated with the Communications, Energy and Paperworkers Union of Canada. The Canadian Union of Public Employees negotiated the twelfth television collective agreement. It expires on December 31, 2010. The other collective agreements are in expired status. None of the approximately 250 employees of the National Post Company are unionized. The CMI Entities propose to honour their payroll obligations to their employees, including all pre-filing wages and employee benefits outstanding as at the date of the commencement of the CCAA proceedings and payments in connection with their pension obligations.

Proposed Monitor

**22**    The applicants propose that FTI Consulting Canada Inc. serve as the Monitor in these proceedings. It is clearly qualified to act and has provided the Court with its consent to act. Neither FTI nor any of its representatives have served in any of the capacities prohibited by section of the amendments to the CCAA.

Proposed Order

**23**    I have reviewed in some detail the history that preceded this application. It culminated in the presentation of the within application and proposed order. Having reviewed the materials and heard submissions, I was satisfied that the relief requested should be granted.

**24**    This case involves a consideration of the amendments to the CCAA that were proclaimed in force on September 18, 2009. While these were long awaited, in many instances they reflect practices and principles that have been adopted by insolvency practitioners and developed in the jurisprudence and academic writings on the subject of the CCAA. In no way do the amendments change or detract from the underlying purpose of the CCAA, namely to provide debtor companies with the opportunity to extract themselves from financial difficulties notwithstanding insolvency and to reorganize their affairs for the benefit of stakeholders. In my view, the amendments should be interpreted and applied with that objective in mind.

(a)    Threshhold Issues

**25**    Firstly, the applicants qualify as debtor companies under the CCAA. Their chief place of

business is in Ontario. The applicants are affiliated debtor companies with total claims against them exceeding $5 million. The CMI Entities are in default of their obligations. CMI does not have the necessary liquidity to make an interest payment in the amount of US$30.4 million that was due on September 15, 2009 and none of the other CMI Entities who are all guarantors are able to make such a payment either. The assets of the CMI Entities are insufficient to discharge all of the liabilities. The CMI Entities are unable to satisfy their debts as they come due and they are insolvent. They are insolvent both under the *Bankruptcy and Insolvency Act*[3] definition and under the more expansive definition of insolvency used in Re Stelco[4]. Absent these CCAA proceedings, the applicants would lack liquidity and would be unable to continue as going concerns. The CMI Entities have acknowledged their insolvency in the affidavit filed in support of the application.

**26**    Secondly, the required statement of projected cash-flow and other financial documents required under section 11(2) of the CCAA have been filed.

    (b)   Stay of Proceedings

**27**    Under section 11 of the CCAA, the Court has broad jurisdiction to grant a stay of proceedings and to give a debtor company a chance to develop a plan of compromise or arrangement. In my view, given the facts outlined, a stay is necessary to create stability and to allow the CMI Entities to pursue their restructuring.

    (b)   Partnerships and Foreign Subsidiaries

**28**    The applicants seek to extend the stay of proceedings and other relief to the aforementioned partnerships. The partnerships are intertwined with the applicants' ongoing operations. They own the National Post daily newspaper and Canadian free-to-air television assets and certain of its specialty television channels and some other television assets. These businesses constitute a significant portion of the overall enterprise value of the CMI Entities. The partnerships are also guarantors of the 8% senior subordinated notes.

**29**    While the CCAA definition of a company does not include a partnership or limited partnership, courts have repeatedly exercised their inherent jurisdiction to extend the scope of CCAA proceedings to encompass them. See for example Re Lehndorff General Partners Ltd.[5]; Re Smurfit-Stone Container Canada Inc.[6]; and *Re Calpine Canada Energy Ltd.*[7]. In this case, the partnerships carry on operations that are integral and closely interrelated to the business of the applicants. The operations and obligations of the partnerships are so intertwined with those of the applicants that irreparable harm would ensue if the requested stay were not granted. In my view, it is just and convenient to grant the relief requested with respect to the partnerships.

**30**    Certain applicants are foreign subsidiaries of CMI. Each is a guarantor under the 8% senior subordinated notes, the CIT credit agreement (and therefore the DIP facility), the intercompany notes and is party to the support agreement and the Use of Cash Collateral and Consent Agreement. If the stay of proceedings was not extended to these entities, creditors could seek to enforce their

guarantees. I am persuaded that the foreign subsidiary applicants as that term is defined in the affidavit filed are debtor companies within the meaning of section 2 of the CCAA and that I have jurisdiction and ought to grant the order requested as it relates to them. In this regard, I note that they are insolvent and each holds assets in Ontario in that they each maintain funds on deposit at the Bank of Nova Scotia in Toronto. See in this regard *Re Cadillac Fairview*[8] and *Re Global Light Telecommunications Ltd.*[9]

(c)    DIP Financing

**31**    Turning to the DIP financing, the premise underlying approval of DIP financing is that it is a benefit to all stakeholders as it allows the debtors to protect going-concern value while they attempt to devise a plan acceptable to creditors. While in the past, courts relied on inherent jurisdiction to approve the terms of a DIP financing charge, the September 18, 2009 amendments to the CCAA now expressly provide jurisdiction to grant a DIP financing charge. Section 11.2 of the Act states:

(1)    On application by a debtor company and on notice to the secured creditors who are likely to be affected by the security or charge, a court may make an order declaring that all or part of the company's property is subject to a security or charge -- in an amount that the court considers appropriate -- in favour of a person specified in the order who agrees to lend to the company an amount approved by the court as being required by the company, having regard to its cash-flow statement. The security or charge may not secure an obligation that exists before the order is made.

(2)    The court may order that the security or charge rank in priority over the claim of any secured creditor of the company.

(3)    The court may order that the security or charge rank in priority over any security or charge arising from a previous order made under subsection (1) only with the consent of the person in whose favour the previous order was made.

(4)    In deciding whether to make an order, the court is to consider, among other things,

(*a*a) the period during which the company is expected to be subject to proceedings under this Act;

(*b*) how the company's business and financial affairs are to be managed during the proceedings;

(*c*) whether the company's management has the confidence of its major creditors;

> (*d*) whether the loan would enhance the prospects of a viable compromise or arrangement being made in respect of the company;

> (*e*) the nature and value of the company's property;

> (*f*) whether any creditor would be materially prejudiced as a result of the security or charge; and

> (*g*) the monitor's report referred to in paragraph 23(1)(*b*), if any.

**32**    In light of the language of section 11.2(1), the first issue to consider is whether notice has been given to secured creditors who are likely to be affected by the security or charge. Paragraph 57 of the proposed order affords priority to the DIP charge, the administration charge, the Directors' and Officers' charge and the KERP charge with the following exception: "any validly perfected purchase money security interest in favour of a secured creditor or any statutory encumbrance existing on the date of this order in favour of any person which is a "secured creditor" as defined in the CCAA in respect of any of source deductions from wages, employer health tax, workers compensation, GST/QST, PST payables, vacation pay and banked overtime for employees, and amounts under the Wage Earners' Protection Program that are subject to a super priority claim under the BIA". This provision coupled with the notice that was provided satisfied me that secured creditors either were served or are unaffected by the DIP charge. This approach is both consistent with the legislation and practical.

**33**    Secondly, the Court must determine that the amount of the DIP is appropriate and required having regard to the debtors' cash-flow statement. The DIP charge is for up to $100 million. Prior to entering into the CIT facility, the CMI Entities sought proposals from other third party lenders for a credit facility that would convert to a DIP facility should the CMI Entities be required to file for protection under the CCAA. The CIT facility was the best proposal submitted. In this case, it is contemplated that implementation of the plan will occur no later than April 15, 2010. The total amount of cash on hand is expected to be down to approximately $10 million by late December, 2009 based on the cash flow forecast. The applicants state that this is an insufficient cushion for an enterprise of this magnitude. The cash-flow statements project the need for the liquidity provided by the DIP facility for the recapitalization transaction to be finalized. The facility is to accommodate additional liquidity requirements during the CCAA proceedings. It will enable the CMI Entities to operate as going concerns while pursuing the implementation and completion of a viable plan and will provide creditors with assurances of same. I also note that the proposed facility is simply a conversion of the pre-existing CIT facility and as such, it is expected that there would be no material prejudice to any of the creditors of the CMI Entities that arises from the granting of the DIP charge. I am persuaded that the amount is appropriate and required.

**34**    Thirdly, the DIP charge must not and does not secure an obligation that existed before the order was made. The only amount outstanding on the CIT facility is $10.7 in outstanding letters of credit. These letters of credit are secured by existing security and it is proposed that that security rank ahead of the DIP charge.

**35**    Lastly, I must consider amongst others, the enumerated factors in paragraph 11.2(4) of the Act. I have already addressed some of them. The Management Directors of the applicants as that term is used in the materials filed will continue to manage the CMI Entities during the CCAA proceedings. It would appear that management has the confidence of its major creditors. The CMI Entities have appointed a CRA and a Restructuring Officer to negotiate and implement the recapitalization transaction and the aforementioned directors will continue to manage the CMI Entities during the CCAA proceedings. The DIP facility will enhance the prospects of a completed restructuring. CIT has stated that it will not convert the CIT facility into a DIP facility if the DIP charge is not approved. In its report, the proposed Monitor observes that the ability to borrow funds from a court approved DIP facility secured by the DIP charge is crucial to retain the confidence of the CMI Entities' creditors, employees and suppliers and would enhance the prospects of a viable compromise or arrangement being made. The proposed Monitor is supportive of the DIP facility and charge.

**36**    For all of these reasons, I was prepared to approve the DIP facility and charge.

(d)    <u>Administration Charge</u>

**37**    While an administration charge was customarily granted by courts to secure the fees and disbursements of the professional advisors who guided a debtor company through the CCAA process, as a result of the amendments to the CCAA, there is now statutory authority to grant such a charge. Section 11.52 of the CCAA states:

(1)    On notice to the secured creditors who are likely to be affected by the security or charge, the court may make an order declaring that all or part of the property of a debtor company is subject to a security or charge -- in an amount that the court considers appropriate -- in respect of the fees and expenses of

(*a*) the monitor, including the fees and expenses of any financial, legal or other experts engaged by the monitor in the performance of the monitor's duties;

(*b*) any financial, legal or other experts engaged by the company for the purpose of proceedings under this Act; and

(*c*) any financial, legal or other experts engaged by any other interested person if the court is satisfied that the security or charge is necessary for their effective participation in proceedings under this Act.

(2)    The court may order that the security or charge rank in priority over the claim of any secured creditor of the company.

**38**    I must therefore be convinced that (1) notice has been given to the secured creditors likely to be affected by the charge; (2) the amount is appropriate; and (3) the charge should extend to all of the proposed beneficiaries.

**39**    As with the DIP charge, the issue relating to notice to affected secured creditors has been addressed appropriately by the applicants. The amount requested is up to $15 million. The beneficiaries of the charge are: the Monitor and its counsel; counsel to the CMI Entities; the financial advisor to the Special Committee and its counsel; counsel to the Management Directors; the CRA; the financial advisor to the Ad Hoc Committee; and RBC Capital Markets and its counsel. The proposed Monitor supports the aforementioned charge and considers it to be required and reasonable in the circumstances in order to preserve the going concern operations of the CMI Entities. The applicants submit that the above-note professionals who have played a necessary and integral role in the restructuring activities to date are necessary to implement the recapitalization transaction.

**40**    Estimating quantum is an inexact exercise but I am prepared to accept the amount as being appropriate. There has obviously been extensive negotiation by stakeholders and the restructuring is of considerable magnitude and complexity. I was prepared to accept the submissions relating to the administration charge. I have not included any requirement that all of these professionals be required to have their accounts scrutinized and approved by the Court but they should not preclude this possibility.

(e)    Critical Suppliers

**41**    The next issue to consider is the applicants' request for authorization to pay pre-filing amounts owed to critical suppliers. In recognition that one of the purposes of the CCAA is to permit an insolvent corporation to remain in business, typically courts exercised their inherent jurisdiction to grant such authorization and a charge with respect to the provision of essential goods and services. In the recent amendments, Parliament codified the practice of permitting the payment of pre-filing amounts to critical suppliers and the provision of a charge. Specifically, section 11.4 provides:

(1)    On application by a debtor company and on notice to the secured creditors who are likely to be affected by the security or charge, the court may make an order declaring a person to be a critical supplier to the company if the court is satisfied that the person is a supplier of goods or services to the company and that the

goods or services that are supplied are critical to the company's continued operation.

(2)     If the court declares a person to be a critical supplier, the court may make an order requiring the person to supply any goods or services specified by the court to the company on any terms and conditions that are consistent with the supply relationship or that the court considers appropriate.

(3)     If the court makes an order under subsection (2), the court shall, in the order, declare that all or part of the property of the company is subject to a security or charge in favour of the person declared to be a critical supplier, in an amount equal to the value of the goods or services supplied under the terms of the order.

(4)     The court may order that the security or charge rank in priority over the claim of any secured creditor of the company.

**42**     Under these provisions, the Court must be satisfied that there has been notice to creditors likely to be affected by the charge, the person is a supplier of goods or services to the company, and that the goods or services that are supplied are critical to the company's continued operation. While one might interpret section 11.4 (3) as requiring a charge any time a person is declared to be a critical supplier, in my view, this provision only applies when a court is compelling a person to supply. The charge then provides protection to the unwilling supplier.

**43**     In this case, no charge is requested and no additional notice is therefore required. Indeed, there is an issue as to whether in the absence of a request for a charge, section 11.4 is even applicable and the Court is left to rely on inherent jurisdiction. The section seems to be primarily directed to the conditions surrounding the granting of a charge to secure critical suppliers. That said, even if it is applicable, I am satisfied that the applicants have met the requirements. The CMI Entities seek authorization to make certain payments to third parties that provide goods and services integral to their business. These include television programming suppliers given the need for continuous and undisturbed flow of programming, newsprint suppliers given the dependency of the National Post on a continuous and uninterrupted supply of newsprint to enable it to publish and on newspaper distributors, and the American Express Corporate Card Program and Central Billed Accounts that are required for CMI Entity employees to perform their job functions. No payment would be made without the consent of the Monitor. I accept that these suppliers are critical in nature. The CMI Entities also seek more general authorization allowing them to pay other suppliers if in the opinion of the CMI Entities, the supplier is critical. Again, no payment would be made without the consent of the Monitor. In addition, again no charge securing any payments is sought. This is not contrary to the language of section 11.4 (1) or to its purpose. The CMI Entities seek the ability to pay other suppliers if in their opinion the supplier is critical to their business and ongoing operations. The order requested is facilitative and practical in nature. The proposed Monitor supports the applicants' request and states that it will work to ensure that payments to suppliers in respect of pre-filing liabilities are minimized. The Monitor is of course an officer of the Court and is always able to seek direction from the Court if necessary. In addition, it will report on any such additional payments when it files its reports for Court approval. In the circumstances outlined, I am prepared to grant the

relief requested in this regard.

    (f)    <u>Directors' and Officers' Charge</u>

**44**    The applicants also seek a directors' and officers' ("D &O") charge in the amount of $20 million. The proposed charge would rank after the administration charge, the existing CIT security, and the DIP charge. It would rank pari passu with the KERP charge discussed subsequently in this endorsement but postponed in right of payment to the extent of the first $85 million payable under the secured intercompany note.

**45**    Again, the recent amendments to the CCAA allow for such a charge. Section 11.51 provides that:

        (1)    On application by a debtor company and on notice to the secured creditors who are likely to be affected by the security or charge, the court may make an order declaring that all or part of the property of the company is subject to a security or charge -- in an amount that the court considers appropriate -- in favour of any director or officer of the company to indemnify the director or officer against obligations and liabilities that they may incur as a director or officer of the company

        (2)    The court may order that the security or charge rank in priority over the claim of any secured creditor of the company.

        (3)    The court may not make the order if in its opinion the company could obtain adequate indemnification insurance for the director or officer at a reasonable cost.

        (4)    The court shall make an order declaring that the security or charge does not apply in respect of a specific obligation or liability incurred by a director or officer if in its opinion the obligation or liability was incurred as a result of the director's or officer's gross negligence or wilful misconduct or, in Quebec, the director's or officer's gross or intentional fault.

**46**    I have already addressed the issue of notice to affected secured creditors. I must also be satisfied with the amount and that the charge is for obligations and liabilities the directors and officers may incur after the commencement of proceedings. It is not to extend to coverage of wilful misconduct or gross negligence and no order should be granted if adequate insurance at a reasonable cost could be obtained.

**47**    The proposed Monitor reports that the amount of $20 million was estimated taking into consideration the existing D&O insurance and the potential liabilities which may attach including certain employee related and tax related obligations. The amount was negotiated with the DIP lender and the Ad Hoc Committee. The order proposed speaks of indemnification relating to the failure of any of the CMI Entities, after the date of the order, to make certain payments. It also excludes gross negligence and wilful misconduct. The D&O insurance provides for $30 million in

coverage and $10 million in excess coverage for a total of $40 million. It will expire in a matter of weeks and Canwest Global has been unable to obtain additional or replacement coverage. I am advised that it also extends to others in the Canwest enterprise and not just to the CMI Entities. The directors and senior management are described as highly experienced, fully functional and qualified. The directors have indicated that they cannot continue in the restructuring effort unless the order includes the requested directors' charge.

**48**    The purpose of such a charge is to keep the directors and officers in place during the restructuring by providing them with protection against liabilities they could incur during the restructuring: *Re General Publishing Co.*[10] Retaining the current directors and officers of the applicants would avoid destabilization and would assist in the restructuring. The proposed charge would enable the applicants to keep the experienced board of directors supported by experienced senior management. The proposed Monitor believes that the charge is required and is reasonable in the circumstances and also observes that it will not cover all of the directors' and officers' liabilities in the worst case scenario. In all of these circumstances, I approved the request.

    (g)   Key Employee Retention Plans

**49**    Approval of a KERP and a KERP charge are matters of discretion. In this case, the CMI Entities have developed KERPs that are designed to facilitate and encourage the continued participation of certain of the CMI Entities' senior executives and other key employees who are required to guide the CMI Entities through a successful restructuring with a view to preserving enterprise value. There are 20 KERP participants all of whom are described by the applicants as being critical to the successful restructuring of the CMI Entities. Details of the KERPs are outlined in the materials and the proposed Monitor's report. A charge of $5.9 million is requested. The three Management Directors are seasoned executives with extensive experience in the broadcasting and publishing industries. They have played critical roles in the restructuring initiatives taken to date. The applicants state that it is probable that they would consider other employment opportunities if the KERPs were not secured by a KERP charge. The other proposed participants are also described as being crucial to the restructuring and it would be extremely difficult to find replacements for them.

**50**    Significantly in my view, the Monitor who has scrutinized the proposed KERPs and charge is supportive. Furthermore, they have been approved by the Board, the Special Committee, the Human Resources Committee of Canwest Global and the Ad Hoc Committee. The factors enumerated in *Re Grant Forest*[11] have all been met and I am persuaded that the relief in this regard should be granted.

**51**    The applicants ask that the Confidential Supplement containing unredacted copies of the KERPs that reveal individually identifiable information and compensation information be sealed. Generally speaking, judges are most reluctant to grant sealing orders. An open court and public access are fundamental to our system of justice. Section 137(2) of the *Courts of Justice Act* provides authority to grant a sealing order and the Supreme Court of Canada's decision in *Sierra Club of*

*Canada v. Canada (Minister of Finance)*[12] provides guidance on the appropriate legal principles to be applied. Firstly, the Court must be satisfied that the order is necessary in order to prevent a serious risk to an important interest, including a commercial interest, in the context of litigation because reasonable alternative measures will not prevent the risk. Secondly, the salutary effects of the order should outweigh its deleterious effects including the effects on the right to free expression which includes the public interest in open and accessible court proceedings.

**52**    In this case, the unredacted KERPs reveal individually identifiable information including compensation information. Protection of sensitive personal and compensation information the disclosure of which could cause harm to the individuals and to the CMI Entities is an important commercial interest that should be protected. The KERP participants have a reasonable expectation that their personal information would be kept confidential. As to the second branch of the test, the aggregate amount of the KERPs has been disclosed and the individual personal information adds nothing. It seems to me that this second branch of the test has been met. The relief requested is granted.

Annual Meeting

**53**    The CMI Entities seek an order postponing the annual general meeting of shareholders of Canwest Global. Pursuant to section 133 (1)(b) of the CBCA, a corporation is required to call an annual meeting by no later than February 28, 2010, being six months after the end of its preceding financial year which ended on August 31, 2009. Pursuant to section 133 (3), despite subsection (1), the corporation may apply to the court for an order extending the time for calling an annual meeting.

**54**    CCAA courts have commonly granted extensions of time for the calling of an annual general meeting. In this case, the CMI Entities including Canwest Global are devoting their time to stabilizing business and implementing a plan. Time and resources would be diverted if the time was not extended as requested and the preparation for and the holding of the annual meeting would likely impede the timely and desirable restructuring of the CMI Entities. Under section 106(6) of the CBCA, if directors of a corporation are not elected, the incumbent directors continue. Financial and other information will be available on the proposed Monitor's website. An extension is properly granted.

Other

**55**    The applicants request authorization to commence Chapter 15 proceedings in the U.S. Continued timely supply of U.S. network and other programming is necessary to preserve going concern value. Commencement of Chapter 15 proceedings to have the CCAA proceedings recognized as "foreign main proceedings" is a prerequisite to the conversion of the CIT facility into the DIP facility. Authorization is granted.

**56**    Canwest's various corporate and other entities share certain business services. They are

seeking to continue to provide and receive inter-company services in the ordinary course during the CCAA proceedings. This is supported by the proposed Monitor and FTI will monitor and report to the Court on matters pertaining to the provision of inter-company services.

**57** Section 23 of the amended CCAA now addresses certain duties and functions of the Monitor including the provision of notice of an Initial Order although the Court may order otherwise. Here the financial threshold for notice to creditors has been increased from $1000 to $5000 so as to reduce the burden and cost of such a process. The proceedings will be widely published in the media and the Initial Order is to be posted on the Monitor's website. Other meritorious adjustments were also made to the notice provisions.

**58** This is a "pre-packaged" restructuring and as such, stakeholders have negotiated and agreed on the terms of the requested order. That said, not every stakeholder was before me. For this reason, interested parties are reminded that the order includes the usual come back provision. The return date of any motion to vary, rescind or affect the provisions relating to the CIT credit agreement or the CMI DIP must be no later than November 5, 2009.

**59** I have obviously not addressed every provision in the order but have attempted to address some key provisions. In support of the requested relief, the applicants filed a factum and the proposed Monitor filed a report. These were most helpful. A factum is required under Rule 38.09 of the Rules of Civil Procedure. Both a factum and a proposed Monitor's report should customarily be filed with a request for an Initial Order under the CCAA.

Conclusion

**60** Weak economic conditions and a high debt load do not a happy couple make but clearly many of the stakeholders have been working hard to produce as desirable an outcome as possible in the circumstances. Hopefully the cooperation will persist.

S.E. PEPALL J.

* * * * *

SCHEDULE A

[Editor's note: Schedule "A" was not attached to the copy received by LexisNexis Canada and therefore is not included in the judgment.]

1 *R.S.C. 1985, c. C. 36, as amended*

2 R.S.C. 1985, c.C.44.

3 R.S.C. 1985, c. B-3, as amended.

4 *(2004), 48 C.B.R. (4th) 299; leave to appeal refused, [2004] O.J. No. 1903, 2004 CarswellOnt 2936 (C.A.).*

5 *(1993), 9 B.L.R. (2d) 275.*

6 [2009] O.J. No. 349.

7 (2006), 19 C.B.R. (5th) 187.

8 (1995), 30 C.B.R. (3d) 29.

9 (2004), 33 B.C.L.R. (4th) 155.

10 *(2003), 39 C.B.R. (4th) 216.*

11 [2009] O.J. No. 3344. That said, given the nature of the relationship between a board of directors and senior management, it may not always be appropriate to give undue consideration to the principle of business judgment.

12 [2002] 2 S.C.R. 522.

# TAB 6

*Case Name:*
# Fairview Donut Inc. v. TDL Group Corp.

## RE: Fairview Donut Inc. and Brule Foods Ltd., Plaintiffs/Respondents, and The TDL Group Corp. and Tim Hortons Inc., Defendants/Moving Parties

[2010] O.J. No. 502

2010 ONSC 789

100 O.R. (3d) 510

Court File No. CV-08-00356806-CP00

Ontario Superior Court of Justice

**G.R. Strathy J.**

Heard: December 22, 2009.
Judgment: February 8, 2010.

(72 paras.)

*Civil litigation -- Civil evidence -- Documentary evidence -- Publication bans and confidentiality orders -- Sealed evidence -- Motion by the Tim Hortons' defendants for a sealing order dismissed -- The proposed class action asserted that the costs and expenses associated with a convection baking method and new lunch menu items were a breach of their individual franchisee licenses -- The defendants sought the order for certain documents in their motion record on certification and summary judgment -- The risk of commercial harm was not real, substantial or well-grounded in the evidence -- Even if an important commercial interest was engaged the salutary effects of a sealing order would not have outweighed its deleterious effects -- Courts of Justice Act, ss. 135(2), 137(2).*

*Civil litigation -- Civil procedure -- Parties -- Class or representative actions -- Procedure -- Motion by the Tim Hortons' defendants for a sealing order dismissed -- The proposed class action asserted that the costs and expenses associated with a convection baking method and new lunch menu items were a breach of their individual franchisee licenses -- The defendants sought the order*

*for certain documents in their motion record on certification and summary judgment -- The risk of commercial harm was not real, substantial or well-grounded in the evidence -- Even if an important commercial interest was engaged the salutary effects of a sealing order would not have outweighed its deleterious effects -- Courts of Justice Act, ss. 135(2), 137(2).*

The Tim Hortons' defendants in the proposed class action moved for a confidentiality or sealing order restricting public access to certain documents, or portions of certain documents, in their motion record on certification and summary judgment. The two putative class representatives were franchisees of Tim Hortons'. The action asserted that the conversion to preparation of frozen baked goods in convection ovens result in increased costs and expenses in breach of their individual license agreements. The action further asserted that the requirement imposed on franchisees to sell lunch menu items at low margins was also a breach of their licence agreements. Tim Hortons' position was that the plaintiffs' claims were entirely without merit and that the information deleted or redacted was personal information about franchisees, financial information about franchisees, competitively sensitive commercial data and trade secrets.

HELD: Motion dismissed. The Court was not satisfied that the interests affected extended beyond the commercial interests of Tim Hortons' and its franchisees or that those interests could be expressed in terms of the broader commercial interest in the preservation of confidential information or the promotion of fair competition. The risk of commercial harm was not real, substantial or well-grounded in the evidence. The baking system was introduced in 2002 and was not unique. The information described as trade secrets was of the most general nature and in order to take advantage of that information it would be necessary to create a substantial baking infrastructure. There was no general authority to redact documents appended to affidavits, or portions thereof, on the grounds they were irrelevant. Even if an important commercial interest was engaged the salutary effects of a sealing order would not have outweighed its deleterious effects. A sealing order was not required to ensure a fair trial and such an order would have adverse effects on public confidence in the administration of justice.

**Statutes, Regulations and Rules Cited:**

Canadian Charter of Rights and Freedoms, 1982, R.S.C. 1985, App. II, No. 44, Schedule B, s. 2(b)

Courts of Justice Act, R.S.O. 1990, c. C.43, s. 135, s. 135(2), s. 137(2)

Criminal Code, R.S.C. 1986, c. C-46, s. 486

**Counsel:**

*Peter Howard and Samaneh Hosseini*, for the Defendants/Moving Parties.

*Jerome Morse and Agapé Lim*, for the Plaintiffs/Respondents.

## REASONS FOR DECISION
## REQUEST FOR SEALING ORDER

**1    G.R. STRATHY J.**:-- The defendants ("Tim Hortons") in this proposed class action move for a "confidentiality order" or sealing order, restricting public access to certain documents, or portions of certain documents, in their motion record on certification and summary judgment. Tim Hortons seeks this order on the ground that these documents are said to contain highly sensitive and competitive financial information, the disclosure of which would cause serious harm to their commercial interests. They propose a mechanism that would allow the plaintiff, members of the proposed class and other advisors to have access to the information while preserving its confidentiality. They also propose an ongoing process for dealing with confidential information in this case, under which parties will be allowed to designate information as confidential, subject to a ruling by the court. The motion engages the test for confidentiality orders in *Sierra Club of Canada v. Canada (Minister of Finance)*, [2002] 2 S.C.R. 522, [2002] S.C.J. No. 42 (*"Sierra Club"*).

*The Proposed Class Action - Certification and Summary Judgment Motions*

**2**    The two putative class representatives are franchisees of the well-known Tim Hortons organization. Their action asserts two basic complaints. The first relates to a franchise-wide conversion in 2002 from a full-baking system, whereby donuts and most other baked goods were baked on-site in each store, to a method called "Always Fresh" or "par baking," where donuts and "timbits" and later sandwich buns and pastries, were baked at a central facility, frozen and shipped to the retail stores, where they were prepared in a special convection oven. The plaintiffs claim that this conversion resulted in increased costs, increased capital expenses and was a breach of their individual license agreements.

**3**    The second complaint relates to the obligation of all franchisees to provide a lunch menu - a requirement that the plaintiffs say was imposed on franchisees, and has caused them to lose money. They say that Tim Hortons breached their license agreements by requiring them to sell lunch menu items at unreasonably low margins.

**4**    The plaintiffs assert claims in breach of contract, unjust enrichment, breach of the *Arthur Wishart Act (Franchise Disclosure) 2000,* S.O. 2000, c. 3 and misrepresentation.

**5**    Tim Hortons has delivered its responding motion record on the certification motion and in support of a motion for summary judgment, to be brought at the same time as the certification motion. The materials are voluminous and include fifteen affidavits of factual witnesses and an affidavit of one expert witness and numerous exhibits, including extensive financial information.

**6**    Certain material has been redacted in the motion record, or has not been included in the record, but a complete and unredacted copy has been delivered to the plaintiffs' lawyers on their undertaking to keep the material confidential pending the outcome of this motion. I have been provided with a copy of the unredacted materials. The plaintiffs have acknowledged that a confidentiality order is warranted for some of the documents and information, but not for other documents.

**7**    Tim Hortons' position on the summary judgment motion is that the plaintiffs' claims are entirely without merit. It says that while the conversion to "Always Fresh" baking had the predicted result of increasing the franchisees' food costs, it has also had the expected result of reducing their labour costs, because they no longer have to hire expensive professional bakers to produce baked goods "from scratch." The result, says Tim Hortons, is that franchisees' profits have generally increased and the program has been a resounding success. Tim Hortons says that lunch items have been part of its business plan since 1986 and that every franchisee is expected to provide a lunch menu.

**8**    Much of the evidence in Tim Hortons' certification and summary judgment motion record, including some of the financial information at issue on this motion, is intended to refute the plaintiffs' assertion that the conversion to par baking, and the lunch menu, resulted in increased costs and lower margins for franchisees. Tim Hortons will argue that the putative plaintiffs were inefficient operators and that their experiences are not reflective of the positive and profitable experiences of the great majority of competent franchisees. It also says that the plaintiffs' financial information and margin analysis are fundamentally flawed.

*The Information at issue*

**9**    A list of the documents at issue, prepared by counsel for the defendants, is attached as a schedule to this endorsement. I will describe it in more detail shortly.

**10**    In his affidavit filed in support of the summary judgment motion and in response to the certification motion, Mr. David Clanachan, the Chief Operating Officer of Tim Hortons, describes the information at issue as "sensitive commercial information that is not public and would be of considerable interest and use to the competitors of Tim Hortons and its store owners." Mr. Jeff O'Rourke, Director Financial Analysis Franchise Operations, who has also filed an affidavit in support of the summary judgment motion, describes the information as "commercially sensitive information."

**11**    Mr. O'Rourke elaborates on his concerns in two affidavits filed in support of the motion for a confidentiality order. As well, a supporting affidavit has been sworn by Drew McLennan, a Tim Hortons franchisee, and a member of the Tim Hortons Advisory Board of franchisees. I will briefly summarize their evidence.

**12**    Mr. O'Rourke describes the information sought to be protected as including "highly confidential and competitively sensitive financial and business data such as profit margins and sales

information of Tim Hortons franchisees from 2001 to 2009."

**13**    Mr. O'Rourke says that public disclosure of this information would give competitors useful information about Tim Hortons' costs, sales and margins that would allow them to increase their market penetration. He says information concerning the "Always Fresh" conversion would facilitate the entry of competitors into the par baking market. He claims that competitors could target geographic areas with lower than average margins and could identify regions where there is untapped demand or lower costs; suppliers and landlords could gain useful information about margins that would lead them to increase franchisees' costs.

**14**    Mr. O'Rourke says that Tim Hortons is careful to secure the confidentiality of this information through confidentiality provisions in its licence agreements with its franchisees and through express notices on some of its documents.

**15**    While Mr. O'Rourke acknowledges that as a public company Tim Hortons makes disclosure of consolidated business and financial information, confidentiality is not claimed for information in the public domain. He says, however, that it is the "level of granularity and detail" in the documents at issue that would make them valuable to competitors and their disclosure would cause damage to Tim Hortons and its franchisees.

**16**    Mr. McLennan, a franchisee and member of the Advisory Board, agrees with Mr. O'Rourke that the information at issue is provided to or by franchisees on a confidential basis. He also says:

> I also agree with [Mr. O'Rourke] that the material he describes is competitively sensitive and if it were made public could be used by our competitors and other third parties with whom we deal to the real disadvantage of the franchisees. [Mr. O'Rourke] has detailed some of the ways that this information could be used to the detriment of the franchisees and I believe that those are all valid and additionally that there are likely other negative consequences for franchisees from potential adverse publicity likely attendant upon that publication.

**17**    Mr. McLennan says that the disclosure of sales and margin information would result in "real harm" to franchisees.

**18**    The defendants say that the information redacted or deleted falls into four general categories:

    (a)    Personal information of Tim Hortons' franchisees

**19**    The information redacted includes names, addresses and phone numbers of franchisees, which Tim Hortons claims was "collected from franchisees in the expectation that it would not be widely disseminated." The personal information is contained in Exhibits 7, 16 and 40 of Mr. Clanachan's affidavit. Exhibit 7 is a 2001 disclosure document, provided to prospective franchisees. It contains a "Confidentiality Notice" on its face. Names and addresses of franchisees have been redacted.

Exhibit 16 is a franchise agreement that has been attached as an example. The name of the franchisee and other personal information about the franchisee have been redacted. The amount of the licence fee and other financial information pertaining to charges to the franchisee, as well as hours of operation, have been redacted. Exhibit 40 is a powerpoint presentation made at Tim Hortons' Ontario Regional Meeting in 2003. It contains some information about the financial experience of identified franchisees.

(b)    Financial information of franchisees

**20**    This information is described as financial information used to track operating margins, including sales and profit and loss information. This information is collected from franchisees by Tim Hortons on the basis that it is confidential.

**21**    Exhibit 35 is part of a presentation made to franchisees in 2002 concerning the "roll-out" of the "Always Fresh" system. It contains breakdowns of food and labour costs at various franchise locations. Exhibit 38 is entitled "Always Fresh Financial Update" and was prepared in 2003. The information redacted includes profit and loss results and operating margins prior to and after the "Always Fresh" conversion. Exhibits 39, 40 and 41 contain similar information. Exhibit 43 was prepared for the 2004 meetings with franchisees and contains information about food unit costs, sales revenue and comparisons of gross margins before and after the "Always Fresh" conversion. Exhibit 2 to Mr. O'Rourke's affidavit shows historical operating margins for Ontario for the period from 2002 to 2008. It is tendered in evidence to support Tim Hortons' position that historical margins have increased as a result of the introduction of the "Always Fresh" baking method.

**22**    Exhibit 3 to Mr. O'Rourke's affidavit is financial information provided by Mr. Jollymore, the operator of one of the putative class representatives, and appears to be introduced to support the assertion that the experiences of the plaintiffs are due to their own inefficiencies and that their financial performance is not representative of those of other franchisees. Exhibit 4 to Mr. O'Rourke's affidavit contains profit margin information for all regions in Canada in the period from 2002 to 2008. It appears to be introduced to support the assertion that the "Always Fresh" conversion has not had a negative effect.

(c)    Competitively sensitive commercial data

**23**    This category includes earnings, projections, profitability and productivity information, historical costs of food, paper and labour, pricing information, operating margins and gross margins, profit and loss results, costs versus pricing per region, and break-downs of sales by time of day.

**24**    Many of the documents in this category are presentations made at the time of the "Always Fresh" conversion in 2002-2003. They consist of analyses of food and labour costs, sales, profits and margins to demonstrate historic results and to project anticipated results of the conversion. Exhibits 28, 33, 35, 37-40 and 43-45 of Mr. Clanachan's affidavit fall within this description. Several of the documents contain more current information of the same kind: exhibit 46 (historic

costs vs. price of donuts and timbits 2003-2009); exhibit 2 to Mr. O'Rourke's affidavit (historic operating margins for Ontario Region 2002-2008, including costs of food, paper, labour, rent, royalty, advertising fees, operating expenses and operating margins); exhibit 4 (historical operating margins 2002-2008, including costs and sales volumes; exhibit 5 (retail price change history); and exhibit 6 (costs versus price of donuts and timbits, 2003-'09) to Mr. O'Rourke's affidavit.

**25**    Exhibit 3 to Mr. O'Rourke's affidavit, referred to above, contains financial information comparing the performance of the proposed representative plaintiffs to average performance figures.

**26**    Paragraph 8 of Mr. Clanachan's affidavit contains information pertaining to the labour costs of Ontario store owners in contrast with Mr. Jollymore's - this information has been redacted. Also redacted is paragraph 20 and portions of one of the exhibits that shows information concerning the percentage of sales made at various times of the day, including during lunch times. This is introduced to respond to complaints that the introduction of the lunch menu was unreasonable and to support the argument that the plaintiffs' evidence is flawed.

(d)    "Trade secrets"

**27**    This information is generally described as "confidential product preparation methods and procedures," relating to the preparation of Tim Hortons' products. Tim Hortons claims disclosure of this information would allow competitors to make use of its experience to gain an unfair competitive advantage.

**28**    The documents that Tim Hortons wishes to redact or seal on this basis include exhibit 29, a 2003 "Production Manual" that includes instructions and procedures for "Always Fresh." It is essentially a "how to" manual for the baking system. The parties agree that it should be excluded and sealed.

**29**    Exhibit 34 is an extract from a meeting of the Advisory Board in 2002 that contains information about the "Always Fresh" roll-out and some very basic information about the par baking system. It describes various products and contains simple baking information such as "Muffins ... bake at x [degrees] for y minutes". The plaintiff does not contest the claim for confidentiality of this document. Exhibit 35 contains similar information.

Redaction for Relevance

**30**    In addition to these documents, certain documents have been partially redacted on the basis that the redacted portions are not relevant to the issues before the court on certification or summary judgment.

*The Sierra Club Test*

**31**    The general principle, expressed in s. 135 of the *Courts of Justice Act*, R.S.O. 1990, c. C.43, is that "all court hearings shall be open to the public." Sub-section 135(2) permits the court to exclude the public from a hearing "where the possibility of serious harm or injustice to any person justifies a departure from the general principle that court hearings shall be open to the public."

**32**    The principle is also expressed in s. 486 of the *Criminal Code*, R.S.C. 1986, c. C-46, as amended, which permits exclusion of the public only where "the judge or justice is of the opinion that such an order is in the interest of public morals, the maintenance of order or the proper administration of justice or is necessary to prevent injury to international relations or national defence or national security." The "proper administration of justice" includes ensuring that witnesses under the age of eighteen are safeguarded and that participants in the justice system are protected. Specific provision is made in s. 486.4 to prevent publication of the names of victims of sexual offences.

**33**    The importance of the open court principle has been repeatedly affirmed by the Supreme Court of Canada in a line of cases interpreting s. 2(b) of the *Canadian Charter of Rights and Freedoms: Dagenais v. Canadian Broadcasting Corp.*, [1994] 3 S.C.R. 835, [1994] S.C.J. No. 104; *R. v. Mentuck*, [2001] 3 S.C.R. 442, [2001] S.C.J. No. 73; *Vancouver Sun (Re.)*, [2004] 2 S.C.R. 332, [2004] S.C.J. No. 41; and *Toronto Star Newspapers Ltd. v. Ontario*, [2005] 2 S.C.R. 188, [2005] S.C.J. No. 41. In the civil context, the principle has been most recently and definitively stated by the Supreme Court in *Sierra Club*.

**34**    The open court principle also governs applications, such as this, to seal portions of a court file. There is no doubt that the court has inherent jurisdiction, and jurisdiction under s. 137(2) of the *Courts of Justice Act*, to seal a portion of the court file:

> A court may order that any document filed in a civil proceeding before it be treated as confidential, sealed and not form part of the public record.

**35**    Even before *Sierra Club*, it was clearly established that a sealing order is an exceptional measure that violates the open court principle, a principle that should be curtailed only "where there is present the need to protect social values of superordinate importance": *Nova Scotia (Attorney General) v. McIntyre* (1982), 132 D.L.R. (3d) 385, [1982] 1 S.C.R. 175 (S.C.C.).

**36**    In *Sierra Club,* at para. 53, the Supreme Court of Canada held that a sealing order will be granted where:

> (a)    such an order is necessary in order to prevent a serious risk to an important interest, including a commercial interest, in the context of litigation because reasonable alternative measures will not prevent the risk; [the necessity stage of the test] and
>
> (b)    the salutary effects of the confidentiality order, including the effects on the right of civil litigants to a fair trial, outweigh its deleterious effects, including the

effects on the right to free expression, which in this context includes the public interest in open and accessible court proceedings [the proportionality stage of the test].

**37**    In that case, Justice Iacobucci stated, at para. 53, that three important elements are subsumed under the first branch of this test. First, the risk in question must be *real and substantial*, in that the risk is *well-grounded in evidence* and poses a serious threat to the *commercial interest* in question. As this case involves interests that are primarily commercial in nature, the words I have italicized bear emphasis - the risk must be real, substantial, and well-grounded in evidence, and disclosure must pose a serious threat to the interest in question.

**38**    Second, Justice Iacobucci made it clear that a "commercial" interest must be an interest that goes beyond harm to the private commercial interests of a person or a business. In order to qualify as an "important commercial interest," the interest must be one that can be expressed in terms of a public interest in confidentiality. Justice Iacobucci stated, at para. 55:

> In addition, the phrase "important commercial interest" is in need of some clarification. In order to qualify as an "important commercial interest", *the interest in question cannot merely be specific to the party requesting the order*; the interest must be one which can be expressed in terms of a public interest in confidentiality. For example, a private company could not argue simply that the existence of a particular contract should not be made public because to do so would cause the company to lose business, thus harming its commercial interests. However, if, as in this case, exposure of information would cause a breach of a confidentiality agreement, then the commercial interest affected can be characterized more broadly as the general commercial interest of preserving confidential information. Simply put, if there is no general principle at stake, there can be no "important commercial interest" for the purposes of this test. Or, in the words of Binnie J. in *F.N. (Re)*, [2000] 1 S.C.R. 880, 2000 SCC 35, at para. 10, the open court rule only yields "where the public interest in confidentiality outweighs the public interest in openness" [emphasis added].

**39**    Third, the phrase "reasonable alternative measures" requires the judge to consider not only whether reasonable alternatives to a confidentiality order are available, but also to restrict the order as much as is reasonably possible while preserving the commercial interest in question.

**40**    In *Sierra Club,* the Supreme Court granted a confidentiality order over technical information concerning an environmental assessment of a site, in China, for the construction of two CANDU nuclear reactors. The documents were the property of the Chinese authority and had been provided to Atomic Energy of Canada Limited ("AECL") on condition that they be protected by a confidentiality order. The Supreme Court found that the test had been met. Under the necessity branch of the test, there was a commercial interest in preserving contractual obligations of

confidentiality. The information had been treated as confidential, had been accumulated with a reasonable expectation that it would be kept confidential and proprietary commercial and scientific interests would be harmed by its disclosure. There was a serious risk of harm to an important commercial interest of AECL if there was disclosure. No alternative measures were available.

**41**    On the application of the proportionality branch of the test, the salutary effect of the order was to promote a fair trial, which would otherwise have been impaired if AECL could not disclose the documents. Limiting disclosure of the documents to the parties, under the protection of a confidentiality order, would promote, rather than harm, the search for the truth. Finally, the technical nature of the information, pertaining as it did to a nuclear facility, gave rise to a public security interest in the confidentiality order.

**42**    The deleterious effect of the order was, in general, to impair the open court principle. In these circumstances, the Supreme Court held that the salutary effects of the confidentiality order outweighed its deleterious effects.

*Application of the Sierra Club test in various contexts*

**43**    The *Sierra Club* case signals an important development of the open court principle and it has been applied in a number of cases. To illustrate the types of cases, and the interests they engage, they can be grouped as follows:

*Trade Secret and Intellectual Property Cases*

**44**    Cases of true trade secrets and patents are likely to involve important public and private interests and sealing orders have frequently been granted in such cases: see *Eli Lilly and Co. v. Apotex Inc.,* 2008 FC 892, [2008] F.C.J. No. 1593; *Laboratoires Servier v. Apotex Inc.,* 2006 FC 1405, [2006] F.C.J. No. 1764; *Camoplast Inc. v. Soucy International Inc.*, 2003 FC 1401, [2003] F.C.J. No. 1791; *Merck & Co. v. Apotex Inc.*, 2004 FC 567, [2004] F.C.J. No. 684; *AB Hassle. v. Canada (Minister of National Health and Welfare)* (2003), 5 C.P.R. (4th) 149, [2000] F.C.J. No. 283 (F.C.A.). They have been granted prior to *Sierra Club-* see, for example, *Dupont Canada Inc. v. Russel Metals Inc.,* [2000] O.J. No. 2043; *CPC International Inc. v. Seaforth Creamery Inc.,* [1996] O.J. No. 2059, 70 C.P.R. (3d) 434. In *Abbott Laboratories v. Canada (Minister of Health)*, 2005 FC 1368, [2005] F.C.J. No. 1669, Prothonotary Milczynski of the Federal Court refused to make a confidentiality order in a patent case, although she noted that such orders were common in patent cases. She found that, on the evidence, the *Sierra Club* test had not been met. See also *Hyundai Auto Canada v. Cross Canada Auto Body Supply (West) Ltd.,* 2006 FC 1127, [2006] F.C.J. No. 1402. Orders were refused in *Osmose-Pentox Inc. v. Société Laurentide Inc.*, 2005 FC 1689, [2005] F.C.J. No. 2093; and in *Novopharm Ltd. v. Company "X"*, 2008 FC 840, [2008] F.C.J. No. 1062.

*CCAA Cases*

**45**    Sealing orders have been granted in several Ontario cases under the *Companies' Creditors*

*Arrangement Act,* R.S.C. 1985, c. C-36 where the release of commercial information would have undermined the efficacy of the proceedings or prejudiced the position of stakeholders: *Re Nortel Networks,* [2009] O.J. No. 4487, 56 C.B.R. (5th) 224 (S.C.J.); *Re Stelco Inc.* [2006] O.J. No. 275, 17 C.B.R. (5th) 76 (S.C.J.); *Re Canwest Global Communications Corp.* [2009] O.J. No. 4286, 2009 CanLII 55114 (S.C.J.). It makes sense in such "real time" litigation that confidential information should be protected where its release would jeopardize the very purpose of the proceeding.

*Cases involving minors or persons under a disability*

**46**    Cases involving children frequently engage public interests that transcend the interests of the parties: *DB Trust (Trustees of) v. J.B. (Litigation guardian of),* [2009] O.J. No. 2693, 50 E.T.R. (3d) 50 (S.C.J.). So too may cases involving persons under a disability. In *Re. Phelan* (1999), 29 E.T.R. (2d) 82, [1999] O.J. No. 2465, a case prior to *Sierra Club,* Kitely J. granted a partial sealing order in a proceeding under the *Substitute Decisions Act, 1992,* S.O. 1992, c. 30.

*Commercial Cases*

**47**    The application of *Sierra* Club in the commercial context requires the court to distinguish between an interest that is specific to the party requesting the order and a general interest that goes beyond the interest of the party. In *Publow v. Wilson* (1992), 36 C.P.C. (3d) 33, [1994] O.J. No. 3036 (Gen. Div.) which pre-dated *Sierra Club,* Spence J. refused to grant a sealing order in spite of the argument that the disclosure of a company's insolvency to its suppliers and customers might cause them to cease dealing with the company, leading to its demise and possible unemployment for hundreds of employees. Relying on the then leading case of *Nova Scotia (Attorney General) v. McIntyre,* above, Spence J. stated, at para. 18:

> The disclosure of internal corporate information in the course of legal proceedings may almost always have the potential for harm to the company concerned and perhaps to others as well. This consequence of the resort to the courts is not limited to corporate parties in commercial matters; individuals may suffer from the public disclosure which ordinarily accompanies litigation. If the prospect of harm were a sufficient basis for preventing disclosure, a great many litigants might justifiably seek to have their proceedings shielded from public view, whether through a sealing order, an order for in camera proceedings or otherwise. Widespread granting of such orders could tend to diminish public confidence in the administration of justice. These considerations suggest that such orders should be available only in exceptional cases.

**48**    The observations of Spence J. in *Publow v. Wilson* were referred to by Nordheimer J. in *Lederer v. 372116 Ontario Ltd.* (2000), 50 O.R. (3d) 282, [2000] O.J. No. 3000 (S.C.J.), another pre-*Sierra Club* case, in which the moving party sought to seal a court file containing allegedly confidential and potentially damaging information. Nordheimer J. refused to seal the file. He observed, at paras. 26 and 27, that litigation frequently involves disclosure of sensitive,

embarrassing and sometimes prejudicial information, but the principle of open justice admits of limited exceptions:

> There are, of course, many instances where matters that parties would prefer to keep private become public because the parties become embroiled in litigation. This applies not only to corporations, both public and private, but also to individuals. Many private matters are forced into the public view as a result of the fact that litigation ensues. That is a necessary consequence of maintaining an open and public judicial system.

> As Madam Justice Swinton observed [in *Ethyl Canada Inc. v. Canada (Attorney General)*, [1998] O.J. No. 315 (Gen. Div.) at para. 9], over the years courts have made exceptions to the general principle that all matters before the court must be part of the public record. Matters involving minors are one example. Matters involving trade secrets or secret processes are other examples. Customer lists and pricing information may constitute even other examples. Also, in cases where victims might be precluded, as a result of trauma and embarrassment, from pursuing a claim or giving evidence then orders restricting the openness of the proceedings may be justified. In all of these situations, though, the court must be satisfied that there is a need to protect "societal values of superordinate importance" before such restrictions on public access to the proceedings of the courts can be justified - see *MacIntyre v. Nova Scotia (Attorney-General),* [1982] 1 S.C.R. 175, supra per Dickson J. at p. 186.

**49**     Subsequent to *Sierra Club*, requests for confidentiality orders or sealing orders have been considered and rejected in *SRM Global Master Fund Limited Partnership v. Hudbay Minerals Inc.*, [2009] O.J. No. 797 (S.C.J.); *Rieger Printing Ink Co. (Re)* (2009), 94 O.R. (3d) 440, [2009] O.J. No. 755 (S.C.J.); *Ontario Council of Hospital Unions v. Ontario (Minister of Health)*, (2007), 85 O.R. (3d) 55, [2007] O.J. No. 411 (Div. Ct.); and *John Deere Ltd. v. Long Tractor Inc.,* 2003 SKQB 24, [2003] S.J. No. 57 (Q.B.).

*Class action cases*

**50**     Class actions, such as this one, give rise to particular concerns in dealing with requests for confidentiality. They frequently attract public attention due to their relative novelty, the public interest in the issues involved, the size of the proposed class, and the large sums at issue. Apart from the public, members of the putative class have a substantial and direct interest in the proceedings, prior to certification, and they have a particular interest in observing and understanding the proceedings. While the defendant in this action is prepared to release the information at issue to members of the putative class who undertake to be bound by the confidentiality order, such undertakings are difficult to monitor and enforce.

**51**    A class action engages broader interests than in an ordinary civil action. With its goals of access to justice, efficient use of judicial resources and behaviour modification, a class action serves public purposes that go beyond the immediate interests of the parties, including members of the putative class. It is particularly important, therefore, that the open court principle should be observed in such proceedings and a request for a sealing order in a class action should be approached with particular caution.

**52**    A sealing order was granted by Master MacLeod in *1176560 Ontario Ltd. v. Great Atlantic & Pacific Co. of Canada*, [2003] O.J. No. 1016, 121 A.C.W.S. (3d) 426 (S.C.J.), a proposed class action in which franchisees alleged that the defendant franchisor had failed to pass on or account for discounts that had been provided by a supplier. The parties had reached an agreement that the confidential information would be sealed and made available only to the proposed class representatives and their counsel. Members of the proposed class would have access to summaries of the information, provided they signed a confidentiality agreement. The Master was satisfied that the proposed order struck an appropriate balance and was prepared to sign it. However, some of the suppliers (whose discounts were at issue) attended court, having been put on notice that their rights might be affect. They claimed an interest as their sensitive, and allegedly proprietary, information was at issue. They were concerned that the release of summaries of information to class members who were not named parties could potentially enable third parties to calculate their prices, costs and contractual arrangements with the defendant.

**53**    It is obvious from the Master's reasons, at para. 6, that he considered the information to be highly confidential and that the release would have "devastating" effects for the suppliers:

> An affidavit was filed on behalf of Parmalat [one of the suppliers]. Other suppliers appeared but only Canada Bread and Hostess Frito-Lay made submissions. Parmalat and Canada Bread appear to be in the most vulnerable position. They are exclusive suppliers of certain products and as a result of their special relationship with the defendant, they have disclosed detailed information about pricing and profit margins. This is a complex and highly competitive business in which the interests of the parties and the suppliers may be congruent for some purposes and adverse for others. I am advised that an example of this sensitivity would be an agreement to supply certain lines at close to cost while entering into an agreement with the defendant to promote other lines which have a higher profit margin. This information could be used to devastating effect by other suppliers who might bid against the current supplier in dealing with A&P, by other grocery stores with whom they will be negotiating and by other suppliers who might bid with other customers.

**54**    The Master granted the suppliers standing and provided that they were entitled to enforce the order if the defendant failed to do so. They were entitled to be informed of the release of information to members of the class. It is noteworthy that in this case the information sought to be

protected was, like the information in *Sierra Club*, confidential to persons who were not parties to the litigation.

**55**    Hoy J. in an unreported endorsement dated November 16, 2007 in *Peter v. Medronic Inc.* (05-CV-295910-PD2), granted a sealing order at the conclusion of a certification motion, at the defendant's request and without opposition from the plaintiff. She found that the documents contained commercially sensitive market information and there was evidence that one of the defendant's competitors had taken an interest in the proceeding. She found that there was a public interest in not granting an unfair advantage to competitors of the defendant, since the public financed the class of medical devices at issue. The information subject to the sealing order was "minimal" and had not even been referred to at the hearing. In that case, the order agreed upon by counsel and approved by Hoy J. permitted the court to refer to any facts in the sealed materials in its reasons. The order was amended by Hoy J. to provide that it would expire in seven years.

**56**    In *Prendiville v. 407 International Inc.* [2002] O.J. No. 2548, 24 C.P.C. (5th) 184 (S.C.J.), leave to appeal refused, [2002] O.J. No. 3913 (Div. Ct.), a decision subsequent to *Sierra* Club, Nordheimer J. declined to grant a sealing order in a proposed class action against the operators of Highway 407, a toll highway. The defendants, supported by the province, sought to seal the court file, which contained agreements between the defendants and the province. The defendants claimed that the disclosure of this information would put them at a competitive disadvantage in future highway privatizations because it would disclose their costs and pricing structures to their competitors. They argued that disclosure of this information would give third parties access to information about their business and their projections as well as historical financial information that could be used in the bid process. Nordheimer J. concluded, at paras. 14 and 15, that the commercial interest of the defendants did not meet the *Sierra Club* test:

> In any event where the 407 defendants fail in their request for a sealing order is in their inability to establish that there is an important public interest in the confidentiality that is sought. As I set out in the quotation from Mr. Justice Iacobucci above, the important commercial interest which has to be established to justify such an order cannot be specific to the party requesting the order. Mr. Justice Iacobucci mentioned expressly that "a private company could not argue simply that the existence of a particular contract should not be made public because to do so would cause the company to lose business, thus harming its commercial interests" and yet that is essentially what the argument of the 407 defendants boils down to here. For example, at para. 16 of their factum, the 407 defendants state:
>
>> "... the disclosure of the Share Purchase Agreement and the 407 Agreements will put the 407 defendants at a competitive disadvantage vis-à-vis their cost and pricing structure in future competitive bidding

> processes concerning highway development and privatization."

> While no doubt arguments could be made as to the actual degree of commercial sensitivity which attaches to such information given that the prospect of future private highway acquisitions is very much speculative both in its occurrence and its timing, it would seem almost by definition to be very specific to the party whose information is involved. While it may well be that the 407 defendants will indeed be put at a commercial disadvantage if their pricing and other information is publicly revealed, that result would appear to fall squarely within the category of commercial information which Mr. Justice Iacobucci said does not constitute the type of important commercial interest justifying a confidentiality or sealing order. In fact, it would appear to more properly fall within the type of information of which Mr. Justice Spence spoke in *Publow v. Wilson* (1994), 36 C.P.C. (3d) 33 (Ont. Gen. Div.) at p. 39 [quoted above] ...

**57** Confidentiality orders or sealing orders have also been granted in class actions to limit or prevent disclosure of:

> (a) private medical information: *Logan v. Harper* (2004), 72 O.R. (3d) 706, [2004] O.J. No. 4132 (S.C.J.);
> (b) names of victims of sexual assault: see *M.G. v. Association Selwyn House*, [2008] Q.J. No. 7721 (S.C.); *White v. Canada (Attorney General)*, [2006] B.C.J. No. 760 (S.C.);
> (c) financial information concerning the defendant and the names of investors and shareholders, on the settlement of the class action where other
> para57proceedings were pending in another jurisdiction: *Mortillaro v. Cash Money Cheque Cashing Inc.* (2009), 73 C.P.C. (6th) 369, [2009] O.J. No. 2904 (S.C.J.); and
> (d) information concerning young offenders: *Richard v. British Columbia*, [2008] B.C.J. No. 1794 (S.C.).

**58** The use of pseudonyms has also been permitted where private medical information is being disclosed: *Jane Doe 1 v. Manitoba* (2008), 66 C.P.C. (6th) 125, [2008] M.J. No. 292 (Q.B.).

**59** It is my understanding that confidentiality orders have been made in the case management of some class actions, to protect the names of victims of mass torts and in other cases on a consent basis, where it was in the interests of both parties to keep information confidential.

*Redaction based on Relevance*

**60** There is no general authority to redact documents appended to affidavits, or portions thereof, on the grounds that they are irrelevant: see *Albrecht v. Northwest Protection Services Ltd.*, [2005]

O.J. No. 2149 (S.C.J.); *Guelph (City) v. Super Blue Box Recycling Corp.* (2004), 2 C.P.C. (6th) 276, [2004] O.J. No. 4468 (S.C.J.).

**61**    Requests for redaction frequently come up at the discovery stage and are often resolved on consent. Although the practice of redacting has in some cases been sanctioned by the court, the cases in which it has been permitted are usually ones in which other important interests are affected: see, for example, *Kimberly-Clark Corp v. Procter & Gamble Inc.* (1990), 31 C.P.R. (3d) 207, [1990] F.C.J. No. 451 (F.C.T.D.) (patent action); *Janhevich v. Thomas* (1977), 15 O.R. (2d) 765, [1977] O.J. No. 2227 (H.C.) (personal tax returns); *United States Surgical Corp. v. Downs Surgical Canada Ltd.,* [1982] 1 F.C. 733, [1981] F.C.J. No. 164 (patent action); *Collins v. Beach* (1988), 24 C.P.C. (2d) 228, [1988] O.J. No. 43 (H.C.) (personal tax returns); *Manufacturers Life Insurance Co. v. Dofasco Inc.* (1989), 38 C.P.C. (2d) 47, [1989] O.J. No. 1456 (H.C.) (confidential and sensitive market information); *John Labatt Ltd. v. Molson Breweries* (1993), [1994] 1 F.C. 801 [1993] F.C.J. No. 1343 (confidential and sensitive commercial information); *North American Trust Co. v. Mercer International Inc.* (1999), 71 B.C.L.R. (3d) 72, [1999] B.C.J. No. 2107 at paras. 11, 13-16 (S.C.) (commercially sensitive information).

*Application of Sierra Club Test*

**62**    As Spence J. observed in *Publow v. Wilson*, above, at para. 18, court proceedings frequently require parties and even witnesses who have no stake in the outcome, to disclose information that they would much rather keep to themselves. The information can be embarrassing and sometimes prejudicial, both personally and financially. Yet the principle of open courts has generally prevailed except in the limited circumstances now permitted by the *Sierra Club* test. In spite of this, requests for sealing orders remain commonplace. It is appropriate to observe that sealing orders impose an additional layer of complexity on an already complicated and expensive litigation process. They require that separate court files be kept, one open to the public and one not. They may require bifurcation of discovery and trial transcripts to exclude references to information in sealed documents. They may require *in camera* hearings where reference is made to documents that are subject to a sealing order. This can give rise to confusion by witnesses, counsel and the court as to what is and what is not sealed. They may restrict the ability of the court to give clear and comprehensible reasons where reference to sealed documents is necessary.

**63**    The request for a sealing order itself raises questions about whether notice must be given to the media and the public to give them an opportunity to contest the order and to speak in favour of the open court principle. On a practical level, this may give the proceeding more notoriety than would otherwise be the case - or than either party might wish.

**64**    Applying the *Sierra Club* test to the facts of this case, I am not satisfied that the interests affected extend beyond the private commercial interests of Tim Hortons and its franchisees or that these interests can be expressed in terms of the broader commercial interest in the preservation of confidential information or the promotion of fair competition. I accept that much of the information

has been treated by Tim Hortons and its franchisees as confidential - obviously in the ordinary course of their businesses they would have absolutely no reason to disclose it to third parties or to make it public. This is true in almost every business relationship, however, and in almost every such relationship it would be possible to characterize the "interest" in terms of a broader public interest in the preservation of confidential information.

**65**    That is not, however, the real interest at stake in this motion. Tim Horton puts the case on the basis that it and its franchisees will suffer commercial harm if the information is disclosed to competitors. While the promotion of fair competition is an important societal interest, I am not satisfied that the risk of harm in this case is real and substantial or well-grounded in the evidence. Tim Hortons' evidence of harm is speculative, general and lacking in specifics. The par baking system was introduced at very substantial costs in 2002, some eight years ago. The system itself is not unique. The notion that information on the successful implementation of the system, even at a "granular" level, would give competitors an unfair advantage is simply speculative. So is the notion that competitors, landlords and suppliers could take advantage of information on costs, sales, profit margins and other financial information, to the detriment of Tim Hortons and its franchisees. The information sought to be disclosed is not dissimilar to the information in *Prendiville v. 407 International Inc.*, above, and it is the kind of private commercial interest that Iacobucci J. in *Sierra Club* expressly excluded from the scope of protection.

**66**    The information described as "trade secrets" is of the most general nature and at the very lowest level of "secrecy." In order to take advantage of the information it would be necessary to create a substantial par baking infrastructure. There is no evidence that any competitor of Tim Hortons has done so or is in a position to do so. Any competitor with the resources to do so would not likely need to know that you must bake a frozen lump of ingredients for a particular length of time at a particular temperature in order to make a muffin.

**67**    As I have noted earlier, sealing orders have been routinely and appropriately granted in cases involving true trade secrets, but this case does not involve that kind of information.

**68**    In light of my conclusion that the information in this case does not meet the necessity test, I need not move to the second stage of the test in *Sierra Club*. However, if I had found that an important commercial interest was engaged in this case, I would not have found that the salutary effects of the order outweighed its deleterious effects. First, a sealing order is not required in this case to ensure a fair trial. In *Sierra Club*, AECL would have been prevented from disclosing the evidence without a sealing order. The absence of a sealing order would have impaired its right to a fair trial. There is no evidence that this is the case here. Nor is there any evidence that the request for disclosure is abusive or being used for the purpose of an unfair tactical advantage - for example, to force the defendant to settle to avoid disclosure of potentially damaging information.

**69**    Second, a sealing order in this case could have significant adverse effects on public confidence in the administration of justice. The defendants' case on the motion for summary

judgment depends to a large degree on the proposition that the putative plaintiffs are inefficient operators, whose experience is not representative of the class. To make out this case, the devil will be in the details and I expect that a careful analysis of the defendants' and the franchises' financial information will be required. There is a real risk that the proceedings will not be comprehensible to the public without reference to the information sought to be sealed. If a detailed examination of the sealed information is required at the hearing, the proceeding may have to be held *in camera*. Any analysis of this issue in reasons may require reference to the confidential information so as to be intelligible. As I said earlier, as a putative class proceeding openness is a particularly important consideration in this case.

**70**    While the consent of the parties does not absolve the court of its responsibility to ensure that court proceedings are open and transparent, I would be reluctant to compel the parties to disclose information that neither of them wishes to produce, *provided* that such material forms no part of the court record. If the parties can agree to any of the redactions proposed by Tim Hortons, and can undertake that the redacted information is not material to the motions and will not be relied upon by either party, the redacted information does not need to form part of the court record. The open court principle will not be infringed by excising irrelevant confidential material as long as the public has access to the same record as the parties and the motion judge.

**71**    Although procedural orders have been granted in some cases to protect documents pending a determination of confidentiality, no purpose would be served by such an order in this case.

**72**    For these reasons, the defendants' motion is dismissed, with costs. If counsel are unable to agree on costs, written submissions may be addressed to me in accordance with a timetable agreed upon by counsel.

G.R. STRATHY J.

\* \* \* \* \*

**SCHEDULE**
**CONFIDENTIAL INFORMATION PUT IN ISSUE BY PLAINTIFFS**

| Reference | Confidential Information | Basis for Claim of Confidentiality |
|---|---|---|
| Ex. 7 | Excerpts from TDL's Ontario 2001 Disclosure Document containing references to: initial license fees, royalty fees, total initial licensee investment, advertising levies, disclosure of administrative proceedings and civil litigation and liabilities, projected store earnings at varying sales levels, names and addresses of franchisees and Ontario store list. Certain portions redacted for relevance. | Personal Information<br><br>Competitively Sensitive Commercial Data |
| Ex. 12 | This document has not been redacted. The only reference in the Clanachan Affidavit is to the Acknowledgement of Receipt of Ontario Disclosure Document. | Not Applicable |
| Ex. 16 | Personal information on sample of agreements has been redacted. | Personal Information |
| Ex. 17 | This document has not been redacted on the basis of confidentiality. The Affidavit refers to only the relevant portion of the Tim Hortons Production Manual. | Not applicable |
| Ex. 28 | Always Fresh Financial Forecast (entire document redacted). Contains references to single store costs, sales, margins and profitability pre-Always Fresh and the projections post-Always Fresh. | Competitively Sensitive Commercial Data |
| Ex. 29 | Always Fresh Baking Production Manual (entire document redacted). | Trade Secrets |
| Ex. 33 | August 2002 Always Fresh Financial Forecast (entire document redacted). Contains references to single store costs, sales, margins and profitability pre-Always Fresh and the projections post-Always Fresh. | Competitively Sensitive Commercial Data |
| Ex. 34 | Excerpt from Advisory Board minutes referring to production methods and procedures. | Trade Secrets |

| Reference | Confidential Information | Basis for Claim of Confidentiality |
|---|---|---|
| Ex. 35 | Excerpts from November 2002 Always Fresh Presentations relating to product preparation methods, food costs, labour costs and projections, costs model, sales and costs information from specific franchisees | Trade Secrets<br><br>Franchisee Financial Information<br><br>Competitively Sensitive Commercial Data |
| Para. 130 of Clanachan Affidavit and Ex. 37 | Excerpts from 2003 Always Fresh Baking Presentation containing current and projected single store costs models and the results to date under Always Fresh. | Competitively Sensitive Commercial Data |
| Ex. 38 | Excerpt from September 2003 Always Fresh Financial Update referring to Ontario and Alberta P&L results, operating margin comparisons, operating margins by month for Always Fresh stores, Ontario and Alberta store sales. | Franchisee Financial Information<br><br>Competitively Sensitive Commercial Data |
| Para 132 of Clanachan Affidavit and Ex. 39 | Excerpts from Advisory Board minutes containing references to Ontario P&L results and pre and post Always Fresh conversion. | Franchisee Financial Information<br><br>Competitively Sensitive Commercial Data |
| Ex. 40 | Excerpts from the Ontario 2003 Regional Meeting Presentation containing profit and loss analysis, price changes, operating margins, productivity data and financial experiences of franchisees. | Personal Information<br><br>Franchisee Financial Information<br><br>Competitively Sensitive Commercial Data |
| Ex. 41 | Excerpts from the Atlantic Canada 2003 Regional Meeting Presentation containing single store operating margins, food cost impact, operating margin comparisons, and Always Fresh financial results. | Franchisee Financial Information<br><br>Competitively Sensitive Commercial Data |

| Reference | Confidential Information | Basis for Claim of Confidentiality |
|---|---|---|
| Ex. 42 | Excerpt from Advisory Board meeting minutes of February 4 and 5, 2004 referring to product improvements | [Not listed in schedule prepared by counsel] |
| Ex. 43 | Excerpts of Spring 2004 Regional Meeting Presentation slides referring to food unit costs, sales revenue and comparison of pre and post Always Fresh gross margins at the store level. | Franchisee Financial Information<br><br>Competitively Sensitive Commercial Data |
| Ex. 44 | 2002 Ontario Product Cost Summary (entire document redacted). | Competitively Sensitive Commercial Data |
| Ex. 45 | Toronto Order Guide, November 2003 (entire document redacted). | Competitively Sensitive Commercial Data |
| Ex. 46 | 2003-2009 Costs vs. Prices Report (entire document redacted). | Competitively Sensitive Commercial Data |
| Para. 8 | Reference to labour costs in specific years redacted. | Competitively Sensitive Commercial Data |
| Para. 20 | Percentage of sales by time of day has been redacted. | Competitively Sensitive Commercial Data |
| Ex. 2 | Ontario Historical Operating Margins based on P&Ls reported for 2002-2008 (entire document redacted). | Franchisee Financial Information<br><br>Competitively Sensitive Commercial Data |
| Ex. 3 | Jollymore reported P&L data (entire document redacted). | Franchisee Financial Information<br><br>Competitively Sensitive Commercial Data |
| Ex. 4 | Historical Operating Margins for all Canadian regions for 2002-2008 (entire document redacted). | Franchisee Financial Information<br><br>Competitively Sensitive Commercial Data |

| Reference | Confidential Information | Basis for Claim of Confidentiality |
|-----------|--------------------------|-------------------------------------|
| Ex. 5 | Price Change History for Ontario for 2002-2009 (entire document redacted). | Competitively Sensitive Commercial Data |
| Ex. 6 | Costs vs. Prices – Donuts and Timbits 2003-2009 (entire document redacted). | Competitively Sensitive Commercial Data |
| Ex. 7 | 2003- 2009 report showing volume and percentage of sale for each part of the day and for each region. | Competitively Sensitive Commercial Data |

# TAB 7

*Case Name:*

# Nortel Networks Corp. (Re)

**IN THE MATTER OF the Companies' Creditors Arrangement
Act, R.S.C. 1985, c. C-36, as Amended
AND IN THE MATTER OF a Plan of Compromise or
Arrangement of Nortel Networks Corporation, Nortel
Networks Limited, Nortel Networks Global Corporation,
Nortel Networks International Corporation and Nortel
Networks Technology Corporation, (Applicants)**

[2009] O.J. No. 4487

56 C.B.R. (5th) 224

2009 CarswellOnt 4838

Docket: 09-CL-7950

Ontario Superior Court of Justice
Commercial List - Toronto, Ontario

**G.B. Morawetz J.**

Heard: July 28, 2009.
Judgment: July 28, 2009.

(41 paras.)

*Bankruptcy and insolvency law -- Companies' Creditors Arrangement Act (CCAA) matters --
Compromises and arrangements -- Applications -- Eligible financial contracts -- Motion by
protected company for order approving and authorizing execution of Asset Sale Agreement, vesting
order with respect to Intellectual Property and order sealing certain financial documents allowed --
Monitor approved of application and no one objected -- Bidding process and auction completed
according to approved procedure and principles of law -- Purchase price fair and, in fact, higher
than expected -- Purchaser committed to making 2,500 employment offers to applicant's employees
-- Asset Sale Agreement and Vesting Order for IP interests approved -- Appendices of Seventeenth
Report contained sensitive commercial information that could prejudice stakeholders so those
reports sealed.*

**Statutes, Regulations and Rules Cited:**

Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 363

**Counsel:**

Mr. D. Tay, Ms J. Stam, for Nortel Networks Corporation et al.

Mr. J.A. Carfagnini, Mr. C.G. Armstrong, for Monitor, Ernst and Young Incorporated.

Mr. Arthur O. Jacques, for Felske, Sylvain.

S.R. Orzy, for Noteholders.

Ms S. Grundy, Mr. J. Galway, for Telefonaktiebolaget LM Ericsson.

Ms L. Williams, Ms K. Mahar, for Flextronics.

Mr. M. Zigler, for Former Employees.

Mr. L. Barnes, for Board of the Directors of Nortel Networks Corporation, Nortel Networks Limited.

Mr. A. MacFarlane, for Official Committee of Unsecured Creditors.

Ms T. Lie, for Superintendent of Financial Services of Ontario.

Mr. B. Wadsworth, for CAW Canada.

Mr. S. Bomhof, for Nokia Siemens.

Mr. R.B. Schwill, for Nortel Networks UK Limited.

---

**1   G.B. MORAWETZ J.**:-- Nortel Networks Corporation ("NNC), Nortel Networks Limited (NNL), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation, (collectively the "Applicants"), bring this motion for an Order approving and authorizing the execution of the Asset Sale Agreement dated as of July 24, 2009, ("the Sale Agreement"), among Telefonaktiebolaget LM Ericsson (PUBL) (the "Purchaser"), as buyer, and NNL, NNC, Nortel Networks, Inc.) ("NNI") or ("Ericsson"), and certain of their affiliates as vendors, (collectively, the "Sellers"), in the form attached and as an Appendix to the Seventeenth Report of Ernst and Young Inc. in its capacity as Monitor in the CCAA proceedings.

**2**    The Applicants also request, among other things, a Vesting Order, an Order approving and authorizing the execution and compliance with the Intellectual Property Licence Agreement substantially in the form attached to the confidential appendix to the Seventeenth Report and the Trademark Licence Agreements substantially in the form attached to the appendix and an Order declaring that the Ancillary Agreements, (as defined in the Sale Agreement), including the IP Licences, shall be binding on the Applicants that are party thereto, and shall not be repudiated disclaimed or otherwise compromised in these proceedings, and that the intellectual property subject to the IP Licences shall not be sold, transferred, conveyed or assigned by any of the Applicants unless the buyer or assignee of such intellectual property assumes all of the obligations of NNL under the IP Licences and executes an assumption agreement in favour of the Purchaser in a form satisfactory to the Purchaser.

**3**    Finally, the Applicants seek an order sealing the Confidential Appendixes to the Seventeenth Report pending further order of this court.

**4**    This joint hearing is being conducted by way of video conference. His Honor Judge Gross is presiding over the hearing in the U.S. Court. This joint hearing is being conducted in accordance with the provisions of the Cross-Border Protocol, which has previously been approved by both the U.S. Court and this court.

**5**    The Applicants have filed two affidavits in support of the motion. The first is that of Mr. George Riedel, sworn July 25, 2009. Mr. Riedel is the Chief Strategy Officer of NNC and NNL. Mr. Riedel also swore an affidavit on June 23, 2009 in support of the motion to approve the Bidding Procedures. The second affidavit is that of Mr. Michael Kotrly which relates to an issue involving Flextronics which was resolved prior to this hearing.

**6**    The Monitor has also filed its Seventeenth Report with respect to this motion. The Monitor recommends that the requested relief be granted.

**7**    The Applicants' position is also enthusiastically supported by the Unsecured Creditors' Committee in the Chapter 11 proceedings and the Noteholders.

**8**    No party is opposed to the requested relief.

**9**    On June 29, 2009 this court granted an Order approving the Bidding Procedures for a sale process for certain of Nortel's Code Division Multiple Access ("CMDA") business, and Long Term Evolution ("LTE") Access. The procedures were attached to the Order.

**10**    The Court also approved the Stalking Horse Agreement dated as of June 19, 2009 among Nokia Siemens Networks B.V. ("Nokia Siemens") and the Sellers (also referred to as the "Nokia Agreement") and accepted agreement for the purposes of conducting the Stalking Horse bidding process in accordance with the Bidding Procedures, including the Break-Up-Fee and Expense Reimbursement as both terms are defined in the Stalking Horse Agreement.

**11** The order of this court was granted immediately after His Honor, Judge Gross, of the United States Bankruptcy Court for the District of Delaware, approved the Bidding Procedures in the Chapter 11 proceedings.

**12** The Bidding Procedures contemplated a bid deadline of 4 p.m. on July 21, 2009. This gave interested parties 22 days to conduct due diligence and submit a bid.

**13** By the Bid Deadline, three bids were acknowledged as "Qualified Bids" as contemplated by the Bidding Procedures. Qualified Bids were received from MPAM Wireless Inc., otherwise known as Matlin Patterson and Ericsson.

**14** The Monitor also reports that on July 15, 2009 one additional party submitted a non-binding letter of intent and requested that it be deemed a Qualified Bidder. The Monitor further reports that upon receiving this request, the Applicants' provided such party with a form of Non-Disclosure Agreement substantially in the form as that previously executed by Nokia Siemens. This party declined to execute the Non Disclosure Agreement and was not deemed a Qualified Bidder. The Monitor further reports that it, the UCC and the Bondholder Group were all consulted in connection with the request of such party to be considered a Qualified Bidder.

**15** The Monitor also reports that it is of the view that any party that wanted to bid for the business and complied with the Bidding Procedures was permitted to do so.

**16** In the period up to July 21, 2009, the Monitor reports that it was kept apprised of all activity conducted between Nortel and the potential buyers. In addition, the Monitor participated in conference calls and meetings with the potential buyers, both with Nortel and independently. The Monitor further reports that it conducted its own independent review and analysis of materials submitted by the potential buyers.

**17** On July 22, 2009, in accordance with the Bidding Procedures, copies of both the MPAM bid and the Ericsson bid were provided to Nokia Siemens, MPAM and Ericsson were both notified that three Qualified Bids had been received.

**18** After consultation with the Monitor and representatives of the UCC and the Bondholder Group, the Sellers determined that the highest offer amongst the three bids was submitted by Ericsson and accordingly on July 22, 2009, the three Qualified Bidders were informed that the Ericsson bid had been selected as the starting bid pursuant to the Bidding Procedures. Copies of the Ericsson bid were distributed to Nokia Siemens and MPAM.

**19** The Monitor reports that the auction was held in New York on July 24, 2009.

**20** Pursuant to the Bidding Procedures the auction went through several rounds of bidding. The Sellers finally determined that the Ericsson bid submitted in the sixth round should be declared the Successful Bid and that the Nokia Siemens bid submitted in the fifth round should be an Alternate

Bid. The Monitor reports that these determinations were made in accordance with consultations with the Monitor and representatives of UCC and the Bondholder group held during the seventh round adjournment.

**21**   The Monitor reports that the terms and conditions of the Successful Bid are substantially the same as the Nokia Agreement described in the Fourteenth Report with the significant differences being as follows:

> 1)   The purchase price has been increased from U.S. $650 million to U.S. $1.13 billion plus the obligation of the Purchaser to pay, perform and discharge the assumed liabilities. The Purchaser made a good faith deposit of U.S. $36.5 million.
>
> 2)   The Termination Date has been extended to September 30, 2009 or in the event that closing has not occurred solely because regulatory approvals have not yet been obtained, October 31, 2009 as opposed to August 31 and September 30, respectively, for the Nokia Agreement.
>
> 3)   The provisions in the Nokia Agreement with respect to the Break-Up Fee and Expense Reimbursement have been deleted.

**22**   Further, I note that the Nokia Agreement provided for a commitment to take at least 2,500 Nortel employees worldwide. Under the Sale Agreement, the Purchaser has also committed to make employment offers to at least 2,500 Nortel employees worldwide.

**23**   The Nokia Agreement provided for a payment of a Break-Up Fee of $19.5 million and the Expense Reimbursement to a maximum of $3 million, upon termination of the Nokia Agreement. The Monitor reports that if both this court and the U.S. Court approve the Successful Bid, the Applicants are of the view that the Break-Up Fee and the Expense Reimbursement will be payable and in accordance with the order of June 29, 2009, the company intends to make such a payment. The Monitor reports that it is currently contemplated that 50% of the amount will he funded by NNL and 50% by NNI.

**24**   The assets to be transferred by the Applicants and the U.S. Debtors pursuant to the successful bid are to be transferred free and clear of all liens of any kind. The Monitor is of the understanding that no leased assets are being conveyed as part of this transaction.

**25**   The Monitor also reports that at the request of the Purchaser, the proposed Approval and Vesting Orders specifically approves Intellectual Property Licence Agreement and Trademark Licence Agreement, collectively, (the "IP Licences"), entered into between NNL and the Purchaser in connection with the Successful Bid.

**26**   The Monitor also reports that subject to court approval, closing is anticipated to occur in September 2009.

**27**    The Bidding Procedures provide that the Seller may seek approval of the next highest or otherwise best offer as the Alternate Bid. If the closing of the transaction contemplated fails to occur the Sellers would then be authorized, but not directed, to proceed to effect a Sale Pursuant to the terms of the Alternate Bid without further court approval. The Sellers, in consultation with the Monitor, the UCC and the Bondholders, determined that the bids submitted by Nokia Siemens in the fifth round with a purchase price of $1,032,500,000 is the next highest and best offer and has been deemed to be the Alternative Bid. Accordingly, the company is seeking court approval of the alternative bid pursuant to the Bidding Procedures.

**28**    The Monitor reports that, as noted in its Fourteenth Report, the CMDA division and the LTE business are not operated through a dedicated legal entity or stand alone division. The Applicants have an interest in intellectual property of the CMDA business and the LTE business which is subject to various intercompany licensing agreements with other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. The Monitor is of the view that the task of allocating sale proceeds stemming from the Successful Bid amongst the various Nortel entities and the various jurisdictions is complex. Further, as set out in the Fifteenth Report, the Applicants, the U.S. Debtors, and certain of the Europe, Middle East, Asia entities, ("EMEA") through their U.K. Administrators entered into the Interim Funding and Settlement Agreement, the IFSA, which was approved by this court on June 29, 2009. Pursuant to the IFSA, each of the Applicants, U.S. Debtors and EMEA Debtors agreed that the execution of definitive documentation with a purchaser of any material Nortel assets was not conditional upon reaching an agreement regarding the allocation of sale proceeds or binding procedures for the allocation of the sale proceeds. The Monitor reports that the parties agreed to negotiate in good faith and attempt to reach an agreement on a protocol for resolving disputes concerning the allocation of sale proceeds but, as of the current date, no agreement has been reached regarding the allocation of any sales proceeds. Accordingly, the Selling Debtors have determined that the proceeds are to be deposited in an escrow account. The issue of allocation of sale proceeds will be addressed at a later date.

**29**    The Monitor expects that the Company will return to court prior to the closing of the transaction to seek approval of the escrow agreement and a protocol for resolving disputes regarding the allocation of sale proceeds.

**30**    In his affidavit, Mr. Riedel concludes that the sale process was conducted by Nortel with consultation from its financial advisor, the Monitor and several of its significant stakeholders in accordance with the Bidding Procedures and that the auction resulted in a significantly increased purchase price on terms that are the same or better than those contained in the Stalking Horse Agreement. He is of the view that the proposed transaction, as set out in the Sale Agreement, is the best offer available for the assets and that the Alternate Bid represents the second best offer available for the Assets.

**31**    The Monitor concludes that the company's efforts to market the CMDA Business and the LTE

Business were comprehensive and conducted in accordance with the Bidding Procedures and is further of the view that the Section 363 type auction process provided a mechanism to fully determine the market value of these assets. The Monitor is satisfied that the purchased priced constitutes fair consideration for such assets and, as a result, the Monitor is of the view that the Successful Bid represents the best transaction for the sale of these assets and the Monitor therefore recommends that the court approve the Applicants' motion.

**32**    A number of objections have been considered by the U.S. Court and they have been either resolved or overruled. I am satisfied that no useful purpose would be served by adding additional comment on this issue.

**33**    Turning now to whether it is appropriate to approve the transaction, I refer back to my Endorsement on the Bidding Procedures motion. At that time, I indicated that counsel to the Applicants had emphasized that Nortel would aim to satisfy the elements established by the court for approval as set out in the decision of Royal Bank v. Soundair Corp. (1991), 7 C.B.R. (3d) 1 (Ont. C.A.), which, in turn, accepts certain standards as set out by this court in Crown Trust Co. v. Rosenberg (1986), 60 O.R. (2d) 87 (Ont. H.C.).

**34**    Although the Soundair and Crown Trust tests were established for the sale of assets by a receiver, the principles have been considered to be appropriate for sale of assets as part of a court supervised sales process in a CCAA proceeding. For authority see Tiger Brand Knitting Co., Re (2005), 9 C.B.R. (5th) 315 (Ont. S.C.J.)

**35**    The duties of the court in reviewing a proposed sale of assets are as follows:

> 1)    It should consider whether sufficient effort has been to obtain the best price and that the debtor has not acted improvidently;
> 2)    It should consider the interests of all parties;
> 3)    It should consider the efficacy and integrity of the process by which offers have been obtained; and
> 4)    It should consider whether there has been unfairness in the working out of the process

**36**    I am satisfied that the unchallenged record clearly establishes that the sale process has been conducted in accordance with the Bidding Procedures and with the principles set out in both Soundair, and Crown Trust. All parties are of the view that the purchase price represents fair consideration for the assets included in the Sale Agreement. I accept these submissions. The consideration provided by Ericsson pursuant to the Sale Agreement, in my view, constitutes reasonably equivalent value and fair consideration for the assets.

**37**    In my view, it is appropriate to approve the Sale Agreement as between the Sellers and Purchaser. I am also satisfied that it is appropriate to grant the relief relating to the Vesting Order, the IP Licences, the Ancillary Agreement and the Alternate Bid, all of which are approved.

**38** The Applicants also requested an order sealing the Confidential Appendixes to the Seventeenth Report pending further order. In considering this request I referred to the decision of the Supreme Court of Canada in Sierra Club of Canada v. Canada (Minister of Finance), 2002 SCC 41 (S.C.C.), which addresses the issue of a sealing order. The Supreme Court of Canada held that such orders should only be granted when:

> 1) An order is needed to prevent serious risk to an important interest because reasonable alternative measures will not prevent the risk;
>
> 2) The salutary effects of the order outweigh its deleterious effects, including the effects on the right to free expression, which includes public interest in open and accessible court proceedings.

**39** I have reviewed the Confidential Appendixes to the Seventeenth Report. I am satisfied that the Appendixes contain sensitive commercial information, the release of which could be prejudicial to the stakeholders. I am satisfied that the request for a sealing order is appropriate and it is so granted.

**40** Other than with respect to the payment and reimbursement of amounts in respect of the Bid Protections nothing in this endorsement or the formal order is meant to modify or vary any of the Selling Debtors' (as such term is defined in the ISFA) rights and obligations under the ISFA. It is further acknowledged that Nortel has advised that the Interim Sales Protocol shall be subject to approval by the court.

**41** An order shall issue in the form presented, as amended, to give effect to the foregoing reasons.

cp/s/qllxr/qljxr/qlaxw

# TAB 8

*Case Name:*
## Stelco Inc. (Re)

**APPLICATION UNDER the Companies' Creditors
Arrangement Act, R.S.C. 1985, c. C-36, as amended
IN THE MATTER OF the Companies' Creditors
Arrangement Act, R.S.C. 1985, c. C-36, as amended
AND IN THE MATTER OF a proposed plan of compromise or
arrangement with respect to Stelco Inc. and the other
applicants listed in Schedule "A"**

[2006] O.J. No. 275

17 C.B.R. (5th) 76

145 A.C.W.S. (3d) 230

2006 CarswellOnt 394

Court File No. 04-CL-5306

Ontario Superior Court of Justice
Commercial List

**J.M. Farley J.**

January 17, 2006.

(8 paras.)

*Civil evidence -- Documentary evidence -- Publication bans and confidentiality orders -- Motion for
permanent sealing order of confidential information allowed -- There was minimal redaction of
material related to Stelco's revenues, costs, selling prices and profitability -- Disclosure of such
information to competitors, suppliers and customers could be injurious to Stelco's business
activities, and benefits of confidentiality order with respect to elements redacted outweighed
deleterious effects of confidentiality order -- Accordingly there was to be a permanent sealing order
-- Three lines of an affidavit that were inadvertently not blacked out were to be treated as having
been blacked out ab initio.*

*Civil procedure -- Discovery -- Production and inspection of documents -- Confidentiality orders -- Motion for permanent sealing order of confidential information allowed -- There was minimal redaction of material related to Stelco's revenues, costs, selling prices and profitability -- Disclosure of such information to competitors, suppliers and customers could be injurious to Stelco's business activities, and benefits of confidentiality order with respect to elements redacted outweighed deleterious effects of confidentiality order -- Accordingly there was to be a permanent sealing order -- Three lines of an affidavit that were inadvertently not blacked out were to be treated as having been blacked out ab initio.*

**Counsel:**

Geoff R. Hall, for the Stelco Applicants

Kyla Mahar, for the Monitor

Peter Jacobsen, for Globe & Mail

Kevin Zych, for the 8% and 10.4% Stelco Bondholders

Peter Jervis and Karen Kiang, for the Equity Holders

Sharon White, for USW Local 1005

---

ENDORSEMENT

(Motion by Applications for permanent sealing order
of confidential information)

**1** J.M. FARLEY J. (endorsement):-- This Endorsement deals with two of the three issues, the third will be forthcoming.

**2** I am satisfied that there has been minimal redaction of material related to Stelco's revenues, costs, selling prices and profitability (directly or implied) which would be ordinarily kept confidential as disclosure of such information to competitors, suppliers and customers would be injurious to Stelco's business activities. Reasonable alternative measures would not prevent the risk to Stelco. The salutory effects of a confidentiality order as to the elements redacted, including the ability of the participants in this CCAA proceeding to deal reasonably pursuant to Non-Disclosure Agreements with submissions related to such confidential financial information, outweigh the deleterious effects of such confidentiality order.

**3**    I am satisfied that there has been a minimal effect negative to the concept of an open court. The Globe was not opposed to this redaction effort.

**4**    It appears to me that the principles and tests involved in Sierra Club of Canada v. Canada (Minister of Finance) (2002), 211 D.L.R. (4th) 193 (S.C.C.) has been met. See also Re Air Canada (S.C.J.) released September 26, 2004.

**5**    There is to be a permanent sealing order subject to any interested party asking for a review of same upon notice to Stelco.

**6**    The second issue relates to the inadvertence as to not blanking/blacking out three lines in an affidavit of one Fabrice Taylor. The first part of the paragraph, all on the preceding page, had been blacked out. Upon reasonable reflection, it would be obvious to a person receiving same that the part not so blacked out did not make any sense on any stand-alone basis. Unfortunately, the incompletely blacked-out affidavit was flipped over to a reporter at the Globe who was not permitted to review unredacted copy (Stelco and the Globe had worked out a very reasonable and common sense arrangement whereby unredacted copy could be reviewed by counsel for the Globe and a Globe employee who was restricted from using same or disclosing such to others). The flip-over by counsel for the Globe was "innocent" as he had not reviewed the material before doing the flip and he had not expected that there would have been a problem with the blacking out.

**7**    The reporter has quite responsibly agreed to treat the three lines not previously blacked-out as having been blacked out ab initio.

**8**    The remaining third issue is whether the portion of the affidavit and exhibits which were blacked out (including the subject 3 lines) and as agreed by Stelco and the equity holders' counsel were to be blacked-out qualify for such redaction. I will deal with that in a further endorsement.

J.M. FARLEY J.

cp/e/qw/qljxh

# TAB 9

*Indexed as:*

# S. & K. Processors Ltd. v. Campbell Ave. Herring Producers Ltd.

**Between**

**S. & K. Processors Ltd., Arthur Lamont Strang and Silverking Processors Ltd., plaintiffs, and Campbell Ave. Herring Producers Ltd., Ocean Fisheries Limited and J.S. McMillan Fisheries Ltd., defendants**

[1983] B.C.J. No. 1499

[1983] 4 W.W.R. 762

45 B.C.L.R. 218

35 C.P.C. 146

20 A.C.W.S. (2d) 183

Vancouver Registry No. C800876

British Columbia Supreme Court
Vancouver, British Columbia

**McLachlin J.**

Heard: March 30, 1983.
Judgment: May 13, 1983.

(7 pp.)

**Counsel:**

S.J. Mulhall, for the plaintiffs.
J.K. Lowes, for the defendants.

**1    McLACHLIN J.**:-- This is an application, brought by way of pre-trial conference, in which the plaintiff seeks an order compelling production of certain documents. The defendants oppose, claiming solicitor-client privilege.

**2**    The action is a complex one. One of the matters raised in the statement of defence concerns expenses alleged to have been incurred by the defendants on behalf of the plaintiff S. & K. Processors Ltd. but not charged to it. On July 17, 1980, this Court ordered that the defendants deliver further and better particulars of these expenses. Complete particulars have not been delivered to date. However, on December 23, 1982, an accountants' report (the Laventhol & Horwath report), particularizing the claim of the defendants Ocean and McMillan for administration expenses, was delivered to the plaintiffs.

**3**    The defendants do not object to producing their financial records and statements to the plaintiffs. They do object to producing: (1) correspondence between their solicitors and Laventhol & Horwath for the purpose of preparing the accounting report, (2) notes of meetings between Laventhol & Horwath and representatives of the defendants and the defendants' solicitors; (3) drafts and working papers of representatives of the defendants, and, (4) drafts and working papers of Laventhol & Horwath. All these documents, the defendants assert, are confidential in nature, and were made solely for the purpose of giving advice and organizing and preparing evidence under the direction of the defendants' solicitors.

**4**    The plaintiffs submit: (1) that the documents in question were not privileged; and (2) that if they were privileged, the privilege has been waived by disclosure to the defendants of the Laventhol & Horwath report.

PRIVILEGE

**5**    The defendants' assertion that the documents originated in confidence and were prepared solely for the purposes of litigation has not been negated. It would seem, therefore, that all elements necessary to establish solicitor-client privilege are met. However, the plaintiffs assert that facts observed or noted by experts consulted by a litigant--as distinguished from his inference, opinions, or conclusions--are not privileged: Bestway Lath & Plastering Co. v. McDonald Const. Ltd. (1972), 4 N.S.R. (2d) 1. In my view, that decision is not of assistance in this case. In Bestway, the issue was whether an expert retained by a litigant was required to answer questions under the Nova Scotia Rule permitting any person to be examined for discovery. It was held that the expert could be examined on facts observed by him that were patent to the senses, these not being privileged. But in the case at Bar, it is not facts which are sought to be produced, but communications which may refer to such facts. Those communications have arisen in circumstances where solicitor-client privilege attaches. The fact that the communications may refer to facts does not deprive them of their privileged character. I conclude that the documents are priveleged and need not be produced, unless that privilege has been waived by the defendants.

WAIVER

**6**    Waiver of privilege is ordinarily established where it is shown that the possessor of the privilege (1) knows of the existence of the privilege, and (2) voluntarily evinces an intention to waive that privilege. However, waiver may also occur in the absence of an intention to waive, where fairness and consistency so require. Thus waiver of privilege as to part of a communication, will be held to be waiver as to the entire communication. Similarly, where a litigant relies on legal advice as an element of his claim or defence, the privilege which would otherwise attach to that advice is lost: Hunter v. Rogers, [1982] 2 W.W.R. 189.

**7**    The plaintiffs contend that by producing the Laventhol & Horwath report, the defendants waived privilege not only with respect to that report but to all the documents and communications which were involved in its preparation. Fairness, they submit, leaves no alternative; if a litigant is to properly evaluate the expert report produced by his opponent, he must have access to the instructions and information upon which it is based.

**8**    The report in question was produced pursuant to the Evidence Act, R.S.B.C. 1979, c. 116, s. 11, shortly before the trial of this action, (subsequently adjourned), was to commence. The Evidence Act, s. 11, abrogates the privilege attaching to such reports by requiring that they be produced 14 days before the expert gives his evidence. The Act sets out the extent to which the privilege is abrogated by specifying what must be disclosed--the expert's opinion and the facts upon which it is based. Analyzed in this light, the plaintiffs may be said to be seeking an extension of the inroad on privilege legislated by the Evidence Act, s. 11.

**9**    It is settled that legislation is to be taken as abrogating privilege only if it does so in clear and unambiguous terms: Re Dir. of Investigation & Research and Can. Safeway Ltd., [1972] 3 W.W.R. 547. It is also apparent that had the Legislature wished to abrogate privilege, not only with respect to an expert's opinion and the facts upon which it is based, but as to the communications between the expert, the instructing solicitor and the client in the course of preparation of the report, it could have drafted s. 11 to so provide. These considerations weigh against requiring production of the documents here in issue.

**10**    Notwithstanding the fact that the Evidence Act, s. 11, does not require production of the documents in question, can it be said that in the interests of fairness and consistency the doctrine of waiver requires their disclosure? As pointed out in Wigmore on Evidence (McNaughton Rev., 1961), vol. 8, pp. 635-36, relied on by Meredith J. in Hunter v. Rogers supra, double elements are predicated in every waiver--implied intention and the element of fairness and consistency. In the cases where fairness has been held to require implied waiver, there is always some manifestation of a voluntary intention to waive the privilege at least to a limited extent. The law then says that in fairness and consistency, it must be entirely waived. In Hunter v. Rogers, supra, the intention to partially waive was inferred from the defendant's act of pleading reliance on legal advice. In Harich v. Stamp (1979), 27 O.R. (2d) 395, it was inferred from the accused's reliance on alleged inadequate legal advice in seeking to explain why he had pleaded guilty to a charge of dangerous driving. In both cases, the plaintiff chose to raise the issue. Having raised it, he could not in fairness be

permitted to use privilege to prevent his opponent exploring its validity.

**11**    In the case of production of an expert's report under the Evidence Act, s. 11, it can be contended that the pre-trial production of the report and the attendant loss of privilege at that stage is involuntary, being compelled by statute. Being involuntary, it cannot constitute waiver, although it is clear that under s. 11 privilege will be lost as to the opinion and the facts upon which it is based. Moreover, even if production of the report pursuant to the Act could be said to constitute waiver, in these circumstances it cannot be said to be unfair or inconsistent that the party producing it retain such privilege as is left to him by the Act.

**12**    In the result, I conclude that the privilege attaching to these documents has not been waived. The plaintiffs are not entitled to production. They are, however, entitled to disclosure of all the facts upon which the inferences and conclusions contained in the Laventhol & Horwath report are based, to be furnished by way of particulars as well as by supplementation of the report in so far as it fails to precisely set forth those facts.

**13**    I may add that the foregoing comments are confined to what must be disclosed upon the pre-trial production of an expert's report pursuant to s. 11 of the Evidence Act--an expert who may or may not be called as a witness. In the event that the expert takes the stand at trial, the situation respecting waiver may well be different.

**14**    I have not found it necessary to look at the actual documents, being able to dispose of the application on the basis of the general description of the documents contained in the material. Should particular question arise of which these reasons do not dispose, counsel have leave to apply.

McLACHLIN J.

# TAB 10

*Case Name:*
# Hollinger Inc. (Re)


**IN THE MATTER OF the Companies' Creditors Arrangement Act,
R.S.C. 1985, c. C-36, as amended
AND IN THE MATTER OF a Proposed Plan of Compromise or
Arrangement with Respect to Hollinger Inc., 4322525 Canada
Inc. and Sugra Limited, Applicants**

[2011] O.J. No. 3977

2011 ONCA 579

283 O.A.C. 264

107 O.R. (3d) 1

84 C.B.R. (5th) 79

341 D.L.R. (4th) 182

12 C.P.C. (7th) 29

2011 CarswellOnt 9272

207 A.C.W.S. (3d) 234

Docket: C53706


Ontario Court of Appeal
Toronto, Ontario

**S.T. Goudge, R.J. Sharpe and A. Karakatsanis JJ.A.**

Heard: August 24, 2011.
Judgment: September 8, 2011.

(32 paras.)

*Civil litigation -- Civil procedure -- Discovery -- Production and inspection of documents --*

*Confidentiality orders -- Privileged documents -- Documents prepared for the purpose of settlement -- Appeal by Black and Conrad Black Corporation from sealing order redacting amounts to be paid by law firm and accounting firm to Hollinger pursuant to proposed settlement agreements dismissed -- After Hollinger, law firm and accounting firm entered into settlement agreement, amounts agreed to be paid were redacted and agreements were distributed to other parties and sealing order was obtained -- Sealing order protected litigation settlement privilege and fostered public interest in settling disputes -- Litigation settlement privilege applied as Hollinger, law firm and accounting firm had legally protected interest in settlement and salutary effects of sealing order outweighed deleterious effects.*

*Bankruptcy and insolvency law -- Proceedings -- Practice and procedure -- Discovery -- Appeal by Black and Conrad Black Corporation from sealing order redacting amounts to be paid by law firm and accounting firm to Hollinger pursuant to proposed settlement agreements dismissed -- After Hollinger, law firm and accounting firm entered into settlement agreement, amounts agreed to be paid were redacted and agreements were distributed to other parties and sealing order was obtained -- Sealing order protected litigation settlement privilege and fostered public interest in settling disputes -- Litigation settlement privilege applied as Hollinger, law firm and accounting firm had legally protected interest in settlement and salutary effects of sealing order outweighed deleterious effects.*

Appeal by Black and Conrad Black Corporation from a sealing order redacting the amounts to be paid by a law firm and an accounting firm to Hollinger Inc pursuant to two proposed settlement agreements. In 2007, Hollinger and two related corporations were granted Companies' Creditor Arrangement Act ("CCAA") protection. Black made a claim against Hollinger in the CCAA proceedings. In addition, he claimed for contribution and indemnity against the law firm and the accounting firm in relation to several claims asserted against him by Hollinger. Hollinger, the law firm and the accounting firm entered into settlement agreements that required court approval. The draft settlement agreements were circulated to all parties with the amounts to be paid redacted. Hollinger, the law firm and the accounting firm brought a motion for a sealing order. The motions judge granted the sealing order, finding that litigation settlement privilege applied and that a sealing order was in the public interest. The sealing order provided for the immediate full disclosure of all terms of the settlements, other than the amounts to be paid, and details as to the manner of payment. In addition, the sealing order provided that any non-settling party could access the redacted information to use in the settlement approval process upon signing a confidentiality agreement. Black and his corporation sought to appeal the sealing order on the basis that the evidence was insufficient to justify a sealing order and departure from the open court principle, that the requirement that a party seeking disclosure of the settlement amounts sign a confidentiality agreement imposed an undue burden, and that the parties to the agreements waived privilege.

HELD: Appeal dismissed. The motions judge made no error in granting the sealing order as it protected litigation settlement privilege and fostered public interest in settling disputes. Litigation

settlement privilege applied as Hollinger, the law firm and the accounting firm had a legally protected interest in the proposed settlement. It was open to the motions judge to find that the salutary effects of the sealing order outweighed its deleterious effects on the right to freedom of expression and the public interest in open and accessible court proceedings. Requiring parties who sought disclosure of the redacted information to sign a confidentiality agreement was not an undue burden as sanctions would only be imposed if the party used the information for an impermissible reason. Finally, as the terms of the order were imposed by the court, abiding by those terms did not result in a waiver of privilege.

**Statutes, Regulations and Rules Cited:**

Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36

**Appeal From:**

On appeal from the order of Justice Colin L. Campbell of the Superior Court of Justice dated February 5, 2011.

**Counsel:**

Earl A. Cherniak Q.C., Kenneth D. Kraft and Jason Squire, for Conrad Black and Conrad Black Capital Corporation.

Paul D. Guy and Faren Bogach, for Daniel Colson.

Michael E. Barrack and Megan Keenberg, for Hollinger Inc.

John Lorn McDougall, Q.C., Norman J. Emblem and Matthew Fleming, for KPMG LLP.

Ronald Foerster, for Torys LLP.

David C. Moore, for Catalyst Fund General Partner I Inc.

George Benchetrit, for the Indenture Trustee.

Lawrence Thacker for Ernst & Young Inc., Monitor.

---

The following judgment was delivered by

**1**   THE COURT:-- Conrad Black and Conrad Black Capital Corporation ("Black") appeal a sealing order redacting the amounts to be paid by the respondents, Torys LLP and KPMG LLP

Canada, to the respondent, Hollinger Inc., pursuant to two proposed settlement agreements. The settlement agreements were made in the context of a *Companies' Creditor Arrangement Act* ("CCAA") proceeding and are subject to court approval. The sealing order provides for the immediate full disclosure of all terms of the settlements, other than the amounts to be paid, and details as to the manner of payment in the Torys agreement. The sealing order further provides that any non-settling party may have access to the redacted information upon signing a confidentiality agreement only to use the redacted information in the settlement approval proceeding. The sealing order terminates upon final approval of the settlements.

**2**    For the following reasons, we reject Black's argument that the sealing order constitutes a serious and unjustified infringement of the open court principle and dismiss the appeal.

**FACTS**

**3**    Hollinger and two related corporations have been granted CCAA protection pursuant to a Commercial List order made in August 2007. The order appoints a Litigation Trustee to deal with the assets available to Hollinger's creditors which consist almost entirely of Hollinger's claims against former officers, directors and advisors, including Black, Torys and KPMG.

**4**    Black asserts a claim against Hollinger in the CCAA proceedings, as well as claims for contribution and indemnity against Torys and KPMG in relation to several claims asserted against him by Hollinger.

**5**    Settlement discussions and mediations between Hollinger, the Litigation Trustee, Torys and KPMG led to two settlement agreements that require court approval. The draft settlement agreements were circulated to all parties with the amounts to be paid by way of settlement redacted. The respondents moved before the judge dealing with the CCAA proceedings for the sealing order that is the subject of this appeal. The crucial paragraph of the affidavit filed by Hollinger in support of that motion reads as follows:

> 21.    In my view, disclosure of the commercially sensitive terms contained in the Settlements and the strategy of the Litigation Trustee and other confidential details relating to Litigation Assets set out in the Litigation Trustee's Report would undermine the Litigation Trustee's initiatives with respect to the remaining Litigation Assets including, without limitation, any possible settlements the Litigation Trustee may reach in respect of any of the remaining Litigation Assets and litigation with KPMG or Torys, in the event that the settlements are not approved.

**6**    The Litigation Trustee's Report has since been disclosed. There was no cross-examination on that affidavit.

**7**    Although the terms of the settlements are not directly at issue on this appeal, Black relies on the

fact that both settlement agreements provide for a "bar order" that would prevent anyone sued by Hollinger; any shareholder, officer, director, or creditor of Hollinger; and any person who could claim rights or interest through Hollinger, from making any claim against Torys or KPMG in relation to the advice given by those parties to Hollinger. Black points out that the bar orders would extinguish his indemnity claims against Torys and KPMG. On the other hand, the respondents submit that the bar orders are economically neutral for Black and other non-settling defendants. This is because Hollinger waives its right to claim joint and several liability with respect to shared liability between settling and non-settling defendants if the non-settling defendant can establish a right to contribution and indemnity from a settling defendant.

## DECISION OF THE MOTION JUDGE

**8**    The motion judge found that litigation settlement privilege applied to the terms of the two settlement agreements. He concluded that the onus to establish that a sealing order protecting the confidentiality of the amounts of the settlements was in the public interest had been satisfied and that the test set out in *Sierra Club of Canada v. Canada (Minister of Finance)*, [2002] 2 S.C.R. 522 ("*Sierra Club*") had been met.

**9**    On the motion judge's suggestion, the sealing order included a "comeback" clause, permitting any party affected by the settlement motion to request relief from the sealing order if it operated in a manner that would prevent that party from making full submissions as to the approval of the settlement.

## ISSUES

**10**    Black submits:

1.    That the evidence was insufficient to justify a sealing order and departure from the open court principle;

2.    That the requirement that a party seeking disclosure of the settlement amounts must sign a confidentiality agreement imposes an undue burden; and

3.    That the respondents have waived privilege.

## ANALYSIS

### 1. Sufficiency of the evidence to justify a sealing order.

**11**    It is common ground that the motion judge applied the correct legal test, namely that laid down by the Supreme Court of Canada in *Sierra Club* at para. 53:

A confidentiality order ... should only be granted when:

(a)    such an order is necessary in order to prevent a serious risk to an important
       interest, including a commercial interest, in the context of litigation
       because reasonably alternative measures will not prevent the risk; and

(b)    the salutary effects of the confidentiality order, including the effects on the
       right of civil litigants to a fair trial, outweigh its deleterious effects,
       including the effects on the right to free expression, which in this context
       includes the public interest in open and accessible court proceedings.

**12**    Before us, there were two significant concessions.

**13**    First, the respondents indicated that they place no reliance upon the portions of the Litigation
Trustee's affidavit referring to the "commercial sensitivity" of the redacted terms of the settlement.
They rely solely upon the evidence that public disclosure of the settlement amounts before the
agreements had been approved "would undermine the Litigation Trustee's initiatives with respect to
... litigation with KPMG or Torys, in the event that the settlements are not approved."

**14**    Second, Black conceded that his attack on the terms of the sealing order rests on the open
court principle and that he does not assert that the terms of the sealing order give rise to any
procedural disadvantage.

**15**    The respondents assert that their interest in maintaining the confidentiality of the amounts of
the proposed settlements falls squarely within litigation settlement privilege. Simply put, the
respondents say that should the settlement agreements not be approved, they would be unfairly
prejudiced in the litigation that would follow if they had to disclose publicly the amounts they were
prepared to pay or accept in settlement of the claims asserted by the Litigation Trustee.

**16**    It is well established that in order to foster the public policy favouring the settlement of
litigation, the law will protect from disclosure communications made where;

    1)    there is a litigious dispute;

    2)    the communication has been made "with the express or implied intention it
       would not be disclosed in a legal proceeding in the event negotiations failed;"
       and

    3)    the purpose of the communication is to attempt to effect a settlement: see Bryant,
       Lederman & Fuerst, *The Law of Evidence in Canada*, 3d ed. (Markham:
       LexisNexis, 2009) at p. 1033, s. 14.322); *Inter-Leasing Inc. v. Ontario (Minister
       of Finance)* (2009), 256 O.A.C. 83 (Div. Ct.).

**17**    We agree with the motion judge that those conditions are met here. We see no error in the
motion judge's conclusion that "[l]itigation settlement privilege ... applies in this case at least until
the Court either accepts or rejects the settlement". In the context of this case, Hollinger, Torys and
KPMG have a legally protected interest in being afforded a zone of confidentiality to shelter the
most sensitive aspect of their proposed settlement.

**18**    The sealing order protects litigation settlement privilege and thereby fosters the strong public interest in the settlement of disputes and the avoidance of litigation. "This policy promotes the interests of litigants generally by saving them the expense of trial of disputed issues, and it reduces the strain upon an already overburdened provincial Court system," (*Kelvin Energy Ltd. v. Lee*, [1992] 3 S.C.R. 235, at p. 259, citing *Sparling v. Southam Inc.* (1988), 66 O.R. (2d) 225 (Ont. H.C.), at p. 28 (emphasis added by the Supreme Court)).

**19**    The rationale for litigation settlement privilege is that unless parties have an assurance that their efforts to negotiate a resolution will not be used against them in litigation should they fail to resolve their dispute, they will be reluctant to engage in the settlement process in the first place. A legal rule that created a disincentive of that nature would run contrary to the public policy favouring settlements.

**20**    We agree with the respondents that litigation settlement privilege constitutes a social value of super-ordinate importance capable of justifying a sealing order that limits the open court principle.

**21**    In our view, it was open to the motion judge to conclude under the *Sierra* test that the salutary effects of the sealing order outweighed its deleterious effects on the important right to free expression and the public interest in open and accessible court proceedings.

**22**    While the evidence led in support of the sealing order is limited to a bald statement that full disclosure of the terms of the settlement agreement "would undermine the Litigation Trustee's initiatives with respect to ... litigation with KPMG or Torys, in the event that the settlements are not approved," in light of the strong public policy favouring settlements and the recognized privilege that protects the confidentiality of settlement discussions, the motion judge did not err in concluding that the evidence was sufficient to satisfy the onus under the *Sierra* test.

**23**    We agree with the respondents that the motion judge's sealing order was a minimal intrusion on the open court principle and on the procedural rights of the non-settling parties. The sealing order protected only the amounts of the settlements and it gave the non-settling parties ready access to the amounts of the settlement upon signing a confidentiality agreement. The "come back" clause allowed any party to return to court for a reassessment of the need for the sealing order should the circumstances change.

**24**    We do not accept Black's submission that these are concluded agreements for which the litigation settlement privilege is spent. The settlement agreements at issue here have no legal effect until they are approved. In the context of this litigation and these settlement discussions, we are satisfied that just as the threat of disclosure of pre-resolution discussions would likely discourage parties from attempting to settle, so too would the threat of disclosure of their tentative settlement requiring court approval. We add, however, that our conclusion on the privileged nature of a settlement requiring court approval is based on the facts and circumstances of this case, and we leave to another day the issue of whether the privilege always attaches to other settlements requiring court approval, for example, class action settlements or infant settlements, where different values

and considerations may apply.

**25**    Nor do we agree with Black's argument that because the litigation settlement privilege would still prevent any party from introducing the terms of the settlement into evidence in any trial that might follow should the court not approve the settlements, the information can now be made available to the public at large. We know of no authority that limits the reach of litigation settlement privilege in this manner. Moreover, the argument that no harm could flow from full public disclosure appears to us to ignore the practical reality that allowing for full public disclosure of all terms of the settlement agreements prior to court approval would have a very perverse effect on the desired incentives to engage in settlement discussions in the context of high stakes, high profile litigation.

### 2. Did the confidentiality agreement impose an undue burden?

**26**    We see no merit in the submission that Black's right to obtain disclosure of the settlement amounts was unduly burdened by the term of the sealing order requiring him to sign a confidentiality agreement as a pre-condition to disclosure. This term of the sealing order protects the non-settling parties' procedural right to have full access to the terms of the settlement agreements while maintaining the protection of the litigation settlement privilege. It is only if Black uses the privileged information for some improper purpose that he would face the prospect of some sanction for breach. Contrary to the submission that that sanction would inevitably be "draconian," it would be a matter for the discretion of the court to decide an appropriate sanction in the circumstances and we see no reason to fear that the court would decide to impose a sanction that did not fit the circumstances of the case.

**27**    We add here that we do not consider the terms of the bar orders relevant to the issue of the sealing order. Neither the motion judge nor this court was asked to pass upon the appropriateness of the bar orders at this stage and as the sealing order allows Black to obtain full disclosure of the terms of the settlement, Black suffers no disadvantage if he chooses to challenge the settlement on the ground that the bar orders should not be approved.

### 3. Did the respondents waive privilege?

**28**    Black submits that by putting virtually all of the terms of the settlements on the public record and by disclosing the redacted portions of the settlement agreements to those non-settling parties who sign confidentiality agreements, the respondents have waived privilege.

**29**    We disagree. These terms were imposed by court order (albeit at the suggestion of the parties) and we fail to see how or why abiding by the terms of a court order should result in a finding that a party has waived privilege. Moreover, in our view, this argument is inconsistent with Black's purported reliance on the open court principle as requiring disclosure of the settlement amounts. The terms of the order said to amount to a waiver of privilege were plainly motivated to ensure that the sealing order was minimally intrusive on the open court principle. To accept Black's submission

that those terms of the order constitute waiver would be to require sealing orders to be more restrictive than necessary to protect the public interest in fostering settlements. Such a rule would be self-defeating and contrary to the public interest in open access to court proceedings.

### 4. Conclusion

**30**    We conclude that the sealing order strikes an appropriate balance between the public interest in the promotion of settlements and the public interest in the open court principle:

> (i)    the public interest in the promotion of settlements and the protection of settlement privileged information and communications is met by the sealing of the redacted portions of the settlement agreements from the public record; and
>
> (ii)    the public interest in the open court principle is met by the public disclosure of all but the redacted terms of the settlement agreements, and the time-limited nature of the sealing order, lasting only so long as the settlements remain contingent on court approval.

**31**    In addition, the sealing order strikes the appropriate balance between the competing private interests of the parties:

> (i)    the settling parties' interest in maintaining the confidentiality of their privileged information is met by the sealing of the redacted portions of the Settlement Agreements;
>
> (ii)    the interests of all non-settling defendants (including Black) are met by the approval of the confidentiality agreement provision affording them access to the redacted portions of the settlement agreements and thereby enabling them to respond meaningfully to the settlement approval motion.

### DISPOSITION

**32**    The appeal is dismissed. In accordance with the agreement of counsel, the respondents Hollinger, Torys and KPMG are entitled to costs of $10,000 each, inclusive of disbursements and applicable taxes.

S.T. GOUDGE J.A.
R.J. SHARPE J.A.
A. KARAKATSANIS J.A.

cp/e/qllxr/qljxr/qlmll/qlkjg/qlhcs/qlgpr/qlhcs/qlcas/qlcas

# TAB 11

*Indexed as:*
## Canada v. Solosky

**William (Billy) Solosky (Plaintiff), Appellant; and
Her Majesty The Queen (Defendant), Respondent.**

[1980] 1 S.C.R. 821

Supreme Court of Canada

1979: June 13 / 1979: December 21.

**Present: Laskin C.J. and Martland, Ritchie, Pigeon, Dickson,
Beetz, Estey, Pratte and McIntyre JJ.**

ON APPEAL FROM THE FEDERAL COURT OF APPEAL

*Prisons -- Censorship of prisoners' mail -- Right of prison inmates to communicate in confidence
with their solicitors -- Solicitor-client privilege -- Inmate failing to establish entitlement to a
declaration -- Penitentiary Service Regulations, SOR/62-90 -- Canadian Bill of Rights, 1960 (Can.),
c. 44, ss. 1(b), (d), 2(c)(ii).*

The appellant, imprisoned at Millhaven Institution, commenced an action in the Federal Court of
Canada for a declaration that "properly identified items of correspondence directed to and received
from his solicitor shall henceforth be regarded as privileged correspondence and shall be forwarded
to their respective destinations unopened". The action was dismissed and on appeal to the Federal
Court of Appeal the pleadings were amended to request a declaration "..... that henceforth all
properly identified items of solicitor-client correspondence should be forwarded to their respective
destinations unopened". The appeal failed, and at the opening of the appeal in this Court counsel for
the appellant moved to substitute, for the prayer for relief in the statement of claim, a declaration
that the order of the Director of Millhaven Institution that the appellant's mail be opened and read
"insofar as it has been applied to mail originating from his solicitor David Cole, and to mail written
by the Plaintiff to his solicitor David Cole, is not authorized by law".

In accordance with the Penitentiary Act, R.S.C. 1970, c. P-6, and Regulations thereunder, an
institutional head of a penitentiary may order censorship of inmate correspondence to the extent
considered necessary or desirable for the rehabilitation of the inmate or the security of the

institution. The main ground upon which the appellant rested his case was solicitor-client privilege.

     Held:   The appeal should be dismissed.

Contrary to the views expressed by the Court below, the important issues raised in this case should not be determined by the particular form of wording employed in the prayer for relief, or on the basis that the question is hypothetical.

There could be no doubt that there was a real, and not a hypothetical, dispute between the parties. The declaration sought was a direct and present challenge to the censorship order of the Director of Millhaven Institute. That order, so long as it continues, from the past through the present and into the future, is in controversy. The fact that a declaration today cannot cure past ills, or may affect future rights, cannot of itself, deprive the remedy of its potential utility in resolving the dispute over the Director's continuing order. Once one accepts that the dispute is real and that the granting of judgment is discretionary, then the only further issue is whether the declaration is capable of having any practical effect in resolving the issues in the case. The determination of the right of prison inmates to correspond, freely and in confidence with their solicitors, is of great practical importance, although, admittedly, any such determination relates to correspondence not yet written. However poorly framed the prayer for relief may be, even as twice amended, the present claim was clearly directed to the procedures for handling prison mail and the invocation in relation thereto of solicitor-client privilege.

Recent case law has taken the traditional doctrine of solicitor-client privilege and placed it on a new plane. Privilege is no longer regarded merely as a rule of evidence which acts as a shield to prevent privileged materials from being tendered in evidence in a court room. The courts, unwilling to so restrict the concept, have extended its application well beyond those limits. However, while there is no question that the Canadian courts have been moving towards a broader concept of solicitor-client privilege, the concept has not been stretched far enough to save the appellant's case. Although there has been a move away from treating solicitor-client privilege as a rule of evidence that can only be asserted at the time the privileged material is sought to be introduced as evidence, the move from rigid temporal restrictions has not gone as far as the appellant contends. The appellant's suggestion that privilege has come to be recognized as a "fundamental principle", more properly characterized as a "rule of property", was not accepted. Without the evidentiary connection, which the law now requires, the privilege cannot be invoked.

The statutory disciplinary regime, described in this case, does not derogate from the common law doctrine of solicitor and client privilege, as presently conceived, but the appellant was seeking in this appeal something well beyond the limits of the privilege, even as amplified in modern cases.

In aid of his main submission, appellant argued faintly that the Penitentiary Service Regulations and Commissioner's Directive should not be construed and applied so as to abrogate, abridge, or infringe any of the rights or freedom recognized in the Canadian Bill of Rights by s. 1(b) (the right

of the individual to equality before the law and the protection of the law), 1(d) (freedom of speech) and 2(c)(ii) (the right of a person arrested or detained to retain and instruct counsel without delay). This argument also failed.

One could depart from the current concept of privilege and approach the case on the broader basis that (i) the right to communicate in confidence with one's legal adviser is a fundamental civil and legal right, founded upon the unique relationship of solicitor and client, and (ii) a person confined to prison retains all of his civil rights, other than those expressly or impliedly taken from him by law. In that context, the Court was faced with the interpretation of the Penitentiary Service Regulations and Commissioner's Directive No. 219.

It was submitted there are three alternative interpretations of the scope of Regulations 2.17 and 2.18 which may govern the extent of the authority of the institutional head in dealing with an envelope which appears to have originated from a solicitor, or to be addressed to a solicitor, in circumstances where the institutional head has reason to believe that the unrestricted and unexamined passage of mail to or from the particular inmate in question represents a danger to the safety and security of the institution. The third such interpretation was as follows: "he may order that the envelope be subject to opening and examination to the minimum extent necessary to establish whether it is properly the subject of solicitor-client privilege". This alternative represents that interpretation of the scope of the Regulations which permits to an inmate the maximum opportunity to communicate with his solicitor through the mails that is consistent with the requirement to maintain the safety and security of the institution.

The "minimum extent necessary to establish whether it is properly the subject of solicitor-client privilege" should be interpreted in such manner that (i) the contents of an envelope may be inspected for contraband; (ii) in limited circumstances, the communication may be read to ensure that it, in fact, contains a confidential communication between solicitor and client written for the purpose of seeking or giving legal advice; (iii) the letter should only be read if there are reasonable and probable grounds for believing the contrary, and then only to the extent necessary to determine the bona fides of the communication; (iv) the authorized penitentiary official who examines the envelope, upon ascertaining that the envelope contains nothing in breach of security, is under a duty at law to maintain the confidentiality of the communication.

Per Estey J.: As to the above item (iii) in the catalogue of considerations in the interpretation of the expression "minimum extent necessary to establish whether it is properly the subject of solicitor-client privilege", any procedure adopted with reference to the scrutiny of letters passing from solicitor to client should, wherever reasonably possible, recognize the solicitor-client privilege long established in the law.

**Cases Cited**

[Mellstrom v. Garner, [1970] 1 W.L.R. 603, distinguished; Russian Commercial and Industrial Bank v. British Bank for Foreign Trade Ltd., [1921] 2 A.C. 438; Pyx Granite Co. v. Ministry of

Housing and Local Government, [1958] 1 Q.B. 554; Pharmaceutical Society of Great Britain v. Dickson, [1970] A.C. 403; Re Director of Investigation and Research and Shell Canada Ltd. (1975), 22 C.C.C. (2d) 70; Greenough v. Gaskell (1833), 39 E.R. 618; Anderson v. Bank of British Columbia (1876), 2 Ch. 644; Re Director of Investigation and Research and Canada Safeway Ltd. (1972), 26 D.L.R. (3d) 745; Re Presswood et al. and International Chemalloy Corp. (1975), 65 D.L.R. (3d) 228; Re Borden and Elliot and The Queen (1975), 30 C.C.C. (2d) 337; Re BX Development Inc. and The Queen (1976), 31 C.C.C. (2d) 14; Re B and The Queen (1977), 36 C.C.C. (2d) 235, referred to.]

APPEAL from a judgment of the Federal Court of Appeal [[1978] 2 F.C. 632, 86 D.L.R. (3d) 316], dismissing an appeal from a judgment of Addy J. who dismissed the appellant's application for a declaration. Appeal dismissed.

Ronald Price, Q.C., and David P. Cole, for the appellant. E. Bowie and J.-Paul Malette, for the respondent.

Solicitor for the plaintiff, appellant: David P. Cole, Toronto.
Solicitor for the defendant, respondent: Roger Tassé, Ottawa.

---

The judgment of Laskin C.J. and Martland, Ritchie, Pigeon, Dickson, Beetz, Pratte and McIntyre JJ. was delivered by

**DICKSON J.**:-- This case concerns the censorship of prisoners' mail and the right of an inmate of a federal penitentiary to communicate in confidence with his solicitor. The appellant, imprisoned at Millhaven Institution, commenced an action in the Federal Court for a declaration that "properly identified items of correspondence directed to and received from his solicitor shall henceforth be regarded as privileged correspondence and shall be forwarded to their respective destinations unopened".

I

Prison Disciplinary Regime

The penitentiary authorities rely upon the following statutes and Regulations as authorizing restrictions upon the personal correspondence of prison inmates. Section 660(1) of the Criminal Code, R.S.C. 1970, c. C-34, provides that a sentence of imprisonment shall be served in accordance with the enactments and rules that govern the institution to which the prisoner is sentenced. Section 29(1) of the Penitentiary Act, R.S.C. 1970, c. P-6, empowers the Governor in Council to make

regulations for the custody, treatment, training, employment, and discipline of inmates, and, generally, for carrying into effect the purposes and provisions of The Penitentiary Act. Section 29(3) authorizes the Commissioner of Penitentiaries to make rules, known as Commissioner's directives, for the custody, treatment, training, employment, and discipline of inmates, and the good government of penitentiaries.

Pursuant to the foregoing, Penitentiary Service Relations SOR/62-90, were passed, which provide in part, as follows:

### Institutional Heads

1.12(1)The institutional head is responsible for the direction of his staff, the organization, safety and security of his institution and the correctional training of all inmates confined therein.

### Visiting and Correspondence

2.17

The visiting and correspondence privileges that may, in accordance with directives, be permitted to inmates shall be such as are, in all the circumstances, calculated to assist in the reformation and rehabilitation of the inmate.

### Censorship

2.18

In so far as practicable the censorship of correspondence shall be avoided and the privacy of visits shall be maintained, but nothing herein shall be deemed to limit the authority of the Commissioner to direct or the institutional head to order censorship of correspondence or supervision of visiting to the extent considered necessary or desirable for the reformation and rehabilitation of inmates or the security of the institution.

It will be observed then that the Regulations, the validity of which are not challenged by the appellant, expressly recognize the authority of the institutional head of a penitentiary to order censorship of inmate correspondence to the extent considered necessary or desirable for the security of the institution. These Regulations are implemented by Commissioner's Directive No. 219 (as amended following the date of issuance of the statement of claim in these proceedings, but prior to the date of trial). The following paragraphs are pertinent to the present inquiry:

Directive

5.a.    Penitentiary staff shall promote and facilitate correspondence between inmates and their
families, friends, and other individuals and agencies who can be expected to make a contri-
bution to the inmate's rehabilitation within the institution and to assist in his subsequent
and eventual return to the community.

c.    Subject to the provisions of paragraph 14 every inmate shall be permitted
to correspond with any person, and shall be responsible for the contents of
every article of correspondence of which he is the author. There shall be no
restriction to the number of letters sent or received by inmates, unless it is
evident that there is mass production.

Paragraph 5 d. makes provision for inspection for contraband, in these terms:

d.    Subject to the provisions of paragraph 8, every item of correspondence to
or from an inmate may be opened by institutional authorities for inspection
for contraband.

Censorship, dealt with in para. 7, is defined as any examination (other than for the express purpose
of searching for contraband) and includes the reading, reproducing, extracting, or withdrawing of
inmate correspondence. Paragraph 7 b. makes the point that censorship in any form is to be avoided,
but reserves to the Commissioner of Penitentiaries and to the Institutional Director the authority to
censor for one of two purposes, the rehabilitation of the inmate, or the security of the institution.
Paragraph 7 b. reads:

Censorship of correspondence in any form shall be avoided, but nothing herein
shall be deemed to limit the authority of the Commissioner to direct, or the
Institutional Director to order, censorship of correspondence in any form, to the
extent considered necessary or desirable for the rehabilitation of the inmate or the
security of the institution. (PSR 2.18). Any form of censorship shall be
undertaken only with the approval of the Institutional Director.

The Directive seeks to maintain the confidentiality of the contents of correspondence. Paragraph 7
c. states that only authorized staff shall be allowed to read inmate mail, when necessary, and further
provides that no comments, other than those required for official duties, shall be made to other
members of the staff on the contents of the correspondence.

Paragraph 8 of Directive 219 speaks of "privileged correspondence", defined as "properly
identified and addressed items directed to and received from" any of a lengthy list of persons
including, among others, members of the Senate, members of the House of Commons, members of

provincial legislatures, and provincial ombudsmen. Conspicuous is the absence of any reference to inmates' legal representatives. Privileged correspondence is forwarded to the addressee unopened with the proviso that in exceptional cases, where institutional staff suspect contraband in such privileged correspondence, the Commissioner's approval shall be obtained before it is opened. Paragraph 8 clearly countenances the maintenance of uncensored channels of mail for complaints and grievances. But the restricted listing of destinations assures that the channels through which grievances pass are limited to internal procedures (Solicitor General, Commissioner of Penitentiaries, Correctional Investigator) or political outlets (Members of Parliament and Senators). Lawyers are mentioned in paragraph 10 c. of Directive No. 219, "Use of Telephone and Telegraph", which reads:

> c. In urgent cases where lawyers call their inmate clients, and wish to communicate privately with them, the institutional authorities shall ask the lawyer to leave his name and telephone number and, following verification of the lawyer's identity, a call shall originate from the institution.

For the purposes of trial, an agreed statement of facts was filed. Paragraphs 4 and 5 of the statement are in the following terms:

> 4. Pursuant to section 6 paragraph (b) [s. 7(b), as amended,] of Directive No. 219, John Dowsett, Director of Millhaven Institution has ordered that William (Billy) Solosky's mail be opened and read. This order has been applied to mail originating from his solicitor David Cole.
>
> 5. William (Billy) Solosky's mail is being read because it is John Dowsett's opinion that William (Billy) Solosky's conduct, activities and attitude cause him to believe that attention should be paid to his incoming and outgoing correspondence. Those letters which are deemed to be significant with respect to the security of the institution are being brought to the attention of John Dowsett.

Paragraph 5 of the statement of defence clarifies any obscurity in para. 5 of the agreed statement of facts. The statement of defence reads "The security of the Millhaven Institution has required that the Plaintiff's mail be opened."

II

Judicial History

Mr. Justice Addy, at trial, was of the view that solicitor and client privilege, upon which the appellant founds his case, can only be claimed document by document and that each document is privileged only to the extent it meets the criteria which would support the privilege. Whether a letter does, in fact, contain a privileged communication cannot be determined until it has been opened and read. There is no logical nor legal justification for permitting correspondence which appears to have emanated from, or to be addressed to, a solicitor to enjoy any special aura of protection. Mr. Justice

Addy relied upon these propositions in dismissing the appellant's action, with costs. He buttressed his conclusion by the argument that in this situation it would be too easy for a person to obtain envelopes and letterheads bearing the name and title of a real or fictitious solicitor, and equally as easy for a prisoner to camouflage the true identity of an addressee.

The appellant appealed to the Federal Court of Appeal. In that Court, his counsel amended the pleadings to request a declaration "... that henceforth all properly identified items of solicitor-client correspondence should be forwarded to their respective destinations unopened". The revised form of declaration differs little from that appearing in the amended statement of claim. Both are defective, at least to this extent--it is not every item of correspondence passing between solicitor and client to which privilege attaches, for only those in which the client seeks the advice of counsel in his professional capacity, or in which counsel gives advice, are protected. That a privilege may not encompass all solicitor and client communications is clearly illustrated by the correspondence exhibited in the present case. Some of the letters concerned the appellant's parole review. Others merely contained criticism of the administration, information about other inmates, and prison gossip. One letter enclosed a second letter with the request that the second letter be forwarded to a named magazine for publication.

The Federal Court of Appeal dismissed the appeal, holding that a declaration that all correspondence between the appellant and his solicitor be declared privileged would extend considerably the ambit of the solicitor-client privilege as it is generally known and understood. To grant the declaration sought would be to give to the appellant an extension of the privilege afforded to the ordinary citizen. As a second ground for rejecting the appeal, the Court held that by issuing an order relating to correspondence not yet written, the court would be granting relief on the basis of purely hypothetical issues, and in futuro. Assuming jurisdiction, the case was not one where jurisdiction should be asserted.

III

Declaratory Relief

At the opening of the appeal in this Court, counsel for the appellant moved to substitute, for the prayer for relief in the statement of claim, a declaration that the order of the Director of Millhaven Institution that the appellant's mail be opened and read "insofar as it has been applied to mail originating from his solicitor David Cole, and to mail written by the Plaintiff to his solicitor David Cole, is not authorized by law". The amended form of prayer seems to have been conceived with a view to meeting the point, taken by the Federal Court of Appeal, that the relief earlier sought would relate to letters not yet written.

With great respect for the views expressed in the Federal Court of Appeal, I do not think that the important issues raised in these proceedings should be determined by the particular form of wording employed in the prayer for relief, or on the basis that the question is hypothetical.

Declaratory relief is a remedy neither constrained by form nor bounded by substantive content, which avails persons sharing a legal relationship, in respect of which a 'real issue' concerning the relative interests of each has been raised and falls to be determined.

The principles which guide the court in exercising jurisdiction to grant declarations have been stated time and again. In the early case of Russian Commercial and Industrial Bank v. British Bank for Foreign Trade Ltd. [ [1921] 2 A.C. 438], in which parties to a contract sought assistance in construing it, the Court affirmed that declarations can be granted where real, rather than fictitious or academic, issues are raised. Lord Dunedin set out this test (at p. 448):

> The question must be a real and not a theoretical question, the person raising it must have a real interest to raise it, he must be able to secure a proper contradictor, that is to say, someone presently existing who has a true interest to oppose the declaration sought.

In Pyx Granite Co. Ltd. v. Ministry of Housing and Local Government [[1958] 1 Q.B. 554], (rev'd [1960] A.C. 260, on other grounds), Lord Denning described the declaration in these general terms (p. 571):

> ... if a substantial question exists which one person has a real interest to raise, and the other to oppose, then the court has a discretion to resolve it by a declaration, which it will exercise if there is good reason for so doing.

The jurisdiction of the court to grant declaratory relief was again stated, in the broadest language, in Pharmaceutical Society of Great Britain v. Dickson [[1970] A.C. 403 (H.L.), a case in which the applicant sought a declaration that a proposed motion of the pharmaceutical society, if passed, would be ultra vires its objects and in unreasonable restraint of trade. In the course of his judgment, Lord Upjohn stated, at p. 433:

> A person whose freedom of action is challenged can always come to the court to have his rights and position clarified, subject always, of course, to the right of the court in exercise of its judicial discretion to refuse relief in the circumstances of the case.

In the instant case, Mellstrom v. Garner [ (1970), 1 W.L.R. 603], was cited in the Federal Court of Appeal in support of the proposition that courts will not grant declarations regarding the future. There, a chartered accountant and former partner of the defendant sought a declaration as to the true construction of the agreement by which the partnership had been dissolved. The plaintiff asked whether, having regard to a clause in the agreement, he would be in breach were he to solicit clients or business of the 'continuing partners'. Karminski L.J. held that declarations concerning the future ought to be approached with considerable reserve. Since neither the plaintiff nor the defendants had broken the provisions of the clause in question, nor sought to do so, there was no useful purpose to be gained in granting the declaration. The application was dismissed. That is a

very different case from the present one.

As Hudson suggests in his article, "Declaratory Judgments in Theoretical Cases: The Reality of the Dispute" (1977), 3 Dal.L.J. 706:

> The declaratory action is discretionary and the two factors which will influence the court in the exercise of its discretion are the utility of the remedy, if granted, and whether, if it is granted, it will settle the questions at issue between the parties.

The first factor is directed to the "reality of the dispute". It is clear that a declaration will not normally be granted when the dispute is over and has become academic, or where the dispute has yet to arise and may not arise. As Hudson stresses, however, one must distinguish, on the one hand, between a declaration that concerns "future" rights and "hypothetical" rights, and, on the other hand, a declaration that may be "immediately available" when it determines the rights of the parties at the time of the decision together with the necessary implications and consequences of these rights, known as future rights. (p. 710)

Here there can be no doubt that there is a real and not a hypothetical, dispute between the parties. The declaration sought is a direct and present challenge to the censorship order of the Director of Millhaven Institute. That order, so long as it continues, from the past through the present and into the future, is in controversy. The fact that a declaration today cannot cure past ills, or may affect future rights, cannot of itself, deprive the remedy of its potential utility in resolving the dispute over the Director's continuing order.

Once one accepts that the dispute is real and that the granting of judgment is discretionary, then the only further issue is whether the declaration is capable of having any practical effect in resolving the issues in the case.

The determination of the right of prison inmates to correspond, freely and in confidence with their solicitors, is of great practical importance, although, admittedly, any such determination relates to correspondence not yet written.

However poorly framed the prayer for relief may be, even as twice amended, the present claim is clearly directed to the procedures for handling prison mail and the invocation in relation thereto of solicitor-client privilege. It is not directed to the characterization of specific and individual items of correspondence. If the appellant is entitled to a declaration, it is within this Court's discretion to settle the wording of the declaration: see de Smith, Judicial Review of Administrative Action (3rd ed. 1973, p. 431). Further, s. 50 of the Supreme Court Act allows the Court to make amendments necessary to a determination of the "real issue", without application by the parties.

IV

Solicitor-Client Privilege

As I have indicated, the main ground upon which the appellant rests his case is solicitor-client privilege. The concept of privileged communications between a solicitor and his client has long been recognized as fundamental to the due administration of justice. As Jackett C.J. aptly stated in Re Director of Investigation and Research and Shell Canada Ltd. [(1975), 22 C.C.C. (2d) 70, [1975] F.C. 184], at pp. 78-9:

> ... the protection, civil and criminal, afforded to the individual by our law is
> dependent upon his having the aid and guidance of those skilled in the law
> untrammelled by any apprehension that the full and frank disclosure by him of all
> his facts and thoughts to his legal advisor might somehow become available to
> third persons so as to be used against him.

The history of the privilege can be traced to the reign of Elizabeth I (see Berd v. Lovelace [(1577), 21 E.R. 33] and Dennis v. Codrington [(1580), 21 E.R. 53]). It stemmed from respect for the 'oath and honour' of the lawyer, dutybound to guard closely the secrets of his client, and was restricted in operation to an exemption from testimonial compulsion. Thereafter, in stages, privilege was extended to include communications exchanged during other litigation, those made in contemplation of litigation, and finally, any consultation for legal advice, whether litigious or not. The classic statement of the policy grounding the privilege was given by Brougham L.C. in Greenough v. Gaskell [(1833), 39 E.R. 618], at p. 620:

> The foundation of this rule is not difficult to discover. It is not (as has
> sometimes been said) on account of any particular importance which the law
> attributes to the business of legal professors, or any particular disposition to
> afford them protection (though certainly it may not be very easy to discover why
> a like privilege has been refused to others, and especially to medical advisers).

> But it is out of regard to the interests of justice, which cannot be upholden,
> and to the administration of justice, which cannot go on without the aid of men
> skilled in jurisprudence, in the practice of the courts, and in those matters
> affecting rights and obligations which form the subject of all judicial
> proceedings. If the privilege did not exist at all, every one would be thrown upon
> his own legal resources. Deprived of all professional assistance, a man would not
> venture to consult any skilful person, or would only dare to tell his counsellor
> half his case.

The rationale was put this way by Jessel M.R. in Anderson v. Bank of British Columbia [(1976), 2 Ch. 644], at p. 649:

> The object and meaning of the rule is this: that as, by reason of the complexity

and difficulty of our law, litigation can only be properly conducted by professional men, it is absolutely necessary that a man, in order to prosecute his rights or to defend himself from an improper claim, should have resource to the assistance of professional lawyers, and it being so absolutely necessary, it is equally necessary, to use a vulgar phrase, that he should be able to make a clean breast of it to the gentleman whom he consults with a view to the prosecution of his claim, or the substantiating of his defence against the claim of others; that he should be able to place unrestricted and unbounded confidence in the professional agent, and that the communications he so makes to him should be kept secret, unless with his consent (for it is his privilege, and not the privilege of the confidential agent), that he should be enabled properly to conduct his litigation.

Wigmore [8 Wigmore, Evidence (McNaughton rev. 1961) para. 2292] framed the modern principle of privilege for solicitor-client communications, as follows:

Where legal advice of any kind is sought from a professional legal adviser in his capacity as such, the communications relating to the purpose made in confidence by the client are at his instance permanently protected from disclosures by himself or by the legal adviser, except the protection be waived.

There are exceptions to the privilege. The privilege does not apply to communications in which legal advice is neither sought nor offered, that is to say, where the lawyer is not contacted in his professional capacity. Also, where the communication is not intended to be confidential, privilege will not attach, O'Shea v. Woods [[1891] P. 286], at p. 289. More significantly, if a client seeks guidance from a lawyer in order to facilitate the commission of a crime or a fraud, the communication will not be privileged and it is immaterial whether the lawyer is an unwitting dupe or knowing participant. The classic case is R. v. Cox and Railton [(1884), 14 Q.B.D. 153], in which Stephen J. had this to say (p. 167): "A communication in furtherance of a criminal purpose does not 'come in the ordinary scope of professional employment'."

Recent case law has taken the traditional doctrine of privilege and placed it on a new plane. Privilege is no longer regarded merely as a rule of evidence which acts as a shield to prevent privileged materials from being tendered in evidence in a court room. The courts, unwilling to so restrict the concept, have extended its application well beyond those limits. See Re Director of Investigation and Research and Canada Safeway Ltd. [(1972), 26 D.L.R. (3d) 745 (B.C.S.C.)]; Re Director of Investigation and Research and Shell Canada Ltd., supra: Re Presswood et al. and International Chemalloy Corp. [(1975), 65 D.L.R. (3d) 228 (Ont. N.C.)], Re Borden and Elliot and The Queen [(1975), 30 C.C.C. (2d) 337], (affirmed on other grounds [(1975), 30 C.C.C. (2d) 345 (Ont. C.A.)]; Re BX Development Inc. and The Queen [(1976), 31 C.C.C. (2d) 14 (B.C.C.A.)]; Re B and The Queen [(1977), 36 C.C.C. (2d) 235 (Ont. Prov. Ct.)].

While there is no question that the Canadian courts have
been moving towards a broader concept of solicitor-client
privilege, I do not think the concept has been stretched far
enough to save the appellant's case. Although there has been a
move away from treating solicitor-client privilege as a rule
of evidence that can only be asserted at the time the
privileged material is sought to be introduced as evidence,
the move from rigid temporal restrictions has not gone as far
as the appellant contends. In the factum of the appellant, it
is suggested that the privilege has come to be recognized as a
"fundamental principle", more properly characterized as a
"rule of property". The cases cited in support of this
proposition, however, all involved search warrants that caught
documents to which the privilege unquestionably attached. In
those cases, such as Re Borden & Elliot and The Queen, supra,
the search warrant led to the seizure of documents believed
"to afford evidence." If privilege were to attach to the
documents, then such material could not afford evidence at
trial and hence the evidentiary connection remained.
The judgments can be rationalized as merely shifting the time
at which the privilege can be asserted. As the comment by
Kasting in (1978), 24 McGill L.J. 115, "Recent Developments in
the Law of Solicitor-Client Privilege" suggests, the shift
away from the strict rule-of-evidence-at-trial approach has
taken place by logical extensions. Chassé, in his annotation
at (1977), 36 C.R.N.S. 349, The Solicitor-Client Privilege and
Search Warrants, asserts that the privilege is being looked
upon "as more akin to a rule of property rather than merely as
a rule of evidence" (p. 350), but the privilege, in my view,
is not yet near a rule of property. That is what the privilege
must become if the appellant is to succeed.

There is no suggestion in the materials in the case at bar that the authorities intend to employ
the letters or extracts obtained therefrom as evidence in any proceeding of any kind. Much as one
might well wish to analogize from the search warrant cases to the censorship order here impugned,
as a form of blanket search warrant upon appellant's mail, the order cannot be characterized as being
directed to obtaining or affording evidence in any proceeding. Without the evidentiary connection,
which the law now requires, the appellant cannot invoke the privilege.

As Mr. Justice Addy notes, privilege can only be claimed document by document, with each
document being required to meet the criteria for the privilege--(i) a communication between
solicitor and client; (ii) which entails the seeking or giving of legal advice; and (iii) which is

intended to be confidential by the parties. To make the decision as to whether the privilege attaches, the letters must be read by the judge, which requires, at a minimum, that the documents be under the jurisdiction of a court. Finally, the privilege is aimed at improper use or disclosure, and not at merely opening.

The complication in this case flows from the unique position of the inmate. His mail is opened and read, not with a view to its use in a proceeding, but by reason of the exigencies of institutional security. All of this occurs within prison walls and far from a court or quasi-judicial tribunal. It is difficult to see how the privilege can be engaged, unless one wishes totally to transform the privilege into a rule of property, bereft of an evidentiary basis.

In my view, the statutory disciplinary regime, which I have earlier described, does not derogate from the common law doctrine of solicitor and client privilege, as presently conceived, but the appellant is seeking in this appeal something well beyond the limits of the privilege, even as amplified in modern cases.

V

In aid of his main submission, resting upon privilege, counsel for the appellant argued faintly that the Penitentiary Service Regulations and Commissioner's Directive should not be construed and applied so as to abrogate, abridge, or infringe any of the rights or freedoms recognized in the Canadian Bill of Rights by s. 1(b) (the right of the individual to equality before the law and the protection of the law), 1(d) (freedom of speech) and 2(c)(ii) (the right of a person arrested or detained to retain and instruct counsel without delay). The authorities relied upon by counsel were, in the main, breathalyzer cases dealing with the right of a motorist to communicate with his counsel in private and without delay. These, and other cases cited, give little assistance to the resolution of the issue now before the Court, due to the difference in factual context and relevant considerations. The question in this case is whether the appellant's right to retain and instruct counsel is incompatible with the right of prison authorities to prevent threat to the security of the institution. In my view, there is no such incompatibility provided the exercise of authority is not greater than is necessary to support the security interest. This, as I read it, is precisely the effect of para. 7b. of Directive 219.

With respect to s. 1(b) of the Bill, it has been held by this Court that equality before the law does not require "that all federal statutes must apply to all individuals in the same manner. Legislation dealing with a particular class of people is valid if it is enacted for the purpose of achieving a valid federal objective": Martland J., giving the unanimous reasons of this Court in Prata v. Minister of Manpower and Immigration [[1976] 1 S.C.R. 376], at p. 382.

It is difficult to attack the validity of Penitentiary Service Regulation 2.18 or Directive 219 with a freedom of speech argument, having regard to the will of Parliament, as reflected in the Penitentiary Act and in the Penitentiary Service Regulations, which preserves a limited right of censorship by penitentiary authorities in the interests of security and, at the same time, affords

inmates a right to communicate freely through uncensored channels with members of Parliament and provincial legislatures, and the many persons listed in para. 8 of Directive 219.

VI

One may depart from the current concept of privilege and approach the case on the broader basis that (i) the right to communicate in confidence with one's legal adviser is a fundamental civil and legal right, founded upon the unique relationship of solicitor and client, and (ii) a person confined to prison retains all of his civil rights, other than those expressly or impliedly taken from him by law.

In that context, the Court is faced with the interpretation of the Penitentiary Service Regulations and Commissioner's Directive No. 219. Section 2.18 of the Regulations, as earlier noted, undoubtedly reserves the authority of the institutional head to order censorship of correspondence to the extent considered necessary or desirable for the security of the institution. As a general rule, I do not think it is open to the courts to question the judgment of the institutional head as to what may, or may not, be necessary in order to maintain security within a penitentiary. On the other hand, it is to be noted that Penitentiary Service Regulation 2.18 and Commissioner's Directive No. 219 speak in general terms, in their reference to the reading of correspondence and to other forms of censorship, without express mention of solicitor-client correspondence. The right to privacy in solicitor-client correspondence has not been expressly taken away by the language of the Regulations and the Directive.

Most prisons are sufficiently remote that the mail constitutes the prime means of communication to an inmate's solicitor. Nothing is more likely to have a "chilling" effect upon the frank and free exchange and disclosure of confidences, which should characterize the relationship between inmate and counsel, than knowledge that what has been written will be read by some third person, and perhaps used against the inmate at a later date. I do not understand counsel for the Crown to dispute the importance of these considerations.

The result, as I see it, is that the Court is placed in the position of having to balance the public interest in maintaining the safety and security of a penal institution, its staff and its inmates, with the interest represented by insulating the solicitor-client relationship. Even giving full recognition to the right of an inmate to correspond freely with his legal adviser, and the need for minimum derogation therefrom, the scale must ultimately come down in favour of the public interest. But the interference must be no greater than is essential to the maintenance of security and the rehabilitation of the inmate.

The difficulty is in ensuring that the correspondence between the inmate and his solicitor, whether within the doctrine of solicitor-client privilege or not, is not cloaking the passage of drugs, weapons, or escape plans. There must be some mechanism for verification of authenticity. That seems to be generally accepted. Yet, no one has so far suggested what third party mechanism might be adopted, or by what authority the courts could impose such a mechanism upon penitentiary

authorities.

Counsel for the Crown submits there are three alternative interpretations of the scope of Regulations 2.17 and 2.18 which may govern the extent of the authority of the institutional head in dealing with an envelope which appears to have originated from a solicitor, or to be addressed to a solicitor, in circumstances where the institutional head has reason to believe that the unrestricted and unexamined passage of mail to or from the particular inmate in question represents a danger to the safety and security of the institution:

    (a)   he may nonetheless permit the letter to be delivered unopened and unexamined to the inmate;

    (b)   he may suspend the inmate's privilege to receive mail, in respect of that letter, pursuant to sections 2.17 and 2.18 of the Penitentiary Service Regulations.

    (c)   he may order that the envelope be subject to opening and examination to the minimum extent necessary to establish whether it is properly the subject of solicitor-client privilege.

Counsel contends that to interpret the Regulations as requiring the first of these alternatives is to leave the institutional head without the authority he requires to control the potential passage of contraband, or of correspondence which may endanger the safety of the institution, under the guise of confidential communications passing between inmate and solicitor. I agree. I would also reject the second as providing no solution. I agree that the third alternative represents that interpretation of the scope of the Regulations which permits to an inmate the maximum opportunity to communicate with his solicitor through the mails that is consistent with the requirement to maintain the safety and security of the institution.

In my view, the "minimum extent necessary to establish whether it is properly the subject of solicitor-client privilege" should be interpreted in such manner that (i) the contents of an envelope may be inspected for contraband; (ii) in limited circumstances, the communication may be read to ensure that it, in fact, contains a confidential communication between solicitor and client written for the purpose of seeking or giving legal advice; (iii) the letter should only be read if there are reasonable and probable grounds for believing the contrary, and then only to the extent necessary to determine the bona fides of the communication; (iv) the authorized penitentiary official who examines the envelope, upon ascertaining that the envelope contains nothing in breach of security, is under a duty at law to maintain the confidentiality of the communication. Paragraph 7c. of Directive 219 underlines this point.

The appellant has failed to establish entitlement to a declaration in any of the three forms he has advanced in these proceedings. The appeal must be dismissed. The respondent is entitled to costs in this Court.

The following are the reasons delivered by

ESTEY J.:-- I have had the opportunity of reading the reasons for judgment of my brother Dickson and I concur therein. I only wish to add to item (iii) in his catalogue of considerations in the interpretation of the expression "minimum extent necessary to establish whether it is properly the subject of solicitor-client privilege". Item (iii) reads as follows:

> (iii)   the letter only should be read if there are reasonable and probable grounds for believing the contrary, and then only to the extent necessary to confirm the bona fides of the communication;

In my respectful view, any procedure adopted with reference to the scrutiny of letters passing from solicitor to client should, wherever reasonably possible, recognize the solicitor-client privilege long established in the law. Any mechanics adopted for their examination should, subject only to special circumstances indicating an overriding necessity for intervention by the authorities, safeguard communications flowing under the protection of the privilege so as to ensure that the privilege is left in a practical, workable condition; for example, a covering letter from a solicitor forwarding a sealed communication which the solicitor states to be a communication of legal advice should ordinarily shield the enclosure from examination by the authorities. I would dispose of the appeal as proposed by Dickson J.

Appeal dismissed with costs.

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.***

Court File No. 09-CL-7950

|  |
|---|
| ***ONTARIO***<br>**SUPERIOR COURT OF JUSTICE**<br>**(Commercial List)** |
| Proceeding commenced at Toronto |

**BOOK OF AUTHORITIES**

**GOODMANS LLP**
Barristers & Solicitors
333 Bay Street, Suite 3400
Toronto, Canada  M5H 2S7

Jay A. Carfagnini  (LSUC #: 22293T)
jcarfagnini@goodmans.ca
Alan Mark (LSUC #: 21772U)
amark@goodmans.ca
Jessica Kimmel (LSUC #: 32312W)
jkimmel@goodmans.ca
Peter Ruby (LSUC #: 38439P)
pruby@goodmans.ca
Joseph Pasquariello (LSUC #: 37389C)
jpasquariello@goodmans.ca

Tel:      416.979.2211
Fax:      416.979.1234

**Lawyers for the Monitor, Ernst & Young Inc.**

**Gowling Lafleur Henderson LLP**
Barristers & Solicitors
1 First Canadian Place
100 King Street West, Suite 1600
Toronto, ON  M5X 1G5

Derrick Tay  (LSUC #: 21152A)
derrick.tay@gowlings.com
Jennifer Stam  (LSUC #: 46735J)
Jennifer.stam@gowlings.com

Tel:   416.862.5697
Fax:  416.862.7661

**Lawyers for the Canadian Debtors**