**Court File No.: 09-CL-7950**

## ONTARIO
## SUPERIOR COURT OF JUSTICE
## (COMMERCIAL LIST)

**IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED**

- and -

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| NORTEL NETWORKS, INC., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | (Jointly Administered) |

**PRE-TRIAL BRIEF OF NORTEL NETWORKS UK PENSION TRUST LIMITED AND THE BOARD OF THE PENSION PROTECTION FUND (collectively, the "UK Pension Claimants")**

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

May 2, 2014

**Thornton Grout Finnigan LLP**
Barristers and Solicitors
100 Wellington Street West, Suite 3200
Toronto, Ontario
M5K 1K7

**Michael E. Barrack** (LSUC# 21941W)
**John Finnigan** (LSUC # 24040L)
**D. J. Miller** (LSUC# 34393P)
**Andrea McEwan** (LSUC# 53781P)
**Rebecca (Lewis) Kennedy** (LSUC# 61146S)

Tel:    416-304-1616
Fax:    416-304-1313

Canadian Counsel to Nortel Networks UK Pension
Trust Limited and the Board of the Pension
Protection Fund

**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, N.Y. 10019-6099

**Brian O'Connor**
**Eugene Chang**
**Sameer Advani**
**Andrew Hanrahan**
Tel:    212-728-8000
Fax:    212-728-8111

**Bayard, P.A.**

**Charlene D. Davis** (No. 2336)
**Justin Alberto** (No. 5126)
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19899
Tel: 302-655-5000
Fax: 302-658-6395
cdavis@bayardlaw.com
jalberto@bayardlaw.com

U.S. Counsel to Nortel Networks UK Pension
Trust Limited and the Board of the Pension
Protection Fund

# TABLE OF CONTENTS

Page

PART I - BRIEF STATEMENT OF POSITION ........................................................................... 1

PART II - OVERVIEW ............................................................................................................... 4

PART III - THE TASK OF THE COURTS ................................................................................. 6

PART IV - BASIS FOR THE PRO RATA DISTRIBUTION MODEL ....................................... 8

    (a)    Nature of the Assets.................................................................................................. 10

    (b)    Integration and Entanglement................................................................................... 12

        Integrated R&D......................................................................................................... 15

        Centralized Patent Policies ...................................................................................... 17

    (c)    The Pro-Rata Distribution Model Provides an Economically Rational Result .......... 19

    (d)    The Parties Did Not Reach an Ex Ante Agreement as to the Division of Their Common Pool of Assets When They Ceased Operating ...................................................... 21

    (e)    Pro Rata is Consistent with Domestic and International Insolvency Principles......... 24

    (f)    Flaws With the Other Methodologies........................................................................ 28

PART V - CONCLUSION .......................................................................................................... 33

APPENDIX "A" Proposed Mechanism for Pro Rata Distribution to Unsecured Creditors......... 35

# PRE-TRIAL BRIEF OF THE UK PENSION CLAIMANTS (ALLOCATION)

## PART I - BRIEF STATEMENT OF POSITION

1.      The Board of the UK Pension Protection Fund and Nortel Networks UK Pension Trust Limited (together, the "**UK Pension Claimants**") represent over 36,000[2] involuntary creditors of the Nortel Group[3] who were former employees of Nortel.  There is a deficit in excess of $3 billion[4] in the pension plan of which they are members.  The Canadian and United States' courts overseeing this proceeding (collectively, the "**Courts**") have confirmed that the UK Pension Claimants are a core party to the litigation to determine how the Lockbox Funds (hereafter defined) are to be allocated (the "**Allocation Litigation**").

2.      The UK Pension Claimants submit that the Courts ought to determine the Allocation Litigation on the basis of a Pro Rata Distribution Model (defined and described below) which has the effect of allocating sufficient funds from the Lockbox to permit a distribution within each Bankruptcy Estate (as hereafter defined) to all unsecured creditors on a *pro rata*, *pari passu* basis, relative to the amount of their unsecured claim, irrespective of the entity against which they may have a claim.  There are no secured creditors of Nortel, and only a small number of preferred or priority claims.  The return to unsecured creditors from a Pro Rata Distribution Model would be dictated by a number of factors including the ultimate level of unsecured claims

---

[2] As of January 2009, the Nortel's UK Pension Plan had approximately 42,000 members.  As of March 31, 2013, the Plan had 36,317 members.

[3] "Nortel" or the "Nortel Group" means Nortel Networks Corporation, the former publicly traded ultimate parent corporation of the Nortel Group, and all of its global subsidiaries.

[4] All monetary references herein are approximate and are in USD.

into each of the relevant estates and the precise *pro rata* methodology which the Courts might consider to be most appropriate.  The UK Pension Claimants do not adopt the report on behalf of the Canadian Creditors' Committee provided by Mr Britven, but note that the *pro rata* methodology and asset/claim assumptions which he applied suggested an illustrative *pro rata* recovery on each creditor claim of as much as 71.2%.[5]

3.      The factual evidence on the manner in which the Nortel Group operated prior to insolvency is remarkably consistent – it was a highly integrated multinational that derived significant benefits from operating as "one Nortel".

4.      Based on the evidence to be presented during the trial, the UK Pension Claimants submit that the Pro Rata Distribution Model is the most appropriate and just result for several reasons, including:

(a)      Nortel was a technology company whose most valuable asset was its intellectual property ("**IP**") assets;

(b)      the assets that were co-developed, jointly used and collectively sold by the members of the Nortel Group giving rise to the proceeds in the Lockbox were so profoundly integrated in creation, ownership and use that they should properly be considered as representing a common pool of assets of the Nortel Group as a whole;

---

[5] This analysis is taken from Schedule 3 to the expert report of Expert Report of Thomas Britven on Valuation and Other Issues Related to the Allocation of Sales Proceeds to the Nortel Debtor Groups dated January 24, 2014 at Schedule 3 (page 65).  The UK Pension Claimants are including it for illustrative purposes only, and do not adopt the assumptions or calculations as anything other than illustrative, since the assumptions and certain claims that are reflected (including that of the UK Pension Claimants) will be determined at trial.

(c)      there exists no more credible, reliable, equitable or economically rational manner with which to disentangle those assets (most of which are intangible) and ascribe value to component parts rather than the Pro Rata Distribution Model; and

(d)      in particular, and contrary to the allocation position of the U.S. Debtors and the Canadian Debtors, there was no *ex ante* agreement as to the distribution of the jointly used assets of Nortel when it ceased to do business, whether under the MRDA[6] or otherwise.

5.      The outcome of the Allocation Litigation will establish a precedent for future international insolvencies involving integrated multinational enterprises, regardless of the allocation theory adopted by the Courts.  The Courts have an opportunity to set a precedent that will avoid the moral hazard that has plagued the Nortel proceedings for more than five years and has cost $1.3 billion in professional fees to date from occurring again in future.  Territorial wrangling significantly diminishes value for stakeholders in a global insolvency involving a highly-integrated multinational enterprise whose assets are entangled, and ought not to be condoned or rewarded.

---

[6] "MRDA" refers to the Master R&D Agreement dated December 22, 2004 (with effect from January 1, 2001), as amended, among the operating subsidiaries in each of Canada, the United States and EMEA.  Exhibit Number TR21038.

# PART II - OVERVIEW

6.      The Nortel insolvency proceedings[7] commenced on January 14, 2009.  At the time of filing, it was contemplated that a restructuring of the Nortel Group would occur and a viable company would emerge.

7.      Ultimately, a restructuring was not feasible and the principal assets of the Nortel Group were liquidated on a global basis.  This liquidation included:

(a)      <u>Business Line Sales</u>: there were a total of eight business line sales[8] which included IP relating to each business line (the "**Business Sales**") with closing dates between March 2009 and March 2011.  The Business Sales generated a total of approximately $2.8 billion in proceeds; and

(b)      <u>Residual IP Sale</u>: Nortel's portfolio of approximately 7,000 patents and patent applications (the "**Residual IP**") was sold by auction in June 2011 to a consortium of major technology companies known as "Rockstar" for approximately $4.5 billion.

---

[7] There are currently three separate insolvency proceedings commenced in each of Canada, the US and the UK on January 14, 2009.  The insolvency proceedings commenced in the UK provide centralized administration for the Nortel entities in the various European, Middle East and African ("**EMEA**") countries; however, each EMEA Debtor maintains its own separate insolvency Estate, while administered in the UK proceedings.  The five Canadian Debtors commenced a proceeding under the CCAA and obtained recognition pursuant to Chapter 15 of the US Bankruptcy Code.  The eighteen US companies filed voluntary petitions pursuant to Chapter 11 of the US Bankruptcy Code and obtained recognition as foreign main proceedings pursuant to the CCAA.  The EMEA debtors comprise 19 Nortel subsidiaries incorporated in the EMEA region that are subject to administration proceedings pursuant to the UK Insolvency Act 1986.

[8] The 8 business line sales involved: (i) the CDMA and LTE business; (ii) the Enterprise Solutions business; (iii) the CVAS business; (iv) the Metro Ethernet business; (v) the GSM and GSM-R business; (vi) the Multi-Service Switch business; (vii) the Layer 4-7 business; and (viii) the Next Generation Packet Core business.

Pursuant to various escrow agreements, the aggregate proceeds of the Business Sales and the Residual IP sold to Rockstar were deposited into a lockbox at JP Morgan Chase Bank N.A. (the "**Lockbox**").    There is approximately $7.3 Billion in the Lockbox (the "**Lockbox Funds**").

8.      In order to facilitate a worldwide sale of assets, in June, 2009 the entities comprising the Nortel Group entered into an Interim Funding and Settlement Agreement ("**IFSA**")[9] that was approved by the Courts. Among other things, that document provided that those administering Nortel's insolvency in Canada, the U.S. and Europe would work together to sell Nortel's principal assets, and the resulting proceeds from such sales would be held in escrow pending a determination as to entitlement to same, either by consent or some other resolution process.

9.      Nortel's principal assets had to be sold collectively due to the highly integrated, multi-jurisdictional nature of Nortel's business and its core intangible assets, which were not confined or "ring-fenced" by geography or corporate entity. The significant degree of integration among the Nortel Group had been a central feature in the affidavit filed by John Doolittle in support of the Initial Order dated January 14, 2009, and in the Monitor's Pre-Filing report to the Court.

10.     To effect a sale of any material assets from such an integrated business, purchasers necessarily required all of the major Nortel entities to relinquish their rights because of the impossibility of determining the particular rights or interests of each entity in the relevant assets and in negotiating the value to be paid for those rights or interests.

---

[9] Exhibit Number TR43794.

11.     Following liquidation of the assets pursuant to the IFSA, the U.S. Debtors, the Canadian Debtors and the EMEA Debtors (collectively, the "**Bankruptcy Estates**") became purely administrative vehicles for the corporations that were subject to bankruptcy proceedings. Those corporations are insolvent and their sole purpose is now to facilitate a distribution to their creditors.

12.     What remains to be determined by the Courts is the appropriate distribution of the Lockbox Funds. Five years have passed, three court-ordered mediations have failed and more than US$1.3 billion in professional fees have been incurred – stark testament to the difficulty and intractability of the task that the Courts face in this Allocation Litigation.

## PART III - THE TASK OF THE COURTS

13.     While the IFSA, executed five years ago, contemplates allocation of the proceeds of sale among the Selling Debtors[10], the pleadings of the parties and the expert reports filed by many parties seem to suggest that the task of the Courts is to allocate the Lockbox Funds among the three Bankruptcy Estates – Canada, the U.S. and EMEA.[11]   However, the Bankruptcy Estates have no economic interest in the Allocation Litigation. The legal entities or Selling Debtors have no independent interest in the Lockbox Funds beyond the interests of their creditors who are ultimately entitled to same. The creditors caught in the global insolvency of the Nortel Group,

---

[10] IFSA para 12(a).

[11] The position of each Bankruptcy Estate on this issue is unclear. For example, despite asserting NNL to be the owner of the whole of the Residual IP, in paragraph 33 of its Allocation Position filing of May 16, 2013, the Canadian Monitor states: "The Monitor and the Canadian Debtors ask the Courts to allocate the US$4.5 billion realized from the Rockstar Transaction …. to the Canadian Debtors." (emphasis added).  It is unclear, on the Monitor's own case, what right any Canadian Debtor other than NNL would have in such proceeds.

including the UK Pension Claimants, are the only parties with an economic interest in the outcome of the Allocation Litigation.[12]

14.    The UK Pension Claimants submit that the task of the Courts is therefore to determine the basis upon which the Lockbox Funds are to be distributed to those entitled to such funds, ultimately the creditors, and the mechanism whereby that can most efficiently be effected.

15.    In undertaking that task, the Courts will be asked to determine the following:

(a)    whether the assets comprising the Business Sales and/or the Residual IP Sale were intermingled or integrated to such an extent pre-filing, that they formed one common pool of assets of the Nortel Group as a whole;

(b)    whether, prior to insolvency, the Nortel entities that were parties to the MRDA had reached an *ex ante* agreement as to the allocation of proprietary or other legal rights over the jointly used IP between particular entities or within particular regions, that can now simply be valued to determine each entity's allocation of Lockbox Funds.  In particular, whether the MRDA explicitly or implicitly deals with the allocation of the proceeds of sale of IP assets on an enterprise wide liquidation of the Nortel Group as a whole;

---

[12] Unlike the Bankruptcy Estates, whose supporting professionals have been paid out of the Nortel assets for five years, as have a number of other creditor groups, the UK Pension Claimants have been responsible for funding all of their own expenses in this litigation.

(c)      whether there is any other reliable method of determining the contribution of each

of the RPEs (as defined below) to the creation of the patents which gave rise to the

majority of the value in the asset sales which funded the Lockbox; and

(d)      whether there is any basis to permit multiple claims to be filed by creditors

holding a guarantee, in respect of the common pool of assets owned jointly by multiple

entities.

## PART IV - BASIS FOR THE PRO RATA DISTRIBUTION MODEL

16.      The UK Pension Claimants submit that the Court should follow an allocation

methodology that reflects: (1) the manner in which the Nortel business operated, including the

creation of assets and incurring of liabilities; and (2) the nature of the assets that were sold.

Based on the evidence to be presented at trial on Nortel's profoundly integrated nature, a Pro

Rata Distribution Model is the most appropriate and economically rational model to be applied to

reflect the realities of "one Nortel".

17.      The Pro Rata Distribution Model is premised on the following:

(a)      the highly integrated nature of the Nortel enterprise;

(b)      the assets that were subject to the global sales were created as a result of the

cooperative, collective efforts of numerous Nortel entities and employees in various

jurisdictions;

(c)      the sale of those assets was effected and only possible through cooperative, collective efforts of the various Nortel entities in numerous jurisdictions.  Once the assets had been jointly sold and the proceeds paid into the Lockbox (avoiding any territorial or geographic tug of war), the global cooperation that had characterized and served Nortel so well to that point came to an end;

(d)      there was no agreement prior to the insolvency of the Nortel Group among the various entities on how the proceeds of a common sale of IP assets would be allocated or as to the rights which each entity would have in the event of a Nortel Group insolvency;

(e)      any attempt to assign value to individual entities based on a tracing of contribution to the creation of Nortel's IP assets, both as part of the Business Lines and the Residual IP, is inherently unreliable due to the hopeless entanglement of these assets. The dramatic failure of the parties to reach an agreement prior to or after the insolvency sales, and after three failed mediations, further demonstrates the hopeless entanglement of Nortel's assets;

(f)      distributing the proceeds of the sale of these entangled assets, based upon unsecured creditors being treated equally so far as possible across the Nortel Group is consistent with the manner in which Nortel operated its business and held itself out to its creditors.  A mechanism for how the Pro Rata Distribution Model could be effected is set out in Appendix "A"; and

(g)      the parties have incurred unprecedented costs, particularly fees of the professionals representing the Bankruptcy Estates and who are funded out of the Nortel

assets, who have no actual economic interest in the proceeds.  The Pro Rata Distribution Model is the only approach that will ensure that the significant expenditures that have been incurred in this case will not become the norm for future multi-jurisdictional insolvencies of highly integrated multinational enterprises, and is consistent with international insolvency policies and principles.

18.    Although advocating radically different outcomes, the U.S. Debtors' and the Canadian Debtors' allocation theories are each premised on the MRDA having conferred enduring legal rights to each entity which, once valued, answer the question of allocation. This approach is fundamentally incorrect, because that is not the purpose or effect of the MRDA (as set out below).

**(a)    Nature of the Assets**

19.    At its core, Nortel was a technology company and it had, prior to filing, outsourced its manufacturing of products.  Its principal asset was IP, primarily patents, derived from research and development ("**R&D**"), which represented the work of thousands of scientists and engineers in numerous jurisdictions, working together over the course of several decades.  R&D formed the backbone for Nortel's product development and the provision of services to its customers.

20.    Nortel's IP assets were created over the course of many years through a highly collaborative R&D process which was integrated geographically and across different technologies. The patents whose sale price forms the majority of the Lockbox Funds were the result of R&D that occurred, and was shared throughout Nortel, in different locations around the world without any delineation based on geography or otherwise.

21.     Legal title to the IP was transferred from the individuals and entities performing the R&D to Nortel Networks Limited ("**NNL**"), one of the Canadian parent companies and the main Canadian operating company.   The fact that NNL held legal title was unremarkable and immaterial to anyone dealing with Nortel, including tax authorities.  Pursuant to the MRDA that placed legal title to the IP in the name of NNL, each of the other entities that were parties[13] ("**RPEs**") were confirmed to hold "equitable and beneficial ownership of certain exclusive rights"[14] in the IP for designated territories and non-exclusive rights for the rest of the world.  In addition, pursuant to the MRDA each of the entities that were RPEs was to bear "the full entrepreneurial risks and benefits for the Nortel Networks business."

22.     As a technology company, Nortel's IP was a central feature of the Business Sales, as well as the Residual IP Sale.  At all times prior to the Residual IP Sale, ownership of the IP within the Nortel Group was irrelevant to the manner in which it conducted its business.  Ownership of the IP was not the subject of any specific covenants within Nortel's bond terms confirming or restricting which Nortel entity owned or could in future own the IP.  Likewise, there was no public reporting that identified the legal, economic or beneficial interests of any member of the Nortel Group to the IP.

23.     Although the IP was Nortel's most valuable asset as a technology company, it did not appear as a specific line item or against any specific Nortel entity on the Nortel Group's balance sheet, whether as part of the consolidated financial statements provided to the market, to the

---

[13] Referred to in the MRDA as Residual Profit Entities or RPEs.

[14] MRDA, second recital.

relevant taxing authorities in each jurisdiction or to the Securities and Exchange Commission in connection with its publicly traded securities.  Ownership of the IP was not addressed in the Offering Memoranda, Prospectus or Indentures governing the public bonds issued by the Nortel Group.

**(b)        Integration and Entanglement**

24.    Nortel operated as a highly integrated multinational enterprise and described itself as a "matrix" organization with business units that worked across geographies.  It had integrated, inter-dependent R&D, as well as centralized patent filing policies and procedures.

25.    The assets and operations of the Nortel Group were not simply intermingled and integrated — a fact which is not disputed by any party and was clearly articulated in the Endorsement of Mr. Justice Morawetz in granting the Initial Order.  The principal asset giving rise to the proceeds of sale comprising the Lockbox Funds – Nortel's IP, including that forming part of the Business Line Sales – was jointly developed, owned, used and integrated to such an extent that it had to be sold by numerous companies in multiple jurisdictions.

26.    Timothy Reichert, an expert on behalf of the Monitor and Canadian Debtors stated:

> Nortel operated as an integrated business, with multiple entities performing and bearing responsibility for R&D.  Nortel's products and services were sold in large complex bundles, making it very difficult for Nortel to assign the revenue and profits from its projects in a non-arbitrary manner.  Revenue was often associated with global clients, or with large regional clients, and involved a large portfolio of technologies and technology-based solutions... R&D investments were highly interrelated, and were often transferred from one R&D center to another during the development cycle.[15]

---

[15] Timothy Reichert Initial Report pp. 31-32.

27.    The entanglement of Nortel's R&D process was not an accidental outcome; it was a direct result of the Nortel Group's vertical and horizontal matrix organizational structure and collaborative R&D process.[16]  This integration was a central feature to all aspects of Nortel's operations, as described more fully in the Statement of Assumed Facts attached at Appendix E to the Expert Report of Judge Clark and Professor Westbrook ("**Clark and Westbrook**") in connection with their expert report.

28.    Detailed filings made by Nortel with relevant taxing authorities and the SEC described a vertically and horizontally integrated global operation, with operations that ran along business lines rather than by legal entity.  Business lines cut across both geographic borders and legal entities within the Nortel Group.

29.    Nortel was, for all intents and purposes, "one Nortel".

30.    The UK Pension Claimants will present the testimony of five fact witnesses, all ex-NNUK[17] employees, who will speak to the integration of Nortel's R&D and patenting efforts, as well as the NNUK's integral contributions to R&D and patenting at Nortel:

(a)    Simon Brueckheimer is a prolific inventor and recipient of the prestigious Silver Medal of the Royal Academy of Engineering (the UK's national academy for engineering).  He worked at Nortel and its predecessor STC from 1986 to 2009, where he

---

[16] Initial Bazelon Report pp. 15-16. And Binning affidavit, April 24, 2014, at paragraph 7: "Nortel's R&D activities were integrated across statutory entities and the R&D organization relied on capabilities in different countries. R&D capabilities in any one specific country were not broad enough to support or develop the product offerings of any individual line of business other than possibly the optical business … in Canada."

[17] NNUK refers to Nortel Networks UK Limited, Nortel's operating subsidiary in the UK.

was recognized as a Technical Fellow (an honor bestowed to only nine employees worldwide) and for his significant patent contributions.

(b)      Geoffrey Hall, a pensioner with a long career at Nortel, first in R&D in the UK, and then serving as Chief Technology Officer ("**CTO**") for the EMEA region, a customer-facing office based in the UK that managed R&D relationships with Nortel's top customers throughout Europe and Asia.

(c)      Andrew Jeffries served as a senior manager of the Wireless Technology Laboratories at the Harlow, UK site, as well as other technical expert and management roles during his 30-year career with Nortel and its predecessor STC.  The Wireless Technology Laboratories developed Long Term Evolution ("**LTE**") or ("**4G**") technology for Nortel.  LTE is the most widely used 4G wireless technology in use today.

(d)      Peter Newcombe served as President for EMEA of various business divisions (Unified Solutions, Optical Networks, and Carrier Networks) from 2000 to 2010 with responsibilities for sales and for bridging Nortel's North American-based product development organizations and product groups in EMEA.

(e)      Angela Anderson served as the head of Nortel's European IP Law Group and was the Chair of Nortel's Patent Practice Group, where she was involved in setting worldwide patent filing policies.

*Integrated R&D*

31.     As Mr. Brueckheimer will testify, R&D at Nortel was generally a collaborative process. NNUK employees routinely shared their expertise, developed foundational technologies, and co-invented patents with Nortel employees based in other geographic locations, which was to the advantage of the Nortel Group.  Mr. Brueckheimer never perceived that there was any difference between particular Nortel entities, but always thought of Nortel as a unified whole.

32.     As Mr. Brueckheimer will explain, while the work done at NNUK was important, NNUK generally had no control over the size of its R&D budgets.  Control was either through the Business Lines (with the heads of business units generally based in the U.S. or Canada) or through the global CTO (based in the U.S. or Canada).

33.     The evidence at trial will show, by way of example, that NNUK's employees worked with others around the globe in a highly integrated and collaborative manner to create, develop and implement technologies for the benefit of "One Nortel," and that the allocation methodologies advanced by the Canadian and U.S. Bankruptcy Estates undervalue the contribution and role of NNUK's researchers in creating the value in the Residual IP portfolio.

34.     Mr. Hall will testify that Nortel's presence in the UK and Europe was significant both in terms of its employee headcount and contribution to the group overall. Nortel recognized that the only way it could seek to compete in markets outside the USA and Canada was to have an R&D presence outside of North America. At one time, there were almost 2,000 R&D professionals working for Nortel in the UK. Over time these new R&D teams in the UK and across the EMEA

region facilitated the creation of Nortel's business outside of North America and by the year 2000, Europe accounted for approximately 30% of Nortel's business.

35.    Mr. Hall will further explain that R&D performed by NNUK employees played a pivotal role in expanding Nortel's presence in Europe and worldwide.  For example, significant work by NNUK  on the development of Nortel's Digital Multimedia Switch ("**DMS**") 100 allowed this product to be marketed and sold outside of North America.  In addition to NNUK's work on DMS, and following the success of the DMS 100, NNUK was active in the R&D relating to successor technologies, including the CS2000 internet protocol switch and Centrix internet protocol exchange.

36.    Mr. Brueckheimer will testify that, during his 23 years working for NNUK and its predecessor, he worked with other NNUK engineers to develop inventions for Nortel that laid the foundation for technologies that are still used today, such as Voice over Internet Protocol. NNUK's R&D labs were strong contributors to Nortel and were highly regarded.  NNUK's R&D labs built strong relationships with Nortel customers (referred to internally as Nortel's "mind share" and "trust relationship").  These relationships took many years to build and were good for Nortel's reputation, but were also personal to the NNUK employees involved.

37.    Mr. Jeffries will testify that, throughout his time at Nortel, the UK team developed ground-breaking wireless technology that laid the foundation for subsequent technology developments in wireless and cellular networks, including the well-known 3G and 4G standards, which today are used in numerous areas including the U.S., Canada and Europe.

38.　　Mr. Jeffries will explain that Nortel's R&D sites in the UK were recognized for their wireless expertise within Nortel and the industry as a whole.

### *Centralized Patent Policies*

39.　　As Mr. Hall will testify, Nortel's patent policies and budget were set globally, and decisions regarding whether and where to file patents were determined by review panels organized along technology and Business Lines.

40.　　Ms. Anderson will  explain that Nortel had policies governing the filing of patents, and that policy applied regardless of where the inventors were located.  The patent filing budget was set by the Finance Group in North America.  Most patents were filed first in the U.S. because the cost of filing was relatively low compared to the size of the market in that jurisdiction.  The patents that were regarded as most important or valuable were "further filed" in additional jurisdictions.  Patents were also continuously "culled" from the portfolio to reduce portfolio maintenance costs.

41.　　Mr. Hall will testify that, despite the fact that NNUK did not have control over its patent budget, employees of NNUK nonetheless contributed a significant percentage of Nortel's patented technology — directly, as inventors, and indirectly, through foundational research and by interfacing with customers to understand needs that Nortel could address through innovation. At certain times, NNUK employees contributed more patents per head than their peers at other Nortel facilities around the world, and many of Nortel's technology "gurus" were based in the UK.

42.     As Mr. Brueckheimer will explain, it could take many years to develop initial research into what ultimately became a product.  This research would often result in patent filings, which could protect many generations of products and also provide licensing opportunities with competitors and discourage in-bound patent infringement claims.

43.     Mr. Brueckheimer will testify that he and his colleagues invented a significant number of patents and developed telecommunications standards-essential technology.  Patents were important to Nortel, and he was one of Nortel's most prolific inventors, contributing approximately 50 patents to Nortel's patent portfolio, some of which were sold in 2011 to the Rockstar consortium.

44.     Mr. Jeffries will also testify that patents were important to Nortel, and the UK was recognized consistently for having significant patents and prolific inventors.

45.     Angela Anderson was located in the UK and served as the head of IP for EMEA.  Ms. Anderson will testify that, despite Nortel's patent filing restrictions and culling, NNUK employees contributed a significant portion of patents to Nortel's global patent portfolio.  NNUK employees invented significant patents, and received awards and recognition for their contribution to the Nortel portfolio.  For example, at least 14% of the patents sold to Rockstar had a first-named inventor from the UK.  She will further explain that, under Nortel's Research and Development Cost-Sharing Agreement, which was the predecessor to the MRDA, NNUK held an exclusive license to Nortel's portfolio of patents and other IP.  NNUK had the right to sublicense Nortel IP and, as an illustration, executed a license with British Telecom which was a lead customer of Nortel.

**(c)    The Pro-Rata Distribution Model Provides an Economically Rational Result**

46.    The UK Pension Claimants will present the testimony of Coleman Bazelon, Ph.D., a principal at The Brattle Group, Inc. and an expert in matters pertaining to regulation, strategy, and valuation in the wireless, wireline, and video industry sectors. Dr. Bazelon will give expert testimony on what allocation approach would have been accepted by the Nortel entities prior to filing, assuming they had considered the issue and were rational economic actors.

47.    Dr. Bazelon will testify that various parties to the current allocation proceeding have proposed two fundamentally different allocation approaches for distributing the Lockbox Funds: (1) a method of allocation that notionally treats the Lockbox Funds as a single pool against which all creditor claims against Nortel are asserted (the Pro Rata Distribution Model); and (2) allocation schemes that require the selection and application of some metric other than creditor claims to allocate the Lockbox Funds before claims are considered. Dr. Bazelon will explain that the Pro Rata Distribution Model is the most consistent with the economics underlying Nortel's business model. The other methods require assumptions that are inconsistent with the operations of Nortel's business. Dr. Bazelon's conclusion is based on three observations about the economics of Nortel, all illustrated by the evidence described above.

48.    First, Nortel operated as a highly integrated, multinational company prior to seeking protection from creditors. Its management and employees, regardless of geographic location or corporate affiliation, treated Nortel as a single company and strove to maximize value to the company's shareholders as a whole, worldwide. Nortel's choice of organizational structure—a matrix across business segments (carrier, enterprise, wireless, etc.) and functional areas (finance, human resources, and, during certain periods, sales and R&D)—was aligned with its system of

incentives and goal of operating as a multinational, highly integrated, and technology-intensive company.

49.     Second, the assets sold in Nortel's bankruptcy (which are the sources of the Lockbox Funds) were mostly IP — entirely so in the case of the Residual IP Sales.  Nortel's patents are the work of thousands of scientists and engineers across multiple lines of business and jurisdictions over decades.  While in principle, each patent could be sold individually, in reality this was not commercially feasible because of the web of relationships between all the patents.  Dr. Bazelon analyzed the degree of interconnections among each of the patents in Nortel's portfolio.  The complex technologies being developed and used in the telecommunication industry in the 2000s created families of interconnected and incremental patents that are essentially a "Gordian knot" in their totality.  Nortel's interrelated technologies were developed around the world and the interconnectedness of the patents makes it highly subjective and artificial to disaggregate value as is often done with patents in industries which develop less complex, or more discrete, technologies.

50.     Third, Nortel's intertwined IP assets were created over the course of many years through a highly collaborative R&D process, which was integrated geographically and across different technologies.  The patents forming the basis of value that underlies the Lockbox Funds were the result of R&D that occurred, and was shared throughout Nortel, in different locations around the world without any contemporaneous recognition of geographic contribution.

51.     Any efforts to now disentangle the IP, to serve as the basis of geographic (or entity by entity) allocation of its sale proceeds, is a wholly artificial and imprecise exercise inconsistent

with the way in which the Nortel Group operated and the way in which the IP was created.  It necessarily entails making considerable assumptions that even then do not fully reflect the contributions, ownership interests, and other rights to the IP by the different estates.

52.     No specific agreement existed prior to filing as to how the value of the Nortel Group's assets might be allocated amongst the individual entities or otherwise in the event of a global liquidation of the Nortel Group.  No consensus exists post-filing as to the manner in which that exercise should be undertaken or the economic results it should produce.

53.     Consequently, a Pro Rata Distribution Model is the most appropriate allocation method for the Lockbox Assets.  Such an approach would treat Nortel in bankruptcy as it operated prior to bankruptcy, as an integrated multinational enterprise.

**(d)     The Parties Did Not Reach an Ex Ante Agreement as to the Division of Their Common Pool of Assets When They Ceased Operating**

54.     The basis for the assertion that there was an agreement prior to insolvency which determines the allocation outcome is the MRDA. It is said that the MRDA conferred rights which now effectively determine the allocation of the proceeds of sale of IP assets on the insolvency of the entire Nortel enterprise.  No party asserts that the MRDA explicitly deals with the question of allocating the proceeds of sales occurring after an enterprise wide insolvency, but instead the U.S. Estate and the Canadian Estate base their allocation submissions on the premise that the MRDA created property interests in the IP, and that, therefore, the creation of these interests should be treated as, in effect, a prior agreement on the method of allocating the proceeds from the sale of IP in the event of an enterprise wide insolvency of Nortel.

55.     This analysis is wholly misconceived.  The MRDA was plainly never contemplated to deal with the allocation of property rights in the event of a global liquidation.  On the contrary, the MRDA was clearly premised on Nortel continuing to trade as a single enterprise and splitting the profits derived from the jointly created IP rights among the participants.

56.     The key elements of the MRDA were as follows:

(a)     The MRDA was a transfer pricing agreement entered into for tax purposes.   As such it set out a method of allocating each year's "residual profit" (or loss) between those entities that engaged in the R&D which resulted in the creation of the IP of Nortel.

(b)     The profit or losses allocated to the RPEs was <u>residual</u>, in the sense that first the profit / returns attributable to routine or non R&D activities were allocated, then the balance "residual" profit or loss generated by Nortel worldwide (which was deemed to be attributable to R&D activities) was allocated to the RPEs.

(c)     The residual profit or loss was allocated by taking the total R&D spend of each of the RPEs over the prior five years and treating this as a capital amount.  The residual profit or loss was allocated annually under the MRDA to each RPE based on its comparative share of that the capital amount.

57.     It is accordingly clear that:

(a)     the MRDA was premised on Nortel being a going concern – that premise no longer applies, and thus the MRDA's purpose no longer exists;

(b)      the MRDA was a tax device for allocating annual profits and losses, and does not (and did not purport to) confer legal rights which would endure follow an insolvency and which would then dictate the division of Nortel's assets;

(c)      the MRDA conferred legal rights and obligations while Nortel was a going concern.  These obligations (to split the profit from the exploitation of the jointly created IP)  are wholly ignored by the U.S. Debtors and the Canadian Debtors in their respective allocation arguments - the MRDA conferred legal title to IP on NNL, and IP licences on each RPE, in exchange for each entity's agreement to share the on-going worldwide profits or losses of the Group. It did not confer such rights "free and clear".  Accordingly, to cherry-pick either legal title or licences as the unencumbered individual 'property right' of any one entity, capable of individual valuation, is fundamentally to misread the MRDA and to misunderstand what had been its function and purpose;

(d)      further, the MRDA did not split revenues (such as sale proceeds – which were expressly excluded) between RPEs, but only profits or losses after the expenses associated with running the Nortel business had been paid.  One can only ascertain profits after liabilities to creditors have first been met.  To this extent it is the Pro Rata Distribution Model that is more consistent with the MRDA and the way the Nortel Group operated while ongoing; and

(e)      any allocation methodology which suggests that geographic revenues or sale proceeds are to flow to one entity alone, in particular without any recognition of the unpaid liabilities associated with the generation of such global revenue or proceeds, is

unsupportable and inconsistent with the MRDA and the manner in which the Nortel Group operated prior to and after its insolvency.

58.     If the Courts accept the UK Pension Claimants' submission that the MRDA does not, explicitly or implicitly, deal with the allocation of the proceeds of sale of IP assets on an enterprise wide insolvency of Nortel, then the allocation arguments of the U.S. Debtors and the Canadian Debtors will not assist the Courts in resolving the Allocation Litigation.

**(e)      Pro Rata is Consistent with Domestic and International Insolvency Principles**

59.     Regardless of the manner in which the Courts decide the Allocation Litigation, it will establish an important precedent in an international bankruptcy proceeding involving proceeds from the global sale of jointly owned, largely intangible assets.  The issues before the Courts are not based purely on domestic law principles, but on wider international law considerations that will be informed by a number of economic and policy factors for which the Courts will hear expert evidence.

60.     Judge Clark and Professor Westbrook ("**Clark and Westbrook**") provide expert evidence on the absence of "hard law" applicable in this unique multi-jurisdictional case and the international insolvency policies, principles and guidelines that the Courts could use to fill that international void in order to arrive at an equitable result.  Clark and Westbrook will also offer expert evidence on the historic and continuing development of international policy and principles which provide context for the decisions the Courts will make about allocation.

61.     While the development of international law to address the insolvency of multinational enterprise groups remains fluid, the basis for such principles as previously established

internationally and adopted domestically by many countries, are founded upon principles of modified universalism.[18]  Those principles, and the application of them to date,[19] provide a clear framework for the application of the Pro Rata Distribution Model to address the Allocation Litigation involving the Nortel Group.

62.     Despite mischaracterization by the U.S. parties to the Allocation Litigation, the Pro Rata Distribution Model is not global substantive consolidation.  In a global substantive consolidation:

(a)     all of the entities would be administered by a single insolvency administrator in one jurisdiction;

(b)     all of the global entities would be treated as one entity;

(c)     all claims against any of the global entities would be determined within the one insolvency proceeding under the supervision of one insolvency administrator; and

---

[18] See, for example: Facilitating the cross-border insolvency of multinational enterprise groups: Note by the Secretariat, United National Commission on International Trade Law, 45th sess, A/CN.9/WG.V/WP.120 (2014); Model Law on Cross-Border Insolvency of the United Nations Commission on International Trade Law, GA Res 52/158, UNGAOR, 52d Sess, Annex I, UN Doc A/52/17 (1997); Ian F. Fletcher & Bob Wessels, "Transnational Insolvency: Global Principles for Cooperation in International Insolvency Cases" (Paper delivered at the 2012 Annual Meeting of The American Law Institute, 21-23 May 2012), online: International Insolvency Institute <http://www.iiiglobal.org/component/jdownloads/finish/36/5897.html>; The American Law Institute, Transnational Insolvency: Cooperation Among the NAFTA Countries excerpted from Principles of Cooperation Among the NAFTA Countries (Juris Publishing Inc, 2003), online: The American Law Institute <http://www.ali.org/doc/InsolvencyPrinciples.pdf>.

[19] See: *In re Maxwell Communication Corporation plc*, 93 F.3d 1036 (2d Cir.), CCAA Sanction Order in *Re Livent Inc.,* (November, 21 2003) Court File No. 98-CL-3162; *Re Everfresh Beverages, Inc*. (May 15, 1996), Court File No. 32-077978 (Ont. Gen. Div.); CCAA Sanction Order in *Re Fraser Papers*, (February 10, 2011) Court File No. CV-09-8241-00CL; Order Recognizing Orders of the Canadian Court and Approving the Debtors' Amended Consolidated Plan of Compromise and Arrangement and Transaction Agreement" *In re Fraser Papers, Inc.* et al (February 11, 201) Case No. 09-12123 (KJC).

(d)      one Plan of Arrangement or Confirmation Plan would be effected for all global entities.

63.    The Pro Rata Distribution Model proposed by the UK Pension Claimants:

(a)      only invites the Court to rule on the allocation of the common assets represented by the Lockbox Funds – it does not ask the Court to make any order concerning the application of any assets already within any Estate, although the Courts are free to take into account such funds as part of any allocation;

(b)      recognizes that common funds are already in place through no steps taken by the UK Pension Claimants – the 'consolidation', if there has been any, was the creation of the common fund by agreement among the Bankruptcy Estates with the approval of the Court; and

(c)      does not seek to merge the corporate entities or the administration of any Bankruptcy Estates through a global Plan or otherwise.  The administration of each Bankruptcy Estate, the admission or rejection of claims and the payment of dividends, would all still be a matter for each estate.  The Pro Rata Distribution Model only addresses the amount of the co-mingled funds that should be distributed to each Bankruptcy Estate to facilitate a distribution to all unsecured creditors on a *pro rata* basis.

64.    It is highly likely that the Canadian Estate and U.S. Estate will seek to effect a substantive consolidation among the Nortel entities existing within their respective jurisdictions. If the Canadian Debtors' theory of allocation (legal-title) was to prevail, virtually all of the

Lockbox Funds which they assert to be attributable to the Canadian Debtors would be allocated to a single corporation, NNL.  However, it seems inconceivable that the Monitor would not then seek to share such funds with NN Technology, the entity which employed thousands of Nortel researchers.   This will, more likely than not, be proposed to be accomplished by a substantive consolidation of the Nortel entities within Canada.

65.     While the domestic legal principles in each of Canada and the U.S. on substantive consolidation within a domestic jurisdiction may provide guidance to the Courts in dealing with inter-mingled assets, they do not provide a complete answer, are not binding in an international insolvency context and are not applicable where substantive consolidation is not sought.

66.     Taking assets that were, at all times, created by multiple parties, used as a common asset and sold jointly to produce comingled proceeds of sale which are now held in a single account, and trying to allocate them on an entity-by-entity basis is akin to forcing a square peg through a round hole.  It is an impractical exercise that represents the antithesis of a practical solution and a fair and efficient process that is the hallmark of bankruptcy and insolvency in Canada, the U.S. and internationally.

67.     The Pro Rata Distribution Model, being based in equity, is a flexible concept that can permit numerous variations to achieve, so far as possible, an equitable outcome among all unsecured creditors.  It is sufficiently flexible to accommodate any findings that the Courts might make regarding the guarantees held by any creditor, any inter-company claims that might exist or any other factors that the Courts consider appropriate in resolving the Allocation Litigation. Appendix "A" outlines how that might be achieved.

**(f)      Flaws With the Other Methodologies**

68.      The legal title approach proposed by the Monitor, Canadian Debtors, and CCC results in a very extreme allocation of the lockbox funds in favour of the Canadian Estate.  In reality this method, if applied based on its fundamental premise that legal title is the sole basis to allocate the proceeds of the residual IP sales, would allocate all of the proceeds of those sales to a single corporation within the Canadian Estate – NNL.   It would have been economically irrational for the non-Canadian RPEs to accept, in exchange for substantial and valuable R&D contribution, a future payoff which provided no protection or value in the event of an insolvency.   This approach should be rejected as economically irrational and implausible, as will be demonstrated at trial by an expert economist.

69.      In particular, had the U.S. and EMEA Estates expected that they would be precluded from sharing in the proceeds of the Rockstar sale, as is proposed under the Monitor's, Canadian Debtors' and CCC's (legal title) allocation approaches, it would have been irrational for the U.S. and EMEA Estates to have agreed to the IFSA.   Rationality would suggest quite a contrary course of behaviour:  that the U.S. and EMEA Estates would have required appropriate and adequate considerations for their agreement to the IFSA, and in the process would have bargained for as much of the proceeds of the Business Sales and Residual IP ale as possible.

70.      If the other RPEs had been informed about the allegedly low value that the Canadians placed upon their licences, it would have been more rational for them hold out for a higher percentage of the proceeds than to willingly relinquish their assets in order to facilitate Nortel's Business Sales.  Conversely, it would have been completely irrational for the RPE's to surrender their licence in exchange for virtually nothing in return.

71.     There are a number of technical flaws in the implementation of the Canadian legal title approach that will be addressed at trial.   These include, an assumption that money losing businesses would continue, use of stub periods in calculating averages, double counts of items, failure to include terminal values, use of improper discount rates and failure to tax effect the results.

72.     The position of the UK Pension Claimants' is that each RPE was granted a perpetual, royalty-free exclusive license to the Nortel Group's patents (and other NN Technology[20]) in their respective territory and a perpetual, royalty free non-exclusive license to those patents (and other NN Technology) in respect of the rest of the world beyond each RPE's own territory. The patent rights granted included rights to sub-license those rights, and independently to enforce those rights against a third party infringer. The licenses are for patents covering a range of technologies, including the technology in commercial offerings of Nortel, technology in development and technology that derived from the commercial offerings and from any other development work of Nortel.

73.     On the interpretation of the exclusive license provision, the UK Pension Claimants appear to be firmly in-line with the US Debtors' position, whereas the Canadian Debtors' position takes an unduly narrow approach to the "Product" reference.

74.     The three main points of disagreement between the experts on the correct interpretation of the licence rights under the MRDA are: (i) the impact of the sub-licensing rights; (ii) the impact of the enforcement rights; and (iii) the impact of the recitals.

_____

[20] As defined in the MRDA.

75.     Even if the "limited" exclusive license espoused by the Canadian Debtors was correct, there is no factual evidence before the Courts to allow a determination as to which patents within the Residual Portfolio sale were sufficiently unrelated to 'Products' to fall outside the scope of such a "limited" license.

76.     The Revenue Approach proposed by the U. S. Debtors would allocate the proceeds on the basis of estimated territorial revenues, ignoring the provisions of the MRDA which distribute profits on a entirely different basis.   Revenues were shared to recognize the multiple contributions to that revenue.  It would be economically irrational for RPEs who participated in substantial IP creating activities to agree to a method of allocation of the proceeds of the sale of jointly created assets that would not allow them to recover their liabilities incurred in creating such assets.

77.     The U.S. Debtors' revenue approach attributes the majority of the Lockbox Funds based upon the revenues generated within the U.S. geographical region.  Sales in the U.S., although the single biggest market for Nortel, would not have been nearly as remunerative if it were not for Nortel's global R&D efforts and its overall IP portfolio.  The U.S. patents in Nortel's portfolio were developed by inventors all over the world, including NNUK.  A pure revenue approach, as suggested by the U.S. Debtors, takes the benefit of these joint assets without requiring a corresponding payment for them.

78.     The revenue approach based upon the territory in which sales were made is contrary to the manner in which profits were divided under the MRDA.  It was understood at Nortel that the

geography or territory in which sales were generated or earned was not relevant to the calculating the shares of residual profits and losses.

79.     The revenue approach advanced by the U.S. Debtors, also suffers from technical flaws including the use of inconsistent values for sales in the geographic areas outside of the RPE's exclusive territories (often referred to as Rest of World "ROW"), use of 2009 – the year of filing and recession – as a base year, and under valuation of the Chinese IP market value in the calculation of the value of the residual IP sold in the Rockstar transaction.

80.     Several of the technical flaws in the U.S. Debtors' Revenue Approach are corrected in the EMEA Licence Approach.  It consistently takes into account all potential markets covered by Nortel's residual high value patent portfolio.  It also consistently allocates the revenue from the rest of the world evenly among the five RPEs.

81.     Net of pension assets, the unfunded pension liabilities of Nortel had an economic value of $4.6 billion at the date of insolvency.  Even if the RPSM and MRDA could be  used as the basis for allocating the Lockbox Funds, the unfunded liabilities would at the very least have to be deducted from the proceeds before any allocation is made to the RPEs.

82.     The IFSA was signed in June 2009, before the commencement of Nortel's liquidation of its collective assets.  The Estates could not agree at the time on how to divide up the proceeds from the liquidation of Nortel and voluntarily put off its resolution until after the sales were completed.   That is, the knowledgeable and self interested parties at the time recognized the lack of clear and common agreement over the allocation of the sale proceeds; even if the MRDA was considered to be a candidate, the parties could not agree on how to apply it.

83.    The stark contrast between the extreme positions taken by the Monitor and the Canadian Debtors, on one hand and the U. S. Debtors, on the other is highlighted by the amount their experts allocate to each estate.  Mr. Green for the Monitor and Canadian Debtors calculated that they are entitled to $6.1 billion out of the total $7.3 billion in lockbox funds.   Mr. Kinrich for the U.S. Debtors calculated that they are entitled to $5.3 billion out of a total of $7.3 billion in lockbox funds.

84.    The R&D Contribution Approach proposed by the EMEA Debtors would allocate proceeds based on R&D spending as a proxy for R&D contribution.   While splitting revenue or profits based on R&D spending may be convenient in an ongoing enterprise, it may not be the most accurate proxy for measuring R&D value creation and contribution.   For example, NNUK consistently "fought above its weight" by contributing significantly  more patentable inventions than R&D spending alone would indicate.

85.    A number of the experts have addressed the fact that the amortization rate of R&D spending contained in the MRDA-30% underestimated the useful life of the patents.   This is based on the fact that the lifespan of technology may be significantly longer than the life span of a particular product.   The 30% amortization rate used in the MRDA would result in R&D losing 80% of its capital value in 5 years.  The evidence demonstrates that the useful life of the Nortel patents was likely in excess of 10 years.

86.    R&D spending is a relatively easy metric to measure but does not necessarily reflect historic value contribution.  This disconnect has been highlighted in the OECD transfer pricing

guidelines when it noted that "there is no necessary link between the costs and value" for intangible assets.

## PART V - CONCLUSION

87.    This case is without precedent and will set the benchmark for international insolvencies of integrated multinational enterprises for years to come.  In the early years following the global insolvency filings it was a success.  The Courts and parties came together to realize on the assets of Nortel in a unified manner which allowed for the benefits of collective action to be shared by the creditors of the Nortel enterprise.  In attempting to then divide the proceeds of the sale of the assets along geographic or legal entity lines, an indefensible amount has been spent to simply divide a common fund which arose from common assets among the worldwide creditors of a single integrated enterprise.

88.    There is only one method of allocation that properly reflects this unique situation and will ensure that it is not to be repeated in future – the Pro Rata Distribution Model.  On behalf of the UK retirees and pensioners, over 6,000 of whom have passed since this case began five years ago, we urge the Courts to accept the jurisprudential challenges of this case and have the allocation method reflect the pre and post insolvency reality of Nortel.

ALL OF WHICH IS RESPECTFULLY SUBMITTED this 2nd day of May, 2014.

May 2, 2014

*Michael E. Barrack*

**Thornton Grout Finnigan LLP**
Barristers and Solicitors
100 Wellington Street West, Suite 3200
Toronto, Ontario, M5K 1K7

**Michael E. Barrack** (LSUC# 21941W)
**John Finnigan** (LSUC # 24040L)
**D. J. Miller** (LSUC# 34393P)
**Andrea McEwan** (LSUC# 53781P)
**Rebecca (Lewis) Kennedy** (LSUC# 61146S)

Tel:    416-304-1616
Fax:    416-304-1313


*Brian E. O' Connor*

**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, N.Y. 10019-6099, U.S.A

**Brian O'Connor**
**Eugene Chang**
**Sameer Advani**
**Andrew Hanrahan**
Tel:    212-728-8000
Fax:    212-728-8111


*Justin R. Alberto*

**Bayard, P.A.**

**Charlene D. Davis** (No. 2336)
**Justin Alberto** (No. 5126)
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19899
Tel: 302-655-5000
Fax: 302-658-6395
cdavis@bayardlaw.com
jalberto@bayardlaw.com

## APPENDIX "A"
## Proposed Mechanism for Pro Rata Distribution to Unsecured Creditors

1.      There a number of ways in which the Pro Rata Distribution Model could be implemented, including as follows:

(a)      Identify the total admitted unsecured claims in each entity estate which makes up the US, Canadian and EMEA Bankruptcy Estates - such Total Claims being $A;

(b)      Identify the total assets in principle available for unsecured creditors, being the sum of (a) the Lockbox Funds and (b) all assets presently held in each such estate; less (c) in each estate an aggregate reserve for (i) Administrative Costs to be incurred and (ii) settlement or payment of priority or preferred claims within each estate - such Total Available Assets being $B;

(c)      Divide Total Available Assets by Total Claims (ie $B divided by $A) to arrive at the notional *pro rata* percentage dividend available to third party unsecured creditors – that rate being C%;

(d)      Allocate the Lockbox Funds as follows:

(i)      For any entity estate where the available assets already within that estate enable it to pay a dividend to its admitted unsecured creditors at or above C%, no allocation of the Lockbox Funds is made;

(ii)      For any entity estate where the available assets already within that estate do not enable it to pay a dividend to its admitted unsecured creditors at or above C%, the Lockbox Funds are allocated to each such estate to 'top up'

such estates to such a level as enables them to pay C% (or as close to C% as can be achieved with the funds available in the Lockbox).

(e)      Based on the evidence and the Courts' conclusions as to the nature of the Lockbox Funds and the entitlements represented thereby, the Courts may conclude that for the purposes of calculating Total Claims either (a) unsecured creditor recovery will be limited to a single claim in a primary jurisdiction (with no duplicate guarantee claims being accepted) or (b) in so far as an unsecured creditor has a principal claim in one entity's estate and a guarantee claim in another entity's estate, both such claims should be taken into account for the purposes of calculating Total Claims and for the purposes of distribution from each estate.

2.      If the Courts wanted to effect a distribution of the Lockbox Funds in advance of each Bankruptcy Estate having completed its claims admission / rejection process, it would be possible to conduct the above calculations at an earlier point based on the best information then available to each Bankruptcy Estate as regards assets and claims. Based on that 'best information' calculation, the Courts could provide for either (a) an interim distribution to be made from the Lockbox on that basis, with a final 'true up' distribution to follow when the claims admission / rejection process had been completed or (b) for the entirety of the Lockbox Funds to be distributed on that basis, but with each estate then only making a partial distribution and holding back sufficient funds to enable 'true up' payments to be made between estates when the claims admission / rejection process is completed.