Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED.

— and —

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>  NORTEL NETWORKS INC., *et al.*,<br><br>                                Debtors. | Chapter 11<br>Case No. 09-10138 (KG)<br>(Jointly Administered) |

**<u>PRE-TRIAL BRIEF OF THE US INTERESTS</u>**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

I.      The US Interests' Allocation Position ..................................................................................1

II.     Nortel's Corporate Structure ...............................................................................................3

III.    NNL's Most Valuable Asset Was Its Equity in NNI ...........................................................4

        A.    Creditor Expectations Were Based on Distinct Corporate Entities ..............................6

        B.    NNI Owned All Valuable Rights to Nortel's Intellectual Property in the United
              States ........................................................................................................................7

IV.     The Monitor's Allocation Theories Are Without Merit .......................................................9

        A.    The Monitor's Disappearing License Theory Is Without Merit ...................................9

        B.    The Monitor's Disappearing One Billion Dollars on the Business Line Sales...........12

V.      Other Parties' Allocation Theories ....................................................................................14

STATEMENT OF FACTS ................................................................................................... 16

I.      The Nortel Group – Overview ...........................................................................................16

II.     The Integrated Entities ......................................................................................................18

III.    NNI's Place in the Nortel Group .......................................................................................19

IV.     NNI's Financial Support of the Nortel Group ...................................................................22

V.      Nortel Group – Background...............................................................................................25

        A.    The Bell System Years (1885-1956).........................................................................25

        B.    The Bell Canada Years – The March South and the Dominance of the US Market
              (1971-1987)............................................................................................................25

        C.    The Bell Canada Years – Beyond North America (1987-1998)..................................27

        D.    Independence, Acquisitions and the Dot-Com Boom (1998-2001).............................28

        E.    Dot-Com Bust, Management Upheaval and Scandal (2001-2007) .............................29

        F.    Endgame .................................................................................................................30

VI.     Nortel Group – Structure and Taxes ..................................................................................31

        A.    Tax Minimization in Corporate Structures and Transfer Pricing ...............................31

        B.    Transfer Pricing and the Arm's Length Standard ......................................................32

        C.    Nortel's Transfer Pricing Prior to 2001 ...................................................................33

        D.    Nortel's RPSM........................................................................................................34

        E.    Negotiations with Tax Authorities and the $2 Billion APA Settlement......................38

        F.    The MRDA ..............................................................................................................38

              1.    The MRDA's Terms ........................................................................................39

              2.    Consistent Views of Economic Ownership .......................................................42

3.  Consistent Representations to Tax Authorities Regarding Economic Ownership ...................................................................................44

4.  Intellectual Property Enforcement and Sublicensing Practices ...........45

5.  Amendments to the MRDA and Related Agreements ...........................46

    a.  The First Addendum ..................................................................46

    b.  The Alcatel-Related Agreement ...............................................46

    c.  The Second Addendum ..............................................................47

    d.  The Third Addendum, Fourth Addendum and the Memorandum of Understanding ...........................................................................47

VII.  The Post-Filing Sales Process ..............................................................................50

    A.  The Insolvency Filings .............................................................................50

    B.  Restructuring Options and NNI's Post-Petition Financial Support of NNL ................51

        1.  Initial Restructuring Discussions ........................................................51

        2.  The IFSA ..............................................................................................53

        3.  The Business Line Sales ......................................................................54

        4.  The Final Canadian Funding and Settlement Agreement ....................57

    C.  The Patent Portfolio ................................................................................58

        1.  Intellectual Property Rights Sold or Relinquished in the Business Line Sales ......58

        2.  The IPCo Model ...................................................................................60

            a.  The Pre-Petition Launch of the Nortel Group's Licensing and Enforcement Business ..........................................................60

            b.  Development of the IPCo Business ...........................................61

        3.  The Patent Portfolio Sale .....................................................................65

**ARGUMENT** ....................................................................................................................... **68**

I.  The US Interests' Allocation Position ..................................................................70

    A.  The Framework for Allocation ................................................................70

        1.  The Touchstone for Allocation Is Fair Market Value ..........................71

        2.  Fair Market Value Principles Are Consistent with the MRDA ...........73

        3.  Fair Market Value of the Assets NNI Sold or Relinquished in Connection with the Sales Must Go First to NNI's Creditors ..........74

    B.  The US Interests' Valuation Methodology ..............................................75

    C.  Value of Assets Relinquished by Each Seller in the Patent Portfolio Sale ................76

    D.  Value of Assets Relinquished in the Business Line Sales ......................79

II.  The Monitor's Allocation Positions Are Fundamentally Flawed .........................82

    A.  The Monitor's Proposed Allocation of the Patent Portfolio Sale Proceeds is Based on an Erroneous Assumption and Must Be Rejected....................................83

       1.   Under the MRDA, NNI Exclusively Held All Valuable Rights to Nortel's Intellectual Property, Including Patents, in the United States ...............................85

          a.   Standard of Contract Interpretation Under Ontario Law ....................86

          b.   The MRDA Granted Equitable and Beneficial Ownership of Nortel Technology to NNI in the US .........................................................87

              (i)   The Valuable Rights that a Patent Affords...............................87

              (ii)  NNI Held the Exclusive Rights to Nortel Intellectual Property, Including Patents, in the United States.....................................88

              (iii) NNI Held the Right to Sublicense ...........................................91

              (iv) NNI Held the Right to Exclude Others from Using Nortel Intellectual Property, Including Patents, in the United States.....................................93

              (v)   The Monitor's Argument that NNI's Rights Had No Value Because of the Word "Products" in Article 5(a) Is Plainly Wrong .......................97

          c.   The MRDA's Factual Matrix Confirms NNI's Equitable and Beneficial Ownership of NN Technology in its Exclusive Territory.............................100

              (i)   Drafting of the MRDA .........................................................101

              (ii)  Representations to Tax Authorities ......................................104

              (iii) Business Practices ...............................................................107

              (iv) Full Economic Ownership...................................................109

              (v)   Custom of the Industry ........................................................112

       2.   The Monitor's Current Position Is Inconsistent with Its Prior Statements and Conduct ....................................................................................................113

    B.   The Monitor's Proposed Allocation of the Business Line Sales Proceeds Is Also Flawed.............................................................................................................118

    C.   The Monitor's Proposed Alternative Allocation of the Patent Portfolio Sale Proceeds in Its Expert's Rebuttal Report is Also Flawed ...........................121

    D.   NNI's Exclusive License Was a Protected Asset of the Debtor's Estate in the United States ......................................................................................................122

III.   The EMEA Debtors' Allocation Position ..........................................................125

IV.   The CCC's and UKPC's Pro Rata Distribution Theory Lacks Merit...................128

    A.   There Is No Legal Basis for a Pro Rata Distribution Approach ...........................130

    B.   There Is No Factual Basis for the Pro Rata Distribution Approach .........................133

    C.   The Pro Rata Distribution Approach Will Prejudice Creditors .................................138

    D.   The CCC Argues for Pro Rata Distributions as an Alternate Theory.......................139

**Conclusion** .........................................................................................................**140**

**Appendix A:  Guide to Common Terms and Abbreviations** ................................................. **A-1**

**Appendix B:  Reference Guide to Business Line Sales and Patent Portfolio Sale** .............. **B-1**

**Appendix C:  Additional Flaws in Green's Opinion** ............................................................. **C-1**

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession (collectively, the "US Debtors"), and the Official Committee of Unsecured Creditors (the "Committee," and together with the US Debtors, the "US Interests") submit this pretrial brief in support of their motion for the allocation of sale proceeds and for such other relief as the Courts deem just and proper.

## PRELIMINARY STATEMENT

The US Debtors, Canadian Debtors and EMEA Debtors cooperated to obtain the highest possible value for the assets of each of the estates.[1] Each estate had the obligation to achieve the highest value for its creditors and each concluded that the best way to do that was by collectively selling Nortel's operating business lines ("Business Lines") and remaining patent portfolio ("Patent Portfolio").[2] On that basis, the sales took place and over $7.3 billion now sits in escrow.[3] All of the estates agree that the issue for the Courts to determine is what portion of the sale proceeds realized was due to the transfer or surrender by the selling US Debtors, Canadian Debtors or EMEA Debtors, as the case may be, of the assets that were the subject of the sale transactions.[4]

## I.    THE US INTERESTS' ALLOCATION POSITION

The aggregate fair market value of the assets sold or surrendered is known:  it is the purchase price achieved as a result of the estates cooperatively selling the Nortel Group's Business Lines and Patent Portfolio.  The task, then, is to determine the fair market value of the

---

[1] The Canadian Debtors include Nortel Networks Corp., Nortel Networks Ltd., and certain of their affiliates.  The EMEA Debtors include Nortel Networks UK Ltd., Nortel Networks (Ireland) Ltd., Nortel Networks S.A., and certain of their affiliates.

[2] References herein to "Nortel" or the "Nortel Group" refer to all affiliated entities in the Nortel group of companies. A reference guide to other commonly used terms and abbreviations is attached as Appendix A hereto.

[3] The Business Line Sales and Patent Portfolio Sale are collectively referred to herein as the "Sales."

[4] See TR50223 at 1, TR21283 at 2-3, TR40731 at 2 (US Debtors', Monitor's and EMEA Debtors' allocation positions).

assets each selling debtor sold or relinquished in each transaction. The US Interests and their valuation expert apply accepted income-based approaches to valuation to make this determination. Based on this analysis, the allocation of sale proceeds should be as follows:[5]

|  | Business Lines | | Patent Portfolio | |
| --- | --- | --- | --- | --- |
|  | Value Relinquished ($ Billions) | Percent | Value Relinquished ($ Billions) | Percent |
| **Canadian Debtors** | $0.34 | 11.9% | $0.43 | 9.7% |
| **EMEA Debtors** | $0.51 | 18.0% | $0.71 | 16.0% |
| **US Debtors** | $1.99 | 70.0% | $3.31 | 74.3% |
| **Total** | **$2.85** | **100.0%** | **$4.45** | **100.0%** |

The US Debtors' allocation follows from the fact that NNI was the Nortel entity that operated in Nortel's most lucrative market, the United States. NNI was the *only* Nortel entity that had the right to operate in that market. NNI owned the Nortel business in the United States.

At bottom, NNI was the engine that drove the Nortel Group, generating most of its revenue and cash-flow, controlling the most valuable customer relationships, funding Nortel operations worldwide (including research and development), and guaranteeing most of Nortel's public debt. NNI exclusively owned all valuable rights to Nortel's intellectual property ("IP") in the United States. In contrast, Nortel Networks Limited ("NNL"), the Nortel Group's Canadian operating company, could not exploit that IP in the United States and did not conduct meaningful business activity in the United States, NNI's exclusive domain. NNL had no right to and could not transfer to a buyer the future revenue and cash-flow opportunities – or any other rights – from exploitation of the US market, whether in respect of the Business Lines or the Patent Portfolio.

By any reasonable measure, NNI was by far the most valuable entity in the Nortel Group

---

[5] Unless stated otherwise, all currency amounts are stated in US dollars, consistent with the Nortel Group's public reporting practices since at least 1995. *See* TR40253 (1995 Northern Telecom Ltd. 10-K).

and had the most valuable assets to contribute to the Sales.  The buyers in the Sales were willing to pay and did pay the most for the ability to generate revenue and cash flow in Nortel's most profitable market, the United States.  That is what NNI brought to the table in the Sales.

Faced with these irrefutable facts, the Monitor of the Canadian Debtors ("Monitor") has decided to go for broke, simultaneously pursuing multiple alternative arguments, each of which is completely without merit as a matter of law and fact.  In its most dramatic overreach, the Monitor claims that NNL is entitled to *all* of the $4.5 billion dollars received from the Patent Portfolio Sale to Rockstar Bidco ("Patent Portfolio Sale").  This argument is based solely on NNL's holding of bare legal title to the patents, even though that legal title was clearly encumbered by NNI's exclusive, royalty-free and perpetual license to exploit those patents in the United States.  Contrary to the Monitor's argument, NNI did not terminate its enormously valuable license in the Patent Portfolio Sale – without which the sale would not have occurred – for zero consideration.

## II.    NORTEL'S CORPORATE STRUCTURE

Nortel was a multinational enterprise ("MNE") with a classic corporate group structure. At the top of the corporate organizational chart stands Nortel Networks Corporation ("NNC"), a Canadian based publicly-traded holding company whose shares were traded on the Toronto and New York stock exchanges.  NNC is the sole shareholder of the Canadian operating company, NNL.  NNL is the sole shareholder of the US operating company, NNI.  It is also the sole shareholder of Nortel's operating companies in the UK, France and Ireland, which were called Nortel Networks UK Limited ("NNUK"), Nortel Networks S.A. ("NNSA"), and Nortel Networks Ireland ("NN Ireland").  Nortel's corporate group, in simplified form, is depicted as follows:



NNL, NNI, NNUK, NNSA and NN Ireland were referred to within the Nortel Group as the "Integrated Entities" ("IEs"), as distinguished from the remaining Nortel Group entities, which were mere distribution outlets, referred to as "Limited Risk Entities" ("LREs"). The IEs undertook entrepreneurial risk, spending billions of dollars – largely funded by NNI – to engage in research and development ("R&D"). They agreed to pool the fruits of their R&D, with each entity exclusively owning all rights in the resulting IP in its respective home country. These separate corporate IEs each had their own boards of directors and their own books and records. They filed their own tax returns and respected corporate formalities. Each entity also had its own separate and easily cognizable creditors.

## III.    NNL'S MOST VALUABLE ASSET WAS ITS EQUITY IN NNI

Prior to insolvency, NNL's most valuable asset was its equity in NNI. As noted, NNI was the Nortel entity that operated in and had the exclusive right to operate in the United States, Nortel's most lucrative market. As set forth in the chart below, for years NNI consistently accounted for over 65% of the revenue and over 75% of the cash flow that was generated in total by the five IEs.

|  | Revenue | | | Cash Flow | | |
|---|---|---|---|---|---|---|
|  | 2009 | 5 Yr | 15 Yr | 2009 | 5 Yr | 15 Yr |
| **NNL** | 12% | 13% | 20% | 1% | 9% | 11% |
| **NNI** | **69%** | **66%** | **67%** | **88%** | **75%** | **81%** |
| **EMEA IEs** | 19% | 21% | 13% | 11% | 16% | 8% |

With this revenue and cash flow, NNI directly or indirectly funded 63% of the Nortel Group's R&D in 2008, and over 65% of the Nortel Group's R&D activities over the fifteen-year period prior to the filing of these insolvency proceedings. From 2001 to 2009, NNI provided NNL with a $1.575 billion revolving credit facility to fund NNL's working capital needs. And, from the early 1980s to liquidation, NNI had substantially more employees than NNL.

NNI was so valuable – and that value was clearly known by the financial markets – that its guarantee was necessary to support the issuance of billions of dollars of the Canadian Debtors' public debt. Without NNI's many guarantees, NNC and NNL would have had to pay their bondholders higher interest rates for less funding with less favorable covenants.

Accordingly, any notion that Nortel was uniquely Canadian or that the vast majority of its value lay in its Canadian operations is simply wrong. As Clive Allen, a former NNL general counsel and a witness for the Monitor in these cases, confirmed, even as early as 1999, Nortel could no longer be called a "Canadian company" because "at this point in time, and actually for many years, less than ten percent of Nortel's sales have been in Canada." As Allen explained, had Nortel decided to remain only a Canadian company, it would have "died because we could not afford the R&D to be competitive." In Allen's words:

> In the case of Nortel, bear in mind that this is a difficult business in which to survive in Canada. Canada has fewer telephones than the state of California. I know of no company in our business that could survive on the amount of business that is available in Canada alone. R&D costs associated with a new product can now run into billions of dollars. . . . That is more than we sell in Canada.[6]

Prior to January 2009, NNL could use NNI's revenue and cash flow to fund NNL operations, but the insolvency proceedings changed everything. From at least that point forward, the Nortel Group no longer continued as a multinational enterprise operating for the benefit of its

---

[6] TR21101 at 416.

parent's shareholders.  Each Nortel debtor owed fiduciary duties to its separate creditors, which

required each debtor to preserve and maximize its assets for the benefit of its separate creditors.

The ability of the Canadian Debtors to extract value out of NNI and transfer it up the corporate

chain to NNL came to an end.  And, after insolvency, NNL's equity in NNI lost its value because

equity takes last, only after NNI's creditors – the largest of which are the bondholders to whom

NNL gave NNI's assets as a guarantee for billions of dollars of debt – are paid in full.  The value

of NNI now belongs first to NNI's creditors, not to NNL.  This is the commonplace, settled and

black letter rule of insolvency in each of the US, the UK and Canada.  That each separate

corporate entity within a corporate group of companies is subject to this rule is undeniable.

There is nothing novel, inequitable or "punitive" about this legal maxim.  Nor is it unusual for an

operating subsidiary of a corporate parent – even one with some operations of its own – to be

worth significantly more than the parent or for the parent's net worth to be largely dependent on

the value of the equity of its largest operating subsidiary.

## A.  Creditor Expectations Were Based on Distinct Corporate Entities

Nortel's creditors lent to distinct corporate entities.  Nortel's employees worked for

distinct corporate entities.  As the Monitor admits:

> [T]he Nortel companies each had a separate and distinct existence.  Employees
> were employed by the specific company they worked for.  Trade creditors
> contracted with specific Nortel entities. Bondholders invested with or lent to
> specific Nortel members of the Nortel Group.  Where applicable, guarantees were
> negotiated from specific Nortel group members.  The . . . *ex post facto*
> characterization of creditors dealing indiscriminately with members of the Nortel
> Group is entirely incorrect and unsubstantiated.[7]

The value of the assets sold or relinquished by NNI during these insolvency proceedings is

legitimately earmarked for NNI's creditors.  It would be contrary to law and to the creditors'

legitimate expectations if that value were stripped out of the NNI estate and given to creditors of

---

[7] TR40711 (Response of the Monitor and Canadian Debtors to the Opening Allocation Pleadings) ¶ 41.

a different debtor.

**B.    NNI Owned All Valuable Rights to Nortel's Intellectual Property in the United States**

The allocation of sale proceeds must account for the fact that only NNI operated and had the right to operate Nortel's businesses in the United States. This included, but was not limited to, the right to exploit Nortel's IP rights, including patents, in the US. This is set forth in the Master R&D Agreement ("MRDA").

In the MRDA, Nortel's five Integrated Entities – NNL, NNI, NNUK, NNSA and NN Ireland – agreed to pool the fruits of their joint R&D activities by having each party hold, in perpetuity, all rights to the resulting intellectual property in its respective Exclusive Territory.[8] The IEs agreed for administrative simplicity to vest legal title in Nortel's intellectual property with NNL "in consideration for" NNL granting *exclusive, royalty-free and perpetual licenses* in respect of that intellectual property to each other IE in its Exclusive Territory.[9]

These Exclusive Licenses granted the Licensed Participants in their Exclusive Territories "all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith." This included the exclusive rights to sublicense, to make, have made, use, lease, license, offer to sell, and sell "Products," and to exclude anyone else (including NNL) from using Nortel's patents and all other intellectual property in their Exclusive Territories.[10] The MRDA also granted NNI the right to enforce the rights with respect to all of the Nortel Group's intellectual property against

---

[8] The IEs' territories in the MRDA are referred to as "Exclusive Territories." NNI's Exclusive Territory was the United States and Puerto Rico ("US" or "United States"). TR21003 (MRDA) at Art. 1(f), Sched. B.

[9] *Id.* at Art. 4(a). The IEs are referred to as "Participants" in the MRDA. The Participants other than NNL are referred to as "Licensed Participants." The licenses granted in the MRDA are defined as "Exclusive Licenses." *Id.* at 2, Art.1(e) .

[10] *Id.* at Art. 5(a). The Licensed Participants also received non-exclusive licenses (also royalty-free and perpetual) with respect to the rest of the world outside of the Integrated Entities' exclusive territories. *See id.*

infringers in the US.[11]  The MRDA expressly provides that the Exclusive Licenses are perpetual.

This is also made clear by its broad definition of "Products":

> [A]ll products, software and services designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, *at any time* by, or for, any of the Participants, and all components, parts, subassemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in any of the foregoing.

*Id.* at 1(g) (emphasis added).

The breadth of the Exclusive Licenses means that NNI owned all of the valuable rights to Nortel's intellectual property in the United States.  The MRDA describes these rights as "equitable and beneficial ownership."  *Id.* at 2.  Consistent with this, both NNL and NNI consistently represented to tax authorities that the IEs owned Nortel's intellectual property in their respective territories.  The key Nortel business persons involved in the creation of the MRDA – including senior *NNL* officers – have confirmed under oath the correctness of what Nortel told tax authorities:  pursuant to the MRDA, NNI owned all valuable rights to Nortel's intellectual property in the US.  Prior to its adoption of its litigation position, the Monitor also confirmed this in an analysis that its representatives helped prepare for submission to tax authorities.[12]

Allocation must account for NNI's consensual termination of its exclusive, royalty-free and perpetual license to the Nortel Group's intellectual property in the United States.  Without such terminations, the Sales would not have occurred.

---

[11] *Id.* at Art. 4(e).

[12] This analysis is discussed further in Section II.A.2 of the Argument below.

IV.    **THE MONITOR'S ALLOCATION THEORIES ARE WITHOUT MERIT**

A.    **The Monitor's Disappearing License Theory Is Without Merit**

The Monitor contends that the Exclusive Licenses granted in the MRDA were limited and not perpetual, and that they lost all value once the Business Lines were sold.  As one of the Monitor's experts memorably described the Monitor's position, the Exclusive Licenses were "perpetual in form, but temporally finite."[13]

The Monitor contends the Exclusive Licenses only granted the Licensed Participants the right in their Exclusive Territories to make or sell the same set of products that the Nortel Group was making or selling prior to the Sales, and nothing more.  According to the Monitor, once the Nortel Group purportedly stopped making narrowly defined products, there was no value left in the Exclusive Licenses.  Based on this theory, the Monitor claims that NNL is entitled to *all* of the $4.5 billion proceeds from the Patent Portfolio Sale and most of the proceeds from the Business Line Sales.

The Monitor's argument is inconsistent with the clear terms of the MRDA.  The Exclusive Licenses were extremely broad and were intended to and did provide each Licensed Participant with all valuable rights to Nortel's IP in its Exclusive Territory.  The Exclusive Licenses did not switch on and off depending on what products Nortel was making or selling, as the Monitor contends.  The MRDA nowhere states that in the event Nortel stopped making products, or even if it never made a product, then the Licensed Participants' exclusive territorial rights in Nortel's IP, including patents, would vanish.

NNI's valuable rights with respect to Nortel's IP in the United States did not come to an end until NNI terminated its Exclusive License – and the US Court approved such termination as

---

[13] Reichert Report.  All references to opening expert reports filed on January 24, 2014, shall be cited with the last name of the author followed by "Report."  All references to rebuttal expert reports filed on February 28, 2014, shall be cited with the last name of the author followed by "Rebuttal."  (E.g., "Kinrich Report" and "Kinrich Rebuttal").

in the best interests of NNI's creditors – to facilitate the Patent Portfolio Sale in consideration of an allocation from the proceeds of that sale.  NNL had nothing of value to offer with respect to the US market.  Accordingly, that portion of the sale proceeds attributable to the right to exploit and profit from the patents in the US market (the most valuable IP rights) belongs solely to NNI.

Notably, the Monitor's position is inconsistent with its prior representations to these Courts, and it should be estopped from now disavowing them.  For three years of these proceedings, in 18 separate publicly-filed reports and in applications seeking the approval of these Courts with respect to many significant case milestones, the Monitor consistently confirmed that while NNL held legal title to the patents, the Licensed Participants held and continued to hold Exclusive Licenses to those patents in their Exclusive Territories.  In other words, for years, the Monitor acknowledged that NNL's legal title was encumbered by the Exclusive Licenses.  The Monitor made these same representations in support of its separate reports advocating for Court approval of each of the Business Line Sales and the Patent Portfolio Sale.  Prior to May 2013, the Monitor never once disclosed that it instead believed the Exclusive Licenses were no longer effective and thus worthless with respect to the Patent Portfolio.

The Monitor's view that the other estates, including NNI, were entitled to *no* allocation of the Patent Portfolio Sale proceeds because the Exclusive Licenses had become worthless plainly would have been highly material information that the other estates, all creditors, and both the US and Canadian Courts should have been told in connection with their consideration of whether to approve, or not approve, the Patent Portfolio Sale.  The US Court, in particular, would surely have wanted to know if the Monitor believed NNI was entitled to nothing from the $4.5 billion Patent Portfolio Sale before it approved that sale and NNI's termination of its Exclusive License to facilitate that sale.

We do not presume that the Monitor – which owes special duties of candor to the Courts and to creditors and should not engage in sharp practice – would represent to the Courts and creditors that it believed Nortel's patents remained subject to the Exclusive Licenses if it in fact believed the licenses no longer had any effect.  In his sworn deposition testimony, Murray McDonald, the principal representative and decision-maker for the Monitor, explained what happened:  he was unaware of any argument that the Exclusive Licenses had no value when the Monitor made its prior representations to the Courts.  According to McDonald's sworn testimony, the first time he learned of this newly-coined argument (first made in May 2013) was sometime after the failure of the third mediation in these proceedings held in January 2013.[14]

Taken at face value, this admission establishes that the Monitor's disappearing license argument is a litigation-driven contrivance with no basis in reality.  The Monitor is no stranger to Nortel.  The Monitor – Ernst &Young Inc. ("Ernst & Young Canada") – worked hand-in-glove with NNL for years before Nortel's insolvency, assisting it with respect to the MRDA and with communications to tax authorities regarding that agreement, including the communications stating that the IEs owned Nortel's IP in their respective Exclusive Territories.  Following Nortel's insolvency, Ernst & Young Canada again continued to work closely with NNL – including with key business persons who had first-hand knowledge of the MRDA and the parties' intentions with respect to the MRDA – for years before it, as Monitor, disclosed its new litigation position in 2013.  McDonald was a key participant in the three allocation mediations that took place at great cost over a three-year span – mediations which all parties were required to and did take very seriously.  If the Monitor's newly-discovered view of the licenses had any basis, McDonald's colleagues at Ernst & Young Canada or NNL's personnel assisting with the

---

[14] *See* McDonald Dep. 145:17-146:5.

bankruptcy and liquidation would surely have informed him about this at the outset of these proceedings or, at a minimum, prior to any one of the three allocation mediations.

> **B.      The Monitor's Disappearing One Billion Dollars on the Business Line Sales**

The Monitor's license argument is not the only way in which the Monitor improperly tries to extract value from NNI and re-allocate it to NNL.  On the Business Line Sales, the Monitor does not attempt to value what the buyers paid for the assets contributed by *each* of the selling debtors, even though it agrees that is the question that the Courts must resolve.  Monitor's Opening Allocation Position ¶ 4.  Rather, the Monitor seeks to allocate to NNI, NNUK, NNSA and NN Ireland only the amounts the Monitor asserts these entities would have earned had the Business Lines not been sold and Nortel had instead continued operating in the same money-losing manner as before.  The difference between these artificially-depressed amounts and the high purchase prices, according to the Monitor, should simply be allocated to NNL.

The Monitor refers to this as a "value in use" calculation, and the Monitor applies that calculation in a flawed and inconsistent manner.  The first flaw in the Monitor's argument is that the Business Line Sales *did* occur and Nortel did not continue operating as it had in the past.  Allocation is not to resolve a hypothetical of what each party might have earned and reported as revenue to tax authorities under Nortel's transfer pricing regime had there been no Business Line Sales, but rather to allocate what was in fact paid for the assets in the Sales that did occur.  Similarly, debtors in bankruptcy often realize values through going concern sales that are significantly higher than the debtor's own "value in use" of the sold business.  Where a business operates inefficiently and loses money, its value in use might be low.  But if a potential buyer believes it could operate the business more efficiently, it would be willing to pay more than the owner's value in use.  No reasonable person would contend that the seller is not entitled to the agreed-upon price if the seller's value in use was lower than that sale price.

The second flaw in the Monitor's approach is that it is once again based on its incorrect view of the scope of the Exclusive Licenses, which alone defeats its value in use approach.

Not only is the Monitor's "value in use" methodology inapplicable to allocation, but the Monitor compounds the error by only computing the supposed value in use for the Licensed Participants, but *not* for NNL.  It thus uses *inconsistent valuation methods* for NNL and the Licensed Participants to allocate the Business Line Sales proceeds.  The Monitor and its experts' sole basis for this inconsistent treatment is that, under the MRDA, NNL had legal title to the patents, and the Exclusive Licenses that encumbered that legal title were only transferrable with consent.  But the Exclusive Licenses' value *was* transferred to the buyers *with* consent.

Moreover, the Interim Funding and Settlement Agreement entered into by all parties and approved by these Courts before the Sales expressly provides that a license termination is the same as a *sale* of the license.[15]  The License Termination Agreements, which were express conditions of the Sales, expressly provide that the Licensed Participants are sellers in the Sales.[16]  It made perfect sense that NNL would have consented to NNI's assignment of its Exclusive License under the MRDA.  When Alan Cox, one of the Monitor's valuation experts, was asked what a "buyer would have paid to NNL to take all of NNL's right under the [P]atent [P]ortfolio subject to whatever NNI's and the EMEA [IEs'] exclusive licenses were," Cox testified:  "I thought about it and amongst the possibilities I thought that they would pay a relatively small amount, certainly a lot less than what was paid in the Rockstar transaction, *possibly nothing*."[17]  As Cox recognized, it was NNL that had little of significant value to transfer to the buyers, and

---

[15] TR21638 (IFSA) § 11(d).

[16] *See infra* n. 427; *see also* TR21638 (IFSA) § 11(d).

[17] Cox Dep. 156:25, 157:2-17 (emphasis added).

his words apply with equal force to the Business Line Sales as they do to the Patent Portfolio Sale.

If one applies the Monitor's value in use analysis for *all* of the selling debtors, including NNL, using the same materially flawed cash flow projections the Monitor uses to calculate that value in use, the total value of what the selling debtors sold according to the Monitor's theory would be about $1 billion less than the amount in fact received in the Business Line Sales. By applying inconsistent allocation theories to NNL and the Licensed Participants, the Monitor, in effect, has made $1 billion disappear from the value of the Business Line Sales that needs be allocated. The Monitor then gifts that $1 billion to NNL.

At bottom, the Monitor's allocation theories with respect to both the Patent Portfolio Sale and the Business Line Sales are an attempt to escape the reality that NNL benefitted from the value of the US market only through its equity in NNI – equity that now stands at the end of the line behind NNI's creditors. In the Patent Portfolio Sale, NNI's relinquishment of its Exclusive License was responsible for transferring to Rockstar the value of the patents and patent applications in the United States. With respect to the Business Line Sales, again it was NNI and only NNI that was able to and did transfer the value of the Business Lines in the United States. NNL had nothing of value to transfer to buyers in these Sales with respect to the US market.

## V.    OTHER PARTIES' ALLOCATION THEORIES

Unlike the Monitor, the EMEA Debtors do not premise their valuation analysis on the fiction that the value at issue was not the result of consensual sales entered into by the US, Canadian and EMEA Debtors. Rather, the EMEA Debtors' alternative allocation position is in fact very similar to the US Interests' position, and is likewise based on a valuation recognizing the valuable Exclusive Licenses that NNI and the EMEA Debtors held. While there are some

differences between these two positions, they are relatively minor and involve straight-forward issues with respect to valuation inputs.

The EMEA Debtors' primary allocation theory – the "contribution" approach – is flawed, but is more reasonable than the Monitor's position as it seeks an allocation based on a correct understanding of the actual assets sold by the selling debtors.  The flaw in the EMEA Debtors' primary approach is that it seeks to allocate based on what the parties spent to create Nortel's intellectual property rather than on the value each selling debtor had in that property and relinquished in the Sales.  If the Courts nonetheless decide to apply a contribution-based approach to allocation (which they should not do), the EMEA Debtors' calculations have to be corrected to account for the full extent of NNI's funding of R&D, which included both direct R&D spending conducted by NNI and NNI's funding of R&D conducted by the other IEs, including NNL, through billions of dollars of transfer pricing payments.[18]

Finally, the allocation theories of the Canadian Creditors Committee ("CCC") and UK Pension Claimants ("UKPC") based on a pro-rata or substantive consolidation theory should be rejected out of hand and as a matter of law for the reasons set forth herein and in the US Interests' motion to strike certain of the CCC's and UKPC's expert reports.[19]  Their experts readily admit that they have made no effort to answer the question posed by the Courts for trial, that adoption of their theory would *prevent* allocation at the trial and they have no legal support for an unprecedented substantive consolidation on a cross-border basis of the assets and liabilities of distinct corporate entities.

---

[18] The US Interests do agree with the EMEA Debtors' adjustment of the contribution to correct the unreasonably short useful life of technology imposed by NNL in the RPSM.

[19] *See* US Interests' Motion to Strike the Expert Reports of the UK Pension Claimants and Canadian Creditors' Committee Advocating for a "Pro Rata Distribution" to Creditors [D.I. 13370].

## STATEMENT OF FACTS

The evidence at trial will establish the following.

## I.    THE NORTEL GROUP – OVERVIEW

The Nortel Group is not a single corporate entity, but rather a group of separate corporate entities.  *See R. v. Dunn*, 2013 ONSC 137 paras. 169-170, 174-177.  Individual members of the Nortel Group are now in the process of being liquidated, have already been liquidated, or are in the midst of other processes as appropriate under the laws of their jurisdictions.[20]

The Nortel Group was a classic MNE.  At the top of the MNE's organization chart is the Nortel Group's publicly-traded holding company, NNC, which was subject to reporting in both the United States and Canada and to supervision by the Ontario Securities Commission and the US Securities and Exchange Commission.[21]  NNC was publicly listed and traded on both the New York Stock Exchange and the Toronto Stock Exchange.[22]

As a holding company, substantially all of NNC's assets were its equity in other Nortel entities.[23]  One of these entities was NNL, the Canadian operating company of the Nortel Group.[24]  NNL is also an intermediate holding company.  As such, NNL owns 100% of the equity of each of NNI, the Nortel Group's US operating company; NNUK, the Nortel Group's operating company in the United Kingdom; NN Ireland, the Nortel Group's Irish operating company; and more than 90% of the equity of NNSA, the Nortel Group's French operating

---

[20] *See, e.g.*, TR21539 ¶¶ 3, 18; TR50760; TR50668 ¶¶ 1-8; TR50310 at 1-2, 9; TR50445 at 20-21.

[21] *See* TR21540 ¶¶ 10, 13; TR11359 at 21.

[22] *See* TR21540 ¶ 10.

[23] *See* TR21539 ¶¶ 2, 19-22; TR21540 ¶ 3.  In addition to its ownership of NNL, NNC is the direct owner of Alteon Websystems, Inc., CoreTek, Inc., Sonoma Systems and Xros, Inc., each a US Debtor.  Architel Systems (U.S.) Corporation is a direct subsidiary of a non-US Debtor subsidiary of NNC.  Nortel Networks Applications Management Solutions Inc. is 88.62% owned by NNC and 11.38% owned by NNI.  *See* TR21540 at Sched. 1 nn. 1-2; TR11359 at 12.

[24] TR21540 ¶ 11.

company.[25]  As noted above, NNSA, NNUK, NN Ireland, NNI and NNL were referred to by the

Nortel Group and are referred to herein as the Integrated Entities, or IEs.[26]

NNL's most valuable asset was its equity in NNI, which as described below possessed,

among other assets, all of the rights to the Nortel Group's intellectual property in the United

States.  NNL's only claim to the value of the Nortel Group's intellectual property in the United

States was through its ownership of NNI's equity.

As controlling equity holder, NNL had the power to appoint the directors of each of the

other Integrated Entities and through those directors, control the actions of each.  The same is

true for downstream subsidiaries of each of the other Integrated Entities.  At all relevant times

prior to January 14, 2009 ("Petition Date"), NNL and its own sole equity holder NNC held the

authority to appoint all directors of each of the other Integrated Entities.[27]

Below NNC and NNL in the Nortel Group corporate structure, there are more than 140

separate corporate entities,[28] incorporated under the laws of over 60 separate sovereign

jurisdictions.[29]  As it approached its peak in 2000, the Nortel Group operated in more than 150

countries around the world and on six continents.[30]

Each of the members of the Nortel Group was and remains today a separate legal entity.

Each entity was and is established and operating under and subject to the laws of its own

jurisdiction.  Each of the members of the Nortel Group possesses the critical characteristics of

corporate existence:  each has a separate legal identity and each has assets and liabilities that

---

[25] TR21539 ¶¶ 23-27; TR22075 at 10.  As of the Petition Date, NNSA was owned 91.17% by NNL and 8.83% by Nortel Networks International Finance & Holding, B.V.  *See* TR22075.

[26] *See* TR22078 (2008 Joint APA Request) at 6, 12.

[27] *See* TR50746 ¶ 1; TR50669 ¶ 70; TR49609; TR50682 at Art. 101; TR50675 at Arts. 14, 23.

[28] *See* TR21539 ¶ 2.

[29] *See* TR43849.

[30] *See* TR50684 at 4-6.

were and are separate and not commingled (neither vertically between parent and subsidiary nor horizontally among the subsidiaries).[31]  Each Nortel entity was and is premised on the concept of limited liability, a longstanding premise of the corporate form in that shareholders hold their investment in the form of equity and are not liable for the debts of the corporation. [32]

## II.    THE INTEGRATED ENTITIES

Each of the Integrated Entities performed nearly all of the Nortel Group's R&D.  They created, owned and licensed the Nortel Group's intellectual property, and generated the vast majority of the Nortel Group's global revenue.[33]  By contrast, other companies within the Nortel Group were described as Limited Risk Entities.  The LREs distributed Nortel products within their jurisdictions in exchange for a fixed return, and did not participate in R&D or bear the associated risks and benefits of such participation.[34]

Nortel described the IEs to the Internal Revenue Service ("IRS") and Canada Revenue Agency ("CRA") as follows:

> An Integrated Entity (IE) is an entity that performs all of the activities required to fulfill customer contracts and effectively orchestrate Nortel's value chain.  Each IE performs the functions of R&D, manufacturing support, distribution and extraterritorial services to varying degrees in a very united and reliant manner.[35]

The IEs, in other words, were not only legally separate in form, but possessed all of the

---

[31] *See, e.g.*, Ray Decl. ¶¶ 30-32 (NNI respected corporate formalities, had and has its own board of directors, has prepared and filed its own tax returns, has prepared audited financial results, and, along with the other US Debtors, has continued to maintain its corporate formalities and separateness in the post-filing period); Zafirovski Dep. 32:14-34:19; Binning Dep. 148:13-149:12; Beatty Dep. 30:23-32:3; Doolittle Dep. 39:10-43:2; Bifield Dep. 88:14-89:3.

[32] In the vast majority of cases, Nortel Group members were owned 100% by some other Nortel Group member. Excluding joint ventures, in those few situations where members of the Nortel Group have multiple shareholders, the other shareholder(s) is (or are) also Nortel Group members.  *See* TR22075 at 10; TR43849.

[33] *See* TR22078 (2008 Joint APA Request) at 6, 11-12; *see also* TR21003 (MRDA) at Sched. A.

[34] *See* TR22078 (2008 Joint APA Request) at 12; Ray Decl. 4.

[35] TR22078 (2008 Joint APA Request) at 6 (emphasis added); *see also id.* at 11 ("In addition to performing ongoing R&D functions, the IEs are fully integrated, meaning they perform all functions related to the customer fulfillment process including manufacturing support and distribution functions both inside and outside of their respective geographic markets.").

hallmarks of fully-functioning businesses, even as they operated as part of an MNE.  They

owned and operated research and development facilities, supported the third parties that

manufactured the Nortel Group's products, marketed such products and solutions, and developed

and maintained relationships with key customers.[36]

Well after the Petition Date, in 2010, the Monitor worked with NNL and NNI to prepare

submissions for the IRS and the CRA.  NNL and NNI were described as follows:

> NNI and NNL *can both be characterized as fully integrated companies* that
> perform the functions of research and development ('R&D'), design, liaison with
> third-party manufacturers, logistics, fulfillment, services, and distribution. NNI
> and NNL are able to perform a full scope of distribution activities, since they have
> technical and other regional sales and marketing personnel and general and
> administrative personnel who support the sales effort both locally and globally.
> These activities include marketing strategy, tactical marketing, and advertising
> development and fulfillment functions.[37]

## III.    NNI'S PLACE IN THE NORTEL GROUP

The Nortel Group's single most important market was the United States and the Nortel

Group's business in the United States was owned and operated by NNI.

NNI conducted research and development at a number of substantial facilities in the US,

including at state-of-the-art research facilities in Richardson, Texas; Billerica, Massachusetts

(along the Route 128 technology corridor outside Boston); Santa Clara, California (in Silicon

Valley);  Raleigh, North Carolina (in Research Triangle Park); Long Island, New York; and

Batavia, New York.[38]  Together, these facilities employed thousands of engineers and other

---

[36] At one point, the IEs manufactured much of Nortel's product line themselves, *see* TR31355 (2000-2004 Functional Analysis) at 17 & 51, but by 2004 most manufacturing activities were outsourced except for the most complex stages, which remained with Nortel's System Houses, *see id.* at 5, 114-23.

[37] TR47221 at 35 (emphasis added); *see also* TR47223 at 34 ("In addition to performing ongoing R&D functions, the IEs are fully integrated, meaning they perform all functions related to the customer fulfillment process including manufacturing support and distribution functions both inside and outside of their respective geographic markets.").

[38] *See* TR33056 at 6-9; TR21203 at 1-2; TR21205 at 5; TR21201A at 3-4; Ray Decl. ¶ 13.

R&D personnel.[39]

NNI's customers were the most important customers of the Nortel Group, and NNI was accordingly the largest revenue generator in the Nortel Group.  Historically, NNI earned nearly 70% of the integrated entities' aggregate annual revenue.[40]  NNI customer Verizon by itself accounted for more than 10% of the Nortel Group's global revenue in 2007, and two other NNI customers – Sprint Nextel and AT&T/SBC – each accounted for over 5%.[41]  NNI was responsible for developing and maintaining the customer relationships that drove these revenues.[42]

NNI possessed administrative and operational capacities, including senior accounting, human resources, legal, real estate, operations, logistics and information technology personnel who supported NNI's operations as well as operations of Nortel Group affiliates around the world.[43]  Although NNL provided certain headquarters functions for the Nortel Group, NNI had corresponding teams in the United States – including those with expertise in accounting, tax, internal audit, compliance, revenue recognition, accounts receivable and payable, and payroll.[44]

The Nortel Group had four business lines in early 2009.  The two largest business lines were located in the US and housed within NNI.  Carrier Networks, led by NNI employee Richard

---

[39] Even after nearly a decade of downsizing, as of Jan. 14, 2009, NNI employed nearly 10,000 people at 80 locations in the United States, including at four primary R&D facilities that together employed 2,294 active R&D employees. Ray Decl. ¶ 12.

[40] See TR49192 at tab "New reconciliation," TR49187 at tab "New reconciliation," TR49188 at tab "New reconciliation," TR49194 at tab "New reconciliation," TR49190 at tab "New reconciliation," TR49191 at tab "A-100 Reconciliation," TR49193 at tab "Q4 2007 SAP Con," TR49189 at tab "Q4 2008 SAP Con" (together with TR49389, the "Transfer Pricing Worksheets").

[41] See TR22078 at App. C, p. 11.

[42] See, e.g., TR22075 at 4 ("Our legal entity structure is primarily country based and each of [Nortel's business] segments sell into these countries via the relevant legal entities."); TR22078 at 22 ("NNI and NNL are able to perform a full scope of distribution activities, since they have technical and other regional sales and marketing personnel and general and administrative personnel who support the sales effort both locally and globally.  These activities include marketing strategy, tactical marketing, and advertising development and fulfillment functions."); TR12017; Zafirovski Dep. 27:11-28:21; R. v. Dunn, 2013 ONSC 137 para. 175.

[43] Ray Decl. ¶¶ 15-16; Ricaurte Decl. ¶¶ 4, 7.

[44] Ray Decl. ¶ 19.

Lowe, was headquartered in Richardson, Texas,[45] and Enterprise Solutions, headed by NNI

employee Joel Hackney, was headquartered at the Research Triangle Park facility near Raleigh,

North Carolina.[46]

      NNI was the center of the Nortel Group's global operations.  NNI employees Joseph

Flanagan and Christopher Ricaurte led the group's 3,600-person Global Operations unit, which

was responsible for "supporting and fulfilling, from beginning to end, orders from Nortel

customers around the world."[47]  Among other things, Global Operations personnel were

responsible for proactively assessing market demand and ensuring that adequate inventory was

on hand to meet anticipated orders, providing technical support for customer networks 24 hours a

day, 7 days a week, and managing service and manufacturing costs for each of the Nortel

Group's Business Lines.[48]  The Global Operations group's Supply Chain Management;

Manufacturing Support, Procurement and Logistics; and Technology Introduction and Support

groups each provided essential services without which the Nortel Group's business lines could

not operate.[49]

      NNI's operational leadership was such that, after the insolvency filings, NNI led the

newly created Nortel Business Services ("NBS") unit, providing essential transitional business

services to the purchasers of the Business Lines – including human resources, finance, IT and

other support required to meet obligations to the purchasers – without which the Nortel Group

---

[45] Riedel Dep. 146:16-147:2; Edwards Dep. 108:12-15; Ray Decl. ¶ 17; Ricaurte Decl. ¶ 5.

[46] Edwards Dep. 108:18-21; Ricaurte Decl. ¶ 5; Ray Decl. ¶ 17.  Other top managers performing essential functions for the Nortel Group were also NNI employees.  George Riedel, an NNI employee, led the Nortel Group's M&A/Strategy function.  Riedel Dep. 32:3-6; 28:18-29:22.  Chief Intellectual Property Officer John Veschi, also an NNI employee, led the Intellectual Property group, the leadership of which was based in the United States.  Veschi Dep. 47:13-25; 244:9-14; 245:21-246:19.

[47] Ricaurte Decl. ¶ 4; *see also* TR48623 at 9-14; T. Collins Dep. 29:21-30:10; Zafirovski Dep. 91:7-18.

[48] Ricaurte Decl. ¶ 4; *see also* TR48623 at 9-14.

[49] Ricaurte Decl. ¶¶ 8-28; *see also* TR48623 at 9-14.

would have been subject to substantial damages claims from customers or purchasers.[50]

## IV.    NNI'S FINANCIAL SUPPORT OF THE NORTEL GROUP

That the Nortel Group was an MNE comprised of separate legal entities was recognized and relied on repeatedly by the financial markets and key counterparties.  This is clear in the guarantees provided by NNI to Export Development Canada ("EDC," Canada's federal export credit agency, which provides financing support to Canadian exporters) for a facility under which NNL was the primary obligor,[51] and in the guarantees provided by NNI for billions of dollars in bond debt issued by either NNC or NNL.[52]

Today, in liquidation, most of the more than $4 billion in bond debt issued by either NNL or NNC is guaranteed by NNI.[53]  The funds generated by these offerings were used to pay NNL and NNC corporate obligations, including $575 million in cash payments to former shareholders of NNC in settlement of securities class action claims arising from four financial restatements during the 2000-2005 fiscal year period and related investigations by the OSC and SEC at the NNL/NNC level (together with the investigations, the "Financial Restatements").[54]  The decision of NNC and NNL to have NNI issue these guarantees was necessary given the financial and reputational weakness of NNC and NNL in the wake of the Financial Restatements.[55]  Liability

---

[50] Ricaurte Decl. ¶¶ 29-38; Ray Decl. ¶¶ 19, 21-22; *see also* TR40030 at attachment; TR50736.

[51] *See* TR11003 at 103-04, 175; TR50744 at 9.

[52] *See* TR44700; TR44615; TR40119.

[53] *See* TR21539 ¶¶ 108-11; TR22075 at 8; TR50744 at 8-9.  A comparatively small amount of financial debt, $350 million, was issued by NNL or NNC, but not guaranteed by NNI.  *See* TR22075 at 8.  In addition, when NNL or NNC previously issued debt without a guarantee by either NNI or NNCC (another US Debtor), one of the Canadian entities issued a separate guarantee for the other.  For instance, in August 2001, NNC issued convertible senior notes guaranteed by NNL.  *See* TR43738 at 39.

[54] *See* TR50725 at 152-53; *see also* TR50734; TR44700 at 30; TR21539 ¶ 14.

[55] Until 2002, NNC and NNL (or their corporate predecessors in interest) were considered by Standard & Poors Corporation ("S&P") and Moody's Investors Service ("Moody's") to be investment grade issuers.  From and after 2002, the S&P and Moody's credit ratings of NNC and NNL were below investment grade.  *See* TR40223 at 35.

for these guarantees accounts today for nearly 75% of the filed claims against the US Debtors.[56]

NNI's guarantees of Canadian-issued debt reduced the interest rate paid by the issuer (either NNC or NNL), made the debt issuance possible in the first place, or both.[57]  Potential investors in this NNC/NNL debt, the future bondholders now parties to these proceedings, were informed by NNC and NNL at issuance that bonds issued without a guarantee against a specific subsidiary would have had no claims against that subsidiary.

For example, a December 2007 prospectus for NNC convertible debt guaranteed by NNI made clear that:

> The . . . notes are senior unsecured obligations of the company [NNC] and rank *pari passu* with all other senior obligations of the company.  The notes are effectively subordinated to all liabilities of the subsidiaries of NNC that are not guarantors to the extent of the value of such subsidiaries.
>
> In the event of a bankruptcy, liquidation or reorganization of any direct or indirect non-guarantor subsidiary of the company, *all of the creditors of that subsidiary . . . and third parties having the benefit of liens . . . against that subsidiary's assets will generally be entitled to payment of their claims from the assets of such non-guarantor subsidiary before any of those assets are made available for distribution to any issuer* that is a shareholder of such subsidiary.[58]

The financial markets were unwilling to take the structural subordination risk of debt not guaranteed by NNI because NNC/NNL's credit ratings were below investment grade and in the eight years prior to the Petition Date, NNL generated in Canada just 13% of the IEs' aggregate

---

[56] *See* Monthly Operating Report No. 59, In re Nortel Networks Inc. et al., No. 09-10138-KG (Apr. 4, 2014) [D.I. 13262] at 6.

[57] *See* Williams Dep. 198:12-198:20; Stevenson Dep. 126:3-128:21; Currie Dep. 263:14-263:21.  *See also* TR21312; TR44710; TR44738.

[58] TR40180 at 3, 9-10 (second italics added).  The offering memoranda for NNC and NNL's 2006-2008 bond offerings similarly made clear the separateness of Nortel's entities, and that non-guarantor subsidiaries of NNC and NNL would have no obligation under the notes issued.  *See* TR44700 at 25 ("The Issuers' subsidiaries are separate and distinct legal entities and *any subsidiary that is not a Guarantor will have no obligation, contingent or otherwise, to pay amounts due under the Notes or the Guarantees or to make any funds available to pay those amounts,* whether by dividend, distribution, loan or other payment.") (emphasis added); TR44615 at 10 (same); TR40119 at 18 (same).

revenue.[59]  Paviter Binning, NNC's CFO from November 2007 to March 2010, agreed in his deposition that "creditors were looking for those guarantees because they wanted to look at the assets of NNI as a support for lending to NNL."[60]

In addition to supporting third-party debt, NNI provided NNL with a revolving credit agreement of up to $2 billion to allow NNL to meet its working capital requirements pending receipt of transfer pricing payments.[61]  NNI was also the borrower under a 2006 $1.3 billion credit agreement with JPMorgan Chase and others as lenders, with NNI providing the loan proceeds to NNL to repay NNL debt and settlements owed to class action plaintiffs with claims against NNC, NNL, and their officers and directors.[62]

As discussed below, NNI's financial support of NNL continued after the Petition Date, with NNI providing nearly $350 million of funding under the June 9, 2009 Interim Funding and Settlement Agreement ("IFSA") and the December 23, 2009 Final Canadian Funding and Settlement Agreement ("FCFSA").[63]  Both the IFSA and FCFSA were approved by the US and Canadian Courts.[64]  Without the funding provided under these agreements, NNL and NNC would have run out of cash.[65]

---

[59] *See* Transfer Pricing Worksheets; *see also* Ray Decl. ¶ 14.

[60] Binning Dep. 148:13-150:16.  Creditors of other Nortel entities were aware of the risk of structural subordination as well.  When the question arose as to the ability of NNUK to service its obligations as sponsor of the UK Pension Plan, the UK Pension Trustees sought additional comfort in the form of two distinct contractual guarantees from NNUK's corporate parent, NNL. This comfort was sought in consultation with the UK's Pension Protection Fund, a UK government pension insurance entity similar to the US's Pension Benefit Guaranty Corporation.  *See* TR21143, (November 2006 guarantee); TR31169 (December 2007 guarantee).

[61] *See* TR50771; TR11148; TR50773.

[62] *See* TR21139 at 43; TR44715; Currie Dep. 259:12-260:6.

[63] *See* TR21638; TR46910.

[64] *See* TR40824; TR50057; TR48733; TR50046.

[65] *See* TR49805 ¶ 81; TR21638 at 2; TR46910 at 2; TR50143 ¶ 27; TR50210 ¶ 27; TR50051; TR50052.

## V.    NORTEL GROUP – BACKGROUND

### A.    The Bell System Years (1885-1956)

The Nortel Group was born in the age of monopolies – in this case, the telephone monopoly.  For nearly 80 of its 115 years, Northern Electric (telephones and equipment) was one-half of the Canadian telephone monopoly and Bell Canada (telephone service) was the other half.[66]

Northern Electric and Bell Canada were also part of the Bell System, the North American telephone monopoly.  For over 70 years, both were under the control of American Telephone and Telegraph ("AT&T"), the US corporate parent of the Bell System.[67]  While under AT&T control, Northern Electric relied for its technology on Western Electric, a US Bell System affiliate that owned over 40% of Northern Electric's equity.[68]  AT&T and Western Electric were forced by the US Department of Justice to divest Bell Canada and Northern Electric in 1956, after which Bell Canada became Northern Electric's majority shareholder.[69]

Bell Canada maintained this control of the Nortel Group through 1998 and remained a major shareholder until 2000, less than nine years before the insolvency filings.[70]

### B.    The Bell Canada Years – The March South and the Dominance of the US Market (1971-1987)

After ceasing to be a subsidiary of a US parent, from 1956 to the early 1970s, Northern Electric continued to be the equipment supplier to Bell Canada, enjoying the protection of what

---

[66] *See generally* TR50288.  The original corporate entity in the Nortel Group was Northern Electric and Manufacturing Co. Ltd ("Northern Electric"), founded by Bell Canada in 1895.  (Bell Canada refers to The Bell Telephone Company of Canada, Inc. and its successors.)  Northern Electric was renamed Northern Telecom Co. Ltd ("Northern Telecom") in 1976,  which was rebranded as "Nortel" in 1996 and renamed Nortel Networks Limited in 1998 following the merger with US based Bay Networks, Inc.  *See id.*

[67] The original name of AT&T was The National Bell Telephone Company.  *See* TR49909.

[68] *See* TR50284.

[69] *See* TR50285; *United States v. American Tel. & Tel. Co.*, 552 F. Supp. 131, 137-38 (D. D.C. 1982).

[70] *See* TR49842.

remained a monopoly within Canada.  Gradually weaning itself from Western Electric technology, Northern Electric established an R&D division in Ottawa and moved from developing about 10% of its telephones and equipment in the 1960s to about 75% of its equipment in the 1970s.[71]

In the 1970s, Northern Electric, which changed its name to Northern Telecom Ltd. ("NTL") in 1976, first began in earnest to expand beyond Canada and that expansion led south to the United States.  NNI, then known as Northern Telecom, Inc. ("NTI"), was incorporated in 1971[72] and opened a factory in Michigan in 1972 and one in Raleigh, North Carolina in 1980, to manufacture digital switching systems.[73]

NTI rapidly accelerated from a standing start through the late 1970s and early 1980s. With the 1982 breakup of the US Bell System creating seven new telephone operating companies in the United States, the door to the Nortel Group – and to NTI as the US operating subsidiary – opened wide.[74]  US revenues grew from 48 percent of Northern Telecom's total revenues in 1982, to 61 percent in 1987.[75]  By the mid-1980s, the US market had become more important to the group than the Canadian market.[76]  Employing 22,000 people, more than NNL, NTI had become by far the largest of NTL's subsidiaries.[77]  The dominance of NNI and the US market within the Nortel Group would never change.

---

[71] *See* TR50286.  BNR was folded into NNL in 1996.

[72] *See* Official Website of the State of Delaware, Division of Corporations, https://delecorp.delaware.gov/tin/GINameSearch.jsp.

[73] *See* TR50286.

[74] "AT&T BREAKUP II: Highlights in the History of a Telecommunications Giant," *L.A. Times* (Sept. 21, 1995), http://articles.latimes.com/1995-09-21/business/fi-48462_1_system-breakup.

[75] *See* TR40245 at 5.

[76] TR50286; TR21101 at 416.

[77] *See* TR40245 at 9-10.

C.      **The Bell Canada Years – Beyond North America (1987-1998)**

In 1987, the Nortel Group made its first significant move outside of North America, buying 27.5% of the UK's STC plc ("STC").[78]  STC was at that point owned by the US's International Telephone and Telegraph ("ITT") and was another former Bell System equipment manufacturer.[79]  The remainder of STC was acquired in 1991 and a stake in France's Matra Communication ("Matra") was acquired in 1992.[80]  Both STC and Matra had strong R&D capabilities.  With these acquisitions, the Nortel Group obtained a substantial foothold in Europe.

Notably, the Nortel Group typically chose to expand by incorporating separate subsidiaries in local jurisdictions.[81]  That decision, while entirely typical among MNEs, takes on particular importance in bankruptcy.  It is a decision that creates separate groups of creditors at each corporate entity, which creditors are entitled to recover in full before any return to equity and where the laws of the jurisdiction of incorporation define the fiduciary duties owed to both creditors and equity holders.

During this period of growth, as described in more detail below, the Nortel Group also made the decision that certain of its local subsidiaries would act as distributors of Nortel goods and services (the LREs), while others (the IEs) would be and do much more.  The IEs were substantial corporate entities by the early 1990s, possessing the characteristics of fully-functioning independent entities, including manufacturing, research and development, finance, sales, service, human resources, logistics and operations.  In addition, the Nortel Group made the

---

[78] *See* TR33041.  STC, originally known as Standard Telephones and Cables, Ltd., was established as International Western Electric and purchased by ITT in 1950 from the Bell System.

[79] *See* TR40245 at 8.

[80] TR40249 at 8; TR40250 at 9.

[81] The principal exceptions were joint ventures in China (GDNT), Korea (LG-Nortel) and Turkey (Netas).  The Netas joint venture was established in 1967, China in 1995 and Korea in 2005.  *See* TR40253 (discussing GDNT joint venture); TR40266 at 52 (discussing LG Electronics joint venture); *Netas: Nortel to sell stake in Turkish unit June 1, 2010*, http://www.globaltelecomsbusiness.com/article/2581874/Nortel-to-sell-stake-in-Turkish-unit.html.

decision to house certain global functions in the IEs, including, for example, placing global operations and the Carrier and Enterprise businesses in NNI.[82]

### D.     Independence, Acquisitions and the Dot-Com Boom (1998-2001)

The Nortel Group's greatest period of expansion occurred during the dot-com boom (or bubble) of 1997 to 2000.  During this period, the Nortel Group shifted from its prior focus on internal R&D and embarked on an acquisition spree during which it made approximately 20 acquisitions.[83]  The largest acquisition was of Bay Networks, Inc., a US company, for $9.1 billion in Northern Telecom stock, announced in June 1998.[84]  This transaction resulted in an official name change from Northern Telecom to Nortel Networks, and Bay Networks' assets and business were absorbed by NNI.[85]  The name change reflected the change in the group's business focus from a provider of telephones and related products to a provider of full networking systems and services for customers.[86]  The Bay Networks acquisition also marked the creation of NNC as the holding company of the Nortel Group and the end of majority ownership by Bell Canada.[87]

By June 26, 2000, Bell Canada had divested itself of the last of its equity in NNC.[88] During this time, NNC stock had a value of $124.50 per share and a market capitalization of roughly $260 billion.[89]  The Nortel Group was at its peak, with nearly 100,000 employees

---

[82] *See, e.g.*, Press Release, Nortel (Northern Telecom) Expands Carrier Networks Unit to Deliver IP, Next Generation Networks (July 8, 1998), http://www.prnewswire.co.uk/news-releases/nortel-northern-telecom-expands-carrier-networks-unit-to-deliver-ip-next-generation-networks-156104795 html.

[83] *See* TR40259 at F-14 to F-16.

[84] *See id.* at F-16.

[85] *See* TR50286.

[86] *See, e.g.*, TR50075 (discussing Nortel's "audacious 'right angle' turn from telecommunications to the Internet market with the $9.1-billion purchase of Bay Networks, a California-based leader in data networking equipment" and the resulting name change to Nortel Networks).

[87] *See* TR40259 at 4, F-6.

[88] *See* TR49842.

[89] *See* TR50313; TR31355 at 4.

worldwide and annual sales in 2000 of $30 billion.[90]  The peak would be short-lived.  By 2002,

nearly 60,000 employees worldwide would be laid off and market capitalization would shrink to

$2 billion.[91]

### E.    Dot-Com Bust, Management Upheaval and Scandal (2001-2007)

The Nortel Group swung to a heavy loss position in 2001.[92]  The huge investment in

telecommunications infrastructure that characterized the late 1990s came to an abrupt halt

requiring retrenchment by Nortel and its competitors.[93]

The ability of the Nortel Group to react to the severe market upheaval was limited

materially by constant turnover and turmoil in the Canadian executive suite at NNC and NNL.

During the eleven-year period from 1998 to 2009, NNC and NNL had four Chief Executive

Officers,[94] four Chief Financial Officers,[95] three General Counsel/Chief Legal Officers,[96] two

Treasurers,[97] four Directors of Tax,[98] and five Chief Technology Officers.[99]  In addition, during

this period, Gary Daichendt of Cisco Systems, a major Nortel competitor, was hired to be NNL's

Chief Operating Officer.  He resigned within three months when the NNC and NNL boards of

---

[90] *See* TR40259  at 15, F-12.

[91] *See* TR40263 at 21 (detailing workforce reductions); TR31355 at 4.

[92] *See* TR43738 at F-2.

[93] *Id.* at 2.

[94] John Roth (1997-2001), Frank Dunn (2001-2004), William Owens (2004-2007), and Mike Zafirovski (2005-2009).  *See* TR50261; TR50534; TR50287.

[95] Frank Dunn (1999-2001), Douglas Beatty (2002-2004), Peter Currie (1994-1997, 2005-2007), and Paviter Binning (2007-2010).  *See* TR50261; Beatty Dep. 22:19-24; Currie Dep. 22:20-24, 25:6-17;  Binning Dep. 15:3-11.

[96] Nicholas DeRoma (1998-2005), David Drinkwater (2005-2009), and Gordon Davies (Jan. 2009- Aug. 2009).  *See* De Roma Dep. 22:9-15, 28:5-9; Drinkwater Dep. 15:21-23, 31:10-20; G. Davies Dep. 25:11-14, 25:24-26:3.

[97] Kate Stevenson (1999-2007) and John Doolittle (2008-2009).  *See* Stevenson Dep. 20:23-21:13;  TR21539 ¶ 1.

[98] David Burn (1989-2000), Kriss Bush (2001-2002), John Doolittle (2002-2006), and Peter Look (2006-2010).  *See* TR40247; TR40259; Bush Dep. 20:22-21:8; TR21539  ¶ 1; Look Dep. 15:14-16:14, 18:3-9.

[99]  William Robert Hawe (1999-2001), Donald Gregory Mumford (2001-2004), Brian McFadden (2004-2005), Gary Kunis (Mar.-June 2005), and John Roese (2006-2009).  *See* TR40258 at 20; TR43738 at 21; McFadden Aff. ¶ 10; TR40263 at 24; TR50292; Roese Dep. 29:14-30:6, 138:16-20.

directors refused to take his recommendations.[100]  The revolving door on the Canadian executive suite set the tone for the entire organization.

The revolving door was accelerated by the scandal that consumed Canadian senior management during the mid-2000's.  During this period, the Nortel Group was the subject of separate investigations by the SEC and the OSC concerning, among other things, the misreporting of income.  These investigations led to Messrs. Dunn, Beatty and then Controller Michael Gollogly being terminated for cause in 2005 and later criminally prosecuted in Canada.[101]  As a result of these investigations, NNC and NNL restated their earnings four separate times.  The impact of the Financial Restatements and related events on the Nortel Group was devastating.

While turmoil plagued NNC and NNL, NNI's cash flow and revenue continued to keep Nortel afloat – for a time.

## F.    Endgame

The cloud of scandal began to lift somewhat by 2007, but it left little time for the Nortel Group to prepare for the financial crisis that would begin in the third quarter of 2008.  In 2006, NNL and NNC returned to the capital markets and were able to refinance maturing debt.  They also used debt borrowed by NNI to pay a substantial settlement of shareholder derivative suits that had been brought in the US and Canada as a result of the Financial Restatements.  As discussed above, from 2006 to 2008, NNL and/or NNC issued over $4 billion in debt, nearly all of which was guaranteed by NNI.[102]  NNL was also able to secure the EDC letter of credit facility, likewise guaranteed by NNI.  As the Nortel Group entered 2008, it was overleveraged

---

[100] TR50292.

[101] They were eventually found not guilty in 2013 after nearly a decade of prosecution. See *R. v. Dunn*, 2013 ONSC 137.

[102] *See* Statement of Facts, *supra* § IV.

compared to its stronger competitors and facing an enormous morale crisis.[103]  Once the financial

crisis hit with the failure of Lehman Brothers, the Nortel Group's path to insolvency became all

but certain.

## VI.    NORTEL GROUP – STRUCTURE AND TAXES

In the decades prior to its insolvency, the Nortel Group's expansion via the incorporation

of subsidiaries in new jurisdictions necessitated intercompany agreements to govern the pricing

of internal group transactions and to define the rights of the subsidiaries that were Integrated

Entities to the intellectual property that resulted from their R&D efforts.  The final such

agreement adopted by the IEs was the MRDA.

### A.    Tax Minimization in Corporate Structures and Transfer Pricing

MNEs are incentivized to minimize overall group taxes in order to maximize shareholder

value, and tax considerations drive material corporate structuring decisions.

For instance, in an MNE, direct sales to a customer in a foreign jurisdiction are likely to

generate taxable income to the seller in that foreign jurisdiction.  This occurs through the

concepts of "nexus" and "permanent establishment."  Under many tax law and treaty regimes, a

corporate entity that makes direct sales into another jurisdiction will be considered to have a

nexus with that other jurisdiction under its laws, and permanent establishment under relevant tax

treaties, thus subjecting the seller to taxation in that jurisdiction as if it were a domestic entity.[104]

By comparison, sales in that other jurisdiction by a local subsidiary generate taxable income in

that jurisdiction for the local subsidiary, but not for the parent.[105]  MNEs' use of local affiliates

to conduct sales and other activities in their respective jurisdictions may bring tax benefits to the

---

[103] Roese Dep. 117:16-118:7; 360:3-25; Veschi Dep. 87:6-14; Gatley Dep. 34:4-21.

[104] *See* Joel D. Kuntz & Robert J. Peroni, *U.S. International Taxation* ¶¶ A1.04, C1.01, C1.04 (Mar. 2014); TR50228 at 1293.

[105] The foreign parent may be taxed by the local jurisdiction on dividends through a withholding tax, but not on the income earned by the local subsidiary.  *See* Kuntz & Peroni ¶ A1.04.

enterprise as a whole.

MNEs also have an incentive to price transactions between affiliated entities in different jurisdictions in a manner that will lower their global tax burden, e.g., by charging high intercompany prices to entities in high tax jurisdictions, so that they earn less revenue there, and vice versa.[106]  For that reason, the pricing of transactions between affiliated entities within an MNE – which is called "transfer pricing" – is highly regulated by tax authorities.

MNEs' minimization of taxes through complex organizational structures and transfer pricing is commonplace.  Because the practice can be subject to abuse, it has drawn and continues to draw the attention of lawmakers and tax authorities around the world.[107]  As the Nortel Group's business expanded globally – with affiliates exchanging goods, services, R&D and corporate support – the structuring of intercompany transactions became more complex, and tax authorities took notice of the implications of the Nortel Group's transfer pricing policies.

### B.      Transfer Pricing and the Arm's Length Standard

Transfer pricing relies on two basic premises.  First, transfer pricing presumes that absent appropriate regulatory intervention, intercompany transactions and related contractual documentation would not be entered into on an arm's length basis.  This is because intercompany transactions are not negotiated by independent (uncontrolled) parties represented by independent advisors.[108]  Second, because these intercompany transactions are not the product of hard bargaining between unrelated parties, tax authorities demand that the economics of the

---

[106] *See, e.g.*, TR50509 at 14-17; Henderson Decl. ¶ 8 ("It has been my experience at Nortel and elsewhere that one objective of an effective global transfer pricing policy is to be compliant with all applicable tax laws while also earning taxable income in jurisdictions with lower relative tax rates, thereby minimizing the MNE's global effective tax rate.  Tax minimization is an objective I would expect most MNEs to seek to achieve, and was a goal I aimed to achieve while advising or employed by NNI.").

[107] *See, e.g.*, TR50308 ( "Caterpillar's Tax Strategy Stirs Senate Debate"); TR50494 ("Starbucks pays UK corporation tax for first time since 2009"); TR49907 ("Apple Avoided Billions in Taxes Congressional Panel Says"); TR50269 ( "Google Joins Apple Avoiding Taxes With Stateless Income").

[108] See TR49860; 26 C.F.R. § 1.482-1(a); TR50295 ¶¶ 3-5.

intercompany transactions be comparable to the economics that would result from arm's length bargaining between unrelated parties.[109]

There are several accepted transfer pricing methods that an MNE can use to approximate arm's length pricing, though the MNE's transfer pricing policies must be tailored to align with MNE entities' functions, assets and risks.[110] These transfer pricing policies are subject to review and potential audit by tax authorities, who may impose penalties if the MNE's transfer pricing policy does not comply with applicable regulations. To mitigate this risk, MNEs may request an Advance Pricing Agreement ("APA") with the tax authority in a particular jurisdiction, whereby the entity and tax authority in that jurisdiction agree upon a mutually-acceptable transfer pricing policy that can be applied over a set period of time.[111]

### C.    Nortel's Transfer Pricing Prior to 2001

From the late 1970s to December 31, 2000, the Nortel Group operated under a series of Cost Sharing Agreements (each a "CSA"), which were bi-lateral agreements between NNL and other Nortel entities, such as NNI. The Nortel Group had CSAs that covered three areas – R&D, tangible property and headquarters expenses.[112] The last CSA for NNI is the 1992 R&D CSA between NNI and NNL ("1992 NNI R&D CSA"), which was drafted in 1996 and made retroactive to 1992 to reflect the terms of an APA between NNL, NNI, the Canada Customs and Revenue Agency, and the IRS.[113] The primary purpose of the 1992 NNI R&D CSA was to provide a mechanism for the sharing of "costs and risks of research and development services or activities in return for interests in any NT Technology that may be produced by such services or

---

[109] *See, e.g.*, Treas. Reg. 86, § 45, Art. 45-1(b) (1935); TR50295.

[110] *See* 26 C.F.R. § 1.482–3(a)(1)-(6) (2013) (listing acceptable transfer pricing methods under US law); TR50295 ¶ 48.

[111] *See* Henderson Decl. ¶¶10-14; Orlando Decl. ¶¶ 3, 10-14.

[112] Until 2001, there were bilateral cost sharing agreements ("R&D CSAs") between NNL and each of the other IEs as well as certain other Nortel Group entities. *See* TR11055 (Horst Frisch Report) at 2 n.1.

[113] In 1992, NNI was known as Northern Telecom Inc. and NNL was known as Northern Telecom Ltd.

activities."[114]  The 1992 NNI R&D CSA used revenue as the measurement for compensating the

parties for their investment in the Nortel Group's IP.[115]

In consideration for sharing in the costs of the Nortel Group's R&D, the 1992 NNI CSA

provided NNI with an exclusive, perpetual royalty-free license to exploit the Nortel Group's

technology within its designated territory (the United States and Puerto Rico).[116]  All US-sourced

income for the Nortel Group was booked in NNI, and NNI was the only Nortel Group member

subject to a CSA that paid corporate income taxes in the United States.[117]

### D.    Nortel's RPSM

Economic concerns and the expiration of the APAs governing the NNI CSAs drove

NNL's tax leadership to reconsider the group's transfer pricing policies.  Under the CSAs, most

operating income being located at NNI increased the group's effective tax rate (and its tax

burden) because NNI's effective US tax rate, 38%, was substantially higher than NNL's

effective Canadian tax rate, 12%, due to the availability of R&D tax credits in Canada.[118]  As a

result, NNL's tax leadership began to explore alternatives to the CSA structure.

By December 2001, Nortel decided to terminate the CSAs and adopt a different transfer

pricing method:  the residual profit split methodology ("RPSM").[119]  During the period from

December 2001 through March 2002, the Nortel tax group, under the direction of NNL's then

---

[114] TR21002 (1992 NNI R&D CSA).

[115] The Nortel Group's intellectual property was defined as "NT Technology" in the 1992 NNI R&D CSA.  *See id.* at Art. 1(k).

[116] *See id.* at Art. 1(z), 5.

[117] Henderson Decl. ¶ 21.

[118] *See* W. Henderson Decl. ¶¶ 40-41, TR11053 at 17 (showing NNL cash tax rate of 12% for NNL as compared to 38% for NNI); *id.* at 15 (showing estimated impact of proposed RPSM to operating income of the IEs and LREs, with an anticipated $4.266 *billion* increase in NNL's operating income and a $3.36 *billion* decrease in that of NNI); *see also* TR21164 at email 2, attachment; Canada Revenue Agency, Overview of the Scientific Research and Experimental Development (SR&ED) Tax Incentive Program, RC 4472(E) Rev. 08 (2008),  available at http://www.craarc.gc.ca/E/pub/tg/rc-4472/rc4472-08e.pdf.

[119] The 1992 NNI R&D CSA was terminated effective December 31, 2001, upon which NNI acquired "a fully paid up license" to all Nortel intellectual property in existence as of that date.  TR21002 at Art. 10.

Vice President of Tax, worked with external advisors to craft an RPSM policy that could be submitted simultaneously to three tax authorities (IRS, CRA and Inland Revenue) as the basis for proposed APAs for the 2000 to 2004 period.[120]  These APA requests were made on or about March 14, 2002.[121]

As explained in a report by Horst Frisch – the Nortel Group's tax and economics advisor – which accompanied the March 2002 APA requests (the "Horst Frisch Report"), Nortel's RPSM worked in two steps.[122]  First, Nortel's Integrated Entities were provided with a "routine return" for the performance of routine activities, such as the distribution or manufacture of Nortel Group products.  Second, the "residual" profits or losses were allocated to the Integrated Entities based on each entity's relative proportion of capitalized R&D expenses from that year and preceding years, assuming a 30% amortization rate.[123]  Only the Integrated Entities were entitled to a portion of the residual profit (or loss) because the IEs alone bore the full entrepreneurial risks and benefits of the Nortel business within their Exclusive Territories.[124]  As the Horst Frisch Report stated, from an economic standpoint each Integrated Entity "*could be considered to 'own' the [Nortel] technology as it related to its specific region*."[125]

The Nortel Group tax team anticipated that the RPSM might have to be adjusted as a

---

[120] Legal advice was received from Sutherland Asbill & Brennan LLP ("Sutherland"), which in turn retained Horst Frisch Inc.  By 2001, Walter Henderson of NNI had been appointed as a project leader for this team.  Henderson Decl. ¶ 28.

[121] TR 22122 (letters submitting 2002 APA Application to IRS, Canada Customs and Revenue Agency and Inland Revenue).  These requests were later amended to cover the 2001-2005 period.  *See, e.g.*, TR47317.

[122] *See* TR11055 (Horst Frisch Report) at 34; Henderson Decl. ¶ 33.

[123] *See* TR11055 at 34-35, 40.  The calculations under Nortel's RPSM were adjusted for the period from 2006 onward.  In that period, the IEs' share of the residual was based on each IE's R&D spend for the five years preceding the relevant calculation year.  The IEs' routine returns – which were previously based on their return on net assets – were changed to include (1) a return based upon comparable independent distributors and (2) a return for global operations, sales and marketing, and general and administrative costs incurred by each IE to support extraterritorial revenues.  *See* Orlando Decl. ¶ 35.

[124] *See id.* at 34.

[125] *Id.* at 10.

result of APA negotiations with tax authorities – i.e., that it presented an aggressive, "going in" position – with the expectation that the IRS would oppose, and the CRA would support, a methodology that shifted taxable income from NNI to NNL.[126]  Accordingly, while the tax professionals for Nortel worked to develop a transfer pricing policy and method that would fall within acceptable limits, as part of NNC's and NNL's overall objective to reduce the group's overall tax burden, Nortel's RPSM was also designed to shift taxable income from NNI to NNL.[127]

The goal of shifting income to NNL and losses to NNI was clear.  Sutherland partner Jerry Cohen, former Chief Counsel to the IRS, recorded in his notes of a December 2003 phone call with Giovanna Sparagna, one of the principal drafters of the MRDA:

> *The APA strategy does one thing.  Takes losses out of Canada and attributes them to the US.* . . . The reason that they will not abandon the APA is because it will help push losses out of Canada to higher tax jurisdictions.[128]

Numerous Nortel Group internal emails and tax presentations reiterated the theme that the RPSM was designed to "drive profit [and] cash to Canada," and former Nortel tax personnel have confirmed this in deposition testimony.[129]  For instance, John Doolittle, Vice President of Tax for

---

[126] Henderson Decl. ¶¶ 34, 42, 50, 53.

[127] First, a provision for routine returns based on sales and manufacturing was rejected in favor of one based on return on net assets. *Id.* ¶¶ 47; *see also* TR49737.  Second, use of sale, general and administrative expenses as part of the "allocation key" for residual profits was rejected in favor of a key that focused solely on R&D expenses. Henderson Decl. ¶ 50;  *see also* TR49737at 5; TR49737at Mem. 2.  Third, and most importantly, an accelerated amortization rate was chosen that was based on a very short lifespan of Nortel Group technology, that ignored the very long useful life of the group's most valuable patents.  Henderson Decl. ¶ 53.

[128] TR11341 (emphasis added).

[129] TR21169  at 1.  A presentation to senior NNL management was made in December 2001 at which it was recommended that the Nortel Group adopt an RPSM going forward and the primary benefit noted was the decrease in the group's effective tax rate.  See TR11058 at attachment.  Senior management included Doug Beatty (Vice President and Controller), Kate Stevenson (Treasurer and Head of Business Development), John Doolittle (Assistant Treasurer), Terry Hungle (Vice President of Finance and Business Development), Nick DeRoma (Chief Legal Officer), Arthur Fisher (Vice President of Intellectual Property Law), and Kriss Bush (Vice President of Tax).  *See id.* at email; *see also* TR21170 at 17 ("RPS method allocates more profit to Canada in the long term and takes advantage of Canada as a tax haven"); TR45137at 3 (noting that one goal of Nortel's transfer pricing policy was "to attribute more income to Canada"); TR22121 at attachment 13 ("GTP's role is to ensure that our business can continue to operate seamlessly globally while effectively reducing the global tax burden and minimizing exposure[.]

Nortel starting in 2002 and an NNL officer, testified that "[t]he thesis behind the [RPSM] . . . was that to the extent laws permitted it, we would move as much profit and hence cash into Canada and as a consequence we would . . . minimize the tax on the entire corporation."[130] Roseanne Culina, former Leader of Tax for Canada and an NNL officer, testified that "[t]ransfer pricing was a key part of [Nortel's] tax strategy," and that "one of the objectives in redeveloping the transfer pricing mechanism was getting cash to Canada," where there was a "low effective tax rate."[131] Other NNL tax officers also referred to Canada as a "tax haven" for the Nortel Group due to Canada's generous R&D credits.[132] There was nothing illegitimate or improper about this; it is entirely reasonable for an MNE to attempt to reduce its overall tax burden, within the bounds of the law. That tax avoidance, however proper, was one of the goals of Nortel's transfer pricing policies is undeniable.

In March 2002, when it was assumed that Nortel would return to profitability, the tax group estimated that the RPSM would increase NNL's operating income by $4.266 billion during the years 2001-2005 and that it would decrease NNI's income by $3.36 billion as compared to the 1992 NNI R&D CSA, achieving nearly $1 billion in tax savings.[133] On March 19, 2002, the day after the IRS APA submission and the accompanying Horst Frisch Report were filed, it was estimated that application of the RPSM "resulted in a $1.6 billion decrease to NNI's

---

[Transfer pricing] is key to Nortel's global tax planning and management of our tax rate[.]"); TR11053 at 15-18 (detailing expected changes to operating income and net tax impact as a result of switch from CSAs to RPSM).

[130] Doolittle Dep. 52:7-12, Dec. 5, 2013.  *See also id.* 104:14-25 (Doolittle: "…[T]here were a few different objectives of the overall transfer pricing methodology, and, you know, one of them was tax minimization, and I think by [November 2005] we may have been profitable, and so, you know, our highest tax costs would have been in the US.  So I'm saying that's what we intended it to do."; Questioner: "Take as much of that profit out of the US as you could to the extent permissible by applicable regulations and laws?"; Doolittle: "Correct. Correct.").

[131] Culina Dep. 164:17-18, 186:2-6.  *See also* Look Dep. 62:21-62:22, 307:6-9 (testimony of the Nortel Group's former tax director, confirming that "[t]he RPS model was a tax model," and that "[t]he Nortel tax group always sought, within the confines of applicable laws and regulations, to minimize its tax exposure.").

[132] *See, e.g.,* TR21170 at 15, 17.

[133] Henderson Decl. ¶ 43.

income" in 2001 alone.[134]

### E.    Negotiations with Tax Authorities and the $2 Billion APA Settlement

Although the Nortel Group's APA requests were submitted in 2002, negotiations with the

tax authorities stretched over seven years and involved multiple rounds of written exchanges

with tax authorities in the US and Canada.[135]

In 2006, after years of expressing concerns about Nortel's RPSM, the IRS expressed

serious criticisms of Nortel's RPSM in a position paper.[136]   Ultimately, neither the IRS nor the

CRA approved Nortel's RPSM.   In 2009, following the Nortel Group's insolvency, over seven

years after the 2002 APA applications, the IRS and CRA agreed that NNI had overpaid NNL by

$*2 billion* in transfer pricing payments between 2001-2005, and demanded a corresponding

income adjustment from NNL to NNI as a condition for resolving the APA for those years.[137]

Likewise, in late 2008, NNL and NNI had filed a second APA application requesting the tax

authorities' approval of its RPSM, but this application was never approved; rather, NNL and

NNI withdrew that application at the tax authorities' request.[138]

### F.    The MRDA

The MRDA also sets forth the rights of the IEs to the Nortel Group's intellectual

property.   Intellectual property rights are addressed in the MRDA because they are the

centerpiece of the intercompany transactions that are governed by Nortel's transfer pricing

---

[134] TR11053.

[135] *See, e.g.*, TR21004.

[136] TR11237.

[137] *See* TR11239 at App A; TR48800 at 9.   The $2 billion income adjustment likely was a compromise position reached in negotiations between the IRA and CRA, with the IRS's true view being that much more income should have been allocated to NNI.   Prior to the announcement of the APA settlement, the IRS had filed a $3 billion claim in NNI's insolvency proceedings that corresponds to over *$7 billion* in income adjustments.   *See* United States' Motion for Withdrawal of Reference of All Issues Relating to Debtor NNI's Objection to Proof of Claim Filed by the Internal Revenue Service, *In re Nortel Networks Inc. et al.*, No. 09-10138 (KG) (Sept. 24, 2009) [D.I. 1543] at Ex. 103 [D.I. 1543-5], Ex. 104 [D.I. 1543-7].

[138] TR50574.

policies.  The Integrated Entities each conducted substantial R&D in their own jurisdictions and

certain of the IEs, most notably NNI, contributed vast sums to pay for R&D conducted by the

other IEs, including NNL.  As an administrative convenience, NNL was designated as the entity

that would hold title to the resulting patents, and each of the other IEs received exclusive,

perpetual and royalty-free licenses to the Nortel Group's intellectual property in its Exclusive

Territory, including the right to sublicense, as well as the unlimited right to exclude anyone else

from using such intellectual property.[139]  As already noted, MRDA designated each IE a

"Participant" and the IEs other than NNL also were designated "Licensed Participants."[140]

This structure – the creation of intellectual property by each of the Integrated Entities as

the result of R&D conducted by each of them, the payment by certain IEs (such as NNI) and the

receipt by others (such as NNL) of vast sums to fund that R&D, and the administrative transfer

of title to intellectual property created by the other IEs to NNL in consideration for the grant by

NNL of the exclusive, perpetual and royalty free licenses back to the Licensed Participants – was

central to the Nortel Group's transfer pricing arrangements.  These transactions, and the

consideration paid and received by the IEs, were required to meet the arm's length standard.  The

economics underlying these transactions – the consideration being paid and received – were

required to be consistent with transactions between independent entities.

### 1.    The MRDA's Terms

The MRDA sets forth the right of each IE to the benefits (and burdens) of fully and

exclusively exploiting the Nortel Group's intellectual property within its Exclusive Territory.

---

[139] Weisz Decl. ¶ 12; Orlando Decl. ¶ 24; *see also*  TR11114 at 1 ("Theoretically, each of the participants could
continue to own the intellectual property it creates, but continuing to assign all intellectual property rights to Nortel
Networks Limited may provide some administrative simplicity."); TR22143 at 1 ("While it is not required by the
[RPSM], for administrative simplicity it is expected that all of Nortel's [intellectual property rights] will continue to
be owned by Nortel Networks Limited.");  TR11065 attachment at 1 ("Suggest maintaining NNL as IPR owner for
administrative simplicity.").
[140] TR21003 (MRDA) at 1-2 & Art. 1(e).

After noting that "each Licensed Participant held and enjoyed *equitable and beneficial ownership* of certain exclusive rights under NT Technology for a Specified Territory" under the preceding and terminated CSA, the MRDA's Second Recital states "the intent of NNL and the Licensed Participants that the Licensed Participants *continue . . . to hold and enjoy such rights.*"[141]

Those rights to equitable and beneficial ownership – each IE's right to the Nortel Group's intellectual property within its own Exclusive Territory – are, in part, set forth in Article 5 of the MRDA.[142]  Article 5 provides an exclusive, perpetual and royalty free license, including "the right to sublicense," separate "rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology," and "all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith."  *Id.* at Art. 5(a).[143]  Article 4(a) provides that "*[e]xcept as otherwise specifically agreed*," NNL will serve as title holder to the patents resulting from the pooled R&D efforts of the IEs, but as an express exception, Article 4(e) provides that the "Licensed Participants have *the right to assert actions and recover damages* or other remedies in their respective Exclusive Territories for infringement or misappropriation of NN Technology by others."  *Id.* at Art. 4(a), (e) (emphasis added).

Reflective of the benefits and burdens associated with each IE's complete and exclusive

---

[141] TR21003 (MRDA) at 2 (emphasis added).

[142] Article 1(l) and Schedule B provide that NNI's Exclusive Territory is the United States and the Commonwealth of Puerto Rico.  The Exclusive Territories of NNUK, NNSA and NN Ireland are defined as the United Kingdom, France, and the Republic of Ireland, respectively.

[143] As noted above, the MRDA uses the term "NN Technology" to describe Nortel's intellectual property.  "NN Technology" is defined is "any and all intangible assets including but not limited to patents, industrial designs, copyrights and applications thereof, derivative works, technical know-how, drawings, reports, practices, specifications, designs, software and other documentation or information produced or conceived as a result of research and development by, or for, any of the Participants, but excluding trademarks and any associated goodwill."  TR21003 (MRDA) at Art. 1.

right to the Nortel Group's intellectual property within its Exclusive Territory, including the right

to exclude others from using that intellectual property in its territory, Article 7(b) requires each

Licensed Participant to "indemnify and hold harmless NNL *from any and all claims and*

*liabilities* for damages, losses, expenses or costs . . . arising in its Territory with respect to NN

Technology." *Id.* at Art. 7(b) (emphasis added).  In the event of the MRDA's termination, "each

Licensed Participant *shall be deemed to have acquired a fully paid up license* permitting it to

continue to exercise the rights granted to it [in the MRDA], and, in particular, the rights granted

to it in Article 5 as though [the MRDA] had continued." *Id.* at Art. 9(b) (emphasis added).

The IEs' beneficial ownership of the Nortel Group's intellectual property in their

Exclusive Territories was deliberate and logical, serving important tax-reducing goals for the

Nortel Group.  Alternative structures, such as transferring the intellectual property created by the

Integrated Entities outright to NNL for fair market value and then charging the IEs market

royalties for their licenses, would have required significant upfront acquisition payments by

NNL (for which NNL did not have the resources) and the payment of royalties would have

triggered tax liability to NNL as operating income.

Nortel tax personnel and outside advisors were "mortified" about the risk that the IRS

could consider NNL to have a permanent establishment in the United States, which animated the

decision to provide NNI, and only NNI, with full rights to exploit the intellectual property in the

United States through the Exclusive Licenses.[144]  As Nortel attorney Matthew Vella informed

colleagues during discussions regarding the shift from the 1992 NNI R&D CSA to the RPSM:

> My recollection from having worked on the original CSA, is that the real issue is
> whether or not we were going to create a taxable entity in the USA, besides NNI
> (it would be called NNL).  Back when I ran into this issue, and talked with our tax
> experts, *they seemed mortified at the prospect of creating a taxable entity in the*

---

[144] TR22083 at 4.

*USA called NNL (i.e., the Canadian parent)*.  Accordingly, the decisions was
made to make the license to IPRs in the USA exclusive to NNI.[145]

### 2.    Consistent Views of Economic Ownership

The consistent views of Nortel's tax leaders and outside advisors demonstrate a common

understanding that the MRDA separated legal title from economic ownership, and that the IEs

held exclusive and complete rights to exploit the Nortel Group's intellectual property in their

Exclusive Territories:

- **John Doolittle**, an NNL officer and the Nortel Group's Vice President of Tax,
  testified that "we had provided each of the RPS participants beneficial
  ownership but not legal ownership to the technology," and that such beneficial
  ownership constituted the right "to exploit the Nortel technology in its
  territory."[146]

- **John Doolittle** also testified that he was unaware of any "exceptions to the
  exclusive right of the [IEs] to the economic and beneficial ownership of
  Nortel technologies within their respective territories."[147]  As he explained,
  the IEs were entitled to participate in the benefits and bear the risks associated
  with their historical IP, and "anticipate[d] sharing in the future benefits" of the
  Nortel Group's IP.[148]

- **Giovanna Sparagna**, a Sutherland partner and primary draftsperson of the
  MRDA, testified in her deposition that "the [L]icensed [P]articipants held
  equitable and beneficial ownership in NN [T]echnology."[149]

- **Giovanna Sparagna** also agreed that the "distinction between legal title and
  economic and beneficial ownership" was one that "tracked economic reality,"
  meaning that "when tax law is looking at the issue of bare legal title versus
  economic benefit, the tax law is looking at trying to place in the right
  jurisdiction the actual economic benefit so that it can be taxed or not taxed
  appropriately."[150]

---

[145] *Id.*(emphasis added).

[146] Doolittle Dep. 95:3, 95:14-17.

[147] *Id.* at 110:4-9, 110:11-12.

[148] *Id.* at 99:11-100:2, 100:4 (agreeing that it is consistent with his business understanding that, as stated in the Horst
Frisch Report, under the RPSM the IEs "'are entitled to participate in the on-going benefits from their historical IP
and bear the risks associated with the continuing value of that IP.  The IEs maintain their historical IP and continue
to develop new IP from which they anticipate sharing in the future benefits'").

[149] Sparagna Dep. 164:2-3, 164:5.

[150] *Id.* at 240:20-24, 241:2, 241:10-14, 241:16-17.

- **Peter Look**, John Doolittle's successor as Vice President of Tax and also an NNL officer, agreed in his deposition that valuable economic rights in Nortel IP existed outside of Canada.[151]  In a series of emails to senior Nortel Group management shortly before the Petition Date, he estimated that as a result of the rights held by the MRDA Participants *two-thirds of the value of the Nortel Group's IP resided in NNI* and the EMEA IEs, and warned that NNL would be required to purchase those rights at fair market value in the event that the MRDA's termination provisions were triggered by insolvency filings.[152]

- **Karina O**, a senior NNL tax employee who was heavily involved both with respect to the 1992 NNI R&D CSA and the MRDA, testified that she understood that the IEs "had exclusive rights to exploit the intellectual property rights in their jurisdiction of incorporation" during the RPSM period.[153]

- **Kerry Stephens**, a senior NNUK tax employee, testified that his view of ownership of IP under the MRDA "was that it was economically owned, for which one might read beneficially owned, by the RPSM participants."[154]

- **Mark Weisz**, Nortel's Director of International Tax from 2003 to 2007, who was involved in the drafting of the MRDA, stated that "from an economic perspective, the MRDA parties intended that each of the MRDA parties would exclusively own the rights to fully exploit technology in their [E]xclusive [T]erritories," while NNL was granted legal title "for administrative simplicity only."  He "did not understand the scope of the exclusive licenses provided to the Licensed Participants to be limited in any way other than with respect to the geographic territory."  "This structure was created to reflect the business reality of the economic ownership of IP rights."[155]

- **Michael Orlando**, an NNI employee and the Nortel Group's Transfer Pricing Leader from 2007 to 2011, confirmed that "[t]he IEs were the entrepreneurs and risk-takers of Nortel because they were the entities responsible for Nortel's R&D activities.  Because of their entrepreneurial and risk-taking function, each of the IEs were entitled to enjoy the benefits from Nortel's R&D investments, and they maintained economic and beneficial ownership of Nortel's IP in their respective geographic territories."  "From a transfer pricing perspective, these terms were intended to reflect the way the IEs functioned and the way they were in fact structured within the Nortel group."

---

[151] Look Dep. 229:6-229:18.

[152] *See* TR22139 at 6; Look Dep. 224:16-229:14.

[153] O Dep. 87:25-88:17; *see also* TR21404 at 3.

[154] Stephens Dep. 56:10-57:21.

[155] Weisz Decl. ¶¶ 3, 10, 12-14.

And it was a "common business understanding at Nortel" that "all of the IEs enjoyed full economic and beneficial ownership rights" in Nortel's IP. [156]

### 3.    Consistent Representations to Tax Authorities Regarding Economic Ownership

Throughout the APA process that began in 2002 and continued well after the Petition Date, NNL, NNI and NNUK made consistent representations to tax authorities that the MRDA provided the Integrated Entities with full economic and beneficial ownership of the Nortel Group's intellectual property in their Exclusive Territories.  Indeed, in its first submissions, the Nortel Group reported to the IRS, CCRA and Inland Revenue that from an economic standpoint dating back to the previous R&D CSA, each IE "*could be considered to 'own' the [Nortel] technology as it related to its specific region.*"[157]

Repeated representations to the tax authorities followed:

- **September 2003 Responses to Questions Posed by Inland Revenue, Internal Revenue Service, Canada Customs and Revenue Authority** – stating that all IEs were "*owners of the intangible property.*"[158]

- **November 2004 Response to IRS Information and Document Request for Functional Analysis** – explaining that the IEs "have agreed to continue participating in the future benefits of new IP" under the RPSM because they were "responsible for ongoing entrepreneurship and risk-taking functions with respect to the IP arising from their collective R&D efforts."[159]

---

[156] Orlando Decl. ¶¶ 4, 16, 23, 26; *see also id.* ¶ 23 ("It was and is my understanding, as well as the understanding of other tax personnel and businesspeople at Nortel, that the MRDA was intended to provide each of the IEs with economic and beneficial ownership of Nortel's IP within their exclusive territories, e.g., the US in the case of NNI, or the UK in the case of NNUK.").

[157] TR11055 at 10 (emphasis added).  The IRS took note of this representation in a subsequent review of NNI's tax liabilities, *see* TR11343 at attachment 3 (reflecting the understanding of the IRS that "each of the cost share participants (CSPs) were treated as owning the technology created by all CSPs and were entitled to use that technology in their respective geographic markets").  The Nortel Group had made a similar representation previously to Inland Revenue.  *See* TR31022 at 2 ("[A]lthough Nortel Canada has legal ownership of Nortel's Intellectual Property, *each participant [in the R&D CSA] has beneficial ownership, within their country of incorporation*") (emphasis added); *see also* Barton Dep. 117:6-7; 117:9-13 ("the large chunk of this information would have come from Canada").].

[158] TR11169 at 25 (emphasis added).

[159] TR11084 at 7.

- **2008 Joint Request for Bilateral APA** – In a joint request for a new APA to cover the years 2007-2011, NNL and NNI told the CRA and IRS that although IP was "*registered*" in NNL's name, "*[e]ach IE maintain[ed] an economic ownership in the IP.*"[160]

- **2009 Transfer Pricing Reports of NNL and NNI** – NNL's transfer pricing report for the tax year ended December 31, 2009, prepared for submission to the CRA upon demand under the supervision of Ernst & Young Canada's Sean Kruger – who was and is an advisor to the Monitor (and attended depositions as its representative) – stated that "NNL and the other integrated entities ('IEs') *are the primary owners of intangibles developed by the Nortel Group* and bear the risk of development." The report further classified each of NNL, NNI, NNUK, NNSA and NN Ireland as possessing "*intangible ownership*," in contrast to the LREs.[161] NNI's transfer pricing report for the same year contained the same classifications, and likewise stated that "NNI, NNL, and other integrated entities . . . *are the primary owners of intangibles developed by the group* and bear the risk of development."[162]

No statement was ever made to a tax authority indicating that the IE's ownership rights in the Nortel Group's IP were limited in any way other than by the geographic scope of the Exclusive Licenses.

### 4.    Intellectual Property Enforcement and Sublicensing Practices

The Nortel Group's IP enforcement and sublicensing practices during the MRDA period also reflected the IEs' exclusive rights in their respective Exclusive Territories. NNI brought suit to enforce its rights in Nortel' IP pursuant to its MRDA Exclusive License and the enforcement provision of Article 4(e).[163] Nortel's legal department recognized that NNI was the essential plaintiff when pursuing claims for infringement of the Nortel Group's patents in the United

---

[160] TR22078 at App. A, p. 4 (emphasis added); *see also* Orlando Decl. ¶ 27.

[161] TR47223 (Oct. 29, 2010 Report entitled "Nortel Networks Limited Transfer Pricing Report for the Taxation Year Ended December 31, 2009") at 1-2 (emphasis added). The report was prepared "under the framework set out in subparagraphs 247(4)(a)(i) through (vi) of the Income Tax Act (Canada)," *see id.* at 1, which provides for the avoidance of certain penalties if a taxpayer "makes or obtains . . . records or documents" describing its transfer pricing policies and provides them "to the Minister [of National Revenue] within 3 months after service . . . of a written request therefor." Income Tax Act, R.S.C. 1985, c. 1, § 247(4).

[162] NNI_00442576 (Sept. 14, 2010 Report entitled "Nortel Networks Inc. Transfer Pricing Report for the Year Ended December 31, 2009") at 1 (emphasis added).

[163] *See* TR22084; TR40777; TR40788; *see also* Argument Point II.A.1.c.iii, below.

States, and that NNI's rights to exclusively exploit the Nortel Group's intellectual property were sufficient in all respects to confer standing to sue.[164]

Likewise, NNI exercised the full range of sublicensing rights in accordance with the MRDA.  During the period of the MRDA, NNL granted dozens of sublicenses to third parties "on behalf of itself and of its Subsidiaries."  This language was viewed by Nortel lawyers as necessary because only the Licensed Participants, and not NNL, had the right to sublicense in their respective Exclusive Territories.  In this fashion, NNI granted third parties the right to use Nortel Group IP in the third parties' *own* businesses and for their *own* purposes and products.[165]

### 5.    Amendments to the MRDA and Related Agreements

The MRDA was amended via four addenda (the "First Addendum" through "Fourth Addendum") prior to the Petition Date.  In addition, the IEs entered into an "Agreement With Respect to Certain NN Technology" in connection with the sale of the Nortel Group's Universal Mobile Telecommunications System ("UMTS") business to Alcatel-Lucent (the "Alcatel-Related Agreement"), and entered into a Memorandum of Understanding (the "MOU") at around the time of the third and fourth addenda.

#### a.    The First Addendum

The First Addendum, signed by the IEs between October 2005 and June 2006, made three minor changes, including minor grammatical changes to Article 5 that were not intended to effect any change in the IEs' rights.[166]

#### b.    The Alcatel-Related Agreement

Nortel sold its UMTS business to Alcatel-Lucent in December 2006.  In order for the

---

[164] *See* TR22151 at 1; TR50593; TR50518.

[165] *See, e.g.*, TR48840; TR48864; TR48929.

[166] TR21003 (MRDA) at 21.  *See also* Orlando Decl. ¶¶ 31-32; TR48784 (Sept. 28, 2005 email from M. Weisz to L. Krebs and others, Subj. "RE: Ireland RPS Buy Out") at 1 ("We needed to add an addendum for clarity due to IP law and Australian purposes. . . .  Effectively there is no change to the agreement[.]").

buyer to receive the rights it needed to operate the business in each IE's Exclusive Territory, each IE had to transfer its exclusive rights to exploit the UMTS-related IP.  Accordingly, the IEs entered into the Alcatel-Related Agreement, which provided a mechanism for the transfer of each IE's assets.[167]

### c.  The Second Addendum

The Second Addendum was signed in 2007.[168]  It included a provision specifying that if an IE ceased to perform R&D for two consecutive years – as NN Australia had done – such IE would be terminated as a Participant and would receive a buy-out payment over the next five years.[169]

### d.  The Third Addendum, Fourth Addendum and the Memorandum of Understanding

In late 2008, Nortel Group tax personnel became concerned that the then current version of the MRDA did not accurately reflect the IEs' exploitation rights and practices in countries outside of the Exclusive Territories raising potential tax issues.[170]  The Third Addendum granted all of the IEs non-exclusive licenses to exploit Nortel IP everywhere in the world outside of the IEs' Exclusive Territories.[171]  The IEs' exclusive rights within their Exclusive Territories remained unaffected.

The Third Addendum also amended Schedule A of the MRDA to reflect revisions to the

---

[167] TR21148 at attachment 1; TR31585.  The IP-related proceeds from this sale were allocated by using the same R&D capital stock percentages generated by the RPSM, but Nortel Group tax personnel who participated in the allocation decision recognized that, by its terms, the MRDA did not govern the allocation of gains or losses from the sale of a business, and evaluated other alternatives before utilizing the RPSM percentages by this one time separately documented agreement.  *See* TR21165 at attachment 2 ("Consistent with the prior operation of the RPS model the profit from the UMTS sale included in gain/loss on sale of assets is excluded from operating income to determine profit for allocation amongst the Residual participants."); TR21147 at 1 ("Since the value of IPR is based on the revenue that it produces, allocate on that basis . . . . RPS determines economic relationships between the parties re operating income only.  It does not impact divestiture gain/loss.").

[168] TR21003 (MRDA) at 27-37.

[169] *See id.* at 27-28.

[170] *See* O Dep. 181:4-18.

[171] TR21003 (MRDA) at 40-42.

RPSM formula for the years 2006 going forward.[172]  As noted earlier, under the RPSM as

initially implemented, the IEs received a routine return based on their net assets, while the LREs

received returns based on those earned by comparable distributors, and the residual profits or

losses were allocated to the IEs based on each IE's capitalized and amortized R&D stock.[173]

Under the Third Addendum, the formula for calculating routine returns was changed and the

"residual" profit or loss was divided among the IEs for tax reporting purposes in proportion to

each IE's R&D spending for the five years preceding the relevant calculation year.[174]

As of December 2008, insolvency filings were increasingly likely.  During this time, in

an email, Orlando informed Look, then Vice President of Tax, that in the event of an insolvency

filing by any IE, the IE would be entitled to a buyout payment entitling it to the fair market value

of its exclusive license rights.[175]  Look responded that in the event a buyout of NNI, NNUK, and

NNSA were required, he believed that *two-thirds* of the value of the Nortel Group's IP would be

"sitting outside Canada."[176]

Look, other senior Nortel Group managers, and the Nortel Group's outside advisors then

drafted the Fourth Addendum to the MRDA,[177] which provided that none of the IEs would be

---

[172] See *id.* at 40-42, 48-49.  The Third Addendum also included an express provision in Schedule A indicating that "gain/loss on the sale of a business" was to be excluded from the RPSM formula as an "item[ ] not related to Nortel's operations."  However, this did not represent a change to the RPSM, as gain or loss on the sale of a business had always been regarded as not covered by the formula.  *See, e.g.*, TR21147 at 1 ("RPS determines economic relationships between the parties re operating income only. It does not impact divestiture gain/loss."); Weisz Dep. 134:16-135:2 (testifying that the MRDA "did not address how to allocate proceeds" from the sale of UMTS).

[173] *See supra* Statement of Facts § VI.D.

[174] TR21003 (MRDA) at 48-49; TR22078 (2008 APA Request) at 41-50; Orlando Decl. ¶ 35.

[175] *See* Orlando Decl. ¶ 37; TR22139 at 8.

[176] TR22139 at 6.

[177] Orlando Decl. ¶ 38; *see also* TR44387 (Dec. 22, 2008 email from P. Look to S. Wilkie, forwarding email in which Look indicates that he is "spooked" regarding the possibility of "triggering the buyout provision" of the MRDA, and that he is "calculating the amount owed under the agreement to the UK if that were to occur," noting that "[t]hese could trigger significant capital gains" to NNUK); TR44858 (Dec. 21, 2008 email chain) at 3 (Peter Look stating, "I'm targeting a push to amend the automatic termination provision before filing."); *id.* at 2 (Look writing, "Essentially, Master R&D Agreement automatically terminates on insolvency, triggering a sale to NNL at FMV of IP rights held by UK, US, France and Ireland.  May create big interco debts and taxable gains to sellers.").

automatically terminated in the event it filed for protection from its creditors.[178]

In light of the likely insolvency proceedings and after consideration of their fiduciary duties, the directors of certain of the Nortel Group's EMEA IEs expressed reluctance to sign the Third Addendum to the MRDA, as the revised transfer pricing formula was viewed as adversely affecting the EMEA IEs.[179]  NNL management and their outside advisors informed the EMEA directors that if they did not sign, NNL could sue the EMEA affiliates for transfer pricing markups arguably due for sales into non-exclusive territories.[180]  Further, they conditioned NNL's signature of the Fourth Addendum on the EMEA affiliates' signature of the Third Addendum, raising the possibility that if the EMEA IEs commenced administration proceedings without signing the Third Addendum, their Exclusive Licenses would terminate immediately.[181] The EMEA directors relented, and the Third Addendum and Fourth Addendum were executed shortly before the Petition Date.[182]

In order to mitigate any risk that the IEs would be viewed as having a permanent establishment outside of their Exclusive Territories, which would have had devastating adverse consequences for the Nortel Group on the eve of the insolvency filings, the IEs entered into the cryptic Memorandum of Understanding (the "MOU").  The MOU, dated December 31, 2008, stated a belief that under the MRDA each IE "was acting in and carrying on its own business in its own right in its own Territory," and that "[n]either the RPSM, the [MRDA], nor this MOU [wa]s intended to constitute . . . an agreement of partnership or other legal arrangement among any Participants," and further that "[t]he use of a profit split calculation such as the RPSM [wa]s

---

[178] *See* TR21003 (MRDA) at 59-60.

[179] *See* TR50813.

[180] *See* TR45377.

[181] *See id.*  NNI's Exclusive License could not have terminated automatically given Section 365(n) of the Bankruptcy Code, 11 U.S.C. § 365(n).

[182] See TR21003 (MRDA) at  40-42; 59-60.

not intended by the Participants to be a transaction among them and should not give rise to consequences or relationships among them independent of their commercial transactions."[183] This 11th hour disclaimer of a partnership structure and the accompanying permanent establishment implications was accompanied by frantic emails among NNL officers and advisors, including a long and tense December 24, 2008 email from Osler, Hoskin & Harcourt partner Scott Wilkie, who concluded, "[i]t is highly inadvisable to have any more of these discussions via email."[184]

## VII.    THE POST-FILING SALES PROCESS

### A.    The Insolvency Filings

On the Petition Date, NNI and its subsidiaries filed voluntary petitions for Chapter 11 relief under Chapter 11 in the US Court.[185]  On the same date, the Canadian Debtors sought protection from their creditors under the Companies' Creditors Arrangement Act (Canada) ("CCAA") with filings in Canadian Court, and Ernst & Young Inc. was appointed Monitor,[186] the EMEA Debtors were placed into administration by the English Court, represented by the Joint Administrators.[187]  In the United States, the Official Committee of Unsecured Creditors ("Committee"), a statutory fiduciary, was appointed by the US Trustee.  Also, from the Petition Date, the *ad hoc* group of bondholders ("Bondholders Group") has been actively involved in all material matters in both the US and Canadian Courts.

---

[183] *See* TR48944 ¶¶ 10-11.  The MOU also described the effect of the MRDA as "memorializ[ing] the agreements of NNL and the Licensed Participants as to the development and deployment of existing and future NN Technology and *ownership of the NN Technology*, with NL holding legal title thereto."  *Id.* ¶ 3.

[184] TR44442 at 4.

[185] *See* TR50364.  Nortel Networks (CALA) Inc. filed a voluntary petition for relief on July 14, 2009.  *See* TR50727.

[186] TR50049; TR50796.

[187] NNSA commenced secondary proceedings before the Commercial Court of Versailles, France on May 28, 2009, but the English Proceedings are the main proceedings in respect of NNSA.  *See* TR50009.

B.      Restructuring Options and NNI's Post-Petition Financial Support of NNL

1.      Initial Restructuring Discussions

The immediate impact of the insolvency filings was the stabilization of the Nortel

Group's business worldwide.  Successful continued coordination among the Nortel estates

allowed customers to experience little to no interruption in service and quality.  Cash positions

generally improved, especially for NNI and the EMEA Debtors, and attention turned to

restructuring options.

Prior to the Petition Date, Canadian management announced an intention to sell the

Nortel Group's Metro-Ethernet ("MEN") business line and had explored other options including

the sale of the Enterprise business line and of the Nortel Group as a whole.[188]  None of these

initiatives were successful.  Following the Petition Date, management of the Canadian Debtors

together with the Monitor began to examine restructuring options and eventually invited the US

Debtors, the Joint Administrators, the Committee and the Bondholders Group to participate in

discussions over those options.

Canadian management continued to consider attempting to sell one or more of the

Business Lines to permit the Nortel Group to eliminate unprofitable Business Lines, reduce its

footprint and focus remaining resources on remaking the Nortel Group into a smaller, but

profitable, enterprise.[189]  The Enterprise Business (phones, voicemail systems and related

solutions) faced much better financed competitors and had more employees and heavier losses

than any other business.[190]  The MEN business, which had already been put up for sale, was also

---

[188] *See News Release:  Nortel Announces Preliminary View of the third Quarter and Revised Full Year 2008 Outlook, SEC* (Sept. 17, 2008), http://www.sec.gov/Archives/edgar/data/72911/000119312508197113/ dex991.htm.
[189] *See* TR40269 at 3.
[190] *See id.* at 67-69; TR50666.

a money-losing business.[191]

By mid-February, the main options on which Canadian management was focused included selling all of the Nortel Group's existing business lines with the exception of (i) CDMA, and (ii) the next generation LTE wireless technology with which the Nortel Group was competing for Verizon's business, as well as attempting to sell the Nortel Group's assets in a series of transactions.[192]

Following a number of setbacks, Canadian management recommended to the US Debtors, the Joint Administrators, the Committee and the Bondholders Group that the Nortel Group seek sale proposals for their lines of business.  These recommendations took place during a series of meetings and calls during the February to April 2009 period.

During this period, two major issues concerning the potential sale process took center stage – allocation of sale proceeds and the funding of NNL.  With the suggestion of Canadian management that the group consider selling the lines of business and other remaining assets, the immediate question raised was whether those sales should take place on a jurisdiction by jurisdiction basis or on a going concern basis across jurisdictional boundaries.  The strong recommendation of Lazard Frères & Co. LLC ("Lazard"), which was acting as financial advisor to all of the Canadian, US and EMEA Debtors, was that the value of the group's assets would be substantially higher if the sale process was done on a collective basis.

The sale discussions were tied closely to the fact that in the post-petition period, NNL, cut off from transfer pricing payments from the other IEs – most notably NNI – was experiencing a severe cash crisis.  The Monitor and the Canadian Debtors informed the others that without an immediate cash infusion, NNL would not be able to continue to operate.  The

---

[191] *See* TR40269 at 70-72.
[192] *See* Hamilton Aff. ¶ 17.

intersection of these two important issues in early 2009 led to the negotiation and entry into the IFSA on June 9, 2009.

## 2.    The IFSA

NNL's liquidity problems were nothing new.  Throughout the ten years prior to the insolvency filings, NNI had provided NNL with billions of dollars in financial support, in the form of direct payments under the RPSM transfer pricing regime, guaranteeing billions in third-party financial debt and providing a revolving credit agreement of up to $2 billion for working capital purposes.[193]  NNI was NNL's bank.

In the post-petition period, NNL continued to look to NNI for financial support.  On the Petition Date, with the permission of the US Court, NNI loaned NNL $75 million under a new revolving loan agreement.  Later in January 2009, NNI paid NNL an additional $30 million, as a transfer pricing payment.[194]

This funding, however, was not sufficient to address NNL's immediate need for additional working capital.[195]  On June 9, 2009,  the US Debtors (excluding NN CALA), Canadian Debtors and EMEA Debtors (excluding NNSA) entered into the IFSA to address both interim funding of NNL (hence the title) as well as principles under which collaborative sales could take place.[196]  The key provisions of the IFSA were:

- Payment by NNI to NNL of  $157 million (net $30 million already paid in January) in full settlement of any transfer pricing and other claims NNL might

---

[193] *See supra* Statement of Facts § IV.

[194] TR21638 at 1.

[195] *See* TR21638 at 2.

[196] *See id.* at.  NNSA and Nortel Networks AG acceded to the IFSA as EMEA Debtors – each agreeing "to perform and comply with its obligations under the IFSA as if it had been a party from the date of execution thereof" – on or about September 11, 2009.  *See* TR47051 (Accession and Amendment Agreement relating to the Interim Funding and Settlement Agreement, September 11, 2009).

have had against NNI for the period from September 30, 2008 through December 31, 2009.[197]

- The US Debtors, Canadian Debtors and EMEA Debtors agreed to cooperate in the anticipated sales of the Nortel Group's assets, without conditioning their participation in the sales upon a prior agreement on allocation and that all proceeds would be placed in escrow.[198]

- If any Debtor determined that it was not in the best interests of its creditors to proceed with a sale transaction, there was no obligation for such Debtor to do so.[199]

- Each IE agreed that if, and only if, it determined to participate in a sale that was in the best interests of its creditors, it would enter into license termination agreements relinquishing the Exclusive Licenses, provided that any such termination or relinquishment of a license would be deemed a sale and the Licensed Participant terminating the license deemed a "Seller."[200]

- Any such license terminations were being provided by the IEs "*in consideration of a right to an allocation*" from such sale.[201]

- The IFSA was not an "amendment, modification or waiver of rights" of any party under any other agreement, including the MRDA.[202]

The US Court and Canadian Court entered orders approving the IFSA following a joint hearing on June 29, 2009.[203]

### 3.    The Business Line Sales

Shortly after the IFSA was entered, the Nortel Group announced that it had entered into a stalking horse agreement with Nokia Siemens Networks B.V. for the sale of substantially all of its CDMA business and LTE assets, and that it was in discussions with others to sell its

---

[197] See TR21638 ¶ 1.

[198] *Id.* ¶ 12(b).

[199] *Id.* ¶ 12(e). Of course, whether the IFSA provided so or not, US bankruptcy law prohibited NNI from selling any of its assets without the US Court's conclusion that such sale was in the best interests of its creditors. *See* 11 U.S.C. § 363.

[200] TR21638 ¶ 11(a)- (b).

[201] *Id.* ¶ 11(a); *see also id.* ¶ 11(d) ("Where any Debtor enters into any Appropriate License in accordance with the provisions of this Section 11, such Debtor shall be deemed to be a Selling Debtor, and the proceeds of such Asset Sale shall be deemed to be Sale Proceeds . . .").

[202] *Id.* ¶ 20.

[203] *See* TR40824.

remaining business lines, but that it would "assess other restructuring alternatives for those businesses in the event it is unable to maximize value through sales."[204]  In other words, the Nortel Group announced to the world truthfully that non-sale alternatives had *not* been foreclosed.

The CDMA stalking horse agreement was the first for a major business line and led to a robust auction won by Telefonaktiebolaget LM Ericsson (publ) ("Ericsson").  From March 31, 2009 through April 4, 2011, the Nortel Group successfully sold the following businesses in coordinated sale processes across multiple jurisdictions, most of which involved vigorous auctions conducted under Section 363 of the United States Bankruptcy Code and under Court-approved sales processes under the CCAA:[205]

- Layer 4-7 data portfolio to Radware Ltd. for $17.7 million (closed March 31, 2009);

- CDMA business to Ericsson for $1.13 billion (closed November 31, 2009) (Auction);

- Enterprise Solutions business, including shares of Nortel Government Solutions Inc. and DiamondWare Ltd. to Avaya Inc. for $900 million (closed December 18, 2009) (Auction);

- Next Generation Packet Core network components to Hitachi Ltd. for $10 million (closed December 8, 2009);

- Sale of MEN business to Ciena Corporation for $775 million (closed March 19, 2010) (Auction);

- GSM and GSM-R business to Ericsson and Kapsch CarrierCom AG for a combined $103 million (closed March 31, 2010) (Auction);

- Carrier Voice Over Internet Protocol business to GENBAND US LLC for $282.6 million (closed May 28, 2010) (Auction);

- Multi-Service Switch business to Ericsson for $65 million (closed March 11, 2011);

---

[204] TR49799.

[205] Attached as Appendix B is a chart listing each sale, its code names, whether an auction took place and if so, how long the auction lasted and what other parties bid at the auction.

- certain other sale transactions.[206]

NNI's representatives took a lead role in the Business Line auctions.  Not only were the auctions all held at the offices of NNI's counsel in New York, but the auctions were also conducted by NNI's counsel.  Moreover, the drafting and negotiation of the highly complex documentation for every sale, other than the MEN transaction, was handled by NNI's counsel.

Indispensable to the success of each of the above sales was the Nortel Business Services ("NBS") unit.  Combining functions of the Nortel Group's Global Operations (already based in the United States), Corporate Operations and Finance, NBS was formed in May 2009, with NNI employees Joseph Flanagan (then head of Global Operations) and Christopher Ricuarte (then Vice President of Financial Planning and Analysis for Global Operations) as its leader and second-in-command, respectively.[207]  NBS provided essential business services to the purchasers of Nortel's business lines under Transition Service Agreements – including human resources, finance, IT and other support – that were necessary to continue the operations of the business lines during their transfer to their new owners and meet the businesses' obligations to customers.[208]  Without the work performed by NBS, the Nortel Group would have been subject to substantial damages claims from customers or the new business owners.[209]

Each Business Line Sale was reviewed and approved by the US Court and the Canadian Court after each determined following a hearing that the sale in question was in the best interests of the US Debtors and Canadian Debtors, respectively.  In total, the Business Line Sales obtained over $3 billion in proceeds for the estates.

---

[206] The other sale transactions included a sale of residual Global System for Mobile Communications (GSM) business, a sale of limited partnership and limited liability company interests and a sale of certain patents and related assets.

[207] Ricuarte Decl. ¶¶ 29-30.

[208] *Id.* ¶¶ 31-38.

[209] *Id.* ¶ 36.

### 4.    The Final Canadian Funding and Settlement Agreement

As 2009 drew to a close, in the midst of the sales process, NNL came to NNI with even greater liquidity needs, again stating that without additional cash, NNL would have to shut down. These demands for additional financing came at the same time that a tax issue that had been outstanding for over seven years came to a head.

As referenced above, NNL and NNI had made requests to the CRA and IRS for approval of an APA governing the RPSM regime.  In fact, two requests had been made, one for the 2001-2005 period and a second for the 2006-2008 period.  The 2001-2005 APA requests were unresolved as of the Petition Date.  It became clear, however, that the IRS and CRA wished to bring the 2001-2005 APA to a conclusion.

First, the IRS filed a proof of claim against NNI in August 2009, asserting a claim of $3 billion.  Based on NNI's calculations, this claim implied that the IRS believed that NNI had underreported its income during this period by approximately $7 billion.  Shortly after the claim was filed, the CRA contacted NNL and the IRS contacted NNI informing both that the CRA and IRS had reached an agreement that NNL's and NNI's income from 2001-2005 should be adjusted by $2 billion because NNI had overpaid NNL by $2 billion in transfer pricing payments during this period.

These tax issues were addressed together with NNL's demand for additional financial support and led to execution of the Final Canadian Funding and Settlement Agreement ("FCFSA") on December 23, 2009.  The material terms of the FCFSA included:

- NNI  paid NNL $190.8 million in full and final settlement of any and all claims that NNL might have (or could have through the final conclusion of the Canadian Debtors' proceedings) against NNI, whether based on transfer pricing arrangements, other intercompany agreements or otherwise.[210]

---

[210] TR46910 (FCFSA) ¶ 1.

- NNI and NNL agreed to enter into APAs with the IRS and CRA, respectively, for the years 2001-2005.[211]

- NNL granted NNI an allowed $2 billion claim in NNL's CCAA proceedings, with such claim not being subject to offset or reduction.[212]

- NNL and NNI agreed not to exercise their rights of termination under the MRDA without prior written consent of the other parties to the MRDA, the Committee, and the Bondholders Group.[213]

The US Court and Canadian Court entered orders approving the FCFSA following a joint hearing on January 21, 2010.  Pursuant to the FCFSA, the order of the Canadian Court, dated January 21, 2010, provided that NNI's $2 billion claim against NNL was allowed and not subject to setoff or counterclaim.[214]  It is presently the single largest allowed claim against NNL.[215]

C.    **The Patent Portfolio**

1.    **Intellectual Property Rights Sold or Relinquished in the Business Line Sales**

The first step in determining how to monetize the Nortel Group's IP took place in the context of the Business Line Sales.  In each Business Line Sale, a team of Nortel Group employees led by Gillian McColgan and John Veschi, both NNI employees, ran an IP "segmentation" process wherein representatives of the Business Lines were required to justify which IP was to be included within the sale of their Business Line.  The standard for inclusion was whether the IP in question was "predominantly used" in that Business Line.  IP that was used in multiple lines of business was not sold with the businesses, and rights to use that IP were instead conveyed to Business Line purchasers as necessary via non-exclusive licenses.

The above process of determining which patents were used in which Business Lines was

---

[211] *See id.* ¶ 9.

[212] *See id.* ¶ 10.

[213] *See id.* ¶ 28.  The EMEA Debtors and NNL separately agreed that they would not exercise any right of termination.

[214] *See* TR50052.

[215] *See* McDonald Dep. 378:12-15.

one that the Nortel Group had never undertaken in the regular course of its business.[216]  Veschi, who led the segmentation process, deliberately designed and operated it in order to minimize the number of patents that would be sold with the Business Lines and thereby maximize the number of patents that would remain in the Patent Portfolio, since he believed that retaining such patents as part of a large portfolio would maximize value for creditors.[217]

In addition to Nortel Group IP used in multiple Business Lines, the patents retained as part of the segmentation process included (i) IP that had been used in past Nortel Group products but was not then being used;[218] (ii) IP that had resulted in prototype products (for example, broadband WiMax wireless communications patents);[219] (iii) IP that had been developed for Nortel's business lines but was not yet being used by a business at the time of the sales (such as the fourth generation wireless LTE technology patents;[220] (iv) IP that representatives of the Business Lines claimed would be of use to their businesses in the future, but which were not yet part of a written business plan;[221] and (v) IP incorporated in products manufactured by original equipment manufacturers ("OEMs") and then sold by Nortel under its brand name.[222]

The Patent Portfolio also included patents which NNI used to sue infringers in the United

---

[216] McColgan Dep. 128:16-22.

[217] See Veschi Dep. 124:10-20 ("So some of the advocates within the M&A team are saying we should take every single patent and put every single patent in one of the businesses so there will be nothing left within Nortel.  Some of them were saying well, if they're primarily used in one business or primarily used in another business, we'll give them to those businesses so there will be some things left but it will probably be the dregs, something in the order of 10 percent of the portfolio left."); id. at 146:7-17 (testimony that Veschi "was still focused personally in the beginning in trying to continue to run and build the business that [he] was chartered to create, because it was [his] view that this was the best way to, at the worst case, maximize value for the creditors.  And [the Nortel Group would] make the best decisions if [it] always viewed [itself] as building a business that's going to potentially emerge out of bankruptcy even if it's just the licensing business.").

[218] McColgan Dep. 130:21-131:7.

[219] Id. at 131:8-18.

[220] See TR44142 (Nov. 11, 2009 CDMA & LTE Intellectual Property License Agreement) ¶¶ 1.01(p); 2.01.

[221] See TR47150.

[222] McColgan Dep. 126:21-27:7.

States.[223]

## 2.    The IPCo Model

A sale of the Patent Portfolio was not preordained.  Over the course of more than a year, the estates, other stakeholders and their advisors carefully weighed the alternative of an IP licensing and enforcement business ("IPCo") using the patent portfolio, developed a comprehensive business plan for it, and were prepared to launch the business.[224]

### a.    The Pre-Petition Launch of the Nortel Group's Licensing and Enforcement Business

The option for an IPCo business – whether to be operated by a restructured Nortel Group or ultimately sold to a third party – was not created from whole cloth after the Petition Date, and instead represented the continuation of a business plan initiated well before the insolvency filings.[225]  Early in 2008, the Nortel Group began to explore options for more effectively monetizing its intellectual property through licensing and enforcement, and hired search firm Egon Zehnder to recruit a leader for this effort.[226]

The search led to John Veschi, who was hired by NNI on July 28, 2008 to fill the re-titled position of Chief Intellectual Property Officer.[227]  Veschi started a shift in the handling of group IP, initiating a program to license group IP to infringing third-parties in four initial franchises – mobile handsets, internet search, TV/display/projector and video game/PC – with plans to license to additional sectors as the business gained steam.[228]  Coordinating with the leaders of the Nortel Group's business lines, Veschi and his team prepared notices of infringement by November, and

---

[223] *See, e.g.*, TR22084; TR40777 (involving patent Nos. 05490252, 5790554); TR40788 (involving patent Nos. 5896411, 6088578, 6223028); TR50518 (involving patent Nos. 6091808, 7050861).

[224] *See* Ray Decl. ¶¶ 49-52; Ray Rebuttal ¶¶ 5-11.

[225] *See* TR50639 at 3 (describing efforts of John Veschi and his impact on the Nortel Group's licensing program).

[226] TR45066 at 2.

[227] Veschi Dep. 45:4-7, 47:13-25.

[228] Veschi Dep. 148:18-153:9; *see also* TR22102.

commenced licensing efforts by early December.[229]  The goal was for Veschi's licensing

business to be a separate business line with direct reporting to Nortel's CEO.[230]

### b.    Development of the IPCo Business

The work of Veschi and his team prior to the Petition Date put the estates in good stead

as they evaluated options for monetizing the Patent Portfolio.  After presentations by Veschi's

team in the summer of 2009 addressing the options for monetizing the Patent Portfolio,[231] the

estates jointly retained the Global IP Law Group ("Global IP") in October 2009 to provide

advice on monetizing the portfolio, including via "options for licensing as opposed to outright

sale."[232]  Lazard's mandate was also expanded for it to be heavily involved in evaluating the

financial aspects of IPCo on behalf of all estates.  Both retentions were approved by the US

Court.[233]

As part of this exercise, Global IP reviewed more than 11,000 patent claims, categorized

patents by technology field, mapped claims to markets for potential enforcement and licensing,

and screened the patents for encumbrances.[234]  Global IP presented its initial findings in

December 2009, and Global IP and Lazard made a follow-on presentation to the boards of

---

[229] See TR50711 (Nov. 6, 2008 email from Veschi to Davies, Roese and Drinkwater, requesting approval to issue infringement letter against license target ▮▮▮▮▮); Veschi Dep. 156:6-157:3 (noting that "everything [Veschi] did had to be coordinated with Richard" Lowe, head of the Wireless business, when targeting potential licensees in the wireless space); TR11150 at 7.

[230] Veschi Dep. 38:6-38:23.

[231] See Veschi Dep. 70:18-71:12, TR11150 at 7, 10-11; see also TR22106 at 2 (elaborating upon five potential "Strategic Alternatives for IP Business," including (i) "Stay the Course"; (ii) "Double Down on IP"; (iii) "Establish Independent Entity"; (iv) "Sell the IP Business"; (v) "Orderly Disposition (Sale) of Patents").

[232] TR48716 (Oct. 15, 2009, Master Consulting Agreement) [hereinafter "MCA"] at Annex A to Exhibit A, at 15; The MCA provided that the Nortel parties jointly owned all "Deliverables, including Intellectual Property rights in the deliverables."  It further provided for weekly update meetings between Global IP and each of the estates. The MCA also provided that Global IP's fees and expenses would be shared by all the Nortel parties but that NNL would be invoiced and then reimbursed by the other estates pursuant to a separate agreement.  NNSA became a party to the MSA by a separate accession letter on Nov. 30, 2009.  See TR50403 .

[233] See TR50155; TR50182; TR50137; TR50138; TR50153.

[234] See TR22097 (Dec. 16, 2009 PowerPoint presentation entitled "Patent Portfolio Analysis Phase One") at 11-12.

directors of NNC and NNL in January 2010.[235]

That same month, representatives of the estates and their advisors formed an IP Steering Committee that included, among others, John Ray, the US Debtors' principal officer; Murray McDonald of Ernst & Young Canada, the Monitor; Robin Jowitt of Ernst & Young UK, on behalf of the Joint Administrators; as well as NNI's George Riedel, the group's Chief Strategy Officer; Lazard and Global IP.[236]  The IP Steering Committee thereafter convened regularly, first developing an "actionable licensing business plan" for IPCo and, later, approving Global IP, Lazard and the Nortel IP team to approach potential buyers of the Patent Portfolio in order to permit an informed assessment of alternatives.[237]  A working group was also formed that included advisors to the Committee and the Bondholders Group.

Development of the IPCo business model continued from January 2010 through early 2011, led by the IP Steering Committee in close consultation with the members of the larger working group.[238]  This broad participation in the development of IPCo reflected the contemporaneous understanding that each of the estates would be entitled to share in proceeds from the monetization of the Patent Portfolio, whether via the operation of IPCo, the whole or

---

[235] *See* TR50754 (Dec. 11, 2009 email, subj. "December 16 Logistics") (listing attendees of December 2009 meeting); TR43655 (Jan. 29, 2010 PowerPoint Presentation, "Patent Portfolio Analysis Phase One:  Board of Directors Presentation").

[236] Ray Decl. ¶¶ 51-52; Riedel Dep. 117:20-118:13.

[237] TR50634 (Jan. 22, 2010 email, sub. "FW: IPR Steering Committee Discussion Materals," forwarding draft materials) at 1; *see also* Ray Decl. ¶¶ 51-52.  Between September 2009 (even before the IP Steering Committee was formed) and June 2010, there were 7 in-person meetings, 32 telephonic meetings, and "countless" informal calls with stakeholders to discuss monetization strategy for the Patent Portfolio.  *See* TR40035 (Sep. 30, 2010 email, no subj., forwarding letter from George Riedel to Bondholders Group).

[238] *See* Ray Decl. ¶ 54. *See also* Riedel Dep. 63:18–64:3 ("There were a number of parties involved. John Veschi was the then chief intellectual property officer. He and his team were involved in developing the plan. Nortel had hired Global IP Law Group. The principal there was Dave Berten. Nortel had retained Lazard or the creditors had retained Lazard Freres investment banking to help model and run the M&A process so those were the principal architects of the plan."); *id.* 124:21–125:4 ("Q. Who was involved in the creation of IPCo. other than as I believe you testified yourself Global IP and Lazard? A. John Veschi's team, the IP licensing team that reported to me was heavily involved. It was reviewed by the creditors and their advisors as we went through the journey and the board and others."); *id.* at 126:14–20 (testifying that the Unsecured Creditors Committee was involved in the IPCo exercise).

partial sale of an operating IPCo to a third party, or through one or more sales of the assets in the

Patent Portfolio.[239]

Never during the very long IPCo process did the Monitor inform any representative of

NNI, the Committee or the Bondholders Group that any rights that NNI held in the Patent

Portfolio were worthless.  The Monitor likewise did not inform its Ernst & Young partners

serving as the Joint Administrators for the EMEA Debtors.  Alan Bloom, one of the Joint

Administrators, testified that he was "astonish[ed]" to learn that this was the Monitor's position

when it was first disclosed in May 2013.[240]

In fact, the opposite was true.  In a July 2010 presentation on IPCo, tax issue, NNL tax

leader Roseanne Culina stated unequivocally that if NNL were to serve as the corporate vehicle

for IPCo, "NNL will need to 'buyout' the other RPS participants; current MRDA provides

licenses to other RPS participants."[241]  This presentation was made to the Monitor, Lazard,

Global IP and Chief Strategy Officer George Riedel.[242]

The IPCo model underwent several rounds of major revisions,[243] based on input from the

Steering Committee and the larger working group, and it was in every respect a detailed and

thoroughly vetted business plan.[244]  The IPCo model assessed products that might be developed

---

[239] *See* TR43655 (Jan. 29, 2010 PowerPoint Presentation, "Patent Portfolio Analysis Phase One:  Board of Directors Presentation").

[240] Bloom Dep. 95:12-14.

[241] TR48685 attachment at 3.

[242] TR48685 (cover e-mail).

[243] The parties' productions contain numerous documents discussing the IPCo model, but the progress is most clearly reflected by the internal version numbers that were assigned.  *See* TR22098 (reflecting first version of the model); TR50825 (version 2.0); TR43658 (version 2.2); TR50823 (explaining the evolution from version 2.0 to 2.2); TR43715 (version 3.0); TR22108 (version 3.2); TR50762 (email discussing version 4.0).

[244] *See* TR11150; Veschi Dep. 69:18–71:12 (describing TR11150, a PowerPoint slide deck titled "IP Aspects of Residual Co.," as a presentation given on July 8, 2009 to "the creditors in general from the various estates"); TR22097 (Dec. 16, 2009, Patent Portfolio Analysis Phase One – Ottawa Presentation); Veschi Dep. 94:2–13 (discussing TR22097 and stating, "So if you go to the summer that we were having the first meeting with the creditors, the fall when we hired Global IP, this is probably their first read-out to the various estates. And I remember something on the order of a hundred people coming here, staying in this hotel, visiting us at the Carling

in each market, associated royalty rates for each market, and projected income and cash flow broken down by technology "buckets" based on projected royalty rates over a ten-year period.[245] The model considered the timing of key business operations developments, required inputs and other factors,[246] projections of litigation costs for various enforcement scenarios (after consultation with specialty law firms),[247] assessment of startup costs for the business,[248] consideration of overhead and operating costs,[249] specific plans for personnel retention and hiring,[250] evaluation of tax attributes,[251] and consideration of the need to lease IP addresses as part of the business,[252] among other things.  Options for joint ventures were explored with potential business partners.[253]  Successive revisions of the IPCo model added consideration of China as a market,[254] reflected target-specific litigation strategies that would change over time,[255] and responded to comments from stakeholders including the Committee and Bondholders Group.[256]

Preparations to launch the IPCo business continued even as the estates received

campus, and then we did a tour of our reverse engineering lab, walked people through the anatomy of a patent, because a lot of people had never seen a patent before, and David went through this presentation that I'm guessing is this one"); TR22098 (March 17, 2010, Email to John Ray, creditors, and others; attaching "the discussion material's for today's meeting" entitled, "Nortel IP Update to Creditor Committees (Mar 17)"); Riedel Dep. 118:10–11 ("The creditors were clearly involved in anything we did with IPCo. . . .").

[245] *See, e.g.*, TR43718 (Oct. 25, 2010, IPCo Model 3.1 Update Presentation).

[246] *See* TR50820.

[247] Ray Decl. ¶ 57.

[248] TR22108 at 5.

[249] *See* TR44763; TR50780; TR50781.

[250] *See* TR50780.

[251] *See* TR48685 at 6-7.

[252] TR50757 (Veschi suggests including IP address business in the standalone entity).

[253] *See* TR50821.

[254] Riedel Dep. 127:25-128:13.

[255] *See* TR43658at 11.

[256] *See generally id.*

substantial expressions of interest in the Patent Portfolio from potential buyers.[257]  When

stakeholders convened at the offices of Lazard in August of 2010 to consider IPCo v3.0, they

were informed:  "We have the team. . . . We know the patents. . . . We know the markets.

. . . We have a plan and are poised to execute."[258]

### 3.    The Patent Portfolio Sale

IPCo remained a viable option into 2011.[259]  During the last months of 2010, the first

clear indications of interest in a sale of the Patent Portfolio were received.  A number of

indications were quite low, with proposed purchase prices in the $200 million to $400 million

range.  At this level, there was very little interest in pursuing negotiations to attempt to reach a

stalking horse transaction.[260]  A proposal was also received in excess of $600 million, but it too

was seen as insufficient when compared to the projected revenue from pursuing IPCo.[261]  Only

when Google submitted a non-binding indication of interest at $900 million was the proposed

price sufficient for the estates to discuss a sale as a credible option to IPCo.[262]

After extensive consultation among the estates, the Committee and the Bondholders

Group, it was determined that negotiations with Google should proceed in an attempt to reach a

stalking horse agreement.  Negotiations with Google commenced in earnest in early 2011 and

culminated in April 2011 with a signed stalking horse agreement (the "IP Stalking Horse

Agreement") between each of the IEs as Sellers and Ranger, Inc. ("Ranger"), a wholly owned

---

[257] In order to give stakeholders the need to weigh various options for IPCo against each other and against the option of selling the Patent Portfolio, a "teaser" was circulated to 105 potential buyers in May of 2010, but "the stakeholders [were] adamant that no outcome ha[d] been preordained."  TR22099 at 3; *see also* TR50634at 7.

[258] *See* TR50639at 11.

[259] *See* TR50783; TR47264; TR50803; TR50797; TR50806.

[260] *See* TR40003.

[261] *See* TR50766.

[262] *See* TR50800.

subsidiary of Google.  The purchase price remained $900 million.[263]

As was the case with each of the Business Line Sales, the IP Stalking Horse Agreement provided a detailed process for the submission of competing bids and the conduct of an auction.[264]  It also provided for a break-up free to Ranger in the event that another offer was accepted.[265]  The US and Canadian Debtors each filed motions seeking approval of their entry into the IP Stalking Horse Agreement and the related auction process.[266]  As described below, the Monitor filed a report in support of the Canadian Debtors' entry into the IP Stalking Horse Agreement in which it stated, as it had 16 times before, that title to the Nortel Group's intellectual property was held by NNL, but that each of the IEs had exclusive licenses to that intellectual property in their Exclusive Territories.[267]  A joint hearing was held before the US and Canadian Courts to consider these motions on May 2, 2011, and both issued orders approving the entry into the agreement and the rules for the conduct of what would become the most successful bankruptcy auction in history.[268]

The IP Stalking Horse Agreement was a heavily negotiated document, with Google represented by the Wachtell Lipton and Bingham McCutcheon law firms.  Among the key provisions demanded by Google was a covenant that required that the MRDA and the Exclusive Licenses be terminated at the closing of the transaction.  Google had demanded this provision early in the negotiations and never deviated from the requirement that the Patent Portfolio be free from the substantial encumbrances of the Exclusive Licenses.[269]

---

[263] *See* TR40725 at Ex. A § 2.22.1; TR40725; Transcript of Joint Hearing (May 2, 2011) 6:24-25, 7:1-5.

[264] TR40725 at 7 & Ex. F.

[265] *Id.* at Ex. A, § 8.2.

[266] *See* TR40725; TR49974.

[267] *See* Argument Point II.A.2, *infra*.

[268] *See* TR21509 at 55:19-58:4, 58:7-62:10.

[269] *See* TR11173; *see also* TR40725 Ex. A, § 5.13(b).

Google was also aware of the IPCo model and business plan and considered it when negotiating the auction provisions.  In a Section 363 sale process under US bankruptcy law, it is common for a purchaser to demand that the seller abandon the possibility of withdrawing from the sale process entirely.  In the stalking horse agreement, Google requested such a provision, but the final document provided that the IPCo option could be pursued if it was done in the context of a qualified competing bid.[270]

Following approval of the stalking horse agreement, it became clear that there was substantial interest from a large number of leading tech companies in competing in the auction. These included Apple, Microsoft, Intel, Sony, Ericsson, RIM (now Blackberry) and EMC, among others.[271]  By the time the auction commenced on June 27, 2011, senior representatives of all of these entities, and more, assembled at the New York offices of NNI's counsel.[272]  Over the course of four days, vigorous bidding took place with the final winning bid of $4.5 billion coming from a consortium of bidders known as Rockstar Bidco ("Rockstar").

The agreement with Rockstar (the "Rockstar Agreement") was signed within hours of the end of the auction and was presented for approval to the US and Canadian Courts at a joint hearing on July 11, 2011.  At that hearing, attended by Sharon Hamilton for the Monitor and Ray for the US Debtors, among others, representations were made about the sale process and the substantial benefit of the result for all of the IEs.[273]  Not a single word was said orally or in writing to either court that the Monitor believed that the entirety of the $4.5 billion should go to NNL and NNL alone or that the IEs' Exclusive Licenses were worthless.  To the contrary, the Monitor's public report recommending the sale to the Canadian Court represented to all who

---

[270] TR40725 Ex. A.

[271] TR21282 ¶ 17.

[272] TR21509 at 40:24-25.

[273] *Id.* at 56:10-18, 101:1-5, 110:6-111:8.

read it that NNL's legal title in the Patent Portfolio was "subject to . . . intercompany licensing agreements with other Nortel legal entities around the world . . . in some cases on an exclusive basis," meaning NNI and the other Licensed Participants.[274]

## **ARGUMENT**

As agreed by each of the estates, the purpose of the upcoming trial is to determine what portion of the sale proceeds received was due to the transfer or relinquishment of assets by each of the selling debtors.  In the course of the Sales, NNI transferred its business operations in the United States, Nortel's most lucrative market.  It also transferred its exclusive and perpetual right to all of Nortel's IP, including patents, in the United States by terminating NNI's Exclusive License in the Patent Portfolio Sale.

NNI was the most valuable Nortel entity and contributed a substantial majority of the value in the Sales.  NNI consistently generated the overwhelming majority of revenue and cash flow.  NNI consistently provided most of the funding for Nortel's R&D through billions of dollars of direct R&D spend and billions of dollars more in transfer pricing payments to NNL that NNL and the other IEs used to support their R&D.  NNI and the other Licensed Participants each agreed, for administrative convenience, to vest legal title to the intellectual property created as a result of that R&D with NNL, but only in consideration for NNL granting exclusive, royalty-free and perpetual licenses with respect to that IP in each Licensed Participant's Exclusive Territory.

Using straightforward and universally accepted valuation methodologies, the value of the assets sold by NNI constitutes the substantial majority of the Sales proceeds.

---

[274] TR21281 ¶ 82.

The fair market value approach advocated by the US Interests is not only supported by well-established valuation principles accepted in all relevant jurisdictions, but also by the MRDA itself.  Article 11 of the MRDA provides that in the event of an exit from the MRDA due to a Participant's insolvency, the Participant will surrender its Exclusive License but must receive, in exchange, the "*fair market value*" of the Exclusive License.[275]  This "Special Retirement Allocation" is defined not by reference to the RPSM formula in Schedule A of the MRDA, but as an amount that "represents the fair market value" of the exclusive and non-exclusive licenses. MRDA at Art. 1(j).  In fact, no party to this litigation proposes that the RPSM formula in Schedule A applies to allocate the Sales proceeds, nor could they.  The MRDA expressly provides that the allocation of proceeds from the sale of a Nortel business shall not be calculated by using the RPSM formula.[276]  Accordingly, the very contract that grants NNI its valuable Exclusive License and NNL bare legal title to Nortel's IP also supports the US Interests' fair market value approach.

The Monitor seeks to escape this irrefutable conclusion by asserting that bare legal title granted to NNL by the other IEs in consideration of the Exclusive Licenses gives NNL the right to all of the value of Nortel's Patent Portfolio and most of the value of the Business Lines.  As discussed below, the Monitor's argument that the $4.5 billion paid by Rockstar was solely for NNL's materially encumbered legal title or that NNL is entitled to most of the proceeds from the Business Sales fails as a matter of fact, law and common sense.  NNL had no right or ability to sell what any buyer would want the most:  the ability to operate the Business Lines and exploit or use in any manner the Patent Portfolio in the United States.  Only NNI could – and did – transfer that value.

---

[275] TR21003 (MRDA) Arts. 1, 11 (emphasis added).
[276] *See* TR21003 (MRDA) 3d Add. at 7.

Point I below discusses the US Interests' allocation position based on the fair market value of the assets sold by the selling debtors in the Sales.  Point II discusses and refutes the Monitor's allocation theories.  Point II first shows that the Monitor misreads the scope of the exclusive, royalty-free and perpetual licenses under the MRDA.  As set forth below and as will be shown at trial, the Monitor's arguments in this regard are contrary to the clear language of the MRDA and the factual matrix relevant to that agreement.  The Monitor's allocation theory with respect to the Patent Portfolio and Business Line Sales is based on this flawed reading of the MRDA and thus should be rejected.  Point II next demonstrates that the Monitor's value in use method for valuing the Business Line Sales is inappropriate in the context of this allocation and inconsistently and erroneously applied.  Finally, Point II discusses how the Monitor's veiled references in this proceeding to "property interests" do not assist in its case.  Point III below addresses the EMEA Debtors' allocation approach, and Point IV discusses the legally and factually unsupportable "pro rata distribution" approach advocated by the CCC and the UKPC.

## I.

## THE US INTERESTS' ALLOCATION POSITION

### A.    The Framework for Allocation

The Canadian, EMEA and US Debtors agree that the Courts must determine the value of the assets each debtor transferred or relinquished in each of the Sales.[277]  It is undisputed that the fair market value of the total assets sold in the Business Line and Patent Portfolio Sales is the price the buyers paid.[278]  Allocation should be based on the relative value of the assets each

---

[277] *See* TR21283 (Allocation Position of the Monitor and Canadian Debtors) ¶ 4; TR40731 (Joint Administrators' Allocation Position) ¶ 3; TR50223 (US Interests' Allocation Position) at 1.

[278] The fair market value of an asset is "[t]he amount at which the property would change hands between a willing buyer and willing seller, when neither is acting under any compulsion and both have reasonable knowledge of relevant facts."  Pratt & Niculita, *Valuing a Business* at 41-42; *see also* Rev. Rul. 59-60, 1959-1 C.B. 237; Green Report at 14 ("All of the sales – both the Business Sales and the Residual IP Sale – occurred through the open market (and usually involved an auction process) in which bids were made by independent third parties. These bids

debtor transferred that generated the Sales proceeds received from the buyers.  As the Monitor put it, that the allocation exercise requires a valuation of "[w]hat portion of the proceeds realized in each [Sale] transaction was due to the transfer of, or surrender, by" the selling debtors' assets "that were the subject of that transaction."[279]

Two central principles should govern allocation.  First, the US Interests submit that the Courts should apply standard valuation methods that have been accepted consistently in legal proceedings, including insolvency proceedings.  Courts routinely value assets based on fair market value, and the income-based methods used by the US Interests are also routinely accepted by courts.  Second, allocation must account for the fact that, in insolvency, equity takes last.  The value of NNI's assets that it sold or surrendered in the Sales, and which generated most of the Sales proceeds now in escrow, must be allocated to NNI for distribution to its separate creditors.

### 1.    The Touchstone for Allocation Is Fair Market Value

To assess the value of what each selling debtor sold or relinquished, the touchstone must be fair market value.  Fair market value is the foundational valuation metric widely accepted in the law and economics throughout the world.  *See United States v. Cartwright*, 411 U.S. 546, 550-51 (1973); *Pocklington Foods Inc. v. Alberta (Provincial Treasurer)* (1998), 218 A.R. 59, para. 197, 354 (Can. Alta. Q.B.), *aff'd* (2000), 250 A.R. 188 (Can. Alta. C.A.) (explaining that "the most common value standard is fair market value"); *Phillips v. Brewin Dolphin Bell Lawrie Ltd,* [2001] UKHL 2, [2001] 1 W.L.R. 143 (H.L.), 154 (appeal taken from Eng.).[280]

---

were reviewed and, generally speaking, the highest or most advantageous bid was accepted. Thus, the net proceeds from each sale represents the 'fair market value' for the totality of the transferred assets at the time of the transaction, net of transaction and wind-down costs. Accordingly, the total fair market value of the assets sold by the Nortel Entities is known.").

[279] TR21283 (Allocation Position of the Monitor and Canadian Debtors) ¶ 14.  *See also* Green Report at 2 (quoting the Monitor's position as the appropriate allocation question to be answered).

[280] The fair market value of a business or asset is the highest amount that a reasonably well-informed purchaser would pay in arm's length negotiations in an open and unrestricted market.  *Cartwright*, 411 U.S. at 551; *Henderson v. Minister of Nat'l Revenue*, [1973], C.T.C. 636, para. 21 (Can. Tax Ct.); *see also Slatky v. Amoco Oil Co.*, 830 F.2d

Fair market value is the chosen standard of value in myriad contexts. Courts use fair

market value to assess the value of a company in the merger and acquisition context.[281] Fair

market value is also the standard used to value real and intellectual property.[282] Courts as well

use fair market value to determine whether and to what extent a party is entitled to damages.[283]

Fair market value also is the correct standard for assessing the value of property in insolvency

proceedings.[284] Moreover, there are well-established methodologies to determine fair market

value that are used every day by investment bankers, economists and valuation experts that are

routinely accepted and analyzed by courts in all relevant jurisdictions.[285] The US Interests use

---

476, 484 (3d Cir. 1987) ("[Fair market value], by definition, is the highest price a willing buyer would pay[.]");
*Phillips*, 1 W.L.R. at 154 ("The value of an asset that is being offered for sale is, prima facie, not less than the amount that a reasonably well informed purchaser is prepared, in arm's length negotiations, to pay for it.").

[281] *See, e.g., Hechinger Litig. Trust v. Bankboston Retail Finance, Inc. (In re Hechinger Inv. Co. of Delaware)*, 147 F. App'x 248, 251 (3d Cir. 2005); *Holston Invs., Inc. B.V.I. v. LanLogistics Corp.*, 677 F.3d 1068, 1072 (11th Cir. 2012); *Standard Fed. Bank v. United States*, No. 95-CV-478, 2002 WL 31947572, at *1 (Fed. Cl. Ct. Dec. 30, 2002); *First Fed. Sav. Bank of Hegewisch v. United States*, 52 Fed. Cl. 774, 776 n.2 (Fed. Cl. Ct. 2002); *Pocklington Foods Inc. v. Alberta (Provincial Treasurer)* (1998), 218 A.R. 59, paras. 338-340 (Can. Alta. Q.B.) (explaining that fair market value is the main criterion to be utilized in establishing the fair value of shares under the various Canadian Business Corporation Acts).

[282] *See, e.g., United States v. 50 Acres of Land*, 469 U.S. 24, 25-26, 29 (1984); *Pleasant Summit Land Corp. v. C.I.R.*, 863 F.2d 263, 272 (3d Cir. 1988); *Broadcast Music, Inc. v. DMX Inc.*, 683 F.3d 32, 45 (2d Cir. 2012) (noting court's determination of reasonable copyright royalty rate is determined by the "fair market value of the music"); *R.M. Smith, Inc. v. C.I.R.*, 591 F.2d 248, 251 (3d Cir. 1979) (determining fair market value of patents following corporate liquidation).

[283] *See, e.g., Official Comm. of Unsecured Creditors of Champion Enters., Inc. v. Credit Suisse (In re Champion Enters., Inc.)*, Adv. No. 10-50514 (KG), 2012 WL 3778872, at *34-35 (Bankr. D. Del. Aug. 30, 2012); *On Davis v. The Gap, Inc.*, 246 F.3d 152, 161-63, 166-67 (2d Cir. 2001) (applying fair market value of a license for use of intellectual property to calculate damages); *Oracle Am., Inc. v. Google Inc.*, 847 F. Supp. 2d 1178, 1182 (N.D. Cal. 2012) (explaining that copyright infringement lost license fee damages are based on the "fair market value of the copyright at the time of infringement"); *Pocklington Foods Inc. v. Alberta (Provincial Treasurer)* (1998), 218 A.R. 59, para. 333 (Can. Alta. Q.B.) (stating that in a "contractual sense," values mean "the price which the subject will bring when it is exposed to the test of competition").

[284] *See Syracuse Eng'g Co. v. Haight*, 110 F.2d 468, 471 (2d Cir. 1940) ("A proper regard for the interests of the bankrupt, as well as for the interests of his creditors, compels the conclusion that fair market price is the most equitable standard."); *see also Lids Corp. v. Marathon Inv. Partners, L.P. (In re Lids Corp.)*, 281 B.R. 535, 545-46 (Bankr. D. Del. 2002); *Alberts v. HCA Inc. (In re Greater Se. Cmty. Hosp. Corp. I)*, No. 04-10366, 2008 WL 2037592, at *8 (Bankr. D.D.C. May 12, 2008) (assessing fair market value of subsidiary hospital to determine whether transaction was fraudulent conveyance); Bankruptcy & Insolvency Act (Canada), R.S.C., 1985, c. B-3, s. 96 (requiring a trustee in bankruptcy to provide the court with "the fair market value of the property or services" at issue to enable the court to determine that a transfer at undervalue is void).

[285] *See, e.g., Shubert v. Lucent Techs., Inc. (In re Winstar Commc'ns, Inc.)*, 348 B.R. 234, 274 (Bankr. D. Del. 2005) (market, income, and asset approaches, used to determine fair market value, are the "three standard approaches" to valuation); *Nordetek Envtl., Inc. v. RDP Techs., Inc.*, 862 F. Supp. 2d 406, 416 (E.D. Pa. 2012) (measurement of fair

such methodologies to determine allocation.

## 2. Fair Market Value Principles Are Consistent with the MRDA

Looking to fair market value of the assets each selling debtor transferred or relinquished

in the Sales for allocation is also consistent with the MRDA.  The MRDA states that if a

Licensed Participant becomes insolvent it may be required to surrender the Exclusive License,

but only in exchange for the fair market value of the license – not the MRDA Schedule A RPSM

formula that the parties used to divide operating income for transfer pricing purposes when

operating as a functioning MNE.  MRDA at Arts. 1, 11.  Indeed, the MRDA explicitly provides

that the RPSM transfer pricing formula does *not* apply to the sale of a line of business, which

includes both the operating Business Lines and the IPCo licensing service business line that the

estates were jointly developing and then ultimately decided to sell in the Patent Portfolio Sale.[286]

As set forth above, the RPSM formula was designed to shift income from the US to

Canada (within the confines of the arm's length principle) so that NNL and the Nortel MNE as a

whole could take advantage of the much lower effective tax rate for NNL in Canada as compared

to the effective tax rate for NNI in the US.[287]  While Nortel's goal was to remain within the

bounds of the tax laws, the fact remains that the IRS seriously criticized and never approved the

RPSM formula, which ultimately led to a settlement increasing NNI's revenue and decreasing

---

market value involves consideration of the market approach, income approach and asset-based approach in context of determining equity interest in corporation); *In re Greater Se. Cmty. Hosp. Corp. I*, 2008 WL 2037592, at *8 (citing Jay E. Fishman et al., *PPC's Guide to Business Valuations* ¶ 203.2; Shannon P. Pratt et al., *Valuing a Business: The Analysis and Appraisal of Closely Held Companies*, at 45 (4th ed. 2000)) (applying the three basic methodologies to determine fair market value in fraudulent conveyance case); *Pocklington Foods Inc. v. Alberta (Provincial Treasurer)* (1998), 218 A.R. 59, para. 201 (Can. Alta. Q.B.) (there are three approaches for valuing a business:  asset base, income, and market); *Phillips*, [2001] UKHL 2, [2001] 1 W.L.R. 143 (H.L.) 154.

[286] TR21003 (MRDA) at Sch. A.

[287] *See infra* Statement of Facts § VI.

NNL's revenue by $2 billion for 2001-2005.[288]  This further demonstrates the inappropriateness of using the RPSM formula in connection with allocation.

Further still, when considering the value of the assets sold or relinquished by the selling debtors in the Sales, the parties' transfer pricing formula is irrelevant because the buyers were in no way bound by and thus would not have been concerned with how the Nortel Group divided operating profits for transfer pricing purposes among affiliated entities.  Based on the foregoing, it is not surprising that none of the Core Parties advocate an approach based solely on the manner in which Nortel divided up operating profits (or, in fact, losses) when it was an operating MNE (*i.e.*, pursuant to the RPSM formula set forth in Schedule A to the MRDA).

**3.      Fair Market Value of the Assets NNI Sold or Relinquished in Connection with the Sales Must Go First to NNI's Creditors**

It is of fundamental importance across these jurisdictions that in insolvency, a debtor's assets must be made available to satisfy the creditors of that debtor before equity may recover.[289] This principle must apply to all aspects of these insolvency proceedings, including to allocation. Thus, in allocation, each Selling Debtor is entitled to the value of the assets it sold.  That share of the sale proceeds will then be available for distribution to that debtor's creditors.

---

[288] *See infra* Statement of Facts VI.

[289] 11 U.S.C. § 1129(b)(2)(B)(ii); Insolvency Act, 1986, c. 45, § 107 (U.K.); *Central Capital Corp., Re* (1995), 29 C.B.R. (3d) 33, para. 36 (Can. Ont. C.J. (Gen. Div. – Commercial List)), *aff'd* (1996), 38 C.B.R. (3d) (Can. Ont. C.A.); Standing Senate Committee on Banking Trade and Commerce, *Debtors and Creditors Sharing the Burden: A Review of the Bankruptcy and Insolvency Act and the Companies' Creditors Arrangement Act*, at 158-59 (2003) ("[Holders of equity] should be afforded lower ranking than secured and unsecured creditors, and the law – in the interests of fairness and predictability – should reflect both this lower priority for holders of equity and the notion that they will not participate in a restructuring or recover anything until all other creditors have been paid in full."); Roy Goode, *Principles of Corporate Insolvency Law* (4th ed. 2011), ¶ 1-04 ("[O]nly when creditors have been paid in full (which is rarely the case) do shareholders come in to participate in the surplus remaining.") (citation omitted). To ensure this absolute priority scheme is followed, bankruptcy focuses "on legal entities, not on corporate groups." *See* Douglas G. Baird & Anthony J. Casey, *No Exit?  Withdrawal Rights and the Law of Corporate Reorganizations*, 113 Colum. L. Rev. 1, 4-5 (2013).

B.    **The US Interests' Valuation Methodology**

The key drivers of the value of a business are revenue and cash flow.[290]  NNI generated

approximately $46 billion in revenue from 2001 to 2009, which amounted to 69.5% of the

revenue generated by the IEs during that same period.[291]  NNI generated 75.9% of the cash flow

of the IEs during that period.[292]

Moreover, the vast majority of patents and patent applications in the Patent Portfolio

were filed *only* in the United States.[293]  This was a clear recognition by NNL that the US market

– as to which NNI alone had the exclusive right in perpetuity to exploit – was the most valuable

market for the Nortel Group.  It was the only market where NNL determined it was worth

seeking patent protection for a majority of the inventions the IEs created and, consequently, the

only market where those inventions have value (because filing in the US but not in any other

jurisdictions means that any third party may use these inventions outside the US without fear of

patent infringement suits).  By designating the US as the sole jurisdiction where the vast majority

of Nortel's Patent Portfolio was filed, NNL acknowledged that the US is the most profitable

market for exploiting Nortel's IP and, accordingly, that NNI's exclusive rights in the US market

were by far the most valuable.

In determining the value each selling debtor relinquished Sales, the US Debtors' expert

on valuation, Jeffrey Kinrich – a Managing Principal at Analysis Group with a wide range of

valuation experience spanning 30 years – applied an income-based approach to valuation.  The

American Society of Appraisers defines the income approach as "a general way of determining a

---

[290] *See* Ibbotson SBBI 2010 Valuation Yearbook: Market Results for Stocks, Bonds, Bills, and Inflation 1926-2009, 19 (James P. Harrington ed., Morningstar 2010); Michael Pellegrino, *BVR's Guide to Intellectual Property Valuation* at 4-5 (2009 ed.).

[291] Transfer Pricing Worksheets.

[292] *Id.*

[293] Kinrich Report ¶¶ 79-80 (citing, *inter alia*, TR43636).

value indication of a business, business ownership interest, security, or intangible asset using one

or more methods through which anticipated economic benefits are converted into value."[294]

Income-based methods value the assets that comprise a business by valuing the business as it

functions as a whole.  The income-based approach is particularly appropriate and indeed

preferred in this instance, where each of the Business Lines was sold as a going concern and the

Patent Portfolio was sold as a single portfolio.[295]  Standard income-based methods of valuing

entities based on expected economic benefits include the discounted cash flow ("DCF") method

and projections based on a revenue multiple or a profit-based indicator, both of which Kinrich

applies here.

## C.    Value of Assets Relinquished by Each Seller in the Patent Portfolio Sale

Kinrich valued the rights relinquished or transferred by each seller in the Patent Portfolio

Sale to determine each seller's right to an allocated share of the Patent Portfolio Sale proceeds.

In the Patent Portfolio Sale, the Canadian, EMEA and US Debtors transferred or

relinquished all of their rights, title and interest in over 7,000 Nortel patents and patent

applications to Rockstar.  The Patent Portfolio consisted of Nortel patents that had not previously

been sold to buyers in the Business Line Sales because Nortel determined they were not

exclusively or predominately used in one of the various Business Lines.[296]  As set forth in

Section VII.C.2 of the Statement of Facts above, in the year prior to the sale, the various Debtor

---

[294] TR49902

[295] *See id.* at 9 (describing asset-based approach as inappropriate when valuing businesses sold as going concerns); *see also* Shannon P. Pratt and Alina V. Niculita, *Valuing a Business:  The Analysis and Appraisal of Closely Held Companies* 276 (5th ed. 2008) ("Going-concern value tends to be based largely – and sometimes entirely – on income and cash flow analyses."); *id.* at 369 ("Some intangibles lend themselves very well to the application of the income approach. Such contract-related or customer-related intangible assets as favorable leases, favorable supply contracts, favorable labor agreements, customer lists, and customer contracts are likely candidates for an application of the income approach. Other technology-related, engineering-related, and marketing-related intangible assets are also likely candidates for an application of the income approach. These intangible assets may include patents, proprietary technology or processes, trademarks and trade names, copyrights, and so forth.").

[296] *See* Kinrich Report ¶ 71.

estates collaborated in considering various options for realizing and maximizing the value of the

Patent Portfolio.  These options included running a standalone licensing servicing business

(IPCo), selling parts of the Patent Portfolio while licensing other parts, and selling the whole

Patent Portfolio.[297]

The IPCo business model was fully developed both as a set of projections to value the

Patent Portfolio and through internal actions taken to prepare to implement the business plan.[298]

The estates tasked Lazard and Global IP – financial and intellectual property professionals

retained to explore options for monetizing Nortel's assets –  to develop projections for a

licensing business around which the Nortel Group could reorganize, which efforts resulted in the

development of the IPCo model.[299]  Representatives of the estates, working closely and

collaboratively, heavily vetted the IPCo business model for "well over a year."[300]

Based on the cash flows projected by the IPCo model,[301] Kinrich valued the assets

relinquished by each of the debtor groups in the Patent Portfolio Sale (*i.e.*, the surrender of their

exclusive and non-exclusive license rights) by performing a DCF analysis to apportion the value

of the Patent Portfolio – the $4.5 billion paid by Rockstar.[302]  Knowing the total value of the

portfolio ($4.5 billion) and the cash flows projected to be realized from the portfolio in each

---

[297] *See* Ray Aff. ¶¶ 51–63.

[298] *See* Statement of Facts, *infra* § VII.C.2.

[299] Ray Aff. ¶¶ 50, 57.  *See also* Kinrich Report ¶ 73 n.96.

[300] Ray Aff. ¶ 61; *see also id.* ¶¶ 58-59.

[301] The IPCo model calculated expected cash flows in the following manner.  First, the model identifies "vendor revenues" (the revenues of target companies) in "addressable markets" (jurisdictions in which the patents can be effectively licensed or enforced through litigation).  Next, the model projects royalty revenues that would be earned by Nortel by multiplying the "vendor revenues" by appropriate royalty rates for each patent "franchise."  Finally, the IPCo model determines expected cash flows for an IPCo business by deducting the expected costs of operating the business from the projected royalty revenues.  Under the IP Co Model, the projected cash flow streams – which are generated through licensing and enforcement activities – are primarily driven by the size of the markets (measured in product sales revenue) in each region.   The cash flows are "projected on a regional level to obtain cash flows from North America (U.S. and Canada), EMEA (France, Germany and U.K.), and, in one scenario, China." *Id.* ¶¶ 96, 100.

[302] A DCF calculation determines the value of assets or a business by discounting (i.e. determining the present value) of cash flows expected to be realized from such assets over time.  *See* Kinrich Report ¶¶ 88-90.

region (the IPCo model cash flow projections), Kinrich derived the appropriate discount rates to determine the portfolio's present fair market value for each selling debtor group.[303]  These calculations result in the allocation of the Patent Portfolio Sale proceeds by debtor group as follows:

|                      | $ Billions | Percent |
|----------------------|------------|---------|
| **Canadian Debtors** | $0.43      | 9.7%    |
| **EMEA Debtors**     | $0.71      | 16.0%   |
| **US Debtors**       | $3.31      | 74.3%   |

Kinrich confirmed the robustness of his valuations in several ways.  He confirmed the discount rate implied by the IPCo model – 12.2% when China is not included and 15.7% when China is included – was consistent with discount rates observed in the market at the time.[304] Kinrich further confirmed the reasonableness of the royalty rates used in the IPCo model, based both on the robustness of the process by which the royalty rates were selected by Nortel and the royalty rates of other companies who licensed similar technologies.[305]

Kinrich also corroborated his DCF valuation results by examining the characteristics of the patents included in the Patent Portfolio and the traditional indicators of the value of a patent portfolio.[306]  Kinrich noted that his valuation of $3.31 billion (or 74.3% of the Patent Portfolio value) for the assets relinquished by the US Debtors in the sale is supported by the fact that over 99% of all highest and high interest technologies included in the sale – as identified by Nortel's IP advisors in connection with the marketing of the Patent Portfolio – were patented in the

---

[303] Kinrich determined the cash flows attributable to each debtor group by dividing the royalty revenue projected by the IPCo model for each region in proportion to the relative telecommunications equipment expenditures (a proxy for market revenues) in each market within a region and then deducting costs and taxes. *Id.* ¶¶ 116-17.

[304] *Id.* ¶¶ 118, 119 n.172.  As Mr. Kinrich noted, according to Ibbotson, a traditional valuation source used for computing a discount rate, the "median WACC for communications equipment companies ranged from 11.3% to 16.5% in June 2011."

[305] *See id.* ¶ 101.

[306] *See id.* ¶¶ 129-42.

United States, and the majority of the high interest (82%) and highest interest (66%) technologies were patented (or had pending patent applications) *only* in the US.[307]  The US also had the largest market size of any IE – creating the largest source of royalty revenue.[308]  Accordingly, Kinrich concluded that, taking into account these factors as well as the remaining terms for the patents and patent applications in the Patent Portfolio and consistent with his DCF calculations, most of the value in the Patent Portfolio was attributable to NNI.[309]

### D.    Value of Assets Relinquished in the Business Line Sales

Each of the Business Lines was sold as a going concern in a coordinated auction and sales transaction.[310]  Similar to the Patent Portfolio, the buyers of the Business Lines paid for the amount of value they expected to generate from the assets, not the value each Nortel estate may have derived from the assets in bankruptcy if they were not sold.

Kinrich allocates the proceeds from each of the Business Line Sales based on a relative revenue analysis for each Business Line.[311]  Leading economics treatises show that revenue multiple is a widely-accepted valuation technique and is a particularly appropriate methodology when valuing companies that have not been making profits.[312]  Kinrich applies two revenue-

---

[307] *Id.* ¶ 132.

[308] *Id.* at 67 (Table 11); *id.* at Ex. 31.

[309] *Id.* ¶ 142.

[310] *See* Hamilton Aff. ¶ 37.

[311] For example, US revenues comprised over 90% of the total revenues of the IEs for the CDMA business.  Kinrich Report Ex. 9, Ex. 14.

[312] *See* Shannon P. Pratt, Robert F. Reilly, & Robert P. Schweihs, *Valuing Small Businesses and Professional Practices* 341 (1998) ("For companies with Losses or Erratic Earnings," "multiples of price to revenues at which actual sales of comparative companies were consummated may offer one indication of value. . . . Gross revenue pricing multiples derived from recent sales of guideline businesses or practices may give some indication of how others assess the future of the industry or the profession."); Aswath Damodaran, *Investment Valuation:  Tools and Techniques for Determining the Value of Any Asset* 543 (3d ed. 2002) ("Revenue multiples have proved attractive to analysts for a number of reasons.  First, unlike earnings and book value ratios, which can become negative for many firms and thus not meaningful, revenue multiples are available even for the most troubled firms and for very young firms.  Thus, the potential for bias created by eliminating firms in the sample is far lower.  Second, unlike earnings and book value, which are heavily influenced by accounting decisions on depreciation, inventory, research and development (R&D), acquisition accounting, and extraordinary charges, revenue is relatively difficult to manipulate.

based approaches to value the assets each estate relinquished in the Business Line Sales.  The

first treats all revenue earned by the Business Lines (whether by an IE or a non-IE) equally and

accordingly apportions proceeds based on relative revenue share using the 2009 carve-out

income statements prepared in accordance with US GAAP.[313]  The second approach, recognizing

that the value of the IEs to a buyer was greater than the value of a non-IE, uses market-based

revenue multiples to value the assets relinquished by the non-IEs in the Business Line Sales, and

then applies the relative revenue share to determine the value relinquished by the IEs.  This

effectively accounts for the differences in value between IEs and non-IEs.

For his valuation, Kinrich used 2009 revenue results for each Business Line – the most

recent data available – and ran sensitivities based on anticipated regional growth rates to confirm

the 2009 data was properly indicative of future revenue flows expected to be realized by a buyer.

Kinrich confirmed the robustness of his valuation through a sensitivity analysis that calculated

valuations based on two profit measures:  gross margin (revenue minus cost of goods sold) and

contribution margin (gross margin minus selling, general and administrative costs).[314]  Kinrich

determined that the results of this exercise were similar to the results of his own revenue-based

methodology, but that use of Nortel's revenue numbers was a more appropriate method for

valuation than profit data because the available gross margin data were somewhat inconsistent

---

Third, revenue multiples are not as volatile as earnings multiples, and hence are less likely to be affected by year-to-year swings in the firm's fortune.  For instance, the price-earnings ratio of a cyclical firm changes much more than its price-sales ratios, because earnings are much more sensitive to economic changes than revenues are.").

[313] While Mr. Kinrich considered historical 2009 revenue figures, his analysis confirms that the 2009 revenue figures are proportional to, and consistent with, the reasonable expectations of future results.  *See also* Kinrich Report ¶¶ 57-64. Moreover, while Mr. Kinrich chose 2009 revenue figures because they were closest in time to the Business Line Sales, he also looked at average revenue figures from 2007-2009 and determined that, while using revenue figures for years 2007 and 2008 is inappropriate as those years were anomalous, his valuation results are not sensitive to using the average of 2007-2009 revenues.  *See id.* ¶¶ 53-56.  See Kinrich Report ¶¶ 38-43.  Mr. Green likewise uses the carve-out income statements in performing his analysis.  *See* Green Report at 41.

[314] *See* Kinrich Report ¶ 42.

and thus were a less reliable measure.[315]

Kinrich's analysis makes clear that the US Debtors contributed the majority of the value in the Business Line Sales. As set forth in Table 5 of Kinrich's Report, considering both revenue approaches as well as all sensitivities, the US Debtors relinquished 70% of the total value relinquished in the Business Line Sales.[316] By contrast, the Canadian and EMEA Debtors contributed 11.9% and 18%, respectively, to the Business Line Sales.[317]

**Business Line Sales Valuation Summary**

|  | Total Value Relinquished ($ Billions) | Percentage |
|---|---|---|
| Canadian Debtors | $ 0.34 | 11.9% |
| US Debtors | $ 0.51 | 18.0% |
| EMEA Debtors | $ 1.99 | 70.0% |
| Total | $ 2.85 | 100.0% |

A potential buyer naturally would be most interested in acquiring the Business Lines in the territories that are expected to generate the most future cash flows. Here, NNI was the only Nortel entity operating in the most valuable US market. It was the only Nortel entity with the exclusive right to operate in the US market and it had the customer relationships in the US. NNI had the exclusive right to convey and did convey those rights, and is entitled to be paid accordingly.

Based on his experience, expertise and analysis, Kinrich considered the range of values that his analyses had produced and opines that the valuations set forth above fairly and accurately measure how much of the proceeds generated in the Sales should be attributed to each selling debtor. The US Interests will further establish the foregoing at trial through Kinrich's expert testimony and other evidence.

---

[315] *Id.* ¶¶ 42-43

[316] *See Id.* at 30 (Table 5).

[317] *Id.*

## II.

## THE MONITOR'S ALLOCATION POSITIONS ARE FUNDAMENTALLY FLAWED

The Monitor's allocation positions have no basis in law or fact.  The Monitor contends that title, and title alone, trumps all other legal interests, including the exclusive and perpetual licenses held by the Licensed Participants and obtained by them at enormous cost.  This position flies in the face of the controlling documents and ignores the extensive factual matrix surrounding the title/license dichotomy for intellectual property that existed for years within the Nortel Group.

The Monitor's allocation positions are primarily set forth in the reports of Philip Green.[318]  For the Patent Portfolio Sale, Green allocates all of the $4.5 billion of the sale proceeds to NNL, based on the assertion that the US Debtors' and the EMEA Debtors' license rights in the Patent Portfolio had *zero value* at the time of the Patent Portfolio.  As set forth below, this assertion is incorrect as a matter of fact and law.  For this reason alone, the Monitor's allocation with respect to the Patent Portfolio Sale proceeds must be rejected.

For the Business Line Sales, the Monitor and Green also rely on their erroneous view of the Exclusive Licenses, and their position should be rejected for that reason alone. There are other flaws as well in the Montior's approach.  In particular, Green uses a so-called "value in

---

[318] *See* Green Report; Green Rebuttal.  The Monitor has also submitted two reports jointly authored by Mark L Berenblut and Alan J. Cox, NERA Economic Consulting (TR22156, TR22157).  The Berenblut/Cox Reports do not include an actual valuation or allocation, however.  Instead, they simply set forth generalized theories upon which Green did not rely when he issued his reports.  Green Dep. 16:25-17:12 (testifying that he "read their reports *after* I issued my reports" (emphasis added)); *see also* Cox Dep. 192:20 (admitting that they did not implement their methodology and Green "has done some calculations and we have not").  As Green is the only Monitor expert witness who purports to opine on the amounts to be allocated to each of the debtor estates, this section of our brief will principally discuss Green's analysis.  In any event, the Berenblut/Cox reports, to the extent they discuss abstract theory rather than actually performing a valuation are duplicative of Green's report and, as such, suffer from many of the same infirmities as Green's reports.  The criticisms herein of Green's analysis apply equally to the two Berenblut/Cox reports.  Simply, the CCC's expert, Thomas Britven, bases his analysis on a value-in-use methodology that is conceptually similar to and subject to substantially the same criticisms as Green's. *See* Britven Report, ¶¶ 3.5, 6.37, 6.48, 6.64.

use" method.  Rather than seeking to allocate the fair market value of the Business Lines (the purchase price paid) to the selling debtors based on the relative value that each contributed to the Sales, he instead bases the Licensed Participants' allocation – but not NNL's allocation – on cash flows that he asserts the Licensed Participants *could* have earned in the future had the Nortel Group *not* liquidated.  Obviously, the task here is not to speculate about what might have been, but instead to focus on what actually occurred – the sale of all of the Integrated Entities' assets.

Apart from his reliance on a flawed view of the Exclusive Licenses, Green's sole stated basis for using this method is that the Exclusive Licenses were also "not transferrable or otherwise 'marketable.'"[319]  This ignores the undeniable fact that the license rights *were* transferred to the buyers; indeed, the IFSA expressly states that *any* Nortel entity terminating a license is a "Selling Debtor."[320]  The MRDA, moreover, expressly permitted the assignment of the Exclusive Licenses with the consent of all parties, which consent was undeniably provided.  In truth, it was NNL's bare legal title that was not "marketable."  Without NNI's participation in the Sales, NNL could not have transferred to a buyer the right or ability to operate in the US market.  The same is true with respect to the Patent Portfolio Sale.  Without that participation, the Sales would not have occurred.

A.    **The Monitor's Proposed Allocation of the Patent Portfolio Sale Proceeds is Based on an Erroneous Assumption and Must Be Rejected**

Green's allocation "analysis" with respect to the Patent Portfolio in his initial expert report consists of only three pages.[321]  The Monitor and Green assert that NNL is entitled to all of the Patent Portfolio Sale proceeds based solely on their erroneous reading of the MRDA, from which Green concludes that neither NNI nor the EMEA Debtors retained any valuable license

---

[319] Green Report at 16.
[320] TR21638 (IFSA) § 11(d).
[321] Green Report at 63-65.

rights in the patents that were sold.  That is not an analysis; it is a legal conclusion.  Green's deposition testimony makes it clear that he is not engaged in an economic or valuation exercise. As Green testified:  "I reviewed the document, the MRDA, I am familiar generally with these types of documents, I read it in plain English, the [the scope of the licenses] term was self-explanatory to me."[322]  The US Interests respectfully submit that the Courts do not need the Monitor's valuation expert to read the MRDA for them.

According to the Monitor and Green, the MRDA only granted the Licensed Participants a limited right to make or sell the same set of products Nortel was selling in the Business Lines. Once the Business Lines Sales occurred, according to the Monitor and Green, the Exclusive Licenses became worthless.  As set forth in Section II.A below, this is a plainly incorrect reading of the MRDA.  As a result, the Monitor and Green's allocation theory fails.

Although the Courts need not go any further to reject the Monitor's proposed Patent Portfolio Allocation, even under the Monitor's and Green's incorrect reading of the MRDA, Green's view makes no sense.  Even Green concedes that many of the patents sold in the Patent Portfolio Sale were in fact used in the Business Lines.  This is because, as noted, if a patent was used in more than one Business Line, but not predominately in any one Business Line, it remained in the Patent Portfolio, and the purchasers of the Business Lines only received a non-exclusive license with respect to those patents.  Green concedes that the Exclusive Licenses were an encumbrance at least on these patents but then, defying logic, claims that the Licensed Participants' allocation from the Business Lines Sales would capture all of the value of their relinquishment of the Exclusive Licenses with respect to those patents.  This makes no sense at all.  The Licensed Participants did not relinquish their Exclusive Licenses to any patents that

---

[322] Green Dep. 23:3-6.  It took the Monitor just under four years after the commencement of these proceedings to discover this reading.

remained after the Business Lines Sales, so it is clear that they cannot be compensated for the relinquishment of those licenses solely from the proceeds of those Sales.  The Licensed Participants did not relinquish the Exclusive Licenses with respect to the Patent Portfolio until the closing of the Patent Portfolio Sale.

> 1.    **Under the MRDA, NNI Exclusively Held All Valuable Rights to Nortel's Intellectual Property, Including Patents, in the United States**

The rights of the Integrated Entities under the MRDA stand at the center of this dispute. Green's assumptions of valueless licenses are the cornerstone of his "analysis" that NNI should receive no allocation for the Patent Portfolio Sale.

NNI's rights under the MRDA are clear and unambiguous.  In consideration for granting NNL the right to register legal title with respect to intellectual property created from all of the IEs' R&D activities but funded largely by NNI alone, NNI received an exclusive, perpetual, royalty-free license to the Nortel Group's intellectual property in its Exclusive Territory.  NNI's exclusive territory is the United States, the Nortel Group's largest market by far.  NNI also had the unfettered right to enforce all rights to the Nortel Group's IP against any infringement or misappropriation in the United States.  That is the essence of the arm's length bargain embodied in the MRDA.

However, even if were there any ambiguity, such ambiguity must be resolved *against* NNL.  The MRDA, as discussed above, was not a document vigorously negotiated at arm's length by parties represented by independent advisors.  Instead, the MRDA was a tax document – a transfer pricing document drafted entirely under the direction of NNL's Vice President of Tax, John Doolittle.[323]  Only NNL had an independent outside advisor on the MRDA who was

---

[323] Doolittle Dep. 106:10-18.

looking out only for its interests. That advice was provided by a partner at the Osler law firm, who asserted attorney-client privilege belonging solely to NNL to decline to answer certain questions at his deposition.[324] The MRDA was never disclosed in any NNC or NNL pre-insolvency securities filing. The MRDA was never discussed or considered by the boards of NNI, NNL or NNC. The Monitor, standing in NNL's shoes, cannot run away from the MRDA's clear language or its negotiating history.

### a. *Standard of Contract Interpretation Under Ontario Law*

Although the MRDA is governed by Ontario law,[325] the rules of contractual interpretation under Ontario law do not differ from general US law on contractual interpretation.[326]

Ontario law states that the goal of contractual interpretation is to determine the intention of the parties. *Consolidated-Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.*, [1980] 1 S.C.R. 888 at paras 25-26. This interpretation "must begin with the words of the document," "giv[ing] meaning to all of its terms and avoid[ing] an interpretation that would render one or more of its terms ineffective." *Ventas Inc. v. Sunrise Senior Living Real Estate Investment Trust* [2007] B.L.R. (4th) 292 at paras. 24, 45 (Ont. S.C.J.); *aff'd*, 2007 ONCA 205.[327] Further, words of one provision must not be read in isolation, but should be considered in harmony with the rest of the contract in order to avoid inconsistency and achieve interpretive

---

[324] Wilkie Dep. 38:16-19.

[325] TR21003 (MRDA) at Art. 14(f).

[326] When construing a contract governed by Delaware law, in considering "the objective intent of the parties," which is "'a court's paramount consideration' in construing a contract," a court may "consider not only the language in the contract but also the circumstances surrounding the making of the contract, the motives of the parties and the purposes which they sought to accomplish." *In re Plassein Int'l Corp.*, 377 B.R. 126 (Bankr. D. Del. 2007) (Gross, J.) (mem. opinion) (internal quotations omitted). These principles are also applied under Ontario law, as discussed below. *Cf. Flintkote Co. v. Gen. Accident Assurance Co. of Can.*, No. C 04-1827 MHP, 2009 WL 3568644, at *2 (N.D. Cal. Oct. 27, 2009) (noting that "there are no material differences" between the laws of Ontario and California in the interpretation of a contract and thus applying the law of California).

[327] *See also Elliott v. Billings (Township) Board of Education, [1960] O.R. 583 at 587 (Ont. C.A.)*; *National Trust Co. v. Mead*, [1990] 2 S.C.R. 410 (S.C.C.); *Scanlon v. Castlepoint Development Corp.*, [1992] O.J. No. 2692 (Ont. C.A.).

accuracy.  *See, e.g.*, *Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)* [1999] O.J. No. 3290 at para. 9 (C.A.).[328]

Courts may also look to the circumstances of the contract – referred to as the "factual matrix" – in order "to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of the entry into the contract." *Consolidated-Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.*, [1980] 1 S.C.R. 888 at para. 26.  "The scope of the surrounding circumstances to be considered will vary from cases to case," but may include the relationship between the parties, the purpose of the contract and the custom of the industry.  *Kentucky Fried Chicken Canada v. Scott's Food Services Inc.*, [1998] O.J. No. 4368 at paras. 24-25 (C.A.); *see also Consolidated-Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.*, [1980] 1 S.C.R. 888 at para. 901. Courts should also interpret a contract "so as to accord with sound commercial principles and good business sense, and avoid commercial absurdity." *Downey v. Ecore International Inc.*, 2012 ONCA 480 at para. 38 (quoting *Salah v. Timothy's Coffees of the World Inc.*, 2010 ONCA 673 at para. 16).

### b.    *The MRDA Granted Equitable and Beneficial Ownership of Nortel Technology to NNI in the US*

#### (i)    *The Valuable Rights that a Patent Affords*

A patent confers valuable exclusivity by providing the party holding rights to the patent the ability to prevent others from making, using or selling the patented invention.  The US Patent Act provides that a party infringes a patent if it "makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention."  35

---

[328] *See also Tercon Contractors Ltd. v. British Columbia (Transportation and Highways)*, [2010] 1 S.C.R. 69 at para. 64 (S.C.C.).; *Bowater Newfoundland Ltd. v. Newfoundland and Labrador Hydro*, [1978] N.J. No. 14, 15 Nfld. & P.E.I.R. 301 at para. 28 (Nfld. C.A.); *Ryan v. Sun Life Assurance Co. of Canada*, [2005] N.S.J. No. 24, 249 D.L.R. (4th) 628 at para. 26 (N.S.C.A.).

U.S.C. § 271(a).  Patents are territorial, and a US patent excludes others from practicing the

patent in the US or importing a patented product into the US.  *Id.*[329]  A Canadian patent likewise

confers in Canada "the exclusive right, privilege and liberty of making, constructing and using

the invention and selling it to others to be used, subject to the adjudication in respect thereof

before any court of competent jurisdiction."  Patent Act (Canada), § 42.  There is no dispute that

the valuable rights of a patent can be transferred to another party through a license.

*(ii)    NNI Held the Exclusive Rights to Nortel Intellectual Property, Including
Patents, in the United States*

The MRDA allocated among the IEs, defined in the agreement as the "Participants," the

rights to the Nortel Group's patents and other intellectual property, defined as "NN

Technology."[330]  "NN Technology" is broadly defined and includes, among other things, all

intellectual property, including patents and patent applications.  *Id.*[331]

The MRDA's premise is that each of the Participants agreed on an arm's length basis to

conduct research and development and to grant to each Participant, in its respective territory, the

exclusive rights to the patents and other IP generated as a result.  The Licensed Participants

agreed in Article 4 – addressing "Legal Title to NN Technology" – to vest "legal title" to NN

Technology in NNL in consideration for NNL granting each Licensed Participant exclusive,

perpetual and royalty-free rights to NN Technology in its respective territory.  *Id.* Art. 4(a).  Title

was vested in NNL for administrative convenience only.[332]  The MRDA expressly provides that

---

[329] *See also* 35 U.S.C. § 154(a)(1) ("Every patent shall contain a short title of the invention and a grant to the
patentee, his heirs or assigns, of the right to exclude others from making, using, offering for sale, or selling the
invention throughout the United States or importing the invention into the United States, and, if the invention is a
process, of the right to exclude others from using, offering for sale or selling throughout the United States, or
importing into the United States, products made by that process[.]")

[330] TR21003 (MRDA) at Art. 1(h).

[331] The only form of intellectual property not included is trademarks.  *Id.*

[332] *See, e.g.*, TR22143 at 1 ("While it is not required by the new model, for administrative simplicity it is expected
that all of Nortel's IPR will continue to be owned by Nortel Networks Limited."); *see also supra* n. 139.

the Licensed Participants have "equitable and beneficial ownership" of NN Technology in their

respective exclusive territories.  As NNL and NNI both explained to the Internal Revenue

Service and the Canadian Revenue Authority, NNI owned the NN Technology "as it related to its

specific region."[333]

Article 4(a) of the MRDA, which vests legal title to NN Technology in NNL, also states

that such vesting is "[e]xcept as otherwise specifically agreed."  Just below Article 4(a), in

Article 4(e), is a material carve-out from that vesting, which is that NNI and the other Licensed

Participants[334] have the "right to assert actions and recover damages or other remedies in their

respective Exclusive Territories for infringement and misappropriation of NN Technology by

others."

Under Article 5(a), each Licensed Participant held:

> an exclusive, royalty-free license, *including* the right to sublicense, which except
> as hereinafter provided shall be in perpetuity, rights to make, have made, use,
> lease, license, offer to sell, and sell Products using or embodying NN Technology
> in and for the Exclusive Territory designated for that Licensed Participant, and all
> rights to patents, industrial designs (or equivalent) and copyrights, and
> applications therefor, and technical know-how, as necessary or appropriate in
> connection therewith ("Exclusive License").[335]

NNI's Exclusive Territory was the United States, and NNI held the exclusive rights to

exploit the NN Technology in that territory.  No other Nortel entity, not even NNL, had any right

to do so.  MRDA Schedule B.  Article 5(a) broadly provides NNI with "all rights to patents,

industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-

how, as necessary or appropriate in connection therewith."  Thus, NNI had the exclusive right to,

among other NN Technology, all patents in the United States.  In addition, Article 5(a) more

---

[333] TR11055 at 10.

[334] NNL is not a Licensed Participant.

[335] TR21003 (MRDA) at Art. 5(a) (emphasis added).  Under Article 5(b) of the MRDA, effective as of January 1, 2009, the Participants were also granted non-exclusive licenses to Nortel technology in all jurisdictions other than the Exclusive Territories.

particularly states that NNI's exclusive license "include[s]" the right to "sublicense" and "rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology" (in other words, the right to "practice" the patent).  The exclusion from the vesting of title, Article 4(e), grants NNI enforcement rights in the United States, which permitted NNI to exclude anyone else (including NNL) from exploiting NN Technology in the US.  Together, these rights – the right to practice the patent, to sublicense and to enforce/exclude – grant to NNI every valuable right to NN Technology, including patents, in the United States.

The plain language of the license grant in Article 5(a) further demonstrates that the rights granted to the Licensed Participants are broad and expansive.  The list of rights granted to the Licensed Participants is preceded by the word "including."  The word "including" does not create a limitation.  *Mahaffey, Re* (1922), 52 O.L.R. 369 (Ont. H.C.); *Dunscombe Estate, Re* (1902), 3 O.L.R. 510, 1 O.W.R. 153 (Ont H.C.).  Here, "including" follows the words "exclusive, royalty-free license" and thus the words that follow cannot – and do not purport to – limit the broad Exclusive Licenses to Nortel Group IP granted to the Licensed Participants under the MRDA.

In connection with the parties' decision to sell their respective rights and interests in the NN Technology, NNL had nothing of value to sell in the US.  NNI held the exclusive rights to exploit patents in the US, and NNL held no right to do so at all.  If NNL had sought to make, use or sell any product using or embodying NN Technology in the US (including any US patent), it would have breached and infringed on the exclusive rights that NNI held under its Exclusive License.

NNL could not, of course, place a buyer of its interests in any better position than it occupied or confer upon that buyer rights that it did not hold.  "Patent owners cannot transfer an

interest greater than what they possess, so assignees 'take[] a patent subject to the legal

encumbrances thereon.'" *Innovus Prime, LLC v. Panasonic Corporation*, 2013 WL 33354390 at

*5 (N.D. Cal., July 2, 2013) (quoting *Datatreasury Corp. v. Wells Fargo & Co.*, 522 F.3d 1368,

1372-72 (Fed. Cir. 2008)).[336]  In other words, "one cannot convey what one does not own."

*TransCore, LLC v. Electric Transaction Consultants Corp.*, 563 F.3d 1271, 1275 (Fed. Cir.

2009).[337]  Ontario law is the same.  *See, e.g.*, *National Carbonising Co., Ld. v. British Coal*

*Distillation, Ld.* (1937), 54 R.P.C. 41 (C.A.) (holding that an assignment of a patent cannot

defeat the rights of the licensee under a licence).[338]

(iii)    *NNI Held the Right to Sublicense*

As reflected in Article 5(a), NNI's Exclusive License included the right to "sublicense" to

other parties.  MRDA Art. 5(a).  The right to sublicense enables the licensee to grant another

party the ability to stand in its shoes and exercise its rights.  As the Supreme Court of Canada has

explained:

> As a general matter, a sublicence amounts to a grant by a licensee of certain
> licensed rights to a third party, the sublicensee. That is, the licensee in effect
> transfers or licenses some or all of his or her rights to the sublicensee, which
> means that the sublicence has similar incidents to the primary licence, including
> the right to exercise independently certain rights enjoyed by the licensee pursuant
> to its licence. It has been said, in fact, that 'a sublicence is simply another name
> for the indirect granting of a licence.'

*Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 at para. 48 (quoting Leslie W. Melville,

*Forms and Agreements on Intellectual Property and International Licensing* (3rd ed. rev 1997)

§ 3.18).  The same is true under US law.  *See, e.g.,* Brunsvold et al., *Drafting Patent License*

*Agreements* (7th ed. 2012) at 84 (A sublicense "permits the sublicensee to act independently of

---

[336] *See also Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 60 (3d Cir. 2001).

[337] The effect of a transfer of title to a US patent on the rights of an existing licensee to the patent is governed by US patent law, even if the underlying license agreement is governed by foreign law.

[338] *See also* P. Bradley Limpert, *Technology Contracting: Law, Precedents and Commentary* (Toronto: Carswell, 2011) at 5-31; *Linden Gardens Trust Ltd. v. Lenesta Sludge Disposals Ltd.*, [1993] 3 All E.R. 417 (U.K. H.L.).

the licensee (subject to the terms of the sublicense agreement).  A sublicensee is in effect another

licensee.").

Because Art. 5(a) expressly included the right to "sublicense," NNI held the right to grant

a sublicense to all or part of its rights under the Exclusive License to one or more other parties,

so that they could stand in its shoes.[339]  In fact, NNI did just that while Nortel was operating and

the MRDA's Exclusive Licenses were in effect, as set forth in Section II.A.1.c.iii below.

A right to sublicense is distinct from a "have made" right, which is the right of a licensee

to have another party make products for it.  "A right to have made is *not* a sublicense, as the

contractor who makes for the licensee does not receive a sublicense from the licensee."

*CoreBrace LLC v. Star Seismic LLC*, 566 F.3d 1069, 1073 (Fed. Cir. 2009) (emphasis added).

*See also Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 at paras. 75-76 (noting

distinction between sublicense and "have made" right under license).

Here, the MRDA's grant of an Exclusive License to NNI *expressly includes* the "have

made" right, stating that the Exclusive License includes the "rights to make, *have made*, use,

lease, license, offer to sell, and sell."[340]  In other words, NNI clearly had a "have made" right

enabling NNI to have other companies make products using or embodying NN Technology *for

NNI*.  The additional right to sublicense necessarily means something else – NNI was permitted

to sublicense to other parties the right to make products using or embodying NN Technology *for

themselves* and to use, sell and offer to sell such products.  As the Canadian Supreme Court

explained in *Eli Lilly*, in granting a sublicense, "the licensee in effect transfers or licenses some

or all of his or her rights to the sublicensee, . . . including the right to *exercise independently*

---

[339] In addition, Article 6(d)(iii) of the MRDA contemplates that the Licensed Participants would sublicense the NN Technology to third parties for their own purposes as it allows each Participant to "communicate to third persons licensing rights to use NN Technology such portions of the NN Technology as are reasonably needed by such licensees in accordance with the applicable license agreement."
[340] TR21003 (MRDA) at Art. 5(a) (emphasis added).

certain rights enjoyed by the licensee pursuant to its licence."[341]

Accordingly, under both the laws of both jurisdictions and the text of the MRDA, the sublicense right was necessarily more than just the right to hire a contract manufacturer to make products for the Licensed Participants, as that is already covered by the "have made" right.[342] And, as set forth in Section II.A.1.c.iii below, the Licensed Participants did sublicense to third parties for those parties to make their own products using NN Technology.

(iv)    *NNI Held the Right to Exclude Others from Using Nortel Intellectual Property, Including Patents, in the United States*

NNI also held the right to enforce the Nortel Group's US patents, without any limitation, and no other party was entitled to control or interfere with NNI's enforcement rights.  No buyer of the Patent Portfolio would have purchased the patents unless NNI terminated this valuable enforcement right because, absent such termination, if the buyer sought to exploit the patents in the US market, NNI had the right and ability to prevent the buyer from doing that.  As discussed below, NNI possessed all substantial rights to the patents; therefore, only NNI had any right to enforce the patents in the United States.[343]  Even if NNI did not possess all substantial rights, as an exclusive licensee, it held the ability to bring an enforcement action against any infringer and, if necessary, could force NNL to join the suit.[344]

As noted, Article 4(e) of the MRDA expressly provides, as an enumerated exception to

---

[341] *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 at para. 48 (emphasis added).

[342] The Monitor's experts have conceded that the sublicense right was not limited to allowing others to make products for the Licensed Participants.  *See* Reichert Dep. 50:23-52:7, 58:21-59:4 (acknowledging that at a minimum the Licensed Participants had the right to settle enforcement rights by granting a sublicense to the infringer for the infringer to make its own products using NN Technology); Green Dep. 112:4-113:20.

[343] *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1340 (Fed. Cir. 2007) (holding that "[w]hen a party has all substantial rights, it alone has standing to sue for infringement").

[344] Further, even when an exclusive licensee does not hold "all substantial rights" to licensed patents, the licensor cannot bring an infringement action without the participation of the licensee.  *Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 434 F.3d 1336, 1344 (Fed. Cir. 2006) ("[F]or the same policy reasons that a patentee must be joined in any lawsuit involving his or her patent, there must be joinder of any exclusive licensee").

NNL's legal title, that "Licensed Participants have the right to assert actions and recover damages or other remedies in their respective Exclusive Territories for infringement or misappropriation of NN Technology by others."  NNI therefore held the right to assert actions and recover damages and other remedies for infringement of NN Technology, including US patents, in the United States.

Further, even without the express language of Article 4(e), the rights that NNI held under the MRDA gave it the right to enforce Nortel's patents in the United States.  At the outset, the question of who has the right to enforce a US patent is governed by US patent law.  As the Court of Appeals for the Federal Circuit[345] has explained, the "patent statutes govern the creation and protection of patent rights, how rights can be transferred, and the parties entitled to assert those rights."  *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1336 (Fed. Cir. 2007) (collecting cases).  "Thus, the patent statutes have long been recognized as the law that governs who has the right to bring suit," and "[w]here parties have contractually divided patent rights, [courts] have analyzed standing to file the infringement suit under patent law principles."  *Id.* at 1337 (collecting cases).  Accordingly, while the MRDA includes an Ontario choice of law provision, US patent law governs the question of whether NNI's rights under the MRDA give it standing to bring a suit asserting infringement of a US patent.

In assessing enforcement rights under an agreement like the MRDA that confers exclusive rights on a party, US courts place the agreement into one of two categories.  If the agreement conveys "all substantial rights" in the licensed patents to the exclusive licensee, the licensee alone has the right to bring infringement suits, without joining the patentee.  *See, e.g.,* *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870, 873-76 (Fed. Cir.

---

[345] In the US judicial system, the Court of Appeals for the Federal Circuit holds exclusive jurisdiction to hear appeals in patent suits from all across the country (28 U.S.C. § 1295), and as a result it is the authoritative source, second only to the US Supreme Court, of US patent law.

1991); *Morrow*, 499 F.3d at 1340.  If an agreement does not convey "all substantial rights," an exclusive licensee is still entitled to bring infringement actions against other parties, but it simply must join the patentee as a prudential matter.  *See, e.g., Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1347-48 (Fed. Cir. 2001).  As a practical matter, exclusive licensees in the second category face no real impediment to bringing infringement suits because, as discussed below, they can force the patentee to join the suit even if it does not wish to do so.

       In determining whether a license agreement conveys "all substantial rights" in a patent to a licensee, courts consider the extent of the rights held by the licensee and any veto or control rights retained by the patentee.[346]  Here, as discussed, the MRDA conferred on NNI the exclusive right to exploit Nortel patents in the US and the right to sublicense its rights to third parties.  Further, the Participants expressly agreed that NNI held the right to bring infringement suits in its Exclusive Territory – a particularly critical factor in the "all substantial rights" analysis.  *See Vaupel*, 944 F.2d at 875 ("This grant [of the right to sue for infringement] is particularly dispositive here because the ultimate question confronting us is whether [the licensee] can bring suit on its own or whether [the patentee] must be joined as a party.").  Thus, in addition to its exclusive right to exploit the patents in the US, NNI could determine whether or not to bring an infringement claim, and it could determine whether or not to sublicense to a third party.

       In light of the expansive scope of rights that the MRDA conveyed to NNI, the MRDA comfortably meets the "all substantial rights" standard.  In its seminal decision in *Vaupel*, for example, the Federal Circuit found this standard satisfied even though the patentee retained significant control rights not present here.  *Id.* at 875.  Because the licensee in *Vaupel* held the

---

[346] *See, e.g.*, *Vaupel*, 944 F.2d at 875; *Intellectual Prop. Dev.*, 248 F.3d at 1343.

exclusive right to exploit the licensed patents and the right to bring infringement suits – just as

NNI does here – the court ruled that the "all substantial rights" test was satisfied and therefore

the exclusive licensee could bring an infringement suit on its own.

Even if the "all substantial rights" standard were not found to be satisfied here (though it

plainly is), NNI would have the right and ability to bring infringement suits as an exclusive

licensee by joining NNL as a party, regardless of whether NNL wished to cooperate.  As the

United States Supreme Court has emphasized, a patentee who grants an exclusive license to

another party "holds the title to the patent in trust for [the exclusive] licensee, to the extent that

he must allow the use of his name as plaintiff in any action brought at the instance of the licensee

in law or in equity to obtain damages for the injury to his exclusive right by an infringer or to

enjoin infringement of it."  *Independent Wireless Tel. Co. v. Radio Corp. of Am.*, 269 U.S. 459,

469 (1926); *see also Intellectual Prop. Dev.*, 248 F.3d at 1347 (same).[347]

If the patent owner "refuses or is unable to join an exclusive licensee as coplaintiff, the

licensee may make him a party defendant by process and he will be lined up by the court in the

party character which he should assume."  *Independent Wireless*, 269 U.S. at 468; *see also

Abbott Laboratories v. Diamedix Corp.*, 47 F.3d 1128, 1133 (Fed. Cir. 1995) ("A patentee that

does not voluntarily join an action prosecuted by its exclusive licensee can be joined as a

defendant or, in a proper case, made an involuntary plaintiff if it is not subject to service of

process.").  An exclusive licensee has constitutional standing to commence an infringement suit

on its own, as the need to join the patentee is a prudential matter rather than a limit on the

exclusive licensee's constitutional standing to bring suit.  *Intellectual Prop. Dev.*, 248 F.3d at

---

[347] The rights an exclusive licensee holds are also referred to as "beneficial ownership."  *Ortho Pharm. Corp. v. Genetics Inst., Inc.*, 52 F.3d 1026, 1030-31 (Fed. Cir. 1995) ("[T]he license makes the licensee a beneficial owner of some identifiable part of the patentee's bundle of rights to exclude others.  Thus, a licensee with proprietary rights in the patent is generally called an 'exclusive' licensee.").  In the MRDA, the parties expressly acknowledged that the rights held by the Licensed Participants qualified as "equitable and beneficial ownership."  TR21003 (MRDA) at 2.

1348.  And if the patentee is beyond the jurisdiction of the court and refuses to join the action, despite being invited, the suit will proceed and the patentee will be bound by its outcome. *Independent Wireless*, 269 U.S. at 468.  Thus, even if NNI did not have "all substantial rights" to NN Technology in the US, NNI could enforce its rights as exclusive licensee simply by joining or inviting NNL as a party, which NNL could not prevent.

> (v)     *The Monitor's Argument that NNI's Rights Had No Value Because of the Word "Products" in Article 5(a) Is Plainly Wrong*

According to the Monitor, because Article 5(a) includes the word "Products," the Exclusive Licenses only gave the Licensed Participants the right in their Exclusive Territories to make or sell the precise products that Nortel was in fact making or selling at the time Nortel decided to sell off its Business Lines, and nothing more.[348]  The Monitor contends that all other rights in NN Technology were vested in NNL.  This fundamentally flawed reading of the parties' respective rights to NN Technology is the backbone of the Monitor's argument that all of the $4.5 billion proceeds from the Patent Portfolio Sale and proceeds from the Business Line Sales must be allocated to NNL.

The Monitor's "Products" argument focuses exclusively on one phrase in Article 5(a), ignoring the rest of Article 5(a) and all other provisions of the MRDA, including most notably Article 4(e). It also ignores that the MRDA conveyed to the Licensed Participants exclusive *rights* to NN Technology – including patents – in its Exclusive Territory, *in perpetuity*.  The MRDA did not convey a limited license to make or sell a specific collection of products that existed at a particular time.  A patent itself confers legal rights, including the right to exclude others from making, using or selling the invention covered by the patent and, thus, the right to enjoy the exclusivity a patent affords.  The Exclusive License refers repeatedly – no less than

---

[348] Allocation Position of the Monitor and Canadian Debtors ¶ 55.

three times – to the "rights" that are being conveyed. *Id.*

Further, the definition of "Products" – which relate to but one of the several rights NNI's license "includes" under the express language of Article 5(a) – makes clear that the Licensed Participants' "rights" were not limited to what a Participant was making or selling at a particular point in time, but rather it embraced anything "*designed*, *developed*, manufactured or marketed, or *proposed* to be *designed*, *developed*, manufactured or marketed *at any time*." Thus, the definition included:

> all products, software and services designed, developed, manufactured or marketed, or *proposed* to be designed, developed, manufactured or marketed *at any time* by, or for, any of the Participants, and all components, parts, subassemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in any of the foregoing.

MRDA Art. 1(1) (emphasis added). Hence, anything that might be "designed [or] developed" or "proposed to be designed [or] developed" at "any time" would be covered.

This point is driven home further by other provisions of the MRDA. Article 4(e), as noted, provides each Licensed Participant with the right to exclude anyone from using NN Technology in its territory. This right is not limited in time, nor is its effectiveness in any way conditioned on the Licensed Participant making or selling any Product at any particular time, or even at all. The word "Products" does not even appear in Article 4(e). Article 9(b) explicitly provides that if the MRDA terminates, the Licensed Participants would have fully-paid up exclusive licenses.[349] Meanwhile, Article 7(b) requires each Licensed Participant to "indemnify and hold harmless NNL from any and all claims and liabilities for damages, losses, expenses or costs (including counsel fees and expenses) arising in its territory with respect to NN Technology." This indemnification obligation is not limited to damages related to Products and

---

[349] Moreover, in the event of the insolvency of a Licensed Participant, the Licensed Participant is entitled to the fair market value of its license as discussed, *supra*, in Section I.A.2.

instead reflects a burden assumed by the IEs commensurate with their right to fully exploit Nortel's IP in their Exclusive Territories.

In addition, although ultimately irrelevant, the Monitor is simply wrong to say that there were Nortel patents in the Patent Portfolio that were not used or proposed to be used in Products. First, "Products" included "services" that Participants might design, develop or market at any time. All Nortel patents were themselves the subject of a service that Nortel already proposed, developed and marketed: the "IPCo" business in which Nortel would market licenses to the Nortel patents to other companies in exchange for royalties.[350] Thus, the proposed IPCo service business of marketing patent licenses to other parties would be embraced within the definition of "Products," as it was a "service[] designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed at any time by . . . the Participants." MRDA Art. 1(1). And of course the proposed service would be subject to NNI's Exclusive License in the US, because it would entail "using . . . NN Technology" – specifically, US patents and applications – "in and for the Exclusive Territory designated for that Licensed Participant." MRDA Art. 5(a).

The Monitor's argument also ignores the fact that research and development, and the patents and other IP rights generated as the product of R&D, are inherently future-looking. The point of R&D is to develop new potential products, services and features that, by definition, do not currently exist.[351] Thus, R&D and the patents obtained as the fruits of R&D will nearly always be ahead of actual products.[352] In fact, if a company publicly uses or offers to sell a new invention before filing a patent application, it risks forfeiting the right to obtain a patent.

---

[350] Veschi Dep. 38:6-23; Bereskin Rebuttal, Feb. 28, 2014, ¶ 52.

[351] *See* Tucker Report § 5, The Economics of High Technology Patents.

[352] *See e.g.*, TR22107 at 2; Anderson Dep. 117:18-118:6

Further, the invention of a new product and the ability to obtain a patent for that

invention often leads to the commercial launch of a product based on the patented invention. In

other words, a company might not be making the product today, but if it develops an invention

and obtains a patent for it – giving it the exclusive right to offer products covered by the patent –

it may decide to begin making and selling the product in the future.

It makes no sense for the Monitor to claim that NNI's rights were fixed to a particular

point in time, or that NNI had no rights to particular NN Technology unless it was currently

making a product embodying NN Technology.  NNI at all pertinent times held all exclusive

*rights* to NN Technology in the United States.  If any other party (including NNL or any assignee

of its interests) tried to make, use or sell a product using or embodying a Nortel patent in the

United States at any time, it would be trespassing on turf reserved exclusively for NNI.  Whether

or not NNI was in fact exercising those rights or any particular right at any particular time is of

no moment.  NNL could not encroach on NNI's exclusive rights, and it could not transfer those

rights to a purchaser of NNL's bare legal title.

In light of all this, no prospective buyer would have paid anything for NN Technology,

including patents, for the US market unless NNI relinquished its exclusive rights under the

MRDA.  In fact, both Google and Rockstar insisted that NNI and the other exclusive licensees

relinquish their rights under the MRDA as a condition of the Patent Portfolio Sale.

> **c.        *The MRDA's Factual Matrix Confirms NNI's Equitable and Beneficial Ownership of NN Technology in its Exclusive Territory***

The factual matrix surrounding the MRDA, including the context in which the parties

drafted the agreement, representations to tax authorities, business practices with respect to

licensing and enforcement of patents, and the business and tax purposes underlying the MRDA,

all further demonstrate that the MRDA conferred all economically valuable rights in Nortel's

intellectual property – the NN Technology – to NNI and the other Licensed Participants in their Exclusive Territories.

*(i)   Drafting of the MRDA*

The MRDA was a tax-driven document, designed to reflect the Nortel group's transfer pricing system.[353]   The MRDA also addressed the Nortel Group's intellectual property because the transfer pricing transactions relate to the performance of R&D, the creation of intellectual property and the consideration passing between Nortel related parties.   To satisfy the tax authorities, the IEs had to make sure that the transactions (and the consideration) met the arm's length standard and reflected the parties' actual "functions, assets and risks."

The MRDA starts with a clear statement of the commercial framework for the agreement. It states that all the Participants "bear the full entrepreneurial risk of the Nortel business such as the risks attendant with the substantial and continuous development and ownership of the NN Technology."   *See* Sched. A; *see also* Whereas clauses ("WHEREAS each Participant bears the full entrepreneurial risks and benefits for the Nortel Networks business[.]").   The MRDA addressed intellectual property by vesting "legal title" to NN Technology in NNL "in consideration" for NNL granting the exclusive licenses to the Licensed Participants, such that they "enjoyed equitable and beneficial ownership" with respect to NN Technology in their respective territories.   *Id.* at Art. 4(a), 5; Whereas Clauses.

John Doolittle, a senior NNL officer and Nortel's Vice President of Tax, signed the

---

[353] *See, e.g.*, Sparagna Dep. 233:11-21 (The MRDA is "primarily focused on transfer pricing," which is "part of tax law," and it is "primarily [a] tax law document[]"); Weisz Decl. ¶ 9 ("The MRDA set forth the agreement among Nortel entities governing intercompany transactions for tax purposes and created ownership and licensing rights to Nortel technology created by the MRDA parties."); Orlando Decl. ¶ 21 (MRDA "formalized the terms of Nortel's transfer pricing policies for 2001 onward, including with respect to economic and beneficial ownership and licensing rights to Nortel's IP"); Stephens Decl. ¶ 13 (noting the MRDA was "designed to be a transfer pricing document"); Collins Dep. 121:7-11 (. . . "[M]ost of the issues for the MRDA were driven by finance and tax . . .").

MRDA on behalf of NNL.[354]  Doolittle testified at his deposition that one of the central purposes

of the MRDA was to provide "each of the RPS participants beneficial ownership but not legal

ownership to the technology," and that beneficial ownership included the right of each IE "to

exploit the Nortel technology in its territory."[355]  Critically, Doolittle testified there were no

"exceptions to the exclusive right of the [IEs] to the economic and beneficial ownership of

Nortel technology within their respective territories."[356]  As Doolittle explained, the "objective in

the MRDA was to accurately reflect the economic realities of how Nortel operated."[357]

Doolittle retained the Sutherland firm to advise the Nortel Group on transfer pricing

matters, including the drafting of the MRDA.  The lead attorney from Sutherland was an

experienced tax partner, Giovanna Sparagna.[358]  Consistent with Doolittle's testimony, Sparagna

testified at her deposition that the Participants were the "entrepreneurs" of Nortel who bore "the

upside risk and downside risk" of their R&D investment, and that the Licensed Participants were

the "beneficial owners" of Nortel's IP in their Exclusive Territories.[359]  Sparagna confirmed the

MRDA was structured such that the Licensed Participants had a "legal entitlement as beneficial

owners of the technology."[360]  When counsel for the Monitor asked about the relationship

between beneficial ownership and the license grant in the MRDA, Sparagna explained as

---

[354] TR21003 (MRDA) at 14, 23, 42 (Doolittle's signature on original MRDA, 1st addendum, and 3d addendum); Doolittle Dep. 106:13-25 (Doolittle explains that he "was head of the tax group when [the MRDA] was signed . . . and it was the agreement that documented the arrangement between the R&D participants, and so I was certainly involved in it.")

[355] Doolittle Dep. 94:24-95:3, 95:14-17.

[356] Doolittle Dep. 110:4-9, 110:11-12.

[357] Doolittle Dep. 107:9-13.  *See also id.* at 106:19-25 (the purpose of the MRDA was "to document the rights, obligations, benefits of the parties that were participants to the R&D – parties that performed R&D that were participants to the agreement."

[358] Sparagna Dep. 24:6-15, 25:12-19, 26:6-24.  Sparagna was retained by Doolittle on behalf of NNC and its subsidiaries.  Counsel for the Monitor has refused to allow the US Debtors meet with Sparagna outside the presence of counsel for the Monitor.

[359] Sparagna Dep. 83:16-85:14, 163:21-164:5, 245:14-25.

[360] Sparagna Dep. 151:17-21.

follows:

> Q: . . . [T]he parties to the MRDA would look, would they not, to the terms of the license contained to determine their rights as between each other in connection with the matters covered by the license, correct?
>
> A:    Correct.
> . . .
> Q:    They wouldn't look to the concept of beneficial or economic ownership or any equivalent for tax purposes, correct?
> . . .
> A:    I think they were supposed to be one and the same here at this point.
>
> Q:    But in terms of determining entitlements that a court, other than a tax court, might recognize, you would expect the parties to look to the terms of their legal agreement, correct?
> . . .
> A:    Well, let me put it this way.  I would point to this grant of a license to defend their right to the perpetual – the perpetual use of that intangible.[361]

Thus, as Sparagna testified, under the MRDA, "the [L]icensed [P]articipants held equitable and beneficial ownership in NN technology" through their grant to a "perpetual license."[362]  This license grant was consistent with the distinction "between legal title and economic and beneficial ownership," which "look[s] at trying to place in the right jurisdiction the actual economic benefit so that it can be taxed or not taxed appropriately."[363]

As already discussed, others with primary tax responsibilities had the precisely the same understanding, including Peter Look, Doolittle's successor as NNL's Vice President of Tax; Karina O, a long-serving NNL Tax officer; Kerry Stephens, a NNUK officer heavily involved in tax matters; Mark Weisz, Director of International Tax at NNI; and Michael Orlando, Transfer

---

[361] Sparagna Dep. 190:17-191:16.

[362] Sparagna Dep. 163:23-164:5, 180:12-17.  *See also* TR21531 at 94 ("Our strategy [in drafting the MRDA] was to have each RPS Participant be the exclusive beneficial owner of their respective geographic locations. . . . In form, however,  Nortel Canada is the formal legal owner of all worldwide registered intangibles.  We accomplished the transfer of all beneficial ownership of a specific geographic location to each RPS Participant by having Nortel Canada granting each of the RPS Participants an <u>exclusive</u> license in their respective specified Territories" (emphasis in original).).

[363] Sparagna Dep. 240:20-241:17.

Pricing Leader at NNI.[364]

The existing record, moreover, demonstrates that after the termination of the 1992 NNI R&D CSA in 2001, legal title to all Nortel IP was kept at NNL for administrative purposes only. In-house counsel at NNL noted that "*for administrative simplicity* it is expected that all of Nortel's [IP] will continue to be owned by [NNL]."[365]  Further evidence confirms the same.[366]

### (ii)    Representations to Tax Authorities

The Nortel Group and NNL in particular repeatedly told tax authorities that the Licensed Participants were the economic owners of Nortel IP within their Exclusive Territories.  These representations began at least in 2001[367] and continued until at least 2010, well after insolvency.

In its 2002 application for an APA with the IRS, CRA, and Inland Revenue, each of NNL, NNI and NNUK represented that each integrated entity subsidiary that conducted R&D "could be considered to 'own' the [Nortel] technology as it related to its specific region."[368] Likewise, in 2003, faced with questions posed by the IRS and CRA in connection with Nortel's APA applications, Nortel responded that the IEs were "owners of the intangible property."[369] And in its 2008 APA request for the 2006-2011 period, Nortel explained to the IRS and CRA that although all Nortel IP "is *registered* by NNL[,] [e]ach IE maintains an *economic ownership*

---

[364] *See supra* Statement of Facts § VI.F.3.

[365] TR22143 at 1.

[366] *See, e.g.*, TR11114 at 1 ("Theoretically, each of the participants could continue to own the intellectual property it creates, but continuing to assign all intellectual property to Nortel Networks Limited may provide some administrative simplicity."); TR11065 (NNL attorney circulates presentation "[s]uggest[ing] maintaining NNL as IPR owner [under the planned RPS agreement] for administrative simplicity").

[367] *See, e.g.*, TR31022 at 2 (Feb. 2001 Letter from I. Barton to Amanda Miller, HM Inspector of Taxes, stating: that "although Nortel Canada has legal ownership of Nortel's Intellectual Property, each participant [in the R&D CSA] has beneficial ownership, within their country of incorporation.").

[368] TR11055 at 10 (emphasis added).  The IRS expressly noted this representation in a subsequent review of Nortel's tax liability.  *See* TR11343 at 4 (Sept. 2004 IRS Notice of Proposed Adjustment indicating understanding of the IRS that under the R&D CSA, "each of the cost share participants (CSPs) were treated as owning the technology created by all CSPs and were entitled to use that technology in their respective geographic markets").  Nortel had previously made a similar representation to the United Kingdom's tax authority, with no limitation attached in any of these cases to the scope of the ownership rights.

[369] TR21080 at 25.

in the IP."[370]

Even after insolvency, while the Monitor was overseeing NNL, NNL was prepared to tell the IRS and CRA that the Licensed Participants owned the intellectual property in their exclusive jurisdictions.  In 2010 – long before the Monitor thought of its present litigation position – Nortel Group tax personnel and representatives of Ernst & Young Canada prepared "Transfer Pricing Reports" for NNL and NNI for submission to the IRS or the CRA.[371]  Notably, one of the members of the Ernst & Young Canada team working on this was Sean Kruger, who is (and was at the time) an "advisor to the Monitor" and who has recently filed an affidavit in this case stating he "ha[s] been personally involved in E&Y's role as the Monitor."[372]

The executive summaries of both reports explained that NNI, NNL, and the other IEs were "the primary owners of intangibles developed by the Nortel group" and that they "bear the risk of [that] development."[373]  Both reports also included a functional analysis that explained the roles of the IEs and other Nortel entities with respect to R&D, including intellectual property ownership.  Specifically, the reports included a chart that listed various activities performed by the IEs, which were either "in support of local and extraterritorial revenues" and designated with an "X," or "in support of local revenues only" and designated with a "Y."[374]  The chart, which is

---

[370] TR22078 at App. A, p. 4 (emphasis added).

[371] *See* TR48622; TR47221.  The NNL Transfer Pricing Report was prepared "under the framework set out in subparagraphs 247(4)(a)(i) through (vi) of the Income Tax Act (Canada)," *see* TR48622 at 1, which provides for the avoidance of certain penalties if a taxpayer "makes or obtains . . . records or documents" describing its transfer pricing policies and provides them "to the Minister [of National Revenue] within 3 months after service . . . of a written request therefor."  Income Tax Act, R.S.C. 1985, c. 1, § 247(4).  The NNI Transfer Pricing Report was prepared "for purposes of determining compliance with the reasonableness requirements of [IRC] § 1.6662-6(d)," TR47221 at 1, which allows for the avoidance of certain penalties if a "taxpayer maintains sufficient documentation" of a transfer pricing method and "provides that documentation to the Internal Revenue Service within 30 days of a request for it in connection with the examination of the taxable year," 26 C.F.R. 1.6662-6 (d)(2)(iii)(A).

[372] TR49893.  In multiple phone calls and letters, the US Debtors demanded the deposition of Kruger, but the Monitor refused to produce Kruger as a witness.

[373] TR48622 at 1; TR47221 at 1.

[374] TR48622 at 39; TR47221 at 37.

partially reprinted below, states that *NNI*, NNUK, NNSA, NN Ireland *and NNL* had "Intellectual

Property Ownership" *locally*, i.e., in their respective home jurisdictions.

| Activity | NNL | NNI | NNUK | NNSA | NN Ireland | NN Australia | LREs |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| **Research, Design and Development** | | | | | | | |
| R&D | X | X | X | X | X | | |
| Registration of Intellectual Property | X | | | | | | |
| Intellectual Property Ownership | Y | Y | Y | Y | Y | | |
| Product Development | X | X | X | X | X | | |
| Common Engineering | X | X | X | X | X | | |

As the chart makes clear, all of the IEs performed R&D activities in support of Nortel's

global revenues, and they were each granted ownership of the Nortel Group's IP in their

Exclusive Territories.  The chart also notes that NNL performed only *one* activity distinct from

the other IEs: "*Registration* of Intellectual Property." [375]  This is entirely consistent with NNL's

role as the holder of legal title for administrative purposes only.

NNL and NNI also represented to tax authorities that the IEs had assumed

entrepreneurial, risk-taking roles in the development of the IP and accordingly were entitled to

the benefit of their work.  In 2004, when asked questions by the IRS in connection with its 2001-

2005 APA application, NNI – with the assistance of E&Y, its APA advisor – responded to the

IRS that the IEs "have agreed to continue participating in the future benefits of new IP" under

the transfer pricing method proposed in the APA submission, and were "responsible for ongoing

entrepreneurship and risk-taking functions with respect to the IP arising from their collective

R&D efforts." [376]  NNL's and NNI's 2008 APA request to the IRS and CRA reiterated:

> [The IEs] are entitled to participate in the ongoing benefits from their historical IP
> and bear the risks associated with the continuing value of that IP.  The IEs
> maintain their historical IP and continue to develop new IP from which they

---

[375] TR48622 at 39; TR47221 at 37.

[376] TR11084 at 7.

anticipate sharing in the future benefits.  These entities are responsible for ongoing entrepreneurship and risk-taking functions with respect to their ongoing IP activities.[377]

The same page of that request made clear that, by definition, IEs "have economic rights to intellectual property."[378]  The NNL and NNI Transfer Pricing Reports for 2009, drafted in 2010, made similar representations.[379]  Ernst & Young LLP, had a role in preparing and submitting all of these APA requests and other communications to tax authorities in both the pre- and post-petition periods.

Giovanna Sparagna could not recall any instance where anyone represented to tax authorities that "the exclusive licenses were limited in any material fashion."[380]  Mark Weisz stated that to his knowledge, nobody ever told the tax authorities "that the MRDA Licensed Participants owned less than the full economic rights to exploit Nortel technology in their respective exclusive territories."[381]  Michael Orlando likewise attested that he was "not aware of any instance in which Nortel or its advisors informed the tax authorities that if Nortel sold its patents, the proceeds from that sale would be recognized exclusively by NNL."[382]

(iii)    *Business Practices*

The Licensed Participants' rights under the MRDA are further demonstrated by the by Nortel Group's business practices.  NNI exercised its enforcement rights by suing third parties for infringement in the US of Nortel Group patents.  In some instances, NNI was not in the

---

[377] TR22078 at 11.

[378] *Id.*

[379] *See* TR48622  at 34; TR47221 at 32.

[380] Sparagna Dep. 104:10-22.  *See also* Sparagna Dep. 243:17-24 (explaining that there was no "point in time when anyone from the [IP] group in legal or elsewhere in Nortel [who] ever told [Sparagna] that representations inconsistent with their view of ownership of the [IP] were being made to any of the taxing authorities")

[381] Weisz Decl. ¶ 17.

[382] Orlando Decl. ¶ 28.

business of making anything similar to the third party's infringing products.[383]

In 2007, following the MRDA's execution in 2004, Nortel's legal department expressly recognized and represented to a court that NNI – as the exclusive license holder – held substantially all rights to Nortel's US patents and therefore was entitled to bring infringement suits on its own.  Specifically, when Vonage challenged NNI's standing to bring infringement claims on its own, NNI responded (undoubtedly with the knowledge and approval of NNL) as follows:  "Nortel Networks Inc. is the exclusive licensee of all United States patents legally owned by Nortel Networks Ltd and *possesses substantially all rights* with respect to those patents.  As exclusive licensee Nortel Networks Inc. has standing to assert these patents against infringers such as Vonage."[384]

Even before the MRDA was executed, when Nortel brought infringement suits, NNI was a party and was described as the "exclusive licensee" of Nortel's US patents, which gave it the right to enforce the patents as discussed above.[385]  Thus, as Nortel's in-house counsel concluded with respect to a 2002 infringement suit against Kyocera Wireless, NNI had standing to bring suit on its own, and NNL was added as a plaintiff just for belt and suspenders purposes.[386]

The Nortel Group's sublicensing business practices also confirm the Licensed Participants' exclusive economic and beneficial rights.  During the MRDA period, NNL entered

---

[383] *See* TR40788; TR50593. ██████████████████████████████

[384] *See Vonage Holdings Corp. v. Nortel Networks Inc. et.al.*, No.04:04-cv-00548-Y, ECF No. 273, at 7 (emphasis added).  NNI had brought infringement claims against Vonage, as "the owner of all rights, title and interest in and to" the named patents and was entitled to sue for past and future infringement."  *See* 4:04-cv-00548-Y, ECF No. 264-2, Motion for Leave to Amend Nortel's Response to Vonage's Counterclaim attaching Nortel's First Amended Reply to Vonage's Counterclaim and Counter-Counterclaims, ¶ 10.

[385] *See, e.g.*, TR22084 (involving patent Nos. 5490252, 5790554); TR40777 (involving patent Nos. 05490252, 5790554); TR40788 (involving patent Nos. 5896411, 6088578, 6223028).

[386] *See* TR22151 at 1 (Nortel attorney Grant Lynds notes NNL added as plaintiff only because license is transferred to NNL if NNI becomes bankrupt); TR50593 (Nov. 14, 2002 email with subject "RE: Attorneys Eyes Only Documents") at 1 (attorney Lynds indicates that prior to commencing the Kyocera lawsuit "we confirmed with Marv [Gittes, outside counsel for Nortel] in January, before we filed, that we are OK with respect for standing – i.e., NNI could have sued in its own name, but we named NNL (the usual practice) in any event as a co-plaintiff").

into dozens of worldwide IP sublicenses "on behalf of itself and its Subsidiaries" (or using substantially similar language).[387]  This language reflected the fact that only the Licensed Participants, not NNL, had the right to sublicense Nortel IP in their respective Exclusive Territories.  As one of NNL's in-house attorneys explained:

> [M]ost licenses are granted by "Nortel Networks Limited acting on its own behalf and on behalf of its subsidiaries (collectively 'Nortel Networks')".  The theory is that *in each of the relevant jurisdictions, the licenses were being granted by the subsidiary which is the exclusive licensee for that jurisdiction*.  This has been the method of licensing used in Nortel for many years, and Tax appears to be comfortable with it.[388]

In short, "the Tax people view[ed] this language as being broad enough so that NNL will be viewed as licensing the Canadian rights, NNI the U.S. rights, . . . etc."[389]

Practices in this regard remained largely consistent throughout the relevant time.[390]  Critically, in many of these sublicenses, the Licensed Participants granted the right to utilize Nortel IP to third parties to use in their *own* businesses, with no requirement that such third parties engage in the manufacture, use, or sale of products for Nortel.[391]  Further, in many cases, these sublicenses permitted the third party to use the IP in a business in which the Nortel Group was not present.[392]

(iv)    *Full Economic Ownership*

As noted above, the MRDA was not negotiated by independent parties, but nevertheless

---

[387] This practice was originally adopted during the previous CSA.

[388] TR22080 at 2 (emphasis added); *see also id.* at 1 (email from Karina O "agree[ing] with everything" said in the above quotation).

[389] TR22154 at 1.

[390] At all relevant times, the Licensed Participants received royalty streams from all Nortel IP sublicenses irrespective of whether or not the sublicenses were limited to the manufacture of Nortel products

[391] *See, e.g.*, TRTR48840; TRTR48864; TR48929.

[392] For example, in 2002, Nortel licensed to ███████████ the right to use certain Nortel patents in connection with ███████████████████████████, though Nortel was not in the business of manufacturing ██████████████████████████████  Thus, the Licensed Participants' exclusive rights under the MRDA extended beyond the manufacture of Nortel products.

must meet the arm's length standard required by the tax authorities for transfer pricing agreements. [393]

Simply put, unrelated parties acting at arm's length would not vest legal title to the Nortel Group IP in NNL without in consideration receiving much more than the mere right to sell current Nortel products. As Lorraine Eden, NNI's transfer pricing expert, explains, under Nortel's RPSM formula, the IEs were allocated billions of dollars of residual losses in proportion with their R&D expenditures, thereby "reflect[ing] the downside of [the IEs'] risk-taking during the 2001-2008 period." [394] For NNI, this meant that it paid $6.7 billion in transfer pricing payments to NNL during this period.[395] The Patent Portfolio Sale resulted in $4.5 billion in revenue – the "previously unrealized value of Nortel's R&D efforts" and the potential "upside" of the IEs' risk-taking.[396] The Monitor, however, now argues that the MRDA gives all of this "upside" – $4.5 billion in upside – to NNL alone. As Eden explains, "[n]o firm in an arm's length negotiation would have agreed to [an] arrangement" whereby all of the parties bear firm-wide losses, but only one party "receive[s] the realized value of the [firm's] R&D efforts."[397] Richard Cooper and Steven Felgran, the EMEA Debtors' and UKPC's transfer pricing experts, agree with this point.[398]

---

[393] *See* Eden Report ¶¶ 26-34. Both the Canadian Debtors and EMEA Debtors agree with this basic proposition. *See* Reichert Report at 3 ("Underpinning the arm's length principle is the concept that rational economic agents, acting at arm's length, demand an appropriate return for contributions, activities, resources or rights that they provide to another party."); Cooper Report ¶ 3.1 ("The result of properly functioning transfer pricing arrangements is that income is recorded in the appropriate legal entity based on what that legal entity would have earned had it participated in the activities in question purely on an arm's length basis.").

[394] Eden Rebuttal ¶ 49.

[395] *Id.* ¶ 48.

[396] *Id.* ¶ 50.

[397] *Id.* at ¶¶ 47-50; *see also id.* ¶ 51 (The Canadian Interests' interpretation of the MRDA "implies that NNI, NNSA, NNUK, and NN Ireland were willing to invest in R&D knowing that if the IP was not used by them to make or sell products, but rather the IP was sold by Nortel to a third party, they would not receive any return on their investment in R&D because all sale rights (and thus all profits from the sales of IP) belonged to NNL. This would not be an arm's length relationship.").

[398] *See e.g.*, Cooper Report ¶ 5.1; Felgran Report ¶ 12.

Catherine Tucker, a professor at the Sloan School of Management at the Massachusetts Institute of Technology and NNI's expert in the economics of high technology organizations, makes two additional observations.  First, she notes that any rational business entity would have been aware that high-technology patents are worth much more than the individual current products in which they are incorporated, including because of their value in protecting current innovation, safeguarding future innovation, and protecting against patent litigation.[399]  Thus, acting in an economically rational manner, the Licensed Participants would not have limited the upside of their investment to the mere right to sell current products in an arm's length transactional setting.  Nortel fully understood this paradigm and sought to capitalize on these sources of IP value.[400]

Second, Tucker notes that both the Nortel Group and the MRDA itself emphasized the importance of R&D to Nortel's business model.  In various statements to tax authorities, public disclosures, and internal documents, Nortel prioritized the development of "new, best in class products for which the company is known."[401]  In order to provide the arm's length incentives for such innovation required by transfer pricing, the MRDA had to provide NNI and the other Licensed Participants with the right to share in the gains from investments in future technologies

---

[399] See Tucker Report ¶¶ 66-76.

[400] See TR22107 at 2-3 ("Nortel's focus was where possible to always file in emerging technology areas as early as possible. . . . Nortel [would] think about what competitors or other target companies might do in the future so Nortel could lay down some inventions to give us defensive patent protection against others . . . ."); McColgan Dep. 69:25-70:4 ("Whether you choose to develop a product or no product emerges from it, the concept of patents and ownership of patents gives you protection in the future.").

[401] TR11055 at 4.  See also TR40264 at 41 ("Our R&D expense did not decline to the same extent as our SG&A expense on a percentage basis due to our technology focus and commitment to invest in next generation solutions."); TR21139 at 3 ("We are seeking to generate profitable growth by using this focus to identify markets and technologies where we can attain a market leadership position. . . . Some areas in which we are increasing investment include 4G broadband wireless technologies."); TR22078 at App. B, p. 5 (emphasizing that Nortel had "[a]ccelerated the shift of R&D dollars towards new and emerging markets and technologies. . . ."); TR22119 at 2nd attachment (Apr. 2008 presentation stating that "[w]e are replicating on a broader scale a model that has proven to be highly successful (historically and today) of driving disruptive technology/innovation into market."); see also additional evidence cited in Tucker Report ¶¶ 37-40 & nn. 19-20, 23-24, 26-27.

that would enable the Nortel Group to remain at the forefront of innovation, rather than just the gains from tweaking existing products.  *See* Tucker Report ¶¶ 41-43.  The exclusive, perpetual and royalty-free rights to exploit Nortel IP found in Article 5 of the MRDA provided to each Licensed Participant precisely this incentive.  Further, the record demonstrates that the Licensed Participants responded to those incentives and did, in fact, direct their energies towards innovation rather than merely focusing on existing products.  *See* Tucker Report at ¶¶ 51-62.

(v)      <em>Custom of the Industry</em>

Ontario law considers the "custom of the industry . . . as part of the factual matrix that must be looked at in interpreting [an] agreement."[402]  Such evidence may include expert testimony on the industry custom and practice.  *See, e.g.*, *Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc.*, 2013 ONSC 1300 at paras. 61-62, 97, 101-07, 111-17 (Newbould, J.) (considering evidence from securities partner at Goodmans LLP as to how a reasonable market actor would interpret a standard contract clause); *Leuthold v. Canadian Broadcasting Corp.*, 2012 FC 748 at paras. 59, 61, 89-90 (expert's knowledge of industry licensing practices is relevant to interpretation of license governed by laws of Ontario); *Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)* (1998), 40 B.L.R. (2d) 1 (Ont. Ct. J.) at para. 391 (relying on expert testimony providing "commercial context" of comfort letters).

Here, Daniel Bereskin – who has vast experience drafting and negotiating technology licensing agreements[403] – has reviewed the MRDA from the industry custom and practice perspective.  As will be shown at trial, Bereskin opines that a sophisticated business person would understand the MRDA Exclusive License grant to convey (1) the right to use, make, and have made "Products" embodying NN Technology (where Products is defined in such broad

---

[402] *Kentucky Fried Chicken Canada v. Scott's Food Services Inc.*, [1998] O.J. No. 4368 at paras. 24-25 (C.A.).

[403] For approximately 25 years, Mr. Bereskin served as a director of a public corporation, negotiating many of its agreements.  Bereskin Dep. 19:23-20:5.

terms that it encompasses all conceptions of the word); (2) the right to all Nortel patents (and other intellectual property including technical know-how); and (3) and the right to sub-license the rights described in (1) and (2) to a third party for its own use.  These rights are exclusive, perpetual, and royalty-free for each Licensed Participant in its Exclusive Territory.

Bereskin also observes that the practice is to construct licenses where the breadth of affirmative license rights (Article 5 in the MRDA) are coextensive with the breadth of enforcement rights conveyed (Article 4(e) in the MRDA).[404]  Bereskin explains that in light of the broad rights possessed by NNI, he would have strongly advised any purchaser of the Patent Portfolio to condition that purchase on the release of the IEs' Exclusive Licenses, which is precisely what Google and then Rockstar insisted occur as a condition to the deal.

### 2.     The Monitor's Current Position Is Inconsistent with Its Prior Statements and Conduct

Prior to May 2013, the Monitor consistently represented in 18 separate publicly-filed reports that NNL's legal title to NN Technology was encumbered by the Exclusive Licenses granted to the Licensed Participants.[405]  For example, in Monitor's Reports filed in these proceedings, the Monitor stated:

- January 2009 (pre-filing report):
  "[Nortel's transfer pricing method] provides [the IEs] with exclusive rights within their geographic area and non-exclusive rights elsewhere to exploit the IP."[406]

- March and July 2009 (reports seeking approval of Business Sales):
  "[T]he Applicants have an interest in intellectual property of the [lines of business] which, in turn, is *subject to various intercompany licensing agreements with other Nortel legal entities around the world*, in some cases on an exclusive

---

[404] This is not only a custom and practice, but logical for a lay person as well.  It would be perplexing if an agreement provided the licensee the right to sue third parties for infringing technology not covered by the license.

[405] *See* TR21278, TR40141, TR21279, TR50260, TR21280, TR40881, TR40621, TR49875, TR49876, TR49877, TR49878, TR49879, TR49880, TR49882, TR49883, TR21281, TR40718, TR21282(a).

[406] Pre-filing Report of the Monitor (Jan. 14, 2009) ¶¶ 42, 43(b) (emphasis added).

basis and in other cases, on a non-exclusive basis." [407]

- June 2011 (report seeking approval of the allocation protocol):

  "[T]he Canadian Debtors held (or hold) legal title to the intellectual property which underpinned Nortel's global businesses, *which intellectual property was and is licensed to its affiliates*, in some cases on an exclusive basis and in other cases on a non-exclusive basis." [408]

- April and July 2011 (reports seeking approval of the Residual Patent Portfolio sale):

  "NNL holds legal title to the Residual IP which, in turn, is *subject to various intercompany licensing agreements with other Nortel legal entities* around the world, in some cases on an exclusive basis and in other cases on a non-exclusive basis." [409]

Notably, the latter two reports were filed *after* the Business Line Sales were completed, despite

the Monitor's current position that NNI's and the EMEA Debtors' licenses were worthless by

that point.

Similarly, in August 2009, the Canadian Debtors' then lead lawyer, Derrick Tay from

Ogilvy Renault LLP, testified before the Canadian House of Commons that the estates were

cooperating in the monetization of the residual patents because those patents were subject to

license rights:

> There's one additional aspect that we need to understand . . ., in that while Nortel Canada owns those patents, licenses have been granted worldwide to the other Nortel entities, and so Nortel is not in a position to simply deal with those patents. Nortel Canada is not in a position to simply deal with this in complete disregard of the rest of the world and in complete disregard of the insolvency processes going on in the rest of the world, so it's an integrated issue. [410]

Likewise, in 2011, NNI sought the US Court's approval of a sale of the Patent Portfolio

as being in the best interests of the US Debtors.  The US Court ultimately concluded that the

---

[407] 4th Monitor's Report (Mar. 2, 2009); 17th Monitor's Report (July 27, 2009).

[408] 67th Report of the Monitor (June 2, 2011) ¶ 14 (emphasis added).

[409] TR21281; TR21282. The Monitor's representations in its reports were echoed in NNC's contemporary public filings.  For example, NNC's 2010 10-K, which was filed in March 2011, stated that "IP is generally owned by NNL and licensed to participating Nortel affiliates (i.e., NNI and certain EMEA Debtors) through exclusive and non-exclusive licenses." TR21541 at 5.  *See also* TR40272 at 4;  TR40270 at 11.

[410] TR12004 at 21.

terms of the Patent Portfolio Sale were the "highest and best available" to the US estate, after reviewing submissions by the Monitor and Canadian Debtors and conducting joint hearings with the Canadian Court in May and July 2011 that were attended by their US and Canadian counsel, among others.[411]  Not once at the hearings or in its submissions did the Monitor inform the Courts that in its view, NNI was about to surrender its remaining license rights under the MRDA for no consideration.  To the contrary, the Monitor's 63rd Report – which the Monitor submitted to both Courts in connection with the April joint hearing[412] – represented that "a sale of Residual IP was the best method of monetizing the Residual IP for the benefit of [Nortel's] stakeholders."[413]

These representations were consistent with the Monitor's conduct and representations toward the other parties throughout the Sales process.  Following the insolvency filings, as noted above, the estates jointly retained Lazard and Global IP, and together, the estates, their advisors, and their creditor constituencies worked together to determine the best way to monetize their assets in a way that would be in the "best economic interests of [each estate's] creditors generally."[414]  The estates considered multiple options for the monetization of the Nortel Group's IP, including the IPCo business model, which would monetize Nortel's technology through license marketing and servicing and enforcement activities.[415]

---

[411] TR21509 (transcript of July 2011 proceedings before the Hon. Kevin Gross) at 110:5-111:11; *see also* McDonald Dep. 137:12-144:20.

[412] TR50174.

[413] *See* Hamilton Dep. 83:16-86:17; 174:2-174:18, 175:5-175:25.

[414] *See* 21638 §§ 11(a)-(b), 12(e) (license rights will be terminated "in consideration of a right to an allocation" of the Sale proceeds at the closing of each Sale unless NNI or another Debtor determined such sale was not in the best interests of its creditors).

[415] *See, e.g.*, TR11150, Veschi Dep. Nov. 7, 2013 69:18–71:12 (describing TR11150 as a presentation given on July 8, 2009 to "the creditors in general from the various estates"); TR22097; Veschi Dep. Nov. 7, 2013 94:2–13 (discussing TR22097 and describing a summer 2009 tour of the Ottawa R&D facility); TR22098; Riedel Dep. 124:21–125:4 ("Q. Who was involved in the creation of IPCo. other than as I believe you testified yourself Global IP and Lazard? A. John Veschi's team, the IP licensing team that reported to me was heavily involved. It was reviewed by the creditors and their advisors as we went through the journey and the board and others."); Riedel Dep.

As representatives of the Monitor themselves testified, at no time throughout this process did the Monitor suggest that a patent needed to be used in a then current product for the Exclusive Licenses to have value or that the Exclusive Licenses had become worthless upon the completion of the Business Line Sales.[416]  Of course, this would have been extremely pertinent information, because if NNI had no right to receive any of the proceeds of Patent Portfolio Sale – the outcome that the Monitor now proposes – it would have made no sense for NNI to relinquish its licenses in the Patent Portfolio Sale or agree to the sale at all.  Instead, to ensure some recovery to the US estate and its creditors, NNI would have adopted the IPCo business model, or a business model in which NNI made products for sale in the US, or indeed any other business model that brought more than zero dollars to the US estate.  Of course, the Monitor's position is not correct, but had it made its position known earlier, the US Debtors could have considered their options, including seeking a prior judicial declaration on this issue before risking the surrender of billions of dollars in valuable license rights for nothing.

John Ray, the Principal Officer of the US Debtors, testified to that effect in his declaration, stating that "[n]ever once during [the Sales] process did anyone ever suggest the argument being advanced by NNL," and that "[i]f this position had ever been asserted, NNI never would have cooperated in the Patent Sale or in any of the Business Sales."[417]  Similarly, Alan Bloom, the NNUK Joint Administrator, testified that "if [he] had ever imagined for one moment" that the Monitor and the Canadian Debtors would argue that the Licensed Participants'

---

126:14–20 (testifying that the Unsecured Creditors Committee was involved in the IPCo exercise).; Hamilton Dep. 99:24-101:9; 101:10-102:16.

[416] *See, e.g.*, McDonald Dep. 122:24-123:4 (Monitor first advised the other estates of its position that they were not entitled to proceeds from the Patent Portfolio Sale in Mary 2013); Hamilton Dep. 126:23-127:10, 128:9-15 (Hamilton was not aware of any communication to the other Nortel debtor estates or prospective bidders that "the patents were not subject to licenses with the other Nortel participants to the MRDA").  The Monitor likewise never advised the estates that if they pursued the IPCo option, the revenues from that business would belong solely to NNL.  *See* MacDonald Dep. 168:15-169:13; 170:16-170:23; Hamilton Dep. 190:17-190:21.

[417] Ray Decl. ¶ 67.

licenses had no value, NNUK would have refused to approve the Patent Portfolio Sale because it would not have been in the best interests of its creditors.[418]  Cosmé Rogeau, the Liquidator of NNSA, testified that he represented to the French Commercial Court – whose approval was required for NNSA'a participation in the Patent Portfolio Sale – that NNSA would be entitled to a share of the proceeds, and if he had known that the Monitor disagreed, he would have refused to approve the terms of the Patent Portfolio Sale.[419]

Presumably, the Monitor – as an officer of the Canadian Court, with a duty of candor[420] and an obligation to act impartially[421] – would have informed the Courts and the estates if it believed at the time of the Patent Portfolio Sale that the Participants' licenses held no value. Where the Monitor did believe there was a real dispute about the existence of rights in Nortel intellectual property, it did not hesitate to say so in its reports, as its duty of candor required.  For instance, when the Monitor and Canadian Debtors took the position that only NNL had the right to participate in the sale of certain internet protocol addresses, the Monitor carefully noted for the Canadian Court in its 81st Report that "[t]he US Debtors have asserted an interest in the IP Addresses and any proceeds of sale derived therefrom.  The Applicants and the Monitor reject such claims."  81st Report of the Monitor (Feb. 14, 2012) at ¶ 30; *see also* 83rd Report of the Monitor (Mar. 29, 2012) at ¶ 27 (reiterating this point).

---

[418] Bloom Dep. 95:12-96:10.

[419] Rogeau Dep. 81:12-15, 81:17-21, 81:25-82:23.

[420] *See Confederation Treasury Services Ltd., Re*, (1995), 37 C.B.R. (3d) 237 (Ont. Ct. J. (Gen. Div.), In Bank.); *see also* McDonald Dep. 27:16-28:5 (Monitor is an officer of the court); 35:5-35:8, 35:24-36:11 (Monitor's duty of candor extends to both US Court and Canadian Court); 83:21-84:2, 84:16-85:2 (duties of accuracy and completeness); Hamilton Dep. 56:18-57:14 (Monitor understood report would be reviewed by both the court and creditors).

[421] *See* McDonald Dep. 28:24-29:9, 30:25-32:25; Hamilton Dep. 44:15-45:4.  In addition to the CCAA, the Monitor owes similar duties pursuant to the Code of Ethics for Trustees in Bankruptcy.  *See* Bankruptcy and Insolvency General Rules, C.R.C., c. 368 ¶ 39 ("Trustees shall be honest and impartial and shall provide to interested parties full and accurate information as required by the Act with respect to the professional engagements of trustees."), ¶ 40 ("Trustees shall not sign any document, including a letter, report, statement, representation or financial statement . . . that they know, or reasonably ought to know, if false or misleading, and any disclaimer of responsibility set out therein has no effect."); McDonald Dep. 87:8-90:23, 91:2-93:7.

Critically, the Monitor – Ernst &Young Canada – is no stranger to the MRDA.  For years before the Nortel Group's insolvency, Ernst & Young Canada served as one of Nortel's principal transfer pricing advisors, including on its APA requests and on the MRDA.  Likewise, the Monitor has had full daily access to NNL's personnel and records, and in order to fulfill its duty to oversee the Canadian Debtors' business and the Sales process, the Monitor would, or should have, asked these individuals – as well as the Ernst & Young Canada representatives – before the spring of 2013 about their understanding of the licenses granted under the MRDA.  Thus, when McDonald testifies that he never heard of the "Products" or "worthless licenses" arguments until early 2013, it is clear that it is a litigation-driven position with no basis in reality and not derived from the understanding of NNL employees and practice with respect to the MRDA.

## B.     The Monitor's Proposed Allocation of the Business Line Sales Proceeds Is Also Flawed

As discussed above, the Monitor's main valuation expert, Philip Green, bases his entire opinion on his erroneous reading of the MRDA that the Exclusive Licenses were neither exclusive nor perpetual.  Green's other perspectives on valuation – value in use and IPCo licensing pro forma – are equally flawed, constituting little more than further fruitless struggling to escape the straightjacket that is the MRDA.  The Monitor's and Green's allocation of the Business Line Sales proceeds is based on a misplaced "value in use" methodology that he applies inconsistently to the selling debtors, coupled with his erroneous view of the scope of the Exclusive Licenses described above.

First, a "value in use" method is inapplicable to the allocation task at hand.  Value in use, if applied correctly (which, as set forth below, Green does not even do), would measure what the Nortel entities could be expected to earn had they not sold the Business Lines and instead continued to operate as an MNE.  But the question is not what might have occurred, it is what

did occur.  No Nortel entity continued to operate its businesses.  The issue is what did the buyers

pay for what each selling debtor sold or relinquished in that Business Line Sale.  The value

attributable to NNI in allocation must therefore be based on the price that the buyer paid for

NNI's US business, not on pure speculation about what might have been.

    Second, Green only applies the value in use method to calculate NNI's and the EMEA

Debtors' allocation.  He does not apply this method to NNL.  There is no basis for inconsistent

methodologies depending on who is the seller.  Green's only purpose in applying inconsistent

valuation methodologies is to stack the deck in favor of NNL's allocation.  Green seeks to justify

this inconsistent treatment again based on his erroneous reading of the Exclusive Licenses and

his further erroneous view that the Licensed Participants purportedly did not have "a transferable

right."[422]  In Green's words, the "value in use concept [with respect to the Licensed Participants'

interest in NN Technology] applies without reference to 'market prices,' which is apt, since the

licenses were not transferable or otherwise marketable.'"[423]

It is apparently the Monitor's and its experts' view that if the licenses are not transferable,

then the Licensed Participants could not have obtained any value that comes from transferring

their Exclusive Licenses and transferring the exclusive right to operate and exploit NN

Technology in their Exclusive Territories.  This is a complete fiction because the Licensed

Participants unquestionably did transfer that value to the buyers.

Green relies on Article 14(a) of the MRDA to support his argument.  But this standard

anti-assignment clause merely provides that the Agreement "shall not be assigned by any

Participant" – including NNL – "except with the written consent of each of the other

---

[422] Green Report at 15.

[423] *Id.* at 16.

Participants."[424]  In fact, consent was provided for every sale.[425]  There can be no question that in those sales the Licensed Participants transferred the exclusive right to operate their businesses and exploit NN Technology in their Exclusive Territories.  NNL had no ability to transfer any rights of the Licensed Participants without their express consent.[426]

Any attempt by the Monitor or Green to rely on the technical happenstance that the Licensed Participants terminated their licenses, rather than formally transferring them, would be baseless.  Aside from being elevation of form over substance, this position is defeated by the License Termination Agreements and the related sale agreements, which expressly refer to NNI and the EMEA Debtors as "Sellers."[427]  The IFSA also makes this crystal clear:  "Where any Debtor enters into any Appropriate License Termination . . . , such Debtor shall be deemed to be a Selling Debtor, and the proceeds of such Asset Sale shall be deemed to be Sale Proceeds."[428]  It is therefore a complete mystery how the Monitor can now base its theory to allocate the proceeds of the Business Line Sales on the patently false assumption that the Licensed Debtors could not and did not transfer the licenses.

The impact of the Monitor's inconsistent application of its value in use theory cannot be overstated.  Green never applies his value in use method to NNL, which obfuscates the impact of

---

[424] TR21003 (MRDA) at Art. 14(a).

[425] Notably, pursuant to the IFSA, none of the parties could have been compelled to participate in any sale that was not in the best economic interest of its creditors.  TR21638 (IFSA) § 12(e).

[426] Where a contract grants an exclusive license to a patent, a prohibition on assigning that contract means that the *licensor* cannot grant rights to the underlying property that would conflict with the rights of the licensee.  A non-assignability clause, such as the one found at Article 14 of the MRDA, is presumed to apply to *all rights* conferred by the agreement.  *See Linden Gardens Trust Ltd. v. Lenesta Sludge Disposals Ltd.*, [1993] 3 All E.R. 417 (U.K. H.L.); *see, e.g., Imoney Corp. v. Quebecor Communications Inc.*, [2002] O.J. No. 4309 at para. 11 (S.C.J.).  Even if the licensor could somehow overcome the prohibition on assignment, the assignee would only receive the licensor's legal interest in the patent subject to the terms of the pre-existing license.  P. Bradley Limpert, Technology Contracting: Law, Precedents and Commentary (Toronto: Carswell, 2011) at 5-31.

[427] *See, e.g.*, TR47424 at 2; TR47363 at 1; TR50611 at 1; TR47463 at 1; TR47539 at 1; TR44186  at 1, 2; TR48121 at 1, 2. TR43642 ; TR31671; TR47855; TR48494. The same is true with respect to the License Termination Agreement in the Patent Portfolio sale.  TR21508 at 1.

[428] TR21638(IFSA) § 11(d).

120

his error.  Thus, Green never attempts to value NNL's contribution to the sales; choosing instead to deduce that everything he has not allocated under his biased value in use methodology to NNI and EMEA must belong to NNL.

After reviewing Green's analysis, NNI's valuation expert applied Green's value in use method (including the same flawed cash flow projections Green cobbled together for his analysis) to NNL.  The results were telling.  Applying Green's valuation methodology consistently for all selling debtors – including NNL – resulted in a total value in use that was approximately *$1 billion* less than what the selling debtors were paid in the Business Line Sales. Green simply allocates this excess $1 billion to NNL.  There can be no question, however, that NNL, selling alone, could not have replicated the same result for the Business Line Sales.  No buyer would have paid much, if anything, for the Business Lines if they could not get the United States market, which was NNI's alone to transfer.  Green makes additional material errors in his value in use method, as summarized in Appendix C.

### C.    The Monitor's Proposed Alternative Allocation of the Patent Portfolio Sale Proceeds in Its Expert's Rebuttal Report is Also Flawed

Recognizing that his assertion that NNL is entitled to all of the $4.5 billion generated by the joint sale of all the estates assets in the Patent Portfolio sale is on its face untenable, Green offered for the first time in his rebuttal report an alternative allocation analysis.[429]  Green claims that the cash flows Lazard projected could be earned by licensing the Patent Portfolio through IPCo (between $458 million - $2.7 billion) is the maximum amount of the Patent Portfolio sale proceeds that NNI or EMEA should be entitled to share since their assets were non-

---

[429] Because this alternative analysis was only first offered in his rebuttal report, NNI's experts were deprived of the opportunity to respond to it in their rebuttal reports.

transferable;[430] limits that amount by ignoring whose assets contributes to the sum and instead allocates based on Nortel's transfer pricing method; and attributes the fictional remainder he creates – between $1.8 and $4.1 billion – entirely to NNL. This is nothing more than a rehash of his failed value in use methodology and it should be rejected for the same reasons. The assets contributed to the Patent Portfolio Sale by NNI clearly were transferable. Moreover, a majority of the patents were US patents and thus could only generate value in NNI's Exclusive Territory. These assets generated the significant majority of the Patent Portfolio Sale proceeds.

### D.     NNI's Exclusive License Was a Protected Asset of the Debtor's Estate in the United States

NNI's Exclusive License was an asset of its bankruptcy estate. As such, NNL could not have interfered with or otherwise impaired that license. This is black letter law. The commencement of the US Debtors' bankruptcy proceeding under Chapter 11 of the US Bankruptcy Code imposed an automatic stay against anyone taking action against the US Debtors' assets, including "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." *See* 11 U.S.C. § 362(a)(3).[431] This stay applies equally against parties taking action to impair or terminate rights of the US Debtors under contracts, which rights are part of the debtor estate. *See, e.g.*, *Computer Communications, Inc. v. Codex Corp.*, 824 F.2d 725 (9th Cir. 1987) (holding that the unilateral termination of a contract with the debtor violated the automatic stay); *Collier on Bankruptcy*, ¶ 362.03(5)(a) (16th ed.) ("Executory contracts and leases are considered a form of property of the estate. As property of the estate, the debtor's interests in such contracts or leases are protected against termination or other interference that would have the effect of removing or hindering the

---

[430] Green himself admits this cannot be true, given that the $4.5 billion Rockstar paid for the rights it acquired could just as easily have been conveyed through a license as through a sale. *See* Green Dep. 258:12-25.

[431] *See also* 11 U.S.C. § 541(a)(1) (the debtor's estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case").

debtor's rights in violation of section 362(a)(3).")  The Canadian Court recognized the US Debtors' Chapter 11 cases as a "foreign proceeding" pursuant to Section 18.6 of the CCAA and, in particular, recognized and gave full force and effect in Canada to this stay.  Recognition Order dated January 14, 2009, at 2; Cross-Border Insolvency Protocol ¶ 16.  These protections precluded the Canadian Debtors or Monitor from terminating or otherwise interfering with NNI's Exclusive License, including in connection with any sale of Nortel's IP.[432]

NNL also surrendered any right it might have had to terminate the MRDA or NNI's Exclusive License in the Final Canadian Funding and Settlement Agreement.[433]  The FCFSA was a critical document in the long life of these proceedings.  NNL, facing a severe liquidity crisis, received $190 million from the US Debtors to settle certain claims NNI had against NNL for, among other things, non-payment of transfer pricing amounts.[434]  At the same time, NNI received from the Canadian Debtors two principal benefits – an allowed claim of $2 billion against NNL for transfer pricing overpayments during the 2001-2005 period and the agreement that the MRDA and the Exclusive Licenses could not be terminated by either NNI or NNL without the consent of both *and* the consent of both the Committee and the Bondholders Group.  Consistent with the FCFSA, the Monitor has continued to affirm before these Courts that the MRDA – and thus NNI's Exclusive Licenses until the close of the Patent Portfolio Sale – remained in "full force and effect."  *See, e.g.*, Response of the Monitor and Canadian Debtors to the Opening Allocation Pleadings, dated May 29, 2013, at ¶ 5.

---

[432] Furthermore, the Monitor and Canadian Debtors have obtained recognition of their Canadian insolvency proceedings in the United States under Chapter 15 of the US Bankruptcy Code, resulting in an automatic stay applicable to all assets of the Monitor and Canadian Debtors in the United States.  Order Granting Recognition and Related Relief, Case No. 09-10164 (KG), D.I. 40 (Feb. 27, 2009).  Pursuant to Section 1520, therefore, any attempt by the Monitor to transfer title to or sell assets in the United States would also be subject to the US Court's approval.

[433] TR46910 ¶28.

[434] This is in addition to the $187 million dollars paid by NNI to NNL in January 2009 and under the IFSA in June 2009.

123

The Monitor has implied, but never actually argued, that NNI's exclusive license rights did not constitute a "property interest" in NN Technology, relying primarily on a 19th century English case, *Heap v. Hartley* (1889), 42 Ch. D. 461 (Eng. Ch. Div.).  The Monitor has never explained what, if anything, this argument has to do with allocation.  Indeed, the Monitor has already admitted that NNI's license rights *are* property interests.  In its initial allocation pleadings, the Monitor stated: "The IP involved in the Business Sales was owned by NNL. . . . [T]he only other *property interest* in the IP involved in the Business Sales were *license rights which were held pursuant to the terms of the* [*MRDA*]."[435]  All of the Monitor's experts on valuation recognize that any allocation must account for NNI's Exclusive License (while at the same time seeking to strip that license of any value based on a blind acceptance of the Monitor's reading of the MRDA).

Any attempt by the Monitor to have interfered with or impaired NNI's license rights – based on a flawed "property interest" argument or otherwise – would have not only violated the automatic stay in effect in the US Chapter 11 proceedings and the terms of the FCFSA, but would also have been contrary to governing US law on licensees of intellectual property in the bankruptcy context.  *Jaffé v. Samsung Electronics Co, Ltd. et al.* (*In re Qimonda*), 737 F.3d 14 (4th Cir. 2013).  In *Qimonda*, the Fourth Circuit held that a German foreign insolvency administrator, as a matter of US law, could not reject licenses to US patents (even if permitted under German law) because the US licensees' interests upon such unilateral rejection would not be "sufficiently protected" under Section 1522(a) of Chapter 15 of the US Bankruptcy Code. 737 F.3d at 25 n.3, 29-31.[436]  The court further found that it was proper under Section 1522(a) to

---

[435] TR21283 ¶ 30 (emphasis added).

[436] Chapter 15 governs the recognition in the US of orders issued in non-US insolvency proceedings.

apply the protection of Section 365(n)[437] in the Chapter 15 proceedings even if German law provided otherwise.  Section 365(n) protects a licensee's right to choose to retain licenses in US patents, "including a right to enforce any exclusivity provision of such contract" if a debtor attempts to reject or disavow the governing license agreement.  11 U.S.C. § 365(n)(1)(B).  And, of course, in any event, the Monitor never attempted unilaterally to sell the Patent Portfolio or Business Lines without NNI's participation, just as it never attempted to repudiate or reject or otherwise impair NNI's licenses.[438]

The legal and economic reality, therefore, is that neither the Monitor nor the Canadian Debtors could have unilaterally transferred the Nortel patents free of NNI's exclusive license rights.

### III.

### THE EMEA DEBTORS' ALLOCATION POSITION

The EMEA Debtors present two allocation methods:  the contribution approach and the "license" approach. The latter approach is similar to the US Interests' allocation method to the

---

[437] Section 365(n) governs intellectual property licenses.  It was enacted by the US Congress with the specific purpose of making "clear that the rights of an intellectual property licensee to use the licensed property cannot be unilaterally cut off" in bankruptcy.  S. Rep. No. 100-105, at 1 (1988), reprinted in 1988 U.S.C.C.A.N. 3200, 3200.  The court's actions under Chapter 15 are further subject to the requirement in Section 1506 that they not be "manifestly contrary to the public policy of the United States." 737 F.3d at 24 (quoting 11 U.S.C. § 1506); *see also In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1054 (5th Cir., 2012) ("Chapter 15 does impose certain requirements and considerations that act as a brake or limitation on comity, and preclude granting the relief requested by a foreign representative.").

[438] Moreover, although it is irrelevant, NNI's license rights are clearly property interests under US law – which would apply here – as well as under Canadian law, as the Monitor has admitted.  Although the MRDA is governed by Ontario law, Canadian Courts will look to and apply the law of the jurisdiction where a patent is registered in order to determine whether a party has a valid ownership interest in such patents.  *See, e.g., Castel & Walker, Canadian Conflict of Laws*, at 24-2 ("Statutory rights of patents and registered trademarks are strictly territorial. They are situated in the jurisdiction of the grant. Therefore, no assignment or transfer can take place except in accordance with the laws of that jurisdiction"); *British Nylon Spinners Ltd. v. Imperial Chemical Industries Ltd.*, [1953] 1 Ch. 19 (C.A.).  Under US law, the grant of an exclusive license including rights to sue to exclude others, such as the license rights granted here, constitutes more than a "bare" license, and invests the licensee with proprietary rights in the underlying patent.  *Ortho Pharm. Corp. v. Genetics Inst., Inc.*, 52 F.3d 1026, 1031-31 (Fed. Cir. 1995).  So too under Canadian law, the MRDA represents a license coupled with a grant in favor of the Licensed Participants, which constitutes a property interest in the underlying intellectual property at the time of the asset sales in these insolvency proceedings.  *See, e.g., Heap v. Hartley* (1889), 42 Ch. D. 461 (C.A.) at 469-9.

extent that it seeks to value the Exclusive Licenses that were terminated to facilitate the Sales based on a DCF analysis. There are, however, certain errors in the EMEA Debtors' DCF analysis. With respect to the Patent Portfolio Sale, the EMEA Debtors' expert looks to the IPCo model for certain inputs into his methodology, but he adopts only pieces of the model. As explained in Kinrich's Rebuttal Report, the adjustments that the EMEA Debtors' expert makes to the IPCo model increase the projected cash flows for the rest of the world outside of the IEs' Exclusive Territories where all of the IEs have non-exclusive license. This inflates the allocation attributable to the EMEA Debtors, primarily because three-fifths of the value of the non-exclusive licenses according to the EMEA Debtors is attributable to the EMEA Licensed Participants (since three of the five IEs are EMEA Debtors).[439] Correcting for these adjustments, the EMEA Debtors' proposed allocation with respect to the Patent Portfolio Sales is similar to the US Interests' proposed allocation.[440]

For the Business Lines allocation, under the EMEA Debtors' license approach, the EMEA Debtors' expert uses global revenue figures for each Business Line, then borrows from the IPCo model to apply royalty rates for each Business Line and calculates the present value of royalty revenues based on an industry weighted average cost of capital.[441] The US Interests agree with this approach to the calculation of the value of the IP associated with the Business Lines, but not with the methodology the EMEA Debtors then use to allocate that value to the selling debtors. The EMEA Debtors look to marketwide telecom expenditure data to allocate the value. However, actual historical Business Line revenue by country is a more accurate predictor

---

[439] *See id.* ¶ 133.

[440] *Compare id.* ¶138, Table 16 with Kinrich Report ¶ 143 Table 14.

[441] *See* Kinrich Rebuttal ¶ 124.

of future Business Line revenue by country than marketwide telecom expenditure data.[442]

Kinrich's rebuttal report shows the effect of using actual historical revenue share in lieu of

market share data.[443]

The "contribution approach," which is EMEA's preferred methodology, focuses on how

much money each IE spent to develop the IP.  Although this approach is far more reasonable

than the Monitor's position that it is entitled to all of the value from the Patent Portfolio Sale, it

is not a valuation of the assets sold or relinquished in the Sales.  As explained by a leading

publication:

> [The relevant cost] is not necessarily the actual historical cost of creating the
> subject intangible and it is not necessarily the sum of the costs for which the
> willing seller would like to be compensated.  In other words, value is not
> necessarily equal to cost, at least not to cost as measured in the historical
> accounting sense.[444]

Quite simply, the value of an asset is not dependent on how much it cost to develop that asset.[445]

In the event the Courts nonetheless determine to allocate on the basis of the money each

entity spent to develop Nortel's IP, the Courts should look to the actual dollar value contributed

to R&D, not just the direct R&D spending attributable to each entity, as EMEA does.  As set

forth above, NNI made significant transfers of cash to fund all other IEs' R&D during both the

cost sharing years and the MRDA time period, for which they must receive credit.  Were it not

for NNI's transfer pricing payments, the other IEs, including NNL, would not have been able to

spend anywhere near the same amount that they did on R&D and NNI would have presumably

spent significantly more on R&D directly rather than funding R&D expenditures of the other

IEs.  The US Interests' expert, Laureen Ryan, has presented adjusted contribution numbers

---

[442] *See id.* ¶¶ 125-27

[443] *See id.* ¶ 128, Table 14.

[444] Robert Reilly and Robert Schweighs, *Valuing Intangible Assets* (McGraw-Hill Companies, Inc., 1999) at 97.

[445] *See* Kinrich Rebuttal ¶¶ 118-19; Tucker Rebuttal ¶ 94, n.108.

taking into account total R&D contribution by each IE.  Correcting the EMEA Debtors' figures to account for each IE's true R&D funding, if the contribution method is used (and it should not be) the proper allocation to the US Debtors is $4.855 billion (66.7%) of the total 7.3 billion Sale Proceeds, as set forth in Ryan's Rebuttal Report.[446]

While the EMEA Debtors clearly err in not looking to each IE's actual R&D funding, the US Interests agree with the EMEA Debtors that if the contribution method is used, it is important to look at R&D spend over the full useful life of the intellectual property sold.  The EMEA Debtors' assertion that the useful life of the patents at issue is significantly greater than 5 years is certainly correct.  As the EMEA Debtors' expert explains, "the outside limit on IP value as a function of time is its term of legal protection" and "there are several reasons why older patents are more valuable than recently filed ones."[447]  As just one example, the Patent Portfolio contained a number of patents associated with GSM technology, and a review of the market shows that the number of GSM subscribers has only peaked 20 years later.[448]  US expert Catherine Tucker makes the same observation, noting that the most valuable patents sold in 2011 were invented between 1995 and 2000.[449]

## IV.

## THE CCC'S AND UKPC'S PRO RATA DISTRIBUTION THEORY LACKS MERIT

As the IFSA makes clear, in express consideration for entering into the Sales and agreeing to terminate its Exclusive License NNI negotiated for a right to receive an allocation of the Sale proceeds.[450]  However, in direct contravention of the IFSA, the CCC and UKPC seek a

---

[446] Ryan Rebuttal at 4, 16-17.

[447] Malackowski Report at 41-42; *see also* Tucker Report ¶¶ 87-94.

[448] Malackowski Report at 42.

[449] Tucker Report ¶¶ 87-84.

[450] *See* IFSA § 11(a) states that "[e]ach of the US Debtors and the EMEA Debtors hereby agrees to" terminate their respective licenses to intellectual property, "for the purpose of facilitating, and in consideration of a right to an

remedy to "enable a broadly common dividend to be paid *to . . . creditors* from each relevant

debtor's insolvency" (UKPC) and to "effect a pro rata distribution *among Creditors*" (CCC).[451]

These pro rata distribution "theories" are simply methodologies for distributing proceeds

to creditors.  They are not theories for allocating proceeds to the debtor entities that sold assets or

relinquished rights in the Sales.  The ultimate distribution to any creditor, however, is a matter

strictly within the purview of each Court to be done in accordance with their respective

insolvency regimes and only after the Sale proceeds have been allocated amongst the estates.

Adopting the CCC's and UKPC's pro rata distribution theories would not only run afoul of the

IFSA, but also would require each Court to cede its separate jurisdiction over distributions to

creditors.  The Cross-Border Court-to-Court Protocol by which these cases have been governed

for nearly five years clearly and unambiguously confirms that the Courts shall retain their

independent jurisdiction and shall not be required to take actions inconsistent with the laws of

their respective nations.[452]  Accordingly, the pro rata distribution theories should be ignored as

irrelevant to the allocation question before the Courts.

Moreover, regardless of the nomenclature used by the CCC and the UKPC to describe

their theories, the single pool, common distribution they seek is nothing more than a request to

effectively substantively consolidate the Nortel estates across geographic and legal borders.

Neither the CCC nor the UKPC offer any valid legal basis for distributing the Sale proceeds in

---

allocation . . . to such Debtors of portions of the" sale proceeds.  Similarly, §12(b) states that the sale proceeds housed in the escrow account are for the "payment of the agreed or determined amount of allocation of Sale Proceeds to all Selling Debtors."

[451] *See Allocation Position of the Canadian Creditors Committee*, dated May 16, 2013 [ECF No. 10538] (the "CCC Initial Allocation Brief") ¶ 5(b) (emphasis added); *Allocation Position of the Trustee of the Nortel Networks UK Pension Plan and the Board of the Pension Protection Fund*, dated May 16, 2013 [ECF No. 10539] (the "UK Pension Claimant Initial Allocation Brief") ¶ 3 (emphasis added).  The CCC asserts its "pro rata" distribution theory as an alternative to its request that the Courts allocate the Sale proceeds based on legal title of the assets sold.  *See* CCC Initial Allocation Brief ¶ 5(a).

[452] *See* Cross-Border Protocol [ECF No. 990-1], ¶¶ 7, 9(a)-(b).

this manner, as no such basis exists.  Further, even if the question of global substantive

consolidation were properly before the Courts, the facts and circumstances here demonstrate that

there is nothing remotely close to the intermingling of assets and disregard for corporate

separateness required to meet the high burden of proof in each jurisdiction to substantively

consolidate these global estates.

### A.    There Is No Legal Basis for a Pro Rata Distribution Approach

Both the CCC and the UKPC describe the question before these Courts in the allocation

litigation in a similar manner – they seek distribution of the Nortel group's global assets,

including those assets that are already held by distinct Nortel debtor entities and not in any

escrow, in a manner that produces a *pro rata*, common dividend to all non-priority creditors.[453]

The only way the Courts could possibly effectuate such a common dividend to Nortel creditors is

to (a) disregard corporate separateness, (b) disregard the jurisdictional divides, (c) consolidate

the assets and claims of multiple Nortel estates into a single, common pool, (d) treat segregated

cash and assets already as available to the creditors of all estates and (e) disregard guarantee and

intercompany claims and thus the reasonable and legitimate expectations of creditors.  No matter

what they call their theory (*e.g.*, single-pool distribution, pro rata distribution, common dividend),

the result sought by the CCC and the UKPC could come about only through the global

substantive consolidation of the Nortel estates.

Substantive consolidation is an extraordinary equitable remedy by which legally separate

debtors are consolidated into one surviving pool of assets and liabilities, with the effect of

---

[453] The UKPC seek an allocation that "should enable a *broadly common dividend* to be paid to the Group's creditors from each relevant debtor's insolvency."  UKPC Initial Allocation Brief, ¶ 3 (emphasis added).  Similarly, the CCC requests "an Order … allocating, administering and effecting the *distribution of the Global Assets* of the Nortel Debtors, including the Sale Proceeds, in accordance with equitable principles, so as to effect a *pro rata distribution* among Creditors, rateably by Claims."  CCC Initial Allocation Brief, ¶ 5(b) (emphasis added).  The CCC asserts its "pro rata" distribution theory as an alternative to their request that the Courts allocate the Sale Proceeds based on legal title of the assets sold.  *See id.* ¶ 5(a).

eliminating intercompany claims and guarantee claims.  The doctrine has been invoked rarely in the United States and Canada.  It has never been applied in a contested, cross-border context.[454]

The experts proffered by the UKPC – including a former US Bankruptcy Court Judge – admit that the pro rata distribution approach represents what they believe the law *should eventually be*, not what the law is today.  At their depositions, both Professor Westbrook and former Judge Clark conceded that there is no rule in the United States or Canada and no international rule for the presumptive use of a common pool distribution for multinational enterprises.[455]  The CCC's proposed expert Thomas Britven also does not offer support for the theory.  He concedes that he was simply the "calculator" who performed an "illustrative" allocation based on assumptions provided to him by the CCC's attorneys.

The remedy advocated by the CCC and the UKPC is also equivalent to an impermissible sub rosa or de facto plan of reorganization or arrangement.  Specifically, if the Courts adopted a pro rata distribution theory, the Courts would be dictating recoveries for creditors and compromising creditors' claims (most notably, intercompany claims and guarantee claims) outside of the plan process in the United States and outside of the sanctioning process under the CCAA.  The law does not permit such an exercise.

---

[454] *In re Lehman Brothers Holdings, Inc., et al.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y.), is not a precedent for global substantive consolidation in a contested proceeding.  In *Lehman*, the court confirmed a plan that effectuated a *settlement* between and among the debtors' major creditor constituencies, as well as between and among Lehman entities in other jurisdictions which gave some credit to arguments made by certain creditors that the global entities should be substantively consolidated.  *See Debtors' Disclosure Statement for Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code*, Sept. 1, 2011, ECF No. 19629, at 58-59.  This compromise is akin to agreements to consolidate that occur in many consensual plans.  In its order confirming the *Lehman* plan, the bankruptcy court stated only that the settlement of substantive consolidation disputes embodied in that plan was reasonable, but did not analyze whether the substantive consolidation of the Lehman entities would have met the applicable standards in the Second Circuit.  *See Order Confirming Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors*, Dec. 6, 2011, ECF No. 23023, at 13-14.

[455] *See* Westbrook Dep. Tr. at 170:22-171:23; Clark Dep. Tr. at 109:23-110:10, 112:3-113:9.  Clark & Westbrook also admit that prominent international insolvency organizations have refrained from recommending the common pool distribution scheme in international insolvency cases.  *See* Clark & Westbrook Report ¶ 22, n.33.

In the United States, if a settlement or transaction effectively mandates the terms of a plan, that agreement must meet the requirements of plan confirmation under Bankruptcy Code section 1129. *See Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.),* 119 F.3d 349, 354 (5th Cir. 1997) (the requirements for confirmation of a reorganization plan cannot be short-circuited by establishing the terms of a plan in connection with a sale of assets) (quoting *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983)).  A transaction amounts to a sub rosa plan "if [it] seeks to allocate or dictate the distribution of . . . proceeds among different classes of creditors." *In re General Motors Corp.*, 407 B.R. 463, 495 (Bankr. S.D.N.Y. 2009) (finding that a sale was not a *sub rosa* plan where the sale did not dictate the terms of a plan or restructure creditors' rights, but merely created certain obligations for the purchaser).  Similarly, under Canadian Law, an agreement or transaction must meet the voting and other requirements of a plan of arrangement or compromise if it deprives creditors of their rights, including rights to sue for and enforce judgment.  *See Crystallex (Re)*, 2012 ONCA 404, [92] (quoting Newbould J.).

Here, the adoption of a pro rata distribution theory would necessarily compromise creditors' rights without the legal and procedural protections provided by both the Bankruptcy and by the CCAA.  A proposed plan that impairs the rights of creditors must receive the requisite support of creditors in both the United States and Canada. *See* 11 U.S.C. § 1129(a)(8); CCAA, RSC 1985, c. C-36, s.6(1).  Yet, to apply a pro rata distribution approach, the Courts would necessarily have to mandate the level of creditor recoveries and compromise creditor claims without a creditor vote or any of the other substantial safeguards provided by the insolvency laws

in their respective jurisdictions. [456]

### B. There Is No Factual Basis for the Pro Rata Distribution Approach

The existing domestic standards for substantive consolidation in the United States and

Canada do not create a legal basis for the consolidation of legal entities across jurisdictional lines.

Furthermore, these stringent standards demonstrate that the facts and circumstances regarding the

Nortel entities, both pre- and post-petition, fall far short of providing any basis for the

intermingling of assets and disregard for corporate separateness required for substantive

consolidation even within one jurisdiction – let alone on a global level.[457]

In the United States, a proponent of substantive consolidation must demonstrate that

either "(i) prepetition [the debtors] disregarded separateness so significantly [that] their creditors

relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition

[the debtors'] assets and liabilities are so scrambled that separating them is prohibitive and hurts

all creditors." *Credit Suisse First Boston v. Owens Corning (In re Owens Corning)*, 419 F.3d

195, 211 (3d Cir. 2005) (footnotes omitted).  In Canada, a consolidated plan was sanctioned by

the court where the creditors voted for the plan and the subject entities were "intertwined."  *See*

*PSINet Ltd., Re*. (2002), 33 C.B.R. (4th) 284 at para. 2 (Ont. S.C.J.) (sanctioning a plan of

arrangement that consolidated Canadian applicants where the applicants essentially operated as a

single unit and only one applicant had employees).  This was nowhere near a litigated result.

---

[456] Section 105(a) of the Bankruptcy Code does not provide any basis for the "pro rata distribution" theory espoused by the UK Pension Claimants and the CCC.  As the U.S. Supreme Court held this year, a bankruptcy court's equitable powers under Section 105(a) "can only be exercised within the confines of the Bankruptcy Code." *Law v. Siegel*, 134 S.Ct. 1188, 1194 (2014) ("It is hornbook law that § 105(a) does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code.") (internal citations omitted).

[457] Thus, it comes as no surprise that the UKPC's purported experts have argued for a change in the existing law to establish a presumption that cross-border multinational entity insolvencies should result in single pool distributions. *See* Clark & Westbrook Report ¶ 3.

The Nortel companies respected corporate separateness, held themselves out to the public markets as separate legal entities, and creditors relied on the separateness of the corporate entities in doing business with and extending credit to the Nortel borrowers.  Further, the post-petition activities of the Nortel debtors and their creditors, as evidenced by numerous orders approved by these Courts, demonstrate the separateness of the Nortel debtors.  There is simply no factual support for the substantive consolidation remedy sought by the CCC and the UKPC.  Rather, the evidence convincingly demonstrates that creditors had legitimate and reasonable expectations of the separateness of the Nortel entities.

First, with respect to its external financing activities, the Nortel debtors held themselves out to creditors as separate legal entities.  While NNC and NNL were the issuers under most of the bond indentures, NNI guaranteed substantially all of the public debt currently outstanding.  While Nortel filed consolidated financial statements in accordance with US securities laws, Nortel also submitted separate financial statements for each significant subsidiary and guarantor, including NNI.[458]  In fact, in the Management Discussion and Analysis section of its securities filings NNC provided separate and detailed discussions of US, Canadian, EMEA, Asian and Latin American revenues.[459]

Creditors, including the bondholders that extended nearly $4 billion of credit to NNC and NNL, relied on the separateness of the Nortel entities in negotiating for guarantees from NNI.  As former NNL Chief Financial Officer Peter Currie testified at his deposition, Nortel was able to get greater funding at better interest rates and with more advantageous terms by including NNI as a guarantor.  Specifically, Mr. Currie stated as follows:

Q: And when you said that if NNI had not been a guarantor that it would have

---

[458] *See* TR40269 at 197-206.
[459] *See id.* at 54-59.

been a different discussion with the lenders, could you clarify what you meant by that?

A: The rate would have been higher, and then the principal amount may have been lower. . . . It became clear to us early on that NNI would have needed to be involved in the transaction, so we structured the deal around that.

Q: Right, in order to get the amount of financing that you needed and also to get a more favourable –

A: At the rate and the covenant structure, yes.[460]

The willingness of the financial markets to extend credit to Nortel on better terms in exchange for a guarantee from NNI demonstrates that creditors relied on the separateness of these entities. A finding now that NNI's guarantees are worthless would be inconsistent with the law and facts and also would fly in the face of how public credit markets function and will severely disrupt the way such markets extend credit, if at all, to multinational enterprises.[461]

Second, in connection with intercompany financing activities, Nortel personnel testified that the separate legal entities respected corporate formalities in negotiating and documenting intercompany loans and transactions. Mr. McCorkle stated that in developing the terms of intercompany loans, NNL consulted with "the separate legal entities which were entering into the loan agreement and their tax and legal departments. Ultimately, the loans had to be approved by their respective boards of directors as required by local governance rules and regulations."[462] Mr.

---

[460] P. Currie Dep. Tr. 266:3-17.

[461] *See* McConell Rep. ¶¶ 67-70. The importance of guarantees and the reliance by creditors on corporate separateness are further evidenced by the conduct of the UKPC themselves in negotiating for a guarantee by NNL of obligations under the UK Pension Plan. John Poos, former Director of Global Pensions for NNL and former Trustee of the UK Pension Plan, testified that the UK Pension Trustees were "concerned" about NNUK's ability to meet its obligations to the UK Pension Plan and "sought a guarantee from NNL" in connection with the negotiation of the 2006 Long Term Funding Agreement. Poos Aff. ¶ 62. Mr. McCorkle testified that the UK Pension Trustees also negotiated a guarantee from NNL as part of Project Swift. McCorkle Aff. ¶ 58. They neither sought nor obtained any guarantees from NNI, against whose assets they now seek to collect. The UKPC's position that creditors did not have an expectation of corporate separateness or the ability to assert claims against separate legal entities is belied by their own prepetition conduct and the rights they negotiated for in protecting their own interests

[462] McCorkle Aff. ¶ 20. Mr. McCorkle – a CCC witness – also testifies that the separate legal entities often sought separate legal advice to determine the propriety of any intercompany transaction. *See id.* ¶ 21.

Currie similarly testified that consummating intercompany transactions required "obtaining board approval from the appropriate subsidiaries for the transactions in question."[463]  In his deposition testimony, Mr. Doolittle stated that Nortel's internal policies were created to ensure that intercompany transactions were properly documented and structured to comply with local laws and regulations of the separate jurisdictions in which the separate Nortel legal entities operated.[464]

Third, the Nortel entities respected corporate formalities and maintained separate books and records prior to the commencement of these insolvency proceedings.  Mr. Binning testifies that:

> [E]ach subsidiary was organized, and its business was conducted, in accordance with local laws.  The boards of directors of subsidiaries were comprised of senior employees within Nortel, who met and considered the transactions and other matters that required board approval from the subsidiaries in accordance with local laws and governance requirements.[465]

McCorkle testifies to the same.[466]  Moreover, cash management and forecasting was done at a legal entity level.  Revenues were collected and booked by individual Nortel entities based on the jurisdiction in which a particular sale to a particular customer was consummated.[467]  Currie further testifies that, in the Nortel group's cash management, "there was no commingling of funds and the integrity of the accounts was maintained for tax, legal and accounting purposes."[468]

Finally, post petition, the Nortel debtors have maintained their corporate separateness.  As John Ray, Principal Officer of the US Debtors, testifies, NNI continued to operate separately

---

[463] Currie Aff. ¶ 75.

[464] *See* Doolittle Dep. Tr., 40:15- 41:04, 43:16-44:24.

[465] Binning Aff. ¶ 9.

[466] McCorkle Aff. ¶ 16.

[467] *See* Currie Aff. ¶ 70.

[468] *Id.* ¶ 78.

from NNL and the Canadian Debtors following the commencement of the chapter 11 cases.[469]

These Courts have also repeatedly treated the Nortel debtors as separate and distinct corporate

entities.  For example, the Courts have entered final orders authorizing NNL to borrow funds

from NNI and to secure such debt with a charge in the Canadian proceedings.[470]  The Courts

have further allowed more than $2 billion in intercompany claims in favor of NNI against

NNL.[471]  Both the US and Canadian dockets are replete with other examples along the same

lines.

Based on the CCC's examinations at depositions and the CCC's and UKPC's deposition

designations, the US Interests anticipate these parties will attempt to characterize mundane and

largely uncontested facts as somehow sinister and inappropriate.  Nortel, like any multinational

enterprise had employees worldwide that collaborated with each other, had superiors or

subordinates in other countries and had Business Lines that operated across legal entities.  This

all is irrelevant.  Nortel's creditors were not deceived, the numerous MNEs respected their

statutory obligations and maintained separate books and records, and intercompany obligations

and guarantees were carefully documented.

---

[469] Ray Aff. ¶¶ 42-43.

[470] *See* Order Pursuant to Sections 345, 363(c)(1), 364(a) and 503(b)(1): (A) Approving the Continued Use of the Cash Management System, Bank Accounts and Business Forms; (B) Permitting Continued Intercompany Transactions, Granting Administrative Priority Status to Postpetition Intercompany Claims and Preserving and Permitting the Exercise of Intercompany Setoff Rights; (C) Authorizing Banks to Honor Certain Transfers and Charge Certain Fees and Other Amounts; and (D) Waiving the Requirements of 11 U.S.C. Section 345(b) on an Interim Basis [ECF No. 58]; Fifth Amended and Restated Initial Order dated January 14, 2009, ¶ 34-38.

[471] *See* Order (A) Approving the Final Canadian Funding and Settlement Agreement, and (B) Granting Related Relief [ECF No. 2347]; Order of the Canadian Court, dated Jan. 21, 2010, ¶ 8.  The US Court has also mandated that, where a claimant asserts a claim against more than one Debtor, the claimant must file separate proofs of claim against each Debtor, including filing separate claims in the Canadian proceedings for claims against any of the Canadian Debtors.  *See* Order Establishing Deadlines for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof [ECF No. 1280], ¶¶ 4, 5(g).

### C.    The Pro Rata Distribution Approach Will Prejudice Creditors

The pro rata distribution approach advocated by the CCC and the UKPC will result in a transfer of wealth from creditors who have bargained for certain rights or have legitimate and reasonable expectations to recover on claims against distinct legal entities. Thus, rather than resulting in a fair or equitable outcome, a pro rata distribution approach will harm many creditors in these proceedings who have relied upon the corporate separateness of the Nortel entities in conducting themselves both before and after the commencement of these cases.

Specifically, holders of over $4 billion in bond claims that have relied upon their ability to assert claims against the original Canadian obligors as well as the US guarantor, NNI, would no longer get the benefit of their bargained-for guarantee. The $2.063 billion intercompany claim against NNL in favor of NNI, which was critical consideration for the FCFSA and approved and allowed by an order of the Canadian Court, would be eliminated, thus irreparably damaging the NNI estate and all of its creditors, including thousands of individual US retirees and former employees. Rather than do justice, a pro rata approach will summarily sweep away billions of dollars in claims, prejudicing creditors around the globe.

Further, even if a "modified" substantive consolidation approach is adopted by the Courts – as seemingly advocated by the UKPC – and intercompany and guarantee claims are recognized, general unsecured creditors in the United States will be severely harmed.[472] In particular, holders of over $6 billion in claims against the Canadian Debtors – NNI and the holders of nearly $4 billion in bonds – would suffer as well. The CCC's constituents on the

---

[472] Notably, the US District Court for the District of Delaware has held that the stringent standards of *Owens Corning* must be satisfied even where a plan provides that inter-estate liabilities remain in place if the aggregation of claims and assets otherwise creates "increased competition for a consolidated pool of assets and a re-valued claim that is less precise than if the creditors were dealing with debtors individually." *In re New Century TRS Holdings, Inc.,* 407 B.R. 576, 591-92 (D. Del. 2009) (finding that even where the plan does not present a "typical substantive consolidation scenario," the standards of *Owens Corning* must be met to combat the "aggregation's potentially deleterious effects on creditors").

other hand, will do quite well.  The US Interests respectfully submit that the prejudice to

creditors around the globe resulting from the imposition of a legally and factually unsupportable

theory, even in a "modified" form, should not be permitted.

### D.    The CCC Argues for Pro Rata Distributions as an Alternate Theory

It is telling that the CCC does not advocate pro rata distribution as its primary theory.

Rather, they first join with the Monitor in asking that almost all of the Sale proceeds – including

all of the $4.5 billion proceeds from the Patent Portfolio Sale – be allocated to NNL.  Only if

NNL fails to obtain that outsized recovery does the CCC argue that "fairness" and the Nortel

Group's business structure warrant substantive consolidation.

The CCC's response to the US Interests' Motion to Strike the SubCon Expert previewed

what the Courts are likely to receive in the CCC's Pre-Trial Brief.  There, the CCC made no

effort to defend its expert report as either relevant or reliable, but rather directed ad hominum

attacks at the US Interests describing the US Interests as having an "insatiable thirst" for the Sale

proceeds and acting in a "punitive" manner for suggesting that NNI receive the full value of the

assets the US Debtors transferred or relinquished in the Sales.

The CCC is using its substantive consolidation argument to offer the Courts "illustrative

recoveries" that have no evidentiary basis in the record or law.  The US Interests anticipate that

the CCC's Pre-Trial Brief will advocate that the Courts allocate more to NNL because the value

of what NNL actually transferred or relinquished in the Sales would be sufficient to provide its

constituents a recovery on their claims that the CCC deems to be unfair or inequitable.  Not only

are hypothetical creditor distributions irrelevant to allocation, the rule that equity recovers after

debt mandates that NNI's assets be made available first to NNI's creditors.[473]

---

[473]    To the extent the CCC or UKPC offer any hypothetical recoveries, there is no evidence in the record to
support such speculation and no basis to allow its admission.

## <u>CONCLUSION</u>

For the reasons set forth above and as will be shown at trial, the US Interests respectfully submit that both Courts should enter orders allocating the proceeds from the Business Line Sales and the Patent Portfolio Sale in accordance with the chart set forth on page 2 of this brief.

Dated:  May 2, 2014
         Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

Howard Zelbo (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Jeffrey A. Rosenthal (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors and the Debtors in Possession*

- and -

AKIN GUMP STRAUSS HAUER & FELD LLP

Fred Hodara (admitted *pro hac vice*)
David Botter (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002

- and -

RICHARDS, LAYTON & FINGER, P.A.

*/s/ Christopher M. Samis*
Mark D. Collins (No. 2981)
Christopher M. Samis (No. 4909)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile: (302) 651-7701

*Counsel for the Official Committee*
*of Unsecured Creditors*

## APPENDIX A:

### Guide to Common Terms and Abbreviations

**1992 NNI R&D CSA** – means the 1992 Research and Development Cost Sharing Agreement between NNI and NNL..

**Alcatel-Related Agreement** – refers to the agreement entered into by the IEs with respect to certain NN Technology that was sold in connection with the Nortel Group's December 2006 sale of UMTS to Alcatel-Lucent.

**APA** – means advanced pricing agreement (or arrangement).

**Bondholders Group** – refers to the Ad Hoc Group of Bondholders holding bonds that had been issued by either NNC or NNL and guaranteed by NNI.

**Business Lines** – refers to the Nortel Group's operating lines of business.

**Business Line Sales** – refers to the sale of Nortel's operating lines of business occurring from March 2009 through March 2011.

**Canadian Debtors** – refers to NNC, NNL, Nortel Networks Global Corporation, Nortel Networks International Corporation, and Nortel Networks Technology Corporation.

**Carrier Networks** – refers to one of Nortel's four Business Lines as of the Petition Date.

**CCAA** – means the Companies' Creditors Arrangement Act (Canada).

**CCRA** – means the Canada Customs and Revenue Agency, now known as the Canadian Revenue Agency.

**Committee** – refers to the Official Committee of Unsecured Creditors.

**CRA** – means the Canada Revenue Agency.

**CSA** – means cost sharing agreement.

**DCF** – means discounted cash flow.

**EDC** – means the Export Development Canada.

**EMEA** – refers to the Europe, Middle East and Africa region.

**EMEA Debtors** – means Nortel Networks UK Limited ("NNUK"), Nortel Networks (Ireland) Limited; Nortel Networks S.A. ("NNSA"); Nortel Networks NV; Nortel Networks SpA; Nortel Networks BV; Nortel Networks Polska Sp z.o.o.; Nortel Networks Hispania, SA; Nortel Networks (Austria) GmbH; Nortel Networks s.r.o.; Nortel Networks Engineering Service Kft;

Nortel Networks Portugal SA; Nortel Networks Slovensko, s.r.o.; Nortel Networks Romania SRL; Nortel GmbH; Nortel Networks OY; Nortel Networks AB; Nortel Networks International Finance & Holding BV and Nortel Networks France S.A.S.

**Enterprise Solutions** – refers to one of Nortel's four Business Lines as of the Petition Date.

**Exclusive License** – refers to the exclusive licenses granted in the MRDA.

**Exclusive Territory** – refers to the designated geographic area for each Licensed Participant's Exclusive License under the MRDA.

**Estates** – refers to the US Debtors, Canadian Debtors, and EMEA Debtors.

**FCFSA** – means the Final Canadian Funding and Settlement Agreement, dated as of December 23, 2009.

**Financial Restatements** – refers collectively to NNC's four financial restatements related to the 2000-2005 fiscal year period.

**First Addendum** – refers to the first addendum to the MRDA.

**Global IP** – refers to the Global IP Law Group.

**Global Services** – refers to one of Nortel's four Business Lines as of the Petition Date.

**Horst Frisch Report** – refers to a document entitled "Economic Analysis of Nortel Networks' Intercompany Transactions," dated March 14, 2002.

**HMRC** – means Her Majesty's Revenue and Customs, the tax authority in the United Kingdom.

**IE** or **Integrated Entity** – refers to NNL,NNI, NNUK, NNSA and NN Ireland.

**IFSA** – means the Interim Funding and Settlement Agreement, dated as of June 9, 2009.

**Inland Revenue** – refers to the former tax authority in the United Kingdom.

**IP Steering Committee** –  refers to a committee of representatives of the Estates and their advisors formed in 2010 with respect to monetizing Nortel's intellectual property.

**IP** – means intellectual property.

**IPCo** – means the IP licensing service and enforcement business Nortel was developing.

**IRS** – means the Internal Revenue Service, the tax authority in the United States.

**ITT** – means International Telephone and Telegraph.

**Joint Administrators** – refers to individuals from Ernst & Young LLP who were appointed as the administrators of the EMEA Debtors' estate by the High Court of Justice of England and Wales.

**Lazard** – refers to Lazard Frères & Co., LLC.

**Licensed Participants** – refers to NNI, NNUK, NNSA and NN Ireland.

**LREs** or **Limited Risk Entities** – describes the Nortel distribution entities.

**MEN** – means the Nortel Group's Metro-Ethernet business line, one Nortel's of four Business Lines as of the Petition Date.

**MNE** – means multinational enterprise.

**Moody's** – means Moody Investors Service.

**Monitor** – refers to the Canadian Monitor.

**MOU** – means the Memorandum of Understanding, which was entered into by the IEs, dated December 31, 2008.

**MRDA** – refers collectively to the Master R&D Agreement, dated as of December 22, 2004, as amended.

**NBS** – means Nortel Business Services.

**NN Australia** – means Nortel Networks Pty. Ltd., which used to be a party to the MRDA.

**NN CALA** – means Nortel Networks (CALA) Inc.

**NN Ireland** – means Nortel Networks (Ireland) Ltd.

**NNC** – means Nortel Networks Corporation.

**NNI** – means Nortel Networks Inc.

**NNL** – means Nortel Networks Limited.

**NNSA** – means Nortel Networks S.A.

**NNUK** – means Nortel Networks UK Limited.

**Nortel** or **Nortel Group** – refers collectively to all entities that are or ever were a direct or indirect subsidiary or affiliate of Nortel Networks Corporation, including any jointly owned ventures of any such subsidiary or affiliate.

**NTI** – refers to Northern Telecom, Inc.

**NTL** – means Northern Telecom Ltd.

**NN Technology** – has the meaning as defined in the MRDA.

**OEMs** –  means original equipment manufacturers.

**OSC** – means the Ontario Securities Commission.

**Participant** – refers to the parties to the MRDA.

**Patent Portfolio** – refers to the collection of patents and patent applications that were not sold in connection with the Business Line Sales and were later sold in the Patent Portfolio Sale.

**Patent Portfolio Sale** – means the sale of the Patent Portfolio to Rockstar.

**Petition Date** – refers to January 14, 2009, when NNC and NNL voluntarily filed for bankruptcy protection under the Companies' Creditors Arrangement Act (Canada) in the Canadian Court and the US Debtors voluntarily filed for bankruptcy protection under Chapter 11 in the US Court. Similarly, the EMEA Debtors sought orders from the High Court of Justice of England and Wales placing the other EMEA Debtors into administration, and appointing individuals from Ernst & Young LLP as administrators.

**PPF** – means the UK's Pension Protection Fund.

**R&D** – means research and development.

**Rockstar** – means the consortium of bidders consisting Apple, EMC, Ericsson, Microsoft, Research in Motion, and Sony known as Rockstar Bidco who purchased the Patent Portfolio.

**Rockstar Agreement** – means the agreement that memorialized the sale of the Patent Portfolio to Rockstar.

**RPSM** – means the residual profit split methodology set forthin the MRDA.

**S&P** – means Standard & Poor's Corporation.

**Sales** – means the Business Lines Sales and the Patent Portfolio Sale.

**SEC** – means the U.S. Securities and Exchange Commission.

**Second Addendum** – refers to the second addendum to the MRDA.

**Schedule A** – refers to the first schedule to the MRDA.

**STC** – means UK's STC plc.

**Third Addendum** – refers to the third addendum to the MRDA.

**TPR** – means The Pensions Regulator.

**TSAs** – refers to Transition Service Agreements.

**UMTS** – means Universal Mobile Telecommunications System.

**UK Pension Plan** – means the Nortel Networks UK Pension Plan.

**UKPI** or **UK Pension Interests** – means the Nortel Networks UK Pension Plan.

**UK Pension Trustee** – means the Nortel Networks UK Pension Trust Limited.

**US Debtors** – means NNI, Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc.

**APPENDIX B:**

**Reference Guide to Business Line Sales and Patent Portfolio Sale**

| Asset Name (Code Name) | Key Dates | Stalking Horse (Code Name) | Auction | Other bidders | Purchaser & Price |
|---|---|---|---|---|---|
| Layer 4-7 (Velocity) | Sale hearing: 3/26/2009 Signing: 2/19/2009 Closing: 3/31/2009 | Radware (Velocity) SH agmt. signed: 2/19/2009 | No auction | N/A | Radware **$17.7 million** |
| CDMA/LTE (Eckberg) | Sale hearing: 7/28/2009 Signing 7/24/2009 Closing: 11/13/2009 | Nokia Siemens Networks (Narnia) SH agmt. signed: 6/19/2009 | Auction 7/24/2009 | Yes | Ericsson **$1.13 billion** |
| Enterprise (Equinox) | Sale hearing: 9/16/2009 Signing : 9/14/2009 Closing: 12/18/2009 | Avaya (Equinox) SH agmt. signed: 7/20/2009 | Auction 9/11/2009-9/14/2009 | Yes | Avaya **$900 million** |
| Next Generation Packet Core (Seville) | Sale hearing: 10/28/2009 Signing: 10/25/2009 Closing: 12/8/2009 | N/A | Auction | No | Hitachi **$10 million** |
| Metro Ethernet Networks (Snow) | Sale hearing: 12/2/2009 Signing: 11/24/2009 Closing: 3/19/2010 | Ciena (Snow) SH agmt. signed: 10/7/2009 | Auction 11/20/20009-11/22/2009 | Yes | Ciena **$775 million** |
| GSM/GSM-R (Isis) | Sale hearing: 12/2/2009 Signing: 11/24/2009 Closing: 3/31/2010 | N/A | Auction 11/24/2009 | Yes | Ericsson & Kapsch CarrierCom **$103 million\*** |
| CVAS (Paragon) | Sale hearing: 3/3/2010 Signing: 12/22/2009 Closing: 5/28/2010 | GENBAND (Paragon) SH agmt. signed: 12/22/2009 | No auction | N/A | GENBAND **$282.6 million** |
| GSM Retained Contracts (Horus) | Sale hearing: 5/24/2010 Signing: 5/11/2010 Closing: 6/4/2010 | N/A | No auction | N/A | Ericsson **$2 million** (add-on to GSM sale) |
| Multi Service Switch (Pluto) | Sale hearing: 9/30/2010 Signing: 9/25/2010 Closing: 3/11/2011 | PSP Holding LLC (Marlin) SH agmt. signed: 8/26/2010 | Auction 9/24/2010 | Yes | Ericsson **$65 million** |
| Patent Portfolio (Iceberg) | Sale hearing: 7/11/2011 Signing: 6/30/2011 Closing: 7/29/2011 | Ranger Inc. SH agmt. signed: 4/4/2011 | Auction 6/27/2011-6/30/2011 | Yes | Rockstar Bidco. **$4.5 billion** |

## APPENDIX C:

### Additional Flaws in Green's Opinion

In addition to the flaws set forth in the body of this brief, the Monitor's valuation expert,

Philip Green, makes numerous additional material errors in his value in use calculations,

including the following, as explained more fully in Kinrich's rebuttal report and in the rebuttal

report of the EMEA Debtors' valuation expert, Paul Huffard,[474] and as will be shown at trial.

Given that the inconsistently-applied value in use method is wholly inapplicable, we will only

briefly describe these further deficiencies in Green's calculation in this Appendix:

- The DCF projections Green uses to calculate the value in use for NNI and the EMEA Debtors are quite simply wrong.  Green failed to use Nortel management's actual projections for the value of the Business Lines.  If he had, the result would have been a value in use calculation for all the parties of $2.82 billion.  This is *very close* to the sum received in the Business Line Sales.  The "excess" Green claims belongs to NNL is nothing more than value attributable largely to NNI and EMEA.

- Green impermissibly rules out – without any analysis – the possibility that goodwill was conveyed in the Business Line Sales even though the buyers have stated that *over $850 million* of the sale proceeds relates to goodwill.  He purposefully ignores that goodwill is defined as the residual difference between the sale price and the value of all identifiable tangible and intangible assets.  Rather than measure goodwill, he chooses not to value the clearly identifiable assets of NNL (although he does for NNI and EMEA) and instead claims that all unidentifiable intangible value must be NNL's value.  The reality is that much of the unidentified value Green claims for NNL has nothing to do with assets Canada contributed to the sales.  The CCC's expert also properly concluded that there is goodwill.

- Green omits a terminal value from his DCF calculation, and thus attributes future value to NNL that even under his value in use methodology should be attributable to NNI and EMEA.  The impact of this error is highlighted by the fact that Green under his model imposes billions of dollars of future R&D expense on EMEA and NNI in the final years of his model, but attributes all of the fruits of that investment to NNL.

---

[474] TR11433 (Feb. 28, 2014 Rebuttal Expert Report of Jeffrey H. Kinrich) ¶¶ 39-54; TR11421 (Feb. 28, 2014 Expert Report of Paul P. Huffard in Rebuttal to Canadian and US Expert Reports) at  ¶¶39-40.

- Green improperly applies Nortel's RPSM transfer pricing formula to redistribute the value he claims NNI and EMEA would earn under his value in use model in favor of NNL. This is improper because the MRDA explicitly states that proceeds from the sale of a business are not to be run through the RPSM. Moreover, the RPSM transfer pricing formula was motivated by a desire to minimize taxes,[475] and there is no basis to speculate that Nortel's transfer pricing policies would have remained unchanged through 2018, particularly given tax authorities' criticisms of those policies. In any event, it would make no sense to apply Nortel's RPSM to determine the going forward value of the Business Lines when a third party purchaser would not have been bound to Nortel's transfer pricing policy. Of course, Green knows all of this, as he does not run any of the sale proceeds he attributes to NNL through the RPSM.

- Foreseeing the unsupportable nature of his value in use analysis, Green offers a further "alternative maximum" allocation theory. It fares no better. First, it is premised on the notion that the RPSM should govern the allocation of all non-tangible sale proceeds, but as noted above, sale proceeds are not to be run through the RPSM. Second, recognizing that if he were to run all the Business Line Sales proceeds through Nortel's transfer pricing formula, the majority of the money would still be attributable to NNI, Green does not run his transfer pricing adjustments as he does in his value in use analysis, but instead makes the spurious assumption that "normal/routine returns are in approximately the same relative proportions as RPS percentages."[476] As Kinrich demonstrated in his Rebuttal Report at Table 6, that was plainly untrue, the impact of which Green admits is not only a faulty calculation but a wholly unreliable methodology.[477]

---

[475] *See supra* Statement of Facts § VI.D.

[476] TR21636 (Feb. 28, 2014 Report of Philip Green Regarding the Allocation of Recoveries among Nortel Entities (Reissued)) at 62.

[477] Green Dep. 220:19-221:3.