Court File No. 09-CL-7950

ONTARIO

SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C.
1985, c. C-36, AS AMENDED

— and —

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| NORTEL NETWORKS INC., *et al.*, | |
| Debtors. | Case No. 09-10138 (KG) |
| | (Jointly Administered) |

# TRIAL BRIEF OF THE
# CANADIAN CREDITORS' COMMITTEE ("CCC")

# TABLE OF CONTENTS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................v

PART I – OVERVIEW.......................................................................................1

    A.    Introduction........................................................................................1

    B.    Ownership Allocation ........................................................................2

    C.    Pro Rata Allocation............................................................................8

PART II – BACKGROUND ..............................................................................11

    A.    Nortel was a Canadian-Based Technology Company ........................11

    B.    The Filing and the Decision to Liquidate ..........................................15

    C.    The IFSA ...........................................................................................16

    D.    The Business Sales.............................................................................17

    E.    The Residual IP Sale .........................................................................20

PART III – OWNERSHIP ALLOCATION .......................................................22

    A.    NNL Should Be Allocated the Substantial Majority of the Sale Proceeds Based on Its Ownership of the NN Technology .................................................22

        1)    NNL Owned the NN Technology Under the MRDA ...............................22

            a.    The Governing Law is Ontario .................................................22

            b.    The MRDA Confirms NNL's Ownership.......................................23

                i.    NNL Held Title to the NN Technology .............................23

                ii.    The LPs Did Not Have Equitable/Beneficial Ownership of the NN Technology..........................................................28

                iii.    The Licenses Were Not Equivalent to Ownership.............37

                    A.    The Licenses Were Limited to a Field of Use .......37

                    B.    The Licenses Were Not Transferrable By the LPs 43

                    C.    The Licenses Did Not Grant Unlimited Enforcement Rights ...............................................45

                    D.    The Licenses Were Not "Perpetual" and "Royalty Free"...................................................48

            c.    The MRDA Ownership Structure Must Be Given Legal Effect....50

                 i.    IP Development Contributions Do Not Alter NNL's Ownership..........................................................50

                ii.    Revenue Contributions Do Not Alter NNL's Ownership..52

                iii.    The Nortel Corporate Group Does Not Alter NNL's Ownership..........................................................53

                iv.    The Tax Objectives of the MRDA Do Not Alter NNL's Ownership..........................................................53

v.     "Administrative Convenience" Does Not Alter NNL's Ownership ........................................................................55

vi.    The Place of Patent Issuance Does Not Alter NNL's Ownership ........................................................................56

vii.   The Post-MRDA Events Do Not Alter NNL's Ownership57

viii.  There Is No Implied Term that Alters NNL's Ownership .61

ix.    There Are No Legitimate Expectations that Alter NNL's Ownership ........................................................................63

2)    The LPs Do Not Have Any Ownership Interest Outside the MRDA ........63

a.    The Governing Law Is Ontario ....................................64

b.    There Is No Resulting Trust ........................................64

c.    There Is No Constructive Trust....................................65

d.    There Is No Proprietary Estoppel ................................66

3)    Ownership Allocation of the Sale Proceeds................................67

a.    Asset Owners Are Entitled to the Fair Market Value of Assets Sold67

b.    NNL Is Entitled to the Majority of IP Proceeds From the Business Sales ........................................................................69

c.    NNL Is Entitled to Virtually All Proceeds From the Rockstar Sale74

B.    The Competing Theories of Allocation are Unprincipled and Incoherent ...........78

1)    The U.S. and EMEA Misconstrue the MRDA ...........................78

2)    The Revenue Theory is Unprincipled and Unsupported by the Facts .......79

a.    Using Revenue is Unjustified and Unprincipled ...........................79

b.    The Revenue Theory Ignores the Expenses and Obligations Associated with the Right to Generate Revenue...........................80

c.    The Revenue Theory Ignores the Role of NNL in NNI's Business81

d.    Revenue Theory Offers a Circular Valuation of What Was Sold..83

e.    Revenue Theory Allocates the Residual IP Proceeds on the Basis of a Wholly Unrealistic "IPCo." Model........................................84

3)    The EMEA Theories are Unprincipled and Unsupported by the Facts .....87

a.    Contribution Does Not Equal Ownership .....................................87

b.    Contribution Does Not Equal Value .............................................88

c.    R&D Spend is an Arbitrary Contribution Proxy............................89

d.    R&D Look Back Period is Selective and Self-Serving to the EMEA Debtors........................................................................90

e.    Alternative License Approach is Equally Flawed ........................91

PART IV – PRO RATA ALLOCATION.................................................................93

A.    In the Alternative, There Should Be A Pro Rata Allocation..................................93

1)      The Courts Have Jurisdiction to Make a *Pro Rata* Allocation Order........93

2)      *Pro Rata* Allocation Reflects the Nature of Nortel's Business..................96

    a.      Management......................................................................98

    b.      Lines of Business .............................................................99

    c.      Employees......................................................................100

    d.      R&D Contributions.........................................................102

    e.      Cash Management...........................................................104

    f.      Sales & Marketing, Operations and Financial Reporting............105

    g.      Conclusion ....................................................................107

3)      *Pro Rata* Allocation Is Distinct from Substantive Consolidation............108

4)      *Pro Rata* Allocation is Consistent with Bondholder Expectations..........109

5)      *Pro Rata* Allocation Is a Fair and Equitable Result................................116

B.      Conclusion ........................................................................117

PART IV – ORDERS SOUGHT ........................................................119

APPENDICES ..............................................................................120

Appendix A – Glossary

Appendix B – MRDA – Conformed Copy

Appendix C – Assumptions about the MRDA made by experts for the U.S. Interests, EMEA Debtors and UKPC

# TABLE OF AUTHORITIES

## TABLE OF AUTHORITIES

| STATUTES | TAB NO. |
|---|---|
| Bankruptcy Code, 11 U.S.C. § 105(a) | 1 |
| *Companies' Creditors Arrangement Act*, R.S.C., 1985, c. C-36, s. 11 | 2 |
| *Conveyancing and Law of Property Act*, R.S.O., c. C-34, s. 1(1) | 3 |
| *Copyright Act*, R.S.C., 1985, c. C-42, ss. 13(7), s. 41.23(1) | 4 |
| *Patent Act*, R.S.C., 1985, c. P-4, s. 55(1) | 5 |
| **CASE LAW** | |
| *1124980 Ontario Inc. (c.o.b. Health-Care Pharmacy) v. Liberty Mutual Insurance Co.* (2003), 33 B.L.R. (3d) 206 (Ont. S.C.J.) | 6 |
| *3869130 Canada Inc. (c.o.b. I.C.B. Distribution 2001) v. I.C.B. Distribution Inc.*, 2008 ONCA 396 | 7 |
| *405341 Ontario Ltd. v. Midas Canada Inc.*, 2010 ONCA 478 | 8 |
| *529198 Alberta Ltd. v. Thibeault Masonry Ltd.*, 2001 ABQB 1108 | 9 |
| *677960 Alberta Ltd. v. Petrokazakhstan Inc.*, 2014 ABCA 110 | 10 |
| *80 Wellesley St. East Ltd. v. Fundy Bay Builders Ltd. et al.*, 1972 CanLII 535 (ON CA) | 11 |
| *A&F Baillargeon Express Inc. (Trustee of), Re*, [1993] Q.J. No. 884 (S.C.) | 12 |
| *A123 Systems, Inc. v. Hydro-Quebec*, 626 F.3d 1213, (Fed. Cir. 2010) | 13 |
| *Alfred E. Mann Foundation for Scientific Research v. Cochlear Corp.*, 604 F.3d 1354, (Fed. Cir. 2010) | 14 |
| *Allen v. Aspen Group Resources Corp.* (2009), 67 B.L.R. (4th) 99 (Ont. S.C.J.) | 15 |
| *Amfac Foods Inc. v. Irving Pulp & Paper, Ltd.* (1984), 80 C.P.R. (2d) 59 (F.C.) (WLeC), aff'd (1986), 12 C.P.R. (3d) 193 (F.C.A.); | 16 |
| *Amgen, Inc. v. Chugai Pharmaceutical Co.*, 808 F. Supp. (D. Mass. 1992), *aff'd*, 52 F.3d 1026 (Fed. Cir.), *cert. denied*, 516 U.S. 907 (1995) | 17 |
| *Armstrong Cork Canada v. Domco Industries Ltd.*, [1982] 1 S.C.R. 907 | 18 |

| CASE LAW | |
|---|---|
| *Arthur Andersen Inc. v. Toronto-Dominion Bank* (1994), 17 O.R. (3d) 363 (C.A.), (QL), leave to appeal refused, [1994] S.C.C.A. No. 189 | 19 |
| *Ashley* v. *Marlow Group Private Portfolio Management Inc.*, [2006] O.J. No. 1195 (S.C.J.) | 20 |
| *Barber v. Vrozos*, 2010 ONCA 570 | 21 |
| *Barclay's Bank PCL v. Inc. Incorporated*, 1999 ABQB 110 | 22 |
| *Barrick Gold Corp. v. Goldcorp Inc.*, 2011 ONSC 3725 | 23 |
| *Bel-Ray Co., Inc. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, (3d Cir. 1999) | 24 |
| *Bensalem Township v. International Surplus Lines Ins. Co.*, 38 F.3d 1303, (3d Cir. 1994) | 25 |
| *Biosynexus, Inc. v. Glaxo Group Ltd.*, 2006 WL 624896, (N.Y. Sup. Ct. 2006), *var'd on other grounds*, 836 N.Y.S.2d 126, 127 (App. Div. 2007) | 26 |
| *Bluestone Innovations LLC v. Nichia Corp.*, 2013 U.S. Dist. LEXIS 57425 (N.D. Cal.) | 27 |
| *Board of Regents of University of Nebraska v. BASF Corp.*, 2007 WL 3342406, (D. Neb.) | 28 |
| *Caisse Populaire de Maillardville Credit Union v. Spraggs*, 1989 CarswellBC 1063 (C.A.) | 29 |
| *Century 21 Canada Limited Partnership v. Rogers Communications Inc.*, 2011 BCSC 1196 | 30 |
| *Century Services Inc. v. Canada (Attorney General)*, 2010 SCC 60 | 31 |
| *Christopher v. Zimmerman*, 2000 BCCA 532 | 32 |
| *Citicorp Trustee Co. Ltd. v. Barclays Bank Plc*, [2013] EWHC 2608 (Ch. D.) | 33 |
| *CivicLife.Com Inc. v. Canada (A.G.)* (2006), 215 O.A.C. 43 (C.A.) | 34 |
| *Commercial Alcohols Inc. v. Suncor Energy Products Inc.* (2006), 17 B.L.R. (4th) 86 (Ont. S.C.J.), aff'd, 2008 ONCA 261 | 35 |
| *Cooper-Standard Automotive Canada*, [2009] O.J. No. 3996 (S.C.J.) | 36 |

| CASE LAW | |
|---|---|
| *CPU Options, Inc. v. Milton* (2006), 79 O.R. (3d) 365 (S.C.J.) | 37 |
| *Crystallex Re*, 2012 ONCA 404, leave to appeal denied 2012 CarswellOnt 11931 | 38 |
| *Cunningham v. Hamilton* (1995), 169 A.R. (C.A.) | 39 |
| *Davies Warehouse Co. v. Bowles*, 321 U.S. (1944) | 40 |
| *Devefi Pty Ltd. v. Mateffy Perl Nagy Ptd Ltd.*, (1993), 113 A.L.R. 225 (F.C.A.F.C.) | 41 |
| *Dorrans v. The Shand Partnership*, [2003] SctosCS 313 (O.H.) | 42 |
| *Dubiner v. Cheerio Toys and Games Ltd.*, [1965] 1 Ex. C.R. 524 (Ex. Ct.), (QL), aff'd, [1966] S.C.R. 206 | 43 |
| *Dumbrell v. Regional Group of Companies Inc.*, 2007 ONCA 59 | 44 |
| *Electric Chain Co. of Canada Ltd. v. Art Metal Works Inc.*, [1933] S.C.R. 581 | 45 |
| *Eli Lilly & Co. v. Novopharm Ltd*, [1998] 2 S.C.R. 129 | 46 |
| *Euro-Excellence Inc. v. Kraft Canada Inc.*, [2007] 3 S.C.R. 30 | 47 |
| *Fairfield Sentry Ltd v Migani*, [2014] UKPC 9 | 48 |
| *Forest Hill Real Estate Inc. v. Harvey Kalles Real Estate Ltd.*, 2010 ONCA 884 | 49 |
| *Fruit of the Loom, Inc. v. Chateau Lingeries Mfg. Co.* (1982), 63 C.P.R. (2d) 51 (F.C.T.D.), (WLeC), aff'd (1983), 78 C.P.R. (2d) 194 (F.C.A.) | 50 |
| *G. Ford Homes Ltd. v. Draft Masonry (York) Co. Ltd.* (1983), 43 O.R. (2d) 401 (C.A.), (QL) | 51 |
| *Garland v. Consumers' Gas Co.*, [2004] 1 S.C.R. 629 | 52 |
| *GATX Corp. v. Hawker Siddeley Canada Inc.* (1996), 27 B.L.R. (2d) 251 (Ont. Gen. Div.), (QL) | 53 |
| *General Mills, Inc. v. Kraft Foods Global, Inc.*, 487 F.3d 1368, (Fed. Cir. 2007), *rehearing granted on other grounds*, 495 F.3d 1378 (Fed. Cir. 2007) | 54 |
| *General Refractories Co. of Canada*, [2002] O.J. No. 54 (S.C.J.) | 55 |
| *Harris v. Nugent* (1996), 141 D.L.R. (4th) 410 (Alta. C.A.), leave to appeal | 56 |

| CASE LAW | |
|---|---|
| refused, [1997] S.C.C.A. No. 77 | |
| *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, (Fed. Cir. 2001), *cert. denied*, 535 U.S. 906 (2002) | 57 |
| *Hospital for Sick Children v. Walt Disney Productions*, [1968] Ch. 52 (C.A) | 58 |
| *Hu v. Sung* (2009), 63 B.L.R. (4th) 286 (Ont. S.C.J.) | 59 |
| *HyrdoFlame Production, L.L.C. v. HyrdoFlame Technologies, L.L.C.*, 2011 WL 1468360, (E.D. La.) | 60 |
| *Imoney Corp. v. Quebecor Communications Inc.*, [2002] O.J. No. 4309 (S.C.J.) | 61 |
| *In re ABC LEARNING CENTRES LIMITED*, 728 F.3d 301 (3rd. Cir. 2013) | 62 |
| *In re Aerobox Composite Structures, LLC*, 373 B.R. 135, (Bankr. D. N.M. 2007) | 63 |
| *In re Combustion Eng'g, Inc.*, 391 F.3d 190, (3d Cir. 2004). | 64 |
| *In re Coy*, 2011 WL 3667607, (Bankr. D. Del. 2011) | 65 |
| *In re Direct Response Media, Inc.*, 466 B.R. 626, (Bankr. D. Del. 2012) | 66 |
| *In re Enron Corp.*, 2005 WL 3832053, n.16 (Bankr. S.D.N.Y. Nov. 28, 2005) | 67 |
| *In re Fisker Automotive Holdings, et al.*, Case No. 13-13087 (KG) (Bankr. D. Del. Jan. 17, 2014) | 68 |
| *In re Nortel Networks, Inc.*, 669 F.3d 128 (3rd. Cir. 2011) | 69 |
| *In re Owens Corning*, 419 F.3d 105, (3rd Cir. 2005) | 70 |
| *In re Residential Capital, LLC*, 501 B.R. 549, (Bankr. S.D.N.Y. 2013) | 71 |
| *In re Tribune*, 464 B.R. 126, (Bankr. D. Del. 2011) | 72 |
| *In re Tucson Yellow Cab Co., Inc.*, 789 F.2d 701, (9th Cir. 1986) | 73 |
| *Independent Wireless Telegraph Co. v. Radio Corp. of America*, 269 U.S. 459 (1926) | 74 |
| *Indian Molybdenum Ltd. v. The King*, [1951] 3 D.L.R. 497 (S.C.C.) | 75 |

| CASE LAW | |
|---|---|
| *Insituform Technical Services v. Inliner UK*, [1992] R.P.C. 83 (Ch. D.) | 76 |
| *Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc.*, 248 F.3d 1333, (Fed. Cir. 2001), *cert. denied*, 534 U.S. 895 (2001) | 77 |
| *International Business Machines Corp. v. Comdisco*, 1991 Del. Super. LEXIS 453 | 78 |
| *International Gamco, Inc. v. Multimedia Games, Inc.*, 504 F.3d 1273, 1275, 1279 (Fed. Cir. 2007), *emphasis added.* | 79 |
| *International Nutrition Co. v. Horphag Research Ltd.*, 257 F.3d 1324, (Fed. Cir. 2001) | 80 |
| *Ion Media Networks, Inc. v. Cyrus Select Opportunities Master Fund, Ltd.*, 419 B.R. 585 (Bankr. S.D.N.Y. 2009) | 81 |
| *IPEX Inc. v. Lubrizol Advanced Materials Canada Inc.*, 2012 ONSC 2717, leave to appeal refused, 2012 ONSC 5382 | 82 |
| *Itak International Corp. v. CPI Plastics Group Ltd.* (2006), 20 B.L.R. (4th) 67 (Ont. S.C.J.) | 83 |
| *J.S. Alberici Const. Co., Inc. v. Mid-West Conveyor Co., Inc.*, 750 A.2d 518, (Del. 2000) | 84 |
| *Jedfro Investments (U.S.A.) Ltd. v. Jacyk*, [2007] 3 S.C.R. 679 | 85 |
| *Kentucky Fried Chicken Canada v. Scott's Food Services Inc.* (1998), 114 O.A.C. 357 (C.A.) | 86 |
| *Kerr v. Baranow*, [2011] 1 S.C.R. 269 | 87 |
| *Kitchener Frame Ltd.*, 2012 CarswellOnt 1347 (S.C.J.) | 88 |
| *Knowles v. Lindstrom*, 2014 ONCA 116 | 89 |
| *Landis v. Science Management Corp.*, 1991 Del. Ch. LEXIS 19 | 90 |
| *Lauren International, Inc. v. Reichart*, 2008 ONCA 382, leave to appeal refused, [2008] S.C.C.A. No. 327 | 91 |
| *Lear v. Lear* (1974), 5 O.R. (2d) 572 (C.A.) (QL) | 92 |
| *M.J.B. Enterprises Ltd. v. Defence Construction (1951) Ltd.*, [1999] 1 S.C.R. 619 | 93 |

| CASE LAW | |
|---|---|
| *Marinangeli v. Marinangeli* (2003), 66 O.R. (3d) 40 (C.A.) | 94 |
| *Martin v. AstraZeneca Pharmaceuticals PLC*, 2012 ONSC 2744, aff'd, 2013 ONSC 1169 (Div. Ct.) | 95 |
| *Matter of Chicago, Milwaukee, St. Paul & Pac. R. Co.*, 791 F.2d 524, (7th Cir. 1986) | 96 |
| *Matter of Terry Ltd. P'ship*, 169 B.R. 182, (Bankr. N.D. Ind. 1993) *aff'd sub nom, Invex Holdings, N.V. v. Equitable Life Ins.*, 179 B.R. 111 (N.D. Ind. 1993) | 97 |
| *Maxwell Commun. Corp v. Barclays Bank (In re Maxwell Comun. Corp.)*, 170 B.R. 800, (Bankr. S.D.N.Y. 1994) | 98 |
| *McNeilab v. Scandipharm*, 862 F.Supp 1351, (E.D.Pa. 1994), aff'd in part and rev'd on other grounds, 95 F.3d 1164 (Fed. Cir. 1996) | 99 |
| *Merchandising Corp. of America Inc. v. Harpbond Ltd.*, [1983] F.S.R. 32 (Eng. C.A.) | 100 |
| *Merck & Co v. Apotex Inc.*, 2010 FC 1265, aff'd, 2011 FCA 363, leave to appeal refused, [2012] S.C.C.A. No. 82 | 101 |
| *Mitutoyo Corp. v. Central Purchasing, LLC*, 499 F.3d 1284, at 1291 (Fed. Cir. 2007) | 102 |
| *Morrow v. Microsoft Corp.*, 499 F.3d 1332, (Fed. Cir. 2007) | 103 |
| *National Carbonising Co. v. British Coal Distillation Ltd.* (1936), 54 R.P.C. 41 (Eng. C.A.) | 104 |
| *Nat'l Wastewater Sys. v. Smith*, 2011 U.S. Dist. LEXIS 47554, (W. D. Okla) | 105 |
| *Nishi v. Rascal Trucking Ltd.*, [2013] 2 S.C.R. 438 | 106 |
| *Nortel Networks Corporation (Re)*, 2011 ONSC 4012 | 107 |
| *Oceanic Exploration Co. v. Denison Mines Ltd.* (1997), 127 O.A.C. 224 (C.A.), (QL) | 108 |
| *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, (3d Cir. 2003) (en banc). | 109 |
| *Ornge Global GP Inc., Re* 2013 CarswellOnt 9770 (S.C.J.) | 110 |

| CASE LAW | |
|---|---|
| *Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, (1977) | 111 |
| *Pacific National Investments Ltd. v. Victoria (City)*, [2004] 3 S.C.R. 575 | 112 |
| *Peter Kiewit Sons' Co. of Canada v. Eakins Construction Ltd.*, [1960] S.C.R. 361 | 113 |
| *Pettkus v. Becker*, [1980] 2 S.C.R. 834 | 114 |
| *PharmAthene, Inc. v. SIGA Techs., Inc.*, 2008 Del. Ch. LEXIS 9 | 115 |
| *Pirani v. Esmail*, 2014 ONCA 145 | 116 |
| *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, (Fed. Cir. 2000) | 117 |
| *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne*, 2012 ONCA 862, leave to appeal refused, [2013] S.C.C.A. No. 68 | 118 |
| *PUC Distribution Inc. v. Brascan Energy Marketing Inc.*, 2008 ONCA 176, leave to appeal refused, [2008] S.C.C.A. No. 217 | 119 |
| *Rana v. Maduck*, 2000 SKQB 318 | 120 |
| *Re Beard and Scott's Patent* (1928), 45 R.P.C. 31 (Eng. Ch. D) | 121 |
| *Re Elliott Estate*, [1962] O.J. No. 164 (C.A.), aff'd, [1963] S.C.R. 305 | 122 |
| *Rhone Poulenc Agro, S.A. v. Dekalb Genetics Corp.*, 284 F.3d 1323, (Fed. Cir. 2002), *cert. denied*, 539 U.S. 957 (2003) | 123 |
| *Righthaven LLC v. Hoehn*, 716 F.3d 1166, (9th Cir. 2013) | 124 |
| *Robertson v. Thomson Corp.* (2001), 15 C.P.R. (4th) 147 (Ont. S.C.J.), aff'd (2004), 72 O.R. (3d) 481 (C.A.), var'd, [2006] 2 S.C.R. 363 | 125 |
| *Rodaro v. Royal Bank of Canada* (2002), 59 O.R. (3d) 74 (C.A.), (QL). | 126 |
| *Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 25 (1941) | 127 |
| *Schmidt v. Air Products Ltd.*, [1994] 2 S.C.R. 611 | 128 |

| CASE LAW | |
|---|---|
| *Schunkewitz v. Prudential Securities, Inc.*, 99 Fed. Appx. 353, (3rd Cir. 2004) | 129 |
| *Schwark Estate v. Cutting*, 2010 ONCA 61 | 130 |
| *Signalisation de Montréal Inc. v. Services de Béton Universels Ltée*, [1993] 1 F.C. 341 (C.A.) | 131 |
| *Simmons v. Webb* (2008), 54 B.L.R. (4th) 197 (Ont. S.C.J.), var'd on other grounds, 2010 ONCA 584, and aff'd, 2011 ONCA 7 | 132 |
| *Site Microsurgical Systems, Inc. v. Cooper Companies, Inc.*, 797 F.Supp. 333, (D. Del. 1992) | 133 |
| *Skye Properties Ltd. v. Wu*, 2010 ONCA 499 | 134 |
| *Slegers v. Sullivan* (2009), 84 C.P.C. (6th) 156 (Ont. S.C.J.) | 135 |
| *Southcott Estates Inc. v. Toronto Catholic District School Board*, [2012] 2 S.C.R. 675 | 136 |
| *StoneEagle Services, Inc. v. Gillman*, 2014 U.S. App. LEXIS 5510, (Fed. Cir.). | 137 |
| *Stubart Investments Ltd. v. The Queen*, [1984] 1 S.C.R. 536 | 138 |
| *Sungard Recovery Services, Inc. v. Florists Transworld Delivery, Inc.*, 1999 U.S. Dist. LEXIS 17709, (E.D. Pa. 1999) | 139 |
| *Tercon Contractors Ltd. v. British Columbia (Transportation and Highways)*, [2010] 1 S.C.R. 69 | 140 |
| *The Plan Group v. Bell Canada*, 2009 ONCA 548 | 141 |
| *Thomas v. Sorrell* (1672), Vaughan 330, 124 E.R. 1098 | 142 |
| *Tiny (Township) v. Battaglia*, 2013 ONCA 274 | 143 |
| *TR Technologies Inc. v. Verizon Communications Inc.*, 2011 ABQB 390 | 144 |
| *Tucows.com Co. v. Lojas Renner S.A.*, 2011 ONCA 548, leave to appeal refused, [2011] S.C.C.A. No. 450. | 145 |
| *Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust*, 2007 ONCA 205 | 146 |

| CASE LAW | |
|---|---|
| *Verdellen v. Monaghan Mushrooms Ltd.*, 2011 ONSC 5820 | 147 |
| *Wade v. Ukeni*, 2014 ONCA 99 | 148 |
| *Waterfall, Economidis, Caldwell, Hanshaw & Villamana, P.C. v. Pima County*, 2004 Ariz. App. Unpub. LEXIS 9, (2004), *review denied and ordered depublished*, 209 Ariz. 200 (2004) | 149 |
| *Wiav Solutions LLC v Motorola, Inc.*, 631 F.3d 1257, (Fed. Cir. 2010) | 150 |
| *Williams-Sonoma Inc. v. Oxford Properties Group Inc.*, 2013 ONCA 441 | 151 |
| *Wotherspoon v. Canadian Pacific Ltd.* (1981), 20 C.P.C. 72 (Ont. C.A.), (QL) | 152 |

| SECONDARY SOURCES | |
|---|---|
| H.G. Fox, *Canadian Law and Practice relating to Letters Patent for Inventions*, 4th ed. (Toronto: Carswell, 1969) | 153 |
| Jackson R., and Sarra, J. P., "Selecting the Judicial Tool to get the Job Done: An Examination of Statutory Interpretation, Discretionary Power and Inherent Jurisdiction in Insolvency Matters," in Sarra, J. P., ed., 2007, *Annual Review of Insolvency Law*, (Vancouver: ThomsonCarswell, 2007) | 154 |
| K.M. Garnett, *Copinger and Skone James on Copyright*, 16th ed. (London: Sweet & Maxwell, 2011), Vol. 1 | 155 |
| Michael B. Rotsztain and Natasha De Cicco, *Substantive Consolidation in CCAA Restructurings: A Critical Analysis*, Torys LLP, 2004 | 156 |
| *Restatement (Second) of Conflict of Laws*, § 221(2)(a) | 157 |
| *Restatement (Second) of Conflict of Laws*, § 221(2)(b) | 158 |
| T. Terrell, *Terrell on the Law of Patents*, 17th ed. (London: Sweet & Maxwell, 2011) | 159 |

# BRIEF

**PART I – OVERVIEW**

*A.    Introduction*[1]

1.       Approximately $7.3 billion in Sale Proceeds[2] must be allocated to the Nortel Debtors and then distributed to Nortel's Creditors worldwide who, collectively, have asserted Claims far exceeding this amount.  The Canadian Creditors Committee (the "CCC") represents the interests of more than 20,000 Canadian Creditors and includes pensioners, pension interests, and current and former employees who have approximately $3 billion in Claims against the Canadian Estate.

2.       The Sale Proceeds consist of approximately $2.8 billion from the sales of Nortel's Lines of Business and $4.5 billion resulting from the sale of Nortel's residual patent portfolio (the "Residual IP").

3.       The Sale Proceeds should be allocated to the owners of the assets sold (the "Ownership Allocation Order").  Nortel was a Canadian-based technology company and its most valuable asset was its intellectual property, which was owned by Nortel's Canadian parent corporation, NNL. In contrast, NNL's main operating subsidiaries in the U.S. and the Europe, Middle East and Asia (EMEA), held limited licenses granted by NNL within a carefully circumscribed Field of Use.  As the owner of the most valuable asset owned and relinquished, NNL is entitled to receive most of the Sale Proceeds.

4.       In the alternative, the Sale Proceeds should be allocated to the Nortel Debtors on a *pro rata* basis (the "Equitable Pro Rata Allocation Order") so as to provide each Creditor having a valid Claim against the Estates the same common dividend.  A *pro rata* allocation is the only fair

---

[1] The CCC does not waive, and expressly reserves, its rights to object to any evidence presented at trial. References to any documents, exhibits or deposition testimony in the CCC's Trial Brief does not constitute an admission by the CCC that such evidence is admissible at trial.

[2] Capitalized terms herein are defined in the Glossary attached as Appendix A.

and equitable alternative to an allocation based on the legal rights of the Nortel Debtors in the underlying assets sold.

5.      Both the Ownership Allocation Order and the Equitable Pro Rata Allocation Order are fair to Nortel's Creditors. *In every case*, Canadian Creditors will share with other Creditors with claims against the Canadian Debtors, including Bondholders, the UKPC, and the U.S. Debtors.

**B.      *Ownership Allocation***

6.      Virtually all of the Core Parties agree that the Sale Proceeds should be allocated according to the owner of the assets that were sold and relinquished by the Nortel Debtors. Only if the Courts determine that the ownership interests of the Nortel Debtors are not capable of being ascertained would an alternative allocation methodology be required.

7.      Intellectual property ("IP") was the most valuable asset owned and then sold by Nortel. The sale of Nortel's Residual IP raised more than the proceeds from the sale of all of the Lines of Business combined.

8.      Nortel was a technology company headquartered in Canada, with a long history of innovation and significant Canadian operations, particularly at its world-class R&D facility in Ottawa, Ontario, where the majority of Nortel's foundational platform technology was invented. The ownership of Nortel's IP was documented in intercompany agreements that reflected a deliberate policy decision by Nortel to vest ownership of IP in NNL.

9.      Nortel's Master Research & Development Agreement ("MRDA") provides that ownership of all NN Technology resulting from R&D vested in NNL.  In return, those NNL subsidiaries that performed R&D – NNI, NNUK, NNSA and NN Ireland (together, the "Licensed Participants" or "LPs") – received:

> (a) royalty-free Licenses to make, use and sell Nortel Products using or embodying
>
> NN Technology owned by NNL and all patents necessary or appropriate in

connection therewith (the "Field of Use"), on an exclusive basis in Exclusive

Territories and non-exclusively in Non-Exclusive Territories; and

(b) a share of operating profits of the business based on a residual profit split method

("RPSM") that took into account each LP's R&D expenditures in the preceding

five years.

10.     The MRDA prescribed not only the methodology for allocating operating profits while

Nortel was a going concern, but the ownership of Nortel's most valuable asset – its IP.  In short,

the MRDA defines the ownership interests of the Nortel Debtors in the IP sold and provides the

key for allocating the Sale Proceeds among the Estates.

11.     All Core Parties other than the CCC and the Monitor and Canadian Debtors propose

allocations that either ignore or depart from the clear terms of the MRDA. The U.S. Interests and

EMEA Debtors' positions – while conceptually distinct – share a common fundamental flaw.

They both attempt to re-write the express agreement of the parties and transform their Licenses

into an ownership interest in NNL's IP. In fact, the MRDA does no such thing.

12.     *First*, the terms of the MRDA make clear that NNL is the only owner of the IP:

(a) the LPs did not own any property interest – legal, equitable or beneficial – in the

NN Technology, which at all times was vested in NNL;

(b) the only interests the LPs had were limited exclusive and non-exclusive Licenses

circumscribed by a carefully defined Field of Use; and

(c) accordingly, the only IP asset the LPs owned and relinquished in connection with

the Sales were their Licenses to make, use and sell Nortel Products according to

the terms of the MRDA.

13.     *Second*, the Licenses were neither legally nor practically transferrable and had no

material commercial value:

(a) the LPs had no legal right to transfer the MRDA or their Licenses to a buyer, either directly or indirectly through a sublicense;

(b) no buyer would have accepted a transfer because the License would be burdened with the obligations of the MRDA;

(c) the LPs could only sublicense within the Field of Use;

(d) even if the LPs could have transferred their Licenses through a sublicense (contrary to the express terms of the MRDA), the sublicensee could only make, use and sell Nortel Products using NN Technology by or for the Participants;

(e) the LPs would have remained subject to their contractual obligations under the MRDA. In particular, the LPs would have had a continuing obligation to conduct R&D, to vest ownership of all NN Technology resulting from R&D in NNL and to make profit sharing payments to the Participants; and

(f) accordingly, the Licenses were practically worthless to any buyer.

14.    *Third*, the U.S. and EMEA Debtors did not have unlimited rights to enforce the NN Technology owned by NNL in the Exclusive Territories. The enforcement provision in Article 4(e) of the MRDA is a permissive agreement by NNL and the LPs *inter se*. It simply permits the LPs to enforce the NN Technology within the Field of Use in their Exclusive Territories but confers no actual right or standing to enforce the NN Technology in any court.

15.    While the U.S. Interests and EMEA Debtors each ignore or depart from the terms of the MRDA, they propose very different, albeit equally flawed, allocation methodologies. The U.S. Interests assert that the Sale Proceeds should be allocated to each of the Nortel Debtors based on the fraction of 2009 revenues recorded by each Nortel Entity to Nortel's total 2009 revenues. The Revenue Theory proposed by the U.S. Interests bears no relationship to the evidence

concerning the manner in which the Nortel Entities operated and disregards the fundamental reality that businesses have both revenues and expenses.

16.    The Revenue Theory ignores all of the limitations and obligations imposed under the MRDA – the very same document on which the U.S. Interests rely for their incorrect and overbroad interpretation of the License granted by NNL to NNI.  The Revenue Theory is based on the false premise that NNI is entitled to keep every cent of revenue earned or collected in the U.S. from technology owned by NNL and licensed to NNI.

17.    Furthermore, revenue is a wholly inappropriate basis by which to allocate the Sale Proceeds. NNI was not a "silo" operation, and was never capable of being a freestanding business in its own right.   NNI was a functional wholly-owned subsidiary of an integrated multinational technology company based in Canada that provided networking solutions to customers located all around the world.  Its ability to earn revenue was fundamentally tied to the technology owned by NNL.  In addition, NNL conducted a disproportionate share of R&D leading to many of Nortel's fundamental technology platforms that enabled all Nortel Entities to earn revenue, and incurred a disproportionate amount of global support and other costs necessary for the Nortel enterprise to conduct business. NNL also arranged financing in the public markets on behalf of Nortel's global operations.

18.    NNI had no independent ability to generate revenue, let alone revenues commensurate with the historical 2009 revenue that happened to be booked by the Nortel Entities incorporated in the U.S. The percentage of historical revenues booked by NNI provides no insight whatsoever into the value of the assets owned and relinquished by the Nortel Debtors.

19.    The EMEA Debtors' primary argument is that each Nortel Debtor is entitled to share in the Sale Proceeds attributable to IP based on relative contribution to R&D.   However, "contribution" – however defined – does not result in ownership. The MRDA expressly provides

that the only consideration for a Licensed Participant's R&D contribution was their RPSM payments, and that ownership of the NN Technology resided in NNL. The EMEA Debtors held personal, contractual and royalty-free Licenses only. They are entitled to no more than the value of the Licenses they held and relinquished in connection with the Sales, which was negligible.

20.     The EMEA Debtors' attempt to draw support for their Contribution Theory from the fact that operating profits were shared by the Participants according to the RPSM. Yet, the EMEA Debtors invent a wholly different "look back period" and formula for sharing the Sale Proceeds attributable to IP and propose that the Courts re-write the bargain the parties made. The EMEA Debtors' "modified RPSM" is selective and ignores how the parties actually codified contribution in the MRDA.

21.     The EMEA Debtors' Alternative License Theory suffers from the same defects as the Revenue Theory proposed by the U.S. Interests. By the EMEA Debtors' expert's own admission, the Alternative License Theory is unfair and undervalues the contributions made employees of the Canadian Debtors through the significant R&D in Canada that created much of Nortel's most valuable technology. It should not be accepted by the Courts.

22.     Accordingly, the Sale Proceeds should be allocated to the Nortel Debtors based on the assets they owned and relinquished in connection with the Sales. In the case of the Business Sales, the Canadian, U.S. and EMEA Debtors owned and relinquished both tangible and intangible assets, including IP, customer relationships and goodwill. NNL owned and relinquished the IP transferred to the purchasers of the Lines of Business, and the U.S. and EMEA Debtors owned and relinquished their Licenses granted by NNL under the MRDA. The Licenses owned and relinquished by the U.S. and EMEA Debtors in the Business Sales are of limited or no value. At most, the U.S. and EMEA Debtors are entitled to the value of the tangible

and non-IP intangible assets they owned and the present value of future cash flows from carrying on business through the exercise of their Licenses in the context of Nortel as a going concern.

23.    Substantially all of the proceeds from the Residual IP Sale accrue to NNL as owner of the Residual IP that was sold. There are two reasons for this.

24.    *First*, the U.S and EMEA Debtors had already been fully compensated for any License rights they had to the Residual IP. The Rockstar Consortium purchased Nortel's Residual IP consisting of over 7,000 patents and patent applications after all of the Lines of Business had been sold. Approximately 98% of the Residual IP sold to Rockstar was owned by NNL. The purchasers of the Lines of Business received all rights to IP necessary to carry on the businesses they purchased, through an (i) assignment of IP Predominantly Used by the Lines of Business or; (ii) royalty-free licenses to other IP necessary to carry on the Lines of Business. Since the LPs' only rights under the MRDA were to make, use and sell Nortel Products using or embodying NN Technology, the LPs did not own or relinquish assets of any value in connection with the Residual IP Sale.

25.    *Second*, the majority of the Residual IP was never licensed by NNL to the LPs at all. Approximately 59-66% of the Residual IP sold to Rockstar was not used or embodied in Nortel Products. Accordingly, the Not Used Residual IP did not fall within the scope of the Field of Use of the Licenses granted by NNL and NNL is entitled to all of the Sale Proceeds attributable thereto.

26.    For these reasons, the CCC submits that the Sale Proceeds should be allocated to the Estates as follows:[3]

---

[3] Britven Primary Report dated January 24, 2014, p. 4, Table 1 and Schedule 2.5.

| Assets ($ in millions) | Canada | US | EMEA |
|---|---|---|---|
| Tangible Assets | 59 | 42 | 68 |
| Intangible Assets | | | |
| • Customer Relationships | 93 | 393 | 197 |
| • IP | 858 | 219 | 66 |
| • Purchaser Goodwill | 427 | 316 | 110 |
| Total Business Sales | 1,438 | 979 | 432 |
| Residual IP Sale | 4,368 | 30 | 57 |
| **Total** | **5,805** | **1,009** | **488** |

27.    This proposed allocation respects the legal rights of the Nortel Debtors and is fair to Nortel's Creditors. Although the total Claims are not known at this time, it is estimated that the above allocation to the Estates would result in Canadian Creditors receiving between approximately 58-61% return on their Claims. By contrast, U.S. Creditors, including the Guaranteed Bondholders and other institutional investors, would receive 100% recovery on their Claims.

## C.    *Pro Rata Allocation*

28.    If it is concluded that ownership should not form the basis for allocating the Sale Proceeds, then the only fair and equitable alternative is to allocate the Sale Proceeds, taking into account approximately $1.7 billion in additional "Residual Assets" (cash and other assets in the possession of Nortel Debtors in various jurisdictions), amongst the Nortel Debtors so as to effect a *pro rata* distribution among Creditors, such that each Creditor receives a common dividend on its Claim.

29.    A *pro rata* allocation is appropriate in light of the globally integrated nature of Nortel's business. Pre-Filing, Nortel was an integrated multinational technology business operating along

four interdependent Lines of Business that spanned borders and legal entities.  Employees served dedicated Lines of Business for the benefit of the group as a whole.

30.      The sale of Nortel's Lines of Business Post-Filing reflected the integrated nature of the business. Purchasers bought Lines of Business consisting of assets residing in various Nortel Entities scattered throughout multiple jurisdictions.

31.      Substantive consolidation, which contemplates the merger of the Estates under the supervision of a single court, is neither requested by the CCC nor necessary to effect an allocation that would yield a *pro rata* result. The Ontario Superior Court of Justice and the United States Bankruptcy Court each have equitable jurisdiction to order and direct that the Sale Proceeds be allocated in a manner that achieves a fair and equitable distribution to Nortel's Creditors, including the retired, disabled pensioners and other employees who relied and depended on the promise of pensions, health, disability and other benefits as part of their compensation for the significant value they contributed to Nortel.

32.      The theories proposed by the U.S. Interests and the EMEA Debtors are fundamentally flawed for the reasons discussed herein, and should not be adopted by the Courts. In addition, both theories produce a grossly inequitable result for Nortel's Creditors, the real parties in interest in these proceedings. Under the theories proposed by the U.S. Interests and EMEA Debtors, approximately 20,000 longstanding Nortel employees, pensioners and disabled employees who dedicated themselves to Nortel's business would receive approximately 10-11% recovery on their Claims. However, the U.S. Creditors, including institutional Creditors that purchased more than $2 billion in bonds, Post-Filing, and at a significant discount to par value, would recover 100% of their Claims. By contrast, it is estimated that a *pro rata* allocation would

result in all Creditors receiving approximately 71% return on their Claims based on the information available to date.[4]

33.      Any prejudice to institutional Creditors pales in comparison to the prejudice actually and already suffered by Nortel's pensioners, retired and disabled employees, who have endured more than five years of lengthy and protracted insolvency proceedings without return on substantial investments they made by dedicating their working lives to Nortel.

---

[4] Britven Rebuttal Report dated February 28, 2014, p. 5, Table 1.

## PART II – BACKGROUND

### A.  *Nortel was a Canadian-Based Technology Company*

34.     Nortel was a Canadian-based technology company headquartered in Canada.

35.     In 1883, Nortel commenced operations as the manufacturing department of the Bell Telephone Company of Canada. In 1964, after Western Electric disposed of its equity interest in Nortel, Bell Canada became the owner of all issued and outstanding shares of Nortel.[5]

36.     In the 1960s, Nortel began to develop technology through centralized R&D operations in Ottawa and smaller manufacturing facilities in other Canadian cities. In 1967, Nortel introduced its first major product for the marketplace, the SP-1 central office switch.[6]

37.      In the late 1960s and early 1970s, Nortel began to enter new markets, especially in the U.S., but also in other parts of the world. In 1972, Nortel incorporated its principal U.S. subsidiary, Northern Telecom Inc., which later became NNI.[7]

38.     In 1974, Nortel established marketing subsidiaries in Europe, Asia and Latin America, and over the years, additional manufacturing, marketing and service operations were established throughout the world.[8]

39.      By 1984, Nortel had four main operating companies:

    (a)     Northern Telecom Canada Limited, the Canadian operator;

    (b)     Northern Telecom Inc., the U.S. operator;

    (c)     Northern Telecom International Limited, the international operator; and

---

[5] Affidavit of Clive Allen sworn April 11, 2014, paras. 12-13.

[6] Affidavit of Clive Allen sworn April 11, 2014, para. 15.

[7] Affidavit of Clive Allen sworn April 11, 2014, para. 16.

[8] Affidavit of Clive Allen sworn April 11, 2014, para. 18.

(d)    Northern Telecom Electronics Limited, headquartered in Mississauga, Ontario, which oversaw semiconductor and other component manufacturing in various parts of the world.[9]

40.    In 1996, Nortel had moved from a geographically focused management structure to one built around Lines of Business based on products. At the time, the Lines of Business were Switching Networks, Enterprise Networks, Wireless Networks and Broadband Networks.[10] While the names of the Lines of Business and their product offerings changed over time, Nortel's product focused management structure continued until, and formed the basis for, the assets sold in the Business Sales.

41.    Nortel continued to grow in the late 1990s in part due to acquisitions funded by equity issued by Nortel's Canadian corporations. Between 1998 and 2000, Nortel made acquisitions totaling over $1 billion, as detailed below:[11]

| Summary of Acquisitions of Nortel Group – 1998-2000 | | | |
|---|---|---|---|
| Target | Closing date | Amount paid ($ millions) | Nature of consideration |
| Bay Networks, Inc. | Aug-31-1998 | 9,060 | NT Canada Stock |
| Qtera Corporation | Jan-28-2000 | 3,004 | NNC Stock |
| Clarify, Inc. | Mar-16-2000 | 2,114 | NNC Stock |
| Xros, Inc. | Jun-02-2000 | 3,227 | NNC Stock |
| CoreTek, Inc. | Jun-23-2000 | 1,411 | NNC Stock |
| Alteon   WebSystems, | Oct-05-2000 | 8,054 | NNC Stock |

---

[9] Northern Telecom Limited Form 10-K, December 31, 1984, p. 4 (TR40243); Affidavit of Clive Allen sworn April 11, 2014, para. 18.

[10] Northern Telecom Limited Form 10-K, December 31, 1996, p. 3 (TR40254).

[11] NNC Form 10-K, December 31, 2000, pp. F-15 and F-16 (TR40259); NNC Form 10-K, December 31, 2001, p. F-14 (TR40261); NNC Form 10-K, December 31, 2002, p. F-33 (TR40263).

| Inc. | | | |
|---|---|---|---|
| **Total value of acquisitions over $1 billion** | 26,870 | | |

42.    Following a corporate reorganization in 2000, NNL emerged as Nortel's Canadian operating parent corporation.  NNL was a wholly subsidiary of NNC, a publicly held corporation with securities traded on the Toronto and New York Stock Exchanges.[12]  By 2009, NNL, in turn, owned, directly or indirectly, more than 130 corporate subsidiaries located in various countries, including NNI in the U.S., and NNUK, NNSA and NN Ireland in EMEA.[13]

43.    Nortel was an integrated business.  Although headquartered in Canada, Nortel operated according to a multidimensional matrix structure based on Lines of Business that spanned jurisdictions and legal entities.[14]  As of the Filing Date, Nortel reported its financial results according to three main Business Segments, as described below:[15]

(a) Carrier Networks, which provided wireless networking solutions that enabled service providers and cable operators to supply mobile voice, data and multimedia communications to individuals and enterprises using mobile phones and other wireless devices. The Carrier Networks segment included the following Lines of Business:

     i.   code division multiple access ("CDMA");

     ii.  carrier voice over internet protocol applications solutions ("CVAS"); and

---

[12] Affidavit of Clive Allen sworn April 11, 2014, para 17.

[13] Affidavit of John Doolittle sworn January 14, 2009, paras. 21 and 26.

[14] Affidavit of Brian McFadden sworn April 11, 2014, paras. 31-39; Affidavit of Peter Currie sworn April 11, 2014, paras. 22-31; Affidavit of John Doolittle sworn January 14, 2009, para. 71.

[15] In addition, until December 31, 2008, Nortel had a fourth business segment called Global Services, which was a support and services arm. The Global Services segment was ultimately integrated into the Lines of Business: see Affidavit of Sharon Hamilton sworn April 11, 2014, para. 9.

      iii.  and global system for mobile communications ("GSM");

(b)  <u>Enterprise Solutions</u> ("Enterprise"), which provided enterprise communications solutions addressing the headquarters, branch and home office needs of large and small businesses globally. Enterprise offered unified communications solutions that helped remove the barriers between voice, email, conferencing, video and instant messaging; and

(c)  <u>Metro Ethernet Networks ("MEN")</u>, which provided optical networking and carrier grade ethernet data networking solutions to make carrier and large enterprise customers' networks more scalable and reliable for the high speed delivery of diverse multimedia communications services such as internet video, residential broadcast TV and video on demand.[16]

44.    Throughout Nortel's history, NNL played a leading role in the R&D resulting in the technology offered to Nortel's customers across all Line of Business and by providing support services for the overall operations of the organization. As the U.S. Debtors acknowledged to the Courts in applying for the approval of the IFSA in January 2009:

> *The importance of NNL to the Nortel Group is self-evident. First, NNL is both the historic and actual operational parent of the global Nortel enterprise.* From the Nortel Group headquarters in Toronto, Canada, *NNL provides corporate overhead support to its affiliates throughout the world.* In particular, a substantial portion of Nortel's legal, finance, strategic, insurance, procurement, human resources and real estate functions are directed on a group-wide basis from NNL's Toronto offices. *Second, NNL conducts a disproportionate share of Nortel's Research and Development Activities* (when compared to revenue generation) *and operates the Carling Facility, the largest Nortel R&D facility in the world... Third, NNL is the legal owner of nearly all of the group's intellectual property...*[17]

---

[16] Affidavit of Sharon Hamilton sworn April 11, 2014, paras. 9-13.

[17] U.S. Debtors' IFSA Motion, para. 16 (TR11366), *emphasis added*; Affidavit of Sharon Hamilton sworn April 11, 2014, para. 17.

**B.**    *The Filing and the Decision to Liquidate*

45.    In light of deteriorating market conditions and weakening customer commitments, Nortel commenced formal bankruptcy and insolvency proceedings in Canada, the U.S. and England (in respect of various entities in the EMEA region) on January 14, 2009.[18]

46.    Between 2007 and 2009, each of the MEN, Enterprise and CVAS Lines of Business were incurring operating losses. While the CDMA and GSM Lines of Business did earn operating profits during this period, profits were forecast to decline in the coming years as customers transitioned to new fourth generation (4G) technology, which was a nascent technology at the time for which Nortel did not have any major customers.[19]

47.    Nortel's Filing was made shortly after the Chapter 11 filing of Lehman Brothers and the onset of the financial crisis in late 2008. At the time, access to capital markets had become severely restricted. The financial crisis also disproportionately affected the telecommunications sector as customers announced plans to cut back or defer capital spending.[20]

48.    Nortel's stakeholders considered various restructuring options, including restructuring the business around Nortel's CDMA business (the most significant Line of Business was Nortel's Carrier Networks) and a sale of the Lines of Business.[21] Ultimately, Nortel elected not to pursue the CDMA restructuring option due to lack of support from its most significant customer of CDMA technology, Verizon, and the inability to obtain the requisite financing.[22]

---

[18] Affidavit of Paviter Binning sworn April 11, 2014, para. 41.

[19] Affidavit of Sharon Hamilton sworn April 11, 2014, para. 11.

[20] Affidavit of Sharon Hamilton sworn April 11, 2014, para. 16.

[21] Affidavit of Paviter Binning sworn April 11, 2014, para. 44; Affidavit of Sharon Hamilton sworn April 11, 2014, paras. 17-18.

[22] Affidavit of Sharon Hamilton sworn April 11, 2014, paras. 23-24; Affidavit of Paviter Binning sworn April 11, 2014, paras. 47-48.

49.      Following significant review by NNC's senior management and board of directors, and in consultation with Nortel's financial advisor, Lazard, the Canadian Monitor, the U.S. Debtors, the Joint Administrators for the EMEA Debtors, the legal and financial advisors to the Committee, the Bondholder Group and various Canadian Creditors, it was determined in June 2009 that the best means to realize value for creditors would be to sell all of the Lines of Business and other assets through a liquidating insolvency.[23]

## C.      *The IFSA*

50.      In part to facilitate the Sales of Nortel's Assets, the Canadian, U.S. and EMEA Debtors entered into an Interim Funding and Settlement Agreement (the "IFSA") on June 9, 2009.

51.      Pursuant to the IFSA, NNI paid $157 million to the Canadian Debtors which, together with a $30 million payment made in January 2009, satisfied NNL's Claims for corporate overhead and research incurred by NNL for the benefit of the U.S. Debtors for the period from the Initial Filing Date to September 30, 2009. In addition, NNL agreed to pay $20 million to NNUK on a deferred basis, to settle all transfer pricing obligations between the Canadian Debtors and the EMEA Debtors for the period from the filing date to December 31, 2009.[24]

52.      With respect to the Sales, the IFSA provided that:

> (a) the execution of definitive documentation with a purchaser for, or closing of, any sale of material assets of any Debtor would not be conditioned upon such party reaching agreement with the other parties regarding the allocation of the sale proceeds from such sale transaction, or the binding procedure for the allocation of such sale proceeds;[25]

---

[23] Affidavit of Sharon Hamilton sworn April 11, 2014, para. 21; Affidavit of Paviter Binning sworn April 11, 2014, para. 49.

[24] Affidavit of Sharon Hamilton sworn April 11, 2014, para. 30.

[25] IFSA, s. 12(a) (TR43794).

(b) for the purpose of facilitating the sale of any material assets of the Canadian and/or U.S. Debtors, the U.S. and EMEA Debtors agreed to enter into appropriate license terminations with respect to the licenses and rights granted by NNL to them under or pursuant to the provisions of the MRDA;[26]

(c) the license terminations would not affect the ownership rights that any party to the IFSA may have to any IP sold;[27] and

(d) the license terminations would not be deemed to be, or result in, an expiry or termination of the MRDA.[28]

53.     The IFSA did not give rise to any right or entitlement in the U.S. or EMEA Debtors to any amount of the Sale Proceeds. Pursuant to the IFSA, the Canadian, U.S. and EMEA Debtors agreed that the Sales would be implemented and reserved all rights regarding the allocation of the Sale Proceeds amongst the Estates.

**D.     *The Business Sales***

54.     The Business Sales took place between 2009 and 2010 and resulted in Sale Proceeds of approximately $2.848 billion. The major Business Sales, which were responsible for the majority of the Business Sale Proceeds, were as follows:[29]

---

[26] IFSA, s. 11(a) (TR43794).

[27] IFSA, s. 11(b) (TR43794).

[28] IFSA, s. 11(b) (TR43794).

[29] Affidavit of Sharon Hamilton sworn April 11, 2014, para. 47.

| Line of Business | Purchaser | Net Sale Proceeds | Closing Date |
|---|---|---|---|
| CDMA/LTE | Ericsson | $1,087.7 million | November 13, 2009 |
| Enterprise | Avaya | $842.84 million | December 19, 2009 |
| MEN | Ciena | $631.85 million | March 19, 2010 |
| CVAS | Genband | $140.07 million | May 28, 2010 |
| GSM/GSM-R | Ericsson and Kapsch Carrier Com AG | $104.47 million | March 31, 2010 |

55.    In addition, Nortel entered into a series of smaller sales transactions in respect of sub-units of Lines of Business or particular technologies or products as follows:[30]

| Line of Business | Purchaser | Net Sale Proceeds | Closing Date |
|---|---|---|---|
| Layer 4-7 | Radware | $18.1 million | March 31, 2009 |
| NGPC | Hitachi | $10.37 million | December 8, 2009 |
| GSM Retained Contracts | Ericsson | $1.5 million | June 4, 2010 |
| MSS | Ericsson | $46.02 million | March 11, 2010 |

56.    Prior to the Business Sales, Nortel went through an extensive patent segmentation exercise (the "Patent Segmentation") to identify patents that were:

(e)    Predominantly Used by a particular Line of Business;

(f)    Shared across multiple Lines of Business; or

(g)    Not Used in any Line of Business.

---

[30] Although these transactions are included as the Lines of Business for ease of reference, only the Layer 4-7 and MSS transactions involved the sale of what could be characterized as an operating business: see Affidavit of Sharon Hamilton sworn April 11, 2014, para. 48.

57.    The Patent Segmentation was conducted by members of Nortel's IP Law Group under the supervision of Nortel's Chief Intellectual Property Officer, John Veschi, in consultation with the heads of the Lines of Business or their delegates. According to Gillian McColgan, who led the Patent Segmentation under Mr. Veschi's supervision, it was a "shared effort among the entire engineering community within Nortel."[31] The process resulted in objective standards and consensus by "the best minds in Nortel who had the deepest understanding of the products in their business units [and] the revenues attached to their products."[32]

58.    In general, each Business Sale consisted of the sale of assets in the following categories:

(h)    Net Tangible Assets, including accounts receivable, property, plant and equipment and inventory, net of assumed liabilities;

(i)    Intangible Assets, including IP, customer relationships and goodwill.[33]

59.    In respect of IP, the purchasers of the Lines of Business acquired the following:

(j)    patents and patent applications that were Predominantly Used by that Line of Business, which were transferred to the purchasers; and

(k)    licenses to Shared patents and patent applications which were necessary to operate the Line of Business sold.[34]

---

[31] McColgan Deposition, 134:4-136:6.

[32] McColgan Deposition, 140:12-141:11. Although an appeals process was established for challenging a designation of a patent or patent application to one of the above standards, in the result, there were no appeals: Veschi Deposition, 126:10-127:10.

[33] Britven Primary Report dated January 28, 2014, para. 6.12.

[34] Affidavit of Sharon Hamilton sworn April 11, 2014, paras. 60-62; Green Primary Report dated January 28, 2014, p. 11.

### E.     The Residual IP Sale

60.     Following the Business Sales, NNL still owned Residual IP consisting of approximately 7,000 patents and patent applications.[35] The Residual IP consisted of Shared and Not Used patents and applications. The majority of patents and applications were Not Used in any Nortel Line of Business.[36]

61.     After negotiation with two prospective purchasers, on April 4, 2011, NNC, NNL, NNI and NNUK (amongst other Nortel Entities) entered into a stalking-horse asset sale agreement with Ranger Inc., a wholly-owned subsidiary of Google Inc., to sell the Residual IP for $900 million.[37]

62.     Following an auction held at the end of June 2011, the Residual IP was ultimately sold to Rockstar Bidco., a consortium backed by several major technology companies, for approximately $4.5 billion.[38] The proceeds from the Residual IP Sale were well in excess of the Estates' and their financial advisors' estimates.[39]

63.     In connection with the Residual IP Sale, the LPs agreed to terminate any license rights they may have had to the Residual IP owned by NNL.[40] The License Termination Agreement executed in connection with the Residual IP Sale (the "Rockstar LTA") provided that the agreements would not affect ownership rights to any intellectual property sold.[41] In addition, the Rockstar LTA was subject to an IP Transaction Side Agreement which expressly provided that

---

[35] Affidavit of Sharon Hamilton sworn April 11, 2014, para. 67.

[36] McColgan Deposition, 141:18:-141:24.

[37] Affidavit of Sharon Hamilton sworn April 11, 2014, para. 85.

[38] Affidavit of Sharon Hamilton sworn April 11, 2014, para. 85.

[39] Affidavit of Sharon Hamilton sworn April 11, 2014, para. 86.

[40] Asset Sale Agreement, June 30, 2011, s. 5.13(b) (TR44220); Closing Date License Agreement, July 29, 2009, s. 2.02 (TR44229).

[41] Rockstar Transaction License Termination Agreement, s. 2.02 (TR21508).

the license terminations would have no impact on allocation of the proceeds from the Residual IP Sale among the Estates.[42]

64.     As a result of the Business Sales and the Residual IP Sale, there is approximately $7.3 billion in Sale Proceeds to be allocated to the Debtor Estates for distribution to Nortel's Creditors.

---

[42] Affidavit of Sharon Hamilton sworn April 11, 2014, para. 100; Reply Affidavit of Sharon Hamilton sworn April 25, 2014, paras. 46-47.

## PART III – OWNERSHIP ALLOCATION

### A. NNL Should Be Allocated the Substantial Majority of the Sale Proceeds Based on Its Ownership of the NN Technology

**1)     NNL Owned the NN Technology Under the MRDA**

**a.     The Governing Law is Ontario**

65.     Ontario law governs all aspects of the interpretation of the MRDA pursuant to Article 14(f).[43] This includes whether NNL is the owner of the NN Technology, the scope of the Licenses, and the right to transfer the Licenses or sublicense them.

66.     Ontario courts rigorously enforce choice of law provisions,[44] and have applied Ontario law when sitting in *CCAA* proceedings to determine contractual ownership of foreign IP rights.[45] U.S. federal courts apply state law when determining the ownership of IP rights,[46] or the interpretation of patent assignments, licenses and the scope of the rights they create.[47] Since Ontario is the governing law identified in the MRDA, it is the applicable "state" law here.[48]

67.     Further, the application of Ontario law is common ground among the Core Parties.  No pleading states that any law other than Ontario governs the construction or legal effect of the

---

[43] All references to MRDA Article numbers herein are to those set forth in the consolidated MRDA attached as Appendix B hereto .

[44] *405341 Ontario Ltd. v. Midas Canada Inc.*, 2010 ONCA 478 at paras. 40-45; *Allen v. Aspen Group Resources Corp.* (2009), 67 B.L.R. (4th) 99 (Ont. S.C.J.) at paras. 102-104.

[45] *Verdellen v. Monaghan Mushrooms Ltd.*, 2011 ONSC 5820 at paras. 1, 27-31. See also: *Fruit of the Loom, Inc. v. Chateau Lingeries Mfg. Co.* (1982), 63 C.P.R. (2d) 51 (F.C.T.D.) at paras. 4-5, *aff'd*, (1983), 78 C.P.R. (2d) 194 (F.C.A.); *TR Technologies Inc. v. Verizon Communications Inc.*, 2011 ABQB 390 at paras. 49-50.

[46] *StoneEagle Services, Inc. v. Gillman*, 2014 U.S. App. LEXIS 5510, at 8 (Fed. Cir.). See also: *Davies Warehouse Co. v. Bowles*, 321 U.S. 144, at 155 (1944); *Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, at 378 (1977).

[47] *Rhone Poulenc Agro, S.A. v. Dekalb Genetics Corp.*, 284 F.3d 1323, at 1327-1328 (Fed. Cir. 2002), *cert. denied*, 539 U.S. 957 (2003); *Board of Regents of University of Nebraska v. BASF Corp.*, 2007 WL 3342406, at 11-12 (D. Neb.); *Alfred E. Mann Foundation for Scientific Research v. Cochlear Corp.*, 604 F.3d 1354, at 1359 (Fed. Cir. 2010); *HydroFlame Production, L.L.C. v. HyrdoFlame Technologies, L.L.C.*, 2011 WL 1468360, at 3 (E.D. La.).

[48] *International Nutrition Co. v. Horphag Research Ltd.*, 257 F.3d 1324, at 1329-1330 (Fed. Cir. 2001); *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, at 1341 (Fed. Cir. 2001), *cert. denied*, 535 U.S. 906 (2002) ("*We... interpret the licensing agreement under the law governing the agreement, here Ontario law*"). See also: *J.S. Alberici Const. Co., Inc. v. Mid-West Conveyor Co., Inc.*, 750 A.2d 518, at 520 (Del. 2000).

MRDA, including its application to ownership or licensing of the IP,[49] and no Core Party filed any expert evidence of non-Ontario law on this issue. Instead, the only expert legal evidence on these issues are reports addressing them from the perspective of *Ontario* law.[50] The totality of the pleadings and evidence before the Courts thus gave notice that the applicable law is that of Ontario. Since both Ontario[51] and U.S.[52] courts require that parties give notice of foreign law where they intend to invoke it, the MRDA issues should be decided pursuant to Ontario legal principles.

**b.    The MRDA Confirms NNL's Ownership**

**i.    NNL Held Title to the NN Technology**

68.    The Ontario Court of Appeal summarized the proper approach to contractual interpretation in the following frequently cited passage:

> …[A] commercial contract is to be interpreted,
>
> > (a) as a whole, in a manner that gives meaning to all of its terms and avoids an interpretation that would render one or more of its terms ineffective;

---

[49] The pleadings instead reference foreign law on other issues, such as valuation methodology, allocation methodology, debtor priorities, reviewable transactions and interest rates: U.S. Debtors' Pleading, pp. 19-25; U.S. Debtors' Response, pp. 6-8, 22, 25, 30-31; Wilmington Pleading, para. 13; Wilmington Response, para. 5; Bondholder Group's Pleading, paras. 17-26; Bondholders' Response, paras. 41, 55-59, 62, 67-68. It is true the EMEA Debtors' Pleading at para. 58 reserves the EMEA Debtors right to rely on undefined foreign laws with respect to its trust and proprietary estoppel claims, and the EMEA Debtors' Response at para. 29 refers to the laws of undefined foreign jurisdictions in regard to whether NNL's ownership under the MRDA can be disregarded if it is found to exist, but they do not challenge the application of Ontario law to the question of ownership under the MRDA..

[50] Bereskin Rebuttal Report dated February 28, 2014; Stratton Rebuttal Report dated February 28, 2014.

[51] *Wotherspoon v. Canadian Pacific Ltd.* (1981), 20 C.P.C. 72 (Ont. C.A.) at para. 13 (QL); *Slegers v. Sullivan* (2009), 84 C.P.C. (6th) 156 (Ont. S.C.J.) at paras. 13-15; *IPEX Inc. v. Lubrizol Advanced Materials Canada Inc.*, 2012 ONSC 2717 at paras. 28-29, *leave to appeal refused*, 2012 ONSC 5382. The Ontario courts also require that foreign law be proven by *expert evidence*, which no party has done here in relation to non-Ontario law: *Lear v. Lear* (1975), 5 O.R. (2d) 572 (C.A.) at paras. 8-11 (QL); *CPU Options, Inc. v. Milton et al.* (2006), 79 O.R. (3d) 365 (S.C.J.) at paras. 21-23.

[52] Fed. R. Civ. P. 44.1. See also: *McNeilab v. Scandipharm*, 862 F.Supp 1351, at 1355 (E.D.Pa. 1994), *aff'd in part and rev'd on other grounds*, 95 F.3d 1164 (Fed. Cir. 1996); *Bel-Ray Co., Inc. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, at 440-441 (3d Cir. 1999).

(b) by determining the intention of the parties in accordance with the language they have used in the written document and based upon the "cardinal presumption" that they have intended what they have said;

(c) with regard to objective evidence of the factual matrix underlying the negotiation of the contract, but without reference to the subjective intention of the parties; and (to the extent there is any ambiguity in the contract),

(d) in a fashion that accords with sound commercial principles and good business sense, and that avoid a commercial absurdity.[53]

69.    It is clear from the words used in the MRDA that the parties intended to and did transfer ownership of the Nortel IP to NNL.  Article 4(a) provides:

[4](a) Except as otherwise specifically agreed, *legal title to any and all NN Technology* whether now in existence or acquired or developed pursuant to the terms of this Agreement *shall be vested in NNL*. In consideration therefor, NNL agrees to enter into an Exclusive License and a Non-Exclusive License with each of the Licensed Participants as set forth in Article 5. [*emphasis added*]

70.    This provision created a full and immediate assignment of all NN Technology to NNL, and no Core Party has asserted otherwise.

71.    Instead, the U.S. Debtors and UKPC argue that because Article 4(a) grants NNL "legal" title to the NN Technology, NNL only acquired "bare" ownership.[54]  But as the Ontario Court of Appeal said in *The Plan Group*:

…[E]ach word in an agreement is not to be "placed under the interpretative microscope in isolation and given a meaning without regard to the entire document and the nature of the relationship created by the agreement." Courts should not strain to dissect a written agreement into isolated components and then interpret them in a way that - while apparently logical at one level - does not make sense given the overall wording of the document and the relationship of the parties.[55]

---

[53] *Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust*, 2007 ONCA 205 at para. 24.  See also: *Lauren International, Inc. v. Reichart*, 2008 ONCA 382 at para. 16, *leave to appeal refused*, [2008] S.C.C.A. No. 327; *3869130 Canada Inc. (c.o.b. I.C.B. Distribution 2001) v. I.C.B. Distribution Inc.*, 2008 ONCA 396 at para. 31; *The Plan Group v. Bell Canada*, 2009 ONCA 548 at para. 37; *Williams-Sonoma Inc. v. Oxford Properties Group Inc.*, 2013 ONCA 441, at para. 27, footnote 1.

[54] U.S. Debtors' Response, pp. 3 and 7 (footnote 4) and 11-12; UKPC's Response, para. 5.

[55] *The Plan Group v. Bell Canada*, 2009 ONCA 548 at para. 38, *emphasis added*. See also: *Eli Lilly & Co. v. Novopharm Ltd*, [1998] 2 S.C.R. 129 at para. 52.

72.     There are several factors here which demonstrate that the MRDA, and Article 4(a) in particular, was intended to provide NNL with full ownership of the NN Technology.

73.     *First*, the words "legal title" are consistent with a grant of ownership.  As stated by Canada's leading patent commentator:

> … *An assignment is a transfer of a right leaving nothing in the grantor qua* that right and bestowing on the grantee the whole of the legal interest in that right.  By an assignment the assignee stands completely in the place and stead of the assignor.  *The essential element of an assignment is that it transfers the legal*, as distinguished from the equitable, *title to that part of the patent…*[56]

74.     *Second*, nothing in Article 4(a) suggests an intent to limit the scope of the grant.[57]  That is significant given s. 5(3) of Ontario's *Conveyancing and Law of Property Act*:

> [5](3) *Where no words of limitation are used, the conveyance passes all the estate, right, title, interest, claim and demand that the conveying parties have* in, to, or on the property conveyed, or expressed or intended so to be, or that they have power to convey in, to, or on the same.[58]

75.     This provision applies to the MRDA in light of the Ontario governing law clause in Article 14(f).[59]  Further, s. 5(3) is part of the context within which the MRDA was negotiated and drafted, and reflects the common law position regarding assignments of IP.[60]  Against this backdrop, the parties would have used different words than they did had they intended to effect only a limited transfer of rights through Article 4(a).

---

[56] H.G. Fox, *Canadian Law and Practice relating to Letters Patent for Inventions*, 4th ed. (Toronto: Carswell, 1969) at 284, *emphasis added.*

[57] Stratton Deposition, 104:11-104:16.

[58] *Conveyancing and Law of Property Act*, R.S.O., c. C-34, s. 1(1), *emphasis added.*  Section 1(1) of the statute defines "property" to include "personal property", which therefore encompasses patents, copyrights and other intellectual property: *Robertson v. Thomson Corp.* (2001), 15 C.P.R. (4th) 147 (Ont. S.C.J.) at para. 25, *aff'd* ,(2004), 72 O.R. (3d) 481 (C.A.), *var'd*, [2006] 2 S.C.R. 363; *Tucows.com Co. v. Lojas Renner S.A.*, 2011 ONCA 548 at paras. 62-66, *leave to appeal refused*, [2011] S.C.C.A. No. 450.

[59] *General Refractories Co. of Canada*, [2002] O.J. No. 54 (S.C.J.) at para. 101; *405341 Ontario Ltd. v. Midas Canada Inc.*, 2010 ONCA 478 at paras. 40-45.

[60] *Re Beard and Scott's Patent* (1928), 45 R.P.C. 31 (Eng. Ch. D.) at 34-35.

76.    *Third*, the MRDA as a whole creates several rights and obligations that reflect NNL's status as the owner of NN Technology under Article 4(a):

(a)    NNL is made the administrator of the MRDA (Article 3(b));

(b)    NNL has the exclusive right to file and prosecute applications for patents, copyrights and other NN Technology in every country of the world (Article 4(d));

(c)    NNL's title to the NN Technology continues to vest in it regardless of any expiry or termination of the MRDA, or the retirement of any LP (Articles 9(c) and 11(e));

(d)    NNL has the power to grant Licenses to new MRDA Participants (Article 10(b));[61]

(e)    the LPs are required to execute any documents necessary to perfect NNL's title (Article 4(b)); and

(f)    NNL is owed confidentiality and indemnity obligations from the LPs regarding the NN Technology, but the LPs are not reciprocally owed such obligations from NNL (Articles 6(a), 6(b) and 7(b)).

77.    *Fourth*, the objective evidence of the factual matrix is telling.  NNL is the parent company of all the LPs, and a significant portion of the Nortel group's global support activities (e.g., executive leadership, finance, legal and insurance) were located with it.[62]  Further, Nortel's R&D efforts, which were the primary driver of Nortel's value and profit, were based in Canada,

---

[61] See: Weisz Deposition, 70:9-70:13 ("*Q. Were you aware of any party who granted licenses for the use of that intellectual property other than NNL? ... A. I am not aware of any other parties*").

[62] Affidavit of Peter Currie sworn April 11, 2014, para. 35; Green Primary Report dated January 24, 2014, p. 18.

with approximately half of all Nortel patents originating there.[63]   Indeed, it was NNL that developed the digital switching technology which led to the creation of modern Nortel, and NNL has been continuously assigned virtually all Nortel IP since the 1970s.[64]

78.    It therefore makes eminent sense that NNL would be granted ownership of the NN Technology under the MRDA.[65]   As the head Nortel operating company, NNL required ownership in order to control the use of the NN Technology, settle differences between subsidiaries and licensees, determine the strategic direction of R&D, and enter into licensing and cross-licensing arrangements with third parties.[66] This centralized IP ownership and licensing structure is typical of multinational corporate groups.[67]

79.    Moreover, absent the vesting of full ownership in a single entity like NNL, the MRDA licensing structure would be unworkable.  If each LP retained ownership of the NN Technology they created, no other LP could make and exploit Nortel Products involving that NN Technology

---

[63] Affidavit of Angela de Wilton sworn April 11, 2004, paras. 13-14; Affidavit of Brian McFadden sworn April 10, 2014, paras. 15-18, 23, 27-28; Affidavit of Clive Allen sworn April 11, 2014, para. 15; Affidavit of Peter Currie sworn April 11, 2014, paras. 113, 117; Reply Affidavit of Brian McFadden sworn April 25, 2014, paras. 3, 12; Reply Affidavit of Paviter Binning sworn April 24, 2014, para. 7; Reply Affidavit of Sharon Hamilton sworn April 25, 2014, para. 17; Britven Rebuttal Report dated February 28, 2014, p. 29, Table 4; Green Primary Report dated January 24, 2014, p. 23; Malackowski Rebuttal Report dated February 28, 2014, p. 40, Table 12; Bazelon Primary Report dated January 24, 2014, p. 18; Dadyburjor Deposition, 41:5-41:18; Ryan Smith Deposition, Vol. 2, 296:21-296:25; 297:1-297:7; Roese Deposition, Vol. 1, 49:17-49:21; Mumford Deposition, 32:10-32:18, 100:20-100:25, 101:1-101:14. See also: Briard Deposition, 101:15-101:24; 34:24-34:25; 35:1-35:9; 39:12-39:14 (agreeing that "*the amount of R&D that was done in North America... was multiple multiples of what was done in Europe*"); Edwards Deposition, 61:12-61:18 ("*Q. Was there a particular occasion where you would get the best shock and awe from? A. Canada was usually a good place to go, particularly Ottawa. Q. Why was that? A. Just the scale and magnitude of the facilities and the demonstration capability there*").

[64] Affidavit of Angela de Wilton sworn April 11, 2004, paras. 8-12; Affidavit of Clive Allen sworn April 11, 2014, paras. 19, 27. See also: MacLean Deposition, 228:24; 229:2 ("*[A] lot of the original ones that the company was based on that we grew out of were all done in Ottawa*").

[65] Veschi Deposition, 170:12-170:15 ("*Q. ... From your point of view setting up a licensing business, it was important that one entity owned them? A. I think that's the ideal. I think in particular that the business units not own them*").

[66] Affidavit of Clive Allen sworn April 11, 2014, paras. 27, 35. ("*NNL could not operate an international business dealing with wholly-owned subsidiaries,* partially-owned subsidiaries and affiliates, partnerships, joint ventures or otherwise, as well as unrelated third parties, *if it did not have ownership and control of the Technology and the ability to manage the Technology throughout the world and exercise its ownership rights as it saw fit*").

[67] Affidavit of Paviter Binning sworn April 10, 2014, para. 10.

without cross-licenses from the LPs.  The fact that the MRDA does not create a cross-licensing regime, but rather one in which all Licenses are granted by NNL, shows that the parties intended to vest the full bundle of rights to the NN Technology in NNL.

### ii.    The LPs Did Not Have Equitable/Beneficial Ownership of the NN Technology

80.    Despite NNL's clear ownership rights under the MRDA, the U.S. and EMEA Debtors, Bondholder Group and UKPC assert that the LPs were "equitable" or "beneficial" owners of the NN Technology.[68]  This argument is based almost entirely on the 2nd recital of the MRDA:

> WHEREAS each Licensed Participant held and enjoyed *equitable and beneficial ownership of certain exclusive rights under NT Technology for a Specified Territory pursuant to the Amended Research and Development Cost Sharing Agreement* entered into on January 1, 1992, and it is the intent of NNL and the Licensed Participants that *the Licensed Participants continue,* as of the effective date of this Agreement, *to hold and enjoy such rights*; [*emphasis added*]

81.    This recital cannot override the operative provisions of the MRDA discussed above, which unambiguously grant NNL ownership of the NN Technology.  Nor can it be used to insert words into those operative provisions which alter or create ambiguity about NNL's ownership.  As the Ontario Court of Appeal held in *Elliott*:

> ...[A] recital is not a necessary part of a document and its use in the interpretation of the document as a whole is strictly limited. ...[T]he qualifying condition for the use of a recital in the interpretation of the operative parts is that there must be ambiguity in the operative parts... It is essential, however, that the construction to be placed upon the operative part in the light of the recital be a construction which the words themselves of the operative part are capable of bearing. *Where, however, the operative parts of a document, due to the lack of appropriate words, are incapable of a construction which will fulfil the intention expressed in recitals, the recital may not be used* for the purpose of reading into the operative clause a meaning which it is incapable of conveying when considered by itself.
> ...
> ... *Resort to the recitals may not be had to clear up the vagueness and to incorporate*

---

[68] U.S. Debtors' Pleading, pp. 11-12; EMEA Debtors' Pleading, paras. 50, 53-54, 57, 79; Bondholder Group's Response, paras. 4 and 20; EMEA Debtors' Response, paras. 27, 31, 33; UKPC's Response, paras. 5-16.

*words which it would be necessary to insert* in order that those clauses expressed the agreement of sale and purchase sought to be found in them...[64]

82.     Further, the 2nd recital must be read in the context of the MRDA and the parties' relationship as a whole.[65]   The 1992 Amended Research and Development Cost Sharing Agreement ("CSA") referred to in the 2nd recital sheds light on the recital's meaning.  As with Article 4(a) of the MRDA, Article 4 of the CSA confirmed that legal title to all NN Technology was vested in NNL.  And under Article 5 of the CSA, NNL only granted the parties to the CSA exclusive field of use licenses in prescribed territories.  Thus, the 1992 CSA between NNL and NNI stated:

> [5] ... Northern Telecom... hereby grants to Participant an exclusive royalty-free license, including the right to sublicense, which, except as hereinafter provided, shall be in perpetuity to make, have made, use, lease and sell Products embodying NN Technology in and for the United States, and to all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith.[66]

83.     No provision of the CSAs said that NNL granted the LPs "equitable and beneficial ownership of certain exclusive rights under NT Technology"; indeed, there was no reference to equitable or beneficial rights in the CSAs at all.  Accordingly, when the 2nd recital to the MRDA states that "the Licensed Participants *continue*, as of the effective date of this Agreement, to hold and enjoy such rights" arising "pursuant to the [CSA]", it can only be referring to their exclusive licenses themselves.

84.     This is demonstrated by Article 5(a) of the MRDA, pursuant to which the *exclusive* licenses of the LPs are not granted but *continued*, without reference to any specific date:

---

[64] *Re Elliott Estate*, [1962] O.J. No. 164 (C.A.) at paras. 11, 13, *aff'd*, [1963] S.C.R. 305, *emphasis added*. See also: *PUC Distribution Inc. v. Brascan Energy Marketing Inc.*, 2008 ONCA 176 at para. 31, *leave to appeal refused*, [2008] S.C.C.A. No. 217 ("*This elevation of a recital to a mutual promise or operative provision* was material to the interpretation reached by the appeal judge. With respect, that approach *was in error*").

[65] *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 at para. 63; *Merck & Co v. Apotex Inc.*, 2010 FC 1265, at para. 51-54, *aff'd*, 2011 FCA 363, *leave to appeal refused*, [2012] S.C.C.A. No. 82.

[66] NNL entered into similar CSAs with the other LPs: Affidavit of Clive Allen sworn April 11, 2014, para. 28.

[5](a) To the extent of its legal right to do so, and subject to the rights of relevant third parties, NNL hereby:

> (i) *continues to grant* to each Licensed Participant an *exclusive, royalty-free license*… [*emphasis added*]

85.     By contrast, Article 5(b) of the MRDA states that the LPs *non-exclusive licenses* – which unlike the exclusive licenses were not previously granted under the CSA – are *granted* rather than continued, as of January 1, 2009:

> [5](a) To the extent of its legal right to do so, and subject to the rights of relevant third parties, NNL hereby:
> …
> (ii) *grants* to each Licensed Participant, *as of January 1, 2009* (the "Non-Exclusive License Effective Date"), a *non-exclusive, royalty-free license*… [*emphasis added*]

86.     Therefore when the words of the 2nd recital are read alongside the operative provisions of the MRDA, it is clear that the reference to the LPs' "equitable and beneficial ownership of certain *exclusive* rights … pursuant to the [CSA]" being "*continue[d]*" is simply a reference to the exclusive licenses that are continued under Article 5(a).[69]

87.     Indeed, the equitable and beneficial ownership referred to in the 2nd recital is of "*certain exclusive rights* under NN Technology for a *Specified Territory*"; it is not ownership of the NN Technology itself.  This reference to exclusive rights logically refers to the exclusive licenses granted by the CSA.  That is supported by the 2nd recital referring to the LPs' rights "*under*" and not "*in*" NN Technology.[70]  As held in *Insituform*:

> The defendants' submission was that an exclusive licence is a right in a patent... *I do not agree that a licence is a right in a patent; it is a right under a patent*…[71]

---

[69] This is acknowledged in the Bondholder Group's Response, para. 20.

[70] The UKPC's expert admitted that he overlooked this language in his Report: Stratton Deposition, 74:2-74:25, 75:2-75:15.

[71] *Insituform Technical Services v. Inliner UK*, [1992] R.P.C. 83 (Ch. D.) at 105, *emphasis added*.

88.    Indeed, if the LPs had beneficial ownership to the NN Technology, they would not have required a license from NNL.

89.    Contrary to the argument of the UKPC,[72] the 2008 Memorandum of Understanding between the MRDA Participants confirms that the reference to "equitable and beneficial ownership of certain exclusive rights" in the 2nd MRDA recital is simply a recognition of the continuation of the LPs' CSA Licenses in Article 5(a)(i):

> 2. … *The 1992 Agreement* was a cost sharing agreement under which NNL, as consideration for the Participant's sharing of costs of research and development, *granted to the Participant an exclusive, perpetual. royalty-free license…* Notwithstanding the termination of the 1992 Agreement, the fully vested and fully paid rights of each Licensed Participant in and to the NN Technology (as defined therein) granted under the 1992 Agreement survived the termination of the 1992 Agreement, and *each Licensed Participant continues to hold such exclusive rights, as stated in the recitals to the 2004 Agreement* [the MRDA]. [*emphasis added*]

90.    The UKPC and EMEA Debtors also rely upon a recital in the 2nd Addendum to the MRDA, which states that "each Participant holds and enjoys equitable and beneficial ownership of NN Technology".[73]    However, this recital is ambiguous and inconsistent with the 2nd MRDA recital, since it extends beyond the "*Licensed* Participants" to every "*Participant*", a defined term which includes NNL.  Further, the 2nd Addendum does not state that this recital forms part of the MRDA recitals, much less its operative terms, so it is excluded from the MRDA by the entire agreement clause in Article 14(d).[74]    Had the parties intended the recital to be part of the MRDA, they would have made this explicit, as they did in the operative provisions (Article II) of the very same Addendum (where they amended a different MRDA recital directly).

91.    Nor do the exclusive licenses themselves create equitable or beneficial ownership of the NN Technology.  The Anglo-American courts have recognized that a license is not equivalent to

---

[72] UKPC's Response, para. 9.

[73] UKPC's, para. 8; EMEA Debtors' Pleading, para. 54.

[74] *Caisse Populaire de Maillardville Credit Union v. Spraggs*, 1989 CarswellBC 1063 (C.A.) at paras. 6-8.

the assignment of a property right for over 300 years.[75]  In *Euro-Excellence*, the Supreme Court

of Canada stated:

> *This case turns on the nature and scope of an* exclusive licensee's rights *under the Copyright Act.* ...
>
> *Under the common law, a licensee does not enjoy property rights*: "A licence is merely a permission to do that which would otherwise amount to trespass"... *In contrast, an assignee receives a property interest* from the original owner and steps into the shoes of the owner with respect to those rights assigned. As the recipient of a property interest, the assignee enjoys a right against the world, including the right to sue others (including the assignor) in trespass. *The licensee's rights, on the other hand, are contractual,* and the licensee is empowered only to sue the owner for breach of contract; it cannot sue in trespass...[76]

92.     Bruce Stratton, an Ontario IP lawyer put forward by the UKPC as an expert, admitted on

his deposition that he did not cite *Euro-Excellence* in his Report.[77]  In his report, Mr. Stratton

suggests that the following comments which the Supreme Court quoted in *Eli Lilly* mean that an

exclusive license creates a beneficial proprietary interest:[78]

> ... But a licence is a grant of a right and does not merely confer upon the licensee a mere interest in equity. A licence is the transfer of a beneficial interest to a limited extent, whereby the transferee acquires an equitable right in the patent. *A licence prevents that from being unlawful which, but for the licence, would be unlawful; it is a consent by an owner of a right that another person should commit an act which, but for that licence,*

---

[75] *Thomas v. Sorrell* (1672), Vaughan 330, 124 E.R. 1098 at 1109 ("A dispensation or *licence properly passeth no interest, nor alters or transfers property in any thing,* but only makes an action lawful, which without it had been unlawful"). See also: *Electric Chain Co. of Canada v. Art Metal Works Inc.,* [1933] S.C.R. 581 at 7-8 (QL); *Armstrong Cork Canada v. Domco Industries Ltd.,* [1982] 1 S.C.R. 907 at paras. 15, 28-29; Stratton Deposition, 118:18-118:25; 119:2-119:22; 124:16-124:25; 125:2-125:12.

[76] *Euro-Excellence Inc. v. Kraft Canada Inc.,* [2007] 3 S.C.R. 30, at paras. 26-27 (and para. 16).  It is true that the Court went on to note that an exclusive copyright licensee possesses a "limited proprietary interest" as a result of s. 13(7) of the *Copyright Act,* R.S.C., 1985, c. C-42, but the Court clarified that "[t]he owner-licensor retains a residual ownership interest in the copyright" (para. 37), "exclusive licensees under our Act have a limited property interest in the copyright that falls short of ownership" (para. 48), and "the property interest so acquired is limited and does not include an interest that defeats the ownership interest of the licensor" (para. 34).  Therefore, any interest in the copyrights the LPs may have received under the MRDA is irrelevant to the ownership allocation issue.  Further, it is inapplicable to the patents, which formed the most valuable part of the NN Technology.

[77] Stratton Deposition, 126:8-126:23.

[78] Stratton Rebuttal Report dated February 28, 2014, paras. 28-29.

*would be an infringement of the right of the person who gives the licence. A licence gives no more than the right to do the thing actually licensed to be done.*[79]

93.    However, Stratton fails to cite the Supreme Court's own words immediately after this passage, which make clear that a licensee's rights are contractual:

> In other words, by the grant of a licence, the patentee grants to the licensee the right to act in a certain way *vis à vis* the patented article, a right which, but for the licence, the licensee would not enjoy. *The licensee's rights, however, are not necessarily equivalent to those of the patentee; rather, they are limited to, and qualified by, the express terms of the licence.*[80]

94.    Further, the passage which the Supreme Court quoted itself draws a distinction between the licensee and the "owner" of the IP.  As Stratton acknowledged:

> Q.   And if you look back at your report to the quote you provide from the *Eli Lilly* case, and it's in paragraph 28 of your report.
>
> A.   Yes.
>
> Q.   *Part of the portion you have underlined is "It is a consent by an owner of a right."* Do you see that?
>
> A.   *Yes.* …
> …
> Q.   … And *if we take that formulation and apply it to the grant of the license in Article 5 of the MRDA, who's filling the role of the owner granting the consent?*
>
> A.   *The NNL is granting the exclusive license* or the nonexclusive license to the other license participants.
>
> Q.   *As an owner?*
>
> A.   *Correct.*[81]

95.    Accordingly, while it is sometimes said that an exclusive licensee has a "beneficial interest" or an "equitable right" in the intellectual property licensed, under the law of Ontario,

---

[79] *Eli Lilly & Co. v. Novopharm*, [1998] 2 S.C.R. 129, at para. 49, *emphasis added.*.

[80] *Eli Lilly & Co. v. Novopharm*, [1998] 2 S.C.R. 129, at para. 49, *emphasis added.*

[81] Stratton Deposition, 134:11-134:18, 135:5-135:14, *emphasis added.*

that interest is contractual. It does not give to the licensee any of the ownership rights to the intellectual property licensed.

96.     Further, the MRDA contains several features which confirm that the LPs were only granted a contractual license right rather than an ownership interest in the NN Technology:

(a)     Article 13 provides that the MRDA does not create a fiduciary relationship (nor any partnership or joint venture), as would be the case if NNL held the NN Technology beneficially for the LPs;

(b)     the 7th recital indicates the parties' intent to enter into a "license agreement";

(c)     Article 1(e) defines the "Exclusive License" in Article 5(a)(i) as an "exclusive license" rather than an ownership right;

(d)     the LPs are defined in Article 1(g) as "Licensed Participants" and not another term suggesting a beneficial owner;

(e)     Article 4(a) says NNL grants the Licenses "in consideration" for the NN Technology, which is the language of a contract rather than a beneficial property grant;

(f)     Article 5 is titled "Grant of Licenses by NNL", and the wording of Article 5(a) refers to the grant as a "license";

(g)     the Licenses are described as being perpetual, yet there would be no need for any temporal rights if the LPs beneficially owned the NN Technology;

(h)     the restrictions in the MRDA on the LPs' uses of the NN Technology (e.g., the confidentiality obligations in Article 6) would not be present if they were beneficial owners, or would have at least apply reciprocally to NNL;

(i)    on termination or expiry of the MRDA, the LPs do not recover their NN Technology but only a fully paid up license, whereas NNL's ownership rights survive regardless of the reason for termination (Articles 9(b) and (c));

(j)    the LPs are not entitled to call for the return of their NN Technology upon an elective/forced retirement from the MRDA, but only receive a payment under Article 11(d), which is again inconsistent with beneficial ownership;

(k)    the rights granted to new Participants upon their entry into the MRDA do not include equitable or beneficial ownership of the NN Technology, but merely an "Exclusive License" pursuant to Article 10(b); and

(l)    the overall scheme of the MRDA, whereby each member transfers its NN Technology to NNL for the exclusive right to exploit Nortel Products in their Territories, is indicative of a license relationship.[82]

97.    Finally, the interpretation of the MRDA proposed by the U.S. and EMEA Debtors and the UKPC would create considerable uncertainty about the Participants' rights. If the MRDA granted beneficial ownership of the NN Technology, it is unclear which Participant would beneficially own which property in which jurisdiction(s).

98.    The Ontario Court of Appeal has consistently refused to interpret commercial agreements in a manner that would create uncertainty.  In *Oceanic*, Goudge J.A. stated:

> The position advanced by Denison... would mean that Oceanic would have placed its ongoing economic interest in this contract entirely in the hands of Denison and Greece. In my view, *if this were the shared intention of the parties, it would have been clearly expressed.*

---

[82] See: Affidavit of Clive Allen sworn April 11, 2014, para. 27 ("*NNL could not operate an international business dealing with wholly-owned subsidiaries*, partially-owned subsidiaries and affiliates, partnerships, joint ventures or otherwise, as well as unrelated third parties, *if it did not have ownership and control of the Technology and the ability to manage the Technology throughout the world and exercise its ownership rights as it saw fit*").

> *Commercial contracts are normally designed, at least in part, to maximize certainty.* In *Spooner Oils Limited v. Turner Valley Conservation Board*, [1933] S.C.R. 629 Duff C.J. addressed this principle…:
>
> …
>
>> … But to us it seems clear that, *if it had been intended* to incorporate, as one of the terms of the lease, a stipulation that all future regulations touching the working of the property should become part of the lease as contractual stipulations, *that intention would have been expressed, not inferentially, but in plain language.*[83]

99.     The position of the U.S. and EMEA Debtors, Bondholder Group and UKPC essentially reduces to the fact that, because the Licenses gave the LPs an *economic* interest in the NN Technology, they also gave them a beneficial *ownership* interest.[84]  But as Smith J. said when rejecting a similar submission in *Citicorp Trustee*:

> *What is sought to be done in this argument is to stretch the meaning of the words beneficial owner to someone who whilst they have no actual interest in a proprietary sense might have an interest in an economic sense.*
>
> …
>
> *The expression "economic interest" is too vague and will give great hostages to fortune and lead to uncertainty.* …[T]he arguments are that despite the lack of actual control because of the ultimate control by Ambac it is nevertheless a beneficial owner and therefore caught by the disenfranchisement provisions. Why should it be exercising economic control as opposed to Ambac? Is it the possible case that both of them are exercising control for economic interest? If so is there more than one beneficial owner? This demonstrates graphically how *departing from the traditional meaning of the words beneficial owner makes a potentially huge minefield of uncertainty.*[85]

100.    Further, for the reasons below, the Licenses did not grant the LPs an economic interest in the NN Technology that was equivalent to ownership.  Instead, the Licenses were subject to numerous limitations that significantly impaired their value in the Sales.

---

[83] *Oceanic Exploration Co. v. Denison Mines Ltd.* (1999), 127 O.A.C. 224 (C.A.) at para. 37-38, *emphasis added.* See also: *The Plan Group v. Bell Canada*, 2009 ONCA 548 at para. 31 ("*[C]ertainty in contract is an important policy value underlying the construction of contracts*"); *Skye Properties Ltd. v. Wu*, 2010 ONCA 499 at para. 101 ("*Such an interpretation makes little sense* from a policy perspective. *It would seriously undermine the important goal of promoting certainty in commercial transactions* of the kind at issue in this case").

[84] U.S. Debtors' Pleading, pp. 11-13; EMEA Debtors' Pleading, paras. 74-75; U.S. Debtors' Response, pp. 3, 9-24; EMEA Debtors' Response, para. 34; Bondholder Group's Response, paras. 19-21.

[85] *Citicorp Trustee Co. Ltd. v. Barclays Bank Plc*, [2013] EWHC 2608 (Ch. D.) at paras. 101 and 114, *emphasis added.*

### iii.    The Licenses Were Not Equivalent to Ownership

### A.    The Licenses Were Limited to a Field of Use

101.    The License grant is set out in Article 5(a) of the MRDA:

> [5](a) To the extent of its legal right to do so, and subject to the rights of relevant third parties, NNL hereby:
>
>> (i) continues to grant to each Licensed Participant an exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, *rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology* in and for the Exclusive Territory designated for that Licensed Participant, *and all rights to patents,* industrial designs (or equivalent) and copyrights, and applications therefore, and technical know-how, *as necessary or appropriate in connection therewith* ("Exclusive License"); and
>>
>> (ii) grants to each Licensed Participant, as of January 1, 2009 (the "Non-Exclusive License Effective Date"), a non-exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, *rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology* in and for the Non-Exclusive Territory, *and all rights to patents,* industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, *as necessary or appropriate in connection therewith* ("Non-Exclusive License"). [*emphasis added*]

102.    The Exclusive and non-Exclusive License grants have two arms:

>> (i) "*rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology*" [the "First Arm"]; and
>>
>> (ii) "*all rights to patents, industrial designs (or equivalent) and copyrights,* and applications therefor, and technical know-how, *as necessary or appropriate in connection therewith*". [the "Second Arm"] …

103.    As to the *First Arm*, it is limited to making or exploiting "Products" using or embodying

NN Technology.   This restricts the scope of the Licenses to a specific Field of Use.   By

definition, NNL, as the licensor, retains all rights to the intellectual property that is not granted to the licensee, including all intellectual property rights outside the Field of Use.[86]

104.    The term "Products" is defined in Article 1(g) as follows:

> [1](g) "Products" shall mean all products, software and services designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, at any time *by, or for, any of the Participants*, and all components, parts, sub-assemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in any of the foregoing. [*emphasis added*]

105.    Therefore, the only "Products" that can be made or exploited are those which have been created or marketed by or for the "Participants".   This means the Products must have been created or marketed by or for the *Nortel group*.   No other products can fall within this definition, including products developed by third parties, even if the products use or embody the NN Technology.   Article 10(a) states that a party may only join the MRDA as a "Participant" if it is an "Eligible Party", which is defined in Article 1(c) to mean an "*Affiliate of NNL*", and Articles 11(b) and 11(c)(ii) state that an LP "will automatically be terminated from participation in this Agreement" (and hence no longer be a "Participant") if it ceases to be an NNL Affiliate. "Participants" therefore mean Nortel group members who are party to the MRDA, and "Products" created or marketed by or for "Participants" therefore mean *products which are part of the business of Nortel*.[87]

106.    This Field of Use limitation is supported by several additional factors.

---

[86] As Bereskin testified: ("… *Whatever the licensor doesn't grant to a licensee, it holds those rights?* A. Correct."), Bereskin Deposition, 51:3-51:5, *emphasis added*.

[87] It is noteworthy that Article 5(a) permits the LPs to sublicense to third parties, but still only grants the LPs rights relating to "Products" that are created or marketed by or for the "Participants" (i.e., NNL Affiliates) – not by or for the "Participants *and any of their sublicensees*".   Had the parties intended the scope of the Licenses to be unlimited, they would not have restricted the Licenses to Participant Products, while in the very same provision recognizing that the Licenses may be sublicensed to non-Participants.   Instead, they would have either: (i) extended the Licenses beyond Participant Products to products developed by any party regardless of their NNL affiliation, or; (ii) not included any "Products" Field of Use limitation at all.

107. *First*, such limitations are a common feature of IP licenses, and are inherent in the concept of a license itself. As the Supreme Court of Canada said in *Eli Lilly*:

> … *The licensee's rights,* however, are not necessarily equivalent to those of the patentee; rather, they *are limited to, and qualified by, the express terms of the licence.*[88]

108. The *Eli Lilly* Court also accepted that not even an exclusive license should be interpreted as involving an unlimited transfer of rights:

> A licence, *even though exclusive*, does not give the licensee all the rights of the patentee. …[89]

109. *Second*, the manner in which the MRDA imposes the Field of Use is not uncommon. As Bereskin testified, a field of use limitation may be embodied in the clause that grants the license:

> Q. … the fact that [a field of use restriction] is not included in the definition section would not be -- would not mean that the licensor intended to grant everything to the licensee?
>
> A. Correct. *You would then have to look at the grant.*
>
> …
>
> Q. *And restrictions on the use that the licensee may make of the licensed property can be contained in the grant?*
>
> A. *Usually are.*[90]

110. This is illustrated by U.S. cases interpreting similar provisions as providing for a limited field of use. In *International Gamco*, the Court of Appeals for the Federal Circuit stated:

> …Gamco and IGT entered a new agreement regarding the rights under the patent. Gamco received rights characterized as an "exclusive license."…:
>
> > License. Gamco shall be granted and *IGT grants to Gamco the exclusive right and license, within the Territory, to make, use, sell, and offer to sell,* with the right to

---

[88] *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 at para. 49, *emphasis added*. See also Bereskin Deposition, 46:17-48:3.

[89] *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 at para. 49, *emphasis added*.

[90] Bereskin Deposition, 47:22-48:3, 48:17-48:20, *emphasis added*.

sublicense others to make, use, sell, and offer to sell *game system networks* covered by the '035 Patent…

… This November 2005 modification *defined the license "Territory" as "the lawful operation of lottery games* authorized by the New York State Lottery in the state of New York." …

…

In this case, *Gamco's exclusive enterprise license conveys* both a territorial license and *a field of use license.* Because the "Territory" of the license includes both geographic (the NYSL-authorized sites) and *field of use ("lottery games") restrictions,* Gamco's "exclusive" rights must meet both conditions. …

In this case, *Gamco's exclusive enterprise license limits its rights to lottery games, but the '035 patent extends beyond that limitation.* For example, a single infringing game system at an NYSL-authorized site could offer blackjack, keno, mahjong, and lottery games. Thus, the single infringing act of offering NYSL games *might subject the infringer to suit by Gamco for the lottery games, and separately by IGT or some other game-specific licensee for the other games. …*[91]

111.   Had the parties intended the LPs to receive a license to all NN Technology, art. 5(a) would have been drafted very differently. For instance, art. 5(a) could have provided that:

> To the extent of its legal rights to do so, and subject to the rights of third parties, NNL hereby:
>
> > (i) continues to grant to each Licensed Participant an exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, *of all rights in the NN Technology…*

112.   The fact that the MRDA is not framed in such terms, but in a way which only extends the Licenses to "Participant" Products shows that the parties did not intend for the LPs to have any rights beyond making and exploiting Nortel's own business products and marketing other products as part of its business.

113.   As to the *Second Arm*, it grants the LPs a license to use NNL's patents, industrial designs, copyrights and technical know-how "as necessary or appropriate in connection" with the making

---

[91] *International Gamco, Inc. v. Multimedia Games, Inc.*, 504 F.3d 1273, at 1275, 1279 (Fed. Cir. 2007), *emphasis added.* See also: *Nat'l Wastewater Sys. v. Smith*, 2011 U.S. Dist. LEXIS 47554, at 10, footnote 3 (W. D. Okla); *Bluestone Innovations LLC v. Nichia Corp.*, 2013 WL 1729814, at 1, 5 (N.D. Cal.).

or exploitation of Nortel Products, without exposing themselves to liability for IP infringement.[92] This formulation of the License has two key aspects to it.

114.    *First*, the IP that is licensed is limited to what is needed to make, use and sell Products – the License is only a license in the Field of Use.

115.    *Second*, to the extent that a patent or other IP was not used to make or exploit any Product, the patent or other IP would not be licensed to the LPs at all. Approximately 59-66% of the IP sold in the Residual IP Sale fell into this category.[93]    Technology companies such as Nortel routinely obtain patents that have claims to inventions which are not embodied in products they sell.    Their patent portfolios, like Nortel's, are generated by a desire for defensive and strategic reasons, to also obtain patents that have claims to inventions not embodied in products they sell.[94]

116.    In summary, the scope of the Licenses is highly limited by a carefully circumscribed Field of Use.

117.    The other Core Parties' arguments to the contrary rely heavily upon parol evidence and matters extraneous to the MRDA.[95]    However, the Supreme Court held that such evidence should be used sparingly when construing an IP licensing agreement in *Eli Lilly*:

---

[92] Stratton Deposition, 73:15-73:20, 67:7-67:20 ("Q. But you will agree with me that as part of the contract interpretation exercise, *the Court itself will have to give meaning to those words 'as necessary or appropriate in connection therewith.'* Correct? A. I believe so. *Yes*").

[93] Britven Primary Report dated January 24, 2014, para. 6.63; Berenblut and Cox Primary Report dated January 24, 2014, para. 50; McColgan Deposition, 141:18-141:24.

[94] Riedel Deposition, 134:11-134:25, 136:1-136:6; Roese Deposition, Vol. 2, 227:13-227:25, 228:1-228:14; McColgan Deposition, 59:5-59:17.

[95] Much of this evidence purports to speak directly to the subjective intentions of the MRDA parties, and is therefore clearly inadmissible under the parol evidence rule: see, e.g.: Declaration of Walter T. Henderson, Jr. dated April 11, 2014, paras. 55-56; Declaration of Michael Orlando dated April 11, 2014, paras. 23-26; Declaration of Mark Weisz dated April 11, 2014, paras. 9-14; Affidavit of Philippe Albert-Lebrun, undated, paras. 19-20, 28; Affidavit of Aylwin Kersey Stephens sworn April 11, 2014, paras. 15, 20, 44. Further, even if this evidence were admissible, it is contradicted by the evidence of other witnesses that NNL was understood to be the owner of all IP: Affidavit of Sharon Hamilton sworn April 11, 2014, para. 34; Reply Affidavit of Brian McFadden sworn April 25, 2014, paras. 5-6; Weisz Deposition, 70:7-70:8; Doolittle Deposition, 161:12-161:21; Sparagna Deposition, 206:24-206:25, 208:1-208:18; Ray Deposition, 87:4-87:14.

*... The contractual intent of the parties is to be determined by reference to the words they used in drafting the document*, possibly read in light of the surrounding circumstances which were prevalent at the time. *Evidence of one party's subjective intention has no independent place in this determination.*

*Indeed, it is unnecessary to consider any extrinsic evidence at all when the document is clear and unambiguous on its face. ...*

...

...[I]t cannot properly be said, in my view, that the supply agreement contains any ambiguity that cannot be resolved by reference to its text. *No further interpretive aids are necessary.*[96]

118.    The U.S. Debtors' submission that it would not be "reasonable" to give effect to the Field of Use limitation in the MRDA was also rejected in *Eli Lilly:*[97]

When there is no ambiguity in the wording of the document, *the notion in Consolidated-Bathurst that the interpretation which produces a "fair result" or a "sensible commercial result" should be adopted is not determinative.* Admittedly, it would be absurd to adopt an interpretation which is clearly inconsistent with the commercial interests of the parties, if the goal is to ascertain their true contractual intent. However, to interpret a plainly worded document in accordance with the true contractual intent of the parties is not difficult, if *it is presumed that the parties intended the legal consequences of their words. ...*[98]

119.    Moreover, the concept of commercial reasonableness must be applied "objectively rather than from the perspective of one contracting party or the other".[99]    There is nothing commercially unreasonable about the Field of Use restriction from the perspective of an objective observer.    The Field of Use did not impair the ability of the LPs to carry out their businesses in designing, developing, manufacturing and marketing Products.

---

[96] *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 at paras. 54-55, 57 (and at paras. 58-60), *emphasis added*. See also: *Indian Molybdenum Ltd. v. The King*, [1951] 3 D.L.R. 497 (S.C.C.) at 502; *Forest Hill Real Estate Inc. v. Harvey Kalles Real Estate Ltd.*, 2010 ONCA 884 at para. 10; *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne*, 2012 ONCA 862 at para. 71, *leave to appeal refused*, [2013] S.C.C.A. No. 68 ("[W]hile *the factual matrix* can 'be used to clarify the parties' intentions as expressed in a written agreement, it *cannot be used to contradict that intention, create an ambiguity which otherwise does not exist in the written document, or have the effect of making a new agreement*'... Ultimately, *the words of the agreement are paramount*").

[97] U.S. Debtors' Response, p. 18.  See also: EMEA Debtors' Response, paras. 26-28; Bazelon Deposition, 195:17-195:25; 196:2, 200:14-200:20, 205:2-205:7.

[98] *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 at para. 56, *emphasis added*.

[99] *Kentucky Fried Chicken Canada v. Scott's Food Services Inc.* (1998), 114 O.A.C. 357 (C.A.) at para. 27.

120.    Even if the MRDA is unreasonable or unfair from the perspective of the U.S. and EMEA

Debtors, which is denied, that has no bearing upon its legal effect.  As the Supreme Court of

Canada held in *Jedfro*:

> …[T]he general rule [is] "that *it is not the function of the court to rewrite a contract* for
> the parties. *Nor is it their role to relieve one of the parties against the consequences of an
> improvident contract*"…[100]

### B.    The Licenses Were Not Transferrable By the LPs

121.    The LPs also had little if any ability to monetize their limited rights under the Licenses

since they could not be transferred to third parties unilaterally.

122.    The very structure of the MRDA makes clear that the LPs could not unilaterally transfer

their Licenses. The MRDA is an intercompany agreement between NNL and the LPs with

various rights and obligations.   Under the MRDA, the LPs are required to conduct R&D

(Article 3), to vest ownership of all IP resulting from R&D in NNL (Article 4) and to make profit

sharing payments pursuant to the RPSM (Schedule A). Article 10(a) requires unanimous consent

of the Participants, including NNL, for the admission of an Eligible Party as a Participant to the

MRDA.

123.    The Licenses granted by NNL to the LPs were personal contractual rights, having been

granted only to NNL Affiliates.  They could not be assigned without NNL's consent.[101]   Article

14(a) of the MRDA makes the prohibition on assignment explicit by precluding a unilateral

assignment of the "Agreement", including the Licenses created under it:

---

[100] *Jedfro Investments (U.S.A.) Ltd. v. Jacyk*, [2007] 3 S.C.R. 679 at 34, *emphasis added*.

[101] *Rodaro v. Royal Bank of Canada* (2002), 59 O.R. (3d) 74 (C.A.) at 33 (QL). See also, in the IP context:
*Merchandising Corp. of America Inc. v. Harpbond Ltd.*, [1983] F.S.R. 32 (Eng. C.A.) at 37; *Devefi Pty Ltd. v.
Mateffy Perl Nagy Ptd Ltd.*, (1993), 113 A.L.R. 225 (F.C.A.F.C.) at 234; H.G. Fox, *Canadian Law and Practice
relating to Letters Patent for Inventions*, 4th ed. (Toronto: Carswell, 1969) at 287; T. Terrell, *Terrell on the Law of
Patents*, 17th ed. (London: Sweet & Maxwell, 2011), at 16-11 and 16-58.

[14](a) This Agreement shall not be assigned by any Participant except with the written consent of each of the other Participants.[102]

124.    An attempted assignment of the Licenses would be a breach of art. 14(a):

> … *An attempted assignment of contractual rights in breach of a contractual prohibition is ineffective* unless the prohibition is void as being contrary to public policy…[103]

125.    A similar principle applies under U.S. law:

> …[W]hat our case law recognizes is the "need for a uniform national rule that *patent licenses are personal and non-transferable in the absence of an agreement authorizing assignment.*" …[104]

126.    The U.S. Debtors argue that their sublicense right under Article 5(a) is the "functional equivalent" of a right of assignment.[105]  However, a purported sublicense that sought to transfer all of the LP's rights would be an attempt to do indirectly what the LP is prohibited from doing directly under Article 14(a).  It would also constitute a breach of that LP's contractual duty of good faith.[106]

---

[102] At para. 6 of their Response, the UKPC suggests that Article 14(a) also precluded the unilateral transfer of the NN Technology by NNL.  However, the NN Technology was not part of the "Agreement" but pre-existed it, and was merely transferred to NNL under Article 4(a).  By contrast, the Licenses are rights created by the Agreement itself.  Further, the NN Technology could be assigned by NNL independently of the MRDA, since "a patentee is fully entitled to assign his rights under the Letters Patent to another": *National Carbonising Co. v. British Coal Distillation Ltd.* (1936), 54 R.P.C. 41 (Eng. C.A.) at 56.

[103] *Imoney Corp. v. Quebecor Communications Inc.*, [2002] O.J. No. 4309 (S.C.J.) at para. 11, *emphasis added*. See also: *1124980 Ontario Inc. (c.o.b. Health-Care Pharmacy) v. Liberty Mutual Insurance Co.* (2003), 33 B.L.R. (3d) 206 (Ont. S.C.J.) at paras. 52, 99.  See also, in the IP context: *Hospital for Sick Children v. Walt Disney Productions*, [1968] Ch. 52 (C.A.) at 67, 71-72, 79; *Devefi Pty Ltd. v. Mateffy Perl Nagy Ptd Ltd.*, (1993), 113 A.L.R. 225 (F.C.A.F.C.) at 234; *Dorrans v. The Shand Partnership*, [2003] ScotCS 313 (O.H.) at para. 16; K.M. Garnett, *Copinger and Skone James on Copyright*, 16th ed. (London: Sweet & Maxwell, 2011), Vol. 1, at 5-205; 5-227.

[104] *General Mills, Inc. v. Kraft Foods Global, Inc.*, 487 F.3d 1368, at 1373 (Fed. Cir. 2007), *rehearing granted on other grounds*, 495 F.3d 1378 (Fed. Cir. 2007), *emphasis added*. See also: *In re Aerobox Composite Structures, LLC*, 373 B.R. 135, at 141 (Bankr. D. N.M. 2007) ("Federal patent law generally *prohibits assignment of both exclusive and non-exclusive license agreements absent consent* of the licensor").

[105] U.S. Debtors' Reply, p. 20.

[106] *GATX Corp. v. Hawker Siddeley Canada Inc.* (1996), 27 B.L.R. (2d) 251 (Ont. Gen. Div.)  at paras. 45, 57-73 (QL); *CivicLife.Com Inc. v. Canada (A.G.)* (2006), 215 O.A.C. 43 (C.A.) at paras. 49 and 51. See also: *Biosynexus, Inc. v. Glaxo Group Ltd.*, 2006 WL 624896, at 1, 3-6 (N.Y. Sup. Ct. 2006), *affirmative aspect of injunction vacated on other grounds*, 836 N.Y.S.2d 126, 127 (App. Div. 2007) ("*It makes no difference whether the parties call the agreement a license… If the agreement transfers "all substantial rights" to a patent, then it qualifies as an assignment*").

127.    Further, even if the LPs could transfer the Licenses through a sublicense, those rights would never have been broad enough to satisfy what a purchaser of the IP required.

128.    *First*, the sublicense could not grant any greater rights than those granted under the License itself, and would thus be limited to making or exploiting the "Products" of Nortel. The sublicensee could not use the sublicense to make or exploit competing products.

129.    *Second*, the sublicensee would not be an MRDA "Participant" given Articles 10(a) and 14(a) of the MRDA.[107]    Therefore, the sublicensee could not use the sublicense to develop new products for its own exploitation – as new Products can only be developed by or for a Participant.

130.    *Third*, no purchaser would buy a business based on an ongoing sublicense which was potentially terminable in an insolvency.

### C.    The Licenses Did Not Grant Unlimited Enforcement Rights

131.    The U.S. Debtors rely upon the enforcement rights in Article 4(e) of the MRDA when arguing that the Licenses conferred "economic owner[ship]" of the NN Technology:[108]

> [4](e) Licensed Participants have the right to assert actions and recover damages or other remedies in their respective Exclusive Territories for infringement or misappropriation of NN Technology by others.

132.    However, the enforcement rights are limited in two important respects.

133.    *First*, Article 4(e) does not itself confer any standing rights but is merely a contractual covenant that, as between the LPs and NNL, permits the LPs to bring infringement claims. Legal standing to bring such a claim arises solely under the applicable IP statute, which limits the right to sue to IP owners and those who acquire the requisite ownership and/or exclusive rights under IP licenses.  As the Federal Circuit Court of Appeals held in *Morrow*:

---

[107] Berenblut and Cox Rebuttal Report dated February 28, 2014, paras. 52-53.

[108] U.S. Debtors' Pleading, pp. 2, 15; U.S. Debtors' Reply, pp. 3, 9-13.

... As the Supreme Court stated in *Independent Wireless*, the right to bring an infringement suit is "to obtain damages for the injury to his exclusive right by an infringer." ... see also *Sicom*, 222 F.3d at 1381 ("*Standing to sue for infringement depends entirely on the putative plaintiff's proprietary interest in the patent, not on any contractual arrangements among the parties regarding who may sue ...*")[109]

134.    Therefore, Article 4(e) cannot enlarge the scope of the LPs' enforcement rights beyond those which arise by operation of law from their Licenses in Article 5(a)(i).  Because those Licenses are limited to a Field of Use, the enforcement rights and cannot exceed the Field of Use.[122]

135.    This is also reflected in the structure of the MRDA.[110]  The Article 4(e) covenant is not included within Article 5, "Grant of Licenses by NNL", but Article 4, "Legal Title to NN Technology".  It appears at the end of the following sequence of provisions:

(a)    Article 4(a), which grants NNL ownership of the NN Technology;

(b)    Articles 4(b) and (c), which impose obligations upon the LPs for the purpose of perfecting NNL's ownership rights; and

(c)    Article 4(d), which grants NNL the right to file and prosecute IP applications "in every country of the world" (which includes the Exclusive Territories).

---

[109] *Morrow v. Microsoft Corp.*, 499 F.3d 1332, at 1342 (Fed. Cir. 2007), *emphasis added*. See also: *Righthaven LLC v. Hoehn*, 716 F.3d 1166, at 1169 (9th Cir. 2013) ("*[T]he assignment of the bare right to sue for infringement, without the transfer of an associated exclusive right,* is impermissible under the *Copyright Act* and *does not confer standing to sue*"); *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, at 1381 (Fed. Cir. 2000). See also: *Century 21 Canada Limited Partnership v. Rogers Communications Inc.*, 2011 BCSC 1196 at paras. 176-179.

[122] *Independent Wireless Telegraph Co. v. Radio Corp. of America*, 269 U.S. 459 (1926); *Site Microsurgical Systems, Inc. v. Cooper Companies, Inc.*, 797 F.Supp. 333, 337 (D. Del. 1992); *Amgen, Inc. v. Chugai Pharmaceutical Co.*, 808 F. Supp. 894, at 899, 901 (D. Mass. 1992), *aff'd*, 52 F.3d 1026 (Fed. Cir.), *cert. denied*, 516 U.S. 907 (1995); *Wiav Solutions LLC v Motorola, Inc.*, 631 F.3d 1257, at 1266-1267 (Fed. Cir. 2010). See also: Bereskin Rebuttal Report dated February 28, 2014, para. 35 ("*... the scope of a licensee's enforcement rights are coextensive with the scope of its license*"); Stratton Rebuttal Report dated February 28, 2014, para. 43.

[110] *Barber v. Vrozos*, 2010 ONCA 570 at para. 123 ("*[T]he structure of the Wahta contract favours the interpretation placed on it by the trial judge*"). See also: *The Plan Group v. Bell Canada*, 2009 ONCA 548 at paras. 49-51.

136.    Viewed in this context, the purpose of Article 4(e) is simply an *inter partes* agreement that allows the LPs to exercise whatever enforcement rights they may have through operation of law without breaching the MRDA.  Had the parties intended to enlarge the scope of the LPs' Licenses to grant them the additional enforcement rights that may legally follow from this, they would not have done so in Article 4 (where NNL acquired its ownership rights). They would have needed to do it directly in Article 5, by substantially amending the License grant to remove the Field of Use limitation.

137.    The law is clear that, to the extent an exclusive licensee has sufficient license rights, it only has standing to sue for infringement *"within the area of exclusivity"*.[111]  As Young J. said in *Amgen*:

> It should be stressed, however, that *it is not enough that the Ortho-Amgen agreements grant Ortho certain exclusive rights. It is also necessary that the infringement have occurred within Ortho's "stated area of exclusivity."* 6 Chisum, Patents § 21.03[2][c] at 21-157. In other words, to be an exclusive licensee for purposes of this infringement action against Genetics, Genetics' adjudicated act of infringement *must have infringed on one of Ortho's exclusive rights...*[112]

138.    Therefore, to the extent the U.S. Debtors had any exclusive patent License grant in the Field of Use created by Article 5(a), they could only exercise their enforcement rights within that Field of Use.[113]  Further, even in relation to that limited area of exclusivity, to the extent it existed, the LPs could still not sue without joining NNL as a co-party:

---

[111] *Site Microsurgical Systems, Inc. v. Cooper Companies, Inc.*, 797 F.Supp. 333, at 337 (D. Del. 1992), *emphasis added*. See also: *Signalisation de Montréal Inc. v. Services de Béton Universels Ltée*, [1993] 1 F.C. 341 (C.A.) at para. 24 (QL), *leave to appeal refused*, [1993] S.C.C.A. No. 82; *Amfac Foods Inc. v. Irving Pulp & Paper, Ltd.* (1984), 80 C.P.R. (2d) 59 (F.C.), at p. 7(QL), *aff'd* (1986), 12 C.P.R. (3d) 193 (F.C.A.); *Patent Act*, R.S.C. 1985, c. P-4, s. 55(1); *Copyright Act*, R.S.C. 1985, c. C-42, s. 41.23(1).

[112] *Amgen, Inc. v. Chugai Pharmaceutical Co.*, 808 F. Supp. 894, at 901 (D. Mass. 1992), *aff'd*, 52 F.3d 1026 (Fed. Cir.), *cert. denied*, 516 U.S. 907 (1995), *emphasis added*.

[113] The U.S. debtors, in fact, did not even have requisite ownership and/or exclusivity to any patents in the NN Technology, as their exclusive rights related only to Nortel Products: *Mitutoyo Corp. v. Central Purchasing, LLC*, 499 F.3d 1284, at 1291 (Fed. Cir. 2007) ("[T]he pertinent question is whether MAC has the exclusive right to sell products made according to the '902 patent in the United States; *the exclusive right to sell only Mitutoyo's products made according to the '902 patent, however, is not a sufficient basis for standing*.").  Moreover, as they had no

> Under long-standing prudential standing precedent, *an exclusive licensee with* less than all substantial rights in a patent, such as *a field-of-use licensee, lacks standing to sue for infringement without joining the patent owner.* ...[114]

139.    This is evidenced by the fact that NNI joined NNL as a co-plaintiff in enforcement actions brought prior to the Nortel insolvency filings.[115]    Further, only NNL had the right to bring suits to enforce the NN Technology outside of the Field of Use.

140.    *Second*, Article 4(e) only permit the LPs to exercise their enforcement rights "in their respective Exclusive Territories".    Therefore, since NNL remains the owner of the NN Technology "[e]xcept as otherwise specifically agreed" under Article 4(a), the right to enforce the NN Technology everywhere else remains solely with it.

### D.    The Licenses Were Not "Perpetual" and "Royalty Free"

141.    The U.S. Debtors also make continuous reference to the Licenses as "perpetual" and "royalty-free" in asserting their economic ownership of the NN Technology.[116]    However, the Licenses were neither perpetual nor royalty free in the absolute sense they suggest.

142.    As to *perpetuity*, Article 5(a) of the MRDA makes clear that the ongoing nature of the Licenses is subject to the other provisions of the contract:

> [5](a) To the extent of its legal right to do so, and subject to the rights of relevant third parties, NNL hereby:
>
> > (i) continues to grant to each Licensed Participant an exclusive, royalty-free license, including the right to sublicense, which *except as hereinafter provided shall be in perpetuity…* [*emphasis added*]

---

license rights to between 59-66% of the Residual IP, they had no right to sue for an infringement of these patents. See: the discussion of the Rockstar Sale Proceeds below.

[114] *A123 Systems, Inc. v. Hydro-Quebec*, 626 F.3d 1213, at 1217 (Fed. Cir. 2010), *emphasis added.*

[115] Stratton Deposition, 107:19-114:14.

[116] U.S. Debtors' Pleading, pp. 2, 11 and 27-28; U.S. Debtors' Reply, pp. 5, 7, 11, 14-18, 24, 26 and 29.  See also: UKPC's Response, para. 14.

143.  Further, Article 11(c) states an LP will be automatically terminated from participation in the MRDA where:

> (a) it fails to perform any R&D Activity for two consecutive years (Article 11(c)(i));

> (b) it loses its status as an Affiliate of NNL (Article 11(c)(ii)); or

> (c) it breaches the MRDA or fails to perform a material obligation under it, and does not cure this within 60 days after receiving notice from another Participant (Article 11(c)(iii)).[117]

144.  Upon such automatic termination, Article 11(d) requires the LP to transfer or surrender its "rights in NN Technology", i.e., its License, in exchange for a cash payment:

> [11](d)(i) *In the event of an Elective or a Forced Retirement*, the retiring Participant consents, in advance, to *transfer all of its rights in the NN Technology* to NNL as of, and from, the Termination Date. In exchange for the Participant's transfer of its rights and obligations, such retiring Participant *accepts as full payment, its R&D allocation...*
> ...
> (iii) Notwithstanding Article 11(d)(i) and (ii), no Retiring R&D Allocation will be due to a retiring Participant for any year in which such Participant is subject to a Defaulting Event described in Article 11(c)(ii) through (iv) (individually, a "Special Default Event"). *In the case of any Special Default Event*, the retiring Participant agrees to *accept the Special Retirement Allocation as full payment for its rights in NN Technology surrendered* on the Termination Date. [*emphasis added*]

145.  This is in contrast to Article 9(b), which provides that an LP will "be deemed to have acquired a fully paid up license" where the MRDA is terminated by the mutual consent of all Participants under Article 9(a).  Therefore, the LPs' License rights were not perpetual, but

---

[117] Article 11(c)(iv) also originally provided that an LP would be automatically terminated upon insolvency, but the 4th Addendum to the MRDA modified this by stating that NNL has sole discretion to terminate that LP's MRDA participation.

contingent upon the non-occurrence of an event in Article 11(c).  Indeed, the Australian Nortel Participant lost its License prior to the insolvency filings.[118]

146.    As to *royalties*, Article 3 of the MRDA creates a profit splitting methodology, or "RPSM", that requires LPs to remit portions of the revenue they generate through their Licenses to other members of the Nortel group, based on their respective R&D contributions.  While this is not a royalty in name, it is one in substance.[119]

### c.    The MRDA Ownership Structure Must Be Given Legal Effect

147.    It is evident from the foregoing that NNL was the owner of the NN Technology and that the LPs did not enjoy "beneficial" or "economic" ownership of it under the MRDA.  In an effort to avoid the allocation results which follow from this, the other Core Parties make several further arguments that are contrary to the MRDA's express terms.  For the reasons below, none of these arguments succeeds.  The MRDA is a binding contract and must be enforced by the Courts.

### i.    IP Development Contributions Do Not Alter NNL's Ownership

148.    The U.S. and EMEA Debtors assert that the MRDA granted them beneficial ownership in the IP based on their R&D contributions.[120]  This argument rests on a fundamental misinterpretation of the MRDA.  Pursuant to the 6th recital and Articles 2(c) and 3(a), the "sole" consideration for the LPs' R&D contributions were their RPSM payments, not beneficial ownership of any IP eventually resulting therefrom:

> WHEREAS each Participant believes that it is appropriate that *each Participant should benefit from its contribution to R&D activity* commensurate with the value of its contribution to that R&D activity in the context of the manner in which the Nortel Networks business is conducted and that *the residual profit split methodology (RPSM) is*

---

[118] Green Primary Report dated January 24, 2014, p. 25; Green Rebuttal Report dated February 28, 2014, p. 8; U.S. Debtors' Pleading, p. 9, footnote 6.

[119] See: Green Rebuttal Report dated February 28, 2014, p. 9.

[120] U.S. Debtors' Pleading, pp. 3 and 15; U.S. Debtors' Response, p. 1; EMEA Debtors' Pleading, para. 53; EMEA Debtors' Response, para. 27.

*the best arm's length measure,* in the circumstances of NNL and the Participants, *of such contributions* with reference to such benefits;

…

[2](c) All costs incurred directly or indirectly by each Participant for R&D Activity shall be borne exclusively by it. *Any reimbursement for costs including any other compensation shall be provided to such Participant for its R&D Activity solely as provided in Article 3 below.*

[3](a) *For and as a consequence of the performance of R&D Activity, each Participant shall be entitled to receive a payment* in an amount equal to the allocation determined *under the RPSM* (the "R&D Allocation") as the measure of the benefit to which it is entitled commensurate with its performance of, and contribution to, R&D Activity. [*emphasis added*]

149.    The same point is reiterated in the Article 1 definition of "RPSM" and Schedule A:

[1](n) *"RPSM" shall mean* the transfer pricing methodology which establishes the fair market value of *the compensation to be received by each Participant for its R&D Activity* and shall have the meaning defined in Amended Schedule A.

…

Schedule A

…

*Nortel uses the residual profit split method ("RPSM")* embodied in the calculation described below, which was originally adopted as of January 1, 2001 at the request of certain Revenue Authorities *as the most appropriate method for determining the arm's length compensation due to each Participant for its respective R&D Activity* provided pursuant to the Agreement. … [*emphasis added*]

150.    Therefore, the only thing given to the LPs for their R&D contributions were the RPSM payments.[121]  In the face of these express provisions of the MRDA, the U.S. and EMEA Debtors cannot assert ownership of the NN Technology simply because they contributed to the R&D from which it resulted.  As the Supreme Court of Canada said in *Pettkus*:

*The common law has never been willing to compensate a plaintiff on the sole basis that his actions have benefited another.* Lord Halsbury scotched this heresy in the case of *The Ruabon Steamship Company, Limited v. London Assurance* [[1900] A.C.]… *It must, in addition, be evident that the retention of the benefit would be unjust* in the circumstances of the case.[122]

---

[121] See also: Britven Rebuttal Report dated February 28, para. 6.11 ("The contribution approach disregards the terms and conditions set forth in the MRDA").

[122] *Pettkus v. Becker*, [1980] 2 S.C.R. 834 at 848, *emphasis added*.

151.    There is nothing "unjust" about NNL's ownership of the NN Technology.  The MRDA is a juristic reason for this and a full answer to the US/EMEA Debtors' claim.[123]

### ii.    Revenue Contributions Do Not Alter NNL's Ownership

152.    The U.S. Debtors also claim the Sale Proceeds on the theory that they "generated the overwhelming majority of revenue… among the MRDA Participants" and that this is somehow relevant to the "fair market value" component of the allocation exercise.[124]

153.    However, this argument conflates valuation with allocation, and is inconsistent with the U.S. Debtors' position that "allocation should be determined based upon the assets that each Selling Debtor sold or relinquished" in the Sales,[125] not value in the abstract.  Nothing in the MRDA says that the amount of revenue a Participant generates from the NN Technology corresponds to its ownership of the NN Technology.  As Green notes:

> … The Kinrich Report proceeds based upon the *assumption that the revenue earned by each Nortel entity* in connection with the relevant Lines of Business *is directly proportional to the value of the assets transferred or surrendered by that entity.* The Kinrich Report *offers no support for this premise and I am not aware of any.*[126]

154.    The mere fact that NNL permitted NNI to generate profits from the use of certain rights under the NN Technology in the United States does not mean that NNI was the NN Technology's owner there.  NNI was simply a licensee holding a limited Field of Use license,

---

[123] *Jedfro Investments (U.S.A.) Ltd. v. Jacyk*, [2007] 3 S.C.R. 679 at paras. 32-34.

[124] U.S. Debtors' Pleading, p. 1 (and pp. 2, 14-15, 26-27); U.S. Debtors' Response, p. 1 (and pp. 8-9).

[125] U.S. Debtors' Response, p. 6.

[126] Green Rebuttal Report dated February 28, 2014, p. 5 (and 6), *emphasis added.* See also: Malackowski Rebuttal Report dated February 28, 2014, pp. 33-34; Malackowski Deposition, 53:9-53:25; 54:2-54:13.

and its profits were entirely contingent upon NNL's consent.[127]  It was no more the owner of the NN Technology than any other licensee of property who uses that property to earn income.[128]

### iii.    The Nortel Corporate Group Does Not Alter NNL's Ownership

155.    While the Nortel matrix structure renders economic-based allocation methodologies like the revenue approach inappropriate, it does not preclude the Courts from assessing ownership of the NN Technology under the MRDA, as alleged by the UKPC.[129]

156.    The reason for this is that, unlike revenue generation or R&D contributions, the MRDA creates a clear demarcation of the Nortel Debtors' *legal* rights.    That the Participants are members of a corporate group does not permit the Courts to disregard the legal rights under the MRDA.  As the Alberta Court of Appeal accepted in *Cunningham*:

> [Counsel] suggested ... that it would be technical for us to distinguish between parent and subsidiary company in this context; economically, he said, they were one. But *we are concerned not with economics but with law.* The distinction between the two is, in law, fundamental and cannot here be bridged. ...[130]

### iv.    The Tax Objectives of the MRDA Do Not Alter NNL's Ownership

157.    The UKPC also suggests that NNL's ownership of the NN Technology should be ignored since it was granted in order to "provide the most advantageous tax results for the Group".[131]

---

[127] Stephens Deposition, Vol. 2, 354:11-345:16 ("*Without NNL in particular NNUK has no business. NNL has – if nothing else, it has the legal right to the IP*, and as part of its business *NNUK needs to license that IP. It would be unable to do business*. It would lose its supply chain").

[128] *Rana v. Maduck*, 2000 SKQB 318 at para. 80 ("*No equity arises in the property because legal title remains with the lessor. The lessee's equitable interest in a true lease does not extend beyond his ability... to earn profits* from the hotel complex during the term of the lease").

[129] UKPC's Pleading, paras. 3(b), 32-38.

[130] *Cunningham v. Hamilton* (1995), 169 A.R. 132 (C.A.) at para. 4, *emphasis added*. See also: *Martin v. AstraZeneca Pharmaceuticals PLC*, 2012 ONSC 2744, at para. 121, *aff'd*, 2013 ONSC 1169 (Div. Ct.); *Southcott Estates Inc. v. Toronto Catholic District School Board*, [2012] 2 S.C.R. 675 at para. 30.

[131] UKPC's Pleading, paras. 37(c) and 42(a).

158.    This argument is without foundation.    There is no principle which permits a court to ignore the legal effects of a *bona fide* agreement between members of a corporate group simply because it was entered into for legitimate tax planning purposes.    That is evident from the Supreme Court of Canada's judgment in *Stubart*:

> *The issue in this case is whether a corporate taxpayer, with the avowed purpose of reducing its taxes, can establish an arrangement whereby future profits are routed through a sister subsidiary* in order to avail itself of the latter corporation's loss carry-forward.
> ...
> ... The transaction and the form in which it was cast by the parties and their legal and accounting advisers cannot be said to have been so constructed as to create a false impression in the eyes of a third party, specifically the taxing authority. *The appearance created by the documentation is precisely the reality. Obligations created in the documents were legal obligations in the sense that they were fully enforceable at law.* The courts have thus far not extended the concept of sham to a transaction otherwise valid but entered into between parties not at arm's length. ... The parties, by their agreement, accomplish their announced purpose. ...[132]

159.    Moreover, while the MRDA and the CSAs were designed partly to address the taxation of intercompany transactions for tax and transfer pricing purposes, they provided the foundation for allocating the ownership and license rights of the Participants. As NNI employee and former counsel in the IP Law Group, Eric Jensen stated:

> *The issue of IP ownership is intertwined with the tax issue* as far as I can tell – the CSA was a tax document that was created, as I understand it, to benefit from certain tax laws, but *which also defined ownership of IP b/w NNL and the subs*...
>
> ... Nortel needs to resolve the IP ownership issue, and sooner rather than later – it impacts litigations and licensing of IP, among other things.[133]

160.    As Jensen stated to Mark Weisz, Nortel's Director of International Tax, in 2004:

> After the Cost Sharing Agreement (CSA) was terminated effective 1/1/2001, our IP-ownership (primarily patents and software/copyrights) became uncertain. According to

---

[132] *Stubart Investments Ltd. v. The Queen*, [1984] 1 S.C.R. 536 at p. 5, 22 (QL), *emphasis added.* See also: *Schmidt v. Air Products Ltd.*, [1994] 2 S.C.R. 611 at para. 70 (The tax motivation of parties to private contracts are not particularly relevant to a judicial interpretation and application of equitable principles.)

[133] Email from Eric Jensen to Mark Weisz, April 12, 2004 (TR11106), *emphasis added.*

the CSA, all IP ownership vested in NNL, and in return NNL licensed the various CSA participants. After the CSA was terminated, it is not explicitly clear how the subsidiaries obtain rights to NNL's patents and which entity has IPR ownership for IP purposes. This comes into play in two primary areas, licensing IPR and lawsuits...

*… [F]or IP ownership issues it doesn't matter how we are "operating", what matters is what the agreements say* and that we currently don't have an agreement and need one to resolve the uncertainty resulting in part from the CSA termination.[134]

161.    The MRDA was a rational agreement among the Participants.  The ownership and licensing structure therein met applicable arm's length transfer pricing standards for tax purposes.[135]  The MRDA documented the legal rights and obligations of the Participants and must be given effect.

### v.    "Administrative Convenience" Does Not Alter NNL's Ownership

162.    Another argument by the EMEA Debtors is that NNL's ownership of the NN Technology should be disregard since it existed for "administrative convenience".[136]

163.    However, vesting ownership of IP in NNL was not a matter of "administrative convenience" but a corporate policy made by senior management of a storied Canadian-based technology company headquartered in Canada.[137]  At the time the initial CSAs were entered into, NNL's predecessor, Northern Telecom Limited, owned technology that was the product of almost hundred years of Nortel's Canadian manufacturing experience, as well as more recent years of substantial R&D and rights to use valuable IP owned by third parties with which NNL had negotiated cross-licenses.[138]

---

[134] Email from Eric Jensen to Mark Weisz, May 27, 2004 (TR11108), *emphasis added.*

[135] Reichert Primary Report dated January 24, 2013.

[136] EMEA Debtors' Response, para. 27.  See also: the Declaration of Walter T. Henderson, Jr. dated April 11, 2014, para. 55.

[137] Affidavit of Clive Allen sworn April 11, 2014, para. 28; Reply Affidavit of Clive Allen sworn April 23, 2014, para. 6.

[138] Affidavit of Clive Allen sworn April 11, 2014, para. 29.

164.    Further, NNL's subsidiaries benefited from the intercompany licenses by being able to commence operations without incurring substantial up-front technology costs and by having access to a far greater pool of technology than they could ever afford, even if that technology was otherwise available.[139] In addition, by having access to certain technology owned by NNL, the subsidiaries incurred R&D costs that were a fraction of what they would have incurred as standalone companies.[140]

165.    Accordingly, the suggestion that the MRDA regime was entered into for "administrative convenience" is without foundation.

### vi.    The Place of Patent Issuance Does Not Alter NNL's Ownership

166.    Contrary to the U.S. Debtors' arguments,[141] the issuance of patents in the United States is irrelevant to the allocation analysis, since it has no bearing on who owns the IP.[142]  Indeed, Article 4(c) of the MRDA expressly contemplates that NNL can register NN Technology patents in any country of the world, without in any way suggesting that this will detract from the ownership rights it acquired under the preceding Article 4(a):

> [4](c) With respect to patentable inventions and copyrightable property encompassed by NN Technology... *NNL shall have the exclusive right but not the obligation to file and prosecute the applications in its name for patents,* copyrights, mask works, industrial designs, and all other registered forms of intellectual property encompassed by such NN Technology *in every country of the world.* [*emphasis added*]

---

[139] Affidavit of Clive Allen sworn April 11, 2014, para. 36.

[140] Affidavit of Clive Allen sworn April 11, 2014, para. 38.

[141] U.S. Debtors' Pleading, pp. 2, 15, 28; U.S. Debtors' Response, pp. 9-10.

[142] Affidavit of Geoffrey Stuart Hall sworn April 10, 2014, para. 76 (noting that "patents were usually but not exclusively filed in the U.S. unless there was a specific reason to file elsewhere" simply because "*Nortel considered it easier to enforce patents in the US*"). See also: Reply Affidavit of Angela Anderson sworn April 25, 2014, para. 20; Britven Rebuttal Report dated February 28, 2014, para. 4.14.

### vii.    The Post-MRDA Events Do Not Alter NNL's Ownership

167.    Another argument made by the other Core Parties is that the following conduct occurring subsequent to the execution of the MRDA either precludes the MRDA from applying, or shows that NNL did not acquire ownership of the NN Technology under it:

(a)    NNL documents stating that the LPs were beneficial or economic owners of the NN Technology;[143]

(b)    the Nortel insolvency filings;[144] and

(c)    the participation of the LPs in the Sales and the License Termination Agreements ("LTAs") they executed therein.[145]

168.    There are several reasons why this argument fails.

169.    *First*, the parties' subsequent conduct may only be used to interpret an agreement that contains a genuine ambiguity.  In *Oceanic*, the Ontario Court of Appeal stated:

> … *I do not find any ambiguity in the wording and hence would not resort to the extrinsic evidence about the subsequent conduct of the parties* or the commercial reasonableness of the outcome. Indeed, the conclusions to be drawn from that evidence seem open to considerable debate. …[146]

170.    Further, an ambiguity in this sense will only arise where it continues to exist after the contractual provision is read in light of its context and factual matrix:[147]

> …[T]he trial judge refers to, and purports to apply, the words of Ryan J. in *Delisle v. Bulman Group Inc.* (1991), 54 B.C.L.R. (2d) 343 at pp. 345-46…:

---

[143] U.S. Debtors' Response, pp. 3, 10-11, 15-17; EMEA Debtors' Response, para. 28.

[144] UKPC's Pleading, paras. 42(b), 42(c), 42(d), 42(g).

[145] U.S. Debtors' Response, pp. 4-5, 10-11 and 16-20; Bondholder Group's Response, paras. 22-23; UKPC's Pleading, para. 37(b).

[146] *Oceanic Exploration Co. v. Denison Mines Ltd.* (1999), 127 O.A.C. 224 (C.A.) at para. 45 (QL), *emphasis added.*

[147] *Dumbrell v. Regional Group of Companies Inc.*, 2007 ONCA 59 at para. 54.

> 3. *If, after examining the agreement itself in its factual matrix, including the particular words used in their immediate context and in the context of the agreement as a whole, there remain two reasonable alternative interpretations, then additional evidence may be admitted. …*

… No analysis is given [by the trial judge] of how, in applying the first portion of the above quotation from the *Delisle* case, the trial judge arrived at his conclusion that there are two possible interpretations of the contract. *First, the words of the contract must be analyzed "in its factual matrix", and a conclusion arrived at that there are two possible interpretations of the contract. Then, and only then, may the trial judge look at other facts, including* facts leading up to the making of the agreement, circumstances existing at the time the agreement was made, and *evidence of subsequent conduct of the parties to the agreement.*[148]

171.    For the reasons above, the MRDA is not ambiguous when viewed within its entire context: indeed, Article 4(a) expressly vest ownership of the NN Technology in NNL. Accordingly, the subsequent conduct relied on by the other Core Parties is irrelevant.

172.    *Second*, even if the MRDA were ambiguous, which is denied, evidence of subsequent conduct may only be admitted where the effect of that evidence is clear and unambiguous:

> … Although there is some confusion in the authorities as to the purpose for which evidence of subsequent conduct may be admitted, the weight of authority does, in my view, support the proposition that *such evidence may only be admitted where the subsequent conduct of a party is unequivocal* and is in conflict with the interpretation of the Agreement advanced by that party.[149]

173.    The conduct of the parties subsequent to the MRDA does not unequivocally establish that NNL lacked ownership of the NN Technology.  For instance, the U.S. Debtors refer to isolated representations by NNL regarding the LPs' beneficial ownership, but NNL was a co-party in IP enforcement actions brought by NNI after the MRDA.[150]  Under U.S. patent standing law, there was no need for NNL to be included in those actions unless it retained "substantial rights" in the

---

[148] *Arthur Andersen Inc. v. Toronto-Dominion Bank* (1994), 17 O.R. (3d) 363 (C.A.) at para. 10 (QL), *leave to appeal refused*, [1994] S.C.C.A. No. 189, *emphasis added.*

[149] *Commercial Alcohols Inc. v. Suncor Energy Products Inc.* (2006), 17 B.L.R. (4th) 86 (Ont. S.C.J.) at para. 23, *aff'd*, 2008 ONCA 261, *emphasis added.*

[150] Stratton Deposition, 107:19-114:14.

NN Technology.[151]  Further, the pleadings in those cases described NNL rather than NNI as the

"owner" of the relevant NN Technology.  As Stratton admitted on his deposition:

> Q.   Now, sir, one of the lawsuits that you referred to in paragraph 77 is Exhibit 22084 in this proceeding, correct?
>
> A.   Yes.  The complaint I think is,
> …
> Q.   All right.  And if you look -- *that is an action in which there were two plaintiffs, Nortel Networks Inc., and Nortel Networks Limited.*  Do you agree?
>
> A.   That's what it says, *yes.*
> …
> Q.   And then if you look at paragraph 14 -- paragraph 8 of *the complaint, it says "NNL is the owner of U.S. Patent Number"* -- and it goes on, correct?
>
> A.   *That's right.*
>
> Q.   All right.  And *the formulation that you used in your report* in paragraph 77 *is that NNL was named as a plaintiff as having title* to the U.S. patents.  *But, sir, in fact, the complaint says "owner,"* does it not?
>
> A.   *Complaint does say "owner," yes.*
>
> Q.   And that would be a complaint -- *that would be a characterization of both Nortel Networks Limited and Nortel Networks Inc. put forward to the United States District Court,* District of Massachusetts, correct?
>
> A.   *Yes,* I think so.[152]

174.   There were also cases in which NNL's predecessor, Northern Telecom Limited, alone

brought claims for infringement.[153]

175.   *Third,* the MRDA did not become ineffective upon the Nortel insolvency filings.  To the

contrary, Articles 10.e and 11.b of the IFSA entered into by the Core Parties *after* the insolvency

filings made clear that the MRDA continued to survive:

---

[151] *Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc.*, 248 F.3d 1333, at 1347-1348 (Fed. Cir. 2001), *cert. denied*, 534 U.S. 895 (2001).

[152] Stratton Deposition, 107:19-107:23, 108:3-108:7, 108:20-108:25, 109:2-109:12, *emphasis added.*

[153] Complaint for Patent Infringement (TR45478), Settlement of Conference Statement of Northern Telecom (TR45481).

[10]e. *[T]his Agreement is without prejudice to any provision of the Master R&D Agreement*, except full and final settlement in relation to Transfer Pricing Payments with respect to the Canada/US Interim Period or the EMEA Interim Period, as applicable, as set out herein;

...

[11]b. ... For the avoidance of doubt, *the Appropriate License Termination will not be deemed to be or result in an expiry or termination of the Master R&D Agreement.* [*emphasis added*]

176.    The same point is reiterated in each of the LTAs.  For instance, Article 2.03 of the Rockstar LTA[154] provided:

2.03 ... *This Agreement will not be deemed to be or result in an expiry or termination of the Master R&D Agreement*, including (without limitation) for the purposes of Article 9 of the Master R&D Agreement.. [*emphasis added*]

177.    Further, Article II of the 4th Addendum to the MRDA stated that no Participant would be automatically terminated from the MRDA upon being made the object of insolvency proceedings.  Therefore, the suggestion that the MRDA was only intended to operate prior to the Nortel insolvency filings is without foundation.[155]  As the Senior Vice-President of the Monitor deposed, "[t]he Canadian Debtors have consistently maintained that NNL was the owner of Nortel's IP" throughout the insolvency proceedings,[156] and:

... Each of the Estates and their creditor constituencies has known about the MRDA since the earliest days of the insolvency filings (and, in fact, prior to them) and its provisions have formed the backdrop for each significant inter-estate settlement... *No Estate has ever sought to reject or terminate the MRDA and prior to the filing the Joint Administrators specifically requested, and NNL agreed, not to terminate NNUK's participation* under the MRDA.[157]

---

[154] Rockstar Transaction License Termination Agreement, s. 2.03 (TR21508).

[155] For the same reason, the suggestion in the U.S. Debtors' Pleading at pp. 13-14 that the LPs are entitled to a payment reflecting the fair market value of their Licenses under Article 11(d)(iii) based on their automatic termination upon the insolvency filings under Article 11(c)(iv) is incorrect.  The 4th Addendum to the MRDA stated that, notwithstanding Article 11(c)(iv), NNL has the sole discretion to terminate that LP's MRDA participation based on insolvency, and no such termination ever occurred.

[156] Reply Affidavit of Sharon Hamilton sworn April 25, 2014, para. 37 (and paras. 38-48).

[157] Affidavit of Sharon Hamilton sworn April 11, 2014, para. 26, *emphasis added.*

178.    *Fourth*, the fact that the LPs participated in the Sales and surrendered their Licenses through the LTAs has no bearing upon NNL's ownership of the NN Technology.[158]  Pursuant to Articles 10.a and 11.b of the IFSA, under which the Sales were structured:

> [10]a. *this Agreement is not, and shall not be* deemed to be, an acknowledgement by any Party of the assumption, ratification, adoption or rejection of the Transfer Pricing Agreements or any other Transfer Pricing methodology employed by the Nortel Group or its individual members for any purpose nor shall it be *determinative of, or have any impact whatsoever on, the allocation of proceeds to any Debtor from any sale of assets of the Nortel Group…*
> …
> [11]b. …*[T]he Appropriate License Termination shall not affect the ownership rights that* such Debtors and *NNL may have to any intellectual property… [emphasis added]*

179.    This is also apparent from the LTAs themselves.  By way of illustration, Article 2.02 of the Rockstar LTA[159] stated:

> 2.02 … *This Agreement shall not affect the ownership rights* that each Seller may have *to any intellectual property. [emphasis added]*

180.    The same point is confirmed by Article 12 of the IP Transaction Side Agreement[160] which the Core Parties entered into as part of the Residual IP Sale on April 4, 2011:

> 12. … *Nothing* in Section 5.13(b) of the Stalking Horse Agreement or the amendments and modifications to the Transfer Pricing Agreements resulting therefrom or the actions taken as a result thereof *shall bar, prohibit, terminate or in any way hinder or enhance the rights of the Parties to this Agreement to present any arguments, methodologies, legal or factual theories in support of a proposed allocation of the IP Sale Proceeds* or the proceeds of any other transaction, including, without limitation, the sale of… intellectual property, that would be subject to allocation amongst any of the Nortel Parties, and such presentation *shall not, or otherwise be deemed to, constitute in any way a violation of a Party's rights under any existing agreement. [emphasis added]*

### viii.    There Is No Implied Term that Alters NNL's Ownership

181.    The EMEA Debtors also assert that the MRDA contained an implied term granting the LPs a beneficial ownership interest in the NN Technology.[161]  However, such an implied term

---

[158] Affidavit of Sharon Hamilton sworn April 11, 2014, paras. 35-46.

[159] Rockstar Transaction License Termination Agreement, s. 2.02 (TR21508).

[160] IP Transaction Side Agreement dated April 4, 2011 (TR46858).

would deprive the MRDA of business efficacy, since it would mean the LPs could not make full use of their rights to create and exploit Products given the absence of cross-licenses from each Participant to the others. Further, the implied term is contradicted by the express MRDA provisions outlined above, which clearly create a different regime based on ownership and licensing by NNL. As the Supreme Court of Canada said in *MJB*:

> ...*[A] contractual term may be implied* on the basis of presumed intentions of the parties *where necessary to give business efficacy to the contract or where it meets the "officious bystander" test.* ... What is important in both formulations is a focus on the intentions of the *actual* parties. A court, when dealing with terms implied in fact, must be careful not to slide into determining the intentions of *reasonable* parties. This is why *the implication of the term must have a certain degree of obviousness to it,* and why, *if there is evidence of a contrary intention, on the part of either party, an implied term may not be found on this basis.* As G. H. L. Fridman states in *The Law of Contract in Canada* (3rd ed. 1994), at p. 476:
>
>> In determining the intention of the parties, *attention must be paid to the express terms of the contract* in order to see whether the suggested implication is necessary and fits in with what has clearly been agreed upon, and the precise nature of what, if anything, should be implied.[162]

182.    Far from being "obvious" to an officious bystander, the existence of an implied term in the MRDA is directly contrary to Article 14(d):

> [14](d) In respect to the subject matter hereof, *this Agreement sets forth the entire agreement and understanding between the Participants. [emphasis added]*

183.    Finally, "the courts will be cautious in their approach to implying terms to contracts".[163] They will only imply a term where it is "capable of clear expression",[164] and not where it "would require deciding a large number of complex matters clearly not contemplated by the parties".[165] As discussed above, the implied term sought here would leave many unanswered questions, such

---

[161] EMEA Debtors' Pleading, paras. 50, 56.

[162] *M.J.B. Enterprises Ltd. v. Defence Construction (1951) Ltd.*, [1999] 1 S.C.R. 619 at para. 29, *italics added, underlining in original.*

[163] *G. Ford Homes Ltd. v. Draft Masonry (York) Co. Ltd.* (1983), 43 O.R. (2d) 401 (C.A.) at p. 3 (QL).

[164] *Marinangeli v. Marinangeli* (2003), 66 O.R. (3d) 40 (C.A.) at para. 65.

[165] *529198 Alberta Ltd. v. Thibeault Masonry Ltd.*, 2001 ABQB 1108 at para. 39.

as the territorial scope of the LPs' beneficial interests and the specific IP to which they relate, together with all the cross-licenses they would require. The Courts cannot rewrite the MRDA to address all this now.

### ix.    There Are No Legitimate Expectations that Alter NNL's Ownership

184.    The UKPC is also incorrect to suggest that the U.S. and EMEA Debtors possessed a "legitimate expectation" that allocation of the Sale Proceeds would not be based upon NNL's ownership rights in the MRDA.[166]  The express MRDA provisions outlined above were designed precisely to avoid this argument.  As Campbell J. said in *Itak*:

> *Agreements between the parties tend to constitute the best evidence of the parties' reasonable expectations. ...*[167]

185.    Indeed, an allocation based on NNL's title under the MRDA reflects the most legitimate expectation the parties could have possessed – that their legal rights would be enforced by the courts.

### 2)    The LPs Do Not Have Any Ownership Interest Outside the MRDA

186.    In a further effort to undermine the express terms of the MRDA, the EMEA Debtors and UKPC assert that the LPs' R&D contributions gave them an ownership interest in the NN Technology based on a resulting trust, constructive trust for unjust enrichment, and proprietary estoppel.[168]  These arguments have no support in fact or law.

---

[166] UKPC's Response, para. 16.

[167] *Itak International Corp. v. CPI Plastics Group Ltd.* (2006), 20 B.L.R. (4th) 67 (Ont. S.C.J.) at para. 47, *emphasis added*. See also: *Simmons v. Webb* (2008), 54 B.L.R. (4th) 197 (Ont. S.C.J.) at para. 92, *var'd on other grounds*, 2010 ONCA 584, *aff'd*, 2011 ONCA 7; *Hu v. Sung* (2009), 63 B.L.R. (4th) 286 (Ont. S.C.J.) at para. 50.  See also, in the U.S.: *Sungard Recovery Services, Inc. v. Florists Transworld Delivery, Inc.*, 1999 U.S. Dist. LEXIS 17709, at 2 (E.D. Pa. 1999) ("*the clear and unambiguous language of a contract is the best evidence of the parties' reasonable expectations* at the time they entered into the agreement. *Bensalem Township v. International Surplus Lines Ins. Co.*, 38 F.3d 1303, 1309 (3d Cir. 1994)"); *Waterfall, Economidis, Caldwell, Hanshaw & Villamana, P.C. v. Pima County*, 2004 Ariz. App. Unpub. LEXIS 9, at 20 (2004), *review denied and ordered depublished*, 209 Ariz. 200 (2004).

[168] EMEA Debtors' Pleading, paras. 58-68; UKPC's Pleading, paras. 49-53.

### a. The Governing Law Is Ontario

187.    As with the ownership issue under the MRDA, the trust and estoppel claims are governed by Ontario law.  Both the EMEA Debtors and UKPC frame the claims on this basis in their pleadings,[169] and the application of Ontario law is mandated by Canadian and U.S. choice of law principles.  In identifying the governing law for equitable restitutionary claims, Ontario and U.S. courts place great emphasis upon the jurisdiction where the defendant was enriched,[170] particularly where the claim is closely connected to a contractual relationship between the parties governed by the law of that same jurisdiction.[171]  That jurisdiction is Ontario, given the residency of NNL and the governing law clause in Article 14(f) of the MRDA.  The CCC therefore analyzes the equitable claims below under Ontario law.

### b.    There Is No Resulting Trust

188.    A resulting trust cannot arise where the plaintiff receives consideration for its property or contribution from the defendant.[172]    Since the MRDA provides the LPs with valuable

---

[169] EMEA Debtors' Pleading, para. 58 footnote 25 ("Except where otherwise indicated, the matters addressed below are dealt with for present purposes under the *law of Ontario*"); UKPC's Pleading, para. 52 ("*In Canada*, such rectification [of unjust enrichment] can be made through the finding of a constructive trust over the assets of the enriched party for the value of the unjust enrichment").  While the EMEA Debtors "expressly reserve the right to pursue the same or equivalent arguments under the law of the other jurisdictions" (EMEA Debtors' Pleading, para. 58, footnote 25), they do not provide any notice of the content of this foreign law, and have not filed any expert evidence regarding it.  Accordingly, they have waived their right to rely on foreign law in relation to these claims.

[170] See in Ontario: *Christopher v. Zimmerman*, 2000 BCCA 532 at paras. 12-15; *Cooper-Standard Automotive Canada Ltd. (Re)*, [2009] O.J. No. 3996 (S.C.J.) at para. 25; *Barrick Gold Corp. v. Goldcorp Inc.*, 2011 ONSC 3725 at paras. 839-848; *Knowles v. Lindstrom*, 2014 ONCA 116 at para. 47.  See in the United States: *International Business Machines Corp. v. Comdisco*, 1991 Del. Super. LEXIS 453, at 27; *Landis v. Science Management Corp.*, 1991 Del. Ch. LEXIS 19, at 8-10; *Restatement (Second) of Conflict of Laws*, § 221(2)(b).

[171] See in Ontario: *Barclay's Bank PCL v. Inc. Incorporated*, 1999 ABQB 110 at paras. 40-41; *Cooper-Standard Automotive Canada Ltd. (Re)*, [2009] O.J. No. 3996 (S.C.J.) at paras. 20, 24-26, 29; *Barrick Gold Corp. v. Goldcorp Inc.*, 2011 ONSC 3725 at paras. 846-848; *Knowles v. Lindstrom*, 2014 ONCA 116 at para. 49; *Fairfield Sentry Ltd v Migani*, [2014] UKPC 9 at para. 17.  See in the United States: *Schunkewitz v. Prudential Securities, Inc.*, 99 Fed. Appx. 353, at 356 (3rd Cir. 2004); *PharmAthene, Inc. v. SIGA Techs., Inc.*, 2008 Del. Ch. LEXIS 9, 23, 25, footnote 32; *Restatement (Second) of Conflict of Laws*, § 221(2)(a).

[172] *Kerr v. Baranow*, [2011] 1 S.C.R. 269 at paras. 16-17; *Nishi v. Rascal Trucking Ltd.*, [2013] 2 S.C.R. 438 at para. 29; *Wade v. Ukeni*, 2014 ONCA 99 at para. 4 ("[W]e see no error in the trial judge's conclusion that *there was no resulting trust, given* his finding *that there was consideration* provided for the transfer of the Clearmeadow property").  A similar principle applies in the United States: *In re Coy*, 2011 WL 3667607, at 6 (Bankr. D. Del.

consideration for both their R&D contributions via the RPSM (Articles 1(n), 2(c) and 3(a)), and

any vesting of NN Technology via the Licenses (Article 4(a)), there can be no resulting trust.

Indeed, the existence of a resulting trust over IP in the face of a license agreement was directly

rejected in *Dubiner*:

> ...[T]he defendant's second proposition... is that even if the legal title to the trade marks
> was transferred by the assignment document... the beneficial or equitable title remained
> with the defendant *and the plaintiff would then be in the position of a trustee...*
> ...
> ...[W]ith respect to *gratuitous transfers*, the law appears to be that the property is
> deemed in equity to be held as a *resulting trust* for the transferor unless there is some
> further indication of an intention at the time to benefit the transferee
> ...
> ...[T]his transaction, as we have seen, was part of an overall deal whereby the majority
> of the shares of the defendant corporation were transferred to Krangle and *the*
> *corporation was allowed to use the said trade marks...* by... the royalty payments...
> Indeed, *by no stretch of the imagination can it be said that this was a gratuitous*
> *transfer.*[173]

### c.    There Is No Constructive Trust

189.    The test for a constructive trust based on unjust enrichment was set out by the Supreme

Court of Canada in *Kerr*:

> ... As the law developed, unjust enrichment carried with it the possibility of a remedial
> constructive trust.  In order to successfully prove a claim for unjust enrichment, *the*
> *claimant must show* [1] that the defendant has been enriched, [2] the claimant suffered a
> corresponding detriment, and [3] *there is no "juristic reason" for the enrichment.* ...[174]

190.    Assuming *arguendo* that NNL was enriched from a corresponding deprivation to the LPs,

the MRDA is a juristic reason for this given contractual provisions cited above.[175]    As the

---

2011) (finding resulting trust where there was no evidence that "the parties had intended for [alleged trustee] to
*reimburse* [alleged beneficiary] for his investment in and maintenance of the Property").

[173] *Dubiner v. Cheerio Toys and Games Ltd.*, [1965] 1 Ex. C.R. 524 (Ex. Ct.) at paras. 94, 96, 99 (QL), *aff'd*, [1966]
S.C.R. 206, *emphasis added*.

[174] *Kerr v. Baranow*, [2011] 1 S.C.R. 239 at para. 3, *emphasis added*.

[175] A contract which governs the relationship between the parties can operate as a juristic reason even where it does
not contain a term that specifically addresses the defendant's enrichment, since the parties could have added one had
they intended to prevent this: *Jedfro Investments (U.S.A.) Ltd. v. Jacyk*, [2007] 3 S.C.R. 679 at paras. 33-34.

Supreme Court of Canada made clear in *Garland*, "[t]he established categories that can constitute juristic reasons include a contract".[176] Indeed, "[i]n the usual course, the existence of a contract… would be a *complete answer* to the claim for unjust enrichment".[177] As such, courts have rejected claims for unjust enrichment where the parties' relationship was governed by royalty or conveyancing agreements similar to the MRDA here.[178] Therefore, the constructive trust claim must fail.

### d.   There Is No Proprietary Estoppel

191.   There are three elements to a claim for proprietary estoppel:

> …1) *encouragement* of the plaintiffs by the defendant owner; 2) *detrimental reliance* by the plaintiffs to the knowledge of the defendant owner; and 3) the defendant owner seeks to take *unconscionable advantage* of the plaintiff by reneging on an earlier promise.[179]

192.   None of these elements is met.   There is no evidence that NNL encouraged the LPs to believe they would have a proprietary interest in the NN Technology, nor that it knew the LPs detrimentally relied upon this.   Further, it strains credulity to say that NNL sought to take "unconscionable" advantage of the LPs.[180]   NNL did not encourage the LPs to act under a mistaken view of their legal rights, but simply adhered to what it understood the LPs' rights to be

---

[176] *Garland v. Consumers' Gas Co.*, [2004] 1 S.C.R. 629 at para. 44. See also: *Kerr v. Baranow*, [2011] 1 S.C.R. 239 at para. 41.

[177] *Pacific National Investments Ltd. v. Victoria (City)*, [2004] 3 S.C.R. 575 at para. 28. See also: *Peter Kiewit Sons' Co. of Canada v. Eakins Construction Ltd.*, [1960] S.C.R. 361 at 369 ("*There is, therefore, no room for the application of any theory of quasi-contractual recovery… where the parties have made an express contract covering the very facts in litigation*"). A similar principle applies in the United States: *In re Direct Response Media, Inc.*, 466 B.R. 626, at 661 (Bankr. D. Del. 2012).

[178] *Harris v. Nugent* (1996), 141 D.L.R. (4th) 410 (Alta. C.A.) at paras. 40-41 (QL), *leave to appeal refused*, [1997] S.C.C.A. No. 77 (royalty agreement); *Wade v. Ukeni*, 2014 ONCA 99 at para. 5 (conveyancing agreement).   See also: *677960 Alberta Ltd. v. Petrokazakhstan Inc.*, 2014 ABCA 110 at paras. 20, 26-27.

[179] *Tiny (Township) v. Battaglia*, 2013 ONCA 274 at para. 131, *emphasis added*. See also: *Schwark Estate v. Cutting*, 2010 ONCA 61 at para. 34.

[180] Affidavit of Gordon Davies sworn April 11, 2014, para. 6 ("To suggest that there was some sort of adversity between the various Nortel entities, or that they were trying to take advantage of one another… strikes me as very wrong").

under express terms of the MRDA.[181]    These were sophisticated commercial entities who negotiated a complex agreement to govern their relationship, and there was no vulnerability here sufficient to justify a finding of unconscionability.    As the Ontario Court of Appeal said when denying a proprietary estoppel claim in *Tiny*:

> This evidence establishes that Mr. Battaglia *acted on his own volition and with the benefit of independent advice* in undertaking a time-consuming project to try to wrest title to the Beach from the Township and obtain it for himself. *The element of vulnerability on the part of the plaintiff… is notably absent in this case.*[182]

### 3)    Ownership Allocation of the Sale Proceeds

#### a.    Asset Owners Are Entitled to the Fair Market Value of Assets Sold

193.    Virtually all of the Core Parties agree with the CCC that the Sale Proceeds should be allocated according to the ownership interests which each Nortel Debtor held in the assets sold:

> (a) The Monitor and Canadian Debtors plead that the allocation question is "[w]hat portion of the proceeds realized in each transaction was due to the transfer of, or surrender by, the Canadian Debtors, EMEA Debtors or U.S. Debtors, as the case may be, of property interests in the assets which were the subject matter of that transaction".[183]

> (b) The U.S. Debtors, joined in by the Indenture Trustee, plead that "[e]ach Selling Debtor is entitled to receive the fair market value of the assets and rights it sold or

---

[181] *Tiny (Township) v. Battaglia*, 2013 ONCA 274 at para. 138.

[182] *Tiny (Township) v. Battaglia*, 2013 ONCA 274 at para. 152, *emphasis added*. See also: *Tercon Contractors Ltd. v. British Columbia (Transportation and Highways)*, [2010] 1 S.C.R. 69 at para. 131.

[183] Monitor and Canadian Debtors' Pleading, para. 4 (and para. 49). See also: Monitor and Canadian Debtors' Response, paras. 2-3.

relinquished in connection with the sale of Nortel's businesses and residual patent portfolio", but "no less and no more".[184]

(c) The EMEA Debtors plead that "allocation of the Sale Proceeds should be determined by analyzing the entitlement of each Selling Debtor to the proceeds of the specific assets that were conveyed to the purchaser in each Asset Sale" after "determin[ing] which Selling Debtor owned (or had an entitlement to or interest in) which assets".[185]

(d) The Bondholder Group pleads that "each estate is entitled to receive the fair market value of the assets it sold and the rights it relinquished in those sales".[186]

(e) Wilmington Trust pleads that "[b]ecause of NNL's ownership of the intellectual property... [i]n the first instance, the proceeds of the sales of NNL's intellectual property should be allocated to NNL".[187]

194.    Accordingly, the allocation analysis that follows is based upon the fair market value of the assets owned and/or relinquished by the Nortel Debtors in the Sales on or about the date of their relinquishment.[188]  As noted by Thomas Britven, Managing Director of Duff & Phelps, this approach is also supported by valuation theory.[189]

---

[184] U.S. Debtors' Pleading, pp. 1 and 26 (and p. 25). See also: U.S. Debtors' Response, pp. 1-2; Indenture Trustee Response, para. 3.

[185] EMEA Debtors' Pleading, para. 3 (and para. 7). See also: EMEA Debtors' Response, paras. 9, 24, 33 and 35.

[186] Bondholder Group's Pleading, para. 2 (and paras. 5-7, 17-19, 28). See also: Bondholder Group's Response, para. 2.

[187] Wilmington Pleading, para. 10 (and paras. 11-12). See also: Wilmington Response, paras. 3-4.

[188] As discussed later in this Brief, the CCC also reserves the right to argue in the alternative that the Sale Proceeds should be allocated on a *pro rata* basis if the Courts conclude that ownership of the NN Technology cannot be determined from NNL's title under the MRDA, or otherwise.

[189] Britven Primary Report dated January 24, 2014, paras. 6.2, 6.4. See also: Green Primary Report dated January 24, 2014, pp. 38-40.

195.   As explained below, when these Sale Proceeds are allocated in accordance with NNL's ownership of the NN Technology as recognized under the MRDA, the appropriate amount owing to the Canadian Debtors is USD $5.805 billion.[190]

### b.   NNL Is Entitled to the Majority of IP Proceeds From the Business Sales

196.   As discussed above, the Business Sales consisted of 8 transactions, undertaken after the Nortel Group filed for creditor protection and concluded that a restructuring was not viable, in which all of the major Nortel Lines of Business, including approximately 2,700 related Nortel patents and patent applications, were sold to third party purchasers.[191]   This generated approximately USD $2.849 billion in Business Sale Proceeds, of which USD $1.143 billion related to the sale of Nortel IP.[192]   As discussed above, the terms of the Business Sales included the transfer to the purchaser of assets used exclusively or predominantly in the business such as fixed assets (excluding real estate), inventor, intellectual property (including patents), and customer contracts. In addition, the purchasers received licenses to use any intellectual property that was retained by any Nortel Entity but that was necessary to operate the acquired business.[193]

197.   For example, Articles 2.1.1 and 4.5 of the Asset Sale Agreement for the CDMA Business Sale provided:

> 2.1.1 ...[E]ach Seller shall transfer or assign to the Purchaser or the relevant Designated Purchasers, *all of such Seller's right, title and interest in and to the assets predominantly*

---

[190] Britven Primary Report dated January 24, 2014, para. 3.4.  The implied aggregate recovery to each Key Creditor Group based on this allocation is set out in the Britven Primary Report dated January 24, 2014, para. 3.8.

[191] Britven Primary Report dated January 24, 2014, paras. 3.41-3.43, 6.12-6.13; Green Primary Report, p. 8; Affidavit of Sharon Hamilton sworn April 11, 2014, paras. 47-64; Affidavit of Paviter Binning sworn April 10, 2014, paras. 50-53.  As noted at para. 53 of the Binning Affidavit, while assets other than IP were also sold in the Business Sales, IP was the "main driver of value" therein.

[192] The discussion below focuses upon the allocation of Sale Proceeds relating to IP, which comprise all of the Residual IP Proceeds and a large portion of the Business Sale Proceeds.  As to the remaining Business Sale Proceeds relating to Tangible Assets, Customer Relationships and Purchaser Goodwill, see Britven Primary Report dated January 24, 2014, paras. 6.16, 6.22, 6.42-6.48.

[193] Green Primary Report dated January 24, 2014, p. 11, *emphasis added.* See also: Britven Rebuttal Report dated February 28, 2014, para. 3.14; Affidavit of Sharon Hamilton sworn April 11, 2014, paras. 52 and 61.

*used or held for use in the conduct of the Business* (such assets, excluding the Excluded Assets, the "Assets")… The Assets described above include:

...

(g) *the Assigned Intellectual Property*[194] as of the Closing Date…

...

4.5 … (a) *The Assigned Intellectual Property, the Licensed Intellectual Property* and the Intellectual Property licensed to the Sellers and/or their Affiliates under the Inbound License Agreements and the Patent Cross Licenses *include all the material Intellectual Property that, as of the date hereof, is used in connection with the conduct and operation of the Business,* except with respect to any Intellectual Property included in Overhead and Shared Services. [195]

198.   As well, Article 2.01 of the CDMA IP License Agreement stated:



---

[194] Pursuant to s. 1.1, CDMA Asset Sale Agreement (TR48909):

> *"Assigned Intellectual Property"* means (i) the *Assigned Patents,* (ii) the *Assigned Trademarks,* (iii) the *Intellectual Property* (other than Patents and Trademarks) in the Software (including previous versions and versions in development) *predominantly used in the CDMA Products and in the Software predominantly used in the LTE Access Products,* respectively, in each case, as listed in Section 1.1(a) of the Sellers Disclosure Schedule, and (iv) *any other Intellectual Property* (other than Patents or Trademarks) owned as of the Closing Date by any of the Sellers that is *predominantly used in the Business…*

> *"Assigned Patents"* means the Patents *predominantly used in the CDMA Business* as of Closing and owned as of the Closing Date by any of the Sellers…

> *"Assigned Trademarks"* means the Trademarks *predominantly used in the Business* as of the Closing and owned as of the Closing Date by any of the Sellers…

[195] CDMA Asset Sale Agreement, arts. 2.1.1, 4.5 (TR48909), *emphasis added.*



███████████████████████████████████

199.    To facilitate this arrangement, the LPs executed LTAs surrendering their Licenses in

relation to all IP either sold or licensed to the purchasers.[199] This is illustrated by the 3rd and 9th

recitals and Article 2.01 of the CDMA LTA:

> WHEREAS, *the Nortel Licensees are recipients of certain licenses and rights granted under or pursuant to the provisions of the Master R&D Agreement* or any other internal agreement among entities of the Nortel group (such licenses and rights, hereinafter referred to as *the "IP Licenses"*); and
>
> ...
>
> WHEREAS, *the Sellers have transferred to the Purchaser certain intellectual property rights* as set forth in the Sale Agreement *and have licensed to the Purchaser certain further intellectual property rights* as set forth in the License Agreement or in any of the Transaction Documents (as defined in the Sale Agreement) (*such transferred and licensed intellectual property rights being hereinafter referred to as the "Transaction IP"*); and
>
> ...
>
> 2.01 ... Subject to the terms and conditions of this Agreement, *the IP Licenses (including the right to sublicense) are hereby terminated with respect only to the Transaction IP* and only to the extent necessary for facilitating the Sale. ...[200]

200.    Accordingly, as Green observes:

> *The license rights under the MRDA were not transferred to purchasers in the Business Sales.* Rather... license termination agreements were executed by the US Entities and EMEA Entities... The effect of these license terminations was to allow the owner of the intellectual property – i.e. NNL – to transfer ownership of the IP, "unencumbered" by any such license, to each purchaser.[201]

201.    In light of this transaction structure, it was the sale of NNL's ownership interest in the

NN Technology, and not the LPs' Licenses, that accounted for the substantial majority of the

---

███████████████████████████████████

[198] CDMA License Agreement, art 2.01 (TR44142), *emphasis added.*
[199] The LPs retained a time-limited, non-exclusive, non-transferrable and largely non-sublicensable license to continue using that NN Technology to wind down their businesses: see, e.g., Arts. 2.02 and 2.05 of the CDMA LTA (TR48909).
[200] CDMA LTA (TR48909), *emphasis added.*
[201] Green Primary Report dated January 24, 2014, p. 4, *emphasis added.*

Business Sale Proceeds relating to the IP.[202]   The LPs did not transfer anything of value to the

Purchasers, since their only ownership interest – i.e., in the Licenses themselves – *could not* be

transferred under Article 14(a) of the MRDA as discussed above.[203]

202.    Nor could the LPs have sought to enter into their own version of the Business Sales by

sublicensing their License rights.   First, they could do indirectly through a sublicense that which

they were prohibited from doing directly through a transfer.   Second, any sublicense would still

have to be within the Field of Use, which would not have permitted the buyer to make, use or

sell any products other than those developed by or for Nortel.   Third, because any non-affiliated

sublicensee would not be an MRDA "Participant", the sublicense would not allow the buyer to

make or exploit any new products.[204]   As Britven opines:

> …[G]iven the numerous restrictions that burden the license, *the Surrendered Licenses*
> *were of de minimis value to a buyer.*[205]

203.    Because of this, the value of the Licenses in the context of the Business Sales was limited

to no more than what the LPs could have obtained by using the Licenses to continue to operate

the Lines of Business:

---

[202] Malackowski Deposition, 181:10-181:19; 182:25; 183:2-183:7 ("Q. …[I]n the valuation that you did of the IP *in the line of business sales, you were, in part, valuing the transfer of patents,* correct? A. *Yes,* sir. Q. …*[T]he asset which is transferred is title to the patent,* correct? … A. In part, *yes,* sir. … Q. …*[T]he title to those patents,* prior to the valuation dates that you have set out, *were held by NNL?* … A. It's my understanding that *they were held by the Canadian entity…*").

[203] See: Malackowski Deposition, 175:22-175:25; 176:2; 17:6-17:10 (and 177:6-177:8) ("Q. … Your understanding was that *the licensees could not transfer the licenses on their own.* … A. …[I]f transferring is used in a general way, we've discussed that *if transferring means assignment of ownership title, that may be the case*"). The LPs did not even possess the power to hold up the Business or Rockstar Sales by refusing to surrender their Licenses, since they relinquished this power in the IFSA: see Bazelon Deposition, 220:23-220:25; 221:2-221:10; 222:14-222:17.

[204] See the discussion of the non-transferability of the Licenses above. See also: Malackowski Deposition, 178:6-178:10 ("Q. In other words, *you couldn't sublicense more than the scope of your license?* A. Generally, I think *that's fair* when used in that linked way of license to sublicense, yes").

[205] Britven Primary Report dated January 24, 2014, para. 6.36, *emphasis added.* See also: Britven Rebuttal Report dated February 28, 2014, paras. 3.24-3.25. Affidavit of Sharon Hamilton sworn April 11, 2014, para. 62 ("*No [LOB] purchaser suggested that they would have been content to pay the purchase price they did to receive only a license to patents – they advocated for ownership* and only accepted licenses for patents when we were able to show them they were used in other LOBs"); Karina O Deposition, 222:3-222:20.

...[B]ecause the licenses were non-transferrable... care must be taken not to attribute to the license holders the value of something which they did not own – namely, a transferable right. *The purchasers paid for ownership of IP, not for a transfer of a non-transferable license. Accordingly,* the proper approach to valuing the license rights must reflect the fact that *the only value that the license holders could realize from the licenses was* the value that could be earned through the working of the licensed invention – i.e. *the profits that could be earned through the exploitation of the licensed IP, in the operation of businesses in accordance with the terms of the license. ...*[206]

204. The evidence is clear that Nortel was in a very weak financial position at the date of the Business Sales, and that the LPs would not have generated significant revenues from the Lines of Business going forward:[207]

> ...[A]s of the filing date, *Nortel could not sustain a viable leading global telecommunications business.*
> ...
> Leading up to 2008/9, Nortel was unable to achieve functional returns on its non-IP assets. *The prospects were poor for the Lines of Business and Licenced Participants looking forward from the filing date ...*[208]

205. Based on Nortel's asset impairment test and financial statements in 2008, which were audited by two major independent accounting firms, Britven opines that the fair market value of all Nortel Lines of Business on a go-forward basis was only $988 million.[209] Further, even that is in excess of what the LPs would have earned if the Lines of Business had continued, since the MRDA would have limited their income by the RPSM:

> ... Under the RPSM, income that was determined to be "residual income" (a measure of income or loss attributable to Nortel's intangible development and exploitation efforts) was required to be split among the Participants. *Participants who, absent the RPSM, had realized residual income in excess of their RPSM shares were required to make a payment (an "R&D Activity Payment") to other Participants...*

---

[206] Green Primary Report dated January 24, 2014, p. 15, *emphasis added.* See also: Britven Rebuttal Report dated February 28, 2014, para. 3.20.

[207] Affidavit of Paviter Binning sworn April 10, 2014, para. 30.

[208] Britven Primary Report dated January 24, 2014, paras. 3.37, 6.33 (and para. 3.38), *emphasis added.* See also: Green Primary Report dated January 24, 2014, pp. 30-38; Affidavit of Sharon Hamilton sworn April 11, 2014, paras. 16-25.

[209] Britven Primary Report dated January 24, 2014, paras. 6.38-6.40.

The Britven Primary Report and in the Green Primary Report acknowledge that *these income reallocation provisions* are part and parcel of the Surrendered Licenses and are relevant to the determination of the value of the Surrendered Licenses in connection with the Business Sales. They *would therefore have significantly reduced the operating profits that the Licensed Participants could have realized* through the exploitation of their interests in the NN Technology. ...[210]

206.    The combined RPSM share of the U.S. and EMEA Debtors under the MRDA was 50.2%, or $496 million, of the $988 million that the Lines of Business would have been worth had they continued.    Of that $496 million, 57.3%, or $285 million, represented the value of the IP as opposed to the other Lines of Business assets.[211]    Therefore, the U.S. and EMEA Debtors are only entitled to a combined allocation of $285 million of the $1.143 billion in Business Sale Proceeds relating to the IP.    The remaining $858 million in Business Sale IP Proceeds should be allocated to the Canadian Debtors.

### c.    NNL Is Entitled to Virtually All Proceeds From the Rockstar Sale

207.    With the conclusion of the Business Sales, Nortel had:

> (a) sold all of its IP that was used predominantly in specific Lines of Business;[212] and

> (b) licensed all of its IP used across multiple Lines of Business to the Business Sale purchasers.

208.    Further, the LPs had surrendered their own Licenses to the extent that they encompassed either of these forms of IP.    As a result, because the Field of Use restriction in Article 5(a) of the MRDA limited the Licenses to the right to make and exploit the "Products" of Nortel's own businesses, *the LPs had no valuable License rights remaining after the Business Sales.*

---

[210] Britven Rebuttal Report dated February 28, 2014, paras. 3.38-3.39, *emphasis added.*

[211] Britven Primary Report dated January 24, 2014, para. 6.40.

[212] Berenblut and Cox Primary Report dated January 24, 2014, para. 45 ("*[A]ll IP* (whether patents or license rights to patents) that was *related to Nortel's business was sold in the Business Sales*"); Affidavit of Sharon Hamilton sworn April 11, 2014, para. 56 ("*Collectively, the LOBs represented the entirety of the operating business any of the Nortel entities engage in... With the closing...* in March 2011, *no Nortel entity had any operating business* save for fulfilling its few remaining transition service obligations with a handful of employees").

209.    As discussed in further detail below, the U.S. and EMEA Debtors could not have sought to monetize the remaining NN Technology owned by NNL by pursuing an "IP Co." business model in which they licensed their patent rights to infringing third parties in lieu of bringing enforcement proceedings against them, as some of their witnesses suggest.[213]  The Field of Use which defined their License rights, and therefore also their License enforcement rights was limited to making Nortel Products, which were not products that Rockstar had any need for.

210.    As discussed above, virtually all of the Residual IP sold to Rockstar was owned by NNL and fell into two categories: Shared and Not Used.

211.    Importantly, this second category of patents involving inventions that were not used in Products comprised the majority of the Residual IP sold in the Residual IP Sale. As Gillian McColgan testified:

> Q. Now, if I look at this list, and tell me if you can categorize it from memory, the shared assets were a minority of the assets left in Residual Co.? A. From memory I believe that is correct, that *the vast majority of what was left was the not used.*"[214]

212.    Based on the available data, Duff & Phelps have estimated that approximately 59-66% of the Residual IP consisted of patents and applications that were not used to make, use or sell Products.[215]

213.    The U.S. and EMEA Debtors should receive an allocation of 2%, or a combined USD $87 million, of the USD $4.454 billion in Rockstar Sale Proceeds attributable to the small

---

[213] Declaration of John J. Ray III dated April 11, 2014, paras. 49-62, 68, 71; Kinrich Primary Report dated January 24, 2014, paras. 7, 70-77, 90-128.

[214] McColgan Deposition, 141:18-141:24, *emphasis added.*

[215] Britven Primary Report dated January 24, 2014, paras. 3.44, 6.57 and 6.63, *emphasis added.* See also: Green Primary Report dated January 24, 2014, p. 12; Berenblut and Cox Primary Report dated January 24, 2014, para. 50.

amount of Residual IP they owned. The remaining USD $4,368 million should be allocated to NNL.[216] The reasons for this are as follows.

214.    *First*, as to the Residual IP that had been used in the Lines of Business but not sold in the Business Sales, the LPs had already surrendered all of their License rights to this through the Business Sale LTAs and the granting of the parallel licenses to the Business Sale purchasers. Thus, the LPs did not relinquish any rights in that Residual IP through the Residual IP Sale other than with respect to the 2% of the Residual IP which they owned:

> As part of the allocation proceeds from the business sales, *the U.S. and EMEA Debtors have already been compensated* for the value of the MRDA license rights that they surrendered relating to the Residual Patents. Specifically under the MRDA the US and EMEA Debtors had obtained license rights to patents owned by NNL for use in their business operations. *In each business sale the income used to determine the values of the license rights surrendered includes access to the Residual Patents* as allowed under the terms of the MRDA. Therefore, determining *the value of the surrendered license rights* using those cash flows *has compensated the U.S. and EMEA Debtors for the profits that they could have earned exploiting this group of patents* based on their rights under the MRDA.[217]

215.    *Second*, the Residual IP which made up 59-66% of the Rockstar Sale Assets was never licensed to the LPs at all. These patents and patent applications were not used to make, use or sell any Products. Accordingly, they did not fall within the second arm of the License which was restricted to patents (and certain other IP) that were needed to make, use and sell Products. The LPs therefore did not relinquish any rights in that Residual IP by virtue of the Rockstar LTA, and are again only entitled to an allocation representing the 2% of that IP which they actually owned:

> …[A]pproximately *59 to 66 percent of the patents conveyed in the Rockstar Transaction* [Residual IP Sale] *were* patents and patent applications that were *not used to make, use or sell Products.* If those patents were not within the scope of the licenses held by the

---

[216] Britven Primary Report dated January 24, 2014, para. 6.65; Green Primary Report dated January 24, 2014, pp. 6, 64-65; Britven Rebuttal Report dated February 28, 2014, para. 2.5.

[217] Green Primary Report dated January 24, 2014, p. 64, *emphasis added*. See also: Britven Rebuttal Report dated February 28, 2014, paras. 3.15-3.16, 6.64.

Licensed Participants, then *any value associated with those patents would be attributed entirely to NNL.*[218]

216.     The same point is made by Green:

> …[T]he U.S. and EMEA Debtors' licenses did not include rights to patents not used in any of their operating businesses under the MRDA. Put another way, the rights would have no value. *Therefore, when license termination agreements were signed for the Rockstar Transaction, no rights of value were surrendered* relating to the Residual Patents…[219]

217.     The fact that the LPs executed an LTA in connection with the Residual IP Sale has no bearing on this analysis.  The Rockstar LTA was only entered into because one member of the Rockstar consortium "was extremely concerned about excluding any and all potential liabilities or encumbrances to the Residual IP (in particular existing license encumbrances), regardless of the degree to which a given liability or encumbrance could be characterized as a realistic concern".[220]  As noted above, the Rockstar LTA, IFSA and IP Transaction Side Agreement all stated that the Rockstar Sale did not impact the Nortel Debtors' ownership rights.   Indeed, Article 2.01 of the Rockstar LTA expressly left open whether the LPs had any License rights under the Residual IP at all:

> 2.01 … Subject to the terms and conditions of this Agreement, the Sale Agreement… and that certain IP Transaction Side Agreement… each of the Sellers hereby agrees that all license rights granted to such Seller under the following agreements are hereby terminated:
>
> > (i) the Master R&D Agreement, *to the extent such license rights are under* any of the Transferred Patents, Specified UK Patents or Undisclosed Patent Interests; …[221] [*emphasis added*]

---

[218] Britven Rebuttal Report dated February 28, 2014, para. 3.35, *emphasis added.* Green Primary Report dated January 24, 2014, p. 64.

[219] Green Primary Report dated January 24, 2014, p. 64, *emphasis added.* See also: Britven Primary Report dated January 24, 2014, para. 6.64.

[220] Affidavit of Sharon Hamilton sworn April 11, 2014, para. 99.

[221] Rockstar Transaction License Termination Agreement, s. 2.01 (TR21508).

### B. The Competing Theories of Allocation are Unprincipled and Incoherent

218.    The approaches to allocation advanced by the U.S. and EMEA Debtors and the UKPC are flawed for many reasons, but most notably because they deviate from the basic principle that in allocation the proceeds of a sale, the first question to ask is who owned the assets sold. Given that for the majority of the assets sold the owner was NNL, the U.S. Interests and EMEA Debtors put forward selective and unprincipled theories designed to obscure this simple answer. As is described further below, these theories ignore the fundamental role of the MRDA in allocating the rights and obligations of the parties. When they do look to the MRDA, they re-cast the key terms of that agreement in a self-serving manner to either suggest that the clear articulation of ownership of IP should be ignored or abandoned on no basis that is rooted in law.

#### 1)    The U.S. and EMEA Misconstrue the MRDA

219.    The expert reports filed by the U.S. and EMEA Debtors and UKPC are based on flawed assumptions that materially affect their conclusions. As detailed in the Table in Appendix C, these reports are based upon numerous inaccurate assumptions about the Nortel Debtors' rights under the MRDA. In particular, Kinrich (retained by the U.S. Debtors) and Malackowski and Huffard (retained by the EMEA Debtors) do not take into account that the Licenses granted by NNL to the LPs:

> (a)  only enabled the LPs to make, use and sell Products (as defined in the MRDA) of the Lines of Business;
>
> (b)  were non-transferable; and
>
> (c)  granted sublicense and enforcement rights in an infringement suit that were circumscribed by the Field of Use and other restrictions and limitations; and

(d) contained associated obligations that were part of the bargain between the parties, including income reallocation provisions under the RPSM.[222]

220.    These erroneous assumptions are critical to the different allocation conclusions reached by these experts,[223] and render them highly unreliable.[224]  Accordingly, the expert reports filed by the U.S and EMEA Debtors and UKPC should be disregarded.  The Courts cannot make an allocation ruling based upon the parties' ownership rights which fails to take into account the legal regime created by the MRDA.  As the Ontario Court of Appeal said in *Pirani*:

> …As *an expert's report is only as good as the underlying data and assumptions*, Mr. Zafar's report is virtually valueless… In my view, the statement "expertise commands deference only when the expert is coherent" applies to Mr. Zafar's calculations… I therefore conclude that the *trial judge ought to have rejected Mr. Zafar's report given that the critical underlying assumption* as to the rental income in 2002 *cannot be reconciled with the… evidence led at trial.*[225]

221.    While they each rely on aspects of the MRDA, the U.S. and EMEA Debtors proceed to ignore the express ownership and licensing terms.

### 2)  The Revenue Theory is Unprincipled and Unsupported by the Facts

### a.  Using Revenue is Unjustified and Unprincipled

222.    The U.S. Interests assert that the Sale Proceeds should be allocated based on each Nortel Entity's proportionate contribution to 2009 revenues.  The U.S. Interests justify this allocation model primarily on the basis that NNI "generated the overwhelming majority of revenue" among the MRDA entities.[226]  Although claiming that "allocation should be determined based upon the

---

[222] Britven Rebuttal Report dated February 28, 2014, paras. 3.1-3.40.

[223] Kinrich Deposition, 93:20-93:25; 94:2-94:17; 102:6-102:20; 153:2-153:21; 154:18-154:25; 155:2-155:24; 156:4-156:25; 157:3-157:7; Huffard Deposition, 92:4-92:16; 93:8-93:25; 123:11-123:25; 124:2-124:12; 146:15-146:25; 147:2-147:4.

[224] Britven Rebuttal Report dated February 28, 2014, paras. 3.1-3.40.

[225] *Pirani v. Esmail*, 2014 ONCA 145 at para. 59.

[226] U.S. Debtors' Pleading, p. 14.

assets that each Selling Debtor sold or relinquished" in the Sales,[227] the Revenue Theory ignores

that the most significant assets sold in the Sales were those that belonged to NNL, not NNI.

223.    There is no logical reason to suggest that the revenue recorded by NNI (or any other

subsidiary) should serve as a proxy for its share of what was surrendered in the Sales.  As Green

notes, the U.S. Debtor's expert, Jeffrey Kinrich, does not offer any explanation for the ostensible

link between the revenue generated by a particular legal entity and its share of the Sale

Proceeds.[228]    The focus on revenue rather than the assets sold and their value, is unprincipled

and designed only to generate an unnaturally high return to the U.S. Interests.

### b.  The Revenue Theory Ignores the Expenses and Obligations Associated with the Right to Generate Revenue

224.    Not only does the Revenue Theory ignore the ownership of the revenue-generating

assets, but it seeks to isolate the Nortel subsidiaries – and particularly NNI – from the expenses

and obligations that were necessary to enjoy the right to generate any revenue at all.  In fact, NNI

was a subsidiary whose revenue-generating efforts depended almost exclusively on the

exploitation of technology that it did not primarily develop and that it never owned.  In order to

be able to use that technology to generate revenue, NNI had related obligations, including to

share the revenue that it generated from the IP.  This was at the heart of the bargain struck in the

MRDA.

225.    NNI was required to remit certain cash surpluses to the other Nortel members under the

RPSM, pursuant to Article 3(b) of the MRDA.[229]  This reflects the fact that, within the Nortel

matrix structure, the revenues that one Participant (e.g., NNL) enabled *another* Participant (e.g.,

NNI) to generate were just as important as the revenues actually generated directly by that

---

[227] U.S. Debtors' Response, p. 6.

[228] Green Rebuttal Report dated February 28, 2014, p. 5 (and 6). See also: Malackowski Rebuttal Report dated February 28, 2014, pp. 33-34; Malackowski Deposition, 53:9-53:25; 54:2-54:13.

[229] Declaration of Walter T. Henderson, Jr. sworn April 11, 2014, paras. 37-38.

second Participant itself.[230]  Accordingly, per-Participant revenue is meaningless as a measure of

the value owned and relinquished by the Nortel Debtors in the Sales..

226.    The focus on revenue, rather than profits or cash flow, is also telling.   While the U.S.

interests repeatedly suggest that the Licenses to use IP were "royalty-free," in fact the use of the

Licenses required adherence to the MRDA terms that expressly restricted what profits generated

by the use of NNL's IP could be retained by the Participants, including NNI.  As Green notes:

> A contractually imposed obligation that reduces cash flow must be taken into account in a
> valuation, especially where it occurs in the same contract that gives rise to the
> opportunity to earn revenue in the first place.  The MRDA contains both the grant of the
> license rights that the Kinrich Report relies on to say the U.S. and EMEA Debtors could
> have earned revenues, and the RPSM obligations to share the profits resulting from
> exploitation of the rights granted.[231]

227.    The U.S. Interests' reliance on revenue in isolation is particularly inappropriate given that

many of the businesses sold in the Sales were not profitable, and had not been for several

years.[232]

### c.  The Revenue Theory Ignores the Role of NNL in NNI's Business

228.    The Revenue Theory also unreasonably seeks to isolate NNI as a subsidiary from the

global business to which it belonged.   The U.S. Interests completely ignore the role of NNL in

providing the assets and creating the conditions that permitted revenue to be generated in the first

place.  In the absence of the spending, capacity, and assets provided by NNL, NNI could not

have existed as a revenue-generating entity.

229.    It is not unusual in a global business for certain legal entities to take on a disproportionate

share of costs, while other related legal entities may benefit from a disproportionate share of

---

[230] Affidavit of Peter Currie sworn April 11, 2014, paras. 70-72.
[231] Green Rebuttal Report dated February 28, 2014, p. 13. See also: Affidavit of Paviter Binning sworn April 10,
    2014, paras. 32-36; Affidavit of Peter Currie sworn April 11, 2014, paras. 23-28.
[232] Green Rebuttal Report dated February 28, 2014, pp. 12-13.

revenues.  In those circumstances, revenue cannot reasonably be used as a measure of the value of each legal entity to the business.  As Green observes:

> The individual entities within each Nortel operating business were interrelated in what Nortel referred to as a matrix structure. *The primary focus of certain entities was sales and distribution. That was possible because other entities* within the Nortel group *bore disproportionate shares [of] centralized expenses like research and development.* Therefore, *a revenue-based valuation multiple is an inappropriate method to value entities within the matrix structure.*[233]

230.  The choice of revenue as a proxy for value ignores that many of Nortel's key corporate functions – R&D, for example – would not be seen as revenue generators if viewed in isolation, but were nonetheless essential to Nortel's business and the value of the assets sold.  The costs of functions like R&D, operations, finance, legal – largely supported by NNL – must be considered alongside the revenue generated by the subsidiaries.  Without them, the subsidiaries would have been unable to perform the sales that generated that revenue.

231.  NNL conducted a disproportionate share of R&D, leading to many of Nortel's most successful innovations that enabled local Nortel Entities to earn revenue.   The largest concentration of R&D employees was in Ottawa, which had been the only site for Nortel's R&D activities until the 1980s.[234]   In the 1970s and 1980s, Nortel's R&D efforts based in Ottawa resulted in several ground-breaking telecommunications platforms and innovations.[235]  Even as Nortel became an increasingly global company, NNL remained at the core of Nortel's R&D activities.[236]

232.  NNL and its employees were always in key global leadership roles in R&D.   As described by Brian McFadden, Nortel's Chief Technology Officer and Chief Research Officer in

---

[233] Green Rebuttal Report dated February 28, 2014, p. 13, *emphasis added*. See also: Affidavit of Paviter Binning sworn April 10, 2014, paras. 32-36; Affidavit of Peter Currie sworn April 11, 2014, paras. 23-28.
[234] Affidavit of Brian McFadden sworn April 10, 2014, paras. 15-16.
[235] Affidavit of Clive Allen sworn April 11, 2014, paras. 19-20.
[236] Affidavit of Brian McFadden sworn April 10, 2014, para. 16.

2004-05, "[n]o major decision regarding R&D direction or funding was taken without approval from Ottawa."[237] Given Ottawa's critical mass of R&D personnel, all business units carried out R&D in Ottawa and most "next-generation technology research" was performed there.[238] By contrast, NNI never had the necessary R&D capacity to operate as a standalone entity.[239]

233.    Notably, NNL also contributed the majority of the "Research" R&D, including Nortel's "Advanced Technology Programs" work.[240] This research – unlike optimization and localization efforts – was most likely to generate patentable intellectual property[241] of the sort that was responsible for much of the value in the Sales.

### d. Revenue Theory Offers a Circular Valuation of What Was Sold

234.    Rather than apply principles of valuation to consider the ownership and features of the assets sold both in the Business Sales and the Residual IP Sale, the U.S. Interests instead offer circular methodologies that merely beg the question on the key question of allocation.

235.    In respect of the Business Sales, Kinrich merely applies the relevant proportion of 2009 revenues by jurisdiction to determine what share of the proceeds should go to each set of Nortel Debtors. No explanation is given to justify why revenue should or can be used in this manner, as opposed to other measures of value. Furthermore, even if revenue were appropriate as one measure, the Kinrich approach considers only point-in-time revenue, failing to take any account of anticipated future cash flows or the risks inherent in the ability of the Nortel Debtors to continue to generate revenue in their respective markets. As noted by Britven, "[i]t is clear that

---

[237] Affidavit of Brian McFadden sworn April 10, para. 15.
[238] Reply Affidavit of Brian McFadden sworn April 25, 2014, para. 3.
[239] Reply Affidavit of Brian McFadden sworn April 25, 2014, para. 3; Reply Affidavit of Sharon Hamilton, April 25, 2014, paras. 4-20.
[240] Reply Affidavit of Brian McFadden sworn April 25, 2014, para. 11.
[241] Reply Affidavit of Brian McFadden sworn April 25, 2014, para. 11.

there is no valuation work done but simply a mathematical calculation distributing the Business Sale Proceeds to the Nortel Debtors based on relative 2009 revenues."[242]

236.    Similarly, in respect of the Residual IP Sale, the U.S. Interests again adopt an entirely circular approach.    Kinrich begins by assuming – without foundation – that the value relinquished by the Nortel Debtors in connection with the Residual IP Sale correlated to forecasted revenues from a licensing business that was rejected by the Estates.

237.    Kinrich "infers" (i.e. plugs) a discount rate for a hypothetical licensing business.[243]  He does no valuation work at all.  Kinrich merely assumes that the purchase price reflects projected cash flows, and then calculates the only discount rate that would lead to that result.  Notably, the discount rate he adopts (12.2% to 15.7%)[244] is entirely different from the discount rates used by Nortel's professional financial advisors (25% to 45%)[245] and the EMEA Debtors' expert (30%).[246]

238.    Kinrich's own footnote observes that the range of discount rates he calculates are appropriate for a "communications equipment manufacturer,"[247] even though the hypothetical business at issue is not a manufacturer of any sort.

### e.  Revenue Theory Allocates the Residual IP Proceeds on the Basis of a Wholly Unrealistic "IPCo." Model

239.    The U.S. Interests theorize that they *could have* earned significant sums in licensing revenue from the IP Co. idea (the "IP Co. Idea") that Nortel and its stakeholders rejected in favour of selling the Residual IP to Rockstar.  There are several reasons why the IP Co. Idea and related modeling are an inappropriate basis on which to allocate the Residual IP Proceeds.

---

[242] Britven Rebuttal Report dated February 28, 2014, p. 19.
[243] Kinrich Primary Report dated January 24, 2014, para. 118.
[244] Kinrich Primary Report dated January 24, 2014, para. 118.
[245] See Green Rebuttal Report dated February 28, 2014, pp. 17-19.
[246] Malackowski Rebuttal Report dated February 28, 2014, p. 39, Table 11; Malackowski Deposition, 63:19-63:22.
[247] Kinrich Primary Report dated January 24, 2014, p. 59, Footnote 172.

240.    *First*, there is no basis for the U.S. Interests' assumption that NNI would have had all legal rights to the Residual IP in the U.S. (part of its Exclusive Territory under the MRDA) necessary to achieve the projected cash flows estimated in the various iterations of the IP Co. financial projections.  NNL owned the IP in the Residual Portfolio and NNI did not have any rights to keep revenue earned from a licensing business had it ever embarked on one.  The IP Co. Idea never even progressed to the point where ownership to the Residual IP was considered or discussed in any detail. The Estates considered having NNL retain ownership of the Residual IP in order to utilize NNL's tax losses in connection with a licensing business, or transferring the Residual IP to a new company (i.e., the "IP Co."). Even if the Residual IP had been transferred to a new company, there was never any agreement by NNL that NNI would be entitled to keep all U.S. revenues generated by a licensing business.[248]

241.    *Second*, Nortel was not capable of generating anything near the $4.545 billion paid by Rockstar for the sale of the Residual IP through a licensing business.  Nortel had no experience operating a licensing business and very little experience in licensing generally.[249] As Veschi testified:

> Q.    All right. Going back to when you started at Nortel, what kind of licensing revenue in comparison to the overall revenue of Nortel was being generated off the IP portfolio?
>
> A.    *Virtually none.*[250]

242.    The IP Co. Idea would have required a start-up phase (expected to last several years) whereby little or no revenue would be generated and significant working capital would be required in order to fund litigation.  For instance, under one scenario, estimated costs for the period 2010 through 2013 were approximately $417 million, with no revenue until the fourth

---

[248] Affidavit of Sharon Hamilton sworn April 11, 2014, paras. 72, 76.
[249] Affidavit of Sharon Hamilton sworn April 11, 2014, para. 78.
[250] Veschi Deposition, 146:18-146:22, *emphasis added.*

year of IP Co.'s operations.[251]  The IP Co. Idea was so fraught with risk that the Estates elected

to sell the Residual IP around the time when the estimated purchase price was approximately

$900 million.  Although the Bondholder Group continued to express interest in the IP Co. Idea, it

did not agree to provide the requisite start-up capital.[252]

243.    *Third*, the Rockstar Proceeds vastly exceeded the revenues that Nortel could have earned

had the IP Co. Idea been capable of implementation.  Specifically, the dynamic of the auction

and the defensive value of the Residual IP to the members of the Rockstar Consortium made the

Residual IP more valuable to Rockstar than it was in the hands of Nortel.[253]  The Rockstar

Consortium obtained ownership of the Residual IP and each of the members of the consortium

(including Apple, Microsoft, Ericsson, Blackberry) received a license to the Residual IP.  The

structure enabled Rockstar to exercise all rights of ownership to the Residual IP against third

parties, while providing the individual consortium members with the defensive benefits to

prevent others from suing them for patent infringement.  In short, the Residual IP was worth far

more to Rockstar than Nortel could have earned from licensing.[254]

244.    *Fourth*, even assuming that projected revenues could form the basis of an allocation of

the Rockstar Proceeds, the data in the financial modeling relied upon by the U.S. Interests is an

unreliable basis for allocation.  Between approximately March and November 2010, Nortel and

Lazard developed various spreadsheets to illustrate potential returns from the IP Co. Idea.  The

various iterations of the spreadsheets include myriad different assumptions regarding discount

rates, amount of litigation engaged in, probability of litigation success, costs of enforcement and

projected future cash flows.  No particular spreadsheet model was ever accepted or approved by

---

[251] Affidavit of Sharon Hamilton sworn April 11, 2014, para. 79.
[252] Affidavit of Sharon Hamilton sworn April 11, 2014, paras. 82-84; Reply Affidavit of Sharon Hamilton sworn
       April 25, 2014, para. 34; Kinrich Primary Report dated January 24, 2014, para. 76.
[253] Affidavit of Sharon Hamilton sworn April 11, 2014, para. 87.
[254] Affidavit of Sharon Hamilton sworn April 11, 2014, paras. 91, 96-97; Berenblut and Cox Rebuttal Report dated
       February 28, 2014, paras. 32-44.

Nortel or Lazard. Kinrich relies upon a particular spreadsheet (version 3.1, October 25, 2010),[255] which was superseded by a later version (version 4.0, November 18, 2010) and which had projected revenues of less than half those contained in version 3.1.[256] The discounted valuations from the data in version 3.1 relied upon by Kinrich range between approximately $458 million to $2.7 billion, depending on the assumptions.[257] As discussed above, Kinrich purports to conduct a "valuation" of the interests owned and relinquished by the Nortel Debtors by reverse-engineering an inconceivably low discount rate that fails to take into account the significant risks of the business idea that had been proposed.

### 3) The EMEA Theories are Unprincipled and Unsupported by the Facts

245. The theories advanced on behalf of the EMEA Debtors are similarly flawed and unprincipled.

### a. Contribution Does Not Equal Ownership

246. The EMEA Debtors assert an entitlement to Sale Proceeds attributable to NNL's IP based on their relative contributions to R&D. However, as discussed above, the R&D contributions of the Participants do not create any ownership interest in the NN Technology owned by NNL and sold to the purchasers of the Lines of Business and Rockstar.

247. As the Joint Administrators admitted in their application for administration in the UK:

> ... all intellectual property ("IP") rights belong to NNL, the Canadian company, irrespective of which Group company originally carried out the research and development activity that generated the IP.[258]

---

[255] Email from J. Lux to M. Sprag et al. re: Project Iceberg Revised Model 3.0, attaching Model 3.1 Excel, dated October 25, 2010 (TR12012), Kinrich Primary Report dated January 24, 2014, p. 3, footnote 4 and Exhibits 27A and 27B.

[256] Kinrich Primary Report dated January 24, 2014; Green Rebuttal Report dated February 28, 2014, pp. 22-23.

[257] Green Rebuttal Report dated February 28, 2014, Appendix N, pp. 3-4.

[258] Nortel Networks EMEA Companies' Report of Alan Robert Bloom, Alan Michael Hudson, Stephen John Harris, David Hughes and Christopher John Wilkinson Hill of Ernst & Young LLP dated January 14, 2009 (TR31623), p. 6, para. 3.3.

Case 09-10138-MFW    Doc 13552    Filed 05/11/14    Page 105 of 168

248.    As Alan Bloom stated in his deposition:

> Q. -- the first sentence says: "Secondly, all intellectual property" -- that's defined as IP -- "rights belonging to -- belong to NNL, the Canadian company, irrespective of which group company originally carried out the research and development activity that generated the IP."
>
> Did you understand that to be the case in January 2009?
>
> That's -- that's our understanding of the case -- the position in January 2009.
>
> Q.    *You were also careful to report accurately in these reports as they were made. Correct?*
>
> A. *Correct.* Finished with this one?[259] [Emphasis added.]

249.    There is nothing "unjust" about the ownership and licensing structure under the MRDA. The EMEA Debtors received a royalty-free License to the NN Technology within the Field of Use and a share of the operating profits resulting from the R&D contributions of NNL and all of its subsidiaries that conducted R&D.

### b.  Contribution Does Not Equal Value

250.    The EMEA Debtors' position ignores the fundamental fact that contribution to the development of an asset, however measured, does not equate to value. As Britven states:

> Malackowski's R&D-based proxy is unsuitable. He acknowledges that an optimal measure of contribution would focus on the output of the R&D process and R&D expense is an input measure, not an output measure.
>
> Using the R&D based proxy also assumes that every dollar of R&D was equally productive (or unproductive), regardless of where it was spent, or how long ago the dollar was spent.[260]

251.    As Green states:

> The Malackowski Report does not provide any explanation as to how each Debtor's relative R&D expenses can be related to the value of the assets transferred or rights surrendered by that [Debtor], and I am not aware of any. Therefore, the entire

[259] Bloom Deposition, 186:16-187:2; 188:6-188:9.
[260] Britven Rebuttal Report dated February 28, 2014, p. 27, para. 6.15.

contribution analysis contained in the Malackowski Report sheds little light, if any, on what I understand the key valuation question to be.[261]

252.   Even EMEA's own expert recognizes this principle in rejecting the "cost approach" when valuing the assets owned and relinquished by the Nortel Debtors:

> Perhaps most importantly in the case of Nortel, [the Cost Approach] does not consider whether the cost of producing an asset was proportional to the actual value of the asset.[262]

**c.   R&D Spend is an Arbitrary Contribution Proxy**

253.   Even if the relative contributions of the Nortel Debtors were relevant, the historical R&D spending is an arbitrary and imperfect proxy for contribution.

254.   Malackowski admits that R&D spend is an imperfect measure of each of the Nortel Debtor' entities contributions:

> *Ideally, the contributions of the RPE's labs to the development of the patented technologies could be fully and accurately determined by interviewing all of the firm's R&D staff, and by reviewing all the documentation related to the firm's research (e.g. lab notebooks, invention disclosures, meeting minutes, research presentations, etc.).* This process would allow one to determine where the conception of the idea for each invention occurred, what resources and data led to the conception of the inventions and what resources were used to reduce each invention to practice. *Based on my experience… this would be the most accurate process for determining research contributions.* This approach is not possible for Nortel's IP due to the size of the portfolio, the limitations on time and the availability of information.[263]

255.   There are other data points for measuring relative contribution that are at least as good, if not better, than the historical R&D expenditure of each Nortel Debtor. For instance, the residence of the inventors is at least as informative as R&D expenditure. It is noteworthy that:

(a)    according to Britven's calculations, approximately 50% of all of the patents and patent applications were invented by Canadian inventors;[264] and

---

[261] Green Rebuttal Report dated February 28, 2014, p. 34.
[262] Malackowski Primary Report dated January 24, 2014, p. 22.
[263] Malackowski Primary Report dated January 24, 2014, p. 39.
[264] Britven Rebuttal Report dated February 28, 2014, para. 6.17.

(b)    according to Bazelon's calculations, approximately 54% of Nortel's "top patents" originated in Canada.[265]

256.    It is noteworthy that the EMEA Debtors' own expert, Malackowski, analyzed the residence of the inventors on certain of Nortel's patents as a "reasonableness check" or a "comparative analysis" of each Core Party's proposed allocation methodologies.[266]

### d.    R&D Look Back Period is Selective and Self-Serving to the EMEA Debtors

257.    The EMEA Debtors attempt to justify a proposed allocation by R&D spend on the basis that it is what the parties to the MRDA agreed to. Yet, the EMEA Debtors then immediately depart from the MRDA and propose that the Courts adopt a wholly different formula for allocation than the RPSM formula for sharing operating profits contained in the very same agreement.[267]

258.    The EMEA Debtors' position is selective and self-serving. As Green states:

> ... a five year look-back period for research and development expenses was included in the MRDA. This look-back period was intended to provide returns for research and development consistent with the actual marketing and use of the technology. The Malackowski Report's use of the 16-year or longer look back period assumes (without support) that the oldest technology was driving current sales. This is not consistent with Nortel's actual operations, nor is it consistent with the MRDA.[268]

259.    The EMEA Debtors' offer no justifiable reason for departing from the five year look back period in the MRDA for the allocation of operating profits. Malackowski selects look back periods for the Business Sales and the Residual IP Sale based on the year prior to the oldest unexpired patent in each Sale that was designated as high interest by Global IP.[269] The proposed start dates for the look back periods are as early as 1989 (in the case of the Enterprise Sale) and

---

[265] Bazelon Primary Report dated January 24, 2014, p. 18, Table 1.
[266] Malackowski Rebuttal Report dated February 28, 2014, p. 41; Malackowski Deposition, 71:4-71:22.
[267] Malackowski Primary Report dated January 24, 2014, p. 45. See also: Cooper Primary Report dated January 24, 2014, pp. 28-32.
[268] Green Rebuttal Report dated February 28, 2014, p. 35.
[269] Malackowski Primary Report dated February 28, 2014, pp. 48-49.

as late as 2001 (in one scenario considered for the Residual IP Sale) and are a multiple of the five year period specified in the RPSM.[270]

260.    The resulting look back periods proposed by Malackowski are arbitrary and self-serving to the EMEA Debtors. As Malackowski testified at his deposition:

> … I think your question was, if I were to limit my methodology to a five-year look-back, would that, in fact, reduce the ultimate allocation to EMEA. And my sense of that is that it would, given my understanding of the historical incurrence of the data, but I can't tell you by how much.
>
> Q.    And you can't tell us by how much because you didn't do that comparison calculation?
>
> A.    I don't believe that comparison is relevant. *I have not done it.*[271]

### e.  Alternative License Approach is Equally Flawed

261.    As an alternative to the Contribution Theory for allocating the Sale Proceeds from IP, the EMEA Debtors put forward an Alternative License Theory. The Alternative License Approach suffers from many of the same defects as the Revenue Theory proposed by the U.S. Interests. The Alterative License Approach:

(c)    assumes that the EMEA Debtors had licenses to all NN Technology in their Exclusive Territories under the MRDA, thus ignoring the terms of the MRDA including NNL's ownership of the NN Technology, the Field of Use and the restrictions on enforcement in the Exclusive and Non-Exclusive Territories;

(d)    ignores the obligations of the LPs under the MRDA – the very same contract on which the EMEA Debtors rely for their overbroad interpretation of the License; and

---

[270] See: Green Rebuttal Report dated February 28, 2014, p. 35.
[271] Malackowski Deposition, 77:24-78 :7; 79:18-79:24; 80:8-80:17, *emphasis added.*

(e)     assumes that revenue earned by each Nortel Debtor correlates perfectly with the value of the assets owned and relinquished by that Nortel Debtor.

262.    Even Malackowski agrees that the Alternative License Theory for valuing and allocating Sale Proceeds attributable to IP is not a preferred method, in part because it undervalues the contributions made by Canadian inventors:

> Q. -- you express the view that what you describe as the contribution approach is your preferred method of allocation, correct?
>
> A. Generally, yes.
>
> Q. All right. And one thing you prefer it to is the license-based approach that you also describe in your report, correct?
>
> A. Yes, I think that's fair.
>
> …
>
> Q. Okay. And if we compare that 10.6 percent result for Canada under the  license approach to the inventorship analysis, we reach the same conclusion as you reached about Mr. Kinrich's approach, don't we, that the disparity is a cause for concern about that approach?
>
> …
>
> A. For the reasons described within my report, the general ratio is similar. So,  again, to me, that points to the use of the contribution analysis. But, yes, I think that the numbers speak for themselves in similar proportion.
>
> Q. The same comments that you made in paragraph 41 -- on page 41 of your rebuttal report, comparing Mr. Kinrich's allocation to Canada, which was 9.7 percent, could be made about the license approach, your license approach allocation to Canada of 10.6 percent. The numbers are close enough so that the same conclusions would follow; isn't that fair?
>
> A. The same order of magnitude comparison of the data would apply.[272]

263.    For these reasons, the Sale Proceeds should be allocated to the Nortel Debtors as set out in paragraph 26 above.

---

[272] Malackowski Deposition, 77:24-789:3; 79:18-80:17.

# PART IV – PRO RATA ALLOCATION

## A.  *In the Alternative, There Should Be A Pro Rata Allocation*

### 1)  **The Courts Have Jurisdiction to Make a *Pro Rata* Allocation Order**

264.    If the Courts choose not to allocate the Sale Proceeds based on the ownership of the assets sold, then the only fair and reasonable alternative is to allocate the Sale Proceeds among the Nortel Debtors in accordance with equitable principles, so as to effect (having taken account those assets that each Nortel Debtor already possesses) a *pro rata* distribution of all Global Assets among Creditors according to their valid Claims. The Court may grant such ancillary or corollary relief as may be necessary to give effect to this order.

265.    There is no doubt that the Courts have jurisdiction to allocate the Sale Proceeds on whatever basis that they determine to be fair and reasonable.  In other contexts, courts have allocated asset values among corporate affiliates in bankruptcy proceedings to effect a rateable distribution.[273]  Should the Courts choose not to enforce the MRDA terms, they can and should choose to effect a *pro rata* outcome.

266.    In the U.S., the Code permits a court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Code]".[274]  The Third Circuit has construed this provision to give a bankruptcy court "broad authority" to provide equitable relief appropriate to assure the orderly conduct of reorganization proceedings,[275] and allows it to "craft

---

[273] *See, e.g.,* Michael B. Rotsztain and Natasha De Cicco, *Substantive Consolidation in CCAA Restructurings: A Critical Analysis*, Torys LLP, 2004 (evaluating cases approving consolidation from the United States and Canada); *Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215 (1941) ["*Consolidating estates (indeed, consolidating debtor and non-debtor entities) traces to the* [United States] *Supreme Court's Sampsell decision in 1941.*" *In re Owens Corning*, 419 F.3d 105, at 209, footnote 14 (3rd Cir. 2005)]; *Ashley* v. *Marlow Group Private Portfolio Management Inc.*, [2006] O.J. No. 1195 (S.C.J.) at para. 71; *A&F Baillargeon Express Inc. (Trustee of), Re*, [1993] Q.J. No. 884 (S.C.) at paras. 21, 23; *Orange Global GP Inc., Re*, 2013 CarswellOnt 9770 (S.C.J.) at paras. 13, 15; *Kitchener Frame Ltd.*, 2012 CarswellOnt 1347 (S.C.J.) at para. 30.
[274] *Bankruptcy Code*, 11 U.S.C. § 105(a).
[275] *See, e.g., In re Combustion Eng'g, Inc.*, 391 F.3d 190, at 236 (3d Cir. 2004).

flexible remedies that, while not expressly authorized by the Code, effect the result the Code was designed to obtain."[276]

267.    Indeed, the fundamental principle of U.S. bankruptcy law is that "[t]he 'overriding consideration' in bankruptcy is that 'equitable principles govern.'"[277]  The "function of equitable considerations in a bankruptcy proceeding is to guide the division of a pie that is too small to allow each creditor to get the slice for which he originally contracted."[278]  In carrying out this objective, "[t]he court may diminish one creditor's bargained for rights in order to protect a second creditor's bargained for rights."[279]

268.    This approach extends to multinational corporate groups in international insolvency.  As courts have noted, "the United States… has embraced an approach to international insolvency…accepting the central premise of universalism, that is, that assets should be collected and distributed on a worldwide basis".[280]  These policies are of particular importance where the business is integrated on a global basis.

269.    In Canada, the Ontario Superior Court of Justice has a broad inherent jurisdiction: "As a superior Court of general jurisdiction, the [Superior Court of Justice] has all of the powers that are necessary to do justice between the parties.  Except where provided specifically to the

---

[276] *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, at 568 (3d Cir. 2003) (en banc).

[277] *In re Tucson Yellow Cab Co., Inc.*, 789 F.2d 701, at 704 (9th Cir. 1986) (quoting *Bank of Marin v. England*, 385 U.S. 99, at 103 (1966)).

[278] *Matter of Chicago, Milwaukee, St. Paul & Pac. R. Co.*, 791 F.2d 524, at 528 (7th Cir. 1986).

[279] *Matter of Terry Ltd. P'ship*, 169 B.R. at 182, 186 (Bankr. N.D. Ind. 1993) *aff'd sub nom, Invex Holdings, N.V. v. Equitable Life Ins.*, 179 B.R. 111 (N.D. Ind. 1993).

[280] *Maxwell Commun. Corp v. Barclays Bank (In re Maxwell Comun. Corp.)*, 170 B.R. 800, at 816 (Bankr. S.D.N.Y. 1994).  See also *In Re ABC Learning Centres Limited*, 728 F.3d 301 at 305-306 (3rd. Cir. 2013).  Several international quasi-governmental organizations [*eg*, World Bank and IMF] and non-governmental organizations [*eg*, INSOL International, International Bar Association, American Bankruptcy Institute, American Bar Association] have joined with the United Nations Commission on International Trade Law (UNCITRAL) Working Group V on Insolvency Law to develop guiding principles for dealing with insolvency proceedings of multinational corporate enterprise groups predicated on core universalism principles.  *See*,  http://www.uncitral.org/uncitral/en/commission/working_groups/5Insolvency.htm; http://www.uncitral.org/uncitral/en/commission/colloquia/insolvency-2013-papers.html.

contrary, the Court's jurisdiction is unlimited and unrestricted in substantive law in civil matters."[281]

270.    Under the CCAA, the Court has a broad discretion to grant such relief as is necessary to achieve the purposes of the Act.[282]    Furthermore, the court has a broad discretion under the CCAA to grant such relief as is necessary to achieve the purposes of the Act.[283]    In *Century Services,* the Supreme Court of Canada observed:

> [60] Judicial decision making under the *CCAA* takes many forms. A court must first of all provide the conditions under which the debtor can attempt to reorganize. This can be achieved by staying enforcement actions by creditors to allow the debtor's business to continue, preserving the *status quo* while the debtor plans the compromise or arrangement to be presented to creditors, and supervising the process and advancing it to the point where it can be determined whether it will succeed....In doing so, the court must often be cognizant of the various interests at stake in the reorganization, which can extend beyond those of the debtor and creditors to include employees, directors, shareholders, and even other parties doing business with the insolvent company.... In addition, courts must recognize that on occasion the broader public interest will be engaged by aspects of the reorganization and may be a factor against which the decision of whether to allow a particular action will be weighed....

> *[61] When large companies encounter difficulty, reorganizations become increasingly complex. CCAA courts have been called upon to innovate accordingly in exercising their jurisdiction beyond merely staying proceedings against the debtor to allow breathing room for reorganization. They have been asked to sanction measures for which there is no explicit authority in the CCAA.*[284]

This equitable power is reflected in the current enactment of the CCAA expressly recognizes that a supervising judge "may, subject to the restrictions set out in this Act... make any order that it

---

[281] *80 Wellesley St. East Ltd.* v. *Fundy Bay Builders Ltd. et al.,* [1972] 2 O.R.280 (C.A.) at para. 9.

[282] *Century Services Inc.* v. *Canada (Attorney General),* 2010 SCC 60 at paras. 57-61; *Crystallex Re,* 2012 ONCA 404, at para. 63, *leave to appeal denied,* 2012 CarswellOnt 11931; Jackson R., and Sarra, J. P., "Selecting the Judicial Tool to get the Job Done: An Examination of Statutory Interpretation, Discretionary Power and Inherent Jurisdiction in Insolvency Matters," in Sarra, J. P., ed., 2007, Annual Review of Insolvency Law, (Vancouver: ThomsonCarswell, 2007).

[283] *Companies' Creditors Arrangement Act,* R.S.C., 1985, c. C-36 ("CCAA"), s. 11; *Crystallex Re,* 2012 ONCA 404 *leave to appeal denied,* 2012 CarswellOnt 11931; Jackson R., and Sarra, J. P., "Selecting the Judicial Tool to get the Job Done: An Examination of Statutory Interpretation, Discretionary Power and Inherent Jurisdiction in Insolvency Matters," in Sarra, J. P., ed., 2007, Annual Review of Insolvency Law, (Vancouver: ThomsonCarswell, 2007).

[284] *Century Services Inc.* v. *Canada (Attorney General),* 2010 SCC 60 at paras. 57-61, *emphasis added.*

considers appropriate in the circumstances."[285] This includes effecting remedies much broader than those sought here, including the actual consolidation of estates and claims.[286]

271.    This is a novel case. Equitable principles, however, are not novel. Equitable pro rated outcomes are ordered by Courts when it is determined that there is no more coherent and fair measure to apportion value and determine entitlements. In this case, having regard to the way Nortel operated, as described in the evidence, and the alternatives presented to the Courts after 5 years of litigation and hundreds of millions of dollars of expenses, if the Courts reject the CCC ownership methodology, the fairest way to apportion value and entitlements is by way of a single pro rated common dividend; no more coherent alternative has been put to these Courts.

## 2)    *Pro Rata* Allocation Reflects the Nature of Nortel's Business

272.    The evidence is clear that Nortel operated as an integrated, interdependent global business through its Lines of Business.    As the U.S. Debtors recognized during these proceedings:

> Together, the Debtors, the Canadian Debtors and certain of their non-debtor affiliates operate an integrated, multinational business, providing networking and communications technology and services to customers in the United States, Canada and around the world.
>
> …
>
> The Nortel Companies' businesses are highly complex and global in nature… The U.S. Debtors, the Canadian Debtors, the EMEA Debtors and their debtor and non-debtor affiliates employ a global integrated business model.[287]

273.    The Joint Administrators for the EMEA Debtors acknowledged the same thing during their application for administration in the UK:

---

[285] CCAA, s. 11.

[286] *Ashley* v. *Marlow Group Private Portfolio Management Inc.*, [2006] O.J. No. 1195 (S.C.J.) at para. 71; *A&F Baillargeon Express Inc. (Trustee of), Re*, [1993] Q.J. No. 884 (S.C.) at paras. 21 and 23.

[287] Declaration of John Doolittle sworn January 14, 2009, paras. 3 and 26 (TR21540).

… the Nortel Group's operations are highly integrated and… individual companies do not operate as fully independent and self sufficient entities.[288]

274.    Nortel was a matrix organization, and referred to itself as such in its public filings.  As set out in the Bilateral APA:

> Nortel is vertically and horizontally integrated meaning that organizations within Nortel share information and perform common tasks across geographic boundaries.  Fully integrated entities performing R&D, manufacturing support and distribution functions interact together to fulfill customer demand for product and services.[289]
>
> …
>
> The matrix organization is intended to foster a collaborative environment where the right resources are brought to an issue, product, proposal, or other organizational need without typical constraints such as where resources are located or reporting lines. .[290]

275.    Nortel's matrix structure was divided into Lines of Business, regions and functional activities (such as R&D, Sales, Operations and Corporate Services), as depicted in the following diagram.[291]

---

[288] Report of Alan Bloom, January 14, 2009, p. 6, para. 3.1 (TR31622).
[289] Bilateral APA, p. 13 (TR22078).
[290] Bilateral APA, p. 38; see also, Appendix J (TR22078).
[291] Britven Primary Report dated January 24, 2014, Appendix C, para. 33.  See also: Bilateral APA, pp. 36-38 (TR22078); Business Update – Reshaping Nortel: Former Structure, p. 6 (TR21499).



### a.  Management

276.    Nortel's senior managers understood that it operated as a matrix organization.[292]  Indeed, many of the Directors and Officers of NNC and NNL also sat on the boards of Nortel's subsidiaries, including NNI and NNUK.[293]  This is reflected in the President's Cabinet, the most senior decision-making body at Nortel,[294] which was composed of three groups of executives:

   (a)    the Presidents of LOBs, responsible for Nortel's product lines;

   (b)    the Presidents of the Regions, responsible for Nortel's sales areas; and

---

[292] Affidavit of Brian McFadden sworn April 10, 2014, para. 31; Affidavit of Gordon Davies sworn April 11, 2014, para. 38; Affidavit of Peter Currie sworn April 11, 2014, paras. 23-28; Affidavit of Newcombe sworn, para. 30; Debon Deposition, 70:23-71:17; Pusey Deposition, 35:9-35:20; 40:11-40:23; Bifield Deposition, 161:2-162:23.

[293] Affidavit of Peter Currie sworn April 11, 2014, para. 40. For example, between 2005 and 2007, while CFO of NNC and NNL, Peter Currie also acted as director of NNUK: Affidavit of Peter Currie sworn April 11, 2014, para. 2.

[294] Affidavit of Brian McFadden sworn April 10, 2014, para. 33.

    (c)      Executive Officers, including the Chief Financial Officer ("CFO"), the Chief Technology Officer ("CTO"), the Chief Legal Officer ("CLO"), and the Chief Marketing Office ("CMO").[295]

277.    Each member of the President's Cabinet reported directly to the CEO in Ottawa.[296] As well, head office functions for the entire Nortel Group were centralized with NNL (e.g., legal, finance, strategy, insurance, real estate and information services),[297] and NNL's senior executives, including the CEO, the CFO and the CTO, all had global responsibility.[298]

### b. Lines of Business

278.    The business model which these NNL executives oversaw was structured around Lines of Business, which were organized on a global basis, according to product lines and related services.[299]

279.    These LOBs were necessary to provide the converged service offerings required by the demands of the telecommunications industry and its customers, and no single LOB or geographic unit could provide the solutions alone.[300]

280.    The LOBs operated and reported within Nortel on a functional basis.[301] Each LOB was responsible for marketing and business activities in the U.S., Canada, EMEA, CALA and Asia, and had all global responsibility for its relevant product manufacturing and product development strategy, including R&D activities.[302]

---

[295]Affidavit of Brian McFadden sworn April 10, 2014, paras. 32-33; Functional Organization Chart, May 26, 2004, p. 2 (TR44896); Pusey Deposition, 34:23-36:03.

[296] Affidavit of Brian McFadden sworn April 10, 2014, paras. 32-33; Functional Organization Chart, May 26, 2004, p. 2 (TR44896).

[297] Affidavit of Peter Currie sworn April 11, 2014, para. 35.

[298] Bilateral APA, Appendix A, p. 11, Appendix B, p. 13 (TR22078).

[299] Reply Affidavit of Brian McFadden sworn April 25, 2014, para. 2.

[300] Bilateral APA, Appendix B, p. 2 (TR22078).

[301] Affidavit of Brian McFadden sworn April 10, 2014, paras. 19, 31.

[302] Northern Telecom Limited Form 10-K, December 31, 1996, p. 3 (TR40254).

281.    The LOBs were managed separately, with heads of each LOB reporting directly to the CEO in Ottawa.[303]  Their employees, located around the world, cooperated to sell products and satisfy customer needs.  While the geographic location of a particular employee determined the entity which paid his or her salary, LOB employees reported to LOB management as well as their legal employer.[304]

282.    Similarly, the Presidents of each of Nortel's four geographic regions (North America, EMEA, the Caribbean and Latin America, and Asia Pacific) all reported to the Executive Vice President of Global Sales.[305]  As well, a "Global Accounts" group existed to facilitate the service of Nortel's global customers, and a Global Operations team provided services that assisted the regions and Nortel customers worldwide.[306]

283.    Nortel's organization around LOBs illustrates why the economic and property interests held by each individual Debtor cannot be isolated on any basis other than the clear division of their legal rights and obligations under the MRDA.

### c.  Employees

284.    The manner in which Nortel hired and managed its employees, and the ways in which those employees viewed the Nortel business, also reflects a highly integrated global business. Many Nortel employees at all levels considered their employer to be "Nortel" as a whole, regardless of the legal entity that employed them, because their services were rendered for the benefit of the Nortel business rather than any particular corporate entity.[307]  Many employees did

---

[303] Minutes of the Joint Meeting of the Board of Directors of Nortel Networks Corporation and Nortel Networks Limited, September 22, 2004 (TR31594); Minutes of the Nortel Networks Corporation Meeting of the Board of Directors, October 28, 2004 (TR31495).
[304] Affidavit of Brian McFadden sworn April 10, 2014, para. 19.
[305] Affidavit of Peter Currie sworn April 11, 2014, para. 29; NNC Form 10-K, December 31, 2002, p. 17 (TR40263).
[306] Affidavit of Peter Currie sworn April 11, 2014, para. 31; Bilateral APA, Appendix A, p. 5 (TR22078).
[307] Briard Deposition (September 26, 2013), 16:18-17:18; 75:14–76:19; 78:6-78:17; 79:25-80:14; Dadyburjor Deposition, 19:7–20:12, 37:07–37:13; Bifield Deposition, 255:21-258:25.

not differentiate between the various corporate Nortel Entities[308] and generally sought to advance the interests of the Nortel business as a whole.[309]

285.    Nortel employees each had a Global Identification Number (GID) that they used throughout their career, regardless of where they worked or for which legal entity.[310] Employees were required by contract to carry out their duties on behalf of Nortel and its affiliates, and upon termination, employees released all Nortel Entities, even if they had only worked for one.[311]

286.    Further, many employees were compensated according to the performance of the global entity and their region, not the performance of their particular legal entity.[312] Compensation and benefits, including bonuses, for all of the regions was under the direction of the "Nortel Parent",[313] and bonuses were predicated on the performance of Nortel's global operations.[314] For employees at the level of Vice President or higher, hiring and firing decisions were done centrally.[315]

287.    Employees regularly worked on projects outside of their geographic location without requiring a reassignment of work location or change of employing entity.[316] An employee could be hired by one entity in one geographic region, work for another in another region, and be paid by their original hiring entity.[317]  An employee from one entity could become employed by and

---

[308] Briard Deposition (September 26, 2013), 79:12-79:16; Richardson Deposition, 51:7-51:18; Rolston Deposition, Vol. 1, 31:10-32:02.

[309] Briard Deposition (September 26, 2013), 78:23-80:17; Dadyburjor Deposition, 25:8-25:12.

[310] Pahapill Deposition, 292:9-292:23.

[311] Briard Deposition (September 26, 2013), 60:20-70:22; Bifield Deposition, 255:21-258:25.

[312] Pahapill Deposition, 291:23-292:08.

[313] Donovan Deposition, 42:23-43:23; 45:17-46:07; 48:05-49:15.

[314] Pahapill Deposition, 291:23-292:8; Donovan Deposition, 45:25-46:2.

[315] Donovan Deposition, 45:16-46:7.

[316] Fox Deposition, 35:24-36:09; Affidavit of Peter Currie sworn April 11, 2014, paras. 27-28, 31; Affidavit of Brian McFadden sworn April 10, 2014, paras. 19, 43-44.

[317] Collins Deposition, 41:25-43:19; Philippe Albert-Lebrun, Vol. 1, 25:05-25:23; Affidavit of Gordon Davies sworn April 11, 2014, para. 10; Affidavit of Michael McCorkle sworn April 11, 2013, para. 5; Affidavit of Brian McFadden sworn April 10, 2014, para. 4.

report to another. In some cases their contract remained with the original employing authority and in other cases it was eventually transferred to another entity.[318]

288.    Despite the fact that Nortel's pension plans were regionally based for regulatory purposes, they were administered globally by the Nortel Parent that directed the funding of such plans from anywhere in the Global Company.[319]

289.    NNL made direct payments to the pension plans associated with other legal entities, including contributions to the UK plan in an instance of diminished liquidity.[320] Among other things, NNL also established a plan, known as the "Common Platform", to address funding of the regional pension plans on a globally integrated manner.[321]

### d. R&D Contributions

290.    Budgets for R&D were allocated by LOB and spending was managed on the same basis and not with a focus on geographical units. The only exception to this was the Ottawa-based Advanced Technology Programs, which were managed directly by the office of the CTO in Ottawa.[322]

291.    R&D was managed and organized on a global basis. As early as 1996, Nortel's R&D activities were unified under a single management group headed by the CTO, whose offices linked the LOBs together so that R&D decisions were made by LOB leaders on an LOB basis.[323]

---

[318] Collins Deposition, 41:25-43:19; Riedel Deposition, 115:09-116:12; Watkins Deposition, 18:19-19:04.

[319] Affidavit of John Poos sworn April 11, 2014, paras. 6, 9; Affidavit of Peter Currie sworn April 11, 2014, paras. 119-121.

[320] Affidavit of Michael McCorkle sworn April 11, 2014, para. 7; Affidavit of John Poos sworn April 11, 2014, paras. 19, 25(m).

[321] Affidavit of Michael McCorkle sworn April 11, 2014, para. 52; Affidavit of John Poos sworn April 11, 2014, paras. 33-38.

[322] Affidavit of Brian McFadden sworn April 10, 2014, para. 20.

[323] Northern Telecom Limited Form 10-K, December 31, 1996, p. 3 (TR40255); Affidavit of Brian McFadden sworn April 10, 2014, paras. 19-20.

The CTO was only directly accountable to NNL, not any Nortel subsidiaries.[324] No major decision regarding R&D direction or funding was taken without approval from Ottawa.[325]

292.    Because Nortel was organized along global product lines, R&D was itself organized globally, around particular projects rather than geographical locations or legal entities.[326] Many of Nortel's products were the result of work performed in multiple Nortel labs around the world. No single R&D location or region was solely responsible for all components that made up a product,[327] and no individual entity outside Canada, including NNI, had the R&D capacity to operate on a standalone basis.[328]

293.    The Chief Technology Officer was an NNL employee based in Ottawa, and was charged with ensuring that Nortel remained at the forefront of technology leadership.[329]  The CTO was directly accountable to NNL only, and not to any of Nortel's LOBs or subsidiaries.[330]

294.    The CTO was accountable for Nortel's future network strategy and architectural vision, network security, R&D effectiveness, Advanced Technology research and maintaining its technology leadership.  The role of a CTO at Nortel involved working with the LOBs that were responsible for particular products to develop next-generation technologies.  It also involved interacting with Nortel's major customers to understand and anticipate their future technology needs.[331]

---

[324] Affidavit of Brian McFadden sworn April 10, 2014, para. 17; Email from Steve Foster to Brian McFadden re: CTO Program Summary dated August 10, 2005 (TR44792)
[325] Affidavit of Brian McFadden sworn April 10, 2014, paras. 15-16; Global R&D Investment Strategy and Recommendations for Nortel, prepared by CTO Office (TR21188).
[326] McFadden Reply Affidavit, para. 8; Bilateral APA, Appendix B, p. 17 (TR22078).
[327] Bilateral APA, Appendix B, p. 17 (TR22078).
[328] Reply Affidavit of Brian McFadden sworn April 25, 2014, para. 3.
[329] Affidavit of Brian McFadden sworn April 10, 2014, para. 11; Email re: RE: CTO Cabinet Meeting From Jean Lapointe To Jean Lapointe and Brian McFadden dated March 17, 2005 (TR44782)
[330] Affidavit of Brian McFadden sworn April 10, 2014, para. 17; Email from Steve Foster to Brian McFadden re: CTO Program Summary dated August 10, 2005 (TR44792).
[331] Affidavit of Brian McFadden sworn April 10, 2014, para. 12; E-mail from the Office of Brian-McFadden to Nortel Leaders and R&D Team dated October 1, 2004 (TR45169).

295.    The CTO was also responsible for Nortel's Vice Presidents' R&D Cabinet. The R&D Cabinet consisted of Vice Presidents for R&D of each of the LOBs, as well as the global Vice Presidents of Advanced Technology and of R&D Effectiveness, who reported to the CTO. The R&D Cabinet facilitated discussions of R&D issues common across the enterprise, including site strategy, uniform designing process, platform convergence and other projects. The R&D Cabinet met every two weeks in Ottawa and was always chaired by NNL personnel.[332]

### e.  Cash Management

296.    Nortel operated a group-wide cash management system in which the Global Treasury Group would redeploy cash generated from various operations and jurisdictions globally for the benefit of the Nortel group as a whole.[333]  This global cash management strategy permitted Nortel to optimize tax obligations, by matching revenues and costs in the most tax advantageous manner possible on a global basis,[334] reducing the need for third-party borrowing, and deploying surplus cash from one entity to another entity as needed.[335]  The transfer of surplus cash was achieved through intercompany loans, dividends, equity injections and return of capital, all of which were duly documented and approved by the board of directors of the entities involved.[336]

297.    The Global Treasury Group monitored cash flows, cash balances and sources of cash for all Nortel Entities worldwide,[337] and ensured that all entities had sufficient funds to meet their current and reasonably foreseeable obligations. To the extent that an entity did not generate

---

[332] Affidavit of Brian McFadden sworn April 10, 2014, paras. 24-25.
[333] Affidavit of Peter Currie sworn April 11, 2014, paras. 68-72.
[334] Affidavit of Peter Currie sworn April 11, 2014, para. 73; Krebs Deposition, 152:09-153:11.
[335] Affidavit of Peter Currie sworn April 11, 2014, para. 74.
[336] Binning Affidavit, para. 35; Affidavit of Michael McCorkle sworn April 11, 2014, para. 20.
[337] Affidavit of Peter Currie sworn April 11, 2014, para. 71.

sufficient funds through its own operations at a given time, Nortel would provide it surplus cash from other entities.[338]

298.    The Global Treasury Group also managed intercompany financing and corporate debt for the benefit of Nortel as a whole.[339]  In this respect, NNL/NNC often provided comfort letters to assist in the establishment of credit facilities for subsidiary entities,[340] and often guaranteed such facilities on a no-fee basis.[341]

### f.  Sales & Marketing, Operations and Financial Reporting

299.    In addition to R&D contributions and revenues, several other aspects of Nortel contributed to its fully integrated matrix structure:

(a)    **Sales & Marketing** – Nortel's sales force operated in a global, regional or centralized manner depending on the customer project,[342] and Regional Presidents reported to the Executive Vice President of Global Sales.[343]  Regional sales teams drew on centralized marketing, product line management and technical support resources[344]  Product team members and R&D personnel from multiple jurisdictions also met quarterly with Nortel's biggest clients[345]

(b)    **Operations** – Nortel's global operations were divided into three primary groups:[346]

---

[338] Affidavit of Peter Currie sworn April 11, 2014, para. 72; Affidavit of Michael McCorkle sworn April 11, 2014, para. 33.

[339] Bilateral APA, Appendix E, p. 7  (TR22078).

[340] Pahapill Deposition, 298:02-298:16.

[341] Pahapill Deposition, 298:02-298:16.

[342] Bilateral APA, Appendix C, p. 5 (TR22078).

[343] Affidavit of Peter Currie sworn April 11, 2014, para. 29; Bilateral APA, Appendix C, p. 5 (TR22078).

[344] Affidavit of Peter Currie sworn April 11, 2014, para. 31; Northern Telecom Limited Form 10-K, December 31, 1996, p. 3 (TR40254); NNC Form 10-K, December 31, 2002, p. 17 (TR40263); Bilateral APA, Appendix C, p. 5 (TR22078).

[345] Bilateral APA, Appendix C, pp. 1-6 (TR22078).

[346] Bilateral APA, Appendix A, p. 8 and Appendix D, p. 9 (TR22078).

(i)    Technology Introduction and Support was responsible for global product technical support, technology introduction, software delivery and emergency recovery. These personnel were employed primarily by NNI;[347]

(ii)    Manufacturing Support, Procurement and Logistics was led by the chief procurement officer ("CPO"), and was responsible for supplier product quality, efficiency and timeliness. While the CPO was employed by NNI, the majority of these personnel were employed by NNL.[348] Nortel also had four transaction control centres ("TCC") in Canada, the US, the UK and France that acted as "purchasing hubs" for all sales, with approximately two thirds of all inventory purchases flowing through the Canadian and American TCCs. Purchase orders were routed on a global basis to ensure prompt payment and service, irrespective of the pace of internal account settlement among Nortel Entities.[349] and

(iii)    The Global Supply Chain was responsible for processing customer orders and ensuring that high quality products were adequately tested and available for the customer in a manner that aligned with market demand.[350] Global Supply Chain personnel were employed primarily in Canada, the U.S. and the UK.[351]

---

[347] Bilateral APA, Appendix A, p. 8 (TR22078).
[348] Bilateral APA, Appendix A, p. 8 (TR22078).
[349] Affidavit of Peter Currie sworn April 11, 2014, para. 52.
[350] Bilateral APA, Appendix A, p. 8 (TR22078).
[351] Bilateral APA, Appendix A, p. 9 (TR22078).

(c) **Corporate Functions** – A significant portion of Nortel's global support activities were centrally coordinated through NNL in Canada. This includes executive leadership, strategy, information services, finance, human resources, real estate, legal and compliance. Employees supporting these functions worked in a coordinated and integrated manner wherever needed in Nortel, regardless of where they were employed or located.[352]

(d) **Financial Reporting** – Nortel reported its financial performance in a way which reflected how it ran its business. Its annual financial statements reported the consolidated financial position of NNC and its subsidiaries, and the financial performance of its LOBs (including global revenues streams).[353] The segmented financial reporting in its public SEC filings was also based on its LOBs, not its legal entities. Nortel's management was chiefly concerned with financial results reported by LOB, which were the primary indicators for which heads of LOBs were held accountable.[354] These SEC filings and financial statements were made available to analysts, lenders, debt purchasers, investors and other stakeholders, and made clear to stakeholders the extent to which Nortel performed as a single global business.[355] Thus, when Moody's Investors Service assessed and downgraded Nortel's credit rating in 2008, it did so for Nortel as a whole.[356]

g. **Conclusion**

300.    Nortel was a globally integrated business which created value by the effort of employees spread across the world. In the end, its most valuable asset – its IP – was owned in almost all

---

[352] Bilateral APA, Appendix A, p. 1 and 5-12 (TR22078).
[353] Affidavit of Peter Currie sworn April 11, 2014, para. 54.
[354] Affidavit of Peter Currie sworn April 11, 2014, para. 53.
[355] Affidavit of Peter Currie sworn April 11, 2014, para. 55.
[356] Declaration of John Doolittle sworn January 14, 2009, para. 17 (TR21540).

cases by NNL. Should the Court not wish to allocate the proceeds of the Sales by ownership, however, the integrated nature of Nortel's business suggests that any other approach to allocation on the part of which Nortel Debtors are somehow "more" entitled to them than others, is doomed to fail. No expert is able to agree on how to allocate value to each Estate because there can be no single measure of value that provides a fair result. It would be particularly inappropriate to look to arbitrary factors such as the revenue a particular Debtor generated or the R&D contributions it made. The Global Assets were produced as a result of the combined efforts of the entire Nortel group. The MRDA is the contractual framework which permits the Courts to understand how the Nortel Debtors intended to structure their ownership and affairs in those circumstances. If the Courts choose not to use the MRDA as the basis for the allocation of the Sale Proceeds, the only fair and just alternative result would be the allocation of the Global Assets based on the rateable liabilities of all the Nortel Debtors.

### 3)    *Pro Rata* Allocation Is Distinct from Substantive Consolidation

301.    The U.S. Interests and EMEA Debtors often seek to re-cast the CCC's position as a form of "substantive consolidation" and assert that such relief is unavailable here. This argument is fundamentally flawed and mischaracterizes the relief sought by the CCC.

302.    Substantive Consolidation involves a merger of two or more estates, which then become subject to the supervision of one over-arching court. It eliminates the separate corporate identity of the merged entities and is typically in breach of standard negative covenants found in loan documentation, such as the anti-merger provisions. The CCC is not proposing any such relief.[77]

303.    The proposed alternative *pro rata* allocation method is not a "consolidation" theory and does not require the Courts to actually combine insolvent estates or eliminate their separate corporate identity. It is simply a proposed methodology for allocating the Sale Proceeds [81]to

each Debtor Estate which takes into account all outcomes based on the claims and assets of each Debtor Estate.

304.    This case raises a matter of first impression.  No U.S. or Canadian court has ever invited parties to propose a transnational allocation methodology.  Accordingly, there is no case law from either jurisdiction that is directly binding or applicable, including the case law relating to substantive consolidation. The only principle necessary to implement a *pro rata* allocation is fairness and equity to creditors, having regard to the nature of Nortel's business and having considered the viability of other methodologies of allocation.

305.    For the reasons herein, a *pro rata* allocation based on liabilities is the most fair, equitable and appropriate one available if the Courts decline to allocate the Sale Proceeds in accordance with the ownership theory set out above.  It is consistent with the legal principles articulated in the jurisprudence. It is the approach that is most consistent with the reality of how Nortel operated.

306.    The CCC's pro rata allocation method is not substantive consolidation.  That said, the equitable principles underpinning substantive consolidation tests applied by the courts, including the tests fashioned by the Third Circuit in *In re Owens Corning*[357], are instructive and comport with the equitable principles sustaining the CCC's pro rata allocation method.

### 4)  *Pro Rata* Allocation is Consistent with Bondholder Expectations

307.    An order allocating *pro rata* by Claims is also wholly in line with the reasonable expectations of Nortel's unsecured bondholders.  All of Nortel's bonds are unsecured debt.

308.    Bondholder expectations are not ironclad and do not begin and end with a guarantee provision in an indenture.  Rather, they arise in the context of risk factors and real-world market

---

[357] *In re Owens Corning*, 419 F.3d 105 (3rd Cir. 2005).

events that are routinely analyzed, modeled, and accounted for by funds such as those in the Bondholder Group and other purchasers of bond offerings.

309.     As of March 11, 2014, the Bondholder Group's members reported approximately $2.24 billion in holdings, more than half of the aggregate outstanding principal amount of the unsecured and guaranteed bonds.[358]     In the aggregate, holders of Nortel's guaranteed but unsecured bonds seek to recover, as unsecured claimants, well in excess of par value[359].  At the same time, the CCC unsecured creditor claimants and other unsecured claimants would receive substantially less than 100 cents on the dollar.  All of Nortel's bondholders purchased bonds after a number of company disclosures regarding the risks to which the guarantees provided by NNI were exposed, including disclosures in the bond offering memoranda themselves.  Moreover, the Bondholder Group member funds – and likely many, if not all, of Nortel's other current bondholders – purchased bonds *after* Nortel filed for bankruptcy and with additional knowledge regarding the risks and uncertainties of the guarantees.

310.     Buyers of distressed debt, including post-petition purchasers of Nortel's bonds, are typically sophisticated hedge funds, private equity firms or investment banks which look to buy debt for "pennies on the dollar"[360] after a company enters a period of financial distress or bankruptcy.[361]

---

[358] See Bondholder Group's Responses and Objections to the Written Questions and Contention Interrogatories Served By The Canadian Creditors' Committee, dated February 25, 2014.

[359] See Claim Nos. 3946, 3971, 3972.  The bondholders' recovery demand depends upon (a) payment of 100% of principal and pre-petition interest, based on certain guarantees providing for such payment by NNI in the event of a default by the issuer; (b) make-whole premium payments ("MWPs") based on provisions found in certain of the Indentures; and (c) payment of substantial post-petition interest.  The bondholder are entitled to the post-petition enhancements only to the extent provided for in the bond Indentures and only if and to the extent that NNI is solvent.  Hence the intense efforts by the U.S. Debtors, the UCC and the Bondholders Group to receive the lion's share of the allocated Sales Proceeds to ensure a determination of solvency and greater recovery to the bondholders over other general unsecured creditors.

[360] See *Ion Media Networks, Inc. v. Cyrus Select Opportunities Master Fund, Ltd.*, 419 B.R. 585 (Bankr. S.D.N.Y. 2009).

[361] Courts have often recognized the nature of distressed debt investing and have at times been critical of the use of litigation tactics to maximize returns.  See *Ion Media Networks, Inc. v. Cyrus Select Opportunities Master*

311.    With one exception, each Bondholder Group member fund acquired nearly 75% of its holdings in the period immediately *after* Nortel's bankruptcy filing on January 14, 2009, and the 2009 Order permitting its liquidation, during which Nortel bonds were trading at a substantial discount to their present day value.

312.    The following chart is a summary of the holdings of each of the Bondholder Group members on the specified dates. The January 13, 2009 column is highlighted, as it is one day prior to the insolvency filing.    The July 18, 2011 column is highlighted, as it is after court approval of the Residual IP Sale ($4.5 billion), but before closing of that transaction.[362]

*US $ millions*

| Ad Hoc Bondholders Group | 13-Jan-09 | 5-May-09 | 31-Jul-09 | 18-Jul-11 | 17-Aug-12 | 8-Feb-13 | 26-Jun-13 | 18-Nov-13 | 11-Mar-14 |
|---|---|---|---|---|---|---|---|---|---|
| ACP Master Ltd. | | | | 33 | | 33 | | 33 | |
| Angelo, Gordon & Co. | | | | | | 185 | 192 | 192 | 161 |
| Aurelius Capital Master, Ltd. | | | | 46 | | 45 | | 45 | 102 |
| Aurelius Convergence Master, Ltd. | | | | 6 | | 7 | | 7 | |
| CarVal Investors, LLC | 173 | 173 | 153 | 129 | 88 | 123 | 122 | 77 | 100 |
| Centerbridge Partnership, L.P. | | | | 277 | 268 | 288 | 308 | 308 | 308 |
| DW Investment Management LP | | | | 15 | | | | 75 | 110 |
| Franklin Mutual Advisers, LLC | | | | 207 | | 169 | 169 | 178 | 169 |
| Golden Tree Asset Management | | | | 91 | 138 | 141 | 143 | 105 | 105 |
| GS Investment Strategies, LLC | | | | 282 | 311 | 343 | 371 | 371 | 349 |
| King Street Capital Management, L.P | | 43 | | 110 | | 70 | 124 | 124 | 124 |
| Monarch Alternative Capital LP | | | 112 | 206 | 144 | 124 | 124 | 112 | 112 |
| Quantum Partners LP | | | | 122 | 391 | 342 | 375 | 362 | 367 |
| Solus Alternative Asset Management L.P. | 5 | 5 | | 117 | | 132 | 118 | 123 | 102 |
| Tenor Capital Management | | | | 98 | 204 | 194 | 178 | 156 | 134 |
| **Grand Total** | **178** | **220** | **264** | **1,738** | **1,544** | **2,198** | **2,223** | **2,266** | **2,243** |

*Fund, Ltd.*, 419 B.R. 585 (Bankr. S.D.N.Y. 2009), (criticizing opportunistic distressed investor that had unnecessarily increased administrative expenses and used vexatious and "aggressive bankruptcy litigation tactics as a means to . . . obtain judicial rulings that will enable [the lender] to earn outsize returns on its bargain basement debt purchases"). See also: *In re Residential Capital, LLC*, 501 B.R. 549, at 624 (Bankr. S.D.N.Y. 2013) (criticizing ad hoc bondholder group for tactics which "burdened the estate and reduced funds available to satisfy creditor claims"; members of bondholder group included Aurelius, a member of the Nortel Bondholder Group); *In re Tribune*, 464 B.R. 126, at 135 (Bankr. D. Del. 2011) (comparing ad hoc bondholder group led by Aurelius to a warring animal who must cooperate with its enemy to cross a river safely, but instead fails and dies, reflecting "an inescapable facet of human character: the willingness to visit harm upon others, even at one's own peril.")

[362] The members of the Bondholder Group from time to time and their positions in the various issuances of Nortel debt are reflected in the three Rule 2019 Statements filed with the court on August 17, 2012 [U.S. D.I. 8204], June 26, 2013 [U.S. D.I. 11035], and March 11, 2014 [U.S. D.I. 13142], as well as in the Bondholder Group's Responses and Objections to the Written Questions and Contention Interrogatories Served By The Canadian Creditors' Committee, dated February 25, 2014 (the "Interrogatory Responses"). Exhibit 1 to the Interrogatory Responses sets forth then current Bondholder Group members and each of their respective positions as of the following dates: January 13, 2009, May 5, 2009, July 31, 2009, July 18, 2011, February 8, 2013 and November 18, 2013.

313.    Over the years, the Bondholder Group funds have continued to actively buy and sell bonds in reaction to certain market events, both positive and negative, which were reflected in the ever-fluid market price of the bonds.  It is interesting to note in the following chart how the pricing of the majority of unsecured Nortel bonds evolved from around 20% or less of par at the date of filing in January, 2009, to the spike to over 100% of par in July, 2011, following the results of the Residual IP sale to Rockstar:



314.    Courts have held that parties who purchase claims from a bankruptcy estate are or should be aware of the risks and uncertainties inherent in the purchase of claims associated with post-petition debtors.  This includes purchasers of bonds or other securities of a debtor.[363]  Even the debt experts proffered by the Bondholder Group and UCC confirmed that bondholder

---

[363] *In re Enron Corp.*, 2005 WL 3832053, at 18 (Bankr. S.D.N.Y. Nov. 28, 2005).  See also: *In re Fisker Automotive Holdings, et al.*, 2014 WL 210593 (Bankr. D. Del. 2014) (disallowing credit bid of full principal amount of claim purchased post-petition for less than par).

expectations are not fixed in stone, but are shaped by a range of risk factors and market events, including credit rating agency reports, company disclosures, Nortel's sale of assets, and the pleadings filed in the allocation proceeding.[364] The existence of a guarantee is just one additional risk/credit support factor.

315.    In this case, about $4 Billion in bonds are guaranteed by NNI.  Nortel's bondholders could not and did not reasonably rely on the enforceability of NNI's guarantees in these insolvency proceedings. Nortel bondholder expectations were initially and reasonably formed at the time of each holder's knowing choice to purchase Nortel debt, and those choices reflected the information known at the time and remained subject to alteration by later real-world market events.

316.    Pre-insolvency filing in January 2009, and post-filing, the bondholders had direct knowledge of the specific risks associated with the enforceability of their guarantees.   The Indentures and their contemporaneous marketing materials straightforwardly disclosed possible difficulties enforcing NNI's guarantees.   For example, referring to language in the Indentures themselves, the Offering Memoranda for the 2012 and 2014 Notes expressly warn purchasers that the guarantees may not be enforceable:

> We refer you to 'Risk Factors – Risks Related to the Notes – *Canadian bankruptcy and insolvency laws may impair the enforcement or remedies under the notes and the guarantees of Canadian domiciled entities…*– NNL's guarantee may be unenforceable, subordinated, or limited in scope under the insolvency and creditor protection laws of Canada…– NNI's guarantee may be unenforceable under U.S. federal and state fraudulent conveyance statutes…-- *U.S. investors in the notes may face difficulties in the enforcement of certain civil liabilities.*

---

[364] Kilimnik Deposition, 31:24-32:3; McConnell Deposition, 193:19-9.

317.    The Offering Memoranda for the 2011, 2013, and 2016 Notes contain substantially the same language.[365]

318.    By way of further example, on the eve of the bankruptcy filings, a December 16, 2008 Moody's Investors Service "Credit Opinion" for NNC "rates all of the Nortel group of companies' debts as if they were *pari passu*" because the "financial consequences of [the bond guarantees] are not determinable and are, in any case, *thought to be minimal*."[366]

319.    Also, NNL's 2008 Form 10-K, dated March 2, 2009 and filed after NNL filed bankruptcy, expressly warned that an "interested party" in the bankruptcy proceedings could request substantive consolidation affecting NNI's ability to make payments on its debt:

> *There is a risk* that an interested party in the Chapter 11 Proceedings . . . could request that the assets and liabilities of NNI, or those of other U.S. Debtors, be *substantively consolidated* with those of one or more other U.S. Debtors. While it has not been requested to date, *we cannot assure you that substantive consolidation will not be requested in the future, or that the U.S. Court would not order it*. If litigation over substantive consolidation occurs, or if substantive consolidation is ordered, *the ability of a U.S. Debtor that has been substantively consolidated* with another U.S. Debtor *to make payments required with respect to its debt could be adversely affected*. [*emphasis added*]

320.    This information was widely available.  Accordingly, dating back to the time the bonds were issued, purchasers of Nortel's guaranteed unsecured bonds were aware of the risks and uncertainties inherent in the guarantees and their enforceability.  These risks should have been even more apparent to post-petition purchasers, including the Bondholder Group's members that opted to buy most of their holdings at times when bonds traded at a substantial discount and thus necessarily did so with knowledge of the risk that claims for payment in the bankruptcy cases would be subject to reduction or disallowance.[367]

---

[365] Offering Memorandum for Notes due 2011, 2013, 2016 (TR40117) at p. 33, *emphasis added*. See also: Indenture dated as of March 28, 2007 (TR40176), Indentures dated as of March 28, 2007 (TR48724); Indenture dated as of July 5, 2006 (TR40044)

[366] Moody's Investor Services Report (TR12045), *emphasis added*.

[367] See e.g., *In re Enron Corp.*, 2005 WL 3832053, at 18 (Bankr. S.D.N.Y. Nov. 28, 2005).

321.    It is not surprising that in the years and months leading up to the Nortel Filing, Moody's and other credit ratings agencies routinely assigned the same rating to the guaranteed bonds and non-guaranteed bonds, allocating no significant additional value to the NNI guarantees and considering the bonds to be on equal footing.[368]

322.    In spite of the ample information available to bond purchasers, Bondholder Group members purchased the vast majority of their holdings during a period when bond prices were depressed.   Furthermore, they continued to actively buy and hold bonds after the parties, including the Bondholder Group, became aware that a method for allocating the Sale Proceeds was being advocated which might eliminate the guarantees, including after the Initial Pleadings were filed in May 2013 formally advocating *pro rata* allocation.  The trades made after these and other various points of notice cannot be said to have reasonably relied on guarantees of a full rate of return.

323.    In all, the Bondholder Group member funds bought most of their holdings at a substantial discount, on notice of the risk that claims for payment would be subject to reduction or disallowance.  There is therefore nothing about a *pro rata* allocation that can be said to unduly prejudice the bonds.  And, as seen in the chart above, any asserted harm to Bondholder Group members and other similarly situated bondholders brought about by a *pro rata* allocation is offset significantly by the sharp increase in bond prices at or around July 18, 2011, by which time the Bondholder Group members had already acquired much of their holdings.

324.    Put differently, Nortel's bondholders knew that the enforceability of the NNI guarantees was uncertain and that there was a possibility of a *pro rata* allocation order affecting the bond

---

[368] See e.g., Moody's Investor Services Report dated June 16, 2006 (TR12036); DBRS Agency Report dated July 6, 2006 (TR12037); Moody's Investor Services Report dated March 22, 2007 (TR12038); DBRS Agency Report dated November 9, 2007 (TR12039); Moody's Investor Services Report dated May 21, 2008 (TR12040); DBRS Agency Report dated July 14, 2008 (TR12041); Moody's Investor Services Report dated December 15, 2008 (TR12042); Moody's Investor Services Report dated December 16, 2008 (TR12045).

guarantees. Nortel's bondholders willingly accepted this risk as market participants. As active participants in the Nortel bond market, these bondholders, including the Bondholder Group member funds, have likely already locked in substantial profits from their distressed investments in both the guaranteed and non-guaranteed issues. As such, even if a *pro rata* allocation order were to eliminate the guarantees, Nortel's bondholders would not be significantly impaired as compared to other creditors under the competing theories of recovery. These bondholders cannot be heard to complain now if a *pro rata* allocation order is made.

325.    Finally, the Bondholder Group pleaded in its allocation position that its members relied on their guarantees and their enforceability. In fact, there is no evidence on the record from any party that the individuals that owned the bonds placed any meaningful reliance on either the guarantee or its enforceability. This absence of evidence, especially in relation to the post-filing environment, is particularly telling.

### 5)  *Pro Rata* Allocation Is a Fair and Equitable Result

326.    A final consideration in identifying the appropriate allocation methodology is the extent to which it will yield a result that is fair and equitable in all the circumstances. This is not a "results-oriented" approach, as the U.S. Interests contend; rather, it is an acknowledgment of the reality that results matter, and that they should be considered alongside other factors in the allocation analysis if the Courts decide not to enforce the bargain struck in the MRDA.

327.    The "revenue", "contribution" and "license" theories proposed by the US/EMEA Debtors would see the Canadian Creditors, whose research efforts and leadership were chiefly responsible for the creation of value at Nortel, receive only 10-25% recovery on their Claims. By contrast, the U.S. Creditor groups will recover *at least* 100% of their Claims.

328. This result is fundamentally unfair. The Bondholder Group is a committee of highly sophisticated distressed debt investment funds, which stands in stark contrast to the Canadian workers who invested years of time and hard work to grow Nortel's global businesses, and whose efforts ultimately permitted Nortel to liquidate for the several billions of dollars that are now the subject of this allocation proceeding. In exchange, these workers – who now comprise the CCC – were guaranteed pension, long-term disability, and other health and welfare benefits.

329. The *pro rata* allocation theory balances these interests in a way that is just and fair to all.

### B. Conclusion

330. In his endorsement in this case dated June 29, 2011, the Honourable Mr. Justice Morawetz observed:

> [9] This allocation issue, together with the resolution of the EMEA claims and the U.K. pension claims, lies at the heart not only of these CCAA proceedings, but also the Chapter 11 Proceedings and proceedings in the United Kingdom. As the Monitor noted in its 67th Report: "Simply put, they are matters that must be resolved before any creditor of an applicant (and likely any other Nortel debtor) can expect to receive a meaningful distribution on account of amounts that have now been outstanding in most cases since January 2009.

> [10] The Canadian Debtors have no significant secured creditors. The Canadian Debtors do, however, have significant unsecured creditors, most of whom are individuals who are employed or were formerly employed by Nortel. Many of these former employees are pensioners and this group have unsecured claims for both pension and medical benefits.

> [11] There are also significant employee and former employee claims against the U.S. Debtors and the EMEA Debtors.

> [12] For many of these individuals, the delay in receiving a meaningful distribution can be significant. It is not just a question of calculating the time value of money. For this group of creditors, time is not on their side.

> [13] This issue is international in scope. It is also a public-interest issue. A protracted delay in resolving the impasse surrounding allocation is highly prejudicial to this group.

> [14] In making these comments, I do not mean to suggest that the claims of other creditor groups are not of equal significance. The reality is, however, that the timing of a receipt of a distribution may be less critical for a financial player as opposed to an individual.

\* \* \*

[17] A protracted delay in the progress of the cases will only exacerbate an already unfortunate situation for the many individual creditors. With extended delay comes uncertainty. For many, uncertainty brings considerable stress and a bad situation becomes even worse. Clearly, the consequences of extended litigation are not desirable.[369]

331.    The Court of Appeal for the Third Circuit has expressed a similar view:

We are concerned that the attorneys representing the respective sparring parties may be focusing on some of the technical differences governing bankruptcy in the various jurisdictions without considering that there are real live individuals who will ultimately be affected by the decisions being made in the courtrooms. It appears that the largest claimants are pension funds in the U.K. and the United States, representing pensioners who are undoubtedly dependent, or who will become dependent, on their pensions. They are the Pawns in the moves being made by the Knights and the Rooks.[370]

332.    Fairness to creditors demands that the allocation dispute finally be resolved in a way that facilitates payment of a reasonable dividend to creditors globally.

333.    If the Courts accept the Canadian Allocation Group's interpretation of the MRDA, it can achieve its objectives by honouring the allocation of rights and expectations of the parties as reflected in the MRDA. Failing this, it is clear that competing allocation theories proposed by the U.S. Interests and the EMEA Debtors are fatally flawed, and that the *pro rata* allocation proposed by the CCC, which fairly reflects the reasonable expectations of creditors and the circumstances of the case, is the only methodology that will permit the court to achieve its objective.

---

[369] *Nortel Networks Corporation (Re)*, 2011 ONSC 4012 at paras. 9-14,17.
[370] *In re Nortel Networks, Inc.*, 669 F.3d 128 at 143 (3rd. Cir. 2011).

## PART IV – ORDERS SOUGHT

334.  For the reasons set out, the CCC seeks the following relief:

(a) an Order (the "Ownership Allocation Order") allocating, administering and effecting the distribution of the Sale Proceeds to the Nortel Debtors holding title to the assets sold; or

(b) in the alternative, an Order (the "Equitable Allocation Order") allocating, administering and effecting the distribution of the Global Assets of the Nortel Debtors, including the Sale Proceeds, as a pro rata distribution among Creditors, rateably by valid Claims.

335.  The CCC reserves the right to seek costs against any Core Party.

ALL OF WHICH IS RESPECTFULLY SUBMITTED, THIS 2ND DAY OF MAY, 2014

_____

For All Counsel for the CCC

TO:    THE SERVICE LIST APPENDED

**APPENDICES**

# APPENDIX A

# APPENDIX A - GLOSSARY OF TERMS[1]

**"Alternative License Theory"** means the alternative theory for allocating Sale Proceeds attributable to IP proposed by the EMEA Debtors as articulated by Mr. Malackowski.

**"Bilateral APA"** means the NNL and NNI Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011 (with rollback to 2006) dated 10/31/2008 (TR22078).

**"Bondholder Group"** means the Ad Hoc Committee of Bondholders that have claims issued and/or guaranteed by NNC, NNL, NNI, and Nortel Networks Capital Corporation.

**"Business Sales"** means the various sales of the Nortel Lines of Business.

**"Business Sale LTAs"** means the LTAs executed by certain of the Nortel Debtors in connection with the Business Sales.

**"Business Sale Proceeds"** means the proceeds of the various sales of the Nortel Lines of Business which total approximately USD $2.848 billion.

**"Business Segments"** means Nortel's main reporting segments, i.e. as of the Filing Date Carrier Networks, Enterprise Solution and MEN.

**"Canadian Allocation Group"** means the CCC, the Monitor, the Canadian Debtors and the Directors and Officers.

**"Canadian Court"** means the Ontario Superior Court of Justice (Commercial List).

**"Canadian Creditors"** means creditors having Claims against the Canadian Debtors.

**"Canadian Debtors"** means Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation.

**"Carrier Networks"** means the Nortel Line of Business which developed wireless networking technology for mobile smartphones, cell phones and other wireless devices for sale to cable operators and to other service providers who offered mobile voice, data and multimedia communications services to individuals and enterprises.

**"CCAA"** means the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended.

**"CCC"** means the Canadian Creditors Committee, a committee of major creditors having claims against the Canadian Debtors, comprised of: Former and Disabled Canadian Employees of the Canadian Debtors through their court-appointed representatives and the Canadian Auto Workers Union (currently Unifor); Morneau Shepell Ltd., as Administrator of Nortel's Canadian

---

[1] All singular terms will have the same meaning in plural.

registered pension plans; the Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund; and the court-appointed representatives of the Current and Transferred Canadian Employees of the Canadian Debtors.

**"CDMA"** means code division multiple access, a Line of Business within the Carrier Networks Business Segment.

**"Claims"** means claims against any one or more of the Nortel Debtors as at the Filing Date, without duplication (whether pursuant to a guarantee, joint liability or otherwise), excluding Intercompany Claims and claims for post-filing interest, make-whole payments and call premiums.

**"Code"** means the United States Bankruptcy Code, Title 11 of the United States Code.

**"Committee"** has the same meaning as the UCC and means the Official Committee of Unsecured Creditors of the U.S. Debtors.

**"Contribution Theory"** means the theory proposed by the EMEA Debtors for allocating Sale Proceeds attributable to IP based on relative "contribution" to the inventions giving rise to the IP, based on historical R&D expenditure.

**"Core Parties"** means collectively the Core Parties in these proceedings as defined in paragraph 2 of the Allocation Protocol, attached as Schedule A of the Amended and Restated Allocation Protocol Order of the Canadian Court on April 3, 2013, including the Selling Debtors, the Committee, the Bondholder Group, the Monitor, the Joint Administrators, the CCC, the Indenture Trustees, the UK Pension Claimants, and the Directors and Officers (individualy, a **"Core Party"**).

**"Courts"** means the Ontario Superior Court of Justice (Commercial List) and the United States Bankruptcy Court for the District of Delaware.

**"Creditors"** means all creditors of any one or more of the Nortel Debtors.

**"CSA"** means Cost Sharing Agreements, bilateral agreements between NNL or its predecessor Canadian corporations and certain of its subsidiaries, which predated the MRDA.

**"CVAS"** means carrier voice over internet protocol applications solutions, a Line of Business within the Carrier Networks Business Segment.

**"Debtor Estates"** has the same meaning as Nortel Debtors and means the Canadian Debtors, the U.S. Debtors and the EMEA Debtors.

**"Directors and Officers"** means certain individuals as former directors and officer of NNC and/or NNL represented by Osler, Hoskin & Harcourt, LLP.

**"EMEA"** means Europe, Middle East and Africa where Nortel operated.

**"EMEA Debtors"** means NNUK, Nortel Networks (Ireland) Limited; NNSA,; Nortel Networks NV; Nortel Networks SpA; Nortel Networks BV; Nortel Networks Polska Sp z.o.o.; Nortel Networks Hispania, SA; Nortel Networks (Austria) GmbH; Nortel Networks s.r.o.; Nortel Networks Engineering Service Kft; Nortel Networks Portugal SA; Nortel Networks Slovensko, s.r.o.; Nortel Networks Romania SRL; Nortel GmbH; Nortel Networks OY; Nortel Networks AB; Nortel Networks International Finance & Holding BV and Nortel Networks France S.A.S. Cosmé Rogeau, who has been appointed Liquidator of NNSA under French secondary proceedings, acts jointly with the Joint Administrators with respect to NNSA.

**"Enterprise Solutions"** means the Nortel Line of Business dedicated to helping business customers build communications networks in the areas of data, voice, and multimedia communications.

**"Exclusive Licenses"** has the meaning set out in Article 5(a)(i) of the MRDA.

**"Exclusive Territories"** has the meaning set out in Article 1 of the MRDA.

**"Field of Use"** means the field of use limitations on the Licenses granted by NNL to the LPs under the MRDA, which only enabled the LPs to make, use and sell Nortel Products using or embodying NN Technology owned by NNL and all patents (and certain other intellectual property) necessary or appropriate in connection therewith, as set out in Article 5(a) of the MRDA.

**"Filing Date"** means January 14, 2009.

**"Global Assets"** means the assets of the Debtor Estates at the Filing Date including the Sale Proceeds and the Residual Assets.

**"Global Services"** means the Nortel Line of Business which provided management and professional services to help customers design and deploy multi-vendor, multi-technology networks for wireline and wireless carriers, cable operators and mobile virtual network operations.

**"GSM"** means global system for mobile communications, a Line of Business within the Carrier Networks Business Segment.

**"Guaranteed Bondholders"** means those bondholders holding unsecured bonds issued by one Nortel Debtor under indentures containing guarantees of repayment of such bonds undertaken by one or more other Nortel Debtors.

**"IFSA"** means the Interim Funding and Settlement Agreement between the Canadian, U.S. and EMEA Debtors dated June 9, 2009.

**"IP"** means intellectual property.

**"IP Transaction Side Agreement"** means the agreement dated April 4, 2011 executed by certain of the Nortel Debtors in connection with the Residual IP Sale.

"**Indenture Trustee**" is defined in Allocation Protocol, attached as Schedule A of the Amended and Restated Allocation Protocol Order of the Canadian Court on April 3, 2013, as (a) Wilmington Trust, National Association as successor indenture trustee pursuant to a trust indenture dated as of November 30, 1988, in respect of the 6.875% notes issued by NNL; (b) The bank of New York Mellon (i) as indenture trustee pursuant to a trust indenture dated as of July 5, 2006 among NNL, as issuer, and NNC and NNI, as guarantors, and (ii) as indenture trustee pursuant to an indenture to an indenture dated as of March 28, 2007 among NNC, as issuer, and NNL and NNI, as guarantors; and (c) Law Debenture Trust Company of New York as successor indenture trust indenture dated as of February 15, 1996, in respect of the 7.875% notes issued by NNL and NNC and guaranteed by NNL.

"**Joint Administrators**" is defined in Allocation Protocol, attached as Schedule A of the Amended and Restated Allocation Protocol Order of the Canadian Court on April 3, 2013, as Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson and Stephen John Harris, as the Administrators in the insolvency proceedings pending in the United Kingdom for all EMEA Debtors except Nortel Networks (Ireland) Limited, and Alan Robert Bloom and David Martin Hughes as Administrators for Nortel Networks (Ireland) Limited.

"**Lazard**" means Lazard Frères & Co., financial advisors to Nortel.

"**Licensed Participant**" or "**LP**" has the meaning set out in Article 1of the MRDA.

"**Lines of Business**" or "**LOBs**" means Nortel's businesses, which were structured around various product lines. At the Filing Date, the major Lines of Business were CDMA/LTE, Enterprise, MEN, CVAS and GSM/GSM-R.

"**LTAs**" means the License Termination Agreements that were executed by certain of the Nortel Debtors, including NNI and the EMEA LPs, in connection with the Business Sales and Residual IP Sale.

"**MEN**" means Metro Ethernet Network, the Nortel Line of Business which provided high-speed carrier grade Ethernet transport capabilities and optical networking solutions for data-intensive video, including internet video, residential broadcast TV, video-on-demand and new wireless multimedia requiring increasing bandwidth.

"**Monitor**" means Ernst & Young Inc., in its capacity as the court-appointed monitor in the proceedings commenced under the CCAA in respect of the Canadian Debtors.

"**MRDA**" means the Master Research and Development Agreement between NNL and certain of its subsidiaries entered into on December 22, 2004 and effective January 1, 2001, including, where applicable, all amendments and addenda thereto. References to MRDA article numbers are to those set forth in the consolidated MRDA attached as Appendix B hereto.
"**NN Australia**" means Nortel Networks Australia Pty Limited, originally a Participant to the MRDA, which retired from the MRDA effective December 31, 2007.

"**NNC**" means Nortel Networks Corporation, a Canadian Debtor and the parent reporting corporation of Nortel.

**"NNI"** means Nortel Networks, Inc., a U.S. Debtor and LP under the MRDA.

**"NNL"** means Nortel Networks Limited, a Canadian Debtor, the Canadian operating parent corporation of Nortel and the owner of the IP under the MRDA.

**"NNSA"** means Nortel Networks S.A., an EMEA Debtor and an LP under the MRDA.

**"NN Ireland"** means Nortel Networks Ireland, an EMEA Debtor and an LP under the MRDA.

**"NN Technology"** has the meaning set out in Article 1 of the MRDA.

**"NNUK"** means Nortel Networks UK Limited, an EMEA Debtor and an LP under the MRDA.

**"Non-Exclusive Licenses"** has the meaning set out in Article 1 of the MRDA as the non-exclusive license granted to the LPs pursuant to Article 5(a)(ii) of the MRDA.

**"Non-Exclusive Territory"** has the meaning set out in Article 1 of the MRDA.

**"Nortel"** means NNC and all of its subsidiaries and affiliates, worldwide, and includes all Nortel Debtors and all Nortel Entities.

**"Nortel Debtors"** has the same meaning as Debtor Estates and means the Canadian Debtors, the U.S. Debtors and the EMEA Debtors.

**"Nortel Entity"** means any Nortel entity.

**"Not Used"** means the Residual IP that was determined not to have been used in any Nortel Line of Business in the Patent Segmentation.

**"Ownership Allocation Order"** means the allocation order sought by the CCC by which the Sale Proceeds are allocated to Nortel Debtors that owned the assets sold.

**"Participants"** has the meaning set out in the preamble to the MRDA. At the Filing Date, NNL, NNI, NNUK, NNSA and NN Ireland were Participants to the MRDA.

**"Patent Segmentation"** means the process by which Nortel determined whether patents were Predominantly Used in a single Line of Business, Shared among two or more Lines of Business or Not Used in any Line of Business.

**"Post-Filing"** means after the Filing Date.

**"Predominantly Used"** means the Reidual IP that Nortel determined was predominantly used by a Line of Business in the Patent Segmentation.

**"Pre-Filing"** means before the Filing Date.

**"Products"** has the meaning set out in in Article 1 of the MRDA.

**"R&D"** means research and development.

**"Residual Assets"** means assets other than the Sale Proceeds in the possession of the Nortel Debtors. ~~as at the date of distribution.~~

**"Residual IP"** means the approximately 7,000 patents and patent applications retained by NNL following the Business Sales and sold to Rockstar in the Residual IP Sale.

**"Residual IP Sale"** means the sale of the Residual IP to Rockstar.

**"Residual IP Proceeds"** means the proceeds of the Residual IP Sale, which totaled approximately USD $4.545 billion.

**"Revenue Theory"** means the theory proposed by the U.S. Interests whereby the Sale Proceeds are allocated to each of the Nortel Debtors based on their proportionate share of revenues as set out in Nortel's 2009 carve-out income statements.

**"Rockstar" or "Rockstar Consortium"** means the consortium of technology companies, including Apple, RIM, Sony and Microsoft, that purchased the Residual IP in the Residual IP Sale.

**"Rockstar LTA"** means the LTA entered into by the Debtor Estates in connection with the Residual IP Sale.

**"RPSM"** means residual profit sharing methodology under the MRDA.

**"Sale Proceeds"** means the sum of the Business Sale Proceeds and the Residual IP Proceeds.

**"Sales"** means the Business Sales and the Residual IP Sale.

**"SEC"** means the United States Securities and Exchange Commission.

**"Selling Debtors"** means the Canadian Debtors, the U.S. Debtors, EMEA Debtors and Nortel Networks Optical Components Ltd., Nortel Networks AS, Nortel Networks AG, Nortel Networks South Africa (Pty) Limited, and Nortel Networks (Northern Ireland) Limited.

**"Shared"** means the Residual IP that Nortel determined was shared by two or more Lines of Business in the Patent Segmentation.

**"Territory"** has the meaning set out in Article 1 to the MRDA.

"**UCC**" has the same meaning as the Committee and means the Official Committee of Unsecured Creditors of the U.S. Debtors.

**"UKPC" or "UKPT"** means the Trustee of the NNUK Pension Plan and the Board of the Pension Protection Fund.

**"U.S. Courts"** means the United States Bankruptcy Court for the District of Delaware.

**"U.S. Creditors"** means creditors having Claims against the U.S. Debtors.

**"U.S. Debtors"** means NNI, Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc., and Nortel Networks (CALA) Inc.

**"U.S. Interests"** means the U.S. Debtors, the Bondholder Group and the UCC.

# APPENDIX B

# MASTER R&D AGREEMENT[1]

Agreement confirming and formalizing the operating arrangements of the Participants at and from January 1, 2001 (the **"Effective Date"**),[2]

**BY AND BETWEEN**:

> **NORTEL NETWORKS LIMITED**,[3] a corporation duly incorporated under the laws of Canada, having its executive offices at 8200 Dixie Road, Suite 100, Brampton, Ontario, Canada L6T 5P6 ("**NNL**")

> AND:

> **NORTEL NETWORKS INC.**, a corporation duly incorporated under the laws of the State of Delaware, having its head office at 4001 East Chapel Hill Nelson Hwy Research Triangle Park, NC 27709 United States of America (including predecessor corporations in interest)

> AND:

> **NORTEL NETWORKS UK LIMITED**, an entity duly formed under the laws of the United Kingdom having its head office at Maidenhead Office Park, Westacott Way, Maidenhead, Berkshire, United Kingdom, SL6 3QH

> AND:

> **NORTEL NETWORKS SA**,[4] an entity duly formed under the laws of France having its head office at Parc d'Activites de Magny-Chateaufort, Chateaufort Cedex 9, France, 78928

> AND:

> **NORTEL NETWORKS AUSTRALIA PTY LIMITED**,[5] an entity duly formed under the laws of Australia having its head office at Level 5, 495 Victoria Avenue, Chatswood, New South Wales, Australia, 2067

> AND:

---

[1] This is a consolidated Master R&D Agreement that reflects the status of the Agreement as of January 14, 2009. It incorporates the amendments made pursuant to four Addenda to the Agreement.
[2] Addendum to Master R&D Agreement (the **"First Addendum"**), Part I.
[3] Third Addendum to Master R&D Agreement (the **"Third Addendum"**).
[4] Third Addendum.
[5] First Addendum, Part II.

- 2 -

**NORTEL NETWORKS (IRELAND) LIMITED,**[6] an entity duly formed under the laws of the Republic of Ireland having its head office at Mervue Business Park, Mervue, Galway, Republic of Ireland

(referred to individually as "**Participant**" or collectively, as "**Participants**")

**WHEREAS** legal title to all NN Technology is held in the name of NNL;

**WHEREAS** each Licensed Participant held and enjoyed equitable and beneficial ownership of certain exclusive rights under NT Technology for a Specified Territory pursuant to the Amended Research and Development Cost Sharing Agreement entered into on January 1, 1992, and it is the intent of NNL and the Licensed Participants that the Licensed Participants continue, as of the effective date of this Agreement, to hold and enjoy such rights;

**WHEREAS** each Participant bears the full entrepreneurial risks and benefits for the Nortel Networks business;

**WHEREAS** each Participant has performed, in the past, and intends to continue to perform R&D Activity with respect to the Nortel Products;

**WHEREAS** each Participant desires to avoid the duplication of R&D Activity;

**WHEREAS** each Participant believes that it is appropriate that each Participant should benefit from its contribution to R&D activity commensurate with the value of its contribution to that R&D activity in the context of the manner in which the Nortel Networks business is conducted and that the residual profit split methodology (RPSM) is the best arm's length measure, in the circumstances of NNL and the Participants, of such contributions with reference to such benefits;

**WHEREAS** this Agreement reflects the Participants' intent and agreement since January 1, 2001 to enter a license arrangement with the Licensed Participants, and the Participants have operated from January 1, 2001 in accordance with the terms set forth herein;

**WHEREAS** Participants acknowledge that as a result of a collective review by the Canadian Customs and Revenue Agency, the US Internal Revenue Service, and the UK Inland Revenue[7] regarding the application of the RPSM, the calculation of the RPSM as set forth in Amended Schedule A[8] may be amended which amendments would require the consent of the Participants;

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants of the parties hereto, it is hereby agreed as follows:

---

[6] Third Addendum.
[7] Addendum to Master R&D Agreement, dated December 14, 2007 (the "**Second Addendum**"), Part II.
[8] Second Addendum, Part IV.

- 3 -

## ARTICLE 1 - DEFINITIONS

As used herein:

(a)     **"Affiliate"** shall be defined as any Person,

　　(1)     more than fifty percent (50%) of whose voting shares or outstanding capital stock is owned or controlled (directly or indirectly) by a Party;

　　(2)     which owns or controls (directly or indirectly) more than fifty percent (50%) of the voting shares or outstanding capital stock of a Party; or

　　(3)     more than fifty percent (50%) of whose voting shares or outstanding capital stock is owned or controlled (directly or indirectly) by an Affiliate (as defined herein) of a Party;

provided, however, such corporation, company or entity shall be deemed to be an Affiliate for purposes of this Agreement only so long as such ownership or control exists.

(b)     **"Admission Eligibility Requirements"** with respect to any NNL Affiliate shall mean an Affiliate that has a level of research and development spending for the three (3) year period prior to the year of admission that exceeds the Threshold Level. The Threshold Level of research and development spending will be determined by mutual agreement of the Participants to this Agreement at the time of consideration for admission of any party.

(c)     **"Eligible Party"** shall mean any Affiliate of NNL provided such Affiliate meets the Admission Eligibility Requirements for admission as a Participant to this Agreement and fully pays any Special Balancing Payment to NNL prior to the effective date of its admission.

(d)     **"Eligible Participant"** shall mean any Participant that is not a party to the Advance Pricing Agreement establishing the transfer price for the R&D Activity provided herein.

(e)     **"Licensed Participant"** shall mean a Participant other than NNL and **"Licensed Participants"** shall mean all Participants other than NNL.

(f)     **"NN Technology"** shall mean, any and all intangible assets including but not limited to patents, industrial designs, copyrights and applications thereof, derivative works, technical know-how, drawings, reports, practices, specifications, designs, software and other documentation or information produced or conceived as a result of research and development by, or for, any of the Participants, but excluding trademarks and any associated goodwill.

(g)     **"Products"** shall mean all products, software and services designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, at any time by, or for, any of the Participants, and all components, parts, sub-assemblies, features, software associated with or incorporated in any of

- 4 -

the foregoing, and all improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in any of the foregoing.

(h)     **"R&D Activity"** shall mean all research and development activity (determined in accordance with US GAAP) performed by, or for, any Participant including, without limitation, development of Products and methods, processes, procedures and tools related to manufacturing, installation, operation, interoperability, maintenance and use of Products.

(i)     **"RPSM"** shall mean the transfer pricing methodology which establishes the fair market value of the compensation to be received by each Participant for its R&D Activity and shall have the meaning defined in Amended Schedule A.[9]

(j)     **"Special Retirement Allocation"** shall mean an amount mutually determined by NNL and any retiring Participant that represents the fair market value (at the time of retirement) of the Exclusive License provided in Article 5 and any prior License to the NN Technology granted by NNL to such retiring Participant, all rights to which are surrendered by such Participant effective on the Termination Date. [10]

(k)     **"Revenue Authority or Revenue Authorities"** shall mean one or more governmental taxing authorities or instrumentalities thereof.[11]

(l)     **"Termination Date"** shall mean with respect to an Elective Retirement the last day of the calendar year in which such election is effective and with respect to a Forced Retirement under Article 11(c)(i), the last day of the second calendar year in which there is no R&D Activity. For all other Forced Retirement events defined in Article 11(c)(ii) through (iv), the Termination Date is the date on which the Defaulting Event occurs.[12]

(m)     **"Special Balancing Payment"** shall mean an amount mutually determined by NNL and an Eligible Party to represent the fair market value for an Exclusive License from NNL as provided in Article 5 with respect to NN Technology existing at the time of admission.[13]

(n)     **"Territory"** shall mean, with respect to each Licensed Participant, its Exclusive Territory as described on Schedule B and its Non-Exclusive Territory.[14]

(o)     **"Exclusive License"** shall mean the exclusive licence granted to a Licensed Participant as further described in Article 5(a)(i) hereof.[15]

---

[9] Second Addendum, Part IV.
[10] Second Addendum, Part III(a).
[11] Second Addendum, Part III(c).
[12] Second Addendum, Part III(d).
[13] Second Addendum, Part III(b).
[14] Second Addendum, Part III(b); Third Addendum, Part II(c).
[15] Third Addendum, Part II(a).

- 5 -

(p)    **"Exclusive Territory"** shall mean the exclusive geographic area specified for a Licensed Participant in Schedule B.[16]

(q)    **"Non-Exclusive License"** shall mean the non-exclusive licence granted to a Licensed Participant as further described in Article 5(a)(ii) hereof.[17]

(r)    **"Non-Exclusive License Effective Date"** has the meaning set forth in Article 5(a)(ii) hereof.[18]

(s)    **"Non-Exclusive Territory"** shall mean, for each Licensed Participant, the entire world except (i) Canada where NNL retains its exclusive rights, and (ii) those geographic areas designated in Schedule B as the Exclusive Territory of another Licensed Participant.[19]

## ARTICLE 2— PERFORMANCE OF R&D ACTIVITY

(a)    Each Participant hereby agrees to use it best efforts to perform R&D Activity at a level consistent with past practices and the ongoing needs of the Nortel Networks business for its respective Territory.

(b)    Each Participant agrees to account for the R&D Activity by disclosing or otherwise making available to each of the other Participants the relevant results, studies etc. resulting from such R&D Activity.

(c)    All costs incurred directly or indirectly by each Participant for R&D Activity shall be borne exclusively by it. Any reimbursement for costs including any other compensation shall be provided to such Participant for its R&D Activity solely as provided in Article 3 below.

## ARTICLE 3 – R&D ACTIVITY PAYMENTS

(a)    For and as a consequence of the performance of R&D Activity, each Participant shall be entitled to receive a payment in an amount equal to the allocation determined under the RPSM (the "**R&D Allocation**") as the measure of the benefit to which it is entitled commensurate with its performance of, and contribution to, R&D Activity.

(b)    Each Participant hereby accepts and agrees to make the payment determined under the RPSM in Amended Schedule A[20] as representing such Participant's share of the R&D Allocation.

(c)    The R&D Allocation will be computed pursuant Amended Schedule A[21] which sets forth the basis of the RPSM as originally proposed to the Revenue

---

[16] Third Addendum, Part II(b).
[17] Third Addendum, Part II(b).
[18] Third Addendum, Part II(b).
[19] Third Addendum, Part II(b).
[20] Second Addendum, Part IV and the Third Addendum, Part III(a).

- 6 -

Authorities. The Participants understand that the RPSM is the subject of review, discussions and negotiations with the Revenue Authorities. The Participants agree to amend this Agreement and to adjust the RPSM to the extent necessary to reflect any negotiated determination with the Revenue Authorities as to the final R&D Allocation.

(d)     NNL agrees to administer this Agreement, or cause this Agreement to be administered by a Licensed Participant or a third party, including without limitation the making of any determinations required under the RPSM with respect to the Participants' respective interests, and the computation of amounts of the R&D Allocations due to and payments due from, as applicable, each Participant on a periodic basis. The Participants will agree to appropriate compensation for administers of this Agreement. Each Participant will be supplied with a copy of the calculations required under the RPSM as set forth in Schedule A. Any true up payment to or from a Participant as described in paragraph 6 of Schedule A will be reflected in the inter-company accounts of the affected Participant as a payable or a receivable as applicable, and may be netted pursuant to the standard Nortel practice for managing inter-company accounts.[22]

(e)     Each Participant and NNL, in its capacity as described in (d) above, agree to keep clear and accurate records to support the calculations under the RPSM as set forth in Amended Schedule A.[23] Each Participant and NNL, in its capacity as described in (d) above, shall provide to each other, upon request in such form as may reasonably be requested, documentation with respect to the foregoing. Each Participant shall have the right to examine and audit, during normal business hours all such records and accounts as may under recognized accounting practices contain information bearing upon the amounts payable under this Article 3. Prompt adjustment shall be made by the appropriate Participant in order to correct any errors or omissions disclosed by an examination or audit.

(f)     Any amount owing by a Participant under this Agreement shall be due and payable in U.S. dollars or equivalent.

(g)     Any amount owing by a Participant under this Agreement will be due and payable immediately upon written notice of its R&D Allocation from NNL. Any amount owed by a Participant that is paid after 90 days after notice of its R&D Allocation from NNL will accrue interest at the short-term applicable federal rate (as determined from time-to-time under section 1274(d) of the U. S. Internal Revenue Code of 1986) for such period commencing with the 91st day after NNL notice of payment until the date that the overdue amount is paid.

---

[21] Second Addendum, Part IV and the Third Addendum, Part III(a).
[22] Third Addendum, Part III(b).
[23] Second Addendum, Part IV and the Third Addendum, Part III(a).

- 7 -

## ARTICLE 4 — LEGAL TITLE TO NN TECHNOLOGY

(a)    Except as otherwise specifically agreed, legal title to any and all NN Technology whether now in existence or hereafter acquired, or developed pursuant to the terms of this Agreement, shall be vested in NNL. In consideration therefor, NNL agrees to enter into an Exclusive License and a Non-Exclusive License with each of the Licensed Participants as set forth in Article 5.[24]

(b)    Each Licensed Participant shall execute or cause to be executed such documents reasonably requested by NNL as may be necessary or desirable to give effect to, or perfect the foregoing. For purposes of Article 4, copyrighted works included in NN Technology pursuant to this Agreement shall be considered a "work made for hire" for copyright law purposes as applicable in the relevant jurisdiction.

(c)    Each Licensed Participant shall, from time to time, promptly upon receipt of NNL request and at NNL's expense, furnish to NNL all available and requested documentation relating to the NN Technology developed by, or for, such Licensed Participant.

(d)    With respect to patentable inventions and copyrightable property encompassed by NN Technology whether in existence at the Effective Date or acquired subsequent to the Effective Date by any Participant pursuant to this Agreement, NNL shall have the exclusive right but not the obligation to file and prosecute the applications in its name for patents, copyrights, mask works, industrial designs, and all other registered forms of intellectual property encompassed by such NN Technology in every country of the world.

(e)    Licensed Participants have the right to assert actions and recover damages or other remedies in their respective Exclusive Territories for infringement or misappropriation of NN Technology by others.[25]

## ARTICLE 5 - GRANT OF LICENSES BY NNL[26]

(a)    To the extent of its legal right to do so, and subject to the rights of relevant third parties, NNL hereby:

(i)    continues to grant to each Licensed Participant an exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Exclusive Territory designated for that Licensed Participant, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and

---

[24] Third Addendum, Part IV.
[25] Third Addendum, Part IV.
[26] Third Addendum, Part V.

- 8 -

technical know-how, as necessary or appropriate in connection therewith ("**Exclusive License**"); and

(ii)    grants to each Licensed Participant, as of January 1, 2009 (the "**Non-Exclusive License Effective Date**"), a non-exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Non-Exclusive Territory, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("**Non-Exclusive License**").[27]

(b)    NNL shall, from time to time, promptly upon receipt of a Licensed Participant's request, and at such Licensed Participant's expense, furnish all available and requested documentation and other information relating to the NN Technology.

(c)    The rights granted under this Article shall not relieve any Participant from its obligations in respect of royalty payments to third parties.

## ARTICLE 6 - CONFIDENTIAL INFORMATION

(a)    The Licensed Participants acknowledge that the NN Technology is proprietary and constitutes a trade secret. Each Licensed Participant shall hold the NN Technology in confidence and only make use of, or disclose it, as permitted by this Agreement.

(b)    During the full term of this Agreement and thereafter for a period of ten (10) years or so long as it remains secret (whichever is longer), each Licensed Participant shall hold secret and not disclose, make known, divulge or communicate to any person (except to such Licensed Participant's employees and permitted licensees and then only under an obligation of secrecy binding upon such employees and licensees) any of the NN Technology.

(c)    Copies or translations of NN Technology made, or permitted to be made in the exercise of a Participant's rights granted pursuant to this Agreement, shall upon reproduction by such Participant contain the same proprietary or confidentiality notices or legends which appear on the NN Technology made available to Participant under this Agreement.

(d)    Notwithstanding the foregoing, each Participant shall have the right:

(i)    to communicate relevant portions of the NN Technology to suppliers in all countries of the world reasonably necessary for, and solely for, the procurement by such Participant of commercially available materials and parts for use in the manufacture and/or installation of the Products; and

---

[27] Third Addendum, Part V.

- 9 -

    (ii)    to communicate to customers purchasing the Products, such portions of the NN Technology as are reasonably needed by such customers for operating and maintaining the Products; and

    (iii)    to communicate to third persons licensing rights to use NN Technology, such portions of the NN Technology as are reasonably needed by such licensees in accordance with the applicable license agreement negotiated;

provided, however, that the recipients of the NN Technology be advised by each Participant, in writing, at the time, or before such communication, that proprietary information is being communicated and that such information is to be kept confidential and not used except as permitted hereunder, and provided further, that such recipients undertake, in writing, prior to disclosure, to respect such confidentiality.

(e)    The provisions of this Agreement concerning confidentiality shall survive the expiration or termination of this Agreement, but in no event shall such provisions apply to the extent that:

    (i)    NN Technology was independently supplied to any Participant by a third party prior to the effective date of this Agreement without access to NN Technology; or

    (ii)    NN Technology becomes known or readily ascertainable by the general public through no fault of a Participant.

## ARTICLE 7 - LIABILITY

(a)    No Participant makes any representation with respect to, and does not warrant any R&D Activity provided hereunder or any NN Technology provided to NNL, but shall furnish such in good faith to the best of its knowledge and ability. Without restricting the generality of the foregoing, no Participant makes any representation or warranty as to whether or not use of the NN Technology supplied hereunder to NNL or the R&D Activity provided hereunder will infringe any patent or other rights of any other person.

(b)    Each Licensed Participant shall indemnify and hold harmless NNL from any and all claims and liabilities for damages, losses, expenses or costs (including counsel fees and expenses) arising in its Territory with respect to NN Technology.

## ARTICLE 8 – FORCE MAJEURE

No Participant shall be in default or liable for any loss or damage resulting from delays in performance of, or from failure to perform or comply with terms of this Agreement due to any causes beyond its reasonable control, which causes include but are not limited to Acts of God or the public enemy; riots and insurrection, war, accidents, fire, strikes and other labour difficulties (whether or not the Participant is in a position to concede to such demands), embargoes, judicial action; lack of or inability to obtain export permits or approvals, necessary labour, materials, energy, components or machinery; acts of civil or military authorities.

- 10 -

## ARTICLE 9 — DURATION AND CONTINUING RIGHTS AND OBLIGATIONS

(a)    This Agreement shall be effective from January 1, 2001 until December 31, 2004, provided however that this Agreement will automatically renew for additional and unlimited one-year terms until terminated by the mutual written consent of all Participants.

(b)    Upon the expiry or termination of this Agreement as provided herein, each Licensed Participant shall be deemed to have acquired a fully paid up license permitting it to continue to exercise the rights granted to it herein, and, in particular, the rights granted to it in Article 5 as though this Agreement had continued.

(c)    The provisions of Article 4 (Legal Title to NN Technology) with respect to NN Technology acquired or developed pursuant to this Agreement from the Effective Date of this Agreement up to and including its expiry or termination date, Article 6 (relating to confidentiality) and Article 7 (relating to liability) shall survive notwithstanding the expiry of this Agreement, or any termination of this Agreement for any cause whatsoever.

(d)    Upon the expiry or termination of this Agreement, all payments accruing under Article 3 for periods prior to such expiry or termination shall become immediately due and payable, and the obligation to pay any outstanding amounts required by Article 3 shall survive notwithstanding the expiry or termination of this Agreement, or any termination of this Agreement for any cause whatsoever.

## ARTICLE 10 - ADMISSION OF NEW PARTICIPANTS

(a)    Upon the written request to NNL, an Eligible Party may be admitted as a signatory to this Agreement thereby becoming a Participant to this Agreement provided there is unanimous consent of the Participants existing at the time of the requested admission. Such Eligible Party's admission may be evidenced as an addendum to this Agreement provided however that the Eligible Party agrees to all the terms and conditions of this Agreement (as amended from time-to-time).

(b)    Upon admission, the New Participant will become a Licensed Participant for the NN Technology in a Territory as amended to Schedule B. Accordingly, NNL will grant the New Participant an Exclusive License pursuant to Article 5.

## ARTICLE 11 - RETIREMENT OF PARTICIPANTS

(a)    Eligible Participants may elect to withdraw from participation in this Agreement (Elective Retirement) effective at the end of any calendar year subsequent to such election, provided however that the retiring Participant provides written notice of its intent to retire to NNL at least 6 months prior to the proposed effective date.

(b)    On the occurrence of a Defaulting Event, a Participant (or solely an Eligible Participant in the case of a Defaulting Event under (c)(i)) will automatically be

- 11 -

terminated from participation in this Agreement as of the Termination Date (Forced Retirement).[28]

(c)    A Defaulting Event will occur if any of the following provisions apply:

(i)    In the event any Eligible Participant fails to perform any R&D Activity for two consecutive years,[29]

(ii)    In the event any Participant loses its status as an Affiliate of NNL,

(iii)    In the event any Participant shall be in breach of this Agreement or fail to perform one or more of its material obligations under this Agreement, any other Participant may, by written notice to the Participant in default, require the remedy of the breach or the performance of the obligation and, the defaulting Participant so notified fails to remedy or perform within sixty (60) days of the forwarding of a notice so to do, or

(iv)    In the event that any one of the Participants becomes insolvent or is the object of bankruptcy or insolvency proceedings, or makes an assignment for the benefit of its creditors, or is placed in receivership or liquidation, or a substantial part of the assets of a Participant, or a controlling interest in the stock of a Participant, is expropriated, seized, or required to be transferred to, or into the control of, a third party, pursuant to a judicial, administrative or other governmental order or decision.[30]

(d)    (i)    In the event of an Elective or a Forced Retirement, the retiring Participant consents, in advance, to transfer all of its rights in the NN Technology to NNL as of, and from, the Termination Date. In exchange for the Participant's transfer of its rights and obligations, such retiring Participant accepts as full payment, its R&D allocation (without any obligation to perform R&D activity) (Retiring R&D Allocation) for the shorter period of years equal to (x) each post-Termination Date year for a five-year period following the Termination Date, or, (y) each post-Termination Date year preceding the year in which the level of the five-year rolling sum of R&D Stock (as defined in Amended Schedule A) for such retiring Participant is zero. The Retiring R&D Allocation cannot be less than zero for any single year in which there is an obligation to make such allocation. The

---

[28] Second Addendum, Part V(a)(i).

[29] Second Addendum, Part V(a)(ii).

[30] Fourth Addendum to Master R&D Agreement, Part II provides: *The Participants hereby agree that, notwithstanding anything to the contrary in the Agreement, in the event of the occurrence of an event described at Section 11(c)(iv): (i) no Participant affected by such event shall be automatically terminated from participation in the Agreement under Article 11(b) for reasons relating to such event; (ii) no Participant shall elect to withdraw from participation in the Agreement under Article 11(a); and (iii) NNL shall have the right, in its sole discretion, to terminate participation in this Agreement of any Participant affected by such event, upon written notice to such Participant. The standstill provision above shall be deemed to form part of the Agreement from its initial effective date and shall serve to prevent any termination or withdrawal described at (i) above from occurring, so that the Participants shall be in the same position as if the Agreement did not originally provide for termination upon the occurrence of an event described at Article 11(b).*

- 12 -

Participants agree that any negative amount (up to zero) tentatively allocated to a retired Participant under the RPSM set forth in Schedule A will be reallocated to the remaining Participants disregarding any R&D spend of the retired Participant in the calculation.[31]

(ii)   For the avoidance of doubt the following example is provided. Assuming Participant A fails to perform any R&D activity in 2006 and 2007, the Termination Date will be December 31, 2007. The R&D Allocation for 2007 will be determined treating Participant A as a Participant of the Prior Agreement and this Addendum for the entirety of 2007. The sole payment for Participant A's transfer of its rights in the NN Technology and other rights and obligations under the Prior Agreement and this Addendum shall be its positive Retiring R&D Allocation for each of 2008 through 2012. However, since Participant A's level of the five-year rolling sum of R&D Stock for the 2006-2010 years is zero at the end of 2011, then pursuant to Article 11(d)(i), Participant A will only receive a Retiring R&D Allocation for three post-Termination Date years (i.e., years 2008 through 2010). Thus, for purposes of computing the Retiring R&D Allocation as set forth in Schedule A, the five-year rolling sum of R&D Stock will include Participant A's R&D activity for years 2003-2007 [first year (2008) allocation], 2004-2008 [second year (2009) allocation], and 2005-2009 [third and final year (2010) allocation].[32]

(iii)   Notwithstanding Article 11(d)(i) and (ii), no Retiring R&D Allocation will be due to a retiring Participant for any year in which such Participant is subject to a Defaulting Event described in Article 11(c)(ii) through (iv) (individually, a "**Special Default Event**"). In the case of any Special Default Event, the retiring Participant agrees to accept the Special Retirement Allocation as full payment for its rights in the NN Technology surrendered on the Termination Date.[33]

(iv)   The Participants agree to amend the terms of Article 11 in order to reflect any negotiated determinations with a Revenue Authority.[34]

(e)   The obligations of a retiring Participant under Article 4 (Legal Title to NN Technology) acquired or developed by such retiring Participant pursuant to this Agreement from the Effective Date of this Agreement up to and including such retiring Participant's Retirement Date,[35] Article 6 (relating to confidentiality) and of Article 7 (relating to liability) of this Agreement shall survive notwithstanding the retirement of a Participant for any cause whatsoever.

---

[31] Second Addendum, Part V(iii).
[32] Second Addendum, Part V(iii).
[33] Second Addendum, Part V(iii).
[34] Second Addendum, Part V(iii).
[35] Second Addendum, Part V(iii).

- 13 -

## ARTICLE 12 - NOTICES

(a)    Any and all notices or other information to be given by one of the Participants to the other shall be deemed sufficiently given when forwarded by prepaid registered or certified first class air mail or by facsimile transmission or hand delivery to the other Party at the following address:

If to:

        Nortel Networks Ltd.
        8200 Dixie Road, Suite 100
        Brampton, Ontario
        Canada L6T 5P6

        Attention: Secretary

If to:

        Nortel Networks Inc.
        4001 East Chapel Hill Nelson Hwy
        Research Triangle Park, NC 27709
        United States of America

        Attention: Secretary

If to:

        Nortel Networks UK Limited
        Maidenhead Office Park,
        Westacott Way, Maidenhead,
        Berkshire, United Kingdom, SL6 3QH

        Attention: Secretary

If to:

        Nortel Networks, S.A.
        Parc d'Activites de Magny-Chateaufort,
        Chateaufort Cedex 9, France, 78928

        Attention: Secretary

If to:

        Nortel Networks Australia
        Level 5, 495 Victoria Avenue,
        Chatswood, New South Wales, Australia, 2067

        Attention: Secretary

If to:

        Nortel Networks Ireland
        Mervue Business Park,

- 14 -

Mervue, Galway, Republic of Ireland

Attention: Secretary

and such notices shall be deemed to have been received fifteen (15) business days after mailing if forwarded by mail, and the following business day if forwarded by facsimile transmission or hand.

(b)     The aforementioned address of any Participant may be changed at any time by giving fifteen (15) business days prior notice to any other Participant in accordance with the foregoing.

(c)     In the event of a generally-prevailing labour dispute or other situation which will delay or impede the giving of notice by any such means, in either the country of origin or of destination, the notice shall be given by such specified mode as will be most reliable and expeditious and least affected by such dispute or situation.

## ARTICLE 13 – RELATIONSHIP OF THE PARTICIPANTS

The relationship of the Participants under this Agreement shall not constitute a partnership or joint venture for any purpose. In addition, no Participant is a fiduciary, an agent, a servant, or a subcontractor of any other Participant as a result of this Agreement, and no Participant has the right, power or authority, expressly or impliedly, to represent or bind any other Participant pursuant to and in performance of any acts under this Agreement, except as expressly authorized herein.

## ARTICLE 14 - GENERAL PROVISIONS

(a)     This Agreement shall not be assigned by any Participant except with the written consent of each of the other Participants.

(b)     The failure of any Participant to give notice to another Participant of the breach or non-fulfilment of any term, clause, provision or condition of this Agreement shall not constitute a waiver thereof, nor shall the waiver of any breach or non-fulfilment of any term, clause, provision or condition of this Agreement constitute a waiver of any other breach or non-fulfilment of that, or any other, term, clause, provision or condition of this Agreement.

(c)     In the event that any term, clause, provision or condition of this Agreement shall be adjudged invalid for any reason whatsoever, such invalidity shall not affect the validity or operation of any other term, clause, provision or condition and such invalid term, clause, provision or condition shall be deemed to have been deleted from this Agreement.

(d)     In respect to the subject matter hereof, this Agreement sets forth the entire agreement and understanding between the Participants.

(e)     This Agreement may be executed in two or more counterparts and upon delivery of counterparts which together show the execution by the Participants hereto,

- 15 -

shall constitute one agreement which shall inure to the benefit of, and be binding upon, the Participants.

(f)     This Agreement shall be construed in accordance with and governed by the laws of the Province of Ontario, Canada.

**IN WITNESS WHEREOF**, the Participants have caused this Agreement to be executed by their duly authorized officers as of the date first written above.

**Nortel Networks Limited**

Per:  _____
         Name:
         Title:


**Nortel Networks Inc.**

Per:  _____
         Name:
         Title:


**Nortel Networks UK Limited**

Per:  _____
         Name:
         Title:


**Nortel Networks SA**

Per:  _____
         Name:
         Title:


**Nortel Networks Australia Pty Limited**

Per:  _____
         Name:
         Title:

- 16 -

**Nortel Networks (Ireland) Limited**

Per:    _____
           Name:
           Title:

## Second Amendment to Schedule A[36]

## Calculation of Arm's Length R&D Allocation ("R&D Allocation")[37]

Nortel uses the residual profit split method ("RPSM") embodied in the calculation described below, which was originally adopted as of January 1, 2001 at the request of certain Revenue Authorities as the most appropriate method for determining the arm's length compensation due to each Participant for its respective R&D Activity provided pursuant to the Agreement. The RPSM acknowledges the fact that the key profit driver in the Nortel business is the development and maintenance of rapidly depreciating intellectual property.[38]

Accordingly, the R&D Allocation provided to Participants under the RPSM reflects the fact that the Participants bear the full entrepreneurial risk of the Nortel business, such as the risks attendant with the substantial and continuous development and ownership of the NN Technology. Mathematically, the RPSM accords the Participants all the upside risk in the Nortel business as well as the downside risk. A functional rate of return ("Functional Rate of Return") is provided to each Participant as compensation for its distribution function and other activities that support revenue outside of the Participant's country of residence.[39]

Other Nortel Affiliates that are not signatories to the Agreement and that have signed (or will sign) a distribution agreement with NNL ("Nortel Distribution Entities") generally are the least complex entities in the Nortel group of companies. They do not perform R&D Activity, and generally perform routine activities. In addition, these entities have limited business risks in that they engage in a limited number of functions. Thus, these entities are provided a Functional Routine Return as compensation for their distribution function and ancillary services (generally, a nominal amount of operating earnings ranging from 0% to 4% of sales, as determined based on current industry standards and third party studies).[40]

The steps for calculating the R&D Allocation for each Participant are as follows:[41]

1. Identify the Nortel entities that are "Participants" under the Agreement as amended from time to time.[42]

2. Determine consolidated Nortel operating earnings/loss in accordance with U.S. GAAP.[43]

3. From the consolidated Nortel operating earnings/loss:

   (i)     Deduct the operating earnings/loss of Nortel's existing joint ventures; deduct the operating earnings/loss of Nortel's former joint venture entities that own significant

---

[36] Third Addendum, Schedule A.
[37] Third Addendum, Schedule A.
[38] Third Addendum, Schedule A.
[39] Third Addendum, Schedule A.
[40] Third Addendum, Schedule A.
[41] Third Addendum, Schedule A.
[42] Third Addendum, Schedule A.
[43] Third Addendum, Schedule A.

A-2

intangibles, as determined by the Participants from time to time; and deduct the operating earnings/loss of Nortel entities that do not perform the function of distribution of Products containing NN Technology.

(ii)    The resulting operating earnings/loss is then further adjusted to deduct the following items not related to Nortel's operations:

- amortization of intangibles[44]
- gain/loss on the sale of business
- restructuring charges
- stewardship costs

The resulting amount is the adjusted operating earnings/loss ("Adjusted Operating Earnings/Loss").

(iii) From the Adjusted Operating Earnings/Loss:

- deduct the Functional Routine Return of each Nortel Distribution Entity, and
- deduct the Functional Routine Returns of each Participant.

in each case as determined by the selected transfer pricing method that establishes such return based on current industry standards and third party studies, or as may be finally determined by Nortel's negotiations with Revenue Authorities, to determine the amount representing the residual profit or loss ("Residual Pool").[45]

4.  Determine the R&D Allocation for each Participant:

(i)    Calculate the relative ratios of each Participant's spending on its R&D Activity to the R&D spend of all Participants, by taking each Participant's total R&D spend over the previous five years as a ratio of the total R&D spend of the previous five years for all Participants.

(ii)    Apply the ratio determined above to the Residual Pool to determine each Participant's R&D Allocation.

Take the R&D Allocation and Functional Routine Return for each Participant and compare it to such Participant's operating earnings/loss, adjusted in the manner described in paragraph 3(ii), to determine whether any "true up" payments are necessary (whereby a Participant that holds profits in excess of its attributable share hereunder would be required to pay amounts to Participants that hold profit in an amount less than their attributable share).[46]

---

[44] Amortization of intangibles includes goodwill impairment, purchased in-process research and development, amortization of acquired technology, and other intangibles such as trademarks, patents, etc.
[45] Third Addendum, Schedule A.
[46] Third Addendum, Schedule A.

**First Amendment to Schedule B**[47]

**Exclusive Territory for Each Licensed Participant**[48]

1) With respect to Nortel Networks Inc., "**Exclusive Territory**" shall mean the United States of America and the Commonwealth of Puerto Rico.[49]

2) With respect to Nortel Networks UK Limited, "**Exclusive Territory**" shall mean the United Kingdom.[50]

3) With respect to Nortel Networks SA, "**Exclusive Territory**" shall mean France.[51]

4) With respect to Nortel Networks Australia Pty Limited, "**Exclusive Territory**" shall mean Australia.[52]

5) With respect to Nortel Networks (Ireland) Limited, "**Exclusive Territory**" shall mean the Republic of Ireland.[53]

5755612

---

[47] Third Addendum, Schedule B.
[48] Third Addendum, Schedule B.
[49] Third Addendum, Schedule B.
[50] Third Addendum, Schedule B.
[51] Third Addendum, Schedule B.
[52] Third Addendum, Schedule B.
[53] Third Addendum, Schedule B.

# APPENDIX C

## APPENDIX C – ASSUMPTIONS ABOUT THE MRDA
## MADE BY EXPERTS FOR THE U.S INTERESTS, EMEA DEBTORS AND UKPC[1]

| Expert | Kinrich | Bereskin | Stratton | Malackowski[2] | Huffard |
|---|---|---|---|---|---|
| Scope of License – Field of use | No limitations (PR 8, 41-42; RR: 8, 44) | No limitations (RR: 2, 10, 13-14) | No limitations (RR: 13, 23) | No limitations (PR: 5; RR: 8, 11) | No limitations (PR: 49; RR: 15, 19-20) |
| Transferability | Transferable via sublicensing (PR: 42; RR: 8, 11-12, 44) | Transferable via license or sublicense (RR: 15) | Transferable via sublicensing (RR: 4, 22) | Transferable via sublicensing (RR: 13) | Transferable via sublicensing (PR: 49-50; RR: 20) |
| Sublicensing Rights | Effectively unlimited (PR: 42; RR: 8, 13, 44) | Unlimited (RR: 10) | Effectively Unlimited (RR: 3, 11, 19-20) | Effectively unlimited (PR: 5, 51; RR: 13) | Effectively unlimited (PR: 49; RR: 20) |
| Enforcement: Exclusive Territories | Unlimited given broad scope of the licenses (PR: 6, 41-42; RR: 8, 44) | Unlimited (RR: 10) | Unlimited (RR: 3, 9, 12, 22) | Unlimited given broad scope of the licenses (PR: 5; RR: 11, 15) | Unlimited given broad scope of the licenses (PR: 49-50 ) |
| Enforcement: Non-Exclusive Territories | NNL enforcement rights has no value given unlimited sublicensing (PR: 42-43; RR: 8, 44) | NNL enforcement rights has no value given unlimited sublicensing (RR: 17) | Not addressed | NNL enforcement rights has no value given unlimited sublicensing (PR: 51; RR: 12-13) | NNL enforcement rights has no value given unlimited sublicensing (PR: 50; RR: 20-21) |
| IP Subject to the Licenses | All patents included (PR: 6; RR: 8, 44) | All Nortel IP (RR: 11) | No limitations on patent inclusion (RR: 3, 10-12) | All patents included (PR: 5; RR: 14-16) | No limitations on patent inclusion (PR: 49-50; RR: 15, 19) |
| RPSM Income Reallocation | Disregarded | Disregarded | Disregarded | Disregarded | Disregarded |

---

[1] This Table provides pinpoint citations to pages of the Primary Reports ("PR") and Rebuttal Reports ("RR") for each proposition.  The UKPC's' Expert Bazelon is not included as he rejects the MRDA as an appropriate valuation and allocation mechanism for the Sales Proceeds.

[2] This Table includes the assumptions made under the "License Approach" of Malackowski and Huffard.  Under the Contribution Theory the only relevant assumption was that the parties would jointly share all proceeds in proportion to contribution proxy measures.

Court File No. 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,* R.S.C. 1985, c. C-36, AS AMENDED
AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION
APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT,* R.S.C. 1985, c. C-36, AS AMENDED

| | |
|---|---|
| | *ONTARIO*<br>SUPERIOR COURT OF JUSTICE<br>(COMMERCIAL LIST)<br>Proceeding commenced in Toronto |
| | **TRIAL BRIEF OF THE CANADIAN CREDITORS' COMMITTEE ("CCC")** |
| | **KOSKIE MINSKY LLP**<br>20 Queen St. W., Suite 900<br>Toronto, ON  M5H 3R3<br>Mark Zigler / Ari Kaplan / Jeff Van Bakel<br>Tel: 416.595.2090 / Fax: 416.204.2877<br>Lawyers for The Canadian Former Employees and Disabled Employees through their court appointed Representative<br><br>**MCCARTHY TETRAULT**<br>TD Bank Tower, Suite 5300<br>66 Wellington Street West<br>Toronto, ON  M5K 1E6<br>R. Paul Steep / Elder C. Marques / Byron Shaw<br>Tel: 416.601.7998 / Fax: 416.868.0673<br>Lawyers for Morneau Shepell Ltd., as administrator of the Nortel Canada registered pension plans<br><br>**PALIARE ROLAND ROSENBERG ROTHSTEIN LLP**<br>155 Wellington St. W., 35th Floor<br>Toronto, ON  M5V 3H1<br>Ken Rosenberg / Lily Harmer / Massimo Starnino<br>Tel: 416.646.4300 / Fax: 416.646.4301<br>Lawyers for the Superintendent of Financial Services as Administrator of the Pension Benefits Guarantee Fund |

Doc 1124215 v1