Court File No: 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re*: | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | (Jointly Administered) |

**PRE-TRIAL BRIEF OF**
**THE MONITOR AND CANADIAN DEBTORS – ALLOCATION**

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

**Jay A. Carfagnini**  LSUC#: 22293T
jcarfagnini@goodmans.ca
**Benjamin Zarnett**  LSUC#: 17247M
bzarnett@goodmans.ca
**Peter Ruby**  LSUC#: 38439P
pruby@goodmans.ca
**Joseph Pasquariello**  LSUC #: 38390C
jpasquariello@goodmans.ca
Tel:     (416) 979-2211
Fax:     (416) 979-1234
*Lawyers for the Monitor*

**GOWLING LAFLEUR HENDERSON LLP**
Barristers & Solicitors
1 First Canadian Place,
100 King Street West, Suite 1600
Toronto ON M5X 1G5

**Derrick Tay**  LSUC#: 21152A
derrick.tay@gowlings.com
**Jennifer Stam**  LSUC#: 46735J
jennifer.stam@gowlings.com
Tel:     (416) 862-5697
Fax:     (416) 862-7661
*Lawyers for the Canadian Debtors*

Dated: May 2, 2014

**BUCHANAN INGERSOLL & ROONEY PC**
919 North Market Street, Suite 1500
Wilmington, Delaware 19801

Mary F. Caloway (No. 3059)
Kathleen A. Murphy (No. 5215)
(302) 552-4200 (telephone)
(302) 552-4295 (facsimile)
mary.caloway@bipc.com
kathleen.murphy@bipc.com

*Attorneys for Ernst & Young Inc., as Monitor
and Foreign Representative of the Canadian
Debtors*

**ALLEN & OVERY LLP**
1221 Avenue of the Americas
New York, NY 10020

Jacob S. Pultman
Paul B. Keller
Laura R. Hall
Ken Coleman
Daniel Guyder
(212) 610-6300 (telephone)
(212) 610-6399 (facsimile)
jacob.pultman@allenovery.com
paul.keller@allenovery.com
laura.hall@allenovery.com
ken.coleman@allenovery.com
daniel.guyder@allenovery.com

*Attorneys for Ernst & Young Inc., as Monitor
and Foreign Representative of the Canadian
Debtors*

**TO:    THE CORE PARTIES SERVICE LIST**

---

[1]    The US Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

# TABLE OF CONTENTS

**Page**

PART I – OVERVIEW ...................................................................................................1

PART II – FACTS ........................................................................................................10
    (a)    Agreements Which Preceded the MRDA ........................................................14
    (b)    the MRDA.........................................................................................................15
    (c)    Nortel's Insolvency, the Decision to Liquidate, and the IFSA ......................19
    (d)    The Business Sales ..........................................................................................23
    (e)    The Rockstar Transaction ...............................................................................26

PART III – ALLOCATION SHOULD BE BASED ON THE RIGHTS OF THE PARTIES ......29

PART IV – THE MRDA AND THE PARTIES' RIGHTS TO NORTEL IP ..............................31
    (a)    Ontario Law of Contractual Interpretation ............................................31
    (b)    NNL Owned the IP .........................................................................................32
    (c)    NNI and NNUK Did Not Own the Nortel IP and NNL Did Not Merely Hold "Bare Legal Title"........................................................................................35
    (d)    NNI and NNUK Were Granted Licenses Restricted to "Products"......................42
    (e)    The MRDA Imposed a Right and Obligation to Share Residual Operating Profits and Losses ........................................................................................45

PART V – ALLOCATION OF THE PROCEEDS OF THE BUSINESS LINE SALES .............45
    (a)    Overview of Methodology ..............................................................................45
    (b)    Allocation of the Proceeds Attributable to the Transfer of Tangible Assets ........46
    (c)    Allocation of Proceeds Attributable to Intangibles........................................47

PART VI – ALLOCATION OF THE PROCEEDS FROM THE ROCKSTAR TRANSACTION ................................................................................................52
    (a)    Total Allocations of Sale Proceeds ................................................................55

PART VII – THE ALLOCATIONS PROPOSED BY THE U.S. AND EMEA EXPERTS ARE NOT SUPPORTABLE ..............................................................................55
    (a)    Introduction.....................................................................................................55
    (b)    The Allocation Proposed by the U.S. Expert with respect to the Business Sale Proceeds Is Not Supportable .................................................................56
    (c)    Allocation Proposed by the U.S. Expert of the Rockstar Transaction Proceeds Is Not Supportable .........................................................................58
    (d)    The Allocation Proposed by the EMEA Experts With Respect to the Business Sale Proceeds Should Be Rejected ...................................................60
    (e)    The Allocation Proposed by the EMEA Experts With Respect to the Rockstar Transaction Proceeds Should Be Rejected ......................................63

PART VIII – CONCLUSION.........................................................................................64

**PART I – OVERVIEW**

1.      The central question before the Courts concerns the basis on which approximately $7.3 billion in sale proceeds, realized on the sales of Nortel assets following the insolvency filings in 2009, should be allocated among the three Debtor Estates.[1]

2.      The Monitor's position[2] on this question is that the proceeds should be allocated based upon the value of the property rights transferred or surrendered by each Debtor in connection with the Business Sales (the sales of each of Nortel's lines of business) and the Rockstar Transaction (the sale of Nortel's residual intellectual property ("IP")).

3.      The Monitor respectfully submits that this approach should be followed because it respects the legal rights of each Debtor.  Moreover, in the context of insolvency, it respects the legal rights of each creditor to recover, from the Debtor indebted to it, out of funds that represent that Debtor's legal entitlement to a portion of the sale proceeds.  This approach is, in essence, the one that the Courts would follow in a priority dispute over property or over funds derived from property – that is, to determine the priorities and how funds will flow according to the applicable legal rights.

4.      The proper approach to allocation involves a two-step process.  First, the specific property or legal rights that were transferred or surrendered by each Debtor (grouped by Estate) must be identified and correctly characterized.  The second step involves the valuation of those

---

[1] For definitions of capitalized terms used in this pre-trial brief, see the Glossary of Terms attached at Schedule "A".
[2] Reference to the Monitor's position in this pre-trial brief includes the position of the Canadian Debtors.

rights.  Thus, embedded within the general question of the basis for allocation are more specific questions, some legal and some factual.

5.      The Business Sales involved the transfer to purchasers of certain categories of assets, including, most importantly, IP; the Rockstar Transaction involved almost exclusively the transfer of IP.  The identification and characterization of the property rights in, or legal rights to, the IP that was transferred or surrendered in the sales are at the centre of the dispute between the parties.

6.      The Monitor's position is that the IP transferred in each of the sales was legally owned by one of the Canadian Debtors, Nortel Networks Ltd. ("NNL"), the parent operating company of the Nortel Group.  It is also the Monitor's position that the only legal rights related to the IP which were held by NNL subsidiaries who are certain of the U.S. and EMEA Debtors were not ownership of the IP, but were license rights that had been granted to them by the IP's owner, NNL, pursuant to, in accordance with, and limited by, the terms of the Master Research & Development Agreement ("MRDA").

7.      This position follows from the clear words of the MRDA, most notably (i) the MRDA's express provision that legal title to the IP is and shall be vested in NNL and (ii) the MRDA's express grant of license rights by NNL (a grant which would be impossible if NNL were not the owner of the IP in question).  It is consistent with (indeed, it is the only conclusion available under) the controlling Ontario law which governs the MRDA and which provides that a license grants no property interest, but is rather a contractual consent by an owner which gives rights that are limited by the terms of the license.  It is also consistent with the history of NNL as the technology-rich parent of the U.S. and EMEA Debtors, the agreements that preceded the MRDA, the thousands of patent registrations which identified NNL as the owner of the patents, and the

- 3 -

description, and inclusion as a plaintiff, of NNL as the patent owner in actions that were taken to enforce patent rights.

8.      This characterization of NNL's property rights related to the IP – i.e., that NNL owned it – bears directly on the second aspect of the allocation question, namely, the value of the property rights transferred.  It was ownership of IP that was transferred to the purchasers in the various sale transactions and, accordingly, it was ownership for which the purchasers paid.  The proceeds that are attributable to that transfer of ownership is allocable to NNL as the IP's owner.

9.      The characterization (including the scope) of the rights of the U.S. and EMEA Debtors as license rights, also bears directly on the second aspect of the allocation question, because it goes to the value of the rights that were surrendered.  The license rights of the U.S. and EMEA Debtors were not transferred to the purchasers in any of the sales.  They were non-transferrable rights, which were surrendered or terminated but not transferred.  The question to be determined with respect to the terminated licenses raises a valuation issue: not one which inquires into what the purchasers paid for licenses (since the purchasers did not acquire the licenses), but rather one which inquires into the value of what the U.S. and EMEA Debtors gave up.  When a license is given up, what the licensee loses is the future opportunity to earn profit from using the license in accordance with its terms.  Even the U.S. Debtors' expert agreed that the value of a license is driven by the profits a licensee could obtain by using the licensed patented technology.  A valuation of those license rights must be based upon the terms and scope of the license, in order to determine the profits, if any, that the licensees would have earned had they not surrendered their licenses but had operated under them in accordance with the licenses' terms.  To the extent that, in terminating their license rights in connection with the sales, the U.S. and EMEA Debtors gave up something of value (which must be carefully scrutinized because the overall business of

- 4 -

Nortel was no longer viable), then the value of those license rights is properly allocated to the U.S. and EMEA Estates.

10.     The scope of the license rights requires careful examination.   That examination, conducted pursuant to the Ontario law of contractual interpretation, reveals that the license rights granted by NNL under the MRDA were not unlimited.   They did not grant to the licensees the right to use, for all purposes, the IP that NNL owned; they granted only the right, exclusive in the designated territories, to use the IP for the purpose of making or selling "Products", a term defined by the MRDA.   The definition of "Products" is limited to those products, software and services that were developed or proposed to be developed by or for one or more of the signatories to the MRDA (each a Nortel entity), and no one else.   In other words, the MRDA license grant only permitted the use of the IP *in connection with Nortel Products made (or proposed to be made) by or for Nortel Entities*.

11.     The characterization of the rights of NNL as owner and of the U.S. and EMEA Debtors as licensees, whose license is circumscribed by those terms, informs the valuation performed by the Canadian experts.   The U.S. and EMEA Debtors' experts proceed on completely different theories.

12.     The U.S. and EMEA Debtors, as well as the UKPC, go to great lengths in their attempts to establish that NNL was not the owner of the IP but held only "bare legal title".   According to their theory, the various NNL subsidiaries are the beneficial owners of the IP in their respective regions or territories.   The U.S. and EMEA Debtors advance this argument notwithstanding that the term "bare" does not appear in the MRDA, notwithstanding that there is no grant of beneficial ownership to them in the MRDA, and notwithstanding that a relationship between a bare legal title holder and beneficial owners would be a fiduciary relationship, which the MRDA

- 5 -

expressly disclaims.  This incorrect approach, which understates NNL's rights and overstates the

U.S. and EMEA Debtors' rights, drives the incorrect allocation theories that the U.S. Debtors

and EMEA Debtors advance.

13.     Following a proposition that the licensees are entitled to share in the proceeds from sales

of Nortel IP according to the relative contribution that each of them made to the creation of that

IP, the EMEA Debtors' expert purports to measure each licensee's spending on R&D and then to

use it as a proxy for determining the contribution that each made to the development of the IP.

He then proposes that the value realized on the sales of the IP be allocated according to those

relative contributions.

14.     Following on an assumption that NNL held only "nominal" legal title to all patents and

that all economic value of Nortel's IP in their exclusive territories was held by the U.S. and

EMEA Debtors, the U.S. Debtors' expert suggests an approach of dividing the sale proceeds, in

the case of the Business Sales, according to the proportion of revenue each geographic region

earned in a single year, namely 2009, and, in the case of the Rockstar Transaction, in accordance

with the proportion of revenues a hypothetical licensing business might have generated in each

region.

15.     It is telling that each of these experts levels trenchant criticisms at the other's approach.

According to the EMEA Debtors' expert, the U.S. Debtors' expert's use of historical revenue as

a measure of value is inconsistent with accepted valuation principles, and his choice, in

connection with the Rockstar Transaction, of discount rates is well outside the range of

reasonableness.  In turn, the U.S. Debtors' expert asserts that the EMEA Debtors' expert's use of

relative contribution to R&D expenditures as an allocation key is fundamentally flawed, because

historical financial contribution provides no indication of value.

- 6 -

16.     There are still further fundamental problems with each analysis, outlined in Part VII below.  But beyond their failure to agree lies a more basic problem.  The premises from which they proceed are simply wrong.  NNL's ownership of the IP was not "bare" or "nominal".  The U.S. and EMEA Debtors did not own the IP or all of the economic value of the IP in their exclusive territories.  Rather, they were licensees of certain rights relating to that IP.  As is discussed more fully below, the governing Ontario law is clear that the grant of a license right is not akin to an assignment that creates an ownership interest in the patent.  Rather, it is simply a contractual right, a promise made by the owner that goes only so far as its terms.  It must be valued on that basis.

17.     Thus, with respect to the assets sold or surrendered in the Business Sales, the proper approach is as follows.

18.     First, tangible assets are valued based on their net book value, which approximates to their fair market value.  Each Nortel Debtor should receive an allocation equal to the net book value, as identified in Nortel financial statements, of the tangible assets it contributed to each sale.

19.     Second, in-place workforce transferred to the purchasers in each sale is valued based on the cost that would be incurred to replace the employees in question.  Each Nortel Debtor should receive an allocation equal to the replacement cost for the employees that were transferred to each purchaser in the Business Sales.

20.     Third, it is necessary to value the license rights the U.S. and EMEA Debtors had to the Nortel IP, which license rights were terminated in connection with the sales of Nortel's then-still-operating businesses.  As with any other contract-based right, the value of the license rights

is equal to the amounts that the licensees could have earned had the licenses not been terminated. Thus, the value of the license rights is equal to the present value of the future operating profit that could have been earned by the U.S. and EMEA Debtors had the Nortel businesses continued to operate.  This value includes the value of any customer relationships associated with the U.S. and EMEA Debtors, since the value of customer relationships is determined by the present value of the future cash flows that those relationships could produce – the very same cash flows that the licenses would have generated.  Thus, a determination of the present value of the future cash flows that would have accrued to the U.S. and EMEA Debtors, if the Nortel businesses had continued to operate, gives them appropriate credit both for any interests they had in customer relationships and for the licenses they terminated.  This approach takes into account the cash inflows (such as revenues) and cash outflows (such as the costs associated with earning those revenues, including the sharing of operating profits and losses required by the MRDA).

21.     Any sale proceeds that are in excess of the aggregate of the foregoing values (i.e. the aggregate of the value of the tangible assets, the in-place workforce, and the license rights) are attributable to the value of the IP (unencumbered by the license rights) owned by NNL and to the value of any customer relationships owned by NNL, being assets which NNL transferred to the purchaser.  Those proceeds are properly allocated to NNL.

22.     With respect to the sale of the residual patent portfolio, this involved the transfer of ownership of IP by NNL to the purchaser.  There were no tangible assets and virtually no in-place workforce transferred as part of this sale transaction.  License rights were surrendered, but that fact does not imply that they were valuable.  On the contrary, the License Termination Agreement for the Rockstar Transaction specifically provided that the termination itself would not affect the ownership rights that any of the sellers may have to any IP, and the Side

- 8 -

Agreement provided that the termination would not hinder or enhance any allocation argument that the parties might advance.

23.    A valuation of the license rights surrendered by the U.S. and EMEA Debtors in connection with the Rockstar Transaction requires consideration of the scope of the license as it relates to two categories of patents that were sold:

(a)    First, there were patents transferred in the sale that were not incorporated into any proposed or actual Nortel Products.  Due to the terms of the license, properly construed, the license rights had no value in so far as they related to such patents.

(b)    Second, with respect to the patents that had been incorporated into proposed or actual Nortel Products, the value of the license rights in so far as they related to those patents has already been accounted for in valuing the license rights surrendered in connection with the Business Sales.  This is because the Business Sale purchasers acquired and paid for licenses to some of the IP later sold in the Rockstar Transaction.

24.    Accordingly, since there is no value attributable to the U.S. and EMEA license rights over and above the value that has already been ascribed to them in the context of the Business Sales, the proceeds realized on the Rockstar Transaction are attributable to the transfer of NNL's ownership of the patents and properly allocated to NNL.

25.    In the result, the values of the property rights transferred or surrendered by each Debtor in connection with the various sale transactions are set out in the chart below.  The Monitor submits that the Courts should allocate the sale proceeds in a manner that matches these values.

- 9 -

| Allocation of Sale Proceeds *(In Millions of USD)* | | | | |
|---|---|---|---|---|
| **Asset** | **Canada** | **U.S.** | **EMEA** | **Total** |
| Tangible Assets | $121.74 | $317.59 | $94.86 | $534.19 |
| IP Rights and Customer Relationship | 1,379.85 | 438.20 | 164.20 | 1,982.25 |
| In-Place Workforce | 79.07 | 135.17 | 41.91 | 256.15 |
| Wholly-Owned Businesses | - | 110.97 | - | 110.97 |
| Residual Intellectual Property | 4,453.45 | - | - | 4,453.45 |
| **Total Allocation** | **$6,034.11** | **$1,001.93** | **$300.97** | **$7,337.01** |
| % of Total – Excluding Residual IP | 54.8% | 34.7% | 10.4% | |
| % of Total – Including Residual IP | 82.2% | 13.7% | 4.1% | |

26.     This result is fair.  It respects the legal entitlements of each Debtor and therefore the legal entitlements of creditors.  It is fair to creditors of each estate that their Debtors should have, in order to make payments towards their creditors' claims, no more and no less than the value of their legal entitlements.  Indeed, there should be nothing surprising in a result that flows from the Canadian parent operating company having owned valuable assets, given that substantial debt and thus creditor claims were also legally undertaken by the Canadian members of the Nortel Group.  Nor should the result be surprising since the value of the licences of U.S. and EMEA Debtors related to lines of business that were losing money, being deserted by their customers, or both.  The Monitor notes that the UKPC and the CCC contend for an allocation of proceeds *pro rata* to the amount of creditor claims, irrespective of the Debtor against whom each creditor has claims.  The CCC contends for this as an alternative approach only if the Courts conclude that ownership should not form the basis for allocating proceeds.  The UKPC, however, contends for

- 10 -

this because they say it will be impossible to determine ownership and legal rights.  However, on the Monitor's approach, ownership and the relevant legal rights are not impossible to determine and should accordingly form the basis for allocation.

27.     The U.S. Debtors appear to make the rather startling additional argument that, even if NNL is entitled to all of the proceeds of the Rockstar Transaction, it should nevertheless not have all of those proceeds allocated to it, due to the timing of its assertion of the position advanced in these proceedings.  However, contrary to the implication of the U.S. Debtors' argument, the allocation position of the Monitor and the Canadian Debtors was asserted at the precise time required by the Court-ordered protocol.  Prior to that time (including at the time of the Rockstar Transaction), the parties had expressly agreed to defer all issues of allocation and to preserve all rights to advance any allocation position.  The U.S. Debtors' position is all the more surprising, given the fact that their principal officer, Mr. John Ray, even after the Allocation Positions in these proceedings had been delivered, could not say whether the U.S. Debtors' position would allocate *any* ~~uns~~funds from *any* of the sales to the Canadian Debtors.[3]   In short, the U.S. Debtors' argument in this regard does not merit the attention or consideration of the Courts.

**PART II – FACTS**

28.     In 2009, the Nortel Group was comprised of more than 130 entities located in more than 100 countries.  NNC, a Canadian company, was the publicly traded, parent holding company of NNL and its subsidiaries.  NNL, another Canadian company, was NNC's principal, direct operating subsidiary.  NNL, in turn, owned corporate subsidiaries located in various countries, including the United States (NNI), the United Kingdom (NNUK), France (NNSA), Ireland (NN

---

[3] Deposition of John Ray, December 13, 2013, 106:6 – 108:2

- 11 -

Ireland) and countries in the Asia-Pacific region, the Caribbean and Latin America.  A corporate chart showing the relevant corporate entities and the Debtor Estate to which each belongs is attached as Schedule "B".

29.     At the time of the filing for protection from creditors in early 2009, the Nortel Group was in the technology and telecommunications business, developing new technologies and selling products incorporating that technology to customers along with related services. Nortel had no material business licensing its technology (i.e., its IP) or monetizing its technology by suing others.

30.     Nortel was always headquartered in Canada, where it was founded as part of the Bell Telephone Company of Canada in 1883.  Before the 1980s, all of Nortel's R&D was performed in Ottawa.   While laboratories were later established in other jurisdictions, Ottawa always remained the primary centre for R&D.   NNL's Ottawa campus was home to the largest concentration of Nortel's R&D employees.   Ottawa was also the location of Nortel's advanced technology and R&D leadership.   No major decision regarding R&D direction or funding was taken without approval from Ottawa.

> Affidavit of Brian McFadden, April 10, 2014, paras. 15-16
>
> Reply Affidavit of Paviter Binning, April 24, 2014, paras. 7 and 8

31.     For the relevant years prior to the insolvency filings, Nortel operated using an integrated structure, which was designed to accommodate the global nature of Nortel's business.  None of the geographic regions was able to provide the full line of Nortel products and services on a stand-alone basis.  The vertically and horizontally integrated organizations within Nortel shared information and performed common tasks across geographic boundaries and across legal entities.

- 12 -

32.    Nortel's main business segments were:

(a)    Carrier Networks, which provided wireless networking solutions that enabled service providers and cable operators to supply mobile voice, data and multimedia communications to individuals and enterprises using mobile phones and other wireless devices.  The Carrier Networks business included:

     (i)    Global System for Mobile Communications ("GSM");

     (ii)    Code Division Multiple Access ("CDMA");

     (iii)    Carrier Voice Over Internet Protocol Applications Solutions ("CVAS"); and

     (iv)    the development of long-term evolution ("LTE") wireless technology;

(b)    Enterprise Solutions, which provided enterprise communications solutions addressing the headquarters, branch and home office needs of large and small businesses; and

(c)    Metro Ethernet Networks, which provided optical networking and carrier grade ethernet data networking solutions.   The Metro Ethernet Networks business included:

     (i)    Carrier Ethernet switching products;

     (ii)    optical networking products; and

     (iii)    multi-service switching products.

- 13 -

Affidavit of Sharon Hamilton, April 11, 2014, paras. 9-13

33.     By the time the Debtors filed for creditor protection, only the GSM and CDMA lines of business were profitable.  As discussed further below, Nortel as a whole was no longer viable.

Expert Report of Philip Green, January 24, 2014, Appendices A-E (3.1-3.3)
Carve-out statements (see Appendices A, B, C, D and E)

34.     R&D was the primary driver of Nortel's value and profit.  In addition to developing new and improved products and services, R&D played a critical role in the sales process of each business line.  For example, prospective customers were given tours of the Ottawa R&D facility, and sales presentations were often made jointly by both sales teams and R&D teams.  Thus, despite the fact that there was, on average, a one-year lag in the deployment of Nortel's IP into the market, current year R&D drove not only future sales but also current year sales.

Affidavit of Brian McFadden, April 10, 2014, paras. 28-29

TR44077 (Nortel Pre-Filing Conference with CRA Presentation, October 2, 2007) p. 5

Affidavit of Paviter Binning, April 24, 2014, para. 10

35.     Patent applications were filed in various countries around the world, including Canada, the U.S., the U.K., Germany, France, China, Japan and Australia.  As of January 2009, over 8,800 patents had been issued.  Virtually all of them were assigned to NNL.

TR11151 (Nortel's IP Team and Patent Portfolio Presentation, August 2010) p. 11

Affidavit of Angela de Wilton, April 11, 2014, paras. 8-12

- 14 -

36.     Moreover, NNL was not a mere registrant of patents.  The Canadian entities/research laboratories were the locations of the inventors of approximately 50% of all patents and patent applications in NNL's portfolio.  Moreover, NNL was a substantial funder of R&D.  In the period prior to the Business Sales, the Canadian Debtors proportionally spent the most on R&D. The proportions of R&D spend for the years 2005 to 2009 were:

     (a)     Canada: 49.9%

     (b)     U.S.: 38.5%

     (c)     EMEA: 11.6%

          Affidavit of Angela de Wilton, April 11, 2014, para. 14

          TPR45645 (Transfer Pricing Adjustments)

**(a)     Agreements Which Preceded the MRDA**

37.     Prior to the MRDA, NNL (or its predecessor) signed various agreements with its major subsidiaries that performed R&D outside of Canada.  Pursuant to these "cost sharing agreements", NNL licensed its technology to subsidiaries to use in connection with the manufacture and sale of Nortel products.  In return, the subsidiaries contributed to the cost of on-going R&D expenses based on complex formulas set forth in the Cost Sharing Agreements. Legal title to the technology created by all parties was vested in NNL.

          Affidavit of Clive Allen, April 11, 2014, paras. 25-28

          TR21002 (Amended Research and Development Cost Sharing Agreement, January 1, 1992) Articles 2 and 4-5

          TR31309 (Research and Development Cost Sharing Agreement, January 1, 1995) Articles 2 and 4-5

- 15 -

> TR46945 (Research and Development Cost Sharing Agreement, January
> 1, 2000) Articles 2 and 4-5

38.    The commercial purpose behind these agreements was to make available to NNL's subsidiaries the Nortel IP that was necessary to the manufacture and sale of Nortel products. While NNL retained control over the use of the IP, the subsidiaries benefited by being able to avoid substantial up-front costs for IP and by having access to a much greater pool of IP than they might otherwise be able to afford.

> Affidavit of Clive Allen, April 11, 2014, paras. 33-36

**(b)    the MRDA**

39.    The last of those cost sharing agreements expired in January 2001.  The MRDA was signed in 2004, but effective as of January 1, 2001.  There is no evidence that it was intended to effect any change with respect to IP ownership or with respect to the scope of the license rights and, by its clear terms, it did not.

> Deposition Giovanna Sparagna, December 10, 2013, 208:22 – 208:23 and
> 209:25 – 212:15 and TR21528
>
> TR11103, TR31016 and TR32240 (Termination of Research and
> Development Cost Sharing Agreements between NNL and NNI, NNUK
> and NN SA, respectively)

40.    The signatories to the MRDA were:

- NNL

- NNI (the U.S. operating subsidiary);

- NNUK (the U.K. operating subsidiary);

- NNSA;

- 16 -

- NN Australia; and

- NN Ireland.

41.    The MRDA was considered to be a binding legal agreement.  Indeed, no witness has suggested that there was any source of the subsidiaries' rights in connection  the IP other than the MRDA.

42.    The MRDA contained certain recitals relating to IP ownership and licensing, including the following:

> WHEREAS legal title to all NN Technology is held in the name of NNL;
>
> WHEREAS each Licensed Participant held and enjoyed equitable and beneficial ownership of certain exclusive rights under NT Technology for a Specified Territory pursuant to the [Cost Sharing Agreement of 1992] and . . . continue, as of the effective date of this Agreement, to hold and enjoy such rights;
>
> WHEREAS this Agreement reflects the Participants' intent and agreement since January 1, 2001 to enter a ***license arrangement*** [emphasis added]
>
> Consolidated Master R&D Agreement, p. 2, attached hereto as Schedule "C"; see also TR21003 (MRDA and addenda)[4]

43.    The MRDA also contained recitals concerning the residual profit split method (the "RPSM") contemplated by the agreement, which recitals discussed the entrepreneurial risks and benefits of the Nortel business borne by each Participant, the parties' intention to perform R&D with respect to Nortel Products, and the intention that each Participant benefit from its

---

[4] The Consolidated Master R&D Agreement, attached hereto as Schedule "C", consolidates into one document the MRDA, as amended, as it stood on January 14, 2009.  It was created by the Monitor and is being included to assist the Courts.  The original MRDA and its addenda is TR21003.

- 17 -

contribution to R&D activity to an extent commensurate with the value of its contribution in the context of the Nortel business, and that the RPSM is the best method of achieving that goal.

44.     The operative provisions of the MRDA that are the focus of the various arguments being advanced with respect to allocation are as follows:

(a)     Legal title to any and all "NN Technology" shall be vested in NNL.  (Article 4(a))

(b)     "NN Technology" is defined very broadly to mean "any and all intangible assets including but not limited to patents, industrial designs, copyrights and applications thereof, derivative works, technical know-how, drawings, reports, practices, specifications, designs, software. . .", but did not include trademarks. (Article 1(f))

(c)     NNL "continues to grant" to each of its subsidiaries who were signatories to the MRDA (referred to as "Licensed Participants") an exclusive, royalty-free, perpetual license, including the right to sublicense, to make, use and sell "Products" using or embodying NN Technology in the Licensed Participant's designated territory, and all rights to patents, industrial designs and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith. (Article 5(a)(i))

(d)     "Products" is defined to mean all products, software and services designed, developed, manufactured or marketed (or proposed to be designed, developed, manufactured or marketed) by or for any of the Participants. (Article 1(g))

- 18 -

(e)     Each Licensed Participant was to have the right to assert actions and recover damages or other remedies in their respective territories for infringement or misappropriation of NN Technology by others. (Article 4(e))

(f)     Each Licensed Participant agreed that NN Technology was confidential and proprietary and undertook that they would not make use of, or disclose, it other than as permitted by the MRDA. (Article 6(a))

(g)     Each signatory (referred to in the MRDA as a "Participant") agreed to use its best efforts to continue to perform R&D at a level consistent with past practices and the ongoing needs of the Nortel business for its respective territory.  (Article 2(a))

(h)     As a result of performing R&D work, each Participant was obliged to share, and entitled to receive, a share of the overall operating profits determined in accordance with the RPSM method set out in the MRDA. (Article 3(a))  The RPSM essentially provided for the parties to share *operating* profits (or losses) in accordance with their proportionate contribution to Nortel's total R&D expenditure, calculated over a rolling five year period. (Schedule A to the MRDA)

(i)     The parties agreed that the relationship under the MRDA did not constitute a partnership or joint venture for any purpose.  In addition, they agreed that no Participant was a fiduciary or agent of any other Participant. (Article 13)

(j)     The MRDA was to be governed by, and construed in accordance with, Ontario law. (Article 14(f))

- 19 -

    (k)     The agreement was the entire agreement between the parties. (Article 14(d))

    (l)     The parties agreed that the MRDA could not be assigned by any Participant without the written consent of all signatories. (Article 14(a))

45.    The MRDA remains in force to this day (subject, of course, to the termination of the subsidiaries' licenses mentioned above and which will be discussed more fully in the section below relating to the sale of Nortel's assets).

**(c)**    **Nortel's Insolvency, the Decision to Liquidate, and the IFSA**

46.    On January 14, 2009, the Canadian Debtors filed for and obtained protection from the Court under the *Companies' Creditors Arrangement Act*.  On that same day, NNI and several of its U.S. affiliates filed petitions in the United States Bankruptcy Court for the District of Delaware for protection under Chapter 11 of Title 11 of the U.S. *Code*.  The following day, on January 15, 2009, NNUK and certain of its European subsidiaries (including NNSA and NN Ireland) were granted administration orders in the U.K. under the *Insolvency Act, 1986*.

47.    Following these filings for protection from creditors, two main restructuring options were considered as a means of maximizing value for Nortel's creditors.  The first involved the sale of all of Nortel's business lines, with the exception of the CDMA wireless business and the LTE wireless technology.  (At the time, the CDMA business, which dealt in an old technology, was profitable.  However, its business was mature, and its revenue was forecast to decline over the coming years as customers transitioned to the next generation LTE technology.)  Under this first option, a smaller Nortel would emerge, centered on the legacy CDMA business and the potential LTE business.

- 20 -

48.     The second restructuring option being considered was the sale of all of Nortel's business lines and other assets, i.e. a liquidating insolvency.

Affidavit of Paviter Binning, April 10, 2014, para. 43

49.     However, in February 2009, Verizon Communications, a major CDMA customer and a prospective customer for Nortel's LTE technology, advised Nortel that it had not been selected as an LTE provider to Verizon.  Verizon subsequently further advised Nortel  that it preferred that the CDMA business be moved into "safe hands" (i.e., to another telecommunications provider with a strong balance sheet), failing which Verizon would direct a significant amount of its CDMA purchases to its other CDMA supplier on a going-forward business.  As a result, the prospective business model for Nortel continuing to operate the CDMA and LTE business was seriously undermined.

Affidavit of Sharon Hamilton, April 11, 2014, para. 23

Affidavit of Paviter Binning, April 10, 2014, para. 47

Reply Affidavit of Paviter Binning, April 24, 2014, paras, 9-12

50.     Ultimately, following significant review by NNC's senior management and board of directors, and following consultation with Lazard Freres & Co (which was Nortel's financial advisor), as well as consultation with all other stakeholders, a decision was made that the best means to realize value for creditors would be to sell all of the business lines along with any other assets.

Affidavit of Paviter Binning, April 10, 2014, para. 49

- 21 -

51.    As a result, on June 19, 2009, Nortel issued a press release announcing that it had entered into a stalking horse agreement to sell its CDMA business and certain LTE assets and that it was advancing in discussions to sell its other business lines.  Each of the Debtor Estates and the relevant stakeholders supported this decision.

Affidavit of Sharon Hamilton, April 11, 2014, para. 25

52.    At approximately the same time, NNL was suffering a significant and increasing cash burn.  As a result of the insolvency proceedings, NNL had received no payments from its subsidiaries pursuant to the RPSM provisions of the MRDA since January 2009.  Nevertheless, NNL had continued to incur significant R&D costs to preserve the enterprise value of the business lines.  It was also incurring significant expenses in respect of corporate overhead, as it worked to coordinate the global restructuring efforts for the benefit of Nortel's global stakeholders.  The resulting negative cash flow was projected to continue unabated over the next few months.

Affidavit of Sharon Hamilton, April 11, 2014, para. 29

53.    Accordingly, on June 9, 2009, NNL, NNI, NNUK and the Joint Administrators (among other parties) entered into the Interim Funding and Settlement Agreement (the "IFSA"), which resolved these funding issues for an interim period.  Pursuant to the IFSA, NNI agreed to pay $157 million to the Canadian Debtors in satisfaction of any claims by NNL for corporate overhead and R&D costs incurred by NNL for the benefit of the U.S. Debtors for the period from the filing date to September 30, 2009.

Affidavit of Sharon Hamilton, April 11, 2014, para. 30

- 22 -

54.    In addition to addressing NNL's immediate funding needs, the IFSA also provided a framework whereby the various Debtor Estates could complete the contemplated sales of Nortel's assets, regardless of whether they had reached an agreement among themselves as to how to allocate the resulting sale proceeds.  More specifically, under the IFSA, the Estates agreed:

(a)    that their execution of sale documentation or the closing of a sale transaction would not be conditioned upon reaching agreement either on allocation of the sale proceeds or on a binding procedure for determining the allocation question;

(b)    that the sale proceeds would be deposited into escrow, and that there would be no distribution out of escrow without either the agreement of all of the selling debtors or the determination of any dispute relating thereto by the relevant dispute resolver;

(c)    that the agreement would not have any impact on the allocation of proceeds to any Debtor from any asset sale; and

(d)    that, in order to facilitate the asset sales, the U.S. and EMEA Debtors would enter into appropriate license termination agreements which would provide for the termination of the license rights granted by NNL under the MRDA.

TR43794 (Interim Funding and Settlement Agreement, June 9, 2009) ss. 10(a), 11, 12(a) and (b)

- 23 -

55.    The parties also agreed that a debtor would not be required to enter into a sale transaction, if it reasonably determined in good faith that the transaction was not in the best economic interest of its creditors.

> TR43794 (Interim Funding and Settlement Agreement, June 9, 2009) s. 12(e)

56.    It was under this framework that Nortel proceeded with the liquidation of its assets.

**(d)    The Business Sales**

57.    With the IFSA framework in place, the Debtor Estates embarked on a process that resulted in a series of sales of the various business lines, which occurred from mid-2009 through late 2010, with the last transaction (the MSS sale) closing in March 2011.  Each of NNL, NNI and (with the exception of the CDMA/LTE sale) NNUK, along with various other Nortel entities were named as "sellers" in the transaction documents.

58.    As part of this process, Nortel had to identify the bundle of assets, rights and obligations that were going to be the subject of any given sale transaction.  This identification exercise, together with efforts to separate the business lines from each other (both operationally and from a reporting point of view) and from other aspects of Nortel so that the assets conveyed would enable each line of business to function on a stand-alone basis, was known as the "carve-out process".  It was not suggested at the time that it was a viable option to restructure along geographic lines or for a country-specific entity to independently continue in Nortel's business.

> Affidavit of Sharon Hamilton, April 11, 2014, para. 51
>
> Reply Affidavit of Paviter Binning, April 24, 2014, paras. 4-11

- 24 -

59.     Through the carve-out process, it became apparent that the sale of each significant business line would generally include the following conveyances of assets, rights and obligations:

(a)     the transfer of those patents that were "predominantly used" in the particular business line;

(b)     a non-exclusive license for any other patent that was used in that particular business line, such license to grant the right to make, use or sell the claimed invention in connection with the particular business;

(c)     the transfer or license of other forms of IP, such as trademarks or software, used in the business line;

(d)     the transfer of tangible assets (such as inventory, R&D equipment, computer equipment) used in the business line;

(e)     the transfer of unbilled or in-process receivables and prepaid expenses related to the business line;

(f)     the transfer of a significant portion of the workforce employed in connection with the business line, including management, R&D personnel, and sales and supply chain personnel;

(g)     the assignment of contracts (or portions thereof) related to the business line, including customer contracts, supply contracts, and license agreements with third parties, and including any warranty rights;

- 25 -

(h)     the sale, lease or sub-lease of real property related to the business line; and

(i)     the assumption of certain liabilities related to the business line, particularly warranty obligations to customers and all liabilities of the business line arising after the closing of the transaction.

Affidavit of Sharon Hamilton, April 11, 2014, para. 52

60.     A key aspect of the carve-out process related to item (a) in the list above, namely, the identification of which IP rights – mainly, patent rights – needed to be conveyed to the purchaser so that it would have the rights needed to operate the business.  Each purchaser was involved in this process (along with Nortel personnel) and each manifested a desire to obtain a transfer of as many patents as possible as part of the sale in question.  Conversely, the Nortel sellers wanted to ensure that the only patents transferred were those that were "predominantly used" in the business line in question.

Affidavit of Sharon Hamilton, April 11, 2014, paras. 59-60

61.     Ultimately, the approach taken was that those patents that were predominantly used in any given business line were transferred to the purchaser as part of the transaction.  For all other patents that were used in that business (but also in other businesses), a license was granted to the purchaser for use of the patents in the operations of the particular business line being purchased.  For those patents in respect of which licenses were granted, NNL retained ownership of the patents.  In the end, 2,700 patents were transferred as part of the Business Sales.  The sales agreements provided for the transfer of all of the sellers' "right, title and interest in and to" the

- 26 -

enumerated IP "subject to any and all licenses" (in reference to third party licenses and not licenses under the MRDA).

> Affidavit of Sharon Hamilton, April 11, 2014, para. 61
>
> TR11151 (Nortel's IP and Patent Portfolio Presentation, August 2010) p. 11
>
> See, e.g., TR44138 (Asset Sale Agreement re CDMA/LTE Assets, July 24, 2009) Articles 2.1.1 and 2.1.1(g)

62.      In addition, in accordance with the provisions of the IFSA, as part of each business line sale, the relevant U.S. and EMEA Debtors (including NNI and NNUK) executed a license termination agreement, which terminated their licenses in so far as those licenses related to the IP that was the subject of the asset sale in question, to the extent necessary to facilitate the sale.

> Affidavit of Sharon Hamilton, April 11, 2014, para. 54
>
> See, e.g., TR44149 (License Termination Agreement re CDMA/LTE Business Sale) Article 2.01

63.      By the time that all of the Business Sales were completed in March 2011, Nortel had no remaining operating businesses.  What it did retain was a residual patent portfolio, consisting of approximately 7000 patents and patent applications, the sale of which is discussed in the section which follows.

> Affidavit of Sharon Hamilton, paras. 56 and 67

**(e)      The Rockstar Transaction**

64.      Even before the conclusion of the Business Sales, representatives of the Debtor Estates began to consider how best to maximize the value of what was expected to be a sizable residual patent portfolio.  Two options were considered:

- 27 -

(a)    the sale of the residual patents through a competitive sale process, such as was followed for the sale of the business lines; or

(b)    the creation of a new licensing business, which would seek to license the residual patents to various technology companies who were believed to be infringing one or more patents.  This potential new licensing business was referred to as "IP Co.".

Affidavit of Sharon Hamilton, April 11, 2014, paras. 68-69

65.    Both of these options were considered in parallel from mid-2009 through early 2011.  At no point did any Debtor Estate or any major creditor group propose any other means of monetizing the patent portfolio.

Affidavit of Sharon Hamilton, April 11, 2014, para. 69

66.    Consideration, study and development of the "IP Co." option was led by John Veschi, a Nortel employee who was hired a few months prior to the commencement of the insolvency proceedings.  The premise of IP Co. was that the residual patents would be monetized by attempting to license them to various technology companies, in exchange for the payment of royalties.  The licensing attempts would be backed by the threat of patent infringement litigation and, if necessary, actual infringement proceedings.  It was considered important that IP Co. not carry on any telecommunications or other technology business, because, if it did, it would be vulnerable to counterclaims for alleged infringement being brought by the targets of its infringement litigation, which would undercut its revenue generating ability.

Affidavit of Sharon Hamilton, April 11, 2014, para. 73

- 28 -

67.    Over the course of 2009 and 2010, Mr. Veschi and his team, assisted by Lazard and Global IP (another financial advisor), prepared various versions of a financial model, in an attempt to forecast the operating profit that could be earned by IP Co. – an exercise that was necessary to any assessment of the potential economic benefits of pursuing the IP Co. option. The various versions of the model had three different sub-models that forecast the revenues that IP Co. would earn based on different assumptions, with the assumptions relating to how much litigation IP Co. would engage in as part of its business model.  The scenarios were dubbed "Harvest" (assuming very little litigation), "Litigation Light" and "Litigation Heavy".  The amount of assumed litigation drove the model: the greater the litigation, the greater the forecasted revenues and the greater the costs.

Affidavit of Sharon Hamilton, April 11, 2014, para. 74

68.    Ultimately, due to concerns about the reliability of the cash flow projections, as well as concerns about the ability to fund IP Co., the Canadian Debtors and the Monitor advised the representatives of the other Estates and the other stakeholders that the Canadian Debtors would not provide any funding to establish IP Co.  If any Estate or other interested party wished to pursue IP Co., they would need to purchase the residual patents from NNL.  No Estate or other interested party ever sought to effect such a purchase.  Instead, all of the Estates agreed to pursue a sale process for the residual patents and to terminate consideration of the IP Co. option.

Affidavit of Sharon Hamilton, April 11, 2014, para. 78-80

69.    The sale process was similar to that followed for the Business Sales.  On April 4, 2011, after significant negotiations with two prospective purchasers, certain Nortel entities (including NNC, NNL, NNI and NNUK) entered into a stalking horse asset sale agreement with a wholly

- 29 -

owned subsidiary of Google Inc.  The purchase price was to be $900 million.  An auction was held at the end of June 2011, with the residual patents ultimately being sold to Rockstar, a single purpose entity backed by a consortium of major technology companies (namely, Apple, Microsoft, Ericsson, Blackberry, Sony and EMC), for $4.5 billion.

Affidavit of Sharon Hamilton, April 11, 2014, paras. 85 and 96

70.    In connection with the sale, the relevant U.S. and EMEA Debtors executed a License Termination Agreement, pursuant to which any MRDA license rights that they may have had in relation to the residual patents were terminated.  The License Termination Agreement further provided for a reservation of each party's rights to "seek its entitlement" to an allocation of the sale proceeds.

TR21508 (License Termination Agreement Rockstar Transaction) Articles 2.01-2.04

TR43794 (Interim Funding and Settlement Agreement, June 9, 2009) s. 12(f)

71.    The $4.5 billion in sale proceeds, together with the $2.8 billion realized from the Business Sales are now being held in escrow pending the Courts' determination as to their proper allocation among the Debtor Estates.

**PART III – ALLOCATION SHOULD BE BASED ON THE RIGHTS OF THE PARTIES**

72.    The question as to how to allocate the $7.3 billion in sale proceeds is a legal question. The Monitor's position on this question of law is that the proceeds should be allocated based upon the value of the property rights transferred or surrendered by each Debtor Estate in connection with the various sales.

- 30 -

73.     Based on the pleadings, this basic position appears to be shared by all three Debtor Estates.  For example, the Allocation Position of the U.S. Debtors and the Official Committee of Unsecured Creditors states as follows:

> Each Selling Debtor is entitled to receive the fair market value of the assets and rights it sold or relinquished in connection with the sale of Nortel's businesses and residual patent portfolio.  The Courts must determine the value of the assets and rights transferred by each of the separate and legally distinct Selling Debtors to allocate over $7 billion in sale proceeds now sitting in escrow.

> Motion to Approve Allocation Position of Nortel Networks Inc. and the Other U.S. Debtors and the Official Committee of Unsecured Creditors, Schedule "A", p. 1

74.     Similarly, the Allocation Position of the EMEA Debtors states:

> [T]he Business Sales require an asset based allocation methodology – in which (a) the assets that comprise the Business Sales are ascertained . . . (b) those assets are valued and reconciled to the purchase price achieved in each Business Sale; (c) the entities which own (or are otherwise entitled to) these assets are identified; and (d) sale proceeds in respect of these assets are allocated to the entities which own (or are otherwise entitled to) the assets.

> Allocation Position of the Joint Administrators Regarding the Entitlement of the EMEA Debtors to Proceeds of the Sales of the business and Residual Patent Assets, para. 45

75.     However, the overlap between the parties' positions ends there.  Although the three Estates (at least based on their pleadings) appear to agree that the sale proceeds should be allocated based upon the value of the assets owned by each Estate, the U.S. and EMEA Debtors either proceed on an allocation theory unrelated to ownership or mischaracterize the nature and extent of the various Debtors' ownership and entitlements, especially with respect to IP.

- 31 -

**PART IV – THE MRDA AND THE PARTIES' RIGHTS TO NORTEL IP**

**(a)     Ontario Law of Contractual Interpretation**

76.     Central to the resolution of the parties' respective ownership and rights is the MRDA, the

interpretation of which is governed by Ontario law, pursuant to Article 14(f) thereof.

> *Hilgraeve Corp. v. Symantec Corp.* 265 F.3d 1336, 1340-1341 (Fed. Cir.
> 2001), cert. denied 535 U.S. 906 (2002); Book of Authorities of the
> Monitor and Canadian Debtors (Pre-Trial Brief – Allocation) ("BOA –
> Allocation"), Tab 1

77.     The guiding principles of contractual interpretation were set out by the Ontario Court of

Appeal in *Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust*.  In that case, the

Court of Appeal stated that a contract is to be interpreted:

(a)     as a whole, in a manner that gives meaning to all of its terms and avoids an
interpretation that would render one or more of its terms ineffective;

(b)     by determining the intention of the parties in accordance with the language they
have used in the written document and based upon the "cardinal presumption"
that they have intended what they have said;

(c)     with regard to objective evidence of the factual matrix underlying the negotiation
of the contract, but without reference to the subjective intention of the parties; and
(to the extent that there is any ambiguity in the contract)

(d)     in a fashion that accords with sound commercial principles and good business
sense, and that avoids a commercial absurdity.

> *Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust*, 2007
> ONCA 205 at para. 24; BOA – Allocation, Tab 2

- 32 -

78.     The court's goal in interpreting a contract is to determine the parties' intent through the words that they have chosen.  As the Supreme Court of Canada said:

> [T]he contractual intent of the parties is to be determined by reference to the words they used in drafting the document . . .

> *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] S.C.J. No. 59 at para. 54; BOA – Allocation, Tab 3

> And see *Merck & Co. Inc. v. Apotex Inc.*, 2010 FC 1265 at para. 47; BOA – Allocation, Tab 4

**(b)     NNL Owned the IP**

79.     The continuous ownership of the IP by NNL to the date of the MRDA is reflected in the agreement's first recital: "Whereas legal title to all NN Technology is held in the name of NNL."

80.     Article 4(a) of the MRDA confirms that NNL shall continue to own all of Nortel's IP.  It states:

> Except as otherwise specifically agreed, legal title to any and all NN Technology whether now in existence or hereafter acquired or developed pursuant to the terms of this Agreement shall be vested in NNL.

81.     Nor is this ownership right subject to temporal limitations.  The MRDA provides that it is to survive any expiry or termination of the MRDA. (Article 9(c))

82.     In Article 5(a)(i) of the MRDA, NNL grants the license to the Licensed Participants: "NNL hereby continues to grant to each Licensed Participant and exclusive, royalty-free license. . ." This provision thereby confirms NNL's ownership.  Under Ontario law, the right to grant a license is the right of an owner, and its grant prevents from being unlawful that which, but for the

- 33 -

license, would be unlawful.  It is a consent *by the owner of a right* that another person may commit an act which, but for the license, would be an infringement of the owner's right.

> *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] S.C.J. No. 59 at para. 49, quoting Harold G. Fox, The Canadian Law and Practice Relating to Letters Patent for Inventions (4th ed. 1969); BOA – Allocation, Tab 3

83.    NNL was named as the patentee on virtually all of the approximately 8,800 patents that were ultimately sold in the Business Sales and the Rockstar Transaction. Rights in inventions were assigned directly or indirectly to NNL, with the assignment documentation invariably providing that the entire right, title and interest in and to the invention was ultimately assigned to NNL.

> Affidavit of Angela de Wilton, April 11, 2014, paras. 8-12
>
> Deposition of Timothy Collins, November 15, 2013, 40:10 – 41:20
>
> TR40197 (List of Transferred Patents in Rockstar Transaction) with column "E" called "Assignee/Owner" showing NNL as owner for the vast majority of the patents.
>
> See, e.g., TR45736 (Agreement relating to intellectual property and confidentiality, February 20, 2006)
>
> See, e.g., TR45734 (Assignment of patent to NNL, April 30, 2002)
>
> See, e.g., TR40236 (Patent Assignment Abstract of Title, showing assignment to NNL)

84.    When patent infringement suits were brought in respect of Nortel patents, Nortel's court filings consistently named NNL as the owner of the patents.

> TR50586 (Amended Complaint for Patent Infringement, March 15, 2002) para. 10
>
> TR11158 (Original Complaint for Patent Infringement, April 17, 2006) paras. 7-12

- 34 -

85.    Contrary to the suggestion of the U.S. and EMEA Debtors,  nothing at all in the MRDA

justifies reading the word "bare" or "nominal" into the MRDA in an attempt to diminish NNL's

legal ownership.  Indeed, to do so would be inconsistent with the entire agreement clause in

Article 14(d) of the MRDA.  It would also be inconsistent with the license clause in Article 5(a)

which is the sole source of the U.S. and EMEA Debtors' rights to use the IP, as NNL could not

have granted those rights had it not been the owner of them.

86.    Ownership embraces a full panoply of rights that customarily attach to ownership,

including the right to possess, to use, to manage, to exclude others from use, as well as the right

to the operating profit of the thing, the right to the capital of the thing, and the right to transfer

the thing to others.

> With respect to the nature of ownership, see Bruce Ziff, *Principles of Property Law*, 5th ed. (Toronto: Thomson Reuters Canada, 2010) at 2-3 and 6; BOA – Allocation, Tab 5

> And see the definition of "ownership", *Black's Law Dictionary*, 9th ed., p. 1215; BOA – Allocation, Tab 6

87.    Of course, just as a landowner is entitled to grant to another person the right to use the

land through the operation of a lease, so NNL as the owner of the IP was entitled to grant to its

subsidiaries a contractual right to do some of the things that are ordinarily the exclusive right of

the owner.  More specifically, NNL was entitled to grant to its subsidiaries the right to use its IP

for specified purposes within their respective territories.  It was entitled to do so "exclusively", in

the sense of excluding itself contractually from exercising the rights that it had licensed.

However, such a license did not render NNL any less the "owner" of the IP.  Nor did it endow

the subsidiaries with any rights beyond those that were expressly granted to them (which rights

are discussed more fully below).  Moreover, in granting a license, the owner is not required to

- 35 -

permit the licensee to enjoy *all* of the customary rights of ownership; the owner may choose to permit the licensee only some of those privileges. Thus, the rights of the licensee are limited to, and qualified by, the express terms of the license.

> *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] S.C.J. No. 59 at para. 49; BOA
> – Allocation, Tab 3

**(c)    NNI and NNUK Did Not Own the Nortel IP and NNL Did Not Merely Hold "Bare Legal Title"**

88.    The U.S. and EMEA Debtors' positions are based on their assertion that they were not simply licensees, but were actually the "beneficial" owners of the IP in their respective territories and that NNL held only "bare legal title".

> With respect to the U.S. Debtors' position on this point, see, e.g., Declaration of John J. Ray III, April 11, 2014, para. 64
>
> And see Rebuttal Expert Report of Jeffrey Kinrich, February 28, 2014, para. 110
>
> With respect to the EMEA Debtors' position on this point, see, e.g., Rebuttal Expert Report of James Malackowski, February 28, 2014, p. 6, section 2.4 and p. 8, section 3.1

89.    The only possible source for such an ownership interest is the MRDA. However, an examination of the provisions of that agreement, which grants license rights to the Licensed Participants, reveals that no such ownership interest exists. The jurisprudence makes it abundantly clear that a license right is a contractual right; it does not constitute ownership of the patent. As stated in the English decision of *Heap v. Hartley*:

> An exclusive license is only a license in one sense; that is to say, the true nature of an exclusive license is this. It is a leave to do a thing, and a contract not to give leave to anybody else to do the same thing. ***But it confers like any other license no interest or property in the thing.*** [emphasis added]

- 36 -

*Heap v. Hartley* (1889), 42 Ch.D. 461 at 470; BOA – Allocation, Tab 7

90.    *Heap v. Hartley* has been followed on multiple occasions by Canadian courts, including by the Supreme Court of Canada:

> "[T]he license pure and simple, and by itself, never conveys an interest in property."
>
> *Armstrong Cork Canada Ltd. v. Domco Industries Ltd.*, [1982] 1 S.C.R. 907 at para. 15; BOA – Allocation, Tab 8
>
> And see *Electric Chain Co. of Canada Ltd. v. Art Metal Works Inc.*, [1933] S.C.R. 581 at 587; BOA – Allocation, Tab 9
>
> And see *Merck & Co. Inc. v. Apotex Inc.*, 2010 FC 1265 at para. 49; BOA – Allocation, Tab 4

91.    Similarly, the Supreme Court stated in *Euro-Excellence Inc. v Kraft Canada Inc.*:

> Under the common law, a licensee does not enjoy property rights[.]
>
> *Euro-Excellence Inc. v. Kraft Canada Inc.*, 2007 SCC 37 at para. 27; BOA – Allocation, Tab 10

92.    The reference in *Fox on Patents*, quoted in the Supreme Court decision in *Eli Lilly*, that a license "is the transfer of a beneficial interest to a limited extent" must be read in the context of all of the above and in the context of the entire quote, which makes it clear that a license does not give all the rights of the patentee to the licensee. It is merely a right of user and does no more than grant a right to do particular acts and only to the extent set out in the license grant:

> A license, even though exclusive, does not give the licensee all the rights of the patentee. A license does not set up rights as between the licensee and the public, but only permits him to do acts that he would otherwise be prohibited from doing. He obtains merely a right of user. But a license is a grant of a right and does not merely confer upon the licensee a mere interest in equity. A license is the transfer of a beneficial interest to a limited extent, whereby the transferee acquires an equitable right in the

- 37 -

> patent.  <u>A license prevents that from being unlawful which, but for the</u>
> <u>license, would be unlawful; it is a consent by an owner of a right that</u>
> <u>another person should commit an act which, but for that license, would be</u>
> <u>an infringement of the right of the person who gives the license.  A license</u>
> <u>gives no more than the right to do the thing actually licensed to be done.</u>
> [emphasis in the original]

> *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] S.C.J. No. 59 at para. 49; BOA
> – Allocation, Tab 3

93.    In support of their assertion that they were the "beneficial" owners of the Nortel IP, the

U.S. and EMEA Debtors appear to rely upon one of the recitals to the MRDA, which states as

follows:

> WHEREAS each Licensed Participant held and enjoyed equitable and
> beneficial ownership of certain exclusive rights under NT Technology for
> a Specified Territory pursuant to the Amended Research and Development
> Cost Sharing Agreement entered into on January 1, 1992, and it is the
> intent of NNL and the Licensed Participants that the Licensed Participants
> continue, as of the effective date of this Agreement, to hold and enjoy
> such rights.

94.    The 1992 Amended Research and Development Cost Sharing Agreement referenced in

the recital was entered into by the predecessors of NNL and NNI.  Like the MRDA, it provided

that NNL held legal title to Nortel IP (Article 4) and that NNL "is the legal owner" of the IP

(Article 6), and it contained a grant by NNL to NNI of certain license rights to the Nortel IP

(Article 5).   Thus, the reference in the MRDA recital to NNI's "equitable and beneficial

ownership of rights under NT Technology . . . pursuant to the" 1992 R&D Cost Sharing

Agreement, is a reference to NNI's "ownership" of license rights.

> TR21002 (Amended Research and Development Cost Sharing Agreement,
> January 1, 1992)

> See also TR33067 (Research and Development Cost Sharing Agreement
> between predecessors to NNL and NNUK, January 1, 1995) and TR46945

- 38 -

(Research and Development Cost Sharing Agreement between NNL and
NN SA, January 1, 2000)

95.    Moreover, the recital cannot be read to imply some kind of ownership by the Licensed

Participants of Nortel's IP, since no operative provision grants such ownership.  The interpretive

use of a recital is limited.  It cannot be used to override the operative words of an agreement, or

to add words to them.  And the operative provision in the MRDA is a grant of license rights, not

a grant of ownership.  Any attempt to read the words in the recital as granting ownership of the

IP to the licensees must yield in the face of the clear words of the operative provisions.

> *Re Elliott Estate*, [1962] O.J. No. 164 at para. 11 (C.A.); BOA –
> Allocation, Tab 11
>
> *PUC Distribution Inc. v. Brascan Energy Marketing Inc.*, 2008 ONCA
> 176 at para. 31; BOA – Allocation, Tab 12
>
> With respect to the paramountcy of the operative provisions of a contract,
> see *Merck & Co. Inc. v. Apotex Inc.*, 2010 FC 1265 at paras. 53-54; BOA
> – Allocation, Tab 4
>
> And see *1124980 Ontario Inc. v. Liberty Mutual Insurance Co.*, [2003]
> O.J. No. 1468 at para. 57 (S.C.J., Commercial List); BOA – Allocation,
> Tab 13

96.    The assertions made by the U.S. and EMEA Debtors that NNL's had only "bare legal

title" are equally unfounded.  "Bare legal title" is a concept taken from trust law, describing the

trustee's interest in property that he holds on trust for others.

> See, for example, *Re: Axelrod*, [1994] O.J. No. 2277 at para. 16 (C.A.),
> quoting with approval from Ground J. in the court below, referring to
> "trust property . . . that is to say, property in which the bankrupt holds a
> bare legal title but has no beneficial interest"; BOA – Allocation, Tab 14
>
> And see the definition of "trust ownership" also termed "bare ownership",
> in *Black's Law Dictionary*, 9th ed. at p. 1215; BOA – Allocation, Tab 6

- 39 -

97.     This attempt to characterize the parties' relationship created by the MRDA as a trust under which NNL held title to the IP in trust for the Licensed Participants (such that it merely had "bare legal title", while the licensees were the beneficial owners) is fundamentally flawed.

98.     Not only are there no words in the MRDA which so provide, but Ontario law's strict requirements for the creation of a trust are negated here.  There is no evidence of an intention to create a trust and no evidence that the "settlor" employed the necessary language clearly showing the requisite intention to create a trust.

> See Donovan Waters, Mark Gillen and Lionel Smith, eds., *Waters' Law of Trusts in Canada*, 4th ed. (Toronto: Thomson Reuters Canada, 2012) at 140 and 159; BOA – Allocation, Tab 15

99.     The granting of a license by NNL, NNL having sole authority to file and hold patents in its name (Article 4(d)), and the Licensed Participants (but not NNL) being required to hold NN Technology in confidence and being limited in their use of it (Article 6(a)) are all inconsistent with NNL being a trustee and the U.S. and EMEA Debtors being the beneficiaries.  In addition, Article 13 of the MRDA expressly disclaims any fiduciary relationship between any of the parties – which, of course, is the hallmark and *sine qua non* of a trust.  If there is no fiduciary relationship, there cannot be a trust.

> With respect to the fact that the trust creates a fiduciary relationship between the trustee and the beneficiary, see Donovan Waters, Mark Gillen and Lionel Smith, eds., *Waters' Law of Trusts in Canada*, 4th ed. (Toronto: Thomson Reuters Canada, 2012) at 42; BOA – Allocation, Tab 15
>
> And see the reasons of Wilson J. in *Lac Minerals Ltd. v. International Corona Resources Ltd.*, [1989] S.C.J. No. 83 at para. 117; BOA – Allocation, Tab 16
>
> And see *Alberta v. Elder Advocates of Alberta*, 2011 SCC 24 at para. 33; BOA – Allocation, Tab 17

- 40 -

100.    The U.S. Debtors seek to rely on extrinsic evidence, namely evidence of the use by NNI

tax department employees of the words "beneficial ownership", in the context of discussions

with tax authorities about Nortel's transfer pricing arrangements.   However, none of this

extrinsic evidence is admissible to add to, subtract from, vary, or contradict the terms of the

MRDA.

> *Gallen v. Allstate Grain Co.*, [1984] B.C.J. No. 1621 at para. 10 (C.A.);
> leave to appeal to SCC refused, [1984] S.C.C.A. No. 171; BOA –
> Allocation, Tab 18

101.    Furthermore and in any event, in tax terms, "beneficial ownership" simply refers to a

party's right to benefit from some or all of an operating profit stream attributable to a defined

undertaking or activity.   In this case, the defined activity was limited to the manufacture and sale

of "Products" made by or for the Participants.   In other words, it was limited to Nortel's ongoing

operations.   Accordingly, "beneficial ownership" describes, in a short-hand form, the fact that

the Licensed Participants had the right to the operating profit stream that was generated as a

result of the sale of Nortel Products that embodied the licensed IP, in accordance with the profit

sharing provisions set out in the MRDA.

> With respect to the use of the term "economic" or "beneficial ownership"
> in the transfer pricing context, see the Expert Report of Dr. Timothy
> Reichert, January 24, 2014, p. 4 and 23

- 41 -

102.    All of the extrinsic evidence upon which the U.S. Debtors seek to rely relates to the use of the words "beneficial ownership" in precisely this tax context.  For example, the declaration of Mark Weisz refers to Nortel informing the IRS "that the MRDA Licensed Participants were the economic and beneficial owners of Nortel's IP in their respective territories".

> Declaration of Mark Weisz, April 11, 2014, para. 17

> And see Declaration of Michael Orlando, April 28, 2014, para. 27

103.    And, on his deposition, Mr. Weisz explained that he had no knowledge or understanding of the terms "beneficial" or "economic ownership" outside of the tax context.  He further explained that the MRDA itself was provided to the tax authorities, that the MRDA was the sole source of the rights of the U.S. and EMEA Debtors, that the economic substance of the MRDA related to operating profit earned from Nortel's operations – specifically operating profit earned from sales of products – and that the MRDA and its economic substance did not relate to proceeds realized on the sale of Nortel's IP.   And he said that he had never had any discussions in which he suggested that "beneficial ownership" for tax purposes was an interest that could be sold, and confirmed that the MRDA did not extend to that.

> Deposition of Mark Weisz, November 25, 2013, 71:20 – 72: 3, 82:10-17,
> 126:25 – 127:13, 259:11 – 261:25 and 263:13-24

104.    In any event, whether the Licensed Participants had "economic ownership" of Nortel's IP in some non-legal sense is irrelevant.  What matters is legal reality.  It is legal reality that gives rise to rights and liabilities that are the province of the courts.  As the Alberta Court of Appeal said: "We are concerned not with economics but with law."

> *Cunningham v. Hamilton* (1995), 169 A.R. 132 at para. 4 (C.A.); BOA –
> Allocation, Tab 19

- 42 -

> *Meditrust Healthcare Inc. v. Shoppers Drug Mart* (2002), 61 O.R. (3d)
> 786 at para. 30 (C.A.); BOA – Allocation, Tab 20
>
> *Martin v. Astrazeneca Pharmaceuticals PLC*, 2012 ONSC 2744 at para.
> 121 (S.C.J.); aff'd 2013 ONSC 1169 (Div. Ct.); BOA – Allocation, Tab 21
>
> *Citicorp Trustee Co. Ltd. v. Barclays Bank Plc,* [2013] EWHC 2608 at
> 101 and 114 (Ch. D.); BOA – Allocation, Tab 22

105.     Accordingly, there is simply no basis for the arguments being advanced by the U.S. and

EMEA Debtors that NNL did not own the IP, or that its rights to the IP were limited to the rights

of a bare legal title holder or a trustee of trust property, or that the Licensed Participants should

be considered in any legally relevant sense beneficial owners or economic owners of the IP.

Rather, the clear words of the MRDA establish that the IP was owned by NNL, and that the

Licensed Participants each had (as their name would suggest) license rights permitting them to

use the Nortel IP in connection with Nortel "Products".

**(d)      NNI and NNUK Were Granted Licenses Restricted to "Products"**

106.     In determining the rights of the licensees, the interpretive exercise begins with the words

of the MRDA and, in particular, with the words of Article 5(a), which contains the grant of

license rights by NNL to NNI and NNUK (and the other Licensed Participants).  Article 5(a)

grants two licenses: an exclusive license and a non-exclusive license.  The two licenses grant

rights to do the same activities – i.e., to make, use and sell Nortel "Products" – with those rights

being granted on an exclusive basis to the Licensed Participants in their respective "exclusive

territories", and the rights being granted on a non-exclusive basis in the designated "non-

exclusive territories".  Article 5(a) states as follows:

> To the extent of its legal right to do so, and subject to the rights of relevant
> third parties, NNL hereby:

- 43 -

(i)      continues to grant to each Licensed Participant an exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Exclusive Territory designated for that Licensed Participant, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Exclusive License"); and

(ii)     grants to each Licensed Participant, as of January 1, 2009 (the "Non-Exclusive License Effective Date"), a non-exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Non-Exclusive Territory, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Non-Exclusive License").

107.    What must be emphasized is that, contrary to the position being advanced by the U.S. and EMEA Debtors, the license is *not* a license to "NN Technology" generally.  NNL did not grant to the licensees all exclusive rights to the Nortel IP.  Rather, NNL granted a license to make "Products" that use or embody such IP; Article 5(a) states that the license is "to make, have made, use, lease, license, offer to sell, and sell *Products* . . ." [emphasis added].

108.    Accordingly, the definition of "Products" is of central importance.  "Products" is defined to mean, in essence, products, software or services that were made or sold by, or for, any of the Participants.  The definition at Article 1(g) of the MRDA states:

"**Products**" shall mean all products, software and services designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, at any time *by, or for, any of the Participants*, and all components, parts, sub-assemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in any of the foregoing. [bold and italics emphasis added]

- 44 -

109.    Thus, the license is one to make, use or sell products, software or services that used or embodied Nortel IP and that were made or sold (or proposed to be made or sold) by, or for, any of the parties to the MRDA.  Article 5(a) goes on to provide that the licensees may use certain Nortel IP as necessary or appropriate in connection with the making, using or selling of "Products":

> . . . and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate *in connection therewith*. [emphasis added]

110.    The scope of the license makes perfect sense as one given by a parent to operating subsidiaries.  The MRDA was about an operating relationship.  What the license did not include was rights beyond making, using or selling Products (which term itself connotes something done only by or for one of the Nortel Debtors who were signatories to the MRDA).

111.    The license included a right to sublicense.  But, by definition, a sublicense cannot extend beyond the scope of the license.  Licensed participants could thus authorize others to make, use or sell Products embodying NN Technology, or to use patents in connection therewith.  However, they could not authorize someone, by sublicense, to do anything else with the patented technology.

112.    The MRDA also stated, in Article 4(e), that Licensed Participants could assert actions and recover damages in their respective territories for infringement or misappropriation of NN Technology by others.  Yet plainly, within the terms of the MRDA read as a whole, the exercise of such a right must relate to matters within the scope of the license, as the right is given to "Licensed Participants".

- 45 -

**(e)      The MRDA Imposed a Right and Obligation to Share Residual Operating Profits and Losses**

113.    In addition to confirming NNL's ownership of the Nortel IP, and granting a license to the Licensed Participants to make, use and sell Products that use or embody that IP, the MRDA also obliged each Participant to carry on R&D activity "at a level consistent with past practices and the ongoing needs" of the Nortel business (Article 2(a)).  In connection with that performance of R&D work, the MRDA provided that each Participant was entitled (and obliged) to share in the residual operating profits (or losses) of the entire Nortel group.  That profit (or loss) sharing was effected by means of payments between the various Participants, calculated in accordance with the RPSM, set out in Schedule A to the MRDA.

114.    Accordingly, none of the MRDA signatories had a right to retain all of the revenues that might be earned from operating under the license in their respective territories.  Rather, each was obliged to share those with the other parties to the MRDA, in accordance with the RPSM.

115.    It is within this framework of the parties' legal rights that the allocation exercise (and the valuation exercise that is part of it) must be undertaken.

**PART V – ALLOCATION OF THE PROCEEDS OF THE BUSINESS LINE SALES**

**(a)      Overview of Methodology**

116.    In the valuation and calculation aspects of the allocation exercise, the Courts will be assisted by the expert evidence of Messrs. Berenblut, Cox and Green proffered by the Monitor. Messrs. Berenblut and Cox address the valuation theory and methodology to be applied, as does Mr. Green, who also performs the valuation and the requisite calculations.  Each proceeds based on an understanding of the property interests and legal rights described above.

- 46 -

117.     As mentioned above, each business line sale involved the purchaser acquiring:

(a)      tangible assets which were owned by different Debtors;

(b)      the transfer of the in-place workforce of different Debtors;

(c)      ownership of  IP (mainly patents) that were predominantly used in the business line in question, and a license for any other patents necessary to the operation of the business.

118.     The U.S. and EMEA Debtors surrendered their license rights under the MRDA in connection with each Business Sale, as contemplated by the IFSA.

**(b)      Allocation of the Proceeds Attributable to the Transfer of Tangible Assets**

119.     With respect to the allocation of proceeds attributable to the transfer of tangible assets by each Debtor Estate, the tangible assets transferred generally consisted of inventory, prepaid expenses and plant, property and equipment.   In the Business Sale agreements, generally the price paid by the purchaser was allocated to tangible assets based on their net book value, with the balance being allocated to intangible assets.

> See, e.g., TR44138 (Asset Sale Agreement re CDMA/LTE Assets, July 24, 2009) Article 6.7(a)

120.     In order to identify precisely which transferred assets were owned by each Debtor Estate and to value those assets, Mr. Green utilized the "gain/loss" financial statement and a "carve-out" financial statement, both of which were organized by business line sale transaction and by legal entity.   These showed the book values of the tangible assets that were "de-booked" in relation to the sales of Nortel's assets. As it corresponded to what the purchasers in the aggregate

- 47 -

paid for tangible assets, book value represented the most reliable values of the tangible assets that had been owned by each Debtor.

> Expert Report of Philip Green, January 24, 2014, p. 41 and Appendix H, p. 1

121.    Following that methodology, the following allocation of proceeds attributable to the transfer of tangible assets results:

| | |
|---|---|
| Canada | $121.74 million |
| U.S. | $317.59 million |
| EMEA | $94.86 million |
| Total attributable to transfer of tangible assets | $534.19 million |

> Expert Report of Philip Green, January 24, 2014, Exhibit D-3

**(c)    Allocation of Proceeds Attributable to Intangibles**

*(i)    In-Place Workforce*

122.    Each Business Sale also involved the transfer of its relevant workforce to the purchaser. Such employees were employed by various Debtors.  The transfer of the assembled workforce enabled the purchasers to continue to operate the businesses without interruption and, therefore, had a value.  Mr. Green opines that the cost approach is applied to the valuation of an assembled or in-place workforce, that is, the value of the transferred workforce is calculated based on the

- 48 -

cost that would have to be incurred to replace it. This cost includes recruiting costs, as well as values for start-up inefficiencies and the internal costs of recruitment.

> Expert Report of Philip Green, January 24, 2014, p. 44 and 47

123. After identifying the relevant employees of each involved Debtor, the following allocation of proceeds is attributable to the transfer of the in-place workforce.

| Canada | $79.07 million |
| U.S. | $135.17 million |
| EMEA | $41.91 million |
| Total attributable to transfer of in-place workforce | $256.15 million |

> Expert Report of Philip Green, January 24, 2014, p. 53 and Appendix I, p. 1

### (ii)    Surrender of the U.S. and EMEA License Rights

124. As contemplated by the IFSA, in connection with the Business Sales, the U.S. and EMEA Debtors surrendered their MRDA license rights, in so far as the licenses related to the IP that was the subject of the asset sale in question, to the extent necessary to facilitate the sale. The license rights are contractual rights; as such they are generally valued based upon the operating profit or cash flow that that the holder of the license expects to obtain from the exploitation of the contractual right.

> Expert Report of Philip Green, January 24, 2014, p. 54

> Note that the U.S. Debtors' expert agrees that license rights are valued

- 49 -

> based on the profits a licensee could earn by using the licensed
> technology.  Expert Report of Jeffrey Kinrich, January 24, 2014, para. 69

125.    The license rights were not transferred.  The purchasers did not buy them.  However, the

U.S. and EMEA Debtors surrender of the license rights allowed ownership of the IP to be

transferred without the MRDA licenses continuing.  Accordingly, a portion of the sale proceeds

that are attributable to IP could be said to have been due to the fact that the value of the licenses

was given up.  The value of the license rights is determined based upon the operating profit that

the license holders (i.e. the U.S. and EMEA Debtors) would have realized had they continued in

business, exercising their license rights, instead of surrendering them.  Because the exercise of

the license rights involves the manufacture, use or sale of Nortel "Products", the value of the

license rights is based upon the operating income that each licensee would have realized from the

continued manufacture and/or sale of Nortel Products, had the licenses not been surrendered.  In

calculating that projected income, regard must be had to the licensees' obligation to share any

residual operating profits or losses with the other signatories to the MRDA, as that is an

obligation to which they would have been subject if they had continued to operate.

> Expert Report of Philip Green, January 24, 2014, p. 54-55

126.    Therefore, it is necessary to estimate the operating results that would have been achieved

by continuing to operate the Nortel businesses, and the resulting amounts that would have been

earned by each licensee given the MRDA.  This involved the following steps:

    (a)    projecting revenues and expenses for each major business sold;

    (b)    deriving the cumulative operating profits that would have been earned based on

           projected revenues, and then aggregating them by Debtor;

- 50 -

(c)     computing the MRDA-imposed adjustments that would be due for each Debtor
        pursuant to the RPSM;

(d)     computing operating profits after the MRDA-imposed adjustments;

(e)     discount the earnings to present value.

        Expert Report of Philip Green, January 24, 2014, p. 57

127.    With respect to (a) and (b) above, the particular forecasts that were used to project the future revenues of the Nortel businesses were forecasts that are referred to as "Retained by Nortel" forecasts.  They project the revenues that would have been earned and the expenses that would have been incurred, if the operating businesses had been retained by Nortel.  These particular forecasts were the most appropriate basis to use for the valuation of the license rights. The value of the surrendered license rights is directly related to the profits that the licensees could have earned had they retained those rights.  Accordingly, the forecasts that project the revenues and the corresponding profits that the licensees could have earned provide the relevant foundation for the valuation exercise.

        Expert Report of Philip Green, January 24, 2014, p. 57 and 59

128.    On this approach, the value of the license rights surrendered by the U.S. and EMEA Debtors for all of the Business Sales is as follows:

| U.S. | $438.20 million |
| EMEA | $164.20 million |

Rebuttal Report of Philip Green, February 28, 2014, p. 43

- 51 -

129.    It should be noted that the value of the license rights includes within it the value of customer-related intangibles such as customer relationships and distribution agreements belonging to the licensees that were transferred to the purchasers.  The value of these intangibles is based on the expected operating profit or cash flow that they would have generated through sales to customers.  That is the same as the expected cash flows from sales to customers that has already been accounted for in valuing the U.S. and EMEA license rights.  Accordingly, the value of the customer relationships is encompassed within the value of the license rights.

Expert Report of Philip Green, January 24, 2014, p. 56

**(iii)    *The Balance of the Proceeds Remaining After Deducting the Value of the Tangible Assets, the In-Place Workforce, and the License Rights Is Properly Allocated to the Canadian Debtors***

130.    The purchasers in each Business Sale paid for the transfer of the ownership of any Nortel IP that was used predominantly in the particular business in question, and for the grant of licenses to any Nortel IP that was used in more than one business.  All of this IP – both that which was transferred and that which was licensed – was owned by NNL alone.  Because the value of the U.S. and EMEA Debtors' license rights has already been accounted for, the remaining sale proceeds are attributable to the transfer of NNL's ownership of IP and, to a lesser extent, to the transfer of any Canadian-owned customer-related intangibles, and is accordingly properly allocated to the Canadian Debtors.

- 52 -

131.    The total allocations of the Business Sale proceeds are as follows:

| Asset | Canada | U.S. | EMEA | Total |
|---|---|---|---|---|
| Tangible Assets | $121.74 m | $317.59 m | $94.86 m | $534.19 m |
| IP Rights (Including License Rights) and Customer Relationships | $1,379.85 m | $438.20 m | $164.20 m | $1,982.25 m |
| In-Place Workforce | $78.68 m | $134.74 m | $41.91 m | $255.33 m |
| Wholly-Owned Business | - | $110.97 m | - | $110.97 m |
| **Total Allocation** | $1,580.27 m | $1,001.50 m | $300.97 m | $2,882.74 m |

Expert Report of Philip Green, January 24, 2014, p. 61
Rebuttal Report of Philip Green, February 28, 2014, p. 44

## PART VI – ALLOCATION OF THE PROCEEDS FROM THE ROCKSTAR TRANSACTION

132.    The basic methodology used for allocating the proceeds of the residual patent portfolio sale is the same as that used to allocate the proceeds from the business line sales.  That is, the value of any tangible assets (based on book value), the value of in-place workforce (based on replacement cost) and the value of the U.S. and EMEA license rights (based on the operating profit that they could have earned from the exercise of the license rights had the license rights not been surrendered) would be allocated from the sale proceeds as noted above.  The balance remaining after those deductions would be properly allocated to the Canadian Estate in respect of the transfer of the IP that was solely owned by NNL.

- 53 -

133.    There were, in fact, no tangible assets transferred in connection with the Rockstar Transaction and, with respect to the in-place workforce, only 26 employees were transferred as part of the transaction, with a value of less than $1 million.

Expert Report of Philip Green, January 24, 2014, Appendix I, p. 1-2

134.    Ownership of two groups of patents were transferred in the sale:

    (a)    ownership of the patents that had been used in several business lines and in respect of which licenses had been granted to the business line purchasers; and

    (b)    the remaining patents, which had not been used in any Nortel business.

135.    In so far as NNI's and NNUK's license rights related to the group of patents identified in (a) above, the U.S. and EMEA Debtors have already been compensated for the value of those license rights, because those rights have been valued (and that value allocated to the U.S. and EMEA Debtors) in connection with the business line sales.  In other words, because the value of the license rights captures all of the value that the U.S. and EMEA Debtors could have earned from their business operations, it includes the value that the U.S. and EMEA Debtors could have earned from the exercise of their rights with respect to any of the Nortel patents that were actually used in the business.  Therefore, the value that the U.S. and EMEA Debtors could have earned from the exercise of their rights with respect to the patents described in (a) above has already been captured.

Expert Report of Philip Green, ~~February~~January 24, 2014, p. 64

136.    With respect to those residual patents that were not used in any of Nortel's operating businesses (i.e. those described in (b) above), the U.S. and EMEA license rights would not be

- 54 -

expected to generate any value from such patents.  The licensees had no prospect of earning any

operating profit from their license rights in so far as they related to such patents, because their

rights were limited to Products.  If there were no Products incorporating the patents and no

proposed Products, and no ability to comply with the "by or for the Participants" aspect of the

license, then the licensees could not earn any cash flow in respect of the patents.  A contractual

right that has no prospective cash flow attached to it has no value.  Accordingly, the U.S. and

EMEA license rights had no value in so far as they related to those patents that were not used in

connection with any of Nortel's Products.

137.    Therefore, there is no additional value allocable to the U.S. or EMEA Debtors in respect

of the surrender of their license rights in connection with the Rockstar Transaction.  To the

extent that the license rights had any value, that value has already been accounted for in valuing

the license rights surrendered as part of the business line sales.

Expert Report of Philip Green, ~~February~~January 24, 2014, p. 64

138.    Accordingly, virtually the entirety of the sale proceeds realized from the Rockstar

Transaction is properly allocated to the Canadian Debtors.

- 55 -

**(a)    Total Allocations of Sale Proceeds**

139.    Based on the foregoing, the total sale proceeds – from both the business line sales and the

Rockstar Transaction – should be allocated as follows:

| Canada | $6,0<u>34.11</u> million |
|--------|--------------------------|
| U.S. | $1,0<u>01.93</u> million |
| EMEA | <u>$300.97 million</u> |

Expert Report of Philip Green, January 24, 2014, p. 65
<u>Rebuttal Report of Philip Green, February 28, 2014, p. 44</u>

**PART VII – THE ALLOCATIONS PROPOSED BY THE U.S. AND EMEA EXPERTS ARE NOT SUPPORTABLE**

**(a)    Introduction**

140.    Although the U.S. Debtors and the EMEA Debtors together served the reports of ten

different experts that relate to the allocation question, three of those reports – one served on

behalf of the U.S. Debtors and two served on behalf of the EMEA Debtors – provide the basic

framework upon which those parties' respective allocation positions rest.  The U.S. Debtors'

expert is Jeffrey Kinrich.  The EMEA Debtors' experts are James Malackowski and Paul

Huffard.

141.    The specific approaches taken to the valuation and allocation question by Mr. Kinrich on

the one hand, and Messrs. Malackowski and Huffard on the other, differ in many respects and

are the subject of criticism that each directs at the other.  However, they share one fundamental

flaw: none of them is based upon a valuation of the specific assets and rights transferred and

surrendered by each Debtor Estate as part of the asset sale transactions, properly construed.

- 56 -

Instead, the U.S. and EMEA experts provide opinions that are dependent upon the Courts endorsing a wholly different legal approach to the parties' rights (ownership and rights with respect to IP being a case in point) and to allocation.  Rather than following a rights-based approach, the U.S. and EMEA experts provide opinions with respect to allocation that are based variously on:

(a)    the geographical location where Nortel's revenues were earned in 2009 (Mr. Kinrich); or

(b)    the geographical location where Nortel's revenues might have been earned, if Nortel had engaged in different businesses (Mr. Kinrich); or

(c)    the relative expenditures made by the various Licensed Participants with respect to Nortel's R&D over an assortment of different time periods (Messrs. Huffard and Malackowski).

142.    These approaches are prisoners of the incorrect assumptions or understandings as to the rights of the parties on which they depend.  The application of any of the approaches espoused by the U.S. and EMEA Debtors would result in an allocation of sale proceeds that is unconnected to the legal entitlements of the parties.

143.    Even on their own terms, these allocation theories as well as their respective applications have additional flaws.

**(b)    The Allocation Proposed by the U.S. Expert with respect to the Business Sale Proceeds Is Not Supportable**

144.    Mr. Kinrich proceeds on the assumption that NNL held only "nominal legal title" and that the U.S. and EMEA Debtors had "all the economic value" of Nortel IP in their exclusive

- 57 -

territories.  If these assumptions are wrong, the conclusions in Mr. Kinrich's initial report do not follow.

> Expert Report of Jeffrey Kinrich, January 24, 2014, paras. 12 and 84
>
> Deposition of Jeffrey Kinrich, April 8, 2014, 148:22 – 151:17

145.    While he purports to "determine the value an entity relinquished" in the Business Sales, Mr. Kinrich does not perform a valuation, which normally involves a discounted cash flow analysis, that is, a projection of future cash flow discounted to the present value at a discount rate.  Moreover, Mr. Kinrich also does not value the licenses by considering what he himself says is involved in the value of a license – i.e., the profits that could have been earned by exploiting the patented technology.

> Expert Report of Jeffrey Kinrich, January 24, 2014, para. 28
>
> Deposition of Jeffrey Kinrich, April 8, 2014, 157:22 – 158:6, 159:11-17 and 161:15-22

146.    Instead, he engages in some other exercise, which (as noted by the EMEA Debtors' expert) does not appear to have any foundation in valuation.  He compares the relative revenue earned in each geography by the various Nortel entities for each business line in a single year, namely, 2009.  He then allocates the sale proceeds from each business line sale to each Debtor Estate based upon the claimed proportionate share of the revenues earned in the estates' respective geographies.  For example, with respect to the CDMA/LTE business, Mr. Kinrich indicates that 90.8% of that business' 2009 revenue was earned in the United States.  Accordingly, Mr. Kinrich allocates 90.8% of the CDMA/LTE sale proceeds to the U.S. Estate.

> See, e.g., Expert Report of Jeffrey Kinrich, January 24, 2014, para. 27 and Exhibits 9 and 10

- 58 -

> With respect to the criticisms levelled by James Malackowski at Mr. Kinrich's revenue approach, see Rebuttal Report of James Malackowski, February 28, 2014, p. 33

147.    Thus, Mr. Kinrich is not proposing an allocation based upon the value of the assets that each entity transferred or surrendered.   Instead, he proposes an allocation whereby the sale proceeds are divided according to the proportionate geographic shares of 2009 revenue.  He does not even consider how the revenues would translate into income, i.e., whether they would exceed corresponding expenses, or how much of the revenues each entity would keep, as opposed to having to pay to others.  It is an approach that has no basis in law or in valuation theory.  It is rejected by the other experts, including the EMEA expert, and should be rejected by the courts.

**(c)      Allocation Proposed by the U.S. Expert of the Rockstar Transaction Proceeds Is Not Supportable**

148.    Mr. Kinrich's approach to the allocation of the Rockstar Transaction proceeds is equally flawed.  It is similarly based on his assumptions about IP rights  It results in the owner of the IP, NNL, being allocated only 9.7% of the proceeds from the sale of that IP.

> Expert Report of Jeffrey Kinrich, January 24, 2014, para. 133

149.    Mr. Kinrich uses projections from the model that was being developed (but that was never adopted or implemented) for IP Co.  He cannot, however, accurately reconcile those projections with the $4.5 billion paid for the IP, because the discount rate that he implies to do so is, even according to Mr. Malackowski, "well below any range of discount rates arguably applicable to the Residual Patent portfolio".  He nonetheless attempts to determine where hypothetical royalty revenues from this hypothetical licensing business would have been earned, and uses the geographical breakdowns to allocate the Rockstar Transaction proceeds.

Rebuttal Report of James Malackowski, dated February 28, 2014, p. 39

150.    Even when doing so, he does not consider, or assumes away, the fact that, even if Nortel had continue to operate and had generate such royalty revenues, at the very least, those revenues would have been subject to the profit sharing under the MRDA, under which Canada receives approximately 50% of the overall operating profit.

TP45645 (Transfer Pricing Adjustments)

151.    The premise of basing allocation on revenues from a business that was not carried on, and whose hypothetical activities did not fall within the scope of the MRDA licenses, is flawed.

152.    Even if Mr. Kinrich's assumption as to the scope of the license rights were correct, his approach suffers from other fundamental failings.  First, since one cannot reconcile through the use of appropriate discount rates the value of the IP Co. projected cash flows to the $4.5 billion sale amount, it does not make sense to allocate to the non-owners of the IP any amount in excess of their share of the value implied from those cash flows at a proper discount rate.  Second, Mr. Kinrich fails to take into account the licensees' obligation to share operating profits or losses pursuant to the RPSM.  Regardless of how much operating profit was earned in any given geography, the licensees were obliged to share that operating profit with NNL in proportion with their respective contribution to Nortel R&D expenditures.

153.    Mr. Green performed a calculation that corrected the two errors referred to in the preceding paragraph for Kinrich.  His analysis in this regard is set out in Appendix P to his Rebuttal Report.  In summary, Green provides corrected results based on a range of appropriate discount rates, and a range of assumptions as to the degree of success that IP Co. would have

enjoyed had it operated and had it commenced litigation against infringing third parties.  If one

assumes the median discount rate (of 35%) and the median litigation success rate (of 70%), then

Mr. Kinrich's allocation of the Rockstar Sale proceeds, as corrected by Mr. Green, is as follows:

| Corrected Kinrich Allocation of Rockstar Sale Proceeds | |
|---|---|
| Canada | $4,003.06 million |
| U.S. | $346.12 million |
| EMEA | $105.19 million |
| Total | $4,454.37 milion |

Rebuttal Report of Philip Green, February 28, 2014, Appendix P, Exhibit 1

**(d)     The Allocation Proposed by the EMEA Experts With Respect to the Business Sale Proceeds Should Be Rejected**

154.    In support of their allocation position, the EMEA Debtors have put forward the expert

reports of James Malackowski and Paul Huffard.  Mr. Malackowski first values the IP that was

transferred or licensed as part of the Business Sales and then proposes an allocation of the sale

proceeds that he attributes to the IP in question.  Mr. Huffard considers the allocation of the

remaining sale proceeds relying upon Mr. Malackowski's allocation of the IP proceeds.

155.    With respect to Mr. Malackowski's approach, it suffers from a flawed assumption.  Mr.

Malackowski proceeds based upon the understanding or assumption that each signatory to the

MRDA was entitled to share in any proceeds realized on the sale of Nortel's IP in accordance

with their proportionate monetary contribution to the creation of that IP.[5]  He describes this as a

"contribution approach" and states as follows:

> Under the Contribution Approach, sale proceeds should be allocated in proportion to the various Nortel entities' contributions towards the creation of the IP.

> Expert Report of James Malackowski, January 24, 2014, p. 6 and 39

156.    This approach does not reflect the legal rights of the parties, nor does it reflect who actually owned the IP, or the scope of the rights granted to the Licensed Participants under the MRDA, or the value of those license rights.  It has no basis in valuation theory or practice, as candidly conceded by Mr. Huffard, EMEA's other allocation expert and as noted by the U.S. Debtors' expert.  Mr. Huffard offers his view as to the extent to which the contribution approach is "consistent" with the RPSM, notwithstanding that the provisions of the MRDA relating to the RPSM expressly state that the methodology shall ***not*** apply to the sharing of proceeds from the sale of a business, and notwithstanding that the RPS methodology considers contributions to R&D made during the preceding five years only, as opposed to Mr. Malackowski's approach which considers contributions to R&D made over a 15-year period stretching from 1991 to 2006), Mr. Huffard concedes however that the question of whether the contribution approach is applicable to the allocation question at hand is a legal question to be determined by the Courts, as

---

[5] It should be noted that Mr. Malackowski also considers an alternate approach (which he calls the "license approach"), which, not wholly dissimilar from Mr. Kinrich's approach, would allocate the proceeds attributable to the sale of the Nortel IP based upon the geographies where the revenues would be earned.  However, Mr. Malackowski goes on to distance himself from this alternate approach, stating that the contribution approach is more "appropriate" and more "consistent" with Nortel's contractual arrangements under the MRDA to use R&D spending as a basis for sharing residual operating profits.  See Expert Report of James Malackowski, January 24, 2014, p. 50 and 54

- 62 -

opposed to a valuation question in respect of which Mr. Huffard's (and, similarly, Mr. Malackowski's) expertise might assist the Court.  The relevant exchange from Mr. Huffard's deposition is as follows:

> Q.     But you have indicated that, in your professional opinion, coming here today, that the contribution approach is the preferable approach.  Can you explain why it is a preferable approach compared to a revenue approach?
>
> A.     Again, I indicated that I believe, ultimately, that's a legal determination that needs to be made. . . .

> Deposition of Paul Huffard, April 3, 2014, 36:19 – 37:5

> With respect to the provisions of the MRDA stating that the RPS methodology shall not apply to the sharing of operating profit resulting from the sale of a business, see Schedule A to the Third Addendum to the Master R&D Agreement, effective as of January 1, 2006, p. 7 (TR21003, p. 31 49): "The resulting operating earnings/loss is then further adjusted to deduct the following items not related to Nortel's operations: . . . gain/loss of the sale of business . . .".

> With respect to Mr. Malackowski's consideration of R&D contributions over the years 1991 to 2006, see Expert Report of James Malackowski, January 24, 2014, Exhibit S.1.0

> With respect to Mr. Kinrich's criticism of the contribution approach, see Rebuttal Report of Jeffrey Kinrich, February 28, 2014, para. 117-118

157.    Mr. Huffard's opinion is quite limited.  Because Mr. Malackowski had already given an opinion with respect to the allocation of the proceeds attributable to the sale of the IP, Mr. Huffard deals only with the tangible assets, customer relationships and goodwill.

158.    With respect to tangible assets, he values the tangible assets based upon net book value and allocates the relevant amounts to the respective owners of the assets in question.

> Expert Report of Paul Huffard, January 24, 2014, para. 78

- 63 -

159.    Having deducted the value of the tangible assets from the sale proceeds, Mr. Huffard then deducts the amounts that Mr. Malackowski proposes to allocate in respect of IP.  With respect to the remainder, Mr. Huffard simply states, without explanation, that it is all attributable to customer relationships and goodwill.  He states:

> In each of the Business Sales, there is residual unallocated value remaining after valuing the Tangible Assets and IP.  That residual value is attributable to Customer-Related Assets and Goodwill not otherwise associated with IP.

> Expert Report of Paul Huffard, January 24, 2014, para. 92

160.    This residual amount, as calculated by Mr. Huffard, accounts for almost **two-thirds** of the Business Sale proceeds.  Mr. Huffard does not appear to question the reasonableness of this result, notwithstanding that the most of the businesses in question had been losing money for several years, and notwithstanding that Nortel had, in the preceding years, written off **all** of the goodwill connected to the businesses.

> Expert Report of Paul Huffard, January 24, 2014, para. 95

> TR43999 (NNC Form 10-K for year ending December 31, 2008) p. 148 and 151

161.    Accordingly, the allocation proposed by the EMEA experts with respect to the Business Sale proceeds should be rejected.

**(e)    The Allocation Proposed by the EMEA Experts With Respect to the Rockstar Transaction Proceeds Should Be Rejected**

162.    As with the Business Sale proceeds, Mr. Malackowski's proposed allocation of the proceeds from the sale of the residual patent portfolio is based upon the assumption that each signatory to the MRDA was entitled to share in any proceeds realized on the sale of Nortel's IP

- 64 -

in accordance with their proportionate monetary contribution to the creation of that IP.  Once again, Mr. Malackowski's approach does not take into account the rights of the parties.  It does not consider who actually owned the IP, nor does it consider the scope of the rights granted to the Licensed Participants under the MRDA, or the value of those license rights.  And, again, it has no basis in law or in valuation theory or practice.  It should be rejected for the same reasons as his proposed allocation of the IP sale proceeds in the Business Sales.

## PART VIII – CONCLUSION

163.    The Monitor respectfully requests that these Courts order an allocation of the sale proceeds as follows:

| Canada | $6,034.11 million |
| U.S. | $1,001.93 million |
| EMEA | $300.97 million |

May 2, 2014

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

**Jay A. Carfagnini**  LSUC#: 22293T
jcarfagnini@goodmans.ca
**Benjamin Zarnett**  LSUC#: 17247M
bzarnett@goodmans.ca
**Peter Ruby**  LSUC#: 38439P
pruby@goodmans.ca
**Joseph Pasquariello**  LSUC #: 38390C
jpasquariello@goodmans.ca
Tel:    (416) 979-2211
Fax:    (416) 979-1234
*Lawyers for the Monitor*

**GOWLING LAFLEUR HENDERSON LLP**
Barristers & Solicitors
1 First Canadian Place,
100 King Street West, Suite 1600
Toronto ON M5X 1G5

**Derrick Tay**  LSUC#: 21152A
derrick.tay@gowlings.com
**Jennifer Stam**  LSUC#: 46735J
jennifer.stam@gowlings.com
Tel:    (416) 862-5697
Fax:    (416) 862-7661
*Lawyers for the Canadian Debtors*

- 65 -

**BUCHANAN INGERSOLL & ROONEY PC**
919 North Market Street, Suite 1500
Wilmington, Delaware 19801

Mary F. Caloway (No. 3059)
Kathleen A. Murphy (No. 5215)
(302) 552-4200 (telephone)
(302) 552-4295 (facsimile)
mary.caloway@bipc.com
kathleen.murphy@bipc.com

*Attorneys for Ernst & Young Inc., as Monitor and Foreign Representative of the Canadian Debtors*

**ALLEN & OVERY LLP**
1221 Avenue of the Americas
New York, NY  10020

Jacob S. Pultman
Paul B. Keller
Laura R. Hall
Ken Coleman
Daniel Guyder
(212) 610-6300 (telephone)
(212) 610-6399 (facsimile)
jacob.pultman@allenovery.com
paul.keller@allenovery.com
laura.hall@allenovery.com
ken.coleman@allenovery.com
daniel.guyder@allenovery.com

*Attorneys for Ernst & Young Inc., as Monitor and Foreign Representative of the Canadian Debtors*



- 66 -

## SCHEDULE "A"

## Glossary of Terms

| | |
|---|---|
| Business Sales | The post-filing sales in 2009 to 2011 involving tangible and intangible assets of, for the most part, operating Nortel businesses. |
| Canadian Debtors | The Canadian Nortel companies that, on January 14, 2009, filed for and obtained protection under the *Companies' Creditors Arrangement Act* from the Ontario Superior Court of Justice being, Nortel Networks Corporation (NNC), Nortel Networks Limited (NNL), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation. |
| Canadian Estate | Collectively, the entities that make up the Canadian Debtors. |
| CCC | The Canadian Creditors Committee, which represents the interests of Canadian pensioners and other pension interests, long-term disabled and other employees and former employees of Nortel who have claims against the Canadian Debtors. |
| Debtor(s) | The companies or entities comprising the Canadian Debtors, the U.S. Debtors and the EMEA Debtors, either individually or collectively. |
| Debtor Estates | Collectively, the Canadian Debtors, the U.S. Debtors and the EMEA Debtors (equivalent to Nortel Estates). |
| EMEA Debtors | The 23 Nortel entities that, on January 15, 2009, were granted administration orders in the U.K. under the *Insolvency Act, 1986* and whose registered offices were in England, Europe, the Middle East and Africa, including Nortel Networks UK Limited (NNUK), Nortel Networks S.A. (NNSA) and Nortel Networks (Ireland) Limited (NN Ireland). |
| EMEA Estate | Collectively, the entities that make up the EMEA Debtors. |
| IFSA | Interim Funding and Settlement Agreement, June 9, 2009 (TR43794) |
| IP | Intellectual Property. |
| Licensed Participant(s) | As defined in Article 1(e) of the MRDA, a Participant (or all Participants) other than NNL. |
| Monitor | Ernst & Young Inc. in its capacity as monitor of the Canadian Debtors appointed in the Initial Order granted January 14, 2009.  By various orders, the Ontario Superior Court of Justice expanded the Monitor's powers and authorized it to exercise the powers of the boards of directors |

| | of the Canadian Debtors. |
|---|---|
| MRDA | Master R&D Agreement dated December 22, 2004 but with an effective date of January 1, 2001, between NNL, NNI, NNUK, NNSA, NN Australia and NN Ireland, as amended at least four times (TR21003). |
| NNC | Nortel Networks Corporation, being a corporation incorporated under the laws of Canada, which was the publicly traded, parent holding company of NNL and its subsidiaries. |
| NNI | Nortel Networks Inc., being a corporation incorporated under the laws of the State of Delaware, the main U.S. operating entity and a direct subsidiary of NNL. |
| NNL | Nortel Networks Ltd., being a corporation incorporated under the laws of Canada, and the main Canadian operating entity. |
| NNSA | Nortel Networks, S.A., being an entity duly formed under the laws of France, one of the EMEA Debtors, and a direct subsidiary of NNL. |
| NNUK | Nortel Networks UK Limited, being an entity formed under the laws of the United Kingdom, one of the EMEA Debtors, and a direct subsidiary of NNL. |
| NN Ireland | Nortel Networks Ireland, being an entity formed under the laws of the Republic of Ireland, one of the EMEA Debtors, and a direct subsidiary of NNL. |
| NN Australia | Nortel Networks Australia Pty Limited, being an entity formed under the laws of Australia.   NN Australia was one of the signatures to the MRDA but retired from the MRDA effective December 31, 2007. |
| NN Technology | As defined in Article 1(f) of the MRDA, NN Technology "shall mean, any and all intangible assets including but not limited to patents, industrial designs, copyrights and applications thereof, derivative works, technical know-how, drawings, reports, practices, specifications, designs, software and other documentation or information produced or conceived as a result of research and development by, or for, any of the Participants, but excluding trademarks and any associated goodwill." |
| Nortel | Collectively, NNC and all of its direct and indirect subsidiaries, including the businesses they operated. |
| Nortel Entity(ies) | Any of the companies or entities, either individually or collectively, within the Nortel Group. |
| Nortel Estates | Collectively, the Canadian Debtors, the U.S. Debtors and the EMEA Debtors (equivalent to Debtor Estates). |

- 68 -

| Nortel Group | Equivalent to "Nortel". |
|---|---|
| Nortel Products | Equivalent to "Products", as defined below. |
| Participant(s) | As defined in the MRDA, any of the parties to the MRDA, namely NNL, NNI, NNUK NNSA, NN Australia, NN Ireland |
| Products | As defined in Article 1(g) of the MRDA, Products "shall mean all products, software and services designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, at any time by, or for, any of the Participants, and all components, parts, sub-assemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in any of the foregoing" (equivalent to "Nortel Products"). |
| R&D | Research and Development |
| Rockstar Transaction | The sale to Rockstar Bidco, LP in 2011 of the residual patent and patent-related assets owned by NNL. |
| RPSM | Residual profit split methodology – the transfer pricing methodology used by Nortel from 2001. |
| U.S. Debtors | The U.S. Nortel companies that, on January 14, 2009, filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware for protection under Chapter 11 or Title 11 of the U.S. *Code*, being Nortel Networks Inc. ("NNI") and several of its U.S. affiliates, namely Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc. |
| U.S. Estate | Collectively, the entities that make up the U.S. Debtors. |
| UKPC | Collectively, the Nortel Networks UK Pension Trust Limited and the Board of Directors of the Pension Protection Fund. |

6320506

B

**Schedule "B" - Organizational Structure of the Nortel Debtors**





### Schedule "C"

### MASTER R&D AGREEMENT[1]

Agreement confirming and formalizing the operating arrangements of the Participants at and from January 1, 2001 (the **"Effective Date"**), [2]

**BY AND BETWEEN**:

**NORTEL NETWORKS LIMITED**,[3] a corporation duly incorporated under the laws of Canada, having its executive offices at 8200 Dixie Road, Suite 100, Brampton, Ontario, Canada L6T 5P6 ("**NNL**")

AND:

**NORTEL NETWORKS INC.**, a corporation duly incorporated under the laws of the State of Delaware, having its head office at 4001 East Chapel Hill Nelson Hwy Research Triangle Park, NC 27709 United States of America (including predecessor corporations in interest)

AND:

**NORTEL NETWORKS UK LIMITED**, an entity duly formed under the laws of the United Kingdom having its head office at Maidenhead Office Park, Westacott Way, Maidenhead, Berkshire, United Kingdom, SL6 3QH

AND:

**NORTEL NETWORKS SA**,[4] an entity duly formed under the laws of France having its head office at Parc d'Activites de Magny-Chateaufort, Chateaufort Cedex 9, France, 78928

AND:

**NORTEL NETWORKS AUSTRALIA PTY LIMITED**, [5] an entity duly formed under the laws of Australia having its head office at Level 5, 495 Victoria Avenue, Chatswood, New South Wales, Australia, 2067

AND:

---

[1] This is a consolidated Master R&D Agreement that reflects the status of the Agreement as of January 14, 2009. It incorporates the amendments made pursuant to four Addenda to the Agreement.
[2] Addendum to Master R&D Agreement (the **"First Addendum"**), Part I.
[3] Third Addendum to Master R&D Agreement (the **"Third Addendum"**).
[4] Third Addendum.
[5] First Addendum, Part II.

- 2 -

> **NORTEL NETWORKS (IRELAND) LIMITED**,[6] an entity duly formed under the laws of the Republic of Ireland having its head office at Mervue Business Park, Mervue, Galway, Republic of Ireland
>
> (referred to individually as "**Participant**" or collectively, as "**Participants**")

**WHEREAS** legal title to all NN Technology is held in the name of NNL;

**WHEREAS** each Licensed Participant held and enjoyed equitable and beneficial ownership of certain exclusive rights under NT Technology for a Specified Territory pursuant to the Amended Research and Development Cost Sharing Agreement entered into on January 1, 1992, and it is the intent of NNL and the Licensed Participants that the Licensed Participants continue, as of the effective date of this Agreement, to hold and enjoy such rights;

**WHEREAS** each Participant bears the full entrepreneurial risks and benefits for the Nortel Networks business;

**WHEREAS** each Participant has performed, in the past, and intends to continue to perform R&D Activity with respect to the Nortel Products;

**WHEREAS** each Participant desires to avoid the duplication of R&D Activity;

**WHEREAS** each Participant believes that it is appropriate that each Participant should benefit from its contribution to R&D activity commensurate with the value of its contribution to that R&D activity in the context of the manner in which the Nortel Networks business is conducted and that the residual profit split methodology (RPSM) is the best arm's length measure, in the circumstances of NNL and the Participants, of such contributions with reference to such benefits;

**WHEREAS** this Agreement reflects the Participants' intent and agreement since January 1, 2001 to enter a license arrangement with the Licensed Participants, and the Participants have operated from January 1, 2001 in accordance with the terms set forth herein;

**WHEREAS** Participants acknowledge that as a result of a collective review by the Canadian Customs and Revenue Agency, the US Internal Revenue Service, and the UK Inland Revenue[7] regarding the application of the RPSM, the calculation of the RPSM as set forth in Amended Schedule A[8] may be amended which amendments would require the consent of the Participants;

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants of the parties hereto, it is hereby agreed as follows:

---

[6] Third Addendum.
[7] Addendum to Master R&D Agreement, dated December 14, 2007 (the **"Second Addendum"**), Part II.
[8] Second Addendum, Part IV.

- 3 -

# ARTICLE 1 - DEFINITIONS

As used herein:

(a)     **"Affiliate"** shall be defined as any Person,

    (1)     more than fifty percent (50%) of whose voting shares or outstanding capital stock is owned or controlled (directly or indirectly) by a Party;

    (2)     which owns or controls (directly or indirectly) more than fifty percent (50%) of the voting shares or outstanding capital stock of a Party; or

    (3)     more than fifty percent (50%) of whose voting shares or outstanding capital stock is owned or controlled (directly or indirectly) by an Affiliate (as defined herein) of a Party;

provided, however, such corporation, company or entity shall be deemed to be an Affiliate for purposes of this Agreement only so long as such ownership or control exists.

(b)     **"Admission Eligibility Requirements"** with respect to any NNL Affiliate shall mean an Affiliate that has a level of research and development spending for the three (3) year period prior to the year of admission that exceeds the Threshold Level. The Threshold Level of research and development spending will be determined by mutual agreement of the Participants to this Agreement at the time of consideration for admission of any party.

(c)     **"Eligible Party"** shall mean any Affiliate of NNL provided such Affiliate meets the Admission Eligibility Requirements for admission as a Participant to this Agreement and fully pays any Special Balancing Payment to NNL prior to the effective date of its admission.

(d)     **"Eligible Participant"** shall mean any Participant that is not a party to the Advance Pricing Agreement establishing the transfer price for the R&D Activity provided herein.

(e)     **"Licensed Participant"** shall mean a Participant other than NNL and **"Licensed Participants"** shall mean all Participants other than NNL.

(f)     **"NN Technology"** shall mean, any and all intangible assets including but not limited to patents, industrial designs, copyrights and applications thereof, derivative works, technical know-how, drawings, reports, practices, specifications, designs, software and other documentation or information produced or conceived as a result of research and development by, or for, any of the Participants, but excluding trademarks and any associated goodwill.

(g)     **"Products"** shall mean all products, software and services designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, at any time by, or for, any of the Participants, and all components, parts, sub-assemblies, features, software associated with or incorporated in any of

- 4 -

the foregoing, and all improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in any of the foregoing.

(h)     **"R&D Activity"** shall mean all research and development activity (determined in accordance with US GAAP) performed by, or for, any Participant including, without limitation, development of Products and methods, processes, procedures and tools related to manufacturing, installation, operation, interoperability, maintenance and use of Products.

(i)     **"RPSM"** shall mean the transfer pricing methodology which establishes the fair market value of the compensation to be received by each Participant for its R&D Activity and shall have the meaning defined in Amended Schedule A.[9]

(j)     **"Special Retirement Allocation"** shall mean an amount mutually determined by NNL and any retiring Participant that represents the fair market value (at the time of retirement) of the Exclusive License provided in Article 5 and any prior License to the NN Technology granted by NNL to such retiring Participant, all rights to which are surrendered by such Participant effective on the Termination Date.[10]

(k)     **"Revenue Authority or Revenue Authorities"** shall mean one or more governmental taxing authorities or instrumentalities thereof.[11]

(l)     **"Termination Date"** shall mean with respect to an Elective Retirement the last day of the calendar year in which such election is effective and with respect to a Forced Retirement under Article 11(c)(i), the last day of the second calendar year in which there is no R&D Activity. For all other Forced Retirement events defined in Article 11(c)(ii) through (iv), the Termination Date is the date on which the Defaulting Event occurs.[12]

(m)     **"Special Balancing Payment"** shall mean an amount mutually determined by NNL and an Eligible Party to represent the fair market value for an Exclusive License from NNL as provided in Article 5 with respect to NN Technology existing at the time of admission.[13]

(n)     **"Territory"** shall mean, with respect to each Licensed Participant, its Exclusive Territory as described on Schedule B and its Non-Exclusive Territory.[14]

(o)     **"Exclusive License"** shall mean the exclusive licence granted to a Licensed Participant as further described in Article 5(a)(i) hereof.[15]

---

[9] Second Addendum, Part IV.
[10] Second Addendum, Part III(a).
[11] Second Addendum, Part III(c).
[12] Second Addendum, Part III(d).
[13] Second Addendum, Part III(b).
[14] Second Addendum, Part III(b); Third Addendum, Part II(c).
[15] Third Addendum, Part II(a).

- 5 -

(p)     **"Exclusive Territory"** shall mean the exclusive geographic area specified for a Licensed Participant in Schedule B.[16]

(q)     **"Non-Exclusive License"** shall mean the non-exclusive licence granted to a Licensed Participant as further described in Article 5(a)(ii) hereof.[17]

(r)     **"Non-Exclusive License Effective Date"** has the meaning set forth in Article 5(a)(ii) hereof.[18]

(s)     **"Non-Exclusive Territory"** shall mean, for each Licensed Participant, the entire world except (i) Canada where NNL retains its exclusive rights, and (ii) those geographic areas designated in Schedule B as the Exclusive Territory of another Licensed Participant.[19]

## ARTICLE 2— PERFORMANCE OF R&D ACTIVITY

(a)     Each Participant hereby agrees to use it best efforts to perform R&D Activity at a level consistent with past practices and the ongoing needs of the Nortel Networks business for its respective Territory.

(b)     Each Participant agrees to account for the R&D Activity by disclosing or otherwise making available to each of the other Participants the relevant results, studies etc. resulting from such R&D Activity.

(c)     All costs incurred directly or indirectly by each Participant for R&D Activity shall be borne exclusively by it. Any reimbursement for costs including any other compensation shall be provided to such Participant for its R&D Activity solely as provided in Article 3 below.

## ARTICLE 3 – R&D ACTIVITY PAYMENTS

(a)     For and as a consequence of the performance of R&D Activity, each Participant shall be entitled to receive a payment in an amount equal to the allocation determined under the RPSM (the **"R&D Allocation"**) as the measure of the benefit to which it is entitled commensurate with its performance of, and contribution to, R&D Activity.

(b)     Each Participant hereby accepts and agrees to make the payment determined under the RPSM in Amended Schedule A[20] as representing such Participant's share of the R&D Allocation.

(c)     The R&D Allocation will be computed pursuant Amended Schedule A[21] which sets forth the basis of the RPSM as originally proposed to the Revenue

---

[16] Third Addendum, Part II(b).
[17] Third Addendum, Part II(b).
[18] Third Addendum, Part II(b).
[19] Third Addendum, Part II(b).
[20] Second Addendum, Part IV and the Third Addendum, Part III(a).

- 6 -

Authorities. The Participants understand that the RPSM is the subject of review, discussions and negotiations with the Revenue Authorities. The Participants agree to amend this Agreement and to adjust the RPSM to the extent necessary to reflect any negotiated determination with the Revenue Authorities as to the final R&D Allocation.

(d)     NNL agrees to administer this Agreement, or cause this Agreement to be administered by a Licensed Participant or a third party, including without limitation the making of any determinations required under the RPSM with respect to the Participants' respective interests, and the computation of amounts of the R&D Allocations due to and payments due from, as applicable, each Participant on a periodic basis. The Participants will agree to appropriate compensation for administers of this Agreement. Each Participant will be supplied with a copy of the calculations required under the RPSM as set forth in Schedule A. Any true up payment to or from a Participant as described in paragraph 6 of Schedule A will be reflected in the inter-company accounts of the affected Participant as a payable or a receivable as applicable, and may be netted pursuant to the standard Nortel practice for managing inter-company accounts.[22]

(e)     Each Participant and NNL, in its capacity as described in (d) above, agree to keep clear and accurate records to support the calculations under the RPSM as set forth in Amended Schedule A.[23] Each Participant and NNL, in its capacity as described in (d) above, shall provide to each other, upon request in such form as may reasonably be requested, documentation with respect to the foregoing. Each Participant shall have the right to examine and audit, during normal business hours all such records and accounts as may under recognized accounting practices contain information bearing upon the amounts payable under this Article 3. Prompt adjustment shall be made by the appropriate Participant in order to correct any errors or omissions disclosed by an examination or audit.

(f)     Any amount owing by a Participant under this Agreement shall be due and payable in U.S. dollars or equivalent.

(g)     Any amount owing by a Participant under this Agreement will be due and payable immediately upon written notice of its R&D Allocation from NNL. Any amount owed by a Participant that is paid after 90 days after notice of its R&D Allocation from NNL will accrue interest at the short-term applicable federal rate (as determined from time-to-time under section 1274(d) of the U. S. Internal Revenue Code of 1986) for such period commencing with the 91st day after NNL notice of payment until the date that the overdue amount is paid.

---

[21] Second Addendum, Part IV and the Third Addendum, Part III(a).
[22] Third Addendum, Part III(b).
[23] Second Addendum, Part IV and the Third Addendum, Part III(a).

- 7 -

## ARTICLE 4 — LEGAL TITLE TO NN TECHNOLOGY

(a)     Except as otherwise specifically agreed, legal title to any and all NN Technology whether now in existence or hereafter acquired, or developed pursuant to the terms of this Agreement, shall be vested in NNL. In consideration therefor, NNL agrees to enter into an Exclusive License and a Non-Exclusive License with each of the Licensed Participants as set forth in Article 5.[24]

(b)     Each Licensed Participant shall execute or cause to be executed such documents reasonably requested by NNL as may be necessary or desirable to give effect to, or perfect the foregoing. For purposes of Article 4, copyrighted works included in NN Technology pursuant to this Agreement shall be considered a "work made for hire" for copyright law purposes as applicable in the relevant jurisdiction.

(c)     Each Licensed Participant shall, from time to time, promptly upon receipt of NNL request and at NNL's expense, furnish to NNL all available and requested documentation relating to the NN Technology developed by, or for, such Licensed Participant.

(d)     With respect to patentable inventions and copyrightable property encompassed by NN Technology whether in existence at the Effective Date or acquired subsequent to the Effective Date by any Participant pursuant to this Agreement, NNL shall have the exclusive right but not the obligation to file and prosecute the applications in its name for patents, copyrights, mask works, industrial designs, and all other registered forms of intellectual property encompassed by such NN Technology in every country of the world.

(e)     Licensed Participants have the right to assert actions and recover damages or other remedies in their respective Exclusive Territories for infringement or misappropriation of NN Technology by others.[25]

## ARTICLE 5 - GRANT OF LICENSES BY NNL[26]

(a)     To the extent of its legal right to do so, and subject to the rights of relevant third parties, NNL hereby:

(i)     continues to grant to each Licensed Participant an exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Exclusive Territory designated for that Licensed Participant, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and

---

[24] Third Addendum, Part IV.
[25] Third Addendum, Part IV.
[26] Third Addendum, Part V.

- 8 -

technical know-how, as necessary or appropriate in connection therewith ("**Exclusive License**"); and

(ii)      grants to each Licensed Participant, as of January 1, 2009 (the **"Non-Exclusive License Effective Date"**), a non-exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Non-Exclusive Territory, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith (**"Non-Exclusive License"**).[27]

(b)      NNL shall, from time to time, promptly upon receipt of a Licensed Participant's request, and at such Licensed Participant's expense, furnish all available and requested documentation and other information relating to the NN Technology.

(c)      The rights granted under this Article shall not relieve any Participant from its obligations in respect of royalty payments to third parties.

## ARTICLE 6 - CONFIDENTIAL INFORMATION

(a)      The Licensed Participants acknowledge that the NN Technology is proprietary and constitutes a trade secret. Each Licensed Participant shall hold the NN Technology in confidence and only make use of, or disclose it, as permitted by this Agreement.

(b)      During the full term of this Agreement and thereafter for a period of ten (10) years or so long as it remains secret (whichever is longer), each Licensed Participant shall hold secret and not disclose, make known, divulge or communicate to any person (except to such Licensed Participant's employees and permitted licensees and then only under an obligation of secrecy binding upon such employees and licensees) any of the NN Technology.

(c)      Copies or translations of NN Technology made, or permitted to be made in the exercise of a Participant's rights granted pursuant to this Agreement, shall upon reproduction by such Participant contain the same proprietary or confidentiality notices or legends which appear on the NN Technology made available to Participant under this Agreement.

(d)      Notwithstanding the foregoing, each Participant shall have the right:

(i)      to communicate relevant portions of the NN Technology to suppliers in all countries of the world reasonably necessary for, and solely for, the procurement by such Participant of commercially available materials and parts for use in the manufacture and/or installation of the Products; and

---

[27] Third Addendum, Part V.

- 9 -

    (ii)     to communicate to customers purchasing the Products, such portions of the NN Technology as are reasonably needed by such customers for operating and maintaining the Products; and

    (iii)    to communicate to third persons licensing rights to use NN Technology, such portions of the NN Technology as are reasonably needed by such licensees in accordance with the applicable license agreement negotiated;

provided, however, that the recipients of the NN Technology be advised by each Participant, in writing, at the time, or before such communication, that proprietary information is being communicated and that such information is to be kept confidential and not used except as permitted hereunder, and provided further, that such recipients undertake, in writing, prior to disclosure, to respect such confidentiality.

(e)    The provisions of this Agreement concerning confidentiality shall survive the expiration or termination of this Agreement, but in no event shall such provisions apply to the extent that:

    (i)     NN Technology was independently supplied to any Participant by a third party prior to the effective date of this Agreement without access to NN Technology; or

    (ii)    NN Technology becomes known or readily ascertainable by the general public through no fault of a Participant.

## ARTICLE 7 - LIABILITY

(a)    No Participant makes any representation with respect to, and does not warrant any R&D Activity provided hereunder or any NN Technology provided to NNL, but shall furnish such in good faith to the best of its knowledge and ability. Without restricting the generality of the foregoing, no Participant makes any representation or warranty as to whether or not use of the NN Technology supplied hereunder to NNL or the R&D Activity provided hereunder will infringe any patent or other rights of any other person.

(b)    Each Licensed Participant shall indemnify and hold harmless NNL from any and all claims and liabilities for damages, losses, expenses or costs (including counsel fees and expenses) arising in its Territory with respect to NN Technology.

## ARTICLE 8 – FORCE MAJEURE

No Participant shall be in default or liable for any loss or damage resulting from delays in performance of, or from failure to perform or comply with terms of this Agreement due to any causes beyond its reasonable control, which causes include but are not limited to Acts of God or the public enemy; riots and insurrection, war, accidents, fire, strikes and other labour difficulties (whether or not the Participant is in a position to concede to such demands), embargoes, judicial action; lack of or inability to obtain export permits or approvals, necessary labour, materials, energy, components or machinery; acts of civil or military authorities.

- 10 -

## ARTICLE 9 — DURATION AND CONTINUING RIGHTS AND OBLIGATIONS

(a)     This Agreement shall be effective from January 1, 2001 until December 31, 2004, provided however that this Agreement will automatically renew for additional and unlimited one-year terms until terminated by the mutual written consent of all Participants.

(b)     Upon the expiry or termination of this Agreement as provided herein, each Licensed Participant shall be deemed to have acquired a fully paid up license permitting it to continue to exercise the rights granted to it herein, and, in particular, the rights granted to it in Article 5 as though this Agreement had continued.

(c)     The provisions of Article 4 (Legal Title to NN Technology) with respect to NN Technology acquired or developed pursuant to this Agreement from the Effective Date of this Agreement up to and including its expiry or termination date, Article 6 (relating to confidentiality) and Article 7 (relating to liability) shall survive notwithstanding the expiry of this Agreement, or any termination of this Agreement for any cause whatsoever.

(d)     Upon the expiry or termination of this Agreement, all payments accruing under Article 3 for periods prior to such expiry or termination shall become immediately due and payable, and the obligation to pay any outstanding amounts required by Article 3 shall survive notwithstanding the expiry or termination of this Agreement, or any termination of this Agreement for any cause whatsoever.

## ARTICLE 10 - ADMISSION OF NEW PARTICIPANTS

(a)     Upon the written request to NNL, an Eligible Party may be admitted as a signatory to this Agreement thereby becoming a Participant to this Agreement provided there is unanimous consent of the Participants existing at the time of the requested admission. Such Eligible Party's admission may be evidenced as an addendum to this Agreement provided however that the Eligible Party agrees to all the terms and conditions of this Agreement (as amended from time-to-time).

(b)     Upon admission, the New Participant will become a Licensed Participant for the NN Technology in a Territory as amended to Schedule B. Accordingly, NNL will grant the New Participant an Exclusive License pursuant to Article 5.

## ARTICLE 11 - RETIREMENT OF PARTICIPANTS

(a)     Eligible Participants may elect to withdraw from participation in this Agreement (Elective Retirement) effective at the end of any calendar year subsequent to such election, provided however that the retiring Participant provides written notice of its intent to retire to NNL at least 6 months prior to the proposed effective date.

(b)     On the occurrence of a Defaulting Event, a Participant (or solely an Eligible Participant in the case of a Defaulting Event under (c)(i)) will automatically be

- 11 -

terminated from participation in this Agreement as of the Termination Date (Forced Retirement).[28]

(c)    A Defaulting Event will occur if any of the following provisions apply:

(i)    In the event any Eligible Participant fails to perform any R&D Activity for two consecutive years,[29]

(ii)    In the event any Participant loses its status as an Affiliate of NNL,

(iii)    In the event any Participant shall be in breach of this Agreement or fail to perform one or more of its material obligations under this Agreement, any other Participant may, by written notice to the Participant in default, require the remedy of the breach or the performance of the obligation and, the defaulting Participant so notified fails to remedy or perform within sixty (60) days of the forwarding of a notice so to do, or

(iv)    In the event that any one of the Participants becomes insolvent or is the object of bankruptcy or insolvency proceedings, or makes an assignment for the benefit of its creditors, or is placed in receivership or liquidation, or a substantial part of the assets of a Participant, or a controlling interest in the stock of a Participant, is expropriated, seized, or required to be transferred to, or into the control of, a third party, pursuant to a judicial, administrative or other governmental order or decision. [30]

(d)    (i)    In the event of an Elective or a Forced Retirement, the retiring Participant consents, in advance, to transfer all of its rights in the NN Technology to NNL as of, and from, the Termination Date. In exchange for the Participant's transfer of its rights and obligations, such retiring Participant accepts as full payment, its R&D allocation (without any obligation to perform R&D activity) (Retiring R&D Allocation) for the shorter period of years equal to (x) each post-Termination Date year for a five-year period following the Termination Date, or, (y) each post-Termination Date year preceding the year in which the level of the five-year rolling sum of R&D Stock (as defined in Amended Schedule A) for such retiring Participant is zero. The Retiring R&D Allocation cannot be less than zero for any single year in which there is an obligation to make such allocation. The

---

[28] Second Addendum, Part V(a)(i).

[29] Second Addendum, Part V(a)(ii).

[30] Fourth Addendum to Master R&D Agreement, Part II provides: *The Participants hereby agree that, notwithstanding anything to the contrary in the Agreement, in the event of the occurrence of an event described at Section 11(c)(iv): (i) no Participant affected by such event shall be automatically terminated from participation in the Agreement under Article 11(b) for reasons relating to such event; (ii) no Participant shall elect to withdraw from participation in the Agreement under Article 11(a); and (iii) NNL shall have the right, in its sole discretion, to terminate participation in this Agreement of any Participant affected by such event, upon written notice to such Participant. The standstill provision above shall be deemed to form part of the Agreement from its initial effective date and shall serve to prevent any termination or withdrawal described at (i) above from occurring, so that the Participants shall be in the same position as if the Agreement did not originally provide for termination upon the occurrence of an event described at Article 11(b).*

- 12 -

Participants agree that any negative amount (up to zero) tentatively allocated to a retired Participant under the RPSM set forth in Schedule A will be reallocated to the remaining Participants disregarding any R&D spend of the retired Participant in the calculation.[31]

(ii)    For the avoidance of doubt the following example is provided. Assuming Participant A fails to perform any R&D activity in 2006 and 2007, the Termination Date will be December 31, 2007.  The R&D Allocation for 2007 will be determined treating Participant A as a Participant of the Prior Agreement and this Addendum for the entirety of 2007. The sole payment for Participant A's transfer of its rights in the NN Technology and other rights and obligations under the Prior Agreement and this Addendum shall be its positive Retiring R&D Allocation for each of 2008 through 2012. However, since Participant A's level of the five-year rolling sum of R&D Stock for the 2006-2010 years is zero at the end of 2011, then pursuant to Article 11(d)(i), Participant A will only receive a Retiring R&D Allocation for three post-Termination Date years (i.e., years 2008 through 2010). Thus, for purposes of computing the Retiring R&D Allocation as set forth in Schedule A, the five-year rolling sum of R&D Stock will include Participant A's R&D activity for years 2003-2007 [first year (2008) allocation], 2004-2008 [second year (2009) allocation], and 2005-2009 [third and final year (2010) allocation].[32]

(iii)    Notwithstanding Article 11(d)(i) and (ii), no Retiring R&D Allocation will be due to a retiring Participant for any year in which such Participant is subject to a Defaulting Event described in Article 11(c)(ii) through (iv) (individually, a "**Special Default Event**"). In the case of any Special Default Event, the retiring Participant agrees to accept the Special Retirement Allocation as full payment for its rights in the NN Technology surrendered on the Termination Date.[33]

(iv)    The Participants agree to amend the terms of Article 11 in order to reflect any negotiated determinations with a Revenue Authority.[34]

(e)    The obligations of a retiring Participant under Article 4 (Legal Title to NN Technology) acquired or developed by such retiring Participant pursuant to this Agreement from the Effective Date of this Agreement up to and including such retiring Participant's Retirement Date,[35] Article 6 (relating to confidentiality) and of Article 7 (relating to liability) of this Agreement shall survive notwithstanding the retirement of a Participant for any cause whatsoever.

---

[31] Second Addendum, Part V(iii).
[32] Second Addendum, Part V(iii).
[33] Second Addendum, Part V(iii).
[34] Second Addendum, Part V(iii).
[35] Second Addendum, Part V(iii).

- 13 -

## ARTICLE 12 - NOTICES

(a)    Any and all notices or other information to be given by one of the Participants to the other shall be deemed sufficiently given when forwarded by prepaid registered or certified first class air mail or by facsimile transmission or hand delivery to the other Party at the following address:

If to:

Nortel Networks Ltd.
8200 Dixie Road, Suite 100
Brampton, Ontario
Canada L6T 5P6

Attention: Secretary

If to:

Nortel Networks Inc.
4001 East Chapel Hill Nelson Hwy
Research Triangle Park, NC 27709
United States of America

Attention: Secretary

If to:

Nortel Networks UK Limited
Maidenhead Office Park,
Westacott Way, Maidenhead,
Berkshire, United Kingdom, SL6 3QH

Attention: Secretary

If to:

Nortel Networks, S.A.
Parc d'Activites de Magny-Chateaufort,
Chateaufort Cedex 9, France, 78928

Attention: Secretary

If to:

Nortel Networks Australia
Level 5, 495 Victoria Avenue,
Chatswood, New South Wales, Australia, 2067

Attention: Secretary

If to:

Nortel Networks Ireland
Mervue Business Park,

- 14 -

Mervue, Galway, Republic of Ireland

Attention: Secretary

and such notices shall be deemed to have been received fifteen (15) business days after mailing if forwarded by mail, and the following business day if forwarded by facsimile transmission or hand.

(b)     The aforementioned address of any Participant may be changed at any time by giving fifteen (15) business days prior notice to any other Participant in accordance with the foregoing.

(c)     In the event of a generally-prevailing labour dispute or other situation which will delay or impede the giving of notice by any such means, in either the country of origin or of destination, the notice shall be given by such specified mode as will be most reliable and expeditious and least affected by such dispute or situation.

## ARTICLE 13 – RELATIONSHIP OF THE PARTICIPANTS

The relationship of the Participants under this Agreement shall not constitute a partnership or joint venture for any purpose. In addition, no Participant is a fiduciary, an agent, a servant, or a subcontractor of any other Participant as a result of this Agreement, and no Participant has the right, power or authority, expressly or impliedly, to represent or bind any other Participant pursuant to and in performance of any acts under this Agreement, except as expressly authorized herein.

## ARTICLE 14 - GENERAL PROVISIONS

(a)     This Agreement shall not be assigned by any Participant except with the written consent of each of the other Participants.

(b)     The failure of any Participant to give notice to another Participant of the breach or non-fulfilment of any term, clause, provision or condition of this Agreement shall not constitute a waiver thereof, nor shall the waiver of any breach or non-fulfilment of any term, clause, provision or condition of this Agreement constitute a waiver of any other breach or non-fulfilment of that, or any other, term, clause, provision or condition of this Agreement.

(c)     In the event that any term, clause, provision or condition of this Agreement shall be adjudged invalid for any reason whatsoever, such invalidity shall not affect the validity or operation of any other term, clause, provision or condition and such invalid term, clause, provision or condition shall be deemed to have been deleted from this Agreement.

(d)     In respect to the subject matter hereof, this Agreement sets forth the entire agreement and understanding between the Participants.

(e)     This Agreement may be executed in two or more counterparts and upon delivery of counterparts which together show the execution by the Participants hereto,

- 15 -

shall constitute one agreement which shall inure to the benefit of, and be binding upon, the Participants.

(f)    This Agreement shall be construed in accordance with and governed by the laws of the Province of Ontario, Canada.

**IN WITNESS WHEREOF**, the Participants have caused this Agreement to be executed by their duly authorized officers as of the date first written above.

**Nortel Networks Limited**

Per:    _____
          Name:
          Title:

**Nortel Networks Inc.**

Per:    _____
          Name:
          Title:

**Nortel Networks UK Limited**

Per:    _____
          Name:
          Title:

**Nortel Networks SA**

Per:    _____
          Name:
          Title:

**Nortel Networks Australia Pty Limited**

Per:    _____
          Name:
          Title:

- 16 -

**Nortel Networks (Ireland) Limited**

Per: _____

Name:

Title:

**Second Amendment to Schedule A**[36]

**Calculation of Arm's Length R&D Allocation ("R&D Allocation")**[37]

Nortel uses the residual profit split method ("RPSM") embodied in the calculation described below, which was originally adopted as of January 1, 2001 at the request of certain Revenue Authorities as the most appropriate method for determining the arm's length compensation due to each Participant for its respective R&D Activity provided pursuant to the Agreement. The RPSM acknowledges the fact that the key profit driver in the Nortel business is the development and maintenance of rapidly depreciating intellectual property.[38]

Accordingly, the R&D Allocation provided to Participants under the RPSM reflects the fact that the Participants bear the full entrepreneurial risk of the Nortel business, such as the risks attendant with the substantial and continuous development and ownership of the NN Technology. Mathematically, the RPSM accords the Participants all the upside risk in the Nortel business as well as the downside risk. A functional rate of return ("Functional Rate of Return") is provided to each Participant as compensation for its distribution function and other activities that support revenue outside of the Participant's country of residence.[39]

Other Nortel Affiliates that are not signatories to the Agreement and that have signed (or will sign) a distribution agreement with NNL ("Nortel Distribution Entities") generally are the least complex entities in the Nortel group of companies. They do not perform R&D Activity, and generally perform routine activities. In addition, these entities have limited business risks in that they engage in a limited number of functions.  Thus, these entities are provided a Functional Routine Return as compensation for their distribution function and ancillary services (generally, a nominal amount of operating earnings ranging from 0% to 4% of sales, as determined based on current industry standards and third party studies).[40]

The steps for calculating the R&D Allocation for each Participant are as follows:[41]

1. Identify the Nortel entities that are "Participants" under the Agreement as amended from time to time.[42]

2. Determine consolidated Nortel operating earnings/loss in accordance with U.S. GAAP.[43]

3. From the consolidated Nortel operating earnings/loss:

   (i)      Deduct the operating earnings/loss of Nortel's existing joint ventures; deduct the operating earnings/loss of Nortel's former joint venture entities that own significant

---

[36] Third Addendum, Schedule A.
[37] Third Addendum, Schedule A.
[38] Third Addendum, Schedule A.
[39] Third Addendum, Schedule A.
[40] Third Addendum, Schedule A.
[41] Third Addendum, Schedule A.
[42] Third Addendum, Schedule A.
[43] Third Addendum, Schedule A.

A-2

intangibles, as determined by the Participants from time to time; and deduct the operating earnings/loss of Nortel entities that do not perform the function of distribution of Products containing NN Technology.

(ii)    The resulting operating earnings/loss is then further adjusted to deduct the following items not related to Nortel's operations:

- amortization of intangibles[44]
- gain/loss on the sale of business
- restructuring charges
- stewardship costs

The resulting amount is the adjusted operating earnings/loss ("Adjusted Operating Earnings/Loss").

(iii) From the Adjusted Operating Earnings/Loss:

- deduct the Functional Routine Return of each Nortel Distribution Entity, and
- deduct the Functional Routine Returns of each Participant.

in each case as determined by the selected transfer pricing method that establishes such return based on current industry standards and third party studies, or as may be finally determined by Nortel's negotiations with Revenue Authorities, to determine the amount representing the residual profit or loss ("Residual Pool").[45]

4.  Determine the R&D Allocation for each Participant:

(i)    Calculate the relative ratios of each Participant's spending on its R&D Activity to the R&D spend of all Participants, by taking each Participant's total R&D spend over the previous five years as a ratio of the total R&D spend of the previous five years for all Participants.

(ii)    Apply the ratio determined above to the Residual Pool to determine each Participant's R&D Allocation.

Take the R&D Allocation and Functional Routine Return for each Participant and compare it to such Participant's operating earnings/loss, adjusted in the manner described in paragraph 3(ii), to determine whether any "true up" payments are necessary (whereby a Participant that holds profits in excess of its attributable share hereunder would be required to pay amounts to Participants that hold profit in an amount less than their attributable share).[46]

---

[44] Amortization of intangibles includes goodwill impairment, purchased in-process research and development, amortization of acquired technology, and other intangibles such as trademarks, patents, etc.
[45] Third Addendum, Schedule A.
[46] Third Addendum, Schedule A.

## First Amendment to Schedule B[47]

### Exclusive Territory for Each Licensed Participant[48]

1) With respect to Nortel Networks Inc., "**Exclusive Territory**" shall mean the United States of America and the Commonwealth of Puerto Rico.[49]

2) With respect to Nortel Networks UK Limited, "**Exclusive Territory**" shall mean the United Kingdom.[50]

3) With respect to Nortel Networks SA, "**Exclusive Territory**" shall mean France.[51]

4) With respect to Nortel Networks Australia Pty Limited, "**Exclusive Territory**" shall mean Australia.[52]

5) With respect to Nortel Networks (Ireland) Limited, "**Exclusive Territory**" shall mean the Republic of Ireland.[53]

5755612

---

[47] Third Addendum, Schedule B.
[48] Third Addendum, Schedule B.
[49] Third Addendum, Schedule B.
[50] Third Addendum, Schedule B.
[51] Third Addendum, Schedule B.
[52] Third Addendum, Schedule B.
[53] Third Addendum, Schedule B.

| | | |
|---|---|---|
| IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*<br><br>In re: Nortel Networks Inc., *et al.*, | | Court File No.:09-CL-7950<br><br>Case No. 09-10138 (KG) |

| | | |
|---|---|---|
| | ***ONTARIO***<br>**SUPERIOR COURT OF JUSTICE**<br>**(COMMERCIAL LIST)** | **IN THE UNITED STATES**<br>**BANKRUPTCY COURT FOR**<br>**THE DISTRICT OF DELAWARE** |
| | **PRE-TRIAL BRIEF OF THE MONITOR**<br>**AND CANADIAN DEBTORS– ALLOCATION** | |

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

**Jay A. Carfagnini**  LSUC#: 22293T
jcarfagnini@goodmans.ca
**Benjamin Zarnett** LSUC#: 17247M
bzarnett@goodmans.ca
**Peter Ruby** LSUC#: 38439P
pruby@goodmans.ca
**Joseph Pasquariello LSUC** #: 38390C
jpasquariello@goodmans.ca
Tel:      (416) 979-2211
Fax:     (416) 979-1234
*Lawyers for the Monitor*

**GOWLING LAFLEUR HENDERSON LLP**
Barristers & Solicitors
1 First Canadian Place,
100 King Street West, Suite 1600
Toronto ON M5X 1G5

**Derrick Tay**  LSUC#: 21152A
derrick.tay@gowlings.com
**Jennifer Stam**  LSUC#: 46735J
jennifer.stam@gowlings.com
Tel:     (416) 862-5697
Fax:     (416) 862-7661
*Lawyers for the Canadian Debtors*

**BUCHANAN INGERSOLL & ROONEY PC**
Mary F. Caloway (No. 3059)
Kathleen A. Murphy (No. 5215)
919 North Market Street, Suite 1500
Wilmington, Delaware 19801
(302) 552-4200 (telephone)
(302) 552-4295 (facsimile)
mary.caloway@bipc.com
kathleen.murphy@bipc.com

**ALLEN & OVERY LLP**
Jacob S. Pultman
Paul B. Keller
Laura R. Hall
Ken Coleman
Daniel Guyder
1221 Avenue of the Americas
New York, NY  10020
(212) 610-6300 (telephone)
(212) 610-6399 (facsimile)
jacob.pultman@allenovery.com
paul.keller@allenovery.com
laura.hall@allenovery.com
ken.coleman@allenovery.com
daniel.guyder@allenovery.com

*Attorneys for Ernst & Young Inc., as Monitor*
*and Foreign Representative of the Canadian Debtors*