**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

```
----------------------------------------------------------  x
                                                            :
```
*In re*                                                     :        Chapter 11
```
                                                            :
```
Nortel Networks Inc., *et al.*,                             :        Case No. 09-10138 (KG)
```
                                                            :
```
                                     Debtors.               :        (Jointly Administered)
```
                                                            :
----------------------------------------------------------  x
```

- and the -

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, C. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION**

<u>**PRE-TRIAL BRIEF OF THE *AD HOC* GROUP OF BONDHOLDERS**</u>

## TABLE OF CONTENTS

Page

I.      Preliminary Statement.................................................................................................1

II.     The Canadian Debtors' IP Theory Cannot be Reconciled with the Parties' Prior
        Conduct or Representations to the Courts ..........................................................5

        A.      The Canadian IP Theory is Contradicted by the Conduct of the Parties ................8

                i.      The Canadian Debtors Never Disclosed Their IP Theory to the
                        Parties Prior to Filing Their Allocation Papers.............................................8

                ii.     Nortel Consistently Made Representations to Tax Authorities That
                        Contradict the Canadian Debtors' IP Theory...............................................11

                iii.    The IFSA Did Not Obligate Exclusive Licensees to Relinquish
                        Their Licenses if Doing So Was Not in the Best Economic
                        Interests of Their Respective Creditors........................................................12

                iv.     The Nortel Estates' Serious Consideration of Multiple Approaches
                        to Monetizing the Patent Portfolio Further Undermines the
                        Canadian IP Theory ....................................................................................14

        B.      The Patent Sale Could Not Have Been Approved in the US Had the
                Canadian Debtors' Disclosed Their IP Theory....................................................18

        C.      It Would Have Been Illogical for the US and EMEA Estates to Consent to
                the Patent Sale Had the Canadian Debtors' IP Theory Been Advanced................20

III.    Global Substantive Consolidation is Contrary to Applicable Law and
        Inappropriate on the Facts...................................................................................21

        A.      "Pro Rata Distribution" is Not an Allocation Methodology and Should Be
                Rejected as Irrelevant to the Courts' Analysis.....................................................22

        B.      No Legal Grounds or Precedent Exists for Non-Consensual Global
                Substantive Consolidation of the Nortel Debtors' Estates....................................25

                i.      The Global Sub Con Proponents are Asking for Substantive
                        Consolidation ..............................................................................................25

                ii.     Global Substantive Consolidation Has Never Been Ordered ...................26

                iii.    A Court-Imposed Global Substantive Consolidation of the Nortel
                        Debtors' Estates Would Have a Significant Negative Impact on
                        Global Capital Markets ..............................................................................28

DOCS_DE:193022.1 61026/001

C.     The Requested Global Substantive Consolidation of the Nortel Debtors' Estates is Contrary to Prevailing US and Canadian Law ........................................ 30

       i.     Appropriate Standard for a Hypothetical Analysis of Global Substantive Consolidation ......................................................... 31

       ii.     The Global Sub Con Proponents Cannot Establish a *Prima Facie* Case for Global Substantive Consolidation ................................................ 34

       iii.     Even if a *Prima Facie* Case for Global Substantive Consolidation Could Be Established, It Can Be Defeated by the Bondholder Group and Other Significant Creditors Who Relied on the Separateness of the Nortel Entities .......................................................... 35

           (a)     *A Global Substantive Consolidation of the Nortel Debtors' Estates would Harm Creditors* ...................................................... 36

           (b)     *Holders of the Bonds Were Told They Could Rely on the Nortel Debtors' Separate Corporate Existence* ............................ 37

       iv.     Global Substantive Consolidation is Not Appropriate Under the Hopeless Entanglement Prong of the *Owens Corning* Test ..................... 40

           (a)     *It is Not Impossible to Identify the Separate Assets and Liabilities of the Three Major Nortel Debtors' Estates* ................ 40

           (b)     *The Intercompany Claims of the Three Major Nortel Debtors' Estates are Substantially Resolved* ............................... 43

           (c)     *Separating the Assets and Liabilities of the Nortel Group is not so Costly that it Harms all Creditors* ..................................... 44

       v.     Substantive Consolidation May Not Be Used as a Sword ........................ 45

IV.     The EMEA Debtors' Approach to Contributions to R&D is Flawed ............................... 45

     A.     The Transfer Pricing Methodology Embodied in the MRDA is Not an Appropriate Guide for Allocation ......................................................... 46

     B.     EMEA Erroneously Implements its Allocation Theory ........................................ 46

CONCLUSION .................................................................................................................... 48

DOCS_DE:193022.1 61026/001

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arrowood Indem. Co. v. Hartford Fire Ins. Co.*,
  774 F.Supp.2d 636, 655 (D. Del. 2011).................................................................................7

*Atlantic Yarns Inc. (Re)*, (2008) 42 C.B.R. (5th) 107 ..................................................................31

*Bell Canada International Inc.*, 2003 CarswellOnt 4537 (Sup. Ct.) ...............................................9

*Ex Parte James*
  (1874), 9 Ch. App. 609, [1874-80] ............................................................................................9

*In re Kane*,
  628 F. 3d 631, 638 (3d Cir. 2010)..............................................................................................7

*In re Nortel Networks Corporation, et al.*,
  426 B.R. 84 (Bankr. D. Del. 2010) ..........................................................................................24

*Northland Properties Ltd. (Re)*, (1988), 69 C.B.R. (N.S.) 266 (Can. B.C. S.C.) ..............27, 31, 33

*In re Owens Corning*,
  419 F.3d 195 (3d Cir. 2005)............................................................................................. *passim*

*In re Snider Bros.*,
  18 B.R. 230 (Bankr. D. Mass. 1982) .......................................................................................33

*Union Sav. Bank v. Augie/Restivo Baking Co., Ltd.*,
  860 F.2d 515 (2d Cir. 1988).....................................................................................................32

**Other Authorities**

*Bankruptcy and Insolvency Law in Canada.*, vol. 2, 4th ed. Toronto: Carswell
  2009...........................................................................................................................................9

TO THE HONORABLE KEVIN GROSS, UNITED STATES BANKRUPTCY CHIEF JUDGE
AND THE HONORABLE JUSTICE F.J.C. NEWBOULD OF THE ONTARIO SUPERIOR
COURT OF JUSTICE:

The *ad hoc* group of bondholders (the "<u>Bondholder Group</u>")[1] hereby delivers its

pre-trial brief in the above-captioned matter to the United States Bankruptcy Court for the

District of Delaware (the "<u>US Court</u>") and the Ontario Superior Court of Justice (Commercial

List) (the "<u>Canadian Court</u>" and, together with the US Court, the "<u>Courts</u>").

## I.     <u>PRELIMINARY STATEMENT</u>

1.      The Bondholder Group, which represents over half of the Bonds and is uniquely

situated as the single largest creditor constituency of both the Canadian and US estates, supports

the fair market value approach to allocation proposed by the US Debtors and the Official

Committee of Unsecured Creditors (the "<u>Committee</u>," and together with the US Debtors, the

"<u>US Interests</u>").  The Bondholder Group submits this brief to highlight certain fundamental

fallacies in (i) the argument of the Monitor of the Canadian Estate ("<u>Monitor</u>") and the Canadian

Estate (collectively "<u>Canadian Debtors</u>") that the Canadian Estate is entitled to 100% of the

proceeds from the sale ("<u>Patent Sale</u>") of the more than 7,000 Nortel patents and patent

applications ("<u>Patent Portfolio</u>") not sold in connection with the sale of Nortel's businesses, (ii)

the argument of the UKPC[2] and Canadian Creditors Committee (the "<u>CCC</u>") (in the alternative)

that the outcome of this allocation trial should be that all creditors receive a "pro rata" recovery

---

[1]      The Bondholder Group consists of entities ("<u>Bondholders</u>") that hold bonds ("<u>Bonds</u>") issued or guaranteed
by Nortel Networks Corporation ("<u>NNC</u>" and together with its affiliates worldwide, "<u>Nortel</u>"), Nortel
Networks Limited "<u>NNL</u>" and together with NNC and certain of their subsidiaries, the "<u>Canadian Estate</u>"),
Nortel Networks Inc. ("<u>NNI</u>"), and Nortel Networks Capital Corporation ("<u>NNCC</u>" and together with NNI
and certain of its subsidiaries, the "<u>US Debtors</u>").

[2]      "UKPC" refers to Nortel Networks UK Pension Trust Limited and the Board of the Pension Protection
Fund.

on their claims, and (iii) the EMEA Debtors'[3] argument that the sale proceeds should be

allocated using each estate's historical contributions to research and development ("R&D"),

unadjusted for the actual source of the funding of such contributions. Each of these arguments

must be rejected.

2.      First, the Canadian Debtors' newly-minted argument that they are entitled to

100% of the Patent Sale proceeds is based on a contrived, results-oriented theory concocted

solely for this litigation, and only after the consensual disposition of the assets giving rise to the

disputed proceeds. The Canadian Debtors' position, if adopted, would represent one of the

greatest heists of value in history. The Canadian Debtors contend that the manner and sequence

by which the liquidation of the assets of the various Nortel entities was conducted leads to a

conclusion that the EMEA Debtors and the US Debtors are entitled to not one cent from the

Patent Sale.[4] As discussed by the US Interests in their pre-trial brief, this argument is neither

supported by the plain language of the Master R&D Agreement (the "MRDA")—the very

agreement that defines the parties' legal and economic rights in the intellectual property of

Nortel (the "Nortel IP")—nor the facts and circumstances of these cases. The MRDA granted to

certain of the US and EMEA Debtors (the "Exclusive Licensees") exclusive, perpetual, royalty-

free licenses to exploit the Nortel IP in their geographic territory, without limitation, and vested

legal title in the Nortel IP in NNL.

3.      The Canadian Debtors' argument that the license rights were rendered worthless

by the time of the Patent Sale was *never* raised by the Canadian Debtors (or anyone else) before

this litigation. To the contrary, the Canadian Debtors at all times prior to the allocation litigation

---

[3]      "EMEA Debtors" refers to the estates of Nortel Networks UK Ltd. ("NNUK"), Nortel Networks (Ireland)
Ltd. ("NNIRE"), Nortel Networks S.A. ("NNSA"), and certain of their affiliates.

[4]      Under the same defective theory, the Canadian Debtors wrongly claim nearly the entire balance of proceeds
attributable to the Nortel IP relinquished in connection with the sale of Nortel's business lines.

acted as though each estate would receive a share of the proceeds from the sale of the Nortel IP. Indeed, they repeatedly made affirmative representations to this effect to the Courts, including (i) when they entered into the Interim Funding and Settlement Agreement (the "IFSA"), (ii) when they participated in the negotiations of the asset sales, and (iii) when they advocated for approval of the asset sales (including the Patent Sale).

4.      The Bondholder Group has been actively involved in these cases since the first day hearings, and was intimately involved in the asset sales and the events leading up to them. Had the Canadian Debtors ever indicated that they were going to later argue that they were entitled to all of the Patent Sale proceeds, the Bondholder Group and the other parties would have acted differently.  At a minimum, the other Nortel Debtors and the Bondholder Group would have sought a judicial determination on the scope of the exclusive IP licenses before agreeing to the asset sales.  If that was not available, they would have continued to aggressively pursue alternatives to an asset sale, including the monetization of Nortel IP through a licensing and enforcement model ("IPCo").

5.      Believing they have successfully duped everyone, including the Courts, into an understanding that the proceeds from the sale of the Nortel IP would be allocated among *all* the estates, the Canadian Debtors (including the Monitor—an officer of the Canadian Court) now urge the Courts to conclude (based purely on a legal theory that could have been raised years ago), that they should receive 100% of the Patent Sale proceeds and over 80% of the proceeds from all asset sales. Had the Canadian Debtors actually held the belief that, as a matter of law, they were entitled to all of the Patent Sale proceeds, they should have raised this issue with the courts years ago, and tens (if not hundreds) of millions of dollars of estate assets expended in professional fees could have been saved.

3

6.    Second, the UKPC and CCC argument that the Courts should order a "pro rata" distribution to creditors of the Nortel estates, without regard to which entity each creditor has a claim against or whether a creditor negotiated for multiple claims, is a transparent attempt to effect a global substantive consolidation of the Nortel Debtors' estates.  Their argument should be rejected for a number of reasons, most importantly because the UKPC and CCC ask the Courts to engage in an entirely different exercise than the one called for by the Nortel Debtors' estates and the IFSA, which forms the basis for the Courts' jurisdiction to hear this dispute.

7.    The UKPC and CCC ask the Courts to determine the ***distribution*** of assets to individual ***creditors***, while the mandate of the trial before the Courts is to decide how to ***allocate*** assets to the various ***estates***.  Their distribution theory is therefore irrelevant to the question before the Courts.  Even if the Courts were to consider the question of distribution, the argument must be rejected because no court in the US or Canada (or anywhere else, as far as we can tell) has ever ordered the non-consensual substantive consolidation of cross-border estates—nor does any court wherever situated have the authority to do so.  This is especially true here, where the standard for domestic substantive consolidation cannot be supported by the facts.  Nortel's bondholders and other creditors (including the UKPC) relied on the separateness of the Nortel entities when extending credit to Nortel on the basis of a guarantee, and the Nortel Debtors' estates are not hopelessly entangled.

8.    Third, the EMEA Debtors' contribution-based approach to allocation is also flawed as implemented.  To their credit, the EMEA Debtors' approach actually seeks to allocate the proceeds of the asset sales to the various estates, unlike the Canadian Debtors' primary approach and the approach of the global substantive consolidation proponents.  The fundamental failings of the EMEA Debtors' contribution-based approach are that it (i) seeks to allocate the

4

sales proceeds based on the ***cost*** of R&D, rather than the ***value*** of the Nortel IP that was sold,

relying inappropriately on the MRDA, a document that by its terms does not apply to the

allocation of sale proceeds; and (ii) uses incorrect inputs to calculate each estate's relative

contribution made to the development of the Nortel IP.  If the Courts decide to adopt a

contribution-based approach to allocation (which we believe they should not), the calculation

methodology set forth by the EMEA Debtors must be modified as detailed by the US Interests'

expert Laureen Ryan.  Ryan more properly reflects each estate's contributions to R&D by

including contributions that were made both inside and outside its own geographic territory

through transfer-pricing adjustments.  A contribution-based approach must consider all

contributions made, not just those made within an estate's geographic territory.

9.      For these reasons, and those presented by the US Interests in their pre-trial brief,

the Courts should reject the allocation positions asserted by the Canadian Debtors, CCC, UKPC,

and EMEA Debtors and instead allocate the sale proceeds according to the fair market value of

the assets relinquished by each estate.

## II.    THE CANADIAN DEBTORS' IP THEORY CANNOT BE RECONCILED WITH THE PARTIES' PRIOR CONDUCT OR REPRESENTATIONS TO THE COURTS

10.     The Bondholder Group has functioned as a key cross-over stakeholder throughout

these insolvency cases, beginning with the first-day hearings in the United States at which the

Bondholder Group was the only creditor constituency to appear and object.  The significant

economic stake of the Bondholder Group and the integral nature of its active participation in

these cases was reflected and memorialized by the parties in the IFSA, which obligated both the

Canadian Debtors and the US Debtors to involve the Bondholder Group in all negotiations.

(IFSA §§ 12(g)(i)-(ii).)  The IFSA also gave the Bondholder Group a consent right over any

determination concerning the allocation of sale proceeds.  (*Id.* at § 13(b).)  As a result of these

express rights, the Bondholder Group has acted as a major constituent in all aspects of the Nortel Debtors' post-petition sale processes and the efforts to monetize the Nortel IP.

11. The Canadian Debtors' new IP theory (the "Canadian IP Theory" or "IP Theory"), first revealed in their May 2013 opening allocation position, came as a complete shock to the Bondholder Group. For the first time, more than four years after the Nortel Debtors commenced these cases and years after all asset sales were completed, the Canadian Debtors claimed that NNL owned *all* economic interests in the Patent Portfolio and were thus entitled to *all* $4.5 billion in proceeds realized from the Patent Sale. The Canadian Debtors' assertion is based on the absurd premise that the Courts should attribute *no value* to the fact that NNI and certain of the EMEA Debtors voluntarily relinquished through the Patent Sale their exclusive, perpetual, royalty-free licenses to exploit *all* of Nortel's IP in their respective territories ("Exclusive Licenses" or "Licenses") and instead award NNL alone the billions of dollars realized through the Patent Sale. This remarkable theory has no basis in fact or law.

12. As the US Interests articulate in their pre-trial brief, the Canadian IP Theory is based on an impossibly narrow interpretation of the scope of the Exclusive Licenses set forth in the MRDA, and should be dismissed on this basis alone. But the Canadian IP Theory is also meritless when reviewed in a broader context. The evidence before the Courts shows that the Canadian Debtors, and every other party (including the Bondholder Group), conducted themselves for years in a manner completely inconsistent with the Canadian IP Theory and, instead, the Canadian Debtors purposely led the Courts to believe that the US Debtors' estate would receive a fair share of the Patent Sale proceeds. Indeed, based on the representations made by the Canadian Debtors and other parties, the US Court approved the Patent Sale as in the US Debtors' "best interests," finding that "the [Patent] Sale Agreement and the Closing will

6

***provide a greater recovery for the [US] Debtors' creditors than would be provided by any other presently available alternative***."[5]  This undisputed finding by the US Court cannot be reconciled with the Canadian IP Theory.

13.    The Canadian Debtors should not now be heard to argue that they are entitled to all proceeds from the Patent Sale when they supported a fundamentally incompatible position (that the Patent Sale was in the best interests of the US Debtors and would provide a recovery to their creditors) during the Patent Sale approval process.  In fact, they are judicially estopped from doing so, as the US Court would not have approved the Patent Sale if the Canadian Debtors had taken the position then that the Patent Sale could result in the US Debtors terminating their Exclusive Licenses in exchange for zero recovery.  *See, e.g., In re Kane*, 628 F. 3d 631, 638 (3d Cir. 2010) ("…the basic principle of judicial estoppel . . . is that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory.") (citation and quotation omitted).  The Canadian Debtors are also equitably estopped from advancing the IP Theory because the Bondholder Group, the US Debtors, and other parties relied upon the Canadian Debtors' false statements and conduct when consenting to the Patent Sale.  *See Arrowood Indem. Co. v. Hartford Fire Ins. Co.*, 774 F.Supp.2d 636, 655 (D. Del. 2011) (noting that equitable estoppel exists where "the party claiming the estoppel lacked knowledge and the means of knowledge of the truth of the facts in question, that he relied on the conduct of the party against whom the estoppel is claimed, and that he suffered a prejudicial change of position in consequence thereof") (citation and quotation omitted).  Even if the Courts were to find that the Canadian Debtors are not judicially or equitably estopped from changing their position on the

---

[5]        Ex. 21510 (Order Authorizing and Approving Patent Sale, July 11, 2011) ("Patent Sale Approval Order") [D.I. 5202] at 14.

7

eve of litigation, the Courts should consider the Canadian Debtors' course of conduct in evaluating the credibility of their current interpretation of the MRDA.

14.     Ultimately, as described further below, had the Canadian Debtors even hinted at their IP Theory at any point prior to the Patent Sale (or, indeed, at any point before this litigation commenced), the Bondholder Group and the US Debtors would have responded to it at that time, either through judicial means or through the pursuit of other options for monetizing the valuable rights that the US Debtors held in the Nortel IP.

**A.     The Canadian IP Theory is Contradicted by the Conduct of the Parties**

15.     The Canadian Debtors' suggestion that they always believed that they were legally entitled to all of the IP sale proceeds, but held the argument in reserve until May 2013, is not credible.  Indeed, the Canadian Debtors' recently-asserted theory is contradicted by their conduct both before and during the asset sales, including the judicial approval process.  The parties collaborated extensively throughout the sales process.  All parties, including the Bondholder Group, rightly understood that each of the Nortel Debtors' estates would share in the sale proceeds, subject to their good faith disagreements on how that sharing would actually occur.  No one believed that the proceeds would be allocated entirely to one estate and the other estates would be left with nothing.  In fact, each estate had a fiduciary duty throughout the process to maximize value for their own creditors, not the other estates.

i.      <u>The Canadian Debtors Never Disclosed Their IP Theory to the Parties Prior to Filing Their Allocation Papers</u>

16.     The Nortel Debtors' estates collectively worked for more than three years to maximize the value to creditors of monetizing the Patent Portfolio, with those efforts ultimately culminating in the Patent Sale.  In addition, the Nortel Debtors' estates and their major creditor constituents engaged in three formal mediations in an attempt to settle the allocation dispute.  At

8

no time during those extensive interactions did the Canadian Debtors ever advise the other

parties of their position that all proceeds from the Patent Sale should go to NNL. The Canadian

Debtors did not adopt their newfound theory until May 2013, when the opening statements were

filed in this litigation. As Murray McDonald, the president of Ernst & Young Inc., in its capacity

as the Monitor,[6] testified, the first time that the Monitor advised anyone from NNI that it was

taking the position that NNL was entitled to all of the proceeds from the Patent Sale was when

the Monitor and the Canadian Debtors filed their opening allocation position pleading in May of

2013.[7]

17.     John Ray, the Principal Officer of NNI and its affiliated US Debtors, also

emphasized this fact in his Declaration:

> Never once during this entire process did anyone ever suggest the argument being
> advanced by NNL during the past year that NNI, NNUK, NNIRE, and NNSA would
> have no rights in the Patent Portfolio following the conclusion of the last Business Sale
> because their exclusive licenses were limited to 'products' that were being marketed by
> the Nortel lines of business at the time of the closing of the Business Sales.[8]

---

[6]     In August 2009, the Monitor sought and obtained an order from the Canadian Court for expanded
powers. The Monitor has since been in *de facto* control of, and has directed the affairs, conduct, and
litigation position and strategy of the Canadian Estate. As an Officer of the Canadian Court, the Monitor
owes a duty of candor and transparency to the other parties and to the Courts. The rule in *Ex Parte James*,
(1874), 9 Ch. App. 609, [1874-80], is a foundational principle of Canadian bankruptcy law and requires an
officer of the court to do the fullest equity among parties. It expressly states that even in circumstances
where a trustee has a legal right to property, the bankruptcy court will not permit it to exercise that right if it
would be inconsistent with natural justice to do so. This rule has been adopted and interpreted in many cases
under both the *Bankruptcy and Insolvency Act* and the *Companies' Creditors Arrangement Act*. (*See, e.g.*,
*Bell Canada International Inc.*, 2003 CarswellOnt 4537 (Sup. Ct.) ("woe betide any officer of the court who
did not observe his duty to be neutral and objective.") The rule is also referenced in Houlden and Morawetz,
*Bankruptcy and Insolvency Law in Canada.*, vol. 2, 4th ed. Toronto: Carswell 2009 (loose-leaf), a leading
Canadian text. The principle recognizes that officers of the court are held to a higher standard and owe
broad duties in dealings with both the court and other parties, including duties of candor, transparency and
fairness, even when acting as litigants. During his deposition, McDonald agreed that he has a duty to be
"open and honest" with both the US and Canadian Courts. (McDonald Tr. 35:24-36:11.) (References to
"Tr." followed by a page number are to the transcript of the deposition of the identified witness in the above
captioned proceedings.)

[7]     McDonald Tr.122:11-15. McDonald also testified, however, that the Canadian IP Theory was discussed
with representatives of the US Debtors in May 2010. *Id.* at 99:14-100:21. Ray, however, disputes that
McDonald (or anyone else on behalf of the Monitor or the Canadian Debtors) ever asserted that position at
that meeting. Declaration of John J. Ray III, dated April 11, 2014 (the "John Ray Decl.") ¶ 72.

[8]     John Ray Decl. ¶ 67.

9

Ray further explained that throughout the sales process, "all stakeholders fully expected to share in the revenues generated from any disposition of the Patent Portfolio."[9]

18.    Alan Bloom, the principal liaison for the Joint Administrators with the US and Canadian Debtors, gave similar testimony.[10]  When Bloom first learned of the Canadian Debtors' claim to exclusive ownership of Nortel's IP, he reacted with "astonishment,"[11] noting that "there'd been no hint of this at all"[12] prior to the allocation briefing.  Bloom said that the Joint Administrators never imagined that the Canadian Debtors would take this position.[13]

19.    Similarly, Cosme Rogeau, the liquidator before the French Commercial Court in Versailles for Nortel's French operating company, NNSA, learned of the Canadian Debtors' current position for the first time by reading their allocation brief[14]—long after he had represented *exactly the opposite* to the French Commercial Court, whose approval was necessary for NNSA to participate in the Patent Sale.[15]  Rogeau said he initially thought the Canadian IP Theory was "not serious" because the Canadian Debtors had specifically asked NNSA to be involved in the sale as sellers,[16] testifying: "[I]t is difficult to see how after the sale and after the cash has been paid to claim that we were not involved."[17]

20.    The Canadian Debtors' silence for more than four years after the commencement of Nortel's insolvency cases is telling.  If their IP Theory were an honest theory, held in good

---

[9]      *Id.* ¶ 66.

[10]     Alan Bloom Tr. 93:5-11; 94:6-21.

[11]     *Id.* 95:12-14.

[12]     *Id.* 95:15-96:3.

[13]     *Id.* at 95:12-96:10.

[14]     Cosme Rogeau Tr. 78:6-9.

[15]     *Id.* at  82:13-17.

[16]     *Id.* at 80:17-81:11.

[17]     *Id.* at 81:8-10.

10

faith, as opposed to a *post hoc* litigation ploy, they would have disclosed it and sought a

determination on it long ago.[18]

      ii.    <u>Nortel Consistently Made Representations to Tax Authorities That Contradict the Canadian Debtors' IP Theory</u>

21.      For years prior to filing its insolvency cases, Nortel, with the blessing of NNL,

represented to US and Canadian tax authorities that the Exclusive Licensees owned the economic

rights to the Nortel IP within their respective jurisdictions.  This was done to benefit NNL by

decreasing its asset base and associated tax liability.  Now the Canadian Debtors argue the

opposite in order to reap the benefits from the sale of assets that NNL repeatedly claimed were

owned by other estates.  These historical representations expose the Canadian IP Theory for what

it truly is: a litigation strategy detached from reality.

22.      For example, in March 2002, Nortel submitted a report to the US Internal

Revenue Service ("<u>IRS</u>") and the predecessor of the Canada Revenue Agency ("<u>CRA</u>")

regarding its first application for Nortel's Advanced Pricing Agreement ("<u>APA</u>") in which it

explicitly represented that "each R&D cost sharing participant [including NNI] ***could be

considered to 'own' the NT technology*** as it related to its specific region" dating back to

Nortel's prior transfer pricing agreement, the R&D CSA.[19]  In 2003, Nortel again reported to the

IRS and CRA that "the residual entities, ***as the owners of the intangible property***, as well as the

manufacturers of the tangible goods, would recognize that [Nortel's] distribution network is

---

[18]    The Canadian Debtors' witness Sharon Hamilton claims that Murray McDonald raised the IP Ownership Theory at a May 2010 meeting attended by certain estate representatives (no member of the Bondholder Group was in attendance) including John Ray, on behalf of the US Debtors.  (*See* Sharon Hamilton Reply Decl. ¶¶ 42-43.)  Ray soundly rejected Hamilton's account stating: "I have a clear recollection of that meeting, which took place over one year before the Patent Sale auction took place.  At no point in the meeting did Mr. McDonald or anyone else there on behalf of the Monitor or the Canadian Debtors ever assert that position, nor did he ever assert that there were any limitations whatsoever on the exclusive license granted to NNI by the MRDA."  John Ray Decl. ¶ 72.

[19]    TR11055 at NNC-NNL004622 ("Economic Analysis of Nortel Networks," Horst Frisch Inc. dated Mar. 14, 2002) (emphasis added).

critically necessary for their long-term survival."[20]  Again, in its transfer pricing report for the year

ended in 2009, Nortel represented that "*NNI, NNL, and other integrated entities…are the*

*primary owners of intangibles developed by the group* and bear the risk of development; non-

routine profits/losses are … shared between the IEs based on their ratios of intangible

ownership."[21]  Nortel reiterated this assertion in 2010 in a presentation prepared in accordance

with CRA and Organization for Economic Co-operation and Development guidelines.[22]

23.     These repeated representations to the US and Canadian tax authorities are at odds

with the Canadian Debtors' IP Theory.  If NNL believed that it exclusively owned 100% of the

Nortel IP by virtue of holding its legal title, it would not have made these official representations

to the contrary, and should not have been allowed to reap the tax benefits on these

representations.

      iii.    <u>The IFSA Did Not Obligate Exclusive Licensees to Relinquish Their Licenses if
Doing So Was Not in the Best Economic Interests of Their Respective Creditors</u>

24.     The terms of the IFSA and its approval process also undermine the Canadian IP

Theory.  The Courts approved the IFSA on June 29, 2009 to establish a consensual framework

for the Nortel Debtors' estates jointly to conduct and to implement the sales of Nortel's

businesses and assets.[23]  The IFSA was a heavily-negotiated document, including by the

Bondholder Group.  It made clear that neither NNI nor any other selling Nortel Debtor was

required to participate in any asset sale or deliver any IP license termination if it determined that

---

[20]     TR21080 (Sep. 2003 APA Responses) at 25 (emphasis added).

[21]     *See* TR47221 (Sept 14, 2010 Transfer Pricing Report for Year Ended December 31, 2009) at 1.

[22]     TR47223 at NNI_00443585 (Nortel Networks Limited Transfer Pricing Report) ( "[t]he Nortel Group …
*including NNL and other integrated entities ("IEs") are the primary owners of intangibles developed by
the Nortel Group* and bear the risk of development') (emphasis added).  The Report also stated that under
the RPSM, non-routine profits/losses were "shared between the IEs based on their ratios of intangible
ownership."  *Id*. at NNI_00443586; *see also* TR47223.

[23]     June 7, 2001 Tr. of Hr'g at 36:19-20 [D.I. 5643].

12

doing so was not in the best economic interests of its ***own*** creditors.

25.     Specifically, the IFSA provided a "fiduciary out" provision for each estate, which, if invoked, could block any sale:

> [N]o Debtor shall be required to enter into a Sale Transaction so long as such Debtor reasonably determines, acting in good faith and after consultation with the other Parties to this Agreement, that such Sale Transaction is not in the best economic interests of its creditors generally . . . .[24]

The IFSA also provided that the Canadian Debtors and the US Debtors must involve the Bondholder Group in all negotiations relating to any asset sales and could not enter into such sales without the Bondholder Group's consent.[25]  Moreover, the IFSA provided that the Exclusive Licensees would terminate their Licenses only in "***consideration of a right to an allocation*** . . . of portions of the sale proceeds from, the sale of any material assets of any of the Canadian Debtors and/or the US Debtors to a third party."[26]

26.     Based on these provisions, each of the parties to the IFSA understood that any of the Nortel Debtors' estates could block any proposed sale and that each estate would terminate its Exclusive License ***only*** in exchange for an ***allocation*** of sale proceeds.[27]  The estates and the Bondholder Group further understood—contrary to the current position of the Canadian Debtors but consistent with a natural reading of the IFSA—that the allocation of the sale proceeds that each estate would receive would be something substantially greater than zero.[28]

27.     The US Court approved the entry by the US Debtors into the IFSA only after finding that it provided for an allocation process that was in the best interests of the US Debtors

---

[24]     IFSA [D.I. 874, Ex. B] at 12(e).

[25]     *Id.* at 12(g).

[26]     *Id.* at 11(a) (emphasis added).

[27]     John Ray Decl. ¶ 68; *see also* Alan Bloom Tr. 96:11-16; Cosme Rogeau Tr. 56:10-17.

[28]     *See, e.g.*, John Ray Decl. ¶ 66.

DOCS_DE:193022.1 61026/001

and their creditors.  As the US Court stated at the IFSA approval hearing:

> [I]t would have been very difficult for this Court to have arrived at an allocation process as fair as these parties have here in this settlement.  And it certainly meets the requirements of Section 105(a) and 363(b), as well as Rule 9019.  It is in the best interest of the [US] debtors' estate.[29]

The US Court's order approving the IFSA confirmed that "such relief is in the best interests of the US Debtors, their estates, their creditors and the parties in interest . . . ."[30]

28.     It is simply not plausible that the US Court would have found the allocation process provided in the IFSA as being "in the best interests of the [US] debtors' estate" if the Court had any reason to believe that the Canadian Debtors intended to argue that they were entitled to 100% of the sale proceeds from the Patent Sale.  It is equally implausible that the US Debtors, acting in accordance with their fiduciary duties, would have agreed to relinquish their license rights without first securing the right to receive a portion of those sale proceeds based upon the value of the rights being relinquished.

      iv.     <u>The Nortel Estates' Serious Consideration of Multiple Approaches to Monetizing the Patent Portfolio Further Undermines the Canadian IP Theory</u>

29.     The inclusion and involvement of NNI and the other Exclusive Licensees, as well as the Bondholder Group and the Committee, in efforts to monetize the Nortel IP confirms that the Exclusive Licenses granted the Exclusive Licensees substantial rights to exploit the Patent Portfolio and therefore had significant value.  The parties spent over two years exploring complex strategies to maximize the value of the Nortel IP, developing viable options, and, finally, achieving consensus.  The parties were focused throughout this process on finding a solution that would maximize value on the understanding that such value would be allocated pursuant to the

---

[29]     June 29, 2009 Tr. of Hr'g at 57:20-25 [D.I. 1042].

[30]     Order Approving the Interim Funding and Settlement Agreement, at 2, *In re Nortel Networks Inc., et al.*, No. 09-10138 (Bankr. Del. June 29, 2009),  [D.I. 993].

DOCS_DE:193022.1 61026/001

IFSA.  The Canadian Debtors did not mention their IP Theory at any time during this process, nor did they tell anyone that they would contend that, if the parties decided to sell the Patent Portfolio (as opposed to pursuing the other available options), that such a decision would result in the Canadian Debtors retaining all of the value thereof.

30.      In January 2010, a steering committee ("IP Steering Committee") of representatives of each of the Nortel Debtors was formed to address issues related to the Nortel IP, including monetization.[31]  A further IP working group ("IP Working Group") comprised of representatives from each of the Nortel Debtors, Lazard, the Bondholder Group, and the Committee was formed and "seriously evaluated a number of options for monetization."[32]  The IP Steering Committee and IP Working Group focused on two monetization strategies, (i) selling the Patent Portfolio in one or more sales, or (ii) pursuing an IPCo business model that would generate revenues for all of the Nortel Debtors' estates.[33]  The IP Steering Committee was committed to both options and, from January 2010 until early 2011, pursued them in parallel.[34]

31.      If pursued, the IPCo business model would have given value to the Exclusive Licenses even under the Canadian IP Theory.  As discussed more fully in the pre-trial brief of the

---

[31]      John Ray Decl. ¶ 51.

[32]      *Id.* at ¶ 54.

[33]      *Id.* at ¶ 52; *see also* TR43725 at 4 (Mar. 22, 2010, Patent Portfolio Work Plan); *see also* TR21281 at ¶ 15 ("Over the course of 2010, Nortel [defined as NNC collectively with all its subsidiaries], in consultation with its financial and legal advisors and various stakeholders, considered different methods of monetizing the Residual IP, including licensing the Residual IP to third parties to generate revenues and conducting a sale process for all of the Residual IP.  Nortel ultimately concluded that a sale of the Residual IP was the best method of monetizing the Residual IP for the benefit of all its stakeholders.").

[34]      John Ray Decl. ¶ 54; *see also* TR43638 (Disclaimer to May 2010 Executive Summary of Patent Portfolio prepared by Nortel in conjunction with Lazard and Global IP Group, stating: "While Nortel will be soliciting expressions of interest in purchasing some or all of Nortel's patents, Nortel has not determined whether it will sell any of the patents, and the scope of the sale has not been predetermined … Nortel reserves the right to reject any and all expressions of interest and the right to pursue other alternatives to monetize its patent portfolio, including retaining ownership of some or all of the patents and licensing them to interested parties and soliciting expressions of interest in third party investment in retained ownership.") ("May 2010 Patent Portfolio Executive Summary")

15

US Interests, the Canadian IP Theory rests on the (inaccurate) assumptions that (i) the Exclusive Licenses held value only if the US and EMEA estates were using the Exclusive Licenses to develop Nortel products or services, and (ii) the US and EMEA estates were no longer developing such products or services at the time of the Patent Sale. It is beyond dispute, however, that under the IPCo business model, the US and EMEA estates would have been engaged, at all times, in the service business of marketing patent licenses to third parties in exchange for royalties. Thus, under the Canadian Debtors' IP Theory, the Exclusive Licenses would have continued to generate significant value for the US and EMEA estates.

32.    Contrary to the Canadian Debtors' representations, the IPCo business model was a "seriously considered and viable approach to IP monetization"[35] that was borne of "[m]ore than a year of presentations, calls, in-person meetings, and email correspondence"[36] involving representatives and advisors from all parties, including the Bondholder Group and the Committee. Nortel represented in its May 2010 Patent Portfolio Executive Summary that it was "poised to implement a licensing campaign from within the company or to assist a buyer of the portfolio in doing so."[37] As of late September 2010, the value expected to be generated from the IPCo business model exceeded the value of any bids received that Nortel had received to purchase the Patent Portfolio.[38]

33.    Through the end of 2010 and early 2011, NNI and the other Nortel Debtors continued to pursue the IPCo model and a sale process in parallel. During that time, NNI and the other Nortel Debtors retained the right to pursue *either* the Patent Sale or the IPCo business

---

[35]    Reply Declaration of John J. Ray III, dated April 25, 2014 at ¶ 5.

[36]    *Id.* at ¶ 6; *see also* TR47264 (Email chain from Jan. 2011 titled "Re: Nortel IP Follow-up Information Request").

[37]    TR43638 at 4.

[38]    John Ray Decl. ¶ 60.

16

model:

> NNI and the other debtors maintained complete optionality at all times to pursue either strategy or to go in another direction, including restarting NNI as an operating business. . . . While the decision to pursue the Patent Sale was made jointly, NNI at all times had the right, at its sole discretion, to withdraw from the sale process.[39]

34.     In April 2011, NNI and the other Nortel Debtors finally received a proposal to purchase the Patent Portfolio for a price ($900 million) that the parties concluded should be pursued as a "stalking horse" bid.  As part of signing up the Stalking Horse Agreement, the Nortel group of companies (the "Nortel Group") agreed that it would cease its own efforts to pursue the IPCo business model as an alternative to the Patent Sale.  But that agreement did not foreclose third parties (including the Bondholder Group) from proposing a transaction that incorporated some version of the IPCo business model as part of the ensuing auction process.[40]

35.     Ultimately, after receiving acceptable bids at the auction, the US Debtors and the Bondholder Group embraced results of the Patent Sale instead of the IPCo business model.  They did so, however, with the clear understanding that all of the Nortel Debtors' estates would be allocated a share of the Patent Sale proceeds, in accordance with the IFSA and the Canadian Debtors' other representations.[41]  Similarly, the Exclusive Licensees terminated their Exclusive Licenses—a condition of the Patent Sale insisted upon by the buyer, Rockstar Bidco—with the expectation of receiving a meaningful portion of the proceeds.[42]  No rational party would have agreed to terminate its Exclusive License for no consideration—particularly when the termination was required (presumably because the purchasers recognized that the value of the

---

[39]     John Ray Decl. ¶¶ 62-63.

[40]     *See* Order Authorizing Debtors' Entry into the Stalking Horse Asset Sale Agreement, at Ex. 1 (Bidding Procedures) *In re Nortel Networks Inc., et al.*, No. 09-10138 (Bankr. Del. May 2, 2011), [D.I. 5359; 5359-1].

[41]     *See* Alan Bloom Tr. 87:11-16; 219:14-16; Cosme Rogeau Tr. 55:5-13.

[42]     Alan Bloom Tr. 86:15-21; Cosme Rogeau Tr. 55:24-56:9.

17

Patent Portfolio could not be unlocked unless the Exclusive Licenses were terminated) as a condition of the sale.  Section 2.04 of the License Termination Agreement, executed in connection with the Patent Sale, reiterated that "[e]ach seller shall have the right to an allocation of a portion of the sale proceeds."[43]

36.     In light of the foregoing, it is inconceivable that the US Debtors, with an exclusive, perpetual, royalty-free license in Nortel's largest and most profitable market, would have undertaken years of effort to monetize the Patent Portfolio or agreed to terminate their licenses solely for the benefit of the Canadian Debtors.

**B.     The Patent Sale Could Not Have Been Approved in the US Had the Canadian Debtors' Disclosed Their IP Theory**

37.     After the estates received and accepted the $4.5 billion bid from Rockstar Bidco, the US Court enthusiastically approved the Patent Sale as a "good and sufficient exercise by the [US] Debtors of their sound business judgment" that was "in the best interests of the [US] Debtors, their estates and creditors, and all parties in interest."[44]  The US Court did so, however, unaware that the Canadian Debtors would later argue that they were entitled to 100% of the proceeds of the sale being approved.[45]

38.     Indeed, the evidence presented by the parties to the US Court in support of the Patent Sale is inconsistent with the IP Theory.  The US Court rightfully understood that the Nortel IP was encumbered by the Exclusive Licenses because the Monitor's own reports, submitted in connection with the sale, indicated that the Exclusive Licenses applied to the Patent

---

[43]     TR21508 (License Termination Agreement).

[44]     TR21510 (Order Authorizing and Approving Patent Sale, July 11, 2011) ("Patent Sale Approval Order") [D.I. 5202] at 2.

[45]     The Monitor was fully aware that in order to approve the sale, the US Court was required to determine that the Patent Sale was in the best interests of the US Debtors.  *See, e.g.,* Murray McDonald Tr. 134:12-16 ("Q. Your understanding is the U.S. Bankruptcy Court has to make a specific finding that the transaction at issue is in the best interest of the U.S. debtors, correct?  A. Yes.")

Portfolio.[46]  The Canadian Debtors and the Monitor cannot now walk away from those

representations.  In fact, the US Court admitted two uncontested proffers into evidence in support

of the motion to approve the Patent Sale, one from David Descoteaux, a Managing Director at

Lazard, and the other from George Riedel, Chief Strategy Officer of Nortel.  Both presented

unrebutted testimony that the Patent Sale was a value-generating boon for the US Debtors and

was plainly in their best interests.[47]  The US Court also admitted into evidence the Seventy-First

Report of the Canadian Monitor, which recognized the US Debtors' "desire to maximize value

for the benefit of stakeholders in relation to the assets which are the subject of the Stalking Horse

Agreement."[48]  The US Debtors themselves represented that the Patent Sale was a "grand slam"

and a clear win for the US Debtors.[49]

39.    Following the hearing, the US Court issued its Patent Sale Approval Order,

memorializing its understanding that the Patent Sale constituted "a good and sufficient exercise

---

[46]    *See, e.g.*, Sixty-Third Report of the Monitor, dated April 14, 2011; Seventy-First Report of the Monitor, dated July 6, 2011.

[47]    *See* Patent Sale Hr'g Tr. 33:20-34:1 ("And Mr. Descoteaux first and foremost would testify that in his opinion, [the Patent Sale] is an appropriate exercise of the debtors' business judgment and appropriate realization of value to proceed with the sale and that the sale would bring more value to the debtors' estates and Nortel generally rather than retaining the patents and keeping them to reorganize around."); *see id.* at 36:6-9 ("And [Mr. Descoteaux] would testify that in his belief, the approval of the sale of assets pursuant to the sale agreement with Rockstar bidco would be in the best interest of the debtors, their creditors, and their estates."); *see id.* at 39:9-11 ("As such, Mr. Riedel would testify that he believes that selling the assets now is the best way to maximize the value for the debtors' estates."); *see id.* at 41:23-42:1 ("Mr Riedel would testify to his belief that the debtors' conclusion that the successful bid from Rockstar does constitute the highest and best offer received for the patent assets and does maximize the value for the debtors' estates.").

[48]    Seventy-First Report of the Monitor, dated July 6, 2011, at ¶ 15 [D.I. 5881-1] (TR21282); *see also Patent Sale Hg'g Tr.* 111:3-8 (In announcing his intention to approve the Patent Sale, Judge Gross noted: "I find that under the circumstances and based upon the evidence, the proffers that I admitted into evidence, as well as the monitor's 71st report that there is more than sufficient cause for a good faith finding under Section 363M here and there is no reason to stay the closing.").

[49]    The Patent Sale Approval Hearing was like a victory lap for the parties.  For example, Derrick Tay, counsel to the Canadian Debtors gleamed: "…the bottom line of what we've seen here is that this is, I think a shining example, and one of many examples that you've seen in this case, of the amazing things we can get done *when the estates work together*."  *See* July 12, 2011 Hr'g Tr. 56:10-14 [D.I. 5939] ("Patent Sale Hr'g Tr.") (emphasis added).  The US Court even singled out the US Debtors' accomplishments, noting: "I think that eventually someone is going to start to check what they have in the water at Cleary Gottlieb, but they've certainly been really quite remarkable in the auctions and in the sales and the terms and *benefits to the estate* that they've obtained."  *Id.* at 110:19-111:8 (emphasis added).

19

by the [US] Debtors of their sound business judgment, and [is] in the best interests of the [US]

Debtors, their estates and creditors, and all parties in interest."  (Patent Sale Approval Order at

13.)  The US Court ordered that the Patent Sale could be consummated without delay, noting:

"In order to maximize the value of the [US] Debtors' assets, it is essential that the Sale occur

within the time constraints set forth in the Sale Agreement."  (*Id.* at 14.)  Finally, in a statement

that is fatal to the Canadian IP Theory, the US Court found that "the [Patent] Sale Agreement

and the Closing ***will provide a greater recovery for the [US] Debtors' creditors than would be***

***provided by any other presently available alternative***."  (*Id.* (emphasis added).)  This

unequivocally shows that the US Court understood, based on the evidence presented by the

parties, that the Patent Sale would not, under any circumstances, result in none of the sale

proceeds going to the US Debtors.  Counsel to the Canadian Debtors did not correct the US

Court's understanding.

### C.    It Would Have Been Illogical for the US and EMEA Estates to Consent to the Patent Sale Had the Canadian Debtors' IP Theory Been Advanced

40.    Representatives from the US and EMEA Debtor estates have testified

emphatically that they would not have supported the Patent Sale had it been determined that the

Canadian Debtors would be entitled to all of the resulting proceeds.[50]  This evidence was

unchallenged and uncontradicted.  The US and EMEA Debtors were aware of and strove to

---

[50]    John Ray Decl. ¶¶ 68, 75; Alan Bloom Tr. 96:11-22 ("Q. Had you known that the Canadian Monitor and debtors would ultimately take this position, would you have unconditionally supported the residual IP sale in the manner that the EMEA debtors did?  A. No. [Objection] Q. Would you have spent so much of the EMEA debtors' time and money trying to maximize the value of the residual IP? [Objection] A. No."); Cosme Rogeau Tr. 55:5-19 ("Q. Was it your understanding at the time you agreed to the license termination that while the amount that NNSA would receive would be decided at a later date, NNSA was guaranteed a portion of the sale proceeds? [Objection] A. Absolutely, and we even considered that the sizeable amount for which this was being sold was a very good piece of news.  Q. Was the agreement of the parties that each seller would get a portion of the sale proceeds material to your decision to approve the sale on behalf of NNSA? [Objection] A. It was the determining factor.")

fulfill their fiduciary duties to maximize value for their respective creditors.[51]  They also

recognized that their Exclusive Licenses to exploit Nortel's IP in their respective jurisdictions

had real value—value that they could not and would not have relinquished for nothing.[52]

41.     Had the Canadian Debtors' current position been known at the time, the US

Debtors and the EMEA Debtors would have been legally obligated to take—and would have

taken, along with the Bondholder Group—very different steps to protect the value of the

Exclusive Licenses.  As an initial matter, the parties undoubtedly would have asked the Courts

for a determination of whether the Exclusive Licenses would be rendered worthless by the

consummation of any of the business line sales or the Patent Sale.  In addition, there were several

alternatives to the Patent Sale that could have been pursued, including (i) resuming operations of

NNI, (ii) pursuing the IPCo business model, or (iii) insisting that the business lines be sold after

the sale of the Patent Portfolio.  Each of these alternatives would have allowed the US Debtors

and the EMEA Debtors to preserve the Exclusive Licenses to generate at least some value for the

benefit of their respective creditors.[53]

## III.    GLOBAL SUBSTANTIVE CONSOLIDATION IS CONTRARY TO APPLICABLE LAW AND INAPPROPRIATE ON THE FACTS

42.     The UKPC and the CCC (together, the "Global Sub Con Proponents") have each

proposed, as an "allocation" position, creditor distribution theories that would ignore corporate

form, eliminate the guarantee claims of the Bondholder Group and many other creditors

(including the UKPC), and pool Nortel's global assets into a common fund, or "single pool."

---

[51]    *See* John Ray Decl. ¶¶ 45, 70; Alan Bloom Tr. 97:24-98:3 ("Q. Did – in connection with your duties as joint administrator do you have a duty to try to maximum [sic] value for the EMEA Debtors? A. Yes, for the EMEA creditors."); Cosme Rogeau Tr. 87:6-15 ("Q. Did you have a fiduciary duty to maximize value for NNSA? A. Without any doubt. Q. Do you believe that the representatives of the other Nortel entities with whom you were working in connection with these sales understood that you had that obligation? [Objection] A. I would presume so.  I don't see how they could conceivably imagine any other solution.")

[52]    *See* Alan Bloom Tr. 97:19-23; Cosme Rogeau Tr. 86:23-87:5.

[53]    *See, e.g.*, John Ray Decl. ¶¶ 70-71.

21

The pooled assets would then be available to each creditor of the Nortel estates, wherever situated, to claim against, and receive distributions from, *pari passu* with all other creditors worldwide regardless of the nature of their claims.  Although the Global Sub Con Proponents go to great lengths to describe their approaches as "pro rata distribution," rather than substantive consolidation, the effect of their approaches would be the unprecedented global substantive consolidation of all the Nortel Debtors' estates.

43.      Arguments in favor of global substantive consolidation should be rejected by the Courts for three reasons.  <u>First</u>, the "pro rata distribution" methodologies are irrelevant to the current dispute which seeks to determine how the escrowed funds should be ***allocated*** as among the US, Canadian, and EMEA ***Debtor estates***, not how funds should be ***distributed*** to ***creditors*** pursuant to applicable plan and claims resolution processes in each relevant jurisdiction.  <u>Second</u>, global substantive consolidation should be rejected because it has no basis in either international or domestic law.  And, <u>third</u>, the factual record cannot support consolidation because (i) the Bondholders, and numerous other creditors, actually relied on the separateness of the various Nortel entities when transacting with them, and (ii) there is no evidence that Nortel's assets and liabilities are entangled, much less "hopelessly entangled," such that all creditors would be harmed absent substantive consolidation.

A.      **"Pro Rata Distribution" is Not an Allocation Methodology and Should Be Rejected as Irrelevant to the Courts' Analysis**

44.      The question presently before the Courts is how the aggregate sale proceeds generated by the sales of substantially all of the assets of the Nortel Group should be allocated among the US, EMEA, and Canadian Debtor estates.  The Global Sub Con Proponents ignore this threshold question and instead answer a different question, one that will be answered by each estate only ***after*** it has received its allocated share of the sale proceeds; that is, how each estate

22

should *distribute* its allocated share of the sale proceeds to its *creditors*.  Specifically, the UKPC

seeks a "*pro rata* dividend to be paid to the *proven creditors* of each of the US Debtors, the

Canadian Debtors and EMEA Debtors."  (UKPC Initial Allocation Brief at ¶ 68 (emphasis

added).)  Similarly, the CCC, as an alternative to the Canadian IP Theory, seeks an "Equitable

Allocation Order" that would distribute the Sale Proceeds "so as to effect a *pro rata* **distribution**

*among Creditors*, ratably by valid Claims."  (CCC Initial Allocation Brief at ¶ 5(b) (emphasis

added).)

      45.     There can be no doubt that this trial is intended to resolve *allocation*, not to

implement distributions.  Indeed, the Allocation Protocol adopted by the Courts explicitly

defines the purposes of these proceedings as "the *allocation* of Sale Proceeds *among the Selling*

*Debtors*."  (Allocation Protocol [D.I. 10565-1] at ¶ 1 (emphasis added).)  Consistent with the

Allocation Protocol, the Courts' subsequent orders repeatedly refer to the pending proceeding as

the "Allocation Trial."  (*See, e.g.*, Amended Order Re Allocation Trial Protocol, entered by the

US Court on March 21, 2014 [D.I. 13208].)  Moreover, with limited exceptions,[54] the Courts

have made clear that the resolution of creditor claims is not part of the Allocation Protocol or

these proceedings.  (*Id.*)  Instead, the US Court clearly envisioned that  assets would first be

allocated to each estate *and then* distributed to creditors.  *See In re Nortel Networks Corporation,*

*et al.*, 426 B.R. 84, 93 (Bankr. D. Del. 2010) (characterizing Debtors' insolvency proceedings as

"highly complex liquidation to assemble the assets, reduce them to money, *allocate those assets*

*among numerous entities in many countries and then distribute the assets*") (emphasis added).

---

[54]     Exceptions were made for certain claims made by (i) the EMEA Debtors and/or Joint Administrators against the US Debtors, the Canadian Debtors, and the Directors and Officers; and (ii) the UKPC against the US Debtors and the Canadian Debtors.  (Allocation Protocol at ¶¶ 5, 6.)  The US Debtors have since settled claims made against them by the EMEA Debtors and/or Joint Administrators and the UKPC.  The claims made against the Canadian Debtors and the Directors and Officers are the subject of a trial scheduled to commence in July 2014 in the Canadian Court.

23

This is consistent with, and reflected by, the allocation positions submitted by all Core Parties, other than the Global Sub Con Proponents.

46.     Judge Leif M. Clark and Prof. Jay L. Westbrook ("Clark & Westbrook") submitted a joint report and testified as purported expert witnesses in support of the UKPC's pro rata distribution approach.  They each testified that their opinion addresses distribution, not allocation.  Specifically, Clark & Westbrook advocate in their expert report for "a single-pool distribution" of Nortel's assets to creditors.  (Expert Report of Leif M. Clark & Jay L. Westbrook ("Clark & Westbrook Report") at ¶ 53 (emphasis added).)  At his deposition, Westbrook agreed that this approach is not relevant to the allocation of the sale proceeds among the Nortel Debtors.  (Westbrook Tr. 33:4-7, 33:9-18.)  Indeed, in response to questions from counsel for the UKPC, Westbrook clearly stated that an allocation of lockbox funds to the Debtor entities *and then* to creditors would be inconsistent with his proffered single pool approach.  (*Id.* at 215:4-20.)

47.     Westbrook further admitted that if the Courts seek to allocate the funds to each estate before distributing them to creditors, his theory is of *no value* to the Courts' analysis.  (*See id.* 33:4-7, 33:9-18.)  In Westbrook's own words, "if we've arrived at the point where the decision has been made to *allocate*, then the court has decided to pursue a course different from the one that, in my opinion, should be pursued, so we are, if you will, *out of the zone of my report*."  (Westbrook Tr. 36:17-25 (emphasis added).)  As the Courts have repeatedly made clear, we have *already* "arrived at the point where the decision has been made to allocate."  (*See, e.g.,* Order Denying Request for Oral Argument at This Time at 1 ("[t]o every thing there is a season, and a time to every purpose under the heavens.  This is the season for the Allocation Trial") (internal citation omitted).)

48.     Accordingly, because the UKPC and CCC advocate theories for distributions to

creditors, and not a theory for allocation to the estates, their allocation positions should be rejected as irrelevant to the matter at hand.

**B.      No Legal Grounds or Precedent Exists for Non-Consensual Global Substantive Consolidation of the Nortel Debtors' Estates**

i.      The Global Sub Con Proponents are Asking for Substantive Consolidation

49.      Although it is absurd, given the substance of the relief being requested, to debate whether their approach is one of substantive consolidation, the UKPC and the CCC actually dispute the point.  Substantive consolidation "treats separate legal entities *as if* they were merged into a single survivor left with all the cumulative assets and liabilities (save for inter-entity liabilities, which are erased).  The result is that claims of creditors against separate debtors morph to claims against the consolidated survivor."  *Owens Corning*, 419 F.3d 205 (3d Cir. 2005) (internal quotation and citation omitted) (emphasis added).  The Global Sub Con Proponents argue that their "pro rata" distribution theories are somehow different from substantive consolidation because they would still recognize the existence of the separate Nortel Debtor estates, using them as conduits through which sale proceeds are funneled to effect this pro rata distribution to creditors "regardless of the jurisdiction in which they reside." (Memorandum of the UK Pension Claimants (Opposing the US Interests' Motion to Strike the Pro Rata Experts, dated April 28, 2014 [D.I. 13418], ¶ 57.)  Label it as they may, they are asking the Courts to substantively consolidate the Nortel Debtors' estates on a global basis.  Indeed, the UKPC concede that their distribution theory is "loosely premised on a substantive consolidation construct that would produce a broadly uniform dividend payable from each debtor estate to proven creditors of the Group."[55]

---

[55]      UKPC Initial Allocation Brief at ¶ 61; *see also* CCC Response to the Core Parties' Opening Allocation Positions at ¶ 36 (noting that "an allocation resulting in a common recovery to all Nortel creditors" would be the same outcome as if the Nortel Debtors' estates were substantively consolidated).

25

50.     Rather than allocating the sale proceeds according to the value of the assets relinquished by each estate, the Global Sub Con Proponents would, consistent with the *Owens Corning* Court's description of substantive consolidation, distribute the assets based on the total amount of worldwide claims.  (UKPC Initial Allocation Brief at ¶¶ 54, 68; CCC Initial Allocation Brief at ¶¶ 16, 60.)  That is, the Global Sub Con Proponents would first "morph" the claims of creditors against the various Nortel Debtors' estates into a single pool of claims against the consolidated assets of the Nortel Group.  (*Id.*)  Then, to implement a pro rata distribution to creditors, they reverse engineer their preferred result by calculating what amount of the consolidated assets (*i.e.*, sale proceeds) must be distributed to each estate to provide for this pro rata distribution to its creditors.  (Expert Report of Thomas Britven on Valuation and Other Issues Related to the Allocation of Sales Proceeds to the Nortel Debtor Groups, dated January 24, 2014 (the "Britven Report"), at ¶¶ 3.13-3.15, 8.3-8.7; *see also id.* at Schedule 3.)

51.     In a blatant attempt to avoid the "substantive consolidation" label, the Global Sub Con Proponents inject the Nortel Debtors' estates in the distribution process and argue that they are advocating for an "allocation" to the estates based on what each estate needs to effect a pro rata distribution to creditors.  Having the Nortel Debtors' estates act as a conduit through which the sale proceeds would be distributed to creditors on a globally pro rata basis does not transform their theories into an allocation approach.  It leads to exactly the same outcome as global substantive consolidation.  (Westbrook Tr. 16:16-21.)

ii.     Global Substantive Consolidation Has Never Been Ordered

52.     Even if the Courts were to consider the pro rata distribution theories as part of the Allocation Trial, they should be rejected on legal grounds.  Specifically, global substantive consolidation must be rejected because, absent consent from all parties in interest, a court cannot substantively consolidate estates of debtors within that court's jurisdiction with estates of debtors

26

outside that court's jurisdiction.

53.    Indeed, the Bondholder Group knows of *no court* in the US or Canada, or in any other jurisdiction for that matter,[56] has *ever* ordered the non-consensual, global substantive consolidation of debtor entities in different countries.  Courts in both the US and Canada have held that substantive consolidation is a "rare" remedy "of last resort" when applied *domestically***,** but they have never applied the doctrine across international borders without the consent of all parties.  *In re Owens Corning*, 419 F.3d at  212; *Northland Props. Ltd. (Re)*, (1988), 69 C.B.R. (N.S.) 266 (B.C. S.C.) [*Northland*], ¶ 49.  It should therefore not be surprising that no public disclosure filed by NNC prior to the commencement of these insolvency cases warned of the risk of a global substantive consolidation.[57]

54.    Faced with the reality of the state of US and Canadian law, the UKPC points instead to principles of "international law" to support their theory.  But even the international legal reform bodies referred to by the UKPC, which themselves recognize that their proposals have to be adopted by legislatures, have not made any legislative recommendations with respect to the application of substantive consolidation to international insolvencies of enterprise groups, and no legislature has considered or passed such a sweeping reform.

55.    Similarly, the United Nations Commission on International Trade Law

---

[56]    The Bondholder Group is not aware of any court in the U.K. imposing substantive consolidation on a domestic enterprise group over the objection of parties in interest.  Indeed, in support of their statement that "[e]quitable distribution based on relative proven creditor claims" has been applied in the U.K, the U.K. Pension Claimants cite only to *consensual* "pooling agreements."  (U.K. Pension Claimants' Initial Allocation Position at ¶ 59(c).)

[57]    In contrast, the theoretical possibility of a *domestic* substantive consolidation of Nortel entities in the US was disclosed by NNC in its Form 10-K for the fiscal year ended December 31, 2008 (the "2008 NNC 10-K").  (TR40269.)  Specifically, the 2008 NNC 10-K, filed after the commencement of these proceedings, disclosed that "an interested party in the Chapter 11 Proceedings, including any of the U.S. Debtors, could request that the assets and liabilities of *NNI, or those of other U.S. Debtors*, be substantively consolidated with those of one or more *other U.S. Debtors*."  (TR40269 at CCC0099058 (emphasis added).)  But neither the 2008 NNC 10-K, nor any subsequent 10-Ks filed by NNC, disclosed a risk of *global* substantive consolidation of the US, Canadian, and EMEA Debtor estates.

27

("UNCITRAL") Working Group V (Insolvency) has not made any headway on the issue.  In July

of 2010, a year and a half after the commencement of these insolvency cases, Working Group V

adopted Part III of the UNCITRAL Legislative Guide on Insolvency Law which focuses on

*domestic* insolvency cases of enterprise groups.  Part III of the Legislative Guide includes

recommended legislative provisions for the purpose of, *inter alia*, specifying "the ***very limited***

circumstances in which the remedy of substantive consolidation may be available" in ***domestic***

insolvency cases.  UNCITRAL Legislative Guide on Insolvency Law, Pt. III: Treatment of

Enterprise Groups in Insolvency (2010) (TR11438) at p. 71 (emphasis added).  With respect to

insolvencies of international enterprise groups, such as Nortel, Working Group V has yet to

agree on any substantive legislative reforms.  As Westbrook conceded during his deposition,

there currently is no law in the US or Canada that would support his proposed "single pool"

distribution theory.  (Westbrook Tr. 170:22-171:18.)

> iii.    A Court-Imposed Global Substantive Consolidation of the Nortel Debtors' Estates
>         Would Have a Significant Negative Impact on Global Capital Markets

56.    Because there is no precedent for cross-border substantive consolidation, an order

imposing such a remedy in this case—thereby rendering worthless the guarantees in the Bonds

and those of other creditors—would have a profound, negative effect on capital markets.  The

consequences could include not only decreased liquidity and increased costs of borrowing, but

also an arbitrary transfer of wealth from structurally senior creditors to more junior creditors.

(Expert Report of Robert Kilimnik ("Kilimnik Report") at ¶¶ 17-19; Expert Report of John J.

McConnell ("McConnell Report") at ¶¶ 67-70.)

57.    When investors purchase bonds, they "rely on guarantees as an essential element

of the structural 'security package' being offered to help reduce the risk exposure of lenders over

the term of the loan."  (Kilimnik Report at p. 2.)  "Guarantees are a way for lenders or

bondholders to contractually protect themselves through separate claims to multiple pools of either cash flows or assets in the event of a default by the issuer."  (Kilimnik Report at p. 6.)  Thus,"[i]n making purchasing decisions, bondholders expect that corporate separateness will be respected and guarantees will be enforced."  (Kilimnik Report at p. 5.)

58.    By disregarding corporate separateness as a matter of course, the adoption of the Global Sub Con Proponents distribution theories would create a new "normal."  Indeed, the single pool distribution theory proffered by Clark & Westbrook would, by their own admission, apply to extinguish corporate separateness for nearly every multinational enterprise group.  (Westbrook Tr. 48:8-24; *see also id.* 44:20-45:16.)  As a result, multinational entities would be incapable of even issuing guaranteed debt that had any chance of operating as contracted, and any guaranteed debt already issued would be rendered effectively unguaranteed.  Capital markets have an aversion to uncertainty and, faced with the potential that guarantees will be eliminated by a court in a bankruptcy, market participants would most likely respond in the short-term by instituting a freeze on bond purchases.  (Kilimnik Report at p. 8.)  In the medium and long-term, bond purchasers would demand enhanced disclosures, more protective terms, and higher spreads to attract buyers.  (*Id.*; *see also* McConnell Report ¶¶ 68, 69.)  This would drive up the cost of borrowing and decrease corporations' access to capital markets, potentially making it unavailable in certain circumstances.  (Kilimnik Report at p. 8.)

59.    Moreover, global substantive consolidation would result in an immediate and drastic change in the price of outstanding corporate debt.  Bonds are priced based on the issuer's perceived credit risk, and elements of security, such as guarantees, have a direct impact on the ultimate price paid for borrowing.  (Kilimnik Report at ¶¶ 2, 10, 12.)  If courts were to order global substantive consolidation, existing senior loans and bonds (*i.e.*, those secured by

guarantees or other credit enhancements) would fall in price while existing junior loans and bonds (*i.e.*, those without guarantees or other credit enhancements) would rise in price. (McConnell Report at ¶ 67.)

60.     The market prices for Nortel debt securities bear this out.  If investors anticipated the risk of a court-imposed global substantive consolidation of the Nortel Debtors' estates, "all of Nortel's bonds would have traded at similar prices as of Nortel's bankruptcy date."  (McConnell Report at ¶ 53.)  Since April 2009, however, the Bonds guaranteed by NNI have consistently traded at prices **well above** those received for the bonds without an NNI guarantee, which only have access to recoveries from NNL's estate.  (McConnell Report at ¶¶ 53-56.)  Thus, sophisticated investors and market participants clearly value guarantees that would be rendered worthless by an unprecedented global substantive consolidation decision.

61.     The impact of a global substantive consolidation order would reach far beyond the vested expectations of the members of the Bondholder Group.  As the *Owens Corning* Court recognized, "[t]o overturn this bargain, set in place by [a debtor's] own pre-loan choices of organizational form, would cause chaos in the marketplace, as it would make this case the Banquo's ghost of bankruptcy."  *Owens Corning*, 419 F.3d at 216.

## C.     The Requested Global Substantive Consolidation of the Nortel Debtors' Estates is Contrary to Prevailing US and Canadian Law

62.     As discussed *supra*, there is no legal mechanism by which the Courts can effect *global* substantive consolidation of an international enterprise group such as Nortel., absent the consent of the requisite creditor majorities in the relevant jurisdictions.  Lest there be any doubt, if a plan that sought to render worthless the guarantees were proposed in either Canada or the US, it would be voted down by the Bondholder Group, the largest creditor in each estate.  In the US, Courts have held that substantive consolidation of domestic debtors  "should be rare" and is a

30

remedy "of last resort." *In re Owens Corning*, 419 F.3d at 212.  In Canada, courts similarly

consider substantive consolidation of domestic debtors to be extraordinary relief.  *See, e.g.,*

*Atlantic Yarns Inc. (Re)*, (2008) 42 C.B.R. (5th) 107 [*Atlantic Yarns*]; *Northland*, ¶ 49.  Thus,

even if the Courts were to apply a **hypothetical** analysis of global substantive consolidation of

the Nortel Debtors' estates using applicable domestic standards, it still should not be granted.

     i.     <u>Appropriate Standard for a Hypothetical Analysis of Global Substantive</u>
<u>Consolidation</u>

63.     The decision in *Owens Corning*, handed down by the United States Court of

Appeals for the Third Circuit in 2005, sets forth the applicable standard for the substantive

consolidation of a **domestic** enterprise group in the Third Circuit.  It is a useful guide for

determining whether substantive consolidation could be appropriate.  The *Owens Corning* court

warned that "because substantive consolidation is extreme . . . and imprecise, this 'rough justice'

remedy should be rare and, in any event, one of last resort after considering and rejecting other

remedies . . . ."  *Owens Corning*, 419 F.3d at 211.  Indeed, even in that seminal case, the Court

declined to substantively consolidate the estates of the separate domestic debtors.

64.     In *Owens Corning*, the Third Circuit adopted and refined the test articulated by

the United States Court of Appeals for the Second Circuit in *Augie/Restivo*,[58] and formulated two

factors, at least one of which must be proven by the proponent of substantive consolidation:

     (1)     That prepetition,[59] debtors disregarded separateness so
                 significantly their creditors relied on the breakdown of entity
                 borders and treated them as one legal entity; *or*

---

[58]    *Union Sav. Bank v. Augie/Restivo Baking Co., Ltd.*, 860 F.2d 515 (2d Cir. 1988).

[59]    Although the *Owens Corning* court is clear that the relevant creditor expectations are those formed ***before
the petition date***, Clark & Westbrook simply assume that the post-petition "global, nonterritorial realization
of assets" "is most likely to correspond to the actual expectations of creditors in dealing with an integrated
global enterprise operating under a single brand."  (Clark & Westbrook Report at ¶ 7.)  As discussed *infra*,
the Third Circuit requires proof of "actual reliance," before the petition date, by a real creditor.

      (2)      That post-petition, debtors' assets and liabilities are so scrambled that separating them is prohibitive and hurts *all* creditors.

*Owens Corning*, 419 F.3d at 211.

65.      The first factor protects prepetition expectations of creditors when they have been misled by a debtor's actions and thus perceived incorrectly that multiple entities were one.  *Id.* As the Third Circuit explained:

> A *prima facie* case for [substantive consolidation] typically exists when, based on the parties' prepetition dealings, a proponent proves corporate disregard creating contractual expectations of creditors that they were dealing with debtors as one indistinguishable entity . . . Proponents who are creditors must also show that, in their prepetition course of dealing, they ***actually and reasonable relied*** on debtors' supposed unity.

*Id.* at 212 (emphasis added).

66.      Even if the proponent of substantive consolidation can establish a *prima facie* case for substantive consolidation, "[c]reditor opponents of consolidation can nonetheless defeat a *prima facie* showing under the [creditor reliance] rationale if they can prove they are adversely affected and actually relied on debtors' separate existence."  *Id.* at 212 (footnote omitted).

67.      As to the second factor, post-petition "hopeless entanglement," the Third Circuit made clear that "[n]either the impossibility of perfection in untangling the affairs of the entities nor the likelihood of some inaccuracies in efforts to do so is sufficient to justify consolidation." *Id.* at 214.[60]   The Third Circuit further held that consolidation should be ordered not where it involves shifting of assets to benefit one group of creditors at the expense of others, but only where ***every*** creditor will benefit from consolidation.  *Id.*  As the Court explained, "the benefit to creditors should be from cost savings that make assets available rather than from the shifting of assets to benefit one group of creditors at the expense of another."  *Id.*

---

[60]      Clark & Westbrook, however, allege "the difficult task of sorting out inter-corporate claims and avoidance actions within the group and among group members, in order to arrive at a properly adjusted allocation of assets among entities and estates, also compels a single distribution."  (Clark & Westbrook Report at ¶ 7.) This is entirely contrary to the Third Circuit's holding and the facts of this case.

68.     Canadian courts have made reference to US case law in considering whether the extraordinary relief of substantive consolidation should be granted.  *See*, *e.g.*, *Atlantic Yarns*, ¶ 34; *Northland*, ¶ 49.  *Northland* is the leading case on substantive consolidation pursuant to the CCAA.  With reference to *In re Snider Bros.*, 18 B.R. 230 (Bankr. D. Mass. 1982), the *Northland* Court concluded that "[i]t would be improper to interfere with or appear to interfere with the rights of creditors" through substantive consolidation of the debtors absent a showing that the "elements of consolidation" are satisfied and that the harm prevented through consolidation outweighs the harm resulting from its imposition.  *Northland* , ¶ 59.

69.     Generally, where domestic substantive consolidation has been ordered in Canadian cases, it has been done with strong, and most often, unanimous creditor support.  There are no cases in which substantive consolidation has been ordered over the objections of a debtor company.  There are similarly no Canadian cases where substantive consolidation has been ordered on a cross-border or international basis.

70.     Finally, this discussion of the law of Canada and the US does not even consider the law of the other jurisdictions that would be implicated in a substantive consolidation decision. For example, a decision determining that there should be a substantive consolidation of the Nortel Debtors' estates, resulting in a pro rata distribution to all creditors, would necessarily require a consideration of the relative rights to recovery of creditors of NNSA, which is in administration proceedings in France.  The UKPC and the CCC do not address how these Courts could ignore the corporate form of a French entity in its own administration proceedings.  This omission alone is fatal to their arguments.

ii.    The Global Sub Con Proponents Cannot Establish a *Prima Facie* Case for Global Substantive Consolidation

71.    The Global Sub Con Proponents cannot credibly contend that the believed that Nortel was a single, unitary entity without regard to the separateness of the various legal entities. The very nature of their claims renders any such assertions frivolous.

72.    The members of the UKPC have asserted claims against NNUK in respect of a funding deficit in the defined benefit pension plan for employees of NNUK.[61]  On two occasions prior to the commencement of these insolvency cases, the Nortel Networks UK Pension Trust Limited (the "Trust") specifically negotiated for and obtained contract-based guarantees from NNL in respect of NNUK's pension plan funding deficit—thus relying on the ability to assert a second claim against another Nortel entity.  The first guarantee (the "Funding Guarantee"), executed by NNL and the Trust on November 21, 2006, "irrevocably and unconditionally" guaranteed performance of certain funding obligations by NNUK.  (TR41344 at EMEAPRIV0300687.)  The second guarantee (the "Insolvency Guarantee"), executed by NNL and the Trust on December 21, 2007, specifically contemplated the potential insolvency of NNUK.  (*See* TR21438 at 3.)  That is, in the event of NNUK's insolvency, the Insolvency Guarantee obligated NNL to pay the Trust $150 million or the amount of the pension plan's deficit, as calculated pursuant to the terms of the Insolvency Guarantee and UK law.  (*Id.* at 335, 338.)[62]

73.    It is illogical for the UKPC to now argue that they "actually and reasonably relied" on the supposed unity of all of the Nortel entities.  Both the Funding Guarantee and the

---

[61]    *See* Amended Proofs of Claim of the Trustee of Nortel Networks UK Pension Plan and the Board of the Pension Protection Fund, filed on September 5, 2012 against NNI and Nortel Networks (CALA) Inc., and listed on the US Debtors' claim register as proof of claim numbers 8357 and 8358.

[62]    The description herein of the Funding Guarantee and the Insolvency Guarantee is not intended to concede either the validity or the enforceability of either guarantee, which we understand to be disputed by NNL.

34

Insolvency Guarantee would have been meaningless if the Trust believed that "Nortel globally," and not solely NNUK, was responsible for NNUK's obligations to the UKPC. Indeed, Nortel employees testified that they understood the Trust was a creditor of just NNUK, and that the Trust sought the guarantees as a means of limiting their exposure to "unforeseen events" at NNUK. (Hern Tr. 75:10-17, 84:21-85:6; Staunton Tr. 208:17-25.)

74.    Similarly, the CCC is defined as an "ad hoc group of officially authorized representatives of employee and employee benefits creditors asserting direct claims ***solely against the Canadian parent and certain Canadian affiliates***."[63] In the very definition of their affiliation, the CCC itself recognizes the separateness of the Nortel estates and the fact that its constituents hold claims solely against the Canadian parent and certain Canadian affiliates. (*See, e.g.*, CCC Initial Allocation Brief at ¶ 1 (stating that the CCC has "asserted approximately $3 billion in Claims against the Canadian Debtors").) The CCC has not asserted any direct claims against US or EMEA Debtors. (*See* DLA Amended 2019 Statement at 1-3.)

      iii.    <u>Even if a *Prima Facie* Case for Global Substantive Consolidation Could Be Established, It Can Be Defeated by the Bondholder Group and Other Significant Creditors Who Relied on the Separateness of the Nortel Entities</u>

75.    Even if the Global Sub Con Proponents could establish a *prima facie* case for substantive consolidation of the Nortel Debtors, which they cannot, "[c]reditor opponents of consolidation can nonetheless defeat a *prima facie* showing under the [creditor reliance] rationale if they can prove they are adversely affected and actually relied on debtors' separate existence." *Owens Corning*, 419 F.3d at 212 (footnote omitted). As discussed below, the evidence clearly demonstrates that the members of the Bondholder Group and other creditors have relied on the

---

[63]    Amended Verified Statement Pursuant to Bankruptcy Rule 2019 of DLA Piper LLP (US), dated June 5, 2013 [D.I. 10761] ("<u>DLA Amended 2019 Statement</u>") at 1 (emphasis added); *see also* Allocation Protocol, Appendix A (defining the CCC as an "ad hoc committee of major creditors having claims *only against the Canadian Debtors*" (emphasis added).)

35

separateness of the various Nortel entities and would be seriously harmed if the Nortel Debtors'

estates were consolidated.

> (a)    *A Global Substantive Consolidation of the Nortel Debtors' Estates*
>        *would Harm Creditors*

76.    Global substantive consolidation would have a significant, negative impact on the

members of the Bondholder Group and similarly-situated creditors.  Substantive consolidation

"restructures (and thus revalues) rights of creditors," as "claims of creditors against separate

debtors morph into claims against the consolidated survivor."  *Owens Corning*, 419 F.3d at 205

(internal quotations and citation omitted).  Thus, a global substantive consolidation of the Nortel

Group would render the bargained-for guarantees held by members of the Bondholder Group

worthless by, in effect, "'[c]ommunizing' assets of affiliated companies to one survivor to feed

all creditors of all companies."  *Id.* at 216.

77.    This "communizing" of assets is specifically designed to harm the holders of the

Bonds, whose NNI guarantees were an integral part of the financing bargain embodied in the

relevant indentures.  (*See* Kilimnik Report ¶¶ 12-15.)  The underwriters of the Bonds guaranteed

by NNI, as the proxy for future bondholders, "lawfully bargained prepetition for unequal

treatment by obtaining guarantees of separate entities."  *Owens Corning*, 419 F.3d at 216.  The

guarantees enabled the issuers of the Bonds to raise funds in the capital markets at prices and on

terms (which included the guarantees) that were acceptable to both the issuers and the

underwriters.  (*See* Kilimnik Report ¶ 10.)  For example, Nortel executives involved in the

$2 billion offering of high yield bonds in 2006 testified that underwriters required an NNI

guarantee and that the presence of the guarantee lowered the cost of borrowing.  (Williams Tr.

197:22-200:2; Currie Tr. 262:14-263:21; *see also* Binning Tr. 149:19-50:16.)

78.    In addition, all creditors of the US Debtors, including the members of the

Bondholder Group, would be adversely affected by global substantive consolidation.  First,

substantive consolidation would dilute the recoveries of all creditors of the US Debtors by

forcing such creditors to share their recoveries with creditors of all other entities.  Moreover, the

Global Sub Con Proponents' proposed theories would eliminate the $2 billion claim of NNI

against the Canadian Debtors, which has already been allowed pursuant to an order of these

Courts.  This would result in a smaller pool of assets against a larger pool of creditors would be

able to assert claims.

> (b)    *Holders of the Bonds Were Told They Could Rely on the Nortel Debtors' Separate Corporate Existence*

79.    The documents evidencing the issuance of the Bonds clearly and unequivocally

provide a basis for holders of the Bonds to rely on the separateness of the Nortel entities.  This

reliance was based, in part, on the various offering memoranda and/or prospectuses concerning

the Bonds.  These documents explicitly provide that the issuers' "subsidiaries are **separate and

distinct legal entities** and any subsidiary that is not a Guarantor will have no obligation . . . to

pay amounts due under the Notes or the Guarantees . . . ."  (TR40117 at CCC0004626 (emphasis

added); *see also* TR40118 at CCC0005276; TR40115 at CCC0004151.)  The guarantees were

provided by specific legal entities, as set forth in the relevant indentures.  The Indenture

Trustees, cognizant that recourse on the Bonds is limited only to those specific Nortel entities

that issued or guaranteed the Bonds, filed claims in respect of the Bonds against each of those

entities, but only those entities.[64]

80.    This reliance on corporate separateness is consistent with the understanding of

Nortel executives involved in the $2 billion offering of high yield Bonds in 2006.  One former

---

[64]    *Compare* TR40050 (Proof of Claim filed by The Bank of New York Mellon against NNI, in its capacity as guarantor of certain Bonds) *with* TR40047 (Proof of Claim filed by The Bank of New York Mellon against NNL, in its capacity as issuer of certain Bonds).

Nortel executive testified that the high-yield market was "highly focused on entities," forcing NNI to attach a guarantee to the Bonds. (Williams Tr. 197:22-200:2; *see also* Currie Tr. 263:14-264:4, 266:3-17.) Other Nortel executives, including two former Nortel Chief Financial Officers, testified that creditors requested an NNI guarantee because they viewed NNI's assets as support for lending to NNL. (Binning Tr. 150:3-7; Currie Tr. 262:25-263:21.)

81.    Indeed, evidence in the record indicates that, in September of 2005, Nortel employees considering the issuance of new debt from NNI were concerned that such bonds "would be structurally better than all . . . existing bonds at the NNL level," resulting in a split credit rating and requiring the provision of an NNI guarantee to the existing unguaranteed bonds. (TR44287 at 1.) In May of 2006, certain Nortel employees reconsidered adding an NNI guarantee to existing bonds because, in their view, the "scarcity value" of an NNI guarantee could positively impact the price of the subsequent bond issuance. (TR21312.)

82.    Other Nortel entities, such as NNUK, were not offered as guarantors of the Bonds because they were neither the source of significant revenue nor a repository of significant hard assets. (*See* Currie Tr. 263:22-264:4; *see also* Affidavit of Peter Currie, dated April 11, 2014 ("Currie Aff."), ¶ 90.) Market participants performed rigorous due diligence to ensure that they were satisfied with Nortel's financial outlook. (*See* Currie Aff. ¶ 92.) The NNI guarantee provided lenders with added security, thereby lowering the cost of NNL's borrowings. (Binning Tr. 149:13-150:16; Currie Tr. 262:25-263:21.) Notably, not one of the Nortel Debtors' estates is advocating for or supporting substantive consolidation.

83.    Creditor expectations and reliance are consistent with the views of the credit research and rating agencies that perceived the NNI guarantee as valuable. For example, Dominion Bond Rating Service ("DBRS"), a Toronto-based provider of credit rating opinions,

issued a rating report on July 18, 2008 confirming its rating of "the short- and long-term debt of

Nortel Networks Corporation, Nortel Networks Limited and Nortel Networks Capital

Corporation." (TR50791 at 1.) The report included a detailed organizational chart illustrating

Nortel's capital structure and the sources of bond issuances and guarantees. (*Id.* at 3.) Notably,

the report highlighted the fact that the Bonds "that carry a guarantee from the US subsidiary NNI

have superior recovery prospects as the guarantee provides these debt issues with an implied

structural preference and a superior claim relative to the notes that do not carry such a guarantee."

(*Id.* at 10.) Conversely, according to DBRS, Bonds without an NNI guarantee "have recovery

prospects in default that are inferior to debt that carries the NNI guarantee."[65] (*Id.* at 11.)

84. Standard & Poor's ("S&P") reached a similar conclusion. On November 21, 2008,

S&P issued a "Recovery Report" detailing NNL's "recovery rating profile." (TR49843 (Nortel

Networks Ltd.'s Recovery Rating Profile, *Standard & Poor's* Global Credit Portal RatingsDirect,

November 21, 2008).) The report rated Bonds without a guarantee from NNI at "CCC" while

rating Bonds with an NNI guarantee at "B-." (*Id.* at 2-3.) S&P reasoned that "NNI represents a

material portion of the company's revenues, cash flow, and assets" and thus, "those obligations

that benefit from the NNI guarantee would be likely to enjoy superior recoveries compared" to

those obligations without the guarantee.[66] (*Id.* at 3.) Indeed, as discussed *supra*, in the post-

petition period, the Bonds guaranteed by NNI have consistently traded at prices well above those

---

[65]    Although DBRS did not issue a split credit rating, it did note that Bonds "that carry no guarantee from NNI"
had an expected recovery in default below that of the anticipated recovery on Bonds carrying the guarantee.
(TR50791 at 11.)

[66]    Notwithstanding the fact that the DBRS and S&P reports, discussed *supra*, attributed greater recovery
value to the Bonds with an NNI guarantee than to those without an NNI guarantee, Moody's Investor
Service ("Moody's"), in a report dated December 16, 2008, stated: "[t]echnically, however, there are two
note issues that are not pari passu, However, since the financial consequences of this situation are not
determinable and are, in any case, thought to be minimal, Moody's rates all of the Nortel group of
companies' debts as is they were pari passu." (TR12045 at 3.) Moody's, of course, was mistaken. The
Nortel Group commenced these insolvency cases a mere four weeks later.

received for the Bonds without an NNI guarantee.  *See supra* Section III.B(iii).

> iv.    Global Substantive Consolidation is Not Appropriate Under the Hopeless
> Entanglement Prong of the *Owens Corning* Test

85.    The "hopeless entanglement" prong of the *Owens Corning* test is an extremely

difficult standard to meet.  As that Court made clear, "[n]either the impossibility of perfection in

untangling the affairs of the entities nor the likelihood of some inaccuracies in efforts to do so is

sufficient to justify consolidation."  *Owens Corning*, 419 F.3d at 214.  Thus, although

"imperfection in intercompany accounting is assuredly not atypical in large, complex company

structures," the Third Circuit was "loathe to entertain the argument that complex corporate

families should have an expanded substantive consolidation option in bankruptcy."[67]  *Id.* at 215.

For that reason, "commingling justifies consolidation **only** when separately accounting for the

assets and liabilities of the distinct entities will reduce the recovery of **every** creditor—that is,

when every creditor will benefit from consolidation."  *Id.* at 214 (emphasis in original).

86.    There is no evidence that suggests that the assets and liabilities of the Nortel

Group are so scrambled that to unravel them would be prohibitively costly and harm **all** creditors.

> (a)    *It is Not Impossible to Identify the Separate Assets and Liabilities
> of the Three Major Nortel Debtors' Estates*

87.    The evidence clearly shows that, in the prepetition period, the Nortel Group's

assets and liabilities were tracked and accounted for on an entity-by-entity basis.  For example:

- All Nortel entities maintained separate financial books and records.[68]

- Each entity's cash was kept separate and there was no intermingling of
  one entity's cash with any other entity's cash.[69]

---

[67]    Notwithstanding this concern expressed by the Third Circuit, Prof. Westbrook, in acknowledging that
Nortel was run the way many multinational enterprises are run, testified that, in the event of insolvency,
such multinational enterprises should be handled with a single-pool distribution.  (Westbrook Tr. 45:5-16,
48:8-24.)

[68]    *See, e.g.*, Doolittle Tr. 39:10-40:7; McCorkle Tr. 160:2-16; Rolston Tr. 161:13-15.

- Intercompany loans were created, tracked and documented according to specific corporate procedures.[70] When necessary, the relevant entities' boards reviewed and approved the transactions.[71]

- All Nortel entities prepared their own, entity-specific financial statements, which were audited by local auditors and reviewed and approved by their respective boards of directors.[72]

- All Nortel entities filed and paid taxes in their respective home jurisdictions in accordance with local law.[73]

88.     Although the "hopeless entanglement" test focuses on the post-petition period, the Nortel Group's ability to trace cash on an entity level, account for intercompany loans, and prepare and maintain entity-specific financial statements in the prepetition period is instructive. At his deposition, Judge Clark agreed.  In his view:

> [I]f I had three companies with three sets of financial statements and a clear cash management system that made it possible to, at any given moment in time, determine whose cash was whose, and I could also identify whose assets were whose, and I had no difficulty establishing intercompany payables and receivables, those could easily be adjusted, that's **not a particularly good case for my model.**

(Clark Tr. 103:3-104:2 (emphasis added).)

89.     It should come as no surprise then that, in the post-petition period, there has been little difficulty separating the assets and liabilities of the various Nortel entities.  Since the commencement of these insolvency cases, the US Debtors, Canadian Debtors, and EMEA Debtors have operated under separate legal regimes, including filing separate required financial information in the relevant insolvency proceedings.  (*See, e.g.*, TR11360; TR11365; Eighty-

---

[69]    Doolittle Tr. 258:9-259:3.

[70]    *See, e.g.*, Doolittle Tr. 40:15-23, 43:23-44:8; Widdowson Tr. 194:3-13; TR22049.

[71]    Currie Aff. ¶ 75.

[72]    *See, e.g.*, *id.* ¶ 39.  Although NNC typically filed consolidated financial statements with the SEC [and Canadian regulators], the 2007 and 2008 NNC 10-Ks, which were filed subsequent to Nortel's final pre-petition public debt offerings, included entity-level financial data.  (TR40268 at CCC0098871-885; TR40269 at CCC0099233-244.)

[73]    *See, e.g.*, Binning Tr. 148:13-23;.McDonald Tr. 225:8-10; Rolston Tr. 161:16-18.

Seventh Report of the Monitor, dated July 19, 2012, at 9, 10, 45-48.)  Additionally, in order to

sell the business lines, audited carve out financials for the major lines of business were created

that show the revenue and cash flow produced by each jurisdictional entity in each business line.

(TR50790 (Optical and Carrier Ethernet); TR50786 (Carrier VOIP Business); TR50788

(Enterprise).)

90.      This is consistent with the testimony provided by Nortel employees.  Jean-Marie

Lesur, NNSA's Finance Director, testified that it is not difficult to determine the assets of each

entity because "each company had an asset base which was regularly audited both under US

GAAP and under local statutory GAAP."  (Lesur Tr. 110:10-111:4.)  Similarly, Peter Look,

former VP and Tax Leader of NNL, testified that it would be "difficult but not impossible" to

value Nortel entities on their own.  (Look Tr. 218:4-7, 218:10-11.)

91.      This is also consistent with representations made by the professionals responsible

for winding down the affairs of the US Debtors, the Canadian Debtors and NNSA.  For example,

John Ray, the Principal Officer of NNI and its affiliated US Debtors, stated that "NNI and the

other US Debtors have maintained their corporate formalities and separateness in the post-filing

period."  (John Ray Decl.  ¶ 32.)  In addition, the Monitor's Eighty-Fourth Report, dated April 5,

2012, stated that "the interdependency of the Nortel entities has diminished" and that the

implementation of plans for separating the estates' IT functions had made "considerable

progress."  (TR49820 at UCC0065767-68.)  In fact, the Canadian Debtors had "successfully

completed the separation of several shared applications including migrating to a standalone

accounting and reporting system."  (*Id.*)  Similarly, Rogeau, testified that NNSA was "absolutely"

able to generate a list of its own creditors and had "no difficulty at all" informing NNSA's

creditors of the liquidation proceedings.  (Rogeau Dep. 95:14-19, 94:25-96:6.)  According to

Rogeau, NNSA was able to identify its creditors and the amounts of their claims by reference to its books and records.  (*Id.*  97:12-16, 97:25-98:3, 98:5-8.)

> (b)    *The Intercompany Claims of the Three Major Nortel Debtors' Estates are Substantially Resolved*

92.    There are three principal Nortel Debtor estates and thus, six possible categories of intercompany claims that could be asserted among them.  To date, all but the EMEA Debtors' claims against the Canadian Debtors and any counterclaims of the Canadian Debtors against the EMEA Debtors—which will be heard and resolved by the Canadian Court after the conclusion of the Allocation Trial—have been substantially resolved.  On December 18, 2009, the US Debtors and the Canadian Debtors reached an agreement, approved by both Courts, allowing the US Debtors a $2 billion claim against the Canadian Debtors and waiving the right of the Canadian Debtors and Monitor to assert any additional pre-petition claims against the US Debtors (unless the US Debtors pursued any additional claims against the Canadian Debtors).  (TR46910 (Final Canadian Funding and Settlement Agreement) at §§ 10, 12, 13.)  Similarly, on January 7, 2014, the US Court approved an agreement between the US Debtors and the EMEA Debtors that resolved all claims between them.[74]  The fact that all significant intercompany claims among the three Nortel Debtors' estates have been or will be resolved is not only a testament to the diligence and hard work of the parties involved, but it also should weigh heavily in the Courts' analysis of "hopeless entanglement."

93.    Westbrook agrees.  Although he was asked to assume, based on a selectively crafted set of facts provided to him by counsel to the UKPC, that "it was a practical impossibility to tease things apart and reallocate" the assets and liabilities of the Nortel Group by legal entity,

---

[74]    Order Approving the US Claims Litigation Settlement Agreement By and Among the Debtors, the Creditors' Committee, the Joint Administrators, the EMEA Debtors, Nortel Networks Optical Components Limited, Nortel Telecom France SA, the Liquidator, the French Liquidator, the UK Pension Parties and Certain Affiliates [D.I. 12785].

when asked to assume the facts in evidence (*i.e.*, that intercompany claims had been substantially resolved), he conceded that "if there are no claims left to be sorted out, then that would reduce substantially our concern about the fairness versus the cost of dealing with these entities entity by entity." (*Compare* Clark & Westbrook Report ¶ 42 *with* Westbrook Tr. 138:20-139:13; *see also id.* 136:2-5, 136:13-16.)

(c)  *Separating the Assets and Liabilities of the Nortel Group is not so Costly that it Harms all Creditors*

94.    As discussed *supra*, much of the work of separating the assets and liabilities of the Nortel Group and settling the intercompany claims has been completed and the costs have been incurred.  Thus, the cost of any remaining "disentanglement" of assets and liabilities will have little impact on the recovery of **any** creditor of **any** Nortel Debtor.  In contrast, a global substantive consolidation of the Nortel Debtor estates would severely harm the Bondholders and other creditors who specifically negotiated for guarantees.

95.    The magnitude of this harm is illustrated by the report of Thomas Britven, an expert witness retained by the CCC.  According to Britven, the Bondholders would recover 100% of their approximately $4.2 billion claim under any of the other parties' proffered allocation approaches.[75]  Under the Global Sub Con Proponents' proffered "pro rata distribution" approach, however, Britven estimates that Bondholders would recover just 71.2% of their claims, or $2.91 billion.[76]  Thus, under Britven's own analysis, global substantive consolidation of the Nortel Debtor estates would harm the Bondholders by at least $1.182 billion, which amount greatly exceeds any cost of any remaining "disentanglement."

96.    Moreover, a global substantive consolidation of the Nortel Debtors' estates would

---

[75]    Rebuttal of Thomas Britven to Reports of Messrs. Kinrich, Zenkich, Malackowski, Huffard, Bazelon, Green, and Berenblut and Cox, dated February 28, 2014, ¶ 2.9.

[76]    Britven Report ¶ 8.6, Schedule 3.

44

result in the elimination of the $2 billion judicially allowed claim by NNI against the Canadian

estates.  This would harm all creditors of the US Debtors' estates by significantly reducing the

pool of assets available for the US Debtors to distribute to their creditors in an amount likely

exceeding any purported cost of "disentanglement."  Accordingly, any remaining

"disentanglement" of the Nortel Debtors is not cost-prohibitive and would not harm all creditors.

       v.      <u>Substantive Consolidation May Not Be Used as a Sword</u>

       97.      Finally, as the *Owens Corning* Court unequivocally stated, substantive

consolidation "may be used to remedy the identifiable harms caused by entangled affairs, [but] it

***may not be used offensively*** (for example, having a primary purpose to disadvantage tactically a

group of creditors in the plan process or to alter creditor rights)."  *Owens Corning*, 419 F.3d

at 211 (emphasis added).  This is precisely what the Global Sub Con Proponents have set out to

do—alter creditor rights and expectations through the elimination of the Bondholder Group's

guarantees and the $2 billion allowed claim of NNI against the Canadian Debtors for the singular

purpose of increasing their recovery at the expense of other creditor groups.

       98.      For this and all of the other foregoing reasons, the Courts should reject the request

of the UKPC and CCC for global substantive consolidation of the Nortel Estates.

## IV.     THE EMEA DEBTORS' APPROACH TO CONTRIBUTIONS TO R&D IS FLAWED

       99.      The EMEA Debtors propose a contribution-based allocation theory that finds its

roots in transfer pricing methodology embodied in the MRDA—the agreement that the estates

entered into effective January 1, 2001, to minimize Nortel's global tax rate through a transfer

pricing system based on each estate's R&D spending.  The EMEA Debtors' approach, which

actually attempts to allocate the assets to the various Nortel Debtors' estates, is a more principled

approach than global substantive consolidation and the Canadian IP Theory, but it too is flawed.

**A.    The Transfer Pricing Methodology Embodied in the MRDA is Not an Appropriate Guide for Allocation**

100.    The main problem with the EMEA Debtors' contribution approach is that it uses a cost-based approach to allocation of value, rather than one based on the revenue that each of the Nortel Debtors' estates generated for Nortel.  Although the estates agreed in the MRDA to use a transfer pricing system based on each estate's R&D spending for the purposes of minimizing their tax exposure, the MRDA was a tax-driven document that was never meant to apply to the valuation of the Debtors' assets or to the allocation of sale proceeds.[77]  Indeed, the MRDA *expressly states* that it does not apply to the allocation of sale proceeds.[78]  The MRDA cost-based approach is also inappropriate because it is inconsistent with economic reality in that buyers of intellectual property take into account the expected benefits or fair market value of intellectual property, not the cost of its development.[79]

101.    For these and the other reasons set forth in greater detail in the US Debtors' pre-trial brief, although the EMEA Debtors' approach has some merit, it is less appropriate for allocation than the US Debtors' fair market value approach, which the Bondholder Group fully supports.

**B.    EMEA Erroneously Implements its Allocation Theory**

102.    To the extent that the Courts were to adopt a contribution approach notwithstanding these flaws, the EMEA Debtors make several critical mistakes in *implementing* their theory.  These flaws result in a significant shift of value away from the US Debtors to the other estates, including the EMEA Debtors.

---

[77]    *See* Eden Report at 58-68.

[78]    *See* TR21003 at Sched. A (excluding "gain/loss on the sale of businesses" from operating earnings/loss when calculating RPSM percentages).

[79]    *See* Kinrich Rebuttal Report ¶¶ 116-119.

46

103.    According to their expert witnesses, the EMEA Debtors would allocate the sale

proceeds based on the historical R&D spending percentages of each of the Nortel Debtors'

estates from 1989 to 2008.[80]  This methodology only accounts for the direct R&D contributions

incurred by each estate in its own geographic territory, ignoring all amounts funded in the other

estates' geographic territories through transfer pricing adjustments.[81]  Transfer pricing

adjustments are critical in implementing any contribution theory, because to employ such a

theory one has to account for *all* of the R&D spending by the various estates.  It is undisputable

that the US Debtors paid not only for R&D within their own geographic territory but also for a

significant amount of the R&D conducted by the Canadian Debtors and the EMEA Debtors in

their respective territories.[82]

104.    Based on the erroneous implementation of their contribution theory, which

disregards substantial contributions made by the US Debtors, the EMEA Debtors would allocate

the total Nortel IP sale proceeds as follows: 17.4% to the EMEA Debtors, 39.6% to the Canadian

Debtors, and 42.9% to the US Debtors.

105.    Laureen Ryan, an expert in accounting and forensic investigations, was retained

by the US Interests to consider and opine on the EMEA Debtors' implementation of their

contribution-based approach.  In her report, Ryan makes the necessary transfer pricing

adjustments to the EMEA Debtors' calculation to account for the fact that the US Debtors funded

not only R&D in the United States but also in Europe and Canada.[83]  Ryan bases her transfer

pricing adjustments on Nortel's (i) cost-sharing worksheets from 1989 to 2000, when it operated

---

[80]    *See* Huffard Report ¶¶ 105-09.

[81]    *See* Ryan Rebuttal Report at 2, 3.

[82]    *Id*. at 2.

[83]    Ryan Rebuttal Report at 1-3, 15-17.

under a series of cost-sharing agreements, and (ii) transfer pricing worksheets from 2001 to 2008, when it operated under the MRDA.[84]

106.    After making all necessary transfer pricing adjustments, Ryan calculates that the allocation based on a contribution theory would allocate the total Nortel IP sale proceeds as follows:  66.3% to the US Debtors, 23.4% to the Canadian Debtors, and 10.4% to the EMEA Debtors.[85]  This outcome more accurately reflects the economic reality that the US Debtors, as the greatest revenue generators in the Nortel group, funded the majority of all Nortel R&D. Accordingly, if the Courts adopt a contribution-based approach to allocation, they should implement the approach as calculated by Ryan, which makes the necessary adjustments to accurately reflect the R&D contributions made by each Nortel Debtor estate.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Bondholder Group requests that the US and Canadian Courts (i) allocate the sale proceeds by determining the fair market value of each Selling Debtor's share of assets, rights, and property it sold or relinquished in the Sale Transactions, as advocated by the US Interests in their pretrial brief; and (ii) grant such other and further relief as the Courts deem just and proper.

---

[84]    Ryan Rebuttal Report at 1-3, 15-17.

[85]    Ryan Rebuttal Report at 1-3, 16-17.

DOCS_DE:193022.1 61026/001

Dated: May 2, 2014

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Peter J. Keane*
Laura Davis Jones (No. 2436)
Peter J. Keane (No. 5503)
919 N. Market Street, 17th Floor
PO Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400

-and-

**MILBANK, TWEED, HADLEY & M<sup>C</sup>CLOY LLP**
Dennis F. Dunne
Albert A. Pisa
Andrew M. Leblanc
Atara Miller
1 Chase Manhattan Plaza
New York, New York 10005-1413
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219

-and-

Thomas R. Kreller
601 S. Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone: (213) 892-4463
Facsimile: (213) 629-5063

-and-

**BENNETT JONES LLP**
Richard B. Swan
Gavin H. Finlayson
3400 One First Canadian Place, P.O. Box 130
Toronto, Ontario, M5X 1A4
Telephone:  (416) 777-5762
Facsimile:  (416) 863-1716

*Attorneys for Ad Hoc Group of Bondholders*

49