Court File No.  09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS*
*ARRANGEMENT ACT,* R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED

**AFFIDAVIT OF CLIVE V. ALLEN**

**(SWORN APRIL 11, 2014)**

I, **Clive V. Allen,** of the City of Toronto, in the Province of Ontario, **MAKE OATH AND SAY:**

1.     I am a retired senior officer of Northern Telecom Limited, having previously served as a senior officer of its predecessor company, Northern Electric Company, Limited, and just prior to my retirement, as a senior officer of Nortel Networks Limited ("NNL" which encompasses Nortel Networks Limited and its predecessor companies as applicable), and thus have personal knowledge of the matters deposed herein.

2.     I graduated from McGill University in 1956 with a Bachelor of Arts (Economics and Political Science) and in 1959 with a Bachelor of Civil Laws, and after completion of Articles was admitted to the Bar of the Province of Quebec in 1960.

3.     Prior to joining Nortel,[1] I was in the private practice of law for six years and then served for eight years as legal counsel to the Canadian subsidiary of an American chemical company.

---

[1] "Nortel" refers to NNL, its predecessors and all of its direct and indirect subsidiaries.

**Career at Nortel**

4.      I joined Northern Electric Company, Limited in May 1974 as Assistant Vice-President and General Counsel, becoming Vice-President and General Counsel later that year and Senior Vice-President and General Counsel of Northern Telecom Limited (the new name of Northern Electric Company, Limited) in 1986.

5.      In 1998, in anticipation of my retirement, I assumed the position of Executive Vice-President – Law to allow the title of Senior Vice-President and General Counsel to be conferred upon my successor.

6.      I ceased to serve as Chief Legal Officer of Nortel on June 30, 1999 and commenced a one-year leave of absence, formally retiring on June 30, 2000.

7.      At all times during my employment at Nortel, I served as a senior executive officer and as its Chief Legal Officer, reporting directly to the Chief Executive Officer (or equivalent), and having world-wide responsibility for the legal activities of Nortel and all its subsidiaries and affiliates, with lawyers from many jurisdictions reporting directly or indirectly to me.

8.      In the latter years of my tenure, the Nortel Law Department comprised approximately 300 legal and patent professionals and support staff, situated in 25 offices in ten countries with an annual budget exceeding CDN $100 million.

9.      My Department's responsibilities included the handling of all legal matters, corporate secretarial activities, corporate governance and intellectual property matters on a world-wide basis.

10.     In the management of intellectual property matters, my Department made decisions *inter alia* regarding patent filings, enforcement and defence including intellectual property strategy, policies and management, the number of employees assigned to patent filing and

licensing, the patent and licensing budget, and the countries in, and the parties against whom, patent prosecutions and enforcement would take place.

11.    In the course of my tenure as Chief Legal Officer, I was involved in most aspects of Nortel's global operations and served on the Boards of Directors and Board and Management Committees of many Nortel subsidiaries throughout the world including, for example, in the 1990s those of Northern Telecom plc in the United Kingdom ("U.K.") and Northern Telecom France SA.

**History of Nortel**

12.    Nortel commenced operations as the manufacturing department of the Bell Telephone Company of Canada in 1883 and over a period of time evolved into a separate company, largely owned by The Western Electric Company, the wholly-owned manufacturing subsidiary of American Telephone and Telegraph Company.

13.    As a consequence of a 1956 United States anti-trust decree, Western Electric chose to dispose of its equity interest in Nortel, and as a result its Nortel shares were acquired over an eight year period by Bell Canada so that by 1964, Bell Canada was the owner of all the issued and outstanding shares of Nortel.

14.    Freed of the limitations imposed by its relationship with Western Electric, Nortel began to develop its own Technology[2] and thus introduced in 1967, as its first major product for the marketplace, the SP-1 central office switch.

15.    To facilitate the development of its own Technology, central R&D operations were established in Ottawa in a newly incorporated company called Bell-Northern Research Ltd. ("BNR"), jointly owned with Bell Canada. Smaller R&D facilities were located in

---

[2] Any reference to "Technology" herein shall include but not be limited to "patents, technical information, know-how, trade secrets, industrial design and trade dress, trademarks, software and cross-licenses."

some of Nortel's Canadian manufacturing facilities. BNR was primarily responsible for fundamental research and some development while the de-centralised facilities concentrated on the development of products originating at those manufacturing facilities.

16.     In the late 1960s and early 1970s, Nortel also began to develop new markets, especially in the United States, but also in other parts of the world including, for example, Turkey where in the late 1960s it established NETAS, a joint venture with the Turkish Post, Telephone and Telegraph organization. The principal American Nortel subsidiary, at the time called Northern Telecom Inc. (later, "Nortel Networks Inc."), commenced operations in Massachusetts in 1972 to serve as both a manufacturer and distributor of Nortel products in the United States.

17.     Northern Telecom Limited became a publicly-traded company in Canada in 1973 and in the United States in 1975, but continued to have Bell Canada, and later BCE Inc., Bell Canada's successor corporation, as the major shareholder until the 1990s.

18.     In 1974, marketing subsidiaries were established in Europe, Asia and Latin America, and over the years additional manufacturing, marketing and service operations were established throughout the world, so that at its peak Nortel carried on business directly or indirectly in more than 150 countries of the world.

19.     Nortel revolutionized telecommunications world-wide with the introduction in North America of digital switching when it offered in the late 1970s the SP-1 Private Automatic Branch Exchange (or "PABX", the switch board for businesses) and shortly thereafter the Digital Multiplex Systems ("DMS") family of central office switches, the backbone of telephone company operations. No other supplier of telecommunications equipment had this ground-breaking Technology available and the second largest company world-wide

4

in this business, International Telephone and Telegraph, was forced to dispose of its telecommunications business, selling most of its telecommunication operations to Alcatel-Alsthon SA. of France. This was the earliest of many ground-breaking industry "firsts" introduced by Nortel in the years that followed, so that by the mid-1980s Nortel was the world's leading supplier of fully digital telecommunications systems and was moving beyond manufacturing traditional land-line telephone technology and equipment into wireless networks and digital transmission.

20.    In the mid-1980's, Nortel's operations were structured around four main operating companies:

    a.  Nortel Telecom Canada Limited, responsible for the Canadian operations;

    b.  Northern Telecom Inc., responsible for the U.S. operations;

    c.  Northern Telecom International Limited, responsible for certain international markets; and

    d.  Northern Telecom Electronics Limited, responsible for semiconductor and other component manufacturing in various parts of the world.

21.    In additional to expanding internally, Nortel made a number of substantial acquisitions and investments commencing in the 1990's. For example, it acquired approximately 27% of STC PLC ("STC") in the U.K. in 1987 and then made an offer in 1991 for the balance of the outstanding shares, a total investment of approximately US $4 Billion. I was significantly involved in the STC acquisition and the sale of various STC lines of business following the acquisition.

22.    Nortel initially acquired a minority interest in STC to gain access to the U.K. market as the government-owned telephone monopoly in the U.K. (then the British Post Office and later British Telecom), like similar government monopolies elsewhere, was unwilling to

use non-local suppliers of telecommunications equipment, in spite of some other suppliers providing better products at lower prices. Nortel determined that the only way to achieve a sizeable presence in the U.K. was to purchase an existing supplier with manufacturing facilities in the region, with the expectation that the acquired business would ultimately migrate the customer to Nortel products manufactured in the U.K. Since Nortel's interest was in telecommunications equipment and not the other businesses of STC, Nortel concluded it was necessary to own the entire company and then divest those businesses that were not of interest to it.

23.     Following the STC acquisition, Nortel divested several of STC's lines of business including, for example, its substantial computer business, sub-marine cable business and electrical products distribution business.

24.     The acquisition was beneficial not only to Nortel but to STC as well, as STC gained access to Nortel's world-class technology and products which allowed it to compete more effectively against other U.K.-based suppliers and also to have access to Nortel resources outside of the U.K. and, because of Nortel's global presence, STC was able to sell its products into new markets.

**History and Evolution of the Cost Sharing Arrangements**

25.     To support the existence, and foster the growth, of its subsidiaries in the many new markets being developed by Nortel, NNL (or Northern Telecom Limited, as it was then known) the Canadian parent operating company, licensed its Technology which it had developed or acquired over the many years since its establishment to certain of its subsidiaries. The Technology was essential to those subsidiaries if they were to manufacture, or in some instances merely to sell, Nortel products.

26.     NNL, having developed and acquired the Technology in Canada as a tax-deductible expense, would be expected by Revenue Canada to be compensated for the licensing of Technology.

27.     Further, NNL could not operate an international business dealing with wholly-owned subsidiaries, partially-owned subsidiaries and affiliates, partnerships, joint ventures or otherwise, as well as unrelated third parties, if it did not have ownership and control of the Technology and the ability to manage the Technology throughout the world and exercise its ownership rights as it saw fit.

28.     To address these concerns, and to minimise the need for substantial up-front payments for Technology by subsidiaries, NNL established R&D cost sharing agreements ("Cost Sharing Agreements") with its major subsidiaries whereby NNL would license the Technology to subsidiaries to use NNL's Technology in connection with the manufacture and sale of Nortel products in return for contributions to the cost of on-going R&D expenses proportionate to the subsidiaries' use of the Technology, all based on complex formulas set forth in the Cost Sharing Agreements. I was significantly involved in the conception, drafting and implementation of the initial Cost Sharing Agreements in the 1970s and 1980s and oversaw the work of lawyers who prepared later versions of the Cost Sharing Agreements. Representative Cost Sharing Agreements are found as follows: at NNC-NNL11772029 is the Research and Development Cost Sharing Agreement ("R&D CSA") between Northern Telecom Limited and Northern Telecom plc, effective January 1, 1985; at NNC-NNL06005572 is the R&D CSA between Northern Telecom Limited and Northern Telecom (Ireland) Limited, effective January 1, 1985; at NNC-NNL006440 is the Amended R&D CSA between Northern Telecom Limited and Northern Telecom Inc., effective January 1, 1992; at NNC-NNL006465 is the Amended

7

R&D CSA between Northern Telecom Limited and Nortel Australia PTY Limited, effective October 1, 1992; at NNC-NNL006453 is the R&D CSA between Northern Telecom Limited and Nortel Limited, effective as of January 1, 1995.

29.     It is important to note that the Technology made available pursuant to the Cost Sharing Agreements was the product of almost one hundred years of Nortel's Canadian manufacturing experience and many more recent years of substantial R&D combined with rights also to use valuable patents of third parties which NNL had negotiated in cross-licenses with such technology heavyweights as Western Electric, IBM and L.M. Ericsson.

30.     Pursuant to the Cost Sharing Agreements, all Technology including all patents no matter where the invention was made, or which entity or entities provided the funding, remained at all times owned by NNL or its predecessors with subsidiaries only entitled to use of the patents in connection with the manufacture and sale of Nortel products, and having no ownership in the patents, copyrights and other Technology. In this regard the Cost Sharing Agreements were, and are, very clear and precise.

31.     During my tenure at Nortel, the function within the Law Department responsible for intellectual property matters, (including patents) was the Patent & Licensing Department, managed by Philip T. Erickson, Vice-President, Patents & Licenses, who reported directly to me. While he and some of his staff were located in the corporate headquarters, most of his staff was based in the Ottawa facilities of BNR, with other smaller offices, primarily in the United States and the U.K.

32.     NNL's subsidiaries also engaged in R&D essentially under the direction of BNR and, of course, pursuant to the Cost Sharing Agreements, any development or improvements (whether patentable or not) to the Technology vested in NNL. In Nortel's licensing of

8

Technology to third parties similar provisions applied. The developer of a Technology cannot be blocked from owning the evolution of that Technology by a third party who has acquired the right to use the underlying Technology initially from the developer.

33.    The overarching policy was to make Technology (including patents) necessary for the manufacture and sale of Nortel products available to the subsidiaries so that they could commence and continue operations based on Technology obtained at virtually no expense, subject to ongoing research and development costs as provided in the Cost Sharing Agreements. The Cost Sharing Agreements effected this arrangement through licenses and it was never intended that ownership of the Technology be transferred to the subsidiaries.

34.    Under the Cost Sharing Agreements, NNL assumed the costs associated with evaluating inventions for their patentability and prosecuting patent filings, and asserting, defending, and maintaining the patent portfolio.

35.    Ownership of all Nortel Technology by NNL was essential because it allowed NNL to control the use of Technology, to settle differences between subsidiaries and licensees, to determine the strategic direction of R&D, and to enter into advantageous licensing and cross-licensing arrangements with third parties.

36.    The subsidiaries benefited initially by being able to commence operations without substantial up-front costs for Technology and thereafter by having access to a much greater pool of Technology than they could ever afford (even if it was available) on an exclusive basis in their territories, subject of course to cross-licenses.

37.    In addition, these arrangements satisfied the requirements of the relevant fiscal authorities at that time, as NNL was receiving in an arms-length manner compensation for its

Technology and the subsidiaries in their jurisdiction were receiving good value for their contributions to R&D.

38.     Nortel's leadership in business and Technology enabled subsidiaries to commence their operations and produce "state of the art" products which allowed them to become important, and frequently dominant, players in their markets.

39.     In addition, with cost sharing of R&D throughout the Nortel family of companies, the R&D costs borne by the subsidiaries were a fraction of what the subsidiaries would have incurred as stand-alone companies. Subsidiaries had access to the results of R&D which would not have been economically viable for a stand-alone company. As only one example, there were no royalties or other fees paid by the subsidiaries that benefited from the use of cross-licenses with other major technology companies (including, for example, Western Electric, IBM and L.M. Ericsson among others).

40.     This was a rational arrangement for Nortel and consistent with the way in which other sophisticated international technology companies manage their technology. It worked well for both NNL and the many subsidiaries involved during the period of my responsibilities as Chief Legal Officer.

41.     I have reviewed a copy of each and every document that I refer to in my affidavit prior to swearing it.

**SWORN BEFORE ME** at the City of
Toronto, Ontario on April 11, 2014.

Commissioner for taking affidavits

Barbara Walancik

Clive V. Allen

**AFFIDAVIT OF CLIVE ALLEN (sworn April 11, 2014)**

**INDEX**

| Tab | Paragraph Referred to in Affidavit | Trial Exhibit Number | Bate Number |
|-----|-----------------------------------|----------------------|-------------|
| 1 | Paragraph 28 | TR45740 | NNC-NNL11772029 |
| 2 | Paragraph 28 | TR44284 | NNC-NNL06005572 |
| 3 | Paragraph 28 | TR21002 | NNC-NNL006440 (Exhibit 21002) |
| 4 | Paragraph 28 | TR43741 | NNC-NNL006465 |
| 5 | Paragraph 28 | TR11411 | NNC-NNL006453 (Exhibit 11411) |

## RESEARCH AND DEVELOPMENT COST SHARING AGREEMENT

Agreement made and entered into with effect as of and from the 1st day of January, 1985,

BY AND BETWEEN:                     NORTHERN TELECOM LIMITED,
                                    a corporation duly incorporated
                                    under the laws of Canada, having
                                    its executive offices at 33 City
                                    Centre    Drive,    Mississauga,
                                    Ontario,

AND:                                NORTHERN TELECOM plc,
                                    a   corporation   organized   and
                                    existing   under  the  laws   of
                                    England, having its head  office
                                    at    Berkeley    Square    House,
                                    Berkeley    Square,    London,
                                    England,

WHEREAS Northern Telecom (as hereinafter defined) and the Participant (as hereinafter defined) have in the past expended, and intend in the future to expend, substantial sums of money on research and development services or activities;

WHEREAS Northern Telecom and the Participant wish to utilize in their businesses the intangible technological property derived from such services or activities; and

WHEREAS Northern Telecom and Participant wish to share the costs and risks of research and development services or activities in return for interests in any intangible technological property that may be produced by such services or activities.

NOW, THEREFORE, THIS AGREEMENT WITNESSETH THAT, IN CONSIDERATION OF THE MUTUAL PROMISES HEREINAFTER SET FORTH, THE PARTIES AGREE AS FOLLOWS:

## ARTICLE 1
### DEFINITIONS

As used herein, unless otherwise defined:

(a)  "Northern  Telecom" shall mean Northern  Telecom  Limited,
     its Subsidiaries, including Participant, and  Affiliates,
     engaged in the manufacture of Products and/or research and
     development   services   or   activities,   excluding   Bell-
     Northern Research Ltd., BNR Inc. and BNR Limited;



CONFIDENTIAL

- 2 -

(b)     "Participant" shall mean Northern Telecom plc, its Subsidiaries and Affiliates engaged in the manufacture of Products and/or research and development services or activities in the United Kingdom, excluding BNR Limited;

(c)     "Products" shall mean all products, software and services manufactured or marketed, or proposed to be manufactured or marketed, at any time by Northern Telecom, and all components, parts, sub-assemblies and software associated with or incorporated in any of the foregoing;

(d)     "Participant's Sales" in respect of any calendar year shall mean an amount equal to the revenues of Participant, excluding revenues derived from Subsidiaries and Affiliates of Northern Telecom Limited, from the sale, lease, or licensing of Products, for such year;

(e)     "Planned Participant's Sales" in respect of any calendar year shall mean an amount equal to the planned revenues of Participant for such year, calculated mutatis mutandis as in the definition of Participant's Sales, as reflected in the approved Northern Telecom Limited Budget and Operating Plan;

(f)     "Consolidated Sales" in respect of any calendar year shall mean an amount equal to the consolidated revenues of Northern Telecom, excluding revenues derived from Subsidiaries and Affiliates of Northern Telecom Limited, from the sale, lease or licensing of Products, as reflected in the consolidated financial statements of Northern Telecom Limited for such year;

(g)     "Planned Consolidated Sales" in respect of any calendar year shall mean an amount equal to the planned consolidated revenues of Northern Telecom, excluding revenues derived from Subsidiaries and Affiliates of Northern Telecom Limited, from the sale, lease or licensing of Products for such year, as reflected in the Northern Telecom Limited Budget and Operating Plan.

(h)     "Research and Development" shall mean all research and development services or activities performed by or for Northern Telecom including, without limitation, development of methods, processes, procedures and tools related to manufacturing, installation, operation, maintenance and use of Products, but excluding services designated by Northern Telecom Limited as custom research and development;

(i)     "Aggregate R&D Costs" in respect of any calendar year shall mean an amount equal to the aggregate of all costs of Research and Development that are (i) approved as contemplated in Article 2 and (ii) incurred directly or indirectly by Northern Telecom for such year;

- 3 -

(j)   "Planned Aggregate R&D Costs" in respect of any calendar year shall mean an amount equal to the aggregate of all planned costs of Research and Development to be incurred directly or indirectly by Northern Telecom for such year, as reflected in the approved Northern Telecom Limited Budget and Operating Plan;

(k)   "Participant's R&D" in respect of any calendar year shall mean an amount equal to the aggregate of all costs of Research and Development that are (i) approved as contemplated in Article 2 and (ii) incurred directly or indirectly by Participant for such year;

(l)   "Planned Participant's R&D" in respect of any calendar year shall mean an amount equal to the aggregate of all planned costs of Research and Development to be incurred directly or indirectly by Participant for such year, as reflected in the approved Northern Telecom Limited Budget and Operating Plan;

(m)   "Participant's Share" in respect of Aggregate R&D Costs shall have the meaning ascribed thereto in Article 3;

(n)   "Participant's Cost Sharing Payment" shall have the meaning ascribed thereto in Article 3;

(o)   "Planned Participant's Cost Sharing Payment" shall have the meaning ascribed thereto in Article 3;

(p)   "Intangible Technological Property" shall mean any intangible technological property that is produced by Research and Development including:

   (i)   inventions, whether or not patented, formulas, processes, designs, patterns, and other proprietary know-how, and all patents, industrial designs (or equivalent) and copyrights, and applications with respect thereto;

   (ii)   drawings, reports, practices, specifications, software and other documentation and information related to the design, manufacture, installation, operation, repair, maintenance and use of Products; and

   (iii) any other technical information;

(q)   "Board of Directors" shall mean the Board of Directors of Northern Telecom Limited;

(r)   "Subsidiary" shall mean a corporation or company in which a Party hereto effectively owns or controls, and continues to own or control, directly or indirectly, more than fifty percent (50%) of the voting stock or shares;

CONFIDENTIAL

- 4 -

(s)   "Affiliate" shall mean a corporation or company which a Party hereto effectively controls, directly or indirectly, other than a Subsidiary, through the ownership or control of shares in the corporation or company; and

(t)   "United Kingdom" shall mean England, Scotland, Wales and Northern Ireland.


## ARTICLE 2
## RESEARCH AND DEVELOPMENT PROGRAM AND BUDGET

Budgets for the performance of Research and Development by or for Northern Telecom, and appropriations for expenditures on all Research and Development projects, shall, from time to time, be reviewed and approved by, or under authority from, the Board of Directors.

All costs incurred directly or indirectly within the Research and Development appropriations approved as contemplated above shall be paid for by the Party or its Subsidiary or Affiliate incurring such expense, and shall be shared by Northern Telecom and Participant as hereinafter set forth.

Except as otherwise directed by, or under authority from, the Board of Directors, all Research and Development services and activities carried out by or for Northern Telecom shall be carried out in Canada.


## ARTICLE 3
## COST SHARING OF RESEARCH AND DEVELOPMENT

Participant and Northern Telecom shall each bear its share of the Aggregate R&D Costs in respect of each calendar year during the term of this Cost Sharing Agreement as hereinafter provided, regardless of whether or not any Intangible Technological Property is successfully produced by any or all of the Research and Development conducted pursuant to this Cost Sharing Agreement.

Participant's share of the Aggregate R&D Costs in respect of each calendar year during the term of this Cost Sharing Agreement shall be an amount ("Participant's Share") equal to the product obtained by multiplying:

(a)   the fraction the numerator of which is Participant's Sales and the denominator of which is Consolidated Sales, by

(b)   Aggregate R&D Costs.



- 5 -

Participant's Cost Sharing Payment for each calendar year, to be paid as hereinafter provided, shall equal Participant's Share less Participant's R&D. In the event Participant's Cost Sharing Payment is negative, Northern Telecom Limited shall make payment to Participant as hereinafter provided.

Northern Telecom plc shall make payments to Northern Telecom Limited on account of Participant's Cost Sharing Payment in the manner hereinafter set forth, with an appropriate adjusting payment to be made as provided in the fourth paragraph of this Article 3. Such payments on account to be made with respect to each calendar year shall aggregate an amount ("Planned Participant's Cost Sharing Payment") equal to:

    (a)   the product obtained by multiplying

         (i)   the fraction the numerator of which is Planned Participant's Sales and the denominator of which is Planned Consolidated Sales, by

        (ii)   Planned Aggregate R&D Costs,

    less

    (b)   Planned Participant's R&D.

On or before December 15 in each year or as soon thereafter as is reasonably practicable, Northern Telecom Limited shall submit to Northern Telecom plc a statement showing Planned Participant's Cost Sharing Payment with respect to the subsequent calendar year, determined as hereinabove provided. Planned Participant's Cost Sharing Payment shall be paid by Northern Telecom plc to Northern Telecom Limited in twelve (12) equal monthly instalments within thirty (30) days of the date of the invoice therefor commencing in January of each year. In the event Planned Participant's Cost Sharing Payment is negative, such amount shall be payable by Northern Telecom Limited to Northern Telecom plc in like manner as hereinabove provided.

Within sixty (60) days following the end of each calendar year, Northern Telecom Limited shall furnish to Participant a statement certified by its chief financial officer or controller recording Aggregate R&D Costs, Participant's Sales, Consolidated Sales and Participant's R&D, and showing Participant's Share and Participant's Cost Sharing Payment, all in respect of such year. Northern Telecom Limited, or Northern Telecom plc, as the case may be, shall forthwith thereafter make an adjusting payment equal to the difference between the aggregate of the payments made pursuant to the third paragraph above and Participant's Cost Sharing Payment.



CONFIDENTIAL

- 6 -

The Parties may agree, from time to time, prior to the end of each calendar year, to an estimate or revised estimate of such adjusting payment and adjust the monthly payments hereinbefore determined, or otherwise make payment, according to such estimate or revised estimate, in which event the final adjusting payment to be made shall reflect such payment(s).


## ARTICLE 4
## LEGAL TITLE TO
## INTANGIBLE TECHNOLOGICAL PROPERTY


The Parties hereto acknowledge that, except as otherwise specifically agreed, legal title to all Intangible Technological Property whether now in existence or developed pursuant to the terms of this Cost Sharing Agreement, shall be vested in Northern Telecom Limited. With respect to patentable inventions and copyrightable property encompassed by Intangible Technological Property, Northern Telecom Limited shall have the exclusive right but not the obligation to file and prosecute applications in its name for patent or copyright protection in every country of the world. Participant shall execute or cause to be executed such documents reasonably requested by Northern Telecom Limited as may be necessary or desirable to give effect to the foregoing.

Participant shall, from time to time, promptly upon receipt of Northern Telecom Limited's request, and at Northern Telecom Limited's expense, furnish to Northern Telecom Limited all available and requested documentation relating to the Intangible Technological Property developed by or for Participant pursuant to the terms of this Cost Sharing Agreement.


## ARTICLE 5
## PARTICIPANT'S NON-EXCLUSIVE ROYALTY-FREE LICENSE
## TO INTANGIBLE TECHNOLOGICAL PROPERTY


To the extent of its legal right so to do, and subject to the rights of third parties under agreements to which Northern Telecom Limited is a party, Northern Telecom Limited, in consideration of Participant's sharing of the costs of Research and Development pursuant to this Cost Sharing Agreement, as from time to time amended, hereby grants to Participant a non-exclusive royalty-free license, including the right to sublicense, which, except as hereinafter provided, shall be in perpetuity to make, have made, use, lease and sell Products embodying Intangible Technological Property in the United Kingdom, and to sell Products embodying

CONFIDENTIAL

- 7 -

Intangible Technological Property in such other countries as may be approved in writing by Northern Telecom Limited, and to all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith.

Northern Telecom Limited shall, from time to time, promptly upon receipt of Participant's request, and at Participant's expense, furnish to Participant all available and requested documentation and other information relating to the Intangible Technological Property developed by or for Northern Telecom Limited pursuant to the terms of this Cost Sharing Agreement.

The rights granted under this Article shall not relieve either Party from its obligations in respect of royalty payments to third parties.


ARTICLE 6
CONFIDENTIAL INFORMATION


Participant acknowledges that Northern Telecom Limited is the legal owner of the Intangible Technological Property developed pursuant to this Cost Sharing Agreement and that the Intangible Technological Property is proprietary and constitutes a trade secret. Participant shall hold the Intangible Technological Property in confidence and only make use of, or disclose, it as permitted by this Cost Sharing Agreement.

Participant shall have primary right and obligation to protect through appropriate contractual arrangements, legal proceedings or otherwise the confidentiality of the Intangible Technological Property in and for the United Kingdom, subject to Northern Telecom Limited's right to file and prosecute applications for patent and copyright protection as hereinbefore provided.

Participant shall, during the full term of this Cost Sharing Agreement and for fifteen (15) years thereafter hold secret and not disclose, make known, divulge or communicate to any person (except Participant's employees and licensees as permitted under Article 5 and then only under an obligation of secrecy binding upon such employees and licensees) any of the Intangible Technological Property.

- 8 -

Participant shall not make or have made or permit to be made any copies or translations of the Intangible Technological Property except those copies or translations which are reasonably necessary for the exercise by Participant of the rights herein granted to it and all such copies or translations shall, upon reproduction by Participant, contain the same proprietary and confidentiality notices or legends which appear on the Intangible Technological Property made available to Participant under this Cost Sharing Agreement.

Notwithstanding the foregoing, Participant shall have the right:

(a) to communicate relevant portions of the Intangible Technological Property to suppliers in all countries of the world reasonably necessary for, and solely for, the procurement by Participant of commercially available materials and parts for use in the manufacture and/or installation of the Products; and

(b) to communicate to customers purchasing the Products, such portions of the Intangible Technological Property as are reasonably needed by such customers for operating and maintaining the Products;

provided, however, that the recipients of the Intangible Technological Property be advised by Participant, in writing, at the time, or before such communication, that proprietary information is being communicated and that such information is to be kept confidential and not used except as permitted hereunder, and provided further, that such recipients undertake, in writing, prior to disclosure, to respect such confidentiality.

The provisions of this Cost Sharing Agreement concerning confidentiality shall survive the expiration or termination of this Cost Sharing Agreement, but in no event shall such provisions apply to the extent that:

(a) Intangible Technological Property was supplied to Participant by an independent third party prior to the effective date of this Cost Sharing Agreement; or

(b) Intangible Technological Property becomes available to the general public through no fault of Participant.

CONFIDENTIAL

- 9 -

ARTICLE 7
LIABILITY

Neither Party makes any representation in respect to, and does not warrant, any Intangible Technological Property provided to the other Party hereunder, but shall furnish such in good faith to the best of its knowledge and ability. Without restricting the generality of the foregoing, neither Party makes any representation or warranty as to whether or not use of the Intangible Technological Property supplied hereunder will infringe any patent or other rights of any other person.

Participant shall have the primary right and obligation to bring and defend in and for the United Kingdom, at its own expense, and for its own benefit, any proceedings relating to alleged infringement of its rights to the Intangible Technological Property by a third party or the alleged infringement by Participant's use of the Intangible Technological Property of the rights of third parties. If Participant fails to act within sixty (60) days from the notice of any such alleged infringement, Northern Telecom Limited shall have the right to bring or defend, in and for the United Kingdom, the proceedings in its own name, at its own expense and for its own benefit.

Northern Telecom plc shall indemnify and save Northern Telecom Limited harmless from any and all claims and liabilities for damages, losses, expenses or costs (including counsel fees and expenses) arising in and for the United Kingdom out of any such infringement or alleged infringement by Participant.

ARTICLE 8
RECORDS

Northern Telecom plc shall keep or cause to be kept clear and accurate records with respect to the Research and Development costs incurred or planned to be incurred by Participant and to be shared pursuant to this Cost Sharing Agreement. Participant shall also keep clear and accurate records to support the calculations of Participant's Sales and Planned Participant's Sales. Northern Telecom Limited shall keep clear and accurate records to support calculations of the Aggregate R&D Costs, Planned Aggregate R&D Costs, Consolidated Sales and Planned Consolidated Sales. Both Parties shall provide to each other upon request, in such form as may reasonably be requested, documentation with respect to the foregoing.

NNC-NNL11772029 / 9

- 10 -

Each Party shall have the right to examine and audit, during normal hours, semi-annually (or at less frequent intervals) all such records and such other records and accounts as may under recognized accounting practices contain information bearing upon the amounts payable to it or the other Party under this Cost Sharing Agreement. Prompt adjustment shall be made by the proper Party to compensate for any errors or omissions disclosed by such examination or audit.


ARTICLE 9
FORCE MAJEURE


Neither Party shall be in default or liable for any loss or damage resulting from delays in performance or from failure to perform or comply with terms of this Cost Sharing Agreement due to any causes beyond its reasonable control, which causes include but are not limited to Acts of God or the public enemy; riots and insurrection, war, accidents, fire, strikes and other labour difficulties (whether or not the Party is in a position to concede to such demands), embargoes, judicial action: lack of or inability to obtain export permits or approvals, necessary labour, materials, energy, components or machinery; acts of civil or military authorities.


ARTICLE 10
DURATION AND CONTINUING RIGHT


This Agreement shall continue until the 31st day of December 1994, unless terminated by either Party in accordance with Article 11, and thereafter shall be renewed for further one (1) year terms unless notice is given by one Party to the other of its intention not to renew this Cost Sharing Agreement at least sixty (60) days before any anniversary date hereof.

Subject to the provisions of the second paragraph of Article 11, upon the expiry or termination of this Cost Sharing Agreement, Participant shall be deemed to have acquired a fully paid up license permitting Participant to continue to exercise the rights granted to it herein, and, in particular, the rights granted to it in Article 5, as though this Cost Sharing Agreement had continued without, however, Participant being subject to payment of any further amounts to Northern Telecom Limited by way of cost sharing payment or otherwise.

CONFIDENTIAL

NNC-NNL11772029 / 10

- 11 -

The provisions of Article 6 related to confidentiality and of Article 7 related to liability shall survive notwithstanding the expiry of this Cost Sharing Agreement or any termination of this Cost Sharing Agreement for any cause whatever.

ARTICLE 11
TERMINATION

In the event either Party shall be in breach of this Cost Sharing Agreement or fail to perform one or more of its material obligations under this Cost Sharing Agreement, the other Party may, by written notice to the Party in default, require the remedy of the breach or the performance of the obligation and, if the Party so notified fails to remedy or perform within sixty (60) days of the forwarding of a notice so to do, the other Party may, by written notice, terminate this Cost Sharing Agreement. In the event of such termination by Participant, Participant shall have such continuing rights as are provided in Article 10.

In the event Participant becomes insolvent or is the object of bankruptcy or insolvency proceedings, or makes an assignment for the benefit of its creditors, or is placed in receivership or liquidation, or if a substantial part of the assets of Northern Telecom plc, or a controlling interest in the stock of Northern Telecom plc, is expropriated, seized, or required to be transferred to, or into the control of, a third party, pursuant to a judicial, administrative or other governmental order or decision, or if Northern Telecom Limited terminates this Cost Sharing Agreement pursuant to the preceding paragraph, or if Northern Telecom Limited so elects in writing in the event its direct or indirect controlling interest in the stock of Northern Telecom plc is sold or transferred to a third party at any time after the expiry of this Agreement, all rights granted to Participant hereunder shall be cancelled forthwith and shall automatically revert, without further action by either Party, to Northern Telecom Limited. Immediately upon such cancellation and reversion, Participant shall discontinue the exercise of the rights granted hereunder and shall promptly deliver to Northern Telecom Limited all documentation with respect to Intangible Technological Property.

In the event of an enforceable judicial decision declaring invalid an essential part of this Cost Sharing

- 12 -

Agreement, without which this Cost Sharing Agreement would not have been entered into, this Cost Sharing Agreement may, at the option of either Party, be terminated upon the giving of notice to the other Party. Save as before set forth, in the event that any term, clause, provision or condition of this Cost Sharing Agreement shall be adjudged invalid for any reason whatsoever, such invalidity shall not affect the validity or operation of any other term, clause, provision or condition and such invalid term, clause, provision or condition shall be deemed to have been deleted from this Cost Sharing Agreement.

### ARTICLE 12
### NOTICES

Any and all notices or other information to be given by one of the Parties to the other shall be deemed sufficiently given when forwarded by prepaid registered or certified first class air mail or by cable, telegram, telex or hand delivery to the other Party at the following address:

If to Participant:

        Northern Telecom plc
        Berkeley Square House
        Berkeley Square
        London, England
        W1X 5LE

        Attention: Secretary

If to Northern Telecom Limited:

        Northern Telecom Limited
        P.O. Box 458, Station A
        Mississauga, Ontario
        Canada   L5A 3A2

        Attention: Secretary

and such notices shall be deemed to have been received fifteen (15) business days after mailing if forwarded by mail, and the following business day if forwarded by cable, telegram, telex or hand.

The aforementioned address of either Party may be changed at any time by giving fifteen (15) business days prior notice to the other Party in accordance with the foregoing.



- 13 -

In the event of a generally-prevailing labour dispute or other situation which will delay or impede the giving of notice by any such means, in either the country of origin or of destination, the notice shall be given by such specified mode as will be most reliable and expeditious and least affected by such dispute or situation.


## ARTICLE 13
## GENERAL PROVISION

This Agreement shall not be assigned by either Party except with the written consent of the other.

The failure of either Party to give notice to the other Party of the breach or non-fulfilment of any term, clause, provision or condition of this Cost Sharing Agreement shall not constitute a waiver thereof, nor shall the waiver of any breach or non-fulfilment of any term, clause, provision or condition of this Cost Sharing Agreement constitute a waiver of any other breach or non-fulfilment of that, or any other, term, clause, provision or condition of this Cost Sharing Agreement.

The Parties recognize that the communication or transfer of Intangible Technological Property may be subject to the specific approval of the Government of Canada, or various agencies thereof, and international control organizations in which the Government participates, including in particular the Free World Coordinating Committee (sometimes known as "CoCom"), and that such government or bodies may require further approval before communication or transfer of any Intangible Technological Property or sale of Intangible Technological Property is made to or for a country other than England, Scotland, Wales or Northern Ireland.

In respect to the subject matter hereof, this Cost Sharing Agreement sets forth the entire agreement and understanding between the Parties.

The currency to be used for computing all amounts hereunder shall be the Canadian dollar, unless the Parties agree otherwise.

This Cost Sharing Agreement may be executed in two counterparts and upon delivery of counterparts which together show the execution by all Parties hereto, shall constitute one agreement which shall enure to the benefit of and be binding upon the Parties hereto.



- 14 -

This Cost Sharing Agreement shall be construed in accordance with and governed by the laws of the Province of Ontario, Canada.


IN WITNESS WHEREOF, the Parties have caused this Cost Sharing Agreement to be executed by their duly authorized officers on the date and at the place indicated below.


Signed at Mississauga, Ontario,          NORTHERN TELECOM LIMITED
this 17ᵗʰ day of December , 1985

Per _____

Per _____


Signed at London, England, this          NORTHERN TELECOM plc
18ᵗʰ day of December, 1985

Per _____

Per _____

## RESEARCH AND DEVELOPMENT COST SHARING AGREEMENT

Agreement made and entered into with effect as of and from the 1st day of January, 1985,

BY AND BETWEEN:            NORTHERN TELECOM LIMITED,
a corporation duly incorporated under the laws of Canada, having its executive offices at 33 City Centre Drive, Mississauga, Ontario,

AND:                      NORTHERN TELECOM (IRELAND) LIMITED,
a corporation registered under the laws in the Republic of Ireland, having its executive offices at Galway Industrial Estate, Galway, Eire.

WHEREAS Northern Telecom (as hereinafter defined) and the Participant (as hereinafter defined) have in the past expended, and intend in the future to expend, substantial sums of money on research and development services or activities;

WHEREAS Northern Telecom and the Participant wish to utilize in their businesses the intangible technological property derived from such services or activities; and

WHEREAS Northern Telecom and Participant wish to share the costs and risks of research and development services or activities in return for interests in any intangible technological property that may be produced by such services or activities.

NOW, THEREFORE, THIS AGREEMENT WITNESSETH THAT, IN CONSIDERATION OF THE MUTUAL PROMISES HEREINAFTER SET FORTH, THE PARTIES AGREE AS FOLLOWS:

## ARTICLE 1
## DEFINITIONS

As used herein, unless otherwise defined:

(a) "Northern Telecom" shall mean Northern Telecom Limited, its Subsidiaries, including Participant, and Affiliates, engaged in the manufacture of Products and/or research and development services or activities, excluding Bell-Northern Research Ltd., BNR Inc. and BNR Limited;



- 2 -

(b)   "Participant" shall mean Northern Telecom (Ireland),
      Limited, its Subsidiaries and Affiliates engaged in the
      manufacture of Products and/or research and development
      services or activities in Ireland;

(c)   "Products" shall mean all products, software and services
      manufactured or marketed, or proposed to be manufactured
      or marketed, at any time by Northern Telecom, and all
      components, parts, sub-assemblies and software associated
      with or incorporated in any of the foregoing;

(d)   "Participant's Sales" in respect of any calendar year
      shall mean an amount equal to the revenues of Participant,
      excluding revenues derived from Subsidiaries and
      Affiliates of Northern Telecom Limited, from the sale,
      lease, or licensing of Products, for such year;

(e)   "Planned Participant's Sales" in respect of any calendar
      year shall mean an amount equal to the planned revenues of
      Participant for such year, calculated mutatis mutandis
      as in the definition of Participant's Sales, as reflected
      in the approved Northern Telecom Limited Budget and
      Operating Plan;

(f)   "Consolidated Sales" in respect of any calendar year shall
      mean an amount equal to the consolidated revenues of
      Northern Telecom, excluding revenues derived from
      Subsidiaries and Affiliates of Northern Telecom Limited,
      from the sale, lease or licensing of Products, as
      reflected in the consolidated financial statements of
      Northern Telecom Limited for such year;

(g)   "Planned Consolidated Sales" in respect of any calendar
      year shall mean an amount equal to the planned
      consolidated revenues of Northern Telecom, excluding
      revenues derived from Subsidiaries and Affiliates of
      Northern Telecom Limited, from the sale, lease or
      licensing of Products for such year, as reflected in the
      Northern Telecom Limited Budget and Operating Plan.

(h)   "Research and Development" shall mean all research and
      development services or activities performed by or for
      Northern Telecom including, without limitation,
      development of methods, processes, procedures and tools
      related to manufacturing, installation, operation,
      maintenance and use of Products, but excluding services
      designated by Northern Telecom Limited as custom research
      and development;

(i)   "Aggregate R&D Costs" in respect of any calendar year
      shall mean an amount equal to the aggregate of all costs
      of Research and Development that are (i) approved as
      contemplated in Article 2 and (ii) incurred directly or
      indirectly by Northern Telecom for such year;

7.9.

- 3 -

(j)     "Planned Aggregate R&D Costs" in respect of any calendar year shall mean an amount equal to the aggregate of all planned costs of Research and Development to be incurred directly or indirectly by Northern Telecom for such year, as reflected in the approved Northern Telecom Limited Budget and Operating Plan;

(k)     "Participant's R&D" in respect of any calendar year shall mean an amount equal to the aggregate of all costs of Research and Development that are (i) approved as contemplated in Article 2 and (ii) incurred directly or indirectly by Participant for such year;

(l)     "Planned Participant's R&D" in respect of any calendar year shall mean an amount equal to the aggregate of all planned costs of Research and Development to be incurred directly or indirectly by Participant for such year, as reflected in the approved Northern Telecom Limited Budget and Operating Plan;

(m)     "Participant's Share" in respect of Aggregate R&D Costs shall have the meaning ascribed thereto in Article 3;

(n)     "Participant's Cost Sharing Payment" shall have the meaning ascribed thereto in Article 3;

(o)     "Planned Participant's Cost Sharing Payment" shall have the meaning ascribed thereto in Article 3;

(p)     "Intangible Technological Property" shall mean any intangible technological property that is produced by Research and Development including:

        (i)     inventions, whether or not patented, formulas, processes, designs, patterns, and other proprietary know-how, and all patents, industrial designs (or equivalent) and copyrights, and applications with respect thereto;

        (ii)    drawings, reports, practices, specifications, software and other documentation and information related to the design, manufacture, installation, operation, repair, maintenance and use of Products; and

        (iii) any other technical information;

(q)     "Board of Directors" shall mean the Board of Directors of Northern Telecom Limited;

(r)     "Subsidiary" shall mean a corporation or company in which a Party hereto effectively owns or controls, and continues to own or control, directly or indirectly, more than fifty percent (50%) of the voting stock or shares;

T.G.

- 4 -

(s)   "Affiliate" shall mean a corporation or company which a Party hereto effectively controls, directly or indirectly, other than a Subsidiary, through the ownership or control of shares in the corporation or company; and

(t)   "Ireland" shall mean the Republic of Ireland.


### ARTICLE 2
### RESEARCH AND DEVELOPMENT PROGRAM AND BUDGET

Budgets for the performance of Research and Development by or for Northern Telecom, and appropriations for expenditures on all Research and Development projects, shall, from time to time, be reviewed and approved by, or under authority from, the Board of Directors.

All costs incurred directly or indirectly within the Research and Development appropriations approved as contemplated above shall be paid for by the Party or its Subsidiary or Affiliate incurring such expense, and shall be shared by Northern Telecom and Participant as hereinafter set forth.

Except as otherwise directed by, or under authority from, the Board of Directors, all Research and Development services and activities carried out by or for Northern Telecom shall be carried out in Canada.


### ARTICLE 3
### COST SHARING OF RESEARCH AND DEVELOPMENT

Participant and Northern Telecom shall each bear its share of the Aggregate R&D Costs in respect of each calendar year during the term of this Cost Sharing Agreement as hereinafter provided, regardless of whether or not any Intangible Technological Property is successfully produced by any or all of the Research and Development conducted pursuant to this Cost Sharing Agreement.

Participant's share of the Aggregate R&D Costs in respect of each calendar year during the term of this Cost Sharing Agreement shall be an amount ("Participant's Share") equal to the product obtained by multiplying:

(a)   the fraction the numerator of which is Participant's Sales and the denominator of which is Consolidated Sales, by

(b)   Aggregate R&D Costs.

*T.G.*

- 5 -

Participant's Cost Sharing Payment for each calendar year, to be paid as hereinafter provided, shall equal Participant's Share less Participant's R&D. In the event Participant's Cost Sharing Payment is negative, Northern Telecom Limited shall make payment to Participant as hereinafter provided.

Northern Telecom (Ireland) Limited shall make payments to Northern Telecom Limited on account of Participant's Cost Sharing Payment in the manner hereinafter set forth, with an appropriate adjusting payment to be made as provided in the fourth paragraph of this Article 3. Such payments on account to be made with respect to each calendar year shall aggregate an amount ("Planned Participant's Cost Sharing Payment") equal to:

    (a)    the product obtained by multiplying

          (i)    the fraction the numerator of which is Planned Participant's Sales and the denominator of which is Planned Consolidated Sales, by

          (ii)   Planned Aggregate R&D Costs,

   less

    (b)    Planned Participant's R&D.

On or before December 15 in each year or as soon thereafter as is reasonably practicable, Northern Telecom Limited shall submit to Northern Telecom (Ireland) Limited a statement showing Planned Participant's Cost Sharing Payment with respect to the subsequent calendar year, determined as hereinabove provided. Planned Participant's Cost Sharing Payment shall be paid by Northern Telecom (Ireland) Limited to Northern Telecom Limited in twelve (12) equal monthly instalments within thirty (30) days of the date of the invoice therefor commencing in January of each year. In the event Planned Participant's Cost Sharing Payment is negative, such amount shall be payable by Northern Telecom Limited to Northern Telecom (Ireland) Limited in like manner as hereinabove provided.

Within sixty (60) days following the end of each calendar year, Northern Telecom Limited shall furnish to Participant a statement certified by its chief financial officer or controller recording Aggregate R&D Costs, Participant's Sales, Consolidated Sales and Participant's R&D, and showing Participant's Share and Participant's Cost Sharing Payment, all in respect of such year. Northern Telecom Limited, or Northern Telecom (Ireland) Limited, as the case may be, shall forthwith thereafter make an adjusting payment equal to the difference between the aggregate of the payments made pursuant to the third paragraph above and Participant's Cost Sharing Payment.

T. G.

- 6 -

The Parties may agree, from time to time, prior to the end of each calendar year, to an estimate or revised estimate of such adjusting payment and adjust the monthly payments hereinbefore determined, or otherwise make payment, according to such estimate or revised estimate, in which event the final adjusting payment to be made shall reflect such payment(s).


ARTICLE 4
LEGAL TITLE TO
INTANGIBLE TECHNOLOGICAL PROPERTY


The Parties hereto acknowledge that, except as otherwise specifically agreed, legal title to all Intangible Technological Property whether now in existence or developed pursuant to the terms of this Cost Sharing Agreement, shall be vested in Northern Telecom Limited. With respect to patentable inventions and copyrightable property encompassed by Intangible Technological Property, Northern Telecom Limited shall have the exclusive right but not the obligation to file and prosecute applications in its name for patent or copyright protection in every country of the world. Participant shall execute or cause to be executed such documents reasonably requested by Northern Telecom Limited as may be necessary or desirable to give effect to the foregoing.

Participant shall, from time to time, promptly upon receipt of Northern Telecom Limited's request, and at Northern Telecom Limited's expense, furnish to Northern Telecom Limited all available and requested documentation relating to the Intangible Technological Property developed by or for Participant pursuant to the terms of this Cost Sharing Agreement.


ARTICLE 5
PARTICIPANT'S NON-EXCLUSIVE ROYALTY-FREE LICENSE TO
INTANGIBLE TECHNOLOGICAL PROPERTY


To the extent of its legal right so to do, and subject to the rights of third parties under agreements to which Northern Telecom Limited is a party, Northern Telecom Limited, in consideration of Participant's sharing of the costs of Research and Development pursuant to this Cost Sharing Agreement, as from time to time amended, hereby grants to Participant a non-exclusive royalty-free license, including the right to sublicense, which, except as hereinafter

*T. G.*

- 7 -

provided, shall be in perpetuity to make, have made, use, lease and sell Products embodying Intangible Technological Property in Ireland, and to sell Products embodying Intangible Technological Property in such other countries as may be approved in writing by Northern Telecom Limited, and to all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith.

Northern Telecom Limited shall, from time to time, promptly upon receipt of Participant's request, and at Participant's expense, furnish to Participant all available and requested documentation and other information relating to the Intangible Technological Property developed by or for Northern Telecom Limited pursuant to the terms of this Cost Sharing Agreement.

The rights granted under this Article shall not relieve either Party from its obligations in respect of royalty payments to third parties.

ARTICLE 6
CONFIDENTIAL INFORMATION

Participant acknowledges that Northern Telecom Limited is the legal owner of the Intangible Technological Property developed pursuant to this Cost Sharing Agreement and that the Intangible Technological Property is proprietary and constitutes a trade secret. Participant shall hold the Intangible Technological Property in confidence and only make use of, or disclose, it as permitted by this Cost Sharing Agreement.

Participant shall have primary right and obligation to protect through appropriate contractual arrangements, legal proceedings or otherwise the confidentiality of the Intangible Technological Property in and for Ireland, subject to Northern Telecom Limited's right to file and prosecute applications for patent and copyright protection as hereinbefore provided.

Participant shall, during the full term of this Cost Sharing Agreement and for fifteen (15) years thereafter hold secret and not disclose, make known, divulge or communicate to any person (except Participant's employees and licensees as permitted under Article 5 and then only under an obligation of secrecy binding upon such employees and licensees) any of the Intangible Technological Property.

T.G.

- 8 -

Participant shall not make or have made or permit to be made any copies or translations of the Intangible Technological Property except those copies or translations which are reasonably necessary for the exercise by Participant of the rights herein granted to it and all such copies or translations shall, upon reproduction by Participant, contain the same proprietary and confidentiality notices or legends which appear on the Intangible Technological Property made available to Participant under this Cost Sharing Agreement.

Notwithstanding the foregoing, Participant shall have the right:

(a) to communicate relevant portions of the Intangible Technological Property to suppliers in all countries of the world reasonably necessary for, and solely for, the procurement by Participant of commercially available materials and parts for use in the manufacture and/or installation of the Products; and

(b) to communicate to customers purchasing the Products, such portions of the Intangible Technological Property as are reasonably needed by such customers for operating and maintaining the Products;

provided, however, that the recipients of the Intangible Technological Property be advised by Participant, in writing, at the time, or before such communication, that proprietary information is being communicated and that such information is to be kept confidential and not used except as permitted hereunder, and provided further, that such recipients undertake, in writing, prior to disclosure, to respect such confidentiality.

The provisions of this Cost Sharing Agreement concerning confidentiality shall survive the expiration or termination of this Cost Sharing Agreement, but in no event shall such provisions apply to the extent that:

(a) Intangible Technological Property was supplied to Participant by an independent third party prior to the effective date of this Cost Sharing Agreement; or

(b) Intangible Technological Property becomes available to the general public through no fault of Participant.

**CONFIDENTIAL**          NNC-NNL06005572 / 8

- 9 -

## ARTICLE 7
## LIABILITY

Neither Party makes any representation in respect to, and does not warrant, any Intangible Technological Property provided to the other Party hereunder, but shall furnish such in good faith to the best of its knowledge and ability. Without restricting the generality of the foregoing, neither Party makes any representation or warranty as to whether or not use of the Intangible Technological Property supplied hereunder will infringe any patent or other rights of any other person.

Participant shall have the primary right and obligation to bring and defend in and for Ireland, at its own expense, and for its own benefit, any proceedings relating to alleged infringement of its rights to the Intangible Technological Property by a third party or the alleged infringement by Participant's use of the Intangible Technological Property of the rights of third parties. If Participant fails to act within sixty (60) days from the notice of any such alleged infringement, Northern Telecom Limited shall have the right to bring or defend, in and for Ireland, the proceedings in its own name, at its own expense and for its own benefit.

Northern Telecom (Ireland) Limited shall indemnify and save Northern Telecom Limited harmless from any and all claims and liabilities for damages, losses, expenses or costs (including counsel fees and expenses) arising in and for Ireland out of any such infringement or alleged infringement by Participant.

## ARTICLE 8
## RECORDS

Northern Telecom (Ireland) Limited shall keep or cause to be kept clear and accurate records with respect to the Research and Development costs incurred or planned to be incurred by Participant and to be shared pursuant to this Cost Sharing Agreement. Participant shall also keep clear and accurate records to support the calculations of Participant's Sales and Planned Participant's Sales. Northern Telecom Limited shall keep clear and accurate records to support calculations of the Aggregate R&D Costs, Planned Aggregate R&D Costs, Consolidated Sales and Planned Consolidated Sales. Both Parties shall provide to each other upon request, in such form as may reasonably be requested, documentation with respect to the foregoing.

*T.G.*

- 10 -

Each Party shall have the right to examine and audit, during normal hours, semi-annually (or at less frequent intervals) all such records and such other records and accounts as may under recognized accounting practices contain information bearing upon the amounts payable to it or the other Party under this Cost Sharing Agreement. Prompt adjustment shall be made by the proper Party to compensate for any errors or omissions disclosed by such examination or audit.

## ARTICLE 9
## FORCE MAJEURE

Neither Party shall be in default or liable for any loss or damage resulting from delays in performance or from failure to perform or comply with terms of this Cost Sharing Agreement due to any causes beyond its reasonable control, which causes include but are not limited to Acts of God or the public enemy; riots and insurrection, war, accidents, fire, strikes and other labour difficulties (whether or not the Party is in a position to concede to such demands), embargoes, judicial action: lack of or inability to obtain export permits or approvals, necessary labour, materials, energy, components or machinery; acts of civil or military authorities.

## ARTICLE 10
## DURATION AND CONTINUING RIGHT

This Agreement shall continue until the 31st day of December 1994, unless terminated by either Party in accordance with Article 11, and thereafter shall be renewed for further one (1) year terms unless notice is given by one Party to the other of its intention not to renew this Cost Sharing Agreement at least sixty (60) days before any anniversary date hereof.

Subject to the provisions of the second paragraph of Article 11, upon the expiry or termination of this Cost Sharing Agreement, Participant shall be deemed to have acquired a fully paid up license permitting Participant to continue to exercise the rights granted to it herein, and, in particular, the rights granted to it in Article 5, as though this Cost Sharing Agreement had continued without, however, Participant being subject to payment of any further amounts to Northern Telecom Limited by way of cost sharing payment or otherwise.

*T. G.*

- 11 -

The provisions of Article 6 related to confidentiality and of Article 7 related to liability shall survive notwithstanding the expiry of this Cost Sharing Agreement or any termination of this Cost Sharing Agreement for any cause whatever.

### ARTICLE 11
### TERMINATION

In the event either Party shall be in breach of this Cost Sharing Agreement or fail to perform one or more of its material obligations under this Cost Sharing Agreement, the other Party may, by written notice to the Party in default, require the remedy of the breach or the performance of the obligation and, if the Party so notified fails to remedy or perform within sixty (60) days of the forwarding of a notice so to do, the other Party may, by written notice, terminate this Cost Sharing Agreement. In the event of such termination by Participant, Participant shall have such continuing rights as are provided in Article 10.

In the event Participant becomes insolvent or is the object of bankruptcy or insolvency proceedings, or makes an assignment for the benefit of its creditors, or is placed in receivership or liquidation, or if a substantial part of the assets of Northern Telecom (Ireland) Limited, or a controlling interest in the stock of Northern Telecom (Ireland) Limited, is expropriated, seized, or required to be transferred to, or into the control of, a third party, pursuant to a judicial, administrative or other governmental order or decision, or if Northern Telecom Limited terminates this Cost Sharing Agreement pursuant to the preceding paragraph, or if Northern Telecom Limited so elects in writing in the event its direct or indirect controlling interest in the stock of Northern Telecom (Ireland) Limited is sold or transferred to a third party at any time after the expiry of this Agreement, all rights granted to Participant hereunder shall be cancelled forthwith and shall automatically revert, without further action by either Party, to Northern Telecom Limited. Immediately upon such cancellation and reversion, Participant shall discontinue the exercise of the rights granted hereunder and shall promptly deliver to Northern Telecom Limited all documentation with respect to Intangible Technological Property.

In the event of an enforceable judicial decision declaring invalid an essential part of this Cost Sharing Agreement,

T.G.

CONFIDENTIAL     NNC-NNL06005572 / 11

- 12 -

without which this Cost Sharing Agreement would not have been entered into, this Cost Sharing Agreement may, at the option of either Party, be terminated upon the giving of notice to the other Party. Save as before set forth, in the event that any term, clause, provision or condition of this Cost Sharing Agreement shall be adjudged invalid for any reason whatsoever, such invalidity shall not affect the validity or operation of any other term, clause, provision or condition and such invalid term, clause, provision or condition shall be deemed to have been deleted from this Cost Sharing Agreement.

## ARTICLE 12
### NOTICES

Any and all notices or other information to be given by one of the Parties to the other shall be deemed sufficiently given when forwarded by prepaid registered or certified first class air mail or by cable, telegram, telex or hand delivery to the other Party at the following address:

If to Participant:

> Northern Telecom (Ireland) Limited
> Galway Industrial Estate
> Galway,
> Eire.

> Attention:  Secretary

If to Northern Telecom Limited:

> Northern Telecom Limited
> P.O. Box 458, Station A
> Mississauga, Ontario
> Canada   L5A 3A2

> Attention:  Secretary

and such notices shall be deemed to have been received fifteen (15) business days after mailing if forwarded by mail, and the following business day if forwarded by cable, telegram, telex or hand.

The aforementioned address of either Party may be changed at any time by giving fifteen (15) business days prior notice to the other Party in accordance with the foregoing.

T.G.

**CONFIDENTIAL**

- 13 -

In the event of a generally-prevailing labour dispute or other situation which will delay or impede the giving of notice by any such means, in either the country of origin or of destination, the notice shall be given by such specified mode as will be most reliable and expeditious and least affected by such dispute or situation.

## ARTICLE 13
### GENERAL PROVISION

This Agreement shall not be assigned by either Party except with the written consent of the other.

The failure of either Party to give notice to the other Party of the breach or non-fulfilment of any term, clause, provision or condition of this Cost Sharing Agreement shall not constitute a waiver thereof, nor shall the waiver of any breach or non-fulfilment of any term, clause, provision or condition of this Cost Sharing Agreement constitute a waiver of any other breach or non-fulfilment of that, or any other, term, clause, provision or condition of this Cost Sharing Agreement.

The Parties recognize that the communication or transfer of Intangible Technological Property may be subject to the specific approval of the Government of Canada, or various agencies thereof, and international control organizations in which the Government participates, including in particular the Free World Coordinating Committee (sometimes known as "CoCom"), and that such government or bodies may require further approval before communication or transfer of any Intangible Technological Property or sale of Intangible Technological Property is made to or for a country other than Ireland.

In respect to the subject matter hereof, this Cost Sharing Agreement sets forth the entire agreement and understanding between the Parties.

The currency to be used for computing all amounts hereunder shall be the Canadian dollar, unless the Parties agree otherwise.

This Cost Sharing Agreement may be executed in two counterparts and upon delivery of counterparts which together show the execution by all Parties hereto, shall constitute one agreement which shall enure to the benefit of and be binding upon the Parties hereto.

*T. G.*

CONFIDENTIAL        NNC-NNL06005572 / 13

- 14 -

This Cost Sharing Agreement shall be construed in accordance with and governed by the laws of the Province of Ontario, Canada.


IN WITNESS WHEREOF, the Parties have caused this Cost Sharing Agreement to be executed by their duly authorized officers on the date and at the place indicated below.


Signed at Mississauga, Ontario, this /7ᵗʰ day of December , 1985

NORTHERN TELECOM LIMITED

Per _____

Per _____


Signed at Galway, Eire, this 2nd day of January, 1985 1986 T.G.

NORTHERN TELECOM (IRELAND) LIMITED

Per _____

Per _____


T.G.

**CONFIDENTIAL**

EXHIBIT
9-24-13
21002
HORN

## AMENDED RESEARCH AND DEVELOPMENT COST SHARING AGREEMENT

Agreement made and entered into with effect as of and from the 1st day of January, 1992,

|  |  |
|---|---|
| BY AND BETWEEN: | NORTHERN TELECOM LIMITED, a corporation duly incorporated under the laws of Canada, having its executive offices at 8200 Dixie Road, Suite 100, Brampton, Ontario, Canada L6T 5P6 (hereinafter referred to as "Northern Telecom") |
| AND: | NORTHERN TELECOM INC., a corporation duly incorporated under the laws of the State of Delaware, having its head office at 200 Athens Way, Nashville, Tennessee, U.S.A. 37228 including predecessor corporations in interest (hereinafter referred to as "NTI") |

WHEREAS Northern Telecom and certain Subsidiaries, including Participant, have in the past expended, and intend in the future to expend, substantial sums of money on research and development services or activities;

WHEREAS Northern Telecom and such Subsidiaries, including Participant, wish to utilize in their businesses the NT Technology (as hereinafter defined) derived from such services or activities;

WHEREAS Northern Telecom and such Subsidiaries, including Participant, wish to share the costs and risks of research and development services or activities in return for interests in any NT Technology that may be produced by such services or activities;

WHEREAS the Parties have, pursuant to a cost sharing arrangement within the meaning of the regulations under section 482 of the Internal Revenue Code of the United States of America embodied in an Agreement, dated as of January 1, 1978, as amended by an Agreement, dated as of January 1, 1980, an Agreement, dated as of January 1, 1983, and an Agreement, dated as of January 1, 1985 (collectively the "Cost Sharing Agreement"), undertaken to share certain costs of research and development services or activities; and

WHEREAS the Parties wish to amend, amplify and clarify certain matters related to the Cost Sharing Agreement to comply with the provisions of the Advance Pricing Agreement between Northern Telecom and the Competent Authority for Canada and the Advance Pricing Agreement between NTI and the Internal Revenue Service of the United States of America;

NOW, THEREFORE, THIS AGREEMENT WITNESSETH THAT, IN CONSIDERATION OF THE MUTUAL PROMISES HEREINAFTER SET FORTH, THE PARTIES AGREE TO AMEND AND RESTATE THE COST SHARING AGREEMENT EFFECTIVE JANUARY 1, 1992 TO READ IN ITS ENTIRETY AS FOLLOWS:

**NNC/NNL Confidential Information - NNC-NNL006440**

- 2 -

## ARTICLE 1
## DEFINITIONS

As used herein, unless otherwise defined:

(a)    "Board of Directors" shall mean the Board of Directors of Northern Telecom;

(b)    "Compensating Adjustment" shall mean adjustments made in accordance with Article 3 of this Cost Sharing Agreement;

(c)    "Cost of Goods Sold" shall mean the cost of goods sold determined according to GAAP;

(d)    "Cost Sharing Participant" shall mean any member of the NTL Group sharing in the R&D Expenses pursuant to a R&D Cost Sharing Agreement;

(e)    "GAAP" shall mean Canadian or U.S. Generally Accepted Accounting Principles as applied by Northern Telecom or Participant, as the case may be, in making determinations under this Cost Sharing Agreement;

(f)    "Intercompany Purchases" shall mean purchases from one member of the NTL Group by another such member;

(g)    "Intercompany Sales" shall mean sales to a member of the NTL Group by another such member;

(h)    "Net Customer Sales" shall mean customer sales, less discounts and returns;

(i)    "NTI Subsidiaries" shall mean those entities the financial results of which are included in the NTI consolidated financial statements under GAAP or, in the case of a jointly-controlled entity (as defined for GAAP purposes), that portion of its financial results that are consolidated in the NTI consolidated financial statements under GAAP;

(j)    "Northern Telecom Subsidiaries" shall mean those entities the financial results of which are included in the NTL Consolidated Financial Statements under GAAP or, in the case of a jointly-controlled entity (as defined for GAAP purposes), that portion of its financial results that are consolidated in the NTL Consolidated Financial Statements under GAAP;

(k)    "NT Technology" shall mean any and all intangible assets (including but not limited to patents, industrial designs, copyrights and applications thereof, technical know-how, drawings, reports, practices, specifications, software and other documentation or information) produced or conceived as a result of the R&D Expenses during a calendar year or any prior years;

(l)    "NTL Consolidated Financial Statements" shall mean the audited consolidated financial statements of Northern Telecom;

(m)    "NTL Group" shall mean Northern Telecom and all Northern Telecom Subsidiaries, and their successors, transferees and assigns;

(n)    "Operating Income" shall mean Net Customer Sales, less Cost of Goods Sold, selling expenses, and general and administrative expenses allocable to such Net Customer Sales, but before the deduction of any R&D Expenses, goodwill amortization, interest expense, income taxes, or any other expenses not relating to

NNC/NNL Confidential Information - NNC-NNL006441

- 3 -

continuing operations; provided, Operating Income shall exclude any other income and expense and extraordinary items;

(o)    "Participant" shall mean NTI and all NTI Subsidiaries that are included in NTI's consolidated federal income tax return for the relevant calendar year, and their successors, transferees and assigns;

(p)    "Participant's Cost Sharing Payment" shall have the meaning ascribed thereto in Article 3 of this Cost Sharing Agreement;

(q)    "Participant's Share" in respect of R&D Expenses shall have the meaning ascribed thereto in Article 3 of this Cost Sharing Agreement;

(r)    "Planned Participant's Cost Sharing Payment" shall have the meaning ascribed thereto in Article 3 of this Cost Sharing Agreement;

(s)    "Products" shall mean all products, software and services manufactured or marketed, or proposed to be manufactured or marketed, at any time by the NTL Group, and all components, parts, sub-assemblies and software associated with or incorporated in any of the foregoing;

(t)    "R&D Cost Sharing Agreement" shall mean a research and development cost sharing agreement that is in effect between Northern Telecom and another member of the NTL Group pursuant to which Northern Telecom and the other such member share in some or all of the R&D Expenses during a calendar year;

(u)    "R&D Expenses" shall mean the sum of the expenses of Research and Development incurred for the development of NT Technology directly or indirectly by all Cost-Sharing Participants in the NTL Group and approved by, or under authority from, the Board of Directors;

(v)    "Research and Development" shall mean all research and development services or activities performed by or for all Cost Sharing Participants including, without limitation, development of methods, processes, procedures and tools related to manufacturing, installation, operation, maintenance and use of Products, but excluding services designated by Northern Telecom as custom research and development;

(w)    "Residual" shall mean the total R&D Expenses less the amount of R&D Expenses allocated to Royalty Income;

(x)    "Royalty Income" shall mean income (net of any income paid to other Cost Sharing Participants and which is included in such other Cost Sharing Participant's Royalty Income) generated during a calendar year through the licensing of NT Technology;

(y)    "Subsidiary" shall mean a Northern Telecom Subsidiary or a NTI Subsidiary as the case may be; and

(z)    "United States" shall mean the United States of America and the Commonwealth of Puerto Rico.

NNC/NNL Confidential Information - NNC-NNL006442

- 4 -

## ARTICLE 2
## RESEARCH AND DEVELOPMENT PROGRAM AND BUDGET

Budgets for the performance of Research and Development, and appropriations for expenditures on all Research and Development projects, shall, from time to time, be reviewed and approved by, or under authority from, the Board of Directors.

All costs incurred directly or indirectly within the Research and Development appropriations approved as contemplated above shall be paid for by the Party or its Subsidiary incurring such expense, and shall be shared by Northern Telecom and Participant as hereinafter set forth.

## ARTICLE 3
## COST SHARING OF RESEARCH AND DEVELOPMENT

Participant and Northern Telecom shall each bear its share of the R&D Expenses in respect of each calendar year during the term of this Cost Sharing Agreement as hereinafter provided, regardless of whether or not any NT Technology is successfully produced by any or all of the Research and Development conducted pursuant to this Cost Sharing Agreement.

Participant's share of the R&D Expenses in respect of each calendar year during the term of this Cost Sharing Agreement ("Participant's Share") shall be calculated in two parts as follows:

(a)     under Part 1, as described below, a determination shall be made of the amount of the R&D Expenses to be allocated to Royalty Income and a portion of this amount of the R&D Expenses shall then be allocated to Participant; and

(b)     under Part 2, as described below, a portion of the Residual shall then be allocated to Participant.

Any foreign currency translations shall be made in accordance with GAAP as adopted in the NTL Consolidated Financial Statements. Calculations under this Article shall incorporate all amounts within a Cost Sharing Participant's geographic market.

Part 1

(a)     The amount of the R&D Expenses to be attributed to Royalty Income for the calendar year shall be determined in accordance with the following formula:

$(R/(T + R))$ x $R\&D = P$, where

$R$ = the total Royalty Income of all Cost Sharing Participants for the calendar year;

$T$ = total Operating Income for all Cost Sharing Participants for the calendar year ($T$ will be deemed to be zero if $T$ is negative);

$R\&D$ = R&D Expenses for the calendar year; and

$P$ = the R&D Expenses to be allocated to Royalty Income for the calendar year.

- 5 -

(b)     The R&D Expenses allocated to Royalty Income for the calendar year in accordance with this Article shall be allocated between Northern Telecom and Participant by applying the following formula:

$(A/R) \times P = S$, where

A = Participant's Royalty Income for the calendar year;

R = the total Royalty Income for all Cost Sharing Participants for the calendar year;

P = the R&D Expenses allocated to Royalty Income for the calendar year, as determined in this Article; and

S = the R&D Expenses attributable to Royalty Income and allocated to Participant for the calendar year.

Part 2

(a)     The allocation of the Residual for each calendar year will be made as follows:

(1)     Ten percent (10%) of the Residual for the calendar year shall be allocated between Participant and Northern Telecom on the basis of Net Customer Sales by applying the following formula:

$(CS/TCS) \times .10 \times (R\&D-P) = B$, where

CS = Participant's Net Customer Sales for the calendar year;

TCS = total Net Customer Sales for all Cost Sharing Participants for the calendar year;

R&D = R&D Expenses for the calendar year;

P = the R&D Expenses allocated to Royalty Income for the calendar year, as determined pursuant to this Article; and

B = Participant's allocation of ten percent (10%) of the Residual for the calendar year.

(2)     Ninety percent (90%) of the Residual shall be allocated between Northern Telecom and Participant on the basis of Modified Operating Income (as defined in this Article) by applying the following formula:

$(MOI/TMO) \times .90 \times (R\&D-P) = C$, where

MOI = Participant's Modified Operating Income for the calendar year (as defined in this Article); provided, if MOI is less than or equal to zero, no allocation will be made to Participant under this subsection (a)(2) of Part 2 of this Article for the calendar year;

TMO = the sum of all Cost Sharing Participants' Modified Operating Income for the calendar year; provided, if the total Modified Operating Income of all Cost Sharing Participants other than

NNC/NNL Confidential Information - NNC-NNL006444

- 6 -

Participant is equal to or less than zero, and MOI is greater than $0, (MOI/TMO) shall be deemed to equal 1, and the R&D Expenses allocated under this subsection (a)(2) of Part 2 of this Article for the calendar year shall be allocated entirely to Participant.

R&D = R&D Expenses for the calendar year;

P = the R&D Expenses allocated to Royalty Income for the calendar year, as determined pursuant to this Article; and

C = Participant's allocation of ninety percent (90%) of the Residual for the calendar year.

(3)   For purposes of subsection (a)(2) of Part 2 of this Article, a Cost Sharing Participant's Modified Operating Income for the calendar year shall be determined in accordance with the following formula:

$$OI - ((CGS - IP) \times M) = MOI, \text{ where}$$

OI = the Cost Sharing Participant's Operating Income for the calendar year, it being acknowledged that Operating Income may change as the result of issues raised on audit other than those presented by this Cost Sharing Agreement.

CGS = the Cost Sharing Participant's Cost of Goods Sold attributable to Net Customer Sales for the calendar year;

IP = the Cost Sharing Participant's Intercompany Purchases for the calendar year; and

M = for the calendar years ending December 31, 1992 - December 31, 1995, M is the Cost Sharing Participant's Operating Income realized on Intercompany Sales divided by the total Cost of Goods Sold attributable to Intercompany Sales and for calendar years ending December 31, 1996, and following, M is the Cost Sharing Participant's Operating Income realized on Intercompany Sales, as determined by Northern Telecom, divided by the Cost of Goods Sold on Intercompany Sales.

Participant's Cost Sharing Payment for each calendar year, to be paid as hereinafter provided, shall equal Participant's Share less Participant's R&D. In the event Participant's Cost Sharing Payment is negative, Northern Telecom shall make a payment to Participant as hereinafter provided.

NTI shall make payments to Northern Telecom on account of Participant's Cost Sharing Payment in the manner hereinafter set forth, with an appropriate adjusting payment to be made as provided below.

NTI shall pay to Northern Telecom, based on budgeted or forecasted amounts but otherwise determined as hereinabove provided, a planned Participant's Cost Sharing Payment ("Planned Participant's Cost Sharing Payment") in twelve (12) equal monthly instalments within thirty (30) days of the date of the invoice therefor commencing in January of each year. In the event the Planned Participant's Cost Sharing Payment is negative, such amount shall be payable by Northern Telecom to NTI in like manner as hereinabove provided.

NNC/NNL Confidential Information - NNC-NNL006445

- 7 -

For the calendar years ending December 31, 1992, December 31, 1993, December 31, 1994 and December 31, 1995, any resulting Compensating Adjustment, reflecting the application of the formula as hereinabove provided, shall be paid within ninety (90) days from the date of execution of the Advanced Pricing Agreement between NTI and the Internal Revenue Service of the United States of America.

For subsequent calendar years, to the extent a Compensating Adjustment is necessary, Northern Telecom or Participant shall pay the Compensating Adjustment to the other entity within three hundred and twenty (320) days of the year end of the paying entity to which the Compensating Adjustment relates.

Compensating Adjustments may also arise when Northern Telecom, Participant, Revenue Canada or the Internal Revenue Service makes normal and routine adjustments (e.g. correction of computational errors) to the determination and computation of Northern Telecom's or Participant's Share of R&D Expenses or related calculations. Any such subsequent Compensating Adjustment agreed to by Northern Telecom and Participant shall be paid within ninety (90) days from the date of final determination and agreement thereof.

Northern Telecom or Participant may employ any payment method which it deems appropriate for settling Compensating Adjustments, including, but not limited to, the use of cheques, wire transfers, or offsets through intercompany accounts maintained by the entities with each other. Payment of Compensating Adjustments shall be made in the currency in which payment between the related entities is made for the transactions covered by this Cost Sharing Agreement.

The Parties may agree, from time to time, prior to the end of each calendar year, to an estimate or revised estimate of such adjusting payment and adjust the monthly payments hereinbefore determined, or otherwise make payment, according to such estimate or revised estimate, in which event the final adjusting payment to be made shall reflect such payment(s).

The receipt or payment of a Compensating Adjustment, shall not be subject to any withholding taxes for U.S. or Canadian income tax purposes.

## ARTICLE 4
## LEGAL TITLE TO
## NT TECHNOLOGY

The Parties hereto acknowledge that, except as otherwise specifically agreed, legal title to all NT Technology whether now in existence or developed pursuant to the terms of this Cost Sharing Agreement, except patents owned by Participant on January 1, 1980, shall be vested in Northern Telecom. With respect to patentable inventions and copyrightable property encompassed by NT Technology, Northern Telecom shall have the exclusive right but not the obligation to file and prosecute applications in its name for patent or copyright protection in every country of the world. Participant shall execute or cause to be executed such documents reasonably requested by Northern Telecom as may be necessary or desirable to give effect to the foregoing.

Participant shall, from time to time, promptly upon receipt of Northern Telecom's request, and at Northern Telecom's expense, furnish to Northern Telecom all available and requested documentation relating to the NT Technology developed by or for Participant pursuant to the terms of this Cost Sharing Agreement.

NNC/NNL Confidential Information - NNC-NNL006446

- 8 -

### ARTICLE 5
### PARTICIPANT'S EXCLUSIVE ROYALTY-FREE LICENSE TO
### NT TECHNOLOGY

To the extent of its legal right so to do, and subject to the rights of third parties under agreements to which Northern Telecom is a party, Northern Telecom, in consideration of Participant's sharing of the costs of Research and Development pursuant to this Cost Sharing Agreement, as from time to time amended, hereby grants to Participant an exclusive royalty-free license, including the right to sublicense, which, except as hereinafter provided, shall be in perpetuity to make, have made, use, lease and sell Products embodying NT Technology in and for the United States, and to all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith.

Northern Telecom shall, from time to time, promptly upon receipt of Participant's request, and at Participant's expense, furnish to Participant all available and requested documentation and other information relating to the NT Technology developed by or for Northern Telecom pursuant to the terms of this Cost Sharing Agreement.

Participant shall not exercise its exclusive rights hereunder to prohibit (to the extent, if any, it were otherwise entitled to do so):

(a)     the import into the United States of products manufactured by licensees of a member of the NTL Group outside the United States and Canada;

(b)     the exercise of the right to make or have made in the United States items required by a third party in connection with manufacturing by such party pursuant to a license agreement with a member of the NTL Group; or

(c)     the procurement by a member of the NTL Group of components, assemblies, sub-assemblies, supplies, facilities, services and products as may be required by the NTL Group in its business outside the United States or in support of the Participant's business in the United States.

Participant shall from time to time upon request by Northern Telecom, grant such non-exclusive license to Northern Telecom in and for the United States under the patents and patent applications encompassed by the NT Technology as may be necessary to enable Northern Telecom to enter into cross-licensing arrangements with one or more third parties.

The rights granted under this Article shall not relieve either Party from its obligations in respect of royalty payments to third parties.

### ARTICLE 6
### CONFIDENTIAL INFORMATION

Participant acknowledges that Northern Telecom is the legal owner of the NT Technology developed pursuant to this Cost Sharing Agreement and that the NT Technology is proprietary and constitutes a trade secret. Participant shall hold the NT Technology in confidence and only make use of or disclose it as permitted by this Cost Sharing Agreement.

Participant shall have primary right and obligation to protect through appropriate contractual arrangements, legal proceedings or otherwise the confidentiality of the NT Technology in and for the United States, subject to Northern Telecom's right to file and prosecute applications for patent and copyright protection as hereinbefore provided.

NNC/NNL Confidential Information - NNC-NNL006447

- 9 -

Participant shall, during the full term of this Cost Sharing Agreement and for fifteen (15) years thereafter hold secret and not disclose, make known, divulge or communicate to any person (except Participant's employees and licensees as permitted under Article 5 and then only under an obligation of secrecy binding upon such employees and licensees) any of the NT Technology.

Participant shall not make or have made or permit to be made any copies or translations of the NT Technology except those copies or translations which are reasonably necessary for the exercise by Participant of the rights herein granted to it and all such copies or translations shall, upon reproduction by Participant, contain the same proprietary and confidentiality notices or legends which appear on the NT Technology made available to Participant under this Cost Sharing Agreement.

Notwithstanding the foregoing, Participant shall have the right:

(a)    to communicate relevant portions of the NT Technology to suppliers in all countries of the world reasonably necessary for, and solely for, the procurement by Participant of commercially available materials and parts for use in the manufacture and/or installation of the Products; and

(b)    to communicate to customers purchasing the Products, such portions of the NT Technology as are reasonably needed by such customers for operating and maintaining the Products;

provided, however, that the recipients of the NT Technology be advised by Participant, in writing, at the time, or before such communication, that proprietary information is being communicated and that such information is to be kept confidential and not used except as permitted hereunder, and provided further, that such recipients undertake, in writing, prior to disclosure, to respect such confidentiality.

The provisions of this Cost Sharing Agreement concerning confidentiality shall survive the expiration or termination of this Cost Sharing Agreement, but in no event shall such provisions apply to the extent that:

(a)    NT Technology was supplied to Participant by an independent third party prior to the effective date of this Cost Sharing Agreement; or

(b)    NT Technology becomes available to the general public through no fault of Participant.

ARTICLE 7
LIABILITY

Neither Party makes any representation in respect to, and does not warrant, any NT Technology provided to the other Party hereunder, but shall furnish such in good faith to the best of its knowledge and ability. Without restricting the generality of the foregoing, neither Party makes any representation or warranty as to whether or not use of the NT Technology supplied hereunder will infringe any patent or other rights of any other person.

Participant shall have the primary right and obligation to bring and defend in and for the United States, at its own expense, and for its own benefit, any proceedings relating to alleged infringement of its rights to the NT Technology by a third party or the alleged infringement by Participant's use of the NT Technology of the rights of third parties. If Participant fails to act within sixty (60) days from the notice of any such alleged

NNC/NNL Confidential Information - NNC-NNL006448

- 10 -

infringement, Northern Telecom shall have the right to bring or defend, in and for the United States, the proceedings in its own name, at its own expense and for its own benefit.

NTI shall indemnify and save Northern Telecom harmless from any and all claims and liabilities for damages, losses, expenses or costs (including counsel fees and expenses) arising in and for the United States out of any such infringement or alleged infringement by Participant.

## ARTICLE 8
### RECORDS

Participant shall keep clear and accurate records to support the calculations under Article 3 pertaining to the Participant and Northern Telecom shall keep clear and accurate records to support the calculations of all other amounts to be determined pursuant to Article 3. Both Parties shall provide to each other upon request, in such form as may reasonably be requested, documentation with respect to the foregoing.

Each Party shall have the right to examine and audit, during normal hours, semi-annually (or at less frequent intervals) all such records and such other records and accounts as may under recognized accounting practices contain information bearing upon the amounts payable to it or the other Party under this Cost Sharing Agreement. Prompt adjustment shall be made by the proper Party to compensate for any errors or omissions disclosed by such examination or audit.

## ARTICLE 9
### FORCE MAJEURE

Neither Party shall be in default or liable for any loss or damage resulting from delays in performance or from failure to perform or comply with terms of this Cost Sharing Agreement due to any causes beyond its reasonable control, which causes include but are not limited to Acts of God or the public enemy; riots and insurrection, war, accidents, fire, strikes and other labour difficulties (whether or not the Party is in a position to concede to such demands), embargoes, judicial action; lack of or inability to obtain export permits or approvals, necessary labour, materials, energy, components or machinery; acts of civil or military authorities.

## ARTICLE 10
### DURATION AND CONTINUING RIGHTS

This Agreement shall continue until the 31st day of December 1999, unless terminated by either Party in accordance with Article 11, and thereafter shall be renewed for further one (1) year terms unless notice is given by one Party to the other of its intention not to renew this Cost Sharing Agreement at least sixty (60) days before any anniversary date hereof.

Subject to the provisions of the second paragraph of Article 11, upon the expiry or termination of this Cost Sharing Agreement, Participant shall be deemed to have acquired a fully paid up license permitting Participant to continue to exercise the rights granted to it herein, and, in particular, the rights granted to it in Article 5, as though this Cost Sharing Agreement had continued without, however, Participant being subject to payment of any further amounts to Northern Telecom by way of cost sharing payment or otherwise.

The provisions of Article 6 related to confidentiality and of Article 7 related to liability shall survive notwithstanding the expiry of this Cost Sharing Agreement or any termination of this Cost Sharing Agreement for any cause whatever.

NNC/NNL Confidential Information - NNC-NNL006449

- 11 -

ARTICLE 11
TERMINATION

In the event either Party shall be in breach of this Cost Sharing Agreement or fail to perform one or more of its material obligations under this Cost Sharing Agreement, the other Party may, by written notice to the Party in default, require the remedy of the breach or the performance of the obligation and, if the Party so notified fails to remedy or perform within sixty (60) days of the forwarding of a notice so to do, the other Party may, by written notice, terminate this Cost Sharing Agreement. In the event of such termination by Participant, Participant shall have such continuing rights as are provided in Article 10.

In the event Participant becomes insolvent or is the object of bankruptcy or insolvency proceedings, or makes an assignment for the benefit of its creditors, or is placed in receivership or liquidation, or if a substantial part of the assets of NTI, or a controlling interest in the stock of NTI, is expropriated, seized, or required to be transferred to, or into the control of, a third party, pursuant to a judicial, administrative or other governmental order or decision, or if Northern Telecom terminates this Cost Sharing Agreement pursuant to the preceding paragraph, all rights granted to Participant hereunder shall be cancelled forthwith and shall automatically revert, without further action by either Party, to Northern Telecom. Immediately upon such cancellation and reversion, Participant shall discontinue the exercise of the rights granted hereunder and shall promptly deliver to Northern Telecom all documentation with respect to NT Technology.

In the event of an enforceable judicial decision declaring invalid an essential part of this Cost Sharing Agreement, without which this Cost Sharing Agreement would not have been entered into, this Cost Sharing Agreement may, at the option of either Party, be terminated upon the giving of notice to the other Party. Save as before set forth, in the event that any term, clause, provision or condition of this Cost Sharing Agreement shall be adjudged invalid for any reason whatsoever, such invalidity shall not affect the validity or operation of any other term, clause, provision or condition and such invalid term, clause, provision or condition shall be deemed to have been deleted from this Cost Sharing Agreement.

ARTICLE 12
NOTICES

Any and all notices or other information to be given by one of the Parties to the other shall be deemed sufficiently given when forwarded by prepaid registered or certified first class air mail or by facsimile transmission or hand delivery to the other Party at the following address:

If to Participant:

Northern Telecom Inc.
200 Athens Way
Nashville, Tennessee
U.S.A. 37228

Attention: Secretary

NNC/NNL Confidential Information - NNC-NNL006450

- 12 -

If to Northern Telecom:

> Northern Telecom Limited
> 8200 Dixie Road, Suite 100
> Brampton, Ontario
> Canada L6T 5P6

> Attention: Secretary

and such notices shall be deemed to have been received fifteen (15) business days after mailing if forwarded by mail, and the following business day if forwarded by facsimile transmission or hand.

The aforementioned address of either Party may be changed at any time by giving fifteen (15) business days prior notice to the other Party in accordance with the foregoing.

In the event of a generally-prevailing labour dispute or other situation which will delay or impede the giving of notice by any such means, in either the country of origin or of destination, the notice shall be given by such specified mode as will be most reliable and expeditious and least affected by such dispute or situation.

### ARTICLE 13
### GENERAL PROVISIONS

This Agreement shall not be assigned by either Party except with the written consent of the other.

The failure of either Party to give notice to the other Party of the breach or non-fulfilment of any term, clause, provision or condition of this Cost Sharing Agreement shall not constitute a waiver thereof, nor shall the waiver of any breach or non-fulfilment of any term, clause, provision or condition of this Cost Sharing Agreement constitute a waiver of any other breach or non-fulfilment of that, or any other, term, clause, provision or condition of this Cost Sharing Agreement.

In respect to the subject matter hereof, this Cost Sharing Agreement sets forth the entire agreement and understanding between the Parties.

The currency to be used for computing all amounts hereunder shall be the U.S. dollar, unless the Parties agree otherwise.

This Cost Sharing Agreement may be executed in two or more counterparts and upon delivery of counterparts which together show the execution by all Parties hereto, shall constitute one agreement which shall enure to the benefit of and be binding upon the Parties hereto.

This Cost Sharing Agreement shall be construed in accordance with and governed by the laws of the Province of Ontario, Canada.

NNC/NNL Confidential Information - NNC-NNL006451

- 13 -

IN WITNESS WHEREOF, the Parties have caused this Cost Sharing Agreement to be executed by their duly authorized officers as of the date first written above.

NORTHERN TELECOM LIMITED

Per: _____

A.J. Lafleur
Vice-President and
Associate General Counsel

Per: _____

D.J. Noble
Assistant Secretary


NORTHERN TELECOM INC.

Per: _____

M.M. Gross
President and Vice-President,
Finance

NNC/NNL Confidential Information - NNC-NNL006452

## AMENDED RESEARCH AND DEVELOPMENT COST SHARING AGREEMENT

Agreement made and entered into with effect as of and from the 1st day of October, 1992,

BY AND BETWEEN:

NORTHERN TELECOM LIMITED, a corporation duly incorporated under the laws of Canada, having its executive offices at 8200 Dixie Road, Suite 100, Brampton, Ontario, Canada L6T 5P6 (hereinafter referred to as "Northern Telecom")

AND:

NORTEL AUSTRALIA PTY. LIMITED, a corporation duly incorporated under the laws of the State of New South Wales, Australia, having its executive offices at Level 5, 495 Victoria Avenue, Chatswood, New South Wales, Australia 2067 (hereinafter referred to as "Nortel Australia")

WHEREAS Northern Telecom and certain Subsidiaries, including Participant, have in the past expended, and intend in the future to expend, substantial sums of money on research and development services or activities;

WHEREAS Northern Telecom and such Subsidiaries, including Participant, wish to utilize in their businesses the NT Technology (as hereinafter defined) derived from such services or activities;

WHEREAS Northern Telecom and such Subsidiaries, including Participant, wish to share the costs and risks of research and development services or activities in return for interests in any NT Technology that may be produced by such services or activities;

WHEREAS the Parties have, pursuant to an Agreement dated as of October 1, 1992 (the "Cost Sharing Agreement"), undertaken to share certain costs of research and development services or activities; and

WHEREAS the Parties wish to amend, amplify and clarify certain matters related to the Cost Sharing Agreement;

NOW, THEREFORE, THIS AGREEMENT WITNESSETH THAT, IN CONSIDERATION OF THE MUTUAL PROMISES HEREINAFTER SET FORTH, THE PARTIES AGREE TO AMEND AND RESTATE THE COST SHARING AGREEMENT EFFECTIVE OCTOBER 1, 1992 TO READ IN ITS ENTIRETY AS FOLLOWS:

### ARTICLE 1
### DEFINITIONS

As used herein, unless otherwise defined:

(a)    "Board of Directors" shall mean the Board of Directors of Northern Telecom;

NNC/NNL Confidential Information - NNC-NNL006465

- 2 -

(b)     "Compensating Adjustment" shall mean adjustments made in accordance with Article 3 of this Cost Sharing Agreement;

(c)     "Cost of Goods Sold" shall mean the cost of goods sold determined according to GAAP;

(d)     "Cost Sharing Participant" shall mean any member of the NTL Group sharing in the R&D Expenses pursuant to a R&D Cost Sharing Agreement;

(e)     "GAAP" shall mean Canadian Generally Accepted Accounting Principles as applied by Northern Telecom or Participant, as the case may be, in making determinations under this Cost Sharing Agreement;

(f)     "Intercompany Purchases" shall mean purchases from one member of the NTL Group by another such member;

(g)     "Intercompany Sales" shall mean sales to a member of the NTL Group by another such member;

(h)     "Net Customer Sales" shall mean customer sales, less discounts and returns;

(i)     "Nortel Australia Subsidiaries" shall mean those entities the financial results of which are included in the Nortel Australia consolidated financial statements under GAAP or, in the case of a jointly-controlled entity (as defined for GAAP purposes), that portion of its financial results that are consolidated in the Nortel Australia consolidated financial statements under GAAP;

(j)     "Northern Telecom Subsidiaries" shall mean those entities the financial results of which are included in the NTL Consolidated Financial Statements under GAAP or, in the case of a jointly-controlled entity (as defined for GAAP purposes), that portion of its financial results that are consolidated in the NTL Consolidated Financial Statements under GAAP;

(k)     "NT Technology" shall mean any and all intangible assets (including but not limited to patents, industrial designs, copyrights and applications thereof, technical know-how, drawings, reports, practices, specifications, software and other documentation or information) produced or conceived as a result of the R&D Expenses during a calendar year or any prior years;

(l)     "NTL Consolidated Financial Statements" shall mean the audited consolidated financial statements of Northern Telecom;

(m)     "NTL Group" shall mean Northern Telecom and all Northern Telecom Subsidiaries, and their successors, transferees and assigns;

(n)     "Operating Income" shall mean Net Customer Sales, less Cost of Goods Sold, selling expenses, and general and administrative expenses allocable to such Net Customer Sales, but before the deduction of any R&D Expenses, goodwill amortization, interest expense, income taxes, or any other expenses not relating to continuing operations; provided, Operating Income shall exclude any other income and expense and extraordinary items;

(o)     "Participant" shall mean Nortel Australia and all Nortel Australia Subsidiaries, and their successors, transferees and assigns;

**NNC/NNL Confidential Information - NNC-NNL006466**

- 3 -

(p) "Participant's Cost Sharing Payment" shall have the meaning ascribed thereto in Article 3 of this Cost Sharing Agreement;

(q) "Participant's Share" in respect of R&D Expenses shall have the meaning ascribed thereto in Article 3 of this Cost Sharing Agreement;

(r) "Planned Participant's Cost Sharing Payment" shall have the meaning ascribed thereto in Article 3 of this Cost Sharing Agreement;

(s) "Products" shall mean all products, software and services manufactured or marketed, or proposed to be manufactured or marketed, at any time by the NTL Group, and all components, parts, sub-assemblies and software associated with or incorporated in any of the foregoing;

(t) "R&D Cost Sharing Agreement" shall mean a research and development cost sharing agreement that is in effect between Northern Telecom and another member of the NTL Group pursuant to which Northern Telecom and the other such member share in some or all of the R&D Expenses during a calendar year;

(u) "R&D Expenses" shall mean the sum of the expenses of Research and Development incurred for the development of NT Technology directly or indirectly by all Cost-Sharing Participants in the NTL Group and approved by, or under authority from, the Board of Directors;

(v) "Research and Development" shall mean all research and development services or activities performed by or for all Cost Sharing Participants including, without limitation, development of methods, processes, procedures and tools related to manufacturing, installation, operation, maintenance and use of Products, but excluding services designated by Northern Telecom as custom research and development;

(w) "Residual" shall mean the total R&D Expenses less the amount of R&D Expenses allocated to Royalty Income;

(x) "Royalty Income" shall mean income (net of any income paid to other Cost Sharing Participants and which is included in such other Cost Sharing Participant's Royalty Income) generated during a calendar year through the licensing of NT Technology; and

(y) "Subsidiary" shall mean a Northern Telecom Subsidiary or a Nortel Australia Subsidiary as the case may be.

## ARTICLE 2
## RESEARCH AND DEVELOPMENT PROGRAM AND BUDGET

Budgets for the performance of Research and Development, and appropriations for expenditures on all Research and Development projects, shall, from time to time, be reviewed and approved by, or under authority from, the Board of Directors.

All costs incurred directly or indirectly within the Research and Development appropriations approved as contemplated above shall be paid for by the Party or its Subsidiary incurring such expense, and shall be shared by Northern Telecom and Participant as hereinafter set forth.

NNC/NNL Confidential Information - NNC-NNL006467

- 4 -

## ARTICLE 3
## COST SHARING OF RESEARCH AND DEVELOPMENT

Participant and Northern Telecom shall each bear its share of the R&D Expenses in respect of each calendar year during the term of this Cost Sharing Agreement as hereinafter provided, regardless of whether or not any NT Technology is successfully produced by any or all of the Research and Development conducted pursuant to this Cost Sharing Agreement.

Participant's share of the R&D Expenses in respect of each calendar year during the term of this Cost Sharing Agreement ("Participant's Share") shall be calculated in two parts as follows:

(a) under Part 1, as described below, a determination shall be made of the amount of the R&D Expenses to be allocated to Royalty Income and a portion of this amount of the R&D Expenses shall then be allocated to Participant; and

(b) under Part 2, as described below, a portion of the Residual shall then be allocated to Participant.

Any foreign currency translations shall be made in accordance with GAAP as adopted in the NTL Consolidated Financial Statements. Calculations under this Article shall incorporate all amounts within a Cost Sharing Participant's geographic market.

### Part 1

(a) The amount of the R&D Expenses to be attributed to Royalty Income for the calendar year shall be determined in accordance with the following formula:

$(R/(T + R))$ x R&D = P, where

R = the total Royalty Income of all Cost Sharing Participants for the calendar year;

T = total Operating Income for all Cost Sharing Participants for the calendar year (T will be deemed to be zero if T is negative);

R&D = R&D Expenses for the calendar year; and

P = the R&D Expenses to be allocated to Royalty Income for the calendar year.

(b) The R&D Expenses allocated to Royalty Income for the calendar year in accordance with this Article shall be allocated between Northern Telecom and Participant by applying the following formula:

$(A/R)$ x P = S, where

A = Participant's Royalty Income for the calendar year;

R = the total Royalty Income for all Cost Sharing Participants for the calendar year;

**NNC/NNL Confidential Information - NNC-NNL006468**

- 5 -

P = the R&D Expenses allocated to Royalty Income for the calendar year, as determined in this Article; and

S = the R&D Expenses attributable to Royalty Income and allocated to Participant for the calendar year.

Part 2

(a)   The allocation of the Residual for each calendar year will be made as follows:

(1)   Ten percent (10%) of the Residual for the calendar year shall be allocated between Participant and Northern Telecom on the basis of Net Customer Sales by applying the following formula:

$(CS/TCS) \times .10 \times (R\&D-P) = B$, where

CS = Participant's Net Customer Sales for the calendar year;

TCS = total Net Customer Sales for all Cost Sharing Participants for the calendar year;

R&D = R&D Expenses for the calendar year;

P = the R&D Expenses allocated to Royalty Income for the calendar year, as determined pursuant to this Article; and

B = Participant's allocation of ten percent (10%) of the Residual for the calendar year.

(2)   Ninety percent (90%) of the Residual shall be allocated between Northern Telecom and Participant on the basis of Modified Operating Income (as defined in this Article) by applying the following formula:

$(MOI/TMO) \times .90 \times (R\&D-P) = C$, where

MOI = Participant's Modified Operating Income for the calendar year (as defined in this Article); provided, if MOI is less than or equal to zero, no allocation will be made to Participant under this subsection (a)(2) of Part 2 of this Article for the calendar year;

TMO = the sum of all Cost Sharing Participants' Modified Operating Income for the calendar year; provided, if the total Modified Operating Income of all Cost Sharing Participants other than Participant is equal to or less than zero, and MOI is greater than $0, (MOI/TMO) shall be deemed to equal 1, and the R&D Expenses allocated under this subsection (a)(2) of Part 2 of this Article for the calendar year shall be allocated entirely to Participant;

R&D = R&D Expenses for the calendar year;

P = the R&D Expenses allocated to Royalty Income for the calendar year, as determined pursuant to this Article; and

NNC/NNL Confidential Information - NNC-NNL006469

- 6 -

C = Participant's allocation of ninety percent (90%) of the Residual for the calendar year.

(3)    For purposes of subsection (a)(2) of Part 2 of this Article, a Cost Sharing Participant's Modified Operating Income for the calendar year shall be determined in accordance with the following formula:

OI - ((CGS - IP) x M) = MOI, where

OI = the Cost Sharing Participant's Operating Income for the calendar year, it being acknowledged that Operating Income may change as the result of issues raised on audit other than those presented by this Cost Sharing Agreement;

CGS = the Cost Sharing Participant's Cost of Goods Sold attributable to Net Customer Sales for the calendar year;

IP = the Cost Sharing Participant's Intercompany Purchases for the calendar year; and

M = for the calendar years ending December 31, 1992 - December 31, 1995, M is the Cost Sharing Participant's Operating Income realized on Intercompany Sales divided by the total Cost of Goods Sold attributable to Intercompany Sales and for calendar years ending December 31, 1996, and following, M is the Cost Sharing Participant's Operating Income realized on Intercompany Sales, as determined by Northern Telecom, divided by the Cost of Goods Sold on Intercompany Sales.

Participant's Cost Sharing Payment for each calendar year, to be paid as hereinafter provided, shall equal Participant's Share less Participant's R&D. In the event Participant's Cost Sharing Payment is negative, Northern Telecom shall make a payment to Participant as hereinafter provided.

Nortel Australia shall make payments to Northern Telecom on account of Participant's Cost Sharing Payment in the manner hereinafter set forth, with an appropriate adjusting payment to be made as provided below.

Nortel Australia shall pay to Northern Telecom, based on budgeted or forecasted amounts but otherwise determined as hereinabove provided, a planned Participant's Cost Sharing Payment ("Planned Participant's Cost Sharing Payment") in twelve (12) equal monthly instalments within thirty (30) days of the date of the invoice therefor commencing in January of each year. In the event the Planned Participant's Cost Sharing Payment is negative, such amount shall be payable by Northern Telecom to Nortel Australia in like manner as hereinabove provided.

For the calendar years ending December 31, 1992, December 31, 1993, December 31, 1994 and December 31, 1995, any resulting Compensating Adjustment, reflecting the application of the formula as hereinabove provided, shall be paid within a reasonable period of time.

For subsequent calendar years, to the extent a Compensating Adjustment is necessary, Northern Telecom or Participant shall pay the Compensating Adjustment to the

NNC/NNL Confidential Information - NNC-NNL006470

- 7 -

other entity within three hundred and twenty (320) days of the year end of the paying entity to which the Compensating Adjustment relates.

Compensating Adjustments may also arise when Northern Telecom, Participant, Revenue Canada or the Australian Taxation Office makes normal and routine adjustments (e.g. correction of computational errors) to the determination and computation of Northern Telecom's or Participant's Share of R&D Expenses or related calculations. Any such subsequent Compensating Adjustment agreed to by Northern Telecom and Participant shall be paid within ninety (90) days from the date of final determination and agreement thereof.

Northern Telecom or Participant may employ any payment method which it deems appropriate for settling Compensating Adjustments, including, but not limited to, the use of cheques, wire transfers, or offsets through intercompany accounts maintained by the entities with each other. Payment of Compensating Adjustments shall be made in the currency in which payment between the related entities is made for the transactions covered by this Cost Sharing Agreement.

The Parties may agree, from time to time, prior to the end of each calendar year, to an estimate or revised estimate of such adjusting payment and adjust the monthly payments hereinbefore determined, or otherwise make payment, according to such estimate or revised estimate, in which event the final adjusting payment to be made shall reflect such payment(s).

The receipt or payment of a Compensating Adjustment shall not be subject to any withholding taxes in Canada or Australia.

## ARTICLE 4
## LEGAL TITLE TO
## NT TECHNOLOGY

The Parties hereto acknowledge that, except as otherwise specifically agreed, legal title to all NT Technology whether now in existence or developed pursuant to the terms of this Cost Sharing Agreement shall be vested in Northern Telecom. With respect to patentable inventions and copyrightable property encompassed by NT Technology, Northern Telecom shall have the exclusive right but not the obligation to file and prosecute applications in its name for patent or copyright protection in every country of the world. Participant shall execute or cause to be executed such documents reasonably requested by Northern Telecom as may be necessary or desirable to give effect to the foregoing.

Participant shall, from time to time, promptly upon receipt of Northern Telecom's request, and at Northern Telecom's expense, furnish to Northern Telecom all available and requested documentation relating to the NT Technology developed by or for Participant pursuant to the terms of this Cost Sharing Agreement.

## ARTICLE 5
## PARTICIPANT'S EXCLUSIVE ROYALTY-FREE LICENSE TO
## NT TECHNOLOGY

To the extent of its legal right so to do, and subject to the rights of third parties under agreements to which Northern Telecom is a party, Northern Telecom, in consideration of Participant's sharing of the costs of Research and Development pursuant to this Cost Sharing Agreement, as from time to time amended, hereby grants to Participant an exclusive royalty-free license, including the right to sublicense, which, except as hereinafter provided, shall be in perpetuity to make, have made, use, lease and sell Products embodying NT Technology in and for Australia, and to all rights to patents, industrial designs (or equivalent) and

NNC/NNL Confidential Information - NNC-NNL006471

- 8 -

copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith.

Northern Telecom shall, from time to time, promptly upon receipt of Participant's request, and at Participant's expense, furnish to Participant all available and requested documentation and other information relating to the NT Technology developed by or for Northern Telecom pursuant to the terms of this Cost Sharing Agreement.

Participant shall not exercise its exclusive rights hereunder to prohibit (to the extent, if any, it were otherwise entitled to do so):

(a)     the import into Australia of products manufactured by licensees of a member of the NTL Group outside Australia and Canada;

(b)     the exercise of the right to make or have made in Australia items required by a third party in connection with manufacturing by such party pursuant to a license agreement with a member of the NTL Group; or

(c)     the procurement by a member of the NTL Group of components, assemblies, sub-assemblies, supplies, facilities, services and products as may be required by the NTL Group in its business outside Australia or in support of the Participant's business in Australia.

Participant shall from time to time upon request by Northern Telecom, grant such non-exclusive license to Northern Telecom in and for Australia under the patents and patent applications encompassed by the NT Technology as may be necessary to enable Northern Telecom to enter into cross-licensing arrangements with one or more third parties.

The rights granted under this Article shall not relieve either Party from its obligations in respect of royalty payments to third parties.

### ARTICLE 6
### CONFIDENTIAL INFORMATION

Participant acknowledges that Northern Telecom is the legal owner of the NT Technology developed pursuant to this Cost Sharing Agreement and that the NT Technology is proprietary and constitutes a trade secret. Participant shall hold the NT Technology in confidence and only make use of or disclose it as permitted by this Cost Sharing Agreement.

Participant shall have primary right and obligation to protect through appropriate contractual arrangements, legal proceedings or otherwise the confidentiality of the NT Technology in and for Australia, subject to Northern Telecom's right to file and prosecute applications for patent and copyright protection as hereinbefore provided.

Participant shall, during the full term of this Cost Sharing Agreement and for fifteen (15) years thereafter hold secret and not disclose, make known, divulge or communicate to any person (except Participant's employees and licensees as permitted under Article 5 and then only under an obligation of secrecy binding upon such employees and licensees) any of the NT Technology.

Participant shall not make or have made or permit to be made any copies or translations of the NT Technology except those copies or translations which are reasonably necessary for the exercise by Participant of the rights herein granted to it and all such copies or translations shall, upon reproduction by Participant, contain the same proprietary and

**NNC/NNL Confidential Information - NNC-NNL006472**

- 9 -

confidentiality notices or legends which appear on the NT Technology made available to Participant under this Cost Sharing Agreement.

Notwithstanding the foregoing, Participant shall have the right:

(a)    to communicate relevant portions of the NT Technology to suppliers in all countries of the world reasonably necessary for, and solely for, the procurement by Participant of commercially available materials and parts for use in the manufacture and/or installation of the Products; and

(b)    to communicate to customers purchasing the Products, such portions of the NT Technology as are reasonably needed by such customers for operating and maintaining the Products;

provided, however, that the recipients of the NT Technology be advised by Participant, in writing, at the time, or before such communication, that proprietary information is being communicated and that such information is to be kept confidential and not used except as permitted hereunder, and provided further, that such recipients undertake, in writing, prior to disclosure, to respect such confidentiality.

The provisions of this Cost Sharing Agreement concerning confidentiality shall survive the expiration or termination of this Cost Sharing Agreement, but in no event shall such provisions apply to the extent that:

(a)    NT Technology was supplied to Participant by an independent third party prior to the effective date of this Cost Sharing Agreement; or

(b)    NT Technology becomes available to the general public through no fault of Participant.

## ARTICLE 7
## LIABILITY

Neither Party makes any representation in respect to, and does not warrant, any NT Technology provided to the other Party hereunder, but shall furnish such in good faith to the best of its knowledge and ability. Without restricting the generality of the foregoing, neither Party makes any representation or warranty as to whether or not use of the NT Technology supplied hereunder will infringe any patent or other rights of any other person.

Participant shall have the primary right and obligation to bring and defend in and for Australia, at its own expense, and for its own benefit, any proceedings relating to alleged infringement of its rights to the NT Technology by a third party or the alleged infringement by Participant's use of the NT Technology of the rights of third parties. If Participant fails to act within sixty (60) days from the notice of any such alleged infringement, Northern Telecom shall have the right to bring or defend, in and for Australia, the proceedings in its own name, at its own expense and for its own benefit.

Nortel Australia shall indemnify and save Northern Telecom harmless from any and all claims and liabilities for damages, losses, expenses or costs (including counsel fees and expenses) arising in and for Australia out of any such infringement or alleged infringement by Participant.

NNC/NNL Confidential Information - NNC-NNL006473

- 10 -

## ARTICLE 8
## RECORDS

Participant shall keep clear and accurate records to support the calculations under Article 3 pertaining to the Participant and Northern Telecom shall keep clear and accurate records to support the calculations of all other amounts to be determined pursuant to Article 3. Both Parties shall provide to each other upon request, in such form as may reasonably be requested, documentation with respect to the foregoing.

Each Party shall have the right to examine and audit, during normal hours, semi-annually (or at less frequent intervals) all such records and such other records and accounts as may under recognized accounting practices contain information bearing upon the amounts payable to it or the other Party under this Cost Sharing Agreement. Prompt adjustment shall be made by the proper Party to compensate for any errors or omissions disclosed by such examination or audit.

## ARTICLE 9
## FORCE MAJEURE

Neither Party shall be in default or liable for any loss or damage resulting from delays in performance or from failure to perform or comply with terms of this Cost Sharing Agreement due to any causes beyond its reasonable control, which causes include but are not limited to Acts of God or the public enemy; riots and insurrection, war, accidents, fire, strikes and other labour difficulties (whether or not the Party is in a position to concede to such demands), embargoes, judicial action; lack of or inability to obtain export permits or approvals, necessary labour, materials, energy, components or machinery; acts of civil or military authorities.

## ARTICLE 10
## DURATION AND CONTINUING RIGHTS

This Agreement shall continue until the 31st day of December 1999, unless terminated by either Party in accordance with Article 11, and thereafter shall be renewed for further one (1) year terms unless notice is given by one Party to the other of its intention not to renew this Cost Sharing Agreement at least sixty (60) days before any anniversary date hereof.

Subject to the provisions of the second paragraph of Article 11, upon the expiry or termination of this Cost Sharing Agreement, Participant shall be deemed to have acquired a fully paid up license permitting Participant to continue to exercise the rights granted to it herein, and, in particular, the rights granted to it in Article 5, as though this Cost Sharing Agreement had continued without, however, Participant being subject to payment of any further amounts to Northern Telecom by way of cost sharing payment or otherwise.

The provisions of Article 6 related to confidentiality and of Article 7 related to liability shall survive notwithstanding the expiry of this Cost Sharing Agreement or any termination of this Cost Sharing Agreement for any cause whatever.

## ARTICLE 11
## TERMINATION

In the event either Party shall be in breach of this Cost Sharing Agreement or fail to perform one or more of its material obligations under this Cost Sharing Agreement, the other Party may, by written notice to the Party in default, require the remedy of the breach or the

NNC/NNL Confidential Information - NNC-NNL006474

- 11 -

performance of the obligation and, if the Party so notified fails to remedy or perform within sixty (60) days of the forwarding of a notice so to do, the other Party may, by written notice, terminate this Cost Sharing Agreement. In the event of such termination by Participant, Participant shall have such continuing rights as are provided in Article 10.

In the event Participant becomes insolvent or is the object of bankruptcy or insolvency proceedings, or makes an assignment for the benefit of its creditors, or is placed in receivership or liquidation, or if a substantial part of the assets of Nortel Australia, or a controlling interest in the stock of Nortel Australia, is expropriated, seized, or required to be transferred to, or into the control of, a third party, pursuant to a judicial, administrative or other governmental order or decision, or if Northern Telecom terminates this Cost Sharing Agreement pursuant to the preceding paragraph, all rights granted to Participant hereunder shall be cancelled forthwith and shall automatically revert, without further action by either Party, to Northern Telecom. Immediately upon such cancellation and reversion, Participant shall discontinue the exercise of the rights granted hereunder and shall promptly deliver to Northern Telecom all documentation with respect to NT Technology.

In the event of an enforceable judicial decision declaring invalid an essential part of this Cost Sharing Agreement, without which this Cost Sharing Agreement would not have been entered into, this Cost Sharing Agreement may, at the option of either Party, be terminated upon the giving of notice to the other Party. Save as before set forth, in the event that any term, clause, provision or condition of this Cost Sharing Agreement shall be adjudged invalid for any reason whatsoever, such invalidity shall not affect the validity or operation of any other term, clause, provision or condition and such invalid term, clause, provision or condition shall be deemed to have been deleted from this Cost Sharing Agreement.

ARTICLE 12
NOTICES

Any and all notices or other information to be given by one of the Parties to the other shall be deemed sufficiently given when forwarded by prepaid registered or certified first class air mail or by facsimile transmission or hand delivery to the other Party at the following address:

If to Participant:

        Nortel Australia Pty. Limited
        Level 5, 495 Victoria Avenue
        Chatswood, New South Wales
        Australia 2067

        Attention: Secretary

If to Northern Telecom:

        Northern Telecom Limited
        8200 Dixie Road, Suite 100
        Brampton, Ontario
        Canada L6T 5P6

        Attention: Secretary

NNC/NNL Confidential Information - NNC-NNL006475

- 12 -

and such notices shall be deemed to have been received fifteen (15) business days after mailing if forwarded by mail, and the following business day if forwarded by facsimile transmission or hand.

The aforementioned address of either Party may be changed at any time by giving fifteen (15) business days prior notice to the other Party in accordance with the foregoing.

In the event of a generally-prevailing labour dispute or other situation which will delay or impede the giving of notice by any such means, in either the country of origin or of destination, the notice shall be given by such specified mode as will be most reliable and expeditious and least affected by such dispute or situation.

### ARTICLE 13
### RESEARCH AND DEVELOPMENT -
### AUSTRALIAN GOVERNMENT PROGRAMS

Notwithstanding anything else contained herein, this Cost Sharing Agreement shall not apply to, and shall be deemed to exclude, any Research and Development performed by Participant pursuant to (i) the "Industry Development Arrangements" established by the Government of Australia, (ii) any "Partnership for Development Agreement" entered into between Participant and the Government of Australia, and (iii) any arrangements or agreements similar to those described in subclauses (i) and (ii) above entered into between Participant and the Government of Australia (collectively, the "Government Programs"), to the extent that the legal title to any NT Technology produced by any such Research and Development would be required to be vested in Participant in order for Participant to comply with the requirements of the Government Programs.

### ARTICLE 14
### GENERAL PROVISIONS

This Agreement shall not be assigned by either Party except with the written consent of the other.

The failure of either Party to give notice to the other Party of the breach or non-fulfilment of any term, clause, provision or condition of this Cost Sharing Agreement shall not constitute a waiver thereof, nor shall the waiver of any breach or non-fulfilment of any term, clause, provision or condition of this Cost Sharing Agreement constitute a waiver of any other breach or non-fulfilment of that, or any other, term, clause, provision or condition of this Cost Sharing Agreement.

In respect to the subject matter hereof, this Cost Sharing Agreement sets forth the entire agreement and understanding between the Parties.

The currency to be used for computing all amounts hereunder shall be the U.S. dollar, unless the Parties agree otherwise.

This Cost Sharing Agreement may be executed in two or more counterparts and upon delivery of counterparts which together show the execution by all Parties hereto, shall constitute one agreement which shall enure to the benefit of and be binding upon the Parties hereto.

This Cost Sharing Agreement shall be construed in accordance with and governed by the laws of the Province of Ontario, Canada.

**NNC/NNL Confidential Information - NNC-NNL006476**

- 13 -

IN WITNESS WHEREOF, the Parties have caused this Cost Sharing Agreement to be executed by their duly authorized officers as of the date first written above.

NORTHERN TELECOM LIMITED

Per: _____

A.J. Lafleur
Vice-President and
Associate General Counsel

Per: _____

D.J. Noble
Assistant Secretary

NORTEL AUSTRALIA PTY. LIMITED

Per: _____

B.P. Davis
Managing Director

Per: _____

K.W. Evans
Secretary

NNC/NNL Confidential Information - NNC-NNL006477



## RESEARCH AND DEVELOPMENT COST SHARING AGREEMENT

Agreement made and entered into with effect as of and from the 1st day of January, 1995.

| | |
|---|---|
| BY AND BETWEEN: | NORTHERN TELECOM LIMITED, a corporation duly incorporated under the laws of Canada, having its executive offices at 8200 Dixie Road, Suite 100, Brampton, Ontario, Canada L6T 5P6 (hereinafter referred to as "Northern Telecom") |
| AND: | NORTEL LIMITED, a corporation duly incorporated under the laws of England, having its executive offices at Maidenhead Office Park, Westacott Way, Maidenhead, Berkshire, England SL6 3QH (hereinafter referred to as "Nortel U.K.") |

WHEREAS Northern Telecom and certain Subsidiaries, including Participant, have in the past expended, and intend in the future to expend, substantial sums of money on research and development services or activities;

WHEREAS Northern Telecom and such Subsidiaries, including Participant, wish to utilize in their businesses the NT Technology (as hereinafter defined) derived from such services or activities;

WHEREAS Northern Telecom and such Subsidiaries, including Participant, wish to share the costs and risks of research and development services or activities in return for interests in any NT Technology that may be produced by such services or activities;

NOW, THEREFORE, THIS AGREEMENT WITNESSETH THAT, IN CONSIDERATION OF THE MUTUAL PROMISES HEREINAFTER SET FORTH, THE PARTIES AGREE AS FOLLOWS:

### ARTICLE 1
### DEFINITIONS

As used herein, unless otherwise defined:

(a) "Board of Directors" shall mean the Board of Directors of Northern Telecom;

(b) "Compensating Adjustment" shall mean adjustments made in accordance with Article 3 of this Cost Sharing Agreement;

(c) "Cost of Goods Sold" shall mean the cost of goods sold determined according to GAAP;

(d) "Cost Sharing Participant" shall mean any member of the NTL Group sharing in the R&D Expenses pursuant to a R&D Cost Sharing Agreement;

(e) "GAAP" shall mean Canadian Generally Accepted Accounting Principles as applied by Northern Telecom or Participant, as the case may be, in making determinations under this Cost Sharing Agreement;

NNC/NNL Confidential Information - NNC-NNL006453

- 2 -

(f)    "Intercompany Purchases" shall mean purchases from one member of the NTL Group by another such member;

(g)    "Intercompany Sales" shall mean sales to a member of the NTL Group by another such member;

(h)    "Net Customer Sales" shall mean customer sales, less discounts and returns;

(i)    "Nortel U.K. Subsidiaries" shall mean those entities the financial results of which are included in the Nortel U.K. consolidated financial statements under GAAP or, in the case of a jointly-controlled entity (as defined for GAAP purposes), that portion of its financial results that are consolidated in the Nortel U.K. consolidated financial statements under GAAP;

(j)    "Northern Telecom Subsidiaries" shall mean those entities the financial results of which are included in the NTL Consolidated Financial Statements under GAAP or, in the case of a jointly-controlled entity (as defined for GAAP purposes), that portion of its financial results that are consolidated in the NTL Consolidated Financial Statements under GAAP;

(k)    "NT Technology" shall mean any and all intangible assets (including but not limited to patents, industrial designs, copyrights and applications thereof, technical know-how, drawings, reports, practices, specifications, software and other documentation or information) produced or conceived as a result of the R&D Expenses during a calendar year or any prior years;

(l)    "NTL Consolidated Financial Statements" shall mean the audited consolidated financial statements of Northern Telecom;

(m)    "NTL Group" shall mean Northern Telecom and all Northern Telecom Subsidiaries, and their successors, transferees and assigns;

(n)    "Operating Income" shall mean Net Customer Sales, less Cost of Goods Sold, selling expenses, and general and administrative expenses allocable to such Net Customer Sales, but before the deduction of any R&D Expenses, goodwill amortization, interest expense, income taxes, or any other expenses not relating to continuing operations; provided, Operating Income shall exclude any other income and expense and extraordinary items;

(o)    "Participant" shall mean Nortel U.K. and all Nortel U.K. Subsidiaries, and their successors, transferees and assigns;

(p)    "Participant's Cost Sharing Payment" shall have the meaning ascribed thereto in Article 3 of this Cost Sharing Agreement;

(q)    "Participant's Share" in respect of R&D Expenses shall have the meaning ascribed thereto in Article 3 of this Cost Sharing Agreement;

(r)    "Planned Participant's Cost Sharing Payment" shall have the meaning ascribed thereto in Article 3 of this Cost Sharing Agreement;

(s)    "Products" shall mean all products, software and services manufactured or marketed, or proposed to be manufactured or marketed, at any time by the NTL Group, and all components, parts, sub-assemblies and software associated with or incorporated in any of the foregoing;

NNC/NNL Confidential Information - NNC-NNL006454

- 3 -

(t)　"R&D Cost Sharing Agreement" shall mean a research and development cost sharing agreement that is in effect between Northern Telecom and another member of the NTL Group pursuant to which Northern Telecom and the other such member share in some or all of the R&D Expenses during a calendar year;

(u)　"R&D Expenses" shall mean the sum of the expenses of Research and Development incurred for the development of NT Technology directly or indirectly by all Cost-Sharing Participants in the NTL Group and approved by, or under authority from, the Board of Directors;

(v)　"Research and Development" shall mean all research and development services or activities performed by or for all Cost Sharing Participants including. without limitation, development of methods, processes, procedures and tools related to manufacturing, installation, operation, maintenance and use of Products, but excluding services designated by Northern Telecom as custom research and development;

(w)　"Residual" shall mean the total R&D Expenses less the amount of R&D Expenses allocated to Royalty Income;

(x)　"Royalty Income" shall mean income (net of any income paid to other Cost Sharing Participants and which is included in such other Cost Sharing Participant's Royalty Income) generated during a calendar year through the licensing of NT Technology;

(y)　"Subsidiary" shall mean a Northern Telecom Subsidiary or a Nortel U.K. Subsidiary as the case may be; and

(z)　"United Kingdom" shall mean the United Kingdom of Great Britain and Northern Ireland.

## ARTICLE 2
## RESEARCH AND DEVELOPMENT PROGRAM AND BUDGET

Budgets for the performance of Research and Development, and appropriations for expenditures on all Research and Development projects, shall, from time to time, be reviewed and approved by, or under authority from, the Board of Directors.

All costs incurred directly or indirectly within the Research and Development appropriations approved as contemplated above shall be paid for by the Party or its Subsidiary incurring such expense, and shall be shared by Northern Telecom and Participant as hereinafter set forth.

## ARTICLE 3
## COST SHARING OF RESEARCH AND DEVELOPMENT

Participant and Northern Telecom shall each bear its share of the R&D Expenses in respect of each calendar year during the term of this Cost Sharing Agreement as hereinafter provided, regardless of whether or not any NT Technology is successfully produced by any or all of the Research and Development conducted pursuant to this Cost Sharing Agreement.

Participant's share of the R&D Expenses in respect of each calendar year during the term of this Cost Sharing Agreement ("Participant's Share") shall be calculated in two parts as follows:

NNC/NNL Confidential Information - NNC-NNL006455

- 4 -

(a) under Part 1, as described below, a determination shall be made of the amount of the R&D Expenses to be allocated to Royalty Income and a portion of this amount of the R&D Expenses shall then be allocated to Participant; and

(b) under Part 2, as described below, a portion of the Residual shall then be allocated to Participant.

Any foreign currency translations shall be made in accordance with GAAP as adopted in the NTL Consolidated Financial Statements. Calculations under this Article shall incorporate all amounts within a Cost Sharing Participant's geographic market.

## Part 1

(a) The amount of the R&D Expenses to be attributed to Royalty Income for the calendar year shall be determined in accordance with the following formula:

$$(R/(T + R)) \times R\&D = P, \text{ where}$$

R = the total Royalty Income of all Cost Sharing Participants for the calendar year;

T = total Operating Income for all Cost Sharing Participants for the calendar year (T will be deemed to be zero if T is negative);

R&D = R&D Expenses for the calendar year; and

P = the R&D Expenses to be allocated to Royalty Income for the calendar year.

(b) The R&D Expenses allocated to Royalty Income for the calendar year in accordance with this Article shall be allocated between Northern Telecom and Participant by applying the following formula:

$$(A/R) \times P = S, \text{ where}$$

A = Participant's Royalty Income for the calendar year;

R = the total Royalty Income for all Cost Sharing Participants for the calendar year;

P = the R&D Expenses allocated to Royalty Income for the calendar year, as determined in this Article; and

S = the R&D Expenses attributable to Royalty Income and allocated to Participant for the calendar year.

## Part 2

(a) The allocation of the Residual for each calendar year will be made as follows:

(1) Ten percent (10%) of the Residual for the calendar year shall be allocated between Participant and Northern Telecom on the basis of Net Customer Sales by applying the following formula:

NNC/NNL Confidential Information - NNC-NNL006456

- 5 -

(CS/TCS) x .10 x (R&D-P) = B, where

CS = Participant's Net Customer Sales for the calendar year;

TCS = total Net Customer Sales for all Cost Sharing Participants for the calendar year;

R&D = R&D Expenses for the calendar year;

P = the R&D Expenses allocated to Royalty Income for the calendar year, as determined pursuant to this Article; and

B = Participant's allocation of ten percent (10%) of the Residual for the calendar year.

(2)    Ninety percent (90%) of the Residual shall be allocated between Northern Telecom and Participant on the basis of Modified Operating Income (as defined in this Article) by applying the following formula:

(MOI/TMO) x .90 x (R&D-P) = C, where

MOI = Participant's Modified Operating Income for the calendar year (as defined in this Article); provided, if MOI is less than or equal to zero, no allocation will be made to Participant under this subsection (a)(2) of Part 2 of this Article for the calendar year;

TMO = the sum of all Cost Sharing Participants' Modified Operating Income for the calendar year; provided, if the total Modified Operating Income of all Cost Sharing Participants other than Participant is equal to or less than zero, and MOI is greater than $0, (MOI/TMO) shall be deemed to equal 1, and the R&D Expenses allocated under this subsection (a)(2) of Part 2 of this Article for the calendar year shall be allocated entirely to Participant;

R&D = R&D Expenses for the calendar year;

P = the R&D Expenses allocated to Royalty Income for the calendar year, as determined pursuant to this Article; and

C = Participant's allocation of ninety percent (90%) of the Residual for the calendar year.

(3)    For purposes of subsection (a)(2) of Part 2 of this Article, a Cost Sharing Participant's Modified Operating Income for the calendar year shall be determined in accordance with the following formula:

OI - ((CGS - IP) x M) = MOI, where

OI = the Cost Sharing Participant's Operating Income for the calendar year, it being acknowledged that Operating Income may change as the result of issues raised on audit other than those presented by this Cost Sharing Agreement;

NNC/NNL Confidential Information - NNC-NNL006457

- 6 -

CGS = the Cost Sharing Participant's Cost of Goods Sold attributable to Net Customer Sales for the calendar year;

IP = the Cost Sharing Participant's Intercompany Purchases for the calendar year; and

M = for the calendar year ending December 31, 1995, M is the Cost Sharing Participant's Operating Income realized on Intercompany Sales divided by the total Cost of Goods Sold attributable to Intercompany Sales and for calendar years ending December 31, 1996, and following, M is the Cost Sharing Participant's Operating Income realized on Intercompany Sales, as determined by Northern Telecom, divided by the Cost of Goods Sold on Intercompany Sales.

Participant's Cost Sharing Payment for each calendar year, to be paid as hereinafter provided, shall equal Participant's Share less Participant's R&D. In the event Participant's Cost Sharing Payment is negative, Northern Telecom shall make a payment to Participant as hereinafter provided.

Nortel U.K. shall make payments to Northern Telecom on account of Participant's Cost Sharing Payment in the manner hereinafter set forth, with an appropriate adjusting payment to be made as provided below.

Nortel U.K. shall pay to Northern Telecom, based on budgeted or forecasted amounts but otherwise determined as hereinabove provided, a planned Participant's Cost Sharing Payment ("Planned Participant's Cost Sharing Payment") in twelve (12) equal monthly instalments within thirty (30) days of the date of the invoice therefor commencing in January of each year. In the event the Planned Participant's Cost Sharing Payment is negative, such amount shall be payable by Northern Telecom to Nortel U.K. in like manner as hereinabove provided.

For the calendar year ending December 31, 1995, any resulting Compensating Adjustment, reflecting the application of the formula as hereinabove provided, shall be paid within a reasonable period of time.

For subsequent calendar years, to the extent a Compensating Adjustment is necessary, Northern Telecom or Participant shall pay the Compensating Adjustment to the other entity within three hundred and twenty (320) days of the year end of the paying entity to which the Compensating Adjustment relates.

Compensating Adjustments may also arise when Northern Telecom, Participant, Revenue Canada or the Inland Revenue of the United Kingdom makes normal and routine adjustments (e.g. correction of computational errors) to the determination and computation of Northern Telecom's or Participant's Share of R&D Expenses or related calculations. Any such subsequent Compensating Adjustment agreed to by Northern Telecom and Participant shall be paid within ninety (90) days from the date of final determination and agreement thereof.

Northern Telecom or Participant may employ any payment method which it deems appropriate for settling Compensating Adjustments, including, but not limited to, the use of cheques, wire transfers, or offsets through intercompany accounts maintained by the entities with each other. Payment of Compensating Adjustments shall be made in the currency in which payment between the related entities is made for the transactions covered by this Cost Sharing Agreement.

NNC/NNL Confidential Information - NNC-NNL006458

- 7 -

The Parties may agree, from time to time, prior to the end of each calendar year, to an estimate or revised estimate of such adjusting payment and adjust the monthly payments hereinbefore determined, or otherwise make payment, according to such estimate or revised estimate, in which event the final adjusting payment to be made shall reflect such payment(s).

The receipt or payment of a Compensating Adjustment shall not be subject to any withholding taxes in Canada or the United Kingdom.

## ARTICLE 4
## LEGAL TITLE TO
## NT TECHNOLOGY

The Parties hereto acknowledge that, except as otherwise specifically agreed, legal title to all NT Technology whether now in existence or developed pursuant to the terms of this Cost Sharing Agreement shall be vested in Northern Telecom. With respect to patentable inventions and copyrightable property encompassed by NT Technology, Northern Telecom shall have the exclusive right but not the obligation to file and prosecute applications in its name for patent or copyright protection in every country of the world. Participant shall execute or cause to be executed such documents reasonably requested by Northern Telecom as may be necessary or desirable to give effect to the foregoing.

Participant shall, from time to time, promptly upon receipt of Northern Telecom's request, and at Northern Telecom's expense, furnish to Northern Telecom all available and requested documentation relating to the NT Technology developed by or for Participant pursuant to the terms of this Cost Sharing Agreement.

## ARTICLE 5
## PARTICIPANT'S EXCLUSIVE ROYALTY-FREE LICENSE TO
## NT TECHNOLOGY

To the extent of its legal right so to do, and subject to the rights of third parties under agreements to which Northern Telecom is a party, Northern Telecom, in consideration of Participant's sharing of the costs of Research and Development pursuant to this Cost Sharing Agreement, as from time to time amended, hereby grants to Participant an exclusive royalty-free license, including the right to sublicense, which, except as hereinafter provided, shall be in perpetuity to make, have made, use, lease and sell Products embodying NT Technology in and for the United Kingdom, and to all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith.

Northern Telecom shall, from time to time, promptly upon receipt of Participant's request, and at Participant's expense, furnish to Participant all available and requested documentation and other information relating to the NT Technology developed by or for Northern Telecom pursuant to the terms of this Cost Sharing Agreement.

Participant shall not exercise its exclusive rights hereunder to prohibit (to the extent, if any, it were otherwise entitled to do so):

(a)   the import into the United Kingdom of products manufactured by licensees of a member of the NTL Group outside the United Kingdom and Canada;

(b)   the exercise of the right to make or have made in the United Kingdom items required by a third party in connection with manufacturing by such party pursuant to a license agreement with a member of the NTL Group; or

NNC/NNL Confidential Information - NNC-NNL006459

- 8 -

(c)    the procurement by a member of the NTL Group of components, assemblies, sub-assemblies, supplies, facilities, services and products as may be required by the NTL Group in its business outside the United Kingdom or in support of the Participant's business in the United Kingdom.

Participant shall from time to time upon request by Northern Telecom, grant such non-exclusive license to Northern Telecom in and for the United Kingdom under the patents and patent applications encompassed by the NT Technology as may be necessary to enable Northern Telecom to enter into cross-licensing arrangements with one or more third parties.

The rights granted under this Article shall not relieve either Party from its obligations in respect of royalty payments to third parties.

## ARTICLE 6
## CONFIDENTIAL INFORMATION

Participant acknowledges that Northern Telecom is the legal owner of the NT Technology developed pursuant to this Cost Sharing Agreement and that the NT Technology is proprietary and constitutes a trade secret. Participant shall hold the NT Technology in confidence and only make use of or disclose it as permitted by this Cost Sharing Agreement.

Participant shall have primary right and obligation to protect through appropriate contractual arrangements, legal proceedings or otherwise the confidentiality of the NT Technology in and for the United Kingdom, subject to Northern Telecom's right to file and prosecute applications for patent and copyright protection as hereinbefore provided.

Participant shall, during the full term of this Cost Sharing Agreement and for fifteen (15) years thereafter hold secret and not disclose, make known, divulge or communicate to any person (except Participant's employees and licensees as permitted under Article 5 and then only under an obligation of secrecy binding upon such employees and licensees) any of the NT Technology.

Participant shall not make or have made or permit to be made any copies or translations of the NT Technology except those copies or translations which are reasonably necessary for the exercise by Participant of the rights herein granted to it and all such copies or translations shall, upon reproduction by Participant, contain the same proprietary and confidentiality notices or legends which appear on the NT Technology made available to Participant under this Cost Sharing Agreement.

Notwithstanding the foregoing, Participant shall have the right:

(a)    to communicate relevant portions of the NT Technology to suppliers in all countries of the world reasonably necessary for, and solely for, the procurement by Participant of commercially available materials and parts for use in the manufacture and/or installation of the Products; and

(b)    to communicate to customers purchasing the Products, such portions of the NT Technology as are reasonably needed by such customers for operating and maintaining the Products;

provided, however, that the recipients of the NT Technology be advised by Participant, in writing, at the time, or before such communication, that proprietary information is being communicated and that such information is to be kept

NNC/NNL Confidential Information - NNC-NNL006460

- 9 -

confidential and not used except as permitted hereunder, and provided further, that such recipients undertake, in writing, prior to disclosure, to respect such confidentiality.

The provisions of this Cost Sharing Agreement concerning confidentiality shall survive the expiration or termination of this Cost Sharing Agreement, but in no event shall such provisions apply to the extent that:

    (a)     NT Technology was supplied to Participant by an independent third party prior to the effective date of this Cost Sharing Agreement; or

    (b)     NT Technology becomes available to the general public through no fault of Participant.

## ARTICLE 7
### LIABILITY

Neither Party makes any representation in respect to, and does not warrant, any NT Technology provided to the other Party hereunder, but shall furnish such in good faith to the best of its knowledge and ability. Without restricting the generality of the foregoing, neither Party makes any representation or warranty as to whether or not use of the NT Technology supplied hereunder will infringe any patent or other rights of any other person.

Participant shall have the primary right and obligation to bring and defend in and for the United Kingdom, at its own expense, and for its own benefit, any proceedings relating to alleged infringement of its rights to the NT Technology by a third party or the alleged infringement by Participant's use of the NT Technology of the rights of third parties. If Participant fails to act within sixty (60) days from the notice of any such alleged infringement, Northern Telecom shall have the right to bring or defend, in and for the United Kingdom, the proceedings in its own name, at its own expense and for its own benefit.

Nortel U.K. shall indemnify and save Northern Telecom harmless from any and all claims and liabilities for damages, losses, expenses or costs (including counsel fees and expenses) arising in and for the United Kingdom out of any such infringement or alleged infringement by Participant.

## ARTICLE 8
### RECORDS

Participant shall keep clear and accurate records to support the calculations under Article 3 pertaining to the Participant and Northern Telecom shall keep clear and accurate records to support the calculations of all other amounts to be determined pursuant to Article 3. Both Parties shall provide to each other upon request, in such form as may reasonably be requested, documentation with respect to the foregoing.

Each Party shall have the right to examine and audit, during normal hours, semi-annually (or at less frequent intervals) all such records and such other records and accounts as may under recognized accounting practices contain information bearing upon the amounts payable to it or the other Party under this Cost Sharing Agreement. Prompt adjustment shall be made by the proper Party to compensate for any errors or omissions disclosed by such examination or audit.

NNC/NNL Confidential Information - NNC-NNL006461

- 10 -

## ARTICLE 9
## FORCE MAJEURE

Neither Party shall be in default or liable for any loss or damage resulting from delays in performance or from failure to perform or comply with terms of this Cost Sharing Agreement due to any causes beyond its reasonable control, which causes include but are not limited to Acts of God or the public enemy; riots and insurrection, war, accidents, fire, strikes and other labour difficulties (whether or not the Party is in a position to concede to such demands), embargoes, judicial action; lack of or inability to obtain export permits or approvals, necessary labour, materials, energy, components or machinery; acts of civil or military authorities.

## ARTICLE 10
## DURATION AND CONTINUING RIGHTS

This Agreement shall continue until the 31st day of December 1999, unless terminated by either Party in accordance with Article 11, and thereafter shall be renewed for further one (1) year terms unless notice is given by one Party to the other of its intention not to renew this Cost Sharing Agreement at least sixty (60) days before any anniversary date hereof.

Subject to the provisions of the second paragraph of Article 11, upon the expiry or termination of this Cost Sharing Agreement, Participant shall be deemed to have acquired a fully paid up license permitting Participant to continue to exercise the rights granted to it herein, and, in particular, the rights granted to it in Article 5, as though this Cost Sharing Agreement had continued without, however, Participant being subject to payment of any further amounts to Northern Telecom by way of cost sharing payment or otherwise.

The provisions of Article 6 related to confidentiality and of Article 7 related to liability shall survive notwithstanding the expiry of this Cost Sharing Agreement or any termination of this Cost Sharing Agreement for any cause whatever.

## ARTICLE 11
## TERMINATION

In the event either Party shall be in breach of this Cost Sharing Agreement or fail to perform one or more of its material obligations under this Cost Sharing Agreement, the other Party may, by written notice to the Party in default, require the remedy of the breach or the performance of the obligation and, if the Party so notified fails to remedy or perform within sixty (60) days of the forwarding of a notice so to do, the other Party may, by written notice, terminate this Cost Sharing Agreement. In the event of such termination by Participant, Participant shall have such continuing rights as are provided in Article 10.

In the event Participant becomes insolvent or is the object of bankruptcy or insolvency proceedings, or makes an assignment for the benefit of its creditors, or is placed in receivership or liquidation, or if a substantial part of the assets of Nortel U.K., or a controlling interest in the stock of Nortel U.K., is expropriated, seized, or required to be transferred to, or into the control of, a third party, pursuant to a judicial, administrative or other governmental order or decision, or if Northern Telecom terminates this Cost Sharing Agreement pursuant to the preceding paragraph, all rights granted to Participant hereunder shall be cancelled forthwith and shall automatically revert, without further action by either Party, to Northern Telecom. Immediately upon such cancellation and reversion, Participant shall discontinue the exercise of the rights granted hereunder and shall promptly deliver to Northern Telecom all documentation with respect to NT Technology.

NNC/NNL Confidential Information - NNC-NNL006462

- 11 -

In the event of an enforceable judicial decision declaring invalid an essential part of this Cost Sharing Agreement, without which this Cost Sharing Agreement would not have been entered into, this Cost Sharing Agreement may, at the option of either Party, be terminated upon the giving of notice to the other Party. Save as before set forth, in the event that any term, clause, provision or condition of this Cost Sharing Agreement shall be adjudged invalid for any reason whatsoever, such invalidity shall not affect the validity or operation of any other term, clause, provision or condition and such invalid term, clause, provision or condition shall be deemed to have been deleted from this Cost Sharing Agreement.

## ARTICLE 12
### NOTICES

Any and all notices or other information to be given by one of the Parties to the other shall be deemed sufficiently given when forwarded by prepaid registered or certified first class air mail or by facsimile transmission or hand delivery to the other Party at the following address:

If to Participant:

> Nortel Limited
> Maidenhead Office Park
> Westacott Way
> Maidenhead, Berkshire
> England SL6 3QH
>
> Attention: Secretary

If to Northern Telecom:

> Northern Telecom Limited
> 8200 Dixie Road, Suite 100
> Brampton, Ontario
> Canada L6T 5P6
>
> Attention: Secretary

and such notices shall be deemed to have been received fifteen (15) business days after mailing if forwarded by mail, and the following business day if forwarded by facsimile transmission or hand.

The aforementioned address of either Party may be changed at any time by giving fifteen (15) business days prior notice to the other Party in accordance with the foregoing.

In the event of a generally-prevailing labour dispute or other situation which will delay or impede the giving of notice by any such means, in either the country of origin or of destination, the notice shall be given by such specified mode as will be most reliable and expeditious and least affected by such dispute or situation.

NNC/NNL Confidential Information - NNC-NNL006463

- 12 -

## ARTICLE 13
### GENERAL PROVISIONS

This Agreement shall not be assigned by either Party except with the written consent of the other.

The failure of either Party to give notice to the other Party of the breach or non-fulfilment of any term, clause, provision or condition of this Cost Sharing Agreement shall not constitute a waiver thereof, nor shall the waiver of any breach or non-fulfilment of any term, clause, provision or condition of this Cost Sharing Agreement constitute a waiver of any other breach or non-fulfilment of that, or any other, term, clause, provision or condition of this Cost Sharing Agreement.

In respect to the subject matter hereof, this Cost Sharing Agreement sets forth the entire agreement and understanding between the Parties.

The currency to be used for computing all amounts hereunder shall be the U.S. dollar, unless the Parties agree otherwise.

This Cost Sharing Agreement may be executed in two or more counterparts and upon delivery of counterparts which together show the execution by all Parties hereto, shall constitute one agreement which shall enure to the benefit of and be binding upon the Parties hereto.

This Cost Sharing Agreement shall be construed in accordance with and governed by the laws of the Province of Ontario, Canada.

IN WITNESS WHEREOF, the Parties have caused this Cost Sharing Agreement to be executed by their duly authorized officers as of the date first written above.

NORTHERN TELECOM LIMITED

Per: _____

A.J. Lafleur
Vice-President and
Associate General Counsel

Per: _____

D.J. Noble
Assistant Secretary

NORTEL LIMITED

Per: _____

Per: _____

NNC/NNL Confidential Information - NNC-NNL006464

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. C-35, AS AMENDED

Court File No: 09-CL-7950

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, et. al.

---

*ONTARIO*
SUPERIOR COURT OF JUSTICE

Proceeding commenced at TORONTO

---

**AFFIDAVIT OF CLIVE V. ALLEN**
(sworn April 11, 2014)

---

**KOSKIE MINSKY LLP**
Mark Zigler / Susan Philpott / Ari Kaplan
mzigler@kmlaw.ca
Lawyers for the Canadian Former Employees and Disabled
Employees through their court appointed Representative

**McCARTHY TÉTRAULT LLP**
R. Paul Steep / James D. Gage / Barbara J. Boake
psteep@mccarthy.ca
Lawyers for Morneau Shepell Ltd., as administrator of the
Nortel Canada registered pension plans

**PALIARE ROLAND ROSENBERG ROTHSTEIN LLP**
Ken Rosenberg / Lily Harmer / Massimo Starnino
ken.rosenberg@paliareroland.com
Lawyers for the Superintendent of Financial Services as
Administrator of the Pension Benefits Guarantee Fund

**UNIFOR LEGAL DEPT.**
Barry Wadsworth
barry.wadsworth@unifor.org
Lawyers for the Canadian Autoworkers Union

**SHIBLEY RIGHTON LLP**
**NELLIGAN O'BRIEN PAYNE LLP**
Arthur O. Jacques  / Thomas McRae / Steve Levitt
arthur.jacques@shibleyrighton.com
Lawyers for active and transferred employees of
Nortel Canada