Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS
LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL
NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES CREDITORS' ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED

**AFFIDAVIT OF PETER CURRIE**

I, PETER CURRIE, of the City of Ottawa, in the Province of Ontario, make oath and say:

1.          I am a former Nortel employee. I worked for Nortel Networks Corporation
("NNC") and Nortel Networks Limited ("NNL") in various capacities within the finance
organization for a total of approximately twenty years, including holding the position of Chief
Financial Officer ("CFO") of NNC and NNL (collectively, "Nortel Canada") between 1994 and
1997, and again between 2005 and 2007.

2.          While I was CFO of Nortel Canada between 2005 and 2007, I was an officer of
NNL and NNC. During much of that same period, I was a director of Nortel Networks UK
Limited ("NNUK"). I was, in the nomenclature of this proceeding, a "cross-appointee". I

understand that the Joint Administrators for NNUK have asserted that during the period that I was a cross-appointee, I breached the duties I owed to NNUK. I do not accept that assertion.

3.        I further understand that a number of NNL's direct and indirect subsidiaries in Europe ("EMEA Companies"), through whom business in Nortel's European, Middle Eastern and African ("EMEA") region was conducted, have asserted claims against NNC and NNL. These claims allege that various transactions carried out during the period 2000 to the end of 2008 benefited NNC and/or NNL and were not in the best interests of the various EMEA Companies. The claims against me and other former cross-appointees are related to the claims made by the EMEA Companies against NNC and NNL. I do not accept those assertions.

4.        NNUK has also asserted a claim against me in the U.K. arising out of substantially the same allegations that are being made in this proceeding.

5.        I am swearing this affidavit to provide evidence regarding a number of issues which have been raised in the dispute between the various Nortel entities regarding the allocation of proceeds generated by the dispositions of Nortel's assets, and in the claims asserted by the various EMEA Companies. I have personal knowledge of the matters to which I depose in this affidavit, except where otherwise indicated. I have reviewed a copy of each and every document referred to in this affidavit before I signed it.

## My Career At Nortel

6.        I joined Nortel (by which term I refer to the global organization including, collectively, all of the entities that made it up) in 1979, working out of the Canadian head office in Islington, Ontario. Between 1979 and 1992, I held a variety of management positions within the finance organization, including General Auditor, Controller and Vice-President Finance. To

the best of my recollection, I was employed throughout my time at Nortel by NNL or its predecessors.

7.          I left Nortel in 1992 and returned in 1994 as Senior Vice President and CFO of Nortel Canada. I remained CFO and Senior Vice President until April 1997, at which time I joined Royal Bank of Canada as Executive Vice President (subsequently Vice Chairman) and CFO, a role I occupied until October 2004.

8.          On February 14, 2005, at the request of NNL's Board of Directors, I returned as CFO of each of NNL and NNC. I was clear with the Board at the time that I returned to Nortel that my intention was to stay for approximately two years. During that time, my priority was to resolve four issues that faced the organization at the time:

>  (a)      Working with other Nortel executives, I wanted Nortel to resolve concerns raised by the United States Securities and Exchange Commission ("SEC") and the Ontario Securities Commission ("OSC"). These concerns had resulted in two "cease-trade" orders being granted in respect of shares in NNC. These cease-trade orders were a concern because NNC was the entity that raised funds through the markets, which funds were deployed throughout Nortel. Until the cease-trade orders were lifted in late 2005, Nortel could not access the capital markets, which created internal pressures in terms of managing liquidity;

>  (b)      Working with Nortel's legal organization, I wanted to resolve the class-action then pending against NNC. The class proceeding created uncertainty in the market, with customers and within Nortel itself. I considered the resolution of the class proceeding to be a very important objective;

(c)     I wanted to resolve certain internal control and corporate governance issues within Nortel. Again, these issues created uncertainty externally, and as an organizational and shareholder value matter I considered it important that governance be improved; and

(d)     I wanted to improve the financial information systems and financial organization within the Nortel group to improve the timeliness and accuracy of Nortel's financial reporting. Nortel was a large and extremely complex organization which had, in the years preceding my return, undergone significant change. I considered that improvements in financial reporting would substantially benefit Nortel in the long term.

9.          In my role as CFO, I reported directly to the Chief Executive Officer ("CEO") of NNC and NNL. The heads of the various functions within the finance organization were my direct reports. These included the Controller, and the heads of Taxation, Treasury, Investor Relations, Financial Planning and Analysis and Mergers and Acquisitions. Vice Presidents responsible for the finance functions in each of the regions in which Nortel operated, including, EMEA, also reported to me, as did Vice Presidents from Nortel's lines of business ("LOBs"), the Vice-President of Real Estate and the General Auditor.

10.          In my role I regularly interacted with, amongst others, credit agencies and investors regarding the future prospects for Nortel, and about other matters, such as the steps Nortel was taking in furtherance of the tasks I had made it a priority to address.

11.          I left the employ of Nortel Canada on April 30, 2007. Since that time I have not provided any further services to Nortel Canada or any other Nortel entity. I am semi-retired, although I still serve as a member of the boards of directors of a number of for-profit and not-for-

profit companies and Atomic Energy of Canada Limited, which is a Canadian Crown corporation.

# THE EVOLUTION OF NORTEL

12.　　　　As Nortel's business evolved during my time there, it went through a number of changes to its corporate and management structure, as well as its finance and operations, both within Canada and internationally.

## *Global Growth 1980s – 2000*

13.　　　　From the mid-1980s, Nortel expanded substantially through the continued development of ground-breaking technology. The Nortel group moved from developing and manufacturing traditional landline phone technology and equipment into digital, wireless and photonic technologies. At the same time, the Nortel group expanded into Europe, Asia, Africa, the Middle East and Latin America.

14.　　　　In addition to expanding organically, Nortel made a number of acquisitions and investments during the 1990s and early 2000s.

## Structure of Management: Lines of Business

15.　　　　Through the 1980s and much of the 1990s, Nortel's operations were structured around four main regional operating companies. Until the late 1990s, Nortel presented its segmented financial results by these geographic entities in its consolidated financial statements.

16.　　　　Beginning in 1991, Nortel began to move towards a management structure organized around product lines. By 1996, each product group (also known as a Line of Business, or "LOB"), was responsible for the marketing and business activities in Canada, the U.S. and

Europe, and had responsibility for all product manufacturing and product development strategy, including research and development ("R&D"). The marketing and business activities of Nortel in the Asia Pacific region and in the Caribbean and Latin American ("CALA") region continued to be managed on a geographic basis for some time.

17.        When I left Nortel in 1997, Nortel reported its segmented information on the basis of business segment by geographic area. When I returned in 2005, Nortel's reporting segments for revenues and management earnings before taxes were the four lines of business in effect at that time.

**2001-2008**

18.        Although I was not at Nortel at the time, I am aware that beginning around 2001, the burst of the "dot-com bubble" had a severe effect on the global economy and on the telecommunications industry in particular, including Nortel. Market forces led to a decline in Nortel's revenues and market share, and a decline in customer demand for Nortel's products.

19.        Subsequently, Nortel was faced with accounting issues which impacted Nortel's credit rating (thereby affecting the cost of financing) and required Nortel to restate its financial statements for the fiscal years 2000 to 2005. The rating downgrades were still affecting Nortel's access to capital markets and cost of financing in 2005 when I re-joined Nortel.

20.        As a result of the above-mentioned factors, amongst others, Nortel undertook a number of restructuring initiatives commencing in about 2002. These included, amongst other things:

(a)        outsourcing nearly all manufacturing and production;

(b)        consolidating R&D expertise into "centres of excellence";

(c)     disposing of certain non-core or unprofitable businesses, including Nortel's UMTS businesses;

(d)     optimizing the use of real estate;

(e)     transitioning Nortel from its former role as a supplier of telecommunications equipment to a position as a leader in networking hardware and associated software solutions; and

(f)     reducing Nortel's workforce.

21.     As discussed below, Nortel was a matrix organization, organized predominantly around LOBs that served customers worldwide. As a result, the restructuring of Nortel was carried out as a restructuring of the business as a global whole, and not just at the level of any individual entity or entities.

# CORPORATE ORGANIZATION OF NORTEL

## *Nortel Was A Matrix Organization*

22.     As discussed above, shortly before I left Nortel Canada in 1997, Nortel had structured its management along LOBs.

23.     When I returned to Nortel Canada in 2005, Nortel had integrated its LOB structure in a matrix format that provided multiple reporting lines across product lines, functional groups, and regions. More specifically, Nortel had:

(a)     multiple product lines/business segments (Carrier Networks, Enterprise Solutions, Metro Ethernet Networks, and Global Services);

(b)    multiple regions (CALA; EMEA; North America; and Asia/Pacific), and

(c)    various global functions supporting the infrastructure of the business (many of which also had regional aspects or presence in local subsidiaries).

24.    This matrix structure was designed to enable Nortel to function more efficiently and to meet the demands of its customers globally.

25.    Nortel kept detailed Functional Organization Charts for the entire Nortel group. The reporting lines shown in the Organizational Charts illustrate the matrix structure. For example, in June, 2006, I reported to the President and CEO. Also reporting directly to him were the heads of each of the LOBs, the heads of the sales regions, the other heads of the business functions and the head of Nortel's joint venture with LG. **[See NNC-NNL06620373]**

26.    A concise and helpful picture of the Nortel matrix structure can be found in **Exhibit 21499**. Although this document is from after I left Nortel, the chart at page 6 illustrates the matrix structure during my second term as CFO. It shows the way in which the LOBs (across the top), the regions (along the side) and the corporate functions (across the very top) worked together to develop products and attract and provide service to customers. The vertical and horizontal integration resulted in various components within the matrix working together to fulfill customer demands.

27.    This structure allowed Nortel to draw on employees from different functional disciplines worldwide (*e.g.* sales, R&D, operations, finance, general and administrative, etc.), regardless of region or country according to need. Individuals could be part of a team with horizontal responsibility without removing them from their respective position vertically (or

departmentally) within the Nortel group. We referred to this as straight line and dotted line reporting.

28.          From the perspective of the Nortel group's senior management, the LOBs were the primary organizational divisions within Nortel. The LOBs were not segregated by legal entities, but operated across legal and geographic boundaries.

### Regions

29.          As mentioned above, when I returned in 2005, Nortel operated in four regions: North America, EMEA, CALA and Asia/Pacific. Regional Presidents reported to the Executive Vice President of Global Sales. Sales teams were aligned with and served LOB customers in their countries and regions, with designated Vice Presidents for Nortel's biggest customers. These individuals supported multiple LOBs in managing day to day relationships with significant customers.

30.          Each region had its own sales and marketing teams, which had responsibility for generating sales and serving customer needs in their respective regions. Customer support was handled by regional Operations teams, who were generally responsible for such matters as project deployment, managing customer projects, providing network engineering and technical services at pre-sales and pre-installation stages, and first level technical support on hardware and software issues.

31.          The regional teams worked with other organizations (such as LOBs) within Nortel. For example, the regional sales teams drew on the resources of centralized marketing, product line management and technical support dedicated to individual product lines in order to serve customers in their respective regions. These resources could consist of people located in

different geographical regions. A "Global Accounts" group also existed to facilitate the service of Nortel's global customers, and a global Operations team provided services that assisted the regions and Nortel customers worldwide.

### Nortel Canada

32.        The principal Canadian Nortel entities, NNC and NNL, were headquartered in Toronto, Ontario. Many of the "head office" functions of the global enterprise were carried on from this location, as further described below.

33.        Each of the boards of directors of NNC and NNL was comprised of the same people and had the same non-executive chair. Meetings of the boards of NNC and NNL were generally held together in Toronto as joint meetings. NNC and NNL's boards were responsible for major strategic decisions and corporate governance. The majority of the directors were resident in Canada, and the companies' headquarters were in Toronto.

34.        From time to time Nortel raised money in the capital markets through debt financing, for various purposes. For example, the money raised in this way had been used to finance the cash costs associated with the acquisition of a number of businesses during the 1990s (many of which were also financed through equity and/or debt), as well as to fund R&D. Regardless of where in the world, or by which entity, funds were to be deployed, it was NNC and NNL that undertook the necessary financing for the benefit of the entire organization (as discussed further below). All debt service costs were borne by NNL and did not form part of the accounting or profit splitting among the subsidiaries.

- 11 -

## Head Office Activities

35.        Head office activities were essential to, and benefited, all of the subsidiaries. Nortel was organized such that a significant portion of the Nortel group's global support activities were located within NNL. Areas of support provided by NNL to the rest of the Nortel group included executive leadership and various critical corporate services such as legal, finance, strategy, insurance, information services and real estate, amongst others. These head office activities were supported by local staff within the Nortel subsidiaries.

## Nortel's subsidiaries

36.        Because Nortel's business was global in scope, NNL incorporated subsidiaries in a number of locations around the world. With the exception of certain joint ventures, these subsidiaries were all directly or indirectly wholly-owned by NNL, which was in turn wholly-owned by NNC.

37.        The Nortel group included an American company, NNI, which is a direct wholly-owned subsidiary of NNL.

38.        NNUK was another significant subsidiary, which served as the regional headquarters for EMEA. NNUK's office in Maidenhead had significant tax, treasury, legal and finance departments, among others, which provided support for NNUK and the other EMEA Companies. These departments operated with a considerable degree of independence, but were supported by, and ultimately reported to, the global heads of the respective departments in Canada. However, their primary responsibility was to support EMEA's operations, and they had dotted line reporting obligations to the executives of EMEA.

39.         Each of the Nortel subsidiaries was organized in accordance with the requirements of the relevant jurisdiction. They each had their own Board of Directors (or the equivalent in the relevant jurisdiction), corporate structure, organizational documents (such as bylaws) and books and records. They prepared their own financial statements, which were audited by local auditors and reviewed and approved by their respective Boards of Directors

### *Boards of Directors of Subsidiaries*

40.         Subject to the requirements of the jurisdiction of incorporation (as to residency and so on), the directors of Nortel's subsidiaries, including in particular the EMEA Companies, consisted of a mixture of senior regional and head office staff. For example, the CFO for the global organization typically sat on the NNUK board, which is why I joined the NNUK board in 2005. My colleagues on the board included Christian Waida, who was the most senior lawyer within EMEA; Bill LaSalle, who was a senior lawyer in Canada, and Geoff Lloyd and Gareth Pugh, who were very senior employees in NNUK's human resources and finance departments, respectively. Dara Gill, another senior EMEA lawyer, was the Corporate Secretary and attended NNUK board meetings, as did senior EMEA tax and treasury personnel, as necessary.

41.         The NNUK board and, to my knowledge, the boards of other Nortel subsidiaries, met in accordance with local legal requirements to consider and approve financial statements, significant transactions that it was proposed NNUK enter into, and such other matters as were required to be brought before the board. For NNUK and the other EMEA Companies, in my understanding, EMEA's legal department kept track of these requirements and coordinated the process of ensuring that the boards were properly briefed with respect to the matters they were to consider. For example, when NNUK financial statements were presented to the NNUK board for approval, they were circulated so that we could review them in advance. A representative of the

auditor was present at the board meeting to answer any questions, and was joined by senior members of EMEA's finance organization. To the extent that the auditor required a letter of representation from NNUK management, it was vetted beforehand by a senior NNUK finance board member such as Mr. Pugh, who would confirm to the rest of the board that it was acceptable.

42.        The claims that the Joint Administrators are making against me and the other cross-appointees allege that the boards of NNUK and the other EMEA Companies essentially met for form's sake and were really only there to implement what NNL "required". I reject that assertion.

43.        First of all, I and my fellow members of the NNUK board were well aware that we owed fiduciary and other obligations to NNUK as a distinct legal entity. We were all senior, experienced executives who exercised significant responsibilities in our day-to-day jobs. Moreover, the board always included at least one senior EMEA lawyer from whom we could obtain whatever advice or guidance we might require. Second, to the extent that the board required advice as to its obligations either internally or from an outside counsel or other professional, it was available to us. Third, we were all well aware of the operations of the business both globally and within EMEA, and so had the perspective and understanding that were required in order to discharge our duties to NNUK. The NNUK board was made up of a mix of very senior Nortel people based in Canada and Europe for precisely that reason: to ensure that the board had sufficient knowledge of the business and its operations to be able to evaluate the various matters that were brought before it.

44.        We made our decisions as NNUK directors knowing that we had to act in the best interests of NNUK. The reality of NNUK's business was that it was a fully integrated,

- 14 -

interdependent part of the global organization. The success or failure of NNUK was inextricably linked to the success or failure of the overall enterprise. Accordingly, one of the most important factors in assessing whether a given matter was in the best interests of NNUK was whether it was in the best interests of the overall enterprise. We all understood that other than in conditions of near-insolvency, which were never present during my time as a director, the interests of NNUK were best served by taking steps to ensure that the global business was conducted, and its resources were used, efficiently and effectively (while complying with local legal requirements).

45.        That did not detract, however, from our understanding that the decisions we made in our capacity as directors of NNUK had to be in the best interests of NNUK. I believe that we discharged our duties as NNUK directors in accordance with our obligations. I certainly never heard anyone suggest otherwise until the Joint Administrators asserted claims against me.

46.        The NNUK directors were all strong people who understood their role. Quite frankly, given my position as CFO of NNC and NNL, if anyone was going to purport to dictate NNL's "party line" to the NNUK board, or tell them that NNL "required" that the board do something, it would have been me. I never did that. If I had, no-one would have listened to me.

### *Functional Groups/Corporate Support*

47.        Nortel's main functional groups were: R&D; sales and marketing; operations; and general and administrative.

48.        Nortel believed that R&D was critical to its on-going operations.

49.        Within the broad R&D group, there were Product Line Management ("PLM") teams. The goal of the PLM teams was to provide oversight and coordination of the strategic direction of the R&D teams as well as the services associated with each product line. Further,

Nortel had a Common Engineering team whose purpose was to build R&D solutions and platforms to meet the multiple demands from the other Nortel R&D teams and LOBs. The Common Engineering team was located in the Office of the Chief Technology Officer ("CTO"). There was interaction between the R&D group, the Common Engineering group and the different regional offices.

50.       As discussed above, sales and marketing and operations were carried out on a regional basis, with support from the LOBs and centralized groups.

51.       I understand that Nortel began to outsource its manufacturing functions in 2000, and by the time I returned in 2005 this outsourcing process was largely complete. Flextronics was Nortel's biggest supplier, supplying approximately 70% of Nortel's products and providing logistical and repair services. Nortel's relationship with Flextronics was governed by several Master Agreements, all between NNL and Flextronics.

52.       Nortel's internal purchasing system consisted of four transaction control centres ("TCCs") in Canada, the US, the UK and France. Approximately two-thirds of all inventory purchases flowed through the Canadian and American TCCs. When a sales order was placed with a regional sales office (the "Originator"), the resulting purchase order was routed through one of the TCCs, which contracted directly with the manufacturer. The TCC paid the manufacturer, then invoiced the Originator (with a mark-up) for settlement upon delivery of the product. As a result, the manufacturer could be paid by the TCC prior to the internal settlement of the account within the Nortel group.

# NORTEL'S FINANCE ORGANIZATION

## *Nortel's Financial Reporting*

53.        NNC and NNL prepared different types of financial reports for different purposes. For example, as the CFO, I regularly presented to the NNC and NNL Boards financial information in various forms including globally, by LOBs and by regions. For management purposes, quarterly financial results by LOB were presented to the Board. This was referred to internally as the "Dashboard" and was the primary information for which heads of LOBs were held accountable.

54.        Nortel's consolidated audited financial statements reported on, among other things:

   (a)     the consolidated financial position of NNC and its subsidiaries, its results of operations and cash flows;

   (b)     the financial performance of each LOB, including global revenue streams;

   (c)     significant business developments, including strategic alliances and acquisitions outside of Canada;

   (d)     risk factors; and

   (e)     restructuring and other plans.

55.        Nortel's consolidated financial statements were used by management to evaluate Nortel's global performance and the performance of LOBs, and were available to analysts, lenders, debt purchasers, investors and other stakeholders. Until 2008, to my knowledge, there

was never a going concern note or exception in any of Nortel's consolidated audited financial statements or restatements.

## Nortel's Financial Position

56.         During my tenure as CFO of NNC and NNL, I did not consider them to be insolvent, technically insolvent, of doubtful solvency or at risk of insolvency or to be experiencing a material weakening of their financial position. To the contrary, at the time that I left, Nortel's financial outlook had improved and was continuing to improve. The cease trade orders had been lifted and access to the capital markets restored. The class proceeding had been resolved. Material improvements had been made to the corporate governance and financial reporting throughout the organization. I considered the progressive accomplishment of the tasks I had prioritized to be contributing factors towards an improved financial outlook.

57.         Each time I signed off on NNL and NNC's audited financial statements, which represented Nortel to be continuing as a going concern, I had to consider whether there was substantial doubt about NNC and NNL's ability to continue as a going concern for at least the next twelve months. At no time did I have doubt about either company's ability to continue as a going concern, for the next twelve months or beyond, nor did the auditors have any such doubt. When we considered these matters, we were aware of the prior operating losses, working capital, cash flows, forecasts and financial ratios, restrictions on access to capital markets and cost of financing, and we were also aware of the causes of any negative issues, mitigating factors and our going-forward plans.

58.         At no time did I consider the viability of Nortel to be at issue, having regard to the plans in place and how things were progressing. Liquidity was sometimes constrained, but illiquidity and insolvency are not equated in my mind, and the liquidity constraints were

associated with specific external factors – a lack of access to the capital markets and uncertainty created by the class-action litigation – that were resolved after I re-joined Nortel.

### Financial Statements prepared by subsidiaries

59.        As discussed above, each of the Nortel operating subsidiaries prepared its own financial statements in accordance with the requirements of the jurisdiction in which it was incorporated. To my knowledge, the financial statements of each subsidiary were audited on a going-concern basis without exception or qualification.

60.        I am aware that from time to time in certain of the Nortel's subsidiaries', expenses exceeded revenues. This was the case, for example, for NNSA in France, in which significant R&D expenditures were incurred which exceeded the revenue from sales in that country. In accordance with local requirements these entities had to be recapitalized from time to time. However, I did not consider these entities to be insolvent or at risk any more than I considered that Nortel as a whole was at risk.

## NORTEL'S CASH MANAGEMENT AND FINANCIAL FORECASTING

### Nortel's Treasury Function

61.        The Nortel Treasury Group had several components, including Pensions, Capital Markets (also referred to as Corporate Treasury), Treasury Operations and Vendor Financing. The Treasury team consisted of both corporate and regional treasury staff and was responsible for various functions, including but not limited to global liquidity management, financial risk management (such as foreign exchange risk, interest rates and credit risks), management of

Case 09-10138-MFW    Doc 13572    Filed 05/13/14    Page 19 of 44

- 19 -

bonds, letters of credit and guarantees. The Treasury team also ensured that Nortel's capital structure was as efficient as possible.

62.         It was important for Nortel to manage significant financial transactions and operations for the maximum benefit of Nortel as a whole, without incurring undue risk. The Treasury group in particular engaged in activities designed to maximize the benefits from the responsible management of strategic capital and assets.

63.         NNL's Treasury department and the Corporate Treasury department were headquartered in Canada. However, EMEA Treasury was heavily involved in the global treasury function.

64.         Many of the Nortel group subsidiaries had their own treasury departments which were responsible for certain treasury functions within those subsidiaries.

65.         In addition to the subsidiaries' treasury departments, the EMEA regional group had its own Treasury group, which was headquartered in the UK and was staffed primarily by employees of NNUK. During my second term as CFO, the head of the EMEA regional Treasury group was Simon Freemantle.

66.         The EMEA Treasury group coordinated Nortel's cash management across all EMEA entities. This included providing support to the entities to ensure that they complied with local statutory requirements.

67.         The regional Treasury groups and/or the individual subsidiary Treasury groups were also responsible for setting their own policies, which were not directed by Nortel's central Treasury group.

## *Cash Management*

68.         Nortel had a Corporate Procedure on Cash Management **[Exhibit 31010]**. This policy outlined the process for managing and reporting on Nortel's global cash balances and short-term debt obligations. Cash management, and therefore compliance with this policy, was primarily a Treasury function. The Treasury group ultimately reported to me and therefore I was ultimately responsible for compliance with this policy during my time as CFO. I believe that Nortel's cash was managed in a manner consistent with the policy during my tenure.

69.         Cash flow and cash liquidity were ultimately managed globally through Nortel's Treasury organization. This function was primarily managed day-to-day out of the EMEA Treasury group located in the UK. Nortel's Treasurer – Kate Stevenson, during my second term as CFO of Nortel Canada – had overall responsibility for monitoring Nortel's global cash flow. Ms. Stevenson reported directly to me. Managers from various Nortel entities reported to her. These managers had oversight of the cash levels of their particular entities.

70.         Revenues that were attributable to a particular sale to a particular customer were collected by the Nortel entity in the jurisdiction in which the sale was made. Once these revenues were received by that Nortel entity, the majority of the cash was deposited into a collecting account within that jurisdiction, in a process known as cash pooling. Within the EMEA cash pool, the funds were notionally held in the accounts of each entity but were pooled at Citibank to maximize investment income and/or interest (which I discuss later).

71.         Nortel's Treasury group monitored cash flows, cash balances and sources of cash within Nortel on a worldwide basis, including from the various Nortel subsidiaries. Nortel's cash level was monitored daily, and was reported to me on a weekly basis. I, in turn, regularly

reported the status of Nortel's global cash flow to Nortel's executive team and the NNC/NNL Board of Directors.

72.         Within Nortel, cash was generated globally from various operations and was deployed globally for the benefit of the Nortel group as a whole. The fact that cash was generated in one jurisdiction did not necessarily mean that it was earmarked to be used within that jurisdiction. Provided that local requirements were satisfied and reasonably foreseeable current obligations could be met, the surplus cash held in the account of a subsidiary could be deployed elsewhere as necessary. However, *only* surplus cash was available for deployment in this way. Nortel always ensured that each of its subsidiaries had sufficient funds to meet their current and reasonably foreseeable obligations as they came due. In other words, while none of the cash generated by any of the individual subsidiaries was *per se* earmarked for that particular subsidiary, sufficient cash for each subsidiary was always provided. Moreover, to the extent that any subsidiary did not generate sufficient funds through its own operations at a given time, and was therefore facing a "cash deficit", Nortel would provide the subsidiary with support to satisfy any obligations and to satisfy its statutory requirements.

73.         One of the objectives of liquidity management in any multinational organization, including Nortel, is to optimize tax obligations globally. This means that attempts are made to match revenues and costs in the most tax advantageous manner possible on a global basis, while still complying with all applicable local laws and requirements.

74.         Another objective is to ensure that surplus cash is deployed efficiently. From an organizational perspective, if one entity has surplus cash, and another entity needs cash, it is much more efficient and desirable to move cash from where it is not needed to where it is

needed, rather than have one entity hold excess cash and another entity borrow money from a third party.

75.        The intercompany funding of Nortel was ultimately managed by the Treasury group, with these two objectives in mind. However, in so doing the Treasury group always ensured that the needs of the subsidiaries were accounted for and that local tax implications and legal considerations were respected. This entailed ensuring that each subsidiary had the ability to meet its cash requirements in the manner required by local laws and regulations, which would, in turn, include the ability to satisfy any statutory deductions, creditor payment terms (when applicable) and local capitalization rules. All liquidity decisions were made in compliance with applicable regulatory and legal requirements, and movements of cash were implemented by way of intercompany loans, dividends, equity investments and the like in accordance with applicable local laws. This included obtaining board approval from the appropriate subsidiaries for the transactions in question. During my time at Nortel I am not aware of NNC, NNL or any of the subsidiaries failing to comply with any of the prevailing rules governing capital requirements.

76.        Because Nortel was an integrated, global organization in which the various entities had a high degree of interdependence and integration, managing cash in an efficient manner was in the best interests of Nortel as a whole, and all of the entities within it. Conversely, if surplus cash was left to sit in the account of one subsidiary and could not be moved, and if as a result tax "leakage" or avoidable financing costs were incurred, every entity in the organization ultimately suffered for it. In my capacity as CFO, I was ultimately responsible for striving to ensure that Nortel deployed its cash around the world in a tax-efficient and capital-efficient manner. Cash was allocated and optimized in the context of a liquidity plan endorsed by the NNC/NNL Board of Directors.

- 23 -

**The EMEA region of the Nortel group had a cash pooling arrangement.**

77.          Nortel Corporate Procedure on Cash Management (Procedure No. 303.26) discusses the management of cash balances to ensure efficient pooling/netting systems were in place to maximize the use of surplus cash balances through cross-border pooling. This was explained in more detail in Nortel Corporate Procedure No. 303.37, "Regional/Global Cash Pooling", which was issued on November 7, 2006 **[Exhibit 21322]**.

78.          Notional Pooling referred to situations where there was no commingling of funds and the integrity of the accounts was maintained for tax, legal and accounting purposes. Notional Pooling enabled Nortel to concentrate its single-currency bank accounts for the purpose of collectively improving yields on balances and minimizing interest costs.

79.          Most of the subsidiaries in the Nortel group maintained local operating bank accounts as well, primarily for local tasks such as payroll.

**Managing Liquidity**

80.          As CFO, it was one of my primary responsibilities to ensure that Nortel was sustainably viable and profitable. Liquidity was a very important issue internally at Nortel. It was also important as a metric for credit rating agencies to determine Nortel's credit-worthiness, particularly at a time when our competitors often held high cash balances.

81.          For approximately 6 months in 2005 and 3 months in 2006, cease trade orders were in effect with respect to NNC, due to ongoing investigations of the SEC and OSC. During those times, Nortel was not able to access the capital markets. From the time that I re-joined Nortel in 2005 until the second of the cease-trade orders lifted, there was a heightened concern with ensuring that Nortel had sufficient cash available to fund its operations. Thus, around 2005-

2006, I sought to ensure that Nortel maintained a higher level of internal liquidity and higher cash balances than would otherwise have been the case. After the cease trade orders were lifted and NNC improved the timeliness of its filings with the OSC and SEC, this concern abated significantly because Nortel had additional sources of capital and cash available.

82.         In late 2005 and early 2006, we were staring to think about what our sources of financing would be (see **NNC-NNL11083276**). At all times, I remained confident that we would have access to the capital markets once the cease-trade orders were lifted.

83.         Despite our efforts to manage cash efficiently, the fact that an entity in the Nortel group, including NNL, had cash on its balance sheet did not necessarily mean that the cash was available to be used at that point in time. Moreover, some of the excess cash was held in jurisdictions in which it was not immediately accessible to address needs elsewhere at Nortel. As a result, I sought to maintain a minimum cash position of approximately $2 billion to meet the cash requirements not only of NNL, but also of any other entity or global function within the Nortel group. This was seen by the rating agencies and others as the minimum acceptable liquidity for Nortel. I also felt that it was the minimum required to cushion the Nortel group against any eventualities that could lead to a sudden drop-off in revenues. As explained in further detail below, the nature of Nortel's business meant that some volatility in revenues was inevitable, so Nortel required more cash and liquidity protection than might another similarly-sized business.

84.         Nortel's liquidity was relevant to its customers and suppliers, as well as ratings agencies and analysts. Accordingly, it was an issue I was asked about from time to time by external third parties, and it was an issue to which we paid close attention. I do not recall any of the creditors or suppliers of NNL, or of any of its subsidiaries that I regularly dealt with,

expressing any concerns about Nortel's liquidity or, if they did, not being satisfied with the answer I gave them. More importantly, my belief as CFO at the time that I left was that Nortel had sufficient cash reserves and access to capital to meet its current and reasonably foreseeable obligations as they came due. I do not recall any occasion where any Nortel entity defaulted, or even seriously considered defaulting, on any obligation or was unable to meet its obligations and liabilities as they came due.

85.          Liquidity was an issue that I had to contend with when I first re-joined Nortel in 2005. As mentioned above, access to the capital markets had been restricted due to cease-trade orders of the OSC and SEC, and Nortel needed cash to continue to fund not only ongoing operations but also a proposed settlement of the class-action lawsuits (all of which arose from the financial statement restatements). Lazard was engaged to assist in Nortel's strategy to consider options for financing the class-action settlement and recommended that we negotiate the lowest possible cash component to any settlement. Lazard provided Nortel with the best possible arguments for Nortel to make to the opposing parties in the litigation to try to structure a favourable settlement in December 2005 **[Exhibit 21580]**. This is reflected in a Lazard December 2005 presentation which gave a negative outlook (on page 13 of Exhibit 21580). The audience for this presentation was an adverse party – a plaintiff – whose aim was to extract as much cash from the company as it could. The purpose of the presentation was to persuade our opponent as to what Nortel could afford to "pay" them in cash. Lazard's statement that Nortel had a limited amount of core cash it could distribute and remain viable was intentionally conservative, and intended to rebut the plaintiff's assumption that Nortel could distribute all or substantially all of its cash. We did not contemplate distributing all of Nortel's cash under this settlement and I was not concerned about Nortel's viability. I was of the view that the class

action plaintiff was prepared to accept a partial share deal, and I was simply trying to negotiate the optimal settlement structure from Nortel's perspective.

86.          In this same Lazard presentation (see page 5 of Exhibit 21580), to reinforce the point, Lazard summarized comments from five customers which reflected concerns about Nortel's financial viability. As mentioned, I spoke with customers from time to time to talk about Nortel's business and prospects. While I do not doubt that the concerns attributed to these customers were expressed, I do not recall those customers, or any others, citing doubts over liquidity or Nortel's viability to me.

87.          Ultimately, the class action settlement was completed, in part in cash and in part in shares, and Nortel continued with its plans for improvement, having shed the last overhang from the financial statement restatements.

## *Capital Markets and Bonds*

88.          In determining Nortel's cash needs and longer-term financing arrangements, consideration would be given to Nortel's broader capital plan. The revenue and investment outlook of Nortel would be considered and compared to the cash that was expected to be generated from Nortel's ongoing business. As and when it was considered opportune to do so, Nortel would raise money on the capital markets (other than during the period of the cease trade orders).

89.          Nortel, through various entities including NNC and NNL, utilized the capital markets as a source of liquidity for the benefit of the Nortel group. To that end, series of bonds were issued from time to time by certain Nortel entities, which bonds were from time to time guaranteed by other entities.

90.          To my knowledge, until the early to mid-2000s, Nortel's public debt was issued by NNL without guarantee from any other Nortel entity. In 2006, while Nortel's credit rating was still adversely affected by various factors, NNL issued notes having an aggregate principal amount of US$2 billion, which notes were unconditionally guaranteed by NNC and also conditionally guaranteed by NNI. NNI was a conditional guarantor in large part because at that time it carried certain hard assets on its balance sheet and because Nortel could obtain slightly better debt terms given that NNI was domiciled in the same place as the ultimate lenders, that is, the United States.

91.          Similarly, on February 14, 2006, NNI entered into a new credit facility for US$1.3 billion in order to refinance notes that had been issued by NNL. As I recall, this facility was a "bridge facility" put in place until NNL was able to secure further funding. In June 2006, NNL announced a further debt offering of US$2 billion and retired the bridge facility.

92.          All of these offerings were subject to rigorous due diligence both internally and by the market. Sophisticated financial institutions and their lawyers reviewed Nortel's financial position in the context of these offers and were sufficiently satisfied with Nortel's prospects and the information they had been given at the time to proceed with the offering.

## *Cash-Flow Forecasting*

93.          As part of liquidity management, and the overall capital plan for the organization, Nortel would prepare forecasts of cash flow and various other financial measures. Given the nature of the business Nortel was in, this was not always straightforward. However, I considered the challenges Nortel faced in forecasting to be inherent in the industry, and not indicative of any difficulty particular to Nortel.

94.        The technology industry, in particular the high-value hardware and software industry in which Nortel competed, is not an industry in which small sales occur consistently over time. Rather, sales tended to occur in large "lumps". This is in contrast to, for example, a retail business such as a car dealership, where there is likely to be a sufficiently predictable volume of sales that a dealer can often forecast the level of cash inflow for any month, with relatively minor variances. In contrast, in the technology industry, Nortel could be waiting on a $150 million sale to a customer, with no certainty as to if or when that transaction would close and the cash would become available. Cash outflows, on the other hand, were more predictable: they were driven by the organization's wages, R&D and other costs which were episodic. These factors created inherent uncertainty and limitations on the accuracy of cash flow forecasts – none of which was specific to Nortel.

95.        At no point during my tenure as CFO of NNL and NNC did I have any concern that Nortel's ability to forecast cash was reflective of deeper problems with the organization. It was a challenge inherent in Nortel's business, which was more of a present concern at some times (such as when access to the capital markets was restricted) than others.

96.        In making cash forecasts, Nortel had two focuses: short and longer term. Nortel Treasury and Financial Planning and Management prepared short-term cash flow forecasts to enable Treasury to sufficiently manage Nortel's cash flow needs and short-terms loans used to finance such needs. These were prepared at least every quarter, if not more frequently. The NNL and NNC Board of Directors also received an annual budget with detailed one-year forecasts on various aspects **[Exhibit 21126]**, as well as regular and detailed cash flow reports, forecasts and updates.

97.         Nortel would have a longer horizon in terms of when it anticipated cash being

expended because, as noted above, cash outflows were inherently more predictable. However,

during the period in which Nortel was unable to access the capital markets, long-term forecasting

was more difficult, and anything beyond nine months remained uncertain. I recall that when

Nortel was in discussions with PricewaterhouseCoopers ("PwC") in the spring of 2006 in respect

of, amongst other things, NNUK pension funding, PwC requested that Nortel provide it with

detailed cash forecasts. At the time, Nortel was still affected by a cease-trade order. Since Nortel

was not in a position at that time to assume that it could go to market and raise funds if it needed

to, it was constrained in its ability to provide an accurate cash flow forecast. I was concerned at

the time that there were so many variables that could change in the short-term (as had been well

chronicled in both the media and various constituencies) that such a forecast would be little more

than an exercise in "optics" **[Exhibit 21300]**. The intention for all of Nortel's forecasts was that

they would be robust and easily understandable. Nortel did not want to produce a forecast merely

for "optics", or to try to obfuscate by producing an unintelligible forecast.

98.         After the cease-trade orders were lifted and Nortel regained its access to the

capital markets, Nortel's ability to forecast its cash flow naturally improved. Thus, by no later

than late 2006, Nortel had returned to what I considered to be "business as usual", and Nortel

was able to much better forecast its forward liquidity profile for a longer period.

99.         Nortel management prepared its forecasts and projections based on current

expectations and estimates and believed them to be reasonable, but they were subject to risks,

assumptions and uncertainties. Nortel always disclosed that such forecasts and projections could

prove to be inaccurate, and they were never perfect. There were instances where errors in

Nortel's forecasts, both negative and positive, were discovered after the fact **[Exhibit 21654]** but

this was to be expected – my objective was to ensure Nortel was constantly updating and looking to improve them as new information became available [**Exhibit 21341**].

100.        Nortel did experience variances in its forecasts (which analysts and others quickly noted and which were no secret), but they were measured against actual performance on a regular basis and were updated accordingly.

101.        Subsidiary-level forecasts could be generated for specific purposes if needed, but were not used in the ordinary course. As discussed above, Treasury kept track of expenses that would be incurred at the subsidiary level, and local capital requirements, and ensured that the subsidiaries had sufficient cash to meet those obligations. Accordingly, subsidiary-level cash forecasts were not a priority.

### *Goodwill & Deferred Tax Forecasting*

102.        Given the nature of Nortel's business, the value to be ascribed to its goodwill and deferred taxes was subject to an extremely high degree of variability. It was inherently difficult to forecast the value of goodwill or other intangible assets over the long term, because Nortel was in a technology business which was constantly evolving at a rapid pace. It had managed for decades to stay at the leading edge of technology in its industry, and we fully expected that to continue. However, that does not mean that Nortel was able to predict with any precision the value of its goodwill ten years down the road, when neither Nortel nor anyone else could predict the global economic outlook, the industry outlook, or our place within the industry, that far into the future. For example, modelling done in 2006 with a ten-year horizon would not have anticipated the collapse of Lehman Brothers, the calcification of the Asset-Backed Commercial Paper market, and the global economic collapse in 2008. For all of these reasons, such long-term forecasts were not generally used by management to run Nortel.

103.        Similarly, the value of Nortel's deferred tax assets was dependent on when and how much profit Nortel would earn. That, in turn, depended on a number of factors, including many factors that were beyond Nortel's ability to predict, much less control. Given the variability of Nortel's cash flows as described above, and the difficulty in predicting the demand for our products in light of the global economic outlook over the long term, this was extremely difficult to predict.

104.        Goodwill and deferred taxes were significant non-cash assets on the balance sheet. Accordingly, when forecasts of these items were prepared, which was done for specific purposes, the goal was to make them as accurate as possible. However, for all of the reasons discussed above, such forecasts were not an important tool for operational planning purposes. Nortel's auditors (Deloitte, at the time) reviewed and tested Nortel's forecasts on a quarterly basis and tested and audited them on an annual basis. The auditors were also aware that Nortel itself was reviewing and updating the forecasts quarterly as new information became available and in light of recent performance against the previous forecasts. The inherent uncertainty associated with long-range forecasting of this kind was well known to the auditors, and was never identified to me or, to my knowledge, anyone else as a cause for concern.

105.        As discussed below, PwC was retained by the UK pension trustee in connection with discussions that were taking place toward an agreement on the funding of the UK pension plan. The trustees were seeking, as is to be expected, for NNUK to maximize its contributions to the pension plan. As part of those discussions, PwC was given access to a considerable amount of information regarding Nortel's business and prospects. PwC requested that Nortel provide them with long-term forecasts. My understanding is that PwC was aware of the possible variance in the projections, but nonetheless wanted to satisfy themselves as to the ranges of future

- 32 -

expectations over the term of any funding agreement regarding the NNUK pension plan. We explained that Nortel did not ordinarily forecast on that basis for operational purposes and were therefore somewhat reluctant to share the long-term goodwill and deferred tax forecasts: see for example **[NOR-CAN00025496]**. Nortel and its auditors understood the limitations on these special-purpose forecasts, but it was not clear how or why PwC intended to use them or if they would want to "audit" them.

106.        During the course of these discussions, I understand that PwC asserted that Nortel's "inability to forecast" beyond one year meant that Nortel could not have confidence that it would exist beyond one year: see **[Exhibit 21300 and Exhibit 21106]**. That was, in my view, clearly incorrect. For the reasons set out above, such long-term forecasts are of limited value in the technology industry, and tell you nothing about a company's ability to continue as a going concern.

107.        In any event, as set out below, whatever concerns PwC expressed were allayed and a long-term funding agreement was eventually agreed with the Trustee.

## *Customer Finance*

108.        It was typical for wireless companies who were Nortel's customers to have a license to operate but to require assistance, in the form of funding, in order to break into the market. Accordingly, it was common in the industry, and important for Nortel, to be able to provide financing to customers of the Nortel group. Global Credit Management ("GCM") generally facilitated the financing arrangements and procedures, assisted in due diligence and managing the overall credit process, although GCM's approval authority was limited.

109.        The availability of customer financing was of considerable benefit to Nortel, in that it facilitated significant orders which generated significant revenue. It was also commonly offered by our competitors. Accordingly, had Nortel not offered customer financing it would have been placed at a competitive disadvantage.

110.        As CFO of NNC and NNL, I had primary responsibility for the application of Nortel's customer financing procedure. The procedure established a Credit Committee, consisting of the CFO of NNL, the Chief Legal Officer of NNL, the Treasurer of NNL and the Vice President of Credit Management. The Credit Committee was provided with transaction summaries prepared jointly by NNL's Credit Management Department, and the VP, Customer Finance for the entity selling to the customer.

111.        Approvals for transactions were required from both LOBs and regions depending on the size and nature of the transaction, and subject to the approval of appropriate committees. Credit approval was made on five defined levels of authority, depending on the credit rating of the customer and the amount involved.

112.        Local sales teams compiled the proposals for customer financing. The Credit Committee was responsible for ultimately approving certain requests for financing. The regional sales teams created the "pitch" and determined the loan conditions, in conjunction with the applicable product group, and the support of the LOB was needed to proceed with the bid.

## RESEARCH AND DEVELOPMENT

113.        R&D was the primary driver of Nortel's business. The success of the business and strength of its sales were based on making cutting-edge technology available to customers. Nortel's demonstrated ability to do this was why it had been in existence for as long as it had.

- 34 -

Nortel understood its success resided in its technology and, as a result, it invested a significant proportion of its revenue in R&D.

114.        Managing Nortel's R&D was the responsibility of the CTO, who was an employee of NNL. It is not my area of expertise, although I did become somewhat familiar with it, as I had oversight responsibility for the creation of R&D budgets.

115.        R&D included the creation of new ideas, their early commercialization and the testing of those ideas against market needs. It also included the adaptation of ideas into commercial products (including adapting them to the specific needs of various jurisdictions) and the support of existing products in the field.

116.        R&D was expensed as it occurred. During my time at Nortel, R&D was never capitalized on the balance sheet.

117.        The R&D headquarters for Nortel were located in Ottawa. Nortel also had additional research centres in the US, France, the UK and Ireland, and also outsourced some R&D.

118.        Factors influencing the location of Nortel labs included: expertise and skill; availability; and increasing efficiencies and reducing costs.

## PENSIONS

### *Pensions Governance Structure*

119.        Nortel had pension plans in various jurisdictions. The plans were sponsored by
one or more of the Nortel companies in the jurisdictions under whose laws the plans were
established – for example, NNUK was the sponsoring employer for the NNUK pension plan. As
part of Nortel's overall liquidity management program, Nortel ensured that the sponsoring
companies had sufficient funds to make any necessary pension contributions. The liquidity
management program was managed through the global treasury organization, which ultimately
reported to me. Accordingly, I was the officer ultimately responsible for overseeing funding for
the pension plans for the Nortel group's various subsidiaries. I was also responsible for keeping
the Board of NNL informed of pension matters that might affect the company.

120.        The committee of NNL's Board that was responsible for overseeing pension
matters was the Pension Fund Policy Committee (the "PFPC"). The responsibility of this
committee included providing governance oversight to ensure that the pension plans of NNL and
its subsidiaries were in compliance with the statutory and other legal requirements affecting the
various pension plans in the jurisdiction in which they operated. I was invited to attend meetings
of the PFPC from time to time.

121.        There was also a committee of senior executives called the Pension Investment
Committee ("PIC"), which had executive-level oversight of pension matters for NNL and its
subsidiaries. I was a member of this committee.

## *My Discussions Regarding the NNUK Pension Plan*

122.        NNUK was the sponsor of a pension plan (the "UK Plan") for its employees. The UK Plan was somewhat unusual among Nortel's pension plans because it was administered by a third party: Nortel Networks UK Pension Trust Limited (the "Trustee"), the directors of which were made up of representatives of NNUK, plan members, an independent chair, and an independent trustee.

123.        When I discharged my duties as an NNUK director I was aware of the status of the UK Plan and I was satisfied that the UK Plan and NNUK itself were carrying on business in accordance with regulatory and other requirements. As far as I am aware, my fellow directors who were all senior staff based in Canada or with EMEA, were also aware of the status of the UK Plan and satisfied that it was in compliance with applicable law. I never heard anyone express any view to the contrary and I have no doubt that if there was a concern about the status of the UK Plan's compliance with legal requirements it would have been brought to the attention of the board either by a board member or by the various senior staff who advised the board.

124.        In my capacity as CFO, I also became involved in discussions with the Trustee over the funding of the UK Plan, either at the request of John Poos, the Global Pension Manager, or at the request of the Trustee of the UK Plan.

125.        At the time that I rejoined Nortel, the UK Plan had an actuarial deficit – as I understand it, the Plan's estimated liabilities over the long term exceeded the estimated value of its assets over the long term. To my knowledge, NNUK's contributions to the UK Plan always complied with the prevailing statutory requirements and the terms of the UK Plan. That was certainly my understanding based on what I was told in my capacity as a director of NNUK. However, the Trustee considered that the minimum funding requirements of the prevailing

legislation would not see the deficit eliminated quickly enough. Accordingly, the Trustee pressed Nortel to commit to make additional contributions over and above what was required by law.

126.         Another dynamic that was relevant at the time was that we understood that changes to the UK pension legislation were forthcoming, under which it would be incumbent on NNUK and the Trustee to reach agreement on funding levels for the UK Plan, failing which the pension regulator in the UK (the "Pension Regulator") would have the power to intervene. As discussed below, Nortel and the Trustee proceeded as though this requirement was in effect before it actually became law.

127.         Accordingly, in 2005 and particularly in 2006, efforts were made to reach a funding agreement with the Trustee. Those efforts were let by John Poos. However, I had a number of discussions with the Trustee, led by the chair, Ken Gardener, over Nortel's funding commitment, the manner in which the deficit would be retired and over what period of time.

**2005 Funding Discussions**

128.         An interim funding arrangement was reached with the Trustee in 2005. I was not heavily involved in these discussions, although I wrote a letter to the Trustee in my capacity as global CFO, confirming the arrangements in respect of funding for 2005, 2006 and 2007 (the "Interim Funding Agreement").

129.         One of the issues I was involved in was the Trustee's request for a guarantee from NNL of NNUK's funding obligation under the interim funding agreement that was then being discussed. To my knowledge, NNL had never guaranteed the pension obligations of a subsidiary and I did not believe that it should. However, I agreed that NNL could provide a comfort letter similar to that which NNL had previously provided on an annual basis to NNUK. I wrote a letter

to the Trustee in August 2005 confirming that NNL agreed to continue to make available funds sufficient to permit NNUK to meet its ongoing commitments, including the pension funding commitments previously agreed in the Interim Funding Agreement, and to carry on business.

## 2006 Funding Guarantee

130.         Shortly after the 2005 Interim Funding Agreement was entered into, negotiations between NNUK and the Trustee began towards a long-term agreement. These discussions led to an agreement on long-term funding for the UK Plan (the "2006 Funding Agreement") and a guarantee from NNL in favour of the Trustee (the "2006 Funding Guarantee"). I again became involved in these discussions, for several reasons.

131.         First, the Trustees were again seeking a guarantee from NNL. As noted above, NNL had never before given a guarantee for a pension obligation of one of its subsidiaries. Given that such a guarantee would be a direct obligation of NNL, as CFO I was very concerned about undertaking such an obligation, which could be precedent setting. Further, the guarantee would require my recommendation to obtain approval from NNL's Board.

132.         Second, although the new UK pension legislation did not yet apply to NNUK, the negotiations were conducted as though it did. Under the new legislation, trustees were being encouraged to perform a covenant review to assess the strength of the employer. As a result, the Trustee retained PwC as business adviser and Standard & Poor's to review the covenant of NNUK. At their request, I met with the Trustees and PwC in London on April 12, 2006 and provided them with a comprehensive presentation on Nortel's global business. I was recently reminded of this meeting upon reviewing the briefing note that PwC later provided to the Pension Regulator in the UK.

133.        Lastly, a long-term funding agreement of the sort sought by the Trustee would involve a long term commitment of cash resources, and could have a material impact on the financial position of one of NNL's subsidiaries. I wanted to ensure that any such commitment was supportable having regard to the overall liquidity management of the organization. Moreover, any such material long-term dedication of cash by one of NNL's subsidiaries required the approval of NNL's Board. **[Exhibit PC18899]**

134.        I was always kept informed and then became personally involved in numerous discussions and correspondence with Ken Gardener regarding the 2006 Funding Guarantee, and by extension the 2006 Funding Agreement itself, although it was John Poos who was principally responsible for negotiating the 2006 Funding Agreement on behalf of NNUK.

135.        During my discussions with Mr. Gardener, he never indicated that the reason the Trustees were seeking a guarantee by NNL was because they were worried that NNUK would not be able to meet its obligations to fund the UK Plan. Instead, my understanding from my discussions with Mr. Gardener was that the Trustees were seeking a guarantee from the parent company because they wanted to ensure that they had stronger protection of their specific interests than a mere assurance or comfort letter from management.

136.        One of the other issues that arose was that the Trustees were requesting that the proposed guarantee rank in priority over all other debt by NNL. In support of this request, Mr. Gardener argued that the policy of the Pension Regulator was that a deficit in a pension plan should be treated as a debt that is equivalent to bank or bond debt and that the Trustee should conduct itself as if it were a material creditor of the employer sponsor. I asked Mr. Gardener on more than one occasion for confirmation that this requirement was reflected in the statute or

regulations. I do not believe that I was provided with anything beyond the policy statement from the Pension Regulator.

137.       While NNL and NNUK always acknowledged the deficit was a contingent liability of NNUK, I was then of the view (and still am) that there are fundamental differences between a bank or bond debt on the one hand, and a contingent liability arising from a pension deficit on the other hand. Bank or bond debt is a liability for the return of a fixed amount of funds actually borrowed and, hence, owed, which is supported by a series of covenants that have very specific repayment terms and specific associated interest. In contrast, a pension deficit is a contingent long-term liability. It arises based on an actuarial estimate at a point in time of the long-term value of the assets and liabilities in the pension fund. The amount of a deficit depends on actuarial assumptions as to mortality, investment returns, contributions, general economic conditions and numerous other factors over the long term. A deficit revealed in one valuation will fluctuate and may disappear by the time of the next valuation as a result of factors having nothing to do with the payment of contributions, including, among other things, changes in actuarial assumptions, changes in the performance of the pension fund's assets and general economic factors. Accordingly, it was not prudent, in my view, to treat the pension deficit as though it was a fixed obligation to pay a sum certain at a definite point in the future, when that is not what it was.

138.       Moreover, in my role as CFO of NNC and NNL, I could not support or recommend any guarantee that would place a new specific and direct interest in the company's assets in priority to any other existing interest, as this would have contravened various covenants already entered into by NNL in public debt instruments and could well have constituted an event of default under those debt instruments. This would have created severe problems with rating

agencies, external lenders and other worldwide pension plans. I was also concerned that every other creditor of Nortel would have wanted to renegotiate their priority position and it would have closed the door to any further access to creditor financing by Nortel, which could have caused a lot of damage to Nortel. Indeed, at the time that the 2006 funding discussions were taking place, NNL had recently negotiated a one-year credit facility of US$1.3 billion, and was required to replace both that facility and an outstanding debt issue of US$1.8 billion within a couple of years. While those debt repayments remained pending, it would not have been reasonable or prudent for NNL to reduce its financial flexibility through any form of third party credit enhancement. [NNC-NNL10817255]

139.        One of the issues that Mr. Gardener raised was why the surplus cash on Nortel's balance sheets could not be used to extinguish the deficit more rapidly. I explained that looking at a balance sheet at a point in time was not an appropriate way to assess Nortel's ability to make a substantial investment, and that the overall complexion of the business had to be considered. As discussed above, and as I told the Trustee, it was in Nortel's interest to maintain a significant level of capital from time to time so that it could meet its ongoing requirements, whether for working capital, capital expenditures, or otherwise. Therefore, the fact that NNUK (or any Nortel entity) had a certain amount of surplus cash on a particular date did not necessarily mean that cash would be available for deployment on that date for any new purpose. It had to be deployed in reference to an overall cash management plan that was designed to ensure the ongoing liquidity and vitality of the entire Nortel group. Based on the requirements of Nortel worldwide at the time, and what was affordable, it would have been imprudent to materially accelerate the payments to the UK Plan just because there was surplus cash on NNUK's balance sheet at the time.

140.        Nonetheless, my intent was to be responsive to the stated concerns of the Trustee and to address them in the manner and to the extent it was prudent for Nortel to do so. I made every effort to deal with the requested guarantee in a constructive fashion, against the context of NNL's prior debt commitments and in a manner that would not restrict NNL's flexibility to fulfill its objective of becoming increasingly viable and profitable in the future. One item which I think everyone agreed on was that the long-term viability of Nortel would benefit the UK Plan and all the other pension plans associated with Nortel's subsidiaries.

141.        From my perspective, the threat of regulatory intervention by the Pension Regulator was incidental to, and not influential on, the funding negotiations. My expectation was that we could reach an agreement on funding that was consistent with the regulatory requirements, in which case there would have been no reason for the Pension Regulator to become involved. My understanding was that the funding agreements that were entered into were in compliance with the legal pension requirements in the UK as they existed at that time. My understanding at the time was that the Pension Regulator had to be advised of the funding agreements that were entered into, but that the Pension Regulator would have intervened only if the funding agreement was not acceptable.

142.        I felt throughout that it was important to come to a fair and reasonable arrangement in the circumstances, having regard to the interests of the UK Plan's members in the context of what was affordable. My dealings with Mr. Gardener during the various funding negotiations were collegial and constructive, even if they were robust at times (as would be expected in any negotiations involving long term commitments for substantial sums). However, I had every impression and understanding that the parties were going to arrive at a funding

- 43 -

agreement that was acceptable to all. The end result was the 2006 Funding Agreement and 2006

Funding Guarantee, which were executed prior to my final departure from Nortel in April 2007.


SWORN BEFORE ME at the City of
Ottawa, in the Province of Ontario, on
April 11, 2014

_____
Commissioner for Taking Affidavits

**Kathleen L. Robichaud**

_____
Peter Currie

**AFFIDAVIT OF PETER CURRIE (sworn April 11, 2014)**

**INDEX**

| Tab | Paragraph Referred to in Affidavit | Trial Exhibit Number | Bate Number |
|-----|-----------------------------------|---------------------|-------------|
| 1 | Paragraph 25 | TR44683.02 | NNC-NNL06620373 |
| 2 | Paragraph 26 | TR21499 | Exhibit 21499 |
| 3 | Paragraph 68 | TR31010 | Exhibit 31010 |
| 4 | Paragraph 77 | TR21322 | NNC-NNL20000313 |
| 5 | Paragraph 82 | TR45402 | NNC-NNL11083276 |
| 6 | Paragraph 85 & 86 | TR21580 | Exhibit 21580 |
| 7 | Paragraph 96 | TR21126 | Exhibit 21126 |
| 8 | Paragraph 97 & 106 | TR21300 | Exhibit 21300 |
| 9 | Paragraph 99 | TR21654 | Exhibit 21654 |
| 10 | Paragraph 99 | TR21341 | Exhibit 21341 |
| 11 | Paragraph 105 | TR48966 | NOR-CAN00025496 |
| 12 | Paragraph 106 | TR21106 | Exhibit 21106 |
| 13 | Paragraph 133 | TR49473 | PC18899 |
| 14 | Paragraph 138 | TR45179.02 | NNC-NNL10817255 |