## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re*: | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| | (Jointly Administered) |
| Debtors. | |

### AFFIDAVIT OF MICHAEL W. MCCORKLE SWORN APRIL 11, 2014

### Submitted by the Canadian Allocation Group (including the CCC)

---

[1]     The debtors in the chapter 11 cases, along with the last four digits of each such debtor's tax identification number, are: Nortel Networks Inc. (6332); Nortel Networks Capital Corporation (9620); Nortel Altsystems Inc. (9769); Nortel Altsystems International Inc. (5596); Xros, Inc. (4181); Sonoma Systems (2073); Qtera Corporation (0251); CoreTek, Inc. (5722); Nortel Networks Applications Management Solutions Inc. (2846); Nortel Networks Optical Components Inc. (3545); Nortel Networks HPOCS Inc. (3546); Architel Systems (U.S.) Corporation (3826); Nortel Networks International Inc. (0358); Northern Telecom International Inc. (6286); Nortel Networks Cable Solutions Inc. (0567); and Nortel Networks (CALA) Inc. (4226).

Court File No.  09-CL-7950

### ONTARIO
### SUPERIOR COURT OF JUSTICE
### - COMMERCIAL LIST

IN THE MATTER OF
THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36,
AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

### AFFIDAVIT OF MICHAEL W. MCCORKLE
### (Sworn April 11, 2014)

I, Michael W. McCorkle, of the City of Mississauga, in the Province of Ontario, **MAKE OATH
AND SAY:**

1.    I am a former employee of Nortel Networks Inc. ("NNI"), Nortel Networks UK Limited
("NNUK") and Nortel Networks Limited ("NNL").[1]  As is set out in more detail below, I was
employed by these entities (first NNI, then NNUK, and eventually NNL) in a variety of
management and executive positions from 1997 until January, 2009.  As such, I have personal
knowledge of the matters to which I hereinafter depose.  Where I do not have personal
knowledge, I have stated the source of my information, and in all such cases believe it to be true.

---

[1]  NNC and NNL will sometimes be collectively referred to herein as "Nortel Canada".

- 2 -

2.    As a professional, I am accustomed to being compensated for my time. I am being compensated for the time I have spent and continue to spend in connection with this proceeding at the rate of $400 per hour, which is not affected by the outcome of this matter.  I have a claim against the Canadian Debtors as a result of the termination of my employment which has been processed as a part of the Canadian Debtors claims process for compensation-related claims.

3.    I have reviewed a copy of each and every document that I refer to in this affidavit prior to swearing it.

**General Background**

4.    I hold a degree in social science from Northwestern University and a post-graduate degree in business administration from DePaul University.   Before joining Nortel I worked in private banking for 18 years at The First National Bank of Chicago, ending my tenure there as Vice President of Corporate Finance.

5.    I began my career with Nortel[2] in 1997 as Director of Structured Finance for North America as an employee of NNI in Richardson, Texas. In 1999 I moved to the United Kingdom (the "UK") and assumed the role of Director of Structured Finance for the region known as EMEA (Europe, the Middle East and Africa), although for a time I remained formally employed by NNI under the Nortel "expatriate" program.  In 2003 I became an NNUK employee.

6.    In May 2005, while still an EMEA employee, I assumed the role of Assistant Treasurer.  In August 2005 I moved to Canada, at which time I became an employee of NNL and also assumed

---

[2] NNC and its direct and indirect subsidiaries will sometimes be referred to in this Affidavit as the "Nortel Group" or "Nortel".

responsibility for Structured Finance activities worldwide. As Assistant Treasurer I oversaw global Treasury activities and reported to the Treasurer, Kate Stevenson, who in turn reported to the Chief Financial Officer (who at that time was Peter Currie).

7.    I was a member of the Pension Investment Committee from May 6, 2005 until December, 2008. From 2006 onward I was also a member of the NNUK Pension Fund Policy Committee.

8.    In August 2007 on the departure of Ms. Stevenson I assumed the role of Interim Treasurer and held that position until mid-2008, at which time John Doolittle assumed that role and my position reverted to that of Assistant Treasurer. I remained at NNL as Assistant Treasurer until January 2009.

9.    After leaving Nortel I served as Vice President and Treasurer of Hudson's Bay Company from June 2009 to February 2012.

**Structured Finance**

10.    In my various roles with respect to Structured Finance I oversaw vendor financing, the initiative whereby Nortel extended credit to customers to assist them in purchasing Nortel goods and services. This was a logical role for me given my background in banking and finance. Provision of vendor financing was a standard procedure in the industry and was utilized by all of Nortel's competitors. As such Nortel needed to offer such financing in order to remain competitive. Many projects required a financing proposal prior to a bid being accepted.

11.    The loans were drawn up and structured with the assistance of the Nortel tax and legal personnel and, if required, external advisers. Credit risk was assessed and accounted for, along with the other financing terms, with a view to the loans eventually being sold to commercial lenders. We

- 4 -

attempted to ensure that financings were domiciled in jurisdictions generally acceptable to commercial lenders. Not all lending requests were approved. Of the ones that were, most were eventually sold to commercial lenders or repaid. Like in any lending situation, some were not and had to be written off.

12.    Generally speaking, vendor financing at Nortel was very successful until 2000, when the "tech bubble" burst. From that time on the industry began to move away from this as a standard term of purchase arrangements. By the time I had moved to NNL in mid-2005, vendor financing was a less active component of Nortel's ongoing business operations.

13.    Vendor financing was driven by the regions, local operating entities, and lines of business as opportunities were identified by sales personnel who had direct dealings with customers. Vendor financing would not be considered until the proponent had obtained the support of the regions and lines of business involved. Before the tech bubble burst, lines of business could approve certain loans, with the approval of the Structured Finance group, or in the case of larger and/or riskier loans they would present proposals for financing facilities for the approval of the Credit Committee, located in Canada. By the time I became Assistant Treasurer virtually all customer financings needed to be approved by the Credit Committee.

14.    Approved loans were funded by regional entities that possessed the required liquidity. For example, if Nortel Spain wished to provide vendor financing to a Spanish company but didn't possess the financial resources, another EMEA entity with surplus cash could advance the funds upon the agreed lending terms, if the risk profile was within the established range of acceptability, and that other EMEA entity would become the lender in the transaction.

- 5 -

15.  Although after 2000 the vendor financing program at Nortel was gradually wound down, I recall that the Treasury group did an assessment of its success sometime before I moved to NNL. My recollection is that it was of significant net financial benefit to the EMEA entities, as well as the Nortel Group in terms of the business it generated from new customers and the competitive edge it provided to negotiate the best terms of sale, even after taking into account defaulted loans.

**Intercompany Loans and Cash Management**

16.  Each legal entity in the global Nortel Group generally maintained its own books and records, financial statements and separate bank accounts.

17.  It was the responsibility of the Treasury group to assure that each entity had sufficient funds to carry out its activities and meet its obligations.  Working with the regional finance, tax, and legal groups to identify each entity's needs (for up to one year, or sometimes longer if the circumstances required), Treasury would provide additional funds or, in the case of surplus cash on hand, consider redeploying that cash to another entity.  Cash would either be moved within the region to another entity that needed it or converted to US dollars and moved to North America where it could be invested until it was needed for redeployment elsewhere.

18.  Surplus cash in North America, if not earmarked for immediate use by Nortel Canada or another member of the Nortel Group, would be placed in short term money market funds and then redeployed as required.  In this manner it earned interest and was denominated in US dollars, avoiding unnecessary foreign exchange fluctuations.

19.  Intercompany loans were a commonly used vehicle for moving cash throughout the Nortel Group.  Such loans would be interest bearing or interest-free, depending upon tax and legal

considerations, with the goal always being to manage tax and other costs in the most efficient way possible for the Nortel Group.

20.     As Assistant Treasurer I bore ultimate responsibility for approving intercompany loans, the terms of which were developed and finalized by Treasury in consultation with the central Nortel tax and legal departments, and the separate legal entities which were entering into the loan agreement and their tax and legal departments. Ultimately, the loans had to be approved by their respective boards of directors as required by local governance rules and regulations.   To the best of my understanding all intercompany loans that were entered into during my time with the Treasury group followed this process.

21.     Intercompany loan decisions were always made in compliance with local regulatory and legal requirements.  This entailed, among other things, ensuring that each subsidiary had the ability to meet its cash requirements as dictated by local laws and regulations and to meet its legal obligations, which would in turn include the ability to satisfy any statutory deductions, creditor payment terms when applicable, and local capitalization rules.  Subsidiaries were always able to (and often did) avail themselves of external legal advice to determine the prudence of any particular intercompany transaction.

**Liquidity and Cash Forecasts**

22.     Given the global reach and complexity of the Nortel Group, liquidity and its management were always very important issues at Nortel.

*Forecasting*

23.    Part of my job was to report to the Treasurer and others what cash was available, when, and where. Due to the nature of the industry, such forecasts were understood to be subject to large and unpredictable inflows and outflows of cash. This was a consequence of operating a global telecommunications enterprise with ongoing large multi-year contracts with complex payment terms, unpredictable payments by customers, unpredictable product obsolescence and technology trends, strategic opportunities for acquisitions and divestitures, transacting business in multiple currencies, and the unpredictability of success or timing in the numerous contract bidding processes pending at any particular time.

24.    The cash forecasting undertaken by Treasury was strictly short-term (horizons of up to 12 months) because we were forecasting for operational liquidity requirements that changed from day to day. It was important that these cash forecasts be very detailed and as accurate as possible so that the identified cash was predictably available to fund the day-to-day operations of the Nortel Group. It was not necessary to forecast operational needs for long periods, as I mention in my April 11, 2007 email at Exhibit 21052, given the abovementioned fluctuations inherent to the telecommunications industry. However detailed and accurate one may be, wide variations can still be expected as I mention in my July 27, 2007 email at Exhibit 21047. I believe this is a general truism for forecasting cash for large corporate enterprises with multiple business and global reach in this industry, and Nortel was no exception.

25.    As Assistant Treasurer I was aware of other forecasts that were prepared and used at Nortel, including:  1) annual forecasting for investors; 2) multi-year long-term strategic planning forecasts; and 3) forecasts for accounting and tax purposes of longer than 5 years that took strategic planning assumptions and overlaid further market-based assumptions using macroeconomic data available through, for example, the International Monetary Fund and other

- 8 -

reputable third parties. This variation in type, duration and use of forecasts was by no means peculiar to Nortel, but something common throughout the industry.

26.     The third category of longer term forecasts were prepared by the financial planning and analysis ("FP&A") and tax groups and were prepared in the context of audit of financial statements, but were not used for business operations. Those had to be prepared based on information external to Nortel because our capital plans did not extend out that far. The modelling needed for these long-term forecasts was necessarily dependent on industry and market outlooks, which in turn were dependent on variables completely outside of Nortel's control and difficult to predict with any degree of certainty. However, they were developed based on the best information and assumptions available, and like any other forecast, were useful and important for their intended purposes.

27.     In April of 2005, I suggested putting together a "task force" to improve our cash forecasting, as noted in my email at Exhibit 21651. Ultimately, in my roles at Treasury my team and I were always looking to improve cash forecasting and accountability for cash management at Nortel. To that end, my team and I participated in the creation of the "Cash Council" to evaluate the detailed liquidity needs of the Nortel Group and the process by which cash was acquired through business operations, worked to increase awareness throughout the organization of the importance of working capital management and cash to the Nortel Group, and increased the frequency of cash forecasting meetings from quarterly to monthly. We also tracked performance against existing forecasts as a means of assessing our approach (see, for example, the email at Exhibit 21654 where our subsequent review demonstrated that Nortel's actual performance beat the forecast.)

28.     Nortel's auditors were familiar with Nortel's forecasting abilities, including that forecasts had historically been of varying accuracy, and they were also aware that we were constantly updating our assessments and adjusting our forecasts and aware of the premises of any updates. On a regular basis the auditors reviewed and tested Nortel's forecasts and had individual interviews with multiple members of senior management to elicit our frank views. I, for one, was always careful to discuss issues related to cash forecasting. Similarly, the credit rating agencies reviewed and analysed Nortel's forecasts, among myriad other factors, on a regular basis to assess NNC's creditworthiness as a going concern.

29.     I do recall a particular instance when our long term forecasting abilities were questioned by an outside party.    This arose in the spring of 2006 when Nortel was in discussions with PricewaterhouseCoopers ("PwC") in respect of the NNUK pension plan funding. PwC requested that Nortel provide it with detailed long term forecasts and was critical of the fact that we did not have any such forecasts published, despite us having told PwC that this was not unusual for a company in Nortel's industry, and that they were receiving the same, or more, information that any other large creditor was receiving.

30.     In this context, we deliberated internally whether PwC should be provided with the longer term limited purpose forecasts that our tax and FP&A groups used, since they continued to insist on seeing existing longer term forecasts.  I was asked by Peter Currie to check whether the tax and FP&A groups would support providing their longer term limited purpose forecasts to PwC with appropriate disclaimer language (see Exhibit 21633, March 21, 2006 email to me on page 3).

31.     Although we were comfortable with the accuracy of the short-term forecasts prepared on the basis of company-specific information and for operational liquidity purposes, as set out in my

- 10 -

email of March 23, 2006 at Exhibit 21301 the high-level limited purpose long-term forecasts were not prepared for the use which PwC appeared to want to make of them. As noted above, they were based primarily on macroeconomic market data as opposed to company-specific information (which granular information was only forecasted on a short term basis).

*Minimum Cash and Liquidity Needs*

32.    When we looked at sources of potential liquidity, we could not assume that just because a Nortel entity had cash on its balance sheet that meant that the cash was available for immediate use elsewhere. Some cash was earmarked for particular uses or needed by that entity for its operations and was therefore not "surplus" or available cash; other funds might be held in jurisdictions in which it was not immediately accessible for redeployment due to legal or commercial factors.

33.    When Nortel Canada drew upon inter-company loan facilities as a source of cash to be used for, among other things, preferred share dividends, it was based on surplus cash not required by the entity that was the source of funds for up to a year. Nortel always ensured that each of its subsidiaries had sufficient funds to meet their obligations as they came due. Moreover, to the extent that any member of the Nortel Group did not generate sufficient funds to support itself through its own operations, and was therefore facing a "cash deficit", other entities within the Nortel Group (often times NNL) would provide the necessary loans, capital infusions and/or other forms of working cash.

34.    My treasury team and I regularly performed analyses of the minimum cash needs to respond to business contingencies on a global basis. The number that we consistently estimated those needs to be was generally in the range of $2 billion, although that amount would be subject to

- 11 -

fluctuation from time to time. Exhibit 21557 is an example of the rationale for that minimum cash balance that I prepared in November of 2006. This is illustrative of the types of factors that we took into account in assessing cash needs and, while the factors changed from time to time, the overall requirements remained relatively constant. Another example of a more detailed assessment of these requirements undertaken in April 2007 is at Exhibit 21052.

35.    Nortel, like most large corporations, used capital markets as a source of liquidity for the funding of global operations. In determining Nortel's cash needs and longer-term financing requirements, consideration would be given to Nortel's broader business and capital plan. The revenue and investment outlook of the global organization would be considered and compared to the cash that was expected to be generated from Nortel's ongoing business, with the anticipation that any shortfall could be raised on the capital markets.

36.    My experience while at Nortel was that we always considered that Nortel had sufficient cash reserves and access to capital, based on the analyses and tests like the ones I have described, until the third quarter 2008, when cash levels had undergone a continual fall after the global market meltdown following the demise of Lehman Brothers in September, 2008. Even then, there was no time in my experience at Nortel when it became unable to meet its obligations as they came due and it was not until near the end of the fourth quarter of 2008 that the possibility of insolvency entered my mind. Up until then, we continued to pursue what we believed to be credible avenues and sources of cash and funding. To my knowledge, we were always in compliance with all material terms and covenants of our loan facilities.

**2006 Refinancings**

- 12 -

37.    As Assistant Treasurer I was closely involved in the refinancings of the Nortel debt undertaken in 2006. During Q4 2005 we were approaching a settlement of our class action lawsuit which would include a substantial cash payment and we were also planning for the refinancing of $1.275 billion of outstanding notes coming due in February 2006. While we had surplus cash, I concluded it was optimistic to consider the cash "available" given other contingencies (see Exhibit 21339.) We wished to complete the refinancing as soon as possible but could not access the markets without first announcing the lawsuit settlement, and we were concerned that the settlement would make it difficult to complete the refinancing. To resolve this, we approached a syndicate of banks made up of JP Morgan, Royal Bank of Canada, EDC and Citibank to secure interim financing prior to the announcement to be used to repay the notes.

38.    On February 14, 2006, NNI entered into a one year interim credit facility in the amount of $1.3 billion, the proceeds of which were used to repay the outstanding $1.275 billion of NNL Notes that matured on February 15, 2006. Part of the agreement with the bank group was that they would lead the longer term financing which would satisfy their loan.

39.    On June 24, 2006 (NOR-CAN00064619) I set forth all potential options that my team and I could then conceive of for dealing with the debt maturities arising from the interim credit facility that was to come due in February, 2007 (that were ultimately repaid by the July 2006 note offering). The option to "do nothing" mentioned in the June 24 email refers to the fact that the interim facility was not then due for repayment, and although the lenders wanted to be paid out early, there was no requirement that funding be obtained to repay it prior to its February, 2007 expiry.

- 13 -

40.   Ultimately, the funds were raised at applicable market rates and on July 5, 2006 NNL completed a $2 billion note offering, the proceeds of which were used to:

     a.   repay the February 14, 2006 interim credit facility entered into by NNI;

     b.   refinance a $150 million bond maturity;

     c.   replenish group cash resources following a class action litigation settlement in the amount of $575 Million;  and

     d.   provide the Group with additional working capital.[3]

41.   Although the process of completing these two financing transactions in 2006 was at times difficult, and was made more complex by the 2006 restatement, I was always confident – even in December 2005 and into January 2006 when the details of the interim credit facility with the banks were still being negotiated (see NNC-NNL11083276) – that they would be consummated and that NNL was not in danger of defaulting on its obligations, or that it would fail to acquire the capital necessary to continue to fund operations on a going concern basis.  I was aware that the transactions would be challenging.  Nortel was a high-yield issuer (rated B- at Standard and Poors) which had surprised investors with the financial restatements.  In light of this, the success of the $2 billion multiyear facility was a strong vote of confidence by the financial community, and our debt ratings remained constant.

**Customer Revenue Trends**

---

[3] NNC-NNL06705393

42.    Prior to Q4 2008, there were particular times when certain of NNL's (or its subsidiaries') creditors, suppliers or customers expressed concerns about Nortel's ability to refinance the debt or settle the class action litigation (both of which were resolved in early 2006).

43.    In a December 2005 presentation prepared by Lazard Freres & Co LLC ("Lazard") at Exhibit 21580, several Nortel customers are identified as having expressed concerns about Nortel's financial position and ability to invest in future technology, including Cingular, Deutsche Telekom, T-Mobile, Vodafone, O2, and Telstra. Questions or concerns about Nortel's financial position were generally answered by the CFO, Head of Investor Relations, and/or Treasurer/Assistant Treasurer.  I recall that questions raised around this time were generally in connection with the class action lawsuit , the upcoming maturity and the restatement, which were resolved following the announcement of the class action settlement and the repayment of the facility.

44.    In order to confirm my recollection and assess whether the customers listed in the Lazard presentation were concerned enough to actually move their business, I asked Stacey Inouye, a Nortel information technology employee, to review the quarterly revenues of each of these customers from 2005 until 2008 with reference to customer revenue reports (also known as "FIND" reports)[4] and she produced a chart which depicts this information in a graph. Attached at Exhibit "A" is a chart illustrating the sales trends of the customers identified in the Lazard report from 2005 to 2008. (I note that none of the customers identified by Lazard were one of the top five revenue-generating companies for Nortel between 2005 and 2008.)

---

[4] I understand that the customer revenue reports for the 2005-2008 financial years are contained at NNC-NNL11428747, NNC-NNL11428748, NNC-NNL11428749, NNC-NNL11428750.

- 15 -

45.    Although there were increases and decreases for each customer's revenues in any given quarter, this chart demonstrates that there was no mass exodus by these five customers from 2005 to 2008. As noted in the Lazard presentation, with the exception of Telstra, the majority of purchases by the other four identified customers were GSM/UMTS related. Accordingly, subsequent to the divestiture of the UMTS business in late 2006 revenue dropped in early 2007 but Nortel continued to maintain it non-UMTS related revenue stream with these customers through to the end of 2008. The sales trends overall demonstrate that these customers continued to purchase from Nortel throughout the period.

46.    I have also reviewed the results shown in the NNC Form 10k filings with the United States Securities Commission for the years 2007[5] and 2008[6]. These filings show the following overall revenue figures for the years 2005-2008, indicating a relatively stable revenue trend:

    a.   $10,509m in 2005;

    b.   $11,418m in 2006;

    c.   $10,948m in 2007; and

    d.   $10,421m in 2008.

47.    I note that this presentation and other documents (Exhibit 21045 and NNC-NNL11083835) were prepared by Lazard as negotiation tools to attempt to minimize the cash payment to be made to the plaintiffs to settle the class action, and as such sought to emphasize the limited cash resources available to Nortel fund such a payment. As the plaintiff was also accepting shares in the

---

[5] NNC-NNL06005571
[6] NNC-NNL06001427

company in settlement, Lazard was also arguing that it was in the plaintiff's interest to leave sufficient cash in the business to allow it to prosper.

**The UK Pension Plan Until 2004**

48.    As previously noted, during my tenure as both Assistant Treasurer and Interim Treasurer of NNL, I was a member of the Pension Investment Committee ("PIC"), which was the senior management committee of NNL that addressed pension investment issues that needed to be considered at the parent company's executive level for the various Nortel pension plans. I was a member of PIC primarily due to my financial expertise, to assist in choosing investment managers and addressing other financial matters that arose, as well as to make sure that I was fully aware of cash requirements related to pensions. In addition, while I was Interim Treasurer from August 2007 to mid-2008, John Poos, the Director of Global Pensions for NNL reported to me. Further, from 2006 until my departure from Nortel, I was a member of the UK Pension Funding and Policy Committee ("UK PFPC"). As such, I have knowledge and awareness of the historical and existing pension funding position of and contributions made to the defined benefits pension plan sponsored by NNUK (the "UK Plan"), from my own involvement in the matters and from information that I received from Kate Stevenson, who was the Treasurer at the material times.

49.    I understand that when NNL acquired STC plc ("STC") in 1991, the UK Plan had already been in a surplus position and STC had been taking an employer contribution holiday since 1987. After Nortel acquired STC in 1991, the UK Plan remained in a surplus position and the contribution holiday was extended until 2002, when the triennial valuation carried out that year revealed a deficit of £177 million, determined on an on-going basis.

50.    I also understand that leading up to, or immediately following, the disclosure of the deficit in 2002, the Trustee Board for the UK Plan sought from NNUK a commitment to a regular schedule of contributions.  My understanding is that NNUK did not commit to a long-term schedule of contributions in 2002 and 2003 for several reasons.  First, there was a chance the assets of the UK Plan could improve if the markets turned around.  Second, in light of the downturn in the technology sector and capital markets, the company needed to be cautious in its use of cash.  Third, as a result of the accounting irregularities and restatements of the financial statements of NNL, there was little ability to properly forecast future cash needs.  Given these circumstances, it would not have been reasonable for NNUK to commit to a long-term schedule of payments.

51.    I understand that although NNUK did not enter into a long-term funding agreement at that time, it made a number of contributions on an "ad hoc" basis to the UK Plan between 2002 and 2004. Contributions were made to the UK Plan in the amounts of £33 million pounds in 2002 and £59 million in 2003, and contributions totalling £46 million pounds on account of the 2004 year were made in December 2004 and January 2005.

52.    In order to assist the company in understanding the relative health of the various pension plans, NNL's actuarial consultant, Mercer, developed a model that became known as the "Common Platform".  The Common Platform was used as an internal management tool to understand the relative positions of the various defined benefits plans sponsored by NNL or its subsidiaries.  It was a complex task to understand the health of the various plans given that they were governed by the laws of various jurisdictions, had different constating documents and operated in different capital market conditions that impacted on their actuarial assumptions.  This was important since some jurisdictions, like Ontario, had very prescriptive regulatory requirements such that only the

- 18 -

regulatory payments were ever expected or required, while other jurisdictions – such as the UK – had lower statutory minimums.

53.  I understand that on December 3, 2004, Kenneth Gardener, then Chair of the Trustee Board and Iain Morgan, a member of the Trustee Board, met with the PIC in Brampton to express their concerns about the ad hoc nature of the contributions to the UK Plan. A working party was struck to work towards a long-term resolution of the funding issues facing the UK Plan. John Poos lead the working party on behalf of Nortel.

**Long-Term Funding Negotiations for the UK Plan**

54.  By the time I became Assistant Treasurer in December 2005, an interim agreement between NNUK and the Trustees (the "2005 Interim Funding Agreement", Exhibit 21118) was already in place and negotiations were underway for a long-term funding agreement. The Trustees retained PwC to provide them with independent financial advice. One of the issues raised by PwC in March 2006 was why NNUK could not pay down the deficit in the UK Plan more rapidly, given that Nortel had $3 billion in cash, including approximately $300 million in NNUK. In a March 23, 2006 email to Peter Currie, John Doolitte, John Poos and Kate Stevenson (Exhibit 21301), I summarized the issues surrounding affordability of contributions to the UK Plan as follows:

a.  Because Nortel was operating in an extremely competitive and rapidly changing industry, there was a constant need to invest in new technologies to remain competitive, whether through internal investments or targeted acquisitions. All competitors in our industry maintained high cash balances.

    b.   Nortel had to keep cash on hand to address working capital obligations in over one hundred countries since a significant component of our business was the building of large complex networks, which by their nature tied up working capital for extended periods. Significant volatility in quarter end balances masked that fact.

    c.   We had provisionally settled very significant lawsuits, with an agreement to place $575 million in escrow by June 1, 2006.

    d.   Rating agencies watched our liquidity closely and viewed it as an important credit metric during this time of transition.

    e.   We were making payments to reduce the deficits of the various pension plans in a responsible manner.

    f.   We used NNUK and NNI as global hubs for managing cash requirements of the organization, so the $300 million is both for use by NNUK and for other entities.

55.    Due to the above factors, it was critical that we manage our business with sufficient liquidity to give us the flexibility to grow the business and succeed.

**Project Swift**

56.    Project Swift was a tax-driven transaction, which entailed selling certain European assets from NNL to NNUK, in return for cancellation of part of the intercompany loan which NNL owed to NNUK (the "Intercompany Loan"). The concept was initiated by the NNUK tax group to avoid imputed interest on the Intercompany Loan becoming cash interest and to avoid a tax outflow

- 20 -

from the Nortel group as a whole.   This would result in substantial tax savings for NNUK and help ease cash repatriation issues by reducing the Intercompany Loan. It also facilitated a restructuring of the EMEA subsidiaries under the umbrella of NNUK.

57.    We were very aware that any cash movements involving NNUK could potentially impact our relationship with the Trustees and the potential involvement of the Pensions Regulator in the UK (the "Regulator") was an important consideration in our negotiations with the Trustees with respect to Project Swift.   We knew what our obligations were and stayed within the bounds of them at all times. I believed that we should consider going to the Regulator if the Trustees were unable to resolve their concerns about Project Swift because I thought the Regulator would have agreed with us that it was an overall transaction to everyone's benefit.   However, at the end of the day, the Trustees became satisfied with the final agreed terms and did not ask the Regulator to intervene.   We worked for many months with the Trustees, PwC and their other external advisers to create a financial result that was acceptable to all parties.  Project Swift was a lengthy negotiated transaction that clearly everyone was comfortable with as indicated by the fact that they all signed the agreement.

58.    As part of Project Swift, the Trustees requested that NNL provide a guarantee of NNUK's payment obligations towards the UK Plan (the "Swift Guarantee", Exhibit 21143).   I was part of the team that considered and oversaw the negotiations on the Swift Guarantee, which were also extensive.  I was responsible for ensuring that the Swift Guarantee was acceptable to Treasury, which primarily meant that its terms would not have a negative impact on NNL's other creditors and rating agencies, and that it was in a form acceptable to NNL.

- 21 -

59.     From my prior experience in Europe, I was familiar with the differences between administration proceedings and liquidations.  I was only willing to recommend a guarantee upon an ultimate wind-up or bankruptcy of NNUK, and not something potentially less terminal, such as administration proceedings, as I was concerned that any guarantee that was triggered sooner than a wind-up of NNUK could cause problems with Nortel's existing financiers and future access to capital markets.  This concept of limiting guarantees was common to all financing transactions where we had an opportunity to negotiate the substantive guarantee terms.

60.     The Swift Guarantee provides that it will be triggered on a wind-up or liquidation of NNUK; it does not provide that it will be triggered if NNUK were placed into administration in the UK. That is in keeping with the extent of the guarantee that the Treasury and Legal representatives were willing to recommend NNL provide, and the guarantee that was in fact recommended to and approved by NNL.

I.      SWORN BEFORE ME at the City of Mississauga, in the Province of Ontario on April 11, 2014.

_____
Commissioner for Taking Affidavits

_____
MICHAEL W. MCCORKLE

Samantha Rebecca Wynne, a
Commissioner, etc., Province of Ontario,
while a Student-at-Law,
Expires May 8, 2016.



THIS IS EXHIBIT "A" TO
THE AFFIDAVIT OF
**MICHAEL W. MCCORKLE**
SWORN BEFORE ME ON
APRIL 11, 2014

COMMISSIONER FOR TAKING AFFIDAVITS

Samantha Rebecca Wynne, a
**Commissioner, etc.,** Province of Ontario
while a Student-at-Law
Expires May 8, 2016.

Customer Revenue - 2005-2008 by Quarter
USD (millions)

| Customer | Quarter 2005-Q1 | 2005-Q2 | 2005-Q3 | 2005-Q4 | 2006-Q1 | 2006-Q2 | 2006-Q3 | 2006-Q4 | 2007-Q1 | 2007-Q2 | 2007-Q3 | 2007-Q4 | 2008-Q1 | 2008-Q2 | 2008-Q3 | 2008-Q4 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 27.86 | 59.73 | 61.08 | 108.91 | 84.46 | 46.61 | 31.88 | 37.80 | 28.45 | 22.58 | 70.12 | 43.63 | 27.34 | 42.49 | 62.73 | 41.70 | 797.37 |
| | 45.22 | 42.15 | 52.16 | 88.16 | 38.71 | 66.56 | 52.76 | 50.58 | 34.97 | 17.13 | 25.21 | 43.87 | 19.84 | 33.39 | 29.24 | 52.26 | 692.22 |
| | 27.11 | 31.37 | 39.28 | 44.77 | 33.05 | 173.03 | 127.24 | 86.32 | 26.60 | 29.82 | 39.47 | 63.02 | 39.37 | 43.53 | 10.37 | 9.03 | 823.37 |
| | 29.27 | 28.43 | 24.95 | 22.56 | 26.01 | 26.88 | 14.05 | 14.05 | 13.42 | 13.19 | 10.94 | 10.12 | 9.51 | 11.07 | 4.41 | 10.12 | 268.98 |
| | 8.71 | 7.25 | 17.01 | 15.76 | 82.35 | 11.10 | 13.60 | 27.02 | 12.43 | 1.98 | 13.30 | 5.23 | 6.44 | 7.20 | 6.31 | 10.77 | 246.45 |
| Total | 138.16 | 168.93 | 194.50 | 280.16 | 264.59 | 324.19 | 239.52 | 215.77 | 115.87 | 84.70 | 159.03 | 165.88 | 102.50 | 137.68 | 113.06 | 123.87 | 2,828.39 |



This is Exhibit......A....... referred to in the
affidavit of...Michael.. W. McCorkle.
sworn before me, this.....11.th.....
day of ........April........20.14.

.................................................
A Commissioner, etc.

Samantha Rebecca Wynne, a
Commissioner, etc., Province of Ontario,
while a Student-at-Law,
Expires May 8, 2015.

# Index

**AFFIDAVIT OF MICHAEL W. MCCORKLE (sworn April 11, 2014)**

**INDEX**

| Tab | Paragraph Referred to in Affidavit | Trial Exhibit Number | Depo Exhibit Number or Bates Number |
|---|---|---|---|
| 1 | Paragraphs 24, 34 | TR21052 | Exhibit 21052 |
| 2 | Paragraph 24 | TR21047 | Exhibit 21047 |
| 3 | Paragraph 27 | TR21651 | Exhibit 21651 |
| 4 | Paragraph 27 | TR21654 | Exhibit 21654 |
| 5 | Paragraph 30 | TR21633 | Exhibit 21633 |
| 6 | Paragraphs 31, 54 | TR21301 | Exhibit 21301 |
| 7 | Paragraph 34 | TR21557 | Exhibit 21557 |
| 8 | Paragraph 37 | TR21339 | Exhibit 21339 |
| 9 | Paragraph 39 | TR49034 | NOR-CAN00064619 |
| 10 | Paragraph 40 Footnote 3 | TR44727 | NNC-NNL06705393 |
| 11 | Paragraph 41 | TR45402 | NNC-NNL11083276 |
| 12 | Paragraph 43 | TR21580 | Exhibit 21580 |
| 13 | Paragraph 44 Footnote 4 | TR45491 | NNC-NNL11428747 |
| 14 | Paragraph 44 Footnote 4 | TR45492 | NNC-NNL11428748 |
| 15 | Paragraph 44 Footnote 4 | TR45493 | NNC-NNL11428749 |
| 16 | Paragraph 44 Footnote 4 | TR45494 | NNC-NNL11428750 |
| 17 | Paragraph 46 | TR44283 | NNC-NNL06005571 |

|    | Footnote 5                 |          |                  |
|----|----------------------------|----------|------------------|
| 18 | Paragraph 46<br>Footnote 6 | TR43999  | NNC-NNL06001427  |
| 19 | Paragraph 47               | TR21045  | Exhibit 21045    |
| 20 | Paragraph 47               | TR45405  | NNC-NNLI1083835  |
| 21 | Paragraph 54               | TR21118  | Exhibit 21118    |
| 22 | Paragraph 58               | TR21143  | Exhibit 21143    |

6330385