equally over a two-year period. For additional information, we refer you to NNC's Form 8-K dated June 27, 2006 incorporated by reference herein to the extent specified under "Incorporation of certain documents by reference."

## Annual Shareholders' Meeting

Our Annual Shareholders' Meeting, or the Annual Meeting, was held on June 29, 2006. As more fully described in our Proxy Circular and Proxy Statement dated April 28, 2006, or the Proxy Statement, incorporated by reference herein, the Annual Meeting was held to (i) receive our audited consolidated financials for the year ending December 31, 2005 and related auditor reports; (ii) elect our directors; (iii) appoint Deloitte & Touche LLP as our independent auditors; (iv) consider the reconfirmation and amendment of our shareholder rights plan; (v) consider an amendment to our articles of incorporation relating to a possible consolidation of our common shares; and (vi) consider two shareholder proposals described in the Proxy Statement. As to matters requiring a vote of shareholders, items (ii) through (v) were approved by the required vote of shareholders and the two shareholder proposals in item (vi) were not approved by the required vote of shareholders. We note that as stated in the report of Institutional Shareholder Services, or ISS, dated June 14, 2006 relating to the Annual Meeting, ISS continues to recommend that we initiate a process to review our relationship with Deloitte & Touche LLP, our independent auditors.

## Restatements; Material Weaknesses; Related Matters

We have effected successive restatements of prior period financial results. In December 2003, we restated our consolidated financial statements for the years ended December 31, 2002, 2001 and 2000 and for the quarters ended March 31, 2003 and June 30, 2003, or the First Restatement. Following an independent review of the facts and circumstances leading to the First Restatement, or the Independent Review, we restated our financial statements for the years ended December 31, 2002 and 2001 and the quarters ended March 31, 2003 and 2002, June 30, 2003 and 2002 and September 30, 2003 and 2002, or the Second Restatement. For more information about the First and Second Restatement, see our 2003 Annual Report.

Over the course of the Second Restatement process, we, together with our independent registered chartered accountants, identified a number of material weaknesses in our internal control over financial reporting as of December 31, 2003. Five of those material weaknesses continued to exist as of March 31, 2006. In addition, in January 2005, our and NNL's Boards of Directors adopted in their entirety the governing principles for remedial measures identified through the Independent Review. We continue to develop and implement these remedial measures.

As part of these remedial efforts and to compensate for the unremedied material weaknesses in our internal control over financial reporting, we undertook intensive efforts in 2005 to validate and enhance our controls and procedures relating to the recognition of revenue. These efforts included, among other measures, extensive documentation and review of customer contracts for revenue recognized in 2005 and earlier periods. As a result of the contract review, it became apparent that certain of the contracts had not been accounted for properly under U.S. GAAP. Most of these errors related to contractual arrangements involving multiple deliverables, for which revenue recognized in prior periods should have been deferred to later periods. In addition, based on our review of our revenue recognition policies and discussions with our independent registered chartered accountants as part of the 2005 audit,

HIGHLY CONFIDENTIAL      NNC-NNL06705393 / 25

we determined that in our previous application of these policies, we misinterpreted certain of these policies.

Management's determination that these errors required correction led to the Audit Committee's decision on March 9, 2006 to effect the Third Restatement. The need for the Third Restatement resulted in a delay in filing NNC's and NNL's 2005 Annual Reports and NNC's and NNL's 2006 First Quarter Reports. Following the announcement of the Third Restatement on March 10, 2006, the Audit Committee directed the Internal Audit group to conduct a review of the facts and circumstances surrounding the Third Restatement principally to review the underlying conduct of the initial recording of the errors and any overlap of items restated in the Third Restatement and the Second Restatement, or the Internal Audit Review. Internal Audit engaged third party forensic accountants to assist in the review. The review is now completed and Internal Audit has reported its findings to the Audit Committee. For more information, see the "Controls and Procedures" section of the 2006 First Quarter Report.

HIGHLY CONFIDENTIAL                              NNC-NNL06705393 / 26

# The offering

The following summary contains basic information about the Notes and related guarantees and is not intended to be complete. It does not contain all the information that is important to you. For a more complete understanding of the Notes and related guarantees, please refer to the section entitled "Description of the Notes" in this offering memorandum.

| | |
|---|---|
| Issuer . . . . . . . . . . . . . . . . | Nortel Networks Limited, a Canadian corporation. |
| Guarantors . . . . . . . . . . . | Nortel Networks Corporation, a Canadian corporation, and Nortel Networks Inc., a Delaware corporation. |
| Securities being offered . . . . . . . . . . . . . . | $450,000,000 aggregate principal amount of 2016 Fixed Rate Notes. |
| | $550,000,000 aggregate principal amount of 2013 Fixed Rate Notes. |
| | $1,000,000,000 aggregate principal amount of Floating Rate Notes. |
| Maturity . . . . . . . . . . . . . | July 15, 2016, in the case of the 2016 Fixed Rate Notes. |
| | July 15, 2013, in the case of the 2013 Fixed Rate Notes. |
| | July 15, 2011, in the case of the Floating Rate Notes. |
| Interest rate . . . . . . . . . . | The 2016 Fixed Rate Notes will bear interest at an annual rate of 10.750%. Interest on the 2016 Fixed Rate Notes is payable on January 15 and July 15 of each year, commencing January 15, 2007. |
| | The 2013 Fixed Rate Notes will bear interest at an annual rate of 10.125%. Interest on the 2013 Fixed Rate Notes is payable on January 15 and July 15 of each year, commencing January 15, 2007. |
| | The Floating Rate Notes will bear interest at an annual rate, reset quarterly, equal to three-month LIBOR plus 4.250%. Interest on the Floating Rate Notes is payable on January 15, April 15, July 15 and October 15 of each year, commencing October 15, 2006. |
| | See "Description of the Notes—Principal, Maturity and Interest" for additional information. |
| Optional redemption . . | The 2016 Fixed Rate Notes will be redeemable at the Company's option, in whole at any time or in part from time to time on or after July 15, 2011, at the redemption prices set forth in this offering memorandum, together with accrued and unpaid interest, if any, to the date of redemption. In addition, at any time prior to July 15, 2011, the Company may redeem all or a portion of the 2016 Fixed Rate Notes at a price equal to 100% of the principal amount thereof plus a "make-whole" premium set forth in this offering memorandum, together with accrued and unpaid interest. |
| | The 2013 Fixed Rate Notes will be redeemable at the Company's option, in whole at any time or in part from time to time, at a price equal to 100% of the principal amount thereof plus a "make-whole" premium set forth in this offering memorandum, together with accrued and unpaid interest. |

15

HIGHLY CONFIDENTIAL

The Company may also, at its option at any time or from time to time on or prior to July 15, 2009, use the proceeds of certain equity offerings to redeem up to 35% of each Series of Notes at the prices set forth in this offering memorandum.

In addition, in the event of certain changes in applicable withholding taxes, the Company may, at its option, redeem the Notes of each Series in whole, but not in part, at the prices described in this offering memorandum.

The Floating Rate Notes are not redeemable at the Company's option, except as described in the two preceding paragraphs.

See "Description of the Notes—Optional Redemption" for additional information.

**Offer to purchase upon a Change of Control . . .**   Upon a Change of Control (as defined under "Description of the Notes—Certain Definitions"), the Company will be required to make an offer to purchase all or a portion of each holder's Notes at a purchase price in cash equal to 101% of the principal amount thereof, together with accrued and unpaid interest, if any, to the date of purchase. See "Description of the Notes—Change of Control" and "Risk Factors—Risks relating to the Notes—The Company may be unable to purchase the Notes upon a Change of Control."

**Certain Covenants . . . . .**   The indenture will contain certain limitations on the ability of NNC and its subsidiaries (other than Nortel Government Solutions Holding Corporation, or NGSH, Nortel LearnIT and their respective subsidiaries) to:

- incur or guarantee indebtedness;

- grant liens;

- pay dividends on or repurchase certain capital stock of NNC and the Company; and

- enter into certain mergers, amalgamations or consolidations.

These covenants are subject to a number of important exceptions and limitations and certain of these covenants will either be inapplicable or more limited at any time that the Notes have an investment grade rating. See "Description of the Notes—Certain Covenants that will Cease to Apply During Suspension Period" and "Description of the Notes—Certain Covenants Applicable at All Times."

**Ranking . . . . . . . . . . . . . .**   The Notes will be senior unsecured obligations of the Company and will rank *pari passu* with all other senior obligations of the Company and effectively junior to all secured obligations of the Company to the extent of the value of the property securing such obligations. The Notes will be effectively subordinated to all liabilities of the

HIGHLY CONFIDENTIAL                    NNC-NNL06705393 / 28

subsidiaries of NNC that are not Guarantors (other than the Company) to the extent of the value of such subsidiaries.

**Guarantees** . . . . . . . . . . .   The Notes will at all times be guaranteed by NNC and will also initially be guaranteed by NNI. If, for any reason, the Company does not make any required payment in respect of any guaranteed Notes when due, whether on the normal due date, on acceleration, redemption or otherwise, the Guarantors with respect to the guarantees that are then in effect will cause the payment to be made to or to the order of the Trustee. Each Guarantee will be the direct, unconditional, unsecured and unsubordinated obligation of the respective Guarantor and will rank equally and ratably with other senior unsecured obligations of the respective Guarantor, except to the extent prescribed by law.

The Guarantee of NNI will be released under certain circumstances set forth under "Description of the Notes—Guarantees; Release of Guarantees."

**Exchange offer and registration rights agreement** . . . . . . . . . . .   In connection with the issuance of the Notes, the Issuers will enter into an agreement with the initial purchasers obligating us to use our reasonable best efforts to file with the SEC and cause to become effective a registration statement relating to an offer to exchange the Notes for SEC-registered notes, or the Exchange Notes, evidencing the same continuing indebtedness as the Notes and with terms substantially identical to the Notes. If applicable interpretations of the staff of the SEC do not permit the Company to effect the exchange offer, we will use our reasonable best efforts to file and cause to become effective a shelf registration statement relating to resales of the Notes.

Holders of the Notes will be entitled to the payment of certain additional interest if (i) the registration statement is not filed within 15 months after the date of issuance of the Notes, (ii) the registration statement does not become effective within 18 months after the date of issuance of the Notes, (iii) the exchange offer is not completed within 45 days after the registration statement becomes effective or (iv) if required, the shelf registration statement does not become effective within 18 months plus 45 days after the date of issuance of the Notes or following its effectiveness, subject to limited exceptions, ceases to remain effective or otherwise available for more than 45 days in any 12-month period prior to the time the Notes are freely transferable under the Securities Act.

See "Exchange offer and registration rights agreement" for additional information.

17

HIGHLY CONFIDENTIAL

| | |
|---|---|
| **Transfer restrictions; absence of a public market for the Notes** . . . | The Notes have not been registered under the Securities Act and are subject to restrictions on transferability and resale. The Notes are a new issue of securities and there is currently no established market for the Notes. If issued, the Exchange Notes will be freely transferable in the U.S. but will also be new securities for which there will not initially be a market. |
| | Notes that are sold to qualified institutional buyers are expected to be eligible for trading in the PORTAL® market. The initial purchasers have advised us that they currently intend to make a market in the Notes and, if issued, the Exchange Notes. However, they are not obligated to do so, and any market-making with respect to the Notes or the Exchange Notes may be discontinued without notice. We do not intend to apply for a listing of the Notes, or, if issued, the Exchange Notes, on any securities exchange or an automated dealer quotation system. For more information, see "Transfer restrictions." |
| **Use of proceeds** . . . . . . . | The Company estimates that net proceeds of this offering, after deducting the commission payable to the initial purchasers and other expenses, will be approximately $1,956 million. |
| | We expect to use $1,300 million of these net proceeds to refinance the 2006 Credit Facility, and the remainder for general corporate purposes, including to replenish our cash resources in light of recent cash outflows of $575 million (plus accrued interest of $5 million) deposited into escrow pursuant to the Proposed Class Action Settlement on June 1, 2006 and $150 million for the repayment at maturity of the outstanding aggregate principal amount of the 7.40% Notes due June 15, 2006. |
| | See "Use of proceeds" for more information. |

# Risk factors

**Investing in the Notes involves substantial risks. You should carefully consider all the information in this offering memorandum prior to investing in the Notes. In particular, we urge you to consider carefully the factors set forth under "Risk factors" beginning on page 25 of this offering memorandum and in the "Risk Factors" sections of the 2005 Annual Report and the 2006 First Quarter Report beginning on page 19 of Annex C and 86 of Annex B, respectively.**

HIGHLY CONFIDENTIAL　　　　NNC-NNL06705393 / 30

# Corporate Structure of Company and Guarantors

The following chart illustrates the simplified vertical corporate structure of the Company and the Guarantors. For information about the indebtedness of NNC and its subsidiaries, see "Capitalization of NNC" and "Description of other indebtedness of NNC."



(1) The NNI guarantee will be released under certain circumstances set forth under "Description of the Notes—Guarantees."

19

HIGHLY CONFIDENTIAL    NNC-NNL06705393 / 31

# Selected historical consolidated financial information of NNC

The following table sets forth summary selected historical consolidated financial data for NNC as of December 31, 2005 and for the three years ended December 31, 2003, 2004 and 2005, as of March 31, 2006 and for the three months ended March 31, 2005 and 2006. This data has been derived from, and should be read in conjunction with, NNC's audited consolidated financial statements and NNC's unaudited condensed consolidated interim financial statements, respectively, and the accompanying related notes, all of which are attached hereto and incorporated by reference herein. Some data has been presented for the twelve months ended March 31, 2006, which has been derived from audited consolidated financial data for NNC for the year ended December 31, 2005 and unaudited condensed consolidated financial data for NNC for the three months ended March 31, 2005 and 2006. The financial results for the three-month periods are not necessarily indicative of financial results for the full year. NNC believes that the unaudited condensed consolidated financial statements include all adjustments necessary for a fair presentation of the results for the periods presented. NNC's consolidated financial results include the operating results of Nortel Government Solutions Incorporated, or NGS, from June 3, 2005, the date we acquired NGS. On June 1, 2006, we deposited into escrow $575 million (plus accrued interest of $5 million) pursuant to the Proposed Class Action Settlement. Balance sheet data as of March 31, 2006 and certain other financial data for the twelve months ended March 31, 2006 have also been adjusted for (1) the issuance of the Notes; (2) the assumed application of a portion of the net proceeds from the sale of the Notes to prepay the $1,300 million amount outstanding under the 2006 Credit Facility; (3) the deposit into escrow on June 1, 2006 of $575 million (plus accrued interest of $5 million) pursuant to the Proposed Class Action Settlement; and (4) the repayment at maturity of the outstanding $150 million aggregate principal amount of 7.40% Notes due June 15, 2006.

| (Millions of U.S. dollars) | Year ended December 31, | | | Three months ended March 31, | |
|---|---|---|---|---|---|
| | 2003 | 2004 | 2005 | 2005 | 2006 |
| Revenues | $9,932 | $9,516 | $10,523 | $2,389 | $2,382 |
| Gross profit | 4,209 | 3,942 | 4,306 | 1,012 | 908 |
| Gross margin | 42% | 41% | 41% | 42% | 38% |
| Selling, general and administrative expense | 1,966 | 2,133 | 2,413 | 578 | 595 |
| Research and development expense | 1,968 | 1,960 | 1,856 | 474 | 478 |
| Amortization of intangibles | 101 | 9 | 17 | 2 | 5 |
| Deferred stock option compensation | 16 | – | – | – | – |
| Special charges | 288 | 181 | 170 | 14 | 5 |
| (Gain) loss on sale of business and assets(1) | (4) | (91) | 47 | 22 | (35) |
| Shareholder litigation settlement expense | – | – | 2,474 | – | 19 |
| Operating earnings (loss) | (126) | (250) | (2,671) | (78) | (159) |
| Other income (expense)—net | 466 | 212 | 303 | 54 | 69 |
| Interest expense | | | | | |
| Long-term debt | (178) | (192) | (207) | (50) | (46) |
| Other | (28) | (10) | (11) | (3) | (24) |

HIGHLY CONFIDENTIAL    NNC-NNL06705393 / 32

| (Millions of U.S. dollars) | Year ended December 31, | | | Three months ended March 31, | |
| --- | --- | --- | --- | --- | --- |
| | 2003 | 2004 | 2005 | 2005 | 2006 |
| Earnings (loss) from continuing operations before income taxes, minority interests and equity in net earnings (loss) of associated companies | 134 | (240) | (2,586) | (77) | (160) |
| Income tax benefit (expense) | 83 | 30 | 56 | (16) | (23) |
| Minority interests—net of tax | (59) | (46) | (50) | (14) | 9 |
| Equity in net earnings (loss) of associated companies—net of tax | (36) | – | 4 | 1 | (2) |
| Net earnings (loss) from continuing operations | 122 | (256) | (2,576) | (106) | (176) |
| Net earnings (loss) from discontinued operations—net of tax | 183 | 49 | 1 | 2 | – |
| Net earnings (loss) before cumulative effect of accounting change | 305 | (207) | (2,575) | (104) | (176) |
| Cumulative effect of accounting change—net of tax | (12) | – | – | – | 9 |
| Net earnings (loss) | $ 293 | $ (207) | $ (2,575) | $ (104) | $ (167) |

(1) Represents net after-tax gains or losses classified in NNC's consolidated statement of operations as gains or losses on the sale of businesses and assets and includes related costs. Consists primarily of: for 2003, the recognition of the remaining unamortized deferred gain related to the sale of substantially all of the assets of NNC's Cogent Defence Systems business during the year ended December 31, 2001; for 2004, a gain of $78 million related to the sale of certain assets in CALA for which we received $80 million in proceeds and a gain of approximately $30 million related to the sale of our directory and operator services business to VoltDelta Resources LLC; for 2005, charges related to the divestiture of our remaining manufacturing operations to Flextronics; for the three months ended March 31, 2005, a loss of $21 million on sale of businesses and assets related to the ongoing divestiture of our remaining manufacturing operations to Flextronics; and for the three months ended March 31, 2006, a gain of $19 million on the sale of certain assets and a gain of $18 million on the sale of our Brampton facility.

## Balance Sheet Data

| (Millions of U.S. dollars) | As of December 31, 2005 | As of March 31, 2006 | |
| --- | --- | --- | --- |
| | | Actual | As Adjusted |
| Total assets | $18,112 | $17,841 | $17,767 |
| Unrestricted cash and cash equivalents | 2,951 | 2,695 | 2,621 |
| Accounts receivable—net | 2,862 | 2,620 | 2,620 |
| Inventories—net | 1,804 | 1,984 | 1,984 |
| Accounts payable—net(2) | 1,166 | 1,053 | 1,053 |
| Plant and equipment—net | 1,564 | 1,531 | 1,531 |
| Total debt(3) | 3,896 | 3,926 | 4,476 |
| Total shareholders' equity | 786 | 675 | 675 |

(2) Accounts payable—net is defined as trade and other accounts payable less notes payable.

(3) Total debt includes long-term debt, long-term debt due within one year, loan payable and notes payable. Notes payable as of December 31, 2005 was $11 million and as of March 31, 2006 was $13 million.

21

HIGHLY CONFIDENTIAL      NNC-NNL06705393 / 33

## Other Financial Data and Credit Statistics

| (Millions of U.S. dollars, except ratios) | Year ended December 31, | | | Three months ended March 31, | | Twelve months ended March 31, 2006 As adjusted(4) |
|---|---|---|---|---|---|---|
| | 2003 | 2004 | 2005 | 2005 | 2006 | |
| Net cash from (used in) operating activities of continuing operations . . . . . . . . . . . . . . . . . . . . . | $(140) | $(179) | $(180) | $(263) | $(174) | – |
| Net cash from (used in) investing activities of continuing operations . . . . . . . . . . . . . . . . . . . . . | 145 | (138) | (425) | 28 | (100) | – |
| Net cash from (used in) financing activities of continuing operations . . . . . . . . . . . . . . . . . . . . . | (359) | (110) | (60) | (21) | 4 | – |
| Adjusted EBITDA(5) . . . . . . . . . . . . . . . . . . . . . . . | 818 | 602 | 913 | 113 | 17 | 817 |
| Capital expenditures . . . . . . . . . . . . . . . . . . . . . . . | 169 | 276 | 258 | 54 | 99 | 303 |
| Cash interest paid . . . . . . . . . . . . . . . . . . . . . . . . | 186 | 189 | 203 | 84 | 105 | 224 |
| Consolidated Fixed Charges(6) . . . . . . . . . . . . . . . | 241 | 235 | 256 | 62 | 82 | 276 |
| Consolidated Fixed Charges Coverage Ratio(7) . . | 3.39 | 2.56 | 3.56 | – | – | 2.96 |
| Ratio of net debt to Adjusted EBITDA(8) . . . . . . . . | – | – | 1.04 | – | – | 2.27 |

(4) On a historical basis for the twelve months ended March 31, 2006, Ratio of net debt to Adjusted EBITDA was 1.51, all other numbers were as presented in this column.

(5) We have presented Adjusted EBITDA because it is a financial measure that is used as a factor in testing whether the Company, the Guarantors and their subsidiaries may incur additional funded debt under the terms of the Notes and the related indenture (see ''Description of the Notes—Certain Definitions'' and ''—Certain Covenants that will Cease to Apply During Suspension Period''). Adjusted EBITDA is derived from EBITDA, which is defined as net earnings (loss) from continuing operations before interest expense (excluding interest income), income tax expense (benefit), depreciation and amortization and cash dividends paid by NNL on outstanding preferred shares (including taxes paid in respect of such dividends).

Adjusted EBITDA and EBITDA, as presented, may not be comparable to similarly titled measures of other companies. Adjusted EBITDA and EBITDA, which are non-GAAP financial measures, have important limitations as analytical tools and you should not consider them in isolation or as substitutes for analysis of NNC's consolidated results as reported under U.S. GAAP. For example, Adjusted EBITDA:

- does not reflect NNC's consolidated cash expenditures, or future requirements for capital expenditures, or contractual commitments including pension and other post-retirement obligations;

- does not reflect the significant interest expense, or the cash requirements necessary to service interest or principal payments, on NNC's consolidated indebtedness and other obligations;

- does not reflect tax payments that represent a reduction in cash available to NNC and its subsidiaries;

- does not reflect expenses resulting from payments or distributions in connection with certain shareholder litigation or regulatory or law enforcement investigations;

- does not necessarily reflect changes in, or cash requirements for, NNC's consolidated working capital needs including the timing of the receipt of cash from our customers for the sales of our solutions or the timing of our payments of costs relating to these sales; and

- does not reflect any cash requirements for the assets being depreciated and amortized that may have to be replaced in the future.

Because of these limitations, we rely primarily on our results under U.S. GAAP. The SEC may require that Adjusted EBITDA and EBITDA be presented differently or not at all in filings we make with it. See ''Non-GAAP financial measures'' for additional information. Adjusted EBITDA and EBITDA also differ in important respects from Management EBT discussed in the MD&A section of our 2006 First Quarter Report. Adjusted EBITDA and EBITDA should not be viewed as substitute measures of our cash flow or reliable predictors of our cash flow or our ability to generate earnings or cash to service our indebtedness.

HIGHLY CONFIDENTIAL   NNC-NNL06705393 / 34

The following table reconciles Adjusted EBITDA for NNC on a consolidated basis to EBITDA and to the most directly comparable U.S. GAAP measure, net earnings (loss) from continuing operations. We have presented a reconciliation to EBITDA because it is a measure that is commonly used by investors in evaluating high yield debt instruments and Adjusted EBITDA is derived from EBITDA.

| (Millions of U.S. dollars) | Year ended December 31, | | | Three months ended March 31, | | Twelve months ended March 31, 2006(a) |
|---|---|---|---|---|---|---|
| | 2003 | 2004 | 2005 | 2005 | 2006 | |
| Net earnings (loss) from continuing operations | $ 122 | $(256) | $(2,576) | $(106) | $(176) | $(2,646) |
| Interest expense(b) | 206 | 202 | 218 | 53 | 70 | 235 |
| Income tax expense (benefit) | (83) | (30) | (56) | 16 | 23 | (49) |
| Depreciation and amortization | 546 | 340 | 302 | 81 | 60 | 281 |
| Dividends on preferred shares(c) | 35 | 33 | 38 | 9 | 12 | 41 |
| EBITDA | $ 826 | $ 289 | $(2,074) | $ 53 | $ (11) | $(2,138) |
| Net (income) loss of equity investments except cash distributions(d) | 36 | 1 | (4) | (1) | 2 | (1) |
| Restructuring charges(e) | 288 | 181 | 170 | 14 | 5 | 161 |
| (Gain) loss on sale of businesses and assets(f) | (4) | (91) | 47 | 22 | (35) | (10) |
| Loss on BSNL contract(g) | – | 162 | 148 | 6 | – | 142 |
| Customer bankruptcy settlement(h) | (53) | – | – | – | – | – |
| Customer financing receivable restructuring gains(i) | (122) | (98) | (10) | (10) | – | – |
| Non-cash compensation expense(j) | 45 | 118 | 88 | 18 | 16 | 86 |
| Restatement costs(k) | 5 | 97 | 102 | 33 | 17 | 86 |
| Finance transformation costs(l) | – | – | 40 | 6 | 14 | 48 |
| Gain related to the sale of EADS interest(m) | (96) | – | – | – | – | – |
| Shareholder litigation settlement expense(n) | – | – | 2,474 | – | 19 | 2,493 |
| Foreign exchange gains | (107) | (57) | (68) | (28) | (10) | (50) |
| Adjusted EBITDA | $ 818 | $ 602 | $ 913 | $ 113 | $ 17 | $817 |

(a) Calculated by adding NNC's audited consolidated financial data for the year ended December 31, 2005 and NNC's unaudited condensed consolidated financial data for the three months ended March 31, 2006 and subtracting NNC's unaudited condensed consolidated financial data for the three months ended March 31, 2005. Amounts presented for the twelve months ended March 31, 2006 are not necessarily indicative of financial results for the full year 2006.

(b) Does not give effect to interest income.

(c) Represents cash dividends paid by NNL on outstanding preferred shares (including taxes paid in respect of such dividends), which are included as part of minority interests in NNC's consolidated financial statements. These amounts are included in the calculation of Consolidated Fixed Charges described below in footnote 6.

(d) Represents the net income or loss of joint ventures in which NNC or a subsidiary of NNC is a party and the net income or loss of entities that are not subsidiaries of NNC, in each case except to the extent of cash dividends or distributions paid to NNC or to a subsidiary of NNC by such joint venture or other entity.

(e) Represents charges (including amounts to be settled in cash) related to exit and disposal activities approved by the board of directors of NNC as part of a restructuring plan. Restructuring charges in 2003, 2004, 2005 and 2006 consist of charges relating to two restructuring plans. We implemented a restructuring plan to streamline our operations and activities around our core markets and leadership strategies during 2001, or the 2001 Restructuring Plan, in light of the significant downturn in both the telecommunications industry and the economic environment, and capital market trends impacting our operations and expected future growth rates. This restructuring plan was adjusted during 2001, 2002 and 2003 to reflect the continued decline in the industry and economic environment, and in the capital markets. In addition, we initiated activities in 2003 to exit certain leased facilities and leases for assets no longer used across all segments. In the third quarter of 2004, we announced a strategic plan that included the 2004 Restructuring Plan. For more information on the 2004 Restructuring Plan, see the MD&A section of our 2005 Annual Report. We may incur restructuring charges of this nature in the future as our business and the telecommunications industry continue to evolve.

(f) Represents net after-tax gains or losses classified in NNC's consolidated statement of operations as gains or losses on the sale of businesses and assets. See footnote 1 for more information.

(g) Represents losses, charges and costs attributed to the contracts with Bharat Sanchar Nigam Limited, or BSNL. The definition of Adjusted EBITDA excludes these losses, charges and costs attributed to BSNL contracts existing on the issue date of the Notes, but not any expansion option, extension, renewal or replacement of those contracts. For more information on the BSNL contract, see the MD&A section of our 2005 Annual Report.

(h) Represents a one-time reduction in accruals of $53 million associated with a certain customer bankruptcy settlement in the third quarter of 2003. The definition of Adjusted EBITDA excludes this item, but if there are any similar items that occur after March 31, 2006, they will not be excluded.

(i) Represents favorable settlements of $122 million in 2003, $45 million in 2004 and nil in 2005 related to the sale or restructuring of customer financing receivables due to subsequent collections for amounts exceeding NNC's original estimates of net recovery, which are included in SG&A expense; and gains of $53 million in 2004 (all of which was recorded in the fourth

23

quarter of 2004) and $10 million in 2005 (all of which was recorded in the first quarter of 2005) resulting from restructured customer financing arrangements, which are included in other income (expense). The definition of Adjusted EBITDA excludes these items, but if there are any similar items that occur after March 31, 2006, they will not be excluded.

(j) Represents non-cash compensation expense related to stock-based compensation plans included as applicable in cost of revenues, SG&A expense and R&D expense.

(k) Represents costs attributable to the First, Second and Third Restatements and any related internal control remedial measures. Considerable effort and resources have been expended on our restatement activities in 2004, 2005 and 2006. We and our independent auditors have identified a number of material weaknesses related to our internal control over financial reporting and concluded that our internal control over financial reporting is ineffective, which could continue to cause us to incur additional costs in relation to the remediation of these material weaknesses. For more information, see the "Controls and Procedures" section in the 2005 Annual Report and 2006 First Quarter Report.

(l) Represents costs attributable to our ongoing finance transformation project, which includes, among other things, the implementation of a new information technology platform (SAP) to provide an integrated global financial system. For more information, see the "Controls and Procedures" section in the 2005 Annual Report and 2006 First Quarter Report.

(m) Represents a non-cash gain of $96 million in 2003 related to the sale of our interest in EADS Telecom S.A.S. (formerly EADS Defence and Security Networks S.A.S.) in conjunction with changes in ownership of our French and German operations.

(n) Represents charges taken as a result of our Proposed Class Action Settlement. See "—Company overview—Recent Developments—Proposed Class Action Settlement" for more information. We adjusted the equity component in the first quarter of 2006 and will further adjust it in future quarters based on the fair value of the NNC common shares issuable until the finalization of the settlement. We may incur additional costs in the future in connection with the settlement of, or satisfaction of any judgment resulting from, any shareholder litigation or regulatory or law enforcement investigation. The definition of Adjusted EBITDA excludes these costs relating to matters disclosed or incorporated by reference in this offering memorandum.

(6) We have presented Consolidated Fixed Charges because it is a financial measure that is used as a factor in testing whether the Company, the Guarantors and their subsidiaries may incur additional funded debt under the terms of the Notes and the related indenture (see "Description of the Notes—Certain Definitions" and "—Certain Covenants that will Cease to Apply During Suspension Period").

Consolidated Fixed Charges, as presented, may not be comparable to similarly titled measures of other companies. Consolidated Fixed Charges is a non-GAAP financial measure, and you should not consider it in isolation or as substitutes for analysis of NNC's consolidated results as reported under U.S. GAAP. The SEC may require that Consolidated Fixed Charges be presented differently or not at all in filings we make with it. See "Non-GAAP financial measures" for additional information. Consolidated Fixed Charges also differs in important respects from fixed charges as calculated for purposes of the ratio of earnings to fixed charges under SEC rules, which is presented under "Ratio of earnings to fixed charges of NNC".

The following table sets out the composition of Consolidated Fixed Charges:

| (Millions of U.S. dollars) | Year ended December 31, | | | Three months ended March 31, | | Twelve months ended March 31, 2006(a) |
|---|---|---|---|---|---|---|
| | 2003 | 2004 | 2005 | 2005 | 2006 | |
| Interest expense(b) | $206 | $202 | $218 | $ 53 | $ 70 | $235 |
| Dividends on preferred shares(c) | 35 | 33 | 38 | 9 | 12 | 41 |
| Consolidated Fixed Charges | $241 | $235 | $256 | $ 62 | $ 82 | $276 |

(a) Calculated by adding NNC's audited consolidated financial data for the year ended December 31, 2005 and NNC's unaudited condensed consolidated financial data for the three months ended March 31, 2006 and subtracting NNC's unaudited condensed consolidated financial data for the three months ended March 31, 2005. Amounts presented for the twelve months ended March 31, 2006 are not necessarily indicative of financial results for the full year 2006.

(b) Does not give effect to interest income.

(c) Represents cash dividends paid by NNL on outstanding preferred shares (including taxes paid in respect of such dividends), which are reflected in NNC's consolidated financial statements as minority interests.

(7) Represents the ratio of Adjusted EBITDA to Consolidated Fixed Charges. See footnote 5 for a description of Adjusted EBITDA and footnote 6 for a description of Consolidated Fixed Charges.

(8) We have presented the ratio of net debt to Adjusted EBITDA, because we believe it provides information that is useful to understand our past financial performance and prospects for the future and because it is a measure that is commonly used by investors in evaluating high yield debt instruments. Net debt is defined as total debt less unrestricted cash and cash equivalents and, as presented, may not be comparable to similarly titled measures of other companies. The SEC may require that net debt be presented differently or not at all in filings we make with it. See "Non-GAAP financial measures" for additional information. Net debt as of December 31, 2005 and March 31, 2006 comprises total debt of $3,896 million and $3,926 million, respectively, less unrestricted cash and cash equivalents of $2,951 million and $2,695 million, respectively. Cash and cash equivalents as of March 31, 2006 does not reflect the deposit into escrow on June 1, 2006 of $575 million (plus accrued interest of $5 million) pursuant to the Proposed Class Action Settlement, the repayment at maturity of the outstanding $150 million aggregate principal amount of 7.40% Notes due June 15, 2006 and other post March 31, 2006 impacts on cash. See footnote 3 for a description of total debt and footnote 5 for a description of Adjusted EBITDA.

24

# Risk factors

Investing in the Notes involves substantial risks.

A description of the risks relating to our restatements and related matters, risks relating to the Company, including risks relating to our business, and risks relating to our liquidity, financing arrangements and capital is included elsewhere herein and in the "Risk Factors" sections of the 2005 Annual Report and the 2006 First Quarter Report, attached hereto as Annex B and Annex C, beginning on page 19 and 86, respectively. You should carefully consider these risks and the risks described below along with other information contained or incorporated by reference in this offering memorandum before making an investment decision with regard to the Notes. The risks and uncertainties described below and in the "Risk Factors" sections of the 2005 Annual Report and the 2006 First Quarter Report are not the only ones relevant to us or to an investment in the Notes. Additional risks and uncertainties not currently known to us or that we currently believe are immaterial may also impair our business, results of operations, financial condition and liquidity.

The above categories and the order in which we have listed our risk factors is not intended to limit your consideration of the possible effects of these risks on our business or to categorize or rank our risks by likelihood of occurrence or severity to our business. Any adverse effects related to the risks discussed may, and likely would, have an adverse impact on many aspects of our business.

## Risks Relating to the Notes

**The Issuers may not be able to generate sufficient cash flow to meet their obligations, including payments on the Notes and the Guarantees. NNC and the Company depend on their subsidiaries for a substantial portion of their cash flow.**

NNC's principal asset is the common shares of the Company, and the capital stock of the Company's subsidiaries represents a significant portion of the Company's assets. Consequently NNC is dependent, and the Company is partially dependent, on distributions from their subsidiaries to service their debt, including any payments on the Guarantees. The Issuers' subsidiaries are separate and distinct legal entities and any subsidiary that is not a Guarantor will have no obligation, contingent or otherwise, to pay amounts due under the Notes or the Guarantees or to make any funds available to pay those amounts, whether by dividend, distribution, loan or other payment. In addition, the Issuers' subsidiaries' ability to pay dividends and make other distributions to the Issuers may also be subject to their having net income and the requisite amounts of paid-in-capital, and other restrictions under applicable laws, including with respect to exchange and capital controls, as well as the absence of any financial or other agreement that may restrict their ability to provide funds to the Issuers. Furthermore, the ability of the Issuers to fund their obligations, including payments on the Notes and the Guarantees, depends on their and their subsidiaries' ability to generate sufficient cash flows from operations, which is subject in part to general economic, financial, business, competitive, legislative, regulatory and other factors, many of which may be beyond their control. If the Issuers and their subsidiaries are unable to maintain a sufficient level of cash flows from operations, and other sources of liquidity are not available to them, or the Issuers' subsidiaries are otherwise unable to pay dividends to the Issuers or provide and make payments on loans or other forms of financing to the Issuers, the Issuers may not be able to make payments of principal, interest or other payments on the Notes and the Guarantees. In these circumstances, the Issuers also may not be able to pay the principal, interest or other

25

amounts due on their other obligations, including outstanding public debt and corporate expenses.

If any Issuer is unable to service its debt or pay its other obligations, it will be forced to take actions such as reducing or delaying capital expenditures, selling assets, restructuring or refinancing its debt, or seeking additional equity capital. It may be unable to effect any of these actions on satisfactory terms, or at all. In addition, if any Issuer cannot make scheduled payments on any of its debt obligations, it will be in default under that obligation and, as a result, among other things, (i) the holders of that obligation could declare all outstanding principal and interest to be due and payable, which could result in additional debt becoming due and outstanding as a result of cross-default or cross-acceleration provisions; and (ii) it could be forced into bankruptcy or liquidation, which could result in you losing your entire investment in the Notes and/or the benefit of the applicable Guarantee. In addition, if either NNC or the Company cannot make scheduled payments on its material debt, Export Development Canada, or EDC, could terminate its commitments under the $750 million support facility, or the EDC Support Facility, and require cash collateralization of any outstanding support under the EDC Support Facility.

**Material adverse legal judgments, fines, penalties or settlements, including the Proposed Class Action Settlement, could have a material adverse effect on our business, results of operations, financial condition and liquidity, which could be very significant and could prevent the Issuers from fulfilling, among other things, their obligations under the Notes and the Guarantees.**

We are subject to significant pending civil litigation and regulatory and criminal investigations, the outcome and timing of which are uncertain and difficult to predict and could require us to pay substantial judgments, settlements, fines or other penalties. We estimate that our cash will be sufficient to fund the changes to our business model in accordance with our strategic plan (see "Summary—Company overview—Our strategy"), fund our investments and meet our customer commitments for at least the twelve month period commencing March 31, 2006, including cash expenditures outlined under "Liquidity and Capital Resources—Future Uses of Liquidity" in the MD&A section of the 2006 First Quarter Report. In making this estimate, we have not assumed the need to make any payments in respect of fines, other penalties, judgments or settlements in connection with our pending civil litigation (other than those encompassed by the Proposed Class Action Settlement and for anticipated professional fees and expenses) or regulatory or criminal investigations related to the restatements, which could have a material adverse effect on our business, results of operations, financial condition and liquidity. Any such payments (in addition to those encompassed by the Proposed Class Action Settlement) could materially and adversely affect our cash position, our available cash and cash flow from operations may not be sufficient to pay them, and additional sources of funding may not be available to us on commercially reasonable terms or at all.

The covenants in the indenture do not restrict us from making any payments to satisfy judgments, settlements, penalties, fines or other penalties in connection with the existing civil litigation or regulatory and criminal investigations or any litigation or investigation brought against us in the future. These payments could materially and adversely affect our cash position and prevent the Issuers from being able to make payments of principal, interest or other payments on the Notes and the Guarantees. These payments could also adversely affect the credit ratings assigned to the Notes and the Guarantees by the nationally recognized rating agencies. In these circumstances, the Issuers also may not be able to satisfy their obligations

HIGHLY CONFIDENTIAL       NNC-NNL06705393 / 38

under other indebtedness, which could result in an event of default under the Notes and the Guarantees as a result of the cross-acceleration provisions contained in the indenture.

In addition, these circumstances could have a material adverse effect on our business, results of operations, financial condition and liquidity, including by:

- requiring us to dedicate a substantial portion of our cash and/or cash flow from operations to these payments, thereby reducing the availability of our cash and/or cash flow to fund working capital, capital expenditures, R&D efforts and other general corporate purposes, including debt reduction;

- increasing the difficulty and/or cost to us of refinancing our indebtedness;

- increasing our vulnerability to general adverse economic and industry conditions;

- limiting our flexibility in planning for, or reacting to, changes in our businesses and the industries in which we operate;

- making it more difficult or more costly for us to make acquisitions and investments;

- limiting our ability to obtain, and/or increasing the cost of obtaining, directors' and officers' liability insurance and/or other types of insurance; and

- restricting our ability to introduce new technologies and products and/or exploit business opportunities.

**Our high level of debt could adversely affect our financial health and prevent the Issuers from fulfilling, among other things, their obligations under the Notes and the Guarantees.**

In order to finance our business, we have incurred significant levels of debt. Following this offering, we will continue to have a substantial amount of indebtedness and other obligations. As of March 31, 2006, as adjusted for (1) the issuance of the Notes; (2) the assumed application of a portion of the net proceeds from the sale of the Notes to prepay the $1,300 million amount outstanding under the 2006 Credit Facility; and (3) the repayment at maturity of the outstanding $150 million aggregate principal amount of 7.40% Notes due June 15, 2006, NNC and its subsidiaries would have had approximately $4,476 million of debt reflected on its consolidated balance sheets. See "Capitalization of NNC" for additional information.

Our high degree of leverage could have important consequences to you. For example, among other things, it could:

- make it more difficult for the Issuers to make payments of principal, interest or other payments on the Notes and the Guarantees;

- make it more difficult for the Issuers to satisfy their obligations under other indebtedness, which could result in an event of default under the Notes and the Guarantees as a result of the cross-acceleration provisions contained in the indenture;

- limit our ability to borrow money or access other sources of funding for future working capital, capital expenditures, acquisitions, investments, litigation or investigation settlements, judgments, fines or other penalties and for other miscellaneous general corporate requirements;

- limit our ability to refinance our existing indebtedness;

HIGHLY CONFIDENTIAL      NNC-NNL06705393 / 39

- require us to dedicate a substantial portion of our cash flow from operations to payments on our indebtedness and other obligations, thereby significantly reducing the availability of our cash and cash flow from operations for other purposes, including payments of judgments, settlements, fines or other penalties and our operational needs (for example, in order to meet our debt service obligations, we may be required to delay or reduce capital expenditures or the introduction of new products, sell assets and/or forego business opportunities such as acquisitions, R&D projects or product design enhancements);

- increase our vulnerability to economic downturns, adverse industry conditions and adverse developments in our business, and limit our flexibility in planning for or reacting to such changes; and

- place us at a competitive disadvantage compared to our competitors that have less debt.

Despite their current debt level, the Issuers may still be able to incur substantially more debt under the covenants in the indenture, which could further exacerbate these risks.

If any Issuer incurs any additional debt that ranks equally with the Notes and the Guarantees, the holders of that debt will be entitled to share ratably with you in any proceeds distributed in connection with any insolvency, liquidation, reorganization, dissolution or other winding-up of that Issuer. This may have the effect of reducing the amount of proceeds paid to you.

**The Notes and Guarantees will be effectively subordinated to all indebtedness and other obligations of NNC's direct and indirect non-guarantor subsidiaries (other than the Company), which may include obligations under the EDC Support Facility. None of NNC's direct and indirect subsidiaries other than NNI will guarantee the Notes.**

The Notes will be guaranteed by NNC and also initially by NNI but not by any of their other subsidiaries. The Guarantee of NNI will be released under certain circumstances set forth under "Description of the Notes—Guarantees; Release of Guarantees." NNC's direct and indirect non-guarantor subsidiaries (other than the Company) will have no obligation to make payments in respect of the obligations under the Notes or the Guarantees. The terms of the indenture permit NNC's non-guarantor subsidiaries to incur or guarantee any additional indebtedness that could be incurred by any Issuer without concurrently providing a guarantee of the Notes. In addition, the indenture does not contain any restrictions on the amount of indebtedness that NGSH, a direct subsidiary of NNI, and its subsidiaries may incur.

In the event of a bankruptcy, liquidation or reorganization of any direct or indirect non-guarantor subsidiary of NNC, all of the creditors of that subsidiary (including trade creditors and creditors holding secured or unsecured indebtedness or guarantees issued by that subsidiary) and third parties having the benefit of liens (including statutory liens) against that subsidiary's assets will generally be entitled to payment of their claims from the assets of such non-guarantor subsidiary before any of those assets are made available for distribution to any Issuer that is a shareholder of such subsidiary. As a result, the Notes and the Guarantees are effectively junior to the obligations of non-guarantor subsidiaries.

Furthermore, the terms of the EDC Support Facility may require NNC's direct and indirect non-guarantor subsidiaries to guarantee the Company's obligations under the EDC Support Facility. If this occurs, EDC will be entitled to payment of its claims under the EDC Support Facility from the assets of such subsidiary before any assets are made available for distribution to any Issuer that is a shareholder of any such subsidiary. As a result, the Notes and the Guarantees would

28

be effectively junior to the EDC Support Facility to the extent of the value of such subsidiary's assets.

For the year ended December 31, 2005 and the three months ended March 31, 2006, the Issuers, on an unconsolidated basis, accounted for a majority of NNC's consolidated revenues and consolidated assets (excluding, in each case, inter-company amounts). As of March 31, 2006, as adjusted for (1) the issuance of the Notes; (2) the assumed application of a portion of the net proceeds from the sale of the Notes to prepay the $1,300 million amount outstanding under the 2006 Credit Facility; and (3) the repayment at maturity of the outstanding $150 million aggregate principal amount of 7.40% Notes due June 15, 2006, Nortel would have had $4,476 million in total debt (including the current portion) of which $464 million would be the debt of NNC's direct and indirect non-guarantor subsidiaries.

The revenue and asset compositions described above may not be representative of the revenue and asset compositions in future periods. Our consolidated financial statements incorporated by reference and attached to this offering memorandum do not present separate financial data or consolidating footnotes for NNC's direct and indirect non-guarantor subsidiaries. In addition, this offering memorandum and the documents incorporated by reference only contain limited disclosure of financial information for NNI, which is less than will be required to be disclosed in periodic reports filed with the SEC pursuant to the Exchange Act following the issuance of the Exchange Notes. See "Presentation of financial and other information; material weaknesses; SEC review" for additional information.

**The Notes and Guarantees will be effectively subordinated to any secured indebtedness or other secured obligations of the Issuers and NNC's direct and indirect non-guarantor subsidiaries, which may include obligations under the EDC Support Facility.**

The terms of the indenture permit the Issuers and NNC's direct and indirect non-guarantor subsidiaries to incur significant amounts of secured debt without equally and ratably securing the Notes. If the Issuers or NNC's direct and indirect non-guarantor subsidiaries were unable to repay such secured indebtedness, the holders of such debt could proceed against the collateral securing that debt and those assets would not be available to holders of the Notes and Guarantees. Because the Notes and Guarantees are unsecured, the Notes and Guarantees will be effectively subordinated to any secured debt incurred by the Issuers and NNC's direct and indirect non-guarantor subsidiaries to the extent of the value of the collateral pledged to secure any secured debt.

The indenture restricts NNC, the Company and certain of their other direct and indirect subsidiaries from creating liens on their assets to secure funded debt in excess of specified amounts unless these liens also equally and ratably secure the Notes. Because funded debt is defined in the indenture to exclude obligations in respect of bid and performance related bonds and receivables securitizations, the indenture does not restrict NNC, the Company and their subsidiaries from pledging their assets to secure the Company's obligations under the EDC Support Facility. The terms of the EDC Support Facility may require the Company and its subsidiaries to equally and ratably secure the Company's obligations under the EDC Support Facility if the Company or its subsidiaries incur secured funded debt in amounts that are not sufficient to require that the Notes also be secured under the terms of the indenture.

**The covenants in the indenture will contain significant exceptions and "carve-outs" which may provide less protection to holders of Notes than indentures governing securities of comparably**

HIGHLY CONFIDENTIAL

rated companies, and many of these covenants will cease to be in effect should the ratings on the Notes increase to investment grade.

The covenants in the indenture governing the Notes and Guarantees contain significant exceptions and "carve-outs" in order to provide significant operating flexibility for NNC and its subsidiaries. These exceptions may provide less protection to holders of Notes than indentures governing securities of non-investment grade rated companies. In particular, you should be aware that the indenture governing the Notes and the Guarantees will:

- not restrict the ability of NNC or its subsidiaries to lend cash to or make investments in non-guarantor subsidiaries, joint ventures, customers or other third parties other than in connection with a transfer of all or substantially all of the assets of NNC, the Company or NNI;

- permit NNC or its subsidiaries to incur substantial amounts of additional indebtedness, including indebtedness to finance the acquisition of additional assets;

- permit any indebtedness allowed under the indenture to be incurred by any of NNC's non-guarantor subsidiaries without requiring such subsidiaries to guarantee the Notes;

- permit payments to current or former NNC shareholders in the form of settlements (and any related fines or penalties) relating to certain regulatory and criminal investigations and certain civil litigation proceedings in the U.S. and Canada, and such payments will not otherwise reduce the amount NNC is permitted under the indenture to pay as dividends or for the repurchase of its shares;

- allow NNC to calculate Adjusted EBITDA (which is used, among other things, to determine the amount of indebtedness that NNC and its subsidiaries are permitted to incur under the terms of the indenture) in the manner presented in "Summary—Selected historical consolidated financial information of NNC" of this offering memorandum, which, among other things, (i) excludes the payments to shareholders and regulatory agencies referred to above and (ii) does not necessarily reflect changes in, or cash requirements for, NNC's consolidated working capital needs including the timing of the receipt of cash from our customers for the sales of our solutions or the timing of our payments of costs relating to these sales. Therefore, Adjusted EBITDA should not be viewed as a substitute measure of our cash flow or a reliable predictor of our cash flow or our ability to generate earnings or cash to service our indebtedness.

- not restrict the ability of NNC's subsidiaries to incur contractual restrictions on their ability to make transfers and pay dividends to NNC and its other subsidiaries;

- not restrict the activities of NGSH or any of its subsidiaries and Nortel LearnIT;

- not restrict the ability of NNC or its subsidiaries to engage in transactions with affiliates, including NGSH and its subsidiaries; and

- contain additional exceptions and carve-outs that you should consider carefully before purchasing the Notes.

In addition, the events of default contained in the indenture relating to bankruptcy, judgments and cross-acceleration of other material indebtedness will be limited to the Issuers and will not apply to any other subsidiary of NNC.

During the time, if any, that the Notes are rated investment grade by both S&P and Moody's and certain other conditions are met (a time we refer to as a "suspension period"), most of the

HIGHLY CONFIDENTIAL

restrictive covenants (including those restricting the incurrence of indebtedness and the payment of dividends and stock repurchases) contained in the indenture governing the Notes will cease to be in effect. In addition, the "Negative Pledge" covenant will not restrict the creation of liens on the assets of any of NNC's subsidiaries (other than the Company, NNI and Nortel Networks Capital Corporation, or NNCC) during a suspension period, but instead will only restrict the creation of liens on the assets owned by the Issuers and NNCC. Any action taken during a suspension period that would have been restricted under the covenants in the indenture if they had been taken when the Notes were not rated investment grade will continue to be permitted even if the Notes cease to be rated investment grade. NNI's Guarantee will also be released during a suspension period.

See "Description of the Notes—Certain Covenants that will Cease to Apply During Suspension Period" and "—Certain Covenants Applicable at all Times" for additional information.

**Should the ratings on the Notes increase to investment grade, NNI's Guarantee will be released.**

NNI's Guarantee will be released during a suspension period. Therefore, during a suspension period, there will be no U.S. obligor with respect to the Notes. If NNI's Guarantee is released, you will not be entitled to receive any payments from NNI. See "Description of the Notes— Guarantees" for additional information.

**Indebtedness under the Floating Rate Notes will be subject to floating interest rates, which will result in Nortel's interest expense increasing if interest rates rise.**

Indebtedness under the Floating Rate Notes will be subject to floating interest rates. Changes in economic conditions could result in higher interest rates, thereby increasing the Company's interest expense. An increase in the Company's interest expense could reduce funds available for operations or other purposes, and we may accordingly experience economic losses and negative impact on results due to interest rate fluctuations.

**Canadian bankruptcy and insolvency laws may impair the enforcement of remedies under the Notes and the Guarantees of Canadian domiciled entities.**

The rights of the trustee who represents the holders of the Notes to enforce remedies could be significantly impaired by the restructuring provisions of applicable Canadian federal bank-ruptcy, insolvency and other restructuring legislation if the benefit of such legislation is sought with respect to NNC or the Company. For example, both the Bankruptcy and Insolvency Act (Canada) and the Companies' Creditors Arrangement Act (Canada) contain provisions enabling an insolvent person to obtain a stay of proceedings against its creditors and others and to prepare and file a proposal to be voted on by the various classes of its affected creditors. A restructuring proposal, if accepted by the requisite majorities of each affected class of creditors, and if approved by the relevant Canadian court, would be binding on all creditors within each affected class that may not otherwise be willing to accept it. Moreover, this legislation permits the insolvent debtor to retain possession and administration of its property, subject to court oversight, even though it may be in default under the applicable debt instrument during the period the stay against proceedings remains in place.

The powers of the court under the Bankruptcy and Insolvency Act and particularly under the Companies' Creditors Arrangement Act (Canada) have been exercised broadly to protect a restructuring entity from actions taken by creditors and other parties. Accordingly, the

HIGHLY CONFIDENTIAL                                    NNC-NNL06705393 / 43

Company cannot predict whether payments of principal, interest or other payments on the Notes by the Company or payments by NNC under its Guarantee would be made during any proceedings in bankruptcy, insolvency or other restructuring, whether or when the trustee could exercise its rights under the indenture or whether, and to what extent, holders of the Notes would be compensated for any delays in payment, if any, of principal, interest and costs, including the fees and disbursements of the trustee.

If NNC or the Company were to become bankrupt under the Bankruptcy and Insolvency Act (Canada), its assets would be vested in a trustee in bankruptcy, subject to the rights of secured creditors. In such a bankruptcy, the rights of the trustee under the indenture would be stayed, and that trustee would receive, on behalf of the holders of the Notes, the pro rata share of the proceeds of the distribution, if any, available to creditors of equal rank.

**The Guarantees are subject to certain defenses that may limit your right to receive payment.**

Although the Guarantees provide the holders of the Notes with a direct claim against the assets of the Guarantors, enforcement of the Guarantees against any Guarantor would be subject to certain "suretyship" defenses available to Guarantors generally. Enforcement could also be subject to other defenses available to the Guarantors in certain circumstances. To the extent that the Guarantees are not enforceable, the Notes would be effectively subordinated to all liabilities of the Guarantors, including trade payables of such Guarantors.

**NNC's Guarantee may be unenforceable, subordinated or limited in scope under the insolvency and creditor protection laws of Canada.**

NNC is incorporated under the laws of Canada. Therefore, any insolvency proceedings by or against NNC would likely be based on Canadian insolvency laws. A trustee in bankruptcy may, among other things, apply to a Canadian court under the Bankruptcy and Insolvency Act (Canada) to have NNC's Guarantee set aside as a fraudulent preference which prefers the holders of the Notes over other creditors of NNC if:

• the Guarantee was given within twelve months of the bankruptcy of NNC;

• NNC was insolvent at the time the Guarantee was given; and

• the Guarantee was given with a view to preferring the holders of the Guarantees over other creditors of NNC.

In this case, it would be necessary to prove that the Guarantee should not be set aside, for example, by demonstrating that the Guarantee was commercially reasonable and was given not to prefer the holders of the Guarantees but rather to achieve the closing of the transaction and the receipt of the net proceeds thereof. The Guarantee could also be challenged under applicable Canadian provincial creditor protection laws.

We believe that NNC's Guarantee would survive any challenge under applicable Canadian federal or provincial insolvency or creditor protection laws given that, among other things, (i) NNC will not be insolvent, nor on the eve of insolvency, when NNC's Guarantee is extended and (ii) NNC's Guarantee will form part of an ordinary commercial transaction. However, we cannot be certain as to the standards that a court would use to determine whether NNC was solvent at the relevant time. For example, a court could take into account the significant pending civil litigation and regulatory investigations, which if decided against us or as a result of settlement, could require us to pay substantial judgments, settlements, fines or other penalties, in determining the solvency of NNC. Regardless of the standards that the court uses,

32

we cannot be certain that the issuance of the applicable Guarantee would not be further subordinated to NNC's other debt.

In addition, there can be no assurance as to how the insolvency laws of the various jurisdictions in which we operate will be applied in relation to one another.

**NNI's Guarantee may be unenforceable under U.S. federal and state fraudulent conveyance statutes.**

NNI's Guarantee may be subject to review under U.S. federal bankruptcy law and comparable provisions of state fraudulent conveyance laws if a bankruptcy or reorganization case or lawsuit is commenced by or on behalf of NNI's unpaid creditors. Under these laws, a U.S. court could void the obligations under the Guarantee, subordinate the Guarantee to NNI's other debt or take other action detrimental to the holders of the Notes, if, among other things, NNI, at the time it incurred the indebtedness evidenced by its Guarantee:

- issued the Guarantee to delay, hinder or defraud present or future creditors; or

- received less than reasonably equivalent value or fair consideration for issuing the Guarantee at the time it issued the Guarantee; and was insolvent or rendered insolvent by reason of issuing the Guarantee; or was engaged, or about to engage, in a business or transaction for which its remaining unencumbered assets constituted unreasonably small capital to carry on its business; or intended to incur, or believed that it would incur, debts beyond its ability to pay such debts as they mature.

The measures of insolvency for purposes of the foregoing considerations will depend upon the law applied in any proceeding with respect to the foregoing. Generally, however, NNI would be considered insolvent in the U.S. if:

- the sum of its debts, including contingent liabilities, was greater than the fair saleable value of all of its assets;

- the present fair saleable value of its assets was less than the amount that would be required to pay its probable liabilities on its existing debts, including contingent liabilities, as they become absolute and mature; or

- it could not pay its debts as they become due.

We cannot be certain as to the standards that a U.S. court would use to determine whether or not NNI was solvent at the relevant time. For example, a court could take into account the significant pending civil litigation and regulatory investigations, which if decided against us or as a result of settlement, could require us to pay substantial judgments, settlements, fines or other penalties and could result in the significant dilution of existing equity positions, in determining the solvency of NNI. A court could also consider whether the Guarantee was incurred principally for the benefit of the Company and only indirectly for the benefit of NNI in determining whether the obligations of NNI were incurred for less than fair consideration. Regardless of the standard that the U.S. court uses, we cannot be certain that the issuance of NNI's Guarantee would not be voided or NNI's Guarantee would not be subordinated to NNI's other debt.

HIGHLY CONFIDENTIAL        NNC-NNL06705393 / 45

**Covenants in the indenture impose operating and financial restrictions on us, which may prevent us from capitalizing on business opportunities.**

The indenture governing the Notes and Guarantees contains various covenants that limit our ability to:

- incur, assume or guarantee additional funded debt, disqualified stock and certain types of preferred stock, in excess of certain baskets and permitted amounts;

- create liens on assets of NNC and its restricted subsidiaries to secure funded debt in excess of certain baskets and permitted amounts without equally and ratably securing the Notes; or

- merge, consolidate and sell or otherwise dispose of substantially all of the assets of any Issuer unless the surviving entity or purchaser of such transaction assumes the obligations of such Issuer under the Notes and no default exists under the indenture after giving effect to such merger, consolidation or sale.

In addition, we may in the future incur and guarantee debt with more restrictive covenants (including maintenance financial tests) that impose significant operating and financial restrictions, including restrictions on our ability to engage in other business activities that may be in our best long-term interests.

Failure to comply with the covenants contained in the indenture, the EDC Support Facility or any future debt instruments or credit agreements, which could be more restrictive than those applicable to the Notes, could materially and adversely affect our business, results of operations, financial condition and liquidity.

**The Company may be unable to purchase the Notes upon a Change of Control.**

Upon a Change of Control (as defined in "Description of the Notes"), the Company will be required to offer to purchase all or a portion of each holder's Notes then outstanding for cash at 101% of the principal amount thereof together with accrued and unpaid interest. If a Change of Control were to occur, the Company may not have sufficient funds to pay the change of control purchase price and the Issuers may be required to obtain third party financing in order to do so. However, the Issuers may not be able to obtain such financing on commercially reasonable terms, or at all. The Company's failure following a Change of Control to make or consummate an offer to purchase the Notes would constitute an event of default under the indenture. In such an event, the trustee or the holders of at least 25% in aggregate principal amount of the outstanding Notes may accelerate the maturity of all of the Notes.

In addition, the occurrence of a change of control of either NNC or the Company would constitute an event of default under the indenture for NNC's 4.25% convertible senior notes due September 2008 and would require NNC to offer to repurchase such notes, of which $1,800 million were outstanding as of March 31, 2006, which notes are fully and unconditionally guaranteed by the Company. The occurrence of a change of control of either NNC or the Company would also constitute an event of default under the EDC Support Facility and would permit EDC to terminate or suspend its commitments thereunder.

The change of control provision in the indenture governing the Notes does not cover all corporate reorganizations, mergers or similar transactions and may not protect you in the event we consummate a highly leveraged transaction. In addition, a consolidation, amalgamation or merger of NNC and the Company with or into each other would not constitute a change of control under the definition.

HIGHLY CONFIDENTIAL      NNC-NNL06705393 / 46

**Your ability to transfer any Series of Notes may be limited by the absence of an active trading market for such Series and there is no assurance that any active trading market will develop for such Series of Notes.**

The Notes are a new issue of securities for which there is currently no established trading market. The Issuers do not intend to have the Notes or the Guarantees listed on a national securities exchange or to arrange for quotation on any automated dealer quotation systems, although the Notes are expected to be eligible for trading in the PORTAL market. Although certain of the initial purchasers have advised the Company that they intend to make a market in the Notes, none of them are obligated to do so, and any or all of them may discontinue such market-making activities at any time without notice. In addition, market-making activity will be subject to the limits imposed by the Securities Act and the Exchange Act, and may be limited during the exchange offer and the pendency of any shelf registration statement. The Notes and the Guarantees are being sold pursuant to an exemption from registration under the Securities Act, and they may not be publicly offered, sold or otherwise transferred unless they are registered or are sold in a transaction exempt from registration. Accordingly, the Issuers cannot assure you that a trading market for the Notes will develop, that you will be able to sell your Notes at a particular time or that the price that you receive when you sell your Notes will be favorable. The liquidity of any market for any Series of Notes will depend on a number of factors, including:

- the number of holders of such Series of Notes;

- our operating performance and financial condition;

- the market for similar securities;

- the ability of the Issuers to complete the offer to exchange the Notes for Exchange Notes;

- the interest of securities dealers in making a market in such Series of Notes; and

- prevailing interest rates.

Historically, the market for non-investment grade debt has been subject to disruptions that have caused substantial volatility in the prices of securities similar to the Notes. The Company cannot assure you that the market, if any, for the Notes will be free from similar disruptions or that any such disruptions may not adversely affect the prices at which you may sell your Notes. Any such disruptions could have an adverse effect on the holders of the Notes.

If Notes are exchanged for Exchange Notes in the exchange offer, the trading market for each Series of Notes that are not so exchanged could be adversely affected due to the limited amount, or "float," of the Notes of such Series that remain outstanding following the exchange offer. Generally, decreased float of a security could result in less demand to purchase that security and could, therefore, result in lower prices for that security. For the same reason, if a large number of Notes of a particular Series are not exchanged in the exchange offer, the trading market for the Exchange Notes of such Series could be similarly affected.

**You may only transfer the Notes and Guarantees in a transaction registered under or exempt from the registration requirements of the Securities Act, or, in Canada, in accordance with, or in a transaction exempt from, the registration and prospectus requirements of the applicable**

HIGHLY CONFIDENTIAL      NNC-NNL06705393 / 47

securities laws of the provinces or territories of Canada. **The Issuers cannot assure you that the registration statement covering the Exchange Notes will be declared effective.**

The Issuers are relying upon an exemption from registration under the Securities Act and applicable state securities laws to offer the Notes and the Guarantees. The Issuers are also relying on exemptions from the prospectus requirements of the applicable Canadian provincial securities laws to offer the Notes and the Guarantees. The Notes and the Guarantees may be transferred or resold only in a transaction registered under, or exempt from, the Securities Act and applicable state securities laws. The Notes and the Guarantees also may not be sold directly or indirectly in Canada except in accordance with the transfer restrictions described under "Transfer Restrictions" and applicable securities laws of a province or territory of Canada.

The Issuers are contractually obligated to file a registration statement with the SEC and to use their reasonable best efforts to cause such registration statement to become effective with respect to the Exchange Notes, to be issued in exchange for the Notes and evidencing the same continuing indebtedness as the Notes, or in some circumstances register the Notes for resale. The SEC, however, generally has broad discretion as to whether it declares a registration statement effective and may delay, defer or suspend the effectiveness of any registration statement for a variety of reasons and therefore the Issuers cannot assure you that a registration statement will become or remain effective. If issued under an effective registration statement, the Exchange Notes, generally, may be resold or otherwise transferred by each holder thereof with no need for further registration in the United States. However, the Exchange Notes will constitute a new issue of securities with no established trading market. The offer to exchange the Notes will not depend upon the amount of Notes being tendered for exchange. The Issuers cannot assure you that there will be a trading market for the Exchange Notes, or, in the case of non-exchanging holders of the Notes, any trading market for the Notes following the exchange offer.

The Issuers are not contractually obligated to file a prospectus with any securities commission in Canada to qualify the Exchange Notes for resale. The Exchange Notes will be issued in Canada only pursuant to exemptions from the registration and prospectus requirements of the applicable Canadian provincial securities laws. The Exchange Notes may be resold or otherwise transferred in Canada only in accordance with applicable securities laws of a province or territory of Canada. The Issuers cannot assure you that there will be any trading market for the Exchange Notes, or in the case of non-exchanging holders of the Notes, any trading market for the Notes in Canada following the exchange offer.

**U.S. investors in the Notes may face difficulties in the enforcement of certain civil liabilities.**

Each of NNC and the Company is a Canadian corporation. A substantial portion of their assets are located in Canada and many of their directors and executive officers, and some of the experts named in this document, are residents of Canada. As a result, it may be difficult for investors to effect service within the United States upon NNC or the Company or those directors, officers and experts. Execution by United States courts of any judgment obtained against NNC or the Company or any of their directors, officers and experts in United States courts would be limited to their assets or those of that person in the United States. Gordon A. Davies, Esq., General Counsel—Corporate and Corporate Secretary of NNC and the Company, has advised the Issuers that there is doubt as to the enforceability in Canada of United States judgments or liabilities in original actions in Canadian courts predicated solely upon the civil liability provisions of the federal securities laws of the United States.

HIGHLY CONFIDENTIAL      NNC-NNL06705393 / 48