# Use of proceeds

We estimate that the net proceeds from the sale of the Notes will be approximately $1,956 million, after deducting the commission payable to the initial purchasers and other offering expenses.

We expect to use $1,300 million of these net proceeds to refinance the 2006 Credit Facility, and the remainder for general corporate purposes, including to replenish our cash resources in light of recent cash outflows of $575 million (plus accrued interest of $5 million) deposited into escrow pursuant to the Proposed Class Action Settlement on June 1, 2006 and $150 million for the repayment at maturity of the outstanding aggregate principal amount of the 7.40% Notes due June 15, 2006.

We entered into the 2006 Credit Facility in February 2006. The $1,300 million of the facility was drawn down on February 14, 2006, and the facility will mature in February 2007. We used the net proceeds of the 2006 Credit Facility primarily to repay at maturity the outstanding $1,275 million aggregate principal amount of NNL's 6.125% Notes due February 15, 2006. J.P. Morgan Securities Inc. and Citigroup Global Markets Inc. arranged the 2006 Credit Facility, and their affiliates and affiliates of RBC Capital Markets Corporation, Credit Suisse Securities (USA) LLC and Deutsche Bank Securities Inc. are lenders under the 2006 Credit Facility.

HIGHLY CONFIDENTIAL      NNC-NNL06705393 / 49

# Ratio of earnings to fixed charges of NNC

The following table sets forth the consolidated ratios of earnings to fixed charges for NNC computed under SEC rules for the periods indicated below on a historical basis and as adjusted for (1) the issuance of the Notes; (2) the assumed application of a portion of the net proceeds from the sale of the Notes to prepay the $1,300 million amount outstanding under the 2006 Credit Facility; (3) the use of cash of $575 million (plus accrued interest of $5 million) deposited into escrow on June 1, 2006 pursuant to the Proposed Class Action Settlement; and (4) the repayment at maturity of the outstanding $150 million aggregate principal amount of 7.40% Notes due June 15, 2006.

Earnings for purposes of the ratios consist of consolidated pre-tax earnings or losses from continuing operations before adjustments for minority interests in consolidated subsidiaries or income or loss from equity investees,

*plus:*

- fixed charges;

- amortization of capitalized interest;

- distributed income of equity investees; and

- pre-tax losses of equity investees for which charges arising from guarantees are included in fixed charges;

*less:*

- interest capitalized; and

- the minority interest in pre-tax income of subsidiaries that have not incurred fixed charges.

Fixed charges for this purpose consist of:

- interest expensed and capitalized;

- amortized premiums, discounts and capitalized expenses related to indebtedness;

- one-third of rental expenses on operating leases, deemed to be representative of interest expenses; and

- preference security dividend requirements of consolidated subsidiaries.

## Ratio of Earnings to Fixed Charges

| | Year ended December 31, | | | | | Three months ended March 31, 2006 | |
|---|---|---|---|---|---|---|---|
| | 2001(a) | 2002(a) | 2003 | 2004 | 2005 | Actual(a) | As adjusted(a) |
| NNC............................... | –(b) | –(b) | 1.1 | –(b) | –(b) | –(b) | –(b) |

(a) Derived from unaudited financial information.

(b) The earnings of NNC calculated in accordance with U.S. GAAP were inadequate to cover fixed charges for the years ended December 31, 2001, 2002, 2004, 2005 by $26,022, $3,421, $286, $2,632, and for the three months ended March 31, 2006 by $153 and $188 on a historical and adjusted basis, respectively.

HIGHLY CONFIDENTIAL　　　　　NNC-NNL06705393 / 50

# Capitalization of NNC

The following table sets forth the unrestricted cash and cash equivalents and capitalization of NNC as of March 31, 2006, on a historical basis and as adjusted for (1) the issuance of the Notes; (2) the assumed application of a portion of the net proceeds from the sale of the Notes to prepay the $1,300 million amount outstanding under the 2006 Credit Facility; (3) the deposit into escrow on June 1, 2006 of $575 million (plus accrued interest of $5 million) pursuant to the Proposed Class Action Settlement; and (4) the repayment at maturity of the outstanding $150 million aggregate principal amount of 7.40% Notes due June 15, 2006.

| (Millions of U.S. dollars) | As of March 31, 2006 | |
| --- | --- | --- |
| | Actual | As adjusted |
| | (unaudited) | |
| Unrestricted cash and cash equivalents ............................. | $  2,695 | $  2,621 |
| Debt (including current maturities): | | |
| Notes offered hereby(a) ......................................... | — | $  2,000 |
| 7.40% Notes due June 15, 2006(b)................................ | 150 | — |
| 4.25% Convertible Senior Notes due September 1, 2008(c) .......... | 1,800 | 1,800 |
| 6.875% Notes due September 1, 2023(d).......................... | 200 | 200 |
| 7.875% Notes due June 15, 2026(e)............................. | 150 | 150 |
| 2006 Credit Facility ............................................ | 1,300 | — |
| Other ........................................................ | 326 | 326 |
| Total debt..................................................... | $  3,926 | $  4,476 |
| Other liabilities................................................ | 5,778 | 5,778 |
| Minority interests in subsidiary companies ........................... | 754 | 754 |
| Shareholders' equity: | | |
| Common shares, without par value—authorized shares: unlimited; | | |
| issued and outstanding shares: 4,339,337,625 as of March 31, 2006 | 33,935 | 33,935 |
| Additional paid-in capital ....................................... | 3,295 | 3,295 |
| Accumulated deficit ........................................... | (35,692) | (35,692) |
| Accumulated other comprehensive income (loss) ................... | (863) | (863) |
| Total shareholders' equity ......................................... | 675 | 675 |
| Total capitalization .............................................. | $ 11,133 | $ 11,683 |

(a) To be issued by NNL and fully and unconditionally guaranteed by NNC and initially by NNI.

(b) Issued by NNCC and fully and unconditionally guaranteed by NNL; fully repaid at maturity on June 15, 2006.

(c) Issued by NNC and fully and unconditionally guaranteed by NNL.

(d) Issued by NNL.

(e) Issued by NNCC and fully and unconditionally guaranteed by NNL.

HIGHLY CONFIDENTIAL

NNC-NNL06705393 / 51

# Description of other indebtedness of NNC

The consolidated total debt of NNC consisted of the following as of the dates set forth below:

| (Millions of U.S. dollars) | As of December 31, 2005 | As of March 31, 2006 |
|---|---|---|
| Debt (including current maturities): | | |
| 6.125% Notes due February 15, 2006(a) . . . . . . . . . . . . . . | $1,275 | $    – |
| 7.40% Notes due June 15, 2006(b) . . . . . . . . . . . . . . . . . . . | 150 | 150 |
| 4.25% Convertible Senior Notes due September 1, 2008(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,800 | 1,800 |
| 6.875% Notes due September 1, 2023(a) . . . . . . . . . . . . . | 200 | 200 |
| 7.875% Notes due June 15, 2026(b) . . . . . . . . . . . . . . . . . | 150 | 150 |
| 2006 Credit Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | – | 1,300 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 321 | 326 |
| Total debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,896 | $3,926 |
| Less: | | |
| Long-term debt due within one year . . . . . . . . . . . . . . . . . | 1,446 | 168 |
| Notes payable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11 | 13 |
| 2006 Credit Facility due in February 2007 . . . . . . . . . . . . | – | 1,300 |
| Total debt (excluding current portion) . . . . . . . . . . . . . . . . | $2,439 | $2,445 |

(a) Issued by NNL.

(b) Issued by NNCC and fully and unconditionally guaranteed by NNL.

(c) Issued by NNC and fully and unconditionally guaranteed by NNL.

As of December 31, 2005, the amounts of consolidated long-term debt of NNC payable for each of the years ending December 31 consisted of:

| | |
|---|---|
| 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $1,446(a) |
| 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 19(b) |
| 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,815 |
| 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15 |
| 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15 |
| Thereafter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 575 |
| Total long term debt payable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,885 |

(a) Does not reflect the repayment of $1,275 million principal amount of NNL's 6.125% Notes due February 15, 2006 at maturity with the net proceeds of the 2006 Credit Facility, and the repayment of $150 million of principal amount of NNCC's 7.40% Notes due June 15, 2006 at maturity. We intend to use $1,300 million of the net proceeds of this offering to repay the 2006 Credit Facility.

(b) Does not include $1,300 million of loan payable in February 2007 under the 2006 Credit Facility.

## Available support facilities

On February 14, 2003, NNL entered into the EDC Support Facility. As of March 31, 2006, the facility provided for up to $750 million in support including:

- $300 million of committed revolving support for performance bonds or similar instruments, of which $143 million was outstanding; and

40

- $450 million of uncommitted support for performance bonds or similar instruments and/or receivables sales and/or securitizations, of which $20 million was outstanding.

The EDC Support Facility provides that EDC may suspend its obligation to issue NNL any additional support if events occur that would have a material adverse effect on NNL's business, financial position or results of operation. The EDC Support Facility does not materially restrict NNL's ability to sell any of its assets (subject to certain maximum amounts) or to purchase or prepay any of its currently outstanding debt. In addition, the EDC Support Facility can be suspended or terminated by EDC if NNL's senior long-term debt rating by Moody's Investors Service has been downgraded to less than B3 or if its debt rating by Standard & Poor's has been downgraded to less than B–.

EDC has also agreed to provide future support under the EDC Support Facility on an unsecured basis and without the guarantees of NNL's subsidiaries provided that should NNL or its subsidiaries incur or guarantee certain indebtedness in the future above agreed thresholds of $25 million in North America and $100 million outside of North America, equal and ratable security and/or guarantees of NNL's obligations under the EDC Support Facility would be required at that time.

Effective February 14, 2006, NNL's obligations under the EDC Support Facility became equally and ratably secured with the 2006 Credit Facility and the 2023 Bonds by a pledge of substantially all of the U.S. and Canadian assets of NNC and NNL and the U.S. assets of NNI and equally and ratably secured with the 2006 Credit Facility by a pledge of substantially all of NNC's U.S. and Canadian assets in accordance with the terms of the EDC Support Facility. NNL's obligations under the EDC Support Facility also were guaranteed by NNC and NNI at such time. These guarantees and security agreements will terminate when the 2006 Credit Facility is repaid.

As described in the MD&A section of our 2006 First Quarter Report, we entered into an amendment and waiver agreement with respect to certain breaches under the EDC Support Facility relating to the delayed filings and the restatements and revisions to our and NNL's prior financial results.

For information related to our outstanding public debt and the 2006 Credit Facility, see note 11, "Long-term debt and support facilities", of the audited consolidated financial statements included in Annex A and note 10, "Long-term debt, credit and support facilities", of the unaudited condensed consolidated financial statements in the 2006 First Quarter Report.

For information related to our debt ratings, see "Credit Ratings" in the MD&A section of the 2006 First Quarter Report.

41

# Description of the Notes

The Company will issue the Notes under an indenture dated as of July 5, 2006, or the Indenture, among itself, the Guarantors and The Bank of New York, as trustee, or the Trustee. The following is a summary of the material provisions of the Indenture. It does not include all of the provisions of the Indenture. We urge you to read the Indenture because it defines your rights. You may request a copy of the Indenture at our address shown under the caption "Incorporation of certain documents by reference." Upon issuance of the Exchange Notes, if any, which will evidence the continuation of the indebtedness originally evidenced by the Notes, or the effectiveness of a shelf registration statement as contemplated under "Exchange offer and registration rights agreement," the Indenture will be subject to, and governed by, the Trust Indenture Act of 1939, as amended, or the TIA. You can find definitions of certain capitalized terms used in this description under "—Certain Definitions." See "Risk Factors" in this offering memorandum and in the documents attached hereto for a discussion of certain factors that you should consider before investing in the Notes.

## Principal, Maturity and Interest

In this offering, the Company will issue:

- $450,000,000 aggregate principal amount of the 2016 Fixed Rate Notes;
- $550,000,000 aggregate principal amount of the 2013 Fixed Rate Notes; and
- $1,000,000,000 aggregate principal amount of the Floating Rate Notes.

The Company may issue additional Notes, or the Additional Notes, of any Series (in addition to other securities under the Indenture having terms different from any Series of Notes issued in this offering) from time to time in an unlimited principal amount, subject to the limitations set forth under "—Limitation on Incurrence of Additional Funded Debt." Holders of Additional Notes of any Series will have the right to vote together with Holders of Notes of such Series issued on the Issue Date and Exchange Notes of such Series as one class. Any Notes of any Series that remain outstanding after the completion of the Exchange Offer, together with the Exchange Notes of such Series issued in connection with the Exchange Offer, will be treated as a single class of securities under the Indenture.

*Fixed Rate Notes.* The 2016 Fixed Rate Notes will mature on July 15, 2016 and the 2013 Fixed Rate Notes will mature on July 15, 2013. Interest on the 2016 Fixed Rate Notes will accrue at the rate of 10.750% per annum and interest on the 2013 Fixed Rate Notes will accrue at the rate of 10.125% per annum. All interest on the Fixed Rate Notes will be payable in cash semiannually in arrears on each January 15 and July 15, commencing on January 15, 2007 (or, if any such day is not a Business Day, the next succeeding Business Day), to the Persons who are registered Holders at the close of business on the January 1 and July 1 immediately preceding the applicable interest payment date. Interest on the Fixed Rate Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from and including the Issue Date. Interest will be computed on the basis of a 360-day year consisting of twelve 30-day months.

*Floating Rate Notes.* The Floating Rate Notes will mature on July 15, 2011 and will bear interest at a rate per annum, reset quarterly, equal to Three-Month LIBOR plus 4.250%, in each case, as determined by an agent appointed by the Company to calculate Three-Month LIBOR for purposes of the Indenture, or the Calculation Agent, which shall initially be the Trustee.

HIGHLY CONFIDENTIAL      NNC-NNL06705393 / 54

Interest will be payable in cash quarterly in arrears on each January 15, April 15, July 15 and October 15, commencing on October 15, 2006 (or, if any such day is not a Business Day, the next succeeding Business Day). The Company will make each interest payment to the Persons who are Holders of record of the Floating Rate Notes on the January 1, April 1, July 1 and October 1 immediately preceding the applicable interest payment date. The Floating Rate Notes will accrue interest from the most recent date to which interest has been paid or, if no interest has been paid, from and including the Issue Date.

Set forth below is a summary of certain of the defined terms used in the Indenture relating solely to the Floating Rate Notes.

"*Determination Date*," with respect to an Interest Period, will be the second London Banking Day preceding the first day of the Interest Period.

"*Interest Period*" means the period commencing on and including an interest payment date and ending on and including the day immediately preceding the next succeeding interest payment date, with the exception that the first Interest Period shall commence on and include the Issue Date and end on and include October 15, 2006.

"*London Banking Day*" means any day in which dealings in United States dollars are transacted or, with respect to any future date, are expected to be transacted in the London interbank market.

"*Representative Amount*" means a principal amount of not less than $1,000,000 for a single transaction in the relevant market at the relevant time.

"*Reuters Screen LIBO Page*" means the display designated as page "LIBO" on the Reuters Monitor Money Rates Service (or such other page as may replace the LIBO page on that service or a successor service for the purpose of displaying London interbank offered rates of major banks).

"*Three-Month LIBOR*," with respect to an Interest Period, will be the offered rate (or, if more than one such rate appears, the arithmetic mean of the rates), expressed as a percentage per annum, for deposits in United States dollars for a three-month period that appears on the Reuters Screen LIBO Page as of 11:00 a.m., London time, on the Determination Date for such Interest Period. If fewer than two rates appear on the Reuters Screen LIBO Page or the Reuters Screen LIBO Page is unavailable on such Determination Date, the Calculation Agent will request the principal London office of each of four major banks in the London interbank market, as selected by the Calculation Agent, to provide such bank's offered quotation (expressed as a percentage per annum), as of approximately 11:00 a.m., London time, on such Determination Date, to prime banks in the London interbank market for deposits in a Representative Amount in United States dollars for a three-month period beginning on the first day of such Interest Period. If at least two such offered quotations are so provided, Three-Month LIBOR for the Interest Period will be the arithmetic mean of such quotations. If fewer than two such quotations are so provided, the Calculation Agent will request each of four major banks in New York City, as selected by the Calculation Agent, to provide such bank's rate (expressed as a percentage per annum), as of approximately 11:00 a.m., New York City time, on such Determination Date, for loans in a Representative Amount in United States dollars to leading European banks for a three-month period beginning on such Determination Date. If at least two such rates are so provided, Three-Month LIBOR for the Interest Period will be the arithmetic mean of such rates. If fewer than two such rates are so provided, then Three-Month

HIGHLY CONFIDENTIAL        NNC-NNL06705393 / 55

LIBOR for the Interest Period will be Three-Month LIBOR in effect with respect to the immediately preceding Interest Period.

The amount of interest to be paid on the Floating Rate Notes for each Interest Period will be calculated by multiplying the principal amount of the Floating Rate Notes by a fraction, the numerator of which is the product of the interest rate and the number of days in such Interest Period and the denominator of which is 360.

All percentages resulting from any of the above calculations will be rounded, if necessary, to the nearest one hundred-thousandth of a percentage point, with five one-millionths of a percentage point being rounded upwards (e.g., 9.876545% (or 0.09876545) being rounded to 9.87655% (or 0.0987655)) and all dollar amounts used in or resulting from such calculations will be rounded to the nearest cent (with one-half cent being rounded upwards).

The interest rate on the Floating Rate Notes will in no event be higher than the lesser of (i) the maximum rate permitted by New York law as the same may be modified by United States law of general application and (ii) the maximum rate or amount that could be received by a Holder of Notes without such Holder receiving interest at a criminal rate (within the meaning of the *Criminal Code* (Canada), which is currently an effective annual rate in excess of 60%).

The interest rate on the Notes is subject to increase if the Company does not file a registration statement relating to the Exchange Offer on a timely basis or if certain other conditions are not satisfied, all as described under the caption "Exchange offer and registration rights agreement." All references to interest on the Notes include any such additional interest that may be payable.

## Form and Denominations; Book Entry

The Company will issue the Notes in fully registered form in denominations of $2,000 and integral multiples of $1,000. The Trustee will initially act as paying agent and registrar for the Notes. The Notes may be presented for registration of transfer and exchange at the offices of the registrar. The Company may change the paying agent and registrar and, so long as the Notes remain in the form of global securities, may do so without notice to Holders of the Notes. It is expected that the Company will pay principal (and premium, if any) on the Notes at the Trustee's corporate office in New York, New York. At the Company's option, interest may be paid at the Trustee's corporate trust office or by check mailed to the registered address of Holders. For so long as the Notes remain in the form of global securities, the Company will pay all principal and interest (and premium, if any) on the Notes to the applicable depositary or its nominee as the registered holder of the global security representing the Notes.

## Ranking of the Notes

The Notes will be senior unsecured obligations of the Company and will rank *pari passu* with all other senior obligations of the Company and effectively junior to all secured obligations of the Company to the extent of the value of the property securing such obligations. The Notes will be effectively subordinated to all liabilities of the Subsidiaries of NNC that are not Guarantors (other than the Company) to the extent of the value of such Subsidiaries.

44

## Guarantees; Release of Guarantees

The Notes will be guaranteed, jointly and severally, by NNC and, initially, by NNI. If, for any reason, the Company does not make any required payment in respect of any guaranteed Notes when due, whether on the normal due date, on acceleration, redemption or otherwise, the Guarantors with respect to the Guarantees that are then in effect will cause the payment to be made to or to the order of the Trustee. Each Guarantee will be the direct, unconditional, unsecured and unsubordinated obligation of the respective Guarantor and will rank equally and ratably without preference among themselves and at least equally with other senior unsecured obligations of the respective Guarantor, except to the extent prescribed by law.

The Guarantee of a Guarantor will be released automatically with respect to any Series of Notes upon defeasance of such Series of Notes as provided below under the caption "—Defeasance" or satisfaction and discharge of such Series of Notes as provided in the Indenture.

In addition, the Guarantee of NNI will be released with respect to any Series of Notes upon the occurrence of a Suspension Period. However, upon the occurrence of a Reversion Date (as defined below), NNI will enter into a supplemental indenture guaranteeing such Series of Notes on terms substantially similar to those under NNI's Guarantee.

At such time as NNI's Guarantee is released with respect to any Series of Notes, NNI will no longer be considered a Guarantor of such Series of Notes.

## Additional Amounts

All payments made by the Company or the Guarantors under or in respect of the Notes or Guarantees will be made without withholding or deduction for or on account of any present or future taxes, duties, assessments or governmental charges imposed or levied by or on behalf of the government of any jurisdiction, including Canada or any province or territory thereof, or by any authority or agency therein or thereof having power to tax, all of which are herein referred to as "Taxes," unless the Company or such Guarantor is required to withhold or deduct Taxes by law or by the interpretation or administration thereof by the relevant governmental authority. If the Company or any Guarantor is required to withhold or deduct any amount for or on account of Taxes from any payment made under or in respect of the Notes or the Guarantees, the Company or such Guarantor will pay such additional amounts, which we refer to as Additional Amounts, as may be necessary so that the net amount received by each Holder of a Note (including Additional Amounts) after such withholding or deduction will not be less than the amount the Holder would have received if such Taxes had not been withheld or deducted. However, no Additional Amounts will be payable with respect to a payment made to a Holder of a Note, which we refer to as an Excluded Holder, in respect of a beneficial owner, (i) with which the Company or such Guarantor does not deal at arm's length (within the meaning of the Income Tax Act (Canada)) at the time of making such payment, (ii) which is subject to such Taxes by reason of its being connected presently or formerly with any jurisdiction, including Canada or any province or territory thereof, otherwise than by reason of the Holder's purchase of the Notes, the holding of Notes or the receipt of payments in respect of the Notes, (iii) which presents such Note for payment (where presentation is required) more than 30 days after the relevant date (except to the extent that the Holder thereof would have been entitled to such Additional Amounts on presenting a Note for payment on the last day of such 30-day period); for this purpose, the "relevant date" in relation to any payments on any Note means: (a) the due date for payment thereof, or (b) if

45

the full amount of the monies payable on such date has not been received by the Trustee on or prior to such due date, the date on which the full amount of such monies has been so received and notice to that effect has been duly given to Holders of Notes in accordance with the Indenture or (iv) who could lawfully avoid or reduce (but has not so avoided or reduced) such withholding or deduction by complying, or procuring that any third party comply, with any statutory requirements or by making, or procuring that any third party make, a declaration of non-residence, eligibility for treaty benefits or other similar claim for exemption or reduction to any relevant tax authority, the Company and such Guarantor as appropriate; *provided* that in the case of a reduction the Holder shall be entitled to receive Additional Amounts up to the reduced amount that would have applied had it made the appropriate claim. The Company and the applicable Guarantor will also make such withholding or deduction and remit the full amount deducted or withheld to the relevant authority in accordance with applicable law. The Company will furnish to the Trustee, within 30 days after the date the payment of any Taxes is due pursuant to applicable law, certified copies of tax receipts evidencing that such payment has been made by the Company or the applicable Guarantor or other evidence of such payment satisfactory to the Trustee. If any Holder pays any Taxes or other amounts in respect of payments that the Company or Guarantors pay to such Holder, the Company and each Guarantor shall indemnify and hold harmless each Holder of Notes (other than an Excluded Holder) and upon written request reimburse each such Holder for the amount of (x) any Taxes so levied or imposed and paid by such Holder as a result of payments made under or with respect to the Notes or the Guarantees, and (y) any Taxes levied or imposed and paid by such Holder with respect to any reimbursement under (x) above, but excluding any such Taxes on such Holder's net income or capital. A certificate of the Holder (or the Trustee on behalf of the Holder) accompanying the written request and containing reasonable detail as to the amount of Taxes to be reimbursed shall be determinative, absent manifest error, of the amount due from the Company and Guarantors to the Holder under this indemnification.

At least 30 days prior to each date on which any payment under or with respect to the Notes or the Guarantees is due and payable, if the Company or any Guarantor is obligated to pay Additional Amounts with respect to such payment, the Company will deliver to the Trustee an officer's certificate stating the fact that such Additional Amounts will be payable, the amounts so payable and that the Company or such Guarantor, as the case may be, will remit such deduction or withholding to the appropriate tax authority, and will set forth such other information necessary to enable the Trustee to pay such Additional Amounts to Holders of the Notes on the relevant date. All references in this offering memorandum to the payment of principal of, premium or any other amount, if any, and interest on, any Note or Guarantee shall be deemed to include the payment of Additional Amounts to the extent that, in such context, Additional Amounts are, were or would be payable.

## Sinking Fund

The Notes will not be entitled to the benefit of any mandatory sinking fund.

## Optional Redemption

Except as described below, the Notes are not redeemable at the option of the Company.

*2016 Fixed Rate Notes.* At any time on or after July 15, 2011, the Company may redeem the 2016 Fixed Rate Notes at its option, in whole at any time or in part from time to time, upon

HIGHLY CONFIDENTIAL                    NNC-NNL06705393 / 58

not less than 30 nor more than 60 days' notice, at the following redemption prices (expressed as percentages of the principal amount thereof) if redeemed during the twelve-month period commencing on July 15 of the years set forth below:

| Year | Redemption Price |
|---|---|
| 2011 | 105.375% |
| 2012 | 103.583% |
| 2013 | 101.792% |
| 2014 and each year thereafter | 100.000% |

In addition, the Company must pay accrued and unpaid interest on the 2016 Fixed Rate Notes redeemed to the applicable date of redemption.

At any time prior to July 15, 2011, the Company may redeem the 2016 Fixed Rate Notes at its option, in whole at any time or in part from time to time, upon not less than 30 nor more than 60 days' notice, at a price equal to 100% of the principal amount thereof plus the 2016 Applicable Premium (as defined below) as of, and accrued but unpaid interest, if any, to, the date of redemption (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date).

''2016 Applicable Premium'' means with respect to any 2016 Fixed Rate Note at any redemption date, the greater of (1) 1.0% of the principal amount of such 2016 Fixed Rate Note; and (2) the excess of (a) the present value at such redemption date of (i) the redemption price of such 2016 Fixed Rate Note on July 15, 2011 (such redemption price being set forth in the table above under the heading ''2016 Fixed Rate Notes'') plus (ii) all required remaining scheduled interest payments due on the 2016 Fixed Rate Note through July 15, 2011 (other than interest accrued to the redemption date), computed using a discount rate equal to the Treasury Rate (as defined below) plus 50 basis points; over (b) the principal amount of such 2016 Fixed Rate Note on such redemption date. Calculation of the 2016 Applicable Premium will be made by the Company or on behalf of the Company by such Person as the Company shall designate; *provided* that such calculation shall not be a duty or obligation of the Trustee or the Calculation Agent.

*2013 Fixed Rate Notes.* The Company may redeem the 2013 Fixed Rate Notes at its option, in whole at any time or in part from time to time, upon not less than 30 nor more than 60 days' notice, at a price equal to 100% of the principal amount thereof plus the 2013 Applicable Premium (as defined below) as of, and accrued but unpaid interest, if any, to, the date of redemption (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date).

''2013 Applicable Premium'' means with respect to any 2013 Fixed Rate Note at any redemption date, the greater of (1) 1.0% of the principal amount of such 2013 Fixed Rate Note; and (2) the excess of (a) the present value at such redemption date of (i) the principal amount of such 2013 Fixed Rate Note on July 15, 2013 plus (ii) all required remaining scheduled interest payments due on the 2013 Fixed Rate Note through July 15, 2013 (other than interest accrued to the redemption date), computed using a discount rate equal to the Treasury Rate (as defined below) plus 50 basis points; over (b) the principal amount of such 2013 Fixed Rate Note on such redemption date. Calculation of the 2013 Applicable Premium will be made by the Company or on behalf of the Company by such Person as the Company

47

shall designate; *provided* that such calculation shall not be a duty or obligation of the Trustee or the Calculation Agent.

*"Treasury Rate"* means, with respect to any redemption date, the yield to maturity at the time of computation (which shall be at approximately 11:00 a.m. on the second business day preceding the redemption date) of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15(519) that has become publicly available at least two business days prior to such redemption date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from such redemption date to July 15, 2011 with respect to the 2016 Fixed Rate Notes, or the 2016 Fixed Rate Notes Applicable Period, and to July 15, 2013 with respect to the 2013 Fixed Rate Notes, or the 2013 Fixed Rate Notes Applicable Period; *provided* that if the 2016 Fixed Rate Notes Applicable Period or the 2013 Fixed Rate Notes Applicable Period, as the case may be, is not equal to the constant maturity of the United States Treasury security for which a weekly average yield is given, the Treasury Rate shall be obtained by linear interpolation (calculated to the nearest one-twelfth of a year) from the weekly average yields of United States Treasury securities for which such yields are given, except that if the 2016 Fixed Rate Notes Applicable Period or the 2013 Fixed Rate Notes Applicable Period, as the case may be, is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year shall be used.

### Optional Redemption with Qualified Equity Proceeds

On or prior to July 15, 2009, the Company may, at its option, use Qualified Equity Proceeds (as defined below) to redeem up to 35% of the original aggregate principal amount of any Series of Notes (including any Additional Notes of such Series), in whole at any time or in part from time to time, at a redemption price equal to (i) in the case of the 2016 Fixed Rate Notes, 110.750% of the principal amount thereof, (ii) in the case of the 2013 Fixed Rate Notes, 110.125% of the principal amount thereof and (iii) in the case of the Floating Rate Notes, 100% of the principal amount so redeemed plus a premium equal to the interest rate per annum of such Floating Rate Notes applicable on the date of redemption, in each case, plus accrued and unpaid interest thereon, if any, to the applicable date of redemption; *provided* that, in each case, the Company makes such redemption not more than 90 days after the receipt by NNC or the Company of such Qualified Equity Proceeds.

*"Qualified Equity Proceeds"* means the net cash proceeds from any issuance or sale of Qualified Capital Stock of NNC or the Company, other than issuances or sales to NNC or any Subsidiary of NNC.

### Optional Redemption for Changes in Applicable Withholding Taxes

The Notes of each Series are also subject to redemption in whole, but not in part, at the Company's option at any time in cash, on not less than 30 nor more than 60 days' notice to the Holders, at a price equal to 100% of the aggregate principal amount, together with accrued and unpaid interest to the date fixed for redemption and all Additional Amounts then due or becoming due on the redemption date, in the event the Company or a Guarantor is, has become or would become obligated to pay, on the next date on which any amount would be payable by the Company or the Guarantor, as the case may be, with respect to the Notes of such Series, any Additional Amount as a result of an actual or proposed change or amendment in the laws (including any regulations promulgated thereunder) or treaties of any jurisdiction

HIGHLY CONFIDENTIAL                          NNC-NNL06705393 / 60

(including Canada or any province or territory thereof) or any change in or new or different position regarding the application, interpretation or administration of such laws, treaties or regulations (including a holding, judgment or order by a court of competent jurisdiction), which change is announced or becomes effective on or after the Issue Date; *provided* that the Company delivers to the Trustee an opinion of counsel attesting to such change or amendment.

## Selection and Notice of Redemption

In the event that the Company chooses to redeem less than all of the Notes of any Series, selection of the Notes of such Series for redemption will be made by the Trustee either:

> (1) in compliance with the requirements of the principal national securities exchange, if any, on which the Notes of such Series are listed; or

> (2) if such Series is not listed on a national securities exchange, on a *pro rata* basis, by lot or by such method as the Trustee shall deem fair and appropriate.

No Notes of a principal amount of $1,000 or less shall be redeemed in part. If a partial redemption is made with Qualified Equity Proceeds, the Trustee will select the Notes of such Series only on a *pro rata* basis or on as nearly a *pro rata* basis as is practicable (subject to procedures of the depositary).

Notice of redemption will be mailed by first-class mail at least 30 but not more than 60 days before the applicable redemption date to each Holder of Notes to be redeemed at its registered address. If the Notes are to be redeemed in part only, then the notice of redemption must state the portion of the principal amount thereof to be redeemed. A new Note in a principal amount equal to the unredeemed portion thereof will be issued in the name of the Holder thereof upon cancellation of the original Note (or appropriate adjustments to the amount and beneficial interests in a global Note will be made). On and after the applicable redemption date, interest will cease to accrue on Notes or portions thereof called for redemption as long as the Company has deposited with the paying agent funds in satisfaction of the applicable redemption price.

## Change of Control

Upon the occurrence of a Change of Control, the Company will be required to make an offer to purchase each Holder's Notes pursuant to the offer described below (the "*Change of Control Offer*"), at a purchase price in cash equal to 101% of the principal amount thereof, together with accrued and unpaid interest to the date of purchase.

Within 30 days following the date upon which the Change of Control occurs, the Company must send, or cause the Trustee to send, by first-class mail, a notice to each Holder, with a copy to the Trustee, which notice shall govern the terms of the Change of Control Offer. Such notice shall state, among other things, the purchase date (the "*Change of Control Payment Date*"), which must be no earlier than 30 days nor later than 60 days after the date such notice is mailed, other than as may be required to comply with any applicable laws. Each Holder who accepts the Change of Control Offer will be required to deliver the form entitled "Option of Holder to Elect Purchase" on the reverse of the Note completed and specifying the portion (in integral multiples of $1,000) of such Holder's Notes that it agrees to sell to the Company pursuant to the Change of Control Offer, to the paying agent at the address specified in the

HIGHLY CONFIDENTIAL    NNC-NNL06705393 / 61

notice prior to the close of business on the third business day prior to the Change of Control Payment Date.

If a Change of Control Offer is made, there can be no assurance that the Company will have available funds sufficient to pay the purchase price for all the Notes that might be delivered by Holders seeking to accept the Change of Control Offer. In the event the Company is required to purchase outstanding Notes pursuant to a Change of Control Offer, the Company expects that it would seek third-party financing to the extent it does not have available funds to meet its purchase obligations. However, there can be no assurance that the Company would be able to obtain such financing. In addition, there can be no assurance that the Company would be able to obtain the consents necessary to consummate a Change of Control Offer from the lenders under agreements governing outstanding Funded Debt that may in the future prohibit the Change of Control Offer. The failure to consummate a Change of Control Offer would constitute an Event of Default under the Indenture. See "Risk Factors—The Company may be unable to purchase the Notes upon a Change of Control" for more information.

One of the events that constitutes a Change of Control under the Indenture is the disposition of "all or substantially all" of NNC's or the Company's assets. This term has not been interpreted under New York law, which is the governing law of the Indenture, to represent a specific quantitative test. As a consequence, if Holders of the Notes assert that the Company is required to make a Change of Control Offer and the Company elects to contest such assertion, there is uncertainty as to how a court interpreting New York law would interpret the term.

Neither the Boards of Directors of NNC or the Company nor the Trustee may waive the covenant of the Company to make a Change of Control Offer following a Change of Control. Restrictions in the Indenture described herein on the ability of NNC, the Company and its Subsidiaries to incur additional Funded Debt, to grant Liens on the property of NNC, the Company and the Restricted Subsidiaries and to make Restricted Payments may also make more difficult or discourage a takeover of NNC or the Company, whether favored or opposed by the management or shareholders of NNC or the Company. There can be no assurance that the Company or the acquiring party will have sufficient financial resources to effect a Change of Control Offer. Such restrictions may, in certain circumstances, make more difficult or discourage any leveraged buyout of NNC or the Company or any of their Subsidiaries by their respective management. However, the Indenture may not afford the Holders protection in all circumstances from the adverse aspects of a highly leveraged transaction, reorganization, amalgamation, restructuring, merger or similar transaction.

The Company will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws and regulations are applicable in connection with the repurchase of Notes pursuant to a Change of Control Offer. To the extent that the provisions of any securities laws or regulations conflict with the "Change of Control" provisions of the Indenture, the Company shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under the "Change of Control" provisions of the Indenture by virtue thereof.

The "Change of Control" provisions described above will apply during any Suspension Period.

## Suspension Period

During each Suspension Period, the provisions of the Indenture described under "Certain Covenants that will Cease to Apply During Suspension Period" will not apply. The provisions of

HIGHLY CONFIDENTIAL

the Indenture described under "Certain Covenants Applicable at All Times" will apply at all times during any Suspension Period so long as any Notes remain outstanding thereunder.

"*Suspension Period*" means, for any Series of Notes, any period (a) beginning on the date that:

> (1) the Notes of such Series have Investment Grade Status; *provided* that prior to the assignment of the ratings contemplated by the definition of Investment Grade Status, the Company has advised Moody's and S&P that the covenants under "Certain Covenants that will Cease to Apply During Suspension Period" will not apply during such Suspension Period;

> (2) no Default or Event of Default has occurred and is continuing; and

> (3) the Company has delivered an officers' certificate to the Trustee certifying that the conditions set forth in clauses (1) and (2) above are satisfied; and

> (b) ending on the date (the "*Reversion Date*") that the Notes of the Series cease to have the applicable rating from either Moody's or S&P specified in the definition of Investment Grade Status; *provided* that solely for the purpose of determining whether and when the Reversion Date shall have occurred, a Series of Notes shall be deemed to have Investment Grade Status if clauses (i) and (ii) of the definition of Investment Grade Status are otherwise satisfied, notwithstanding that either Moody's and/or S&P shall have announced a negative outlook with respect to such Notes.

On each Reversion Date, (i) all Funded Debt of NNC or any Subsidiary of NNC incurred during the Suspension Period prior to such Reversion Date will be deemed to have been outstanding on the Issue Date and classified as permitted under clause (3) of the definition of Permitted Funded Debt, and (ii) all Liens granted or created by any Subsidiary of NNC (other than the Company or any Subsidiary that was a Restricted Subsidiary during such Suspension Period) during the Suspension Period prior to such Reversion Date (other than any Lien granted or created in connection with a transaction that directly results in a downgrade in the rating of the Notes of any Series from S&P or Moody's to below the applicable rating specified in the definition of Investment Grade Status) will be deemed to have been outstanding on the Issue Date and classified as permitted under clause (10) of the definition of Permitted Liens.

For purposes of calculating the amount available to be made as Restricted Payments under clause (iii) of the first paragraph of the "Limitation on Restricted Payments" covenant, calculations under that clause will be made with reference to the Measurement Date as set forth in that clause. Accordingly, Restricted Payments made during the Suspension Period not otherwise permitted pursuant to any of clauses (1) through (11) under the second paragraph under the "Limitation on Restricted Payments" covenant will reduce the amount available to be made as Restricted Payments under clause (iii) of the first paragraph of such covenant; *provided* that the amount available to be made as Restricted Payments on the Reversion Date shall not be reduced to below zero solely as a result of such Restricted Payments, but may be reduced to below zero as a result of cumulative Consolidated Net Income for the purpose of sub-clause (w) of clause (iii) of the first paragraph of such covenant being a loss, and the items specified in sub-clauses (w) through (z) of clause (iii) of the first paragraph of such covenant that occur during the Suspension Period will increase the amount available to be made as Restricted Payments under clause (iii) of the first paragraph of such covenant. Any Restricted Payments made during the Suspension Period that would have been made pursuant to clause (11) of the second paragraph under the "Limitation on Restricted Payments" covenant if

HIGHLY CONFIDENTIAL      NNC-NNL06705393 / 63

such covenant were then applicable, shall reduce the amounts permitted to be incurred under such clause (11) on the Reversion Date.

## Certain Covenants that will Cease to Apply During Suspension Period

Set forth below are summaries of certain covenants contained in the Indenture that will apply at all times except during any Suspension Period.

*Limitation on Incurrence of Additional Funded Debt.* (a) The Company and the Guarantors will not, and will not permit any of their Subsidiaries to, directly or indirectly, create, incur, assume, guarantee, acquire, become liable, contingently or otherwise, with respect to, or otherwise become responsible for the payment of (collectively, *"incur"*) any Funded Debt (other than Permitted Funded Debt); *provided* that the Company, any Guarantor and any other Subsidiary of NNC may incur Funded Debt (including, without limitation, Acquired Funded Debt), if on the date of the incurrence of such Funded Debt, after giving effect to the incurrence thereof, the Consolidated Fixed Charge Coverage Ratio is greater than 2.0 to 1.0.

(b) The Company and the Guarantors will not, directly or indirectly, incur any Funded Debt which by its terms (or by the terms of any agreement governing such Funded Debt) is subordinated in right of payment to any other Funded Debt of the Company or such Guarantors, unless such Funded Debt is also by its terms (or by the terms of any agreement governing such Funded Debt) made expressly subordinate to the Notes and the Guarantees, as applicable, to the same extent and in the same manner as such Funded Debt is subordinated to other Funded Debt of the Company and the Guarantors, as applicable.

*Limitation on Restricted Payments.* The Company and the Guarantors will not, and will not cause or permit any of their Subsidiaries to, directly or indirectly:

(1) declare or pay any dividend or make any distribution (other than dividends or distributions payable in Qualified Capital Stock of NNC) on or in respect of shares of NNC's Capital Stock or the Company's Preferred Stock to holders of such Capital Stock or Preferred Stock, as the case may be, in their capacity as such; or

(2) purchase, redeem or otherwise acquire or retire for value any Capital Stock of NNC or any Preferred Stock of the Company or any warrants, rights or options to purchase or acquire shares of any class of such Capital Stock or Preferred Stock or make any payments with respect to Synthetic Purchase Agreements,

(each of the foregoing actions set forth in clauses (1) and (2) being referred to as a *"Restricted Payment"*), if at the time of such Restricted Payment or immediately after giving effect thereto,

(i) a Default or an Event of Default shall have occurred and be continuing;

(ii) the Company would not be able to incur at least $1.00 of additional Funded Debt (other than Permitted Funded Debt) in compliance with the "Limitation on Incurrence of Additional Funded Debt" covenant; or

(iii) the aggregate amount of Restricted Payments (including such proposed Restricted Payment) made subsequent to the Measurement Date shall exceed the sum, without duplication (the *"Restricted Payments Basket"*), of:

(w) 50% of the cumulative Consolidated Net Income of NNC (or if cumulative Consolidated Net Income shall be a loss, minus 100% of such loss) earned subsequent to

52

the Measurement Date and on or prior to the last day of the most recent fiscal quarter for which consolidated financial information for NNC is publicly available (the "*Reference Date*") (treating such period as a single accounting period); plus

(x) 100% of the aggregate net cash proceeds received by NNC from any Person (other than a Subsidiary of NNC) or the Company from any Person (other than NNC or any other Subsidiary of NNC) from the issuance and sale subsequent to the Measurement Date and on or prior to the Reference Date of Qualified Capital Stock of NNC or Preferred Stock (other than Disqualified Capital Stock) of the Company or warrants, options or other rights to acquire Qualified Capital Stock of NNC (but excluding any debt security that is convertible into, or exchangeable for, Qualified Capital Stock); plus

(y) 100% of the aggregate net cash proceeds of any equity contribution received by NNC or the Company from a holder of NNC's or the Company's Capital Stock (other than an equity contribution received by the Company from NNC) following the Measurement Date; plus

(z) the amount by which Funded Debt of NNC, the Company or another Subsidiary of NNC is reduced on NNC's consolidated balance sheet subsequent to the Measurement Date upon the conversion or exchange (other than by a Subsidiary of the Company) of such Funded Debt for Qualified Capital Stock of NNC or Preferred Stock (other than Disqualified Capital Stock) of the Company (less the amount of any cash, or the fair value of any other property, distributed by NNC, the Company or another Subsidiary of NNC upon such conversion or exchange).

Notwithstanding the foregoing, the provisions set forth in the preceding paragraphs shall not prohibit:

(1) the payment of any dividend within 60 days after the date of declaration of such dividend if the dividend would have been permitted on the date of declaration;

(2) the purchase, defeasance, repurchase, prepayment, redemption or other acquisition or retirement for value of Capital Stock of NNC or Preferred Stock (other than Disqualified Capital Stock) of the Company or any warrants, rights or options to purchase or acquire shares of any class of such Capital Stock or Preferred Stock in exchange for, or out of the proceeds of the substantially concurrent sale of, Qualified Capital Stock of NNC or Preferred Stock (other than Disqualified Capital Stock) of the Company (other than Capital Stock issued or sold to NNC or a Subsidiary of NNC); *provided* that the net cash proceeds from such exchange or sale shall be excluded from the calculations pursuant to clause (iii)(x) of the preceding paragraph;

(3) the repurchase or other acquisition of Capital Stock of NNC or any warrants, rights or options to purchase or acquire shares of any such Capital Stock or securities convertible into Capital Stock of NNC, from or on behalf of current or former employees, directors, consultants, or contractors of NNC or any of its Subsidiaries (or permitted transferees of such current or former employees, directors, consultants or contractors), pursuant to the terms of the agreements (including employment, consulting or severance agreements) or plans (or amendments thereto) under which such individuals purchase or sell, or are granted the option to purchase or sell, shares of such Capital Stock;

(4) the redemption by NNC of any rights to purchase shares of Common Stock of NNC outstanding from time to time under the amended and restated shareholder rights plan agreement between NNC and Computershare Trust Company of Canada, as rights agent,

HIGHLY CONFIDENTIAL        NNC-NNL06705393 / 65

dated as of February 14, 2003, as the same may be further amended, restated or replaced from time to time, in accordance with the terms thereof; *provided* that such rights are redeemed for nominal consideration;

(5) payments to holders or former holders of Capital Stock of NNC, the Company or any other Subsidiary of NNC pursuant to a statutory dissent right or appraisal remedy;

(6) payments to holders of Capital Stock (or to the holders of Funded Debt or Disqualified Capital Stock that is convertible into or exchangeable for Capital Stock upon such conversion or exchange) in lieu of the issuance of fractional shares;

(7) payments to holders of Capital Stock of NNC under any stock purchase plan or similar employee or director benefit plan in settlement of fractional shares issued under such plan;

(8) the declaration and payment by NNC or the Company of regularly scheduled cash dividends with respect to, and the redemption by NNC or the Company on a scheduled mandatory redemption date of, any Disqualified Capital Stock (including Existing Preferred Stock) or Designated Qualified Preferred Stock;

(9) the declaration and payment by NNC or the Company of regularly scheduled cash dividends with respect to, and the redemption by NNC or the Company on a scheduled mandatory redemption date of, any Qualified Capital Stock (other than Designated Qualified Preferred Stock) issued after the Issue Date in an amount not in excess of the aggregate net cash proceeds received by NNC or the Company from any Person (other than NNC or a Subsidiary of NNC) from such issuance; *provided* that the amount of Restricted Payments made pursuant to this clause (9) shall be excluded from the calculation pursuant to clause (iii)(x) of the preceding paragraph;

(10) any payment or distribution to holders or former holders of Capital Stock of NNC in connection with the settlement of, or satisfaction of a judgment resulting from, any shareholder litigation or regulatory or enforcement proceeding; and

(11) any other Restricted Payments in an aggregate amount which, when taken together with all other Restricted Payments pursuant to this clause (11), does not exceed $25,000,000.

Notwithstanding the foregoing, none of NNC, the Company or any other Subsidiary of NNC may make any Restricted Payment in reliance on clause (11) if, after giving effect to such Restricted Payment, a Default or Event of Default shall have occurred and be continuing. In calculating the aggregate amount of Restricted Payments made subsequent to the Issue Date for purposes of clause (iii) of the second preceding paragraph of this covenant, amounts expended pursuant to clause (1) of the immediately preceding paragraph shall be included in such calculation and amounts expended pursuant to clauses (2) through (11) of the immediately preceding paragraph shall be excluded in such calculation.

## Certain Covenants Applicable at All Times

Set forth below are summaries of certain covenants contained in the Indenture that, except as expressly indicated, will apply at all times so long as any Notes remain outstanding.

54

*Negative Pledge.* NNC and the Company will not and will not permit any Restricted Subsidiary to:

(1) issue, assume or guarantee any Funded Debt that is secured by a Lien upon any property of NNC, the Company or any Restricted Subsidiary, whether now owned or hereafter acquired; or

(2) secure any Funded Debt by a Lien upon any property of NNC, the Company or any Restricted Subsidiary, whether now owned or hereafter acquired;

unless any outstanding Notes are concurrently secured equally and ratably with such Funded Debt; *provided* that the foregoing restrictions shall not apply to Funded Debt secured by Permitted Liens.

*"Permitted Lien"* means:

(1) any Lien existing on property at the time of the acquisition of that property by NNC, the Company or the relevant Restricted Subsidiary;

(2) any Lien on property that is incurred after the date of issuance of the Notes to secure or provide for the payment of the purchase price of the property or the cost of construction or improvement thereon;

(3) any Lien on property of a Person existing at the time that Person is liquidated, dissolved or merged into, or amalgamated or consolidated with, NNC, the Company or any Restricted Subsidiary, or at the time the properties of or equity interests in the Person are sold, leased or otherwise transferred to NNC, the Company or any Restricted Subsidiary;

(4) any Lien securing intercompany Funded Debt among or between NNC, the Company and/or the Restricted Subsidiaries;

(5) deposits of cash, cash equivalents or investment securities against which the lender of any Credit Enhanced Foreign Subsidiary Debt has a Lien or right of set off;

(6) any Lien on property of a Foreign Subsidiary securing any Funded Debt incurred pursuant to clause (9) of the definition of Permitted Funded Debt;

(7) Liens in favor of the United States of America or any State thereof, Canada or any Province or territory thereof, or any department, agency or instrumentality or political subdivision thereof, or in favor of any other country or political subdivision, to secure partial, progress, advance or other payments pursuant to any contract or statute or to secure any Funded Debt incurred or guaranteed for the purpose of financing or refinancing all or any part of the purchase price of the property, shares of capital stock or indebtedness subject to such Liens, or the cost of constructing or improving the property subject to such Liens (including, without limitation, Liens incurred in connection with pollution control, industrial revenue or similar financings or relating to the development, restoration, demolition or remediation of property);

(8) any Lien created by or resulting from litigation or other proceedings against, or upon property of, NNC, the Company or any Restricted Subsidiary, or any Lien securing appeal bonds (or letters of credit or other similar instruments issued in support of or in lieu of appeal bonds) in respect of judgments, in each case, or any Lien for workmen's compensation awards or similar awards, so long as the finality of such judgment or award is being contested and execution thereon is stayed or such Lien relates to a final unappealable judgment which is satisfied within 30 days of such judgment or any Lien

55

incurred by NNC, the Company or any Restricted Subsidiary for the purpose of obtaining a stay or discharge in the course of any litigation or other proceeding;

(9) any other Liens securing Funded Debt of any Foreign Subsidiary; *provided* that the aggregate outstanding principal amount of Funded Debt secured pursuant to this clause (9) by any individual Foreign Subsidiary would not, after giving effect to the relevant transaction, exceed $5,000,000;

(10) Liens existing on the Issue Date and any extension, renewal or replacement in whole or in part of any Lien existing on the Issue Date or referred to in the above exceptions, so long as the total amount of secured Funded Debt does not increase, and the property securing the Funded Debt is not expanded, as a result of the extension, renewal or replacement; and

(11) Managed Service Contract Liens.

Notwithstanding the foregoing, NNC, the Company and any Restricted Subsidiary may issue, assume or guarantee Funded Debt secured by a Lien upon any of their property that would otherwise be subject to the foregoing restrictions, and may carry out any other transactions that would otherwise be subject to the foregoing restrictions, so long as the aggregate amount of all such secured Funded Debt incurred pursuant to this sentence would not, after giving effect to the relevant transaction, exceed 10% of NNC's Consolidated Net Tangible Assets on or prior to the earlier of (a) September 2, 2008 or (b) the refinancing or repayment (including by redemption) in full of the 4.25% Convertible Senior Notes due September 1, 2008 issued by NNC and guaranteed by the Company, and 15% thereafter.

*Amalgamation, Merger, Conveyance, Transfer or Lease.* Each of NNC, the Company and, during any period in which NNI is a Guarantor, NNI, under the terms of the Indenture, has covenanted in the Indenture that it will not amalgamate or merge with any other corporation or enter into any reorganization or arrangement or effect any conveyance, transfer or lease of all or substantially all of its and its Subsidiaries' assets, taken as a whole, unless specified conditions are satisfied. These conditions are as follows:

(1) either (a) it is the surviving Person or one of the continuing Persons or (b) the successor corporation (or the Person that leases or that acquires by conveyance or transfer all or substantially all of its and its Subsidiaries' assets, taken as a whole) expressly assumes, by supplemental Indenture, its obligations under the Indenture; and

(2) NNC, the Company, NNI or any successor Person, as the case may be, are not immediately after the transaction in Default under the Indenture or the Notes.

## Events of Default

The following events are defined in the Indenture as *"Events of Default"* with respect to any Series of Notes:

(1) the failure to pay the principal of the Notes of that Series when such principal becomes due and payable, whether at maturity, upon redemption or otherwise;

(2) the failure to pay interest on the Notes of that Series when the same becomes due and payable and the Default continues for a continuous period of 30 days;

(3) a Default by NNC, the Company, or during any period in which NNI is a Guarantor, NNI, in the performance or observance of any of their respective covenants, agreements or other

56

obligations set forth in the Indenture for a continuous period of 90 days after the Company or such Guarantor receives written notice specifying the Default (and demanding that such Default be remedied) from the Holders of at least 25% of the then-outstanding principal amount of the Notes of such Series;

(4) certain events of bankruptcy, insolvency or reorganization affecting the Company or any Guarantor;

(5) a Default by NNC, the Company, or during any period in which NNI is a Guarantor, NNI, under a single obligation in respect of Funded Debt that exceeds on its face $100,000,000 in principal amount which results in the acceleration of the due date of that Funded Debt, and this acceleration is not rescinded or annulled within 10 days after notice from Holders of at least 25% of the then-outstanding principal amount of the Notes of such Series has been given;

(6) any Guarantee shall cease to be in full force and effect (other than in accordance with the terms of the Indenture) or any Guarantor denies or disaffirms its obligations under its Guarantee;

(7) one or more judgments in an aggregate amount in excess of $100,000,000 shall have been rendered against NNC, the Company or, during any period in which NNI is a Guarantor, NNI, and such judgments remain undischarged, unpaid in accordance with its or their respective terms or unstayed for a period of 90 days after such judgment or judgments become final and non-appealable; and

(8) a failure by the Company to make a Change of Control Offer.

An Event of Default with respect to a particular Series of Notes may, but will not necessarily, constitute an Event of Default with respect to any other Series of Notes. The Company is required to file with the Trustee annual officers' certificates as to the absence of specified Defaults under the Indenture.

If an Event of Default with respect to a Series of Notes occurs and is continuing, either the Trustee or the Holders of not less than 25% in principal amount of the then-outstanding Notes of the affected Series may declare the principal of, and premium, if any, on, all Notes of the Series to be due and payable, together with accrued interest. The Indenture provides that, in certain cases, the Holders of a majority in principal amount of the then-outstanding Notes of a Series may on behalf of the Holders of all Notes of that Series waive any past Default or Event of Default and rescind and annul any such declaration and its consequences.

The Trustee may require indemnification from the Holders of Notes of a Series before proceeding to exercise any right or power under the Indenture at the request of those Holders. The Holders of a majority in principal amount of the then-outstanding Notes of any Series may:

(1) direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on it with respect to the Notes of that Series, and

(2) take any other action authorized to be taken under the Indenture or under applicable law. However, the Trustee may refuse to follow any direction that conflicts with law or the Indenture or is unduly prejudicial to the rights of other Holders.

57

HIGHLY CONFIDENTIAL

No Holder will be entitled to pursue any remedy with respect to the Indenture unless the Trustee fails to act for 60 days after it is given:

(1) a notice of Default by that Holder,

(2) a request to enforce the Indenture by the Holders of not less than 25% in aggregate principal amount of all of the then-outstanding Notes issued under the Indenture (treated as a single class), and

(3) an indemnity in favor of the Trustee, satisfactory to the Trustee, and during this 60-day period the Holders of a majority in principal amount of all of the then-outstanding Notes issued under the Indenture (treated as a single class) do not give a direction to the Trustee that is inconsistent with the enforcement request. These provisions will not prevent any Holder of Notes from enforcing payment of the principal of (and premium, if any) and interest on the Notes at the relevant due dates.

If an Event of Default with respect to a Series of Notes occurs and is continuing, the Trustee will mail to the Holders of those Notes a notice of the Event of Default within 90 days after it occurs. However, except in the case of a Default in any payment in respect of a Series of Notes, the Trustee shall be protected in withholding notice of an Event of Default if it determines in good faith that this is in the interests of the Holders of the relevant Notes.

## Modification of the Indenture

The Company and the Trustee may modify the Indenture without the consent of Holders to make certain changes, including:

(1) to reflect the succession of another corporation to the Company or any Guarantor and the assumption of the Notes or the Guarantees of the Notes, as applicable, by the successor;

(2) to add covenants to any or all Notes or surrender any right or power of the Company or any Guarantor;

(3) to add additional Events of Default to any or all Notes;

(4) to change or eliminate any restrictions on the payment of principal of (or premium, if any, on) Notes;

(5) to change or eliminate any provision of the Indenture; *provided* that any such modification shall only become effective when there are no Notes outstanding which were issued prior to such modification;

(6) to establish the form or terms of Notes of any Series;

(7) to reflect the acceptance of a successor Trustee or to facilitate the administration of the trust under more than one Trustee;

(8) to secure the Notes;

(9) to add an additional Guarantor in respect of the Notes;

(10) to permit or facilitate defeasance or discharge of any or all Notes; *provided* that such modification shall not adversely affect the interests of Holders of any Notes in any material respect; or

HIGHLY CONFIDENTIAL    NNC-NNL06705393 / 70

(11) to cure any ambiguity or correct or supplement any defective or inconsistent provisions; *provided* that any changes will not adversely affect the interests of Holders of Notes in any material respect.

The Indenture provides that, in general, the Company and the Trustee may modify the Indenture or the rights of the Holders of any Series of Notes so long as the Company obtains the consent of the Holders of not less than a majority in principal amount of the then-outstanding Notes of such Series affected by the modification. The Indenture also provides, however, that the Company may not effect any modification without the consent of each affected Holder if that modification would:

(1) change the maturity of any Note, or reduce the principal amount or any premium payable on redemption thereof, or reduce the rate or change the time of payment of interest thereon, or change any place of payment or change the currency in which a Note is payable or affect the right of any Holder to institute suit for the enforcement of payment in accordance with the foregoing;

(2) reduce the percentage in principal amount of the outstanding Notes the consent of whose Holders is required for approval of any proposed modification to the Indenture or for waivers of certain covenants or Defaults under the Indenture, or reduce the requirements for quorum or voting; or

(3) in the case of guaranteed Notes, change the terms and conditions of the obligations of the Guarantors in respect of payments under the Guarantee.

The Indenture contains provisions for convening meetings of the Holders of Notes of a Series. A meeting may be called at any time by the Trustee, or upon the request of the Company or any Guarantor, as the case may be, or the Holders of at least 10% in principal amount of the then-outstanding Notes of the Series. Except as described in the preceding paragraph and as otherwise provided in the Indenture, any resolution presented at a meeting or adjourned meeting at which a quorum is present may be adopted by the affirmative vote of the Holders of a majority in principal amount of the then-outstanding Notes of that Series.

Any resolution passed or decision taken at any meeting of Holders of Notes of any Series duly held in accordance with the Indenture will be binding on all Holders of Notes of that Series whether or not present or represented at the meeting. The quorum at any meeting of the Holders of Notes of a Series called to adopt a resolution, and at any reconvened meeting, will be persons holding or representing a majority in principal amount of the then-outstanding Notes of that Series.

## Defeasance

The Indenture contains provisions that permit the Company or a Guarantor to omit to comply with the covenants described above in this Description of Notes with respect to Notes of any Series. This is known as "covenant defeasance." If the Company or a Guarantor satisfies the conditions for covenant defeasance, then any failure on its part to comply with the terms of the covenants described above will not be an Event of Default under the Indenture with respect to the relevant Notes. The conditions the Company or a Guarantor must satisfy are as follows:

(1) the Company or such Guarantor must irrevocably deposit with the Trustee as specific security pledged for the due payment and ultimate satisfaction of the Company's obligations in respect of the Notes of the Series affected, funds in U.S. dollars and/or,

59

subject to specified conditions, U.S. government obligations in an amount sufficient to pay the principal of, and premium, if any, and interest on the outstanding Notes of the particular Series on their stated maturity;

(2) the Company or such Guarantor must receive opinions of counsel to the effect that Holders of the Notes affected will not recognize income, gain or loss for United States or Canadian federal income tax purposes as a result of the deposit of funds and defeasance of the Company's and the Guarantors' obligations and will be subject to United States and Canadian federal income tax as if the deposit and defeasance had not occurred;

(3) the deposit of funds must not result in a breach or violation of, or constitute a Default under, the Indenture or any other material agreement or instrument to which the Company or any Guarantor is a party or by which it is bound;

(4) no Default with respect to the Notes of such Series shall have occurred and be continuing on the date of the deposit of funds;

(5) the Company or such Guarantor must deliver to the Trustee an officers' certificate or an opinion of counsel stating that all conditions precedent to the defeasance under the Indenture have been complied with; and

(6) the deposit of funds must not cause the Trustee to have a conflicting interest, within the meaning of the Indenture and the TIA.

## Concerning the Trustee

The Bank of New York is the trustee, registrar and paying agent, or the Trustee. The Trustee maintains an office in New York, New York. The Trustee will also initially serve as the Calculation Agent.

If an Event of Default occurs and is continuing, the Trustee will be required to use the degree of care and skill of a prudent person in the conduct of his own affairs. The Trustee will become obligated to exercise any of its powers under the Indenture at the request of any of the Holders of any Notes only after those Holders have offered the Trustee an indemnity reasonably satisfactory to it.

If the Trustee becomes one of our creditors, it will be subject to limitations in the indenture on its rights to obtain payment of claims or to realize on some property received for any such claim, as security or otherwise. The Trustee is permitted to engage in other transactions with us.

## Certain Definitions

Set forth below is a summary of certain of the defined terms used in the Indenture. Reference is made to the Indenture for the full definition of all such terms, as well as any other terms used herein for which no definition is provided.

*"Acquired Funded Debt"* means Funded Debt of a Person or any of its Subsidiaries existing at the time such Person becomes a Subsidiary of NNC or at the time it merges, amalgamates or consolidates with or into NNC or any of its Subsidiaries or assumed in connection with the acquisition of property or assets from such Person and in each case not incurred by such Person in connection with, or in anticipation or contemplation of, such Person becoming a Subsidiary of NNC or such acquisition, merger or consolidation or acquisition of such property or assets.

HIGHLY CONFIDENTIAL                    NNC-NNL06705393 / 72

*"Adjusted EBITDA"* means, with respect to NNC, for any period, the sum, all as determined on a consolidated basis for NNC and its Subsidiaries in accordance with GAAP (without duplication), of:

(1) Consolidated Net Income; *plus*

(2) to the extent Consolidated Net Income has been reduced thereby (without duplication):

(a) all income taxes and related interest and penalties of NNC and its Subsidiaries paid or accrued (net of any income tax credits or gains) in accordance with GAAP for such period;

(b) Consolidated Fixed Charges;

(c) any non-cash expenses, charges or losses that decreased Consolidated Net Income during such period;

(d) any loss, charge or cost attributable to exit or disposal activities approved by the board of directors of NNC as part of a restructuring plan;

(e) any loss, charge or cost attributable to any restatements of financial information of NNC or any of its subsidiaries disclosed in, incorporated by reference in or contemplated by this offering memorandum or any related internal control remedial measures;

(f) any loss, charge or cost attributable to the actual and contemplated transactions with Flextronics disclosed in, incorporated by reference in or contemplated by this offering memorandum;

(g) any loss, charge or cost attributable to the finance transformation project of NNC and its Subsidiaries, including, without limitation, the implementation of a new information technology platform (SAP) to provide an integrated global financial system;

(h) any loss, charge or cost attributable to any payment of fines, penalties or other amounts paid to any government authority or stock exchange in connection with any regulatory or enforcement proceeding relating to events disclosed in, incorporated by reference in or contemplated by this offering memorandum; and

(i) any loss, charge or cost attributable to the contracts existing on the Issue Date with Bharat Sanchar Nigam Limited disclosed in, incorporated by reference in or contemplated by this offering memorandum but not any expansion option, extension, renewal or replacement thereof; *minus*

(3) any non-cash credits and gains that increased Consolidated Net Income during such period, including any reversal of a charge referred to in clauses (2)(c) or (i) above; *minus*

(4) to the extent Consolidated Net Income has been increased thereby:

(a) any gains attributable to reversals prior to the Issue Date of provisions relating to a certain customer bankruptcy settlement during the year ended December 31, 2003 as disclosed in Note 5 "Consolidated financial statement details—Cost of revenue" to NNC's consolidated financial statements contained in NNC's 2005 Annual Report;

(b) any credits and gains attributable to the restructuring of customer financing receivables prior to the Issue Date; and

(c) any reversals of any reserves for any losses, charges or costs with respect to the matters covered by clauses (d), (e), (f), (g), (h) or (i) of clause (2) above.

61

HIGHLY CONFIDENTIAL