*"Affiliate"* means, with respect to any specified Person, any other Person who directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, such specified Person. The term *"control"* means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise; and the terms *"controlling"* and *"controlled"* have meanings correlative of the foregoing.

*"Asset Acquisition"* means (1) an investment by NNC or any Subsidiary of NNC in any other Person pursuant to which such Person shall become a Subsidiary of NNC or shall be merged, consolidated or amalgamated with or into NNC or any Subsidiary of NNC, or (2) the acquisition by NNC or any Subsidiary of NNC of the assets of any Person (other than a Subsidiary of NNC) which constitute all or substantially all of the assets of such Person or comprise any division or line of business of such Person or any other properties or assets of such Person other than in the ordinary course of business.

*"Capital Stock"* means:

    (1) with respect to any Person that is a corporation, any and all shares, interests, participations or other equivalents (however designated and whether or not voting) of corporate stock, including each class of Common Stock and Preferred Stock of such Person; and

    (2) with respect to any Person that is not a corporation, any and all partnership, membership or other equity interests of such Person.

*"Capitalized Lease Obligation"* means, as to any Person, the obligations of such Person under a lease that are required to be classified and accounted for as capital lease obligations under GAAP and, for purposes of this definition, the amount of such obligations at any date shall be the capitalized amount of such obligations at such date, determined in accordance with GAAP.

*"Change of Control"* means the occurrence of one or more of the following events:

    (1) any "person," including its affiliates and associates, or any "group," in each case, other than NNC, any one or more Subsidiaries of NNC or NNC's or such Subsidiaries' employee benefit plans, files a Schedule 13D or Schedule TO (or any successor schedule, form or report under the Exchange Act) disclosing that such person or group has become the "beneficial owner" of 50% or more of the combined voting power of NNC's Capital Stock having ordinary power to elect directors, or has the power to, directly or indirectly, elect a majority of the members of the NNC's Board of Directors; *provided* that the foregoing shall not apply if as a result of, and immediately following, the transaction giving a person such beneficial ownership (including an exchange offer or a transaction referred to in clause (3) below), the holders of the Company's or NNC's Common Stock immediately prior to such transaction are, directly or indirectly, the beneficial owners of at least a majority of the total voting power in the aggregate of all classes of Capital Stock of such person.

    (2) NNC ceases to be the "beneficial owner" of 100% of the voting power of the Common Stock of the Company;

    (3) there shall be consummated any share exchange, amalgamation, consolidation, or merger of NNC pursuant to which NNC's Common Stock would be converted into cash, securities or other property, or the Company or NNC sells, assigns, conveys, transfers, leases or otherwise disposes of all or substantially all of its assets, in each case other than pursuant to a share exchange, amalgamation, consolidation or merger of the Company or

HIGHLY CONFIDENTIAL       NNC-NNL06705393 / 74

NNC in which the holders of the Company's or NNC's Common Stock immediately prior to the share exchange, amalgamation, consolidation, or merger have, directly or indirectly, at least a majority of the total voting power in the aggregate of all classes of Capital Stock of the continuing or surviving corporation (or of the parent of such continuing or surviving corporation) immediately after the share exchange, amalgamation, consolidation or merger; or

(4) the Company or NNC is dissolved or liquidated.

For purposes of this "Change of Control" definition:

(1) "person" or "group" has the meaning given to it for purposes of Sections 13(d) and 14(d) of the Exchange Act or any successor provisions, and the term "group" includes any group acting for the purpose of acquiring, holding or disposing of securities within the meaning of Rule 13d-5(b)(1) under the Exchange Act or any successor provision;

(2) a "beneficial owner" will be determined in accordance with Rule 13d-3 under the Exchange Act, as in effect on the date of the Indenture; and

(3) the number of shares of the Company's voting stock outstanding will be deemed to include, in addition to all outstanding shares of the Company's voting stock and unissued shares deemed to be held by the "person" or "group" or other person with respect to which the Change of Control determination is being made, all unissued shares deemed to be held by all other persons.

Notwithstanding the foregoing, any (i) amalgamation, consolidation or merger of NNC with or into the Company (whether directly or indirectly by merger with or into an entity with only nominal assets created in anticipation or contemplation of such amalgamation, consolidation or merger), (ii) transfer of assets solely between or among NNC, the Company and any successor entity to NNC or the Company or (iii) liquidation or dissolution of NNC or the Company resulting in the transfer of all of the assets of NNC or the Company to NNC, the Company or any successor entity to NNC or the Company shall, in each case, not constitute a Change of Control; *provided* that such transaction does not contravene the terms of the "Amalgamation, Merger, Conveyance, Transfer or Lease" covenant.

"*Commission*" means the Securities and Exchange Commission.

"*Common Stock*" of any Person means any and all shares, interests or other participations in, and other equivalents (however designated and whether voting or non-voting) of, such Person's common equity interests, whether outstanding on the Issue Date or issued after the Issue Date, and includes, without limitation, all series and classes of such equity interests.

"*Consolidated Fixed Charge Coverage Ratio*" means the ratio of (i) Adjusted EBITDA of NNC during the four full fiscal quarters (the "*Four Quarter Period*") ending prior to the date of the transaction (the "*Transaction Date*") giving rise to the need to calculate the Consolidated Fixed Charge Coverage Ratio for which financial statements are publicly available to (ii) Consolidated Fixed Charges for such Four Quarter Period. In addition to and without limitation of the foregoing, for purposes of this definition, "Adjusted EBITDA" and "Consolidated Fixed Charges" shall be calculated after giving effect on a *pro forma* basis (as reasonably estimated by NNC) for the period of such calculation to:

(1) the incurrence of any Funded Debt of NNC or any of its Subsidiaries giving rise to the need to make such calculation and any incurrence or repayment of other Funded Debt (and the application of the proceeds thereof), other than the incurrence or repayment of

HIGHLY CONFIDENTIAL    

Funded Debt in the ordinary course of business for working capital purposes pursuant to working capital facilities, occurring during the Four Quarter Period or at any time subsequent to the last day of the Four Quarter Period and on or prior to the Transaction Date, as if such incurrence or repayment, as the case may be (and the application of the proceeds thereof), occurred on the first day of the Four Quarter Period; and

(2) (A) any asset sale during the Four Quarter Period involving the sale of a Subsidiary or line of business by NNC or any of its Subsidiaries, in each case, that accounted for at least $150,000,000 of NNC's consolidated revenues for the Four Quarter Period and (B) any Asset Acquisition by NNC or any of its Subsidiaries during the Four Quarter Period which would have accounted for at least $150,000,000 of NNC's consolidated revenue for the Four Quarter Period, in each case, so as to exclude or include, as the case may be, NNC's good faith estimate of any Adjusted EBITDA (including any *pro forma* expense and cost reductions calculated on a basis consistent with Regulation S-X under the Exchange Act) attributable to the assets which are the subject of such asset sale or Asset Acquisition, as if such asset sale or Asset Acquisition occurred on the first day of the Four Quarter Period.

If NNC or any of its Subsidiaries directly or indirectly guarantees Funded Debt of a third Person, the preceding sentence shall give effect to the incurrence of such guaranteed Funded Debt, without duplication, as if NNC or any Subsidiary of NNC had directly incurred or otherwise assumed such guaranteed Funded Debt.

Furthermore, in calculating the "Consolidated Fixed Charge Coverage Ratio:"

(1) for purposes of determining the numerator (but not the denominator) of this "Consolidated Fixed Charge Coverage Ratio," interest income determined on a fluctuating basis as of the Transaction Date and which will continue to be so determined thereafter, shall be deemed to have accrued at a fixed rate per annum equal to the applicable rate of interest in effect on the Transaction Date;

(2) for purposes of determining the denominator (but not the numerator) of this "Consolidated Fixed Charge Coverage Ratio," interest on outstanding Funded Debt, determined on a fluctuating basis as of the Transaction Date and which will continue to be so determined thereafter, shall be deemed to have accrued at a fixed rate per annum equal to the applicable rate of interest in effect on the Transaction Date; and

(3) notwithstanding clause (1) or (2) above, interest on Funded Debt determined on a fluctuating basis, to the extent such interest is covered by agreements relating to Interest Swap Obligations, shall be deemed to accrue at the rate per annum resulting after giving effect to the operation of such agreements.

"*Consolidated Fixed Charges*" means, for any period, the sum, without duplication, of:

(1) Consolidated Interest Expense for such period; plus

(2) the amount of all dividends on any series of Disqualified Capital Stock (including the Existing Preferred Stock) or Designated Qualified Preferred Stock of NNC or its Subsidiaries paid, declared or accrued during such period multiplied, to the extent such dividend payments are not a deduction to the federal income tax liabilities of NNC or its applicable Subsidiary, by a fraction, the numerator of which is one and the denominator of which is one minus the then current effective consolidated federal, state and local tax rate of NNC or such Subsidiary, expressed as a decimal.

HIGHLY CONFIDENTIAL     NNC-NNL06705393 / 76

*"Consolidated Interest Expense"* means, for any period, total interest expense (including that portion attributable to Capital Lease Obligations in accordance with GAAP) of NNC and its Subsidiaries for such period, on a consolidated basis, determined in accordance with GAAP (without duplication).

*"Consolidated Net Income"* means, with respect to NNC, for any period, the aggregate net income (or loss) of NNC and its Subsidiaries for such period on a consolidated basis, determined in accordance with GAAP; *provided* that there shall be excluded therefrom (without duplication):

(1) net after-tax gains or losses classified in NNC's consolidated statement of operations as gains or losses on the sale of businesses or assets;

(2) net after-tax items classified as extraordinary gains or losses;

(3) the net after-tax expense (or gain) resulting from any payment, distribution or accrual in connection with the settlement of, or satisfaction of any judgment resulting from, any shareholder litigation or regulatory or law enforcement investigation, in each case, relating to circumstances disclosed in, incorporated by reference in or contemplated by this offering memorandum;

(4) the net income (but not loss) of any Subsidiary of NNC (other than the Company or any Guarantor) to the extent that (a) the declaration of dividends by such Subsidiary of that income is prohibited by a contract, operation of law (other than as a result of any solvency or minimum capital requirement) or applicable judgment and (b) such net income cannot otherwise be distributed or transferred to NNC;

(5) the net income or loss of any Person that is not a Subsidiary of NNC, and any joint ventures in which NNC or any Subsidiary is a party, except to the extent of cash dividends or distributions paid to NNC or to a Subsidiary of NNC by such Person;

(6) after-tax income or loss attributable to discontinued operations;

(7) the cumulative effect of changes in accounting principles; and

(8) for purposes of calculating Consolidated Net Income pursuant to clause (iii) of the first paragraph of the "Limitation on Restricted Payments" covenant only, in the case of a successor to NNC by consolidation, amalgamation or merger or as a transferee of assets of NNC or the Company, as applicable, the net income (but not loss) of the successor corporation prior to such consolidation, amalgamation, merger or transfer of assets (other than the successor of a merger, amalgamation or consolidation of the Company with or into NNC or any Subsidiary of NNC or of NNC into any Subsidiary of NNC).

*"Consolidated Net Tangible Assets"* means NNC's consolidated total assets after deducting therefrom (i) all current liabilities and (ii) all goodwill, trade names, trademarks, patents, unamortized debt discount and expense and other like intangible assets, as shown in NNC's then most recent consolidated balance sheet prepared in accordance with GAAP contained in (x) NNC's most recent annual or quarterly report on Form 10-K or Form 10-Q, as applicable, as filed with the Commission or (y) if NNC is no longer subject to reporting requirements under the Exchange Act, NNC's most recent annual or quarterly financial statements certified by NNC's chief financial officer.

*"Credit Enhanced Foreign Subsidiary Debt"* means any Funded Debt of a Foreign Subsidiary payable to a financial institution that has (i) sold a participation for cash consideration in the

65

HIGHLY CONFIDENTIAL      NNC-NNL06705393 / 77

full principal amount of such Funded Debt to NNC, the Company or any other Subsidiary of NNC or (ii) a Lien on or right of set-off against deposits of cash, cash equivalents or investment securities of NNC, the Company or any other Subsidiary of NNC; *provided* that, in the case of clause (ii) above, the principal amount of such Funded Debt does not exceed the amount of cash, cash equivalents or investment securities so deposited.

*"Default"* means an event or condition the occurrence of which is, or with the lapse of time or the giving of notice or both would be, an Event of Default.

*"Designated Qualified Preferred Stock"* means any Preferred Stock consisting of Qualified Capital Stock issued by NNC or any of its Subsidiaries that is designated as such by NNC by an officers' certificate delivered to the Trustee; *provided* that, immediately after giving effect to the issuance thereof, the Consolidated Fixed Charge Coverage Ratio is greater than 2.0 to 1.0.

*"Disqualified Capital Stock"* means, with respect to the Notes of any Series, that portion of any Capital Stock which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable at the option of the holder thereof), or upon the happening of any event (other than an event which would constitute an asset sale or Change of Control), matures or is mandatorily redeemable (other than such Capital Stock that will be redeemed with Qualified Capital Stock), pursuant to a sinking fund obligation or otherwise, or is redeemable at the sole option of the holder thereof (except, in each case, upon the occurrence of an asset sale or Change of Control) on or prior to the final maturity date of the Notes of such Series.

*"dollar"* or *"$,"* unless otherwise indicated, means lawful currency of the United States of America.

*"Exchange Act"* means the Securities Exchange Act of 1934, as amended, or any successor statute or statutes thereto.

*"Existing Preferred Stock"* means the Company's Redeemable Class A Preferred Shares Series 5, of which 16,000,000 shares are outstanding on the Issue Date (and the Company's Redeemable Class A Preferred Shares Series 6 into which such shares are convertible), and Non-cumulative Redeemable Class A Preferred Shares Series 7, of which 14,000,000 shares are outstanding on the Issue Date (and the Company's Redeemable Class A Preferred Shares Series 8 into which such shares are convertible), in each case as the same may be amended from time to time.

*"Foreign Subsidiary"* means a Subsidiary of NNC organized under the laws of a jurisdiction outside the United States of America and Canada.

*"Funded Debt"* means with respect to any Person, without duplication:

    (1) all indebtedness of such Person for borrowed money;

    (2) all indebtedness of such Person evidenced by bonds, debentures, notes or other similar instruments;

    (3) all Capitalized Lease Obligations of such Person;

    (4) guarantees of indebtedness of another Person of the type referred to in clauses (1) through (3) above and clause (5) below (each such guarantee to constitute Funded Debt in an amount equal to the maximum amount of such other Person's Funded Debt guaranteed thereby);

HIGHLY CONFIDENTIAL       NNC-NNL06705393 / 78

(5) all indebtedness of any other Person of the type referred to in clauses (1) through (4) which is secured by any Lien on any property or asset of such Person, the amount of such indebtedness being deemed to be the lesser of the fair market value of such property or asset and the amount of the indebtedness so secured; and

(6) all Disqualified Capital Stock (including the Existing Preferred Stock) and Designated Qualified Preferred Stock issued by such Person with the amount of Funded Debt represented thereby being equal to the greater of its voluntary or involuntary liquidation preference and its maximum fixed repurchase price, if any, but excluding accrued dividends, if any.

For greater certainty, (i) proceeds received in respect of any factoring, securitization, sale of receivables or similar transaction, (ii) obligations in respect of the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and obligations of a like nature, (iii) guarantees of, and indemnity arrangements with respect to, obligations described in clauses (i) and (ii) of this paragraph, or (iv) obligations under letters of credit and letters of guarantee issued to support (A) trade or performance obligations, (B) obligations under operating leases or (C) contingent obligations arising in connection with the settlement of any shareholder litigation or regulatory or criminal investigation, or satisfaction of any judgment resulting therefrom, will not be considered Funded Debt.

For purposes hereof, the "maximum fixed repurchase price" of any Disqualified Capital Stock that does not have a fixed repurchase price shall be calculated in accordance with the terms of such Disqualified Capital Stock as if such Disqualified Capital Stock were purchased on any date on which Funded Debt shall be required to be determined pursuant to the Indenture, and if such price is based upon, or measured by, the fair market value of such Disqualified Capital Stock shall be determined in accordance with the definition thereof.

Accrual of interest, accrual of dividends, the accretion of accreted value, the payment of interest in the form of additional Funded Debt and the payment of dividends in the form of additional shares of Preferred Stock will not be deemed to be an incurrence of Funded Debt. The amount of any Funded Debt outstanding as of any date shall be (i) the accreted value of the Funded Debt, in the case of any Funded Debt issued with original issue discount or (ii) the principal amount or liquidation preference of such Funded Debt, in any other case.

For purposes of determining compliance with any U.S. dollar-denominated restriction on the incurrence of Funded Debt, the U.S. dollar-equivalent principal amount of Funded Debt denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Funded Debt was incurred, in the case of term Funded Debt, or first committed, in the case of revolving credit Funded Debt. Notwithstanding any other provision of the "Limitation on Incurrence of Additional Funded Debt" covenant, the maximum amount of Funded Debt that NNC, the Company or the Guarantors may incur pursuant to the "Limitation on Incurrence of Additional Funded Debt" covenant shall not be deemed to be exceeded solely as a result of fluctuations in the exchange rate of currencies. The principal amount of any Funded Debt incurred to Refinance other Funded Debt, if incurred in a different currency from the Funded Debt being Refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such Refinancing Funded Debt is denominated that is in effect on the date of such Refinancing.

"GAAP" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards

HIGHLY CONFIDENTIAL                    NNC-NNL06705393 / 79

Board or in such other statements by such other entity as may be approved by a significant segment of the accounting profession of the United States, which are in effect from time to time.

*"Holders"* means the holders of the Notes.

*"Interest Swap Obligations"* means the obligations of any Person pursuant to any arrangement with any other Person, whereby, directly or indirectly, such Person is entitled to receive from time to time periodic payments calculated by applying either a floating or a fixed rate of interest on a stated notional amount in exchange for periodic payments made by such other Person calculated by applying a fixed or a floating rate of interest on the same notional amount and shall include, without limitation, interest rate swaps, caps, floors, collars and similar agreements.

*"Investment Grade Status,"* with respect to the Notes of any Series, shall occur when the Notes of such Series have both (i) a rating of "BBB–" or higher from S&P and (ii) a rating of "Baa3" or higher from Moody's, and each such rating shall have been published by the applicable agency, in each case with no negative outlook.

*"Issue Date"* means the date of original issue of the Notes.

*"Lien"* means any mortgage, hypothec, pledge, lien, security interest, privilege, floating charge, conditional sale or other title retention agreement or other similar encumbrance securing indebtedness for borrowed money. For greater certainty, "Lien" does not include any such encumbrance covering receivables or other assets an interest in which has been transferred to a third party in a factoring, securitization or similar transaction that is accounted for as a sale under GAAP.

*"Managed Service Contract Liens"* means any Lien in favor of a customer of NNC or any of its Subsidiaries and/or a third party financing company relating to equipment owned by NNC or any of its Subsidiaries that is (i) used by such customer in the conduct of its business and (ii) managed by NNC or any of its Subsidiaries under a managed services or hosting services contract between NNC or any of its Subsidiaries, such customer and/or such third party financing company.

*"Measurement Date"* means March 31, 2006.

*"Moody's"* means Moody's Investors Service, Inc. and its successors.

*"NGSH"* means Nortel Government Solutions Holding Corporation, a Delaware corporation.

*"NNC"* means Nortel Networks Corporation, a Canadian corporation.

*"NNCC"* means Nortel Networks Capital Corporation, a Delaware corporation.

*"NNI"* means Nortel Networks Inc., a Delaware corporation.

*"Permitted Funded Debt"* means, without duplication, each of the following:

(1) Funded Debt under the Notes (other than Additional Notes) and the Exchange Notes and the Guarantees;

(2) Funded Debt incurred to finance the acquisition, improvement or construction of assets that is secured by Purchase Money Liens on the assets so acquired, improved or constructed;

(3) Funded Debt of NNC, the Company and/or any Subsidiary of NNC outstanding on the Issue Date;

68

(4) Funded Debt of NNC, the Company and/or any Subsidiary of NNC to NNC, the Company and/or any Subsidiary of NNC;

(5) Funded Debt of NNC, the Company and/or any Subsidiary of NNC owing to any joint-venture in which NNC, the Company or such Subsidiary has a minority holding;

(6) any guarantee of Funded Debt by NNC, the Company or any Subsidiary of NNC so long as the incurrence of such Funded Debt would otherwise be permitted or is otherwise not restricted under the Indenture;

(7) Refinancing Funded Debt;

(8) any Credit Enhanced Foreign Subsidiary Debt and any Funded Debt arising out of the deposit of cash or cash equivalents to secure any Credit Enhanced Foreign Subsidiary Debt;

(9) additional Funded Debt of NNC, the Company and any Subsidiary of NNC in an aggregate outstanding principal amount not to exceed, after giving effect to the relevant transaction, $250,000,000;

(10) any other Funded Debt of any Foreign Subsidiary; *provided* that the aggregate outstanding principal amount of Funded Debt issued or assumed pursuant to this clause (10) by any individual Foreign Subsidiary would not, after giving effect to the relevant transaction, exceed $5,000,000; and

(11) Funded Debt in an aggregate outstanding principal amount not to exceed 15% of Consolidated Net Tangible Assets after giving effect to any such incurrence of Funded Debt under this clause (11).

For purposes of determining compliance with the "Limitation on Incurrence of Additional Funded Debt" covenant, in the event that an item of Funded Debt meets the criteria of more than one of the categories of Permitted Funded Debt other than clause (3) above or is entitled to be incurred pursuant to the Consolidated Fixed Charge Coverage Ratio provisions of such covenant, the Company or the applicable Guarantor shall, in its sole discretion, classify such item of Funded Debt in any manner that complies with such covenant. In addition, the Company or the applicable Guarantor may, at any time, change the classification of an item of Funded Debt (or any portion thereof) to any other clause, and may classify an item in part under any one or more of the clauses listed above, or in whole or in part to the first paragraph of the "Limitation on Incurrence of Additional Funded Debt" covenant; *provided* that NNC, the Company or any other Subsidiary of NNC would be permitted to incur such item of Funded Debt (or portion thereof) pursuant to such other clause or clauses, as the case may be, or of the first paragraph of the "Limitation on Incurrence of Additional Funded Debt" covenant, as the case may be, at such time of reclassification. Accrual of interest, accretion or amortization of original issue discount or other discounts or premiums, the payment of interest on any Funded Debt in the form of additional Funded Debt with the same terms, and the payment of dividends on Disqualified Capital Stock or Designated Qualified Preferred Stock in the form of additional shares of the same class of Disqualified Capital Stock or Designated Qualified Preferred Stock and any other changes in reported Funded Debt required by GAAP and other non-cash changes in Funded Debt due to fluctuations in currency exchange rates, will not be deemed to be an incurrence of Funded Debt or an issuance of Disqualified Capital Stock or Designated Qualified Preferred Stock for purposes of the "Limitation on Incurrence of Additional Funded Debt" covenant.

HIGHLY CONFIDENTIAL  NNC-NNL06705393 / 81

*"Person"* means an individual, partnership, corporation, limited liability company, unincorporated organization, trust or joint venture, or a governmental agency or political subdivision thereof.

*"Preferred Stock"* of any Person means any Capital Stock of such Person that has preferential rights to any other Capital Stock of such Person with respect to dividends or redemptions or upon liquidation.

*"Purchase Money Lien"* means any Lien on property existing at the time of acquisition thereof by NNC or any Subsidiary of NNC; any Lien on any property acquired, constructed or improved by NNC or any Subsidiary of NNC incurred subsequent to the Issue Date, which is created or assumed contemporaneously with, or within 180 days after, such acquisition or the completion of such construction or improvement, to secure or provide for the payment of the purchase price thereof or the cost of construction or improvement thereon incurred subsequent to the Issue Date (including the cost of any underlying real property); *provided* that in the case of any such acquisition, construction or improvement, the Lien shall not apply to any property previously owned by NNC or any Subsidiary of NNC, other than, in the case of any such construction or improvement, any real property, theretofore substantially unimproved for the purposes of NNC or any Subsidiary of NNC, on which the property so constructed, or the improvement, is located and other than any machinery or equipment installed at any time so as to constitute immovable property or a fixture on the real property on which the property so constructed, or the improvement, is located.

*"Qualified Capital Stock"* means any Capital Stock that is not Disqualified Capital Stock.

*"Refinance"* means, with respect to any security or Funded Debt, to refinance, extend, renew, refund, repay, prepay, redeem, defease or retire, or to issue a security or any Funded Debt in exchange or replacement for, such security or Funded Debt in whole or in part. *"Refinanced"* and *"Refinancing"* have correlative meanings.

*"Refinancing Funded Debt"* means any Refinancing by NNC, the Company or any other Subsidiary of NNC of Funded Debt permitted by the "Limitation on Incurrence of Additional Funded Debt" covenant (other than pursuant to clauses (4), (5), (6), (8), (9), (10) or (11) of the definition of Permitted Funded Debt), in each case that does not:

 (1) result in an increase in the aggregate principal amount of Funded Debt of such Person as of the date of such proposed Refinancing (plus the amount of any premium required to be paid under the terms of the instrument governing such Funded Debt and plus the amount of reasonable expenses incurred by NNC, the Company or any other Subsidiary of NNC in connection with such Refinancing); or

 (2) create Funded Debt with either (a) a Weighted Average Life to Maturity that is less than the Weighted Average Life to Maturity of the Funded Debt being Refinanced or (b) a final maturity earlier than the final maturity of any of the Notes.

*"Registration Rights Agreement"* means the registration rights agreement dated as of the Issue Date among the Company, the Guarantors and the Initial Purchasers.

*"Restricted Subsidiary"* means (i) during a Suspension Period, NNI and NNCC and (ii) at all other times, any Subsidiary of NNC (other than the Company).

*"S&P"* means Standard & Poor's Rating Service, a division of The McGraw-Hill Companies, Inc., and its successors.

HIGHLY CONFIDENTIAL   NNC-NNL06705393 / 82

*"Securities Act"* means the Securities Act of 1933, as amended, or any successor statute or statutes thereto.

*"Subsidiary,"* with respect to any Person, means:

(1) any corporation of which the outstanding Capital Stock having at least a majority of the votes entitled to be cast in the election of directors under ordinary circumstances shall at the time be owned, directly or indirectly, by such Person; or

(2) any other Person of which at least a majority of the voting interest under ordinary circumstances is at the time, directly or indirectly, owned by such Person;

*provided* that none of (a) NGSH, (b) any direct or indirect Subsidiary of NGSH or (c) for long as it is a tax exempt organization under Section 501(c)(3) of the Internal Revenue Code, Nortel LearnIT, a Delaware corporation, shall constitute a Subsidiary of NNC or any of its Subsidiaries for purposes of the "Limitation on Incurrence of Additional Funded Debt," "Limitation on Restricted Payments" and "Negative Pledge" covenants (or the defined terms used therein other than Consolidated Net Income and Adjusted EBITDA) or any Event of Default.

*"Suspension Period"* has the meaning set forth under "—Suspension Period."

*"Synthetic Purchase Agreement"* shall mean any derivative or similar agreement pursuant to which NNC or any of its Subsidiaries is or may become obligated to make any payment the amount of which is determined by reference to the price or value at any time of any Capital Stock of NNC; *provided* that no phantom stock or similar plan providing for payments only to current or former directors, officers, employees, consultants or contractors of NNC or any Subsidiary of NNC (or to their heirs or estates or successors or assigns) shall be deemed to be a Synthetic Purchase Agreement.

*"Weighted Average Life to Maturity"* means, when applied to any Funded Debt at any date, the number of years obtained by dividing (a) the then outstanding aggregate principal amount of such Funded Debt into (b) the sum of the products obtained by multiplying (i) the amount of each then-remaining installment, sinking fund, serial maturity or other required payment of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) which will elapse between such date and the making of such payment.

71

# Book-entry settlement and clearance

## The Global Notes

The Notes will be issued in the form of several registered Notes in global form, without interest coupons, or the Global Notes, as follows:

- Notes sold to qualified institutional buyers under Rule 144A will be represented by the Rule 144A Global Note; and

- Notes sold in offshore transactions to non-U.S. persons in reliance on Regulation S will be represented by the Regulation S Global Note.

Upon issuance, each of the Global Notes will be deposited with the Trustee as custodian for The Depository Trust Company, or DTC, and registered in the name of Cede & Co., as nominee of DTC.

Ownership of beneficial interests in each Global Note will be limited to persons who have accounts with DTC, or DTC Participants, or persons who hold interests through DTC Participants. We expect that under procedures established by DTC (these procedures are subject to change):

- upon deposit of each Global Note with DTC's custodian, DTC will credit portions of the principal amount of that Global Note to the accounts of the DTC Participants designated by the initial purchasers; and

- ownership of beneficial interests in each Global Note will be shown on, and transfer of ownership of those interests will be effected only through, records maintained by DTC (with respect to interests of DTC Participants) and the records of DTC Participants (with respect to other owners of beneficial interests in that Global Note).

The "Distribution Compliance Period" will begin on the closing date and end 40 days after the closing date. During the Distribution Compliance Period, beneficial interests in the Regulation S Global Note may be transferred only to non-U.S. persons under Regulation S or qualified institutional buyers under Rule 144A.

Beneficial interests in the Global Notes may not be exchanged for Notes in physical, certificated form except in the limited circumstances described below.

Each Global Note and beneficial interests in each Global Note will be subject to restrictions on transfer as described under "Transfer restrictions."

## Exchanges among the Global Notes

Beneficial interests in one Global Note may generally be exchanged for interests in another Global Note. Depending on whether the transfer is being made during or after the Distribution Compliance Period, and to which Global Note the transfer is being made, the Trustee may require the seller to provide certain written certifications in the form provided in the Indenture.

A beneficial interest in a Global Note that is transferred to a person who takes delivery through another Global Note will, upon transfer, become subject to any transfer restrictions and other procedures applicable to beneficial interests in the other Global Note.

HIGHLY CONFIDENTIAL       NNC-NNL06705393 / 84

## Book-entry procedures for the Global Notes

All interests in the Global Notes will be subject to the operations and procedures of DTC. We provide the following summaries of those operations and procedures solely for the convenience of investors. The operations and procedures of each settlement system are controlled by that settlement system and may be changed at any time. Neither we nor the initial purchasers are responsible for those operations or procedures.

DTC has advised us that it is:

- a limited purpose trust company organized under the laws of the State of New York;

- a "banking organization" within the meaning of the New York State Banking Law;

- a member of the Federal Reserve System;

- a "clearing corporation" within the meaning of the Uniform Commercial Code; and

- a "clearing agency" registered under Section 17A of the Exchange Act.

DTC was created to hold securities for its participants and to facilitate the clearance and settlement of securities transactions between its participants through electronic book-entry changes to the accounts of its participants. DTC Participants include securities brokers and dealers, including the initial purchasers, banks and trust companies, clearing corporations and other organizations. Indirect access to DTC's system is also available to others such as banks, brokers, dealers and trust companies; these indirect participants clear through or maintain a custodial relationship with a DTC Participant, either directly or indirectly. Investors who are not DTC Participants may beneficially own securities held by or on behalf of DTC only through DTC Participants or indirect participants in DTC.

So long as DTC's nominee is the registered owner of a Global Note, that nominee will be considered the sole owner or holder of the Notes represented by that Global Note for all purposes under the Indenture. Except as provided below, owners of beneficial interests in a Global Note:

- will not be entitled to have Notes represented by the Global Note registered in their names;

- will not receive or be entitled to receive physical, certificated Notes; and

- will not be considered the owners or holders of the Notes under the Indenture for any purpose, including with respect to the giving of any direction, instruction or approval to the Trustee under the Indenture.

As a result, each investor who owns a beneficial interest in a Global Note must rely on the procedures of DTC to exercise any rights of a holder of Notes under the Indenture (and, if the investor is not a DTC Participant or an indirect participant in DTC, on the procedures of the DTC Participant through which the investor owns its interest).

Payments of principal, premium (if any) and interest with respect to the Notes represented by a Global Note will be made by the Trustee to DTC's nominee as the registered holder of the Global Note. Neither the Company nor the Trustee will have any responsibility or liability for the payment of amounts to owners of beneficial interests in a Global Note, for any aspect of the records relating to or payments made on account of those interests by DTC, or for maintaining, supervising or reviewing any records of DTC relating to those interests.

HIGHLY CONFIDENTIAL      NNC-NNL06705393 / 85

Payments by DTC Participants and indirect participants in DTC to the owners of beneficial interests in a Global Note will be governed by standing instructions and customary industry practice and will be the responsibility of those participants or indirect participants and DTC.

Transfers between participants in DTC will be effected under DTC's procedures and will be settled in same-day funds.

DTC has agreed to the above procedures to facilitate transfers of interests in the Global Notes among participants in its settlement system. However, DTC is not obligated to perform these procedures and may discontinue or change these procedures at any time. Neither the Company nor the Trustee will have any responsibility for the performance by DTC or its participants or indirect participants of their obligations under the rules and procedures governing their operations.

## Certificated Notes

Notes in physical, certificated form will be issued and delivered to each person that DTC identifies as a beneficial owner of the related Notes only if:

- DTC notifies us at any time that it is unwilling or unable to continue as depositary for the Global Notes and a successor depositary is not appointed within 90 days;

- DTC ceases to be registered as a clearing agency under the Exchange Act and a successor depositary is not appointed within 90 days;

- an event of default has occurred and is continuing and DTC requests the issuance of certificated Notes;

- the Company, at its option, notifies the Trustee that it elects to cause the issuance of certificated Notes; or

- certain other events provided in the Indenture should occur.

74

HIGHLY CONFIDENTIAL      NNC-NNL06705393 / 86

# Exchange offer and registration rights agreement

The Issuers will enter into a registration rights agreement with the initial purchasers on the closing date. In that agreement, we will agree for the benefit of the holders of the Notes that we will use our reasonable best efforts to file with the SEC and cause to become effective a registration statement relating to an offer to exchange the Notes for the Exchange Notes, evidencing the same continuing indebtedness as the Notes and with terms substantially identical to the Notes except that the Exchange Notes will not be subject to restrictions on transfer in the United States.

When the exchange offer registration statement becomes effective, the Company will offer the Exchange Notes in return for the Notes. The exchange offer will remain open for at least 20 business days after the date the Company mails notice of the exchange offer to noteholders. For each Note surrendered to us under the exchange offer, the noteholder will receive an Exchange Note of equal principal amount. Interest on each Exchange Note will accrue from the last interest payment date on which interest was paid on the Notes or, if no interest has been paid on the Notes, from the closing date of this offering.

If applicable interpretations of the staff of the SEC do not permit the Company to effect the exchange offer, we will use our reasonable best efforts to cause to become effective a shelf registration statement relating to resales of the Notes and to keep that shelf registration statement effective until the expiration of the time period referred to in Rule 144(k) under the Securities Act, or such shorter period that will terminate when all Notes covered by the shelf registration statement have been sold. The Company will, in the event of such a shelf registration, provide to each noteholder copies of a prospectus, notify each noteholder when the shelf registration statement has become effective and take certain other actions to permit resales of the Notes. A noteholder that sells Notes under the shelf registration statement generally will be required to make certain representations to us (as described in the registration rights agreement), to be named as a selling security holder in the related prospectus or prospectus supplement and to deliver a prospectus to purchasers, will be subject to certain of the civil liability provisions under the Securities Act in connection with those sales and will be bound by the provisions of the registration rights agreement that are applicable to such a noteholder (including certain indemnification obligations).

If (i) the registration statement is not filed within 15 months after the date of issuance of the Notes, (ii) the registration statement does not become effective within 18 months after the date of issuance of the Notes, (iii) the exchange offer is not completed within 45 days after the registration statement becomes effective, (iv) if required, the shelf registration statement does not become effective within 18 months plus 45 days after the date of issuance of the Notes, or (v) the shelf registration statement, if required, has become effective and then ceases to remain effective or otherwise available for more than 45 days in any 12-month period prior to the time the Notes are freely transferable under the Securities Act, subject to limited exceptions, the annual interest rate borne by the Notes will be increased by 0.25% per annum with respect to each 90-day period that passes, up to a maximum of 1.00% per annum, in each case, until the registration statement is filed, the registration statement becomes effective, the exchange offer is completed, the shelf registration statement becomes effective or again become available, as applicable) or the Notes otherwise become freely tradable under the Securities Act.

HIGHLY CONFIDENTIAL                    NNC-NNL06705393 / 87

If the Company effects the exchange offer, the Company will be entitled to close the exchange offer 20 business days after its commencement, provided that the Company has accepted all Notes validly surrendered in accordance with the terms of the exchange offer. Notes not tendered in the exchange offer shall bear interest at the rate set forth on the cover page of this offering memorandum and be subject to all the terms and conditions specified in the Indenture, including transfer restrictions.

This summary of the provisions of the registration rights agreement does not purport to be complete and is subject to, and is qualified in its entirety by reference to, all the provisions of the registration rights agreement, a copy of which is available from us upon request.

HIGHLY CONFIDENTIAL       NNC-NNL06705393 / 88

# Certain U.S. federal income tax considerations

*The following summary describes certain U.S. federal income tax considerations with respect to the purchase, ownership and disposition of Notes as of the date of this offering memorandum. The summary does not purport to be a comprehensive description of all of the tax considerations that may be relevant to any particular investor, including tax considerations that arise from rules of general application to all taxpayers or to certain classes of investors or that are generally assumed to be known by investors. The discussion set forth below deals only with Notes purchased at their original issuance and issue price held as capital assets and does not deal with special situations, such as those of dealers in securities or currencies, financial institutions, tax-exempt entities, insurance companies, persons liable for alternative minimum tax, persons holding Notes as a part of a hedging, integrated, conversion or constructive sale transaction or a straddle, traders in securities that elect to use a mark-to-market method of accounting for their securities holdings, U.S. Holders (as defined below) of Notes whose "functional currency" is not the U.S. dollar or U.S. expatriates. Furthermore, the discussion below is based upon the provisions of the Internal Revenue Code of 1986, as amended, or the Code, and regulations, rulings and judicial decisions thereunder as of the date hereof, and such authorities may be repealed, revoked or modified so as to result in U.S. federal income tax consequences different from those discussed below.*

If an entity classified as a partnership for U.S. federal income tax purposes holds Notes, the tax treatment of a partner will generally depend upon the status of the partner and the activities of the partnership. Any partner of a partnership holding Notes should consult its own tax advisors.

**Prospective investors are hereby notified that: (A) any discussion of federal income tax issues on this document is not intended or written to be relied upon, and cannot be relied upon, by prospective investors for the purpose of avoiding penalties that may be imposed on them under the Code; (B) such discussion is included in connection with the promotion or marketing of the Notes addressed herein; and (C) prospective investors should consult their own tax advisors with respect to the tax consequences to them of the purchase, ownership or disposition of the Notes in light of their own particular circumstances, including the tax consequences under state, local, foreign and other tax laws.**

## U.S. federal income tax consequences to U.S. Holders

The following discussion is a summary of certain U.S. federal income tax consequences that will apply to you if you are a beneficial owner that is, for U.S. federal income tax purposes, an individual who is a citizen or resident of the United States, a corporation created or organized in or under the laws of the United States or any political subdivision thereof, or any other person that is subject to U.S. federal income tax on a net income basis in respect of its investment in the Notes, or a U.S. Holder.

### Payments of interest

Interest on a Note will generally be taxable to a U.S. Holder as foreign source ordinary income at the time it is paid or accrued in accordance with the U.S. Holder's method of accounting for U.S. federal income tax purposes. In certain circumstances, we may be obligated to pay additional interest at an annual rate of up to a maximum of 1% in respect of the Notes. See "Exchange offer and registration rights agreement." According to Treasury Regulations, a U.S. Holder will not be required to take account of such additional interest for U.S. federal

HIGHLY CONFIDENTIAL     NNC-NNL06705393 / 89

income tax purposes prior to the time such additional interest is paid or accrued, provided that there is only a "remote" chance, as of the date the Notes are issued, that additional interest will be paid. We believe the likelihood we will be obligated to make any payments of such additional interest is remote, and therefore, we do not intend to take account of such potential payments for U.S. federal income tax purposes prior to their actual payment or accrual. Our determination that payments of additional interest are remote is binding on a U.S. Holder unless such holder discloses its contrary position in the manner required by applicable Treasury Regulations. Our determination is not binding, however, on the Internal Revenue Service, or IRS, and if the IRS were to challenge this determination, a U.S. Holder might be required to accrue income on its Notes under the rules applicable to debt instruments that provide for alternative payment schedules or the rules applicable to contingent payment debt instruments. Those rules, if applicable, could have a significant effect on both the timing and character of a U.S. Holder's taxable income in respect of the Notes, and U.S. Holders should consult with their tax advisors about the potential application of such rules. If we pay additional interest on the Notes, U.S. Holders will be required to recognize such amounts as ordinary interest income.

### Exchange Offer and Registration Rights Agreement

A Holder's exchange of Notes for Exchange Notes pursuant to the terms of the Exchange Offer and Registration Rights Agreement will not be considered an actual exchange of debt instruments for U.S. federal income tax purposes, and accordingly will give rise to no taxable gain or loss, and will have no affect on the Holder's basis in the Notes or holding period. Instead, the Exchange Notes will be treated as a continuation of the Notes offered hereby.

### Sale, exchange and retirement of Notes

Upon the sale, exchange, retirement or other taxable disposition of a Note, a U.S. Holder will recognize gain or loss equal to the difference between the amount realized upon the sale, exchange, retirement or other disposition (less an amount equal to any accrued interest not previously included in income, which will be taxable as such) and the U.S. Holder's adjusted tax basis in the Note. Gain or loss recognized by a U.S. Holder on the sale, exchange, retirement or other disposition of a Note will generally be treated as U.S. source gain or loss. Such gain or loss will be capital gain or loss and will be long-term capital gain or loss if at the time of sale, exchange, retirement or other disposition, the Note has been held for more than one year. Capital gains of individuals derived with respect to capital assets held for more than one year are eligible for reduced rates of taxation. The deductibility of capital losses is subject to limitations.

### Information reporting and backup withholding

In general, information reporting requirements will apply to certain payments of principal and interest on a Note and to the proceeds of the sale of a Note made to U.S. Holders other than certain exempt recipients (such as corporations). Backup withholding will apply to such payments if the U.S. Holder fails to provide its taxpayer identification number or, in the case of interest payments, fails either to report in full dividend and interest income or to make certain certifications. Any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against the U.S. Holder's U.S. federal income tax liability provided the required information is furnished to the IRS.

HIGHLY CONFIDENTIAL                    NNC-NNL06705393 / 90

## U.S. federal income tax consequences to Non-U.S. Holders

The following is a summary of certain U.S. federal tax consequences that will apply to you if you are a Non-U.S. Holder of the Notes. The term "Non-U.S. Holder" means a beneficial owner that is not a U.S. Person.

As used herein, the term "U.S. Person" means a citizen or resident of the United States, a corporation, partnership or other entity created or organized in or under the laws of the United States or any political subdivision thereof, an estate the income of which is subject to U.S. federal income taxation regardless of its source or a trust if (i) a U.S. court is able to exercise primary supervision over the trust's administration and (ii) one or more U.S. persons have the authority to control all of the trust's substantial decisions, and the term "United States" means the United States of America (including the States and the District of Columbia), its possessions, territories and other areas subject to its jurisdiction.

### U.S. federal income and withholding tax

Under United States federal income tax law as currently in effect, holders of Notes that are Non-U.S. Holders will not be subject to U.S. federal income taxes, including withholding taxes, on payments of interest on the Notes so long as the requirements described in the second succeeding paragraph are satisfied, unless:

- the holder is an insurance company carrying on a U.S. insurance business, within the meaning of the Code, to which the interest is attributable; or

- the holder has an office or other fixed place of business in the United States to which the interest is attributable and the interest either (a) is derived in the active conduct of a banking, financing or similar business within the United States or (b) is received by a corporation the principal business of which is trading in stock or securities for its own account, and certain other conditions exist.

The gain realized (including on redemption) on any sale or exchange of the notes by a holder that is a Non-U.S. Holder will not be subject to U.S. federal income tax, including withholding tax, unless (i) such gain is effectively connected with the conduct by the holder of a trade or business in the United States or (ii) in the case of gain realized by an individual holder, the holder is present in the United States for 183 days or more in the taxable year of the sale and either (a) such gain or income is attributable to an office or other fixed place of business maintained in the United States by such holder or (b) such holder has a tax home in the United States.

Persons holding notes who are Non-U.S. Holders may be required to comply with applicable certification procedures to establish that they are not U.S. Persons in order to avoid the application of such information reporting requirements and backup withholding tax.

HIGHLY CONFIDENTIAL      NNC-NNL06705393 / 91

# Certain Canadian federal income tax considerations

*The following summary describes certain Canadian federal income tax considerations applicable to a Non-Resident Holder (as defined below) of the Notes who acquires Notes pursuant to this offering memorandum.*

This summary is based on the current provisions of the Tax Act and the regulations thereunder, the current administrative practices and policies of the Canada Revenue Agency made publicly available prior to the date of this offering memorandum, and all specific proposals to amend the Tax Act and the regulations publicly announced by the Minister of Finance (Canada) prior to the date of this offering memorandum. This summary does not otherwise take into account or anticipate changes in the law or in administrative practices or policies of the Canada Revenue Agency, whether by judicial, governmental or legislative decision or action, nor does it take into account tax legislation or considerations of any province or territory of Canada or any jurisdiction other than Canada. This summary is of a general nature only and is not intended to be, and should not be interpreted as, legal or tax advice to any particular holder of the Notes. Prospective holders should consult their own tax advisors with respect to the income tax considerations applicable to them.

As used herein, a "Non-Resident Holder" of a Note means a beneficial owner who, at all relevant times, (i) is not, has not been and is not deemed to be a resident of Canada for purposes of the Tax Act, or any applicable income tax convention, (ii) deals at arm's length with the Company and the Guarantors and is not affiliated with the Company or the Guarantors for purposes of the Tax Act, (iii) does not use or hold and is not deemed to use or hold the Notes in connection with any business carried on in Canada, and (iv) is not an insurer for purposes of the Tax Act.

Amounts paid or credited, or deemed to be paid or credited, as, on account or in lieu of payment of, or in satisfaction of the principal amount of the Notes or premium, discount or interest on the Notes by us to a Non-Resident Holder, including in respect of an offer to purchase the Notes required to be made under the terms of the Notes, will be exempt from Canadian withholding tax.

No other taxes on income (including taxable capital gains) will be payable under the Tax Act by a Non-Resident Holder of the Notes by reason only of the acquisition, ownership or disposition of the Notes by such Non-Resident Holder.

HIGHLY CONFIDENTIAL    NNC-NNL06705393 / 92

# Plan of distribution

Subject to the terms and conditions in the purchase agreement among the Issuers and the initial purchasers, the Company has agreed to sell to the initial purchasers, and the initial purchasers have agreed to purchase from the Company, the entire principal amount of the Notes.

The obligations of the initial purchasers under the purchase agreement, including their agreement to purchase Notes from the Company, are several and not joint. The purchase agreement provides that the initial purchasers will purchase all the Notes if any of them are purchased.

The initial purchasers initially propose to offer the Notes for resale at the issue prices that appear on the cover of this offering memorandum. After the initial offering, the initial purchasers may change the offering prices and any other selling terms. The initial purchasers may offer and sell Notes through certain of their affiliates.

In the purchase agreement, the Issuers have agreed that:

- the Issuers will not offer or sell certain debt securities issued or guaranteed by the Issuers (other than the Notes) for a period of up to 30 days following the closing date without the prior consent of J.P. Morgan Securities Inc.

- the Issuers will indemnify the initial purchasers against certain liabilities, including liabilities under the Securities Act, or contribute to payments that the initial purchasers may be required to make in respect of those liabilities.

The Notes and the related guarantees have not been registered under the Securities Act or the securities laws of any other jurisdiction. Accordingly, the Notes are subject to restrictions on resale and transfer as described under "Transfer restrictions." In the purchase agreement, each initial purchaser has agreed that:

- the Notes and related guarantees may not be offered or sold within the United States or to or for the account or benefit of U.S. persons except in certain transactions exempt from, or not subject to, the registration requirements of the Securities Act.

- during the initial distribution of the Notes and related guarantees, it will offer or sell Notes and related guarantees only to qualified institutional buyers in compliance with Rule 144A and outside the United States in compliance with Regulation S.

In addition, until 40 days following the commencement of the offering, any offer or sale of Notes and related guarantees within the United States by a dealer (whether or not participating in the offering) may violate the registration requirements of the Securities Act unless the dealer makes the offer or sale in compliance with Rule 144A or another exemption from registration under the Securities Act.

The Notes and the related guarantees have not been and will not be qualified for sale under the securities laws of any province of Canada. Each of the initial purchasers has agreed that it will not offer, sell or deliver the Notes and related guarantees as part of its distribution at any time within Canada or to, or for the account of any resident of Canada, except pursuant to an available exemption from the prospectus requirements of the applicable provincial or territorial securities laws. The initial purchasers have advised the Issuers that they or their Canadian securities dealer affiliates may offer the Notes and related guarantees for sale in certain provinces of Canada to eligible investors pursuant to specified exemptions from the prospectus

HIGHLY CONFIDENTIAL    NNC-NNL06705393 / 93

requirements of the securities legislation of such provinces. Resales of the Notes are restricted as described under "Transfer restrictions."

In the purchase agreement, each initial purchaser has also agreed that:

- it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the Financial Services and Markets Act 2000 of the United Kingdom, or the FSMA) received by it in connection with the issue or sale of the Notes and related guarantees in circumstances in which Section 21(1) of the FSMA does not apply to the Company or the Guarantors.

- it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to the Notes and related guarantees in, from or otherwise involving the United Kingdom.

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a "Relevant Member State") an offer to the public of any Notes which are the subject of the offering contemplated by this offering memorandum may not be made in that Relevant Member State except that an offer to the public in that Relevant Member State of any Notes may be made at any time under the following exemptions under the Prospectus Directive, if they have been implemented in that Relevant Member State:

- to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities;

- to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts;

- by the initial purchasers to fewer than 100 natural or legal persons (other than qualified investors as defined in the Prospectus Directive) subject to obtaining the prior consent of the J.P. Morgan Securities Inc. for any such offer; or

- in any other circumstances falling within Article 3(2) of the Prospectus Directive,

provided that no such offer of Notes shall result in a requirement for the publication of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer of the Notes to the public" in relation to any Notes in any Relevant Member State means the communication in any form and by any means, presenting sufficient information on the terms of the offer and the Notes to be offered, so as to enable an investor to decide to purchase or subscribe to the Notes, as the same may be varied in that Relevant Member State by any measure implementing the Prospectus Directive in that Member State and the expression "Prospectus Directive" means Directive 2003/71/EC and includes any relevant implementing measure in the applicable Relevant Member State.

The Notes are a new issue of securities, and there is currently no established trading market for the Notes. In addition, the Notes are subject to certain restrictions on resale and transfer as described under "Transfer restrictions." The Company does not intend to apply for the Notes to be listed on any securities exchange or to arrange for the Notes to be quoted on any quotation system. Notes that are sold to qualified institutional buyers are expected to be eligible for trading in The PORTAL® Market. Each initial purchaser has advised us that such

HIGHLY CONFIDENTIAL    NNC-NNL06705393 / 94

initial purchaser intends to make a market in the Notes, but none of the initial purchasers are obligated to do so. Each initial purchaser may discontinue any market-making in the Notes at any time in its sole discretion. Accordingly, the Company cannot assure you that a liquid trading market will develop for the Notes, that you will be able to sell your Notes at a particular time or that the prices that you receive when you sell will be favorable.

You should be aware that the laws and practices of certain countries require investors to pay stamp taxes and other charges in connection with purchases of securities.

In connection with the offering of the Notes, the initial purchasers may engage in overallotment, stabilizing transactions and syndicate covering transactions. Overallotment involves sales in excess of the offering size, which creates a short position for the initial purchasers. Stabilizing transactions involve bids to purchase the Notes in the open market for the purpose of pegging, fixing or maintaining the price of the Notes. Syndicate covering transactions involve purchases of the Notes in the open market after the distribution has been completed in order to cover short positions. Stabilizing transactions and syndicate covering transactions may cause the price of the Notes to be higher than it would otherwise be in the absence of those transactions. If the initial purchasers engage in stabilizing or syndicate covering transactions, they may discontinue them at any time.

Certain of the initial purchasers and their affiliates have provided in the past to us and our affiliates and may provide from time to time in the future certain commercial banking, financial advisory, investment banking and other services for us and such affiliates in the ordinary course of business, for which they have received and may continue to receive customary fees and commissions. In particular, J.P. Morgan Securities Inc. and Citigroup Global Markets Inc. arranged the 2006 Credit Facility, and an affiliate of RBC Capital Markets is the Documentation Agent for the 2006 Credit Facility, and their affiliates and affiliates of Credit Suisse Securities (USA) LLC, and Deutsche Bank Securities Inc. are lenders under the 2006 Credit Facility. In addition, from time to time, certain of the initial purchasers and their affiliates may effect transactions for their own account or the account of customers, and hold on behalf of themselves or their customers, long or short positions in our debt or equity securities, and may do so in the future.

HIGHLY CONFIDENTIAL

NNC-NNL06705393 / 95

# Transfer restrictions

The Notes are subject to restrictions on transfer as summarized below. By purchasing Notes, you will be deemed to have made the following acknowledgements, representations and agreements with the Company, the Guarantors and the initial purchasers:

(1) You acknowledge that:

- the Notes and related guarantees have not been registered under the Securities Act or any other securities laws and are being offered for resale in transactions that do not require registration under the Securities Act or any other securities laws; and

- unless so registered, the Notes and related guarantees may not be offered, sold or otherwise transferred except under an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act or any other applicable securities laws, and in each case in compliance with the conditions for transfer set forth in paragraph (4) below.

(2) You represent that you are not an affiliate (as defined in Rule 144 under the Securities Act) of ours, that you are not acting on our behalf and that either:

- you are a qualified institutional buyer (as defined in Rule 144A under the Securities Act) and are purchasing Notes for your own account or for the account of another qualified institutional buyer, and you are aware that the initial purchasers are selling the Notes to you in reliance on Rule 144A; or

- you are not a U.S. person (as defined in Regulation S under the Securities Act) or purchasing for the account or benefit of a U.S. person, other than a distributor, and you are purchasing Notes in an offshore transaction in accordance with Regulation S.

(3) You acknowledge that neither we nor the initial purchasers nor any person representing us or the initial purchasers has made any representation to you with respect to us or the offering of the Notes and related guarantees, other than the information contained or incorporated by reference in or attached to this offering memorandum. You represent that you are relying only on this offering memorandum and the documents incorporated by reference therein or attached thereto in making your investment decision with respect to the Notes and related guarantees. You agree that you have had access to such financial and other information concerning us and the Notes and related guarantees as you have deemed necessary in connection with your decision to purchase Notes and related guarantees, including an opportunity to ask questions of and request information from us.

(4) You represent that you are purchasing Notes and related guarantees for your own account, or for one or more investor accounts for which you are acting as a fiduciary or agent, in each case not with a view to, or for offer or sale in connection with, any distribution of the Notes and related guarantees in violation of the Securities Act, subject to any requirement of law that the disposition of your property or the property of that investor account or accounts be at all times within your or their control and subject to your or their ability to resell the Notes pursuant to Rule 144A or any other available exemption from registration under the Securities Act. You agree on your own behalf and on behalf of any investor account for which you are purchasing Notes and related guarantees, and each subsequent holder of the Notes and related guarantees by its acceptance of the Notes and related guarantees will agree, that until the end of the Resale Restriction Period (as

84

HIGHLY CONFIDENTIAL

defined below), the Notes and related guarantees may be offered, sold or otherwise transferred only:

(a) to any of the Company or the Guarantors;

(b) under a registration statement that has been declared effective under the Securities Act;

(c) for so long as the Notes are eligible for resale under Rule 144A, to a person the seller reasonably believes is a qualified institutional buyer that is purchasing for its own account or for the account of another qualified institutional buyer and to whom notice is given that the transfer is being made in reliance on Rule 144A;

(d) through offers and sales that occur outside the United States within the meaning of Regulation S under the Securities Act;

(e) to an institutional accredited investor (within the meaning of Rule 501(a)(1), (2), (3) or (7) under the Securities Act) that is not a qualified institutional buyer and that is purchasing for its own account or for the account of another institutional accredited investor, in each case in a minimum principal amount of Notes of $250,000; or

(f) under any other available exemption from the registration requirements of the Securities Act;

subject in each of the above cases to any requirement of law that the disposition of the seller's property or the property of an investor account or accounts be at all times within the seller or account's control.

You also acknowledge that:

- the above restrictions on resale will apply from the closing date until the date that is two years (in the case of Rule 144A Notes) or 40 days (in the case of Regulation S Notes) after the later of the closing date and the last date that we were, or any of our affiliates was, the owner of the Notes or any predecessor of the Notes, a period we call the Resale Restriction Period, and will not apply after the applicable Resale Restriction Period ends;

- if a holder of Notes proposes to resell or transfer Notes under clause (e) above before the applicable Resale Restriction Period ends, the seller must deliver to the Issuers and the Trustee a letter from the purchaser in the form set forth in the Indenture which must provide, among other things, that the purchaser is an institutional accredited investor that is acquiring the Notes and related guarantees not for distribution in violation of the Securities Act;

- we and the Trustee reserve the right to require in connection with any offer, sale or other transfer of Notes and related guarantees under clauses (e) and (f) above the delivery of an opinion of counsel, certifications and/or other information satisfactory to the Issuers and the Trustee; and

- each Note will contain a legend substantially to the following effect:

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS

HIGHLY CONFIDENTIAL                                              NNC-NNL06705393 / 97

EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION. THE HOLDER OF THIS SECURITY, BY ITS ACCEPTANCE HEREOF, AGREES ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR ACCOUNT FOR WHICH IT HAS PURCHASED SECURITIES, TO OFFER, SELL OR OTHERWISE TRANSFER SUCH SECURITY, PRIOR TO THE DATE (THE "RESALE RESTRICTION TERMINATION DATE") THAT IS TWO YEARS (IN THE CASE OF RULE 144A NOTES) OR 40 DAYS (IN THE CASE OF REGULATION S NOTES) AFTER THE LATER OF THE ORIGINAL ISSUE DATE HEREOF AND THE LAST DATE ON WHICH THE ISSUER, ANY GUARANTOR OR ANY AFFILIATE OF THE ISSUER OR ANY GUARANTOR WAS THE OWNER OF THIS SECURITY (OR ANY PREDECESSOR OF SUCH SECURITY), ONLY (A) TO THE ISSUER OR ANY GUARANTOR, (B) PURSUANT TO A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, (C) FOR SO LONG AS THE SECURITIES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT, TO A PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (D) PURSUANT TO OFFERS AND SALES THAT OCCUR OUTSIDE THE UNITED STATES WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT, (E) TO AN INSTITUTIONAL "ACCREDITED INVESTOR" WITHIN THE MEANING OF RULE 501(a)(1), (2), (3) OR (7) UNDER THE SECURITIES ACT THAT IS AN INSTITUTIONAL ACCREDITED INVESTOR ACQUIRING THE SECURITY FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF SUCH AN INSTITUTIONAL ACCREDITED INVESTOR, IN EACH CASE IN A MINIMUM PRINCIPAL AMOUNT OF THE SECURITIES OF $250,000, FOR INVESTMENT PURPOSES AND NOT WITH A VIEW TO OR FOR OFFER OR SALE IN CONNECTION WITH ANY DISTRIBUTION IN VIOLATION OF THE SECURITIES ACT, OR (F) PURSUANT TO ANOTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUBJECT TO THE ISSUER'S, ANY GUARANTOR'S AND THE TRUSTEE'S RIGHT PRIOR TO ANY SUCH OFFER, SALE OR TRANSFER PURSUANT TO CLAUSES (D), (E) OR (F) TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATION AND/OR OTHER INFORMATION SATISFACTORY TO EACH OF THEM. THIS LEGEND WILL BE REMOVED UPON THE REQUEST OF THE HOLDER AFTER THE RESALE RESTRICTION TERMINATION DATE.

(5) You acknowledge, represent to and agree with us, the initial purchasers and the securities dealer from whom you receive confirmation of purchase of Notes or confirmation of exchange of Notes for Exchange Notes that:

- no prospectus has been or will be filed with the securities commission or similar regulatory authority of any province or territory of Canada in connection with the offering and sale of the Notes or in connection with the issuance of the Exchange Notes under the Exchange Offer;

- you will not sell Notes, directly or indirectly, in Canada for a period of four months following the closing date except pursuant to an available exemption from the prospectus requirements of the applicable provincial or territorial securities laws; and

- in addition to the legend referred to in paragraph (4) above, each Note will contain a legend substantially to the following effect:

UNLESS PERMITTED UNDER CANADIAN SECURITIES LEGISLATION, THE HOLDER OF THIS SECURITY MUST NOT TRADE THIS SECURITY IN CANADA BEFORE NOVEMBER 6, 2006.

(6) You acknowledge that the Issuers, the initial purchasers and others will rely upon the truth and accuracy of the above acknowledgments, representations and agreements. You

86

agree that if any of the acknowledgments, representations or agreements you are deemed to have made by your purchase of Notes is no longer accurate, you will promptly notify us and the initial purchasers. If you are purchasing any Notes and related guarantees as a fiduciary or agent for one or more investor accounts, you represent that you have sole investment discretion with respect to each of those accounts and that you have full power to make the above acknowledgments, representations and agreements on behalf of each account.

HIGHLY CONFIDENTIAL    NNC-NNL06705393 / 99