## NORTEL NETWORKS CORPORATION

### Notes to Consolidated Financial Statements — (Continued)

and as a result consolidation of this VIE was no longer required. As of December 31, 2005, Nortel's consolidated balance sheet included $83 of long-term debt (see note 11) and $82 of plant and equipment — net related to the remaining VIE. These amounts represented both the collateral and maximum exposure to loss as a result of Nortel's involvement with the VIE.

Effective April 1, 2005, Nortel began consolidating a VIE for which Nortel was considered the primary beneficiary under FIN 46R. The VIE is a cellular phone operator in Russia. Loans to this entity comprise the majority of the entity's subordinated financial support. No creditor of the VIE has recourse to Nortel. This entity's financial results have been consolidated using the most recent financial information available.

On June 3, 2005, Nortel acquired PEC, a VIE, for which Nortel was considered the primary beneficiary under FIN 46R. The consolidated financial results of Nortel include PEC's operating results from the date of the acquisition (see note 10).

On November 2, 2005, Nortel formed LG-Nortel, which is a VIE. Nortel is considered the primary beneficiary under FIN 46R. No creditor of the entity has recourse to Nortel. This entity's financial results have been consolidated from the date of formation (see note 10).

As of December 31, 2005, Nortel did not have any variable interests related to transfers of financial assets. Nortel has other financial interests and contractual arrangements which would meet the definition of a variable interest under FIN 46R, including investments in other companies and joint ventures, customer financing arrangements, and guarantees and indemnification arrangements. As of December 31, 2005, none of these other interests or arrangements were considered significant variable interests and, therefore, did not meet the requirements for consolidation or disclosure under FIN 46R.

As a result of the Third Restatement adjustments, effective July 1, 2003, Nortel began to consolidate the Health and Welfare Trust, a VIE, for which Nortel was considered the primary beneficiary under FIN 46R (see note 4).

HIGHLY CONFIDENTIAL    NNC-NNL06705393 / 175

## NORTEL NETWORKS CORPORATION

### Notes to Consolidated Financial Statements — (Continued)

### 16. Capital stock

*Common shares*

Nortel Networks Corporation is authorized to issue an unlimited number of common shares without nominal or par value. The outstanding number of common shares and prepaid forward purchase contracts included in shareholders' equity consisted of the following as of December 31:

| | 2005 | | 2004 | | 2003 | |
|---|---|---|---|---|---|---|
| | Number | $ | Number | $ | Number | $ |
| *(Number of common shares in thousands)* | | | | | | |
| **Common shares:** | | | | | | |
| Balance at the beginning of the year | 4,272,671 | $33,840 | 4,166,714 | $33,674 | 3,844,172 | $33,234 |
| Shares issued pursuant to: | | | | | | |
| Stock option plans | 2,624 | 14 | 7,127 | 39 | 1,550 | 38 |
| Acquisition and acquisition related[(a)] | (6) | (1) | (3) | — | (330) | (11) |
| Common share cancellations[(c)] | (968) | (3) | (3) | — | — | — |
| Prepaid forward purchase contracts[(b)] | 64,842 | 82 | 98,833 | 127 | 321,322 | 413 |
| Balance at the end of the year | 4,339,163 | $33,932 | 4,272,671 | $33,840 | 4,166,714 | $33,674 |
| *(Number of prepaid forward purchase contracts)* | | | | | | |
| **Prepaid forward purchase contracts:[(b)]** | | | | | | |
| Balance at beginning of the year | 3,840 | $ 82 | 9,693 | $ 209 | 28,722 | $ 622 |
| Prepaid forward purchase contracts settled | (3,840) | (82) | (5,853) | (127) | (19,029) | (413) |
| Balance at the end of the year | — | $ — | 3,840 | $ 82 | 9,693 | $ 209 |

---

(a) Common shares issued as part of the purchase price consideration. During the years ended December 31, 2005, 2004 and 2003, common shares were cancelled as earn out provisions were forfeited pursuant to their applicable agreements.

(b) Included in additional paid in capital in the consolidated balance sheets. During the years ended December 31, 2005, 2004 and 2003, 64,842, 98,833 and 321,322 common shares were issued as a result of the early settlement of 3,840, 5,853 and 19,029 prepaid forward purchase contracts, respectively. The net proceeds from the settled contracts of $82, $127 and $413, respectively, were transferred from additional paid-in capital to common shares.

(c) Relates to common shares of Nortel Networks Corporation surrendered by members and former members of Nortel's core executive team for cancellation in connection with the voluntary undertaking by each such individual to pay over a three year period an amount equal to the return to profitability bonus paid in 2003.

*Prepaid forward purchase contracts*

As of December 31, 2005, the remaining 3,840 forward purchase contracts outstanding were settled by the holders, resulting in an issuance of approximately 65 million common shares of Nortel Networks Corporation.

*Preferred shares*

Nortel Networks Corporation is authorized to issue an unlimited number of Class A preferred shares, which rank senior to the Class B preferred shares and the common shares upon a distribution of capital or assets, and an unlimited number of Class B preferred shares, which rank junior to the Class A preferred shares and senior to the common shares upon a distribution of capital or assets, in each case without nominal or par value. Each of the Class A and Class B preferred shares is issuable in one or more series, each series having such rights, restrictions and provisions as determined by the Board of Directors of Nortel Networks Corporation at the time of issue. None of the Class A or Class B preferred shares of Nortel Networks Corporation has been issued.

62

## NORTEL NETWORKS CORPORATION

### Notes to Consolidated Financial Statements — (Continued)

*Shareholder rights plan*

At the Nortel annual and special shareholders' meeting on April 24, 2003, shareholders approved the reconfirmation and amendment of Nortel's shareholder rights plan, which will expire at the annual meeting of shareholders to be held in 2006 unless it is reconfirmed at that time. Under the rights plan, Nortel issues one right for each Nortel Networks Corporation common share outstanding. These rights become exercisable upon the occurrence of certain events associated with an unsolicited takeover bid.

### 17. Earnings (loss) per common share

The following table details the weighted-average number of Nortel Networks Corporation common shares outstanding for the purposes of computing basic and diluted earnings (loss) per common share for the following periods:

| | 2005[a] | 2004[a] | 2003 |
|---|---|---|---|
| *(Number of common shares in millions)* | | | |
| Basic weighted-average shares outstanding: | | | |
|     Issued and outstanding | 4,297 | 4,264 | 3,952 |
|     Prepaid forward purchase contracts[b] | 41 | 73 | 378 |
| Basic weighted-average shares outstanding | 4,338 | 4,337 | 4,330 |
| Weighted-average shares dilution adjustments: | | | |
|     Dilutive stock options | — | — | 2 |
| Diluted weighted-average shares outstanding | 4,338 | 4,337 | 4,332 |
| Weighted-average shares dilution adjustments — exclusions: | | | |
|     Stock options | 303 | 295 | 286 |
|     4.25% Convertible Senior Notes[c] | 180 | 180 | 180 |

(a) As a result of the net loss from continuing operations for the years ended December 31, 2005 and 2004, all potential dilutive securities were considered anti-dilutive.

(b) The impact of the minimum number of common shares to be issued upon settlement of the prepaid forward purchase contracts on a weighted-average basis was 41 and 73 for the years ended December 31, 2005 and 2004, respectively. As of December 31, 2005 and 2004, the minimum number of Nortel Networks Corporation common shares to be issued upon settlement of the prepaid forward purchase contracts was nil and 65, respectively. Had the weighted-average number of prepaid forward purchase contracts been settled as of December 31, 2005 and 2004, no additional Nortel Networks Corporation common shares would have been issued above the minimum number of Nortel Networks Corporation common shares based on the market price of Nortel Networks Corporation common shares on the respective dates.

(c) These notes were anti-dilutive for the year ended December 31, 2003.

HIGHLY CONFIDENTIAL      NNC-NNL06705393 / 177

## NORTEL NETWORKS CORPORATION

### Notes to Consolidated Financial Statements — (Continued)

**18. Accumulated other comprehensive loss**

The components of accumulated other comprehensive loss, net of tax, were as follows:

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| **Accumulated foreign currency translation adjustment** | | | |
| Balance at the beginning of the year | $ 353 | $ 165 | $(344) |
| Change in foreign currency translation adjustment[a] | (146) | 188 | 509 |
| Balance at the end of the year | 207 | 353 | 165 |
| **Unrealized gain (loss) on investments — net** | | | |
| Balance at the beginning of the year | 30 | 94 | 24 |
| Change in unrealized gain (loss) on investments | (2) | (64) | 70 |
| Balance at the end of the year[b] | 28 | 30 | 94 |
| **Unrealized derivative gain (loss) on cash flow hedges — net** | | | |
| Balance at the beginning of the year | 18 | 12 | (3) |
| Change in unrealized derivative gain (loss) on cash flow hedges[c] | (11) | 6 | 15 |
| Balance at the end of the year | 7 | 18 | 12 |
| **Minimum pension liability[d]** | | | |
| Balance at the beginning of the year | (934) | (824) | (638) |
| Change in minimum pension liability adjustment | (210) | (110) | (186) |
| Balance at the end of the year | (1,144) | (934) | (824) |
| **Accumulated other comprehensive loss** | $ (902) | $(533) | $(553) |

(a) The change in the foreign currency translation adjustment was not adjusted for income taxes since it related to indefinite term investments in non-U.S. subsidiaries.

(b) Certain securities deemed available-for-sale by Nortel were measured at fair value. Unrealized holding gains (losses) related to these securities were excluded from net earnings (loss) and were included in accumulated other comprehensive loss until realized. Unrealized gain (loss) on investments was net of tax of nil, for each of the years ended December 31, 2005, 2004 and 2003. During the years ended December 31, 2005, 2004 and 2003, realized (gains) losses on investments of $(9), $(14) and $(6), respectively, were reclassified to other income (expense) — net in the consolidated statements of operations.

(c) During the years ended December 31, 2005, 2004 and 2003, net derivative gains of $18, $14 and $32 were reclassified to other income (expense)-net. Unrealized derivative gain (loss) on cash flow hedges is net of tax of nil, nil and nil for the years ended December 31, 2005, 2004 and 2003, respectively. Nortel estimates that $7 of net derivative gains (losses) included in accumulated other comprehensive loss will be reclassified into net earnings (loss) within the next 12 months.

(d) Represents non-cash charges to shareholders' equity related to the increase in the minimum required recognizable liability associated with Nortel's pension plans (see note 9). The change in minimum pension liability adjustment is presented net of tax of $6, $7 and $31 for the years ended December 31, 2005, 2004 and 2003, respectively.

**19. Stock-based compensation plans**

*Stock options*

Prior to 2005, Nortel granted options to purchase Nortel Networks Corporation common shares under two existing stock option plans, the 2000 Plan and the 1986 Plan. Under these two plans, options to purchase Nortel Networks Corporation common shares could be granted to employees and, under the 2000 Plan, options could be granted to directors of Nortel. The options under both plans entitle the holders to purchase one common share at a subscription price of not less than 100 percent of market value on the effective date of the grant. Subscription prices are stated and payable in U.S. dollars for U.S. options and in Canadian dollars for Canadian options. Generally, options granted prior to 2003 vest 33⅓ percent on the anniversary date of the grant for three years. Commencing in 2003, options granted generally vest 25 percent each year over a four year period on the anniversary date of the grant. The committee of the Board of Directors of Nortel that administers both plans generally has the discretion to vary the period during which the holder has the right to exercise options and, in certain circumstances, may accelerate the right of the holder to exercise options, but in no case shall the term of an option exceed ten years. Nortel meets its obligations under both plans by issuing Nortel Networks Corporation common shares.

HIGHLY CONFIDENTIAL      NNC-NNL06705393 / 178

## NORTEL NETWORKS CORPORATION

### Notes to Consolidated Financial Statements — (Continued)

During 2005, the shareholders of Nortel approved a new stock-based compensation plan, the Nortel 2005 Stock Incentive Plan ("SIP"), which permits grants of stock options, including incentive stock options, stock appreciation rights, performance stock units and RSUs. Stock options granted under the SIP may be granted only to employees of the Company. The subscription price for each share subject to an option shall not be less than 100% of the market value on the effective date of the grant. Subscription prices are stated and payable in U.S. dollars for U.S. options and in Canadian dollars for Canadian options. The options granted generally vest 25% each year over a four year period on the anniversary date of the grant. The committee of the Board of Directors of Nortel that administers the SIP generally has the discretion to vary the period during which the holder has the right to exercise options and, in certain circumstances, may accelerate the right of the holder to exercise options, but in no case shall the term of the option exceed ten years.

Options granted under the SIP, 2000 Plan and 1986 Plan may be granted with or without a SAR. A SAR entitles the holder to receive payment of an amount equivalent to the excess of the market value of a common share at the time of exercise of the SAR over the subscription price of the common share to which the option relates. Options with SARs may be granted on a cancellation basis, in which case the exercise of one causes the cancellation of the other, or on a simultaneous basis, in which case the exercise of one causes the exercise of the other. As of December 31, 2005 and 2004, there were no SARs outstanding.

As of December 31, 2005, the maximum number of common shares authorized by the shareholders and reserved for issuance by the Board of Directors of Nortel under each of the 1986 Plan, 2000 Plan and SIP is as follows:

| | Maximum (Number of Common Shares in Thousands) |
| --- | --- |
| **1986 Plan** | |
| Issuable to employees[a] | 469,718[b] |
| **2000 Plan** | |
| Issuable to non-employee directors | 500[b] |
| Issuable to employees | 94,000[b] |
| **SIP** | |
| Issuable to employees | 122,000[b] |

(a) As of December 31, 2005, the maximum number of Nortel Networks Corporation common shares with respect to which options may be granted in any given year under the 1986 Plan is three percent of Nortel Networks Corporation common shares issued and outstanding at the commencement of the year, subject to certain adjustments.

(b) Common shares remaining available for grant after December 31, 2005 under the 1986 Plan and the 2000 Plan (and common shares that become available upon expiration or termination of options granted under such plans) will roll-over to the SIP effective January 1, 2006.

In January 1995, a key contributor stock option program (the "Key Contributor Program") was established that applies to both the 1986 Plan and the 2000 Plan. Under that program, a participant was granted concurrently an equal number of initial options and replacement options. The initial options and the replacement options expire ten years from the date of grant. The initial options have an exercise price equal to the market value of common shares of Nortel Networks Corporation on the date of grant and the replacement options have an exercise price equal to the market value of common shares of Nortel Networks Corporation on the date all of the initial options are fully exercised, provided that in no event will the exercise price be less than the exercise price of the initial options. Replacement options are generally exercisable commencing 36 months after the date all of the initial options are fully exercised, provided that the participant beneficially owns a number of common shares of Nortel Networks Corporation at least equal to the number of common shares subject to the initial options less any common shares sold to pay for options costs, applicable taxes and brokerage costs associated with the exercise of the initial options. No Key Contributor Program options were granted for the years ended December 31, 2005 and 2004, respectively, under either stock option plan.

During the year ended December 31, 2005, approximately 1,633,651 Nortel Networks Corporation common shares were issued pursuant to the exercise of stock options granted under the 1986 Plan and 899,415 Nortel Networks Corporation common shares were issued pursuant to the exercise of stock options granted under the 2000 Plan. There were no stock options granted or exercised under the SIP.

HIGHLY CONFIDENTIAL      NNC-NNL06705393 / 179

## NORTEL NETWORKS CORPORATION

### Notes to Consolidated Financial Statements — (Continued)

Nortel also assumed stock option plans in connection with the acquisition of various companies. Common shares of Nortel Networks Corporation are issuable upon the exercise of options under the assumed stock option plans, although no further options may be granted under the assumed plans. The vesting periods for options granted under these assumed stock option plans may differ from the SIP, 2000 Plan and 1986 Plan, but are not considered to be significant to Nortel's overall use of stock-based compensation.

The following is a summary of the total number of outstanding stock options and the maximum number of stock options available for grant:

| | Outstanding Options (Thousands) | Weighted-Average Exercise Price | Available For Grant (Thousands) |
|---|---|---|---|
| Balance at December 31, 2002 | 256,873 | $15.52 | 128,166 |
| Granted options under all stock option plans | 74,924 | $ 2.40 | (74,924) |
| Options exercised | (1,550) | $ 1.99 | — |
| Options forfeited | (11,734) | $11.66 | 11,472 |
| Options expired | (30,115) | $20.37 | 23,283 |
| Balance at December 31, 2003 | 288,398 | $12.27 | 87,997 |
| Granted options under all stock option plans | 37,856 | $ 7.74 | (37,856) |
| Options exercised | (7,127) | $ 4.24 | — |
| Options forfeited | (7,908) | $ 5.22 | 7,865 |
| Options expired | (16,666) | $26.64 | 15,056 |
| Balance at December 31, 2004 | 294,553 | $11.77 | 73,062 |
| Granted options under all stock option plans | 64,219 | $ 2.92 | (64,219) |
| Options exercised | (2,624) | $ 2.27 | — |
| Options forfeited | (7,831) | $ 5.92 | 7,789 |
| Options expired | (45,399) | $17.16 | 37,978 |
| Balance at December 31, 2005 | 302,918 | $ 9.43 | 54,610 |

The following table summarizes information about stock options outstanding and exercisable as of December 31, 2005:

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| Range of Exercise Prices | Number Outstanding (Thousands) | Weighted-Average Remaining Contractual Life (In Years) | Weighted-Average Exercise Price | Number Exercisable (Thousands) | Weighted-Average Exercise Price |
| $0.0084 - $2.3900 | 47,121 | 6.9 | $ 2.33 | 24,121 | $ 2.30 |
| $2.3901 - $3.5852 | 79,364 | 8.8 | $ 2.97 | 11,444 | $ 3.09 |
| $3.5853 - $5.3779 | 7,095 | 5.1 | $ 5.04 | 7,082 | $ 5.04 |
| $5.3780 - $8.0670 | 77,478[a] | 5.6 | $ 6.92 | 60,037 | $ 6.71 |
| $8.0671 - $12.1006 | 41,978[a] | 4.6 | $ 9.36 | 33,943 | $ 9.51 |
| $12.1007 - $18.1510 | 12,581 | 2.1 | $14.64 | 11,981 | $14.63 |
| $18.1511 - $27.2267 | 16,620 | 3.5 | $22.70 | 16,337 | $22.74 |
| $27.2268 - $40.8402 | 9,771 | 3.6 | $32.98 | 9,761 | $32.98 |
| $40.8403 - $61.2605 | 7,237 | 3.3 | $53.64 | 7,115 | $53.74 |
| $61.2606 - $102.2916 | 3,673 | 3.8 | $74.34 | 3,649 | $74.33 |
| | 302,918 | 6.1 | $ 9.43 | 185,470[b] | $12.80 |

(a) Included approximately 32,603 stock options granted under the Exchange Program.
(b) Total number of exercisable options for the years ended December 31, 2005 and 2003 were 185,470 and 168,923, respectively. As of December 31, 2004, the exercise of otherwise exercisable stock options was suspended, until such time, at the earliest, that Nortel and NNL are in compliance with U.S. and Canadian regulatory securities filing requirements.

HIGHLY CONFIDENTIAL      NNC-NNL06705393 / 180

## NORTEL NETWORKS CORPORATION

### Notes to Consolidated Financial Statements — (Continued)

*Restricted stock unit plans*

The Nortel Networks Limited Restricted Stock Unit Plan is a long-term incentive plan that generally provides executive officers and certain senior management with the opportunity to receive RSUs over a specified period of time if assigned performance thresholds are achieved and the compensation and human resources committee (formerly the joint leadership resources committee) of the Boards of Directors of Nortel and NNL (the "Committee") determines, in its discretion, to issue and settle all or a portion of the allocated RSUs. Each RSU issued entitles the holder, upon exercise, to receive one authorized, but until selling of the RSUs unissued, common share of Nortel Networks Corporation, purchased either on the open market, or from shares held in third party trusts. As a result of changes to the NYSE listing standards effective June 30, 2004, no further RSUs may be allocated without shareholder approval.

The RSUs allocated in 2003 had a three year performance period ended December 31, 2005, which included four performance thresholds. The performance criteria for each of the four performance thresholds were distinct "Return on Sales Before Tax" percentage targets, calculated on a rolling four-quarter basis. In order to receive a payout, the recipient must have continued employment until the date the allocated RSUs were issued and settled. Once the Committee determined that a threshold had been achieved, the Committee had the discretion to determine whether additional factors should be considered in determining the number of allocated RSUs to be issued and settled. Such additional factors included the performance of competitors and other relevant business, financial, competitive, political and other criteria deemed appropriate by the Committee. Nortel issued and settled approximately 13 million units of the RSUs allocated in 2003.

On January 10, 2005, the Committee exercised the discretion reserved to it with respect to the RSUs allocated in 2003 and determined, and the Boards of Directors of Nortel and NNL confirmed and approved, that no additional RSUs allocated in 2003 would be issued (including in connection with the achievement of the third and fourth "Return on Sales Before Tax" performance targets or otherwise) and that all unissued RSUs relating to 2003 were immediately terminated and cancelled in their entirety.

The SIP, an additional equity incentive plan, was approved by shareholders of Nortel at the June 29, 2005 combined 2004 and 2005 annual meeting of shareholders. Under the SIP, time based or performance based RSUs may be amended.

The number of RSUs (in millions) allocated as of December 31, 2005, 2004 and 2003 were approximately 7, 11 and 20, respectively. All of the RSUs awarded to executive officers in 2005 are time based awards granted pursuant to the SIP. Generally, each award vests in equal installments on the first three anniversary dates of the date of the award. The RSUs awarded in 2005 under the SIP will be settled in shares at the time of vesting.

*Directors' deferred share compensation plans*

Under the Nortel Networks Corporation Directors' Deferred Share Compensation Plan and the Nortel Networks Limited Directors' Deferred Share Compensation Plan, non-employee directors can elect to receive all or a portion of their compensation for services rendered as a director of Nortel or NNL, any committees thereof, and as board or committee chairperson, in cash, share units or a combination of cash and share units. Generally, the share units are settled four trading days following the release of Nortel's financial results after the director ceases to be a member of the applicable board, and each share unit entitles the holder to receive one common share of Nortel Networks Corporation purchased on the open market. As of December 31, 2005 and 2004, the number of share units outstanding (in millions) was 1 and 2, respectively.

*Employee stock purchase plans*

Nortel has ESPPs to facilitate the acquisition of common shares of Nortel Networks Corporation by eligible employees. On June 29, 2005, the shareholders of Nortel approved three new stock purchase plans, the Nortel Global Stock Purchase Plan, the Nortel U.S. Stock Purchase Plan and the Nortel Stock Purchase Plan for Members of the Savings and Retirement Program which have been launched in jurisdictions throughout the world.

The ESPPs are designed to have four offering periods each year, with each offering period beginning on the first day of each calendar quarter. Eligible employees were permitted to have up to 10 percent of their eligible compensation deducted from their pay during each offering period to contribute towards the purchase of Nortel Networks Corporation

HIGHLY CONFIDENTIAL    NNC-NNL06705393 / 181

## NORTEL NETWORKS CORPORATION

### Notes to Consolidated Financial Statements — (Continued)

common shares. The Nortel Networks Corporation common shares were purchased by an independent broker through the facilities of the TSX and/or NYSE, and held by a custodian on behalf of the plan participants.

*December 31, 2005 Purchase*

For eligible employees, Nortel Networks Corporation common shares were purchased on the TSX at fair market value but employees effectively paid only 85% of that price as a result of Nortel contributing the remaining 15% of the price.

The purchases under the ESPPs for the years ended December 31 are shown below:

| (number of shares in thousands) | 2005 | 2004 | 2003 |
|---|---|---|---|
| Nortel Networks Corporation common shares purchased[a] | 776 | — | 11,532 |
| Weighted-average price of shares purchased | $3.08 | $— | $ 3.10 |

(a) Compensation expense was recognized for Nortel's portion of the contributions. Nortel contributed an amount equal to the difference between the market price and the purchase price.

The delay in filing the 2003, 2004 and 2005 Annual Reports (see note 23) resulted in suspension of the purchase of Nortel Networks Corporation common shares under the stock purchase plans. In lieu of the employer portion of stock purchase plan contributions, Nortel made equivalent pre-tax payments to eligible employees during the year ended December 31, 2005 totaling $5, which was recorded as compensation expense.

*Stock-based compensation*

Effective January 1, 2003, Nortel elected to adopt the fair value based method for measurement and recognition of all stock-based compensation prospectively for all awards granted, modified or settled on or after January 1, 2003 in accordance with SFAS 148. Prior to January 1, 2003, Nortel, as permitted under SFAS 123, applied the intrinsic value method under APB 25, and related interpretations in accounting for its employee stock-based compensation plans.

The fair value at grant date of stock options is estimated using the Black-Scholes-Merton option-pricing model. Compensation expense is recognized on a straight-line basis over the stock option vesting period. Adjustments to compensation expense due to not meeting employment vesting requirements are accounted for in the period when they occur.

Stock-based compensation recorded during the years ended December 31 was as follows:

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| **Stock-based compensation:** | | | |
| Stock option expense | $87 | $ 77 | $26 |
| Employer portion of ESPPs[a] | — | — | 6 |
| RSU expense[a] | 1 | 41 | 19 |
| DSU expense[a] | 1 | (1) | 4 |
| Total stock-based compensation reported — net of tax | $89 | $117 | $55 |

(a) Compensation related to employer portion of ESPPs, RSUs and DSUs was net of tax of nil in each period.

During the year ended December 31, 2005, approximately 64 million stock options were granted. During the year ended December 31, 2004, approximately 38 million stock options were granted.

HIGHLY CONFIDENTIAL      NNC-NNL06705393 / 182

## NORTEL NETWORKS CORPORATION

### Notes to Consolidated Financial Statements — (Continued)

The following weighted-average assumptions were used in computing the fair value of stock options for purposes of expense recognition and pro forma disclosures, as applicable, for the following periods:

|  | 2005 | 2004 | 2003 |
|---|---|---|---|
| **Black-Scholes weighted-average assumptions** | | | |
| Expected dividend yield | 0.00% | 0.00% | 0.00% |
| Expected volatility | 86.26% | 94.47% | 92.49% |
| Risk-free interest rate | 4.11% | 2.96% | 2.81% |
| Expected option life in years | 4 | 4 | 4 |
| **Weighted-average stock option fair value per option granted** | $ 1.88 | $ 5.21 | $ 1.57 |

## 20. Discontinued operations

In 2001, Nortel's Board of Directors approved a plan to discontinue Nortel's access solutions operations consisting of all of Nortel's narrowband and broadband access solutions, including copper, cable and fixed wireless solutions, as well as Nortel's then consolidated membership interest in Arris Group and equity investment in Elastic Networks, Inc. ("Elastic Networks"). Also affected by the decision were Nortel's prior acquisitions of Sonoma Systems ("Sonoma"), Promatory Communications, Inc. ("Promatory"), Aptis Communications, Inc. ("Aptis") and Broadband Networks Inc.

Certain disposal activities were delayed beyond the original planned timeframe of one year due to the prolonged deterioration in industry and market conditions during 2003. Accordingly, during the year ended December 31, 2003, Nortel continued to wind down its access solutions operations and, as of December 31, 2003, Nortel had substantially completed the wind down of these operations.

The following consolidated financial results for discontinued operations are presented as of December 31 for the consolidated statements of operations and consolidated statements of cash flows:

*Consolidated statements of operations:*

|  | 2005 | 2004 | 2003 |
|---|---|---|---|
| Revenues | $— | $ 4 | $ 14 |
| Net gain (loss) on disposal of operations — net of tax[a] | $ 1 | $49 | $183 |
| Net earnings (loss) from discontinued operations — net of tax | $ 1 | $49 | $183 |

(a) Net gain (loss) on disposal of operations was net of an applicable income tax expense (benefit) of nil, nil and $1 for the years ended December 31, 2005, 2004 and 2003, respectively.

*Consolidated statements of cash flows:*

|  | 2005 | 2004 | 2003 |
|---|---|---|---|
| **Cash flows from (used in) discontinued operations** | | | |
| Operating activities | $33 | $22 | $149 |
| Investing activities | — | — | 241 |
| Net cash from discontinued operations | $33 | $22 | $390 |

*2005 Activity*

Nortel recorded net earnings from discontinued operations — net of tax, of $1 in 2005.

*2004 Activity*

Nortel recorded net earnings from discontinued operations — net of tax, of $49 in 2004. The significant items included in net earnings are summarized below.

69

## NORTEL NETWORKS CORPORATION

### Notes to Consolidated Financial Statements — (Continued)

During the year ended December 31, 2004, Nortel reassessed its remaining provisions for discontinued operations and recorded a net gain of $17, consisting of changes in estimates of $13 for liabilities and $4 for both short-term and long-term receivables.

On December 23, 2004, a customer financing arrangement was restructured. The notes receivable that were restructured had a net carrying amount of $1, net of a provision of $63. The arrangement increased the net carrying amount of the receivable to $33 and resulted in a gain of $32 due to the revaluation of the receivable. On January 25, 2005, Nortel sold this receivable for cash proceeds (see note 15).

*2003 Activity*

Nortel recorded net earnings from discontinued operations — net of tax, of $183 in 2003. The significant items included in net earnings are summarized below.

During the year ended December 31, 2003, Nortel reassessed its remaining provisions for discontinued operations and recorded a net gain of $68, consisting of changes in estimates of $149 for liabilities, offset by additional provisions for both short-term and long-term receivables of $81.

On December 17, 2003, Nortel entered into an agreement to settle an outstanding $21 note receivable from one of its customers, which was previously provisioned, for total cash proceeds of approximately $17. A gain of $17 was recorded as a result of this transaction.

On December 23, 2003, Nortel sold certain plant and equipment, inventory, patent and other intellectual property related to its fixed wireless access operations, to Airspan Networks Inc. ("Airspan"). Nortel received cash proceeds of $13. The majority of the assets transferred to Airspan had previously been written off by Nortel as part of its discontinued operations. As a result of this transaction, Nortel recorded a gain of $14 during the year ended December 31, 2003.

On March 24, 2003, Nortel sold 8 million common shares of Arris Group back to Arris Group for cash consideration of $28 pursuant to a March 11, 2003 agreement, which resulted in a gain of $12. Following this transaction, Nortel's interest in Arris Group was reduced to 18.8 percent, and it ceased equity accounting for the investment. As a result, Nortel classified its remaining ownership interest in Arris Group as an available-for-sale investment within continuing operations.

On March 18, 2003, Nortel assigned its subordinated redeemable preferred interest ("membership interest") in Arris Interactive, L.L.C. ("Arris Interactive") to ANTEC Corporation, an Arris Group company, for cash consideration of $88. As a result of this transaction, Nortel recorded a loss of $2. Also in connection with the March 2003 transactions, Nortel received $11 upon settlement of a sales representation agreement with Arris Group and recorded a gain of $11.

On March 20, 2003, Nortel entered into an agreement with a customer to restructure approximately $465 of trade and customer financing receivables owed to Nortel, the majority of which was previously provisioned. As a result of the restructuring agreement, Nortel received consideration including cash of $125, notes receivable and an ownership interest which were fully provided for and the mutual release of all other claims between the parties. A gain of $66 was recorded as a result of the transaction. In addition to the restructuring agreement, a five year equipment and services supply agreement was entered into requiring customer payment terms of either cash in advance or guarantee by letters of credit in favor of Nortel.

## 21. Related party transactions

In the ordinary course of business, Nortel engages in transactions with certain of its equity-owned investees that are under or are subject to Nortel's significant influence and with joint ventures of Nortel. These transactions are sales and purchases of goods and services under usual trade terms and are measured at their exchange amounts.

HIGHLY CONFIDENTIAL                    NNC-NNL06705393 / 184

## NORTEL NETWORKS CORPORATION

### Notes to Consolidated Financial Statements — (Continued)

Transactions with related parties for the years ended December 31 are summarized as follows:

|  | 2005 | 2004 | 2003 |
|---|---|---|---|
| Revenues | $ 4 | $ 1 | $ 1 |
| Purchases: |  |  |  |
| Bookham | $20 | $73 | $84 |
| LG Electronics Inc.[a] | 41 | — | — |
| Sasken Communications Technology Ltd.[b] | 18 | — | — |
| Other | 10 | — | — |
| Total | $89 | $73 | $84 |

(a) LG is a minority interest holder of LG-Nortel. Nortel's purchases relate primarily to certain inventory related items. As of December 31, 2005, accounts payable to LG were $18.

(b) Nortel currently owns a minority interest in Sasken Communications Technology Ltd ("Sasken"). Nortel's purchases from Sasken relate primarily to software and other software development related purchases. As of December 31, 2005, accounts payable to Sasken were $2.

As at December 31, 2005 and 2004, accounts receivable from related parties were $8 and nil, respectively. As at December 31, 2005 and 2004, accounts payable to related parties were $26 and $5, respectively.

Nortel purchases certain inventory for its Enterprise Solutions and Packet Networks business from Bookham, a related party due to Nortel's equity interest in Bookham. During the years ended December 31, 2005, 2004 and 2003, Nortel's aggregate purchases from Bookham were $20, $73 and $84, respectively. As of December 31, 2005 and December 31, 2004, accounts payable to Bookham were nil and $5, respectively. Nortel also has certain notes receivable due from Bookham with a carrying amount of $20 and $20 as of December 31, 2005 and 2004, respectively.

Nortel currently relies on Bookham as its sole supplier of key components to Nortel's optical networks solutions in its Enterprise Solutions and Packet Networks segment. On December 2, 2004, Nortel and Bookham entered into a restructuring agreement which, among other changes, extended the maturity date of a senior secured note (the "Series B Note") by one year from November 8, 2005 to November 8, 2006, and eliminated the conversion feature of a senior unsecured note (the "Series A Note"). Bookham also agreed to secure the Series A Note, provide additional collateral for the Series A Note and the Series B Note, and provide Nortel with other debt protection covenants. See note 10 for additional information on the Bookham transactions.

In 2001, Nortel completed the sale of substantially all of the assets in the Cogent Defence Systems ("CDS") business to EADS Telecom. At that time, Nortel held a 41 percent ownership interest in EADS Telecom and EADS held the remaining 59 percent. Under the terms of the agreement, Nortel sold substantially all of its assets in the CDS business including: fixed assets; accounts receivable; inventory; intellectual property; and licenses (but excluding cash on hand as at the closing date) for consideration of approximately $143, comprised of a loan note due in 2002 and a call option to acquire an additional approximate 7 percent ownership interest in NNF beginning in 2004. Nortel recorded a gain on the sale of approximately $37 which was included in (gain) loss on sale of businesses and assets, and a deferred gain of $26, which is amortized into (gain) loss on sale of businesses and assets over the life of the assets sold to EADS Telecom. In 2002, in connection with negotiations with EADS, the loan note and call option were cancelled and a new loan note was issued to satisfy the remaining consideration owing in 2003. As a result, Nortel recorded an additional gain on the sale of approximately $30, which was included in (gain) loss on sale of businesses and assets and a further deferred gain of $21, which is amortized into (gain) loss on sale of businesses and assets over the remaining life of the assets sold to EADS Telecom in 2001. During the years ended December 31, 2003 and 2002, $13 and $11, respectively, of the deferred gain was amortized into (gain) loss on sale of businesses and assets. On September 18, 2003, as a result of the sale of Nortel's 41 percent interest in EADS Telecom (see note 10), the remaining unamortized deferred gain of $23 related to the sale of substantially all of the assets in the CDS business during the year ended December 31, 2001, was recognized and included in (gain) loss on sale of businesses and assets.

HIGHLY CONFIDENTIAL   NNC-NNL06705393 / 185

# NORTEL NETWORKS CORPORATION

## Notes to Consolidated Financial Statements — (Continued)

### 22. Contingencies

Subsequent to the February 15, 2001 announcement in which Nortel provided revised guidance for financial performance for the 2001 fiscal year and the first quarter of 2001, Nortel and certain of its then current officers and directors were named as defendants in more than twenty-five purported class action lawsuits. These lawsuits in the U.S. District Courts for the Eastern District of New York, the Southern District of New York and the District of New Jersey and in courts in the provinces of Ontario, Québec and British Columbia in Canada, on behalf of shareholders who acquired Nortel Networks Corporation securities as early as October 24, 2000 and as late as February 15, 2001, allege, among other things, violations of U.S. federal and Canadian provincial securities laws. These matters also have been the subject of review by Canadian and U.S. securities regulatory authorities. On May 11, 2001, the defendants filed motions to dismiss and/or stay in connection with the three proceedings in Québec primarily based on the factual allegations lacking substantial connection to Québec and the inclusion of shareholders resident in Québec in the class claimed in the Ontario lawsuit. The plaintiffs in two of these proceedings in Québec obtained court approval for discontinuances of their proceedings on January 17, 2002. The motion to dismiss and/or stay the third proceeding (the "Québec I Action") was heard on November 6, 2001 and the court deferred any determination on the motion to the judge who will hear the application for authorization to commence a class proceeding. On December 6, 2001, the defendants filed a motion seeking leave to appeal that decision. The motion for leave to appeal was dismissed on March 11, 2002. On October 16, 2001, an order in the U.S. District Court for the Southern District of New York was filed consolidating twenty-five of the related U.S. class action lawsuits into a single case, appointing class plaintiffs and counsel for such plaintiffs (the "Nortel I Class Action"). The plaintiffs served a consolidated amended complaint on January 18, 2002. On December 17, 2001, the defendants in the British Columbia action (the "British Columbia Action") served notice of a motion requesting the court to decline jurisdiction and to stay all proceedings on the grounds that British Columbia is an inappropriate forum. The motion has been adjourned at the plaintiffs' request to a future date to be set by the parties.

On April 1, 2002, Nortel filed a motion to dismiss the Nortel I Class Action on the ground that it failed to state a cause of action under U.S. federal securities laws. On January 3, 2003, the District Court denied the motion to dismiss the consolidated amended complaint for the Nortel I Class Action. The plaintiffs served a motion for class certification on March 21, 2003. On May 30, 2003, the defendants served an opposition to the motion for class certification. Plaintiffs' reply was served on August 1, 2003. The District Court held oral arguments on September 3, 2003 and issued an order granting class certification on September 5, 2003. On September 23, 2003, the defendants filed a motion in the U.S. Court of Appeals for the Second Circuit for permission to appeal the class certification decision. The plaintiffs' opposition to the motion was filed on October 2, 2003. On November 24, 2003, the U.S. Court of Appeals for the Second Circuit denied the motion. On March 10, 2004, the District Court approved the form of notice to the class, which was published and mailed.

On July 17, 2002, a purported class action lawsuit (the "Ontario Claim") was filed in the Ontario Superior Court of Justice, Commercial List, naming Nortel, certain of its current and former officers and directors and its auditors as defendants. The factual allegations in the Ontario Claim are substantially similar to the allegations in the Nortel I Class Action. The Ontario Claim is on behalf of all Canadian residents who purchased Nortel Networks Corporation securities (including options on Nortel Networks Corporation securities) between October 24, 2000 and February 15, 2001. The plaintiffs claim damages of Canadian $5,000, plus punitive damages in the amount of Canadian $1,000, prejudgment and postjudgment interest and costs of the action. On September 23, 2003, the Court issued an order allowing the plaintiffs to proceed to amend the Ontario Claim and requiring that the plaintiffs serve class certification materials by December 15, 2003. On September 24, 2003, the plaintiffs filed a notice of discontinuance of the original action filed in Ontario. On December 12, 2003, plaintiffs' counsel requested an extension of time to January 21, 2004 to deliver class certification materials. On January 21, 2004, plaintiffs' counsel advised the Court that the two representative plaintiffs in the action no longer wished to proceed, but counsel was prepared to deliver draft certification materials pending the replacement of the representative plaintiffs. On February 19, 2004, the plaintiffs' counsel advised the Court of a potential new representative plaintiff. On February 26, 2004, the defendants requested the Court to direct the plaintiffs' counsel to bring a motion to permit the withdrawal of the current representative plaintiffs and to substitute the proposed representative plaintiff. On June 8, 2004, the Court signed an order allowing a Second Fresh as Amended Statement of Claim that substituted one new representative plaintiff, but did not change the substance of the prior claim.

HIGHLY CONFIDENTIAL    NNC-NNL06705393 / 186

## NORTEL NETWORKS CORPORATION

### Notes to Consolidated Financial Statements — (Continued)

Subsequent to the March 10, 2004 announcement in which Nortel indicated it was likely that it would need to revise its previously announced unaudited results for the year ended December 31, 2003, and the results reported in certain of its quarterly reports for 2003, and to restate its previously filed financial results for one or more earlier periods, Nortel and certain of its then current and former officers and directors were named as defendants in 27 purported class action lawsuits. These lawsuits in the U.S. District Court for the Southern District of New York on behalf of shareholders who acquired Nortel Networks Corporation securities as early as February 16, 2001 and as late as May 15, 2004, allege, among other things, violations of U.S. federal securities laws. These matters are also the subject of investigations by Canadian and U.S. securities regulatory and criminal investigative authorities. On June 30, 2004, the Court signed Orders consolidating the 27 class actions (the "Nortel II Class Action") and appointing lead plaintiffs and lead counsel. The plaintiffs filed a consolidated class action complaint on September 10, 2004, alleging a class period of April 24, 2003 through and including April 27, 2004. On November 5, 2004, Nortel and the Audit Committee Defendants filed a motion to dismiss the consolidated class action complaint. On January 18, 2005, the lead plaintiffs, Nortel and the Audit Committee Defendants reached an agreement in which Nortel would withdraw its motion to dismiss and plaintiffs would dismiss Count II of the complaint, which asserts a claim against the Audit Committee Defendants. On May 13, 2005, the plaintiffs filed a motion for class certification. On September 16, 2005, lead plaintiffs filed an amended consolidated class action complaint that rejoined the previously dismissed Audit Committee Defendants as parties to the action. On March 16, 2006, the plaintiffs withdrew their motion for class certification.

On July 28, 2004, Nortel and NNL, and certain of their current and former officers and directors, were named as defendants in a purported class proceeding in the Ontario Superior Court of Justice on behalf of shareholders who acquired Nortel Networks Corporation securities as early as November 12, 2002 and as late as July 28, 2004 (the "Ontario I Action"). This lawsuit alleges, among other things, breaches of trust and fiduciary duty, oppressive conduct and misappropriation of corporate assets and trust property in respect of the payment of cash bonuses to executives, officers and employees in 2003 and 2004 under the Nortel Return to Profitability bonus program and seeks damages of Canadian $250 and an order under the Canada Business Corporations Act directing that an investigation be made respecting these bonus payments.

On February 16, 2005, a motion for authorization to institute a class action on behalf of residents of Québec, who purchased Nortel securities between January 29, 2004 and March 15, 2004, was filed in the Québec Superior Court naming Nortel as a defendant (the "Québec II Action"). The motion alleges that Nortel made misrepresentations about 2003 financial results.

On March 9, 2005, Nortel and certain of its current and former officers and directors and its auditors were named as defendants in a purported class action proceeding filed in the Ontario Superior Court of Justice, Commercial List, on behalf of all Canadian residents who purchased Nortel Networks Corporation securities from April 24, 2003 to April 27, 2004 (the "Ontario II Action"). This lawsuit alleges, among other things, negligence, misrepresentations, oppressive conduct, insider trading and violations of Canadian corporation and competition laws in connection with Nortel's 2003 financial results and seeks damages of Canadian $3,000, plus punitive damages in the amount of Canadian $1,000, prejudgment and postjudgment interest and costs of the action.

On September 30, 2005, Nortel announced that a mediator had been jointly appointed by the two U.S. District Court Judges presiding over the Nortel I Class Action and the Nortel II Class Action to oversee settlement negotiations between Nortel and the lead plaintiffs in these two actions. The appointment of the mediator was pursuant to a request by Nortel and the lead plaintiffs for the Courts' assistance to facilitate the possibility of achieving a global settlement regarding these actions. The settlement discussions before the mediator are confidential and non-binding on the parties without prejudice to their respective positions in the litigation. The mediator, United States District Court Judge the Honorable Robert W. Sweet, is not presiding over either of these actions. On February 8, 2006, Nortel announced first that, as a result of this mediation process, Nortel and the lead plaintiffs in the Nortel I Class Action and the Nortel II Class Action have reached an agreement in principle to settle these lawsuits (the "Proposed Class Action Settlement").

The Proposed Class Action Settlement would be part of, and is conditioned on, Nortel reaching a global settlement encompassing all pending shareholder class actions and proposed shareholder class actions commenced against Nortel and certain other defendants following Nortel's announcement of revised financial guidance during 2001, and Nortel's revision of its 2003 financial results and restatement of other prior periods, including, without limitation, the Nortel I Class Action, the Nortel II Class Action, the Ontario Claim, the Québec I Action, the British Columbia Action, the

HIGHLY CONFIDENTIAL

## NORTEL NETWORKS CORPORATION

### Notes to Consolidated Financial Statements — (Continued)

Ontario I Action, the Québec II Action and the Ontario II Action. The Proposed Class Action Settlement is also conditioned on the receipt of all required court, securities regulatory and stock exchange approvals. The Proposed Class Action Settlement would contain no admission of wrongdoing by Nortel or any of the other defendants.

The Proposed Class Action Settlement was also conditioned on Nortel and the lead plaintiffs reaching agreement on corporate governance related matters and the resolution of insurance related issues. On March 17, 2006 Nortel announced that it and the lead plaintiff had reached such an agreement with Nortel's insurers agreeing to pay $228.5 in cash towards the settlement and Nortel agreeing with its insurers to certain indemnification obligations. On April 3, 2006, the insurance proceeds were placed into escrow by the insurers. Nortel believes that these indemnification obligations would be unlikely to materially increase its total cash payment obligations under the Proposed Class Action Settlement. The insurance payments would not reduce the amounts payable by Nortel as noted below. Nortel also agreed to certain corporate governance enhancements, including the codification of certain of its current governance practices in its Board of Directors written mandate and the inclusion in its annual proxy circular and proxy statement of a report on certain of its governance practices.

Under the terms of the proposed global settlement contemplated by the Proposed Class Action Settlement, Nortel would make a payment of $575 in cash, issue 628,667,750 of Nortel Networks Corporation common shares (representing 14.5% of Nortel's equity as of February 7, 2006), and contribute one-half of any recovery in Nortel's existing litigation against Messrs. Frank Dunn, Douglas Beatty and Michael Gollogly, Nortel's former senior officers who were terminated for cause in April 2004, seeking the return of payments made to them under Nortel's bonus plan in 2003. In the event of a share consolidation of Nortel Networks Corporation common shares, the number of Nortel Networks Corporation common shares to be issued pursuant to the Proposed Class Action Settlement would be adjusted accordingly. The total settlement amount would include all plaintiffs' court-approved attorneys' fees. As a result of the Proposed Class Action Settlement, Nortel has established a litigation provision and recorded a charge to its full-year 2005 financial results of $2,474, $575 of which relates to the proposed cash portion of the Proposed Class Action Settlement, while $1,899 relates to the proposed equity component and will be adjusted in future quarters based on the fair value of the Nortel Networks Corporation common shares issuable until the finalization of the settlement. Any change to the terms of the Proposed Class Action Settlement would likely result in an adjustment to the litigation provision.

Nortel and the lead plaintiffs in the Nortel I Class Action and the Nortel II Class Action are continuing discussions towards a definitive settlement agreement based on the Proposed Class Action Settlement. At this time, it is not certain that such an agreement can be reached, that each of the actions noted above can be brought into, or otherwise bound by, the proposed settlement, if finalized, or that any such definitive settlement agreement would receive the required court and other approvals in all applicable jurisdictions, and the timing of any developments related to these matters is not certain.

In addition to the shareholder class actions encompassed by the Proposed Class Action Settlement, Nortel is also subject to ongoing regulatory and criminal investigations and related matters relating to its accounting restatements, and to certain other class actions, securities litigation and other actions described below. The Proposed Class Action Settlement and the litigation provision charge taken in connection with the Proposed Class Action Settlement do not relate to these matters. Nortel has not provided any additional provisions at this time for any potential judgments, fines, penalties or settlements that may arise from these other pending investigations or actions (other than for professional fees and expenses incurred).

On April 5, 2004, Nortel announced that the SEC had issued a formal order of investigation in connection with Nortel's previous restatement of its financial results for certain periods, as announced in October 2003, and Nortel's announcements in March 2004 regarding the likely need to revise certain previously announced results and restate previously filed financial results for one or more periods. The matter had been the subject of an informal SEC inquiry. On April 13, 2004, Nortel announced that it had received a letter from the staff of the Ontario Securities Commission (the ''OSC'') advising that there is an OSC Enforcement Staff investigation into the same matters that are the subject of the SEC investigation.

On May 14, 2004, Nortel announced that it had received a federal grand jury subpoena for the production of certain documents, including financial statements and corporate, personnel and accounting records, in connection with an ongoing criminal investigation being conducted by the U.S. Attorney's Office for the Northern District of Texas, Dallas

74

# NORTEL NETWORKS CORPORATION

## Notes to Consolidated Financial Statements — (Continued)

Division. On August 23, 2005, Nortel received an additional federal grand jury subpoena in this investigation seeking production of additional documents, including documents relating to the Nortel Retirement Income Plan and the Nortel Long-Term Investment Plan.

On August 16, 2004, Nortel received a letter from the Integrated Market Enforcement Team of the Royal Canadian Mounted Police ("RCMP") advising Nortel that the RCMP would be commencing a criminal investigation into Nortel's financial accounting situation.

A purported class action lawsuit was filed in the U.S. District Court for the Middle District of Tennessee on December 21, 2001, on behalf of participants and beneficiaries of the Nortel Long-Term Investment Plan (the "Plan") at any time during the period of March 7, 2000 through the filing date and who made or maintained Plan investments in Nortel Networks Corporation common shares, under the Employee Retirement Income Security Act ("ERISA") for Plan-wide relief and alleging, among other things, material misrepresentations and omissions to induce Plan participants to continue to invest in and maintain investments in Nortel Networks Corporation common shares in the Plan. A second purported class action lawsuit, on behalf of the Plan and Plan participants for whose individual accounts the Plan purchased Nortel Networks Corporation common shares during the period from October 27, 2000 to February 15, 2001 and making similar allegations, was filed in the same court on March 12, 2002. A third purported class action lawsuit, on behalf of persons who are or were Plan participants or beneficiaries at any time since March 1, 1999 to the filing date and making similar allegations, was filed in the same court on March 21, 2002. The first and second purported class action lawsuits were consolidated by a new purported class action complaint, filed on May 15, 2002 in the same court and making similar allegations, on behalf of Plan participants and beneficiaries who directed the Plan to purchase or hold shares of certain funds, which held primarily Nortel Networks Corporation common shares, during the period from March 7, 2000 through December 21, 2001. On September 24, 2002, plaintiffs in the consolidated action filed a motion to consolidate all the actions and to transfer them to the U.S. District Court for the Southern District of New York. The plaintiffs then filed a motion to withdraw the pending motion to consolidate and transfer. The withdrawal was granted by the District Court on December 30, 2002. A fourth purported class action lawsuit, on behalf of the Plan and Plan participants for whose individual accounts the Plan held Nortel Networks Corporation common shares during the period from March 7, 2000 through March 31, 2001 and making similar allegations, was filed in the U.S. District Court for the Southern District of New York on March 12, 2003. On March 18, 2003, plaintiffs in the fourth purported class action filed a motion with the Judicial Panel on Multidistrict Litigation to transfer all the actions to the U.S. District Court for the Southern District of New York for coordinated or consolidated proceedings pursuant to 28 U.S.C. section 1407. On June 24, 2003, the Judicial Panel on Multidistrict Litigation issued a transfer order transferring the Southern District of New York action to the U.S. District Court for the Middle District of Tennessee (the "Consolidated ERISA Action"). On September 12, 2003, the plaintiffs in all the actions filed a consolidated class action complaint. On October 28, 2003, the defendants filed a motion to dismiss the complaint and a motion to stay discovery pending disposition of the motion to dismiss. On March 30, 2004, the plaintiffs filed a motion for certification of a class consisting of participants in, or beneficiaries of, the Plan who held shares of the Nortel Stock Fund during the period from March 7, 2000 through March 31, 2001. On April 27, 2004, the Court granted the defendants' motion to stay discovery pending resolution of defendants' motion to dismiss. On June 15, 2004, the plaintiffs filed a First Amended Consolidated Class Action Complaint that added additional current and former officers and employees as defendants and expanded the purported class period to extend from March 7, 2000 through to June 15, 2004. On June 17, 2005, the plaintiffs filed a Second Amended Consolidated Class Action Complaint that added additional current and former directors, officers and employees as defendants and alleged breach of fiduciary duty on behalf of the Plan and as a purported class action on behalf of participants and beneficiaries of the Plan who held shares of the Nortel Networks Stock Fund during the period from March 7, 2000 through June 17, 2005. On July 8, 2005, the defendants filed a Renewed Motion to Dismiss Plaintiffs' Second Amended Class Action Complaint. On July 29, 2005, plaintiffs filed an opposition to the motion, and defendants filed a reply memorandum on August 12, 2005. On March 30, 2006, the defendants filed an additional motion to dismiss raising the jurisdictional challenge that all former plan participants, including one of the named plaintiffs, lack standing to assert a claim under ERISA. On April 17, 2006, the plaintiffs filed a motion to strike this motion to dismiss.

On May 18, 2004, a purported class action lawsuit was filed in the U.S. District Court for the Middle District of Tennessee on behalf of individuals who were participants and beneficiaries of the Plan at any time during the period of December 23, 2003 through the filing date and who made or maintained Plan investments in Nortel Networks

HIGHLY CONFIDENTIAL     NNC-NNL06705393 / 189

# NORTEL NETWORKS CORPORATION

## Notes to Consolidated Financial Statements — (Continued)

Corporation common shares, under the ERISA for Plan-wide relief and alleging, among other things, breaches of fiduciary duty. On September 3, 2004, the Court signed a stipulated order consolidating this action with the Consolidated ERISA Action described above. On June 16, 2004, a second purported class action lawsuit, on behalf of the Plan and Plan participants for whose individual accounts the Plan purchased Nortel Networks Corporation common shares during the period from October 24, 2000 to June 16, 2004, and making similar allegations, was filed in the U.S. District Court for the Southern District of New York. On August 6, 2004, the Judicial Panel on Multidistrict Litigation issued a conditional transfer order to transfer this action to the U.S. District Court for the Middle District of Tennessee for coordinated or consolidated proceedings pursuant to 28 U.S.C. section 1407 with the Consolidated ERISA Action described above. On August 20, 2004, plaintiffs filed a notice of opposition to the conditional transfer order with the Judicial Panel. On December 6, 2004, the Judicial Panel denied the opposition and ordered the action transferred to the U.S. District Court for the Middle District of Tennessee for coordinated or consolidated proceedings with the Consolidated ERISA Action described above. On January 3, 2005, this action was received in the U.S. District Court for the Middle District of Tennessee and consolidated with the Consolidated ERISA Action described above.

On July 30, 2004, a shareholders' derivative complaint was filed in the U.S. District Court for the Southern District of New York against certain current and former officers and directors, of Nortel alleging, among other things, breach of fiduciary duties owed to Nortel during the period from 2000 to 2003 including by causing Nortel to engage in unlawful conduct or failing to prevent such conduct; causing Nortel to issue false statements; and violating the law (the "U.S. Derivative Action"). On February 14, 2005, the defendants filed motions to dismiss the derivative complaint. On April 29, 2005, the plaintiffs filed an opposition to the motions to dismiss. On May 26, 2005, the defendants filed a reply memorandum in support of the motions to dismiss. On August 24, 2005, the Court issued an opinion and order granting the defendants' motions to dismiss the derivative complaint. Since the plaintiffs did not appeal the dismissal and the time to file an appeal has passed, this action is concluded.

On December 21, 2005, an application was filed in the Ontario Superior Court of Justice for leave to commence a shareholders' derivative action on Nortel's behalf against certain current and former officers and directors, of Nortel alleging, among other things, breach of fiduciary duties, breach of duty of care and negligence, and unjust enrichment in respect of various alleged acts and omissions including causing or permitting Nortel to issue alleged materially false and misleading statements regarding expected growth in revenues and earnings for 2000 and 2001 and endorsing or permitting accounting practices relating to provisions not in compliance with GAAP. The proposed derivative action would seek on Nortel's behalf, among other things, compensatory damages of Canadian $1,000 and punitive damages of Canadian $10 from the individual defendants (the "Proposed Ontario Derivative Action"). In the Proposed Ontario Derivative Action, the defendants are the same and the allegations are substantially similar to the derivative complaint in the U.S. Derivative Action. The Proposed Ontario Derivative Action would also seek an order directing Nortel's Board of Directors to reform and improve Nortel's corporate governance and internal control procedures as the Court may deem necessary or desirable and an order that Nortel pay the legal fees and other costs in connection with the Proposed Ontario Derivative Action. The application for leave to commence the Proposed Ontario Derivative Action has not yet been heard. However, in response to a motion brought by the applicants to preserve potential claims against the possible expiration of potential limitation periods, Nortel consented to an order, entered February 14, 2006, permitting the applicants to file and have issued by the Court, on an interim basis and pending final determination of the application, the Proposed Ontario Derivative Action without prejudice to Nortel's position on the merits of the application itself. The order provides that no further steps shall be taken against the individual defendants in the Proposed Ontario Derivative Action unless the application is granted and if the application is denied the Proposed Ontario Derivative Action is to be discontinued.

Except as otherwise described herein, in each of the matters described above, the plaintiffs are seeking an unspecified amount of monetary damages. Nortel is unable to ascertain the ultimate aggregate amount of monetary liability or financial impact to Nortel of the above matters, which, unless otherwise specified, seek damages from the defendants of material or indeterminate amounts or could result in fines and penalties. With the exception of $2,474 which Nortel has taken as a charge in its 2005 financial results as a result of the Proposed Class Action Settlement, Nortel has not made any provisions for any potential judgments, fines, penalties or settlements that may result from these actions, suits, claims and investigations. Nortel cannot determine whether these actions, suits, claims and proceedings will, individually or collectively, have a material adverse effect on the business, results of operations, financial condition or liquidity of Nortel. Except for matters encompassed by the Proposed Class Action Settlement, as to which Nortel and the lead

76

**NORTEL NETWORKS CORPORATION**

Notes to Consolidated Financial Statements — (Continued)

plaintiffs are continuing discussions towards a definitive settlement agreement, Nortel intends to defend these actions, suits, claims and proceedings, litigating or settling cases where in management's judgement it would be in the best interest of shareholders to do so. Nortel will continue to cooperate fully with all authorities in connection with the regulatory and criminal investigations.

Nortel is also a defendant in various other suits, claims, proceedings and investigations which arise in the normal course of business.

*Environmental matters*

Nortel's operations are subject to a wide range of environmental laws in various jurisdictions around the world. Nortel seeks to operate its business in compliance with such laws. Nortel is subject to new European product content laws and product takeback and recycling requirements that will require full compliance commencing in July 2006. As a result of these laws and requirements, Nortel will incur additional compliance costs. Although costs relating to environmental matters have not resulted in a material adverse effect on the business, results of operations, financial condition or liquidity in the past, there can be no assurance that Nortel will not be required to incur such costs in the future. Nortel is actively working on compliance plans and risk mitigation strategies relating to the new laws and requirements. Although Nortel is working with its strategic suppliers in this regard, it is possible that some of Nortel's products may not be compliant by the legislated compliance date. In such event, Nortel expects that it will have the ability to rely on available exemptions under the new legislation for most of such products and currently expects minimal disruption to the distribution of such products. Nortel intends to manufacture products that are compliant with all applicable legislation and meet its quality and reliability requirements.

Nortel has a corporate environmental management system standard and an environmental program to promote such compliance. Moreover, Nortel has a periodic, risk-based, integrated environment, health and safety audit program. Nortel's environmental program focuses its activities on design for the environment, supply chain and packaging reduction issues. Nortel works with its suppliers and other external groups to encourage the sharing of non-proprietary information on environmental research.

Nortel is exposed to liabilities and compliance costs arising from its past and current generation, management and disposal of hazardous substances and wastes. As of December 31, 2005, the accruals on the consolidated balance sheet for environmental matters were $27. Based on information available as of December 31, 2005, management believes that the existing accruals are sufficient to satisfy probable and reasonably estimable environmental liabilities related to known environmental matters. Any additional liabilities that may result from these matters, and any additional liabilities that may result in connection with other locations currently under investigation, are not expected to have a material adverse effect on the business, results of operations, financial condition and liquidity of Nortel.

Nortel has remedial activities under way at 14 sites which are either currently or previously owned or occupied facilities. An estimate of Nortel's anticipated remediation costs associated with all such sites, to the extent probable and reasonably estimable, is included in the environmental accruals referred to above in an approximate amount of $27.

Nortel is also listed as a potentially responsible party under the U.S. Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") at four Superfund sites in the U.S. (at two of the Superfund sites, Nortel is considered a *de minimis* potentially responsible party). A potentially responsible party within the meaning of CERCLA is generally considered to be a major contributor to the total hazardous waste at a Superfund site (typically 10% or more, depending on the circumstances). A *de minimis* potentially responsible party is generally considered to have contributed less than 10% (depending on the circumstances) of the total hazardous waste at a Superfund site. An estimate of Nortel's share of the anticipated remediation costs associated with such Superfund sites is expected to be *de minimis* and is included in the environmental accruals of $27 referred to above.

Liability under CERCLA may be imposed on a joint and several basis, without regard to the extent of Nortel's involvement. In addition, the accuracy of Nortel's estimate of environmental liability is affected by several uncertainties such as additional requirements which may be identified in connection with remedial activities, the complexity and evolution of environmental laws and regulations, and the identification of presently unknown remediation requirements. Consequently, Nortel's liability could be greater than its current estimate.

77

# NORTEL NETWORKS CORPORATION

## Notes to Consolidated Financial Statements — (Continued)

*Other*

In August 2004, Nortel entered into a contract with BSNL to establish a wireless network in India. Nortel recognized revenues of $228 and $20 in 2005 and 2004, respectively, and project losses of approximately $148 and $160 in the corresponding years. Nortel expects to recognize additional revenues of approximately $92 and additional project losses of approximately $19 in 2006. The losses are primarily driven by the existing contractual terms negotiated in response to pricing pressures as a result of the competitive nature of India's telecommunications market and an increase in project implementation costs. The time limit within which BSNL could have exercised its 50% business expansion option under the contract has passed and Nortel will not supply BSNL with products or services for this expansion.

## 23. Subsequent events

*Nortel Restatement of previously issued financial statements*

On March 10, 2006, in conjunction with the release of Nortel's preliminary unaudited fourth quarter and full year 2005 results, Nortel announced that it and NNL would restate their financial results for 2003, 2004 and the first nine months of 2005, and would have adjustments to periods prior to 2003. As a result of the Third Restatement, Nortel and NNL delayed the filing of their annual reports on Form 10-K for the year ended December 31, 2005 (the "2005 Reports") beyond their regulatory filing deadline of March 16, 2006. Nortel and NNL completed the Third Restatement through the filing of the 2005 Reports with the SEC and OSC on April 28, 2006. For additional information on the restatement adjustments see note 4.

*Sale of Brampton facility*

On January 4, 2006, Nortel announced that it had finalized an agreement to sell its facility in Brampton, Ontario to Rogers Communications Inc. ("Rogers") for approximately $84. The sale includes the buildings, which comprises approximately one million square feet, fixtures and certain personal property located at the facility and 63 acres of land. Included in the sale was the sale-leaseback of a portion of the buildings on the Brampton facility to Nortel for lease terms of five years. The gain on sale is expected to be approximately $18. As of December 31, 2005, Nortel classified the carrying value of the Brampton facility as held for sale (see note 5).

*Bookham transactions*

On January 13, 2006, Nortel received $20 in cash plus accrued interest from Bookham to retire its $20 aggregate principal amount Series A secured note receivable due November 2007. In addition, Nortel sold its $25.9 aggregate principal amount Series B secured note receivable due November 2006 for approximately $26 to a group of unrelated investors.

On January 13, 2006, Nortel announced that it had entered into an agreement with Bookham to amend the current supply agreement and extend certain purchase commitments, which were scheduled to expire on April 29, 2006. Under the terms of the amended supply agreement, Nortel will purchase a minimum of $72 in product from Bookham during the calendar year of 2006. In addition, Nortel has entered into an agreement on the same date as the supply agreements under which Nortel agreed not to sell the approximately 4 million shares of Bookham common stock that it currently owns until after June 30, 2006.

*Credit and Support Facilities*

On February 14, 2006, Nortel entered into a new one-year credit facility in the aggregate principal amount of $1,300 ("2006 Credit Facility"). This new facility consists of (i) a senior secured one-year term loan facility in the amount of $850 ("Tranche A Term Loans"), and (ii) a senior unsecured one-year term loan facility in the amount of $450 ("Tranche B Term Loans"). The Tranche A Term Loans are secured equally and ratably with NNL's obligations under the EDC Support Facility and NNL's 6.875% Bonds due 2023 by a lien on substantially all of the U.S. and Canadian assets of NNL and the U.S. assets of NNL's indirect subsidiary, Nortel Networks Inc. ("NNI"). The Tranche A Term Loans are also secured equally and ratably with NNL's obligations under the EDC Support Facility by a lien on substantially all of NNC's U.S. and Canadian assets. The Tranche A Term Loans and Tranche B Term Loans are also guaranteed by NNC and NNL and NNL's obligations under the EDC Support Facility are also guaranteed by Nortel and

HIGHLY CONFIDENTIAL    NNC-NNL06705393 / 192

## NORTEL NETWORKS CORPORATION

### Notes to Consolidated Financial Statements — (Continued)

NNI, in each case until the maturity or prepayment of the 2006 Credit Facility. The 2006 Credit Facility, which will mature in February 2007, was drawn down in the full amount on February 14, 2006 and Nortel used the net proceeds primarily to repay the outstanding $1,275 aggregate principal amount of NNL's 6.125% Notes that matured on February 15, 2006. Nortel and NNI agreed to a demand right exercisable at any time after May 31, 2006 pursuant to which Nortel would be required to take all reasonable actions to issue senior unsecured debt securities in the capital markets to repay the 2006 Credit Facility.

At Nortel's option, loans bear interest based on the "Base Rate" (defined as the higher of the Federal Funds Rate, as published by the Federal Reserve Bank of New York, plus 0.5% and the prime commercial lending rate of JPMorgan Chase Bank, N.A., established from time to time) or the reserve-adjusted London Interbank Offered Rate ("LIBOR"), plus the Applicable Margin. The "Applicable Margin" was initially defined as 225 basis points in the case of Tranche A Term Loans that are LIBOR loans (125 basis points if such Tranche A Term Loans are Base Rate loans) and 300 basis points in the case of Tranche B Term Loans that are LIBOR loans (200 basis points if such Tranche B Term Loans are Base Rate loans). The Tranche A Loans initially as of February 14, 2006 bore interest at 6.875% while the Tranche B Loans initially as of February 14, 2006 bore interest at 7.625%.

Initially the Tranche A Loans contained financial covenants that require that Nortel achieve Adjusted Earnings before interest, taxes, depreciation and amortization ("Adjusted EBITDA") of not less than $850, $750, $850 and $900 for the twelve-month period ending March 31, 2006, June 30, 2006, September 30, 2006 and December 31, 2006, respectively. Adjusted EBITDA is generally defined as consolidated earnings before interest, taxes, depreciation and amortization, adjusted for certain restructuring charges and other one-time charges and gains that will be excluded from the calculation of Adjusted EBITDA. Both the Tranche A Term Loans and the Tranche B Term Loans also initially contained a covenant that consolidated unrestricted cash and cash equivalents of Nortel must at all times exceed $1,000. In addition, the 2006 Credit Facility contains covenants that limit Nortel's ability to create liens on its assets and the assets of substantially all of its subsidiaries in excess of certain baskets and permitted amounts, limit its ability and the ability of substantially all of its subsidiaries to merge, consolidate or amalgamate with another person. Payments of dividends on the outstanding preferred shares of NNL and payments under the Proposed Class Action Settlement are permitted. NNI is required to prepay the facility in certain circumstances, including in the event of certain debt or equity offerings or asset dispositions of collateral by Nortel, NNL or NNI.

As a result of the delayed filing of Nortel's and NNL's 2005 Annual Reports with the SEC, certain events of default occurred under the 2006 Credit Facility and the EDC Support Facility. On May 9, 2006, Nortel entered into an amendment and waiver with the lenders under the 2006 Credit Facility and with EDC under the EDC Support Facility. The amendment and waiver agreements, among other things, waived the events of defaults that had occurred under the facilities due to the need to restate and make adjustments to Nortel's and NNL's financial results for prior periods as well as the delay that occurred in filing their 2005 Annual Reports and extending the required filing date under the 2006 Credit Facility and the EDC Support Facility of Nortel's and NNL's 2006 First Quarter Reports. The amendment and waiver under the 2006 Credit Facility removed the minimum Adjusted EBITDA covenant and revised the minimum cash covenant to require that Nortel's consolidated unrestricted cash and cash equivalents exceed $1,250 at all times and $1,500 on the last day of each fiscal quarter. The amendment and waiver under the 2006 Credit Facility also made certain adjustments to the restrictions on the incurrence of liens and the provisions determining the percentage of lenders required to amend or waive the terms of the 2006 Credit Facility.

On May 19, 2006, Nortel entered into a further amendment of the 2006 Credit Facility to modify the interest rate applicable to the Tranche A Term Loans and the Tranche B Term Loans. The amendment revised the definition of "Applicable Margin" contained in the 2006 Credit Facility to mean 200 basis points in the case of Tranche A Term Loans that are LIBOR loans (amended from 225 basis points), 100 basis points in the case of Tranche A Term Loans that are Base Rate loans (amended from 125 basis points), 325 basis points in the case of Tranche B Term Loans that are LIBOR loans (amended from 300 basis points), and 225 basis points in the case Tranche B Term Loans that are Base Rate loans (amended from 200 basis points). The Tranche A Loans as of February 14, 2006 had an interest rate of 6.875% while the Tranche B Loans as of February 14, 2006 had an interest rate of 7.625%. As of May 19, 2006, the Tranche A loans bear interest at 7.125% and the Tranche B loans bear interest at 8.375%.

HIGHLY CONFIDENTIAL  NNC-NNL06705393 / 193